**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
**Plaintiffs,**

    **v.**         **No. CIV S-90-0250 LKK  DAD PC**

**EDMUND G. BROWN, JR., et al.,**
**Defendants**

**SPECIAL MASTER'S REPORT ON
ADEQUACY OF INPATIENT MENTAL HEALTH CARE
FOR INMATES OF THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax:  (401) 824-5123
May 30, 2014

**SPECIAL MASTER'S REPORT ON**
**ADEQUACY OF INPATIENT MENTAL HEALTH CARE**
**FOR INMATES OF THE CALIFORNIA DEPARTMENT OF**
**CORRECTIONS AND REHABILITATION**

## Introduction

On April 11, 2013, plaintiffs in this matter moved for enforcement of orders relating to treatment of those *Coleman* class members who are receiving mental health care at the inpatient level at the six programs that provide treatment for CDCR inmates requiring that level of care. [Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment, Docket No. 4543, filed April 11, 2013]. Among other things, plaintiffs argued that access to, and provision of, care at these programs had reached a "crisis point" due to mismanagement of wait lists and discharges, staffing shortages, excessively restrictive custodial policies and resulting deprivation of care, and lack of basic amenities.

Beginning on June 19, 2013, an evidentiary hearing on plaintiffs' motion took place over the course of three and a half days. Testimony was taken from nine witnesses. On July 11, 2013, plaintiffs' motion was granted in part and denied in part. [Order, Docket No. 4688]. On August 12, 2013, defendants appealed the July 11, 2013 order to the United States Court of Appeals for the Ninth Circuit, and moved the trial court for a stay pending the appeal. [Motion to Stay, Docket No. 4742]. After duly filed opposition by plaintiffs, the motion to stay pending appeal was denied. [Order, filed September 5, 2013, Docket No. 4784]. As of this writing, defendants' appeal remains pending.

In its July 11, 2013 order, the court directed the Special Master to monitor all six of the inpatient mental health programs for CDCR inmates, and to "report to the court on their adequacy and whether any modifications to defendants' remedial plan are required to ensure that

members of the plaintiff class are receiving adequate inpatient mental health care." [Order, Docket No. 4688 at 11-12]. From August 2013 through March 2014, members of the Special Master's staff of clinical experts and monitors toured the six programs and gathered the relevant information which is discussed in detail below.[1]

Two of the six programs are run exclusively by the California Department of State Hospitals (DSH) and also treat patients who are not CDCR inmates. These programs for CDCR inmates are at Atascadero State Hospital (ASH) and Coalinga State Hospital (CSH). At three of the six programs, clinical services are provided by DSH to only CDCR inmates at locations within CDCR prison facilities. These are the Vacaville Psychiatric Program (VPP), which is within the CDCR prison California Medical Facility (CMF); the Salinas Valley Psychiatric Program (SVPP), which is at the Salinas Valley State Prison (SVSP); and the mental health inpatient program at the California Health Care Facility (CHCF), which also provides inpatient medical care as well as dental care to only CDCR inmates. At the Psychiatric Inpatient Program at the California Institution for Women (CIW PIP), inpatient care is provided for female CDCR inmates exclusively by CDCR. ASH, the CHCF, and CIW PIP are accredited by the Joint Commission; SVPP, VPP and CSH are not.

The court ordered the Special Master to report *first* on the adequacy of staffing levels at the SVPP, and on whether so-called cuff or orientation status, either as designed or implemented at that program unduly interfered with or delayed the provision of necessary care to class members, as well as other matters deemed by the Special Master to require urgent attention by the court. Plaintiffs' request for additional orders was denied without prejudice, pending the Special Master's monitoring and reporting.

_____

[1] As in prior reports by the Special Master, the experts and monitors on his staff who toured the inpatient programs shall be referred to collectively as "the monitor," or, as applicable, "the Special Master's expert."

As ordered, the Special Master's report and recommendations for orders with respect to SVPP was filed first, on September 24, 2013.  Special Master's Report on the SVPP, Docket No. 4830, filed September 24, 2013.  In that report, the Special Master recommended:

1. That the SVPP be directed to fill remaining staffing vacancies and consider modifying its planned staff-to-patient ratio of 1:35.  Priority should be given to filling psychiatry, psychology, and social work positions.

2. That the SVPP be directed to increase significantly the amount and quality of individualized and group therapy provided.

3. That the SVPP be directed to reconsider and re-evaluate its use of Orientation Status to automatically require patient cuffing whenever out-of-cell and withhold mental health programming or treatment other than a daily cell-front contact by a member of the interdisciplinary treatment team (IDTT).

4. That the SVPP be directed to eliminate the use of Cuff Status to require automatic cuffing of patients when out-of-cell, overriding of patients' stage designations, and barring of patients' access to out-of-cell individual and group treatment.

5. That the SVPP be directed to begin tracking all patient bed assignments, and admit referred and accepted patients as quickly as bed availability permits so that all beds are utilized to the fullest extent possible, and in no event beyond 72 hours following bed assignment and 30 days from the date of the referral.

6. That the SVPP resolve any and all remaining issues with, and obstacles to, providing patients with the full complement of clean clothing, towels, and bed coverings, and make these provisions available to patients on a timely basis according to established schedules.

Defendants filed objections to the Special Master's report on SVPP and moved to strike or modify it in part.  Plaintiffs filed a response with a request for additional recommendations and orders.  On November 13, 2013, the *Coleman* court denied defendants' motion to modify the Special Master's findings in his SVPP report and adopted them in full, and denied without prejudice plaintiffs' motion for additional orders.  [Order, Docket No. 4925].  Insofar as the Special Master's recommendations in his SVPP report, the court ruled as follows:

1. In light of defendants' representations concerning their efforts to recruit and hire staff and improve the quantity and quality of therapy, and the continuation of monitoring

SVPP and the other DSH programs, any orders on staffing and the quantity and quality of therapy were deferred pending further reporting and recommendations from the Special Master.

2.  CDCR and DSH shall review and re-evaluate the use of orientation and cuff status at SVPP to determine whether these policies as designed and implemented achieve the proper balance between legitimate security needs and access to necessary inpatient mental health care.  This shall be carried out under the guidance of the Special Master and his staff, with participation and input from plaintiffs.  The Special Master shall report to the court on the results of this review and re-evaluation in the report to be filed on March 31, 2014.  In addition, defendants were ordered to report to the court within 15 days whether there was any inmate-patient at SVPP on cuff status without required supporting documentation.

3.  Defendants must forthwith begin tracking all patient bed assignments at SVPP, and admit referred and accepted patients to SVPP as quickly as bed availability permits and in no event beyond 72 hours following bed assignment and 30 days from the date of referral (i.e. the date which the completed referral packet is received by DSH by facsimile or overnight mail).

With regard to laundry issues, the court noted defendants' representation that a committee had been formed to inventory and resolve any problems with the program's supply of clean laundry leaving it to the Special Master to report any failure to solve this problem.

The following is the Special Master's composite report of his findings and conclusions across the six inpatient programs, plus individual reports on each of the six programs.  This report was prepared with great effort to present the Special Master's findings clearly and in the most organized and readable fashion possible.  However, the Special Master's tours of these inpatient programs revealed that they vary widely in their respective policies, practices, and operations in nearly every aspect of inpatient mental health care administration and delivery.  From facility to facility, the Special Master found differences, with seemingly no discernible semblance of coordination or consistency among any of the DSH programs, as the reader will see below.  Because of this unevenness, thorough and consistent monitoring, and coherent and helpful reporting, on these programs was a challenge.  To the extent the reader finds any

apparent disconnectedness among the program reports which follow, it is more likely the result of actual differences among these programs than it is the result of gaps in monitoring strategies and practices.

In this report, discussion of the programs' performance in the various examined areas is organized according to the three general categories into which the six programs fall, as described above. Individual dedicated reports on each of the programs are attached as Exhibits A through F, and program-by-program case reviews by the Special Master's clinical experts are attached as Exhibits G through L. A list of all acronyms appearing in this report is attached at Exhibit M.

## I.   STAFFING

### A.   ASH and CSH

As of February 10, 2014, there were 207 *Coleman* class inpatients at ASH. Psychiatry staffing at ASH was severely low, with a vacancy rate of 61 percent, which was mitigated to a still-low 39 percent with use of contract coverage. The detrimental effect this had on the program's ability to treat its patients was significant. It led to limited participation of psychiatrists on IDTTs, which in turn limited the efficacy of these teams for patient treatment planning and follow-up, which is particularly important at the inpatient level of care for seriously mentally ill persons. Staff reported that other disciplines attempted to bridge the gap in psychiatry but were crossing into psychiatry's traditional clinical role, affecting the quality of care provided. Staff also reported a perceived lack of support for psychiatry leadership at ASH in that the lack of overtime pay for supervisors created a disincentive for psychiatrists to seek supervisory posts. As a result, supervisory positions were filled predominantly by non-psychiatrists, placing staff psychiatrists in the position of being, in effect, supervised by nurses, rehabilitation therapists, and psych techs who occupied the supervisory positions. The staff-to-

patient ratio in the admission unit at ASH was insufficient, at 1:25.  Cognizant of its problems

with psychiatry staffing, ASH did seek a site-specific hourly pay increase for psychiatrists, but

approval by the California Department of General Services (DGS) had not been given as of the

time of the Special Master's most recent visit to ASH.

As of March 18, 2014, 2014, there were 49 *Coleman* class patients at CSH.  Its two

psychiatry positions in the program for CDCR inmates had been vacant since the unit opened

and remained vacant, but CSH did manage to cover them with contract psychiatrists.  Like ASH,

CSH covered its psychology positions, albeit with unlicensed psychologists who were supervised

by the senior psychologist supervisor.  ASH also filled all of its social work positions.  CSH

filled two-thirds of its social work positions, with unlicensed social workers.  CSH filled its

rehabilitation therapist positions, while ASH filled only three-quarters of them.  Conversely,

ASH filled all of its psych tech positions, but CSH had a 17-percent vacancy rate among psych

techs.

At ASH, staffing levels were adequate in the admissions unit for psychologists, social

workers, and rehabilitation therapists.  In its intermediate care treatment unit, CSH maintained a

ratio of 1:25 for psychiatrists and rehabilitation therapists, and ratio of 1:15 for psychologists and

social workers.

### B.    SVPP, VPP, and CHCF

At the time of the Special Master's Report on SVPP, filed on September 24, 2013,

staffing was problematic at that program.  It remained problematic through the time of the

Special Master's visit to SVPP in March 2014.  The program continued to rely on

registry/contract staff and second positions held by existing staff to cover core roles, including in

some instances both line and supervisory positions being covered by the same staff.  The result

was over-extension and inability of staff to carry out all of the attendant responsibilities of more than one position.

As of March 4, 2014, SVPP housed 224 *Coleman* class patients. Like ASH, SVPP was understaffed in psychiatry. While it had four of its five psychiatry positions covered, one of these psychiatrists was on extended leave, three were registry staff, and two were on loan from other DSH facilities, for a level of less than optimal stability in this important discipline in an inpatient program. Recruitment efforts were reportedly underway.

As of March 14, 2014, there were 406 *Coleman* class patients housed at VPP. VPP was the only one of the six inpatient programs to have its own established staffing ratios of 1:15 in acute care units and 1:35 in intermediate care units. However, VPP failed to satisfy its own ratios in a number of its units. VPP covered all of its psychiatry positions with a combination of full-time and registry staff, yet it did not satisfy its own program-established staff-to-patient ratios in psychiatry in one acute care unit and three intermediate care units. At the CHCF, the shortage of psychiatrists was so severe as to delay activation of five housing units in the mental health program, with only nine of the 35 psychiatry positions filled, for a 74-percent vacancy rate.

In psychology, SVPP filled ten of its 12 positions, but three of the psychologists were on extended leaves, making a total of five or 42 percent of psychology positions functionally vacant. VPP covered all of its 23 psychology positions, but did not satisfy its own staffing ratios in six of its acute care units and two of its intermediate care units.

SVPP filled ten of its 12 social work positions, but again, extended staff leaves reduced the number of covered positions to eight, for a 33-percent functional vacancy rate. VPP filled all of its 23 social work positions, but it did not meet its own staffing ratios in three of its acute care units and one of its intermediate care units. SVPP and VPP fared well in staffing rehabilitation therapy positions, with SVPP filling nine of its ten positions, and VPP filling all 23 of its positions. In nursing, SVPP covered 26 of its 36 RN positions, while VPP covered all of its RN positions.

At the CHCF, the average daily census of *Coleman* class members for the month of January 2014 was 279.[2] The CHCF struggled with filling its psychology positions, with a 36-percent vacancy rate. It filled 29 of its 35 social work positions, for a 17-percent vacancy rate, but it filled only 21 of its 35 rehabilitation therapy positions. The CHCF did better with staffing its RN positions, with only an eight-percent vacancy rate.

## C.    California Institution for Women Psychiatric Inpatient Program (CIW PIP)

As of February 21, 2014, there were 38 *Coleman* class members housed at the CIW PIP. Staffing levels were adequate to support functions at the CIW PIP, with all psychiatry and psychology positions filled, and three of the four social work positions filled. Of the four recreation therapist positions, three were filled, as were 29 of the 32 psych tech positions. Staff-to-patient ratios for psychiatrists, psychologists and social workers were adequate.

---

[2] Source: Department of State Hospitals Report, Staff Levels for *Coleman* Patients, January 1, 2014 through January 31, 2014, submitted February 1, 2014.

8

## II.    TREATMENT AND CLINICAL SERVICES

### A.    ASH and CSH

#### 1.    IDTTs

Not surprisingly, ASH's shortage of psychiatrists meant that IDTT meetings were not always conducted with a psychiatrist present, which meant that patients' treatment plans did not always have the benefit of a psychiatrist's input.  The quality of the treatment team meetings varied across units in terms of clinical and patient-team interactions.  Treatment plans were somewhat generic and lacked clarity of treatment goals and/or behavioral therapy-based interventions.  However, teams did appear to know their patients and had the relevant patient information at hand.

Unlike at other inpatient programs, treatment team meetings at CSH were typically led by psychologists, and the role of psychotropic medications and psychiatry in general were given less emphasis in treatment plans.  Conduct of observed IDTT meetings appeared to be more rote than truly responsive to the patient and his needs expressed at the meetings.  Treatment plans were not modified in accordance with clinical information being provided by the patient at his own treatment team meeting.

#### 2.    Group Therapy

Group therapy was the primary treatment modality at ASH, and was occasionally supplemented by some individual therapy.  This was problematic because the amount of group therapy was very deficient.  In 2011, the average number of provided weekly group hours was 12.94, but in 2013 it had fallen to only 7.23 hours.  More concerning was that the average number of group hours actually *attended* by patients was only 4.6 hours per week, as of the time of the Special Master's September 2013 visit.  Group offerings remained limited at five to eight

hours per week as of the time of the Special Master's visit in February 2014.  Recreation therapy made up the largest group enrollment, at 27.4 percent of all group sessions.  The group therapy that was given at ASH was generally well conducted.

At CSH, scheduled group treatment hours for patients were low, and had wait lists of one to eight patients.  By the time of the Special Master's March 2014 visit, CSH had developed the ability to track group hours received, and indicated that for the preceding year, there had been an average of 6.19 weekly scheduled hours per patient, and 4.25 weekly hours received per patient. The quality of the groups provided was good overall.

### 3.    Individual Treatment

ASH rarely offered individual therapy to its patients, even for patients not ready for group therapy or for whom groups would be clinically contraindicated.  Only occasionally was individual therapy used to supplement group therapy.  Staff attributed the paucity of individual therapy to workload demands but it appeared that the culture of the program did not envision individual treatment for most of the patients.  When patients failed to improve after all the treatment team had exhausted its clinical resources, staff did not avail themselves of the Positive Behavioral Support Team (PBST) to develop any behaviorally-based treatment interventions.

The treatment milieu at CSH was therapeutic overall.  However, it was insufficient, including with respect to individual therapy.  Patients reported that the only individual contact with clinicians occurred on the hallways of the unit; this was consistent with staff reports that clinicians walked the hallways and if approached, they met with patients.  Even when individual clinical interventions would be indicated for a patient in a treatment team meeting, they were not included in the patient's treatment plan.

### 4. <u>Other Treatment Issues</u>

At ASH, psychiatry contacts with patients were required monthly, and were occurring, according to staff reports. However, psychiatrists' progress notes appeared to be predominantly repeats of previous notes with little narrative on patients' clinical status. Psychiatrists expressed concern with decision-making on patient transfers to other units being non-clinically driven, and that patients were being removed from admission units prematurely. Because ASH was short-staffed on psychiatry, a "crisis document" issued in September 2013 prioritized their tasks and eliminated some when psychiatry caseloads reach a certain size. This had a ripple effect on other staff, to whom some psychiatry duties were shifted.

With only two psychiatrist positions, neither of which were filled but were covered by contractors, these limited psychiatry resources at CSH were consumed by intake assessments, clinical evaluations, clinical interventions, and writing of progress notes and orders for seclusion or restraints.

At the time of the Special Master's visits, ASH was running a pilot known as the Enhanced Treatment Unit (ETU). Its purpose was to provide a secure, 24-hour living area for the treatment of physically aggressive and high-risk patients who had not otherwise responded to treatment. Four CDCR inmates had been treated in the ETU. Before it opened, the program appeared to have been developed well, with a comprehensive staff training program. It was staffed appropriately, enabling staff to observe and identify precursors to patient aggressive or dangerous behaviors and immediately intervene to prevent escalation. The unit operated on basic behavioral principles, with staff providing attention and other positive reinforcement when patients engaged in prosocial behaviors. The Special Master's expert reported that early results of the ETU pilot are promising, and that although it is too early to say with any certainty, the

ETU may have potential as a prototype to be used in other appropriate inpatient programs within the CDCR facilities, such as VPP, SVPP and the CHCF, which house patients who have not responded to treatment.

### B. SVPP, VPP, and CHCF

#### 1. IDTTs

The quality of case discussion and interactions with patients in IDTT meetings at SVPP varied from team to team. Some improved over the course of the Special Master's visits while others did not. In some meetings the emphasis was more on completion of patient evaluations that should have been done prior to the meeting, with only minimal engagement of the patient in a discussion about his treatment plan. Conversely, IDTT meetings observed on C-unit were organized, multidisciplinary, and in a confidential space, with patients uncuffed in the room and included in the treatment planning process. Many treatment plans themselves, however, continued to be inadequate and generic, without sufficient targeting of patients' presenting problems. Supervisory staff were working on improving IDTT meeting practices.

At VPP, problems with acute level care IDTT meetings and treatment plans were identified during all of the Special Master's four visits. All patients were cuffed behind their backs during the meetings, regardless of their level of advancement through the program, in the absence of any controlling policy on this practice. By the time of the Special Master's final visit, it was reported that plans to end this practice were being made. Interaction with patients was minimal or not meaningful. Patient assessments were observed being completed during IDTT meetings, including follow-up IDTT meetings, when attention should have been focused on good clinical interaction and development of treatment plans that were individualized and responsive to the particular patient's condition. At the intermediate care level, quality of meetings was

somewhat better overall than in acute care, ranging from adequate to good, with a full complement of staff in attendance, and discussion of treatment plans with patients. However, as in acute care, some staff conducted assessments during the meetings, and successive treatment plans tended to repeat information from past meetings that were generic and not reflective of effectiveness of diagnostic thinking, success or failure of clinical interventions, or modifications of treatment planning to overcome barriers to patient improvement and transition back to outpatient care.

At the CHCF, IDTT meetings were typically well attended and case discussions were robust. However, observed meetings lacked leadership and structure, with cases not formally presented and vagueness surrounding diagnoses and treatment approaches. Sometimes patients were brought into the room during the team's case discussion. Patients reported not receiving or being shown their treatment plans. Patient requests for individual treatment rarely were fulfilled.

### 2. **Group Therapy**

Throughout the Special Master's visits to SVPP, group treatment offerings remained inadequate, with patients reporting receiving only three to four hours per week. Continued use of dayrooms for group treatment was problematic, due to ambient noise and other distractions. Rooms outside of the housing units could have accommodated smaller, more high-functioning groups, but they were not used. Because of logistical and other limitations, patients were attending groups based on their location rather than their treatment needs. At the time of the visits, SVPP could not generate reports of group participation by individual patients, but staff reported that a new electronic tracking and reporting program known as the Patient Wellness and Recovery Model Support System (PaWSS) was in the process of being implemented. Staff reported that psychologists were beginning to facilitate groups and would be required to

complete two hours of groups per week, and that a curriculum committee had been organized to develop group curricula and lesson plans.

In acute care at VPP, the quality of group offerings was variable. The amount of groups was far below what review of patient records indicated was clinically needed. As of March 2014, out-of-cell and clinical treatment activities were provided 1.4 to 4.7 hours per month, and even such patently non-therapeutic activities as magazine exchange were credited an hour. Group scheduling was widely inconsistent among patients, with some scheduled for one hour and others up to 36 hours, with no apparent explanation in patients' treatment plans of these wide variances. Patients also complained of having no one to talk to when they were having difficulties. VPP had no tracking mechanism to verify receipt of individual treatment hours.

VPP treated both low-custody and high-custody patients at the intermediate level of care. In addition to other high-custody units (L1, L2, L3, A2 and A3) VPP also had a 64-bed stand-alone treatment center (TC) for high-risk, high-custody patients at the intermediate level of care, known as the High-Custody Intermediate Treatment Center (HCITC) program. In low-custody intermediate care, VPP was beginning a Dialectical Behavioral Therapy (DBT) unit, and was soliciting staff who were interested in working on that unit and sending staff for DBT training.

In the high-custody intermediate care program, VPP was offering group therapy, therapeutic community, patient government, and yard activities to promote patients' development of positive relationship skills. The process of escorting patients to and from groups was time-consuming and labor-intensive. The groups were of generally good quality, and group space was abundant. However, the amount of group treatment offered was inadequate and assignments of patients to groups did not always correlate with treatment plans. In the HCITC, VPP reported that it offered approximately 18 hours of out-of-cell activities per week from

14

December 2013 through February 2014, but it did not distinguish between structured and unstructured activities. Patients' reports and health record reviews, however, indicated only six to eight hours per week of true structured activities there, with yard for one hour per day and dayroom for one hour every other day.

In the non-HCITC intermediate care program, the quality of groups was adequate, but the quantity was insufficient, due largely to limited treatment space. By the time of the Special Master's March 2014 visit, VPP had placed therapeutic modules in the dayroom and in interview rooms, and escorted patients off unit, freeing up more time in the dayroom for group therapy.

At the CHCF in January 2014, four core groups (meaning groups focused more directly on treatment than leisure time activities), as well as several non-core groups were being offered in the intermediate treatment program (ITP). It was reported that the program would eventually have 11 core groups plus additional non-core groups such as art and music therapy, board games, etc. Some patients reported enjoying the non-core groups but others expressed concern with lack of groups addressing significant clinical issues such as voyeurism and exhibitionism. Observed non-core groups revealed generally good group facilitation and interactions.

### 3. <u>Individual Treatment</u>

Individual treatment remained underutilized at SVPP. Treatment plans did not indicate individual treatment where it was needed. At the time of the Special Master's March 2014 visit, the default practice was to have two MTAs in the treatment room, based on institutional cultural perceptions of patient dangerousness rather than on current policy, and thus compromising confidentiality of patient-care provider communications. Assessments of "dangerousness" were not individualized and were overestimated in the context of these clinical contacts. Some efforts to increase the quantity and quality of individual treatment were being made.

VPP offered very little individual treatment in its acute care program, despite the clear need for it by patients who needed enhancement of gains made in group treatment, or because they were not yet able to participate in group treatment. Patients complained that if they asked for individual sessions, too often the response was a "PRN" (Take As Needed) medication. The content and amount of discussion in individual treatment sessions varied across clinicians, with some doing little more than basic check-ins and others having in-depth discussions with patients. Nevertheless, little of it was treatment goal-directed. Despite the shortage of individual treatment, psychologists and social workers appeared to be very familiar with patients on their caseloads. Psychologists described treatment interventions they would like to provide, if given appropriate time and space. By the time of the Special Master's February 2014 visit, VPP had begun using off-unit treatment space for psychological testing and individual therapy for primarily acute care patients. Therapeutic modules were reportedly added to the acute care interview rooms, enabling individual contacts for Discretionary Program Status (DPS) or Step 1 patients (see below) for individual treatment without an MTA present. Most contacts with the psychiatrist were at cell front, given space constraints. MTAs were present during any contacts that occurred in the dayroom.

In the HCITC at VPP, approximately one third of patients reported receiving regular individual treatment, but patients reported intervals between sessions that varied from weekly, to placement on a month-long waitlist, to "unavailable." Staff reported that staffing levels were too low to support any significant increase in individual treatment. As in the acute care program, patients reported staff over-reliance on medication, rather than individual treatment, as a response to patients' requests to discuss their problems.

16

At the CHCF, patients reported, and the chief psychologist corroborated, that regular individual clinical appointments were scheduled only at patients' requests or following IDTT meetings.

### 4.    Other Treatment Issues

At SVPP, the default practice for escorts to clinical contacts continued to require two MTAs present for all out-of-room encounters, unless the clinician asked the MTAs to wait outside. This was true regardless of the patient's custody status. Custody staff did not interfere with SVPP operations.

VPP required two escorts for any patient movement, regardless of the patient's custody, status, classification, or behavior. This consumed MTA resources to an extent that treatment activities were cancelled due to MTA unavailability. In fact, clinical and administrative staff reported that this was the predominant reason limiting out-of-cell activity.

Through a program developed by DSH headquarters, VPP received consultative services on medication management from a psychopharmacologist to assist with medication management for difficult cases. This was beneficial for patients at VPP who were seriously mentally ill and had not improved after multiple medication trials and still had severe symptoms.

Condemned patients at the acute level of care were treated at VPP. They received far less treatment than other patients in acute care, with no access to group activities or outdoor yard, and only an hour of dayroom on one of the weekend days. Reportedly, they received a weekly contact with the psychiatrist or psychologist, but it was either at cell front, or was in a non-confidential setting. They received no more than four hours of scheduled out-of-cell activity per week, in the evening, indicating that it was probably nursing-level staff who facilitated the activity.

At the CHCF, patient evaluations improved over the course of the Special Master's visits. Treatment planning forms provided several areas for notation of reasons for referral, and the patient's status and progress, but most staff did not use them effectively. Successive forms often merely repeated notations from past forms.

Patients at the CHCF reported that it was considerably more restrictive than the prisons from which they were referred, stating that it was like being in a maximum security environment, spending 21 to 22 hours per day in their rooms.

### C.    CIW PIP

Generally, the CIW PIP provided the necessary care for patients referred to the program, with patients participating in group, individual, and unit activities. Custody did not appear to interfere with delivery of treatment and services to patients.

#### 1.    IDTTs

Treatment teams included the necessary disciplines. Patients attended team meetings, and patients' family members could also be included via teleconferencing, with consent of the patient and approval by the CC I. SREs, violence risk (V-Risk) assessments, and an initial, partial treatment team conference were completed within 72 hours of the patient's arrival. Each discipline completed an initial assessment and presented it at the full initial IDTT meeting, which took place within ten days of the patient's admission. "Mini" IDTT meetings could be held at any time, to address urgent or emergent issues. All observed "mini" and full IDTT meetings were well run. Clinical staff were sensitive to patients' concerns. Interdisciplinary discussion was good. Treatment plans improved over the course of the Special Master's visits, but more alignment with patients' individual treatment needs was required.

### 2.    **Group Therapy**

CIW PIP had a mechanism for tracking group hours.  Reviewed quality assurance information indicated that nearly all scheduled group treatment hours were completed.  There were 28 to 30 different group activities including core and recreation-based groups.  They were generally well run.  However, the practice of allowing patients to leave groups for other appointments, plus late arrivals, caused some disruption in group sessions.  In January 2014, acute and intermediate care patients were offered an average of 15 hours of group per week.

### 3.    **Individual Therapy**

Nearly all of scheduled individual treatment was completed, according to review of the program's quality assurance information.

### 4.    **Other Treatment Issues**

Treatment at the acute level of care was supposed to include enhanced therapeutic groups and more individual therapy than at the intermediate level of care, but record review did not reflect enhancement of treatment or individualization of treatment plans to address their higher acuity.  Thus, it was difficult to distinguish acute care from intermediate care.  Review of records of some patients admitted at the acute level of care but not improving indicated that the treatment team did not provide additional services consistent with the needs of an acute care patient.  Treatment hours for acute and intermediate care patients were about the same, and in January 2014 they were the same, at an average of 13.6 hours per week.

Suicide risk assessment was problematic.  They were documented as occurring at the time of admission, but not subsequently or repeatedly when clinically indicated.  CIW PIP had a pre-set schedule for suicide risk assessments, but these would not necessarily capture significant risks precipitated by adverse events in a patient's life.

III.    **PATIENT ACCESS TO TREATMENT**

As described below, all six of the inpatient programs used their own distinct systems of orientation, cuffing, and restrictions for newly admitted patients, steps/stages through which patients must progress to fully access treatment, and imposition of restrictions on patients following behavioral problems and/or disciplinary infractions.  These six systems varied widely in terms of the amount and severity of restrictions on patients' movements, contact with others, and eligibility to receive treatment.  It appeared that placement of new patients in extremely restrictive conditions was often based on rote application of the individual programs' established procedures rather than on the severity of individual patients' mental illness, their propensities for aggressive or self-harming behavior, or their readiness for treatment.  Although some of the differences among the programs' systems were based on the custody level(s) of patients admitted to these programs, the degree of variability appeared to be excessive for its purpose.

There is a need for the development of a consistent, more therapeutically-oriented and less punitively-oriented system that can be applied across all six programs.  It should have the flexibility to accommodate differences in custody levels and physical plant differences from program, to program to the extent necessary.  More importantly its emphasis should be re-directed toward greater individualization of any necessary restrictions and staging of patients based on their unique mental health and behavioral conditions and readiness for treatment, and away from automatic presumption of violent behavior, anti-therapeutic withholding of interaction with others, and deferral of much needed treatment.

It must be borne in mind that the CDCR patients in these inpatient programs have all been found to require the highest level of care that can be made available to seriously mentally ill inmates of the CDCR.  It does not make sense to remove these patients from a prison

environment where they were receiving treatment (albeit not at the level which is clinically indicated), and place them into inpatient programs only to subject them to harsher, less therapeutic conditions than those in the prisons, and defer necessary treatment for the sake of following a one-size-fits-all orientation and staging process.

A.    **ASH and CSH**

Patients who arrived at ASH from CDCR prisons remained in cuffs until they were seen initially by nursing staff, which occurred shortly after their arrivals. Cuffs were then removed, and these patients went through the admission process, and spent typically 45 to 90 days in the admissions unit where they lived in single rooms or dorms without locked doors, and were given initial and follow-up treatment plans, morning meetings, group therapy, access to the dayroom, and were assessed for readiness to move freely within the facility. Once they were evaluated and stabilized, patients were transferred to one of the treatment units for CDCR inmates. Patients then entered a five-step system of advancement through increasing levels of freedom of movement within the facility, known as the Hospital Access System (HAS). The system offered incentives that supported treatment paradigms, and did not punish patients by setting back their HAS levels.

CSH also did not automatically use anything akin to a "cuff status" for newly admitted patients. Newly arrived patients were not cuffed at any time during the admission process, even when being escorted from Receiving and Release (R&R). Rather, CSH referred to patient "level" and placed newly admitted patients on what it called "level on hold." This meant that patients were restricted to their units until they underwent several discipline-specific assessments, which had to be completed within seven days of the patient's arrival. Patients were

21

then seen by the treatment team, after which they were permitted to leave the unit. The only time cuffing was used was when needed to address dangerous behavior.

## B.    SVPP, VPP, and CHCF

SVPP continued to use the same staging and status process that it was using at the time of the Special Master's visit in August 2013. As noted above on page 4, and as discussed in greater detail below on pages 49 through 51 below, following the Special Master's filing of his Report on SVPP on September 24, 2013, the *Coleman* court ordered CDCR and DSH to review and re-evaluate the use of orientation and cuff status at SVPP. The goal of this project is to determine whether, as designed, these practices at SVPP achieve the proper balance between legitimate security needs and access to necessary inpatient mental health care. This review and re-evaluation is to be carried out under the guidance of the Special Master and his staff, with participation and input of the *Coleman* plaintiffs. [*See* Order, Docket No. 4925].

SVPP's staging and status process determined housing and programming for newly admitted patients.[3] The stages and statuses at SVPP were denominated as Orientation, Stages 1, 2, and 3, and Cuff Status. To advance in housing and programming, SVPP patients were required to proceed from one level to the next, depending on their behavior and participation in programming. All newly admitted patients were placed on Orientation Status, which meant that for up to their first 14 days at SVPP, they had only personal hygiene items for property, and had to be cuffed at all times when outside of their cells. They were to be seen daily at cell front by an IDTT member, but received no other programming.

When they were cleared by the ICC, they were removed from Orientation Status and could program without restrictions. After Orientation Status, the patient at SVPP advanced to Stage 1, wherein he does not have to be cuffed when out of cell, receives individual treatment

---

[3] This process was described in the Special Master's Report on SVPP, Docket No. 4830, filed September 24, 2013.

planning by the IDTT, and begins to program, including participation in groups. Yard, visitation, dormitory living, and television or radio may be available. After programming successfully at Stage 1, the patient progresses to Stage 2 where programming continues, and he may receive increased privileges including two telephone calls per week, limited positions in the patient government, basic personal property, store incentive points, and eligibility for participation in a patient mentoring program. To proceed to Stage 3, the patient must complete 80 percent of the core groups and demonstrate appropriate knowledge of their content as well as coping skills. At Stage 3, the patient is expected to be actively involved in treatment activities, with good attendance, and be preparing for discharge from SVPP. Increased privileges at Stage 3 include any position in patient government, use of recreational supplies, open telephone access, added points in the incentive and mentor programs, and loaner entertainment devices.

An SVPP patient may be removed from his Stage and placed on Cuff Status due to safety concerns, clinical reasons, or because of indecent exposure (EIX), or aggressive, assaultive, or threatening behavior. While on Cuff Status, the patient must be cuffed and escorted by MTAs whenever he is out of cell. The patient's Cuff Status must be reviewed daily by the SRN (Senior Registered Nurse). Removal from Cuff Status must be discussed by the SRN/SMTA (Senior Medical Technical Assistant) and the IDTT to assess safety issues. If the patient is removed from Cuff Status, the IDTT determines which Stage the patient will then be placed into.

At the time of the Special Master's December 2013 visit, SVPP reported that it was creating a 14-day orientation program which will include focus groups on what to expect at SVPP, individual therapy sessions, group sessions with other patients on orientation, clinical assessments, socialization techniques, medication management, and treatment planning, among other things. All orientation patients will be housed on one wing rather than be interspersed

23

throughout the facility, have a designated and trained admission treatment team, and be tracked

to assist with improved utilization management (UM) and delivery of care and resources to

patients.        At the time of the February 2014 visit, SVPP Cuff Status policies required that

Sensitive Needs Yard (SNY) patients be cuffed on arrival and remain cuffed until ICC review,

regardless of their custody levels, and with no rationale.  Of the 12 Cuff Status patients who had

been seen by the ICC, the durations of their Cuff Status ranged from two days to 437 days, with

several having been on Cuff Status for nearly a year or longer.  Eleven of the 12 were retained on

Cuff Status based on input from the treatment team.  While this was fewer patients on Cuff

Status than during the Special Master's August 2013 visit, there continued to be problems with

SVPP's tracking and treatment of these patients.  Important items such as behavioral plans and

documentation of initial and continued placement on Cuff Status were missing from records.

Treatment plans were not modified to address behaviors that led to Cuff Status, resulting in

patients not receiving the necessary treatment interventions.

By the time of the March 2014 visit at SVPP, there had been some decrease in use of

Cuff Status.  Some administrative directives (ADs) had been revised, although they did not

consistently cross-reference other related directives.  A significant change was that patients at

less than maximum custody status would no longer be automatically placed in cuffs/mechanical

restraints upon admission or during orientation.  However, there were no procedures regarding

proper use of therapeutic modules for patients on maximum custody status.  The role of the

treatment team in recommending reduction of custody status to the ICC needed clarification.

Oversight, management, and supervisory safeguards were not specified sufficiently.  These

changes did not address the larger issues of how to better review and document patients on Cuff

Status and provide treatment interventions calculated to improve the patient's condition and

move him to a less restrictive, more therapeutic environment, with increased individual contacts with the psychiatrist, psychologist, and social worker.

Unlike SVPP, VPP did not use a process of orientation, staging, or cuff status. It used a System to Encourage Progress (STEP) process in its acute and intermediate care programs. However, like the SVPP process, the STEP process was premised on the patient's advancement through STEPs with delineated increased privileges and activities at each successive STEP.

All seven acute inpatient units at VPP used a five-step progression from admission to discharge. On arrival, patients were placed into STEP I Solo, which meant being cuffed while in the dayroom with staff oversight. In no less than 72 hours, if the patient successfully completed two out-of-cell activities (which may include individual clinical contacts), he may progress to STEP II if deemed ready by the treatment team. At STEP II Solo, the patient may be uncuffed in the dayroom and watch television, read, or write under staff supervision, or make telephone calls. At STEP III, the patient may participate in groups of two or three patients, and may use group items, if given approval. At STEP IV, the patient may attend larger groups, and use group items, again if given approval. STEP V gives the patient full programming status and access to the yard.

Staff reported (but the acute care Program Manual did not confirm) that progression for acute care patients from step to step was based on successful completion of two 30-minute out-of-cell activities. The deprivation of yard access until the patient attained STEP V, and the inability to advance a patient to the next STEP before the next scheduled treatment team meeting, were of concern to the Special Master's expert.

Patients admitted to the HCITC or to non-high custody intermediate care at VPP were first placed on DPS, where they remained during an observation period and until cleared by

25

clinical assessment and evaluation.  Patients who engaged in aggressive/threatening/assaultive behavior, or patients with enemy concerns, also could be placed into DPS status.  In addition, all patients discharged from acute to intermediate care at VPP were placed on DPS status, with no individual assessment of risk, which brought about a reduction of patients' programming because they had improved clinically.  While on DPS, patients were held in stripped-down cells with only personal hygiene items pursuant to physicians' order.  They attend groups in cuffs and had limited phone use, visitation subject to treatment team and custody clearance, access to the library, and in-cell recreation material, but no access to yard.  For all patients designated for the SHU (Security Housing Unit), administrative segregation, or an SNY, ICC clearance was needed before removal from DPS status, and SHU or administrative segregation terms had to be held in abeyance.  DPS status then remained in effect until IDTT action.

Following removal from DPS status at VPP, intermediate care patients were moved into a three-step process, beginning with STEP I where they received further assessment and evaluation as well as individual, group (without cuffs) and other therapeutic activities, and were to be reviewed daily.  Privileges were the same as those of DPS, plus haircuts, shaving, and nail clippers, eligibility for a mini-radio in cell, and limited yard and canteen privileges.  Stays in STEP 1 lasted at least ten days.  If patients, with minimal prompting, attended all therapeutic activities, participated in groups, maintained personal hygiene and their cells, followed community rules, and completed and turned in assignments they could advance to STEP 2.  At this step, patients were expected to participate in therapeutic community meetings, recover from lapses without disruption of treatment plans, respect others and their property, appropriately interact with other patients and staff and remain compliant with medications.  Privileges included all those of STEP 1 plus a higher canteen allowance.  Patients at STEP 2 may advance to STEP 3

after at least 30 days of compliance with the same expectations as for STEP 2.  STEP 3 privileges included eligibility for Wii group, in-cell television, eligibility for ward government chairperson or secretary positions, and a still higher canteen allowance.  Patients who did not conform to these expectations associated with these STEPs were subject to being put back to a lower STEP.

A patient could not progress from DPS to the next STEP without ICC clearance.  This took on average 36 days, with a range of 14 to 96 days at the time of the September 2013 visit, thus causing a patient to linger for long periods of time at a STEP he should be removed from.  Further, because a patient formally removed from DPS status must remain at STEP 1 for an additional ten days at a minimum, neither DPS nor STEP 1 patients were allowed access to yard.  A patient moving from DPS through STEP 1 could not have yard for a minimum of 20 days, even assuming all timeframes were met at the earliest possible time.  By the time of the January 2014 visit, there had been some improvement with timing of ICC action, but for 60 percent of the 35 new admissions, ICC action took 15 days or longer.  Even more concerning was the fact that patients, including SNY patients, could remain on DPS status for the duration of their hospitalizations at VPP.  For example, the ICC could not remove DPS status for an SNY patient, unless the patient waived his SNY status, but if he did not, he would have to remain on DPS for the duration of his stay at VPP.  If the ICC continued a patient's custody status, it could reconsider it if the IDTT re-referred the patient to the ICC, but there were no timeframes for reconsideration, potentially leaving the patient on DPS status indefinitely.  In such cases, the IDTT worked with the patient to offer some higher STEP privileges, *but in effect, this was akin to placement in administrative segregation for these patients who were so seriously mentally ill as to require inpatient hospitalization.*

As of March 2014, VPP began tracking all patients on DPS status, including the justification for remaining on DPS, and the ICC meeting date, determinations, and comments. As of mid-March 2014, there were 11 intermediate care patients who remained on DPS status after ICC action or placed back onto DPS status because of behavioral issues.

For low-custody intermediate care patients at VPP, the STEP process was used, but it skipped DPS status. Advancement through STEPs for these patients was driven by IDTT action. Privileges in the intermediate care STEPs for low-custody patients were greater than those in the analogous STEPs of the high-custody program.

The CHCF also used a STEPs and STAGEs process, which utilized incentives to reward and promote positive, adaptive, and socially desirable patient behaviors. All patients admitted to the CHCF (but not necessarily patients arriving from DSH inpatient programs) were placed on Orientation Status, which meant that until they were cleared by the ICC or the UCC (Unit Classification Committee), they had to be cuffed whenever out of their rooms.

All new acute care patients at the CHCF were placed into STEP 1, known as "solo with cuffs," meaning that these patients were brought out of their cells alone and cuffed. Privileges at STEP 1 included television, reading, listening to music, or yard by themselves with staff supervision. Programming safely at STEP 1 allowed progression to STEP 2, known as "solo without cuffs." This STEP added card playing, letter writing, and making telephone calls on the unit. Safe programming at STEP 2 allowed for advancement to STEP 3, known as "small group," which permitted programming with one or two other patients, and included activities such as television, small therapeutic or educational groups, board or card games, outdoor activities, and art or music therapy. Uneventful negotiation of activities at STEP 3 meant the patient may progress to STEP 4, known as "large group," consisting of four or more patients and

including therapeutic, educational and/or rehabilitative groups, socialization activities, outdoor activities, exercise, leisure activities, and writing.

CHCF patients at the intermediate level of care were offered the opportunity to participate in the Stage Behavioral Program or "STAGE," which, like the STEP program, involved a series of progressive levels beginning with DPS and three successively higher levels. Patients in the STAGE process could earn treatment and property privileges through pro-social behaviors. Some STAGEs had a minimum stay before patient advancement to the next level. DPS was an observation period, with assessment and evaluation, when patients programmed "solo with cuffs." They attended groups while in cuffs, with a maximum of four DPS patients. Privileges included limited telephone use, visitation if cleared by the IDTT and ICC, and library books. Successful completion of DPS activities allowed for advancement to STAGE 1, where the patient may also attend groups uncuffed, and have canteen privileges and outdoor activities. Appropriate programming at STAGE 1 allowed for advancement to STAGE 2, where appropriate programming in turn allowed for advancement to STAGE 3.

CHCF patients classified as maximum custody were always cuffed when leaving their rooms and were escorted by two custody officers, except when going to yard alone or to showers. These patients remained on this status until cleared by the ICC, which reportedly routinely reviewed their status timely. Restrictions associated with maximum custody status created challenges with providing care. Their solo programming requirement meant they could not partake of group therapy, except in so-called "solo groups" in which they were the only participant. Patients' cuffs and waist chains made it difficult to participate in the designated activity of the "solo group." In addition, because each housing unit had only two correctional

officers who had the keys to these units, the two-officer escort requirement meant that the units could not be entered or exited while maximum custody patients were being transported.

### C.    CIW PIP

New arrivals at the CIW PIP were placed on Orientation Status which the program also referred to as DPS. The IDTT evaluated and recommended programming status via the patient's treatment plan. All movement of patients on DPS occurred with custody staff present and with the patient in cuffs. These patients were confined to their cells for meals. Group activities were limited to two-patient groups until they were cleared. Individual therapy was conducted with the correctional officer in the room, compromising confidentiality and quality of the treatment process. Patients on DPS were given a workbook. After completion of the workbook, the patient's leisure activities could be increased. However, infractions or decompensated behavior could cause DPS status to be reinstated.

The PIP also had a stage system whereby patients may attain graduated privileges based on good behavior. Once cleared from DPS by the ICC, the patient progressed to stage two, when she could go to the dining room and have a radio, and then moved to stage three which allowed televisions.

In sum, the differences among the six programs' processes and practices for orientation and progression of new patients and those who transgress behavioral/disciplinary standards make for a great deal of inconsistency across the programs and are confusing to say the least. As discussed in detail below, a review and re-evaluation of not only SVPP's processes but those of all of the inpatient programs is in order to help clarify and systematize the six programs' approaches to balancing security needs with patients' treatment needs. *See* "Recommendations," *infra* p. 49-55.

## IV.    REFERRALS AND TRANSFERS

### A.    ASH and CSH

At ASH, the director of forensics reviewed the referral packets, accepted or rejected the referral, and conveyed clinical input of the Coordinated Clinical Assessment Team (CCAT). Because referral packets often lacked all of the necessary documentation, a process was being developed to make patients' eUHRs (Electronic Unit Health Records) at CDCR prisons available to ASH clinical staff. Of those patients admitted and transferred to ASH from June 7, 2013 to January 30, 2014, 97 percent transferred within the 30-day transfer timeframe for intermediate care patients. Review of rejected referrals indicated that patients were rejected for a variety of reasons including diagnostic disagreement, cognitive disorders, RVRs which did not indicate whether the patient had a propensity for violence, failure to meet criteria for involuntary medication, and limited remaining prison sentences. Patients were also rejected if deemed to have already reached "maximum benefit." These included some patients who had already been treated by a DSH inpatient program.

Beginning in October 2013, CSH began accepting direct admissions from CDCR institutions, in addition to transfers from ASH. The process entailed submission to ASH of a list of referrals who were eligible for either ASH or CSH, plus CSH's census and bed availability. ASH then determined whether that patient could be accepted into its program and sent a chrono to DSH headquarters and the referring CDCR institution, after which ASH was not involved in the balance of the process for referral and transfer to CSH.

### B.    SVPP, VPP, and CHCF

Of the 55 patients who transferred to SVPP from December 2013 through January 2014, 25 percent occurred within the 30-day timeframe for intermediate care transfers. The average

transfer time was 42.9 days with a range of six to 128 days. Staff reported that delays were largely due to lack of available beds.

VPP had a Clinical Assessment Team (CAT) that managed and processed acute and intermediate care referrals, plus conducted mental health and medical evaluations and admitted patients. From December 2013 through February 2014, average stays for the 189 acute care admissions and 192 acute care discharges were 105 days. During the same period, there were 100 intermediate care admissions and 107 intermediate care discharges, with an average length of stay of 226 days.

From June 13, 2013 to January 24, 2014, the CHCF admitted 55 patients from CDCR institutions at the acute level of care. Of these, 64 percent were transferred within the ten-day timeframe. From July 22, 2013 to January 31, 2014, the CHCF admitted 126 patients from CDCR institutions at the intermediate level of care. Of these, 18 percent were transferred within the 30-day timeframe. There were also four acute care and 146 intermediate care transfers from DSH inpatient programs.

### C.     CIW PIP

Documentation of admissions was incomplete at the PIP. Ten of 13 documented referrals were accepted at the PIP, five at the acute level of care and four at the intermediate level of care, and the remaining four unknown. All three of the documented acute care admissions met the ten-day timeframe, and both of the two documented intermediate care admissions met the 30-day timeframe. Because the four admissions for which there was no documented indication of level of care occurred within two to five days, the nine admissions with documented transfer timeline data were transferred within timeframes, and within 72 hours of a bed assignment.

## V.     ADMISSIONS AND DISCHARGES

### A.     ASH and CSH

Staff and workload issues led ASH to limit its admissions to 20 per week.  Newly

admitted patients from CDCR institutions spent 24 to 48 hours in the "admissions suite" before

transfer to an admissions unit, usually Unit 27, unless it was filled, in which case patients would

be sent to another unit.  Patients typically spent 45 to 90 days in the admissions unit.  They lived

in single rooms or dorms, had daily access to the dayroom, television, and telephone, and were

oriented to treatment at ASH.  They received initial, seven-day, and monthly follow-up IDTT

review, attended morning meetings and group treatment, and were assessed for readiness to

move freely within the facility and participate fully in therapeutic activities.  Unit 27 generally

had more activities than the other admission units.  Decisions to transfer to treatment units

required a psychiatrist's order and generally did not involve clinical staff.

Discharges from ASH were generally based on the lengths of patients' stays rather than

on condition.  In five of seven reviewed cases, patients were discharged back to CDCR before

receipt of adequate therapeutic intervention.  Notably, these patients' mental illnesses prevented

them from engaging in treatment.  Staff indicated that some discharges of CDCR patients

deemed "inappropriate" for intermediate inpatient care occurred shortly after their arrival at

ASH.

At CSH, admission packets were prepared and posted on SharePoint.  On admission,

patients received several discipline-specific assessments, including a psychiatric evaluation,

within four hours of admission, a nursing assessment, a psychological and social assessment, a

recreational assessment, and a physical examination.  Assessments had to be completed within

seven days to be presented to the IDTT.  CSH reported that it had been granted access to the

33

referring institutions' eUHRs for the referred patients. Average stays last from six to nine months.

The few patients at CSH who were coming up on parole were returned to a CDCR prison before their releases. It was unclear how much pre-release planning was done by CDCR before the patient returned. CSH staff did not appear to be familiar with basic parole planning – none were aware of the Transitional Case Management Program (TCMP), nor how to assist a patient with application for benefits such as Supplemental Security Income (SSI) or MediCal. During the Special Master's March 2014 visit, staff reported that patients had access to a 12-week group to assist them with identifying and locating community resources that would be helpful after release to the community.

### B.    SVPP, VPP, and CHCF

During December 2013 and January 2014, of the 50 patients who had been at SVPP, 96 percent received an ICC meeting within ten days of admission. Suicide risk assessments were documented as occurring at the time of admission, but not at other times. Noted instances of documented "contracting" by the clinician with the patient to not commit suicide were not a clinically valid alternative to a suicide risk assessment.

VPP had a CAT that managed and processed both acute and intermediate care acceptances, conducted mental health assessments and medical evaluations, admitted patients, and maintained records relating to referrals, acceptances, admissions, and discharges. It implemented the V-Risk Assessment instrument. It also conducted all bed assignments, taking patient enemy concerns, communication barriers, specialized clinical and medical needs, and accommodations into account. As VPP did not have a designated admissions unit, admissions

were processed through CMF's R&R unit. Processed patients were then escorted in restraints to their assigned housing units.

All CDCR patients at VPP were discharged back to CDCR. Those pending parole were transferred to the Mental Health Crisis Bed (MHCB) unit at CMF to facilitate parole services.

The CHCF began admitting patients on July 22, 2013. Documentation indicated that as of the Special Master's January 2014 visit, a total of 117 patients had been discharged from the program. Observation of an acute care admission indicated that the patient was placed in a program room for an initial assessment with a psychiatrist and a nurse, with two correctional officers present. The psychiatrist had not reviewed the patient's referral packet beforehand. After about an hour of assessment, the patient was assigned a room and was told he would be seen again later. Observation of an intermediate care admission indicated the patient did not speak English and the facility had no formal translators. Both mental health leadership and staff expressed concern regarding the general lack of knowledge of times of patients' arrivals, which led to delays in processing new admissions. Patients arriving on a Friday night would not be seen by the IDTT until the following Monday at the earliest. Institutional policy that intake requires a psychiatrist and an RN with two correctional officers present was not adhered to consistently. Review of a census log indicated that 35 of 45 listed patients had an initial ICC or UCC meeting within ten or 14 days, as required by CDCR policy, but it did not list any ICC or UCC dates at all for the remaining ten patients.

Some patients at the CHCF reported that discharge planning included a meeting with the social worker and was adequate, but that discharge planning was not part of their treatment plans.

### C.    CIW PIP

The PIP had an admission and discharge team that reviewed the referral packet and determined whether the patient met admission criteria.  It used the same admission criteria as the DSH-run inpatient programs for CDCR patients.  The team included a psychiatrist, psychologist, social worker, RN, and the admission and discharge coordinator who was an RN.  There were reported issues with receiving prior mental health histories from DSH, although it was also reported that CDCR and DSH were working on resolving this problem.  An observed admission was conducted by the psychiatrist and an RN.  The patient was on DPS status and was dressed in a suicide-resistant smock and waist chains, as she had made a recent suicide attempt.  The custody officer was in the room the entire time and the door was open, compromising the confidentiality of the process.

Criteria for discharge from the PIP were set by policy and applied by the IDTT.  Staff reported that patients clinically ready for discharge and approaching parole or release would be returned to CDCR a minimum of 30 days before their release for purposes of pre-release planning.  Returns to CDCR were clinical decisions.  Back at CDCR, patients were provided with a step-down process to transition to the structured environment before actually returning to the community.  However, patients deemed not ready for discharge would not be returned first to CDCR, and would parole directly from the CIW PIP.

## VI.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

### A.    ASH and CSH

ASH did not use a disciplinary process comparable to the Rules Violation Report (RVR) process that was used in CDCR prisons or in DSH-run inpatient programs for CDCR patients.  All patient behavioral issues were addressed by the treatment team.

At CSH, patient discipline consisted of restriction on off-yard activities, such as library access. Any patient placed on "hold" from activities as a form of discipline was reassessed daily for removal from that status. Serious Incident Reports (SIRs) were written for behaviors such as sexual offenses, drug-related problems, contraband, aggressive acts, assaults, suicidal gestures, and other behaviors deemed significant. The unit supervisor decided whether to report any SIRs to CDCR for consideration of issuance of an RVR, but no criteria were included in any policy or directive. Record review indicated that eight RVRs were written for patients during the first quarter of 2014. The three adjudicated by the time of the Special Master's March 2014 visit reflected consideration of the patient's mental health assessment by the hearing officer. Penalties involved loss of credit but not loss of privileges.

**B.    SVPP, VPP, and CHCF**

At SVPP, there were no meaningful mitigations of penalties based on the role of patients' mental illnesses in their behavior. They remained subject to multiple forfeitures of credits, increases in their classification scores, and referrals to the District Attorney (DA) for possible prosecution. The result was that CDCR patients housed at SVPP, a CDCR/DSH jointly-operated facility, were subject to a disciplinary process that could result in their being incarcerated for longer periods of time than if they had been housed at a DSH facility. Staff reported that the most recent training on the RVR process at SVPP had occurred about two years earlier. Mental health assessments, all completed by a social worker, were not subject to any quality assurance process. The monitor's review of the disciplinary log for Facility C indicated seven RVRs issued to four SVPP patients during January 2014. Six were for IEX and one was for fighting. Five had been heard, all resulting in a guilty finding, loss of 90 days' credit, and subsequent assessment and addition of up to six classification points by the ICC or UCC. Review of ICC

37

files indicated rote, formulaic findings, with no real mitigation of disciplinary measures based on the role of the patient's mental illness in his behavior.  The fact there was no loss of privileges was quite meaningless in that SVPP patients had almost no privileges in any event.  Guilty findings in themselves could extend patients' release dates.  The monitor did not find any issues with use of force at SVPP.

As at SVPP, RVRs issued to patients at VPP were processed, heard, and disposed of within the CDCR RVR system.  Accordingly, all requests for mental health assessments for use in the disciplinary process were originated from CDCR, then routed to VPP program directors, and then forwarded to SRNs within the units.  The SRNs then distributed the requests to VPP clinicians for completion and return to the SRNs.  Although the assessments were completed timely, it appeared that they were not given appropriate consideration by the senior hearing officers (SHOs).  Review of RVR dispositions indicated minimal mitigations, with significant loss of behavior credits and accumulation of additional classification points, extending release dates and limiting treatment opportunities based on custody levels.  The rare mitigation usually involved only patient privileges.  Even though under Title 15 SHOs were authorized to use discretion in their findings and decisions when considering mental health input, VPP operated under the erroneous assumption that hearing officers lacked authority to reduce a penalty or dismiss charges based on mental health input.

At VPP, all cell extractions were performed by MTAs.  Review of documentation indicated that from May 2013 through October 2013, the acute care units had 26 cell extractions, of which eight resulted in the patient voluntarily leaving his cell and thus not requiring actual extraction.  During the same period, the intermediate care units had one cell entry and no cell extractions.  AD 6.07 at VPP stated that a patient may be physically removed from his cell/dorm

if he posed a danger to himself or others and was unwilling or unable to leave his cell/dorm

voluntarily, utilizing a process that was "safe, organized and systematic." It further stated that if

extraction was needed, the RN shift leader or designee had to notify the SRN and the SMTA on

duty. It was the responsibility for the SMTA to obtain approval from the program director or

designee prior to conducting the extraction. During weekdays and regular work hours, the

program director or designee must be present to oversee the process. On weekends, holidays,

and after regular work hours, the SMTA had to obtain approval from the DSH AOD or designee,

and an SIR, and CDCR forms 837 and 7219 had to be completed. During the October 2013 visit,

the Special Master's expert observed preparation for two cell extractions and noted that verbal

interventions before both planned extractions were done by MTAs, with minimal presence of

either RNs or other mental health clinicians. These two instances did not develop into completed

extractions.

The monitor did not find any issues with RVRs at the CHCF. As of the January 2014

visit to the CHCF, the use-of-force log indicated that there had been 12 use-of-force incidents on

mental health patients in 2013. It was not indicated whether pepper spray was used to effect a

cell extraction, the reason why force was used and how much of it was used, and whether

applicable CDCR policy on use of force was followed.

### C.    CIW PIP

At the CIW PIP, any staff member could write an RVR. RVRs affected the patient's

stage level after IDTT consideration. A staff psychologist who did not carry a caseload

completed all of the mental health assessments. Initially there were concerns with these

assessments, including vagueness in identification of mental health factors to be considered. At

a subsequent visit, after the psychologist had received training, the assessments improved. RVRs

were reviewed monthly by the performance improvement committee, and any identified

problems were raised through the chain of command.  Review of RVR logs at the September

2013 visit indicated that they were incomplete.  By the time of the February 2014 visit, the RVR

process at the CIW PIP had improved, with better information on the mental health assessments,

and consistent documentation of consideration of the assessments.  However, hearing officers

continued to assess significant forfeitures of credit, of 90 to 120 days.  The performance

improvement committee reviewed and dismissed some guilty findings.

**VII.    USE OF SECLUSION AND RESTRAINT**

**A.    ASH and CSH**

ASH used a combination of restraint, seclusion, and/or assignment of a staff member to

stay with a patient 24 hours per day to stabilize those patients who were struggling with

adjustment to the program.  Reasons why seclusion or restraint were used included verbal and/or

physical aggression toward peers or staff, self-harm, attempted escape, or medical issues.

Patients in full restraint were continuously monitored by staff sitting outside the room.  In some

cases, a patient's removal from restraint included an intervening step of being strapped to a chair

(so-called "non-ambulatory restraint") as well as being cuffed.  There were 76 instances of full-

bed restraints from January 2013 through August 2013, lasting 24 hours or less in 79 percent of

cases, and the longest duration was 94.7 hours.  During the same period, there were 63 instances

of seclusion.  Durations were 24 hours or less in 65 percent of cases, and the longest duration

was in excess of 123 days.  An ASH audit of seclusion and restraint found problems with two-

hour and four-hour interdisciplinary notes (IDNs), documentation of completion of nursing

assessments, and evidence of the use of prone stabilization.

CSH had two observation rooms that were used, respectively, for seclusion and restraint. The seclusion room had one thin mattress, and the restraint room had a bed affixed to the floor with restraints attached to the bed.  Records indicated that for the first quarter of 2014, there were four instances of seclusion or restraint.  Documentation was present for timely physician orders and progress notes, seclusion and restraint behavior notes, RN notes, and debriefings.

**B.    SVPP and VPP**

At SVPP, use of restraints was limited, with it used twice during the period of December 2013 and January 2014.  One placement lasted two hours and 45 minutes, and the other lasted four hours and 35 minutes.  Appropriate documentation was found in the medical records. Restraints were used twice in February 2014, for durations of one hour and four hours. Seclusion was used more extensively, with a total of 57 uses involving 43 patients from December 2013 through February 2014.  By the time of the February 2014 visit, reviewed charts included timely psychiatry orders and nursing documentation but no documentation of offering of urinals or bed pans every two hours, as required.

At VPP, as of the March 2014 visit, data on use of seclusion and restraint had improved. During the period of January 2014 through February 2014, no patients were placed in seclusion and patients were placed in restraints on eight occasions with two occasions involving the same patient.  Durations ranged from one hour and five minutes to four hours.  VPP produced a report from a Restraint and Seclusion Performance Improvement Project which covered the same period.  It identified justification for restraints and release criteria as areas in need of improvement, plus a number of corrective actions.  Review of health care records indicated timely psychiatrist orders, release criteria, nursing IDNs, neurological assessment forms, and

observation records for seclusion/restraint, seclusion/restraint nursing care plans, and seclusion/restraint debriefing forms.

### C.    CIW PIP

The CIW PIP tracked use of seclusion and restraint.  There were five seclusion and seven restraint episodes in 2013.  Detailed information was provided for December 2013.  In that month alone, there were three instances of restraint, with two used on the same patient.  For that month, the average duration of restraint was four hours and 15 minutes.  Seclusion was not utilized during that month.  There were no reports of seclusion or restraint being used in January 2014.

## VIII.   EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### A.    ASH and CSH

ASH used the National Incident Management System (NIMS) and the Incident Command System (ICS) for emergency management.  Emergency response hospital training standards required basic first aid training and American Heart Association basic life support training for designated staff.

The facility had a comprehensive performance improvement structure in place, which included quarterly reporting to the Quality Council by all committees within the performance improvement structure.  Among them, the Mortality Incident Review Committee (MIRC) was responsible for ensuring that, following a patient death, staff conducted a systematic, interdisciplinary review to identify contributing factors and/or any gaps in services, and to recommend and/or implement corrective actions.

CSH conducted quarterly mock emergency drills on each Unit for each shift.  There had not been a death in Unit 21, the unit housing mental health caseload CDCR patients, since its opening.

## IX.    UTILIZATION REVIEW AND QUALITY MANAGEMENT

### A.    ASH and CSH

ASH's performance improvement program evaluated the quality of care through the use of numerous data collection tools and systems.  The Wellness and Recovery Model Support System (WaRMSS) tracked treatment-related activities and key indicator data that were used to identify patients who might require additional interventions.  The incident management system tracked certain adverse incidents, such as suicides, suicide attempts, and homicides.  The risk management system identified and reduced risk, and provided patients with interventions and corrective actions commensurate with the level of risk.  The Kardex worksheet completed for each patient assisted with the prioritization of patient's care needs and the provision of continuity of care.

In addition to the Quality Council and the MIRC, ASH had numerous other standing performance improvement committees.  Many discipline heads also prepared and presented quarterly reports on their respective departments' performance improvement activities, recruitment, statewide projects, and other matters.

The Medication Management committee utilized a dual focus of risk management and performance improvement toward the safe use of medication.  The UM committee developed performance improvement recommendations toward the objective of effective and cost efficient quality patient care.

The Program Review Committee (PRC) facilitated discussion with committee members on individual cases to address interventions or another placement that could benefit the patient's treatment. The Treatment Support Committee (TSC) reviewed patients who were exhibiting high risk behaviors that were not amenable to first level interventions or through treatment team referrals. The Medical Risk Management Committee (MRMC) provided consultation and oversight to treatment teams in the management of patients on the high-risk list for medical concerns. The Facility Review Committee (FRC) reviewed patients from lower level committees who required a higher level of review.

The V-Risk Management Committee reviewed and analyzed data concerning the variables that might contribute to violence. The Suicide Prevention Committee (SPC) provided coordination and oversight to reduce the risk of suicide and suicidal behavior. The Incident Management Review Committee (IMRC) identified programmatic and systemic issues and made recommendations to the appropriate departments for corrective/preventative measures related to abuse/neglect/policy investigations. The Intensive Case Analysis/Preventative Case Analysis (ICA/PCA) offered processes that identified the contributing factors to a potentially severe adverse event.

The RMC provided risk management oversight. The Security and Contraband Committee reported on changes in the patient contraband list and issues related to incoming mail/packages and contraband and security issues. The Environment of Care Committee reported on emergency drills, Occupational Safety and Health Administration (OSHA) compliance, security issues, and hospital health and safety compliance matters. The Standards Compliance Committee oversaw quarterly standard compliance reports to the Quality Council.

The CSH performance improvement process used a hierarchy of interventions. Unit 21 also held weekly quality improvement meetings to address issues specific to the Unit. The PRC was the first level of intervention. It monitored interventions and corrective actions for patients involved in high risk or trigger behaviors and provided clinical feedback to treatment teams. It made referrals to the Enhanced Trigger Review Committee, the Psychology Specialist Services Committee, and the MRMC when second-level interventions were met. The FRC was the final tier in the quality improvement system. It reviewed and provided clinical consultation for patients designated as high risk who met certain trigger thresholds. Staff reported that most issues raised during the Unit 21 meetings did not rise to a higher level of intervention and were handled within the Unit.

B.    **SVPP, VPP, and the CHCF**

SVPP did not have an operational quality improvement or performance indicators process in place, but data from My Activity Participation Plan (MAPP) was available for TCs 1 and 2. The facility was working on implementation of the PaWSS.

VPP was also implementing PaWSS on selected units and training staff on its operation. The facility was thus unable to track and report on therapeutic hours offered and received by individual patients.

VPP had a patient improvement system in place. A quarterly mock survey for all acute and intermediate care units identified deficiencies for which units were responsible for developing corrective plans. A Patient Care Plan (PCP) treatment guide assisted staff with identification and documentation of individualized, patient-tailored PCPs.

An Improvement Practice Performance Appraisal (IPPA) assisted managers and supervisors with increased awareness of employee practices that deviated from VPP's

policies and procedures.  Post-hospitalization audits reviewed the records of patients who returned to VPP following hospitalization in community health care facilities to track patient continuity of care between medical providers.  A Proposed Program Protocol for Foreign Body Insertion/Ingestion was intended to address opportunities for risk management for patient ingestion/insertion of foreign materials.  In-Shift Small Group Modules trained new MTAs on schedule management.

Electronic Medication Variance Reporting (MVR) was developed to replace a paper collection process for medication error reports with an electronic reporting process that permitted the sharing of medication error information with the CMF pharmacy; this project was in its infancy and was being beta-tested.  A revised RN Admission Assessment improved nursing assessment documentation.  A Plan of Correction review identified deficiency trends and patterns and analyzed the efficacy of correction plans.

At CHCF, staff training on PaWSS was ongoing, but not all staff had been trained. Although food service was improving at CHCF, quality management issues related to food persisted.  These problems included inconsistent meal times, certain ordered food items missing from trays without explanation or substitution, and the same items/meals being served multiple times during the same week.  On a positive note, meals were planned around nutritional value and therapeutic and medical needs, and nurses daily recorded patients' caloric, food, and fluid intake.

C.    **CIW PIP**

A quality assurance process collected and analyzed extensive performance data and provided corrective actions for specified areas of improvement; collected data addressed seclusion and restraints, cell extractions, RVRs, group attendance, medication errors, and IDTTs,

among other areas.  However, staff indicated that the executive director's request for additional quality assurance staffing resources had been denied.  There was also a Patient Care Policy committee that addressed matters from all areas of patient care within CIW and CIW PIP.

## X.    END OF SHIFT REPORTS

### B.    VPP and CHCF

Observation of VPP shift report meetings revealed the exchange of relevant information and indicated that they were a valuable means for staff to discuss unit events, individual patient problems, and clinical information that was relevant to treatment planning and maintenance of unit functioning.  Observed CHCF shift report meetings varied from cursory to extensive.

### C.    CIW PIP

CIW PIP staff daily received end-of-shift reports, which were a good vehicle for information-sharing between staff working on different shifts.  The reports included relevant information from each watch, as well as administrative information.

## XI.    *COLEMAN* POSTINGS

### A.    CSH

 CSH had ordered from CDCR posters detailing *Coleman* class members' rights and their attorney contact information.  In the interim, copies of the poster were placed in the Unit.

### B.    VPP and the CHCF

*Coleman* notices were posted in all VPP units and were prominently posted in housing units at the CHCF.

XII.    **LAUNDRY AND SUPPLY ISSUES**

A.    **ASH and CSH**

At ASH, *Coleman* class patients indicated no difficulties obtaining clean and properly fitting clothing and shoes, and clean sheets and blankets.  Neither CSH staff nor patients indicated any issues concerning laundry or supplies.

B.    **SVPP, VPP, and the CHCF**

SVPP reported no problems with the adequate amount of supplies, but serious problems with laundry persisted at the facility.  Among them, some clothing sent to the Prison Industries Authority (PIA) at Avenal State Prison (ASP) through SVSP was not returned to SVPP, while returned clothing was not consistently of the right size and same condition as what was sent there.  Following the February 2014 site visit, SVPP undertook numerous steps to attempt to rectify the laundry problem.  Among them, two MTAs were assigned to specifically work on laundry issues and the facility purchased new clothing, linens, and towels.

No laundry issues were identified at VPP.

Although supply shortages at the CHCF had eased somewhat as of the January 2014 site visit, they persisted for many items, including socks, underwear, t-shirts, shoes, appropriate-sized pants, liquid soap, and deodorant, among others.  Staff reported communication problems with warehouse staff as to the availability of supplies and that the warehouse frequently did not deliver ordered clothing.

C.    **CIW PIP**

No laundry or supply issues were identified at CIW PIP.

### XIII.  **VISITATION**

#### A.     **ASH and CSH**

ASH's visiting center was open daily and typically permitted contact visits.  CSH patients were routinely permitted contact visits seven days a week from 8:00 a.m. until 4:00 p.m.

#### B.     **SVPP, VPP, and CHCF**

As of the January 2014 site visit, visitation for mental health patients at CHCF had begun, but was restricted to non-contact visits with immediate family members.  Although an earlier CHCF policy permitted either contact or non-contact visits, as determined by the IDTT, and did not restrict visitation to immediate family members, the warden had made the policy more restrictive.  Some patients reported having had non-contact visits, while others indicated not knowing whether they had been approved for visitation.

The monitor did not find any issues with visitation at SVPP and VPP.

### XIV.  **LAW LIBRARY ACCESS**

#### A.     **ASH and CSH**

ASH had an adequate library and afforded patients appropriate access.

There were no reports of patients being denied library access at CSH.  Patients with active cases were permitted four hours of weekly library time, while other Unit 21 patients had library access three times per week, for one hour each visit.

#### B.     **SVPP and CHCF**

SVSP patients complained of lack of access to the law library.

Law library access was limited at the CHCF.  Mental health patients were not permitted physical access to the law library building, but only to four computers on mobile carts, of which

only two had Lexis installed and were operational. Only patients with active legal cases were granted law library access, in contravention of CHCF policy.

## **RECOMMENDATIONS**

The foregoing survey of the six mental health inpatient programs for CDCR inmates indicates that levels of quality in treatment and overall function at these programs vary to a large extent. Some general observations can be drawn at this point. One is that at the two exclusively DSH-run programs at ASH and CSH, and at the exclusively CDCR-run program at the CIW PIP, treatment and clinical services were better overall than they were at the combined DSH/CDCR-operated programs at SVPP, VPP, and the CHCF. The CHCF mental health program is in a somewhat unique position as it has only recently been activated and, as of this writing, it is still struggling to establish itself. Another observation is that all six of the programs were engaged in improving their operations via development and implementation of quality assurance measures, pilots of new treatment approaches, or the implementation of improved electronic scheduling and tracking tools, etc. Specifically with respect to the CIW PIP, it is noteworthy that in the relatively short period of time that the CIW PIP has been operating, CDCR has managed to fill all of the psychiatry and psychology positions, and three-quarters of its social work positions at that program. The results were good staff-to-patient ratios and rendition of necessary and adequate care to patients. Assuming that CDCR maintains the performance level it has demonstrated thus far in its operation of the CIW PIP, it may serve as a useful model for DSH in its continued work to improve its inpatient programs' abilities to treat inpatients from CDCR institutions.

The Special Master's findings all indicate that the landscape of inpatient care for CDCR inmates is evolving, and that further review by the Special Master of the six inpatient programs

is warranted. The Special Master finds that CSH, and the CIW PIP are presently operating at a level that justifies monitoring by means of paper review, i.e. review of requested documentation and records from these programs, rather than by on-site visits. The state of operations at ASH, SVPP, VPP, and the CHCF, however, indicates that at this time, continued on-site review of these programs is required. With respect to ASH, it appeared that the program's challenges with delivery of care were grounded in understaffing of psychiatry positions. If ASH brings its psychiatry staffing level up to acceptable levels[4], and if provision of treatment at ASH improves accordingly, ASH may then reasonably expect to also be transitioned to being monitored by paper review. Accordingly, for the time being, the Special Master recommends that he be directed to conduct a further review of CSH, and the CIW PIP by means of paper review and of ASH, SVPP, VPP, and the CHCF by on-site monitoring.

As ordered by the *Coleman* court following the filing of the September 24, 2013 Special Master's Report on the SVPP, CDCR and DSH were to "review and re-evaluated the use of orientation and cuff status at SVPP to determine whether these policies as designed and implemented achieve the proper balance between legitimate security needs and access to necessary inpatient mental health care. This shall be carried out under the guidance of the Special Master and his staff, with participation and input from the plaintiffs." [Order, Docket No. 4925, filed November 13, 2013].

The Special Master's recent tours of all six inpatient programs revealed significant variability among the individual programs' approaches to orientation and cuffing of newly

---

[4] *See, e.g.*, Order, filed June 13, 2002, Docket No. 1383 ["Defendants shall maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services; . . . "]; Order, filed March 9, 2006, Docket No. 1774 ["Defendants shall be given until May 15, 2006 to reduce the vacancy rate among all categories of mental health personnel at CSP-Corcoran, including psychiatrists, case managers, psych techs, recreational techs and supervisory clinicians, to ten percent or less through the employment of permanent staff and/or contract providers."].

admitted patients, imposition of more restrictive conditions on patients based on behavioral/disciplinary factors, and the steps/stages through which the patient must progress in order to receive the least restrictive and most treatment-oriented status in the program. It appeared that at least some of the variation among the six programs' processes was attributable to their treatment of patients' differing custody levels, and possibly also to physical plant differences across the programs. However, with that in mind, there is a need for development of an overall consistent process for orientation, cuffing, DPS, and step/stages processes to be implemented across the six programs, which addresses the differences in patients' custody levels and provides for consistency from program to program with respect to treatment of patients' custody levels.

On April 25, 2014, DSH filed an Update to the Court on the SVPP to "address several of the issues raised by the Special Master's report on the SVPP, including revised policies which implement recommendations made by the Special Master" and "to provide the Special Master with additional information pertaining to the steps Defendants have taken to address the Special Master's concerns." [Docket No. 5142, filed April 25, 2014]. Defendants' SVPP update indicates that its program management tracks all patients on cuff status and that a weekly cuff status meeting is held. [*See* ¶ H, "SVPP Status Report – Issues Identified in Special Master Report."] It also indicated that the program had already made some changes with regard to Orientation, DPS, and Cuff Status. "SVPP has adopted new policies related to the use of handcuffs: Orientation, DPS, and Maximum Custody. These policies were discussed during the Special Master team's prior visit and their recommendations were incorporated into the revised policies, dated April 10, 2014. Program Management tracks all patients on cuff status at a weekly status meeting. DSH also reported that as of February 27, 2014, there were 15 patients

on cuff status (six for behavioral issues, seven new admissions, and two maximum custody inmates-patients). [*See* ¶ 11, Declaration of Dante Karas, Executive Director for DSH – SVPP, Update, Docket No. 5142.]

Given the benefit to be gained from a collective review and re-evaluation of all six programs' use of cuff status, orientation, DPS, and steps/stages, and a streamlining of these processes to make them consistent across programs, plus SVPP's initiation of a review and revision of its own processes, it appears that CDCR's and DSH's review and re-evaluation of SVPP's processes should be expanded into a collective review and re-evaluation encompassing all six programs..

Accordingly, the Special Master recommends that CDCR and DSH be directed to review and re-evaluate the cuff, orientation, DPS, and step/stages processes of all six inpatient programs, under the guidance of the Special Master and his staff, with participation and input from plaintiffs. This review and re-evaluation should include the six programs' various orientation, cuff, DPS, and stage/step processes through which CDCR patients must proceed following admission to the programs, and the more restrictive conditions and subsequent stage/step processes into which patients are placed based on their behavioral/disciplinary infractions. The Special Master requests that this review and re-evaluation be conducted to determine whether the six programs' policies, as designed and implemented, achieve the proper balance between legitimate security needs and access to necessary inpatient mental health care.

Adequate staffing of treatment programs is the foundation of successful delivery of care. There was wide variability in clinical staffing levels across programs. Staffing in the treatment units at the CIW PIP, the CHCF, and CSH appeared to be generally adequate. However, the other inpatient programs fared significantly less well with staffing. VPP reported that it had its

own established mental health staffing ratios (1:15 in admission units and 1:35 in treatment units), but it did not satisfy them in all disciplines in seven acute care units and three intermediate care units.  In two units, VPP failed to comply with its own ratios in all four disciplines of psychiatry, psychology, social work, and rehabilitation therapy.  SVPP and ASH were also clinically understaffed, most notably in psychiatry, and also in psychology, social work, and rehabilitation therapy in the treatment units at ASH.  As a general matter of practice, hospitals have their own established staffing ratios which are determined according to their mission, characteristics of their own patient populations, and the staff disciplines they employ. Previously at ASH, staffing ratios of 1:15 in admission units and 1:25 in treatment units were used in accordance with the terms of the consent judgment in *Kim v. Yang, U.S. v. State of California,* Consent Judgment, Part C.1.i.[5]  While on site at ASH, the Special Master's experts received reports from ASH clinical staff that they had been able to deliver adequate treatment in sufficient amounts to patients while those staffing ratios were in place at ASH.  Since that time, however, clinical staffing levels at ASH were reduced.  According to ASH staff reports, this has affected the program's ability to maintain adequacy and sufficiency of treatment delivery.  The experience at ASH is at least informative, and may be instructive in the context of addressing and resolving the problem of low staffing levels.  Given the variability among the six programs' clinical staffing levels and their abilities to deliver appropriate treatment, the Special Master recommends that CDCR and DSH, under the guidance of the Special Master and his staff, be directed to review and re-evaluate existing clinical staffing levels in the six programs and their effect on the delivery of treatment to CDCR patients, and to develop a plan to adjust clinical

---

[5]"Integrated Therapeutic and Rehabilitative Services Planning, Interdisciplinary Teams" ("Hospitals shall ensure that the team shall . . . [n]ot include any core treatment team members with a case load exceeding 1:15 in admission teams (new admissions of 90 days for less), and, on average, 1:25 in all other teams at any point in time.")

staffing levels where necessary to ensure that adequate and sufficient treatment can be delivered to CDCR patients of those programs.

As summarized above, the Special Master's examination of the six inpatient programs identified a number of issues at all of them, albeit to varying degrees. Of particular concern among the Special Master's findings were the apparent deficiencies in the programs' clinical staffing levels and their effect on the delivery of mental health care to CDCR patients at those programs. Another concern lies with the seemingly endless discrepancies and discontinuities among the programs' use of orientation, cuff, and DPS, the wide variability among the steps and stages processes across the programs, and most importantly the effect of these policies and practices on the provision of an effective therapeutic environment for CDCR patients. Based on these concerns, the Special Master recommends the following:

1. That the Special Master be directed to review further all six inpatient programs, by means of paper review of the CIW PIP and CSH, and by on-site monitoring of ASH, the CHCF, SVPP and VPP, and that following the conclusion of his further review, he be directed to report his findings and conclusions to the Court.

2. That CDCR and DSH, under the guidance of the Special Master and his staff, be directed to review and re-evaluate the use of orientation, cuff status, DPS, and the steps/stages processes and any variations thereon at the six inpatient programs, and whether those policies, as designed and implemented, achieve the proper balance between legitimate security needs and access to necessary inpatient mental health care. The Special Master further recommends that he be directed to report to the court on the results of this review and re-evaluation following its conclusion.

3. That CDCR and DSH, under the guidance of the Special Master and his staff, be directed to review and re-evaluate existing clinical staffing levels in the six inpatient programs and their effect on the delivery of treatment to CDCR patients in those programs, and to the extent indicated, develop a plan to adjust clinical staffing levels where necessary to ensure that adequate and sufficient treatment can be delivered to CDCR patients at those programs.  The Special Master further recommends that he be directed to report to the court on the results of this review and re-evaluation following its conclusion.

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

May 30, 2014

EXHIBIT A
Atascadero State Hospital (ASH)

**Atascadero State Hospital (ASH)**
September 10, 2013 – September 13, 2013
October 8, 2013 – October 10, 2013
October 15, 2013 – October 17, 2013
November 4, 2013 – November 6, 2013
February 11, 2014 – February 13, 2014

## I.    INTRODUCTION

Members of the Special Master's staff of experts and monitors examined the acute and intermediate care programs at ASH over the course of five on-site visits, beginning in September 2014 and concluding in February 2014.  *Coleman* class patients generally were housed in Program V Unit 27, which was an acute care admissions unit, and in five intermediate care units also within Program V.  As of the time of the Special Master's latest visit in February 2014, there were 207 *Coleman* class patients at ASH.

## II.    SUMMARY OF THE FINDINGS

- **The vacancy rate among mental health staff at ASH was relatively low, except in psychiatry.**

- **In the admissions unit, the clinician-to-patient ratio was richer than the ratio of 1:15 which had been used previously, but the psychiatrist-to-patient ratio was deficient.**

- **In the treatment units, the clinician-to-patient ratio was deficient.**

- **Due to staffing challenges, the frequency of IDTT meetings and review of patients' treatment plans had changed from monthly to quarterly.**

- **The quality of IDTT meetings varied across the treatment units, from positive and therapeutic to problematic in the area of treatment planning.  Behaviorally-based treatment plans were nearly nonexistent.**

- **Group therapy made up the majority of treatment given at ASH, and generally the treatment within the groups was adequate.**

- **The average number of weekly group treatment hours per patient had dropped significantly since 2011.**

- **Individual treatment was rarely offered to patients, even if they were not ready for group therapy or it was contraindicated for them due to their conditions.**

- **Although psychiatry contacts were required monthly at a minimum, they were taking place more often where clinically indicated. Progress notes were predominantly repeats of earlier notes.**

- **Decisions to transfer patients from admissions to treatment units were not clinically driven; psychiatrists did not have input into these decisions.**

- **The Enhanced Treatment Unit (ETU) pilot for treatment of physically aggressive and high-risk patients appeared to be effective and showed promise.**

- **ASH did not have a "cuff status" in its program.**

- **ASH had a five-stage access process, the Hospital Access System that offered incentives and permitted patients to advance toward being allowed increasing freedom of movement and access to an increasing number of destinations within the facility.**

- **From June 7, 2013 to January 30, 2014, 97 percent of patient transfers to ASH were timely, with an average transfer time of six days.**

- **According to staff reports, ASH discharged some patients prematurely, based more on their lengths of stay rather than clinical reasons.**

- **Parole planning for patients approaching release was nearly non-existent at ASH and primarily was left up to CDCR.**

- **For patient disciplinary problems, ASH did not use a process similar to the CDCR Rules Violation Report (RVR) process but instead addressed disciplinary issues through the treatment team.**

- **Aggressive or self-harming patients were accompanied by a staff member at all times, usually for one to three days, or until it was resolved.**

- **ASH had a highly structured quality review/performance improvement system in place.**

- **There were no patient reports of any problems with laundry or meals at ASH.**

- **Patients were allowed daily, contact visits in the visiting center.**

- **Patients had appropriate access to the law library at ASH.**

- **If patients had complaints or concerns with services or treatment at ASH, they had direct telephone access to a patients' rights advocate and grievances could be aired at Hospital Advisory Council meetings.**

## III.  CENSUS

On February 10, 2014, there were 207 CDCR *Coleman* class inpatients at ASH.  For *Coleman* patients, ASH typically used Program V, where it allocated 256 beds for them. Program V consisted of an acute care admissions unit (Unit 27) and five intermediate care treatment units (Units 28, 31, 32, 33, and 34).  Of the 207 *Coleman* patients, 188 were housed in Program V.  The remaining 19 were housed in non-Program V units.

## IV.  STAFFING

The vacancy rate among mental health staff at ASH was relatively low, except in psychiatry.[6]

### 1.    Administrative, Clinical, and Correctional Staffing

Positions for the executive director, clinical administrator, hospital administrator, and program assistant, chief psychiatrist, chief social worker, chief recreational therapist, and chief psychologist were filled.  Positions for program director and nursing coordinator were filled by staff in acting capacities.  Because the medical director had been on extended leave, the director of forensics was covering that position, in addition to the chief physician position.

Of 223 allocated clinical positions, including nursing, 189.5 were filled, for a vacancy rate of 15 percent.  With two vacancies covered by contractors, the functional vacancy rate was 14 percent.  No positions were designated as "blanket positions."

Psychiatrists.  The senior psychiatrist supervisor position and 5.5 of the nine staff psychiatrist positions were vacant, for a 61-percent vacancy rate.  Use of two contractors reduced

---

[6]Source of staffing information reported herein was information provided to the monitor while on site at ASH during the February 2014 visit.

the functional vacancy rate for staff psychiatry to 39 percent.  A forensic nurse practitioner's services were used to augment the psychiatry staff.  The shortage of psychiatrists led to limitations on participation by psychiatry on treatment teams and according to staff reports, it affected staff morale, quality of care, and use of emergency measures to help close the gap in coverage.  Psychiatrists reported meeting with patients monthly and more frequently, if clinically indicated.  They indicated that the psychiatry shortage led to expanded activities by disciplines that encroached upon psychiatry's traditional role.

Staff attributed the psychiatry shortage to lower salaries for psychiatrists at ASH than in CDCR and the private sector, the remote location and high cost of living in the area, the lack of a "feeder" medical school or fellowship program, and limited opportunity for professional growth at ASH.  Staff reported a perception of a general lack of support for psychiatrists, and an abrupt termination of contract psychiatrists and retired annuitants following the dissolution of a consent decree that had been entered into pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA).  Because supervisors were not paid overtime pay, many staff psychiatrists did not seek supervisory positions, resulting in their becoming supervised/managed by registered nurses (RNs), rehabilitation therapists, and psych techs who accepted management positions.  Also, the State Personnel Board website had previously published erroneous psychiatry salaries at less than half of what they actually were, deterring possible interest in posted positions.

Given its difficulties with psychiatry staffing, ASH sought and obtained a site-specific increase in the contract psychiatry rate of pay to $200 per hour.  This increase was approved by DSH and was pending approval by the DGS at the time of the February 2014 visit.

Psychologists.  The one senior psychologist supervisor position was filled.  Seven of eight allocated staff psychologist positions were filled, for a vacancy rate of 12.5 percent.

61

ASH indicated it was advertising and reaching out to internship directors to recruit psychologists. The chief psychologist reported making telephone calls to solicit candidates.

Social Workers. ASH reported that the 0.5 supervising social worker position and all eight social worker positions were filled. Three of the social workers were not licensed.

Rehabilitation Therapists. The 0.5 supervising rehabilitation therapist position was filled. Six of eight rehabilitation therapist positions were filled, for a 25-percent vacancy rate.

RNs. Of 48 RN positions, 44 were filled and four were vacant, for an 8.4-percent vacancy rate.

Senior Psych Techs. Seventeen of 18 senior psych tech positions were filled, for a six-percent vacancy rate.

Psych Techs. Of 111 psych tech positions, 93 were filled and 18 were vacant, for a vacancy rate of 16 percent.

Unit Supervisors. Of the six units designated for the *Coleman* class, one did not have its unit supervisor position filled, for a 17-percent vacancy rate.

Correctional Staff. ASH did not use CDCR correctional officers, but employed Department of Police Services staff to provide security. Police Services staff patrolled ASH's exterior and interior, and responded to emergencies, and was described as an integral "part of the team." The Police Services chief reported directly to the hospital administrator and was under the full control of DSH and ASH.

### 2.    Staff-to-Patient Ratios

Program V's admission unit (Unit 27), which served the *Coleman* class, was more richly staffed than the other units, with one psychiatrist, two psychologists, two rehabilitation

therapists, and two social workers.  Given Unit 27's patient census of 25 on February 10, 2014,

the clinician-to-patient ratio for psychologists, rehabilitation therapists, and social workers was

1:12.5.  The psychiatrist-to-patient ratio was 1:25.  For February 2014, ASH reported a psych

tech-to-patient ratio of 1:7 for the morning and afternoon shifts, and 1:15 for the overnight shift.

ASH further reported a RN-to-patient ratio of 1:10 for the morning shift, 1:14 for the afternoon

shift, and 1:18 for the overnight shift.

Clinician-to-patient ratios in Program V's five treatment units were based on each unit's

own census.  On February 10, 2014, the five treatment units had censuses ranging from 37 to 42

patients.  Each unit was assigned one psychiatrist, one psychologist, one rehabilitation therapist,

and one social worker.  The respective clinician-to-patient ratios for these collective disciplines

ranged from 1:37 to 1:42.  For February 2014, treatment unit psych tech-to-patient ratios ranged

from 1:9 to 1:13 for the morning shift, 1:10 to 1:12 for the afternoon shift, and 1:16 to 1:20 for

the overnight shift.  ASH further reported RN-to-patient ratios of 1:21 to 1:32 for the five

treatment units for the morning shift, 1:23 to 1:34 for the afternoon shift, and 1:30 to 1:58 for the

overnight shift.

### 3.    Staff Training

For training purposes, ASH employees were separated into 16 categories.  Nurses and

psych techs were in Category 1.  Their courses included mental disorders, therapeutic

communications, psychiatric terminology, cultural diversity, fire, life, general safety, infection

control, reporting of abuse and neglect, patients' rights, therapeutic strategies and interventions,

and suicide review, as well as CPR and first aid training.  Category 1 compliance with employee

training requirements exceeded 90 percent.

Category 2 employees included social workers, rehabilitation therapists, unit supervisors, teachers, and registered dietitians.  Category 3 employees included physicians, psychiatrists, and psychologists.  Categories 2 and 3 included many of the same classes as Category 1.  Compliance for both Categories 2 and 3 approached 100 percent.

Categories 4 through 16 employees were not involved in direct patient care.  This included Category 7, which was Police Services staff.  Training included an overview of mental health issues, use of force, tactical communications, arrest and control, baton, and chemical agents, on a 24-month cycle.  It did not include therapeutic communications, or psychiatric terminology.

## V.    TREATMENT AND CLINICAL SERVICES

Within the admission process, each patient had two sponsors assigned to him, one for day and one for evening.  Sponsors were essentially the patient's "point persons," so that the patient had someone to talk to, confide in, or share troubling concerns with.  Sponsors were then assigned on the treatment units.

CDCR inmates were treated in Units 28, 31, 32, 33, and 34.  Patient movement throughout the facility was controlled by staff escorts and staff-based decisions regarding patient levels.  Initially, patients were escorted to off-unit activities such as groups and medical appointments, but as the patient demonstrated adherence to rules and ability to manage his behavior and function independently, he was moved through a system of increasing levels of freedom until eventually he was responsible for getting himself to his own appointments.

Patients offered generally positive comments about their treatment at ASH, saying that staff were accessible and responsive.

1.    **IDTTs**

The Special Master's expert observed a number of IDTT meetings over the course of the six tours of ASH. Due to staffing challenges, the required frequency of IDTT meetings had dropped from monthly to quarterly. Several units continued to review their patients monthly but had to submit a request to do so. Treatment plans were reviewed quarterly.

During the September 2013 visit, the Special Master's expert observed treatment teams on Units 27, 28, 31, and 33. Treatment teams observed in Unit 27 were well run except for the absence of a psychiatrist, which necessitated transmittal of any questions for the psychiatrist via a sick call request. Otherwise, the teams functioned very positively and therapeutically, with appropriate clinical interaction and patient-team interactions. Treatment plans were discussed, printed, and provided to the patient.

The treatment team in Unit 28 was run by a psychiatrist, and had two psychologists, psych techs and a nurse, but no social worker or rehabilitation therapist. The treatment team meeting on Unit 33 was led by a psych tech and did not have a psychiatrist. While it was clear that the teams in Units 28 and 33 were attempting to discuss their patients in detail, it was also clear that there was not enough necessary information or staff participation. Although the team reviewed the treatment plan with the patient, it was not clear that he understood its components. The Special Master's expert was also notified that the intermediate care program treatment team meetings were being reduced in frequency from monthly to quarterly.

Treatment team members in Unit 31 included a psychiatrist, a psychologist, a psych tech, a rehabilitation therapist, and an RN. Not all meetings were attended by the psychiatrist, and the psychologist led meetings when the psychiatrist was unavailable. Patients attended the meetings. Projection of the treatment plan on a PowerPoint screen was helpful, but there were significant

problems in the treatment planning process in the area of discharge planning and communications with CDCR. A patient scheduled for release from CDCR was clearly not ready for discharge, with psychotic symptoms associated with significant functional impairments. Staff were unaware whether mentally disordered offender (MDO) proceedings were going to be initiated and reported no means by which they could obtain the answer. They anticipated discharging this patient back to CDCR before his release. The expectation was that discharge planning would be done by CDCR staff, even though there was no routine communication with CDCR staff concerning this.

Treatment team meetings observed by the Special Master's expert during the February 2014 tour indicated that individualized treatment planning was occurring, but the treatment plans themselves were somewhat generic. The Special Master's expert observed four meetings on Unit 33. Meetings were reportedly attended by the psychiatrist, the psychologist, social worker, rehabilitation therapist, nurse, and a psych tech, although the psychiatrist was out sick on the day of the observed meeting. All team members appeared to know the patients well and had good rapport with them in the meeting. The team had relevant information such as the frequency of patients' attendance at groups, and solicited patients' input on their interests and groups they would like to attend. Chart reviews indicated assignments to core groups amounted to ten or fewer hours per week, although there was little specificity regarding supplemental group treatment planning. Charts also reflected that documentation from all professional disciplines ranged from adequate to good, and that treatment plans were updated regularly.

Treatment plans tended to be overly generic. They contained vague treatment goals and inadequate interventions, with little to no data on treatment progress. There was also a clear pattern of failure to revise treatment plans even when the patient failed to progress or experience

other significant clinical events that would ordinarily result in revision of the treatment plan. There was almost never a behavior therapy-based treatment plan, despite the importance of that type of plan in the context of ASH.

Although patients' charts generally contained detailed and potentially useful assessments by all clinical disciplines, this did not reliably translate into clinically effective treatment plans. Follow-up treatment plans noted scheduled group therapy hours and percentage of attendance but did not utilize the information in the initial evaluations or in subsequent clinician contacts to craft treatment plans that were aimed toward improving group participation.

For patients who were difficult to treat, i.e. who resisted treatment, either because of negative symptoms such as withdrawal, isolation, hopelessness or low energy, or because of positive symptoms such as paranoia, delusions, and hallucinations, unit staff appeared to have difficulty developing treatment plans that were individualized with specific interventions that extended beyond encouragement to attend groups.

## 2.    **Group Therapy**

Treatment at ASH was delivered primarily through the group format, supplemented by some individual therapy where clinically indicated. Group treatment began while patients were on admission status in Unit 27, after they had attended orientation and while their intake assessments were still ongoing. They attended two new admissions groups per day for four days, plus three additional groups per day by their own selection. When the census of *Coleman* class patients in Unit 27 increased, they may be housed in another unit, but appropriate group offerings there for CDCR patients may be few to none. In addition, it was learned during the monitor's September 2013 tour that cutbacks and related staffing decreases led to a decrease in

the frequency of those groups that met twice per week to only once, reducing the likelihood of positive treatment gains.

In late 2012, ASH administrators restructured group therapy activities into a "treatment mall" paradigm, which involved division of groups into two classifications: core and centralized. Core groups were those run by members of the patient's treatment team, on his treatment unit, and comprise the majority of treatment services to CDCR inmates at ASH. Each treatment unit was required to schedule a minimum of ten 50-minute core groups per week. Core group offerings must include Orientation, Mental Health Wellness, Aggression Reduction, Staying Safe, Healthy Living, and Preparing for Discharge. Centralized groups were opened to all patients throughout the facility and were held in centralized areas such as the treatment mall, music center, gymnasium, and outdoor courtyards, and consisted of activities focused on specific areas such as substance abuse, and veterans' issues. These required group facilitators who have specialized expertise, for example in DBT, or involve special supplies or space, such as musical instruments, art supplies, or weight-lifting machines. The treatment mall paradigm was adopted to increase the amount of contact time between patients and clinicians and used staff resources more efficiently.

Notably, the number of scheduled hours of group therapy per patient per week had decreased dramatically since 2011, when the average number per week was 12.94. In 2012 it was 8.87, and in 2013 it was only 7.23. The largest group enrollment was for recreation therapy, comprising 27.4 percent of all group sections. The next largest group enrollment was healthy living, with 96 sections or 20 percent of all sections.

Generally, the treatment provided via groups was adequate. Therapeutic groups observed in the treatment mall and on Unit 31, and recreational groups in the main yard and the

68

gymnasium were all conducted competently. Some observed groups were well facilitated, and others less so. In some instances, groups covering the same themes were run significantly differently, indicating a need for approved group curricula. Some of the facilitators were well skilled in group process and engagement of all participants, particularly for drawing out lower-functioning and more acutely ill patients. Other facilitators did not appear to appreciate the usefulness of certain activities to enhance group understanding of topics and concepts, further indicating the utility of approved group curricula. The Special Master's expert observed that group observation by the more highly skilled and qualified facilitators may be helpful when included in peer review/quality improvement strategies. Training opportunities through continuing education may also prove helpful to the institution.

During the monitor's September 2013 tour, staff reported that patients received an average of eight weekly hours of therapeutic groups, but provided data indicated that average scheduled and attended hours were less, with an average of 7.1 weekly hours scheduled and an average of 4.6 hours attended. Core groups, such as mental health education, depression, aggression, and discharge planning, were facilitated by members of the patient's treatment team and were typically conducted on the treatment units. Centralized programming, which included groups with such topics as DBT, sexual abuse, and substance abuse, were facilitated in the treatment mall by subject-matter expert/clinicians who usually were not members of the patient's treatment team. Some groups followed a lecture format and others relied almost exclusively on group discussion. Most groups lasted approximately 45 to 50 minutes and began and ended on time. Group treatment was documented in patients' charts to varying degrees, with monthly progress notes that characterized the patient's overall functioning, as well as more frequent

detailed notes of the patient's level of participation. Space for groups on the units and in the treatment mall was not an issue at ASH.

At the time of the monitor's February 2014 tour, the number of core treatment hours continued to be limited to five to eight hours per week. The Special Master's expert observed groups on preparing for discharge and on cognitive therapy for psychotic symptoms. In the former group, patients were passive and poorly engaged, even though three of the five group participants were expected to return to CDCR prisons and were years away from potential release to the community. No groups on return to prison were offered, although they should be developed and offered as there is apparent great need for such groups. It appeared that patients were sometimes assigned to groups based on availability rather than appropriateness of the group to the patients' needs. In the latter group, however, many of the approximately 20 participants appeared to be interested and engaged with the material and the co-facilitators.

### 3.    Individual Therapy

With the units run as therapeutic milieus, all staff were expected to interact frequently and therapeutically with patients. Consequently, patients were receiving a significant amount of staff contact and positive reinforcement for displaying pro-social behaviors and positive coping skills, and redirection and problem-solving assistance when demonstrating problematic behaviors.

As noted above, treatment at ASH was delivered primarily through therapeutic groups. Occasionally, treatment was supplemented through the use of individual therapy when it was clinically indicated. One form of this was referred to at ASH as psychologists' "walk and talks." This meant that several times per week they walked the units and engaged in interactions with patients, some of which were planned, some patient-initiated, or impromptu. A few

psychologists held open office hours each week to allow patients predictable access to a psychologist, as needed.

Individual treatment was rarely offered, even to patients who were clearly not ready for group therapy or for whom group treatment was contraindicated, for example for a patient who was highly paranoid. Staff reported that the lack of individual therapy was due in large part to workload demands, but also to some extent to the culture of the facility. The Special Master's expert observed that there did not appear to be an expectation that individual treatment would be provided to the majority of patients despite its value to enhancing treatment effectiveness, as well as out of necessity for many patients. Behavioral therapy-based treatment plans were nearly nonexistent, although they may be clinically indicated for some patients in that setting. When patients had failed to improve even after treatment team staff had exhausted their clinical resources, staff did not consistently consult with the PBST or consider referring the patient to the acute level of care. Instead, the patient was usually left in the unit, and may spontaneously improve, sometimes even while suspended from active treatment, or was clinically discharged and returned to the referring institution with little to no improvement in mental status and symptom presentation.

Some treatment staff reported using behavioral processes, such as using music as a positive reinforcement and reward for patients who attend groups, but these strategies were not documented in patients' treatment plans. It appeared that no behavioral plans were in place at the time of the November 2013 tour. Although staff mentioned the possibility of peer mentors to assist clinicians with efforts to engage patients, in practice this technique seemed to be limited.

The Special Master's expert observed that the treatment plan form was not conducive to documenting behavioral techniques used by treatment staff.

### 4.    Other Treatment Issues

Monthly psychiatric notes were predominantly repeats of previous notes, with little additional narrative concerning updates on clinical status.  Individual contacts with the psychiatrist were required monthly at a minimum, and according to staff reports were taking place, more often where clinically indicated.  Some patients were being seen more frequently because of sick-call referrals.  Psychiatrists assigned to the units also held open office hours and "walk and talks" so that they could monitor and assess patients more frequently, and intervene more rapidly to address problems with medications and/or increased symptomatology.

Psychiatrists expressed concern with what they considered the non-clinical decision making process that transferred patients from admissions to treatment units.  They reported being directed to sign transfer orders, but not having input into these decisions.  They also reported patient transfers from admissions units before they believed they were clinically advisable and expressed a fear of reprisals if they refused to sign them.

Because high psychiatrist vacancies led to an inability to complete all regular duties, the psychiatry department created a crisis document in September 2013 that prioritized tasks and indicated which ones could be eliminated when the psychiatry caseload increased to a particular level.  However, this actually impacted all disciplines as some psychiatry duties, including forensic reporting and testimony, were shifted to others.

Social workers and rehabilitation therapists reported that they frequently interacted with patients apart from structured therapeutic activities.

Staff indicated that ASH was running a pilot program known as the Enhanced Treatment Unit (ETU) on locked Unit 4.  Specific goals and outcome measures for the ETU had been identified and were being monitored.  Its purpose was to provide a secure, 24-hour living area for

the treatment of physically-aggressive and high-risk patients who had not responded to treatment. Its stated goals were to provide:

- Psychiatric stabilization

- Diagnostic clarification

- Assessment and evaluation to determine the most effective treatment regimen

- Provide the patient with a realistic opportunity to recover and hope for an improved quality of life, and

- Protect staff and patients from harm

No CDCR patients were being treated there at the time of the site visits, but four had been treated in it previously. Stays were expected to be brief. Patients were accepted if there was a reasonable clinical expectation of behavioral change within 90 days of enhanced treatment. The ETU program appeared to have been well developed prior to implementation and included a comprehensive training plan for staff working on the unit

The psychiatrist and psychologist were required to have expertise in assessing and managing aggressive patients. Each treatment team member had assigned responsibilities. The psychiatrist was required to provide daily rounds to each patient and document weekly in progress notes. The psychologist was required to conduct additional assessments and complete the PCL-SV. Elevated PCL-SV scores were reviewed by the Wellness and Recovery Treatment Team (WRTT), as patients with high scores were deemed likely inappropriate for ETU placement. The social worker must demonstrate competence in group and individual treatment of patients who were persistently and severely mentally ill. Members of the WRTT included the unit supervisor, unit psychiatrist, unit psychologist, social worker, rehabilitation therapist, RN, psych tech, and the ETU coordinator, and additional members may be added as needed. There was also a therapeutic Milieu, Transition, and Evaluation (MTE) coordinator.

73

Following a referral to the program, the WRTT reviewed and decided whether to admit the patient.  The referral was then sent to the Program Director, the MTE coordinator and then finally the ETU admissions team which consisted of a psychiatrist, psychologist, MTE coordinator, unit supervisor and/or program management designee.  The treatment team handled orientation to the unit, medication management, psychological interventions, behavioral interventions, milieu treatment, and psychoeducational groups.  All treatment was individualized and may be adapted by adding additional treatment options as needed.  Individual therapy was required for all patients unless precluded by safety concerns.  Treatment teams met weekly, allowing for rapid modification of the treatment plan when needed.

The ETU housed a maximum of 12 patients and was staffed appropriately, with seven nursing staff on the morning and afternoon shifts, and four assigned to the overnight shift.  There was one unit supervisor, plus a 0.6 psychiatrist, one psychologist, one clinical social worker, and one rehabilitation therapist.  Two Police Services officers were on the unit at all times.  Because of the smaller census and higher staff-to-patient ratio in the ETU, staff would be better able to observe patients and identify precursors to aggressive or dangerous behaviors.  Once those precursors were identified, all staff were tasked with intervening immediately to prevent escalation.  The unit operated on basic behavioral principles with staff providing attention and other positive reinforcement when patients engaged in prosocial behaviors.  A more extensive behavioral plan would be incorporated into a patient's treatment plan when needed, and all staff would be responsible for its implementation.

## VI.    PATIENT ACCESS TO TREATMENT

ASH monitored and regulated patient movement through the HAS, which permitted patient advancement through five distinct access levels. HAS was designed to allow patients to

leave their units unescorted while ensuring they were always accounted for, and that the environment remained safe. It afforded patients freedom of movement but within the limits, as guided by observed behaviors and risk factors. It also provided incentives that supported patient treatment commensurate with patients' levels of functioning and risk factors. Criteria for advancement or reduction to another access level, access to off-unit destinations, and patient activities were set forth in the HAS manual. Level changes could not be used punitively.

The treatment teams were primarily responsible to regularly evaluate the patient's progress and determine his access level, based on the patient's demonstration of adherence to rules, milieu-specific expectations, self-regulation of behavior, maintenance of therapeutic relationships, independent functioning, and taking responsible for getting to appointments on time.

Newly admitted patients remained at Level 1 for a minimum of seven days. At this level, patients typically had a staff escort and continual staff supervision while attending off-unit activities such as groups and medical appointments. Patients who demonstrated the ability to navigate themselves directly to and from a single destination advanced to Level 2, where they were allowed to attend off-unit destinations unescorted where staff was present.

Patients who demonstrated the ability to conform to expectations of a hospital-wide environment and behave in a safe, responsible manner (not necessary for extended periods) advanced to Level 3. This permitted them access to three destinations, and in activities in which their behavior could be assessed in a variety of settings, while also providing them with the necessary skills to reduce the risk of problematic behavior. Patients who maintained themselves at Level 3 for 90 days advanced to Level 4, which also provided access to three destinations.

Patients who attained Level 5 were given access to six destinations. These patients had consistently displayed good behaviors across a variety of hospital settings and were recommended by the treatment team for community placement. "Goldenrod" passes were temporarily issued to patients at vocational assignments or other off-unit recovery activities, and could be used for breaks during work or for job-related errands.

ASH did not utilize "cuff status" in its program. Patients who arrived from CDCR remained in handcuffs in the "admissions suite" until seen initially by nursing, which occurred shortly after arrival. The handcuffs were removed prior to commencing the admission process unless clinically contraindicated, which was then addressed by the clinical staff. There were no stages of programming or treatment at ASH that required patients to move around the hospital or attend any treatment services in handcuffs.

## VII. REFERRALS AND TRANSFERS

The director of forensics reviewed all patient referral packets, decided to accept or reject, and conveyed the clinical input at any meetings of the CCAT. Documentation in referral packets varied. The most common problems were inadequate medical and clinical information, and sparse and generic CDCR admission paperwork. Referral documentation also often directed the reader to consult the UHR regarding medical issues, but ASH lacked access to paper UHRs, eUHRs, SOMS (Strategic Offender Management System), and C-Files. The monitor brought this to the attention of DSH and CDCR headquarters staff during the February 2014 site visit, which began to address the lack of access. During follow-up with CDCR staff in April 2014, the monitor was informed by CDCR that the department has commenced the process of providing access to the eUHR to ASH clinical staff.

The Special Master's expert's review of all 20 rejections of *Coleman* class referrals from April 19 to July 31, 2013 indicated various reasons for rejection.  Reasons included diagnostic disagreements, patient medical conditions and cognitive disorders (which staff indicated ASH was not equipped to treat), patients with RVRs which did not reveal whether the charge indicated a propensity for violence that disqualified transfer to ASH, patients who did not meet criteria for orders for involuntary administration of medications, and patients whose remaining prison sentences were limited.  Another reason for rejection was that the patient had already attained "maximum benefit."  In some cases, these patients had already been treated in a DSH program but due to the patient's lack of participation in treatment or ineligibility for an involuntary medication order, it was decided that the patient should remain at CDCR.

From June 7, 2013 to January 30, 2014, 114 CDCR patients were admitted and transferred to ASH. [7]  Of these 114 admissions, 111 or 97 percent transferred within the 30-day timeframe, and three or three percent transferred late.  The transfers within the 30-day timeframe took an average of six days, with a range of zero to 25 days.

## VIII.  ADMISSIONS AND DISCHARGES

### 1.    Admissions Unit

Staff and workload issues led ASH to limit total weekly admissions to 20 patients.  Newly admitted *Coleman* class patients initially spent 24 to 48 hours in the "admissions suite" before transfer to an admission unit, primarily admissions Unit 27, which served Program V.  If all Unit 27 beds were filled or the Unit had already admitted four patients that week, then additional incoming patients were housed in other admissions units.

CDCR patients typically spent 45 to 90 days in the admissions unit, where they lived in single rooms or dorms with locked doors, were given daily access to the dayroom, television

---

[7] Source for ASH transfer data:  DSH Bed Utilization Management Report dated January 31, 2014.

room, and phone usage, and were oriented to ASH's mental health programming.  In the

admissions unit, patients received treatment plans and initial, seven-day, and monthly follow-up

IDTT reviews, attended morning meetings and group treatment, and were assessed for readiness

to move freely within the facility and thereby fully participate in therapeutic and other activities.

Admissions unit patients were also assigned two sponsors, one for the morning shift and one for

the afternoon shift, who served as a "point person" for the patient to confer with.

      The amount of activities varied across admission units, with more on Unit 27 than others.

For example, staff reported that the admissions unit which typically housed patients who were

incompetent to stand trial offered no groups, and otherwise there was little to do on that unit.

      Once clinical and nursing staff completed evaluations and patients were stabilized, they

were typically transferred from the admissions unit to one of the treatment units for CDCR

patients.  Decision to transfer to treatment units were processed through the transfer desk and

required a psychiatric order.  Clinical staff typically had no participation in transfer decisions and

was pressured not to interfere with them.  Transfers to treatment units were decided by non-

clinicians for administrative reasons, such as patient length of stay and bed availability.  The

process involved a psych tech contacting the nursing coordinator, who then spoke with the unit

manager, another psych tech, who asked the psychiatrist to write the transfer order.

     **2.**    **Discharges**

      Staff reported that ASH discharged some patients before they had reached their

"maximum benefit" of the program.  The director of forensics reviewed ASH discharges to

CDCR.  Discharge decisions were based largely on patients' lengths of stay, as reflected on the

DSH Bed UM report.  In particular, patients participating in Dialectical Behavioral Treatment

(DBT) groups were often discharged prior to completion of the six to eight-month course of treatment.

Review of patient medical records corroborated staff reports of some premature patient discharges. While there was no apparent overall pattern of early discharges, in five of seven or 71 percent of reviewed cases patients were discharged prior to receipt of adequate therapeutic intervention. Notably, these patients' mental illnesses prevented them from engaging properly in treatment. At times, group therapy was suspended or stopped due to "psychiatric instability," but document review did not indicate that alternative interventions, such as behavioral therapy, were offered. In two cases, the admissions unit psychiatrist dictated the discharge decision only seven days after patient admission, which was not even an adequate amount of time to assess a chronically mentally ill patient. Although the five patients had not achieved "maximum benefit," they were returned to CDCR without any improvement or recommendations to enable CDCR to better treat them.

Discharges of CDCR patients averaged 15 monthly, and ranged from nine to 20. ASH staff indicated that some discharges were of CDCR patients who were deemed "inappropriate" for intermediate inpatient care and who were typically returned to CDCR fairly shortly after admission to ASH. A report indicated that from January through September 2013, 16 or 12 percent of all CDCR patients at ASH were discharged from an admissions unit.

Discharge planning at ASH was problematic. Reviewed discharge summaries for CDCR patients lacked detail, which staff confirmed and attributed to staff shortages and workload problems. Staff also indicated that ASH needed to improve transitioning of patients from discharge to CDCR administrative segregation and Enhanced Outpatient Program (EOP) units. Staff reported that ASH clinicians, including the director of forensics, rarely, if ever, called

CDCR referring clinicians or DSH coordinators; communication with the coordinators consisted of infrequent email. As a result, potential opportunities to intercept premature discharges and avoid discontinuity of care were lost.

The Special Master's expert observed a discharge preparation group on treatment Unit 31 during the February 2014 visit. The treatment team assigned patients to this 12-week group that was facilitated by two clinical social workers and attended by five patients. The group focused on preparation for discharge to the community. Three of the five patients were discharging to CDCR and one was an MDO who would not be discharging from ASH. Only one patient indicated that he was possibly being discharged to the community. It appeared that ASH did not have a group for patients discharging back to CDCR, which was a serious gap in its planning and preparation for these patients.

### 3. **Parole Planning**

ASH considered parole planning for patients with imminent release dates to be CDCR's responsibility, with little coordination between ASH and CDCR. Staff noted that ASH typically attempted to discharge paroling patients one to two weeks prior to their release dates so that CDCR would handle re-entry planning. The scant attention paid to parole planning involved correctional counselors from the California Men's Colony (CMC), a nearby CDCR prison, meeting with ASH patients who had upcoming parole dates. Staff reported occasionally assisting patients with applications for SSI.

## IX. **PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE**

ASH did not use a disciplinary process similar to the RVR process used at SVPP and VPP. All behavioral issues were addressed by the treatment team.

Patients deemed to require close monitoring due to aggressive or self-harming behavior were accompanied by a staff member at all times, generally lasting from one to three days, with the assigned staff member typically changing every two to three hours. During the first eight months of 2013, this process was used 152 times for suicide prevention and 34 times for medical issues.

Key indicator reports captured and tracked incidents of aggressive behavior. They indicated that aggressive acts among patients and directed toward staff resulting in a "major injury" substantially decreased from January 2011 to July 2013.

In 2011, there were 103 or an average of 8.6 per month patient-on-patient aggressive acts resulting in a major injury. In 2012, there were 88 or an average of 7.3 per month patient-on-patient acts. During January through July 2013, there were 24 or an average of 3.4 per month patient-on-patient acts, indicating a 60-percent decline.

In 2011, there were 130 or an average of 10.8 per month patient-on-staff aggressive acts resulting in a major injury. In 2013, there were 81 or an average of 6.8 per month patient-on-staff aggressive acts resulting in a major injury. During January through July 2013, there were 25 or an average of 3.6 per month patient-on-staff aggressive acts resulting in major injury, representing a 67-percent decline.

Staff opined that the decline in aggressive behavior was related to the loosening of restrictions on the use of psychotropic medications, restraint, and seclusion, following termination of the Department of Justice's Enhancement Plan.

## X.    USE OF SECLUSION AND RESTRAINT

Generally, ASH used a combination of restraint, seclusion, and/or assignment of a staff member to accompany a patient 24 hours per day to quickly stabilize patients who were

struggling to program.  According to ASH policy on restraint and seclusion, the room used for seclusion must have appropriate light and ventilation, a window that permits a view of the room, and provide maximum safety, comfort, and freedom of movement for the patient.  Seclusion rooms were used properly at ASH.

All Program V units were equipped with one seclusion room and one restraint room. ASH also did not have the equivalent of a crisis bed unit, did not return patients to admission units for crisis care, and did not refer patients to the VPP.  Staff reported that treatment teams handled most incidents of acute decompensation on the individual living units.

Reasons for patient seclusion or restraint included verbally and/or physically aggressive behavior toward peers or staff, self-harm, attempted escape, or medical issues.  Patients placed in "full-bed" restraint were continuously monitored by staff sitting outside the restraint room.  As part of the process for discontinuing a "full-bed" restraint, patients were sometimes removed from the restraint cell and strapped to a chair, the so-called "non-ambulatory" restraint, in addition to ambulatory restraint (meaning restraint of wrists only).

There were 76 instances of full-bed restraints during January through August 2013. Duration was 24 hours or less in 60 or 79 percent of these cases.  It exceeded 24 hours in 16 or 21 percent of cases.  Restraint exceeded 36 hours in 11 or 14 percent of cases, and exceeded 48 hours in seven or nine percent of cases.  Specific durations of the seven full-bed restraints that exceeded 48 hours were (1) 94.7 hours or nearly four days, (2 and 3) two instances of 65.25 hours, (4) 58.25 hours, (5) 53.75 hours, (6) 52.9 hours, and (7) 51.7 hours.

Patients placed in seclusion were continuously monitored by staff sitting outside of the seclusion room.  From January through August 2013, there were 63 uses of seclusion.  Durations were 24 hours or less in 41 or 65 percent of cases.  They exceeded 24 hours in 22 or 35 percent

of cases.  They exceeded 48 hours in 12 or 19 percent of cases, and exceeded 72 hours in nine or

14 percent of cases.  In eight of the nine instances where seclusion exceeded 72 hours, durations

were (1) 325.25 hours or over 13 days, (2) 170 hours or one week, (3) 150 hours or over six

days, (4) 143.25 hours, (5) 142.1 hours, (6) 126 hours, (7) 125.3 hours, and (8) 80.5 hours.

During December 2013 and January 2014, there were seven cases of full-bed restraint,

two of non-ambulatory restraint, and three of ambulatory-wrist restraint.  During the same

period, eight patients were placed in seclusion a total of 11 times, with three patients each having

two seclusion instances.

ASH conducted an audit of the use of seclusion and restraint in December 2013.

Examining 17 criteria, it found problems with two-hour and four-hour IDNs, documentation in

IDNs of completion of nursing assessments within 15 minutes of the initiation of restraint or

seclusion, and evidence of the initial use of prone stabilization.

## XI.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

ASH's emergency response plans were outlined in their operating manual.  The facility

used the NIMS and its component, the ICS, for emergency management.  According to policy,

all persons participating in an emergency response must be trained on the ICS.  NIMS courses

were available for staff on the department intranet.

According to policy, emergency response hospital training standards required basic first

aid training and American Heart Association basic life support training for designated staff.  The

facility directive regarding medical emergency response stated that competency-based training

was provided to staff commensurate with the designated level of emergency response.

ASH had a comprehensive performance improvement structure in place, as required by

DSH.  The process was restructured in September 2012 to include a system of quarterly reporting

to the program's Quality Council by all committees within the performance improvement structure. One of these committees was the MIRC which was chaired by the medical director and included the executive team, standards compliance director, chief of police, the treatment team, and program management.

When a patient died, the MIRC was responsible for ensuring that staff followed standardized procedures and conducted a systematic, interdisciplinary review of the death. The purpose was to identify factors that may have contributed to the patient's death and/or any gaps in services, and to recommend and/or implement corrective actions to improve staff and systems performance. This review process applied to any death of a patient while housed at ASH, within 30 days of discharge, or while being treated at a community facility. It could also be used upon request beyond the 30-day timeframe if it were determined that an in-depth review would benefit program improvement practices.

## XII.  UTILIZATION REVIEW AND QUALITY MANAGEMENT

ASH's performance improvement program, managed by the standards compliance department, was responsible for the ongoing evaluation of the quality of care at ASH. The facility used a number of data collection tools and systems to assist with these efforts.

The WaRMSS, implemented in 2008 as part of U.S. Department of Justice's Enhancement Plan, was used to track various treatment-related activities. WaRMSS was adopted by ASH and other state hospitals and supported by an information technology team in Sacramento. WaRMSS was not compatible with PaWSS which was being activated by the SVPP, VPP, and the CHCF, or with CDCR tracking systems. WaRMSS was used, among other things, to schedule and track groups (My Activity Participation and Planning – or MAPP report), manage the HAS, tracked administration of PRN and STAT medications, and tracked attendance

at treatment team meetings.  WaRMSS also stored electronic copies of each patient's admission and updated treatment plans and psychosocial rehabilitation (PSR) progress notes, and tracked various key indicators (psychiatric, medical and environmental).

The key indicator data were used to produce morning "trigger" reports, which identified individual patients who may require additional attention and/or interventions.  Key indicators included, among other things, aggressive behavior, weight change, testing positive for an illicit substance, placement on one-to-one observation, three or more falls within 30 days, and "combined pharmacology" (prescribed four or more inter-class psychotropic medications).  ASH stated that the statewide revision of the key indicators was completed on May 2, 2012 and the risk management administration letter was finalized on August 30, 2012.

The incident management system, implemented in the 1980s, tracked all "special" incidents deemed to have "an adverse effect on the safety, care, treatment and rehabilitation of patients in the hospital."  Special incidents include suicides, suicide attempts, homicides, verbal assaults on staff and peers, and physical assaults on staff and peers.  The special incident data dashboard, which also tapped into information from WaRMSS, produced for all ASH patients an "individual profile" that included previous DSH stays, suicide attempts, aggressive incidents, movement within the hospital, time in/out of seclusion and restraint, suicide watches, current medications (mental health and medical) and group attendance (number of groups scheduled and attended, number of hours attended).  The incident management system also produced monthly aggression trend reports, among other things.

The risk management system was used "to identify and reduce risk, and provide patients with interventions and corrective actions commensurate with the level of risk to maintain a safe and therapeutic environment."  Revisions to the facility risk management system began statewide

in mid-2012, with local revisions beginning April 23, 2013.  This revision was still in progress locally at the time of the February 2014 site visit, with an estimated completion date of the end of March 2014.  While revisions were in progress the system was reported to be still functioning, with implementation of changes planned one phase at a time.

The Kardex was a printed worksheet that was completed for each patient on the unit. According to policy, the information it contained was designed to assist in prioritizing the patient's care needs and providing continuity of care.  A copy was to be kept in a binder for quick reference.  The Kardex PowerPoint or Projected Electronic Kardex was a patient information system used for staff briefings/shift meetings.  Information regarding each patient on the unit was projected on the wall of the meeting room.  Information included diagnosis, criminal history, behavioral alerts and triggers, physical alerts, medication concerns, diet and legal status. According to policy, the electronic Kardex was to be updated at least monthly.

The facility's performance improvement structure included a quarterly reporting system to the Quality Council for all committees in the performance improvement system.  The Quality Council provided approval, oversight, monitoring, tracking and follow-through of all performance activities in the facility.  The executive director served as chairperson of the Quality Council.  Membership was comprised of the standards compliance director, the health and safety officer, a unit supervisor representative, and a program director representative.

In addition to the Quality Council and the MIRC, the standing performance improvement committees in place at ASH were Psychiatry Services; Psychology Services; Social Work Services; Rehabilitation Therapy Services; Nursing Services; Dental Services; Nutrition Services; Medical Services; Medication Management; UM; PRC; TSC; MRMC; FRC; V-Risk Management Committee; SPC; IMRC; ICA/PCA; RMC; Security and Contraband Committee;

Environment of Care Committee; Information Management/Information Technology; Training; Health Information Management; and Standards Compliance.

The chief psychiatrist prepared and presented quarterly reports on the psychiatry department's performance improvement activities; recruitment; statewide projects; and any additional issues related to the department. Medical Staff Committee activities that were reported may also be included in this report or are presented separately by the committee chair.

The chief of psychology prepared and presented a quarterly report on the psychology department's performance improvement activities; recruitment; assessment; audits; statewide projects; and any additional issues/concerns related to the psychology department. Special projects/workgroups that were chartered within the department would be included in this report or would be presented separately by the committee/workgroup chair.

The chief of social work was responsible for presenting a quarterly report on the social work department's performance improvement activities, recruitment, Conditional Release Program (CONREP) and discharge planning updates/issues, statewide projects, and any additional issues related to the department. Special projects/workgroups that were chartered within the department would be included in this report or presented separately by the committee/workgroup chair.

The program director of rehabilitation therapy prepared and presented a quarterly report on the rehabilitation therapy department's performance improvement activities, recruitment, statewide projects, and any additional issues related to the department. Special projects/workgroups that might be chartered within the department would be included in this report or presented separately by the committee/workgroup chair.

The nurse administrator prepared and presented quarterly reports on the department of nursing services performance improvement activities, recruitment, assessment, audits, statewide projects, and any additional issues related to the department. Special projects/workgroups that might be chartered within the department would be included in this report or presented separately by the committee/workgroup chair.

The chief dentist was charged with preparing and presenting the quarterly reports on dental services performance improvement activities, recruitment, statewide projects, refusals, audits, and any additional issues related to the department.

The director of nutritional services was responsible for preparing and presenting the quarterly reports on department of nutrition services performance improvement activities, recruitment, statewide projects, and any additional issues related to the department's clinical, administrative, and production/meal service areas. Special projects/workgroups that might be chartered within the department would be included in this report or presented separately by the committee/workgroup chair.

The chief physician and surgeon was responsible for preparing and presenting quarterly reports on the medical department's performance improvement activities, recruitment, statewide projects, and any additional issues related to the department. This report was expected to encompass information/updates on the facility lab, med surge clinic, the infirmary unit, outside medical, and central supply.

Medication management committee membership was comprised of interdisciplinary stakeholders in the medication-use process. It was co-chaired by a physician and RN, and included the standards compliance representative, data manager, pharmacy director, a health services supervisor, medication room staff and a central nursing services representative. The

88

committee operationalized a dual focus of risk management and performance improvement toward the safe use of medication. The committee was responsible for ensuring hospital-wide participation with the MVR process. The medication management committee was required to report quarterly to Quality Council and program directors.

The UM committee was chaired by psychology and included representatives of psychiatry/psychology, nursing services, and the utilization review coordinator (RN). The UM committee was designed as a component of the hospitals overall risk management system, and tasked with the development of sound systemic performance improvement recommendations that ensured quality patient care in an effective and cost efficient manner.

The program managers, unit supervisors, unit psychiatrist, senior clinicians, unit psychologist, the standards compliance director, and a health services specialist were members of the PRC. At the time of the February 2014 site visit, staff reported that due to critical staffing levels in psychiatry, there was temporary attendance exclusion for unit psychiatrists at PRC meetings. The PRC meeting also facilitated open discussion with committee members on individual cases to develop interventions, look at previous interventions or medications that were successful, or find a different placement that could be beneficial to the patient's treatment.

The chief psychiatrist and the psychology behavioral specialist served as co-chairs for the TSC. Additional membership included, the clinical administrator or executive team member, discipline chiefs, and the standards compliance director. Other members included specialists as needed, treatment team and senior clinicians for the case being presented. The TSC was responsible for reviewing all patients who were exhibiting high risk behaviors that were not amenable to first level interventions or through referrals directly from their treatment teams. It was the responsibility of the committee to offer considerations for the treatment team that could

include but not be limited to adjustment to medication; behavioral consultation; transfer of the patient in or outside of the facility; or referral to the FRC.

The chief physician and surgeon chaired the MRMC, which was comprised of the nurse administrator (NA), the medical director, a medical doctor, the nursing coordinator, the health services specialist, and the unit supervisor. Staff reported that the MRMC provided consultation to treatment teams in the management of patients on the high-risk list for medical concerns. It also provided oversight of the implementation of medical, nursing, and allied interventions for patients on the high-risk list for medical concerns, and referred patients to the FRC for consultation as clinically indicated.

The FRC was chaired by the medical director. Members included the clinical administrator, chief psychiatrist, discipline chiefs, nurse administrator, standards compliance director, risk management coordinator, a specialist as needed, treatment team, program director, unit supervisor and the program senior clinicians for the patient being reviewed. The committee was charged with reviewing patients from lower level committees who were not amenable to interventions put in place by those committees and required a higher level of review. This committee also had the option to seek out consultation from outside consultants for difficult cases.

The senior psychologist and program director were co-chairs of the Violence Risk Management Committee (VRMC). Other members included the clinical administrator, the director of risk management, a behavioral psychologist, the standards compliance director, a unit supervisor representative, a program director representative, and representatives from the Department of Police and Central Nursing Services. Staff informed the monitor that the VRMC was a component of the hospital's risk management system. The committee was responsible for

reviewing and analyzing data to understand variables that may contribute to violence, report any findings, and alert staff and hospital management regarding actions that may reduce violence.

The committee analyzed aggression rates including, peer-to-peer, patient-to-staff, by commitment code, patient characteristics, and injury.  Factors that influenced aggression were also reviewed such as, admission rates, commitment codes, time of day, and aggression by unit, unit location, prison culture, and political and institutional factors.  Local interventions for aggression that have had success would also be described, including, the Enhanced Treatment Unit (ETU), mall restructuring, evening supplemental activities, mentor project, Peaceful Resolution Committee, patients on Quality Council, VRMC, and continued staff training.

The SPC was chaired by the senior psychologist.  Members included the program director, nurse administrator, health and safety officer, a medical staff representative, the standards compliance director, a unit supervisor representative, a psychology department representative, a social work department representative, a rehabilitation therapy service representative, the training coordinator, a plant operations representative, joint commission coordinator and the risk management coordinator.  The prime function of the SPC was to provide coordination and oversight of performance improvement activities, policies, trainings, and practices designed to reduce the risk of suicide and suicidal behavior.

The IMRC was chaired by the standards compliance director.  Committee members included, the executive team, the Chief of Police, and the assistant hospital administrator (AHA). The IMRC's responsibility was to ensure that programmatic and systemic issues were identified and recommendations for corrective/preventative measures related to abuse/neglect/policy violation investigations were presented to the appropriate departments for follow through.  The IMRC was also responsible for tracking programmatic and administrative recommendations and

91

effective implementation of recommendations.  The committee was responsible for identifying opportunities for performance improvement and tracking identified action items.

The ICA/PCA analyses were performed by the standards compliance director and their staff and reviewed in the IMRC.  The ICA/PCA offered processes that identify the contributing factors that resulted in, or could result in a severe adverse event.  This was achieved through evaluating the incident, environmental factors and operational systems within the facility, to identify areas for performance improvement opportunities.

The medical director chaired the RMC.  Members included chairpersons for psychology specialist services, FRC, MRMC, enhanced trigger review committee, PRC, incident management, violence prevention committee, peaceful resolution committee, hospital advisory committee, SPC, psychiatry services as well as the nurse administrator and clinical administrator. The RMC provided oversight of the risk management system and reviewed outcome data reaching a standard deviation of two or more for performance improvement opportunities. Chairs of all risk management levels reported to this committee.  Recommendations from the RMC for programmatic or systematic changes were vetted through the Quality Council.

The Chief of Police served as the chair of the Security and Contraband Committee, which also included as members the executive director, the clinical administrator, the hospital administrator, and a variety of staff representatives hospital-wide.  The Security and Contraband Committee reported quarterly on changes in the patient contraband list, new vendors, and issues related to incoming mail/packages and contraband and security issues.

The health and safety officer chaired the Environment of Care Committee.  Membership included the public health RN, fire chief, a police lieutenant, the general services administrator, the joint commission coordinator, a unit supervisor, a nurse instructor, and representatives from

plant operations and nutrition services.  The committee reported quarterly on emergency drills; OSHA compliance; safety and security issues; and hospital health and safety compliance/issues. It also handled Environment of Care Committee findings and/or performance improvement projects, the Injury and Illness Prevention Program, staff injury reviews/trends/prevention, findings from the various safety committees at ASH, and staff training for hazardous material handling.

The information technology director prepared and presented quarterly reports regarding electronic heath record updates, development of new databases, and statewide enterprise systems.

The training director prepared and presented quarterly reports regarding quarterly training compliance, changes in the training curriculum, performance improvement measures, and training related issues.

The director of health information prepared and presented quarterly reports regarding changes or issues related to the designated record set, delinquent medical record statistics, and annual auditing of charts for HIPAA notice of privacy practices requirements.  The director also coordinated changes in international classification of diseases implementation and clinical data management and collaborated with standardizing clinical records for electronic health record implementation.

The Standards Compliance Committee oversaw quarterly standard compliance reports to the Quality Council.  The reports covered ORYX compliance (a tool of the Joint Commission), key indicator outcome measures, licensing /joint commission complaints, deficiencies, activities, and training, special incident reporting, high risk process analysis projects, and various performance improvement projects.

## XIII.  LAUNDRY AND FOOD ISSUES

Interviewed *Coleman* class patients indicated no difficulties obtaining clean and properly fitting clothing and shoes, and clean sheets and blankets.  They also did not express any complaints concerning the quality or quantity of meals.

## XIV.  VISITATION

The visiting center at ASH was open daily and, in most cases, contact visits were permitted.  Those CDCR patients who were not yet authorized to walk freely within the hospital were escorted to the visiting center.

## XV.  LAW LIBRARY ACCESS

ASH had an adequate library and afforded appropriate access to patients.

## XVI.  PATIENT'S RIGHTS AND CONCERNS

Patients with complaints concerning services or treatment at ASH reportedly had direct telephone access to a patients' rights advocate.  An observed Hospital Advisory Council meeting appeared to give representatives of patient ward governments an appropriate forum to discuss and resolve patient concerns.  Addressed issues included obtaining permission to attach nets to courtyard basketball hoops, clarifying approved and unapproved items for patient packages, changing the fragrance of the air-fresheners used, ensuring adherence to the monthly barbershop schedule, and stocking a longer toothbrush in the canteen.  No issues related to mental health services were raised during the meeting.

The DSH contracted with a private, non-profit organization to operate the California Office of Patients' Rights (COPR), which monitored mental health facilities, services, and programs for statutory and regulatory compliance related to patients' rights, and provided training and education to mental health providers.  The monitor met with an ASH patients' rights

94

advocate.  He explained the process by which patient complaints regarding mental health laws, regulations, policies, and rights were forwarded to his office, and investigated, reported, and closed.  Patients could also appeal "closed complaints" if they were dissatisfied with COPR's findings.  Approximately 20 percent of received complaints fell under COPR's jurisdiction.

EXHIBIT B
Coalinga State Hospital (CSH)

**Coalinga State Hospital (CSH)**
September 16, 2013 – September 18, 2013
March 18, 2014 – March 20, 2014

## I.    INTRODUCTION

Members of the Special Master's staff of experts and monitors examined the intermediate inpatient care program for CDCR patients at CSH over the course of two on-site visits, in September 2013 and in March 2014.  The program was located in one housing unit, Unit 21, and had 50 designated beds.  There were ten individual patient rooms used for whom single-room placement was indicated, and ten more rooms that could accommodate four patients each.  Two additional individual rooms located in a short hallway behind the nursing station were used for seclusion and/or restraint.  The rooms were located along both sides of two corridors.

There were two dayrooms.  The smaller of the two was used to watch sporting events on television.  Patients were permitted access to an outdoor courtyard outside of the larger dayroom for ten-minute fresh air breaks between scheduled activities during the daytime, every hour between 8:00 a.m. and 9:00 p.m.  Patients were also permitted access as scheduled to a larger sports yard with basketball hoops, a handball court, and some grass.  All patients were escorted by two escorts when being taken off the Unit, one of the escorts being an officer.  Showers were provided once in the morning and twice in the afternoon.

## II.    SUMMARY OF THE FINDINGS

The Special Master's findings included the following:

- **Staffing levels, clinicians' caseload sizes, and the physical plant were adequate to support appropriate programming.**

- **Treatment teams did not solicit or incorporate patients' input into the treatment plans but appeared to follow a script for the meeting.**

- **Treatment plans were vague and not individualized to the patient.**

- **The number of group treatment hours scheduled and provided was very inadequate, although the quality of the groups provided was good.**

- **There was a lack of individual treatment.**

- **Intake assessments were completed timely by all disciplines.**

- **Suicide risk assessments at times contained contradictory information.**

- **Audits were needed to ensure thorough utilization of medical records that were divided and placed in different locations within Unit 21.**

- **Clinicians were granted access to patients' eUHRs in CDCR.**

- **Patients had access to group treatment focused on discharge back to the community, but not on discharge back to CDCR.**

- **Patients' treatment plans and interventions were not being modified to address the significant upcoming event of parole.**

- **The patient disciplinary process functioned well.**

- **There was a functioning quality management system which included an executive committee within Unit 21 that met weekly.**

- **There were no laundry, visitation, or library access issues.**

## III.  <u>CENSUS</u>

At the time of the March 2014 site visit there were 49 CDCR patients at CSH.  The majority of CDCR patients at CSH were Levels I and II.  Since its opening in 2011, Unit 21 had admitted over 200 patients.

## IV.  <u>STAFFING</u>

### 1.  <u>Administrative and Clinical Staffing</u>

At the time of the visits, the positions of executive director, hospital administrator, nursing coordinator and medical director were filled.  The clinical administrator position was vacant but filled in an acting capacity.

Of the eight program director positions, five, including the program director for Unit 21, were filled. Seven of the eight program assistant positions were filled; the sole vacancy was not on Unit 21. Positions for the chief psychiatrist, chief social worker, chief rehabilitation therapist, chief psychologist, and chief physician were all filled.

Clinical staff at CSH were divided into two treatment teams (A and B), each consisting of a psychologist (the team leader), psychiatrist, social worker, nurse, and art or recreation therapist. A number of them had recently been hired or transferred to the intermediate care Unit. Psych techs were not formally assigned to the treatment teams, but were responsible for patients and were referred to as level-of-care staff.

Of the 55 allocated mental health positions for Unit 21, 52 were filled with full-time equivalent staff, for a vacancy rate of six percent. Two of the vacant psychiatrist positions were covered by contractors who had worked on the Unit since it opened, resulting in a Unit overall functional vacancy rate of two percent. There was one vacant RN position.

Psychiatrists

Both of the allocated staff psychiatry positions were vacant but had been covered by contractors since the Unit opened.

Psychologists

The three staff psychologist positions were filled by unlicensed psychologists who were supervised by the senior psychologist supervisor. Although the treatment notes of the unlicensed psychologists were not co-signed, treatment plans they wrote were audited quarterly and annually, and groups they facilitated were observed randomly.

Social Workers

Two of the three allocated social worker positions were filled with unlicensed social workers. Their notes were not co-signed and were reviewed by their clinical supervisor.

Rehabilitation Therapists

Positions for the supervising rehabilitation therapist and both line rehabilitation therapist positions were filled.

RNs

Six of the seven allocated RN positions were filled.

Psych Techs

The three senior psych tech and all 30 line psych tech positions were filled.

Correctional Staff

A CDCR lieutenant and sergeant were assigned to the program but not specifically to Unit 21.

## 2. Staff-to-Patient Ratios

CSH maintained a ratio of 1:25 for psychiatrists and rehabilitation therapists on the intermediate care unit, based on its 50-bed capacity, consistent with the customary ratio for treatment units. The clinician-to-patient ratio for psychologists and social workers was 1:15. The licensed staffing ratio for psych techs in licensed facilities was 1:8, but CSH staffed the Unit more richly, using an enhanced ratio of 1:6 during the day shifts and 1:12 on the night shift.

## V. TREATMENT AND CLINICAL SERVICES

Staffing and treatment space resources were appropriate for CSH's provision of intermediate inpatient care. Although CSH has a "treatment mall" design, patient intermediate

care programming was conducted on the housing Unit to prevent mingling of the populations at CSH and any potential difficulties that may result therefrom.

Psych tech rounds were conducted every ten minutes, 24 hours per day. CDCR patients on Keyhea orders can be admitted to CSH. Keyhea petitions can be initiated and Keyhea orders can be renewed there. *See* California Penal Code Art.1, Sec. 2602. At the time of the monitor's September 2013 visit, CSH reported six patients on orders for involuntary medications and no involuntary medication administrations. Medication renewal orders were routinely written for 45-days duration.

There were morning and afternoon end-of-shift meetings of out-going and incoming staff for a verbal report on the status and activity of each patient during the preceding shift, as well as any other information deemed relevant to pass on to the incoming shift.

Management staff reported that a PBSP was available for the CDCR patients.

1.    **IDTTs**

Unlike at typical inpatient programs, at CSH, psychologists were, in effect, the leaders of the IDTTs. Psychologists had limited contact with patients; contacts essentially occurred only in preparation for, and during, IDTT meetings. Documentation of their patient contacts was not required. Patients' treatment plans appeared to minimize the role of psychotropic medication and psychiatry in general.

At CSH, patients' treatment plans were considered one component of the treatment model, the WaRMSS. Under this treatment philosophy, patients' problems are reformulated as one or more of 11 focus items:

1.  Psychiatric & psychological
2.  Social skills
3.  Dangerousness & impulsivity
4.  Hope & spirituality

101

5. Substance abuse
6. Medical, health & wellness
7. Legal
8. School & educational
9. Occupational skills
10. Leisure & recreation
11. Community integration

Not all patients seen in an IDTT meeting were given Item 1 (psychiatric and psychological) as an identified treatment focus, which appeared inconsistent with the mental health care inpatient setting.  Even when Focus Item 1 was identified for a patient, interventions to address that Focus Item were not always provided.  Two separate treatment teams, A and B, met separately on Tuesdays, Wednesdays, and Thursdays.  Generally, in the patient's absence there was a brief pre-meeting discussion, the substance of which was repeated after the patient was brought into the room.  Treatment plans were projected onto a screen.  Patients were offered written copies of their updated plans and were asked to sign, indicating their attendance at the meeting.

The monitor observed six IDTT meetings of both teams.  All members were present, provided information about the patient, and addressed him when he was in the room.  However, some important issues such as suicidal thoughts, auditory hallucinations, and impending parole/release dates were not addressed, even when the patient spontaneously raised them.  At times, the team appeared more concerned with following the "script" for the meeting than listening to the patient.  During none of the six meetings observed by the monitor was the treatment plan modified to incorporate the patient's input into his own plan, even though the plan was readily available on the computer and projected onto a screen.

The quality of the treatment plans was variable.  Generally, they were too vague and not properly individualized to the patients.  Patients were placed into offered treatment groups rather

102

than proper treatment interventions designed to address the patients' diagnoses, current symptoms, and primary behavioral concerns.  Treatment plans were cumbersome and unwieldy, containing long running chronologies, sometimes as long as 14 pages, rather than summarizing the patients' progress from the last treatment team meeting and identifying completed treatment goals for moving forward.

Psychiatric and psychological interventions were often inadequate to address symptoms and behaviors.  At times, treatment objectives were too broad and not sufficiently operationalized, with outcome criteria not relevant to the treatment target.  Discharge criteria were often not related to the initial reason for referral and not indicative of treatment progress and readiness for discharge.

## 2. **Group Therapy**

Programming was provided primarily through therapeutic groups.  The group schedule was changed quarterly.  Overall, the quality of the groups that were provided appeared to be appropriate.  There were approximately six to eight group activities per day.  They were run on Monday through Friday, 9:00 a.m. to 4:00 p.m., with each session lasting approximately one hour.  There were three designated group treatment rooms that could accommodate groups of ten to 12 patients.  Two dayrooms could be used for group activities.

Treatment focused primarily on what would be considered leisure, rehabilitation therapy, and supplemental treatment groups.  Some of the treatment groups that the facility considered "core" groups would have been suitably classified as "leisure" or "supplemental" (e.g. open art studio, yoga).  Patients requested more clinical or insight-oriented treatment groups to better manage their illnesses.  Transition groups with prison scenarios would be beneficial to patients returning to CDCR rather than groups focusing on returning to the community.

Despite the low treatment hours scheduled for the patients, there remained wait lists for groups ranging from one patient to eight patients.  Administration indicated that a minimum of ten hours of treatment per week for each patient was expected.  A group treatment roster was generated for each group on a daily basis.  At the end of each day, the completed rosters were taken to Treatment Mall Services where the data on their completion was entered within about three days.  A tracking tool used at CSH, known as MAPP, enabled the program to determine the percentage of time that a patient attends groups.

At the time of the September 2013 visit, the program reported that it did not have a system to track the average weekly number of treatment hours provided to its patients.  However, during the March 2014 visit, the facility reported that its tracking abilities had improved.  The monitor was provided with data detailing the average number of group treatment hours scheduled and attended weekly by the patients in Unit 21.  The provided data indicated that for the 12-month period from March 2013 to February 2014, the average number of group treatment hours scheduled for a patient per week was 6.19, and the average number of hours attended was 4.25.  This represented a patient attendance rate of 67 percent.  Minutes reviewed of the Unit 21 quality improvement executive meeting indicated that the low number of group treatment hours being offered and attended by patients was repeatedly referenced.  The goal, as stated in the minutes, was to offer at least ten hours of group treatment to each patient.

The monitor observed groups on social skills, medication education, relationship skills and art therapy lab.  Four to ten patients attended these groups.  Some groups were structured, and others consisted of library use, listening to music, etc.  Patients were awarded group attendance points to later purchase toiletry items, snack foods, and even portable radios/headsets. The structured groups were generally well facilitated by professional staff, using a variety of

modalities including music, drawing, discussion, and didactics that engaged the participants.

Several patients were observed during open art studio time. Activities included ceramics, pottery, drawing, painting, leather crafting, and other small craft projects. Patients appeared to enjoy these activities very much. There was also a music studio outfitted with drums, keyboards, and guitars that patients may use at scheduled times, but the monitor was unable to observe patients' use of the music studio because the studio time slot for Unit 21 did not coincide with the site visit.

The monitor observed a group entitled "Breaking Barriers" which took a cognitive/behavioral therapeutic approach. Four of the five patients assigned to this group generally attended, and three were present on the day of the monitor's observation. The group was led by a psych tech who showed a video to stimulate discussion among the group. Participants were engaged with the material and the group leader did an adequate job of facilitating the group.

In the medication education group, however, the nurse facilitator merely had patients read aloud from handouts and then asked them questions about the printed material. The content was discussed abstractly and without application to the patients' own experiences. When one patient volunteered that he took medication for post-traumatic stress disorder after having been sexually abused, the group leader did not even acknowledge his statement.

The program ran a "community meeting" on Wednesday mornings. All patients were encouraged to participate and approximately 20 did so. The Unit supervisor covered several topics, including reminders to respect one another's space and property, and invited suggestions for group topics for upcoming meetings. Patients were invited to comment or ask questions but the only issue raised was the timeframe for repair of a broken telephone. Staff reported that

105

patients were ordinarily more engaged in these meetings; participation may have been subdued due to the monitor's presence.

During the March 2014 visit, a random walk through the Unit at 11:00 a.m. found 18 patients lying in their rooms not participating in treatment. At 1:30 p.m. that same day, only one patient was in his room. This coincided with staff offering snacks as a positive incentive to draw patients out of their rooms. It was reported that staff had initiated a new process to increase group attendance, but the only intervention was to encourage patients to attend groups immediately before the group was scheduled to begin.

### 3.   **Individual Therapy**

Overall, the amount of treatment provided to these seriously mentally ill patients was inadequate. There was a paucity of individual treatment. Although the treatment milieu at CSH was therapeutic, as described above, it alone was insufficient to meet the needs of the patients. Some patients' clinical records lacked documentation of important clinical information that had been communicated only verbally. Patients reported that the only regular individual contact with clinicians occurred in the hallways on the Unit. Staff also reported that clinicians regularly walked the hallways and met with patients if approached.

The most effective treatments were not always selected, given the diagnosis, target symptom or behaviors for a given patient. For example, a specific treatment modality, such as individual cognitive behavioral therapy, would be indicated for a patient with depression based on well documented empirically-based interventions, but it was not included in treatment plans where it should have been.

106

### 4. __Other Treatment Issues__

The staff at CSH completed detailed IDNs. They were well written and helpful in capturing the patients' behavior and activity during their stay at the facility.

Intake assessments were completed timely by all disciplines. Psychiatrists, psychologists and social workers completed annual update evaluations for patients who had been in the program for one year or more.

The quality of clinical evaluations completed by psychiatrists and psychologists varied across providers. Diagnoses were not always supported by the data found in the chart and were not always properly substantiated.

Suicide risk assessments contained contradictory information. Some assessments clearly suggested that the patient was at a moderate or high risk, yet the evaluator rated the patient at a low risk. There were multiple cases when the evaluator failed to consider important risk factors and placed too much weight on protective factors.

Patient records in Unit 21 were divided into three separate files labeled "medical," "clinical," and "legal/overflow," located in different locations on the Unit. This division of documents was completed in 2009 following a recommendation by a reviewing entity. The other DSH facilities and programs did not follow this procedure. Patient charts cannot be properly reviewed in a serial manner, but rather they must be examined individually and then cross-referenced with the other charts for the patient, as necessary. This structure hampered clinical staff trying to synthesize data when updating their clinical conceptualization of the patients.

## VI.    __PATIENT ACCESS TO TREATMENT__

The facility did not use a stage system or cuff status but rather referred to a "level" or "level on hold." The patient's level was considered "on hold" for all new arrivals until the

107

patient was seen by a treatment team. All patients with "level on hold" status were restricted to the Unit but were not denied any treatment offered on the Unit. A patient's level could also be placed "on hold" due to problematic behavior, after which his status would be reviewed by the treatment team within one to two days.

Cuffs were only used as needed. New arrivals were not cuffed at any point during the admissions process, even when the patient was escorted from R&R to Unit 21.

## VII.    REFERRALS AND TRANSFERS

At the time of the September 2013 visit, there were no direct admissions from CDCR institutions to intermediate care at CSH. All patients came through ASH, where they had stayed for 30 to 90 days prior to transfer to CSH. However, at the time of the March 2014 visit, CSH was accepting direct admissions also from CDCR. CDCR generated a referral list of patients who were eligible for either ASH or CSH and transmitted this list to ASH. CSH sent its census and bed availability to ASH daily. From the list from CDCR, and after receiving notification of bed availability at CSH, ASH determined which patients might be eligible for admission to CSH. CSH would then make a determination if the patient could be accepted into its program and would send a chrono directly to DSH headquarters and the sending CDCR institution, thereby removing ASH at that point from the remainder of the referral and acceptance process for direct admissions to CSH from CDCR institutions.

## VIII.    ADMISSIONS AND DISCHARGES

Admission packets were prepared and posted on SharePoint. Staff reported that basically all referrals were accepted unless Valley Fever risk exclusion criteria applied. Most admissions were Level II, while a few were Level I and Level III. The program reported that admissions occurred only on Tuesdays only to ensure that clinicians would be available for the first four

days of patients' stays, and to give them sufficient time to adjust to the environment before the weekend.

Unit 21 had received approximately 200 admissions since it was activated in November 2011. Upon admission, the patient underwent several discipline-specific assessments including a psychiatric evaluation within four hours of admission, a nursing assessment, a psychological and social assessment, a recreational assessment, and a physical examination. Assessments had to be finalized within seven days in order to be presented at the patient's initial IDTT meeting. At the September visit, CSH staff reported that they did not have direct access to CDCR information, but reportedly CSH psychiatrists sometimes called CDCR psychiatrists to discuss cases. At the March 2014 visit, CSH reported it had been granted access to patients' eUHRs in CDCR and that its clinicians had submitted their applications for approval to access these records.

The average length of stay at CSH was six to nine months. Nearly all discharged patients returned to CDCR at the EOP level of care. Discharge criteria were ambiguous to both treatment team members as well as patients. During the period of December 2013 through February 2014, CSH reported a total of 11 admissions and 14 discharges. For those patients who discharged during that three-month period, the average length of stay was approximately 280 days.

During the September 2013 visit, staff reported no formalized mechanism for ascertaining patients' parole dates, relying to a large extent on self-reported information. The few patients at CSH approaching parole were returned to a CDCR facility prior to their releases. A clinical staff member reported that once a patient's parole date became known, an attempt was made to return him to CDCR at least 60 days in advance so he could receive assistance with reentry planning. During the September 2013 visit, it was unclear how much pre-release planning occurred by CDCR prior to the patient's return because it was not communicated to

CSH staff except via the patient's own report. There was no evidence that the coordinated parole planning effort articulated in the intermediate care Memorandum of Understanding (MOU) was being carried out at CSH. Patients' treatment plans and interventions were not being modified to address the significant upcoming event of parole.

Staff reported that for reasons unknown to them, there appeared to have been an unquantifiable increase in the number of patients paroling in the near future. When made aware of this, staff reportedly attempted to assist with reentry planning, but this appeared to have been mostly limited to providing the patient with generic information about possible treatment programs or shelters. In one instance, a CCAT was convened, but staff was largely unaware of the result. Other examples were two patients at CSH at the time of the monitor's visit who approaching parole in the near future. However, staff was not focused on reentry planning for these patients, even though a primary goal stated on their treatment plans was the patient's ability to function after parole.

During the September 2013 visit, staff reported some consideration of reinvigorating a defunct discharge planning group. No staff member queried was aware of the TCMP. Other than returning the patient to CDCR, no staff member knew how to direct a patient toward obtaining assistance in applying for benefits such as MediCal, SSI, or Veterans Administration benefits upon release. One social worker reported contacting the Social Security Administration about the possibility of assisting a paroling patient with application for SSI benefits, but was told that because CSH was not a "discharge facility," i.e., that the patient would return to CDCR before being released, the process could not be initiated while the patient was still at CSH.

At the March 2014 visit, staff reported that patients had gained access to a 12-week group entitled "Community Resources Group" to assist the patient in identifying and locating needed

community resources.  This group was available to patients who were discharging or paroling to the community within 24 months and was instituted at CSH in November 2013.  The patient's parole information was transmitted with the admission packet, and the CC I at CSH verified the patient's parole date with CDCR.

The Program Assistant reported that when discharging a patient back to CDCR, discharge information was sent to the receiving institution pursuant to the MOU.  The Program Assistant also stated that there was a process in place and a form utilized for facilitating clinician-to-clinician contact between CSH and CDCR.  Staff reported that there were no tracking logs or audits to verify if clinician-to-clinician contacts were occurring.

## IX.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

Patient discipline consisted of restrictions on off-yard activities, such as access to the library.  Any patient placed on "hold" from privileges was assessed daily to reconsider his status.  At the time of the monitor's visits there were no patients on "hold."

It was reported that there had not been any use of force incidents during the preceding 12 months.

A copy of the SIR AD 830 was provided to the monitor.  It indicated that SIRs were written for behaviors such as sexual offenses, drug-related problems, contraband, aggressive acts, assault, suicidal gestures, and other matters deemed significant.  Although all such incidents were written up as SIRs, not all incidents were reported to CDCR for consideration of issuance of an RVR.  The determination as to whether the behavior was reported as an SIR, or was sent to CDCR for issuance of an RVR, was made by the unit supervisor.  However, the criteria used by the Unit supervisor for that determination were not included in any AD or policy.  The monitor

was informed that the criteria used by the Unit supervisor were based on the severity of the patient's misbehavior.

A review of the first quarter of 2014 indicated that eight RVRs were written for patients in Unit 21. Of the three RVRs adjudicated at the time of the March 2014 visit, the records reflected consideration by the hearing officer of the patient's mental health evaluation. Two dispositions resulted in loss of credit for 30 days and one resulted in a loss of credit for ten days. No loss of privileges was noted.

Any referrals to the DA's office were made by the Department of Police Services at CSH.

## X.     USE OF SECLUSION AND RESTRAINT

There were two observation rooms on Unit 21, one for seclusion and one for restraint. The seclusion room contained one thin mattress. The restraint room contained a bed affixed to the floor with restraints attached to the bed. Records for the first quarter of 2014 indicated four instances of seclusion or restraints. Documentation was present for timely physician orders, physician progress notes, restraint and seclusion behavior notes, RN notes, and debriefings.

## XI.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

CSH utilized AD 343, "Medical Emergency Response Plan," which appeared to be appropriate. The monitor was present during an alarm and observed an appropriate response by both clinical staff and custody staff. The monitor also noted automated electronic defibrillators (AEDs) and crash carts located throughout the facility. Pursuant to AD 343, mock emergency drills were conducted quarterly on each Unit for each shift.

Staff reported that there had not been a death in Unit 21 since its opening and that any death review would be conducted pursuant to AD 528, "Patient Death and Death Investigation Procedures" and established California state law.

## XII.    UTILIZATION REVIEW AND QUALITY MANAGEMENT

The performance improvement process at CSH was multi-tiered and utilized a hierarchy of interventions.  Although not part of the official quality management process, AD 141, Unit 21 held weekly quality improvement executive meetings to address issues specific to the Unit.

Pursuant to AD 141, the PRC constituted the first level of intervention.  Unit 21 was one of three units in Program 7 that was reviewed by the PRC.  The PRC met weekly and monitored interventions and corrective actions for patients involved in high risk or trigger behaviors and provided clinical feedback to the treatment teams.  Minutes of these meetings were forwarded to the Enhanced Trigger Review Committee, the Psychology Specialist Services Committee, and the MRMC.  Referrals were made to these committees when second-level interventions were met.  The final tier in the quality improvement system was the FRC which met monthly.  Unit 21 staff reported that few issues from Unit 21 made it to the third level of intervention.  The role of the FRC, as indicated in AD 141, was to review and provide clinical consultation for patients designated as high risk and having met the trigger thresholds in AD 141.

A review of meeting minutes indicated that groups were repeatedly the topic of discussion.  The focus of group discussions included a review of groups offered, review of group attendance, group schedules, group data, group cancellations and increasing the number of groups.  Additional topics included use of the library, review of *Coleman* Special Master visits to CHCF and ASH, orientation packet for clinicians, development of a protocol binder for Unit 21 and identifying a location for patients who refuse groups.

Staff reported that the majority of the issues raised during the Unit 21 meetings did not rise to a higher level of intervention and were handled within the Unit.

## XIII.  *COLEMAN*  POSTINGS

Posters detailing the rights of *Coleman* class members and their attorney contact information had been ordered from CDCR.  In the interim, 8.5" by 11" copies of the poster were placed in the Unit.

## XIV.  LAUNDRY AND SUPPLY ISSUES

There were no issues reported by either staff or patients regarding laundry or supplies.

## XV.  VISITATION

The visiting room was located off one of the treatment mall hallways.  This was the only location where commingling with other patients occurred.  The visiting room consisted of approximately 50 chairs and 15 tables in a large room with access to an outdoor yard.  There were five private rooms for attorney visits, including one room with windows for non-contact visitation.  Patients were permitted visitation seven days a week from 8:00 a.m. until 4:00 p.m. Patients were escorted to visitation by two escorts.

## XVI.  LAW LIBRARY ACCESS

Some of the unstructured group activity consisted of use of the library.  Patients in Unit 21 had access to the library three times per week, for one hour, on Mondays, Wednesdays, and Fridays.  There were no reports of patients being denied library access.  Due to the physical distance to the library and the escort times, the time spent in the library was actually closer to 45 minutes.  During these hours, Unit 21 patients were the only patients allowed in the library. They had access to general library materials as well as Westlaw which could be accessed through multiple computers in the library.  Copies of documents cost ten cents per page unless the patient was deemed indigent.  If a patient was unable to locate certain materials, he could make written requests for them and library staff would attempt to locate them for the patient.  Patients who had

active cases would be considered "priority legal users" and were allowed four hours of library time per week.

EXHIBIT C
Salinas Valley Psychiatric Program (SVPP)

**Salinas Valley Psychiatric Program (SVPP)**
December 9, 2103 – December 11, 2013
February 4, 2014 – February 6, 2014
March 3, 2014 – March 5, 2014

## I.    INTRODUCTION

As noted above, this is the Special Master's second report on the SVPP.  His first report, filed on September 24, 2013, followed the monitor's three on-site tours of SVPP in August 2013. Those tours were conducted pursuant to an order entered on July 11, 2013, directing the Special Master to monitor and report to the court within 75 days on the adequacy of staffing levels at SVPP and on whether cuff or orientation status there unduly interferes with or delays the provision of necessary care to *Coleman* class members, and on any other matters at SVPP which the Special Master determined required urgent attention by the court.  Order, Docket No. 4688.

On November 13, 2013, the Coleman court adopted in full the findings of the Special Master's first SVPP report, and ordered among other things that CDCR and DSH review and re-evaluate the use of orientation and cuff status at SVPP to determine whether these policies, as designed and implemented, achieve the proper balance between legitimate security needs and access to necessary inpatient mental health care.  Order, Docket No. 4925.  This process was ordered to be carried out under the guidance of the Special Master and his staff, with participation and input from the plaintiffs.  The court ordered a second report by the Special Master on SVPP, along with his reports on the other inpatient programs for CDCR inmates, to be filed no later than March 31, 2014 (now May 30, 2014.  *See* Order, filed April 28, 2014, Docket No. 5143).  This is the Special Master's second report on SVPP.

II.    **SUMMARY OF THE FINDINGS**

The monitor's findings from the second round of SVPP tours include the following:

- **Staffing remained a challenge at SVPP, with insufficient numbers of staff to attain acceptable staff-to-patient ratios.**

- **Multiple staff in supervisory positions were "acting" rather than actually appointed to these positions, and there were significant numbers of unlicensed clinical staff in the program.**

- **Recruitment of psychiatrists remained a significant problem at SVPP.**

- **Except at the time of patient admission, there was generally no documentation of appropriate assessments of patients' suicide risk.**

- **Observations of IDTT meetings indicated that the quality of the case discussions and interactions with the patient varied across meetings and providers.**

- **Many treatment plans were inadequate.**

- **SVPP continued to provide very limited numbers of treatment groups, and was not able to generate reports on individualized group therapy participation.**

- **Group space in the dayroom was inadequate.**

- **Group therapy was not tailored for individual patients and outlined in their treatment plans.**

- **The PaWSS Program was being implemented at SVPP and would assist clinicians with all aspects of tying the patients' scheduled and individual therapy sessions to their treatment plans.**

- **SVPP purchased eight therapeutic modules to be utilized for maximum custody groups, solo programming, and confidential therapeutic sessions.**

- **At the time of the monitor's visit, implementation of SVPP's MAPP had been completed on TC 1 and TC 2, and was in progress in C-yard.**

- **Individual treatment and counseling continued to be underutilized at SVPP.**

- **One-to-one clinical encounters were not completed in confidential settings due to the presence of two MTAs in the same room.**

- **ICC meetings were appropriately conducted within ten days for newly arrived**

patients.

- **SVPP did not have an operational Quality Improvement/Performance Indicators process in place.**

- **SVPP was working on three ADs that would affect cuff status at the institution: AD 6.1 Orientation, AD 6.2 Maximum Custody Status and AD 6.3, DPS.**

- **SVPP required that SNY patients be automatically placed on cuff status upon arrival, regardless of their custody levels and without consideration of individual risks.**

- **Although the number of patients on cuff status had been greatly reduced, SVPP continued to experience problems with required documentation and appropriate treatment planning in relation to cuff status.**

- **Most patient transfers to SVPP did not comply with timeframes.**

- **While nursing appropriately documented 15-minute evaluations, the documentation did not reveal appropriate offering of bathroom privileges for patients in seclusion.**

- **The use of restraints was limited at SVPP.**

- **SVPP continued to apply and maintain "timeouts," in violation of its own policies.**

- **Laundry remained a serious problem at SVPP, while the program was taking steps to remedy the problem.**

- **SVPP had not resolved the problem of how to ensure the right count and same items were returned to patients after being cleaned, and how to distribute items appropriately according to patient needs.**

- **SVPP reported no problems with adequate amounts of supplies including soap, shoes, deodorant, toothbrushes, and shoes.**

- **MTA escorting practices remain unchanged with two MTA escorts present for all out-of-room patient encounters.**

- **SVPP implemented a psychiatric sick call process, but it did not include procedures regarding what happened daily with the sick call log, who was responsible for follow-ups with patients and how soon they would be provided, what happened on weekends, and what happened with emergency requests.**

- **SVPP was in the process of drafting a revision to its IEX policy.**

- **Mentally disordered inmates at SVPP remained subjected to multiple forfeitures of behavior credits, increases in their classification scores, referrals to the DA for possible prosecution, and lack of actual mitigation of penalties based on the role of patients' mental illness in their infractions.**

- **CDCR patients housed in CDCR-DSH jointly-operated facilities were subjected to a disciplinary process that could result in longer periods of incarceration for the same behavior than if they had been housed in facilities managed solely by DSH.**

## III.    CENSUS

On February 4, 2014, there were 230 patients housed in the program, with 195 patients in single-cell units, 21 patients in two-man dormitories, and 14 patients in four-man dormitories. One single-person, five two-man dorms, and 18 four-man dorms were vacant.  Staff reported that no patients had been in D-yard since October 22, 2013, and administrative staff indicated that future use of that space had not been determined.  Staff from D-yard was redistributed throughout the program. There was remaining capacity for 254 patients in the TCs and on C-yard.

By March 4, 2014, there were 224 patients housed in the program.  One hundred ninety six patients were in single-cell units, 17 patients were in two-man dormitories, and 11 patients were in four-man dormitories.  Six single-person, three two-man dorms, and 21 four-man dorms were vacant.

## IV.    STAFFING

Staffing remained challenging at SVPP, with continuous movement of staff through the program.  SVPP was using a combination of registry/contract staff and second positions to cover vacancies and extended staff leaves.  There were a number of staff covering acting supervisory positions as well as their own official duties, resulting in coverage being diluted and some duties not carried out.  There was also a significant number of unlicensed clinical staff in the program,

requiring mandatory supervision to get their licensing hours and supervision, and causing staff resources to be spread even more thinly.

1.    **Administrative and Clinical Staffing**

Psychiatrists.   One senior psychiatrist supervisor position was authorized and reportedly filled as of February 3, 2014.  Of the five authorized staff psychiatrist positions, four were filled, one was vacant, and one psychiatrist was on extended leave.  Three psychiatrists were registry staff.  Two of the five psychiatrists at SVPP at the time of the site visit were on loan from other DSH facilities.

During the February and March, 2014 site visits, recruitment of psychiatrists remained a significant issue.  Staff reported that DSH continued a recruitment campaign through advertising in journals, responding to individual employment inquires, and attending conferences and job fairs.  It was attempting to reinitiate fellowship programs with California medical schools.  There was no apparent budget for reimbursement of potential candidates' expenses.

Psychologists.   No chief or senior psychologist specialist positions were allocated to SVPP.  An acting chief psychologist was a senior psychologist specialist on loan from CSH who maintained responsibilities there.

There were ten authorized psychologist positions, all of which were filled, plus another two psychologists were working.  Three psychologists were on extended leave.  Of the psychologists working at SVPP, one was from another facility and six were unlicensed and at varying stages of the licensing process.  SVPP administration reported revising the role of psychologists to include:

- Complete a Suicide Risk Assessment within 72 hours of admission.
- Complete a V-Risk Assessment (V-Risk 10) by the tenth day, unless clinically indicated to be done earlier.  These were generally completed soon after arrivals.

121

- Complete an Admission Psychological Assessment by the tenth day of admission.
- Meet with patients for ten-day and monthly IDTT meetings and complete a progress note.
- Complete any Psychodiagnostic Assessment as requested by the referring institution.
- Respond to all crises on the unit involving self-harm and aggression.
- Complete Behavior Plans for patients with significant behavior problems.

During the March 2014 visit, staff reported that training of psychologists on behavioral plans was conducted on February 27, 2014. Sign-in sheets indicated that four staff psychologists, the acting senior supervising psychologist, and the acting chief psychologist attended. Training material included examples of behavioral guidelines and a behavior management plan. The Special Master's expert observed that the behavioral guidelines were not tailored to each patient's reinforcers or behavioral antecedents. The example presented in the training was neither informative nor useful and relied heavily on punishment as an intervention, although it did include treatment goals. It would have been beneficial for the training to include practice scenarios for staff to develop behavioral treatment plans for critique.

Supervising Social Workers. There was no authorized position for a supervising social worker. There was an acting supervising social worker working out of class.

Social Workers. There were ten authorized social worker positions and 12 filled, with two on extended leave. Five were unlicensed and one was assigned out of class.

Supervising Rehabilitation Therapist. No supervising rehabilitation therapist position was authorized. A rehabilitation therapist was acting as supervisor and working out of class.

Rehabilitation Therapists. Nine of the ten authorized rehabilitation therapist positions were filled.

Supervising Registered Nurses. SVPP had ten authorized Supervising Registered Nurses positions, with 12 of them filled.

RNs.  During February 2014, there were 26 authorized RN positions and 36 filled, including nine positions filled by registry staff.

SMTAs.  Of the 20 authorized senior MTA positions, 18 were filled.

Medical Technical Assistants (MTAs).  At the time of the February 2014 visit, there were 78 authorized MTA positions, and staff reported that 180 were filled.  New MTAs were not being hired, but rather psych techs were being placed into MTA vacancies.  MTAs served as facilitators and co-facilitators of leisure activity groups on second and third watch, and groups were programmed until 10:30 p.m.  They were not provided formal training on groups.  Staff reported that rehabilitation therapists showed the MTAs how to set up activities or had them co-facilitate groups with the rehabilitation therapist.

Psych Techs.  At the time of the February 2014 visit, SVPP had 20 authorized psych tech positions, three of which were filled and 17 were vacant, with seven hires pending and ten positions covered by registry staff.

## 2.    Staff-to-Patient Ratios

At the time of the February 2014 visit, treatment teams were comprised of a psychiatrist, psychologist, social worker, and rehabilitation therapist, and had an average staff-to-patient ratio of 1:26.  By the time of the March 2014 site visit, SVPP reported varying ratios among the disciplines. In TC 1, ratios were 1:22 for psychiatrists, psychologists, social workers, and rehabilitation therapists.  In TC 2, ratios were 1:35 for psychiatrists, 1:23.3 for psychologists, 1:35 for social workers, and 1:23.3 for rehabilitation therapists.

However, staff also reported that two psychiatrists in TC 1 had 9 patients from TC 2 in their caseloads, making the *actual* ratio 1:30.5 in TC 1 and 1:26.5 in TC 2.  In C-5, the ratio was 1:29 for each discipline, and in C-6, the ratio was 1:28.5 for each discipline.

## V.    TREATMENT AND CLINICAL SERVICES

During the February 2014 visit, SVPP reported that it was planning to implement DBT at the institution.  Staff indicated that DSH headquarters staff wanted it implemented as a standardized treatment across facilities.  DBT would focus on treating patients with behavioral problems such as self-injury, emotional dysregulation, and maladaptive coping skills.  The focus would be on integrating these patients back into the general population.  Initial steps involve intensive training of a select group of clinicians dedicated to the initiation of this program on a chosen unit, and then training all staff from senior management to janitorial staff prior to implementation.

The monitor was informed that because SVPP had been in a state of transition, DSH had elected to defer DBT implementation until administrative stability was restored.  Training was targeted to begin in September 2014 and would consist of a one-time three-day training session for all staff, offered every three months.

### 1.    IDTTs

During the February and March 2014 visit, the special master's experts observed IDTT meetings throughout the program.  Quality of the case discussion and interactions with patients varied across team meetings and providers.  Some teams were generally improved while others were unimproved since prior visits.

During the February 2014 visit, the monitor observed an IDTT meeting in TC 2.  Staff was in the early stages of learning the PaWSS process for treatment planning.  There was minimal discussion of the treatment plan with patients.  During some meetings there were fewer evaluations particularly in TC 1, but the majority continued to focus on clinicians' completion of evaluations that should have been completed before the meeting, leaving little opportunity for

discussion of the treatment plan with the patient.  Many treatment plans continued to be inadequate, overly vague and generic, and not sufficiently focused on identified patient problems and necessary clinical interventions.

During the March 2014 visit, the monitor observed IDTT meetings on C-5 and C-6. They were organized, multidisciplinary, and included patients in treatment planning.  There was sound privacy.  Two MTAs present during the interviews provided valuable clinical input. Patients were seen uncuffed.

There was significant ongoing supervision of the teams, with immediate feedback. Management staff reported that psychologists had received training on facilitating treatment team meetings, but did not report on whether psychiatrists had received the same.  Since management had stated previously that psychiatrists were identified as the preferred treatment team facilitator, with psychologists an acceptable designee, it was concerning that confirmation of this training of both disciplines was lacking.  Nursing staff in particular appeared to be struggling with their role in the treatment team process and the provision of meaningful input. The Special Master's expert recommended team member-patient role reversal training to foster empathy for patients.

Management reported the implementation of a practice of having patients sign their treatment plans, but in fact patients were merely asked to sign the signature page indicating their attendance at the IDTT meetings.  Patients should be involved in the treatment planning process. The team should be encouraged to partner with the patient in developing and implementing his treatment plan.  When the team does not show the treatment plan to the patient or discuss it with him, and only requests that he sign a signature page, the effect may be to reinforce the notion that the patient is a passive recipient of treatment.  This is contraindicated for the paranoid or

distrustful patient, does not adhere to the recovery model espoused by DSH and the current standard of care, and may ultimately hinder patients' attainment of their highest level of recovery.

### 2. Group Therapy

At the time of the February and March 2014 visits, SVPP's offering of treatment groups remained sparse. Patients continued to complain about limited groups and reported receiving only three to four hours of group per week. Most patients reported that they were not getting enough group treatment. SVPP was also unable to generate individualized group participation reports.

The continuing use of dayrooms for groups on C-Yard was a concerning practice. During an observed group, the dayroom was noisy and other activities in the area detracted from the therapeutic quality of the group. The Special Master's expert observed that group therapy rooms outside of the housing units were not routinely utilized for group, but for IDTT meetings and individual therapy. Although these rooms were small, they could have accommodated smaller groups of higher functioning patients.

Another continuing concern at SVPP was the lack of group therapy tailored to individual patient needs and their treatment plans. Staff confirmed that because of physical plant limitations and other factors, attendance at groups was not treatment-specific. Rather, patients attended based upon their desire to attend and where the groups were located, rather than for clinical reasons. On C-Yard, groups were assigned according to area of the building where the patient was housed rather than treatment plan. Administration indicated that they were working on increasing patients' total out-of-cell hours, including yard and leisure time, to an average of 16 hours per week by July 2014, for patients fully participating in programming.

126

Staff reported that implementation of the new PaWSS system had begun (*see infra* "Quality Management") and that it would assist clinicians with all aspects of aligning patients' therapy sessions with their treatment plans. PaWSS will have the capacity to track group hours by patient, group, foci, program, unit, facilitator, and schedule, among other things. It was being further developed to track numbers of structured treatment hours that were scheduled, conducted, and/or attended; attendance (by patient); and groups provided (by facilitator). Reportedly, additional capacities were in the early stages of development.

Staff reported that as of January 23, 2014, psychologists began facilitating groups. They were required to complete a minimum of two group hours per week, and will be reevaluated before the next quarter with a view toward increasing the minimum number of weekly group hours they provide. SVPP reported that it would continue to monitor treatment groups being offered and work with IDTTs to determine whether clinical needs were being met and to add groups as indicated. In addition, the clinical supervisors in psychiatry, psychology, social work, rehabilitation therapy, and nursing would be meeting to discuss auditing of groups, using a form to evaluate each group facilitator and provide feedback to improve overall group dynamics. The institution also reported that a curriculum committee had developed a description of the treatment groups, and that it would be developing curricula and lesson plans.

SVPP indicated that the MAPP had been implemented on TC 1 and TC 2; implementation on C-yard was in progress at the time of the site visit. The MAPP module was used to assign treatment groups and track attendance. Staff also reported that yard times were 11:30 a.m. to 3:30 p.m. in all areas.

As of January13, 2014, times of treatment groups were changed to assist with providing groups during afternoon hours and increase patient and staff awareness of uniformity of group

schedules across all units. Schedules in TCs 1 and 2 will change as necessary, and the MAPP rollout in C-Yard will continue. Program staff were working with headquarters IT staff to generate PaWSS reports to assist with the monitoring of treatment groups and data entry into MAPP.

SVPP reported that it had purchased eight therapeutic modules to be used for maximum custody groups, solo programming, and confidential treatment sessions. The goal was to have eight modules in a room to provide orientation groups to all newly admitted patients. Staff reported that discussions about placement of the modules in TC 1 were ongoing.

### 3.    **Individual Therapy**

Individual treatment and counseling continued to be underutilized at SVPP. At the time of the March 2014 visit, the default practice for one-to-one clinical encounters was to have two MTAs in the same room, compromising confidentiality of the session. This practice appeared to stem from misunderstanding of the current policy and institutional cultural perceptions of patient dangerousness. The Special Master's expert observed that perceived levels of "dangerousness" were not individualized and were overestimated in the context of these clinical contacts.

Some efforts to improve were being made. Administration reported that the acting chief of psychology was monitoring the quality and quantity of each psychologist's work load. All psychologists and social workers were expected to complete their assessments before IDTT meetings. Program management designated set times on the units for the clinicians to have individualized therapy sessions in treatment rooms rather than at cell front. The units were reported to be creating a structured schedule for all disciplines so that one-to-one time will be scheduled regularly.

Administration indicated that beginning in April 2014, once the therapeutic modules are

installed, patients for whom their use is clinically indicated will be more accessible to clinicians for individual therapy sessions.  The institution reported that SVPP will conduct monthly audits of completion of individual therapy sessions.

### 4.     Other Treatment Issues

During the February 2014 visit, staff reported there was no policy or procedure for patient requests to see a mental health care provider; patients merely told any staff member they needed to see one.  The request was conveyed to the SMTA, who documented it on the 24-hour report and contacted a clinician.  This practice was not tracked or documented.  Patients reported that multiple requests often did not elicit a response.

During the March 2014 visit, SVPP staff indicated that psych sick calls had been incorporated into the existing medical sick call nursing policy and procedure AD 6.32.  The policy did not require the psychiatrist to review the psych sick call log every day or record that he saw the patients, or indicate what action was taken for patients who were not seen.  It also did not contain procedures on what was done with the log, who was responsible for follow-up with the patient, how soon the follow-up would be provided, what was done on weekends, and how emergency requests were to be handled.

MTA escort practices remain unchanged, with the default practice being two MTA escorts present for all out-of-room patient encounters, unless clinical staff request they wait outside.  The SMTA assigned to C-5 indicated that all escorts were completed with two custody staff, regardless of the patient's custody status or stage designation.  This was confirmed by observation of patient escorts in TCs 1 and 2.

CDCR custody staff did not interfere with DSH operations and worked collaboratively with MTA staff to support the DSH mission.  CDCR custody staff ran yard every day.  During

yard time, MTAs were utilized to escort and cover psychiatry and psychology/social worker one-to-one clinical appointments, RN assessments, and solo dayrooms.

## VI.    PATIENT ACCESS TO TREATMENT

### 1.    Standards and Procedures for Orientation and Stages

At the time of the December 2013 visit, SVPP reported that it was creating a 14-day orientation program for all newly admitted patients.  This program was intended to include focus groups on what patients may expect at SVPP, individual therapy sessions, group sessions with other patients on orientation, clinical assessments, socialization techniques, medication management, and treatment planning, among other things.

The new orientation program would include patients cleared for non-cuff status as well as those remaining on it by decision of the ICC/IDTT.  The plan called for SVPP to house all orientation patients in one wing on TC 1, rather than throughout the facility.  The program would have a designated and trained admission treatment team, and be tracked to assist with improved utilization and delivery of care and resources to patients.

### 2.    Cuff Status

During the February 2014 visit, the executive director reported that SVPP was working on three ADs that would affect cuff status: AD 6.1, Orientation; AD 6.2, Maximum Custody Status; and AD 6.3, DPS.  Review of these ADs indicated they would benefit from clarification of the maximum custody review process and IDTT action, placement and removal criteria for DPS, and documentation of staff action to place or remove a patient from DPS status.

At the time of the February 2014 visit, the cuff status policies at SVPP required that, regardless of their custody levels, SNY patients be cuffed on arrival and remain cuffed until ICC/UCC review, with no rationale.  SVPP staff provided a cuff status report indicating a total of

17 patients on cuff status.  Of those 17, five were new admissions not yet seen by ICC.  For the remaining 12 patients, the duration of cuff status ranged from two to 437 days, with several on cuff status for nearly a year or longer.  The reasons for patients continuing on cuff status included maximum custody status, assaultive behavior, threatening behavior, and IEX.

Although significantly fewer patients were on cuff status than during the Special Master's August 2013 visits, chart reviews for all patients on cuff status indicated that there were still problems in this area.  Eleven of the 12 patients were kept on cuff status based on input from the clinical team.  Important items were missing from records, such as behavioral plans and documentation of initial placement and ongoing retention of cuff status.  Treatment plans were not modified to address whatever behavior allegedly created the need for cuffs, often resulting in patients being denied treatment.

By the time of the March 2014 visit, the use of cuff status showed continued improvement, as evidenced by a decrease in its utilization.  The executive director reported that he had signed these ADs.  Review of the revised, signed directives indicated that they did not consistently cross-reference other related internal policies.  There was a significant modification to AD 6.1 in that patients not at maximum custody status would not be automatically placed in handcuffs/mechanical wrist restraints upon admission, i.e. during orientation, as in the past.  There was an absence of procedures regarding proper utilization of therapeutic modules where indicated for those patients on maximum custody status, for example, the policy did not state that a patient shall not be handcuffed while placed in a module.  Review of AD 6.2 indicated a need for greater clarity of the treatment team's role in making recommendations to reduce custody status to the ICC.  AD 6.3 did not contain adequate oversight, supervisory and management safeguards.  For example, AD 6.3 did not specify if, when, and how a treatment team might

remove a patient from DPS when clinically indicated, leaving placement and release nearly exclusively to the SRN or SMTA.

These practices violated SVPP policy as well as acceptable clinical practices. SVPP policy requires that cases of patients remaining on cuff status for long periods must be reviewed and fully documented. Reason(s) for cuff placement must be fully documented with each placement and at each treatment team meeting wherein cuff status is continued. Cuff status should call for treatment interventions calculated to move the patient to a less restrictive treatment environment, and should also require increased individual clinical contacts with the psychologist, social worker, and psychiatrist.

## VII.  REFERRALS AND TRANSFERS

SVPP provided a report indicating 55 patients who transferred into SVPP from December 1, 2013 to January 31, 2014. Fourteen or 25 percent of these transfers occurred within the 30-day time frame, and 41 or 75 percent were out of time. The average transfer time was 42.9 days, with a range of six to 128 days.

Staff reported that transfer delays were largely due to lack of available beds. Notes on patients awaiting transfer longer than 30 days indicated additional reasons, including patients being out to court and pending 2602 hearings.

During the March 2014 visit, staff presented data indicating that after transfers during that week, there would be 14 inmates on the ICF list of pending referrals.

## VIII.  ADMISSIONS AND DISCHARGES

During December 2013 and January 2014, of the 50 patients who had been at SVPP at least ten days, 48 or 96 percent had their ICC meetings completed within ten days. During the same period, there were five additional patients who had not yet been there for ten days.

Suicide risk assessments were documented at the time of admissions, but generally at no other times. Documentation of "contracting" with the patient for safety was not a valid alternative to a suicide risk assessment.

## IX.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

It remained clear from the February and March 2014 visits that even if patients' behaviors were due to their mental illness, they remained subject to multiple forfeitures of behavior credits, increases in their classification score, referrals to the DA for possible prosecution, as well as no meaningful mitigation of penalties. This means that CDCR patients housed in CDCR-DSH jointly operated facilities were subjected to a disciplinary process that could result in their being incarcerated for longer periods for the same behavior that might yield a different result if the patient had been housed in facilities managed solely by DSH.

At the time of the February 2014 visit, there were no changes and/or additional training for clinical staff regarding the RVR process at SVPP. Staff reported that the most recent training on preparation of mental health assessments for use in the disciplinary process was provided approximately two years earlier. Staff also reported that only social workers completed these assessments, and there was no related review or quality assurance process.

During the February 2014 visit, documentation of the total RVRs issued during December 2013 and January 2014 was requested but not produced. Review of the SVSP disciplinary log for SVPP patients housed in TCs 1 and 2 for the months of January and February 2014 showed there were a total of eight RVRs issued to six patients. Three of the RVRs were for battery on a peace officer, two for threat of force on a peace officer, one for battery on a non-peace officer, one for assault, and one for refusal to test for a controlled substance.

During the March 2014 visit, the monitor was advised that one training session for social workers on how to prepare a CDCR RVR mental health assessment had been completed since the site visit during the preceding month. The SVPP RVR coordinator reported that additional training sessions were planned.

The coordinator maintained a log of all requests from SVSP disciplinary officers for an RVR mental health assessment, assigned the assessments to an SVPP clinician for completion, and tracked the assignments to ensure timeliness of response to the SVSP disciplinary officers. Review of the SVSP disciplinary log for Facility C identified seven RVRs issued to four SVPP patients during January 2014, six of which were for IEX and one for fighting. Five of the RVRs had been heard, all resulting in a guilty finding, a loss of 90 days' credit, and a subsequent assessment and addition of up to six classification points for each RVR by the UCC/ICC. There was no loss of privileges assessed by the SHOs due to the patients' mental illness. Given the paucity of privileges for SVPP patients generally, the loss of no privileges had little practical effect.

However, the guilty findings may in themselves extend these patients' earliest possible release dates. *See* Title 15, section 3327(a) (2), Restoration of Forfeited Credit, "No credit shall be restored if the inmate is found guilty of any subsequent rule violation that occurred within the required disciplinary-free periods provided in Section 3328." It also must be kept in mind that for each patient at SVPP who received an RVR for IEX while at a CDCR prison, there was a mandatory referral to the DA for consideration of prosecution.

Unlike at SVPP, however, other DSH programs such as ASH or CSH (CSH) which treat CDCR patients do not have a policy or practice of referral to the DA, loss of credit/increased time to serve, or potential terms in the SHU. Rather, according to SVPP staff, if IEX behavior

occurred at ASH or CSH, the response would be action via the patient's treatment plan or behavior plan, and the patient would not receive a CDCR RVR, no lost credit, not gain additional classification points, and not have to serve a longer prison sentence.  Referral to the DA may be considered based on the patient's commitment offense.  File reviews indicated rote, formulaic findings in ICC classification chronos regarding RVR guilty findings, and no real mitigation of disciplinary measures because of the patient's mental illness.

During the March 2014 visit, staff reported that the program was drafting a revision of its IEX policy based on CDCR's policy and mandated RVRs for all incidents of IEX or masturbation.  This was a marked departure from prior DSH policy which did not mandate RVRs. Mental health staff at SVPP were provided training on the IEX program at VPP.  Staff reported that a training module for unit staff was also being developed.  The module focused on IEX patients and the behavioral management of such patients.

X.    **USE OF SECLUSION AND RESTRAINTS**

On December 1, 2013, SVPP revised and implemented AD 14.03, "Seclusion and/or Behavioral Restraint."  Pursuant to this directive, "a patient in seclusion or restraint shall be evaluated every 15 minutes, especially in regard to regular meals, water and snacks, bathing, the need for motion and exercise, and *use of bathroom privileges*, and documentation of these evaluations shall be entered in the patient's record."  Further, DSH Procedure 3.03-Nursing Care of Patients in Seclusion and/or Restraints dated May 2013, Section (E) requires …. offering of a urinal and bedpan at least every two hours or when requested by the patient and document (*sic*). The policy did not include instructions for removal of the used bed pan and/or urinal from the seclusion room.  Staff reported that procedures for removal had been in the 2010 policy but were deleted in error during rewriting in 2013.  The coordinator of nursing services reported that

135

removal procedures will be restored.  Review of records revealed that while nursing appropriately documented 15-minute evaluations, it did not find appropriate offering of bathroom privileges for patients in seclusion during December 2013 and January 2014. Documentation was not found in the IDNs, seclusion and restraint intake and output record, or the observation notes and records of any of the patients reviewed.

SVPP maintained restraint, seclusion, and "timeout" logs on each housing unit.

### A.    Restraints

Restraints were utilized twice during December 2013 and January 2014.  One patient was placed in restraints in C-5 during January 2014 for two hours and 45 minutes.  A second patient was placed in restraints in TC 2 during January 2014 for four hours and 35 minutes.  Appropriate documentation was found in the medical records, including psychiatry orders and range of motion.  Restraints were used twice during February 2014, for one-hour and four-hour durations. Both episodes occurred in housing unit C-5.

### B.    Seclusion

From December 2013 through February 2014, there were 57 instances of seclusion involving 43 patients.

During December 2013, in housing unit C-5 there were five instances of seclusion among five patients, with a range of 16 hours and 30 minutes to 205 hours.  In C-6 there were six instances of seclusion among four patients, with a range of 14 hours and 30 minutes to 135 hours and 30 minutes.  In TC 1, one patient was placed in seclusion for 65 hours and 55 minutes.  In TC 2, there were eight instances of seclusion among seven patients, with a range of six hours and 15 minutes to 119 hours and 30 minutes.

In January 2014, in C-5, nine patients were involved in 13 instances of seclusion, with a

range of 12 hours to 69 hours.  In C-6, one patient was placed in seclusion on three occasions, with a range of ten hours and 25 minutes to 45 hours and 55 minutes.  There were no placements in TC 1.  In TC 2 there were three instances of seclusion involving three patients, with a range of 16 hours to 48 hours and 50 minutes.

In February 2014, reviewed charts contained appropriate documentation, including timely psychiatry orders and nursing documentation of seclusion.  However, as during the prior visit, none of the charts included documentation of the offering of urinals and bedpans every two hours, as required by SVPP policy.  In C-5, three patients were placed in seclusion six times, with one patient having three placements and one having two.  Time in seclusion ranged from one hour and five minutes to 186 hours.  One placement was ongoing at the time of the site visit. In C-6, four patients had five placements in seclusion during February 2014, with one patient having two stays.  The range of stay lasted 11 hours to 70 hours and 25 minutes.  In TC 1, one patient was placed in seclusion for danger to self.  He remained there for 115 hours and 15 minutes.  In TC 2, five patients (one of them twice) were placed in seclusion, with time ranges from 23 hours and 20 minutes to 157 hours and 40 minutes. TC 2 had a hole in the floor for patients to utilize for toileting, and the remaining units utilized urinals and bedpans.

### C.    Timeout

SVPP continued to utilize "timeout," which means placing patients in locked seclusion rooms.  Many timeouts were in violation of SVPP's own policy, lasting well over 30 minutes at a time, and over three hours within a 24-hour timeframe.  Pursuant to policy, timeout placement can only be pursuant to a patient's treatment plan.  Placement is not to exceed 30 minutes and the patient is to be observed and supervised by a staff member, as described by the executive director as regular 15-minute checks.  Timeout placements shall not exceed three hours total in

24 hours without shifting to seclusion status, and the date and time of placement must be documented.  SVPP had two policies addressing the use of timeout.  AD 14.01, Behavior Management of Patients Section III (G), defines "Timeout" as "a patient's voluntary change in previous activity and/or location (unlike seclusion, which is involuntary) for the purpose of re-establishing appropriate self-control.  Staff may well suggest such a change, but the patient must freely consent."  AD 14.01 also notes that use of timeout must be developed through the treatment team in conjunction with the Senior Psychology Supervisor and noted in a behavior management treatment plan.  AD No. 14.03-Seclusion and/or Behavioral Restraint also addresses the use of timeout at SVPP.  Section IV (K) Time Out Room states that a patient may be placed in a room or other area pursuant to behavior shaping techniques such as "time-out."  Section V(A)(7) further notes that "time-out" confinement pursuant to behavior shaping techniques such as 'time-out,' *may only be used as part of a written Treatment Plan*, shall not be used for convenience of staff, and may be used only according to specified standards and procedures.[8]

SVPP began logging/tracking timeout usage during November 2013 and utilized timeouts during December 2013 and January 2014.  During December 2013, three patients were in the timeout room four times in TC 1 with a range of 40 minutes to ten hours and twenty five minutes.  In TC 2, five patients utilized timeout 19 times, with a range from 45 minutes to five

---

[8] a)      Placement alone in a room or other area shall be imposed only when less restrictive measures are inadequate.
b)      Placement alone in a room or other area shall only be implemented by a qualified professional trained in behavior-shaping techniques and authorized in accordance with the written policies and procedures of the facility to order the use of behavioral-shaping techniques.
c)      The period of placement alone in a room or other area shall not exceed thirty minutes.
d)      The patient shall be observed and supervised by a staff member.
e)      The period of placement alone in a room or other area shall not exceed a total of three hours in any twenty-four hour time period.  If the placement alone in a room or other area exceeds a total of three hours in any twenty-four-hour time period, it shall then be considered seclusion and shall be governed by the procedures and standards set forth herein for seclusion.
f)      The date, time, and duration of the placement shall be documented.
g)      In treatment facilities where patients are placed alone in a room or other area as a behavior-shaping technique, there shall be written policies and procedures governing use  of such behavior-shaping technique.

hours.  There were no instances of patients utilizing the seclusion rooms for timeout in housing units C-5 and C-6.

During January 2014 in TC 1, six patients utilized the timeout room eight times with a range of two hours to fifteen hours.  In TC 2, five patients utilized timeout 16 times, with a range of one hour to 23 hours.  There were no instances of patients utilizing the seclusion rooms for timeout in housing units C-5 and C-6.

During February 2014, 13 SVPP inmates were placed in timeout on 27 occasions.  TC 1 had five patients and ten placements, one patient with four placements and one inmate with three placements.  Only one of the 27 placements in TC 1 was under 30 minutes; the remainder ranged from 35 minutes to 23 hours and 55 minutes.  TC 2 had eight patients with 17 placements, one patient with eight placements, one patient with three placements, and the remaining patients all having one placement.  In TC 2, only one placement lasted 30 minutes, and the remainder ranged from one hour to 13 hours and five minutes.  Logs for all units were completed during the month of February 2014, including the date and time of placement, but none of the reviewed health records included timeout placement in any of the treatment plans.

Patients who requested a timeout were moved to the seclusion room within the unit. Doors of the timeout room remained locked when the patient was inside.  Patients in C-5, C-6, and TC 1 were placed in rooms without toilets or sinks.  TC 2 rooms had toilets and sinks.  As seen in the month-by-month summary above, the 30-minute limit was always exceeded, as was the three-hours in a 24-hour period rule, noted in the above AD.  Patients were never converted to seclusion status and remained in "timeout" status for as much as 23 hours in one instance. TCs 1 and 2 utilized timeouts more frequently than C-5 and C-6.  The timeout logs for TCs 1 and 2 were incomplete.  There were patients with extensive lengths of stay in timeout in these units,

including one patient who was in timeout for 23 hours.

## XI.  UTILIZATION REVIEW AND QUALITY MANAGEMENT

At the time of the March 2014 visit, SVPP did not have an operational quality improvement or performance indicators process in place.  Data from MAPP was available for TCs 1 and 2.

The program was continuing to work on implementation of the PaWWS, an electronic system for tracking and reporting.
It had not been fully implemented in C-5 or C-6.  The monitor was notified that the available data was "preliminary" because DSH headquarters was in the process of constructing PaWSS standardized reporting formats, and SVPP's ability to produce usable reports was contingent on completion of that process.

At an observed PaWSS roll-out meeting during the March 2014 visit, discussion included concerns by staff, specifically MTAs, surrounding patients gaining knowledge of staff names via the patient's being given a copy of their treatment plans to sign.  Management, however, acknowledged the patients' right to the information contained in their treatment plans.  This was a program cultural issue that needed to be addressed.

## XII.  LAUNDRY AND SUPPLY ISSUES

SVPP reported no problems with adequate amount of supplies including soap, shoes, deodorant, toothbrushes and shoes.  However, serious problems with laundry persisted at SVPP.  Some clothing sent to the PIA at ASP through SVSP was not returned to SVPP; clothing that was returned was not consistently of the right size and same condition as what was sent there.  Within SVPP, there were still problems with lack of inventories individualized for the patients, including SVPP staff not knowing what each individual patient actually has and/or needs.

During the December 2013 visit, staff reported they were in the process of ordering 16 sets of laundry for each patient, but by mid-January the order had not yet been placed.

The SVPP laundry committee continued to meet to address this problem. However, there was no representative from SVSP on the committee. The laundry committee reported to the SVPP quality council (an internal DSH committee including all SVPP department heads), from which the SVPP executive director brought laundry issues to the SVSP Chief Executive Officer (CEO) and warden.    Following the February 2014 visit, SVPP took a number of steps to address the laundry problem:

- Assigned two MTAs to work specifically on laundry issues.

- Agreed with SVSP laundry staff to address problem of return of unserviceable items.

- Agreed with SVSP laundry staff that SVSP will correct any deficiencies in the amount of returned laundered items from ASP if short.

- Purchased new clothing, linens, and towels.

SVPP reported that the assigned MTAs cleaned and organized the clothing rooms of the housing units for TCs 1 and 2. The clothing room of the housing unit of C-5 and C-6 was still in the process of being renovated. The MTAs were also working on identifying additional storage space in each housing unit for laundry storage.

At the time of the March 2014 visit, MTAs reportedly were working on a system to establish accountability for clothing, linen, and towels at the housing unit and patient levels and meeting with the housing unit patient councils to increase the amount of laundry exchanged each week. Staff did not know what each patient had or may need, nor how to conduct a laundry exchange and maintain an accurate accounting for each patient. It was reported that the plan was to implement a one-for-one exchange process for all patients and limit each patient to one set of

141

clothing in his room.  Staff were under the impression that patients were not turning in their soiled laundry out of fear of not getting clean items or the same ones back.

At the time of the February and March 2014 visits, laundry was processed in two different areas at SVSP, Facilities A and C laundry rooms.  During the March 2014 visit, the SVSP Facility A Materials and Stores Supervisor-I (M&SS-I) confirmed the agreements referenced above.  However, for the process to work, DSH staff needed to be present during the count of the soiled laundry as it was processed at the SVSP clothing rooms, and during the count of the clean laundry as it was processed back.

As of the monitor's latest visit in March 2014, SVPP had not resolved the problem of how to ensure that all of its laundry was returned after being cleaned at ASP PIA.  The practice at the time of the visits was that a "serviceable" item be returned, but not necessarily the new item that had been sent for cleaning.  SVPP reported that as a result of its purchase of laundry items, it had 16 sets of clothing for each patient, plus three sets provided by SVSP.  However, the new clothing has not been put into use at the time of the site visit because of the possibility it will not be returned from ASP after being cleaned.  Staff indicated that until DSH, SVSP, and ASP PIA reach an agreement ensuring the new laundry will be returned to SVPP, these items would not be used.  ASP PIA participation and agreement is critical to any resolution to the ongoing laundry problem.  Staff reported that SVSP staff were beginning to participate in SVPP laundry committee meetings, which the monitor did observe to be occurring.  The monitor recommended that ASP PIA representatives attend SVPP laundry committee meetings to help resolve the ongoing laundry issues.

The SVPP laundry committee reported that it had identified five possible long-term solutions:

1. Maintain status quo and improve accountability.

2. Work directly with ASP PIA and not use SVSP laundry staff.

3. Contract out laundry services to local provider.

4. Utilize Correctional Training Facility (CTF) laundry services.

5. Purchase and install washers and driers in a DSH building and do its own laundry.

## XIII.  LAW LIBRARY AND CHAPLAINCY ACCESS

Patients complained of lack of access to the law library and to the chaplains.

EXHIBIT D
Vacaville Psychiatric Program (VPP)

<u>**Vacaville Psychiatric Program (VPP)**</u>
September 11, 2013 – September 13, 2013
October 21, 2013 – October 23, 2013
January 13, 2014 – January 15, 2014
March 12, 2014 – March 14, 2014

I.    <u>**INTRODUCTION**</u>

    The DSH' VPP provides acute and intermediate inpatient mental health care to CDCR

inmates.  Although VPP is located within the CMF, which is one of the 34 facilities of the

California Department of Corrections and Rehabilitation (CDCR), admission to VPP is available

to all CDCR inmates in need of the services provided by VPP.

II.    <u>**SUMMARY OF THE FINDINGS**</u>

- **Although all psychiatry positions were covered at VPP, psychiatry did not satisfy VPP's own staff-to-patient ratio in one acute care unit and three intermediate care units.**

- **Psychology did not satisfy VPP's own staff-to-patient ratios in six acute care units and two intermediate care units.**

- **Nursing staff satisfied VPP staff-to-patient ratios in all units on all watches.**

- **As a default practice in the acute care program, patients were cuffed behind their backs in IDTT meetings, with two MTAs placed next to them.**

- **Some patient assessments at VPP that should have been completed outside of IDTT meetings were being conducted during the meetings, diverting attention and resources from preparation of thoughtful and responsive treatment plans.**

- **Treatment plans for intermediate care patients were often generic, too vague, and not an adequate indicator of patient progress.**

- **The quality of therapeutic groups ranged from inadequate to good, but the amount of group therapy in both the acute and intermediate care programs was severely deficient.**

- **Outside of the 64-bed HCITC, treatment and interview space was extremely limited and far too inadequate for VPP to provide the amount of treatment needed by its patients.**

145

- **Individual treatment was far too scarce to meet the treatment needs of patients at VPP.**

- **VPP lacked the capacity to track individual treatment hours.**

- **Condemned patients at the acute level of care received far less treatment than other patients at the acute level of care, and received only one hour of individual dayroom time on the weekend days, and no group activities or yard time at all.**

- **VPP had a PBST which provided a valuable treatment service, primarily to acute care patients.**

- **VPP generally adhered to policies and protocols governing the use of seclusion and restraints.**

- **All high-custody intermediate care patients, which included all patients designated for the SHU, administrative segregation, and SNY, who are admitted to VPP are initially placed on DPS. This means that until they were cleared from that status, they were held in stripped-down cells, and could attend groups only while handcuffed.**

- **VPP required two escorts for all patient movements, which diverted MTAs from other duties and sometimes resulted in cancellations of treatment and other out-of-cell activities. Staff conceded that this practice was not mandated by any AD.**

- **All RVRs issued to patients were processed and adjudicated within CDCR's RVR process. Although mental health assessments for use in the disciplinary process were routinely completed timely, SHOs rarely gave them appropriate consideration or mitigated penalties based on mental health input.**

- **VPP had a significant utilization review and quality management structure, although much of it was in its early stages.**

- ***Coleman* postings were found throughout VPP units.**

- **In the acute program, a patient had to progress to STEP V to be able to access the yard.**

- **There were no laundry issues at VPP.**

## III.    <u>CENSUS</u>

Patient capacity at VPP was 438, which included 354 single cells and 84 dorm beds.  As of the monitor's March 2014 visit, VPP housed 331 patients in single cell rooms and 75 in

146

dormitory beds.  Of the 218 beds in the acute care program, 204 were filled, and of the 221 intermediate care beds, 202 were filled.

All 64 beds in the HCITC were occupied.  Sixty-three of the 73 beds in the L wing-high custody intermediate care program were filled.  Of the 84 beds in the A wing-low custody intermediate care program, 75 were filled.

As of March 2014, retrofitting and licensing of the P3 acute care unit was completed but the unit was still empty.  In 2013, VPP began transferring patients to the newly-activated CHCF for further treatment and was continuing to do so in early 2014.  Clinicians in VPP intermediate care units L1 and L3 were being asked to evaluate each patient to determine whether they should be transferred to the CHCF or to an EOP.  Transfers to the CHCF were to begin March 24, 2014, at the rate of ten per week.  It was reported that once all patient transfers from VPP's L1 and L3 intermediate care units had been completed, no further moves would be taking place.  As of April 30, 2014, all patients had been transferred out of units L1 and L3.[9]

VPP maintained the master list, including the wait list of all CDCR inmates referred to acute care.  The SVPP did the same for all referrals of CDCR inmates to intermediate care.

## IV.   <u>STAFFING</u>

Since the beginning of 2014, VPP hired a chief psychologist, two program directors, two psychiatrists and two psychologists.  Additional hires included two social workers, one psychiatric technician, and seven RNs.  Staff indicated that three MTAs began working on March 1, 2014, and two rehabilitation therapists were scheduled to start in April 2014.  The health administrator had been selected and was pending appointment.  Interviews for the chief psychiatrist position began on March 21, 2014.

---

[9] Source:  Department of State Hospitals Monthly Report on the Licensure of Intermediate Care Treatment Programs at the California DSH-Vacaville, Salinas Valley, and Stockton, data as of April 30, 2014.

1.    **Administrative and Clinical Staffing**

There were no authorized senior psychiatrist supervisor positions, but two were in the blanket and were filled, with one serving as acting medical director.

A psychologist served as acting clinical administrator. The chief psychologist position was filled with a new hire in early 2014.

Although there were no authorized positions for supervising social workers, rehabilitation therapists, or senior psychologists at VPP, these positions were in the blanket and filled, as were three authorized senior psychologist specialist positions.

Psychiatrists. All 24 authorized psychiatrist positions were in the blanket, with 20 filled, for a vacancy rate of 17 percent. Registry staff covered all vacancies. Five psychiatrists had second positions within VPP. One was assigned to headquarters for statewide psychopharmacology.

Psychologists. VPP had 23 authorized psychologist positions, all of which were in the blanket, with 21 filled, for a nine-percent vacancy rate. Four psychologists also had second positions within VPP. One psychologist was assigned to headquarters to do V-Risk assessments.

Social Workers. The institution had 24 social work positions, all in the blanket. One social work position was vacant. Four social workers had second positions and another was a retired annuitant.

Rehabilitation Therapists. There were 23 rehabilitation therapist positions, all in the blanket, with 21 filled, and two employees scheduled to start in April 2014.

Medical Technical Assistants. The institution had 32.2 authorized SMTA positions, with 23 filled, for a vacancy rate of 28 percent.

There were 160.7 MTA positions authorized.  During the March 2014 site visit, there were 212 MTAs on staff at VPP, including three retired annuitants.

RNs.  There were 22.1 supervising RN positions authorized, with 21 filled, for a vacancy rate of five percent.  There were 54.7 authorized RN positions, and 72 RN positions filled.

Psych Techs.  Staff reported that as of the March 2014 visit, ten of the 16 authorized psych tech positions were filled, for a vacancy rate of 37 percent.  With two vacancies covered by registry staff, the functional vacancy rate was reduced to 25 percent.

## 2.    **Staff-to-Patient Ratios**

VPP's own established staff-to-patient ratios for clinical staff, including psychiatrists, psychologists, social workers, and rehabilitation therapists, were 1:15 for acute care and 1:35 for intermediate care on every unit.  Psychiatry did not satisfy these ratios in acute care unit P2 and in intermediate care units A2, L1, and L3.  Psychology did not satisfy these ratios in acute care units Q1, Q2, S1, S2, P1, and P2, and in intermediate care units L1 and L3.  Social work did not satisfy these ratios in acute care units Q3, S1, and P2, and in intermediate care unit L1. Rehabilitation therapists did not satisfy these ratios in acute care units Q1, Q3, P1, and P2, and in intermediate care unit L1.

Nursing staff (including psych techs, RNs, and MTAs) had specified staff-to-patient ratios for each shift.  The first watch ratio was 1:16 for all units.  The ratios for second and third watch were 1:8 for low custody units and 1:6 for high custody units.  As of March 2014, these ratios were satisfied.

In anticipation of a decline in patient census as a result of patient transfers to the CHCF, VPP reported that it was working on a plan to keep its budgeted positions.  This plan would

significantly enrich the MTA staffing ratio, as well as establish a clinician-to-patient staffing

ratio of 1:15 for both acute and intermediate care, across all disciplines

## V.     TREATMENT AND CLINICAL SERVICES

### 1.     IDTT

#### a.     Acute Care

During all visits, the Special Master's expert identified problems with treatment team

meetings and treatment plans in the acute care program.  In the absence of any controlling policy

or directive, all acute care patients in IDTT meetings, including patients at STEP V (see below),

were cuffed behind their backs, with two MTAs next to them.  Staff reported that this practice

was the result of isolated occurrences of patients behaving aggressively toward the psychiatrist

during IDTT meetings.  Use of this practice as the default indicated a need for better staff

communication skills and therapeutic relationships with patients.  By the time of the March 2014

visit, it was reported that plans to discontinue this practice were underway.

Patient assessments were observed being conducted during IDTT meetings, even during

follow-up meetings.  This practice was attributed to a shortage of spaces where assessments

could be completed.  Use of the IDTT meeting as the time to complete assessments was a poor

use of the meeting and can be counterproductive to good clinical practice.  The result was that

IDTTs were sometimes diverted from accomplishing their objective of preparing a clinically

appropriate and responsive treatment plan.  For example, in one observed IDTT meeting, the

patient reported that his difficulties arose from a sexual assault by rival gang members, but

nursing staff were not attentive to this significant report from the patient because they were

discussing an unrelated matter.  The treatment plan developed for this patient was unresponsive

to his presenting problem.  In another meeting, the psychiatrist repeated the evaluation so that the

entire IDTT could hear the patient's answers, but the resulting treatment plan was too vague to adequately address the patient's long history of suicidal ideation and behaviors.

The Special Master's expert observed three follow-up IDTT meetings on unit P1. Discussion of treatment interventions with patients was vague and minimal. Some scheduled patients could not be seen in IDTT meetings because MTAs had been diverted to yard duty. Nursing staff participation was observed to be minimal in IDTT meetings at VPP.

### b.    <u>Intermediate Care</u>

IDTT meetings typically were held within the patient's first 72 hours, at ten days, and then monthly thereafter. The quality of observed intermediate care IDTT meetings ranged from adequate to good. They were attended by a full complement of staff who had access to relevant documents. Treatment plans were discussed with patients. In some cases, staff discussion was quite limited, although in other cases it was apparent that staff was knowledgeable about the patient and utilized the meeting to review the treatment plan and the patient's progress towards treatment goals. However, similar to observations in the acute program, some staff conducted assessments during IDTT meetings, diverting the meeting from its objective of developing clinically appropriate treatment plans.

Treatment plans often repeated notations from past meetings, including the same diagnoses, problems, and interventions that were often generic and did not reflect ongoing diagnostic thinking, success or lack of success with clinical interventions, and/or consideration of changes of interventions where indicated. As a result, treatment plans were often an inadequate gauge of patient progress, and did not reflect whether diagnoses should be re-formulated, interventions should be reconsidered, or whether patients were improving and/or progressing

toward discharge, or whether the discharge plan should be modified to address barriers to transition to outpatient care.

    2.    **Group Therapy**

        a.    **Acute Care**

Therapeutic groups varied in quality.  Some were well facilitated and appeared meaningful to patients, while others were inappropriate to the functioning levels and treatment goals of the patients.  According to staff, all groups required two facilitators, one of whom may be an MTA, nurse, or other staff, and may or may not be a contributing facilitator.  An MTA stood outside the door of the group room while group activities occurred.

Scheduled treatment hours included non-therapeutic activities such as magazine exchange, which was credited as one hour.  As of the March 2014 visit, provision of out-of-cell and clinical treatment activities remained very minimal, at only 1.4 to 4.7 hours per month.  This was dramatically less than what review of patient records indicated was needed for these acute care patients.

Patients complained that group offerings were insufficient, and that there was no one to talk to when they were having difficulties.  There was also inexplicable wide variation in the amount of scheduled treatment hours among patients, with some scheduled for one hour and others for up to 36 hours.  It was not clear from the treatment plans how these differences were determined or what the treatment goals were for those patients given high treatment hours as compared to those scheduled for very little treatment.  VPP did not have the capacity to track individual treatment hours and could not verify whether the stated treatment hours were achieved.

Data for July through December 2013 revealed a monthly average of only 9.57 group hours scheduled and only 4.53 hours attended. The treatment schedule provided for little more than two hours of weekly treatment per patient, which was very inadequate for the acute level of care. Reasons for patient non-attendance were not tracked. Staff reported reasons such as treatment groups not taking place; competing activities such as involuntary medication administration and hygiene; emergency responses; and lockdowns. Consequently, it is estimated that actual group attendance time per-patient would more likely be approximately one hour per week.

During the March 2014 visit, staff provided information on out-of-cell activities, but it was erroneous and incomplete due to ongoing implementation of PaWSS. The quality of reporting had improved by February 2014. The average number of hours reported as attended per-month from December 2013 through February 2014 was 12.84 hours. The average number of hours reported as attended per patient per month for the same period was 3.1 hours.

VPP also offered some enrichment hours, which included groups led by MTAs, yard, solo programming time for patients on discretionary programming status, and dayroom. The reported average number of enrichment hours attended per patient per month was 10.5 hours.

The Special Master's expert found that treatment space was insufficient for the acute care program. There was one multi-purpose room that was used for all group and most individual therapies, IDTT meetings, and other unit functions. To compound matters, scheduling issues and limited availability of MTAs exacerbated the limitations on out-of-cell time for patients. For each group session, VPP required one MTA inside the room and one outside. For example, during the October 2013 visit, an IDTT meeting was scheduled in the dayroom on unit Q3. No groups were scheduled that day until 1:15 p.m. because of the IDTT meeting and the yard time

scheduled for 10:00 a.m., making the room occupied and unavailable as treatment space.  With

eight to ten patients permitted to go to yard, two MTAs were required to be present at yard, and

because the other two MTAs were involved in patient checks, groups could not be run in the

dayroom at the same time.

During the March 2014 visit, several recently-implemented interventions were reported.

Therapeutic modules had been installed in the dayroom and in the interview rooms in acute care

units P1, P2, and S2, allowing for increased use of these spaces.  A quality assurance initiative to

identify and recommend ways of optimizing treatment space was also undertaken.  VPP had also

begun escorting patients off unit for psychological testing and individual clinical contacts in the

O1, O2, and P2 units, freeing up the dayrooms for more group therapy.  Observation of the room

in O1 that was utilized for off-unit interviews and testing indicated that it was appropriate for

patient interviews.

### b.    Intermediate Care

Group therapy in the intermediate care program ran on 11-week cycles, with two weeks

off for restructuring.  Groups were led by social workers, psychologists and recreation therapists.

In the HCITC (*see* below), MTAs stayed outside the group room.  The group space was

appropriate and adequate.  However, units in the older buildings each had only one multipurpose

room that was used for all groups, IDTT meetings, community meetings, recreation, admissions,

and individual sessions, limiting their availability.  In addition, clinicians' offices were accessed

through these rooms, hindering patient privacy and confidentiality during therapeutic sessions in

these multipurpose rooms.

1. **Dialectical Behavioral Therapy**

VPP reported that it had begun a DBT unit on A3, which was low-custody intermediate care. During Fall 2013, a DBT leadership committee was formed and informational meetings for staff and clinicians were conducted. Staff other than MTAs, who were considered management, were invited to submit letters of interest in working on the unit, and interested staff were being interviewed and selected during January and February 2014. During February 2014, clinical, nursing, and executive staff attended three days of DBT training at Napa State Hospital and a full-day leadership session was held at VPP for the executive team. Clinicians were expected to take three additional three-day trainings, and nursing staff were expected to take six days of training before the end of 2014.

2. **High-Custody Intermediate TC Program**

Program manuals for the HCITC and the VPP high-custody intermediate care program stated that a goal of these programs was for patients to develop positive relationships with each other. Activities directed toward this goal included group therapy sessions, therapeutic community, patient government, and yard activities.

The HCITC was a 64-bed stand-alone TC providing intermediate inpatient care to high-risk patients within a custody high-security setting. The unit had four wings (A, B, C, and D) with 18 patient rooms, all single-celled and with two showers per wing. The TC had two restraint rooms, two observation rooms, and two safety cells. Four group rooms with a maximum capacity of 18 patients were available.

The process of escorting patients from their housing areas to groups was time-consuming and labor intensive. Custody escort procedures for patients who did not have SHU or administrative segregation designations were not individualized according to risks. The Special

155

Master's expert observed that these same patients were not subjected to similar procedures in the prisons. Although patients were carefully monitored by multiple staff as they were being transported to groups, once inside the group-room they were not restrained or closely monitored.

The Special Master's expert attended groups during all four visits. The quality of the structured out-of-cell clinical activities was generally good. The quality of observed groups ranged from adequate to excellent. However, the amount of both structured and unstructured activities offered was inadequate. Key clinical and administrative staff reported that the predominant limiting factor in providing group therapy was the unavailability of MTAs due to escort practices, including escorting patients to off-unit appointments. Patients in the HCITC reported being placed in groups without apparent correlation to their treatment plans. This was confirmed in reviews of treatment plans.

VPP reported an average of approximately 18 hours of out-of-cell activities offered weekly from December 2013 through February 2014 in the HCITC. It did not distinguish structured from unstructured activities. However, patient reports and healthcare record review indicated only six to eight hours per week of true structured therapeutic activities offered in the HCITC. Patients and staff reported, and record review corroborated, that patients were locked down in their cells about 20 hours per day. Yard was limited to one hour per day, and dayroom was offered one hour every other day.

As of March 2014, healthcare records for patients housed in the HCITC included a tracking sheet that recorded monthly programming hours, listed as "scheduled" and "received." Times credited toward structured therapeutic activities were excessive or inappropriate. For example, book/magazine exchange was routinely listed as a weekly 45-minute out-of-cell encounter but it actually was recreational rather than treatment-focused, and involved only a few

minutes with the patient, who did not leave his room.  Many other recorded activities were merely time out of the patient's room but not for treatment purposes, for example, solo or group yard time, shower time, chow hall, and recreational small groups such as DPS-current events, and DPS-leisure.  Cell cleaning was often given 75 minutes of weekly treatment credit.

An observed group was conducted for four DPS patients who attended in waist chains and leg irons.  Prior to the patients' arrival, the clinician leading the group expressed the opinion that these patients did not require such a high level of physical restriction.  There was open discussion of relevant issues, as well as excellent rapport between the group leader and the participants and among the participants.  Patients voiced concerns that some MTAs removed privileges arbitrarily or punitively.  They thought that community meetings would be a helpful forum for discussing issues and resolving concerns.

### 3.    L1, L3, A2 and A3 (Non-HCITC Intermediate Care Units)

L-wing was an unlicensed high-custody intermediate care wing that included housing units L1, L2, and L3.  It was located among the CDCR housing units at CMF.  While the quality of the groups provided to intermediate care patients in these housing units was adequate, the number of hours actually provided to patients was insufficient, largely due to limited treatment space.

As of March, 2014, average weekly numbers of hours of out-of-cell activities were, by unit: L1 – 18.76 hours scheduled, 10.63 hours attended; L3 – 17.13 hours scheduled, 8.7 hours attended; A2 - 40.14 hours scheduled, 31.51 hours attended; and A3 – 36.24 hours scheduled, 24.76 hours attended.

For intermediate patients housed in L3, a review of the schedule revealed that there were several periods designated for DPS solo and DPS group activities, meaning that during these

times patients on DPS status were allowed to leave their cells and go to the dayroom. For those patients on Stages One to Three, the schedule indicated that "independent leisure" was available from 7:00 p.m. to 8:55 p.m. Such time was very limited as there was only one available room that was used for multiple purposes.

**3.**     **Individual Therapy**

**a.**     **Acute Care**

There was very little individual therapy in the acute care program, despite the clear need for it among patients who could benefit from its enhancement of gains made in group treatment, or as the appropriate treatment for patients not yet able to participate in group therapy. Given their workloads and resulting time constraints, psychologists rarely provided individual therapy, leaving social workers to provide what little there was, even though psychologists were more appropriately trained to provide treatment to the more severely mentally ill patients.

Monthly documentation of individual contacts suggested that the content and amount of discussion with patients varied across clinicians. Some did little but the most brief and basic check-ins, while others discussed the patient's case with some degree of depth. Very little of it was treatment-goal directed.

Most individual contacts with the psychiatrist occurred at cell front, as lack of available treatment space was a significant obstacle. If the patient was seen in the dayroom, MTAs were present. During the Special Master's expert's tour of unit S1 in October 2013, staff reported that the psychiatrist on that unit only did individual follow-up sessions as part of check-ins during the IDTT meeting, and apart from the initial psychiatric assessment, the psychiatrist did not see patients alone for clinical interventions.

Despite the small amount of individual contacts, psychologists and social workers

appeared to know their patients well.  Psychologists described the treatments they would like to provide, if given appropriate time and space.  Patients complained that whenever they approached their psychiatrist or staff to talk about their problems, staffs' immediate response was to offer a "PRN" medication, perpetuating reliance on external supports or solutions -- a risky strategy where a significant number of patients have co-morbid substance abuse disorders.

During February 2014, VPP began utilizing the off-unit treatment space in the O Wing and R Wing of CMF for psychological testing and individual therapy, primarily for patients in the acute care program.  Discussions with the warden were continuing with regard to further expansion of off-unit treatment space.  During the March 2014 visit, it was reported that three therapeutic modules had been installed in the acute care interview rooms.  These additional modules would make it possible for clinicians to see DPS patients or Step 1 patients for testing or individual therapy without an MTA present.  The AD governing the use of interview rooms was being updated accordingly.

### b.    Intermediate Care

As of March 2014, approximately one third of patients in the HCITC reported receiving individual treatment on a regular basis.  However, reports of availability of individual treatment varied, ranging from regular weekly one-to-one contacts to one patient reporting he had been told that individual contacts were unavailable.  Even patients reporting regular contacts stated that there was a "wait-list" and that it took up to a month for sessions to begin.  Similar to the acute care program, patients voiced concerns that staff was overly focused on offering medication rather than on individual treatment sessions to discuss patients' problems in a confidential setting.  Staff reported that staffing levels were too low to support any significant increase in individual treatment.

4.    **Other Treatment Issues**

   a.    **Psychology Services**

Psychologists' responsibilities were significant at VPP. They included conduct of suicide risk assessments, V-Risk assessments, psychological testing, IDTT membership, and preparation of a portion of patients' treatment plans. Staff indicated that allocations of psychologist positions were not sufficient to meet the demands posed by psychological testing and reporting, as well as the provision of treatment. Only one hour per day was allotted for psychological testing, and that hour could be easily lost due to any unexpected event in the unit such as a disruptive patient, urgent escort, etc. Psychologists reported having to choose between completing testing and treatment, and reported great difficulty with completing documentation timely.

Because testing by psychologists was done in the dayroom and some staff offices were located behind them, testing was often disrupted by staff traversing the dayroom, thereby compromising test administration conditions and potentially affecting reliability of test results. As noted above, during February 2014, VPP began escorting acute care patients off unit for psychological testing and individual contacts in the O1, O2 and P2 units, to afford some relief from these constraints on confidential space, as well as to free up the group room.

   b.    **Care of Condemned Patients at the Acute Level of Care**

All condemned male patients requiring acute level care were housed on unit Q3. Whenever a condemned patient left his cell, the entire unit was locked down, including the hallway grates.

Condemned patients received far less treatment than other patients in acute care. They had no access to any group activities or outdoor yard, and they were given only one hour of

160

individual dayroom time on Saturdays and/or Sundays.  They reportedly received at least a weekly contact from the psychiatrist and psychologist, although often at cell front, or if in the dayroom, an MTA was present.  The unit schedule listed programming for the condemned patients as four days per week, in the form of a total of four, one-hour blocks, meaning that condemned patients could receive no more than four hours of scheduled out-of-cell activity per week.  Programming occurred from 5:00 p.m. to 8:00 p.m., after most clinical staff had left the facility, suggesting that staff at the nursing level were facilitating the activity.  Showers were offered three times per week.

      **c.**     <u>**Yard**</u>

The VPP Program Manual, Policy and Procedure 3.06, stated that yard shall be held one hour per day, per unit, weather and security permitting.  Although it was discussed during shift change meetings, access to yard was not consistently documented at VPP.

During visits in 2013, staff reported that solo yards in the HCITC were difficult to offer daily, due to competing demands for the limited number of yards available.  Further, acute care staff reported that not all yard-eligible patients were offered yard daily, as only ten patients were allowed on the yard together.  Consequently, patients were provided with yard only on alternating days, depending on which side of the hallway their rooms were on.

However, as of the January 2014 visit, VPP reported that yard capacity increased from ten to 18 patients per daily yard release, and that yard was offered to all yard-eligible patients irrespective of which side of the hallway they lived on.  By the March 2014 visit, the monitor observed all units following this new practice.  Further, during the March 2014 visit, VPP staff reported that if poor weather prohibited outside yard, alternate programming was offered to groups in the dayroom, as dayroom was not typically utilized during yard time, due to lack of

MTA coverage during that time.

### d.    Positive Behavioral Support Team

Pursuant to AD 6.07, VPP had a consulting team known as the PBST that included a psychologist, a second psychologist who specialized in treatment of IEX, and an MTA. The PBST appeared to be a valuable treatment service. Its caseload included primarily acute care patients, with some intermediate care patients. This team saw patients in response to requests to be seen, interviewed patients, attended IDTT meetings, and developed treatment plans to assist the patient and the IDTT with addressing behavioral issues such as IEX, self-injurious behaviors, and resistance to treatment. Plans were underway to add an additional MTA to the team.

### e.    Medication Management

A VPP psychiatrist/psychopharmacologist described a program that was developed by DSH headquarters in which psychopharmacologists were made available for consultation and recommendations to DSH clinicians to assist with medication management of difficult cases. This was beneficial to treatment of VPP's population of severely mentally ill patients, some of whom had not experienced success with multiple medication trials or management of intractable symptoms.

## VI.    PATIENT ACCESS TO TREATMENT

### 1.    Standards and Procedures for Orientation and Stages

The programs at VPP did not use orientation, staging or cuff status. VPP had a STEP program in the acute care and intermediate care programs which is discussed below.

2.    **STEP Program**

The STEP program was structured to delineate each patient's privileges and access to activities within the program.  Patients were expected to demonstrate skills and advance within the STEP program to more privileges and responsibilities.

Program Manual provisions covering the acute care program, the HCITC, L wing, and the remaining, low-custody intermediate care units defined the requirements for advancement through each STEP as reported below under each area heading.

There were seven acute inpatient units at VPP: Q1, Q2, Q3, P1, P2, S1, and S2.  All condemned inmates were admitted to housing unit Q3.  The acute care program utilized a five-step progression from admission to discharge.  The Program Manual provided that there was no set duration for each STEP, except as clinical prudence suggested.  STEP progression was individualized and did not require the patient to reach STEP V in order to be discharged.  STEP progression depended on the patient's behavior, and was determined by the treatment team.  There was no ICC requirement for progression in the acute care program.

Upon arrival to the acute care program, patients were placed on STEP I Solo with cuffs in the dayroom.  The Program Manual stated that there was no change in STEP until team consensus was reached at the 72-hour conference.  Patients were allowed television privileges in dayroom with the channel selected by the patient, or alternate activity, with staff oversight.  Staff reported that in practice, once the patient successfully completed two out-of-cell activities, the patient could progress to STEP II.  Completed out-of-cell activities had to be approximately 30 minutes in length and could include individual clinical contacts and dayroom usage.

Pursuant to the acute care Program Manual, STEP II Solo without cuffs in the dayroom allowed television with the channel selected by the patient with staff oversight, or reading

material without staples in the dayroom.  Patients could also choose to write a letter under staff supervision only with approval to use a flexible pen or short pencil.  Patients were granted permission to make telephone calls as available on the unit, typically on third watch.  Use of the phone would be considered after the patient had been assessed by the treatment team and the ten-day treatment team conference had been held.

STEP III Small Group allowed patients to participate in groups with two to three patients. Patients had to have approval for the items used during the group in order to attend.

STEP IV Large Group included large group activities with four or more patients.  Again, patients had to have approval for items used during the group in order to attend.

STEP V was full programming status.  A patient had to progress to STEP V to be able to access the yard.

Despite staff reports that criteria for movement through the steps were based on two successful 30-minute out-of-cell activities, the acute care Program Manual Section 03.10 did not provide objective criteria for progression through the steps.  While some supervisory and clinical staff indicated that patients moved quickly through the STEPs, other clinical and custody staff reported differently.

During the site visits, the Special Master's expert observed with serious concern that more than half of acute patients could be without any access to yard because they had not yet reached STEP V. The Special Master's expert was also concerned that a decision to raise a patient up a STEP could not occur until the next scheduled team meeting, but a similar decision to reduce a STEP could be effected in a shorter time.

3.    **DPS**

This status was regulated by Section 05.13, DPS, of the Program Manual at VPP. Patients on DPS were held in a stripped-down cell with personal hygiene items pursuant to physician's order. The IDTT could approve additional items pursuant to physician's order. A safety blanket and safety gown, if applicable, could also be provided to a DPS patient. DPS status patients attended groups in cuffs and had limited phone use. Additional privileges included visitation (subject to team and custody clearance), access to library checkout, and in-cell recreation material checkout, as limited by their "issue status." DPS status patients were not eligible for yard privileges.

Patients admitted into VPP's HCITC or its non-HCITC high-custody intermediate care program first were placed on DPS status, where they remained during what was called the observation period, until cleared by the required clinical assessment and evaluation. All patients designated for the SHU, administrative segregation, and SNY remained on DPS status until cleared by the institutional classification committee (ICC). For SHU and administrative segregation patients, an ICC needed to suspend or hold the SHU/administrative segregation term in abeyance, and then DPS status remained in effect until the IDTT acted to remove or continue the status. The Program Manuals also provided that aggressive/threatening behavior, assaultive behavior/battery, and potential enemy concerns could have caused a patient to be placed on DPS status.

The Special Master's expert observed with significant concern that all patients discharged from the VPP acute to the VPP ITP, including those at the highest STEP of the acute treatment program (ATP) were automatically placed in DPS status without any individual clinical

assessment of risk, which resulted in a patient receiving less programming because he had improved clinically.

Prescribed treatment programming occurred following action of the IDTT to remove the patient from DPS status. VPP offered group therapy to patients on DPS for extended periods, for example, SNY patients who did not waive their SNY status. These groups included up to four DPS patients. The few process groups provided were targeted for the longer-term DPS-status patients. Most of the groups were leisure-oriented, reportedly due to rapid turnover of DPS patients. Regular access to solo yard was difficult due to limited yard availability. Solo yard was not typically noted in the patients' healthcare records, but was discussed in shift change meetings on the units.

4. **STEP 1**

Patients entering the ITP were placed in STEP 1. It was also the next step following DPS status for those patients who had been admitted into high-custody intermediate care.

STEP 1 was considered a period of further assessment and evaluation. A patient in STEP 1 would be placed in activities in order to provide "the opportunity to demonstrate his coping skills, his ability to assume greater responsibility for himself, and to identify areas to be targeted for improvement." Patients in STEP 1 were offered individual, group, and other therapeutic activities. Staff was required to record and evaluate patients' progress in STEP 1, which would be reviewed and utilized by the IDTT to decide whether or not the patient should advance to the next level or be given more privileges in STEP 1.

Patients in STEP 1 were required to be in STEP 1 for at least ten days prior to advancement to STEP 2. Their progress was required to be reviewed daily, with formal reviews occurring every 30 days. Patients "who clearly demonstrate readiness to assume greater

responsibilities may advance at any time to another level or be given more privileges" within STEP 1. Patients were required to be evaluated by the IDTT for continued participation in the program or possible discharge.

STEP 1 patients attended groups without cuffs. Privileges included limited phone use, visitation (subject to IDTT and custody clearance), access to library checkout, in-cell recreation checkout, sign-ups for haircuts, shaving and use of nail clippers, eligibility for a mini-radio in cell, limited yard privileges and canteen privileges up to a $10.00 maximum.

**5.    STEP 2**

Patients who had been in STEP 1 for at least ten days, and with "minimal prompting" attended all therapeutic activities, participated in groups, maintained personal hygiene and their cell, followed community rules, and completed and turned in assignments were eligible for advancement to STEP 2. In addition, these patients were required to participate in therapeutic community meetings, recover from lapses in judgment/behavior without seriously disrupting their treatment plans, and respect others and their property. Patients were also required to appropriately interact and socialize with other patients and staff and remain compliant with medications.

STEP 2 patients who successfully demonstrated appropriate behavior were given privileges including attendance and participation in all groups, limited phone use, visitation subject to team and custody clearance, access to library checkout, in-cell recreation material checkout, sign-ups for haircuts, shaving, and use of nail clippers, eligibility for a mini-radio in cell, limited yard privileges and canteen privileges up to a $20.00 maximum.

6.    **STEP 3**

In order to advance to STEP 3, patients were required to be at STEP 2 for at least 30 days.  In addition, they were required "without prompting" to attend all scheduled group activities, complete and turn in assignments, maintain personal hygiene and their cells, and follow community rules.  Other requirements to advance from STEP 2 to STEP 3 included active and appropriate participation in groups, recovery from lapses in judgment/behavior without serious disruption of the treatment plan, respect of others and their property, appropriate interaction and socialization with others, and remaining compliant with medications.

In addition to all available STEP 2 privileges, STEP 3 privileges included eligibility for Wii group, in-cell TV, eligibility for ward government chairperson or secretary positions, and canteen privileges up to a $35.00 maximum.

7.    **Retention and Reduction of STEPs**

STEP 1 patients who disrupted, disturbed or provoked others, or refused to participate in scheduled activities, assessments, evaluations and treatment groups were retained at STEP 1.  To continue in the program, they were required to be evaluated by the treatment team or possibly face discharge.

The Program Manual indicated that patients in the VPP were subject to possible return to a lower STEP if they disrupted the program, disturbed others, or presented serious disciplinary problems.  A reduction in STEP was to be seen "as a normal consequence of a general decline in behavior and/or performance," and "must not be associated with guilt or punishment."  The treatment team decided reductions in STEPs, and the reason for the reduction had to be clearly communicated to the patient so that he understood the reason for the reduction.  Policy further required any STEP reduction decision to be entered into the medical record in detail.

After hours and on weekends and holidays, staff was authorized to "temporarily reduce the patient to DPS until seen by the treatment team." The treatment team was then required to review the decision and decide whether to uphold or modify the STEP reduction "depending upon the nature of the patient's infraction."

Timely clearance by the ICC from DPS status was critical to a patient's advancement through the STEP program. During the September 2013 visit, the monitor found that ICC action took on average 36 days, with a range of 14 to 96 days. Once the patient was cleared by the ICC, his treatment team had to meet to remove him from DPS. There were no noted concerns with regard to the timeliness of treatment team action once the patient was cleared by the ICC. However, once the patient was formally removed from DPS status, he must remain on STEP 1 for an additional ten days, at a minimum, before potentially moving on to STEP 2. Therefore, because neither DPS status nor STEP 1 allowed access to yard, even if all timeframes were fully met, a patient moving from DPS status through STEP 1 would not have access to yard for at least 20 days after arriving at the VPP intermediate care program.

By the January 2014 visit, progress regarding the ICC process was noted. A second correctional counselor II (CC II) had been assigned to assist the ICC. Examination of new admissions from October 2013 through December 2013 found some acceleration of completion of ICC meetings, but of 35 new admissions, in 20 or nearly 60 percent of cases it was 15 days or longer before there was ICC action. As of the March 2014 visit, timeliness of completion of ICCs improved significantly. Review of the dates of ICC action for patients who were admitted to VPP intermediate care from January through February 2014 revealed 37 new admissions during that timeframe. Of those, 16 did not require ICC action, as they were neither high-

169

custody nor SNY patients, and the remaining 21 patients were all seen by the ICC within ten days.

The monitor observed several ICC sessions during the March 2014 visit, each of which was effectively administered by the warden and his staff. Clinical input was also effective and utilized by the committee.

The monitor observed that in the event custody factors were not modified by the ICC and the patient was not permitted to program unrestrained within the high-custody units, VPP could provide limited treatment in mechanical restraints, consider placement into another intermediate care program, or consider whether the patient was ready to transition to an outpatient setting. The treatment team could present the patient again at a later time for consideration for release from DPS status. However, there were instances when the ICC could not remove the status, for example for SNY patients. In those cases, the ICC requested the patient to waive SNY status during his stay at VPP. If the patient waived SNY status, he could fully program. Where the patient waived SNY, it was restored on discharge back to CDCR. Patients who did not waive SNY status continued on DPS status throughout their stays at VPP.

Where the ICC action resulted in continuation of custody status, the ICC could reconsider this action. There were no specific timeframes for such reconsideration, and whether to or when to re-refer the patient to ICC was up to the IDTT. Staff reported that when patients were maintained indefinitely on DPS status, the IDTT worked with the patient to provide some higher step privileges, such as a radio, and offering groups with up to four other patients on DPS.

The Special Master's expert observed with concern that patients including SNY patients who refrained from waiving their SNY status could remain on DPS for the duration of their stay in the program, which was effectively equivalent to administrative segregation. This concern

also extended to maximum custody (non-SHU and administrative segregation) patients who had previously attended their mental health programs in CDCR without cuffs, being required to be in cuffs to move around in VPP.

As of March 2014, VPP began tracking all patients on DPS status, including the justification for remaining on DPS, the ICC date, and ICC determination and comments. Program directors and program assistants compiled the tracking and reviewed it weekly. As of March 14, 2014, there were 11 patients in the intermediate care program who either remained on DPS status after ICC action or were placed back to DPS status due to behavioral issues including RVRs.

### 8. Low-Custody Intermediate Treatment Program

Pursuant to AD 04.12, before a high-custody patient could be placed into a low-custody unit, ICC action was required. Similar to the high custody units, the low custody intermediate care program utilized the STEP model; however, it did not utilize DPS status. Advancement through the STEP process was IDTT-driven. The privileges at each STEP were greater than those at the analogous STEP in the high-custody program.

### 9. Escorting Practices

VPP required two escorts for any patient movement. CDCR custody staff stated that this policy was enforced for all off unit escorts pursuant to the MOU between CDCR and DSH. However, review of the MOUs for acute and intermediate care, Sec. V, Safety and Security Issues, and of the Bargaining Unit 6 MOU, Sec. 21.01, MTAs, found no reference to escort practices. CDCR correctional officers' post orders stated that all off-unit escorts will be done with two custody staff. AD No. 06.13, Supervising and Escorting of Patients to Appointments

stated, "All patients, regardless of custody levels, shall be escorted in mechanical waist restraints (belly chains)."

The monitor was informed that as a result of the local two-custody staff escort practice even on the units, it was not uncommon for treatment to be cancelled due to MTA unavailability for observation of a treatment group or a one-on-one treatment session with a care provider. This practice did not take into consideration the patient's current custody designation or classification, or his behavior. While the post orders specifically referred to "off-unit" escorting practices, they did not explain why two MTAs were needed for <u>on-unit</u> activities. Reports from MTAs suggested that the two-custody escort practice on the units may have become customary based on procedures no longer followed at VPP.

The Special Master's expert observed that these escort practices appeared overly labor-intensive and found that they were detrimental to the quantity of activities and treatment provided to patients at VPP. Key clinical and administrative staff reported that the predominant limiting factor for out-of-cell activity was the unavailability of MTA staff, based upon these patient escort practices. This problem was even further exacerbated by the diversion of MTAs to escort patients to various clinic appointments off the patient's housing unit, which was required by policy.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Clinical Assessment Team (CAT)

Pursuant to AD 4.16, VPP had a CAT that managed and processed acute and intermediate care referrals and acceptances, conducted mental health and medical evaluations, and admitted patients. The CAT maintained necessary records of patient referrals, admissions, discharges, transfers, lengths of stay, and diagnoses, and tracked data reflecting referral and discharge trends.

During the September 2013 site visit, VPP reported the recent implementation of the V-Risk Assessment instrument.  Use of the instrument involved training of clinical and nursing/MTA staff on V-Risk assessment and documentation of patient behavior that would assist the clinical team as well as documentation that may be used to justify keeping a patient in mechanical restraints.

The CAT assigned beds for all accepted patients, taking into consideration any enemy concerns, communication barriers, special clinical and medical barriers and accommodation needs.  The CAT also generated bed utilization reports and was represented at CMF's daily Bed UM meeting.

Referrals originated from numerous CDCR institutions.  Referrals that were rejected by the CAT were reviewed by the medical director, who made the final decision on rejections.  Rejections which survived the medical director's review were then reviewed by the joint CDCR and DSH CCAT.

VPP did not have a specific admissions unit, but processed admissions through CMF's R&R unit.  Processed patients were escorted in restraints to their assigned housing units.

For December 2013 through February 2014, VPP reported 189 acute care admissions and 192 acute care discharges, with an average length of stay of 105 days.  For the same period, VPP also reported 100 intermediate care admissions and 107 intermediate care discharges, with an average length of stay of 226 days.

During the March 2014 site visit, 25 patients were on the acute care accepted referral list and seven patients had pending bed chronos.  The longest wait appearing on the waitlist was 16 days.  Nineteen intermediate care beds were available and four referrals were pending review for acceptance.

2.      **Discharges**

All VPP patients were discharged back to CDCR.  Patients pending parole were

transferred to the CMF MHCB to facilitate parole services.

## VIII.   PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

1.      **Rules Violation Reports (RVRs)**

RVRs issued to CDCR patients while at VPP were processed, heard, and disposed of

within the CDCR RVR system.  Accordingly, all requests for mental health assessments for use

in the patient disciplinary process were originated from CDCR.  The requests were then routed to

VPP program directors, who in turn forwarded them to SRNs within the relevant units.  The

SRNs then distributed the requests for assessments to VPP clinicians for completion and return

to the SRNs.  The VPP executive director did not know who trained DSH clinicians regarding

completion of mental health assessments, what training material was used, and whether anyone

reviewed the assessments for timeliness and quality.

Although the mental health assessments were routinely completed timely, it appeared that

SHOs did not give them appropriate consideration.  Reviewed RVR dispositions indicated

minimal mitigation, with patients' regular forfeiture of significant amounts of behavior credits,

and accumulation of additional classification points, which directly affected release dates and

treatment opportunities based on custody levels.  The rare instance of mitigation typically

involved only patient privileges.  SHOs were empowered to exercise discretion in their findings

and decisions to take mental health evaluations into consideration in rendering decisions.  *See*

Title 15, Section 3315(f) (1), (2) and 3326(3) (b).  However, contrary to Title 15, the facility

captain stated that SHOs lacked authority to reduce a patient's penalty or dismiss charges based

on a mental health assessment, even if it indicated that he lacked the ability to understand his actions or punishment.

During February 2014, 34 RVRs were issued to VPP patients.  Of these, ten were for IEX, with three involving the same patient.  Ten of the remaining 24 RVRs were received by four patients.  Of the 34 RVRs, 11 were heard by the time of the March 2014 visit and all 11 resulted in dispositions with forfeiture of behavior credits.  The remaining 23 RVRs either had not been heard, were pending disposition, or had been issued to patients that were transferred to another institution.

### 2.    Cell Extractions

At VPP, all cell extractions were performed by MTAs.  Review of documentation indicated that from May 2013 through October 2013, the acute care units had 26 cell extractions, of which eight resulted in the patient voluntarily leaving his cell and thus not requiring actual extraction.  During the same period, the intermediate care units had one cell entry and no cell extractions.  AD 6.07 at VPP stated that a patient may be physically removed from his cell/dorm if he posed a danger to himself or others and was unwilling or unable to leave his cell/dorm voluntarily, utilizing a process that was "safe, organized and systematic."  It further stated that if extraction was needed, the RN shift leader or designee had to notify the SRN and the SMTA on duty.  It was the responsibility for the SMTA to obtain approval from the program director or designee prior to conducting the extraction.  During weekdays and regular work hours, the program director or designee must be present to oversee the process.  On weekends, holidays, and after regular work hours, the SMTA had to obtain approval from the DSH AOD or designee, and an SIR, CDCR forms 837 and 7219 had to be completed.  During the October 2013 visit, the Special Master's expert observed preparation for two cell extractions and noted that verbal

interventions before both planned extractions were done by MTAs, with minimal presence of either RNs or other mental health clinicians.  These two instances did not develop into completed extractions.

## IX.    USE OF SECLUSION AND RESTRAINT

During the earlier visits, seclusion and restraint data was unclear and contradictory, but as of the March 2014 visit, provided data was clearer.  During January and February 2014, no patients were placed into seclusion and eight patients were placed in restraints, including one patient on two occasions.  Lengths of stay in restraint ranged from one hour and five minutes to four hours.

VPP produced a Restraint and Seclusion Performance Improvement Project Report which analyzed data for January and February 2014.  It identified two problematic areas in need of improvement: (1) justification for restraints, and (2) release criteria explained.  Corrective actions included:

1.  Reassignment of the SRN to the standards and compliance department,

2.  Ongoing monitoring and mentoring,

3.  Focus on physician and nursing documentation after initiation of restraints or seclusion,

4.  Effective March 2014, monthly provision of data to the medical director, nursing coordinators, and health program coordinator,

5.  Continuation of monitoring by the Performance Improvement Program,

6.  Implementation of the Plato software to enhance data reporting and analysis by April 2014, and

7.  Input of audit data from January 2014 through June 2014 into Plato to enable in-depth analysis by July 2014.

The monitor's review of health care records revealed timely psychiatrist orders, release criteria, nursing IDNs, neurological assessment forms (including range of motion), observation

176

records for seclusion/restraint, seclusion/restraint nursing care plans, and seclusion/restraint debriefing forms.

## X.    UTILIZATION REVIEW AND QUALITY MANAGEMENT

### 1.    Clinical Management Team (CMT) Committee

CMT meeting minutes for November and December 2013 did not identify when an agenda item was initially discussed, and did not track findings or recommendations from one meeting to the next.  These minutes rarely identified responsible staff, and seldom designated a reporting or completion date for identified actions.  Items that would be expected to appear on a subsequent meeting's agenda instead frequently disappeared.

### 2.    Utilization Management

UM meeting minutes for each housing unit for December 2013 contained numerous deviations from relevant ADs.  For example, although AD 4.01 indicated that a quorum consisted of the UM chairperson and any three other members, UM meetings for Unit P1 on December 2 and 30, 2013 lacked a quorum, as only the chairperson and two other members were present.  AD 4.01 required UM meeting minutes to include the date, time, meeting length, and UM coordinator's signature, but all reviewed UM meeting minutes lacked this information.  There were also inconsistencies in meeting minute dates; for example, the cover page of certain Unit S-2 meeting minutes indicated three different dates.  Unit Q-2 UM meeting minutes for December 4, 2013 did not identify any attendees.

### 3.    Quality Improvement

#### a.    Patient Wellness and Recovery Model Support Systems (PaWSS)

As of March 2014, VPP was not able to track and report on therapeutic hours offered and received by individual patients, which was essential to managing appropriate

care in the psychiatric program. The Department of State Hospital's Patient Wellness and Recovery Model Support Systems (PaWSS) was still in the process of implementation at VPP, which would ultimately provide this capacity.

PaWSS was a comprehensive data system that tracked and provided functional reports on individual patient care for quality improvement and supervisory purposes. It also tracked custody data provided by CDCR. PaWSS incorporated clinical and custodial information and supported treatment planning, IDTT scheduling, individualized therapeutic group assignment and management, and individual therapy.

Staff reported that VPP management was trained in PaWSS in February 2014. As of the March 2014 site visit, VPP was implementing and introducing the system on selected units and training staff on its operation, but was not yet able to track and report the number of therapeutic hours offered and received by individual patients.

Each mental health discipline had designated responsibilities in PaWSS, which are discussed below.

Psychiatry's responsibility required them to make sure that psychiatric histories included diagnoses, and reported any rule-outs, and cognitive functioning and testing summary determinations. Psychiatry also covered treatment prior to placement, and while at VPP. Psychiatry also completed an annual summary, and addressed psychotropic medication issues.

Psychology examined risk factors and documented suicide history and current risks, including any self-injurious behavior. Psychology also addressed aggression, victimization, and contraband and drug testing issues.

178

Social work addressed patient personal histories, including developmental histories, relationships, education, work history, and pertinent medical history prior to admission.  Social work also documented issues related to advanced health care directives, cultural preferences, and legal history, including any juvenile and adult offenses, RVRs, qualifying offenses, and discharge planning matters.

Rehabilitation Therapy addressed therapeutic services offered to and received by individual patients.

Nursing addressed medical risks, allergies, and diets.

### b.    Patient Improvement Program

As of March 2014, VPP had a patient improvement system in place.  A mock survey was conducted quarterly for all acute and intermediate care units to identify deficiencies for which units were responsible for developing corrective plans.  Surveyors included the hospital administration team.  There was also a weekly mock survey schedule rotation for each program unit.  Survey information was recorded in a database and forwarded to the surveyed unit's SRN, who developed any corrective action plans that were reviewed by the program director within seven days.

A PCP treatment guide assisted staff with identification and documentation of individualized, patient-tailored PCPs.  The Guide addressed the ten most difficult patient problems with corresponding lists of interventions and objective samples.  Multidisciplinary training and Guide publication had been completed and Guides were distributed to all psychologists, social workers, rehabilitation therapists, supervising RNs, and nursing coordinators.  The Guide was also available

179

electronically on the network.  Audits tracked PCPs, and follow-up audits were planned to determine whether PCP quality had improved.

An IPPA assisted managers and supervisors with increased awareness of employee practices or incidents that deviated from VPP's policies and procedures, including ADs and program and discipline manuals.  IPPA memos referenced relevant policies and procedures and alerted supervisors to discrepancies between VPP's standards and actual staff practices; a database recorded details.  Performance improvement staff collected information and provided feedback to managers and directors.

Post-hospitalization audits reviewed the records of patients who returned to VPP following hospitalization in community health care facilities, thereby reviewing patient care continuity between medical providers.  These audits sought to determine the availability of hospitalization discharge records to the treatment team, whether hospital discharge recommendations were addressed, and confirmed initiation of appropriate nursing care and medical treatment.  A database indicated continuity of care trends for these patients.

A Proposed Program Protocol for Foreign Body Insertion/Ingestion was intended to address opportunities for management of risks for patient ingestion/insertion of foreign materials.  These patients posed special challenges across clinical disciplines and support services.  This protocol addressed the environmental sources of ingestion/insertion risk materials, and included food service, housekeeping, clothing, building maintenance, and nursing and clinical staff.

In-Shift Small Group Modules were developed to train new MTAs to manage their schedules.

Electronic MVR was developed to replace a paper   collection process for reports of medication errors with an electronic reporting process that allowed for sharing of medication error information with the CMF pharmacy.  The project was in its infancy and was being beta-tested on selected units, allowing for staff feedback and improvements.  Once fully operational, it would link to a PIP database to support data collection and analyses.  This streamlined process supported inter-facility communication and collaboration with CMF to identify and correct internal system failures, policy and procedural issues, and inter-departmental and inter-facility communications problems.

A revised RN Admission Assessment was designed to streamline and enhance documentation of nursing assessments and improve efficiency and timeliness while sharpening the form's content applicability.  Research for this endeavor included collection of RN admission assessment forms from acute care inpatient psychiatric facilities.  This collaborative process included solicitation of feedback from affected staff.

A Plan of Correction review collected all deficiencies to identify trends and patterns of deficiencies, analyze the efficacy of correction plans, and track adherence to policies, directives, and licensure compliance standards.  The PIP collected all deficiency data from 2006 to the present.  This ongoing process supported VPP adherence to its policies, directives, and licensure compliance standards to identify and isolate specific unit, discipline, or program weaknesses requiring improvement.

181

**XI.** **END OF SHIFT REPORTS**

At the end of every shift, staff going off shift and staff coming on met and exchanged relevant information. Observation of several of these meetings indicated that these meetings were a valuable means for staff to discuss unit events, individual patient problems, and clinical information that was relevant to treatment planning and maintenance of unit functioning. Discussed matters included patient refusals to program and the reasons therefor, which were not captured in nurses' regular documentation in patient charts.

**XII.** ***COLEMAN* POSTINGS**

Coleman notices were posted in all VPP units.

**XIII.** **LAUNDRY AND SUPPLY ISSUES**

No laundry or supply issues were identified at VPP.

EXHIBIT E
California Health Care Facility (CHCF)
Mental Health Program/Department of State Hospitals – Stockton

**California Health Care Facility (CHCF)**
**Mental Health Program/Department of State Hospitals – Stockton**
August 13, 2013 – August 15, 2013
September 4, 2013 – September 6, 2013
October 8, 2013 – October 10, 2103
January 28, 2014 – January 30, 2013

## I.      INTRODUCTION

The mental health program within the CHCF[10] is operated by the California DSH and is known as DSH-Stockton.  When fully operational, it will be a 514-bed licensed acute and intermediate care inpatient mental health treatment program occupying a total of 17 housing units in eight and a half buildings.  As of the monitor's January 2014 visit, 12 of the 17 DSH housing units had been activated.

The acute care program, known as the ATP will occupy three units and consist of 82 beds.  It will treat male CDCR inmates requiring emergency stabilization of mental health symptoms resulting in danger to selves, others, and/or grave disability.  The intermediate treatment program, will occupy seven buildings consisting of 432 beds.  DSH-Stockton patients may be referred from other levels of care within CHCF, from other DSH inpatient programs that treat CDCR patients, and from CDCR who suffer from a major mental illness which has diminished their ability to function within the correctional environment.

## II.     SUMMARY OF THE FINDINGS

During the monitor's visits, the CHCF was in the process of activating.  Many areas required improved coordination between clinical and correctional staff, and further development of the treatment programs.  Correctional officers were in the process of making the transition from working in a prison to working in a health care facility.  During this critical time, when

---

[10]The CHCF is licensed under State of California Regulations, Title 22, Division 5, Chapter 12, "Correctional Treatment Center."

procedures, goals, and expectations were being developed and implemented, it was critical that

the CHCF rectify ongoing problematic practices before they became institutionalized.

The Special Master's findings included the following:

- **CDCR, CHCF, and DSH management teams appeared to be working together to address operational matters, but attention at the headquarters level was needed to clarify regulatory conflicts, provide adequate resources, and foster interdepartmental collaboration.**

- **Although the CHCF was designed around a shared services design to eliminate duplications and maximize efficiency, there did not appear to be a master agreement or agreed definition of "shared service," nor any implementation plan. As a result, implementation of many of the shared services was problematic.**

- **Facility rules on all patient movement appeared to be highly restrictive without sufficient clinical and/or custodial justification.**

- **Patients on maximum custody status were provided with minimal programming without individualized clinical justification. Restrictions associated with maximum custody status created challenges in providing clinical care to other patients.**

- **Difficulties with recruiting and retaining psychiatrists resulted in problems with treatment delivery and delay in activation of the remaining five housing units.**

- **Many supervisory and line non-custody staff had little or no correctional experience, resulting in a need for increased line-level supervision.**

- **Inconsistencies between Title 15 of the California Code of Regulations, under which CDCR operated, and Title 22 of the California Code of Regulations, under which DSH operated, led to unresolved conflicts in staff roles. As a result, delivery of mental health care was adversely affected in some cases.**

- **The patient admissions process, including composition of intake examination staff and the lack of knowledge of patient arrival times, was problematic.**

- **Of 55 admissions to the ATP from CDCR institutions since activation, 20 or 36 percent were transferred late.**

- **Of 126 admissions to the ITP from CDCR institutions, 103 or 82 percent were transferred late.**

- **Patients generally reported that overall they were provided good mental health treatment under existing conditions.**

- **While the quality of observed IDTT meetings ranged from poor to excellent, many of these meetings lacked structure and did not meaningfully integrate correctional input into the meeting.**

- **There were problems with treatment planning and related forms, assessments for suicidality and violent behavior, and diagnoses drawn from psychiatric and psychological evaluations.**

- **Provision of only four core groups was insufficient, although several observed groups were of very good quality.**

- **Regularly scheduled one-to-one individual clinical sessions were insufficient.**

- **The quality of shift report meetings ranged from cursory to in-depth and excellent.**

- **Institutional meals were planned around patients' prescribed medications, food allergies, and nutritional requirements. Nurses recorded patients' food and fluid intake. However, certain food items were missing from trays and meals were delivered very late on some nights.**

- **Shortages of patient clothing and certain personal care items such as liquid soap and deodorant continued. Staff at the supply warehouse typically did not respond to attempts to track orders or inquire whether items were in stock.**

- **Although patient visitation had been activated as of the January 2014 site visit, only non-contact visits with immediate family members were allowed for mental health patients. Medical patients, on the other hand, were allowed contact visits where clinically appropriate.**

- **Law library access was restricted to only patients with active legal cases.**

## III.   INSTITUTIONAL OVERVIEW

### 1.    Governance, Organizational Structure, and Problem Resolution

CHCF had numerous governance issues that required attention and resolution. As of the

January 2014 visit, it was revamping its governing body under the direction of a new health care

CEO to improve performance in clinical areas. The reconstituted governing body had fewer

members and was re-directed toward addressing the significant problems faced by the CHCF.

The various subcommittees of the governing body would address any problems within their

jurisdiction and would forward to the governing body only problems which they could not resolve. The CHCF was designed around a shared services design to maximize efficiencies, but in the absence of a master agreement or definition of "shared services" or an implementation plan, implementation of many of the shared services was problematic.

Whatever collaboration there was among the warden, the CEO, and the DSH executive director and clinical administrator appeared to be based more on personal relationships than on an effective institutional management structure. Staff reported that the CHCF lacked critical collaborative support from CDCR and DSH headquarters, which was greatly needed in an environment of unique complexities that result from the divergent missions of the CHCF and its recent activation. As of the January 2014 site visit, staff reported that high-level DSH leadership had not visited the mental health program to observe operations. Given the magnitude of operations, a more visible headquarters' presence was needed.

Health care management indicated that, given CDCR's heading of the CHCF and its operation under the control of a warden, the CHCF was more akin to a CDCR prison in which a health care facility was operating, rather than a hospital. The facility looked to Title 15 to operate the institution, but Title 22 directed the operation of DSH-Stockton. As a result, it was difficult to ensure that mandates for various licenses and delivery of mental health care were DSH's responsibility. Examples of the results of this inconsistency were patients not being provided with care or treatment, being denied basic provisions such as personal supplies or clothing, or visitation, all of which were reportedly based on CDCR decisions premised on Title 15. Similarly, although Title 22 licensing provisions required the CHCF to have a licensed dietician, none had been hired prior to or during CHCF's activation; the CHCF dietician was on loan from another DSH facility. If not rectified, such continuing deficiencies and failures to

comply with Title 22 could potentially affect the CHCF's licensing to house and treat mental health patients. There were also problems beyond the jurisdiction of the governing body, such as the provision of clothing, food services, and law library access, among others. Management of these matters was similar to that of a CDCR institution, relegating some health care concerns secondary to custodial priorities.

### 2.    Culture

CHCF was designed to function as a health care facility that provided mental health, medical, and dental services to all CDCR inmate classification levels on the premise that the CHCF was to operate as a health care facility with a surrounding security layer, as opposed to as a prison with an incarceration mission that incorporated health care. However, there were some initial impediments to carrying out this institutional philosophy.

While it was understood and agreed that nursing staff would have interior keys so as to have quick access to patients, nursing staff were denied keys. This was eventually resolved on the headquarters level, by giving nursing staff keys to the interiors of the units and correctional officers keys to the outside of the housing units. A related concern was that staff could open their office doors and could not lock office file cabinets, compromising their ability to keep patient information confidential in compliance with the Health Insurance Portability and Accountability Act (HIPAA). Although this concern was acknowledged, it was not addressed promptly.

During the design phase of the CHCF, it was acknowledged that the merging of CDCR, CHCS, and DSH would require a greater than usual amount of training during activation, to make staff aware of the varying missions, understand the culture and semantics used in day-to-day operations, and how to operate interdependently. One aspect of training was acculturation

training, which was initially conceived of as a two-week course on understanding basic mental health. DSH lost control of the acculturation training curriculum, and the CDCR training officer reduced the training to two days or less, and prepared a new curriculum that removed the core curriculum of an earlier version, raising staff concerns about its efficacy. DSH-Stockton leadership indicated this had a major effect, and the executive director and CEO also voiced concern that a correctional lieutenant alone managed the training, even though all three entities had operating budgets for training. The CEO also stated that over 500 employees, most of whom had never worked in a prison, had not received new employee orientation. Both the CEO and the executive director indicated that training space outside the facility would have to be located and paid for.

Another area of concern involved the differences between Title 15 and Title 22 on use of force. DSH-Stockton had developed an AD on restraint and seclusion consistent with the Joint Commission standards manual. It provided for therapeutic strategies and interventions training (TSI), which focused on the use of de-escalation techniques. The CDCR training office determined that only DSH staff needed this training, resulting initially in correctional officers typically standing back before moving in to assist, while DSH staff used the TSI techniques on a distressed patient. However, correctional officers indicated that CDCR policy did not permit them to stand back while DSH staff implemented TSI. In response, staff from the two departments developed their own local practices in the absence of clear direction from either CDCR or DSH headquarters. More recently, CDCR issued a revised use of force policy that did not include directives regarding DSH psychiatric programs located inside prisons.

**3.    <u>Systems</u>**

189

CHCF was designed to share services, including food service, laundry, information technology, warehouse operations, visitation, and the pharmacy. There was no definition or master agreement governing shared services, and implementation of the sharing arrangement was problematic from the start. Patients were not being provided with sufficient clothing, shower shoes, toiletries, and smocks. CDCR decided against purchasing shower shoes for DSH-Stockton patients based on CDCR policy permitting inmates to purchase them from the canteen, despite DSH's shower shoes allocation which was included in the CHCF's operating funds. The DSH-Stockton executive director had to purchase them from another funding source. The executive director also reported having to purchase portable medical equipment such as an electrocardiogram (EKG) machine for mental health use upon learning that this was not a shared service.

DSH-Stockton patient visitation was included in treatment plans by IDTTs, but CDCR decided that mental health patients would be permitted only non-contact visits, irrespective of treatment team decisions.

## IV.    CENSUS

At the CHCF, the average daily census of *Coleman* class members for the month of January 2014 was 279.[11]

## V.    STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

DSH staffed and administered the mental health program. Mental health leadership included an executive director of DSH-Stockton, a clinical administrator, and the respective ATP and ITP program directors.

---

[11] Source: Department of State Hospitals Report, Staff Levels for *Coleman* Patients, January 1, 2014 through January 31, 2014, submitted February 1, 2014.

Mental health leadership reported difficulties with hiring. A significant number of the facility's mental health staff were new to prison operations. The DSH-Stockton personnel report dated January 23, 2014 indicated that the facility had a total of 932 positions, of which 766 were filled and 166 were vacant, for an overall 18-percent vacancy rate. Staffing statistics reported below are based on the DSH-Stockton personnel report. Notably, that report appeared to reflect the total number of positions for when the mental health program reaches full activation. As the facility had not yet been fully activated as of the time of the monitor's visits, vacancy rates within the activated units may have actually been lower than they appeared to be, based on the DSH-Stockton personnel report.

Psychiatrists

The DSH-Stockton executive director reported that activation of the remaining five housing units was delayed due to a shortage of psychiatrists. The DSH-Stockton personnel report indicated that the chief psychiatrist and both senior psychiatrist supervisor positions were filled. However, only nine of 35 staff psychiatrist positions were filled, indicating a 74-percent vacancy rate. There were three part-time contract psychiatrists at the institution in January 2014, but the executive director also expressed hesitance in hiring contract psychiatrists because their availability was only variable.

Psychologists

The DSH-Stockton personnel report indicated that the chief psychologist and both senior psychologist specialist positions were filled, but the senior psychologist supervisor position was vacant. Twenty-one of 33 psychologist positions were filled, for a 36-percent vacancy rate.

Senior Psych Techs

Of 40 senior psych tech positions, 36 were filled, for a ten-percent vacancy rate.

Psych Techs

The challenge with psych tech staffing was that the CHCF competed with DSH hospitals, the Department of Developmental Services' hospitals for the developmentally disabled, and CDCR for available psych techs.  CHCF expected to hire a total of 427 psych techs, many of whom would be new to prison operations.  The DSH-Stockton personnel report stated that 362 of these positions were filled, for a 15-percent vacancy rate.  However, 40 of the 362 already-hired psych techs were not licensed and therefore could not perform all of a licensed psych tech's duties and required direct supervision.

Supervising Social Workers

One of two supervising social worker positions was filled, for a 50-percent vacancy rate.

Social Workers

The DSH-Stockton personnel report indicated that 29 of 35 social worker positions were filled, for a 17-percent vacancy rate.

Supervising Rehabilitation Therapists

Both supervising rehabilitation therapist positions were filled.

Rehabilitation Therapists

Twenty-one of 35 rehabilitation therapist positions were filled, for a 40-percent vacancy rate.  The program reported that it was working with the California Department of Human Resources to authorize overtime work for rehabilitation therapists to cover vacancies.

Supervising Registered Nurses

Nineteen of 27 supervising registered nurse positions were filled, for a 30-percent vacancy rate.

RNs

Of 183 RN positions, 169 were filled, indicating an eight-percent vacancy rate.

Unit Supervisors

Of 17 unit supervisor positions, 14 were filled, for an 18-percent vacancy rate.

Correctional Staff

The roles of correctional staff at DSH-Stockton were evolving.  Their duties included escorting maximum custody and handcuffed patients, opening and closing unit entrance doors, unlocking patients' room doors, defusing problematic situations, communicating with mental health staff and patients, and conducting pat-downs and room searches.  They attended shift report and IDTT meetings as needed.  It was also reported that there were insufficient correctional officers to escort non-maximum custody patients to dental, medical, and visitation appointments, impacting access to care.

Correctional officers reported the need to adjust to the unique layout of the CHCF's physical plant, which was very different from the prisons where they had worked.  Staff reported that some adjusted better than others to the presence of the mental health program within the facility.  CDCR post orders for correctional officers assigned to the DSH-Stockton housing units were very generic and lacked any reference to the DSH mission or the patient population.

2. **Staff-to-Patient Ratios**

Each housing unit typically had 28 patients.  DSH-Stockton produced documentation on housing unit staffing.  During first watch, all units had two psych techs (or one for every 14 patients, or 1:14), one RN (1:28), and one correctional officer (1:28).  During second watch, staffing on all units increased significantly to five psych techs (1:5.6), one senior psych tech (1:28), two RNs (1:14), one unit supervisor (1:28), two psychiatrists (1:14), two psychologists (1:14), two social workers (1:14), two rehabilitation therapists (1:14), two correctional officers

(1:14), and 0.29 registered dieticians (1:97).  There was also one supervising registered nurse per building, or one for every two units (1:56).  During third watch, staffing consisted of five psych techs (1:5.6), one senior psych tech (1:28), two RNs (1:14), and two correctional officers (1:14).  There were also two escort officers assigned to Facility B, which was where all DSH patients were housed, who were not assigned to any specific unit or building but assisted with the movement of patients out of the housing units.

## VI.   TREATMENT AND CLINICAL SERVICES

### 1.   IDTTs

Confusion surrounding start times for IDTT meetings caused the Special Master's experts to miss some opportunities to observe IDTT meetings.  Typically, IDTT meetings were well attended, except for correctional counselors at some meetings.  However, custody officers were not meaningfully integrated into IDTT meetings and generally stood behind the patient.

Those meetings that were observed had robust discussions of patients.  Staff appeared committed to making appropriate treatment decisions according to individual patient needs.  Some of the meetings lacked structure, with cases not formally presented, or the patient joining the meeting before completion of the team's case discussion.  In some cases, there was vagueness surrounding patients' diagnoses, and treatment approaches and goals.  IDTT meetings typically had the patient's chart, but in one meeting, staff did not appear to know that the patient's C-file may contain relevant information concerning the patient's history until the clinical administrator mentioned it.  When present, the clinical administrator was able to address questions and provide guidance to the treatment team, but there was need for more leadership and supervision at the unit level because the clinical administrator could not always attend meetings.

Interviewed patients stated that they attended their initial 72-hour, ten-day, and 30-day IDTT meetings but had not been shown or given copies of their treatment plans.  Some patients expressed desire for one-to-one treatment, but review of mental health records indicated that one-to-one treatment was rare.

### 2.    **Group Therapy**

As of the monitor's January 2014 site visit, there were four core groups in the ITP, all facilitated by social workers and rehabilitation therapists.  Psych techs provided supplemental group activities during weekends and evenings, but these were not tracked through PaWSS.  The clinical administrator indicated that the program would eventually have 11 core groups, and additional non-core groups such as art and music therapy and board games.  Many patients reported attending and enjoying numerous weekly non-core groups, and requested more groups, including fitness and use of games in a therapeutic setting, but others expressed concern with the lack of groups addressing certain clinical issues such as voyeurism and exhibitionism.  The program director indicated that the facility began tracking patient group attendance as of the week prior to the monitor's September 2013 site visit.  During the January 2014 site visit, provided documentation identified groups that particular inmates attended.

During some of the monitor's initial visits, there was confusion surrounding scheduled groups and their meeting times.  Some groups listed on provided schedules did not meet, some identified as occurring were still being developed, and others did not meet because the group leader had transferred to another unit.  The unit supervisor was unaware these groups would not be meeting, and there were no plans to substitute other therapeutic activities.

An observed group on wellness through art journaling was well-conducted by a recreation therapist facilitator.  The facilitator of an observed art therapy group skillfully engaged

the sole maximum custody participant, although his waist-chains made it difficult for him to draw freely.  Other observed art therapy groups were facilitated adequately, with patients engaged and talking among themselves.  An observed group on stress management revealed good interaction between patients and the recreation therapist.  At an observed recovery group which was dominated by one patient, the facilitator may have benefitted from supervision and guidance on developing strategies for engaging less verbal participants.  A recreation therapist facilitating an art therapy group expressed concern regarding the lack of correctional officer presence during groups, and opined that staff resources were too thin.

      3.    **Individual Therapy**

Patients reported being scheduled for regular individual clinical appointments only at their request or following IDTT meetings.  The chief psychologist corroborated this.

      4.    **Other Treatment Issues**

      a.    **Psychology Services**

Staff reported that psychologists conducted admissions assessments, the brief psychiatric rating scale, and risk-of-violence assessments, participated in treatment teams, and conducted more in-depth psychological evaluations and testing in response to treatment team concerns and where otherwise indicated.  According to supervisory staff, psychologists worked in their units, attended the shift report meeting, had clinical one-to-one sessions with patients, attended IDTT meetings, conducted assessments, attended training sessions, and completed paperwork.

The chief psychologist reported that psychologists did not have regularly scheduled one-to-one contacts with their patients, as she believed they were not required for optimal treatment.  Instead, contacts were provided according to individual patient needs, as determined through

engagement of patients at cell front.  The chief psychologist did note that contacts may not have always been properly documented.

Staff reported that quality improvement processes were slowly being introduced into the program.  They described the program as "meticulous" about staff professional competencies and said it was testing extensively on, among other things, competency with conduct of SREs, psychological assessments, and brief psychiatric rating scales.  Phased hiring, testing, and training of psychologists were ongoing.

### b.    Intermediate Treatment Program

In the ITP, the monitor's review of medical record documentation during the January 2014 visit found improved completeness and timeliness since the preceding visit in December 2013.  DSH-Stockton supervisory staff conducted chart audits in late November/early December 2013 and shared feedback with staff.  Previously, only the nursing admission assessments and brief psychiatric admission assessments had been completed timely.  By January 2014, most intake evaluations were completed timely.  Some social work history evaluations were late, but their completeness had improved.  Rehabilitation therapy assessments appeared to be consistently good.  However, the quality of psychology admission evaluations, suicide risk evaluations (SREs), and V-Risk assessments were variable; in some cases important information was missed or not synthesized, and some were not completed timely.  Notably, conclusions drawn from suicide and V-Risk assessments and diagnoses from psychiatric and psychological evaluations were not always supported by the assessments.  Supervisory staff indicated that some line staff were not yet licensed, and many were new and inexperienced, which may explain some deficiencies in documentation and indicate need for closer supervision.  However, many

supervisory staff were also new and still in the process of learning to supervise.  A quality

management/quality assurance program that includes peer review may be helpful.

       c.      **Patient Evaluations**

Patient evaluations generally improved over the course of the monitor's visits.  Social

work social history assessments improved with timeliness and thoroughly.  Diagnosis of

Antisocial Personality Disorder was not well-substantiated in some cases.  Differential diagnoses

were not considered for some patients with substance abuse histories who reported manic or

psychotic symptoms.  Prior clinical records were often not requested, or if they were, this was

not documented.  In some cases, when diagnoses included a rule-out or provisional diagnosis,

clinical staff did not consistently complete the diagnostic process, leaving the patient with a

provisional diagnosis throughout his stay.

Treatment planning forms used by DSH staff provided several areas for a summary of the

reason(s) for referral and the patient's status and progress.  Most staff did not use them

effectively, and copied and carried over past summaries on successive forms, providing only a

summary of static factors of the case overall rather than the patient's progress since the last

treatment team meeting.  This was not useful for the treatment team with determining what, if

any, changes should be made to the treatment plan.

Record reviews found that in at least one case, the treatment plan did not address

problems in the narrative, for example paranoia, withdrawal, isolation, and failure to engage in

treatment, and instead focused on other less significant behaviors.  Some targeted behaviors were

defined too broadly, for example "paranoia," and objectives and goals were sometimes confused

with interventions.  Group treatment was rarely listed as an intervention despite being the

primary intervention utilized. At least one patient was also recommended for a treatment modality that was not consistent with his needs.

### d. Program Restrictiveness

Patients reported that DSH-Stockton was considerably more restrictive than the prison settings from which many had arrived and that they felt as if they were housed in a maximum security environment. They complained about insufficiency of programming, activities, and out-of-cell time; many indicated they spent 21 to 22 hours per day in their rooms. Patients arriving from maximum security environments reported that they had considerably more access to out-of-cell time in dayrooms and yard in those programs. Weekend activities consisted of mainly watching television. The program director reported that typically patients were moved from their rooms only for restraint or seclusion in the therapeutic seclusion room, which was used rarely.

### e. Yard

Outdoor yard consisted of concrete floored and walled spaces accessible from each individual housing unit, with a concrete table, two benches, a toilet and water fountain, and a partially open roof. A yard was available for approximately every 28 patients. There were no specific schedules for yard use, and patients were typically permitted to go to yard whenever they requested. Staff and patients expressed dissatisfaction with the yard's layout and lack of recreational equipment. There was no other access to outdoor activities.

Yard observation indicated one patient or several, sitting around the table talking or walking back and forth, but no other activity. In some units, no patients were observed participating in yard and the space was unoccupied. Patients reported other times when numerous patients' yard attendance and the yard's small size resulted in the space being overcrowded.

The Special Master's expert advised that the yard could be appropriate for a short term stay for acute care patients.  Given the potential extensive stays for intermediate care patients, however, the yard arrangement was inadequate.  The lack of significant structured outdoor activity also seemed to be at odds with AD 20.18, entitled "Outdoor Activity," which indicated it was DSH-Stockton policy "to provide both structured and unstructured outside activities for all patients, to ensure the safety of staff and patient, and allow the patient a full spectrum of program activities as appropriate based on their clinical needs."  In response to the monitor's inquiry, recreation therapists had numerous suggestions to increase yard activity, including adding a basketball hoop, ping-pong table, and/or posters referencing yoga, stretching, or calisthenics as prompts for patients.  Staff further indicated that some yard activities in which the recreation therapist participated were considered structured therapeutic activities, as opposed to yard time.

### f.    **Patient Movement**

Patients were not allowed to walk freely within the housing unit.  At the time of the monitor's first three site visits, patients were moved by what was referred to as "pitch and catch," meaning that patients were essentially handed off by one staff member to another until the destination was reached.  While the patient was moving toward his destination, staff's activities in the area subsided as staff maintained him in their line of sight.  In observed instances, staff on one side of the unit yelled "pitch" or "send," and after the patient arrived at his destination within the closed unit, receiving staff members yelled "catch" or "receive."

The "pitch and catch" method of patient movement drew negative, unwarranted attention to what should be routine movements.  It was also counter-therapeutic, as a goal of treatment is to reinforce skills and behavior that will prepare the patient to eventually function normally and appropriately outside the hospital setting.  "Pitch and catch" does not promote this.

As of the January 2014 site visit, "pitch and catch" had stopped, but staff movement continued to freeze while patients were being escorted on the unit.

## VII.    PATIENT ACCESS TO TREATMENT

### 1.    STEPS and STAGES

DSH-Stockton had individualized incentive programs known as STEPS and STAGES. They used privileges to reward and promote positive, adaptive, and socially desirable behaviors. All staff routinely monitored patient behavior to provide input for identifying the individualized incentives to promote attainment of specific patient goals and motivate patients to improve their levels of functioning.

In the STEP program, patients programmed through a series of progressive levels or steps based on their participation, treatment, and behavior.  Patient progress through successive steps was individualized and served as a means to assess patient readiness to progress to the next level. All new acute care patients began at step one, known as "solo with cuffs."  At this step, patients were brought out of their rooms alone and in handcuffs.  Allowable activities at step one included watching television, reading a book, listening to music, or utilizing yard alone, with staff supervision.

Patients who programmed safely at step one progressed to step two, known as "solo without cuffs," which permitted additional activities including card playing, letter writing, and making telephone calls on the unit.  Patients who programmed safely at step two then advanced to step three, known as "small group," which permitted programming with one or two other patients.  Step three small group activities included watching television, small therapeutic or educational groups, board or card games, outdoor activities, and art or music therapy. Ultimately, patients could progress to step four, known as "large group," which consisted of four

or more patients.  Large group activities included therapeutic, educational and/or rehabilitative groups, socialization activities, outdoor activities, exercise, leisure activities, and writing.

ITP patients were offered the opportunity to participate in the Stage Behavioral Incentive Program, known as "STAGE."  Like the STEP program, STAGE also involved a series of progressive levels made up of DPS and three successively higher levels that allowed a patient to earn greater treatment and property privileges through pro-social behaviors.  Patients had to remain at some of the stages for designated periods before they were allowed to advance to the next stage.  All ITP patients began at DPS, which was an observation period which allowed for assessment and evaluation of the patient's mental health condition, behavior, and adjustment to the new environment.  While on DPS, patients programmed "solo with handcuffs" and attended groups in handcuffs, with a maximum of four DPS patients in a group.  Privileges at the DPS stage included limited phone use, visitation (if cleared by the treatment team and custody), and borrowing books from the library.

Patients who programmed safely at DPS were allowed to progress to STAGE 1, at which the patient may also attend groups without handcuffs, have canteen privileges, and engage in outdoor activities.  Patients who programmed appropriately at STAGE 1 one were allowed to advance to STAGE 2 and ultimately STAGE 3.  Each of these stages allowed the patient more activities and privileges, but also required their satisfaction of various requirements.  For example, to progress to STAGE 2, among other things the patient must attend all therapeutic activities and groups and maintain personal hygiene and his room with minimal prompting. Patients who then attended all scheduled group activities without prompting, and actively and appropriately participated in all groups, among other things, were eligible for advancement to STAGE 3, which permitted still further privileges.

2.      **Orientation Status**

CDCR required placement of all patients admitted to DSH-Stockton from CDCR

institutions on "orientation status," meaning that until the patient was reviewed and cleared by

the ICC or UCC, he had to be escorted in handcuffs whenever he was out of his room.

Correctional officers escorted all cuffed patients; psych techs escorted non-cuffed patients.

Patients arriving from other DSH institutions were not necessarily placed on "orientation status."

3.      **Maximum Custody Status**

Patients classified as maximum custody were always cuffed when leaving their rooms

and were escorted by two custody officers.  The only exception was when they went to yard

alone or showered.  Maximum custody patients remained on this status until their initial ICC

meeting.  It was reported that the ICC routinely reviewed maximum custody cases timely,

although maximum custody patients often remained on cuff status longer than other patients.

Restrictions associated with maximum custody status created challenges in providing

clinical care.  Requiring two officers to accompany these inmates caused staffing pressures, as

each housing unit only had two correctional officers, who had the keys to enter or leave the units.

As a result, these units could not be entered or exited while maximum custody inmates were

being transported.  The solo programming requirement for maximum custody patients meant that

they could not partake of the group therapy that is the primary treatment modality at DSH-

Stockton, but only the so-called "solo groups" in which they are the only participant.

Observed solo groups for maximum custody patients had a facilitator and co-facilitator.

Patients' waist-chains made it difficult to reach the table to write or draw, which were the

"group" activities.  One patient indicated that it was his first group since arriving 36 days earlier.

For patients who were difficult to engage, the use of cuffs exacerbated the challenges with

getting these patients to program.  Staff acknowledged these obstacles on various occasions.

Some non-maximum custody patients pointed out that their own programming was hindered by

other patients' maximum custody status.  For example, if a maximum custody patient was

watching television in one of the group rooms, other patients could not watch television in the

same room.

## VIII.    REFERRALS AND TRANSFERS

### 1.    Acute Care

DSH-Stockton's acute care unit admitted a total of 55 patients from CDCR who were

referred from June 13, 2013 to January 24, 2014.[12]  Of those 55 admissions, 35, or 64 percent

were transferred within the ten-day timeframe, and 20, or 36 percent, were transferred late.  The

transfers within the ten-day timeframe took an average of 6.5 days, with a range of two to ten

days.  Month-by-month, referrals and transfers were as follows:

- **June 2013.**  The sole patient whom CDCR referred in June 2013 to ATP transferred 67
  days later, beyond the ten-day transfer timeframe.

- **July 2013.**  The sole patient whom CDCR referred in July 2013 to ATP transferred 29
  days later, beyond the ten-day transfer timeframe.

- **August 2013.**  There were no referrals from CDCR to the ATP during August 2013.

- **September 2013.**  In September 2013, CDCR referred five patients who were admitted
  to the ATP.  Of those five admissions, two or 40 percent were transferred within the ten-
  day timeframe, and three or 60 percent were transferred late.  The transfers within the
  ten-day timeframe took an average of eight days, with a range of six to nine days.

- **October 2013.**  In October 2013, CDCR referred 11 patients who were admitted to the

---

[12] Source: DSH Monthly Bed Utilization Report for January 2014.

ATP.  Of those 11 admissions, four or 36 percent were transferred within the ten-day timeframe, and seven or 64 percent were transferred late.  The transfers within the ten-day timeframe took an average of six days, with a range of two to eight days.

- **November 2013**.  In November 2013, CDCR referred 11 patients who were admitted to the ATP.  Of those 11 admissions, eight or 73 percent were transferred within the ten-day timeframe, and three or 27 percent were transferred late.  The transfers within the ten-day timeframe took an average of eight days, with a range of six to ten days.

- **December 2013**.  In December 2013, CDCR referred ten patients that were admitted to the ATP.  Of those ten admissions, nine, or 90 percent, were transferred within the ten-day timeframe, and one, or 10 percent, was transferred late.  The transfers within the ten-day timeframe took an average of four days, with a range of three to eight days.

- **January 2014**.  In January 2013, CDCR referred 16 patients who were admitted to the ATP.  Of those 16 admissions, 12 or 75 percent, were transferred within the ten-day timeframe, and four or 25 percent were transferred late.  The transfers within the ten-day timeframe took an average of seven days, with a range of six to ten days.

2.    **Intermediate Care**

The ITP admitted a total of 126 patients from CDCR who were referred from July 22, 2013 to January 31, 2014.  Of those 126 admissions, 23 or 18 percent were transferred within the 30-day timeframe, and 103 or 82 percent were transferred late.  The transfers within the 30-day timeframe took an average of 26 days, with a range of 16 to 30 days.  Fourteen or 61 percent of the transfers within 30 days took from 25 to 30 days.

Month-by-month referrals and transfers were as follows:

- **June 2013**.  In June 2013, CDCR referred four patients who were admitted to the ITP.

Of those four admissions, one or 25 percent was transferred within the 30-day timeframe, and three or 75 percent were transferred late. The one transfer within the 30-day timeframe took 25 days.

- **July 2013.** In July 2013, CDCR referred 29 patients that were admitted to the ITP. Of those 29 admissions, 18 or 62 percent were transferred within the 30-day timeframe, and 11 or 38 percent were transferred late. The transfers within the 30-day timeframe took an average of 26 days, with a range of 16 to 30 days. Eleven or 61 percent of the transfers within 30 days took from 25 to 30 days.

- **August 2013.** In August 2013, CDCR referred three patients who were admitted to the ITP. Of those three admissions, none were transferred within the 30-day timeframe.

- **September 2013.** In September 2013, CDCR referred 25 patients that were admitted to the ITP. Of those 25 admissions, none were transferred within the 30-day timeframe.

- **October 2013.** In October 2013, CDCR referred 34 patients who were admitted to the ITP. Of those 34 admissions, one or three percent were transferred within the 30-day timeframe, and 33 or 97 percent were transferred late. The one transfer within the 30-day timeframe took 21 days.

- **November 2013.** In November 2013, CDCR referred 12 patients who were admitted to the ITP. Of those 12 admissions, none were transferred within the 30-day timeframe.

- **December 2013.** In December 2013, CDCR referred 17 patients who were admitted to the ITP. Of those 17 admissions, one or six percent were transferred within the 30-day timeframe, and 16 or 94 percent were transferred late. The sole transfer within the 30-day timeframe took 22 days.

- **January 2014.** In January 2014, CDCR referred two patients who were admitted to the

ITP, both of whom were transferred within the 30-day timeframe, on days 27 and 28 respectively.

There were also four DSH internal transfers to the ATP and 146 internal transfers to the ITP since CHCF's activation through January 31, 2014. Additionally, 19 patients were admitted to the ATP from the Acute Psychiatric Program (APP) at Vacaville list, and 28 patients were admitted to the ITP from the SVPP list.

## IX.    ADMISSIONS AND DISCHARGES

The CHCF began admitting patients on July 22, 2013. Although the institution was initially scheduled to be fully activated by December 31, 2013, five buildings had not been activated as of the January 2014 site visit. Documentation produced during the last site visit indicated that a total of 117 inmates had been discharged from DSH-Stockton.

The PMU custody sergeant reported that patients were classified as "psych and return." Except for a few items such as legal correspondence related to an active case, eyeglasses, and ADA-required appliances, patients were not allowed to bring personal property with them.

At an observed ATP admission, the patient was placed in a program room for an initial assessment with a psychiatrist and nurse, with two correctional officers in attendance. The psychiatrist stated that he had not had time to review the patient's packet prior to meeting with him.[13] The patient was assigned a room and told he would be visited later for further clinical assessment. This admission process lasted approximately 55 minutes. The clinical administrator suggested to the psychiatrist that the patient's blood should be drawn, as he stated he was not

---

[13]The clinical administrator reported that DSH-Stockton typically had about one week's notice before a patient's arrival and attempted to confirm patient arrival times so the psychiatrist had time to review the file. Although most new patients arrived in the afternoon, mental health leadership and staff expressed concern regarding the general lack of knowledge as to patients' arrival times at both the CHCF and in the housing units, as well as admissions after 5:00 p.m. after clinical staff had left for the evening.

taking medication but the record indicated otherwise.  Staff said they provided the patient with an orientation packet.

At an observed ITP admission, the patient did not speak English and the facility did not have any formal translators.  A staff member on the unit who spoke Spanish attempted to translate but the patient spoke Chinese/English, which made the admission process problematic.

Although most new patients arrived in the afternoon, mental health leadership and staff expressed concern regarding the general lack of knowledge as to patients' arrival times at both CHCF and in the housing units, as well as admissions after 5:00 p.m. after clinical staff had left for the evening.  During one of the monitor's visits, a patient arrived after staff had left for the evening.  The psychiatrist on call and a RN saw the patient and made decisions about his management until his initial IDTT meeting.  However, for patients who arrived on a Friday night, the IDTT will not see him until the following Monday, or potentially even later during holiday weekends.

For one patient who arrived during one of the site visits, mental health staff were unaware when his intake processing would be completed.  The expert attempted to observe the intake procedure, but the patient was waiting in intake for transfer to the unit for clinical admission interviews and reportedly "acted out."  On the unit, while waiting for the patient's arrival, the psychiatric staff were conferring and attempting to plan for coverage when this patient would eventually arrive.  This situation indicated problems in coordination and communications related to admissions.

At an observed intake, an RN with one correctional officer present performed the new intake examination.  Policy, however, required new admissions to have an intake examination conducted by a psychiatrist and RN with two correctional officers in attendance.

AD 14.14, "Institution Classification Committee Case Reviews," dated August 22, 2013, stated that an ICC or UCC shall be conducted on all newly admitted patients to assess any existing custody concerns, "threat immediacy based on existing case factors, and/or any existing danger to self or others, prior to participating in treatment groups or activities without handcuffs." The directive did not reference multiple CDCR memoranda that provided extensive direction regarding ICC/UCCs for DSH patients, and admission and discharge policy. The most recent CDCR memorandum addressing this subject was dated March 21, 2013.

During the January 2014 site visit, the monitor attended two ICC meetings. The warden and other committee members moved through the housing units to conduct these meetings, which helped treatment team members attend. Members of the ICC members were introduced to patients at one of the meetings, and IDTT documentation was available at only one of the meetings. A treatment team member attended and participated actively at both ICC meetings. The warden and ICC committee members requested and considered input from DSH staff in reaching decisions and explaining them to the patient, and informing him when he would appear again before the ICC.

During the January 2014 site visit, the monitor reviewed a census log for housing units B301-A and B301-B. The log included the patients' names and numbers, admission dates, ICC and IDTT meeting dates, and custody levels following the ICC meetings. It further indicated that 35 of 45 listed patients had an initial ICC or UCC conducted within ten or 14 days, as required by CDCR policy. The log did not list dates for the ICC or UCC meetings for the ten patients whose meetings did not conform to these timeframes.

During the January 2014 site visit, the monitors interviewed the CC II who was responsible for DSH patients. She reported that all five correctional counselor I (CC I) positions

were filled, for a staff-to-patient ratio of 1:100. She reported a busy but manageable workload. She stated that correctional counselors did not have regularly scheduled housing unit hours or at specific times in the housing units, but instead they went to the housing units to check the drop box or when patients requested to see their correctional counselors.

The CC II reported that she did not track new arrivals in a log. Instead, she daily checked the DDPS (Distributed Data Processing System) for new arrivals and scheduled the patient for his ICC meeting within 10-14 days, based on the patient's custody status upon arrival; maximum custody inmates were required to have their ICC within ten days, while all other inmate's ICC/UCC had to be scheduled within 14 days. She indicated only being advised of discharges on the discharge day or the day before. As a result, correctional counselors had to adjust their day's work to expedite discharges and transfers.

During the monitor's initial three site visits, observed ICC meetings for ATP and ITP patients all reviewed maximum custody patients. Only one correctional officer, and not the required two, escorted some maximum custody patients to ICC meetings. At most of these meetings, no case factors were identified to preclude the least restrictive treatment measures, and patients' custody statuses were reduced from maximum to Close A, allowing these patients to program without cuffs. Some maximum custody patients were kept maximum custody status for up to an additional 90 days, although the ICC can see the patients again sooner if recommended by the IDTT.

Some patients indicated that discharge planning included meeting with a social worker and was adequate. Patients also indicated that planning for transfer or discharge, from either ATP to ITP, or from either program to patients' sending institutions or other facilities, was not part of their treatment plan.

During the January 2014 site visit, the monitor learned that on the preceding day, a patient who was to be transferred to MCSP was escorted to the PMU for discharge processing where he was placed in a holding cell during the morning while awaiting transport staff to pick him up. However, MCSP staff never arrived and the patient remained in the PMU for nine hours, without food, medication, or other services. DSH executive staff did not learn about the incident until late in the day. The monitor was not provided further details as to this communication breakdown or any corrective action that would be taken.

## X.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

During the January 2014 site visit, the CHCF use-of-force log was reviewed for incidents involving DSH patients and the use of pepper spray. The log recorded 12 incidents during 2013, and none as of that time in 2014. It did not indicate whether pepper spray was used to effect a cell extraction, nor the reason why force was used, how much of it was used, or whether applicable CDCR use of force policy was adhered to.

## XI.    UTILIZATION REVIEW AND QUALITY MANAGEMENT

### 1.    Food Service

Food service was improving but problems remained. Staff and patients reported inconsistent meal times, some dinners occurring as late as 8:00 p.m., and condiments not being consistently provided. Certain ordered food items occasionally were missing from trays without explanation or a substitution, although reportedly this had improved significantly during the three-month period before the January 2014 site visit. Patients reported small portions, the same items/meals being served multiple times during the same week, and lack of meaningful response from staff in response to patient complaints about food.

The DSH Assistant Director for Dietetics acknowledged some problems with food service, but stated that problems were being resolved overall.  She reported that initially DSH used a food service program for prisons rather than health care facilities.  The software was problematic because it could not be programmed to detect allergens which may be harmful to some patients.  As a result, all meals had to be examined for potentially harmful ingredients, and many extra hours were spent on establishing food allergy protocols for the menus around individual patients' dietary needs.  DSH had no input into the decision to purchase this program, but had to use it even though it was not suitable for a licensed heath care facility.  The Assistant Director also reported that, as of the January 2014 site visit, only three of eight dietician positions were filled, and the vacancies were not all covered by registry staff.

The DSH Assistant Director of Dietetics was assigned responsibility for the CHCF food services and implemented the Nutrition management System per licensing requirements.  The kitchen made up individual patient meal trays based on patients' approved diets and their prescribed medications, food allergies, and caloric and nutritional requirements.  Food trays were delivered to the housing units the day before being served, with the intention that psych techs would check them and request any missing items.  In practice, however, staff typically was not checking the food trays until meals were being served.

On a daily basis, nurses monitored patients' food trays and recorded their food and fluid intake on daily care flow sheets.  This tracking was reported to be important because of patients' prescribed medications and need for appropriate caloric and nutritional intake.  It was also reported that portion sizes may appear relatively small to patients who were accustomed to larger but less nutritious prison meals, while the meals served at DSH-Stockton were planned around nutritional value and/or therapeutic and medical needs rather than mass.

2.    **PaWWS**

CHCF's electronic program for tracking care was known as the PaWWS.  It was designed to comprehensively track access to care and individual patient care and provide functional data and reports for quality improvement and supervisory purposes.  PaWSS could track scheduling of IDTT meetings, treatment planning, individualized therapeutic group assignment and management, and individual treatment, among other things.

Staff training on the use of PaWSS was ongoing.  An observed training session indicated that PaWSS was thorough and user friendly.  As of the January 2014 site visit, staff was starting to use the scheduling modular, but not all staff had been trained as of that time.

**XII.    END OF SHIFT REPORTS**

Shift report meetings were observed.  Nursing personnel routinely conducted shift report meetings in all units during shift changes to facilitate communication on patients' care and continuity of treatment.  Observed meetings varied from cursory to extensive.  Discussions addressed patients' adjustment problems and other difficulties, whether patients' step/stage levels should be changed, patient participation in out-of-cell and other activities, and patients expected to be admitted, requiring more attention, or approaching transfer/discharge.

**XIII.    *COLEMAN* POSTINGS**

*Coleman* court case information for patients was prominently posted in the housing units.

**XIV.    LAUNDRY AND SUPPLY ISSUES**

At the January 2014 site visit, it was reported that shortages had eased since the previous site visits.  However, shortages continued for socks, underwear, t-shirts, shoes, and appropriate-sized pants and shirts, and clean sheets and towels.  Staff reported that the warehouse often did

not deliver ordered clothing.  On many occasions, mental health staff had to address the supply shortages, which was time consuming and diverted them from their clinical duties.

Patients reported that typically they were issued one set of clothing at a time; some reported having extras of some items.  The policy was for patients to receive a new set of clothing whenever they showered, and clean bed linens weekly.  They placed their dirty clothes in a bin when they showered, but sometimes after showers some clean clothing items or sizes of clothing were unavailable, requiring them to retrieve dirty clothes from the bin.  One patient had not received shoes since his arrival nearly a month earlier.  Staff confirmed that shoes had been ordered for him but had not been received.

Shortages of liquid soap, deodorant, combs, pen refills, and envelopes for use by indigent patients were found during the monitor's January 2014 visit.  However, supplies of toothpaste, tooth brushes, shampoo, lotion, toilet paper, and paper had become available as of the time of the January 2014 visit.

The monitors' observation of the supply storage area found medical supplies and equipment that were not needed, but could not be returned to the warehouse because they were part of the established housing unit inventory.  At the same time, certain necessary items, such as gloves, could not be obtained.

During the January 2014 site visit, two unit supervisors reported communication problems with warehouse staff on supply availability.  They said that warehouse staff typically did not respond to emails or phone call inquiries to track orders or determine whether certain needed items were in the warehouse.  There was no list of inventory in the warehouse.

## XV.   <u>VISITATION</u>

As of the January 2014 site visit, visitation for mental health patients had begun.  Some patients reported having had non-contact visits, and others reported that they did not know whether they had been approved for visitation.

IDTTs determined eligibility for visitation, and ICC reviewed and ultimately approved or disapproved eligibility depending on assaultive behavior by the patient.  Eligibility determinations were communicated to patients, who in turn may contact potential visitors, who then may contact the facility to schedule a visitation.  Before the visit, the treatment team reassessed the patient's eligibility.

CHCF AD 14.17, "Visitation Policy," dated October 3, 2013, indicated that all patient visits had to comply with local operating procedures, namely the CDCR Department Operating Manual (DOM) Supplement, Chapter 5, Article 42,  "Visiting."  AD 14.17 restricted mental health patient visitation to non-contact visits with immediate family members.[14]  The DOM Supplement, in section 54020.27, also allowed non-contact visits limited to immediate family members.  However, CDCR's statewide DOM limited non-contact visits for only segregated inmates or for inmates with disciplinary issues, indicating that the more restrictive visitation policy at the CHCF was based on custodial and security factors.  DSH patients at all of the other DSH facilities were permitted contact visits, where clinically or custodially appropriate.

## XVI.   <u>LAW LIBRARY ACCESS</u>

Although the facility reported that patients had law library access on Mondays from 8:30 a.m. to 3:30 p.m., access in fact was much more limited.  The Law Library Electronic Delivery

---

[14]Notably, an earlier version of the CHCF  AD 14.17, dated July 22, 2013, permitted contact or non-contact visits as determined by the IDTT, and did not restrict visitation to immediate family members.  It was reported during the monitor's January 2014 site visit that the warden had made the policy more restrictive.  Many patients stated that because they were permitted only non-contact visits, they had advised family members against visiting.

System (LLEDS) consisted of four computers on mobile carts, but only two had Lexis installed and operating.  Patients were not permitted physical access to the library building.  The law librarian had only one hour of Lexis training,[15] and unit supervisors had none.

The law librarian and the unit supervisors, through whom DSH-Stockton patients could access the library, stated that only patients with active legal cases were granted law library access, and that patient requests for access were minimal.  This restriction appeared to directly contravene applicable policy and regulations regarding patient law library use.  AD 14.16, "Law Library," stated "that every patient admitted shall be afforded access to Law Library services . . . for *active and current personal legal cases*", and that "(t)he law library will check for active legal cases.  If the patient has an *active* case, the Law Library will complete the request as appropriate."  (emphasis added).  A flow sheet entitled "Law Library Workflow for DSH" developed by the ITP Program Director, in consultation with CDCR, indicated that patients with active cases were entitled to four hours of weekly LLEDS mobile computing, and that patients without active cases would be granted two hours per week on the LLEDS mobile computing system.  Furthermore, Title 15, section 3123, indicated that inmates with active cases receive a weekly *minimum* of four hours of law library access, while general library users (i.e. those who do not have active cases) receive a *minimum* of two hours of weekly access.

---

[15]The three assistant librarian positions were vacant.

EXHIBIT F
California Institution for Women Psychiatric Inpatient Program (CIW PIP)

**California Institution for Women Psychiatric Inpatient Program (CIW-PIP)**
September 17, 2013 – September 19, 2013
November 19, 2013 – November 21, 2013
February 19, 2014 – February 21, 2014

## I.    INTRODUCTION

Members of the Special Master's staff of experts and monitors examined the CIW PIP over the course of three on-site visits from September 2013 to February 2014. The PIP was a licensed, 45-bed inpatient program for female inmates of the CDCR. It was the only fully CDCR-operated inpatient program for CDCR inmates. Its mission was "to provide inpatient evaluation and evidence-based mental health treatment to female patients with the goal of reintegrating them into the general prison population and eventual discharge to the community." CIW-PIP CTC Psychiatric Policy and Procedure Manual, Volume 19, Section 1. The program was accredited by the Joint Commission and met the Behavioral Health Care Standards.

All cells in the PIP were single occupancy rooms with adequate space, in two wings which essentially mirrored each other. The A and B side yards included one solo and one large group yard. The C and D side of the building included two solo and one large group yard, allowing a maximum of 11 to 12 patients to participate. Patients were transported by "pitch and catch" between nursing and custody staff, with hallways cleared during patient movement.

Overall, the monitor and the Special Master's expert found that the CIW PIP was succeeding at providing necessary care to patients and was well run, especially in view of the relatively brief period of time that it has been in operation. The CIW PIP may be a useful model for DSH's consideration and instruction as DSH continues to work on improving the functioning of its inpatient programs which treat CDCR inmates.

## II.    <u>SUMMARY OF THE FINDINGS</u>

The Special Master's findings included the following:

- **Mental health services were generally functioning well.  Patients consistently reported positive benefits from their hospitalization at the facility.**

- **Staffing levels, clinicians' caseload sizes, and the physical plant were adequate to support appropriate programming.**

- **The enhanced nursing requirements of the PIP needed greater coordination and cooperation among disciplines.**

- **Required membership of the admission and discharge referral team was unclear.**

- **The program could have benefitted from having a process for automatic CCAT review of all rejected referrals to the PIP.**

- **Clinical input into the ICC process needed to be strengthened.**

- **There were problems with meeting the ten-day timeframe for completion of psychological assessments.**

- **There were no clear policy and programming distinctions between the levels of acute care and intermediate care.**

- **The group therapy curriculum was a good mix of core and recreation-based groups, with significant clinical and educational benefit to participants.  It could have benefitted further from having specific therapy groups that have structured formats, such as DBT, and other cognitive-behavioral therapy programs.**

- **Whenever possible, therapy sessions were conducted in confidential settings, without custody unless necessary.**

- **Patients on DPS status were allowed group therapy on a limited basis.**

- **Although the facility used a "pitch and catch" approach to patient movement, it was done in a way that was less dehumanizing than at some other DSH programs.**

- **The PIP had a functioning quality management program, but it did not include the use of mental health assessments in the disciplinary process as part of its performance indicator review system.**

219

- **The program's data management system needed to be adapted for better maintenance of accurate, up to date information.**

## III.   CENSUS

At the time of the February 2014 visit, the PIP census was 38, with three admissions expected later that week.  The bed UM report summary dated February 18, 2014 reported a census of 36, of whom seven patients were at the acute level of care, and 29 were at the intermediate level of care.

## IV.   STAFFING

Since its activation, the program had some changes in executive staff, with the reclassification of the executive director position to a chief psychologist position.  Positions were allocated to CIW, rather than specifically to the PIP, so staff could be rotated between the prison and the PIP.  Shortly before the September 2013 visit, the three psychologists at the PIP were switched with three CIW psychologists.  By the time of that visit, some of the psychologists were still familiarizing themselves with the content of group treatment.

### 1.   Administrative and Clinical Staffing

The overall staffing vacancy rate for the PIP was nine percent.  Per the CIW PIP staffing classifications/vacancy rate report for February 28, 2014, staffing of position allocations was as follows: one unit supervisor, two staff psychiatrists, three clinical psychologists, four clinical social workers, four recreation therapists, and 32 psych techs.

Chief Psychologist/Executive Director:  The chief psychologist/executive director position was filled.

Program Director:  The program director position was filled.

Senior Psychiatrist Supervisor:  The senior psychiatrist supervisor position was filled.

Program Assistant:  The program assistant position was filled.

Psychiatrists:  The two staff psychiatrist positions were filled.  A new psychiatrist began work two weeks before the November 2013 site visit, and was engaged in the training curriculum at the time of that visit.

Psychologists:  The three psychologist positions were filled.

Social Workers:  The four social worker positions were filled.

Recreation Therapists:  Of the four recreation therapist positions, three were filled, for a 25-percent vacancy rate.

Senior Psych Techs:  Five of the six senior psych tech positions were filled, for a 17-percent vacancy rate.

Psych Techs:  Of the 32 psych tech positions, 29 were filled, for a nine-percent vacancy rate.

Correctional Counselors:  There were no correctional counselors specifically assigned to the PIP.  They were being "floated" from other yards, which limited opportunity for them to become familiar with individual patients.

## 2.     Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

Staffing ratios appeared to be appropriate for the PIP.  Interviews with staff and review of staffing data indicated a staff-to-patient ratio of 1:22.5 for psychiatrists, 1:15 for psychologists, and 1:11.25 for social workers and recreation therapists.

## 3.     Staff Training

The PIP had a full-time training officer who, with a nurse instructor, handled all orientation training of all new employees - clinical, custodial, office, and maintenance - in the PIP.  Training was comprehensive and complete for all permanent and floating staff in the PIP.

Training of all permanent staff involved five days of training, with two days of classroom training covering policies, procedures, and operation of the PIP, and three days of floor training shadowing all staff except clerical.

TSI training[16] entailed two days of training of all staff on collaboration and communication. It was designed to assist staff with intervention and utilization of de-escalation techniques in potentially dangerous behavioral situations. During the November 2013 visit, the monitor attended the two eight-hour days of TSI training for new PIP employees. The sessions were co-facilitated by the training officer and a psych tech. Attendees included a sergeant, correctional officer, psychiatrist, unit supervisor, nursing staff, and custodian supervisor. The training material, which covered intervention strategies, was thought-provoking and elicited discussion among staff members and the facilitators. The disciplines present appeared to gain useful knowledge of each other's backgrounds and experiences. Custody and clinical staff asked each other questions about their respective disciplines.

Collaboration training involved one full day of training for mental health and custody staff. Headquarters provided the lesson plan and materials.

CTC orientation training took three days and was provided to anyone having patient contact, meaning all PIP staff. This training, plus another eight hours of training annually, was required for program licensure.

Training for new health care/mental health care staff took five days, the last two of which were exclusively for nursing staff regarding medication pass testing, chronic care, etc.

Motivational interview training was provided to custody staff. It covered communication techniques for trying to persuade patients to go to shower, come out for group therapy, and go out to yard, among other activities.

_____

[16]TSI was formerly known as prevention and management of assaultive behavior or PMAB.

Staff reported that continuous, as needed on-the-job training was provided on the unit floors. This was particularly necessary when policies were changed, and the training officer and nurse instructor would provide PowerPoint presentations on the unit floor. Training was provided to all staff on all shifts.

To train floating staff, the training officer attended weekly CDCR block training on the mainline and presented an hour and a half PowerPoint on the opening of the PIP and its operations and patient population. A guide binder, known as "Custody Float," was agreed to by the correctional officers' association and provided an overview of PIP operations and expectations. It supplemented and was maintained with the post orders at the PIP entry control desk.

During the February 2014 visit, further observation of staff training indicated that it continued to be well run as a regularly scheduled activity, remaining comprehensive and interactive among all of the involved disciplines.

## V.    TREATMENT AND CLINICAL SERVICES

Generally, mental health services at the CIW PIP provided the care necessary for patients referred to the program. Competent and dedicated leadership was in place. Patients participated in group, individual, and unit activities, with therapeutic benefit. Custodial interventions did not appear to have a negative impact upon the services provided.

During all three visits, the Special Master's expert observed treatment activities, including IDTT meetings, group therapy and patient observations that occurred on the unit. Findings from these observations were as follows:

1.    **IDTTs**

The IDTT was responsible for assessing, planning, and implementing individualized treatment via the patient's treatment plan.  According to policy, the treatment team was comprised at a minimum of a psychiatrist, psychologist, rehabilitation therapist, social worker, CC I, and a nurse, as well as the patient herself.  (*See* Policy, Ch.1, Sec. 106).  Psychiatrists were responsible for admissions and attended and participated in IDTT meetings in the PIP.  Patients' input was actively solicited.  Family members could also be included in IDTT meetings via teleconferencing, upon consent of the patient and approval by the CC I.  Within 72 hours of a patient's admission, an SRE and V-Risk assessment were completed.

Each discipline had to complete an initial assessment of the patient and present findings at the IDTT meeting, preferably the initial meeting.  (*See* PIP Policy, Chapter 1, Section 111 "Treatment Planning")  An initial partial team conference, requiring only the psychiatrist or a psychologist with order-writing privileges, an RN, a psych tech, and a custody representative, occurred within 72 hours of patient admission.  The full team was required at the team meeting, which had to occur within ten days of patient admission.  The follow-up meeting to be held 30 days after admission could be conducted by the abbreviated team that appeared for the 72-hour meeting.  Thereafter, treatment team meetings were held every 30 days.

"Mini" treatment team conferences could be held at any time, with the same abbreviated complement of members.  Reasons would include urgent or emergent issues, or problems, interventions, and objectives that need to be added or modified before availability of the full team membership.  (*See* PIP Program Manual, Vol. 19, Ch. 1, Sec. 111).

The Special Master's expert observed full and mini IDTT meetings during all three site visits.  They were very well run.  All clinical team members contributed to the discussion and

encouraged the patient to participate, although the CC I, when present, did not participate.

Program audits of IDTTs for October 2013 and January 2014 indicated that attendance by a

correctional counselor was problematic, with a 73-percent compliance rate. This was consistent

with staff reports.

Clinical staff were very sensitive to patients' concerns and tried to minimize their

anxiety. Staff were very familiar with the patients under their care. Interdisciplinary discussion

and treatment planning were good, and patients with very difficult clinical presentations were

discussed. Team discussions included patients' program participation and dining room

attendance.

Observed mini IDTTs were attended by all necessary disciplines, including the treating

psychiatrist, who ran the meetings. Patients attended and were engaged in the meetings. The

correctional officer stood in the room behind the patient. Teams discussed patients' current

treatment needs and reviewed treatment plans with patients. One patient remained in cuffs due

to assaultive behavior related to her medication non-compliance.

During the February 2014 site visit, a review of treatment plans found some improvement

with greater individualization of treatment planning. However, more alignment with individual

treatment needs and goals was required. The quality of written documentation and the plans

themselves were not as high as the quality of observed clinical interactions with the patients. For

example, diagnoses were not always updated or revised when new information or reassessment

indicated it. Interventions were not always clearly tied to identified patient problems, or altered

based on patient progress or lack thereof. Program audits of IDTTs for October 2013 and

January 2014 indicated greater than 90-percent compliance in timeliness and identification of the

referring institution's patient treatment goals.

2.    **Group Therapy**

Treatment groups were held in 12-week cycles with one break week. During break week, enrichment groups were increased so that patients continued to have activities while clinical staff reviewed patients' needs and modified group treatment content as needed. Some of the group treatment rooms could accommodate large numbers of patients and staff. However, staff reported that more and larger group rooms were needed.

During the February 2014 visit, a review of quality assurance information regarding group therapy indicated that from October 2013 to January 2014, 95.8 percent of scheduled group and individual treatment hours were completed. From 28 to 30 different group activities, including core and recreation-based groups, were provided. In December 2013, acute care patients were offered an average of 18.3 hours per week of activities and chronic care patients were offered an average of 16.7 hours of activities per week. In January 2014, both acute care and chronic care patients were offered an average of 15 hours per week.

The Special Master's expert observed a variety of treatment groups. Content centered on recreation, education, and alcohol and drug related issues. The scheduled group treatment suggested some very solid clinical content for the patient population, but it was unclear whether the group treatment that was actually provided matched up with the groups as indicated on the schedule. Variability in quality of treatment may have been due in part to some staff still becoming familiar with the treatment materials.

PIP had a mechanism for tracking the provision of group therapy hours. Sessions were well attended. There were no correctional officers present in the rooms during the sessions. The groups were generally well-run, with good relevant clinical content. Participants were engaged and participated, and reported good experiences with the program.

If necessary, patients were allowed to leave the group for appointments and later return. Custody staff would enter the treatment group and call for particular patients so that they could attend psychiatric appointments. However, this interrupted treatment as patients were repeatedly being called out of groups for other appointments. This was particularly difficult for patients experiencing difficulty with attention and concentration, even in recreation therapy groups. It was even more problematic in clinically-focused treatment groups in which participants were often engaged in intense emotional disclosures.

Another challenge to the group process was late arrivals. The reason for them was unknown, but staff acknowledged they were not unusual. It led to some groups starting as much as 20 minutes late, and even then several patients arrived another ten minutes later. This was very disruptive, particularly when a late arrival wanted to be briefed on what had already happened.

Groups were co-facilitated by staff members, but staff expressed mixed opinions on this practice. Some co-facilitators were merely present, others were active, skilled, and beneficial to the group, and still others did not have a good grasp of group process or content and could have benefitted from training or mentoring.

### 3.    Acute Care Program

The admission process was the same for both acute and intermediate care referrals. For acute referrals, if the patient's mental status and behavior were more consistent with intermediate care, then her care level would have been changed to intermediate, and the treatment team had to document the change in the treatment team documentation and in the treatment plan. Changes in level of care were also made according to patient improvement, and documented accordingly. Entry of changes in level of care into MHTS.net was cumbersome, however, requiring

downloading first into the custody system which then had to be downloaded to MHTS.net.  This affected the PIP's ability to have accurate and current level-of-care information in MHTS.net. The numbers of acute and intermediate care patients were not tracked through other internal databases.

Treatment services at the acute level of care included enhanced therapeutic groups and increased individual therapy, as compared to the intermediate level of care.  However, record review for acute care patients did not reflect such enhanced treatment or individualization of treatment plans to address their higher acuity, and it was very difficult to determine which patients were truly being provided acute level care.  Most patients were identified as "ICF" (intermediate care) or "PIP" (which is not an actual level of care), regardless of whether their designated referral or admission levels were for acute care.

The Special Master's expert reviewed charts of some patients who had been admitted at the acute level of care but were not improving.  The treatment team did not appear to address their issues as acute care patients, or they were designated for intermediate care but needed a change to acute care for the more intensive treatment at that level.  If these patients were in fact receiving enhanced treatment, it was not properly documented.

The Special Master's expert reviewed treatment data for October 2013 through January 2014.  Apart from the month of October, the weekly average numbers of treatment hours offered to intermediate care patients and acute care patients were nearly the same: in November 2013, it was 11.9 hours for intermediate, 12.6 hours for acute; in December 2013, it was 15.1 hours for intermediate, 16.5 hours for acute, and in January 2014, it was 13.6 hours for intermediate, 13.6 hours for acute.  October 2013 had the largest difference, with 14.1 hours for intermediate, and

17.5 hours for acute.  The relative amounts of core or true clinical treatment and leisure and supplemental therapies making up those average numbers of treatment hours were unknown.

In sum, based on reviewed measures, there was no real distinction between the acute and intermediate care treatment programs at the PIP.  Staff were less familiar with the acute care program, as PIP program descriptions were general and had no specific polices that established treatment planning expectations, treatment services, or other program parameters.  The only specified policies were for the intermediate care program.

### 4.     Intermediate Care Program

At the time of the November 2013 visit, the intermediate care program was on its ninth cycle, to last from November 11, 2013, to January 20, 2014.  The treatment schedule included core and ancillary/leisure groups.  Weekend and evening hours until 8:30 p.m. were included for group treatment provided by nursing staff.  Due to space and time constraints, doctors' lines were scheduled at the same time as group treatment, which led to patients being called out of groups, as described above.

By the time of the later visits, documentation in medical records had improved. Provisional diagnoses and rule-out diagnoses were typically followed up and clarified.  In some cases, treatment plans contained target behaviors that attempted to address too many different behaviors and were thus overly broad.  Some patients' primary behavioral and/or symptomatic issues were not identified as treatment targets despite the fact that they interfered with the patients' abilities to function in the environment.

Recreation therapists' notes were often very well documented, noting the goals of each treatment session and whether the patient had met them.  However, in some cases where treatment interventions were ineffective and inadequate, treatment plans were not modified.

Over time, this occurred across different treatment teams and was a significant weakness within the treatment program.  It appeared that some treatment teams were not monitoring progress or the lack thereof, and were instead simply implementing a generic type of treatment.  In some cases, progress notes by clinicians were rarely connected to the treatment plan and did not note treatment targets.

### 5.    Other Treatment Issues

Psychologists were completing "mental health evaluations" at intake for each patient, utilizing the CDCR Form 7386, that were due within ten days.  This was the same form used for an initial referral to the MHSDS when a non-caseload inmate is referred for consideration.  Different psychologists used different versions of this form, resulting in inconsistency of information collected.  The psychologist was also required to complete the same initial psychological assessment that was done at all other inpatient programs.  It was based on interviews soon after the patient's arrival and was due within 30 days.

As early on the psychological assessments were not being completed within ten days, staff indicated that the mental health evaluation requirement described above was implemented so that the treatment team would have information for treatment planning purposes.  In the records reviewed, the Form 7386 mental health evaluation was generally completed within ten days.

Suicide risk assessment was problematic. It appeared that the SREs were completed at the time of admission, but it was not documented that they were occurring subsequently when indicated.  Repeat evaluations were not invariably done at times when a patient was at a higher risk, for example, when a patient had been recently downgraded back to DPS status or was placed on one-to-one continuous observation.

About two weeks before the February 2014 visit, requirements for repeat SRE had been distributed.  They included at least quarterly reassessments, and for patients at moderate or high short-term risk, monthly reassessments.  The Special Master's expert noted that reassessments at regular pre-set intervals would not necessarily capture significant risks inherent in a patient's receiving a new prison sentence, loss of appeal, sudden loss of family support, recent suicide attempt or self-injury while in the hospital, notification of impending and unwanted discharge, downgrade in privilege level, or significant unexpected changes or changes for the worse in mood or behavior.

A review of medical records indicated that psychiatric prescribing practices were appropriate and within accepted guidelines.  Staff and quality assurance minutes reflected that there were some concerns regarding abnormal laboratory studies that may have been the result of erroneous laboratory practices; this issue was in the process of investigation between the psychiatric staff and the laboratory.

During the February 2014 visit, the Special Master's expert observed the evening medication pass that was done at approximately 5:00 p.m. by two LVNs (Licensed Vocational Nurses) and one correctional officer.  Medications were passed through the food port, and one of the LVNs checked the patient's mouth for cheeking of medications.  It was noted that medication administration differed significantly between the C/D side and the A/B side of the unit.  On the A/B side, the door was only opened for those patients who were not on DPS.  However, the practice of opening the door had developed from observations that a patient *while on* DPS status had hoarded her medications, which made the practice of opening doors for patients *not on* DPS status nonsensical and problematic.  The practice on the C/D side was for all patients that after

231

medication was administered, the custody officer opened the door and the LVN looked inside the cell to ensure that medications had not been discarded.

There was no policy governing staff referrals or patient requests to be seen by a clinician. Staff reported that in practice, when a patient asked to be seen by a clinician during normal working hours, the clinician was contacted the same day.  After normal working hours, the patient's request was documented in the end-of-shift report and the clinician was emailed notification of the request.  If the request involved an urgent matter, the psychiatrist on call was immediately contacted.

## VI.    PATIENT ACCESS TO TREATMENT

CIW PIP Policy Chapter 1, Section 107 prescribed how patients at the PIP were cleared for programming.  New arrivals were placed on orientation status, also referred to as DPS.  The IDTT evaluated the patient and recommended programming status via the individual treatment plan.  This recommendation included a recommendation regarding the need for "escort restraints" or the use of mechanical wrist restraints, i.e. cuffs.

All movement of patients in DPS occurred with custody staff present and in wrist restraints.  (*See* Chapter 3, Security Policies and Procedures, Section 313, "DPS")  Patients on DPS also were confined to their cells for meals.  Group treatment activities were limited until the patient was cleared for participation.  Other than at the time of intake, patients could be placed on DPS status as the result of a mini-treatment team planning conference meeting.  The rationale for DPS status was required to be documented in an IDN.  At the time of the November 2013 site visit, there were no patients with extended lengths of time on DPS status during the review period without well-documented and reviewed reasons.

According to staff, patients on DPS can go to DPS treatment groups. These have only two patients in the room at a time, with the facilitator, a nurse co-facilitator, and the correctional officer in the room. If a DPS patient was offered group but refused it, staff offered it to the next DPS patient, in an effort to maximize the presence of two DPS patients in each DPS treatment group.

For the duration of patients' DPS status, when they received individual therapy, they were seen by the mental health staff with a correctional officer in the same room. This compromised confidentiality and quality of the treatment process. DPS patients were provided with a folder entitled "My Personal Empowerment Workbook" which outlined unit policies and procedures, assisted patients with setting treatment and improvement goals, and provided didactic materials for individual and group study. Staff reported that most treatment centered on this workbook.

Once DPS patients completed this workbook, staff increased patients' access to leisure activities. However, patients could be returned to DPS status due to infractions or decompensated behavior. When this happened, the IDTT reportedly met on the following day for a "mini IDTT" to review these cases.

CIW electronically tracked the durations of patients' DPS status on a DPS master tracking sheet. Reasons for retention on DPS were documented in both the treatment plan, and for those on DPS status over 30 days, reasons were documented in the minutes of the monthly PIP quality management subcommittee meetings.

CIW PIP had a stage system that allowed for graduated privileges based upon patient behavior. The orientation status included a DPS stage, as described above, on which a newly arriving patient remained until cleared by the ICC. Patients at stage two were allowed radios,

and patients at stage three were allowed televisions.  If they were not on DPS or strip-cell status, patients were allowed to go to the dining rooms for meals.  The dietary department tracked patients' taking of meals in the dining room and provided this information to the treatment team.

Patients returning from court were placed on DPS status immediately upon their return. PIP administrative staff acknowledged that there were often delays in removing the patient's DPS status, commonly due to the absence of a correctional counselor from IDTT meetings. Consequently, the PIP adopted a provision addressing the return of patients from out to court. *See* Policies and Procedures Vol.19, Ch. 1, Treatment and Planning Procedures, Sec. 107, No. 9. This was a newly implemented policy at the time of the September 2013 visit.

According to the policy, PIP patients who left for a court visit and returned to the PIP had to be maintained on DPS status until the IDTT met.  The IDTT was required to meet the next business day following the patient's return from court.  During the IDTT meeting, the CC I would inform the team members, based on the results of the court leave, if the patient could immediately be released to program and return to her previous stage level, or whether she required a new ICC meeting before being released to program.  During the November 2013 site visit, the monitor verified that this policy was fully implemented and that patients returning from court were seen the next day after their return.

CIW also revised the out-to-court policy in the Program Manual, Vol. 19, Ch. 1, Sec. 101, No. 13.  Under this new policy, if the patient's expected return date could not be confirmed by the tenth calendar day from the patient's going out to court, she could be administratively (but not clinically) discharged from the PIP and the vacated bed could be filled with an approved admission, if needed.  If the patient's return date was confirmed by the tenth day, and the return was to occur before calendar day 14 after the patient went out to court, she would not be

discharged and would be placed directly back into the PIP upon her return. If a patient returned within the prescribed time frame, she would not require an initial psychiatric evaluation but would require a psychiatric progress note within 24 hours of return.

## VII.    REFERRALS AND TRANSFERS

The monitor reviewed CIW PIP referral and transfer data.[17] There were 13 referrals from September 1 through December 2013, but the data was incomplete. Of those, five were documented as acute care, four were documented as intermediate care, and four had no documented level of care. Ten of the 13 were documented as admitted, but there was no data on the remaining three (one acute care and two intermediate care referrals) to indicate acceptance or rejection.

All of the three acute care admissions for which there was transfer timeline data were transferred within the ten-day timeframe. Both of the two intermediate care admissions for which there was transfer timeline data transferred within the 30-day timeframe. The four admissions for which no level of care was indicated were all transferred within two to five days. In sum, for the nine admissions having transfer timeline data, there was 100 percent compliance with transfer timeframes.

Bed assignment dates were not listed for all admissions. Of the ten admissions for which there was transfer timeline data, nine included bed assignment dates. All nine or 100 percent of those admissions were transported within 72 hours of bed assignment.

At the time of the September 2013 visit, there were five patients designated as receiving acute care. Three had been there less than 120 days, one had been there from 120 to 180 days, and one had been there longer than 251 days. There were 37 patients designated as receiving

---

[17] Source: CDCR FTP Secure Website. Because this data source was incomplete, analysis and statistics reported herein are based on only the data that was available.

intermediate care.  Seven had been there less than 120 days, seven patients had been there from 121 to 180 days, five patients had been there from 181 to 250 days, and 18 had been there over 251 days.

At the time of the November 2013 site visit, there were nine patients receiving acute care. Six had been there less than 120 days, two patients had been there from 121 to 180 days, and one had been there over 251 days.  There were 34 patients receiving intermediate care.  Twelve had lengths of stay of less than 120 days, four had been there from 120 to 180 days, three had been there from 181 to 250 days, and 15 patients had been there over 251 days.

At the time of the February 2014 visit, there were seven patients receiving acute care. Three had been there zero to 120 days, two had been there from 121 to 180 days, two had been there from 181 to 250 days, and none had been there beyond 251 days.  Of the 29 patients in intermediate care, 12 had been there from zero to 120 days, one had been there from 121 to 180 days, four had been there from 181 to 250 days, and 12 had been there longer than 251.

## VIII.   ADMISSIONS AND DISCHARGES

For referrals to the PIP, once an inmate had been identified for referral, the inpatient referral packet was completed and posted on SharePoint.  The admission and discharge referral team at the PIP reviewed the referral packet and determined whether the inmate met admission criteria.  PIP used the same admission criteria as the other inpatient programs for CDCR inmates. There was a large admissions area that included examination rooms for initial interviews and physical examinations.

Required membership on the admission and discharge referral team included a psychiatrist, psychologist, social worker, and RN.  The admission and discharge coordinator, who is a RN by policy, also participated.  There were inconsistencies in the policy as to who

required members were and who were merely preferred members.  The Special Master's expert observed a meeting at which more than minimum staff members were present and participating. It was facilitated by the admission and discharge coordinator, and a senior psychiatrist also played an active role in facilitating case reviews for admission.

During the February 2014 site visit, the Special Master's expert observed an admission that was performed by the psychiatrist and RN.  The patient, who was on DPS status, was dressed in a suicide smock, as she had made a recent suicide gesture, and was also in waist chains.  A custody officer was present in the room during the entire interview, and the door to the examination room was open.  This created problems with lack of confidentiality.  When the psychiatrist was asked about this, he indicated that custody staff were trained on confidentiality during their orientation training. There were also reported issues with receiving prior mental health history from DSH.  It was reported that CDCR and DSH were working on this problem. The interview was thorough and complete.

The process for rejected referrals was for them to be further reviewed by the admission and discharge coordinator, and then submitted for final review by the program director and senior psychiatrist.  The referring clinician was then notified of the rejection, both via a Decision Form and by telephone, according to supervisory staff.  According to the executive director/chief psychologist, no referral had been rejected.

To be cleared of DPS status, all patients on maximum custody status had to be referred and cleared by the ICC.  According to policy, ICC reviews had to be scheduled and held within ten days of admission to the PIP, and as necessary, based on changes of programming status.  At the time of the September 2013 site visit, ICC meetings occurred weekly and as necessary.  No

problems with timely occurrence of initial ICC meetings were identified.  Since January 2013, only one patient's ICC meeting had exceeded the ten-day timeframe.

During the November 2013 and February 2014 site visits, the monitor observed ICC meetings.  Mental health input consisted of the patient being asked basically the same questions as in the orientation process.  The clinician's role was essentially a *pro forma* approval of the ICC process.  The patient's staff assistant did not effectively communicate with the patient to ensure that she understood the proceedings, but instead merely repeated the words of the committee chair, which were usually at a level too difficult for a typical patient to comprehend.

Criteria for discharge from the PIP were set by policy and were applied by the IDTT when deciding whether to discharge a patient.  Staff reported that for patients clinically ready for discharge and approaching their parole or release dates, they would be returned to a mainline institution a minimum of 30 days before their release.  Then, pre-release planning could be completed at the institution.  Returns to mainline institutions were clinical decisions whereby patients would be provided with a "step-down" to the less structured environment there before actually paroling or being released.  Patients who were not clinically ready for discharge would not be returned to a mainline institution, and would be paroled directly from the PIP.  The Special Master's expert noted the importance of basing decisions to discharge/return to mainline institutions on clinical reasons rather than on approaching parole dates.

The monitor reviewed pre-release planning at the PIP during the November 2013 visit.  A patient could be released from the PIP in three ways: (1) as a MDO to be sent to Patton State Hospital (PSH), (2) to post-release community supervision, or (3) parole directly to the community.

The social worker reported that patients went through the TCMP 90 days before release. Benefits workers met with involved patients on the unit. The social worker stated that Los Angeles County had access to patients' records but forms for the counties varied and were cumbersome. For a patient paroling to the community, the social worker would contact the parole office and talk to the correctional counselors who would also contact the parole officer. The social worker would also meet with the benefits workers concerning SSI and MediCal benefits for the patient, and would work on arranging housing for the patients upon their release. Rather than have a released patient take a bus back to the community, the parole agent would pick up the patient at CIW and take her to be dropped off in a safe location.

Patients also attended pre-release groups while in the PIP. The monitor reviewed the group lesson plan, which was an 11-week plan that covered introduction to pre-release, 211 social service phone assistance, housing, SSI, state disability insurance (SDI), general relief, gate money, employment, budgeting income, treatment programs, having a plan, mental health and medications, parole and parole outpatient treatment, medical and dental health care, and wrap-up and review of pre-release issues and return to the community. Each of these topics also had indicated outcome measures.

## IX.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

Any clinical or custody staff member could write an RVR in the PIP. If a patient received an RVR, she was not placed on administrative segregation status. Pursuant to PIP policy, the only changes made to patients' stage levels were through IDTT consideration.

A staff psychologist who did not carry a caseload completed all of the mental health assessments for any patient who received an RVR. In October 2013, the psychologist received training on these assessments. The training included communications with custody. The

assessments were not subject to any quality review process.  During the September 2013 visit, the monitor identified concerns with these assessments.  For instance, the clinician's notation of mental health factors to be considered in penalties was often too vague, stating merely that the inmate is "at PIP level of care and her mental health should be considered."  This was not useful to a SHO deciding whether to mitigate penalties.  During the February 2014 visit, the monitor reviewed the most recent mental health assessments, which were completed after the psychologist had been trained, and found the assessments were improved and contained helpful recommendations provided by the clinician.

RVRs were reviewed monthly by the performance improvement committee at the PIP. Any identified problems with RVR issuances or dispositions were raised through the appropriate chain of command to the performance improvement committee.  For example, committee action resulted in the dismissal of an RVR received by a patient who had broken her own radio, as PIP patients purchased their own radios.

As of the time of the September 2013 visit, there had been 68 RVRs written for 30 patients in the PIP since it opened in July 2012.  During December 2013 and January 2014, CDCR issued 12 RVRs to 11 patients.  Staff described a lag between completion of the RVR and receipt of the final dispositions.  Consequently, the binder of completed RVRs was missing a significant amount of current RVRs.  For 11 incidents, there were no findings, nor any indications of whether the SHO took into consideration the results of the mental health assessment in the adjudication, or documented that consideration in the disposition.  Staff at the PIP indicated that this information was difficult to obtain from CDCR.

By the time of the February 2014 visit, on average, five to six RVRs were issued per month to PIP patients.  There were improvements.  Information from the clinician on the mental

health assessments had improved and was more useful. Hearing officers were consistently documenting consideration of the mental health assessment. They usually mitigated by not removing patient privileges that could have potentially affected their stage level. However, hearing officers did continue to assess significant forfeitures of credit, for example, 90 days or 120 days, in effect extending the patient's commitment.

The CIW-PIP performance improvement committee reviewed and challenged some RVR dispositions, and dismissed some guilty findings. However, more detail was needed in the minutes regarding the committee's actions. Further training on the issuance of RVRs, and quality review of the clinician's mental health assessments would have been helpful.

During the February 2014 visit, a review of use of force incidents found that in December 2013 and January 2014, eight incident reports (Form 837s) were generated for patients in the PIP. Six incidents involved use of force to bring a patient down and apply mechanical restraints. There were two incidents in which OC (pepper) spray was utilized, both involving two bursts, before the patients complied. All patients were decontaminated afterwards. There did not appear to be any issues with excessive use of force or the number of incidents at the facility.

## X.    <u>USE OF SECLUSION AND RESTRAINT</u>

The facility tracked usage of seclusion and restraint. There were five seclusion and seven restraint episodes in 2013. Detailed information was provided for the months of December 2013 and January 2014. During the month of December, there were three separate occasions of restraint use; two of the three incidents occurred with the same patient on separate days. The average time in restraint per episode was four hours, 15 minutes for that month. Seclusion was not utilized during that month. There was no reported restraint and seclusion usage for January 2014.

## XI.    <u>UTILIZATION REVIEW AND QUALITY MANAGEMENT</u>

The program had implemented a quality assurance process to identify and to provide corrective action for specified areas of improvement.  Performance data was collected on seclusion and restraints, cell extractions, RVRs, environment of care, infection control, group attendance, effective communications, credentialing, medication errors, training, IDTTs, housekeeping, work orders, dietary service, unusual occurrences, perception of care, and employee satisfaction.

Quality assurance responsibilities were carried out by the program director and program assistant.  Staff indicated that the executive director's request for additional quality assurance resources had been denied.  They expressed concern that without a standards compliance department, the workload for completing quality assurance tasks would deter the executive director, program director, and program assistant from other important managerial and operational duties.

CIW had a patient care policy committee that met monthly.  Members included the CEO, the chief medical executive, and all department heads.  During the November 2013 visit, the monitor attended a committee meeting at the CIW mainline.  It was well-attended, with excellent discussions of issues affecting specific areas of patient care as well as all departments.  Staff reviewed and addressed matters from all areas of patient care within CIW and CIW PIP, including food services, CTC issues, pharmacy issues, nursing issues, laboratory issues, and personnel issues, among others.

## XII.    <u>END OF SHIFT REPORTS</u>

Every day, staff received end-of-shift reports.  These end-of-shift meetings appeared to be a good vehicle for information-sharing between staff working on different shifts.  The reports

included relevant information from each watch as well as administrative information such as mandated overtime, census at start of watch, and patient admission dates.  A shift change observed during the September 2013 visit was attended primarily by nursing staff, several recreation therapists, and one custody staff member.  Pertinent information was shared.  An 8:00 a.m. morning meeting was also observed.  All unit staff attended, and discussion covered patients who were problematic or issues of concern.

## XIII.   LAUNDRY AND SUPPLY ISSUES

Laundry policies and procedures were included in the Program Manual, Volume 19, Chapter 2, Patient Rights and Policies and Procedures, Section 210, "Laundry Service."  There were no laundry issues identified at CIW PIP.

EXHIBIT G
Atascadero State Hospital (ASH)

**1. Patient A**

Brief History:  This patient was admitted on 6/26/13 to ASH from MCSP due to persistent auditory hallucinations.  He also "reported difficulty sleeping, racing thoughts, poor impulse control, and poor coping skills" and had symptoms associated with depression, including fatigue. Other than two prior MHCB admissions, he had no psychiatric history.

He was prescribed Zyprexa 5 mg twice per day on 7/11/13 and Zoloft 50 mg every morning on 7/16/13.  On 8/20/13, Zyprexa was discontinued due to increased appetite and weight gain and Geodon was started at 80 mg at bedtime.  Over the subsequent three months, there were a series of dosage adjustments and medication changes.  Geodon was changed back to Zyprexa on 9/16/13.  Zyprexa was discontinued on 9/25/13 and Haldol was started on 10/8/13 and then discontinued on 11/25/13.  He was prescribed psychotic medications to address symptoms of auditory hallucinations, mood lability, and paranoia.  Each medication was discontinued due to non-adherence.  Brief trials of Effexor ("for depressive symptoms"), Thorazine ("for aggressiveness"), and lithium carbonate ("for mood lability and aggressiveness") were also discontinued because of non-adherence.  The patient also did not comply with recommended DBT and presented with isolative behavior on the unit.

The patient was discharged from ASH on 12/11/13.  He was provided with a primary discharge diagnosis of Bipolar I Disorder, depressed, severe with psychotic features.  He also received diagnoses of Antisocial and Borderline Personality Disorders.  He was discharged from ASH based on a determination that he "will not benefit by further care and treatment at Department of State Hospitals-Atascadero due to his pattern of noncompliance with recommended treatments." The discharge summary documented that he had mildly constricted/depressed affect and mild paranoia.  Regarding hallucinations and suicidal or homicidal thoughts, the mental status examination only indicated that the patient denied these problems without describing objective observations or findings.  He was recommended to continue mental health services at the EOP level of care after discharge.

On 12/5/13 at approximately 12:30 a.m., the patient was placed in full bed restraints after repeatedly striking a staff member in the face and head areas with closed fists.  This occurred after the staff person redirected him about pacing and talking in the hallway.  IDNs at that time described the patient as pressured, restless, and agitated.  After the assault, he told nursing staff that he had "blacked out" and did not know what had happened.  He also told psychiatry staff that he had been hearing voices and felt disrespected by the nurse who had asked him to stop pacing and talking.

Psychology notes on the day following the 12/5/13 incident pointed out inconsistencies in the patient's presentation.  For example, his hallucinations were described as vague and lacking associated affect; the psychologist also noted that he did not mention the hallucinations until prompted.  The note also described the patient as "guarded, focused on impression management, and tense."

A psychiatric progress note from 12/9/13 noted that the patient had demonstrated a reduction in agitation, aggression, and reactivity after medication adherence with recommended doses of psychotropic medications.  The psychiatrist indicated that the medications would take additional

time to become efficacious and plans were in place to continue current psychotropic medications and restraint/seclusion for this reason.

The patient also had a diagnosis of hyperparathyroidism. His laboratory results included a serum calcium of 10.3 mg/dl on 9/24/13 and 10.8 on 11/5/13 (normal range 8.5 − 10.1) and a parathyroid hormone (PTH) level of 56 pg/ml on 9/3/13 (normal range 10 - 65). An elevated serum calcium along with an elevated PTH, or a PTH in the upper half of the normal range is often the result of primary hyperparathyroidism (PHPT). Neuropsychiatric symptoms can occur at greater frequency among patients with PHPT. These symptoms can include depression, lethargy, psychosis, decreased social interactions, and cognitive dysfunction.

**Findings:** The patient received diagnoses of both a psychotic mood disorder and personality disorders. Although these diagnoses are not mutually exclusive, it is not uncommon for one to be mistaken for the other. For example, individuals with Antisocial Personality Disorder sometimes receive diagnoses of bipolar or similar affective disorders, and vice versa, because of some similarities in their presentations. Based on medical record review, there was no way to independently ascertain the accuracy of these diagnoses for this patient.

Nevertheless, the case presented some areas of concern. It appeared that the discharge decision was made in immediate response to the assault that led, appropriately, to the patient's restraint. This suggested that the incident itself caused a rapid resolution of any diagnostic uncertainty, even though either a psychotic mood or personality disorder could have an association with such behavior. Medical record progress notes after the incident, however, continued to reflect differing interpretations of the patient's presentation.

Psychiatry notes focused on the need for medications, which the patient had "finally become compliant with" and additional time needed for the medications to become effective. This assessment was made as late as 12/9/13, even though the discharge summary prepared on 12/5/13 indicated that the discharge process, which ended on 12/11/13, had already begun. The discharge summary also suggested that non-compliance with treatment provided a basis, at least in part, for the discharge decision. Discharge for this reason can be appropriate in some cases (e.g., individuals with personality disorders and disruptive behaviors in the hospital), but it rarely, if ever, provides an appropriate justification for discharging an actively psychotic patient with significant behavioral problems.

The seemingly precipitous decision to discharge after the assault in the context of unresolved diagnostic questions and active but incomplete treatment raised concerns about the discharge decision-making process. The unresolved and apparently unaddressed inconsistency in assessments between psychiatry and psychology also raised questions about interdisciplinary communication.

The discharge summary also did not discuss the potential contribution of PHPT to the patient's presentation other than a nonspecific comment that "his symptoms are not better described by substance abuse or a general medical condition." The patient's presentation led to conflicting diagnostic impressions and the possible role of PHPT warranted explicit consideration.

## 2. Patient B

Brief History: This patient was admitted to ASH on 12/31/13 from the WSP reception center. He had been housed out of state as a CDCR patient in Arizona and arrived at WSP on 11/13/13 after he had attempted suicide using a rope fashioned from his t-shirt. The suicidal thoughts arose after his son died in an automobile accident on 10/30/13.

The patient had a history of inpatient treatment in or about 1993 during a prior incarceration, and a 25-year history of depression with auditory hallucinations and suicide attempts.

Treatment plans dated 1/7/14 and 1/30/14 identified as foci of the hospitalization the following: psychiatric stability, orientation, danger to others, cognitive behavioral interventions, substance abuse, and "my family, my recovery," along with other mostly non-psychiatric related foci. To address these issues, his interventions include mental health wellness, orientation, aggression reduction, cognitive behavioral interventions, and substance abuse awareness. The plans, however, indicated that the patient was considered at low risk for violent or aggressive behavior, that his crimes had been against property, and that he had not shown violence or aggression in the hospital.

The medical record included documentation of weekly social work clinical contacts; the most recent contact was dated 2/6/14. All of these notes documented a lack of involvement by the patient's family. For example, the note from 1/6/14 stated that "family appears disengaged at this point and his contact is limited which causes him stress" and that his daughter did not respond to messages from the social worker. Notes from 1/30/14 and 2/6/14 both indicated that the patient's brother and daughter continued not to respond to calls from the social worker. The notes also described the patient as having 100 percent attendance and of being an active group participant throughout hospitalization.

The patient was prescribed Remeron 45 mg at bedtime and Depakote 500 mg twice per day for seizures.

**Findings:** Although this patient had a long history of depression, the precipitant for this hospitalization was the unexpected death of his son in an automobile accident. Along with this loss, the patient's family was not responsive to outreach by hospital social workers. This estrangement exacerbated the patient's sense of loss.

Despite the precipitants for this hospitalization, none of the groups or interventions mentioned for him focused on grief or bereavement. The reason for his enrollment in a group focused on learning "to better manage his anger and aggressive behavior" was unclear given his apparent absence of such behaviors. A grief or bereavement group would have better met this patient's needs and would likely benefit other patients with similar issues. The reviewer was unable to determine the type and frequency of groups attended by the patient based upon the information provided.

## 3. Patient C

Brief History: This patient's chart was reviewed for general assessment of care and assessment of an episode of seclusion on 1/4/14.

The patient was admitted to ASH due to depression on 7/2/13 from RJD, where he was serving time for involuntary manslaughter. He had been prescribed Wellbutrin 150 mg per day, which was continued on admission. He had no prior hospitalizations at DSH facilities, but may have had a community psychiatric hospitalization as a child.

He met with a psychologist for a risk assessment on 8/2/13 and 8/14/13. The assessment was completed on 8/21/13 and he was determined to pose low risk for institutional violence. The assessment stated that he had a history of attacking others when agitated or frustrated. The assessment also indicated that he had an episode during February 2013 in which he reacted with physical aggression towards another patient after bumping into him. The patient reportedly had gang affiliation. In addition to his current incarceration for manslaughter, he had prior convictions for attempted murder, terrorist threats, robbery, and battery on a person. He received 115s for physical altercations and mutual combat and had a history of impulsively lashing out towards others in response to internal tension/stress. Nevertheless, the risk assessment noted that he was highly motivated for treatment and the plan included placement in an aggression reduction group.

After completion of the risk assessment, the patient was seen monthly for a "check in" with psychology and on 1/10/14 to evaluate a suicidal statement.

In contrast to the psychology assessment, the 30-day psychosocial assessment concluded that the patient was at moderate risk for aggression and suicide. In addition to the violence history already noted, this social work assessment identified domestic violence issues with girlfriends in which he was assaultive towards them. He also reportedly assaulted students and teachers in grade school, including breaking his second grade teacher's knee by kicking her with steel toe boots.

The rehabilitation therapy transfer assessment dated 8/28/13 stated that the patient had no behavioral problems since admission and made no mention of his history of violence. Weekly and then monthly psychiatry notes also did not discuss his history of violence.

The treatment plan summarized the violence history and stated that the patient's primary risk factors were low frustration tolerance and poor impulse control, with limited ability to cope with his triggers. The plan further identified his history of impulsively lashing out in response to internal tension/stress. No other triggers were identified. His interventions included "aggression reduction" with the objective to "identify triggers to his impulsive behavior and learn coping skills to manage his triggers."

At about 10 p.m. on 1/4/14, the patient approached a psych tech and said that he was feeling suicidal and "would be bleeding out right now" if he had access to a razor blade. He spoke with the psych tech while other staff notified the psychiatrist regarding this statement. The patient discussed his feelings of depression and of being shunned by his family, who had no contact with him. He spoke about issues from his childhood and of his criminal history. The psych tech attempted to focus him on positive aspects including goals, available community programs, support services, and church. The patient was also encouraged to focus on changing his negative

thoughts. The patient reportedly requested to be placed in seclusion. In an order timed at 10 p.m. on 1/4/14, a physician ordered seclusion for four hours or until the patient no longer posed a danger to himself or to others. The order included as release criteria that he demonstrate control of behavior with no threats to harm others or himself, demonstrate relaxed body posture with no agitation or angry affect, and be able to consistently follow staff direction and exhibit alternatives to violence. One-to-one observation was ordered upon release from seclusion. The same order was again written at midnight.

The restraint or seclusion RN initial assessment included as one of its psychiatric treatment interventions the need to encourage verbalization of feelings to staff and that staff try to explore options to gain the patient's trust and confidence. The assessment also indicated that staff would explore triggers for the patient's behavior to prevent future incidents.

During an interview with staff at 12:30 a.m. on 1/5/14, the patient denied intent to harm himself or others according to an RN re-assessment note.

**Findings:** The assessments by psychology and social work appeared to be comprehensive in identifying the patient's history of violence. However, they did not elaborate on the triggers that the patient needed to identify. Those triggers also were not prominently presented in the medical record in a way that all staff could quickly find them. Categorizing the level of violence has only limited utility. For example, the psychology and social work assessments categorized this patient with low risk and moderate risk, respectively. The category level by itself, however, did not convey specific remediable risk factors for the patient, interventions needed to mitigate those factors, signs and symptoms that needed monitoring, contingency plans if the patient's condition deteriorated, or similar information that directly helped staff with ongoing assessment and interventions.

The seclusion episode had both constructive and counterproductive elements regarding the staff response. On the positive side, the psych tech was accessible to the patient and engaged him when the patient approached to express his suicidal thoughts. The psych tech made a well-intentioned attempt to speak with the patient, be helpful, and instill hope. Other staff also responded quickly to the situation. All of this indicated staff availability and their therapeutic motivations.

However, other staff responses appeared to have been counterproductive and an overreaction. The patient had not acted on his suicidal thoughts, but had appropriately approached staff to talk about how he felt. He made no attempt to harm himself or others and had no behaviors that required intervention or extinguishing. Although he said that he would like to go into seclusion, his voluntary request for a quiet respite (and presumably the staff contact and interaction that would accompany it) led to an involuntary order for seclusion. That order included release criteria that were inappropriate for the patient at that time. He had not engaged in behavior that represented a danger to others, danger to self, or a lack of control of behavior (expressly outlined in the order). He also had made no threats to harm others or self. His statement that he would be bleeding if he had access to a razor blade was an expression of his distress, not a threat.

The reason for requiring the patient to demonstrate relaxed body posture with no agitation or angry affect was unclear. This requirement in effect asked him not to show tension, agitation, or anger, even though he may have had such feelings. Appearing tense, agitated, or angry are not assaultive behaviors or dangers to self. There was also no indication of an inability to "consistently follow staff direction." By contrast, the patient had been following staff directions prior to being placed in involuntary seclusion. The RN initial assessment note appropriately directed that he should be encouraged to verbalize his feelings to staff, which was exactly what he did in his initial approach to the psych tech. The subsequent response by staff that put the patient in involuntary seclusion after he stated his feelings was not one likely to gain his trust and confidence.

There was nothing in the medical record that suggested anything other than staff's good intentions. Their response, however, was likely counterproductive. Several aspects of that response likely conveyed their discomfort and alarm by the patient's expressed distress. These included attempting to "find optimism" without first and fully acknowledging the patient's distress, requiring that he no longer express suicidal feelings before release from seclusion, and requiring that he appear relaxed and without dysphoric affect. Instead of encouraging him to talk about his distress, including his suicidal thoughts, the staff response required him not to have, or at least not show, these thoughts and feelings lest he remain in involuntary seclusion.

## 4. Patient D

Brief History: This patient was a 38-year-old man admitted to ASH on 3/11/13 due to auditory hallucinations and multiple delusions, including the belief that he could talk to the spirit world, was the original Eve, and had a special relationship with God. He carried a diagnosis of Schizoaffective Disorder, with symptoms since childhood. He also had a history of variable adherence to his medications, which included Prozac and Abilify at the time of admission.

The medical record included many illegible entries. During the first seven to eight days of December 2013, progress notes described the patient as agitated with pacing, angry, and verbally aggressive toward staff. His activities of daily living were decreasing with increasing isolation and refusal of many meals and groups. He received Haldol and hydroxyzine on an as needed (prn) basis on at least one occasion, after which his symptoms began to lessen and group attendance improved 47 percent by 12/24/13. On 12/29/13, he was involved in mutual combat with another patient. He received more Haldol prn with subsequent improvement and increased cooperation. The following day the patient was transferred from unit 28 to unit 34 after he made threatening statements about a peer.

The most recent IDN at the time of medical record review on 2/13/14 was the social work monthly note. The note documented the patient's group attendance of 65 percent and the social worker's effort to have him become more engaged with group treatment. The patient had six psychology notes in his medical record from 12/8/13 to 2/6/14.

The monthly psychiatric progress note dated 12/9/14 revealed stability of the patient's psychotic symptoms, but with ongoing delusions. The note indicated that he had no current moderate or high risks for assault.

A psychiatric transfer note dated 12/30/13 concluded that the "violent incident appears to be due to behavior, not due to psychiatric symptoms or causes…[and] that the current psychotropic medications be continued." The monthly psychiatric progress note of 2/7/14 described the patient as less symptomatic, but with limited engagement in treatment.

The patient's medication and treatment record indicated that he received haloperidol 10 mg twice a day and aripiprazole 30 mg at bedtime throughout the month of December 2013. Medication and treatment records for January and February 2014 were not located in the medical record, but physician orders indicated that he continued to be prescribed these medications, along with Venlafaxine 150 mg per day.

The most recent treatment plans were dated 9/10/13, 12/9/13, and 1/8/14. They noted current group interventions that included mental health wellness, staying safe, aggression reduction, substance abuse awareness, and healthy living. However, mental health wellness and aggression reduction were not included in the 12/9/13 treatment plan, which only listed the three other groups.

**Findings:** Overall, the care provided to this patient appeared to be reasonable and appropriate. He had adequate frequencies of contact with various disciplines and staff responded reasonably to the fighting incident. The indication for his medications was clear and there was adequate monitoring by psychiatry.

The number of groups that the patient appeared to have been assigned to was only three in December 2013 and five in January 2014, after the fighting incident. His group attendance was consistently limited. There was a lack of documentation whether the patient's poor attendance accounted for his assignment to this limited number of groups.

## 5. Patient E

Brief History: This patient was admitted to ASH on 12/30/13. As to his history of present problems, he reported "cutting on self, a whole year straight. Lick the blood and spit on cops." He was referred for a higher level of care as he had required multiple MHCB admissions. A long history of a serious mental disorder associated with psychotic features was noted. Diagnoses included Schizophrenia, Amphetamine Abuse, Borderline Intellectual Functioning, and Antisocial Personality Disorder.

A 1/13/14 treatment plan was reviewed, which had been formulated one week earlier. Identified problems included the need for psychiatric stability and better impulse control.

This patient was restrained on 1/14/14 at 6:15 p.m. after he spit on a staff member in the dining hall and threw his coffee cup against the wall. He also attempted to bite staff.

The appropriate observation record for behavioral seclusion or restraint forms was completed. Useful progress notes were written at least every two hours by nursing staff specific to the use of restraints. On 1/15/14 at 7:55 a.m., the patient met criteria for release from restraints and they were discontinued. A seclusion/restraint debriefing form was completed that same day.

251

A 1/16/14 social work weekly note indicated that the patient had been psychotic and agitated and included the following:

> He has no collateral contacts. Discharge plans to transfer to treatment unit and then return to CDCR when he has met his treatment objectives. He will require ongoing psychiatric services as well as protective housing when he returns to CDCR to monitor for mood lability and psychosis.

The patient was again restrained on 1/19/14 at 6:25 p.m. after he was involved in an unprovoked assault on a peer. He hit this patient after he asked for his bread at the dining room and was refused. Appropriate documentation was present in the medical record relevant to release criteria and formulation of plans for alternatives to assaultive behaviors. The observation record for behavioral seclusion or restraint forms was completed. The following day at 11:00 a.m., the patient was released from full body restraints as he met his release criteria. A seclusion/restraint debriefing form was completed at that time.

A 1/20/14 progress note by a psychologist indicated that the patient had been involved in four physical altercations since his admission and had been assessed to be at high risk for institutional violence/aggression. Related to these assaults and his lack of motivation for treatment, the treating psychiatrist dictated a recommended continued care plan on 1/21/14 based on the treatment team's assessment that he had reached maximum benefit at the hospital.

On 1/30/14 at 8:25 a.m., the patient was again restrained following an incident that involved threatening another patient for unclear reasons and throwing feces in the seclusion room. Subsequent progress notes indicated that the patient denied any responsibility for his actions. Progress notes were written in a timely manner. The observation record for behavioral seclusion or restraint forms was completed.

A 1/30/14 social work discharge note at 13:00 indicated the following:

> Patient is not engaged in treatment. He is not motivated to learn coping skills to manage his symptoms. He has assaulted both staff and peers. Today he was placed in FBR [full bed restraints] after he smeared feces while in the seclusion room. He wants to go back to CDCR. His behavior is motivated by Axis II symptoms. No collateral contacts. Low on SRA. No advanced directives. Discharge to CDCR.

A 1/31/14 discharge summary indicated that the patient had been discharged from ASH due to reaching maximum benefit from his current hospitalization; this appeared to be equivalent to saying that he did not receive any benefit from this hospitalization. Referral to an EOP level of care in a secure setting was recommended.

**Findings:** The use of restraints and/or seclusion with this patient was clinically appropriate. However, discharge back to CDCR was very concerning in the context of the lack of any

documentation regarding communication between ASH and CDCR concerning his course of treatment and reasons for discharge.

## 6. Patient F

Brief History:  This patient was admitted to ASH on 1/30/12.  He demonstrated symptoms of neuroleptic malignant syndrome on 5/4/12.  During early 2013, he experienced thought disorganization, paranoia, grandiose and religious delusions, and auditory hallucinations.  He became verbally aggressive toward staff and displayed bizarre mannerisms.  He subsequently required the use of full bed restraints for high kicking at staff, as well as verbally threatening them.  The use of Clozaril resulted in clinical improvement, with attendance and participation in groups.  Positive contact with his mother and sister was also noted.  He was assessed to be progressing well in treatment at the time of the monitoring visit.

A 1/30/14 treatment plan was reviewed.  Diagnoses included Schizophrenia, Alcohol Dependence, and hypertension.  The patient was initially admitted for stabilization of his psychiatric symptoms, including auditory hallucinations and disorganized behavior.

Foci of treatment included symptom stability, management of clozapine, and discharge planning.  The discharge planning section indicated that the patient was serving a life sentence with his earliest possible release date of 12/31/2600.  This same section noted that he would need assistance in learning to navigate public transportation in preparation for his CDCR release.

A 1/24/14 monthly psychiatric progress note was reviewed.  This three-page report only included three new sentences relevant to this patient's clinical condition, which focused on non-psychiatric medical issues.  The rest of the progress note was cut and pasted from previous notes.  A similar progress note was written during December 2013 and included the statement that the patient was not having current problems with auditory hallucinations.

A 1/29/14 annual psychology risk assessment progress note was reviewed.  The patient's risk for violence was noted as low as long as he remained compliant with court-ordered medications.  A significant past history of institutional violence was summarized.  Clinical improvement while on Clozaril, which was restarted around May 2013, was reported.

On 2/5/14 the patient remained on unit 1 for medical reasons, where he functioned as the chairman of ward government.

A comprehensive 30-day psychosocial assessment written by a social worker was present in the medical record.  Rehabilitation therapy notes and extensive nursing notes were also present.

**Findings:**  This patient was receiving mental health services at the appropriate level of care.  The mental health treatment provided to him appeared adequate.

## 7. Patient G

Brief History:  This patient was admitted to ASH on 12/4/13 with the chief complaint of auditory hallucinations and paranoia.  He had five MHCB admissions since his incarceration on 5/9/13.

253

His diagnosis prior to transfer was Schizophrenia. He was prescribed Risperdal Consta and oral Risperdal. His presentation was consistent with a history of Polysubstance Dependence.

The initial treatment plan included oral Risperdal and Cogentin, and he received his medications by court order. A DSH comprehensive admission assessment form was completed.

The 30-day treatment team meeting occurred on 12/30/13. The patient reportedly made acceptable progress toward treatment expectations, but had little insight into the nature of his mental illness. He was also in the process of evaluation as a possible MDO. His group therapy participation had significantly increased during the preceding 30 days. The patient again requested to talk to the psychiatrist about returning to CDCR.

A 1/26/14 treatment plan was reviewed. A SIR dated 1/5/14 was completed that indicated that the patient was involved in an altercation with a peer. He required the use of full bed restraints on 1/8/14 following this first SIR. On 1/11/14, a second SIR was completed due to another incident with the same patient. The patient had a history of aggression/violence that appeared to be associated with lack of medication adherence. Foci of treatment included psychiatric stability, impulse control, and substance abuse.

The patient had a history of multiple ASH admissions. He was concerned about being hospitalized after he paroled in several months pursuant to PC2962.

A 1/31/14 note indicated that the patient was making a good adjustment to unit 28. He was open to adding more scheduled treatment groups. Discharge planning focused on helping him learn better ways to handle stress and anxiety so that he could become more comfortable in his interactions with others.

A 2/3/14 monthly psychiatric progress note did not include any new narrative except for a summary of incidents during the past 30 days. A 2/4/14 nursing discharge summary indicated that the patient was being discharged, but the reasons for the discharge were not specified. His recommended continued care plan was completed on 2/10/14. A 2/5/14 nursing note indicated that he was the victim of an assault that staff had not observed.

**Findings:** Psychiatric documentation was very sparse and unclear. Definitive documentation relevant to the reason for the patient's planned discharge was not located in the medical record.

## 8. Patient H

Brief History: This patient was admitted to ASH on 5/29/13 after being treated at the MHCB at CSATF due to psychotic symptoms. His sending and admitting diagnosis was Bipolar I Disorder, most recent episode manic. The initial treatment plan included the use of Zyprexa. He was determined to be at moderate risk for future assaultive and self-injurious behaviors following a risk assessment.

A 12/4/13 treatment plan was reviewed. The patient was noted to have a four percent group attendance rate during his most recent treatment team meeting. This treatment plan did not appear to address this low attendance rate. A 12/23/13 group facilitator monthly progress note

was reviewed. The patient's progress toward meeting group objectives ranged from no progress to acceptable progress, which was dependent on the specific groups in question.

A 12/31/13 social work note indicated that the patient's group attendance treatment had improved to 22 percent. A 1/27/04 monthly psychiatric progress note documented that he continued to struggle with acknowledging that he had a mental illness that required treatment. Due to the cheeking of his medications, they were subsequently crushed. Zyprexa was also adjusted due to reported side effects. A 1/31/14 social work note indicated that his attendance and treatment group participation continued to be problematic. Medication side effects were also reported.

**Findings:** This patient was receiving mental health services at the appropriate level of care and the mental health treatment provided to him appeared to be adequate.

## 9. Patient I

Brief History: This patient was admitted to ASH on 9/17/12 due to repeated psychotic decompensation when living in a general population CDCR setting. The medical record described a long history of mental illness since the age of 16. A comprehensive history of present illness was described in the admission note; his history included an initial hospitalization at CMF for one year that apparently began when he was 21 years of age. He was started on Risperdal at the CMF MHCB in 2012. It appeared that he had at least two prior ASH hospitalizations during 1995 and 2008.

A 12/18/13 treatment plan was reviewed. Foci of treatment included obtaining psychiatric stability and managing his danger to others and to self. A 12/17/13 psychology progress note indicated that he was experiencing auditory hallucinations. He tended to have poor group therapy attendance.

A 12/31/13 medical quarterly note provided a useful summary of the patient's various medical problems, which included hypertension/cardiomyopathy, Hypogonadism, and constipation. A 1/14/14 monthly psychiatric progress note provided a useful summary of his current medication management.

**Findings:** This patient was receiving mental health services at the appropriate level of care and the mental health treatment provided to him appeared to be adequate.

## 10. Patient J

Brief History: This patient was admitted to ASH on 6/12/13 due to a recent manic episode. He had been provided with a diagnosis of Schizoaffective Disorder, bipolar type. A history of numerous other psychiatric hospitalizations was reported. The patient also had a 20-year history of homelessness prior to incarceration. Other pertinent history included Alcohol Dependence (in institutional remission), diabetes, and Hepatitis C. The initial treatment plan included psychopharmacological management through treatment with Abilify, Thorazine, and lithium.

A 12/24/13 treatment plan was reviewed. Foci of treatment included psychiatric stability, danger to others, substance abuse, and diabetes. The patient was reportedly offered a minimum of ten

255

weekly hours of leisure and recreational supplemental activities, but the reviewer was unable to determine the number of core treatment group hours offered based on review of the treatment plan.

A 2/4/14 monthly social work note indicated that the patient was participating in some on unit groups, but was unclear regarding the actual number of weekly hours. The patient continued to experience auditory hallucinations and suicidal thinking. A similar note was written by a rehabilitation therapist on 1/30/14.

Nursing staff wrote progress notes on a regular basis with a particular focus on his left foot drop and cellulitis.

**Findings:** It was difficult to assess the adequacy of the current treatment due to the vagueness of progress notes concerning the patient's assigned group treatments and participation. The patient appeared to be receiving mental health services at the appropriate level of care in the ICF.

## 11. Patient K

Brief History: This patient was admitted to ASH on 12/11/13 and had previously been hospitalized there. He was provided with a diagnosis of Bipolar I Disorder, depressed, severe, without psychotic features at the time of admission. The diagnosis was later changed to Schizoaffective Disorder, bipolar type. He had a reported history of delusions, auditory hallucinations, paranoia, grandiosity, poor insight, poor judgment, flat affect, depressed mood, isolation, poor ADLs, and poor treatment compliance. He had multiple community psychiatric hospitalizations. He also had a substance abuse history, but denied alcohol use for more than 20 years.

After approximately six weeks of hospitalization at ASH, the patient remained at HAS level 1, but medical record progress notes did not indicate the rationale for his retention at this lowest level. There were several incidents when he was described as delusional, with rambling and pressured speech. There was an incident in which he became angry regarding his medications, yelled at staff, and accused them of being the devil. Staff was ultimately able to convince him to take prn medication, which addressed his agitation.

The treatment plan did not address the patient's symptoms of irritability and psychosis, nor did it indicate his HAS level; only one social work note referred to his HAS level at all. One nursing note also mentioned the HAS level; it noted the patient was told that if he did not change his behavior, his HAS level (already at the lowest level) would be reduced. The progress note did not document that this interaction occurred in a clinically therapeutic manner.

**Findings:** There were times when the patient's HAS level 1 appeared to be justified (i.e., when he was aggressive with staff) for short periods of time, but there was a lack of documentation as to the rationale for his extended time at this level. The behavior resulting in HAS level 1 was not clearly documented in the medical record, nor did the treatment plan target it. The patient's primary dysfunctional behaviors also were not primary targets of the treatment plan and the patient did not have a behavioral plan despite clear clinical indications for one. The treatment

plan required further revision and improvement to develop clear and effective clinical interventions.

This patient was not adequately treated due to the lack of appropriate behavioral treatment targets, effective interventions, and extended HAS level 1 placement without appropriate clinical rationale. It was concerning that one of the progress notes suggested that the HAS level system may have been utilized as a threat for the patient, which was inconsistent with ASH policy.

## 12. Patient L

Brief History: This case was selected for review as the patient was at HAS level 1. He arrived at ASH on 2/3/14. He was provided with diagnoses of Bipolar I Disorder, most recent episode depressed, severe, with psychotic features, Alcohol Dependence, Hallucinogen Dependence in a controlled environment, Amphetamine Dependence, sustained in full remission, and Antisocial Personality Disorder with borderline personality traits. He was prescribed Ativan, hydroxyzine, and Haldol on an as needed basis, Risperdal Consta 37.5 mg intramuscular every two weeks, Paxil 20 mg at night, and Ambien 10 mg at night. The patient had a prior DSH admission.

Review of the medical record did not locate a social work psychosocial evaluation. However, a psychological admission assessment was completed on 2/4/14. A treatment plan also was not located in the medical record. Several medical record entries described the patient as cooperative with treating staff, with one instance in which he required medication for anxiety. The patient also requested to see the psychiatrist for mood stabilizing medications. Progress notes suggested that he was adjusting well to the unit and following unit rules.

**Findings:** The rationale for the patient's continued placement at HAS level 1 was unclear and was not documented in the medical record. The behavior documented in the medical record indicated that the patient was stable, programming well, and following unit rules. No treatment plan was located in the medical record; this despite progress notes indicating that the treatment team was seeing the patient. The social work psychosocial assessment also was not located in the medical record. The omission of these items made it difficult for the treatment team to adequately address needed clinical therapeutic interventions.

## 13. Patient M

Brief History: This patient arrived at ASH on 1/7/13, following admission to the acute care psychiatric program at VPP. The patient had received mental treatment since the 1960s. He was provided with a diagnosis of Schizophrenia, undifferentiated type. He served the last 40 years in prison and had repeated DSH hospitalizations. Even after treatment with psychotropic medications, he was noted to respond to auditory hallucinations. Several months prior to the site visit, he began screaming in his cell at night in loud, guttural, animal-like sounds that disturbed other patients.

The treatment plans were reviewed. They primarily focused on the patient's mental instability and lack of appropriateness for "treatment," which appeared to refer to his group therapy involvement. The treatment plans did not identify alternative therapy. The medical record indicated that the patient was receiving medication management and minimal leisure services, but no other treatment. Treatment plans also did not address the patient's HAS level. On 2/7/14,

it was identified as level 2 by the social worker, but the HAS level scores program report (provided 2/11/14) listed it as level 1. Other progress notes suggested that the social worker erroneously entered this information.

**Findings:** The care provided to this patient was of concern. Although his low HAS level may have resulted from psychiatric instability, it did not appear that he received adequate treatment beyond medication management and minimal leisure services. The patient also did not have a behavioral plan, which would have assisted in addressing his severe symptoms.

## 14. Patient N

Brief History: This patient was admitted to ASH on 7/29/13 with a diagnosis of Schizophrenia, paranoid type, Polysubstance Dependence, and dementia due to a general medical condition with behavioral disturbance. He was referred to ASH due to worsening depression and suicidal ideation. Medical record review documented that he had been hospitalized at DSH yearly since 1999.

The patient reported a history of four prior suicide attempts. He also reported chronic auditory and visual hallucinations. A psychological note from 11/4/13 suggested that he might be malingering as he clearly comprehended instructions, read at a grade level of 12.5, had no evidence of memory impairment, functioned well on the unit, and was often observed laughing and smiling with a peer. Subsequent notes indicated that he was motivated to remain at ASH because he had significant difficulties adjusting to prison. No further psychological testing was indicated or ordered in light of the patient's functional ability and the results of cognitive screening.

The patient was prescribed Cymbalta, lithium, propranolol, Cogentin, and Benadryl on an as needed basis.

**Findings:** Medical record documentation indicated the need for diagnostic clarification. It included contradictory diagnostic information that was not reconciled by the treatment team and incorporated into the treatment plan, which negatively impacted the patient's treatment.

## 15. Patient O

Brief History: This patient was a 69-year-old black male from CSP/Solano, where he was a Level II inmate. He was provided with diagnoses of Bipolar Disorder, manic, severe with psychotic features, and Polysubstance Dependence. He was admitted to ASH on 5/28/13, but previously had multiple DSH admissions, including two at ASH, one hospitalization at Coalinga, and four CMF admissions on PC2684 status.

The DSH comprehensive assessment psychiatric section was completed on the day of the ASH admission, when it was noted that the patient was serving a sentence of 25-years-to-life. He was under an involuntary medication order (PC2602) which expired on 5/16/14. He was transferred from the MHCB at CSP/Solano, where he presented with medication noncompliance, manic symptoms, and the inability to function in the 3CMS program. He was subsequently placed on PC2602 status and transferred to DSH for acute care. His medical history was significant for hypertension. His mental status examination upon admission was remarkable for a score of 28 of

30 on the mini-mental status examination. The suicide risk assessment was unremarkable and indicated low risk; the V-Risk assessment indicated moderate risk. He was provided with an admission diagnosis of Bipolar I Disorder, most recent episode manic, severe with psychotic features, and Polysubstance Dependence. The treatment plan indicated that he had been receiving Zyprexa at CDCR, which was switched to Risperdal at the patient's request, with planned titration and consideration of the addition of a mood stabilizing medication.

The medical history and physical assessment did not indicate acute medical issues, but noted hypertension and a history of a positive TB test. Laboratory testing on 5/30/13 noted an elevated prolactin level of 55.1 (normal 2.0 - 18.0).

The patient was seen by the psychiatrist on 6/7/13 when he reported that Risperdal was helpful; no side effects were noted. He had advanced to level 2. Risperdal had been increased from three to four mg per day; the patient reportedly mumbled to himself with evidence of responding to internal stimuli. One week later, the psychiatrist noted the patient had achieved level 3; he had been treatment compliant without the use of prn medications. The monthly psychiatric progress note indicated that he was doing well with treatment adherence; he attended 95 percent of groups with good participation. The monthly psychiatric progress note on 7/22/13 noted continued improvement with no medication changes and treatment adherence.

A progress note on 8/1/13 indicated auditory hallucinations and sleep difficulties; the patient requested a change in medications from Risperdal to Geodon. The psychiatrist saw him the following day when he reported some drowsiness related to the new medication. Subsequent progress notes indicated that Geodon was increased due to a continued report of auditory hallucinations. However, Geodon was discontinued, and Trilafon was started, due to intolerance to Geodon's side effects. A psychiatric progress note on 8/22/13 noted that the patient continued to have hallucinations and Trilafon was increased to 32 mg at night. The monthly psychiatric progress note of the previous day noted that the patient was relatively stable with auditory hallucinations and delusional symptoms. Trilafon was further increased to 48 mg at night on 8/3/13 due to the patient's complaint of continued hallucinations; hydroxyzine was also added for "prevention of EPS." The monthly psychiatric progress note dated 9/24/13 indicated additional medication changes, including treatment with Melatonin for difficulty sleeping and Thorazine for hallucinations and sleep difficulties; Trilafon was then decreased to 24 mg per day. Subsequently, hydroxyzine and Melatonin were decreased. The most recent psychiatric progress notes indicated that the patient reported improved sleep and hallucinations with plans to continue the cross-taper from Trilafon to Thorazine.

Treatment plans were dated 6/6/13, 6/27/13, and 7/22/13. All were essentially repetitive and listed the same foci of treatment, objectives, and interventions.

A psychologist completed an admission psychological assessment on 5/30/13. Documentation of subsequent individual psychology contacts was not located in the medical record. A DMH 30-day psychosocial assessment was completed on 6/14/13. As to discharge planning, the assessment indicated that the patient would benefit from protective housing upon return to CDCR. Social work weekly notes were generally consistent with other clinical descriptions of the patient. They noted that he tended to isolate, but was treatment adherent and cooperative.

259

Psych tech weekly notes indicated that the patient was an active treatment participant on the unit with medication adherence. He continued to report fluctuating auditory hallucinations. Nursing notes indicated that he was transferred to unit 28 (intermediate) on or about 7/17/13. The nursing care plan dated 8/28/13 noted Bipolar Disorder and hypertension as treatment concerns with expected outcomes, nursing interventions, and evaluations to address these problems. The most recent recreation therapy notes reported greater than 95-percent group participation. It was noted that he was offered a minimum of ten hours of weekly leisure and recreational supplemental activities, and attended approximately four hours of weekly activities.

A Vitek hearing was completed on 3/21/13. A DSH vocational rehabilitation assessment was completed on 8/2/13. The consent for notification of patient rights was present, but the consent for treatment with psychotropic medications was incomplete. The medical record contained the DSH referral packet.

**Findings:** All of the treatment plans were essentially repetitive and listed the same foci of treatment, objectives, and interventions, and lacked individualization. As documented by the medical record, there also appeared to be little clinical integration between disciplines. There was little or no evidence of individual therapy. The only psychologist documentation in the medical record was during the initial assessment.

### 16. Patient P

Brief History: This patient was admitted on 1/7/13 due to suicidal ideation and depressive symptoms with derogatory auditory hallucinations urging him to kill himself. He was transferred from VPP to ASH for continued treatment. At the time of admission, he was provided with a diagnosis of Major Depressive Disorder, recurrent with psychotic features, and Polysubstance Dependence. He had been treated with Thorazine 300 mg per day and Depakote 500 mg per day. He was admitted to acute care after an attempted hanging at NKSP in July 2012. He also attempted suicide by choking himself with a sock at VPP in December 2012.

The patient's medical history was significant for a motorcycle accident in 2003 that resulted in extensive reconstructive surgery to his pelvis and testicles, and required skin grafting. He also had a history of asthma.

His suicide risk was determined as high, and he was placed on one-to-one observation for suicide watch at the time of admission. He was also determined to have moderate violence risk and impulsivity.

A psychiatric progress note on 5/7/13 noted that the patient was prescribed Abilify 5 mg per day, Zyprexa 40 mg per day, Remeron 30 mg per day, and Effexor 150 mg per day. Abilify was beneficial to address an elevated prolactin level. The patient continued to have low level depressive symptoms and stability of his auditory hallucinations. The note indicated that he attempted to address his elevated body mass index (BMI) through exercise and dieting. Plans were also underway to taper and discontinue Zyprexa and to increase Abilify due to excessive weight gain (68 lbs.) since admission. Effexor was later increased to address continued depressive symptoms.

An initial treatment plan was dated 1/14/13. There were subsequent treatment plans on 6/6/13 and 7/6/13; the latest one noted that the patient had a moderate current suicide risk with no suicidal ideation since admission to ASH. The outlined foci of treatment appeared to be appropriate and included increased BMI (not present in the initial treatment plan), danger to self and others, and psychiatric stabilization/medication education. The plan noted that he was enrolled in 11 hours of groups and had 92-percent attendance compliance during the previous month. He reportedly had medication adherence.

The nursing care plans addressed issues including an acute finger injury and more chronic issues such as Major Depression, imbalanced nutrition; more than body requirements, risk of impaired skin integrity, risk for peripheral neurovascular dysfunction, and chronic pain as treatment concerns with expected outcomes, nursing interventions, and evaluations to address these problem areas.

A psychologist completed an admission psychological assessment on 1/10/13. It was generally consistent with the initial psychiatric and nursing assessments. It was noted that individual treatment was not recommended as a follow-up treatment and assessment consideration. There were two psychology progress notes dated 5/7/13 and 8/6/13 that indicated that the patient was seen during the treatment team meeting.

A DMH 30-day psychosocial assessment was completed on 2/1/13 by a licensed social worker. Recommendations included patient enrollment in various treatment and leisure groups. This was generally consistent with other disciplinary assessments.

Monthly RN progress notes were present in the medical record for assessment and evaluation. There was also documentation of weekly psych tech nursing progress notes. The patient's obesity and skin grafts were some areas of nursing assessment.

The medical record contained a signed notification of patient rights, a release of information and signed consent for treatment with psychotropic medications, and the DSH referral packet. The patient also had a detainer for return to CDCR upon discharge.

**Findings:** There was documentation of monthly psychiatric contacts, but portions of the notes were repeated each month. It appeared that the psychiatrist was monitoring and addressing issues related to excessive medication-related weight gain. The medical physician followed the patient quarterly.

Treatment planning was generic and not individualized. Few modifications were noted after changes in treatment occurred. As documented by the medical record, there appeared to be little clinical integration between disciplines.

There was little to no documentation regarding individual therapy. With the exception of the initial assessment, the only documentation by the psychologist noted in the record was treatment team meeting notations.

**17. Patient Q**

Brief History:  This patient's medical record was reviewed to evaluate whether the appropriate laboratory studies for treatment with mood stabilizing medications were performed.  He was transferred from CSATF to ASH on 5/8/13.  He had been placed in the CSATF MHCB for punching himself in the face and chest, causing bruises, and making aggressive and racial comments about other Asians.  He had a significant history of self-injurious behavior.  He was provided with diagnoses of Bipolar I Disorder, most recent episode mixed, severe with psychotic features, and Amphetamine Dependence.  His most recent medications included Zyprexa 20 mg per day and lithium 1500 mg per day, with a Haldol injection for medication refusal.  He received his medications involuntarily by court order PC2602, which would expire on 7/24/14.

The most recent progress notes indicated that the patient had persistent auditory hallucinations of God, friends, and enemies that were distressing to him.  He reportedly made a self-inflicted laceration to his hand, due to repetitive scratching with a broken plastic food utensil.  He was on one-to-one suicide observation, and plans were underway to increase Zyprexa to 20 mg per day.

The appropriate laboratory studies were obtained for treatment with lithium.  His medications were subsequently crushed after it was noted that his lithium level had significantly decreased following an increase in medication dosage.

All laboratory studies were within normal limits with the exception of lipid studies, which were uniformly elevated.  He was provided with a diagnosis of Dyslipidemia and was treated with a statin medication.

**Findings:**  The appropriate laboratory testing for treatment with lithium was performed.  There was appropriate follow-up after an abnormal (low) lithium level was noted.  There was also appropriate assessment, treatment, and follow-up regarding abnormal lipid levels.  However, the medical record documented little clinical integration between disciplines.

**18.  Patient R**

Brief History:  The patient was a 19-year-old black male who was serving his first prison term.  The DSH comprehensive assessment psychiatric section was completed by the psychiatrist on 12/12/12.  The patient was initially admitted from DVI to the CMF MHCB on 11/9/12 due to suicidal ideation.  He reported visual and auditory hallucinations and significant depression.  The note indicated that MHCB staff suspected some secondary gain regarding the patient's presentation.  He was treated with Zyprexa 5 mg per day and Zoloft 50 mg per day.  His early childhood history was significant for reported physical abuse by his stepfather.  He was initially provided with a diagnosis of Bipolar I Disorder, most recent episode depressed, severe, with psychotic features.  He was assessed with moderate suicide risk and low violence risk with impulsivity.  Zyprexa and Zoloft were continued.

Psychiatric progress notes indicated that the patient was engaged in treatment and was compliant with medications.  Zyprexa was discontinued.  The notes indicated that the patient generally did not like groups.  He did not exhibit evidence of depression.  He was involved in work, but reportedly had issues with challenging authority figures.  Zoloft was tapered and eventually discontinued.  He reportedly presented with euthymic mood.

The most recent psychiatric progress notes indicated that the patient was not prescribed routine psychotropic medications. He had achieved level 3. He was enrolled in six hours of groups and attended 78 percent of them.

The most recent treatment plan dated 9/6/13 provided a diagnosis of Adjustment Disorder with depressed mood and a GAF score of 40. Listed foci of treatment included psychiatric stability, impulse control, elevated BMI, college correspondence, vocational services, leisure skills, and discharge planning. Previous treatment plans included some differing foci of treatment and there appeared to be changes based on clinical need. One area of needed improvement was discharge planning, which appeared to be insufficient.

The nursing care plans addressed diagnoses listed in the treatment plan, including Adjustment Disorder with depressed mood, deafness in the left ear, and flat feet, as treatment concerns; they included expected outcomes, nursing interventions, and evaluations to address these problem areas.

The psychologist completed the admission psychological assessment on 12/17/12. Based upon this assessment, the patient's diagnosis was changed from Major Depressive Disorder to Adjustment Disorder with depressed mood and PTSD, due to a history of childhood physical abuse. Group treatment was the only follow-up treatment and assessment consideration recommended by this evaluation. Despite this omission, there was documentation of almost monthly contacts with the psychologist. However, most of these contacts appeared to be in relation to the treatment team meeting, due to the patient's request, or for a suicide risk assessment.

The social worker completed the DMH 30-day psychosocial assessment on 1/7/13, which was consistent with assessments performed by other disciplines.

There was documentation of monthly RN progress notes for assessment and evaluation. Psych tech weekly notes indicated that the patient was an active treatment participant on the unit with medication compliance. He continued to report fluctuating auditory hallucinations.

A DMH vocational rehabilitation assessment was completed on 8/2/13. A 90-day rehab/supplemental note dated 9/6/13 indicated that the patient was offered a minimum of ten weekly hours of supplemental activities and was an active participant in hospital-wide and unit supplemental activities.

A social worker note on 10/10/13 indicated that the patient was worried about his ability to function following release from prison. The social worker indicated that contact with CDCR had been made regarding prospective discharge and the patient's SSI and MDO status.

The medical record contained the consent for notification of patient rights and consent for treatment with psychotropic medications. There was documentation that the patient had a detainer placed by CDCR. The medical record also contained referral packet documentation.

**Findings:** There was documentation of monthly psychiatric contacts, but portions of the notes were repeated monthly. Although the patient was identified with a diagnosis of Adjustment Disorder and PTSD, there was no recommendation regarding individual therapy despite discontinuation of psychotropic medications. Individual contacts with the psychologist appeared to be related to matters other than individual therapy. The medical record documented little evidence of clinical integration and treatment planning between disciplines.

Treatment planning appeared to be deficient; the treatment plan did not provide details as to assisting the patient in transitioning to the community. The treatment plan noted that his EPRD was 2/7/14 and the patient could navigate public transportation, but needed his reading glasses. It also stated that he needed to develop a discharge plan for managing his self-harm and Adjustment Disorder before returning to CDCR.

## 19. Patient S

Brief History: This patient was admitted to ASH on 7/15/13 due to continued psychotic symptoms. The DSH comprehensive assessment psychiatric section dated 7/15/13 indicated that he was referred from DVI to the CMC MHCB due to paranoid and bizarre behaviors. He was sent to CMC as a psych and return and had a long history of mental illness with auditory hallucinations and delusional thinking. Despite treatment with psychotropic medications, he remained psychotic with paranoia and an inability to function in an EOP setting, necessitating DSH referral. The suicide risk evaluation and V-Risk assessment both indicated low risk. The patient was provided with diagnoses of Schizophrenia, paranoid type, Cannabis and Opioid Dependence, and Hallucinogen Abuse. The treatment plan outlined discontinuing Haldol, which had been ineffective, and beginning Zyprexa at 20 mg per day with Depakote ER 1000 mg per day. Cogentin was tapered and discontinued.

Subsequent psychiatric progress notes indicated that the patient's Zyprexa was increased to 25 mg per day to address continued auditory hallucinations and paranoia; he remained with minimal socialization. Depakote was also increased to 1250 mg per day to reach a target therapeutic blood level. He was reportedly medication compliant. Improvement was noted after medications were increased.

On 9/10/13, Depakote ER was tapered and discontinued due to a lack of clear indications for the medication and possible adverse cognitive effects. Neuropsychological testing was ordered. The patient was also noted to have an elevated BMI, which was possibly related to treatment with atypical antipsychotic medications from which he was benefitting. After discontinuation of Depakote, the patient reported sleep difficulties and Zyprexa was increased to 30 mg at night.

The most recent treatment plan dated 8/14/13 noted the above diagnoses with a GAF score of 35. Foci of hospitalization included psychiatric stability, orientation, impulse control, substance abuse, recreation, and leisure. For many of these foci, it was noted that the patient had made little or no improvement and his group attendance was not optimal, with poor participation when present. Treatment goals were consistent with the previous treatment plan dated 7/22/13, but some additions were noted in the most recent treatment plan.

The nursing care plan dated 7/16/13 noted several areas for improvement including an elevated BMI and addressing the patient's exacerbation of nose bleeds.

An admission psychological assessment was completed by a psychologist on 7/17/13. This assessment led to diagnoses of Schizophrenia, undifferentiated type, Alcohol Abuse, and Cannabis and Opioid Dependence. Follow-up treatment and assessment considerations included group treatment, sex offender treatment (controlling offense of rape), substance abuse treatment, and neuropsychology assessment or treatment. Neuropsychology testing was recommended to rule out the possibility of a cognitive disorder due to the patient's history of head injury and noted cognitive impairments. The result of this testing on 9/6/13 indicated a diagnosis of Cognitive Disorder NOS, and recommended referral to the brain fitness, attention memory, and reasoning groups. An addendum to the assessment dated 10/2/13 attempted to address the "provisional" designation of a diagnosis of cognitive disorder, as the original assessment indicated that prior medical records should be reviewed to provide a definitive diagnosis. The records were reviewed, and it appeared that the patient's head injury was not of a severity likely to produce significant cognitive impairment, and that additional medical records would be reviewed.

A DMH 30-day psychosocial assessment was completed by the social worker on 7/25/13. This assessment was consistent with assessments by other clinicians with a focus upon discipline-specific issues. Recommendations were made for patient involvement in several groups. The assessment's discharge planning mentioned returning the patient to CDCR after treatment objectives were met.

Nursing contact documentation included the RN progress note for assessment and evaluation and weekly nursing progress notes reflecting psych tech observations. The notes described the patient as isolative with minimal interactions with peers and staff.

There was documentation that indicated that the social worker made contact with the patient's mother on 7/17/13. She was described as supportive and additional family history was obtained. Subsequent social work and rehabilitation therapy notes continued to describe the patient as having minimal participation with isolative behavior and he was encouraged to attend more groups. The most recent notes indicated improved participation and appropriate activities of daily living.

The medical record contained the consent for notification of patient rights, the consent for treatment with psychotropic medications, and a release of information to obtain prior medical records. It also contained a pre-registration notice for the sex offender tracking program and documentation regarding the DSH referral packet. Documentation further indicated that the patient had a detainer placed by CDCR.

**Findings:** The patient was consistently followed by the psychiatrist with appropriate medication management. Appropriate laboratory testing for treatment with Depakote and Zyprexa was performed. It appeared that appropriate measures were initiated to address the patient's weight gain from Zyprexa.

Patient care appeared to be generally appropriate, with some exceptions. The patient was followed weekly while on the admissions unit and monthly after transfer by the social worker. With the exception of psychiatric and social worker contacts, there was a lack of documentation of consistent individual contacts. As documented by the medical record, there appeared to be little clinical integration between disciplines.

## 20. Patient T

Brief History: This 60-year-old black male was admitted to ASH on 12/13/11. The DSH comprehensive assessment psychiatric section was completed by the psychiatrist on 12/21/11. The patient had been transferred from SVPP, where he was housed since his admission on 2/1/11. The patient was originally transferred from CSP-LAC, where he had been poorly functioning in the EOP program with periodic auditory hallucinations. He was serving a sentence of 25-years-to-life for first degree homicide. The assessment described the patient's long history of mental health treatment and his presentation of delusional thinking and response to auditory hallucinations. He was provided with a diagnosis of Schizophrenia, paranoid type and Sarcoidosis. His suicide risk and V-Risk assessments indicated low risk. Although the assessment identified target symptoms of assaultiveness, paranoia, thought disorder, hallucinations, anxiety, and delusions, initially the patient was only willing to take Melatonin as a sleep aid; with the exception of Ativan as needed for agitation, no medications were prescribed.

The medical record had been thinned and information between the time of admission and April 2013 was not available. It appeared that an order for involuntary medications was obtained on 4/18/12 due to danger to others under PC2602. This occurred after the patient threatened the psychiatrist and grabbed and wrestled him to the ground as the psychiatrist was attempting to walk away. The patient was then placed in full bed restraints. This PC2602 order was renewed for an additional year and expired on 4/17/14.

The progress notes stated that the patient was treated with Zyprexa 30 mg per day and Melatonin 6 mg per day on 5/13/13. The psychiatric progress note of that date also noted that Zyprexa would be increased to 40 mg per day due to ongoing derogatory hallucinations. However, review of physician orders indicated that the patient was already prescribed Zyprexa at 40 mg. This erroneous medical record documentation persisted for subsequent entries and was indicative of the problem with cutting and pasting documentation. These notes provided minimal clinical information, but subsequent psychiatric notes after August 2013 were more informative and detailed. The patient was described as having continued stability of his auditory hallucinations, paranoia, and agitation while prescribed Melatonin and Zyprexa.

The patient was followed by the medical physician for his Sarcoidosis and for an elevated BMI and pre-diabetes.

The most recent treatment plan located in the medical record was dated 9/10/13. It noted that the patient had no subsequent incidents following placement on involuntary medications after his verbal and physical assault of staff on 3/26/12. Foci of hospitalization included symptom stability, harm to others, academic education, health living, and piano.

Nursing care plans addressed treatment plan diagnoses including Schizophrenia and the patient's multiple medical issues, including Sarcoidosis, pre-diabetes, and elevated BMI with expected outcomes, nursing interventions, and evaluations to address them.

The DMH integrated assessment psychology section was completed by the psychologist on 12/19/11. Cognitive testing was attempted, but was not completed due to the patient's psychotic symptoms. He was provided with a diagnosis of Schizophrenia, disorganized type, chronic. Several foci for treatment were identified, including lack of insight regarding mental illness, medication noncompliance, paranoia/suspiciousness/anxiety, and unpredictable agitation associated with Schizophrenia. Group therapy and cognitive screening were the recommended clinical services to be utilized.

There was documentation of occasional psychology contacts, but these contacts appeared to be in the context of the treatment team meeting.

The DMH integrated assessment social work section was completed by a social worker on 12/14/11. The DMH 30-day psychosocial assessment was completed on 1/9/12. The assessment was consistent with those documented by other disciplines and indicated that the patient was a very poor historian with poor insight as to his mental illness. Discharge planning indicated that he would discharge back to CDCR as he was serving a life sentence.

Monthly RN progress notes for assessment and evaluation were present in the medical record and reflected the patient's initial paranoia, delusional thinking, and lability. It appeared that he continued with auditory hallucinations and limited social interactions, but there were some improvements in his symptoms. The patient required prompting to take his medications and to attend groups, but was reportedly compliant. The most recent note dated 10/11/13 indicated that he had achieved level 4. Social work progress notes described similar findings.

The medical record contained the consent for notification of patient rights, the consent for treatment with psychotropic medications, and a release of information to obtain prior medical records.

There was documentation concerning the order and decision on the petition for involuntary medication with an annual renewal. There was also an intermediate care length of stay review form dated 12/5/12 that recommended continued DSH stay for one to two months. Documentation also indicated that the patient had a detainer placed by CDCR. The DSH referral packet was in the medical record.

**Findings:** The progress notes stated that the patient was treated with Zyprexa 30 mg per day and Melatonin 6 mg per day on 5/13/13. The psychiatric progress note of that date also noted that Zyprexa would be increased to 40 mg per day due to ongoing derogatory hallucinations. However, review of physician orders indicated that the patient was already prescribed 40 mg. This erroneous medical record documentation persisted for subsequent entries and was indicative of the problem with cutting and pasting documentation, which was noted at this facility.

The psychiatrist and nurse did not attend the most recent IDTT meeting. The psychiatrist also was not present at the last two IDTT meetings, while the nurse was consistently absent from team meetings. The lack of psychiatric presence at treatment team meetings may have been the result of ASH psychiatric staffing shortages. As documented by the medical record, there was little clinical integration between disciplines. Individual therapy was not documented.

## 21. Patient U

Brief History: This patient was admitted to ASH on 7/27/12 from SVSP due to increased delusional thinking with ideas of reference and auditory hallucinations. He also had exhibited aggressive behavior toward his cellmate. He had a history of prior ASH hospitalization in 2010. At the time of this ASH admission, he had delusional thinking regarding contamination of his food. He presented with paranoid and persecutory delusional thinking with thought blocking and auditory hallucinations. He was provided with diagnoses of Schizophrenia, paranoid type, Polysubstance Dependence, and Antisocial Personality Disorder. His suicide and V-Risks were assessed as low. He was prescribed Zyprexa 30 mg per day and lithium 1200 mg per day.

On 3/21/13, the psychiatrist saw the patient when he presented with abnormal involuntary jaw movements. The psychiatrist discontinued Celexa, which had previously been prescribed, and added Benadryl with increased Cogentin for the treatment of atypical extrapyramidal side effects (EPS) or possible tardive dyskinesia. Several days later, the movements stopped. At a subsequent visit on 4/8/13, the patient reported continued movements; the psychiatrist noted that he appeared stable psychiatrically and questioned whether the movements were due to malingering or tardive dyskinesia. Geodon was decreased to 80 mg per day. Later that month, Geodon was discontinued at the patient's request due to reported continued movements. On 5/6/13, the patient reported improvement in movements off of Geodon and the psychiatrist noted no worsening of psychosis. The psychiatrist noted that the movements were resolved, but were likely the result of malingering. His medications were simplified at that time to discontinue Ambien and Benadryl, to decrease Cogentin to 2 mg per day, and to continue lithium, Ativan, and Zyprexa.

The patient was seen by the psychiatrist on 5/14/13 when he had been refusing Zyprexa due to his belief that it caused the movements. On 5/14/13, Zyprexa was discontinued and Geodon was resumed. On 6/4/13, the psychiatrist stated that the patient was "back on Geodon" with no increase in psychotic symptoms. It appeared that staff believed that the movements were under voluntary control, but Geodon would not worsen the symptoms. An alternative medication, Clozapine, had been rejected by the patient. Cogentin was decreased at that visit. The patient only attended 17 percent of groups at that time.

At the most recent psychiatric contact dated 10/4/13, the psychiatrist noted continuing anxiety complaints. Propranolol, which had been prescribed, was increased, with plans for gradual discontinuation of Ativan. At this visit, the patient was prescribed Ativan 2 mg per day, Zyprexa 40 mg per day, propranolol 40 mg per day, and lithium 1200 mg per day.

The most recent treatment plan dated 7/25/13 provided diagnoses of Schizophrenia, paranoid type, Polysubstance Dependence, and Antisocial Personality Disorder. Foci of hospitalization included symptom stability and danger to self. The treatment plan did not address the issues

regarding possible malingering, medication seeking, or a report of increased water intake. The psychiatrist and the nurse were not present at this IDTT meeting; this was also true for the prior team meeting that occurred on 6/20/13.

The original DSH integrated assessment psychology section was not present in the medical record provided, but an addendum was present and reviewed. It indicated that the psychologist met with the patient on 8/2/12. He was provided with a diagnosis of Schizoaffective Disorder, depressed type, Alcohol Dependence, and Amphetamine Dependence. He was assessed with low risk for suicide. Treatment recommendations included involvement in various groups.

The DSH 30-day psychosocial assessment was completed on 8/27/12 by the social worker. Discharge planning was nonexistent and indicated that the patient would return to CDCR upon discharge.

There was documentation of monthly RN progress notes for assessment and evaluation and psych tech nursing contacts. The notes described the patient as psychotic with auditory hallucinations, delusions, anxiety, and depression. He did not attend all of his treatment groups, and many of the nursing notes described his behavior of drinking large amounts of water. It did not appear that this behavior was addressed in treatment planning or by the psychiatrist. The most recent notes indicated that the patient attended 50 percent of his groups; he had previously lost his level due to group non-attendance.

The consent for notification of patient rights was present in the medical record, as was the consent for treatment with psychotropic medications. There was documentation that the patient had a detainer placed by CDCR. The DSH referral packet was also present in the medical record.

**Findings:** The appropriate laboratory studies for treatment with lithium and Zyprexa were performed. There was documentation of monthly psychiatric contacts. It appeared that there were multiple medication changes that resulted in the prescription and discontinuation of psychotropic medications with treatment team concern that the patient may have been malingering some of his symptoms. It did not appear that treatment planning addressed this possible medication seeking behavior, nor did it appear that there was a concerted plan to address this issue; this issue also may have been made worse by the treatment of differing psychiatrists and a lack of continuity of care.

Treatment planning was poor and not individualized. The treatment plan did not address issues regarding possible malingering, medication seeking, or the report of increased water intake. Necessary participants were not present at the treatment team meeting. The psychiatrist and the nurse were not present at the most recent IDTT meeting. This was also true for the prior team meeting on 6/20/13.

It was of note and concern that the issue regarding the patient's possible excessive intake of water did not appear to be noted by pertinent treatment team members. This appeared to be an example of the problems with the medical record's segregation of progress notes by discipline instead of by chronological order. This issue was further worsened by the lack of psychiatric

presence at treatment team meetings.  This issue was brought to the attention of staff for follow-up.

## 22.  Patient V

Brief History:  This patient was referred from CDCR due to intrusive hallucinations, severe decompensation, negative symptoms, a possible need for a medication change, and extremely poor ADLs.  He was admitted to acute care unit 8 on 6/21/13.  An admission assessment was completed on the day of his arrival by the psychiatrist; this evaluation was further refined on 6/27/13.  The suicide risk assessment and admission psychological assessment were completed on 6/26/13 and the social work 30-day psychosocial assessment and rehabilitation therapy assessments were completed on 7/17/13.

The patient was provided with a diagnosis of Schizophrenia, paranoid type.  On 8/8/13, he was moved to intermediate care unit 31 in Program V.  At the time of review, he was prescribed Zyprexa 10 mg per day, Risperdal 2 mg per day, Trileptal 600 mg twice per day, Paxil 20 mg per day, and Cogentin 2 mg per day.  All of the prescribed psychotropic medications were ordered to be crushed.

The patient underwent a neuropsychological evaluation on 8/2/13.  That evaluation noted diminished mental speed of processing and support for the diagnosis of Cognitive Disorder NOS.  The evaluator believed that some improvement in cognitive functioning was possible with an improvement in psychiatric symptomatology.

The most recent treatment plan noted psychiatric stabilization and danger to self as treatment foci for the next treatment period.  Progress notes repeatedly documented the patient's refusal to leave his cell for lunch; instead, he slept through lunch or hid under his blanket due to fear and paranoia.  The patient continued to exhibit negative symptoms that prompted referral, with social isolation.  He only attended 33 to 50 percent of group therapy.  However, this did not appear to be a primary focus of treatment.  The treatment plan also did not provide guidance to staff as to addressing the patient's severe symptomatology.

**Findings:**  Timely staff assessments were documented.  However, the treatment plan lacked individualization and did not address the patient's treatment needs.

## 23.  Patient W

Brief History:  This case was selected for review because of the minimal length of the patient's hospitalization at ASH.  This 69-year-old patient was admitted to ASH on 11/15/12 and was clinically discharged on 1/29/13 (with a physical discharge date of 2/12/13).  The discharge diagnosis was Schizophrenia, paranoid type.

The patient was referred from CMC due to increasing paranoia that included oppositional behavior toward custody staff (although he did not receive RVRs for this behavior) and long-term treatment to address his history of treatment non-adherence.  The referral included information regarding the patient's interactions with custody due to his paranoia, his history of selective mutism, treatment refusal, multiple delusions, erratic medication compliance, poor participation in treatment groups, and individual treatment.  Although there was mention in the

CMC referral regarding initiation of a forced medication order (PC2602), there was no documentation that such an order was attempted or obtained at the sending facility. The patient had been provided with a diagnosis of Delusional Disorder and was prescribed Risperdal.

The patient continued to refuse to cooperate with treatment interventions after his arrival at ASH. He consistently refused to cooperate with tuberculin testing, which made it impossible for staff to transfer him from admissions to a long-term treatment unit. The patient isolated himself in his room all day and refused to take medications. He reportedly attended an art treatment group.

Staff reported that the patient consistently presented with irritability and agitation, but generally adhered to unit rules and routines. However, he exhibited paranoid delusions throughout his ASH hospitalization.

The patient continued to refuse treatment, necessary medical laboratory work, and TB testing. The treatment team determined that he had "reached maximum benefit from his current hospitalization" and it was recommended that he return to CDCR. Medical record review revealed that he attended some groups with much prompting, but occasionally left early due to disruptive behavior and paranoia. For example, during one group, he stated loudly that he was going to assault the peer sitting next to him because that man had attacked him in prison. He also accused that person of putting threatening notes under his room door. However, when escorted back to his unit from group, he could not produce these notes. Staff also noted that the patient who was accused of the threatening notes did not live in the same housing unit and would not have been allowed on the housing unit, providing further proof that the allegation was delusional.

There was a lack of documentation of treatment interventions to address the patient's treatment resistance and psychosis other than encouraging him to attend group. In fact, some groups were suspended until the patient could "tolerate" them. During this period, no alternative treatment was provided and the patient effectively received neither group therapy nor medication management while housed in the admissions unit. He continued to demonstrate the negative symptoms of his mental illness with refusal of treatment, but his treatment plan was not modified to address this issue.

**Findings:** This patient was not adequately treated while hospitalized at ASH. Due to his mental illness, he was unable to cooperate with required medical testing that was necessary for his transfer from the admissions unit to a treatment unit. Despite this, staff did not modify his treatment plan and even suspended group therapy. No alternative interventions appeared to have been implemented. An intensive behavioral incentive plan may have been beneficial in attempting to engage the patient in treatment or otherwise enhance his ability to access treatment services. Ineffective strategies were repeatedly employed with negative results. Consequently, the patient failed to progress and was discharged without any apparent improvement.

## 24. Patient X

Brief History: This patient was admitted to ASH on 1/15/13 and discharged on 3/5/13. He was provided with a diagnosis of Schizophrenia, undifferentiated type. He was referred from

271

CSP/LAC due to psychosis with paranoid delusional thinking, rapid and incoherent speech, and medication and treatment non-adherence with 39-percent group attendance.

The patient had a history of mental health problems including at least two prior DSH admissions in 2010 and 2011; the last admission ended in discharge due to noncompliance. He also had a history of forced medication orders, but was not receiving medications by court order at the time of his ASH admission in 2013.

During hospitalization at ASH, the patient became upset and yelled at peers in the dayroom, threatening to assault one peer. He also presented with disorganized and demanding speech, psychomotor agitation with pacing, and grandiosity. His behavior escalated to the extent that he was placed in the seclusion room and eventually into full bed restraints as emergency medications were initiated. He was prescribed Zyprexa 15 mg twice per day, but the administrative law judge denied the involuntary medication request and Zyprexa was discontinued. Staff reported he appeared to show improvement while taking Zyprexa.

The medical record frequently described the patient as speaking incoherently with "word salad" and at times being easily angered or engaging in disputes with peers. The treatment plan of 2/12/13 indicated that he had several areas of treatment focus, but treatment groups were deferred due to the patient's psychiatric instability. This resulted in very limited treatment for him during his brief ASH hospitalization.

The patient subsequently withdrew his consent for inpatient treatment and no documentation indicated that staff attempted to pursue involuntary placement (Vitek). The patient was considered to have reached maximum benefit and was discharged despite remaining acutely ill.

**Findings:** This was a difficult patient to treat. Although ASH clinical staff sought a forced medication order, there did not appear to be other significant efforts to engage him in treatment. While the treatment plan identified therapy groups for the patient, he was never actually allowed to participate in these groups as they were deferred until he was "psychiatrically stable." Despite his inability to tolerate groups and his refusal of psychotropic medications, no alternative therapy was provided and no behavioral plan was established. Consequently, this patient was inadequately treated and prematurely discharged.

## 25. Patient Y
Brief History: This patient's medical record was reviewed as he was identified by staff as not being engaged in treatment. He arrived at ASH on 5/1/13 with diagnoses of Schizophrenia, undifferentiated type, Alcohol Dependence, and epilepsy. He received psychotropic medications by a forced medication order (PC2602). He was prescribed Zyprexa 20 mg twice per day, Haldol 10 mg per day, lithium 600 mg twice per day, and lorazepam as needed with intramuscular injections in the event of medication refusal. He had a history of hospitalization at SVPP from July 2009 to June 2010.

The psychological admission assessment noted that the patient presented with disorganized and tangential speech throughout the interview. Consequently, the interview was terminated prematurely.

A July 2013 progress note indicated that the patient remained with significant psychotic symptoms, including illogical and disorganized speech and delusions regarding his placement at ASH. An August 2013 psychiatric progress note revealed an increase in Zyprexa due to continued psychotic symptoms. According to the psychiatrist, the patient continued to demonstrate thought disorganization and grandiose delusions during September 2013. In October 2013, Haldol was added to his medication regimen in an effort to improve his functioning and decrease psychiatric symptoms.

The most recent treatment plan dated 7/30/13 indicated that the patient had not been attending groups, including leisure or supplemental groups. He only attended one of ten scheduled/offered hours of supplemental activity groups. Despite this, lack of group and treatment adherence were not foci of treatment, and the treatment plan was not modified to reflect the patient's lack of engagement in therapy. An updated treatment plan was not located in the medical record.

**Findings:** This patient was not receiving adequate treatment. While his medication regimen was modified slightly three months after arrival at ASH due to continued acute psychotic symptoms, this was the only change in intervention. The patient remained acutely psychotic and was unable to fully participate in treatment. Nonetheless, his lack of treatment engagement was not a treatment target goal and his treatment plan was not modified. This patient exhibited both positive and negative symptoms that interfered with his ability to access treatment, but the treatment plan did not list alternative interventions that would address those symptoms which were obstacles. A functional analysis and subsequent behavioral treatment plan, or consultation with a PBSP, may have been beneficial for this patient. The patient was also overdue for an updated treatment plan.

## 26. Patient Z

Brief History: This patient's medical record was reviewed because he was identified by unit 28 staff as one of their most difficult to engage patients. Staff reported that he refused to attend groups and stated his preference of waiting until two weeks before his parole date to begin attending groups. Staff indicated that this is what occurred during his past incarceration, after which he reoffended. According to staff, the patient was hospitalized for the past year and was compliant with medication, but continued to refuse to engage in other treatment.

Medical record review revealed that the patient's admitting diagnoses were Schizophrenia, undifferentiated type, Alcohol Dependence, and Cannabis Abuse.

The patient was seen monthly by the psychiatrist. Psychiatric progress notes indicated that he was medication adherent. Most of the notes indicated that he was stable, although he required a second antipsychotic medication to achieve and maintain stability. He spent much of the day sleeping. The patient remained bitter about a prior experience with treatment groups as he had attended groups but this did not result in discharge from ASH; since that time, he refused group participation.

The majority of psychology notes appeared to have occurred as a result of treatment team meetings. The patient was noted to have refused SREs and testing. On 12/5/13, he was assessed

with a low risk for suicide. A 1/31/12 progress note documented his history of water intoxication.

Psychological testing on 12/8/11 contained similar language to some of the treatment plans. Specifically, it noted that the patient did not appear to have the cognitive abilities to engage in wellness and recovery treatment activities without modification. His reading was estimated to be at the sixth grade level. The assessment noted that he might benefit from attending groups that incorporated various teaching modalities including visual, oral, and written materials. The assessment also noted that he might benefit if group leaders repeated or modified provided information. It was recommended that his level of mall participation be revisited and modified due to his improved level of functioning.

The treatment plan of 9/3/13 noted that the patient had previously responded to internal stimuli. His controlling offenses included revocation of parole. In 1989, he cut his artery, and in 2009 he hit his ten-year-old niece with a concrete block. One focus of treatment was for him to learn to safely manage his hallucinations, but he reportedly had not experienced these symptoms for an extended period of time. There was also treatment plan documentation of a very slight increase in group attendance. The patient had no instances of water intoxication during the preceding 90 days. There was no specific plan to increase his group participation. The treatment plan noted that he did not have the cognitive abilities to engage in wellness and recovery treatment activities without modification. It was also estimated that he was able to read above the sixth grade level. He was placed in the assisted level of mall support services.

A primary objective for the patient was to manage his urges to use drugs. He enrolled in a group to address this concern, but the group was cancelled.

Social work progress notes revealed continued difficulties in engaging the patient in treatment activities. The patient reported that he saw no benefit to treatment activities and his group attendance remained at or near zero percent. However, he indicated to the psychiatrist that he would be interested in programing in January 2014, which was apparently related to his release date of 12/14/13. He declined to attend the most recent treatment team. The treatment focus was for him to be psychiatrically stable and involved in treatment. The patient left his room for meals, medication, and mandatory activities, and he occasionally interacted with peers or watched television.

Nursing progress notes reported that the patient's ADLs were adequate, but his appearance was disheveled. He was reportedly compliant with his prescribed medications, including Thorazine and Risperdal.

A rehabilitation note of 9/11/13 indicated that during the preceding thirty days, the patient was offered a minimum of ten weekly hours of leisure and recreational supplemental activities. He attended about 3.5 hours of weekly activities.

**Findings:** This patient was followed consistently by social work and psychiatry, but these progress notes tended to be repetitive in nature. The psychology notes were sparse and were primarily related to treatment team contacts. There were some indications noted regarding the

basis of the patient's anger and treatment refusal, but this was not utilized to develop a behavioral plan or to otherwise address his lack of participation in treatment beyond medications. The notes also did not reflect that the modifications suggested by the previous psychology assessment were implemented.

## 27. Patient AA

Brief History:  This patient's medical record was reviewed as staff identified him as frequently moving between CDCR and ASH.  He had a history of childhood abuse and multiple brain injuries.  Also significant were four suicide attempts, three by hanging in 2004, 2005, 2006, and one in which he attempted to shoot himself with shotgun in 1990.

The patient was provided with a diagnosis of Major Depression, recurrent, severe with psychotic symptoms and hypothyroidism.  The record revealed various transfers between CMF and DSH between 2006 and 2011.  The patient was hospitalized at ASH from 8/2/12 to 2/22/13 and was readmitted on 4/30/13.

The patient's group attendance dropped to 48 percent.  He also had not been attending the substance abuse group and since he had a life sentence, it was decided to remove him from this group.  The patient apparently wrote to the psychiatrist requesting return to CDCR because he wanted to return to writing his book.  He was persuaded to remain at ASH for an additional month.  Stated discharge goals were to develop better depression coping skills related to having a life sentence.  Various social work notes indicated group attendance of approximately 60 percent.  The patient reportedly enjoyed his job, but became depressed with poor motivation when he focused on his life sentence.

An admission note indicated that the patient thought about hanging himself on 4/21/13.  His affect was described as sad and it was noted that he had been on suicide watch for eight days prior to transfer to ASH.

The psychiatric admission note of 4/30/13 reported that the patient's depression rated an eight on a scale of one to ten.  His multiple psychiatric hospitalizations in the community, corrections, and crisis bed admissions were noted.  It was reported that prior to admission to ASH, he was on one-to-one watch for eight days and endorsed auditory hallucinations, increased hopelessness, and active suicidal ideation.  He was envisioning a place to hang himself.

Subsequent progress notes indicated that the patient was followed consistently by the psychiatrist.  He presented with mildly depressive symptoms.  A psychiatry note of 10/28/13 showed that he was being treated with Abilify and Effexor, with noted improvement in his depressive symptoms.

The treatment plan indicated that the patient was involved in a depression mental health wellness group and an overcoming trauma group.  It was noted that he would be offered a minimum of ten weekly hours of leisure and recreational activities.

**Findings:**  This patient was seen regularly during his hospitalization and his medical record included complete evaluations.  His treatment might have benefitted from additional assessment of his significant history of head trauma.

EXHIBIT H
Coalinga State Hospital (CSH)

## 1. Patient A

Brief History:  This patient was admitted to CSH on 3/21/13.  He was provided with a diagnosis of Bipolar Disorder, manic, severe with psychotic features.  He was prescribed olanzapine and had also received treatment with Depakote.  His history was significant for a past suicide attempt while homeless and for being in withdrawal from substance abuse.  While incarcerated in CDCR, he reported command auditory hallucinations telling him to harm and to kill others.

Several social work notes from March and April 2013 noted the patient's repeated requests that they contact his case manager in the community.  However, a note on 4/18/13 indicated that the social worker told the patient to call or to write his uncle (who was his legal guardian) and that she would no longer work with him regarding that matter.

On 6/26/2013, the patient told the psychiatrist that the Bloods gang wanted to harm him.  He also reported that he was sending "bad vibes to the president."

A nursing note on 9/15/13 described the patient as disheveled with poor hygiene and auditory hallucinations.  There was minimal contact with the psychologists during the patient's hospitalization.

**Findings:**  Although the patient was seen consistently by the psychiatrist, there was minimal contact with psychologists during his hospitalization.

Neither the medical record that was reviewed nor the treatment team that was observed showed sufficient focus in specifically assisting the patient with reentry planning.  While the treatment plan noted his life goal as "making it on the outside," the plan's discharge section only indicated the patient's return to CDCR.  His expected release date was 11/13/13.

There were significant problems with the discharge planning provided to this patient.  The patient repeatedly requested that staff contact his community case manager, but this request was rebuffed for a number of months until July 2013.  The patient would apparently be homeless upon discharge, although there was some mention of his living with his uncle.  The medical record also mentioned that the patient had not had recent contact with him.  The patient's anticipated homelessness, lack of stability, and history of mental illness made more coordinated reentry planning an important focus.  His history of receiving SSI also indicated that he might benefit from assistance in applying to have it reinstated upon his release.  Assessments conducted during his hospitalization noted that his risk for violence was increased by this lack of feasible long-term plans and support.  This case was brought to the attention of the supervisor for remedy.

## 2. Patient B

Brief History:  The patient's medical record was reviewed as he requested to speak with the review team.  He was admitted to CSH on 5/23/13; initial DSH placement occurred on 2/11/13.  He was admitted due to increasing paranoia, agitation, erotomania, grandiosity, and persecutory delusions with erratic medication adherence.  He was provided with diagnoses of Bipolar I Disorder, manic, moderate and Polysubstance Dependence.  He was prescribed lithium carbonate, Geodon, and Desyrel.

278

The patient was a direct admission from ASH.  He had a history of community psychiatric hospitalizations due to paranoia and methamphetamine use, which included intravenous use.  He had originally refused inpatient care but a *Vitek* hearing found that he did not have the ability to refuse inpatient care and he was committed to DSH care.

The comprehensive psychiatric assessment was completed on 6/18/13; it was untimely at 26 days following admission.  The psychiatric assessment did not refer to the results of the many other assessments that had been completed by that time (e.g., psychological, rehabilitation, suicide risk) and did not explain contradictory information.  A medical history and physical assessment were completed at the time of admission.  The psychologist completed a suicide risk assessment on 5/24/13, while the psychological admission assessment was completed four days later on 5/28/13.  The patient repeatedly refused various aspects of care throughout his admission, including the flu vaccination, insulin injections, dental appointments, medical tests, and various medications, including psychotropics.

The most recent treatment plan, dated 2/19/14, indicated that the patient had not met many of his treatment objectives, yet he was scheduled for treatment discharge only a few weeks after this treatment team meeting.  Many of the treatment objectives and outcome variables from the most current treatment plan required better operationalization.  The treatment plan was modified slightly over time, but not significantly; the plan did not demonstrate progression in treatment or clinical modification due to lack of clinical progress.  The patient appeared to function at essentially the same level at discharge as at the time of intake, although overt symptoms of mania had generally decreased.  However, other treatment goals established at intake (i.e., insight into mental illness, treatment compliance) showed no real progress justifying discharge.

Based upon review of progress notes, the patient appeared to have been generally stable for a period of months, but there was no significant progress toward his treatment goals and objectives.  According to the physician's progress notes, the discharge summary was dictated for the patient on 3/17/14.  The treatment team appeared to be unclear regarding his treatment and discharge goals.  After ten months of inpatient treatment at CSH, the patient did not appear to have progressed, and the treatment team did not appear to be providing very aggressive treatment directed at specific goals.

**Findings:**  This patient's treatment was unfocused and nonspecific for his treatment needs.  The treatment team did not adequately monitor and document his treatment progress.  The patient did not demonstrate progress regarding treatment adherence in clinical groups, yet staff did not modify clinical interventions to address this significant area of treatment focus.  The patient required more aggressive treatment interventions.  If issues of treatment non-adherence continued, a behavioral plan should be developed and implemented; only then should discharge be considered.

## 3.  Patient C

Brief History:  This patient was admitted to CSH on 2/13/13.  He was provided with diagnoses of Bipolar Disorder, manic, severe with psychotic features, Polysubstance Dependence, and

Antisocial Personality Disorder.  He was prescribed olanzapine and his psychotropic medications were administered by court order.

The patient received an annual psychological assessment update on 2/6/14, which was clinically informative.  According to this update, he was received at CSH following a two-week ASH hospitalization.  He was referred to DSH due to inadequate functioning as a result of manic symptoms including pressured speech, expansive mood, and grandiose delusional thinking.  At the time of assessment, he was described as stable with improvement in these areas of prior dysfunction and adherent with treatment.

Over the course of his hospitalization at CSH, the patient had six incidents of note.  In one, he exhibited physical posturing toward another patient in a challenging manner; staff was able to de-escalate the patient and prevent a physical altercation.  He also had significant problems with poor ADLs at the time of admission and required repeated prompts.  After twelve months in the program, he had begun to shower on his own and kept his room relatively clean.  He was also able to articulate the importance of taking his medication and adhering to his treatment program.

The patient was placed on a court order for medication due to danger to others, but the order was allowed to expire on 1/22/14, to the dismay of clinical staff at the sending facility.  He had received his medications by court order on at least four previous occasions due to grave disability.

Psychiatric monthly progress notes contained repetitive information.  No explanation was provided regarding the decision to allow the PC2602 forced medication order to lapse, although, presumably, it was due to the patient's medication adherence.  His medication adherence appeared to be due primarily to the psychiatrist telling him that he would be returned to involuntary medications at the sending facility if he was not medication adherent.

An interview with the patient during the monitoring visit revealed that he had no insight regarding his mental illness and a very negative view of mental health staff at his referring facility; this may have been exacerbated by the compliance strategy that the CSH psychiatrist utilized.  While the patient reportedly told his prescribing psychiatrist at CSH that he would take his medications, it was unclear this would continue following CSH discharge.

The patient continued to demonstrate poor to fair hygiene, irritability, grandiose delusions, and periods of agitation.  The number and types of incidents with other patients and staff also appeared to be increasing.  Despite this, CSH psychiatric staff chose not to renew the forced medication order.  There was no documentation in the record indicating that CSH psychiatric staff consulted with CMC psychiatric staff regarding this issue prior to deciding not to renew the order.  Given this patient's history of forced medication orders, a consultation with his long-term treatment team at the referring facility would have been indicated.

Based on medical record review, it appeared that the patient was enrolled in the same groups repeatedly, such as managing mental illness: part one, medication education, and music for leisure, despite staff stating that he had met the objectives for these groups.

**Findings:** This patient did not receive adequate mental health care at CSH. His treatment plan was not modified when he met treatment objectives, as evidenced by those treatment goals and objectives being removed from the treatment plan and replaced by other goals and objectives. The treatment plan was not modified when he did not meet objectives over a prolonged period, in this case twelve months. Treatment also was not aggressive with clear, targeted, short-term and long-term goals. The patient appeared to exhibit progressive decompensation during the previous three months as evidenced by an increase in the frequency and severity of incidents that he was involved in on the unit. His irritability and agitation increased, yet the patient's treatment plan was not modified to add interventions that would more aggressively prevent his downward spiral.

## 4. Patient D

Brief History: This patient was admitted to CSH on 1/21/14. A PC2602 order was pursued, but the request was denied on 3/14/14. The forced medication order was requested on the basis of dangerousness to self and others and grave disability. The patient had received his psychotropic medications previously by court order from 2010 through 2013. The order denying the petition also noted in handwriting "withdrawn by petitioner." The petition was denied due to the judge's ruling that the patient's dangerousness was not specifically proven and he was also adherent with medication treatment at that time.

The comprehensive psychiatric assessment was completed on the day of arrival; the suicide risk assessment was completed the following day. The patient's psychosocial assessment was completed on 2/12/14, within the 30-day timeframe. The nursing assessment was completed timely. The rehabilitation assessment was completed on 1/29/14, the nutrition assessment was completed on 1/25/14, and the history and physical was completed on 1/21/14. The admission psychological assessment was completed on 1/29/14.

The comprehensive psychiatric assessment provided the following diagnoses: Schizoaffective Disorder, bipolar type, Obsessive Compulsive Disorder, provisional, and Mild Cognitive Impairment secondary to traumatic brain injury. The initial psychological assessment included the following diagnoses: Schizoaffective Disorder, bipolar type, Cognitive Disorder NOS, Polysubstance Dependence, and Antisocial Personality Disorder. The patient was reportedly engaged in cross-dressing behavior and other unusual behaviors for sexual enjoyment or orgasmic enhancement that were not captured diagnostically. He also reportedly engaged in multiple self-injurious behaviors and suicide attempts, which also were not captured diagnostically. The psychological admission assessment indicated that further testing, and specifically cognitive testing, would occur over the following 60 days to clarify the Cognitive Disorder NOS diagnosis.

On 2/5/14, a psychology progress note indicated that the patient brought up "…LGBT needs…" and reported "…being born 70% female and 30% male." The patient inquired about receiving hormone therapy. As of 2/26/14, no neuropsychological testing had occurred. A subsequent psychology note on 3/5/14 noted that he was decompensating due to medication non-adherence. He exhibited pressured speech, paranoid delusions, rambling speech, irritability, and agitation. He continued to exhibit decompensation, with an escalation of aggressive behavior. As of 3/11/14, he was prescribed Keppra and Zyprexa.

The most recent treatment plan included diagnoses of Schizoaffective Disorder, bipolar type, Obsessive Compulsive Disorder, and Cognitive Disorder NOS. Treatment goals and objectives did not fully correlate in some areas (e.g., "patient will learn to manage his symptoms as evidenced by attending group" when the patient had been attending group), but the treatment plan was generally adequate given his relatively new status in the inpatient setting. However, given his ongoing decompensation, lack of medication adherence and, most importantly, his potential threat to staff and patient safety, more assertive treatment through an active behavior support plan was indicated. No such intervention was located in the most recent treatment plan.

**Findings:** All intake assessments were completed timely. The patient did not receive a neuropsychological assessment as was indicated and dictated by the treatment plan. There was a need for diagnostic clarification for him as varying diagnoses were present in the medical record. Further psychological testing and medical record review would be beneficial to provide that diagnostic clarification.

The patient was not receiving adequate mental health care. While staff attempted to obtain a court order for involuntary medication, there was insufficient justification provided in the medical record regarding the patient's dangerousness to self. The petition in the medical record indicated that it was based upon all three criteria, but the judge's order of denial only noted danger to self and danger to others. There appeared to be evidence of dangerousness to others, and this information combined with the patient's decompensation and prior history of forced medication orders from 2010 through 2013 should have resulted in a successful petition. However, staff lacked access to the eUHR and did not contact the referring facility for necessary historical information for the PC2602 petition. Following failure of the involuntary medication order, the treatment team should have immediately modified the treatment plan to initiate additional interventions to directly address the patient's decompensation and heightened danger to staff and patients. At a minimum, a behavioral plan should have been developed and implemented.

## 5. Patient E

Brief History: This patient arrived at CSH from ASH on 2/13/13. He had been hospitalized in DSH since December 2012. He was referred to DSH due to persistent self-injurious behavior with subsequent feelings of relief and "almost daily abuse of other patients' medications...and flagrant medication seeking behavior." He was provided with the following diagnoses at the time of admission: Pedophilia, sexually attracted to both, non-exclusive type, Cannabis Dependence, and Borderline Personality Disorder, as well as multiple medical issues.

Nursing, psychiatric, medical, psychosocial, rehabilitation, and psychological assessments were all completed timely. Their common theme was the patient's unreliable self-report; he was a poor historian. Clinically beneficial annual update evaluations were also completed by social work, psychiatry, and psychology. The psychosocial assessment update suggested that the patient had minimal treatment motivation as evidenced by his failure to participate in many of the treatment groups that the treatment team recommended and ongoing failure to fully participate in individual therapy. However, he exhibited obvious enjoyment in the attention that individual treatment provided. Based on an interview with him, he did not appear to take

responsibility for his treatment as he repeatedly complained that the treatment did not pertain to him and that treatment providers did not provide him with adequate treatment. When confronted about these complaints with contradictory information that he had provided, he continued to resist and placed blame for his lack of progress on his providers rather than on his refusal to attend treatment and/or fully participate, as the medical record documented.

On 2/19/14, an annual psychiatric evaluation described the patient's poor medication adherence and poor self-care with ongoing depression and avolition at the time of admission. During the two months of hospitalization at ASH, he exhibited no progress regarding his presentation of symptoms and behavior and did not utilize the treatment provided to him.

The patient had an extensive history of cannabis usage and cocaine use. He had no substance related convictions; his incarcerations were due to sexual offenses against children. The treating psychiatrist characterized his course of treatment at CSH as "tumultuous, slow, full of backsliding, resistance against treatment recommendations, and recurrent persistent self-injurious behaviors" that resulted in multiple incidents of enhanced observation status. At times he had also threatened suicide, with at least twelve episodes (two of which were for actual suicidal statements). The psychiatrist indicated the patient's main coping skill appeared to involve cutting himself in response to emotional distress and psychological pain. The longest period of one-to-one observation occurred from 11/14/13 to 1/2/14. The psychiatrist indicated that the incidents were trending down in duration, with faster resolution and stabilization; the patient was also more cooperative in accepting medications during these incidents. However, data provided in the patient's behavior guidelines suggested that the psychiatrist's perception was inaccurate; the only incident of aggression occurred during the patient's initial hospitalization at ASH.

The patient was prescribed Cogentin, Depakote, lithium, Risperdal, propranolol, Seroquel and Effexor. The psychiatrist provided him with the following diagnoses: Pedophilia, sexually attracted to both, nonexclusive type as the primary diagnosis, Major Depression, recurrent with psychosis, in partial remission, Cannabis Dependence, and Borderline Personality Disorder. There was no documentation of recent psychotic symptoms in the medical record.

The admission SRE assessed the patient with low suicide risk despite the reason for his referral to DSH, his lack of improvement while at ASH, his continued self-injurious behaviors, and other known risk factors. While the patient had known protective factors, he had multiple high risk factors that were not included for consideration by the psychologist at the time of evaluation. The patient was administered a series of cognitive screening tools. However, in light of his low motivation and possible secondary gain in performing poorly, the results should have been interpreted cautiously and measures of malingering should have been included with the testing battery. However, this did not occur.

The medical record documented the patient's report that voices told him to cut himself, but there was no objective evidence of psychosis. He was receiving individual therapy from the psychologist, but the purpose of the intervention appeared to be uncertain to the provider. The provider continued to allow the patient to guide treatment, with poor boundaries in therapy and treatment goals, all necessary in the treatment of a patient with Borderline Personality Disorder.

The treatment provided appeared to reinforce the patient's problematic behavior. A behavioral plan and cognitive behavioral therapy were indicated for this patient.

A behavior guidelines plan was located in a separate binder on the unit that was dated 2/18/14. This plan was generally well-written and had many positive elements. However, there were also portions of the plan that were more generalized when the plan required more specific analysis and intervention. Elements of the plan presumed that the patient had reached a certain level of skill acquisition and mastery that he had actually not demonstrated. The primary treatment plan did not note that these behavioral guidelines had been completed; that section had not been updated since September 2013. The treatment plan also failed to include important interventions in some areas, such as including rehabilitation groups to address depressive symptoms; however, the plan included dialectical behavior therapy (DBT).

**Findings:** This patient posed a challenge to the CSH treatment team. The treatment team should have first determined the primary diagnosis for this hospitalization. Although a primary diagnosis of Pedophilia was provided, the patient was not treated for this disorder at CSH; his admission was primarily due to behaviors related to Borderline Personality Disorder. Those behaviors required an assertive treatment plan that included DBT and a behavioral plan in light of his history of treatment resistance and poor motivation. The treatment team also had to convey to the patient specific and clear treatment goals and his responsibility in treatment, as well as create a behavioral plan with an initial focus on short-term goals. As those goals were achieved and the positive/preferred behaviors established, the behavioral plan then could be modified as the treatment team worked to extinguish the patient's negative behaviors, and specifically, the self-injurious behaviors. This patient was inadequately treated and his problematic behaviors appeared to have inadvertently been reinforced at times by well-intentioned providers. The patient was not properly assessed for suicide risk at the time of intake.

This patient was treated with a variety of psychotropic medications, including an antidepressant, two antipsychotics, an anticholinergic, and two mood-stabilizing medications. This polypharmacy was not supported by medical record documentation. Of particular concern was the treatment with two antipsychotic medications without clear evidence of psychosis. The use of polypharmacy increased the possibility of medication side effects, especially tardive dyskinesia, which was potentially irreversible.

## 6. Patient F

Brief History: This patient was admitted to CSH on 3/3/14. He was provided with the following diagnoses: Polysubstance Dependence, Borderline Personality Disorder, and Antisocial Personality Disorder. Rehabilitation, nursing, social work, medical psychiatry, and psychology intake assessments were all completed timely. The patient reported a history of self-injurious behaviors beginning at age 11. He heard voices telling him to hurt himself or others and experienced auditory and visual hallucinations of his deceased brother. The evaluating CSH psychiatrist reported no objective evidence of psychosis and, in fact, noted contradictory evidence. The patient received his psychotropic medications by court order due to danger to self.

The psychiatrist completed a thorough medication evaluation. He tapered the patient from Prozac that had been prescribed at CDCR, continued Zyprexa, and discontinued Cogentin with a recommendation for consideration of lithium or Depakote during the patient's hospitalization. At the time of the monitoring visit, a different psychiatrist prescribed the following medications: Haldol, Ativan, Benadryl, Buspar, Prozac, and Zyprexa. Although the intake psychiatrist provided clear and precise justification for modifying his medication regimen, the subsequent psychiatrist provided no justification for modifying the medication regimen.

The patient was placed in seclusion beginning on 3/11/14 due to extreme agitation, unusual behaviors, and a refusal to redirect or respond to interventions. He was ultimately placed in restraints when he began banging his head against the wall and hit his nose, causing bleeding. He reported auditory hallucinations, specifically the voice of his deceased brother. He was given intramuscular injections of Haldol, Benadryl, and Ativan prior to leaving seclusion and during transport to the restraint room. He remained in restraints or seclusion until 3/17/14.

The patient's seven-day initial treatment plan was completed on 3/11/14. It did not mention the seclusion incident, suggesting that it occurred after the team meeting. The treatment plan focused on the existence of auditory hallucinations, despite the admission psychiatrist's well-documented evaluation and clinical interview questioning the patient's self-report of hallucinations. The treatment plan also appeared to have been duplicated, as the progress section for the first criterion to discharge indicated that the patient was new to the program, but then also stated that he had "partially met" the treatment objective/goal. As the patient had only been physically present on the unit for eight days and was not enrolled in any treatment groups or individual treatment, this simply was not possible. This contradictory information was repeated in the next objective, although the other objectives correctly stated "not met." None of the psychiatric/psychological treatment areas of the treatment plan were completed.

**Findings:** Although this patient was new to CSH, treatment planning was inadequate with incomplete psychiatric and psychological objectives. Intake assessments were completed timely. There was obvious disagreement among psychiatrists regarding the patient's proper medication regimen and medication changes were made without clear justification.

## 7. Patient G

Brief History: The patient arrived at CSH on 10/28/13. He was provided with a diagnosis of Major Depression, recurrent, severe, without psychotic features. He was referred to DSH due to a serious suicide attempt. Nursing, medical, rehabilitation, psychosocial, psychiatry, and psychology assessments were completed timely. The suicide risk assessment inexplicably determined that he posed low suicide risk, despite a serious attempt immediately preceding DSH referral and continued feelings of extreme hopelessness and utter despondency.

The patient was incarcerated since the age of 15 and reportedly had resulting significant depression and hopelessness regarding his prison release. The suicide attempt involved him cutting his left wrist, groin, and left ankle with a sharp stone; the injuries required sutures and were deemed serious. The patient had a history of suicide attempts beginning at age 12. At the time of intake, he expressed reluctance to take psychotropic medications, initially preferring to participate in group and individual therapy. However, he subsequently agreed to take Prozac.

285

The patient experienced episodes of suicidality while hospitalized at CSH, with periods of extreme hopelessness due in large part to his inability to cope with his long sentence. He was incarcerated for first degree murder that occurred during a burglary. He reported that his parents were hopeful that he would parole soon, but he was extremely pessimistic about that possibility.

There were several treatment plans located in the medical record. The most recent plan dated 2/27/14 documented a suicide risk assessment of low suicide risk and indicated that his risk should be monitored and addressed in ongoing treatment. The treatment plan listed incidents chronologically rather than summarizing the progress since the last team meeting. Discharge criteria were not consistently relevant to the reason for referral. While the treatment plan included some positive interventions for the patient's depression and prior substance issues, he had been incarcerated for nine years and had not disclosed ongoing substance concerns. Substance abuse treatment did not appear to be a necessary current treatment target, particularly in light of his significant issues of depression, hopelessness, anhedonia, withdrawal, and suicidality. There were insufficient interventions for the severe depression that the patient experienced and the significant risk of suicide and self-harm. In contrast, the patient had five leisure foci opened and only one psychiatric/psychological focus addressed.

During patient interviews, he expressed frustration that certain treatment groups discussed content that pertained to the community and when he asked questions about prison scenarios or coping with life in prison, the facilitators had difficulty applying these concepts to the prison setting. This was troubling given that none of these patients would discharge from CSH directly to the community; most of the participants would return to CDCR, although not all faced life sentences.

**Findings:** This patient did not receive adequate treatment at CSH. He presented with significant suicide risk, and had severe depression and hopelessness with insufficient clinical treatment targets in his treatment plan. The clinical interventions identified in the most recent treatment plan were inadequate to address his severe mental health needs and consequently, he failed to improve much during his hospitalization. He continued to struggle daily with suicidal ideation and severe symptoms of depression. A recent medication adjustment, an increase of Prozac, was the only identified treatment intervention to address his significant symptoms.

The patient was candid in disclosing the reasons for his depression (i.e., incarceration since age 15, length of sentence, pessimism regarding chance of parole) and his strong desire to participate in individual and group therapy to address these issues, but the clinical team did not provide him with the necessary treatment. He was placed in groups that were not clinically relevant and treatment was not modified as clinically indicated. These inadequate interventions might actually have increased his frustration, sadness, and hopelessness. It was clinically inappropriate to involve him in group discussions regarding reentering the community when he presented with hopelessness about that possibility and suicidal ideation because he believed he would never return to the community.

This patient should be seen by his treatment team for revised treatment planning that would more appropriately address his serious mental health needs. He should receive individual cognitive

behavioral therapy weekly until his suicidal ideation decreased, and he should be placed in additional clinical groups including depression management and suicide prevention.

EXHIBIT I
Salinas Valley Psychiatric Program (SVPP)

**1. Patient A**

Brief History:  This patient was admitted to SVPP on PC1370 status on 6/9/13.  He had a long history of mental health treatment for Schizoaffective Disorder.  He was prescribed Prolixin, Buspar, Depakote, and Zyprexa.  The medical record indicated that he had expressed a desire to return to the EOP or be transferred to ASH.

The medical record contained nursing care plans.  A 6/26/13 IDTT note indicated that the patient remained on cuff status.  The ICC review on 6/26/13 noted that he met custody criteria for maximum security status.

Progress notes during the monitoring period were reviewed.  A 10/3/13 note indicated that the patient remained on cuff status.  A 10/9/13 progress note indicated that cuff status was being continued.  Progress notes during October 2013 clearly demonstrated that the patient was making homicidal threats toward staff.

The patient received psychotropic medications by court order.  The medical record also provided graphic detail regarding his IEX behaviors.

The 11/25/13 treatment plan was reviewed.  The current status section contained a useful narrative, which indicated that he was at very high risk for violence due to his past history.  He remained on cuff status due to his history of aggression toward staff and peers.

The patient met criteria for Clark status DD1.  Risk factors for self-abuse included boredom, frustration, and a desire to satisfy his sexual urges.  His treatment plan included the following intervention for social skills issues, namely, "team members will provide weekly in cell activities for patient to complete."  The intervention for leisure and recreation activity included the following: "patient will attend one solo yard, dayroom or 1:1 leisure session with clinician per week.  Patient will engage with RT at cell-front in order to find healthy leisure activities for in cell use at least one time per week."  Other than the use of psychotropic medications on an involuntary basis, no other clinical interventions were provided in his treatment plan.  The medical record's treatment activities section did not include any information.

The patient was also briefly interviewed.  He had difficulty speaking in a direct and goal-oriented manner.  The interview confirmed the lack of adequate out-of-cell therapeutic activities offered to him.

**Findings:**  This patient's treatment program was essentially all in-cell activities on an infrequent basis, as he was on cuff status due to his maximum security status.  His treatment program was inadequate.  Based on review of other medical records and discussion with administrative staff, it appeared that this limited and inadequate programming was common for other patients on similar status.  The planned use of therapeutic modules would hopefully provide out-of-cell therapeutic programming for such patients.

**2. Patient B**

Brief History: This patient was admitted to SVPP on 9/12/2013 on PC1370 status.  His 11/13/13 treatment plan was reviewed.  He was described as being preoccupied with his ICC classification

and was adamant that a mistake had been made as to his maximum custody status. He was again informed that he would not be attending activities out of cell without handcuffs. He stated that he would no longer attend any out-of-cell activities until his maximum custody status was changed. He remained on stage 1 cuff solo programming.

The medical record indicated that the patient's foci of treatment included trial competency, denial, and thought disorder.

A 10/9/13 clinician progress note indicated that he was seen at cell front. He informed the clinician that he would boycott all activities pertaining to his PC1370 treatment until he was no longer classified as maximum custody.

The patient refused to attend his 11/13/13 IDTT meeting. He continued to refuse to leave his cell as long as he was cuffed. The plan outlined by the treatment team was for team members to encourage him to attend weekly treatment groups aimed at educating him about the courtroom, his role, and the current charges being filed.

The patient attended a one-to-one session out of cell on 11/21/13. The medical record's treatment activities section did not include any information.

The patient was briefly interviewed. Overt psychotic symptoms were clearly present, which made it difficult for him to talk directly and in a goal-oriented manner. He reported a chronic history of hepatitis and he focused on this treatment. The patient confirmed lack of access to adequate provision of out-of-cell structured therapeutic activities.

**Findings:** This patient's treatment program was inadequate which was related, in part, to the lack of adequate programming offered to him due to his maximum security and cuff status.

### 3. Patient C

Brief History: It appeared that this patient was admitted to SVPP on 10/31/13. The medical record did not contain a treatment plan. The reviewer was subsequently informed that the treatment plan was completed through the PaWSS process, but had not been finalized, which was the reason that it was not in the medical record. A 12/10/13 treatment plan was subsequently produced, although it was based on an 11/19/13 treatment plan meeting. A 10/31/13 note by a psychiatrist indicated that the patient's presentation was consistent with a diagnosis of Schizophrenia. Abilify and Cogentin were continued. This note essentially contained only a mental status examination and very brief history.

An 11/4/13 admission psychological assessment report was present in the medical record. An 11/5/13 72-hour IDTT note was reviewed, but it was very brief in content. An 11/6/13 ICC note indicated that the patient was on Max-S status due to his history of an in-cell homicide. An 11/19/13 10-day note by the psychiatrist indicated that the patient reported visual hallucinations. He was accused of murdering his cellmate on 5/28/13. A 11/20/13 DSH suicide risk assessment form was completed.

A 12/17/13 cuff status update progress note stated in part that "(t)his writer encouraged patient to continue to attend all his solo activity." The medical record contained nursing care plans. The medical record's treatment activities section did not include any information.

The patient was briefly interviewed. He reported that he had not yet been offered out-of-cell structured therapeutic activities. He stated that his first individual therapy session since his admission occurred during the week of the interview.

**Findings:** This patient was not receiving adequate mental health treatment. The medical record did not contain a psychiatric evaluation. The treatment plan did not address clinical interventions.

### 4. Patient D
Brief History: This patient was admitted to SVPP on 2/27/13. The 150-day treatment plan review was completed on 7/25/13. The patient was provided with diagnoses that included Schizophrenia, paranoid type, Antisocial Personality Disorder, and history of head trauma. The medical record documented that he had a history of numerous staff assaults. The most recent treatment plan was dated 11/21/13. The patient continued to experience auditory hallucinations instructing him to hurt officers.

The medical record was disorganized as evidenced by the filing of recent progress notes in different volumes of the record. Psychopharmacological consults were obtained.

A 12/2/13 cuff status review/update progress note included the following:

> (o)n cuff status due to verbalized threats to harm cops (MTAs/peers). I met with patient at the cell front to discuss cuff status. 'Still having those thoughts of hurting someone, I'm not ready yet, I'm good where I am at.' Encouraged patient to continue programming and stay appropriate with staff/peers. I further encouraged prn, timeouts and coping skills usage.

The patient was briefly interviewed. His description of cuff status was consistent with previously described limited out-of-cell therapeutic activities and cuffing when out of cell.

**Findings:** This patient was receiving inadequate mental health treatment based upon the lack of offered out-of-cell therapeutic activities. This was a common theme for SVPP patients who were maximum custody designation on cuff status.

### 5. Patient E
Brief History: The 12/2/13 treatment plan indicated that this patient consistently felt anxious around other patients and staff. He had a history of numerous assaults on others. An 11/18/13 cuff status review progress note indicated that he was in the observation room due to auditory hallucinations telling him to hurt others. He had been on cuff status due to an incident on 10/22/13, which involved him lunging at a senior MTA. The reviewer did not locate a progress note in the medical record addressing his subsequent cuff status placement, but a progress note dated 10/25/13 indicated that he remained on stage 3 cuff status.

291

On 11/18/13, the patient indicated that he still needed to be on cuff status as he did not trust himself. The following day he threw orange juice at an MTA. On 11/25/13, he required placement in the observation room due to increased auditory hallucinations and subsequent problems during an escort.

A 12/4/13 cuff status review note indicated very little clinical change. A 12/5/13 psychology note relevant to a 12/3/13 602 form completed by the patient indicated that his presentation was consistent with Schizophrenia, paranoid type, chronic. The patient continued to demonstrate active symptoms of psychosis.

A 12/6/13 treatment team note indicated that efforts were being made to reintroduce him to individual clinical sessions uncuffed. He was started on Clozaril, which was his second trial of this medication. Treatment interventions continued to be limited to solo yard and dayroom.

**Findings:** This patient was receiving inadequate mental health treatment based upon the lack of offered out-of-cell therapeutic activities. This was a common theme for maximum custody patients on cuff status.

## 6. Patient F

Brief History: This patient was admitted to SVPP on 4/25/13 after transfer from CMC. His 11/14/13 treatment plan indicated that he had been referred to SVPP for further treatment of depression and psychosis. Diagnostic clarification was requested to rule out malingering. A structured interview of reported symptoms (SIRS) test was consistent with malingering.

A 4/26/13 72-hour IDTT note indicated that the patient would remain on cuff status orientation until cleared by the ICC. Medical record review was unable to locate a note referencing the ICC meeting.

A 11/20/13 progress note indicated that the patient was placed on TSP (temporary suspension of program) status due to safety concerns, but it was removed on 11/22/13.

A 11/25/13 note indicated that the patient was placed on cuff status due to a security concern as there was a report that he had threatened to kill a staff member. On 11/26/13, he reported that he was suicidal related to his cuff status. He was placed in restraints on 11/28/13 due to being a danger to himself. On 12/1/03, he remained on full safety precautions, but was no longer on one-to-one observation status.

The patient was disruptive in his cell on 12/5/13 due to his distress about remaining on cuff status. Five days later, he cut the back of his left hand.

**Findings:** Although it was likely appropriate to place the patient on cuff status, the subsequent lack of treatment associated with this status was clinically contraindicated and appeared to have resulted in clinical deterioration.

### 7. Patient G

Brief History:  This patient was admitted to SVPP on 10/23/13 and was housed in TC1.  His medical record was reviewed as he was on cuff status at the time of the site visit.  He was transferred to SVPP from the Santa Clara County Jail.  He was admitted to SVPP as he was found incompetent to stand trial (PC1370).  He was provided with a diagnosis of Psychotic Disorder NOS; the 72-hour treatment plan provided a diagnosis of Mood Disorder NOS.  He was prescribed lithium and Effexor.

A progress note dated 10/25/13 indicated that the patient remained on cuff status/orientation until cleared by the ICC.  The medical record noted that he was on maximum custody status and remained on cuff status during his SVPP stay.  Progress notes reported that he remained in his cell most of the time; he bathed in his cell and refused to attend ICC and IDTT meetings.  He was released from orientation status, but his cuff status did not change.  Progress notes described few, if any, out-of-cell activities; cell-front contacts were the norm.  A SIR was completed on 11/7/13 after he commented about another patient who was openly masturbating.

A nursing weekly progress note dated 11/12/13 indicated that the patient had recently started solo programming.  However, there was little documentation of group involvement or individual therapy except for the patient leaving his cell on a few occasions for music therapy.

Other progress notes indicated that the patient refused to shower, meet with the social worker or dietitian, or allow monitoring of vital signs.  He advanced to stage 2 on 11/20/13.  He reportedly enjoyed "yard and dayroom."  The most recent progress notes indicated that staff continued to encourage out-of-cell activity participation.

A suicide risk assessment completed on 10/31/13 indicated that the patient had moderate/elevated suicide risk, but refused to participate in the assessment.  A V-RISK 10 that the psychologist completed on 11/1/13 indicated a high level of risk for violence.  The treatment activities section of the medical record did not include any information.

A treatment plan dated 11/27/13 noted that the patient was transferred due to incompetence to stand trial.  He was seen at cell front.  The only listed goal for treatment was that the "patient will attend and complete with positive results his RCAI (Revised Competency Assessment Instrument) and Mock Trials."

**Findings:**  This patient appeared to be receiving few therapeutic interventions at SVPP.  Most of the clinical encounters were performed at cell front and the treatment plan did not address his treatment refusal or plans to increase programming.  The patient remained on cuff status throughout his SVPP stay.  There was little documentation of out-of-cell clinical therapy or regarding the reasons for continued cuff status other than his maximum custody designation.

### 8. Patient H

Brief History:  This patient was admitted to SVPP on 5/22/13 from CMF-VPP.  His medical record was reviewed as he was on cuff status at the time of the monitoring visit.  He was provided with diagnoses of Schizophrenia, paranoid type, chronic and Polysubstance Dependence, in remission.  He was transferred to DSH due to incompetence to stand trial.  He

received his psychotropic medications by court order due to danger to self and others; his PC2602 order expired on 8/7/14.

The patient had a long and significant history of severe mental illness and psychiatric hospitalization and treatment.  He was hospitalized for acute care at VPP for nine months.  The DSH discharge summary indicated that at no time during his VPP hospitalization was he symptom free or in partial remission, with disorganization (pouring urine over his head to shower), assaultive behavior (gassing staff), delusional thinking, and hallucinations.  His history was significant for a two-year hospitalization at PSH after which he was reportedly still incompetent to stand trial.

While hospitalized at VPP, the patient was treated with Clozaril and there was some improvement with his disorganization.  However, a decrease in his absolute neutrophil count (ANC) resulted in discontinuation of the medication.  He was transferred to SVPP prior to re-challenge of Clozaril.  His treating psychiatrist described his case as one of "drug resistant schizophrenia."

The most recent treatment plan was dated 11/20/13 and indicated the following treatment goals:

1.  Patient will interact positively with staff and other peers on the unit;
2.  Patient will understand his pending charges and identify the plea options afforded to him in a court of law;
3.  Patient will attend all one-to-one activity and treatment groups aimed at his education of court personnel and procedures; and
4.  Patient will be able to fully integrate and interact positively with peers on the unit. (repeated from number 1).

This and other treatment plans did not address the serious, intractable, and significant psychotic symptoms present and the need for attempted stabilization and increased programming participation.

Upon arrival on the unit on 5/22/13, the patient reportedly lunged at the MTA and an alarm was sounded.  It appeared that he was placed on "full safety" after the incident, which appeared to be observation without clothing and property.  A 5/28/13 progress note indicated that he was on cuff status with no groups at that time.  On 5/29/13, while in ICC, he reportedly abruptly jumped up from a sitting position and an alarm was activated.  The senior MTA authorized the use of a spit mask and leg irons when he was being escorted and for out-of-cell activities.

Subsequent progress notes indicated that the patient remained with auditory and visual hallucinations and delusional thinking with periods of agitation.  Documentation indicated that he required and was provided with prn medications to address these symptoms.

On 10/7/13, a progress note reported that the treatment team met to discuss the patient's programming status.  They determined that he would remain at stage 1 cuffed status due to his unpredictable assaultive behavior.  The patient did not attend his 180-day IDTT meeting and was interviewed at cell front.

The patient continued to exhibit loud yelling, response to auditory hallucinations, and disorganized behavior and thinking, and remained at stage 1 cuff status with a spit mask. He continued to require prn medications for psychosis and agitation. Documentation indicated infrequent out-of-cell sessions for yard and dayroom.

The patient was apparently removed from cuff status and a note dated 11/14/13 actually indicated recent release from cuff status, but he was still required to wear a spit mask. He reportedly advanced toward a staff person with combative behavior, but was restrained, and returned to cuff status. There was also another incident of a reported staff assault later during November 2013.

On 12/2/13, the patient requested a "time out." He was placed in the observation cell where he was provided with prn medications and was returned to his room later that day.

**Findings:** Treatment plans and clinical and psychiatric progress notes did not address this patient's serious, intractable, and significant psychotic symptoms, nor did they outline necessary treatment planning to stabilize him and increase programming participation. Other than medication management, there was a lack of documentation as to the provision of necessary out-of-cell treatment for this severely ill individual.

The medical record was very difficult to review. Notes and signatures were frequently illegible and the reviewer was unable to determine the discipline of most entries.

After implementation of the new procedure for cuff status documentation, there was appropriate documentation regarding cuff status placement with release criteria. The facility would nonetheless benefit from a more concise and readily accessible means of documenting cuff status. The patient would also benefit from more intensive treatment planning and possibly a case conference to assist the treatment team address his difficult treatment needs.

## 9. Patient I

Brief History: This patient was admitted to SVPP from CIM on 7/24/13. His medical record was reviewed as he was on cuff status at the time of the monitoring visit. He was provided with a diagnosis of Major Depressive Disorder, recurrent severe with psychotic features. He was treated with Zyprexa and Depakote, with prn medications also ordered.

The patient had a history of multiple suicide attempts, multiple MHCB admissions for suicidal ideation, and depressive symptoms since placement in administrative segregation.

On 10/2/13, he was placed in the observation room on cuff status after presenting with agitation, flooding his cell, and yelling loudly. He was placed on suicide precaution with one-to-one observation. The following day, he was evaluated and released to his cell and was returned to stage 1.

The patient went out to court on 10/22/13 and returned on 10/25/13. Progress notes indicated that he was placed on orientation/cuff status upon return and could not attend solo yard until the ICC cleared him. He was released from orientation/cuff status at the ICC on 10/30/13 and was

returned to stage 2.  He again went out to court on 11/27/13 and the medical record indicated that he returned on 12/4/13.  A progress note indicated that the ICC saw him on 12/9/13 when he was removed from cuff status and returned to stage 3.

**Findings:**  Cell-front contacts appeared to be the default means of clinical contact for this patient.  The treatment plan indicated that "during cell fronts pt continues to be selectively guarded depending on the topic being discussed and his mood."  Treatment planning was repetitive with each treatment plan essentially stating the same thing.  The treatment plan did not specifically address the patient's refusal to program out of cell.  There was a lack of documentation of out-of-cell therapeutic interventions.

It was illogical that this patient went to court twice for only three to seven days and upon return to SVPP was again placed on orientation/cuff status with no programming until ICC clearance five days later.

**10.  Patient J**
Brief History:  This patient was admitted to SVPP on 11/21/13 from the CMF MHCB.  His medical record was reviewed due to his cuff status at the time of the monitoring visit.  He was provided with a diagnosis of Mood Disorder NOS.  He was prescribed Trileptal and Vistaril as needed, but had been refusing medications and they were discontinued at the time of arrival.  He had a significant history of cutting himself; most recently he had cut his thighs with a razor, requiring 91 sutures to repair, two months prior to his SVPP transfer.  A 72-hour treatment plan was completed, but subsequent treatment planning was not documented.

A cuff status note dated 11/22/13 indicated that the patient was on cuff status awaiting ICC clearance.  The UCC met on the same date and cleared him to program.  A cuff status release note dated 11/27/13 indicated that he was released from cuff status on that date, with inclusion in stage 1 groups and solo dayroom.

A nursing weekly progress note dated 12/5/13 indicated that the patient had been refusing all medications and had not been attending groups.  An IDTT was completed on 12/6/13 and a progress note documented his reluctance to participate in programming.  A treatment plan was not located in the medical record.  The patient was continued at stage 1.

On 12/8/13, a behavior note stated that the patient was going to hurt someone and he was placed on cuff status.  A subsequent MTA note indicated the patient's concern that he would harm someone and thus add time to his prison sentence.  He thus did not wish to leave his cell for dining, but the MTA explained that dining room attendance was part of his treatment.  The patient was placed on cuff status at that time.  A note two days later indicated that he was removed from cuff status as he met release criteria.

**Findings:**  There was a lack of documentation that the patient received adequate treatment while at SVPP.  There also was no documentation of completion of the 10-day IDTT meeting; therefore, treatment planning had not been completed.  However, there was documentation of cuff status placement, the rationale for the placement, and the criteria for release.

**11. Patient K**

Brief History:  This patient was admitted to SVPP on 12/5/13 from the CSP/Sac MHCB.  His medical record was reviewed as he was on cuff status at the time of the visit.  He was provided with a diagnosis of Schizoaffective Disorder, bipolar type, and Polysubstance Dependence.  He had a significant history of suicidal ideation, mood instability with grandiosity, and self-injurious behavior.  His brother had recently died and he had recently received a life sentence.  He was treated with Risperdal.

A progress note dated 12/5/13 indicated that the patient was placed on cuff status as a new arrival.  There was documentation of completion of the 72-hour treatment plan, but little medical record documentation of the patient's involvement in therapeutic activity.  A progress note dated 12/10/13 indicated that a 10-day IDTT meeting occurred, but there was no documentation of treatment plan completion.  It did not appear that the ICC had occurred, as it was not due as of the time of the monitoring visit.

**Findings:**  The medical record did not contain the treatment plan.  There was also a lack of documentation of the patient's involvement in therapeutic activity during his SVPP stay.

**12. Patient L**

Brief History:  This patient's medical record was reviewed for follow-up during December 2013 due to incomplete cuff status documentation during the previous site visit.  At the time of the previous review, no reason was provided for cuff status placement.  There also was no documentation of required intervention measures, release criteria, or referral to the psychologist supervisor for behavioral planning to address issues after the tenth day of cuff status.

At the time of this review, the patient, who was admitted on 2/7/13, was housed in C5 and was reported by staff not to be on cuff status.  He was reportedly on maximum custody status, although at other times he was noted to be at medium custody level A.  He was provided with a diagnosis of Schizoaffective Disorder and was primarily treated with Zyprexa.

A nursing discharge summary dated 12/9/13 was located in the medical record; the patient apparently left SVPP for court at that time.  It noted a history of a suicide attempt and assaultive behavior and indicated that he had been exhibiting signs of decompensation for the past two to three months.  The patient did not attend yard, showered only sporadically, and had poor group attendance.  He exhibited bizarre delusions and communicated through gibberish speech.  He also exhibited grandiose and paranoid delusions.  Treatment expectations were to stabilize his thoughts and to connect him more with reality, improve his ability to interact with others based on a more concrete connection with reality, and participate in his treatment programs.  It was also noted that he believed that he was related to royalty and spoke to God.  He continued to refuse psychiatric medications.

The ICC saw the patient and cleared him for a single cell and programming, but it was unclear when this occurred.  The patient refused to attend groups or solo dayroom.

Documentation indicated that the patient had a court hearing for administration of medication over objection on 12/5/13, but the precise outcome was unclear.  The note documented his maximum custody status and his suicidal, self-abusive, and assaultive history.

A 11/12/13 psychology contact was made in connection with an IDTT meeting.  The patient refused to attend the IDTT and was seen at cell front.  He spoke in a language that included a mixture of Spanish and English.  He also spoke with a Spanish-speaking MTA and denied all mental health concerns.  At that time, the diagnosis of Schizophrenia was provided.  Additional psychology notes dated 2/8/13, 3/11/13, 4/9/13, 4/30/13, 5/23/13, 6/25/13, and 8/20/13 were in the record.  Many of the notes were in connection with an IDTT and indicated that the patient was seen at cell front.

A recreation therapy note on 9/17/13 indicated that a goal was for the patient to actively participate in 60 percent of his groups, but noted that he had not attended any treatment groups in the last 30 days.  The writer indicated that he had checked in with the patient at cell front, but the patient was uninterested.  Various similar notes were present from prior months.

The only social work note in the medical record at the time of review was dated 2/19/13.  Treatment recommendations included building rapport through frequent cell-front contacts, but there was no medical record documentation at the time of review that this had occurred.

This reviewer spoke with the SVPP staff member responsible for organizing information and documentation regarding patients' cuff status.  This staff person reported that review of an Excel spreadsheet indicated that the patient was housed on C-yard; he was admitted in February 2013 and cuff status was discontinued around 3/11/13.  At the time of the December 2013 visit, the patient was not on cuff status.  It was also noted that he had left for court and upon return, refused to program.  This staff member also maintained a binder that assembled documentation concerning patients' cuff status; the binder contained no documentation as to this patient at that time.

**Findings:**  Documentation regarding the patient's cuff status was unclear and at times contradictory, but he was not on cuff status at the time of the monitoring visit.  Also unclear was the status of staff efforts to obtain a medication over objection order, although it appeared that this was eventually completed.  Two medical record references indicated that the patient was on medium custody status and one indicated that he was on maximum custody status; it was not clear whether his status had changed.  One note documented that the patient had returned to cuff status following return from court.

Treatment plans contained only minimal focus on efforts to engage the patient in hospital-level treatment.  The medical record did not reflect the plan for frequent cell-front contacts to build rapport with the patient.

### 13.  Patient M
Brief History:  This patient's medical record was reviewed for follow-up during December 2013 due to incomplete documentation as to cuff status during the previous site visit.  At the time of the previous review, no reason was provided for cuff status placement.  There also was no

documentation of required intervention measures, release criteria, or referral to the psychologist supervisor for behavioral planning to address issues after the tenth day of cuff status.

At the time of the instant review, the patient was housed in C5 and staff reported that he was not on cuff status. The patient was admitted to SVPP on 6/19/13. He was provided with diagnoses of Psychotic Disorder NOS and Antisocial Personality Disorder. An alternative diagnosis of Schizophrenia was also present in the medical record. The patient was primarily treated with olanzapine.

Medical record review indicated that the patient had a PC2602 hearing on 10/17/13. The petition indicated that he was hostile and highly agitated when approached by staff. He had refused psychotropic medications since his arrival at the hospital on 6/19/13. He stated that he would never leave his cell. He reportedly had progressive worsening to the extent that on 10/3/13, he threatened to gas staff and was placed on cuff status for his aggressive and threatening behavior. Emergency medications were initiated at that time.

The most recent treatment plan was dated 11/12/13. It repeated information contained in the referral of 5/13/13 indicating the patient was irritable, hostile, and paranoid, with response to internal stimuli, poor impulse control, and isolation. He had an extensive history of violence and treatment non-adherence.

The plan indicated that the patient was assessed with low assault and low suicide risk. An ICC on 6/26/13 determined that he could have a cellmate. He declined to attend the IDTT meeting and the team saw him at cell front. At that time, he had refused all medical, psychiatric, and out-of-cell self-care activities such as showering, shaving, and cell-front interactions with staff. He reportedly had not showered out of cell in the past month, but was taking his medications due to a PC2602 order. He reportedly shouted vulgarities at staff and talked with a peer through the vents. The IDTT also documented that he spoke with custody and MTA staff appropriately until he was denied a request. He remained in cell refusing to exit except under direct order from CDCR officers. No vital signs or weights had been performed since his arrival. He continued to refuse all programming in any form.

IDTT documentation indicated that the patient had achieved two of his three treatment goals. It noted that on 8/20/13 he achieved the goal of decreasing delusional outbursts. On the same date, he was noted to also have achieved the goal of addressing the behavior of screaming or threatening clinical staff by using the replacement behavior of expressing emotions in writing, and discussing feelings with non-clinical staff. At that time, the goal was to increase positive cell-front interactions with clinical staff. The third problem noted was his treatment resistance with the goal of increasing out-of-cell time up to five minutes per week. The update of 11/12/13 indicated that this goal was discontinued due to the patient's intractable resistance to treatment.

Psychiatric and psychology progress notes were consistent with other documentation indicating that the patient refused out-of-cell contacts. Nursing progress notes documented his stage 1 solo programming status, his treatment resistance, and medication adherence. At the time of review, the medical record contained no social work notes after June 2013.

299

This case was discussed with the staff member responsible for tracking and organizing documentation regarding cuff status. This staff member's review of an Excel spreadsheet and binder used for this purpose indicated that the MTA supervisor placed the patient on cuff status on 9/28/13 for threatening behavior; when the MTA spoke to the patient at cell front, he became agitated and denied that he was threatening. The patient was unreceptive to verbal redirection or prompts. Release criteria included no aggressive or threatening patient behavior toward staff for 72 hours and staff conducting an IDTT meeting to address such behavior. The medical record did not contain a release note.

**Findings:** This patient was very difficult to engage and to treat, and there was no clear or sustained plan to do so. There was a 9/5/13 psychology note that described an attempt to engage the patient by showing his pictures to generate discussion, but this appeared to be an isolated incident.

The patient was placed on cuff status on 9/28/13 following a number of instances of aggressive behavior that occurred on 9/21/13. A note dated 10/3/13 indicated that he had threatened an MTA. A "mini" treatment team meeting was held on 10/1/13 to discuss his cuff status. At that time it was noted that he met the criteria for cuff status release as he had 72 hours without showing aggressive or threatening behavior toward staff. It was noted that the team recommended stage 1 programming and the MTA agreed. This implied that he was to be released from cuff status. A note later that same day indicated that the patient had been verbally abusive and was placed at stage 1 solo programming. It was not clear whether this was related to a new incident or was a recitation of the previous behavior. A 10/15/13 senior MTA note stated that the patient was released from cuff status, but it was unclear whether he had remained on cuff status since 10/1/13 until that time.

## 14. Patient N

Brief History: This patient's medical record was reviewed for follow-up due to incomplete documentation regarding cuff status during the previous site visit. At the time of the previous review, no reason was provided for cuff status placement; there also was no documentation of required intervention measures, release criteria, or referral to the psychologist supervisor for behavioral planning to address issues after the tenth day of cuff status.

At the time of the instant review, the patient was housed in TC 1. He reportedly was not on cuff status at the time of the monitoring visit. He had been admitted to SVPP on 5/15/13. He was provided with diagnoses of Schizoaffective Disorder, bipolar type, and Polysubstance Dependence in remission. He was prescribed Seroquel, Abilify, and Depakote. His history included symptoms of paranoia, auditory hallucinations, and mood instability. At times he refused to take medications and his disciplinary history included a 2009 charge of aggravated battery by gassing.

A 5/5/13 psychiatry admission note documented an extensive history of mental illness, including symptoms of impulsivity and assaultive behavior, paranoia, auditory hallucinations, mood instability, loose and disorganized thinking, poor hygiene and grooming, and a history of sexual and physical abuse. Prior to admission, the patient had refused medications and had not been

300

attending weekly groups. Expected treatment outcomes for his hospitalization included medication adherence, reduced paranoia and hallucinations, and mood stabilization.

At the time of review, the most recent social work note was dated 6/20/13, but, as noted above, the patient had reportedly refused social worker contacts. The note indicated that he was placed on cuff status by the senior MTA due to threats toward staff and was transferring to TC1 due to enemy concerns. It was noted that his new treatment team would need to discuss his stage level. The note also indicated that he needed a social work assessment, which was not located in the medical record.

A 9/9/13 progress note by a supervisor noted that the patient had an episode of aggressive behavior during feeding through the food port and would remain on cuff status for a minimum of 72 hours until it was determined that he no longer posed a threat. The treatment team was notified. A 9/12/13 social work note indicated that the clinical team had conducted cuff status review. The team agreed that the patient would remain on cuff status as long as psychotic symptoms continued to manifest with aggressiveness in any form as outlined in the SVPP cuff status policy.

A 9/12/13 progress note by a supervisor contained a cuff status update which indicated that the patient was aggressive with staff. He did not want to remain at SVPP and believed that staff was his enemy. He reportedly exhibited delusional thinking. His medication was adjusted and the plan was for him to be evaluated by the IDTT. A 9/25/13 note indicated that he was reviewed by the treatment team, which decided to remove him from cuff status and moved him to stage 1 solo yard with one-to-one activities with a clinician present.

A 9/17/13 psychology note quoted the patient as stating "I just want to be out of cuff status." The patient then pushed his food tray stating that he was not hungry. The plan was to place him on cuff status. A 9/23/13 note from the psychologist indicated that the clinical team reviewed the patient's progress and placed him in solo programming with one-to-one clinical and solo yard and day room. A 10/22/13 psychology note indicated that he attended his 150-day IDTT meeting when he reported visual hallucinations and hearing voices coming through the vent. The treatment plan indicated that he would be moved to stage 1, solo with groups.

The most recent treatment plan included in the medical record was dated 11/19/13. That plan indicated that the patient displayed regression in his ability to self-manage feelings of paranoia. He attempted to grab an MTA while exchanging his food tray and had continued auditory and visual hallucinations. At the time of that IDTT meeting, the patient requested his "next stage" and was advanced. He refused individual or cell-front contacts with his social worker. He also heard voices of other people and reported being able to see his sister burning as well as smelling her burning flesh. The treatment plan objective was for the patient to identify three to four skills for coping with the hallucinations, but this was not accomplished. Treatment interventions included the following: the patient "will address issue individually trough [sic] reality orientation" and medication management. It then noted "no associated courses." No plan was outlined to meet the goals or to change them in light of the lack of progress.

301

A 12/3/13 note indicated that the patient wanted to be discharged and advanced to stage 3. The note also indicated that he enjoyed working on his art.

**Findings:** This patient showed some improvement in functioning more recently, indicating some benefit from treatment. The period of time on cuff status was difficult to follow and at least one progress note reflected that a minimum of 72-hours of cuff status was required without regard to behavior. This issue was discussed with staff and it was indicated that this was a common staff misconception, although training regarding this issue had been provided.

There was no evidence of referral for psychology assessment following ten days of cuff status. Criteria for cuff status release were also unclear.

### 15. Patient O

Brief History: This patient's medical record was reviewed for follow-up due to incomplete documentation as to cuff status during the previous site visit. At the time of the previous review, no reason was provided for cuff status placement and there was no documentation of required intervention measures, release criteria, or referral to the psychologist supervisor for behavioral planning to address issues after the tenth day of cuff status. There also was no subsequent documentation by the psychiatrist, psychologist, or social worker to support that the required evaluation of stability had occurred as part of the overall cuff status procedure.

At the time of the monitoring visit, the patient was housed in C5 and was reportedly not on cuff status. The medical record indicated that he was receiving psychotropic medications by court order that would expire on 2/24/14. He was provided with diagnoses of Bipolar Disorder NOS and Personality Disorder NOS. He was prescribed olanzapine. Progress notes indicated that he was often "claiming distress by claiming suicidal ideation." At the time of SVPP admission, he had over four crisis bed admissions during the preceding six months.

A 6/4/13 progress note indicated that the patient was bored sitting in his cell all day due to his cuff status. He requested reading materials. A psychology assessment on 6/4/13 indicated that his suicidal ideations were related to efforts to relieve boredom. A 6/6/13 IDTT psychology progress note indicated that he presented in cuffs and was awaiting ICC clearance. The patient was guarded during the interview and refused to answer several questions.

A 10/8/13 psychiatry note reported that the patient stated that he was not depressed and wanted to return to his cell. He was placed in the observation room on the day prior after reporting suicidal ideation. The psychiatrist discontinued one-to-one observation. A 10/23/13 psychiatry note indicated that he wanted to be discharged. A social work note on the same date written in connection with the IDTT indicated that he was placed on a self-imposed temporary suspension of program on three occasions due to suicidal ideation and thoughts of self-harm. The note indicated that he continued to actively participate in treatment activities and was medication compliant.

An 11/20/13 psychiatry note indicated that the patient was fairly stable on medications. An 11/20/13 IDTT note indicated no changes in his program or level. He remained at stage 3. A nursing weekly progress note nine days later reported that he had attended groups and was

described as being "happy" during activities. A 12/2/13 progress note documented that an MTA reported that he stated that he was "stressing out" and wanted to talk to the nurse. The patient was seen at cell front and offered a prn medication.

**Findings:** This patient was not on cuff status at the time of review and did not appear to have returned to that status during the review period. He had progressed to stage 3 programming. Treatment documentation was relatively sparse. A note during October 2013 indicated that he had been placed on self-imposed temporary suspension of programming multiple times related to suicidal ideation and thoughts of self-harm. However, there was a lack of documentation that other, more active, clinical interventions had been pursued.

## 16. Patient P

Brief History: This patient was admitted to SVPP on 1/23/13 and was seen by the ICC on 1/29/13. According to the cuff status log, he was placed on cuff status on 4/17/13 for threatening behavior; at the time of review, he had been on cuff status for 293 days. He was provided with diagnoses of Schizophrenia, paranoid type, Polysubstance Dependence in a controlled environment, and Antisocial Personality Disorder. He received psychotropic medications by court order due to danger to self and to others. He was prescribed Clozapine, Zyprexa (Zydis), and Depakote ER. He had a history of assaultive behavior and medical record documentation noted recent assaults.

Volume one of the patient's medical record was reviewed, but no documentation as to the initial cuff status placement was located. The patient was not seen timely by the treatment team. The treatment plan most contemporaneous to his cuff status placement was dated 7/18/13. It noted that he was reclusive with a messy cell and remained on modified program with poor group and individual attendance due to residual psychosis and continued to exhibit negative symptoms. He was described as acutely psychotic and "in the midst of an acute paranoid schizophrenic decompensation." His cuff status was not identified as a treatment target and the underlying behaviors were not appropriately specified. The criteria for cuff status release also were not identified in the treatment plan.

The subsequent treatment plan dated 8/13/13 was not modified as the patient failed to improve. However, he was described as cooperative, less anxious with blood draws (a high risk situation for assault), and more tolerant with waist restraints and the presence of two MTAs during clinical and recreation therapy sessions. Although these indicators suggested that he might be a candidate for removal from cuff status, no behavioral plan was included in the treatment plan, despite the extended cuff status placement.

The treatment plan on 9/12/13 noted that the cuff status committee had reviewed the patient. No such committee was otherwise mentioned, but it was the treatment team's role to review cuff status. Staff reported that the patient had not exhibited behavior that required further cuffing, and the IDTT "explored" with him his "readiness and willingness" to attend treatment activities uncuffed. The treatment plan again did not include behavioral interventions to reinforce his treatment engagement and uncuffed participation. This specific section of the treatment plan (106 assaultive behavior) was also not modified to reflect the patient's progress toward this goal. Subsequent treatment plans were also not modified. The most recent treatment plan dated

1/28/14 was extremely brief and did not adequately address the patient's continued isolation, treatment resistance/reluctance, paranoia, concerns regarding problems with peers, and concerns about attending activities uncuffed.

**Findings:**  This patient was not adequately treated and was inappropriately maintained on cuff status without clinical rationale for continuation.  His initial cuff status placement did not meet policy guidelines and his continued maintenance on cuff status was also inconsistent with policy guidelines.  When the patient was acutely psychotic, his treatment was reduced rather than increased to minimize decompensation.  No behavioral plan was implemented as indicated by cuff status policy; such a plan was clinically indicated for the patient due to his symptoms and behavior.  The treatment plans were inadequate and did not appropriately specify treatment goals and objectives and did not include adequate clinical interventions.

## 17.  Patient Q

Brief History:  This patient had been placed in seclusion/timeout multiple times throughout December 2013 and January 2014.  He was admitted to SVPP on 11/14/13, due to "para-suicidal behavior, episodes of mania, hypomania, and depression.  Post traumatic head injury and stress." He was medication non-adherent and had a high risk for suicide with a history of self-injurious behavior.  He had three suicide attempts during January, March, and May 2013; all were considered lethal attempts.  He was provided with diagnoses of Bipolar I Disorder, most recent episode manic, Polysubstance Dependence in a controlled environment, and Antisocial Personality Disorder.  He also had a seizure disorder and wore a safety helmet.

The patient exclusively spoke Spanish and staff utilized an interpreter during at least one treatment team meeting on 11/21/13.  The most recent treatment plan on 1/15/14 did not include descriptions of treatment target behaviors that were well-operationalized.  Treatment goals required increased specification, target dates were non-specific, and replacement behaviors and coping skills were poorly defined.

The monthly seclusion log indicated that the patient had multiple timeout requests and placements; medical record documentation indicated that he had been placed on suicide watch due to staff reports that he was suicidal.  Based upon the documentation, it appeared that staff believed that he used suicidality and self-injury to manipulate them and his housing; they thus believed his suicidality statements to be false.  Medical record documentation and seclusion log information were inconsistent as to the reasons for and type of placement.  The patient was repeatedly placed on suicide watch during December 2013 and January 2014, but the treatment plan did not adequately address this issue.

**Findings:**  This patient was not adequately treated.  Medical record and facility logs were inconsistent.  The medical record was unclear regarding whether he was placed on suicide watch, seclusion, or timeout.  The patient had a significant history of suicide attempts that should have been a primary focus of treatment and adequately addressed in the treatment plan.  The treatment plan included goals and objectives that were overly broad and vague and interventions that did not adequately address the patient's treatment needs.

EXHIBIT J
Vacaville Psychiatric Program (VPP)

**1.  Patient A**

Brief History:  This case was reviewed as the patient remained at step 1, solo programming with wrist mechanical restraints (cuffs) at the time of the October 2013 site visit.  He was admitted to VPP on 10/2/13 and was immediately placed on suicide precaution.  At the time of his 72-hour treatment team conference, it was noted that he had been admitted from an MHCB due to suicidal ideation and grave disability.  The patient had intended to cut and/or starve himself and was experiencing paranoid persecutory delusions that his food was poisoned.  He had refused food and lost ten pounds during his first week in the MHCB.  He also had refused to shower and smeared feces on himself.  Involuntary medications were initiated and he showed some improvement in mood and suicidal ideation, but continued to exhibit withdrawn behavior with paranoia.

The patient's mental health history included prior psychiatric hospitalizations.  According to the medical record, he had no recent history of aggressive or disciplinary problems while incarcerated.  However, his commitment offenses were violent and included murder and assault with a deadly weapon.  He had hearing and sight impairment, as well as mobility impairment requiring a chrono to allow him access to an elevator while housed at CMF.

The patient was provided with a diagnosis of Schizoaffective Disorder, depressed type.  He was prescribed Cymbalta, Risperdal Consta, Vistaril, and intramuscular medications in the event of medication refusal.  IDNs indicated that he remained primarily in his bed, resulting in the development of pressure sores on both hips.  At the time of admission, he had a pressure sore on only one hip, but by the ninth day following admission he had also developed a wound on the other hip due to inactivity.  Staff reported he was not cooperative to prompts to change positions.

In the V-Risk assessment documentation completed by the psychologist, the patient was described as fearful of his environment due to his vision and auditory and mobility impairments.  Despite his limitations, his acute and chronic risks of violence were assessed as moderate.  Based on the medical record, it appeared that he remained at step 1 primarily because of the lack of opportunity to progress to step 2.

This patient's treatment plan did not include specific interventions designed to address his social withdrawal and isolation; the plan merely described "encouraging" more activity.  No specific therapeutic and/or behavioral interventions, including a functional assessment, were included in the treatment plan.

**Findings:**  This patient's step level did not appear to be supported by documentation in the medical record.  His lack of engagement in unit activities appeared in large part due to a lack of opportunity and inadequate treatment.  The treatment plan did not adequately address his primary symptomatology of severe social withdrawal and vegetative symptoms.  He should have been seen by the treatment team with referral to the PBST if assistance was needed in developing an adequate treatment plan.

**2.  Patient B**

Brief History:  This patient remained at step 1 with ankle restraints since his admission to VPP on 11/19/12.  He was provided with a diagnosis of Schizophrenia, paranoid type.  He received

his psychotropic medications by court order and was prescribed Seroquel, Thorazine, and Cogentin, with intramuscular medications ordered in the event of medication refusal.

The medical record indicated that he was scheduled for 7.2 hours and received 5.4 hours of therapy during August 2013.  However, a review of actual therapy hours indicated that the totals were primarily based on "book/magazine exchange" activity with some time allotted for psychological assessment and community games.

The most recent treatment plan dated 10/14/13 noted the patient's chronic history of psychiatric hospitalizations that included command auditory hallucinations to harm himself.  He also had a history of harming others, including correctional officers, resulting in multiple RVRs; it appeared that the most recent RVR occurred on 1/2/12 for battery on a peace officer.  He was deemed to be too dangerous to treat in the state hospital and was transferred to CDCR in 2003 on PC7301 status.  He also had a history of IEX.  He was placed in a spit mask routinely by CSP/Sac, his referring institution, and had a history of throwing bodily fluids at staff and keeping a cup of urine by his door.  His assault history included unpredictable and explosive assaults on staff.  His commitment offense included an attack on family members with an axe.  One section of the treatment plan indicated that he was not present and could not have his mental status assessed, but another section stated that he had attended and was dressed in his prison attire.  His diagnosis was modified to include Antisocial Personality Disorder without justification or substantiation.

Psychiatric documentation indicated that nursing staff questioned whether he was actually taking his medications or was flushing them down the toilet.  Nursing staff reported to the treating psychiatrist that they preferred that medications be prescribed and administered in whole pill form rather than "crush and float" so the patient could inspect the pills; it was also easier for staff to track whole pills.  The patient was reportedly turning his head away from nursing staff during medication administration.  It was unclear why he was not removed from the cell or why the cell door was not opened for pill pass to allow proper directly observed therapy and to ensure that medications were taken.

On 7/6/10, the patient was physically subdued by staff for failing to follow staff directions, and his visit was canceled due to "lack of psychiatric stability and unpredictable behavior."  On 8/25/13, he was removed from his cell during a cell extraction due to his refusal to take prescribed medications or to leave his cell for his backup medication injections.  The extraction occurred "without incident," suggesting no violence on the patient's part.  A psychology note from the treatment team meeting on 10/16/13 stated "IP remains @ solo w/cuffs due to the extensive hx of violence that is unpredictable, unprovoked, + spontaneous, even during times of [psychiatric] stability."  The writer further stated that the violent behavior was believed to persist as "supported by spontaneous yelling in his cell, cursing @ staff, + agitated affect between periods of presenting as pleasant."

The plan was to discharge the patient, who had been in acute care for 330 days, as of 10/21/13 to the EOP level of care rather than to ICF.  It was unclear how acute care clinical staff concluded that he would function at an EOP level of care if he was "not ready" for ICF level of care.  It also was unclear why the PBST was not consulted for this patient.

**Findings:** There were many areas of concern regarding this patient's care. Medication administration was problematic, and team members did not agree on the best method of administration for this patient who they suspected of diverting his medications. Given the severity of his symptoms, it did not appear that he received care beyond medication management, making the issue of appropriate medication administration very important. Therapy hours were insufficient and were heavily reliant upon book and magazine pass activities.

The patient was maintained at step 1. Although his history of unprovoked aggression was of concern, he had not exhibited such behaviors in more than one year. The patient would possibly benefit from PBST consultation and based on medical record review, this treatment modality was not considered. His diagnosis was also modified to include Antisocial Personality Disorder without any justification or explanation. The patient was not receiving adequate treatment and had very restricted programming with lack of yard access.

## 3. Patient C

Brief History: This case was reviewed as the patient was identified at step 1 status. He had been admitted on 10/17/13 for continued depression, psychosis, and suicidal ideation. He was referred from the SQ reception center where he reported increased suicidal thoughts and depression; he scratched his wrist with his nail, but no sutures were required. He had a history of chronic suicidal ideation and self-injurious behaviors, but the attempts were believed to be less than serious (e.g., he poured hot water on his leg). Additionally, his presentation was not always consistent with his self-reported symptoms. He was discharged from a prior hospitalization at ASH after approximately two months; he was provided with diagnoses of Malingering and Major Depressive Disorder, severe, with psychotic symptoms.

The patient had been referred to ICF level of care, but was diverted to APP when he refused housing in a dormitory setting. The medical record indicated that he was scheduled for 25.2 monthly hours of treatment, but activities such as book/magazine exchange, writing skills, and open recreation comprised significant portions of this treatment. He was also enrolled in anxiety and depression groups. He only received 13.2 hours of treatment for the month of December 2013 and the reasons for missed activity were not tracked. The patient was medication non-adherent due to perceived possible side effects.

At the initial treatment team meeting on 10/18/13, staff indicated that the patient was at step 1. The 30-day treatment plan noted hallucinations as a treatment target, despite staff's documented suspicion that the patient was malingering. In fact, dishonesty was added to the problem list and added as a treatment target. However, interventions were not included for the treatment targets and treatment objectives were vague. The patient's 60-day review dated 12/16/13 noted that he was still at step 1. The rationale for continued maintenance at step 1 was not documented in the plan. According to the medical record, the patient participated in large groups and yard; therefore, for some period during December 2013, he was assigned to step 5.

On 1/8/14, a mini-treatment conference was conducted to specifically address the patient's reported dishonesty as to his suicidality. Documentation of this team meeting was comprehensive and completed psychological testing strongly supported the patient's

malingering. However, documented treatment interventions were vague. There also was no updated treatment plan to reflect a more intensive approach to address the patient's escalating suicidal threats due to his concerns about his impending discharge.

On 1/9/13, a progress note by the MTA indicated that the patient was at step 1, solo programming with cuffs. The patient agreed to take medications and was prescribed Zydis 30 mg per day.

**Findings:** This patient's medical record was very confusing as it contained contradictory information regarding his housing and step level.

The patient was inadequately treated. His diagnosis required clarification in light of documentation regarding exaggerated symptom presentation and psychological assessment results that supported malingering. Additionally, as the patient's suicidal threats and behavior escalated, the treatment plan was not modified to include more active and intensive treatment interventions to address the escalation. In fact, the treatment plan did not include specific interventions. Treatment plans also often contained contradictory information regarding the patient's step level and did not justify continued maintenance at step 1. The patient's access to treatment was limited by his step level, yet the behavior underlying continued maintenance at step 1 was not a target of treatment. Based on available documentation, it did not appear that maintaining him at step 1 for three months was justified.

## 4. Patient D

Brief History: This patient was admitted to VPP on 12/9/13 due to depression, anxiety, suicidal ideation, and several interrupted suicide attempts by hanging. At the time of review, he was programming at step 1. The patient also reported several prior episodes of overdose, one of which required psychiatric hospitalization.

The treatment plan for December 2013 included book/magazine exchange as "active treatment," but did not include other activities. Six hours of treatment were scheduled, but the patient received none. He had significant safety concerns due to stealing drugs from another inmate and believed that the Crips gang had issued a "green light" to kill him. He denied gang affiliation and suggested that he may have stolen the drugs from a Crips gang member. He had a significant history of substance use. He also previously had a restraining order issued against him (female victim), but otherwise had no violent convictions or behavior. The medical record contained contradictory information regarding his security level, alternately listing it as 1 or 2, although he appeared to be classified at a low security level. He was provided with diagnoses of Major Depressive Disorder, moderate, recurrent, with psychotic features and Opioid Dependence in a controlled environment.

The 72-hour treatment plan indicated that the patient was assessed with low acute and moderate chronic risk of suicide. Step level information was not included in this plan, despite a section in the form designated for this information.

The patient's 10-day treatment team meeting was not conducted until 12/24/13, which was 15 days following admission. During this meeting, staff reported that he exhibited increased social withdrawal. He had initially left his cell for showers, but later refused. In fact, he refused the

last four opportunities to leave his cell, expressing increased safety concerns.  The patient initially expressed fears as to other inmates and this fear progressed to fear of staff members.  He also complained of seeing ants and smoke in his cell and became upset when staff did not verify his symptoms.  The treatment plan targeted depression in a general sense without clear, appropriate interventions, as it did not target his social isolation.  The lack of treatment for his withdrawal and isolation was indeed significant as he remained at step 1 for 15 days following admission due to not attending out-of-cell activity.  It appeared that his lack of treatment participation was due to his psychiatric symptomatology.

At the 30-day treatment team meeting, progress notes described continuing decompensation, with disorganized speech and thinking, increased paranoia, and social isolation.  Despite this increase in symptoms, the treatment plan was not modified, and paranoia and social withdrawal were not incorporated as treatment targets.  The patient reported to the treatment team that he would go to solo programming, but subsequently refused all programming.  The treatment plan indicated that he requested programming solo with cuffs due to safety concerns, but other documentation regarding this request was not located in the medical record.  It appeared that the only means of engaging him in therapy was by verbal encouragement.  Progress notes repeatedly stated that he would benefit from additional treatment, but additional treatment did not occur.

On 1/9/13, the patient was brought to the MTA to have his vital signs obtained and exhibited confusion, believing he was going to be released that day.  On 1/6/14, he reported seeing a rat on his food tray.  Because he left his cell to have his vital signs checked and for other individual activities, it appeared that he might participate in individual therapy.

**Findings:**  This patient was not adequately treated.  His primary symptoms, withdrawal and paranoia, were not treatment targets despite their interference with his ability to access treatment.  He was inappropriately maintained at step 1 for behavior resulting from his mental illness.  Staff reported that he felt safer at this level, but there was a lack of documentation to support this assertion.  The patient exhibited decompensation, but his treatment plan was not modified to provide treatment to address the decompensation and increase his functional ability.  A behavioral treatment plan was indicated for him, but staff did not document consideration of such a plan or referral to the PBST.

## 5.  Patient E

Brief History:  This case was selected for review as the patient was maintained at step 1 since his VPP admission on 10/31/13.  His active treatment participation record for December 2013 documented that he was scheduled for 12 hours of monthly activity, but only received 5.4 hours.  The therapeutic activity included both clinical and non-clinical activities.  The patient had a long history of psychiatric symptoms.  He was referred to VPP due to suicidal ideation and paranoia, as he threatened to harm others before they harmed him.  He also exhibited signs of mania and psychosis with poor hygiene and bizarre behavior.

The initial (72-hour) treatment plan dated 11/1/13 noted a diagnosis of Schizophrenia, paranoid type.  It did not include information regarding medication therapy or the patient's step level.  The only treatment target identified was suicidality.  The subsequent 10-day treatment plan dated 11/8/13 continued to document the assessment of acute and chronic suicide risk as low and was

the only treatment target identified. The treatment plan also noted that he had reached step 1 and 2 on 11/1/13. He was returned to step 1 during November 2013, but the treatment plan was unclear when this occurred. The patient programmed successfully on three occasions with cuffs, but was not promoted to step 2 at that time.

At the time of the 60-day treatment team meeting on 12/24/13, the patient appeared to be functioning at a higher level, with improved thinking and insight. According to the treatment plan, he reached step 3 on 12/14/13, step 4 on 12/19/13, and step 5 on 12/20/13.

The patient was prescribed Thorazine, Abilify, Depakote ER, and Vistaril. He was returned to step 1, but there was a lack of adequate documentation to support demotion.

**Findings:** This patient did not receive appropriate mental health treatment at VPP. The treatment target was vague and not appropriately operationalized. The patient's other primary symptoms were not targeted, despite their negative impact on his access to care. His continued placement at step 1 was not properly documented in the medical record and maintenance at this initial step level interfered with his access to treatment.

## 6. Patient F

Brief History: This patient was housed in the high custody 64-bed ICF. He was provided with diagnoses of Major Depression, single episode and Antisocial Personality Disorder. He was admitted to the VPP acute care program on 11/15/13 and was discharged to the ICF program on 1/30/14. Prior to treatment at VPP, he was housed at CSP/LAC in the EOP, but was transferred to the MHCB and subsequently to the DSH APP in November 2013. He was treated with Remeron, Zyprexa, Trileptal, and Vistaril. He was also treated with morphine for chronic pain due to a gunshot wound.

The patient had a determinate SHU term with a MERD of 7/15/13 for an IEX RVR that was later suspended. He had five pending SHU RVRs from CSP/LAC (four RVRs for IEX and one RVR for sexual misconduct). He also had an extensive disciplinary history of offenses that resulted in SHU terms that had since expired.

Review of the patient's medical record revealed that he was transferred to the ICF for continued depression treatment and to help develop coping skills to deal with prison life. He had a reported history of IEX while in prison, as well as during his DSH history. Medical records indicated that he was involved in the DPS group and was medication compliant. A progress note on 2/6/14 by the social worker indicated that the ICC saw him on that date, but he was not cleared to begin unrestrained programming "due to pt's extensive and recent IEX history." He was then placed on modified programming and DPS groups. An MTA note on 2/20/14 indicated that he had been promoted to step 2 modified DPS with a radio.

A monthly nursing note on 2/27/14 reported that the patient was medication and treatment adherent. On the following day, it was noted that he requested more groups and wanted "as much treatment as possible."

311

On 3/6/14, the patient engaged in sexually inappropriate IEX behavior while on the yard. His programming was placed on hold and he returned his radio without incident. A progress note on 3/13/14 indicated that the ICC did not clear him to progress to step 1 and he continued with modified programming on DPS status.

The 10-day master treatment team conference was completed on 2/4/14. Diagnoses of Mood Disorder NOS and Antisocial Personality Disorder were provided. The treatment plan did not contain any documentation regarding his extensive IEX history (except for listing his pending IEX RVRs) or treatment interventions to address this issue. The only problem listed was depression. The PCP and 72-hour initial treatment team conference also did not include IEX issues as treatment targets.

Review of the patient's active treatment participation for February 2014 revealed that he was scheduled for 13.5 hours and participated in 13.48 hours.

**Findings:** There were significant problems with this patient's treatment planning. As IEX was a significant problem for him, it should have been listed as a treatment issue with interventions outlined.

There was appropriate laboratory testing for treatment with psychotropic medications, but a lack of adequate treatment hours for the intermediate level of care.

The patient remained on DPS and would likely remain on this status due to his extensive history and current IEX behaviors. The treatment team should have determined appropriate clinical interventions to address this persistent behavior that would result in longer incarceration and loss of privileges, and document them in the patient's treatment plan.

## 7. Patient G

Brief History: This patient was admitted to VPP on 1/15/14 due to depression, hopelessness, history of self-harm, and suicidal ideation. He was classified as Level III Close-B SNY custody and was serving a 26-year-to-life sentence with a MEPD of 3/4/36.

The patient's suicide risk was assessed as moderate short-term and high long-term with low V-Risk. He was noted to have a long reported history of self-injury with impulsivity and an occasional wish to die. He attended DPS group, but did not attend solo yard. He was often impulsive. No documentation indicated that staff considered that he exhibited signs of psychosis. He was prescribed Effexor, Vistaril, Thorazine, and as needed medications. He was provided with diagnoses of Major Depressive Episode, recurrent, and Personality Disorder, mixed borderline and narcissistic. His GAF score was assessed at 30.

During January 2014, the patient's treatment record documented 14.4 hours of scheduled therapy with nine hours, 30 minutes attended. The one clearly therapeutic activity that the treatment record noted was "emotional regulation" for a total of 45 minutes. Other activities included items such as "showers," "book exchange," and "gym." During February 2014, he participated in 18.3 of 26.7 scheduled hours; possible therapeutic time included six DPS groups and one session of "overcoming obstacles" for 75 minutes.

**Findings:** Medical record documentation did not contain consent forms for all psychotropic medications. Medication therapy appeared to be consistent with the provided diagnosis.

This patient's treatment was inadequate. He was receiving less than one daily hour of therapeutic activity and less than one daily hour of total recorded out-of-cell activities. Advancement from DPS status appeared to be unduly delayed, as the reviewer noted no indication of further IEX behavior, violence, or threats of violence since the one episode that occurred in early January 2014 on unit A-2. The patient was scheduled for ICC re-review of DPS status on 3/12/14. If automatic review occurred monthly, it was possible that his privileges would have been at least incrementally advanced in early February 2014.

## 8. Patient H

Brief History: This patient was received in CDCR on 2/06/12 and was classified as maximum Level IV with an EPRD of 5/21/15. He was transferred to the VPP HCITC from the DSH-CMF APP. He was hospitalized at PSH under PC1026, where he had assaulted staff. He was found incompetent to stand trial for the assault and was deemed too dangerous for treatment at PSH. He was remanded to CDCR for treatment on 2/06/12 and was admitted to the DSH-CMF. Eventually housed on unit Q-1, after several trials of oral medication he responded very well to long-acting injectable Invega Sustenna with "remarkable improvement," and began participating in activities. He was referred to the high-custody ICF for longer-term care.

The patient was admitted to the HCITC on 12/02/13. The ICC denied removal from DPS status, but the case was scheduled for ICC re-review on 3/13/14. The patient had an extensive history of violence with highly assaultive behavior, fecal smearing, and self-harm attempts. He received his psychotropic medications by court order due to grave disability, which expired on 4/18/14, if not renewed. Despite this history, the initial short-term suicide risk was assessed as low and the short-term V-Risk was assessed as moderate.

The patient's most recent treatment plan listed problems that included risk of violence, history of violence in DSH including chasing staff to assault them, and a significant history of thought disorder. Since his admission to the HCITC, he had no episodes of violence.

At the 90-day review on 2/25/14, the patient was provided with diagnoses of Schizoaffective Disorder, bipolar type, and Antisocial Personality Disorder. His GAF score was assessed at 36. At that time his speech was rapid and mumbling, with some tangentiality; his mood was euthymic with some lability of affect. The patient was focused on "being out of cuffs." He repeatedly asked when he would return to PSH. It was also noted that he drank large amounts of water, but his electrolytes were normal.

During January 2014, the patient was scheduled for 42.6 hours of activity and received 31.78 hours. The one specifically therapeutic activity listed was "coping skills", which he did not attend. Other activities included solo yard, cell-cleaning (75 minutes), book/magazine exchange, and non-specific DPS small group activities. During February 2014, he received 36 hours, 38 minutes of 49 scheduled hours.

The patient was prescribed Invega Sustenna 154 mg every four weeks intramuscular and Prozac.

**Findings:**  The patient remained on DPS status for a prolonged period of time, which interfered with the provision of needed therapy.  He reportedly made remarkable improvement in the APP, yet on transfer to HCITC was returned to DPS status in December 2013, and remained at this status at the time of the monitoring visit.

Apart from DPS status limiting his available treatment, the overall care provided to the patient was adequate.  He was functioning at a higher level than he had during multiple prior hospital settings, but most of this improvement appeared to have occurred in the APP.  Since his transfer to intermediate care, he had essentially been waiting to regain privileges and to increase his treatment activities, which had been the point of the transfer.  Appropriate laboratory testing was completed as was clinically indicated.

## 9.  Patient I

Brief History:  This patient was admitted to the VPP ICF on 12/30/13 as a transfer from the DSH-CMF APP.  He stated he had been in the APP for 26 weeks, and prior to that, was housed in the CSP/SAC PSU (Psychiatric Services Unit).  He became depressed in the PSU when his pet mouse died.  He then cut his wrists and was sent to an MHCB, and then to DSH.

The patient was received in CDCR on 12/26/08; he had an EPRD of 10/26/16.  He was classified as maximum custody Level IV.  He was provided with diagnoses of Schizoaffective Disorder, depressed type, and Antisocial Personality Disorder.  There were two different opinions in the current medical record regarding his suicide risk.  Initially, he was assessed with low short-term and moderate long-term suicide and V-Risks.  A more recent suicide risk assessment dated 1/09/14 rated him with moderate short-term and high long-term suicide risk.

The patient stated that he felt angry most of the time.  He appeared hostile toward staff.  He endorsed suicidal ideation and auditory hallucinations, which he stated were "my multiple personalities."  He reported that the voices sometimes told him to kill everyone.  He reported that he had 30 to 40 suicide attempts in his lifetime, but had no current suicidal plans.

In 1984, the patient was convicted of sodomy.  He had two pending IEX charges from 2013 (making him maximum custody), a SHU term for battery on a peace officer with a stated MERD of 1/19/22 (possibly a typographical error), and on 4/06/12 he threatened staff.

The initial mental status examination described the patient as somewhat disheveled and endorsing auditory hallucinations, but his speech was normal, with no disorganization of associations or delusions.  His affect and thought were considered appropriate.

He was prescribed Remeron and Zyprexa and was reportedly adherent with prescribed medications.  A serum carbamazepine (Tegretol) level was below therapeutic on 2/26/14.  An olanzapine level was normal at 35.9 ng/ml.  A signed consent form was present for Remeron (mirtazapine), Zyprexa (olanzapine), and Trilafon.

In January 2014, activity sheets documented participation in 10.8 of 12.6 scheduled hours. Three of these 12.6 hours were weekly book exchange rounds. The only specifically therapeutic activities listed were a total of three DPS groups on "coping skills" attended at 60 minutes each. In February 2014, the activity sheets documented attendance at 18.3 of 22.2 hours. Two-and-one half of these hours were for cleaning his cell; another 2.5 hours of cell cleaning was counted as non-participating. Book exchange was offered every week for a total of three hours, but the patient did not participate. He participated in solo yard twice for another 75 minutes of total credit. Based upon this information, the activities of cell cleaning, book exchange, and solo yard accounted for 9.25 of the 22.2 offered hours of programming. The only therapy groups offered during February 2014 were four sessions of coping skills group, three of which he attended.

**Findings:** This patient had a significant history of substance abuse and symptoms consistent with a severe personality disorder. However, he appeared to have received little treatment; the minimal treatment he received did not focus on these issues with the provision of appropriate group and individual therapies.

The patient's treatment was inadequate, with therapeutic groups averaging less than one weekly hour for the months of January and February 2014. Even the total scheduled activities, inflated by including cell-side book exchange at 45 minutes weekly and weekly "cell cleaning," fell far short of the ten weekly hours of structured therapeutic activity expected at a lower level of care in the PSU or EOP. The minimal treatment offered also was not individualized to the patient's needs. As this patient had a possible parole date in approximately 2.5 years, the lack of treatment for this very impaired individual after at least eight months at DSH-CMF was problematic.

### 10. Patient J

Brief History: This patient was hospitalized in the low custody VPP-ICF program. He was admitted on 1/27/14 and was clinically discharged on 3/11/14, apparently to transfer to the CHCF ICF upon bed availability. He had an EPRD of 12/06/14. He was classified as Level II, medium A. A decision was made to administratively move him after a fight with another patient at the DSH-CMF ICF program.

The patient had a total of eight MHCB admissions at WSP since March 2013, all for self-injurious behavior. He was eventually transferred from the MHCB to the DSH-CMF APP and from there to ICF unit A-2. It appeared that pending transfer to CHCF, he had been moved from A-2 to L-1 at DSH-CMF.

The patient was provided with diagnoses of probable Fetal Alcohol Syndrome, Schizoaffective Disorder, bipolar type, and Polysubstance Abuse. He was prescribed Buspar, Effexor, Abilify, and Depakote. He was assessed with low short-term and moderate long-term suicide risk. His V-Risk was assessed as high short-term and moderate long-term.

The most recent treatment plan dated 2/04/14 indicated that the patient would "continue DPS status but advance to include DPS groups." He indicated that he wanted to attend more groups and learn more about managing his problems. He also expressed his approval of transfer to the CHCF.

Laboratory testing was performed and included a mildly elevated prolactin level of 19.3 on 2/7/14 (often caused by antipsychotic medication) and a valproic acid level (Depakote) on 2/26/14 of 99.3, which was within normal limits. An initial serum ammonia level was somewhat elevated (probably caused by Depakote), but a repeat ammonia level on 2/7/14 was within the normal range. By the time of clinical discharge, the patient's medications had significantly decreased. Abilify, Thorazine, and olanzapine were discontinued, Effexor was decreased, and Depakote remained at its previous full dose.

On the 10-day master treatment plan, the patient's diagnosis was changed from Mood Disorder NOS and Substance-Induced Psychotic Disorder to Schizoaffective Disorder, bipolar type and Amphetamine Dependence. His GAF score was assessed at 38. At the 30-day treatment plan the same diagnoses, same GAF score, and even the same progress notes were repeated as in the 10-day master treatment plan.

A note dated 2/26/14 stated that the ICC again refused to remove the patient from DPS status due to the assault on another patient at the hospital, although this behavior apparently did not recur after his transfer to another unit.

The medical record included the patient's activities in his treatment plan. These activities included DPS coping skills group, DPS leisure activity group, DPS music therapy, book/magazine exchange, and in-cell study activities. From 1/27/14 to 2/3/14, only one out-of-cell treatment group was offered and received.

**Findings:** The appropriate laboratory testing was performed. The very limited therapeutic activity (one therapy group in an eight-day period between 1/27/14 and 2/3/14) was insufficient for an in-patient psychiatric program; this low level of programming would be considered grossly insufficient even for an outpatient EOP, ASU-EOP, or PSU program. The treatment plan did not contain specific interventions to address the patient's substance abuse relapse prevention and borderline personality features. Despite his very troubled prior history, the patient seemed interested in improving himself. Unfortunately, at the time of review, the provided hospital programming was inadequate for his treatment needs. Limitations associated with DPS status were the single greatest obstacle to improved treatment.

## 11. Patient K

Brief History: This patient entered CDCR on 1/08/13. He had an EPRD of 5/16/15. He had a pending SHU term and was classified as custody Level II, medium A. He was transferred to the HCITC from DSH-VPP on 9/23/13 and admitted to the acute care program in March 2013. He was provided with diagnoses of Psychotic Disorder NOS, Mood Disorder NOS, Polysubstance Dependence, and Cognitive Disorder NOS. He had several community hospital holds (reportedly none longer than 72 hours) and admissions at ASH and Napa State Hospital due to incompetence to stand trial.

At a 150-day treatment plan update on 2/26/14, the same vague diagnostic impressions from the time of admission continued without refinement to more specific diagnostic formulations. His recent medications included Cogentin, Thorazine as needed, Depakote, Zoloft, Geodon, and

Vistaril. His adherence with medications was good and he occasionally made use of prn medication.

Laboratory testing was adequate and included a serum valproic acid (Depakote) level of 72.8, which was at the therapeutic level. Geodon was chosen due to mild elevation of hemoglobin a1c and lipids, indicating risk for metabolic syndrome and diabetes; Geodon had a lower risk for worsening such problems.

The mental status examination showed evidence of a psychotic disorder, in partial remission, with some auditory hallucinations and inappropriate laughter. He also appeared grandiose and paranoid, had circumstantial speech, poverty of speech, and possible thought-blocking, as well as ideas of reference. He reported a family history of psychosis and depression. He had a substance abuse history including alcohol use since age 13, cocaine use (his drug of choice) for 10 years, LSD, methamphetamine, PCP, mushrooms, intravenous heroin, and prescription pills. His short-term risk for either suicide or violence appeared to be low and he was cooperating with treatment and apparently benefitting from it.

During October 2013, the patient was on DPS status for at least part of the month and participated in 17.3 of 22.4 scheduled hours of activity. During November 2013, he participated in 36.6 of 38.7 scheduled hours, which included five groups that focused on symptom management. During December 2013 (only the first two weeks were reported), he participated in 8.1 of 9.9 scheduled hours, including several symptom management groups.

In January 2014, there was a large increase in his scheduled therapy groups. He participated in 106 of 127.6 total scheduled activity hours, including symptom management, relapse prevention, and "think different" groups, anger management, and men's group, for a total of 14.5 hours spent in specific therapy groups. In February 2014, he participated in 107 of 135.4 hours, which included therapy groups on relapse prevention, symptom management, "think different," psychological testing, and men's group. At least nine hours, 45 minutes were spent in specific therapeutic groups. During March 2014, although the month was incomplete, a rehabilitation therapist progress note indicated that the patient was now at step 2 and was ready for step 3. Although the patient minimally participated in groups, he did attend. He was polite, but often seemed distracted and had trouble focusing on group discussions.

**Findings:** This patient's treatment was generally appropriate, although treatment hours were limited, in part due to the patient's erratic therapeutic group attendance.

There was a lack of diagnostic clarification after 150 days of hospitalization, but prescribed medications were appropriate for provided diagnoses. However, monthly treatment plan updates included diagnoses, interventions, and even specific comments that were all repeated without any change from the prior month, making it difficult to determine whether there was an actual ongoing reassessment of diagnosis, degree of progress, and/or changes in interventions when clinically indicated.

The patient appeared to be improving, substantially increasing his participation in treatment and other activities beginning in January 2014. Although he continued to show some signs of a

thought disorder, his behavior was in much better control than it had been during prior hospitalizations.

## 12. Patient L

Brief History:  This patient was received in the CDCR on 6/12/02 with a term of 30-years-to-life. His custody status was Level II, medium A.  He had been housed at CMC and was admitted to an MHCB for two months.  Subsequently, he was hospitalized at the DSH-CMF APP for three months and then transferred to the HCITC on 10/28/13.  He was provided with the following diagnoses at the time of admission: Schizophrenia, chronic, paranoid type, and Antisocial Personality Disorder.  He also had medical diagnoses of Wolff-Parkinson-White syndrome and dyslipidemia.

The medical record included alerts for suicidal behavior by cutting, overdose, or hanging, for self-injury, assaultiveness toward both peers and staff, manufacturing pruno (inmate-manufactured alcohol), covering his window, head-banging, pill-hoarding, head-butting, fire setting, flooding, and cheeking medications.  At the time of review, he was prescribed clozapine, insulin, warfarin, and blood pressure medications.  He reportedly had two significant suicide attempts, by attempted hanging and by jumping from an upper tier.  He had longstanding substance abuse problems.  He stated that his auditory hallucinations began during his teens after he began using PCP and cocaine, possibly prior to his substance abuse.

During November 2013, the patient attended 24.66 of 29 scheduled hours, including three hours of a therapeutic group entitled "symptom management."  During December 2013, he attended 18.6 of 20.4 hours of scheduled activity, including 3.75 hours of participation in the symptom management group.  In January 2014, there was a substantial increase in both scheduled and attended activity and he attended 74.5 of 101.6 scheduled hours.  This included 4.5 hours attending the symptom management group, 1.25 hours attending the relapse prevention group, 1.5 hours attending the lifer's group, and three hours attending the "think different" group; this totaled 10.25 hours of attendance at structured therapy groups, which was more than 2.5 times his maximum prior participation.

**Findings:**  This patient's treatment appeared adequate.  Although his treatment activities were still below the expectations for a longer-term inpatient program, he demonstrated progressive improvement in participation, without episodes of self-injury and aggression toward other patients or staff; all of this had been problems in other treatment settings.

EXHIBIT K
California Health Care Facility (CHCF)

## 1. Patient A

Brief History:  This patient arrived at the CHCF on 10/10/13, following referral due to anxiety, agitation, paranoia, and delusions.   He was also classified as DD1.  The initial treatment plan located in his medical record was dated 10/5/13 and was his 60-day review.  As the medical record contained other documents from the date of admission, it did not appear that the chart had been thinned (i.e., had documents removed from admission date to a specific more recent date to minimize the bulk of the record).  The patient reported continued hallucinations and blurred vision during that team meeting, although his mood was described as euthymic.  He had advanced to stage 2 and requested advancement to stage 3, but staff denied the request and retained him at stage 2.  The rationale for denial of stage advancement was unclear from medical record documentation.

The patient had multiple well-documented suicide attempts, but only acknowledged one attempt that occurred in 1990.  He also had engaged in self-injurious behavior for the last two to three years to cope with feelings of depression and guilt and to cope with auditory and visual hallucinations.  The hallucinations were derogatory in nature.  The patient had a history of aggressive and violent behaviors when not taking psychiatric medications.  He also had previous involuntary medication orders and court-ordered (Vitek) inpatient care hospitalizations.  There was no documentation that he had exhibited aggressive behavior since his arrival at the CHCF. He was provided with diagnoses of Schizophrenia, paranoid type and Borderline Intellectual Functioning.

The patient was prescribed Haldol Decanoate 300 mg intramuscular every four weeks, Zyprexa, and Cogentin.  The treatment plan indicated that he was enrolled in symptom management, anger management, thinking for a change, and co-occurring disorders groups.  The plan noted that he had been participating in groups, but not the degree or frequency of participation.  According to the treatment plan, the patient had to be redirected because he had been observed responding to internal stimuli during the group session.  He typically only interacted with the facilitator and was withdrawn and self-conscious with peers.  In the actual goal and intervention section of the treatment plan document, where specific groups were linked to specific treatment goals, no treatment groups were listed.  Medication non-adherence was listed as a treatment goal three times even though psychiatric notes did not include this as a treatment issue.

The next treatment plan, dated 1/8/14, modified treatment target goals, but treatment groups continued not to be included in the intervention section.  It was unclear why medication adherence remained as a treatment goal when it was documented that the patient had been medication adherent since his arrival.  Referral documentation also indicated he was medication adherent at PBST.

Treatment goals, objectives, and interventions were confused and mislabeled.  The treatment plan included items in the intervention section that were actually treatment goals (e.g., attend one meal in the dining hall per day; interact with other patients during groups).  Specific interventions would not facilitate meeting those treatment goals; for example, integrated treatment for co-occurring disorders was a treatment for people with substance use disorders and mental illness.  This patient had not been provided with a diagnosis of a substance use disorder; therefore this group was not indicated for him.  This group would not address his withdrawal and

self-consciousness with peers except in the most broad and vague sense and could serve to further alienate him since he would not share some of their same issues.  To meet the goal of reducing the patient's response to his auditory hallucinations, the treatment team cited the same group, integrated treatment for co-occurring disorders, in the treatment plan.  This did not appear to be an appropriate or adequate group treatment for the treatment target.  Later in the treatment plan, the patient's use of drugs and associated anger was briefly referenced and used as justification for enrollment in co-occurring group treatment.  If this issue was of such importance, the patient should have been provided with a substance abuse related diagnosis; however, according to his social history, the patient had been sober since 1988.

The patient received an adequate admission psychiatric evaluation.  There was a social history evaluation completed by the social worker on 12/3/13, nearly two months following admission to the CHCF.  The patient had four prior DSH commitments, all at SVPP.  The suicide risk assessment contained contradictory information (e.g., "strong religious belief as a protective factor while at the same time the patient was experiencing strong persecutory religious delusions;" social support "his mother…children" while noting that he had not spoken to either "in a while.").

The patient eventually was promoted to stage 3 on 1/14/14.  No group therapy was documented in the medical record, nor were there progress notes documenting his attendance or participation level in group therapy.

**Findings:**  The mental health care that this patient received was inadequate.  While his admission evaluations were completed timely and appropriately, the initial psychological evaluation and social history documents were not.  The suicide risk assessment contained contradictory information.  Information provided as "protective" was actually aggravating or increased the patient's risk.  Treatment plans were not completed timely, and when treatment plans were completed, they were inadequate, confusing treatment goals, objectives, and interventions.  Group therapy was not included in any of the treatment plans.  The care provided to this patient was not individualized for his specific treatment needs.

## 2.  Patient B

Brief History:  This patient received nursing and brief admission assessments at the time of admission to the CHCF on 11/1/13.  An admission psychological assessment dated 10/7/13 appeared to be erroneous as the patient did not arrive at the CHCF until 11/1/13.  Based on review of this document, it appeared more likely that the admission psychological assessment was completed on *November* 7, 2013, rather than October 7, 2013.  The patient was referred for intermediate care from the SVSP EOP due to increased paranoia, delusions, and medication non-adherence.  Referring mental health staff indicated that the referral was submitted in an attempt to reduce symptomatology, to improve the patient's overall functioning, and to increase his treatment adherence.

This was the patient's first DSH admission and he reportedly had no community inpatient psychiatric hospitalizations.  He was provided with diagnoses of Schizophrenia, paranoid type and Antisocial Personality Disorder.  He repeatedly refused psychotropic medication and no

court order was in place for medication administration. The rehabilitation therapy assessment was completed on 11/6/13, but the social history evaluation was not completed until 12/4/13. After the admission assessments, the patient was not seen by a treatment team member apart from the treatment team until 12/24/13. On that date, he was seen by the psychiatrist, psychologist, and social worker. The social worker noted "checking in" with the patient at his room to evaluate his mood; this appeared to be a non-confidential interaction, as were the majority of subsequent social work contacts. The patient reported to both the psychiatrist and psychologist significant feelings of depression, hopelessness, and despair. The psychiatrist prescribed Remeron and Thorazine. The patient took only two doses of the Remeron and five doses of the Thorazine; he subsequently reported that the medications did not work.

The initial (10-day) treatment plan in the medical record was dated 11/7/13. It did not include group treatment, even when this treatment modality was a treatment goal or objective. Treatment goals were not appropriately operationalized and interventions required greater specification. The patient was initially placed at stage 1. The subsequent treatment plan, dated 11/26/13, included a current status that was essentially repetitive with minimal updating. The patient was moved to stage 2, but his treatment plan remained unchanged.

The patient was next seen on 12/30/13 for his monthly treatment team to update the treatment plan. The current status section continued to contain repetitive information. The updated information included more of the patient's self-report during the team meeting than a true clinical summary of his current clinical status and update since the last treatment team meeting. An objective was added to the treatment plan related to his delusions and the addition of Thorazine. However, the patient quickly ceased taking the medication and his medication non-adherence was not appropriately addressed in treatment plans. Otherwise, treatment plans remained unchanged. No group therapy was documented.

**Findings:** The patient was not seen timely by the social worker for the social history assessment. Clinical contacts with the social worker occurred at cell front and were non-confidential, despite the sensitive nature of the content of the contacts. Psychiatric and psychological contacts were infrequent and inadequate. Given the patient's presenting symptomatology, treatment plans were also inadequate. This patient did not receive adequate treatment based upon available documentation.

## 3. Patient C

Brief History: This patient was admitted to the CHCF on 10/14/13 and received timely nursing and brief admission assessments. The rehabilitation therapy initial assessment was completed on 10/21/13 and the admission psychological assessment was completed on 10/22/13. The patient had a history of self-injurious behaviors, specifically swallowing objects such as razor blades, small toothbrushes, and part of a plastic spoon. These behaviors were reportedly the result of the patient's safety concerns and not due to any intent to harm himself. He was described as paranoid and reported concerns that he had been labeled a "snitch" and that correctional officers had "set him up" to be harmed by other inmates (at prior facilities).

The patient was referred to the CHCF from CMF-VPP. Although he stated that he did not consider himself to be mentally ill, he viewed his admission to a DSH facility as a method of

protecting himself while in prison.  He was provided diagnoses of Delusional Disorder, persecutory type, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, and Antisocial Personality Disorder.  He received his medications by court order.  He was prescribed Cogentin, Vistaril, Risperdal and as needed medications in the event of medication refusal.

The psychiatric notes were illegible and very difficult to read.  The patient's involvement in group therapy was documented; he had variable participation consistent with his symptoms related to paranoid delusional thinking.  He became argumentative and was difficult to redirect when perseverating on his fears regarding safety and beliefs regarding custody persecution.  Rehabilitation therapy notes were thorough with goals that were well-operationalized and the progress toward those goals was noted.

The patient engaged in rumination.  However, the treatment team did not target that behavior based on the progress notes; documentation indicated that he was simply told not to ruminate.  The first treatment plan located in the medical record on 11/7/13 was a monthly update; an initial treatment plan was not located.  It included treatment targets that were not identified as problem areas in the evaluations or treatment plan.  The treatment plan listed no specific treatment groups in the interventions section of the plan.  Treatment goals and objectives were not clearly operationalized and interventions required greater specificity and a clear connection to the treatment goal.  Treatment goals were not appropriate to the symptom presentation or were overly broad (e.g., "reduce paranoia" rather than a more specific goal such as "initiate conversation with a fellow group member once per week.").

The patient was seen on 12/11/13 and the subsequent treatment plan included significant amounts of repetitive information in the current status section.  This section appeared to be more of an informal narrative of issues discussed with the patient during the treatment team meeting than a summary of his current status and progress since the last team meeting.  Verbatim quotes of the patient were frequently found in this section.  The treatment plan was not modified.

On 1/7/14, the patient was seen for his 90-day treatment plan.  The current status section contained repetitive information and the treatment plan was not modified despite the fact that the patient continued to express grave concerns about discharge back to prison and the EOP level of care.  The patient did not appear to have met the treatment goals or to have improved since admission.

**Findings:**  This patient did not receive adequate treatment.  His treatment plans were never adequately completed and did not include appropriate treatment target behaviors/symptoms, goals, or interventions.  Primary symptoms and behaviors that interfered with his ability to function and access treatment were either not targeted by the treatment plan or were not addressed with adequate treatment interventions.  The patient's initial treatment plans were not completed timely and much of the information was merely repeated from previous plans and not adequately updated.

## 4.  Patient D

Brief History:  This patient was admitted to the CHCF on 12/10/13 and received nursing admission and psychiatric admission assessments on that date.  All initial assessments were

completed within two weeks of arrival.  The patient was referred to the ITP from CSP/Corcoran due to increased isolation, a long history of auditory hallucinations, paranoid delusions, mood lability, poor impulse control, medication non-adherence with resulting aggression, disorganized thoughts, poor grooming, confusion, and insomnia.  He reportedly experienced auditory, visual, and tactile hallucinations, with somatic, grandiose and paranoid delusions.  He also had impaired insight and poor judgment.  He had multiple inpatient psychiatric hospitalizations within the prison setting and while in the navy.

The patient was provided with a diagnosis of Schizoaffective Disorder, bipolar type.  In addition, several possible differential diagnoses were also present in the medical record including Schizophrenia, paranoid type, Bipolar Disorder NOS, Psychotic Disorder secondary to substance abuse, and Malingering.  He was prescribed Risperdal and Vistaril, but typically refused those medications.  The medications were discontinued on 1/27/14.

The only treatment plan located in the medical record was a monthly update on 1/8/14.  The patient was on DPS at that time; he was placed on that status on 1/3/14 due to refusing to leave the yard.  There was no documentation located in the medical record that he was assaultive or had threatened anyone.  He was not aggressive toward staff or other patients.  The patient was to be advanced to stage 1 following the treatment team meeting.  The treatment plan indicated that he was decompensating, but the plan did not include actual treatment interventions to mitigate the decompensation.  No group treatment was included in the plan.  Treatment goals were repetitive and new treatment goals were not identified.  Treatment goals were also overly broad and vague.

On 1/21/14, the patient was placed on DPS for "holding program" after refusing to return to his room after the television group.  It took staff thirty minutes to talk him into returning to his room.  The rehabilitation therapist described the patient's behavior at that time as bizarre and included splashing water throughout his room.  A review of progress notes indicated that he was extremely disorganized and delusional, with response to internal stimuli.

There was no documentation of referral to the Positive Behavior Support Team, although there was a note on 1/22/14 regarding consulting with the team.  It did not appear that actual consultation occurred.  The treatment team did not modify the treatment plan to include a functional analysis and associated behaviorally-based treatment plan.  There was a lack of documentation in the medical record regarding DPS placement beyond occasional mention of that status.  There was no explanation regarding the rationale for reducing the patient's stage level to DPS and there were no criteria for releasing him from DPS.  The treatment plan was also not modified as a result of the patient's DPS placement.

On 1/24/14, the patient was seen by a mini-team regarding DPS and was maintained on this status due to "refusal to follow instructions and concomitant institutional safety concerns…"  There was a lack of documentation that he was provided with information regarding what he needed to do to advance from DPS to stage 1.  The patient was described by clinical staff as not benefitting from treatment, but was receiving limited, if any, treatment due to his DPS status and inadequate treatment plan.  The patient remained on DPS status on 1/28/14 after placing water on his floor.  This behavior was due to a visual hallucination of flames and smoke coming from the

electrical socket in his room. According to the rehabilitation therapist, the patient was placed on DPS for not obeying staff orders.

**Findings:** Initial evaluations were completed timely for this patient, but he did not receive adequate treatment at the CHCF. DPS was used inappropriately and appeared to be implemented as punishment for his mental illness. The stage system, by policy, was to be based on an "individualized behavioral incentive program" (CHCF AD, Chapter 14, section 14.08), yet no such program or plan was ever included in the treatment plan. The patient continued to decompensate while hospitalized at the CHCF, yet his treatment was severely limited due to his DPS placement and consideration of referral to DSH for acute care was not documented.

### 5. Patient E

Brief History: This patient was admitted to the CHCF on 1/17/14 from the RJD SNY. The DSH referral packet was not located in the medical record. A nursing assessment and a brief psychiatric admission assessment were completed on the date of admission. A comprehensive assessment was completed on the day after arrival and noted that the patient reported intermittent auditory hallucinations and mildly dysphoric mood. He had a history of daily marijuana use and used crystal methamphetamine and alcohol three days weekly with twice monthly blackouts. He was provided with a provisional diagnosis of Psychotic Disorder NOS with differential diagnoses of Polysubstance Dependence and Antisocial Personality Disorder. He was prescribed Zyprexa and Cogentin.

A V-Risk assessment utilizing the HCR-20 (historical, clinical risk, version 3) assessed the patient with low acute risk and moderate chronic risk of violence and low acute risk of serious physical harm. The only treatment plan located in the medical record was dated 1/21/14. This "7-day master" plan referenced the patient as "present and semi-cooperative during his *72 hour* (emphasis added) IDTT team meeting," making it unclear if the patient was seen late for his 72-hour treatment team meeting or on time for his seven-day team planning conference. An associated progress note indicated that this was a "72 hour IDTT," which indicated that it occurred one day late. No treatment goals or interventions were identified in this treatment plan. No interdisciplinary progress notes were located in the medical record until four days after the patient's arrival. On 1/21/14, prior to treatment planning, the patient was offered group therapy, but refused to attend. According to progress notes, he was scheduled for IDTT on 1/27/14, but that meeting did not occur. Consequently, no treatment plan was developed.

**Findings:** This patient did not receive adequate treatment; treatment planning was inadequate and the patient was not provided with a diagnosis. The only treatment plan in the medical record indicated that treatment was still to be determined and the patient was not seen timely by his subsequent treatment team. Consequently, the patient did not have an adequate treatment plan.

### 6. Patient F

Brief History: This patient was reviewed by the expert on a prior site visit when he exhibited little improvement despite treatment with various psychotropic medications, including sertraline, olanzapine, chlorpromazine, and lamotrigine. He was provided with a diagnosis of Schizophrenia. At the time of admission, he presented with gross disorganization and seclusive

behavior.  His latest commitment offense was sexual assault with a prior charge of rape.  His EPRD was 11/8/2015.

At the time of this visit, after several medication changes and adjustments, the patient was prescribed olanzapine 30 mg per day, memantine 20 mg per day, and mirtazapine 30 mg per day.  A progress note indicated that he was "still unable to attend Symptom Management group, as he was still on Stage 2."  The patient was enrolled in a leisure and recreation group.  On 1/6/14, progress notes indicated that he was "offered 1:1 cell-front (sic) once weekly by staff; seems happier and smiles at staff when they look into his cell (sic)."  He was brought out of cell to attend the coping with anxiety group.  At the time of review, the patient remained at stage 2.

The patient had a long history of mental health treatment in the community including electroconvulsive therapy (ECT) and psychiatric hospitalizations.  His brother had reportedly committed suicide.  The patient was assessed with moderate short-term and moderate long-term suicide risk during this admission.  He had been noted to have auditory hallucinations, paranoia, bizarre behavior, withdrawal, a history of alcoholism in the community, and prior episodes of self-injury which may not have been actual suicide attempts or bizarre behavior driven by psychosis.  At his latest IDTT on 1/22/14, he was provided with a diagnosis of Schizophrenia, disorganized type.  His mood was described as frequently irritable and unpredictable with occasional anxiety, social isolation, and blunted affect.

On 1/14/14, the patient stated that he wanted to progress to stage 3.  He stated that medications did not help him.  He remained on a court order for involuntary medication due to grave disability, which would expire on 9/09/14; the patient was adherent with taking oral medications without objection.  Some anxiety was noted, but he was not depressed.  His thinking as reflected in his speech appeared to be more coherent.  He remained with mildly tangential thinking, guardedness, and suspiciousness, but smiled appropriately at times.

UM minutes reflected referral to the ICF level of care during November 2013.

**Findings:**  The patient appeared to have benefitted from treatment during the three months since the prior review.  Although he was taking a higher-than-average dosage of olanzapine, no blood level of olanzapine was located in the medical record.  Prior description of jaw movements in the MHCB after three weeks of medication non-adherence suggested the possibility of withdrawal dyskinesia, which would place him at risk for permanent tardive dyskinesia.  The current medication olanzapine appeared a safer alternative than earlier trials of perphenazine and chlorpromazine regarding this issue.

The patient continued to be treated with an antidepressant without a diagnosis of a mood disorder.  This may have been rationalized by the reported family history of suicide, moderate suicide risk, and prior history of self-injury.  However, the assessment and the treatment plan should have identified the rationale.

No rationale was found regarding the use of memantine, which is approved for treatment of Alzheimer's-type dementia.  Brief notes indicated that the patient complained of memory

problems, had a history of alcoholism, and that "perhaps memantine was reducing his confusion." However, a clearer rationale for its use should have been provided.

The patient's hospital management was marginally adequate. He apparently made progress since the last review and ICF referral appeared appropriate. However, his offered therapeutic activities were minimal. The level of care provided to him was little more than a patient at the 3CMS level of care might receive and the activities were not driven by an individualized treatment plan.

## 7. Patient G

Brief History: This patient was admitted to the CHCF acute care after a hanging attempt on 1/03/14. At the CSP/Sac MHCB, he hit the wall so forcibly with his fist that bone was exposed over his knuckles, requiring many sutures at an outside hospital. CDCR clinicians indicated that despite the manipulative appearance of this behavior, the patient probably would attempt to kill himself if provided the opportunity (which he had also explicitly stated). He had been monitored on one-to-one watch from the time of his admission until the expert's visit on 1/29/14.

His medications at the time of this review included gabapentin, amantadine, duloxetine, Vistaril, lithium, and olanzapine, as well as prn medications in the event of medication refusal. No maximum limit on the daily dosage of olanzapine was provided in the physician orders. Should the patient have requested and the nursing staff administered every available prn and regular dose of olanzapine, he would have received a total of 90 mg in 24 hours (including possible intramuscular administration which is more potent than oral dosing). The maximum FDA approved daily dose of olanzapine is 20 mg and the highest dose noted in the literature was approximately 50 mg/day. The expert asked nursing staff if there was a maximum olanzapine dosage that they were allowed to administer in 24 hours and the staff member stated that she did not know.

A treatment plan dated 1/23/14 provided diagnoses of Mood Disorder NOS and Antisocial Personality Disorder. Various clinicians provided other diagnostic impressions; all suggested dual diagnoses of Antisocial Personality Disorder and Borderline Personality Disorder. Interestingly, the patient also identified himself as being "a psychopath" and defiantly stated that staff would not stop his problematic behaviors.

The patient's behavior was very difficult to manage in the acute inpatient unit; it included a recent assault on a male correctional officer and a forcible cell extraction with placement in leather restraints (all occurring on the same day, 1/23/14). The patient also had dramatic incidents of self-injury, such as causing himself to bleed and mixing the blood with water, so that it appeared to be a much larger volume of blood, and subsequently smearing the blood on the walls of his cell. He had a past history in CDCR of attempting to lure staff into his cell and then assaulting them. His history of self-injury included inserting foreign objects into his penis and under his skin. During this hospitalization, he may have even "manipulated" an EKG record to appear abnormal; the printout stated the EKG was abnormal and the most likely explanation was that the placement of two leads had been switched. At the time of the visit, staff was in the process of pursuing a court order for involuntary medication.

327

A Positive Behavioral Support Plan was in place to attempt to manage the patient's self-destructive and assaultive behaviors; this included more incremental increases in privilege and activity level than the standard four stages and assisting the patient in controlling his progress based upon his readiness. Nursing staff indicated that the plan had been helpful.

**Findings:** The assessment of referring CDCR clinicians appeared accurate that this patient was at high long-term risk for suicide. A central problem was likely his rage and underlying despair at receiving a third strike. Because the patient acted out his feelings in a highly dramatic fashion, it was difficult for treating clinicians to establish therapeutic rapport with him.

The Positive Behavioral Support Plan, properly and consistently implemented, appeared critical for any successful outcome of this hospitalization. Because it had only been recently implemented, it was too early to determine whether the patient would respond positively.

Recent cell extraction and placement in restraints a few days prior to this review appeared appropriately managed. Unfortunately, the patient's behavior appeared to have been designed to force such an outcome.

The olanzapine orders were disturbing in two respects. First, there was no indication in the record of psychosis or mania, which would warrant treatment with a high-dose antipsychotic medication. Second, the lack of any upper limit on the daily dose, with orders which could reach up to 90 mg in 24 hours, which was 4.5 times the FDA-approved maximum, appeared unreasonably hazardous, particularly as there was no documentation of blood level monitoring.

Overall, this patient's care was inadequate. The limited out-of-cell activity was appropriate due to the very recent staff assault and daily disruptive behaviors. The Positive Behavioral Support Plan was also clinically indicated for this patient. However, his medication management appeared to be unduly risky and without adequate rationale.

## 8. Patient H

Brief History: This patient was admitted to the CHCF on 12/13/13 from the SQ MHCB due to medication refusal, poor hygiene, and chronic neutropenia. He was provided with diagnoses of Schizophrenia, paranoid type and Antisocial Personality Disorder. He received his psychotropic medications by court order due to grave disability; the order would expire on 12/9/14. Although he did not have a history of significant violence in the community, his V-Risk assessment was rated as high. By contrast, the psychiatric evaluation determined that he posed low short-term risk for violence (actually "absent" on a scale of "present" vs. "absent"). The suicide risk assessment indicated low short-term and moderate long-term suicide risk. Laboratory testing noted a complete blood count on 12/18/13 in which the absolute neutrophil count was 1180 (normal 1500-7800), but there was no apparent resulting clinical effect.

Medications at the time of review included olanzapine, with intramuscular backup of Haldol and Cogentin, if oral olanzapine was refused.

The patient's treatment plan listed six goals, of which only one had any related plan for intervention, specifically, a symptom management group. Despite reportedly not wishing to take

328

psychotropic medications, at the time of review the patient was taking oral olanzapine without objection.

The treatment approach appeared to favor the staff's clinical impressions and the patient's actual conduct rather than his V-Risk assessment, as he was increased to stage 3 privileges on 1/09/14.

The original treatment plan outlined plans for possible referral to intermediate care after stabilization in the acute care program.  However, staff noted that the patient had an EPRD of 5/21/14.  Nursing staff indicated that the plan was changed from intermediate care referral to likely transfer back to an EOP setting.

**Findings:**  The treatment plan had many more goals than interventions, but overall the patient's care seemed adequate.  His psychosis appeared to have improved, but he was not motivated to participate in clinically-oriented activities.  In response to the most recent attempt to increase his treatment participation, he stated that he might leave his room to attend a music group.  Long-term continuity of care after parole from prison was more problematic given his lack of insight as to his mental illness and lack of commitment to continuing his treatment on a voluntary basis.

## 9.  Patient I

Brief History:  This patient was admitted to the CHCF acute care inpatient unit on 12/13/13.  It appeared that he was admitted due to continued psychosis, poor participation in treatment and acceptance of medication, and lack of improvement at the EOP level of care.  He was serving a life sentence without the possibility of parole and had previously received SSI disability in the community.  He had a long history of mental illness dating back to his twenties.

Clinical staff in the acute care program expressed some ambivalence as to whether he had a psychotic disorder, but the discharge diagnoses were Schizophrenia, paranoid type and Antisocial Personality Disorder.  CDCR staff stated that although he denied psychotic symptoms and superficially appeared to be high-functioning, over time he had revealed bizarre, grandiose, and persecutory delusions, as well as auditory hallucinations.

Progress notes indicated that the patient often verbally taunted and threatened staff with aggression, especially female staff.  He appeared to exhibit grandiose delusional thinking with ideas of reference that everything said pertained to him, as well as antisocial attitudes.

A treatment plan dated 1/14/14 listed goals and progress as "address coping skills: met;" "maintain appropriate behavior and verbalize his needs: partially met, no plan for interventions for further improvement; Hope and Spirituality: not met and no planned interventions; leisure and recreation: not met and no plan for further intervention" despite a statement elsewhere in the record that the only activities that the patient wanted to participate in were recreational activities. Four identical copies of the same treatment plan dated 1/14/14 were found in the medical record.

The patient was prescribed Zyprexa, Vistaril, and Zoloft.  However, he had sporadic medication adherence and rarely took Zyprexa.  The medication order for Zyprexa expired on 1/16/14 and was not renewed due to non-adherence.

At the time of the CHCF admission, there was consideration of possible intermediate care referral after stabilization in the acute care program. However, after 35 days it was decided that he was "not a good fit at ATP" and he was returned to the EOP. Progress notes indicated that this decision may have been based on the patient's medication non-adherence, his failure to meet the criteria for involuntary medication administration, and the lack of interest in participating in therapeutic activities, as well as his taunts and threats toward staff.

The patient was assessed with low short-term and moderate long-term risk for suicide. However, his suicide risk could increase if he was confronted with the reality of the denial of his appeals. At the time of the monitoring visit, he denied current or past thoughts of self-harm. He had reached a maximum of stage 2 of privileges and activities.

**Findings:** The treatment plan was generic and lacked planned interventions to address goals. The patient's participation in both group and individual treatment was minimal. However, overall it appeared that the mental health care that was provided to this patient was adequate. Provided diagnoses appeared accurate and medication management was clinically appropriate, although the patient's adherence was poor. Staff also made repeated efforts to establish rapport and to increase the patient's participation. Although the patient was calmer at the time of the discharge request, his participation remained minimal and it appeared that no further benefit from hospitalization could be obtained at that time.

## 10. Patient J

Brief History: This patient was a recent CHCF admission on 1/08/14 from MCSP. He reportedly had a desire to die, mood-congruent auditory hallucinations including command and derogatory voices, and increasing social withdrawal and isolation.

The patient was provided with diagnoses of Major Depressive Episode, single, severe with psychotic symptoms (mood congruent) and Antisocial Personality Disorder. The treatment plan included goals of stress management, medication compliance, and insight into mental illness.

He was prescribed Zyprexa, Effexor, and Prozac. A signed medication consent form was virtually illegible, but appeared to include proposed medications including Zyprexa, lithium, valproic acid, Prozac, and Remeron, but not Effexor.

The patient reported four suicide attempts since adolescence, but the Integrated Suicide Risk Assessment indicated moderate short-term and long-term suicide risk.

On 1/16/14, the patient had progressed to stage 2 and by the time of the expert's visit in January 2014, he had achieved stage 3.

**Findings:** The treatment plan was generic and did not specifically address depression, expressed desire to die, social isolation, or interventions for the problems noted on referral. Overall, the patient's care was adequate, but marginally so. He appeared to be progressing through the stage level system. As he had not been hospitalized for a long period at the time of review, there was an opportunity to improve the specificity of his treatment plan and interventions with additional hospitalization time.

EXHIBIT L
California Institution for Women Psychiatric Inpatient Program (CIW-PIP)

**1. Patient A**

Brief History:  This patient was received in CDCR on 12/26/07.  She was admitted to the CIW-PIP on 8/14/12.  She was provided with a diagnosis of Schizoaffective Disorder, bipolar type.

The medical record indicated that she had refused many medical procedures, examinations, and testing.  Upon arrival, she was treated with Clozaril, which resulted in severe neutropenia; as a result of this severe side effect, she could not be retreated with this medication.  The medical record also indicated that she continued with severe refractory psychosis, despite treatment with Zyprexa and Geodon 160 mg per day.  She was also treated with Latuda 40 mg per day and Depakote liquid 1500 mg per day; olanzapine was discontinued on 9/17/13.  Medications were ordered for directly observed therapy (DOT) administration.  She received her psychotropic medications by court order due to danger to others that expired on 8/14/13.

Progress notes indicated that the patient presented with chronic psychosis, refusal to shower, and lability, and inconsistently attended DPS groups and yard.  There was documentation that she at times refused her court-ordered medications, resulting in involuntary medication administration.  Recent progress notes indicated that she continued to have disorganized thinking with loose associations and neologisms.  She made a threat against President Obama, necessitating interview of the patient and the treating psychologist by the Secret Service.  She was seen by the psychiatrist at least every three days.  Recent laboratory studies indicated abnormal blood studies and decreased absolute neutrophil counts (ANC), which might necessitate interruption of her treatment with antipsychotic medication if continued.  The appropriate laboratory testing for treatment with valproic acid was conducted.

Documentation indicated that the patient had been on DPS status for 191 days as of 6/28/13.  Review of the interdisciplinary care plan that was last updated on 9/16/13 indicated that she would be placed on modified DPS and that a radio would be approved to assist her with coping skills.  She was provided with diagnoses of Schizoaffective Disorder, depressive type, Borderline Personality Disorder, and Antisocial Personality Disorder.

The patient was seen during DPS group on 9/17/13 when she presented to the staff what appeared to be crushed medications that she had hoarded.  She was returned to her room prior to group completion due to her agitation and psychotic behavior.  She was seen in IDTT on the following day when she continued to present with hostility, paranoid and grandiose delusional thinking, and threats of harm to others.  The treatment team determined that she would keep her radio as an incentive to participate in treatment and to assist in her goal of stability; her medications were also ordered crushed and her room was searched to ensure that no additional medications had been hoarded.

**Findings:**  The administrative staff and treatment team appeared to address the issues that this patient presented.  After the incident of possible hoarding, the process of medication administration was modified to attempt to prevent further hoarding.  In addition, there were changes made to the nursing supervisory staff to allow for increased supervision and monitoring of RNs who passed medications.  Despite the patient's DPS status, the treatment team worked with her to allow her to have a radio and the psychiatrist appropriately changed medication administration to minimize the risk of cheeking.  This patient with severe and persistent

psychosis had been treated with Clozaril, but was unable to continue and could not be re-challenged due to low ANC levels.

Although the patient was on DPS status for greater than 90 days, this status appeared to be indicated based upon her clinical instability and potential for violence.

## 2. Patient A (February 2014 update)

Brief History:  This patient's medical record was reviewed during the September 2013 monitoring visit.  This review will provide an update regarding the treatment provided in the PIP.

The patient had been hospitalized in the PIP since 11/28/12.  She was provided with a diagnosis of Schizoaffective Disorder, bipolar type and Antisocial Personality Disorder.  She had been psychiatrically unstable with disorganized thinking/speech and behavior and response to auditory hallucinations, making threatening remarks and racial slurs to staff.  She had very poor insight regarding her mental illness.  She remained on involuntary medications due to dangerousness.

A psychologist progress note on 12/4/13 indicated that she presented with more organized thinking and speech, but remained with delusional thinking that she was a Russian spy.  The outlined plan included biweekly individual sessions with ten hours per week of DPS groups.  On 12/7/13, the psychiatrist reported that the patient remained delusional and stated that she had homicidal ideation regarding black people and remained with disorganized thinking.  Two days later, the psychiatrist reported that she remained with disorganization, threats to kill the psychiatrist, and unpredictable behavior.  The psychiatrist indicated that the patient should not be re-challenged with clozapine due to the drop in her absolute neutrophil count (ANC) to less than 1000 on this medication.  Latuda was added to Geodon to address her severe psychosis, and Risperdal was added to address her intractable symptoms, with plans to taper to one or two antipsychotic medications.

The psychologist noted on 1/9/14 that the patient might be discharged to PSH soon under PC1026, but also that she might be returned under PC7301 (too violent, request housing in CDCR).

Subsequent progress notes indicated that the patient remained with very severe psychosis, despite medication compliance reported by nursing staff.  She frequently refused to leave her cell for individual sessions and IDTT meetings.  She was frequently seen at cell front due to treatment refusal.  She also broke her radio, which she enjoyed listening to, during a period of agitation.  A 115 mental health assessment was completed on 1/16/14 that concluded that her mental illness contributed to the behavior (breaking her radio).  The evaluating psychologist recommended that if she was found guilty of the offense, the hearing officer should consider mental health factors in assessing the penalty, including a recommendation to reduce the 115 to a 128-A or a lesser charge/lower sentence.

**Findings:**  The appropriate laboratory testing for treatment with Depakote and atypical antipsychotic medications was completed.  It appeared that the patient was seen consistently for individual therapy with the primary clinician, as well as in DPS groups.  Medication management was appropriate in light of her history of severe psychosis and medication side

effects preventing treatment with clozapine.  It was unusual to prescribe three antipsychotic medications, but this case may be exceptional due to the patient's very severe symptomatology.

Treatment planning was generally appropriate, listing the patient's psychotic symptoms and violent threats/behavior as treatment issues.  However, all of the treatment plans, goals, and interventions were redundant and did not address the patient's treatment resistance (frequent refusal to attend treatment sessions).

## 3.  Patient B
Brief History:  This patient was transferred from CCWF on 7/8/13 to the CIW-PIP.  She had a history of treatment at the 3CMS, EOP, and MHCB levels of care, with multiple MHCB placements.  She was provided with provisional diagnoses of Bipolar Affective Disorder, with no psychotic features, and Personality Disorder NOS.  She was admitted due to self-injurious behavior, impulsivity, and depression with auditory hallucinations.  She was treated with Abilify, hydroxyzine, and sertraline.

The most recent treatment plan was dated 9/13/13 and there was documentation of monthly treatment planning.  The patient was also seen by the psychiatrist on the same date when she was provided with a GAF score of 50.  The most recent progress notes indicated that she was progressing in therapy with good involvement in groups and individual therapy.  Psychiatric contacts also occurred on 9/9/13, 8/20/13, 8/15/13, 8/12/13, 8/7/13, and 7/29/13.  The notes indicated that the patient experienced periods of auditory hallucinations and some difficulty with peers taking advantage of her.  She had advanced to stage 3 and was an active participant in group therapy.

**Findings:**  It appeared that this patient was receiving mental health services that were appropriate to her clinical needs.

## 4.  Patient C
Brief History:  This patient was admitted to the CIW-PIP due to self-injurious behavior and continued suicidal ideation.  She was on DPS status at the time of the monitoring visit.  She was provided with diagnoses of PTSD, Polysubstance Dependence, and Antisocial and Borderline Personality Disorder.  She had a long history of self-injurious behaviors, including serious cutting and swallowing.  She was serving a life sentence without parole and had recently exhausted her legal appeals.  She was prescribed Latuda, Zydis, Depakote, Geodon, and propranolol.

A placement chrono dated 11/8/13 indicated that she was housed in the CIW MHCB.  It appeared that she had multiple MHCB admissions.  She was referred to the PIP on 11/22/13; however, this referral was rescinded "because the patient learned she would not have any privileges there and was agreeable to going to PSU."  However, after transfer to the PSU, she remained unstable, resulting in her return to the MHCB.

A placement chrono dated 1/22/14 indicated that the patient was admitted on that date to the PIP for intermediate level of care.  She was seen by the psychiatrist for an initial evaluation on 1/22/14 when it was reported that she had a previous PIP admission from 8/20/12 to 3/11/13.

However, she was discharged due to disruptive behavior, including ordering patients to assault others, threatening staff, making death threats to two custody officers, and exhibiting intimidating behavior to inmates and staff. For these reasons, custody determined that she would remain on DPS status throughout her current PIP stay. A mental health evaluation completed by a PIP psychologist indicated that she had been placed on suicide watch due to suicidal ideation and recent serious self-injurious behaviors. A SRE was completed on 1/22/14 and 1/23/14 and indicated high chronic and acute suicide risk.

An interdisciplinary care plan dated 1/22/14 noted as problems: "risk for ineffective breathing pattern (due to an asthma diagnosis) and risk for self-harm and/or injury, suicide ideations by cutting." The goals for addressing the issue of self-injury appeared to be somewhat simplistic: "not harm self for 10 days, if present seek help; express decreased anxiety and control of impulses; talk about feelings/express anger appropriately and will maintain self-control without supervision." A nursing note on the following day after admission documented that she swallowed a piece of a plastic comb. Later that day, she was observed cutting herself and reopening an old abdominal wound, despite being placed on suicide watch with one-to-one observation. Attempts were made to treat the wound, but the patient refused. She was given Zyprexa for agitation. Subsequent progress notes indicated that she was noncompliant with treatment attempts regarding wound care and medications; she also required treatment with as-needed medications for agitation on several occasions.

A mental health treatment plan completed on 1/23/14 offered some additional focus on the self-injurious behaviors. However, a subsequent plan completed on 1/30/14 was essentially a duplication of the previous plan. An interdisciplinary progress note on 1/28/14 noted that the patient remained on suicide watch. The note also indicated that dialectic behavioral therapy (DBT) and reading materials would be provided to her. A mini-IDTT was completed on 1/31/14 due to placement on suicide watch and the recent opening of her wound. Another mini-IDTT occurred on 2/3/14 as per a progress note of that date to evaluate the need for continued suicide watch. Suicide watch was continued and the note indicated that the patient would be provided with reading and writing materials that would be closely regulated due to her chronic suicidal behavior. A psychiatric progress note on 2/4/14 indicated that suicide watch was discontinued and the patient denied intent to harm herself. However, one-to-one observation was continued due to her "severe maladaptive and disruptive behavior clearly documented in her last PIP stay." Suicide precautions with checks every 15 minutes were continued. Psychiatric progress notes also documented attempts at gradually providing additional materials, such as reading and writing materials, as the patient remained in her cell due to her DPS status.

A progress note on 2/4/14 indicated that the patient fell while standing on a stool in her room, hitting the back of her head on the floor. She was sent to an outside hospital for medical evaluation; she returned the following day with no evidence of spinal fracture and was medically cleared. Staff also reported that she had on several occasions attempted to manipulate staff into providing prohibited items to her, such as a razor and hard plastic cup. When the IDTT confronted her with these and other allegations, denying her request for step down to enhanced observation, she angrily left the IDTT, cursing at the treatment team. A psychiatric progress note on 2/10/14 indicated that suicide precautions were discontinued and she was placed on enhanced observation with checks every 30 minutes; one-to-one observation was continued due to the

335

patient's behaviors. She was also allowed a small pencil and all allowable DPS items with the exception of a filler pen.

Progress notes on 2/11/14 reported that the patient allegedly swallowed her pencil; an x-ray revealed a foreign body in her stomach.

**Findings:** Treatment planning for this patient should be improved. Psychiatric progress notes indicated that DBT was implemented and there was other documentation regarding the appropriateness of behavioral therapy for her; however, treatment plans were silent regarding this treatment.

There was a lack of documentation regarding appropriate SRE when clinically indicated. The only SREs located in the medical record occurred at the time of admission, but not when suicide monitoring was downgraded or changed.

Aside from the lack of documentation of treatment planning and suicide risk assessment, it appeared that the treatment team delivered adequate care to this very ill individual. Behavioral therapy was implemented and she was closely monitored by treatment staff. She was seen consistently by the psychiatrist and the treatment team. When staff attempted to provide additional items to assist her in treatment, she utilized these items for self-harm; this resulted in these items' removal and increased isolation for the patient. The intermediate level of care appeared to be the appropriate treatment setting for her.

## 5. Patient D

Brief History: This patient was referred to the PIP from CIW on 10/1/13 for intermediate care due to poor impulse control and affect regulation. She had been housed in the PSU. She had multiple MHCB admissions. She was previously hospitalized in the PIP in June 2013. She had been on an involuntary medication order due to danger to others since 8/21/13.

At the time of admission on 10/28/13, she was provided with diagnoses of Mood Disorder NOS and Antisocial Personality Disorder. She was prescribed Zyprexa. On 11/12/13, she had an incident in which she threw a chair during group. The psychiatrist began a trial of Trileptal on 11/19/13 to address her mood instability.

Progress notes indicated that the patient was adherent to group therapy attendance. On 12/1/13, she swallowed a piece of a toothbrush in front of staff. She was placed on suicide watch at that time. Suicide watch was discontinued on the following day and she was placed on suicide precaution with checks every 15 minutes, and then enhanced observation. After discontinuation of suicide precaution, the patient advanced from stage 1 to stage 2. Soon after, she was temporarily placed on DPS due to an incident during a group.

The patient had an additional incident in which she kicked an officer that resulted in DPS placement and reduction in her stage. The psychiatrist prescribed Seroquel to address continued affective and psychotic symptoms and Zyprexa was discontinued. Later progress notes indicated that DPS had been discontinued and the patient returned to stage 2. The most recent progress notes indicated that she attended and participated in approximately half of her groups and was

compliant with psychotropic medications. She appeared to be benefitting from treatment with Seroquel, but remained with delusional thinking.

It appeared that the patient was again returned to DPS status and suicide precaution after presenting with agitation during a unit party and scratching herself after returning to her room.

Treatment plan review indicated that although the patient's specific problems were identified, treatment interventions appeared to be repetitive and lacked detail regarding implementation of the interventions.

**Findings:** There was a lack of documentation of suicide risk assessment when clinically indicated, such as when assessing for the discontinuation of suicide watch or precaution. There were also problems with treatment planning, as previously discussed. Medication management appeared to be appropriate.

## 6. Patient E

Brief History: This 46-year old male-to-female transgendered patient was admitted to the PIP on 8/27/13. She was provided with a diagnosis of Post-Traumatic Stress Disorder (PTSD) and Adjustment Disorder, as well as a diagnosis of Narcissistic Personality Disorder with borderline and antisocial features. She declared a hunger strike at the time of admission and had lost 17 pounds at the time of the September 2013 monitoring visit.

The patient was prescribed mirtazapine as well as other topical dermatological, hormonal, and other medications related to her transgendered status. She also received treatment for other medical issues including HIV, hepatitis C, and asthma. Her medication adherence was erratic. Mirtazapine was discontinued on 9/6/13. As part of the treatment plan, she was provided with additional fluids at meal times and between meals. Specifically, she was allowed two cups of decaffeinated coffee and two cups of juice at breakfast, one cup of juice at morning and afternoon snack times, two cups of juice at lunch and dinner, and two cups of juice at evening snack.

The patient's SRE was completed on 8/28/13 and her treatment plan was completed ten days later on 9/6/13. The completed evaluation (dated 9/5/13) indicated that Adjustment Disorder was her primary diagnosis due to ongoing stressors. However, psychiatry progress notes indicated provisional diagnoses of Depressive Disorder versus Mood Disorder NOS, as well as PTSD, Narcissistic Personality Disorder, and Borderline Personality Disorder. The treatment plan on 8/30/13 contained contradictory information; specifically, that mirtazapine was prescribed for pain, anxiety, and insomnia secondary to depression. As this medication was prescribed by the psychiatrist, it appeared most likely that it was prescribed primarily for psychotropic reasons. The most recent treatment plan identified problems, but indicated that goals could not be identified because staff was gathering information, and the responsible person was "TBD" or "to be determined." It appeared that based on the information available, initial goals could be identified and certainly responsible staff could be identified as well. In addition, the patient's hunger strike was not identified as a problem area in the initial treatment plan, nor was her poor medication adherence. These two areas should have been included as a focus of treatment.

337

After her return to the PIP, medical record documentation indicated that the hunger strike formally ended on 9/21/13. The treatment plan was updated on 10/29/13, although a mini-treatment team was conducted on 9/23/13. The mini-team was primarily to review the patient's DPS status. She was moved to stage 1 programming with enhanced observation and a nutrition program was instituted to prevent refeeding syndrome. The 10/29/13 treatment plan indicated that she had begun to attend groups with 46 percent participation. However, her dining room attendance remained poor at eight percent. This treatment plan was more appropriate to the patient's current functioning, but the plan continued not to address her poor treatment adherence directly, including her repeated refusals to see the psychiatrist. This treatment plan was more specific and clearly individualized.

**Findings:** The patient's treatment plan was initially not appropriately individualized and did not identify the most urgent treatment targets early in her hospitalization. It appeared that she should have received services at the acute care level at that time. Her clinician modified the treatment plan with increased specificity and individualization, but the plan did not address her poor treatment adherence and participation. At this time, her level of care could have been downgraded to intermediate care. Staff did not appropriately conceptualize this case clinically, although they met weekly with custody management and medical staff due to the hunger strike protocol that was in effect.

### 7. Patient F

Brief History: This patient had initially been paroled to PSH during May 2012. After custody staff re-heard one of her 115/RVRs and submitted the findings to the Board of Prison Hearings, an additional four months were added to her prison sentence. The patient originally received a four-year commitment under PC1026 (not guilty by reason of insanity), but that commitment was subsequently extended due to assaults committed against peers and staff.

The patient was admitted to the PIP on 8/6/12, with a diagnosis of Schizoaffective Disorder, bipolar type. She received her psychotropic medications by court order, which expired during May 2014, due to danger to self. She was prescribed valproic acid, clozapine, olanzapine, and as needed medications in the event of medication refusal.

Early during the hospitalization, the patient exhibited decompensation with assaultive and aggressive behavior and suicidality. Although staff appropriately reduced her stage due to safety concerns, her access to treatment was made contingent upon her behavior. If the patient was adherent with treatment recommendations, with no incidents of self-harm or assault, no racial slurs and was appropriate during her DPS group, she would be offered another DPS treatment group. If she did not comply with those conditions, she would be denied group treatment for 24 hours to "redeem herself" to be able to attend another treatment group. She was expected to attend 30 days of DPS groups; conversely, treatment groups occurred three times per week. She was required to be fully compliant with this schedule to be considered for movement to stage 1. This treatment plan was not well-individualized; the interventions were vague and broad.

The patient was placed on suicide watch on 11/11/13. The suicide risk assessment noted that she had given nursing staff her belongings and made statements suggestive of suicidal intent. Later documentation indicated that she had been assaulted by another patient while on the exercise

338

yard; however, this information was not communicated to the evaluator. It was unclear why staff supervising the recreation yard did not report the assault, especially since the patient received obvious injuries. Impulsivity and emotional dysregulation were primary issues for this patient. She was also referred for a neuropsychological evaluation, but at the time of the visit, the PIP did not have the capability to provide such an assessment.

In the February 2013 treatment plan, the case formulation noted that the treatment team had suspended weekly individual clinical contacts because the patient was not benefitting from them due to her psychosis; however, that intervention remained in the treatment plan and in the subsequent treatment plan. The treatment plans also were not modified in any way based on the patient's behavior and lack of progress. In fact, according to the January 2013 treatment plan, the patient had severely deteriorated, yet that treatment plan was not modified from prior plans.

By July 2013, the patient had moved to stage 2, although group participation was not reported in the treatment plan. She reported to staff during IDTT that she would attend more groups if she was not too sleepy or tired. The case formulation of the treatment plan was never updated and the treatment plan was essentially repetitive of prior plans, even including the same typographical errors. As of the most recent treatment plan on 11/6/13, the patient had returned to stage 1, even though she had no physical assaults against anyone for over one year. This treatment plan was effectively the same plan that had been in place for over one year with little positive effect on this patient's behavior.

**Findings:** Treatment planning documentation for this patient was poor. Treatment plans were not individualized or modified when treatment was ineffective. The patient exhibited significant symptoms of major mental illness with poor functioning, but interventions appeared to be designed for someone at a higher level of functioning. The patient would benefit from behavior therapy and a specific behavioral treatment plan. Due to inadequate treatment, the patient was unable to maintain any gains achieved for more than just a few days and had significant deterioration at times.

## 8. Patient G

Brief History: This medical record was reviewed because, according to census documentation, the patient was identified as receiving services at the acute level of care. She was admitted to the PIP on 6/27/13. She had transferred to CIW from PSH on 3/5/12, due to PC7301 (too dangerous to treat). The mental health evaluation on 7/3/13 indicated that the level of care was intermediate. Her initial psychological assessment indicated that she had a poor initial adjustment to the PIP, ignoring staffs' redirection and refusing to return several cups in her room stating that she was a "Future Farmer of America" and was going to grow things in her room. She also yelled profanities to staff and peers, causing several peers to become agitated.

All treatment plans (6/28/13, 7/5/13, 8/30/13, 9/1/13, 9/24/13, and 10/24/13) indicated intermediate level of care, but only the most recent treatment plan listed any type of goals, objectives, or interventions. The objectives lacked the necessary specificity or seemed inappropriate in light of the patient's primary symptomatology expressed since admission. The problem descriptions included multiple items that were not interrelated, resulting in goals and objectives that were not always clearly connected and interventions that appeared only indirectly

339

related. For example, in problem one, the clinician combined issues of treatment adherence with aggressive acts toward others with psychotic symptoms. The goal was focused on group treatment adherence, which the patient was doing reasonably well with 60 percent compliance, but not medication adherence, an area of significant difficulty for this patient. The objective targeted interactions with others while the intervention was a basic self-care skill building group. That treatment group may benefit the patient, but did not directly target treatment adherence or psychotic symptoms. The group might have a positive impact on aggression toward others, but it was not designed for that purpose.

**Findings:** While the patient was identified on the census as receiving mental health services at the acute level of care, most documentation listed her level of care as intermediate. The lack of treatment planning for most of this patient's hospitalization to date was also of concern. The mental health treatment provided to her was inadequate.

## 9. Patient H

Brief History: This case was selected for review because the patient was scheduled to parole in less than 60 days on 12/25/13. According to staff, she would receive pre-release planning and would attend a pre-release treatment group. She was provided with diagnoses of Schizophrenia, undifferentiated type, Cocaine Dependence in a controlled environment, and Personality Disorder NOS. She was prescribed Risperdal Consta. Review of the patient's most recent treatment plan on 10/30/13 indicated that staff was aware of her impending parole date, but the patient "would not work on parole plans, insisting she will be fine in a shelter and won't need mental health services outside." That appeared to be the reason that she was enrolled in the pre-release group. Parole issues were reportedly discussed during one-to-one sessions with the psychologist. While working on parole planning was not a targeted area in the treatment plan, it was specifically listed repeatedly in the psychologist's progress notes as an area of focus in the plan.

**Findings:** It appeared that this patient was appropriately not enrolled in a pre-release planning group as she refused to participate in such a treatment group. Clinical staff then appropriately addressed these issues as much as possible with her during individual therapy sessions, although the patient was reluctant to address parole planning at all.

## 10. Patient I

Brief History: This case was selected for review because the patient was identified by documentation as an acute care patient at the PIP. She had a recent suicide attempt requiring 38 sutures, a blood transfusion, and hospitalization in an intensive care unit. Following that hospitalization and stabilization, she was transferred to the PIP for further stabilization. None of the initial assessment evaluations noted the acuity of her referral other than the initial psychiatric evaluation note documenting the referral for "psychiatric stabilization," a common phrase for acute care. All treatment plans (11/18/13, 10/21/13, and 10/11/13) indicated the level of care as "PIP" and included interventions that were indistinct from those listed for patients in the intermediate care program. A mini-team interdisciplinary progress note on 10/14/13 indicated "Acute LOC," although it was unclear if that was due to the patient's placement on suicide watch and one-to-one status or if it was reflective of acute care referral status. The progress note did not provide clarification and subsequent progress notes did not indicate any level of care.

**Findings:**  This patient was not clearly designated as receiving services at the acute or intermediate level of care.  She required acute level of care and intensive treatment related to suicidality following a very serious attempt.  She was not receiving adequate treatment.

## 11.  Patient J

Brief History:  This case was selected for review because the patient was identified on the census as receiving mental health services at the acute level of care.  She was admitted to the PIP on 9/17/13 for "stabilization" following a crisis bed admission.  She reportedly had a long history of self-injurious behaviors and suicide attempts.  She continued to harm herself while in the CIW MHCB, necessitating referral to the PIP.  The initial psychiatric evaluation on 7/17/13 noted a prior PIP hospitalization from 9/18/12 to 5/30/13.  She was provided with the following diagnoses: Major Depressive Disorder, severe, recurrent with intermittent psychotic symptoms; Post Traumatic Stress Disorder, chronic type; Polysubstance Dependence; and Borderline Personality Disorder.

The patient was prescribed hydroxyzine, Paroxetine, quetiapine, benztropine, and olanzapine as needed for agitation and irritability.  The intake mental health evaluation noted that she was referred to the PIP for acute care.  However, treatment plans listed "PIP" as the level of care.  In the intervention portion of the treatment plan, there were no specific interventions related to acute care.  The patient appeared to be receiving services consistent with the intermediate level of care.  One difference noted was the objectives which provided timeframes for achievement that appeared congruent with an acute level of care.

Each of the timeframes aligned with the treatment plan timeframes so it was reasonable to expect the treatment plan to be modified each time, either because the patient had achieved the objective or had failed to do so.  If the treatment had a positive effect but the patient needed more time, the treatment plan should note such.  Unfortunately, none of that typically occurred.  In one case progress was noted, but not progress directly related to the objective.  When the patient appeared to decompensate and engaged in self-injurious behavior after three months in the program, the treatment plan was not modified in any way.  The treatment plan also included items that were inappropriately grouped together or objectives that did not relate to the problem area.  For example, one problem area was self-injurious behavior, but one of the objectives involved skills to decrease "DTO behavior" (danger to others behavior).

**Findings:**  The patient's level of care was unclear based upon review of available documentation.  The treatment plans did not reflect clinical evaluation of the patient's progress or lack of progress and were insufficiently operationalized.  The patient did not appear to be receiving adequate treatment.

## 12.  Patient K

Brief History:  This case was reviewed as an example of intermediate care at the PIP.  The patient was admitted on 8/1/12 due to "multiple self-injurious behaviors."  According to documentation, she was referred by CCWF staff after engaging in persistent self-injury and suicidal gestures with the "goal of obtaining special housing within CDCR-CCWF... initial psychological assessment (8/10/12) indicated that the patient acknowledged that she had done

341

these things to cause a housing change and reported that she had been threatened by staff and other inmates due to her instant offense."

The patient was provided with diagnoses of Adjustment Disorder, with mixed anxiety and depressed mood, Sedative, Hypnotic, or Anxiolytic Dependence, in a controlled environment, PTSD, chronic, rule-out Nightmare Disorder, Borderline Personality Disorder, and Antisocial Personality Disorder. Her diagnosis was slightly modified to change the diagnosis of Adjustment Disorder to Major Depressive Disorder, recurrent, severe without psychotic features. The Nightmare Disorder was also eliminated. The most recent treatment plan was well-constructed and had been modified from prior treatment plans.

The patient was prescribed lithium and diphenhydramine. A review of progress notes indicated that she continued to engage in self-harming behaviors, primarily when frustrated. The eUHR contained observation logs from May 2013; their review revealed that she had multiple episodes each month except for July 2013, due to self-injurious behavior. The patient also had erratic group therapy attendance, yet this was not specifically addressed as a treatment target in her treatment plan. Her apparent lack of significant progress after 15 months also was not addressed in the treatment plan. The plan also repeated the same target problems and many of the same objectives. The patient had recently received a new care provider which resulted in the only changes to the treatment plan to date.

**Findings:** The patient's diagnosis was appropriately reevaluated and updated. Her most recent treatment plan was an improvement over previous plans and would hopefully lead to treatment progress. The patient's poor progress over 15 months of treatment was due in part to inadequate treatment interventions and poor monitoring of progress/lack of progress. However, her poor treatment adherence was never identified as a treatment target, which contributed further to insufficient treatment progress. Her frustration and attempts to manipulate housing should also have been addressed clinically. It was quite disturbing that the patient was allowed to remain in treatment without progressing for so long, yet her treatment plan was not significantly modified to attempt to improve treatment.

## 13. Patient L

Brief History: This case was selected for review as an example of intermediate level of care treatment. The patient was admitted to the PIP on 8/22/13 due to self-injurious behaviors. She had a history of such behavior, including head banging, hitting herself in the head with a coffee cup, and hitting herself with a lock in a sock. She acknowledged to the PIP staff at intake that she engaged in such behavior when she felt that no one was acknowledging her. She also reported a history of depression and PTSD with a prior diagnosis of Bipolar Disorder in the community and mental health treatment beginning at age 17. Her mental health history and physical, completed on 8/24/13, noted Bipolar Affective Disorder, depressed with psychotic features, PTSD, and Personality Disorder NOS, as diagnoses.

At times the patient engaged in self-injurious behaviors five to six times daily. Referring staffs' expected outcome was that the patient "eliminate self-injurious behaviors and utilize her own coping skills to practice self-restraint without requiring daily monitoring or interventions from staff." Her treatment plan did not list specific staff responsible for various interventions, but

instead listed all disciplines for each. The plan also combined goals, objectives, and interventions that were unrelated. For example, in the problem area focused on self-injurious behaviors, the objective was that the patient be willing to talk to staff about her psychotic symptoms. This was not an identified precipitant at the time of that treatment plan on 8/30/13. There were no other objectives or problem areas identified in the treatment plan.

The subsequent treatment plan on 9/27/13 was modified; medication adherence was added as an objective in the self-harm problem area. The treatment plan was further modified during the next monthly team meeting on 10/18/13; while there were still weaknesses with the plan (e.g., using cut and paste, over-inclusive regarding which staff were responsible so that inappropriate staff were included), the modifications suggested treatment progress. This was also true for the most recent treatment plan on 11/12/13. The patient was prescribed Cogentin, Buspar, Depakote, and Prozac.

**Findings:** This patient received adequate treatment. However, the treatment plan should be rewritten without repeating inappropriate and unnecessary information from past plans and with a focus on specific staff truly tasked with listed interventions instead of listing all staff in every intervention area. The treatment plan should also list clinically specific interventions rather than Program Guide requirements.

## 14. Patient M

Brief History: This case was selected as an example of treatment at the intermediate level of care. The patient was admitted to the PIP on 9/24/13 for mental health stabilization. She had been engaging in self-injurious behavior and had a history of mood and psychotic symptoms. She had a previous hospitalization at the PIP from 7/23/12 to 10/8/12. She paroled from CDCR on 11/21/12, but returned to CDCR custody on 7/30/13 "due to violation of her parole…with the controlling offense of second degree burglary." She was admitted to a crisis bed on 8/22/13 for five days and was readmitted to the MHCB on 8/29/13.

At the time of the PIP intake, the patient was provided with the following diagnoses: Bipolar I Disorder, history of Alcohol Dependence, history of Methamphetamine Dependence, history of Opiate Dependence, and rule-out Kleptomania. According to the most recent treatment plan on 10/29/13, the only diagnostic changes included eliminating the provisional diagnosis of Kleptomania and adding a diagnosis of Personality Disorder NOS, with borderline and antisocial traits.

The patient was prescribed Cogentin, Celexa, Zyprexa, Risperdal, Depakote, and Vistaril. Despite her minimal treatment group attendance, the treatment plan of 10/29/13 was not modified to reflect that as a treatment target. In fact, her treatment plan remained unchanged since the initial plan on 9/27/13. On 11/15/13, the rehabilitation therapist noted that the patient had made minimal progress toward her goal; however, the specific goal was unclear and the patient remained at stage 1 due to her poor treatment attendance. The patient received repeated prompts daily, but continued to fail to attend treatment sessions. The recreation therapist described her as pleasant, but unkempt.

**Findings:** This patient had not fully engaged in treatment and the lack of engagement significantly interfered with her ability to progress. Despite this, poor treatment engagement and poor treatment adherence were not identified as treatment targets. The treatment plan was not modified in any way to reflect her lack of progress. The patient was not receiving adequate care and her lack of treatment engagement should have been a focus of treatment.

## 15. Patient N

Brief History: This case was selected as an example of acute care treatment. The patient was admitted to the PIP from an MHCB due to bizarre behavior. Her admission diagnosis was Bipolar I Disorder, most recent episode depressed, with psychotic symptoms. She was admitted on 1/30/13 and was clinically discharged on 3/4/13. The diagnosis of Alcohol Dependence was added while she was hospitalized at the PIP due to her long history of alcohol abuse beginning at the age of 12. According to the medical record, her alcohol abuse continued at the time of incarceration. She was placed on a court order for her psychotropic medications due to grave disability. While in the MHCB, she stopped eating and showering, refused interactions or eye contact, and would not cooperate with blood draws.

The psychological assessment was completed on 2/1/13. This evaluation added the diagnosis of Methamphetamine Dependence to the existing diagnoses (listed previously). The patient was prescribed lithium, Risperdal M-tabs, and Paxil with as needed medications in the event of medication refusal.

The patient's initial treatment plan on 2/1/13 indicated "ICF" (intermediate care) level of care rather than acute. This treatment plan included goals, objectives, and interventions that were all "TBD," or to be determined. This initial treatment plan did not mention that the patient had been referred for acute care or provide any justification for the level of care change. The subsequent IDTT, the seven-day IDTT on 2/7/13, was marked in error as the initial IDTT and also listed her level of care as intermediate. However, in the narrative of the clinical summary, there was reference to the acute nature of this referral.

There was no further reference to acute level of care or explanation regarding the intermediate level of care indication on the treatment plan document itself. This treatment plan included three problem areas with associated interventions, including group therapy and medication management. At the next IDTT on 3/4/13, the patient was still indicated at the intermediate level of care. There was no further reference to the acute nature of the patient's referral or level of care. However, this treatment plan indicated the patient's progress and agreement between the patient and clinical staff that she had met the goals of her hospitalization and was ready for discharge.

**Findings:** This patient was identified in documents provided by CIW as requiring acute care. However, medical record documentation, including treatment plan and admission documentation, did not confirm that clinical staff were consistently aware that she should receive acute level of care services. Only one treatment plan made any reference to the nature of the initial referral as an acute referral. The treatment plans did not appear to differ from treatment plans for intermediate care patients. This patient's treatment plan did not include enhanced treatment groups or increased individual clinical contacts, as should occur for acute care patients.

While clinical documentation suggested that this patient's acuity decreased from acute to intermediate care prior to her discharge, no level of care discussion was ever documented by her treatment team and intermediate care placement was not explained in the medical record.  This patient's level of care was unclear and was not properly documented.  As an acute admission, she did not receive acute care treatment.

## 16.  Patient O

Brief History:  This case was selected as an example of acute care treatment.  The patient was admitted on 12/30/13 due to suicidal ideation, multiple MHCB admissions, and a repeated expressed desire to die.  She was provided with diagnoses of Bipolar I Disorder, depressed, with psychotic features, Polysubstance Dependence in a controlled environment, and Borderline Personality Disorder.  The social work history evaluation was completed on 1/06/14 and the rehabilitation therapy evaluation was completed on 1/08/14.  A mental health evaluation was completed on 1/09/14, but the initial psychological assessment was not completed until 1/29/14.  None of these documents referred to the patient's level of care status or the referral for acute care.

The patient was prescribed Vistaril, Zyprexa, and Celexa.  Upon admission she was placed on suicide precaution with 15-minute checks.  She remained on enhanced observation status until 1/02/14.

The patient's initial treatment plan on 1/2/14 listed the current level of care as intermediate and did not reference the original acute care referral.  There was no documentation of a treatment team discussion regarding level of care or substantiation of the decision to modify the admission level of care to intermediate care.  The treatment plan did not include any enhancement when compared to treatment plans for intermediate care patients.  However, the treatment plan contained problem areas with multiple issues that should have been entered as separate treatment targets/problems to be addressed.  The plan also listed a different primary diagnosis:  Major Depressive Disorder, severe with psychotic features, without providing justification for the diagnostic change.

The subsequent treatment plan was completed on 1/09/14.  This plan continued to list the current level of care as intermediate with the same diagnoses.  There continued to be no reference to the original acute referral in this plan.  The patient was added to more treatment groups following this treatment team meeting, but that change was due to the patient's expressed request for more groups according to treatment plan documentation.  These groups included content such as creative expression, karaoke, and living skills.

The most recent treatment plan on 2/5/14 also listed the current level of care as intermediate and did not document any discussion of level of care or reference the acute nature of the referral and admission of the patient.  The diagnosis was changed to that listed above: Bipolar I Disorder, most recent episode depressed with psychotic features, Polysubstance Dependence in a controlled environment, and Borderline Personality Disorder.  This diagnostic change was explained and justification was provided.

345

**Findings:** According to documents provided by the CIW-PIP, this patient was referred, accepted, and admitted for acute care, but none of the admission evaluation documents noted this level of care, nor did any treatment plans. There was no documentation supporting a discussion of level of care by the treatment team or substantiating a decision to reduce the patient's level of care from acute to intermediate care. The treatment plan documents reviewed did not reference the original referral document level of care and only noted the current level of care as "ICF." In fact, upon admission the patient was placed on suicide monitoring. The treatment plans did not include enhanced services or increased clinical contacts as would be expected for a patient receiving acute level of care. This patient's level of care was unclear and staff did not appropriately document that level of care in the medical record. Consequently, the patient did not receive adequate treatment.

## 17. Patient P

Brief History: This case was selected as an example of acute care. The patient was admitted to the PIP as an acute care patient on 10/7/13 and was placed on suicide watch upon admission. She had been found hanging in her cell, requiring cut down, while housed in the MHCB prior to PIP admission. The mental health evaluation conducted on 10/10/14 noted "ICF" as her level of care with no mention of her status as an acute referral. All other admission evaluations failed to discuss level of care. However, a brief mental health evaluation on 1/6/14 completed due to discharge noted that she was receiving services at the intermediate level of care.

The patient was provided with the following diagnoses: Major Depression with psychotic features, Post Traumatic Stress Disorder, history of Attention Deficit Hyperactivity Disorder, and Personality Disorder NOS. She was prescribed Prozac, Benadryl, and Prolixin.

The initial treatment plan on10/10/13 noted that the patient was receiving services at the intermediate level of care and did not contain documentation of any team discussion regarding the level of care change. The treatment plan itself listed "TBD" (to be determined) for objectives and interventions; this notation indicated that she was not receiving enhanced services that would be provided to an acute care patient. The next treatment plan on 10/17/13 continued to list her level of care as intermediate without reference to the acute nature of the referral. The treatment plan included objectives and interventions, but objectives were grouped together inappropriately and interventions were consistent with an intermediate level of care.

The subsequent treatment plan on 11/12/13 appropriately separated objectives and added intermediate level of care treatment groups to the treatment plan. Individual clinical contacts remained on an "as needed" basis, but more treatment groups were made available. The following treatment plan on12/9/13 again grouped the previously separated objectives together and added even more objectives. There appeared to be too many unrelated or only minimally related objectives combined for no apparent clinical reason. Subsequent treatment team documentation indicated that the patient continued to be considered at the intermediate level of care.

**Findings:** This patient was not appropriately recognized by treatment staff as an acute level of care patient. Staff failed to construct an appropriate treatment plan and failed to document any discussion regarding her level of care. Her treatment plans were generally poorly constructed

with objectives inappropriately grouped together and with inadequate interventions.  She did not receive adequate treatment for an acute care patient.

## 18.  Patient Q

Brief History:  This case was selected as an example of acute care.  The patient was admitted to the PIP on 9/23/13.  Her initial treatment plan on 9/26/13 noted that she was receiving mental health services at the acute level of care.  The plan actually stated "ICF-Acute," suggesting some confusion regarding the acronyms.  The patient was provided with diagnoses of Post-Traumatic Stress Disorder, Polysubstance Dependence in a controlled environment, and Borderline Personality Disorder.  The treatment plan did not list interventions, stating instead "TBD."

The subsequent treatment plan on 10/3/13, which continued to list her level of care as acute, included interventions.  However, the care outlined in that treatment plan was not consistent with what would be expected for a patient receiving an acute level of care; individual clinical contacts were not a part of the treatment plan and group treatment was minimal.  Subsequent treatment plans (dated 11/1/13, 11/26/13, 12/18/13, 1/16/14, and 2/13/14) continued to indicate the level of care as acute, but individual contacts were only included in the treatment plan beginning in December 2013 and only "as needed."  Additional group treatment was added during November 2013, but the treatment plan remained similar to one for a patient receiving intermediate level of care.

**Findings:**  Although clinical staff noted "acute" in the level of care portion of this patient's treatment plan, it appeared that there was confusion regarding the intended level of care.  The treatment plan for this patient did not include services that were consistent with an acute level of care.  This was the only case reviewed in which the treatment team at least repeatedly noted acute level of care in documentation, even if the care outlined in the treatment plan was not consistent with that level of care.  The patient received inadequate care as evidenced by poor treatment planning.

347

EXHIBIT M
Acronyms and Abbreviations

## Acronyms and Abbreviations

AD:                    AD

AHA:                   Assistant Hospital Administrator

ASH:                   Atascadero State Hospital

ASP:                   Avenal State Prison

ATP:                   Acute Treatment Program

CAT:                   Clinical Assessment Team

C-file:                Central File

CC I:                  Correctional Counselor I

CC II:                 Correctional Counselor II

CCAT:                  Coordinated Clinical Assessment Team

CDCR:                  California Department of Corrections and Rehabilitation

CEO:                   Chief Executive Officer

CHCF:                  California Health Care Facility

CIW PIP:               California Institution for Women Psychiatric Inpatient Program

CMF:                   California Medical Facility

CMC:                   California Men's Colony

CMT:                   Clinical Management Team

CONREP:                Conditional Release Program

COPR:                  California Office of Patients' Rights

CSH:                   Coalinga State Hospital

CTF:                   Correctional Training Facility

DA:                    District Attorney

DBT:                     Dialectical Behavioral Therapy

DDPS:                    Distributed Data Processing System

DGS:                     Department of General Services

DOM:                     Department Operating Manual

DPS:                     Discretionary Program Status

DSH:                     Department of State Hospitals

EKG:                     Electrocardiogram

EOP:                     Enhanced Outpatient Program

ETU:                     Enhanced Treatment Unit

eUHR:                    Electronic Unit Health Records

FRC:                     Facility Review Committee

HAS:                     Hospital Access System

HCITC:                   High Custody Intermediate Treatment Center

HIPPA:                   Health Insurance Portability and Accountability Act

ICA/PCA:                 Intensive Case Analysis/Preventive Case Analysis

ICC:                     Institutional Classification Committee

ICS:                     Incident Command System

IDN:                     Interdisciplinary Note

IDTT:                    Interdisciplinary Treatment Team

IEX:                     Indecent Exposure

IMRC:                    Incident Management Review Committee

IPPA:                    Improvement Practice Performance Appraisal

ITP:                     Intermediate Treatment Program

LLEDS:          Law Library Electronic Delivery System

LVN:            Licensed Vocational Nurse

MAPP:           My Activity Participation Plan

MCSP:           Mule Creek State Prison

MDO:            Mentally Disordered Offender

MHCB:           Mental Health Crisis Bed

MIRC:           Mortality Incident Review Committee

MOU:            Memorandum of Understanding

MRMC:           Medical Risk Management Committee

M&SS:           Materials and Stores Supervisor

MTA:            Medical Technical Assistant

MTE:            Milieu, Transition and Evaluation

MVR:            Medication Variance Reporting

NIMS:           National Incident Management System

OSHA:           Occupational Safety and Health Administration

PaWSS:          Patient Wellness and Recovery Model Support System

PBST:           Positive Behavioral Support Team

PCL-SV:         Hare Psychopathy Checklist Screening Version

PCP:            Patient Care Plan

PIA:            Prison Industries Authority

PMU:            Patient Management Unit

PRC:            Program Review Committee

PRN:            Take As Needed

351

PSU:                    Psychiatric Services Unit

RMC:                    Risk Management Committee

RN:                     Registered Nurse

R&R:                    Receiving and Release

RVR:                    Rules Violation Report

SDI:                    State Disability Insurance

SHO:                    Senior Hearing Officer

SIR:                    Serious Incident Report

SOMS:                   Strategic Offender Management System

SPC:                    Suicide Prevention Committee

SRN:                    Senior Registered Nurse

SHU:                    Security Housing Unit

SMTA:                   Senior Medical Technical Assistant

SNY:                    Sensitive Needs Yard

SRE:                    Suicide Risk Evaluation

SSI:                    Supplemental Security Income

STEP:                   System to Encourage Progress

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TC:                     Treatment Center

TCMP:                   Transitional Case Management Program

TSC:                    Treatment Support Committee

TSI:                    Therapeutic Strategies and Interventions Training

UCC:                    Unit Classification Committee

UM:                     Utilization Management

VPP:                    Vacaville Psychiatric Program

V-Risk:                 Violence Risk

VRMC:                   Violence Risk Management Committee

WaRMSS:                 Wellness and Recovery Model Support System

WRTT:                   Wellness and Recovery Treatment Team