# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
**Plaintiffs,**

        **v.**                      **No. CIV S-90-0250 LKK  DAD PC**

**EDMUND G. BROWN, JR., et al.,**
**Defendants**

## SPECIAL MASTER'S REPORT ON THE
## SAN QUENTIN ASSESSMENT PROJECT FOR INPATIENT CARE
## OF CONDEMNED INMATES

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax:  (401) 824-5123
June 10, 2014

SPECIAL MASTER'S REPORT ON THE
SAN QUENTIN ASSESSMENT PROJECT FOR INPATIENT CARE
OF CONDEMNED INMATES

## I.  <u>Introduction</u>

On April 11, 2013, plaintiffs in this matter moved for enforcement of court orders and for further relief with respect to treatment at the inpatient level of care for members of the plaintiff class who are condemned to death and housed at San Quentin State Prison (SQ).  (ECF No. 4543).  Defendants objected to plaintiffs' motion on May 9, 2013.  (ECF No. 4592).  A 14-day evidentiary hearing on plaintiffs' motion began on October 1, 2013 and concluded on November 6, 2013, after which the parties submitted closing briefs.

The *Coleman* court granted plaintiffs' motion in part on December 10, 2013.  (ECF No. 4951).[1]  The court held that the evidence established "an identified need in the condemned inmate population for long-term inpatient mental health care equivalent to that provided by the [intermediate care] programs described in the Program Guide."  (ECF No. 4951 at 18-19).  It found that, given the custodial restrictions place on condemned inmates, the evidence suggested significant impediments to adequate intermediate inpatient care[2] of condemned inmates if they were transferred to existing intermediate care units for California Department of Corrections and Rehabilitation (CDCR) inmates.  Accordingly, the court ordered defendants, under the guidance and supervision of the Special Master, to:

---

[1] Plaintiffs also sought orders requiring defendants to "regularly screen all individual on death row for mental health needs and assess suicide risk using formal, validated screening tools, and to develop "adequate reporting mechanisms regarding mental health care for the condemned, as well as an order directing the Special Master to conduct a full evaluation of the Enhanced Outpatient Program (EOP) and Correctional Clinical Case Management System (3CMS)  programs for condemned inmates at San Quentin."  The court denied this request without prejudice, noting that "the Special Master is already tasked with monitoring the delivery of mental health care at San Quentin and no further orders are necessary to direct him to fulfill that obligation."  (ECF No. 4951, at 26).  The Special Master reports that, following exhaustive examination of the 3CMS and EOP programs at SQ, at this time oversight of these programs at SQ does not require more than his regular monitoring of them.

[2] Inpatient care for condemned inmates at the acute level of care has been available at the CMF, but intermediate inpatient care had been heretofore unavailable to condemned male inmates.

- Conduct an assessment of unmet need for inpatient care in the condemned inmate population at SQ;

- Resume working to establish a durable remedy that provides adequate access to necessary inpatient mental health care or its equivalent for seriously mentally ill condemned inmates; and

- Consider all remedies, including, but not limited to, creation of a hospital unit for condemned inmates only at the California Medical Facility (CMF), SQ, the California Health Care Facility (CHCF) or some other appropriate facility.

(ECF No. 4951 at 27-28).

The court also ordered "Within six months[3] the Special Master shall report to the court on the remedy elected and the time frame for its complete implementation." (ECF No. 4951 at 28, ¶ 5). The ensuing project to identify and condemned inmates in need of intermediated inpatient care (known and referred to hereinafter as the San Quentin Assessment Project or the Assessment Project) began within days of the court's order. It was completed on May 7, 2014.

On June 3, 2014 CDCR's Division of Health Care Services (DHCS) submitted to the Special Master its revised report on the Assessment Project and its plan for an inpatient mental health program for condemned inmates, to be known as the San Quentin Psychiatric Inpatient Program (SQ PIP). On June 6, 2014, CDCR submitted its draft activation schedule for the SQ PIP. Following a teleconference on June 9, 2014 among CDCR officials and the Special Master and members of his staff, CDCR then submitted its revised activation schedule, plus an accompanying letter from CDCR General Counsel to the Special Master indicating that "CDCR . . . will accelerate the timelines in the attached schedule whenever possible consistent with patient safety . . . (and) . . . will provide you with monthly updates to the activation schedule." This is the Special Master's report, together with the CDCR's revised report on the Project, its revised

---

[3] i.e. on or before June 10, 2014.

activation schedule, and the above-referenced letter from General Counsel, which are attached as

Exhibits A, B, and C, respectively.  A list of acronyms and abbreviations used in this report is

also attached, as Exhibit D.

## II.    Development of the Assessment Process

Planning of the Assessment Project began on December 20, 2013 with a teleconference

among CDCR central office staff, SQ mental health staff, and the Special Master and some of his

expert staff to discuss plans for implementation of the court-ordered tasks.  In-person meetings at

SQ were held on January 22 and 23, 2014, attended by the Special Master and members of his

expert staff, the parties' counsel, as well as CDCR central office staff and SQ mental health staff.

At these meetings, SQ mental health staff gave a presentation on their existing program for care

of condemned patients, known as the Specialized Condemned Care Program (SCCP).  They also

identified selected proposals for expansion of the SCCP into what would later become known as

the SQ PIP.  Patient assessment criteria were developed with the goal of ensuring that all patients

in need of inpatient care would be identified.

On February 5, 2014, CDCR submitted to the Special Master a draft SQ PIP Screen Data

Collection Tool, Custody Questionnaire, and Screen Flow Sheet, for the Special Master's

experts' review and comments.  Recommendations relative to the Screen Data Collection Tool

included recommendations for increased standardization of interviews of correctional officers,

and increased sensitivity in screening protocols to identification of patients whose participation

in treatment was more akin to attendance than true participation or hovered around an attendance

rate of 50 percent or less.  Other recommendations included identification of patients with stays

in mental health crisis beds that exceeded ten days, and detection of patients who had existing

orders for involuntary medication administration.

With regard to the Custody Questionnaire, the experts' recommendations included adoption of the interview format that had been developed for the CDCR's Continuous Quality Improvement Tool (CQIT), which would allow for clarification and elaboration of responses as necessary.  Other recommendations were to identify on the Flow Sheet those patients who had been identified in psych tech and/or correctional officer interviews, and to use regular housing officers, rather than officers on relief or working overtime from other units, for the custody officer interviews.  Others recommendations were to initially select and train those clinicians who would be conducting clinical reviews, and for SQ clinical line staff to subsequently assume clinical review responsibilities as part of routine clinical duties.  Standards for Electronic Unit Health Record (eUHR) reviews would need greater specificity for clinicians' use.  Patients who had indicators for inpatient care but who were *not* being considered for referral, as well as those who were being considered, would need to be interviewed.

Finally, the Special Master's experts recommended that in cases where the clinical review indicated referral but the Interdisciplinary Treatment Team (IDTT) elected to not refer, the IDTT's decision and justification should be clearly documented in the patient's treatment plan.  The experts further recommended that the decision must be based on current clinical status, that there must be a plan to specifically address any ongoing indicators that led to the decision, and that the patient should be monitored regularly until he has no longer met selection/referral criteria, or has been referred as clinically indicated.

Following receipt of the experts' recommendations, on February 19, 2014 CDCR submitted revised drafts of the Screen Data Collection Tool, the Interview Screening Instrument (formerly referred to as the Custody Questionnaire) and the Screen Flow Sheet.  The experts and CDCR then discussed the revised drafts by teleconference on the following day.

An in-person meeting among all parties was held at SQ on February 24, 2014.  The meeting included a presentation by CDCR, discussion of the revised documents, and further input and guidance from the experts as well as substantive and process comments from plaintiffs' counsel.  CDCR indicated that it had re-ordered some items on the Interview Screening Instrument and added psych techs and primary care physicians as staff to be interviewed.  One of the experts' recommendations was to provide the correctional officers who were selected for interview an overview of the interview questions and then to ask them if they were sufficiently familiar with the patient to answer the questions adequately.  The questions should be provided no more than two days in advance so that the officers may review Form 114s or discuss the patients with colleagues on the shift.

Plaintiffs expressed concern that the Flow Sheet limited clinical evaluations to eUHR reviews, and asked that mental health staff be required to conduct clinical interviews of all identified inmates.  They also recommended that the regional mental health administrators, rather than the IDTT, should complete the final assessment and have the final say on referrals to the proposed inpatient program.  Although the experts endorsed this proposal, final decisions on whether to refer to the SQ PIP remain with the IDTT, which is consistent with *Coleman* Program Guide provisions on referrals to inpatient care.  The experts also recommended that clinical evaluations include both eUHR reviews and confidential interviews.  It was also decided that CDCR would have completed the assessment tools by March 2014, and that the on-site patient assessments would begin in April 2014.  The experts and plaintiffs' counsel would attend the data review process, which would start with observation of completed Form 7388-Bs (worksheets which have been in use for screening non-condemned inmates for referral to inpatient care).

III.    <u>Conduct of the Assessment</u>

    A.    <u>Phase One – Use of the Screening Tool</u>

Phase One screening began on March 20, 2014.  In Phase One, all approximately 720 condemned inmates at SQ were screened by use of the 12-item screening tool.  The screening identified 127 inmates.  Phase One also consisted of data review at CDCR DHCS headquarters, attended by representatives of Health Care Services quality management staff, the parties' counsel, and expert and non-expert members of the Special Master's staff.  The health care services staff reviewed and identified the data source(s) for each of the objective criteria in the assessment protocol.  Potential barriers to accessing or confirming the data were addressed.  Of the 127 inmates identified by the 12-item screen, 54 were recommended for a clinical evaluation as of the end of Phase One.

