DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone:   (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone:   (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone:   (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, JR., et al., <br><br> Defendants. | Case No. 2:90-cv-0520 LKK DAD <br><br> **PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS** <br><br> Judge:  Hon. Lawrence K. Karlton |

[1224630-10]

# TABLE OF CONTENTS

Page

I.   Based on the Special Master's Findings, this Court Should Issue Additional
     Orders to Ensure *Coleman* Class Members Receive Timely Access to
     Adequate Inpatient Care ................................................................................. 4

     A.   This Court Should Order Defendants to Immediately Take Steps to
          Increase Mental Health Treatment in Its Inpatient Programs, and to
          Develop Inpatient Treatment Guidelines Systemwide ................................... 4

          1.   Ongoing Deficiencies in Treatment at SVPP ..................................... 4

          2.   Deficiencies in Treatment at the Remaining DSH Programs .............. 6

     B.   The Court Should Order Defendants to Cease Inappropriate Discharge
          Practices Immediately ..................................................................... 10

          1.   Defendants Continue to Improperly Discharge Class Members
               from Inpatient Care in Anticipation of Parole, In Violation of
               this Court's Orders .......................................................... 10

          2.   Defendants Continue to Discharge Class Members from
               Inpatient Care Based on Lengths of Stay and Inpatient Bed
               Shortages Rather than Clinical Need ................................... 11

          3.   Based on the Special Master's Findings Confirming Plaintiffs'
               Evidence, This Court Should Now Issue Orders Prohibiting
               Defendants from Discharging Patients from Inpatient Programs
               for Any Non-Clinical Reason ............................................ 12

     C.   This Court Should Order Defendants to Properly Track and Comply
          with Transfer Timelines for Inpatient Care .................................... 13

     D.   The Court Should Order Defendants to Remedy Immediately the
          Ongoing Shortages of Basic Necessities in DSH Programs ..................... 15

     E.   This Court Should Explicitly Order Defendants to Include Review of
          Its Use of Force and Disciplinary Procedures in Inpatient Programs in
          Ongoing Efforts to Comply with This Court's April 10, 2014 Order .......... 16

     F.   This Court Should Order Defendants to Cease Installation of Cages in
          Inpatient Settings, and to Immediately Remove Any Cages Already
          Installed ................................................................................ 18

     G.   The Court Should Direct Defendants to Respond to the Special
          Master's Program-Specific Findings, Including with Plans for
          Corrective Action Where Necessary ............................................... 19

[1224630-10]

1    Defendants' constitutional obligation is to provide a "system of ready access to

2    adequate [mental health] care," including inpatient psychiatric hospitalization. *Coleman v.*

3    *Brown*, 938 F. Supp. 2d 955, 981 (E.D. Cal. 2013) (emphasis removed, quoting *Hoptowit*

4    *v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)).  On July 11, 2013, after more than three full

5    days of live testimony, this Court found that Plaintiffs had adduced "significant and

6    troubling evidence" of serious deficiencies in core components of Defendants' inpatient

7    programs, which are tasked with treating the very sickest and most vulnerable *Coleman*

8    class members. 7/11/13 Order (Dkt. No. 4688) at 10.  Among the areas of constitutional

9    concern this Court identified were serious understaffing, unnecessary custodial practices

10   that impede treatment, failures to timely transfer class members to inpatient programs,

11   premature discharges, and denials of basic human necessities like soap and clean

12   underwear. *Id.* at 10-11.  Nonetheless, rather than immediately ordering Defendants to

13   take remedial steps, the Court prudently ordered the Special Master to investigate

14   conditions in all six of the inpatient programs and to issue two reports concerning the

15   programs' "adequacy and whether any modifications to defendants' remedial plan are

16   required to ensure that members of the plaintiff class are receiving adequate inpatient

17   mental health care." *Id.* at 11-12.  The Court ordered the Special Master to investigate and

18   report on SVPP first, given the evidence of dangerous, life-threatening conditions in that

19   program, and then to issue a second report assessing the adequacy of all six inpatient

20   programs, including SVPP. *Id.* at 13-14.

21   The Special Master issued his first report on September 24, 2013, in which he found

22   that conditions at SVPP were in many respects even worse than the trial testimony

23   suggested. *See* Special Master's Report on the Salinas Valley Psychiatric Program

24   ("SVPP Report") (Dkt. No. 4830).  Based on his extensively documented findings, the

25   Special Master recommended that the Court issue remedial orders addressing staffing

26   deficiencies, treatment inadequacies, unnecessary custodial practices related to

27   "Orientation Status" and "Cuff Status," untimely transfers to inpatient settings, and denials

28   of clean laundry.  SVPP Report at 44-45.  Defendants objected, and Plaintiffs requested

1 further remedial orders in addition to those recommended by the Special Master. *See*

2 Defs' Objections to SVPP Report (Dkt. No. 4868), filed 10/14/13; Pls' Response to SVPP

3 Report and Proposed Order (Dkt. Nos. 4867, 4867-1), filed 10/14/13.

4       On November 13, 2013, the Court adopted the Special Master's SVPP findings in

5 full, but only issued orders requiring Defendants to address their dangerous custodial

6 practices and ongoing failures to track and timely transfer class members to inpatient

7 settings consistent with the *Coleman* Program Guide. 11/13/13 Order (Dkt. No. 4925) at

8 20-21. The Court declined at the time to issue the further orders recommended by the

9 Special Master concerning staffing, treatment, and denials of basic necessities in order to

10 allow Defendants time to remedy the identified problems. *Id.* at 11, 19. The Court also

11 denied without prejudice Plaintiffs' request for additional remedial orders concerning the

12 same topics, as well as Defendants' disciplinary (RVR) and use-of-force practices in the

13 inpatient programs, pending both its resolution of Plaintiffs' use-of-force and RVR motion

14 and the Special Master's completion of his first full round of investigation and reporting

15 pursuant to the July 2013 order. *Id.* at 19.

