KAMALA D. HARRIS
Attorney General of California
PATRICK R. MCKINNEY
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 324-4921
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK DAD |
| Plaintiffs, | **DEFENDANTS' PLANS AND POLICIES SUBMITTED IN RESPONSE TO APRIL 10, 2014 AND MAY 13, 2014 ORDERS** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

On April 10, 2014, this Court ordered Defendants to revise policies and create plans related to use of force and segregated housing involving *Coleman* class members within California Department of Corrections and Rehabilitation (CDCR) institutions. (Order at 72-74, ECF No. 5131, Apr. 10, 2014.) The initial deadline for compliance with certain provisions of the order was extended to August 1, 2014. (Order, ECF No. 5150, May 13, 2014.) The Court further extended the time for Defendants to submit the plans and protocols contemplated by paragraphs 2.b and 2.e of the April 10 order to August 15, 2014. (Order, ECF No. 5189, July 25, 2014.)

Pursuant to the foregoing orders and under the guidance of the Special Master, Defendants submit CDCR's Report on Compliance with the April 10, 2014 Order. The report, attached

1

hereto as Exhibit A, includes a detailed summary of the work done by the Defendants to comply with the terms of the April 10 order, including the initial review, evaluation, and drafting by Defendants, meetings and consultation with the Special Master and his team of experts, and meetings with the Special Master and Plaintiffs' counsel during the weeks of July 7, July 21, and July 30, 2014, to reach an agreement on the policies and plans contemplated by the April 10 order. Specifically, the report summarizes and attaches the revised policies and plans referred to in the following provisions of the April 10 order:

- Revisions to CDCR's use of force policy required by paragraph 1.a. The revised use of force policy is attached as Exhibit 1 to the report and is summarized at pages 2 through 8 of the report.

- CDCR's statewide management cell status policy created in response to paragraph 1.c. The statewide management cell status policy is attached as Exhibit 2 to the report and is summarized at pages 9 and 10 of the report.

- A plan to limit or eliminate the placement of *Coleman* class members removed from the general population for non-disciplinary reasons in administrative segregation units that house inmates for disciplinary reasons as required by paragraph 2.a. The plan is described and summarized at pages 11 through 13 of the report and a copy of the CDCR memorandum titled *Non-Disciplinary Segregation Processing Procedure for Mental Health Services Delivery Inmates* is attached as Exhibit 3 to the report. Also included as part of Exhibit 3 is a copy of a CDCR memorandum titled *Pre-minimum Eligible Release Date Reviews for Inmates Included in the Mental Health Services Delivery System.*

- A plan to report on Program Guide compliance in the Enhanced Outpatient Program Administrative Segregation Units required by paragraph 2.c. The plan is described and summarized at pages 13 through 15 of the report and a copy of the template for the monthly ASU EOP Hub Performance Certification is attached as Exhibit 4 to the report.

2

1    • A revised policy on unclothed body searches in Enhanced Outpatient Program

2        Administrative Segregation Unit hubs required by paragraph 2.d.  The revised

3        policy is attached as Exhibit 5 to the report and is summarized at pages 15 and 16

4        of the report.  The revised policy is accompanied by a memorandum directing

5        custody and mental health staff to collaborate to identify and address the reasons

6        for any inmate's refusal to participate in treatment in an Enhanced Outpatient

7        Program Administrative Segregation Unit hub.

8    Defendants respectfully submit that the foregoing revised plans and policies comply with

9    and in some respects exceed the terms and intent of the Court's April 10, 2014 order.  To the

10   extent that the Court determines that any of Defendants' proposed policies and plans do not

11   comply with the terms and intent of the April 10 order, Defendants request a modification of the

12   April 10 order consistent with the policy revisions and plans submitted herewith.

13

14   Dated:  August 1, 2014                              Respectfully submitted,

15                                                       KAMALA D. HARRIS
                                                         Attorney General of California
16                                                       PATRICK R. MCKINNEY
                                                         Supervising Deputy Attorney General

17                                                       /s/ ELISE OWENS THORN

18                                                       ELISE OWENS THORN
                                                         Deputy Attorney General
19                                                       *Attorneys for Defendants*

20   CF1997CS0003
     11420842.doc
21

22

23

24

25

26

27

28

# EXHIBIT A

**[DEFENDANTS' PLANS AND POLICIES SUBMITTED IN RESPONSE TO APRIL 10, 2014 AND MAY 13, 2014 ORDERS]**

## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION REPORT ON COMPLIANCE WITH THE COURT'S APRIL 10, 2014 ORDER ON USE OF FORCE AND SEGREGATION OF COLEMAN CLASS MEMBERS

### INTRODUCTION

The California Department of Corrections and Rehabilitation (CDCR), in cooperation with the Special Master and counsel for the Plaintiff class, has made substantial changes to its policies and procedures to comply with the Court's April 10 and May 13, 2014 orders, summarized as follows:

- CDCR amended its Use of Force and unclothed body search policies in Enhanced Outpatient Program (EOP) Administrative Segregation hubs to meet the letter and spirit of the Court's orders (*see* Exhibits 1 & 5);

- CDCR exceeded the Court's directive to review the use of management cell status, and created a statewide policy to ensure consistent application (*see* Exhibit 2). Until training on the statewide policy is developed and completed, CDCR will not place any *Coleman* class members on management cell status;

- CDCR developed guidelines for moving non-disciplinary segregation inmates to appropriate housing within 72 hours of being placed on non-disciplinary segregation status (*see* Exhibit 3); and

- CDCR developed a plan to assess and report on the EOP Administrative Segregation Unit hubs' compliance with Program Guide requirements (*see* Exhibit 4).

Consistent with the Court's July 25, 2014 order, CDCR continues to work on a plan to create alternative housing for Correctional Clinical Case Management System (CCCMS) inmates placed in administrative segregation units and security housing units that substantially improves conditions of confinement and increases opportunities for mental health treatment.

Several of CDCR's proposals extend beyond the Court's orders by instituting additional policy changes that will impact how the Department is run and how class members are treated. These changes will reinforce a system-wide culture change in the way Defendants treat members of the *Coleman* class, will foster collaboration between custody and mental health, and provide for a strong sustainable process ensuring that mentally ill inmates will continue to receive quality, constitutionally adequate mental health care.

## DEFENDANTS' PLANS AND POLICY CHANGES DEVELOPED
## IN RESPONSE TO THE APRIL 10, 2014 ORDER

### Use of Force Policy Revision

CDCR undertook a substantial revision to its use of force policy. A copy of the revised use of force policy is attached as Exhibit 1. The revisions were presented to the Special Master and his team of experts who provided guidance for further revisions to the policy. The revised policy was then presented to Plaintiffs' counsel for input.

The goal of the revisions is to systemically improve CDCR's practice and culture regarding both when and how force can be used. The revised policy expressly requires custody staff to consider the mental health condition of the inmate before using controlled force and to examine the totality of circumstances so that staff employ the least amount of force necessary to resolve a situation. The Court recognized that the previously-made policy revisions were "a critical step forward . . . ." (4/10/14 Order at p. 18.) The Court further recognized that the "DOM revisions concerning controlled use of force evidence an effort to heighten consideration of the impact of UOF measures on mentally ill inmates." (*Id.* at p. 28.) The Court also recognized that "[a]s revised, defendants' current written policy concerning immediate use of force appears to be adequate on its face." (*Id.* at p. 20.)

CDCR has undertaken further significant revisions to address and extend beyond the order's requirements. In addition to changes regarding controlled use of force and the role of mental health clinicians, CDCR revised policies on immediate use of force, documentation, reporting, and review. Each policy change is presented to the Court below.

*Requirements of the April 10 Order*

The April 10, 2014 order requires that CDCR "work under the guidance of the Special Master to revise their use of force policies and procedures as required by this order. Said revisions shall be completed within sixty days from the date of this order." (Order at p. 72.) The Court's May 13, 2014 order extended the time to complete the revisions to August 1, 2014. (Order at p. 2.)

The order specified that CDCR revise its use of force policies and practices to include "(1) consideration of the role of mental illness in an inmate's ability to comply with staff directives; (2) adequate guidance concerning the role of mental health clinical judgments in the use of force on class members and when, if ever, those judgments may be overridden by custody staff; and (3) alternatives to use of force on seriously mentally ill inmates where there is no imminent threat to life and force is contraindicated by the inmate-patient's mental health." (Order at p. 30:5-12.) With respect to monitoring use of force, the Court directed CDCR to "provide adequate staff training and to closely monitor all UOF incidents, particularly those classified as 'immediate' uses of force, to ensure that these policy revisions are actually effected." (*Id.* at p.

21.) Additionally, the Court required CDCR to clarify policies regarding the use of the expandable baton. (*Id.* at p. 31.)

*Steps Taken By CDCR in Finalizing the Revised Policy*

Even before the April 10 order, CDCR had already taken substantial steps to revise its use of force policy. On January 21, 2014, CDCR, through Michael Stainer, Director of the Division of Adult Institutions, provided the Court a copy of the revisions to CDCR's Department Operations Manual (D.O.M.) Chapter 5, Article 2-Use of Force. This revision clarified the Response Supervisor, Incident Commander, and Manager's responsibilities for determining what types of force should be used, and the manner in which they will be applied, including the documentation and video recording of the decision to use force during cell extractions. It also established strict limits on the types, amounts, and waiting periods between uses of chemical agents to be applied in a controlled use of force. It further clarified the role of mental health and medical staff's assistance in evaluating the inmates during the cool-down period.

On February 21, 2014, Mr. Stainer further provided the Court a copy of the CDCR's Implementation Plan, and training lesson plans, needed to effectuate the revised use of force policy. CDCR provided training to Wardens, Institutional Use of Force Coordinators, and other supervisory staff to ensure all necessary employees, including those who conduct Institutional Executive Review Committees, understand and apply the new policies when reviewing use of force incidents. Clinical and medical staff also attended the training. Additionally, staff from the independent Office of the Inspector General attended and observed training sessions on the new provisions. These changes were fully implemented on April 21, 2014.

After April 10, CDCR reconvened its Use of Force Workgroup (the Workgroup). The Workgroup consists of experienced wardens and other correctional staff familiar with all levels of use of force and review, mental health practitioners and executives, and medical staff working under the supervision of the Receiver in *Plata v. Brown*. The Workgroup further revised the use of force policy to meet the Court's directives and ensure the policy is consistent with sound correctional and clinical practice. CDCR presented the draft revision to the Special Master's team (which included both correctional and clinical experts) on June 4, 2014. CDCR reviewed the entire use of force policy with the Special Master team and then adopted the Special Master team's recommended revisions. CDCR and the Special Master team met again on June 18, 2014, and worked through the revised policy, line by line. Following that detailed review of the proposed policy, CDCR again adopted the Special Master's team's recommendations. A third meeting was held with the Special Master team on June 25, 2014, which resulted in further revisions based on recommendations made by the Special Master team.

The revised draft policy was presented to Plaintiffs' counsel on July 2, 2014. On July 9, 2014, Plaintiffs' counsel provided CDCR with a letter which proposed further revisions to the policy. Following meetings with Plaintiffs' counsel and the Special Master on July 10 and 11, 2014,

3

Plaintiffs' counsel proposed further revisions by sending a redlined version of the use of force policy to CDCR. The Workgroup reconvened following the meetings and further refined the policy in light of Plaintiffs' counsel's suggestions. CDCR provided an updated revision to the Plaintiffs' counsel and the Special Master on July 21, 2014. On July 23, 2014, CDCR again met with the Special Master and Plaintiffs' counsel. Following that meeting, CDCR considered and incorporated almost all of the Plaintiffs' counsel's suggested revisions. On July 30, 2014, Defendants presented a final version of the revised use of force policy to the Special Master and Plaintiffs' counsel with all prior changes incorporated. Plaintiffs' counsel suggested additional revisions at the meeting, which were discussed, and CDCR agreed to incorporate many of the suggested revisions. CDCR believes that it has addressed Plaintiffs' counsel's substantive concerns.

*The Revised Policy Complies with the Court's Order*

 Controlled Use of Force

The revised policy complies with the order's requirement to take "consideration of the role of mental illness in an inmate's ability to comply with staff directives." (Order at p. 30.) Amended D.O.M. Section 51020.5, Use of Force Options, sets forth expectations for correctional officers prior to utilizing any force. (*See* Ex. 1.) Correctional staff must evaluate the "totality of circumstances involved in any given situation, to include consideration of an inmate's demeanor, bizarre behavior, mental health status if known, medical concerns, as well as ability to comply with orders" in every use of force situation. The policy directs staff to utilize verbal persuasion whenever possible. Additionally, CDCR amended D.O.M. Section 51020.12 to require an evaluation by a mental health practitioner of the inmate's ability to understand orders and the inmate's ability to understand or comply with the order. This evaluation is for all inmates, not just *Coleman* class members. The clinician must also evaluate whether the use of force contemplated poses a threat of decompensation. The clinician will, based on his or her assessment, make recommendations to the on-site manager regarding strategies to avoid use of force. The policy mandates a cool-down period prior to any potential controlled use of force. During a cool-down period, staff will attempt to deescalate the situation via verbal persuasion by licensed mental health staff. Other staff, including religious leaders, correctional officers, correctional counselors or others who have an established rapport with the inmate, may also attempt to verbally persuade the inmate to follow directions.

Second, the revised policy provides "adequate guidance concerning the role of mental health clinical judgments in the use of force on class members and when, if ever, those judgments may be overridden by custody staff," consistent with the Court's requirements. (Order at p. 30.) CDCR achieved this by modifying the policy to ensure that, in a potential controlled use of force setting, custody staff cannot override clinical judgment if a disagreement arises on how to proceed. Under the new policy, disagreements must be elevated up both the mental health clinician's and the custody staff's chain of command for joint resolution by respective managers.

D.O.M. Section 51020.17.8, Manager Reporting Requirements for Controlled Uses of Force, requires that staff document the involvement of managers in disagreements.

Section 51020.12 requires a cool-down period before any controlled use of force. During the cool-down period, a licensed mental health practitioner will intervene with the inmate and attempt to de-escalate the situation. The mental health practitioner must review the inmate's health record to determine if any prior mental health issues exist. Using that information and the information gained from interacting with the inmate, the mental health practitioner shall advise the on-site manager of any mental health issues impacting the inmate's ability to comply with or understand orders, and any issues that the clinician determines could lead to a substantial risk of decompensation should force be utilized. Where an inmate has the ability to understand but does not have the ability to comply with orders, the policy requires the mental health practitioner to propose strategies to gain compliance before resorting to force. Both the on-site manager and the mental health practitioner must agree that all reasonable options have been exhausted and that the cool-down period has ended before controlled force may be used. If there is a disagreement among the collaborative team regarding strategies employed to avoid force, or if the disagreement involves the length of the cool-down period, the issue shall be elevated for joint resolution between managers of mental health and custody.

D.O.M. Sections 51020.17, Use of Force Reporting Requirements, and 51020.17.6, Health Care Staff Use of Force Reporting Requirements, mandate documenting whether de-escalation strategies were used and the result. D.O.M. Section 51020.17.6 requires that the mental health practitioner document the inmate's ability to comply with or understand orders and document the timeline for the assessment and clinical intervention.

Third, the revised policy complies with the requirement to include "alternatives to use of force on seriously mentally ill inmates where there is no imminent threat to life and force is contraindicated by the inmate-patient's mental health." (Order at p. 30.) D.O.M. Section 51020.15.3, Use of Chemical Agents for Inmates with Mental Health Issues, bans the use of chemical agents in controlled use of force incidents within mental health treatment facilities absent high level authorization. Unless authorized by the Warden, Administrative Officer of the Day, or Chief Deputy Warden, the policy prohibits the use of chemical agents in controlled use of force incidents where the inmate is housed in a Mental Health Crisis Bed, Psychiatric Inpatient Program, Outpatient Housing Unit, Psychiatric Services Unit, or Enhanced Outpatient Program Administrative Segregation Unit hub. The use of chemical agents is similarly limited for inmates who do not possess the ability to understand orders, have difficulty complying with orders due to mental health issues, or are at increased risk of decompensation resulting from such use of force. For inmates who do not possess the ability to understand orders, the Warden, Administrative Officer of the Day, or Chief Deputy Warden, may only authorize the use of chemical agents where serious circumstances exist calling for extreme measures to protect staff or inmates.

5

CDCR added D.O.M. Section 51020.12.1, Controlled Use of Force without Extraction, to clarify that not all controlled use of force incidents will require a full cell extraction. For instance, controlled use of force may be used to administer medication or provide medical treatment without removing the inmate from the cell. While normally, the inmate would be taken to a health care setting for the administration of medication and medical care, CDCR recognizes that in some circumstances, adherence to this may in fact increase the incidences of force. The team should try verbal persuasion before using any force options. And to minimize force when it is required, the controlled use of force team may simply enter the cell, restrain the inmate, administer the treatment, and exit the cell. [1]

A central goal underlies all the individual policy changes related to the controlled use of force: correctional staff must take into account the totality of the circumstances, including the inmate's demeanor, mental health status, and ability to comply with directions, prior to utilizing force. Correctional staff will employ verbal persuasion where no imminent threat exists. In controlled use of force incidents, correctional and mental health staff employ a substantial cool-down period which includes attempts to verbally persuade the inmate to comply with staff directions. These policy changes will ensure that CDCR staff meaningfully consider avoiding the need to use force, and, when possible, exhaust all other possibilities before using force.

Immediate Use of Force

CDCR also made changes to the D.O.M. related to the immediate use of force. Immediate use of force is distinguishable from controlled use of force because it is used when an imminent threat arises which requires an immediate response. Notwithstanding the immediate nature of this type of force, CDCR has revised its policy to both limit when immediate force can be used but also what force can be used. The new policy also requires similar consideration of mental health status as outlined above regarding controlled use of force. D.O.M. Section 51020.5, Use of Force Options, sets forth expectations that staff, when possible, will evaluate an inmate's demeanor, mental health status, bizarre behavior, medical concerns, and the ability to comply with orders before taking any action. The section mandates that staff will employ verbal persuasion to avoid force whenever possible. Section 51020.5 represents a sweeping culture change for CDCR as it expects staff to step back and evaluate the totality of the circumstances, whenever circumstances permit, before using force. Additionally, CDCR amended D.O.M. Section 51020.8, Non-Deadly Force, to clarify that the use of immediate force is not permitted solely to gain compliance with a lawful order. In incidents where an inmate is solely disobeying a lawful order, and no imminent threat exists, controlled use of force must be utilized.

