1  FUTTERMAN DUPREE DODD CROLEY MAIER LLP

2  MARTIN H. DODD (104363)
   180 Sansome Street, 17th Floor
3  San Francisco, California 94104
   Telephone: (415) 399-3840
   Facsimile: (415) 399-3838
4  mdodd@fddcm.com

5  *Attorneys for Receiver*
   J. Clark Kelso
6

7

8               **UNITED STATES DISTRICT COURT**

9         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10       **AND FOR THE EASTERN DISTRICT OF CALIFORNIA**

11  MARCIANO PLATA, et al.,                   Case No. C01-1351 TEH

12          *Plaintiffs*,

13       v.

    EDMUND G. BROWN, JR., et al.,

14          *Defendants*.

15  _____

16  RALPH COLEMAN, et al.,                    Case No. CIV S-90-0520 KJM-DAD

17          *Plaintiffs*,

18       v.

    EDMUND G. BROWN, JR., et al.,

19          *Defendants*.

20  _____

21  JOHN ARMSTRONG, et al.,                   Case No. C94-2307 CW

22          *Plaintiffs*,

23       v.

    EDMUND G. BROWN, JR., et al.,

24          *Defendants*.

25  _____

26          **NOTICE OF FILING OF RECEIVER'S**
            **TWENTY-SEVENTH TRI-ANNUAL REPORT**
27

28

1    PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

2  1351 TEH, has filed herewith his Twenty-Seventh Tri-Annual Report.

3  Dated:  October 1, 2014                                FUTTERMAN DUPREE
                                                                    DODD CROLEY MAIER LLP
4

5                                                                    By:/s/ Martin H. Dodd
                                                                          Martin H. Dodd
6                                                                          Attorneys for Receiver J. Clark Kelso

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# Achieving a Constitutional Level of Medical Care in California's Prisons

**Twenty-seventh Tri-Annual Report of the Federal Receiver's Turnaround Plan of Action
For May 1 – August 31, 2014**

**October 1, 2014**

# California Correctional Health Care Receivership

## Vision:

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation within a delivery system the State can successfully manage and sustain.

## Mission:

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1.  **Executive Summary**.................................................................... 1

2.  **The Receiver's Reporting Requirements**.................................... 3

3.  **Status and Progress Toward the Turnaround Plan Initiatives**.................... 4

    **GOAL 1**    **Ensure Timely Access to Health Care Services**......................... 4

    *Objective 1.1*    Screening and Assessment Processes................................ 4

    *Objective 1.2*    Access Staffing and Processes...................................... 5

    *Objective 1.3*    Scheduling and Patient-Inmate Tracking System.......................... 5

    *Objective 1.4*    Standardized Utilization Management System................................ 5

    **GOAL 2**    **Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services**......................... 6

    *Objective 2.1*    Primary Care............................................. 6

    *Objective 2.2*    Chronic Care.............................................. 7

    *Objective 2.3*    Emergency Response........................................ 7

    *Objective 2.4*    Specialty Care and Hospitalization.............................. 7

    **GOAL 3**    **Recruit, Train and Retain a Professional Quality Medical Care Workforce**......................... 8

    *Objective 3.1*    Physicians and Nurses..................................... 8

    *Objective 3.2*    Clinical Leadership and Management Structure................................ 8

    *Objective 3.3*    Professional Training Program.............................. 8

    **GOAL 4**    **Implement a Quality Assurance and Continuous Improvement Program**......................... 9

    *Objective 4.1*    Clinical Quality Measurement and Evaluation Program................. 9

    *Objective 4.2*    Quality Improvement Programs............................. 13

    *Objective 4.3*    Medical Peer Review and Discipline Process................... 15

    *Objective 4.4*    Medical Oversight Unit................................... 15

    *Objective 4.5*    Health Care Appeals Process.............................. 16

*Objective 4.6*    Out-of-State, Community Correctional Facilities and Re-entry
Oversight.................................................................................    16

**GOAL 5    Establish Medical Support / Allied Health Infrastructure.....................    21**

*Objective 5.1*    Pharmacy.....................................................................    21

*Objective 5.2*    Medical Records...........................................................    21

*Objective 5.3*    Imaging/Radiology and Laboratory Services.....................    21

*Objective 5.4*    Clinical Information Systems..........................................    23

*Objective 5.5*    Telemedicine...............................................................    23

**GOAL 6    Provide for Necessary Clinical, Administrative and Housing**

**Facilities.................................................................................    24**

*Objective 6.1*    Upgrade Administrative and Clinical Facilities..................    25

*Objective 6.2*    Expand Administrative, Clinical, and House Facilities....................    26

*Objective 6.3*    Finish Construction at San Quentin State Prison..............    26

**4.    Additional Successes Achieved by the Receiver.........................................    27**

A.  Electronic Health Records System    27

**5.    Particular Problems Faced by the Receiver, Including Any Specific Obstacles**

**Presented By Institutions Or Individuals.........................................................    28**

A.    CCHCS Activities related to the Court's June 24, 2013, Order Granting

Plaintiff's Motion for Relief Re: Valley Fever at PVSP and ASP..........................    28

B.    Overcrowding Update..........................................................................    29

**6.    Other Matters Deemed Appropriate for Judicial Review...........................    31**

A.    Coordination with Other Lawsuits......................................................    31

B.    Master Contract Waiver Reporting......................................................    31

C.    Consultant Staff Engaged by the Receiver...........................................    31

D.    Overview of Transition Activities........................................................    31

**7.    Required Reporting Pursuant to Judge Thelton Henderson's March 27, 2014,**

**Court Order Regarding the Receiver's Tri-Annual Report........................    39**

A.    California Health Care Facility – Level of Care Delivered....................    39

B.    Statewide Medical Staff Recruitment and Retention...........................    41

C.  Sustainability of Receiver's Reforms............................................................... 44

D.  Development of Independent Systems for Evaluation of the Quality of Health Care.................................................................................................. 46

E.  Custody Interference with the Delivery of Health Care...................................... 47

8.  An Accounting of Expenditures for the Reporting Period.......................................... 48

9.  Conclusion............................................................................................................. 49

# Section 1: Executive Summary

In our second Tri-Annual report for 2014, the accomplishments for the period of May 1, 2014, through August 31, 2014, are highlighted. Progress continues toward fully implementing the Vision and Mission outlined in the Receiver's Turnaround Plan of Action (RTPA). Highlights for this reporting period include the following:

- The improvement continues related to custody and health care operations at the California Health Care Facility (CHCF).  Since the last reporting period, a new, permanent leadership team at CHCF, including a new Warden, has been put in place. In July 2014, medical admissions to the facility resumed. Headquarters, regional, and facility staff continue to evaluate the need for additional staffing and intensively monitor the progress at CHCF towards improving clinical and operational issues.

- Supplemental funding necessary for the Health Care Facility Improvement Program (HCFIP) was approved by the Legislature and signed by the Governor in July 2014. As a result of this funding decision, the remaining five HCFIP projects were authorized during this reporting period. While much progress has been made in the HCFIP program, individual project timelines continue to slip for varying reasons. As a result, it is anticipated that the final HCFIP projects will not be completed until late 2017.

- The federal Center for Disease Control and Prevention (CDC) released its report on July 9, 2014, on their recommendations regarding prevention strategies for cocci. Their report recommends the use of a newly licensed skin test on inmates who could be housed safely, or moved, from Pleasant Valley and Avenal State Prisons. California Correctional Health Care Services (CCHCS) and California Department of Corrections and Rehabilitation (CDCR) are currently planning how to implement this recommendation.

- CCHCS continues its efforts to implement an Electronic Health Records System (EHRS). This system will be pivotal for improving those elements of the RTPA that have yet to be completed.

- The Office of the Inspector General (OIG) continues to prepare for Round 4 of monitoring. At this point, the parties and the *Plata* Court Experts have not reached final agreement on the OIG's proposed audit instrument. According to the OIG, Round 4 monitoring will now begin in early 2015.

- In compliance with the requirement of the three-judge panel that CDCR reduce prison overcrowding statewide, the State successfully met the first benchmark – 143 percent of design capacity – by August 31, 2014. The next benchmark, 141.5 percent of capacity, must be met by February 28, 2015.

- This report includes a new section (Section 7) as required in Judge Thelton Henderson's March 27, 2014, Order Re: Receiver's Tri-Annual Report (refer to Appendix 1) to report on topics of importance, including, but not limited to, progress at CHCF, recruitment and retention efforts, as well as the Receiver's views on the sustainability of reform efforts. Section 7 can be found beginning on page 39.

- CCHCS is currently evaluating the need for additional staffing, especially in the area of recruitment and retention and the expansion of our quality management efforts, which are critical to the successful completion of objectives identified in the RTPA.

Format of the Report
To assist the reader, this Report provides three forms of supporting data:

*Metrics*: Metrics that measure specific RTPA initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions that are not completed.

*Appendices*: In addition to providing metrics, this report also references documents in the Appendices of this report.

*Website References*: Website references are provided whenever possible.

Information Technology Project Matrix
A chart has been created to specifically illustrate the major technology projects and the deployment of those projects. This document is included as Appendix 2.

# Section 2: The Receiver's Reporting Requirements

This is the twenty-seventh report filed by the Receivership, and the twenty-first submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006, calls for the Receiver to file status reports with the *Plata* Court concerning the following issues:

1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
3. Particular success achieved by the Receiver.
4. An accounting of expenditures for the reporting period.
5. Other matters deemed appropriate for judicial review.

(Reference pages 2-3 of the Appointing Order at
http://www.cphcs.ca.gov/docs/court/PlataOrderAppointingReceiver0206.pdf)

Judge Thelton Henderson's March 27, 2014, Order Re: Receiver's Tri-Annual Report directs the Receiver to discuss in each Tri-Annual report his views on the sustainability of the reforms he has achieved and plans to achieve. Each report is to include updates on the development of an independent system for evaluating the quality of care, as well as a discussion on the degree, if any, to which custodial interference with the delivery of care remains a problem.

In support of the coordination efforts by the three federal courts responsible for the major health care class actions pending against CDCR, the Receiver files the Tri-Annual report in three different federal court class action cases: *Armstrong, Coleman, and Plata*. An overview of the Receiver's enhanced reporting responsibilities related to these cases and to other *Plata* orders filed after the Appointing Order can be found in the Receiver's Eleventh Tri-Annual Report on pages 15 and 16. (http://www.cphcs.ca.gov/receiver_othr_per_reps.aspx)

Court coordination activities include: facilities and construction; telemedicine and information technology; pharmacy; recruitment and hiring; credentialing and privileging; and space coordination.

# Section 3: Status and Progress Toward the Receiver's Turnaround Plan Initiatives

## Goal 1: Ensure Timely Access to Health Care Services

**Objective 1.1.** Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

> ***Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation.***
This action is completed.

> ***Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons.***
This action is completed.  Volume 4, Chapter 2.1, Reception Health Care Policy and Volume 4, Chapter 2.2, Reception Health Care Procedure were both revised and updated in October 2012.

Based on the *Plata* Court Experts review of the San Quentin State Prison (SQ) reception center processes in March 2013, a review of the objective of optimizing further reception center processes, in light of redistribution of reception center missions, is underway. Also, the Population Management Care Coordination Committee (PMCCC) is in the process of reviewing, revising and developing policy and procedure for Reception and Receiving & Release (R&R) for population management. Population management at Reception and R&R involves the stratification of the patient-inmate population based on the acuity level/clinical needs of new arrivals and/or transfers so that appropriate resources may be deployed to facilitate the provision of appropriate care management and care coordination across the continuum of care. It is anticipated this program will begin to be deployed to the institutions in early 2015.

