**Exhibit B**

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                             EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Benjamin T. Rice
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 15, 2014

Paul Mello
Hanson Bridgett
1676 N. California Blvd., Suite 620
Walnut Creek, CA  94596

Dear Mr. Mello:

Attached, please find California Department of Corrections and Rehabilitation's Status Update for 3JP.

Sincerely,

BENJAMIN T. RICE
General Counsel, Office of Legal Affairs
California Department of Corrections and Rehabilitation

Attachments



# OCTOBER 15, 2014 UPDATE TO THE THREE-JUDGE COURT

In response to the Three-Judge Court's February 10, 2014 Order, CDCR Staff report on the status of the following measures being taken to reduce the State's adult inmate population. This report reflects CDCR's efforts as of October 15, 2014 to develop and implement measures to comply with the population reduction order. Because this is an evolving process, CDCR reserves the right to modify or amend its plans as circumstances change. At present, the State's prison population is approximately 140.9% of design capacity.

1. <u>Contracting for additional in-state capacity in county jails, community correctional facilities, and private prison(s):</u>

    Defendants have reduced the population in CDCR's 34 institutions by transferring inmates to in-state facilities.

    a. Private Prison (California City):

    The current population of California City is approximately 2,256 inmates.

    b. Community correctional facilities (CCFs) and modified community correctional facilities (MCCFs):

    The State currently has contracted for 4,178 MCCF beds that are in various stages of activation and transfer. Intake at the McFarland Female Community Reentry Facility located in McFarland, California began the week of August 4, 2014. The State also has the option to add an additional 260 beds at the McFarland Female Community Reentry Facility. An additional 887 contract beds have been identified as potential capacity for the State. The State continues its discussions with these providers.

    c. County jails:

    The State continues to evaluate the need for additional in-state jail bed contracts to house CDCR inmates.

2. <u>Reentry Hubs:</u>

    The State continues to maintain thirteen prison-based reentry hubs.

3. <u>Newly-enacted legislation:</u>

    The State continues to implement Senate Bill 260 (2013), which allows inmates whose crimes were committed as minors to appear before the Board of Parole Hearings (BPH) to demonstrate their suitability for release after serving at least fifteen years of their sentence. BPH held 28 hearings in September, bringing the total number of hearings held in 2014 to 232. Many additional hearings were scheduled from January through September, but inmates postponed or waived the hearings and they will be rescheduled

9863638.1

in the future. Nearly all youth offenders who received a grant prior to January 1, 2014 have reached their minimum eligible parole dates.

Proposition 36, passed by the voters in November 2012, revised the State's three-strikes law to permit resentencing for qualifying third-strike inmates whose third strike was not serious or violent. As of October 1, 2014, approximately 1,901 third-strike inmates have been released.

The Governor also recently signed into law several criminal justice reform and rehabilitative measures, including:

- Senate Bill 1010, which eliminates sentencing disparities between cocaine base and powder cocaine by lowering the minimum and maximum sentences for cocaine base;

- Senate Bill 1058, which expands the grounds on which a writ of habeas corpus may be prosecuted;

- Assembly Bill 1468 as amended by Senate Bill 1054, which provides grants to counties to implement programs aimed at reducing crime and offenses committed by persons with mental illness;

- Senate Bill 1391, which requires CDCR and the California Community Colleges to expand access to educational courses for inmates;

- Assembly Bill 2308, which requires CDCR and the Department of Motor Vehicles to ensure all eligible inmates released from state prison have valid identification cards;

- Assembly Bill 1276, which requires CDCR to provide special classification considerations for inmates under the age of 22 in order to permit increased access to rehabilitative programs; and

- Assembly Bill 2060, which provides grants to counties to support vocational training and apprenticeship opportunities for offenders released from custody.

4. <u>Prospective credit-earning increase for non-violent, non-sex second-strike offenders and minimum custody inmates:</u>

Effective from the date of the Court's Order, February 10, 2014, non-violent, non-sex second-striker offenders are earning credits at the rate of 33.3% (increased from the previous rate of 20%) and release dates have been recalculated. The State's automated systems have been modified and the court-ordered credits are being automatically applied. In September, 607 inmates were released as a result of the court-ordered credit increases.[1] These inmates earned an average of 51.3 days of additional credit.

With respect to two-for-one credit earning for minimum custody inmates, the State has determined that such an extension of credits would detrimentally impact fire camp participation. It has become increasingly difficult to fill fire camp beds following realignment as the number of eligible low-level, non-violent inmates has significantly decreased. If the State were to provide enhanced credits to all minimum custody

---

[1] Of the 607, 474 have been released to Post Release Community Supervision and 133 have been released to parole.

