**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
**Plaintiffs,**

           **v.**                         **No. CIV S-90-0250 KJM  DAD PC**

**EDMUND G. BROWN, JR., et al.,**
**Defendants**

**SPECIAL MASTER'S REPORT ON THE**
**SAN QUENTIN PSYCHIATRIC INPATIENT PROGRAM**
**FOR CONDEMNED INMATES OF THE CALIFORNIA DEPARTMENT OF**
**CORRECTIONS AND REHABILITATION**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax:  (401) 824-5123
December 30, 2014

I.    **INTRODUCTION**

This is the Special Master's second report to the court this year on the San Quentin

Psychiatric Inpatient Program (SQ PIP).[1]  His first report, covering the development of the SQ

PIP, was filed on June 10, 2014.  On June 27, 2014, the *Coleman* court directed the Special

Master to report again "not later than ninety days after full activation of the SQ PIP . . . on

patient admissions and treatment at the SQ PIP as well as on any other matters or concerns with

the SQ PIP which may have emerged as of that time."  (ECF 5174).

Having been fully activated only as recently as October 1, 2014, the SQ PIP is still a very

new program. It is the first and only program to provide intermediate inpatient mental health

treatment for male condemned inmates of the California Department of Corrections (CDCR) in

need of such care.[2]  It is also equipped to treat male condemned inmates at the acute inpatient

level of care.

II.    **HISTORY AND DEVELOPMENT OF THE SQ PIP**

The impetus for an intermediate inpatient program to treat condemned CDCR inmates

originated with the *Coleman* plaintiffs.  They expressed ongoing concerns regarding the

treatment of serious mental illness among the condemned population needing intermediate

inpatient care and the lack of any specific program to respond to this problem.  This evolved into

a gradual recognition of the need for the availability of intermediate inpatient care for

condemned male CDCR inmates, all of whom are housed at the San Quentin State Prison (SQ).

In 2009, CDCR mental health leadership directed SQ mental health staff to research and develop

---

[1]A list of acronyms and abbreviations appearing in this report is attached as Exhibit A.
[2]Intermediate inpatient care programs "provide longer-term mental health intermediate and non-acute inpatient treatment for inmate-patients who have a serious mental disorder requiring treatment that is not available within CDCR."  Mental Health Services Delivery System Program Guide, 2009 Revision, at 12-6-6.  Acute inpatient care "is a short-term, intensive-treatment program with stays usually up to 30 calendar days to 45 calendar days provided."  Program Guide at 12-6-2.  Acute inpatient care has been provided at the California Medical Facility (CMF) for male condemned CDCR inmates.

a specialized care program that would address the problem of unmet need for intermediate inpatient care among its condemned population.  This effort resulted in what was termed at the time a Specialized Treatment Plan for these inmates. It was based on the precept that the unique situation of condemned inmates clinically indicated that mental health care should be provided in close proximity to these inmates' living environment, i.e. within SQ.

In early 2011, the Specialized Treatment Plan became more formalized as a written diagnostic and treatment plan.  CDCR issued a Budget Change Proposal (BCP) to fund this program, referring to it as the Specialized Care for the Condemned Program (SCCP).  Among other things, the BCP cited the identification of up to 31 condemned inmates who demonstrated need for intermediate inpatient care and reflected acknowledgement of the importance of an appropriate treatment program to address this need.

In August 2012, the Special Master's expert[3] examined the SCCP on site.  Among other things, there were significant shortcomings with the program in the areas of admission and discharge criteria, space, and insufficiency of treatment and treatment planning.  *See* Special Master's Twenty-Fifth Round Monitoring Report, p. 177-178 (ECF 4298).  In December 2012, the Special Master's expert, together with representatives of CDCR, the Department of State Hospitals (DSH) and plaintiffs' counsel, returned to SQ to further examine the SCCP.  At that time, defendants agreed to work with the Special Master's expert to prepare an addendum to the local operating procedure for the SCCP, addressing identified problems with admissions, staffing, services, space, and the need for a dedicated housing unit.  Over time, the working

---

[3]Although the information and findings discussed in this report may be the product of more than one member of the Special Master's monitoring staff, any references to experts are stated collectively as "the Special Master's expert" or "the expert."  Likewise, findings by the Special Master's monitors are attributed collectively to "the Special Master's monitor" or "the monitor."

document for the SCCP underwent successive revisions.  Admission criteria that were developed came to more closely resemble those for intermediate inpatient care.

During 2011 – 2012, the number of patients receiving SCCP care ranged from six to 45. With regard to use of a dedicated housing unit for these patients, SQ has a Central Health Services Building (CHSB), which includes a 50-bed health care unit containing a Correctional Treatment Center (CTC) with 17 licensed mental health crisis beds (MHCBs) and 33 unlicensed beds operated as Outpatient Housing Unit (OHU) beds.  It was determined that the 17 unlicensed MHCBs and the ten additional OHU beds designated by the *Plata* receiver as "flexible beds" for occupancy by SCCP patients would provide a total of 27 beds for SCCP patients at that time. However, progress toward the development of a more comprehensive and mature program of inpatient care for condemned inmates was suspended upon the defendants' filing on January 7, 2013 of their motion to terminate federal court oversight in the *Coleman* case.  (ECF 4275).

Shortly after entry of the order denying defendants' motion to terminate on April 5, 2013 (ECF 4539), issues surrounding the SCCP and its use for condemned inmates needing a longer-term inpatient level of care were raised within a motion filed by plaintiffs on April 11, 2013. Plaintiffs' motion sought, among other things, enforcement of court orders and affirmative relief related to inpatient treatment for members of the *Coleman* plaintiff class who were condemned to death and housed at SQ. (ECF No. 4543).

Following a 14-day evidentiary hearing that ended on November 6, 2013, and the parties' submission of briefs, the *Coleman* court granted plaintiffs' motion in part on December 10, 2013. (4951). With regard to *Coleman* class members who were condemned, the court found that the evidence established "an identified need in the condemned inmate population for long-term inpatient mental health care equivalent to that provided by the [intermediate inpatient care]

programs described in the Program Guide" (ECF 4951, p. 18-19), and that custodial restrictions on condemned inmates severely limited placement options for their inpatient treatment.  (ECF 4951, p. 14).  Accordingly, the court ordered defendants, under the guidance and supervision of the Special Master, to:

- Conduct an assessment of unmet need for inpatient care in the condemned inmate population at SQ;

- Resume working to establish a durable remedy that provides adequate access to necessary inpatient mental health care or its equivalent for seriously mentally ill condemned inmates; and

- Consider all remedies, including, but not limited to, creation of a hospital unit for condemned inmates only at the CMF, SQ, the California Health Care Facility (CHCF) or some other appropriate facility.

(ECF No. 4951 at 27-28).  The court also ordered the Special Master to report on the remedy elected and the time frame for its complete implementation within six months. (ECF 4951, p. 28).

Work on the identification of condemned inmates in need of intermediate inpatient care, known as the Assessment Project, began on December 20, 2013.  The Special Master and members of his staff, the parties' counsel, CDCR central office staff, and SQ mental health staff met at SQ in January 2014 for a presentation on the existing SCCP program and consideration of selected proposals for its enhancement into what would later become the SQ PIP.  Patient identification and assessment criteria were developed.  On February 5, 2014, CDCR developed and submitted a draft SQ PIP Screen Data Collection Tool, Custody Questionnaire, and Screen Flow Sheet for the Special Master's expert's review and comments.  Recommendations for improvement of these tools and instruments and related practices were relayed back to defendants and were incorporated into the tools.  On February 19, 2014, CDCR submitted its revised drafts of the tools and instruments, which were then reviewed and discussed further.

The *Coleman* plaintiffs joined the process at an in-person meeting at SQ on February 24, 2014, where the revised tools and instruments were presented and discussed. There was further input and guidance from the Special Master and his staff, and both substantive and process input from plaintiffs' counsel. It was also decided that CDCR would complete the patient assessment tools by March 2014, that the on-site assessments would begin in April 2014, and that the Special Master's staff and plaintiffs' counsel would attend the patient data review process.

