# An Audit of Suicide Prevention Practices
## in the Prisons of the California Department of
## Corrections and Rehabilitation

Lindsay M. Hayes, M.S.
January 14, 2014

## Introduction

Over the past several years, the *Coleman* Court has addressed the continuing problem of inmate suicides in the prisons of the California Department of Corrections and Rehabilitation (CDCR). On April 5, 2013, the Court stated that "for over a decade a disproportionately high number of inmates have committed suicide in California's prison system. Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR. Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy these inadequacies. The evidence shows they have not done so. In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not. An ongoing constitutional violation therefore remains." (ECF 4539)

On July 12, 2013, the *Coleman* court ordered the establishment of a Suicide Prevention Management Workgroup to address and resolve this problem. Among other things, the Court ordered that:

> Defendants shall forthwith, under the supervision of the Special Master, establish a suicide prevention/management work group comprised of CDCR clinical, custody, and administrative staff, Department of State Hospitals (DSH) staff, the Special Master's experts, plaintiffs' counsel and, as appropriate, the *Plata* receiver to work under the guidance of the Special Master to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause.

(ECF 4693) The Workgroup was organized and met on three occasions, July 31, August 21, and October 17, 2013. Its members decided and agreed that an expert assessment of current suicide prevention practices in all 34 CDCR prisons was needed for the workgroup to carry out its charge. As a result of this decision by the work group, and at the request of the *Coleman* Special Master, this reviewer was engaged to conduct an audit of inmate suicide prevention practices within the 34 CDCR prisons.

The audits began on November 12, 2013 and continued through July 24, 2014. They entailed an on-site assessment of each prison's suicide prevention practices, and included reviews of suicide prevention local operating procedures (LOPs), selected health care records of inmates currently or recently on suicide precautions/suicide watch status (referred to collectively as "suicide observation" in some portions of this report), hundreds of electronic unit health records (eUHRs) of inmates who had been referred to the mental health program for assessment of suicide risk, minutes of meetings of the institutional Suicide Prevention and Response Focused Improvement Teams (SPRFITs), and all inmate suicides which occurred from 2012 to

1

the times of this reviewer's site visits by examination of eUHRs, CDCR Suicide Reports, and, where applicable, any Quality Improvement Plans (QIP)[1].  The audit also included observation of psychiatric technician (psych tech) rounds in administrative segregation units, the intake screening process conducted by nursing staff in the institutional reception centers (RC) and receiving and release units, Inter-Disciplinary Treatment Team (IDTT) meetings, and custody rounds in administrative segregation units and Security Housing Units (SHUs).  This reviewer also interviewed numerous custody and health care staff.

The order and dates of this reviewer's on-site assessments were as follows:

1.  California State Prison, Los Angeles County (CSP/LAC): November 12-13, 2013
2.  California Correctional Institution (CCI): November 14-15, 2013
3.  California State Prison, Sacramento (CSP/Sac): November 20-21, 2013
4.  Folsom State Prison (FSP): December 3-4, 2013
5.  California Institution for Men (CIM): December 5-6, 2013
6.  Centinela State Prison (Cen): December 17, 2013
7.  Calipatria State Prison (Cal): December 18, 2013
8.  Richard J. Donovan Correctional Facility (RJD): December 19-20, 2013
9.  California Medical Facility (CMF): January 7-8, 2014
10. California State Prison, Solano (CSP/Solano): January 9-10, 2014
11. San Quentin State Prison (SQ): January 21-22, 2014
12. California Men's Colony (CMC): February 4-5, 2014
13. Salinas Valley State Prison (SVSP): February 6-7, 2014
14. California State Prison, Corcoran (CSP/Cor): February 18-19, 2014
15. California Substance Abuse Treatment Facility (CSATF): February 20-21, 2014
16. Ironwood State Prison (ISP): March 4-5, 2014
17. Chuckawalla Valley State Prison (CVSP): March 5-6, 2014
18. Wasco State Prison (WSP): March 25-26, 2014
19. North Kern State Prison (NKSP): March 27-28, 2014
20. Central California Women's Facility (CCWF): April 8-9, 2014
21. Valley State Prison (VSP): April 10-11, 2014
22. Kern Valley State Prison (KVSP): April 22-23, 2014
23. Correctional Training Facility (CTF): April 24-25, 2014
24. Pleasant Valley State Prison (PVSP): May 6-7, 2014
25. Avenal State Prison (ASP): May 8-9, 2014
26. California Institution for Women (CIW): May 20-21, 2014
27. California Rehabilitation Center (CRC): May 22-23, 2014
28. Sierra Conservation Center (SCC): June 10-11, 2014
29. Mule Creek State Prison (MCSP): June 12-13, 2014
30. California Health Care Facility (CHCF): June 24-25, 2014
31. Deuel Vocational Institution (DVI): June 26-27, 2014

---

[1]For purposes of this report, all reviews of eUHRs and Suicide Reports do not include critiques of clinical judgment. Rather, these reviews are based upon critiques of implementation and use of suicide prevention practices set by the *Coleman Program Guide* (2009 revision) and generally applicable standards of care.  Suicides by CDCR inmate-patients while in inpatient mental health programs run by the California Department of State Hospitals (DSH) were not included in this audit.

32. California Correctional Center (CCC): July 8-9, 2014
33. High Desert State Prison (HDSP): July 10-11, 2014
34. Pelican Bay State Prison (PBSP): July 23-24, 2014

In addition, this reviewer observed a full-day Mental Health Services Delivery System (MHSDS) training workshop at the CDCR Basic Correctional Officer Academy in Galt, California, on November 22, 2013. The workshop included a section on "Crisis Intervention and Suicide Prevention." Block suicide prevention training workshops were also observed at seven prisons: CIW, CMC, KVSP, PVSP, CSATF, VSP, and WSP.

## SUMMARY OF FINDINGS AND EMERGING TRENDS

It is the opinion and conclusion of this reviewer that the applicable provisions of the *Coleman Program Guide* on suicide prevention and response provide reasonable and comprehensive guidelines for the identification and management of suicidal inmates. However, the most significant finding from this audit was that suicide prevention practices in the prisons often did not mirror *Program Guide* requirements. While CDCR has made important advances with its suicide prevention practices, it has not yet fully implemented a thorough, standardized program for the identification, treatment, and supervision of inmates at risk for suicide. As shown in Table 1, from 2010 through 2013, the *number* of inmate suicides in CDCR prisons annually has remained nearly unchanged. Across the same period the *rate* of inmate suicides per 100,000 in CDCR prisons has remained substantially higher than the inmate suicide rate of 16 suicide deaths per 100,000 inmates in other correctional systems throughout the United States.[2] Although the total number of inmate suicides and the corresponding suicide rate in any prison system should not be the sole barometer by which adequacy of its suicide prevention practices should be measured, they can be important tools in making that assessment.

## TABLE 1

### AVERAGE DAILY INMATE POPULATION, SUICIDES, AND SUICIDE RATE IN CDCR PRISONS, 1999 THROUGH DECEMBER 2014[3]

| Year | ADP | Suicides | Suicide Rate |
|------|-----|----------|--------------|
| 1999 | 159,866 | 25 | 15.6 |
| 2000 | 160,855 | 15 | 9.3 |
| 2001 | 155,365 | 30 | 19.3 |
| 2002 | 158,099 | 22 | 13.9 |
| 2003 | 155,722 | 36 | 23.1 |
| 2004 | 163,346 | 26 | 15.9 |
| 2005 | 164,179 | 43 | 26.2 |
| 2006 | 171,340 | 43 | 25.1 |
| 2007 | 172,535 | 34 | 19.7 |
| 2008 | 165,700 | 37 | 22.3 |

---

[2]*See, e.g.* Noonan, M.E. (2014), *Mortality in Local Jails and State Prisons, 2000-2012 - Statistical Tables*, Washington DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.
[3]Data does not include suicides of CDCR inmates which occurred in contracted, out-of-state facilities.

| 2009 | 159,084 | 25 | 15.7 |
| 2010 | 165,747 | 35 | 21.1 |
| 2011 | 161,818 | 34 | 21.0 |
| 2012 | 134,901 | 33 | 24.4 |
| 2013 | 132,827 | 31 | 23.3 |
| 2014 | 126,619 | 23[4] | 18.2 |

The best methodology for determining whether CDCR has fully implemented its suicide prevention program is to (1) assess suicide prevention practices within each CDCR prison, and (2) review each inmate suicide in relation to practices in the prison and determine its degree of preventability. The critical measurement tool that was utilized was the *Coleman* Program Guide. Specific standards on suicide prevention training, levels of suicide observation, suicide risk evaluation (SRE), management of suicidal inmates, emergency medical response, responsibilities of the SPRFITs, and the mortality review process are found in *Program Guide* Chapter 10, "Suicide Prevention and Response." Other *Program Guide* chapters, including "Reception Center Mental Health Assessment" (Chapter 2), "Mental Health Crisis Bed" (Chapter 5), and "Administrative Segregation" (Chapter 7), provided guidance in other suicide prevention-related areas.

CDCR has made significant progress in suicide prevention with its creation of important tools including the Suicide Risk Evaluation (SRE) form, the requirement that psych techs conduct daily rounds in administrative segregation units to help identify potentially suicidal behaviors, the establishment of SPRFITs to monitor suicide prevention practices, and comprehensive reviews of each inmate suicide. However, there continued to be significant problems with implementation of these practices.

The inmate suicide review process and the issuance of a Suicide Report on each inmate suicide continued to be one of the strengths of the CDCR suicide prevention program. However, a significant number of the corrective actions, developed as "quality improvement plans" within CDCR's suicide review and reporting process, were seemingly repeated over and over again, from one suicide to another, from year to year. A prime example of this was the frequent appearance of corrective actions requiring mental health clinicians to be trained or retrained on the administration of SREs and the associated mentoring program. Other prominent examples were the frequent appearance of corrective actions requiring correctional officers (CO) to be retrained on the requirement to conduct 30-minute rounds in administrative segregation units, and requiring nursing staff to be retrained on appropriate emergency medical response to suicides.

Perhaps the most surprising finding from this audit was how strikingly obvious many of the deficiencies in suicide prevention practices were. Yet, they had not been identified in any CDCR quality assurance/quality improvement activities, including the SPRFIT process. For example:

---

[4]As of December 26, 2014.

- Initially, psych techs responsible for daily administrative segregation unit rounds were observed at many prisons to be conducting them without timely completing "Psych Tech Daily Rounds" forms, or were completing forms not authorized by CDCR.

- COs in various prisons were observed not conducting timely 30-minute rounds in administrative segregation units, or not documenting their completed rounds in housing logs.

- Medical staff responsible for conducting observation of inmates in several Mental Health Crisis Bed (MHCB) units were observed to be not conducting rounds at required intervals and then falsifying documentation on observation sheets.

- In many prisons operating MHCB units or Outpatient Housing Units (OHUs), unauthorized observation forms and an unauthorized level of observation referred to as "psychiatric observation" were being utilized, regardless of their nonexistence or the lack of even any mention in the *Program Guide*.

- Staff in various prisons were observed to be not only conducting intake screening without sufficient privacy, but failing to ask all of the required questions, *including whether the inmate was currently suicidal*.

While these deficiencies were not found at all 34 prisons, to varying degrees they were found in most of the prisons. Had a viable suicide prevention quality assurance/quality improvement process been in place, most, if not all, of these deficiencies should have been readily identified and corrected.

The following are 12 areas in which this reviewer found CDCR prisons to be consistently deficient. Sustained correction of the problems in these areas could dramatically improve CDCR's suicide prevention practices and have the greatest impact on reducing the number of inmate suicides in its prisons.

### 1)   Suicide Prevention Training

#### A.   Pre-Service Training

On November 22, 2013, this reviewer observed a full-day pre-service training workshop in a classroom at the CDCR Basic Correctional Officer Academy in Galt, California. The venue was very good, with comfortable seating and excellent audio-visual equipment. The training instructor was a Ph.D. clinical psychologist. The approximately 40 cadet officers were attentive and interactive throughout the full-day workshop.

The workshop was based on the 110-page *Mental Health Services Delivery System Instructor Guide* that was last revised in May 2013. The workshop included an Introduction and sections on (1) The MHSDS, (2) Recognizing Mental Disorders, (3) Crisis Intervention and Suicide Prevention, (4) Conclusion: MHSDS, and (5) Heat-Related Pathologies.

Review of the *Instructor Guide* found that it had very good content, including crisis intervention, emergency mental health referrals stressors and internal/external factors regarding suicide, interaction with the suicidal inmate, levels of suicide observation, and responding to a suicide attempt (SA) in progress. However, what the *Instructor Guide* did not include, and what could have been very helpful in basic instruction on suicide prevention, were sections on (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) ineffectiveness of "contracting for safety"; (4) updated research on CDCR suicides, (5) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (6) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices.

Overall, the workshop was problematic. The first few hours of it were quite good, with the instructor presenting an unscripted introduction to the signs and symptoms of mental illness and promoting interaction among the cadets by inviting them to discuss any personal insights on the topic. However, the remainder of the workshop, including presentation of the "Crisis Intervention and Suicide Prevention" section, was deficient for several reasons. First, the instructor appeared very unfamiliar with using the PowerPoint slides that accompanied sections of the *Instructor Guide*. Second, the instructor's presentation did not follow the order of the PowerPoint slides, causing confusion and distraction as the cadets and other observers attempted to find the corresponding sections in the *Student Handbook*.

Presentation of the "Crisis Intervention and Suicide Prevention" section was especially problematic. This section was scheduled to take 2.5 hours, but the instructor spent only about an hour on it. The presentation began out of order with a discussion of emergency response to a SA, followed by a haphazard presentation of other information. For example, the instructor read a list of suicide protective factors without explaining what the terms meant or their effect on the SRE process. Much of the information was presented either inadequately or not at all. For example, an extremely important PowerPoint slide (No. 58) in the *Instructor Guide* entitled "IS PATH WARM" (i.e., isolation, substances, purposeless, anxiety, trapped, hopelessness, withdrawn, agitation/anger, recklessness, mood) was not covered.

## B.   Annual Training

With regard to annual suicide prevention instruction, the *Program Guide* requires that "All CDCR health care and custodial employees at the local institutions shall attend updated training on suicide prevention and response at least once annually. Suicide Prevention and Response Training shall be part of the new employee orientation provided by mental health staff in collaboration with the in-service training (IST) unit at each local institution. New COs shall receive this training at the Basic Correctional Officer Academy." *Program Guide*, Chapter 10, p.12-10-6, 12-10-7.

This reviewer had been informed by CDCR officials from the Statewide Mental Health Program that the annual suicide prevention workshop would be expanded to two hours of instruction for 2014. However, review of IST training schedules at several audited prisons found that only one-hour instruction was offered during 2014. This reviewer examined both the one-hour IST lesson plan entitled "Suicide Prevention" (approved February 2011), and the one-hour

lesson plan entitled "Suicide Prevention" for Health Care New Employee Orientation. Both contained basically the same instruction. Although the content of the 38 PowerPoint slides was very good, the material was somewhat outdated.

The current annual suicide prevention training program in CDCR is inadequate. At a minimum, the annual training should be expanded to include the same topics that were offered in the pre-service training described above, including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) ineffectiveness of "contracting for safety"; (4) updated research on CDCR suicides, (5) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (6) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices.

This reviewer observed presentations of the one-hour IST Suicide Prevention Training workshops at seven CDCR prisons. Many were problematic. For example, at CSATF on February 20, 2014, the instructor (a mental health clinician) simply read the 38 PowerPoint slides at a fairly quick pace, ending the presentation after about 25 minutes. The workshop was extended only another 15 minutes because this reviewer and other invited observers attempted to engage the audience in further discussion about inmate suicides. A similar training workshop at WSP on March 25, 2014 lasted only approximately 40 minutes. The training was not interactive except for one participant asking "How long is this class?" Until recently, the suicide prevention workshop at VSP had been offered only via DVD, and the presentation by an instructor on April 10, 2014 was fraught with audio-visual problems. A suicide prevention workshop conducted at PVSP on May 6, 2014 was completed in a mere 35 minutes.

The greatest deficiency in annual suicide prevention training was ***the complete lack of enforcement of any requirement for annual training of non-custody staff, which includes medical, nursing, and mental health staff.*** In addition, CDCR's "Recommended Training for Institutional New Employee Orientation" ***did not include any requirement for suicide prevention training for new employees, making CDCR's Office of Training and Professional Development training mandate noncompliant with the suicide prevention training requirements in the Program Guide***.[5] "All CDCR health care and custodial employees at the local institutions shall attend updated training on suicide prevention and response at least once annually." *Program Guide*, Chapter 10, Part C., p. 12-10-6.

Not surprisingly, this inconsistency between CDCR's Office of Training and Professional Development and the *Program Guide* has led to inconsistent suicide prevention training practices across the prisons. A few had high levels of compliance for both custody and health care personnel, but the vast majority had very low or zero levels of compliance for health care personnel. While a few prisons, such as FSP, offered non-custody personnel suicide prevention handouts and quizzes from a facility training bulletin, this practice does not suffice as sound suicide prevention training. Suicide prevention training is best provided in a live, interactive

---

[5]Conversely, for *custody* staff, CDCR's Office of Training and Professional Development mandated annual one-hour instruction on suicide prevention within the annual 40-hour Off-Post Training Schedule for 2013 (January 1, 2013 through December 31, 2013).

environment among correctional, mental health, and medical personnel, as suicide prevention is really about collaboration across these groups. Simply having staff read printed or electronic material by themselves has very limited instructional value.

In addition to correctional staff, nursing personnel and psych techs should be the backbone of CDCR's suicide prevention program because these staff are well positioned to identify potentially suicidal behavior. Observations of the intake screening process by nursing staff and the daily administrative segregation unit rounds by psych techs indicated a dire need for high quality annual suicide prevention training for these staff.

This reviewer's discussions with mental health clinicians likewise indicated a great need for their training as well, as illustrated by the following examples of this reviewer's interactions with clinical staff. One clinician told this reviewer that it was his/her clinical judgment that an inmate would be at only moderate acute risk for suicide if his/her stated means of committing commit suicide were limited, for example, to use of a handgun, as compared to hanging with a bed sheet. In another example, a psychiatrist stated in conversation with this reviewer that he/she had been recently surprised by national research indicating that over 90 percent of inmate suicides were committed by hanging. This psychiatrist had mistakenly assumed that the vast majority of inmate suicides were by drug overdose, and was apparently completely unaware of overwhelming data on CDCR inmate suicides indicating that hanging was by far the most common means by which these inmates had committed suicide.

At other prisons, "contracting for safety" was regularly utilized by medical staff with inmates who were referred to Triage and Treatment Areas (TTAs) for assessments after hours. There are several problems associated with "contracting for safety." First, there are no CDCR policies authorizing its use. In fact, the practice is not even addressed in any national correctional standards. Second, most correctional systems do not utilize "safety contracts" because they have been found to be ineffective in the management of suicidal individuals. While there may be some positive therapeutic aspects to safety contracts, most clinicians agree that once a patient becomes suicidal, his or her written or verbal assurances are no longer effective to counteract suicidal impulses. *See* K. Garvey, J. Penn, A. Campbell, C. Esposito, and A. Spirito, *Contracting for Safety With Patients: Clinical Practice and Forensic Implication*, JOURNAL OF THE AMERICAN ACADEMY OF PSYCHIATRY AND LAW, 37:363-370 (2009).

In a discussion with a nurse conducting intake screenings, this reviewer asked why she had not asked the newly admitted inmate if he/she were currently feeling suicidal after the nurse had asked the inmate if he/she had a history of suicidal behavior. The response from the nurse was "If the inmate did not report any history of suicidal behavior, they could not have current ideation." This response indicated inadequate training.

***Recommendations***: [6]

- ***Expand the length and content of the*** <u>***pre-service***</u> ***"Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.***

- ***Expand the length and content of the*** <u>***annual***</u>  ***"Crisis Intervention and Suicide Prevention" training workshop to  include the topics described above;***[7]

- ***Ensure that*** <u>***all***</u> ***custody and health care staff receive both pre-service and annual suicide prevention training;***[8] ***and***

- ***Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.***[9]

## 2)     Initial Health Screening and Receiving and Release Unit Environment

This reviewer audited two areas of intake screening: 1) the adequacy of the intake screening form and the completeness of nursing staff's conduct of the intake process, and 2) the adequacy of privacy and confidentiality during the process.

The Initial Health Screening form (CDCR Form 7277) utilized by nursing staff on inmates newly admitted into CDCR's RCs and all other prisons contained several questions pertaining to the identification of suicide risk and mental illness.  Before 2014, the form was last revised in July 2013.  It contained the following mental health/suicide risk questions:

- Does the inmate have a mental health problem?
- Has inmate received bad news?
- Has the inmate ever been treated for mental illness?

---

[6] As stated in the Special Master's report which accompanies this report ("Special Master's Report on His Expert's Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation"), the *Coleman* parties timely submitted their responses to the draft version of this report, which was distributed to them on November 20, 2104.  Within Defendants' submission were specific responses to this reviewer's recommendations in this report.  Defendants' responses are referenced individually where each of these recommendations appears in this report.

[7] Defendants reported that they agree to work with the Special Master within the context of the Suicide Prevention Management Workgroup, that they are revising and updating both the Pre-Services and Basic Cadet Officer Academy training materials to incorporate the first and second recommendations above, and that they will provide the training materials to the Special Master for his review and comment before they are finalized.

[8] Defendants reported among other things that they are developing a tracking system and audit programs for all suicide prevention trainings to ensure employee compliance with training requirements.

[9] Defendants reported that all such training will be conducted by a psychiatrist, psychologist, or social worker, who will be required to undergo "training for trainers" that is being developed, and that the training materials will be provided to the Special Master for review and comment before they are finalized.

- Has the inmate been hearing voices or seeing things that are not there?
- Has the inmate had any thoughts of hurting himself/herself or others in the past year?
- Is inmate thinking of committing suicide now or ever attempted suicide?
- Does the inmate appear disoriented as to time, place, or person?
- Does the inmate appear to have difficulty understanding the questions, or in making appropriate responses to them?

In May 2014, the Form was revised slightly by CDCR headquarters, as follows:

- Do you have a mental health problem?
- Have you recently received bad news?
- Have you ever been treated for mental illness?
- Have you been hearing voices or seeing things that are not there?
- Does the I/M report feeling down or depressed more than half the time in the last two weeks?
- Are you thinking of committing suicide now, or have you ever attempted suicide?
- Does the inmate appear disoriented to time, place, or person?
- Does the inmate appear to have difficulty understanding the questions, or in making appropriate responses to them?
- In the past year, has the I/M had thoughts that they would be better off dead or of hurting themselves?

During this reviewer's on-site audits at the CHCF on June 24, 2014 and at PBSP on July 23, 2014, a *second* version of the revised Form was found to be in use.  It had been last revised by CDCR headquarters in May 2014, as follows:

- Does the inmate have a mental health illness?
- Has inmate recently received bad news?
- Has the inmate ever been treated for a mental illness?
- Has the inmate been hearing voices or seeing things that are not there?
- Does inmate report feeling down or depressed more than half the time in the past two weeks?
- In the past year, has the inmate had thoughts that they would be better off dead or of hurting themselves?
- Has the inmate ever made a suicide attempt?
- Does the inmate appear to have difficulty understanding the questions, or in making appropriate responses to them?
- Does the inmate appear disoriented to time, place, or person?

*Notably, this second May 2014 version of the Initial Health Screening form (CDCR 7277) does **not** contain any inquiry regarding whether the inmate is currently at risk for suicide.*

10

As stated above, CDCR Form 7277, Initial Health Screening Form, has recently undergone several revisions and various versions of the Form remain in circulation in the CDCR system. In the earlier of the two May 2014 versions, one of the most important questions -- "Have you ever attempted to commit suicide, or are you currently thinking of hurting yourself?" -- was flawed because it was presented as a compound question. During this reviewer's observations of the intake process at several prisons, nurses often asked inmates *only* whether they had previously attempted suicide, *but not whether they were currently suicidal*. Clearly this compound question should be divided into two separate questions. Additionally, as stated above, the second of the May 2014 versions of the Form is seriously flawed because it does not inquire about current risk of suicide.

With regard to privacy and confidentiality considerations, the booking and processing area of any correctional facility is usually chaotic and noisy. Staff there may feel pressured to process a high number of inmates in a short period of time. Under these circumstances, two key components of identifying suicidal behavior – time and privacy – are scarce. Staff's ability to carefully assess inmates' potential for suicide by asking the inmate a series of questions, interpreting inmates' responses (including gauging the truthfulness of their denials of suicide risk), and observing their behavior is greatly compromised in this impersonal environment, which actually lends itself to the opposite of what is being sought. As a result, clearly suicidal behaviors of many inmates and the presence of suicide risk-inducing stressors and conditions can be lost on intake staff.

Privacy in the intake process was often compromised in the Reception and Receiving (R&R) units audited by this reviewer.[10] An array of different practices made for lack of privacy and confidentiality. These ranged from an open door to the nurse's office, officers stationed inside the office or at the door, conducting of intake screening outside the nurse's office in an open area close to officers and other inmates, and multiple intake screenings occurring simultaneously as inmates sat in close proximity to each other. At PBSP, as there was *no* nurse's office within the R & R unit, intake nurses were forced to stand in a large holding cell to which inmates brought one-by-one, with an officer on each side of the inmate holding his arms. At DVI, two intake nurses were in a large office within the R&R unit, but were simultaneously conducting separate intake screenings, with two inmates sitting in close proximity to each other, and several other inmates waiting to be screened and sitting within 15 feet of the nurse's station. At MCSP, intake screenings were conducted in an open area of the officers' station with an officer straddling the inmate; the nurse's office in the R&R unit was *not* used.

**Recommendations**:

- ***The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?";***[11]

---

[10]The prisons where privacy did not appear to be a problem were ASP, CEN, CCC, CCWF, CIM, CIW, CRC, CTF, PVSP, CSP/Solano, SQ, and VSP.

[11] Defendants reported that they agree to address this recommendation by working with the Special Master in the Suicide Prevention Management Workgroup, that they are revising the initial health screening form to omit

- ***Intake screening should be conducted only in the nurse's office within an R&R unit;***

- ***The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and***

- ***Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.***[12]

### 3)  Suicide Risk Evaluations

The *Program Guide* requires that a SRE be completed by a trained mental health clinician at various times during an inmate's CDCR confinement. These times include but are not limited to:

- Any time the medical or mental health screening of a new arrival at an institution indicates a current or significant history within the past year of suicide risk factors, ideation, threats, or attempts. *Program Guide*, Chapter 10, Part D., 12-10-9.

- Any time that it is reported an inmate is currently experiencing suicidal ideation (SI), threats, and/or engaging in a gesture or attempt. *Program Guid*e, Chapter 10, Part D., 12-10-8.

- Before placement in an OHU or MHCB based on the inmate's suicidal ideation, threats, or attempt. *Program Guide*, Chapter 10, Part D., 12-10-8.

- Following release from an OHU or MHCB if the placement had been based on suicidal behavior, and thereafter a minimum of every 90 days for one year. *Program Guide*, Chapter 10, Part D., 12-10-9.

This reviewer found that almost all emergency mental health referrals for reported suicidal ideation (SI) and/or self-injurious behavior drew a response from mental health (if on site) or from medical staff almost immediately. However, there were numerous examples of emergency referrals for SI and/or self-injurious behavior in which SREs were <u>not</u> completed. This problem was most acute at CCWF, where approximately 56 percent of all emergency

---

compound questions and include the recommended questions, and that they will share the revised form with the Special Master for review and comment before the next Suicide Prevention Management Workgroup meeting. They also reported that current forms were redistributed to the field and that, within the nursing leadership of the California Correctional Health Care Services, a teleconference among all Chief Nurse Executives was conducted to ensure that current forms were being used during the intake process.

[12] Defendants reported that they agree to work with the Special Master to address and resolve the second through fourth recommendations above.

mental health referrals for SI did not result in completion of an SRE. Other prisons that were problematic in this respect were CCC (40 percent), CHCF (37 percent), MCSP (32 percent), and CIW (24 percent).

CDCR developed an SRE Mentoring Program to improve the quality of SREs and decrease the number and rate of inmate suicides. An integral part of the Mentoring Program was the requirement that all mental health clinicians complete a seven-hour SRE training workshop. This reviewer found high completion rates for SRE training. On November 20, 2013, this reviewer attended a portion of an SRE training session at SAC and reviewed the 78-slide PowerPoint presentation entitled "Suicide Risk Assessment for CDCR Clinicians." The slides included a review of chronic and acute risk factors, protective factors, basic elements of a thorough risk assessment (data collection, suicide inquiry, judgment of risk and rationale, treatment planning, and documentation), and review of scientific journal articles/research on the assessment process, manipulative and malingering behaviors, etc. The PowerPoint presentation and the observed portion of the training workshop were excellent. However, a weakness in the Mentoring Program was that the clinician/mentee was required to complete only two SREs under the supervision of a mentor before being credentialed for two full years, with no formalized subsequent `critique by a mentor or supervisor.

Based on review of hundreds of SREs during this audit, this reviewer found that the quality of the SREs was often problematic. Many reviewed SREs contained chronic and acute risk factors and protective factors that were inconsistent with assessments of chronic and acute risk levels. Deficiencies in SREs had been reported in numerous CDCR Suicide Reports, resulting in QIPs to return the clinician to the same mentoring program that he or she had previously completed. This problem was most acute at SVSP, where at least seven of the ten suicides that occurred between 2012 and 2014 involved deficient SREs. As one CDCR reviewer noted: "During this review, as in others at other facilities, there is poor inter-relator reliability of the SRE and the reluctance of clinicians to classify an inmate a moderate or high risk even when the data clearly show numerous chronic risk factors. In this inmate's case[13], the multiple chronic factors were correctly identified but because he denied a history of SI or attempts the clinician rated him low. More training appears to be needed." It should not take the tragedy of an inmate suicide and the resulting Suicide Report to prompt remedial training of clinicians on how to conduct a competent SRE.

This reviewer also found that the institutional SPRFITs were not adequately monitoring and evaluating the SREs completed at their prisons. Reviewed SPRFIT minutes often included only quantitative but not qualitative monthly data on completion of SREs. For example, a recent audit by an institutional SPRFIT coordinator indicated 100-percent compliance with the treatment planning section of the SRE during the audit. However, in this reviewer's discussion of the "MHCB-SRE Audit" with the SPRFIT coordinator, it became apparent that the audit measured only whether the treatment planning section of the SRE was completed, and not whether the treatment plan contained a specific strategy to reduce SI/self-injurious behavior and/or whether subsequent progress notes addressed the appropriate problem area in the inmate's treatment plan.

---

[13]SVSP 6.

*Recommendation*:

- ***CDCR should revise its SRE Mentoring Program to***
  - ***eliminate its "graduation" component after completion of two adequate assessments,***
  - ***conduct ongoing mentoring throughout the year, and***
  - ***audit clinicians' SREs on a regularly scheduled basis.***

- ***Each facility's SPRFIT should audit the <u>quality</u> of completed SREs on a monthly basis.*** [14]

### 4)   30-Minute Welfare Checks in Administrative Segregation, SHUs, and Condemned Units

Pursuant to previous CDCR directives, correctional staff had been required to complete 30-minute welfare checks of inmates in administrative segregation since 2006 and in Security Housing Units since 2013. In 2014, CDCR implemented the Guard One system to verify 30-minute welfare checks of all inmates in administrative segregation during the first 21 days of their stays.[15]  Per memorandum dated May 9, 2014 from the CDCR Director of the Division of Adult Institutions (DAI), use of the Guard One system was amended again to require welfare checks of all inmates in administrative segregation, SHUs, and Condemned Units at staggered intervals not to exceed 35 minutes via the Guard One system for the entire lengths of their stays. This expansion was the result of finding continuing deficiencies in the use of the Guard One system, described below.  This expansion was a significant and commendable policy change.

Overall, this reviewer found high compliance rates for Guard One documentation during the on-site audits, with most prisons exceeding a rate of 90 percent.  However, before the May 9, 2014 memorandum was issued, this reviewer found very low compliance levels for 30-minute welfare checks of inmates housed in administrative segregation units for more than 21 days, and for inmates in SHUs, for whom the Guard One system was not used, regardless of their lengths of stay.  For example, despite CDCR directives that required 30-minute welfare checks in administrative segregation units since 2006 and in SHUs since 2013, this reviewer examined housing unit logs that indicated large gaps between welfare checks, finding intervals as long 60 and to 120 minutes between checks.  There were even examples of falsification of the documentation.  Many administrative and supervisory custody staff were either unaware of

---

[14] Defendants reported that SRE mentoring is being reviewed for adequacy, sustainability, frequency, and duration. They also reported that an SRE audit tool is being developed, that the audit will begin in January 2015, and that they will work on its implementation with the Special Master in the context of the Suicide Prevention Management Workgroup.

[15] The Guard One system involves a hand-held "pipe," a metal disc that is attached to each cell door, and a software program.  The officer conducting housing unit rounds is required to touch the end of the pipe to the disc on the cell door.  The pipe will then emit a sound and the time of the contact with be recorded on the pipe.  The data from the pipe is then downloaded into the software program on a desktop computer in the housing unit by a supervisor, and is reviewed daily to ensure compliance.  Although the Guard One offers dramatic improvement over previous practices, the technology can validate that correctional staff are conducting rounds at the required intervals, but it cannot assure that staff are actually observing the interior of each cell to verify the inmate's well-being.

previous directives or were not enforcing compliance. Many COs were aware of the requirement for 30-minute checks but were simply not complying and/or were failing to document the checks as required. Although compliance levels for the 30-minute checks improved somewhat over the course of this reviewer's site visits, documentation problems continued despite the advance notice that prisons began receiving that this reviewer would be examining their housing unit logs.

***Recommendation***:

- ***Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at PBSP and at the CHCF (Phase 3, per the directive).***[16] [17]

### 5)   Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units

Pursuant to CDCR policy, for the first 72 hours of all newly-arrived inmates' stays in administrative segregation, they must be assigned cells that have been retrofitted to be suicide-resistant, i.e. having no features conducive to the commission of a suicide. The 72-hour timeframe is based on earlier CDCR data indicating that risk of suicide is elevated during the initial 72 hours of placement. After the initial 72 hours, inmates are then to be reassigned to other cells in administrative segregation.

This reviewer observed several problems with regard to the housing of newly admitted inmates in the administrative segregation units:

- Not all newly admitted inmates (i.e., those in the first 72 hours of their stays in the unit) were housed in suicide-resistant cells.
- Not all of the suicide-resistant cells housed newly admitted inmates.
- Several newly admitted inmates were double-celled in non-suicide-resistant cells.

There appeared to be multiple reasons for these practices. These included the fact there were insufficient retrofitted cells to accommodate all newly arrived inmates. Also, custody staff were not consistently rotating inmates out of these retrofitted cells after the 72-hour period to allow for assignment of these cells to newly arrived inmates.[18]   As shown in Table 2 below, nine inmates committed suicide within 72 hours of their transfers into an administrative segregation

---

[16]The May 9, 2014 directive set forth the following schedule for implementation: "Phase 1 will begin on May 19, 2014, with all ASUs that have the Guard One system currently installed; Phase 2 will begin on June 16, 2014, consisting of KVSP's ASU overflow, all PSU, SHUs (excluding PBSP's Facilities C & D), and Condemned Housing Units; and Phase 3 will consist of PBSP's Facilities C & D along with the CHCF-Stockton. Phase 3's activation date has yet to be determined and will be announced in a subsequent directive."

[17]Defendants reported among other things that, to address concerns regarding documentation and accuracy, each unit supervisor will print and review the Round Tracker Report at the end of each shift to ensure that all required safety/welfare checks were completed, and that any discrepancies will be appropriately addressed with staff.

[18]According to the most recent available data from CDCR, there were 406 retrofitted new intake cells throughout the prison system as of March 29, 2007.

units between 2012 and 2014, ***and in eight of the nine cases, the inmates were <u>not</u> placed in suicide-resistant, retrofitted cells as required.***

<u>**TABLE 2**</u>
**Length of Stay in Administrative Segregation Before Suicide**
**2012 – October 18, 2014**

| <u>**Inmate**</u> | <u>**Date of Suicide**</u> | <u>**Length of Stay**</u> | <u>**Placed in Retrofitted Cell**</u> |
|---|---|---|---|
| SVSP 5 | 3/20/12 | 27 days | |
| WSP 1 | 5/12/12 | 38 days | |
| FSP 8 | 5/30/12 | 14 days | |
| MCSP 1 | 6/7/12 | 65 days | |
| RJD 5 | 6/23/12 | 12 hrs. | no |
| ASP 1 | 6/28/12 | 1 day | no |
| SAC 4 | 7/25/12 | 3 days | no |
| SCC 1 | 7/28/12 | 1 day | no |
| CMF 3 | 8/17/12 | 39 days | |
| SVSP7 | 9/7/12 | 74 days | |
| SVSP 8 | 10/25/12 | 5 days | |
| SVSP 11 | 1/24/13 | 7 days | |
| FSP 10 | 3/8/13 | 10 hrs. | no |
| LAC 5 | 4/15/13 | 81 days | |
| COR 10 | 4/29/13 | 1 day | no |
| FSP 11 | 5/27/13 | 9 days | |
| CTF 1 | 6/16/13 | 51 days | |
| MCSP 2 | 8/19/13 | 71 days | |
| SQ 9 | 9/24/13 | 86 days | |
| PVSP 1 | 10/15/13 | 88 days | |
| WSP 2 | 12/27/13 | 21 days | |
| CCI 1 | 2/24/14 | 90 days | |
| PBSP 7 | 2/24/14 | 41 days | |
| HDSP 7 | 2/27/14 | 249 days | |
| SVSP 13 | 3/18/14 | 57 days | |
| MCSP 3 | 5/19/14 | 74 days | |
| SQ 12 | 5/22/14 | 49 days | |
| CSATF 5 | 7/6/14 | 13 days | |
| KVSP 6 | 7/9/14 | 22 hrs. | no |
| CIW 8 | 7/30/14 | 15 days | |
| CSATF 6 | 9/6/14 | 69 days | |
| CCC 5 | 9/7/14 | 2 days | no |
| CCI 8 | 9/14/14 | Unknown | |
| SVSP 14 | 10/18/14 | 1 day | yes[19] |

_____

[19] Although the assigned cell had been retrofitted, the inmate asphyxiated himself with a plastic bag.

**Average length of stay in administrative segregation before suicide:  42 days**

In addition, it appears that more than housing of only newly arrived inmates in these retrofitted cells may need to be done.  Current data now indicates that the risk of suicide is extending beyond the initial 72 hours of inmates' stays.  This reviewer examined the 34 inmate suicides that occurred in administrative segregation units from 2012 to October 18, 2014.  Among these suicide deaths, the average length of stay in administrative segregation was ***42 days, with a range of ten hours to 249 days***.  See Table 2.

An emergent problem that requires immediate corrective action is the CDCR policy and practice of not requiring a newly admitted inmate into administrative segregation to be housed in a retrofitted cell if he or she can be double-celled with another compatible inmate.  Such double-celling is in a non-retrofitted cell. The apparent underlying theory -- that assigning a newly arrived inmate with a compatible cellmate provides more protection from suicide than assigning the inmate to a single suicide-resistant, retrofitted cell -- is flawed for several reasons.  Among them is the simple fact that the cellmate may be out of the cell, recently transferred, or sleeping during a SA. Double-celling should not be considered a protective factor and, in fact, CDCR's own data indicates that numerous CDCR suicides during 2012-2014 took place in double-celled administrative segregation cells, general population (GP), and Sensitive Needs Yard (SNY) housing.

Finally, this reviewer examined several cases in which the inmate was placed on suicide observation in a OHU or MHCB, stabilized, and then returned to the same environment (usually an administrative segregation unit) where he or she was housed before the OHU or MHCB placement. In all of these cases, the inmate was re-housed in an unsafe, non-retrofitted cell.  Although CDCR initiated a policy several years ago to provide five-day clinical follow-up by mental health staff and welfare checks by correctional staff at 60-minute intervals as a means to further ensure inmates' stability following MHCB discharge[20], it did not extend this policy to require housing in retrofitted cells for inmates returning to their housing units from OHU or MHCB stays.

***Recommendations:***

- ***CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house  newly admitted inmates (i.e.,  those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).***[21]

---

[20]The efficacy of these clinical and custodial follow-up procedures is discussed in detail in Part 11 of this report, pp. 27-29.

[21] Defendants reported among other things that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation, including a reassessment of the number of appropriate intake cells.

- ***CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.***[22]

- ***Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan;***[23]

- ***Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted cells.***[24]

- ***Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.***[25]

### 6)    Treatment Planning for Suicidal Inmates

The standard of care requires an individualized treatment plan, including provision of follow-up services, for each inmate placed on suicide observation status.  The treatment plan should be developed by qualified mental health staff in conjunction with the inmate and medical and correctional staff.  It should describe the signs, symptoms, and circumstances under which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions the inmate and staff will take if SI reoccurs.

The *Program Guide* briefly addresses treatment planning for inmates at risk of suicide within the section of Chapter 10, "Suicide Prevention and Response," part D., "Clinical Care Services," that covers the SRE.  It states "Treatment recommendations should be as specific as possible, leaving as little room as possible for misinterpretation or confusion. A brief rationale for each recommendation shall be provided. They shall also address how the treatment plan will be implemented and any required follow-up procedures."  *Program Guide*, Chapter 10, p. 12-10-11.  The "Suicide Risk Assessment for CDCR Clinicians" PowerPoint presentation observed by this reviewer on November 20, 2013, described above, offered some additional instruction on development of treatment plans for suicidal inmates. For example, one of the slides stated the

---

[22] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

[23] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

[24] Defendants' response to this recommendation was essentially that, although double-celling has been previously identified as having a preventive effect on suicides, the Suicide Prevention Management Workgroup should examine relevant data on this practice to better understand its effect on suicide risk.

[25] Defendants reported that they are evaluating the appropriate duration for an inmate's placement in an intake cell, that other clinical measures that can contribute to inmate safety in administrative segregation are being discussed or piloted, and that they agree to continue to address this issue with the Special Master in the Suicide Prevention Management Workgroup.

following: "(1) How to decrease acute risk and warning signs; (2) How to increase protective factors; (3) Does current treatment plan need to be changed (if MHSDS); (4) Be concrete/behavioral;[26] (5) Need for psychiatric intervention - medication consult; (6) Plan should include crisis management (3 days ) and short-term (1-2 weeks); and (7) what resources are available to the patient (internal and external)?"

This reviewer examined hundreds of mental health treatment plans (MHTP) and treatment plan sections of discharging SREs to determine whether mental health clinicians had developed reasonable treatment plans for reducing inmates' SI, suicidal behaviors, and/or self-injurious behaviors, and whether there was concordance between the treatment plans and subsequent progress notes. In an overwhelming number of cases, most of the SRE treatment plan sections simply provided narrative that repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-day follow-up by Primary Clinician (PC), provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the inmate's suicide risk. Reviewed MHTPs were also problematic. In some, the "problem" area of SI was properly identified and a specific "intervention" was outlined, but there was no evidence in subsequent progress notes that the plan was being effectuated. In other reviewed records, the treatment plans were not even revised to include SI *despite the fact the inmate had been placed in the MHCB for SI.*

Treatment planning practices at DVI perhaps best exemplified this problem. The quality of treatment planning ranging from one extreme to the other. In one reviewed case, a clinician developed a very thoughtful and individualized treatment plan:

"The I/P will be admitted to OHU for psychiatric observation. OHU team to monitor I/P for safety concerns. Treatment plan to include following goals: 1) Reduce daily on-going Sx ideation to 2x/week, I/P making vague statements, need to clarify overall baseline; 2) Reduce anxiety from daily to 2x/week or below by Cognitive Behavioral Therapy (CBT), anxiety management skills, i.e., relaxation, breathing exercises, thought analysis to contain worries; 3) Reduce depression from daily to 2x/week or below by supportive counseling, challenging maladaptive thoughts by CCM; and 4) Psychiatric medication evaluation to alleviate acute distress and stabilize sleep."

But at the other extreme, another clinician who regularly completed SREs at the prison had developed and inserted the following template into each treatment plan section of the SRE form:

___Place in OHU to monitor for signs and symptoms and safety
___Released to custody with a 5-day F/U
___Hold in OHU for Parole Agent pick-up
___Needs further evaluation

---

[26]During the SRE training attended by this writer at CSP/Sac on November 20, 2013, the instructor stressed that the treatment plan components should be concrete in that they "should be measurable, e.g., the specifically recommended intervention 'will decrease suicide ideation by 50 % by next week,' rather than simply 'decrease agitation or increase coping skills.'"

___Transfer to MHCB with first bed availability
___Refer to PC and psychiatrist for appointment within one week
___Review LOC/IDTT

This template, which simply recited *Program Guide* requirements, reflects a lack of understanding and/or indifference to effective treatment planning for inmates presenting with SI.

As a result of this reviewer's initial suicide prevention audits, CDCR created a 60-slide PowerPoint webinar-based training presentation entitled "Safety/Treatment Planning for Suicide Risk Assessment" in June 2014. Webinars were conducted on four occasions (on July 8, July 10, July 14, and July 16) and attended by approximately half of all CDCR mental health clinicians. Review of the PowerPoint slides indicated that training was intended to enable clinicians to create reasonable, short-term, and specific strategies to reduce inmates' suicidal thoughts, avoiding the tendency of clinicians to simply repeat *Program Guide* requirements. It is premature to opine on the effectiveness of this training for creating better treatment plans within SREs and for improving concordance between treatment planning strategies and subsequent progress notes. It also remains unclear whether all of the remaining mental health clinicians will receive this new training.

In conclusion, treatment planning to include continuity of care for suicidal inmates is a critical element of any correctional system's suicide prevention program. It remains a work in progress for CDCR.

***Recommendations***:

- ***CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning contained in the SREs section above; and***

- ***CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above.***[27]

### 7)   Perception of Suicidal Inmates as Manipulative

Inmates perceived as manipulative pose a great challenge to correctional and health care professionals. It is not unusual for inmates to call attention to themselves by threatening suicide or even feigning an attempt in order to avoid a court appearance, avoid a disciplinary sanction, bolster an insanity defense, gain cell relocation, receive preferential treatment by staff, or draw compassion from an unsympathetic spouse or other family member. As this reviewer has noted

---

[27] In response to both recommendations above, Defendants reported that they developed a training program to improve the quality of treatment plans, that half of staff have received the training, that the rest will receive it during spring 2015, and that new clinical staff will receive it as well. They also reported that training on treatment planning is currently included in the SRE training, which is required every two years.

in numerous examined eUHRs, some CDCR inmates simply use manipulation as a survival technique.

The prevailing approach to this problem should be that any inmate who would go to the extreme of threatening suicide or even engaging in self-injurious behavior requires special attention. Too often correctional and health care professionals conclude that the inmate is simply attempting to manipulate his or her environment and, therefore, such behavior should be ignored and not reinforced through intervention. And also too often, a feigned SA goes further than anticipated and results in death. The research warns against assuming that inmates who appear to be manipulative are not also suicidal. These behaviors are not mutually exclusive.[28] Although there are no easy solutions to the management of inmates who threaten suicide or engage in self-injurious behavior for a perceived secondary gain, the critical issue is not how staff label the behavior, but how they react to it. The reaction must include a multidisciplinary treatment plan.

This reviewer found that there was a misguided mindset among a small but formidable faction of mental health clinicians at each prison who perceived *all* self-injurious behavior as manipulative and that inmates feigned SI for secondary gain. This mindset was often expressed during IDTT meetings. For example, in July 2014 this reviewer attended an IDTT meeting at PBSP. A particularly challenging inmate was being discussed. When this reviewer asked for the inmate's current diagnosis, the rapid-fire response from one unidentified team member was "manipulation." At the same prison, as recently as February 2014, an inmate had committed suicide. Clinical staff had perceived this inmate's chronically bizarre behavior to have been related to "hiding out in the MHSDS for secondary gains." This reviewer found other examples at CIW, where some inmates perceived as manipulative by clinical staff were placed in a MHCB on Suicide Precaution status, with observation at 30-minute intervals, clothed only in a safety smock, and prohibited from having mattresses.

Nevertheless, even assuming a clinician correctly concludes that the inmate feigned SI in order to achieve a secondary gain (for example, a cell relocation due to safety concerns), the inmate's treatment plan should nevertheless address the issue. Examples of appropriate response might include working with custody staff on inmate safety issues, teaching the inmate alternative ways to advocate for himself or herself, etc.

Many Correctional Treatment Centers (CTCs) contained so-called "safety cells"[29] in which inmates were temporarily housed while in immediate crisis as a result of mental illness and/or suicidal behavior. Physician orders for use of these cells were typically limited to four-hour blocks. Due to the intended temporary use of these cells, the safety cells did not contain beds and the seclusion rooms did not contain sink/toilets. Despite these intended limited uses of these cells, this reviewer was informed of at least two prisons – HDSP and VSP – which had been placing inmates believed to be feigning SI for secondary gain *into safety cells for up to five days, without immediately notifying the Health Care Placement Oversight Program (HCPOP)*.

---

[28]See G. Dear, D. Thomson, A. Hills, "Self-Harm in Prison: Manipulators Can Also Be Suicide Attempters," *Criminal Justice and Behavior*, 27: 160-175 (2000); J. Haycock, "Listening to 'Attention Seekers:' The Clinical Management of People Threatening Suicide," *Jail Suicide Update* 4 (4): 8-11 (1992).

[29]These cells are used for seclusion and mental health observation and can also be utilized for constant observation of an inmate under suspicion of secreting contraband.

These inmates would later be returned to their housing units without the knowledge of HCPOP. Until June 2014, and in preparation for this reviewer's on-site assessment, all inmates at HDSP who were referred to a MHCB were initially housed in the CTC safety cells to "weed out suspected manipulative behavior." At VSP, these uses of safety cells were detected several months earlier by CDCR's quality improvement process.  These practices at both of these prisons were identified and corrected before this reviewer's assessments, but this reviewer observed in other prisons that alternative housing was used initially for inmates thought to be manipulative, *even though MHCBs were readily available within the prison.*

In November 2013, this reviewer conversed with a mental health clinician who had been conducting annual suicide prevention block training to custody staff for many years.  This clinician volunteered that most inmates placed in their prisons' OHUs were not suicidal, but rather were manipulative and simply desired "a change of scenery." According to the clinician, these inmates then quickly learn that placement on suicide observation status means removal of all clothing and underwear, issuance of a safety smock, and sleeping on the bare floor – not what they expected  -- and they were quickly returned to their housing units. It was obviously problematic that the clinician chosen to instruct most of the annual suicide prevention workshops at the prison would believe that most inmates threatening suicide were manipulative.

Further, also problematic was the practice by CCWF custody personnel of placing inmates perceived to be feigning SI on a "modified property issue" status in administrative segregation with little, if any, collaboration with mental health clinicians.

Finally, many CDCR Suicide Reports have included criticisms that decisions made by the treatment teams have been flawed because of their perception of the inmate as exhibiting manipulative behavior. Most of these Suicide Reports did not include formal recommendations for corrective action because the problem of perceived manipulative behavior driving clinical decisions was not an isolated problem.  Rather, it was described as an issue of "complexity within correctional institutions statewide" that would be addressed by via teleconference from central office.[30]  This problem remains pervasive across CDCR prisons and requires more than a webinar to be rectified.

**<u>Recommendation</u>**:

- *The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.*[31]

---

[30]See, e.g., the case review for the inmate designated as Inmate CIW5 in the Appendix.
[31] Defendants reported that inmate manipulative behavior is covered within the seven-hour training on SREs, and that in spring 2014 they presented a webinar on management of manipulative inmates.  They also reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

8)   **Psych Tech Practices**

According to the *Program Guide*, psych techs are required to "conduct rounds seven days per week in all administrative segregation units to attend to the mental health needs of all inmates. The psych tech shall make initial contact with each inmate placed in the administrative segregation unit within 24 hours of placement." *Program Guide*, Chapter 7, "Administrative Segregation," Part F., p. 12-7-5. Psych techs are also required to conduct weekly rounds of mental health caseload inmates in SHUs, and bi-weekly rounds for non-mental health caseload inmates in SHUs.  *Program Guide*, Chapter 8, "Security Housing Unit," Part F, subpart 6, p. 12-8-7.  Psych techs are required to document their observations of each mental health caseload inmate on a daily basis on the Psych Tech Daily Rounds form.

This reviewer observed daily psych tech rounds in the administrative segregation units in most of the audited prisons.  In almost all cases, the psych techs appeared to be hard-working and conscientious employees. Most also appeared to have good rapport with the majority of the inmates, and a basic knowledge of the mental health caseload inmates they were seeing.

However, this reviewer also found several systemic problems with psych tech practices in the administrative segregation units, and to some extent in the SHUs:

- Psych techs rarely received the annual suicide prevention training required by the *Program Guide*.  *Program Guide*, Chapter 10, "Suicide Prevention and Response," Part C, p. 12-10-6, 7.

- It did not appear during this reviewer's initial prison tours that psych techs were spending any more time determining the mental health status of mental health caseload inmates than non-caseload inmates while conducting their daily rounds in administrative segregation units.  The "Psych Tech Daily Rounds" form  requires the psych tech to note the inmate's mental health concerns, prescribed medications, medication side effects, suicidal/homicidal ideation, appetite, sleep, orientation, mood, affect, behavior, grooming/hygiene, cell condition, medication compliance per the medication administration record (MAR), participation in program, and signs of decompensation. While a few psych techs spent sufficient time with mental health caseload inmates to accurately observe their mental health status, most rounds could be more accurately described as "drive-by" encounters lasting a few moments.

- Although a few psych techs completed the "Psych Tech Daily Rounds" form immediately following each inmate encounter, more commonly they completed the forms after the rounds were finished.  This practice raises concern about the accuracy of the completed forms, given the difficulty with recalling the details of each inmate's mental health status by the time rounds were ended.  In one administrative segregation unit, there were 54 Enhanced Outpatient Program (EOP) and 33 Correctional Clinical Case Management System (3CMS) inmates.  It was not surprising that there were significant inconsistencies between these inmates' records and the corresponding entries by the psych techs on the daily rounds forms.  This inconsistency was also seen in reviewed inmate suicide cases

(e.g., <u>SQ 9</u>, suicide on September 24, 2013; <u>SVSP 13</u>, suicide on March 18, 2014, and <u>PBSP 7</u>, suicide on February 24, 2014).

- In a few toured facilities, unauthorized "Psych Tech Daily Rounds" forms were being used.

It should be noted that this reviewer found that psych tech practices improved dramatically over the nearly nine-month course of the CDCR prison tours.  The "drive-by" contacts and untimely completions of Psych Tech Daily Rounds forms found during the earlier tours were greatly diminished by the time of the later tours.  It appeared that this improvement in psych tech rounds in the administrative segregation units may have been the result of advance notice being given to the prisons that this reviewer would be observing such rounds, as opposed to any increased auditing by supervising nursing staff.  Although psych tech practices during administrative segregation unit rounds were said to be periodically audited by supervisory nursing staff, such oversight appeared to be lacking.

CDCR's commitment to posting psych techs in locked housing units, particularly in the administrative segregation units, was an excellent initiative. When psych techs are utilized correctly, that is, when they are properly trained and instructed to spend sufficient time with each inmate (particularly those on the mental health caseload) and to accurately document their observations, psych techs' input from their rounds can be a critically important tool in CDCR's suicide prevention effort.  For now, the sustainability of adequate psych tech practices in administrative segregation and SHU rounds is unproven and requires continued monitoring.

*<u>Recommendation</u>:*

- ***CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.*** [32]

### 9)   Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates

This reviewer found that many CDCR prisons were using a practice known as "psychiatric observation" status to manage suicidal inmates in either their MHCBs or alternative housing cells. Presumably this practice is used by mental health clinicians to avoid the more stringent requirements of Suicide Precaution/Suicide Watch.

---

[32]Defendants reported that the correct form for documenting psych tech rounds was re-distributed to all CDCR chief nurse executives, and that existing training on psych tech clinical rounds will be updated to address the deficiencies identified in this report.  They also reported that the current tool for conduct of quarterly audits of psych tech rounds will be reviewed for needed improvements, and that each prison will ensure that the results of its audits will be provided to the institutional quality management committee and mental health quality management subcommittee.

At CCI, for example, "psychiatric observation" status was used frequently in the prison's Outpatient Housing Unit (OHU), while Suicide Precaution/Suicide Watch was used infrequently, with the last Suicide Precaution used in late October 2013 and that last Suicide Watch used in September 2013. When this reviewer asked CCI mental health staff for the written policy on "psychiatric observation," he was given a copy of Chapter 5 of the *Program Guide*, "Mental Health Crisis Bed." On page 12-5-32, "Mental Health Conditions Appropriate for Placement into an OHU," the following sentence was circled: "Inmates who engage in behaviors that might be indicative of a mental disorder that interferes with daily living and requires further observation and evaluation." It is clear that this policy directive was not intended to create a separate "psychiatric observation" status, distinct from Suicide Watch or Suicide Precaution, making "psychiatric observation" an unauthorized practice. Another practice found by this reviewer in July 2014 at PBSP was "behavioral checks" at 60-minute intervals for most inmate-patients *admitted* into the MHCB for SI.

At CEN, although both Suicide Precaution and Suicide Watch were frequently used in the CTC for inmates identified as suicidal, "psychiatric observation" status was also being used there. Although first seen at CEN, similar practices were seen at many of the other prisons. Mental health leadership at CEN developed a local policy, found in their CTC Policy and Procedure Manual, that outlined procedures for using psychiatric observation status. The stated "purpose" of psychiatric observation status was: "(1) To prevent suicide and/or injury to self, other inmate(s) patient(s), and/or staff; (2) To assess the inmate-patient's mental health condition and treatment needs; and (3) To provide interim treatment measures pending transfer to a MHCB." Clinical judgment dictated whether or not inmates on psychiatric observation status had allowable items (including beds) and clothing in their rooms. Although not stated in the policy, inmates on psychiatric observation status were normally observed at 30-minute intervals, well below the standard of care for observation of suicidal inmates. Many prisons were also using psychiatric observation status as a step-down from Suicide Precaution or Suicide Watch, a reasonable concept but, again, it was not authorized by the *Program Guide*.

Without opining on the efficacy of psychiatric observation status as a step-down from Suicide Precaution and/or as an observation level for non-suicidal inmates in mental health crisis, there are additional concerns with use of psychiatric observation for suicidal inmates. At CCI, there was no documentation of this type of observation. It resulted in inmates being stripped naked, clothed in safety garments, and being placed in cells without bedding. Rather, if the clinician assesses the inmate as suicidal and determines that items and possessions should be restricted from the inmate's room or cell, what *should* occur is placement of the inmate on either Suicide Precaution or Suicide Watch status. A suicidal inmate should never be observed at 30-minute -- and certainly not at 60-minute -- intervals, regardless of acuity level. Another problem with psychiatric observation status is that because it is not sanctioned by the MHSDS or the *Program Guide*, it escapes any continuous quality improvement review.

"Crisis evaluation" status was found in use at some of the prisons which have OHUs. A CDCR mental health quality management official told this reviewer that "crisis evaluation" status was developed as a way to distinguish the mental health patients from medical patients in the OHU, as a data entry label, and was not intended to replace "suicide precaution" or "suicide

watch." However, this reviewer found otherwise. For example, the applicable LOP at CTF, dated August 29, 2013, defined "crisis evaluation" as follows:

> "If the clinician cannot determine, with reasonable certainty, that the inmate-patient is at high or medium risk for suicide, and more time is needed to evaluate the inmate-patient's condition, the clinician shall place the inmate-patient in an OHU with orders for Crisis Evaluation. The clinician will then specify the method, frequency, and materials/items the patient may have in order to keep him safe. This will not trigger an immediate/automatic referral to MHCB and allows for clinicians to further evaluate the level of care and treatment needs of the patient. The inmate-patient must be discharged from the OHU within 48 hours."

At CTF, an inmate who was expressing SI and threatened to cut himself on March 1, 2014, was seen by a clinician. The following physician's order was placed in his record: "Admit to OHU for 'crisis evaluation' until further notice." Most concerning was the fact that the inmate was discharged from the OHU two days later without an SRE, five-day clinical follow-up, or treatment plan. In another case involving a suicidal inmate at CTF, clinicians were using an unauthorized CDCR observation form that contained separate options for Suicide Watch, Suicide Precaution, psychiatric observation, and *crisis evaluation*.

This reviewer also observed a wide spectrum of observation practices for inmates in MHCBs who were not on suicide precaution or suicide watch status. These observation levels ranged from none to 30-minute, 60-minute, and 120-minute intervals, all in stark contrast to the *Program Guide* objective "To observe, monitor, and provide continuous nursing assistance to inmate-patients whose condition requires 24 hours or more to achieve stabilization." *Program Guide*, Chapter 5, "Mental Health Crisis Bed, p. 12-5-2. According to CDCR mental health officials, a work group has been established to review the use of psychiatric observation and possibly develop policies and procedures that may make its use appropriate. To date, the Special Master and his experts have not received any documentation of this workgroup activity.

***Recommendation***:

- ***CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.***

- ***CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.*** [33]

---

[33] With regard to the first of the two recommendations above, defendants reported that a workgroup has been established to assess the minimum frequency of rounding in MHCB units and to consider implementation of a new "step down" status for inmates previously on suicide precaution, with clearly identified frequency of rounding. They further reported that once the frequency has been determined, training will be issued to the institutions. With

### 10)   Use of "Alternative Housing Cells" and OHUs for Suicidal Inmates

CDCR directives do not address the frequency of observation, nor any requirement of suicide-resistant cells, for inmates placed in alternative housing cells while awaiting placements into MHCBs.  *See*  Memorandum, "Alternative Housing Cell Prioritization," December 12, 2012. In a recent discussion with CDCR officials, it was indicated to this reviewer that there were "expectations" that inmates be placed in suicide-resistant cells and observed continuously until transferred to an MHCB.

This reviewer's observations indicated that these expectations were not being met. At NKSP, for example, unit A-4 was observed being used for administrative segregation overflow housing, RC inmates, and as alternative housing for inmates  awaiting MHCB placement. While touring the unit, this reviewer found several problems, including that all ten alternative housing cells were not suicide-resistant, and staff were conducting rounds at only 30-minute intervals for suicidal inmates. Similar problems were found at other prisons.  Holding cells in CTCs designated as alternative housing were not always suicide-resistant, and nursing rounds were not meeting the minimum standard of staggered 15-minute intervals.

There were other problems as well in a significant number of prisons.  Most OHUs contained cells designated to house suicidal inmates that were not suicide-resistant.  CTF, for example, had cells with bars, wall ventilation grates, non-suicide-resistant handicapped railing, window brackets, television stands, etc.  CRC also had dangerous OHU cells, although all inmates identified as suicidal were placed on continuous observation until transferred to an MHCB.  At SCC, the three cells in the ten-bed OHU that were used for suicidal inmates contained cell bars on the doors (with Lexan paneling on the *outside*), sinks with dangerous faucet lips, and tables and stools with dangerous brackets. Despite these conditions, inmates on suicide observation status were to be observed at 15-minute and 30-minute intervals. Conditions were acutely problematic at MCSP, where six cells in the administrative segregation building (Building 13) were designated as "Mental Health Outpatient Housing Unit" (MHOHU) cells. Except for the sink/toilet combo, all fixtures including beds had been removed from these cells. The environment more closely resembled seclusion cells than an MHOHU, making it difficult to envision a suicidal inmate feeling safe in a therapeutic environment.  At DVI, damaged floor tiles in several of the ten rooms could easily have been used for self-harm by inmates.

Other prisons, such as VSP for example, had rooms which they used to house patients with both medical and mental health needs ("swing beds") and placed suicidal inmates there. These rooms contained numerous suicide hazards, including hospital beds, window brackets, wall/ceiling ventilation grates with large holes, exposed pipe chases, etc.  In most, but not all, of these prisons, continuous observation was required for these suicidal inmates.  At CCC, for example, two OHU cells were designated as "swing beds" to house suicidal inmates, where inmates were placed on continuous observation until transfer to an outside MHCB, usually at HDSP.

---

regard to the second of the two recommendations, they indicated that the same workgroup will collaborate with CCHCS nursing to clarify procedures and policies for observation of inmates housed in MHCB units.

Although the *Program Guide* and various CDCR directives emphasize that inmates housed in OHUs on suicide observation status should be transferred within 24 hours, it was not unusual for inmates to remain in the OHUs for up to 72 hours or longer. During this time, they did not have beds and were forced to sleep on the floor with only a mattress. In most OHUs that used "swing beds," the rationale for removing hospital beds was that they were not suicide-resistant. While the hospital beds were indeed hazardous for suicidal inmates, the practice of withholding a bed from an inmate is not an acceptable alternative and does not reflect the standard of care for correctional facilities.  Inmates placed on suicide observation must be housed in a cell or room that is suicide-resistant, with a bed that is suicide-resistant. Pursuant to a CDCR directive dated October 29, 2013, entitled "State-Issued Clothing and Bedding for Mental Health Inmate-Patients in the Mental Health Crisis Bed and Out-Patient Housing Unit," inmates placed in either an MHCB or OHU for suicidal observation must be housed in a room that contains "*a bed (cement bed with mattress on top acceptable)*." Although this reviewer observed that most, if not, all of the MHCBs contained suicide-resistant beds, few, if any, of the OHUs contained any kind of bed.  Forcing an inmate to sleep on a mattress on the floor can only exacerbate the suffering of those who are suicidal and/or mentally ill.

**<u>Recommendation</u>**:

- ***The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide-resistant.***[34]

- ***Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.***[35]

- ***Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.***[36]

- ***Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.***[37]

---

[34] Defendants reported that they are discussing retrofitting alternative cells to insure that they are suicide-resistant and considering a review of the settings used for alternative housing.  They agreed to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

[35] Defendants reported that CDCR policy already requires that inmates placed into alternative housing or OHUs are to be observed continuously, (*per 10/13 Memorandum, revised 7/14, Inmate Medical Services Policies and Procedures: Vol. 12: Mental Health Services, Ch. 5, Provision of Care, Pol. 12.05.301, Housing of Inmate-Patients Pending MHCB Transfer*).  They agreed to discuss implementation of this policy with the Special Master in the Suicide Prevention Management Workgroup.

[36] Defendants reported that the *Program Guide*, Chapter 5, p. 12-5-42, already requires Suicide Watch or Suicide Precaution for suicidal inmates placed in OHUs, and that observation practices in alternative housing and OHUs will be monitored by CDCR regional mental health staff.

[37] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to review this recommendation and the settings used for alternative housing.

11)     **OHU/MHCB Discharge and Efficacy of Five-Day Clinical Follow-Up and 60-Minute Custody Welfare Checks**

According to the *Program Guide*, following discharge from an MHCB, the inmate shall receive five-day follow-up assessments by mental health clinicians, and welfare checks by custody personnel at 60-minute intervals for at least the first 24 hours. After the initial 24-hour period, "a mental health clinician shall then discuss the inmate-patient's behavior with the custody staff and evaluate the inmate-patient to determine if the custody checks should be continued or discontinued. If the custody checks are continued, the mental health clinician shall determine whether the checks are to be every hour, every two hours, or every four hours for the next 24-48 hours." If, after a second evaluation, mental health clinical staff believe that additional hourly checks are required, the inmate shall be readmitted to the MHCB for further stabilization. *Program Guide*, Chapter 5, "Mental Health Crisis Bed," p. 12-5-29.  As reflected in SPRFIT meeting minutes at almost all of the prisons, historically there have been varying degrees of compliance with five-day follow-ups and hourly custody welfare checks of recently released inmates from suicide watch or suicide precaution status.

The efficacy of this *Program Guide* requirement is questionable. In fact, the form used to document these follow-up assessments ("Interdisciplinary Progress Note – 5-day Follow-Up," CDCR MH 7230B), forced clinicians to write five days of progress notes in five small boxes on a single page.  Even if the clinician were operating with an adequate treatment plan, there was no room on the current form to document such work.  As a reasonable alternative, mental health clinicians at CTF were observed using a different form, "Interdisciplinary Progress Note," CDCR 7230-MH," that was Subjective Objective Assessment and Plan (SOAP)-formatted, with each of the five days of follow-up documented on a separate form.  The extra space was sufficient to document the inmate's mental status and the status of his or her treatment plan.

In addition, placement of an inmate in a non-suicide-resistant cell and requiring observation at 60-minute intervals for the first 24 hours (or at two-hour and four-hour increments on subsequent days) certainly does not suffice as a protective measure against suicide so soon after discharge from an OHU/MHCB.  Subsequent observation of these inmates "every two hours, or every four hours for the next 24-48 hours" certainly has no protective value. This schedule appears to be designed for the convenience of custody staff rather than for the protection of an inmate who might have a recurrence of SI.  In fact, CDCR appears to be advancing contradictory approaches by implementing the Guard One system, which mandates 30-minute rounds in its special housing units, while it continues to require rounds at one-hour, two-hour, and four-hour intervals for inmates recently discharged from an OHU or MHCB. Finally, in at least one prison, SVSP, toured by this reviewer, mental health clinicians apparently believed that five-day follow-up assessments and 60-minute checks for 24-hours by custody staff were an acceptable *alternative* to MHCB admission.

As shown below in Table 3, during the past three years, ten suicides occurred within 30 days or less after the inmate's discharge from the OHU/MHCB.   Among these suicide deaths, the average period between discharge and suicide was 11 days.  Six of the ten suicides occurred in administrative segregation units, and none of these six inmates were housed in suicide-

resistant cells at the times of their deaths.  This data is clearly important for purposes of treatment planning and follow-up services, and may also have implications for the adequacy of the SREs completed upon the discharges, and the clinical judgments exercised therein.

### TABLE 3
### Length of Time Between MHCB Discharge and Suicide, Within 30 Days
### 2012 through November, 2014

| Inmate | Date of Suicide | Location | Length of Time from Discharge |
|--------|-----------------|----------|-------------------------------|
| SVSP5 | 3/10/12 | Admin. Seg. | 5 days |
| DVI4 | 5/12/12 | RC | 11 days |
| FSP8 | 5/30/12 | Admin. Seg. | 14 days |
| CIW5 | 7/6/12 | SCU[38] | 1 day |
| SCC4 | 7/28/12 | Admin. Seg. | 1 day |
| SVSP11 | 1/24/13 | Admin. Seg. | 6 days |
| SAC6 | 5/28/14 | PSU | 21 days |
| SATF5 | 7/6/14 | Admin. Seg. | 13 days |
| CIW8 | 7/30/14 | Admin. Seg. | 15 days |
| CIM3 | 8/11/14 | RC | 19 days |

### Average:  11 days

*Recommendation*:

- *CDCR, under the guidance of the  Special Master, should completely revise the current Five-Day Follow-up/60-Minute Welfare Check protocol. At a minimum:*

  - *The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the "Interdisciplinary Progress Note" utilized at CTF that allows clinicians to use a separate sheet for each day of follow-up.[39]*

  - *All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.[40]*

  - *The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-*

---

[38] Supportive Care Unit

[39] Defendants reported that the five-day follow-up form is currently being revised to address this concern, and will be sent to the Special Master before it is implemented. They also reported that the electronic health record will reflect this change when it is implemented.

[40] Defendants' response to this recommendation was that it requires further discussion in the Suicide Prevention Management Workgroup.  They indicated that they are not aware of any another state penal system which implements 30-minute observations for these inmates and that they focus on preparation and treatment planning for inmates being discharged from placement in an MHCB or alternative housing for suicidal behavior.

*case basis by the mental health clinician and clinically justified in the inmate's treatment plan.  No other frequency of observation should be authorized.*[41]

- *All inmates discharged from an MHCB or alternative housing and immediately re-housed in an administrative segregation unit should only be placed in a suicide-resistant, retrofitted cell for a period to be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan.*[42]

- *Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing suicidal ideation and/or engaging in self-injurious behavior.*[43]

### 12)   Local SPRFITs

The *Program Guide*, Chapter 10, "Suicide Prevention and Response," sets the various responsibilities for the local SPRFITs.  Following review of all CDCR suicides from the 2012 through September 2014, it appeared that the deficiencies cited in each case and the parties responsible for the corrective actions fell within the jurisdiction of the local SPRFIT.

One of the inherent responsibilities of the SPRFIT system should be systematic progress toward a decrease in the number and rate of inmate suicides at each prison.  This has not occurred consistently throughout CDCR. For example, each local SPRFIT is required to meet at least monthly and carry out various responsibilities including ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, treatment plans, etc. However, during local SPRFIT meetings attended by this reviewer and/or in meeting minutes examined by this reviewer, there was little discussion of overall suicide prevention strategies.  The SPRFIT meetings were mostly recitations of monthly statistics regarding compliance rates for five-day follow-ups and use of the Guard One system. There were few meaningful discussions about challenging inmates such as those on the "high risk" list, struggles with SREs and treatment planning, etc.  Any discussions of SREs in monthly local SPRFIT meetings minutes were quantitative rather than qualitative.

Although SPRFIT meetings were scheduled for 60 minutes, most of the local meetings attended by this reviewer were much briefer. Review of minutes of local SPRFIT meetings in some prisons indicated that several of the required team members such as the Chief of Mental Health (CMH), Chief Psychiatrist, Chief Psychologist, etc. were often absent from at least three consecutive monthly meetings, most notably at CSATF from November 2013 through January 2014, at DVI from April through June 2014, and at PVSP from November 2013 through April 2014.

---

[41] Defendants' response to this recommendation was that it also requires further discussion in the Suicide Prevention Management Workgroup.

[42] Defendants offered no response to this recommendation.

[43] Defendants reported that they will clarify appropriate use of five-day clinical follow-up so that it is not used indiscriminately or inappropriately.

Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable. They should not have been identified for the first time by a *Coleman* expert and/or monitor, but rather by the local SPRFIT. Although the local SPRFIT concept is a valuable tool in CDCR's suicide prevention program, its process appears to have lost its way and needs to be rebooted.

### *Recommendation*:

- ***CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.***[44]

### 13)   Other Miscellaneous Issues

#### A)   Forms for Documentation of Observation

The MHCBs, OHUs, and other alternative housing cells in many CDCR toured facilities were using observation forms containing pre-printed 15-minute intervals. This practice is contrary to *Program Guide* requirements for observation at staggered 15-minute intervals. Only the "Suicide Watch/Suicide Precaution Record" (CDCR 7365, revise July 2009) should be utilized. CSATF was noted to be using a form last revised in October 1990. In addition, this reviewer observed several poor practices regarding documentation of observation at many of the toured prisons. These included forms with time intervals that were not up-to-date, forms that were being updated as this reviewer was touring the unit, and observation sheets that were not being kept on each room door but rather at the Nurse's Station, thus allowing for the possibility that these sheets were being completed without rounds having been performed. This reviewer's observation of falsification of observation sheets was found in at least six CDCR facilities, CCI, CIM, CMF, DVI, LAC, and SAC, and resulted in notification to nursing supervisors in each site.[45]

#### B)   Non-Suicide-Resistant MHCBs

Although most MHCBs were suicide-resistant, several were not. They contained handicap railing with a several-inch open gap between the railing and wall, and square-

---

[44] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation. They also reported that CDCR's statewide mental health program will work with the SPRFIT coordinator at each prison to enhance the effectiveness of the SPRFIT, focusing on quality of clinical assessments and interventions, quality of rounding, and institution-specific issues. Defendants also indicated that the items raised in this report may be monitored by the SPRFIT and integrated into CDCR's Continuous Quality Improvement Tool (CQIT).

[45] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation, that the correct form and requirements for documentation of psych tech rounds were discussed with nursing leadership, and that the correct form has been distributed to all chief nurse executives. They also reported that an audit tool is being developed to assist the prisons with monitoring of suicide precaution documentation.

shaped stainless steel sinks protruding from the wall that were conducive to SAs by hanging. Handicap railing should be replaced with solid stainless steel railing that does not contain gaps.  Triangle-shaped stainless steel shelving should be attached to each side of existing square-shaped stainless steel sinks so that any ligatures will slide off the sink.[46]

### C)   Privileges for Inmates in MHCBs

Inmates housed in the CTC for medical purposes were not prohibited from recreation, visits, or telephone calls. However, there were questionable practices in the CTCs regarding privileges afforded to MHCB inmates.  For example, although recreation was permitted based upon clinical judgment for an inmate on MHCB status, visits and telephone calls were prohibited. Most recreation was time spent with the recreation therapist outside inmate-patient's room, and rarely, if ever, included yard time. Many clinicians appeared indifferent to the issue or dismissed it as a "custody" issue. Although the *Program Guide* indicates that recreation is permitted, the allowance of visits, telephone calls, or yard for an MHCB inmate is not addressed.

While generally an inmate's stay in an MHCB is relatively brief and temporary loss of such privileges may not be onerous, CDCR's own data indicates that MHCB lengths of stay are increasing and are no longer relatively brief.  One could also argue that MHCB inmates are in crisis and very unstable, and allowing them a family visit and/or telephone call may exacerbate their suicidal symptoms. The stronger counter-argument is that these inmates will eventually be discharged from the MHCB, and there is both a safety and therapeutic value to gauging the inmate's response to a visit, telephone call, or potential bad news while the inmate is being closely monitored by the Interdisciplinary Treatment Team (IDTT) within the MHCB, on a case-by-case basis as clinically indicated.[47]

### D)   Informal Recommendations Within CDCR Suicide Reports

Many CDCR Suicide Reports of 2012 – 2014 inmate suicides included "deficiencies" and/or "concerns" listed by the CDCR reviewer that did *not* result in a recommendation for corrective action through a QIP.  It appeared the CDCR reviewer was simply identifying a problem and informally relaying it back to the facility for resolution.  The problem with that is, without a QIP, the deficiency was not subject to any formal corrective oversight from CDCR headquarters.[48]

---

[46] Defendants reported that replacement of non-suicide resistant beds in MHCBs is a priority, and that they will work with the Special Master in the Suicide Prevention Management Workgroup to address this problem.

[47] Defendants reported that they are willing to discuss the provision of telephone and visiting privileges to inmates in CTCs in the Suicide Prevention Management Workgroup.  However, they also stated that because stays in MHCBs are intended to be brief (i.e. no longer than ten days), the privileges identified in this recommendation may not be practicable, particularly in cases in which visitation or telephone calls are not clinically indicated.

[48] Defendants reported that this issue has been corrected via a memorandum dated 11/21/14, and that any concerns in a suicide report that arose out of operations within the jurisdiction of CCHCS will be handled through the *Plata* receiver's nursing and medical death review committee process.

### E)  Frosted Exterior Cell Windows and Sensory Deprivation

Many toured administrative segregation units had exterior cell windows that were frosted to prevent natural sunlight from entering the cell. Although some custody officials suggested that the windows were frosted to reduce heat from the sunlight during the hot weather months, many inmates complained of sensory deprivation from the lack of natural sunlight.  They were also free to cover their exterior windows with paper if heat became excessive.[49]

### F)  High Refusal Rates for New Admit Screens in Administrative Segregation

Many facilities reported high rates of refusal of mental health screenings for newly admitted administrative segregation inmates.  At ISP, the refusal rate was 86 percent in February 2014. Although the mental health screenings should ideally be administered to inmates once they are physically housed in the administrative segregation unit, some facilities reported much lower refusal rates when the screens were administered by a mental health clinician in the TTA before the inmate was re-housed in administrative segregation.[50]

*Recommendation*:

- ***CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues.***

## CONCLUSION: NEXT STEPS

Following debriefing sessions at the end of each prison tour, this reviewer was frequently assured by the CMH that the identified deficiencies would be corrected as soon as possible. Despite such assurances, it would be impossible to verify that such corrective actions have been taken without re-inspection. For example, during the tour of CSP/Solano in January 2014, this reviewer found that mental health clinicians were frequently ordering observation at 30-minute intervals for inmates admitted into alternative housing or  MHCBs and on Suicide Precaution status. This practice was a clear violation of the CDCR *Program Guide*, and the CMH indicated that the deficiency would be corrected. However, during a review of an inmate's eUHR in July 2014, this reviewer examined a June 27, 2014 SRE when the inmate was at CSP/Solano.  This SRE was completed over five months after this reviewer's on-site assessment there. The inmate had been admitted into the MHCB the day before the SRE for "increased instability, disheveled, and danger to self." According to the SRE, he was assessed as being a "moderate" acute risk for suicide and placed on Suicide Precaution status with observation at 30-minute intervals. This

---

[49] Defendants reported that frosted windows are used to reduce excessive heat entering the prison housing units, but they agreed to continue discussing this matter with the Special Master in the Suicide Prevention Management Workgroup.

[50] Defendants reported they already screen all inmates before placement into administrative segregation units, but they stated that they are examining screening options and are willing to discuss this proposal in the Suicide Prevention Management Workgroup, which they said may also want to consider additional screenings before placement of inmates into administrative segregation.

practice violated *Program Guide* requirements back in January 2014 and continues to violate it today.

In addition, the CDCR mental health and custody officials who accompanied this reviewer on many of his prison tours gave informal assurances that many of the identified deficiencies had been acknowledged and that corrective actions were planned. There was also some discussion of revising the Continuous Quality Improvement Tool (CQIT) to ensure that it had a more robust focus on suicide prevention. Some of these corrective actions have already been seen. Examples are the recent webinar on SRE treatment planning, and the expansion of the Guard One system to require 30-minute welfare checks beyond the inmates' initial 21 days in the administrative segregation units and the use of the technology in all SHUs, and Condemned Units. However, there has been silence on the other promised initiatives, perhaps because CDCR has been awaiting the findings and recommendations in this report.

In conclusion, it is hoped that the next step in this process is for CDCR to review this report's findings, embrace its recommendations, and develop a comprehensive corrective action plan under the guidance of the Special Master. The appropriate context would appear to be the Suicide Prevention/Management Workgroup that was ordered by the *Coleman* Court on July 12, 2013, "comprised of CDCR clinical, custody, and administrative staff, DSH staff, Special Master's experts, plaintiffs' counsel and, as appropriate, the Plata Receiver."[51] These workgroups should convene on a regular basis, preferably monthly, until the work is completed.

Finally, re-inspection of select prisons which continue to struggle with their suicide prevention programs would promote both the provision of technical assistance and a measurement of the sustainability of CDCR's corrective actions.

---

[51] Defendants reported that CDCR has collected responses and comments from each individual institution discussed in this report and that they believe those comments should be addressed within the Suicide Prevention Management Workgroup. They also reported that they agree that the Suicide Prevention Management Workgroup should work with the Special Master to develop a comprehensive corrective action plan to address the outstanding issues identified in this report.

## <u>APPENDIX</u>

|  | **<u>Prison</u>** | **<u>Page</u>** |
|---|---|---|
| 1) | California State Prison, Los Angeles County | 1 |
| 2) | California Correctional Institution | 4 |
| 3) | California State Prison, Sacramento | 12 |
| 4) | Folsom State Prison | 19 |
| 5) | California Institute for Men | 24 |
| 6) | Centinela State Prison | 27 |
| 7) | Calipatria State Prison | 30 |
| 8) | Richard J. Donovan Correctional Facility | 32 |
| 9) | California Medical Facility | 39 |
| 10) | California State Prison, Solano | 45 |
| 11) | San Quentin State Prison | 49 |
| 12) | California Medical Center | 63 |
| 13) | Salinas Valley State Prison | 65 |
| 14) | California State Prison, Corcoran | 79 |
| 15) | Substance Abuse Treatment Facility | 85 |
| 16) | Ironwood State Prison | 89 |
| 17) | Chuckwalla Valley State Prison | 91 |
| 18) | Wasco State Prison | 92 |
| 19) | North Kern State Prison | 97 |
| 20) | Central California Women's Facility | 103 |
| 21) | Valley State Prison | 107 |
| 22) | Kern Valley State Prison | 111 |
| 23) | Correctional Training Facility | 117 |
| 24) | Pleasant Valley State Prison | 122 |
| 25) | Avenal State Prison | 127 |
| 26) | California Institution for Women | 132 |
| 27) | California Rehabilitation Center | 145 |
| 28) | Sierra Conservation Center | 147 |
| 29) | Mule Creek State Prison | 151 |
| 30) | California Health Care Facility | 165 |
| 31) | Deuel Vocational Institution | 168 |
| 32) | California Correctional Center | 174 |
| 33) | High Desert State Prison | 176 |
| 34) | Pelican Bay State Prison | 180 |

**1)      California State Prison - Los Angeles County (LAC)**

**Inspection**: November 12-13, 2013

LAC housed approximately 4,500 inmates, most of whom were at Level IV security classification.  It had a 16-bed Correctional Treatment Center (CTC) and three administrative segregation units.  Approximately 37 percent of inmates were on the mental health caseload, which included 1,316 3CMS and 371 Enhanced Outpatient Program (EOP) inmates.  CTC holding cells were designated as alternative housing beds and were used for inmates identified as suicidal and awaiting placement in a Mental Health Crisis Bed (MHCB).  Other alternative housing cells were located in the administrative segregation units.

**Screening/Assessment**: There were no new admissions during this reviewer's site visit.  Psych techs rounds in administrative segregation were not observed.

**Housing**: Fourteen of the 16 CTC beds were designated as MHCBs.  There was also a safety cell and a mental health observation cell.  All MHCB rooms did not contain any obvious features which could be used for a suicide attempt (SA) by hanging.  Two holding cells were also located in the CTC and were said to be used infrequently for temporary alternative housing for suicidal inmates, who were required to be on continuous observation.  These holding cells were suicide-resistant.  The prison also used other alternative housing cells for inmates on suicide precaution/suicide watch.  These cells were located in Facility D, Building 1 (cells 101-105) and one of the administrative segregation units (A-4, cells 119-126).

Occasionally, suicidal inmates were also housed in R & R Unit cells.  The alternative housing cells located in D-1 (cells 101-105) were not suicide-resistant.  They all contained stools, gaps between the desktop and wall, and mesh screening that contained holes with a diameter greater than the industry standard of 3/16 inch.  Ironically, Lexan paneling that seemingly had been installed to block access to the holes was incorrectly installed on the outside (and not from inside), thereby allowing the inmate easy access to the mesh screening for use as an anchoring device in a SA.

In addition, although the three administrative segregation units had a total of 21 retrofitted suicide-resistant cells for inmates on new intake status, this reviewer also observed that newly arrived inmates were being placed in any available cell within the three units.  Each of these cells was not retrofitted.

**Observation**: This reviewer examined the forms being used to document required observation of suicidal inmates housed in the CTC by either nursing staff or psych techs.  One concern was that staff were using a form that contained pre-printed 15-minute intervals.  Another, more important concern was staff had not documented any observation of an inmate on suicide precautions for over one hour, from 9:30 a.m. to 10:30 a.m.

Further, during the tour of the administrative segregation unit housing 3CMS inmates (Unit A-5), correctional staff were aware of the California Department of Corrections and Rehabilitation (CDCR) requirement to conduct staggered 30-minute rounds of new inmates housed in the unit

1

for their first 21 days using the Guard One electronic scanning system, but not of the requirement to observe all inmates there at 30-minute intervals.  Instead, officers were documenting checks at 60-minute intervals.  Subsequent review of the Guard One data for November 11, 2013 in the Unit A-5 found only a few violations during the 24-hour period, with an overall compliance rate of 97 percent.

**Management/Treatment Planning**:  This reviewer examined various Electronic Unit Health Records (eUHRs) of inmates on suicide observation status and of inmates referred to mental health on an urgent and/or emergent basis.  Although these charts indicated that inmates were consistently seen by clinical staff on a daily basis while on suicide observation status, and that inmates referred to mental health were generally seen timely, there were several problems.  For example, in one reviewed chart (LAC 1), the inmate cut his left arm on October 29, 2013 in an act of self-injurious and/or suicidal behavior.  He informed the triage nurse "that he cut himself because of family stressors and that he felt suicidal at the time, but not feeling suicidal now" (a few minutes later).  The inmate was placed on Suicide Watch status.  The treatment plan section of a Suicide Risk Evaluation (SRE) completed the following day (October 30) simply stated "continue SW, awaiting admission to MHCB when bed is available."  The inmate had a long history of self-mutilation and multiple SAs during 2012, yet the mental health treatment plan (MHTP) form completed the following day (November 1) and signed by various team members failed to address the problem of suicidal and/or self-injurious behaviors.

In another case (LAC 2), an EOP inmate became agitated on October 27, 2013 and began hitting the wall of the cell, stating "I am feeling suicidal."  He complained of problems with his family and custody staff.  He was pacing in his cell and appeared agitated to the responding nurse.  The inmate was placed on Suicide Watch.  An SRE was completed approximately 12 hours later, on the following day (October 28).  It was inadequate.  The clinician noted that the inmate denied any suicidal ideation (SI) and did not report SI (within the past three months) as an acute risk factor on the form, and stated that the "patient is a poor historian."  This reviewer's examination of the Mental Health Tracking System (MHTS) found that the inmate had been placed in an MHCB on ten different occasions from July 9, 2007 through September 22, 2013 for a period of 336 days, including a recent 18-day stay from September 22 through October 10, 2013.  Almost all of the inmate's MHCB placements were for suicidal behavior.  The clinician noted that the inmate was "not in acute distress" and that his "suicide risk is minimal."  The treatment plan section of the SRE did not address treatment planning.  It simply stated: "Discharge suicide watch, released to custody, start 5-day step down, canceled MHCB."  A review of the inmate's chart found that the five-day follow-up never occurred.

In contrast, in case LAC 3, the treatment plan section of an SRE completed on October 10, 2013 repeated policy requirements and stated: "IP is being discharged as EOP LOC, 5-day step down to be initiated when IP returns to D Yard EOP program; IP to be seen on a weekly basis for 1:1 Case Manager (CM) contacts; IP should be encouraged to participate in groups and activities with Recreational Therapist (RT); IP may benefit from learning to manage difficult mood states and circumstances without resorting to maladaptive patterns (claiming he is suicidal)."

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambulatory Bag (Ambu bag), and cut-down tool.

**Training**: According to training records, approximately 97 percent of custody staff was currently certified in Cardiopulmonary Resuscitation (CPR).  Nursing staff reported 100 percent compliance with CPR training.  In addition, approximately 90 percent of both custody and non-custody staff were currently compliant with annual suicide prevention block training.  Non-custody personnel (including medical, nursing, and mental health staff) had <u>not</u> received annual suicide prevention block training.  Finally, almost all of the required mental health clinicians had received the seven-hour SRE training as of November 5, 2013, with most receiving it in March 2013 and completing the mentoring program.

**Recent Suicides**: LAC had two inmate suicides during 2012-2014.  In the **first** case (LAC 4), during the early morning of December 8, 2012, the inmate was found hanging by a sheet from the upper bunk of his general population (GP) cell.  His body was in *rigor mortis*.  He had entered CDCR in September 2011 to serve a life sentence for murder.  He was transferred to LAC in April 2012.  He had no history of mental illness or suicidal behavior, and was not on the mental health caseload.  He did not have any recent RVRs nor was he recently housed in administrative segregation.  A possible precipitating factor listed by the CDCR reviewer in the Suicide Report was a perceived inability to serve his life sentence.  No recommendations were offered in the Suicide Report.

In the **second** case (LAC 5), during the morning of April 15, 2013 the inmate was found hanging by a sheet from the upper bunk of his administrative segregation unit cell.  He had entered CDCR in November 2008 to serve a sentence of voluntary manslaughter of his ex-girlfriend.  He began receiving mental health care in 2008 and was diagnosed with Schizoaffective Disorder in April 2009, after previous diagnoses of Adjustment Disorder and Major Depressive Disorder.  In October 2012, the inmate was placed in a MHCB for SI.  In January 2013, after requesting protective custody due to fear for his personal safety, he was housed in the administrative segregation unit while awaiting possible transfer to a Sensitive Needs Yard (SNY) in another prison.  At the time of his death, he was at the 3CMS level of care (LOC) and was being considered for EOP based upon increasing paranoia, auditory hallucinations (AH), and noncompliance with psychotropic medication.  On March 15, 2013, the psychiatrist changed his medication.  On both April 4 and April 9, at the inmate's request the primary clinician (PC) agreed to postpone his elevation to EOP.  Possible precipitating factors listed by the CDCR reviewer in the Suicide Report were his inability to serve a long sentence and his fear for his personal safety.

The Suicide Report noted three issues with this suicide;  (1) The inmate's primary clinician twice postponed his transfer to a higher level of care in the weeks immediately preceding his death, despite noting the inmate's decompensation.  The clinician did not sufficiently document the rationale for the delays, did not consult with other psychologists, and did not appear to have offered increased clinical services in lieu of the transfer.  (2) On two separate occasions, discrepancies in mental health documentation were found.  (3) The inmate had been refusing psychotropic medications from November 2012 through February 2013, yet there was no documentation of a nursing referral to psychiatry for medication noncompliance.

There were several issues not addressed in the Suicide Report.  For example, the Report did not contain discussion of other possible precipitating factors, including the inmate's increasing paranoia, AH, and noncompliance with psychotropic medication.  In addition, in the months leading up to his suicide, the inmate was seen by a clinician on both February 7, 2013, with a progress note stating that the inmate reported that "I wish I was dead," and on February 15, 2013, with an SRE stating "I want to die".  Despite this information and worsening mental health status, the clinician determined the inmate continued to be at "low" acute risk for suicide.  In addition, the February 7 encounter should have resulted in completion of an SRE.  Further, despite being housed in the administrative segregation unit at the time of his death and required to be seen daily by a psych tech, the last "Cell Check-Psych Tech. Rounds" sheet in the chart was dated March 28, 2013.  Review of all of these sheets since January 2013 found that the psych tech consistently documented that the inmate exhibited no signs of mental illness, reported normal sleep and eating, demonstrated alert behavior and appropriate mood, exhibited fair personal hygiene and cell cleanliness, and was stable overall.  These observations were in stark contrast to the PC's observations of increasing paranoia, AH, noncompliance with his psychotropic medication, and need for elevation to the EOP level of care.

**2)**     **California Correctional Institution (CCI)**

**Inspection**: November 14-15, 2013

CCI housed approximately 4,700 inmates, most of whom were at Level IV security classification.  CCI had a 16-bed Outpatient Housing Unit (OHU), eight SHUs; and three administrative segregation units for caseload and non-caseload inmates.  In addition, alternative housing beds (in Unit 4B) were available but were said to be rarely used for inmates identified as suicidal and awaiting placement in an MHCB.  Approximately 24 percent of CCI inmates were on the caseload, including 1,125 3CMS and six EOP inmates.

**Screening/Assessment**: This reviewer observed one new admission during the intake screening process.  The nurse asked all the required questions on the Initial Health Screening form, CDCR 7277.  However, due to the inmate's Secured House Unit (SHU) status, privacy and confidentiality were compromised because the inmate was housed in a therapeutic module and two correctional officers (CO) were standing between the inmate and nurse during the entire screening process.

In addition, this reviewer observed required daily psych tech rounds in the administrative segregation units on November 15.  Only a few inmates who were new intakes into the unit were required to have the 31-item Mental Health Screening form completed.  The psych tech confided to this writer that it was her practice that if the inmate answered "no" to the first 12 questions on the screening form, the remaining 19 questions were not asked.  Although the administrative segregation unit rounds conducted by this psych tech were thorough, the practice of not asking all the required questions on the screening form was problematic.  The screening was also performed cell-side with little effort to persuade the inmate to be escorted outside his cell to a private setting.

4

**Housing**: CCI had a 16-bed OHU, with eight cells designated to house inmates with mental illness and/or requiring suicide observation.  The cells were mostly suicide-resistant.  Conduit piping was on the wall and ceiling, although it was adequately covered with security caulking. In addition, electrical outlets in several cells were "hot," although correctional staff informed this reviewer that maintenance staff had been asked to place a metal plate over the outlet whenever an inmate was on suicide observation status.  This stated practice seemed unlikely, given the methods that were said to be employed each time an inmate was placed on an observation status. Most importantly, this writer found that inmates on Suicide Precaution/Suicide Watch, or a local CCI practice of placing inmates on "psychiatric observation" status (see below), were not provided with suicide-resistant beds in the cells.  In fact, because CCI did not have any suicide-resistant beds, inmates housed in the OHU on any observation status were forced to sleep on a mattress placed the floor because metal-framed bunks had been removed from each cell.  The lack of suicide-resistant beds in the OHU was problematic.  Two alternative housing cells (in Unit 4B) located in close proximity to the OHU were said to be used infrequently for overflow for Suicide Precaution/Suicide Watch.  These cells were found to be suicide-resistant.

In addition, although the three administrative segregation units had a total of 17 retrofitted cells for inmates on new intake status, this writer also observed that newly arrived administrative segregation inmates were being placed in any available cell within the three units, each of which were not suicide-resistant.

**Observation**: This reviewer determined that Suicide Precaution/Suicide Watch was infrequently used at CCI.  Suicide Precaution was last used a few weeks earlier in late October 2013, and Suicide Watch was last utilized over a month earlier, on September 14, 2013.  Instead, mental health staff frequently utilized "psychiatric observation" status.  When this writer asked for a written policy on psychiatric observation, a page from the MHCB chapter of the *Program Guide* was provided and the following was circled: "Inmates who engage in behaviors that might be indicative of a mental disorder that interferes with daily living and requires further observation and evaluation."

This writer also observed that observation sheets were not completed for two inmates on psychiatric observation status on November 14, although all OHU inmates were said to be observed at 15-minute intervals.  When this reviewer asked why these inmates were on psychiatric observation status, the response was that one inmate had a "mood disorder" and the other inmate had been exhibiting "bizarre behavior."  Despite the fact they were not on Suicide Precaution/Suicide Watch, both inmates were clothed in *paper* shirt/shorts and housed in cells without beds.  When asked why these inmates were clothed in paper garments and without beds if they were not suicidal, neither health care or custody staff could provide an explanation.  The eUHRs of both inmates were subsequently reviewed.  In the first case (CCI 1), the inmate was at the 3CMS level of care with a diagnosis of Major Depressive Disorder, was admitted to the OHU on November 13 for "SIs, and was placed on psychiatric observation," not Suicide Precaution. In the second case (CCI 2), the inmate was admitted to the OHU for "aberrant bizarre behavior" that was neither identified nor explained in his record.  An SRE subsequently completed on November 14 resulted in the inmate's discharge from the OHU later that day.

The use of "psychiatric observation" status at CCI was problematic for many reasons. It was not authorized in the *Program Guide* for inmates who require Suicide Precaution/Suicide Watch; it did not result in documented observation; it resulted in inmates being stripped naked and placed in paper garments; it resulted in inmates being placed into cells without beds; and it may have been used to avoid the requirements of Suicide Precaution/Suicide Watch. Most importantly, it appeared that neither of the two cases discussed above were reported to HCPOP as required for anticipated MHCB transfer.

On November 15, this reviewer spent over two hours in the administrative segregation units observing required daily rounds by the psych tech. During that time, COs did not conduct any 30-minute cell checks of non-intake cells, although subsequent review of the unit log indicated that the checks were purportedly performed during this time frame. Such falsification of records is problematic. Administrative segregation unit logs for other reviewed days listed only hourly counts as welfare checks, or simply read: "30 minute checks done." Subsequent review of Guard One data, which is required to verify the observation of new intake inmates in administrative segregation units for the first 21 days of their stays, found a 99-percent compliance rate during the 24-hour period of November 12, 2013.

In addition, this reviewer's examinations of several SHUs found that required 30-minute rounds were performed inconsistently. For example, in SHU Bldg. 3, no observation checks were recorded in the unit log for the two prior shifts; in SHU Bldg. 6, the unit log read: "welfare checks every 1/2 hour from 14:30-21:30," which reflects an inadequate practice for documenting 30-minute checks; in SHU Bldg. 7, observation checks were recorded in the unit log at 30-minute intervals except for the 60-minute period preceding this reviewer's arrival; and in SHU Bldg. 8, 30-minute rounds were not being done consistently.

Finally, it should be noted that there were only six psych techs employed at the facility to provide daily rounds of the three administrative segregation units, as well as weekly rounds of eight SHU units and three SNY units. CCI previously had 11 psych tech positions for these responsibilities.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation status and of inmates referred to mental health on an urgent and/or emergent basis. Although the reviewed charts indicated that inmates were consistently seen daily by clinical staff while on suicide observation status, and that inmates referred to mental health were generally seen timely, several problems were found. For example, in a reviewed record for an inmate (CCI 3), although all required forms were completed, the quality of the documentation was problematic. An SRE completed on October 31, 2013 contained a sufficient treatment plan that included the following: "continue to reinforce adaptive coping skills with IP per treatment plan dated 8/26/2013, to eliminate over-reporting exaggeration of symptoms including using suicidal language for secondary gain." However, no documentation was found in either the Interdisciplinary Progress Notes: 5-Day Follow-Up CDCR Form 7230B or Interdisciplinary Progress Notes: General CDCR Form 7230A to indicate any such treatment planning was occurring. In addition, although the inmate was on Suicide Precaution in the OHU from October 25 through October 27, the psych tech conducting daily rounds in the administrative segregation unit completed a Psych Tech Daily Rounds Form indicating that the same inmate had been

observed in administrative segregation unit *during the same time period*.  Such falsification of records is problematic.

In another case (<u>CCI 4</u>), the inmate cut his forearm with a razor in a "suicidal gesture" that required eight stitches on October 4, 2013.  He was escorted to the OHU and placed on Suicide Precaution.  A subsequent SRE documented that the inmate was expressing SI and reporting a desire to die, but "no plan yet."  He had several other risk factors, including being at the 3CMS level of care, current anxiety and depression, a diagnosis of Major Depressive Disorder, a poor social support system, and a prior history of SAs.  His mental status was poor, and included poor sleep, appetite, and hygiene.  Although the clinician ultimately maintained the inmate on Suicide Precaution, the inmate was assessed as being a "low" acute risk for suicide.  On the following day, October 5, another clinician assessed the inmate and determined that he was no longer a suicide risk and would be discharged from Suicide Precaution.  No SRE was completed to justify the assessment and release from the OHU.  On the following day, October 6, an SRE was completed that justified the discharge from Suicide Precaution.  The next day, October 7, the inmate was returned to the OHU on Suicide Precaution after again verbalizing SI.  According to the progress note and SRE, the inmate had "a flat affect, recent cutting episode, paranoid ideation, social isolation, poor coping skills, and substantial acute risk."  On October 8, another clinician completed an SRE that noted "acute risk seems low as inmate denies any current SI, intent, attempt, or plans."  The inmate was continued on Suicide Precaution and referred to an MHCB.  However, a progress note authored by the same clinician for the same date and time stated that "SRE was completed.  Inmate didn't fit the criteria for OHU admission.  He was released to custody as CCCMS LOC."  Despite this contradictory progress note, the inmate was maintained on Suicide Precaution.  On October 10, the inmate was transferred to an MHCB at California Men's Colony (CMC).  A MHTP completed on October 15 did not address SI.  On October 18, the inmate was returned to CCI and the SRE and Five-Day Follow-Up Forms were completed, but neither gave any indication of treatment planning for SI.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 97 percent of custody staff was currently certified in CPR.  Records regarding non-custody compliance with CPR training were requested, but were not provided.  In addition, approximately 90 percent of both custody and non-custody staff were initially reported to be currently compliant with annual suicide prevention training, although it was later determined that non-custody staff had not completed the block training.  Further, 86 percent of required mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

Finally, current CCI practice was for mental health personnel to provide instruction for the one-hour annual suicide prevention workshop.  In this reviewer's brief discussion with the clinician designated to provide most of the annual suicide prevention training, the clinician said that most inmates placed in the OHU were not suicidal, but were simply manipulative and desired a change of scenery.  According to the clinician, these inmates quickly learn that placement on suicide observation status was not what they expected and were quickly returned to their housing units.

It was problematic that the clinician designated to instruct most of the annual suicide prevention workshops would espouse this belief.

**Recent Suicides**: CCI experienced five inmate suicides during 2012-2014.  In the **first** case (<u>CCI 5</u>), the inmate was found hanging by a sheet from the ventilation grate of his SHU cell during the evening of March 18, 2012.  The inmate had entered CDCR in November 2004 to serve a 59-year sentence for attempted murder and had been transferred to CCI in July 2007.  He was not on the caseload and did not have a history of mental illness or suicidal behavior.  The inmate had been housed in the SHU since May 2008 and was scheduled for release from the unit in August 2012.  Although possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report, the inmate left a suicide note in which he expressed having experienced symptoms of depressed mood and remorse over his crime and decisions made during his life.  The CDCR suicide reviewer did not offer an opinion on the impact, if any, of the inmate's five-year SHU confinement on his decision to commit suicide.  According to the CDCR reviewer, this 31-year-old inmate also had little hope of eventual parole.  The Suicide Report contained three bases for recommendations for corrective actions via a Quality Improvement Plan (QIP): "(1) Incident reports indicated that chest compressions were not initiated as part of the CPR response until the inmate arrived at the Facility B's medical clinic; (2) Facility B medical staffing was inadequate to handle emergency medical response for that facility.  Assistance by staff from Facilities A and C was needed, causing a delay in medical assistance during this emergency.  (It should be noted that CCI responded to this finding by stating that the Facility B nurse arrived at the cell within five minutes); and (3) Daily SHU records for the inmate from July 2011 through March 18, 2012 indicated approximately 14 occasions when he was offered exercise time.  This is significantly less yard time than is mandated for SHU inmates."

It was noteworthy that in this reviewer's discussion of this suicide with CCI mental health staff, they did not appear to be particularly familiar or interested in the case, apparently because the inmate was not on the caseload.  One clinician commented, "We haven't had a caseload suicide since 2011."

In the **second** case (<u>CCI 6</u>), the inmate was found asphyxiated by a sheet in his SHU cell during the afternoon of December 16, 2013.  He had tied a sheet around his neck and then used a magazine as a tourniquet to tighten the ligature.  When found, the inmate's body was in *rigor mortis*.  The inmate had entered CDCR in February 1995 to serve a 15-year to life sentence for second-degree murder of his girlfriend.  He was transferred to CCI in May 2013.  The inmate served a prior CDCR term for manslaughter.  He had an extensive disciplinary history, with 15 RVRs from nine different CDCR facilities from 1995 through 2013, including violence against other inmates.  Due to safety concerns, he was designated as SNY.  At the time of his death, the inmate was serving a second SHU term for assaulting an inmate.

Although the inmate denied any history of suicidal behavior, and an SRE completed in a 2013 assessed his chronic risk for suicide to be "moderate" and acute risk to be "low," he reported a previous history of mental illness and had been placed in 3CMS in September 2002.  His most recent diagnoses were Mood Disorder Not Otherwise Specified (NOS) and Anti-Social Personality Disorder.  He also reported a family history of mental illness, including suicides of

both his father and grandfather, and a difficult childhood, including physical abuse by his father. He confided to his PC in January 2013 that his father did not commit suicide, but that he had accidentally shot his father during an argument when he was 11-years-old.  He reported increased depression and requested an increase in psychotropic medication.  The inmate also reported in April 2012 that he wanted to commit "one more murder" so that he could receive the death penalty because he did not want to live out his life in prison.  In October 2013, he also requested assistance from his correctional counselor with obtaining information about organ donation.

Despite these behaviors, the inmate always denied any thoughts of suicide to his PC, although he did endorse problems with sleeping that included nightmares of his father and flashbacks to his turbulent childhood.  Because this inmate had refused all out-of-cell mental health appointments, he was being seen only cell-side by his PC.  He had not had any interaction with his psychiatrist since August 2013.  The psychiatrist's note dated November 19, 2013 indicated that medications were being reduced in a "benign manner to elicit cooperation with medication monitoring."  A psychiatrist added that "cell front visits are not satisfactory for assessment."  In a note dated December 5, 2013, the psychiatrist noted that the inmate's motivation for treatment was "minimal" and that "due to continued non-compliance with mental health program and medication, monitoring will continue to reduce and discharge meds."  The inmate had refused psychotropic medication nine times during the ten days before his death.

According to records, the inmate had limited family contact and had not received any visitors for over seven years.  However, on the morning of his suicide on December 16, 2013, the inmate's sister apparently called CCI in response to a "goodbye" letter she had recently received from the inmate.  In the letter, he said that he "expected to die from HIV."  However, medical records did not contain any information to support this, and historically the inmate reported few serious medical problems.  It appeared that the sister talked to a correctional counselor who attempted to transfer the call to the mental health clinician, but the call did not go through.  The inmate committed suicide later that day, which also was the anniversary of his girlfriend's death.

Possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report.  Although the inmate did not specifically verbalize SI in the weeks prior to his death, there was deterioration in his mood.  He complained to his PC of poor sleep and nightmares, symptoms of post-traumatic stress, and became increasingly more irritable, refusing medications and out-of-cell mental health appointments.

The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) On December 16, 2013, the inmate's sister contacted his correctional counselor. According to the counselor's documentation, during the telephone conversation, counselor revealed to inmate's sister that he was in the mental health program.  Inmate participation in the Mental Health Services Delivery System (MHSDS) is considered confidential medical information and cannot be divulged without a release of information from the inmate for the recipient; and (2) the documentation by the CCI psychiatrist notes no face-to-face visits with inmate after August 18, 2013.  The 2009 *Program Guide* requires that a 3CMS inmate's psychiatric medication be re-evaluated at least once every 90 days....Inmate was ducated several times during November 2013, but (psychiatrist) did not visit the inmate at cell front.  Inmate's

medications were decreased and the psychiatrist noted that he would continue to taper the medication."

The Suicide Report did not refer to two other deficiencies that should have precipitated corrective action.  First, although the CDCR reviewer was critical of the correctional counselor's disclosure of confidential information to the inmate's sister regarding his caseload status during their December 16 telephone conversation, there was no further discussion or recommended inquiry into the failure of the correctional counselor to establish contact with a mental health clinician as a result of the sister's emergency call.  The telephone conversation should have been treated as an emergency mental health referral.  Second, inmates housed in SHU were required to be observed by correctional staff at 30-minute intervals.  Given that the inmate was found in a state of *rigor mortis*, it appeared that correctional staff had failed to conduct 30-minute welfare checks as required during the hours preceding his death.

In the **third** case (CCI 7), the inmate was found hanging by a sheet from a ventilation grate of his administrative segregation cell during the late evening of February 24, 2014.  CPR was delayed for over 11 minutes because the inmate had jammed the cell door with a towel and first responding correctional staff had difficulty entering the cell.  Officers carried him down the stairs of the housing unit without initiating life-saving measures.  The inmate had entered CDCR in April 2004 to serve a 27-year to life sentence for rape, sodomy by force, and assault with a deadly weapon against a former acquaintance.  He was transferred to CCI on November 27, 2013 and was immediately placed in the administrative segregation unit due to safety concerns.

Upon entering CDCR, the inmate denied any prior history of mental illness or suicidal behavior.  His reporting of family history of mental illness was inconsistent with his reports to mental health staff during clinical contacts.  He had an extensive history of substance abuse.  During his CDCR term, the inmate had received 12 RVRs, most of which involved fighting with other inmates.  The most recent RVR resulted in a SHU term in November 2012.  While housed in the SHU, the inmate was attacked with a razor by his cellmate.  The incident resulted in his cellmate being charged with assault with a deadly weapon and a trial in which the inmate was waiting to testify at the time of his death.

The inmate was placed on the mental health caseload following a SA by hanging in his administrative segregation cell on October 28, 2005.  He was placed in a MHCB for approximately ten days, with diagnoses of Adjustment Disorder, Polysubstance Abuse by History, and Anti-Social Personality Disorder.  Precipitating factors for the SA were cited as an alleged recent battery on an officer that resulted in a Rule Report Violation (RVR), the recent death of his grandmother, and estrangement from his family in Mexico.  The inmate also self-reported two other incidents of suicidal behavior outside of CDCR -- a drug overdose at age 18 and intent to shoot himself at age 22.  Following discharge from the MHCB, the inmate was maintained at the 3CMS level of care.  The inmate also had been designated SNY due to the nature of his commitment offense.

The inmate was generally compliant with mental health treatment, participating in Interdisciplinary Treatment Team (IDTT) meetings and taking psychotropic medication, although he rarely agreed to confidential sessions.  He often complained about increased

depression and sleeping problems.  He reported good family support through telephone calls and letters.  According to his PC, the inmate never voiced any SI or victimization concerns during their weekly cell-side interactions.  He did, however, appear to be waiting impatiently to testify in the court proceedings.  It had been expected that he would be at CCI for only approximately one week, but trial dates kept being postponed.

The weekly psych tech rounds were unremarkable.  According to administrative segregation staff, the inmate kept to himself, rarely went out to yard, and never disclosed his commitment offense due to fear of assault.  His most recent SRE was completed in December 2013, indicating chronic risk for suicide as "moderate" and acute risk as "low."

Although the CDCR reviewer did not find any obvious or known precipitating factors for the suicide, the inmate left a suicide note that was addressed to an inmate in a nearby cell.  In the note, the inmate apologized for disrespecting this inmate and asked him not to harm his family.  In another letter, the inmate was apparently feeling threatened by gang members and feared they might harm his family.  It was unclear if this fear was due to the nature of his commitment offense, or because he would be testifying against his former cellmate, or was a combination of these and other issues.

During the course of the review, the CDCR reviewer found numerous deficiencies of varying levels of importance with the inmate's care.  For example, nursing documentation of the emergency response on February 24, 2014 was sparse.  Regarding nursing response, the Automatic External Defibrillator (AED) was not applied at the scene, and nursing staff waited until the inmate was transported to the Triage and Treatment Area (TTA).  Nursing staff were initially delayed in responding to the emergency because they were not stationed at the TTA during the first watch shift.  With regard to mental health care, the SRE completed on December 3, 2013 did not include a mental status evaluation.  There was no direct clinician-to-clinician contact between Salinas Valley State Prison (SVSP) and CCI clinical staff when the inmate arrived at CCI in November 2013.  The inmate's IDTT meeting was scheduled several days late.  The inmate never met with his psychiatrist during his nearly three-month stay in administrative segregation at CCI.  With regard to custody concerns, correctional staff did not initiate CPR at the scene of the emergency.  It was initiated by medical staff outside the housing unit.  An administrative segregation placement notice should have been issued to the inmate within 48 hours of his November 27, 2013 admission to the unit, but it was not issued until January 14, 2014.

The Suicide Report contained two bases for recommendations for corrective action through a QIP: (1) first responding personnel, including custody staff, were required to immediately initiate CPR at the scene of the emergency; and (2) the AED was required to be brought to the scene, and immediately utilized at the scene, of the emergency.

In the **fourth** case (CCI 8), the inmate was found to have ingested multiple prescription pills in his administrative segregation cell during the late evening of September 14, 2014.  He entered CDCR on October 4, 2012 to serve an unknown sentence for conspiracy to kidnap.  He was transferred to CCI on December 5, 2012 and was placed at the 3CMS level of care for anxiety

and depression.  At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

In the **fifth** case (<u>CCI 9</u>), the inmate was found hanging by a coaxial cable and t-shirt from the bunk in his cell during the morning of November 30, 2014.  He entered CDCR on November 10, 2009 to serve a life sentence for first degree murder.  He was transferred to CCI on March 9, 2012 and was placed at the 3CMS level of care for anxiety and depression.  At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer.  To date, the Suicide Report had not yet been completed.


3)        **California State Prison - Sacramento (CSP/Sac)**

**Inspection**: November 20-21, 2013

CSP/Sac housed approximately 2,217 inmates, most of whom were at Level IV security classification.  It had two CTCs with a total of 20 MHCBs, a 20-bed unlicensed MHCBU, five PSUs, a 20-bed OHU; a SHU; and three administrative segregation units for caseload and non-caseload inmates.  In addition, this writer was informed that "alternative housing" beds were available throughout the complex, but rarely utilized for inmates identified as suicidal and awaiting MHCB placement because SAC had 40 MHCBs. (As seen below, however, this writer found that "alternative housing" beds in OHU were indeed being utilized temporarily for suicide precaution/suicide watch.)  The 1,299 caseload inmates comprised approximately 59 percent of the total prison population.

**Screening/Assessment**: This reviewer observed several new admissions during the intake screening process on November 21, 2013.  The two nurses assigned to the Receiving and Release (R & R) Unit were not normally assigned to the post and appeared confused as to whether newly arrived inmates who were presented as "lay-overs" and probably would be transferred the next day were required to go through the Initial Health Screening CDCR Form 7277 process.  These lay-overs would later be housed in an administrative segregation unit.  It also appeared that the nurses were utilizing a CDCR Form 7277 form that differed slightly from forms this reviewer had observed at other prisons.  Both nurses were observed to be conducting the screening process as if it were their first time.  They both failed to ask all the required questions of at least two inmates.  But for a CO's presence in the doorway, the Nurse's Office provided sufficient privacy and confidentiality.

This reviewer observed daily psych tech rounds in the administrative segregation units on November 21.  Psych tech rounds of the stand-alone administrative segregation unit and the B-4 administrative segregation unit, which housed over 160 inmates of whom approximately half were 3CMS, took less than one hour.  Three inmates identified as new intakes into the stand-alone administrative segregation unit required the 31-item Mental Health Screening.  One refused the interview.  Because the second inmate was leaving for an out-of-state placement the following day, he was not offered any screening.  The third inmate initially consented to the interview but refused to leave the cell when he was approached by an officer to be escorted to an office.  No attempt was made by the psych tech to conduct the screening cell-side.  Review of

these inmates' eUHRs indicated that two of them were at the 3CMS level of care at their sending facilities and, therefore, not required to have the mental health screening.

As observed by this reviewer, daily psych tech rounds were brief, with little effort to engage each inmate or initiate even a brief conversation.  Although only weekly rounds were required for SHU inmates, this reviewer was informed that psych techs conducted daily rounds in the B-3 because it was less confusing to schedule.  However, this reviewer observed that the psych tech's rounds of the 90-bed SHU housing approximately 17 3CMS inmates took less than five minutes.

**Housing**: CSP/Sac had two CTCs.  CTC-1 had 16 beds and CTC-2 had 12 beds, of which 20 were designated as MHCBs.  The rooms and the beds within them were suicide-resistant.  All cells in the 20-bed MHCBU were designated as providing unlicensed MHCB level of care.  Each cell was suicide-resistant, and had safe beds, ventilation grates, and light fixtures.  The environment in this unit was sterile.  Cells appeared dirty and dark and offered limited visibility of their interiors.  It was nearly impossible to see into the cell of an inmate who had been downgraded from Suicide Watch to Suicide Precaution earlier that morning because he had rubbed soap on his entire cell door window.  The observation sheet for this inmate's cell indicated that a CNA had documented that the inmate had done this 90 minutes earlier, but there was no attempt to clean it until this reviewer's inquiry resulted in removal of the inmate from the cell and the window being cleaned.

This reviewer was informed earlier in the day that "alternative housing" beds were available in the OHU but rarely used for inmates identified as suicidal and awaiting MHCB placement because there were sufficient MHCBs.  This reviewer's examination of the OHU housing logs for the preceding week indicated that four inmates had been placed on both Suicide Watch and Suicide Precaution status pending transfer to an MHCB.  The designated cells in the OHU were not suicide-resistant, and had dangerous ventilation grates and gaps between bunk railings and walls that could be used for suicides by hanging.

There were no clinician's offices in either the MHCBU or OHU in which assessments could be conducted privately.  Assessments were conducted either cell-side in the OHU, and either cell-side or in therapeutic modules in the MHCBU.  The MHCBU modules were located in a high traffic area of the dayroom area that offered very limited privacy and confidentiality.

This reviewer found that several of the 12 designated new intake cells in the administrative segregation units were not suicide-resistant.  In Unit A-5, the administrative segregation unit for EOP inmates, there were gaps between the bunks and walls, and between the desks and walls, that could be used for suicides by hanging.

**Observation**: This reviewer found different observation forms being used for documentation of required observation of suicidal inmates in each of the two CTCs.  In CTC-1 the form had pre-printed time intervals and blank spaces for Q-15 checks.  In CTC-2, the form appropriately contained blank spaces to be filled in.  The MCHBU also used a form with pre-printed time intervals.  In CTC-2, at 9:42 a.m. on November 20, 2013, examination of an observation sheet for an inmate on Suicide Precaution indicated that the assigned CNA had already pre-filled in

13

checks for 9:54 a.m., 10:00 a.m., 10:14 a.m., 10:38 a.m., and 10:51 a.m.  In CTC-2, reviewed observation sheets were filled out correctly.

This reviewer toured several administrative segregation units and examined unit logs that were required to document 30-minute cell checks of non-intake cells.  Various problems were found.  For example, in administrative segregation unit B-4, documentation of 30-minute checks had stopped at 5:30 a.m. that morning, November 20.  In the stand-alone administrative segregation unit, the log book indicated that the 3:00 p.m. check had been done, but the current time was only 2:50 p.m.  Later review of Guard One data on checks during new intake inmates' initial 21 days in administrative segregation identified numerous documentation irregularities in B-4 Unit during the 24-hour period of November 20, 2013.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis.  Although the reviewed charts indicated that inmates were consistently seen daily by clinical staff while on suicide observation status, and inmates referred to mental health were generally seen timely, several problems were found.

For example, this reviewer observed an inmate (Sac 1) being downgraded from Suicide Watch to Suicide Precaution in the MHCBU on November 20, 2013.  The documentation supporting the downgrading was an initial psychiatric evaluation by the unit psychiatrist done mid-morning that same day.  The three-page evaluation was very thorough.  It indicated that the inmate had a current diagnosis of Bi-Polar Disorder and a history of self-injurious behavior.  He had been a patient in the state hospital most recently from July through October 2013.  He was admitted to the MHCBU the previous day for cutting himself on the forearm.  The document indicated that the inmate had refused to be assessed.  When asked whether the inmate had in fact refused, the psychiatrist answered "Yes, he refused to talk to me today," and based the evaluation solely upon a chart review.  When asked how the inmate could be downgraded from Suicide Watch to Suicide Precaution without an actual face-to-face assessment, the psychiatrist indicated that it was his clinical judgment that the inmate was no longer at high acute risk for suicide and had not engaged in any self-injurious behavior since his arrival in the MHCBU during the previous day.  This reviewer then asked whether an SRE had been completed since the inmate's admission to the MHCBU.  The psychiatrist replied "no," but said that one would probably be completed later in the day by the inmate's PC.  Soon thereafter, this reviewer determined that an SRE had been completed by the inmate's PC at 8:15 a.m. that same day, shortly before the psychiatric evaluation.  The SRE indicated that the inmate was cooperative with that assessment and reported with regard to his self-injurious behavior," 'I was just stressed out....being in prison.'  He stated that some of the stress is related to the additional prison time he is facing.  He said he is 'sick of prison' and has difficulty coping... He denies SI, but stated he has thoughts of harming himself to relieve stress.'" The SRE indicated that the inmate continued to be at "high acute risk" for suicide and recommended continued Suicide Watch status. This case was problematic because the clinician downgraded the inmate from Suicide Watch to Suicide Precaution without either a face-to-face assessment or review of an SRE completed a short time earlier indicating a continued high acute risk for suicide.

In another reviewed chart (Sac 2), although all required forms were completed, the quality of the documentation was problematic. The inmate had been in an MHCB from October 25 to November 4, 2013 for self-injurious behavior. The discharge SRE contained the following treatment plan: "Discharge from MHCB with 5-day follow-up, continue to provide motivational interviewing to learn and use effective coping skills to manage acuity of MH symptoms in program activities less acute than in MHCB." The plan appeared adequate, yet there was no documentation found in either the Interdisciplinary Progress Notes 5-Day Follow-Up CDCR Form 7230B or Interdisciplinary Progress Notes General CDCR Form 7230A to indicate any such treatment planning was occurring. On November 12, another clinician wrote a treatment plan entry on an Interdisciplinary Progress Note that read, "Present case at IDTT, develop a treatment relationship with I/P and set goals of 60 days w/o a crisis bed visit or an RVR. Group attendance at 85% and 100% participation in clinical contacts. I/P will contract with clinician to have her alerted when the voices start telling him to hurt himself." This treatment plan was not consistent with the previous plan of November 4, and there was no indication that it was being followed as of November 21, 2013.

This reviewer observed the IDTT process in CTC-2 and the MHCBU. The sessions were very different from each other. During the CTC-2 process, inmates were fully participating members of the team and advocated for themselves. The team chair withheld discussion of any inmate until he was present, unless there was a security issue. The process worked quite well. However, although there was discussion of various inmates' self-injurious behaviors, there was limited concordance between discussions and treatment planning.

In the IDTT process in the MHCBU, inmates were discussed openly before their arrivals. One session became quite confusing to the participants. The inmate (Sac 3) arrived in a safety smock and appeared to be on either Suicide Watch or Suicide Precaution. The unit psychiatrist summarized the case, stated that the inmate was not suicidal, and looked to the inmate for confirmation. The inmate nodded his agreement that he was not suicidal. When another team member asked the inmate if he had ever attempted suicide, he replied, "Yes, approximately six months ago by hanging." There was no attempt to verify this reported history of a SA or of any other information during the meeting, and the inquiring clinician suggested that the inmate be kept on Suicide Precaution. A brief discussion followed. A few minutes later, the same clinician recommended that the inmate be taken off Suicide Precaution. When the CMH, who was observing the process, noted this apparent conflict, the original clinician corrected herself and suggested that the inmate remain on Suicide Precaution.

This reviewer was told on November 21, 2013 that a Suicide Prevention Response Team (SPRFIT) workgroup would be established to work in improving documentation of clinical judgments used to place inmates on, and remove them from, suicide observation status.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 100 percent of custody staff and 95 percent of nursing staff were currently certified in CPR. Approximately 95 percent of custody staff had received annual suicide prevention training, but nearly none of health care staff had

15

received it.  As of November 20, 2013, 97 percent of mental health clinicians had received the seven-hour SRE training and completed the SRE mentoring program.

**Recent Suicides**: There were four inmate suicides at CSP/Sac in 2012-2014. All four occurred in the PSU.  In the **first** case (SAC 4), the inmate strangulated himself with an ace bandage in his PSU cell during the early morning of July 25, 2012. He had entered CDCR in December 1990 to serve a 31-year to life sentence for murder. He had been at CSP/Sac since May 2011, and had been at the 3CMS level of care since April 2009, following a MHCB placement for self-injurious behavior. His most recent admission to an MHCB was in March 2012 for self-injurious behavior. The inmate had multiple diagnoses over the years that included Psychotic Disorder, Schizophrenia, and Bi-Polar Disorder. He had accrued numerous disciplinary charges over the years, resulting in more than 13 years added to his sentence. On July 21, 2012, the inmate was involved in a fight with his cellmate and was subsequently placed in an administrative segregation unit overflow cell in the PSU. He was noted to be "disorganized and not making sense." Two days later, on July 23, custody staff noted that the inmate was "acting weird." He was seen by a clinician who described the inmate as "pacing in his cell, appeared agitated and refused to speak with the psychologist." There was no indication that a higher level of care was considered at that time. The inmate was found dead in his cell less than 24 hours later, in a state of *rigor mortis*. It took the emergency response team more than 14 minutes to enter the cell.

The Suicide Report from the CDCR reviewer contained two bases for recommendations for corrective action through a QIP: (1) The clinical psychologist who assessed the inmate on July 23, 2012 did not consult the eUHR before contact with the inmate and did not sufficiently document whether or not an MHCB admission was warranted based upon the inmate's presenting behavior; and (2) custody staff did not follow the proper protocol in responding to an unresponsive inmate, resulting in a 14-minute delay in entering the cell. Custody staff were disciplined as a result of the delayed emergency response.

The Suicide Report did not cite at least three other deficiencies that should have precipitated corrective action: (1) The psych tech progress note dated July 23, 2012 indicated that the inmate exhibited a normal mental status, in stark contrast to both custody's and the mental health clinician's observations that the inmate was acting weird and pacing the cell; (2) The inmate was not placed in a retrofitted suicide-resistant cell when he was placed in an administrative segregation overflow cell in the PSU on July 21, although such placement was unrelated to his suicide by self-strangulation; and (3) Because the inmate was found in a state of *rigor mortis*, it appeared that the required observations at 30-minute intervals were not performed on July 24.

In the **second** case (Sac 5), the inmate committed suicide on February 16, 2013 by overdosing on approximately 108 pills. The inmate had been assigned to a PSU cell and was at the EOP level of care. During the afternoon of February 16, he had told custody staff that he was suicidal and was transported to the TTA to be assessed. However, before the assessment, he became unresponsive.  CPR was initiated, but he was subsequently pronounced dead. The inmate had entered CDCR in March 2001 to serve a term for arson. In 2005, he set fire to his cell at California Medical Facility (CMF), was again charged with arson, and was found not guilty by reason of insanity and sent to the state hospital. He had an extensive history of self-injurious behavior that included a near-fatal SA by setting himself on fire in February 2011.  He was

transferred to CSP/Sac in December 2012. The inmate had been seen last by his PC on February 13, 2013, three days before his death. He denied any SI and requested that, based upon his EOP progress, he be considered for 3CMS level of care. The CDCR reviewer's investigation found that the inmate was unhappy being kept at EOP level of care and may have ingested the medication in an attempt to gain transfer from the prison, although this would have likely resulted in his placement in a state hospital and eventual return to the EOP level of care. The reviewer also noted that the inmate had previously stated to a psychiatrist "that he could not tolerate social isolation as it reminded him of the severe neglect and abuse endured as a child....and the psychiatrist reasoned that the inmate did not want to be in the PSU or SHU due to the bad memories the isolation triggered."

The Suicide Report contained one basis for recommendation for corrective action through a QIP: (1) "Incorrect tubes were used in the blood draw and the laboratory was not able to test medication levels in the inmate."

The autopsy report concluded that the inmate committed suicide by ingesting an excessive amount of propranolol.  The Suicide Report failed to address the question of how the inmate could possess excessive amounts of such medication, nor did it recommend any corrective actions to prevent similar incidents in the future.

In the **third** case (Sac 6), the inmate was found hanging by a sheet from a ventilation grate of his PSU cell during the late evening of May 28, 2014. Life-saving measures including initiation of CPR and transport to a local hospital were commenced, but the inmate was pronounced dead three days later on May 31, 2014. The inmate had entered CDCR in July 1992 to serve a 38-year to life sentence for several counts of second-degree robbery and battery. He received additional time for subsequent convictions of sexual battery on a county jail inmate in 1990, and an assault on a CDCR inmate resulting in death in 1994. He had an extensive history of violence against both CDCR staff and inmates, and had received approximately 30 RVRs.  He had most recently been housed at Pelican Bay State Prison (PBSP) until his transfer to the PSU at CSP/Sac in February 2013. His most recent RVR occurred on May 16, 2014 for sexual misconduct. He also had a significant history of gang involvement.

The inmate had an extensive history of mental illness. He received inpatient psychiatric as early as 11 years of age. During his CDCR confinement, he was hospitalized several times between 1995 and 2012 for both grave disability and incompetence to stand trial. Records indicated that he had experienced "psychosis during incarceration that had manifested into poor activities of daily living, illogical thinking, disorganized grooming and bizarre behavior, poor cell sanitation, and allowing excrement to accumulate around his toilet." He was last admitted into Department of State Hospitals (DSH) in April 2012. At the time of his death, the inmate was at the EOP level of care and most recently was diagnosed with Schizophrenia, Polysubstance Dependence, and Anti-Social Personality Disorder. He had periodically been on *Keyhea* orders since 1991.

The inmate's history of suicidal behavior was not well documented within the eUHR.  He confided to a psychiatrist in November 2012 that he attempted suicide a few times during the late 1980s and early 1990s, once at age 18 with a steak knife "but it was too dull," and then again a few years later at age 22 by trying to break his own neck. Several recent SREs noted "non-lethal

17

suicide" attempts on six occasions, including scratching his wrist in 1993 which resulted in MHCB placement at Mule Creek State Prison (MCSP).

On April 20, 2014, the inmate expressed SI and was placed on suicide observation status in the OHU at CSP/Sac, first on Suicide Watch, and then on Suicide Precaution a few hours later. He was assessed by a clinician the following morning on April 21, and denied any SI, stating that "I just needed a change of view.... I've been in that section for eight months, and everyone who was there has left. I wanted a different cell." An SRE was completed and the inmate was discharged back to the PSU. The treatment plan section of the SRE addressed development of an alternative strategy to cope with confinement and not misusing the MHCB process. Required five-day follow-up assessments were completed by a clinician, but they did indicate concordance with the above plan.

The following week, on April 28, the inmate again reported SI, severe depression, and visual hallucinations (VH) of "dead people." He was placed in an MHCB where he remained until May 7, 2014. On April 30, the inmate received an RVR for battery on an officer, an incident that allegedly occurred before his MHCB admission. On May 7, an MHCB clinician completed an SRE that assessed both his chronic and acute suicide risks as "low." The examiner was apparently unaware of the recent RVR because the appropriate box for recent disciplinary infraction on the SRE was marked "no." Given the inmate's extensive history of mental illness, history of violence, long sentence, history of sexual assault, and history of suicidal behavior, an assessment of low chronic risk for suicide was inconsistent with this inmate's record. The treatment plan contained in the discharge SRE stated the following: "(1) Staff on treatment unit will continue to monitor and treat IP per program protocol; (2) Medication assessment and management if deemed appropriate by psychiatry staff; (3) Psychosocial intervention could include: a) aiding IP in developing therapeutic alliance in order to facilitate better tx participation, b) aiding IP in identifying sources of distress and creating repertoire of useful coping mechanisms; and (4) Reality therapy to assist I/P and better managing psychotic symptoms." Required five-day follow-up assessments were completed by a clinician, but again they did not show any concordance with the above plan.

On the morning of his suicide, May 28, the inmate again threatened suicide to a CO and was referred to mental health staff for assessment. A clinician later assessed the inmate and determined that he was not at risk for suicide. An SRE was not completed.

The CDCR reviewer in this case did not offer any possible precipitating factors for this suicide, and no suicide note was found. This reviewer found several deficiencies in mental health services, including inaccuracies in SREs completed on April 21, April 29, and May 7, 2014. Most importantly, an SRE was not completed after the inmate threatened suicide on the morning of May 28. There were also concerns related to the emergency medical response by both medical and correctional staff. The Suicide Report contained three bases for recommendations for corrective action through a QIP: "(1) According to policy, when correctional staff responds to an inmate in need of life-saving measures, they must immediately initiate CPR. Custody staff did not initiate CPR in accordance with policy; (2) According to the Emergency Medical Response System, the AED is to be brought to the emergency scene and utilized immediately. During the inmate's emergency response, the AED was not applied until arrival at the TTA; and (3) Per the

18

Mental Health Program Guide, a SRE should be completed on an inmate reporting SI. The evaluation did not occur."

In the **fourth** case (Sac 7), the inmate was found hanging by a sheet from the light fixture of his PSU cell during the afternoon of July 7, 2014. He entered CDCR in December 1997 to serve a 40-year to life sentence for second-degree murder. He was transferred to CSP/Sac on June 20, 2014. The inmate was placed on the caseload in December 2002, and was designated for the EOP level of care on March 27, 2014.  His most recent diagnosis was Mood Disorder NOS. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, had not been reviewed by this writer.

### 4)      Folsom State Prison (FSP)

**Inspection**: December 3-4, 2013

Folsom State Prison (FSP) housed approximately 3,000 male inmates, most of whom were at Level II security classification.  In addition, almost two-thirds of the inmates were serving life sentences. Approximately 25 percent of FSP inmates were on the caseload, including 757 3CMS and eight EOP inmates.  The prison did not have a CTC, MHCB, or OHU. There were nine alternative housing cells located in the administrative segregation unit to temporarily house suicidal inmates before their transfers to an MHCB.

**Screening/Assessment**: There were no new admissions for this reviewer to observe during this visit.  Daily psych tech rounds in the administrative segregation unit were observed on December 2. The rounds were generally unremarkable. The psych tech completed the required form for all 3CMS inmates, but told this reviewer that psych techs converse only with inmates in administrative segregation for disciplinary reasons and do not converse with other non-caseload inmates in the unit who are there, for example, on orientation status.  This writer was informed that orientation status inmates were not eligible for yard, were locked down in their cells 24 hours a day, and were allowed out only for scheduled appointments. The average length of stay for orientation status inmates in administrative segregation was approximately 14 days.

**Housing**: Reviewed records indicated that most inmates requiring an MHCB were transferred from FSP within 24 hours. The alternative housing cells in the administrative segregation unit, B-Side, cells 1-9, were suicide-resistant.  These cells were also used for new intakes in administrative segregation.  Ten cells, cells 10-19, on the B-Side were also used for new intakes but were not suicide-resistant, as they contained large mesh ventilation grates, bunk railings, and shelving that were conducive to SAs by hanging. During 2012-2013, FSP had three inmate suicides in the administrative segregation unit in which either light fixture conduit piping or shelving was used as an anchoring device in these hangings.

**Observation**: There were no inmates on suicide observation status in alternative housing cells during the two-day audit period. The administrative segregation unit logs that were used to document 30-minute checks of non-intake cells were documented appropriately.  Review of Guard One data for checks of new intakes in administrative segregation during their first 21 days indicated only one missed check during the 24-hour period of December 2, 2013.

**Management/Treatment Planning**: This writer reviewed eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis. The charts indicated that clinical staff consistently saw inmates daily while on suicide observation status, and  inmates referred to mental health generally seen on a timely basis.  However, several problems were found.  For example, in one reviewed case (FSP 1), a 3CMS inmate was placed on Suicide Watch on September 9, 2013 after cutting his left arm with a razor. According to the Interdisciplinary Progress Note, "I/P reports he wanted to kill himself because he cannot take being in prison. I/P reports past SA by cutting his wrists in 2009 and he had to be treated at the emergency room. I/P reports if left alone he will try to kill himself by finding a way to cut his wrist and arms." The inmate was placed on Suicide Watch pending MHCB placement in another prison.  However, on the following day, September 10, the same clinician assessed the inmate cell-side and wrote in another Interdisciplinary Progress Note that "I/P was stabilized and removed from 1:1 suicide watch. I/P reports he is no longer feeling like harming himself and he no longer wants to die." The clinician apparently consulted with two other clinicians, the MHCB placement order was rescinded, and the Suicide Watch was discontinued. A MHTP completed two days later, on September 11, did not address the suicidal or self-injurious behavior, nor the September 9 SA. A progress note completed by the clinician a few weeks later, on September 27, stated "F/U every 90 days or by IP request."

There were numerous concerns associated with this case.  No SRE was used to place this inmate on Suicide Watch status on September 9, nor to remove him from Suicide Watch status less than 24 hours later on September 10. There was no clinical justification in the September 10 Interdisciplinary Progress Note to remove the inmate from Suicide Watch status nor was there consideration of a downgrade to Suicide Precaution.  The clinician conducted a cell-side assessment of the inmate on September 10, with no explanation of why it was not conducted in private.  There was no treatment planning to address the problem of suicidal or self-injurious behavior or continuity of care.

In another case (FSP 2), the inmate was transferred from Wasco State Prison (WSP) to FSP on September 4, 2013. During the initial health screening by nursing staff, he self-reported as 3CMS and taking psychotropic medication. Although apparently referred to mental health from screening, he was not seen by mental health until two months later on November 4, when he was seen by a clinician as result of a self-referral. His psychotropic medication, however, had been continued.

In another case (FSP 3), medical staff responded to a medical emergency in the administrative segregation unit on November 13, 2013. Upon arrival, the inmate complained of chest pain and anxiety. He was stabilized and placed on the urgent mental health referral list. Review of the record on December 3 did not find documentation of any assessment by mental health staff.  This reviewer requested an investigation by the CMH, and later received word that a clinician had assessed the inmate nine days later on November 22, but had not yet written an Interdisciplinary Progress Note.

In another case (FSP 4), on November 4, 2013, mental health received an emergency referral from custody regarding notification by the inmate's family that the inmate might be suicidal.

20

Upon assessment, the inmate denied any SI and indicated he was upset following a weekend visit by his girlfriend. In addition, he reported the second anniversary of his mother's death was approaching and that it was a sad time for him. No SRE was completed.

In another case (FSP 5), a clinician saw an inmate on November 8, 2013 for a one-week follow-up. The inmate appeared tearful, anxious, and stressed following "recent news that his wife wants to leave him." He also reported having financial concerns and difficulty sleeping. He denied any SI. Sleep hygiene and relaxation training were discussed. The clinician noted "consider 3CMS placement if I/P continues distress; currently I/P is ambivalent about volunteering for treatment." Several days later, on November 12, the inmate was seen by a psychiatrist after referral by the PC. The inmate reported AH which "usually just say his name but have told him to kill self. He believes they are from his mind playing tricks and he will not do what they say." The inmate reported feeling irritable and having difficulties with both sleep and appetite. He denied any suicidal intention, but "states he thought about suicide." The inmate was diagnosed with Bi-Polar Disorder and psychotropic medication was initiated. He was recommended for 3CMS level of care. He was seen the same day by another clinician and reported similar symptoms. No SRE was completed by either clinician.

It appeared to this reviewer that there was reluctance and/or hesitation to complete SREs on inmates presenting with possible SI, even if ideation was denied. It also appeared inmates were placed on suicide observation status infrequently.  The last placement on Suicide Watch status was on November 13, two weeks before the audit.  Few incidents of self-injurious behavior, and none for November 2013, were reported.  After this reviewer's record examination, corrective action by the CMH was taken immediately in several cases.

In contrast to the numerous problems detected during the chart review, there was strong continuity of care provided in another reviewed case (FSP 6). The inmate, housed in the administrative segregation unit, had conditionally threatened to commit suicide if he were found guilty and sentenced to serve additional time. He appeared in court on September 5, 2013. On his return later that day, he appeared to be in a "hypomanic state, saying hello to everybody loudly and telling everybody to accept his last BYE BYE." Although denying any SI, he was placed on Suicide Watch as a precaution. He was assessed the following day. An SRE indicated a moderate acute risk for suicide. He remained on Suicide Watch pending MHCB placement in another prison. He was seen daily by mental health and was subsequently transferred to a MHCB at Kern Valley State Prison (KVSP). He remained in the MHCB until September 12 when he was returned to FSP.  Five-day follow-up assessments were conducted as scheduled.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro- shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 98 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  Approximately 99 percent of custody staff received annual suicide prevention training. One hundred percent of mental health clinicians received the seven-hour SRE training in March 2013 and completed the mentoring program.

There were several issues with annual suicide prevention training at FSP. For example, non-custody staff, including medical, nursing, and mental health, did <u>not</u> receive the required one-hour classroom instruction in suicide prevention.  They were simply offered handouts and quizzes from an FSP training bulletin. During the 2012-2013 training calendar, only 20 minutes was devoted to classroom instruction for suicide prevention for custody staff because the In-Service Training (IST) coordinator decided to include two other subject areas within the one-hour time block. For 2013-2014, the calendar was corrected and the original one-hour block was devoted to suicide prevention. Given that FSP had five inmate suicides during 2012-2013, it was disconcerting that FSP did not devote more time and resources to suicide prevention training.

**Recent Suicides**: FSP had five inmate suicides in 2012-2014. In the **<u>first</u>** case (<u>FSP 7</u>), on May 21, 2012, the inmate was found hanging by a sheet from the light fixture conduit of his GP cell. He also sustained massive bleeding due to cutting with two razor blades. He had entered CDCR in 1999 to serve a 32-year to life sentence for murder and had been at FSP since December 2009. He did not have a history of mental illness and had not been on the caseload.  His sister committed suicide in March 2010. The inmate had several medical problems including chronic shoulder pain. According to the CDCR Suicide Report, there were no obvious precipitating factors leading to the inmate's suicide. A suicide note found in the inmate's cell referred to his chronic shoulder pain and expressed frustration that medical staff was not providing sufficient pain medication. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Review whether the pain management provided this inmate was adequate, and if necessary, generate their own Quality Improvement Plan."

In the **<u>second</u>** case (<u>FSP 8</u>), this 3CMS inmate was found hanging by a sheet from the light fixture conduit of his administrative segregation unit cell on May 30, 2012. He had entered CDCR in 2005 to serve an 11-year sentence for assault.  In 2009, he was assessed an additional eight years to serve for assault on an inmate. At the time of his death, he was scheduled for trial on June 8, 2012 for attempted murder of an inmate, and facing a "third strike" conviction. He had been housed in the administrative segregation unit since November 2010. The inmate had various diagnoses over the years, including Anxiety Disorder, Bi-Polar Disorder, and Depressive Disorder, and had a family history of suicide. He also had several medical problems, including acute neck pain for which he was prescribed methadone. On May 15, 2012, the inmate threatened suicide after being informed that he was being temporarily transferred from the administrative segregation unit at CSP/Sac to the administrative segregation unit at FSP due to overcrowding. He was placed on Suicide Precaution in a MHCB at CSP/Sac. The following day, May 16, the inmate was discharged from the MHCB with a recommendation for placement in an administrative segregation unit at CSP/Sac. Instead, he was transferred to the administrative segregation unit at FSP. On May 30, the day of his suicide, the inmate was seen by his primary care physician (PCP) who discontinued his methadone because of suspected misuse.

The CDCR reviewer found two possible precipitating factors in the inmate's suicide. One was his upcoming trial on an attempted murder charge and possible life sentence if convicted.  The other was the abrupt discontinuation of his methadone medication. The reviewer also found several problems, including inconsistent SREs completed on May 15 and May 16, the lack of collaboration between mental health and custody staff regarding a mental health recommendation to retain the inmate in the administrative segregation unit at CSP/Sac, the

unawareness by the PCP who discontinued the inmate's methadone on the day of the suicide that he had recently been on Suicide Precaution, and custody staff's failure to observe the inmate at 30-minute intervals. There were two bases for recommendations and corrective actions through a QIP: (1) "The inmate's bridging order for opiate medication was allowed to expire without interviewing the inmate and was discontinued; and (2) Tier COs signed for all the completed welfare checks, although from 0700 to 2100, the ASU S&E COs actually completed the welfare checks."

In the **third** case (FSP 9), the inmate was found hanging by a wire and sheet from a wall bracket of his GP cell on November 13, 2012. His body was found in *rigor mortis*. The inmate had entered CDCR in September 1989 to serve an 18-year to life sentence for murder, and had been at FSP since June 2012. He was placed at the 3CMS level of care in May 2011.  He was diagnosed with Mood Disorder and received psychotropic medications until he asked that they be discontinued in September 2012. A few months later, on November 7, 2012, a week before his death, the inmate met with his PC. He was described as frustrated and complaining of ongoing pain in his back and shoulder. He also requested an appointment with the psychiatrist to restart his psychotropic medication. No obvious precipitating factors for the suicide were found by the CDCR reviewer.  A few delays in mental health evaluation and treatment planning were noted, but they were deemed unrelated to the suicide and therefore did not result in any formal recommendations. In addition, although his body was found in rigor mortis, his GP housing unit was not subject to either 30-minute or 60-minute rounds.

In the **fourth** case (FSP 10), the inmate was found hanging by a sheet from the shelf of his administrative segregation unit cell on March 8, 2013. He had entered CDCR in May 2012 to serve a five-year sentence for assault, and had been at FSP since June 2012. The inmate did not have a history of mental illness or being on the caseload. He did, however, have various recent medical problems, including swelling of his face and limbs. The autopsy found a large tumor on his liver that had been unknown to both the inmate and medical staff.

The inmate had been transferred to the administrative segregation unit during the early morning of March 8 for protective custody. Contrary to policy, he was <u>not</u> placed in a retrofitted new intake cell. He committed suicide several hours later. Although the CDCR reviewer did not find any obvious precipitating factors for the suicide, the inmate appeared to be concerned about his recent medical problems. His last letter contained numerous bizarrely written passages that may have indicated undiagnosed mental illness. It remained unclear why the inmate requested protective custody on the day of his death.

The Suicide Report contained five bases for recommendations for corrective action through a QIP: "(1) Documentation of the emergency response indicated that life-saving measures were not begun on the tier, but while the inmate was being transported to the TTA….; (2) Correctional staff failed to properly perform CPR, as only chest compressions were done and the Ambu-bag or personal mouth barriers were not used; (3) When re-housed in ASU, the inmate was not placed in a retrofitted intake cell, and was not housed with another inmate….; (4) Documentation of the required 30-minute welfare checks in ASU indicated that the checks exceeded 30-minutes several times on March 8, 2013 in violation of DAI policy….; and (5) Several recommendations

were identified pertaining to ways FSP could improve their emergency response and staff documentation of the response."

In the **fifth** case (FSP 11), the inmate was found hanging by a sheet from the shelf of his administrative segregation unit cell on May 27, 2013. He entered CDCR in March 2010 to serve a nine-year sentence for burglary and other offenses and was house at FSP. He had served five years of the sentence and had approximately 11 months remaining before parole. Although the inmate did not have a history of mental illness and was not on the caseload, he self-reported hallucinations to a nurse shortly after entering the administrative segregation unit on May 18, 2013. He was seen by a clinician on May 20 and reported vague AH for a two- to three-year period of time. The inmate denied any SI and "was considering entering 3CMS level of care." The clinician's diagnostic impression was "Rule-Out Amphetamine-Induced Psychotic Disorder," with a plan for follow-up, although no follow-up date was in the progress note. Although the CDCR reviewer did not find any obvious precipitating factors for the suicide, he or she referred to the inmate's recent letters to his wife indicating stress over a pending transfer to a new prison, uncertainty about his future as a gang dropout, anxiety about release in 2014, and AH threatening to hurt him as possible precipitants. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Despite the availability of clinical mental health staff on call during weekends, nursing staff did not appropriately process the 'urgent' referral written on May 18, 2013 as they failed to alert mental health staff of the referral." The inmate was seen by a clinician two days later on May 20.  The Suicide Report did not offer a recommendation and QIP for the clinician's May 20, 2013 progress note that lacked a date for follow-up with the inmate. This reviewer raised this issue with the CMH during the on-site assessment and the administrator agreed that a corrective action was warranted.

## 5)    California Institution for Men (CIM)

**Inspection**: December 5-6, 2013

The CIM housed approximately 4,800 inmates, including inmates with Level I, II, and III security classifications. CIM had two CTCs containing a total of 34 MHCBs; two administrative segregation units for caseload and non-caseload inmates; and a Reception Center (RC) with capacity for approximately 600 inmates. Approximately 34 percent of CIM inmates were on the caseload, with 1,597 3CMS and 48 EOP inmates.

**Screening/Assessment**: Several new admissions were observed undergoing the medical intake and mental health screening processes on December 5.  The Initial Health Screening process using CDCR Form 7277 was conducted by two nurses assigned to the R & R Unit. Each was observed to be appropriately conducting the screening process in a private cubicle. The 31-item mental health screening form was completed in private offices of two clinical psychologists. This process worked quite well, with staff having full access to the MHTS to verify the inmate's history of mental health/suicidal behavior.

Daily psych tech rounds in both administrative segregation units were observed on December 5. In the Palm Unit, the psych tech spent an adequate amount of time conducting rounds, but

stopped to converse with only caseload inmates.  In the Cypress Unit, the psych tech attempted to converse with all inmates in the unit.

**Housing**: Both CTCs, Units 1 and 4, did not have suicide-resistant cells.  Unit 1 had rooms with small gaps between the walls and window frames, faucet handles, and large-hole ventilation grates in the ceilings that could be used for suicides by hanging. Unit 4 also had rooms with small gaps between the walls and window frames, faucet handles, exposed toilet chase piping, and large-hole ventilation grates in the ceiling that could be used for suicides by hanging.  Both CTCs contained suicide-resistant beds.

Each administrative segregation unit contained eight retrofitted new intake cells.  There were several conditions that were problematic with regard to housing of newly admitted inmates.  Not all newly admitted inmates were housed in retrofitted cells during their first 72 hours in segregation.  Not all of the retrofitted cells housed newly admitted inmates.  Several newly admitted inmates were double-celled in non-retrofitted cells.

Because of lack of space, several inmates on RC orientation status were housed in one of the administrative segregation units.  They were not locked down and were permitted yard privileges.

**Observation**: On December 5, 2013, there was one inmate on Suicide Watch and five inmates on Suicide Precaution in the CTCs.  When the observation forms for the inmates on Suicide Precaution were requested, it took the CNAs an inordinate amount of time to locate them, indicating that documentation was not being recorded at 15-minute staggered intervals. One CNA was observed "catching-up" by recording at least four notations on one observation sheet as this reviewer was attempting to review it. Other forms contained recordings of exact 15-minute intervals. Because it appeared that this inauthentic documentation on the observation sheets was being done by multiple CNAs, this reviewer discussed this problem with the nursing supervisor.

There was no documentation in either administrative segregation unit of the required 30-minute cell checks, except occasionally by a third shift crew who documented the checks correctly. However, review of Guard One data to verify observation of new intake inmates in the administrative segregation units for their first 21 days indicated no violations in either unit during the 24-hour period of December 3, 2013.

**Management/Treatment Planning**: This writer reviewed various eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis. The charts indicated that inmates were consistently seen daily by clinical staff while on suicide observation and that inmates referred to mental health were generally seen timely basis. However, several problems were found. In one reviewed case (CIM 1), the inmate had an extensive history of mental illness and self-injurious/suicidal behavior. He had most recently engaged in self-injurious behavior on October 3, 2013 when he cut his wrist and arm at the county jail and required emergency care. He entered CDCR through CIM on October 18, 2013, and was placed in a MHCB for assessment on November 18. A MHTP completed on November 20 included the problem of "SI," with the appropriate objective of "reduce/eliminate SI" and the

25

reasonable interventions of "daily clinical, therapeutic contact using CBT/DBT to facilitate cognitive restructuring and increase problem solving skills." The inmate remained in the CTC until December 2.  His discharge SRE included the following treatment plan: (1) EOP LOC, (2) Med per MD, (3) Weekly follow-up by assigned clinician, and (4) Crisis intervention as needed. This treatment planning from the SRE was inadequate for the objective of reducing and/or eliminating SI in an inmate with an extensive history of self-injurious behaviors. In fact, the inmate was returned to the MHCB two days later on December 4 for SI with a specific plan to commit suicide.

Review of a recent SPRFIT audit indicated 100 percent compliance with the treatment planning section of the SRE. Discussion of the audit with the SPRFIT coordinator indicated that the audit measured only whether the treatment planning section of the SRE was completed, and not whether the treatment plan contained any specific strategy to reduce SI and/or whether subsequent progress notes addressed the appropriate problem area within the inmate's treatment plan.

Review of 20 sample records of inmates referred to mental health on an urgent or emergent basis for SI during 2013 found that 18 (or 90 percent) appropriately included completion of an SRE.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut down tool.  One CO had considerable difficulty opening the emergency response kit in the Palm administrative segregation unit.

**Training**: According to training records, 100 percent of custody staff and nursing staff were currently certified in CPR.  One hundred percent of custody staff received annual suicide prevention training, but medical and mental health staff had not received annual suicide prevention block training. One hundred percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CIM had two inmate suicides during 2012-2014. In the **first** case (CIM 2), the inmate was found unresponsive in his GP SNY cell on October 27, 2012. The death was originally classified by CDCR as an accidental overdose, but the medical examiner determined on June 6, 2013 that the death was a suicide by amitriptyline poisoning. The inmate entered CDCR in 1997 to serve a 13-year to life sentence for first-degree murder, use of a firearm, great bodily injury, and possession of controlled substances. Before this inmate's confinement in CDCR, he was a practicing psychiatrist in California and had been consistently employed until his commitment offense, which involved a violent dispute with his neighbor. He remained incident-free throughout his confinement, and never incurred any RVRs.

Upon entering CDCR, the inmate experienced sleep disturbance, decreased energy levels, lethargy, and other symptoms related to depression. He also admitted to being a substance abuser. He was eventually placed on the caseload in 2004 at the 3CMS level of care. By September 2008, his behavior was stabilized and he was discharged from the caseload.  He also had several medical problems, including degenerative joint disease, chronic kidney disease, Hepatitis C, and gout. He had been receiving amitriptyline as a keep-on-person pain medication.

On October 12, 2012 the inmate appeared at his initial Board of Parole Hearing (BPH) and was denied parole. The BPH committee encouraged the inmate to "stay discipline free, earn positive chronos, and get self-help groups, and seek therapy." He completed all of the BPH recommendations for treatment, including Anger Management, Creative Options, and Narcotics Anonymous. Fifteen days later, on October 27, the inmate committed suicide.

Although the inmate did not leave a suicide note, the CDCR suicide reviewer offered the inmate's recent parole denial as the possible precipitating factor to the suicide, suggesting that after he had already served 15 years of his sentence, and the denial of parole "most likely had a significant negative affect and he may have felt that no matter what he did, he could not secure parole." The Suicide Report did not contain any recommendations.

In the **second** case (CIM 3), the inmate was found hanging in his RC cell during the afternoon of August 11, 2014. He was placed at CIM on July 3, 2014, expressed SI the following day, and was transferred to an MHCB and placed on Suicide Precaution. He was discharged from the MHCB on July 23 and returned to the RC at the EOP level of care with a diagnosis of Schizophrenia. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

## 6)    **California State Prison – Centinela (CEN)**

**Inspection**: December 17, 2013

CEN housed approximately 2,782 inmates, most of whom were at Level III security classification. It had a 15-bed CTC that was licensed only for medical inmates and was not used as an MHCB. The CTC had four alternative housing cells it used for inmates identified as suicidal and awaiting placement in an MHCB. There were two administrative segregation units for caseload and non-caseload. Less than one percent of inmates were on the caseload, including 38 3CMS and 1 EOP.

**Screening/Assessment**: Intakes for several new admissions were observed. Two nurses asked all required questions on the Initial Health Screening CDCR Form 7277. Each nurse was assigned an office with sufficient privacy. Confidentiality was maintained by custody staff stationed outside the closed glass door.

Daily psych tech rounds in the administrative segregation units were observed on December 17. A psych tech was assigned to each administrative segregation unit and conducted rounds twice per day. Observed rounds were conducted appropriately.

**Housing**: Although the alternative housing cells were suicide-resistant, they were not equipped with suicide-resistant beds, which was problematic. Inmates on any suicide observation level slept on mattresses on the floor.

Administrative segregation unit A-5 housed several 3CMS inmates. It had eight retrofitted new intake cells. Administrative segregation unit A-6 had 11 retrofitted cells. Although there were newly-arrived inmates in A-5, all of the new intake cells in A-5 were empty. All of the

27

retrofitted cells in A-6 cells were filled with inmates beyond their initial 72 hours. As a result, newly arrived inmates in both units were housed in non-retrofitted cells.

**Observation**: Although both Suicide Precaution and Suicide Watch were used frequently in the CTC for suicidal inmates, psychiatric observation was also being used. There is no CDCR system-wide policy or procedure relative to psychiatric observation, nor is it ever appropriate to use it in lieu of Suicide Precaution or Suicide Watch. Like some other CDCR prisons, Centinela developed a local policy, contained in its CTC Policy and Procedure Manual, that set forth the purpose of psychiatric observation: "(1) To prevent suicide and/or injury to self, other inmate(s) patient(s), and/or staff; (2) To assess the inmate-patient's mental health condition and treatment needs; and (3) To provide interim treatment measures pending transfer to an MHCB." Clinical judgment dictated whether or not inmates on psychiatric observation status had allowable items, including beds and clothing in their cells. Although it was not stated in the policy, inmates on psychiatric observation status were normally observed at 30-minute intervals, well outside the standard of care for observation of suicidal inmates.

Without opining on the efficacy of utilizing psychiatric observation status as a step-down from suicide precautions and/or as an observation level for inmates in mental health crisis but not suicidal, there were several problems with the use of psychiatric observation for suicidal inmates. First, if the clinician assessed the inmate as suicidal and determined that items and possessions should be restricted, the inmate should be placed on either Suicide Precaution or Suicide Watch status. Second, a suicidal inmate should never be observed at 30-minute intervals, regardless of his or her level of acuity. Third, because use of psychiatric observation status is not sanctioned by CDCR nor referenced in the *Program Guide*, it does not appear to be included in any continuous quality improvement review.

The administrative segregation units' log books were examined for correct documentation by custody officers of 30-minute checks of non-intake cells. Documentation in the A-6 log was slightly late, but both logbooks were generally accurate. Review of Guard One data to verify the observation of newly arrived inmates in A-5 for their first 21 days indicated only one missed check during the 24-hour period of December 16, 2013.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation status or referred to mental health staff on an urgent and/or emergent basis were reviewed. These records indicated that inmates were consistently seen daily by clinical staff while on suicide observation status and were seen timely after referral to mental health. However, several problems were found. For example, in one reviewed chart (CEN 1), on October 14, 2013 the inmate was referred to mental health staff by nursing and reported that "I'm losing my mind. I can't think straight." He was described in the clinician's progress note as "alert, verbal, fully oriented. Mood and affect depressed. Tearful at times. Recently arrived at CEN after lengthy stay in Contra Costa County Jail. Passive SI without plan or intent." An SRE was completed and the inmate was assessed as moderate acute risk for suicide. The inmate was not placed on Suicide Precaution. The follow-up visit scheduled by the clinician was not until one week later. Three days later on October 17, the inmate was placed on Suicide Precaution by another clinician after displaying almost the same behavior that was seen on October 14.

28

In another reviewed case (CEN 2), an emergency referral was sent to mental health staff on November 18, 2013 after the inmate's mother called the facility expressing concern that he might be suicidal. When interviewed by the clinician, the inmate stated "No, I'm not suicidal. What I told my mother is that I would go on suicide watch before I let them send me to Jamestown." The inmate had several risk factors, including being at the 3CMS level of care with a Depressive Disorder, and refusing psychotropic medication, resulting in a worsening mood. In addition, his fiancée had recently lost her job and called off their wedding for financial reasons. The inmate had been recently informed he would soon be transferred to Sierra Conservation Center (SCC) which was further away from his fiancée. He reported sleep and appetite difficulties, and that "Everything looks gray at the moment." He was referred to the psychiatrist and scheduled for follow-up with the clinician in one week. He was not placed on Suicide Precaution nor was an SRE completed. Two days later on November 20, the inmate was seen by a psychiatrist and displayed much of the same behavior as he did two days earlier, and he again denied SI. The clinician noted that the "inmate had been seen by three different clinicians since November 16 based on both self-referral and mother calling in reporting concerns about the inmate that he might be suicidal....and that he had expressed SI." He was not placed on Suicide Precaution nor was an SRE completed.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR.  Ninety-nine percent of custody staff were compliant with annual suicide prevention training, but neither medical nor mental health staff had completed the annual block training. One hundred percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CEN had one inmate suicide during 2012-2014. In that case (CEN 3), the inmate was found by his cell mate hanging by a sheet from the shelf and desk of his GP cell during the morning of January 1, 2012. The inmate had entered CDCR in August 1996 to serve a 19-year to life sentence for murder and had been housed in Cen since April 2009. He was not on the caseload and did not have a history of mental illness or suicidal behavior. Although possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report, the inmate was described as isolative and withdrawn, had not had any family contact since 2007, and was facing deportation upon his eventual parole. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Documentation of the emergency medical response....contained multiple inconsistencies in the recording of the various actions taken."

**7)**     **Calipatria State Prison - Calipatria (CAL)**

**Inspection**: December 18, 2013

CAL housed approximately 3,850 inmates, most of whom were at Level IV security classification. It had an 18-bed OHU with alternative housing cells that were used for inmates identified as suicidal and awaiting placement in an MHCB.  There were two administrative segregation units for caseload and non-caseload inmates.  Less than one percent of CAL inmates were on the caseload, with 17 3CMS and two EOPs.

**Screening/Assessment**: There were no new admissions during the audit.

Daily rounds by two psych techs in the two administrative segregation units were observed on December 18. A psych tech was assigned to each unit and conducted rounds twice per day. Administrative Segregation Unit A-5 housed caseload inmates.  There were four 3CMS inmates in the unit on December 18.  The psych tech was observed to be not spending any additional time with these caseload inmates and did not complete a Psych Tech Daily Rounds Form on any of them during the rounds. In the stand-alone unit, the psych tech conducted rounds appropriately.

**Housing**: Although no inmates were on a suicide observation status during the December 18 audit, review of the unit log indicated that most inmates on suicide observation were placed in two designated cells.  Although all of the OHU rooms were suicide-resistant, they were not equipped with suicide-resistant beds.  Inmates on any suicide observation level had to sleep on a mattress on the floor, which is problematic.

Administrative segregation unit A-5 had eight retrofitted new-intake cells and unit A-6 had ten. Most new intakes were housed in A-5.  All of the retrofitted cells were occupied by inmates housed in the unit longer than 72 hours, while numerous newly admitted inmates in the unit were housed in non-retrofitted cells. For example, one inmate who had arrived the day before was at the 3CMS level of care, and was housed in a cell with mesh screening on the interior door containing large holes, shelves, a gap between the bunk and wall, and desk/stool bracket, all of which were conducive to suicide by hanging. Cells in the unit had fewer protrusions, with most furnishings made of cement.

**Observation**: Although both Suicide Precaution and Suicide Watch were used in the OHU for suicidal inmates, psychiatric observation was also occasionally used in the unit.  This practice was not sanctioned by CDCR nor referenced in the *Program Guide*.  Mental health officials at CAL developed a local operating procedure (LOP) which explained "psychiatric observation": "When an inmate is experiencing psychotic symptoms such as hallucinations and delusions that may have harm contents (both toward self and others), he will be placed on Psychiatric Observation." Clinical judgment dictated whether or not inmates on psychiatric observation were allowed property including beds and clothing in their rooms.  Psychiatric observation procedure required observation at 15-minute intervals.

Log books for each of the two administrative segregation units were reviewed for documentation of 30-minute cell checks of non-intake cells by COs. The logbooks for both administrative

30

segregation units bore no documentation of these checks.  Supervisory and line correctional staff were unaware of the CDCR policy requiring these checks.  Review of Guard One data to verify observations of new-intake inmates during their first 21 days found over 49 violations during the 24-hour period of December 16, 2013.

**Management/Treatment Planning**: Review of  eUHRs of all inmates referred to mental health staff on an urgent and/or emergent basis during the 30-day period before the audit indicated that all 14 inmates were seen timely.  Due to time constraints, records of inmates on suicide observation status were not reviewed.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 96 percent of custody staff and 100 percent of nursing staff were certified in CPR.  With regard to annual suicide prevention training, 96 percent of custody staff received the training during 2013, but only 51 percent of medical and mental health personnel received the training. After the audit, the Chief Nurse Executive provided documentation indicating that 86 percent of nursing staff had received suicide prevention training during 2013.  Most of the workshops were conducted  from December 17 through December 31, 2013, after this reviewer's on-site audit.  One hundred percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CAL had one inmate suicide during 2012-2014. In that case (Cal1), the inmate was found during the morning of October 24, 2012 hanging by a sheet from the top bunk of his GP cell. His body was in *rigor mortis*. The inmate had entered CDCR in May 1999 to serve a 12-year to life sentence without parole for murder, and had been housed at CAL since September 2010. He was not on the caseload and did not have a history of mental illness or suicidal behavior. Although possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report, the inmate had little family contact for several years.  It was speculated that his death might have been related to gang affiliation. The reviewer found several deficiencies in the emergency response and offered three bases for recommendations for corrective action through a QIP: "(1) CDCR cell standards policy requires that inmates maintain an unobstructed view of the interior of their cells at all times to facilitate security and checks by custodial staff. During the night-time hours of October 23, a sheet of obscured secured the inmate's bunk so that correctional staff could not complete their duties to identify a 'living, breathing' inmate in the cell; (2) Confusion regarding the initiation of CPR in the context of apparent rigor mortis occurred during the emergency response procedures for the inmate; and (3) CDCR custodial practices require prompt sounding of alarms when an inmate is unresponsive due to a suspected medical emergency....an excessive amount of time elapsed before the alarm was initiated and the cell door opened."  An additional problem in the emergency medical response was that vital signs were attempted while the ligature was still tightly wrapped around the decedent's neck.

**8)    Richard J. Donovan Correctional Facility (RJD)**

**Inspection**: December 19-20, 2013

RJD housed approximately 3,270 inmates, most of whom were at Level III security classification.  RJD had a 28-bed CTC, with 14 rooms designated as MHCBs, and two administrative segregation units for caseload and non-caseload inmates. There alternative housing beds in one of the administrative segregation units, a mainline EOP unit, and an SNY unit. Inmates temporarily placed in these cells were observed on continuous Suicide Watch while awaiting an MHCB.  Approximately 59 percent or 1,935 inmates in the prison were on the caseload.

**Screening/Assessment**: An intake screening for one new arrival  was observed on December 20. The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the R & R Unit. The Nurse's Office provided only partial privacy, as the door remained open with an officer stationed in the doorway. This was unnecessary because the inmate being processed was elderly, frail, and physically disabled. Observation by this reviewer was stopped when a nursing supervisor lingered in the area and the nurse conducting the assessment became uncomfortable.

Daily psych tech rounds in administrative segregation unit were observed on December 20. The psych tech had been working in the unit for several years and had good rapport with the inmates. Psych Tech Daily Rounds Forms were completed for all inmates in the unit. It was this psych tech's practice to defer completing the forms until rounds were finished.  This is a questionable practice because it is unrealistic for the psych tech to remember the mental status of each of the approximately 150 inmates in the unit after rounds have been finished.  The psych tech did not spend any additional time conversing with the approximately 54 EOP inmates and 33 3CMS inmates in the unit during rounds.

**Housing**: All 14 MHCBs in the CTC were suicide-resistant and furnished with suicide-resistant beds. Administrative segregation unit B-6 contained 12 retrofitted new-intake cells. There were problems with the housing of newly-admitted inmates into the administrative segregation units: (1) not all newly-admitted inmates were housed in retrofitted cells; and (2) not all of the retrofitted cells housed newly admitted inmates. The same problems were found in administrative segregation unit B-7, which had 12 new-intake cells. This practice was particularly concerning because an EOP inmate committed suicide on June 23, 2012 within several hours of entering unit B-6 and being placed in a non-retrofitted cell.

**Observation**: Observation sheets for inmates on suicide observation were attached to the door of each MHCB cell.  This was a good practice that helped facilitate observation at required intervals. All forms appeared to have been documented correctly by CNAs, although the forms being used had 15-minute time intervals pre-printed on them.

This reviewer found that COs in both administrative segregation units were not conducting 30-minute rounds of inmates in non-intake cells, and instead were using "ASU *Hourly* Welfare Track Sheets." It was reported that COs used the Guard One system only to record 30-minute

checks of inmates who had pink intake sheets on their cell doors.  In unit B-6, this reviewer found at least six inmates on new-intake status who were housed in non-retrofitted cells and were not receiving 30-minute checks via the Guard One system because the pink intake sheets were not placed on their doors. In two of these cases, the inmates were on the caseload, with one just returned from DSH and the other just returned from an MHCB placement.

Review of Guard One data to verify observation of newly admitted inmates in administrative segregation for their first 21 days found over 188 violations in B-6 during the 24-hour period of December 18, 2013.

**Management/Treatment Planning**: Review of eUHRs of inmates on suicide observation status or referred to mental health on an urgent and/or emergent basis indicated that inmates were consistency seen daily while on suicide observation and were seen timely by mental health after referral. However, several problems were found. In most of the reviewed cases, concordance between the treatment plan and subsequent progress notes was not found.  In one case (RJD 1), the portion of the MHTP dated December 6, 2013, while the inmate was in a MHCB, listed the problem area of "SI" and appropriately contained "interventions" for teaching dialectical behavioral therapy (DBT) distress tolerance skills, assisting the inmate with developing a safety plan for managing SI, developing goals and reasons for living, and clarifying safety concerns, among other things. A clinician's subsequent progress note dated December 11, 2013, when the inmate had returned to the administrative segregation unit, was generally concordant with the earlier treatment plan. It stated: "Tx plan while in ASU will focus on utilizing cognitive behavioral therapy (CBT) and relaxation techniques and learning coping skills to increase ability to self-regulate mood, decrease impulsivity, and manage reported sxs of depression and reported AH in conjunction with medication management."

In another reviewed case (RJD 2), the inmate was admitted to an MHCB on November 15, 2013, after being observed with a ligature around his neck and suicide note in the cell. The treatment plan dated a week later, on November 23, did <u>not</u> identify "SI" as a problem area.  The treatment plan section of the MHCB discharge SRE, dated November 23, stated simply: "Discharge from MHCB to EOP level of care for 5-day follow-up protocol.  I/P may benefit from DBT skills training. Encourage the inmate to allow himself to feel the emotions that accompany his loss of his mother. Assist IP with medical follow-up care upon arrival to HU." A review of subsequent progress notes during November and December 2013 did not find any DBT therapy groups offered to the inmate.

Another reviewed case (RJD 3) showed inconsistency between descriptions of the inmate's behavior in documentation by the primary clinical staff and documentation by the psych tech on the Psych Tech Daily Rounds Forms. The inmate had written a Health Services Request Form on November 15, 2013 stating that he was refusing to eat his meals in protest of his administrative segregation status. Two other request forms, dated November 14 and November 18, spoke of his self-reported worsening of mental health symptoms, including AH. According to the progress notes by the PC on November 18, the inmate had become very isolative, refusing to come out of his cell or participate in any programming. The inmate was also refusing his psychotropic medication and some of his meals, and his cell window was almost completely covered.  He reported sleeping only three hours per night. He had been placed on the high-risk list upon return

33

from an MHCB placement in September 2013. The clinician also noted that the inmate continued to be irritated regarding his administrative segregation placement and the circumstances relating to it, but demonstrated insight into how his problems could worsen by his isolating himself from others.  However, the psych tech' s Daily Rounds Forms for November 4 through November 17 indicated that the inmate expressed no mental health concerns, had a fair appetite and fair sleeping pattern, pleasant mood, participated in programming, and showed no signs of decompensation.

Apart from the problems discussed above, mental health staff at RJD had begun to develop a fairly good quality improvement process for suicide prevention. A designated clinical psychologist had been tasked with responsibility for several aspects of an audit, including the SRE mentoring program, preparation of executive summaries of individual sentinel events, audit of the high-risk list, creation of a "tier walk report" (a shorter version of the executive summary audit), and audit of Interdisciplinary Progress Notes. To date, this quality improvement process has not included auditing of treatment planning for suicidal inmates or measurement of concordance between treatment planning and subsequent progress notes.

The IDTT process worked well during three observed case presentations. During the team meeting, it was reported to this reviewer that although recreation may be permitted for an inmate on MHCB status based on clinical judgment, visits and telephone calls were prohibited by custody practice. Conversely, inmates housed in the CTC for medical reasons were not denied recreation, visits, or telephone calls. Review of the *Program Guide* indicated that recreation was permitted, but visits and telephone calls for a MHCB inmate were not addressed.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: Training records indicated that 100 percent of custody staff and nursing staff were certified in CPR.  One hundred percent of custody staff were compliant with annual suicide prevention training. Medical and mental health staff did not receive annual suicide prevention training. One hundred percent of mental health clinicians received the seven-hour SRE training and completed the mentoring program.

This reviewer asked a mental health clinician who conducted the annual suicide prevention training for custody staff if he/she was able to present all of the PowerPoint slides in the CDCR lesson plan.  The clinician responded that not all of the slides were presented because of personal preference to allow time for dialogue with participants and review pertinent local issues, including recent RJD suicides. This valuable approach indicated that the current the one-hour time allotment for annual suicide prevention training is insufficient.

**Recent Suicides**: RJD had six inmate suicides during 2012-2014. In the **first** case (RJD 4), the inmate was found hanging by a sheet from the top bunk of his SNY cell during the early morning of June 11, 2012. His cellmate was asleep. Because medical responders were unable to establish an oral airway due to the decedent's clenched teeth, he was probably in at least partial *rigor mortis*.  The inmate had entered CDCR in June 2004 at the age of 18 to serve a 40-year to life sentence for second-degree murder.  He had been housed at RJD since August 2011 and had

34

been on the caseload since July 2010 and at the EOP level of care since April 2012. He had multiple MHCB admissions, the last of which occurred in July 2011. He had a self-reported history of multiple SAs and a family history of suicide. In violation of a policy requiring an SRE every 90 days for one year following discharge from an MHCB, no SRE had been completed since July 2011, shortly after this inmate's last MHCB placement.

The inmate also had various prior administrative segregation and SHU terms, the last in November 2011. In April 2012, his level of care was increased to EOP due to his deteriorating mental health, including poor mental status, AH, SI, poor hygiene, and inconsistent medication compliance. There was disagreement among his IDTT, principally with the psychiatrist, as to whether or not the inmate had a serious mental illness. He had been diagnosed with a Psychotic Disorder, but the psychiatrist believed he had Anti-Social Personality Disorder. The inmate's psychotropic medication was discontinued on May 3, 2012, allegedly at the inmate's request, but there was no documentation as to why it was discontinued. During this time, there was a one-month gap in weekly PC contacts. Psychotropic medication was re-started a month later, on June 1, 2012, after the inmate complained of increasing AH and depressed mood. He denied any SI. An order to restart his psychotropic medications was given, but when "the inmate stated he would not take medication daily, the psychiatrist negotiated with him to take the medication every third day. The inmate missed multiple individual and group therapy appointments and refused yard during the month before his suicide. He also had various somatic complaints and appeared obsessed about possible HIV infection, although test results were all negative.

Although possible precipitating factors for the suicide were not identified by the CDCR reviewer, the Suicide Report noted that the inmate had recently lost family support and that his mental health had deteriorated significantly during the preceding several months. The Suicide Report contained four bases for recommendations for corrective actions through a QIP: "1) Despite the inmate's history of SI and attempts and his frequent crisis bed admissions prior to arriving at RJD, no SREs were completed by clinicians at the RJD; (2) The inmate demonstrated on-going reluctance to comply with his medication routine. Psychiatrist attempted to encourage his compliance by prescribing psychotropic medications on an as needed basis and based on the inmate's request; (3) Documentation describing the inmate's psychological concerns appeared inconsistent with his presentation and suggested the need for a more in-depth review of his history along with more detailed interviewing of his current symptoms; and (4) A one-month gap in weekly PC contacts occurred in May 2012, when the inmate was a participant in the EOP level of care, which requires weekly clinical contact."

In the **second** case (RJD 5), the inmate was found hanging by a sheet from the top bunk of his administrative segregation cell during the evening of June 23, 2012. He had been single-celled in a double cell. The inmate had been involved in a fight earlier in the day and was subsequently placed in administrative segregation unit B-6. He should have been placed in a retrofitted cell, but he was not. He committed suicide by tying a sheet through the gap between the wall and the bunk, then around the support that holds the bunk to the wall, and then around his neck. The inmate had entered CDCR in October 2003 to serve a 12-year sentence for burglary. He served his entire sentence at RJD before his death.

This inmate had a long history of mental illness, SAs, and self-injurious behavior. He was placed at the EOP level of care a month after his October 2003 admission. He was initially diagnosed with Schizoaffective Disorder, and later with Bi-Polar Disorder. He was on the high-risk list for chronic SI. Although he expressed SI in December 2010 and engaged in self-injurious behavior in February 2011, his last SRE was on November 15, 2010. He last saw the psychiatrist on June 11, 2012 after becoming noncompliant with his psychotropic medication because of perceived weight gain. His medication was adjusted. He last saw his PC on June 15 and again on June 22, the day before his suicide. The inmate denied any current SI.

According to the CDCR reviewer, the inmate's last treatment plan, dated June 21, 2012, "was vague and did not include all current symptoms, specifics of past treatment and treatment response, or significant psychiatric events such as SAs and episodes of self-harm." It was noted that the inmate was estranged from his family due to his sexual orientation and was becoming increasingly anxious regarding a potential parole in March 2013. The reviewer noted that "the inmate worried almost constantly about things over which he had no control....As his parole date drew nearer he focused on what might go wrong and feared he would fail again in the community. As he already had two strikes, he feared another conviction would lead to a life sentence."

The Suicide Report contained five bases for recommendations for corrective action through a QIP: "(1) Several omissions and inconsistencies in the 30-minute Welfare Check Tracking Sheet were noted during the review period; (2) This review noted difficulties in the mental health treatment of the inmate as outlined in the progress notes, the treatment plan, and treatment goals; (3) An SRE was not completed following an event in which the inmate cut himself deeply, requiring sutures; (4) On February 21, 2011, the inmate initiated a fight in the morning food line and received an RVR. No referral was made for a mental health evaluation for possible mitigation of the RVR; and (5) After the fight on February 21, the inmate cut himself and disclosed his behavior to a psychiatrist on March 3, 2011. An SRE was not completed, the treatment plan was not updated for self-harm as a problem area until June 2011, and documentation did not indicate that IDTT team members were informed of the self-harm incident." The Suicide Report did not include that the inmate was placed in a non-retrofitted cell on June 23, 2012, shortly before his suicide.

In the **third** case (RJD 6), the inmate was found hanging in the Prison Industries Authority (PIA) Shoe Factory by a supervisor during the afternoon of August 8, 2013. The inmate had entered CDCR in March 2010 to serve a 20-year sentence for sexual abuse of children. He had been at RJD since August 2012. He did not have a history of mental illness or suicidal behavior, and was not on the caseload. He had little contact with his family, and had few disciplinary infractions. The CDCR reviewer did not find any precipitating factors. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Neither the PIA employee who found the inmate nor his supervisor used their personal alarms to alert others of the emergency. As a result, there was a delay in the emergency response time."

In the **fourth** case (RJD 7), the inmate was found hanging by a sheet from the top bunk of his SNY cell during the afternoon of September 18, 2013. He had been single-celled in a double cell after his cell mate was transferred to a different prison several days earlier. The inmate had

entered CDCR in August 2006 to serve a sentence of life without parole for first-degree murder. He was transferred to RJD in March 2013, when he informed the intake nurse that he was "living on the edge". Shortly after his arrival, he was placed in the SNY after an allegation of an in-cell sexual assault. The inmate had a vague history of mental illness.  He had not been on the caseload since October 2010. He self-reported three prior SAs and a family history of suicide. The inmate had little contact with his family and had few disciplinary infractions. He had several medical problems, and sporadically used a wheelchair due to a degenerative bone disease. He frequently complained about pain management; he was tapered off morphine in 2010 and prescribed over-the-counter pain medication and anti-inflammatory medication. He continued to file appeals regarding medication until the time of his suicide.

The CDCR reviewer noted several possible precipitating factors, including a sentence of life without parole, recent loss of his cell mate to a prison transfer, lack of family support, dissatisfaction with pain management, and apparent upset with a CO on the morning of his suicide who had allegedly taken his special diet identification card. The Suicide Report contained four bases for recommendations for corrective action through a QIP: "(1) The inmate was tapered off his morphine pain medication by CDCR physicians, and offered over-the-counter pain medication in its place. Despite documentation that indicated the inmate felt his pain level was poorly managed on the new regime, medical did not make any changes to his medications; (2) Upon arrival at RJD on March 21, 2013, the inmate screened positive for previous mental health and suicidal behavior and was not referred to mental health; (3) On the day of his death, the inmate 'may have had his special diet card taken and put on the bottom of the stack, and him being sent back to the food line. As a result, the inmate allegedly left the chow hall without being able to eat;' and (4) At the time of the review, there were no instructions posted on the door of the mental health building for how inmates can request emergent or urgent mental health services."

In the **fifth** case (<u>RJD 8</u>), the inmate was found hanging by a sheet from a ventilation grate of his SNY cell during the morning of November 26, 2013. The inmate had entered CDCR in July 2009 to serve a 29-year sentence for attempted murder and robbery. He had two previous CDCR commitments. The inmate was transferred to RJD on July 22, 2013.  He had an extensive history of mental illness in CDCR, including five in-patient hospitalizations from 1994 to 2009, during his two prior CDCR commitments. Following these commitments, he was designated as a Mentally Disordered Offender and was hospitalized further. Upon his last commitment to CDCR in July 2009, he was initially diagnosed with Schizoaffective Disorder by History and placed at the 3CMS level of care. In September 2011, following a series of fights with other inmates and poor programming, disorientation, pressured speech, derailed answers, flat affect, and obsessive complaints of being wrongly classified as Hispanic, he was elevated to the EOP level of care. He often refused his psychotropic medication and was on a *Keyhea* order. The inmate had little contact with his family, and had not received any visitors nor made any telephone calls since 2010. He had four RVRs for fighting, all in close proximity to each other during an eight-month period in 2011. A fifth and final RVR was issued in June 2012, involving indecent exposure front of a female staff member.

During 2012, the inmate's mental health continued to deteriorate, and he was placed on the High-Risk List at RJD, to which he had transferred on May 25, 2012.  He was in intermediate

inpatient care at the Salinas Valley Psychiatric Program from September 2012 through July 2013. Upon his return to RJD on July 22, 2013, his diagnosis was Psychosis NOS, Rule-Out Substance Induced Psychosis, Schizophrenia by History, Poly-Substance Dependence, and Personality Disorder NOS.

On October 25, 2013, his SNY housing unit was placed on lockdown following two staff assaults. All therapeutic groups were canceled and the inmate's PC saw him weekly at cell front. During that time, the clinician's progress notes generally indicated that he was stable, his thought processes were clear and organized, and he appeared to be coping well with lockdown conditions. On November 19, 2013, however, the inmate told the clinician that he was experiencing stomachaches which he attributed to swallowing pages from a Bible ten years earlier. He also submitted health care requests that complained of cramping, constipation, and pain. He was scheduled for an IDTT meeting the following day, November 20, but did not attend. Despite his non-attendance, a progress note from the meeting included responses to a mental status examination (MSE). The CDCR reviewer in this case questioned how an MSE could have been completed without the inmate being present at the IDTT meeting. The PC last saw the inmate on November 25, when he appeared relieved that the lockdown had ended, but was still fixated on his stomachaches being attributable to eating pages from the Bible or possibly to his psychotropic medication. He also reported sleep and appetite problems.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, but noted that a number of chronic risk factors, including his long prison sentence, poor impulse control, and history of psychotic symptoms, coupled with the month-long lockdown in his housing unit, resulted in deteriorating mental health and possible delusions, elevating his risk for suicide.

The Suicide Report listed numerous deficiencies and six bases for recommendations for corrective action through a QIP: "(1) Documentation received from Investigative Services Unit (ISU) contained in the preliminary incident package was incomplete and contained discrepancies, contradictions, and omissions; (2) The inmate's property was not available for inspection to this reviewer as a result of a mix-up with his property in the ISU; (3) Both the psychiatrist and psychologist appeared to have re-dated notes written previously without modifying or adding information to make them current; (4) The inmate did not attend the IDTT of November 20, but there appeared to be a MSE completed on this date. The time and date of the MSE completion was not clearly documented on the CDCR Form 7388; (5) Two different inmates said that the inmate communicated to custody officers that he was suicidal before he died; and (6) Documentation reviewed as part of this evaluation suggested that mental health ducats during late October 2013 through early December 2013 lockdown were disproportionately completed compared to medical and dental. During the lockdown, there were numerous cell-front and/or dayroom mental health contacts but very few face-to-face, confidential contacts. The lack of confidential, face-to-face contacts provided is problematic." A subsequent investigation determined that there was no evidence to support the allegation that the inmate self-reported that he was suicidal shortly before committing suicide.

In the **sixth** case (RJD 9), the inmate was found hanging by a sheet from the upper locker of his GP sheet during the evening of August 19, 2014. The inmate entered CDCR in September 2010 to serve a sentence of unknown duration length for robbery. He was transferred to RJD on

February 25, 2011. The inmate was placed on the caseload at the EOP level of care.  His most recent diagnosis was Schizophrenia and Mood Disorder NOS. At the time of this report, the eUHR, the Suicide Report, and other documents from the CDCR secure website had not been examined by this reviewer.

## 9)   California Medical Facility (CMF)

**Inspection**: January 7-8, 2014

CMF housed 2,063 inmates, most of whom were at Level III security classification. CMF had two 23-bed MHCB wings.  Temporary alternative housing of inmates who required an MHCB was available in observation cells within the MHCBs. There were three administrative segregation units for caseload and non-caseload inmates. Approximately 40 percent of CMF inmates were on the caseload, with 430 3CMS and 400 EOPs.  In addition, DSH ran a 199-bed acute care program and a 208-bed intermediate care facility (ICF).

**Screening/Assessment**: Intake screening of one new admission was observed on January 7.  The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the R & R Unit. The nurse asked all of the required intake screening questions.  The Nurse's Office provided sufficient privacy and confidentiality, but an officer was stationed inside the room rather than in the hallway, compromising the privacy and confidentiality of the assessment. Replacement of the solid door with one containing a large window could accommodate both safety for staff and auditory privacy for the inmate.

Daily psych tech rounds on all three administrative segregation units were observed on January 8. Rounds in units I-3 and M-3, which housed caseload inmates, were quite thorough. The psych tech documented the form for each inmate as the psych tech conducted the rounds, which this reviewer had seen only rarely before this site inspection.  Rounds in the Willis Unit, which housed GP inmates, were more cursory and best described as "drive-by" rounds.

It was reported that mental health clinicians tried to complete the 31-Item Mental Health Screening Questionnaire for non-caseload new intakes to administrative segregation in the TTA. However, a recent SPRFIT audit found that in December 2013, in 50 percent of cases, the screening forms were not completed for new intakes.

**Housing**: All rooms in the two MHCBS were suicide-resistant and furnished with suicide-resistant beds.  The three administrative segregation units contained a total of 11 retrofitted new intake cells. However, housing of newly-admitted inmates in administrative segregation was problematic in several respects.  Not all newly admitted inmates were housed in retrofitted cells during their first 72 hours, while some retrofitted cells housed inmates who were not new admittees.  Although several newly-admitted caseload inmates in administrative segregation had histories of self-injurious and suicidal behavior and were housed in non-retrofitted cells, three of the seven retrofitted cells in Unit I-3 were empty.

**Observation**: There were several problems with observation of patients in the MHCBs. First, although it was reported that all patients were observed at 15-minute intervals, review of observation sheets indicated that there were gaps because the assigned CNA on the unit had left for a lunch break and no other staff were conducting rounds in her place. More concerning was the fact that after nursing staff were eventually located to resume the 15-minute rounds, this reviewer observed staff falsifying the observation sheets by filling in times for the observations that had been missed. It was obvious which patients were on Suicide Watch because there was a staff conducting constant observation from outside the room door.  However, it was impossible to determine which patients were on Suicide Precaution without reviewing each chart. The census board located on the wall of the Nurse's Station did not distinguish patients on Suicide Precaution/Suicide Watch from other patients on the units. The Chief of Mental Health (CMH) at CMF accompanied this reviewer on his inspection of the MHCBs and immediately initiated corrective action based on these findings.

In the Willis Unit, Guard One data was reviewed for custody checks on administrative segregation new intakes during their initial 21 days.  The compliance rate was 95 percent during the 24-hour period of January 6, 2014.  Review of documentation for 30-minute rounds of non-new intake inmates in administrative segregation indicated that officers were noting the checks in *each* inmate's individual custody file. The impracticality of this practice, which would require an officer to enter a notation in each of the 20 inmates' files twice per hour during an entire eight-hour shift, made this practice suspect.  It should be noted that the Willis Unit, for GP administrative segregation inmates, housed only 41 inmates in this 125-bed unit on January 7.

**Management/Treatment Planning**: This writer reviewed eUHRs of various inmates on suicide observation status or referred to mental health on an urgent and/or emergent basis. The reviewed records indicated that inmates were consistently seen daily by clinical staff while on a suicide observation status, and that inmates referred to mental health generally seen timely.  Review of charts of inmates recently discharged from suicide observation status  indicated a mix of adequate and inadequate treatment planning. For example, in one case (CMF 1), the inmate was admitted to an MHCB on November 2, 2013 after expressing SI. An undated MHTP correctly listed the problem of SI, but listed the treatment goal as simply "maintain safety."  When the inmate was released from the MHCB ten days later, on November 12, 2013, the treatment plan section of the SRE stated "Discharge to EOP with 5-day follow-up, provide group and individual treatment to promote adjustment to recent incarceration, reality orientation, and management of AH, medication management." There was no indication in subsequent progress notes that such individual and group treatment was being provided.

Conversely, in another case (CMF 2), the inmate was re-admitted into the MHCB on November 1, 2013 for the fourth time since September 2013 for SI. He was a gang dropout with safety concerns and  well known to the clinical team for threatening suicide to avoid being housed in administrative segregation. The inmate's treatment plan, developed on November 6, documented the problem as "the inmate-patient was not suicidal, but in order to get away from ASU, he uses SI to get admitted."  The treatment goal was "the inmate-patient's coping resources are limited and it is crucial to learn some coping skills through counseling to be able to adapt to his environment." The treatment plan also noted that "he makes progress while in MHCB, but has not been able to maintain progress when he returns to Ad Seg. His clinician was notified of his

return and need for support." The discharge SRE on November 6 adequately contained a treatment plan consistent with the treatment plan that stated: "Discharge to EOP with 5-day follow-up; provide support/encouragement/ frequent contacts to promote ability to deal with frustrations of waiting for endorsement to another institution; individual and group treatment to promote increase in tolerance for frustration, better coping skills, and rational thinking." Review of five-day follow-up progress notes indicated that the inmate was receiving individual counseling for his perceived manipulative behavior (e.g., "Discussions regarding the use of the 'S' word and going to a MHCB would not help him to reduce his level of care and would hold up any endorsement/ transfer, which he seemed to understand at that moment."

Although a recent SPRFIT review found that 100 percent of inmates released from an MHCB during December 2013 had an accompanying discharge SRE, the review did <u>not</u> address whether the SREs contained a viable treatment plan.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 81 percent of custody staff and 100 percent of nursing staff were certified in CPR. Approximately 94 percent of custody staff were compliant with annual suicide prevention training, although they were being instructed by IST instructors and not by mental health clinicians. Ninety-five percent of mental health clinicians received the seven-hour SRE training and completed the mentoring program. Until a workshop was initiated in December 2013, health care staff had not been receiving the required annual suicide prevention block training.

**Recent Suicides**: CMF had four inmate suicides during 2012-2014. In the **first** case (CMF 3), the inmate was found hanging by a sheet from two ventilation grates of his Unit M-3 administrative segregation cell during the evening of August 17, 2012. He had several prior CDCR confinements. In 2009, he was paroled to Atascadero State Hospital but, following an assault on a program psychiatrist in July 2011, was returned to CDCR to serve a new 14-year sentence for assault. The inmate had several MHCB admissions in early 2012, resulting in elevation to the EOP level of care and transfer to Unit M-3 ASU at CMF in July 2012. He was considered highly assaultive and received many RVRs resulting in both SHU and administrative segregation terms throughout his multiple CDCR confinements.

This inmate had a long history of mental illness, with four SAs by hanging and self-injurious behaviors including cutting and setting his cell on fire. His most recent MHCB admission was in April 2012. He was diagnosed with Schizoaffective Disorder and had been recently noted as stable on psychotropic medication. The inmate was seen weekly by his PC. Although initially described as feeling stressed by his current administrative segregation placement and upset about some missing property in early July 3, 2012, he was seen on the day of his suicide, August 17, and described as "having a good mood, his thought process was organized and goal directed, and he seemed future oriented." The CDCR reviewer in this case did not identify any specific factors precipitating the suicide. However, the reviewer did note that the inmate was housed in the same administrative segregation cell for the entire month of his confinement and had not been housed in either of the two new intake cells. The CDCR reviewer also noted that, although the inmate

was not required to receive Guard One 30-minute welfare checks because he was beyond his initial 21 days in administrative segregation, other inmates on new intake status were designated for those checks but there was no documentation that the required checks occurred during the shift in which the inmate was found hanging. The Suicide Report contained one (1) recommendation for corrective action regarding the lack of documented welfare checks.

In the **second** case (CMF 4), the inmate was found hanging by an extension cord from a support beam of his EOP GP cell during the early morning of August 14, 2013. Although he was housed in a double cell, no other inmate was assigned to the cell. The inmate entered the CDCR in July 1999 to serve a seven-year to life sentence for attempted first-degree murder of his sister. He had a long history of mental illness and was most recently diagnosed with Bipolar Disorder.  He had been placed at the 3CMS level of care upon his admission. He was transferred to CMF in July 2007 and elevated to the EOP level of care. This inmate also had several medical problems, including obesity, chronic back pain, and prior surgeries to repair a ruptured Achilles tendon and to reconstruct his knee. He often used a wheelchair due to chronic pain and struggles with incontinence.

The inmate also had a history of being physically abused by other inmates and was regularly assigned a single cell. In July 2012, he was scheduled to move from his single EOP cell to a 3CMS dormitory. He became overwhelmed by this reclassification decision and attempted suicide by overdosing on Tylenol, muscle relaxants, and sleeping pills. He was admitted to an MHCB.  The clinician noted upon discharge in August 2012 that "any future plans to change his housing should be planned with his clinician, as it represents a high risk situation of SIB." He was returned to single-cell status in an EOP housing unit.

Several events occurred in early and mid-2013 that might have contributed to this inmate's eventual suicide in August.  He was notified in February 2013 that one of his sons had died. On August 24, 2013, he attended a parole hearing and received an unexpected five-year deferral, which resulted in mild SI. Due to his chronic medical problems, the inmate informed a nurse on June 5, 2013 that he "elects to be Do Not Resuscitate (DNR) and request that no heroic interventions be attempted." On July 16, 2013, he wrote a 23-page letter to the *Coleman* Compliance Unit expressing overall frustration with confinement and SI. In the letter, he stated he had 400 pills that he could use to kill himself and he was experiencing AH. The letter also indicated that he gave the pills to his PC. A progress note from the clinician dated July 18 stated that "IP continues to deal with various stressors. He is anxious and worries excessively about others' opinions of him. His depressive symptoms appear to have moderated somewhat. Thoughts of self-harm are still present but he denies any specific plans." An SRE completed on July 19, 2013 noted that "IP acknowledged that he had been having suicidal thoughts and plans but stated he had written a letter almost 2 weeks ago when he was very depressed and frustrated." The clinician noted his chronic suicide risk as "moderate," and his acute suicide risk as "low to moderate."

On July 25, 2013, the inmate met with his IDTT who decided to transfer him to a different EOP unit with a different psychiatric team. He expressed reservations about moving to the new unit. In a subsequent progress note dated August 9, his PC stated that the inmate "is less depressed that he was several weeks ago. He does not report any SI or plans.... He continues to express

42

anxiety about potential problems he could face on a different unit." Two days later on August 11, 2013, the inmate was seen by another clinician in response to a suicide letter that correctional staff had found in his cell. The inmate denied any SI, but endorsed several suicide risk factors. The clinician wanted to admit the inmate to an MHCB, but  a conferring psychiatrist disagreed and the MHCB admission was not initiated nor was an SRE completed. Instead, the clinician decided to place the inmate on "24-hour custody watch with a 5-day follow-up." The following day, August 12, the clinician again saw the inmate.  He stated, "I tried to be in a better mood tomorrow. I know I get upset by the past. Not sure what I will do (on August 14, the day of transfer). I might refuse to move." The clinician rescinded the five-day extended observation because it was thought to be contrary to LOP at CMF. The inmate committed suicide two days later.

The Suicide Report contained four bases for recommendations for corrective action through a QIP: (1) Despite a post order requiring security checks to be conducted at 30-minute intervals, checks were not recorded for at least two hours prior to discovery of the decedent; (2) An SRE was not completed as required following the mental health clinician's interview with the inmate on August 11, 2013; (3)  Important clinical documentation was missing from the eUHR, including documentation of consultations between the mental health clinician and psychiatrist on August 12 regarding possible placement in an MHCB and the decision to rescind the five-day follow-up and custody welfare checks; and (4) CTC by-laws at CMF should be revised to allow admitting privileges to clinical psychologists in order to avoid clinical disagreements with psychiatrists regarding admitting decisions.

The Suicide Report, however, omitted several deficiencies that contributed to this suicide.  When the inmate was seen by a clinician on August 11 and August 12, an SRE was not completed despite strong indications of suicide risk. In addition, any disagreement between clinical staff regarding the level of suicide risk should always result in a conservative approach and decision for MHCB admission. Absent a decision for MHCB admission, if mental health staff still felt the inmate was at risk for suicide, alternative interventions, such as placement on Suicide Watch/Suicide Precaution in alternative housing and/or extended observation, five-day clinical follow-up and custody welfare checks, should be used.  As discussed in this report, although the efficacy of five-day clinical follow-up and 60-minute welfare checks as currently practiced were questionable, these strategies were available but were not fully used in this case.

During the CMF audit, this reviewer discussed this suicide with mental health officials at the prison and from CDCR mental health administration.  They discussed various corrective actions taken as a result of this suicide, but said that various CTC licensing requirements created an impediment to allowing psychologists to have admitting privileges, and that "admitting privileges to the CTC for psychologists has been highly contentious within the medical community at California Training Facility (CTF) and system-wide."  To date, *no* solution has been found to correct the problem.

As a result of the deficiencies in this suicide case, the Chief Psychiatrist and Acting Chief Executive Officer (CEO) at CMF conducted a two-hour suicide prevention training workshop for over 150 mental health and custody staff in September 2013. The workshop, conducted before completion of the Suicide Report, included a presentation of 50 PowerPoint slides that utilized

this inmate's suicide as a teaching tool for appropriate documentation of clinical decisions, required completion of SREs when suicide risk is indicated, appropriate use of an MHCB, and other tools to manage suicide risk.

In the **third** case (CMF 5), the inmate was found hanging by a sheet from a ventilation grate of his GP cell during the early morning of September 21, 2013. He entered CDCR in April 2004 to serve a 16-year to life sentence for second-degree murder. The inmate had initially been placed at the 3CMS level of care during his first few years of confinement, based on a self-reported history of mental illness and suicidal behavior while confined pretrial in a county jail and while he was in the community. His initial diagnosis by a CDCR clinician was "Major Depressive Disorder, Mild, with considerations given to Substance-Induced Mood Disorder and Alcohol Dependence in Institutional Remission." In August 2006, the inmate was removed from the caseload based on remission of symptoms of mental illness and being free of psychotropic medication for more than one year. He had no history of gang involvement or RVRs.

On August 23, 2013, the inmate was referred to mental health.  He reported AH and difficulty sleeping, and requested resumption of his psychotropic medication. He was placed at the 3CMS level of care and referred to a psychiatrist.  On September 9, 2013, he was seen by another clinician who completed a mental health evaluation. The inmate again stated that he was hearing voices telling him "he would be better off dead than in prison, and telling him to kill himself. The inmate believed the voices were coming from his desk, the TV and books in the library. He experienced tactile disturbances consisting of someone touching his legs at night. He expressed paranoid beliefs about the sexual orientation of his work supervisor. He was having nightmares, sleeping three hours a night, and experiencing diminished appetite." According to the evaluation, "the inmate stated that he did not want to reach the point where he hurt himself or anyone else." According to an SRE completed on September 9, the inmate was assessed at a "moderate" chronic risk and at acute risk for suicide. The clinician conferred with a supervisor and psychiatrist before deciding that "Placement in MHCB was considered, but the IP stated he had no suicidal intent or plan and was seeking help (although he has many statistical risk factors, and has AH with command for self-harm)." The inmate was elevated to the EOP level of care and placed in a double cell in another housing unit. He was also seen by a psychiatrist and restarted on psychotropic medication, while denying any SI.

On several occasions, the inmate reported to custody and mental health staff that he was being sexually harassed by several transgender inmates in the housing unit and/or an incident of attempted rape.  He reported to the IDTT on September 19, 2013 that he was inappropriately touched in the shower by other inmates. He also recanted any AH and commands to kill himself and stated that he had been placed at the EOP level of care by mistake,  claiming there was a miscommunication between himself and the Spanish interpreter regarding his symptoms. He requested a return to work on the mainline. However, he did not deny the attempted rape. According to the IDTT, because the inmate did not display any signs of acute psychosis nor appear to be crisis, they decided to return him to the 3CMS level of care. His diagnosis was changed to Paranoid Schizophrenia with a rule-out for Post-Traumatic Stress Disorder (PTSD). The following day, September 20, the inmate was transferred to another housing unit, where the alleged attempted rape had occurred, and placed in a single cell. He committed suicide the following day.

The CDCR reviewer in this case found that the inmate had been notified of his mother's death on September 17, but did not disclose this information to any mental health staff.  The Suicide Report contained three bases for recommendations for corrective action through a QIP: (1) Despite reporting on several occasions that he had been sexually assaulted, custody, mental health, and nursing staff all failed to properly initiate the PREA (Prison Rape Elimination Act) protocol; (2) The referral to the psychiatrist written on August 23 was not processed correctly and the inmate was not seen by the psychiatrist until 17 days later on September 9; and (3) The psychiatrist's order for psychotropic medication written on September 9 failed to reach the pharmacy and the medication had to be re-ordered by another psychiatrist one week later, on September 16. In addition to the failure to report the inmate being a victim of sexual assault, the inmate was re-assigned shortly before his death to the same housing unit in which the sexual assault occurred.

In the **fourth** case, the inmate (CMF 6) was found hanging in the bathroom area of his dormitory cell in the ICF during the early afternoon of July 7, 2014. He entered CDCR in December 1997 to serve a life sentence for attempted murder of his wife. He was transferred to CMF in January 2014. He had an extensive history of mental illness, with the most recent diagnosis of Major Depressive Disorder, Severe, Recurrent, and Personality Disorder NOS. He also had a history of attempted suicide by hanging in 2005 and 2013. Because the ICF is a DSH program and was not included in this assessment, this death was not reviewed for this report.

## 10)     California State Prison - Solano (CSP/Solano)

**Inspection**: January 9-10, 2014

CSP/Solano housed 4,121 inmates with Level II and III security classifications. CSP/Solano had a 15-bed CTC, with nine rooms designated as MHCBs. An administrative segregation unit contained six retrofitted cells that could be used for alternative housing of inmates requiring an MHCB.  Approximately 36 percent of CSP/Solano inmates were on the caseload, with 1,455 3CMS and 16 EOPs.

**Screening/Assessment**: Intakes screenings of several new admissions was observed on January 9.  The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the Reception and Receiving (R&R) Unit. The Nurse's Office provided sufficient privacy and confidentiality, with custody staff stationed in the corridor.  The nurse conducted the intake screening process thoroughly.

Daily psych tech rounds in the administrative segregation unit were observed on January 10. There were approximately 53 3CMS inmates in the unit at the time.  The psych tech interacted adequately with most inmates who were awake during rounds, but there were no efforts to interact and/or at inspect cell conditions of inmates who were sleeping, including those on the caseload.  As at most of the other prisons, the psych tech did not complete the Psych Tech Daily Rounds Forms on caseload inmates until the rounds were completed.  This practice was unreliable because it was  unreasonable to expect psych techs to remember the mental status of each of the 53 caseload inmates in the unit after rounds were finished.

**Housing**: All of the MHCBs were suicide-resistant and furnished with suicide-resistant beds. The two administrative segregation units, Buildings 9 and 10, contained a total of ten retrofitted new intake cells. There were problems with the housing of newly admitted inmates in the administrative segregation units. Not all newly admitted inmates were housed in retrofitted cells during their initial 72 hours, and not all of the retrofitted cells housed newly admitted inmates. On January 10, two of the six intake cells in Building 10 were empty while at least eight new intakes were housed in non-retrofitted cells.

**Observation**: Although there were no inmates on Suicide Precaution/Suicide Watch during the site visit, there were several problems with observation of patients in the CTC. The nursing supervisor reported that all patients in the MHCB were on a Q-60 minute level of observation and that these rounds were not documented. Although not specifically prohibited within the *Program Guide*, observation at Q-60 minute intervals for patients in a crisis unit exceeded the standard of care.

Although CSP/Solano's local suicide prevention policy was revised in October 2013, it was outdated and inconsistent with the *Program Guide* and current CDCR policies. For example, the LOP stated that "no furniture shall be allowed in the room unless approved by the MHCB psychiatrist or psychologist or on weekends and holidays by the on-call psychiatrist. The inmate shall be initially issued a safety mattress on the floor..." This LOP was incorrect. All patients assigned to a MHCB were required to be housed in a room that had a suicide-resistant bed and a non-tear mattress. The LOP also incorrectly stated that "a psychiatrist or psychologist, in consultation with IDTT members, shall write an order to discontinue Suicide Precaution when the inmate-patient is no longer in imminent danger of self-harm. The inmate-patient shall then be moved to routine checks by nursing staff every 15 minutes and then, if clinically indicated, to every 30 or 60 minutes." This portion of the LOP was incorrect as well. The *Program Guide* requires that inmates on Suicide Precaution are required to be observed at 15-minute intervals, not *moved to* that level of observation. The *Program Guide* does not call for observation of MHCB patients at Q-30 or Q-60 minute intervals, although it does not prohibit them.

It was reported that use of alternative housing cells for inmates referred to an MHCB was infrequent and was last done in September 2013. However, review of the "Alternate/Temporary Housing Log" for that period, and discussion with the CMH, indicated that mental health staff were frequently using "psychiatric observation" status at Q-30 minute intervals for inmates placed in these alternative housing cells. As discussed above with regard to other CDCR prisons, it is inappropriate to use psychiatric observation status at Q-30 minute intervals pending MHCB admission when Suicide Precaution or Suicide Watch is indicated. Staff at CSP/Solano were frequently using Q-30 observation for inmates admitted to an MHCB and on Suicide Precaution, in violation of the *Program Guide*.

Guard One data on correctional staff checks on inmates during their initial 21 days in administrative segregation was reviewed. The compliance rate was 89 percent during the 24-hour period of January 6, 2014. Review of the administrative segregation unit log indicated that 30-minute rounds of inmates in non-intake cells were being documented.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis were reviewed.  Inmates were consistently seen daily by clinical staff while on suicide observation status, and inmates referred to mental health were generally seen timely.  However, several problems were found. For example, in the first case (SOL 1), the inmate was admitted into the CTC on December 24, 2013 after expressing SI. A treatment plan was developed two days later, on December 26.  It correctly listed the problem of SI, but the stated treatment goal was simply "stabilize symptoms." When the inmate was discharged from the MHCB on January 1, 2014, the treatment plan section of the SRE stated that the inmate would be returned "to Adseg. with a 5-day follow-up by PC and hourly checks by custody. Inmate will see psychiatrist within one week of return to AdSeg.... Inmate encouraged to pursue transfer with custody, inmate would like to transfer to CMF to be with brother who is now there."  This narrative did not amount to an adequate treatment plan. When the inmate was readmitted to the CTC on January 7, 2014 for SI, he was initially placed on Q-30 minute observation which was downgraded the following day to Q-60 minute observation. Treatment planning remained inadequate.

In another case (SOL 2), the inmate was admitted into the CTC on December 31, 2013 for SI. The SRE indicated "high acute risk." However, he was placed on Q-30 observation and on the following day, January 1, 2014, the clinician ordered: "Continue CTC MHCB observation for suicide precautions and Q-30 minute for psychiatric observation." The inmate's treatment plan, dated January 2, 2014, listed a  treatment goal to "stabilize symptoms," which was inadequate. The patient was subsequently discharged from the CTC on January 8, but without a discharge SRE.  In another case (SOL 3), an inmate with an extensive and recent history of self-injurious behavior and multiple MHCB admissions was seen by a CTC psychiatrist on December 9. Although he had a depressed mood and continued to endorse SI ("I can't tell you the plans"), the clinician downgraded this inmate to Q-30 minute psychiatric observation status.

In another reviewed case (SOL 4), there was inconsistency between descriptions of the inmate's behavior in documentation by the primary clinical staff and documentation by the psych tech on the Psych Tech Daily Rounds Forms. The inmate was seen by his PC on December 3, 2013, appearing anxious about his Institutional Classification Committee (ICC) meeting the following day. He had been refusing his psychotropic medication during the preceding two weeks because he was waking up in the middle of the night in a panic. He expressed guilt and remorse for past mistakes and poor choices made and the harm caused to his family. He had a depressed affect and was observed to be tearful throughout the assessment, and was referred to the psychiatrist for medication evaluation. The inmate was seen by the psychiatrist a short time later that same day and was described as "highly labile, cries easily, cooperative, sad mood." However, according to the psych tech's documentation on the daily rounds forms for December 3, the inmate expressed no mental health concerns, had a good appetite and good sleeping pattern, pleasant mood, affect within normal limits, participated in programming, had not been prescribed any psychotropic medication, and showed no signs of decomposition.

This reviewer observed an IDTT meeting in the CTC. The patient (SOL 5) was readmitted to the CTC on January 7, 2014 for SI. For reasons that were unclear, he was currently on Q-60 minute observation.  This 3CMS patient had previously been in the CTC from December 24, 2013 through January 2, 2014. During the required five-day clinical follow-ups in the administrative

segregation unit, it was determined that he had been refusing his psychotropic medication and expressing SI. He had been placed in the administrative segregation unit for non-disciplinary, safety reasons. During the IDTT meeting, the inmate appeared concerned about the location of his property and possible increase in classification points due to an alleged verbal threat to a CO. There was little, if any, discussion about treatment planning or reference to strategies to reduce the patient's SI during the meeting. The escorting CO volunteered to ask about the inmate's property, which made the inmate appeared relieved and appreciative of this offer.

**Intervention**: All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR.  Ninety-four percent of custody staff had completed the annual suicide prevention block training.  Although it was reported that many medical and mental health staff received suicide prevention training, it was not completed during the annual block training. Ninety-five percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: SOL had two inmate suicides during 2012-2014. In the **first** case (SOL 6), the inmate was found hanging by a sheet from the bunk of his GP cell during the early morning of July 13, 2012. His body was described by medical responders as "pale, unresponsive, slightly stiff". He had entered the CDCR in January 1991 to serve a 16-year to life sentence for second-degree murder of his mother.  He had served 21 years of the sentence, was housed at CSP/Solano since July 2004, and had very few disciplinary problems.  He had numerous chronic medical conditions including chronic back pain, Hepatitis C, and hearing impairment.  He was never on the mental health caseload.  Before his involvement in an altercation with another inmate on May 14, 2012, this inmate had not received an RVR since May 1999. The May 14, 2012 incident did not result in an administrative segregation placement, but he was re-housed in another GP unit. Although allegedly upset by the housing change, this incident occurred two months before his suicide.  No other identified precipitating events were found by the CDCR reviewer. The inmate was viewed by staff and other inmates as a loner who kept to himself and followed a very rigid schedule. No recommendations for corrective action were generated as part of the CDCR Suicide Report.

In the **second** case (SOL 7), the inmate was found hanging in his GP cell during the afternoon of September 2, 2014. He entered CDCR in October 2007 to serve a 25-year to life sentence for second-degree murder. He was transferred to CSP/Solano on June 14, 2011. The inmate was placed on the caseload at the 3CMS level of care in December 2013.  His most recent diagnoses were Post-Traumatic Stress Disorder and Polysubstance Dependence. At the time of this writing, the eUHR and other documents posted on the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

**11)**     **San Quentin State Prison (SQ)**

**Inspection**: January 21-22, 2014

SQ housed approximately 4,036 inmates at Level II, RC, and Condemned Unit security classifications. SQ had a variety of housing units, including a 38-bed CTC with 17 rooms designated as MHCBs; ten Specialized Care Beds for condemned inmates in the Central Health Services Building; three housing units held approximately 685 condemned inmates (the Condemned Unit, the Adjustment Center, and North Segregation); a five-tier administrative segregation unit; and a RC. An OHU contained several retrofitted cells that could be used for alternative housing of inmates awaiting a MHCB, but were said to be used rarely. Approximately 28 percent of SQ inmates were on the caseload, including 1,072 3CMS and 67 EOPs.

**Screening/Assessment**: The intake and mental health screening processes of several new admissions were observed on January 21. The Initial Health Screening CDCR Form 7277 process was conducted adequately in private by a nurse assigned to the R & R Unit. The initial 31-item mental health screening form was completed in the private office of a clinical psychologist. This process worked well, with the clinician having full access to the MHTS to verify the inmate's history of mental health/suicidal behavior.

This reviewer observed daily psych tech rounds conducted by two psych techs assigned to the administrative segregation unit on January 22. It was found that the two psych techs employed different practices. A psych tech observed on Tiers 1 and 2 only stopped and interacted with caseload inmates, while the psych tech on Tiers 3 through 5 was observed stopping and attempting to interact with all inmates regardless of their caseload status. As found at almost all of the other prisons, the psych techs did not complete the Psych Tech Daily Rounds Forms on caseload inmates until after the rounds were finished. This practice raised questions as to the reliability of the documentation, given the apparent difficult the psych techs would reasonably be expected to have with remembering the mental health status of each of the approximately 78 caseload inmates housed in the unit.

In addition, this writer had the opportunity to observe completion of the 31-item mental health screening form that was administered to non-caseload inmates upon admission into the administrative segregation unit. The screening included completion of two forms: the original 31-item mental health screening form, as well a 14-item abbreviated form that was being pilot-tested. The process was problematic because the screening occurred in a very cramped officer station on the second tier, with an officer stationed at the door, thereby negatively impacting privacy and confidentiality.

This reviewer observed a psych tech conduct daily rounds on the Condemned Unit for inmates classified as "Class B," meaning they were serving a disciplinary sanction for an RVR, and were on the mental health caseload. Psych tech rounds for all other condemned inmates, including the approximately 185 caseload inmates, were conducted only twice per month.

**Housing**: All 17 MHCB cells were suicide-resistant and furnished with suicide-resistant beds. The administrative segregation unit contained approximately eight new intake cells that had been retrofitted. However, there were problems with housing of newly admitted inmates in the administrative segregation unit.  Not all newly admitted inmates were housed in retrofitted cells during their initial 72 hours, and not all of the retrofitted cells housed newly admitted inmates. This reviewer observed at least five newly arrived inmates who were housed in non-retrofitted cells, and at least one of them was on the caseload.

**Observation**: All patients in the MHCB were required to be observed a Q-15 minute level of observation, unless they were on Suicide Watch status and received constant observation. The Observation Record form, used for documentation of observation of patients on Suicide Precaution, contained pre-printed 15-minute time intervals.  This was inconsistent with the *Program Guide* requirement for observation at *staggered* intervals that did not exceed 15 minutes.

With regard to custody checks of inmates in the administrative segregation unit, this reviewer examined the Guard One data, which is used to verify checks on newly admitted inmates in administrative segregation during their initial 21 days.  The data indicated a compliance rate of only 62 percent during the 24-hour period of January 21, 2014.  Review of the administrative segregation unit log found that 30-minute rounds of inmates in non-intake cells were not always being documented timely.

Correctional staff were required to conduct rounds at only 60-minute intervals in the three housing units holding condemned inmates.  These rounds were <u>not</u> recorded in any logbook.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation and inmates referred to mental health on an urgent and/or emergent basis were reviewed. Although the reviewed charts indicated that clinical staff consistently saw inmates daily while on suicide observation status, and inmates referred to mental health seen timely, several problems were found.  For example, in the first case (<u>SQ 1</u>), the inmate had most recently been admitted to an MHCB on November 10, 2013 for SI and self-injurious behavior by cutting. An SRE documented an extensive history of suicidal and self-injurious behaviors, including head-banging, lacerations on his arms, and hanging. The patient was stabilized in the CTC and discharged four days later on November 14. He was assessed as a "high chronic risk" and a "moderate acute risk" for suicide. Follow-up assessments occurred as required. Several weeks later, during the evening of January 14, 2014, the inmate received distressing family news and again engaged in self-injurious behavior by head-banging. He was transferred to an MHCB and assessed by a clinician the following day, January 15. However, according to the SRE, the inmate did not have a history of SAs, did not have either current SI or ideation within past three months -- despite the fact that he had engaged in self-injurious behavior less than 24 hours earlier. The clinician completing the SRE consulted with other members of the IDTT and concluded that the inmate was a "moderate chronic risk"  and a "low acute risk" for suicide. This risk assessment, and recording of this patient's historical information regarding prior risk, were inconsistent with the November 2013 assessments. On January 15, 2014, the IDTT discharged the inmate from the MHCB to GP housing with five-day clinical follow-up and the following

treatment plan: "IP agrees to once again access safety plan with PC if new SIB urges arise." No "safety plan" could be found in the eUHR.

In another case (SQ 2), the inmate was admitted to an MHCB at some time before December 5, 2013. His initial treatment plan, dated December 5, listed the problem of "suicidal thoughts" and the goal of "eliminate suicidal thoughts." The inmate was stabilized in the CTC and discharged a week later on December 12, 2013. The discharge SRE contained the following treatment plan: "discharge to EOP LOC, 5-day follow-up, transfer back to home institution Avenal State Prison (ASP), and out-patient team notified."  Notably, almost the exact same treatment plan by the same clinician was found for the MHCB discharge of another inmate (SQ 3) on the same day, December 12.  On both December 16 and December 17, 2013, the inmate (SQ 2) received follow-up visits by an out-patient clinician. The two progress notes contained *exactly the same narrative* except for the  different dates recorded on the forms. Because these two progress notes were identical, it was unclear whether the inmate was seen by this clinician on either or both of these dates.

In another reviewed case (SQ 4), the inmate, who was in the Condemned Unit, threatened suicide on December 16, 2013, following an argument with nursing staff. He appeared enraged, paranoid, and despondent. He had an extensive history of mental illness and suicidal behavior, and had recently been admitted to the CTC in November 2013. A clinician completed an SRE on December 16, assessed the inmate as being "high chronic risk" and "high acute  risk" for suicide, and the inmate was admitted into an MHCB. A treatment plan completed two days later, on December 18, listed the problem of "suicidal thoughts" and the goal to "resolve suicidal thoughts." The inmate was stabilized in the CTC and discharged the following week, on December 23, 2013. The discharge SRE contained the following treatment plan: "(1) IP will be discharged from CTC to EOP LOC and will be moved to East Block (EB), (2) medication monitoring with adjustments as needed, (3) weekly 1x1 session with PC and follow-up in five days, (4) attendance of groups and recreation therapy, (5) to maintain stability, and (6) continuous focus on suicide prevention."

Treatment planning, in treatment plans themselves and in the treatment plan sections of discharge SREs, were problematic in nearly all of the reviewed charts reviewed, and clearly in all three cases discussed above. Of interest, an SRE audit conducted internally  at SQ in December 2013 found that treatment plan "goals and objectives were identified" in 67 percent of audited MHCB cases, and treatment plan "interventions were identified" in 100 percent of audited MHCB cases. These audit findings are a stark contrast to this reviewer's findings and raise questions regarding the efficacy of the quality improvement process at SQ.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR.  Ninety-seven percent of custody staff and none of the medical and mental health staff received annual suicide prevention training during 2013.  Eighty-nine percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: SQ had eight inmate suicides, including four on the Condemned Unit, during 2012-2014.  In the **first** case (SQ 5), the inmate was found hanging by a shoelace from the top bunk of his GP cell during the early afternoon of April 25, 2012. His body was in *rigor mortis*. He had last been seen alive during breakfast approximately eight hours earlier. The inmate had entered CDCR in April 2004 to serve a 16-year to life sentence for second-degree murder of his ex-girlfriend.  Although he previously attempted suicide following the murder in January 2002, and had been on suicide observation status at the county jail, the inmate did not have a history of mental illness and was not on the caseload. He had no prior criminal record.  He had served approximately eight years of the sentence and had been housed at SQ since August 2010.  He had very few disciplinary problems. The inmate had frequent visits by both friends and family members, including a visit three days before his death on April 22. He did not have any significant medical problems. The CDCR reviewer did not find any precipitating factors leading to this suicide.  Other than the lack of required welfare checks in GP housing that allowed the inmate's suicide to go unnoticed for a significant amount of time, no bases for recommendations were offered.

In the **second** case (SQ 6), the inmate was found hanging by an electrical cord from the bookshelf of his Condemned Unit cell during the late afternoon of May 27, 2012. He entered CDCR in 1999 to serve a 60-year to life sentence for multiple counts of child sexual assault. In June 2004, the inmate was sentenced to death for the 1979 murder of a young boy and was transferred to SQ. He had multiple prior convictions for child sexual assault.  He was on various protective custody statuses over his eight years in the Condemned Unit, due to the nature of the offenses.  These included administrative segregation, SNY, Medically Restricted Yard due to various medical problems, and Small Management Yard (SMY).  Although the inmate had not self-reported any previous history of mental illness, he was placed at the 3CMS LOC in 2004 upon his arrival at the Condemned Unit, following a mental health evaluation. During his confinement in the Condemned Unit, the inmate had "a waxing and waning of depressed feelings" regarding the legal appeals of his conviction and his future. He often complained about harassment by inmates and COs due to the nature of his offenses. He was prescribed psychotropic medication at various times during his confinement to reduce depression and anxiety. His diagnoses varied among Major Depressive Disorder, Dysthymia, and Depressive Disorder. At 68 years of age, the inmate was having increasing medical problems, including chronic knee, back, and shoulder pain, diabetes, and chronic obstructive pulmonary disease. He used a wheelchair when moving long distances.

The inmate consistently denied SI during his incarceration. When asked by a clinician in late 2008 "what kept him going," he responded, "All I know is I don't want to die." He was consistently assessed as both low chronic and acute risk for suicide in multiple SREs completed during his confinement. These included one conducted two days before his death in which he "denies any current SI, plan or intent. Is future oriented, compliant with mental health treatment."

Although the CDCR reviewer did not find any precipitating factors leading to this suicide, it was noteworthy that the inmate was experiencing significant and more frequent harassment from inmates following the airing of an episode on a television program known as "Cold Case Files"

in November 2011 that highlighted a series of this inmate's previous offenses. The CDCR reviewer theorized that because the inmate attempted suicide during one of the most staff-intensive periods of the day, at approximately 4:00 p.m., this suicide may have been an attempt to gain cell relocation rather than an attempt to end his life. The Suicide Report did not contain any recommendations.

It is noteworthy that although the CDCR reviewer theorized that the inmate attempted suicide to coincide with one of the most staff-intensive periods of the day, the CDCR review did not verify when the inmate was last seen alive. As discussed above, correctional staff were required to only conduct rounds at 60-minute intervals in the three units housing condemned inmates, and these rounds were not recorded in any logbook.

In the **third** case (SQ 7), the inmate was found hanging by a sheet from the bars of his Condemned Unit cell during the early morning of August 26, 2012. He entered CDCR in December 2005 on a death sentence for two murders.  He was housed at SQ during his entire confinement. The inmate did not have a history of mental illness or suicidal behavior, and was not on the caseload.  He was seen by mental health clinicians periodically throughout his confinement, most recently in May 2012.  He always denied SI or any mental health problems. He did not have any RVRs during his confinement. This inmate had a number of chronic medical conditions, the most important of which was a degenerative joint disease and orthopedic problems with his ankles, knees, and shoulders for which he was prescribed Morphine and Fentanyl patches. In July 2012, his PCP discontinued his prescription for Fentanyl after a nurse observed that he was not wearing his patch, and a patch was found elsewhere in the housing unit. On July 17, the inmate met with the PCP who explained that the Fentanyl prescription "had been stopped due to a violation of the pain medication contract," and that his Morphine prescription "will be eventually discontinued after a long taper," but that his case would be discussed with the SQ Narcotic Management Committee. The inmate became upset, refused to speak with medical staff on several occasions, and filed an appeal of the medication discontinuation. According to the CDCR reviewer, "it was evident from the review conducted for this report that the cessation of analgesic medications played the prominent role in the inmate's suicide....Although there were some aspects of the discontinuance that could have been handled differently, such as the provision of non-opiate analgesics during the morphine taper, it appeared to have been done appropriately and with reasoned discussion among health care staff." No recommendations were contained within the Suicide Report.

In the **fourth** case (SQ 8), the inmate was found hanging by a sheet from the bars of his Condemned Unit cell during the evening of April 14, 2013. He entered CDCR in March 2005 on a death sentence for five murders. He was housed at SQ for most of his confinement. Although the inmate did not have a prior history of suicidal behavior, he did express SI during the sentencing phase of his trial, stating "I just want to be done with this, I want to die." He had frequent family visits and very few RVRs during his confinement.

From 2005 through late 2009, the inmate was at the 3CMS LOC due to intermittent grandiose and paranoid delusional beliefs and intermittent auditory and VHs. His diagnoses varied among Delusional Disorder, Schizophrenia, and Personality Disorder NOS. His medical records also indicated a fixation with somatic medical issues. In late 2009, he began to refuse psychotropic

medication, became socially withdrawn, and refused to eat. His LOC was elevated to EOP in October 2009.

On January 21, 2010, the inmate pushed two ballpoint pens into both eye sockets, resulting in traumatic brain injury and permanent blindness. Following return from the hospital, he was placed in an MHCB and told the psychiatrist that he blinded himself to relieve pain from other parts of his body. He was diagnosed with Chronic Paranoid Schizophrenia with Somatic Delusions, and subsequently agreed to restart psychotropic medication. In February and March 2010, the inmate was in a rehabilitative facility for speech and physical therapy, and then subsequently transferred to CSP/Cor. In April 2010, he was admitted to an MHCB for psychotic delusions and grave disability. He returned to SQ in December 2010.

During 2011 and 2012, the inmate's medication compliance was inconsistent.  He  continued to voice somatic complaints about hip and joint pain that were not verified by supplemental testing. On August 4, 2012, the inmate was taken to the hospital following a methadone overdose, returned to the prison, and placed in an MHCB. The inmate later stated that the overdose was not a SA but rather an attempt to relieve foot pain. The following month, on September 25, 2012, he overdosed on morphine and heroin, was hospitalized, and returned to the prison and again placed in an MHCB. Although initially stating that the overdose was a SA, the inmate later retracted the statement and insisted it was an attempt to bring attention to his medical needs. His treatment team considered a higher level of inpatient treatment, but ultimately decided to keep him in EOP on the Condemned Unit and housed next to his brother on the assumption that it would be less stressful. In addition to weekly visits with his PC and monthly contacts with the psychiatrist, the inmate was identified as a "high risk" inmate and seen daily by a psych tech at cell front.

Over the next several months, the inmate was compliant with his medication but was reluctant to attend mental health groups because he did not believe he had a mental illness. His last SRE was completed on February 1, 2013, with an assessment of both "low" chronic risk and acute risk for suicide. Given this inmate's history of serious self-injurious behavior and two drug overdoses, and his placement on a high-risk list, an assessment of "low" chronic risk suicide was dubious. On April 5, 2013, the inmate told his PC, "I don't really see the point in coming to therapy" and requested a change in frequency of their sessions from weekly to every two weeks. On April 8, he asked his psychiatrist to reduce his psychotropic medication. He last saw a mental health clinician on April 13, 2013, the day before his suicide, and appeared "relaxed and comfortable."

Although the CDCR reviewer praised mental health staff for attempting to build "a fragile therapeutic alliance despite his resistance and lack of insight into his condition," the CDCR reviewer noted that "clinicians did not accurately appreciate the lethal potential he presented" by his self-injurious and suicidal behavior, and that "over the last seven months of his life, the clinicians caring for the inmate consistently rated his chronic suicide risk as low or moderate, given these chronic risk factors. Conversations with his clinicians suggested to this reviewer that they put more weight on his denials of suicidality, rather than on his overt behavior." The Suicide Report did not contain any recommendations.

In the **fifth** case (SQ 9), the inmate was found hanging by a sheet from the top bunk of his administrative segregation unit cell during the early afternoon of September 24, 2013. He re-

entered CDCR in May 2013 as a parole violator with a new conviction, for assault with a deadly weapon, which potentially was a third strike, but he was able to plead guilty to a lesser charge to avoid a life sentence and instead received a six-year sentence. The inmate had several prior CDCR confinements. He had previously been at the 3CMS LOC due to self-reported AH and depression. He was previously diagnosed with Schizoaffective Disorder. His most recent CDCR confinement ended when he was released on parole in August 2011.

Upon arrival at the SQ RC in May 2013, the inmate denied any mental health problems and expressed unwillingness to participate in mental health services. On July 1, 2013, while still in the RC, he was accused of drugging and raping his cell mate resulting in his administrative segregation placement. The inmate was seen by a mental health clinician and complained of AH and depression.  He vehemently denied the rape accusation. He was again diagnosed with Schizoaffective Disorder with Cluster B Traits.  He agreed to re-start psychotropic medication and was placed at the 3CMS LOC. Almost immediately, he became noncompliant with his psychotropic medication and generally resistant to mental health treatment.  He frequently refused appointments with his PC or he appeared but invariably asked to be removed from the caseload. Both a treatment plan and an SRE were completed during an IDTT meeting on July 26, 2013.  The treatment plan listed the problem of "mood stability."  The SRE estimated his suicide risk to be both "low" for chronic and acute risk.  It should be noted, however, that the SRE was generally inadequate. There were no inquiries regarding the lethality and date of two previous SAs.  Acute risk factors such as "change in housing," "single cell placement," "recent disciplinary" were all marked "no," even though the inmate had recently been placed in a single cell in the administrative segregation unit following the rape allegation.

During a session with his PC on August 13, 2013, the inmate appeared very upset and was crying during the session, complaining "I've not heard from a family...my fiancé has not written in a month...I feel very depressed, restless, and not eating...I have racing thoughts...I am feeling really bad...I think he might come in and talk about it...I have a back-up plan if he leaves me...I wrote to him all the time for two years when he was in prison...it really hurts me...I haven't learnt to deal with my mental illness but I feel really stressed out right now...."  The inmate continued to refuse to start any psychotropic medication, but agreed to attend the next scheduled appointment with his PC. During a session with his  clinician the following week, on August 20, the progress note stated that the inmate's "mood had improved  from last week," but that "I saw him (the alleged rape victim) sign some papers....I am stressing out what they are….He has placed me in hell, there is homo bashing in there...I can't sleep, they don't give you Trazodone or Benadryl in here, I have racing thoughts...they run rampant...I am reaching out to my family, my mom and sister...I have had no contact for a year...I got a letter from him (fiancé)...he said he was working and moved, but I am now not sure if he is right for me, he put hate in my heart..." The progress note also stated that the clinician would request a medication evaluation.

On August 26, the inmate met with a psychiatrist and again refused psychotropic medication, commenting that he thought sessions with his PC were helpful, and "he gets a lot of benefit from writing things out." On the following day, August 27, the inmate again met with his PC and stated that "he saw the doctor yesterday and refused medication... He said he would see me in three weeks but I think I will be moving on... I hope to get to committee and go back...if not another month it's not going to kill me... I sent my partner a poem for his birthday... I am back

talking to my neighbor we talked it out, I don't want to leave on a bad note, I did that with someone in the county and I still feel bad about it...this is it for me (last spell in prison)... I don't let any man bruise me, this guy just came up to me and hit me, I stabbed him in the park with children around, I had scissors... I don't wear bruises well..." The clinician noted that the inmate's mood was stable.

On September 3, 2003, the inmate met with his PC and appeared very upset at the clinician, stating "... It hurt me all week, you said you would not give me any paper and yet you do XXX for XXX... I just use it to write my racing thoughts... I thought we had an understanding ...you know I am sensitive...I wish to refuse all mental health ducats." The clinician noted that the inmate "expressed benefits from interacting with PC but today expressed the opposite. Pt presentation vacillates from enjoying/accepting services to refusing services and feeling slighted. Pt has poor insight and fair judgment." The inmate was seen briefly at cell front by another clinician the following week, September 12, and was observed as "minimally cooperative, dysphoric mood." The following week, September 17, the inmate met briefly with his PC and stated "I refuse, you know why...I will always refuse...I am okay..." The progress note stated that the inmate "remains stable but is refusing to have office contact with PC. Pt changes his mind easily about interaction."

On the morning of September 24, 2013, the inmate again met with his PC and reported, "I can't think straight anymore, I think I need to go back on my meds...It's like I am going along this road and it forks but I still want to keep going straight...I start a book and can't do it...I went to ICC last week, they are going to hold me for 60 days but I didn't do nothing...I'm tired of being back there...I am taking the Depakote (for seizure disorder), but I think I need to go back on my Geodon." According to the progress note, the inmate's mood was "tearful and emotional." He reported an increase in anxiety and "eluded (*sic*) to thinking about whether to leap or live but has no plan to harm himself or others and able to contract with PC re plan to see MD and discuss other medication....Pt brought up incident from 16 years ago that he feels remorseful for." The progress note also stated that clinician would again request a medication evaluation. The inmate returned to his cell and committed suicide a few hours later.

As described by the CDCR reviewer, the inmate had been experiencing multiple stressors during the last few months of his life that in all likelihood were the precipitants to his suicide. These included placement in the administrative segregation unit pending an investigation of allegedly raping his cellmate, being angry at medical staff after they rescinded his Continuous Positive Airway Pressure (CPAP) machine, describing the administrative segregation unit as "hell" and that there was "homo bashing" directed at him. In addition, he appeared to become increasingly upset regarding the perceived lack of family support and his disintegrating relationship with his fiancé. His overall frustration and anxiety was increasing, and coincided with a recent ICC decision to extend his administrative segregation placement for another 60 days. The Suicide Report contained three bases for recommendations for corrective action through a QIP: (1) the PC failed to complete an SRE on September 24, 2013 after inmate verbalized SI; (2) the inmate was never formally or properly evaluated (i.e., utilizing a mental health evaluation) prior to being placed in 3CMS; and (3) the PC noted that they met with the inmate on July 1, 2013 to initiate a 3CMS LOC but there was no verification that the meeting ever occurred.

It should be noted that there were several other concerns and/or deficiencies noted in this case that were not addressed in the Suicide Report. One was the inadequate and incomplete SRE dated July 26, 2013, discussed above.  Although the CDCR reviewer noted that the inmate was very upset with his PC in late August 2013 for allegedly withholding writing paper, which he had found to be therapeutic, there was no inquiry and/or explanation in the Suicide Report as to whether such writing paper was, in fact, withheld and, if so, why it was withheld.  Review of the weekly Psych Tech Daily Rounds forms during August and September 2013 indicated that the inmate's presentation was consistently stable, with a pleasant mood, affect, cooperative behavior, and few complaints about appetite and sleep. This documentation was in stark contrast to the inmate's increasingly poor mental status, as consistently documented in his PC's progress notes during the same time period, which raised serious questions regarding the veracity of the information on the Psych Tech Daily Rounds forms. This issue was not addressed in the Suicide Report.

In the **sixth** case (SQ 10), the inmate was found hanging by a sheet from the bars of his Condemned Unit cell during the late evening of October 4, 2013. He entered CDCR in January 1999 after being sentenced to death for the murders of two sheriff's deputies.  He had been housed at SQ for his entire confinement. During his almost 15 years in the Condemned Unit, the inmate had only one disciplinary incident. The inmate was placed on the caseload in response to a self-referral for depression in February 2003. He reported becoming increasingly depressed, with periodic crying spells and poor sleep habits. Psychotropic medication was started and he was placed at the 3CMS LOC with a diagnosis of Bipolar Disorder. During the ensuing years, the inmate's mood and irritable behavior was managed with varying medications. He reported occasional SI, but identified his children and mother as protective factors against suicide. The records, however, also reflected that his elderly mother had been in declining health and was moved into assisted living sometime during 2012.  The inmate continued to speak with her frequently by telephone.  He became estranged from his daughter and was in contact with his son only infrequently. The inmate experienced several medical problems, the most acute of which was a painful condition known as geniculate neuralgia, a condition of the facial nerve which causes severe intermittent pain localized in the inner ear. His symptoms were treated with a variety of medications.

At the 3CMS LOC, the inmate was seen by his PC every 90 days. During a session on July 5, 2013, the clinician noted that the inmate had a history of mood instability, paranoia, and depression. The inmate reported that "I'm having problems on the yard. It's complicated, but I'm getting a lot of attitude from them. I don't want to go out anymore. I'm thinking of going to Yard 7." Although the inmate did not present as depressed, the clinician noted that the inmate "did admit to having depressing thoughts at times and stated he does have transient SI with no plan or intent 'about once a month.' Stated he would never harm himself because he cares about his mother and his children.  Talked about relationships with children and he recently spoke to his son, though his daughter has not spoken to him in years....His SI is concerning, however, the protective factors are strong ones." The inmate was referred to "stress management group therapy list for next rotation" and would be seen again by the PC within 90 days. There was no indication in the chart that the inmate was ever assigned to, or participated in, stress management therapy prior to his death.

On September 5, 2013, the inmate met with his psychiatrist.  He was described as increasingly irritable with "crankiness" over the past several weeks. His psychotropic medication was increased and he was scheduled to be seen again in 60 to 90 days. The inmate was seen again by his PC on September 17, 2013 and was observed to be exhibiting both paranoia and irritability. He stated "I don't have anything to say. I don't want to talk to you. I don't like your agenda. I'm not going to talk about that. I don't want to talk to you ever again. I don't like you mental health people." Although denying any SI, the inmate continued to be irritable and somewhat hostile. His case was discussed later that day with the treatment team, including the psychiatrist, who "plans to see patient."  The team decided "to maintain PC at this time as his desire to speak with clinician may be attributable to increase in paranoia, which is what it looks like .... Follow by psychiatry per plan this morning." This was the last contact with a mental health provider prior to his death on October 4, 2013.

The CDCR reviewer did not offer any precipitating factors for the inmate suicide, nor did the Suicide Report contain any recommendations/corrective actions for this case. There were, however, several areas of concern that should have been addressed in the Suicide Report. First, the two most recent encounters with the inmate's PC, on July 5 and September 17, 2013 were characterized by the inmate's increased irritability and increased paranoia. Although the dosages of his medications were increased when seen by the psychiatrist on September 5, there was no discussion in the record regarding a possible elevation in LOC and/or frequency of contact by clinical staff. Second, although the PC stated on September 17 that the case was discussed with the psychiatrist, who "plans to see the patient," there was no record that the inmate was seen by the psychiatrist prior to his death three weeks later on October 4. Third, although the PC stated in the July 2013 progress note that the inmate would be referred to stress management therapy, there was no indication that the inmate was referred and/or participated in such therapy. Fourth, although the inmate consistently denied any SI throughout his confinement during administration of SREs, he self-reported in July 2013 that he experienced SI "about once a month."  Although the clinician noted that the SI was "concerning," it was offset by the strong protective factors of his children and his mother. However, these protective factors may not have been as strong as they appeared. For example, although the record reflected a strong relationship with his elderly mother, he appeared to be estranged from both children. Regardless, the inmate had not had an SRE completed since March 2013 and, given his self-reporting of monthly SI and his increasing irritability and paranoia, the CDCR reviewer failed to raise the issue of whether completion of at least one additional SRE was appropriate. It was unclear why these multiple issues were not raised during the CDCR review.

In the **seventh** case (SQ 11), the inmate was observed jumping from the fourth tier railing of his GP housing unit during the early morning of January 21, 2014.  He sustained severe injuries, including a traumatic brain injury.  He was pronounced dead in the hospital the following day, January 22. The inmate entered CDCR in December 1985 to serve a 40-year to life sentence for the murders of his girlfriend and her six-year-old son. He had been at SQ since June 26, 2013. He arrived with his cellmate from RJD and, although they had requested to be housed together, they were assigned to different housing units and remained friends.

Although the inmate did not report any history of mental illness in the community, he began to receive mental health services for depression shortly after entering CDCR in 1985. His

depressive symptoms increased to a point where he was transferred to ASH in February 1987 where he remained for almost five years, returning to CDCR in 1992. While at ASH, he received treatment for "depression, SI, rageful thinking, homicidal fantasies involving his mother and women who looked like his mother, and substance abuse." He returned to CDCR with a diagnosis of Major Depressive Disorder.

According to reports, the inmate programmed well over the course of more than 20 years following his return from ASH, holding down a job and avoiding disciplinary problems. Although he had reported several prior SAs in the community, and was noted to have requested the death penalty for the instant offense in 1985, records did not indicate any instances of suicidal behavior during his CDCR confinement.  At the time of his death, the inmate was at the 3CMS LOC.  The records also indicated episodic periods of depression accompanied by SI and "vague homicidal ideation (HI)." His behavior began to de-escalate upon his transfer to SQ in June 2013 and the denial by custody officials of his request to be housed with his cellmate from RJD.  On July 1, 2013, he requested discontinuance of the psychotropic medication and removal from 3CMS. A few months later, in September 2013, he was briefly placed in administrative segregation because of refusing to move from a lower bunk to an upper bunk. This signified his first RVR in almost 30 years of incarceration. He began to regularly complain to his PC about conditions at SQ, including ability to share a cell with his previous cellmate, sanitary conditions, noise, and boredom in his job. He began to request a prison transfer.

On October 2, 2013, his PC received notification that the inmate had told his former RJD cellmate that he was considering committing suicide by jumping off the housing tier. The inmate was seen by his PC the following day and reported being "very depressed.... Did think about jumping, but briefly and no longer feels that way." He again complained about the conditions at SQ and the "difficulty getting into programs." The inmate also told the clinician that if he were not transferred, he "might get desperate." He was seen again by his PC on October 11, and then the following week, on October 16, by a psychiatrist who noted "vague references to thoughts of self-harm and being tired of life." He told the psychiatrist, "I despise this place." A diagnosis of Bipolar Disorder with Depression was reconfirmed. During a session with his PC on October 25, the inmate admitted to experiencing "periods of thinking he might be better off dead" and continued to feel "sad." During his IDTT meeting on October 31, the inmate was observed to be "close to tears" and admitted to "feelings of hopelessness." The inmate was preparing for his upcoming parole hearing in March 2014, and hoped to at least be transferred to another CDCR prison. As part of the IDTT meeting, the PC completed an SRE which indicated both "moderate" chronic and acute risk for suicide. The "moderate" acute risk for suicide was based on positive responses for recent SI, current depression, hopelessness/helplessness, and recent change in housing. The inmate reported only a few protective factors.  The mental status portion of the document simply stated "depressive feeling discouraged being in SQ  - once transfer and obsessing regarding it." The treatment plan section of the SRE simply stated, "CCCMS, PC contact."

Although the PC had noted on the October 25 progress note that the inmate would be seen the following month, he was not seen again until December 20, 2013. It was noteworthy that the chart contained a CDCR Form7362 Health Care Services Request from the inmate, dated November 28, 2013, and signed by the PC as having seen the inmate on December 20, 2013.

The form was stamped as received by medical records on December 23, 2013, three days after that appointment took place. There was no indication as to when the PC received this request. During the December 20 session with the inmate, the PC noted that the "IM is coping better with SQ, and appeared to be in a better mood. Seems this is because he sees that the possibility of transfer to another prison as possible, and says he can be patient with it for a few months. Has a board meeting in March and knows he cannot ask for transfer until after that, will make the request after the date." Although the clinician noted that the inmate's "affect was sad, and significantly depressed over being in SQ, and having to deal with many stressors, but depression over this has improved.... No SI, intent, or plans." A follow-up session was scheduled for two months later, but the inmate committed suicide the following month.

The CDCR reviewer found numerous deficiencies in the case, including: (1) there was sparse documentation and no written referral generated by the clinician who received information that the inmate was contemplating jumping off the tier on October 2, 2013; (2) although the PC received notification that the inmate was very depressed and contemplated jumping off the tier on October 2, 2013, the inmate was not immediately placed on any suicide observation status nor seen by the clinician until the following day; (3) an SRE was not completed as required on October 3 as a result of the referral that the inmate was suicidal; (4) the PC noted in a progress note dated October 25, 2013 that the inmate would be seen again in one month, but was not seen for almost two months following that session; (5) the SRE completed on October 31, 2013 was problematic, including an inadequate plan to reduce risk by stating simply "CCCMS, PC contact"; (6) the medical chart was unclear as to when medical/mental health staff received the inmate's Health Care Services Request Form dated November 20, 2013 stating "I need to see doctor. I need some help. Please schedule me." The PC saw the inmate on December 20, well outside the timeline for mental health referrals; and (7) given the inmate's mental status at the IDTT meeting on October 31, 2013, which included appearing "very depressed," "close to tears," "looks downward," and has "poor" insight and judgment, coupled with a diagnosis of Bipolar Disorder, Most Recent Episode Depressed, Moderate," there was no mention in the record of consideration of a higher LOC or details on how the depressive symptoms were going to be treated.

Despite all of the above identified deficiencies in mental health services provided in this case, the corrective action contained in the Suicide Report was focused on only one recommendation: to provide SRE mentor training to the inmate's PC.

In the **eighth** case (SQ 12), the inmate was found hanging by a sheet from the bars of his administrative segregation unit cell during the early morning of May 22, 2014. He entered CDCR on February 27, 2014 to serve a nine-year sentence for attempted murder. He had been at SQ for his entire confinement, and was transferred to the administrative segregation unit on April 4 due to safety concerns, following a fight with another inmate of different ethnicity. A transfer to SNY was pending. Although the inmate reported a history of substance abuse, he did not have a history of mental illness in the community. However, during a competency evaluation related to the instant offense, he was briefly found incompetent to stand trial based on possible cognitive problems. He was also believed to be "feigning psychiatric and memory impairment.....and might exhibit malingering behaviors in the future." There was brief reference in the inmate's county jail records that he had a "history of SI," but no indication of a timeframe.

The inmate reported family support and denied any gang involvement during his brief CDCR confinement.

Following his placement in the administrative segregation unit on April 2, the inmate was referred to mental health, based upon a positive mental health screening.  He was seen by a psychiatrist on April 10. The psychiatric note indicated that although the inmate was self-reporting AH, there did not appear to be any evidence of such. Nonetheless, the psychiatrist's provisional diagnosis was Psychotic Disorder NOS. Several days later on April 15, the inmate was seen by another clinician who completed a Mental Health Evaluation based upon a referral for possible "thought disorder" and "suicidality." Although the inmate was thought to be possibly malingering, it was recommended that he be placed on the caseload at the 3CMS LOC. This clinician's diagnosis was Adjustment Disorder, depressed type. An SRE was  completed and showed both "low" moderate and acute risk for suicide. The SRE treatment plan goal was to provide "weekly individual treatment to address stressors and determine whether malingering or if reports of psychotic sx are genuine."

The inmate was seen by his PC on April 21, April 23, May 5, and May 12, 2014. Although the PC told the CDCR reviewer that the inmate was seen on May 19, there was no documentation of this alleged session found in the eUHR. In the April 21 progress note, the clinician stated that the inmate "Inconsistently reports intermittent SI, ideas of reference and AH while also denying that he has these experiences any longer." On April 23, the inmate attended his IDTT meeting and was given a diagnosis of Psychotic Disorder NOS, R/O Malingering. The May 5 progress note indicated that he denied any SI and "reports some paranoid about the well-being of his family. Reports intermittent SI." The last progress note, dated May 12, indicated that the inmate denied any current SI and "continues to present inconsistently sometimes stating intermittent SI, delusions of his mother having sex with inmates, his family being under threat if he doesn't kill himself, having spirits in his body and no brain in his head. IP's statements do not match affect which is often playful and smiling.....IP may be malingering for secondary benefits of seeking meds. IP gave verbal contract for safety...."

The CDCR reviewer did not offer any specific precipitating factors for this suicide, noting that the inmate did not leave a suicide note.  The CDCR reviewer theorized that the death "was most likely influenced by an underlying depressive, paranoid, possibly psychotic process resulting in an impulsive act on his life."

The reviewer raised two concerns regarding mental health services: (1) Documentation in the record frequently mentioned the inmate's "intermittent suicidality" and "intermittent SI," without further detail.  "Documentation of SI should provide more depth, including details of any difficulty elucidating information from the inmate about reported ideation;" and (2) The PC's purported last session with the inmate on May 19 was not available for review in the eUHR, and the "missing progress note calls into question the timely filing of healthcare information into the eUHR."

It remained unclear why the CDCR reviewer's above concerns did not result in formal recommendations for corrective action in the Suicide Report, including the fact that the alleged May 19 progress note that was thought to be "untimely" filed was still not accounted for as of

July 3, 2014, the issuance date of the Suicide Report. It would have been reasonable to offer a recommendation calling for further inquiry regarding whether in fact there ever was a progress note for that date. Further, the Suicide Report did <u>not</u> address the clinician's assessment of the inmate's acute risk for suicide as "low" on the SRE dated April 15, 2014.  This assessment was questionable, given the "intermittent SI," single cell placement, safety concerns (which were incorrectly listed as "none" on the form) which prompted the administrative segregation placement, current/recent psychotic symptoms, and increasing interpersonal isolation. In addition, it fell short of the standard of care for the clinician to engage in a "verbal contract for safety" with the inmate during their session on May 12, 2014.

In sum, it  is noteworthy that four of the eight suicides that occurred at SQ from 2012 to 2014 were in the Condemned Unit. According to mental health staff, despite its uniqueness, the Condemned Unit is run much like any other mainline housing unit.  Given the high incidence of suicides in the Condemned Unit, it was problematic that psych tech rounds occurred only twice per month and that correctional staff were only required to conduct rounds at 60-minute intervals that were not recorded in any logbook. The issue of custody rounds was addressed in May 2014 with issuance of a DAI memorandum requiring Guard One rounds in the Condemned Unit. Beginning on June 16, 2014, observation at 30-minute intervals was required in the Condemned Units.  It was also noteworthy that there were <u>no</u> recommendations offered within any of the CDCR reviews of the four suicides by condemned inmates.

## 12)    California Men's Colony (CMC)

**Inspection**: February 4-5, 2014

CMC housed 4,771 inmates, most of whom were at Level III security classification. A new 50-bed MHCB unit was opened in August 2013.  An administrative segregation unit housed caseload and non-caseload inmates. The administrative segregation unit also contained 16 retrofitted cells that were used to house newly admitted inmates during their first 72 hours in the unit.  These could be used for temporary alternative housing of inmates requiring an MHCB. Twenty-nine percent of CMC inmates were on the caseload, with 740 3CMS and 659 EOPs.

**Screening/Assessment**: The intake screening process on a new admission was observed on February 4.  The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the R & R Unit. The Nurse's Office provided sufficient privacy and confidentiality, but a CO was stationed inside the room, and the door, which had a large glass window, remained open. Despite the compromised privacy and confidentiality, the nurse asked all of the required intake screening questions.

Daily psych tech rounds by two psych techs assigned to the administrative segregation unit were observed on February 4 and 5. The two psych techs employed differing practices.  One of the psych techs, who had started work at the prison in November 2013, carried the Psych Tech Daily Rounds Forms with her and completed them for caseload inmates as the rounds were conducted. The other psych tech, who had been at the prison for several years, completed the Psych Tech Daily Rounds Forms on EOP inmates after the rounds were completed.  This psych tech suggested to this reviewer that it would be distracting to the inmate if time were taken to fill out

each form while at the cell, which would interrupt continuous eye contact during the psych tech-inmate interaction. As found in almost all of the other prisons, this psych tech's practice of deferring completion of the Psych Tech Daily Rounds Forms on caseload inmates until after rounds were completed raised questions concerning the reliability of the documentation, as it would be unreasonable to expect the psych tech to remember the mental status of each of the approximately 65 EOP inmates housed in the unit after rounds had concluded.

**Housing**: All of the MHCB cells were suicide-resistant and furnished with suicide-resistant beds. Unlike the other facilities  examined by this reviewer, there were no newly admitted inmates within their initial 72 hours in administrative segregation who were housed in non-retrofitted cells. In fact, all of the new intake cells were empty and the census of the administrative segregation unit was low during this period.

**Observation**: Although the CMC's LOP on suicide prevention  contained an "observation status" requiring supervision at 30-minute intervals for non-suicidal patients, in practice all inmates designated for an MHCB were required to be observed at Q-15 minutes unless they were on Suicide Watch and received constant observation. The prison's "Suicide Watch/Suicide Precaution Record" contained 15-minute pre-printed time intervals, which is inconsistent with *Program Guide* requirement for observation at *staggered* intervals not to exceed 15 minutes. After discussion with the CMH, the  observation form was replaced.

Guard One data on custody 30-minute checks on inmates during their first 21 days in administrative segregation was reviewed.  The compliance rate was 97 percent during the 24-hour period of February 3, 2014. Review of administrative segregation unit logs indicated that 30-minute rounds of inmates in non-intake cells were documented as required.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation status and of inmates referred to mental health on an urgent and/or emergent basis were reviewed. Inmates on suicide observation status were consistently seen daily by clinical staff while on suicide observation status.  Inmates referred to mental health were consistently seen on a timely basis. However, there were some problems, primarily with treatment planning.

In the first case (CMC 1), a 3CMS inmate housed in the administrative segregation unit was seen cell-front on a weekly basis by his PC during December 2013 and January 2014.  Progress notes indicated that he consistently complained of a poor appetite and poor sleeping.  He was showing increasing agitation, indifferent hygiene, racing thoughts, labile mood, and refused to take his psychotropic medication. During this same period, the weekly Psych Tech Daily Rounds forms completed by psych techs indicated that this inmate's presentation was consistently stable, with a pleasant mood, affect, and cooperative behavior. These forms did not contain any complaints about appetite and sleep, nor noncompliance with medication. This content is in stark contrast to the consistent documentation of this inmate's behavior in his PC's progress notes, raising serious questions about the reliability and veracity of the information entered on the Psych Tech Daily Rounds forms.

In another case (CMC 2), the inmate was admitted to an MHCB several times during December 2013 for SI. He had an extensive history of self-injurious and suicidal behavior, including

hanging and cutting, and a recent DSH placement ten months earlier. The inmate was assessed as being at "high" chronic risk for suicide. On December 10, 2013, an MHCB discharge SRE was completed.  The entirety of the treatment plan was: "DC to EOP LOC: 1."

In another reviewed case (CMC 3), the inmate was placed in an MHCB on December 19, 2013, after "cutting his wrist out of anger and frustration" while housed in the administrative segregation unit.  He had a history of depression and prior MHCB placements for SI. The inmate's treatment plan identified the problems of "SI and depression," with the goal being to "eliminate SI, decrease frustration and depression." The inmate remained in an MHCB until December 31, 2013, when the discharge SRE listed the following treatment plan: "D/C CTC, Return to ASU, 5-Day FU, and no psych. Rx." Review of the inmate's five-day follow-up forms suggested no effort at treatment planning to reduce his SI.

It should be noted that a quarterly audit of SREs conducted by a CMC health program specialist in January 2014 corroborated this reviewer's assessment of treatment planning, finding low levels of compliance with plans that consistently addressed strategies to reduce suicidal behavior.

**Intervention**: Housing units examined by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR.  Consistent with *Program Guide* requirements, custody, medical, and mental health staff received annual suicide prevention training, with compliance rates over 90 percent for 2013. Ninety percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: Although CMC had eight inmate suicides during 2010 and 2011, it had no suicides since December 2011.  The SPRFIT was active in its suicide prevention role.  It developed several local strategies to reduce the incidence of inmate suicide. It established a walk-in clinic in the GP yards as a way to establish better communication between the inmate population and mental health staff, and offered inmates an opportunity to express concerns and need for assistance. In addition, placards listing warning signs of suicidal behavior and mental health contact information were posted in family and attorney visiting rooms.  A 13-minute DVD on suicide prevention was developed entirely by an inmate advisory group in July 2011.  It educated the larger inmate population on the warning signs and risk factors for suicide and encouraged inmates to seek assistance whenever they and/or a peer they observed were struggling with depression and suicidal thoughts.

Compared to the other prisons examined by this reviewer, CMC overall had a more than adequate suicide prevention program.

13)    **Salinas Valley State Prison (SVSP)**

**Inspection**: February 6-7, 2014

SVSP housed 3,361 inmates, including  226 patients in the SVPP program run by DSH.   The majority of SVSP inmates were at Level IV classification.  SVSP had a 22-bed CTC, with ten designated MHCBs and four alternative housing cells in the CTC to temporarily house suicidal inmates prior to transfer to an MHCB.  There were four administrative segregation units for caseload and non-caseload inmates.  Thirty-four percent of SVSP inmates were on the mental health caseload.  There were 1,142 3CMS and 354 EOP inmates.

**Screening/Assessment**:  Intake screening at SVSP was not observed because there were no new admissions during the site visit.  However, daily psych tech rounds in administrative segregation unit D-2 were observed on February 7.  The rounds were unremarkable and the psych tech completed the Psych Tech Daily Rounds Form for all caseload inmates.  The psych tech reported that she had been instructed to complete the Forms at cell-front that week and had been reluctantly complying with the directive.  Under the previous practice, Forms were completed following round completion.

**Housing**:  All CTC rooms were clean, suicide-resistant, and furnished with suicide-resistant beds.  However, the four alternative housing cells were <u>not</u> suicide-resistant and contained protrusions, including handicapped railings and privacy barriers that obscured observation of the toilet, that were conducive to a SA by hanging.

The four administrative segregation units had a total of 20 new intake cells that had been retrofitted to be suicide-resistant; the only exception was administrative segregation unit Z-9, where the holes in the wall ventilation grates were too large.  However, there were several problematic issues concerning the housing of newly admitted inmates in administrative segregation.  Specifically, not all inmates within their first 72 hours of administrative segregation housing were in retrofitted cells, while not all retrofitted cells housed newly admitted inmates.  In fact, at least nine inmates housed in administrative segregation for 72 hours or less were assigned to unsafe cells; among them was at least one caseload inmate.

**Observation**:  Four inmates were on Suicide Precaution in CTC alternative housing cells on February 6, the day before the site visit, receiving checks at 15-minute intervals.  Because these inmates were housed in unsafe cells, continuous observation was required.  MHCB inmates were on a staggered Q-15 minute level of observation, unless they were on Suicide Watch and received continuous observation.  The Observation Record Form used to document observation of inmates on Suicide Precaution contained pre-printed 15-minute time intervals that were contrary to the *Program Guide* requirement of observation at staggered intervals not exceeding 15 minutes.  It was also reported that budget concerns had resulted in mental health clinicians <u>not</u> authorizing the use of Suicide Watch in the CTC until March 2013, when the CDCR regional director for mental health discovered the violation and instituted corrective action.

Several IDTT meetings in the CTC were observed on February 6, 2014; one was particularly troublesome.  The inmate (<u>SVSP 1</u>) was admitted to the MHCB on January 27 after expressing

65

SI and was placed on Suicide Precaution. During the February 6 IDTT meeting, he was upset, angry, frustrated, and tearful. There appeared to be several ongoing stressors in his life, including an upcoming murder trial and a potential "third strike." His PC explained that his frustration tolerance was low, while the inmate reported "that he did not think he could trust himself to be safe." During the prior few days, he had refused out-of-cell contacts and staff reported that he appeared severely depressed, frequently tearful, and continued to endorse feelings of hopelessness. The IDTT meeting recommended a DSH referral with continued observation on Suicide Precaution. At the end of the IDTT meeting, however, the CDCR regional mental health administrator and the CDCR chief of clinical support, both of whom had attended the IDTT meeting, spoke briefly with the PC and convinced her to upgrade the inmate's status to Suicide Watch. Due to concern with the inmate's safety, the reviewer returned to the MCHB on the morning of February 7 to check on the inmate's observation status. The inmate was neither on Suicide Watch nor Suicide Precaution. Corrective action was subsequently initiated.

Review of unit logs for all four administrative segregation units as to documentation of 30-minute welfare checks of non-intake cells revealed that welfare checks were not being performed nor documented. Review of Guard One data to verify observation of new intake inmates housed in administrative segregation for 21 days or less indicated 97 percent compliance for January 6, 2014.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis revealed that clinical staff consistently saw inmates daily while on suicide observation, and inmates referred to mental health were generally seen timely. However, other matters were problematic.

The eUHR examination revealed several charts where the only document used to provide clinical justification for MHCB discharge was the Mental Health Crisis Bed Discharge Summary Form. Because this Form lacked a treatment plan section and SREs were not completed at discharge, these inmates did not have a treatment plan at discharge.

There were also concerns as to the quality of SREs completed as a result of emergency mental health referrals for SI. The charts of 14 inmates who had recently received emergency mental health referrals for SI were reviewed. All of these inmates were initially placed on Suicide Precaution in alternative housing, including the four on February 6 as indicated above, and were referred to a mental health clinician for assessment. SREs were completed for 12 of the 14 inmates. In one (SVSP 2) of the two cases where an SRE was not completed, the clinician's progress note reported that the caseload inmate was having difficulties with his cellmate and expressed SI. The clinician noted that the "patient was tearful throughout session and stated that he will 'get suicidal' if he is not moved to ad. seg." The clinician conferred with the correctional sergeant and the plan was that the "patient will be transferred to ad. seg. in an effort to ensure safety. Patient will continue to receive mental health services." In essence, the inmate was removed from Suicide Precaution in an alternative housing cell and relocated to administrative segregation and placed on 24-hour observation; this consisted of 60-minute rounds by custody staff.

Only four of the 12 cases where SREs were completed resulted in MHCB admission.  The remaining eight inmates were discharged from Suicide Precaution and returned to their original housing units from alternative housing, often with a plan for five-day follow-up mental health assessments and 24-hour, 60-minute custody checks; SVSP clinicians apparently believed these were an acceptable alternative to MHCB admission.  Several of these inmates continued to express SI, albeit some conditionally based on their attempt to drive their housing placement.

Mental health staff completing SREs also set high thresholds for placing inmates on suicide observation.  In one case (SVSP 3), the inmate was placed on Suicide Precaution in a CTC alternative housing cell during the evening of February 5, 2014 after expressing SI in administrative segregation.  This EOP inmate, who had a *Keyhea* order and a prior history of self-injurious behavior, was seen early the next morning on February 6.  Despite several acute risk factors, including SI, he was assessed at "low" acute suicide risk because he was informed that he "was being considered for a referral to DSH."  The inmate was discharged from Suicide Precaution, with a plan "to be returned to yard housing to his EOP clinician on the yard for follow-up with 5-day mental health follow-ups and 24-hour custody checks."  However, he was returned to administrative segregation, which was the housing unit from which he came before arriving at CTC alternative housing.  The reviewer's visit to administrative segregation on February 7 to examine documentation ordering the 24-hour custody checks revealed that custody never received the order and the inmate had <u>not</u> been observed as expected by mental health.

In another case (SVSP 4), the inmate was in an MHCB from December 14 through 16, 2013.  He was at the EOP LOC and was previously admitted to the CTC in August 2013 for the suicidal gesture of cutting his right wrist with a razor, which required suturing.  His updated MHTP was completed following MHCB discharge on December 19, 2013, but it did not include any reference to, or plan for, addressing self-injurious and/or suicidal behavior.

Other concerns with SREs and treatment planning documentation by SVSP clinicians will be discussed in the "Recent Suicides" section.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records did not indicate the percentage of custody staff that had CPR certification, but approximately 100 percent of nursing staff were certified.  Ninety-seven percent of custody staff was compliant with annual suicide prevention training.  Contrary to preferred practices, psych techs, and not qualified mental health clinicians, presented most training workshops.  Medical and mental health staff did not receive annual suicide prevention training during 2013.  The percentage of mental health clinicians who received the seven-hour SRE training in March 2013 and completed the mentoring program was unknown.  As SVSP had ten inmate suicides during 2012-2014, the lack of annual suicide prevention training for non-custody staff was problematic.

**Recent Suicides**:  SVSP had ten inmate suicides from 2012-2014.  In the **first** case (SVSP 5), the inmate was found hanging by a sheet from a ventilation grate of his administrative segregation cell on March 20, 2012.  He had entered CDCR in April 2005 to serve a nine-year

parole violation term for residential burglary.  In January 2009, he received an additional three-year term for drug possession.  He was transferred to SVSP in May 2010.  He had been at the 3CMS LOC since 2002 and had at least five previous MHCB and OHU admissions for SI and self-injurious behaviors.  He also had multiple RVRs during the past four years; the most recent involved a February 22, 2012 assault on another inmate and led to his administrative segregation placement.

On March 14, six days before his suicide, the inmate allegedly attempted to hang himself, but was stopped by his cellmate and subsequently referred to a clinician.  An SRE was completed; the inmate continued to express SI with a plan to hang himself.  He was referred for MHCB admission.  Upon arrival at the MHCB, clinicians assessed him.  He reported no longer feeling suicidal and described the SA as "stupid."  He also stated that "I felt better before I got here."  Although clinicians were aware that he had allegedly attempted suicide, they neither consulted with the referring clinician nor reviewed the initial SRE.  The clinician completing the SRE  had not identified <u>any</u> acute risk factors and had assessed the inmate as a "low" acute suicide risk.  On March 15, less than 24 hours after the MHCB admission, the inmate was discharged.  Five-day follow-up was completed and he did not voice further SI.  However, on the fourth and fifth days of follow-up, he was agitated and stressed that his wife had missed her scheduled visit; he reported increased sadness, crying, and anxiety.  Despite these behaviors, no further mental health intervention was provided.  The inmate committed suicide on March 20.

The CDCR reviewer provided an insightful clinical critique of the case and stated in the Suicide Report that:

> This case demonstrates the importance of obtaining first-hand information about an individual referred for a mental health evaluation for admission to the CTC.  For example, information from an officer would identify the inmate-patient as being suicidal would have been helpful.  In addition, had the CTC clinicians been aware of the PC's findings and specifically the inmate-patient statements, they would have had valuable information to complete their assessment.  The inmate-patient informed the PC he wanted to die and was upset that the cellmate intervened in his plan to kill himself.  The inmate- patient presented differently at the CTC.  The clinicians could have questioned him about his sudden change if they had access to the earlier information.  His statements about wanting to die could have influenced the CTC clinicians to admit him.  In addition, suicide is often a process with a beginning and an end.  His suicidal behavior on March 14, 2012 suggested that he had been thinking about taking his life and the fact that he was stopped did not necessarily mean that his problems have been resolved and that he no longer wished to die.  This makes it important to discuss the origins of the suicidal behavior and to use the 5-day follow-up sessions to closely examine the crisis and work towards a resolution of the stress causing the suicidal thoughts.

The Suicide Report contained one basis for recommendation for corrective action through a QIP: (1) all mental health clinicians involved in the inmate's case enter the Proctor-Mentor Program to improve the quality of SREs completed by mental health clinicians.

In the **second** case (SVSP 6), the inmate was found hanging by a sheet from the upper bunk of his GP cell on August 12, 2012.  He had entered CDCR in May 2011 to serve a 30-year-to-life sentence for his girlfriend's murder.  Upon admission, he reported anxiety, insomnia, and depression, and was placed at the 3CMS LOC with a diagnosis of Bipolar Disorder.  The diagnosis was changed to Adjustment Disorder upon arrival at SVSP in October 2011.  Two months later, on December 7, 2011, he was placed on Suicide Precaution for 24 hours after expressing SI.  In May 2012, he was removed from the caseload after refusing mental health services and psychotropic medication for six months as a result of peer pressure.

The CDCR reviewer identified several chronic risk factors and possible precipitating factors to the inmate's suicide.  Among them were his grandmother's death in July 2012 and his father's recent cancer diagnosis.  His suicidal behavior history included SI prior to his CDCR confinement, a non-verified SA upon CDCR admission in May 2011, and his brief placement on Suicide Precaution in December 2011 after expressing SI.  The inmate also told his probation officer in 2011 that "I wish I could get the death penalty but only if they could do it (execute him) in six months to a year;" he remained remorseful for killing his girlfriend.  The reviewer noted that:

> during this review, as in others at other facilities, is the poor inter-relator reliability of the SRE and the reluctance of clinicians to classify an inmate a moderate or high risk even when the data clearly show numerous chronic risk factors.  In this inmate's case, the multiple chronic risk factors were correctly identified but because he denied a history of SI or attempts the clinician rated him low.  More training appears to be needed.

The Suicide Report contained one basis for recommendation for corrective action through a QIP:  (1) development of a Proctor-Mentor Program at SVSP to improve the quality of SREs completed by mental health clinicians.

In the **third** case (SVSP 7), the inmate was found hanging by a sheet from the upper bunk of his administrative segregation cell on September 17, 2012.  He had re-entered CDCR for the fifth time in March 2004 to serve a 21-year term for assault with serious injury.  He was transferred to SVSP in July 2009.  He had been at the 3CMS LOC since 2005 due to stress and long-term imprisonment.  He had various medical problems, including arthroscopic knee surgery and Hepatitis C.  On July 6, 2012, he was involved in a fight with another inmate and placed in administrative segregation due to enemy concerns.  Four days later, he was seen by a mental health clinician after CDCR received a letter from the Prison Law Office alleging that he had been the victim of a gang rape on July 3.  Upon being assessed, the inmate reported being raped and expressed SI.  He was tearful, hopeless, helpless, sad, anxious, and fearful.  He was referred to the CTC and placed on Suicide Precaution in an alternative housing cell pending MHCB admission.  He was also seen by a psychiatrist, who changed his medication.

On July 11, the following day, another psychiatrist saw the inmate and completed an SRE which stated that he was at "low" acute risk for suicide because he denied any SI, intent, or plan.  He was discharged from Suicide Precaution and cleared to return to administrative segregation with

a five-day mental health follow-up.  In addition to these follow-up assessments, the PC saw him on a regular basis.  Progress notes indicated treatment related to sexual assault issues and coping strategies for dealing with stress, depression, and anger.  The inmate was compliant with his psychotropic medication.  He was seen by his PC on August 23 and was "still discouraged by lack of response to allegations of assault. Stated that his mood has been depressed and that he has been oversleeping."

The inmate was seen again on August 27 and September 13, but denied any acute mental health problems, including SI.  He received arthroscopic knee surgery on August 29; the sutures were removed on September 11.  He also periodically complained that the pain medication was not completely effective.  He filed complaints against a SVSP physician for discontinuing his surgeon's pain medication order and against SVSP custody officials concerning their investigation of his alleged sexual assault.

The CDCR reviewer offered several precipitating factors to the suicide based on personal letters found in the inmate's cell following his death.  These factors included increased depression due to his alleged sexual assault, fear of continued retaliation following administrative segregation release, and frustration with continued pain following knee surgery and inadequate medication dosages to manage the pain.  The Suicide Report contained four bases for recommendations for corrective action through a QIP:  (1) the adequacy of the investigation and apparent violation of PREA protocol concerning the inmate's sexual assault allegation; (2) custody staff's mishandling of the PLO letter; (3) discontinuation of a mood stabilizing psychotropic medication on July 10 without written clinical justification; and (4) review of the inmate's prescribed pain medication protocol.

Although not related to the proximate cause of his death, there was another concern that the CDCR reviewer did **not** identify.  This concern was with the adequacy of the SRE that the psychiatrist completed on July 11, 2012.  This SRE assessed the inmate at "low" acute risk of suicide, because he denied SI, despite the abundance of other acute risk factors.

In the **fourth** case (SVSP 8), the inmate was found hanging by a sheet from the ventilation grate of his administrative segregation cell on October 25, 2012.  He had entered CDCR in September 1984 to serve a 17-year-to-life sentence for a gang-related, second-degree murder.  He was not a caseload inmate.  His medical history included Hepatitis C and chronic pain from both a degenerative disc in his back and a gunshot wound.  He had a significant history of gang involvement within CDCR, but left gang activity in 2001 and was reclassified to a SNY.  His last RVR was in 2003.

On October 20, 2012, the inmate reported a safety concern and was re-housed in administrative segregation.  The following day, he allegedly took too much methamphetamine and was sent to the emergency room for treatment.  When he returned to the institution on October 22, he was sent to the CTC pending a mental health evaluation.  An SRE was subsequently completed; the inmate denied SI and indicated that the methamphetamine overdose was not related to suicidal behavior.  The clinician assessed him at both "low" chronic and acute suicide risk.  The inmate was returned to administrative segregation.  During the next few days, he displayed bizarre behavior, his cell was in disarray, and he was heard saying "I feel like crap," complaining of

nausea and vomiting.  He also began to refuse medication to treat his Hepatitis C and other medical treatment.  On October 23, he suggested to a psych tech that "I want help but don't trust anyone."  Mental health continued to see him daily, including the morning of his death on October 25.  Although the inmate continued to deny SI, staff was concerned about his behavior.

The CDCR reviewer offered one possible precipitating factor to the suicide; the likelihood that the inmate would receive an RVR for his methamphetamine overdose that would jeopardize his possibility of paroling in July 2013.  The CDCR reviewer also opined that the inmate likely "developed an acute, drug-induced psychotic disorder (from his methamphetamine overdose) that was not diagnosed by SVSP clinicians."  The Suicide Report contained four bases for recommendations for corrective action through a QIP:  (1) the clinician who conducted the SRE on October 22 did not gather correctional and medical information; as such, there was a lack of awareness of the inmate's administrative segregation housing for safety concerns and the likelihood that he would be denied parole due to his methamphetamine use.  The clinician also did not communicate with available staff, resulting in the failure to identify all risk factors; (2) the administrative segregation clinician failed to identify an acute drug-induced psychotic disorder in the inmate upon his return to the unit; (3) there was no documentation from medical providers regarding an inquiry as to how much methamphetamine the inmate ingested and/or swallowed; and (4) the psych tech conducting administrative segregation  rounds on October 23 did not initiate a mental health referral when the inmate stated "I want help but don't trust anyone."

In the **fifth** case (SVSP 9), the inmate was found to have asphyxiated himself with a shoelace in his GP cell on November 20, 2012.  He had entered CDCR in October 1994 to serve a four-year term for assaulting peace officers, namely, a CYA teacher and medical technician.  While in prison, he committed four more felonies that added more than 15 years to his sentence.  He had been scheduled for parole on December 11, 2012 and, as an undocumented alien, anticipated deportation to Mexico following CDCR release.  However, on October 27, 2012, he was informed that he had been certified as a Mentally Disordered Offender and would be paroled directly to ASH.  The inmate had over 27 RVRs, many of which were for assault, resulting in single-cell housing.  His most recent assault occurred on October 11, 2012, leading to another RVR and a revised parole date of December 11, 2012.

The inmate was transferred to SVSP in January 2009 and was at  EOP LOC.  He had multiple DSH and MHCB admissions.  His most recent diagnosis was Schizoaffective Disorder and he had a *Keyhea* order since 2004.  According to the CDCR reviewer, the inmate's:

> psychiatric symptoms were described as visual and AH, rambling or tangential
> speech, poor impulse control (hitting, kicking, and spitting at staff), poor hygiene
> and grooming, anger, agitation, smearing feces, confusion,
> refusal to eat, and lack of insight into his mental illness.  He frequently asserted
> that his psychiatric medications were causing his AH.  Some clinicians doubted
> that he suffered from a mental illness because after his assaults, the inmate usually
> claimed that the voices told him to hit someone.  His lack of remorse for the
> assaults was also a factor in their skepticism.  Furthermore, he was uncooperative

71

with some competency and insanity assessments in that he did not appear to give his best effort and clinician suspected him of malingering.

The inmate did not appear to be completely compliant with his psychotropic medication in the weeks prior to his death; laboratory results showed sub-therapeutic levels on October 25, 2012.  It was believed that he was cheeking and/or vomiting the medications.

The inmate had several recent, but brief, placements on Suicide Precaution for SI on June 11, October 14, and October 23, 2012.  The placements did not last for more than 24 hours and did not include MHCB admissions.  The CDCR reviewer noted that "SREs pertaining to this inmate's risk of suicide were variable in diligence of completion."

The reviewer offered several possible precipitating factors to the suicide, including anxiety related to his upcoming parole and ASH transfer rather than deportation to Mexico.  Although the inmate claimed to be looking forward to his return to Mexico, he had neither visits nor telephone calls during his SVSP confinement and there were no funds in his trust account.  It was not known whether he had any existing family members living in Mexico.  The Suicide Report contained two bases for recommendations for corrective action through a QIP:  (1) it took approximately 17 minutes for medical personnel to arrive at the scene because staff reductions delayed opening of a security gate; and (2) the officers failed to notice the shoelace ligature around the inmate's neck during approximately ten minutes of CPR.  The CDCR reviewer did <u>not</u> recommend a QIP to improve SREs, but indicated initiation of an SRE mentoring program at SVSP in the near future.

In the **sixth** case, the inmate (<u>SVSP 10</u>) was found hanging by a sheet from the ventilation grate of his cell at the DSH Salinas Valley Psychiatric Program (SVPP) during the morning of November 29, 2012.  He had entered CDCR in February 2006 to serve a 32-year-to-life sentence for second-degree murder of his mother's companion.  He was transferred to DSH's SVPP on November 2, 2012.  He had an extensive history of mental illness, with the most recent diagnosis of Major Depressive Disorder, Severe, with Psychotic Features, or Schizoaffective Disorder, Depressed Type.  He also had an extensive history of self-injurious and suicidal behaviors.  Because DSH administered the SVPP program and it was not subject to this reviewer's on-site suicide prevention assessment, the death was not examined for this report.

In the **seventh** case (<u>SVSP 11</u>), the inmate was found hanging by a sheet from the bunk of his administrative segregation cell on January 24, 2013.  He had entered CDCR in August 1996 to serve a 28-year-to-life sentence for first-degree murder; he began his sentence in the CYA in December 1995 and was transferred to CDCR when he was 20 years old.  He was placed at the 3CMS LOC from 2002 to 2003 and was then discharged from the mental health caseload until 2009, when he was again placed at the 3CMS LOC.  As his mental health continued to deteriorate, he was placed at the EOP LOC in September 2010.  He received in-patient DSH care at ASH and SVPP for two years and was transferred to SVSP on January 16, 2013.  He committed suicide eight days later.  His most recent diagnosis was Major Depressive Disorder and Anti-Social Personality Disorder.

During his 16 years of confinement, the inmate accumulated 17 RVRs; most were non-assaultive and involved possession of contraband or willful delay of a peace officer. His last RVR was in March 2011. He had several administrative segregation placements for either rules violations or safety concerns. His last administrative segregation placement occurred upon transfer to SVSP on January 16, 2013 "pending classification review." The following week, on January 24, the day of his death, the ICC saw him and approved his release from administrative segregation to SNY housing pending transfer to another facility. He was also approved for double-cell housing with another EOP inmate.

The inmate had a significant history of SI and self-injurious behavior. However, there were few serious SAs except for one by hanging in 1999, that records did not verify. During his SVPP hospitalization in January 2012, a clinician noted that "he states that he thinks about suicide 1-2 times each week and feels that he is 'very likely' to attempt suicide again in the future... At intake, patient stated that he thought about suicide 'all the time.' He has an extensive history of self-injury; however, previous SREs have not categorized these as SAs." Documented self-injurious behavior occurred in 1997 for scratching his arm with a razor, 2000 and through 2010 for multiple incidents of cutting, and 2011 for cutting, while at SVPP.

When transferred to SVSP on January 16, 2013, an intake nurse saw the inmate, who reported hearing voices "all the time telling him to hurt self and is worthless." He denied feeling suicidal, but stated feeling anxious. He was placed on Suicide Precaution in the CTC's alternative housing unit (AHU) and was seen by a psychiatrist the following day. An SRE was completed, the inmate denied SI, and the clinician noted that "chronic risk moderate due to history of multiple SAs and history of severe mental illness, but doing very well on meds, currently euthymic, not psychotic, so acute risk is low." He was cleared for EOP housing with a five-day mental health follow-up and 60-minute welfare checks for 24 hours.

The inmate was seen daily during the next five days by mental health and was reported to be "stable." He did not participate in group activity during this time period with the exception of a group conducted a few hours prior to his death. He also saw a psychiatrist for an initial psychiatric evaluation approximately three hours before his death on January 24 and denied SI. However, he admitted to AH "mostly derogatory and tell him to hurt himself. States he tries to read to keep the voices away. AH, but not as intense... alert, cooperative...good eye contact, speech is not pressured, mood is mildly anxious; affect intense, stable....relatively stable on current meds and doses." There was also a question whether he received all of his prescribed psychotropic medication because the eUHR did not contain the medication administration record (MAR). A few hours later at approximately 4:00 p.m., the PC saw the inmate, although no interaction was documented. At that time, he expressed concern about being housed in a SNY that lacked adequate EOP services. Supportive counseling was provided, but the inmate was found hanging in his cell approximately 90 minutes later.

The CDCR reviewer offered a few possible precipitating factors to the suicide, including the fact that the inmate:

> did have a number of chronically high suicide risk factors (life sentence, history of violence, substance dependence, depression, and paranoia) and it is unclear if

he received medication while at SVSP.  These factors, combined with previous
attempts and historically impulsive behavior, making the possibility that he
became overwhelmed by the stress of his impending move and, in an increased
depressed and paranoid state, impulsively took action to end his life.  However,
several factors suggest that his actions did not reflect that he intended to die, but
only intended to interrupt is scheduled housing move to Facility A/SNY.

The Suicide Report contained two bases for recommendations for corrective action through a
QIP:  (1) the MAR from January 17-24, 2003 was missing from the records; although
medications were noted as having been ordered by the pharmacy, "it is unknown whether the
inmate received prescribed medications during this crucial time."  A subsequent review of the
autopsy report by this reviewer also indicated that several medications were not listed in the
toxicology results; and (2) all items in the inmate's cell not deemed to be evidence by
correctional staff were not retained; CDCR reviewers were thus unable to examine these items.

Although not raised by the CDCR reviewer, several other matters were problematic.  Among
them, the psychiatrist who completed the SRE on January 17, 2013, resulting in the inmate's
release from Suicide Precaution, only interviewed the inmate and did not speak with other staff
or review the eUHR or Central File (C-file).  Given that the inmate had been consistently
assessed as a "high" chronic risk for suicide during the past three years, an assessment of
"moderate" chronic risk was questionable.  The clinician also only found two acute risk factors,
namely, administrative segregation housing and single-cell placement, and seemingly ignored the
acute risk factor of "safety concerns," which the inmate had consistently endorsed during the
past several years.  Psych techs were conducting daily administrative segregation rounds using a
rounds form that was not authorized by CDCR and did not allow for collection of adequate
mental health status information.  There also was no inquiry as to why, contrary to CDCR policy,
the inmate was housed in the same unsafe, non-retrofitted intake cell during his entire eight days
of administrative segregation confinement.

In the **eighth** case (SVSP12), the inmate severely slashed both sides of his throat with a razor in
his SNY cell on July 31, 2013.  The incident was witnessed by his cellmate and responding COs.
Despite life-saving measures, he lost a tremendous amount of blood and was subsequently
pronounced dead.

The inmate had re-entered CDCR in July 2012 to serve a 17-year sentence for assault; he had
seven prior CDCR confinements.  He had been transferred to SVSP on July 22, 2013, nine days
prior to his death.  He had a few prior RVRs, was classified as double-cell eligible, and required
SNY housing.  He was placed on the mental health caseload in November 2012 following
MHCB admission for SI, AH, and refusing psychotropic medication.  Upon MHCB discharge,
he was placed at the 3CMS LOC.  His most recent diagnosis was Schizoaffective Disorder.  In
May 2013, he expressed safety concerns to staff and was placed in administrative segregation at
California Substance Abuse Treatment Facility (CSATF) until July 22, 2013, when he was
transferred to SVSP and placed in the SNY.  He consistently denied SI.

With the exception of MHCB admission in November 2012, the inmate had no recent significant
history of suicidal behavior other than an incident of self-injurious behavior, by superficially

cutting his wrist, approximately seven years earlier. During a psychiatric assessment at CSATF on May 28, 2013, he complained of AH, lack of sleep, and poor appetite, but refused psychotropic medication. An SRE completed on June 6, 2013 assessed him as a "moderate" chronic and acute suicide risk. When he arrived at SVSP in July 2013, a clinician assessed him for purposes of treatment planning. A resulting SRE completed on July 26, five days before his death, indicated a "low" chronic and acute risk of suicide.

On July 31, 2013, the day of his death, the inmate's proposed list of visitors, including several family members who had last visited him in 2008, was disapproved. It was unclear why these visitors were disapproved and whether the inmate was aware of this decision prior to his death.

The CDCR reviewer did not offer any possible precipitating factors to the suicide. However, it was noted that the inmate's cellmate had observed him destroying personal paperwork, including pictures and letters to/from family members, in the days prior to his suicide. The cellmate believed that the inmate was becoming increasingly fearful, confused, and perhaps paranoid. The Suicide Report did not contain any recommendations.

Although not raised in the Suicide Report, the CDCR review did not sufficiently address two issues. First, the reviewer did not seek a definitive explanation from SVSP officials as to why the inmate's proposed list of visitors was disapproved; this was possibly a significant decision since it occurred on July 31, the date of the inmate's death. Second, two SREs completed approximately six weeks apart on June 6 and July 26 listed very different chronic and acute risk factors; the June 6 SRE listed ten chronic and seven acute risk factors, while the July 26 SRE listed only five chronic and one acute risk factor. Although any relationship to the proximate cause of the suicide was arguably unclear, such disparity should have been seen as problematic to the CDCR reviewer.

In the **ninth** case (SVSP 13), the inmate was found hanging by a sheet from the light fixture of his administrative segregation cell during the late evening of March 18, 2014. Life-saving measures, including CPR, were initiated and he was transported to a local hospital, where he was pronounced dead three days later on March 21, 2014. He had entered CDCR in May 2010 to serve a 14-year sentence for second-degree attempted murder, use of a deadly weapon, and infliction of grave bodily injury. He was placed at the 3CMS LOC following RC screening based on current symptomology and a history of mental health treatment in the community, including AH and an initial diagnosis of Schizophrenia. He was transferred to SVSP in December 2012.

The inmate's mental illness resulted in a very difficult transition to CDCR. He had six RVRs for fighting and assaults on correctional staff, four of which occurred during a two-month period in September and October 2010 while confined at PBSP. He had three MHCB admissions during that time for SI, aggression, and agitated behavior. He was eventually referred to DSH and received treatment at an ICF from February 2011 through February 2012. Upon return to CDCR, he was maintained at the EOP LOC with a diagnosis of Schizophrenia, Paranoid Type. The inmate did not acknowledge his mental illness and inconsistently took his psychotropic medication, resulting in a *Keyhea* order. Due to his mental illness, he continued to be assaultive and was confined to administrative segregation on several occasions. His mental illness also

resulted in other inmates trying to take advantage of him by pressuring him for sex and/or taking his possessions and canteen items.  He often threatened suicide as a means of dealing with these safety concerns.

The inmate's history of self-injurious and suicidal behavior was extensive and included incidents in 2005, 2006, 2008, 2010, and 2012 for wrist cutting and choking.  He experienced SI on numerous occasions, resulting in multiple MHCB placements.  His most recent SRE was completed on January 23, 2014; the administrative segregation clinician assessed him as a "moderate" chronic suicide risk and "low" acute suicide risk.

In November 2013, the inmate reported SI and was placed in an MHCB.  At that time, he complained of not having regular contact with his family and of being taken advantage of by his cellmate, who had stolen several of his possessions.  On January 21, 2004, he approached this former cellmate in the SVSP dining hall and punched him in the back of the head.  The inmate was transferred to administrative segregation and, at the time of his death, was awaiting transfer due to safety concerns.

Inmates interviewed following the suicide indicated that, although his family continued to place funds in his account, they had little contact with the inmate and he rarely received visits or letter correspondence.  They also consistently reported that he frequently talked about committing suicide and appeared to become more depressed and hopeless during the last few months of his life.

These inmate accounts were consistent with the inmate's recent interactions with mental health staff.  During his last MHCB stay for SI in November 2013, the inmate told his PC that "I haven't heard from my family I think they are mad at me."  He also stated that "I think my cellie is trying to make me mad."  On February 21, 2014, he was seen by an administrative segregation clinician after being placed in a holding cell due to custody's concern that he "was a danger to himself."  The inmate denied SI, but reported that he was "very depressed."  An SRE was not completed.  During this time, he became focused on real and imagined physical ailments; he complained about a hole in his ribs that nursing staff indicated was psychosomatic in nature.  The CDCR reviewer also indicated that the inmate was anxiously obsessing about his body.

On March 6, 2014, the psychiatrist saw the inmate, who reported feeling more depressed.  The following day, he stated to the administrative segregation clinician that he felt "stressed and angry" and of not sleeping for the previous two nights.  The last session with the administrative segregation clinician occurred on March 13; the inmate again reported feeling "a little depressed," but refused a confidential session.  Group progress notes from this time period reported his refusal to participate in group treatment.  A psych tech who the CDCR reviewer interviewed stated that the inmate had "left two groups early during the final weeks of his life and then stopped coming to group altogether."

The CDCR reviewer did not offer any specific precipitating factors for the suicide, but theorized that during the last few weeks of the inmate's life, he exhibited increasing anxiety and depression.  As stated in the Suicide Report, "his increasing feelings of helplessness, on-going

victimization, impulsivity, and possible feelings of rejection from his family may have contributed and experiencing overwhelming hopelessness" that resulted in his suicide.

The Suicide Report did not contain any recommendations for corrective action. However, the CDCR reviewer raised several concerns. Among them, nursing staff saw the inmate on February 22, 2014 regarding a medical complaint that was deemed "a somatic delusion" and led to a mental health referral. However, there was no evidence in the eUHR that the referral was forwarded to mental health. An SRE that a telepsychiatrist completed on November 21, 2013 was also incorrectly completed and neither contained information regarding previous SAs nor addressed a mental status evaluation. There was also no documentation of clinician-to-clinician contact between the administrative segregation and EOP clinicians within five days of the inmate's January 21, 2014 administrative segregation placement.

The CDCR reviewer reported that "the above concerns have been communicated at the institutional level." It was unclear, however, why such concerns were not formalized as bases for recommendations for corrective action through a QIP. There also were several other problem areas that were not identified in the Suicide Report. First, the inmate's most recent SRE on January 23, 2014, which was conducted two days after his administrative segregation placement, did not completely reflect his suicide risk factors. The risk factors for current recent depressive episode, hopelessness/helplessness, increasingly interpersonal isolation, safety concerns, and single-cell placement were all marked "no," but should have been marked "yes" based on his behavior. Protective factors of family support were noted on the SRE, but the inmate had informed his PC and other inmates during this time that his family had abandoned him. This inconsistency might reflect a lack of communication between administrative segregation and EOP clinicians, although these clinicians subsequently insisted that such communication took place.

Second, these risk and protective factors could have been correctly identified on February 21 had the mental health clinician completed an SRE following a custody staff referral that the inmate was "a danger to himself." Third, during the last few weeks of the inmate's life, the administrative segregation clinician and fellow inmates consistently reported that he was becoming increasingly more depressed, anxious, and isolated, resulting in his refusal to participate in group treatment. A psych tech reported that he "left two groups early during the final weeks of his life and then stopped coming to group altogether." However, review of the weekly Psych Tech Daily Rounds Forms suggested quite the opposite; they indicated that the inmate had no mental health concerns, did not complain about appetite for sleep, exhibited a mental status within normal limits, and participated in programming. This perspective called into question the veracity of the Psych Tech Daily Rounds Forms.

In the **tenth** case (SVSP 14), the inmate was found to have asphyxiated himself with a plastic bag in his ASU cell during the late afternoon of October 18, 2014. The inmate re-entered the CDCR system on May 10, 2013 to serve a 30-year-to-life sentence for robbery. He was transferred back to SVSP from CHCF two days earlier on October 16, 2014. The inmate was placed in the MHSDS at EOP LOC for Paranoid Schizophrenia and Anti-Social Personality Disorder. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

77

*Summary*:  This reviewer found that SVSP was a problematic facility.  In addition to the very high number of suicides during the past few years, SVSP exhibited numerous poor practices concerning suicide prevention.  Among them, it appeared that mental health clinicians completing SREs in response to emergency mental health referrals set high thresholds for placing inmates on suicide observation.  Many inmate suicides during the 2012-2014 time period also involved incomplete or otherwise inadequate SREs.

## 14)   California State Prison/Corcoran (CSP/Cor)

**Inspection**: February 18-19, 2014

CSP/Cor housed 4,365 inmates, the majority of which were at Level IV classification.  The institution had a 96-bed Acute Care Hospital (ACH), with 24 designated MHCBs.  There were four alternative housing cells in Unit D of the ACH to temporarily house suicidal inmates prior to MHCB transfer.  There were three administrative segregation units for caseload and non-caseload inmates.  Two SHU facilities housed almost 50 percent of the total inmate population.  Thirty-six percent of CSP/Cor inmates were caseload inmates; there were 1,290 3CMS and 274 EOP inmates.

**Screening/Assessment**:  As there were no new admissions during the two-day site visit, the intake screening process at CSP/Cor was not observed.  However, psych tech rounds in SHU 4B1 were observed on February 19; these rounds were performed daily in administrative segregation, but weekly in the SHU.  With the exception of the psych tech using an unauthorized CDCR form, the rounds were unremarkable and the form was completed at cell-front for all caseload inmates.  Psych techs were subsequently provided with the correct Psych Tech Daily Rounds Form.

**Housing**:  All 24 MHCBs in the ACH were clean, suicide-resistant, and furnished with suicide-resistant beds.  The alternative housing cells in Unit D of the ACH were suicide-resistant, but lacked beds and inmates slept on a mattress on the floor.  IDTT meeting space in the ACH was problematic; one IDTT treatment team meeting was conducted in a converted cell, while another was held in the ACH's "tub room."  IDTT meeting spaces were so small that this reviewer and the CMH had to stand in the doorway to the outside exercise yard in order to observe one of the IDTT meetings.  These rooms were also used as staff offices.  It was reported that many senior clinicians choose not to work in the ACH due to these working conditions.

ASU 1, the stand-alone administrative segregation unit, contained five new intake cells that had been retrofitted to be suicide-resistant.  As detailed below, an inmate committed suicide in April 2013 in ASU 1 by hanging himself from a ventilation grate in a non-retrofitted intake cell.  Contrary to policy, this inmate was placed in this unsafe cell the day before his suicide.  Administrative segregation unit 3A03, which also served as an EOP Hub, had six suicide-resistant, new intake cells.  Administrative segregation unit 3A04, which mostly housed 3CMS inmates, had three non-suicide resistant new intake cells that contained protrusions such as shelves, large gauge ventilation grates, and gaps between the wall and desk and between the wall and bunks, which made them conducive to a hanging SA.

**Observation**:  All inmates assigned to an MHCB had Q-15 minute observation, unless on Suicide Watch and receiving constant observation.  The Observation Record Forms that documented observation of the 23 inmates on Suicide Precaution on February 18 were up-to-date and accurate.  No inmates were in alternative housing cells during the site visit, although a few of the cells had been used the previous week.

Several IDTT meetings held in the ACH on February 18 and 19 were observed.  The IDTT meetings conducted on February 18 were problematic, with the psychologist always only referring to inmates by their last name.  In one case, the inmate (COR 1) was admitted to an MHCB a few days earlier on February 14 and was on Suicide Precaution.  An SRE completed the previous day was incomplete, while the assessment conducted during the IDTT meeting was comprised of a clinician asking the inmate "you're not suicidal, right?"  In another case, the inmate (COR 2) also had been admitted to an MHCB on February 14 and was on Suicide Precaution.  The IDTT meeting's purpose was to assess his suicide risk with a preliminary plan for discharge.  Although the treatment team ultimately decided to allow him to receive his clothing, there was never any discussion about his suicide risk.  The IDTT meetings conducted the following day, on February 19, were much better; the treatment team adequately reviewed each case and assessed the risk of inmates on Suicide Precaution.

Review of unit logs for all three administrative segregation units as to documentation of 30-minute welfare checks of non-intake cells revealed adequate documentation.  Review of Guard One data for inmates housed in administrative segregation for 21 days or less indicated 95 percent compliance for February 18, 2014 for both ASU1 and 3A03.

**Management/Treatment Planning**:  eUHRs of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis were examined.  Although the review indicated that clinicians consistently saw inmates on suicide observation daily, and inmates referred to mental health were generally seen timely, other matters were problematic.

Several eUHRs in which inmates were discharged from either alternative housing or an MHCB without completion of an SRE were reviewed.  Because SREs contained a treatment plan section, if the clinician discharged an inmate from Suicide Precaution without an SRE, the inmate would not have a treatment plan at discharge.  For example, one inmate (COR 3) who expressed SI was placed on Suicide Precaution in alternative housing in the late evening of January 22, 2014.  He was seen by a clinician the following morning and only a Release Orders from Alternate/Temporary Housing Form was completed; it merely stated "Patient to talk to Building Sergeant about lost property issue, referred to psychiatry for medication change."  Neither an SRE nor progress note was completed.  This same inmate was previously admitted to an MHCB on December 3, 2013 and was discharged the following day by way of a Mental Health Crisis Bed Discharge Summary Form rather than an SRE.  No treatment plan was also written on that occasion.

In another case, the inmate (COR 4) expressed SI during the evening of January 16, 2014 to a TTA nurse and was placed on Suicide Precaution in alternative housing.  The following morning he was seen by a clinician who completed an Interdisciplinary Progress Note-PC Crisis

Evaluation Form that was sub-titled "Psychologist/Psychiatrist Admission Checklist at ER" and simply stated "I'm doing fine. I don't feel like hurting myself or anyone else anymore. No longer endorses SI, HI, AH, VH. Awoke from sleep and came to the door to speak to PC. Calm and respectful." The inmate was discharged from Suicide Precaution with a Release Order from Alternate/Temporary Housing Form. An SRE was not completed.

In another case, the inmate (COR 5) was admitted to an MHCB on January 16, 2014 for SI. An SRE was not completed and the inmate was discharged the following day with an incomplete MHTP that listed SI and interventions of "psycho-pharmaceutical assessment, daily clinical contact, and welfare check," but did not indicate goals or target dates for completion. A Mental Health Crisis Bed Discharge Summary Form was also completed, but no discharging SRE. There was thus no treatment planning beyond the required five-day follow-up note.

There were also concerns regarding the quality of SREs completed due to emergency mental health referrals for SI. In one case, the 3CMS inmate (COR 6) ingested a razor blade and was transported to the emergency room on January 1, 2014. Upon returning to CSP/Cor several days later on January 6, he was placed in alternative housing pending a mental health assessment. A clinician saw him several hours later and completed an SRE that indicated a "low" acute risk for suicide; the estimate of chronic risk was not stated. The inmate denied SI and reported that he swallowed the razor blade by "accident." The SRE's treatment plan section simply stated "(r)elease from AHU, 5-day follow-up initiated. If decompensation is observed, he should be referred to ER/TTA for further break evaluation/treatment." In another case, the same clinician used the same poor treatment planning narrative for an EOP inmate (COR 7) by writing the following in the SRE's treatment plan section: "Stable at the present time. Release from the alternative housing program. Begin 5-day follow-up upon release from AHU. If decompensation is observed, refer back to the ER/TTA for further evaluation/treatment."

In other cases, although discharging SREs were completed, the SRE treatment plan section simply stated "refer to treatment plan of this date." When the medical chart was reviewed for a treatment plan, the only document completed was the Interdisciplinary Treatment Team-Level of Care Decision Form that lacked a treatment plan, and simply noted the LOC (see, for example, COR 8). There were thus numerous problems with CSP/Cor clinicians' SREs and treatment planning documentation when discharging inmates from alternative housing and MHCBs.

**Intervention**: All reviewed housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**: Training records indicated that 99 percent of custody and 97 percent of nursing staff had CPR certification. Ninety-nine percent of custody staff was also compliant with annual suicide prevention training, as was 77 percent of mental health staff and six percent of medical staff. Ninety-eight percent of mental health clinicians received the seven-hour SRE training, and 92 percent completed the SRE mentoring program.

**Recent Suicides**: CSP/Cor had three inmate suicides from 2012-2014. In the **first** case (COR 9), the inmate strangulated himself with a sheet and shoelace in his SHU cell during the afternoon of August 28, 2012. The inmate entered CDCR in June 2000, at age 17, to serve a

nine-year term for burglary and robbery.  In February 2002, he received a 25-year to life sentence for assault on a CO.  He was transferred to CSP/Cor in June 2003 and spent most of his confinement in the SHU.  He had 16 RVRs, the last of which occurred in November 2011.  He had good family support, especially from his girlfriend, until April 2012, when she was arrested for mailing drugs to her brother at another CDCR facility.

The inmate had been at the 3CMS LOC from 2006 through 2008, and from 2009 until his death.  His most recent diagnosis was Depressive Disorder.  He was known to be struggling with the reality of his life sentence and often refused mental health services.

On August 21, 2012, the inmate was brought to the TTA following an alleged drug overdose.  He later reported he had staged the incident because he wanted protective custody and removal from the SHU due to fear for his life from gang and drug activities.  He refused further medical treatment and was temporarily rehoused in administrative segregation.  The following day, the Institutional Gang Investigators (IGI) unit interviewed him; he had been providing information about Mexican Mafia operations inside and outside of the prison since 2011.  He was subsequently rehoused in another SHU building pending further investigation.

On August 27, 2012, the day before his death, the inmate's PC attempted to interview him in preparation for his IDTT meeting scheduled for the following morning, but the inmate refused the interview.  The clinician wrote an SRE that was identical to one completed the previous year on November 8, 2011; the clinician apparently used the template from the first SRE due to the inmate's refusal to be interviewed.  The inmate's alleged drug overdose was not mentioned in the SRE.  Review of the inmate's medical chart did not indicate any known history of suicidal behavior.

On the morning of August 28, 2012, IGI unit members visited the inmate and informed him that officers from the Los Angeles County Sheriff Department's gang unit would be at CSP/Cor later that day to interview him.  In exchange, his property was returned to him and he was told that he would be permitted to telephone his girlfriend.  Several hours later, however, the inmate refused to leave his cell to call his girlfriend, meet with the Los Angeles County Sheriff's Department, or attend his IDTT meeting.  IGI staff reported that he appeared very fearful and paranoid and suggested to the SHU lieutenant and COs that they monitor him.  He was found dead several hours later in a state of *rigor mortis*.

The CDCR reviewer theorized that the main precipitating factor to the inmate's suicide was his perception that he would be assaulted and/or killed by the Mexican Mafia for cooperating with the IGI unit.  Three bases for recommendations for corrective action through a QIP were identified in the Suicide Report:  (1) there was a lack of communication between medical and mental health staff regarding the alleged drug overdose on August 21, 2012; as a result, the inmate's PC was unaware of the alleged overdose and the extent of the inmate's fear for retaliation of informant activities; (2) although IGI staff alerted housing unit staff about the inmate's unusual behavior on August 28 and requested that he be more closely monitored, he was left unobserved for over two hours prior to being found dead; and (3) the inmate's fear of retaliation from gang members following his decision to become an informant could have been a

suicide risk factor that should have been addressed by CDCR headquarters in their statewide suicide prevention efforts.

In the **second** case (COR 10), the inmate was found hanging by a sheet from the ventilation grate of his administrative segregation cell on April 29, 2013.  He had entered CDCR in February 2010 to serve an 82-year to life sentence for first-degree murder and attempted murder.  He was transferred to CSP/Cor in March 2012.  He had good family support and frequent telephone contact and visits.  He had two RVRs during his approximate two-year confinement and was given SNY status based on his fear of retaliation from gang members.

Despite the inmate having an extensive mental health history that the C-file documented, he was never placed on the mental health caseload; his C-file was never reviewed and he consistently denied any current or previous mental health history.  Subsequent C-file review by the CDCR reviewer revealed that the inmate had been treated for AH and paranoia in the community, had received psychotropic medication for Paranoid Schizophrenia and Bipolar Disorder while incarcerated in the Orange County Jail, and had several previous admissions to Western Medical Center for forensic evaluations.  The reviewer found that, although a CD containing the inmate's mental health history from the community was contained on the C-file, medical and/or mental health staff never reviewed the information; the Orange County Jail Transfer Form that arrived with the inmate did not document any mental health history.

On April 28, 2013, the inmate, who had been experiencing significant difficulty sleeping during the previous week and was upset by the perceived loud noises from a certain inmate in a nearby cell, manufactured a shank and stabbed this inmate as he returned from yard.  He was placed in administrative segregation pending investigation, but the assigned cell was not a suicide-resistant new intake cell.  His former cellmate subsequently told the CDCR reviewer that the inmate had become increasingly more paranoid during the week and believed the entire housing unit was talking about him.  He had told his cellmate that "he was afraid he was going crazy" and "don't want to live if I'm crazy."

On April 29, the following morning, a psych tech saw the inmate at approximately 7:45 a.m.  The inmate did not make eye contact and refused to come out of the cell.  The psych tech noted that the inmate appeared extremely anxious, paced the cell, and rubbed his hands against his forehead.  He then began to self-report an extensive psychiatric history, current paranoid thoughts, grandiose beliefs, and auditory and VHs.  He denied current SI, but told the psych tech that he had been unable to sleep for over one week.  The psych tech completed an Emergency Mental Health Referral at approximately 9:00 a.m.  In addition, and unrelated to the psych tech referral, a housing sergeant completed an Urgent Mental Health Referral at approximately 9:00 a.m. based on information received the previous day that the inmate had been unable to sleep and it "was making him feel crazy."  A short time later at approximately 9:38 a.m., the CO discovered that the inmate had committed suicide.

The Suicide Report contained four bases for recommendations for corrective action through a QIP:  (1) although the inmate was appropriately identified as needing an emergency mental health referral on April 29, 2013, there was a two-hour delay by the psych tech in providing mental health with this information.  Contrary to *Program Guide* requirements, the inmate was

not "under continuous staff observation until evaluated by a licensed mental health clinician;" (2) rather than administering the 31-item mental health screen to the inmate, the psych tech allowed the inmate to complete the screening form himself; (3) it did not appear that responding medical staff retrieved an emergency response bag as there was no mention of an AED being applied; and (4) supporting information related to the inmate's prior mental health treatment at the Orange County Jail was not appropriately transferred to CDCR. The inmate's mental health history was thus unknown to medical and mental health personnel.

Although not contained in the Suicide Report, two other matters were problematic. First, upon entry to administrative segregation on April 28, 2013, the inmate was placed in an unsafe, non-intake cell rather than in a suicide-resistant, new intake cell as per CDCR policy. Second, although the CDCR reviewer criticized the Orange County Jail for not forwarding a discharge summary with the inmate that noted his extensive mental health history, the reviewer located and reviewed the inmate's mental health history from a CD that the Orange County Jail forwarded and was contained in C-file. It was unclear why CDCR did not recommend a QIP based on this finding.

In the **third** case (COR 11), the inmate was found hanging by a sheet from the door holes of his SHU cell on July 22, 2013. He had entered CDCR in May 1999 at 18 years of age to serve a 15-year to life sentence for attempted murder. In 2004, he was sentenced to an additional 18-year to life sentence for the attempted murder of another inmate. In 2007, he allegedly murdered his cellmate; a trial on that case was scheduled to begin on August 9, 2013. The inmate had been transferred to CSP/Cor in July 2007. He was placed in the SHU in 2010 when he was validated as a member of the Mexican Mafia and due to multiple serious RVRs. He was briefly at the 3CMS LOC between June and September 1999 for an Adjustment Disorder with Depressed Mood. Other than routine screenings, he had no further interactions with mental health and consistently denied both SI and a history of suicidal behavior. He did not have any serious medical conditions. Beginning on July 8, 2013, he participated in a mass hunger strike and continued to refuse all meals until July 21, 2013. He began accepting food the following day, on July 22, which was the day of his death.

Although the CDCR reviewer offered several scenarios as possible precipitating factors to his death, no definitive precipitant could be confirmed. The Suicide Report contained one basis for recommendation for corrective action through a QIP: (1) contrary to CDCR policy for SHU inmates, this inmate had not been consistently offered ten hours of weekly yard.

Although not raised in the Suicide Report, the case revealed two additional problems. First, contrary to CDCR policy dated May 28, 2013 requiring observation of SHU inmates at 30-minute intervals, the inmate had not been observed for over one hour prior to being found hanging on July 22, 2013. Medical records indicated he had "lividity on his back." Second, emergency response records indicated the 911 emergency call was not initiated until 9:19 p.m., which was over 13 minutes from the notification of the SA and an excessive amount of time.

**15)   California Substance Abuse Treatment Facility (CSATF)**

**Inspection**: February 20-21, 2014

CSATF housed 5,522 inmates in a mixture of mostly Level II, III, and IV security classifications. CSATF had a CTC with 20 designated MHCBs. There were four alternative housing cells, two holding cells and two mental health observation cells, in the CTC to temporarily house suicidal inmates prior to MHCB transfer. There were two administrative segregation units for caseload and non-caseload inmates. Thirty-seven percent of CSATF's inmates were caseload inmates; there were 1,682 3CMS and 354 EOP inmates.

**Screening/Assessment**: The intake screening process of several new admissions was observed on February 21. A nurse assigned to the R & R Unit conducted the Initial Health Screening. The screening was conducted in the open doorway of the Nurse's Office, as other inmates sat behind the inmate being screened; privacy and confidentiality were thus compromised. A CO also stood directly behind any screened inmate with a Level IV security classification. The nurse was observed asking all required questions on the Initial Health Screening Form.

The reviewer observed required psych tech rounds in both administrative segregation units. The rounds were unremarkable and the Psych Tech Daily Rounds Form was completed at cell-front for all caseload inmates. A psych tech was observed administering the 31-item mental health screen to a newly admitted administrative segregation inmate. The screening was completed in the privacy of a small office on the unit, with an officer stationed outside of the room.

**Housing**: All MHCB rooms were clean, suicide-resistant, and furnished with suicide-resistant beds. However, the two mental health observation cells did not have suicide-resistant beds; inmates slept on a mattress on the floor. Inmates in the mental health observation cells were under constant observation because the cells were not suicide-resistant.

The administrative segregation unit housing caseload inmates, E-1, contained five new intake cells that were retrofitted to be suicide-resistant. The stand-alone administrative segregation unit similarly contained five new intake cells. However, several inmates who had been housed in the unit for less than 72 hours were housed in unsafe, non-retrofitted intake cells in both units. In E-1, cells housing new intake inmates contained protrusions including shelves, large gauge ventilation grates, and gaps between the wall and desk and between the wall and bunks conducive to a hanging SA. In the stand-alone unit, cells housing new intake inmates contained ventilation grates that had not been retrofitted.

**Observation:** Although Suicide Precaution and Suicide Watch were frequently used in MHCBs for inmates identified as suicidal, psychiatric observation was also observed in the unit during the site visit. Although not sanctioned by CDCR and not referenced in the *Program Guide*, CSATF mental health officials previously developed a local policy within their CTC Policy and Procedure Manual that outlined procedures for using psychiatric observation. This policy indicated that the purpose of psychiatric observation was: "(1) To prevent suicide and/or injury to self, other inmate(s)patient(s), and/or staff; and (2) To assess the inmate-patient's mental health condition and treatment status." In fact, however, psychiatric observation was often used

as a step-down from Suicide Precaution, with inmates observed at 60-minute intervals. MHCB clinicians also frequently used psychiatric observation at 30-minute intervals for inmates assessed as suicidal. Such a practice was contrary to *Program Guide* requirements.

As to documenting observation of inmates on suicide observation, CTC nursing staff did <u>not</u> use the CDCR-approved Suicide Watch/Suicide Precaution Record CDCR 7365 (revised July 2009) Form. Instead, they used an outdated Patient Observation Record Form that had been last revised in October 1990 and allowed for Suicide Precaution at 30-minute intervals.

Observed IDTT meetings of two CTC inmates on February 20 were problematic. In the first case, the inmate (<u>CSATF 1</u>) had been admitted to the MHCB approximately one week earlier for SI. Although several Physician's Orders were written during the week, the last clinical progress note was dated five days earlier, on February 15. Although the inmate continued to endorse SI, Suicide Precaution were reduced from 15-minute to 30-minute intervals. During the February 20 IDTT meeting, the inmate continued to endorse SI; he stated that although he had no plan yet, he "wouldn't want it to be painful, if it's painless, it would be a possibility." He rated the severity of his SI to be "7 out of 10." Although the treatment team engaged in a thoughtful conversation as to his level of suicide risk, there was no discussion regarding his observation level.

In the second case, the inmate (<u>CSATF 2</u>) had voiced SI and was admitted to the CTC's mental health observation room, without a suicide-resistant bed, after-hours on February 18, 2014. Because the observation room was considered alternative housing, he was initially placed on constant observation. The following day, the inmate continued to report SI without a plan. He remained in the observation room, but was downgraded to Suicide Precaution with observation at 15-minute intervals. During the February 20 IDTT meeting, this reviewer asked why the inmate had been assigned to a specific MHCB cell, yet remained in the mental health observation room with only a mattress on the floor? The PC appeared unaware of the inmate's housing status. Another clinician indicated concern with his level of suicidal behavior, but not enough to warrant constant observation. However, such elevated concern was not documented in progress notes. Subsequent review of the inmate's observation form revealed that nursing staff had not observed him for over one hour prior to his IDTT meeting.

Review of administrative segregation unit logs for documentation of 30-minute welfare checks of non-intake cells revealed their proper documentation for the stand-alone unit. However, 30-minute welfare checks were not consistently performed in administrative segregation unit E-1, which housed caseload inmates. Review of Guard One data for inmates housed in administrative segregation for 21 days or less indicated 97 percent compliance for a selected 24-hour period for each administrative segregation unit.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that clinical staff consistently saw inmates daily when on suicide observation and that inmates who were referred to mental health were generally seen timely. However, other matters were problematic.

Among them, several reviewed eUHRs revealed inmates being discharged from the MHCB without an adequate treatment plan. For example, one inmate (<u>CSATF 3</u>) expressed SI and

engaged in superficial wrist cutting with a razor.  He was placed on Suicide Precaution in alternative housing during the late evening of January 15, 2014.  He had been "intermittently included in the MHSDS for recurring depression with reports of hopelessness, feelings of sadness, isolation, at times SI, vegetative symptoms, and decreased energy.  He has in the past attributed his depression due to his vision loss and other medical problems."  His most recent diagnosis was Major Depressive Disorder.  Although a clinician decreased his observation from 15 to 30-minute intervals on January 16, he remained in the mental health observation cell for two additional days without a suicide-resistant bed.  On January 21, he was released from alternative housing following completion of an SRE in which the clinician documented the following treatment plan, in its entirety: "Discharge CCCMS with 5-day follow-up."

In another case, the inmate (CSATF 4) expressed SI in the EOP yard on December 14, 2013 following bullying problems with his cellmate.  He was brought to the TTA, where a clinician completed an SRE with a finding of "moderate" chronic and acute suicide risk.  He was placed in alternative housing in the mental health observation room with observation at 15-minute intervals.  Two days later, on December 16, he was moved to a MHCB.  A MHTP was completed on December 19 with "anxiety" as the identified problem and "decrease anxiety" as the treatment goal.  An SRE was also completed on December 19 and the inmate was discharged from Suicide Precaution and the MHCB, with the following treatment plan, in its entirety: "Discharge to EOP, five day follow-up to yard."

There were numerous problems with SRE and treatment planning documentation by CSATF clinicians when discharging inmates from alternative housing and MHCBs.

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records revealed that 97 percent of custody and 100 percent of nursing staff had CPR certification.  Ninety-seven percent of custody staff was compliant with annual suicide prevention training, but only 22 percent of medical and mental health staff received this training.  Eighty-one percent of mental health clinicians received the seven-hour SRE training and 92 percent completed the mentoring program.

**Recent Suicides**:  CSATF had two inmate suicides from 2012-2014.  In the **first** case (CSATF 5), the inmate was found hanging by a sheet from the light fixture of his administrative segregation cell during the afternoon of July 6, 2014.  He had entered CDCR in March 2010 to serve a 15-year to life sentence for second-degree murder.  He was transferred to CSATF in April 2014 and transferred to the caseload inmate administrative segregation unit, E-1, on April 25.  At that point, he was at the 3CMS LOC.  The inmate had ten RVRs during his confinement, the most recent of which occurred in October 2013.  He had few medical complaints.

Both custody and mental health records revealed that the inmate was fearful of assault by other inmates due to an incident at Calipatria State Prison, where he allegedly had consensual sex with another inmate.  He had repeatedly requested SHU placement for protection.  On May 27, 2014, he expressed SI, with a plan to cut his wrists, and was admitted to a MHCB for further evaluation.  An SRE was completed and indicated "high" chronic and acute suicide risk.  He

self-reported a prior SA by cutting his wrist approximately 11 years earlier at age 17.  Clinical notes reported that:

> the inmate-patient has become increasingly depressed and he genuinely believes his life is in danger if sent back to the yard.  He was unable to program on D & E Yards at SATF.  He is isolative, hopeless and helpless, is single cell and has a definite plan in mind to kill himself.  He does believe suicide to be his only option at this point since he 'can't stay in ASU for years.'  He has the plan to cut his wrist, but is seeking help.

The inmate was initially diagnosed with Adjustment Disorder with Anxiety and placed on Suicide Precaution with observation at 15-minute intervals.  He remained in the MHCB for several weeks and was subsequently placed on psychiatric observation at 60-minute intervals.

On June 23, a MHTP was completed and indicated problem areas of "depression" and "anxiety," with the goal to "decrease anxiety/depressive symptoms with positive CBT."  The treatment plan stated that the:

> I/P is being discharged at the EOP LOC and will have weekly PC contacts, monthly psychiatry contacts, and 10 or more groups per week.  Continue to work on alleviating anxiety symptoms as well as paranoia, rumination, and obsessions related to safety concerns 'having a hit put on me' by way of reality therapy and CBT.  I/P placed on 5-day follow-up.  Educated I/P on his medications and encouraged to continue with his compliance.

An SRE was completed and assessed his chronic suicide risk as "high" and his acute suicide risk as "moderate."  The clinician noted that he "continues to struggle with hopelessness and helplessness.  Anxiety and depressive symptoms have improved. Continues to have safety concerns but is less paranoid."  The IDTT meeting also recommended the inmate to the ICF LOC at DSH.  He was accepted on July 1.

On June 24, the inmate was discharged from the MHCB and rehoused in administrative segregation unit E-1 while awaiting a DSH bed.  He continued to express safety concerns and told a clinician that he "feels as though a DSH placement will jeopardize his life."  Five-day follow-up progress notes reflected an inmate with unresolved safety concerns and increased anxiety and paranoia, noting his "overall level of functioning remains unimproved."  The notes did not indicate any concordance with his MHTP or the plan contained within the discharging SRE dated June 23.  Psych Tech Daily Rounds Forms from June 30 through July 6, the morning of the suicide, were unremarkable.  The inmate was apparently informed of his DSH acceptance during an ICC meeting on July 3.  He committed suicide three days later.

The CDCR reviewer did not offer any specific precipitating factors to the death, but noted the inmate's persistent and increasing anxiety and paranoia leading to the DSH referral.  Several letters that the inmate wrote but had not mailed reflected isolation and loneliness concerning his perceived lack of recent contact from his fiancée and fear of assault.  The CDCR reviewer listed numerous deficiencies in the mental health services provided to the inmate, including inadequate

treatment plans that did not address safety concerns, poor communication between mental health and custody staff regarding these safety concerns, inadequate SREs, and at least four duplicative and boilerplate progress notes written in June 2014. Despite these deficiencies, the Suicide Report contained only one basis for recommendation for corrective action through a QIP: (1) additional clinical training regarding both the quality and accuracy of five-day follow-up progress notes.

In the **second** case (CSATF6), the inmate was found hanging by a sheet from the light fixture in his administrative segregation cell during the early morning of September 6, 2014. He had entered CDCR in 1998 to serve an unknown sentence. He was at the 3CMS LOC at the time of his death. His most recent diagnosis was Adjustment Disorder. He had been housed in administrative segregation since June 10, 2014 for an alleged battery on another inmate and was facing a long SHU term. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, which had not been completed, had not been examined by this reviewer.

## 16)   **Ironwood State Prison (ISP)**

**Inspection**: March 4-5, 2014

ISP housed 3,077 inmates, the majority of which were Level III classification. The institution had a 14-bed OHU for inmates with medical or mental health issues, with three rooms designated as alternative housing cells for suicidal inmates. There was one administrative segregation unit for caseload and non-caseload inmates. ISP housed 12 caseload inmates, including one inmate at the EOP LOC.

**Screening/Assessment**:  The intake screening process of several new admissions was observed on March 4. A nurse assigned to the R & R Unit conducted the Initial Health Screening, which was performed in the Nurse's Office with the door open. Nonetheless, privacy and confidentiality were not technically compromised because officers and other inmates were not in the area. Observation revealed that the nurse did not ask all of the Initial Health Screening Form's mental health and suicide risk questions. Among those not asked were questions regarding current suicide risk, prior SAs, and the receipt of bad news.

Observation of psych tech rounds in administrative segregation indicated little distinction between the psych tech's interaction with caseload and non-caseload inmates. The psych tech did not complete the Psych Tech Daily Rounds Form for the five caseload inmates during rounds. Observation of the psych tech administering the 31-item mental health screen to a newly admitted administrative segregation inmate indicated completion of the process in the privacy of a small office with an officer stationed outside of the room. The psych tech confided that it was unusual for inmates to participate in the mental health screening process. Recent SPRFIT meeting minutes revealed an 86 percent refusal rate.

**Housing**:  The three rooms designated as alternative housing cells contained wall ventilation grates with large holes that had not been retrofitted, but were otherwise suicide-resistant. The rooms lacked beds and inmates slept on a mattress on the floor.

Administrative segregation unit A-5 contained five new intake cells that had been retrofitted to be suicide-resistant.  Observation indicated that all inmates who were housed in administrative segregation for 72 hours or less were in a new intake cell.

**Observation**:  The OHU utilized Suicide Precaution and Suicide Watch for inmates identified as suicidal and awaiting MHCB transfer.  However, psychiatric observation was also used in the OHU, even though this practice was neither sanctioned by CDCR nor referenced in the *Program Guide.*  Inmates on psychiatric observation were observed at 15-minute intervals.  OHU nursing staff relied on an older version of the CDCR-approved Suicide Watch/Suicide Precaution Record CDCR 7365 Form that contained pre-printed 15-minute time intervals, and did not allow for staggered observation.

Administrative segregation unit logs that contained documentation of 30-minute welfare checks for non-intake cells were up-to-date.  Review of Guard One data indicated 100 percent compliance for administrative segregation inmates housed in the unit for 21 days or less during the reviewed 24-hour period.

**Management/Treatment Planning:**  eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that inmates were consistently seen by clinical staff daily when on suicide observation.  Inmates referred to mental health were seen timely.  However, treatment planning was problematic.  For example, on December 5, 2013, mental health received an emergency referral from custody for an inmate (ISP 1) who expressed SI with a plan to hang himself.  The inmate was also concerned about being assaulted by other inmates.  He was placed in the OHU on psychiatric observation at 15-minute intervals.  When seen the following day by mental health, he denied SI and only complained of "poor sleep in past few days."  An SRE was completed and the chronic and acute suicide risk were assessed as "low."  The inmate was discharged from the OHU and returned to administrative segregation.  The SRE treatment plan merely stated:  "(1) Release to custody (back to unit), (2) Initiate 5-day follow-up protocol."

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Records indicated that 98 percent of custody and 96 percent of nursing staff had CPR certification.  Ninety-three percent of custody, but only one percent of medical and mental health staff, were compliant with annual suicide prevention training.  One hundred percent of required mental health clinicians received the seven-hour SRE training and completed the mentoring program.  Observation of the one-hour suicide prevention block training on March 4, 2014 indicated that a very proficient clinical psychologist conducted the training and covered the required material.

**Recent Suicides**:  There were no suicides at ISP from 2012-2014.

**17)**     <u>**Chuckawalla Valley State Prison (CVSP)**</u>

**Inspection**: March 5-6, 2014

CVSP housed 2,294 inmates, the majority of whom were at Level II classification.  The institution had one administrative segregation unit.  Its OHU had been closed since October 2013, with no plans to reopen it.  CVSP housed 12 caseload inmates, including one at the EOP LOC.

**Screening/Assessment**:  Because there were no new admissions to CVSP during the site visit, intake screening could not be observed.  An intake nurse reported that inmates who received intake screening typically stood in the open doorway of the Nurse's Office, with a custody officer standing directly behind them.  Privacy and confidentiality were thus compromised.

Psych tech rounds in administrative segregation were observed on March 6, 2014.  As no caseload inmates were housed in the unit at the time, completion of Psych Tech Daily Rounds Forms was not required.  The psych tech reported that the Forms were completed at cell-front following interaction with each caseload inmate.  Observed psych tech rounds were conducted in accordance with policy.

**Housing**:  Inmates requiring alternative housing for suicidal behavior were immediately transported to the ISP OHU pending MHCB transfer.

CVSP's administrative segregation unit contained nine new intake cells that had been retrofitted to be suicide-resistant.  All inmates housed in administrative segregation for 72 hours or less were in a new intake cell, but several inmates reported having been housed in non-intake cells for the entirety of their initial 21 days in administrative segregation.

**Observation**:  Suicide observation (Suicide Watch and Suicide Precaution) did not operate at CVSP as all suicidal inmates were immediately transported to the ISP OHU pending MHCB transfer.

Administrative segregation unit logs that contained documentation of 30-minute welfare checks for non-intake cells were not always up-to-date.  Review of Guard One data indicated 100 percent compliance for administrative segregation inmates housed in the unit for 21 days or less during the reviewed 24-hour period.

**Management/Treatment Planning**:  eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that inmates were consistently seen by clinical staff timely, but that treatment planning was problematic.  Because CVSP and ISP shared mental health clinicians and this issue was addressed in the ISP review, it will not be repeated here.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records reported that 95 percent of custody and 100 percent of nursing staff had CPR certification.  Ninety-nine percent of custody was compliant with annual suicide prevention training, but only five percent of medical and mental health staff were compliant. Seventy-five percent of mental health clinicians received the seven-hour SRE training and 67 percent completed the mentoring program.

**Recent Suicides**:  There were no suicides at CVSP from 2012-2014.


**18)**     **Wasco State Prison (WSP)**

**Inspection**: March 25-26, 2014

WSP housed 5,144 inmates, with the vast majority on RC status.  WSP had an 18-bed CTC with six designated MHCBs; and an administrative segregation unit located in building D-6. Approximately 20 percent of WSP inmates were on the mental health caseload, with 1,033 3CMS and 105 EOP inmates.  In addition, alternative housing beds located in the administrative segregation unit were used for inmates identified as suicidal and awaiting placement in a MHCB.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake and mental health screening processes.  The Initial Health Screening (CDCR Form 7277) process was conducted by a nurse assigned to the RC.  All questions on the form were asked appropriately.  There was semi-privacy afforded during the process, with the door to the Nurse's Office left open, but no other inmates in the area and officers attending to other responsibilities. The initial 31-item mental health screening form was completed in the private offices of three clinical psychologists.  This process normally occurred on the fifth day of the RC process unless an emergent or urgent mental health referral was generated, with staff having full access to the Strategic Offender Management System (SOMS).  Most of the RC clinical staff indicated that both SOMS and the MHTS would not be accessed unless the inmate self-reported a prior CDCR confinement.  Such a practice was troubling given the fact that WSP had an inmate suicide in April 2013 in which mental health clinicians were unaware of the inmate's history of mental illness during a prior CDCR confinement because the inmate denied any such history upon intake.

This reviewer observed daily rounds by two psych techs in the administrative segregation unit. One psych tech was regularly assigned to the unit and observed to accurately conduct their rounds.  The other psych tech, a registry employee, was observed to be only briefly interacting with inmates and did not appear to differentiate between caseload inmates and non-caseload inmates. In addition, although a private area was available for confidential mental health screening of newly-arrived administrative segregation inmates, the registry psych tech was observed asking an inmate "Do you want a confidential setting or can we just do the screening right here?"  This reviewer then observed completion of the cell-front mental health screening with the cellmate casually observing the process.

**Housing**:  WSP had an 18-bed CTC, with six rooms designated as MHCBs.  The rooms contained no obvious protrusions which could be utilized in a SA by hanging.  The institution

also used alternative housing cells in the administrative segregation unit for inmates identified as suicidal and awaiting MHCB placement. Because any available administrative segregation cell could be used, including cells that were not suicide-resistant, inmates were required to be on continuous observation until transferred. Several mental health clinicians stated that alternative housing was frequently used at WSP because only six MHCBs were available. According to available data, 82 percent of inmates were transferred to a MHCB within 24 hours.

The administrative segregation unit contained 12 retrofitted cells for inmates on new intake status. During the site visit, two newly-admitted inmates were observed housed in non-retrofitted cells despite the fact that there were four empty new intake cells. Each of the non-retrofitted cells was very dangerous.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit. Review of the CTC Census Reports for January and February 2014 found that psychiatric observation was used much more frequently than either Suicide Precaution or Suicide Watch. On March 25, 2014, for example, five inmates were on psychiatric observation and one inmate was under Suicide Precaution in the six MHCBs. Mental health officials at WSP previously developed a local procedure within their LOP for Suicide Prevention and Response that contained a brief explanation of psychiatric observation:  "Whenever a patient exhibits unusual behavior or becomes dangerous to self or others....To prevent suicide and/or injury to self, others, and staff."  Inmates were issued regular prison uniforms and required observation at 15-minute intervals. In practice, however, inmates on psychiatric observation were more likely to be observed at 30-minute intervals. The practice of 30-minute observation for suicidal inmates was problematic.

This reviewer examined the observation forms used to document observation of suicidal inmates housed in MHCBs and found that all of the forms were up-to-date, but the observations were not documented on a staggered basis.

Finally, during the initial tour of the administrative segregation unit, the unit log used to document 30-minute welfare checks of non-new intake inmates appeared to be up-to-date. However, upon this reviewer's return to the administrative segregation unit unannounced the following day, the unit log had not been updated for approximately two hours. Subsequent review of the Guard One data for the administrative segregation unit found only a few violations during the 24-hour period, with overall compliance at 96 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis. Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found. For example, in one case (WSP 1), the inmate had an extensive history of mental illness and reported AH that resulted in an altercation with his cellmate on December 30, 2013. He was admitted to a MHCB on Suicide Precaution based upon both a "moderate" chronic and acute risk for suicide. He remained hospitalized for

approximately two weeks and was discharged from the MHCB on January 15, 2014 with the following treatment plan:

> DC from CTC-MHCB at the EOP LOC 24-hour custody checks to commence 5-day follow-ups by clinician to assure symptom stabilization; 10-day psychiatry to maintain or adjust med doses. Safety plan extensively discussed and rehearsed with I/P which includes education about how to receive emergency psychiatric care for re-emerging symptoms and/or suicide/homicide urges, and how to think through problems that arise and choose alternate solutions other than threats. I/P also educated about his mental illness and expected emotional experiences along with the importance of treatment compliance and reaching out to MH staff.  I/P informed about his rights to receive or refuse treatment; and the risk and benefits of receiving or declining treatment.  Other areas of focus is on intensive anger management through integrated overlearning of new behaviors; observance of consequences of threats toward staff; and learning alternate behaviors.

This thoughtful treatment plan was offset by five-day follow-up progress notes that did <u>not</u> contain any concordance with the above plan, as well as the following treatment plan contained in a SRE dated the fifth follow-up day of January 21, 2014:  "IP will be offered EOP LOC with weekly PC encounter, daily groups, monthly IDTT (with initial IDTT to be held next week), at least for face-to-face Licensed Psychiatric Technician (LPT) contacts per week.  He agrees to notify staff if his symptoms worsen or if he does not feel safe."  This treatment plan bore no resemblance to the January 15 plan.

Finally, this reviewer examined a sample of charts of inmates referred to mental health staff on an urgent or emergent basis during January and February 2014.  Of 22 reviewed charts, 19 or 86 percent appropriately included completion of a SRE for inmates who presented with SI.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambulatory Bag (ambu bag), and cut-down tool.

**Training**:  According to training records, 94 percent of custody staff was certified in CPR.  Nursing staff reported 100 percent compliance with CPR training.  In addition, 93 percent of custody staff and 73 percent of nursing staff were compliant with annual suicide prevention block training.  The nursing staff had been trained by a nurse educator at the institution.  Mental health staff had not received annual suicide prevention block training.  Finally, 93 percent of required mental health clinicians had received the seven-hour SRE training, with only 73 percent having completed the mentoring program.

This reviewer observed the annual suicide prevention block training on March 25, 2014.  The scheduled 60-minute workshop lasted approximately 40 minutes and was not interactive other than a participant inquiring "How long is this class?"

**Recent Suicides**: WSP had two inmate suicides during 2012 – 2014.  In the first case (<u>WSP 2</u>), the inmate was found hanging from the ceiling light fixture of his administrative segregation cell by a sheet during the afternoon of May 12, 2012.  The inmate re-entered CDCR on February 15,

2012 to serve a four-year sentence for grand theft auto and a parole violation. He remained in the RC at WSP until his death. The inmate's intake medical screening and mental health screening were negative for both mental health and suicidal behavior histories.

On April 5, 2012, the inmate cut his wrists in his cell and, while officers were escorting him for treatment, he became combative and inadvertently injured an officer who hit his head on a guard rail and broke his right hand when falling to the floor. The inmate was referred to a mental health clinician who completed a SRE that identified the following chronic risk factors: history of major depressive disorder, psychotic disorder, substance abuse, violence, poor impulse control, perceived loss of social support, and SAs (hanging and cutting in 2008). The identified acute risk factors included: SI, current depressive episode, current psychotic symptoms, current anxiety, agitation, disturbance of mood, and recent negative staff interactions.

The inmate reported that he cut himself because he was "stressed out" and angry, and "I told the cop last night that I needed to talk to the doctor and he would not let me.... I urinated on myself because it stressed me out." He also stated he heard voices that told him "I have to give oral copulation to fight back." The psychologist described the inmate as "very agitated and hypomanic with slightly pressured speech." The clinician rated him as both a "moderate" chronic and acute risk for suicide. The inmate was referred to a psychiatrist for further evaluation, and recommended for 3CMS LOC. The inmate was not placed on Suicide Precaution. The inmate was seen by a psychiatrist shortly thereafter for "anxiety and auditory hallucinations." The psychiatrist noted that the inmate "cut left wrist superficially today" and had a history of self-injurious behavior. The inmate told the psychiatrist that "I am not suicidal. I needed to get away from my cellmate." His mood was described as "anxious, paranoid" and he was given a diagnosis of Psychotic Disorder NOS and Anxiety Disorder. Psychotropic medication was prescribed. The inmate was transferred to the administrative segregation unit based upon the alleged assault on an officer.

Four days later on April 9, 2012, the inmate was assessed by another psychologist who apparently was unaware of the assessments conducted on April 5, 2012. The inmate reported similar symptoms and this clinician offered a diagnosis of Depressive Disorder NOS and Amphetamine Dependence. An SRE was also completed and the clinician determined that the inmate was both a "low" chronic and acute risk for suicide. The clinician also wrote that custody staff and a psych tech reported that the inmate was manipulative and "using alleged symptoms to go to hospital."

On April 11, 2012, the inmate was seen again by a psychiatrist after fighting with his cellmate. He presented as "depressed and anxious and worried about how his pending assault case could result in additional charges." He reported experiencing AH since 2006, and repeated his history of suicidal behavior, as well as disclosing that his mother had previously committed suicide. The psychiatrist gave a diagnosis of Depressive Disorder NOS, and revised the psychotropic medication. The inmate also attended an IDTT that day and a progress note stated that he was "fearful, cautious, agitated, sad, moody, angry." The inmate reported having a good appetite, but difficulty with sleep. He was experiencing command AH telling him to harm himself and "pee on people." The IDTT diagnosed him with Schizoaffective Disorder Depressive Type, and he was officially placed on 3CMS LOC.

In subsequent interactions with the administrative segregation clinician on a weekly basis from April 13, 2012 through May 9, 2012, the inmate presented as anxious and preoccupied with the possibility of getting additional prison time for his alleged assault on an officer.  There were unconfirmed reports that the inmate perceived he was likely to receive an additional five-year prison term.  He also reported sleeping problems and concerns about losing his single cell status. He asked the clinician about using his mental illness as a defense, asked about the insanity defense, and requested assistance in forming a defense.  In contrast, the Psych Tech Daily Rounds forms suggested that the inmate had no complaints and was otherwise stable during this period.

The CDCR reviewer in this case was critical of the clinical treatment provided, stating, "A review of clinical documentation did not show evidence that clinicians probed for details about this self-harm history, current symptoms, and violent behaviors toward self and others thus clinicians did not have important information to make and justify clinical decisions, implement interventions, and develop treatment plans to address his serious mental illness and deteriorating condition, and the origins of the suicidal behaviors."  The Suicide Report contained three bases for recommendations for corrective action through a QIP: (1) Apparent lack of follow-up questions during clinical interviews; (2) Lack of mental health evaluation based upon ICC recommendation of April 12, 2012; and (3) the UHR did not contain an administrative segregation unit Pre-Placement Chrono form.  A fourth recommendation to retrofit the light fixture in the inmate's administrative segregation unit cell was rescinded because the cell had not been designated to be suicide-resistant.

Finally, there were several issues that were <u>not</u> addressed in the Suicide Report, including a discussion as to why an inmate who engaged in self-injurious behavior, reported current SI, and was assessed as a moderate acute risk for suicide on April 5, 2012 was not placed on Suicide Precaution in a MHCB.  In addition, there was no discussion regarding how completion of two SREs a few days apart on April 5, 2012 and April 9, 2012 by two different clinicians resulted in assessment of "moderate" and "low" chronic risk for suicide, or why the clinician that assessed the inmate on April 9, 2012 was unaware of their colleagues' assessments on April 5, 2012 and April 6, 2012.  Finally, there was no discussion regarding the inconsistency of reporting the inmate's behavior in weekly progress notes by the administrative segregation clinician and the Psych Tech Daily Rounds forms by the psych tech.

In the **<u>second</u>** case (<u>WSP 3</u>), the inmate was found hanging from the upper bunk of his GP cell by a sheet during the early morning of April 18, 2013.  The inmate re-entered CDCR on February 20, 2013 to serve a two-year sentence for possession of a controlled dangerous substance.  He remained in the RC at WSP until his death, and was eligible for parole in December 2013.  The inmate had two previous CDCR terms, and had been placed on the mental health caseload in 2011 due to paranoid and delusional behavior that resulted in three brief admissions to a MHCB.  The inmate had never fully participated in treatment due to fear of gang reprisals.  However, upon arrival at WSP in February 2013, the inmate denied any history of mental illness and suicidal behavior, and was never seen by a mental health clinician after completion of the mental health screening on February 28, 2013.

Although the inmate had a history of mental illness during a prior CDCR confinement, he did not demonstrate any obvious signs of SI during his current incarceration.  The CDCR reviewer did not identify any possible precipitating factors to the suicide, but the Suicide Report contained two bases for recommendations for corrective action through a QIP:  (1) Some of the inmate's personal effects were sent to his family prior to inspection by the CDCR reviewer; and (2) The inmate had been previously paroled in December 2011 at 3CMS LOC.  Upon re-admission in February 2013, a new CDCR number was issued and medical and mental health personnel failed to review either the SOMS or MHTS.  On July 1, 2013, the SPRFIT coordinator at WSP reported to Division of Correctional Health Care Services (DCHCS) headquarters that "mental health clinicians will be trained to use the SOMS computer program to (1) locate the inmate's previous CDCR numbers, and (2) locate their LOC history."

## 19)   <u>North Kern State Prison (NKSP)</u>

**Inspection**: March 27-28, 2014

NKSP housed 4,716 inmates, with the vast majority on RC status.  NKSP had a 16-bed CTC with ten designated MHCBs, and an administrative segregation unit housed in building D-6.  Approximately 20 percent of NKSP inmates were on the mental health caseload, with 822 3CMS and 102 EOP inmates.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in housing unit A-4, which was also utilized for administrative segregation and RC overflow.

**Screening/Assessment:**  This reviewer observed several new admissions during the medical intake and mental health screening processes.  The Initial Health Screening (CDCR Form 7277) process was conducted by two nurses assigned to the RC.  Privacy and confidentiality were compromised because each nurse was conducting the screening adjacent to each other, separated only by a small partition with the two inmates in close proximity to each other.  One nurse consistently failed to ask inmates if they were currently suicidal, instead only inquiring as to whether they had a history of SAs.  There was, however, an excellent practice of stationing a psychiatrist in the RC to expedite mental health evaluations and assessment of medication needs.

This reviewer observed the administration of the 31-item mental health screening form completed by clinical psychologists.  This process normally occurred on the third day of the RC process, unless an emergent or urgent mental health referral was generated, with staff having full access to SOMS.  However, most of the RC clinical staff indicated that both SOMS and the MHTS would not be accessed unless they felt it necessary.  Privacy and confidentiality were compromised because the two psychologists assigned to the process were sitting in close proximity to each other in one narrow room, separated by a small partition.  In addition, a third staff member was working at a third desk. When situated at either end of the room, this reviewer could clearly hear the screening questions by each clinician, responses from both inmates, as well as telephone conversation of the third staff member.  It should be noted that the diagnostic building was configured similarly to other CDCR facilities inspected by this reviewer.  At NKSP, three small offices in the Diagnostic Building were assigned to three health care specialists who did not conduct inmate interviews in their respective offices, whereas in other

prisons, these same three offices were assigned to three clinical psychologists and designated for mental health screening and other diagnostic testing.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit. The psych tech was observed to accurately conduct and document their rounds. However, it appeared that the psych tech was spending an inordinate amount of time with each inmate to impress the reviewer, thus observation of the process was stopped.

**Housing**: NKSP had a 16-bed CTC, with ten rooms designated as MHCBs. The rooms contained no obvious protrusions which could be used in a SA by hanging. The institution also used alternative housing beds in A-4 Unit for inmates identified as suicidal and awaiting MHCB placement. The conditions in this unit were very problematic. Cells 101 through 110 were designated for alternative housing. Upon inspection, this reviewer found that these cells contained metal screens with perforated holes on cell fronts that could easily be used as an anchoring device in a SA by hanging. In addition, not all of these designated cells contained retrofitted ventilation grates. Most problematic was the fact that inmates housed in these cells awaiting MHCB placement were often <u>only</u> observed at 30-minute intervals.

Finally, the administrative segregation unit contained nine retrofitted cells for inmates on new intake status. During the inspection, this reviewer observed several newly-admitted inmates housed in non-retrofitted cells. In fact, one inmate had returned from a MHCB on March 27, 2014 and was housed alone on the second floor of the unit in a non-retrofitted cell. Each of the non-retrofitted cells in D-6 was very dangerous. It should also be noted that an inmate committed suicide in December 2013 by hanging himself from an exposed sprinkler head pipe in an administrative segregation cell. Although the cell (No. 131) had not been designated as a new intake cell and, therefore, was not retrofitted, the protective cone to the sprinkler head had still not been replaced as of March 27, 2014. Several other cells in building D-6 also had exposed sprinkler head pipes.

**Observation**: Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit. Mental health officials at NKSP previously developed a local procedure within their LOP for Suicide Prevention and Response that required observation of inmates on psychiatric observation at 60-minute intervals. In addition, although the LOP also stated that inmates on Suicide Precaution were required to be observed at 30-minute intervals, this reviewer observed that, in practice, inmates were being observed at 15-minute intervals for Suicide Precaution and 30-minute intervals for psychiatric observation. This reviewer examined the observation forms used to document observation of suicidal inmates housed in MHCBs and found that all of the forms were up-to-date, but the observations were not documented on a staggered basis.

Finally, during the tour of the administrative segregation unit on March 27, 2014, the unit log used to document 30-minute welfare checks of non-new intake inmates was found to be up-to-date. Subsequent review of the Guard One data for the administrative segregation unit found only a few violations during a 24-hour period, with overall compliance at 98 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (NKSP 1), the inmate had been placed on Suicide Precaution in a MHCB on March 22, 2014 with observation at 15-minute intervals.  At some point, the inmate was downgraded to psychiatric observation with observation at 30-minute intervals, although a Physician's Order was not found in the eUHR.  He was seen by a psychiatrist on a daily basis and, despite verbalizing that "I am still suicidal" on March 25, 2014 and "expressing intermittent feelings of self-harm" on March 26, 2014, the psychiatric note stated "continue CTC care at the level of psychiatric observation."  On March 28, 2014, this reviewer observed an assessment by two clinicians who were not regularly assigned to the CTC, during which the inmate stated that he "was thinking of killing himself yesterday, but not today, was very anxious about not getting his meds, wanted to bang his head against the wall, but got tired and fell asleep."  Following the assessment, when this reviewer asked the clinicians what level of observation the inmate was on, they responded that he was on Suicide Precaution with observation at 15-minute intervals.  This reviewer examined the chart and the CTC Daily Census for March 28, 2014 and confirmed that the inmate was still on psychiatric observation with observation at 30-minute intervals.

Cases NKSP 2 and NKSP 3 symbolized the inadequacy of treatment plans found in SREs used to justify discharge from a MHCB.  The discharging SREs in both cases are presented in their entirety as follows: "(1) Discharge to CCCMS LOC, (2) Initiate *Coleman* follow-ups, (3) 7-day psychiatry follow-up, and (4) 7-day CM follow-up."  In another case (NKSP 4), the treatment plan section of the SRE dated January 28, 2014 stated: "Present at IDTT - 1/29/14, continue mental health services with case management at the CCCMS LOC, medication compliance or referral to psychiatry for follow-up, individual therapy, reduce inappropriate aggressive behavior and increase boundaries, increase coping mechanisms and impulse control, and decreased SI and grave disability (reports) to manage conflict."  There was no documentation found in either the five-day follow-up progress notes or any subsequent progress notes from the PC to indicate concordance with the above treatment plan.

Finally, this reviewer examined a sample of charts of inmates referred to mental health staff on an urgent or emergent basis during February 2014.  The review found that SREs were completed for inmates who presented with SI in 100 percent of the cases.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 95 percent of custody staff was certified in CPR.  Nursing staff reported 100 percent compliance with CPR training.  In addition, 96 percent of custody staff and 94 percent of nursing and mental health staff were compliant with annual suicide prevention block training.  Finally, 93 percent of required mental health clinicians had received the seven-hour SRE training, with only 77 percent having completed the mentoring program.

**Recent Suicides**:  NKSP had one inmate suicide during 2012 – 2014.  In that case (NKSP 5), the inmate was found hanging from the exposed sprinkler head pipe of his administrative segregation unit cell by a sheet during the early morning of December 27, 2013.  The inmate entered CDCR in April 2011 to serve a 15-year sentence for robbery, assault, and false imprisonment.  According to available records, the inmate did not have a history of mental illness in the community, however, both parents were reported to have histories of depression and an uncle had previously committed suicide.  Upon entry into CDCR, inmate did not report any concerns regarding mental health or suicidal behavior.  He enjoyed strong support from his family.

While housed at CEN September 7, 2013, the inmate complained to a nurse of feeling depressed due to concerns regarding a sick family member and possible out-of-state transfer.  He was referred to a mental health clinician who determined that he did not meet criteria for the mental health caseload.  On September 12, 2013 the inmate was informed that he was declared eligible for out-of-state transfer.  During subsequent interactions with mental health staff, the inmate began to report an increasing number of serious symptoms of mental illness, including depression and anxiety and AH.  Clinicians believed that he was reporting the symptoms in an attempt to meet the criteria for caseload inclusion, thereby avoiding out-of-state transfer.  On September 17, 2012, an SRE was completed and the inmate reported that he "had passive SI during the criminal proceedings against him and during times of 'severe hardship,' such as adjusting to school, peers, authority figures.  He has thought about jumping off a bridge or a building.  Most recent SI occurred three months ago.  Patient asserts that he does not really want to die."  His affect was described as "looks superficial, with moist and tearful eyes."  The clinician determined that the inmate was not a "reliable informant," and although he endorsed many acute risk factors for suicide, he was assessed as a "low" acute risk because the endorsements were "unreliable."

On September 26, 2013, the inmate filed a medical appeal regarding his ineligibility for the mental health caseload.  A few weeks later on October 8, 2013, his appeal was granted.  He was diagnosed with an Adjustment Disorder with Depressed Mood and prescribed psychotropic medication to address continuing complaints of anxiety and poor sleep.  A diagnosis of Anti-Social Personality Disorder was added.  He was entered into 3CMS LOC. When informed that would be transferred from because the institution did not offer mental health services, he inquired as to what prisons were close to his family in the San Diego area and appeared to make a conditional suicide threat during a session with his clinician on October 21, 2013:  "If they take me away from my family I will feel more entitled to carry out the thoughts." As a result, a MHTP completed the following day referenced "passive SI."  The inmate was not transferred to the San Diego area, but to NKSP on December 6, 2013, and housed in the administrative segregation unit due to the vague self-reported safety concerns.

While in administrative segregation, the inmate was seen on a weekly basis by mental health clinicians and during daily psych tech rounds.  During the first few days of administrative segregation confinement, the records indicated that he did not voice any complaints, showed no signs of decompensation and denied any SI.  However, when interviewed on December 9, 2013 by a correctional lieutenant regarding the veracity of his safety concerns, the inmate became

frustrated and stated "I want to go home and be with my family.  I'm done."  A mental health referral was generated and he was seen the following day by a psychologist.  An SRE was completed and the clinician assessed the inmate as being both a "low" chronic and acute risk for suicide.  The clinician, however, failed to document several acute risk factors, including current SI, current recent depressive episode, current/recent anxiety or panic symptoms, recent change in housing (i.e., administrative segregation), and single cell placement.  The SRE form also had very little, if any, second page narrative.  Several days later on December 16, 2013, the inmate was seen by a psychiatrist following complaints of side effects and sleeping problems caused by his medication.  The psychotropic medication was adjusted.  In contrast to this clinical perception of the inmate's declining mental health, Psych Tech Daily Rounds forms completed by psych tech staff from December 9, 2013 through December 22, 2013 indicated that the inmate did not voice any mental health concerns, did not report any side effects from medication, did not experience any appetite or sleep problems, and his mental status was observed to be within normal limits.

On December 23, 2013 the inmate was seen again by the psychiatrist and complained about his medication and feeling "anxious and stressed out."  The following day, the inmate was initially seen by a psych tech after officers observed him yelling and kicking his cell door during the previous night.  He told the psych tech that people were plotting to harm his family.  An urgent mental health referral was written and he was seen later that morning by a psychologist who noted that the inmate reported persistent fear and concern about the safety of his parents and himself, and wanted to make a telephone call to his parents to warn them of the danger.  He told the psychologist that "They put a hit out on me....They know where I live, my parents' names, and what kind of car they have."  The inmate was also seen by a psychiatrist who offered him different medication, but the inmate refused.  He appeared calmer the next two days, but refused to speak to the psychiatrist on December 26, 2013 simply stating "I refuse, just leave me alone."  He committed suicide the following day.

Although the CDCR reviewer did not offer any specific precipitating factors to the suicide, it was noted that the inmate had "acknowledged to past clinicians that he felt guilty and remorseful about the impact his arrest and conviction have had on his family.  Maybe that those feelings, separation from family support during the holidays, and his frustration that his plans to stay close to his family had not succeeded led to his resolve to end his life."  The Suicide Report contained five bases for recommendations for corrective action through a QIP:

> (1) There were concerns regarding the accuracy of testimony and documentation from the officer who discovered the inmate hanging at 6:19 a.m. and stated he was performing Guard One checks at the time.  Review of Guard One logs failed to indicate any checks being performed at 6:19 a.m., rather they were performed at both 6:09 a.m. and 6:38 a.m.  The officer also wrote on the Inmate Segregation Record that he found the inmate hanging out approximately 6:25 a.m.; (2) The requirement for observation at 30-minute intervals was violated because emergency medical response documents indicated the inmate was found in the state of rigor mortis with "both arms raised and stiff" and had a "clenched jaw," indications that the inmate had been dead for several hours.  However, correctional staff documented in the Inmate Segregation Record that the inmate

had been observed at regular 30-minute intervals and was "exercising /miscellaneous cell activity" at 6:09 a.m.; (3) There was conflicting documentation pertaining to emergency medical response and whether the AED and Ambu bag were utilized; (4) An SRE dated December 10, 2013 failed to document the presence of a number of acute risk factors; and (5) There was no documentation of the pre-placement administrative segregation unit screening form in the eUHR.

Finally, there were several issues that were <u>not</u> addressed in the Suicide Report.  First, similar to the incomplete SRE completed by an NKSP clinician on December 10, 2013, there was an incomplete SRE completed by a CEN clinician on September 17, 2013.  On both occasions, these two clinicians separately assessed the inmate as being at "low" acute risk for suicide despite numerous acute risk factors.  The SRE dated September 17, 2013 included the following acute risk factors: SI, current/recent depressive episode, current/recent psychotic symptoms, current/recent anxiety or panic symptoms, current/recent substance abuse/intoxication, hopelessness/helplessness, increasing interpersonal isolation, recent bad news, single cell placement, recent negative staff interactions, and recent disciplinary.  Despite these 11 acute risk factors, the CEN clinician assessed the inmate as being at "low" acute risk for suicide.  In addition, and related to the miscalculation of acute risk factors, there were at least two other occasions, on October 21, 2013 and October 22, 2013, when SI was indicated, but did not result in completion of an SRE.  Although the CDCR reviewer indicated that mental health clinicians might have wrongly perceived the inmate to be manipulative, e.g., noting that the "although inmate may have exaggerated some symptoms to gain admission into MHSDS, he seemed to suffer from symptoms of anxiety and depression," the reviewer did not go far enough in suggesting that such a perception by both CEN and NKSP clinicians resulted in dismissal of the inmate's acute risk factors for suicide, and should have resulted in additional training.  Finally, there was no discussion regarding the inconsistency of reporting the inmate's declining mental health as noted in weekly progress notes by the administrative segregation unit clinician and psychiatrist with weekly Psych Tech Daily Rounds forms completed by psych tech staff that reported a mental health status within normal limits.


## 20)   Central California Women's Facility (CCWF)

**Inspection**: April 8-9, 2014

CCWF housed 3,658 inmates with an array of security classifications, Levels I through IV and RC status.  CCWF had a 39-bed Skilled Nursing Facility (SNF) with 12 designated MHCBs in eight rooms, and an administrative segregation unit that also contained a 20-cell condemned unit.  Approximately 36 percent of CCWF inmates were on the mental health caseload, with 1,273 3CMS and 58 EOP inmates.  In addition, alternative housing cells for inmates identified as suicidal and awaiting placement in a MHCB were located in either TTA holding cells or safety/observation rooms in the SNF.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake and mental health screening processes on April 8, 2014 and April 9, 2014.  The Initial

Health Screening (CDCR Form 7277) process was conducted by two nurses assigned to the RC. Good privacy and confidentiality were maintained because only one inmate was screened at a time and the door to the Nurse's Office remained closed. However, the nurse who conducted the vast majority of the screenings consistently failed to ask inmates if they were currently suicidal, instead only inquiring as to whether they had a history of SAs. Following this reviewer's observation of the process, the nurse was asked why they had not inquired whether the inmates were currently feeling suicidal after asking them about a history of suicidal behavior. The nurse responded by saying "If the inmate did not report any history of suicidal behavior, they could not have current ideation."

In addition, this reviewer observed the administration of the 31-item mental health screening form completed by clinical psychologists. This process occurred within the first seven days of the RC process unless an emergent or urgent mental health referral was generated, with staff having full access to SOMS. However, most of the RC clinical staff informed this reviewer that both SOMS and the MHTS would not be accessed unless they felt it necessary. Good privacy and confidentiality were maintained because clinicians had private offices and doors remained closed during the process.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit. The psych tech was observed to accurately conduct and document their rounds, however, unlike the SQ condemned unit, psych tech rounds were not conducted in the CCWF condemned unit.

**Housing**: CCWF had a 39-bed SNF, with 12 designated MHCBs in eight rooms. The rooms did not contain any obvious protrusions which could be utilized in a SA by hanging. In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in either TTA holding cells or safety/observation rooms in the SNF. Inmates were required to be under continuous observation while housed in these cells.

In addition, the administrative segregation unit contained four retrofitted suicide-resistant cells for inmates on new intake status. During the site inspection, although this reviewer observed only one newly admitted inmate housed in a non-retrofitted cell, correctional staff stated that new intake inmates were frequently placed in non-retrofitted cells when the four designated cells were occupied.

Finally, CCWF custody officials utilized "Modified Property Control Status" (MPCS) for selected problematic inmates housed in administrative segregation. According to institution policy (Special Placements, Policy No. 62050), "MPCS is to manage inmates who continued to pose a serious threat to the physical safety of staff, other inmates or themselves, after placement on PCS (property control status)." Inmates on this status were required to be observed at 60-minute intervals and issued only a "safety gown, blanket and mattress, toilet paper (issued on an as-needed basis), sanitary napkins (issued on an as-needed basis), one bra (exchanged on an as-needed basis), and one panty (exchange daily)." Inmates were also issued a paper tray, one spoon, and a Styrofoam cup for each meal. Although inmates on MPCS were required to be referred to mental health staff within 24 hours and seen by a clinician on a daily basis, custody staff were solely responsible for an inmate's placement on, and discharge from, MPCS.

This reviewer observed the problematic use of MPCS during a tour of the administrative segregation unit on April 8, 2014.  While observing psych tech rounds, this reviewer was surprised to see an inmate (CCWF 1) clothed only in a safety smock.  Subsequent review of her eUHR found the following:  The inmate presented as a significant management problem to both custody and mental health staff.  She had been housed in the administrative segregation unit since November 2013 for refusal to accept a cellmate in GP.  She was 3CMS LOC with a diagnosis of Polysubstance Dependence, Adjustment Disorder with Anxiety, and Narcissistic Personality Disorder.  The inmate frequently threatened suicide when she perceived her needs were not being met, but was rarely placed on suicide observation.  For example, on March 12, 2014, she threatened suicide and was escorted to the TTA for assessment, but not admitted to a MHCB.  The following week on March 20, 2014 the inmate again threatened suicide, was escorted to the TTA for assessment, but again returned to the administrative segregation unit shortly thereafter.  The following day, the inmate threatened suicide on two separate occasions and was escorted to the TTA for assessment.  She was returned to administrative segregation each time without being admitted to a MHCB.  During this two-day time period, the inmate repeatedly told staff that "I will kill myself if I don't get to go to a crisis bed," and "I will kill myself if I don't get to go to EOP and get the help I need." The administrative segregation clinician offered to meet with the inmate more regularly and offered her treatment materials from the EOP program and to schedule an IDTT hearing to review her LOC, but she refused to cooperate, stating "I just can't go on. I can't cope with everything."  Progress notes indicated that the inmate was not admitted to a MHCB because her "SI is not credible" and there was an "absence of positive symptoms for depression, lack of adequate description of thoughts/intention regarding suicide...and the fact that she refused to share any information about her reasons for being suicidal."

The inmate, however, was admitted to a MHCB during the later evening of March 21, 2014 after she placed a ligature (sheet) around her neck in a suicidal gesture.  She remained in the MHCB for approximately a week and was discharged back to administrative segregation on March 27, 2014.  The discharging treatment plan recommended that the inmate be placed in a "behavioral management cell, commence 5-day follow-up, take to ASU IDTT to address inmate-patient's request to be made EOP.  Assess overall functioning, encourage inmate-patient to cope with her current status and returned to the comprehensive parole planning she was engaging in prior to insisting she be made EOP and paroling at that LOC."  On April 2, 2014 the inmate attended an IDTT and the team declined to place her in EOP LOC; determining that she "appears to be engaging in behavior that is for secondary gain, as opposed to being the result of the severe and persistent mental disorder."  Several hours later, the inmate again threatened suicide, was escorted to the TTA for assessment and, although a clinician completed an SRE that found her to be at "moderate" acute risk for suicide, she was returned to the administrative segregation unit shortly thereafter without a MHCB admission.

The following day, April 3, 2014, a correctional lieutenant wrote a "general chrono" that stated the following:

> On Thursday, April 3, 2014, while housed in ASU, the inmate was removed from
> her cell due to her notifying staff of having SIs.  Recently, inmate has had
> multiple incidents similar to this nature; specifically, on March 20, 2014, March

21, 2014, April 1, 2014, and again on April 3, 2014, the inmate has expressed an intent to harm herself.  She also displayed behavior that is unusual, bizarre and/or uncharacteristic, making reference on multiple occasions that she "sees dragons" and that she is "living in another world."  Per consultation with mental health, due to inmate's continued SIs, coupled with her bizarre behavior, hallucinations, and disrespect towards others, she will be placed on MPCS as a control message in an attempt to prevent her from harming herself or others.  Inmate will be seen by the ICC within 10 days of placement.

There were several concerns with using MPCS in this case.  First, if staff (whether custody or health care) were concerned that the inmate was at potential risk for suicide, the inmate should have been admitted to a MHCB, or alternative housing until a MHCB was available.  Second, if MPCS was a behavioral management plan, it was not being utilized collaboratively in this case.  In fact, the inmate's most recent MHTP, dated April 3, 2014, did not even contain reference to her MPCS.  Pursuant to CCWF policy, MPCS is a custody initiative, and mental health clinicians have no input into its duration for an inmate.  An example of lack of collaboration between custody and mental health with MPCS was a brief passage contained within the December 2013 SPRFIT minutes that simply stated: "Custody in Ad-Seg has been stripping out cells and restricting property for patients claiming they are suicidal."  Third, a safety smock is a garment designed exclusively for the prevention of suicide by hanging. Pursuant to the *Program Guide*, a safety garment should only be authorized by the mental health clinician following the comprehensive assessment of suicide risk.  Custody staff should be prohibited from authorizing use of safety smocks.  Fourth, although this inmate was clothed in a safety smock and allegedly on MPCS because of a concern for suicide and/or other self-injurious behavior, she was only required to be observed at 60-minute intervals (although all administrative segregation inmates were required to be observed every 30 minutes) and not housed in a retrofitted, suicide-resistant administrative segregation cell.  Such measures did not demonstrate a concern for suicide.  Fifth, although the MPCS policy stated that "inmates will be placed on MPCS as a control measure only.  MPCS will not be utilized for punitive reasons," the policy could easily be interpreted by inmates and other observers as a punitive response to perceived manipulative behavior.

**Observation**:  Both Suicide Precaution and Suicide Watch were used in the SNF for inmates identified as being suicidal.  Unlike many other toured institutions, this reviewer did not observe the use of psychiatric observation at CCWF, and all inmates in a MHCB were required to be observed at 15-minute intervals.  This was a good practice.  In addition, this reviewer examined the observation forms used to document observation of suicidal inmates and found that all of the forms were up-to-date and observations documented on a staggered basis.

Finally, the administrative segregation unit log used to document 30-minute welfare checks of non-new intake inmates was observed to be up-to-date.  Subsequent review of the Guard One data for the administrative segregation unit found very few violations during a 24-hour period, with overall compliance at 99 percent for new intake inmates.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a

daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (CCWF 2), the inmate was admitted to a MHCB on March 6, 2014 for SI and discharged approximately a week later on March 12, 2014 with the following treatment plan:

> Discharge to EOP on hourly checks and 5-day follow-up. Sergeant and CO notified.  Inmate-patient will be housed in the room with other Developmentally Disabled Person (DDP) inmates for support and to minimize opportunities for her to be picked up.  Recommend continued work with PC on grief issues and behavioral management of depression.  Recommend inmate-patient be referred to EOP "Grief" and Loss" group and "Substance Abuse" group.  She should also be encouraged to participate in every Rec Therapy group in which she is invited. Wellness and Yoga would be helpful as the endorphins of physical activity will improve her mood and overall energy.  Due to borderline intellectual functioning, it will be difficult for inmate-patient to stay informed of medications and note the medication regime that works best for her.  In addition, inmate-patient tends to be suggestible, may readily endorse symptoms that she does not have….best to keep in mind before making changes to her medication regime.

Despite this thoughtfully worded treatment plan, there was no documentation found in either the five-day follow-up progress notes or any subsequent progress notes from the PC to indicate concordance with the above plan.

This reviewer examined a sample of charts of inmates referred to mental health staff on an emergent basis during a three-week period in March 2014.  The review found that SREs were completed for inmates who presented with SI in only eight of 18, or 44 percent of the cases.  One case (CCWF 3) was symbolic of most cases reviewed.  The inmate expressed SI to custody staff during the late evening of March 2, 2014 and was transported to the TTA for assessment.  She informed the nurse that she had a plan to hang herself and stated she had attempted suicide earlier in the evening and also was cutting herself.  The on-call psychiatrist was notified and decided not to admit the inmate to a MHCB because she recanted her ideation and "contracted for safety" with the nurse.  The required SRE was not completed.  The following day, March 3, 2014, the inmate was returned to the TTA and informed the nurse that "I feel suicidal, my daughter is sick, and I feel suicidal, I also feel homicidal, I can't honestly don't feel safe going back there, I am hearing voices to do things." The on-call psychiatrist was notified and again a decision was made not to admit the inmate to a MHCB, and she was returned to her housing unit. The required SRE was not completed.

Finally, several other miscellaneous issues arose during the eUHR review.  For example, this reviewer examined several cases in which both nursing and mental health staff used "contracting for safety" in the assessment of suicide risk.  In fact, in one particular case (CCWF 4) the safety contract was actually written into the nurse's progress note on March 15, 2014 as follows:  "I, CCWF 4 agree not to harm myself or others and contacting medical, mental health, or custody staff.  I'm not hearing voices or seen things that are not there."  In other cases (e.g., CCWF 5) inmates were discharged from MHCBs without a discharging SRE, thus without treatment plans. In addition, both medical and mental health staff complained that it took between one and four

weeks for documents to be scanned into the eUHR, an issue that would impact the ability for continuous quality improvement.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 100 percent of custody and 93 percent of nursing staff were certified in CPR.  In addition, 97 percent of custody staff was compliant with annual suicide prevention block training.  Neither medical nor mental health staff had completed the annual suicide prevention block training, although informational material was said to have been given to nursing staff.  Finally, 100 percent of required mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CCWF did not have any inmate suicides during 2012-2014.


**21)**    **Valley State Prison (VSP)**

**Inspection**: April 10-11, 2014

VSP housed 3,216 inmates, with the vast majority being Level II SNY status. VSP had a 23-bed OHU that utilized "swing beds" for inmates identified as suicidal and awaiting placement in a MHCB.  In addition, until recently, three dry holding cells in the OHU were also being used for alternative housing of suicidal inmates.  On April 11, 2014, following this reviewer's suggestion, alternative housing was relocated into the administrative segregation unit. Approximately 42 percent of VSP inmates were on the mental health caseload, with 1,163 3CMS and 192 EOP inmates.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on both April 10, 2014 and April 11, 2014.  The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit.  Privacy and confidentiality were adequate, with the door to the nurse's office partially closed during the screening process.  On April 10, 2014 the nurse consistently failed to ask inmates if they were currently suicidal, instead only inquiring as to whether they had a history of SAs.  On April 11, 2014 however, the same nurse apparently had received corrective action from the previous day and consistently asked each newly admitted inmate about current SI.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit on April 10, 2014.  The psych tech was observed to accurately conduct and document their rounds.

**Housing**:  VSP had a 23-bed OHU that utilized "swing beds" for inmates identified as suicidal and awaiting placement in a MHCB.  All of the rooms contained obvious protrusions which could be utilized in a SA by hanging, including furniture, handicap railing, exposed pipes etc.  Most problematic, however, was the fact that suicidal inmates were <u>not</u> observed on a continuous, 1:1 basis in the OHU, which was required when housed in rooms that were not suicide-resistant.  In addition, three dry holding cells in the OHU were, until recently, also being

used for alternative housing of suicidal inmates. This reviewer was informed that these cells, without sinks and toilets, were holding inmates up to five days without the knowledge of Health Care Placement Oversight Program (HCPOP). Previous VSP mental health officials (i.e. CEO and CMH) had initiated the practice in an attempt to decrease manipulative behavior. Those officials were recently replaced and suicidal inmates were no longer housed in the dry cells up to five days, but could be housed for up to 48 hours. On April 11, 2014, alternative housing was relocated into the administrative segregation unit.

Finally, the administrative segregation unit contained two retrofitted cells for inmates on new intake status. In fact, most of the administrative segregation cells had concrete construction and there were not any gaps between the wall and furnishings.

**Observation**:  Although both Suicide Precaution and Suicide Watch (on rare occasions) was used in the OHU for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit and most inmates were said to be observed at 15-minute intervals. However, as noted above, because none of the OHU rooms were suicide resistant, all suicidal inmates should be observed on a continuous, 1:1 basis. Because no inmates were on suicide observation during this reviewer's two-day assessment, observation forms used to document observation could not be examined.

Upon examination of the administrative segregation unit log used to document 30-minute welfare checks of non-new intake inmates this reviewer found that welfare checks conducted during the First Watch (10:00 p.m. to 6:00 a.m.) were not properly documented, with notations simply stating "30-minute rounds done" at the end of the shift. Subsequent review of the Guard One data for the administrative segregation unit found very few violations during a 24-hour period, with overall compliance at 99 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis. Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found. For example, in one case (VSP 1), the inmate had been placed on Suicide Precaution in the OHU during the evening of March 9, 2014 after informing a nurse that "I have thoughts of hurting myself." He was seen the following morning, by a mental health clinician who completed an SRE indicating the inmate had "expressed SI after receiving some bad news that he will be transferred again, causing him to lose family visits and completing his education again. He currently denies any thoughts of SI with no specific plan, intent, or means, however, continues to feel hopeless and powerless with constant change." He was assessed as being at "low" acute risk for suicide and downgraded to psychiatric observation, a level of observation that was not authorized in the *Program Guide*.

In addition, while on Suicide Precaution and psychiatric observation, nursing staff were documenting the observation at 60-minute intervals. On March 11, 2014, the inmate was released from the OHU with the following treatment plan: "I/P was seen on 3/10/14 and completed 7386 and 7388 assessment to continue mental health treatment. IDTT held today to change LOC to C3MS. He will be discharged from the OHU and released to yard with 5-days.

He will follow with assigned PC and be referred for Stress Management."  Review of the eUHR found that five-day follow-ups were completed from March 12, 2014 through March 16, 2014 without any accompanying progress notes and no indication of any treatment planning (including stress management).  As of April 11, 2014, the inmate had not been seen by any mental health staff, including his PC, since the last day of the five-day follow-up approximately three weeks earlier on March 16, 2014.

In another case (VSP 2), the inmate reported AH telling him "to hurt myself," with a plan to cut himself with a razor.  He was on 3CMS LOC and appeared paranoid. He was placed on Suicide Watch and housed in alternative housing because there were no OHU beds available.  The inmate was seen by the IDTT the following morning, elevated to EOP LOC, discharged from Suicide Watch, and returned to his housing unit.  An SRE was not completed, therefore, a treatment plan was not completed.  Review of the eUHR found that, although five-day follow-ups were completed from March 18, 2014 through March 23, 2014 and a separate progress note completed on March 21, 2014 there was no other documentation that the inmate was being treated as of April 11, 2014.

As noted above, the CEO and CMH were replaced in March 2014 and the current CMH identified several problem areas in the delivery of mental health services.  The following areas were in the midst of corrective action:  Pre-administrative segregation unit screening, administrative segregation unit cell front contacts, OHU policy and procedures, SRE audit and training (to include review of ten SREs per month), annual suicide prevention training, urgent mental health referrals, 90-day follow-up SREs, and five-day follow-ups.

Finally, this reviewer examined a sample of charts of inmates referred to mental health staff on an emergent basis for SI during March 2014.[1]  Of these emergency mental health referrals, 18 were found in the MHTS, and an additional 16 were found in the TTA Log.  The review found that SREs were completed in 94 percent, or 32 of 34 of the cases.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 94 percent of custody and 97 percent of nursing staff were in compliance with CPR training.  In addition, 95 percent of custody staff was compliant with annual suicide prevention block training. Medical and mental health staff had not received annual suicide prevention training.  Finally, 98 percent of required mental health clinicians had received the seven-hour SRE training, and 86 percent had completed the mentoring program.

This reviewer observed the annual suicide prevention block training on April 10, 2014.  Until recently, the suicide prevention workshop at VSP had only been offered via a DVD.  The observed presentation on April 10, 2014 was fraught with audio-visual problems and periodic

---

[1]It should be noted that, beginning with this facility review, this writer also began to review the TTA Log at each facility because it was discovered that the MHTS was not an accurate repository for all emergency mental health referrals. In fact, emergency referrals found in the TTA Log were not always found in the MHTS, and emergency referrals found in the MHTS were not always found in the TTA Log. In some of the subsequently reviewed facilities, the total number of emergency referrals found in the TTA Log greatly exceeded those found in the MHTS.

interruptions from VSP medical officials accompanying this reviewer on the tour, which distracted both the instructor and participants.

**Recent Suicides**:  VSP had one inmate suicide during 2012 – 2014.  In that case (VSP 3), the inmate was found hanging from the shower head of a SNY shower room by an electrical cord during the afternoon of October 1, 2013.  The inmate entered CDCR in September 1996 to serve an 85-year to life sentence for assault on a peace officer, disregard for safety, and vehicle theft.  According to available records, the inmate did not have a significant history of mental illness in the community, although he was treated for Attention Deficit-Hyperactivity Disorder (ADHD) as a child.  While in CDCR, although not on the caseload at the time of his death, the inmate received mental health services at the 3CMS LOC from 2000 through 2002 for anxiety, depression, and insomnia.  He did not have any history of suicidal or self-injurious behavior.  The inmate accrued seven RVRs during his 17-year confinement, the last of which occurred shortly after his transfer to VSP in November 2012.

Due to a history of gunshot wounds to his abdomen and pelvic area in 1992 and 1995, resulting in multiple abdominal surgeries, the inmate suffered from severe chronic pain throughout his incarceration.  He frequently requested further surgery for the removal of bullet fragments, but medical experts believed the risk of surgery was too dangerous.  The inmate had been treated for many years with anti-inflammatory medication to manage his pain, and was approved to receive morphine in December 2012.

The CDCR reviewer believed that two issues might have been precipitating factors for the inmate's suicide.  First, according to inmate's mother (who was interviewed by the reviewer following the suicide), "He was preparing us when he said there was nothing more they could do for him.  He had hopelessness.  He asked to be sent home to die, but he was rejected.  He was suffering so much.  And with all that morphine he couldn't think straight."  Second, the inmate was informed on September 18, 2013 (two weeks before his death) that his 24-year-old daughter had committed suicide by hanging.  Although he had only met the daughter once 20 years earlier, according to his mother, "he was devastated ....That put them in a tailspin.  She (his ex-girlfriend and daughter's mother) dropped a bomb.  He was so so mad.  He called every day after that, venting.  That type of news and being so sick.  He had to vent."  In addition, three suicide notes that were found in the inmate's cell spoke of frustration for chronic pain he suffered, separation from his family, and problems with a cellmate.

Although the Suicide Report did not recommend any corrective action in this case, the subsequent DCHCS Combined Death Review Summary found a few issues, including nursing staff using an Epi-Pen during CPR without authorization, and "the lack of a 'code leader' to accept leadership responsibility caused the Emergency Medical Response to be disorganized."  The CDCR reviewer did not believe either issue to be a contributing factor to the inmate's death.

In addition, there were a few other issues that were not addressed in the Suicide Report.  For example, the Suicide Report stated that "According to available records, the inmate had *received* a telephone call on September 18, 2013 notifying him that someone had died."  It was unclear from the wording of this statement how an inmate could have "received a telephone call" from outside the prison without VSP staff knowing about it, nor any inquiry or discussion as to

whether or not any VSP staff were aware that the inmate's daughter had died prior to his death. If VSP staff were aware of the death, a mental health referral should have been generated. In addition, CDCR reviews of other inmate suicides that involved the issue of chronic pain management invariably contained a recommendation and corrective action for collaboration between medical and mental health staff in best treating the inmate. It was unclear why such a recommendation was not offered in this case.

## 22)   **Kern Valley State Prison (KVSP)**

**Inspection**: April 22-23, 2014

KVSP housed 3,795 inmates, with the vast majority being Level IV classification. KVSP had a 20-bed CTC with 12 designated MHCBs, and four administrative segregation units (B-1, B-2, ASU 1, and ASU 2). Approximately 33 percent of KVSP inmates were on the mental health caseload, with 1,145 3CMS and 122 EOP inmates. In addition, alternative housing beds for inmates identified as suicidal and awaiting MHCB placement were located in both the administrative segregation units and selected SNY housing units.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on April 22, 2014. The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit. Privacy and confidentiality were compromised because the nurse conducted the screening with a door to the Nurse's Office open and the inmate straddling a chair positioned in the hallway facing into the Office. The hallway was very noisy, with officers yelling instructions to other inmates. The nurse was observed to be asking all the required intake screening questions.

This reviewer observed daily rounds by psych techs in a few of the administrative segregation units on April 22 and 23, 2014. The psych techs were observed to accurately conduct and document their rounds.

**Housing**:  KVSP had a 20-bed CTC with 12 designated MHCBs. The rooms did not contain any obvious protrusions which could be utilized in a SA by hanging. In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in both the administrative segregation units and selected SNY housing units. Because many of these cells had not been retrofitted, inmates housed there were required to be observed on a continuous basis.

Finally, three of the administrative segregation units (B-1, ASU 1, and ASU 2) contained 20 retrofitted cells for inmates on new intake status. During the site inspection, however, this reviewer toured B-1 and observed all ten new intake cells full, and an additional ten inmates on new intake status housed in non-retrofitted cells. In addition, although B-2 Unit did not have any designated new intake cells, there were several newly-admitted inmates housed in non-retrofitted cells. Of note, a recent suicide in July 2014 involved a newly admitted inmate placed into a non-retrofitted cell in B-2 Unit in violation of CDCR policy. Each of the non-retrofitted cells in both

B-1 and B-2 Units were very dangerous, and contained gaps between the wall and bed, desk/stool, and shelf.

**Observation**:  Although both Suicide Precaution and Suicide Watch was used in the CTC for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit.  In fact, there were eight inmates on psychiatric observation and three on Suicide Precaution during this reviewer's inspection of the CTC on April 22, 2014.   It appeared that the practice and/or pattern was for clinicians to place an inmate on Suicide Precaution for 24 to 48 hours and then downgrade them to psychiatric observation.  Psychiatric observation was regularly used at KVSP, with inmates observed at 60-minute intervals.  Review of selected eUHRs did not find adequately documented clinical judgment for step-down decisions.  Further, up until a few days before this reviewer's assessment, KVSP nursing staff was using an old CDCR observation form that contained pre-printed time intervals, therefore, staggered observation was not occurring.  The correct observation form was being used beginning April 19, 2014.

Finally, during the tours of three administrative segregation units on April 22 and 23, 2014, this reviewer examined the unit logs used to document 30-minute welfare checks of non-new intake inmates.  The reviews found that no welfare checks were documented during the Second Watch (6:00 a.m. to 2:00 p.m.) for several days in both March and April 2014 in all three units.  In one administrative segregation unit (B-1), welfare checks were not performed during several 16-hour periods spanning the First and Second Watch.  In administrative segregation unit 2, the monitoring team entered the Unit at approximately 8:10 a.m. on April 23, 2014.  The Unit Log was reviewed and indicated that a 30-minute welfare check had last been completed at 5:35 a.m. The team exited the Unit and returned approximately 40 minutes later.  At that time, the Unit Log was re-checked and it indicated that all of the missing welfare checks from 5:35 a.m. forward had been brought up-to-date and documented on a staggered basis.  Such falsification of a document was problematic.  However, subsequent review of the Guard One data for all four administrative segregation units found high compliance rates during a 24-hour period (B-1: 92 percent, B-2: 98 percent, Administrative Segregation Unit 1: 96 percent, and Administrative Segregation Unit 2: 98 percent) for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (KVSP 1), the inmate was returned from a two-day hospitalization during the evening of March 15, 2014 following treatment for an intentional overdose of methadone.  He was on 3CMS LOC and had a diagnosis of Schizoaffective Disorder.  The inmate was placed on Suicide Watch in alternative housing on a SNY.  The following morning, March 16, 2014, the inmate was seen by a psychiatrist and discharged from Suicide Watch and returned to the SNY with a "3-day mental health f/u."  An SRE was not completed.  Review of the eUHR did not find any follow-up progress notes by mental health staff.  A week later on March 24, 2014, an initial SRE was completed the PC.  The clinician assessed the inmate as having a "moderate" chronic risk for suicide based upon an extensive history of SAs and self-injurious behaviors that included an

111

overdose from heroin in 2010, cutting his neck and attempting to hang himself two months later, an overdose from alcohol and pills and 2011, and placing a razor blade in his mouth and having another inmate hit them in the face. He had three prior MHCB admissions. The March 24, 2014 SRE contained the following treatment plan: "(1) I/P will attend all MH appointments and take psychotropic medication as directed, (2) The I/P shall refrain from engaging in self-harming behaviors, and (3) should I/P have thoughts, plan, or intent to harm himself, he will first notify any staff person prior to taking any action against himself."

The eUHR review also found that clinicians were using the same treatment plan boiler-plate narrative for many inmates released from a MHCB. For example the discharging SREs of three different inmates (KVSP 2, KVSP 3, and KVSP 4), written by three different clinicians on March 5, 2014, March 24, 2014, and April 1, 2014, contained the same exact treatment plan: "Release to custody for housing assignment, Mental Health to monitor with 5-day Follow-Up, Custody to monitor with a 3-day Follow-Up, Psychiatry to monitor psych meds Rx once inmate-patient reaches assigned housing, Mental Health Primary Clinician to update 7388 Treatment Plan regarding recent MHCB admission, Recommend Group Therapy participation for enhanced coping skills and problem-solving techniques."

Finally, this reviewer examined emergency mental health referrals for SI during March and April 2014. Of these referrals, eight were found in the MHTS for March 2014, and an additional 59 were found in the TTA Log for March and April 2014. A review of selected eUHR charts found that SREs were completed in 83 percent, or 15 of 18 of the cases.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 99 percent of custody and 90 percent of nursing staff were in compliance with CPR training. In addition, 98 percent of custody and 16 percent of nursing staff were compliant with annual suicide prevention block training. Mental health staff had not received annual suicide prevention training. Finally, 80 percent of required mental health clinicians had received the seven-hour SRE training, and 34 percent had completed the mentoring program.

This reviewer observed the annual suicide prevention block training on April 22, 2014. The one-hour workshop was provided by a clinical psychologist who provided a very good overview of the materials and invited/received participation from trainees.

**Recent Suicides**: KVSP had two inmate suicides during 2012 – 2014. In the **first** case (KVSP 5), the inmate was found hanging from the light fixture of his SNY cell by a sheet during the afternoon of October 1, 2013. The inmate entered CDCR on his 20th birthday in September 2009 to serve a six-year sentence for armed robbery and causing great bodily injury. The inmate accrued four RVRs during his confinement, the last of which occurred in November 2012. He associated with a prison gang that was noted for its involvement in trafficking drugs  In June 2010, the inmate dropped out of a gang and was endorsed to a SNY. He was transferred to KVSP in August 2010 and had an estimated parole release date in February 2014.

112

According to available records, the inmate did not have a history of mental illness in the community, although there was significant substance abuse within the family, and his sister was previously diagnosed with Bipolar Disorder and had attempted suicide. While in CDCR, the inmate first complained about "severe depression and constant inability to sleep" in December 2010 following his transfer to KVSP. He was eventually placed in 3CMS with an initial diagnosis of Adjustment Disorder with Depressed Mood. Although he was initially assessed as being at "moderate" chronic risk for suicide (and "low" acute risk) on an SRE, the inmate did not self-report a history of suicidal or self-injurious behavior, nor express any SI. An initial IDTT was held in February 2011, however, a MHTP was never developed. Subsequent progress notes indicated that the inmate was not receptive to mental health treatment, often refused mental health contacts and any psychotropic medication. According to the records, although the inmate often refused services, he was seen on a quarterly basis and "wanted to stay in 3CMS because he liked to have his clinician stop by to check on him, even though he didn't always want to talk. He never attended his annual IDTTs, although he was encouraged to do so." His last IDTT was held on February 5, 2013, and he refused to attend the meeting. The inmate was seen cell front by his PC and appeared stable, although his diagnosis was changed to Major Depressive Disorder, Recurrent, Unspecified.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, and he had been projected for release on parole in February 2014. Both inmates and staff who were interviewed by the CDCR reviewer expressed shock regarding the inmate's suicide. His cellmate said that the inmate received financial support from his aunt, had completed several college courses, had future plans, and a parole date in less than a year. However, in his suicide note, the inmate wrote that he had contemplated suicide for a long time and had even made several SAs. He also admitted to an extensive use of methamphetamine in prison, had become addicted, and deeply in debt. He also reported violent tendencies that had not yet acted upon, suggesting that "simply put, I have a major screw loose. I know is just a matter of time before I act on these urges. It's better that I go now before I do." Although the CDCR reviewer found a few problems in the documentation of the inmate's mental health treatment in late 2010 and early 2011 (e.g., a Health Care Request form that was not followed up on until four weeks later, and a MHTP that was not completed as required in February 2011), those areas were not contributory to his death because he was seen on multiple occasions by mental health clinicians during the past two years. The Suicide Report did not recommend any corrective action in this case.

In the **second** case (KVSP 6), the inmate was found hanging from the top bunk of his administrative segregation unit cell by a sheet during the morning of July 9, 2014. The inmate entered CDCR in January 1994 at age 18 to serve a 22-year to life sentence for murder and robbery that was committed when he was 16 years of age. He was transferred to KVSP on January 31, 2014. The inmate was seen by the BPHs in 2011 and received a five-year set off until 2016. He had 34 RVRs during his 20-year confinement, the most recent of which occurred the day before his suicide and involved battery on his cellmate. The inmate was reported to be estranged from most of his family, but received frequent visits from his girlfriend, the most recent of which occurred four days before his death. He was being medically treated for Hepatitis C, Hyperthyroidism, Psoriasis, and chronic lower back pain.

According to records, the inmate had a history of mental illness in the community that included both ADHD and substance abuse.  There was also a significant family history of mental illness, including the suicide of his grandmother and a reported history of depression of his mother and sisters.  During his CDCR confinement, the inmate first reported symptoms of depression in November 1995 and was placed in 3CMS.  Through the years, he was elevated to EOP due increased depression and anxiety and housed in a PSU. The inmate self-reported a history of suicidal behavior during his CDCR confinement that included a SA by hanging and cutting his arms.  Both incidents reportedly occurred in 2002 while the inmate was housed in a SHU at COR, and resulted in MHCB admissions.  According to the inmate, "I was serving an indeterminate SHU term and I was overwhelmed."  His last SRE was completed in 2010, but did not include the lethality of suicide risk.

Most recently, the inmate was receiving 3CMS LOC, although he was historically a marginal participant, often refusing psychotropic medication, meeting one-on-one with his PC, and missing IDTT meetings.  According to records, he preferred cell-front visits from his clinician.  His most recent MHTP dated March 2014 indicated diagnoses of Adjustment Disorder with Mixed Anxiety and Depression and Panic Disorder Without Agoraphobia.  The inmate last met with his PC on May 22, 2014.  His mental status was reported to be within normal limits.  The clinician wrote the following treatment plan in the progress note: "I/P will be monitored for an increase in mental health systems and suicidality. PC will utilize motivational interviewing, DBT, and CBT to assist I/P with learning and implementing positive coping skills, reframing is thinking, and identifying and correcting cognitive distortions.  PC will follow-up with IP in 30 days/PRN to monitor sxs, monitor appropriateness of LOC, and safety concerns."  Despite the intention of seeing the inmate again in 30 days, there was no documentation found in the eUHR that the PC saw the inmate again.

During the last several months of his life, the inmate was seen on a regular basis by a psychiatrist for non-compliance with psychotropic medication.  The eUHR also indicated that the inmate began to submit health care requests with regularity beginning in May 2014 that included complaints of numbness in the shoulder, shortness of breath, chest pain, weight gain and thyroid issues which he believed were caused by his psychotropic medication.  He was last assessed by a psychiatrist on June 26, 2014 and diagnosed with Generalized Anxiety Disorder.  He had previously been seen by a psychiatrist a few weeks earlier on June 6, 2014 for the same concern, and was diagnosed with Mood Disorder NOS.  On both occasions, the inmate denied any SI and his mental status appeared to be within normal limits.

On July 7, 2014, the inmate was observed to be "sluggish when walking, staggering, with slurred speech."  He was seen by a nurse, but refused to be escorted to the TTA for further evaluation.  During the afternoon of the following day, however, the inmate was escorted from a SNY to the TTA after exhibiting combative and bizarre behavior.  He appeared to be experiencing a drug overdose and was transferred to a local hospital for treatment.  At the hospital, the inmate admitted that he "smoked meth with marijuana."  He was returned to KVSP several hours later with a diagnosis of Methamphetamine Intoxication and re-housed in an administrative segregation unit (B-2) following an altercation with his cellmate.

The inmate was found hanging at approximately 10:38 a.m. on July 9, 2014. Although Guard One data indicated that the inmate's cell had been checked eight minutes earlier at 10:30 a.m., the veracity of this check by correctional staff was questionable given a subsequent emergency medical response notation that life-saving measures were terminated "due to lividity."

The CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, and a suicide note was not found. The reviewer, however, noted the inmate's "chronic SI and had reoccurring thoughts of ending his life due to the perceived futility of his future." The reviewer estimated his chronic risk for suicide as "high." The reviewer also noted several deficiencies in mental health and medical care, including lack of a mental health evaluation upon KVSP admission in January 2014, prolonged delay in the initial IDTT until March 2014, inconsistent MHTPs, the most recent SRE had been completed in 2010 and did not include lethality of risk, and failure of a prompt mental health referral by medical staff following observation of "bizarre" behavior following suspected drug overdose on July 8, 2014. Despite the multiple deficiencies found, the Suicide Report only contained one basis for recommendation for corrective action through a QIP: "Contrary to CDCR policy, the inmate was not placed in a retrofitted new intake cell upon admission to the ASU on July 8, 2014."

Finally, there were two additional issues not contained within the Suicide Report. First, despite the fact that the inmate's PC scheduled a 30-day follow-up, there was no indication in the eUHR that the inmate was seen by the clinician after May 22, 2014. Second, although Guard One data indicated that the inmate's cell had been checked eight minutes earlier at 10:30 a.m., the veracity of this check by correctional staff was questionable given a subsequent emergency medical response notation that life-saving measures were terminated "due to lividity."


## 23)   **Correctional Training Facility (CTF)**

**Inspection**: April 24-25, 2014

CTF housed 4,869 inmates, with the vast majority being Level II classification. CTF had a 21-bed OHU/Infirmary with four designated rooms to temporarily house suicidal inmates awaiting MHCB placement and an administrative segregation unit located in O-Wing. Approximately 23 percent of CTF inmates were on the caseload, with 1,100 3CMS and two EOP inmates. In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in OHU overflow cells that were said to be rarely used for that purpose.

**Screening/Assessment**: This reviewer observed several new admissions during the medical intake screening process on April 24, 2014. The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit. Privacy and confidentiality were somewhat compromised because the door to the Nurse's Office was left open, but no officers or other inmates were observed in the area. The nurse was observed to be asking all the required intake screening questions.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit on April 24, 2014. The psych tech was observed to accurately conduct and document their rounds.

**Housing**:  CTF had a 21-bed OHU/Infirmary with four designated rooms to temporarily house suicidal inmates awaiting MHCB placement.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in OHU overflow cells that were said to be rarely used for that purpose.  All of the rooms designated to house suicidal inmates were found to be extremely dangerous, with ventilation grates that had not been retrofitted, cell bars, and in at least one room, a handicap railing that could easily be used in a SA by hanging.  At the time of the site visit, there were not any pending work orders to retrofit any of these designated OHU rooms.  Whereas most institutions required continuous observation of suicidal inmates placed in designated alternative housing cells that were deemed unsafe, CTF did not have such a policy and suicidal inmates could be placed on any level of suicide observation.

Finally, the administrative segregation unit contained 12 retrofitted cells for inmates on new intake status.  During the inspection, this reviewer did not observe any new intake inmates in non-retrofitted cells.

**Observation**:  Although both Suicide Precaution and Suicide Watch was referenced in CTF's LOP on suicide prevention, the LOP also referenced the term "crisis evaluation."  According to the directive, signed August 29, 2013:

> If the clinician cannot determine, with reasonable certainty, that the inmate-patient is at high or medium risk for suicide, and more time is needed to evaluate the inmate-patient's condition, the clinician shall place the inmate-patient in an OHU with orders for Crisis Evaluation. The clinician will then specify the method, frequency, and materials/items the patient may have in order to keep him safe.  This will not trigger an immediate/automatic referral to MHCB and allows for clinicians to further evaluate the LOC and treatment needs of the patient.  The inmate-patient must be discharged from the OHU within 48 hours.

Although a Quality Management official with the DCHCS Mental Health Program informed this reviewer that the "crisis evaluation designation was developed as a way for us to distinguish the mental health inmate-patients in the OHU from those in the unit for medical reasons. The crisis evaluation status was developed as a data entry label and was not intended to replace 'Suicide Precautions' or 'Suicide Watch' criteria or designation," this reviewer found otherwise at CTF.  A review of various eUHRs and an un-authorized CDCR observation form, indicated that Suicide Watch, Suicide Precaution, psychiatric observation, *and* crisis evaluation were used at CTF for suicidal inmates housed in the OHU.  More problematic was the fact that the levels of observation for such suicidal inmates ranged from continuous observation to 60-minute intervals.  In one case (CTF 1), for example, the inmate reported command AH to commit suicide and was placed on observation at 15-minute intervals in the OHU on February 16, 2014.  The following morning, February 17, 2014, he was assessed by a clinician who completed a SRE that indicated both a "moderate" acute and chronic risk for suicide, but decreased the level of observation to 30-minute intervals.  Several hours later, the clinician further downgraded the level of observation to 60-minute intervals.  The following day, February 18, 2014, another clinician initiated a MHCB referral based upon continued AH.  All of these varying levels of observation occurred in an unsafe OHU room.

Finally, during the tour of the administrative segregation unit on April 24, 2014, this reviewer examined the logs used to document 30-minute welfare checks of non-new intake inmates on each of the three tiers.  The reviews of several 24-hour periods in April 2014 found that welfare checks were not always correctly documented on each shift on each tier, with most chronic problems occurring on the third tier during the First Watch (10:00 p.m. to 6:00 a.m.).  However, subsequent review of the Guard One data for the administrative segregation unit found fewer violations during a 24-hour period, with overall compliance at 94 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found, particularly in the area of adequate treatment planning.  For example, in one case (CTF 2), the inmate was placed in the OHU for SI on April 18, 2014.  Upon his discharge three days later on April 21, 2014 the treatment plan contained within the SRE stated the following in its entirety:  "IM to be discharged from the OHU as safety concerns will be addressed by custody and mental health.  IM has been given psychotropic medication for anxiety.  IM to be placed at 3C LOC with follow-up for anxiety and hopelessness."

In another case (CTF 3), the inmate was admitted into the OHU on crisis evaluation status for threatening to cut himself.  He was placed on Suicide Watch.  The following morning, March 2, 2014, the level of observation was downgraded to 15-minute intervals.  Several hours later during the afternoon, the same clinician discharged the inmate from the OHU.  With the exception of Physician's Orders, the eUHR in this case did not contain an admission SRE, a progress note to clinically justify the downgrading of observation, a discharge SRE, or a treatment plan.

This reviewer examined emergency mental health referrals for SI from January 2014 through March 2014.  Of these referrals, 21 were found in the MHTS and an additional 13 were found in the TTA Logs.  A review of eUHRs found that SREs were completed in 80 percent or 27 of 34 of the cases.  In one emergency referral (CTF 4), the inmate approached an officer on a SNY on January 27, 2014 and stated "he was having suicidal thoughts."  An emergency mental health referral was generated and the inmate was seen shortly thereafter by a mental health clinician.  According to progress note, the inmate reported that he "was feeling intimidated and threatened sexually by his cellie.  Patient reported that he felt 'my back was against the wall' and suicide was the only way out.  Patient stated that if his housing situation is resolved then he will no longer feel suicidal."  Although the clinician collaborated with a SNY lieutenant to find an AHU for the inmate, an SRE was not completed despite the fact that the inmate was on the "high risk list" for previous suicidal behavior.

Finally, it should be noted that mental health clinicians at CTF were observed using a different form to document five-day follow-up progress notes following an inmate's discharge from an OHU or MCHB.  The form, entitled "Interdisciplinary Progress Note," CDCR 7230-MH, was SOAP-formatted and each of the five days of follow-up were documented on a *separate* daily

form.  The extra room on the form allowed for sufficient space to document the inmate's mental health status and status of their treatment plan.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 97 percent of custody and 100 percent of nursing staff were in compliance with CPR training.  In addition, 96 percent of custody staff was compliant with annual suicide prevention block training. Medical and mental health staff had not received annual suicide prevention training.  Finally, all of the required mental health clinicians had both received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  CTF had two inmate suicides during 2012 – 2014.  In the **<u>first</u>** case (<u>CTF 5</u>), the inmate was found hanging from the ventilation grate of his administrative segregation cell by a sheet during the evening of June 16, 2013.  The inmate entered CDCR in August 2002 to serve a 16-year sentence for continuous sexual abuse of a child (his 18-year-old daughter).  The inmate accrued four RVRs during his confinement, the last of which occurred in July 2008.  He was transferred to CTF in June 2010 and was eligible for parole in December 2015.  Due to the nature of his crime, the inmate was assigned to a SNY his entire incarceration.

According to available records, the inmate did not have a history of mental illness in the community, although he grew up in a chaotic family lifestyle.  His family also had a history of suicide, which included a step-brother (who allegedly sexually abused him on one occasion), a grandfather, and two uncles.  In 1978, the inmate was hit by truck while riding a motorcycle and received a sizable insurance settlement.  Following the accident, he began to abuse drugs.  During his CDCR confinement, he remained in contact with a two brothers and a cousin, but was estranged from his wife, who filed for divorce following his arrest and two children.  The inmate had various medical problems related to his 1978 motorcycle accident, including hypertension, hypothyroidism, and multiple sequelae.  He was treated with various medications and, according to the CDCR reviewer, it did not appear that his medical problems were the proximate cause of his eventual suicide.

The inmate was placed in 3CMS  shortly after his initial CDCR confinement in August 2002.  He presented with "complaints of AH, flat affect, loss of appetite, and anhedonia, and guilt."  He was initially diagnosed with Major Depression with Psychotic Features and treated with psychotropic medication.  He carried a diagnosis of Schizoaffective Disorder from 2003 through 2008, and then Mood Disorder NOS, from 2008 through April 2013.  Other than attempting suicide by cutting his wrist in the county jail in 2002, the inmate did not have a significant history of suicidal and/or self-injurious behavior, and was assessed as both a "low" acute and chronic risk for suicide on the two occasions that SREs were completed (in April 2012 and March 2013).  In April 2012, the inmate informed his psychiatrist that he wanted to discontinue all medications and be discharged from 3CMS. Although the medications were discontinued, he was retained in 3CMS  until April 9, 2013 when he was discharged at his annual IDTT meeting.

A few weeks later on April 25, 2013, the inmate reported enemy concerns to an officer on a SNY and was transferred to administrative segregation.  Although hesitant to re-enroll in 3CMS

because he believed it might adversely affect his post-prison release plans, the inmate agreed to speak with mental health staff on a weekly basis while in the administrative segregation unit. During the last contact with the PC on June 13, 2013, the inmate reported sleeping problems and feeling stressed and anxious. The clinician initiated a referral to the psychiatrist, but the inmate was apparently not seen prior to his suicide.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, noting that, other than the enemy concerns from a specific inmate that he reported to custody staff on April 25, 2013, his behavior appeared consistent over the past few months of his life. There was, however, some evidence of increased anxiety during these last few months, exemplified by a mental health referral from custody staff on May 22, 2013 in which the officer believed the inmate was showing signs of hallucinations and paranoia regarding threats from another inmate. In fact, during an interview with the CDCR reviewer following the death, the inmate's brother suggested that he was becoming increasingly paranoid and fearful that his offense was going to be announced to other inmates by the inmate he viewed as an enemy. His brother also stated that the inmate spoke about the isolation of the administrative segregation unit, complaining about "no job, books, people, nothing but sitting and thinking."

The Suicide Report contained four bases for recommendations for corrective action through a QIP. All of these issues related to officer and nursing responsibilities on the day of the inmate's suicide on June 16, 2013: (1) neither of the two officers who found the inmate hanging, nor a third officer, activated their personal alarms or institutional radios to alert others custody personnel of the emergency; (2) documentation of the emergency response indicated that life-saving measures were not begun on the tier, but rather five minutes later when the inmate arrived at the TTA; (3) two nurses working in the administrative segregation unit did not immediately join in the emergency response; and (4) in violation of CDCR policy, security rounds were not conducted at 30-minute intervals, rather they occurred at 60-minute intervals.

In the **second** case (CTF 6), the inmate was found dead from exsanguination in his SNY cell during the early morning of July 4, 2013. The inmate entered CDCR for the second time in December 1999 to serve a 25-year to life sentence for the first-degree murder of his girlfriend. He received an additional enhancement of six years for a prior felony conviction and use of a weapon. He was transferred to CTF in March 2005. He enjoyed good family support, and had weekly telephone conversations with his mother. The inmate had an "exemplary" work record during confinement, and was placed on SNY status in 2009 after providing information about a riot to custody officials. The inmate accrued only two RVRs during his almost 14-year confinement, the most recent of which occurred two days before his death. On July 2, 2013 the inmate was charged with "overfamiliarity with staff" after writing "I love you" on his cell window, a message that was intended for a female CO working in the unit.

According to available records, the inmate did not have a history of mental illness in the community, although he and his family suffered from substance abuse. He was placed in 3CMS shortly after his initial CDCR confinement in 1999 and diagnosed with Major Depressive Disorder with Psychotic Features. He was discharged from the MHSDS a few years later in January 2002. According to the CDCR reviewer, the inmate "had no further contact with mental health for the remainder of incarceration, functioned well, and appeared emotionally stable."

119

The inmate had a history of two SAs, both of which occurred in 1998 prior to his CDCR confinement and involved driving his truck over a cliff following his girlfriend's murder and cutting his throat in the county jail.  He did not have any major medical problems during his CDCR confinement.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, noting that he had spoken with his mother on the telephone a few days before his death and did not appear to be depressed nor give any indication of his impending suicide.  In his suicide letter, however, the inmate expressed feelings of loneliness and isolation and profound remorse for his girlfriend's death.  In addition, the reviewer found that the inmate's recent RVR, occurring two days before his death and more than ten years removed from his only other rules violation, was puzzling.  The reviewer theorized that, because he had cellmate, the inmate intentionally incurred the RVR so as to be single-celled in the administrative segregation unit or another housing unit in order to better ensure his SA was not discovered.  In addition to the suicide note, various poems were found in the inmate's cell, including one addressed to a childhood friend who had also committed suicide by exsanguination.

The Suicide Report contained four bases for recommendations for corrective action through a QIP.  All of these issues related to officer and nursing responsibilities on the day of the inmate's suicide on July 4, 2013 and were very similar to those found in the previous CTF suicide (CTF 5): (1) the CO who found the inmate did not activate his personal alarm to alert others of the emergency; (2) contrary to basic first aid principles, correctional staff failed to immediately apply pressure to the wound in the inmate's neck; (3) there was a significant delay in the arrival of TTA nurses to the housing unit; and (4) deficiencies and inconsistencies were noted in the incident package and TTA log regarding documentation of the timeline of the emergency response.


## 24)    **Pleasant Valley State Prison (PVSP)**

**Inspection**: May 6-7, 2014

 PVSP housed 3,063 inmates, with the vast majority being Level III classification.  PVSP had a 16-bed CTC with six rooms designated as MHCBs and two administrative segregation units.  Approximately 43 percent of PVSP inmates were on the caseload, with 1,316 3CMS and three EOP inmates.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in TTA holding cells and CTC overflow rooms.

**Screening/Assessment**:  This reviewer only observed one new admission during the medical intake screening process on May 6, 2014.  The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit.  Privacy and confidentiality were adequately provided because the door to the Nurse's Office was closed.  The nurse was observed to be asking all of the required intake screening questions.

This reviewer observed daily rounds by psych techs in the two administrative segregation units on May 6 and 7, 2014. The psych techs were observed to accurately conduct and document their rounds.

**Housing**: PVSP had a 16-bed CTC with six rooms designated as MHCBs. The rooms did not contain any obvious protrusions which could be used in a SA by hanging. In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in TTA holding cells and CTC overflow rooms. Inmates placed in alternative housing cells were required to be observed on a continuous basis.

Finally, one administrative segregation unit (D-4) designated to house caseload inmates contained three retrofitted cells for inmates on new intake status, whereas the stand-alone administrative segregation unit had six retrofitted new intake cells. During the inspection of D-4 Unit, although this reviewer did not observe any newly admitted inmates housed in non-retrofitted cells, correctional staff stated that new intake inmates were frequently placed in non-retrofitted cells when the three designated cells were occupied. It should also be noted that this reviewer could not assess whether all new intake inmates in the stand-alone administrative segregation unit were housed in retrofitted cells because of a recent practice of no longer placing "new intake" placards with entry dates on the cell doors.

**Observation**: Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer also observed that psychiatric observation was regularly used in the unit. On May 7, 2014, there were five inmates in MHCBs, with three on psychiatric observation and two on Suicide Precaution. Two of the inmates on psychiatric observation had been admitted into the CTC the previous day. In addition to this observation status not being referenced in the *Program Guide*, it was problematic that some inmates assessed as being suicidal were being observed at 30-minute intervals. This reviewer examined the observation forms used to document observation of suicidal inmates housed in the MHCBs and found that all of the forms were up-to-date, with observations documented on a staggered basis.

Finally, during the tour of both administrative segregation units, this reviewer examined the logs used to document 30-minute welfare checks of non-new intake inmates. The reviews found that there were at least 11 days during April 2014 in which 30-minute welfare checks were not consistently performed during the First and Third Watches in D-4 Unit, and at least six days during April 2014 in which 30-minute welfare checks were not consistently performed during the First and Third Watches in the stand-alone administrative segregation unit. However, subsequent review of the Guard One data for both administrative segregation units showed no violations during a 24-hour period, with compliance at 100 percent for new intake inmates.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis. Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found, particularly in the area of adequate treatment planning. For example, in two cases (PVSP 1 and PVSP 2), both inmates had exactly

the same treatment plan contained within their respective SREs to justify discharge from the MHCB.  The plans, written by two different clinicians, stated the following:

> d/c to CCCMS LOC on OP-41 status and 5-day MHCB f/u, DC meds written x 30 days, consult PC for continuity of care, PC contact q 90 days or prn for mental status updates, MHCB f/u q 90 days x 1 year to monitor stability, psychiatry contact prn for medication mgnt, IDTT q 365 days or prn to update treatment plan as necessary."

Another clinician typically wrote the following treatment plan narrative in the SRE justifying discharge from the MHCB:  "Discharge on OP-41 F/U" (see, e.g., PVSP 3).  In yet another case (PVSP 4), both the clinician's admission SRE of March 4, 2014 and the discharging SRE of March 6, 2014 were exactly the same, with the discharging SRE containing the following treatment plan: "d/c to CCCMS LOC on OP-41 status and 5-day MHCB f/u, consult PC, PC contact q 90 days, psychiatry contact prn, IDTT q 365 days."

This reviewer examined emergency mental health referrals for SI from January 2014 through April 2014.  Of these referrals, ten were found in the MHTS and an additional 14 were found in the TTA Logs.  A review of eUHRs found that SREs were completed in 92 percent, or 22 of 24 of the cases.

Finally, it should be noted that review of minutes from SPRFIT meetings held at PVSP for the six-month period of November 2013 through April 2014 found that several prominent members of the Committee, including the CMH, Chief Psychiatrist, and Chief Nurse Executive, were missing from most, if not all, of the monthly meetings.  Such a lack of leadership attendance was troubling.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 99 percent of custody and 100 percent of nursing staff were in compliance with CPR training.  In addition, 98 percent of custody and 79 percent of medical and mental health staff was compliant with annual suicide prevention block training.  Finally, 93 percent of the required mental health clinicians had both received the seven-hour SRE training and completed the mentoring program.

This reviewer observed the annual suicide prevention block training on May 6, 2014.  Although the instructor appeared very proficient, the material was presented in rapid fashion, there was little interaction with participants, and the workshop lasted only 35 minutes followed by a ten-minute post-test.

**Recent Suicides**:  PVSP had three inmate suicides during 2012 – 2014.  In the **first** case (PVSP 5), the inmate was found hanging from the upper bunk of his SNY cell by a shoelace during the afternoon of May 15, 2012.  His body was found in the early stages of *rigor mortis*.  The inmate entered CDCR in May 1999 to serve a 34-year to life sentence for two counts of second-degree murder (vehicular homicide), evading a peace officer, and hit-and-run.  The inmate accrued

seven RVRs during his confinement, the last of which occurred in April 2011.  He was affiliated with a gang until 2003 and was assigned to a SNY.  The inmate was transferred to PVSP in September 2011.  He enjoyed good family support, with weekly visits from his wife.

According to available records, the inmate did not have a history of mental illness in the community, but had a history of substance abuse.  He also did not report any history of suicidal and/or self-injurious behavior, and denied any SI during his CDCR confinement. The inmate had various chronic medical conditions, including asthma, migraine headaches, and left elbow pain.  According to the CDCR reviewer, these medical problems did not appear to be contributing factors to his suicide.

On January 3, 2012, the inmate submitted a request to be seen by mental health staff because of decreased sleep, increased fatigue, and excessive worrying about "a lot of things."  He was diagnosed with Generalized Anxiety Disorder and referred to the IDTT for a follow-up assessment within 30 days.  However, the follow-up assessment never occurred and he submitted another health care request on April 21, 2012 and was seen by the same clinician more than a week later on April 30, 2012.  His symptoms were similar to that which was reported in January, and he denied any SI.  The clinician wrote a diagnosis of "no diagnosis" and again requested that he be seen by the IDTT within 30 days.  Two weeks later on the morning of May 15, 2012 a CO responded to an altercation between the inmate and his cellmate. He was seen shortly thereafter by mental health clinician, but was generally uncooperative.  The clinician also incorrectly noted in a progress note that the inmate was a participant in 3CMS.  The inmate committed suicide several hours later that day.  Following the inmate's suicide, however, the clinician who had assessed the inmate in January and April 2012 informed the CDCR reviewer that she had considered referring him to 3CMS, but that his level of distress was both "non-acute in non-emergent," and he had been reluctant to enter the MHSDS because he did not want to take psychotropic medication.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, although noting that he appeared to seek assistance of mental health staff during the past few months in managing his increasing anxiety regarding his mother's declining health and other unknown concerns.  He did not leave a suicide note.  According to his cellmate, the inmate had stopped leaving his cell for meals and yard time during the past week, and had begun to see "mice, faces, and people in the cell" that were not there.  There were rumors that the inmate had been taking illegal drugs.  According to the CDCR reviewer, "given his self-reported symptoms of anxiety, it is possible that he chose to self-medicate his stress and worry."

The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) On January 12, 2012, the inmate was evaluated by a clinician who intended to schedule him for a follow-up by the IDTT within 30 days.  A referral for that follow-up did not occur.  On April 21, 2012, after a second evaluation, the clinician evaluated the inmate's level of distress as non-acute and non-emergent.  Although progress notes indicated plans for IDTT follow-up, no referral was made; and (2) Progress notes documenting the incidents listed above suggest a lack of familiarity with this inmate's history.  Diagnoses were not consistent from one evaluation to the next and available documentation did not indicate the development of a treatment plan, other than referral to IDTT."

In the **second** case (PVSP 6), the inmate was found dead from exsanguination in his SNY cell during the afternoon of May 16, 2012.  His body was found in the state of *rigor mortis*.  This suicide occurred one day after the death of the inmate detailed above (PVSP 5) in another SNY housing unit, and the deaths appeared to be unrelated and coincidental.  The inmate had entered CDCR in December 2011 to serve a 22-year sentence for two counts of sexual molestation of his girlfriend's daughter.  In addition, there were allegations that he was being investigated for similar offenses against his twin sons.  The inmate did not have any RVRs during his confinement, and was assigned to a SNY based upon the nature of his crime.  He was transferred to PVSP on April 3, 2012, less than six weeks prior to his death.  It did not appear that the inmate had any family support in the form of visits, telephone calls, or letter correspondence during his brief six-month confinement.

According to available records, the inmate's social history was unclear, but he reportedly had a history of substance abuse.  According to his ex-wife, he experienced a depressive episode in 2001 which resulted in a SA (cutting his right wrist) and psychiatric hospitalization. Upon entry into CDCR in December 2011, the inmate self-reported this prior SA and psychiatric hospitalization from ten years earlier, but denied any current SI or other mental health concerns. Based upon the screening, the clinician decided not to refer the inmate for a further mental health evaluation.  The inmate's medical history was unremarkable.

Although the CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, the review found he had received a letter from his brother on May 12, 2012 indicating that his twin sons had recently made accusations that he had sexually abused them and that he might be facing additional criminal charges.  In a suicide note found in his cell, the inmate apologized to his family, but vehemently denied sexually abusing any of his children.  He also stated in the letter that "I can't continue with this, it's too hard for me."

The Suicide Report contained one basis for recommendation for corrective action through a QIP: "The inmate was not referred for a further mental health evaluation despite positive responses on the RC 31-item mental health screening questionnaire indicating a previous SA, psychiatric hospitalization, and being prescribed psychotropic medication.  The SPRFIT of DCHCS should discuss ways to improve the accuracy and utility of this standardized mental health screening, to include making recommendations for changing the scoring rules for the questionnaire."

In the **third** case (PVSP 7), the inmate was found hanging by a sheet from the ventilation grate of his administrative segregation unit cell during the morning of October 15, 2013.  His body was found in *rigor mortis*.  The inmate entered CDCR in May 2001 to serve a 21-year sentence for voluntary manslaughter of his girlfriend, assault with a deadly weapon, and burglary.  He was transferred to PVSP in October 2012.  The inmate accrued three RVRs during his confinement, the last of which occurred in July 2013 and involved battery on another inmate resulting in his placement in administrative segregation.  He enjoyed good family support, including regular visits from his father.

According to available records, the inmate did not have a history of mental illness in the community, but had a history of substance abuse.  In addition, he apparently tried to commit

suicide by cutting his arms immediately after the death of his girlfriend in 1999.  Upon entry into CDCR, the inmate was on the caseload until July 2008.  He was initially placed in 3CMS  until December 2007 and carried a diagnosis of Major Depressive Disorder, Recurrent.  For a two-month period of December 2007 through January 2008, he was elevated to EOP with a diagnosis of Schizoaffective Disorder, followed by a return to 3CMS with a diagnosis of Major Depressive Disorder, Recurrent.  While on the caseload, the inmate had a history of refusing his psychotropic medication.

On July 21, 2013, inmate was referred to mental health staff after refusing to participate in the mental health screening upon admission to administrative segregation.  However, he was not seen by mental health staff until over a month later on September 27, 2013, a few weeks prior to his death.  The clinician's progress note stated that the inmate "reported being slightly depressed due to medical problems."  'I have neck and back pain.'"  He denied any mental health issues and the clinician did not feel that he met MHSDS criteria.

The inmate suffered from chronic back and neck pain sustained from a fall in 2008.  He was treated with morphine (then methadone) and other pain medication and physical therapy.  His complaints about pain seemed to intensify during 2013, and he was seen by medical staff more than 15 times for what he described on calendars in his cell as "insufferable pain" from April 2013 until a week before his death on October 15, 2013.  In fact, on the calendars examined by the CDCR reviewer following his suicide, the inmate had documented his pain level on a daily basis and noted his level of depression beginning in late September and continuing through several days prior to his death.  Apparently, psych tech staff conducting daily rounds of the administrative segregation unit did not notice these calendar entries or observe the inmate's level of distress.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, a curious non-finding given the fact that he had increasingly complained about the "insufferable pain" in his back that was documented on calendars in his cell.  The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) Nursing staff appropriately referred the inmate to the mental health department after he refused to participate in the 31-item screen on July 21, 2013.  However, mental health staff did not evaluate the inmate for his refusal until September 27, 2013; and (2) Two concerns related to custodial procedures were identified in this review.  These warranted a referral to the Warden of PVSP to determine the need for investigation."

The two concerns were that, after the inmate was found hanging in his cell, the administrative segregation sergeant ordered the cell door immediately closed and the area treated as a crime scene, thereby prohibiting medical staff from initiating life-saving measures.  In addition, the inmate's body was found in rigor mortis and the coroner's investigator estimated that he had been dead for approximately four to eight hours.  The CDCR policy for 30-minute welfare checks in the administrative segregation unit had been repeatedly violated in this case.  Of note, a review of Guard One in both administrative segregation units by PVSP officials found significant problems with 30-minute welfare checks during a six-month period of June 2013 through November 2013.  As previously stated, continuing problems with 30-minute welfare checks in the administrative segregation unit were found during this reviewer's May 2014 tour.

**25)**   **Avenal State Prison (ASP)**

**Inspection**:  May 8-9, 2014

 ASP housed 3,949 inmates at Level II security classification.  ASP had a ten-bed OHU with six designated rooms to temporarily house suicidal inmates awaiting MHCB placement.  There was also an administrative segregation unit.  Approximately 35 percent of ASP inmates were on the caseload, with 1,399 3CMS and two EOP inmates.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in OHU overflow cells that were said to be rarely used for that purpose.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on May 8, 2014.  The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit.  Privacy and confidentiality were adequately provided because the door to the Nurse's Office was closed.  Although the nurse was observed to be asking all the required intake screening questions relating to suicide risk, several medical and mental health questions were missed.

This reviewer observed daily rounds by two psych techs assigned to the administrative segregation unit on May 9, 2014.  The psych techs were observed to accurately conduct and document their rounds.

**Housing**:  ASP had a ten-bed OHU with six designated rooms to temporarily house suicidal inmates awaiting MHCB placement.  In addition, there were OHU overflow cells that were said to be rarely used for that purpose.  All of the rooms designated to house suicidal inmates were found to be extremely dangerous, with the ceiling ventilation grates that had not been retrofitted, a smoke detector cage in one cell, and handicap railings in three cells that could easily be used in a SA by hanging.  In addition, all rooms had live electrical outlets. There were not any pending work orders to retrofit any of these designated OHU rooms.  None of the rooms had suicide-resistant beds, and metal beds were removed when inmates were on either Suicide Watch or Suicide Precaution.  As detailed below, ASP also used psychiatric observation for some suicidal inmates, with observation at 30-minute intervals.  The unsafe metal bunks were <u>not</u> removed from cells housing suicidal inmates on psychiatric observation.

In addition, the administrative segregation unit had eight retrofitted cells for inmates on new intake status, and this reviewer observed that all newly-arrived administrative segregation inmates were housed in these retrofitted cells.  In fact, because the administrative segregation unit was approximately 50 percent under capacity at the time, there were a sufficient number of retrofitted cells to house inmates who had been placed in the unit for less than 21 days.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the OHU for inmates identified as being suicidal and awaiting placement in a MHCB, this reviewer was informed that psychiatric observation was regularly used in the unit.  This reviewer examined several cases in which inmates were admitted into the OHU for SI and placed on crisis evaluation status with observation at either 30-minute or 60-minute intervals.  For example, in one case (<u>ASP 1</u>), the inmate voiced SI during the late evening of April 21, 2014 and was

126

admitted to the OHU for crisis evaluation with observation at 30-minute intervals. A SRE was not completed, nor were any observation forms found in the eUHR. The inmate was released from suicide observation the following day, but, according to the discharging SRE, remained in the OHU pending transfer to an institution with EOP LOC. In a similar case (ASP 2), the inmate voiced SI during the late evening of April 30, 2014 and was admitted into the OHU for "crisis intervention" with observation at 30-minute intervals. A SRE was not completed until the afternoon of the following day, May 1, 2014, when he was discharged from the OHU.

In another case (ASP 3), an administrative segregation inmate voiced SI to a psych tech on the morning of January 19, 2014 and was assessed shortly thereafter by a psychiatrist. The psychiatrist wrote the following in the SRE: "Given severity of acute stressor, I/P endorsing significant depression, maintaining SI without a plan, endorsing extreme helplessness/hopelessness, high impulsivity and unpredictability in future actions, he cannot be sent back to the ASU today and benefits from OHU admission for crisis intervention and for safety reasons. He has a history of depression." The inmate was then admitted into the OHU with observation at 60-minute intervals.

In summary, clinical orders for observation of suicidal inmates at either 30-minute or 60-minute intervals was problematic, particularly in a physical environment like the OHU that did not have any suicide-resistant cells. Such practices were not referenced in the *Program Guide*.

Finally, during the tour of the administrative segregation unit on May 9, 2014, a review of the logs used to document 30-minute welfare checks of non-new intake inmates found that welfare checks were correctly documented as required. Subsequent review of the Guard One data for the administrative segregation unit found very few violations during a 24-hour period, with overall compliance at 99 percent for new intake inmates.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis. Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several problems found related to treatment planning. For example, in one of the cases (ASP 3) that involved an inmate admitted to the OHU for SI, but on observation at only 60-minute intervals, the subsequent treatment plan found in the discharging SRE dated February 5, 2014 was quite thorough. It stated:

> Crisis assessment treatment for immediate mental health care will be provided as needed. Will continue to monitor any SIs or changes in behavior as appropriate. Motivational interviewing to be provided in concert with Prchaska and DiClemente's Stages of Change model in regards to his drug use, motivation to remain sober, and criminal thinking. I/P to identify three negative consequences of using. Short-term care - I/P to be seen weekly and PRN for individual therapy and monthly and PRN for medication management. I/P to attend groups as appropriate. I/P to be seen daily by LPT to review and monitor symptoms; report to be presented to PC. Long-term-care - I/P to remain compliant with medication. I/P to continue individual therapy, including addressing depression and anxiety

127

through supportive psychotherapy, CBT and psycho-education.  Therapy will also address the increasing of protective factors such as familiar support, exercise, plans for the future and self-efficacy.  Address any anger management issues in individual therapy and group therapy.

This detailed and thoughtful treatment plan was offset by the fact that review of five-day follow-up notes and subsequent progress notes did not show any concordance with the above plan.

In several other cases, inmates were discharged from the OHU without a SRE and, therefore, without a treatment plan.  For example, an inmate (ASP 4) was admitted into the OHU on January 30, 2014 for SI and discharged four days later on February 3, 2014.  An SRE was not completed.

Finally, this reviewer examined emergency mental health referrals for SI from January 2014 through March 2014.  Of these referrals, six were found in the MHTS and an additional 24 were found in the TTA Logs.  Subsequent review of 20 eUHRs found that SREs were completed in 80 percent or 16 of 20 of the cases.  One of the cases (ASP 5) of an emergency referral not resulting in completion of an SRE was particularly troubling.  The inmate had been referred to mental health on an emergency basis from custody on April 2, 2014 because of observation of a depressed mood.  The clinician described the inmate's presentation as follows:

> His birthday just passed, he caught his wife with another man on the day after his birthday.  He lost both his parents within the year apart, he lost his dog, brother committed suicide a year and a half ago.  One child in Washington and two other children.  He was assaulted in his dorm a week ago.  Feels mad, extremely depressed, irritable, 'I feel loss and spaced out.'  Antisocial and paranoid.  Experiencing anxiety.  I/P states he attempted suicide by his mother's grave.  I/P experienced a lot of loss.  He states he recently got a letter from his current wife who is 50 years old, telling him she is going to 'party' and do all that she wants since she is not with I/P anymore.  I/P reports he feels depressed as well because he recently received a letter from social services informing him his children are currently in foster care.  PC encouraged I/P to get in contact with social worker to obtain more information on what is going on.  Before ending interview, PC asked I/P if he was experiencing any SI or AH and he denied.

The inmate "contracted for safety." A SRE was not completed.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 95 percent of custody staff was certified in CPR.  Nursing staff reported 89 percent compliance with CPR training.  In addition, 95 percent of custody and 83 percent of medical and mental health staff were compliant with annual suicide prevention block training.  Finally, 89 percent of the required mental health clinicians had received the seven-hour SRE training and 96 percent had completed the mentoring program.

128

**Recent Suicides**:  ASP had one inmate suicide during 2012 – 2014.  In that case (ASP 6), the inmate was found unresponsive by self-strangulation with a t-shirt around his neck in the lower bunk of his administrative segregation cell during the early morning of June 28, 2012.  His body was in the state of *rigor mortis*.  The inmate re-entered CDCR in August 2007 to serve an eight-year sentence for arson of his family's home.  He was transferred to ASP in September 2009.  The inmate had three RVRs during his CDCR confinement, the last of which occurred in October 2011.  It did not appear that the inmate had any strong family support, although he was in periodic contact with his grandmother.

According to available records, the inmate did not have a history of mental illness in the community, although he and other family members suffered from substance abuse.  Upon entry into CDCR in August 2007, he told the intake screening nurse that he was "possibly suicidal" and had been on suicide precautions in the county jail.  He also reported a SA by drug overdose a few months earlier in May 2007.  He was referred to mental health staff for further evaluation and assessed as being at low risk for suicide.  A few months later in September 2007, inmate again attempted suicide by drug overdose.  He was placed on Suicide Precaution in the administrative segregation unit, which had been used for MHCB overflow at the time, diagnosed with Bipolar Disorder, and placed in 3CMS.  The inmate was discharged from Suicide Precaution a few days later.  Of note, when assessed by a psychiatrist during this time, the inmate denied any current SI, "but said he would not tell me if he was experiencing.  Said suicide would be very helpful in solving our problems."  Subsequent SREs from 2008 through 2011 consistently assessed him as being at both "low" chronic and acute risk for suicide.  Records also indicated that he was only sporadically compliant with psychotropic medication, and his medications were discontinued in June 2011.  He appeared generally ambivalent about his mental health treatment.

During the inmate's last IDTT on October 12, 2011, the PC at the time completed a SRE based solely on his self-report.  The SRE erroneously reflected that the inmate had never made a SA, had no family history of suicide despite the inmate previously reporting that an uncle had committed suicide prior to his birth, and had no history of violence or poor impulse control despite the arson of his family home.  The inmate's last contact with mental health staff occurred on May 10, 2012 when he again requested to be removed from 3CMS,  having been off psychotropic medication for almost a year.  The progress note indicated that the inmate did not like to talk about himself or his feelings.  The CDCR reviewer noted that "given that the inmate's past four quarterly PC sessions had been with four different psychologists, his reluctance to speak was perhaps understandable."  The inmate remained in  3CMS.  He did not have any significant medical problems.

On June 27, 2012, the day before his death, the inmate approached an officer in the yard and stated that, although not gang-affiliated, he had been carrying drugs for a gang, had taken more than his allowance and was in severe debt, and believed his life was in danger.  He requested protection and was transferred to the administrative segregation unit.  Upon arrival, he was not placed in any of the eight retrofitted new intake cells, apparently because they were all full.  Instead, he was single-celled at the far end of the unit on the second tier.

The CDCR reviewer did not offer any plausible precipitating factors for the suicide and the inmate did not leave a suicide note.  The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) On October 12, 2011, the inmate's PC completed a SRE based only on the inmate's self-report.  His history of SAs, family history of suicide, and poor impulse control were not documented.  This error was repeated on the MHTS, a primary source of information for future clinicians and PTs. According to the CMH at ASP, several concerns exist regarding this clinician's clinical practice; and (2) The inmate was not placed into an intake cell upon entry into the ASU. Intake cells were full at that time."

Finally, it should be noted that several of the conclusions contained in the Suicide Report were troubling.  The CDCR reviewer appeared particularly concerned about the inaccurate SRE of October 12, 2011, completed nine months prior to the inmate's death, noting that "the primary issue of concern raised by this review was insufficient documentation on the SRE."  Other important issues, occurring on the day of the suicide, appeared less significant to the reviewer. For example, it was curious that the reviewer opined that the fact "the inmate was in rigor does not imply that his death occurred hours before, due to the variability in the onset of rigor," as well opining that the "emergency response was rapid and appropriate."  Although medical experts cannot always ascertain the exact time of death after an individual is found in rigor mortis, the medical literature is quite consistent in reporting that rigor mortis begins immediately after death and becomes visible after two to three hours.  And while it would certainly have been appropriate to opine that CPR should not have been initiated if the inmate was in rigor mortis, to suggest that the "emergency response was rapid and appropriate" was simply incorrect given the fact that an officer discovered the inmate unresponsive at 6:45 a.m. on June 28, 2012 and medical staff were not able to initially assess the inmate and begin CPR until almost 11 minutes later at 6:56 a.m.  Finally, although the Suicide Report contained a recommendation and QIP regarding the fact that the inmate was not put in a new intake cell as required by CDCR policy, the reviewer seemed to downplay this violation was by stating "given that self-harm was not apparent to staff viewing him through the cell window, cell location may not have been a significant factor in the suicide."  Prior CDCR reviews of inmate suicides have <u>not</u> contained attempts at justifying or downplaying violations of policy and it was curious that it occurred several times in this case.


## 26)   California Institution for Women (CIW)

**Inspection**:  May 20-21, 2014

CIW housed 2,092 inmates across three classification levels, Level I, II, and III.  CIW had an 18-bed CTC with ten designated MHCBs, an OHU, Support Care Unit (for EOP inmates), SHU, PSU, and administrative segregation unit.  Approximately 43 percent of CIW inmates were on the caseload, with 801 3CMS and 89 EOP inmates.  In addition, alternative housing beds located in the OHU were used for inmates identified as suicidal and awaiting placement in a MHCB.  In addition, CIW administered a 45-bed Psychiatric In-Patient Program (PIP) for inmates in CDCR custody.

**Screening/Assessment**:  This reviewer did not observe any new admissions during the medical intake screening process on May 20-21, but returned to the institution on May 22 to observe the process.  Two nurses were observed conducting intake screening in two separate rooms.  Privacy and confidentiality were adequately provided.  Each nurse was observed to be asking all the required intake screening questions.

In addition, this reviewer observed daily rounds by three psych techs assigned to the administrative segregation unit and PSU on May 20-21. All of the psych techs were observed to accurately conduct and document their rounds.

**Housing**:  CIW had an 18-bed CTC, with ten rooms designated as MHCBs.  Generally, the rooms did not contain any obvious protrusions which could be used in a SA by hanging.  The only potentially dangerous fixture in the MHCBs and all of the CTC rooms, was a stainless steel sink that had sharp edges that could be used as an anchoring device in a SA by hanging.  In other CTCs assessed by this reviewer, two stainless steel triangles were attached to the wall and both sides of the sink to eliminate the sharp edges.  The institution also used four "swing" medical beds in the CTC as alternative housing cells for inmates identified as suicidal and awaiting MHCB placement.  These rooms also contained the same potentially dangerous sinks as detailed above and a handicap railing that was not suicide-resistant.  In addition, the medical beds were removed from the rooms and inmates had to sleep on the floor.  The OHU could also be used for alternative housing, but was said not to have been used for that purpose to date.

This reviewer observed that most inmates on Suicide Precaution were <u>not</u> issued mattresses.  Subsequent review of several eUHRs of these inmates did not find any clinical justification for the removal of mattresses.  Such practices were contrary to the *Program Guide*, and very problematic.

Finally, the administrative segregation unit contained eight retrofitted cells for inmates on new intake status.  During the site inspection, this reviewer observed that all eight cells were occupied by inmates on new intake status.  This reviewer was informed, however, that the number of new intake inmates exceeded the number of new intake cells a few times per month and when that occurred, inmates were placed in non-retrofitted cells that contained multiple hazards.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer observed that other observation levels were regularly used in the unit.  For example, in addition to inmates on Suicide Precaution being observed at 15-minute intervals, contrary to the *Program Guide*, inmates on Suicide Precaution were also being observed at 30-minute intervals.  In addition, psychiatric observation was regularly used in the CTC, with the inmates observed at 15-minute, 30-minute, and 60-minute intervals.  Although such practices were not referenced in the *Program Guide*, mental health officials at CIW previously developed an LOP for Suicide Prevention and Response that authorized their use.

The practice of 30-minute observation for suicidal inmates was problematic.  For example, this reviewer examined the eUHRs of two inmates (<u>CIW 1</u> and <u>CIW 2</u>) that were both admitted to the MHCB in close proximity to each other during the evening of May 19, 2014, after expressing SI.

Both were receiving 3CMS LOC.  Both inmates were placed on Suicide Precaution with observation at 30-minute intervals, clothed only in a safety smock, and prohibited from having mattresses.  This reviewer attended the IDTT of one of the inmates (CIW 2) the following day, May 20, 2014.  During the meeting, it was learned that the two inmates were sexual partners and the team believed they had threatened suicide for the secondary gain of being housed near each other in the CTC.  Regardless of the clinicians' belief that these inmates were manipulative, their placement on 30-minute observation for SI and withholding their mattresses, was well below the standard of care and in violation of the *Program Guide*.

This reviewer examined the observation forms used to document observation of suicidal inmates housed in the MHCBs and found that all of the forms were up-to-date, but the observations were not documented on a staggered basis.  In addition, contrary to practices found at other CTCs where observation forms were placed outside each MHCB, certified nursing assistants (CNAs) at CIW kept the forms in individual folders on a desk at the end the corridor.  This reviewer observed two CNAs sitting at the desk and documenting in each inmate folder.  Placement of these observation forms on a desk at the end of the corridor, and not on MHCB doors, created the possibility that observation would not be consistently performed as required.

Finally, during the tours of the administrative segregation unit, SHU and PSU on May 20 and 21 2014, this reviewer examined the unit log used to document 30-minute welfare checks prior to full implementation of the Guard One system.  In reviewing unit logs for April and May 2014, we found that correctional staff had been conducting welfare checks at 60-minute intervals.  It appeared that CIW officials, specifically the supervising lieutenant over these three housing units, were unaware of numerous CDCR directives (the most recent of which was issued on May 28, 2013) requiring 30-minute welfare checks of all inmates housed in the administrative segregation unit, SHU and PSU.

In addition, pursuant to a recent CDCR directive that expanded the use of Guard One to *all* administrative segregation inmates (both pre-and post-21 days),[2]  review of the Guard One data for the administrative segregation unit found overall compliance during the 24-hour period of May 20, 2014 to be only 73 percent.  This low compliance rate could be attributed to the fact that May 20 was only the second day that correctional staff were required to utilize the Guard One system throughout the entire administrative segregation unit.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to treatment planning.  For example, in one case (CIW 3), the inmate was admitted to a MHCB on April 3, 2014 for SI.  She had a significant history of suicidal behavior, including at least four SAs.  Upon discharge from the MHCB four days later on April 7, 2014, the SRE contained the following treatment plan: "I/P will be discharged from the MHCB on 4/7/14 on a 5-day step down.  She will follow-up

---

[2] As previously detailed in this report, the May 9, 2014 directive expanded the requirement for welfare checks at staggered intervals that did not exceed 35 minutes to all inmates housed in ASUs, SHUs, PSUs, and the Condemned Units. The directive applied to ASUs beginning May 19, 2014.

with the treatment team in CCCMS about developing healthy relationship skills and coping techniques for frustration/impulsivity."  In a similar case (<u>CIW 4</u>), the CTC clinician wrote the following treatment plan in the discharging SRE:  "I/P will be discharged to CCCMS/Yard on 5-day step down."

In addition, this reviewer observed three IDTT meetings in the CTC on May 20, 2014.  Overall, the IDTT performed well and was well represented with two psychologists, a psychiatrist, a recreation therapist (who was particularly engaged with all three inmates), a nurse, and a correctional counselor.  It appeared that at least two of the inmates were viewed by the treatment team as being manipulative, and decisions in all three cases were made to change the conditions of Suicide Precaution without the benefit of risk assessments.  The team did not offer any reasonable response to this reviewer's inquiry as to why five of nine CTC inmates that day were <u>not</u> provided mattresses.

This reviewer examined emergency mental health referrals for SI from January 2014 through May 2014.  Of these referrals, eight were found in the MHTS (from January 2014 thru April 2014) and an additional 17 were found in the TTA Logs (from April and May 2014).  A review of eUHRs found that SREs were completed in only 76 percent or 19 of 25 of the cases.  This relatively low level of SRE completion might be attributed to clinicians' belief that SREs were unnecessary if the inmate was manipulative.  For example, in one case (<u>CIW 3</u>), the inmate submitted a Health Care Services Request Form that was received by mental health staff on January 21, 2014 that stated:  "I keep having flashbacks….I want to die, I feel like hurting myself, I think I am overmedicated, I can't handle this prison program, I have sex with every girl I meet, and need to go back to the EOP program." The inmate was seen by a clinician shortly thereafter and denied any SI.  The clinician found that she "has secondary gains to her behaviors."  The clinician placed the inmate on five-day follow-up services, but did <u>not</u> complete an SRE.  In a similar case (<u>CIW 1</u>), the inmate expressed SI to a psych tech during rounds and was referred to a psychologist for further assessment.  The clinician's subsequent progress note stated the following:  "I/P claiming she is feeling suicidal 'send me to suicide watch, I'm going to hang myself if you send me back to my cell.'  When asked if she has something to hang herself with, she stated, 'I'll find something.'  Angry and upset being told in ICC that she will be transferred to CCWF.  Informed I/P that being sent to the MHCB will not deter her from being transferred up north.  I/P indicated that she understands this, and was not the reason why she is claiming SI." Although the clinician believed that "IP's claim of SI is most likely not valid" and an SRE was <u>not</u> completed, the inmate was recommended for further assessment by the psychiatrist in the TTA.  A short time later, the inmate was seen by the psychiatrist and continued to express SI.  The psychiatrist decided not to admit the inmate to a MHCB, rather she was returned to her housing unit on a five-day follow-up and an SRE was <u>not</u> completed.

Finally, it should be noted that review of monthly SPRFIT Committee minutes held at CIW from February through April 2014 found that the Chief Psychiatrist (or other psychiatrist) did not attend any of the meetings.  The lack of psychiatric leadership attendance was troubling.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

133

**Training**:  According to training records, 92 percent of custody staff was certified in CPR. Nursing staff reported 100 percent compliance with CPR training.  In addition, 100 percent of custody staff was compliant with annual suicide prevention block training.  Medical and mental health staff had not received annual suicide prevention block training.  Finally, 94 percent of required mental health clinicians had received the seven-hour SRE training, with 96 percent having completed the mentoring program.

This reviewer observed the annual suicide prevention block training on May 20, 2014.  The instructor appeared proficient, the material was presented adequately, and there was some interaction with participants.  The instructor later informed this reviewer that it was very challenging to present all of the required PowerPoint slides and encourage participation within the 60-minute allotted timeframe for the workshop.

**Recent Suicides**:  CIW had four inmate suicides during 2012 – 2014.  In the **first** case (CIW 5), the inmate was found hanging from the bed and locker of her Support Care Unit cell by a mesh laundry bag during the evening of July 6, 2012.  The inmate entered CDCR in April 1996 to serve a 30-year to life sentence for the murder of her husband.  She was transferred to and from CIW on several occasions, and last transferred to the institution in January 2010.  The inmate only had one RVR during her confinement, and the incident, smoking in her cell, occurred in 1998.  She appeared to have good family support and frequent visits from a religious community group.

The inmate had a significant history of mental illness, both in the community and during CDCR confinement.  She was placed at EOP LOC soon after her CDCR arrival.  She was hospitalized twice at Patton State Hospital (PSH), the first time for 11 months from September 1999 through August 2000 following a serious SA by hanging, and the second time for more than five years from December 2004 through January 2010 following a SA of cutting her wrists.  The inmate had multiple diagnoses during her hospitalization, including Major Depressive Disorder, PTSD, Borderline Personality Disorder and Schizoaffective Disorder.  At the time of her death in July 2012, her diagnosis was Mood Disorder NOS and a provisional diagnosis of Psychotic Disorder NOS.  The inmate was on both 3CMS and EOP  during her CDCR confinement, and was most recently elevated to EOP in January 2012.  She was reportedly compliant with her psychotropic medication throughout most of her confinement.  According to the CDCR reviewer, the inmate had a number of chronic medical conditions that were not contributory to her subsequent death.

The inmate had a social history that was once termed "colorful," and included four marriages and employment as a prostitute in a legal brothel in Nevada.  The CDCR reviewer in this case believed that a more accurate descriptor of her life was "tumultuous" because of her multiple psychiatric hospitalizations and SAs.  In addition, the inmate self-reported a mental health history that began at age 12 due to physical and emotional abuse by her mother, and death of her brother by drowning.  She also reported sexual abuse by her step-father.  In addition to her own prior SAs, the inmate reported that her sister had also attempted suicide.

As indicated above, the inmate had a significant history of suicidal and self-injurious behaviors, both in the community and during CDCR and PSH confinement.  The incidents in the community included SAs by laceration, overdose, and hanging.  The SA by drug overdose

occurred following her fourth husband's murder in August 1994. As stated above, she attempted suicide in CDCR by hanging in 1999 and again by cutting her wrists in 2004. During her stay at PSH, she again attempted suicide by hanging in October 2009. Following her return from PSH, the inmate again attempted to hang herself with a belt from her bathrobe in April 2012. Although she had a total of 14 MHCB admissions in the period between her return from PSH in January 2010 and her death, she was not referred back to DSH. During this time period, when not in a MHCB, the inmate was housed in CIW's Support Care Unit.

There were various reasons for the inmate's multiple MHCB admissions during 2010 and 2012, including wrist lacerations after her father died in March 2011, AH of SI, other self-injurious behavior (e.g., cutting her ankles), panic attacks, and severe depression when told that her sister had spent all of their inheritance following their parents' deaths. She also complained of having a microchip implanted in her head that she believed had been put there by an ex-husband so that he could spy on her and control her thoughts.

In May 2012, clinicians began to observe that the inmate's behavior was deteriorating, with increased depression, more frequent complaints about the microchip in her head, more anxiety and paranoia, and sleeping problems. Her psychotropic medication was adjusted in an attempt to decrease her symptoms. On May 19, 2012, she was escorted to the TTA following complaints about panic attacks and SI. She was not admitted to a MHCB, but returned to the SCU with a five-day follow-up. Several days later on May 24, 2012 the inmate attended an IDTT and the progress note from the session noted her "obsessions, ruminating, anxiety, sadness, constricted affect, and some paranoid ideation." She continued to complain about increased panic attacks during clinical sessions on May 29, 2012 and June 1, 2012. A week later on June 9, 2012, the inmate was taken to the TTA after expressing SI when reportedly informed that her sister had spent all of her inheritance. She was admitted to a MHCB feeling "overwhelmed" with a plan to hang herself. She was discharged from the MHCB two days later on June 11, 2012 with a five-day follow-up. Her PC began twice-weekly contacts with the inmate on June 16, 2012 and she again reported receiving a disturbing letter from her sister, expressed SI, and "placed on 5-day follow-ups with custody rounds on the SCU." On June 28, 2012 she told her PC that she was "really worried about my money..... I feel that my sister has spent the money."

By early July 2012, the inmate's anxiety and agitation continued to increase. She became obsessed with the state of her inheritance and told her PC on July 2, 2012 that she had been writing several letters every day to her sister. Three days later on July 5, 2012, she expressed feelings of hopelessness and SI, increased anxiety and poor sleep, binge eating, and "too many conflicts on the unit." Regarding her inheritance, the inmate told the clinician that "Even if I had my inheritance, I just don't feel good. I want to die. Death seems better." She was admitted to a MHCB. The inmate was seen by a CTC clinician the next day and stated "I feel better today. I just needed time to think." The clinician wrote that "I/P reported that she had slept better last night and realized that she needed to accept things in her environment that she had no control of. I/P was encouraged to use her coping skills when encountering stressors. I/P was glad to know that she would be returning to her unit. I/P stated, I want to be with my friends and get their support." An SRE was completed, and the inmate denied any current SI. Although endorsing AH, she insisted "they don't bother me." She was assessed as "high" chronic risk and "low" acute risk for suicide. The inmate was discharged back to the SCU and the treatment plan

section of the SRE stated the following in its entirety: "I/P will be discharged on a 5-day step-down. This writer will communicate with PC regarding status and transfer." Welfare checks at 60-minute intervals were also recommended. The inmate committed suicide several hours later.

The CDCR reviewer in this case was critical of the clinical treatment provided, particularly the lack of referral to a higher LOC following 14 MHCB admissions between 2010 and 2012 and the impact that perceived manipulative behavior had on the decision by multiple IDTTs not to refer. The reviewer's comments were insightful and pointed:

> It appeared to this evaluator that staff at CIW was split into two camps - those that believed that the inmate was crippled by severe personality pathology that included some psychotic features (implanted chip, AH), and others who focused instead on her blatant manipulations (pressuring other inmates to clean her cell or rub her back) and label her symptom complaints as malingering. Staff splits like those seen in this case can have a deleterious effect on clinical care. For this I/P, the team that believed that she did not have an Axis I mental disorder moved quickly to a discussion of reduction of LOC, while those who that believed that she did suffer serious psychotic symptoms increased her antipsychotic medications to the maximum dose, without significant clinical improvement. The staff of the MHCB appeared to downplay her reported psychotic symptoms and seem to have attributed her behaviors solely to her Axis II personality disorder pathology.

Although the CDCR reviewer detailed several specific deficiencies in clinical care, the Suicide Report contained only two bases for recommendations for corrective action through a QIP: "(1) Providing inmates with double-cell status is a known protective factor in preventing suicide in correctional settings. The inmate was single-celled upon discharge from the MHCB unit on July 6, 2012. It is likely that she would not have died by suicide if assigned the cellmate; and (2) The period immediately following an in-patient hospitalization is a period of high suicide risk. The timing of discharges is an important component of the MHCB unit decision-making. The inmate was discharged on a Friday afternoon. The records suggest that she was discharged without adequate consideration of the consequences of a Friday PM discharge."

Finally, although the Suicide Report was otherwise very comprehensive, several other issues regarding the case and the above recommendations were worth noting. First, the treatment plan contained within the discharge SRE written on the morning of the inmate's death simply stated "I/P will be discharged on a 5-day step-down. This writer will communicate with PC regarding status and transfer" was particularly unhelpful. The CDCR reviewer noted that treatment planning was inadequate in this case, suggesting that several "forms seem identical - as if they were cut-and-pasted. Overall this reviewer does not believe the shortcomings contributed significantly to the inmate's demise, therefore, this issue is not the basis of a formal recommendation." Given the fact that treatment planning should be the critical tool in the continuity of care following an inmate's discharge from a MHCB, it was troubling that the reviewer did not believe that the lack of treatment planning contributed significantly to this inmate's death, particularly when the reviewer was critical of clinical care.

Second, the fact that clinical judgment becoming clouded by perceived manipulative behavior was a systemic problem within CDCR should not prevent a recommendation for corrective action in a specific inmate suicide case. There are many systemic issues identified in other CDCR Suicide Reports (e.g., failure to conduct 30-minute welfare checks, delay in initiation of life-saving measures, inadequate treatment planning, etc.) that still result in specific recommendations and QIPs. Third, although the vast majority of CDCR suicides occur in single cells, there are many suicides that occur with inmates on double cell-status, including two of the four suicides at CIW during 2012 – 2014, and double-celling is not always the strong protective factor that one might hope it to be. As such, the reviewer's statement that "it is likely that she would not have died by suicide if assigned the cellmate" was dubious at best.

In the **second** case (CIW 6), the inmate was found hanging from the shower head in her GP housing area by a sheet during the morning of November 14, 2013, and pronounced dead at the hospital two days later on November 16, 2013. The inmate re-entered CDCR on January 24, 2012 to serve a four-year sentence for burglary and possession of a controlled dangerous substance. She was transferred to CIW on April 18, 2012. The inmate had 14 RVRs during her confinement, the most recent of which occurred in August 2013 for refusal to submit to a urine sample and disobeying orders. She appeared to have good family support. According to the CDCR reviewer, the inmate had a few chronic medical conditions that were not contributory to her subsequent death.

According to the review of records in this case, the inmate did not have a significant history of mental illness in the community, but had a significant history of substance abuse that began when she was 13-years-old. She had several prior arrests as a juvenile, and three prior CDCR confinements, all of which were related to her substance abuse. At age 15, she was reportedly hospitalized for SI, and attempted suicide by drug overdose the following year for which she was not hospitalized. During this time, her older brother committed suicide by hanging.

Prior to the inmate's first CDCR confinement in 2004, she was diagnosed with Bipolar Disorder at the county jail and prescribed psychotropic medication. Upon entering CDCR a short time later, she was placed in 3CMS with a diagnosis of Adjustment Disorder and Amphetamine Dependence. She was discharged from the caseload less than a year later.

Upon her most recent CDCR admission in January 2012, the inmate received a mental health evaluation that determined she did not meet criteria for inclusion on the caseload. A year later on February 13, 2013, the inmate was admitted to the emergency room after being found unresponsive in a housing unit from an alleged drug overdose. She was returned to CIW four days later on February 19, 2013 and denied the overdose was a SA, stating the incident was the result of "spiritual warfare in my head" that she was trying to stop. She was diagnosed with Anxiety Disorder NOS, Cannabis Dependence, and Amphetamine Dependence. The inmate was placed on five-day follow-up and placed in 3CMS. As part of her enrollment in 3CMS, her PC completed an SRE on February 26, 2013 that stated the following: "IP reports that she put rope around her neck two weeks ago but then stopped herself, then on February 13, 2013, OD on methamphetamine, though she denies it was a S/A." The inmate denied any current SI and was assessed as being at "low" chronic risk and "moderate" acute risk for suicide. The treatment plan included "3CMS LOC, IDTT, and continue current psychotropic medication." The medication,

however, was discontinued at her request in March 2013, and then restarted again in June 2013. On August 5, 2013, the inmate was assessed by a psychiatrist due to medication non-compliance. She also reported symptoms of "panic attacks, waking up at night and not sleeping." Her medication was increased for better efficacy.

On September 10, 2013, the inmate was seen by mental health staff as a result of an emergency referral regarding the alleged death of her son. She informed the clinician that her mother had informed her of the death during a telephone conversation the previous night. She told the clinician that "she had lost the two closest people in her life the last six months," in reference to the death of her father in May 2013. (A subsequent investigation by the CDCR reviewer in this case determined that the inmate's son had not died.) She denied any SI. The inmate was seen twice more in October for medication non-compliance, and the medication was discontinued on October 23, 2013.

Other than theorizing that the inmate may have been harassed by other inmates to repay a significant drug debt, the CDCR reviewer did not identify any possible precipitating factors to the suicide. The inmate did not leave a suicide note. The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) The inmate was placed in the MHSDS at the CCCMS LOC per a placement chrono dated February 26, 2013. However, per the clinical documentation, the initial IDTT and corresponding treatment plan were not completed until March 26, 2013....A treatment plan must be completed by the PC within 14 working days; (2) At the two IDTTs held for the inmate on March 26, 2013 and June 14, 2013, there were no psychiatrists present. The absence of psychiatrists is a policy violation according to the 2009 *Program Guide*."

In the **third** case (CIW 7), the inmate was found hanging from the cell door in her GP cell by a sheet during the morning of February 24, 2014. The inmate re-entered CDCR on October 18, 2011 to serve an 11-year sentence for burglary and theft. She was transferred to CIW on October 18, 2012. The inmate had three RVRs during her three-year confinement, one of which involved conspiracy to introduce controlled substances for distribution, for which she received an additional 32-month sentence in November 2013. She appeared to have good family support, demonstrated by visits from family and friends. According to the CDCR reviewer, the inmate had several chronic medical conditions that were not contributory to her subsequent death.

According to the review of records in this case, the inmate did not have a significant history of mental illness in the community, but she had a history of substance abuse. Upon entry into CDCR in October 2001, she denied any current or prior mental health concerns and, therefore, was not entered into the MHSDS. In December 2012, the inmate was seen by a clinician as the result of an emergency referral after she reported being depressed because of her uncle's death. She also self-reported anxiety and being sexually molested by a cousin during her adolescence. The inmate also reported two prior SAs by drug overdose (in 2002 and 2005) that resulted in hospitalizations. A SRE completed on December 21, 2012 found her at "moderate" chronic risk and "low" acute risk for suicide. She placed in 3CMS with diagnoses of Anxiety Disorder, Major Depressive Disorder, Poly-Substance Dependence, Personality Disorder and PTSD.

138

During the early part of 2013, the inmate was seen by her PC on a regular schedule and continued to complain about nervousness, anxiety, poor concentration, and impaired memory. From May 31, 2013 through December 19, 2013, she was housed in the administrative segregation unit because of the aforementioned conspiracy to bring drugs into the institution.  A SRE completed on June 4, 2013 by the PC determined that the inmate was at both "low" chronic and acute risk for suicide.  It was noted by the CDCR reviewer in this case that the PC either ignored or did not review the inmate's prior SRE which documented the two prior SAs and subsequent hospitalizations.  Another SRE, completed by the PC a month later on July 2, 2013, also failed to document the inmate's prior SA history.  Also in June 2013, the inmate began to take psychotropic medication, and her diagnosis was revised to Anxiety Disorder, Polysubstance Dependence, and Personality Disorder.

The inmate's last contact with a mental health clinician before her February 24, 2014 suicide occurred three weeks earlier on February 3, 2014 as the result of a routine contact.  She appeared both anxious and irritable, and displayed some paranoia.  Supportive counseling was provided.

Other than theorizing that the inmate may have been upset regarding the dissolution of a sexual relationship with another inmate the week before and recently receiving an additional 32-month sentence in November 2013, the CDCR reviewer did not identify any possible precipitating factors to the suicide.  The Suicide Report did not contain any recommendations for corrective action, although the reviewer noted a concern that the PC had not conducted thorough reviews of the eUHR to document the inmate's previous SAs on the SREs.  The reviewer "recommended that CIW conduct an inquiry regarding the necessity of reviewing previous SRE collateral information in the most recent SREs and determine if additional training or action is necessary." This reviewer's examination of the CDCR secure site did not contain any documentation that this informal recommendation was acted upon by CIW, and it was unclear why this recommendation was not formally presented in the Suicide Report with the required QIP.

Finally, one additional issue that was not found in the Suicide Report concerned the emergency response to the suicide on February 24, 2014.  According to the records, COs responding to the emergency initially allowed another inmate to assist with CPR, and it appeared that correctional staff had to return to the Unit staff office on two separate occasions to retrieve both the cut-down tool and Ambu bag.  The Suicide Report did not include a discussion as to the necessity for allowing an inmate to conduct CPR in the presence of other correctional staff, nor why it was necessary for correctional staff to take separate trips back to the Unit office when the rescue tool and Ambu bag should be contained in the same emergency response bag.  The impact of this delay, if any, to the overall emergency response was not explored in the Suicide Report.

In the **fourth** case (CIW 8), the inmate was found hanging from the bookshelf of  the SHU section of her administrative segregation cell by a sheet during the afternoon of July 30, 2014. The inmate re-entered CDCR on May 18, 2011 to serve a five-year sentence for discharge of a firearm and a parole violation. She was 19-years-old. The inmate had been previously committed to the California Youth Authority (CYA) at age 15 in 2006 for possession of a controlled dangerous substance and robbery.  She was transferred from CYA to CDCR in July 2009, then paroled from CDCR in November 2010.  Less than six months later, she was re-committed to CDCR.  The inmate remained at CIW for most of her confinement, only leaving the institution

for brief hospitalizations related to seizures.  The inmate accumulated over 26 RVRs during her three-year confinement, including being out of bounds, possession of a controlled substance, disobeying a direct order, contraband, kissing another inmate, alteration of clothing, refusing assigned housing, and attempted escape.  She spent the majority of her confinement in either administrative segregation or SHU during the last two years of her life, and told a clinician that "I just stopped caring" after her aunt's death in March 2013.  It was a potentially stressful event because her aunt's residence was a primary ingredient of her parole plan.  Her estimated parole release date was extended from September 2013 to October 2015 as a result of her multiple RVRs.

The inmate had several serious medical problems, included a history of pancreatitis and migraines.  Following an assault by another inmate in December 2013, she developed seizures and was treated by medical providers on a regular basis.  Her most recent seizure occurred on July 25, 2014, a few days before death.

Although the inmate was not viewed as a reliable historian, and did not report a significant history of mental illness in the community, she reported a history of substance abuse beginning at age 12 when she joined a gang.  She also reported being sexually molested as a teenager and that that her mother suffered from depression.  Upon re-entry into CDCR in May 2011, the inmate screened negative for any mental health problems and was not referred to the MHSDS.  However, in early February 2012, she submitted a mental health referral reporting a depressed mood, low energy, poor sleep, and racing thoughts.  She was seen by a clinician and reported being depressed because her family had recently cut off all contact with her.  The inmate was found to meet the criteria for 3CMS LOC.  Her initial diagnosis was Depressive Disorder NOS, and she was prescribed psychotropic medication.  She continued to program within GP and was seen by her PC on a regular basis.

The inmate had an extensive history of suicide and self-injurious behavior in both the community and during CDCR confinement.  She reported an attempted suicide by hanging at age 15 and cutting herself.  The inmate stated that she cut himself to relieve pain, and had at least five incidents of self-injurious behavior by cutting during her CDCR confinement.  In addition, her close friend committed suicide in November 2013.

The inmate also had multiple admissions to a MHCB, beginning on May 12, 2013 when she allegedly threatened suicide when her needs were not being met.  She told a clinician that "I am not suicidal, I just wanted to talk to the psychologist."  The inmate was discharged from the MHCB two days later on May 14, 2013 with the following treatment plan in her SRE:  "Place on 5-day step down, will be seen by the IDTT in ASU, psych techs to follow-up daily, medications to be monitored by psychiatry."  The inmate was again placed in a MHCB for SI and anxiety from September 28 through September 30, 2013.  Upon discharge on September 30, 2013, the treatment plan on the SRE simply stated:  "I/P to be discharged from MHCB to CCCMS/SHU on a 5-day step down."  Her diagnosis was changed to Depressive Disorder NOS, Amphetamine Dependence, and Anti-Social Personality Disorder.

During this time, the inmate was serving a six-month SHU term for multiple RVRs from May 12 through October 24, 2013.  Following her release, she was readmitted into the administrative

segregation unit a few weeks later on November 12, 2013 for refusing assigned housing in GP and disobeying orders resulting in the use of force. She continued to be seen by a mental health clinician on a weekly basis. The inmate was released back into GP on December 11, 2013, but was assaulted by another inmate, hospitalized, and returned to CIW the following day and placed back into administrative segregation for safety concerns. On January 17, 2014, she told the clinician that she began experiencing SI two days earlier due to depressed feelings of hopelessness related to termination of a relationship. She also expressed anxiousness regarding seizures that had started as a result of the recent assault. The inmate continued to be seen on a weekly basis by the administrative segregation unit clinician for the next several months and was provided supportive counseling.

During the late evening of June 27, 2014, the inmate was admitted to a MHCB following an assault on staff in the administrative segregation unit. The incident began when she was observed to be having a seizure or drug-induced seizure in her cell. When COs began to enter the cell, she began to resist by flailing her arms and spitting. She was escorted to the CTC and placed on Suicide Watch under continuous observation. She continued her disruptive behavior and both the mattress and safety blanket were removed from her room. The next day, she refused to submit to urinalysis. The inmate was downgraded to psychiatric observation at 30-minute checks and issued a safety mattress and blanket on June 30, 2014. She was discharged from the MHCB on July 1, 2014 with the following treatment plan in her SRE:

> While in MHCB, I/P was seen daily by the MHCB treatment team and she had her medication evaluated by the MHCB psychiatrist. I/P had initial IDTT on 6/30/14. Treatment focused on: Reinforcing the verbalized acceptance of responsibility for connection between impulsive behavior and negative consequences. I/P was educated about the use of 'stop, think, listen and plan' in day-to-day living and to identify the positive consequences of using this technique. I/P will be discharged from the MHCB on 7/1/14 to CCCMS/SPHU on a 5-day step down. She will follow up with her team treatment team in CCCMS. Future treatment recommendations include: Assisting I/P and identifying rewards that would be effective in reinforcing suppression of impulsive behavior, and teaching I/P cognitive methods (thought stoppage, thought substitution, reframing, etc.) in gaining and improving control over impulsive actions.

Several days later on July 4, 2014, the inmate was found hanging in her administrative segregation cell by a sheet. She had also swallowed a razor blade. She was sent out to the hospital for treatment and returned to CIW a week later on July 11, 2014 and was immediately placed in a MHCB on Suicide Watch. She informed a clinician that her SA was an impulsive act due to many factors, including her birthday a day earlier (July 3), the birthday of her brother who was fatally shot six years earlier, the possibility of picking up additional charges based upon the alleged staff assault, and possibility of a prolonged SHU placement or transfer to CCWF where she had enemies. The inmate was seen by CTC clinicians on a daily basis until her MHCB discharge on July 16, 2014. She was assessed as being at "high" chronic risk and "low" acute risk for suicide. The treatment plan in the discharging SRE was consistent with the above plan from July 1 and stated the following:

> While in MHCB, I/P was seen daily by the MHCB treatment team and she had her medication evaluated by the MHCB psychiatrist. I/P had initial IDTT on 7/11/14.  Treatment focused on: Reinforcing the verbalized acceptance of responsibility for connection between impulsive behavior and negative consequences.  I/P was educated about coping skills for recent stressors in her environment and anger and depression.  Specifically, she was educated about coping skills for symptoms related to trauma.  Discussed coping skills for both anger and anxiety related to assault that occurred in December 2013.  I/P will be discharged from the MHCB on 7/16/14 on a 5-day step down to EOP/SPHU.  This is a higher LOC.  Future treatment recommendations include processing I/P's angry feelings or anger outbursts that have recently occurred and reviewing alternative behaviors.  I/P should also be encouraged to explore the negative self talk that is associated with past trauma and the predictions of unsuccessful coping or catastrophizing.

The inmate was released back into the administrative segregation unit and provided with five-day follow-ups.  There was <u>no</u> indication from the eUHR of any concordance with the thoughtful treatment plans noted above on July 1, 2014 and July 16, 2014 and five-day follow-ups or any subsequent progress notes.

On July 28, she was seen by a psychiatrist after an argument with one of the administrative segregation officers.  She appeared to be both frustrated and angry, but denied any SI.  According to the psychiatric note, the inmate "was moderately agitated and punched the window a couple of times but was able to follow direction."   Two days later on the morning of her suicide (July 30, 2014), the inmate appeared at her IDTT meeting.  She complained of depressive symptoms of crying, hopelessness, irritability, and oversleeping.  She had been refusing most of services and appeared angry that her LOC had been increased to EOP. Her diagnoses were revised to Major Depressive Disorder, Amphetamine Dependence, and Anti-Social Personality Disorder.  Of note, the MHTP developed at the July 30, 2014 IDTT bore <u>no</u> resemblance to the treatment plans found in the July 1 and July 16 SREs.  Following the meeting, the inmate was escorted back to her cell and immediately covered up the cell window. After being told by custody staff that she was going to be cell-extracted and sent to the CTC due to safety concerns, she removed the covering from her window and denied any SI to her PC.  The inmate was found hanging a few hours later, and it took correctional staff over eight minutes to enter the cell and initiate life-saving measures.

The CDCR reviewer speculated that there were several recent stressors in the inmate's life that were possible precipitating factors to her suicide, noting that "life began a downward spiral following the severe head injury she suffered on December 12, 2013 when she was assaulted by other inmates."  These stressors included continued fear of assault from other inmates, her cellmate had recently moved out because of the continuing seizures from the head injury and she felt rejected, her girlfriend had recently been transferred to another prison, and she had been admonished by her brother for being a lesbian.  The reviewer also noted that the 23-year-old had poor coping and problem-solving skills to handle these stressors.  A suicide note was found in her cell that read, in part, that "I am tired of suffering and hurting everyone….I just can't go on

anymore, forgive me." The Suicide Report included three bases for recommendations for corrective action through a QIP: (1) Despite the fact that the inmate was assessed to be at both "high" chronic and acute risk for suicide on June 28, 2014, made a serious SA on July 4, and acquired five RVRs from June 27 through July 11, 2014, "there was no clear documentation or rationale as to why a Psychiatric Inpatient Program (PIP) referral was not generated. This was particularly troublesome in terms of the team's notation that the inmate needed a higher structured LOC in a hospital setting;" and (2) and (3) "The presence of organized drug trafficking and use within the institutional environment poses a suicide risk to inmates" and needs to be addressed systemically by DCHCS and DAI.

Finally, two additional issues were <u>not</u> found in the Suicide Report. First, there was no concordance with the treatment plans dated July 1 and July 16 and the five-day follow-ups or any subsequent progress notes. Second, when the inmate was found hanging in her administrative segregation unit cell on July 30, 2014, it took correctional staff over eight minutes to enter the cell and initiate life-saving measures.

*<u>Summary</u>: This reviewer found that CIW was a problematic institution that exhibited numerous poor practices in the area of suicide prevention, including conducting 60-minute rounds in administrative segregation, SHU, and Psychiatrist Services Unit (PSU); observing some suicidal inmates at 30-minute intervals; withholding mattresses without clinical justification from some suicidal inmates; not always completing SREs on inmates expressing SI; and inadequate treatment planning.*

## 27)   **California Rehabilitation Center (CRC)**

**Inspection**: May 22-23, 2014

CRC housed 2,892 inmates, with the vast majority at Level II classification status. CRC had a ten-bed OHU in six rooms for both medical and mental health needs. The institution did <u>not</u> have an administrative segregation unit. Approximately 40 percent of CRC inmates were on the caseload, with all 1,143 in 3CMS LOC.

**Screening/Assessment**: This reviewer observed several new admissions during the medical intake screening process on May 23, 2014. The nurse was observed conducting intake screening in a Nurse's Office that was separated from the custody portion of the R&R Unit. Privacy and confidentiality were adequately provided. The nurse was observed to be asking all the required intake screening questions in rapid-fire fashion and appeared uninterested. Limited vital signs were taken (i.e., only blood pressure). Each screening took between one and two minutes.

**Housing**: CRC had a ten-bed OHU in six rooms for both medical and mental health needs. All of the rooms contained obvious protrusions which could be used in a SA by hanging. All inmates housed in the OHU awaiting transfer to a MHCB were observed on a 1:1, continuous basis.

**Observation**:  Although both Suicide Precaution and Suicide Watch could theoretically be used in the OHU for inmates identified as being suicidal, due to the fact that none of the rooms were suicide-resistant, all inmates were required to be observed on a 1:1, continuous basis.  Between January 1, 2014 and April 30, 2014, CRC had seven inmates admitted into the OHU for SI.  All of the inmates were discharged within 24 hours and either returned to their CRC housing unit or transferred to a MHCB at either CMC or CIM.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to treatment planning and failure to always complete and SRE for inmates presenting with SI.  For example, in one case (CRC 1), the inmate was admitted to the OHU on March 17, 2014 for SI.  He had scratched himself on the wrist a few days earlier and reported paranoid thoughts of other inmates trying to hurt him.  He was discharged from the OHU the following day and the SRE contained the following treatment plan:  "Inmate is at EOP LOC.  He is seen at least weekly for CCM.  Plan to update and monitor status, including emotional and paranoia."  In another case (CRC 2), the inmate was admitted into the OHU on March 21, 2014 after informing staff that he would kill himself if he was transferred. He was discharged from the OHU the same day and the SRE contained the following treatment plan:  "Return to dorm on 5-day follow-up, notify PC that inmate is on psychotropic medication and will be assessed for CCCMS LOC, educated the importance of taking the psychotropic medication daily, notify someone if he feels like he needs extra help."  In a third case (CRC 3), the inmate was admitted into the OHU on April 19, 2014 after expressing SI.  He was discharged from the OHU the following day with the following treatment plan:  "Encourage patient to work with his psychologist on coping skills, five-day follow-up."

Finally, this reviewer examined emergency mental health referrals for SI from January through May 2014.  Of these referrals, one was found in the MHTS and an additional 11 were found in the TTA Logs.  A review of eUHRs found that SREs were completed in only 66 percent, or eight of 12, of the cases.  For example, in one case (CRC 4), the inmate expressed SI to a medical provider and was appropriately referred to a mental health clinician.  The inmate informed the psychologist that he was receiving treatment for Hepatitis C and the medication was reportedly making him "feeling down" with "tranquil ideation of hurting himself."  He denied a specific plan for suicide or history of suicidal behavior.  The psychologist did not complete an SRE and recommended that the inmate be returned to his dorm.  In another case (CRC 5), an inmate told a nurse during a five-day follow-up on the morning of March 30, 2014 that "I do think about hurting myself, but I don't want to hurt myself."  The nurse contacted the on-call clinician who simply recommended that the inmate be returned to his dorm.  An SRE was not completed.

**Intervention**: This reviewer did not tour any of the CRC housing units.

**Training**:  According to training records, 100 percent of custody staff was certified in CPR. Nursing staff reported 100 percent compliance with CPR training. Medical and mental health staff had not received annual suicide prevention block training. Finally, all of the required mental

144

health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  CRC did not experience any inmate suicides during 2012 – 2014.

**28)**   **Sierra Conservation Center (SCC)**

**Inspection**:  June 10-11, 2014

SCC housed 2,652 inmates across three classification levels, Level I, II, and III.  An additional 2,010 Level I inmates were dispersed among 19 conservation camps.  SCC had a ten-bed OHU for inmates with medical and mental health needs, and an administrative segregation unit.  Approximately 24 percent of SCC inmates were on the caseload, with all 625 at the 3CMS LOC.  In addition, alternative housing beds were designated in the administrative segregation unit, but said to not have been used in several years.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on June 11, 2014.  The screening process was conducted in the Nurse's Office of the R & R Unit, but privacy and confidentiality were compromised because the door to the office remained open and the next inmate to be screened was sitting in close proximity outside in the hallway.  The nurse was observed to be asking all the required intake screening questions.

In addition, this reviewer observed daily administrative segregation unit rounds by a psych tech on June 11, 2014.  The rounds were problematic because the psych tech was only interacting with 3CMS inmates and not conversing with non-caseload inmates in the administrative segregation unit.  In a subsequent discussion with the psych tech's supervisor, this reviewer was informed that the psych tech and supervisor were "unaware of a policy" that required psych techs to conduct rounds of all inmates.  The supervisor assumed that, because CDCR policy only required documentation on caseload inmates, psych techs were not required to interact with non-caseload inmates.

**Housing**:  SCC had a ten-bed OHU used for inmates with both medical and mental health needs.  Although each of the rooms had tall ceilings and unsafe ventilation grates that were not easily assessable, some of the rooms contained obvious protrusions which could be used in a SA by hanging.  For example, three of the rooms primarily used for suicide observation (Nos. 6, 7, and 8) had Lexan paneling on the outside of the cell bars, thereby allowing inmates easy access to the cell bars in a SA by hanging.  In addition, some rooms had faucet lips that could be used as an anchoring device and a table top which should either be removed or retrofitted with two stainless steel triangles attached to the wall and either side of the table top to eliminate the sharp edges from being an anchoring device.  In addition, similar to most OHUs toured by this reviewer, the OHU at SCC did not have any suicide-resistant beds and inmates slept on the floor.  Further, alternative housing beds were designated in the administrative segregation unit, but said to not have been used in several years.

145

Finally, the administrative segregation unit contained 12 retrofitted cells for inmates on new intake status.  During the inspection, this reviewer observed the cells were either empty or occupied by inmates on new intake status.  This reviewer did not observe any new intake inmates in non-retrofitted cells.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the OHU for inmates identified as being suicidal, this reviewer also observed that psychiatric observation was used in the unit.  Although most inmates assessed as being suicidal were on either Suicide Precaution or Suicide Watch, this reviewer did find that psychiatric observation at 30-minute intervals was used for a handful of inmates assessed as being suicidal.  For example, in one case (SCC 1), the EOP inmate was admitted into the OHU on June 1, 2014 after being observed to be "anxious, pacing back and forth in cell, exhibited anger, delusional ideation."  He was referred to mental health staff, and the completed SRE found that he was both a "moderate" chronic and acute risk for suicide.  Although he expressly denied any SIs, he "made statements that were self-critical" and had "multiple warning signs and mood volatility."  He was placed on psychiatric observation at 30-minute intervals.  Such practices were not referenced in the *Program Guide*.

Nursing staff was <u>not</u> using the current CDCR observation form (CDCR 7365), rather they were using an antiquated form and not providing documentation at staggered intervals.

Finally, during the tour of the administrative segregation unit, this reviewer examined unit logs used to document 30-minute welfare checks prior to full implementation of the Guard One system in mid-May 2014.  The review of unit logs for March and April 2014 found only 79 percent compliance with 30-minute welfare checks.  Subsequent review of Guard One data for the entire administrative segregation unit for selected 24-hour periods in late May 2014 found overall compliance at 95 percent.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to incomplete SREs and treatment planning.  For example, in one case (SCC 2), the SRE written on April 22, 2014 was incomplete because the second page of the assessment form was not completed (other than checkmarks noted on the Estimate of Risk).  In another case (SCC 3) the inmate was admitted to the OHU on February 9, 2014 for SI.  He was discharged from Suicide Precaution two days later on February 11, 2014 with the following treatment plan in his SRE:  "Place in 3CMS, D/C from OHU, 5-day follow-up, one day-in."

This reviewer examined emergency mental health referrals for SI from January through May 2014.  Of these referrals, three were found in the MHTS and an additional 36 were found in the TTA Logs.  A review of 23 eUHRs found that SREs were completed in 96 percent, or 22 of 23 of the cases.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 100 percent of both custody and nursing staff were certified in CPR.  In addition, 90 percent of custody staff had completed annual suicide prevention block training; whereas 63 percent of medical staff and 68 percent of mental health staff had completed the same annual training.  Finally, 100 percent of required mental health clinicians had received the seven-hour SRE training, with 94 percent having completed the mentoring program.

**Recent Suicides**:  SCC had one inmate suicide during 2012 – 2014.  In that case (SCC 4), the inmate was found hanging from the light fixture in his administrative segregation unit cell by a sheet during the early morning of July 28, 2012.  The inmate had entered CDCR in April 2007 to serve a ten-year sentence for assault and terroristic threats.  He was transferred to SCC on July 16, 2012.  The inmate had five RVRs during his confinement, the last of which occurred on June 2, 2012 and involved destruction of the property for a broken light fixture in the administrative segregation unit at CSP-Solano.  He appeared to have good family support and was not thought to be gang-affiliated.

Upon entry into CDCR in April 2007, the inmate reported receiving mental health services in the community, including three hospitalizations for depression between 1985 in 2004 and treatment for substance abuse.  Although viewed as an unreliable historian, he was placed into the MHSDS at the 3CMS LOC.  His initial diagnosis was Adjustment Disorder with Depressed Mood, Rule Outs (R/O) for Major Depressive Disorder with Psychotic Features and Anxiety Disorder NOS.  The diagnosis was changed to Depressive Disorder NOS.  He was maintained on psychotropic medication, but was not always compliant.  The inmate denied either a history of suicidal or self-injurious behavior.  He did, however, report several medical problems, including occasional seizures, dizziness, and blackouts from previous head injuries. He was also treated for hypertension.  The inmate also complained about chronic knee and back pain and arthritis in his hands.  He had been prescribed several pain medications, but they were changed the week before his suicide.

In February 2012, the inmate was placed in the administrative segregation unit at CSP-Solano after being assaulted by another inmate in GP.  He remained in that institution's administrative segregation unit until transfer to SCC on July 16, 2012.  He was initially housed in the administrative segregation unit, but transferred to GP on July 20, 2012. Three days later on July 23, an emergency mental health referral was issued by custody staff based upon observations of paranoia and fear of assault in GP.  A subsequent SRE completed the same day by a clinician found that although the inmate denied any SI or history, he appeared "unpredictable due to voices and no sleep in four days, and being in a new prison....Very paranoid....Possible hopelessness due to yard."  He was assessed as being both at "moderate" chronic and acute risk for suicide, and placed on Suicide Precaution with observation at 15-minute intervals.  The inmate was discharged from Suicide Precaution the following day, on July 24, 2012, but remained in the OHU.  The next day, July 25, he was seen by a clinician who assessed and revised his diagnosis to Major Depressive Disorder with Psychotic Features, Poly-Substance Dependence, and Anti-Social Personality Disorder.  Soon thereafter, an OHU nurse observed the inmate to be pacing the floor and tearing his sheet into strips.  She documented the observation and informed a CO, but neither of them alerted mental health staff.

147

A discharging SRE completed the following day on July 26 was problematic.  There was no narrative or mental status exam listed on the second page, the chronic risk for suicide column was left blank, acute risk for suicide was assessed as being "low," and justification for the risk level stated the following:  "Able to recognize where his paranoia came from  - said he was coming off other meds when he arrived here, feels okay, going back to yard now."  The treatment plan section of the SRE simply stated:  "CM, 5-day follow-up, psy., 1-day lay-in." There was no discussion regarding his previous hopelessness and paranoia regarding returning to the GP yard.  The inmate was discharged back to GP the next day, July 27, 2012.

After being in the GP yard for less than 24 hours, the inmate was again assaulted by another inmate on July 27, 2012.  He was again re-housed in the administrative segregation unit, but placed on the second floor and not in a new intake cell as required.  He was seen briefly by a mental health clinician for the first day of his five-day follow-up and was described as being "hostile, irritable, and marginally cooperative," apparently angry over the change in his pain medication.  He committed suicide several hours later.

The inmate did not leave a suicide note and, although the CDCR reviewer did not offer any specific precipitating factors for the suicide, speculated that, given his history of substance abuse, his difficulties in the GP yard might have been related to "on-going efforts to obtain substances, and possibly due to drug debts."  The Suicide Report contained three bases for recommendations for corrective action through a QIP:

> (1) Serious failures to follow CDCR policy and procedures occurred prior to and during the discovery of the suicide, including, but not limited to the following - no 30-minute welfare checks documented during first watch, gap in 30-minute checks...., officer did not activate alarm or radio for help, do not communicate emergency to control officer, the officer entered ASU cell alone and cut down the inmate without assistance, an ASU intake cell was not used for newly arrived inmate who was on a 5-day suicide follow-up, a nurse stationed in the OHU saw the inmate tearing his sheet into strips.  She did not tell mental health staff, but she did tell an officer who did not act on this information, CO in the OHU did not pass on the nurse's report of the inmate tearing sheets to mental health staff; (2) In response to the OHU nurse's failure to refer the inmate to mental health staff after he was observed tearing sheets, training was provided to all nursing staff regarding mental health referrals and appropriate documentation practices; and (3) When inmate was placed in OHU on July 23, 2012, he was put on suicide precautions.  He was not referred to an MHCB, as required by current policy for all inmates placed on either suicide watch or suicide precautions.

Finally, there were a few issues that were not addressed in the Suicide Report.  First, although the CDCR reviewer suggested that certain factors may have precipitated the inmate's suicide, such as "his status as an untreated addict who struggled unsuccessfully to cope with emotional distress, his experience of perceived physical pain, his conflict with other inmates resulting in injury and contributing to a state of fear and anxiety," such known triggers to suicide risk were not incorporated into the inmate's treatment plan that was completed within the problematic SRE

dated July 26, 2012.  That treatment plan, which simply stated "CM, 5-day follow-up, psy., 1-day lay-in," was grossly inadequate.  Second, the inmate had been charged with destruction of the property for a broken light fixture in the administrative segregation unit at CSP-Solano on June 2, 2012.  In light of the fact that his suicide involved a hanging from a light fixture in his administrative segregation unit cell at SCC, the Suicide Report was missing a discussion and/or investigation regarding whether the earlier incident at CSP-Solano was a possible failed SA by hanging.

## 29)    Mule Creek State Prison (MCSP)

**Inspection**: June 12-13, 2014

 MCSP housed 2,950 inmates across three classification levels, Levels I, III, and IV, although most were Level III.  MCSP had a ten-bed CTC, with eight rooms designated as MHCBs; a MHOHU; and two administrative segregation units located in Buildings 12 and 13.  Approximately 60 percent of MCSP inmates were on the caseload, with 1,172 in the 3CMS and 609 in the EOP LOC.  In addition, alternative housing cells were designated in the MHOHU and were used on a daily basis.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on June 13, 2014.  The screening process was problematic for several reasons.  First, the screening was not conducted in the Nurse's Office, rather it was staged in the large open area of the R & R Unit, with an officer standing alongside each inmate being screened.  As such, there was no privacy and confidentiality for the process.  Second, the nurse conducting the screening consistently failed to ask inmates if they were *currently* suicidal.  Third, the nurse did not take vital signs on any of the inmates being screened.

In addition, this reviewer observed daily administrative segregation unit rounds by two psych techs on June 12, 2014.  The psych techs were observed to accurately conduct and document their rounds.

**Housing**:  MCSP had a ten-bed CTC, with eight rooms designated as MHCBs.  The rooms did not contain any obvious protrusions which could be used in a SA by hanging.  In addition, alternative housing cells were designated in the MHOHU, a six-cell section of the overflow administrative segregation unit in Building 13.  The unit was mislabeled as a MHOHU as it was neither a mental health unit nor an OHU.  With the exception of the sink/toilet combo, all other fixtures had been removed from each of the six cells.  Despite an LOP signed by the MCSP Warden and CEO in December 2013 stating "a cement bed with mattress on top is acceptable" for housing in the MHOHU, all cement beds had been removed from each MHOHU cell.  The reason for this action was unclear because, similar to new intake administrative segregation cells, simply retrofitting the original beds by closing the gap between the bed and the wall would have made these cells suicide-resistant.  As such, all inmates housed in these MHOHU cells had to sleep on the floor.  These cells, used on a daily basis, were more sterile than an administrative segregation unit cell and more closely resembled seclusion cells.  In fact, 49 inmates were housed in these cells on suicide observation during the month of May 2014, and most inmates

admitted to a MHCB at MCSP were initially housed in MHOHU cells. In conclusion, *the physical environment of the MHOHU was very problematic, and it was difficult to imagine why a suicidal inmate would continue to endorse SI when subjected to such an anti-therapeutic atmosphere.*

Finally, the administrative segregation unit in Building 12 contained three retrofitted cells for inmates on new intake status. During the site inspection, this reviewer found that there were at least seven newly admitted inmates (i.e., those housed in the unit for the first 72 hours) that were housed in unsafe, non-retrofitted cells.

**Observation**: Both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal. However, although the use of psychiatric observation was no longer used in the CTC, there were two inmates in MHCBs on June 12, 2014 that were not under any enhanced level of observation.

CTC nursing staff was using an older version of the CDCR observation form that contained pre-printed 15-minute time intervals, thus not allowing for documentation at staggered intervals. In addition, staff in the MHOHU was using an antiquated CDCR observation form that also contained pre-printed 15-minute time intervals.

Finally, during the tour of the administrative segregation unit in Building 12, it was observed that the Guard One system had been used to document 30-minute welfare checks of both Buildings 12 and 13 (and not simply those inmates on 21-day orientation status) since September 2013. This was a good practice. Subsequent review of Guard One data for both administrative segregation units for selected 24-hour periods found overall compliance at 93 percent.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis. Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to incomplete SREs and treatment planning.

In one particularly problematic case (MCSP 1), the inmate was placed in the MHOHU on January 16, 2014 after making superficial lacerations to his left forearm. A few hours later, he was moved to a MHCB after banging his head on the wall of his MHOHU cell. The inmate had an extensive recent history of suicidal and self-injurious behavior, including a SA by hanging. He previously stated that he had been "cutting all my life, it relieves stress and evil spirits." The inmate remained in a MHCB for two weeks and was discharged on January 31, 2014, and returned to the administrative segregation unit with the following treatment plan: "I/P was seen by the IDTT on 1/31/14 for discharge planning. I/P was in agreement with plan to discharge from MHCB to assigned housing on a 5-8 day follow-up." During the late evening of the following day, February 1, 2014, the inmate was referred back to the TTA by custody staff after again engaging in superficial, self-injurious behavior. He reported feeling anxious, "a bunch of drama from people," and told the nurse that he was "picking at an old scar to relieve stress." The on-call clinician was notified and ordered that the inmate be returned to the administrative

150

segregation unit. An SRE was not completed. Three days later on February 4, the inmate yelled out to a clinician in the administrative segregation unit that "I'm suicidal, I ain't got my yard, my property. I haven't had a phone call." When the clinician asked him if he was suicidal because he had not gotten what he wanted, the inmate stated "Besides that, I'm just not feeling right." An SRE was completed and the inmate was assessed as being a "moderate" chronic risk and "low" acute risk for suicide. He denied any SI but felt "hopeless, helpless, angry, and agitated. I/P has difficulty managing his frustration level and is very open about his willingness to self-harm to get what he wants." The inmate was not referred to a MHCB, rather, he was returned to his administrative segregation unit cell and "custody to do 15-minute checks and LPTs to continue with daily checks. PC will continue with weekly contact."

Fifteen-minute checks in the administrative segregation unit was not authorized in the *Program Guide*, and any inmate requiring 15-minute checks should be on Suicide Precaution in a MHCB. The above case was not an aberration. The same clinician ordered "safety checks every 15 minutes" for another inmate (MCSP 2) in administrative segregation unit on May 21, 2014.

Treatment planning for inmates expressing SI was also problematic. In one case (MCSP 3), the inmate was brought to the TTA during the late evening of May 31, 2014 after superficially cutting his left wrist with a razor and expressing SI. He was then escorted to the MHOHU and placed on Suicide Watch. The inmate had an extensive history of suicidal and self-injurious behavior and multiple MHCB and DSH admissions. He was seen by a clinician the following morning, June 1, and an SRE was completed that indicated both a "moderate" chronic and acute risk for suicide. Although the SRE was unclear as to whether or not the inmate at "moderate" acute risk for suicide would remain on Suicide Watch, i.e., the treatment plan stated the following the following: "Short-term goals - Patient needs evaluation for EOP LOC; Long-term goals - evaluate for MHCB, DSH referral, or LOP LOC," a Physician's Order dated June 1, 2014 specified the inmate's discharge from the MHOHU on a five-day follow-up back to GP. In another case (MCSP 4), the inmate was initially housed in the MHOHU for SI on May 5, 2014 and moved to a MHCB the following day. He remained in the CTC for approximately ten days and discharged on May 15, 2014 with the following treatment plan in the SRE: "I/P is being sent back to the B-Yard. With his clinician there, he will be urged to improve his problem-solving and social skills through clinical intervention and psycho-education."

This reviewer observed several IDTT meetings for inmates in a MHCB on June 12, 2014. The meetings were problematic. In one case (MCSP 5), the inmate was dressed in a smock and, because there was no discussion from the IDTT and no indication on the CTC Census Sheet, it was unclear whether or not he was on suicide observation. Subsequent review of the eUHR found a "continuation order" for Suicide Precaution. In another case (MCSP 6), there was no discussion by the IDTT regarding the inmate's status on Suicide Precaution until he was exiting the meeting and inquired about getting his clothes back.

Finally, this reviewer examined emergency mental health referrals for SI from January through May 2014. Of these referrals, 45 were found in the MHTS, but an additional 145 were found in the TTA Logs. A review of 40 eUHRs found that SREs were completed in only 68 percent, or 27 of 40 of the cases. In two cases (MCSP 7 and MCSP 8), SREs were not completed despite the fact that both inmates stated they were suicidal and nursing staff completed Administrative

Segregation Pre-Placement Chrono forms (CDCR 128-MH7) that required completion of SREs following expressions of SI.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 96 percent of custody and 99 percent of nursing staff were certified in CPR.  In addition, 99 percent of custody staff was compliant with annual suicide prevention block training.  Neither medical nor mental health staff had completed the annual suicide prevention block training.  Finally, 100 percent of required mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  MCSP had five inmate suicides during 2012 – 2014.  In the **first** case (MCSP 9), the inmate was found hanging from the bookshelf of his administrative segregation unit cell by a sheet during the afternoon of June 7, 2012.  The inmate re-entered CDCR in June 2009 to serve a seven-year sentence for possession of a controlled dangerous substance.  He was transferred to MCSP on February 8, 2010.  The inmate had 12 RVRs during his confinement, the last of which occurred on April 4, 2012 and involved battery on another inmate that resulted in his placement in the administrative segregation unit.  It did not appear that he had any family support, and was not thought to be gang-affiliated.  The inmate had a few medical problems, including seizures that, according to the CDCR reviewer, appeared adequately managed.

Upon re-entry into CDCR in June 2009, the inmate did not report any previous history of mental illness, but had an extensive history of substance abuse.  He did, however, have a history of mental health treatment during previous CDCR confinements, beginning in 2004 when he was placed on the caseload at EOP LOC following a serious assault by another inmate.  In 2006, the inmate tried to commit suicide by hanging and was placed in a MHCB. When he returned for his third CDCR commitment in June 2009, he was again placed on the caseload at 3CMS LOC.  He was diagnosed with Major Depressive Disorder, Mild, Recurrent, and prescribed psychotropic medication.  The inmate became non-compliant with the medication and it was discontinued.  He was placed in a MHCB in both December 2009 and January 2010 for another SA by hanging and superficial self-injurious behavior.  SREs completed during this time consistently documented a "low" chronic risk for suicide.  When transferred again to a MHCB in February 2010, he was elevated to EOP.  Following several months of stability, the inmate was downgraded to 3CMS in June 2010. His diagnosis was changed to Mood Disorder NOS, Poly-Substance Dependence, Personality Disorder NOS (R/O Anti-Social Personality Disorder).

During both 2011 and early 2012, the inmate was treated for depression, irritability, and anger control.  He also accrued several RVRs for fighting.  On April 4, 2012, he received an RVR for battery on an inmate and was placed in the administrative segregation unit.  Mental health records during this time reflected that mental health clinicians believed him to be an unreliable historian (once disclosing that his mother had committed suicide when he was 3-years-old, then reporting that she had died from a heroin overdose), who often exaggerated his symptoms to get his needs met.  The inmate was often described as "grandiose, narcissistic, and shallow."  Although placed back on psychotropic medication a few months earlier, he continued only to take them on an intermittent basis.  A few weeks later on April 20, 2012, the inmate was seen by

his PC in the administrative segregation unit and reported that his mood had been "up and down" for the past few weeks. He also complained of a lack of appetite and difficulty sleeping. According to the progress note, "he discussed intermittent SI saying that he would not spend the rest of his life in prison. He referred to it as 'checking out' and said he would not be 'checking out' anytime soon. He denied current SI, plan, or intent. He disclosed that he has been to Department of Mental Health (DMH) in the past and stated that if he becomes suicidal and has to be hospitalized in the future he wants to go straight to DMH and skip the OHU." Given the fact that the inmate had an estimated release date a year later in September 2013, and there was no information in the Suicide Report to indicate he was facing additional time because of the recent RVR, his statement that he "would not spend the rest of his life in prison" was curious.

On the morning of June 7, 2012, the inmate attended his ICC meeting and was informed that because of continuing enemy concerns in GP, he would be transferred to another CDCR institution when he was released from the administrative segregation unit. The inmate apparently believed that the enemy concerns could be resolved, and became angry at the Committee's decision. According to the CDCR reviewer, the inmate was overheard to say on his way back to his cell that "I'll show them." He committed suicide several hours later.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, and a suicide note was not found. However, the reviewer did speculate that, given his perceived history of malingering and manipulative behavior, the timing of the suicide in late afternoon when both mail and food trays were being distributed might have indicated that he had attempted suicide by hanging with the intention of being rescued. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "SREs completed at MCSP were inadequate in that they did not reflect the inmate's documented mental health history and seemed to be based largely on self-report." The reviewer noted that, despite the inmate's multiple prior SAs by hanging and other self-injurious behaviors, several SREs completed in 2010 and 2011 continued to assess his chronic risk for suicide as "low."

In the **second** case (MCSP 10), the inmate was found hanging from the bunk in his administrative segregation unit cell by a sheet during the afternoon of August 19, 2013. The inmate had entered CDCR in October 1993 to serve a 31-year to life sentence for first-degree murder of a neighbor. He was transferred to MCSP on July 11, 2013. The inmate had only two RVRs during his 20-year confinement, the last of which occurred in 2002. It did not appear that the inmate had significant family support, although he maintained delusions of family visits if he was transferred closer to home. The inmate was receiving treatment for several medical problems, including hypertension, diabetes, glaucoma, and hyperlipidemia. He became very concerned about these ailments and unexplained recent weight loss which medical providers believed were primarily related to his increased anxiety.

Prior to his CDCR confinement, the inmate had not received any mental health services in the community. However, it appeared that he had an untreated history of mental illness because upon entering CDCR, the inmate reported AH beginning almost ten years earlier in 1984, and had been diagnosed with Schizophrenia, Paranoid Type, while confined in the county jail on the instant offense. He was hospitalized at ASH for one year (1990 – 1991) during the pretrial stages of his case. His initial CDCR diagnosis was Psychotic Disorder NOS, that was changed to

Schizophrenia, Paranoid Type, Chronic.  He was prescribed psychotropic medication.  During the ensuing years, he continued to suffer from AH and paranoia that other inmates were talking about him.  He vacillated between various levels of mental health care, including both 3CMS and EOP between 1996 and 2013.  Although the inmate had been compliant with his psychotropic medication for more than 20 years, he began to refuse medication in late 2012.

The inmate was housed in administrative segregation on several occasions due to unconfirmed safety concerns (based upon his paranoia), including most recently on June 10, 2013 when he was housed at FSP.  Due to increasing symptoms of mania and paranoia, his LOC was increased to EOP, and his diagnosis was changed to Mood Disorder NOS.  He was transferred to MCSP a month later on July 11, 2013.

Upon arrival to MCSP, the inmate was housed in the administrative segregation unit awaiting housing in an EOP yard.  According to records, the inmate had previously asked the ICC at FSP for SNY placement due to safety concerns.  It was determined that his safety concerns were delusional and his request for SNY placement was denied.  He remained single-celled in administrative segregation because he could not be housed with any SNY inmates.  On July 12, 2013, the inmate wrote a disjointed health services request to see mental health staff immediately regarding alleged rumors that "people are spreading."  The request was apparently received by the inmate's PC five days later on July 17, but there was no indication in the eUHR that the request was responded to in the form of a progress note.  The following week on July 23, 2013, the inmate was seen by the clinician and his diagnosis was again changed to Schizoaffective Disorder, Bipolar Type.  The IDTT reviewed his case for a possible DSH referral, but determined that a higher LOC was not indicated at the time.  On July 30, 2013, the inmate submitted another disjointed health services request to mental health stating "I tried to tell you long before this got to such a critical mass. .... Now it is seriously out of control.....God bless us all."  Although this request was also reviewed and signed by the PC, there was no progress note found in the eUHR indicating any intervention with the inmate.

The inmate, however, continued to be seen on a weekly basis, and on August 2, 2013 his diagnosis was changed again to Major Depressive Disorder, Severe with Mood Congruent with Psychotic Features, R/O Schizophrenia, Paranoid Type v. Schizoaffective Disorder.  Progress notes from both his PC and psychiatrist indicated that the inmate felt he had superpowers and that other inmates and staff were out to harm him.  Although he was an active participant in administrative segregation EOP group therapy, he continued to refuse psychotropic medication.  The inmate's clinical team considered involuntary medications on several occasions, but ultimately decided that he did not meet criteria.  According to the CDCR reviewer, "although he presented with significant mental health issues, he appeared oriented, took adequate care of his activities of daily living, and was able to advocate for himself.  He denied he had a mental illness and refused all suggestions of psychotropic medications."

On the morning of his suicide, August 19, 2013, the psych tech reported during morning administrative segregation unit rounds that the inmate was delusional, claiming another inmate in a nearby cell had killed his family and raped his sister.  He became very agitated and was observed to be screaming and yelling.  He refused to converse with either the psych tech or

administrative segregation unit sergeant.  A mental health referral was <u>not</u> generated.  The inmate committed suicide a few hours later.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, and a suicide note was not found.  However, several deficiencies were found and the Suicide Report contained three bases for recommendations for corrective action through a QIP:  "(1) On the morning of his death, both custody and nursing staff reported noting that the inmate was acting in an unusual manner and demonstrating increased symptoms of agitation and psychosis; however, staff from either discipline did not submit a referral for mental health evaluation....; (2) Despite FSP participating in the 7-hour Suicide Prevention training and recently receiving 2-hour training on appropriate SRE completion in the SRE mentoring program, the PC submitted a SRE dated May 13, 2013 which contained incorrect data and was incomplete; and (3) The inmate submitted two self-referrals requesting mental health assistance - CDCR Form 7362 and CDCR Form 22.  Both of these forms were logged as received and processed; however, clinical documentation from these two referrals could not be located in the eUHR at the time of the review.  Additionally, it is unknown if the ASU-EOP PC appropriately referred the inmate to be seen for the CDCR Form 22 referral...."

With regard to this third deficiency, the CDCR reviewer referenced a dubious late eUHR entry by noting in the Suicide Report that "Immediately prior to the suicide case review teleconference, held on October 3, 2013, a copy of the note, dated July 17, 2013, was sent to this reviewer.  However, the exact date of when this note was completed is unknown and it is unknown what caused the delay of this note getting into the eUHR."

In the **third** case (MCSP 11), the inmate was found unresponsive in his CTC cell during the early morning of September 7, 2013.  He was later pronounced dead and a subsequent autopsy determined the death to be a suicide by asphyxia due to "food and fecal material placed in tracheostomy stoma by decedent."  The inmate had re-entered CDCR on August 30, 2013 to serve a seven-year sentence for robbery.  He was transferred from NKSP to MCSP on September 4, 2013.  The inmate had two RVRs during his brief confinement, an assault on an officer shortly after his arrival at NKSP on August 30 and resisting an officer on September 6, 2013.

The inmate had a chaotic childhood and adolescence filled with behavioral problems, substance-abuse, and mental illness.  He became gang-affiliated at an early age, and his behavior resulted in numerous placements, including camps, foster homes, juvenile halls, and psychiatric hospitalizations.  As an adult, he was treated on the caseload during prior CDCR confinements, at both 3CMS and EOP levels of care.  In addition, he was placed in a MHCB on several occasions, as well as one placement in the Vacaville Psychiatric Program (VPP).  The inmate's primary diagnoses ranged from Anti-Social Personality Disorder and Poly-Substance Abuse Dependence to Bipolar Disorder to Schizoaffective Disorder.  He had a long history of medication non-compliance during prior CDCR confinements and had been involuntarily medicated per *Keyhea* proceedings in 2001.  The inmate was eventually paroled in June 2008.

Prior to his most recent and last CDCR commitment, the inmate was housed pre-trial in the Los Angeles County Jail system.  Jail records listed several medical, mental health, and substance abuse problems, including a tracheostomy in 2006 as a result of a bullet wound in his neck that

also paralyzed his vocal cords, multiple stab wounds, Hepatitis C, seizures, substance abuse, Schizoaffective Disorder, Bi-Polar Disorder, Anti-Social Personality Disorder, SI, and self-injurious behavior (self-inflicted abdomen wound).

Although the inmate's most recent CDCR confinement spanned just eight days, almost all of these days were noteworthy up until, and including, the day of his death.  Upon arrival at NKSP on August 30, 2013, he got into an altercation with an officer and was placed in administrative segregation.  The inmate also was argumentative with nursing staff who wanted to assist in clearing out his tracheostomy tube.  He refused any medical attention.  The initial medical screening indicated a history of mental illness and he was referred to mental health staff for further assessment.  The inmate was placed at 3CMS LOC and prescribed psychotropic medication.  Two days later during the evening of September 2, 2013, the inmate reported to a nurse in administrative segregation that he was suicidal and had a plan to cut himself.  He also complained of depression.  The nurse received an order from the on-call psychiatrist for Suicide Watch and the inmate was placed in an alternative housing cell in the A-4 Unit with a safety smock, safety blanket, and mattress, pending transfer to a MHCB.  A nursing note also suggested that the "Patient contracted for safety, 'I will stay safe and not hurt myself.'"  Documentation of observation on the Suicide Watch log was found to be incomplete for several hours that evening.

The following morning, September 3, (his birthday), the inmate was assessed by a mental health clinician who determined that he "was having difficulty with coping with his depression.  His physical issues also are affecting both his attitude and behaviors."  He continued to report SI.  The clinician completed an SRE which found that he was depressed, had a decreasing appetite ("can't swallow"), sad affect ("upset/pissed off"), and poor coping skills.  The SRE indicated that the inmate was at both "high" chronic and acute risk for suicide, noting that "I/M is experiencing hopelessness/helplessness, won't contract for safety, impulsive, per custody I/M's single cell status.  Hx of cutting on his arms and needs stabilization with medication through MHCB."  In addition, an undated handwritten note from the inmate was scanned into the eUHR on September 3 that stated "I need 2 speak 2 a psychiatrist.  I am not doing 2 good.  I'll go downstairs if I got to.  My head is not clear right now.  I'm in pain.  I am Suicidal."  The nursing note indicated that he allowed medical staff to clear his tracheostomy tube.  Documentation of observation on the Suicide Watch log was found to be incomplete for almost the entire shift from 12:00 a.m. to 6:00 a.m.

On the morning of September 4, 2013, the inmate was seen again by the mental health clinician and he described his mood as "bad."  His affect appeared "depressed and sad," and the clinician believed his condition was "deteriorating."  The inmate continued to endorse SI and "would not contract for safety."  He remained on Suicide Watch in the AHU (A-4) of NKSP.

According to some records, during the evening of September 4, 2013, the inmate was transferred from the AHU at NKSP where he was on Suicide Watch to the CTC at MCSP. The nurse called the on-call psychiatrist for orders and the Physician Order's reflected that the on-call psychiatrist diagnosed the inmate with Depressive Disorder NOS, and admitted him to a MHCB on Suicide Precaution with only a safety smock (i.e., without a safety blanket or mattress).  It was unclear from the records why the on-call psychiatrist downgraded the inmate from Suicide Watch to Suicide Precaution on September 4 without a face-to-face assessment, nor if the clinician was

156

even aware that the inmate had been on Suicide Watch at NKSP.  Of note, other eUHR and CDCR records suggested that the inmate was transferred to MCSP at 3:25 a.m. on September 5, 2013 with admission to the CTC at approximately 10:00 a.m.

In any event, the inmate was seen by both a nurse practitioner and a psychiatrist the following day, September 5, at MCSP.  According to the Medical History and Physical Examination form completed by the nurse practitioner, the inmate's chief complaint was "Verbalization that he wanted to commit suicide.  Also, he is complaining of pain on his right lower leg and pain in his right lower rib area.  He had an altercation with an officer or several officers or something prior to coming to our CTC.  The history of that is not clear."  According to the progress note completed by the psychiatrist that day, the inmate denied any SI, stating "I am not suicidal."  He also stated "I am being followed....I get agitated," and the psychiatrist wrote that he "endorses paranoia, stated COs at the sending institution 'strangled and choked him,' he is 'feeling anxious of being followed.'"  The progress note also indicated that the psychiatrist reviewed the records from the Los Angeles County Jail system and quoted the NKSP clinician's assessment of the inmate's behavior.  The psychiatrist found that the inmate was cooperative, but appeared paranoid, and "his insight and judgment were poor."  He was given a diagnosis of Psychotic Disorder NOS, Mood Disorder NOS, Poly-Substance Dependence, Adjustment Disorder with Disturbance of Emotions and Conduct, and R/O Anti-Social Personality Disorder traits.  Nursing notes for September 5 indicated that the inmate was labile, agitated, and disorganized.  He was, however, able to clear his tracheostomy tube without the assistance of nursing staff.  He also refused his evening medication, stating "I don't believe those are my meds."

On the morning of September 6, 2013, the inmate appeared uncooperative with nursing staff, refusing his morning medication and vital signs.  Nursing notes reflected his paranoid, delusional thoughts.  He also began to engage in attention-seeking behavior, such as demanding then refusing his medication and removing and reinserting his tracheotomy tube.  He refused to attend his IDTT.  According to the MHTP completed for the IDTT, a psychologist assessed the inmate and noted that "Today he appeared much worse, anxious, agitated, restless, frantic, refusing to cuff up in order to be removed from his cell for morning rounds, taking of his weight and other vital signs, etc.  Has also been refusing his meds and refusing to eat, communicating his belief that his food and medication are poisoned.  *Keyhea* watch was initiated this date."  The MHTP listed problem areas of SI, psychotic symptoms, confusion, and diagnostic clarification.

At approximately 4:00 p.m. on September 6, 2013, a nurse received a Physician's Order from a psychiatrist to initiate a "*Keyhea* Watch" (that was previously referenced in the MHTP) which required monitoring of the inmate's daily food intake, performance of activities of daily living, showers, and body weight.  As noted by the CDCR reviewer in the Suicide Report, "the order for the 'PC 2602 Watch' is neither a recognized CDCR order, nor a MCSP specific local policy, and did not have a prescribed protocol associated with it.  It did not appear that nursing staff made an effort to clarify the unspecific order."  The psychiatrist also wrote a Physician's Order that discontinued the inmate's Suicide Precaution and placed him on "Violence Precautions," noting that the inmate was paranoid regarding both officers and health care staff.  The term "Violence Precautions" was not contained within the *Program Guide*.  Despite the ambiguity of the Physician's Order, it appeared that nursing staff continued to observe the inmate on a 15-minute

basis.  There was <u>no</u> documentation in the eUHR that the psychiatrist had a face-to-face assessment with the inmate prior to the discontinuation of Suicide Precaution.

During the next several hours of September 6, nursing staff observed the inmate to be standing near the cell door, periodically knocking or beating on it, and talking incessantly.  The nurse described his behavior as both agitated and frustrated.  The inmate accepted his dinner tray, but refused to eat, claiming his food was poisoned.  He also refused to shower.  At approximately 8:30 p.m., he initially requested his medication and a snack, and the food port on his cell door was opened.  However, he then refused to "cuff-up" and grabbed the food port which prevented its closure.  Following several warnings to let go of the food port, the inmate was pepper-sprayed by COs.  He refused another request to cuff-up so that he could be decontaminated outside of the cell.  The inmate was then observed to be using sink water to decontaminate himself.  However, his behavior quickly escalated again when he removed the tracheostomy tube and was coughing up blood after putting his finger down the stoma.  He was then seen to be putting food (spaghetti) into the stoma.  He began flooding his cell and was smearing blood on his chest.  At approximately 10:10 p.m., the nurse notified two providers, the medical officer of the day (MOD) and the on-call psychiatrist.  The MOD ordered the nurse to clean the tracheostomy tube and stoma, monitor the inmate for respiratory distress, and send him to the hospital if his condition deteriorated.  At approximately 10:35 p.m., the on-call psychiatrist ordered that the inmate be removed from the cell and given involuntary psychotropic medication.

According to the records, the nurse then approached a CO and repeated the Physician's Orders.  The CO refused to open the door, citing security concerns.  The nurse then approached the sergeant on duty, explained the Physician's Orders for involuntary medication and cleaning and reinsertion of the tracheostomy tube, but the sergeant, and the watch commander, both refused to remove the inmate from the cell.  In the meantime, the inmate continued to pace the cell, placing his fingers in the stoma to make it bleed, and stuffing food and fecal matter into the stoma.  In addition, the administrative officer-of-the-day was also consulted and also refused to open the cell door.  At approximately 11:25 p.m., the nurse notified the MOD that correctional staff would not open the door, the inmate was pacing in his cell, and appeared to have trouble breathing.  The MOD responded by suggesting "If the inmate is walking around how can he be in distress?" and told the nurse "Please don't call me if it is not important."  According to nursing notes, the nurse then apologized to the MOD.

Approximately 30 minutes later at midnight, the nurse observed the inmate smearing feces and blood on the walls and cell door, and vacillating between calm and agitation.  For the next few hours,  he continued to be observed at 15-minute intervals and seen to be alternating between pacing the floor, standing by the cell door, and briefly sleeping on the floor.  He had not reinserted his tracheostomy tube and food particles were seen in his stoma.  The inmate's behavior seemed to have deescalated, and there was no indication of volatile behavior reflected in the nursing notes during this time.  At 4:48 a.m. on September 7, 2013, the nurse observed the inmate to be standing at his cell door window.  During morning medication rounds approximately 19 minutes later at 5:07 a.m., the nurse discovered him unresponsive and not breathing on the floor of the cell.  A medical emergency was called and it took approximately eight minutes for custody staff to gather and enter the cell.  Life-saving measures, including

CPR, were initiated two minutes later, but other problems arose as medical staff could not locate an AED nor a new tracheostomy tube.  The inmate was pronounced dead at 5:40 a.m.

The CDCR reviewer did not offer any specific precipitating factors for the suicide and, in fact, speculated that the inmate did not intend to commit suicide.  The reviewer suggested that the inmate "had a pattern of claiming to be suicidal when it appeared to be of benefit to him or when he was unable to cope with a particular situation."  The reviewer acknowledged that "the convergence of events and decisions led to what this reviewer believes may have been a preventable death in custody."  However, numerous deficiencies were found by the CDCR reviewer in this case.  Of note, two versions of the Suicide Report were issued: the first version some time following the Suicide Case Review Focused Improvement team meeting on October 31, 2013 that contained eight recommendations for corrective action; and a second version issued on January 7, 2014 that contained seven recommendations, with an identified deficiency regarding pepper-spraying the inmate and subsequent documentation problems by custody staff having been deleted.

The original eight bases for recommendations for corrective action through a QIP were as follows:

"(1) Critical documentation from NKSP dated September 3, 2013, including a copy of the inmate's note expressing SI was not scanned into the eUHR until seven days later on September 10, 2013.  As a result, the inmate's treatment team at MCSP lacked vital information; (2) Despite an emergency treatment center with a history of treating patients with tracheostomies, tracheostomy tubes could not be located in either the TTA or the CTC when they were needed as part of life-saving efforts for the inmate.  As a result, nursing inserted an ineffective trumpet into his trachea which was not able to penetrate the blockage; (3) Despite the absence of documented clear risk, custody staff failed to comply with medication treatment orders given by healthcare staff.  Although nursing staff tried multiple different custodial staff members, custody refused to comply and, as a result, the inmate did not receive the proper medical treatment that had been ordered for him; (4) Form 114-D, the Inmate Segregation Record, appeared to have been inaccurately completed as important interactions with the inmate, including the actions that resulted in the discharge of chemical agents and his refusal to come out for medical care had not been documented.  According to policy, all interactions with the inmate should have been documented; (5) Errors in documentation on the inmate's mental health treatment plan were noted, including in accurately listing what medications the inmate was prescribed.  Additionally, treatment interventions identified were not measurable or observable and as a result, would not assist in determining if progress had been made.  The treatment plan also noted that the psychologist disagreed with the referring clinician's SRA of high chronic and acute risk, however, another SRE could not be located in the eUHR; (6) It appears from evidence reviewed for this case review that his psychiatrist may have made deviations from policy and/or poor documentation in treatment the inmate received, including the discontinuation of suicide precautions on September 6.  She also failed to order

medical restraints or continuous observation, despite the inmate repeatedly pulling out his tracheotomy tube and wrote an order for a non-CDCR sanctioned policy ("violence precautions"); (7) Similarly, it appears that the MOD may have made deviations from policy and/or poor documentation in the treatment the inmate received, including the failure to follow-up when nursing staff called to update her on her patient's condition and replied, 'If he is walking around how can he be in distress?  Please don't call me if it is not important.'  The statement is not only unprofessional behavior towards her co-worker, but also may represent poor clinical care.  She also failed to order medical restraints or continuous observation, despite the inmate repeatedly pulling out his tracheostomy tube; (8) A number of concerns related to staff's adherence to policies and procedures were identified in this review.  As a result, the OIA has initiated investigations on specific staff members."

Despite listing numerous deficiencies and recommendations for corrective action, there were several other deficiencies that were <u>not</u> identified and/or adequately discussed the Suicide Report.  <u>First</u>, although there was no evidence to suggest that it influenced clinical judgment, both nursing and mental health staff at NKSP used "contracting for safety" with the inmate, a practice that was below the standard of care and not authorized within the *Program Guide*. <u>Second</u>, nursing staff at both NKSP and MCSP used un-authorized observation forms that contained pre-printed time intervals and did not allow documentation of observation that staggered 15-minute intervals.  In addition, there were significant gaps in the observation logs while the inmate was on Suicide Watch at NKSP.  Further, at the time he was found unresponsive during the early morning of September 7, 2013, he had not been observed for approximately 19 minutes (beyond the 15-minute requirement).  <u>Third</u>, the inmate was on Suicide Watch when he was transferred from NKSP to MCSP during the evening of September 4, 2013 and the on-call psychiatrist changed his level of observation to Suicide Precaution.  It was unclear from the records why the on-call psychiatrist downgraded the inmate from Suicide Watch to Suicide Precaution without a face-to-face assessment, nor if the clinician was even aware that he was on Suicide Watch at NKSP.  <u>Fourth</u>, the MCSP psychologist completing the MHTP for the inmate in conjunction with his IDTT on September 6, noted on the document that the referring clinician from NKSP had rated the inmate at both "high" chronic and acute risk for suicide "with scant justification on how such a determination was reached."  The MCSP clinician believed that "the presence of several positive protective factors would serve to mitigate risk more toward the moderate to moderately severe level."  However, some of these alleged protective factors (e.g. "future orientation/plans for the future," "insight into problems," "active and motivated in psych treatment," "sense of optimism self-efficacy") were dubious at best and not reflected in the inmate's eUHR.  In addition, this MCSP psychologist never completed another SRE to validate their clinical judgment.

In the **fourth** case (MCSP 12), the inmate was found hanging from the bunk of his administrative segregation cell by a sheet during the evening of May 19, 2014.  Life-saving measures were initiated and he was pronounced dead at a local hospital the following day, May 20, 2014.  The inmate had entered CDCR in March 1998 to serve a 24-year to life sentence for second-degree murder, false imprisonment, terroristic threats, and possession of a firearm by an ex-felon.  He was transferred to MCSP on May 25, 2000.  The inmate had 11 RVRs during his

15-year confinement, the last of which occurred on March 6, 2014 and involved assault (with his cane) on an officer.  It appeared that the inmate had adequate family support, with a visit from his sister a month before his death.  The inmate was receiving treatment for several medical problems, including hypertension, chronic body pain, seizures, and end-stage liver disease with "decompensated" cirrhosis secondary to Hepatitis C.  In early May 2014, he requested to complete an advanced directive for health care, and completed the form that listed his cellmate as his primary agent.

According to available records, the inmate had previously reported a history of both emotional and physical abuse as child.  In addition, he struggled with both substance abuse and mental illness from "an early age," and was reportedly hospitalized at Napa State Hospital from 1983 to 1985 and subsequently at another hospital for SI and self-injurious behavior.  Upon admission to CDCR, he was placed on the caseload and alternated between EOP and 3CMS throughout most of his confinement.

The inmate had a history of several serious SAs by hanging during his CDCR confinement.  For example, on July 30, 2004, correctional staff found him hanging in his cell "turning blue with a sheet around his neck."  He was admitted to a MHCB.  On November 2, 2007, he attempted suicide by hanging from a lower rail of the housing unit's second tier by a sheet.  On July 17, 2011, the inmate attempted to commit suicide by hanging in his administrative segregation unit cell.  He was discovered unresponsive and transported to a local hospital where he stayed for several days, then was committed to VPP for SI and on-going depression until October 2012.  His diagnosis was Major Depressive Disorder, Recurrent, Severe, Without Psychotic Features, Polysubstance Dependence, in Full Remission, Anti-Social Personality Disorder, and Other Personality Traits. During his stay at the VPP, he was twice provided acute care for SI.  He was viewed as manipulative by the VPP clinical staff.

Upon his return to CDCR and MCSP, he was maintained at EOP  and carried multiple diagnoses over the years.  Between September 2013 and March 2014, his diagnoses were consistently listed as Depressive Disorder NOS, Poly-Substance Dependence, and Personality Disorder NOS.  The diagnosis of Anti-Social Personality Disorder with Borderline Traits was added on March 12, 2014.

During the evening of March 5, 2014, the inmate was placed in the MHOHU on crisis evaluation with observation at 15-minute intervals after expressing SI and frustration in dealing with custody staff in his housing unit.  He was seen by a clinician the following morning, March 6, and admitted using the "suicide card" in order to get medication for sleep ("I told the building officer that I was suicidal in order to be seen by my psychiatrist, but he put me on the bus and brought me here.  I've no intention of hurting myself").  An SRE completed that morning assessed the inmate at "moderate" chronic risk and "low" acute risk for suicide. Although the plan was to "place at MHOHU under psychiatric precaution" and evaluate on a daily basis, the inmate was released back to his housing unit shortly thereafter on the morning of March 6.  Several hours later, however, he was returned to the MHOHU after a confrontation with an officer on the yard regarding his lost property and charged with assault (with his cane). The reason for the admission on crisis evaluation status was unclear from the eUHR.  The following day, March 7, 2014, he was seen by the same clinician and, although denying any SI, "presently

he reports some on-going dysthymic mood over family and medical issues, however, he denies any sustained, acute mood symptoms as of late." Another SRE was completed and the clinician concluded that the inmate was at "moderate" chronic risk and "low" acute risk for suicide. The inmate was discharged from the MHOHU and transferred to administrative segregation. He continued to be seen by his clinician at the EOP LOC.

It should be noted, however, that several chronic and acute risk factors were inaccurately documented on the March 6 and March 7 SREs, and in particular, the March 7 assessment. For example, despite the inmate's extensive history of at least three serious SAs by hanging in CDCR custody (in 2004, 2007, and 2011), the clinician apparently either discounted this information or was unaware of such history based upon what was written in the SRE section for history of SAs: "Father reportedly killed himself at age 38. By OD and hanging with most recent in 2012." In addition, despite the fact the inmate was diagnosed with end-stage liver disease, had a dysthymic mood, and had just been charged with assault on an officer regarding his lost property, the clinician checked "no" on the following acute risk factors: "current/recent depressive episode," "recent serious medical diagnosis," "hopelessness/helplessness," "recent negative staff interactions," and "recent disciplinary ('115')."

On May 14, 2014, the inmate was seen for a routine contact by his clinician and stated "'I'm better than some days and worse than others. I had to go to the CTC because I had an allergic reaction to a new med. It made me break out in hives. I still have some of it, it's (the hives) not all gone yet.' The inmate stated the Doctor changed his medication and gave him pills for the itching and a shot for inflammation. The inmate stated he just completed a DNR because he says he doesn't think his body is going to make it much longer. He says he stopped taking pain pills because they don't help and he feels like the doctors treat him like a drug addict. Encouraged the inmate to take care of himself as best he can and he might live longer than he thinks. He said his enzyme levels are too high and he just doesn't feel well." Two days later on May 16, the inmate had his RVR hearing and was found guilty of the assault (with his cane). On May 18, 2014 he reportedly had a seizure, but refused any medical treatment. The inmate committed suicide the following day.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, but noted his terminal illness, recent RVR disposition, and continuing fixation regarding his lost property as risk factors for suicide. According to the CDCR reviewer's interview with his cellmate, the inmate was "depressed and suicidal the whole time I knew him....for years....I was very surprised he did it when I was in the cell." The reviewer raised two concerns regarding mental health services received by the inmate, one concerning a Mental Health Evaluation form that could not be found in the eUHR, and a concern regarding the inadequacy of several SREs completed during 2013 and 2014. Two emergency medical response concerns were also noted, one involving a question as to whether a C-Collar was brought to the scene of the emergency, and the other regarding the untimely response of the ambulance and excessive time it took for medical staff to transport the decedent from his cell to the TTA. Finally, there were minor custody concerns regarding reporting documentation. According to the CDCR reviewer, "All identified concerns have been communicated at the institutional level." It was unclear why some of these deficiencies, particularly the inadequate SREs, did not result in formal recommendations for corrective action through a QIP.

162

In the **fifth** case (MCSP13), the inmate was found hanging by a sheet from a ventilation grate of his SNY cell during the late morning of November 2, 2014. The inmate entered the CDCR system on June 9, 1998 to serve an unknown sentence. He was placed in the MHSDS at EOP LOC for Major Depressive Disorder. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report (which had not been completed), had not been examined by this writer.

*Summary*:  *While acknowledging that new mental health leadership, including a new CMH and MHCB/OHU supervisor, was recently installed a few months prior to the on-site assessment, this reviewer found that the MCSP was a problematic institution that exhibited numerous poor practices in the area of suicide prevention, including, but not limited to, an intake nurse who conducted screening in the large open area of the R & R Unit and failed to ask inmates if they were currently suicidal, an anti-therapeutic MHOHU that was neither a mental health unit nor an OHU, an inadequate number of retrofitted new intake administrative segregation cells, a high percentage of inmates expressing SI that did not receive SREs, and inadequate treatment planning.*

## 30)   **California Health Care Facility (CHCF)**

**Inspection**:  June 24-25, 2014

CHCF housed 1,488 inmates across multiple classification levels; all were assigned to the CHCF for mental health and/or medical needs.  CHCF had 98 MHCBs in three units on Facility A, acute and intermediate programs operated by DSH on Facility B, an OHU on Facility C, a CTC on Facility D, and a yet-to-be-activated multiple use Level II program for EOP and 3CMS inmates and an administrative segregation unit on Facility E.  Excluding the MHCBs and DSH programs, approximately 25 percent of the remaining CHCF inmates were caseload inmates; there were 332 3CMS and 46 EOP inmates.

**Screening/Assessment**:  On June 24, several new admissions were observed during the medical intake screening process in the Patient Management Unit, which CDCR institutions referred to as the R & R Unit.  Screenings were conducted in the Nurse's Office.  However, privacy and confidentiality were compromised because correctional staff stood in the doorway during intake, even though there was a large viewing window between the Nurse's Office and the Officer's Station.  Observation also indicated that the nurse did not ask all of the intake screening questions, including whether the inmate was *currently* suicidal.  Examination of the Initial Health Screening CDCR 7277 Form that CHCF used revealed that it was defective; the critical question regarding whether the inmate was currently suicidal had been *deleted*.  DCHCS officials reported that this question had been inadvertently deleted and sent out from headquarters in May 2014.

**Housing**:  Only 58 of the CHCF's total 98 MHCBs in housing units 301A, 301B, and 302B were occupied during the site visit.  All were suicide-resistant and did not have any obvious protrusions which could be used in a hanging SA.  The units also contained safety and observation rooms, but otherwise lacked alternative housing.

Although Facility E's administrative segregation unit had not been activated by the time of the site visit, with one exception, all of the cells had been constructed to be as suicide-resistant as possible. The only exception was the horizontal brackets that connected desk stools to the walls. These brackets could potentially be used as an anchoring device in a hanging SA. Guard One equipment had been installed in the administrative segregation unit.

**Observation**: All MHCB inmates were on either Suicide Precaution or Suicide Watch. No other observation statuses were authorized, and <u>all</u> inmates were observed at a minimum of 15-minute intervals. Examination of the observation form that the CHCF used revealed that it allowed for documentation at staggered intervals. All forms indicated up-to-date documentation. These were all very good practices.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of those referred to mental health on an emergent basis indicated that clinical staff consistently saw suicide observation inmates daily, while inmates referred to mental health were generally seen timely. However, treatment planning was problematic, while SREs were not always completed for inmates who expressed SI. In one reviewed case (CHCF 1), the inmate was admitted to a MHCB on March 28, 2014 after sustaining a serious self-inflicted laceration that severed a nerve on his left wrist in the OHU. He remained on the unit for four days. The discharging SRE contained the following treatment plan: "(1) D/C suicide watch, restore full issue, (2) initiate 5-day F/U, (3) retain in CCCMS, (4) housing per custody, (5) Rx. meds per MD orders, 6 F/U with assigned PC asap, (5) continue to monitor and observe prn/asap, (6) medical tx. services as prior, (7) reassess in IDTT 4/8/." In another case (CHCF 2), the inmate was discharged from a MHCB on May 29, 2014 with the following treatment plan contained within the SRE: "Discharge to EOP LOC, Discharged with 5-day follow-up."

Several IDTT meetings in all three MHCB units were observed on June 24 and 25, 2014. Several were problematic. In one case (CHCF3), the inmate was placed in the MHCB on June 16, 2014. The June 24 IDTT meeting lacked a case presentation, the psychiatrist in attendance was not interactive and did not appear to know the inmate very well, and there was no discussion regarding the inmate's SI and/or treatment planning. In another case (CHCF 4), eUHR review revealed the inmate's admission for SI on May 14, 2014 to an MHCB at CHCF from Deuel Vocational Institution (DVI). His history included several SAs, including a handgun incident in 2011 and cutting himself three times in August 2013. He remained at the CHCF until June 6, when he returned to DVI. He again expressed SI and was transferred to a MHCB at CMC. The CMC IDTT meeting initiated a DSH-APP referral and he was subsequently accepted into that in-patient program.

The inmate arrived at the CHCF on the evening of June 23 and was placed in the MHCB on Suicide Watch and with a safety smock. During the June 24 IDTT meeting, there was initial confusion why he was in the MHCB and little discussion regarding his SI. Despite the inadequate discussion, the lead psychologist told the inmate that "we'll try to get your blues back by the end of the day." A subsequent progress note documented that the inmate was downgraded from Suicide Watch to Suicide Precaution. Following the IDTT meeting, it was learned that he had a court hearing on the following day. However, there was no discussion during the IDTT

164

meeting about how the inmate felt about this upcoming hearing in relation to his SI. There also was no discussion as to whether it was premature to step the inmate down from Suicide Watch prior to the court hearing.

Only one correctional counselor was assigned to all three MHCB units and IDTT meetings were scheduled around her availability. This correctional counselor was extremely competent and had excellent rapport with all inmates during their respective IDTT meetings. In fact, the correctional counselor was observed to be leading the discussion in those IDTT meetings where clinical leadership was otherwise lacking. Notably, IDTT meetings held in Unit 301B on June 25 were much better and had good case presentations by lead psychologists and more interactive team member participation. The CMH attended several IDTT meetings on June 24 and acknowledged that much work needed to be done to strengthen the IDTT process.

Emergency mental health referrals for SI during May and June 2014 were examined. Of these referrals, the MHTS identified seven and an additional six were located in the SEMS Logs, which CDCR institutions referred to as TTA logs. Review of eight eUHRs revealed that SREs were completed in only five of eight or 63 percent of cases. In one case (CHCF 5), the clinician's May 23, 2014 progress note stated that the inmate was seen "due to an emergent episode the previous day requiring sedation." Although unclear from the progress note, the observation form indicated that he was on Suicide Watch in an isolation room in the MHCB unit. An SRE was not completed and the clinician's progress note was unclear as to any recommendation for further observation. However, documentation on the observation form ended at 10:30 a.m. on May 22, presumably because the inmate was discharged from observation status.

Another case (CHCF 6) was more problematic. On May 4, 2014, an officer observed an inmate housed in the Facility D CTC place a bed sheet around his neck and begin to choke himself. He was placed on Suicide Watch by the on-call psychiatrist at approximately 7:35 a.m. A psychologist subsequently saw him at approximately 9:30 a.m. Contrary to what the officer observed, the inmate told the clinician that he was cold and "I was trying to take off the chill." The progress note indicated that he denied SI and his suicide risk was "low." The Physician's Order was changed to Suicide Precaution. Several hours later at 12:30 p.m., the Physician's Order was changed again to the following: "Clarification for the order Suicide Precaution. Suicide Precaution Q-30 minutes x 24hrs." A few hours later at 4:40 p.m., the Physician's Order was changed for the final time when the inmate was discharged from Suicide Precaution. An SRE was not completed to authorize Suicide Watch, an SRE was not completed to discontinue Suicide Precaution, and a treatment plan was not completed. Within a span of nine hours, this inmate's observation level went from Suicide Watch to Suicide Precaution at 15-minute intervals to Suicide Precaution at unauthorized 30-minute intervals to discontinuation of observation.

**Intervention**: All toured housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**: Training records indicated that 92 percent of custody, but only 76 percent of nursing staff, had CPR certification. One hundred percent of custody staff and 97 percent of medical and mental health staff were compliant with annual suicide prevention block training. Ninety-seven

percent of mental health clinicians received the seven-hour SRE training and 50 percent completed the mentoring program.

**Recent Suicides**:  There were no inmate suicides at CHCF during 2012-2014.

## 31)   <u>Deuel Vocational Institution (DVI)</u>

**Inspection**: June 26-27, 2014

DVI housed 2,707 inmates; the vast majority were on RC status.  The institution had a 28-bed OHU with ten rooms and four seclusion cells, two of which were padded, that were designated to house inmates awaiting MHCB placement, two administrative segregation units located in K and L Wings, and a RC.  Twenty-one percent of DVI inmates were on the mental health caseload; there were 542 3CMS and 29 EOP inmates.  Cells in the K and L Wing administrative segregation units were designated for overflow alternative housing.

**Screening/Assessment:**  Several new admissions during the medical intake and mental health screening processes were observed on June 26-27, 2014.  Two nurses assigned to the RC conducted the Initial Health Screening.  Both nurses appropriately asked all screening questions.  However, no privacy or confidentiality were afforded during this process as multiple intake screenings occurred simultaneously in a large open area with the various nurses and inmates only separated by a small partition.  Several inmates were also seated in a line within this large open area in close proximity to the nursing stations.  The Nurse's Office appeared to  be solely occupied by a nursing supervisor and not utilized for intake screening.

Two clinical psychologists performed the initial 31-item mental health screen.  These screens normally occurred within 24 to 72 hours of an inmate's admission to the RC, unless an emergent or urgent mental health referral was generated.  One of the clinicians performed the screening in the privacy of their office; the other clinician conducted it in a semi-private housing unit dining hall during off hours when no other inmates were present.  Both clinicians reported that SOMS, eUHR, and MHTS were <u>not</u> accessed unless the inmate self-reported a prior CDCR confinement.

Daily rounds by two psych techs in the K and L Wing administrative segregation units were observed.  Both psych techs appropriately interacted with caseload and non-caseload inmates.  However, neither psych tech completed the Psych Tech Daily Rounds Forms for the 67 caseload inmates until after completion of the rounds.

**Housing**:  Most of the ten OHU rooms were suicide-resistant and did not have any obvious protrusions which could be used in a hanging SA; an exception was those rooms that had warped and/or broken floor tile panels that could be used for self-injury and faucet handles that could be used as anchoring devices in a hanging attempt.  Beds were removed from OHU rooms for Suicide Watch and Suicide Precaution, resulting in suicidal inmates having to sleep on the floor. Cells in the K and L Wing administrative segregation units were designated for overflow alternative housing, but were not used in this capacity since the CHCF's opening in July 2013. Because most of these administrative segregation units' cells were not suicide-resistant, inmates required one-on-one continuous observation.

The K Wing administrative segregation unit contained 24 retrofitted suicide-resistant cells for new intake inmates.  Sections of the L Wing administrative segregation unit were designated for administrative segregation overflow, OHU overflow, and the Special Program Unit, which was reserved for RC inmates who were likely to be approved for SNY housing.  Although some L Wing cells had been retrofitted to be suicide-resistant, most were unsafe. During the site visit, four newly admitted inmates were observed being housed on the second floor of the L Wing in extremely dangerous, antiquated cells that contained metal bunk brackets, ladders, shelving, open window panes/grates, and towel racks.  The wall ventilation grates had been retrofitted to be suicide-resistant.

The reviewer observed the very problematic case (<u>DVI 1</u>) of an inmate released from the OHU who was subsequently housed in an unsafe cell in K Wing.  When touring the OHU on June 26, the reviewer observed two clinicians conducting this inmate's SRE.  The inmate arrived at DVI on June 24 and was referred by an intake nurse to mental health based on positive responses for a mental health history and recent suicidal behavior.  A mental health clinician assessed him on the same day and reported a significant history of suicidal and self-injurious behavior, including cutting and stabbing himself with a pencil two weeks prior in the county jail.  The inmate told the clinician that engaging in self-injury "helps me cope with my anger."  Although he denied SI on June 24, he told the clinician that he "quickly decompensates."  An SRE assessed him as being at "moderate" chronic and acute suicide risk.  The inmate was placed in the OHU on Suicide Precaution.  During his assessment with the two OHU clinicians on June 26, he again denied SI and was subsequently discharged from Suicide Precaution and rehoused in administrative segregation.  On June 27, the following day, while the reviewer was observing psych tech rounds on K Wing, the same inmate was observed in a special management cell at the far end of the tier.  The cell was neither retrofitted nor designated as a new intake cell.

**Observation**:  Although both Suicide Precaution and Suicide Watch were regularly used in the OHU for inmates identified as suicidal, a recently drafted LOP at DVI (dated June 2014) indicated that psychiatric observation and "enhanced suicide precautions" were available to clinical staff.  The LOP stated "at times, inmate-patients admitted to the infirmary for mental health reasons will fit into a category between Suicide Precaution and Suicide Watch.  These inmate-patients are categorized as Enhanced Suicide Precaution and must be placed in cells B-233 through B-236 or L-138 through L-149."  Inmates on enhanced suicide precautions were required to be observed at staggered 10-minute intervals.  Although placing a suicidal inmate on observation at intermittent intervals that did not exceed 10 minutes was clearly within the standard of care, such a practice, along with psychiatric observations, was not sanctioned by CDCR and not referenced in the *Program Guide*.

During an OHU tour on June 27, nursing staff's falsification of observation forms was observed.  The reviewer entered the unit at 10:39 a.m. and found five inmates on Suicide Precaution.  Review of each of their observation forms revealed that times had been post-dated to 10:47 a.m. and 10:59 a.m.  A nursing supervisor was notified of the falsification.

Review of Guard One data for the K and L Wing administrative segregation units found numerous violations in four reviewed housing floors during multiple 24-hour periods; overall

compliance was only 71 percent.  Inmates housed in the Special Program Unit on the second floor of the L Wing administrative segregation unit (overflow), which housed inmates needing SNY classification, did not receive routine observation from custody staff.  As this unit was used for inmates needing protective custody, the lack of welfare checks was problematic.

**Management/Treatment Planning**:  eUHR review of inmates on suicide observation and of those referred to mental health on an emergent basis indicated that clinical staff consistently saw inmates on suicide observation daily, while inmates referred to mental health were generally seen timely.  However, other areas, including treatment planning, were problematic; DVI treatment planning went from one extreme to another.  In one reviewed case (DVI 2), although the clinician incorrectly placed an inmate on psychiatric observation, a very thoughtful and individualized treatment plan was developed:

> The I/P will be admitted to OHU for psychiatric observation.  OHU team to monitor I/P for safety concerns.  Treatment plan to include following goals:  1) Reduce daily on-going Sx ideation to 2x/week, I/P making vague statements, need to clarify overall baseline; 2) Reduce anxiety from daily to 2x/week or below by CBT, anxiety management skills, i.e., relaxation, breathing exercises, thought analysis to contain worries; 3) Reduce depression from daily to 2x/week or below by supportive counseling, challenging maladaptive thoughts by CCM;, and 4) Psychiatric medication evaluation to alleviate acute distress and stabilize sleep.

At the other extreme (DVI 3), another clinician who regularly completed SREs developed the following template that was inserted in each treatment plan section of the SRE form:

> ___Place in OHU to monitor for signs and symptoms and safety
> ___Released to custody with a 5-day F/U
> ___Hold in OHU for Parole Agent pick-up
> ___Needs further evaluation
> ___Transfer to MHCB with first bed availability
> ___Refer to PC and psychiatrist for appointment within one week
> ___Review LOC/IDTT

The above template, which simply recited *Program Guide* requirements, epitomized the lack of understanding and/or  indifference to treatment planning for inmates presenting with SI.  This clinician chose to develop a user-friendly, institutionalized alternative instead of developing a reasonable and measurable strategy to reduce suicidal behavior.

Emergency mental health referrals for SI from January through June 2014 were observed.  Of these referrals, ten were found in the MHTS and 151 were found in the TTA Logs.  Review of 15 eUHRs revealed that SREs were completed in 13 of 15 or 87 percent of cases.

Review of monthly DVI SPRFIT Committee minutes from April through June 2014 revealed that the CMH, Chief Psychologist, and Chief Psychiatrist or other psychiatrist were all absent from all three meetings, which was problematic.

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records indicated that 98 percent of custody and 100 percent of nursing staff had CPR certification.  Eighty-nine percent of custody staff was compliant with annual suicide prevention block training, but neither medical nor mental health staff received this training.  Ninety percent of mental health clinicians received the seven-hour SRE training and 89 percent completed the mentoring program.

**Recent Suicides**:  DVI experienced two inmate suicides during 2012-2014.  In the **first** case (DVI 4), the inmate was found hanging by a sheet from the ventilation grate of his Special Program Unit cell during the morning of May 12, 2012.  He had entered CDCR a few weeks earlier on April 25, 2012 to serve a 49-years to life sentence for multiple counts of child sexual abuse.  He remained on RC status until his death.  He had not reported any significant medical problems.

Although experiencing substance abuse as a teenager, the inmate did not report a history of mental illness in the community.  He briefly received treatment for pedophilia as a teenager while continually denying that such a lifestyle was problematic.  Upon arrival at DVI, he informed the intake nurse during the medical screening process that he was depressed and "suicide was the only option;" he had reportedly begged the judge for the death penalty during his sentencing hearing.  He also told the nurse that he was scared to be in prison.  He was immediately placed on Suicide Precaution in the OHU, and was provisionally diagnosed with Depressive Disorder NOS, and placed in the MHSDS at the 3CMS LOC.

Two days later on April 27, he was transferred to an MHCB at SQ.  One progress note reported he "appears fairly naïve with poor judgment in his cavalier verbalizations of suicide by 'Japanese sword' or displaying absolute bravery if other inmates are going to attack him, akin to characters in a fantasy video game. Appears out of touch with reality when speaking about the possibility of having a normal sexual relationship with a child."  His diagnosis was changed to Adjustment Disorder with Depressed Mood and R/O Major Depressive Disorder.  On April 30, he was assessed as being at "moderate" chronic and "low" acute risk for suicide.  He was discharged from the MHCB with the following treatment plan contained within the SRE:  "I/P has been DC'ed from the CTC at the CCCMS LOC with a 5-day F/U. To return to DVI."

Upon his return to DVI on May 1, he was housed in administrative segregation unit for protective custody due to the nature of his charges.  All but one of the required five-day follow-up notes were completed.  On May 8, he met with his PC prior to his IDTT meeting.  He appeared stable to the clinician and denied any SI, stating "I'm still depressed and have ups and downs but I'm doing good with my cellie."  The clinician's plan was to "continue to track symptoms.... continue to encourage participation."  Two days later on May 10, the ICC transferred the inmate from administrative segregation to the Special Program Unit, then housed on E Wing, which was designated for inmates likely to be classified for SNY housing.  DVI policy indicated that inmates housed in the unit were not routinely supervised by custody staff.  Two days later on May 12, he committed suicide.  The eUHR indicated that nursing staff had difficulty maintaining CPR because they were "unable to open mouth, jaw clenched down."

In a subsequent interview with the CDCR reviewer, a cellmate who was briefly housed with the inmate in administrative segregation stated that the decedent had spoken about his plans to commit suicide "from day one" and had also contemplated suicide since being held in the county jail.  He also told his cellmate that "he didn't want to be in a rubber room," referring to the MHCB and OHU.

As to the precipitating factors for the suicide, the CDCR reviewer wrote in the Suicide Report that "from the moment of his arrest, everything that happened to the inmate led directly to his suicide.  As he clearly stated, documented in many clinical notes, he did not want to live in prison.  Do not want to die, but felt it was his only option." The Suicide Report contained two bases for recommendations for corrective action through a QIP:  "(1) This review revealed at least a 10-minute discrepancy between the time the inmate was discovered hanging.....and the time the alarm was given as documented by responding medical staff and by the unit logbook; (2) The last day of the 5-day post MHCB discharge follow-up was not completed by the primary clinician."

It was unclear why, given the CDCR reviewer's suggestion that the inmate would have been at increased risk for suicide throughout his CDCR confinement, there was no discussion in the Suicide Report concerning the absence of treatment planning to address this continuing problem.  Also, given that the inmate was housed in the Special Program Unit due to protective custody concerns and was found hanging after not being observed by custody staff for an unknown period of time -- his body was in partial *rigor mortis* -- the Suicide Report lacked a discussion regarding the efficacy of mandating welfare checks on the unit.

In the **second** case (DVI 5), the inmate was found hanging by a sheet and extension cord from the upper ladder of his GP cell during the afternoon of July 25, 2012.  His body was found in the state of full *rigor mortis*.  The inmate had re-entered CDCR on July 27, 2011 to serve a 24-month sentence for burglary and possession of a controlled dangerous substance.  He was transferred to DVI on November 10, 2011.  Although he had an estimated release date of December 2012, he had recently been informed of a pending investigation of another alleged burglary and might be facing the potential of at least 15 additional years in prison.  The inmate had two RVRs during his confinement, the most recent of which, for tobacco possession, occurred the day before his suicide.  He appeared to have good family support, with frequent telephone calls with his parents.

Although the inmate had a significant history of substance abuse, he did not report any mental illness in the community or during prior CDCR confinements.  Upon admission to CDCR on July 27, 2011, he denied any current SI, prior history of suicidal behavior, or need for mental health services.  Upon arrival at DVI in November 2011, he reported a history of depression, but denied the need for mental health services.  As to medical problems, he reported both Hepatitis C and knee joint pain.  He refused any treatment for the hepatitis and pain medication was prescribed for his knees.

As to possible precipitating factors for the suicide, the CDCR reviewer listened to several recent telephone conversations between the inmate and his parents and examined his suicide note.  The

materials reflected the inmate's struggle with feelings of guilt and remorse as to his substance abuse, pain he had caused his parents, and the likelihood of facing additional criminal charges. The Suicide Report contained three bases for recommendations for corrective action through a QIP:

> 1) Security checks were not completed on July 25, 2012, on either second or third watch prior to the time of the discovery of the inmate. This lapse in Post Order protocol stemmed from a permanent reduction in correctional staff instituted on that date. Performance of required security checks would have alerted staff in a timelier manner regarding this attempt, although it is highly unlikely that it would have changed the outcome; 2) Basic life support and advanced cardiac life support protocols were instituted for the inmate although the condition of his body indicated he had died a relatively long time prior to discovery. As a result of interviews with emergency responders, it appeared that staff could benefit from more explicit guidelines and training about if and when emergency medical efforts can be skipped or ended under the circumstances of the clear presence of rigor mortis....; and 3) As a result of the discussion by case review participants on September 7, 2012, of the problem stated in QIP #2, it was determined that the policy pertaining to the emergency response measures, and specifically to the question of the cessation of those measures, requires further discussion by Headquarters staff in order to clarify policy parameters.

*Summary*:  This reviewer found that DVI was a problematic institution that exhibited numerous poor practices concerning suicide prevention.  These poor practices included, but were not limited to, intake nurses who conducted multiple screenings at the same time in a large open area, OHU nursing staff's falsification of observation forms, new intake inmates housed in non-retrofitted administrative segregation units, inmates housed in unsafe OHU rooms, low compliance rates for Guard One checks, SRE forms with pre-printed treatment plan templates, and a lack of mental health leadership attendance at recent monthly SPRFIT meetings.

## 32)   **California Correctional Center (CCC)**

**Inspection**: July 8-9, 2014

CCC housed 2,960 inmates at Level I, II, and III classifications.  Approximately 2,000 additional Level I inmates were dispersed among 18 conservation camps.  The institution had a 13-bed OHU for inmates with medical or mental health needs, with two alternative housing rooms for inmates awaiting MHCB transfer, and an administrative segregation unit.  There was only one caseload inmate, at the 3CMS LOC, at the institution during the site visit.

**Screening/Assessment**:  Several new admissions during the medical intake screening process were observed on July 9, 2014.  Two nurses conducted the screening process in small offices of the R & R Unit.  With one exception, privacy and confidentiality were adequate as each nurse conducted the screenings in separate offices; the only exception was an office technician who was weighing inmates in preparation for intake screenings and was stationed outside of the open doorways between each small office.  Moving the weight scale to the opposite wall of the area

would better ensure privacy and confidentiality during the intake screening process. Each nurse was observed to be asking all the required intake screening questions.

Observation of a psych tech conducting daily rounds in administrative segregation on July 8 revealed the psych tech adequately conversing with all inmates, but only one caseload inmate was housed on the unit.

**Housing**: The OHU rooms, including the alternative housing rooms, were not suicide-resistant and had obvious protrusions which could be used in a hanging SA. Because the rooms were unsafe, any suicidal inmate awaiting MHCB transfer was required to be on one-to-one continuous observation. Most inmates were expedited to a MHCB at High Desert State Prison (HDSP), which was adjacent to CCC.

The administrative segregation unit contained nine retrofitted suicide-resistant cells for new intake inmates. During the site visit, several problematic conditions regarding the housing of newly admitted inmates in administrative segregation were found. Specifically, not all inmates who were housed in administrative segregation for their first 72 hours were housed in retrofitted cells, while not all of the retrofitted cells housed newly admitted inmates. For example, on July 8, 2014, the eight inmates housed in new intake cells had all been housed in administrative segregation for more than 72 hours; the ninth cell was unoccupied. Moreover, all eight new intake inmates who were admitted to administrative segregation on July 8 were placed in unsafe cells, although two of these inmates were double-bunked.

**Observation**: OHU practices were problematic. Although Suicide Precaution and Suicide Watch were routinely used in the MHCB and OHU throughout CDCR for suicidal inmates, inmates were observed being routinely admitted to the CCC OHU *without* any level of observation ordered. The reviewer thus could not locate any observation forms for inmates admitted to the OHU. In one case (CCC 1), the inmate was admitted to the OHU on February 15, 2014 for abdominal pain, anxiety, depression, and paranoia. However, his level of observation was not specified and he was referred to mental health for further assessment. He remained in the OHU for four days until February 18, when he was discharged back to his housing unit. A mental health clinician did not assess him until February 24. In another case (CCC 2), the inmate was admitted to the OHU on February 22, 2014 for a crisis evaluation after learning that his sister had been shot by a gang member and his girlfriend had been raped. His level of observation was not specified and no observation forms were found in the chart. An SRE was not completed and five-day follow-up was not initiated following his discharge from the OHU on February 24.

Review of unit logs for March and April 2014 that documented 30-minute welfare checks prior to Guard One's full implementation in mid-May 2014 indicated 99 percent compliance for 30-minute rounds. Review of Guard One data for the entire administrative segregation unit for selected 24-hour periods in June 2014 revealed overall compliance at 98 percent.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated problems as to levels of observation for inmates admitted to the OHU for crisis evaluations. Because most

inmates identified as suicidal were only temporarily placed in the OHU while awaiting MHCB placement at HDSP, treatment planning was not typically developed by CCC clinicians and, therefore, not reviewed during this site visit.

Urgent and emergency mental health referrals from January through early July 2014 were examined. Twenty-nine of these referrals were found in the MHTS and an additional 21 were located in the TTA Log. Of 15 reviewed cases that required SREs because the emergency referral indicated SI, only nine of 15 or 60 percent had completed SREs. In one case, (CCC 3), the inmate was escorted to the TTA on April 22, 2014 after expressing SI. He subsequently informed a mental health clinician that "I want to kill myself. Cut my wrist....I hear voices telling me to kill myself." The inmate subsequently recanted his SI and was not placed on suicide observation status. A progress note dated April 22 indicated that a SRE had been completed, but, as of July 9, 2014, no SRE was found in the eUHR. In another case (CCC 4), custody staff wrote an emergency mental health referral on May 19, 2014 indicating that the inmate had expressed SI and was exhibiting bizarre behavior. A mental health clinician saw the inmate on the same day, but a subsequent progress note indicated that he then denied SI. An SRE was not completed.

**Intervention**: All toured housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**: Training records indicated that 97 percent of custody and 100 percent of nursing staff had CPR certification. Ninety-four percent of custody staff completed annual suicide prevention block training, while only 22 percent of medical personnel, who were mostly new employees, had recently completed the training. No mental health staff had completed the annual suicide prevention training. All mental health clinicians received the seven-hour SRE training and had completed the mentoring program.

**Recent Suicides**: There was one inmate suicide at CCC during 2012-2014. In that case (CCC 5), the inmate was found hanging by a sheet from the top bunk of his administrative segregation cell during the morning of September 7, 2014. He had entered CDCR on February 4, 2013 and was transferred to CCC on May 28, 2013, where he was subsequently designated to a conservation camp. He had a prior history of Anxiety and Adjustment Disorders, but was not a caseload inmate at the time of his death. He escaped from the camp on September 2, 2014, but was apprehended two days later. He was returned to CCC and rehoused in administrative segregation. The inmate was the sole occupant of a cell that was not designated for new intake, and therefore, was not suicide-resistant. As the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report (which had not been completed), had not been examined by this reviewer.

## 33)   **High Desert State Prison (HDSP)**

**Inspection**: July 10-11, 2014

HDSP housed 3,309 inmates, of which the vast majority were at Level IV classification. The institution had a ten-bed CTC, with all rooms available as MHCBs, and three administrative

segregation units in buildings D-7, D-8, and the Z-Unit.  Approximately 30 percent of HDSP inmates were on the mental health caseload, with 960 3CMS and 21 EOP inmates.  Two safety cells in the CTC, namely, a seclusion and an observation cell, were designated as alternative housing cells for inmates awaiting MHCB transfer.

**Screening/Assessment**:  The reviewer did not observe new admissions during the medical intake screening process on July 10-11, 2014.  Observation of daily psych tech rounds in Building D-7 and in the Z-Unit on July 10 and 11 indicated two psych techs who were accurately conducting and documenting their rounds.

**Housing**:  With two exceptions, all of the beds in HDSP's CTC were suicide-resistant.  The two exceptions were that some MHCBs had handicap railing that was not suicide-resistant, as the railing had gaps between the rail and wall as opposed to being a solid railing, while stainless steel sinks had sharp edges that protruded from the wall and could be used as an anchoring device in a hanging attempt.  These sinks could be retrofitted by adding stainless steel triangle extensions to each side of the sinks.  Until recently, mental health clinicians had initially placed most inmates in safety cells to "weed out suspected manipulative behavior" prior to consideration for MHCB placement.  The CMH corrected this problematic practice in June 2014 during preparation for this site visit.

HDSP's three administrative segregation units had a total of 15 retrofitted, suicide-resistant cells for new intake inmates; Building D-7, which was used for caseload inmates, had eight cells, Building D-8, which was used for overflow, had five cells, and the Z-Unit had two cells.  Buildings D-7 and D-8 had undergone renovation immediately prior to the site visit; administrative segregation inmates had been transferred back and forth between the two units during the past several months.  During the site visit, almost all of the eight new intake cells in Building D-7 were full and there were at least nine inmates who were housed in the unit for 72 hours or less housed in unsafe, non-retrofitted cells.  Building D-7's eight new intake cells also were not completely suicide-resistant; each cell contained desk stools that were held in place with vertical brackets attached to the wall that could be used as an anchoring device in a suicide hanging attempt.

**Observation**:  The HDSP CTC used Suicide Precaution and Suicide Watch for suicidal inmates.  However, all other inmates in the MHCB who were not on suicide observation were observed by nursing staff at two-hour intervals, which was problematic.  Also, until June 2014, CTC nursing staff used an older version of the CDCR observation form that contained pre-printed 15-minute time intervals, thus not allowing for documentation at staggered intervals.  Observation forms were <u>not</u> located outside of the MHCBs, but were on a clipboard in the Nurse's Station; this increased the possibility of inmates not being consistently observed.

During the tour of the three administrative segregation units, unit logs for D-7 and D-8 that were used to document 30-minute welfare checks prior to full implementation of the Guard One system in mid-May 2014 were reviewed.  Log review for March and April 2014 revealed 97 percent compliance for 30-minute welfare checks.  Review of Guard One data for all three administrative segregation units for selected 24-hour periods in June 2014 indicated overall compliance at approximately 90 percent.  However, contrary to CDCR policy, correctional staff

had <u>not</u> been conducting 30-minute rounds in the Z-Unit until shortly after an inmate suicide in that unit on February 27, 2014.

**Management/Treatment Planning**:  eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that clinical staff consistently saw inmates daily when on suicide observation, and that inmates who were referred to mental health were generally seen timely.  However, problems were found related to incomplete SREs and treatment planning.  In one case (<u>HDSP 1</u>), the inmate was placed in the MHCB on April 14, 2014 and discharged by a psychiatrist at the 3CMS LOC several days later without an SRE, and thus without a treatment plan.  In another case (<u>HDSP 2</u>), the inmate was discharged from the MHCB on May 19, 2014 without an SRE and, although five-day follow-up was provided, there was no treatment plan.  In a third case (<u>HDSP 3</u>), the inmate was discharged from the MHCB on May 14, 2014 and the SRE's treatment plan section stated the following: "Discharge from MHCB to EOP LOC; future treatment recommendation - medication compliance for continuing mood/psychosis stability, development of coping skills and distraction techniques with frequent reality testing.  These to be achieved through individual group therapy as well as medication management."  Review of subsequent five-day follow-up and weekly progress notes from the inmate's PC did not indicate concordance with the above treatment plan.

Several IDTT meetings for MHCB inmates held on July 10, 2014 were observed.  IDTT meetings were well-represented, with two psychologists, a psychiatrist by way of remote access, two nurses, a RT, and a correctional counselor in attendance.  However, only the psychologists and psychiatrist were fully engaged during these IDTT meetings; other treatment team members were silent.  The IDTT meetings were also somewhat problematic due to limited suicide risk inquiry.  In one case (<u>HDSP 4</u>), the inmate had been placed on Suicide Watch in a MHCB the previous evening due to SI.  Although there was little discussion during the IDTT meeting as to his SI, the treatment team reduced his level of observation to Suicide Precaution.  It was unclear whether an SRE had been completed.  In another case (<u>HDSP 5</u>), the inmate was in the MHCB for approximately one week and the treatment team discharged him to the EOP LOC without a suicide risk inquiry.

Emergency mental health referrals for SI from January through July 2014 were examined.  Eighteen of these referrals were found in the MHTS and an additional 16 were found in the TTA Logs.  Review of the 34 eUHRs indicated that SREs were completed in 33 of 34 or 97 percent of cases.

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records indicated that 96 percent of custody and 99 percent of nursing staff had CPR certification.  Ninety-nine percent of custody staff was compliant with annual suicide prevention block training, but neither medical nor mental health staff completed this training.  Ninety-four percent of mental health clinicians received the seven-hour SRE training and 100 percent completed the mentoring program.

**Recent Suicides**:  HDSP had two inmate suicides during 2012-2014.  In the **first** case (<u>HDSP 6</u>),

the inmate asphyxiated himself with two cable/extension cords around his neck and a piece of cloth in his mouth during the very early morning of May 6, 2013. He had entered CDCR in April 2008 to serve a 34-year sentence for robbery and assault with a deadly weapon. He was transferred to HDSP in October 2008. He had three RVRs during his confinement, the last of which occurred in February 2013 and involved gang activity during an organized inmate group workout in administrative segregation. It did not appear that he had any recent family support; the last family visit occurred in June 2009. The inmate had no significant medical problems.

Upon entry into CDCR in April 2008, the inmate did not report any community mental health treatment, but was referred to the mental health caseload for evaluation after presenting with depressive symptoms and reporting AH. He was subsequently placed at the 3CMS LOC with a diagnosis of Schizoaffective Disorder and was prescribed psychotropic medication. He denied any current or previous history of SI. All SREs completed for him during 2008 and 2009 indicated a "low" chronic and acute suicide risk. He was discharged from the mental health caseload in April 2009 at his own request following a period of stability. The CDCR reviewer indicated that his request for removal from mental health services may have been related to his gang affiliation. The inmate also staged a brief one-week hunger strike in June 2012 in protest of an RVR.

The CDCR reviewer did not offer any specific precipitating factors for the suicide and a suicide note was not found. However, the reviewer speculated that letters and poems found in his cell reflected themes of anguish and regret about a life he would never experience, including a wife and children, because of his long incarceration. The Suicide Report contained three bases for recommendations for corrective action through a QIP; all were related to deficiencies in the emergency medical response to the inmate's suicide on May 6, 2013:

> (1) Twenty-four minutes elapsed between when the inmate was discovered unresponsive in his cell and when first responders first entered the cell; (2) Emergency response documentation noted the first use of the AED in the TTA at 0330. (Policy requires that responding health care staff transport an AED to the incident scene); (3) According to the Form 837 Incident Report, the emergency response vehicle took 15 minutes to move from Facility D, Building 3 to the TTA.

It should also be noted that most of the 24-minute delay in entering the cell was due to officers changing into personal protective equipment (PPE) due to observation of blood coming from the victim's mouth.

In the **second** case (HDSP 7), the inmate was found hanging by a t-shirt from the ventilation grate of his administrative segregation cell during the early morning of February 27, 2014. He had entered CDCR in March 2013 to serve a five-year sentence for burglary and receipt of stolen property. He was transferred to HDSP in June 2013. He had one RVR during his confinement for battery on an officer on August 13, 2013, resulting in his placement in administrative segregation. He appeared to have had significant family support. He received routine medical treatment for psoriasis and back pain; the CDCR reviewer did not believe that either condition was a contributing factor to the suicide.

176

Prior to CDCR confinement, although the inmate received treatment for ADHD as a teenager, he did not report any other mental health problems other than substance abuse. Following CDCR admission in March 2013, he denied any current mental health concerns and any SI or history of suicidal behavior. Two months later in May 2013, a psychiatrist accidentally saw him following submission of a health care request that was suspiciously written in different handwriting and contained a different first name than that of the inmate. The inmate denied any mental health concerns or mental illness history, but reported prior substance abuse. He again denied any current or prior history of SI and his mental status appeared within normal limits. However, the psychiatrist diagnosed the inmate with Mood Disorder NOS and Amphetamine Dependence, and recommended that he be seen by his PC in the GP. However, the inmate was never enrolled in the mental health caseload. He thus did not have a PC and was not seen again.

The CDCR reviewer did not offer any specific precipitating factors for the suicide. A suicide note and several unfinished letters found in his cell appeared disjointed and suggested rumination and a possible untreated mental illness. Other possible precipitating factors were the inmate's initial placement in administrative segregation for safety concerns, while the subsequent alleged battery on an officer had resulted in a referral to the local district attorney for prosecution, and a sanctioned SHU term. The court ordered an inmate psychological evaluation during a court hearing on January 30, 2014.

The Suicide Report contained three bases for recommendations for corrective action through a QIP:

> (1) According to the July 2013 memorandum, security check should be documented. At HDSP, the ASU security checks were conducted but not logged as required. This is a policy violation; (2) PPE kits were utilized because of reported visible bodily fluids. After review of emergency procedures, medical appeared to be waiting at the cell door for custody to put on their PPEs which appeared to influence timely cell entry and commencement of CPR; and (3) According to the Emergency Room Medical Response System policy, the AED is to be brought to the emergency scene and utilized immediately. During the inmate's emergency response, the AED was not applied until arrival at the TTA.

The failure to promptly enter the cell and respond to the scene with an AED were found in both HDSP suicide cases. These deficiencies had not been corrected following the inmate suicide the previous year (HDSP 6).

This reviewer would note two additional concerns in the case. First, the CDCR reviewer indicated a "significant concern" that the inmate was diagnosed with a Mood Disorder in May 2013 and referred to a PC that never existed because he was not on the mental health caseload. However, it was unclear why the CDCR reviewer did not develop a formal corrective action or recommend further inquiry as to whether the inmate *should* have been enrolled on the mental health caseload. Second, the CDCR reviewer was not correct in stating that "ASU security checks were conducted but not logged as required." During inspection of the Z-Unit at HDSP on

177

July 11, 2014, correctional staff admitted that they had <u>not</u> been conducting 30-minute rounds in the Z-Unit, but rounds were only initiated after the inmate suicide on February 27, 2014.

## 34)   <u>Pelican Bay State Prison (PBSP)</u>

**Inspection**: July 23-24, 2014

PBSP housed 2,824 inmates, with the vast majority at Level IV classification.  The institution had a 14-bed CTC, with ten rooms designated as MHCBs.  Administrative segregation units were located in Buildings A-1, A-2 and the Z-Unit, the PSU was in B-2, and there were 22 SHUs in Buildings C and D.  PBSP was unique in that 42 percent of the inmate population was housed in a SHU.  Nine percent of PBSP inmates were caseload inmates; there were 171 inmates at the 3CMS  and 78 at  EOP.  Two CTC safety cells, namely a seclusion and an observation cell, were designated as alternative housing cells for inmates awaiting MHCB transfer.

**Screening/Assessment**:  Several new admissions observed during the medical intake screening process on July 23, 2014 were problematic.  Two nurses conducted intake screening in two separate large holding cells in the R & R Unit; a room that was routinely utilized as a Nurse's Office in similarly configured R & R Units at other CDCR facilities housed a large piece of photo identification equipment.  Inmates accompanied by two officers were brought into a holding cell.  Each officer held one of the inmate's arms as the screening was conducted.  Privacy and confidentiality thus were obviously compromised.  It was further reported that when the large holding cells were not available due to the high volume of incoming inmates, the screening process was conducted outside of these holding cells in a similarly non-confidential environment.  Observation of both nurses revealed that they were <u>not</u> asking the inmate whether he was *currently* suicidal.  Similar to previous findings at the CHCF, examination of the Initial Health Screening CDCR 7277 Form used at PBSP revealed that it was defective because the critical question of whether the inmate was currently suicidal had been deleted.  DCHCS officials previously reported that the question had been inadvertently deleted and sent out from headquarters in May 2014.

Observation of daily psych tech rounds in administrative segregation Building A-1 indicated adequate rounding.

SHU rounds conducted by a psychologist on July 24 were observed.  These rounds were scheduled to be conducted on a weekly basis; one clinician was assigned to approximately 1,200 inmates assigned to PBSP's 22 SHUs.  The psychologist conducted rounds in approximately four SHU units per day.  Caseload inmates were not housed in the SHUs, therefore, observed rounds were brief, with limited inmate interaction.  The clinician indicated that developing rapport with SHU inmates was challenging and that most preferred not to interact with mental health staff.  When asked whether the distribution of Sudoku puzzles or other CDCR-approved word games, which were commonly found in other lockdown units within CDCR facilities, might be helpful in initiating conversations with inmates, the psychologist was resistant; he stated his belief that the puzzles were not therapeutic, while their distribution was not his responsibility.

**Housing**:  All CTC cells were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging SA.

The three administrative segregation units contained a total of nine cells identified by CDCR as retrofitted for new intake inmates.  Building A-1, which was used for caseload inmates, had two cells, Building A-2, which was also used for caseload inmates but was not housing new intake inmates, also had two cells, and the Z-Unit had five cells.  Although Building A-1 only had two retrofitted cells (117-118), the unit's correctional staff reported that up to 20 (113-122 and 213-222 in Sections B and C) were used for new intake inmates.  However, the two retrofitted cells in Building A-1 had large gauge grate windows that were on the inside of the cell door, with Lexan panels on the outside, but otherwise were suicide-resistant.  Several other cells in sections B and C that were used for new intake inmates had various hazards, including gaps between the wall and bunk and between the wall and desk, and stools with horizontal brackets that were attached to the wall.  Several new intake inmates were housed in these unsafe cells, including an inmate who had recently returned from a DSH program at the CHCF on July 21, 2014.

**Observation**:  Although Suicide Precaution and Suicide Watch were the only CDCR-authorized levels of observation for suicidal inmates, the CTC also regularly used psychiatric observation and/or behavior checks.  Although CDCR had not sanctioned this practice and it was not referenced in the *Program Guide*, PBSP mental health officials previously developed an LOP for Suicide Prevention and Response that contained a brief explanation of psychiatric observation: "Whenever an inmate-patient exhibits unusual behavior or becomes dangerous to self or others....To prevent suicide and/or injury to self, others, and staff."

In fact, it appeared that behavior checks often were the *only* level of observation that PBSP used. Of eight inmates in the MHCB on July 23, 2014, all were on behavior checks.  All of the inmates in an MHCB were considered at "moderate" or "high" risk for suicide, but were only required to be observed at 60-minute intervals.  Despite this low level of observation, most inmates were deprived of their clothing and issued a safety smock, safety mattress, and safety blanket.  In one case (PBSP 1), the inmate was escorted to the CTC on March 15, 2014 after correctional staff observed him placing a ligature around his neck.  Upon assessment by both a psychologist and psychiatrist, he admitted to being suicidal and stated "I've had enough.  Death has always been a thought.  I'd rather suicide than face certain things.  I can't deal with close relationships.....I tried to kill myself earlier today."  He told the clinicians that his cellmate had returned earlier than anticipated and "got custody involved."  Although not a caseload inmate, he self-reported a prior history of SAs.  He was diagnosed with Mood Disorder NOS, with a diagnosis rationale that "patient has a long history of viewing self as someone who should never have been born and has a history of four SAs with regret none resulted in a completed suicide."  An SRE was completed and found the inmate to be at "high" acute risk and "moderate" chronic risk for suicide.  *The inmate was admitted to an MHCB with observation at 60-minute intervals*.

In another case, an inmate (PBSP 2) was admitted to an MHCB on June 21, 2014 with observation at 60-minute intervals after an SRE found him to be at "moderate" acute risk for suicide due to "SI with a vague plan."  On July 18, 2014, an inmate (PBSP 3) was admitted to an MHCB after an SRE found him to be at "high" acute risk for suicide due to SI and "recent psychotic and depressive symptoms, recent losses, hopelessness, single cell placement, potential

179

reported safety issue, and early into current prison term." He was placed on 60-minute behavior checks. All of the above cases involved different PBSP clinicians.

Unit logs from A-1, A-2, and the Z-Unit were reviewed regarding documentation of 30-minute welfare checks prior to full implementation of the Guard One system in mid-May 2014. Review of unit logs for February, March, and April 2014 found 98 percent compliance with 30-minute checks. Review of Guard One data for all three administrative segregation units for selected 24-hour periods in June 2014 found overall compliance at 95 percent. Review of Guard One data for the PSU during selected 24-hour periods in June 2014 found overall compliance at 99 percent.

The institution's 22 SHUs had yet to be required to activate the Guard One system at the time of this site visit. PBSP officials reported that the 30-minute welfare check requirement in the SHUs had been suspended in June 2013 due to the "unique physical design" of the units having a "negative impact on staff and inmates at PBSP."[3] As such, welfare checks within the SHUs were typically conducted at 60-minute intervals.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of inmates referred to mental health on an urgent and/or emergent basis indicated that inmates were consistently seen by clinical staff daily when on suicide observation and that inmates referred to mental health were generally seen timely. However, there were other problems related to incomplete SREs and treatment planning. In one case (PBSP 4), the inmate was placed in an MHCB during the evening of January 20, 2014 for SI and required observation at 15-minute intervals. On the next day, January 21, a psychologist completed an SRE that found him to be at "low" acute risk and "moderate" chronic suicide risk. However, the SRE was completed *without* an inmate interview and was based on eUHR review and discussion with other staff. Despite the inmate not being interviewed, the clinician lowered his observation level from Suicide Precaution at 15-minute intervals to 60-minute behavior checks. The clinician stated that a decision on the issuance of clothing would be deferred, stating "no increase in issue, as we are unable to assess patient's status in order to increase his issue, at this time."

Treatment planning was problematic in other cases. In one case (PBSP 5), the inmate was discharged from an MHCB on June 25, 2014 with the following treatment plan contained within the SRE: "I/P is being discharged back to custody and his sending institution at the CCCMS LOC for symptom and medication management. Five-day follow post discharge. Follow-up with psychiatry and psychology within seven days for on-going medication management and stabilization." In a previously referenced case (PBSP 2), the inmate was admitted to the MHCB for SI on June 21, 2014, and then discharged on June 30, with the following treatment plan contained within the SRE: "Discharge to custody at CCCMS LOC, pending transportation to return to DVI, with 5-day follow-up, safety check log, psychiatry and CM lines in 7 days." Other than reciting *Program Guide* requirements, these treatment plans did not contain specific strategies to reduce SI.

---

[3] In addition to the "unique physical design," other reasons listed for the suspension of 30-minute welfare checks in the SHUs were staff shortages, increased staff injuries, and an alleged increase in inmate complaints.

The reviewer observed IDTT meetings in the PSU and CTC. The IDTT meetings of two inmates housed in the CTC were observed on July 24, 2014. The IDTT meetings were well-represented, with a psychiatrist, DSH coordinator, RT, correctional counselor, and several psychologists and nurses in attendance. There was very good interaction between the inmate and the treatment team during each meeting and good discussion between treatment team members as to strategies for these inmates' stabilization. At the conclusion of the IDTT meetings, this reviewer asked team members why, contrary to *Program Guide* requirements, most suicidal inmates were admitted to the MHCB with observation at 60-minute intervals? The IDTT treatment team had no explanation as to why this practice occurred.

The reviewer examined emergency mental health referrals for SI from January through July 2014. Of these referrals, 36 were found in the MHTS and an additional 12 were found in the TTA Logs. eUHR review found that 18 of 22 or 82 percent had completed SREs. One case (PBSP 6) symbolized the problem of not consistently completing SREs as required. On February 24, 2014, a psych tech initiated an emergency mental health referral of the inmate after he was observed engaging in self-injurious behavior by cutting his forearms with his fingernails. He was escorted to the EOP clinic and seen by a nurse. He stated that "I feel better now," and told the nurse that "when he feels stress he cuts himself to feel better but denies ever being suicidal." The nurse contacted the on-call clinician who "advised to go back to housing and submit emergency referral for tomorrow morning." An SRE was not completed. The inmate was seen by another clinician on February 25, the following morning, and an SRE was still not completed. A few weeks later on March 12, 2014, the inmate was again observed engaging in the same self-injurious behavior as he did on February 24. However, this time he was admitted to the MHCB. On March 13, the following day, an SRE was completed and indicated that the inmate had multiple prior SAs by both hanging and cutting from 2004 through 2013. He admitted that "cutting could be a way to get attention" and to relieve stress in dealing with an upcoming parole hearing, scheduled for next month, and probable deportation back to Mexico. This critical information could have been gathered earlier, and appropriate treatment provided, if an SRE had been previously completed on February 24.

**Intervention**: Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**: Training records indicated that 96 percent of custody and 100 percent of nursing staff had CPR certification. Ninety-six percent of custody staff was compliant with annual suicide prevention block training, but neither medical nor mental health staff completed this training. Eighty-nine percent of mental health clinicians received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: PBSP had one inmate suicide during 2012-2014. In that case (PBSP 7), the inmate was found hanging by a sheet from the bunk of his administrative segregation cell during the afternoon of February 24, 2014. His body was in the state of *rigor mortis*. The inmate had entered CDCR in January 2007 to serve a 15-year sentence for assault with a firearm and firing into an inhabited vehicle. He was transferred to PBSP on January 14, 2014 and was housed in administrative segregation because of two pending disciplinary reports for obstructing a peace officer. He had 20 RVRs during his confinement, mostly for assaultive behavior; the last was in

November 2013 for fighting.  The inmate had recently renounced his gang affiliation and had received notification on February 12, 2014 that he was approved for transfer to an appropriate SNY.  He had adequate family support, with visits and letter correspondence.  He did not have any significant medical problems.

Upon entry into CDCR in January 2007, the inmate did not report any mental health concerns or prior treatment in the community.  However, he and other family members reportedly had substance abuse problems.  He denied SI and a history of suicidal behavior.  He had intermittent contact with mental health clinicians throughout his CDCR confinement.  For example, following his self-report of depression while confined in administrative segregation in February 2008, he was diagnosed with Adjustment Disorder, Mixed, and Anti-Social Personality Disorder, but was not admitted to the mental health caseload.  Several months later in September 2008, a psychiatrist saw him for an evaluation of psychotropic medication needs due to increased stress, but he was not prescribed any medication nor received further assessments.  On December 5, 2013, while housed in administrative segregation at HDSP, he threatened suicide and was admitted to an MHCB at the institution.  He was discharged from the MHCB on December 16, 2013 and returned to administrative segregation at HDSP.  An SRE determined that he was at both "low" chronic and acute risk for suicide.  He was again diagnosed with Adjustment Disorder with Mixed Disturbance, but was not enrolled in the mental health caseload.  Three days later on December 19, 2013, an emergency mental health referral was initiated after he reported vague AH and SI.  The responding clinician completed an SRE that found the "I/P has a documented history of attempting to gain access to certain desired changes in his environment by using conditional language of suicidal verbal behavior.  When P/C explained directly and clearly that the two options were for the I/P to be sent back to housing or be admitted to CTC, I/P recanted his suicidal language and stated he just wanted a shower."  The inmate was then returned to administrative segregation.

On January 9, 2014, custody staff generated an urgent mental health referral after a member of the inmate's family called HDSP and expressed concern about his mental health.  He was subsequently seen by a clinician.  The inmate appeared stable and denied mental health problems.  When the inmate arrived at PBSP the following week on January 14, 2014, he informed the intake nurse that he had experienced SI before his transport from HDSP and further reported "auditory hallucinations but that they do not tell him to hurt himself or others."  Although he denied SI, an urgent mental health referral was initiated and the inmate was seen by a clinician the following morning, on January 15.  He told the clinician that "I have safety concerns.  I'm afraid for my life.  I need protective custody right now.  I don't want mental health."  The inmate denied any current SI.  Two days later on January 17, he was again referred to mental health by custody staff, who noted that he was "incapable of caring for himself, confused, disoriented, hostile, assaultive, poor tension, needs med review, exhibits bizarre behavior, unpredictable, hears things."  Custody described him as "yelling and throwing himself at the cell door."  However, when seen by a clinician, he denied SI or mental health concerns.  He was diagnosed with Personality Disorder NOS.

A psych tech saw him during daily rounds two days later on January 19, which was incorrectly listed as January 21 in the Suicide Report.  At that time, his behavior was observed as bizarre, his mood as manic, his insight and judgment as poor, and his thought processes and content as

jumbled.  He was referred to, and seen by, a mental health clinician on January 22.  He appeared "uncooperative, guarded, evasive," his mental status was found to be within normal limits, and the clinician did not believe he met the inmate caseload criteria.

On February 5, 2014, custody staff initiated another mental health referral that stated "Third referral from custody since 01-15-2014, he appears paranoid and inappropriate affect."  The following day, February 6, a mental health referral was initiated by a psych tech who stated, "Possible delusional thought process and has thrown himself into the cell door and punching walls....Needs psychotropic medication review, exhibits bizarre behavior, hears things/sees things/imagine things."  The inmate was subsequently seen by a clinician who noted that "he did appear to be responding to internal stimuli and appeared to be talking to himself.  He was advised that he will be admitted to CCCMS for a monitoring period due to four mental health referrals and recent MHCB admission."  The inmate was seen at his initial IDTT meeting on February 12, 2014 and given diagnoses of Adjustment Disorder, with Disturbance of Mood and Conduct, and Personality Disorder NOS, with Narcissistic, Anti-Social, Borderline and Histrionic Traits.

On February 18, 2014, a clinician saw the inmate, who denied having mental health problems.  The inmate was uncooperative.  The clinician submitted a psychiatric referral for medication review due to "possible delusional thought process and has thrown himself into the cell door and punching walls."  He was seen by a psychiatrist that same day, who noted the inmate "with no prior mental health services, suddenly now hearing radio waves, throwing himself against the cell walls, intense religious delusion .... 'safety concerns' hiding out in the MHSDS for secondary gains."  He was not seen again by mental health staff and committed suicide one week later.

The CDCR reviewer did not offer any specific precipitating factors for the suicide and a suicide note was not found.  Although the Suicide Report contained only one basis for recommendation for corrective action, the reviewer raised several concerns, including observation that the inmate "routinely and throughout his incarceration refused out-of-cell contact with mental health and custody staff.  He signed refusals only when required.  Inmate appears to have systematically desensitized staff to his lack of cooperation, by often refusing to even acknowledge the presence of custody and mental health staff when they came to the cell."  The reviewer noted that the SRE completed on February 6, 2014 incorrectly rated the inmate as both a "low" chronic and acute risk for suicide and incorrectly listed several protective factors that were not substantiated.  Based on the inmate's chronically bizarre behavior, the reviewer asked mental health officials to "Please address methods of intervention with patients that may be refusing services and frequently coming to the attention of staff for disruptive and strange behaviors."  It was unclear whether the reviewer was addressing these concerns to HDSP or PBSP officials, or both.  The reviewer also expressed concern that the inmate had not been initially placed at the 3CMS LOC following his MHCB discharge at HDSP on December 13, 2013.  The only recommendation contained within the Suicide Report was a broad plea to all CDCR facilities:  "Appropriate intervention and identification, assessment, and treatment of complex mental disorders has been a concern noted in a number of suicide cases, and is highlighted in the current review.  This suggests a need for further training for clinical staff in the institutions."

This reviewer notes that this case presents several other concerns.  First, although this reviewer was informed during both the HDSP and PBSP site visits that this case presented several deficiencies, and that subsequent corrective actions had been completed, it was unclear why the Suicide Report did not include formal recommendations for corrective action based on the CDCR reviewer's multiple concerns. Second, although at least two psych techs initiated mental health referrals based on the inmate's bizarre behavior, review of weekly Psych Tech Daily Rounds Forms for the three-week period prior to the inmate's suicide suggested that he was consistently displaying behavior within normal limits.  Such a description was inconsistent with the concerning behavior noted by custody, mental health, and other psych techs.  Finally, the CDCR reviewer failed to address the fact that, due to the inmate's body being found in a state of rigor mortis, administrative segregation correctional staff had failed to observe him at 30-minute intervals.

184

## ACRONYMS and ABBREVIATIONS

3CMS:                  Correctional Clinical Case Manager System

ACH:                   Acute Care Hospital

ADHD:                  Attention Deficit Hyperactivity Disorder

AED:                   Automatic External Defibrillator

AH:                    Auditory Hallucinations

AHU:                   Alternative Housing Unit

Ambu bag:              Ambulatory Bag Used for CPR

APP:                   Acute Psychiatric Program at Vacaville

ASH:                   Atascadero State Hospital

ASP:                   Avenal State Prison

BPH:                   Board of Parole Hearings

C-file:                Central File

CAL:                   Calipatria State Prison

CAP:                   Corrective Action Plan

CBT:                   Cognitive Behavioral Therapy

CCC:                   California Correctional Center

CCI:                   California Correctional Institution

CCWF:                  Central California Women's Facility

CDCR:                  California Department of Corrections and Rehabilitation

CEN:                   Centinela State Prison

CEO:                   Chief Executive Officer

CHCF:                  California Health Care Facility

| | |
|---|---|
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMH: | Chief of Mental Health |
| CNA: | Certified Nursing Assistant |
| CO: | Correctional Officer |
| CPAP: | Continuous Positive Airway Pressure |
| CPR: | Cardiopulmonary Resuscitation |
| CQIT: | Continuous Quality Improvement Tool |
| CRC: | California Rehabilitation Center |
| CSATF : | California Substance Abuse Treatment Facility |
| CSP: | California State Prison |
| CSP/Cor: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | California Training Facility/Soledad |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DAI: | Division of Adult Institutions |

DBT:            Dialectical Behavioral Therapy

DCHCS:          Division of Correctional Health Care Services

DDP:            Developmentally Disabled Person

DMH:            Department of Mental Health

DNR:            Do Not Resuscitate

DSH:            Department of State Hospitals

DVI:            Deuel Vocational Institution

EB:             East Block

EOP:            Enhanced Outpatient Program

eUHR:           Electronic Unit Health Record

FSP:            Folsom State Prison

GP:             General Population

HCPOP:          Health Care Placement Oversight Program

HDSP:           High Desert State Prison

HI:             Homicidal Ideation

ICC:            Institutional Classification Committee

ICF:            Intermediate Care Facility

IDTT:           Interdisciplinary Treatment Team

IGI:            Institutional Gang Investigators

I/P:            Inmate/Patient

ISP:            Ironwood State Prison

IST:            In-Service Training *or* Incompetent to Stand Trial

ISU:            Investigative Services Unit

| | |
|---|---|
| KVSP: | Kern Valley State Prison |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| LPT: | Licensed Psychiatric Technician |
| MAR: | Medication Administration Record |
| MCPS: | Modified Property Control Status |
| MCSP: | Mule Creek State Prison |
| MHCB: | Mental Health Crisis Bed |
| MHCBU: | Mental Health Crisis Bed Unit |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHSDS: | Mental Health Services Delivery System |
| MHTP: | Mental Health Treatment Plan |
| MHTS: | Mental Health Tracking System |
| MOD: | Medical Officer of the Day |
| MSE: | Mental Status Examination |
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Internal Affairs |
| OP: | Operating Procedure |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PCP: | Primary Care Physician |

| | |
|---|---|
| PIA: | Prison Industry Authority |
| PIP: | Psychiatric Inpatient Program |
| PPE: | Personal Protective Equipment |
| PREA: | Prison Rape Elimination Act |
| PRN: | As Needed |
| PSH: | Patton State Hospital |
| PSU: | Psychiatrist Services Unit |
| PT: | Psychiatric Technician or Psych Tech |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| R&R: | Reception and Receiving |
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| R/O: | Rule Out |
| RT: | Recreational Therapist |
| RVR: | Rule Violation Report |
| SA: | Suicide Attempt |
| SCC: | Sierra Conservation Center |
| SHU: | Secured Housing Unit |
| SI: | Suicidal Ideation |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |

SNY:                    Sensitive Needs Yard

SOMS:                   Strategic Offender Management System

SOAP:                   Subjective Objective Assessment and Plan

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SQ:                     San Quentin State Prison

SRA:                    Suicide Risk Assessment

SRE:                    Suicide Risk Evaluation

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TTA:                    Triage and Treatment Area

VH:                     Visual Hallucinations

VSP:                    Valley State Prison

VPP:                    Vacaville Psychiatric Program

WSP:                    Wasco State Prison