    B.    <u>Phase Two – Survey of Correctional Officers and Psych Techs at San Quentin State Prison</u>

On the first day of the on-site assessment process at SQ, all parties agreed to a process that was developed for interviewing key custody and psych tech staff and that was implemented immediately.  Under the process, correctional officers are selected for interview if they are assigned or posted to a condemned housing unit as a tier officer.  Psych Techs are to be selected for interview if they are assigned or posted to conduct screenings on a condemned housing unit.  One tier officer per custody watch (first, second, and third watch) and the assigned psych tech for each condemned housing tier will be interviewed for each of the inmates currently housed on their tier.  Clinicians who will conduct clinical reviews should be specified and trained, and as in the previous unmet need assessment studies, should not be San Quentin line or supervisory staff.

During the actual interviews, there were several correctional officers on the tiers who were not regularly assigned there.  The CDCR regional clinician and the Special Master's expert

6

agreed that if an officer were not sufficiently knowledgeable about a particular housing unit, an attempt should be made to interview a regularly assigned officer the following calendar day. This had to be done in East Block (the condemned unit) and the Adjustment Center, but not in the North Segregation building.[4]  The Special Master's experts considered the information obtained from correctional officers sufficient to satisfactorily complete the custody officer interview portion of the assessment.

The CDCR Assessment team's interviews of all assigned psych techs were observed by the Special Master's experts and by counsel.  All psych techs were asked about the cases that had been identified during the review at headquarters as requiring more information for a determination of whether full clinical review was necessary.  By the end of the Phase Two correctional officer and psych tech interviews, a total of 98 inmates were identified as appropriate to proceed to a clinical evaluation.

>        **C.      Phase Three - Clinical Evaluations**

After completion of the correctional officer and psych tech interviews, all of the gathered information was integrated and reviewed by CDCR regional clinicians, in the presence of the Special Master's experts and plaintiffs' counsel, to decide which cases should proceed to a full clinical evaluation.  There was little disagreement on which cases should proceed to full evaluation.  Cases were identified for these full evaluations, which included a record review.  Of the 98 cases that were clinically evaluated, 17 were recommended for referral to inpatient care, and another 17 were recommended for a change in level of care.

>        **D.      Phase Four – Interdisciplinary Treatment Team Reviews**

IDTT reviews were designated for ten inmates and began on April 29, 2014 and concluded on May 7, 2014, resulting in approval of 14 of the 17 clinically evaluated inmates for

---

[4]All are locations in which condemned inmates may be placed.

admission to inpatient care.  All three of the remaining inmates were approved for changes in their levels of care.  These IDTT meetings were observed by the Special Master's experts and the parties' counsel.

       **E.**      **Completion of the Assessment**

In sum, as a result of the Assessment, 98 inmates were identified as requiring a clinical evaluation, 17 were recommended for referral to inpatient care, and by the end of the assessment process, 14 were approved by the IDTT for admission to inpatient care.  In addition, there were another 23 inmates in the existing SCCP, all of whom were to be included for inpatient care in the SQ PIP[5].  All together, 37 condemned inmates have been referred, accepted, and are awaiting admission to intermediate inpatient care in the planned SQ PIP.

**IV.**    **Conclusion and Recommendation**

On May 22, 2014, CDCR submitted to the Special Master its initial report on the Assessment Project.  At an in-person meeting of CDCR staff, the Special Master and his experts, and plaintiffs' counsel on May 28, 2014 at SQ, CDCR formally presented the findings from the San Quentin Assessment Project.  Following comments and input during that meeting, CDCR agreed to modify its report plan in some respects, and submitted its revised report to the Special Master on June 3, 2014.  (*See* Exhibit A)  Details of the planned SQ PIP are set forth in the CDCR's report, and need not be repeated here.

As noted above, on June 6, 2014, CDCR submitted its revised activation schedule for the SQ PIP (*see* Exhibit B), which indicates that CDCR intends to begin activation of the SQ PIP on October 1, 2014 and complete it as of November 15, 2014.  CDCR's planned dates for completion of other interim steps toward program activation are also set forth in its activation

---

[5]Most of these patients were identified and moved as CDCR and SQ clinical staff responded to questions and concerns from the Special Master and the Court's order.

schedule.  These include construction and retrofitting (projected commencement July 30, 2014 but no designated completion date at this time), establishment of statewide and local policies and procedures (projected completion July 30, 2014), staffing and staff training (projected completion September 30, 2014), Joint Commission training (February 28, 2015), and accreditation by the Joint Commission (projected received by November 15, 2015).  Notably, the activation schedule indicates that for all proposed end dates for each item on the schedule, "this schedule will be accelerated consistent with patient safety whenever possible."  (*See* Exhibit B).

Thus far, the Assessment Project has been a productive collaborative effort among CDCR, the Special Master, and the *Coleman* plaintiffs.  It appears to have been successful with identifying inmates currently in need of inpatient care, and for developing and establishing a process for ongoing identification and referral of condemned patients to inpatient care into the future.  With the input of the Special Master, his experts, and the *Coleman* plaintiffs, CDCR's DHCS and the San Quentin mental health staff who have been working on the Assessment Project and toward making the SQ PIP a reality should be commended for what has been achieved thus far.

Ongoing use of the assessment process and treatment of patients in the planned SQ PIP will become CDCR's responsibilities to execute, but in the meantime more work remains to be done before patients can be admitted and treated.  Because of the urgency of admitting and rendering inpatient care to the 37 already-identified and referred inmates in need of this level of care, as well as future additional patients who will be identified over time, the Special Master urges CDCR to maintain the momentum of this project and move as swiftly as possible toward full activation of the SQ PIP.  He and his experts will continue to receive regular updates from

CDCR throughout the SQ PIP implementation process and will continue to provide their guidance to CDCR, as required by court order, towards the full activation of the SQ PIP.

Accordingly, in light of the work that has been completed thus far and the current status of the SQ PIP, the Special Master requests an order of the court directing:

1. That CDCR shall provide monthly status reports on the SQ PIP to the Special Master until the beginning of activation of the SQ PIP; and

2. That no later than 90 days following the full activation of the SQ PIP, the Special Master shall report to the Court on patient admissions and treatment at the SQ PIP, as well as any other matters or concerns with the SQ PIP which may have emerged as of that time.

Respectfully submitted,

_____
Matthew A. Lopes, Jr., Esq.
Special Master

June 10, 2014

EXHIBIT A

**DIVISION OF HEALTH CARE SERVICES**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**REPORT ON RESULTS OF THE CONDEMNED INPATIENT MENTAL HEALTH**
**ASSESSMENT PROCESS**

## I.  Introduction

On December 10, 2013, the *Coleman* Court issued an order that "Defendants shall forthwith, under the guidance and supervision of the Special Master, conduct an assessment of unmet need for inpatient care in the condemned inmate population at SQ."

The Defendants complied with the Court's order. The California Department of Corrections and Rehabilitation (CDCR) in conjunction with the *Coleman* Special Master and his team conducted this assessment. After reviewing the relevant population of condemned inmates, CDCR, in coordination with the Special Master's Team, has identified 14 inmates for inpatient care.  After meeting with Plaintiffs' counsel and the Special Master's team to discuss and review CDCR's report on the assessment process, CDCR presents the results of this process to date, including referrals to inpatient care.

In addition to the 14 inmates identified through this assessment process, San Quentin State Prison (SQ) mental health staff previously identified and assessed 23 inmates who began receiving treatment in the Specialized Care for the Condemned Program (SCCP) beginning in February 2013 (see Section IV).   Since the SCCP will be subsumed into the SQ Psychiatric Inpatient Program, the resulting number of participants, including the 23 patients identified by SQ staff and the 14 new referrals, total 37.

## II.  Background

On January 22, 2014, the *Coleman* Special Master, his team, Plaintiffs' counsel, Department of State Hospitals headquarters staff, CDCR headquarters staff and SQ staff met at SQ.  The purpose of this meeting was to discuss and develop a plan to assess the condemned inmate population for a potential unmet need of mental health inpatient care. This first meeting was to frame the evaluation process and develop criteria that would identify inmates meeting a threshold for a clinical evaluation to consider referral to an inpatient level of care.

On February 24, 2014 a second meeting was held at SQ to finalize the evaluation process and assessment criteria.  Four draft documents that established the format and criteria for the assessment process were shared, discussed, edited, and finalized.  (Attachment A).  The four documents are:

- Condemned Inpatient Mental Health Survey Instrument Data Collection Tool
- Condemned Inpatient Mental Health Survey Instrument Flow Sheet
- Condemned Inpatient Survey Instrument
- Psychiatric Inpatient Program Decision Tree (flow chart)

The Condemned Inpatient Mental Health Survey Instrument Data Collection Tool outlines how the assessments are conducted, lists the criteria used to identify inmates appropriate for

consideration of referral to inpatient level of care, and provides detailed guidelines on how the criteria should be documented.

The second document, the Condemned Inpatient Mental Health Survey Instrument Flow Sheet, again lists the criteria that identify inmates appropriate for advancement to the clinical assessment phase of the process. The Flow Sheet also outlines the general procedures for conducting the Clinical Evaluations and, the final part of the process, the Interdisciplinary Treatment Teams (IDTT).

The Condemned Inpatient Survey Instrument (third document) provides guidance to the clinical survey team for seeking information from correctional officers and psychiatric technicians regarding the condemned inmates that they supervise and monitor.

The fourth document, Psychiatric Inpatient Program Decision Tree, is a flow chart that illustrates the agreed-upon condemned inpatient assessment process.

### III.  Assessment Process

The process to assess the condemned population at SQ was designed as a multi-faceted, multi-disciplinary procedure comprised of four phases:

- Phase One applied 12 criteria to be used in a screening tool intended to identify inmates through case file review.

- Phase Two was a survey of the Correctional Officers and Psychiatric Technicians who work in units that house condemned inmates. The intent of the survey was to discover any staff concerns or observations regarding the inmates under their watch which could provide additional information for the clinical assessment and clarify the need, if any, for an inpatient referral.  This survey was conducted with the Psychiatric Technicians who engage in daily rounds and the Correctional Officers working on all tiers and all watches (first, second and third) of East Block, North Segregation, and the Adjustment Center.