16       The Special Master has now completed his first full report on the adequacy of

17 Defendants' inpatient programs, including his second report on SVPP and its compliance

18 with this Court's November 11, 2013 order. Special Master's Report on Adequacy of

19 Inpatient Mental Health Care for CDCR Inmates ("the Report") (Dkt. No. 5156), filed

20 5/30/13. That Report makes clear that SVPP has not complied with this Court's November

21 2013 Order, and that serious and life-threatening inadequacies pervade Defendants' entire

22 inpatient system.

23       Based on the Report's extensive, well-documented findings establishing that

24 Defendants are failing to provide timely access to adequate inpatient care for *Coleman*

25 class members, the Special Master recommends (1) continued monitoring of the inpatient

26 programs, (2) an expansion of the Court's November 2013 SVPP Order to require

27 Defendants to revisit their unnecessary and dangerous custodial practices at all six

28 inpatient programs, and (3) an order requiring Defendants, with the Special Master's

[1224630-10]

2

1   assistance, to establish adequate clinical staffing ratios.[1]  Report at 55-56.

2          Nonetheless, the Special Master's recommendations, while important and worthy of

3   adoption, do not go far enough to address the unconstitutional conditions plaguing

4   Defendants' inpatient system.  The Special Master's findings reveal that multiple "serious

5   and troubling" deficiencies identified by the Court in its July 2013 Order continue to

6   pervade Defendants' inpatient system, and that Defendants have not complied with the

7   Court's November 2013 SVPP Order in key respects.  Plaintiffs therefore request

8   additional remedial orders addressing quality and quantity of treatment, improper

9   discharges, timeliness of transfers, and provision of basic human necessities.  Additionally,

10  now that this Court has issued is April 10, 2014 order declaring Defendants' disciplinary

11  and use-of-force policies and practices unconstitutional, Defendants should be required to

12  address the problems identified in the Report related to those areas as part of current and

13  future remedial processes.  This Court should further order Defendants to remove the

14  inhumane and counter-therapeutic cages they recently began unilaterally installing, for the

15  first time in any inpatient setting, at SVPP and VPP, and to prohibit them from installing

16  cages in any inpatient programs in the future.  Finally, this Court should order Defendants

17  to respond to the Special Master's program-specific findings in the Report, including with

18  plans for corrective action where necessary.

19

20

21

22

23
_____

24  [1] Plaintiffs fully concur with the Special Master's recommendation that Defendants be
    required to establish appropriate clinical staffing ratios for its inpatient programs.
25  Adoption of that recommendation, combined with this Court's recent order requiring
    Defendants to revise their mental health staffing plan to comply with the Court's multiple
26  orders prohibiting clinical vacancy rates of greater than 10%, is essential to adequately
    address the dire understaffing reported by the Special Master.  *See* 6/19/14 Order (Dkt. No.
27  5171) at 2; 6/13/02 Order (Dkt. No. 1383) at 4.

28

[1224630-10]

**I.     Based on the Special Master's Findings, this Court Should Issue Additional Orders to Ensure *Coleman* Class Members Receive Timely Access to Adequate Inpatient Care**

    **A.     This Court Should Order Defendants to Immediately Take Steps to Increase Mental Health Treatment in Its Inpatient Programs, and to Develop Inpatient Treatment Guidelines Systemwide**

The Special Master's report makes clear that the treatment provided to class members in inpatient settings is highly variable, and in almost all programs, staggeringly deficient.  With respect to SVPP in particular, the Report demonstrates that the inadequacies in quantity and quality of treatment identified by the Special Master in his September 2013 report persist, even after even this Court deferred further orders so Defendants could fix the problems.  *See* 11/13/13 Order at 11.  Further remedial orders are therefore warranted.

                   **1.     Ongoing Deficiencies in Treatment at SVPP**

The Special Master's first SVPP Report from September 2013 documented the woefully inadequate treatment provided to class members at SVPP.  The Special Master and SVPP's own psychiatrists agreed that "patients should be receiving four to five hours per day of structured out-of-cell therapeutic activities."  SVPP Report at 20 (emphasis added).  Nonetheless, the Special Master found that SVPP provides only four to six hours of group therapy per week.  *Id.* at 3.  Additionally, the Special Master reported that (1) the few groups provided were of inconsistent, and sometimes "very poor," quality; (2) class members were assigned to groups based on housing location rather than individual clinical need; and (3) "the majority of [groups] lacked clinical content and individualization to the patients' treatment needs."  *Id.* at 3; *see also id.* at 14-17.

With respect to individual treatment, the Special Master found that SVPP generally failed to provide individual therapy in all but rare cases, even when prescribed by an Interdisciplinary Treatment Team (IDTT), when otherwise clinically indicated, or when requested by a class member.  *Id.* at 4; *see also id.* at 17-18.  The Special Master further concluded that IDTTs at SVPP were inadequate, generally consisting of only "scant and superficial" interdisciplinary discussion that resulted in cursory, undeveloped treatment

4

[1224630-10]

1   plans, and that clinicians improperly used IDTTs to conduct initial assessments that should

2   have already been completed. *Id.* at 12. The Special Master therefore recommended in his

3   SVPP Report that the Court require SVPP "to increase significantly the amount and quality

4   of individualized and group therapy provided." *Id.* at 45.