The Court noted that CDCR had been working under a "broad definition of 'imminent threat'" with regard to immediate use of force. (Order at p. 20.) CDCR amended D.O.M. Section 51020.4, Definitions, to include the following definition of "Imminent Threat": An imminent threat is "any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include,

but are not limited to: an attempt to escape, on-going physical harm or active physical resistance." The policy mandates that an imminent threat must be present before using immediate use of force and that requirement is repeated throughout the revised policy. (See, for instance, D.O.M. Section 51020.4, defining Immediate Use of Force; Section 51020.11, Immediate Use of Force; Section 51020.11.1, Immediate Use of Force in Cells; Section 51020.12.2, Extractions, specifying extractions must be controlled unless an imminent threat is present; Section 51020.14.2, Use of Less Lethal Weapons for Inmates with Mental Health Issues, requiring an imminent threat before a Warden or Chief Deputy Warden may authorize use of less lethal weapons on mentally ill inmates.)

### Hand Held Baton

The order requires CDCR to clarify its use of the hand held baton. (Order at p. 30-31.) CDCR presented its existing lesson plan on the use of the baton to the Special Master's experts and has updated its policy to clarify the purpose of the expandable baton. CDCR discussed the expandable baton policy and training materials with the Special Master team on June 5 and June 18, 2014. Following those discussions, Plaintiffs' counsel provided a letter to CDCR on July 9, 2014, regarding the use of force policy. The letter included Plaintiffs' counsel's comments regarding the use of the baton. CDCR met with the Special Master and Plaintiffs' counsel on July 10 and July 11, 2014 for discussion on use of force and the baton. The Workgroup revised the use of force policy with respect to the use of the hand held baton the following week. CDCR provided a copy of the revised policy to the Plaintiffs' counsel on July 21, 2014. Plaintiffs' counsel replied with a letter on July 22, 2014. CDCR met with the Special Master and Plaintiffs' counsel on July 23, 2014.

CDCR revised D.O.M. Section 51020.5, Use of Force Options, to better define the use of the hand held baton. (*See* Ex. 1.) The policy clarifies that CDCR issues the baton to custody staff assigned to positions with direct inmate contact. The policies further clarifies that the baton is solely intended for use in defense of self and others and shall be held in an expanded position during escorts of inmates in restraints for that purpose only. The baton is also used in cell extractions for the protection of staff involved and to gain compliance of the inmate.

### Use of Force Incident Review

CDCR revised its policy to require that a mental health practitioner participate in institutional reviews of all use of force incidents on *Coleman* class members. D.O.M. Section 51020.19.5, Institutional Executive Review Committee Monitoring Requirements, mandates that a licensed mental health practitioner participate in all Institutional Executive Review Committee meetings that involve controlled use of force incidents, all immediate use of force incidents involving an inmate participating in the Mental Health Services Delivery System, and all incidents where there are allegations of excessive force. The review ensures that immediate uses of force against *Coleman* class members are limited to instances in which there is an imminent threat. CDCR

7

amended D.O.M. Section 51020.17.1, Involved Staff Reporting Requirements, to require a description of the inmate's ability or lack of ability to understand and follow orders. CDCR revised D.O.M. Section 51020.19, Reviewing the Use of Force, to require review of steps taken to minimize the need for force and the level of force, and revised D.O.M. Section 51020.17, Use of Force Reporting Requirements, to require the documentation of the steps taken to minimize force and the level of force used.

A further modification to the policy is made in D.O.M. Section 51020.11, Immediate Use of Force, to encourage video recording of an immediate use of force, whenever possible. That recording will be submitted into evidence for review by the Institutional Executive Review Committee. Finally, D.O.M. Section 51020.22, Revisions – Use of Force Joint Use Committee (JUC), mandates that the JUC, a committee tasked with reviewing and evaluating recommended revisions to CDCR's use of force policy, shall always include involvement from a mental health Regional Administrator.

*Implementation*

Over the next several months, the Division of Adult Institutions will work collaboratively with CDCR mental health clinicians to develop a lesson plan that will emphasize the goal of changing the culture on how force is used. The training plan will include lessons on why, when, when not to, and how to use force. It will also emphasize de-escalation and alternatives to use of force.

Upon approval of the policy, CDCR will immediately revise the controlled use of force lesson plan. CDCR anticipates that the changes can be made in approximately 30 days from the date the policy is approved. Thereafter, CDCR will begin training Master Trainers for both custody and mental health. After Master Trainers have been trained, CDCR will begin regional training for both mental health and correctional managers. Thereafter, the institutions will be directed to train all correctional, mental health, and appropriate medical staff in the new controlled use of force policy. It is anticipated that the controlled use of force policy can be fully implemented by the end of November 2014.

More extensive revisions to the expandable baton, firearms, less lethal impact weapons, chemical agents, and general use of force lesson plans are anticipated to be completed by the end of the year. This training will be implemented in the academy upon finalization. Trainers at the academy will be trained and training modules will be developed for clinical staff. Beginning early 2015, CDCR anticipates providing training to both clinical and custodial Master Trainers on the revised use of force lesson plan who will be responsible for training all necessary staff at the institutional level. By late February 2015, CDCR anticipates that it will hold regional training for institutional managers. Upon completion of this training, all institutional staff will begin receiving training on the revised use of force policy. CDCR anticipates the training will be fully and finally implemented late next summer.

**Management Cell Status Policy Revision**

*Requirements of the April 10 Order*

The Court's April 10, 2014, order requires that CDCR "work with the Special Master on a timeline for completion of their review of the use of management cell status so that this practice can be reviewed by the Special Master as part of his review of the implementation of defendants' RVR policies and procedures." (Order at p. 72.)

*Steps Taken By CDCR in Creating a Uniform Policy*

CDCR completed the review process contemplated by the order. During the review of the local operating procedures from the institutions that use management cell status, CDCR recognized the need to draft a uniform statewide policy. A copy of the new statewide policy governing the use of management cell status (D.O.M. Section 52080.22.4, Management Cells) is attached as Exhibit 2. While CDCR develops and completes training on the revised policy, CDCR will temporarily prohibit the placement of any *Coleman* class member on management cell status.

CDCR provided a draft of the policy in advance of meetings held with the Special Master team on June 5, 2014. CDCR then incorporated comments from the Special Master team into the revised policy. CDCR met with the Special Master team on June 17 and 24, 2014, and incorporated the Special Master team's suggestions into the revised the management cell status policy, which was presented to the Plaintiffs' counsel and the Special Master on July 2, 2014.

On July 9, 2014, Plaintiffs' counsel provided CDCR a letter with objections and proposals regarding the management cell status policy. On July 11, 2014, CDCR met with the Special Master and Plaintiffs' counsel and discussed the policy. Following that meeting, CDCR again revised the policy, incorporating and addressing several of Plaintiffs' counsel's suggestions. CDCR provided an updated revision to the Plaintiffs' counsel and the Special Master on July 21, 2014. On July 23 and July 24, 2014, CDCR met with the Plaintiffs' counsel and the Special Master regarding the policy revision. On July 25, 2014, Plaintiffs' counsel provided further suggested revisions to the policy to CDCR. On July 30, 2014, Defendants presented a final version of the management cell status policy to the Special Master and Plaintiffs' counsel with all prior changes incorporated. Following discussion at the meeting, Defendants made further revisions to the policy.

The management cell status policy goes beyond what the order requires, and CDCR anticipates that it will reduce the use of management cell status for the *Coleman* class. The new policy bans the use of management cells for inmates in the Enhanced Outpatient Program, and instead requires an emergent mental health referral.

For all other inmates, Section 52080.22.4 restricts when staff can use management cells, how long staff can use management cells, and who can authorize continued use of management cells.

9

In addition, any inmate placed on management cell status will have daily clinical contacts with licensed mental health practitioners. Before being placed on management cell status, all inmates will receive an emergent mental health referral. A licensed mental health practitioner will also work with custody staff to develop an individual behavior plan designed to provide positive reinforcement in response to specific appropriate behaviors. The plan will be documented and will be monitored daily by a licensed mental health practitioner who may recommend modifications as needed. Behavior plans may be continued after the removal from management cell status.

Only a Lieutenant or higher may initiate management cell status. That individual will then notify the Associate Warden who will review the inmate's management cell status placement daily with the licensed mental health practitioner. Should an inmate remain on management cell status beyond 72 hours, approval from the Warden or Chief Deputy Warden is required. To extend management cell status beyond six days, approval from a Division of Adult Institution (DAI) Associate Director is required. The institution's Chief of Mental Health must review the behavior plan for adequacy by the sixth day, and present a modification to the plan if needed. To extend management cell status beyond ten days, approval of the DAI Deputy Director is required. Inmates on management cell status beyond ten days must be seen at the next Institutional Classification Committee for retention or removal.

Yard privileges must be maintained during management cell status. Staff may suspend yard time for up to five days only where there is a nexus between yard access and the inmate's placement on management cell status.

*Implementation*

Pending development and completion of statewide training on the revised policy, CDCR will place a moratorium on the use of management cell status for all *Coleman* class members. CDCR is developing a collaborative training plan regarding the proper use of management cell status with an emphasis on positive behavior plans and the involvement of mental health staff practitioners. Before lifting the moratorium, CDCR will confer with the Special Master about the training and ending the moratorium as part of the Special Master's review of the implementation of Defendants' rule violation report policies and procedures.

Within 30 days of this filing, institutions will provide on the job training to staff affected by the revised policy. For non-class members placed on management cell status during the moratorium, the individual behavior plan provision will not be implemented until training is provided to mental health staff. Any non-class member placed on management cell status determined to need a higher level of care will immediately be removed from management cell status.

**Non-Disciplinary Segregation Inmates**

*Requirements of the April 10 Order*

The Court stated: "Not later than August 1, 2014, defendants shall file a plan to limit or eliminate altogether placement of class members removed from the general population for non-disciplinary reasons in administrative segregations units that house inmates removed from the general population for disciplinary reasons. Defendants shall be prepared to fully implement the plan not later than September 1, 2014. If feasible, Defendants shall commence forthwith to reduce the number of Coleman class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates; feasibility shall be determined by the Special Master. Commencing on September 1, 2014, defendants will be prohibited from placing any class members removed from the general population for non-disciplinary reasons for more than seventy-two hours in administrative segregations units that house inmates removed from the general population for disciplinary reasons." (5/13/14 Order at p. 2; *see also* 4/10/14 Order at p. 72.)

*Steps Taken By CDCR in Finalizing the Plan*

CDCR met with the Special Master's team on June 5, 2014, to discuss the Court's order regarding Non-Disciplinary Segregation (NDS) inmates. Over the course of meetings held with the Special Master's team on June 17, June 24, June 25, and July 10, 2014, CDCR formulated a plan to transfer inmates out of Administrative Segregation Units within 72 hours of being designated NDS. Additionally, CDCR presented a memorandum to the Special Master's team outlining an early transfer review process for inmates serving a Security Housing Unit (SHU) term nearing the expiration of their term.

On July 10, 2014, CDCR provided the Plaintiffs' counsel and the Special Master with draft memoranda regarding NDS transfer guidelines, the definition of NDS, and early SHU transfer reviews. On July 11, 2014, CDCR met with the Special Master and Plaintiffs' counsel and discussed the plan. On July 21, 2014, Plaintiffs' counsel provided a letter outlining their proposed revisions to CDCR's NDS plan. On July 21, 2014, CDCR provided an amended NDS transfer guidelines memo and amended NDS definition to Plaintiffs' counsel and the Special Master. On July 22, 2014, CDCR provided an amended memo on early SHU transfer reviews. On July 24, 2014, CDCR met with Plaintiffs' counsel and the Special Master for discussion of the NDS plan. Plaintiffs' counsel provided CDCR with proposed revisions to the NDS memoranda following that meeting. On July 30, 2014, Defendants presented a final version of the NDS plan with all prior changes incorporated. Plaintiffs' counsel suggested additional revisions at the meeting, which were discussed, and CDCR agreed to incorporate many of the suggested revisions.

*CDCR's Plan Complies with the Court's Order*

CDCR's plan to protect Non-Disciplinary Segregation inmates from prolonged segregation[1] is attached as Exhibit 3.   The exhibit includes the proposed memorandum entitled "Non-Disciplinary Segregation Processing Procedure for Mental Health Services Delivery System Inmates," and the proposed memorandum entitled "Pre-Minimum Eligible Release Dated Reviews for Inmates Included in the Mental Health Services Delivery System" (hereinafter Pre-MERD Memo).

Inmates who are unable to house in the general population due to safety concerns not related to misconduct resulting in a Rules Violation Report or inmates who are a relative or associate of a prison staff member are designated NDS.   To prevent these NDS inmates from staying in administrative segregation for prolonged periods alongside inmates housed there for disciplinary reasons, CDCR prepared a memorandum to the field directing institutions to streamline the transfer process for NDS inmates.

NDS status is a designation issued at the initial Institutional Classification Committee (ICC) after full investigation of the circumstances surrounding the placement into ASU.   ICC must be held within ten days of placement in to an administrative segregation unit.   However, CDCR has now modified its policy so that *Coleman* class members predicted to be designated NDS will be given priority ICC scheduling.

Prior to attending ICC, the unit Captain shall determine if retention in administrative segregation is necessary.   If retention is necessary and there are no issues likely to result in disciplinary sanctions, the Captain shall grant the inmate NDS property and privileges at that time in order to mitigate any concerns about mental health impacts resulting from prolonged retention.

CDCR must balance the speed at which it holds the committee with the need to have meaningful and complete review of the circumstances of the ASU placement.   The time between placement in segregation and the initial ICC is vital for staff to investigate and resolve whether the inmate is in segregation for a non-disciplinary or disciplinary reason.   During the time between placement in ASU and the initial ICC, custody staff must interview the inmate, complete a thorough review of the inmate's file, and investigate the circumstances of the placement in ASU that may result in NDS status.   The file review helps ensure that the inmate transfers to an appropriate and safe institution.   Once an inmate's case factors have been assessed, the ICC will be able to properly designate the inmate and make a transfer recommendation.   This ensures the NDS process is reserved for those inmates with legitimate safety concerns who need to be re-housed.

---

[1] CDCR continues to work with the Special Master and the Plaintiffs to develop a plan for alternative placement of *Coleman* class members who would otherwise be placed in an administrative segregation unit.

12

The memorandum requires that within 72 hours of being designated NDS by the ICC, the inmate shall transfer out of the administrative segregation unit to designated safe housing. In rare cases where the inmate's case factors cannot be resolved at the initial ICC, the Warden shall confer with the Associate Director. If the ICC and Classification Staff Representative cannot endorse the inmate to transfer, the inmate shall transfer to the NDS hub at California State Prison, Sacramento within 72 hours of being designated NDS at the ICC. The memo also reiterates that the purpose of this expedited process is to reduce the risk of harm to inmates that may inure as a result of placement in ASU. This new process will ensure that any inmate designated NDS will transfer within 72 hours of attending the ICC.

While there are currently approximately 250 inmates in administrative segregation designated NDS and will benefit from the new transfer process, there are also approximately 75-100 inmates in administrative segregation who are waiting for appropriate housing following the completion of a SHU term. To address this issue, CDCR has developed a Pre-MERD memorandum that will direct SHU and PSU institutions to prepare inmates approaching the end of their SHU terms for transfer at least 120 days prior to the SHU term expiration. Previously, this process did not begin until 45 days prior to the expiration of a SHU term, resulting in inmates being held in administrative segregation awaiting their final housing assignment. This new process will ensure that inmates do not wait for an appropriate bed once their SHU term expires. In the rare instance that appropriate housing is not found before the SHU term ends, those inmates will be provided with NDS property and privileges. Other inmates—including inmates who are awaiting a bed at their proper institution, inmates out to Court for non-criminal cases that cannot be housed in a general population unit, and inmates being processed at a reception center—will also receive NDS property privileges while in segregation but will not receive accelerated transfers.

*Implementation*

Institutions will have until September 1, 2014, to complete on-the-job training to staff affected by the NDS and Pre-MERD memos. By September 1, 2014, the new NDS processes shall be fully implemented for any inmate entering segregation for NDS reasons. Inmates already in segregation for NDS on September 1, 2014, will be reviewed. Those with endorsements to transfer will be given expedited transfer timelines. Those inmates without endorsements to transfer will return to the next available ICC for expedited processing in accordance with the NDS memorandum.

## Reporting on Administrative Segregation Enhanced Outpatient Program Hubs Compliance with Program Guide Requirements

*Requirements of the April 10 Order*

The Court ordered: "Beginning August 1, 2014, defendants shall provide to the Court and the Special Master monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care. Commencing October 1, 2014, defendants shall not

admit any <u>Coleman</u> class member at the EOP level of care to any EOP ASU hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months. Beginning October 1, 2014, defendants shall not place any class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP Ad Seg Hub beds available unless failure to remove the inmate from the general population presents an imminent threat to life or safety." (5/13/14 Order at pp. 2-3; *see also* 4/10/14 Order at p. 73.)  The Court noted that "the Program Guide contains specific requirements for necessary care in . . . EOP ASU hubs," and recognized that "[w]hether or not the care provided in each EOP ASU hub meets Program Guide requirements is, again, a clinical judgment and one that must be exercised by Dr. Belavich and his staff." (4/10/14 Order at p. 63.)

*Steps Taken By CDCR in Developing the Report*

Following the issuance of the Court's order, CDCR developed a report and data collection process whereby CDCR will certify to the Court that each EOP ASU hub is operating in compliance with the Mental Health Program Guide.[2]  Following discussions with the Special Master's team on June 6, 2014, CDCR presented a draft report on June 17, 2014.  CDCR accepted the Special Master team's recommendations at that meeting, revised the report, and again presented it to the Special Master's team on June 25, 2014.

On July 2, 2014, CDCR provided an updated draft to the Special Master and Plaintiffs' counsel. On July 9, 2014, Plaintiffs' counsel provided CDCR with a letter outlining their concerns and suggestions regarding the report.  On July 25, 2014, CDCR met with the Special Master and Plaintiffs' counsel to discuss the report and the requirements under the April 14 order.  CDCR amended the report to address Plaintiffs' counsel's substantive concerns.

Under the guidance of the Special Master, the discussions resulted in an agreement that Defendants would not immediately file the report they developed contemplated by the order. Instead, CDCR will complete an in-depth evaluation of the hubs, modeled after the Continuous Quality Improvement Team (CQIT) process, working in coordination with the Special Master's team.  After the hubs are evaluated, CDCR will complete the attached report which will be certified by the local chief of mental health, the regional administrator, and the Director of Mental Health (See exhibit 4).