> ***Action 1.1.3. By January 2010, begin using the new medical classification system at each reception center prison.***
This action is completed.

> ***Action 1.1.4. By January 2011, complete statewide implementation of the medical classification system throughout CDCR institutions.***
This action is completed.

**Objective 1.2.** **Establish Staffing and Processes for Ensuring Health Care Access at Each Institution**

*Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution.*

This action is completed.

*Action 1.2.2. By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions.*

This action is completed. Refer to Appendix 3 for the Executive Summary and Health Care Access Quality Reports for April through July 2014.

**Objective 1.3.** **Establish Health Care Scheduling and Patient-Inmate Tracking System**

*Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System (SOMS) with a scheduling and inmate tracking system as one of its first deliverables.*

This action is complete. The Health Care Scheduling and Patient-Inmate Tracking System project was closed on April 16, 2014. The medical, dental, and mental health scheduling systems have been in production at 34 institutions since July 2013, and all aspects of technical support have been transitioned to information technology (IT) maintenance and operation.

**Objective 1.4.** **Establish a Standardized Utilization Management System**

*Action 1.4.1. By May 2010, open long-term care units.*

This action is completed.

*Action 1.4.2. By October 2010, establish a centralized UM System.*

This action is completed.

## Goal 2: Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services

**Objective 2.1.** Redesign and Standardize Access and Medical Processes for Primary Care

*Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models.*

This action is ongoing. Progress during this reporting period is as follows:

As part of the PMCCC, an interdisciplinary team of headquarters, regional, and institutional staff reviewed and revised the Primary Care Model. Based on the review, the team re-organized the relevant policies and procedures to include:

- Overview of the Health Care Model: Defines and establishes relationship, integration, and responsibilities for Primary Care, Diagnostic and Therapeutic Services, Urgent Care, Tertiary Care, Dental Care, and Mental Health Care.
- Primary Care Team: Defines membership in primary care team, responsibilities, continuity of team, primary care team huddles, care conferences, and primary care panel assignments.
- Disease Management (Chronic Care): Defines program for management of enduring medical conditions, including establishment of clinical guidelines, surveillance and screening, tracking of conditions, adjustment of therapy, patient-inmate self-management, tracking of patient-inmate outcomes and populations, continuity of care, and case conferences.
- Preventive Primary Care Services: Requires established guidelines for preventive services, infectious disease surveillance, immunizations, screening, patient-inmate education and support in health maintenance. Includes annual primary care nursing visit focused on screening and patient-inmate education, as well as season-focused immunization program for influenza.
- Episodic Primary Care Services: Establishes a system to respond to symptoms of a new condition and to exacerbation of pre-existing conditions. Includes method for patient-inmates and others to initiate health care visits.

The PMCCC is reviewing and revising the above policies and procedures to incorporate Population Stratification, Care Management, Disease Management, Medication Management and Care Coordination across all continuums of care and all disciplines of health care. In addition, PMCCC is integrating EHRS workflows into the policies and procedures in preparation for transition to the EHRS.

*Action 2.1.2. By July 2010, implement the new system in all institutions.*

This action is ongoing. Progress during this reporting period is outlined above in Action 2.1.1.

**Objective 2.2.** Improve Chronic Care System to Support Proactive, Planned Care

*Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered.*
This action is completed.

**Objective 2.3.** Improve Emergency Response to Reduce Avoidable Morbidity and Mortality

*Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions.*
This action is completed.

*Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff.*
This action is completed.

*Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response.*
This action is completed.

**Objective 2.4.** Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality

*Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals.*
This action is completed.

*Action 2.4.2. By October 2010, establish on a statewide basis approved contracts with specialty care providers and hospitals.*
This action is completed.

*Action 2.4.3. By November 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner.*
This action is completed.

## Goal 3: Recruit, Train and Retain a Professional Quality Medical Care Workforce

<u>**Objective 3.1**</u> **Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions**

For details related to vacancies and retention, refer to the Human Resources Recruitment and Retention Reports for May through August 2014. These reports are included as <u>Appendix 4</u>.

>  ***Action 3.1.1.  By January 2010, fill ninety percent of nursing positions.***

This action is completed.  However, pursuant to Judge Thelton Henderson's March 27, 2014, Order Re: Receiver's Tri-Annual Report, an update on this action item is provided in Section 7(B) of this report. Judge Thelton Henderson's March 27, 2014, Order Re: Receiver's Tri-Annual Report is included as <u>Appendix 1</u>.

>  ***Action 3.1.2. By January 2010, fill ninety percent of physician positions.***

This action is completed.  However, pursuant to Judge Thelton Henderson's March 27, 2014, Order Re: Receiver's Tri-Annual Report, an update on this action item is provided in Section 7(B) of this report. Judge Thelton Henderson's March 27, 2014, Order Re: Receiver's Tri-Annual Report is included as <u>Appendix 1</u>.

<u>**Objective 3.2**</u> **Establish Clinical Leadership and Management Structure**

>  ***Action 3.2.1. By January 2010, establish and staff new executive leadership positions.***
>  ***Action 3.2.2. By March 2010, establish and staff regional leadership structure.***

These actions are completed.

<u>**Objective 3.3.**</u> **Establish Professional Training Programs for Clinicians**

>  ***Action 3.3.1. By January 2010, establish statewide organizational orientation for all new health care hires.***

This action is completed.

>  ***Action 3.3.2. By January 2009, win accreditation for CDCR as a Continuing Medical Education provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education.***

The action is completed.

# Goal 4: Implement a Quality Assurance and Continuous Improvement Program

**Objective 4.1. Establish Clinical Quality Measurement and Evaluation Program**

> ***Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs.***

This action is ongoing. Progress during this reporting period is as follows:

Patient Safety Culture Survey
During this reporting period, CCHCS released the results from its first Patient Safety Culture Survey.

In February 2014, the Patient Safety Committee surveyed health care staff at institutions statewide, applying a nationally-recognized survey tool developed by the federal Agency for Healthcare Research and Quality (AHRQ). Over half of our health care staff – more than 5,400 individuals – participated in the baseline survey. A culture of safety at all levels of the organization is a required organizational building block for the Patient Safety Program; with that foundation in place, we can increase health incident reporting so that system and process problems are identified, analyzed and fixed in order to prevent similar types of problems in the future.

The baseline survey results told us that when looking at key patient safety domains, such as communication and coordination within and across care teams and identification of potential environmental hazards, CCHCS has similar strengths and weaknesses in organizational culture as the hundreds of other health care organizations that use the AHRQ survey. However, there are two striking findings from our statewide survey that differ from other health care organizations nationally:
1) Staff are afraid to report problems because they believe they will be punished, and
2) Safety gaps or system vulnerabilities are most likely to occur with patient-inmate handoffs and transitions of care.

Please refer to survey categories entitled "Non-Punitive Response to Errors" and "Handoffs & Transitions" in Figure 1 (results shown in red). Staff reported one or more events in the past 12 months.

*Figure 1 - CCHCS/DHCS Performance in Patient Safety Culture Survey Categories Compared to Other Health Care Organizations Nationwide*
*Data Sources:  2014 AHRQ Comparative Database and 2014 CCHCS/DHCS Survey Results*

| Dimensions of Patient Safety | AHRQ Results Govt | AHRQ Results Non-Govt | CCHCS/ DHCS |
|---|---|---|---|
| *Number of Participating Facilities* | *140* | *513* | *34* |
| *Response Rate* | *54%* | *54%* | *53%* |
| 1  Non-Punitive Response to Errors | 43% | 45% | **25%** |
| 2  Feedback & Communication About Errors | 66% | 67% | 51% |
| 3  Communication Openness | 61% | 63% | 58% |
| 4  Handoffs & Transitions | 50% | 47% | **43%** |
| 5  Teamwork Across Units | 61% | 60% | 52% |
| 6  Teamwork Within Units | 79% | 81% | 72% |
| 7  Organizational Learning-Continuous Improvement | 72% | 73% | 59% |
| 8  Facility Management Support for Patient Safety | 74% | 72% | 57% |
| 9  Staffing | 54% | 56% | 48% |
| 10  Supervisor/Manager Expectations & Actions Promoting Patient Safety | 75% | 76% | 66% |
| *Overall Score – 10 Dimensions of Patient Safety* | *64%* | *64%* | *52%* |

| Patient Safety Outcomes | AHRQ Results Govt | AHRQ Results Non-Govt | CCHCS/ DHCS |
|---|---|---|---|
| A  Overall Perceptions of Safety | 66% | 66% | 54% |
| B  Frequency of Events Reported | 66% | 66% | 58% |
| C  Staff Reported One or More Events in 12 Months | 37% | 45% | **30%** |
| D  Overall Patient Safety Grade | 76% | 76% | 62% |

Three out of four respondents (75 percent) believe that when a bad outcome or error occurs, individuals will be punished and, not surprisingly, only 30 percent of respondents reported any health care events in the last 12 months. There was some variation in individual institution performance, but no institution met the statewide goal of 75 percent for overall score in this baseline survey and all institutions rated below the national average, with the exception of California Correctional Center (CCC) at 66 percent.

It is the goal of all patient safety programs to achieve a high level of reliability or predictability in health care systems, processes, and outcomes. Organizations that have been able to achieve high reliability status – nuclear power operators, commercial aviation, the military – have an important cultural norm in common: they identify danger signals and respond to them effectively, fixing system problems before an adverse event occurs.  This kind of early warning system only works well in places where staff are not afraid to report potential and real system failures.

This year, the Patient Safety Committee has set a new statewide goal to improve our organizational culture. Statewide performance objectives have a target date that allows the organization a period of time for improvement activities before re-evaluation in approximately 12–18 months, at which time results will be available in 2016.

*Figure 2 - Patient Safety Committee Goal*

*By December 31, 2016, each institution will:*

★ Achieve an average of 75% or more in the Patient Safety Culture Survey overall score and in each of the 10 major dimensions and 4 patient safety outcomes, or at least a 20% increase from baseline results.

★ Achieve an average of 75% or more, or at least a 20 percentage point increase from baseline results, for the following measures:  Non-Punitive Response to Errors and Staff Reported One or More Events in 12 Months.

CCHCS has already taken steps to address the survey findings. For months now, CCHCS has been working to improve transitions in care for our patient-inmate population through the PMCCC Workgroup. Recently, the Patient Safety Committee chartered a workgroup to develop a decision algorithm for health care leaders faced with an adverse event.

The algorithm will provide a structured, standardized mechanism for leaders to evaluate appropriate response to an adverse event, ensuring that disciplinary action only results in situations involving a blameworthy act. The Patient Safety Culture Survey Report also includes recommendations for actions that leadership at the statewide and institution levels can take to immediately promote a patient safety culture.

To view the full text of the report, please refer to Appendix 5, Patient Safety Culture Survey Report.

Polypharmacy Workgroup

As of the beginning of September 2014, five percent of the total patient-inmate population in the California prison health care system, or more than 6,600 patient-inmates, had current prescriptions for 10 or more medications, and roughly 230 of these patient-inmates were taking 20 or more medications. Many of these patient-inmates are considered clinically complex, and all are at risk for medication adherence problems and drug-drug interactions. A number of recent adverse events have been linked to polypharmacy, including falls for patient-inmates taking medications with side effects of dizziness or blurred vision and accidental toxicity due to drug-drug interactions.