**2**

inmates, the vast majority of low-level, non-violent inmates would choose to participate in the Minimum Support Facility (MSF) program rather than endure strenuous physical activities and risk injury in fire camps. Because the fire camp program is entirely voluntary, the State will likely face significant challenges filling program vacancies. Even the extension of two-for-one credits solely to MSF inmates who are fire camp ineligible would impact fire camps. Nearly two-thirds of the MSF population is fire camp ineligible; the extension of enhanced credit-earning to these inmates would result in higher turnover and an even greater demand for minimum custody inmates. CDCR would be forced to draw down its fire camp population to fill these vital MSF positions.

5. <u>New parole determination process whereby non-violent second-strikers will be eligible for parole consideration by BPH once having served 50% of their sentence:</u>

   The State has developed a tentative policy approach for identifying and notifying eligible offenders, and for scheduling and tracking actions taken. Implementing this measure has required developing eligibility criteria, the process for reviewing cases, creating staff roles, and identifying necessary modifications to information technology systems to identify and track eligible offenders. The Budget Act of 2014 (Chapter 25, Statutes of 2014) includes additional funding to support these efforts. The State is developing an implementation process that includes, but is not dependent upon, the regulatory process. Defendants will continue to report on progress in implementing this measure.

6. <u>Parole determination process for certain inmates with indeterminate sentences granted parole with future parole dates:</u>

   BPH authorized the release of four additional inmates who were granted parole with future dates since the last report to the Court. The State continues to identify additional potentially eligible inmates who have already been found suitable for parole by BPH. As part of the verification of eligibility, the State will review inmates' disciplinary histories and any outstanding holds, detainers, warrants, or *Thompson* terms. Once eligible inmates are identified, the State works with the inmates to update their parole plans, if needed, and verifies their existing parole plans. BPH then documents its decision and if the inmate is to be released from his or her life term, issues a memorandum to institutions releasing the inmate from his or her life term. Institutions will then process the inmate for release to parole if there are no outstanding holds, detainers, warrants, or *Thompson* terms.

7. <u>Parole process for medically incapacitated inmates:</u>

   The State continues to work closely with the Receiver's Office to implement this measure. CDCR and the Receiver's Office have agreed to use Resource Utilization Guide scores to help identify medically eligible inmates. CDCR, BPH, and the Receiver's Office have revised referral, hearing, and placement procedures for medically incapacitated inmates. The Receiver's Office is continuing to review inmates and is sending completed recommendations to CDCR. Recommendations received from the Receiver's office are reviewed by DAI and referred to BPH for a hearing. BPH has held ten medical parole hearings under the revised procedures.

8. <u>Parole process for inmates 60 years of age or older having served at least 25 years:</u>

   The State continues to develop procedures for tracking eligible offenders and a systemic methodology for scheduling and tracking hearings. Risk assessments for these offenders will be revised to specifically address how advanced age, long-term

confinement, and diminished physical condition, if any, may impact the inmate's potential risk for future violence. The revised risk assessments were prepared for elderly parole hearings held on or after October 1, 2014. Many eligible offenders are life-term inmates who are already in the Board of Parole Hearings' parole suitability hearing cycle. As of June 20, 2014, BPH has granted parole to 63 inmates over age 60 and who have served at least 25 years. Upgrades to the Board's main computer system to accommodate electronic identification of eligible inmates and scheduling of hearings were implemented last month. BPH is now scheduling eligible inmates for hearings who were not already in the board's hearing cycle.

9. Reentry programs:

The contract for the San Francisco reentry program is in place. The State continues to refer eligible inmates to county officials and the county is currently reviewing these inmates for placement.

The Fiscal Year 2014/2015 budget included $20 million for the expansion of reentry programs. The Administration proposes to fund local reentry programs targeting the mental health population who are within six to twelve months of release to facilitate their reentry into the community. The facilities will offer services such as case management services, employment services, and assistance with securing identification cards, housing, and enrollment in programs such as Medi‑Cal and CalWORKs. The facilities will house offenders who will be released to both parole and Post Release Community Supervision, and would allow parole agents and probation officers access to this population for the purpose of developing reintegration plans and strategies for continuity of treatment upon release. In mid-September, CDCR received Letters of Interest from prospective providers. The Administration has identified several proposals that may be viable Community Reentry Facilities and will begin negotiating contracts.

10. Expanded alternative custody program for females:

On August 4, 2014, the State activated an 82 bed facility in San Diego, and is searching for additional sites for the expanded alternative custody program for females, called the Custody to Community Transitional Reentry Program (CCTRP). As of October 3, 2014, 35 female inmates are housed at the San Diego facility. Female inmates in the CCTRP are provided with a range of rehabilitative services that assist with alcohol and drug recovery, employment, education, housing, family reunification, and social support.