The patient assessment process was conducted in four basic phases: (1) use of the screening tool and review of patient data at CDCR Division of Correctional Health Care Services (DCHCS), (2) survey of SQ correctional officers and psych techs who work in condemned housing units to help identify potential patients, (3) clinical evaluations of patients, and (4) reviews of the work of SQ mental health interdisciplinary treatment teams (IDTTs).

Beginning on March 20, 2014, all of the approximately 720 condemned inmates at SQ were screened. This yielded identification of 127 inmates as potentially in need of intermediate inpatient care. The data reviews of these 127 inmates at headquarters yielded a recommendation of 54 of these inmates for clinical evaluation.

Correctional officers and psych techs who work in condemned housing units were questioned about their observations of condemned inmates who displayed signs of serious mental illness and potential need for inpatient care. By the end of this portion of the patient identification process, a total of 98 inmates had been identified as appropriate for the next step in the process, a clinical evaluation.

For the next phase, all of the gathered information was integrated and reviewed by CDCR regional clinicians, in the presence of the Special Master's experts and plaintiffs' counsel, for determination of which cases should proceed to a full clinical evaluation. There was a nearly

unanimous recommendation that 17 of the 98 clinically evaluated inmates be referred to inpatient care and that another 17 be designated for a change to a higher level of care other than inpatient care.

As a result of IDTT reviews for the 17 inmates who had been recommended for referral to inpatient care, 13 were approved for admission to intermediate inpatient care, one was approved for admission to acute inpatient care, and the rest were approved for changes in level of care. In addition, there were another 23 condemned inmates who were already being treated in the existing SCCP, and who were to be included for intermediate inpatient care in the SQ PIP.

The Assessment Project was completed on May 7, 2014, with a total of 37 condemned inmates who were referred, accepted, and awaiting admission to intermediate inpatient care in the planned SQ PIP. On June 3, 2014, DCHCS submitted to the Special Master its revised report and plan for an inpatient mental health treatment program for condemned inmates to be known as the SQ PIP. On June 6, 2014, CDCR submitted its draft activation schedule for the SQ PIP, and three days later submitted its revised activation schedule indicating that it intended to begin activation of the SQ PIP on October 1, 2014 and complete it as of November 15, 2014, and that for all proposed end dates for each item on the schedule, "this schedule will be accelerated consistent with patient safety whenever possible."

The number of beds which comprise the SQ PIP today – 39 licensed beds plus an observation room – grew as the program and its related clinical assessment process were developed, and as the concomitant degree of need for intermediate inpatient care for condemned inmates became clearer. Earlier in the phase of this project, while the predecessor SCCP program was operating, CDCR was utilizing its 17 MHCBs in the CHSB for inpatient care of its condemned inmates in the SCCP. However, it was apparent from the Special Master's

monitoring of the SCCP in mid-2012 that, among other things, more inpatient program beds were needed. In response to this need, the *Plata* receiver in December 2012 re-designated ten OHU or "flexible" beds in the CHSB as inpatient beds for use by SCCP patients, bringing the total number of condemned mental health inpatient care beds to 27 at that time. As stated above, after the defendants' motion to terminate federal court oversight was denied in April 2013, the *Coleman* plaintiffs then moved for, among other things, enforcement of orders and affirmative relief insofar as unmet need for mental health inpatient care of condemned CDCR inmates. The court granted their motion in this regard and ordered, among other things, the conduct of an assessment of this need. In discussions between the Special Master and the *Plata* receiver on the procurement of necessary additional beds to meet this need, it was agreed that determination of the number of additional beds should be deferred until completion of the court-ordered unmet need assessment. As stated above, that assessment was completed on May 7, 2014, and identified 37 condemned inmates for inpatient mental health care. As a result, the *Plata* receiver agreed to re-purpose another 12 licensed beds plus an observation room for use in the SQ PIP. Hence, the SQ PIP is today comprised of a total 39 of licensed beds plus an observation room, without the need for construction of any new or additional building.

On June 10, 2014, the Special Master reported to the court on defendants' plan for the SQ PIP (ECF 5164), terming the Assessment Project "a productive collaborative effort among CDCR, the Special Master, and plaintiffs . . . that appears to have been successful with identifying inmates currently in need of inpatient care and with developing and establishing a process for ongoing identification and referral of condemned patients to inpatient care into the future." (ECF 5164, p. 10). He recommended, and the court ordered on June 27, 2014, that CDCR provide monthly status reports on the SQ PIP to the Special Master until the beginning of

activation of the SQ PIP, and that no later than 90 days following the full activation of the SQ

PIP, the Special Master shall report to the Court on patient admissions and treatment at the SQ

PIP, as well as any other matters or concerns with the SQ PIP which may have emerged as of

that time.  (ECF 5174, p. 2).  This is the Special Master's report in response to the court's June

27, 2014 order.

Following entry of the June 27, 2014 order, the Special Master's expert returned to the

SQ PIP regularly during the summer of 2014 as the SQ PIP was moved along toward full

activation.  The Special Master's expert and monitor then conducted on-site monitoring of the

SQ PIP beginning immediately upon program activation, from October 1–3, November 4-6, and

December 2-4, 2014.  Plaintiffs' counsel and mental health leadership from CDCR headquarters

and SQ were also present during the December monitoring visit.  Inspections included visual

examination of the facility, interviews of program mental health line staff, medical staff, nursing

staff, and custody staff, as well as document reviews and observation of treatment and custodial

activities in the program.

## III.    ACTIVATION AND OPERATION OF THE SQ PIP

### A.    OVERVIEW OF THE SQ PIP ACTIVATION

According to SQ PIP staff, on September 24, the California Department of Public Health

conducted an unannounced full survey of the then-extant program under its ongoing CTC

license.  On September 25, it conducted an initial review for additional program beds.  As no

deficiencies were found, the SQ PIP was approved for activation on October 1, 2014.

As planned, patient admissions began on October, 1, 2014. On that day, all but two of the

patients in existing SCCP beds (unlicensed) and the patients in the Non-Acute Mental Health

(NAMH) beds (licensed) were admitted to the SQ PIP, for a total of 23 admissions.  The two

patients who were not admitted had been discharged the previous day after prevailing on their *Vitek* motions in which they challenged their admission to the SQ PIP.

According to an intake plan, each admitted patient underwent a formal admission process. Each of four clinical teams made up of a psychiatrist, a psychologist, a social worker, and a nurse or psych tech  processed approximately six patients.  The patients admitted from the licensed NAMH did not require new physicians' orders, new medications, or full nursing assessments, as these had already been completed as part of the NAMH program and were part of these patients' mental health records.  The patients admitted from the unlicensed SCCP, on the other hand, required physician's orders, medication orders including renewals, and comprehensive nursing assessments.

New SQ PIP admittees were given packets that included a statement on patients' rights, information on advanced psychiatric directives, written material on social work, recreational therapy, primary clinical services, primary psychiatric services, and the Patient's Empowerment Handbook.  The Handbook provided basic information about the program, but served primarily as a treatment tool for the patient to use throughout his inpatient stay.  Each admission team discussed the subject matter areas in the Handbook with the new patients, who were then asked to sign signifying their participation and comprehension of the content.

On the first day of activation, staffing of the intake process was clearly sufficient for attention to individual patient needs.  However, observation of the admission process on the first day indicated a need for further training of admission staff, which would be expected of a new program.  Such staff training on the admission process may benefit from use of scenario-based-learning and role-playing exercises.

On October 2, 2014, the second day of program activation, the first Institutional Classification Committee (ICC) and the initial IDTT meetings for new admittees were conducted. All patients scheduled for ICC and/or IDTT meeting were seen. SQ PIP patients were to be seen by an ICC at their initial meeting, at each stage level, and annually as required. The activation plan called for a mandatory IDTT meeting within 72 hours for patients admitted from the (unlicensed) SCCP. The treatment team also saw on a priority basis those patients in greatest need of an ICC meeting and gave them property and yard privileges. Other patients were also given priority scheduling for an IDTT meeting, based on need and acuity.