- Phase Three, which was a clinical evaluation, was applied to all inmates who, by virtue of Phase One, had a "positive" finding on one or more of the 12 criteria and/or identification in the Correctional Officer/Psychiatric Technician surveys,.  The clinical evaluation consisted of another review of the inmate-patient's case file and a clinical interview. Those inmates recommended for inpatient treatment were then elevated to Phase Four.

- Phase Four involved a review of each inpatient referral by an Interdisciplinary Treatment Team. The IDTT was conducted by the SQ mental health treatment team serving the condemned population, HQ Regional clinicians, and the *Coleman* Special Master's team clinicians (subject matter experts).

All four phases of the Condemned Inpatient Assessment were conducted and/or observed by CDCR staff, members of the *Coleman* Special Master's Team, and plaintiffs' counsel.  The process was conducted cooperatively with CDCR clinical staff and the *Coleman* Special Master's clinicians, and was fully transparent to all observers.

2

<u>Phase One</u>:  12 Criteria Screening and Documentation Review (March 20 to April 3, 2014)

All condemned inmates were screened based on 12 criteria to identify those inmates who met at least one element of the 12 item screen.  The 12 criteria used in the initial screening were:

1.  The individual is unable to adequately function or is unable to take care of himself on either a part-time or full-time basis at the current level of care.

    a.  A full time pattern of refusing food trays or an intermittent pattern of refusing food trays.
    b.  A full time pattern of refusing showers or an intermittent pattern of refusing showers.
    c.  Poor hygiene/grooming or living conditions on a constant basis or intermittent poor hygiene/grooming.
    d.  A noticeably persistent body odor.
    e.  Refusal to leave one's cell for long periods of time (e.g., for yards, visits, health care appointments, showers).
    f.  Frequent yelling or screaming for no apparent reason.
    g.  Frequently talking to oneself.
    h.  Crying in cell.
    i.  Bizarre or confused behavior; social isolation (including outside supports); not doing well.
    j.  A pattern of hostile, aggressive, or threatening behavior or statements.
    k.  Talking about suicide, death, dying, or hurting oneself.

2.  The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision.
3.  On average and in the last 90 days, the inmate-patient has participated in less than the minimum number of structured treatment hours per week.
4.  The inmate-patient is currently in a mental health level of care and demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.
5.  The inmate-patient is currently in a MHCB, has been in a MHCB for at least 10 days or has had a 10+ day stay in the MHCB during the past 6-months.
6.  The inmate-patient has had a minimum of three MHCB placement requests initiated during the preceding 6-months.
7.  The individual is currently at a custody grade status of Grade B and their custody grade status changed from Grade A to Grade B in the last 6-months.
8.  The inmate-patient is currently housed in the Adjustment Center and is in a mental health level of care.
9.  The inmate-patient has had a minimum of one DSH admission or referral in the past year.
10. The inmate-patient has been treated with clozapine in the past year.
11. The inmate-patient has been placed on a Penal Code 2602 order in the past year.
12. The inmate-patient has been on the High Risk List or the Self-Harm Log over the past 6-months.

Applying these criteria yielded an initial list of 127 inmates who met one or more items on the screening tool (Attachment B).  We noticed that, when pulling the report for criteria Number 4, of the 88 inmate-patients that were currently in a mental health level of care for at least six months, only one inmate's clinician had checked that the inmate was not responding sufficiently to the 6 months of treatment.  In order to ensure the screening process was as inclusive as possible, all

3

88 of those inmate-patients were included as part of this initial phase of the assessment. Of the 88 inmate-patients identified as being in a mental health level of care for at least six months, 60 of the inmate-patients had a positive finding only on this specific item.

On April 1, and 2, 2014 members of the *Coleman* Special Master's team met with Plaintiffs' counsel and CDCR clinical and administrative staff at Mental Health Headquarters in Elk Grove, CA. The purpose of these meetings was to review documentation in the Electronic Unit Health Records (eUHRs) of the 127 inmate-patients identified in the initial screening. The 60 inmate-patients identified solely on criteria Number 4 were reviewed first. All other inmates were flagged by meeting additional or different criteria and would, by design, advance to Phase Three for a clinical evaluation. All told, of the 127 inmates identified, after pulling the data predicated on the referral criteria and a subsequent records review, 54 were recommended for a clinical evaluation prior to Phase Two.

From February 25, 2014 to February 28, 2014, Headquarters clinicians reviewed a total of 287 inmates who were incarcerated prior to 1995 and placed in SQ's Condemned Unit (Attachment C). The purpose of the review was to determine if these inmates had received psychological assessments and/or evaluations upon admission to the institution. A vast majority of the inmates did not receive a 31 Item Questionnaire (CDCR-Form 7277), as this was not the standard practice. However, 152 of the 287 inmates received either a brief or full psychiatric evaluation upon admission – typically on the day of admission or within the first 72 hours. Psychiatric evaluations typically included information obtained from a review of the central file, medical records, and an interview with the psychiatrist. Of the 287 inmates, 145 received either a brief or full psychological evaluation on or near the date of arrival. Brief psychological evaluations were conducted when the inmates refused to participate. Again, a review of the central file and medical records were typically completed and the information was incorporated into the brief psychological evaluation. Full psychological evaluations typically included a psycho-social history, mental status exam, diagnosis, as well as MMPI, Bender-Gestalt, and Draw-A-Person psychological tests. In total, 262 out of the 287 inmates received either a brief or full psychiatric evaluation or a brief or full psychological evaluation usually within the first 72 hours of arrival at SQ. Of the 287 inmates reviewed, 13 did not receive a psychological or psychiatric evaluation nor did they receive a 31 item questionnaire subsequent to their incarceration on death row. Of the 13, two were identified and reviewed in this current assessment project. For the 11 inmates who received neither a brief or full psychiatric or psychological evaluation or a 31 item questionnaire, a 31 item questionnaire will be provided by SQ mental health staff.

Phase Two: Correctional Officer and Psychiatric Technician Surveys (April 8 - 9, 2014)

The second phase of the assessment process was a survey of Correctional Officers (COs) and Psychiatric Technicians (PTs). The purpose of this survey was to solicit information on condemned inmates with whom they were familiar by virtue of their current position or job assignment. The CO surveys were conducted on April 8 extending into the early hours of April 9, 2014 for officers on all tiers during all watches (first watch, second watch and third watch). In all, 48 officers were surveyed. In addition, on April 9, six PTs were surveyed to solicit information from their interactions with inmates in the condemned units. Both COs and PTs were asked to identify any condemned inmates who they believed were unable to adequately function or were unable to take care of themselves on either a part-time or full-time basis based on criteria set forth in 1a through 1k above.

Correctional officers mentioned a total of 79 inmates. Twenty-four of these inmates were not deemed to be in need of a clinical assessment. Four had medical concerns and were referred for medical assessments and/or joint clinical consultations or IDTTs with medical and mental health. The other 20 inmates were not assessed because the nature of the comments by correctional staff did not reach a threshold suggestive of the need for an assessment. For instance, in this latter category an inmate may have been described by an officer as "talkative" or "manipulative" or, simply "covers his cell" with no further concerns about the inmate's demeanor, cell hygiene, or personal appearance. Following the elimination of those inmates mentioned by custody officers who were not in need of a clinical assessment, a total of 55 remained.

The Psychiatric Technicians identified a total of 13 inmates, all of whom were deemed in need of a clinical assessment. Data Review, either solely, or in conjunction with CO and/or PT surveys, resulted in the identification of 54 inmates. There were an additional 44 inmates identified by CO and/or PT surveys not previously identified by Data Review, for a total of 98 inmates identified for clinical evaluation (see Attachment D).

From the information sources identified (see breakdown in the box below) these 98 inmates were identified as appropriate to proceed to Phase Three.

| CATEGORICAL AND NUMERICAL SUMMARY OF INMATE-PATIENTS IDENTIFIED FOR CLINICAL EVALUTION IN PHASE I AND PHASE II | |
|---|---|
| **REFERRAL SOURCE** | **# OF I/Ps IDENTIFIED** |
| Data Review (only) | 37 |
| Data Review and Correctional Officer | 8 |
| Data Review and Psychiatric Technician | 4 |
| Data Review, Correctional Officer, and Psychiatric Technician | 5 |
| Correctional Officer | 40 |
| Correctional Officer and Psychiatric Technician | 2 |
| Psychiatric Technician | 2 |
| Total number of inmate-patients identified for clinical evaluation | 98 |

Phase Three: Clinical Evaluations (April 15 to May 6, 2014)

The third phase of the process involved a clinical evaluation that, if deemed clinically appropriate, would result in a recommendation to the SQ IDTT that the inmate was positive for referral to an inpatient level of care. The clinical evaluations were conducted by CDCR psychologists from the northern Regional Director's team, or a headquarters CDCR psychiatrist, in conjunction with clinicians from the *Coleman* Special Master's team. Following each clinical interview, a collaborative discussion occurred between the CDCR Regional clinician or psychiatrist and the *Coleman* Special Master's team clinician and a joint decision was made regarding the need for referral to an inpatient level of care. After the post-assessment review, the findings of the clinical interview, including the recommendations regarding inpatient referrals, were promptly shared with plaintiffs' counsel and non-clinical Court Monitors.

The clinical evaluations consisted of four distinct parts:

1. A review of the inmate's case records in the eUHR including, but not limited to, suicide history and mental health history.
2. An interview with the inmate.
3. Inquiry into the criteria items that were positively identified based on documentation review and/or CO/PT surveys.
4. Written reports on all positive and negative (i.e. non-referrals to inpatient care) findings.