5       This Court adopted the Special Master's finding that the care provided at SVPP is

6   inadequate, but declined to adopt the Special Master's recommendation for a specific order

7   requiring SVPP to improve the quality and quantity of care provided to class members

8   based on Defendants' representations that they were taking steps to improve the program.

9   11/13/13 Order at 9-11 & n.8. In order to give Defendants the opportunity to fix the

10  egregious failures, the Court deferred further orders on "the quantity and quality of

11  therapy" pending the instant Report. *Id.* at 11.

12      The instant Report, however, makes clear that treatment at SVPP remains

13  inadequate, and has in fact gotten worse in key respects. In this Report, the Special Master

14  found that class members at SVPP now receive a scant three to four hours per week of

15  group therapy—significantly less than the four to six hours per week the Special Master

16  and this Court already declared inadequate. *Compare* Report at 13, *with* SVPP Report at

17  3; *see also* 11/13/13 Order at 12 n.8. As in the SVPP Report nine months ago, SVPP

18  continues to assign class members to groups based on administrative convenience rather

19  than clinical need. Report at 13. Groups are "problematic[ally]" conducted on the

20  dayroom floor despite the availability of other, more private rooms outside of the housing

21  units. *Id.* SVPP still has no idea how many groups each class member receives, because it

22  still has no functioning tracking system. *Id.* at 13, 126; *see also* 11/13/13 Order at 12 n.8.

23  (A new tracking and reporting program, The Patient Wellness and Recovery Model

24  Support System (PaWSS) was reported to be "in the process of being implemented," but

25  not yet in place. Report at 13.)

26      Nor has SVPP improved the quality or quantity of individual therapy, which

27  remains "underutilized." *Id.* at 15, 118. The Special Master found that treatment plans did

28  not prescribe individual treatment even when clinically indicated, and that the few one-to-

[1224630-10]

1   one clinical encounters provided were undermined by non-confidentiality. *Id.* at 118.

2   Finally, in the instant Report, the Special Master found the quality of SVPP's IDTTs

3   remained deficient in key ways already identified nine months earlier:  Clinicians still use

4   IDTT meetings to conduct patient evaluations rather than discussing treatment with the

5   patient, and treatment plans themselves are still "inadequate and generic." *Id.* at 12, 118.

6          Significantly, the Special Master found that SVPP currently "does not have an

7   operational Quality Improvement/Performance Indicators process in place," *id.* at 119,

8   rendering SVPP's ability to fix these outrageous breaches in care on its own a fantasy.

9          This Court in November declined to issue orders requiring SVPP to improve the

10  quality and quantity of treatment provided to *Coleman* class members in the hopes that

11  Defendants might do so on their own.  The Special Master's Report makes clear that

12  mental health treatment at SVPP actually has devolved since the September 2013 SVPP

13  Report.  Defendants had their chance to fix the gross inadequacies on their own and failed.

14  Because Defendants have demonstrated that they cannot or will not improve the quality

15  and quantity of care at SVPP absent further court orders, this Court should now intervene

16  by requiring Defendants to work with the Special Master team to develop a plan "to

17  increase significantly the amount and quality of individualized and group therapy

18  provided" at SVPP, as the Special Master recommended in September 2013.  *See* SVPP

19  Report at 45.  But, as discussed below, it should do so as part of a broader order requiring

20  Defendants to remedy systemwide treatment deficiencies that the Special Master found to

21  be plaguing most, if not all, of Defendants' inpatient psychiatric hospitalization programs.

22              **2.    Deficiencies in Treatment at the Remaining DSH Programs**

23          Now that the Special Master has had the opportunity to examine the adequacy of

24  treatment at all of Defendants' inpatient hospitals pursuant to this Court's July 2013 order,

25  his findings illustrate that the gross deficiencies in mental health care at SVPP are not

26  limited to that program, but instead pervade Defendants' inpatient programs.

27              **(a)    Inadequate Group Therapy**

28          This Court, in reliance on the Special Master's expertise, already has made clear

6

1  that the level of treatment provided in inpatient settings must exceed the 10 hours per week

2  of structured therapeutic activities Defendants are required to provide to class members in

3  the lower-level-of-care EOP program.  11/13/13 Order at 10 n.8 (discussing Program

4  Guide at 12-4-8).  With the exception of CIW's PIP program, the Special Master's Report

5  found that none of Defendants' inpatient programs are providing anywhere the minimum

6  group treatment hours for the EOP setting, much less the enhanced care necessary for

7  adequate inpatient treatment.  Moreover, the Report concludes that the quality of group

8  therapy provided is inadequate in numerous respects.

9        The Special Master reported that group therapy is the primary treatment modality at

10  ASH, supplemented only "occasionally … by some individual therapy."  Report at 9.

11  Nonetheless, he found that the amount of group therapy at ASH was "very deficient" and

12  had in fact gotten substantially worse in recent years.  *Id.* at 9.  Class members at ASH

13  attended only 4.6 hours per week on average as of September 2013, and were offered

14  between 5-8 hours per week as of February 2014.  *Id.* at 9-10.  Moreover, class members at

15  ASH were assigned to groups for administrative convenience rather than clinical need.  *Id.*

16  at 70.  In terms of group therapy hours, CSH was no better than ASH:  Over the course of

17  the last year, patients at CSH received on average 4.25 of the meager 6.19 hours of

18  treatment groups offered per week, and CSH had waitlists of up to eight patients for

19  groups.  *Id.* at 10, 104.  Moreover, the groups CSH did offer typically were not clinical in

20  nature, and the monitor observed clear deficiencies in some of the therapy-oriented groups

21  that were offered.  *Id.* at 103, 105.