*Implementation*

After meeting with the Plaintiffs' counsel and the Special Master on July 25, 2014, the parties agreed to the evaluation process discussed above.  Beginning July 29, 2014, a team of Regional

---

[2] A template of the report developed by CDCR is attached as Exhibit 4. As discussed in this section, the Special Master proposed a different process for evaluating the EOP ASU hubs, and Defendants have not completed the initial report contemplated by the order.

Administrators will tour all 10 EOP ASU hubs at least once a month, for two consecutive months, for the purposes of auditing each hub for Program Guide compliance, and utilizing the Continuous Quality Improvement Tool (CQIT) structure to do so. This in-depth CQIT review of each EOP ASU hub will provide Headquarters the necessary information to make an initial baseline evaluation as to each hub's compliance with Program Guide requirements. After the initial two month CQIT audit process of each hub is completed, and initial certification is achieved, Dr. Belavich and Headquarters staff will then review the snapshot of monthly data discussed above, to ensure the hubs are continuing to maintain compliance.

### Revisions to the Unclothed Body Search Policy

*Requirements of the April 10 Order*

The Court requires that CDCR "file a revised policy concerning strip searches in EOP ASU hubs." (Order at p. 74.)

*Steps Taken By CDCR in Revising the Policy*

CDCR gathered the local operating procedures from CDCR institutions and examined other states' policies in an effort to develop a uniform state policy on unclothed body searches for inmates housed in an EOP ASU hub. CDCR worked on this policy with the Special Master's team on June 5, June 18, June 24, and June 25, 2014. Following these meetings, CDCR drafted a new policy - DOM Section 52050.16.6, Unclothed or Clothed Body Searches of Inmates in Administrative Segregation Enhanced Outpatient Program Hubs.

CDCR provided the draft policy to Plaintiffs' counsel on July 2, 2014. On July 9, 2014, Plaintiffs' counsel provided a letter detailing their concerns and suggestions. On July 24, 2014, CDCR met with the Plaintiffs' counsel and the Special Master to discuss the proposed policy. Following that meeting, CDCR revised the policy to fully address the privacy concerns expressed by Dr. Belavich at the hearings and noted by the Court in its order. On July 30, 2014, Defendants presented a final version of the unclothed body search policy to the Special Master and Plaintiffs' counsel. For inmates refusing to attend treatment in the EOP ASU hubs, CDCR has also drafted a memorandum directing custody and mental health staff to collaborate to identify and address the reasons for the inmate's refusal to participate in treatment.

*CDCR's Revised Policy & Accompanying Memorandum Comply with the Court's Order*

The order requires CDCR to provide a "revised policy to the court" by August 1, 2014. In undertaking the review of local operating procedures and other states' policies regarding unclothed body searches, CDCR created a new policy targeted at reducing the unclothed body searches of inmates housed in EOP ASU hubs. A copy of the revised policy is attached as Exhibit 5.

D.O.M. Section 52050.16.6 mandates that an EOP inmate in administrative segregation will no longer be subject to unclothed body search upon return from an activity so long as the inmate remains under staff supervision while at that activity. The policy also provides that inmates exiting their cell for activity within the unit shall not be subject to unclothed body searches. Those inmates will be subject to a clothed pat down search and scanned with a metal detector. The revised policy balances the need for safety and security in segregation units with the need to provide inmates with uninhibited access to care.[3] Inmates will be subject to an unclothed body search upon leaving the unit to prevent the movement of contraband and weapons. Supervision by staff while out of the unit will ensure that inmates do not obtain contraband and weapons thereby negating the need for an additional unclothed body search upon return to the unit. Whenever an unclothed body search shall occur, the policy requires it be conducted in the inmate's cell unless there is a visibility issue, in which case the search shall be conducted in an alternative private setting.

Section 52050.16.6 substantially reduces the number of unclothed body searches performed on *Coleman* class members in EOP ASU hubs. The policy thus removes unnecessary barriers to treatment while still providing for the safety and security of staff and inmates in EOP ASU hubs.

*Implementation*

Upon approval of the policy, institutions shall be given 30 days to complete on the job training to staff assigned to EOP ASU hubs and fully implement the policy upon completion of the training.

---

[3] The revised policy strikes the appropriate balance regarding these important penological concerns, and extends as far as Defendants believes it can to ensure the safety of inmates and staff.

# EXHIBIT 1

[CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
REPORT ON COMPLIANCE WITH THE COURT'S APRIL 10, 2014 ORDER ON USE
OF FORCE AND SEGREGATION OF COLEMAN CLASS MEMBERS]

# ARTICLE 2 – USE OF FORCE

*Revised May 2014*

**51020.1 Policy**
It is the policy of the California Department of Corrections and Rehabilitation's (CDCR), Division of Adult Institutions (DAI), to accomplish custodial and correctional functions with minimal reliance on the use of force. Employees may use reasonable force as required in the performance of their duties, but shall not use unnecessary or excessive force. Staff may, at any point, determine the situation can be resolved without the use of force and terminate the use of force process.
This policy, in conjunction with related procedures and training, defines staff responsibilities and requirements concerning the use of force.
This policy will assist staff in identifying when and how much force is appropriate under different circumstances, ensure that supervision, monitoring, and evaluation of the use of force is consistent with procedures and training, and ensure the investigation of possible unnecessary or excessive use of force. Staff found culpable of violations of the Use of Force Policy will be subject to disciplinary (preventive, corrective, or adverse action) procedures.

**51020.2 Purpose**
The purpose of this Article is to outline DAI's procedures pertaining to the use of force, as set forth in CCR, Title 15, Section 3268.

**51020.3 Responsibility**
It is the responsibility of all employees to understand and comply with the Use of Force policy, related procedures, ongoing training, and applicable law.
It is the responsibility of each Institution Head:
To ensure that all employees receive appropriate training annually and understand the Use of Force policy and procedures, including both the application of force and subsequent reporting and documentation requirements.
To record and track all training and discipline related to the use of force.

**51020.4 Definitions**
The following shall define language usage in this Article:
   **Reasonable Force**
Reasonable force is the force that an objective, trained, and competent correctional employee faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.
   **Unnecessary Force**
Unnecessary force is the use of force when none is required or appropriate.
   **Excessive Force**
Excessive force is the use of more force than is objectively reasonable to accomplish a lawful purpose.
   **Immediate Use of Force**
Immediate use of force is the force used to respond without delay to a situation or circumstance that constitutes an imminent threat to security or the safety of persons. Employees may use immediate force without prior authorization from a higher official.
   **Imminent Threat**
An imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some

examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance.

## Controlled Use of Force

A controlled use of force is the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the immediate threat to loss of life or immediate threat to institution security. All controlled use of force situations require the authorization and the presence of a First or Second Level Manager, or Administrative Officer of the Day (AOD) during non-business hours. Staff shall make every effort to identify disabilities, to include mental health issues, and note any accommodations that may need to be considered.

## Non-conventional Force

Non-conventional Force is force that utilizes techniques or instruments that are not specifically authorized in policy, procedures, or training. Depending on the circumstances, non-conventional force can be necessary and reasonable; it can also be unnecessary or excessive.

## Non-deadly Force

Non-deadly force is any use of force that is not likely to result in death.

## Deadly Force

Deadly force is any use of force that is likely to result in death. Any discharge of a firearm other than the lawful discharge during weapons qualifications, firearms training, or other legal recreational use of a firearm, is deadly force.

## Great Bodily Injury (GBI)

Great bodily injury is any bodily injury that creates a substantial risk of death.

## Serious Bodily Injury

Serious bodily injury means a serious impairment of physical condition, including, but not limited to the following:

- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring suturing, or
- Disfigurement.

## Response Supervisor

The Response Supervisor is the first line supervisor in an institution/facility responsible for the area where an incident occurs. When responding to or observing an incident involving the use of force, the response supervisor shall assume control of the responders and direct the tactics used to stop the threat. Additionally, the response supervisor shall assess the appropriateness/effectiveness of the force options being deployed ensuring compliance with policy and training.

## Incident Commander

The Incident Commander is the second line supervisor in an institution/facility responsible for the area where an incident occurs or an allegation of excessive or unnecessary force is received.

## First Level Manager

A First Level Manager in an institution/facility is a Captain, or the AOD.

## Second Level Manager

A Second Level Manager in an institution/facility is an Associate Warden.

## Institution Head

The Institution Head is a Warden or designee.

## Institutional Executive Review Committee (IERC)

The IERC is a committee of institution staff chaired by the respective Institution Head tasked with reviewing all uses of force and every allegation of excessive or unnecessary force. The IERC is the final institutional level of review.

**Department Executive Review Committee (DERC)**

The DERC is a committee of staff selected by, and including, the Associate Director who oversees the respective institution/facility Mission-based group. The DERC has oversight responsibility and final review authority over the IERC. The DERC shall review every use of deadly force and every serious injury, great bodily injury or death that could have been caused by a staff use of force. The DERC shall also review those incidents referred to the DERC by the IERC Chairperson or otherwise requested by the DERC.

**Deadly Force Investigation Teams (DFIT)**

DFIT is a team of trained department investigators that shall conduct criminal and administrative investigations into every use of deadly force and every death or great bodily injury that could have been caused by a staff use of force, except the lawful discharge of a firearm during weapons qualifications or firearms training, or other legal recreational uses of a firearm. Based on certain local Memoranda of Understanding, criminal investigations may instead be conducted by an outside police department or sheriff's office. Although defined as deadly force DFIT need not investigate the discharge of a warning shot inside an institution/facility if an Investigative Services Unit_Sergeant or above, or an uninvolved Correctional Lieutenant, confirms that the discharge of deadly force was a warning shot and that no injuries were caused by the shot. All warning shots shall be reported to the Office of Internal Affairs/DFIT and the Office of the Inspector General (OIG).

**Deadly Force Review Board (DFRB)**

The DFRB conducts a full and complete review of all incidents involving a use of deadly force (except warning shots) and every death or great bodily injury that could have been caused by a staff use of force, regardless of whether the incident occurs in an institutional or community setting.

**Joint Use Committee (JUC)**

The JUC is a committee of field staff from the DAI tasked with reviewing and evaluating recommended revisions to the Division's Use of Force Policy and Procedures.

**Holding Cells**

All holding cells shall be located within buildings or sheltered areas. A holding cell shall not be used as a means of punishment, housing or long-term placement. If clothing is taken from an inmate when he/she is placed in a holding cell, alternate clothing shall immediately be provided unless security concerns preclude issuance. Refer to DOM Section 52050.10.4

## 51020.5 Use of Force Options

It is the expectation that staff evaluate the totality of circumstances involved in any given situation, to include consideration of an inmate's demeanor, bizarre behavior, mental health status if known, medical concerns, as well as ability to understand and/or comply with orders in an effort to determine the best course of action and tactics to resolve the situation.

Whenever possible, verbal persuasion should be attempted in an effort to mitigate the need for, and amount of, force. The type of verbal persuasion will vary dependent upon the inmate's ability to understand.

If time permits, verbal orders should be issued prior to resorting to force and are required to be provided before controlled force is used.

The unresisted searching or escorting of an inmate/parolee and the unresisted application of authorized restraint equipment is not a use of force.

Use of Force options do not have to be utilized in any particular sequence, but should be the force option staff reasonably believes is sufficient.

Each force option has specific qualities that should be considered when choosing which option to deploy, including but not limited to: range of effectiveness, level of potential injury, staff safety, deployment methodology, level of threat presented, distance between staff and inmate, number of staff and inmates involved and the inmate's ability to understand.

When responding to or observing an incident involving the use of force, the response supervisor shall assume control of the responders and direct the tactics used to stop the threat. Additionally, the response supervisor shall assess the appropriateness/effectiveness of the force options being deployed ensuring compliance with policy and training.

Use of force options include but are not limited to:

Chemical agents: Provides staff the ability to use force while maintaining distance.

Hand-held batons: The baton is normally issued to custodial staff assigned to positions with direct inmate contact. The baton is intended solely for use in self-defense and the defense of others.

During the escort of an inmate in restraints, the baton shall be carried in the extended position for the protection of the inmate and staff. In controlled use of force, the baton is intended for the defense of staff and to assist in gaining control of the inmate.

Physical strength and holds: Any deliberate physical contact, using any part of the body, to overcome conscious resistance, is considered physical force. A choke hold or any other physical restraint which prevents the person from swallowing or breathing shall not be used unless the use of deadly force would be authorized.

Less-lethal weapons: A less lethal weapon is any weapon that is not likely to cause death. A 37mm or 40mm launcher and any other weapon used to fire less-lethal projectiles is a less lethal weapon.

Lethal weapons: A firearm is a lethal weapon because it is used to fire lethal projectiles. A lethal weapon is any weapon that is likely to result in death.


## 51020.6 Use of Restraints

The unresisted application of authorized restraint equipment is not a use of force. When mechanical restraint is required, handcuffs, alone or attached to a waist chain, will be the means of restraint normally used. However, additional mechanical restraints, including leg irons, additional chains, leather cuffs, or other specialized restraint equipment may be used when the circumstances indicate the need for the level of control that such devices will provide. Restrained inmates shall never be left unsupervised.

Use of mechanical restraints on persons confirmed, or suspected by health care staff to be pregnant shall be subject to the following requirements found in California Code of Regulations (CCR) Title 15 section 3268.2 (d) and (e):

- No leg restraints or waist chains shall be applied.
- If handcuffs are applied, the person's arms shall be brought to the front of her body for application.

Mechanical restraints shall not be placed on an inmate during labor, including during transport to a hospital, during delivery, and while in recovery after giving birth, unless circumstances exist that require the immediate application of mechanical restraints to avoid the imminent threat of death, escape, or great bodily injury. In this case, mechanical restraints may be used only for the period during which such threat exists.

The following state-issued restraints and equipment are authorized for use at the discretion of on-duty staff:

- Handcuffs
- Waist Chain
- Leg Irons
- Escort Chains

- Padlocks
- Security Chain
- Spit Hood
- Martin Chain

The following restraints may be used as specified below:

- Safety Triangle: This device is a handcuff retention device, used to prevent inmates from pulling restraint equipment into their cell and may be used at the discretion of on-duty staff Some reasons for using the safety triangle include, but are not limited to: rehousing an irate inmate who has threatened violence or an inmate who was just involved in a use of force incident. The safety triangle may remain attached to the handcuffs if the inmate is being relocated in the housing unit and if attaching and detaching the safety triangle to and from the handcuffs presents a safety concern. The safety triangle is not intended to control the inmate outside of the cell. The officer controlling the safety triangle must be vigilant and efforts should be directed to prevent the inmate from pulling his hands inside the cell while the door is being closed.

  In the event that an inmate who is attached to a triangle refuses to place their hands in the food/security port to allow the handcuffs to be removed, it may be necessary to pull the safety triangle to retrieve the handcuffs. When it is necessary to pull the safety triangle, a single staff member shall slowly move away from the door while holding onto the safety triangle, in order to bring the inmate's hands through the port. This will be conducted with extreme caution in order to minimize the risk of injury to the inmate. Additional staff may be needed to assist with the safety triangle in the event that the one staff member is insufficient to get the inmate's hands through the food port. Once the inmate's hands, wrists, and forearms are through the port, staff will grasp the inmate's forearms, the tension on the safety triangle shall be released, and the handcuffs removed.

  Prior to using a safety triangle on an inmate confirmed or suspected by health care staff to be pregnant, a physician must be consulted and any potential risks fully discussed.

  The final decision to place the device on the pregnant inmate will rest with the Warden or Chief Deputy Warden (CDW) and the reviewing physician. The consultation and its outcome must be documented for inclusion in the inmate's health record and central file.

- Leather Restraints: Leather restraints are used for four/five point restraint in a Correctional Treatment Center, General Acute Care Hospital, or community hospital. Authorization for application of four/five point restraints shall only be given by health care staff in accordance with California Code of Regulations, Title 22, Section 79801 Clinical Restraint, Treatment Restraint, and Clinical Seclusion, and the Mental Health Program Services Delivery System Program Guide, Chapter 10, Suicide Prevention and Response. Use of restraint equipment at the direction of medical staff shall be fully documented in the inmate's health record.

- Hand Isolation Devices (HID): These devices (e.g., hand mittens, etc) are used as an additional measure to restrict an inmate's ability to use his/her hands. HIDs may only be purchased from an approved vendor and used at an institution when authorized, in writing, by the Warden or CDW. Inmates in HIDs must have constant and direct visual supervision at all times. In instances where HIDs are used for Contraband Surveillance Watch (CSW), staff must maintain a log (CDCR Form 114A) which reflects usage times and correlating actions (e.g., 1200 hrs - One HID was removed so the inmate could eat lunch). Prior to placing a HID on an inmate confirmed, or suspected by health care staff to be pregnant, a physician must be consulted and any potential risks fully discussed. The final decision to place the device on the pregnant inmate will rest with the Warden or CDW and the reviewing physician. The consultation and its outcome must be documented for inclusion in the inmate's health record and central file. Equipment Hygiene - HIDs must be cleaned and

sanitized on an ongoing basis (e.g., if soiled after a bowel movement, after termination of the CSW, etc.).

Mechanical restraint equipment shall not be used in any manner described in CCR, Title 15, Section 3268.2(c), Use of Restraints. The use of restraint equipment not identified in this section must be preapproved at the level of Associate Director or higher. As part of the mechanical restraint maintenance process, restraints should be routinely cleaned and sanitized to adhere to an acceptable equipment hygiene standard.

Inmates who have a disability that prevents standard search methods or application of restraint equipment in the prescribed manner shall be afforded reasonable accommodation under the direction of the response supervisor. Mechanical restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.

### 51020.7 Deadly Force

The CDCR recognizes the sanctity of human life. Therefore, deadly force will only be used when it is reasonably necessary to:
Defend the employee or other persons from an immediate threat of death or great bodily injury.
Prevent an escape from custody.
Stop acts such as riots or arson that constitute an immediate jeopardy to institutional security and, because of their magnitude, are likely to result in escapes, great bodily injury, or the death of other persons.
Additionally, CDCR operates facilities that maintain livestock or are situated in remote areas. CDCR recognizes the need to dispose of seriously injured or dangerous animals when no other disposition is practical.
A firearm shall not be discharged if there is a reason to believe that persons other than the intended target will be injured.

### 51020.7.1 Warning Shots

A warning shot discharged from a lethal weapon is deadly force. Firearms may be discharged as a warning only in the safe area of an institutional/facility setting, and only when the use of deadly force is warranted.

### 51020.8 Non-deadly Force

Non-deadly force will only be used when reasonably necessary to:
Subdue an attacker.
Overcome resistance.
Effect custody. or to
Gain compliance with a lawful order.
Immediate force may be necessary to subdue an attacker, overcome resistance or effect custody. If it is necessary to use force solely to gain compliance with a lawful order, controlled force shall be used.