To address the patient-inmate risks associated with polypharmacy, the Patient Safety Committee and Pharmacy and Therapeutics Committee convened a workgroup during this reporting period to accomplish the following tasks:

- Establish requirements for reviewing medication regimens when patient-inmates are prescribed 10 or more drugs.
- Develop expectations and standard processes in the form of a policy and procedure, guidelines or other appropriate strategy for reviewing the clinical care provided to all patient-inmates on more than 10 medications. These reviews can be carried out on a regular basis (e.g., monthly or quarterly) by an interdisciplinary team. The idea would be to develop a streamlined process that can be integrated with or at least connected to other existing requirements to support quality care.
- Provide input on the methodology that can be used to collect and report baseline performance data on the Dashboard as well as suggest training content for Chief Medical Executive sessions to be provided before the end of 2014.

The Polypharmacy Workgroup met three times during this reporting period. In addition to the polypharmacy review process, guidelines, and performance evaluation methodology, the workgroup has developed tools to assist care teams in identifying patient-inmates that may benefit from a polypharmacy review, including a patient-inmate registry.

*Action 4.1.2. By July 2009, work with the Office of the Inspector General to establish an audit program focused on compliance with Plata requirements.*

This action is completed. Discussions are continuing with OIG and the *Plata* Court Experts to implement refinements to the OIG's inspection program. OIG plans to begin Round 4 of medical inspections in 2015. For more information, see page 46.

**Objective 4.2.** **Establish a Quality Improvement Program**

*Action 4.2.1.(merged Action 4.2.1 and 4.2.3): By January 2010, train and deploy existing staff--who work directly with institutional leadership--to serve as quality advisors and develop model quality improvement programs at selected institutions; identify clinical champions at the institutional level to implement continuous quality improvement locally; and develop a team to implement a statewide/systems-focused quality monitoring/measurement and improvement system under the guidance of an interdisciplinary Quality Management Committee.*

This action item is ongoing. Progress during this period is as follows:

Quality Management/Patient Safety Maturity Matrix

Though the Quality Management (QM) Program Policy and Procedures have been in place for nearly two years, many headquarters and institution staff do not have a clear understanding of current standards and best practices in quality improvement and performance evaluation.

To help all CCHCS staff better understand what a well-functioning QM system looks like, CCHCS began development of a Quality Management and Patient Safety Maturity Matrix during the last reporting period, a self-assessment tool intended to present a clear, concrete description of what key QM components look like at beginning, intermediate, and advanced levels of implementation. Institutions will be able to use the tool to identify where they are in adherence to statewide Quality Management and Patient Safety Program standards and what they need to put into place to move forward with their local QM systems.

Development of this tool will also allow CCHCS to fulfill reporting requirements – CCHCS has committed to measuring the status of Quality Management and Patient Safety Program implementation in the Health Care Services Dashboard and as part of the CDCR Strategic Plan.

During this reporting period, CCHCS established the rating criteria for all major domains in institution-level Quality Management and Patient Safety Programs, including:

- Performance Improvement Work Plan
- Performance Evaluation System
- Management and Implementation of Improvement Projects
- Quality Management Support Unit (QMSU) Functions
- Quality Management Committee Structure
- Patient Safety Program

CCHCS has set a statewide goal that all institutions will have implemented Quality Management and Patient Safety Programs by December 31, 2015 (the equivalent of meeting Level 2 criteria in all program areas).

Figure 3 depicts an example of what the three levels of rating criteria might look like for Institution Performance Improvement Work Plans. Please refer to Appendix 6, Maturity Matrix 2014, for the full rating criteria (all program categories).

*Figure 3 – Institution Performance Improvement Work Plan*

| Subcategory | Level 1 Criteria | Level 2 Criteria | Level 3 Criteria |
|---|---|---|---|
| Updates | • Quality Management Committee (QMC) updates the plan at least annually, adopting new improvement priorities as appropriate.<br>• QMC has submitted an update on the status of initiatives to headquarters Quality Management Section and the Regional Health Care Executives at least once in the past 12 months. | • Quality Management Committee (QMC) updates the plan at least quarterly, adopting new improvement priorities as appropriate.<br>• QMC has submitted an update on the status of initiatives to headquarters Quality Management Section and the Regional Health Care Executives within the past three months. | • Quality Management Committee (QMC) updates the plan at least quarterly, adopting new improvement priorities as appropriate.<br>• QMC has submitted an update on the status of initiatives to headquarters Quality Management Section and the Regional Health Care Executives within the past three months. The update includes an accurate and detailed status of initiatives, performance objectives, and data trends to date. |
| Plan Content | • Plan includes priority improvement areas, relevant and measurable performance objectives, and improvement strategies.<br>• Plan contains less than 50% of High Priority Improvement Areas for institution.<br>• Plan may not reference all major improvement projects occurring at the institution (other corrective actions plans/ improvement projects are managed in separate documents). | • Plan includes priority improvement areas, relevant and measurable performance objectives, and improvement strategies.<br>• Plan contains 50-75% of High Priority Improvement Areas for institution.<br>• Plan covers all major improvement projects occurring at institution. | • Plan includes priority improvement areas, relevant and measurable performance objectives, and improvement strategies.<br>• Plan contains 85% or more of High Priority Improvement Areas for institution.<br>• Plan covers all major improvement projects occurring at institution. |
| Communication with and Engagement of Staff | • QMC has been disseminated the plan to health care staff at least once in the past year. | • QMC disseminates an updated plan at least quarterly, so that all health care staff have current information about the status of improvement projects. | • QMC disseminates an updated plan at least quarterly to all health care staff. The plan and updates are posted in a centralized location where health care staff can easily access it.<br>• Staff can articulate at least some of the current priorities and how their work contributes to improvements. |

As next steps, CCHCS will develop a standardized evaluation methodology and tool to score institutions and will test the application of the evaluation process at a subset of institutions.

<u>Institution Quality Management Support Units</u>
In July 2014, CCHCS issued a memorandum to the field requiring each institution to establish a QMSU by September 30, 2014. The memorandum included a standardized organizational model for the unit and duty statements that clarify the roles and responsibilities of QMSU members. Please refer to Appendix 7, Establishing an Institution Quality Management Support Unit Memorandum.

Establishing these units is not as simple as pulling a group of existing staff together and calling them a quality improvement team. The QMSU represents a cultural change, a commitment to bringing the kind of improvement expertise that is commonplace at other organizations to our prison system at the point of care where it is needed most. The QMSU also represents an improvement approach that is collaborative, capitalizing on the strengths of each individual discipline for the benefit of the entire health system.

To begin the process of developing staff and increasing program coordination, as required to make these units successful, CCHCS will hold a QMSU kick-off session in each region during September and October 2014. During the kick-off sessions, QMSU staff will receive direction about program priorities in the next six to nine months, as well as information about required training programs that will be rolled out over the next nine months (beginning in November 2014), which include advanced topic training on:

- Performance Improvement Work Plan facilitation.
- Packaging best practices.
- Managing improvement projects using project management tools.
- Improvement committee support.
- Lean/6 Sigma green belt certification.

The kick-off sessions are the first of several regular forums with the QMSU, which will provide an opportunity to create collective purpose, develop camaraderie amongst team members and clarify roles and responsibilities.

**Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.**
This action is completed.

**Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors.**
This action is combined with Action 4.2.1.

**Objective 4.3.** Establish Medical Peer Review and Discipline Process to Ensure Quality of Care

**Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care.**
This action is completed.

**Objective 4.4.** Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations

**Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations.**
This action is completed.

**Objective 4.5.** **Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative**

*Action 4.5.1. By July 2008, centralize management over all health care patient-inmate appeals, correspondence and habeas corpus petitions.*
This action is completed.

Refer to Appendix 8 for health care appeals and habeas corpus petition activity for May through August 2014.

*Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver.*
This action is completed.

**Objective 4.6.** **Establish Out-of-State, Community Correctional Facilities (CCF) and Re-entry Facility Oversight Program**

*Action 4.6.1.  By July 2008, establish administrative units responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional and re-entry facilities.*
This action is completed. However, ongoing efforts are summarized below:

To ensure compliance with the Remedial Plan developed in July 2008 and to meet the court mandate to provide a constitutional level of health care to patient-inmates in contracted facilities, CCHCS' Private Prison Compliance and Monitoring Unit (PPCMU) continues to conduct on-site compliance reviews of the four California Out-of-State Correctional Facilities (COCFs), six in-state male Modified Community Correctional Facilities (MCCFs), and two in-state Female Rehabilitative Facilities contracted to provide housing to California patient-inmates. An accurate and objective review of each facility's demonstrated ability to deliver a constitutional level of care is critical to ensuring compliance with the RTPA. Bi-annual audits of each of the contracted facilities are conducted, and detailed final audit reports are submitted to executive management.

Out-of-State Correctional Facilities
All four COCFs are contracted through one vendor, Corrections Corporation of America (CCA). To determine CCA's compliance with the remedial plan developed in July 2008, the PPCMU conducted the following during this reporting period:
- COCF Compliance Audits.
    - A compliance review has been conducted at each of the CCA facilities. The results reflect an overall compliance rating surpassing the required 85.0 percent benchmark at three of the four facilities (refer to Figure 4, Compliance Rating).

*Figure 4 - COCF Compliance Rating*

| Facility | Date of Audit | Population Count at Time of Audit | Compliance Score |
|---|---|---|---|
| Florence Correctional Center, Arizona | May 8, 2014 | 580 | 96.4% |
| La Palma Correctional Center, Arizona | May 5-7, 2014 | 2,981 | 96.2% |
| Tallahatchie County Correctional Facility, Mississippi | June 2-5, 2014 | 2,638 | 97.1% |
| North Fork Correctional Facility, Oklahoma | June 16-19, 2014 | 2,497 | 84.7% |

In addition to formal audits, CCHCS continues to gauge the contracted health care vendor performance through the following structured activities:

- Weekly physicians' collaborative conference calls to discuss medical updates on COCF patient-inmates consist of the following staff: CCA Regional Medical Director; CCA physicians; CCHCS Deputy Medical Executive, Utilization Management; CCHCS Regional Physician Advisor; Deputy Director, Field Operations; and PPCMU administrative staff.

  o A total of 237 patient-inmate cases were discussed on these calls during this reporting period, resulting in 10 patient-inmates returning to California due to medical reasons.

- A distinct weekly collaborative call between the CCA Regional Medical Director and the CCHCS Deputy Medical Executive, Utilization Management, identified a list of 206 patient-inmates that had developed 1) serious medical conditions; 2) pending surgical intervention; 3) previous chronic medical conditions had worsened over time; or 4) were prescribed continuous use of schedule IV medications. Out of the 206 patient-inmates identified to date, a total of 70 patient-inmates have been confirmed as needing to return to California for proper care and monitoring. Allowing these patient-inmates to remain in contract facilities would restrict CCHCS' ability to manage and monitor the quality of their care.

  o The CCHCS physician advisor and RN conducted a review of the potential 206 patient-inmates which resulted in a more thorough review of 108 medical records of patient-inmates with chronic medical conditions housed in COCF. A review was conducted to provide substantiating information to the Deputy Medical Executive, and resulted in the return of 70 patient-inmates to California. Further review is pending for the 38 remaining patient-inmates.

- Processing of credentialing requests for physicians and mid-level providers for COCF and MCCFs.

  o Each contract physician applicant is required to pass the CCHCS credentialing verification process. During this reporting period PPCMU received, submitted for approval, tracked, and sent final disposition letters for a total of 24 curriculum vitae's, with 21 clinicians approved to provide medical care to the patient-inmate populations in COCF, MCCF and Female Rehabilitative Facilities.

- Receive, review, assign, and track second-level medical appeals from patient-inmates housed in COCFs.
  - o PPCMU screens and tracks all second level health care appeals submitted by patient-inmates housed in the COCFs. All accepted second-level health care appeals are assigned to the CCHCS RN assigned to PPCMU; a total of 47 second level health care appeals were received during this report period.