The expert and monitor observed ICC and IDTT meetings and found them adequate in all relevant respects, including participation, collaboration, interaction, and engagement with the patient. The ICC chairperson was particularly skilled at dealing with the various issues involving each patient, whether pertinent to the condemned mentally ill population or unique to the particular patient's own mental health status. Patients were not confronted or dismissed, but were treated with due respect and did not escalate in any case. Even very challenging patients were managed successfully.

As early as October 2, primary clinical activities were occurring in-cell, as planned. Art and recreation therapies had already been developed. They were appropriate for the range of patients' skill and cognitive ability levels and could be carried out within patients' own rooms, with some assistance. The art and recreation therapist visited each patient and offered the activities. The same patients were also offered clinical cell-front contacts with their psychiatrists and with primary and secondary clinicians (PCs and SCs) throughout the day. The same activities and offerings were provided on the following day. Staff reported that additional ICC and IDTT meetings were scheduled, with completion anticipated for all 23 patients by October 7.

According to staff reports, while the SQ PIP admission process was occurring, the SQ condemned unit was scheduling IDTT assessments of whether the 13 condemned inmates who had been identified for intermediate inpatient care should still be referred to the SQ PIP. These patients were in their condemned housing unit at that point. As part of the activation plan, the SQ PIP Medical Director and the Senior Psychologist for the Condemned Program had met to review all pending SQ PIP patient cases and prioritize their admissions based on clinical factors and acuity levels. The plan was to admit these patients to the SQ PIP based on this jointly-developed list.

*Vitek* hearings were scheduled for those patients who wished to challenge their admissions to the SQ PIP. Admissions of patients who did not prevail at those hearings and remained designated for the SQ PIP after IDTT consideration would begin on Monday, October 6, at the rate of approximately seven patients per week until all were admitted.

During the October monitoring visit, staff reported that the SQ PIP had submitted its application for The Joint Commission accreditation. The Commission's accreditation tour of the SQ PIP was scheduled to take place in April 2015.

As noted above, the Special Master's expert and monitor returned for a second monitoring visit at the SQ PIP, from November 4-6, to follow up on their October inspection, examine the continuation of the program activation, and inspect the program itself by reviewing documents, interviewing staff, observing treatment and staff activities, and interviewing SQ PIP patients.

By the time of the third and final monitoring visit before this report in December, the SQ PIP was continuing to progress, dealing with challenges that new programs typically face. There had been positive developments by that time. Multiple self-monitoring systems, including

11

systems to elicit feedback from patients, were in place.  When impediments to effective

operations were detected, attention was quickly focused on how to correct them.  This resulted in

many rapid changes at the SQ PIP during the two-month period between the October 1 program

activation and the December monitoring visit. In some instances, line staff did not have fully up-

to-date information.  Program staff pledged to work on resolving these communication problems.

The commitment of program staff to the success of the SQ PIP was apparent during the

conduct of the patient assessment process and in the significant amount of treatment

opportunities being established.  It was clear that staff had worked hard to bring the program to

the operational level that was observed a mere two months after its activation had begun.

### B. PROGRAM CENSUS

The SQ PIP has 39 licensed beds, plus an additional dedicated observation room,

designated to provide intermediate and acute inpatient mental health care to condemned CDCR

inmates.  As noted above, it admitted 23 inmates on its first day of activation, October 1.  By

November 4, program census had risen to 31, and by December 3, it had risen to 34.  All patients

admitted to the SQ PIP since its activation have been admitted at the intermediate inpatient level

of care.

### C. STAFFING AND STAFF TRAINING

Staff reported that employee recruitment was ongoing and that the program utilized

Request for Freeze Exemption Requests (RFER) and Limited Term and Full-Time certification

lists (LTFT), as appropriate, to fill vacancies.

#### 1. Administrative Staffing

As of December 4, 2014, the SQ PIP had a budgeted position for its executive director,

which was filled by a senior psychologist supervisor.  Its budgeted program director position was

filled, as was its program assistant position, by a senior psychiatric social worker.  A budgeted and filled physician/surgeon position for Central Health Services at SQ also provided services to the SQ PIP.

### 2.    Clinical Staffing

#### a.    Psychiatrists

The budgeted senior psychiatry supervisor position and the three line psychiatrist positions were all filled.  In addition, to enhance treatment capacity during the period of transition to full programming, the SQ PIP decided to utilize four psychiatrists, each of whom was assigned to one of four IDTTs.   The fourth psychiatrist had been re-directed from the enhanced outpatient program (EOP) to the SQ PIP, and the resulting psychiatry position opening in the EOP was back-filled by use of registry staff, according to SQ PIP management.

#### b.    Psychologists

The senior psychologist specialist position was filled by a behavioral psychologist, who, according to staff, had previously been with the DSH and was providing consultation to each SQ PIP treatment team and training for staff.  All three budgeted line clinical psychologist positions were filled.

#### c.    Social Workers

All four budgeted licensed social worker positions were filled.

#### d.    Recreation Therapists

All four budgeted recreation therapist positions were filled.

e.      **Registered Nurses (RNs)**

The SQ PIP utilized nurses as mental health workers.  The three budgeted supervising RN II positions were filled.  Seven of the 11 budgeted RN positions were also filled, for a vacancy rate of 36 percent in line nursing staffing.

f.      **Medical Technical Assistants (MTAs)**

The SQ PIP did not utilize MTAs.

g.      **Licensed Vocational Nurses (LVN)**

Six of the 11 budgeted LVN positions were filled, for a vacancy rate of 43 percent.

h.      **Psych Techs**

Five of the six budgeted senior psych tech positions were filled, for a 17-percent vacancy rate.  Twelve of the 31.5 budgeted line psych tech positions were also filled, leaving a vacancy rate of 62 percent.

Staff reported that nursing vacancies (RNs, LVNs, and psych techs) were covered by the following staff, in the order indicated:  (1) voluntary staff overtime, (2) re-direction of staff (provided that it caused no adverse effect on functioning of the program from which staff was re-directed), (3) mandatory overtime, and (4) use of registry staff.

i.      **Office Staff**

Budgeted positions for the correctional health services administrator II, the office technician II, and four office techs were all filled.  Each of the budgeted training officer and associate government program analyst (AGPA) positions were also filled.

j.      **Correctional Staff**

All 21.2 budgeted custody positions, including a correctional counselor I position with a relief factor, were filled.

### 3.    Clinical Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

Generally, the SQ PIP was richly staffed and exceeded the mental health clinician staff-to-patient ratio of 1:15 that is appropriate for admissions units and acute inpatient care programs. The SQ PIP ratio is similar to the ratio that was established by CDCR in its psychiatric inpatient program at the California Institution for Women (CIW PIP).  The following line staff-to-patient ratios, by discipline, were in place at the time of the December monitoring visit.

#### a.    Psychiatrists

As reported above, the SQ PIP was budgeted for three line psychiatrists, for a psychiatrist-to-patient ratio of 1:12.  In addition, the use of the fourth psychiatrist during the transition period (see above), further enhanced the richness of line psychiatry staffing in the program.

#### b.    Psychologists

The staffing ratio for line psychologists was 1:11.3.

#### c.    Social Workers

Among line social workers, the staffing ratio was 1:8.5.

#### d.    Recreation Therapists

Line recreation therapy positions were filled at a ratio of 1:8.5

#### e.    Registered Nurses (RNs)

The staff-to-patient ratio at the SQ PIP for line RNs was 1:4.9.  For nursing positions, the SQ PIP followed the nursing staffing ratio of four nurses to 31 to 40 patients (4:31-40) for an acute care program, as provided in California Code of Regulations, Title 22, Section 79757, "Mental Health Treatment Program Staffing – Acute Care Requirements."  The seven filled line RN positions satisfied the Title 22 requirement.