Prior to each interview, an in-depth comprehensive clinical review of the inmate's case record was conducted and documented.  The interviews were held on the inmates' housing units on the same day as their documentation review or the closest following date allowing for weekends. Some inmates preferred to be interviewed at cell front, others were agreeable to being interviewed in a confidential setting.  Given the extent of the documentation reviews, a sizable amount of lead time was necessary to prepare for the inmate interviews.  Of the 98 clinical evaluations conducted, 17 were recommended for referral to an inpatient level of care to be discussed by the IDTT in phase four.

Of the remaining 81 negative cases (i.e. non-referrals), 17 inmates were recommended for a change in level of care.  A total of 11 inmates were recommended for elevation from Correctional Clinical Case Management System (CCCMS) level of care to the Enhanced Outpatient Program (EOP) level of care; a total of six inmates who were not in the Mental Health Services Delivery System were recommended for inclusion in the CCCMS level of care. In nine additional cases there were recommendations for specific treatment interventions.

<u>Phase Four</u>:  Interdisciplinary Treatment Teams (April 29 to May 7, 2014)

The IDTTs were held within 14 days of the recommendation for referral to an inpatient level of care. The IDTTs were conducted by the SQ treatment team in conjunction with the Regional headquarters clinician and the Special Master's clinician who had conducted each particular inmate's clinical evaluation.  Following a presentation of the case to the IDTT by the Regional headquarters clinician, a discussion was held involving the entirety of the treatment team. The SQ treatment team were very receptive to the recommendations for referral, and in many cases, had already identified that this new level of care would be an appropriate clinical setting for the inmate-patient.

A total of 17 IDTTs were conducted for the inmates referred:

        On April 29, 2014, the first seven IDTTs were held.
        On May 1, 2014, three IDTT's were held.
        On May 6, 2014, six IDTT's were held.
        On May 7, 2014 one IDTT was held.

Of the 17 inmates recommended for referral to inpatient care, the IDTT approved 14 inmate-patients for admission.  The three inmate-patients not accepted into the inpatient program included: one inmate-patient was recommended to have his level of care elevated from CCCMS to EOP; one inmate-patient who was recommended for referral to the Acute Psychiatric Program and to be considered for an ICF level of care upon return; and, one inmate-patient who was recommended to continue at the EOP level of care with an enhanced treatment plan.  The IDTT rationale for the treatment plans for the three inmate-patients not approved for inpatient

level of care was reasonable to both the Regional clinicians and the *Coleman* Special Masters' clinicians (Attachment D).

During quarterly regional sustainable process visits, the Regional team will follow up on the cases identified during the assessment of unmet needs for inpatient care of the condemned population conducted during April 2014. This follow-up will involve placing the names/numbers of the identified inmates on the sustainable process tracking sheets, then following up directly with the inmates and with the treatment teams to ascertain the status and appropriateness of the inmate's level of care.

## IV. Specialized Care for the Condemned Program

The SCCP began in November 2012 as an individualized incentive program for EOP condemned inmate-patients who were either not participating in treatment and/or not experiencing symptom reduction in response to current treatment. The first 10 inmate-patients were placed in this program between February and August 2013. In October 2013 an additional 13 inmate-patients had been assessed and placed in the SCCP. The goal of SCCP is to help inmate-patients reach their highest level of functioning and maintain that functioning upon integration back into their housing units.

At the outset of the current process to assess the condemned population, 23 inmate-patients were already receiving treatment in the SCCP. Once the mental health inpatient beds for the condemned population at SQ are activated, the inmate-patients receiving treatment in the SCCP will be transferred to those beds. As such, the SCCP will be subsumed into the SQ Psychiatric Inpatient Program once the 40 inpatient beds are activated.

As part of a critical needs assessment inmate-patients were screened for symptoms of acute distress and/or unidentified mental health needs. The assessment consisted of:

- An in person interview with all inmate-patients.
- An invitation for a confidential one on one interview.
- Providing the inmate-patient with a SQ Mental Health Brochure.
- Providing the inmate-patient with a CDCR inmate request for interview.

The identification of symptoms of acute distress and/or unidentified mental health needs were based on the following criteria:

1. Acute onset of symptoms or significant decompensation due to a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, agitated or vegetative signs, definitive impairment in reality testing and/or judgment.

2. Inability to function in the condemned population based upon any of the following:

   a. A demonstrated inability to program in and/or benefit from the Condemned EOP Treatment Program for two consecutive months.

   b. A demonstrated inability to program in condemned correctional activities such as education, religious services, self-help programs, canteen, recreational activities, or visiting, as a consequence of a serious mental disorder.

c. The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre behavior, extreme argumentativeness, inability to respond to staff directions, provocative behavior, or inappropriate sexual behavior, as a consequence of a serious mental disorder.

d. An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of a serious mental disorder.

## V.   Conclusion

The assessment project concluded on May 7, 2014 with the completion of the last IDTT for consideration of referral to an inpatient level of care.  This project was a comprehensive review, evaluation and assessment of the condemned population at SQ.  The project involved four incremental steps toward assuring that the condemned population had been reviewed, on the basis of clinical criteria, to ensure inmates were receiving the appropriate level of care.

As part of the *Coleman* Court order filed on December 10, 2013, it was also ordered that:

"Defendants shall forthwith resume working under the guidance of the Special Master to establish a durable remedy that provides adequate access to necessary inpatient mental health care or its equivalent for seriously mentally ill inmates on California's death row."

CDCR has already begun activation of a 40 bed psychiatric inpatient program (PIP) at SQ to provide intermediate and acute levels of mental health care to the condemned population.  The assessment project confirmed that the proposed 40 bed program would provide sufficient resources to meet the mental health needs of the inmates on death row.  In anticipation of this outcome, work on the activation was begun in late December 2013 starting with a preliminary walk-through conducted by Division of Health Care Services (DHCS) to review the proposed 40 bed unit on SQ's fourth floor.

A number of steps that lay the foundation for activation have been underway as the assessment project was designed and coordinated with the Special Master's team, Plaintiffs' counsel, CDCR Headquarters and SQ staff.   In expectation that a 40 bed PIP would provide more than enough inpatient beds, work was begun on several fronts to start the activation as noted below.

Program Overview:

The SQ PIP will provide inpatient mental health treatment services for those individuals who require lengthier inpatient hospitalization for the treatment of severe and persistent mental illness at the intermediate or acute levels of care.  The SQ PIP will provide comprehensive treatment services to inmate-patients who require 24-hour inpatient care and treatment for mental health disorders.  Services are provided within an interdisciplinary treatment team approach that places high priority on inmate-patient involvement.

The SQ PIP project will be subject to rigorous healthcare standards as required by the California Department of Public Health (CDPH) and will be licensed under Title 22 Correctional Treatment Center standards.  In addition, the SQ PIP will be Joint Commission (JC) accredited.   The SQ PIP's licensure, activation, operation and accreditation will demonstrate that CDCR can meet all inpatient mental health needs for the condemned population.

CDCR plans to activate the new 40-bed facility at SQ under the direct supervision of the DHCS headquarters, in collaboration with all stakeholders, including the Division of Adult Institutions headquarters staff as well as institutional custody and health care staff.  In order to ensure the successful endorsement of this program by the JC in accordance with their Behavioral Health Care standards, CDCR intends to staff and operate this new facility using the model employed by the PIP at California Institution for Women (CIW).  Healthcare staff will be responsible for keys and the control of IP movement within the facility.  Custody staff will be inside the facility, and will be responsible for security at the doors and security at the perimeters of the facility, and will control IP movement outside of the facility.  Health care staff will be trained in Positive Approaches and Strategies Techniques and Management of Assaultive Behavior, and will provide the role of first responder to behavioral interventions. Custody staff will provide additional support in responding to personal alarms when activated by healthcare staff as needed for significant behavioral and physical interventions.

The treatment approach in the SQ PIP will be designed to integrate the biological, psychological, and social aspects of each patient.  Patients will typically be admitted directly from an Enhanced Outpatient Program (EOP) when it is deemed that they are in clinical need of a higher level of mental health care.  However, patients may also be admitted directly from a Mental Health Crisis Bed or a Correctional Clinical Case Management System outpatient program.

The SQ PIP will provide a treatment program consistent with that in place at the CIW PIP that will include the following:

- A structured and comprehensive treatment environment with appropriate clinical staffing levels.
- Clinical evaluation to prevent injuries from occurring due to threat of suicide of self-harm.
- Regular psychotropic medication evaluation, review and maintenance.
- Psycho-educational therapy to increase understanding of mental illness, the symptoms, warning signs of decompensation, and the building/reinforcing of management and coping skills.
- Mental health treatment focused on understanding and reducing substance abuse behaviors through psycho-educational, supportive/directive, and relapse prevention strategies.
- Ancillary and supportive therapies geared toward acquiring skills in adaptive living through rehabilitative therapies such as art, music, and movement activities.
- Establishment of a Performance Improvement Committee to implement and monitor program performance.

The SQ PIP will implement an admission and orientation process that mirrors the Discretionary Program Status system currently in place at the CIW PIP.  This entails graduated stages of privileges based on good behavior and participation in treatment groups.  The Stage program will recognize and promote the responsible functioning of individual patients as they progress in meeting their treatment goals.

DHCS is working closely with the California Correctional Health Care Services (CCHCS) in designing and implementing the new SQ inpatient mental health program.  CDCR intends the new SQ PIP to resemble the PIP established at CIW. To this end, DHCS will collaborate with CCHCS and CIW on many issues including, but not limited to, activation, staffing, training,

policy, procedures, program design, licensing, and accreditation. The clinical mental health staff at SQ PIP will be provided mentoring and training by staff at the CIW PIP.