22        CHCF scheduled four hours of treatment-focused (as opposed to recreational)

23  groups, although the monitor observed that some of the purportedly offered groups were

24  neither actually held nor replaced with other therapeutic activities.  *Id.* at 195.  The Special

25  Master reported that class members in the DSH program at CHCF are confined to their

26  cells for 21-22 hours per day, every single day.  *Id.* at 18.

27        In the VPP acute program, the highest level of care in Defendants' mental health

28  system, patients were offered an abysmal 1.4 to 4.7 hours <u>per month</u> of combined out-of-

[1224630-10]

7

PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL
HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS

1    cell and clinical treatment activities as of March 2014—"far below what review of patient

2    records indicated was clinically needed." *Id.* at 14. The quality of groups varied as well,

3    with some "patently non-therapeutic activities" like exchanging magazines credited as an

4    hour of group therapy. *Id.* Condemned class members in the acute program at VPP

5    receive no group therapy or yard whatsoever for the duration of their stay, and are offered

6    only one hour of dayroom per week. *Id.* at 17.

7        VPP's ICF programs were not significantly better than its acute program in terms of

8    group therapy. The Special Master found "the amount of group treatment offered was

9    inadequate and assignments of patients to groups did not always correlate to treatment

10   plans." *Id.* at 14. In VPP's stand-alone ICF facility (HCITC), patients received on average

11   6 to 8 hours of structured activities per week, plus an hour of yard per day and an hour of

12   dayroom every other day. *Id.* at 15. In the other portions of VPP's intermediate care

13   program, the quantity of groups was also insufficient. *Id.* Further, VPP has no idea how

14   much out-of-cell or group clinical activities class members actually receive because it

15   lacks a tracking system. *Id.* at 152.

16                      **(b)    Insufficient Individual Treatment**

17       The Special Master's Report further clarifies that multiple DSH programs provide

18   inadequate individual treatment, and come nowhere near providing the extensive amount

19   of one-to-one care that would be needed to offset the serious deficiencies in group therapy

20   throughout the system described above. ASH "rarely offered individual therapy to its

21   patients, even for patients not ready for group therapy or for whom groups would be

22   clinically contraindicated," which the Special Master concluded could not be attributed

23   solely to staff shortages. Report at 10. CSH also provided insufficient individual therapy,

24   consisting only of instances of patients stopping clinicians in the unit's hallways and

25   requesting to speak. *Id.* In VPP's acute and ICF programs, the Special Master found that

26   "[i]ndividual treatment was far too scarce to meet the treatment needs of patients." *Id.* at

27   146. CHCF provided "insufficient" one-to-one clinical sessions to patients. *Id.* at 186.

28   The chief psychologist of CHCF's program reported to the Special Master that, in her

PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL
HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS

1   view, regular individual contacts were "not required for optimal treatment." *Id.* at 196.

2                    **(c)    Deficient IDTTs**

3          Finally, the Special Master noted deficiencies in IDTTs at all of the DSH programs.

4   IDTTs at ASH were "overly generic," and "continued vague treatment goals and

5   inadequate interventions, with little to no data on treatment progress."  Report at 66.  The

6   Special Master found "a clear pattern of failure to revise treatment plans even when the

7   patient failed to progress or experience other significant clinical events that would

8   ordinarily result in revision." *Id.* at 66-67.  CSH IDTTs were similarly flawed, including

9   scripted treatment team meetings in which patients were ignored and vague, generic

10  treatment plans that did not address patients' needs. *Id.* at 97, 101-03.  In addition to

11  troubling custodial practices that interfered with acute IDTTs, VPP clinicians issued

12  generic and vague treatment plans that did not properly track patient progress, and, like at

13  SVPP, conducted patient assessments during IDTT meetings that should have already

14  occurred. *Id.* at 145, 150-52.  Treatment plans produced by CIW IDTTs also remained

15  somewhat generic, with interventions that were not properly tied to patient symptoms and

16  progress. *Id.* at 225.  The Special Master also found problems with the IDTTs and

17  treatment planning at CHCF. *Id.* at 186.

18         These findings, coupled with the Special Master's repeated findings that SVPP's

19  mental health treatment is fundamentally inadequate, more than justify further remedial

20  orders.  As the Report notes, the inpatient programs vary wildly in terms of the treatment

21  offered and provided to class members, and do not appear to adhere to, or even espouse,

22  any minimum treatment requirements.  Plaintiffs therefore request the Court order

23  Defendants to work with the Special Master, and with input from Plaintiffs, to develop

24  minimum treatment hours requirements for all inpatient programs, and to order the Special

25  Master to report on the results of that process by December 31, 2014.  Further, because the

26  deficiencies in care are egregious and life-threatening to the very ill class members in need

27  of this highest level of care, the Court should also order Defendants immediately to take all

28  necessary steps to improve the quantity and quality of mental health care in its inpatient

                                             9

programs, and to develop a plan to do so under the guidance of the Special Master team, in consultation with Plaintiffs.