### 51020.9 Medical Evaluation

When force is used, a medical evaluation shall be provided as soon as practical.

### 51020.10 Application of Force

Employees may use force in circumstances that require immediate action in response to an imminent threat, or in circumstances that require a controlled use of force. Any application of force, whether immediate or controlled, must be reasonable and in accord with the applicable standards for deadly or non-deadly force.

## 51020.11 Immediate Use of Force

When time and circumstances do not permit advanced planning, staffing and organization, and an imminent threat exists to security or safety of persons, immediate force may be used.

If time and resources allow, an immediate use of force should be video recorded. If an immediate use of force is recorded, the recording shall be submitted into evidence.

If an immediate use of force is captured on security cameras (i.e. yard or visiting cameras), those recordings shall be placed into evidence.

### 51020.11.1 Immediate Use of Force in Cells

When immediate force is necessary due to an imminent threat, for inmates confined in their cells, Oleoresin Capsicum (OC) is the preferred option for carrying out the immediate use of force. Whenever possible, a verbal warning shall be given before force is used.

### 51020.11.2 In-Cell Assaults

Staff discovering an in-cell assault shall sound an alarm and order the inmates to stop fighting. If the inmates continue to fight or one inmate continues to assault the other, staff shall use appropriate force options to stop the incident.

Should the use of force fail to stop the incident, staff shall form an extraction team and conduct an immediate extraction of the inmates. While the team is being formed, at least one staff member shall remain at the cell to continue observation of the incident and deploy additional force if needed.

The cell door should not be opened until sufficient staff is present. A minimum of two officers shall be present, prior to the door being opened.

The on-scene staff may use their discretion to order the opening of the cell without both inmates being restrained in handcuffs. This discretion would apply in the event of incapacitating injuries, illness, or overriding security concerns.

### 51020.11.3 Food/Security Ports

If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock the food/security port:

The officer shall verbally order the inmate to relinquish control of the food port and allow staff to secure it.

If the inmate relinquishes control of the food/security port, it will be secured.

In the event the inmate does not relinquish control of the food port, the officer shall back away from the cell and contact and advise the custody supervisor of the situation. Controlled force may be initiated in accordance with DOM Section 51020.12, while custody staff continue to monitor the inmate.

### 51020.12 Controlled Use of Force General Requirements

When force is necessary but does not involve an imminent threat to subdue an attacker, effect custody or to overcome resistance, the force shall be controlled.

The controlled Use of Force involves advance planning, staffing and organization. A controlled use of force requires authorization and the presence of a First or Second Level Manager, or an AOD (on-site manager) during non-business hours. The on-site manager is ultimately responsible for the controlled use of force incident. The Incident Commander shall supervise the controlled use of force process. The Response Supervisor shall direct the controlled use of force team.

Once a situation exists that may result in a controlled use of force, a custody staff member shall remain at the location to monitor the inmate and continue to attempt to gain compliance from the inmate through attempts at verbal persuasion until the controlled use of force team arrives and the staff member is relieved by the Incident Commander to resume their regular duties. The

custody staff member will be positioned as close as possible to the affected location, without jeopardizing their own safety.

All controlled uses of force shall be preceded by a cool down period to allow the inmate an opportunity to comply with custody staff orders. The cool down period shall include clinical intervention (attempts to verbally counsel and persuade the inmate to voluntarily exit the area) by a licensed mental health practitioner and may include similar attempts by custody staff if authorized by the on-site manager. This intervention shall take place for all inmates and is not limited to participants in the Mental Health Services Delivery System.

During the cool down period:

- Licensed nursing staff shall review the inmate's health record for medical conditions which put the inmate at increased risk for adverse outcome from the use of chemical agents and or physical force. In addition licensed nursing staff shall review the health record for any known disabilities that will require accommodation during the controlled use of force. For inmates housed in an inpatient setting the Inpatient RN shall conduct the review. For all other inmates the review shall be conducted by the TTA RN.

- If the licensed mental health practitioner is not the treating clinician, he/she shall review the inmate's health record to determine if the inmate has any previous or current mental health issues. The licensed mental health practitioner shall use that information along with information gained during the clinical intervention to advise the on-site manager of any mental health issues that impact the inmate's ability to understand orders, make it difficult for the inmate to comply with orders, or could lead to a substantial risk of decompensation.

If it is determined the inmate does not have the ability to understand orders, chemical agents shall not be used without authorization from the Warden, Chief Deputy Warden or AOD. Any decision to proceed with the use of chemical agents shall be documented, along with the details of the underlying reasons to proceed, and the outcome. When serious circumstances exist, calling for extreme measures to protect staff or inmates, (i.e., the inmate may be armed with a deadly weapon) the Warden, Chief Deputy Warden or AOD may authorize use of chemical agents when the inmate does not have the ability to understand orders.

If it is determined an inmate has the ability to understand orders but has difficulty complying due to mental health issues, or when a licensed mental health practitioner believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation, a licensed mental health practitioner shall propose reasonable strategies to employ in an effort to gain compliance. Some strategies to consider may include, but are not limited to: verbal persuasion, positive behavior modification, and/or other de-escalation/intervention techniques by the licensed mental health practitioner, or engaging additional clinicians that have an established rapport with the inmate. If the efforts are not successful, it may be necessary for the controlled use of force to proceed. Chemical agents shall not be used without authorization from the Warden, Chief Deputy Warden or AOD.

The cool down period may also include use of other available resources/options such as dialogue via religious leaders, correctional counselors, correctional officers and other custody and non-custody staff that have an established rapport with the inmate. The on-site manager and licensed mental health practitioner shall collaborate on efforts to be made during the cool down period. The length of the cool down period can vary depending upon the circumstances, but should be allowed to continue until all reasonable interventions have been attempted, or an imminent threat exists.

When the on-site manager and licensed mental health practitioner together determine that reasonable efforts have been exhausted, the cool down period will end and the controlled use of force will be initiated.

If there is disagreement among the collaborative team members (medical, nursing, mental health and custody) regarding the strategies to be employed, or length/termination of the cool down

period, the issue shall be elevated to the appropriate clinical and custodial managers up to and including the Chief of Mental Health (or designee), Chief Medical Executive (or designee), and Warden or Chief Deputy Warden.

In the event the disagreement is not resolved at the institution level, the issue shall be elevated to the Regional Administrators (Mental Health and Medical), and the appropriate Associate Director.

The Incident Commander shall document the start time and duration of the cool down period on the CDCR 837-A/A1.

During the cool down period, a tactical plan for the potential controlled use of force will be developed by the Incident Commander in collaboration with the Response Supervisor and on-site manager, with input from licensed nursing staff (registered nurse, licensed vocational nurse, psychiatric technician) and a licensed mental health practitioner. During the collaboration, the possible use of chemical agents, physical force, or other approved force options that may be used to complete the lawful objective will be discussed utilizing their collective knowledge, training, and experience, as well as an evaluation of the totality of circumstances.

General circumstances to consider include but are not limited to:

- inmate's current demeanor, (verbal vs. physical aggression / passive vs. active resistance)
- prior incidents of violence toward staff
- safety of inmates and staff
- possession of a weapon
- use of barriers, barricades or a personal barrier (cloth or plastic placed about the inmates face and head)
- inmate's actions during any prior controlled uses of force.
- physical design of the cell
- location of cell with regard to cross contamination (i.e., OHU/CTC/PIP/PSU, open cell front, etc.)
- effective communication needs as identified by the Disability and Effective Communications System (DECS).
- input from the assigned housing unit staff

Health care concerns to consider include but are not limited to:

- current medical health
- current and prior mental health issues
- inmate's ability to understand orders or difficulty complying with orders due to mental health issues
- potential for substantial risk of decompensation
- developmental/intellectual disabilities

A decision to use chemical agents for the extraction should be based on more than passive resistance to placement in restraints or refusal to follow orders. If the inmate has not responded to staff for an extended period of time, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized.

Based on the collaborative effort, the tactical plan will be finalized and approved by the on-site manager.

A controlled use of force shall not be accomplished without the physical presence of a licensed nursing staff. The licensed nursing staff shall be in close proximity to the incident to facilitate an immediate medical response, but not so near as to become involved in the controlled use of force. The licensed nursing staff is not required to don controlled use of force team equipment such as a helmet, PPE kit, etc. Prior to commencing with the controlled use of force, the Incident Commander shall ensure the licensed nursing staff is in possession of the appropriate medical supplies and equipment to respond to a medical emergency. The licensed nursing staff who

reviewed the health record and the licensed nursing staff that is on-site during the controlled use of force is not required to be the same person.

### 51020.12.1    Controlled Use of Force Without Extraction

Not all controlled use of force situations are conducted to remove an inmate from a cell or other location. Controlled use of force may also be used to administer medications or provide medical treatment (PC 2602, TB testing, etc.)  When circumstances are such that a controlled use of force is considered within a cell, on-duty Health Care staff shall ensure medical authorization for the involuntary medication exists.  Health care staff shall also consult with the treating psychiatrist, primary care provider or mid-level provider, if available, to verify the current and critical need for involuntary medication or treatment.  If the treating psychiatrist, primary care provider or mid-level provider is not available, the physician or psychiatrist on call shall be consulted. Health Care staff shall advise the Incident Commander of such prior to the application of controlled use of force procedures. In these circumstances a controlled use of force team may enter the cell, physically restrain the inmate while medications/treatment are administered, and exit the cell.

The Incident Commander shall determine what, if any, safety equipment to be utilized (as identified in 51020.12.2).  The decision shall be based on the totality of circumstances to include, but not be limited to:

- inmate's current demeanor (passive resistance vs. physical aggression)
- prior incidents toward staff
- inmate's actions during prior controlled use of force incidents
- current medical health
- current mental health
- specific purpose of the controlled use of force

These incidents shall be video recorded, therefore, a video camera with backup videotape or media and backup batteries is required.

### 51020.12.2    Extractions

An extraction is the involuntary removal of an inmate from an area and usually occurs when the inmate is in a confined area such as a cell, holding cell, shower, or small exercise yard.

Extractions can be conducted as a controlled or immediate use of force. Except in the case of an imminent threat, extractions shall take place in a controlled manner.

Controlled extractions occur when no imminent threat exists but an inmate's refusal to comply with orders and presence in a cell, yard, or other previously identified location poses a threat to safety and security, or disrupts the normal operation of the housing unit, facility, or institution.

Immediate extractions occur when an imminent threat exists. An immediate extraction may be necessary to prevent or stop, great bodily injury and/or serious bodily injury, attempted suicide, self–harm, in-cell assault, or for medical concerns such as an inmate who is non-responsive, convulsing, or seizing.

The presence of supervisors, managers or health care staff is not required to conduct an immediate extraction.

If a controlled extraction becomes necessary, extraction team members shall be issued extraction equipment:

- Riot helmet, with protective face shield, protective vest, respirator, elbow and shin protectors, gloves, Kevlar neck protector, and bloodborne pathogen protective suit.
- Protective shield, approximately 22" wide and 48" long.
- Expandable baton(s), handcuffs, and leg restraints.
- Video camera(s) with a backup videotape or media and back up batteries.

If an immediate extraction in a Security Housing Unit/Administrative Segregation Unit becomes necessary, extraction team members shall be issued extraction equipment:

- Riot helmet, with protective face shield, and protective vest.
- Protective shield, approximately 22" wide and 48" long.
- Expandable baton(s) and handcuffs.

The bloodborne pathogens protective suit can be used in an immediate extraction if needed. The suit is not required if bodily fluids are not present in sufficient quantities which present a threat to staff.

The bloodborne pathogens protective suits, riot helmets, and protective shields are to be stored in locations that are readily accessible to the staff responding to conduct an immediate cell extraction so as not to delay entry/response.

Prior to a controlled extraction, the Response Supervisor or Incident Commander shall ensure that the members of the extraction team do not include any staff member who was directly involved in the incident precipitating the need for extracting the inmate.

The Incident Commander will ensure the Response Supervisor and extraction team members clearly understand their role, appropriate signals, and are familiar with the departmental use of force policy.

A briefing, including possible tactics to be used, shall be given to the extraction team by the Response Supervisor and/or Incident Commander. This briefing shall not be video recorded and should be completed away from the presence of any inmates.

If time permits prior to the actual extraction, a mock extraction may be conducted in a vacated area with participating staff in order to ensure that custodial staff are familiar with their roles during the extraction. Several simulated operations will ensure smoothness, and timing during the actual extraction.

Prior to the extraction, the Incident Commander will communicate with the officer responsible/assigned to open/close cell doors and establish verbal/non-verbal signals specific to the controlled use of force.

The Incident Commander shall ensure this officer understands that only the Incident Commander shall authorize the opening and closing of affected doors.

For the safety of staff, prior to being removed from a cell, it is preferred that the inmate submit to a (visual) search. The inmate should remove all clothing, except their underwear, and move back far enough from the cell door to allow a visual inspection. The inmate shall be visually inspected from head to toe, front and back. The inmate will run their fingers around the inside waistband of their underwear. The inmate shall be allowed to retain their underwear while being restrained and removed from the cell.

If the inmate refuses to cooperate with the (visual) search, but is willing to submit to restraints, the inmate shall be placed in restraints and removed from the cell. The application of restraints shall not be delayed due to the inmate's refusal to submit to being searched, or to have the inmate remove any clothing. Upon removal from the cell, the inmate should be subjected to search for staff safety.

Placement of an inmate on the stomach for a short period of time to restrain an inmate is authorized; however once the inmate is exposed to chemical agents and/or if a spit hood/mask is placed on the inmate, staff shall not place the inmate on his stomach, or in a position that allows the inmate to end up on his stomach, for any period longer than necessary to gain or maintain control.

The procedure for cell extractions where two inmates are in the cell remains the same as for a single celled inmate with the following additions:

- Additional team members shall be assigned as determined by the Incident Commander.
- In the event one of the inmates is compliant with staff's instructions, and if in the judgment of the Incident Commander it is safe to open the cell door, the inmate shall be removed.

If it is unsafe to remove the compliant inmate, he shall be required to remain in the cell and appropriate instructions shall be issued for the duration of the incident.

The procedures for an extraction from a holding cell, shower, small exercise yard, etc., whether in a segregated housing unit or general population remain the same as cell extractions except as follows:

- Additional extraction team members or an additional extraction team may be assigned as determined by the Incident Commander.

- In the event two or more inmates are to be extracted from the same area, at least one additional supervisor shall be assigned.


### 51020.12.3    Controlled Uses of Force-Video Recording Requirements

Each controlled use of force shall be video recorded. The camera operator shall procure the camera, videotape or media, backup videotape or media, and backup battery. Prior to initiating video recording, the Incident Commander shall ensure the staff member operating the camera is familiar with the operation of the camera, and the expectations of the camera operator while recording the introductions and extraction in accordance with 51020.12.1 Controlled Uses of Force-Video Recording Requirements.

Only one incident shall be recorded on each video recording (videotape or video media will not include multiple incidents).

If the proposed controlled force involves a cell extraction of two inmates, two camera operators shall be used. Each camera operator will be designated an inmate prior to the application of the controlled use of force and concentrate on that inmate during the recording. The camera operator(s) will be positioned as close as possible to the immediate area to record as much of the incident as possible, yet at a sufficient distance so as to ensure no interference with the extraction team or jeopardy to their own safety.

The camera operator shall ensure that an accurate date and time is displayed on the recording. Filming shall begin with the camera operator stating their name, rank, date, time, and location of the controlled use of force.

The Incident Commander shall identify the inmate involved and state the circumstances of the proposed controlled use of force and/or extraction. The circumstances shall include a summary of the events leading up to the controlled use of force and what efforts have been made toward mitigation, to include the duration of the cool down period, as well as custody, supervisory, medical, and mental health intervention, as applicable. The Incident Commander shall explain the tactical plan, rationale of the plan, and the intended use of force.

The on-site manager shall identify themselves on camera and confirm they are authorizing the controlled use of force, including the force options as stated by the Incident Commander. The on-site manager shall also ensure the video introduction includes all required information.

The TTA RN/Inpatient RN shall identify himself/herself on camera and confirm he/she reviewed the inmate's health record. The RN shall indicate if the inmate has any health conditions that will put him/her at increased risk for adverse outcome from the use of chemical agents or other force options. The RN shall also note any known disabilities the inmate has that will require any accommodation before, during or after the controlled use of force. The RN shall not include specific conditions or any other protected health information.

The licensed nursing staff that will be on-site during the controlled use of force shall also identify themselves on camera as performing that role and having the necessary medical equipment.

The licensed mental health practitioner who provides clinical intervention shall identify himself/herself on camera and provide a detailed timeline of his/her efforts. This narrative shall not include specific conditions or any other protected health information but shall include a summary of the inmate's reaction. The actual clinical intervention shall not be video recorded.

The Response Supervisor and members of the controlled use of force team shall identify themselves on camera and state their roles in the controlled use of force.

Following the introduction, the camera operator shall continue filming enroute to the scene of the proposed controlled use of force and record the events.

Prior to the application of force, the camera operator should videotape the interior of the cell/area and the inmate's actions.

The incident commander shall issue a verbal warning prior to initiating the application of force. The verbal warning shall contain the following five elements:

- Address the inmate by name.
- Advise the inmate that he/she is being video recorded.
- Order the inmate to voluntarily comply.
- Advise the inmate of the intent to use chemical agents and/or physical force if he/she does not comply.
- Advise the inmate that sufficient force will be used to remove him/her from the area, administer medications, etc.

After the introduction of chemical agents, the camera operator should again video record the inmate and the interior of the cell/area.

If the video recording is interrupted for any reason once the incident/extraction has begun, the camera operator will give an explanation verbally of the interruption once recording has resumed. The entire incident must be video recorded in one segment or scene.

Once the inmate has been extracted, the licensed nursing staff shall conduct an initial medical evaluation of the inmate and provide any necessary initial treatment. While the inmate is being evaluated or treated the camera shall continue recording, but will not be aimed at the inmate or the licensed nursing staff. During this time the camera should be aimed at a clock, floor, wall, etc. If it becomes necessary for staff to use force on the inmate while he is being examined or treated, the camera will immediately be aimed at the inmate until such time as the inmate is no longer resistive and the medical evaluation resumes.

If the purpose of the controlled use of force was to administer medications, video recording shall continue as the medications are administered, and until the controlled use of force team disengages from the inmate.

If chemical agents were used and the inmate is allowed to decontaminate, ensure the decontamination is filmed.

The Incident Commander shall determine when the incident has concluded and video recording shall end. This is typically when the inmate is placed in a holding cell/area or re-housed.