*Figure 5 - Health Care Appeals*

| Facility | Number Processed |
|---|---|
| Florence Correctional Center | 1 |
| La Palma Correctional Center | 27 |
| North Fork Correctional Facility | 7 |
| Tallahatchie County Correctional Facility | 12 |
| **Total** | **47** |

<u>In-State MCCFs</u>

As overcrowding remains an ongoing challenge within CDCR, the MCCF population continues to move towards capacity. The combined capacity of the eight MCCFs stands at 4,293; as of August 29, 2014, the combined population of the MCCFs has reached 4,098, which is 95.5 percent of capacity. As early as last year there were only two MCCFs with a total combined population of 775 patient-inmates. The activation of the additional six MCCFs reflects an increase in population by 450 percent, all of which are also monitored by PPCMU. During this reporting period PPCMU completed a total of six on-site audits of MCCFs, including five initial audits and one follow-up audit.

Weekly MCCF collaborative conference calls to discuss methods to streamline medical services, and address any issues impacting patient-inmates housed in the MCCF. The calls consist of the following staff: medical and administrative personnel from the MCCF and the assigned CDCR hub institution; contract managers from Contract Beds Unit; CCHCS Deputy Medical Executive, Utilization Management; CCHCS Regional Physician Advisors; Deputy Director, Field Operations; and PPCMU.

CCA EHRS and CCHCS electronic Unit Health Record (eUHR) review: The CCHCS Registered Nurse (RN) assigned to the COCF program reviewed a random sample of medical records of patient-inmates housed in the MCCFs to establish the focus for areas to review when conducting the actual on-site facility audit. A total of 120 CCHCS eUHRs were reviewed during the reporting period.

*Figure 6 - MCCF Compliance Rating*

| Facility | Date of Audit | Population Count at Time of Audit | Compliance Score |
|---|---|---|---|
| Golden State MCCF | May 19–21, 2014 | 687 | 91.9% |
| Shafter MCCF | July 14–15, 2014 | 635 | 57.2% |
| Central Valley MCCF | July 21–22 & July 30, 2014 | 693 | 86.3% |
| Desert View MCCF | August 5–7, 2014 | 693 | 88.8% |
| *Shafter MCCF **follow up audit** | August 19–21, 2014 | 633 | 70.1% |
| Delano MCCF | August 18–19, 2014 | 568 | 72.4% |

The audit conducted July 14–15, 2014, at the Shafter MCCF revealed significant deficiencies. An unscheduled and unannounced re-audit was conducted the following month, August 19–21, 2014.

The follow-up audit indicated an improvement in the Shafter MCCF's performance. A genuine effort on the part of the contractor to provide a constitutional level of care to their patient-inmate population was observed and documented. Both the Chief of Police, who manages the facility, and the Shafter City Manager were present during the exit conference following the re-audit. Although substantial room for improvement remains, the Shafter MCCF provided evidence to support their commitment to achieve full compliance. This facility will continue to be monitored closely, to ensure that the delivery of health care meets the required standards.

The primary common theme that emerged as a result of the MCCF audits was the minimal physician and nursing coverage at each facility. Other systemic issues identified include poor or absent training of clinical personnel, and the lack of knowledge relative to providing quality medical care to the patient-inmate population. The MCCFs report limited availability of qualified physician candidates, primarily because the current budget allows for only half-time positions. This limitation has severely challenged the MCCFs in hiring qualified clinical staff.

In recognition of these shortcomings, an agreement was reached between CCHCS and CDCR to expand nursing coverage to 24 hours a day, seven days a week. Physician coverage was not expanded, but the facilities were noticed that physician coverage must be provided five days a week, rather than working only one or two days. These adjustments were to be in place as of September 1, 2014, and PPCMU has received copies of the amended contracts from four of the facilities. The remaining two contracts are pending local city council review; however, the additional nursing coverage was initiated in early September 2014. Spot checks are being completed to ensure new clinical staffing requirements are in place. In addition, PPCMU staff has completed a detailed analysis of the similarities and differences between all the contract bed facilities and is developing recommendations to further improve patient-inmate health care in all contract facilities.

Medical Audit Revisions

To ensure the delivery of health care in contracted facilities mirrors standards of care provided in the State institutions, PPCMU staff are revising the private prison audit instrument so that it parallels the most recent draft medical inspection instrument developed by the OIG.

Finally, during this reporting period; one new contract facility for female inmates was opened for a total of two female facilities monitored by PPCMU. The existing Female Rehabilitative Community Correctional Center is located in Bakersfield and the newly activated Female Community Reentry Facility is located in McFarland.

*Figure 7 – Female Facility, Location, Population Count and Capacity*

| Facility | Location | Population Count as of 9/5/14 | Capacity |
|---|---|---|---|
| Female Rehabilitative Community Correctional Center | Bakersfield | 51 | 75 |
| Female Community Reentry Facility | McFarland | 185 | 300 |
| **Total** | | **236** | **375** |

## Goal 5: Establish Medical Support / Allied Health Infrastructure

**Objective 5.1.** **Establish a Comprehensive, Safe and Efficient Pharmacy Program**

> ***Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications.***
This action is completed.

Refer to Appendix 9 for Top Drugs, Top Therapeutic Category Purchases, and Central Fill Pharmacy Service Level for May through August 2014.

> ***Action 5.1.2. By March 2010, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system.***
This action is completed.

> ***Action 5.1.3. By May 2010, establish a central-fill pharmacy.***
This action is completed.

**Objective 5.2.** **Establish Standardized Health Records Practice**

> ***Action 5.2.1. By November 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions.***
This action is completed.

**Objective 5.3.** **Establish Effective Imaging/Radiology and Laboratory Services**

> ***Action 5.3.1. By August 2008, decide upon a strategy to improve medical records, radiology, and laboratory services after receiving recommendations from consultants.***
This action is ongoing. Progress during the reporting period is as follows:

Imaging/Radiology Services
The following strategies to improve radiology services statewide have been established:
- Since CCHCS completed implementation of the Radiology Information System and Picture Archiving and Communication System (RIS/PACS) statewide in July 2013, enhancements have been continuously added to the system including those that will shorten page-loading time and assist medical providers in quickly locating their patients.
- Training in use and access of RIS/PACS has been provided to all affected staff. New training material is provided to RIS/PACS users, as updates are made.
- Mobile imaging services are available at all institutions, and electronic transmission capabilities are at all locations with the exception of the California Medical Facility (CMF) and Deuel Vocational Institution (DVI). (Additional work is needed to ensure reliable connectivity at a few sites and to upgrade to October 2012 network and power box standards).

- All pre-RIS/PACS imaging records from all institutions have been sorted and filed at the Imaging Record Center where they are uploaded as needed.
- A single radiology group contracted through HealthNet provides for radiology interpretation services statewide, improving consistency and standardization of protocols, providing cost savings, and enhancing quality control.
- The contracted statewide radiology group also provides Radiology Supervisor and Operator (RS&O) oversight to all institutions for radiation safety, as well as quarterly mammography program review at the women's institutions. These services ensure complete coverage of all institutions, standardization of practices, and improvement in quality control activities. The annual RS&O inspections have been completed in more than 30 institutions to date in 2014. Quarterly mammography inspections are current.
- The six hour timeframe for report turnaround times is being maintained due to statewide use of the RIS/PACS, which is a great improvement on the previous turnaround time of three to five days.

Laboratory Services

The following strategies to improve laboratory services statewide have been established:

- Point of Care (POC) testing practices in the institutions are being standardized to enhance patient-inmate care and safety.
  - Support for institution laboratory staff has been enhanced with implementation of a centralized warmline for questions from the field to centralize reporting and enhance responses to questions and issues, and development of statewide e-mail alerts when our lab contractor's service is interrupted.
  - Establishment of monthly laboratory staff conference calls with headquarters laboratory management.
- Standardized laboratory policies and procedures which accommodate the future state with the EHRS are in development to assist institution laboratory staff with efficient processing of laboratory specimens.
- Guidelines to assist providers in delivering appropriate and cost effective patient-inmate care for particular conditions based on CCHCS Care Guides and other clinical recommendations are being developed as 'order sets' in the EHRS.
- Closure of in-house laboratory operations to improve efficiency, reduce costs and integrate into the EHRS is underway. In-house laboratory operations at all of our institutions except our three licensed general acute care hospitals (GACH) have been discontinued, effective August 31, 2014. It is anticipated that the in-house laboratories in the GACH facilities will cease early in 2015 as these facilities are relicensed to Correctional Treatment Centers. The affected institutions will utilize our contract laboratory service provider for all laboratory tests as is currently the practice at all other CCHCS institutions.

<u>**Objective 5.4.**</u> **Establish Clinical Information Systems**

    ***Action 5.4.1. By September 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems.***
This action is completed.

<u>**Objective 5.5.**</u> **Expand and Improve Telemedicine Capabilities**

    ***Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure.***
This action is completed.

## Goal 6: Provide for Necessary Clinical, Administrative and Housing Facilities

The two major projects planned for the purpose of adding new medical and mental health beds to the CDCR system at CHCF and DeWitt Nelson Correctional Annex (currently now referred to as CHCF's Facility E) are complete. As previously reported, the Receiver halted intake of additional patient-inmates in January 2014 to improve the supply chain system and delivery of care and to ensure that the CHCF could support the operations at Facility E. During this reporting period, substantial improvements have been achieved and the Receiver resumed intake to CHCF.

Regarding the HCFIP, which includes upgrades to add/renovate exam rooms and related health care treatment space, as well as improvements to medication distribution at existing prisons; the State Public Works Board (SPWB) approved project authorizations in July 2014 for the remaining five projects [Centinela State Prison (CEN), Calipatria State Prison (CAL), Ironwood State Prison (ISP), Chuckwalla Valley State Prison (CVSP), and Pelican Bay State Prison (PBSP)]. Since the last reporting period, funding for these five projects was provided through the General Fund appropriation of Assembly Bill 900. The HCFIP project at Avenal State Prison (ASP) was authorized in the 2014–15 Budget Act as a minor capital outlay project funded with the General Fund using CDCR's Inmate/Ward Labor (IWL) Program. In August 2014, the Office of Statewide Fire Marshal (OSFM) approved working drawings for the Statewide Medication Distribution (SWMD) projects. The Department of Finance (DOF) approved the working drawings/proceed to construction for the SWMD projects. With the authorization of these last five projects, and the ASP and SWMD projects, all planned HCFIP projects have been authorized and are in various stages of design. ASP and SWMD have received approval for construction and are in the process of construction material procurement.

CDCR continues to face significant schedule and budget challenges in the HCFIP projects and further schedule delays are expected. The challenges include deficiencies in some of the consultants' design documents, development and refinement of site swing space/operational continuity plans, onsite infrastructure deficiencies (e.g., alarms, fire water distribution, storage), and the volume of workload as multiple projects require simultaneous reviews. While resources and workload at the OSFM continues to be a challenge, collaborative meetings between CDCR and the OSFM have recently resulted in improved design review processes and timeframes. Concurrently, CDCR and CCHCS continue developing construction phasing and sequencing plans to ensure medical and security operational continuity plans are vetted and approved with key stakeholders prior to the start of construction at each site. CDCR has also been refining construction schedules to be more complete and accurate. All of these efforts are being monitored with the goal to have working drawing approval from both the OSFM and the DOF for all intermediate acuity level prisons by December 31, 2014.