15

### f.     Licensed Vocational Nurses

The staff-to-patient ratio for LVNs was 1:6.

### g.     Psych Techs

 Psych tech positions were filled for a staff-to-patient ratio of 1:2.8.

### 4.     Staff Training

During the October monitoring visit, the Master Assignment Roster (MAR) and In-Service Training (IST) sheets for the SQ PIP were reviewed. Documentation indicated monthly training in August and September 2014 on the CTC and on cultural diversity and personality disorders, and two-day training sessions in the areas of the SQ PIP and therapeutic skills intervention (TSI). Documentation indicated that as of October 1, 2014, 45 percent of custody staff, 75 percent of psych techs, 60 percent of senior psych techs, and all of the RNs had received all or at least part of the required IST. No LVNs had been hired as of the October monitoring visit.

At the November monitoring visit, review of the staffing roster and IST documentation again indicated that monthly training continued into October in the same areas as during August and September. Eighty-nine percent of licensed clinical mental health and recreation therapist staff (including one contract worker), 75 percent of psych techs, 80 percent of senior psych techs, and all RNs had received partial or complete IST. Suicide prevention training was added. Because no LVNs had been hired by the time of the November monitoring visit, there were no trained LVNs on site at that time. Staff reported that the next SQ PIP training was scheduled to follow the suicide prevention training set for December 14, 2014. Some custody staff had received all necessary training, but others had received only partial training.

The monitor also learned at the November monitoring visit that SQ PIP mental health management had embraced the behavioral change treatment model, as evidence by their use of a recently-hired behavioral psychologist with extensive expertise in this area.  During the visit, this psychologist conducted a two-hour orientation training session on changing behavior through positive behavioral support (PBS).  It was required for all mental health staff, and SQ PIP nursing and custody were also invited.  Content was extensive, although some areas for improvement of the training were discussed with some program management staff while on site. Medical staff were invited to a dedicated one-hour training session on PBS systems in mental health.  It focused on the research supporting PBS for patients like those in the SQ PIP, in similar treatment environments.

As of the December monitoring visit, 92.8 percent of mental health clinical staff in the SQ PIP (exclusive of nursing and custody staff) had received suicide prevention training.  The nurse instructor stated that staff across all disciplines who had not received the training would receive it during the next New Employee Orientation (NEO) training session on December 14, 2014.  As of the December monitoring visit, eight licensed clinicians and recreational therapists were already scheduled for the training.  Nursing documentation on suicide prevention training indicated that five of the 11 psych techs, three of the five senior psych techs, and four of the five RNs had received suicide prevention training.  Documentation on suicide prevention training for custody staff was not provided to the monitor.

### D.    TREATMENT AND CLINICAL SERVICES

During the October monitoring visit, SQ PIP management staff presented a treatment schedule to be implemented once the program was fully operational and initial admissions had been completed. It required ICC meetings, initial IDTT meetings within 72 hours of patient

admission, two-hour morning psychiatric lines followed by two and a half hours devoted to
IDTT meetings and/or addressing urgent treatment issues ("mega treatment sessions") five days
per week. Planned treatment for weekdays involved two therapeutic groups each afternoon,
daytime outdoor yard time, and opportunity for therapeutic groups from 7:00 p.m. to 9:00 p.m.
For weekends, it involved therapeutic groups and yard time throughout the day, so that yard time
would be offered to each patient every day. However, because delivery of the restart chairs[4] in
one group treatment room was not expected until November, the array of offered treatment
services was limited to some extent at the time of the October monitoring visit.

By the November monitoring visit, the SQ PIP had evolved further as program
management staff identified and resolved operational impediments at multiple levels. Program
management indicated that out-of-cell treatment activities were suspended during the patient
admission process, and consequently treatment activities decreased for at least some patients.
Recreation therapists were still providing some in-cell activities when possible. The treatment
schedule at that time provided on average approximately 13 treatment hours per patient, with
therapeutic yard time. Because patients expressed lack of interest in certain types of groups
(e.g., "I don't want to color…I want to learn.") and were locked down while not in groups,
increased treatment opportunities needed to be made available. Program management indicated
that this was a priority, and reported that they were in the process of addressing it. There was
also lingering staff unfamiliarity and patient confusion with some aspects of the SQ PIP, which
was not surprising given the newness of the program and which was likely to dissipate over time.

During the December monitoring visit, CDCR mental health staff confirmed that the SQ

_____

[4]Restart chairs are used for security purposes to limit inmate mobility during therapeutic sessions. CDCR has
piloted the use of restart chairs at California State Prison, Los Angeles County (CSP/LAC) and reportedly is
gradually integrating them into more CDCR prisons to explore their usefulness as a potential alternative to
therapeutic modules.

PIP would be staffed to provide both intermediate and acute inpatient levels of care to condemned patients. The enhanced staff-to-patient ratio of 1:15 required for acute care was exceeded for all disciplines, including line psychiatry with a ratio of 1:12, at the time of the December monitoring visit.

At the same time, the description of the SQ PIP acute and intermediate-level programs was incomplete and did not adequately set forth the demarcation between these two levels of care. CDCR headquarters staff, SQ mental health management, and SQ PIP supervisory staff all acknowledged the importance of clarity regarding these programmatic distinctions.

### 1.    Interdisciplinary Treatment Teams (IDTTs)

During the October monitoring visit, staff reported that behavioral plans would be developed as indicated for certain patients in conjunction with their treatment plans. Program management had adapted a treatment plan form to better record treatment planning activities. The form had been approved by the time of the visit. It accommodated entries covering new developments at successive treatment team meetings, the extent of the patient's progress, and any necessary modifications to treatment. Staff reported that training on the new form had been provided and would be provided again as training opportunities arose. They also expected that the new form would be helpful to their preparation for The Joint Commission review.

By the time of the December monitoring visit, it was established that each IDTT had an assigned psychiatrist, psychologist, social worker, recreational therapist, and the assigned SQ PIP correctional counselor. A newly-admitted SQ PIP patient's initial IDTT meeting must be conducted within 72 hours of admission, and the next follow-up meeting must take place within the ensuing ten days. Thereafter, successive IDTT meetings must be held no less frequently than monthly and, as noted above, "mega treatment sessions" would be conducted as needed to

address patients' treatment issues. The Special Master's expert observed two IDTT meetings, both of which were conducted competently, with ample interdisciplinary input from the participants. Treatment planning was thoughtful and clinically appropriate. Both inmates were invited to participate in their treatment planning processes, and one accepted the offer.

### 2.    Group Therapy

At the time of the November monitoring visit, patients did not appear to be assigned to specific groups based on their therapeutic needs, but staff indicated that they were working to provide this. According to the treatment schedule provided to the monitoring team, groups were facilitated primarily by recreation therapists, followed by social workers and psychologists. Five of the 12 staff providing groups were contract/registry staff. Many groups did not yet have assigned staff by the time of the November monitoring visit. Group opportunities were not fully utilized due to lack of psych techs who, according to staff, were used for groups only on Saturday and Sunday evenings. Treatment groups were generally held to four in size to maximize their effectiveness, while enrichment groups could be larger.

Patients were assigned to group tracks A through F. (*See* more detailed discussion of this below). Treatment hours varied according to group assignment and use of therapeutic yard time.[5] The provided program schedule, plus staff interviews, indicated that therapeutic groups continued to be offered during afternoons. Group therapy generally began at 1:30 p.m. and typically lasted 75 minutes to allow for patient transport time. Most treatment groups were conducted on the second floor of the facility, which had adequate and appropriate space.

---

[5]Group A was scheduled for 15.25 hours with therapeutic yard and nine hours without it. Group B was scheduled for 21.5 hours with therapeutic yard and 15.25 hours without it. Group C was scheduled for 24 hours with therapeutic yard and 15.25 hours without it. Group D was scheduled for 26.5 hours with therapeutic yard and 17.75 hours without it. Group F was scheduled for 12.5 hours with therapeutic yard and five hours without it.