Activation:

A preliminary walk through of the SQ PIP 40 bed unit was conducted by DHCS on December 23, 2013 to review SQ's fourth floor licensed space. At that time, the physical plant on the fourth floor consisted of 17 Mental Health Crisis Beds, and 23 unlicensed beds. A service request review was submitted to Facility Planning, Construction and Management (FPCM) on February 28, 2014. FPCM completed an initial walk through and submitted the response to the service request on April 14, 2014. DHCS met with SQ to determine the retrofit project scope and responded to the service request on May 12, 2014. Inmate Ward Labor (IWL) and FPCM conducted a follow up walk through of the fourth floor on May 19, 2014. Thereafter, DHCS and IWL began work on costing, estimating time frames, and phasing of scope of work. Currently, the initial stages of the design phase are underway. The reconfiguration of exercise yards, installation of fixed elements, and changes to the medical gas system will require review and approval by the Office of the State Fire Marshall. The retrofits and modifications will take a minimum of 90 days and include:

- Add screening in the yard over existing wire fabric.
- Divide group yard into two separate program yards.
- Patient sinks will require the addition of a suicide resistant shelf to be welded.
- Removal of medical gas outlets.
- Installation of suicide resistant beds.
- Installation of a restraint bed.
- Installation of "no pick" caulking.
- Install a sink in the Day Room.
- Install a phone line in the Day Room.
- Install suicide resistant grab bars in patient rooms and yards.
- Add lighting to yards to maximize patient access to yard time.
- Installation of cable television coaxial outlets and security plates.

Patient room and treatment space have been identified to accommodate the 50 bed floor (40 inpatient mental health beds and 10 medical beds). The treatment and office space available to the SQ PIP on the fourth floor where the inmate-patients will be housed is:

- 2  IDTT conference rooms.
- 2  IDTT work stations.
- 1  Activity therapy room.
- 1  Day room.
- 4  Interview / Consultation Rooms.

Additional treatment and IDTT rooms have been identified on the second floor to allow for expanded treatment access. The second floor space provides:
- 4  Group treatment rooms.
- 1  Treatment office with treatment module.
- 5  Clinical offices with treatment module.
- 3  IDTT conference rooms.

10

Initial identification of equipment needs was initiated on February 28, 2014. The procurement process began on May 7, 2014 for items requiring 60 days or more to manufacture and deliver. A consumables list was initiated by SQ on May 6, 2014.

Licensing and Accreditation:

Development of the licensing application packet was started on May 12, 2014. Leadership training regarding JC requirements was provided to SQ health care mental health and SQ leadership in a "kick-off" meeting on May 6, 2014. Additional Leadership training sessions will be scheduled after new management and supervisory staff have been hired. Informal notification with the CDPH's Licensing Division has been completed to inform them of the request to activate licensure of the 23 suspended beds. In addition, JC training and preparation will be continuous throughout activation. The JC process will take up to 18 months for SQ to obtain accreditation. However, this will not impede the activation process because the program will be operational during the accreditation process, which is required by JC standards.

Training:

A meeting was held on May 6, 2014 to identify effective training and mentoring topics designed to assist in the establishment of the PIP. The initial scheduled mentoring process for SQ mental health staff will be held at the CIW PIP on June 2 and 3, 2014.

The following is a summary of topics to be included in the initial training and mentoring sessions conducted with CIW and SQ mental health staff:

- Meet with CIW's leadership for an introduction to its PIP Program
  o PIP's Mission
  o Program Highlights
  o Joint commission highlights including organization of JC requirements (Chapter Experts)
  o Leadership and communication (e.g. with custody and nursing at Shift Report re: allowable item changes/ Privilege/ Stage changes etc)
  o Performance improvement (Discussion of areas tracked and reported on during PI)
  o Tracking system: manual for now and AMP

- Observe/ Discuss the Admission Process
  o RN Assessment
  o Psychiatrist admission process
  o Discussion/review of Psychologist, SW, RT initial evaluations

- Scheduled IDTTs
  o 72 Hour; 10 day; 30 day IDTTs
  o Observe and discuss specific inquiries required by JC
  o Review documentation

- Mini IDTTs
  o Purpose of Mini IDTTs (following UO etc)
  o Observe mini IDTT

11

- Stage Program
  - o  Review of Stage requirements and allowable property per Stage level

- Unusual Occurrences
  - o  Review of what constitutes a UO and the process of completion

Additional mentoring sessions will occur in conjunction with CIW PIP staff as new SQ staff is hired, and will continue until there is no further need.

Staffing:

The staffing premise was completed in February 2014 for mental health positions, custody positions, and medical/nursing positions designated to provide mental care health services for the 40 bed SQ PIP.  A meeting was held with health care and custody leadership to review current positions associated with the premise.   Recruitment efforts were initiated on April 28, 2014 and will continue until complete.

Policies and Procedures:

In mid February 2014 the Statewide Mental Health Program began converting the CIW PIP's policies to statewide policies with a deadline of six weeks.

A conversion process plan was developed and included three phases:

1.  Initial conversion to statewide format.
2.  Content review (identifying references to local operations and further formatting).
3.  Final review to prepare the documents for the policy workgroup review and vetting.

A document sharing application, SharePoint, was established and dedicated to the PIP policy conversion project.  This SharePoint is used to coordinate and organize the phases of policy development and is utilized to maintain version control of all documents.  Ten Statewide Mental Health Program staff members were trained to conduct the policy conversion.  By the end of March 2014, all of CIW's PIP policies were converted and ready for the vetting process, which met the six week deadline set in February.   This produced 416 separate documents, both policies and procedures.

Policy vetting webinar meetings were initiated as soon as policies were ready for the workgroup. The first vetting meeting occurred at the end of February 2014. These meetings were conducted with stakeholders from Division of Adult Institutions, CCHCS Nursing, SQ staff, DHCS Licensing, and Statewide Mental Health.   During the vetting process, the policies and procedures were reviewed, edited and/or notes recorded for further work to be performed later. As of the first week of May 2014, 98 percent of all policies had been vetted by the workgroup.

Following the vetting process, documents were put through a process of finalization to prepare them for release. Of the total number of policies, 55 percent are finalized and have been released to SQ to be converted to Local Operating Procedures. Currently, Statewide Mental Health Program staff members are continuing to finalize the remaining policies and procedures. SQ has a process in place to ensure that the statewide PIP policies are converted to local operating procedures. Once they receive the statewide documents, SQ conducts several phases of review and editing in order to finalize their policies. As of mid-May, 50 percent of the

statewide policies that they have received have been finalized as PIP local operating procedures.

In conclusion, the successful completion of the project to assess the SQ condemned population for any unmet need of inpatient mental health care and the ongoing work to expedite the activation of the 40 bed SQ PIP clearly demonstrate the efforts CDCR is undertaking to comply with the letter and spirit of the *Coleman* Court's December 10, 2013 order. CDCR, in collaboration with the *Coleman* Special Master, will continue work to activate the "durable remedy" the 40 bed SQ PIP will be in order to ensure the condemned population has unfettered access to the full continuum of mental health care services.

**Attachment A**

**Condemned Inpatient Mental Health Survey Instrument Data Collection Tool**
**Condemned Inpatient Mental Health Survey Instrument Flow Sheet**
**Condemned Inpatient Survey Instrument**
**Psychiatric Inpatient Program Decision Tree Flow Chart**

# Condemned Inpatient Mental Health Survey Instrument Data Collection Tool

As surveys are likely to be more effective, correctional officers (COs) are selected for survey if they are assigned or posted to a condemned housing unit as a tier officer.  Psychiatric Technicians (PT) are selected for survey if they are assigned or posted to conduct surveys on a condemned housing unit. Medical physicians are selected for survey if they are assigned or posted as primary care providers (PCP) on a condemned housing unit.  Custody, PCP, and PT survey data will be obtained upon completion of the survey.  One tier officer per custody watch (first, second, and third watch), and the assigned PT and PCP, for each condemned housing tier will be surveyed for each of the inmates currently housed on their tier (or housing unit for PT and PCP). Accordingly, under this approach, each inmate will have 5 separate surveys pertaining to his perceived inability to adequately function or perceived inability to take care of himself on either a part-time or full-time basis.

Clinicians who will conduct clinical reviews should be specified and trained, and as in the previous unmet need assessment studies, should not be San Quentin line or supervisory staff. The line staff will subsequently assume this responsibility of following the assessment as part of their routine clinical duties.  If indicated, there will be clinical surveys of those inmates who have indicator(s), but the initial decision is not to refer to ICF/APP.

The Protocol is intended to be consistent with the Program Guide requirement that the Interdisciplinary Treatment Team (IDTT) make decisions regarding referrals. In those cases where the outcome of the Clinical Assessment is to refer, and the IDTT elects not to refer, the IDTT's decision and justification must be clearly documented in the treatment plan. The decision must be based on current clinical status and a plan to specifically address any ongoing indicators that led to the decision to refer based on the clinical review. The inmate should be monitored regularly consistent with program guide expectations until he no longer meets selection/referral criteria or referred when clinically indicated.

1. **The individual is unable to adequately function or is unable to take care of himself on either a part-time or full-time basis at the current level of care.**
   Check "Yes" if the individual was referred to mental health by a custody officer, PCP, or PT at least once in the preceding 6-months.  Check "Yes" if anyone surveyed indicated "Yes" to the question of being unable to function or take care of themselves. Check "No" if the individual was not referred to mental health by a custody officer, PCP, or PT at least once in the preceding 6-months and if none of the custody tier officers, PCP, or PT staff indicated "Yes' to the question of unable to take care of himself on either a part-time or full-time basis .

   Narrative Introduction:
   You are being surveyed in order to solicit information from you on condemned inmate-patients which you are familiar with by virtue of your current position.

   Generally speaking we will be asking you about identifying condemned inmate-patients who you believe are unable to adequately function or are unable to take care of themselves on either a part-

time or full-time basis.  You may choose to review the 114-A log.  Examples of being unable to adequately function or care for oneself could include, but are not limited to the following:

- A full time pattern of refusing food trays or an intermittent pattern of refusing food trays
- A full time pattern of refusing showers or an intermittent pattern of refusing showers
- Poor hygiene/grooming or living conditions on a constant basis or intermittent poor hygiene/grooming
- A noticeably persistent body odor
- Refusal to leave one's cell for long periods of time (e.g., for yards, visits, health care appointments, showers)
- Frequent yelling or screaming for no apparent reason
- Frequently talking to oneself
- Crying in cell
- Bizarre or confused behavior; social isolation (including outside supports); not doing well
- A pattern of hostile, aggressive, or threatening behavior or statements
- Talking about suicide, death, dying, or hurting oneself.