**B.    The Court Should Order Defendants to Cease Inappropriate Discharge Practices Immediately**

The Special Master's Report shows that Defendants continue to deny class members access to necessary inpatient hospitalization by inappropriately discharging them to outpatient settings without clinical justification.  First, numerous inpatient programs continue to violate this Court's prior orders by discharging class members from inpatient settings to CDCR due to impending parole dates.  *See* 8/8/08 Order (Dkt. No. 2930).  Second, Defendants continue to prematurely discharge class members solely based on lengths of stay, rather than clinical need.  This Court should take steps to ensure Defendants comply with its prior orders and cease these practices forthwith.

**1.    Defendants Continue to Improperly Discharge Class Members from Inpatient Care in Anticipation of Parole, In Violation of this Court's Orders**

On August 8, 2008, this Court ordered Defendants to provide full access to inpatient psychiatric hospitalization to all inmates irrespective of release date.  8/8/08 Order at 5.  This Court stated then, in no uncertain terms, that it is essential to the *Coleman* remedy that "inpatient mental health treatment shall be determined by an individual's need, not release date."  *Id.* at 4.

Despite this Court's clear mandate, the Special Master found that Defendants continue to deny inmates access to necessary inpatient psychiatric hospitalization because of their anticipated releases to parole, in direct violation of this Court's previous order, and generally failed to provide any significant prerelease planning despite DSH's MOU with CDCR requiring a coordinated effort.  Report at 80 (ASH discharges paroling patients "one to two weeks prior to their release dates so that CDCR would handle re-entry planning"); *id.* at 109 (CSH discharges patients to CDCR "at least 60 days in advance so [they can] receive assistance with reentry planning"); *id.* at 174 (VPP discharges class members with upcoming parole dates "to the CMF MHCB to facilitate parole services").

[1224630-10]

1    The Special Master's findings in this regard corroborate the evidence Plaintiffs

2 presented in support of their affirmative motion that Defendants continue to violate this

3 Court's August 2008 order. *See, e.g.*, Galvan Decl. ISO Pls' Aff. Mot. re Inpatient

4 Treatment (Dkt. No. 4546) ¶¶ 4-12 & Exs. B-J.

5    Defendants' practice of discharging patients from inpatient settings to lesser and

6 inappropriate levels of care based solely on their release dates causes needless harm to

7 class members. Defendants' actions risk reversing any progress towards stabilization that

8 patients made in the inpatient hospitalization setting, and allowing patients to dangerously

9 decompensate just as they are about to be released back into the community.

10    **2.    Defendants Continue to Discharge Class Members from Inpatient
            Care Based on Lengths of Stay and Inpatient Bed Shortages
11            Rather than Clinical Need**

12    The Special Master found that Defendants continue to discharge patients in need of

13 inpatient care for other inappropriate, non-clinical reasons. In the Report, the Special

14 Master found that ASH continues to prematurely discharge patients from its programs

15 "based on the lengths of patients' stays rather than on condition." Report at 33. In fact, in

16 71% (or 5 of 7) of the cases examined by the Special Master, he determined that the

17    patients were discharged back to CDCR before receipt of adequate
         therapeutic intervention. Notably, these patients' mental illnesses prevented
18       them from engaging in treatment. Staff indicated that some discharges of
         CDCR patients deemed 'inappropriate' for intermediate inpatient care
19       occurred shortly after their arrival at ASH.

20 *Id.* at 33; *see also id.* at 78-79, 272 (finding, e.g., Patient X was "inadequately treated and

21 prematurely discharged"). The Special Master's findings are not new, as his suicide expert

22 reported in 2009 that ASH's premature discharge of a class member contributed to that

23 class member's foreseeable and preventable suicide. *See* Special Master Report of 2007

24 Suicides (Dkt. No. 3677) at 58-59, 66 & n.3.

25    Plaintiffs presented extensive evidence that premature discharges for non-clinical

26 reasons pervade the inpatient system. Current and former DSH psychiatrists testified that

27 high-level administrative and headquarters staff pressured them to discharge patients from

28 inpatient programs in order to open up beds. *See* 6/21/13 Hearing Tr. (Dkt. No. 4691) 53-

[1224630-10]

55; 6/19/13 Hearing Tr. (Dkt. No. 4690) at 95-97; Amended Badeaux Decl. ISO Pls' Aff.

Mot. re Inpatient Treatment ("Badeaux Decl.") (Dkt. No. 4560-1) ¶¶ 29-30. Plaintiffs' and

Defendants' experts agreed that DSH discharges patients from inpatient settings before

clinically indicated, "with no apparent clinical change from when they were initially

referred." Stewart Decl. ISO Pls' Opp. to Defs' Mot. to Terminate ("Stewart Decl.") (Dkt.

No. 4381) ¶¶ 399-400; *see also* 6/19/13 Hearing Tr. (Dkt. No. 4690) at 26-37; Rifkin Decl.

ISO Pls' Aff. Mot. re Inpatient Treatment ("Rifkin Decl.") (Dkt. No. 4545, 4545-1) Ex. 9

at 131 (2/27/13 Dvoskin deposition excerpt); Stewart Decl. ¶ 414. This practice often

results in the placement of the inmate-patient in a crisis bed and another referral to DSH

within a very short time, although the patient may then have to wait for an extended period

of time to actually transfer back to DSH. *See* Stewart Decl. ¶¶ 399-408, 411, 414-415.

Indeed, the Special Master's suicide expert reported a foreseeable and preventable suicide

involving a patient who had been moved between DSH and CDCR a "staggering" number

of times, when there was "clear evidence in the record of recommendations" that he be

retained in the inpatient program. Special Master 2011 Suicide Report (Dkt. No. 4308),

filed 1/25/13, at 94-95.