### 51020.12.4    Controlled Use of Force in Health Care Facilities

When circumstances are such that a controlled use of force is considered within a health care facility (departmental hospital, infirmary, Correctional Treatment Center (CTC), Skilled Nursing Facility (SNF), Psychiatric Inpatient Program (PIP), Outpatient Housing Unit (OHU), etc) licensed nursing staff shall consider the impact on medical conditions and the possible need to relocate uninvolved inmates in the immediate vicinity during a controlled use of force.

Administration of Involuntary Medication or Medical Treatment (PC 2602/Probate Code 3200): When force is necessary to administer medication or medical treatment within a health care facility, on-duty Health Care staff shall ensure medical authorization for the involuntary medication or treatment exists. Health care staff shall also consult with the treating psychiatrist, primary care provider or mid-level provider, if available, to verify the current and critical need for involuntary medication or treatment. If the treating psychiatrist, primary care provider or mid-level provider is not available, the physician or psychiatrist on call shall be consulted. Health care staff shall advise the Incident Commander of such prior to the application of controlled use of force procedures.

Application of Four/Five point Restraints: Only departmentally approved four/five point restraints shall be applied by authorized licensed nursing staff in health care facilities. Authorization for application of four/five point restraints shall only be given by health care staff in accordance with California Code of Regulations, Title 22, Section 79801 Clinical Restraint, Treatment Restraint, and Clinical Seclusion, and the Mental Health Program Services Delivery System Program Guide, Chapter 10, Suicide Prevention and Response. On-duty Health Care staff shall ensure authorization exists, and shall advise the Incident Commander of such prior to the controlled use of force under these circumstances.

Inmate Refusal of Admission, Discharge, or Transfer to/from a Health Care Facility: When a clinician with admitting privileges to a CDCR Health Care Facility has determined it is necessary to admit, discharge, or transfer an inmate into/from a health care facility, Health Care staff shall ensure that a written order for the admission, discharge, or transfer exists, and shall advise the Incident Commander of such, prior to the controlled use of force.

## 51020.12.5 Food Trays

Accountability for food trays is an operational concern for the safety and security of institutions. It is important that the staff who issue food trays to inmates in cells account for all trays after the meal is concluded.

If an inmate attempts to break a food tray, the immediate use of chemical agents is authorized to stop the threat of the inmate obtaining dangerous contraband.

If the inmate refuses to return a food tray, the supervisor and the First or Second Level Manager shall be notified. Staff shall document the inmate's refusal to return the food tray on a CDC-115, Rules Violation Report.

The inmate will be advised that he shall not receive another meal until the first scheduled mealtime after the tray is returned.

Additionally, the inmate – and all other inmates in the pod/section – will be placed on escort/restraint status to prevent passing of contraband items. Inmates may exit their cells to acquire various services. If the cell is vacated, staff will use that opportunity to retrieve the food tray.

Notice shall be provided to staff members working subsequent shifts to ensure their awareness of the circumstances. Institution/facility staff shall implement security measures to deter and prevent the movement of the retained food tray from one cell to another.

If the inmate retains control of the food tray for a period of 24 hours, the Manager shall determine if controlled force will be used to retrieve the tray. This does not preclude the Manager from making a determination, based on safety and security concerns, to retrieve the tray using force prior to the 24-hour time frame.

If the goal of the controlled use of force is only to retrieve the tray, all staff shall be informed of this in advance. If the inmate has retreated to the back of the cell and the tray can be safely retrieved without the application of force, then staff shall retrieve the tray and exit the cell.

## 51020.13 Video Equipment and Records

Video equipment, including cameras, batteries, and blank tapes or media shall be stored in a designated area at each institution. Video recordings shall be maintained for a period of five years from the date of the incident, or longer if warranted.

Video recordings shall be processed as follows:

The camera operator shall label the tape/media with the date, time, inmate's name and CDCR number, the camera operator's name, and incident log number, if applicable.

The Incident Commander shall, prior to being relieved from duty, forward to the designated area for storage any video recordings of controlled uses of force and any video recordings of inmate injuries or interviews following an immediate use of force or an allegation of excessive or

unnecessary force. The Incident Commander shall ensure that all such recordings are secured, logged and processed in a manner to preserve evidentiary value.

Based upon individual institution space availability, an institution may maintain evidentiary related video recordings and non-evidentiary video recordings in separate locations, which shall be identified within a local supplement to this section.

## 51020.14     Use of Less Lethal Weapons

The 37mm and 40mm launchers are weapons designed to discharge less lethal impact munitions or chemical agents. They are authorized for use in all areas including segregated housing units, general population housing units, cells, dayrooms, dining halls, concrete yards, exercise yards and work areas. It is recommended a Response Supervisor be assigned the duties of discharging less lethal impact munitions during controlled use of force-cell extraction.

### 51020.14.1 Use of Less Lethal Weapons During Controlled Uses of Force

During the formation of the tactical plan defined in 51020.12, the on-site manager may authorize the use of less lethal impact munitions during controlled use of force situations in a cell, if the inmate is barricaded, or if circumstances are serious in nature calling for extreme measures to protect staff or inmates (the inmate is armed with a deadly weapon).

### 51020.14.2 Use of Less Lethal Weapons for Inmates with Mental Health Issues

In controlled use of force situations for inmates who are housed in Mental Health Crisis Bed, PIP, OHU, PSU, or have an EOP level of care designation, or do not possess the ability to understand orders, have difficulty complying with orders due to mental health issues, or are at substantial  risk of decompensation from the use of force, the use of less lethal weapons is prohibited for direct or indirect use, (i.e., body or barricade removal), unless the Warden or Chief Deputy Warden authorize their use. If circumstances are serious in nature and involve an imminent threat, the use of less lethal weapons in accordance with this section may be authorized.  In immediate use of force situations involving an imminent threat, staff are not precluded from using less lethal weapons to gain control of a disturbance involving inmates who may have mental health issues.

## 51020.15     Chemical Agents

Departmentally approved chemical agents include, but are not limited to the following: Oleoresin Capsicum (OC), Chloroacetophenone (CN), and Orthochlorobenzalmalononitrile (CS). OC may be issued to all on-duty departmentally trained peace officers, certified in the use of chemical agents. Employees shall only administer the amount of chemical agents necessary and reasonable to accomplish the lawful objective.

While in the community, non-uniformed peace officers that are issued OC products shall carry the product in a concealed manner, unless the peace officer has a badge clearly displayed.

### 51020.15.1 Chemical Agent Use During Controlled Use of Force – Small Space

During a controlled use of force in a cell, single person holding cell, shower, or other small space, only the chemical agent products listed in 51020.15.1 may be deployed. Any future *additional* products authorized by the Office of Correctional Safety, Emergency Operations Unit, and approved by the Director, Division of Adult Institutions must be specifically authorized for controlled use of force in a cell or other small space in order to be utilized for this purpose.

- MK-9 OC Vapor - limited to a single burst of 1-3 seconds in duration per application with a maximum of two applications.
- MK-9 OC Fogger – limited to a single burst of 1-5 seconds in duration per application with a maximum of four applications.

- MK-9 OC Foam – limited to a single burst of 1-5 seconds in duration per application with a maximum of four applications.
- OC Vapor Grenade – limited to 2 devices
- OC Flameless Expulsion Grenade – limited to 2 devices
- X-10 Barricade Removal Device – limited to a single burst of 1-5 seconds in duration per application with a maximum of four applications. Chemical agents may only be deployed from the X-10 during the removal of a barricade. The X-10 is not to be used solely as a delivery device for chemical agents.

Regardless of which chemical agents are deployed, or in what combination, no more than a total of four (4) chemical agent applications shall be administered. In unusual circumstances or when circumstances call for extreme measures to protect staff or inmates, it may be necessary to exceed the 4 allowed applications. In this event, the Incident Commander shall consult with the on-site manager, who can authorize additional chemical agent applications. For each *additional* chemical agent application authorized, the on-site Manager shall verbalize to the camera, the chemical agent application being authorized and the rationale for the decision.

The amount of time needed for the chemical agents to become effective will vary based upon the delivery method, individual tolerance levels, and environment. A minimum of (3) three minutes shall lapse between each application of chemical agents before additional chemical agents may be applied.

It is recommended a Response Supervisor is assigned the duties of administering chemical agents during controlled use of force in a cell or other small space. Prior to each use of a chemical agent, the staff member applying it shall display the device in view of the camera and state out loud for the camera the time of application and the type of device being applied.

After each application of a chemical agent, the Incident Commander and Response Supervisor shall assess the effectiveness or lack thereof. In the event chemical agents have not proven effective, the Incident Commander and Response Supervisor should carefully weigh the continued use of chemical agents versus use of physical force to complete the extraction. If a decision is made to apply additional chemical agents, the Incident Commander shall verbalize to the camera the rationale for the decision. For example: "A vapor grenade was deployed. It has been three minutes. The inmate is not showing any visible reaction, is using a personal barrier, and is shouting. We will now attempt to strike the personal barrier with a fogger product."

Staff shall make every reasonable effort to maintain visual contact with an inmate when administering chemical agents and until the inmate is decontaminated.

## 51020.15.2 Chemical Agent Use During Controlled Use of Force – Large Area

During a controlled use of force in larger areas such as rotundas, small management yards, large holding cells, segregated housing unit exercise yards, etc., departmentally approved chemical agents may be used in accordance with DOM 55050, Armory, Weapons, and Chemical Agents, and applicable training. In these situations, dependent on the size of the area, number of inmates involved, and complexity of the incident, it may be necessary to administer chemical agents in a larger quantity and more frequently than would occur during a controlled use of force in a small space.

## 51020.15.3 Use of Chemical Agents for Inmates with Mental Health Issues

In controlled use of force situations for inmates who are housed in Mental Health Crisis Bed, PIP, OHU, PSU, EOP, or an ASU-EOP Hub, or do not possess the ability to understand orders, have difficulty complying with orders due to mental health issues, or are at increased risk of substantial decompensation from the use of force, the use of chemical agents is prohibited, unless the Warden, Chief Deputy Warden or AOD authorize the use.

If circumstances are serious in nature and involve an imminent threat, the use of chemical agents are authorized in accordance with this section for use against an inmate who may not possess the

ability to understand orders or to gain control of a disturbance involving inmates who may have mental health issues.

### 51020.15.4 Decontamination from Chemical Agents – General

Any inmate exposed to a chemical agent shall be afforded an opportunity to decontaminate as soon as practical. Staff shall provide reasonable accommodation to disabled inmates who require assistance exiting a contaminated area and during the decontamination process.

If an inmate refuses to decontaminate, no other action is necessary, unless the inmate was exposed in a cell and not removed from the cell where the exposure occurred. In these instances, refer to Section 51020.15.6. If an inmate refuses decontamination, licensed nursing staff shall be responsible to explain the importance of decontamination and encourage the inmate to decontaminate.

Inmates in an adjacent cell or in the general area where chemical agents are used shall be questioned by custody staff to determine if decontamination is warranted.

Decontamination of those inmates not directly exposed to chemical agents will be based upon obvious, physical effects of the chemical agent.

The need to medically treat an inmate for serious injury may supersede the need to decontaminate from the effects of exposure to chemical agents.

Inmates exposed to chemical agents shall be allowed to change their clothes as soon as practical.

Inmates exposed to chemical agents in a cell shall be afforded the opportunity to exchange linens and bedding, including the safety blanket, when applicable.

### 51020.15.5 Decontamination from Oleoresin Capsicum

Decontamination from OC may be accomplished by exposing the individual to fresh moving air, or flushing the affected body area with cool water, e.g., shower, sink water, or wet cloths and providing clean clothing.

Except when it is determined that removing an inmate from a cell would result in additional force or give rise to an imminent threat, the inmate will be provided an opportunity to decontaminate outside of a cell in which OC has been used.

Force shall not be used to decontaminate inmates/parolees from the effects of OC unless a serious threat to the inmate's health is present and a licensed nursing staff determines the inmate must be decontaminated.

No other decontamination is necessary for inmates who have been medically treated and a licensed nursing staff has determined the inmate has been decontaminated.

As soon as it is practical and safe to do so, decontamination of the affected cell and housing unit shall be accomplished by ventilating the area to remove the airborne agent. Open doors and windows as permitted, or use portable fans to speed up the process. If applicable manually turn the air exchange system to high. A fan and the use of the air exchange system is not recommended for any dry agent that is utilized (i.e., expulsion grenades or muzzle blast). Wiping the area down with damp cloths or mopping is only necessary if a noticeable amount of residue is visible.

After decontamination, the inmate should not be returned to a contaminated cell until sufficient time has elapsed to allow for dissipation of the OC or until the cell has been cleaned.

### 51020.15.6 In-Cell Decontamination from Oleoresin Capsicum

In-cell decontamination may be used for inmates housed in an institution/facility when the Incident Commander or Response Supervisor determines that removing the inmate would result in the need for additional use of force or give rise to an imminent threat.

The circumstances leading to the order for in-cell decontamination shall be clearly explained in the Response Supervisor's/Incident Commander's report.

When an inmate is going to be decontaminated in his/her cell, a licensed nursing staff shall advise the inmate how to self-decontaminate and the importance of decontamination. Licensed nursing staff shall explain to the inmate that he/she should remove contaminated clothing and use water from the sink to flush the affected area(s). The licensed nursing staff shall also explain to the inmate that he/she should pat or air dry and avoid rubbing the exposed areas.

When an inmate is not removed from the cell, a licensed nursing staff shall monitor the inmate approximately every 15 minutes for a period of not less than 45 minutes starting from the last application of chemical agent. During the monitoring, if the licensed nursing staff determines there is a need for additional medical assessment/treatment outside the cell, the licensed nursing staff shall advise a custody supervisor of the need to remove the inmate from the cell. The custody supervisor shall coordinate the removal of the inmate.

A licensed nursing staff shall document the fact the inmate was given instructions and the approximate times of the 15 minute observations on a CDCR 7219, Medical Report of Injury or Unusual Occurrence.

### 51020.16 Application of Spit Hoods or Masks

Only departmentally approved spit hoods/masks are authorized for use. A spit hood/mask shall not be placed upon an inmate who:
Is in a state of altered consciousness (visibly drowsy, stuporous, or unconscious) or;
Has any visible signs of a seizure; or
Is vomiting or exhibits signs of beginning to vomit.
A spit hood/mask may be applied to an inmate if:
There is verbal or physical intent by the inmate to contaminate others with spit or other bodily fluids from the nose or mouth; or
The inmate is not able to control expelling fluids from the nose or mouth (with the exception of vomit); or
The inmate is on authorized security precautions according to the procedures of the unit where the inmate is housed.
If the inmate was contaminated with OC before the mask was applied, the mask shall be kept on until the inmate is afforded decontamination unless the inmate is in a state of altered consciousness (visibly drowsy, stuporous, or unconscious); or has any visible signs of a seizure; or is vomiting or exhibits signs of beginning to vomit. In this case the spit hood/mask will be removed immediately and appropriate treatment will be administered.
If the inmate is decontaminated with fresh moving air, the spit hood/mask may remain on during decontamination and can be exchanged for a new spit hood/mask when decontamination is complete. If the inmate is decontaminated with water, the spit hood/mask shall be removed during decontamination and a new spit hood/mask can be placed on the inmate when decontamination is complete.
If an inmate has been exposed to chemical agents after the spit hood/mask is applied, the spit hood/mask shall be replaced with a new one when it is safe to do so.
If a spit hood/mask was applied and the inmate loses consciousness, begins seizing, or begins vomiting the spit hood/mask shall be removed immediately and appropriate treatment will be administered.
If a spit hood/mask is applied to an inmate, it is imperative that constant supervision of the inmate be maintained for signs of respiratory distress. If any respiratory distress is observed, the spit hood/mask shall be removed until the signs of respiratory distress have dissipated.
Once an inmate is exposed to chemical agents and/or if a spit hood/mask is placed on the inmate, staff shall not place them on their stomachs, or in a position that allows the inmate to end up on his stomach, for any period longer than necessary to secure (e.g. handcuff) and/or gain control of the inmate. A prone position makes it difficult for any exposed individual to breathe and may be

a contributing factor in positional asphyxia. Positional asphyxia occurs when an individual's body position interferes with respiration, resulting in death.

If an exposed individual is in handcuffs and requires transportation via a gurney, stokes litter, etc., he shall be positioned on his back or side.

## 51020.17 Uses of Force-Reporting Requirements

Every staff use of force is an incident that shall be reported. Uses of force include non-deadly force, deadly force, immediate force, controlled force and non-conventional force. Verbal commands, the unresisted application of restraints or escort of an unresisting inmate and the movement of an unconscious or otherwise incapacitated inmate are not uses of force.

Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty.

The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837.

Documentation shall identify any witnesses to the incident and describe the circumstances giving rise to the use of force, whether the inmate is a participant in the Mental Health Services Delivery System and the nature and extent of the force used. The documentation shall also describe any involvement of licensed mental health practitioners prior to or during the use of force incident, if de-escalation strategies were attempted prior to the use of force, and the outcomes of any strategies used.

## 51020.17.1 Involved Staff-Reporting Requirements

Written reports regarding staff uses of force shall be documented on a Crime/Incident Staff Report (CDCR 837-C). This requirement includes the on-site manager authorizing the use of controlled force.

Reports shall be prepared by any employee who uses or observes the use of force. The reports shall be submitted to, and reviewed by, the Response Supervisor prior to being relieved from duty. Staff shall not collaborate with each other in the preparation of reports.

If possible, identify important information in the content of the report as follows:

Identities of staff that observed and/or participated in the use of force.

Description of the actions of the inmate and circumstances leading to the use of force.

Description of the specific force used or observed.

If chemical agents were used, identify the type of product used, duration of application, point of aim, and from what distance, e.g., a burst of OC from an MK- 9, to the face, from six feet.

Description of the inmate's level of resistance.

Description of the inmate's ability or lack of ability to understand and follow orders.

Description of why force was used and description of the threat perceived.

Description of any identified disabilities ascertained through any tracking system and what form of reasonable accommodation and/or assistance was provided during and after the controlled use of force.

Description and observations of staff or inmate injuries and the cause of the injury, if known.

Description of observations of decontamination of chemical agents or medical attention given.

Description of observations or knowledge of the steps taken to decontaminate the housing unit, and those inmates not directly exposed to chemical agents.

Documentation of any inmate allegation of an unnecessary or excessive use of force.

## 51020.17.2 Involved Staff-Additional Reporting Requirement for Deadly Force

An employee who intentionally or accidentally uses deadly force, whether on or off-duty, shall ensure that a supervisory employee is verbally notified of the incident without delay. A written report shall also be required. This reporting is not a requirement for the lawful discharge of a

firearm during weapon's qualifications, firearms training, or other legal recreational use of a firearm.