**Objective 6.1.** Upgrade administrative and clinical facilities at each of CDCR's thirty-three prison locations to provide patient-inmates with appropriate access to care

Initial SPWB project approvals have been secured for all 10 of the intermediate level-of-care projects, the four reception center projects, and all 17 basic level-of-care projects. The HCFIP project at ASP is a Fiscal Year (FY) 2014–15 minor capital outlay project and is underway. A decision by the Administration relative to continued use or closure of California Rehabilitation Center (CRC) has not been released and, thus, the need or plan for clinical renovations at CRC is still pending. The SWMD projects have been approved and funded. The current SWMD schedule shows that IWL procurement activities have commenced, and construction is scheduled for completion on a phased basis with the final institutions completed in February 2016. Pre-construction and procurement activities for the first HCFIP projects are expected to begin in Fall 2014, which is a delay from the last report. Due to project slippage, however, activation of the final HCFIP projects will occur in late 2017.

*Action 6.1.1. By January 2010, completed assessment and planning for upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.*
This action is complete. Progress during this reporting period is as follows:

All planned HCFIP projects, including the SWMD projects and ASP, have been approved and funded and are in various stages of design and construction.

*Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.*
This action item is ongoing.  Progress during this reporting period is as follows:

There are 11 projects in the preliminary planning phase; California Substance Abuse Treatment Facility (SATF), California State Prison - Corcoran (COR), CCC, High Desert State Prison (HDSP), Pleasant Valley State Prison (PVSP), Kern Valley State Prison (KVSP), CEN, CAL, ISP, CVSP, and PBSP.

SPWB approved preliminary plans for the Central California Women's Facility and Valley State Prison (VSP) in May 2014, for Correctional Training Facility and Salinas Valley State Prison in June 2014, and for California Correctional Institution and Sierra Conservation Center in July 2014; moving these projects into the working drawing phase. Working drawing phase activities continue for 19 prisons. The working drawings for approximately half of these locations have been submitted to the OSFM for review. In an effort to accelerate the review process, it should be acknowledged the parties initiated simultaneous project reviews by the OSFM and DOF of some projects rather than the traditional sequential review process. As a testament to that collaboration, although occurring in late September 2014 and beyond the reporting period, it is noteworthy that the final designs for the first clinic construction and renovation project have been approved, enabling CDCR to proceed promptly with construction at California State Prison - Sacramento.

The ASP HCFIP project will be delivered by the IWL program and funding for this project has been transferred. IWL's pre-construction procurement activities have commenced.

**Objective 6.2.** **Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs**

Construction of CHCF was completed in August 2013 and the first patient-inmates were received on schedule in July 2013. Some residual work continues, such as the addition of an additional visiting building and further Americans with Disabilities Act (ADA) modifications, as well as assessment and continued work on the hydronic loop as reported in the last Tri-Annual report. Construction of Facility E was completed in February 2014 and the first patient-inmate was received in May 2014.

*Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible.*
This action item is complete.

*Action 6.2.2. By February 2009, begin construction at first site.*
This action item is complete.

*Action 6.2.3. By July 2013, complete execution of phased construction program.*
This action item is complete.

**Objective 6.3.** **Complete Construction at San Quentin State Prison**

*Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility.*
This action is completed.

*Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility.*
This action is completed.

# Section 4: Additional Successes Achieved by the Receiver

**A.   Electronic Health Records System**

As mentioned in the last reporting period, Cerner Corporation has been selected to provide a commercial "off-the-shelf" EHRS for CCHCS. This system will provide CCHCS and CDCR demonstrable and sustained benefits to patient-inmate safety, quality and efficiency of care, and staff efficiencies and satisfaction.

During this reporting period, the EHRS project team completed workflows for more than 150 health care delivery processes including medication administration, medical and mental health scheduling, computerized provider order entry and chronic care management. An initial design review and system build review was also complete, and the EHRS project now has an integrated project schedule. The EHRS project team is also working on an approach to incorporate electronic dental records into the EHRS and recently delivered a requirements document to the vendor for analysis.

Implementation of the system is expected to begin in 2015.

# Section 5: Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

**A.  CCHCS Activities related to the Court's June 24, 2013, Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at Pleasant Valley and Avenal State Prisons**

In February 2014, CCHCS and CDCR received the final report from National Institute for Occupational Safety and Health (NIOSH) with recommendations to reduce the risk of cocci for employees at ASP and PVSP. The recommendations are divided into engineering controls, administrative controls, and personal protective equipment. For engineering controls, there is a new clinic design at ASP that will reduce exposure to dust when passing medications to patient-inmates. For personal protective equipment, fit testing for N95 respirators has been completed among CCHCS personnel at ASP and PVSP. PVSP personnel have been advised of the availability of N95 respirators for protection from cocci exposure. The majority of recommendations from NIOSH address workplace medications that are not under the control of the Receiver; however, we have encouraged CDCR to carefully consider NIOSH's recommendations for their areas of responsibility.

On July 9, 2014, the federal CDC provided us with their final report on their investigation regarding prevention strategies for cocci. They recommended immunocompromised patient-inmates not be housed at the California's Men's Colony (CMC) because of the high rates of cocci among patient-inmates who resided at CMC. They also advised that our current strategy of exclusion from ASP and PVSP based on demographic (African Americans and Filipino) and clinical risk factors (diabetes mellitus and medical high risk) would be expected to reduce cocci morbidity by 10 percent. In contrast, a strategy based on excluding patient-inmates who test negative to the cocci skin test would be expected to decrease morbidity by about 60 percent. In July 2014, the cocci skin test called spherusol became available commercially. CDC recommended the use of the skin test-based strategy as the most effective means currently available to reduce morbidity due to cocci in our population.

CCHCS has now made plans to offer this new cocci skin test to all patient-inmates who could be eligible to transfer to ASP and PVSP. CCHCS plans to first provide appropriate education to the patient-inmates; staff are developing a video in the format of questions and answers between a doctor and a nurse. This video will be played on the patient-inmate television for several weeks before the testing occurs. CCHCS also anticipates written educational materials from the company that is producing the skin test and will use that information together with the planned changes to the medical classification system based on the skin test result if available, to create written educational materials for the patient-inmates about the skin test and how the medical team will use the test results to provide as much protection as possible from cocci morbidity. Staff are also developing a database so that the results of the skin test can be used to risk stratify    the    patient-inmates    and    to    assess    the    cocci    testing    program.

The test results will be incorporated into our existing cocci mitigation strategies and will exclude all inmates from ASP and PVSP who test negative when tested with spherusol. For those patient-inmates who elect not to accept the offer of the test, CCHCS plans to exclude them from the cocci 2 area (that includes ASP and PVSP) based on the current exclusion criteria (African Americans, Filipinos and those with diabetes mellitus). We are coordinating closely with CDCR on the details of testing and are anticipating offering testing to patient-inmates in January 2015.

CCHCS continues ongoing surveillance for cocci. The number of cases at ASP and PVSP is lower this year compared with prior years primarily because of both a lower population in these prisons and environmental conditions (e.g., drought) that are not conducive to the growth of cocci.  Between September 1, 2013, and August 15, 2014, there were 22 new cases of cocci at ASP, 9 new cases of cocci at PVSP, and 42 cases at other institutions.

CCHCS plans to continue surveillance for cocci statewide; continue to exclude immunocompromised patient-inmates from the cocci 1 area; add CMC and California City Correctional Facility to the cocci 1 area; continue to encourage CDCR to implement the NIOSH recommendations; offer the cocci skin test to appropriate inmates within the system; and modify the medical classification policy to incorporate skin test results in determining exclusion from the cocci 2 area.

## B.  Overcrowding Update

California's prisons remain significantly overcrowded. As of the end of this reporting period, California's prison population stood at 135,789, which is an increase of almost 1,000 inmates since the last reporting period. In addition, during this reporting period, the three-judge panel granted a two-month extension to CDCR for meeting its first capacity benchmark of 143 percent of capacity. Previously, CDCR was required to meet this benchmark by June 30, 2014. However, CDCR requested the extension, which was granted, due to a previous ruling by the court that the entire capacity of CHCF could not be used to calculate overcrowding capacity of the statewide prison system while CHCF activation was delayed. CHCF medical admissions were subsequently resumed in July 2014, which allowed CDCR to again use the CHCF capacity to determine statewide overcrowding levels. As a result, the August 31, 2014, deadline for meeting 143 percent of design capacity was reached by CDCR (statewide prison capacity as of August 27, 2014, was 140.4 percent).

During this reporting period, CDCR published its Spring 2014 population projections. The report projects that by June 30, 2019, the total institution population will be 146,796. This represents an increase of nearly 4,000 inmates compared to their Fall 2013 projections, which estimated that the June 30, 2019, population would be 142,990.

As mentioned in the previous Tri-Annual report, the three-judge panel ordered the State to immediately implement several population-related strategies designed to reduce the level of overcrowding in state prisons to include:

- Cap out-of-state placements at 8,900;
- Increase credit-earning for non-violent second strike offenders and minimum custody patient-inmates;
- Implement new parole determination process for non-violent second strikers who have served half of their sentence;
- Parole certain inmates serving indeterminate terms who have been granted future parole dates by the Board of Parole Hearings;
- Expansion of existing medical parole process;
- Implementation of new parole process for patient-inmates 60 years of age or older who have served at least 25 years in state prison;
- Activation of new re-entry hubs at a total of 13 prisons to be operational by February 2015;
- Expansion of pilot re-entry programs with additional counties/local communities; and
- Expansion of alternative custody program for female inmates, and
- Appointment of a "compliance officer" empowered to order necessary releases (in a subsequent order, the Court appointed the Honorable Elwood Liu as the compliance officer).

The Court ordered CDCR to submit monthly status reports on its progress to implement the provisions listed above. To date, CDCR has submitted several monthly status reports outlining its progress in implementing the strategies.

# Section 6: Other Matters Deemed Appropriate for Judicial Review

### A.  Coordination with Other Lawsuits

During the reporting period, regular meetings between the three Courts, *Plata, Coleman,* and *Armstrong* (Coordination Group) class actions have continued. A Coordination Group meeting was held on May 28, 2014. Progress has continued during this reporting period and is captured in meeting minutes.

### B.  Master Contract Waiver Reporting

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the Court's Orders, and therefore, the Receiver will not reiterate those details here.

As ordered by the Court, included as Appendix 10 is a summary of the contracts the Receiver awarded during this reporting period, including a brief description of the contracts, the projects to which the contracts pertain, and the method the Receiver utilized to award the contracts (i.e., expedited formal bid, urgent informal bid, sole source).

### C.  Consultant Staff Engaged by the Receiver

The Receiver has not engaged any consultant staff during the reporting period.

### D.  Overview of Transition Activities

#### Post-Delegation Report for Health Care Access Units

Access Quality Report
During this reporting period Field Operations staff revised the Access Quality Report (AQR), vetted the changes through CDCR, and implemented the revised AQR per instructional memorandum dated August 7, 2014 (refer to Appendix 11). The revision to the AQR is intended to streamline AQR reporting to better align with the post delegation environment and the Round III Operations Manual Audit (OMA) structure, and the redefined relationship and roles of CCHCS and CDCR subsequent to the October 26, 2012, Delegation of Authority.

Although the appearance of the AQR is slightly different, the structure remains the same – an accounting of ducats issued and the categorization of the respective outcomes. Below is a summary of the elements either removed or modified to further define or draw focus to the reporting of custody activity.

*Elements Removed*

- Ducat Outcomes for "provider" and "other:" These ducat outcomes are collapsed into one category, "non-custody." This reduces the 23 combined appointment outcome codes for inmates not seen due to "provider" and "other" across the four health care disciplines into four codes, one code per discipline – "non-custody."