Program managers reported sufficient space, time, and escort staff for weekday evening groups which could be run if group facilitators were available during the evenings.

Document review during the December monitoring visit indicated that there had been progress during November in the area of therapeutic groups, specifically with increases in both group offerings and average number of hours of group treatment received. In December, the group treatment schedule allotted 42 hours of treatment opportunities, with three treatment groups and therapeutic yard each day. As some treatment rooms were not yet fully functional, 42 hours per week was the maximum that *could be* scheduled at that time with group room rotation for other treatment uses, as opposed to the number of hours of treatment that was *actually* offered. Staff reported that each patient was scheduled for three treatment groups and one therapeutic yard, for a total of six hours of treatment per day or 42 hours per week, exclusive of individual treatment hours with a psychiatrist or other clinician. This was a dramatic increase over the November group scheduling, although it included the non-operational treatment room. Once the non-functional treatment room became functional with the modification of the restart chairs, the full 42 hours would be available to all patients.

Patients' group participation was fairly evenly distributed across the range of offered groups, although there was some clustering, with a group of ten patients who typically attended less than 8.3 hours of treatment and a subgroup who typically participated in fewer than three hours of group treatment per week. Patients in this subgroup would likely benefit from referral to the behavioral psychologist and consideration for individual behavioral plans to address apparent issues with treatment participation.

Group offerings and attendance during November 2014 are summarized as follows[6], exclusive of patients' individual treatment hours:

| WEEK | AVERAGE SCHEDULED HOURS | RANGE | AVERAGE OFFERED HOURS | RANGE | AVERAGE ATTENDED HOURS | RANGE |
|---|---|---|---|---|---|---|
| 11/2-11/8/14 | 20 | 15-26 | 19 | 14-25 | 12 | 2-23 |
| 11/9-11/15/14 | 22 | 20-27 | 22 | 19-27 | 11 | 1-26 |
| 11/16-11/22/14 | 29 | 30-40 | 27 | 14-32 | 15 | 1-32 |
| 11/23-11/29/14 | 36 | 31-41 | 35 | 30-40 | 16 | .25-38 |

During the December monitoring visit, the Special Master's expert observed three group therapy sessions, ranging from two to four patients per group. Two of the groups were very well conducted. The third group had only two inmates, which was problematic in terms of size and suitability of the group to these two inmates.

Group therapy was the major treatment modality at the SQ PIP. As stated above, it was formatted around a total of three clusters of therapeutic groups, each of which was known as a cohort. Within each cohort, the group offerings were subdivided into tracks. All SQ PIP patients participated in all three cohorts. However, within each cohort, each patient was assigned to one of the tracks of therapeutics groups. All programming within cohorts was comprised of structured activities only.

One of the cohorts, which was comprised of six tracks and was known as Cohort A-F, delivered the majority of clinical treatment at the SQ PIP. Assignments to this cohort were made by consensus of the treatment team to meet the patient's treatment needs, upon consideration of the patient's treatment targets, symptomology, treatment goals, potential group dynamics with

---

[6] Source: Data provided to the Special Master by SQ PIP, taken from the CDCR's internet-based mental health treatment tracking system, Mental Health Tracking System, MHTS.net.

other patients, and willingness to participate in treatment.  Informally, information from custody staff was also taken into consideration if relevant. Program custody staff should be formally incorporated into this process, given the likelihood of their having valuable relevant information.

The second cohort, Weekday Evening Cohort 1-4 (comprised of four tracks), was comprised of structured activities in evening groups that were larger than those in Cohort A-F. There were four evening groups with approximately eight to nine patients in each that were made up of enrichment activities, such as cinema.

The third cohort, known as Weekend Evening Cohort 1-4 (comprised of four tracks), provided activities that were determined by the patients and have included ukulele lessons and watching the World Series and movies.  The patients specifically request activities during the week or are prompted for activities during the weekend until four activities have been identified. They also self-select which groups they will be in. These are very significant differences from the way group content and assignments are made in Cohort A – F and Weekend Evening Cohort 1 – 4.  This permitted patients to participate in selecting enrichment activities that they would enjoy during weekend evenings.

During the December monitoring visit, staff indicated that there were treatment groups that addressed self-injurious behaviors (SIBs). SIB and suicide prevention concerns were being appropriately addressed in treatment groups, as patients acknowledged.

As of the December monitoring visit, the SQ PIP had not scheduled nor offered any unstructured activities to its patients. Program and custody management staff agreed to consider offering supervised unstructured activities which would also be clinically beneficial to individual patients.  Staff also indicated that the program was considering instituting communal dining after the restart chairs in the dayrooms have been modified.  However, as of the December monitoring

visit, it was not determined how the limitations on available time and space in the dayrooms where dining would occur would be overcome.

### 3.    Individual Therapy

By the time of the November monitoring visit, two hours each morning were blocked out for psychiatry line, and individual clinical sessions after the psychiatry line had concluded.  As confirmed during the December monitoring visit, the patient's assigned psychiatrist is a required member of the patient's IDTT.  Psychiatrists were required to see each of their patients at least every 72 hours.  Each patient was also assigned a PC, who may be either a psychologist or a social worker. Every PC is required to see his patients at least weekly. In addition, other clinicians (except psychiatrists) who are members of a patient's IDTT may serve as SCs for individual patients.

Space for individual treatment was limited. Staff reported that problems with coordination and scheduling of available rooms were addressed by assignment of individual treatment spaces to designated treatment teams.  Each team then scheduled its own members' use of its designated space, with priority given to psychiatry.  Because this process was implemented only one to two weeks before the November monitoring visit, program management said that it was too early to assess its efficacy.  By the time of the December monitoring visit, IDTT meetings and patient contacts with psychiatrists and PCs were taking place in appropriate confidential settings.

### 4.    Other Treatment Issues

#### a.    Cross-Discipline Relations

Numerous staff reported positive working relationships among themselves and custody and mental health staff. As the program evolved, staff reported a number of issues of concern

related to the working relationships between medical and mental health staffs in the SQ PIP. During the December monitoring visit, healthcare leadership at SQ committed to address and resolve the issues amicably.

        **b.**        **Effect of Nursing Vacancies on Delivery of Care**

During the November monitoring visit, it was clear that the role of nursing in the SQ PIP was still evolving while it was also affected by slow hiring, changes in institutional nursing leadership and in the psych tech reporting structure, and ongoing development of program changes.

Staff said that all SQ PIP patients were on mandatory 15-minute checks by nursing throughout their stays. Nurse-facilitated treatment groups were facing significant challenges at the time of the December monitoring visit. Patients described these groups as unstructured, with facilitators constantly changing. Program management and level-of-care nursing staff readily acknowledged these concerns as well as the need for additional training, and said that they were working on remedying them. They said that permanent group facilitator assignments were impeded by the nursing staff vacancies, which the institution was addressing at the time of the December monitoring visit.

        **c.**        **Yard, Dayroom, and Treatment Space**

As of the November monitoring visit, SQ PIP patients had access to only therapeutic yard, with no "custody" or general yard time for unstructured yard activity. Interviewed patients complained about not having access to unstructured yard activities.

By the time of the December monitoring visit, staff reported plans to divide a larger yard into two yards to provide more programming, and that drawings were completed and awaiting action by the State Fire Marshal for approval. Each of the two dayrooms was equipped with two

telephones and one television. If allowed under custodial eligibility rules, patients could access these rooms for telephone calls. One of the dayrooms had three restart chairs installed, and another three were planned for the second room. Staff indicated that they were in the process of identifying appropriate materials to modify the chairs. Plans for use of the dayrooms for non-structured therapeutic activities were also under consideration.

At the time of the December monitoring visit, staff reported that the program activities of no single treatment cohort were disproportionately affected by rotating group cohorts through the currently available treatment space.