Data Source: Custody, PCP, and PT survey data will be obtained upon completion of the survey.  One tier officer per custody watch (first, second, and third watch), and the assigned PT and PCP, for each condemned housing tier will be surveyed for each of the inmates currently housed on their tier (or housing unit for PT and PCP).

**2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision.**
Check "Yes" if any of the surveyed staff endorsed "Yes" to an inmate-patient being unable to adequately function or unable to take care of themselves on either a part-time or full-time basis; **OR** Check "Yes" if the inmate-patient is currently in a mental health level of care and the treatment team documented "Yes" to Item 2 of Section A, Part II of the most recently submitted *Interdisciplinary Treatment Team – Level of Care Decision, CDCR MH-7388-B.*

Data Source: Data will be obtained from custody, PCP, and PT surveys, eUHR and the Mental Health Tracking System (MHTS).

**3. On average and in the last 90 days, the inmate-patient has participated in less than the minimum number of structured treatment hours per week.**
Check "Yes" if the inmate-patient is at an EOP level of care and, on average over the preceding 90 days, has participated in less than five hours of structured mental health treatment per week. Check "No" if the inmate-patient is at an EOP level of care and, on average over the preceding 90 days, has participated in five hours or more of structured mental health treatment per week.

Data Source: Data will be obtained from the Mental Health Tracking System (MHTS) and CDCR MH-7388-B.

**4. The inmate-patient is currently in a mental health level of care and demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.**

Check "Yes" if the inmate-patient is currently in a mental health level of care and the treatment team documented "Yes" to Item 3 of Section A, Part II of the most recently submitted *Interdisciplinary Treatment Team − Level of Care Decision, CDCR MH-7388-B*. Check "No" if the inmate-patient is currently in a mental health level of care and the treatment team documented "No" to Item 3 of Section A, Part II of the most recently submitted *Interdisciplinary Treatment Team − Level of Care Decision, CDCR MH-7388-B*. Check "No" if the individual is not currently in a mental health level of care.

Data Source: Data will be obtained from the eUHR, CDCR MH-7388-B and the Mental Health Tracking System (MHTS).

**5. The inmate-patient is currently in a MHCB, has been in a MHCB for at least 10 days or has had a 10+ day stay in the MHCB during the past 6-months.**
Long lengths of stay in MHCB was shown in prior studies as a potential indicator of low functioning and the clinical need for ICF level of care post-MHCB stay.  Accordingly, check "Yes" when patients have had a 10+ day stays in MHCB during the past 6-months, but who are not currently in MHCB. Check "Yes" if the inmate-patient was in the MHCB, and had been in the MHCB for a minimum of 10 consecutive days, on the date the survey tool was completed. Check "No" if the inmate-patient is not currently in a MHCB, has not been in a MHCB for at least 10 days or has not had a 10+ day stay in the MHCB during the past 6-months.

Data Source: Data will be obtained from the MHCB Daily Census and the Mental Health Tracking System (MHTS).

**6. The inmate-patient has had a minimum of three MHCB placement requests initiated during the preceding 6-months.**
Check "Yes" if the inmate-patient has had three or more MHCB placement requests during the preceding 6-months. Check "No" if the inmate-patient has had zero, one, or two MHCB placement requests initiated during the preceding 6-months.

Data Source: Data will be obtained from the Mental Health Tracking System (MHTS).

**7. The individual is currently at a custody grade status of Grade B and their custody grade status changed from Grade A to Grade B in the last 6-months.**
Check "Yes" if the individual was at a custody grade status of Grade B on the date the survey tool was completed and had their condemned custody grade status changed from Grade A to Grade B in the preceding 6-months. A "Yes" response would include individuals whose status changed from Grade A in East Block to Grade B in East Block as well as individuals whose status changed from Grade A in East Block to Grade B in the Adjustment Center. Check "No" if the individual was Grade A on the date the survey tool was completed. Check "No" if the individual has not had their condemned custody grade status changed from Grade A to Grade B in the last 6-months. This would include individuals who maintained continuous Grade A status, maintained continuous Grade B status, or those whose status changed from Grade B to Grade A in the preceding six months.

Data Source: Data will be obtained from custody grade status logs.

**8. The inmate-patient is currently housed in the Adjustment Center and is in a mental health level of care.**

Check "Yes" if the inmate-patient was housed in the Adjustment Center (AC) and in a mental health level of care on the date the survey tool was completed. Check "No" if the individual was housed in the Adjustment Center (AC) but not in a mental health level of care on the date the survey tool was completed. Check "No" if the inmate-patient was not housed in the Adjustment Center (AC) on the date the survey tool was completed.

<u>Data Source</u>: Data will be obtained from custody housing reports and the Mental Health Tracking System (MHTS).

9. **The inmate-patient has had a minimum of one DSH admission or referral in the past year.**
Check "Yes" if the inmate-patient was referred or transferred to a DSH facility (DSH-Acute or DSH-Intermediate) for treatment in the preceding 12-months. Check "No" if the inmate-patient was not referred or transferred to a DSH facility (DSH-Acute, DSH-Intermediate) for treatment in the preceding 12-months.

<u>Data Source</u>: Data will be obtained from the DSH Coordinator and the Mental Health Tracking System (MHTS).

10. **The inmate-patient has been treated with clozapine in the past year.**
Check "Yes" if the inmate-patient received at least one prescribed dose of clozapine (Clozaril) in the preceding 12 months. Check "No" if the inmate-patient did not receive at least one prescribed dose of clozapine (Clozaril) in the preceding 12 months.

<u>Data Source</u>: Data will be obtained from the Clozapine Status report.

11. **The inmate-patient has been placed on a Penal Code 2602 order in the past year.**
Check "Yes" if the inmate-patient was placed on a PC 2602 court order in the preceding 12-months. Check "No" if the inmate-patient was not placed on a PC 2602 court order in the preceding 12-months.

<u>Data Source</u>: Data will be obtained from the PC 2602 Status Report.

12. **The inmate-patient has been on the High Risk List or the Self-Harm Log over the past 6-months.**
Check "Yes" if the inmate-patient was on the High Risk List or the Self-Harm Log over the past 6-months. Check "No" if the inmate-patient was not on the High Risk List or the Self-Harm Log over the past 6-months.

<u>Data Source</u>: Data will be obtained from the Suicide Prevention Coordinator (SPC) and submitted Suicide Prevention and Response Focused Improvement Team (SPR-FIT) audits.

## Condemned Inpatient Mental Health Survey Instrument
## Flow Sheet

**A.** **12 Item Condemned Survey Instrument:**
If a referral to an inpatient level of care is currently recommended by local administration and/or an IDTT then proceed to Step C-IDTT.

Otherwise, if any of the following 12 condemned survey items are identified as positive then proceed to Step B-Clinical Assessment.

1. **The individual is unable to adequately function or is unable to take care of himself on either a part-time or full-time basis at the current level of care.**
   - A full time pattern of refusing food trays or an intermittent pattern of refusing food trays
   - A full time pattern of refusing showers or an intermittent pattern of refusing showers
   - Poor hygiene/grooming or living conditions on a constant basis or intermittent poor hygiene/grooming
   - A noticeably persistent body odor
   - Refusal to leave one's cell for long periods of time (e.g., for yards, visits, health care appointments, showers)
   - Frequent yelling or screaming for no apparent reason
   - Frequently talking to oneself
   - Crying in cell
   - Bizarre or confused behavior; social isolation (including outside supports); not doing well
   - A pattern of hostile, aggressive, or threatening behavior or statements
   - Talking about suicide, death, dying, or hurting oneself.

2. **The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision.**

3. **On average and in the last 90 days, the inmate-patient has participated in less than the minimum number of structured treatment hours per week.**

4. **The inmate-patient is currently in a mental health level of care and demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.**

5. **The inmate-patient is currently in a MHCB, has been in a MHCB for at least 10 days or has had a 10+ day stay in the MHCB during the past 6-months.**

6. **The inmate-patient has had a minimum of three MHCB placement requests initiated during the preceding 6-months.**

7. **The individual is currently at a custody grade status of Grade B and their custody grade status changed from Grade A to Grade B in the last 6-months.**

8. **The inmate-patient is currently housed in the Adjustment Center and is in a mental health level of care.**

9.  The inmate-patient has had a minimum of one DSH admission or referral in the past year.

10. The inmate-patient has been treated with clozapine in the past year.

11. The inmate-patient has been placed on a Penal Code 2602 order in the past year.

12. The inmate-patient has been on the High Risk List or the Self-Harm Log over the past 6-months.

## B. Clinical Assessment

The interview will be conducted in a confidential setting, unless the inmate-patient refuses, then a cell front interview will occur. If the inmate-patient refuses to participate in the cell front interview, the clinician will seek out additional sources of information as related to the positive survey item(s).

The Clinical Assessment will consist of the following:

- eUHR Review (suicide history, ADL issues, mental health history)

- Mental Status Exam

- Inquiry into the positive items on the 12-item survey instrument

The findings of the Clinical Assessment will be summarized in a clinical report.

If the clinician completing the Clinical Assessment recommends that the inmate-patient be considered for an inpatient level of care, then the clinician would present their written recommendations in a report to be discussed in an IDTT within 30 days (Proceed to Step C-IDTT).

## C. Interdisciplinary Treatment Team (IDTT)

If a referral to an inpatient level of care is recommended by local administration and/or an IDTT, then the inmate will be referred to an inpatient care program.