> **3.    Based on the Special Master's Findings Confirming Plaintiffs'
> Evidence, This Court Should Now Issue Orders Prohibiting
> Defendants from Discharging Patients from Inpatient Programs
> for Any Non-Clinical Reason**

This Court deferred issuing further orders related to Defendants' inappropriate and

illegal discharge practices so that the Special Master could investigate. 7/11/13 Order at

13-14. The Special Master has now confirmed that Plaintiffs' evidence was correct, and

that Defendants continue to violate this Court's orders and to deny the Plaintiff class

access to needed inpatient care in violation of the Constitution. Based on the Special

Master's findings, Plaintiffs renew their request for additional enforcement and related

affirmative orders. *See* Pls' Proposed Order re Motion for Enforcement & Aff. Relief re

Inpatient Treatment (Dkt. No. 4543-1) at 2-3. Plaintiffs therefore request this Court direct

Defendants, with the assistance of the Special Master and with Plaintiffs' input, to revise

1    their policies, procedures, and practices to conform to the dictates of this Court's August 8,

2    2008 order and to further prohibit Defendants from discharging class members from

3    inpatient care for any non-clinical reason, including but not limited to reentry planning for

4    parole.  Plaintiffs further request that this Court require Defendants to establish local

5    policies, procedures, and staffing to assure that prisoners will be paroled directly from

6    inpatient psychiatric programs.   This Court should also order the Special Master to report

7    on Defendants' progress on this issue by the end of the year.

8         **C.    This Court Should Order Defendants to Properly Track and Comply**
         **with Transfer Timelines for Inpatient Care**

9

10        Upon reviewing the evidence Plaintiffs proffered in support of their affirmative

11   motion and at trial, this Court determined that Plaintiffs "presented significant and

12   troubling evidence of … failure to follow established timelines for transfer of patients to

13   inpatient care."  7/11/13 Order at 10-11.  As with Plaintiffs' other requested relief, the

14   Court initially declined to issue further remedial orders pending the Special Master's

15   investigation.  After the Special Master's SVPP Report conclusively established that SVPP

16   failed to comply with the Program Guide's requirements for transferring vulnerable class

17   members needing inpatient care in a timely fashion, this Court ordered SVPP to "forthwith

18   begin tracking all patient bed assignments at SVPP, and admit referred and accepted

19   patients to SVPP as quickly as bed availability permits and in no event beyond seventy-

20   two hours following bed assignment and thirty days from the date of referral."  11/13/13

21   Order at 21.  The Court explicitly clarified that the deadlines are measured from the date

22   on which DSH receives the completed referral packet, not the date on which DSH

23   "accepts" the patient, and credited the Special Master's finding that such transfers "'need

24   not take anywhere close to 30 days to complete" in a system where Defendants have

25   sufficient numbers of beds to treat all class members needing inpatient care.  *Id.* at 16-18;

26   *see* SVPP Report at 32.

27        The Special Master's Report demonstrates that SVPP's compliance with the

28   Program Guide's transfer requirements has deteriorated dramatically since this Court's

PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL
HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS

1  November 2013 order:  Whereas 27% of transfers were untimely as of the September 2013

2  SVPP Report, a full 75% of SVPP's transfers were untimely as of the Special Master's

3  May 30, 2014 DSH Report.  *Compare* Report at 132 (75% untimely)[2], *with* SVPP Report

4  at 31 (27% untimely).  Moreover, the Report finds that other inpatient programs are either

5  also egregiously noncompliant with the Program Guide's transfer timelines, or fail to

6  properly track information necessary to assess compliance.  *See* Report at 204-05 (CHCF:

7  82% of intermediate care referrals, and 36% of acute referrals, were untimely); *id*. at 235

8  (CIW fails to properly track some transfers).

9        Finally, a cross-comparison of CDCR and DSH monthly data[3] reveals that

10  Defendants are not complying with the Program Guide's requirement that DSH receive all

11  ICF referrals within five working days of the date a patient's IDTT determines the class

12  member needs inpatient care, or ten days where a due process hearing is required.  *See*

13  Program Guide at 12-1-16.  As explained in Plaintiffs' May 12, 2014 letter to the Special

14  Master, unwarranted delays of as long as 3-5 weeks in this step of the inpatient transfer

---

[2] Defendants' recent Update to Court on SVPP, filed on April 24, 2014 (Dkt. 5142), purports to demonstrate improvements in transfer timeline compliance.  But the data Defendants submit in support of their claim continues to calculate timeliness based on acceptance date, not referral date.  *See* Karas Decl. ISO Defs' Update to Court on SVPP (Dkt. No. 5142-1), filed 4/25/14, Ex. A at 5 (reporting on steps taken toward completing "transfers within 30 days of <u>acceptance</u>" (emphasis added)).  This Court already explicitly rejected that approach to assessing compliance, rendering Defendants' calculations irrelevant and misleading.  *See* 11/13/13 Order at 17-18; *see also id.* at 21 (requiring accurate tracking and reporting on transfer timelines).

[3] Defendant DSH used to include in its monthly reporting a column entitled "Date of Referral," which provided the Special Master and Plaintiffs with the information necessary to evaluate compliance with the IDTT referral deadline.  *See generally* DSH Bed Utilization Report as of May 30, 2013 (Dkt. No. 4656), filed on June 17, 2013 (including columns listing each class member's "Date of Referral,"  "Date [Referral] Received at DSH," and "Date of Admission").  Starting approximately a year ago, Defendant DSH cut that column from its monthly reports without explanation.  *See generally* DSH Bed Utilization Report as of June 30, 2013 (Dkt. No. 4695), filed under seal on 7/15/13 (including only "Date Referral Is Released to DSH" and "Date of Admission").  As such, the Special Master and Plaintiffs now have to engage in the time-consuming, costly activity of cross-comparing CDCR and DSH data for each individual prisoner-patient in order to assess Defendants' compliance with the Program Guide's transfer timelines.  Defendants' intentional obfuscation of compliance data should not be countenanced.