## 51020.17.3 Video Records Made After Uses of Force That Cause Serious Bodily Injury, Great Bodily Injury, or Result in Allegations of Unnecessary or Excessive Force

Under the following circumstances, a video recorded interview of an inmate shall be conducted and documented on the Inmate Interview Guidelines form (CDCR 3013) and Report of Findings-Inmate Interview form (CDCR 3014):

- The inmate has sustained a serious bodily injury or great bodily injury that could have been caused by a staff use of force.
- The inmate has made an allegation of an unnecessary or excessive use of force.

Any visible or alleged injuries shall be video recorded. The video recording shall be conducted by custodial supervisors (sergeants or lieutenants) who did not use, or observe the force used, in the incident.

The video recording should be made as soon as possible, but no later than 48 hours from discovery of the injury or allegation.

The video recording shall also include a request of the inmate to be interviewed regarding the circumstances of the incident. If the inmate refuses to be video recorded, such refusal shall be recorded.

The custody supervisor shall not inhibit the inmate being interviewed from providing relevant information.

## 51020.17.4 Response Supervisor- Reporting Requirements

In addition to writing his/her own report when applicable, prior to being relieved from duty the Response Supervisor shall:

Gather written reports from staff involved in the use of force incident.

Serve as the first level of review for all subordinates' reports and shall ensure that all necessary information is contained in these reports. The Response Supervisor is expected to ensure that each employee's report is prepared independent of any other report.

Ensure no involved employee is relieved of duty prior to receiving his/her written report, unless the employee is physically unable to prepare the report due to an injury. If due to the circumstances a verbal report is not possible, the Response Supervisor shall explain the reason for not taking a verbal report.

Obtain applicable medical reports from health care staff, inspect the form(s) and determine if all relevant information is present.

If applicable, complete Report of Occupational Injury or Illness Form (SCIF-3067).

If applicable, complete State Compensation Insurance Fund Employee Claim for Workers' Compensation Benefits Form (SCIF-3301).

If applicable, complete Department of Health Services Report of Request and Decision for HIV Testing (CDC-8439) in cases of potential exposure to blood borne pathogens.

## 51020.17.5 Response Supervisor-Additional Reporting Requirements for Deadly Force

When there has been a use of deadly force, the on-duty/Response Supervisor shall ensure that the chain of command is notified and all necessary health and safety, medical, and security measures are initiated. The on-duty/Response Supervisor shall go to the location and ensure that the scene is protected.

For incidents occurring in an institutional setting, the Watch Commander shall contact the institution's ISU.

For incidents occurring in a community setting, the on-duty supervisor or Watch Commander shall ensure local law enforcement is contacted.

The on-duty/Response Supervisor shall ask the employee who used deadly force to provide a public safety statement immediately after the incident. This is the employee's oral statement. This statement helps determine the general circumstances of the incident, assess the need for resources, set the perimeter, locate injured persons, and determine the nature of the evidence to be sought. It shall provide basic information such as the number of persons involved in the incident, the number not yet in custody and number and direction of shots fired. The statement shall not include, and the employee should not be asked to provide, a step-by-step narrative of the incident or a motive for his/her actions.

The on-duty/Response Supervisor shall capture the essence of the oral statement in writing and submit it to the Incident Commander.

In circumstances where the use of deadly force results in death or GBI, the staff using the force will be placed on administrative time off (ATO) for 72 hours in order to facilitate department interviews and staff wellness. These 72 hours will be paid contiguous time off, unless they are scheduled regular days off (RDO). RDOs will count toward the contiguous 72 hours but will not be paid unless the employee is called to work. If the 72 hours ATO overlap with a period of pre-scheduled time off (i.e. vacation, holiday, sick leave, etc.) the ATO will be used in lieu of, not in addition to the affected employee's leave credits.

As soon after the incident as is practical, the on-duty/Response Supervisor or Incident Commander must also initiate Peer Support Program (PSP) protocols as delineated in DOM Section 31040.3.2

## 51020.17.6 Health Care Staff Use of Force-Reporting Requirements

Health Care staff shall complete and submit a Crime/Incident Staff Report (CDCR 837-C) whenever a Health Care staff member:

Observes use of force.

Uses force on an inmate.

Provides clinical intervention prior to a use of force.

Reviews the health record for conditions that may put an inmate at increased risk for adverse outcome from the use of force.

Hears an inmate allegation of an unnecessary or excessive use of force during a reportable incident, if not already reported on a Notice of Injury or Unusual Occurrence form (CDCR 7219).

On the CDCR 837-C, the licensed mental health practitioner shall provide a timeline for the clinical assessment and intervention process. He/she shall also document if the inmate had the ability to understand orders, had difficulty complying with orders based on mental health issues or was at increased risk of substantial decompensation due to mental illness. If it was determined the inmate had difficulty complying with orders or was at increased risk of substantial decompensation, the licensed mental health practitioner shall document that strategies were developed, if the strategies were implemented and whether those strategies were successful. On the CDCR 7230, Interdisciplinary Progress Note, the licensed mental health practitioner shall document information regarding the clinical assessment and intervention process. The licensed mental health practitioner shall document the rationale for the assessment results regarding the inmate's ability to understand direction, any difficulty complying with direction or substantial risk of decompensation. If strategies were developed, the licensed mental health practitioner shall document specific strategies, whether the strategies were implemented, and the results.

In addition to the requirements noted above, licensed nursing staff shall complete and submit a CDCR 7219 upon conducting a medical evaluation after a use of force. The CDCR 7219 shall be completed and submitted to the Response Supervisor prior to the licensed nursing staff leaving the institution and shall:

Include a quote of the inmate's own words in the patient comment section.

After examination, document observations of the areas on the inmate where force was applied.

Include comments or information garnered from custody staff regarding the type and amount of force used.

Document the injuries sustained and the medical treatment rendered.

Document if the inmate refuses medical examination and/or treatment.

Document any alternative assistive device provided and any medical recommendation / accommodation suggested during and after the use of force.

Document in-cell decontamination instructions and times of 15-minute checks, if applicable.

In addition to the above requirements, licensed nursing staff shall be responsible for providing custody staff and the Use of Force Coordinator, with notification and updated information in the event that the aftercare treatment process reveals new facts about the severity of an injury.

## 51020.17.7 Incident Commander-Reporting Requirements

It is the responsibility of the Incident Commander to notify the Office of Internal Affairs (OIA) and the Office of Inspector General (OIG) as soon as possible, but no later than one hour from the time the incident is discovered, of any use of deadly force and every death, great bodily injury or serious bodily injury that could have been caused by a staff use of force. Depending on the specific Memorandum of Understanding (MOU) and the nature of the incident, a call to the county sheriff or police department may also occur.

Prior to being relieved from duty the Incident Commander or designee shall:

Initiate the initial incident report, consisting of the Crime/Incident Report Cover Sheet (CDCR 837-A), the Crime/Incident Report Supplement (CDCR 837-A1) and the Crime/Incident Report Inmate/Staff/Visitor, Other (CDCR 837-B1/2/3) reports. This shall be an accurate summary of the events as described in the written reports submitted by all employees.

Prepare the initial incident-package. This includes the CDCR 837-A/A1, B and C forms; , and any other applicable forms or documents.

Review all incident reports for quality, accuracy and content.

Clarify incomplete reports with involved staff by completing a CDCR 837-C-2 Review Notice.

In controlled use of force cases in institutions/facilities involving involuntary medication, placement into four/five point restraints, or admission into a licensed health care facility, the Incident Commander shall include in the CDCR 837-A/A1, the name and title of the on-duty health care staff that verified the appropriate medical authorization existed prior to the use of force.

Prepare and submit a separate Crime/Incident Staff Report (CDCR 837-C) if he/she actually used force during an incident, or observed the use of force.

Within 24 hours of the incident the Incident Commander or designee shall ensure the initial incident report (CDCR 837-A/A1 and CDCR 837-B ) is uploaded in the Daily Information Reporting System (DIRS).

Ensure all force related video recordings of inmate injuries or interviews and recordings of controlled force are forwarded to the appropriate location, as set forth in Section 51020.13.

Initiate the Use of Force Review process as set forth in Section 51020.19.1.

Should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside investigating agency, the Incident Commander shall suspend all review of that incident until the investigation is complete.

## 51020.17.8 Manager-Reporting Requirements for Controlled Uses of Force

The on-site manager authorizing the use of controlled force is required to be present during the use of force and document involvement in a CDCR 837C.

Any institutional managers consulted regarding a disagreement among the collaborative team members during a controlled use of force shall submit a CDCR Crime/Incident Staff Report (CDCR 837-C) detailing their involvement.  If the Regional Administrators (Medical or Mental

Healthy or the Associate Director are contacted, their involvement will be documented in the CDCR 837-C of the institutional manager who made contact.

## 51020.18 Reporting Allegations of Unnecessary or Excessive Force

Any employee who observes a use of force that is unnecessary or excessive shall attempt to stop the violation. Any employee who becomes aware of an allegation of unnecessary or excessive force, whether it occurs during a reportable incident or not, shall verbally report the allegation to a custody supervisor as soon as possible, followed with appropriate documentation.

If the allegation occurs in conjunction with a reportable incident, the incident shall be reported in accordance with the requirements set forth in this Article and any such allegation shall be documented and included in the incident report package. Each involved employee shall document all details regarding any allegations or observations of use of force that is unnecessary or excessive. This includes a quote of the allegation, or what was seen or heard, including observations of any apparent injuries, and the name of the supervisor the employee reported the allegation to.

All reports shall be submitted to a custody supervisor.

## 51020.18.1 Allegations of Excessive or Unnecessary Force-Supervisor Reporting Requirements

Whether or not the allegation of excessive or unnecessary force is made in conjunction with a reported use of force, a supervisor who learns of such an allegation shall:

Make a verbal notification to the Incident Commander as soon as practical.

Arrange for the inmate to be medically examined and request a full medical assessment of injuries, if any.

Ensure every staff member who witnessed the allegations and/or staff who witnessed the event leading to the allegations immediately submits the applicable report.

Review any reports for clarity.

Submit a package of all documents relating to the allegation, including a copy of the medical report, to the Incident Commander.

## 51020.18.2 Allegations of Excessive or Unnecessary Force-Incident Commander and Appeals Coordinator Reporting Requirements

When informed of allegations of the use of unnecessary or excessive force, the Incident Commander and/or the Appeals Coordinator shall make an initial assessment of the information received and notify the appropriate First or Second Level Manager

Additionally, the Incident Commander and/or the Appeals Coordinator shall:

Ensure a licensed nursing staff has evaluated the inmate and a Medical Report of Injury or Unusual Occurrence (CDCR 7219) has been completed.

Review written reports of witnesses and obtain statements from inmate witnesses, if any.

Ensure that the inmate's injuries are video recorded and the inmate is interviewed within 48 hours in accordance with the requirements set forth in 51020.17.3. This shall be done as soon as possible upon receiving verbal notification of the allegation.

When an allegation is received, whether verbally or through the appeals process, the Appeals Coordinator or Incident Commander shall contact ISU or the Watch Commander and determine if the related incident report exists. The respective Appeals Coordinator or Incident Commander shall note the existence of the incident report by log number in their submittal prior to forwarding the allegation for administrative review.

If the inmate has suffered serious bodily injury or great bodily injury, the Incident Commander shall notify the OIA and the OIG as soon as possible, but no later than one hour from the time the incident is discovered. In instances where the allegation was submitted through the inmate

appeal process and there is no corresponding incident report, the Appeals Coordinator shall, in consultation with the hiring authority, notify the OIA and OIG.

If, at any point in the review, the Incident Commander and/or the Appeals Coordinator discovers information that leads him/her to reasonably believe or suspect an employee has committed any serious misconduct, the Incident Commander and/or Appeals Coordinator shall immediately forward all information to the Institution Head via the chain of command, recommending an internal affairs investigation if appropriate.

Prepare a Report of Findings-Inmate Interview (CDCR 3014) and/or Appeal Inquiry. The report shall contain the allegations made, an explanation of the incident, the written or verbal statements of the witnesses, the health care information, and a conclusion and recommendation.

Submit the Report of Findings and/or Appeal Inquiry and evidence through the chain of command to the Institution Head. The evidence shall include copies of the medical reports, and any other documentation that is deemed significant to further document the incident/allegation. If the Incident Commander learns that the verbal allegation is part of a reported incident, the incident package shall be included with the Report of Findings. Correspondingly, if the Appeals Coordinator learns that the written allegation is part of a reported incident, the incident package shall be included with the appeal for administrative review.

## 51020.19 Reviewing the Use of Force

Each Institution Head shall establish and chair an IERC to evaluate and review every use of force and every allegation of excessive or unnecessary force. Each incident or allegation shall be evaluated at both supervisory and management levels to determine if the force used was reasonable under policy, procedure, and training.

For reported incidents, a good faith effort must be made at all levels of review in order to reach a judgment whether the force used was in compliance with policy, procedure and training and follow-up action if necessary. The following factors must be evaluated:

The threat perceived by the responsible individual applying the force.

The need for the application of force

The relationship between that need and the amount of force used

The extent of the injury suffered

What steps were taken to avoid and/or minimize the need for/level of force used.

Should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside investigating agency, the IERC shall suspend all review of that incident until the investigation is complete. Examples of what may be referred for investigation include but is not limited to: unexplained injuries, impact strikes to lethal target areas (head, eyes, throat, spine or groin), incomplete/conflicting reports, and application of non-deadly weaponry that exceeds what would normally be expected for the type of force reported. The IERC shall consider the completed investigative report, and any report by the DFRB, as part of its own review.

## 51020.19.1 Incident Commander Review

The Incident Commander shall review the completed incident package documentation to ensure that it is adequately prepared and shall reach a judgment whether the force used was in compliance with policy, procedure, and training.

The Incident Commander shall:

Review all incident reports for quality, accuracy, and content, including, the Report of Finding-Inmate Interview (CDCR 3014) when there are allegations of unnecessary or excessive force. Clarify incomplete reports with involved staff by completing a Crime/Incident Report Review Notice (CDCR 837-C-2) to the applicable employee.

Complete an Incident Commander's Review / Critique Use of Force Incidents (CDCR 3010). The report shall contain a description of inmate injuries due to force used, an explanation of why

force was needed, description of the threat that required force to be used, what steps were taken to minimize the need for force, and any relevant comments.

In the event the Incident Commander believes an investigation may be necessary, the Incident Commander shall suspend review and recommend that the case be referred for investigation.

## 51020.19.2 First Level Manager Review

The First Level Manager of the area where the incident or allegation occurs shall reach a judgment whether the force used was in compliance with policy, procedure, and training.

The manager shall:

Review all documentation in the incident package, including, the Report of Finding-Inmate Interview (CDCR 3014) when there are allegations of unnecessary or excessive force.

Review the quality of all reports to ensure the use of force was properly documented and reviewed. This includes a review of the Incident Commander's conclusions.

Determine if any corrective action taken by his/her subordinates in relation to the incident was adequate/proper.

Conduct an in depth analysis to determine if the use of force described in the incident package was within the guidelines of the Use of Force policy, procedures and training. This analysis should address any non-compliance not identified earlier.

Complete a review of the incident or allegation on the Manager's Review – First Level Use of Force Incidents (CDCR 3011).

In the event the First Level Manager believes an investigation may be necessary, ~~the Manager~~ he/she shall suspend the review and recommend that the case be referred for investigation.

## 51020.19.3 Second Level Manager Review

The Second Level Manager is the final level of review prior to the completed incident package being sent to the Use of Force Coordinator for review by the (IERC). The Second Level Manager shall reach a judgment whether the force used was in compliance with policy, procedure, and training.

The second level manager shall:

Review all documentation in the incident package, including, the Report of Finding-Inmate Interview (CDCR 3014) when there are allegations of unnecessary or excessive force.

Review the quality of all reports to ensure the use of force was properly documented and reviewed. This includes a review of the Incident Commander's conclusions and the First Level Manager's conclusions.

Determine if any corrective action taken by his/her subordinates in relation to the incident was adequate/proper.

Conduct an in depth analysis to determine if the use of force described in the incident package was within the guidelines of the Use of Force policy, procedures and training. This analysis should address any non-compliance not identified earlier.

Complete a review of the incident or allegation on the Manager's Review – Second Level Use of Force Incidents (CDCR 3012).

In the event the Second Level Manager believes an investigation may be necessary, he/she shall suspend review and recommend that the case be referred for investigation.

## 51020.19.4 Use of Force Coordinator Responsibility

The Use of Force Coordinator shall log and track all use of force incidents and all allegations of excessive or unnecessary force (including those originating from inmate appeals) to ensure thorough and timely review by the IERC. The log should be capable of producing statistical reports to monitor trends and patterns of force used, whether the report is received in the form of an incident report, a verbal allegation of excessive or unnecessary force, or an allegation contained in an inmate appeal. At a minimum, the log should address the following categories:

- Incident Log Number
- Incident Date
- Specific Area of Institution
- Specific Crime
- Controlled or Immediate Use of Force
- Allegations of Unnecessary or Excessive Use of Force
- Significant Injury (SBI, GBI, or Death)
- Injuries caused by Use of Force
- Staff Involved
- Inmate(s) Involved
- Mental Health Status
- Type of Force Option(s) Utilized
- Ethnicity,
- Security Threat Group Status.

The Use of Force Coordinator shall schedule use of force incident packages for presentation to the IERC within 30 days from the date of incident. If an investigation has been requested for a use of force incident, the Use of Force Coordinator will track and maintain the completed incident package until completion of the investigation.

Upon completion of the investigation, the Use of Force Coordinator will be provided a copy of the investigation report and shall then complete the in-depth analysis as described below. Investigative reports will be returned to the Investigative Services Unit Office upon completion of the final IERC review of the incident.

The Use of Force Coordinator shall conduct an in-depth analysis of the documentation from each use of force incident, including the conclusions of the Supervisor and Managers. The Use of Force Coordinator shall request any clarification or additional information necessary to complete his/her analysis.

The Use of Force Coordinator shall complete the IERC Use of Force Review & Further Action Recommendation (CDCR 3035), and Institutional Executive Review Committee (IERC) Critique and Qualitative Evaluation (CDCR 3036), documenting his/her findings regarding whether the force used was in compliance with policy, procedure, and training; as well as identifying any recommended revision to policy, procedure, or training.