- Overall AQR Performance Indicator: given the removal of the categories explained above, this indicator is no longer relevant and no longer able to be tabulated, leaving the Custody AQR Performance Indicator as the only indicator on the AQR.

- Personnel Post Assignment Schedule (PPAS) Timekeeper's Monthly Overtime and Expenditure Report data: CDCR's Division of Adult Institutions retired the PPAS and replaced it with a system, TeleStaff, now accessible from headquarters. Institutions are no longer responsible for providing this information.

- Number of CDCR 7362s and Request for Services: Captured electronically by Utilization Management.

*Elements Modified*

- Terminology for appointment outcomes: Rephrased to reference the outcome of a priority "ducat," instead of the outcome of an "appointment." For example, if an inmate is escorted to the clinic, but is ultimately not seen by the provider, the outcome is recorded as completed ducat as opposed to "inmate not seen due to provider." The ducat was completed since the inmate arrived at the prescribed time and place; the outcome of the appointment itself is outside the scope of the AQR and is captured in other systems such as MedSATS, Mental Health Tracking System, and Dental Tracking System. A second example is refusals. An inmate refusing to come to the appointment at the prescribed time and place would be recorded as a "refusal," explaining the reason the ducat was not completed. An inmate complying with the ducat and refusing treatment would be recorded as a completed ducat.

- Licensed Vocational Nurse (LVN) Ducats: Line item added to appropriately account for LVN issued ducats in an effort to capture all health care related custody movement.

- Mental Health Group Ducats:  The number of ducats issued for mental health group therapy is to be included in the line item for number of ducats issued for Mental Health Services in an effort to capture all health care related custody movement.

The revision of the AQR in no way impacts the established means of monitoring the Health Care Access Units (HCAUs) utilizing the "Custody AQR Performance Indicators" or performance targets outlined in the Delegation.  The AQR, Version 2.0, was effective as of the August 2014 reporting cycle, and will be published in mid-September 2014.

In association with the implementation of the updated Health Care AQR, staff from Field Operations provided training to all institution HCAU and the staff member designated as the back-up analyst. Training was divided into five, four-hour sessions at various locations statewide on August 12–15, and 18, 2014. A make-up training session was held on September 17, 2014, at CCHCS headquarters in Elk Grove.

The Receivership continues to receive the required monthly AQR data from institutions. As indicated in the previous Tri-Annual report, the new time and shift system ("TeleStaff") does not provide certain data points the institutions are required to report to complete the AQR. Upon the close of this reporting period, the remaining three institutions have transitioned to the new system. TeleStaff continues to require adapted data retrieval methods for Transportation and Medical Guarding hourly overtime, permanent intermittent employee, and redirected staff hours. Since the institutions are unable to extract the data utilizing a single report, Field Operations staff has trained all HCAU Analysts at the institutions on how to accurately obtain and calculate the information. Field Operations staff met with the Division of Adult Institution's Program Support Unit on July 9, 2014, to discuss the issues faced by the HCAU Analysts in obtaining accurate information. As a result, the Program Support Unit has agreed to develop a single reporting mechanism for the analysts to utilize.

As reported in the previous Tri-Annual report, Field Operations experienced difficulty with obtaining valid data from SQ and Folsom State Prison (FSP).  The AQR data received from SQ for the month of March 2014 was determined to be valid and was published as part of the March 2014 AQR after a three month pause. On June 19, 2014, Field Operations staff held training for FSP staff and believes the issues impeding the counting and reporting of urgent and emergent Triage and Treatment Area (TTA) encounters and Transportation and Medical Guarding redirect hours have been resolved.  The data received for the July 2014 report appears to be valid.

Custody Access to Care Success Rate

Statewide AQRs were published for the months of April 2014 through July 2014 during this reporting period. The average custody *Access to Care Success Rate* for this period was 99.64 percent. This represents an increase of 0.06 percentage points as compared to the previous reporting period (inclusive of data from December 2013 through March 2014). The following figure is a summary by month of the number of institutions failing to attain the 99.00 percent benchmark established in the Delegation.

*Figure 8 – Institutions Failing to Attain the 99.00% Standard for the Custody Access to Care Success Rate*



For institutions failing to attain the benchmark, nine Corrective Action Plans (CAPs) were required during this reporting period.  All plans were received.

<u>Operations Monitoring Audits</u>
As outlined in the HCAU Delegation of Authority (October 26, 2012), Field Operations continues to conduct audits at the adult institutions of the CDCR. During this Tri-Annual reporting period, Field Operations completed the Round II series of audits, conducting a total of seven audits, each scheduled approximately 180 days following the Round I audit of the same institution, and relying upon the same methodology as during Round I. Official findings have been published for all Round II audits.

The seven institutions averaged an overall score of 90.4 percent compliance, which is an increase of 2.81 percentage points. One institution (California State Prison - Los Angeles County) remained below the benchmark overall of 85.0 percent. Compliance scores for individual chapters

| Figure 9 - Audits Conducted May - August, 2014 | | |
|---|---|---|
| **Institution** | **Round II** | **Change from Round I** |
| Pelican Bay State Prison | 86.3 | +6.8 |
| Wasco State Prison | 91.6 | -1.4 |
| California State Prison – Los Angeles County | 84.8 | +10.7 |
| California Substance Abuse Treatment Facility | 94.0 | -0.8 |
| Chuckawalla Valley State Prison | 89.9 | +0.7 |
| Valley State Prison | 93.1 | +2.8 |
| North Kern State Prison | 92.8 | +0.9 |

within the audits indicate systemic non-compliance in the following areas (chapter scores averaging below 85.0 percent):

- *Access to Medication* (73.8 percent), and
- *Access to Mental Health Care* (81.6 percent).

Within the Access to Medication chapter, the substandard scores hinged upon the non-compliant institutions' failure to (a) ensure custody staff knowledge and adherence to correct medication transfer procedures, and (b) ensure diabetic patient-inmates have access to food within 30 minutes of receiving insulin treatment.  Within the Access to Mental Health Care chapter, substandard scores resulted from a wide array of non-compliance issues, including (a) failure to transport Mental Health Crisis Bed (MHCB) patient-inmates within 24 hours of referral, (b) failure to properly conduct and document hourly welfare checks following patient-inmates' discharge from MHCB, (c) failure to ensure suicide cut-down kits are properly

maintained and inventoried, and (d) failure to consistently transfer EOP inmates to designated EOP facilities within the clinically indicated timeframe.

Failure to Resolve Round I CAP Items
The following institutions' Round II OMA findings indicated problems identified during Round I audits, which *had not been resolved or significantly improved* as of the Round II audits.

*Figure 10 – Institutions' Round II OMA Findings*

| INSTITUTION(S) WHERE OBSERVED | SPECIFIC PROBLEM OBSERVED BY AUDITORS |
|---|---|
| PBSP | Custody staff is not aware of proper medication transfer protocols. |
| PBSP, LAC | Custody check-in meetings with mental health staff in administrative segregation are not occurring. |
| PBSP | Patient-inmates in restricted housing units do not have access to submit completed requests for health care services. |
| PBSP | Institution is using an incorrect/antiquated process for requesting health care services from an offsite provider (CDCR Form 7243). |
| PBSP | Custody staff are not consistently/accurately documenting hourly welfare checks for recently discharged mental health crisis patient-inmates. |
| PBSP, CVSP | HCAU custody manager is not consistently attending SPR FIT meetings. |
| PBSP, VSP | Nurse triage is conducted outside of the inmate priority ducat process, in violation of IMSP&P and DOM. |
| WSP, SATF, VSP | The institution is not accurately reporting data regarding vehicle transports and numbers of inmates transported, for inclusion in the monthly AQR. |
| WSP | Patient-inmates needing transfer for MHCB placement are not transferred within 24 hours. |
| WSP | Patient-inmates needing transfer for EOP placement are not transferred within clinically indicated timeframes. |
| LAC | HCAU custody staff does not consistently know how to access local health care procedures. |
| LAC | Nursing rounds and collection of health care requests are not documented in ASU unit logs. |
| LAC | Peace officers are not consistently carrying CPR mouth shields. |
| LAC, VSP | The institution is not reporting accurate data regarding numbers of health care ducats issued per health care discipline. |
| LAC, VSP | The institution is not reporting accurate data regarding numbers of add-on appointments per health care discipline. |
| LAC, VSP | The institution is not reporting accurate data regarding numbers of refusals per health care discipline. |
| LAC, SATF, VSP | The institution is not reporting accurate data regarding numbers of inmates seen in the TTA and numbers of urgent/emergent transports. |
| LAC | The institution is failing to ensure that all suicide cut down kits contain all required items. |
| LAC | The institution is failing to ensure that suicide cut down kits are inventoried daily. |
| LAC | The institution is failing to adhere to its own procedure for verification of ducat issuance, and is at times utilizing inmates to pass out these ducats to other inmates, abandoning accountability. |
| SATF, VSP | The institution is not reporting accurate data regarding transportation team and medical guarding redirected hours. |
| CVSP | Medical staff continue to <u>refuse</u> to provide critical information to custody staff regarding specific injuries of inmates during incidents, for the purpose of investigations, disciplinary proceedings, and criminal prosecution. |
| CVSP | The CEO continues to hold QMC meetings outside of business hours, in a combined forum with a neighboring institution, making the meeting both impractical and functionless. |
| NKSP | Custody staff are failing to ensure transferring patient-inmates' "keep-on-person" medications are not packaged with personal property. |

Round III Series of Operations Monitoring Audits

As the Round II series of OMAs drew to a close, Field Operations drew upon policy shifts, transition of responsibility for HCAU operations as outlined in the Delegation of Authority (October 26, 2012), and lessons learned during Round I and II, to develop an improved instrument for auditing custody access to health care services. The Round III Operations Monitoring Audit will continue to evaluate compliance and sustainability of the HCAUs, with emphasis upon successful and lasting resolution of previously identified deficiencies (i.e., CAP items). The Round III audit focuses on the time period between the current and the most recent audits, and has a follow-up schedule driven by performance. Institutions performing well can expect annual audits, while institutions demonstrating residual issues will be subject to more frequent monitoring.

Other significant modifications distinguishing the Round III OMA from its predecessors are:

1. Corrective action is now required on the basis of individual question performance, rather than chapter performance;
2. Thirteen chapters have been consolidated into five balanced *components,* representing HCAU operational areas; and
3. Individual question weighting now takes into consideration both risk to patient-inmate health, and risk to ensuring access to care.

The Round III OMA Instruction Guide has been presented in detail and vetted through numerous stakeholders, both internal and external, with vested interest in access to health care, and patient-inmate welfare. The input, concerns, and suggestions of all consulted parties have been duly considered and incorporated into the guide where appropriate. The final Round III OMA Instruction Guide awaits only the outcome of the CDCR Use of Force Policy, currently under review and revision, as this policy affects numerous aspects of the custody access to care audit.

Transportation Vehicles

After nearly two years following the Receiver's delegation to CDCR the responsibility to replace medical transportation vehicles, there is both some significant progress as well as significant disappointment to report.

Shortly after the filing of the Twenty-Sixth Tri-Annual Report in early June 2014, the CDCR Office of Business Services (OBS) reported to CCHCS staff that procurement had been initiated for 61 medical transportation vehicles. Of this number, there were 11 emergency transportation vehicles, 8 para-transit vehicles, and 41 transportation vans/sedans in the procurement. As the procurement process continued, the total number of vehicles was reduced to 60 vehicles due to a redirection of one vehicle. Ultimately, the procurement included 13 emergency transportation vehicles, 6 para-transit vehicles and 41 transportation vans/sedans.