### E. PATIENT ACCESS TO TREATMENT

#### 1. Security Measures in the SQ PIP

Staff reported that SQ's "Operational Procedure: Condemned Manual," as revised in October 2014, required that all condemned inmates be handcuffed during all movements from place to place, and that they must be in therapeutic modules or restart chairs during all treatment. Staff pointed out that although CDCR regulations required all condemned inmates to be escorted in handcuffs, this rule did not apply while patients were in treatment settings, and accordingly, SQ PIP patients were not handcuffed while in therapeutic modules during therapeutic sessions. They were, however, placed in restart chairs, regardless of patients' stage levels. Staff also reported that custody-cleared SQ PIP patients would eventually be allowed to participate in group yard, once construction of the SQ PIP yard is completed to allow for non-therapeutic yard activities.

#### 2. The SQ PIP Stage Level System

The SQ PIP utilized a behaviorally-based stage level system that was designed on the theory of incentivizing patients with various privileges, including personal property. This stage

26

level system did not affect patients' access to treatment and care, but as discussed below, it did have the potential for disincentivizing some patients from seeking and participating in needed treatment.

At the time of program activation, the SQ PIP instituted its stage level system. The system had five levels: (1) Discretionary Program Status (DPS), (2) Discretionary Program Status 72 (DPS 72), (3) Stage 1, (4) Stage 2, and (5) Stage 3. As is typical of stage level systems in mental health programs, there were multiple behavioral objectives that each patient must attain to advance to the next stage. A patient could move through the DPS and DPS 72 stages fairly quickly, but Stages 1 through 3 would take longer. At the time of the December monitoring visit, five patients were at DPS, including two who had arrived as recently as December 1. Eleven of the 12 patients at Stage 1 had been admitted during the first or second week of program activation; the twelfth was admitted on November 13. Two patients were at Stage 2, and the remaining 15 patients were at Stage 3.

It was noted with concern that the distribution of patients across the five stages was uneven, with five patients clustered at the DPS level and the rest toward the end of the stage level spectrum. Many of these DPS patients were already well known to SQ PIP staff, having already been treated in SQ's CTC and OHU for many months. For these patients and others who linger at the initial stage levels, the incentive/reinforcement feature of the stage level system does not appear to be effective. Individualized behavioral plans including individualized reinforcement systems should be considered for those patients who remain at the DPS Stages and Stage 1 and have never had a higher level of functioning. SQ PIP management staff indicated that they would review the implementation of the stage level system as a whole, as well as the

case of a particular patient who had regressed several stages but had not received any change in treatment.

### a. Property and Privileges of Condemned Inmates, Generally and in the SQ PIP

All condemned inmates at SQ are classified for custody purposes as Grade A or Grade B, regardless of their housing, including the SQ PIP. A condemned inmate's custody grade level governs all of his privileges, including canteen, packages, family telephone access and visitation, custody yard access, property, and quantity and type of clothing.[7] However, ***regardless of a patient's custody Grade***, on a patient's admission to the SQ PIP, all canteen, packages, and family telephone and visitation privileges are withdrawn in order to use them as behavioral incentives under the stage level system in the SQ PIP. Patients in the SQ PIP received eating utensils, clothing, underwear, socks, linens, shoes, personal care items, a pen filler, loose paper, books, magazines, art supplies, and religious materials, but only to limited and varying degrees according to whatever stage level the patient attains or "earns." Patient record review and interviews indicated that IDTTs have, at times, granted exceptions to stage level restrictions for some patients but only if clinically beneficial. Line clinical staff indicated that they exercised the latitude to deviate from strictly stage level limitations if in the best clinical interest of their patients. This was observed to occur during IDTT meetings over the course of the three monitoring visits in limited instances.

---

[7]SQ's Operational Procedure: Condemned Manual (*revised* October 2014), governs condemned inmates' privileges. Grade A condemned inmates are entitled to two family telephone calls per week for 15 minutes, but may have more if time permits. Grade B condemned inmates do not have family telephone access except in cases of emergency. Grade A condemned inmates are entitled to the maximum canteen draw of $220.00 monthly, while the maximum canteen draw for Grade B condemned inmates is $55.00 monthly. Grade A condemned inmates are entitled to two contact visits per week for up to two and a half hours. Grade B condemned inmates are allowed one hour non-contact visits, with up to two visits per week if space permits. Grade A condemned inmates are allowed one package every calendar quarter, while Grade B condemned inmates are entitled to one package every 365 days.

###### b.    **DPS**

All patients were placed on DPS upon their admissions to the SQ PIP.  They remained there until their initial IDTT meeting which is required within 72 hours.  These patients receive prescribed quantities and types of eating utensils, clothing, underwear, and socks, linens, shoes, personal care items, pen filler, loose paper, books, magazines, oil pastels, and religious materials. They do not have access to canteen, packages, nor family telephone calls or visits. They may have one-to-one yard time as a clinical intervention, as indicated.

###### c.    **DPS 72**

After the initial IDTT meeting, patients are placed on DPS 72, where they received prescribed quantities and types of the same property as patients on DPS plus stamps, envelopes, a pad, legal documents, letters, and photographs. DPS 72 patients were entitled to canteen up to $25.00 and to packages according to their Grade level, access to therapeutic yard, and earplugs if approved by the IDTT.  They were not granted access to family visits or telephone calls.

###### d.    **Stage 1**

Stage 1 patients received prescribed quantities and types of the same property as DPS 72 patients, plus playing cards for Grade A inmates, monthly canteen up to $55.00, packages according to their Grade level, and access to therapeutic yard.  They did not have access to family visits and telephone calls.

###### e.    **Stage 2**

Stage 2 patients received prescribed quantities and types of the same property as Stage 1 patients, plus one ring, and monthly canteen up to $110.00 for Grade A level patients and $75.00 for Grade B level patients, packages according to their custody Grade level, and access to

therapeutic yard. Grade A patients had access to family telephone calls, and both Grade levels had access to family visits as designated for their Grade level.

### f.       Stage 3

Stage 3 patients received prescribed quantities and types of the same property as Stage 2 patients, earplugs if approved by the IDTT, monthly canteen up to $220.00 for Grade A level patients and $110.00 for Grade B custody level patients, packages according to their Grade level, and access to therapeutic yard. Grade A patients had access to daily family telephone calls, and both Grades had full access to family visits as designated for their Grade levels.

### 3.       Critique of the SQ PIP Stage Level System

From the outset of the assessment of the SQ PIP in April 2014, and through each visit since then, there have been concerns surrounding the program's stage level system.  The same concerns had been raised about the CIW PIP stage system, on which the SQ PIP system was based.  Without clinical justification and as a routine part of the SQ PIP admission process, the SQ PIP stage level system restricts patients from such basic supports as family telephone and visitation privileges. No clinically justifiable rationale was offered for automatically denying new patients these basic fundamental sources of support that can help them cope with their mental health problems and their adjustment to entrance into inpatient care.  These deprivations are not, and should not be considered, therapeutic or appropriate incentives for treatment. Instead, they tend to promote a system of institutionalized *dis*incentive to treatment, particularly for those patients who are already resistant to treatment, as was found among several patients during the assessment process.  It was also observed that many of the patients admitted into the SQ PIP requested *Vitek* hearings challenging their referrals to the SQ PIP.  Several of these patients prevailed on their *Vitek* hearings.

Interviews of patients corroborated these concerns, indicating that the automatic removal of the basic privileges that patients had while in their housing units created a patient perception and an experience of admission to the SQ PIP as a form of discouragement to enter treatment, not unlike placement in the SQ Adjustment Center (AC), where inmates also lose privileges. Interviews of patients indicated that some had acquiesced to the stage level system, but others remained resistant to it, complaining that they felt they were somehow being penalized for having a serious mental illness and needing treatment for it, which could potentially adversely affect their prospects for successful treatment.