The Protocol is intended to be consistent with the Program Guide requirement that the Interdisciplinary Treatment Team (IDTT) make decisions regarding referrals. In those cases where the outcome of the Clinical Assessment is to refer, and the IDTT elects not to refer, the IDTT's decision and justification must be clearly documented in the treatment plan. The decision must be based on current clinical status and a plan to specifically address any ongoing indicators that led to the decision to refer based on the clinical review. The inmate should be monitored regularly consistent with program guide expectations until he no longer meets selection/referral criteria or referred when clinically indicated.

# Condemned Inpatient Survey Instrument
# San Quentin State Prison

**<u>Narrative Introduction</u>:**

You are being surveyed in order to solicit information from you on condemned inmate-patients which you are familiar with by virtue of your current position.

Generally speaking we will be asking you about identifying condemned inmate-patients who you believe are unable to adequately function or are unable to take care of themselves on either a part-time or full-time basis. You may choose to review the 114-A log. Examples of being unable to adequately function or care for oneself could include, but are not limited to the following:

- A full time pattern of refusing food trays or an intermittent pattern of refusing food trays
- A full time pattern of refusing showers or an intermittent pattern of refusing showers
- Poor hygiene/grooming or living conditions on a constant basis or intermittent poor hygiene/grooming
- A noticeably persistent body odor
- Refusal to leave one's cell for long periods of time (e.g., for yards, visits, health care appointments, showers)
- Frequent yelling or screaming for no apparent reason
- Frequently talking to oneself
- Crying in cell
- Bizarre or confused behavior; social isolation (including outside supports); not doing well
- A pattern of hostile, aggressive, or threatening behavior or statements
- Talking about suicide, death, dying, or hurting oneself.

Generally speaking those identified as being condemned inmate-patients whom you believe are unable to adequately function or are unable to take care of themselves on either a part-time or full-time basis, may include:

Surveyor:        ___ _____        Respondent:   _____

Inmate Name:   _____        Respondent Discipline: _____

CDCR Number: _____        Today's Date:   _____/_____/ 2014

Unable to adequately function or are unable to take care of themselves?

                        YES            NO            (Circle one)

**Inmate's Current Housing Unit** (circle all that apply):

        East Block            Adjustment Center        North Segregation            CHSB

        Bayside   Yardside        Northside  Southside        Northside  Southside        MHCB   OHU   SCCP

**Inmate's Current Tier** (circle one):     1st        2nd        3rd        4th        5th

**Inmate's Current Cell/House Number**:      _____

**PT or Custody Watch** (circle one):        1st            2nd            3rd

### Notable Information For Potential IDTT Follow-up (e.g., specific examples)

_____

_____

_____

_____

_____

### Thank you for your cooperation with this survey.



**All Condemned Receive 12-Item Screen**

**SCCP Only**

Minimum of 1 Positive Screening Item?

Local Admin and/or previous
IDTT Recommends Referral
Inpatient Care

STOP ← No    Yes

No    Yes

**Clinical Evaluation**

Clinical Eval Recommends Inpatient

STOP ← No    Yes

**IDTT** w/in 14d

IDTT Refers to Inpatient?

STOP    No    Yes →    **REFER TO INPATIENT**
(Reasoning & How Address
Ongoing Indicators in Tx Plan)

**Legend for 12 Item Condemned Survey Instrument**

1.  The individual is unable to adequately function or is unable to take care of himself on either a part-time or full-time basis at the current level of care.

    a.  A full time pattern of refusing food trays or an intermittent pattern of refusing food trays
    b.  A full time pattern of refusing showers or an intermittent pattern of refusing showers
    c.  Poor hygiene/grooming or living conditions on a constant basis or intermittent poor hygiene/grooming
    d.  A noticeably persistent body odor
    e.  Refusal to leave one's cell for long periods of time (e.g., for yards, visits, health care appointments, showers)
    f.  Frequent yelling or screaming for no apparent reason
    g.  Frequently talking to oneself
    h.  Crying in cell
    i.  Bizarre or confused behavior; social isolation (including outside supports); not doing well
    j.  A pattern of hostile, aggressive, or threatening behavior or statements
    k.  Talking about suicide, death, dying, or hurting oneself.

2.  The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision.
3.  On average and in the last 90 days, the inmate-patient has participated in less than the minimum number of structured treatment hours per week.
4.  The inmate-patient is currently in a mental health level of care and demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.
5.  The inmate-patient is currently in a MHCB, has been in a MHCB for at least 10 days or has had a 10+ day stay in the MHCB during the past 6-months.
6.  The inmate-patient has had a minimum of three MHCB placement requests initiated during the preceding 6-months.
7.  The individual is currently at a custody grade status of Grade B and their custody grade status changed from Grade A to Grade B in the last 6-months.
8.  The inmate-patient is currently housed in the Adjustment Center and is in a mental health level of care.
9.  The inmate-patient has had a minimum of one DSH admission or referral in the past year.
10. The inmate-patient has been treated with clozapine in the past year.
11. The inmate-patient has been placed on a Penal Code 2602 order in the past year.
12. The inmate-patient has been on the High Risk List or the Self-Harm Log over the past 6-months.

**Outcome Descriptions**

Outcome A:  In LOC more than six months.
Outcome B:  Currently in the SCCP.
Outcome C:  Recommended for Clinical Review.
Outcome D:  Ask CO and PT about I/P.
Outcome E:  Consider referral to EOP.
Outcome F:  False positive for Item #4.

EXHIBIT B

**California Department of Corrections and Rehabilitation (CDCR) - San Quentin State Prison (SQ)**

**San Quentin Psychiatric Inpatient Program (SQ PIP)**

## *This schedule will be accelerated consistent with patient safety whenever possible*

| TASK | ACTIVITY NAME | DURATION | PROPOSED START DATE | *PROPOSED END DATE | ACTUAL START DATE | ACTUAL END DATE | RESPONSIBLE PERSON | STATUS |
|---|---|---|---|---|---|---|---|---|
| **1. SCREENING** | | | | | | | | |
| ACT-01 | **Screening criteria development** | 30 Days | 1/25/2014 | 2/28/2014 | 1/25/2014 | 2/28/2014 | | Task Completed |
| | Screening Assessment | 45 Days | 4/1/2014 | 5/9/2014 | 4/1/2014 | 5/9/2014 | | Task Completed |
| **2 . DE-ACTIVATION PLAN** | | | | | | | | |
| ACT-02 | **Develop Movement/Transfer Plan** | 70 Days | 5/21/2014 | 7/31/2014 | 5/21/2014 | | | Long term medical condemned patients identified on 4/1/14; meeting 6/2/14, institution identified, alternative location requested; policy memo under development |
| | Patient Movement | 30 days | 7/1/2014 | 7/31/2014 | | | | |
| **3. CONSTRUCTION** | | | | | | | | |
| ACT-03 | **Architectural/Engineering** | 581 Days | 12/23/2013 | 6/30/2015 | 12/23/2013 | | | |
| | Identify physical plant needs | 140 Days | 12/23/2013 | 5/12/2014 | 12/23/2013 | 4/14/2014 | | 12/23/13:  initial tour completed by Dr.; no pick caulking needed on grab bar showers; piped O2 needs capping; grab bars in the yard not suicide resistant; due to title 22/24 additional observation rooms will be required. A service request completed 2/28/14; completed response to service request 4/14/14; DHCS reviewed and responded 5/12/14. |
| | Scope of Work | 45 days | 5/15/2014 | 6/30/2014 | 6/3/2014 | | | |

Updated 6/10/2014

**California Department of Corrections and Rehabilitation (CDCR) - San Quentin State Prison (SQ)**

**San Quentin Psychiatric Inpatient Program (SQ PIP)**

***This schedule will be accelerated consistent with patient safety whenever possible***

| TASK | ACTIVITY NAME | DURATION | PROPOSED START DATE | *PROPOSED END DATE | ACTUAL START DATE | ACTUAL END DATE | RESPONSIBLE PERSON | STATUS |
|---|---|---|---|---|---|---|---|---|
| | Drawings | 132 Days | 6/3/2014 | 10/15/2014 | 6/3/2014 | | | Non-detailed drawings for installation of suicide resistant beds/coaxial cables; detailed drawings for lighting, sink installation, etc. |
| | Construction and Retro fits | 60 Days | 7/30/2014 | TBD | | | | Includes the installation of suicide resistant beds.  Work requiring approval, such as capping medical gas, lighting of yards, installation of sink will not impede operating beds, program to develop operational processes prior to and during retro fits |
| ACT-04 | **Self Certification Review** | 60 days | 7/15/2014 | 9/15/2014 | | | | Review Self Certification |
| | Alternative Means of Compliance (AMC) Review | 60 Days | 7/15/2014 | 9/15/2014 | | | | A review to be completed to determine if AMCs are required |
| **4.  ACTIVATION PLANNING** | | | | | | | | |
| ACT-05 | **Location identified for PIP Program** | 60 Days | 5/5/2014 | 5/30/2014 | 5/5/2014 | 5/5/2014 | | Assessment completed; SQ to be location for services |
| ACT-06 | Provide floor plan to Stakeholders | 30 Days | 12/23/2013 | 12/23/2013 | 12/31/2013 | 12/23/2014 | | Two sets provided - task completed |