[1224630-10]

1  process are causing lengthy wait times for urgently needed inpatient care, and cause

2  Defendants' transfer timeliness to appear better than it is.  *See* Sealed Fischer Decl. Ex. A

3  at 6-7 (5/12/14 Fischer letter to Special Master).

4          The Special Master's Report and Defendants' own reporting establish that multiple

5  inpatient programs currently are failing to accurately track and comply with the Program

6  Guide's transfer timelines for moving the most seriously ill class members into psychiatric

7  hospitalization settings, including SVPP, which was already explicitly ordered to do so

8  over six months ago.  This Court should therefore direct Defendants to do the following

9  forthwith:  (1) cease their practice of reporting to the Special Master or this Court transfer

10  timeliness data based on referral date, rather than acceptance date; (2) include in the DSH

11  monthly data each patient's IDTT referral date so that the Special Master and Plaintiffs can

12  evaluate Defendants' compliance with the Program Guide's requirement that DSH receive

13  all ICF referrals within five days of the IDTT referral decision (or ten days where a due

14  process hearing is required); and (3) track and report on bed assignments for all inpatient

15  programs in order to enable the Special Master to assess compliance with the Program

16  Guide's 72-hour timeframe for transport.

17          Additionally, this Court should direct Defendants to work with the Special Master

18  team, with Plaintiffs' input, to review their referral, acceptance, and transfer policies and

19  procedures to determine whether their inability to comply with the Program Guide dictates

20  is the result of an inpatient bed shortfall or deficiencies in their processes.  The Special

21  Master should then be directed to report to the Court the results of this review and any

22  recommendations necessary to ensure transfer timeline compliance by the end of the year.

23      **D.      The Court Should Order Defendants to Remedy Immediately the
              Ongoing Shortages of Basic Necessities in DSH Programs**

24

25          As this Court already found, Plaintiffs at trial presented "significant and troubling

26  evidence of … denial[s] of basic necessities including clean underwear."  7/11/13 Order at

27  10; *see* Rifkin Decl. Ex. 5 at 62 (3/1/13 Brim deposition excerpts) (SVPP has "a severe

28  shortage of clean clothes, bedding, coats"); *see also* 6/19/13 Hearing Tr. (Dkt. No. 4690) at

[1224630-10]

51-52, 82, 98-101; Badeaux Decl. ¶ 23; Stewart Decl. ¶¶ 448. These failures violate the Constitution. *Hoptowit*, 682 F.2d at 1246; *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013); *see also Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011). In his SVPP Report nine months ago, the Special Master confirmed that SVPP continued to deny class members fundamental human necessities like clean laundry. SVPP Report at 35-36. This Court once again gave Defendants the benefit of the doubt and allowed them more time to fix the problem, rather than issuing further orders. 11/13/13 Order at 19. Additionally, since the trial, the *Plata* Receiver has documented similar systemic denials of basic human necessities at CHCF. *Plata* Receiver's 25th Tri-Annual Report (Dkt. No. 5036), filed 2/3/14, at 29-32.

Now, the Special Master's Report confirms those same unconstitutional, fundamentally inhumane conditions remain present at both the SVPP and CHCF inpatient programs. Report at 48 ("serious problems with laundry persist[]" at SVPP, and CHCF remains unable to consistently supply class members with "socks, underwear, t-shirts, shoes, appropriate-sized pants, liquid soap, and deodorant, among others"). This Court should therefore order the Wardens and the DSH inpatient program administrators at SVPP and CHCF to jointly report to the Special Master on a monthly basis regarding the steps they are taking to immediately resolve any and all issues with, and obstacles to, providing patients at SVPP and CHCF with the full complement of clean, appropriate-sized clothing, towels, and bed coverings, as well as personal hygiene supplies, and to provide those items to patients on a timely, scheduled basis. *Cf.* SVPP Report at 45.

**E.      This Court Should Explicitly Order Defendants to Include Review of Its Use of Force and Disciplinary Procedures in Inpatient Programs in Ongoing Efforts to Comply with This Court's April 10, 2014 Order**

On April 10, 2014, this Court found Defendants' current use-of-force and disciplinary (RVR) practices unconstitutional and ordered Defendants to take a number of steps to remedy the violations, including revising their existing policies and procedures. 4/10/14 Order (Dkt. No. 5131) ("the April Order") at 72. On May 13, 2014, this Court extended the deadline for compliance with the April Order through August 1, 2014. *See*

PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS

5/13/14 Order (Dkt. No. 5150). Plaintiffs understand that Defendants currently are working under the guidance of the Special Master on developing revised use of force and disciplinary policies and practices that will comply with the Constitution and this Court's orders.

Although nothing in the April Order excludes Defendants' inpatient programs from its ambit, Plaintiffs request that this Court make explicit that Defendants must also address the disciplinary and use-of-force policies and practices governing inpatient settings as part of the court-ordered remedy. The Special Master's Report makes clear that existing procedures in these areas are deficient in many respects.