If a completed incident package has not been received by the Use of Force Coordinator in time to allow for IERC review within 30 days of the incident, the Use of Force Coordinator shall present the initial incident package to the IERC for an initial review. The initial review of the initial incident package is intended to give the IERC an opportunity to conduct a preliminarily review and document obvious procedural concerns. During the initial review, the CDCR 3035 or CDCR 3036 do not need to be completed. Once the completed incident package is received, the CDCR 3035 and CDCR 3036 shall be completed by the Use of Force Coordinator for presentation to the IERC.

In cases involving allegations of excessive or unnecessary force, whether or not the allegation was part of a reported use of force, the Use of Force Coordinator shall prepare an Institutional Executive Review Committee Allegation Review (CDCR 3034), for review by the IERC.

The Use of Force Coordinator shall prepare complete copies of the incident packages to be reviewed by the IERC during the scheduled meeting. The OIG shall be provided reasonable notice and copies of the packages to be reviewed in advance of the meetings.

If the IERC determines additional information or clarification is required, the Use of Force Coordinator will forward a request for this information to the responsible Manager and track the assignment.

The Use of Force Coordinator will maintain a copy of the completed incident package until the information or clarification is received. The Use of Force Coordinator will then complete the analysis and resubmit the case to the IERC.

The Use of Force Coordinator will ensure the IERC findings are documented on the CDCR 3035 and CDCR 3036 following final IERC review of the completed incident package.

After final review by the IERC, any copies of staff disciplinary documents will be removed from the incident package and routed to the appropriate Manager for placement into the appropriate file.

The IERC Chairperson and the Use of Force Coordinator shall review the status of all pending UOF cases following each IERC meeting to evaluate the readiness for final review of the cases.

By the fifth day of each month, the Use of Force Coordinator shall forward a memorandum to the respective Associate Director listing the date of IERC meetings, incident package log numbers, specific crime, and disposition of all incident packages reviewed during the previous month.

## 51020.19.5 Institution Executive Review Committee Monitoring Responsibility

The IERC is a committee of executive staff tasked with reviewing reported use of force incidents and allegations of excessive or unnecessary force. The IERC shall normally be comprised of the following institutional staff:

Institution Head or Chief Deputy Warden, as chairperson and final decision maker,

At least one other manager assigned on a rotational basis,

In-Service Training Manager,

One health care staff, and

A Use of Force Coordinator.

A licensed mental health practitioner shall participate in the IERC for all controlled use of force incidents. A licensed mental health practitioner shall also participate in the IERC for any immediate use of force incidents involving an inmate participant in the Mental Health Services Delivery System.

Other designated supervisors and rank and file staff may also attend, as determined by the appointing authority. A representative of the OIG may also attend and monitor IERC meetings.

The IERC shall meet to review its cases on at least a monthly basis, or on a schedule to ensure all cases are reviewed within 30 days. Unless there are outstanding issues or a corresponding investigation, this review will be both an initial/final review.

The IERC Chairperson shall personally view all video recordings arising from controlled use of force incidents. This viewing can be accomplished either before or during the IERC.

During the IERC, at a minimum, the committee members shall view the portions of the controlled use of force video from the admonishment through the last use of force.

The IERC shall determine if the use of force was reasonable and in compliance with policy, procedures and training. The IERC shall also examine the critique and conclusions of the managers and supervisors, and ensure the appropriateness of completed documentation.

The IERC shall complete an Allegation Review of all allegations of excessive or unnecessary force.

The IERC may initiate requests for additional information or clarification (clarification requests will be routed to the responsible Manager and tracked by the Use of Force Coordinator). The final review will determine whether the use of force was reasonable.

The IERC may recommend changes to procedure or training. The IERC is also responsible for identifying possible employee misconduct and recommending the initiation of training, corrective action or disciplinary action in such cases. However, only IERC members in supervisory or management roles (including the Use of Force Coordinator) and the OIG may participate in discussions involving the initiation of corrective or disciplinary action.

The hiring authority may initiate changes to local procedure or training based on the findings or recommendations of the IERC, or forward a recommendation of change to the CDCR policy or procedure via the Associate Director. The Institution Head may also initiate corrective or adverse employee action based upon the findings or recommendations of the IERC.

Should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside investigating agency, the IERC shall suspend all review of that incident until the investigation is complete. The IERC shall consider the completed investigative report, and any report by the DFRB, as part of its own review.

### 51020.19.6 Department Executive Review Committee Monitoring Responsibility
The Department Executive Review Committee is a committee of staff selected by, and including, the Associate Director who oversees the respective Mission-based group. The DERC shall review all incidents involving deadly force, serious injury, great bodily injury, or death. The DERC shall also review those incidents referred to the DERC by the IERC Chairperson or otherwise requested by the DERC.

The DERC shall conduct a review of the incident and document its findings on the DERC Use of Force Review form. The DERC shall also review the actions of the IERC and in the event the DERC has questions or concerns with actions taken by the IERC, the DERC shall take appropriate action.

The Director of DAI may choose to provide final review for any incident reviewed by the DERC.

### 51020.20 Investigating Deadly Force and Any Use of Force That Could Have Caused Death or Great Bodily Injury
Every use of deadly force and every death or great bodily injury that could have been caused by a staff use of force shall be investigated by the DFIT and reviewed by the DFRB.

### 51020.20.1 Investigative Services Unit (ISU) Monitoring the Use of Deadly Force
For incidents occurring in an institutional setting, involving the use of deadly force and any use of force resulting in death or GBI, the ISU shall take preliminary charge of the investigation and will remain in charge of the investigation while contacting the DFIT to inform them of the incident.

For incidents occurring in a community setting, local law enforcement and the DFIT shall take preliminary charge of the investigation.

For every discharge of deadly force from a firearm, an ISU Sergeant or above shall be tasked with making the prompt determination of whether the deadly force was a warning shot and whether anyone suffered any injuries as a result of the deadly force. The ISU shall verbally notify the DFIT of its determination as soon as possible and shall confirm its determination, along with the reasons in support of it, in a written memorandum to be forwarded to the DFIT. If the ISU is unavailable to assume this responsibility, an uninvolved Lieutenant shall do so.

### 51020.20.2 Deadly Force Investigation Team Responsibility
Trained Department investigators assigned to a Deadly Force Investigation Team shall conduct criminal and administrative investigations of every use of deadly force and every death or great bodily injury that could have been caused by a staff use of force. All DFIT criminal investigations will be referred to the local District Attorney for review where MOU's provide for referral.

Based on certain local Memoranda of Understanding, criminal investigations may instead be conducted by an outside police department or sheriff's office. If an outside law enforcement agency is conducting the criminal investigation, the DFIT investigator will monitor the progress of the criminal investigation while providing appropriate support.

Although defined as deadly force DFIT need not investigate the discharge of a warning shot inside an institution/facility if an Investigative Services Unit Sergeant or above, or an uninvolved Correctional Lieutenant, confirms that the discharge of deadly force was a warning shot and that no injuries were caused by the shot. All warning shots shall be reported to the Office of Internal Affairs/DFIT and the Office of the Inspector General (OIG).

### 51020.20.3 Deadly Force Review Board

The DFRB is the board responsible for conducting a full and complete review of all incidents involving a use of deadly force (except warning shots) and every death or great bodily injury that could have been caused by a staff use of force, regardless of whether the incident occurs in an institutional or community setting.

The DFRB shall be composed of at least four members. Three shall be non-departmental law enforcement professionals. One (1) shall be a Division, Parole Region, or Institutional/facility manager (i.e. Associate Directors, DJJ Superintendents, Chiefs or designees) from outside the chain of command of the involved employee(s). Additional members may be designated by the Secretary or designee.

The reports and findings generated from the separate investigative bodies (DFIT and local law enforcement if applicable) will be presented to the DFRB. The DFRB shall be convened as soon as possible after the criminal and administrative investigations are completed.

The DFRB shall examine all aspects of the incident to determine the extent to which the use of force complied with departmental policies and procedures, and to determine the need for policy, training, and/or equipment modifications.

The DFRB shall report its findings and recommendations in writing, to the Undersecretary assigned to oversee the DAI.

### 51020.21 External Review of the Use of Force - The Use of Force Coordinator Responsibility

For purposes of an external review, the Use of Force Coordinator shall identify and retain use of force cases closed by the IERC during the review period. External reviews of closed use of force cases shall be conducted at least every 24 months.

### 51020.22 Revisions - Use of Force Joint Use Committee (JUC)

The Use of Force JUC is a committee of field staff tasked with reviewing and evaluating recommended revisions to the CDCR's Use of Force Policy and Procedures.

The JUC shall be comprised of the following field staff:

At least one Institution Head, as chairperson

At least one staff member from each DAI, mission based region, at the level of Lieutenant or Captain

At least one Use of Force Coordinator,

At least three representatives from the CCPOA, as designated by the CCPOA

At least one Mental Health Regional Administrator

The Chief of OIG or designee, and

Others as needed and assigned by the Deputy Director, DAI,

The JUC shall meet quarterly as necessary, but not less than annually, to review recommended revisions

### 51020.22.1 Revisions Approval

Any recommendations for revisions to this Article shall be referred to the Use of Force Joint Use Committee. After review and consideration, the Use of Force JUC shall refer revisions to the Director, DAI, for approval, via the Deputy Director.

Only the Director of DAI, or the Director's designee, may issue clarification memoranda to this Article.

## 51020.23 Revisions
The Director, DAI, or designee shall be responsible for ensuring that the contents of this Article are kept current and accurate.

## 51020.24 References
PC § 118.1, 196, 197, 243, 835, 835a, 843.
CCR (15) § 3268, 3268.1, 3268.2, 3275, 3276, 3278, and 3397.
Hudson v. McMillian, 503 U.S. 1 (1992).

# EXHIBIT 2

**[CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION REPORT ON COMPLIANCE WITH THE COURT'S APRIL 10, 2014 ORDER ON USE OF FORCE AND SEGREGATION OF COLEMAN CLASS MEMBERS]**

CHAPTER 5 – ADULT CUSTODY AND SECURITY OPERATIONS

ARTICLE 23 – INMATE DISCIPLINE

**52080.22.4**
**Management Cell**

*Revised July 28, 2014*

Management Cell Status (MCS) placement is to urgently address an inmate's dangerous or destructive behavior that may imminently cause cell damage or injury to a person. MCS may only be authorized when the inmate has used materials of any kind to cover up windows, damage lighting, windows and/or doors. The authority to place an inmate on MCS shall not be designated below the level of Lieutenant. The Administrative Segregation Unit (ASU) Lieutenant, or watch commander, shall initiate contact with the respective Associate Warden/Administrative Officer of the Day (AOD) and make notification of MCS placement. The Lieutenant will document the cause for MCS on a CDCR form 128-B, Informational Chrono and document MCS placement in the 114-A Inmate Segregation record. The respective Associate Warden, or designee at a level no less than Captain, shall review MCS daily, making a notation of the review on the CDCR form 114-A, Inmate Segregation Record. The reviewing manager, after consulting with the licensed mental health practitioner about the inmate's progress on an established behavior plan, will make a determination on a daily basis to either, grant additional items of property within the cell, or remove the inmate from MCS based on the inmate's current behavior and compliance with rules. These decisions will be based solely on the inmate's behavior while on MCS. On weekends and holidays, the AOD shall personally review MCS placement and complete the daily notation on the CDCR form 114-A, Inmate Segregation Record. The respective Captain will have functional responsibility to ensure compliance with the MCS review procedures. The Warden, or designee at a level no less than Captain, or AOD may authorize the release of an inmate from the MCS by written order and recorded on the inmate's CDCR form 114-A, Inmate Segregation Record.

In the event an inmate's disruptive behavior continues and requires retention beyond 72 hours, authorization of the Chief Deputy Warden or Warden is required. In addition, a licensed mental health practitioner shall consult with the Chief Deputy Warden or Warden regarding the inmate's behavior plan and barriers to progress, as well as any significant risk of exacerbation of mental illness if management cell status is maintained. The Lieutenant will document approval of the extension by the authorizing officer on a CDCR 128-B and include a description of the inmate's disciplinary history in ASU/segregated housing unit (SHU)/psychiatric services unit (PSU), with specific dates and rule violations, counseling, disruptive behavior, etc. A copy will be placed in the inmate's CDCR 114-A Inmate Segregation Record, distributed to the respective Associate Warden, Captain, and Lieutenant, and documented in the daily transactions on the CDCR 114-A, Inmate Segregation Record. The respective Captain, or designee, will provide daily updates during executive staff meetings.

To extend an inmate's MCS beyond six calendar days, approval from the respective Associate Director must be obtained. The Chief of Mental Health must also review the behavior plan for adequacy and a revised behavior plan shall

be developed if the current plan is determined to be inadequate. The Warden or designee will contact the respective Associate Director's office to schedule a conference call. A memorandum detailing the history leading to MCS and the need to extend beyond six calendar days will be forwarded to the respective Associate Director for approval or disapproval. The memorandum and decision will be placed in the inmates 114-A Inmate Segregation Record.

To extend an inmate's MCS beyond ten calendar days, and every 3 days thereafter, approval from the Division of Adult Institutions (DAI) Deputy Director, Field Operations must be obtained. The Chief of Mental Health must also review the behavior plan for adequacy and a revised behavior plan shall be developed if the current plan is determined to be inadequate. The Warden or designee will contact their respective Associate Directors office to schedule a conference call with the Deputy Director. A memorandum detailing the history leading to MCS and the need to extend beyond ten calendar days will be forwarded to the Associate Director prior to the conference call with the Deputy Director. The approval or disapproval will be documented on the memorandum and a copy placed in the inmates 114-A Inmate Segregation Record. Prior to placing an inmate on MCS and upon removal, the inmate shall be examined by the on-duty licensed health care practitioner. Each examination shall be documented on a CDCR form 7219, Medical Report of Injury or Unusual Occurrence, and retained in the inmate's CDCR 114-A Segregation file.

No EOP inmate will be placed on MCS. If an EOP inmate is engaging in behavior that that requires and justifies placement on MCS that inmate will be medically evaluated, and if necessary, transferred to a crisis bed or a higher level of care. Clinical interventions such as individualized positive behavior plans may be implemented without imposition of MCS placement.

Inmates placed on MCS shall receive an emergency mental health referral. A mental health practitioner (psychiatrist, psychologist or social worker) shall conduct an evaluation to determine if crisis issues exist and if a referral to a higher level of care is needed. At each consideration of extension, the inmate shall be considered for referral to a higher level of care as well as if there is a significant risk of exacerbation of mental illness if management cell status is maintained.

Following the initial mental health clinical contact, the licensed mental health practitioner shall consult with the Lieutenant and discuss how the inmate's mental health conditions affect the inmate's behavior. If placement occurs after a controlled use of force, the mental health practitioner shall communicate the results of the mental health assessment and interventions. The licensed mental health practitioner shall immediately work in conjunction with custody to develop an individualized behavior plan designed to provide positive reinforcement (for example, restoration of privileges) in response to specific appropriate behaviors. The behavior plan shall not be used to extend placement on MCS. Individual behavior plans may be continued after removal from MCS.

The licensed mental health practitioner shall make a daily clinical contact with the inmate until removal of MCS to ensure continued psychiatric stability and evaluate for the emergence of crisis issues and/or need for higher level of care. Individualized strategies for coping with placement on MCS

shall be reviewed with the inmate. The licensed mental health practitioner shall also monitor the efficacy of the behavior plan and recommend modifications as needed. All mental health contacts shall occur in confidential out-of-cell settings.

The mental health practitioner shall document that the initial evaluation occurred on an information chrono.

The details of the behavior plan shall also be documented on an information chrono. The informational chronos shall not include information regarding specific mental health diagnoses, conditions or other protected health information. Placement on MCS will not preclude an inmate from access to health care.

Upon removal from MCS, all documents included in the CDCR 114-A Inmate Segregation Record related to the MCS, will be forwarded to the records office for inclusion in the inmates central file.

Each institution shall designate cells in ASU/SHU as management cells. Other cells in ASU/SHU may also be used as management cells if the designated cells are unavailable. When placed on MCS, all inmate property and clothing will be removed from the cell, and documented on the CDCR form 1083, Inmate Property Inventory, with the exception of:

**Male Institutions**
- One state issued mattress
- One blanket
- One T-shirt
- One pair of boxer shorts
- One toothbrush with tooth powder/toothpaste
- One bar of soap
- One towel
- Daily supply of toilet tissue
- Legal materials (priority legal user status only)

**Female Institutions**
- One state issued mattress
- One blanket
- Three brassieres
- Three pairs of panties
- Night gown/smock
- One toothbrush with tooth powder/toothpaste
- One bar of soap
- Two towels
- Daily supply of toilet tissue
- Feminine hygiene products
- Legal materials (priority legal user status only)

Inmates with priority legal user status will be allowed to maintain possession of their legal paperwork as long as their placement on MCS did not involve said material (e.g., covering cell window with legal papers).

Yard privileges shall continue for inmates placed on MCS. Yard privileges may be suspended for behavior not related to the behavior requiring placement on MCS. Yard privilege suspension may not exceed five days. Reason for yard suspension shall be documented in the initial MCS 128B and recorded on the inmate's CDCR form 114-A, Inmate Segregation Record.

If an inmate is on MCS during his/her regularly scheduled Institutional Classification Committee (ICC) review, the MCS retention or removal will be reviewed and documented in the ICC 128G. Inmates on MCS beyond ten days must be seen at the next scheduled ICC for retention or removal review and the outcome of that committee will be documented in the 128G. The individualized mental health plan will be addressed by the mental health clinician present in the ICC reviews and documented in the CDCR 128G.

# EXHIBIT 3

[CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
REPORT ON COMPLIANCE WITH THE COURT'S APRIL 10, 2014 ORDER ON USE
OF FORCE AND SEGREGATION OF COLEMAN CLASS MEMBERS]

# Memorandum

Date    :

To      :   Associate Directors, Division of Adult Institutions
            Wardens
            Classification Staff Representatives
            Classification and Parole Representatives

Subject :   **NON-DISCIPLINARY SEGREGATION PROCESSING PROCEDURE FOR MENTAL HEALTH SERVICES DELIVERY SYSTEM INMATES**

The purpose of this memorandum is to provide direction regarding the placement of Mental Health Services Delivery System (MHSDS) participants into Administrative Segregation Units (ASU) for possible non-disciplinary reasons.  Due to the significant risks to the health and safety of MHSDS inmates who are placed in ASUs for non-disciplinary reasons, it is critical to expedite the processing and transfer of these inmates.  The April 10, 2014, *Coleman v. Brown*, court order requires inmates in the MHSDS who are placed into ASU for non-disciplinary reasons to be removed within 72 hours of Non-Disciplinary Segregation (NDS) designation by the Institution Classification Committee (ICC). To ensure compliance with the April 10, 2014, court order and to address the increased risk of suicide among MHSDS inmates in segregation, the following procedure shall be adhered to effective immediately:

<u>Non-Disciplinary Segregation Definition</u>

Non-Disciplinary Segregation (NDS) is defined as any inmate who is placed in administrative segregation for: safety concerns not resulting from misconduct warranting a Rules Violation Report, investigations not related to misconduct or criminal activity, or being a relative or an associate of a prison staff member who works at the institution where the inmate is currently housed.

The following are examples of what **would not** be considered appropriate criteria for placement on Non-Disciplinary Segregation status:

- Out to court and return for criminal proceedings.
- Safety concerns as a result of drug debts, gambling debts or bartering with other inmates as documented on a Rules Violation Report.
- Failure to cooperate with an investigation into the inmates alleged safety concerns by not providing pertinent information to staff about the nature of the safety concerns.
- Cases requiring a Departmental Review Board action.

[1251914-1]

Associate Directors, Division of Adult Institutions
Wardens
Page 2

The following are examples of what **would** be considered appropriate criteria for placement on NDS status for privileges and property but **not be** considered for the accelerated transfer process.

- Inmates placed into segregation units upon transfer to their endorsed institution due to lack of an appropriate bed will retain NDS privileges and property but not be considered for the accelerated transfer process.
- Out to court and return for non-criminal proceedings that cannot be released to the General Population due to case factors will retain NDS status for privileges and property but not be considered for the accelerated transfer process
- Post MERDS will retain NDS status for privileges and property but not be considered for the accelerated transfer process.
- Inmates who are being processed at the Reception Centers will retain NDS status for privileges and property but not be considered for the accelerated transfer process. Such class members remain subject to the transfer timelines set forth in the Program Guide.

Processing NDS with MHSDS Level of Care

When a Correctional Lieutenant is determining if an inmate in the MHSDS requires ASU placement and is likely to be designated as NDS by ICC, the staff member authorizing placement shall consider all less restrictive housing alternatives prior to ordering ASU placement. If it is determined ASU placement is the only available option, he/she shall ensure all documentation required to bring closure to the issues is completed prior to the inmates initial ICC review.

The Captain shall conduct an administrative review of the inmate's case the next business day following ASU placement. During the review, the Captain shall consider all reasonable alternative housing options prior to determining whether retention in ASU is necessary. If the determination is made to retain the inmate in ASU pending review by the ICC and it is likely there are no issues which will result in disciplinary sanctions, the Captain shall clear the inmate for privileges and property at this review. NDS inmates shall be granted privileges (e.g., yard, canteen) and access to personal property for the duration of their placement in NDS. The Captain may only authorize "*Walk Alone Yard for Small Management Yards (SMY)/ Individual Exercise Yards (IEM)*" for these potential NDS inmates. While these inmates will be permitted privileges and property as potential NDS, if at any point in the future it is determined the inmate no longer meets the criteria to be designated as NDS, he/she will no longer be granted NDS property/privileges.

The Captain shall ensure all closure documentation is completed prior to the inmate's initial appearance before the ICC. The Captain will case conference with the Correctional Lieutenant who authorized ASU placement along with the assigned caseworker. The case conference shall consist of a review of all closure documentation, case factors and transfer recommendations that will be presented to the ICC.

Associate Directors, Division of Adult Institutions
Wardens
Page 3

The initial ICC committee will be held as soon as possible upon completion of all the appropriate casework but no later than 10 calendar days from the initial placement into Administrative Segregation. MHSDS inmates who are likely to be classified as NDS will be granted first priority with respect to the scheduling of ICC committee.

During the initial ICC review, the ICC shall review the circumstances of the inmate's placement inclusive of the closure documentation submitted by the sending facility, relevant case factors and consider all less restrictive housing options (release to original facility, placement in alternative facility within institution, etc.). If the ICC concludes the inmate requires continued ASU placement and an NDS designation has been determined, the inmate will be recommended for transfer to an alternate institution commensurate with the inmate's existing case factors.

The Classification and Parole Representative (C&PR) on behalf of the Warden or designee shall ensure the CDC Form 128-G, Classification Chrono is completed, signed and scanned into the Electronic Records Management System file by the close of business on the day the initial ICC was held.

The next business day the C&PR shall make contact with the Classification Services Unit (CSU) to schedule a Classification Staff Representative (CSR) review of the transfer recommendation in collaboration with the Population Management Unit (PMU). The C&PR shall attend the review via teleconference with the CSR and note the CSR review results. Should any deficiencies be noted by the CSR during this review, the C&PR shall take whatever course of action is necessary to remedy the deficiencies and reconvene the review with the CSR to obtain an endorsement to transfer. Upon completion of the CDCR 128-G endorsement chrono, the CSR shall provide electronic notification of the endorsement to PMU.

Upon transfer endorsement by the CSR, the PMU shall coordinate with the Statewide Transportation Unit (STU) and the sending and receiving institutions to determine availability of transportation to the designated institution for the next business day. If transportation cannot be made available through the STU, the C&PR shall arrange for the inmate to be transferred utilizing existing institutional resources the next business day. This will ensure the inmate has been transferred within the 72 hour time frames.

In the rare case where it is not possible to resolve the issues preventing the inmate from transferring out of ASU by the initial ICC, the Warden shall notify their respective Mission, Associate Director. The Associate Director and the Warden shall case conference the remaining issues and collaborate with any existing stakeholders (e.g., Health Care Oversight Placement Program) with consideration for placement at the alternative to ASU housing at California State Prison, Sacramento (SAC) to ensure transfer of the inmate within mandated time frames.

Associate Directors, Division of Adult Institutions
Wardens
Page 4

NDS Tracking

Information regarding the use of NDS status for all inmates including MHSDS participants shall be tracked in the COMPSTAT ASU Tracking system. To that end the COMPSTAT ASU Tracking system will be modified to include the following additional ASU Placement Codes for use by September 1, 2014:

- NDS:200 – NDS status for accelerated transfer process
- NDS:201 – NDS status for accelerated transfer process to alternative ASU housing at SAC.
- NDS:102 – NDS status for privileges and property but not considered for accelerated transfer process.

If you have any questions regarding these expectations, please contact your respective Mission, Associate Director.


M. D. STAINER                          TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP
Director                               Director(A), Division of Health Care Service
Division of Adult Institutions         Deputy Director, Statewide Mental Health


cc: Kathleen Allison
    Kelly Harrington
    Tim Virga
    Dennis Halverson
    Kevin Ormand
    Thomas Tyler

[1251914-1]

# Memorandum

Date    :

To      :   Associate Directors, Division of Adult Institutions
            Wardens
            Classification Staff Representatives
            Classification and Parole Representatives
            Correctional Counselors III, Reception Centers

Subject:   **PRE-MINIMUM ELIGIBLE RELEASE DATED REVIEWS EXPECTATIONS**

The purpose of this memorandum is to provide direction for expedited pre-Minimum Eligible Release Date (MERD) reviews for those inmates housed in Security Housing Units (SHU), Psychiatric Services Unit (PSU), and Administrative Segregation Unit (ASU) whom are serving lengthy projected or active SHU term(s). The goal of the expedited pre-MERD review is to assist in the timely resolution of issues which may delay or prevent release of the inmate from SHU, PSU, or ASU upon completion of the MERD; and to ensure the inmate is released or transferred from SHU, PSU, or ASU within the guidelines established in the attached December 3, 2013, policy memorandum titled, "*Non Disciplinary Segregation Enhanced Outpatient Program and Correctional Clinical Case Management Services Release or Transfer Timelines.*"

The California Code of Regulations, Title 15, Section 3341.5(c) (2) (B) (10), Segregated Program Housing Units, establishes the requirement that a classification hearing be held at least 30 days prior to the expiration of a MERD. The purpose of this pre-MERD review is to determine the inmate's housing needs upon release from or completion of a SHU term.

**Effective immediately, all inmates with projected or active SHU shall have a pre-MERD conducted 120 days prior to the expiration of the MERD and presented to the Classification Services Representative (CSR) 60 days prior to the expiration of the MERD. Those inmates housed in ASU with a projected MERD less than 120 days shall be reviewed at the initial ICC review for release consideration. Additionally, MHSDS participants retained in ASU beyond the expired MERD and who have no further disciplinary issues will be granted NDS status with respect to the retention of privileges and property, but will not be designated as Non-Disciplinary Segregation (NDS) status for transfer timelines.**

Associate Directors, Division of Adult Institutions
Wardens
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselors III, Reception Centers
Page 2

**TRANSFER REFERRALS DURING PRE-MERD REVIEW**

Institution Classification Committees shall refer inmates who require a transfer to the CSR at the 120 day pre-MERD review and present the cases to the CSR within 60 days of the MERD unless other factors have developed or are present which require resolution prior to transfer recommendation. Safety investigations which impede or delay transfer must be resolved expeditiously to allow for release or transfer from SHU within the timelines established in the December 3, 2013, policy memorandum. Prior to the 120 day pre-MERD review, staff shall identify those inmates who, as a result of safety/enemy concerns, require an investigation.

It is the expectation that investigations shall be completed within 30 days from the 120 day pre-MERD review date.

The support of all staff is appreciated and necessary to ensure this process works effectively. If you have any questions please contact Melanie Scott, Correctional Counselor III, Classification Services Unit (CSU), at (916) 322-4730 or Gena Jones, Captain, CSU, at (916) 445-1810.

M. D. STAINER
Director
Division of Adult Institutions

Attachment

cc:   Kelly Harrington
      Kathleen Allison
      Gena Jones
      Melanie Scott

# EXHIBIT 4

[CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
REPORT ON COMPLIANCE WITH THE COURT'S APRIL 10, 2014 ORDER ON USE
OF FORCE AND SEGREGATION OF COLEMAN CLASS MEMBERS]

State of California    Case 2:90-cv-00520-KJM-DB    Document 5190    Filed 08/01/14    Page 63 of 69    Department of Corrections and Rehabilitation
ASU EOP HUB Program Certification    **Form:** Page x of x
CDCR MH-XXXX (xx/xx)    **Instructions:** Page x of x

ASU EOP HUB Program Performance Certification

Based upon the mental health performance report and local audits of the ASU EOP HUB unit, I DO \_\_\_\_ / DO NOT \_\_\_\_ (check one) certify that, based upon my clinical expertise, the ASU EOP HUB program at _____ has met program guide requirements from _____ to _____ , 2014.

Check one below:

☐ The ASU EOP HUB program has not had any significant changes in performance since certification by the regional administrator on _____ .

☐ The ASUEOP HUB program has had significant changes in performance since certification by the regional administrator on _____ .

Notes regarding performance changes below.

Provide a brief summary of areas assessed. If certification is recommended, describe the rationale for this. If certification is not recommended, describe the areas in which performance has lapsed.

_____      _____

Chief of Mental Health  - Print and Sign            Date

_____      _____

Warden - Print and Sign            Date

State of California    Case 2:90-cv-00520-KJM-DB    Document 5190    Filed 08/01/14    Page 64 of 69 Department of Corrections and Rehabilitation
ASU EOP HUB Program Certification                                                                                              **Form:** Page x of x
CDCR MH-XXXX (xx/xx)                                                                                                           **Instructions:** Page x of x

I ☐ agree/ ☐ do not agree   (check one) with the Chief of Mental Health and Warden's assessment.

_____          _____

Institution CEO - Print and Sign                                  Date

I ☐ agree/ ☐ do not agree   (check one) with the Chief of Mental Health and Warden's assessment.

_____          _____

Mental Health Regional Administrator - Print and Sign          Date

I ☐ agree/ ☐ do not agree   (check one) with the Chief of Mental Health and Warden's assessment.

_____          _____

Regional Chief Executive Officer- Print and Sign              Date

State of California    Case 2:90-cv-00520-KJM-DB    Document 5190    Filed 08/01/14    Page 65 of 69 Department of Corrections and Rehabilitation

ASU EOP HUB Program Certification      **Form:** Page x of x

CDCR MH-XXXX (xx/xx)      **Instructions:** Page x of x

### Instructions

**1.** Using your audit and performance report date and, using a 90% benchmark, select the correct box to establish that you are or are not recommending certification.

**2.** Enter the first day and last day of the month in which you are reporting. Submit all reports for performance of the month prior to your institution Chief Executive Officer by the 3rd of each month.

**3.** The Chief of Mental Health will check the correct selection to establish if the program has had lapses in performance since initial certification by the regional administrator. **If lapses are identified, you may NOT certify.**

**4.** Enter the most recent date of the regional certification.

**5.** The Chief of Mental Health and Warden will both provide succinct observations regarding the ASU EOP HUB program as they relate to the program's performance on the items outlined in the audit instructions. If performance has remained within a 90% threshold on all items, provide specific examples of what was observed. If performance has lapsed, list the areas where improvement is needed.

**6.** If, in your assessment, your program has failed to meet program guide requirements, contact your regional administrator and/or the Chief of Quality Management/Coleman Compliance immediately.

**7.** Both the Chief of Mental Health and the Warden will sign before forwarding to the institution CEO. If the Chief of Mental Health and Warden disagree in certification, they must examine data together and come to an agreement.

**8.** The institution Chief Executive Officer will select if they agree with the Chief of Mental Health's assessment, sign, and ensure the signed report is sent to the Mental Health Regional Administrator for signature by the 5th of each month.

**9.** The Mental Health Regional Administrator will select if they agree with the Chief of Mental Health's assessment, sign, facilitate obtaining the signature of the Regional Chief Executive Officer, and submit to the Chief of Quality Management/Chief of Coleman Compliance by the 9th of each month.

**10.** The Chief of Quality Management/Chief of Coleman Compliance will ensure the Director of Mental Health receives the documents within one business day of receipt.

**11.** The Director of Mental Health will review the information to submit a final verification to the court by the 15th of each month.

# EXHIBIT 5

**[CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
REPORT ON COMPLIANCE WITH THE COURT'S APRIL 10, 2014 ORDER ON USE
OF FORCE AND SEGREGATION OF COLEMAN CLASS MEMBERS]**

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
DIVISION OF ADULT INSTITUTIONS
REVISION OF DEPARTMENT POLICY CONCERNING UNCLOTHED BODY
SEARCHES OF INMATES
July 29, 2014

**52050.16.6    Unclothed or Clothed Body Search of Inmates in Enhanced Outpatient Administrative Segregation Hubs**

- Inmates shall be subject to an unclothed body search as described in section 52050.16.5 upon their initial placement into designated Enhanced Outpatient Administrative Segregation hubs.
- Unclothed body searches shall be conducted within the cell unless the physical design prevents visibility, at which point the inmate will be escorted to an alternate private/secure setting where the unclothed body search will be conducted.
- Inmates exiting the unit will be subject to an unclothed body search as described in section 52050.16.5 and scanned with a metal detector.
- Inmates returning to the unit who have been under constant staff supervision shall not be subject to an unclothed body search but shall be subject to a clothed body search as described in 52050.16.3 and scanned with a metal detector.
- Inmates removed from their cell for routine activity in the unit shall be subject to a clothed body search as defined in 52050.16.3 and scanned with a metal detector.
- When circumstance exist that would lead an objective, trained, and competent Correctional Officer to believe it is necessary, he or she can perform an unclothed body search as described in 52050.16.5. These searches shall be noted on the CDC Form 114-A, Inmate Segregation Record. These searches shall only be conducted when necessary to control contraband or recover missing or stolen property.

# Memorandum

Date :

To : Associate Directors – Division of Adult Institutions
Wardens – Institutions with EOP ASU Hubs
Chief Executive Officers – Institutions with EOP ASU Hubs
Regional Directors – Mental Health

Subject: **REVIEW OF REFUSAL TO ATTEND TREATMENT BY ENHANCED OUTPATIENT INMATES HOUSED IN ADMINISTRATIVE SEGREGATION HUB UNITS**

Access to mental health treatment for inmates housed within the Enhanced Outpatient Program (EOP) Administrative Segregation hub units (ASU) is important to help assure the safety of EOP inmates in the segregated housing environment. Therefore, if an EOP inmate repeatedly refuses to attend offered mental health treatment, it is incumbent on staff to take steps to identify why the inmate is not willing to attend such treatment and to work toward remedying any problem as described more completely below.

Within one week of the identification by the Interdisciplinary Treatment Team (IDTT), other clinical staff, or other custody staff that an inmate has refused more than 50% of offered treatment activities in a two month period, the EOP ASU hub Correctional Lieutenant and a mental health clinician shall work collaboratively to evaluate the circumstances underlying the inmate's refusal to attend the scheduled treatment sessions.

In order to evaluate the circumstances of the inmate's refusal to attend scheduled treatment sessions, a Correctional Lieutenant and a mental health clinician shall review the CDC114-A Inmate Segregation Record to determine if the inmate is refusing other services and programs including but not limited to showers, yard, medical, visiting, etc. Additionally, correctional and mental health staff shall jointly interview both the inmate and staff assigned to the unit to better understand causal factors that may be impacting the inmate's refusal to attend offered treatment. Mental health staff shall complete a review of the central file and health record to determine whether there are relevant facts that may inform the cause of the inmate's refusal. If a specific cause for the inmate's refusal can be identified and can be reasonably resolved, correctional and mental health staff shall attempt to work together with the inmate to resolve such issues.

If the inmate identifies barriers related to security policies (including but not limited to search or restraint procedures) as a cause for his or her refusal to attend treatment, the correctional and mental health staff shall jointly document their findings on a CDC 128-B General Chrono and submit the completed 128-B to both the Chief Deputy Warden and the Chief of Mental Health. The Chief Deputy Warden and the Chief of Mental Health shall confer and shall consider various methods to encourage the inmate to attend treatment including whether viable alternatives to the identified security policies

Associate Directors – Division of Adult Institutions
Wardens – Institutions with EOP ASU Hubs
Chief Executive Officers – Institutions with EOP ASU Hubs
Regional Directors – Mental Health
Page 2

exist without jeopardizing the security of the unit, or the safety of staff or inmates. Should the Chief of Mental Health and the Chief Deputy Warden disagree on the proper solution of the matter, the issue shall be elevated to the Warden and the Chief Executive Officer for their review and resolution.

Within 30 days of the date of this memorandum, Wardens, Chiefs of Mental Health, and Chief Executive Officers at each institution shall work collaboratively to develop a jointly signed local operating procedure consistent with this directive.

M. D. STAINER                        TIMOTHY BELAVICH, Ph.D ,MSHCA, CCHP
Director                             Director (A), Division of Health Care Services
Division of Adult Institutions       Deputy Director, Statewide Mental Health