CDCR staff committed to having the emergency transportation vehicles purchased and on-site at the respective institutions by July 1, 2014. Unfortunately, this did not happen, as no emergency transportation vehicles were purchased, nor did anyone from CDCR communicate to CCHCS any difficulties CDCR was experiencing in making this procurement. In fact, full disclosure of this situation did not come to light until CCHCS specifically asked for a status report on the delivery of the emergency transportation vehicles.

Staff from CCHCS and CDCR OBS met in August 2014 to discuss CDCR's progress in purchasing the vehicles. OBS staff explained that they had no success in capturing any prospective bidders for used ambulances (which are used as on-grounds emergency medical transportation vehicles). The emergency transportation vehicles which were originally committed by OBS to have been purchased and on site by July 1, 2014, are now projected for delivery sometime between April–June 2015.

In addition, OBS reported purchase orders for the para-transit vehicles were never completed prior to the end of FY 2013–14; a revelation that came in sharp contrast to previous reports from OBS.  OBS also reported they were required to seek approval from the Governor's Administration before proceeding with the procurement of the para-transit vehicles. This required OBS to submit a Governor's Office Action Request seeking an exemption to a previous Executive Order that limited State agencies from expanding their fleet.  This unexpected requirement added additional time to the procurement process. In addition, OBS disclosed that the number of para-transit vehicles was pared down to 6 vehicles based upon available funding. OBS has projected delivery to the receiving institutions sometime between July–September 2015.

OBS did report that the 41 transportation vehicles have been purchased and delivery is anticipated during October or November 2014. Delivery to the institutions, after necessary security modifications, will be between April–June 2015.

While CDCR did a remarkable job in developing the vehicle replacement criteria as favorably reported in the previous Tri-Annual Report; the lack of progress, follow-through and commitment is disappointing. If the current projected delivery dates provided by OBS stand firm and are successfully fulfilled, OBS will have missed their original commitments by 6 to 12 months.

**Post Delegation Report for Facility Planning and Activation Management (FPAM)**

CDCR Performance under the October 26, 2012, Revocable Delegation of Authority for FPAM
Since the signing of this revocable delegation, FPAM has continued to perform with the same rigor, focus, and skills they demonstrated prior to the delegation. New challenges will be presented in the HCFIP projects due to the many components of each project, the number of projects, and the need to maintain effective healthcare and correctional services during construction. Thus, collaboration and coordination with field staff will be critical.

While the challenges and approach to the HCFIP will differ from CHCF and Facility E due to the prisons' continuous operation, sound project management tools and skills should continue to be effective.

Post Delegation Report for Construction Oversight

In order to streamline and coordinate health care construction, on September 21, 2009, the Receiver and the Secretary of CDCR issued a revocable delegation of their respective authorities related to the construction of the CHCF and the HCFIP. Facility Planning and Construction Management became responsible for the study, planning, design, development, management, and construction of CHCF (and Facility E) and HCFIP.  These projects comprise the elements of Goal 6: to expand administrative, clinical and housing facilities for patient-inmates with medical and/or mental health needs and to upgrade administrative and clinical facilities at CDCR's existing prisons.

CDCR Performance under the September 21, 2009, Revocable Delegation of Authority for Construction Oversight

CDCR continues to demonstrate the commitment, focus, and ability to effectively manage the health care construction projects. CHCF and Facility E are each complex facilities with challenging schedules and budgets and FPCM demonstrated the capacity and leadership to effectively manage these critical projects.

Facility Construction

With the exception of SQ, which had physical plant upgrades constructed under the Receivership to address lack of treatment and clinic space, the *Plata* Court Experts found that all of the facilities they visited had serious physical plant issues. Their observations underscore the importance of completing the HCFIP program as quickly as possible.

# Section 7: Required Reporting Pursuant to Judge Thelton Henderson's March 27, 2014, Court Order Regarding the Receiver's Tri-Annual Report

On March 27, 2014, Judge Thelton Henderson issued an order pertaining to the content of subsequent Tri-Annual reports.  In his order, the Judge asked the Receiver to report on the following: the level of care being delivered at the CHCF in Stockton; the increasing difficulties with recruiting and retaining medical staff statewide; the sustainability of reforms achieved, or being achieved to date; an independent system for evaluating quality of care; and discussion on the degree to which custodial interference with the delivery of care remains a problem and what actions are being taken to address the issue. These topics are discussed below:

**A.    California Health Care Facility – Level of Care Delivered**

During this reporting period, CHCF reopened to medical intake. CHCF has installed a permanent health care leadership team including the Chief Executive Officer, Chief Support Executive, Chief Medical Executive, Chief Nurse Executive, and Chief of Mental Health.  CDCR has also assigned a new Warden, Brian Duffy, at CHCF.

Significant areas of improvement and development include:
- The clinical focus teams completed the "Reboot" in Facilities D and C.  A process has been put in place to monitor and verify success of the Reboot and the accomplishment of addressing issues.
- CHCF QM processes have been modified to provide QM oversight with the QM Council. The five committees in QM ensure quality is ongoing and assured.  Each of the five committees has appropriate, assigned formal work groups and ad hoc Quality Improvement Teams (QITs) to accomplish their mission.
- Completion of a pilot study to observe internal ambulance vehicle egress from the Standby Emergency Medical Services (SEMS) to E Facility. A joint effort with custody to coordinate passage of multiple gates during a code has decreased the time for the ambulance to respond to emergencies.
- Supply Chain improvements have been made by training staff to oversee support of inventory in patient-inmate buildings. Periodic Automatic Replenishment levels have been established and improvements made to better meet the needs of our patient-inmates.
- Food Services addressed serving tray issues and through research developed a new food tray that accommodates hot and cold food without adhesive buildup.
- A leader in a Career Executive Assignment to oversee the Food Services Department is under recruitment.
- CHCF completed the installation of 50 Omni-Cell cabinets in the housing units. The Omni-Cell acts as a remote Pharmacy and is safety driven via its finger print access and enhances the security for narcotic medication.

<u>Additional Measures Taken</u>

- CHCF eliminated the New Employee Orientation backlog by increasing training availability including scheduling more classes and identifying additional classroom sites.
- Annual employee training which was temporarily suspended, has resumed.
- An ADA Compliance Analyst has been hired to ensure adherence to the Disability Placement Program Log procedures.
- A Wound Care program has been established in the CHCF Procedure Center.
- CHCF established a Total Care Unit for patient-inmates with the highest acuity needs who require higher nursing staffing levels.
- CHCF has chartered individual, time-limited QITs to review and recommend process changes. These include:
  - Intra-Facility Transfers
  - Focused Infection Control
  - Mental Health Office Technician workflow and data entry
  - Mental Health Forward Scheduling
- Workgroups have been established and are ongoing including:
  - Reboot Data Workgroup to look at audit tool
  - 2015 Performance Improvement Work Plan Workgroup
  - Non-Formulary Pharmaceutical Workgroup
  - Mental Health Workgroups
    - MHCB
    - 30-day Community Hospital Readmission
    - 30-day MHCB or Department of State Hospitals readmission
    - Potentially avoidable hospitalization
  - Durable Medical Equipment Workgroup
  - Appeals Workgroup
- CHCF established a multidisciplinary team to focus on and address placement of disruptive inmates.
- CHCF successfully acquired permanent licensure after completing a Licensing survey by the California Department of Public Health.
- CHCF developed a wheelchair team to expedite basic wheelchair repairs. This significantly reduced the time it takes to get wheelchairs repaired and returned to the patient-inmate.
- CHCF developed a medical process whereby any patient-inmate refusing dialysis must be taken to the SEMS department for medical evaluation.
- CHCF developed a list of seven behavior standards and three priorities for CHCF employees to follow.
- Leaders assemble 75 percent of their employees every two weeks to foster communication flow throughout all levels of the organization.
- CHCF has successfully installed a new Radio Tower, which has allowed deployment of pagers to clinical staff. Deployment of pagers has increased communication between clinical staff.

Intake
- An Inter-facility conference call has been established to identify patient-inmates' needs, in advance of their arrival from different institutions.
- A Care Coordination Team meets weekly to address incoming patient-inmates' level of care needs.
- Facility E increased its medical staffing to provide prompt medical staff screening of patient-inmates who have newly arrived.
- The Headquarters Utilization Management Team met on-site with CHCF staff. As a result of this visit, process improvements were made based on their findings and a comprehensive spreadsheet data collection tool was developed that screens and assesses placement of patient-inmates in D, C and E yards.

## B.  Statewide Medical Staff Recruitment and Retention

As of August 2014, over 90 percent of the nursing positions have been filled statewide (this percentage is an average of six State nursing classifications). More specifically, 46 percent of institutions (16 institutions) have filled 90 percent or higher of their RN positions, and 49 percent of institutions (17 institutions) have filled between 80 and 89 percent of their RN positions. Only 6 percent (2 institutions) have filled between 78 and 79 percent of their RN positions. The goal of filling 90 percent or higher of the LVN positions has been achieved at 66 percent of institutions (23 institutions). The remaining 34 percent of institutions (12 institutions) have filled between 80 and 89 percent of their LVN positions.

During the reporting period, hiring-related initiatives for nursing classifications continued where a variety of online job postings were the focus of hiring activities. Nursing vacancies are posted on multiple websites, including school career websites, www.ChangingPrisonHealthCare.org, www.Indeed.com, and www.VetJobs.com. Each job posting typically represents multiple vacancies at an institution, and CCHCS staff monitor vacancy reports and job postings to ensure that vacancies are accurately represented in all job postings.

In general, physician recruitment efforts continued to focus on "hard-to-fill" institutions during this reporting period. As of August 2014, 85 percent of physician positions are filled statewide (this percentage is an average of all three State physician classifications). More specifically, 40 percent of institutions (14 institutions) have achieved the goal of filling 90 percent or higher of their P&S positions. Of these 14 institutions, 8 have filled 100 percent of their P&S positions. Additionally, 23 percent of institutions (8 institutions) have filled between 80 and 89 percent of their P&S positions, and 37 percent (13 institutions) have filled less than 80 percent of their P&S positions.

Workforce Development is continuing to look for innovative ways to improve this trend.  Job postings for physicians continue to be placed online at the CCHCS' recruitment website, other online job boards, and staff continues to recruit at medical conferences. CCHCS' present and future recruitment efforts for nursing and primary care provider classifications will continue to include the following:

Sourcing - Whenever possible we are working with on-line media outlets (e.g., Practicelink, LinkedIn, HEALTHeCAREERS). These media sources provide direct access to their resume/member databases which will allow CCHCS to take a more proactive approach to recruitment by enabling CCHCS to select the candidates we are interested in and contacting the candidates directly rather than simply running an ad or job posting and waiting for candidates to respond to CCHCS.

Visa Sponsorship Program – The Visa Sponsorship Program provides opportunities for international candidates looking to gain experience in the United States. The Program has proved invaluable in our recruiting efforts for psychiatrists.  The common feature of the various visa types that we sponsor, which includes TN, J-1 Waiver, H-1B and PERM, is that the employer is an integral part of the process. CCHCS is considered an exempt employer, which means we can sponsor more employees than the typical non-exempt employer.

Classification Salary Review – In an effort to ensure that CCHCS remains competitive in an ever-changing market, CCHCS has entered into a contract with Cooperative Personnel Services (CPS) Consultant Group. CPS is a human resources company who can conduct salary surveys that take into consideration total compensation of health care professionals throughout the field on a geographical (e.g., west coast) or nationwide level. The results of the survey will allow CCHCS to compare our current salary structure against that of our top competitors (both public and private) and make the necessary recommendations for salary increases as appropriate. These salary surveys will be requested on a regular basis to ensure that we remain competitive in the future.

Professional Conferences – CCHCS has identified professional health care conferences where we can have a presence either in-person with an exhibitor booth or remotely through sponsorships and other promotional opportunities. This strategy will allow CCHCS to increase our name recognition and brand awareness among both conference attendees and the health care community at large. Additionally, recruitment opportunities at these events are more personal, as CCHCS is able to speak directly to potential candidates in a way online postings or print ads cannot.

<u>Educational Programs within Our Institutions</u>

Workforce Development has recently surveyed all 35 institutions to determine what health care related educational programs, if any, are currently being utilized. A review of the responses indicated that 13 institutions are currently employing formal health care education programs, including rotations, clinicals, externships, and internships. These programs cover multiple classifications in the Medical, Mental Health, and Dental programs.

CCHCS currently has 14 agreements with some of California's top universities and medical school programs offering student rotations and internships in Internal and Specialty Medicine, Pharmacy, Dietary Services, and Public Health. These rotations afford students experience in multiple areas within the correctional health care setting, including clinics, TTAs, and various other departments that allow learning by viewing and doing.

Efforts are currently underway to provide statewide standards to our health care student rotations in order to improve ease and consistency for students and institutional leadership. In addition, we are working to increase the number of students/residents rotating through our various CDCR institutions.

Workforce Development is standardizing the health care related educational program process across all institutions and is developing surveys to follow-up with both students and clinical leaders to ensure that these programs continue to improve and be of value to both students and the institutions.

Additionally, Workforce Development will begin to engage with these students after their participation in our health care educational programs is complete in an effort to convert these soon-to-be medical professionals from interns and students to full time employees.

<u>Correctional Medicine Fellowship Program</u>

CCHCS is in the process of developing a 24-month curriculum for a Correctional Medicine Fellowship program. The Correctional Medicine Fellowship program is aimed at providing two fellows per cohort with a high quality, advanced and comprehensive cognitive and clinical education that will allow them to become competent, proficient, and professional Correctional Medicine Physicians. The American Osteopathic Association now provides board certification in Correctional Medicine which CCHCS hopes to pursue. This program will allow a physician who has completed a three-year residency in Family Medicine, Internal Medicine, or Physical Medicine and Rehabilitation the opportunity for advanced training by completing a two-year Correctional Medicine Fellowship. Upon completion of the program, fellows will additionally have earned a Masters in Public Health, and may be eligible to sit for their boards.

The advantages of this new Correctional Medicine Fellowship program includes, but is not limited to:

- Creating a platform to train and retain physicians who are board certified in Correctional Medicine for the State of California.
- Promoting excellence in correctional medicine and improving our image, prestige, and position in the community.
- Promoting physician recruitment by attracting young graduates to correctional medicine.
- Setting future standards for quality in correctional medicine.
- Reducing recruitment costs by hiring at least two fellows per year at a much reduced salary.
- Creating future leaders in Correctional Medicine and improving succession planning.
- Creating opportunities for our medical executives and primary care providers to have advanced academic exposure and, in turn, boost morale.

These combined efforts (Visa Sponsorship Program, compensation analysis, outreach advertisement, educational programs, etc.) will help ensure that CCHCS has a consistent pipeline of quality physician candidates to fill vacancies as they arise and enhance our image as a competitive employer of choice.

For additional details related to vacancies and retention, refer to the Human Resources Recruitment and Retention Reports for May 2014, June 2014, July 2014, and August 2014. These reports are included as Appendix 4.  Included at the beginning of each Human Resources Recruitment and Retention Report are maps which summarize the following information by institution: Physicians Filled Percentage and Turnover Rate, Physicians Filled Percentage, Physician Turnover Rate, Nursing Filled Percentage and Turnover Rate, Nursing Filled Percentage, and Nursing Turnover Rate.

## C.  Sustainability of Receiver's Reforms

One of the most difficult issues at this point is assessing whether the reforms that have been achieved to date are sustainable over time. It is one thing to make changes during a period of recognized crisis; it is quite another for such reforms to take root and become sustainable as a matter of routine organizational performance.

In defining sustainability, it may be helpful to distinguish the elements of sustainability from the Receiver's reforms themselves. The Receiver's reforms are, essentially, the goals and action items identified in the RTPA. There may be elements of sustainability included in the RTPA, but elements of the Turnaround Plan are largely the "ends" of the Receivership, while the elements of sustainability are those qualities that will prevent the erosion of those ends.

The Receiver considers all of the goals in the RTPA necessary for sustainability, including:

Goal 1:  Ensuring timely access to health care services
Goal 2:  Establishing a prison medical program addressing the full continuum of health care services
Goal 3:  Recruiting, training and retaining a professional quality medical care workforce
Goal 4:  Implementing a quality assurance and continuous improvement program
Goal 5:  Establishing a medical support infrastructure (including pharmacy, medical records, radiology, laboratory, clinical information systems and telemedicine)
Goal 6:  Providing for necessary clinical, administrative and housing facilities

In addition to the goals and action items set forth in the RTPA, the Receiver views the following elements as necessary for sustaining the reforms he has achieved and plans to achieve:

Adoption of the primary care medical home model;
1.  An independent system for evaluating the quality of health care;
2.  A public dashboard, including regularly updated performance indicators;
3.  Freedom from unnecessary custodial interference in the delivery of health care;
4.  A transition from Court orders to statutes or regulations providing the authorities now required by the prison medical system;
5.  A budget and personnel allocation sufficient for the necessary expenditures and staffing of the prison medical system, and a budget process preserving the health care budget allocation from diversion to other divisions of the Department;
6.  A system for the development, review (including periodic review of existing policy), approval and distribution of central and local policies and procedures;
7.  Providing adequate resources and focus to ensure facilities and equipment are serviced, maintained, and repaired or replaced in order to meet the health and safety needs of inmates and staff;
8.  A system for equipment and fleet management, including inventory, routine maintenance and planned replacement;
9.  A health care leadership structure with a direct reporting relationship to the Secretary of CDCR;
10.  A time-tested regional leadership structure; and
11.  A culture in which patient-inmate care is a valued priority.

Of particular concern are the continued deteriorating conditions of the facilities and essential equipment. Recent results of the Environmental Health Reviews performed by the California Department of Public Health have documented significant and unaddressed deficiencies that put staff and inmates at risk, including, but not limited to, food services, health services, housing, and support spaces. Even the *Armstrong* plaintiff's Monitoring Tour Reports have documented these conditions:

"*Prisoners reported that the toilets clog frequently, causing feces to come up through the ADA shower drain every few days. As discussed above with regard to Elm Hall, standing wastewater and feces in the bathroom is problematic for ADA and a [sic] basic public health sanitation reasons.*"[1]

Most recently, CCHCS implemented a Prison Industry Authority health care cleaning program to address long standing deficiencies in sanitation and cleaning services provided through CDCR. While there have been remarkable improvements in the short time this program has been in operation, it has also documented the poor conditions of the facilities, which makes the sanitation and cleaning difficult at best. It is clear that the current resources in the prisons' plant operations are understaffed to perform preventative maintenance and repairs and are suffering disproportionately in achieving CDCR's salary savings targets. While many clinics will be renovated or added through the HCFIP projects, other spaces critical for health and safety are not. It is also critical that new spaces constructed under HCFIP are not allowed to deteriorate as other areas have.

Current activity at CCHCS centers on developing, implementing, and creating a process whereby these elements of sustainability are incorporated into the daily operations of the Office of the Receiver. As well, CCHCS will focus its efforts, as a requirement for successfully transitioning medical care back to State control, to ensure that CDCR adopts these tenets of sustainability.

### D.  Development of Independent Systems for Evaluation of the Quality of Health Care

Due to differences between the *Plata* Court Experts and the OIG findings in Round 3, the OIG's Round 4 medical inspections were halted pending an assessment of the Comprehensive Inspection Tool. During the reporting period, CCHCS, the parties, and the *Plata* Court Experts continued to work with the OIG to refine their Comprehensive Inspection Tool to include modified indicators and expanded inspection methodology intended to facilitate an accurate measurement of the health care quality provided by an institution.

CCHCS, OIG, the parties, and *Plata* Court Experts met in July and September 2014 following the OIG's pilot inspections testing their Comprehensive Inspection Tool. At each meeting, the parties provided feedback concerning the sample sizes used for the compliance portion of the inspection tool, inclusion of the qualitative patient-inmate care case reviews, and reporting format. The OIG incorporated many suggestions and changes offered by the stakeholders.

The definition of constitutional adequacy of care was discussed at both stakeholder meetings in July and September 2014, as there are varying opinions between the parties regarding what this means.  Additional meetings have taken place to discuss this issue, but there has not been any final agreement.  Until this distance between the parties is addressed, OIG assessments will

---

[1]    Corene Kendrick, Amber Norris, Sarah Hopkins, Armstrong Monitoring Tour Report, California Institution for Men,  July 22-25, 2014

be measuring to a standard that has not been well defined or agreed to by the parties. The OIG is planning to resume inspections in early January 2015.

The OIG has two additional pilot medical inspections planned at HDSP and CMC during the week of October 6, 2014. During that same week, the *Plata* Medical Experts are planning to conduct their own, separate inspection at HDSP for the purpose of comparing their findings with those of the OIG. Following the HDSP and CMC medical inspections, additional meetings are planned with the parties.

We will continue to collaborate with all stakeholders and provide additional reviews concerning the work of the OIG as we proceed in the upcoming reporting period.

**E.  Custody Interference with the Delivery of Health Care**

Fortunately, there is little to report on this subject during the reporting period.  At the direction of the Receiver, CCHCS Field Operations staff has been tasked with developing proposed policy and training recommendations to address the role of custody staff during clinical encounters. The work plan has progressed to completion of a draft training outline that is aimed at creating uniform standards for providing custodial security during clinical encounters. At this point, topics for the outline include the following areas:

- Overview of the different controlling Policy and Procedural documents and how they are applied
- Discretionary/appropriate decision making process in preventing and responding to emergencies in medical, dental  and mental health areas
- Use of holding cells for patient-inmates awaiting appointments as well as during appointments
- Use of restraints during medical, dental and mental health encounters
- Patient-inmate confidentiality during clinical encounters
- Priority ducats and institution security
- Report writing
- Communication between custody, medical, mental health and dental staff; communication with supervisory and management staff; and communication with patient-inmates.

Security experts representing Division of Adult Institutions as well as those working within CCHCS will combine with a multidisciplinary team of medical, nursing, dental and mental health clinical staff to parse out the outline and develop their recommendations during the next reporting period.

# Section 8: An Accounting of Expenditures for the Reporting Period

**A.   Expenses**

The total net operating and capital expenses of the Office of the Receiver for the 12 month period from July 1, 2013 through June 30, 2014 were $1,761,290 and $0.00 respectively.

The total net operating and capital expenses of the Office of the Receiver for the two month period from July 1 through August 31, 2014 were $260,267 and $0.00 respectively.

A balance sheet and statement of activity and brief discussion and analysis for each period is attached as Appendix 12.

**B.   Revenues**

For the months of May and June 2014, the Receiver requested transfers of $350,000 from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the Office of the Receiver.

For the months July and August 2014, the Receiver requested transfers of $350,000 from the State to the CPR to replenish the operating fund of the Office of the Receiver.

Total year to date funding for the FY 2013–14 to the CPR from the State of California is $1,675,000.

All funds were received in a timely manner.

## Section 9: Conclusion

The next Tri-Annual report will be filed on or before February 1, 2015.