During the December monitoring visit, the Special Master's expert discussed the stage level system at length with mental health and custody leadership at SQ.  It was recommended to the SQ PIP management and headquarters staff who were present that, to the extent family telephone calls and visitation would continue to be used as reinforcers for positive behavior in the SQ PIP, patients should also be able to retain whatever privileges they had had in their housing units and the reinforcers would be to provide those at an *enhanced* level.  These privileges should be dispensed and managed as clinically-appropriate incentives, in line with those that are provided in patients' housing units, with full support by the custody chain of command.  Program mental health and senior custody staff indicated that they would re-examine the stage level system and reconsider the automatic removal family telephone calls and visitation for newly admitted SQ PIP patients, unless removal of these privileges was clinically supported.

### F.   REFERRALS, ADMISSIONS, AND DISCHARGES

Two referrals for admission to the SQ PIP were in progress during the time of the December monitoring visit. According to program management, since activation on October 1, 2014 several patients were nearing discharge and the process had begun.  Referred to as "360-

degree discharge," it consisted of discussions among SQ PIP staff and the mental health, custody, and nursing staff in the patient's housing unit on planning his transition back there.  The behavioral psychologist also participated in these discharge case conferences and was to meet with the discharged patients' treatment teams as an additional resource after these patients had left the SQ PIP.

**G.**    **PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE**

As of the December monitoring visit, six Rule Violation Reports (RVRs) had been issued to SQ PIP patients since activation.  Mental health assessments for all were completed as required. None had been heard as of the time of the last monitoring visit to the SQ PIP.  One use of force had occurred, and Oleoresin Capsicum (OC) spray ("pepper spray") was used to enforce the patient's compliance with a custody order.  He was escorted to decontamination, cleared medically, and re-housed without further incident.  This use of force was still under review, as required by CDCR, and no final report had yet been completed.

**H.**    **UNUSUAL OCCURRENCES**

Staff documented any unusual occurrences and reported them monthly to the mental health subcommittee. Three unusual occurrences per month were documented for both October and November.

**I.**    **USE OF OBSERVATION CELLS; SECLUSION AND RESTRAINT**

Log reviews and staff interviews indicated that no inmates had been placed in restraints for mental health purposes since program activation on October 1, 2014 through December 4, 2014.  Program staff indicated that they would take quality improvement needs into consideration in tracking the use of restraints.

J.   **EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS**

No suicides at the SQ PIP were reported for the period from its activation on October 1 to December 4, 2014.

K.   **UTILIZATION REVIEW AND QUALITY MANAGEMENT**

During the October monitoring visit, staff reported that there would be a dedicated quality management process to monitor and gauge adherence to licensing and The Joint Commission standards.  Staff reported that quality management activities were scheduled to officially begin in November 2014, under the management of the SQ PIP clinical director.

By the time of the November monitoring visit, it had been decided that because of the data collection and reporting involved with the multiple licensing and accrediting agencies for the SQ PIP apart from CDCR requirements, the SQ PIP would establish a mental health subcommittee distinct from the larger institutional subcommittee. The subcommittee's first meeting took place during the November monitoring visit.

L.   **MORNING MEETINGS, END-OF-SHIFT BRIEFINGS, AND INTER-STAFF COMMUNICATION**

At the time of the November monitoring visit, all disciplines working in the SQ PIP and in the triage and treatment area (TTA) met at 7:30 a.m. each work day.  Attending disciplines included mental health, custody, and nursing.  Participants included the chief psychiatrist, supervising psychiatric social worker, and two senior psych techs.  Discussion of all 31 SQ PIP patients at that time centered on medication, activities of daily living (ADLs) treatment concerns, patients' current steps, and any issues with "mega-meetings," i.e. urgent treatment team meetings to address urgent treatment issues.  In these meetings, staff used an electronic recording system[8] to record information on each patient from each watch.  It appeared at the time of the

---

[8]Comparable to the more commonly known Kardex system.

November monitoring visit that all nursing staff could access and enter or delete information from that system, rather than through a single designated person on each shift. Two separate databases – one for second watch and another for first and third watch – were created and maintained, necessitating that a care provider pull up both databases to see what occurred with any given patient during the preceding 24-hour period. The senior psych techs at the morning meeting indicated no known reason for keeping two separate databases and acknowledged the value of having the databases merged, accessed, and modified by only one designated person on each shift to foster consistency, accuracy, and currentness of content.

The SQ PIP also held regular morning operational meetings/teleconferences among staff from each major discipline/area of operation including nursing, custody, mental health, medical, and plant operations. They were conducted to timely address administrative issues that affected SQ PIP operations. The Special Master's team observed an operational meeting during the November monitoring visit. It addressed updates on the restart chair installation and the medication reconciliation form, grooming schedule issues, and the lack of a specific RVR policy for the SQ PIP. The meeting generated discussion by various attendees, was brief and focused, and concluded with a plan for training and further discussion.

Shift-change briefings at the SQ PIP were required by policy for nursing staff but were neither required nor occurring among multiple disciplines. In the past, third watch custody staff had complained that without any briefing by the preceding shift, they felt insufficiently informed. Their complaint was valid. Multidisciplinary shift change meetings would help keep all staff on each shift informed of developments and promote cohesiveness in staff function. On transitions from second and third watch, mental health staff could meet with nursing and custody

staff. Such meetings are utilized to considerable benefit at the DSH's inpatient programs and at the CIW PIP for enhancing treatment continuity, and staff education and safety.

During the December monitoring visit, the Special Master's expert attended a shift change briefing on the transition from second to third shift for nursing. Among other things, it covered identification of nursing group facilitators and contact persons for specified patients as required by their treatment plans. Attendance was multi-disciplinary, with custody, mental health, and nursing supervisors. This positive practice should also include a review of patients to ensure notice to the oncoming shift of any significant concerns with individual patients.

Given the newness, complexity, and continuing changes in the SQ PIP, it was not surprising that some staff had inaccurate information about many aspects of the program. To address this, SQ PIP management reported that it had implemented meetings among line staff as well as chain-of-command meetings with support staff, including plant operations workers, all of whom have a role in the successful operation of the program.

M.    *COLEMAN* POSTINGS

*Coleman* postings were noted in the SQ PIP during the December monitoring visit.

N.    VISITATION

At the time of the December monitoring visit, staff reported that those SQ PIP patients who had visitation privileges had the same ones as inmates in the SQ housing units, with frequency and duration of visits varying by patients' custody grade levels. No issues with visitation were reported at that time for those patients permitted visitations. As in other prison health care settings, patients' acuity levels were also taken into consideration in determining the extent of their visitation privileges.

O.    ACCESS TO LEGAL REPRESENTATION AND LAW LIBRARY

No issues with patients' access to legal counsel via telephone were reported as of the time of the December monitoring visit.  By that time, the Special Master had received a letter from legal counsel for the California Appellate Project who, along with several other entities within the California capital defense community, represents the interests of CDCR condemned inmates. The letter acknowledged some concerns arising out of overlapping areas of interest to counsel and to the Special Master that could potentially affect SQ PIP patients' legal defense interests. The Special Master, defendants, and plaintiffs' counsel agreed that CDCR and the capital defense community would meet to address and seek resolution of the issues of concern raised in the referenced letter. These issues will be examined during an upcoming monitoring re-visit to the SQ PIP, and relevant updates will be reported within the Special Master's report on the mental health inpatient programs which treat CDCR inmates.

Ongoing problems with patients' access to the law library and other legal resource materials persisted into November, after activation of the SQ PIP on October 1.  Staff reported that a paging system in place was difficult and had been placed on management's agenda to be addressed.  By the time of the December monitoring visit, the paging system was still being used, but staff reported plans to install a kiosk by the end of December to help improve patient accessibility to the law library through the paging system.

P.    **LAUNDRY, SUPPLY, AND OTHER ISSUES**

No laundry or supply issues at the SQ PIP were reported since activation on October 1.

Q.    **PATIENTS' CONCERNS AND REPRESENTATION**

Management staff were told that patients continued to express concerns about the appeals process, indicating that resolutions implemented by SQ PIP staff did not work if appeals had to

reach higher levels.  Management staff reported that they would continue working on resolving the problems with the appeal process.

Eight of the 31 patients in the SQ PIP were interviewed at the time of the November monitoring visit.  They expressed concerns in the areas of (a) reduction in treatment groups since admission to the SQ PIP, (b) insufficient communication between staff and patients, (c) an annoying unresolved alarm malfunction, (d) insufficient yard, (e) challenges with the patient appeal process; (f) excessive limitations on telephone and visitation privileges, (g) and lack of any clear description of the SQ PIP, and of the differences between privileges for those patients from the AC and those from East Block (EB).  Some patients reported that they requested program information/description in advance of their admissions, including a description of the program.  Clinicians talked to their patients about the program but were not provided any written information, which they wanted to review and consider in deciding whether to consent to treatment.  Patients should be given adequate and timely information about the SQ PIP program, covering services and privileges at a minimum.

During the December monitoring visit, a total of seven patients were interviewed.  Their reaction to the SQ PIP treatment programs was generally positive, except regarding loss of the privileges they had had in their housing units.  (*See* discussion above).  Patients also expressed frustration with the frequency of changes in the SQ PIP that had been occurring during the preceding months as the program evolved.  A consistent theme in patients' feedback was feeling infantilized by some of the program rules.

The changes in the treatment program being implemented were clearly in the patients' best interests -- to increase treatment opportunities, improve patient access to PCs, and improve the operations of the unit as a whole. Staff acknowledged the difficulties and challenges that

come with changes, particularly for patients. In addition, because of custody considerations involving condemned inmates, staff could not meet with all of the patients at one time to ensure that they receive an accurate, consistent message. As a result, patients often resorted to sharing information and sometimes misinformation among themselves, which can take time to correct. To help address patient concerns about not knowing what is happening in the SQ PIP, staff reported they had also conducted patient surveys the week prior to the December monitoring visit regarding the program and the care being provided. The survey results were reviewed and provided to the treatment teams so that they could be taken into consideration in treatment decisions. These surveys included inquiries regarding the types of treatment groups and co-participants that patients would like to have.

During the December monitoring visit, staff reported that the SQ PIP had recently implemented its patient council, which was modeled after the CIW PIP patient council. Its purpose was to help patients express their concerns to staff and help resolve some issues. Staff identified patients for council membership and for serving as council president, vice president, secretary, public relations officer, and resource coordinator. Staff met with the patient council on the weekend prior to the December monitoring visit and explained the role, process, and staff expectations of the council.

Patients would meet with the council, but in small groups because no space was large enough for all patients to meet at the same time. After the patient meetings, council members would then meet with management representatives of custody, medical, nursing, and mental health to discuss patients' concerns. Following that meeting, the council would reconvene with the patients to report the outcome of its meetings with staff with the goal of helping to open communication channels between patients and staff and to provide another means for addressing

and resolving patients' concerns. During the December monitoring visit, patients voiced concern that they were not allowed to elect their own council representatives. The idea of a newsletter was suggested to staff as another way of improving program/patient communications.

The SQ PIP revised its policy on lighting effective November 2014 to end "lights on" during sleep hours, from 10:00 p.m. to 6:00 a.m., except in cases of suicide watch or precautions, continuous direct observation and "plus" precautionary observations, in safety cells and observation rooms, and at patients' requests. The monitor observed that patients were afforded shower privacy, unless they were considered at risk, for example when using a sharp implement such as a razor, or if the IDTT had determined that the patient required enhanced monitoring.

## IV.    **CONCLUSION**

The SQ PIP was found to be a promising treatment program for inpatient care of condemned CDCR patients. Generally, it was functioning at a higher, more effective level than is usually found in a complex inpatient program only two months after its activation. This was particularly true with regard to treatment planning and delivery.

Among the impediments that needed to be addressed and corrected were a shortage of adequate space to be used for treatment pending completion of yard construction and modification of restart chairs. There were issues surrounding lack of communication and misinformation among patients, between patients and staff, and among staff themselves, as discussed above. However, it appeared that SQ PIP management staff were aware of these issues and were working on resolving them.

The most troubling aspect of the SQ PIP was the program's stage level system which, as implemented, removes recently-admitted patients' family visitation and telephone privileges, among other privileges, that they enjoyed while in their housing units. The system re-cast these

privileges as incentives to progress through the stage levels described above. The clustering of some patients at the initial stage levels would suggest that the intended incentivizing effect of this system is not working for at least some patients. It is not surprising that there are patients and observers who have viewed this system as unnecessary and anti-therapeutic. As noted above, mental health and custody administrative staff have indicated willingness to revamp the stage level system to end the automatic removal of these privileges for patients admitted into the SQ PIP, unless suspension of these privileges is clinically indicated.

Because of the overall positive direction found at the SQ PIP and the apparent receptivity among program staff to reconsidering its stage level system, it is now time for the SQ PIP to operate and mature as a program, and for a shift away from the Special Master's frequent presence at the SQ PIP over the past year and toward monitoring of the program within the course of his monitoring of the other mental health inpatient programs which treat CDCR inmates. The Special Master invested significant resources and effort to helping CDCR cultivate the SQ PIP, which appears thus far to have reaped good results. In fact, it is not an exaggeration to say that no other single mental health unit has drawn more concentrated attention and effort by the Special Master as the program was shepherded along from being essentially some enhanced treatment services to becoming a full-blown mental health hospital-level inpatient program. In 2014 alone, the Special Master's staff worked closely with CDCR to develop the patient assessment process and conduct the assessment, as described in the Special Master's report that was filed last June. Thereafter, the Special Master's expert worked on site at the SQ PIP regularly, followed by the three monitoring visits during the fall of 2014 which are covered in this report.

SQ PIP staff have worked hard to bring the program as far as it has come in this relatively short period of time.  Nevertheless, the program is still very new and will likely have to undergo more challenges and changes before oversight of it should end.  Accordingly, the Special Master recommends the entry of an order directing him to continue monitoring the progress of the SQ PIP as part of his ongoing monitoring of the other programs which provide mental health inpatient treatment to CDCR inmates, and to provide an updated report on the SQ PIP within his comprehensive report on his findings at all of the other such programs.

Respectfully submitted,

_____
Matthew A. Lopes, Jr., Esq.
Special Master

December 30, 2014

**EXHIBIT A**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AC | Adjustment Center |
| ADL | Activities of Daily Living |
| AGPA | Associate Government Program Analyst |
| BCP | Budget Change Proposal |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | California Health Care Facility |
| CHSB | Central Health Services Building |
| CIW PIP | California Institution for Women Psychiatrist Inpatient Program |
| CMF | California Medical Facility |
| CTC | Correctional Treatment Center |
| DCHCS | Division of Correctional Health Care Services |
| DPS | Discretionary Program Status |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| ICC | Institutional Classification Committee |
| IDTT | Interdisciplinary Treatment Team |
| IST | In-Service Training |
| LTFT | Limited Term Full-Time |
| LVN | Licensed Vocational Nurse |
| MAR | Master Assignment Roster |
| MHCB | Mental Health Crisis Bed |
| MTA | Medical Technical Assistant |

| | |
|---|---|
| NAMH | Non-Acute Mental Health |
| NEO | New Employee Orientation |
| OC | Oleoresin Capsicum |
| OHU | Outpatient Housing Unit |
| PBS | Positive Behavioral Support |
| PC | Primary Clinician |
| RFER | Request for Freeze Exemption |
| RN | Registered Nurse |
| RVR | Rule Violation Report |
| SC | Secondary Clinician |
| SQ | San Quentin State Prison |
| SQ PIP | San Quentin Psychiatric Inpatient Program |
| SCCP | Specialized Care for the Condemned Program |
| TSI | Therapeutic Skills Intervention |
| TTA | Triage and Treatment Area |