**California Department of Corrections and Rehabilitation (CDCR) - San Quentin State Prison (SQ)**

**San Quentin Psychiatric Inpatient Program (SQ PIP)**

## *This schedule will be accelerated consistent with patient safety whenever possible*

| TASK | ACTIVITY NAME | DURATION | PROPOSED START DATE | *PROPOSED END DATE | ACTUAL START DATE | ACTUAL END DATE | RESPONSIBLE PERSON | STATUS |
|------|--------------|----------|--------------------|--------------------|-------------------|-----------------|--------------------|--------|
| ACT-07 | Determine Patient Room Layout and Service Areas | 158 Days | 12/23/2013 | 5/30/2014 | 12/23/2013 | 5/9/2014 | | Provided fourth floor draft layout 12/13; patient and service areas completed fourth floor; additional IDTT and treatment space determined for use on second floor |
| ACT-08 | **Funding Identification** | 105 Days | 4/15/2014 | 6/30/2014 | 4/15/2014 | 5/12/2014 | | DHCS will fund |
| **5.  PERSONNEL/STAFFING** | | | | | | | | |
| ACT-09 | **Staff Planning** | 235 Days | 2/15/2014 | 9/30/2014 | 2/15/2014 | | | |
| | Develop Staffing Plan | 15 Days | 2/15/2014 | 2/26/2014 | 2/15/2014 | 2/26/2014 | | Premise Completed |
| | MH Staffing Recruitment | 120 Days | 4/30/2014 | 7/30/2014 | 4/28/2014 | | | Positions posted; pending interviews |
| | Custody Staff Recruitment | 90 Days | 7/1/2014 | 9/30/2014 | | | | Resources have been identified, hiring predicated on first patient date (determined to be 10/1/14 ) |
| | Nursing/Medical Recruitment | 90 days | 7/1/2014 | 9/30/2014 | | | | Resources have been identified, hiring predicated on first patient date (determined to be 10/1/14) |
| **6.  Procurement** | | | | | | | | |

**California Department of Corrections and Rehabilitation (CDCR) - San Quentin State Prison (SQ)**

**San Quentin Psychiatric Inpatient Program (SQ PIP)**

## *This schedule will be accelerated consistent with patient safety whenever possible*

| TASK | ACTIVITY NAME | DURATION | PROPOSED START DATE | *PROPOSED END DATE | ACTUAL START DATE | ACTUAL END DATE | RESPONSIBLE PERSON | STATUS |
|---|---|---|---|---|---|---|---|---|
| ACT-10 | **Equipment and Supplies** | 244 Days | 2/26/2014 | 9/30/2014 | 2/26/2014 | | | Equipment identification initiated 2/26/14; procurement process began 5/7/14; draft group 2 and consumables received 6/3/14 for HQs initial review; suicide resistant beds ordered/planned delivery date prior to 6/30/14; mattresses shipped to SQ from vendor, pending arrival |
| ACT-11 | **Review Contracts** | 75 Days | 6/1/2014 | 8/15/2014 | | | | |
| | Review Existing Contracts | 75 Days | 6/1/2014 | 8/15/2014 | | | | |
| | Determine Additional Contract needs | 75 Days | 6/1/2014 | 8/15/2014 | | | | |
| ACT-12 | **Labor Notifications** | 180 Days | 4/1/2014 | 9/30/2014 | 4/1/2014 | | | |
| | Labor Relations Notifications | 90 Days | 4/1/2014 | 4/30/2014 | 4/1/2014 | 4/5/2014 | | Labor representatives for CDCR have been notified |
| | Tool Kit Development | 30 Days | 7/1/2014 | 8/1/2014 | | | | Tool kit pending |
| | Bargaining Units Meet and Confer | 90 Days | 8/1/2014 | 9/30/2014 | | | | Pending completion of tool kit and scheduling that is determined by |
| **7. PRE- ACTIVATION** | | | | | | | | |
| ACT-13 | **Information Technology** | 90 Days | 7/1/2014 | 9/30/2014 | | | | |
| ACT-14 | **Policies** | 184 Days | 2/26/2014 | 7/30/2014 | | | | |
| | State Wide PIP Policies & Procedures | 180 Days | 2/26/2014 | 6/30/2014 | 2/26/2014 | | | 64% completed and sent to SQ |
| | Local Operating Procedures | 120 Days | 3/15/2014 | 7/30/2014 | 3/24/2014 | | | 5/15/14: 50% of received policies completed; 6/5/14 65% of received policies completed; |

Updated 6/10/2014

**California Department of Corrections and Rehabilitation (CDCR) - San Quentin State Prison (SQ)**

**San Quentin Psychiatric Inpatient Program (SQ PIP)**

## *This schedule will be accelerated consistent with patient safety whenever possible*

| TASK | ACTIVITY NAME | DURATION | PROPOSED START DATE | *PROPOSED END DATE | ACTUAL START DATE | ACTUAL END DATE | RESPONSIBLE PERSON | STATUS |
|---|---|---|---|---|---|---|---|---|
| ACT-15 | **Operational Procedures edit/review** | 45 Days | 3/25/2014 | 7/30/2014 | 3/25/2014 | | | |
| ACT-16 | **Activation Population Schedule Development** | 30 Days | 9/1/2014 | 9/30/2014 | | | | |
| ACT-17 | **State Fire Marshall Facility Inspection** | 30 Days | 9/1/2014 | 9/30/2014 | | | | |
| ACT-18 | **Activation - Staffing - Stocking** | 60 Days | 8/1/2014 | 9/30/2014 | | | | |
| | Equipment and Furnishing Installation | 60 Days | 8/1/2014 | 9/30/2014 | | | | |
| ACT-19 | **Licensing & Joint Commission** | 120 Days | 6/1/2014 | 9/30/2014 | | | | |
| | Completing  HS 317 | 60 Days | 6/15/2014 | 8/15/2014 | | | | |
| | Prepare Licensing Application | 30 Days | 5/15/2014 | 6/30/2014 | 5/15/2014 | | | Draft application package in review |
| | Public Health Notification and Inspection | 120 Days | 5/15/2014 | 9/30/2014 | 5/15/2014 | | | informal discussion and notification of intent to activate suspended beds |
| | Prepare staff for survey | 30 Days | 9/1/2014 | 9/30/2014 | | | | |
| | Mock Survey | 30 Days | 9/1/2014 | 9/30/2014 | | | | |
| | CADPH Survey | 15 Days | 9/15/2014 | 9/30/2014 | | | | |
| | Joint Commission | 540 Days | 6/15/2014 | 11/15/2015 | | | | Process will take up to 18 months; includes application, full training, 2 separate surveys. (process does not impede ability to operate beds) |
| ACT-20 | **Training** | 320 Days | | | | | | |
| | Transitional Training | 14 Days | 9/15/2014 | 9/30/2014 | | | | |
| | Mentoring Training | 190 Days | 4/23/2014 | 9/30/2014 | 4/23/2014 | | | Initial visit/mentoring at CIW PIP held 6/2 and 6/3/14 |
| | Joint Commission Training | 320 Days | 5/6/2014 | 2/28/2015 | 5/6/2014 | | | Joint Commission Training initiated 5/6/14; Leadership requirements started |

Updated 6/10/2014

**California Department of Corrections and Rehabilitation (CDCR) - San Quentin State Prison (SQ)**

**San Quentin Psychiatric Inpatient Program (SQ PIP)**

**_*This schedule will be accelerated consistent with patient safety whenever possible_**

| TASK | ACTIVITY NAME | DURATION | PROPOSED START DATE | *PROPOSED END DATE | ACTUAL START DATE | ACTUAL END DATE | RESPONSIBLE PERSON | STATUS |
|---|---|---|---|---|---|---|---|---|
| | CTC Training | 45 Days | 7/15/2014 | 9/1/2014 | | | | |
| **8. ACTIVATION - CERTIFICATE OF OCCUPANCY / 1ST PATIENT** | | | | | | | | |
| ACT-21 | **Identification of Patients for Admission** | 90 Days | 4/1/2014 | 5/9/2014 | 4/1/2014 | 5/5/2014 | | Assessment process completed; patients identified |
| ACT-22 | **Current Patients Receiving Services** | 575 Days | 2/1/2013 | 9/30/2014 | 2/1/2013 | | | |
| ACT-22 | **Full PIP Patient Activation** | 45 Days | 10/1/2014 | 11/15/2014 | | | | |
| ACT-23 | **Court Notification Preparation** | 30 Days | 8/1/2014 | 8/31/2014 | | | | |
| **9. PROJECT CLOSURE** | | | | | | | | |
| ACT-24 | **Project Closure** | 60 Days | 4/1/2015 | 6/30/2015 | | | | |

| | |
|---|---|
| Completed: Activity has finished | |
| On Target: Activity finish date is on schedule with the planned finish | |
| Delayed: Current activity finish date is later than planned finish date | |
| Late: planned finish date has passed | |

Updated 6/10/2014

EXHIBIT C

**OFFICE OF LEGAL AFFAIRS**
Benjamin T. Rice
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 10, 2014

Mr. Matthew A. Lopes, Jr., Esq.
Office of the Special Master
Pannone Lopes & Devereaux LLC
317 Iron Horse Way, Suite 301
Providence, RI  02908

Dear Special Master Lopes:

Please see attached California Department of Corrections and Rehabilitation's (CDCR) current activation schedule for the San Quentin Psychiatric Inpatient Program.  CDCR continues to implement the program working in concert with you and your staff, and will accelerate the timelines in the attached schedule wherever possible consistent with patient safety.  CDCR is currently providing all inmates identified through this process with enhanced mental health service, and believes its plan will adequately address the inpatient needs of all condemned Coleman class members.

In addition to the informal updates that you and your staff will receive throughout the implementation process, we will provide you monthly updates to the activation schedule."

Sincerely,

*Kate Falvah for*

BENJAMIN T. RICE
General Counsel
Office of Legal Affairs

Enclosures

EXHIBIT D

## ACRONYMS AND ABBREVIATIONS

3CMS:              Correctional Clinical Case Management System

CDCR:             California Department of Corrections and Rehabilitation

CHCF:             California Health Care Facility

CMF:              California Medical Facility

CQIT:             Continuous Quality Improvement Tool

EOP:              Enhanced Outpatient Program

eUHR:             Electronic Unit Health Record

DHCS:             Division of Health Care Services

IDTT:             Interdisciplinary Treatment Team

SCCP:             Specialized Care for the Condemned Program

SQ:               San Quentin State Prison

SQ PIP:           San Quentin Psychiatric Inpatient Program