The Special Master's Report documents a number of problems with Defendants' use-of-force and RVR policies and practices within inpatient settings, as well as a lack of uniformity across programs. At SVPP, for example, the Special Master found that, as in his earlier SVPP Report,

> even if patients' behaviors were due to their mental illness, they remained subject to multiple forfeitures of behavior credits, increases in their classification score, referrals to the DA for possible prosecution, as well as no meaningful mitigation of penalties. This means that CDCR patients housed in CDCR-DSH jointly operated facilities were subjected to a disciplinary process that could result in their being incarcerated for longer periods for the same behavior that might yield a different result if the patient had been housed in facilities managed solely by DSH.

Report at 133; *see also id.* at 134-135. As of February 2014, clinical staff at SVPP had not received any training on the RVR process in over two years, despite the significant problems reported by the Special Master in his SVPP Report. *Id.* at 133. SVPP failed to provide documentation to the Special Master about issued RVRs. *Id.* And SVPP was in the process of revising its policy for indecent exposures to make it harsher and more punitive, a "marked departure from prior DSH policy" and a step in the wrong direction. *Id.* at 135.

The Special Master also reported problems—and a clear lack of uniformity at the policy and procedure level—at multiple other inpatient programs. *See, e.g.*, *id.* at 174-76 (mental health assessments during the RVR process at VPP were essentially ignored, and

17

[1224630-10]

1  clinical staff failed to participate in verbal efforts to forestall cell extractions); *id.* at 211

2  (CHCF logged 12 uses of force against patients, but provided no information regarding

3  "whether pepper spray was used …, nor the reason why force was used, how much of it

4  was used, or whether applicable CDCR use of force policy was adhered to"); *id.* at 239-41

5  (despite improvements between visits to CIW, "hearing officers did continue to assess

6  significant forfeitures of credit, for example, 90 days or 120 days, in effect extending the

7  patient's commitment," and failed to provide documentation regarding the impact of

8  mental health assessments on multiple RVRs issued against patients); *id.* at 111 (no policy

9  or directive governed CSH supervisor's decision regarding whether to report an incident to

10  CDCR for issuance of an RVR).

11  Accordingly, because the Special Master has documented numerous and varied

12  problems with the use of force and disciplinary processes in effect in Defendants' inpatient

13  programs, and because this Court's April Order covers the entire *Coleman* class regardless

14  of their level of care, this Court should make clear what is implicit already:  Defendants

15  must include review of its use-of-force and disciplinary procedures in inpatient programs

16  to comply with this Court's April 10, 2014 Order.

17  **F.**    **This Court Should Order Defendants to Cease Installation of Cages in
18         Inpatient Settings, and to Immediately Remove Any Cages Already
          Installed**

19  The Report contains an additional shocking finding:  Defendants, for the first time,

20  have installed numerous cages in its inpatient programs, and are in the process of installing

21  many more.  *See* Report at 15-16 (VPP), 118 (SVPP).  This Court should prohibit the use

22  of cages in all inpatient facilities.  Plaintiffs have presented extensive evidence that the use

23  of cages for individual or group therapy hinders the delivery of mental health care and

24  discourages class members from receiving essential treatment.  Plaintiffs' expert

25  psychologist, Dr. Craig Haney, testified that cages are "dehumanizing and degrading" and

26  that they pose substantial "obstacles to treatment."  11/19/13 Hearing Tr. (Dkt. No. 5009)

27  at 2125, 2156.  Similarly, Plaintiffs' expert forensic psychiatrist, Dr. Edward Kaufman,

28  testified that the use of cages is "counter-therapeutic and inhumane."  Kaufman Decl. ISO

PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL
HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS

1  Pls' Opp. to Defs' Mot. to Terminate (Dkt. No. 4379) ¶ 86.  Dr. Kaufman, who has treated

2  patients in psychiatric hospitals, jails, federal prisons, and community clinics, testified that

3  the use of cages is "totally unnecessary as a general practice," and he "can't ever recall

4  needing to put somebody in a module."  11/22/13 Hearing Tr. (Dkt. No. 5012) at 2480-81.

5  DSH has never, to Plaintiffs' knowledge, treated patients in cages.  Introducing them into

6  Defendants' inpatient programs, which treat the most acutely ill, vulnerable class members

7  in the entire mental health delivery system, would be a major step backwards in the

8  delivery of adequate mental health care.

9      **G.   The Court Should Direct Defendants to Respond to the Special Master's
           Program-Specific Findings, Including with Plans for Corrective Action
10         Where Necessary**

11         Finally, in the appendices to his Report, the Special Master has identified and

12  summarized key findings from his investigation that are specific to each of the six inpatient

13  programs treating *Coleman* class members.  *See* Report Ex. A at 58-60 (ASH); Ex. B at

14  97-98 (CSH); Ex. C at 118-20 (SVPP); Ex. D at 145-46 (VPP); Ex. E at 185-86 (CHCF);

15  & Ex. F at 219-20 (CIW PIP).  In these findings, the Special Master has identified a

16  number of highly concerning program-specific policies, procedures, and/or practices that

17  must be addressed.  Plaintiffs therefore request this Court order the program director or

18  designee for each of the six programs to provide, within 30 days, a written response to the

19  Special Master's program-specific findings that includes any relevant updated information

20  or data, as well as any corrective action steps the program has taken, or plans to take, to

21  address the findings of ongoing deficiencies in the respective program.

22

23  DATED: June 30, 2014            Respectfully submitted,

24                                 ROSEN BIEN GALVAN & GRUNFELD LLP

25                                 By: */s/ Lisa Ells*
                                        Lisa Ells
26

27                                 Attorneys for Plaintiffs

28

19

PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL
HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS