# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.**
  **Plaintiffs**


**v.**                                        No. CIV S-90-0520 KJM DAD PC


**EDMUND G. BROWN, JR., et al.**
  **Defendants**


## SPECIAL MASTER'S REPORT ON THE
## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S
## IMPLEMENTATION OF POLICIES AND PROCEDURES
## ON RULES VIOLATION REPORTS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
January 30, 2015

## I.    **INTRODUCTION**

This is the Special Master's report on defendants' implementation of agreed-to policies and procedures concerning mental health input into the inmate disciplinary process in the prisons of the California Department of Corrections and Rehabilitation (CDCR).  This disciplinary process is referred to as the Rules Violation Reports or RVR process.  The Special Master submits this report in accordance with this Court's order of April 10, 2014, directing him to report to the court on whether defendants have adequately implemented the RVR policies and procedures that were agreed to in 2011.  (ECF 5131)

The genesis of the April 10, 2014 order was a motion filed by plaintiffs on May 29, 2013 (ECF 4638) in which they argued, among other things, that further remedial orders were required to remedy a constitutional violation in defendants' use of inmate disciplinary measures, based on a finding that "seriously mentally ill inmates `who act out are typically treated with punitive measure without regard to their mental status.'"  [ECF 5131 at 31, *quoting Coleman v. Wilson*, 912 F.Supp. 1282, 1230 (E.D. Cal. 1995)].  This Court stated that the issue relative to the disciplinary process turned on the adequacy of defendants' implementation of a plan on which the *Coleman* parties agreed and which the Special Master approved in 2011.  (ECF 5131, at 35-36)  The referenced plan, developed by defendants in response to an order entered on August 2, 2007 (ECF 2345), was for the purpose of "identifying and developing changes necessary to broaden the impact of the then-existing mental health assessment process in CDCR prison disciplinary matters for 3CMS inmates, testing those changes and implementing them system wide."  (ECF 2345 at 1).

In response to the April 10, 2014 order, the Special Master directed members of his staff to examine and review on site the RVR process at all 34 CDCR institutions.[1]  The RVR process, the Special Master's review methodology, his findings on the extent to which defendants have implemented those policies and procedures, and his recommendations in connection therewith are set forth below.[2]

This report is accompanied by individual reports on each CDCR institution's implementation of RVR policies and procedures, together with reviews of RVR cases at each of the institutions.  (*See* Exhibit A)  Within the attached individual institutional reports are numerous references to implementation of standards that are recited in CDCR memoranda, and to the official form that is used in the procurement of mental health input in individual RVR cases.  The pertinent CDCR internal memoranda concerning RVR policies, procedures, and staff training, dated October 26, 2011 and November 3, 2011, respectively, are attached.  (*See* Exhibits B, C).  The official form that is used for obtaining clinical input into the inmate disciplinary process is also attached.  (*See* Exhibit D)  The final attachment to this report is a list of all acronyms/abbreviations which appear in this report, and their definitions.  (*See* Exhibit E)

## II.    <u>BACKGROUND OF THE RULE VIOLATION REPORT PROCESS</u>

The significance of policies, procedures, and staff training requirements associated with mental health input into the inmate disciplinary process within CDCR prisons has a long history,

---

[1] Four of CDCR's institutions - Calipatria State Prison (Cal), Chuckawalla Valley State Prison (CVSP), Centinela State Prison (Cen), and Ironwood State Prison (ISP) - are located in a desert environment.  Because persons taking prescribed psychotropic medications experience heightened sensitivity to adverse effects of high temperatures, inmates in the CDCR Mental Health Service Delivery System (MHSDS) are to be excluded from housing at these four institutions.  However, MHSDS inmates are sometimes found at these institutions, due to some inmates' development of mental illness while incarcerated at these locations, CDCR staff's lack of knowledge of inmates' mental health issues at the times of inmate placements, or mistakes in inmate housing assignments.  Accordingly, the RVR process at these four desert institutions was examined, and they are included within the individual institutional reports in covered in Exhibit A.

[2] Although the information and findings discussed in this report are the product of more than one member of the Special Master's monitoring staff, any observations, findings, and conclusions of the Special Master's monitors are attributed collectively to "the monitor."

dating back to the time of the remedial order in this case. This Court found that, at that time, "mentally ill inmates who act out are typically treated with punitive measures without regard to their mental status," and that "such treatment was the result of inadequate training of the custodial staff so that they are frequently unable to differentiate between inmates whose conduct is the result of mental illness and inmates whose conduct is unaffected by disease. *Coleman*, 912 F.Supp. at 1320. This Court found further that there was "substantial evidence in the record of seriously mentally ill inmates being treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illness." *Id.* The cause of this problem was identified by the Court as inadequate training of CDCR staff on recognition of the signs and symptoms of serious mental illness among inmates who acted out. *Id.*

CDCR took up the task of addressing this problem. On August 14, 1998, it issued a memorandum modifying its existing RVR process ("Adjudication of Rules Violation Reports Involving Mental Health Services Delivery System Inmate Program Participants/Patients"). This modified process required a mental health review of all cases of RVRs issued to CDCR inmates within CDCR's Mental Health Services Delivery System (MHSDS). The new policy required that any inmate who received an RVR and who exhibited "bizarre behavior" must be referred for a mental health review.

In 2003, CDCR further modified its RVR policies and procedures, mandating that all MHSDS inmates who had been designated for either the Mental Health Crisis Bed (MHCB) or Enhanced Outpatient Program inmate (EOP) levels of care, and who had been issued RVRs, were to receive mental health assessments. In addition, all inmates at the Correctional Clinical Case Management System (3CMS) level of care (LOC), as well as all inmates *not* within the

MHSDS who exhibited or demonstrated "bizarre, unusual, or uncharacteristic behavior" and who were issued RVRs, were required to receive mental health assessments as part of the RVR process.

Staff training was also a component of the changes implemented in 2003. On July 1, 2003, CDCR directed that all clinical staff who conducted RVR mental health assessments and all custody staff who conducted RVR hearings were required to undertake a mandatory four-hour course prior to participating in the RVR process, with exemptions allowed.

In the meantime, the Special Master regularly monitored and reported on the use of the mental health assessments in the inmate disciplinary process. In his Seventeenth Round Monitoring Report, Part B, filed on April 2, 2007 (ECF 2180), the Special Master found and reported that institutional use of mental health assessments for 3CMS inmates in the RVR process was unsatisfactory. The process was marked by very low numbers of referrals for assessments, errors, inconsistencies, inadequate documentation, and mental health input not being taken into consideration in RVR deliberations and dispositions. Overall, the Special Master found that the very purpose of assessing mentally ill inmates who were charged with violation of prisons rules was being overlooked. He recommended that "defendants be ordered to develop a plan to identify and develop the changes necessary to broaden the impact of the mental health assessment process on 3CMS inmates, to test those changes, and then to implement them system wide. The plan would be submitted to the Special Master and plaintiffs' counsel for review and comment." (ECF 2180 at 108-109)

On August 2, 2007, the Court adopted the Special Master's recommendations and ordered defendants, within the next 60 days, "to develop (the above-referenced plan) for developing the changes deemed necessary to broaden the impact of the mental health assessment

process in prison disciplinary matters on 3CMS inmates, testing those changes, and implementing them system wide." The Court further ordered the Special Master to report to the court on the adequacy of this plan and make any appropriate recommendations in his next regularly scheduled monitoring report. (ECF 2345)

Defendants' initial submission of a revised plan to the Special Master was made on May 1, 2008. It included representations that a pilot of the new plan would be completed by August 5, 2008, and that the development of an implementation plan, including a procedure for effective monitoring of the RVR process, would be completed by November 1, 2008. It was not until May 10, 2011 that defendants circulated a new memorandum to the field directing completion of mental health assessments for 3CMS inmates charged with the most serious disciplinary infractions. In this memorandum, defendants instructed staff that all 3CMS inmates receiving a Division A, B, or C RVR must be referred for mental health assessments. Mental health assessments of 3CMS inmates who received RVRs for Division D, E, or F violations would continue to be governed by the standard that "bizarre, unusual, or uncharacteristic behavior" and require a mental health assessment.

In June 2011, after repeated requests from the Special Master, defendants produced a report on their pilot which indicated that key elements of it had never been piloted or implemented. The *Coleman* parties and the Special Master then met on several occasions during the following fall, after which there was agreement by the parties, with the approval of the Special Master, for a newly revised policy for mental health assessments for 3CMS inmates charged with RVRs. On September 21, 2011, CDCR, the Special Master and plaintiffs' counsel agreed to expand the policies outlined in the May 10, 2011 memorandum to 3CMS inmates who received a rules violation report "that may result in being assessed a Security Housing Unit

5

(SHU) term as identified in the California Code of Regulations (CCR) Title 15, Section 3341.5," requiring that they be referred for mental health assessments. In addition, it was required that the Institutional Classification Committee (ICC) consider the mental health assessment prior to any action regarding such inmates.

On October 26, 2011, defendants distributed their associated staff training memorandum (Exhibit B).  The memorandum, captioned "Training for Custody and Clinical Staff Regarding Mental Health Input into the Inmate Disciplinary Process," reiterated that the four-hour mandated training was a pre-condition for clinical and custody staff to participate in the RVR process. It specifically directed the following:

1.    The updated September 2011 version of the RVR training curriculum shall be used to train involved staff.

2.    All hearing officers, Senior Hearing Officers, Captains, Chief Disciplinary Officers (CDO), and appeals coordinators shall receive four hours of training related to appropriate documentation of mental health input into the RVR process.

3.    All clinical staff responsible for review of RVRs and preparation of the mental health assessment (CDCR Form 115-MH) shall receive four hours of training relative to providing mental health input into the RVR process.

4.    The above requirement is to be provided on an ongoing basis prior to staffs' involvement in the RVR process.

5.    The training is to be collaboratively between custody and mental health.

6.    All new staff hired into the applicable classifications were to be trained prior to their involvement in the RVR process.

Defendants directed that training of all staff in affected classifications was to be completed by January 30, 2012, with proof-of-practice documentation submitted to the Audits and Litigation Unit no later than February 3, 2012.

On November 3, 2011, defendants issued their memorandum covering the changes to the form used for requesting a mental health assessment.  (Exhibit C)  It was entitled "Revision to the Mental Health Assessment Request Process for Rules Violation Reports (Update)."  This memorandum instituted the following policies and procedures, expanding the application of the mental health assessment:

1. All 3CMS inmates receiving a Division A, B, or C RVR and for any rules violation that may result in being assessed a SHU term shall be referred for a mental health assessment via a CDCR Form 115-MH.

2. All 3CMS inmates receiving a Division D, E, or F RVR shall be referred for a mental health assessment based upon existing guidelines, which requires a referral if the inmate's behavior was bizarre, unusual or uncharacteristic.

3. The clinical assessment must be considered during the ICC to ensure the inmate's mental health is considered prior to any committee action.  The clinical input must be documented on the CDCR Form 128-G, Classification Chrono.

4. All custody and clinical staff involved in the inmate disciplinary process shall receive on-site training regarding the RVR assessment requirements listed in this memorandum.

5. Revised training regarding Inmate Disciplinary Process: Mental Health Assessment was to be provided to In-Service Training (IST) for on-going use.

CDCR required that all clinical and custody staff involved in the RVR process receive on-the-job training regarding the policies and procedures outlined in the November 3, 2011 memorandum.  This was to be completed by December 30, 2011, with proof-of-practice documentation submitted to the Associate Director (Custody) no later than January 2, 2012.

The form to be used for requesting a mental health assessment and for the mental health clinician's entry of his findings contains three questions to be answered by the clinician.  (*See* Exhibit D)  These questions are generally referenced by their numbers (*see e.g.* Exhibit A), and are to be answered by checking boxes "yes" or "no," with an accompanying written explanation of these answers.  These three questions are:

1. 3CMS/Non-MHSDS only. Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant?

2. In your opinion, did the inmate's mental disorder appear to contribute to the behavior that led to the RVR?

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty?

On December 1, 2011, in his Twenty-Third Round Monitoring Report, the Special Master recounted the course of defendants' response to the August 2, 2007 order.  He noted the long time lapse before defendants began to respond to this order, and that little had been accomplished, pointing out that defendants appeared to "have lost sight of the original identified problem and the goal of the pilot to resolve that problem," as ordered by the court.  The Special Master expressed concern, that given the "limited character of what defendants now propose as their plan, appropriate use of the mental health assessments in the disciplinary process for 3CMS inmates may well end up being even more limited than it was before the plan was ordered."  The Special Master emphasized that nearly four years had passed with "very little progress," pointing out that defendants had violated the 60-day time limit in the August 2, 2007 court order "literally by years."  (ECF 4124 at 20-28)

In response to the Twenty-Third Round Monitoring Report, and as a result of initiatives undertaken by the Special Master, defendants introduced a further modification of the RVR process, in collaboration with the Special Master and the *Coleman* plaintiffs, to address the issues raised in the Special Master's Report.

As noted above, plaintiffs' motion for relief from defendants' use of the inmate disciplinary process with punitive measures without adequate regard for inmates' mental health status (ECF 5131), resulted in the order entered April 10, 2014, directing the Special Master's

review of defendants' implementation of the 2011 agreed-to plan for mental health input into the RVR process.  The description and outcome of that review follow.

## III.    THE SPECIAL MASTER'S REVIEW OF DEFENDANTS' IMPLEMENTATION OF THE RVR PROCESS AGREED TO IN 2011

### A.    Methodology

The Special Master reviewed on site the RVR process in all 34 CDCR institutions.  The site visits ran from June 2014 through December 2014.  The review period (i.e. the period in which the examined RVRs were issued) was January 2014 through March 2014 for all 34 institutions.  This period was selected in order to allow sufficient time for these RVRs to have been adjudicated and for any resulting ICC action to have taken place before the monitor's examination of these RVRs.

During each site visit, the monitor interviewed the institutional warden or his/her designee, institutional mental health supervisors, mental health clinicians who were responsible for preparing the mental health assessments, and the Senior Hearing Officers before whom RVRs were adjudicated.  The monitor also reviewed institutional policies and procedures related to the RVR process, training materials provided by CDCR headquarters, and any local training materials that were provided by the institutions to their staff.  The monitor reviewed any institutional audits and/or quality improvement processes that were utilized with respect to RVRs.

To gather data, and for consistency across institutions, the monitor also used the institution register and CDCR 1154 logs, which are required to be maintained under Title 15, CCR, "Crime Prevention and Corrections," to gather data.  The monitor also utilized CDCR

Computer Statistics Electronic Information Management Tool (COMPSTAT)[3] reports for institution-specific information, including institution population, number and percentage of MHSDS inmates within institutional populations, total numbers of RVRs issued, numbers and percentages of RVRs issued to MHSDS inmates, among other relevant data points.

       1.   <u>Document Request</u>

Each institution received a document request from the monitor prior to its on-site visit. The document request identified the documentation which the monitor would be examining during the site visit. These identified documents were requested as follows:

1. Provide copies of CDCR Form 1154, Rules Violation Report logs for the months of January, February, and March 2014 for each facility, area, or unit within the institution. Identify which log(s) contains RVRs written for inmates housed in a mental health crisis (MHCB), a psychiatric services unit (PSU), a SHU and in administrative segregation.

2. Have available for review the institution registries of all completed RVR report packages, with any/all mental health assessments attached, for the months of January, February, and March 2014. The monitor will review the registries and identify RVR packages for copying.

3. Provide a copy of all completed RVR packages issued to inmates housed in the MHCB during the month of January, February, and March 2014.

4. Provide a copy of an alphabetical roster of the institution's current CDOs, Captains, Senior Hearing Officers, Hearing Officers, and Appeal Coordinators.

5. Provide a copy of an alphabetical roster of the institution's current clinical staff who are responsible for the preparation of the 115 mental health assessment forms.

6. Provide a copy of an IST report for class code A0564, B0564, and/or M0564, Mental Health Input into the Disciplinary Process, for all of the custody and clinical staff listed in requests numbered 4 and 5 above for the period of October 1, 2011 until the present.

7. Have available for review all lesson plans, PowerPoint presentations, curricula, and documents used in the ongoing training of custody and clinical staff involved in the inmate disciplinary process as it relates to mental health assessments.

---

[3]"COMPSTAT" stands for "computer statistics" and refers to CDCR's electronic organizational tool. It is not a computer system or software package. Source: CDCR Website.

8. Provide copies of the required "proof-of-practice" memoranda submitted by the institution in response to the October 26, 2011 and November 3, 2011 memoranda.

      2.   <u>Institutional On-Site Reviews</u>

Once on site, the monitor reviewed the CDCR 1154 logbooks at each institution to identify RVRs issued to MHSDS inmates and to select sample of RVRs packages to be reviewed. Additionally, all RVRs issued to MHCB inmates were reviewed. Copies of the completed RVRs that were identified were provided to the monitor, who then reviewed each RVR, applying the following criteria and content:

1. Whether a CDCR Form 115-MH (mental health assessment form) was requested in accordance with policy;

2. Whether the CDCR Form 115-MH was completed and returned to custody staff in a timely manner;

3. Whether the CDCR Form 115-MH was completed appropriately, (i.e., was it legible, responsive to the questions, and written in laymen's terms);

4. Whether the mental health input was considered and documented by the senior hearing office in the findings;

5. If the mental health input was used to mitigate the penalty, was it documented by the Senior Security Officer;

6. If a penalty was imposed on an inmate for whom a mental health assessment was completed, provide the terms of the penalty, including losses of credits and privileges; and

7. Whether the ICC considered the mental health input in its action, including in any assessment of a SHU term. Provide the documentation of its consideration of the input and/or any mitigation.

      3.   <u>CDCR Staff Training</u>

As stated above, one of the central requirements of both the October 26, 2011 and November 3, 2011 memoranda is that all clinical and custody staff involved in the RVR process receive specified training using a designated curriculum. The October 26, 2011 memorandum

mandated the four-hour training as a pre-condition for clinical and custody staff participation in the RVR process, and made the updated September 2011 version of the RVR training curriculum the training tool. The November 3, 2011 memorandum required that all custody and clinical staff involved in the inmate disciplinary process receive on-site training on the mental health assessment requirements listed in the memorandum, and further, that the revised training ("Inmate Disciplinary Process: Mental Health Assessment") be used for ongoing training.

To determine whether an institution complied with the training mandates in these memoranda, the monitor obtained a copy of all current staff assigned to positions involved in the RVR process at each institution. This list was then compared to the IST reports on which staff members were documented as having attended the required four-hour and one-hour of training sessions. The monitor requested IST reports covering the period from October 1, 2011 through the date of the site visit because this training of both clinical and custody staff was required to be ongoing. Because the training records were institutional "stand-alone" records that may cover training received at other institutions where employees had worked earlier, the monitor used data from the IST Fox Pro tracking system to help ensure completeness and accuracy of the training information.

    4.  <u>Review of Rules Violation Report Cases</u>

At each institution, the monitor reviewed records of sample RVRs issued to MHSDS inmates. These reviews included inmates at all levels of care provided at CDCR institutions, including MHCB, EOP, and 3CMS, as well as inmates who were not within the MHSDS but who were referred for a mental health assessment within the RVR process. Summaries of selected RVR case reviews at the are found in Exhibit A, as noted above. The monitor did not review RVRs issued to CDCR inmate-patients in the inpatient programs run by the Department

of State Hospitals (DSH) which are physically located at the Salinas Valley State Prison (SVSP), the California Medical Facility (CMF), and the California Health Care Facility (CHCF), or in the CDCR-run inpatient programs at the California Institution for Women (CIW Psychiatric Inpatient Program or CIW PIP), or at San Quentin State Prison (SQ) (the SQ Psychiatric Inpatient Program or SQ PIP).

     5.    <u>Staff Interviews</u>

As noted above, the monitor also interviewed staff involved with the RVR process, including Senior Security Officers and clinicians assigned to complete the mental health assessments to be used within the process. The purpose of these interviews was to obtain information on training of staff as well as their understanding of RVR policy, process, impact and value. Information gathered from these interviews was useful for corroborating or refuting the monitor's findings obtained from other sources, including documentation, reports, and mental health assessments provided to the monitor. The monitors also elicited staff recommendations as to how the process may be improved.

## IV.    **FINDINGS OF THE SPECIAL MASTER**

Overall, the monitor found that CDCR institutions had not implemented and sustained the RVR policies and procedures that had been agreed to in 2011, as memorialized in the October 26, 2011 and November 3, 2011 memoranda.  (*See* Exhibits B, C)  Not a single institution could demonstrate that it had implemented and was compliant with the applicable policies and practices in a consistent and thorough manner. This is a disturbing in itself because it demonstrates a pervasive failure of execution of the RVR plan throughout the CDCR system. What is even more disturbing is *that seven and a half years have passed* since CDCR was directly ordered on August 2, 2007 to address this problem (ECF 2345), yet the same

13

deficiencies that the Special Master reported in April 2007 in his Seventeenth Round Monitoring Report, Part B – errors, inconsistencies, inadequate documentation, and mental health input not being taken into consideration in RVR deliberations and dispositions[4] -- were again found by the monitor across institutions over the past several months.  This is unacceptable and must be resolved forthwith.

      A.      <u>**Staff Training was Insufficient**</u>

No institution provided documentation to the monitor indicating that all clinical and custody staff assigned to the RVR process at their institution had received the mandated training per the memoranda.  The training that was occurring was not consistently conducted in a collaborative format, i.e. with custody and clinical being trained together, nor was it being provided on an ongoing basis.

      B.      <u>**Mental Health Assessments Were Not Consistently Written According to Policy or in a Manner that Served Their Intended Purpose**</u>

Generally, mental health assessment forms (*See* Exhibit D) were being requested appropriately and completed timely.  The monitor found that during the review period mental health assessments were being completed within the required timeframes at 24 institutions, Avenal State Prison (ASP), California Correctional Institution (CCI), CHCF, CIW, CIM, CMF, California Men's Colony (CMC), California Rehabilitation Center (CRC), California State Prison/Corcoran (CSP/Corcoran), CSP/Sac, California State Prison/Solano (CSP/Solano), California Substance Abuse Treatment Facility (CSATF), Centinela State Prison (CEN), Correctional Training Facility/Soledad (CTF), Deuel Vocational Institute (DVI), Folsom State Prison (Folsom), High Desert State Prison (HDSP), Kern Valley State Prison (KVSP), North Kern State Prison (NKSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison

---

[4] ECF 2180 at 105-109.

(PVSP), SVSP, SQ, and Valley State Prison (VSP).  However, they were not consistently

completed timely at six institutions, California State Prison Los Angeles County (CSP/LAC),

Central California Women's Facility (CCWF), Mule Creek State Prison (MCSP), Richard J.

Donovan Correctional Facility (RJD), Sierra Conservation Center (SCC), and Wasco State

Prison (WSP).  No inmates were referred for a mental health assessment at four institutions,

California Correctional Center (CCC), Calipatria State Prison (CAL), Chuckawalla Valley State

Prison (CVSP), and Ironwood State Prison (ISP).

 The monitor found numerous mental health assessments ordered for charges that were not

Division A, B or C offenses, with no explanation provided.  It was unclear whether these charges

could draw a SHU term for the inmate, which would justify the completion of a mental health

assessment, since this was not articulated within the RVR.

 Another issue identified during the monitor's review was the problem of clinicians

checking "no" to question number one on mental health assessment forms for inmates to whom a

staff assistant was automatically assigned, e.g., EOP and MHCB inmates.  This also led to

confusion for Senior Security Officers.  This problem was identified at California Institution for

Men (CIM), CSP/LAC, CCWF, KVSP, NKSP, PVSP, and SVSP.  At VSP, clinicians were

found to check "yes" to question number one and offer an explanation as to why a staff assistant

was needed for inmates to whom a staff assistant was automatically assigned.

 There were also various problems with clinicians' explanations on mental health

assessments where question number two was checked "yes," indicating that the inmate's mental

illness contributed to the behavior that led to the RVR.  Some clinicians merely provided the

inmate's diagnosis, while others did not clearly indicate that the inmate's mental illness

contributed to the behavior.  Some clinicians documented what the inmate said rather than

provide an independent clinical opinion, while others would use diagnostic language as opposed to laymen's terms.  In some cases, question number two was checked "no," but the clinician would provide a written response that conflicted with a "no" answer.  The aforementioned problems were found to varying degrees at ASP CHCF, CIM CIW CMF, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/SAC, CSP/Solano, CEN, CCWF, CTF, DVI, HDSP, KVSP, MCSP, PBSP, PVSP, RJD, SVSP, SQ, SCC, and WSP.

The monitor's review also uncovered problems with clinicians' explanations accompanying a "yes" response to question number three.  These included failing to provide any useful information for the Senior Security Officer to consider when assessing a penalty.  The clinicians' responses merely stated the inmate's diagnosis, noted which privileges the inmate did not want to lose instead of providing a clinical opinion, and failed to use laymen's terms, among other problems.  The review also found mental health assessments in which question number three was answered "no," but the clinician still provided a written response, and in some cases, wrote that the inmate was responsible for his or her own actions.  These problems were found to varying degrees at ASP, CIM, CIW, CMF, CMC, CRC, CSP/Corcoran, CSP/SAC, CSP/Solano, CSATF, CEN, CCWF, CTF, DVI, Folsom, HDSP, MCSP, NKSP, PVSP, RJD, SVSP, SQ, VSP, and WSP.

There were cases across the institutions in which the writers of the RVRs referenced the "bizarre, unusual or uncharacteristic behavior" standard with regard to EOP and MHCB inmates or to RVRs for which mental health assessments were automatically required by policy, while the "bizarre, unusual or uncharacteristic behavior" did not apply to cases at those levels of care or to the nature of the charges leveled.  In these cases, this erroneous standard was usually

referenced with stock or canned language, indicating a misapprehension that this standard should be applied regardless of the inmate's LOC or the nature of the charges.

The majority of the mental health assessments found no nexus between the inmate's mental health status and his or her behavior which led to the writing of the RVR. Many clinicians entered inapposite or non-responsive input on the mental health assessment form (CDCR Form 115-MH), or used overly-clinical jargon or conclusory diagnostic language in their responses, which were not informative or useful to Senior Security Officers and ICCs.

Multiple clinicians told the monitor that they considered the mental health assessment form too vague, confusing, and unworkable, often expressing a desire to change the way in which the questions were asked and to increase the amount of space on the form for entry of responses. Several clinicians proposed that the form be presented electronically to overcome problems with legibility of entries and space for responses. A number of Senior Security Officers echoed this concern and suggested solution.

There were problems with documentation of the content of mental health assessments as well as clinicians' responses to all three questions on the mental health assessment form. Illegible writing on mental health assessments was identified as problematic by Senior Security Officers at CSP/LAC, CCWF, and SCC.

## C. Senior Hearing Officers Did Not Properly Take the Clinical Input on Mental Health Assessments into Consideration in their Dispositions of RVRs, or Adhere to Other Applicable Policy

To some degree, all of the institutions noted that mental health input was considered in RVR adjudications. However, in 365 of the RVR cases that were reviewed by the monitor, and which appear within Exhibit A, mitigation in some form occurred in 119 or 33 percent of cases, and no mitigation occurred in 233 or 64 percent of cases. In addition, there were 13 cases in

which it appeared that mitigation might have occurred (*e.g.* assessment of low end of credit forfeitures), but these cases included no references to any mitigation in the decisions or dispositions.  Of the 119 cases in which mitigation was noted, 74 or 62 percent were mitigated based on mental health factors, and 21 cases were mitigated based on other factors (*e.g.* evidentiary grounds).  In addition, there were 24 cases in which the reason for mitigation was not specified or could not be determined.  Institutions where this occurred included PBSP and SVSP.

In many cases, Senior Hearing Officers considered the clinical input on mental health assessment forms in a perfunctory or *pro forma* manner, without appropriately taking the assessment into consideration.  Senior Hearing Officers disregarded or ignored the clinical opinions on the assessments and assessed loss of privileges, including for inmates who were decompensating or in the MHCB, such as at CHCF, CMC, and MCSP.  In some cases they merely noted the existence of mental health input without specifying how the individual assessments were considered. The monitor found that this occurred at ASP, CHCF, CIW, CMF, CMC, CRC, CSP/LAC CSP/Sac, CSP/Solano, CSATF, CCWF, CTF, KVSP, MCSP, NKSP, PVSP, SQ, and WSP.  Instead of utilizing the clinical input, some hearing officers, including those at CMF, CTF, NKSP, and RJD, made gratuitous but unfounded statements that the inmates should be held accountable for their behaviors/actions.

At some institutions, Senior Hearing Officers considered the mental health of the inmate at the time of the hearing, rather than rely on the clinical opinion contained in the mental health assessment.  This was found at CMC, CSP/LAC, NKSP, PVSP, RJD, SVSP and VSP.  The monitor also found various unauthorized *ad hoc* or "homemade" approaches to the mental health assessment aspect of the RVR policy, resulting in penalties not being mitigated, imposition of significant credit losses on MHSDS inmates, increased placement scores, and elevation of

custody levels. The RVR process does not imbue the Senior Hearing Officers with any latitude to override the clinician's mental health assessment and instead apply his or her own "clinical" evaluation of the inmate's mental health status, based on how the inmate appeared to the Senior Hearing Officer at the time of the hearing or at any other time.

Multiple Senior Hearing Officers also referenced the "bizarre, unusual or uncharacteristic behavior" standard to offenses that were charged under Divisions A, B, C or that were SHU-able, even though the Division or SHU-ability of the offense was what warranted the completion of a mental health assessment and not the inmate's "bizarre, unusual or uncharacteristic" behavior. RVRs and decisions also referenced the standard of "bizarre, unusual or uncharacteristic behavior," when such standard was inapplicable due to the LOC of the inmate, such as EOP or MHCB. Institutions which applied the "bizarre, unusual or uncharacteristic" behavior standard in these inappropriate ways included CCI, CRC, CSP/Corcoran, CSP/LAC, CSATF, CCWF, CTF, KVSP, NKSP, PVSP, and SVSP.

In many cases, including at CMF, NKSP, and RJD, where the clinician did not recommend mitigation for mental health reasons, Senior Hearing Officers interpreted this to mean that they were prohibited from mitigating the penalty for any other reason. *This is neither mandated nor intended or implied in any way in the RVR policy.* There appeared to be an underlying sense among a number of Senior Hearing Officers across institutions that a guilty finding necessitated imposition of losses of credit or privileges. In fact, hearing officers clearly had the discretion to reduce charges to administrative violations and not impose credit or privilege losses if they saw fit to do so, regardless of clinical reasons.

The monitor also found a number of cases in which Senior Hearing Officers interpreted the mental health assessment under an "exonerating evidence" standard. That standard is not

provided for in the RVR policy, nor is any "insanity," "incompetency," or "reduced competency" standard either provided for or applicable. Senior Hearing Officers treated mental health assessments as competency exams, rather than examined whether the inmate's mental illness contributed to the behavior that led to the RVR. This was found by the monitor at CCI, CIM, CSP/LAC, CEN, HDSP, KVSP, and SQ.

There were many cases in which Senior Hearing Officers did not adequately document consideration of the mental health assessment in the RVR adjudication, such as at CSP/LAC, CEN, NKSP, and VSP, nor whether or how penalties were mitigated as a result of the assessment. In multiple instances, there was mitigation of penalties, but no indication as to the reason(s) why. Other decisions merely provided a verbatim recitation of the questions and answers on the assessments, for example at VSP. In some decisions, the only indication as to why the inmate was referred for a mental health assessment was the fact that he or she was referred to the ICC for a possible SHU term. This was found at CCI, CSATF, and NKSP.

### D.    Institutional Classification Committees Did Not Consistently Take Mental Health Input into Consideration

During the review, the monitor found very limited documentation of consideration of mental health input or mitigation by ICCs. Typically, ICCs did not disturb the Senior Hearing Officers' penalty assessments and added a SHU term. Consideration of inmate mental health assessments in the ICC review process was reported at CIM, CSP/LAC, CSP/Sac, DVI, HDSP, NKSP, PBSP, PVSP, RJD, SVSP, SQ, SCC, VSP, and WSP. At CRC, CSP/LAC, PBSP, RJD, SVSP, and VSP, ICCs generally considered the input of clinicians who were present at the meetings. At CSP/LAC, references to mental health assessments and clinicians' comments were case/inmate-specific.

ICCs at other institutions including CSP/Sac, DVI, HDSP, NKSP, and SQ considered mental health assessments in a more perfunctory manner, with rote repetition of hearing officers' findings or use of generalized statements and canned language. At NKSP, there was no mention of clinical input at ICC meetings, and at CMF mental health input was minimal. At DVI, mental health input at ICC meetings was not helpful to decisions on inmate housing or transfers. At CMC, there was some indication that mental health input in ICC meetings was reviewed and considered but not with regard to how the information affected ICC action, if at all.

At MCSP and PBSP, ICCs mitigated penalties based on mental health factors. Other institutions mitigated based on other rationales, such as lack of prior disciplinary history at NKSP, absence of prior similar acts at CIM and SVSP, and factors unrelated to mental health at CSP/Sac.

Review of cases at CCI, CIM, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, Folsom, RJD, SVSP, and WSP indicated that their ICCs typically did not mitigate inmate penalties based on mental health input. At CTF, HDSP, and SVSP, ICCs increased SHU terms based on past similar inmate behavior and/or violations.

### E.    The RVR Process Lacks a Quality Improvement Program

At the time of the monitor's review, only one institution – the Richard J. Donovan Correctional Facility (RJD) – had implemented its own local quality control/quality improvement initiative applicable to the RVR process. While RJD still has work to do in some aspects of the RVR process (*see* RJD institutional report, Exhibit A), its robust RVR quality review process is a significant step in the right direction that CDCR might consider as a model process for other institutions and for incorporation into its Continuous Quality Improvement Tool (CQIT).

F.    **Use of Inmate Workers in the RVR Process is Inappropriate**

At several institutions, the monitor found that inmates were performing clerical services in the RVR process.  This practice compromises the confidentiality of the process and related inmate mental health information and should be stopped.

V.    **CONCLUSION AND RECOMMENDATIONS**

This review of the CDCR RVR process found pervasive flaws in the execution of the RVR process that was agreed to in 2011.  The root of the problem appears to have been a breakdown in the training elements of the process.  Most of the failures described above are attributable to staff's lack of understanding of the process and awareness of its purpose.  That purpose is to remedy the problems with defendants' use of inmate disciplinary measures that, as this Court said nearly 20 years ago, were based on its finding that seriously mentally ill inmates "who act out are typically treated with punitive measures without regard to their mental status. *Coleman*, 912 F.Supp. at 1230.  The problem appears to be compounded by the fact that 33 of the 34 CDCR institutions were found to have no quality control/quality improvement mechanism to detect and address lapses in staff training.

The effect of staff noncompliance with the RVR process on MHSDS inmates' mental health is far more than a mere procedural deviation from the plan.  It is serious and can lead to grave consequences for affected inmates.  Inappropriate impositions of loss of credits and SHU terms may exacerbate serious mental illness, leading to decompensation or worse.  If staff training on the RVR process is not completed, both thoroughly and correctly, in the very near future, the Special Master may be forced to recommend that, for at least affected EOP inmates, their RVR dispositions should be overturned.

On October 20, 2015, the Special Master briefed the defendants by teleconference on the monitor's preliminary findings from the RVR review, and offered defendants the opportunity to submit comments.  CDCR submitted written comments to the Special Master on January 9, 2015, indicating that they had already begun undertaking efforts to address these preliminary findings.  These early efforts include (a) revision of the form for requesting a mental health assessment to be used in the RVR process and related training of clinicians on the purpose of the form, (b) development of a clinician's guide to drafting these mental health assessments and a companion guidebook on RVRs for hearing officers, (c) development of a program for institutional tracking of mental health assessments and corresponding RVRs, (d) conduct of regular meetings between institutional mental health and custody management regarding RVR hearings that have required mental health assessments, (e) provision of both separate and joint training to clinicians and custody staff on the new mental health assessment forms and policies, and (f) further refinement of CDCR's quality improvement tool, CQIT, to be used in substantive review of input on the mental health assessment forms, RVR dispositions, and of how Senior Hearing Officers mitigated penalties based on information in the mental health assessments.

To date, it appears that these initiatives have not yet been fully developed or implemented and remain general abstract ideas, albeit good ones.  They do indicate a general awareness, understanding, and willingness on the part of defendants to respond to the problems with the RVR process, for which defendants should be commended and encouraged.  However, vigilance in this area should not abate until the necessary changes have been developed, implemented, and most importantly, sustained, and shown to be a regular, well-functioning part of the RVR process.

The Special Master is also mindful of the numerous ongoing court-ordered remedial projects in which defendants continue to be engaged.  These include:

- Implementation of defendants' recently revised policies on:

    a. Use of force,
    b. Management status, and
    c. Strip searches,

- Completion and execution of defendants' plans to

    a. Limit or eliminate non-disciplinary segregation (NDS) class members from administrative segregation units (ASU) which hold general population (GP) inmates for disciplinary reasons,
    b. Report on levels of compliance with the Program Guide by EOP the administrative segregation hubs (which entails their process for certification of these hubs via audits using their CQIT),
    c. House and provide increased treatment and out-of-cell activities to class members placed in administrative segregation for disciplinary reasons, using of the stand-alone ASUs (to be known as Short-Term Restricted Housing or Short Term Restricted Housing (STRH) and Long-Term Restricted Housing or LTRH), and
    d. Conduct case-by-case reviews of class members in administrative segregation to reduce their lengths of stay there, and to promote their returns to less restrictive and more therapeutic housing environments when they no longer pose any threat to safety and security.

(ECF 5131).  In addition, defendants are about to resume focused work on reducing the number of suicides among CDCR inmates through the vehicle of the court-ordered Suicide Prevention Management Workgroup (ECF 4693), and on improving mental health staffing in CDCR institutions.  (ECF 5171).  Nevertheless, the seriousness of the issues surrounding the process for mental health input into the RVR process calls for immediate attention.

Accordingly, in view of the foregoing, the Special Master requests that the court enter an order directing the following:

1. CDCR shall immediately end the practice of using inmate workers in any aspect of the RVR process.

2.  CDCR shall devise an RVR quality improvement process for incorporation into its Quality Improvement Tool (CQIT) and conduct regular quality improvement reviews of the RVR process, including but not limited to the staff training aspects of the RVR process, in all of its institutions.

3.  Within 243 days, CDCR shall implement, under the guidance of the Special Master, its program of RVR mandatory initial and ongoing training/re-training of all clinical and custody staff who are involved in the RVR process.

4.  Following the 243-day period for implementation of the staff training/re-training program, the Special Master shall conduct a review of staff training/re-training on the RVR process in all CDCR institutions, and shall report to the Court on his findings no later than 90 days after the completion of his review.

Respectfully Submitted,


_____/s/_____
Matthew A. Lopes, Jr., Esq.
Special Master



Date:  January 30, 2015

**Exhibit A**

**California State Prison/Sacramento (CSP/Sac) RVR Review**

**SUMMARY OF FINDINGS**

A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CSP/Sac by completing and sustaining all requirements.

B. CSP/Sac was not compliant with required training of custody and mental health staff related to the RVR process.

C. Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D. Mental health assessments were appropriately requested.

E. Mental health assessments were completed timely.

F. Senior Hearing Officers (SHO) generally noted that mental health assessments were considered and reviewed, but most often in a pro forma manner using canned language.

G. The quality of mental health assessments was poor.

H. There was no formalized quality review of the RVR process at CSP/Sac.

I. The ICC considered mental health input in a pro forma manner.  No mitigation based on mental health factors occurred at the ICC level.


**INTRODUCTION**

On June 9-11, 2014 the Coleman monitoring team reviewed the RVR process at CSP/Sac.  At the time of the visit, CSP/Sac housed Level I and IV inmates, including those housed in the MHCB and those at the EOP and 3CMS levels of care; CSP/Sac also housed EOP inmates in the PSU.  As of March 2014, CSP/Sac had a total inmate population of 2,189, of which 1,299 or 59 percent were caseload inmates.

During the site visit, the team met with the warden, mental health supervisors, SHOs, and the mental health clinician responsible for preparing mental health assessments.

The monitoring team reviewed policies and procedures related to CSP/Sac's RVR process, training materials provided by headquarters, and any local training materials provided by CSP/Sac to staff.  For uniformity purposes throughout all CDCR institutions, the monitors utilized the CSP/Sac Institution Register and CDCR 1154 logs to gather RVR data which was required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections."

The review period covered RVRs issued and/or heard during January, February, and March 2014.  During this time period, as reported in "COMPSTAT," there were a total of 866 RVRs, of which 396 or 46 percent were issued to caseload inmates.

**TRAINING**

CSP/Sac staff was unable to produce a proof of practice memorandum in response to the October 26, 2011 and November 3, 2011 memoranda requirement.  CSP/Sac staff was also unable to produce the approved PowerPoint presentation regarding mental health input in the RVR process.  However, IST produced a report of attendance at the required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda.

CSP/Sac only demonstrated compliance for the one-hour training for facility captains. Sixty-seven percent of CDOs, and 14 percent of lieutenants and sergeants received the one-hour training.  CSP/Sac was also unable to demonstrate compliance for any job classification required to attend the four-hour training; all classifications indicated zero-percent compliance.

CSP/Sac RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 6 | 0/0% | 4/67% |
| Captains | 6 | 0/0% | 6/100% |
| Lieutenants | 29 | 0/0% | 4/14% |
| Sergeants | 51 | 0/0% | 7/14% |
| CC-II Appeals | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

SHOs at CSP/Sac were knowledgeable of the RVR process; they were aware of it from the RVR's issuance through its conclusion with the hearing.  Each facility at CSP/Sac had disciplinary officers who reviewed RVR paperwork and determined whether an assessment was required.  If it was determined that an assessment was required, the request was emailed to the mental health department.  SHOs reported that CDOs indicated meeting with mental health staff to ensure the RVR met criteria.

One SHO stated that he encouraged RVRs to be issued for indecent exposure (IDX) in the hope that their sheer volume would encourage prosecution by the District Attorney.  The effect of this practice was evidenced by the monitors' RVR review, which revealed a high volume of RVRs issued for IDX/sexual misconduct, including to inmates diagnosed with Exhibitionism Not Otherwise Specified (NOS).  Reviewed RVRs revealed that the District Attorney always declined to prosecute, reasoning that administrative remedies were sufficient.

None of the interviewed SHOs were able to articulate any specific formal training regarding the RVR process; only one was a lieutenant in 2011. The majority of SHOs stated that they received on the job training that consisted of the shadowing of an experienced SHO. They also indicated receiving a local RVR process manual designed to guide them through the hearing process.

SHOs generally agreed that mental health assessments were not particularly helpful. One SHO stated that assessments sometimes contained contradictory information. All SHOs reported that some assessments simply noted the inmate's mental disorder and did not render clinical insight into why these disorders should be taken into account and how they may have affected the behavior leading to the RVR. SHOs stated that they were more likely to mitigate based on their own knowledge of the inmate and his behaviors. One SHO in particular stated that he was familiar enough with inmates on his facility that he knew if taking away a certain privilege would be detrimental, whether the assessment stated it or not. Another officer stated that it also depended on the inmate's facility; for example, in the PSU they would not take away yard or phone privileges. Yet another SHO stated that he only mitigated penalties if the clinician recommended such mitigation; this statement was concerning due to what the review revealed regarding the quality of mental health assessments.

**Clinicians**

The monitors interviewed the RVR coordinator, a clinical social worker who was solely responsible for completing mental health assessments for the entire institution. Also present at the meeting was the RVR coordinator's supervisor, who was the senior psychologist supervisor over the mental health assessment process.

The RVR coordinator described the mental health assessment process. He stated that he received assessment requests from the disciplinary officers at each facility. He then had an office technician (OT) perform all inmate background research, such as developmental disability status, caseload statistics, Test of Adult Basic Education (TABE) score, and where housed. Once this information was received, the inmate was interviewed. Following the inmate interview, the RVR coordinator reviewed treatment plans, clinical notes, and medical records. Upon completing the assessment, he faxed or scanned and emailed it back to the CDO.

The RVR coordinator reported never recommending penalty considerations. This was evidenced by the monitors' review of mental health assessments, which showed that penalty considerations were never recommended by the RVR coordinator.

The supervisor reported a good working relationship with SHOs. He indicated that in the past he engaged in conversations with officers on the different yards about the RVR process. The RVR coordinator and his supervisor reported that there was no quality review of the mental health assessments at CSP/Sac. The supervisor specifically added that there was no requirement to do so.

3

**MENTAL HEALTH ASSESSMENT REQUESTS**

Custody staff generally requested mental health assessments as appropriate and per policy. Although CSP/Sac had a large mental health mission, only one clinician was assigned to complete mental health assessments. Despite this, document review did not indicate any problems with timely completion of mental health assessments. Remarkably, some assessments were marked as completed in advance of the deadline and some were marked completed the same day they were submitted to mental health.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

The quality of mental health assessments was generally poor. For many reviewed assessments, including those involving CSP/Sac Inmates E, G, H, J, and L, the clinician responded to questions number two and three in the negative. However, even when the clinician indicated there were factors to consider in response to question number three concerning penalty assessment, the information provided was nonresponsive and not helpful to the SHO, as the cases involving CSP/Sac Inmates A, B, C, D, and F indicated. Clinicians also regularly used canned language in answering question number three. Such responses included, "the inmate has a serious and persistent mental disorder," "the inmate has a serious thought disorder," "the inmate has a TABE score less than 4.0," "the inmate is under a Keyhea Order" and "the inmate's TABE score is not listed." (*See*, CSP/Sac Inmates A, B, C, D, and F).

Further, for IEX cases, the clinician often simply noted the inmate's diagnosis in response to questions number two and three. CSP/Sac Inmate M was assessed 382 days forfeiture of credits during a three month period for multiple IEX offenses and on the mental health assessment, the clinician repeatedly provided that he was being treated for Exhibitionism.

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

SHOs typically noted consideration of the mental health assessment in the RVR process, but often in a pro forma manner that used canned language. Moreover, as was the case with CSP/Sac Inmates B, E, F, G, H, I, K, and L, SHOs often did not indicate how the mental health assessment was considered and applied.

The poor quality of assessments also made it difficult to understand how assessments were considered; this also resulted in the mental health assessment not effectively providing recommendations or guidance concerning penalty assessment to the SHO, as was the case with CSP/Sac Inmates A, B, C, D, F, and I. It also appeared that any mitigation was less likely due to the mental health assessment and more likely attributable to SHO's personal knowledge of inmate behavior and mental health status. As noted above, during the monitor's interview of SHOs, it was indicated that they at times mitigated penalties based solely on their personal knowledge of inmates and their behavior. There were also cases, such as those involving CSP/Sac Inmates E and J, where the SHO applied a standard interpreting the clinician's finding that there were no mental health factors to consider to mean that the SHO was barred from

4

considering mental health issues in mitigating the penalty.  Penalty mitigation was typically in the form of assessing the low end of credit forfeiture.

The monitors also reviewed the case of CSP/Sac Inmate O, where the clinician indicated suicidal behavior, but protocols for writing RVRs for suicide attempts were not mentioned.  The SHO also failed to address the issue of suicidality in the RVR.

## ICC REVIEW

The monitors reviewed files of inmates who received RVRs during the monitoring period where there was subsequent ICC action.  ICC actions typically indicated consideration of mental health input with regard to SHU term assessments, although this generally occurred with the use of canned language.  Such statements included the following: "The treating clinician presented ICC with a mental health assessment that included Subject's LOC, treatment needs, ability to understand/participate in the hearing, and effects of his psychological state will not decompensate if ordered retained in segregated housing."

Typically, the mental health determination at the ICC was that there were no mitigating mental health factors to consider in SHU term assessment.  There were several cases, however, where the ICC nonetheless chose to mitigate based on factors unrelated to mental health.

## QUALITY REVIEW

There was no formalized quality review of the RVR process at CSP/Sac.  The senior psychologist supervisor reported that there was no requirement for them to implement one.

### CSP/Sac RVR Case Reviews

**<u>Inmate A</u>**
Date of Violation:  1/19/14
Date of Mental Health Assessment:  2/3/14
Date of Disposition:  2/24/14
Charge:  Fighting – Division D Offense

On 1/19/14, this EOP inmate was involved in a fight with his cellmate.  A mental health assessment was completed on 2/3/14 with questions number two and three answered in the affirmative.  The answer to question number two stated that "The inmate has on-going thinking disturbances which may have contributed to the behavior that led to the RVR."  The answer to question number three stated "The inmate is under Keyhea Orders due to danger to others."  The inmate appeared before the SHO on 2/24/14 for a hearing and pleaded guilty.  The SHO found him guilty and based on the mental health evidence, mitigated to the lower end of the disciplinary credit forfeiture and assessed 61 days loss of behavior/work credits and referred the inmate to the Unit Classification Committee (UCC).

The SHO mitigated based on mental health factors.  However, the assessment did not use conclusive language in the answer to question number two by stating that the inmate's mental

health factors "may have contributed" to the behavior. The answer to question number three also provided no recommendation or guidance for the SHO when assessing the penalty.

**Impression:** There was mitigation in this case. The SHO reported considering the mental health assessment and mitigating the penalty to a lower credit forfeiture. The inmate was assessed significant credit and privilege losses. The mental health assessment did not provide recommendations or guidance to the SHO regarding penalty assessment.

## Inmate B
Date of Violation: 2/13/14
Date of Mental Health Assessment: 2/19/14
Date of Disposition: 3/12/14
Charge: Obstructing a Peace Officer in the Performance of their Duties/Refusing to Accept Assigned Housing - Division D Offense

On 2/13/14, this EOP inmate was in a holding cell and informed the officer that he would not go back to his cell; he provided no reason for refusing to return to his cell. A mental health assessment was completed on 2/19/14 with questions number two and three answered in the affirmative. The answer to question number two stated that "The inmate stated he did not understand a previous 115 punishment which no consistent for a Developmentally Disabled I (DDI) designated inmate." The answer to question number three stated that "The inmate also has a low TABE score." The inmate appeared before the SHO at a hearing held on 3/12/14. The SHO took the mental health assessment into consideration. The inmate was found guilty and assessed 90 days loss of credit, in addition to loss of vendor packages, telephone privileges, and personal property for 45 days.

The assessment provided no guidance for the SHO upon which to mitigate the charges. The answers to questions number two and three were inadequate and did not address the actual questions.

**Impression:** There was no mitigation in this case. The SHO reported considering the mental health assessment, but did not indicate how it was considered and applied, and did not specifically address the issue of mitigation. The mental health assessment did not provide recommendations or guidance to the SHO regarding penalty assessment. The inmate was assessed significant credit and privilege losses.

## Inmate C
Date of Violation: 1/17/14
Date of Mental Health Assessment: 1/29/14
Date of Disposition: 2/13/14
Charge: Disobeying a Direct Order – Division F Offense

On 1/17/14, while being escorted from the treatment center, this EOP inmate stepped out of line and refused to get back into line. A mental health assessment was completed on 1/29/14 with questions number two and three answered in the affirmative. The answer to question number two stated that "The inmate was not taking his prescribed medication at the time of his incident

which because of his underlying disorder, contributed to the behavior." The answer to question number three stated that "The inmate is designated as DDI and he tends to minimize his cognitive deficit and may have misinterpreted his order." The inmate appeared at the hearing before the SHO on 2/13/14 and was found guilty. Due to his mental health status, the SHO reduced the penalty by five days and assessed 25 days loss of credit under a Division F offense. He also assessed loss of canteen, appliances, vendor packages, telephone privileges, and personal property privileges for 90 days, and loss of yard for ten days.

Although questions number two and three on the assessment were answered, the answer to question number three was actually just a continuation of the answer to question number two. The clinician did not adequately answer question number three by failing to identify any factors that should be considered when assessing a penalty.

**Impression:** There was mitigation in this case. The SHO reported considering the mental health assessment and specifically addressed the issue of mitigation. The mental health assessment did not provide recommendations or guidance to the SHO regarding penalty assessment. The inmate was assessed credit and privilege losses.

**Inmate D**
Date of Violation: 2/13/14
Date of Mental Health Assessment: 2/19/14
Date of Disposition: 3/14/14
Charge: Resisting a Peace Officer Resulting in the Use of Force – Physical - Division D Offense

On 2/13/14, while escorting this EOP inmate back to his cell, the inmate refused to walk up the steps to the second tier and stated that he wanted to go to administrative segregation. The officers physically restrained the inmate in leg restraints. A mental health assessment was completed on 2/19/14 with questions number two and three answered in the affirmative. The answer to question number two stated that "The inmate reports he did not understand why he needed to go back to his cell. This concrete thinking is consistent with DDI." The answer to question number three stated that "The inmate in addition to being DDI, has a low TABE score." On 3/14/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. The SHO assessed 61 days credit forfeiture; the lower credit forfeiture was based on the inmate's current LOC and program. There was no loss of privileges.

Although questions number two and three on the mental health assessment were answered, the answer to question number three was actually just a continuation of the answer to question number two. The clinician did not adequately answer question number three by failing to identify any factors that should be considered when assessing a penalty.

**Impression:** There was mitigation in this case. The SHO reported considering the mental health assessment and specifically mitigated by imposing the lower end of the penalty range. The mental health assessment did not provide recommendations or guidance to the SHO regarding penalty assessment. The inmate was assessed credit and privilege losses.

**Inmate E**
Date of Violation:  1/22/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  2/26/14
Charge:  Refuse to Provide Urine Sample for Mandatory Testing – Division F Offense

On 1/22/14, this EOP inmate refused to submit to a mandatory urine test.  A mental health assessment was completed on 2/5/14 with questions number two and three answered in the negative.  On 2/26/14, the inmate appeared before the SHO for a hearing and was found guilty.  The SHO considered the mental health assessment and assessed 30 days credit forfeiture.

The SHO misinterpreted the language in question number three of the mental health assessment.  The interpretation was that the SHO should not consider the inmate's mental health disorder prior to assessing the penalty.  By answering "no" to question number three, the mental health clinician was simply stating that in his/her opinion, there were no mental health factors to consider when assessing a penalty.  The SHO interpreted this as a blanket prohibition against considering any mental health issues.

**Impression:** There was mitigation in this case.  The SHO reported considering the mental health assessment, but did not explain how it was considered.  The SHO applied a standard interpreting the clinician's finding that there were no mental health factors to consider to mean that the SHO was barred from considering mental health issues in mitigating penalty.

**Inmate F**
Date of Violation:  1/9/14
Date of Mental Health Assessment:  1/24/14
Date of Disposition:  1/28/14
Charge:  Refusing to Accept Assigned Housing – Division D Offense

On 1/9/14, this EOP inmate refused to accept another inmate in his cell and further stated that he refused to cell with anyone.  A mental health assessment was completed on 1/24/14 with questions number two and three answered in the affirmative.  The answer to question number two stated that "The inmate has a serious and persistent mental disorder and his functioning appears have be declining around the time of the RVR, which contributed to behavior."  The answer to question number three stated that "The inmate has a low TABE score."  On 1/28/14, the inmate appeared at the hearing.  The SHO considered the mental health assessment and found the inmate guilty.  The SHO assessed 90 days loss of credit and loss of canteen, appliances, vendor packages, telephone privileges, and personal property for 90 days.

Although assessment questions number two and three were answered in the affirmative, the answer to question number three was actually just a continuation of the answer to question number two.  The clinician did not adequately answer question number three by failing to identify any factors that should be considered when assessing a penalty.

**Impression:** There was no mitigation in this case.  The SHO reported considering the mental health assessment, but did not explain how it was considered.  The mental health assessment did

not provide recommendations or guidance to the SHO regarding penalty assessment. The inmate was assessed significant credit and privilege losses.

## Inmate G
Date of Violation:  2/20/14
Date of Mental Health Assessment:  3/14/14
Date of Disposition:  4/29/14
Charge:  Battery on Inmate Resulting in Use of Force – Division D Offense

On 2/20/14, this EOP inmate was involved in an altercation with two other inmates on the yard. A mental health assessment was completed on 3/14/14 with questions number two and three answered in the negative.  On 4/29/14, the inmate appeared at the hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The SHO assessed zero days loss of credit due to the failure to abide by the time constraints, but referred the inmate to the ICC for a SHU assessment.

**Impression:** There was no mitigation in this case.  The SHO reported considering the mental health assessment, but did not explain how it was considered.  The SHO could not impose credit loss because of time constraints.

## Inmate H
Date of Violation:  3/4/14
Date of Mental Health Assessment:  3/18/14
Date of Disposition:  4/3/14
Charge:  Disobeying Orders - Division F Offense

On 3/4/14, this EOP inmate asked for alternative housing.  He was offered three different cellmates, but refused all three and said that he could only house alone even though he was double-cell compatible.  A mental health assessment was completed on 3/18/14 with questions number two and three answered in the negative.  On 4/3/14, the inmate appeared for the hearing. The SHO considered the mental health assessment and stated that clinical staff indicated that the inmate's behavior may have been influenced by mental illness.  It is unclear how this clinical information was provided to the SHO since the mental health assessment did not state any such concerns.  The SHO found the inmate guilty and assessed 30 days loss of credit.

**Impression:** There was no mitigation in this case.  The SHO reported considering the mental health assessment, but did not explain how it was considered.  The SHO reported that clinical staff found that the inmate's behavior may have been influenced by mental health factors, but did not state how the information was obtained since it was not contained in the mental health assessment.  The inmate was assessed credit loss.

**Inmate I**
Date of Violation:  1/1/14
Date of Mental Health Assessment:  1/17/14
Date of Disposition:  1/30/14
Charge:  Threats Against a Peace Officer - Division B Offense

On 1/1/14, this EOP inmate threatened to stab an officer in the housing unit.  A mental health assessment was completed on 1/17/14 with questions number two and three answered in the affirmative.  The answer to question number two stated that "The inmate has a serious mood disorder which likely contributed to the behavior that led to the RVR."  The answer to question number three stated that "The inmate has a treatment goal to reduce the number of RVRs which has been a chronic problem, is prescribed psychotropic medications, and is under a Keyhea Order."  On 1/30/14, the inmate appeared at the hearing before the SHO.  The SHO considered the mental health assessment, but found the inmate guilty.  The SHO assessed 121 days loss of credit forfeiture, five days confined to quarters, and referred the inmate to the ICC for a SHU assessment.

The mental health assessment did not provide direction for the SHO regarding penalty mitigation.  Rather, the answers provided more of a diagnosis than a tool that the SHO could use.  The clinician did not properly address the questions.  The answer to question number two also was not definitive in determining whether mental illness contributed to the behavior.

**Impression:** There was no mitigation in this case.  The SHO reported considering the mental health assessment, but did not explain how it was considered.  The mental health assessment did not provide recommendations or guidance to the SHO regarding penalty assessment.  The inmate was assessed significant credit loss.

**Inmate J**
Date of Violation:  1/30/14
Date of Mental Health Assessment:  2/12/14
Date of Disposition:  3/1/14
Charge:  Obstructing a Peace Officer in the Performance of their Duties/Refusing to Accept Assigned Housing - Division D Offense

On 1/30/14, this EOP inmate was being escorted to his new housing unit when he refused to move to the new unit.  A mental health assessment was completed on 2/12/14 with questions number two and three answered in the negative.  On 3/1/14, the inmate appeared before the SHO for a hearing.  The SHO considered the mental health assessment and found the inmate guilty.  The SHO assessed the inmate 90 days loss of credit forfeiture and loss of personal property for 180 days, and referred him to the ICC for assessment of a SHU term.

The SHO used canned language in his consideration of the mental health assessment that he should not consider the inmate's mental health disorders prior to assessing the penalty.  The SHO interpreted the answer to question number three as a prohibition against considering the inmate's mental health status in his decision.

**Impression:** There was no mitigation in this case.  The SHO reported considering the mental health assessment, but did not explain how it was considered.  The SHO applied a standard interpreting the clinician's finding that there were no mental health factors to consider to mean that the SHO was barred from considering mental health issues in mitigating the penalty.

## Inmate K
Date of Violation:  3/28/14
Date of Mental Health Assessment:  4/8/14
Date of Disposition:  4/29/14
Charge:  Threatening Staff - Division E Offense

On 3/28/14, this EOP inmate was yelling from his cell at the officer securing the food ports.  The inmate used profanity and stated that he would physically assault her.  A mental health assessment was completed on 4/8/14 with questions number two and three answered in the affirmative.  The answer to question number two stated that "The inmate's acute psychotic presentation which is the result of his mental disorder contributed to his misbehavior."  The answer to question number three stated that "The inmate's disorder is acute and serious (and persistent)."  On 4/29/14, the inmate appeared before the SHO.  The SHO considered the mental health assessment and found the inmate guilty of a lesser offense based on the evidence presented and not on the inmate's mental health status.  The SHO assessed the inmate a credit loss of 30 days and referred him to the ICC.

The clinician used canned language in the mental health assessment and did not answer the questions adequately.  The answer to question number three was simply a continuation of the answer to question number two; it was also a regurgitation of a stock diagnosis used in multiple mental health assessments written by this clinician.  However, the language used in the answer to question number two was definitive regarding the mental illness contributing to the behavior.

**Impression:** There was mitigation in this case.  The SHO reported considering the mental health assessment, but did not explain how it was considered.  The SHO found the inmate guilty of a lesser offense based on the evidence presented, but not based on the mental health assessment.  The clinician's mental health assessment was not responsive and employed stock language.

## Inmate L
Date of Violation:  1/17/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  2/21/14
Charge:  Battery on an Inmate with Serious Bodily Injury – Division A Offense

On 1/17/14, this EOP inmate was involved in a fight with his cellmate.  Both inmates refused to comply with orders to cease fighting and were sprayed with OC.  A mental health assessment was completed on 2/5/14 with questions number two and three answered in the negative.  On 2/21/14, the inmate appeared for a hearing before the SHO and was found guilty.  The SHO considered the mental health assessment.  The SHO assessed the inmate 360 days loss of credit under a Division A-1 offense and referred him to the ICC for a SHU assessment.

**Impression:** The SHO reported considering the mental health assessment, but did not explain how it was considered. The SHO did not speak to mitigation. The inmate was assessed significant loss of credit.

**Inmate M**
Date of Violation:  3/11/14 (three days after previous RVR for sexual misconduct IEX with masturbation)
Date of Mental Health Assessment:  3/21/14
Charge:  IDX with Prior Convictions - Division D Offense

The charge of IDX with Prior Convictions on 3/11/14 was based on the fact that this inmate had also received four other RVRS in January and February 2014 for IDX prior to this charge, as follows:

1. 1/2/14:  IDX – Mental health assessment noted "yes" for question number two and the clinician explained by simply noting the inmate had a diagnosis of Exhibitionism.  The clinician answered "no" to question number three.  The inmate was found guilty, but the offense was reduced from a Division D to a Division B offense.  He was assessed 61 days loss of credit and 180 days loss of privileges.  The SHO stated that the "SHO chooses to hold him accountable for his actions, but chose to mitigate the loss of credit forfeiture due to the mental health assessment."

2. 2/2/14:  IDX with Masturbation – The inmate was found guilty of a Division B offense.  He was assessed 121 days loss of credit and 90 days loss of all privileges.  A mental health assessment was completed and noted that the inmate's diagnosis of Exhibitionism led to the behavior.  The response to question number three noted that the inmate was being treated for Exhibitionism and a serious mental disorder.  The SHO also noted mitigation of the credit forfeiture to the lower end for a Division B offense based on the mental health assessment.

3. 2/7/14:  This incident occurred in the Correctional Treatment Center (CTC) but the inmate was noted to be at the EOP LOC, and not housed in the MHCB.  However, this IDX incident was not issued within 15 days of the incident as the inmate was housed in the MHCB at MCSP.  He was found guilty.  The SHO noted review of the mental health assessment and "chooses to hold … accountable for his actions."  There was no mention of any mitigation and the inmate was assessed zero days forfeiture of credits (lost time constraints) but assessed 180 days loss of all privileges.

4. 2/8/14:  The inmate was in the CTC but it was stated that he was at the EOP LOC.  The charge was for sexual misconduct.  The inmate was rubbing his genital area during a clinical treatment session.  The clinician noted in answering question number two that the inmate had an Exhibitionism diagnosis.  In response to question number three, it was noted, "in addition, the inmate has a serious thought disorder."  The inmate was found guilty, but no loss of credit could be assessed due to lost time constraints.  The SHO indicated consideration of the mental health assessment and stated, "SHO chooses to hold … accountable for his actions but chooses to mitigate the privilege loss due to the mental

12

health assessment …." The inmate was assessed five days loss of yard privileges and 180 days loss of canteen, property, vending, packages, appliances and telephone.

The ICC had not heard any of the above cases at the time of the site visit.

On 3/11/14 while in the MHCBU on suicide watch, the inmate stood on his sink and masturbated while looking at the CNA who was performing his suicide watch. A mental health assessment was completed and the clinician noted "yes" in response to questions number two and three. In answering question number two, the clinician reported, "The inmate has a diagnosis of exhibitionism," and for question number three it was stated, "The inmate is being treated for exhibitionism"

The inmate was found guilty. He was assessed 90 days forfeiture of credit, loss of all privileges for 180 days, referred to the ICC for SHU review, and referred to the DA. The SHO noted that the mental health assessment was reviewed and taken into consideration. Upon review, the CDO mitigated the credit loss to 80 days.

**Impression**: There was mitigation in the loss of credit forfeiture in two of the five cases due to mental health reasons. Two cases were outside of time constraints and thus prohibited imposition of credit forfeiture, and in one the CDO reduced the credit forfeiture. The mental health assessment was completed timely in each case and the SHO noted review and consideration of the assessments. The clinician's responses to the questions in the mental health assessment did not assist the SHO other than to restate the inmate's diagnosis, and did not provide adequate factors for consideration by the SHO. It was observed that the inmate received multiple RVRs and accumulated significant loss of credit and loss of multiple privileges for long periods of time for behavior consistent with his mental health "diagnosis" for which he was receiving treatment. During a three month period, the inmate was assessed 382 days loss of credit and thereby significantly extended his sentence.

**Inmate N**
Date of Violation: 3/5/14
Date of Mental Health Assessment: 3/18/14
Charge: Obstructing a Peace Officer Resulting in Use of Force (OC) – Division D Offense

On 3/5/14, when the unit sergeant went to the inmate's cell to explain the IEX placarding procedure, the inmate was papering his cell windows and told the sergeant to get away. The sergeant notified the lieutenant and the psychologist who both spoke with the inmate with negative results. An extraction team was assembled and Oleoresin Capsicum (OC) use was cleared. The inmate submitted to cuffs after the OC was administered into his cell. The evidence summary for the RVR noted that the inmate would not comply with staff's order to remove his smock that was smeared with feces and he would not come out of his cell to receive his court ordered medication.

A mental health assessment was completed and the clinician answered "no" to questions number two and three. The inmate was found guilty and assessed 90 days loss of credit.

**Impression:** There was no mitigation in this case.  It was observed that although the inmate was housed in the MHCB, covered in his own feces, was covering his windows, and would not come out for his Primary Clinician (PC) 2602 medication, the clinician nonetheless found that his mental illness did not appear to contribute to the behavior that led to the RVR.  The inmate was assessed significant credit forfeiture.

### Inmate O
Date of Violation:  3/17/14
Date of Mental Health Assessment:  4/2/14
Charge:  Arson – Division A-2 Offense

On 3/17/14, while on suicide precaution, the inmate put a paper clip into the light switch in his MHCBU cell, which was not retrofitted for suicide safety, found a "hot wire," and arched it onto a torn blanket.  Once the blanket caught fire, he threw it onto a pile of linen including a blanket, smock, and his mattress.  Staff used a fire extinguisher through the food port to extinguish the fire and the inmate was cuffed, lifted to his feet, and escorted out of the cell.  Staff removed the smock that the inmate had wrapped around his face.

The clinician who completed the mental health assessment answered questions number one and two in the affirmative.  For question number two, the clinician noted, "The inmate stated the fire was for the purpose of a suicide attempt and reported to his psychiatrist that hopefully the smoke kills me."  For question number three, the clinician reported, "The inmate has a serious and persistent mental disorder which limits his ability to make reasonable and sound judgments.  He is under a Keyhea order for forced medication due to danger to others."

The SHO referenced the mental health assessment in the additional comments section of the RVR and wrote, "The information provided by clinical staff indicates that … mental disorder did appear to contribute to the behavior that led to the Rules Violation Report.  Information provided by clinical staff has been reviewed and taken into consideration during this CDCR 115 hearing in the disposition of this CDCR 115.  This SHO chooses to hold him accountable for his actions."  This canned language was found in other reviewed RVRs at CSP/Sac.

The inmate was found guilty and assessed 150 days loss of behavioral credit and loss of all privileges for 90 days.  He was also referred to the ICC for SHU review and to the District Attorney for prosecution.

**Impression**: There was no mitigation in this case.  Both the SHO and clinician used canned language in their reports and assessments.  It was observed that although the inmate was under suicide precaution, and the clinician reported that he was under a forced medication order and that his mental disorder did contribute to the behavior, the SHO indicated that the inmate would be held "accountable."  It was also observed that the incident happened in a non-retrofitted cell.  Significantly, there was no consideration of the statement that the inmate was attempting suicide and neither the clinician nor the SHO addressed this issue.  The inmate was assessed significant credit and privilege losses.

**Folsom State Prison (Folsom) RVR Review**

## SUMMARY OF FINDINGS

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at Folsom by completing and sustaining all requirements.

B.  Folsom was not compliant with required training of custody and mental health staff related to the RVR process.

C.  Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D.  Although the quality of mental health assessments was generally adequate, the review revealed an incomplete assessment which offered no explanation as to how the inmate's mental disorder contributed to the behavior that led to the RVR or what mental health factors should be considered in assessing the penalty as per policy.

E.  Generally, mental health assessments were appropriately requested and timely completed, and SHOs indicated consideration of mental health assessments.

F.  Mitigation based on mental health input occurred at Folsom.

G.  Mental health and custody staff reported a collaborative relationship with effective communication.

## INTRODUCTION

On June 12-13, 2014, the Coleman monitoring team reviewed the RVR process at Folsom. At the time of the site visit, Folsom housed Level I and II inmates, including those requiring 3CMS LOC. Folsom also housed the Folsom Women's Facility (FWF), which housed women at custody Levels I, II, and III, and had recently been approved to house 3CMS inmates. As of March 2014, Folsom had a total inmate population of 3,212, of which 751 or 23 percent were on the mental health caseload.

During the site visit, the monitoring team conducted entrance and exit meetings with the warden, CEO and other executive staff, and interviewed SHOs and mental health clinicians responsible for completing mental health assessments.

The review period covered RVRs issued and/or heard during January, February, and March 2014. During this period, a total of 311 RVRs were issued, with 75 or 24 percent issued to caseload inmates. With the exception of Unit 2, which also maintained a handwritten log, all Folsom facilities used an electronic log to track RVRs. Staff indicated that the electronic log was accessible from any computer at Folsom. For quality assurance purposes, sergeants conducted bi-weekly reviews, which included printing and signing off on hard copies of the

electronic log.  However, the form used to maintain Unit 2's handwritten log was out-of-date and lacked a column that indicated mental health status or whether a mental health assessment had been requested.

**TRAINING**

Folsom staff produced a proof of practice memorandum dated January 25, 2012 as required by the October 26, 2011 and November 3, 2011 memoranda.  Staff also provided an IST sign-in sheet dated January 18, 2012 for 30 minutes of training received by seven mental health staff on Inmate Disciplinary Process Mental Health Assessment Training; this training appeared to be in response to the November 3, 2011 requirement.  Staff also provided reports of training for mental health clinical staff dated June 4 and June 10, 2014 regarding the mental health assessment process.  These training sessions were reported as 15 minutes and 30 minutes, and were attended by 13 mental health clinical staff.

IST produced a report of attendance at the required training sessions for each job classification, which indicated training sessions ranging from 30 minutes to three hours.  The report also identified multiple dates when training was provided; to determine compliance when multiple dates were indicated, the total number of training hours was counted.

Folsom was unable to demonstrate compliance for required trainings for required personnel.  The CDOs, lieutenants, psychiatrists, psychologists, social workers, and appeals coordinator did not receive the required four-hour training regarding mental health assessments and the RVR process, while it was received by two percent of sergeants.  Data indicated that 67 percent of CDOs, psychiatrists, psychologists, and social workers, 70 percent of lieutenants, and 60 percent of sergeants received the required one-hour training.

Folsom RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 6 | 0/0% | 4/67% |
| Lieutenants | 27 | 0/0% | 19/70% |
| Sergeants | 62 | 1/2% | 37/60% |
| Psychiatrists | 3 | 0/0% | 2/67% |
| Psychologists | 3 | 0/0% | 2/67% |
| Licensed Social Workers | 2 | 0/0% | 2/100% |
| MSW | 1 | 0/0% | 0/0% |
| CC-II Appeals | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

The monitoring team conducted several custody and mental health staff interviews on the first day of the site visit.  Eleven SHOs from second and third watch and eight clinicians who were responsible for completing mental health assessments were interviewed.  Eight OTs were also present during the clinician interviews.

**SHOs**

      All of the SHOs demonstrated knowledge of both the RVR and mental health assessment processes.  In addition to the standard policy request for a mental health assessment, SHOs indicated that if an inmate who had otherwise not been referred for a mental health assessment exhibited bizarre or unusual behavior during the hearing, the hearing would be halted and the inmate would be immediately referred for an assessment.  One SHO expressed concern with time constraints for EOP inmates.  Although policy required that the hearing take place within 30 days of the date of discovery, mental health staff had 15 days to complete the mental health assessment for EOP inmates, but only five working days to complete it for 3CMS inmates.  This left only 15 days for SHOs to complete preparation for and conduct the hearing.  However, other SHOs were not concerned with this issue, as Folsom housed very few EOP inmates.  SHOs also all agreed that there were no timeliness concerns with returning completed mental health assessments and that they generally received them within three days of the request.

      All SHOs agreed that they had the authority to mitigate or dismiss an RVR.  They generally felt that mental health input was valuable to the process, as it had the potential to be good supporting evidence as to whether mitigation was warranted.  As to penalty assessment, SHOs indicated that they would take mitigation into consideration, and assign penalties accordingly, in those instances where the clinician suggested mitigation.  Clinicians were stationed near the SHOs, which made it easy to contact them if further clarification was needed.  Communication between the two groups was reported to be sound.  Furthermore, when asked, none of the SHOs offered any recommendations to improve the RVR and assessment process, indicating that it worked well.

**Clinicians**

      The monitors were informed that a QIT regarding the 2011 policy change had been assembled the day before the site visit.  Similar to the SHOs, clinicians demonstrated competent knowledge of the assessment process.  When an assessment request was received, the chief of mental health logged and stamped it "received" and forwarded it to the OT for scheduling.  The assigned clinician then interviewed the inmate, reviewed the Electronic Unit Health Record (eUHR) for mental health history, and prepared a progress note for the medical record.  The completed assessment was returned to the OT, who contacted the disciplinary officer to pick it up.  Staff indicated that the disciplinary officer made regular visits to mental health to pick up completed assessments or to drop off assessment requests.

      Clinicians generally expressed displeasure with the policy change that required 3CMS inmates to also be referred for a mental health assessment depending on the Division offense.  They felt this additional requirement diluted the process; in the majority of these cases they were not finding that mental health contributed to the behavior that led to the RVR.  Clinicians' recommendations to improve the RVR process included revising current policy so that 3CMS inmates only received mental health assessments for exhibiting bizarre or unusual behavior, and adding additional space on box number three of the assessment to explain penalty considerations.

Clinicians agreed with SHOs that there was open communication between custody and mental health staff. Some also acknowledged having been directly contacted regarding mental health assessments.

**MENTAL HEALTH ASSESSMENT REQUESTS**

Staff reported that the CDO hand-delivered requests for mental health assessments. Upon receipt of the assessment request, the chief of mental health entered it into the tracking log, stamped it "received" and then forwarded it to the OT for scheduling. Following completion, the mental health assessment was returned to the OT, who contacted the CDO for the assessment to be picked up.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

The monitors' review indicated that mental health assessments were requested as per policy. Most reviewed assessments also revealed the clinician noted that the inmate's mental disorder did not contribute to the behavior that led to the RVR and there were no mental health factors to consider for penalty assessment. Where clinicians reported that mental health factors contributed to the inmate's behavior and there were thus mental health factors to consider in penalty assessment, the provided mental health information offered for consideration was documented in layman's terms.

The mental health assessment for Folsom Inmate C was poorly written. Although the clinician answered "yes" to question number two to indicate the inmate's mental disorder appeared to contribute to the behavior that led to the RVR, there was no further explanation. The clinician also responded positively to question number three, indicating there were mental health factors the SHO should consider in penalty assessment, but only stated further that the inmate was now at the EOP LOC. The SHO noted that evidence of mental illness was insufficient to exonerate the inmate, but considered it during penalty assessment. For refusing assigned housing, the inmate was assessed 90 days loss of credits and privileges, including canteen, appliances, telephone, and quarter packages.

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

The monitors typically found, as was the case with Folsom Inmates D, E, F, G, H, I, J, and K, that SHOs noted consideration of the mental health assessment. However, there were cases, such as that of Folsom Inmate A, where the SHO did not indicate consideration of the mental health assessment. There were also instances, such as for Folsom Inmate B, where the SHO mitigated the RVR by dismissing it as a result of the assessment. The dismissed RVR for Folsom Inmate B was issued to him for resisting staff, which required the use of force.

The monitors also reviewed a case in which a mental health assessment was properly requested and completed, but the SHO was unaware of it (*See* Folsom Inmate L), for a Division C offense. At the hearing, the SHO indicated that a mental health assessment had not been completed because the behavior was not bizarre, unusual, or uncharacteristic. This was

concerning and raised the question of whether the SHO had been properly trained as to policy and procedure.

**ICC REVIEW**

Three cases referred to the ICC were reviewed.  In the case of Folsom Inmate F, the inmate had been discharged from the mental health caseload prior to the ICC.  In the case of Folsom Inmate D, mental health input appeared minimal, except for the inmate's current mental health status and consideration of whether the recommended placement would result in decompensation.  Neither case indicated mitigation based on mental health concerns.  With respect to Folsom Inmate C, the inmate had been transferred to an MHCB at another institution, where the ICC took place.  During the ICC, the inmate's psychiatric status and treatment needs were reviewed.  The ICC recommended referral to CSR for transfer to DSH for placement at the intermediate LOC.


**Folsom RVR Case Reviews**

**Inmate A**
Date of Violation: 1/10/14
Date of Mental Health Assessment:  Not Available for Review
Date of Disposition: 3/6/14
Charge:  Battery on Peace Officer – Division B Offense

On 1/10/14 the inmate was extracted from his cell.  The reason for the cell extraction was not stated within the body of the RVR.  During the extraction process, the inmate bit an officer's finger while the officer was attempting to cut the inmate's shirt off of his body.  The RVR did not state why the inmate's shirt had to be cut off.

A copy of the mental health assessment was not provided as part of the RVR package.  As a result, the statements included in the RVR will be used as the source document.  The RVR stated the mental health assessment was completed because the behavior was considered to be bizarre, unusual, or uncharacteristic.  Based on the inmate not being on the caseload at the time of the incident, the reason for the referral was appropriate.  A mental health assessment was completed on 2/10/14 with all three questions answered in the affirmative.  The RVR did not report what, if any written comments were provided for any of the three questions.

The RVR was heard on 3/6/14 at CHCF, as the inmate had transferred there for ICF LOC within the DSH program on 2/19/14.  A staff assistant was assigned and the inmate was present at the hearing, at which time he plead not guilty, stating, "I don't remember any of the incident."

The SHO found the inmate guilty and assessed zero days loss of credit as a result of a due process violation.  The due process violation was that the initial RVR was not issued to the inmate within 15 days of the incident.  The inmate was also referred to the ICC for SHU consideration.  At the time of this review, the ICC had not taken any action on the SHO's referral.

19

**Impression:** The RVR did not adequately state when the inmate changed from a non-caseload inmate to the ICF LOC, resulting in placement into the DSH program. The SHO did not state the consideration or mitigation as a result of the mental health assessment information. Additionally, the SHO did not indicate if the mental health assessment included any written comments.

**Inmate B**
Date of Violation: 3/14/14
Date of Mental Health Assessment: 3/27/14
Date of Disposition: 4/2/14
Charge: Resisting Staff Resulting in Use of Force – Division D Offense

On 3/14/14 the inmate requested to see medical staff for psychological issues. He was handcuffed and then escorted to the Triage and Treatment Area (TTA) by two officers. Once in the TTA, he began to lunge and tried to break away from the two officers. The officers used physical force to take the inmate to the floor and gain control. While being examined by medical staff, he made a number of bizarre statements to the officer.

A mental health assessment was completed on 3/27/14, but did not indicate the inmate's LOC. All three questions were answered in the affirmative. In response to question number one, the written comment stated, "Pt is at MHCB LOC." The written comment for question number two stated, "Patient was noted to be behaving bizarre at the time by C/Os, psychiatrists & psychologist." The written comment for question number three stated, "Patient does not tolerate small spaces well."

The RVR was heard on 4/2/14 and a staff assistant was assigned. The inmate was present and plead guilty, stating, "I did pull away from the officers, and I don't know why I did. I think it was something about the room. I wasn't feeling right."

The SHO stated that the inmate was at the EOP LOC at the time of the hearing, yet the RVR stated the inmate was 3CMS at the time of the incident. The SHO stated consideration of the information reported in the mental health assessment. The SHO found the inmate "not guilty" due to his bizarre behavior at the time of the RVR, and the information provided on the mental health assessment.

**Impression:** The RVR noted the inmate's behavior at the time of the incident as being bizarre. The mental health assessment failed to indicate the LOC, but the written comments were legible and in layman's terms. The SHO considered and mitigated the RVR as a result of the mental health assessment. The RVR was dismissed.

**Inmate C**
Date of Violation:  1/1/14
Date of Mental Health Assessment:  1/8/14
Date of Disposition:  2/5/14
Charge:  Refusing Assigned Housing – Division D Offense

On 1/1/14 the inmate was informed he would be receiving a cellmate.  He responded that he did not want a cellmate after which he was issued an RVR for refusing assigned housing.  He was subsequently re-housed in administrative segregation for refusing assigned housing.  A mental health assessment was completed on 1/8/14 with questions number one, two, and three answered in the affirmative.  The response to question number one stated that the inmate provided poor responses and minimal information and that his TABE score was 3.8.  The response to question number two did not include an explanation and the space provided was left blank, contrary to RVR policy.  The response to question number three stated, "IM now EOP LOC."  The clinician's response to question number three did not provide any useful recommendations for the hearing officer when assessing the penalty.

On 2/5/14, the inmate declined to appear before the SHO for the hearing.  The SHO noted the mental health assessment in the disposition, stating that the clinician concluded that mental illness may have influenced the behavior that led to the RVR.  The SHO found the evidence of mental illness insufficient to exonerate the inmate, but noted that the mental health evidence would be considered during penalty assessment.  The inmate was found guilty and assessed 90 days loss of credit, consistent with a Division D offense, 90 days loss of privileges, including canteen, appliances, special purchases/quarter packages, telephone, and personal property and referred to the ICC for a possible SHU term assessment.

**Impression:** There was no mitigation in this case.  The clinician's response to questions number two and three provided no assistance to the hearing officer in determining guilt or assessing a penalty.  Although the hearing officer indicated the mental health assessment would be considered in assessing the penalty, it was unclear how it factored into the determination of guilt and penalty assessment.

**Inmate D**
Date of Violation:  3/28/14
Date of Mental Health Assessment:  4/9/14
Date of Disposition:  5/5/14
Charge:  Participation in a Riot Resulting in Use of Force – Division D Offense

On 3/28/14, as two separate one-on-one fights occurred on the main yard, an officer observed this 3CMS inmate join one of them and punch another inmate.  Officers used force to break up the fights.  The inmate was struck in the thigh with a round from a Direct Impact 40mm Launcher after which he ceased fighting.  A mental health assessment was completed on 4/9/14 with questions number one, two, and three answered in the negative.  The inmate appeared before the SHO for a hearing on 5/5/14.  The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three.  The inmate was

found guilty and assessed 90 days credit forfeiture, five days confinement to quarters and was referred to the ICC for program review and SHU term consideration.

**Impression:** There was no mitigation in this case. The SHO considered the mental health assessment and did not mitigate any penalties. There were no mitigating mental health factors recommended for consideration by the clinician. The inmate was assessed significant credit forfeiture.

## Inmate E
Date of Violation: 3/26/14
Date of Mental Health Assessment: 4/1/14
Date of Disposition: 4/24/14
Charge: Battery on an Inmate Requiring the Use of Force (OC) – Division D Offense

On 3/26/14, this 3CMS inmate, along with another inmate, was observed striking a third inmate with his fists. The inmate did not comply with an order to get down and officers subsequently used pepper spray to gain his compliance. A mental health assessment was completed on 4/1/14 with questions number one, two, and three answered in the negative. On 4/24/14, the inmate appeared before the SHO for a hearing. The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three. The inmate was found guilty and assessed 90 days credit forfeiture.

**Impression:** There were no mitigating mental health factors recommended for consideration by the clinician. The inmate was assessed significant credit forfeiture.

## Inmate F
Date of Violation: 3/15/14
Date of Mental Health Assessment: 3/21/14
Date of Disposition: 4/20/14
Charge: Battery on an Inmate Resulting in the Use of Force – Division D Offense

On 3/15/14, this 3CMS inmate, along with another inmate, was observed punching a third inmate. The inmates did not obey an order to get down and pepper spray was used to gain compliance. A mental health assessment was completed on 3/21/14 with questions number one, two, and three answered in the negative. On 4/20/14, the inmate appeared before the SHO for a hearing. The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three. The inmate was found guilty and assessed 90 days credit forfeiture and referred to the ICC for program and SHU term consideration.

**Impression:** There were no mitigating mental health factors recommended for consideration by the clinician. The inmate was assessed significant credit forfeiture, consistent with a Division D offense.

**Inmate G**
Date of Violation:  3/14/14
Date of Mental Health Assessment:  4/3/14
Date of Disposition:  4/24/14
Charge:  Inmate Manufactured Alcohol – Division C

On 3/14/14, during a random search of this 3CMS inmate's cell, an officer found two five gallon buckets filled with inmate manufactured alcohol.  Upon questioning, the inmate admitted the alcohol belonged to him.  A mental health assessment was completed on 4/3/14 with questions number one, two, and three answered in the negative.  On 4/24/14, the inmate appeared before the SHO for a hearing.  The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three.  The inmate was found guilty.  The inmate was assessed 120 days credit forfeiture, five days confinement to quarters and placement in Privilege Group C for 60 days.

**Impression:**  There was no mitigation in this case.  There were no mitigating mental health factors recommended for consideration by the clinician.  The inmate was assessed significant credit forfeiture.

**Inmate H**
Date of Violation:  1/13/14
Date of Mental Health Assessment:  1/21/14
Date of Disposition:  2/1/14
Charge:  Possession of a Controlled Medication (Morphine) – Division B Offense

On 1/13/14, a nurse observed this 3CMS inmate spit his medication (Morphine Sulfate 30 mg) into his milk carton.  The nurse confiscated the milk carton and turned it over to an officer.  A mental health assessment was completed on 1/21/14 with questions number one, two, and three answered in the negative.  On 2/1/14, the inmate appeared before the SHO for a hearing.  The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three.  The inmate was found guilty.  The inmate was assessed 121 days credit forfeiture, 90 days loss of visitation followed by 90 days non-contact visits, one year mandatory drug testing, ten days loss of weekend yard privileges and required attendance in Alcoholics Anonymous/Narcotics Anonymous (AA/NA).

**Impression:**  There was no mitigation in this case.  There were no mitigating mental health factors recommended for consideration by the clinician.  The inmate was assessed significant credit forfeiture.

**Inmate I**
Date of Violation:  3/14/14
Date of Mental Health Assessment:  4/3/14
Date of Disposition:  4/24/14
Charge:  Inmate Manufactured Alcohol – Division C Offense

On 3/14/14, during a random search of the inmate's cell, an officer found two five gallon buckets filled with inmate manufactured alcohol.  Upon questioning, the inmate's cellmate admitted the alcohol belonged to him and stated the inmate had nothing to do with it.  The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three.  This 3CMS inmate was found not guilty.

**Impression:**  Based on the evidence presented, the SHO found the inmate not guilty.  It was further noted that the charges were dismissed in the interest of justice.

**Inmate J**
Date of Violation:  1/1/14
Date of Mental Health Assessment:  1/9/14
Date of Disposition:  2/27/14
Charge:  Battery on an Inmate – Division D Offense

On 1/1/14, the inmate, along with another inmate, was observed striking a third inmate with his fists.  The inmates did not obey an order to get down and pepper spray was used to gain compliance.  A mental health assessment was completed on 1/9/14 with questions number one, two, and three answered in the negative.  On 2/27/14, the inmate appeared before the SHO for a hearing.  The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three.  This 3CMS inmate was found guilty.  The inmate was assessed 90 days credit forfeiture, five days confinement to quarters and referred to the ICC for program review.

**Impression:**  There was no mitigation in this case.  There were no mitigating mental health factors recommended for consideration by the clinician.  The inmate was assessed significant credit forfeiture.

**Inmate K**
Date of Violation:  1/27/14
Date of Mental Health Assessment:  2/11/14
Date of Disposition:  2/26/14
Charge:  Possession of Inmate Manufactured Alcohol – Division C Offense

On 1/27/14, during a search of the inmate's cell, an officer found a one gallon bucket filled with inmate manufactured alcohol.  Upon questioning, the inmate's cellmate admitted the alcohol belonged to him and stated that he wanted to take responsibility for it.  Both inmates were

subsequently issued RVRs. A mental health assessment was completed on 2/11/14 with questions number one, two, and three answered in the negative. On 2/26/14, the inmate appeared before the SHO for a hearing. The SHO noted review of the mental health assessment by documenting the negative responses to questions number two and three. This 3CMS inmate was found not guilty.

**Impression:** Based on the evidence presented, the SHO found the inmate not guilty. It was further noted that the charges were dismissed due to lack of evidence.

**Inmate L**
Date of Violation: 1/27/14
Date of Mental Health Assessment: 2/11/14
Date of Disposition: 2/24/14
Charge: Possession of Inmate Manufactured Alcohol – Division C Offense

On 1/27/14, during a search of the inmate's cell, an officer found a one gallon bucket filled with inmate manufactured alcohol. Upon questioning, the inmate admitted the alcohol belonged to him and stated that he wanted to take responsibility for it. Both the inmate and the cellmate were subsequently issued RVRs. A mental health assessment was completed on 2/11/14 with questions number one, two, and three answered in the negative.

On 2/24/14, the inmate appeared before the SHO for a hearing. The SHO wrote in the hearing document that a mental health assessment was not completed as the behavior was not considered bizarre, unusual, or uncharacteristic. However, as noted above, a mental health assessment was completed on 2/11/14 per policy, as this was a Division C offense. Proof that the substance found in the inmate's cell was inmate manufactured alcohol was not presented at the hearing. Based on the lack of evidence, the SHO found the inmate not guilty.

**Impression:** As the charge leveled against the inmate was a Division C offense, a mental health assessment was requested and completed as per policy. Based on the hearing disposition notes, the SHO did not appear to be aware that a mental health assessment had and should have been completed. This raised a concern as to whether the SHO had an adequate understanding of RVR policy and procedure.

## California Health Care Facility (CHCF) RVR Review

**SUMMARY OF FINDINGS**

A.  Defendants have not sufficiently implemented RVR policies and procedures by completing and sustaining all requirements.

B.  CHCF was unable to demonstrate compliance with the necessary training of custody and mental health staff related to the RVR process.

C. SHOs reported that newly promoted lieutenants had not attended the lieutenants' academy, where relevant information concerning mental health training was disseminated; CDCR had not offered this training for several years according to staff.

D. SHOs reported and RVR reviews indicated that SHOs were typically aware of the policy regarding mental health input into the RVR process.

E. Interviewed SHOs were aware of their ability to reduce or dismiss RVRs based on mental health factors and indicated doing so.

F. Some SHOs expressed concern with the quality, content, and clinical language that clinicians used in mental health assessments, noting that some clinical language was problematic and not in laymen's terms. SHOs also reported that at times mental health assessments merely indicated inmate diagnoses.

G. Some RVRs issued to MHSDS inmates were not completed within established timeframes; the delay appeared to be in forwarding the RVR to mental health staff. However, once received by mental health staff, assessments were completed within required timeframes.

H. Mental health assessments were typically responsive to the three questions.

I. SHOs routinely noted that the mental health assessment was reviewed and taken into consideration, but often did not indicate *how* the mental health assessment had been considered.

J. There were numerous cases of mitigation/penalty reduction, with the SHO reducing or dismissing the RVR due to mental health input and/or the totality of the circumstances. However, there were also RVRs where the SHO did not consider the mental health assessment's recommendations.

**INTRODUCTION**

On June 23-24, 2014, the Coleman monitoring team reviewed the RVR process at the CHCF. At the time of the site visit, CHCF housed custody levels I, II, III, and IV and inmates requiring MHCB, EOP, and 3CMS levels of care. As of June 2014, CHCF had a total inmate population of 1,488, of which 330 or 22 percent were on the mental health caseload. CHCF also housed inmates receiving acute and intermediate inpatient care. The monitoring team's RVR review did not include those issued to DSH inmates.

During the site visit, the monitoring team met with the warden, associate wardens, SHOs who conducted RVR hearings, and clinicians responsible for preparing mental health assessments. The monitors relied on CHCF's CDCR Form 1154 Disciplinary Log to gather RVR data. The review period covered RVRs issued during January, February, and March 2014. During this period there were a total of 151 RVRs written, with 83 or 55 percent issued to mental health caseload inmates. The monitors also reviewed ICC actions for several inmates for whom SHU terms were recommended.

**TRAINING**

CHCF was unable to demonstrate compliance with the required training of custody and mental health staff related to the RVR process.  CHCF was not activated until July 2013, therefore was unable to produce the proof of practice memorandum as required by the October 26, 2011 and November 3, 2011 memoranda.  However, some custody and clinical staff had transferred to CHCF from other institutions and were likely in a classification which required attendance at these trainings.  As such, the monitors requested an IST report to identify staff that had attended the required training.  IST produced a report on training session attendance for various job classifications from CHCF's activation to the present.

The IST reports indicated that training was from .25 to four hours in length.  None of the required staff members completed the four-hour training.  The one-hour training was received by 100 percent of CDOs, 75 percent of captains, 33 percent of lieutenants, 54 percent of sergeants, 100 percent of senior psychologist specialists, and 100 percent of the Correctional Counselor IIs (CC IIs).  None of the psychologists or the senior psychologist supervisor received the one-hour training.  CHCF reported that all associate wardens received the one-hour training on June 20, 2014.

SHOs reported that newly promoted lieutenants had not attended the lieutenants' academy, where relevant information concerning mental health training was disseminated.  CDCR had not offered this training for several years.  There was thus no system in place to ensure that newly promoted custody staff received the necessary training concerning mental health input into the disciplinary process.

<u>CHCF RVR Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 1 | 0/0% | 1/100% |
| Captains | 4 | 0/0% | 3/75% |
| Lieutenants | 24 | 0/0% | 8/33% |
| Sergeants | 57 | 0/0% | 31/54% |
| Senior Psychologist Specialist | 1 | 0/0% | 1/100% |
| Senior Psychologist Supervisor | 1 | 0/0% | 0/0% |
| Psychologists | 3 | 0/0% | 0/0% |
| CC-II appeals | 1 | 0/0% | 1/100% |

**STAFF INTERVIEWS**

**SHOs**

As reported above, although SHOs indicated that newly promoted lieutenants had not attended the lieutenants' academy, interviewed officers who were lieutenants in 2011 reported receiving the required trainings. Interviews and discussions with second and third watch SHOs and RVR review revealed that SHOs were typically aware of the policy concerning mental health input into the RVR process. Interviewed SHOs also knew of their ability to reduce or dismiss RVRs based on mental health factors and indicated doing so.

Some SHOs expressed concern with the quality, content, and clinical language used by some assessing clinicians. Although SHOs stated that they reviewed and considered clinical input, and generally found it helpful, they noted that at times the language that clinicians' used was "mental health jargon" that was not of assistance, for example, in rendering a decision on whether "an inmate's television should be taken away." They stated it would be better if mental health assessments were more in laymen's terms. They indicated other occasions when mental health assessments were not helpful because they merely stated inmate diagnoses. One SHO indicated routinely following up with the clinician when he did not understand the information provided on the mental health assessment. Another SHO reported two occasions where he contacted the clinician for further explanation of the mental health assessment.

**Clinicians**

The monitoring team met with several clinicians who performed the mental health assessments. The clinicians reported completing assessments within required timeframes. The clinicians indicated that a disciplinary log recorded and tracked RVRs and maintained other relevant information. The clinicians stated that a senior psychologist specialist completed the majority of the mental health assessments. The monitoring team met with the senior psychologist specialist who described his process for completing mental health assessments.

The senior psychologist specialist reviewed inmate charts and other RVRs that the inmate had received for patterns, and searched for additional information on Strategic Offender Management System (SOMS) and Electronic Record Management System (ERMS). He stated that he approached the mental health assessment as if it was a "mini-form of a forensic evaluation," which he believed had to be undertaken to answer the mental health assessment's three questions. The senior psychologist specialist indicated that this level of detail and investigation was required to ensure that he did not miss anything. He also reported seeking information from PCs and custody officers to learn anything further. Once he had gathered this information, he conducted an inmate interview and answered the three mental health assessment questions. He further stated that because these inmates typically had few things that could be taken away, his comments regarding inmate penalties were typically general in nature. The senior psychologist specialist opined that perhaps having only three questions on the assessment was insufficient, stating that the more information that could be shared with custody, the better.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

The monitoring team reviewed RVRs to determine whether mental health assessments were completed within established timeframes and if clinicians had documented adequate and appropriate information. Some RVRs issued to inmates on the mental health caseload were not completed within established timeframes. The delay appeared to be in forwarding the request to mental health staff for completion of an assessment. Once received by mental health staff, mental health assessments were completed within required timeframes.

The monitors found many of the assessments to be responsive to the three questions; written comments were specific and appropriate based on inmates' limited privileges and property. One such example was the assessment for CHCF Inmate B, which stated in response to question number two, "(h)is misperception of reality includes a delusional belief he does not belong here and tries to leave." It also noted that he had a poor sense of reality and dementia with a poor adaptive process from day-to-day and hour-to-hour. Another example was the case of CHCF Inmate E. The inmate stated that he did not know what he was doing at the time of the incident because he was having a seizure; the mental health assessment stated in response to question number two that after a seizure the inmate became confused and aggressive. Similarly, in the case of CHCF Inmate D, in response to question number three, the mental health assessment stated that the inmate was off of his medications, resulting in a decrease in his coping skills.

However, other mental health assessments were not as complete and responsive. For example, in one case, no boxes were checked and in response to question number two, the clinician wrote, "(i)nmate was verbally hostile, threatening and refused to engage even to her." In response to question number three, the clinician stated, "Same." (*See* CHCF Inmate A.) These responses were not helpful to the SHO in determining whether the inmate's mental health contributed to the behavior identified in the RVR.

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

Generally, the review of the hearing documents revealed that SHOs routinely noted that the mental health assessment was reviewed and taken into consideration. Often, however, there was no further explanation as to *how* the assessment had been considered. There were numerous cases of mitigation/penalty reduction, with the SHO reducing charges or completely dismissing them, due to mental health input and/or the totality of the provided information. For example, in one case, the SHO found the inmate not guilty and dismissed the charges, after observing the scene where the incident occurred and concluding that the circumstances of the RVR did not coincide with the physical evidence. (*See* CHCF Inmate C.) Similarly, in the case of CHCF Inmate B, the SHO relied on the totality of the circumstances and mental health input to reduce the RVR to a CDCR 128-A Counseling Chrono. Also, in the case of CHCF Inmate F, the SHO reduced the RVR's offense level due to the totality of circumstances and mental health input on the mental health assessment.

However, the monitors also reviewed RVRs that did not consider the mental health assessment's recommendations. For example, in the case of CHCF Inmate G, the mental health assessment stated in response to question number three that the "inmate gets depressed and makes worse decisions when he does not have yard time." The SHO nonetheless assessed the inmate loss of yard for 61 days. Also, in the case of CHCF Inmate I, an EOP inmate approached the officer's station in a disruptive state and received an RVR for behavior which could lead to violence. Although the clinician answered questions number two and three in the affirmative, the SHO's decision stated that mental illness had not influenced the RVR.

## ICC REVIEW

Another case of significant concern was that of CHCF Inmate A, which involved an EOP inmate with a developmental disability (DD3 inmate), who was issued an RVR for the Division B offense of battery on a non-prisoner. The mental health assessment did not provide the SHO with adequate mental health information. The SHO determined that due to the inability to determine whether the inmate's mental health contributed to the behavior resulting in the RVR, mental health evidence did not provide any exonerating evidence. The inmate was found guilty and assessed 150 days loss of behavior credit, 90 days loss of privileges, no dayroom, and no telephone. The ICC subsequently assessed a 13-month aggravated SHU term and the inmate was transferred to PBSP. As of 6/24/14, the inmate was housed in the PBSP CTC as he could not be housed in the SHU due to his EOP and DD status. However, when this case was discussed with CHCF staff, they were unaware that the inmate had transferred, believing he was still at CHCF. They also seemingly acknowledged that this case should not have resulted in a SHU term and transfer to PBSP.

### CHCF RVR Case Reviews

#### Inmate A
Date of Violation:  3/5/14
Date of Mental Health Assessment:  4/3/14
Date of Disposition:  4/8/14
Charge:  Battery on a Non-Prisoner - Division B Offense

On 3/5/14, CNA staff was checking call lights in cells in housing unit D3B. Staff entered the cell and advised this EOP/DD3 inmate that they were checking the call light. The inmate was lying on his back under his blanket. He did not respond so staff pressed the call light button on the bed rail. As staff pressed the button, the inmate quickly slapped the CNA across the face. The CNA exited the cell and activated the alarm. The inmate did not attend the hearing, which was conducted on 4/8/14.

A mental health assessment was completed on 4/3/14, with none of the boxes to the three questions checked. The response to question number two stated, "Inmate was verbally hostile, threatening and refused to engage even her. The purpose was explained. Unknown". The response to question number three stated, "Same".

The inmate did not attend the hearing conducted on 4/8/14.  The SHO noted that the mental health assessment indicated that the inmate's mental disorder contributed to the behavior that led to the RVR; this was in error, as the mental health assessment did not state that.  The SHO stated in the findings section that the inmate's mental health could not be assessed to determine if it influenced the behavior resulting in the RVR.  The SHO further noted that the mental health evidence did not provide any exonerating evidence, but that the SHO would consider mental health when assessing the penalty.  The inmate was found guilty of battery on a non-prisoner.  The SHO assessed 150 days loss of behavioral credits, which was at the high end of credit loss for a Division B offense, and 90 days loss of privileges.  The case was also referred to the District Attorney for possible felony prosecution.

The ICC met on 4/14/14, at which time a 13-month aggravated SHU term was imposed with a recommendation for transfer to PBSP.

**Impression:**  There was no mitigation in this case.  This was a Division B offense for which loss of credit was not restorable, resulting in the inmate's incarceration being permanently extended.  The completion of the mental health assessment was untimely as the request was not sent to mental health staff for nearly a month after the RVR was issued.  The mental health assessment was not properly completed as no box was checked nor were any of the written statements on the form helpful to the SHO.  The ICC action stated the committee considered the inmate's mental illness, yet imposed an aggravated SHU term with a recommendation for transfer to an institution that was not approved to house EOP within their SHU or house inmates with a developmental disability designation of DD3, which is the most severe level of impairment.  The SHO applied a standard of "exonerating evidence" that is not consistent with RVR policy.  The inmate was assessed significant loss of credit and privileges.

**Inmate B**
Date of Violation:  1/31/14
Date of Mental Health Assessment:  3/3/14
Date of Disposition:  3/14/14
Charge:  Battery on a peace officer - Division B Offense

On 1/31/14, this EOP inmate tried to push his way out of the housing unit past a correctional officer (CO).  The inmate stated he was leaving and a second time tried to push past the CO.  The inmate then grabbed the CO's arm and attempted to strike the CO.  The inmate was taken to the ground and handcuffed by responding staff.

A mental health assessment was completed on 3/3/14, which was not within mandated timeframes.  Questions number one, two, and three were answered in the affirmative.  The response to question number one indicated the inmate suffered from Dementia with poor adaptive process from day-to-day and hour-to-hour.  The response to question number two stated, "His misperception of reality includes a delusional belief he does not belong here and tries to leave."  The response to question number three stated, "Observe for decompensation in cognitive emotions and behavior.  Please report same to MH staff."

31

The inmate appeared for a hearing before the SHO on 3/14/14. The SHO considered the mental health assessment form and found the inmate guilty. The penalty was mitigated by reducing the RVR from a serious Division B to an administrative offense and further reducing the administrative offense to a 128-A counseling chrono.

**Impression:** There was mitigation in this case. The charges were reduced twice resulting in counseling. The mental health assessment was not completed within mandated timeframes. The SHO considered and mitigated the RVR as a result of the mental health assessment.

**Inmate C**
Date of Violation: 2/8/14
Date of Mental Health Assessment: 2/20/14
Date of Disposition: 3/22/14
Charge: IDX/Masturbation with priors - Division B Offense

On 2/8/14, the inmate received an RVR for IDX/masturbation with priors, a Division B offense. An LVN running the pill line in front of the medication room alleged that this 3CMS inmate, who was in the shower nude, made eye contact with her and proceeded to masturbate. A mental health assessment was completed on 2/20/14, with question number two answered in the affirmative and question number three answered in the negative.

The inmate attended the hearing on 3/22/14, where he requested that the SHO view the physical layout of the unit's showers; the hearing was subsequently postponed and reconvened so the SHO could view the physical evidence, including the inmate shower, partition, and shower door, and relevant distances and views.

Upon reconvening the hearing, the SHO noted that an IDX finding required evidence of deliberate exposure of private body parts under circumstances likely to cause affront or alarm. Here, review of the physical evidence indicated that "the circumstances of the RVR do not coincide with the physical evidence." Among other findings, the SHO reported that the shower's physical location made it very difficult to see inside the shower without a deliberate effort to do so, while it was impossible to see the lower body of a person standing in the shower area while standing in front of the medication room. The SHO noted the mental health clinician's conclusion that mental illness may have influenced the behavior resulting in the RVR. The SHO found a lack of preponderance of evidence to substantiate this IDX/masturbation charge and found the inmate not guilty and dismissed the charges.

**Impression:** There was mitigation in this case based in part on additional evidence gathered by the SHO. The SHO indicated that the mental health assessment concluded that mental illness influenced the inmate's behavior. The case was dismissed.

**Inmate D**
Date of Violation:  3/3/14
Date of Mental Health Assessment:  4/3/14
Date of Disposition:  4/5/14
Charge:  Behavior that could lead to Violence - Division F Offense

On 3/3/14, the inmate refused his medication during medication pass and stated "something was going to go down."  He subsequently came out of his room in an agitated state, carrying a bag of feces, and approached the officer's station while mumbling.  A mental health assessment was completed on 4/3/14 with questions number two and three answered in the affirmative.  The response to question number two stated, "inmate has used carrying feces in a bag as a coping skill in the past - learned from hunting in Africa - soothes him when stressed/depressed."  The response to question number three stated, "off of meds at time so coping skills decrease . . . needs meds to engage in positive coping skills and management of MI."

On 4/5/14, the inmate appeared before the SHO for the hearing.  The SHO's decision indicated that the inmate was at the EOP LOC, but noted that "(i)t did not appear that the behavior resulting in the RVR may have been influenced by mental illness."  Further, under "findings," the SHO incorrectly reported that "the mental health clinician concluded that mental illness did not influence the behavior resulting in the RVR."  The inmate was found guilty of behavior which might lead to violence, a Division F offense.  The SHO assessed 30 days loss of behavioral/work credits and 30 days loss of privileges, to include no telephone and no yard.

**Impression:**  There was no mitigation documented in this case.  Although the clinician affirmatively stated that the mental health status of the inmate influenced his behavior, the SHO incorrectly reported that the clinician found that it did not.  The inmate was assessed losses of credit and privileges.

**Inmate E**
Date of Violation:  3/16/14
Date of Mental Health Assessment:  4/11/14
Date of Disposition:  4/16/14
Charge:  Willfully Resisting, Delaying, Obstructing Peace Officer - Division D Offense

On 3/16/14[5], the inmate received an RVR for willfully resisting, delaying, and obstructing a peace officer, which allegedly occurred while he was having a seizure.  The inmate stated he was unaware what he was doing when he had seizures.

A mental health assessment was completed on 4/11/14 with questions number two and three answered in the affirmative.  The response to question number two stated, "documents support that after seizure inmate becomes confused and aggressive . . .mixes up words spoken."  The response to question number three stated, "inmate needs glasses - both in all situations as he has a disorder of eyes lights . . .very difficult time hearing."

---

[5] It should be noted that Inmate E received another RVR on the same day, 3/16/14; however, that RVR packet was not provided to the monitors for review during the site visit.

The inmate attended the hearing held on 4/16/14. The SHO noted in his decision that DECS indicated that the inmate was 3CMS, but SOMS reported he was at the EOP LOC. The SHO considered the mental health assessment and noted that "it appear(ed) that the behavior resulting in the RVR may have been influenced by Mental Illness." The inmate was found guilty of willfully resisting/delaying a peace officer in the performance of duty, a Division D offense. The SHO assessed the inmate 80 days loss of behavioral/work credits and 60 days loss of privileges, to include no dayroom, no special purchases/quarter packages and no telephone.

The clinician indicated positive responses to question numbers two and three and the RVR indicated that "the behavior resulting in the RVR may have been influenced by Mental Illness." There was no notation in the penalty assessment that stated that the SHO actually mitigated the penalty as a result of the mental health assessment.

**Impression:** There was no mitigation in this case. The clinician answered questions number two and three in the affirmative. The SHO documented consideration of the mental health assessment, and indicated that mental illness may have influenced the behavior resulting in the RVR. However, the SHO did not document how it was considered. The inmate was assessed losses of credit and privileges.

## Inmate F
Date of Violation: 3/25/14
Date of Mental Health Assessment: 4/5/14
Date of Disposition: 4/14/14
Charge: Conduct, Disrespect w/potential for violence - Division E Offense

This EOP inmate became irate during the evening meal as he claimed food was missing from his tray. The inmate was on a special diet and his tray was made up by food service staff to meet his medical needs. The inmate was yelling at staff and swearing at them, even after they complied with his request for beans on his food tray.

A mental health assessment was completed on 4/9/14, with questions number two and three answered in the affirmative. The response to question number two stated, "EOP level of MH care, known difficulty with affect regulation." The response to question number three stated, "Documented history of depression and possible personality disorder."

The inmate appeared before the SHO for a hearing on 4/14/14. The SHO reiterated what the clinician stated on the mental health assessment and went on to state, "However, this does not exonerate him from his actions. The inmate did not evidence impairment in his ability to comprehend the nature of the charges and the disciplinary process." The SHO found the inmate guilty of a lesser offense but included a charge of disrespect towards staff, a Division F offense. The SHO further stated that he found the evidence of mental illness insufficient to exonerate the inmate. The inmate was assessed 30 days loss of behavior credit and 30 days loss of privileges.

**Impression:** There was mitigation in this case. The mental health assessment was not appropriately completed with relevant information as required by the question. The SHO applied

34

a standard to the mental health assessment as a form of evidence to exonerate the inmate of the charges, which was not the intent of the mental health information or within the scope of the RVR policy. The inmate was found guilty of a lesser included charge and assessed loss of credit and privileges.

**Inmate G**
Date of Violation: 2/8/14
Date of Mental Health Assessment: 4/7/14
Date of Disposition: 4/20/14
Charge: Battery on Inmate - Division D Offense

This RVR was ordered re-issued and re-heard by the CDO due to there not being a mental health assessment completed for the initial hearing, in violation of CDCR policy. It appeared at the time of the RVR that the inmate was at the 3CMS LOC, however the re-issued RVR stated that he was not on the mental health caseload. A mental health assessment was completed for the re-hearing.

The inmate was observed by staff to strike another inmate in the face/chest area with a closed fist. When ordered to get down, the inmate complied and was handcuffed by responding staff.

A mental health assessment was completed on 4/7/14 with question number two answered in the negative and question number three answered in the affirmative. The response to question number two stated, "He felt he was protecting another – unverifiable." The response to question number three stated, "I/m gets depressed and makes worse decisions when he does not get yard time."

On 4/20/14, the inmate appeared before the SHO for a hearing. The SHO noted that the inmate did not exhibit any evidence of impairment in his ability to effectively present his position during the disciplinary hearing. The inmate was found guilty and assessed 61 days forfeiture of credit and 61 days loss of yard.

**Impression:** There was no mitigation in this case. The mental health assessment was not completed with responses relevant to the questions being asked. Additional concerns were the conflicting levels of care recorded for the inmate and no discussion as to which LOC was correct. The SHO appeared to make a clinical judgment at the time of the hearing by referencing the presentation of the inmate during the hearing, which was not in conformity with CDCR policy.

**Pelican Bay State Prison (PBSP) RVR Review**

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at PBSP by completing and sustaining all requirements.

B.  PBSP was not compliant with required training of custody and mental health staff related to the RVR process.

C.  Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D.  Custody staff documented consideration of the mental health assessments in the RVR process.

E.  Some SHOs mitigated the penalties based on the mental health assessments, while others provided no reasons for penalty mitigation.

F.  Clinician responses on the mental health assessments were not always responsive to the question asked and thus not helpful to the SHOs.

G.  The majority of mental health assessments indicated no mental health concerns or factors to consider when assessing penalties, including for those inmates experiencing documented increases in acuity.

H.  There was no quality review of the mental health assessment process until the final weeks of the monitoring period.

I.  The ICC gave consideration to mental health factors and mitigated one case based on the assessment.

**INTRODUCTION**

During October 8-9, 2014, the *Coleman* monitoring team reviewed the RVR process at Pelican Bay State Prison (PBSP).  PBSP is designated to house inmates at the Level I, IV and SHU custody levels, and inmates with a mental health designation of 3CMS and EOP.  As of March 2014, PBSP had a total inmate population of 2,754.  Of that population, 193 had a MHSDS designation, which is seven percent of the total population.

The monitors reviewed RVRs for the first three months of 2014.  During this period there were a total of 380 RVRs written with 40 or 11 percent of the RVRs issued to inmates with a mental health designation.  During the site visit, the team met with eight SHOs, the Chief of Mental Health, ten clinicians responsible for the preparation of mental health assessments, the

HCAU Captain and the CHSSA.  The team reviewed policies and procedures related to the RVR process at PBSP, as well as any training materials provided by the institution to PBSP staff.  The monitors utilized the PBSP Institution Register and CDCR 1154 logs to gather RVR data, which are required to be maintained under Title 15 of the CDCR.

**TRAINING**

IST was asked to produce a report of who attended the required training sessions for each job classification.  The IST reports indicated training was for anywhere from one hour to four hours.  The October 26, 2011 memorandum required four hours of training and the November 3, 2011 memorandum required one hour of training.

PBSP staff was able to produce one proof of practice memorandum dated January 17, 2012, which was in response to the October 26, 2011 memorandum requirement.  However, PBSP staff was not able to produce a lesson plan or PowerPoint presentation for "Inmate Disciplinary Process Mental Health Assessment Training."  While on site, the monitors provided the clinicians with a copy of the current approved lesson plan.

PBSP Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
| --- | --- | --- | --- |
| CDO | 5 | 3/60% | 5/100% |
| Captains | 7 | 4/57% | 4/57% |
| Lieutenants | 29 | 6/21% | 27/93% |
| Sergeants | 79 | 1/1% | 63/80% |
| CC-II Appeals | 2 | 0/0% | 1/50% |
| Psychiatrists | 3 | 0/0 | 2/67% |
| Psychologists | 7 | 0/0 | 6/86% |
| Social Workers | 1 | 0/0% | 1/100% |

**STAFF INTERVIEWS**

**SHOs**

The team met with eight SHOs during the site visit.  The SHOs reported a good working relationship with the mental health staff and a clear understanding of the RVR referral process.

Regarding the mental health assessment form, the SHOs stated that clinicians rarely indicated mental health influenced the inmate's behavior; however, when they did, the clinicians most often used the term "decompensating" to describe the inmate's condition.  Further, the SHOs stressed handwriting legibility to be difficult at times.  Regarding question number three of the assessment, the officers reported that there was generally no elaboration even when the clinician answered in the affirmative.  Some officers were unfamiliar with the true meaning or

intent of question number three on the assessment.  When writing the final RVR Part C, the officers reported using a drop down box with four different stock phrases to use for completing the hearing document.

**Clinicians**

The monitoring team interviewed ten clinicians regarding the RVR process.  None of the interviewed clinicians reported formal training regarding the process.  As of March 2014, one clinician was primarily responsible for completion of all RVR mental health assessments, except for those inmates on his caseload.  The clinician informed the team that he reviewed the RVR, met with the inmate out of cell if the inmate consented (usually 50 percent refused), and reviewed the eUHR.  The clinician indicated that the process took about one hour to complete. The other clinicians reported the same process but indicated that the time to complete varied for each case.

As described by the SHOs, the clinician primarily responsible for completion of the mental health assessments reported that he typically wrote a "sterile" explanation when he answered question number two in the affirmative by stating that the inmate was "decompensating" or recently had a medication change.  None of the clinicians had a clear understanding of question number three on the assessment form, and they indicated that they did not receive clear instructions from headquarters on how to complete the mental health assessment.  There was no feedback from custody staff to clinicians on the outcome of the RVRs.

Clinical input during ICC meetings was reportedly program specific.  The clinicians stated that in the EOP/PSU, clinical input was well received; however, in administrative segregation, it depended on how many inmates were being seen by committee on that day.  If it was a busy day, the input became "pro forma" and custody staff was not looking for much input. In the SHU, the clinicians indicated that the custody staff was not accustomed to clinician participation, thus input was not always welcomed and was typically limited to one question of whether there were any current mental health concerns.

As of March 2014, a Quality Improvement Team (QIT) was chartered on the mental health assessment processes at PBSP.  The QIT was ongoing at the time of the visit, and included clinical input during the ICC.  One OT was responsible for the receipt and distribution of mental health assessment requests.  Prior to June 2014, requests were distributed to multiple clinicians for completion; however, since June, one clinician retained primary responsibility for completion of all RVRs, except for those inmates on his caseload.  There was no RVR Coordinator position at PBSP.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Generally, the review showed that mental health assessments were requested as appropriate, per policy; however, the large majority of assessments indicated no mental health concerns.  When assessments indicated mental health concerns, the clinicians failed to provide useful/helpful information for the SHOs.  (*See* PBSP Inmates A, B, C, D.)

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

The reviewed RVR packages revealed that overall, the SHO generally noted that the mental health assessment was reviewed and taken into consideration. Further, SHOs mitigated penalties based specifically on the mental health assessment or mental health factors. (*See* PBSP Inmates B, E.) One SHO mischaracterized the clinician's "no" response to question number three when he noted that the clinician "requested no mitigation due to mental health factors. The SHO concurred with the request for non-mitigation of penalties." (*See* PBSP Inmate F.) On the other hand, other decisions which appeared to mitigate by assessing less than the full amount of potential penalties, provided no reasons for such actions. One SHO stated that the inmate must be held accountable for his actions but in consideration of the clinician's recommendation, he was <u>only</u> assessing 90 days credit forfeiture – which was the maximum amount allowable for a Division D offense. The SHO also stated that he was mitigating any additional penalties but did not specify what penalties were mitigated. (*See* PBSP Inmate G.)

**ICC REVIEW**

The ICC considered the assessments as well as input from the clinicians present at the meetings. (*See* PBSP Inmates H, I, J, B.) There was one instance where the ICC mitigated based on mental health factors. (*See* PBSP Inmate A.)

**QUALITY REVIEW**

Towards the end of the review period on March 10, 2014, a QIT was chartered regarding Enhancement of Disciplinary/115X and Developmentally Disabled Progam (DDP) Processes. The stated purpose was to improve collaboration between custody and mental health regarding the disciplinary/115 process and the DDP process.   The first meeting was held on March 18, 2014 and included the chief of mental health, CHSSA II, chief psychologist, staff psychologist (responsible for 90 percent of mental health assessments), correctional captain, OT (responsible for routing and logging requests), and the correctional administrator.  The QIT minutes revealed meetings were held in March, April and June, 2014.  The minutes revealed agenda topics including collaboration between custody and mental health throughout the 115 process (e.g. tracking evaluation results), SHO dispositions and ICC/UCC outcomes.  Additional agenda topics included quality assurance of the mental health evaluations through review by the chief of mental health, as well as improving clinical input in the ICC process.
As of the time of the site visit, staff reported the utilization of a newly implemented tracking log of all positive 115 mental health assessments where mitigation or lack thereof was tracked and discussed with custody staff during the October, 2014 QIT meeting.  The meeting minutes were not yet prepared at the time of the site visit.

**PBSP RVR Case Reviews**

**Inmate A**
Date of Violation:  2/4/14
Date of Mental Health Assessment:  2/8/14
Date of Disposition:  3/6/14
Charge:  Willfully Resisting, Delaying, Obstructing Peace Officer – Division D Offense

At 1050, in response to a previous RVR above, officers entered the PSU treatment center group room number three to remove this EOP inmate.  He was ordered to submit to handcuffs for escort and he refused and stated, "I'm not going anywhere."  He refused several more orders and began kicking the holding cell door.  He was ordered to stop kicking but refused.  The officer then left to retrieve a MK9 OCV Vapor canister with wand attachment from the program office.  Upon his return, he observed the inmate with blood and a cut on his forehead. The inmate ripped open his jumpsuit and then began punching himself in the face and both sides of his head causing injury to himself.  He was ordered to stop to which he replied, "…, go ahead and spray me, I don't give a [expletive]," while he continued to punch himself in the face and head with both fists.  The officer administered one burst of OC into the cell, "fearing if allowed to continue, as well as knowing his past history of self-injurious behavior and that he would cause further harm to himself."  The inmate stopped hitting himself.  The PSU Treatment Center alarm was then sounded and the inmate began screaming and hit his head on the glass cell door window.  The officer documented blood on both the glass window and the inmate's head.  The officer again ordered the inmate to stop hitting his head and he complied.  Several minutes later, the inmate began again screaming and banging his head on the cell door window.  He was ordered to stop, refused, and the officer administered another burst of OC vapor into the cell.  After that application, the inmate stated, "I'm done, I want out!"  He was placed in handcuffs and removed from the cell.

The mental health assessment was sent to the mental health department on 2/4/14 and completed on 2/8/14.  The clinician answered yes to question number two and noted, "Inmate has a long history of mental illness issues which might have impacted his behavior on this day."  For question number three whether there were mental health factors to consider in assessing the penalty, the clinician checked "no."

The SHO referenced the mental health assessment in the RVR-Part C Assessment Request section, noting that although the clinician concluded the inmate's mental disorder may have contributed to this disciplinary offense, she has not recommended mitigation of any penalties.  The inmate was found guilty and assessed 90 days credit forfeiture.  The mental health assessment is not mentioned in the findings or disposition, only in the "assessment request" section of the RVR.

**Impression:**  There was no mitigation in this case.  The inmate ultimately lost 240 days of behavioral/work credits for the two incidents.  The mental health assessment for this incident was not helpful as written, offering the SHO no guidance regarding the inmate's mental illness which may have affected his behavior or mitigation of penalties.  The officer clearly notes this inmate's long history of mental illness and propensity for self-injurious behavior; however, it

appears to have no effect on the outcome of these two RVRs. The inmate was assessed the maximum credit forfeiture for both RVRs. The inmate was admitted to the MHCB due to decompensation later that day.

_____

**Inmate B**
Date of Violation: 2/14/14
Date of Mental Health Assessment: 2/20/14
Date of Disposition: 3/6/14
Charge: Disorderly Conduct – Sexual

During a confidential interview with his social worker, this EOP inmate placed his hand in his IDX control jumpsuit and began masturbating. When told that it was unacceptable behavior, he removed his hand; however he resumed the behavior moments later. The incident was reported to the facility lieutenant.

A mental health assessment request was sent to the mental health department on 2/14/14 and completed on 2/20/14. The clinician answered "yes" to questions number two and three. For question number two, the clinician noted that the inmate was admitted to the MHCB on 2/4/14 for acute decompensation and released five days before the RVR incident. In response to question number three, the clinician noted, "the inmate's recent decompensation MHCB admission and HX chronic/severe MH disorder should be considered when assessing the penalty."

The SHO referenced the mental health assessment in the RVR-Part C and noted, "The clinician has recommended mitigation of any penalties. If the inmate is found guilty, this will be considered in assessing penalties." The inmate was found guilty and assessed 31 days credit forfeiture. The SHO noted that the credit forfeiture was reduced based upon mitigating circumstances, "specifically, in the assessment request, the clinician felt that the inmate's misconduct may have been influenced by his mental disorder, and has recommended mitigation." Further, the SHO stated that the inmate was subject to loss of any or all privileges for up to 180 days; however, "none will be assessed as the clinician has recommended mitigation of any penalties."

ICC Action: The inmate was seen on 5/22/14 by ICC at CHCF where he was receiving DSH LOC. For the RVR dated 1/28/14, the committee imposed and suspended a nine month SHU term. The committee documented, "ICC considered the CDCR 115MH and the information provided by the clinical staff, noting inmate's mental health did not contribute to his behavior. ICC acts to hold him accountable." Further, for the IDX RVR dated 2/4/14, the committee imposed and suspended a nine month SHU term. The committee documented, "ICC considered the CDCR 115MH and the information provided by the clinical staff, noting [inmate's] mental health did not contribute to his behavior. ICC acts to hold him accountable." For the Assault on a Peace Officer RVR dated 2/5/2015, ICC imposed and suspended another nine month aggravated, concurrent SHU term. The committee documented, "ICC has considered the CDCR 115MH and the information provided by the clinical staff, noting [inmate's] mental health did not contribute to his behavior. ICC acts to hold him accountable." Finally, for the Disorderly Conduct-Sexual RVR dated 2/14/14, the committee elected not to impose a SHU term as he had

41

not received another RVR for the same offense in the last 12 months. At the time of the committee action, the inmate was serving a determinate SHU with a controlling Minimum Early Release Date (MERD) of 9/8/2042.

**Impression:** There was mitigation in this case by the SHO. Mitigation of both the assessment of credit forfeiture as well as privileges was noted by the SHO due specifically to the mental health assessment. However, while the clinician acknowledged the inmate's mental disorder appeared to contribute to the RVR, the clinician failed to provide particularly useful information to the SHO describing how it contributed. Further, the clinician's explanation regarding mental health factors to consider when assessing penalties was similarly unhelpful. From the information provided, it appears that the clinician may not have an understanding of the purpose of question number three. There was documentation of mental health considerations at the ICC; however, it was concerning that the inmate received multiple RVRs during a period wherein his mental health was rapidly deteriorating, eventually precipitating a DSH admission and the mental health assessments documented no mental health considerations for the SHOs.

## Inmate C
Date of Violation:  1/16/14
Date of Mental Health Assessment:  1/22/14
Date of Disposition:  2/12/14
Charge:  Battery on Peace Officer – Division B-1 Offense

On 1/16/14, this 3CMS inmate pushed the food tray off the food port and struck the officer in the hand. The officer reported that the inmate also made statements that were incoherent prior to pushing the tray. A mental health assessment was completed on 1/22/14 with questions number two and three answered in the affirmative. The response to question number two stated that the inmate was not taking his PC2602 medications and was presenting as very psychotic at the time. The response to question number three stated that the inmate was psychotic and responding to voices. The clinician's answer to question number three was unresponsive and provided no assistance to the SHO regarding mitigation of penalties. On 2/12/14, the inmate appeared for a hearing before the SHO and was found guilty. The inmate was assessed 121 days forfeiture of credit, the least amount of time for a B-1 offense. The SHO mitigated the penalty based specifically on the mental health assessment but referred the inmate to ICC for SHU term assessment.

The ICC met on 5/22/14 at CSP/Sac where the inmate had transferred. A clinician was present during the ICC and provided mental health input for the committee. The mental health assessment was also considered and the committee elected to assess and impose a 16-month aggravated SHU term. The SHU term was mitigated two months based on the mental health assessment.

**Impression:** There was mitigation in this case with the imposition of the minimum credit loss applicable. The SHO considered the mental health assessment and mitigated the penalty based on the assessment. The clinician's response to question number three provided no assistance for the SHO related to the mitigation of any penalties.

**Inmate D**
Date of Violation:  1/25/14
Date of Mental Health Assessment:  2/4/14
Date of Disposition:  3/5/14
Charge:  Attempted Manufacture of a Deadly Weapon – Division A-1 Offense

On 1/25/14, this 3CMS inmate was in the shower when the officer noticed a state issued razor blade that was not intact.  The inmate refused to respond to questions about a missing piece of the razor blade.  A mental health assessment was completed on 2/4/14 with questions number two and three answered in the negative.  Although the response to question number two was in the negative, the clinician wrote that the inmate stated "No, I wasn't even on the mental health program at the time."  The response to question number three indicated that there were no mental health factors that the SHO needed to consider, however the inmate denied making any weapons or being in possession of any weapons.  The answers to both questions were unhelpful and contained unnecessary information. On 3/5/14, the inmate appeared for a hearing before the SHO.  The SHO wrote in the decision that no mental health assessment was required.  The SHO did not reference any mental health assessment in his decision and found the inmate guilty.  The SHO reduced the charge to a lesser offense of dangerous contraband, a Division F offense and assessed 30 days forfeiture of credit, the maximum time allowed for such an offense.

**Impression**:  There was mitigation of the penalty although the SHO did not know that a mental health assessment had been completed.  The clinician's responses to questions number two and three on the assessment contained information not relevant to the questions and unhelpful to the SHO.

**Inmate E**
Date of Violation:  1/31/14
Date of Mental Health Assessment:  2/13/14
Date of Disposition:  3/10/14
Charge:  Disruptive Housing Violations – Division F Offense

While awaiting escort back to his cell from the PSU treatment center group room, this EOP inmate urinated in the cell.  A mental health assessment was sent to the mental health department on 2/5/14 and completed on 2/13/14.  The clinician answered question numbers two and three "no."  The mental health assessment was referenced in the RVR-Part C Assessment Request section revealing that the clinician did not believe this behavior was influenced by the inmate's mental disorder and did not recommend mitigation of penalties.

The inmate was found guilty and assessed 15 days forfeiture of credits.  The penalty was mitigated "after consideration of the overall circumstances of this offense."  Mitigation was not based solely on mental health considerations; although, the mental health assessment was referenced in the findings.

**Impression**:  There was mitigation in this case.  The mental health assessment was negative for any mental health considerations regarding the RVR.  The SHO considered the mental health

43

assessment and mitigated based on the totality of circumstances.  Minimum loss of credit was imposed.

## Inmate F
Date of Violation:  3/18/14
Date of Mental Health Assessment:  3/18/14
Date of Disposition:  4/1/14
Charge:  Disorderly Conduct – Sexual – a Division E Offense

On 3/17/14, the CTC RN responded to a call light from this MHCD inmate.  When she approached the cell, the inmate asked her if she could give him an "E".  The RN asked him what that meant, then she noticed his right hand in his partially open smock making an up and down motion.  She asked the inmate what he was doing and he immediately stopped.  The RN notified the facility lieutenant of the incident.  The mental health assessment was sent to the mental health department on 3/18/14 and completed on the same date.  The clinician answered no to questions number two and three.

The SHO noted the mental health assessment in the RVR-Part C Assessment Request section.  The inmate was found guilty and assessed 60 days forfeiture of credits.  The RN noted in the disposition that the clinician "requested no mitigation due to mental health factors.  The SHO does concur with the request for the non-mitigation of penalties."  This is a mischaracterization of the clinician's response.

**Impression:**  There was no mitigation in this case.  The mental health assessment found no mental health factors regarding the incident; however, the SHO mischaracterized the clinician's response in the assessment.  The clinician did not affirmatively request not to mitigate, but concluded that there were no mental health factors to consider towards mitigation when assessing penalties.  The inmate was assessed credit forfeiture.

## Inmate G
Date of Violation:  1/26/14
Date of Mental Health Assessment:  3/18/14
Date of Disposition:  2/25/14
Charge:  Battery on a Prisoner with no Serious Bodily Injury – Division D Offense

On 1/26/14, this EOP inmate admitted to being in a physical altercation with another inmate.  On 1/29/14, a mental health assessment was completed with questions number two and three answered in the affirmative.  In response to question number two, the clinician stated that the inmate suffered from chronic, major mental illness that remained symptomatic despite ongoing treatment in the MHSDS and despite having an involuntary medication order.  The clinician also stated that the symptoms of the inmate's mental illness did significantly contribute to the behavior for which he was charged.  In response to question number three, the clinician stated that the relative mental instability of the inmate should be taken into account in assessing a penalty regarding this RVR.  The clinician's response to question number three did not provide any useful recommendations for the SHO when assessing a penalty.  On 2/25/14, the inmate appeared for a hearing before the SHO.  The SHO gave consideration to the mental health

assessment but stated that the inmate must be held accountable for such a serious offense although the SHO indicated that in consideration of the clinician's recommendation, he was only assessing 90 days credit forfeiture; this was the maximum amount of time allowable for such offense. He further stated that he was mitigating any additional penalties for this Division D offense however did not specifically state what penalties were mitigated. The inmate was referred to the ICC for SHU term assessment.

**Impression:** There was no mitigation in this case. The clinician's response to question number three provided no recommendations for the SHO when determining if the penalty should be mitigated. Although the SHO stated that the penalty was mitigated based upon the recommendation of the clinician, no mitigation was specifically indicated in the decision. The inmate received the maximum credit loss allowable for the offense.

**Inmate H**
Date of Violation: 1/31/14
Date of Mental Health Assessment: 2/10/14
Date of Disposition: 3/2/14
Charge: Battery on an Inmate with No Serious Bodily Injury – Division D Offense

On 1/31/14, this 3CMS inmate was involved with another inmate in the beating of a third inmate. When the custody officer arrived at the scene, the inmates assumed the prone position on the ground. A mental health assessment was completed on 2/10/14 with questions number two and three answered in the negative. On 3/2/14, the inmate appeared for a hearing before the SHO. The SHO noted in his decision that since the offense charged had the potential for a SHU term, a mental health assessment was completed. Although the mental health assessment did not indicate the necessity of a staff assistant, one was provided based on the inmate's low TABE score. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 90 days forfeiture of credit, the maximum amount of time for a Division D offense, and was referred to ICC for SHU term evaluation.

The ICC met on 3/26/14, considered the mental health assessment and assessed and imposed a three-month SHU term with no aggravating factors.

**Impression:** There was no mitigation in this case. The SHO considered the mental health assessment and found that no mitigation was recommended by the clinician, and did not mitigate. Significant losses of credit and privileges were imposed.

**Inmate I**
Date of Violation: 2/20/14
Date of Mental Health Assessment: 2/20/14
Date of Disposition: 3/31/14
Charge: Battery on an Inmate Causing Serious Bodily Injury – Division A-1 Offense

On 2/20/14, this 3CMS inmate was involved in an altercation with another inmate. Video footage showed that the inmate charged was the aggressor. A mental health assessment was completed on 2/20/14 with questions number two and three answered in the negative. On

3/31/14 the inmate appeared for a hearing before the SHO. The SHO gave consideration to the mental health assessment and found the inmate guilty. The inmate was assessed 360 days forfeiture of credit, the maximum amount of time for a Division A-1 offense, and was referred to ICC for SHU term assessment.

The ICC met on 4/23/14. The ICC noted that the inmate met the PBSP SHU exclusionary criteria. A clinician was present during the ICC and appeared to provide proper mental health input for the committee. The mental health assessment was also considered and the committee elected to assess and impose a 15-month SHU term. Although no aggravating factors were noted, the SHU term was not mitigated due to the inmate's prior disciplinary history.

**Impression:** There was no mitigation in this case. The SHO considered the mental health assessment and found that no mitigation was recommended by the clinician and did not mitigate. The ICC gave consideration to the mental health assessment and the clinician provided adequate mental health information at the committee hearing.

### Inmate J
Date of Violation: 1/7/14
Date of Mental Health Assessment: 1/19/14
Date of Disposition: 1/15/14
Charge: Battery on Prisoner with no Serious Bodily Injury – Division D Offense

On 1/7/14, this EOP inmate was observed by a CO striking another inmate with his fist. A mental health assessment was completed on 1/9/14 with questions number two and three answered in the negative. Although question number two was answered in the negative, the narrative by the clinician stated that the inmate reported it was simply a misunderstanding. The clinician also indicated the inmate's mental disorder did not appear to play a role in the disciplinary infraction. On 1/15/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 90 days credit forfeiture, the maximum amount of time allowed for such offense, and was referred to the ICC for SHU evaluation.

The ICC met on 2/5/14 at CMF where the inmate had transferred from PBSP. A clinician was present during the ICC and provided mental health input for the committee. The mental health assessment was also considered and the committee elected to assess and impose a six-month aggravated SHU term for prior similar acts. The committee also elected to assess and impose an expected concurrent ten month SHU term for a subsequent RVR and referred the inmate for adverse transfer to a PSU facility.

**Impression:** There was no mitigation in this case. The SHO considered the mental health assessment and found that no mitigation was recommended by the clinician, and did not mitigate. Significant loss of credit was imposed. The ICC gave consideration to the assessment and to the input from the clinician present at the meeting.

## High Desert State Prison (HDSP) RVR Review

**SUMMARY OF FINDINGS**

A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at HDSP by completing and sustaining all requirements.

B. HDSP did not demonstrate compliance with training for all required staff members.

C. Mental health assessments were timely completed.

D. Clinicians provided inappropriate and unresponsive answers on the mental health assessment form.

E. There was a practice amongst clinicians at HDSP to answer question number three on the mental health assessment form in the affirmative if question number two had been answered in the affirmative. The explanation accompanying the response to question number two would be restated using the same verbiage in response to question number three.

F. Clinical reviewers expressed reluctance to offer recommendations for mitigation of penalty either because it was perceived as being outside their scope or because of confidentiality concerns.

G. Some SHOs went into great legal detail regarding the standards of insanity/sanity based on California Penal Code section 25 or Evidence Code 522; this is not a standard required as part of the RVR process.

H. All loss of credit penalties were assessed at the top of the range for the Division of the offense.

I. In numerous cases where a mental health assessment was neither required nor requested, the SHO documented that the inmate's mental health status and/or LOC were considered in the disposition and findings.

J. A copy of the CDCR 7230, Progress Note, which was required as part of the mental health assessment process, was routinely provided to the inmate's PC in order to keep the clinician informed of the evaluator's findings related to an RVR.

**INTRODUCTION**

On October 7 – 8, 2014, the Coleman monitoring team reviewed the RVR process at HDSP. At the time of the site visit, HDSP housed inmates at custody levels I, III and IV, including those requiring 3CMS LOC. As of March 2014, which covered the period under

47

review, HDSP had a total inmate population of 3,140.  Of the total population, 996 or 32 percent of inmates were on the mental health caseload.

During the site visit, the monitoring team met with the warden, mental health supervisors, SHOs and mental health clinicians responsible for completing mental health assessments.  The monitoring team reviewed policies and procedures related to the RVR process at HDSP, training materials provided by headquarters, as well as any local training materials provided by the institution to HDSP staff.  The team also reviewed any RVR audits completed by the institution.  For uniformity purposes throughout all CDCR institutions, the monitors utilized the HDSP institution register and CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections".

The review period covered RVRs issued and/or heard during January, February, and March 2014.  During this time frame as reported in "COMPSTAT", there were a total of 448 RVRs written with 186 or 42 percent issued to inmates on the mental health caseload.  The monitoring team also reviewed ICC actions for three inmates.

**TRAINING**

HDSP produced one proof of practice memorandum, dated January 17, 2012, in response to the October 26, 2011 and November 3, 2011 memorandum requirement.  HDSP also produced the approved PowerPoint presentation regarding mental health input into the RVR process.

IST provided a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda.  With the exception of CC IIs, HDSP was unable to demonstrate adequate compliance with the required one-hour training for designated staff members.  The one-hour training was received by 40 percent of CDOs, 33 percent of captains, 82 percent of lieutenants, 68 percent of sergeants, 25 percent of psychologists and 33 percent of social workers.  HDSP was also unable to demonstrate compliance with the required four-hour training for designated staff members.  The four-hour training was received by 80 percent of CDOs, 67 percent of captains, 27 percent of lieutenants, ten percent of sergeants and six percent of psychologists.  None of the CC IIs or social workers received the four-hour training.

HDSP RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 5 | 4/80% | 2/40% |
| Captains | 6 | 4/67% | 2/33% |
| Lieutenants | 22 | 6/27% | 18/82% |
| Sergeants | 71 | 7/10% | 48/68% |
| CC-II Appeals | 2 | 0/0% | 2/100% |
| Psychologists | 16 | 1/6% | 4/25% |
| Social Workers | 6 | 0/0% | 2/33% |

**STAFF INTERVIEWS**

**SHOs**

The SHOs described the RVR and assessment practice at HDSP.  Mental health staff completed and returned the mental health assessment to custody staff within two to three days of the request.  The SHOs experienced no difficulty in reading the clinician's responses on the mental health assessment or the signature of the clinician completing the form.  One clinician who completed the vast majority of the mental health assessments, was well-known to the SHOs. If there were any questions regarding the mental health assessment, the clinician would be called for clarification.  The SHOs did not provide any examples or recall any specific recommendations by mental health staff regarding mitigation of any penalties.  RVRs were typed by disciplinary officers on each facility and were not being handled by inmate clerks at any time.

**Clinicians**

Clinicians reported that a copy of the RVR and mental health assessment form was delivered to one location within mental health services.  The RVR and mental health assessment form was completed within one to two days.  Mental health staff stated they had a good working relationship with custody staff.

The process for completing a mental health assessment consisted of an inmate interview, reviewing the eUHR and C-file (CF) and speaking with the inmate's PC.  This process took about one to two hours to complete.  For inmates in administrative segregation, the clinician would go to the cell door and ask the inmate if he wanted to come out and speak regarding the RVR.  If he did not, then the interview would be conducted at the cell door.  If the inmate agreed to come out, then custody staff would remove the inmate from the cell and escort them to an interview room.

Mental health staff indicated that if question number two on the mental health assessment was answered affirmatively, it was their practice to also respond to question number three in the affirmative.  Mental health staff reported that the explanation accompanying the response to question number two would consist of basic mental health information.  That same explanation would be restated in response to question number three.  The monitors found examples of this practice during their review, examples are given in the following section.  Mental health staff stated the reason for this practice was that they did not know who would see the comments and did not want to expose the inmate's vulnerabilities to others as the inmate might be punished as a result of providing this information.  With regard to question number three on the mental health assessment, mental health staff indicated it was their belief that inmate discipline was a custody issue and they should not weigh into that arena.

The clinicians stated that a copy of the CDCR form 7230, Progress Note, which was generated as a result of the mental health assessment, was given to the inmate's PC.  This was a good practice to ensure the PC was aware of the RVR and the information/impressions of the evaluator as it related to the inmate's recent behavior.

When asked if they had any recommendations to improve the process, the clinicians recommended that question number three be re-written to be more specific as to what information is relevant for the SHO to consider, e.g., the question could be written to ask, what privileges, if any should not be reduced/limited if the inmate is found guilty of the RVR.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

The monitoring team reviewed mental health assessments for RVRs to determine if they were being completed within established timeframes, and if adequate and appropriate information was being documented by the clinician as per policy. The review showed that the assessments were being processed and completed within established time frames. The majority of the mental health assessments revealed all three questions answered in the negative.

Generally, when clinicians provided written answers to questions number two and three on the mental health assessment, they were unresponsive and of little use to the SHOs. An example of this was the assessment for HDSP Inmate M, where in response to question number two the clinician stated, "Patient-inmate suffers psychiatric symptoms which compromise his ability to resist impulses". In response to question number three the clinician wrote, "Patient-inmate experiences diminished ability to resist his impulses as a result of psychiatric symptoms he suffers".

A second example was the assessment for HDSP Inmate O. In response to question number two the clinician stated, "Patient-inmate suffers psychiatric symptoms which at times profoundly diminish his abilities to resist impulses in a manner consistent with the description of this reported rules violation incident". In response to question number three the clinician stated, "Patient-inmate's abilities to resist impulse is at times profoundly diminished due to psychiatric symptoms he suffers in a manner consistent with the descriptions of this specific reported rules violation incident". These types of responses on the mental health assessment form were not helpful to the SHOs in their determination of whether or not the inmate's mental illness contributed to the behavior for which they was written up for or in assessing any penalties.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION

The review of the hearing documents revealed that SHOs were documenting consideration of mental health status within the findings and disposition even when a mental health assessment was not completed. (*See* HDSP Inmates A, B, F, K.) The monitors also reviewed cases where the SHO documented consideration of mental health status although questions number two and three on the mental health assessment had been answered in the negative. (*See* HDSP Inmates E, H, N.) In all of these cases it was unclear exactly how mental health status was considered.

An additional concern was SHOs utilizing California Penal Code and Evidence Code sections to make a determination of an inmate's sanity as part of the RVR hearing process. An example of this was found in the case of HDSP Inmate M where the SHO states,

Penal Code 25 states in part, public policy precludes consideration of either diminished capacity or irresistible impulse.  Not guilty by reason of insanity can be found only with a preponderance of evidence that the inmate was incapable of understanding right from wrong or knowing the nature and quality of his act at the time of the offense.  Evidence code section 522 states in part, the party claiming insanity has the burden of proof and anyone who has not met their burden of proof including a person who has been diagnosed with a mental illness is presumed to be sane and responsible for the commission of the offense.  This burden has not been met and for this reason inmate Spencer is presumed sane and fully responsible for his actions at the time of the offense.

The application of these California Code sections were outside the scope of the RVR hearing process.  (*See also*, HDSP Inmate O.)

**ICC REVIEW**

Three cases that were referred to ICC were reviewed.  The ICC's consideration of the mental health assessment information appeared to be perfunctory in nature and mimicked the findings of the SHO.  The ICC notes regarding mental health consistently read, "ICC notes the clinical assessment documented on 115–MH was reviewed and taken into consideration during committee."  ICC actions included the aggravation of two of the three SHU terms, due to prior similar behavior by the inmate, usually more than two years in the past.

**HDSP RVR Case Reviews**

**Inmate A**
Date of Violation:  1/22/14
Date of Mental Health Assessment:  N/A
Date of Disposition:  2/19/14
Charge:  Disobeying an Order Resulting in the UOF – Division F Offense

On January 22, 2014, this 3CMS inmate approached the floor officer and insisted that the officer sign a citizen's complaint.  The officer attempted to redirect the inmate several times but the inmate continued to insist that the officer sign the paper.  The inmate refused a direct order to submit to handcuffs.  The officer used pepper spray to gain the inmate's compliance.  The RVR indicated the inmate did not display bizarre, unusual or uncharacteristic behavior and determined therefore that a mental health assessment was not required.  The RVR also noted that although the inmate had a TABE score below 4.0, he did not need a staff assistant because a verified GED was noted in the file.

On 2/19/14, the inmate appeared before the SHO for a hearing.  The inmate was found guilty and assessed 30 days loss of credit, the upper limit for a Division F offense.  The SHO documented consideration of the inmate's mental health status in the hearing documents.

**Impression:**  There was no mitigation in this case.  A mental health assessment was not completed, therefore it was unclear how mental health factors were considered in determining guilt and/or a penalty.  The inmate was assessed credit loss consistent with a Division F offense.

## Inmate B

Date of Violation:  1/7/14
Date of Mental Health Assessment: N/A
Date of Disposition:  1/22/14
Charge:  Fighting – Division D Offense

This 3CMS inmate received a RVR on January 7, 2014 for fighting.  The RVR indicated the inmate did not display bizarre, unusual or uncharacteristic behavior and determined therefore that a mental health assessment was not required.  The inmate did not meet the threshold for a staff assistant.

On 1/22/14, the inmate appeared before the SHO for a hearing.  The inmate was found guilty and assessed 90 days loss of credit, the upper limit for a Division D offense and 90 days loss of yard.  The SHO documented consideration of the inmate's mental health status in the hearing documents.

**Impression:**  There was no mitigation in this case.  A mental health assessment was not completed, therefore it was unclear how mental health factors were considered in determining guilt and/or a penalty.  The inmate was assessed significant loss of credit and privileges.

## Inmate C

Date of Violation:  1/7/14
Date of Mental Health Assessment:  2/22/14
Date of Disposition:  5/19/14
Charge:  Battery on Inmate Resulting in SBI – Division A-1 Offense

This 3CMS inmate received an RVR on 1/7/14 for fighting with two other inmates resulting in serious bodily injury to the inmate and one of the combatants.  The case was referred to the DA for felony prosecution.  The inmate requested postponement of the hearing pending outcome of the DA referral.  The case was rejected for prosecution on May 5, 2014, and the hearing was held on May 19, 2014, within expected time constraints.

The inmate did not meet the threshold for a staff assistant.  On 2/20/14, the case was referred for a mental health assessment based on its classification as an A-1 offense.  A mental health assessment was completed on 2/22/14 with questions numbers one, two and three answered in the negative.

For the findings, the SHO documented that he relied upon the disciplinary and medical reports.  He stated that the inmate's "mental health was considered."  The inmate was found guilty and assessed 360 days loss of credit, the upper limit for a Division A-1 offense, ten days loss of administrative segregation exercise yard privileges and referral to ICC for SHU term assessment.

**Impression:** There was no mitigation in this case. The mental health assessment results were not specified as playing a role in the SHO's decision. The inmate was assessed significant credit loss and some loss of privileges.

---

**Inmate D**
Date of Violation: 1/22/14
Date of Mental Health Assessment: 1/24/14
Date of Disposition: 2/21/14
Charge: Behavior which could lead to violence – Division F Offense

On 1/22/14, while having his dressing changed and being educated about how to keep his skin clean by a nurse, this 3CMS inmate became angry raising his voice stating, "who are you talking to"? The nurse responded, "to you". The inmate then said, "you need to shut up" and stepped towards the nurse in an aggressive manner yelling "Don't ever come back here again". The nurse exited the cell and advised custody staff of what had occurred.

A mental health assessment was completed on 1/24/14 with questions number two and three answered in the affirmative. The response to question number two stated, "Patient-inmate suffers psychiatric symptoms which have been assessed to result in deterministic affects on his conduct. The influence of these symptoms in this reported rules violation incident cannot be ruled out." The response to question number three stated, "The behavior identified as the rules violation in this reported incident may have been influenced by psychiatric symptoms he suffers."

The inmate declined to appear at the hearing held 2/21/14. The SHO noted what was written on the mental health assessment and stated his acknowledgement of the inmate's mental health LOC as well as taking it into consideration in the findings portion of the hearing. The inmate was found guilty and assessed 30 days forfeiture of credit, consistent with the maximum amount of credit loss for a Division F offense, and 30 days loss of yard.

In the findings section, the SHO wrote, "Deterministic influence would indicate that the inmate may not have the ability to precisely predict the outcome of his actions, because all of its causes are either known or the same as those of a previous event. The inmate's medical symptoms are acknowledged however; the inmate's ability to precisely predict the consequences of his actions is not authorization to act in a manner that is aggressive and threatening to others." The SHO went on to state, "the inmate's medical symptoms are acknowledged, however the symptoms alone do not dismiss nor minimize the inmate's personal responsibility related to this manner. I find the inmate to be fully responsible for his actions in this matter."

**Impression:** There was no mitigation in this case. The assessing clinician did not provide adequate guidance to the SHO via the mental health assessment. The inmate was assessed the maximum credit loss for a Division F offense in addition to loss of privilege.

**Inmate E**
Date of Violation: 3/29/14
Date of Mental Health Assessment: 4/4/14
Date of Disposition: 6/27/14
Charge: Battery on Inmate with a Weapon – Division A-1 Offense

This 3CMS inmate received a RVR on 3/29/14 for battering an inmate by punching his head and torso with his fist. A knife was found and determined to have been clenched in his fist at the time of the battery. The case was referred to the DA for felony prosecution. The inmate requested postponement pending outcome of the DA referral. The DA declined to prosecute. The RVR hearing was held on 6/27/14, within expected time constraints.

The inmate did not meet the threshold for a staff assistant. On 4/2/14, the case was referred for a mental health assessment based on its classification as a Division A-1 offense. The mental health assessment was completed on 4/4/14, with questions number one, two and three answered in the negative. On 6/27/14, the inmate appeared before the SHO for a hearing. The inmate was found guilty of the charge. The SHO noted the inmate's "mental health and his LOC were considered in the findings portion of this hearing." The inmate was assessed 360 days loss of credit, consistent with the upper limit for a Division A-1 offense, ten days loss of administrative segregation exercise yard privileges and referred to the ICC for SHU term assessment. The SHO further noted that the inmate's "mental health and his LOC were considered during the disposition."

**Impression**: There was no mitigation in this case. The SHO reported that the "inmate's mental health and LOC" were considered for the finding and during the disposition, however it was unclear how. The mental health assessment results were not specified as playing a role in the SHO's decision. The inmate was assessed significant credit loss.

**Inmate F**
Date of Violation: 1/25/14
Date of Mental Health Assessment: N/A
Date of Disposition: 2/7/14
Charge: Fighting – Division D Offense

This 3CMS inmate received a RVR for fighting on 1/25/14. The hearing was held on 2/7/14. The inmate was provided a staff assistant due to a TABE score of below 4.0. It was noted that the circumstances of the violation did not indicate bizarre, unusual or uncharacteristic behavior, therefore, the case was not referred for a mental health assessment. The inmate was found guilty and assessed 90 days loss of credit consistent with the upper limit for a Division D offense and 60 days loss of dayroom. The SHO stated that the inmate's "mental health factors" were considered in the findings and disposition phases of the hearing.

**Impression:** There was no mitigation in this case. A mental health assessment was not completed, therefore it was unclear how mental health factors were considered in determining guilt and/or a penalty. The inmate was assessed significant loss of credit.

**Inmate G**
Date of Violation:  2/11/14
Date of Mental Health Assessment:  2/15/14
Date of Disposition:  3/12/14
Charge:  Destruction of state property over $400 – Division B Offense

On 2/11/14, nursing staff responded to this 3CMS inmate's room in the CTC, due to a feeding pump alarm.  The nurse found the face of the feeding pump broken and not in working order.  The inmate claimed the machine fell, however during an assessment of the inmate's hands nursing staff found "excoriated bruises on his 1st, 3rd, and 5th right hand knuckles".  The cost to replace the feeding pump is $524.70.

A mental health assessment was completed on 2/15/14 with questions number two and three answered in the affirmative.  The response to question number two stated, "Patient-inmate suffers psychiatric symptoms which have been assessed to result in deterministic affects on his conduct.  Thus the influence of these symptoms in this reported rules violation incident cannot be ruled out."  The response to question number three stated, "The behavior identified as the rules violation in this reported incident may have been influenced by psychiatric symptoms he suffers."  It is worth noting that the written responses to questions number two and three are identical to those recorded on a mental health assessment for another RVR subsequently issued to the same inmate.

The inmate declined to appear at the hearing held 3/12/14.  The SHO documented what was written on the mental health assessment in response to questions number two and three.  The SHO stated, "I have reviewed the assessment, and considered the conclusions of clinical staff."  In the findings portion of the RVR, the SHO stated, "As the senior hearing lieutenant I have clearly considered the inmate's mental health as well as the 115 MH, it is clear through the evidence in the body of the RVR that the inmate was lucid and capable of understanding the ramifications of his actions, the inmate had the mental capacity to make a fictitious story as to how the pump was broken to avoid having to pay for its replacement.  Inmates whom are in the process of a psychiatric episode would not formulate or fabricate a reason for damaging property.  The inmate is clearly utilizing his inclusion in the mental health program to manipulate staff into not holding him responsible for his actions."

The inmate was found guilty and 150 days loss of credit, the maximum allowed for a Division B offense and ten days loss of yard.  The SHO stated that the inmate's mental health was considered in the disposition portion of the hearing.

**Impression:**  There was no mitigation in this case.  The assessing clinician did not provide adequate guidance to the SHO via the mental health assessment.  The SHO applied a self-developed "manipulation" standard, which appeared to preclude mitigation of the penalty according to the SHO.  The inmate was assessed the maximum credit loss in addition to loss of privilege.

**Inmate H**
Date of Violation: 2/23/14
Date of Mental Health Assessment: assessment not provided for review
Date of Disposition: 5/27/14
Charge:  Disrespect – Division B Offense

This 3CMS inmate received an RVR on 2/23/14 when he resisted being escorted to a holding cell.  The inmate kicked the program sergeant twice in the calf.  While forcing the inmate to the ground, the sergeant's left leg was injured when it was smashed between the inmate's body and the waist restraints.
.
A mental health assessment was completed on 3/1/14, with questions number one, two and three answered in the negative.  The RVR indicated that the inmate did not exhibit any bizarre or unusual behavior during the charged offense.  A copy of the mental health assessment was not provided for review, therefore it could not be determined whether the clinician offered further comments.  The inmate met the requirement for a staff assistant due his placement in a MHCB at the time of the hearing.  The inmate was found guilty and assessed 150 days loss of credit consistent with the upper limit of a Division B offense, ten days loss of yard and referral to ICC for SHU term assessment.  The SHO documented that the inmate's mental health was considered during the findings and disposition phases.

**Impression:**  There was no mitigation in this case.  Questions number two and three on the mental health assessment were answered in the negative.  Although the SHO documented consideration of the inmate's mental health status, it was unclear how it was considered in determining guilt and/or a penalty.  The inmate was assessed significant loss of credit and minimal privilege loss.

**Inmate I**
Date of Violation: 3/17/14
Date of Mental Health Assessment:  not provided for review
Date of Disposition: 4/17/14
Charge:  Possession of a Weapon – Division A-1 Offense

On 3/17/14, a cell search led to the discovery of a weapon secreted in a plastic glove on the floor of this 3CMS inmate's cell.  The inmate was issued a RVR and the case was referred to the DA for felony prosecution.  The inmate elected not to postpone the hearing pending outcome of the DA referral.  A copy of the mental health assessment was not provided for review.

On 4/17/14, the inmate appeared before the SHO for a hearing.  The inmate did not meet the threshold for a staff assistant.  The SHO documented that he considered the findings of the mental health assessment.  He recounted the clinician's findings as, "[Inmate] suffers from no mental health issues or complications that could explain the inmate's misconduct.  The report also showed no considerations to be given in the assessment of guilt or possible penalties if indicated by this hearing."

The inmate was found guilty and assessed 360 days loss of credit, consistent with the upper limit of a Division A-1 offense, ten days loss of yard and referred to the ICC for SHU term consideration.

**Impression:** There was no mitigation in this case. The clinician did not recommend any mental health factors be considered in assessing a penalty. There was significant credit loss imposed along with minimal loss of privileges.

**Inmate J**
Date of Violation: 2/12/14
Date of Mental Health Assessment: 2/17/14
Date of Disposition: 3/12/14
Charge: Threats Against a Public Official – Division B Offense

On 2/12/14, during a search of this 3CMS inmate's CTC cell by custody staff, a nurse came to the cell front and asked staff if everything was all right. The inmate made a threat towards the nurse. Upon completion of the cell search, the inmate was advised by the officer he would be receiving a RVR for the threat made to the nurse. The inmate cursed at the officer.

A mental health assessment was completed on 2/17/14 with questions number two and three answered affirmatively. The response to question number two stated, "patient-inmate suffers psychiatric symptoms which have been assessed to result in deterministic affects on his conduct. Thus the influence of these symptoms in this reported rules violation incident cannot be ruled out." The response to question number three stated, "The behavior identified as the rules violation in this reported incident may have been influenced by psychiatric symptoms he suffers." This is unresponsive to question number three and contains similar canned language found in other RVRs issued to the inmate.

The inmate declined to appear at the hearing held 3/12/14. The SHO noted what was written on the mental health assessment writing, "I have reviewed the assessment and considered the conclusion of clinical staff". The SHO wrote in the findings portion of the RVR, "as the senior hearing lieutenant I have clearly considered the inmate's mental health as well as the 115 MH, it is clear through the evidence in the body of the RVR that the inmate was lucid and capable of understanding the ramifications of this action. The inmate is clearly utilizing his inclusion in the mental health program to manipulate staff into not holding him responsible for his actions, the inmate is clearly in his right mind when he chooses and utilizes his Mental Health Status as a crutch when he is acting out in an attempt to not be held accountable."

The inmate was found guilty and assessed 150 days loss of credit, the maximum allowed for a Division B offense, and 10 days loss of yard.

**Impression:** There was no mitigation in this case. The assessing clinician did not provide adequate guidance to the SHO via the mental health assessment and used the same language that had been used in other assessments for this same inmate. The inmate was assessed the maximum credit loss in addition to loss of privilege.

**Inmate K**
Date of Violation:  2/27/14
Date of Mental Health Assessment:  N/A
Date of Disposition:  3/19/14
Charge:  Disrespect – Division F Offense

The inmate received a RVR on 2/27/14 for using profanity while yelling and arguing with a correctional counselor about Open Line Hours.  The RVR indicated the case was not referred to mental health because the inmate's behavior was not bizarre or unusual.

On 3/19/14, the inmate appeared before the SHO for a hearing.  The inmate did not meet the threshold for a staff assistant.  The inmate was found guilty and assessed 30 days forfeiture of credits, consistent with the upper limit for a Division F offense and 60 days loss of dayroom and non-emergency telephone calls.  The SHO noted he "considered the inmate's  mental health status and LOC and that having considered these, he found no evidence suggesting that the inmate's mental health status in any way contributed to the behavior."

**Impression:**  There was no mitigation in this case.  A mental health assessment was not completed, therefore it was unclear how mental health status was considered in determining guilt and/or assessing a penalty. The inmate was assessed loss of credit consistent with a Division F offense.

**Inmate L**
Date of Violation:  2/26/14
Date of Mental Health Assessment:  N/A
Date of Disposition:  3/27/14
Charge:  Resisting Peace Officer Resulting in UOF – Division D offense

On 2/26/14, this 3CMS inmate twice ignored an order to enter his cell and lock up.  He complied with an order to cuff up.  During escort, the inmate abruptly turned away from the officer's grip.  The officer used the force of his body weight to bring the inmate to the ground.

On 3/27/14, the inmate appeared before the SHO for a hearing.  The inmate was assigned a staff assistant because there was no documented TABE score on file.  The RVR indicated the inmate was a 3CMS participant, and the behavior exhibited by the inmate was not bizarre or out of character.  Therefore, the case was not referred for a mental health assessment.  The inmate pled not guilty and stated, "I don't feel I'm guilty.  I was just trying to pull my pants up.  I'm on medication.  I don't understand.  I shouldn't even be at this prison.  I feel like I cooperated to the best of my ability."  The officer wrote that the inmate was "contending that his mental capacity is diminished to the point that he did not understand his actions were wrong.  However, diminished capacity is never an excuse for criminal activity (PC 26)."  Based on the charge, the SHO found the inmate guilty, noting he considered the inmate's mental health status and found no evidence "that his mental status in any way contributed to the behavior."

The inmate was assessed 90 days loss of credit, consistent with the upper limit for a Division D offense, 60 days loss of dayroom and non-emergency telephone calls.

**Impression:**  There was no mitigation in this case.  The SHO utilized his own personal observation to draw a conclusion about diminished capacity; a standard not applicable this case or part of CDCR's RVR policy.  A SHO is not one of the CDCR classifications that may reach a mental health conclusion.  The inmate was assessed significant credit loss and loss of privileges.

**Inmate M**
Date of Violation:  1/14/14
Date of Mental Health Assessment:  1-26-14
Date of Disposition:  2/4/14
Charge:  Resisting a Peace Officer – Division D Offense

On 1/14/14 at 1755 hours, while observing inmates returning to their housing units during the evening meal release, the inmate was observed to have stopped at the Facility B Program gate after leaving the medication line.  The inmate then began to walk towards building 3 around the track.  The officer instructed the inmate to stop in order to counsel the inmate about not stopping on the track during the evening meal program.  The inmate did not stop walking and the officer again ordered the inmate to stop at which time the inmate responded negatively and kept walking.  The officer then ordered the inmate to get down which the inmate did not comply resulting in two officers using physical force to take the inmate down to the ground and placing him in handcuffs.

A mental health assessment was completed on 1/26/14.  The response to question number one stated, "Patient-inmate is currently assessed at the EOP LOC and this requires assignment of a staff assistant."  Questions number two and three were answered in the affirmative.  The response to question number two stated, "Patient-inmate suffers psychiatric symptoms which compromise his abilities to resist impulses."  The response to question number three stated, "Patient-inmate experiences diminished ability to resist his impulses as a result of psychiatric symptoms he suffers."

On 2/4/14, the inmate appeared before the SHO for a hearing.  The SHO documented what was written on the mental health assessment and stated his acknowledgement of the inmate's mental health LOC.  The SHO noted in the findings portion of the RVR, "The findings detailed by the Licensed Clinical Social Worker (LCSW) concluded that the inmate was influenced to an unstated degree by his mental health status."  The SHO cited California Penal Code section 25, which states in part, "Public policy precludes consideration of either diminished capacity or irresistible impulse.  Not guilty by reason of insanity can be found only with a preponderance of evidence that the inmate was incapable of understanding right from wrong or knowing the nature and quality of his act at the time of the offense.  Evidence code section 522 states in part, the party claiming insanity has the burden of proof and anyone who has not met their burden of proof including a person who has been diagnosed with a mental illness is presumed to be sane and responsible for the commission of the offense.  This burden has not been met and for this reason the inmate is presumed sane and fully responsible for his actions at the time of the offense."

The inmate was found guilty and assessed 90 days forfeiture of credit, consistent with the maximum amount of credit loss for a Division D offense and 30 days loss of dayroom and telephone privileges.   The SHO noted that the inmates EOP LOC was considered in the disposition of this RVR.

**Impression:**  There was no mitigation in this case.  The assessing clinician did not provide adequate guidance to the SHO on the mental health assessment.  The SHO's identification of penal code and evidence code sections within the findings portion of the RVR was not appropriate for an administrative hearing process.  The inmate was assessed the maximum credit loss in addition to loss of privileges.

**Inmate N**
Date of Violation:  2/13/14
Date of Mental Health Assessment:  3/1/14
Date of Disposition:  3/6/14
Charge:  Battery on an inmate resulting in a use of force – Division D Offense

On 2/13/14, an officer observed this 3CMS inmate fighting with another inmate on the grass area in front of building two.  All inmates were ordered to get down with everyone complying except the two inmate combatants.  Additional staff responded using OC pepper spray in order to gain compliance.  A mental health assessment was completed on 3/1/14.  Question numbers one, two and three were answered in the negative.

On 3/6/14, the inmate appeared before the SHO for a hearing.  The SHO noted that the mental health assessment disclosed several mental health issues that needed to be considered.  This statement was inaccurate based on the mental health assessment, which indicated a "no" response to all three questions.  The SHO, in the findings section of the RVR, accurately stated that the responses to the three questions on the mental health assessment were "no".  Additionally the SHO indicated in the findings that the inmate was suffering from no mental health issues or complications that led to or could excuse the inmates behavior.  The SHO also stated that the inmates' 3CMS LOC was considered during the adjudication of the RVR.  The inmate was found guilty of the charge of battery on an inmate and assessed 90 days loss of credit consistent with a division D offense, in addition to ten days loss of yard.

**Impression:**  The SHO indicated that there were several mental health issues that needed to be considered in hearing the RVR.  However this was inconsistent with the mental health assessment, which showed a "no" response to all three questions.  The SHO documented consideration of the inmate's mental health LOC at multiple places within the RVR.  However there was no explanation as to how or what impact that consideration had on the findings and disposition.

**Inmate O**
Date of Violation:  3/16/14
Date of Mental Health Assessment:  2/13/14
Date of Disposition:  4/7/14
Charge:  Battery on an inmate with a weapon – Division A-1 Offense

On 3/16/14 the inmate was observed exiting his cell and running into another cell.  He entered the other cell and began to assault another inmate.  Custody staff ordered the inmates to get down which they complied.  The victim had injuries consistent with being slashed or cut with a slashing type weapon.

A mental health assessment was completed on 2/13/14.  Question number one was answered in the negative.  Questions number two and three were answered in the affirmative.  The response to question number two stated, "Patient-inmate suffers psychiatric symptoms which at times profoundly diminished his abilities to resist impulses in a manner consistent with the description of this reported rules violation incident."  The response to question number three stated, "Patient-inmate's abilities to resist impulses is at times profoundly diminished due to psychiatric symptoms he suffers in a manner consistent with the descriptions of the specific reported rules violation incident."  This is unresponsive to question three in addition to being canned language found in other mental health assessments completed for other RVRs.

On 4/7/14, the inmate appeared before the SHO for a hearing.  The SHO noted what was written on the mental health assessment, writing, "The inmate's mental health status at the CCCMS LOC was considered in the findings of this RVR.  The findings detailed by the LCSW concluded that the inmate was influenced to an unstated degree by his mental health status."  The SHO then quoted sections of the California Penal Code and Evidence code referring to diminished capacity or irresistible impulses as well as claiming insanity during the commission of an offense.  The use of these legal standards were not applicable within the RVR process.

The inmate was found guilty and assessed 360 days loss of credit, the maximum allowed for a Division A-1 offense, ten days loss of yard, and referred to ICC for a SHU term consideration.

**Impression**:  There was no mitigation in this case.  The assessing clinician did not provide adequate guidance to the SHO via the mental health assessment.  The SHO's identification of Penal Code and Evidence Code sections within the findings portion of the RVR was not appropriate for an administrative hearing process.  The inmate was assessed the maximum credit loss in addition to loss of privileges.

## California Correctional Center (CCC) RVR Review

**SUMMARY OF FINDINGS**

A. Based on data provided by the institution, training on the RVR process and the role of the mental health assessment was deficient for clinical and custody staff.

B. CCC did not refer any inmates for a mental health assessment during the review period.

C. Interviews of mental health clinicians indicated they were confused regarding the information solicited by one of the questions on the mental health assessment form.

D. The SHOs were aware of the policy and procedures regarding referrals for a mental health assessment for RVRs.

**INTRODUCTION**

At the time of the monitor's visit, CCC housed Level I, II, and III inmates. As of March 2014, the institution housed a total of 5,027 inmates, including two, or fewer than one percent, of whom had a mental health caseload designation. The monitor met with the warden, mental health supervisors as well as four SHOs (SHO) and two mental health clinicians responsible for preparing the mental health assessments.

The monitor reviewed RVR policies and procedures, training materials provided by headquarters, and any local training materials provided to CCC staff. The team also reviewed any RVR audits completed by the institution. For consistency in data gathering, the monitor used the CCC institution register and CDCR 1154 logs, which is required by CCR, Title 15, "Crime Prevention and Corrections."

The review covered RVRs issued and/or heard during January through March, 2014. According to a COMPSTAT report, during this period 1,324 RVRs were written, with none issued to inmates with a mental health designation.

**TRAINING**

CCC staff produced a proof-of-practice memorandum, dated January 30, 2012, in response to the October 26, 2011 requirement, but none in response to the November 3, 2011 requirement. It also produced the approved PowerPoint presentation on mental health input in the RVR process. IST was asked to produce an attendance report for the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda.

The institution was unable to demonstrate adequate compliance with the required one-hour or four-hour training requirements. Eighty-five percent of lieutenants and only 50 percent of the CDOs received the required four hours of training. None of mental health staff attended either the one-hour or four-hour training sessions.

CCC RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 2 | 1/50% | 0/0 |
| Captains | 3 | 2/67% | 0/0 |
| Lieutenants | 20 | 17/85% | 0/0 |
| Sergeants | 50 | 28/56% | 1/2 |
| Psychologists | 1 | 0/0% | 0/0 |

**STAFF INTERVIEWS**

**SHOs**

Because no mental health assessment forms were requested or completed during the review period, interviews with SHOs did not cover results of any specific case findings. Lieutenants were able to describe the policies and procedures for referrals for mental health assessments to be used in the RVR process. They reported good working relationships with the clinicians and that they called the clinicians with any concerns regarding inmates' mental health. They also indicated that all CCC staff proactively identified and referred inmates to mental health to intercede in cases of problematic inmate behavior before it could escalate into a rule violation.

**Clinicians**

CCC designated one clinician to complete all mental health assessment forms. The clinician was able to describe the policy and procedures to be followed if custody staff requested a mental health assessment. The clinicians appeared a bit confused regarding question three on the mental health assessment form, which mental health staff recommended be re-written to draw more specific information for the SHO to consider. For example, the question could be written to indicate which, if any, privileges should not be reduced or limited if the inmate were found guilty of the RVR. Mental health staff indicated they had a good working relationship with custody staff.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

No mental health assessments were completed during the review period.

**CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION**

The monitor reviewed over 100 adjudicated RVRs in the CDCR 1154 logs. These logs were being maintained in an orderly manner and indicated the inmate's mental health status. The review found that per policy, the RVRs indicated whether the inmate was on the mental health caseload and whether his behavior was deemed bizarre, unusual, or uncharacteristic. The monitor found no RVRs issued to any inmates on the mental health caseload.

63

**ICC REVIEW**

There were no cases for review by the ICC.

**CASE REVIEWS**

Because there were no mental health assessments completed during the monitoring period, there were no cases for the monitor to review.

## Mule Creek State Prison (MCSP) RVR Review

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at MCSP by completing and sustaining all requirements.

B.  MCSP was not compliant with required training of custody and mental health staff related to the RVR process.

C.  Appropriate and complete collaborative RVR training between custody and mental health had not occurred.

D.  Inmate "advocacy" training resulted in the unintended consequence of adversely impacting the credibility of assessing clinicians with some SHOs.

E.  Custody staff indicated concern with the quality, content, and clinical language used by some assessing clinicians.

F.  Several assessing clinicians merely stated the inmate's diagnosis.

G.  Mental health assessments were not completed timely.

H.  Assessing mental health staff was unaware that SHOs did not have access to mental health progress notes related to RVR assessments.

I.  Mental health assessments were appropriately requested.

J.  SHOs generally noted that mental health assessments were considered and reviewed, in a pro forma manner.

K.  Where mitigation occurred, it was achieved by assessing the minimum amount of credit loss.

L.  A small number of reviewed RVR packets indicated a correlation between clinicians' recommended penalties in the mental health assessment and the penalties assessed by the SHO.

M.  Additional points were assessed in each ICC case reviewed.

N.  MCSP did not conduct quality reviews of SHOs' consideration of mental health assessments.

O.  The methodology of audits conducted during the review period was flawed.


**INTRODUCTION**

During June 4-6, 2014, the Coleman monitoring team reviewed the RVR process at MCSP.  At the time of the visit, MCSP housed Level I, III, and IV inmates, including those requiring EOP and 3CMS levels of care, and inmates housed in the MHCB.  MCSP was a designated ASU EOP Hub and operated an Outpatient Housing Unit (OHU).  As of March 2014, MCSP had a total inmate population of 2,913.  Of that population, 1809 or 62 percent were on the mental health caseload.

During the site visit, the monitoring team met with the warden, chief deputy warden, associate wardens, two of which were CDOs, the IST lieutenant, and other administrative staff.  The team also met with nine SHOs, five mental health clinicians responsible for preparing mental health assessments, and the OT who tracked and routed requests for mental health assessments.  The current RVR coordinator assumed this position in January 2014, but was unavailable during the site visit.  The team met with the previous RVR coordinator from 2013.

The team reviewed policies and procedures related to the RVR process, headquarters-provided training materials, and local training materials provided by MCSP to staff.  The team also reviewed RVR-related audits that MCSP conducted.  While the institution maintained a local tracking system for RVR adjudication, for uniformity purposes throughout all CDCR institutions the monitors utilized the MCSP Institution Register and CDCR 1154 logs to gather RVR data, which was required to be maintained under Title 15 of the CDCR.

The review period covered RVRs issued and/or heard during January, February, and March 2014.  During this period, the "MCSP Institution Register Report, RVRs within MHSDS" indicated there were a total of 741 RVRs, of which 563 or 76 percent were issued to caseload inmates.  The team reviewed 77 completed RVRs and the ICC's actions for several inmates for whom SHU terms were recommended.

**TRAINING**

MCSP was unable to demonstrate compliance for required personnel trainings other than for those of two CDOs.  The institution reported that 41 percent of lieutenants and 18 percent of

sergeants received the required four-hour training on mental health assessments and the RVR process.  However, only four percent of psychologists and zero percent of psychiatrists, social workers, and appeals coordinators completed this four-hour training.

MCSP RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 2 | 2/100% | 2/100% |
| Lieutenants | 22 | 9/41% | 19/86% |
| Sergeants | 61 | 11/18% | 43/70% |
| Psychiatrists | 5 | 0/0% | 2/40% |
| Psychologists | 26 | 1/4% | 7/27% |
| Social Workers | 16 | 0/0% | 2/13% |
| CC-II Appeals | 1 | 0/0% | 0/0% |

Custody staff produced one proof of practice memorandum dated December 22, 2011 in response to the one-hour November 3, 2011 training requirement.  MCSP mental health staff also produced a memorandum dated August 10, 2012 in response to the November 3, 2011 memorandum.

MCSP also provided training reports for mental health clinical staff dated October and November 2013 concerning mental health assessment completion.  This training was a one-hour session provided by the RVR coordinator during 2013 that was attended by 40 mental health clinicians.  The RVR coordinator reported that a major training focus emphasized the importance of being inmate advocates.  However, staff indicated that when put into practice, this training may have had the unintended consequence of negatively impacting clinicians' credibility with SHOs.  The monitoring team also identified multiple mental health assessments where clinicians inappropriately stated inmates' wishes instead of the appropriate clinical or treatment factors that the SHO should consider during penalty assessment.

Interviewed second and third shift SHOs confirmed the lack of training.  While officers reported receiving significant training regarding RVR adjudication, as such training was ongoing at MCSP, none reported attending the four-hour training in October 2011.  In fact, two MCSP lieutenants employed for more than one year had not received this training.  Third shift lieutenants reported they would receive this training at the Lieutenant's Academy, although the Academy had not met in approximately three years.  It was reported that there were eight MCSP lieutenants who were awaiting the next Academy.  While all officers appeared well-versed concerning the standards for requesting mental health assessments and reported consideration of assessments, MCSP training was not compliant with the 2011 memoranda.

**STAFF INTERVIEWS**

**SHOs**

As to the efficacy of mental health assessments in RVR adjudication, many lieutenants expressed concern with the quality, content, and clinical language used by clinicians. All officers stated that they reviewed and considered clinical input. However, many expressed concern that inmates' often manipulated clinicians and that many RVRs documented inmate privilege requests that they did not want taken away. SHOs reported that clinicians often simply wrote inmate diagnoses and used language that they did not understand. Several lieutenants reported that assessments often were not timely returned.

A minority of SHOs expressed concern about the current RVR process. These officers stated that clinical assessments should be considered, but that inmates also needed to be held accountable. In their opinion, punishment should be consistent with the offense, regardless of the inmate's mental health at the time of the offense. Other comments included concern that clinicians sometimes went too far and assumed the SHO's responsibility. One lieutenant stated he could disagree with a clinical assessment even if the clinician found the inmate schizophrenic by determining the inmate's "sophistication" level through discussions with the inmate during the hearing. Such comments, which were contrary to the intent of RVR policies, underscored the critical need for completion of required training.

**Clinicians**

The monitors met with five clinicians who completed mental health assessments. They reported that assessments were assigned on a rotating basis; the only exception was for administrative segregation inmates, whose assessments were completed by the RVR coordinator. Clinicians reported attending the October 2013 training. They also described the assessment completion process, which included inmate interviews, speaking with PCs, and conducting eUHR reviews. Clinicians reported occasions when they consulted with custody.

Clinicians were surprised to learn that SHOs did not review clinical progress notes. These notes contained extensive explanations which were included in the belief that SHOs reviewed them. Clinicians indicated being unaware whether SHOs' RVR process review was limited to the mental health assessment.

**MENTAL HEALTH ASSESSMENT REQUESTS**

MCSP had a system to track mental health assessment requests and completions. Staff reported officers' typically hand-delivered requests for mental health assessments, although on occasion requests were routed through inter-prison mail. An OT maintained a tracking log for mental health assessment requests; the log indicated the date received, the completion date, and the inmate's PC. As part of the tracking process, appointment information was documented with the supervising clinician on the inmate's yard; this clinician assigned the assessment to a clinician other than the PC. Following completion, the assessment was returned to the

responsible OT, who returned it to the yard by way of the outbox in her office. Staff reported that officers checked their outboxes once daily when delivering new assessment requests.

Staff reported that recently there were occasional delays with third shift officers' delivery of mental health assessment requests. Mental health staff had met with custody, including associate wardens, to resolve this problem.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

This review generally indicated that mental health assessments were typically requested as appropriate and according to policy. MCSP was not compliant for timely assessment completion; 27 percent of reviewed assessments were completed late. Completion timeliness also varied among clinicians, while there were issues with recording the correct due date on the mental health assessment.

The quality of mental health assessments varied among clinicians. Some assessments, such as the one for MCSP Inmate B, were incomplete, while mental health assessments for MCSP Inmates C, E, F, H, and I were completed. A majority of reviewed assessments indicated "no" in response to questions number two and three on Facilities B and C. Of the 14 reviewed Facility B RVRs that had mental health assessments, ten responded "no" to question number two and three answered "no" to question number three. Of the 13 reviewed Facility C RVRs that had mental health assessments, nine responded "no" to question number two and three indicated "no" to question number three.

Clinicians also frequently merely listed inmate diagnoses, in contravention of training documentation and policy as to the use of plain language. For example, for MCSP Inmate B, the clinical response stated "DX: Bipolar Disorder; Rule out Dementia due to anoxia @ birth. Inmate/Patient (I/P) was reportedly under the influence of bath salts when 115 occurred. Symptoms: expansive mood, impulsivity, extreme agitation." Another clinician completed an assessment for an EOP inmate by noting in response to question number two, "DX mood disorder/psychotic disorder NOS. Medication compliant, however, symptoms of depression, paranoia, low frustration tolerance, auditory hallucinations, danger to self and others persist. Numerous recent admits to OHU, MHCB. Numerous 115s for threatening staff due to paranoid ideations." For question number three, the clinician noted only "Pending DSH referral."

The review revealed one clinician who instead of making his own clinically-based recommendations as to penalty assessment recorded inmate preferences for punishment. Such clinically reported inmate punishment preferences, as reported for MCSP Inmates C, E, F, H and I, included "if penalty invoked, [inmate] would take loss of phone privilege, given a choice," "inmate anticipates an increase in stress if his canteen privileges are removed," and "inmate anticipates increased stress if his dayroom and yard privileges are removed."

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

Reviewed RVR packages revealed that overall SHOs typically indicated that mental health assessments were reviewed and considered. This was, however, generally in the form of a perfunctory, verbatim quotation indicating assessment consideration. In multiple cases, such as MCSP Inmate B, there was no explanation concerning the SHO's consideration of the mental health assessment. However, there were cases, such as those for MCSP Inmates D, G, and H, where the SHO indicated how the mental health assessment was considered.

Review of RVRs where the SHO elected penalty mitigation indicated that this was typically accomplished through assessment of the minimum amount of credit loss.

In the noteworthy case of MCSP Inmate A, an MHCB inmate, the clinician reported that his mental health had directly affected the behavior that led to the RVR. Although the SHO noted consideration of this assessment, it did not appear to have any impact on the SHO's findings and disposition. In fact, the SHO noted that "there were no mitigating circumstances to consider in this matter" and the inmate was found guilty of a Division B offense, assessed 121 days loss of behavioral credit, and referred to the ICC for SHU term consideration. This inmate was housed in the MHCB after receiving an RVR for threatening a public official.

A small number of reviewed RVRs, including those for MCSP Inmates D and G, revealed SHO penalties that correlated with clinical recommendations indicated by mental health assessments.

**ICC REVIEW**

The monitors' review of ICC actions revealed assessment of additional classification points in each case. An additional eight points were assessed for a Division A offense, while six points were assessed for Division B, C, and D offenses, and four points were assessed for Division E and F offenses. Additional points were also awarded for specific offenses. Among them, eight points were assessed for battery or attempted battery on a non-prisoner, and 16 points were assessed for possession of a deadly weapon. There appeared to be no mitigation in the awarding of points following a guilty finding for an RVR. With the awarding of additional points, an inmate's placement in a particular institution could change due to a change in the inmate's level. For example, this would occur with a change from a Level III to Level IV, when an inmate's points exceeded 59 points.

The monitors reviewed several cases where the ICC mitigated SHU terms due to inmate mental health. In other cases, no mitigation took place. For one inmate, the ICC held on April 3, 2014 suspended the remainder of a nine-month aggravated SHU term previously imposed on March 7, 2014. However, at this time of the site visit, this inmate had two additional pending RVRs. He was retained in administrative segregation pending their adjudication; suspension of the remaining SHU term thus in effect had no true mitigating impact.

**QUALITY REVIEW**

MCSP did not perform quality review of SHOs' consideration of mental health assessments in the RVR process.  However, mental health staff conducted quarterly audits of assessments.  The latest audit dated April 22, 2014 included January, February, and March 2014 data and indicated 100 percent compliance for appropriately answering all three questions.  Audit comments included the need for continued training and identified new clinical staff as the target audience, as opposed to training all clinicians and relevant custody officers.  The monitoring team's review of data and documentation indicated findings that were contrary to these audit results and numerous incomplete assessments.  The utilized audit methodology was also flawed, as the RVR coordinator reviewed her own assessments.

## MCSP RVR Case Reviews

**Inmate A**
Date of Violation:  3/5/14
Date of Mental Health Assessment:  3/10/14
Date of Disposition:  4/11/14
Charge:  Threatening a Public Official - Division B Offense

On 3/5/14, the inmate received an RVR for "threatening a public official," which was a Division B offense.  The RVR indicated that he was being escorted to a temporary holding cell awaiting an MHCB bed when he "made direct eye contact" and used profanity to threaten a Registered Nurse (RN) in the TTA.  The RVR noted that the comment was unprovoked.  The inmate was at the EOP LOC at the time of the incident.

The inmate was interviewed on 3/7/14 and a mental health assessment was completed on 3/10/14.  The assessment stated that the mental disorder appeared to contribute to the behavior that led to the RVR, noting that "I/P was observed being paranoid, disorganized and exhibiting very poor insight and judgment."  The inmate was referred to the TTA for more evaluation and treatment a few hours prior to this incident due to being in a very poor mental state.

The clinician checked "yes" for question number three of the mental health assessment.  The clinician noted that the inmate was non-compliant with mental treatment offered, displayed poor insight/judgment, and, as a result, demonstrated impulsive and violent behavior.

The SHO stated that he considered the written reports in the RVR's "Findings" section, noting "The written reports clearly delineates the circumstances and they meet the criteria for a finding of guilty to the written charge.  There are no mitigating circumstances to consider in this matter."

The inmate was found guilty and assessed 121 days loss of behavioral credit consistent with a Division B offense, was referred to the ICC for placement in an appropriate SHU term, and was counseled, warned, and reprimanded.  He was advised that due to the nature of the offense, he did not qualify for restoration of forfeited credits.  There was no referral to the District Attorney.

**Impression:** There was no penalty mitigation in this case. The SHO referenced the mental health assessment and concluded that there were no mitigating factors that impacted the penalty. The inmate was assessed significant credit loss.

### Inmate B

Date of Violation: 3/28/14
Date of Mental Health Assessment: 4/16/14
Date of Disposition: 5/5/14
Charge: Resisting Staff Resulting in Use of Force (physical)—Division D Offense

On 3/28/14, the inmate was transported to an outside hospital emergency room. When staff informed him that they would be securing his leg to the hospital gurney, he informed the officers that he would resist if they tried. The inmate ripped his spit mask and stated he was going to break his cuffs. He then began applying outward pressure in an attempt to break the cuffs and the officer used his hands to apply physical force to keep the inmate's arms close to his torso. He subsequently banged his head on the bed rail and the officers grabbed his head and neck to stop the head banging. The inmate continued to resist, moving violently and yelling threats and obscenities. Once placed in hard restraints, he stopped resisting and became cooperative.

The RVR coordinator completed the mental health assessment on 4/16/14, which was beyond time frame guidelines; custody staff delivered the assessment on 4/2/14. The assessment was incomplete; only question number two was completed. The clinician checked the "yes" box for question number two and noted, "DX Bipolar Disorder; Rule out Dementia due to anoxia @ birth. I/P was reportedly under the influence of bath salts when 115 occurred. Symptoms: expansive mood, impulsivity, extreme agitation."

The SHO indicated consideration of the mental health assessment by documenting what the clinician noted. However, there was no explanation of how it was taken into consideration. The SHO also noted that the assessment did not indicate additional factors to be considered in assessing a penalty for the violation. The inmate was found guilty of a Division D offense, and assessed 80 days loss of behavioral credits and loss of ten days of administrative segregation yard privileges.

**Impression:** There was no mitigation in the case. The mental health assessment was incomplete and was not completed timely. The SHO did not explain consideration of the mental health assessment, but indicated that it was considered. The inmate was assessed significant credit loss.

### Inmate C

Date of Violation: 3/25/14
Date of Mental Health Assessment: 4/9/14
Date of Disposition: 4/21/14
Charge: Obstructing a Peace Officer (Refusing Assigned Housing) - Division D Offense

On 3/25/14, the inmate was informed that he was being released from the OHU back to Facility A. He stated that he was not going back and received an RVR for obstructing a peace officer. The clinician completing the mental health assessment checked "yes" for both questions number

two and three and wrote, "patient has mood disorder with anxiety that may have caused him to exaggerate threat—if he were to disclose the name of an enemy that had threatened his life on SNY." The clinician indicated under question number three that "I/P realized a real fear, not paranoia. He admitted no suicidal ideas, only fears of assault. Patient did not refuse to return to A5 when he was informed the enemy inmate was paroled and the threat removed. If penalty invoked, ____ would take loss of phone privilege, given a choice." The inmate was found guilty of a Division D offense and assessed 61 days loss of behavioral credit.

**Impression:** The monitor was unable to review the entire packet. Therefore, the monitor could not assess whether the mental health assessment was considered and whether there was mitigation. The mental health assessment was not appropriately completed in response to the questions.

**Inmate D**
Date of Violation: 1/30/14
Date of Mental Health Assessment: 2/18/14
Date of Disposition: 2/24/14
Charge: Failure to Comply with DOT Procedures - Division F Offense

During the evening medication pass on 1/30/14, the inmate attempted to hoard his medication by keeping his pills in his mouth; he also refused to open his mouth when ordered to do so. The RVR coordinator completed the mental health assessment. The clinician checked "yes" to both questions number two and three of the assessment. The clinician indicated in response to question number two, "DX: Major Depressive Disorder, Severe w/o Psychotic features. I/P has had 7 MHCB admissions in the past 3 months due to self-harm and transient SI. Has declined in mental status. DSH referral was recommended." In an explanation in response to question number three, the clinician stated, "Loss of privileges that would reduce his ability to exercise or participate in other stress reduction activities could have a negative impact on his mental status."

The SHO noted consideration of the mental health assessment. The inmate was found guilty and assessed 30 days loss of behavioral credit. The SHO noted, "SHO read and considered the Mental Health Assessment and the mitigating factors as noted in the assessment. Therefore, the SHO chooses to assess 30 days loss of behavioral credit and not assign any loss of privileges which would reduce subject's ability to exercise or participate in other stress reduction activities which could have a negative impact on his mental status."

**Impression:** There was mitigation in this case. The SHO referred to the mental health assessment, indicated how it was considered, and noted the mitigating factors. The SHO assessed low credit forfeiture and did not assign any privilege loss.

**Inmate E**
Date of Violation:  1/9/14
Date of Mental Health Assessment:  1/17/14
Date of Disposition:  2/1/14
Charge:  Refusing to Provide a Urinalysis Test - Division F Offense

On 1/9/14, this EOP inmate received an RVR for failing to provide a urinalysis (UA) test.  The inmate had three prior RVRs in December 2013; two were for refusing to provide a UA test and one was for calls and passes (failed to report to school).  One clinician completed the three mental health assessments for these RVRs.  On all three, the clinician checked "no" for question number two, but checked "yes" for question number three.  On one of the assessments for question number three, the clinician noted, "Inmate reports he would experience increased stress if his dayroom privileges were restricted and he was unable to call family members."  For the other two assessments, the clinician wrote, "Inmate reports he would experience increased stress if he was not allowed to attend day room."

The mental health assessment for the 1/9/14 RVR was completed on 1/17/14.  On this assessment, the clinician checked "no" for question number two, but checked "yes" for question number three.  As an explanation for checking "yes" to question number three, the clinician, who completed all of this inmate's multiple mental health assessments, noted "Inmate anticipates an increase in stress if his canteen privileges are removed."

The SHO noted consideration of the mental health assessment by indicating this in the disposition and directly quoting what the clinician wrote on the assessment.  The inmate was found guilty.  He was assessed 30 days loss of behavioral credit, 90 days loss of dayroom, 180 days of no visitation, and was referred to the ICC for possible endorsement to a substance abuse center.  He did not lose canteen privileges.

**Impression:**  The answers on the mental health assessments were not responsive to the questions.  The SHO referenced the mental health assessment and quoted the clinician.  The inmate was assessed both credit loss and loss of privileges.

**Inmate F**
Date of Violation:  1/9/14
Date of Mental Health Assessment:  1/22/14
Date of Disposition:  2/4/14
Charge:  Possession of Inmate-Manufactured Syringe - Division C offense

On 1/9/14, this EOP inmate was issued an RVR for possession of an inmate-manufactured syringe.  The assessment was delivered to mental health on 1/10/14 and completed on 1/22/14.  The clinician checked "yes" for both questions number two and three and noted under question number two, "Inmate reports he likes using heroin to cope with depression."  Under question number three, the clinician noted, "Inmate anticipates an increase in stress if his canteen privileges are removed."  The SHO indicated consideration of the mental health assessment and quoted the clinician's statements on the assessment.  The inmate was found guilty and was

assessed 120 days loss of behavioral credit, 90 days on Privilege Group C status, and one year mandatory random drug testing.

**Impression:**  The mental health assessments were not appropriately completed in response to the questions.  The SHO indicated consideration of the mental health assessment and quoted the clinician's statements from the assessment.  The inmate was assessed significant credit loss.

**Inmate G**
Date of Violation:  12/19/13
Date of Mental Health Assessment:  12/30/13
Date of Disposition:  1/8/14
Charge:  Battery on a Peace Officer Requiring Use of Force (OC) – Division B Offense

On 12/19/2013, this EOP inmate threw a clear liquid that smelled of urine at the psych tech during medication pass in administrative segregation.  On the mental health assessment dated 12/30/2013, the clinician checked "yes" to both questions number two and three.  The clinician indicated in response to question number two, "the I/P was released from MHCB the same day as the RVR and had consistently been described as agitated and angry.  These symptoms are consistent with his diagnoses of Bipolar Disorder."  Regarding question number three, the clinician noted, "Loss of property including state issued property (e.g. mattress/blanket) tends to worsen his mood instability."

The SHO documented consideration of the mental health assessment and quoted the clinician's statements in the body of the RVR.  The inmate was found guilty and assessed 150 days loss of behavioral credit and 90 days loss of phone privileges, personal property privileges, and entertainment privileges.  The inmate was referred to the ICC with a recommendation of a SHU assessment and the matter was referred to the District Attorney for prosecution.

The SHO stated, "The SHO notes that the Mental Health Assessment recommends considering that a loss of property including state issued property (e.g. mattress/blanket) tends to worsen his mood instability."  The SHO considered the recommendation and indicated that the inmate would not be deprived of his state issued property as part of the assessed penalty.

**Impression:**  There was mitigation in the case.  The SHO noted the mental health assessment and indicated how it was considered.  The SHO's mitigation was consistent with the clinician's recommendation regarding property loss, although significant losses of credit and privileges were imposed.

**Inmate H**
Date of Violation:  12/26/13
Date of Mental Health Assessment:  1/9/14
Charge:  Refusal to Provide a UA Test - Division F Offense

The clinician checked "no" to question number two of the mental health assessment, but checked "yes" to question number three.  Regarding question number three, the clinician reported "inmate anticipates increased stress if his dayroom and yard privileges are removed."

74

The inmate was found guilty, but the SHO noted that he relied on information on the mental health assessment and considered it in assessing the penalty for this offense. The SHO assessed 30 days loss of yard, as opposed to the allowed 90-day maximum. However, in the disposition, the SHO noted that "no loss of dayroom was assessed due to the subject's mental health issues….the SHO assesses 90 days loss of yard privileges." The inmate was also assessed 180 days loss of visiting privileges.

**Impression:** The answers on the mental health assessment were not responsive to the questions. The SHO reported considering the mental health assessment and indicated how the assessment was considered. The SHO did not impose any loss of credit, but significant losses of privilege were imposed.

**Inmate I**
Date of Violation: 12/26/13
Date of Mental Health Assessment: 1/9/14
Charge: Possession of Paraphernalia (Inmate Manufactured Syringe) - Division C Offense

The clinician checked "no" for question number two of the mental health assessment, but checked "yes" for question number three. On the mental health assessment, the clinician noted "Inmate anticipates increased stress if his dayroom privileges are removed."

This EOP inmate was found guilty and assessed 120 days loss of behavior credit and 60 days loss of yard privileges. However, the SHO indicated that the privilege loss was mitigated in that only loss of yard privileges was assessed and not for the maximum of 90 days. There was no loss of dayroom due to the subject's mental health.

**Impression:** There was no effective mitigation in the case. The mental health assessment was unresponsive to the questions. The SHO assessed significant credit loss and loss of privileges.

## Sierra Conservation Center (SCC) RVR Review

### SUMMARY OF FINDINGS

A.   Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at SCC by completing and sustaining all requirements.

B.   Based on provided institutional data, training on the RVR process and the role of the mental health assessment was deficient for clinical and custody staff.

C.   Mental health assessments were not consistently completed within required time frames.

D.   Mental health staff was hesitant to provide their opinion and/or recommendations on the mental health assessment.

E.    In one of the three cases reviewed, the clinician did not provide responsive answers to the question of mitigation.

F.    There were discrepancies between the CDCR 1154 logs and the RVRs concerning inmates' mental health status.


## INTRODUCTION

On September 15, 2014 the Coleman monitoring team reviewed the RVR process at SCC.  At the time of the visit, SCC housed Level I, II, and III inmates, including those at the 3CMS LOC.  As of March 2014, SCC had a total inmate population of 4,585.  Of that population, 606 or 13 percent were caseload inmates.

During the site visit, the team met with the warden, facility captains, and mental health supervisors, and with seven SHOs and nine mental health clinicians responsible for preparing mental health assessments.

The monitoring team reviewed policies and procedures related to SCC's RVR process, headquarters-provided training materials, and local training materials provided by SCC to staff. The team also reviewed RVR audits that SCC completed.  For uniformity purposes throughout all CDCR institutions, the monitors used the SCC Institution Registry and CDCR 1154 logs to gather RVR data which was required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections."

The review period covered RVRs issued and/or heard during January, February, and March 2014.  During this period, as reported in "COMPSTAT," there were a total of 1,137 RVRs, of which 117 or ten percent were issued to caseload inmates.

## TRAINING

SCC staff produced two proof of practice memoranda dated January 4, 2012 and February 15, 2012 in response to the October 26, 2011 and November 3, 2011 memoranda requirements, respectively.  SCC also produced the approved PowerPoint presentation and lesson plan regarding mental health input in the RVR process.

IST produced an attendance report of required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda.  SCC did not demonstrate compliance with the one and four-hour training requirements.  Thirty percent of lieutenants, but zero percent of CDOs and captains received the four-hour training.  There was 100-percent compliance for social workers and 60-percent compliance for psychologists for the four-hour training.

SCC RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 3 | 0/0% | 0/0% |
| Captains | 4 | 0/0% | 1/25% |
| Lieutenants | 23 | 7/30% | 15/65% |
| Sergeants | 52 | 10/19% | 21/40% |
| CC-II Appeals | 1 | 0/0% | 0/0% |
| Psychologists | 10 | 6/60% | 3/30% |
| Social Workers | 3 | 3/100% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

The SHO explained that a copy of the RVR and mental health assessment were hand-delivered to mental health staff, and that assessments were typically returned within established timelines.  It was also reported that mental health would process the assessment within one day in those instances where custody required an expedited assessment completion.

The SHO reported that question number two was occasionally answered "yes," but that clinical responses to this question were sometimes illegible and used mental health terms that the SHO did not understand.  SHOs' reported contacting mental health when this occurred to try to understand the assessment.  SHOs further stated that written responses to question number three varied from basic information to very specific details.

SHOs reported having a good working relationship with mental health staff.  They indicated directly talking to clinical staff when they had questions concerning an inmate, and communicating with mental health on a formal and informal basis.

**Clinicians**

Mental health staff explained the process of receiving the mental health assessment and a copy of the RVR, and what was required to complete the assessment.  They reported that the mental health OT scheduled inmate interviews with assigned clinicians.  Clinicians stated it took approximately one hour to complete the mental health assessment process.

Clinicians stated being uncomfortable answering question number two because it requested their opinion.  They similarly expressed concern with question number three and reported that inmate discipline was a custody function in which clinicians should not be involved.  They further indicated that answering question number three put them in a problematic situation with custody and expressed concerned about jeopardizing their relationship with custody if clinicians' provided advice regarding inmate discipline.  One clinician stated concern that inmates who learned that mental health staff was advocating for them in the RVR process might attempt to manipulate clinical staff more than they currently did.  Lastly,

77

concerning HIPPA, clinicians were not aware of the mental health assessment information that could be shared with custody.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

Clinicians provided unresponsive answers to the questions on the mental health assessments.  For example, for SCC Inmate A, the clinician indicated in response to question number two that the inmate's traumatic brain injury might contribute to explosive behavior and anger, but in response to question number three stated that the inmate needed consequences for his behavior.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION

Review of the CDCR 1154 logs and RVRs uncovered inconsistencies concerning inmate mental health status.  For example, one document might indicate that an inmate was not on the mental health caseload, while another stated he was a caseload participant.

RVR review, including those for SCC Inmates A, B, and C, indicated that SHOs typically considered the mental health assessment.  However, documentation regarding SHO penalty mitigation due to assessment consideration was inconsistent.  Nonetheless, for SCC Inmate B, the SHO mitigated the penalty and dismissed the RVR in the interest of justice even though the clinician answered "no" to question number three.

## ICC REVIEW

The single ICC case reviewed revealed that the ICC documented consideration of the mental health assessment in assessing a SHU term.  However, all three assessment questions were answered in the negative.

### SCC RVR Case Reviews

**Inmate A**
Date of Violation:  1/29/14
Date of Mental Health Assessment:  2/11/14
Date of Disposition:  3/6/14
Charge:  Threatening Staff Resulting in the Use of Force

This 3CMS inmate received an RVR for threatening staff on 1/29/14, resulting in the use of force.  A mental health assessment was completed on 2/11/14, which was eight days after the five working day timeframe.  He did not meet the threshold for a staff assistant and the mental health assessment answered "no" in response to question number one.  Question number two was marked "yes" and clearly stated that the inmate had a traumatic brain injury that might contribute to explosive behavior and anger.  The clinician answered "no" to question number three, stating that the inmate needed consequences to help him learn the necessity of controlling his behavior, which was an inappropriate response.  Question number two provided clear information for the

78

SHO, but question number three did not. The SHO stated that in the opinion of the clinician the mental disorder did not appear to contribute to the behavior that led to the RVR and there were no mental health factors that the SHO should consider in assessing the penalty.

The inmate was found guilty of a Division B offense and assessed 150 days forfeiture of credit loss, which was at the top of the Division B offense range. He was placed in Privilege Group C for 90 days, which included no telephone, no A-1-A night yard, and no quarterly packages/special privileges. He was also assessed ten days CTQ and was referred to the ICC for consideration of placement in work group/Privilege Group C.

**Impression:** There was no mitigation in this case. The mental health assessment occurred beyond the required timeframe. The SHO considered the mental health assessment, but noted that mental health factors did not contribute to the inmate's conduct; there were thus no mental health factors to consider in penalty assessment. The inmate was assessed significant credit and privilege losses.

### Inmate B
Date of Violation: 2/24/14
Date of Mental Health Assessment: Completion date not recorded
Date of Disposition: 3/20/14
Charge: Controlled Substance

This 3CMS inmate received an RVR for possession of a controlled substance on 2/24/14. He requested protective custody as he had a $1,100 methamphetamine debt. An assessment was sent to mental health on 3/18/14, which was completed but not dated. Question number one was marked "no" and a staff assistant was not assigned. Question number two was marked "yes," noted the inmate was depressed and recovering from a family death, and stated that his mental state contributed to the RVR. Question number three was marked "no." The inmate was found not guilty due to insufficient corroboration in terms of evidence. The SHO dismissed the RVR in the interest of justice based on the inmate's comments of crisis and that information's reinforcement on the mental health assessment. Due process timelines also were not met, as indicated in Part C of the RVR.

**Impression:** There was mitigation in this case. The SHO dismissed the charge for insufficient evidence, while noting the mental health assessment's findings. The RVR also exceeded due process timelines.

### Inmate C
Date of Violation: 3/10/14
Date of Mental Health Assessment: 3/28/14
Date of Disposition: 6/9/14
Charge: Battery on an Inmate Resulting in the Use of Force – Division D offense

This 3CMS inmate received an RVR for battery on an inmate on 3/10/14, resulting in the use of force. A mental health assessment was performed on 3/28/14, which was 13 days beyond the required five working days for assessment completion. The mental health assessment was

marked "no" in response to all three questions. The inmate did not meet the threshold for a staff assistant. The SHO noted that the mental disorder did not contribute to the behavior that led to the RVR and there were no mental health factors that should be considered in penalty assessment. The inmate was found guilty of battery on an inmate resulting in the use of force, a Division D offense. He was assessed 90 days loss of behavioral/work credits, which was at the top of the range for a Division D offense. He was also referred to the ICC for program/custody review and a SHU assessment term.

**Impression:** There was no mitigation in this case. The SHO considered the mental health assessment, noting that mental health factors did not contribute to the inmate's conduct and there were no such factors to consider during penalty assessment. The inmate was assessed significant credit and privilege losses.

## California Medical Facility (CMF) RVR Review

## SUMMARY OF FINDINGS

    A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CMF by completing and sustaining all requirements.

    B.  The institution was not compliant with the RVR training requirements.

    C.  The current RVR Coordinator received no formalized training on the RVR process.

    D.  Clinical staff reported no ongoing training regarding the RVR process, with the exception of new hires at CMF.

    E.  There was at least one clinician completing mental health assessments at CMF with no training.

    F.  There was no communication between custody and clinical staff regarding efficacy and impact of the mental health assessments at CMF.

    G.  Cultural issues persisted at CMF wherein mental health clinicians were concerned about advocating for inmates both at the hearing level and ICC due to inferences of overfamiliarity by custody staff.

    H.  Custody regularly issued RVRs to inmates in the MCHB.

    I.  Mental health assessments were completed timely.

    J.  The overall quality of mental health assessments was generally poor.

    K.  Custody staff indicated concern with the quality, content, and clinical language used by some assessing clinicians.

L.  Several assessing clinicians merely stated the inmate's diagnosis.

M.  Several assessing clinicians did not provide adequate information for consideration by SHOs in assessing penalties.

N.  SHOs documented consideration of mental health assessments; however, true consideration and mitigation was not evident.

O.  Custody staff's stated need for inmate accountability and documentation of the behavior superseded any mental health considerations in the RVR process.

P.  Where mitigation occurred at CMF, it was achieved by assessing minimal privilege restrictions.

Q.  SHOs often assessed the maximum forfeiture of work/behavioral credit thereby increasing the inmates' length of stay in prison.

R.  Mental health input during ICC was minimal.

S.  There was little mitigation occurring during ICC at CMF.

T.  There were no quality reviews of the mental health assessments or consideration of the mental health assessments by SHOs CMF.

**INTRODUCTION**

On June 17-19, 2014, the Coleman monitoring team reviewed the RVR process at California Medical Center (CMF).  At the time of the visit, CMF housed inmates at custody level I, II and III and DSH inmates including those requiring 3CMS, EOP and MHCB LOC.  CMF is also a designated ASU-EOP Hub and operated an OHU.  As of March 2014, CMF had a total inmate population of 2,057, with 841 or 41 percent of inmates on the mental health caseload.

During the site visit, the monitoring team reviewed any and all policies and procedures regarding the RVR process at CMF, all training materials provided by CDCR headquarters, as well as any local training materials provided by the institution to CMF employees.  The monitoring team also reviewed any audits completed with regard to RVRs issued at CMF.  The monitoring team utilized the CMF Institution Register and CDCR 1154 logs to gather RVR data, which are required to be maintained pursuant to Title 15.

The review period covered RVRs issued and/or heard during January, February and March 2014.  During this period, there was a total of 375 RVRs written with 250 or 67 percent issued to inmates on the mental health caseload, including 69 issued to inmates receiving treatment in the Department of State Hospitals (DSH) at CMF.  CDCR heard all RVRs that were issued in DSH at CMF.  The monitoring team reviewed completed RVRs as well as several ICC actions (through ERMS) for inmates for whom SHU terms were recommended.

81

**TRAINING**

CMF custody staff was able to produce a proof of practice memorandum, dated January 4, 2012, in response to the November 3, 2011 memorandum requirement. IST (IST) produced a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda. The IST reports indicated training sessions ranged between .30 of an hour to four hours. The PowerPoint presentation regarding mental health input into the RVR process provided to the monitoring team for review was the currently approved version, dated October 2011.

CMF was not able to demonstrate compliance with the required four-hour training for designated staff members. The four-hour training was only received by eight percent of psychologists. None of the other designated staff members received the training. CMF was also unable to demonstrate compliance with the required one-hour training for designated staff members. The one-hour training was received by 67 percent of CDOs, 83 percent of captains, 33 percent of lieutenants, 64 percent of sergeants, 88 percent of psychologists and 57 percent of LCSWs.

CMF RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 3 | 0/0% | 2/67% |
| Captains | 6 | 0/0% | 5/83% |
| Lieutenants | 30 | 0/0% | 10/33% |
| Sergeants | 80 | 0/0% | 51/64% |
| Psychologists | 24 | 2/8% | 21/88% |
| Social Workers | 14 | 0/0% | 8/57% |

**STAFF INTERVIEWS**

**SHOs**

During the two and one half days on site, the monitors requested to meet with any and all SHOs. Of the 31 currently employed lieutenants (according to personnel data provided by the institution), two met with the monitors. The interviewed lieutenants reported that 60 percent of the mental health assessments were returned with the question marked either "yes" or "no" with no further explanation. Consequently, they reported that the mental health assessments were not helpful.

Further, the lieutenants reported that while they "routinely" mitigated by not removing privileges that may affect an inmate's mental health, they stated it was very important to assess loss of credits "to keep in line with their points and level," even when they believed that the inmate's behavior at the time of the offense was affected by his mental illness. With regard to

inmates in the MHCB, the lieutenants stated that they often do not write RVRs; however, when they do, they typically assess credit forfeiture and refer the inmate to ICC for program review and SHU term assessments.

**RVR Coordinator**

The RVR coordinator in place at the time of the site visit began in January 2014. The RVR coordinator described his duties to include tracking all referrals to ensure assessment requests were appropriately routed to clinicians and completed timely, coordinating and troubleshooting with DSH regarding their RVRs, consultation with clinicians on complicated cases, and review and respond to 602 appeals. The RVR coordinator reported that there was no formalized quality improvement of mental health assessments and described only "spot checks" of assessments "every now and then."

**Clinicians**

There were 38 clinicians designated to complete RVR mental health assessments at CMF. The monitoring team met with eleven of the clinicians during the site visit. The clinicians reported that they rarely received any inquiries from the SHOs, nor did they receive any feedback on the outcome of the RVR. Overall, the clinical staff expressed that their input was not truly considered by SHOs.

Only two clinicians reported mitigation occurring at ICC due to mental health input; the remaining nine clinicians stated that they had never seen any mitigation at ICC due to their input. Several clinicians voiced strong concerns about advocating for inmates as it had been tied to "overfamiliarity" by custody staff. Consequently, all of the clinicians agreed that they merely completed the form and attempted no further advocacy for the inmates.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

CMF had a satisfactory system in place, including tracking, for requesting completion of mental health assessments. The monitors did not identify any problems with timeliness of requests or completion of mental health assessments.

The quality of the mental health assessments by clinicians were generally poor. Often, clinicians included information regarding inmates' diagnoses that was not helpful to the SHO, e.g., "a specific Axis I diagnosis that impacts his ability to control his behavior," (*See* CMF Inmate H.) and, "psychosis and auditory hallucinations and paranoia could contribute," (*See* CMF Inmate I.). This was most problematic in response to question number three of the mental health assessment regarding factors to consider when assessing the penalty.

In three of the 11 reviewed cases that occurred in the MHCB, the clinician noted that the inmates' mental illness impacted the behavior, including language such as, "inmate suffers from delusions, paranoia and impaired reality…" and, "he has a major mental illness which interferes with his thinking and behavior, (*See* CMF Inmates N, O.) Another assessment stated that the

inmate was psychotic and referred to an acute program. (*See* CMF Inmate K.).  However, in response to question number three in these cases, the clinician offered no factors that should be considered when assessing the penalties.

Further, when clinicians included explanations, they often simply restated the inmates' diagnoses.  For example, one clinician noted that an inmate who was at MHCB LOC was presently psychotic and documented to experience profound chronic mental illness; however, in response to question number three, the clinician simply wrote, "i/p is well documented to be chronically mentally ill and profoundly impaired…at the time of the hearing, inmate was at the MHCB LOC."  (*See* CMF Inmate L.)  The clinician offered no guidance of clinical factors for the SHO to consider when assessing the penalty if found guilty.  Another MHCB inmate's mental health assessment revealed similar language regarding him being actively psychotic at the time of the incident, yet in response to question number three, the clinician merely noted, "i/p documented to be psychotic and clinically unstable."  (*See* CMF Inmate M.)

Some clinicians included explanations in the mental health assessments that were vague and confusing, again offering little to no help to the SHOs such as, "the inmate had the inability to control behavior along with the ineffectiveness of penalties in facilitating change,"  (*See* CMF Inmate H.); "penalty for behavior impacted by psychosis could contribute,"  (*See* CMF Inmate I.); "even with extensive treatment, IP has not attained any stability or ability to control his behavior,"  (*See* CMF Inmate F.); and "ability to communicate adequately and understand the procedure should be considered." (*See* CMF Inmate G.).  These explanations bestowed minimal, if any guidance to the SHOs regarding mental health treatment issues or factors to consider when assessing the penalties.

One clinician's response to question number three was particularly troubling as the clinician documented that the inmate had a history of multiple arrests (the clinician underlined arrests) for rape and offered no clinical/treatment factors to consider when assessing the penalty (*See* CMF Inmate A.).

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

Documentation of consideration of the mental health assessments was noted by SHOs in every RVR reviewed.  However, actual consideration and mitigation was frequently not evident in the reviewed cases.  The interview of the SHOs and the review of completed RVR packages revealed a fundamental misunderstanding and consequential misuse of the mental health assessment.  When a clinician answered "no" to question number two or three, some SHOs noted, "the clinician expressed that the **SHO SHOULD NOT** (all capitalized and bolded in body of RVR) consider inmate X's mental health status when assessing a penalty if found guilty" (*See* CMF Inmates D, J, N, O.)

Further, the need to document inmate behavior and inmate accountability trumped any and all information provided by clinicians in the RVR process.  While SHOs specifically noted consideration of the mental health assessment, it was not uncommon to find RVRs where the

SHO noted, "the SHO reviewed the clinical information on the CDC 115MH and determined that inmate X should be held accountable for his actions. The SHO believes it is important to maintain a chronological history of the inmate's potential for misbehavior, as well as maintaining a custody level and classification score consistent with his potential to commit acts of violence, such as this one;" (*See* CMF Inmate M.); "the SHO believes it is important to have the Subject's custody level reflect his potential for misbehavior;" (*See*, CMF Inmate A.); and, "the SHO reviewed the clinical information contained in the CDCR 115MH and determined inmate X should be held accountable for his actions as the incident did occur. The SHO believes it is important to have Inmate X custody level reflect his potential for misbehavior;" (*See* CMF Inmate I.) All of the included inmates were either in the MHCB or at EOP LOC when the incidents occurred. The monitoring team observed that a 128A chrono in an inmate's C-file would accomplish the purpose of noting the behavior for future situations without the punitive effect of forfeiture of behavioral/work credits and potential increase in custody level.

While SHOs noted consideration of the mental health assessments and stated that as a result penalties were mitigated, mitigation was most routinely in the area of privileges. Due to the above-referenced standards utilized by the SHOs regarding accountability, inmates were often times assessed the maximum credit forfeiture allowed for their charge, and consequently, their stays in prison lengthened due to the RVR. (*See* CMC Inmates A, D, F, G, H, J, K, M, N, O.)

One case in particular demonstrated the SHO's confusion regarding the purpose of the mental health assessment. In that case, the SHO noted, "the subject is a participant in the MHSDS Delivery System with an Enhanced out Patient (3CMS) designation. The subject's behavior was not deemed bizarre, unusual or uncharacteristic." (*See* CMF Inmate B.) However, the inmate *was* receiving 3CMS LOC and the mental health assessment was requested because it was a Division B offense. The SHO's lack of understanding of the process was demonstrated in his description of why the mental health assessment was required.

There was no quality review of the completion of the mental health assessments or consideration of the mental health assessments by SHOs in the RVR process at CMF.

**ICC REVIEW**

The monitors' reviewed several ICC actions as a result of a finding of guilt on the RVR. (*See* CMF Inmates C, F, G, I, M.) Mental health input was notably minimal with generally one comment regarding the inmate's capability to understand and participate in the proceedings and whether housing in administrative segregation would deteriorate his mental health. There were only two cases with mitigation; although both mitigated the SHU term by only one month for a 20 month and 11 month SHU term. (*See* CMF Inmates C, M.)

**CMF RVR Case Reviews**

<u>Inmate A</u>
Date of Violation:  3/8/14
Date of Mental Health Assessment:  3/12/14
Date of Disposition:
Charge:  Threatening to Kill a Peace Officer - Division B Offense

This EOP inmate received an RVR on 3/8/14 for threatening to kill a peace officer.  The inmate was sitting in his cell in his wheel chair yelling at the nurse and the officer told him to stop yelling as others were sleeping.  The inmate continued to yell profanities.  The officer told the inmate that he would get a RVR for disrespect, and the inmate continued using profanities towards the officer.

The mental health assessment was completed on 3/12/14 with questions number two and three answered in the affirmative.  The response to question number two stated that the inmate had a "long history of mental illness per C-file.  Currently in MHSDS at EOP LOC.  Long history of alcohol abuse which might affect current mentation.  Multiple medical conditions that likely affect his mentation.  Periods of lucidity and not."  The response to question number three stated, "same as above; also has history of multiple <u>arrests</u> (clinician underlined) for rape."

The SHO repeated the clinician's language from the assessment in the RVR and noted, "the SHO determined that the Subject SHOULD be held accountable for his actions.  Specifically, the SHO believes it is important to have the Subject's custody level reflect his potential for misbehavior; nevertheless, the SHO did not take away any privileges that would isolate the Subject as it would be counterproductive to his mental health treatment."  The inmate was found guilty, referred to the DA, and assessed 150 days forfeiture of credit and 30 days loss of canteen, appliances, vendor packages, and telephone privileges.  He was referred to ICC for program review.

**Impression:**  There was minimal mitigation in this case.  The SHO referenced the mental health assessment, indicated it was considered, and noted that the inmate should be held accountable.  The SHO applied a standard of having the inmate's "custody level reflect his potential for misbehavior" that is not consistent with the RVR policy.  There was also a significant assessment of penalty in loss credits.  The clinician's responses to the questions in the mental health assessment were not in conformity with CDCR RVR policy.

<u>Inmate B</u>
Date of Violation:  3/15/14
Date of Mental Health Assessment:  3/21/14 (one day late)
Date of Disposition:
Charge:  Battery on a Peace Officer – Division B Offense

This 3CMS inmate received an RVR on 3/15/14 for battery on a peace officer.  During a body search of the inmate, the inmate took his hands off the wall, turned suddenly and struck an officer with his shoulder while cursing at him.

86

The mental health assessment was completed on 3/21/14 with questions number one, two and three answered in the negative.   However, under question number three, the clinician wrote, "[it] should not impact his mental health treatment."   The clinician did not expand on exactly what the mental health treatment included, consequently, not providing the information to the SHO.

The SHO noted, "The subject is a participant in the MHSDS Delivery System with an Enhanced out Patient (CCCMS) designation."   The SHO also noted that the mental health assessment said that subject's mental status was not a contributing factor but that the penalty should not impact the subject's mental health treatment.   The subject's behavior was not deemed bizarre, unusual or uncharacteristic.

The inmate was found guilty, referred to the DA, assessed 121 days forfeiture of credit, ineligible for restoration of credit.

**Impression:**  There was no mitigation in this case.   The inmate was penalized with significant credit loss.   The SHO confused the levels of care within MHSDS.   The language employed by the SHO appeared pro forma and a recital.   It also appeared that the SHO was not aware that the reason the mental health assessment was completed was because the inmate's offense was deemed a Division B offense, and the mental health assessment was required by policy.

### Inmate C
Date of Violation:  1/18/14
Date of Mental Health Assessment:  2/18/14
Date of Disposition:  4/15/14
Charge:  Battery on a Peace Officer – Division B Offense

On 1/18/14, this EOP inmate was in his cell and threw his dinner tray at an officer, hitting him in the temple.  A mental health assessment was completed on 2/18/14 with questions number two and three answered in the affirmative.  The response to question number two stated, "The inmate has had a marked change in his mood stability over the past few months which likely contributed to the behavior."  The response to question number three stated, "The inmate would like the SHO to know that the inmate cannot recall his state of mind at the time of the incident because it was a month ago."

The inmate appeared before the SHO for a hearing on 4/14/14.  The inmate was found guilty and assessed 121 days forfeiture of credit pursuant to a Division B offense and referred to ICC for SHU term assessment.

The ICC met on 4/17/14 and in assessment of the SHU term noted, "ICC has considered the CDCR 115MH and the information provided by clinical staff, noting that the inmate's mental health did contribute to this behavior based on clinician's note on MHA, the inmate has had a marked change in his mood stability over the past few months which likely contributed to the behavior."  Although answer to question number three was unresponsive, the ICC did mitigate the SHU term, but only by one month.

**Impression:**  There was no mitigation at the SHO level; the ICC mitigated the imposed SHU term by one month. The clinician's response to question number three was not helpful to the SHO.  The SHO did not reference the mental health assessment or indicate if it was considered, and did not state if there was mitigation.  The inmate was assessed significant credit forfeiture.

**Inmate D**
Date of Violation: 2/26/14
Date of Mental Health Assessment:  3/25/14 (late)
D\ate of Disposition:
Charge:  Battery on an Inmate with Use of Force/Security Threat Group II – Division D Offense

On 2/26/14, this 3CMS inmate received an RVR for battery on an inmate with use of force/Security Threat Group II.  A mental health assessment was completed on 3/25/14 with questions number one, two and three answered in the negative.

The SHO noted, "the clinician expressed that the **SHO SHOULD NOT** consider the inmate's mental health status when assessing a penalty if found guilty."  The inmate was found guilty and assessed 90 days loss of behavioral credit.  He was referred for a SHU term and advised that he could restore credits if he remained disciplinary free for 180 days.

**Impression:**  There was no mitigation in this case.  The mental health assessment was not completed timely.  The SHO appeared to be inappropriately applying a standard that a "No" response to question number three necessarily means that the SHO "should not" take the inmate's mental health status at the time of the offense into consideration when assessing a penalty.

**Inmate E**
Date of Violation:  2/1/14
Date of Mental Health Assessment:  2/11/14
Date of Disposition:  3/4/14
Charge:  Battery on Inmate without Serious Bodily Injury – Serious Division D Offense

On 2/1/14, this EOP inmate was involved in a fight with another inmate.  Both inmates were ordered to stop and they complied.  A mental health assessment was completed on 2/11/14 with questions number two and three answered in the affirmative.  The response to question number two stated, "Psychosis with auditory hallucinations and paranoia could contribute".  The response to question number three stated, "[the] penalty for behaviors impacted by psychosis could contribute to increased psychosis/paranoia."

On 3/4/14, the inmate appeared before the SHO for a hearing.   The disposition stated,"The SHO reviewed the clinical information contained in the CDCR 115-MH and determined [inmate] should be held accountable for his actions, as the incident did occur.  The SHO believes it is important to have [inmate's] custody level reflect his potential for misbehavior."  It was unclear why the SHO made the statement that the incident did occur.  It was also unclear why the SHO stated that the custody level reflected the inmate's potential for bad behavior, when the intent of

mitigating the penalty is to reflect that the inmate's mental health may have contributed to the violation. The inmate was found guilty and assessed 90 days forfeiture of behavioral credit.

The ICC met on 3/19/14. The notes stated: "Committee notes the guilty finding on the 2/1/14 RVR for Battery on an Inmate W/OUT SBI and that a SHU review is now required. Committee agrees to aggravate the 3-month expected term by 3-months due to prior similar behavior. As a result, committee elects to assess and impose a 6-month aggravated SHU term with MERD of 6/16/14. Committee considered subject's mental health status prior to arriving at any decisions regarding the SHU assessment. As a result of the aforementioned RVR, subject now has a documented enemy concern at CMF. Subject's case will also be referred for adverse transfer to SAC-PSU to serve the remainder of the SHU term."

**Impression:** There was no mitigation in this case. The SHO did reference the mental health assessment and indicate it was considered. The SHO applied a standard, the inmate's <u>potential</u> for bad behavior, to conclude that the penalty would not be mitigated. The inmate was assessed significant credit loss.

### Inmate F
Date of Violation: 3/21/14
Date of Mental Health Assessment: 4/1/14
Date of Disposition: 4/4/14
Charge: Battery on Inmate with Serious Bodily Injury – Serious D Offense

On 3/21/14 this EOP inmate battered his cellmate by striking him in the face several times. A mental health assessment was completed on 4/1/14 with questions number two and three answered in the affirmative. The response to question number two stated, "Documentation indicates significant psychosis at the time of the alleged incident". The response to question number three stated, "Even with extensive treatment, IP has not attained any stability or ability to control his behavior." The inmate attended the hearing held on 4/4/14 and was found guilty. The SHO considered the mental health assessment. The inmate was assessed 90 days forfeiture of behavioral credit and referred to ICC for SHU term consideration.

The ICC met on 4/30/14. The notes stated: "Therefore, today's committee acts to assess and impose a 6-month aggravated SHU-term with MERD of 8/6/14 for the offense of Battery on Inmate. Committee aggravated the SHU term based on subject having history of prior similar behavior. Committee did not find mitigating factors. Committee reviewed the Mental Health Assessment dated 4/1/14 as it pertains to Subject's mental health when assessing penalties. Committee noted the clinician's comments that staff should consider Subject's mental health when assessing penalties."

**Impression:** There was no mitigation in this case. The SHO referenced the mental health assessment and indicated it was considered. The clinician's response to question number three provided no guidance for the SHO in assessing the penalty. The inmate was assessed significant credit loss.

**Inmate G**
Date of Violation:  3/24/14
Date of Mental Health Assessment:  4/9/14
Date of Disposition:  5/2/14
Charge:  Threatening to Kill a Peace Officer – Division B Offense

On 3/24/14 during morning medication pass, this EOP inmate told a CO that he was going to stab him to death.  A mental health assessment was completed on 4/9/14 with questions number two and three answered in the affirmative.  The response to question number two stated that "significant psychosis and disorganization currently and documented at the time of the event".  The response to question number three stated, "Ability to communicate adequately and understand the procedure should be considered."  This answer was unresponsive and unrelated to the question.

On 5/2/14 the inmate appeared before the SHO for a hearing.  The SHO considered the mental health assessment but "determined that [Inmate] should be held accountable for his actions."  The SHO found the inmate guilty.  The inmate was assessed 150 days loss of behavioral credit, 60 days loss of appliances/personal property, and referred the inmate to ICC for program review and SHU term consideration.

The ICC met on 6/4/14.  The notes stated:  "The offense warrants an assessment of SHU term based upon the willful intent of Subject's actions.  Therefore, today's committee acts to assess and impose a 7-month aggravated SHU-term with MERD of 9/2/14 for the offense of Threatening a Peace Officer [log#].  Committee calculated the beginning date of the SHU term assessment as the day of the incident, giving Subject credit for the time he would have been in ASU.  Committee aggravated the SHU term based on subject having history of prior similar behavior.  Committee did not find mitigating factors.  Committee reviewed the Mental Health Assessment dated 4/9/14 and noted the clinician's comments that staff should consider Subject's mental health when assessing penalties.  Committee agreed not to aggravate the term to full range.

**Impression:**  There was no mitigation at the SHO level in this case.  The SHO referenced the mental health assessment and indicated it was considered.  The answer to question number three on the mental health assessment was unresponsive to the question.

**Inmate H**
Date of Violation:  1/19/14
Date of Mental Health Assessment:  1/22/14
Date of Disposition:  3/1/14
Charge:  Obstructing a Peace Officer Requiring Use of Force – Division D Offense

On January 19, 2014, during medication pass, this EOP inmate would not relinquish his food port after repeated requests and was subsequently pepper sprayed by an officer.  A mental health assessment was completed on 1/22/14 with questions number two and three answered in the affirmative.  The response to question number two stated that the inmate had "A specific Axis I diagnosis that impacts his ability to control his behavior".  The response to question number

three stated that the inmate had the "inability to control behavior along with the ineffectiveness of penalties in facilitating change."

The inmate appeared at the disciplinary hearing on 2/24/14 and pled guilty to the charge. The inmate was assessed 90 days loss of credit pursuant to a Division D offense. The SHO considered the mental health assessment but did not mitigate.

**Impression:** There was no mitigation in this case. The clinician's answer to question number three did not properly address the question and provided no information for the SHO to consider in assessing the penalty. The SHO did reference the mental health assessment and indicated it was considered. The inmate was assessed significant credit loss.

**Inmate I**
Date of Violation:  2/2/14
Date of Mental Health Assessment:  2/11/14
Date of Disposition:  3/4/14
Charge:  Willfully Obstructing a Peace Officer Requiring Use of Force – Division D Offense

On 2/2/14, this EOP inmate refused to put his hands back inside his food port after repeated requests by an officer. In response, officers took hold of both the inmate's arms and pushed him back into his cell. A mental health assessment was completed on 2/11/14 with questions number two and three answered in the affirmative. The response to question number two stated, "Psychosis with auditory hallucinations and paranoia could contribute." The response to question number three stated, "Penalty for behavior impacted by psychosis could contribute to increased paranoia."

On 3/3/14 the inmate appeared before the SHO for a hearing. The inmate was found guilty. The SHO considered the mental health assessment but based the decision not to assess any loss of privileges on the inmate's administrative segregation status. The inmate was assessed 61 days forfeiture of credit and was referred to ICC for program review.

**Impression:** There was no mitigation in this case. The SHO did reference the mental health assessment, indicated it was considered, and reported mitigation by not imposing loss of privileges. The clinician's answers on the assessment did not provide clear and affirmative direction for the SHO to consider and were evasive in nature.

**Inmate J**
Date of Violation:  2/20/14
Date of Mental Health Assessment:  3/6/14
Date of Disposition:
Charge:  Battery on an Inmate –Division D Offense

On 2/20/14, this 3CMS inmate received a RVR for battery on an inmate for striking an inmate in the face. A mental health assessment was completed on 3/6/14 with questions number one, two and three answered in the negative.

In the mental health services section of the RVR, the SHO wrote, "the SHO notes that the clinician expressed that the **SHO SHOULD NOT** consider the subject's mental health status when assessing the penalty if found guilty." The inmate was found guilty and assessed 90 days forfeiture of credit and referred to ICC for SHU consideration.

**Impression:** There was no mitigation in this case. The SHO appeared to be inappropriately applying a standard that a "No" response to question number three necessarily means that the SHO "should not" take the inmate's mental health status at the time of the offense into consideration when assessing a penalty.

### Inmate K
Date of Violation:  2/18/14
Date of Mental Health Assessment:  3/5/14
Date of Disposition:
Charge:  Battery on a non-prisoner by gassing - Division B Offense

This inmate received a RVR on 2/18/14 for battery on a non-prisoner by gassing while in the MHCB. The inmate threw clear liquid from a milk carton on a RN and an officer assisting when passing medication through the food port. A mental health assessment was completed on 3/5/14, with question number two answered in the affirmative and question number three answered in the negative. The response to question number two stated, "i/m knowingly went off all meds for 3 days (he says 5) which was his choice and responsibility. But the evidence suggests that auditory hallucinations contributed to his rule breaking behavior, so much so that his treatment team are sending to acute psych program."

The inmate was found guilty and the SHO noted in the RVR Part C:  "Mental health status considered…The subject's mental health status was considered during the hearing and the SHO determined that the subject SHOULD be held accountable for his actions. Specifically, the SHO assessed no penalties which would impact subject's mental health status." The inmate was assessed 121 days of behavioral credit forfeiture and 90 days placement of Privilege Group C. He was also referred to ICC for program review and SHU consideration. The inmate was not eligible for credit restoration and the case was referred to the DA.

**Impression:** There no mitigation in this case, notwithstanding that the SHO did not take away any privilege. The SHO did reference the mental health assessment and indicated it was considered, and that the inmate should be held accountable. The SHO applied a standard of having the inmate's "custody level reflect his potential for misbehavior" that is not consistent with the RVR policy. The inmate did not have any privileges to lose and significant credit loss was imposed.

### Inmate L
Date of Violation:  2/26/14
Date of Mental Health Assessment:  3/14/14
Date of Disposition:  3/24/14
Charge:  Battery on Inmate with Weapon without Serious Bodily Injury - Division A-1 Offense

This EOP inmate received an RVR on 2/26/14 for battery on an inmate with a weapon without serious bodily injury. An investigation concluded that the inmate battered another inmate with a pen by striking him in the face. A mental health assessment was completed on 3/14/14 wherein the clinician noted that the inmate was "presently psychotic." Questions number two and three were answered in the affirmative. The response to question number two stated, "i/p documented to experience profound chronic mental illness. Documentation circa the time of the incident reports active mental illness." The response to question number three stated, "i/p is well documented to be chronically mentally ill and profoundly impaired. At the time of the hearing, inmate was at the MHCB LOC."

The SHO noted the mental health assessment, but wrote, "based on the MHA, which indicates that it does appear the subject's behavior was influenced by his mental illness, the SHO ascertained during the disciplinary hearing that the subject did not exhibit any evidence of impairment in his ability to effectively present his position, as evidenced by his participation in the hearing process and his answering and asking questions appropriately. During the hearing, the subject appeared coherent and was able to respond to specific details regarding the alleged offense. The subject stated he understood the decision reached including its implication. The SHO believes the subject was aware of his actions at the time of the disciplinary hearing and the consequences thereof. The SHO believes the subject should be held accountable for his actions."

The inmate was found guilty and assessed 181 days forfeiture of credit, not restorable, referred to the DA and referred for SHU term.

**Impression:** There was no mitigation in this case. The SHO referenced the mental health assessment and indicated it was considered. However, the SHO also applied a standard related to the inmate as he appeared at the time of the hearing, which was not consistent with CDCR's RVR policy. The intention of the mental health assessment is to address the inmate's mental health status at the time of the violation. The inmate did not have any privileges to lose and significant credit loss was imposed.

**Inmate M**
Date of Violation: 3/12/14
Date of Mental Health Assessment: 3/14/14
Date of Disposition:
Charge: Battery on a Peace Officer - Division B Offense

This MHCB inmate received a RVR on 3/12/14 for battery on a peace officer in the MHCB. The inmate spit on the officer while being escorted back to his cell after receiving his Keyhea medication in the examination room. A mental health assessment was completed on 3/14/14, and the clinician noted that the inmate was presently psychotic. Questions number two and three were answered in the affirmative. The response to question number two stated, "i/p currently presents with psychosis and is well documented to be profoundly psychotic circa the time of the incident." The response to question number three stated, "i/p documented to be psychotic and clinically unstable."

The SHO noted in the hearing document that "the SHO reviewed the clinical information on the CDC 115-MH and determined: That [inmate] should be held accountable for his actions.  The SHO believes it is important to maintain a chronological history of the inmate's potential for misbehavior, as well as maintaining a custody level and classification score consistent with his potential to commit acts of violence, such as this one.  As such, the SHO felt it was appropriate to find [inmate] guilty of the offense and assessed credit loss within the scale.  However, in order to maintain a mental health program consistent with [inmate's] needs, the SHO did not suspend any privileges, which could be considered therapeutic."  However, the inmate was found guilty of a Division B offense, not eligible for credit restoration and assessed 150 days loss of behavioral credit.

On 4/23/14, the ICC met.  This was the inmate's initial ICC review at DSH at CMF, as he transferred to DSH on 4/11/14 from CMF-ASU.  The Committee Summary was to retain on ASU status, assess/impose/commute nine month SHU with expired MERD of 5/12/12; assess/impose 20 month SHU with controlling MERD of 5/26/15; assess/impose 17 month SHU with MERD of 4/5/15.  Medical/psych noted that LCSW stated that subject was able to understand and participate in the proceedings and his continued placement on ASU status while housed in DSH would not likely lead to a deterioration of his mental health.

In the body of the committee action notes, it states, "taking everything into consideration ICC elects to assess a 20-month SHU term with a controlling MERD of 5/26/15.  The SHU term was mitigated one month for mental health concerns and was aggravated due to the same similar behavior for assault/battery (10/19/12).  The likelihood of decompensation is low based on subject's current clinical environment.  The next paragraph addresses the RVR on 3/12/14.  It stated, "taking everything into consideration ICC elects to impose a 17-month SHU term with a MERD of 4/15/15.  The SHU term was mitigated one month for mental health reasons and was aggravated due to same similar behavior for assault/battery 10/19/12 and 2/26/14.  The likelihood of decompensation is low based on subject's current clinical environment.

The CDCR reclassification score sheet 840 dated 4/17/14 revealed an additional 56 points added as a result of the RVRs dated 10/19/12, 2/26/14 and 3/12/14.  This brought the inmate's score from 42 points to 98 points.  Of concern is that on the CDC 840 dated 3/11/14, 14 points were added for the offense on 10/19/12—then again on the CDC 840 date 4/17/14, they gave him another 14 points for the same offense.  This is troubling based on assessments saying he was profoundly psychotic at time of incident.

**Impression:**  The SHO stated that there was mitigation because there was no loss of privilege, which had no actual effect because the patient was in the MHCB.  There was significant loss of credit imposed.  Further, the inmate's points increased from level III to level IV, and it appeared he was assessed 14 points twice for the RVR dated 10/19/12.

## Inmate N
Date of Violation:  3/28/14
Date of Mental Health Assessment:  4/8/14
Date of Disposition:  4/22/14
Charge:  Battery on a Non-Prisoner:  Division B offense

On 3/28/14 at 1920 hours, this MHCB inmate received an RVR in the crisis bed for battery on a non-prisoner, a Division B offense.  The inmate grabbed a psych tech's arm and pulled it through the food port.  The mental health assessment was completed on 4/8/14, with question number two answered in the affirmative and question number three answered in the negative.  The response to question number two stated, "i/p suffers from delusions, paranoia and impaired reality parameters.  He has a major mental illness which interferes with his thinking and behavior."

The SHO noted the consideration of the mental health assessment; however, noted that "the clinician expressed that the **SHO SHOULD NOT** consider [inmate's] mental health status when assessing a penalty if found guilty."  The inmate was found guilty and assessed 150 days of behavioral credit forfeiture and lost 90 days canteen, appliances, vendor packages, telephone and personal property privileges.  The case was also referred to ICC for SHU term assessment.

**Impression:**  There was no mitigation in this case.  The SHO referenced the mental health assessment concluding that its indication that there was no mental health factors to consider when assessing a penalty meant that the SHO "should not" consider mental health when imposing a penalty.  The inmate was assessed significant credit and privilege losses.

**Inmate O**
Date of Violation:  3/28/14
Date of Mental Health Assessment:  4/8/14
Date of Disposition:  4/22/14
Charge:  IDX without Prior Conviction – Division D offense

On 3/28/14, this MHCB inmate received a second RVR in the MHCB, this one for IDX without prior court conviction, a Division D offense.  The RN who wrote the RVR wrote, "On Friday, March 28, 2014 at approximately 2300 hours, after receiving the nursing shift report and while on rounds to check on inmate's welfare and safety, I arrived at the cell of [inmate], housed in A-10).  I observed [inmate] pacing throughout the cell yelling and cursing, getting three (3) cups of water from the sink in the cell and splashing the water on the cell door and food port, and pouring a cup of water over his head.  I/P was agitated, delusional and made statements such as "I'm getting raped on the telepathic network in my mind…" and "I sent my family home today because they keep raping my family in the telepathic network!  I don't want them to have to deal with this…!"  The inmate subsequently exposed himself and started masturbating while continuing to yell nonsensically at the RN.  The inmate was given oral medication that he requested for migraine pain by the medication nurse per protocol.  The inmate then walked away from the cell door and resumed pacing, and shouting while removing all of his clothes.

The same mental health assessment from the prior incident was attached to the RVR noting there were no factors to consider when assessing the penalty.

The SHO noted the mental health assessment and wrote, "the clinician expressed that the SHO **SHOULD NOT** (underlined, bold and all caps) consider [inmate's] mental health status when assessing the penalty if found guilty."  The inmate was found guilty and assessed 90 days of

behavioral credit forfeiture, 90 days loss of all privileges and referred to ICC for SHU consideration, R suffix custody designation and prohibiting family visiting.  The inmate was not eligible for credit restoration.

The SHO additionally noted, "it should be noted that [inmate] is a participant in the MHCB. MHCB mental health treatment program is based on the inmate's behavior.  The inmate earns privileges for good behavior and as an incentive; therefore the SHO determined that the loss of privileges should be suspended so that the CDCR 115 adjudication does not interfere with the Mental Health Treatment from the Mental Health Crisis Bed."

**Impression:**  There was no mitigation in the case.  The SHO reference appears to indicate that the penalty was mitigated, when there was actually no mitigation.  In a time span of conduct occurring within three hours, the inmate lost 240 days of behavior credits.  The SHO appeared to be inappropriately applying a standard that a "No" to question number three necessarily means that the SHO "should not" take the inmate's mental health status at the time of the offense into consideration when assessing a penalty.

## California State Prison/Solano (CSP/Solano) RVR Review

**SUMMARY OF FINDINGS**

  A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CSP/Solano by completing and sustaining all requirements.

  B. CSP/Solano did not demonstrate compliance with training for all required staff members.

  C. The CSP/Solano institution registry of violations did not consistently contain the mental health assessment as part of the record.

  D. Mental health assessments were generally timely completed.

  E. A number of the mental health assessments found no nexus between mental health and the actions which lead to the RVR.

  F. CSP/Solano had a system in place for tracking mental health assessments and the results of the RVR hearing.

  G. The assessing clinician did not always provide adequate information for consideration by SHOs in assessing penalties.

  H. Clinicians did not always properly complete the mental health assessments by checking a box in each of the three questions, as required by policy.

  I. SHOs generally did not document how mental health assessments were taken into consideration.

  J. SHOs mitigated penalties in some cases.

K.  In some cases, the SHO's interpretation of the mental health assessment did not appear to match the clinician's intent.

**INTRODUCTION**

On June 30 – July 1, 2014, the Coleman monitoring team reviewed the RVR process at CSP/Solano.  At the time of the site visit, CSP/Solano housed inmates at custody levels II and III and inmates requiring 3CMS and MHCB LOC.  As of March 2014, CSP/Solano had a total inmate population of 4,061.  Of the total population 1,481 or 36 percent of inmates were on the mental health caseload.

During the site visit, the monitoring team met with SHOs and mental health clinicians responsible for completing mental health assessments.  The monitoring team reviewed policies and procedures regarding the RVR process and all training materials provided.  The monitors used the CSP/Solano Institution Register and CDCR 1154 logs to gather RVR data.  The review period covered RVRs issued and/or heard during January, February and March 2014.  During this period there were a total of 250 RVRs written with 80 or 32 percent issued to inmates on the mental health caseload.

**TRAINING**

CSP/Solano was able to produce a proof of practice memorandum dated January 31, 2012 as required by the October 26, 2011 memorandum.  However, IST produced printouts listing staff that attended the training which indicated that only one lieutenant and one psychologist had received the required four hours of training.

CSP/Solano was not able to demonstrate compliance with the required one-hour training for designated staff members.  The one-hour training was received by 40 percent of CDOs, 60 percent of captains, 73 percent of lieutenants and 65 percent of sergeants.  None of the psychiatrists, psychologists, social workers or CC IIs received the training.  CSP/Solano was also unable to demonstrate compliance with the required four-hour training for designated staff members.  The four-hour training was received by four percent of lieutenants and seven percent of psychologists.  None of the CDOs, captains, sergeants, psychiatrists, social workers or CC IIs received the training.

CSP-Solano RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 5 | 0/0% | 2/40% |
| Captains | 5 | 0/0% | 3/60% |
| Lieutenants | 26 | 1/4% | 19/73% |
| Sergeants | 58 | 0/0% | 38/65% |
| Psychiatrists | 8 | 0/0% | 0/0% |
| Psychologists | 15 | 1/7% | 0/0% |
| Licensed Clinical Social Workers | 6 | 0/0% | 0/0% |
| Social Workers | 3 | 0/0% | 0/0% |
| CC-II Appeals | 2 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

During the site visit, the monitors met with nine SHOs and nine mental health clinicians responsible for completing the mental health assessments. Also present during the meeting with the clinicians were two associate wardens, the CEO and the clinician supervisor.

**SHOs**

The SHOs described the RVR and assessment practice at CSP/Solano. Mental health assessment requests were hand-delivered to mental health staff for completion. The SHOs stated that there were no issues with timely completion of the assessments. Upon completion, the mental health department called to inform custody staff the assessment was ready for pick up. The SHOs generally agreed that mental health and custody staff worked well together.

Most of the SHOs reported that they found the mental health assessments useful in the hearing process. However, one SHO indicated that he did not "give much weight" to the clinical input because he felt that he knew the inmates better than the clinicians. He stated that the mental health assessments were just a "technicality" of the RVR process that they had to complete. This attitude regarding the assessment process and the value of clinical input was concerning. When asked, none of the SHOs offered any recommendations of how to improve the RVR and assessment process.

**Clinicians**

The interview with the clinicians also began with them describing the mental health assessment process. When an assessment request was received, the RVR was logged and a clinician was assigned to complete the assessment. The assigned clinician interviewed the inmate and reviewed the inmate's medical record. In addition to completing the mental health assessment, clinicians also completed a progress note to be placed in the inmate's medical record. There was one clinician responsible for completing all of the assessments for the ASU;

98

that clinician also attended ICC.  The clinicians stated that they communicated well with custody staff.

The clinicians felt that the value of their input to the process was dependent on whether SHOs took the mental health assessments into consideration.  Some clinicians indicated that the SHOs did not always consider the mental health assessments.  Others felt that they could not gauge the value of their input because they did not see the hearing dispositions.  One described it as being "hit or miss".  It was also stated that most RVRs were given out for minor offenses, so there was not a lot of need to complete complicated assessments.


## QUALITY OF MENTAL HEALTH ASSESSMENTS

The monitoring team reviewed mental health assessments for RVRs to determine if they were being completed within established timeframes, and if adequate and appropriate information was being documented by the clinician as per policy.  The review showed that the mental health assessments were being completed within the required timeframes.  However, the monitors found there was no consistency of the clinician completing the form by checking a box in each of the three questions, as required by policy.  Additionally, when boxes were not checked the clinician may or may not have written anything for the SHO to consider in the space provided on the form.  An example of this was the mental health assessment for CSP/Solano Inmate O, where question three did not have a box checked and no written consideration for the SHO.  A number of the mental health assessments were completed with a "no" response to all three questions.

The monitors reviewed some mental health assessments where question number two was answered in the affirmative and the clinician's notes were not helpful or on point.  In response to question number two, one clinician documented what the inmate said: "Inmate reports increased stress, 'bullying' that contributed to the offense occurring."  (*See* CSP/Solano Inmate F.)  The responses on the assessment should consist of the clinician's opinion, not inmate reports.  In response to question number two on another assessment, a clinician wrote, "He is not tracking the interview questions and responds inappropriately."  (*See* CSP/Solano Inmate K.)  Noting the inmate's behavior at the time of the interview does not address whether his mental disorder contributed to the behavior that led to the RVR and as such is unhelpful to the SHO.  On another assessment, a clinician wrote, "symptoms may have exacerbated his response."  This answer is confusing and unhelpful to the SHO.  By checking "yes" for question number two the clinician indicated that that the inmate's mental disorder appeared to contribute to the behavior that led to the RVR.  However the clinician went on to say that the inmate's symptoms *may have* exacerbated the behavior.  (*See* CSP/Solano Inmate D.)

The monitors also reviewed mental health assessments where the response to question number three was too vague to prove helpful to the SHO in considering a penalty.  An example of this was the mental health assessment for CSP/Solano Inmate D, where the clinician wrote, "Prolonged ASU may worsen mental health symptoms."  (*See also* CSP/Solano Inmate E ["Extended ad seg placement may lead to psychological decompensation."] and CSP/Solano Inmate F ["Extended ASU time will worsen inmate's functioning."].)

The monitors also found mental health assessments where the clinician did a proper job of providing specific information for the SHO to consider. One example of this was the mental health assessment for CSP/Solano Inmate M, where the clinician wrote, "Any restriction of yard privilege in excess of 10 days could contribute to psychological decompensation." (*See also* CSP/Solano Inmates B and K.) Another example of this was the mental health assessment for CSP/Solano Inmate A, where the clinician wrote that the inmate's mental health symptoms sometimes caused him to experience things from the past if they were occurring in the present and that he relied on family support and would decompensate without regular visits from his wife.

CSP/Solano had a system in place which attempted to track all mental health assessments including the results on the RVR hearing, including any documentation of mitigation. The monitors reviewed a copy of a mental health quality improvement record maintained by the supervising psychologist. This was not a mandatory function, but one which could provide valuable information and initiate discussion between clinical and custody staff when the data is reviewed as part of a continuous quality improvement process.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

Generally, the review of the hearing documents revealed that SHOs were reviewing the mental health assessments and documenting that review in the hearing disposition. Most of the RVRs reviewed contained language regarding the SHO's review of the mental health assessment. However, the SHOs did not consistently detail their consideration of the mental health assessment input or mitigation, if any, as a result of the assessment. The SHO just reiterated what the mental health assessment stated, without any additional description or reference to this information as part of deliberations or mitigation if the inmate was found guilty. Examples of this are found in the RVRs for CSP/Solano Inmates A, B, E, F, H and M.

The review revealed that in some cases, the SHO's interpretation of the mental health assessment did not appear to match the clinician's intent. For example, on one mental health assessment the clinician checked "yes" for question number three, writing, "increased time in isolation might contribute to the inmate's deterioration." However, the SHO indicated in the disposition that the question was answered in the negative, writing "…the mental health clinician determined that if the subject is found guilty of the specific act, that this SHO should consider all of the following mental health factors in assessing the penalty: NONE." (*See* CSP/Solano Inmate G.) In another case, the SHO documented a statement attributed to the mental health assessment, but the monitor's review of the assessment revealed no such statement. (*See* CSP/Solano Inmate J.) There was also a case reviewed where the SHO wrote in the hearing document that a mental health assessment had not been requested, however, the monitor found that a mental health assessment had indeed been completed prior to the hearing. (*See* CSP/Solano Inmate L.)

The monitors also found examples where SHOs elected to mitigate penalties. For example, the mental health assessment for CSP/Solano Inmate N, stated in part that the inmate

may decompensate if assessed a SHU term.  The SHO acknowledged this information and noted that he elected "to minimize some of the possible penalties in this case, i.e. no A1-C status and no disciplinary detention."  The monitors also found cases where the SHO appeared to mitigate although it was not noted as such in the hearing disposition.  Examples of this were the RVRs for CSP/Solano Inmates K and B, in which the mental health assessments stated that any yard restriction beyond ten days could contribute to psychiatric decompensation.  In the first case, the inmate was not assessed any loss of yard privileges, in the second case the inmate was assessed ten days loss of yard.

The RVRs reviewed also reflected the SHOs' ability to reduce or dismiss RVRs, as well as consider the totality of the information provided during the hearing.  In one example, an inmate was charged with battery on an inmate with a weapon based on confidential information.  The SHO reviewed all of the confidential information received, determined the inmate acted in self-defense and found him not guilty.  (*See* CSP/Solano Inmate D.)


### CSP/Solano RVR Case Reviews

**Inmate A**
Date of Violation:  1/6/14
Date of Mental Health Assessment:  3/4/14 (sent to mental health 2/26/14)
Date of Disposition:  3/6/14
Charge:  Possession of a Controlled Substance (Marijuana) – Division B Offense

On 1/6/14, during a search of this 3CMS inmate's belongings, two bundles were found, which were later identified to contain marijuana.  A mental health assessment was completed on 3/4/14 with question number one answered in the negative and questions number two and three answered in the affirmative.  The response to question number two stated that the inmate claimed the contraband was not his and that the inmate may experience flashbacks and emotions associated with prior traumatic events.  The clinician did not indicate whether the inmate's mental disorder contributed to the behavior that led to the RVR.  The response to question number three stated that the inmate's mental health issues caused him to experience things that were not happening in the present.  The clinician further noted that the inmate relied on support from his family and would decompensate without regular visits from his wife.

The inmate appeared for a hearing before the SHO on 3/6/14.  The SHO indicated review of the mental health assessment by noting the responses to questions one, two and three in the hearing document.  The SHO did not state how the assessment was considered in determining guilt and/or assessing a penalty.  The SHO found the inmate guilty.  The inmate was assessed 121 days forfeiture of credits, 90 days loss of contact visits followed by 90 days loss of non-contact visits, 30 days loss of privileges, one year random drug testing and assignment to AA/NA or substance abuse program (SAP) and referred to committee for program and custody review.

**Impression:**  There was no mitigation in this case.  The mental health assessment stated that the inmate relied on family support and would decompensate without regular visits from his wife.

The SHO reviewed the mental health assessment and did not mitigate any penalties. The inmate was assessed significant credit loss in addition loss of visitation privileges.

## Inmate B
Date of Violation: 2/27/14
Date of Mental Health Assessment: 4/17/14
Date of Disposition: 4/25/14
Charge: Distribution of a Controlled Substance – Division A-2 Offense

During a random search of this 3CMS inmate's cell, an officer found 13 bindles of what was later determined to be black tar heroin. A mental health assessment was completed on 4/17/14 with questions number one and two answered in the negative and question number three answered in the affirmative. The response to question number three stated, "Any restrictions of yard privileges for more than ten days could contribute to psychological decompensation". On 4/25/14, the inmate appeared before the SHO for a hearing. The SHO indicated review of the mental health assessment by noting the responses to questions one, two and three in the hearing document. The SHO did not state how the assessment was considered in determining guilt and/or assessing a penalty. The inmate was found guilty and assessed 180 days loss of credit, ten days loss of yard, 90 days loss of canteen, one year loss of visitation followed by two years of non-contact visits, one year random drug testing, assignment to AA/NA or SAP and referral to ICC for program and custody review.

**Impression:** Mitigation in this case appeared to be in the form of the ten days loss of yard. The SHO did not state how the mental health assessment was considered in determining a penalty. The inmate was assessed significant credit loss.

## Inmate C
Date of Violation: 2/28/14
Date of Mental Health Assessment: 3/28/14
Date of Disposition: 4/4/14
Charge: Distribution of a Controlled Substance – Division A-2 Offense

After an unclothed body search, this 3CMS inmate was discovered to have two small bindles of what was later determined to be marijuana. A mental health assessment was completed on 3/28/14 with questions numbers one, two and three answered in the negative. The inmate appeared before the SHO for a hearing on 4/4/14. The SHO noted review of the mental health assessment and found the inmate guilty. The inmate was assessed 161 days forfeiture of credit, three days CTQ, 30 days loss of yard, one year loss of visitation followed by two years of non-contact visits, assignment to AA/NA or SAP and referral to ICC for SHU term assessment and consideration for work group C.

**Impression:** There was no mitigation in this case. There was no mitigation recommended by the clinician. The SHO reviewed the mental health assessment and did not mitigate any penalties. The inmate was assessed significant credit loss.

**Inmate D**
Date of Violation: 3/18/14
Date of Mental Health Assessment: 4/23/14
Date of Disposition: 4/25/14
Charge: Battery on an Inmate with a Weapon – Division A-1 Offense

Based on confidential information it was reported that this 3CMS inmate had battered another inmate by hitting him in the forehead with a cane. A mental health assessment was completed on 4/23/14 with question number one answered in the negative and questions number two and three answered in the affirmative. The response to question number two stated, "symptoms may have exacerbated his response." This answer was confusing and unhelpful to the SHO. By checking "yes" for question number two the clinician indicated that that the inmate's mental disorder appeared to contribute to the behavior that led to the RVR. However the clinician went on to say that the inmate's symptoms *may have* exacerbated the behavior, which is not the same. The response to question number three stated, "prolonged ASU may worsen mental health symptoms." The clinician did not specifically indicate if there were any mental health factors to consider when assessing a penalty.

The inmate appeared for a hearing before the SHO on 4/25/14. The SHO noted reviewing the mental health assessment in the hearing document. The inmate was found not guilty based on the SHO's determination that the inmate acted in self-defense.

**Impression:** There was mitigation in this case for reasons unrelated to mental health factors. The inmate was found not guilty based upon all of the confidential information received, therefore no penalties were assessed. The mental health assessment responses were confusing and unhelpful to the SHO.

**Inmate E**
Date of Violation: 3/20/14
Date of Mental Health Assessment: 4/4/14
Date of Disposition: 4/20/14
Charge: Participation in a Riot – Division D Offense

On 3/20/14, this 3CMS inmate was observed fighting with another inmate while other inmates were fighting simultaneously. This met the definition of participation in a riot, as there were three or more inmates involved in a physical altercation. A mental health assessment was completed on 4/4/14 with questions numbers one and two answered in the negative and question number three answered in the affirmative. The response to question number three stated, "extended ad seg placement may lead to psychological decompensation." This response was unhelpful to the SHO. Although question number two was answered in the negative, the clinician wrote, "[Inmate] denies participating in the cited behavior." This response was not consistent with RVR policy.

On 4/20/14, the inmate appeared before the SHO for a hearing. The SHO indicated review of the mental health assessment by noting the responses to questions one, two and three in the hearing document. The inmate was found guilty and assessed 90 days loss of credit, consistent with a

Division D offense and referred to ICC for program and/or housing review and SHU term assessment.

**Impression:**  It was unclear if there was mitigation in this case based on the mental health assessment.  The SHO noted that the mental health assessment was taken into consideration in assessing the penalty, but did not detail how.  The inmate was assessed significant credit forfeiture.

**Inmate F**
Date of Violation:  2/18/14
Date of Mental Health Assessment:  2/24/14
Date of Disposition:  3/1/14
Charge:  Battery on an Inmate – Division D Offense

On 2/18/14, this 3CMS inmate was observed striking another inmate with his fists.  The inmate refused orders to get down and was subsequently pepper-sprayed to gain his compliance.  A mental health assessment was completed on 2/14/14 with question number one answered in the negative and questions number two and three answered in the affirmative.  The response to question number two stated, "inmate reports increased stress, 'bullying' that contributed to the offense occurring."  This response was unhelpful and substituted the inmate's statements for a clinical opinion regarding whether there were any mental health factors the SHO should consider in assessing a penalty.  The response to question number three stated, "extended ASU time will worsen inmate's functioning."  This is a vague response, as it is not explained what is meant by "extended time" and as such was unhelpful to the SHO.

On 3/1/14, the inmate appeared before the SHO for a hearing.  The SHO indicated review of the mental health assessment by noting the responses to questions one, two and three in the hearing document.  The inmate was found guilty and assessed 90 days loss of credit, consistent with a Division D offense.

**Impression:**  It was unclear if there was mitigation in this case based on the mental health assessment.  The SHO noted that the mental health assessment was taken into consideration in assessing the penalty, but did not detail how.  The inmate was assessed significant credit forfeiture.

**Inmate G**
Date of Violation:  2/7/14
Date of Mental Health Assessment:  2/18/14
Date of Disposition:  2/20/14
Charge:  Participation in a Riot – Division D Offense

On 2/7/14, this 3CMS inmate, along with five other inmates, was observed striking two inmates with closed fists.  A mental health assessment was completed on 2/18/14 with questions number one and three answered in the affirmative and question number two answered in the negative. The response to question number one stated that the inmate's mental health symptoms might at times cause him difficulty in understanding the process, particularly if he was nervous.  The

response to question number three stated that increased time in isolation might contribute to the inmate's deterioration. This statement was unhelpful, the clinician did not indicate whether there were any mental health factors the SHO should consider in assessing a penalty.

On 2/20/14, the inmate appeared before the SHO for a hearing. The hearing document made no mention of whether the inmate was assigned a staff assistant. In documenting the review of the mental health assessment, the SHO indicated that question number three was answered in the negative, writing, "…the mental health clinician determined that if the subject is found guilty of the specific act, that this SHO should consider all of the following mental health factors in assessing the penalty: NONE." The inmate was found guilty and assessed 90 days loss of credits, consistent with a Division D offense and referred to ICC for program and custody review and SHU term assessment.

**Impression:** There was no mitigation in this case. The clinician's response to question number three was unhelpful to the SHO as indicated by the SHO's interpretation of the response as noted in the hearing disposition. The inmate was assessed significant credit forfeiture and losses of privileges.

**Inmate H**
Date of Violation: 1/17/14
Date of Mental Health Assessment: 1/21/14
Date of Disposition: 2/21/14
Charge: Sexual Disorderly Conduct – Division E Offense

On 1/17/14, during a mental health assessment, this 3CMS inmate began masturbating in front of the social worker. The assessment was concluded upon the inmate's refusal to stop and the employee reported the inmate's conduct. A mental health assessment was completed on 1/21/14 with questions number one and three answered in the affirmative and question number two answered in the negative. The response to question number one stated that the inmate had a TABE score of 2.2 and a staff assistant was recommended to help him better understand the process and represent his interests. The response to question number three stated that the inmate was in the process of collecting personal care items that his brother would be sending him and he might become angry or agitated if he was unable to make phone calls or receive the items in a timely manner. This response was unhelpful to the SHO. The clinician did not indicate whether there were any mental health factors to consider when assessing a penalty. Although the question number two was answered in the negative, the clinician wrote, "The inmate's judgment and insight were intact during the mental health evaluation, as evidenced by his ability to process the consequences related to the current incident and discuss the gang's reaction to members taking psychotropic medication at a level two facility versus a level three or four." This response was not consistent with RVR policy.

On 2/21/14, the inmate appeared before the SHO for a hearing. The inmate was assigned a staff assistant. The SHO documented review of the mental health assessment and noted that although the clinician concluded that mental health did not contribute to the behavior that led to the RVR, the SHO would consider the inmate's mental health in assessing the penalty. The inmate was found guilty and assessed 60 days loss of credits, 90 days loss of canteen, appliances, vendor

105

packages and personal property.  The SHO did not explain how the inmate's mental health was considered in assessing the penalty.

**Impression:**  There was no mitigation in this case.  The clinician's response to question number three provided no assistance to the SHO in assessing a penalty.  The SHO indicated that the inmate's mental health would be considered in assessing a penalty, but did not explain how it was considered.  The inmate was assessed the maximum credit loss consistent with a Division E offense.

## Inmate I
Date of Violation:  2/7/14
Date of Mental Health Assessment:  2/14/14
Date of Disposition:  2/20/14
Charge:  Participation in a Riot – Division D Offense

On 2/7/14, this 3CMS inmate, along with five other inmates, was observed striking two inmates with closed fists.  A mental health assessment was completed on 2/14/14 with questions number one and two answered in the negative and question number three answered in the affirmative.  The response to question number three stated, "Prolonged ASU placement or isolation may lead to a worsening of psychiatric symptoms that would likely lead to a loss of functioning."  The inmate appeared for a hearing before the SHO on 2/20/14.  The SHO noted review of the mental health assessment by documenting the responses in the hearing disposition, but did not explain how it was considered in determining a penalty.  The inmate was found guilty and assessed 90 days loss of credits, consistent with a Division D offense and referred to the ICC for program and custody review and SHU term assessment.

**Impression:**  There was no mitigation in this case.  The SHO reviewed the mental health assessment and did not mitigate any penalties.  The inmate was assessed significant credit loss.

## Inmate J
Date of Violation:  1/23/14
Date of Mental Health Assessment:  1/31/14
Date of Disposition:  5/25/14
Charge:  Battery on Staff – Division B Offense

On 1/23/14, after having been reprimanded for coming to the medication line at the wrong time, this 3CMS inmate forcefully pushed an officer's hand in response to being asked for his ID.  A mental health assessment was completed on 1/31/14 with question number one answered in the negative and questions number two and three answered in the affirmative.  The response to question number two stated, "Symptoms under which pt receives treatment could exacerbate the behaviors noted in the RVR."  This answer was unclear and as such unhelpful to the SHO.  The response to question number three stated, "Prolonged ASU placement may impact mental health status and lead to decompensation."

On 5/25/14, the inmate appeared before the SHO for hearing.  The SHO noted in the hearing disposition that the mental health assessment was taken into consideration.  The SHO quoted a

statement purportedly from the assessment, which read, "The Mental Health Clinician…believes the subject's mental disorder did appear to contribute to the behavior which led to the RVR. Noting the inmate was aware he was arguing and not remembering the incident." However, the monitor's review of the mental health assessment revealed no such statement. The inmate was found guilty assessed 121 days loss of credits, consistent with a Division B offense and referred to the ICC for SHU term assessment.

**Impression:** Mitigation in this case appeared to be in the form of declining to assess the inmate any loss of privileges. The response to question number two on the mental health assessment was unclear. The SHO noted consideration of the mental health assessment, however, there appeared to be confusion in the interpretation of it.

**Inmate K**
Date of Violation: 1/16/14
Date of Mental Health Assessment: 2/12/14
Date of Disposition: 5/31/14
Charge: Battery on Inmate with Weapon Resulting in Serious Bodily Injury – Division A-1 Offense

Confidential information was received that on 1/16/14, this 3CMS inmate assaulted another inmate with a slashing-type weapon, striking him in the left arm and the facial area causing serious bodily injury. The inmate had injuries consistent with being involved in an altercation. A mental health assessment was completed on 2/12/14 with questions number one, two and three answered in the affirmative. The response to question number one stated that the inmate was unable to adequately respond to questions and could not read the RVR copy because he did not have eyeglasses. The response to question number two stated, "He is not tracking the interview questions and responds inappropriately." This response does not indicate whether the inmate's mental disorder contributed to the behavior that led to the RVR. The response to question number three stated that any yard restriction beyond ten days could contribute to psychiatric decompensation.

On 5/31/14, the inmate appeared before the SHO for a hearing. The SHO noted review of the mental health assessment by documenting the responses in the hearing disposition. The inmate was found guilty and assessed 360 days loss of credit, consistent with a Division A-1 offense.

**Impression:** Mitigation in this case appeared to be in the form of declining to assess the inmate any loss of yard privileges. The SHO considered the mental health assessment and assessed the inmate the maximum credit forfeiture consistent with a Division A-1 offense.

**Inmate L**
Date of Violation:  3/6/14
Date of Mental Health Assessment:  3/24/14
Date of Disposition:  4/5/14
Charge:  Obstructing P.O. (I.H.P.) – Division D Offense

On 3/6/14, this 3CMS inmate refused to go back to his cell and would not explain why he felt he and his cellmate were incompatible.  The inmate was placed in administrative segregation pending further investigation.  A mental health assessment was completed on 3/24/14 with questions one, two and three answered in the negative.  On 4/5/14, the inmate appeared before the SHO for a hearing.  The SHO noted in the hearing disposition that a mental health assessment was **not** requested because the behavior at issue was not bizarre, unusual or uncharacteristic for the inmate.  However, as noted above, a mental health assessment was completed on 3/24/14.  It was unclear why the SHO appeared to be unaware that an assessment had been completed.  The inmate was found guilty and assessed 90 days loss of credit, consistent with a Division D offense.

**Impression:**  There was no mitigation in this case. The SHO appeared to be unaware that a mental health assessment had been requested.  The completed mental health assessment did not indicate that mental health should be considered in assessing a penalty.  The inmate was assessed the maximum credit forfeiture consistent with a Division D offense.

**Inmate M**
Date of Violation:  1/6/14
Date of Disposition:  3/25/14
Date of Mental Health Assessment:  1/29/14
Charge:  Conspiracy to Distribute a Controlled Substance – Division A-2 Offense

On 1/6/14, custody staff was notified by the Solano County District Attorney's Bureau of Forensic Services that a suspected controlled substance tested positive for marijuana.  The amount of marijuana was 1.69 grams.  The suspected controlled substance was confiscated from this 3CMS inmate's visitor on 11/30/13 while she was being processed into the institution for a visit with the inmate.  It was noted on the RVR that the inmate was at the 3CMS LOC.

A mental health assessment was sent to mental health on 1/21/14 and completed on 1/29/14, which was within established timeframes.  Questions numbers one and two were answered in the negative and question number three was answered in the affirmative.  The response to question number three stated "IM participates in MHSDS.  Any restriction of yard privileges in excess of 10 days could contribute to psych.  Decompensation.  TABE score 11.8, NCF, Zero accommodations."

The RVR was heard on 3/25/14 with the inmate present.   A staff assistant was assigned to the inmate.  The SHO stated a mental health assessment was completed as the RVR was a Division A-2 offense and then went on to state, "The behavior resulting in the RVR was not considered bizarre, unusual, or uncharacteristic; the Mental Health Clinician determined that the subject's mental disorder did not contribute to the behavior that led to this RVR."

The SHO found the inmate guilty and assessed 151 days forfeiture of credit, loss of visits for one year followed by non-contact visits for two years, mandatory UA testing once a month for a year, 90 days loss of packages, and referral to ICC for a SHU term assessment. The SHO did not state their consideration of the mental health assessment information or mitigation of any penalties within the findings and disposition portion of the RVR.

**Impression:** It was unclear if there was mitigation in this case based on the mental health assessment. The reference to the inmate's behavior not being bizarre, unusual or uncharacteristic in reference to referring the inmate for a mental health assessment is unnecessary, as the Division of the offense requires a mental health assessment to be completed. The SHO did not indicate their consideration and/or mitigation based on the mental health assessment information.

**Inmate N**
Date of Violation: 3/18/14
Date of Mental Health Assessment: 3/26/14
Date of Disposition: 4/21/14
Charge: Controlled Substance, Possession of Alcohol – Division C Offense

On 3/18/14 at approximately 1945 while doing a random search of this 3CMS inmate's cell, custody staff found five Folgers cans and one baby powder container filled with an orange liquid substance. The liquid substance contained fruit pulp and had a pungent alcohol smell.

A mental health assessment was requested on 3/26/14 and completed on 4/2/14, which was within established time frames. Questions number one and two were answered in the negative and question number three was answered in the affirmative. The response to question number three stated, "IP's current bereavement along with his pre-existing MH factors may place IP at risk for decompensation if assessed for SHU term."

The RVR was heard on 4/21/14 and the inmate was present. A staff assistant was not assigned. The SHO noted the mental health assessment information and stated their mitigation of possible penalties by not imposing "A1/C status and no disciplinary detention." The inmate was found guilty and assessed 120 days loss of behavior credits consistent with a Division C offense, 90 days loss of privileges, confined to quarters for ten days, and referred for endorsement to a SAP.

**Impression:** The SHO considered the assessment and mitigated based on it, however the assessment of ten days of confinement to quarters appeared to be inconsistent with their statement of no disciplinary detention. The inmate was assessed significant loss of credit and privileges.

**Inmate O**
Date of Violation:  1/7/14
Date of Mental Health Assessment:  1/23/14
Date of Disposition:  1/30/14
Charge:  Inmate Manufactured Alcohol – Division C Offense

During a search of this 3CMS inmate's cell, a CO discovered a plastic bag containing a brown liquid with fermented fruit floating in it.  The liquid had a strong smell of alcohol.  The inmate was the only inmate assigned to the cell at the time of the discovery.

A mental health assessment was requested on 1/21/14 and completed on 1/23/14 with questions number one and two answered in the negative.  Question number three was not checked either "yes" or "no" and no written comment was included.  Additionally, there was no date indicated as to when the clinician conducted the required non-confidential interview with the inmate.

The RVR was heard on 1/30/14 at which time the SHO stated the inmate was a participant in the MHSDS at the 3CMS LOC.  The SHO noted that the circumstances in the RVR were not bizarre, unusual or uncharacteristic and therefore a mental health assessment was not requested.  However, the word "not" was crossed out at a later point in time, but it is not noted on the RVR as to why, or when this occurred.

The SHO found the inmate guilty and assessed him 91 days loss of work time credit consistent with a Division C offense, 30 days loss of night time yard and 30 days loss of day time yard.

The SHO did not mention the mental health assessment as having been completed, what it stated or whether it was considered during the hearing.

**Impression:**  The mental health assessment was incomplete.  Question number three was not answered, and the date of the required non-confidential interview with the inmate was missing.  The SHO did not adequately address the mental health assessment.  Additionally, staff appeared to be confused as to which RVRs must be referred for a mental health assessment.  This was evidenced by the reference by the SHO regarding the inmate's behavior as not being bizarre, unusual or uncharacteristic.  This was not the standard for a Division C offense.  The inmate was assessed significant credit forfeiture in addition to losses of privileges.

## San Quentin State Prison (SQ) RVR Review

## SUMMARY OF FINDINGS

A.    Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at SQ by completing and sustaining all requirements.

B.    Based on the data provided by the institution, training on the RVR process and the role of the mental health assessment was deficient for clinical and custody staff.

C.    Mental health assessments were completed timely.

D.      Some clinicians provided inappropriate and unresponsive answers on the mental health assessments.

E.      A majority of the mental health assessments found no nexus between mental health and the actions which led to the RVR.

F.      SHOs and Institution Classification Committees documented consideration of mental health assessments; however, actual consideration and mitigation was not evident.

G.      Some SHOs appeared to consider the review of the mental health assessments a pro forma requirement that simply needed to be checked off.

H.      There was inconsistency among SHOs as to the validity and usefulness of the mental health assessments.

I.      SQ converted the mental health assessment into a Word document which allowed staff to type their responses, eliminating illegibility and providing an expandable space to include more clinical information on the form itself.

**INTRODUCTION**

On July 8-9, 2014, the Coleman monitoring team reviewed the RVR process at (SQ. At the time of the visit, SQ housed Level II, Reception Center and condemned inmates including those requiring 3CMS, EOP and MHCB levels of care. As of March 2014, which covered the period under review, SQ had a total inmate population of 3,938. Of that population, 1,215 inmates or 31 percent were on the mental health caseload.

During the site visit, the monitoring team met with the chief deputy warden, the IST lieutenant, chief of mental health, supervising psychologist/RVR coordinator, as well as 16 SHOs and three mental health clinicians responsible for completing mental health assessments.

The team reviewed policies and procedures related to the RVR process at SQ, training materials provided by CDCR headquarters, as well as any local training materials provided by the institution to SQ staff. The team also reviewed any RVR audits completed by the institution. While SQ maintained a local tracking system for RVR adjudication, for uniformity purposes throughout all CDCR institutions, the monitors utilized the SQ Institution Register and CDCR 1154 logs to gather RVR data which are required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections".

The review period covered RVRs issued and/or heard during January, February and March of 2014. During this time frame, as reported in "COMPSTAT", there was a total of 477 RVRs written, with 131 or 27 percent issued to inmates on the mental health caseload. However, a review of SQs CDCR Form 1154, Disciplinary Log showed the total number of RVRs written as 526, with 161 or 30 percent issued to inmates on the mental health caseload. The monitors also reviewed ICC actions for several inmates for whom SHU terms were recommended.

A review of the 1154 disciplinary log for the units unit revealed that inmates' mental health status was not consistently noted in the logs. There were also discrepancies and inconsistencies between the logs and the RVR itself when reporting on the inmate's LOC. During the review of information in ERMS, it was also noted that the mental health assessments were not always scanned into the file and made a part of the RVR package.

## TRAINING

SQ was unable to demonstrate adequate compliance with any of the required trainings for any of the required personnel. SQ staff produced one proof of practice memorandum, dated February 1, 2012, which identified the memorandum as the response to the October 26, 2011 four-hour training requirement. However, the IST manager and the chief deputy warden both indicated the proof of practice memorandum was actually responsive to both the October 26 and November 3, 2011 memoranda. The supervising psychologist indicated that clinical staff did not submit a response to the two memoranda since this was left to IST to complete. Although it could be assumed that the February 1, 2012 memorandum was responsive to the custody and mental health staff training requirement, it was not specifically stated in the proof of practice memorandum.

The four-hour training was received by 16 percent of captains, 53 percent of lieutenants, 48 percent of sergeants and 33 percent of psychologists. The CC II appeals coordinator and CDOs did not receive the training. The one-hour training was received by sixteen percent of captains, 80 percent of lieutenants and 54 percent of sergeants. The CC II appeals coordinator and CDOs did not receive the training. Two of the three psychologists responsible for completing the mental health assessments, who were relatively new to the process stated they had received training. Based on the clinicians understanding of the RVR process and the role of the mental health assessments, it appeared they had been trained but this information was not recorded within the IST records.

### SQ RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 6 | 0/0% | 0/0% |
| Captains | 6 | 1/16% | 1/16% |
| Lieutenants | 30 | 16/53% | 24/80% |
| Sergeants | 87 | 42/48% | 47/54% |
| Psychologists | 3 | 1/33% | 0/0% |
| CC-II Appeals | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

Generally, the lieutenants indicated that mental health staff completed the mental health assessment forms in a timely manner and were willing to expedite the completion of a mental health assessment if asked. However, there were marked differences in the responses provided by the second watch lieutenants versus those provided by the third watch lieutenants.

One issue raised by second watch lieutenants concerned the lack of specificity and the use of boilerplate language on the mental health assessment. The second watch lieutenants reported that clinicians repeatedly recommended that the SHO not take yard time away or assess a penalty that would affect an inmate's programming. The consensus among the lieutenants was that the clinician's input was helpful roughly 50 percent of the time. The SHOs reported that they considered the mental health recommendations but still believed that inmates must be held accountable for their behavior regardless of the impact of mental illness. One SHO stated that the clinicians were routinely answering the assessment questions in the negative without thoroughly researching the inmate's history.

The second watch lieutenants appeared to be more open and willing to consider and mitigate the penalty as a result of the clinical recommendations and information contained in the mental health assessment. However, the third watch lieutenants considered a review of the mental health assessment as a pro forma requirement that needed to be checked off in the RVR process rather than actually utilizing the information and recommendations of the clinicians during the hearing and mitigation phases.

The third watch lieutenants expressed the belief that their knowledge of the inmates was superior to that of the clinicians and considered the clinicians' input as insignificant. One of the lieutenants stated that the assessment was useless regarding condemned inmates since ten days loss of yard was the harshest penalty that could be assessed regardless of the nature of the RVR. The monitors' review of multiple RVRs issued to condemned inmates at SQ determined that his belief was incorrect. It was clear that the SHOs needed additional training given their lack of understanding concerning the intent of the mental health assessment in the RVR process and their dismissive attitude towards clinical recommendations.

**Clinicians**

The monitoring team met with the three clinicians at SQ who completed the mental health assessments. The clinicians reportedly received the mental health assessment requests from custody staff in a timely manner with rare exceptions for expedited processing. They were aware of the time constraints in which the forms had to be completed and returned to custody.

The clinicians stated that completion of an assessment took between one and four hours depending on the inmate's LOC and the complexity of the RVR itself. Completion of the assessment included a non-confidential interview with the inmate, a review of information contained in the eUHR, SOMS and ERMS, and making contact with the inmate's PC.

The clinicians believed that the clinical information contained on the mental health assessments was valuable to SHOs.  However, they indicated that the questions on the assessment form could be revised to provide some more clarity and reduce the ambiguity.  They reported a good working relationship with custody staff and at times were contacted by the SHOs for additional information.  In addition, some clinicians had even been called as witnesses by the SHO at RVR hearings.

A unique occurrence at SQ was the conversion of the mental health assessment into a Word document which allowed staff to type their responses and provided an expandable space to include more clinical information on the form itself.  The limited availability of space on the pre-printed mental health assessment was identified as a problem at other institutions.  This also made the form user friendly and legible for all staff involved.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

A review of those RVRs which required mental health assessments indicated that the assessments were processed and completed within established policy timeframes.  A majority of the reviewed mental health assessments revealed all three questions on the assessment answered in the negative.  On assessments written for inmates at the EOP and MHCB LOC, the clinicians were thorough and provided adequate clinical information for the SHO to consider during the hearing and mitigation phases.

For inmates at the 3CMS LOC, the written responses to questions number two and three varied among clinicians.  Although clinicians generally answered "no" to question number two, written responses were still provided in multiple cases.  After answering in the negative, several clinicians appeared to be non-committal in their responses to question number two with one clinician stating that "some possibility remains that there may be mental health factors involved." (*See* SQ Inmate F.)  After answering "no" to question number two, another clinician wrote that "there is no indication that inmate was experiencing mental health symptoms at the time of this incident.  However, the inmate adamantly maintains his innocence and claims he knew nothing about the weapon in his cell."  (*See* SQ Inmate G.)  The inmate's statements about his innocence should not be included on the mental health assessment.

After checking "yes" to question number three, one clinician wrote that the "I/P reported that as a result of this 115, he was discontinued from all of his medications, including psychiatric medication that was not listed in the 115.  His primary psychiatrist has been notified of this, but custody should be aware as this may contribute to some increase in his symptoms."  (*See* SQ Inmate L.)  This answer was unresponsive as to whether the SHO should consider any mental health factors when assessing a penalty and there was no verification by the clinician as to whether the inmate's medication was in fact discontinued as reported by the inmate.  Another clinician's answer to question number three merely stated that the inmate was experiencing stress due to the RVR – another unresponsive answer that provided no guidance for the SHO.  (*See* SQ Inmate N.)

114

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

The reviewed RVR packages revealed that overall, the SHO generally noted that the mental health assessment was reviewed and taken into consideration.  It was also noted that this was generally in the form of a perfunctory quotation of the mental health assessment verbatim and stating that it was considered.  In multiple cases, there was no explanation as to how the mental health assessment was considered.  (*See* SQ Inmates A, B, C, D, F, I, J, K, L.)

In numerous cases, the SHO stated that the mental health assessment was considered but that it did not provide any exonerating evidence.  (*See* SQ Inmates A, D, G, J.)   The SHOs appeared to be using the mental health assessment as a document to gauge an inmate's culpability or as a competency exam, which was not in conformity with the RVR policy.  There was one instance where the SHO made no mention of the mental health assessment in his decision even though the assessment had been provided and was made part of the RVR package.  (*See* SQ Inmate M.)  In yet another case, when referring to his consideration of the mental health assessment, the SHO incorrectly referred to a memorandum dated 8/14/98 as the controlling memorandum that mandated a review of the mental health assessment during a hearing.  (*See* SQ Inmate O.)  This clearly indicated that the SHO was utilizing an outdated memorandum and was unaware of the current standards and benchmarks that warranted a mental health assessment referral.  However, it was noted that the inmate was placed on a one-to-one observation immediately after a guilty finding based on the clinician's recommendation that the inmate should be evaluated for risk of suicide immediately in the MHCB if found guilty.

There were only a few cases reviewed where penalties were mitigated, reduced or dismissed based on mental health assessments.  (*See* SQ Inmates E, H)

**ICC REVIEW**

The Institution Classification Committee's (ICC) consideration of the mental health assessment appeared to be perfunctory in nature and mimicked the findings of the SHO.  In one case where the clinician raised concerns about changing the inmate's custody Grade, the ICC made no mention of the mental health assessment and changed the inmate's status to Grade B.  (*See* SQ Inmate C.)

<strong>SQ RVR Case Reviews</strong>

**<u>Inmate A</u>**
Date of Violation:  1/4/14
Date of Mental Health Assessment:  1/14/14
Date of Disposition:  1/18/14
Charge:  IDX/Masturbation - Division D Offense

On 1/4/14, this 3CMS inmate was found masturbating on a lower bunk by an officer who was doing dorm count.  A mental health assessment was completed on 1/14/14 with question number two answered in the negative and question number three answered in the affirmative.  Although a

negative answer to question number two does not require an explanation, one was provided which stated that the inmate was not experiencing psychotic symptoms and was not decompensating at the time of the incident. The response to question number three stated that "according to documentation in the eUHR, it seems that this inmate has a chronic mental illness and that his symptoms intermittently become exacerbated. Due to varying reports, it is unclear what the etiology of his symptoms are, but documentation indicates that his symptoms seem to become worse when under situational distress. A high stress environment, such as prolonged isolation, could further exacerbate his symptoms."

The inmate refused to attend the hearing held on 1/18/14. The SHO considered the mental health assessment and wrote that "the mental health assessment does not provide any exonerating evidence. SHO will, however, consider mental health when assessing the penalty." The inmate was found guilty of IDX, a Division D offense and was assessed 90 days loss of behavior/work credits, 180 days loss of canteen, packages and telephone privileges and was referred to ICC for possible SHU assessment.

The mental health assessment made it clear that any prolonged isolation could cause the inmate to decompensate. The SHO disregarded the recommendation of the clinician when he referred the inmate to the ICC for SHU assessment (prolonged isolation). There was no evidence in the penalty assessment that stated the SHO actually mitigated the penalty as he indicated he was going to do in the decision.

The ICC met on 2/20/14: "Committee elects to A & I a 6 month SHU term with a MERD of 5/19/14. SHU was not mitigated due to prior disciplinary history. There are no aggravating factors. Committee elects to suspend balance of SHU term eff. 2/20/14. In assessment of this SHU term, ICC has considered S placement in the MHSDS and the information provided by clinical staff, noting S's mental health did not contribute to the behavior. As a result, ICC acts to hold him accountable for his actions." The ICC elected to consider only whether the inmate's mental health contributed to his actions (answer number two) and not if the penalty would have a negative effect on the inmate's mental health (answer number three).

**Impression:** There was no mitigation in this case. The SHO referenced the mental health assessment, but found it did not provide "exonerating evidence," which is not what the mental health assessment is intended to do under CDCR policy. The SHO indicated that the mental assessment would be considered in the penalty phase, but did not document if and how it was considered in mitigation. The inmate was assessed significant time credit and privilege losses.

### Inmate B
Date of Violation: 1/4/14
Date of Mental Health Assessment: 1/28/14
Date of Disposition: 2/1/14
Charge: Possession of Tobacco - Division F Offense

On 1/4/14, during a cell search, tobacco was found in this EOP inmate's cell. The inmate was single celled at the time of the search. A mental health assessment was completed on 1/28/14 with questions number two and three answered in the affirmative. The response to question

number three stated, "While this inmate has been considered relatively stable recently, he has a history of decompensation. He is an active participant and benefits greatly from treatment in the EOP program. Any penalties that might restrict programming or further isolate the inmate could contribute to a decompensation of the inmate's mental health."

On 2/1/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed ten days loss of yard program, however the SHO noted that the inmate was still allowed to attend EOP yard program in consideration of the mental health assessment.

**Impression:** The SHO noted that there was consideration given to the mental health assessment, but did not articulate how the assessment was actually considered or specifically if there was mitigation. The inmate was assessed loss of yard program, except for EOP yard.

**Inmate C**
Date of Violation: 3/6/14
Date of Mental Health Assessment: 4/7/14
Date of Disposition: 4/9/14
Charge: Use of Controlled Substance – Division F Offense

On 3/6/14, this 3CMS inmate was subjected to a mandatory random UA test which indicated a positive result for marijuana. The reason for the mental health assessment as reported in the RVR, was due solely to his 3CMS LOC. The mental health assessment was completed on 4/7/14 with question number two answered in the negative and question number three answered in the affirmative. Although question number two was checked "no", the clinician elaborated with a written answer writing that there was insufficient evidence to connect mental illness to the inmate's behavior at the time of the violation. The response to question number three stated, "If the penalty resulting from a potential guilty finding includes a change in grade or privileges, it is possible that his mental health could be affected as a result."

The SHO considered the mental health assessment and found the inmate guilty. The SHO assessed the inmate ten days loss of yard program and 30 days loss of canteen, special packages and phone calls. In addition the inmate was informed that he would be subject to random drug testing once per month for one year and that he had to enroll in NA/AA. The inmate was not allowed visitors for 90 days and at the expiration of that 90-day period, all visits would be no-contact for another 90 days. He was referred to East Block ICC. The SHO did not mitigate as recommended by the mental health assessment.

The ICC met on 4/9/14 and again on 4/23/14. On 4/9/14, the committee considered the mental health status of the inmate, removed the confined to quarters status and placed the inmate on Grade B SMY pending final adjudication of the RVR. On 4/23/14, the committee elected to assess a nine month Grade B term and made no mention of the concerns raised in the mental health assessment about the effect of changing the inmate's Grade.

117

**Impression:** There was no mitigation in this case. The SHO noted the mental health assessment and indicated it was considered, but did not explain how. The SHO did not address mitigation of the penalty. The inmate was assessed significant loss of privileges.

**Inmate D**
Date of Violation: 1/21/14
Date of Mental Health Assessment: 2/27/14
Date of Disposition: 3/3/14
Charge: Fighting with Force - Division D Offense

On 1/21/14, this 3CMS inmate was involved in a fight with another inmate in the dining hall. A mental health assessment was completed on 2/27/14 with question number two answered in the affirmative and question number three answered in the negative. Although the clinician felt that mental illness may have contributed to the behavior that gave rise to the RVR, the clinician also stated that as of the day of the assessment, the inmate had improved and his treatment team could address any symptoms that might arise.

On 3/3/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. The SHO stated that pursuant to the mental health assessment, the mental illness did not influence the behavior resulting in the RVR and did not provide any exonerating evidence. However, the SHO indicated that mental health would be considered when assessing the penalty. The inmate was assessed 90 days credit forfeiture. The SHO made no mention of mitigation of the penalty.

**Impression:** The SHO noted that there was consideration given to the mental health assessment, and found that the inmate's "mental illness did not influence the behavior resulting in the RVR and did not provide any exonerating evidence," which is not a standard consistent with CDCR's RVR policy. The SHO indicated that the mental health assessment would be considered in the penalty phase, but did not ultimately state how it was considered. The inmate was assessed significant credit forfeiture.

**Inmate E**
Date of Violation: 1/13/14
Date of Mental Health Assessment:
Date of Disposition: 2/243/14
Charge: Threats against Staff - Division E Offense

On 1/13/14, this 3CMS inmate approached an officer who was supervising showers and stated that he wanted to kill him and other staff members in the unit. The inmate stated that the voices in his head were telling him to kill the staff members. A mental health assessment was completed on 2/4/14 with question number two answered in the affirmative and question number three answered in the negative. The response to question number two stated that there was evidence suggesting the inmate was falsely reporting the voices to obtain preferred housing, but that there was also too much history of numerous hospitalizations due to the voices telling him to harm others to ignore this as a factor that likely contributed to the behavior.

118

On 2/24/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and dismissed the RVR in the interest of justice based upon the mental health assessment and the inmate's mental illness.

**Impression:** There was mitigation in this case. The SHO noted that there was consideration given to the mental health assessment, and dismissed the RVR based upon the mental health assessment, noting the inmate's mental illness.

### Inmate F
Date of Violation:  1/26/14
Date of Mental Health Assessment:  3/27/14
Date of Disposition:  4/8/14
Charge:  Masturbation with Exposure – Division D Offense

On 3/26/14, this non-MHSDS inmate was found masturbating by a female officer during the performance of welfare checks and the inmate failed to stop after the officer inquired what he was doing. The inmate stated that he waited until the officer had passed his cell before he started masturbating. The report indicates that a mental health assessment was ordered due to the nature of the charges. The mental health assessment was completed on 3/27/14 with questions number two and three answered in the negative.

On 4/8/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 90 days loss of behavioral/work credits and 90 days loss of canteen, appliances, purchases/packages, telephone and personal property. The inmate was referred to the ICC for SHU term assessment.

The ICC met on 5/8/14. The committee elected to re-affirm the ICC action of 5/1/14 to assess and impose a six-month expected SHU term. There was no mention of the mental health assessment in the ICC meeting of 5/8/14 but a classification chrono dated 6/5/14, which included this RVR disposition, indicated that there were no MHSDS concerns based on the 128-MH1 dated 3/13/14 (not the 115 MH completed for this RVR.)

**Impression:** There was no mitigation in this case. The SHO noted the mental health assessment and indicated it was considered, but did not explain how. The SHO did not address the issue of mitigation of the penalty. The inmate was assessed significant losses of credit and privileges.

### Inmate G
Date of Violation:  2/7/14
Date of Mental Health Assessment:  2/19/14
Date of Disposition:  3/12/14
Charge:  Possession of Weapon - Division A-1 Offense

On 2/7/14, while this 3CMS inmate and his cell mate were in the dining hall, a search of their cell was performed. An inmate manufactured weapon was discovered in a shelf that also contained the inmate's ID. A mental health assessment was completed on 2/19/14 with question

number two answered in the negative and question number three answered in the affirmative. The response to question number two stated "There is no indication that inmate was experiencing mental health symptoms at the time of this incident. However, the inmate adamantly maintains his innocence and claims he knew nothing about the weapon in his cell." The response to question number three stated, "Besides the increased stress the inmate is experiencing over the possibility of receiving additional time if he is found guilty, he also appears to have legitimate concerns about his children being removed and placed in foster care if he is not released by his original date. While this wouldn't necessarily warrant a recommendation to mitigate that penalty if he is in fact found guilty, any restrictions on his ability to communicate with his lawyer or Child Protective Services should be avoided if possible, as he does not appear to be coping well with the apparent possibility of losing his children."

On 3/12/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment, determined that it did not provide any exonerating evidence and found the inmate guilty. The inmate was assessed 360 days credit forfeiture. In the SHO's decision, language was found regarding lack of evidence in the mental health assessment to exonerate the inmate. This was not the appropriate standard for interpreting the answer to question number two.

The ICC met on 3/27/14. The committee considered the mental health status of the inmate and elected to assess and impose a nine month SHU term. The committee considered whether the inmate's mental health contributed to the behavior and nothing more.

**Impression:** There was no mitigation in this case. The SHO noted that there was consideration given to the mental health assessment, and found that it did not "provide any exonerating evidence," which is not a standard consistent with CDCR's RVR policy. The inmate was assessed significant credit forfeiture.

**Inmate H**
Date of Violation: 2/26/14
Date of Mental Health Assessment: 3/19/14
Date of Disposition: 3/26/14
Charge: Sexual Misconduct – Division F Offense

On 2/26/14, during a PC session, this 3CMS inmate stated that the voices in his head were telling him to do things that were wrong like telling him to lick and kiss his clinician's breasts. A mental health assessment was completed on 3/19/14 with questions number two and three answered in the affirmative. The response to question number two stated, "It appears that this I/M had been reporting an increase in symptoms (also identified by staff) over the past several months. He has consistently reported that he hears voices which may tell him to engage in inappropriate actions. It remains a definite possibility that his mental illness contributed to the behavior that led to the RVR." The response to question number three stated, "It appears that this 115 has placed the I/M under a significant amount of stress which may be serving to further exacerbate his mental health symptoms. It is recommended that the IM retain his access to activities that encourage socialization and that mental health treatment remain a priority in his program."

120

On 3/26/14, the inmate appeared before the SHO for a hearing. Based on the mental health assessment, the SHO found the inmate not guilty of the charge of sexual misconduct and dismissed the charges in the interest of justice.

**Impression:** There was mitigation in this case. The SHO noted that there was consideration given to the mental health assessment, and dismissed the charges.

**Inmate I**
Date of Violation: 3/6/14
Date of Mental Health Assessment: 4/14/14
Date of Disposition: 4/15/14
Charge: Out of Bounds – Division F Offense

On 2/14/14, this 3CMS inmate was standing out of bounds, appeared confused and disoriented and stated that he was an FBI agent and that it was time for him to leave. The investigation was concluded on 3/6/14 and the inmate was charged with out of bounds, a Division F offense (reduced from attempted escape, a Division C offense). He was subsequently admitted to the MHCB the same day. A mental health assessment was completed on 4/14/14 with question number two answered in the affirmative and question number three in the negative. The response to question number two stated, "Immediately following the incident, the I/M was admitted to the CTC/MHCB due to psychotic symptoms (bizarre thoughts and beliefs), which appear to have contributed to the behavior in question. However, it remains a possibility that his psychotic symptoms (which were seemingly acute and legitimate in nature at the time of the offense but appear to have resolved since) were induced by methamphetamine usage."

On 4/15/14, the inmate appeared before the SHO for a hearing and pleaded guilty. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 30 days loss of behavior credit. On 4/16/14 the charges against the inmate were dismissed by the CDO in the interest of justice.

**Impression:** The SHO noted that there was consideration given to the mental health assessment, but did not state how it was considered. The SHO did not indicate if the penalty was mitigated. The inmate was assessed loss of credit. The RVR was mitigated by CDO by dismissal of the charges.

**Inmate J**
Date of Violation: 1/21/14
Date of Mental Health Assessment: 2/6/14
Date of Disposition: 3/3/14
Charge: Battery on Inmate – Division D Offense

On 1/21/14, this 3CMS inmate was accused of battery by another inmate. On 2/6/14, a mental health assessment was completed with question number two answered in the negative and question number three answered in the affirmative. The response to question number three stated, "Documentation in eUHR indicates pt has reported an increase in symptoms since being

121

placed in Ad Seg and recently his risk of suicide has been deemed as moderate by his treatment team.  Isolation and single cell housing are risk factors for suicide, and if penalties include prolonged isolation, access to mental health treatment should not be restricted."

On 3/3/14, the inmate appeared before the SHO for a hearing.  The SHO considered the mental health assessment and found no "exonerating" evidence but stated that he would consider mental health when assessing the penalty.  The inmate pled guilty and was subsequently found guilty by the SHO.  The inmate was assessed 90 days credit forfeiture.  However, the SHO made no mention of mitigating the penalty due to mental health concerns as stated in Part C of the RVR.

The ICC met on 3/27/14.  The committee elected to assess and impose a three month SHU term.  The committee considered the mental health status of the inmate and noted that it did not contribute to his behavior.  The committee only considered the response to question number two on the mental health assessment and made no mention of question number three and the recommendations made by the clinician about the detrimental effects of prolonged isolation.  Accountability was the focus of the ICC and not mitigation.

**Impression:**  There was no mitigation in this case.  The SHO referenced the mental health assessment, but found it did not provide "exonerating evidence," which is not what the mental health assessment is intended to do under CDCR policy.  The SHO indicated that the mental assessment would be considered in the penalty phase, but did not document if and how it was considered in mitigation.  The inmate was assessed significant time credit loss.

**Inmate K**
Date of Violation:  1/24/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  2/12/14
Charge:  Possession of Inmate manufactured Alcohol - Division C Offense

On 1/24/14, a random cell search was performed on the cell solely occupied by this 3CMS inmate.  Approximately four gallons of pruno were found under the lower bunk.  A mental health assessment was completed on 2/6/14 with questions number two and three answered in the negative.

On 2/3/14, the inmate appeared before the SHO for a hearing and entered a plea of guilty.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 120 days credit forfeiture.

**Impression:**  The SHO noted that there was consideration given to the mental health assessment, but did not state how it was considered. The SHO did not indicate if the penalty was mitigated.  The inmate was assessed a loss of credit.

**Inmate L**
Date of Violation: 2/4/14
Date of Mental Health Assessment: 2/19/14
Date of Disposition: 3/15/14
Charge: Possession of and Hoarding Medication – Division F Offense

On 2/4/14, a cell search was performed of this 3CMS inmate's cell. Approximately 40 pills were discovered and later determined to be Benadryl and Naproxen. The inmate admitted that the medication belonged to him. A mental health assessment was completed on 2/19/14 with question number two answered in the negative and question number three answered in the affirmative. The response to question number three stated, "IP reported that as a result of this 115, he was discontinued from all of his medications, including psychiatric medication that was not listed in the 115. His primary psychiatrist has been notified of this, but custody should also be aware as this may contribute to some increase in his symptoms."

On 3/15/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 30 day loss of work time credits.

The clinician's response to question number three did not recommend that the SHO consider any mental health factors when assessing the penalty, but served more as a warning that the inmate may experience an increase in symptoms due to his medications being taken away.

**Impression:** The mental health clinician's response to question number three was unresponsive to the question asked as intended by the RVR policy. The SHO noted that there was consideration given to the mental health assessment, but did not document how. The SHO did not indicate if the penalty was mitigated. The inmate was assessed loss of credit.

**Inmate M**
Date of Violation: 2/6/14
Date of Mental Health Assessment: 2/27/14
Date of Disposition: 3/10/14
Charge: Refusing Housing Assignment – Division D Offense

On 2/6/14, this 3CMS inmate was released from administrative segregation but refused to pack his property and move to the reception center. A mental health assessment was completed on 2/27/14 with questions number two and three answered in the affirmative. The response to question number two stated, "Based on evaluation, review of the records, and consultation with [inmate's] PC, diagnostic picture appears complicated by both medical as well as environmental factors. His apparent mood lability and difficulty programming could be due to personality changes related to his medical condition." The response to question number three stated, "[Inmate] appears to benefit from attending yard. Restricting yard may exacerbate symptoms as [inmate] appears to be having significant difficulty adjusting to and coping with circumstantial stress at this time."

123

On 3/10/14, the inmate appeared before the SHO for a hearing. The SHO did not consider the mental health assessment in his decision and found the inmate guilty. The inmate was assessed 90 days loss of behavior credit.

**Impression:** The SHO did not consider the mental health assessment as required by the CDCR policy. The inmate was assessed significant loss of credit.

### Inmate N
Date of Violation: 2/8/14
Date of Mental Health Assessment: 2/18/14
Date of Disposition: 2/26/14
Charge: Possession of Hypodermic Needle – Division C Offense

On 2/8/14, this 3CMS inmate was observed placing an unknown item at his feet during security check. An officer subsequently found a hypodermic needle and two plastic bags containing an unknown substance. A mental health assessment was completed on 2/18/14 with question number two answered in the negative and question number three answered in the affirmative. The response to question number three stated, "IP reported that as a result of this 115, he has begun to experience additional mood related symptoms due to stress." On 2/26/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 120 days credit forfeiture and ordered that he be subject to four random drugs tests per month for one year.

The response to question number three did not provide any guidance for the SHO in assessing the penalty. It merely stated that the inmate was experiencing stress due to the RVR which did not answer the question. Although the SHO considered the mental health assessment, he incorrectly stated that the assessment was ordered due to bizarre behavior by the inmate. The reason for the mental health assessment was due to the offense being classified as a Division C offense.

**Impression:** There was no mitigation in this case. The mental health assessment did not provide any guidance for the SHO when assessing the penalty. The SHO referenced the mental health assessment but did not state how it was considered. The SHO incorrectly stated that the assessment was ordered due to bizarre behavior by the inmate. The inmate was assessed significant credit loss.

### Inmate O
Date of Violation: 3/11/14
Date of Mental Health Assessment: 4/3/14
Date of Disposition: 4/4/14
Charge: Possession of a Weapon (razor blade in ASU) – Division A-1 Offense

On 3/11/14, a cell search of the cell occupied solely by this EOP inmate yielded a razor blade. A mental health assessment was completed on 4/3/14 with question number two answered in the negative and question number three answered in the affirmative. The response to question number three stated, "Yes, [inmate] reported he would kill himself if found guilty of this RVR.

He therefore should be evaluated for risk of suicide immediately in the MHCB if found guilty. If he is housed elsewhere, please transport him to the TTA immediately to be evaluated there."

On 4/4/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 360 days of credit forfeiture and referred to ICC for SHU assessment.

Although the response to question number three did not offer any mental health factors to consider in assessing the penalty, it did provide the SHO with a valuable recommendation to transfer the inmate to the TTA in the event of a guilty finding. Based on the statement in the mental health assessment, the SHO placed the inmate on one-to-one observation due to the guilty finding. In considering the mental health assessment, the SHO incorrectly referred to a memorandum dated 8/14/98 as the controlling memorandum mandating a review of the mental health assessment during the hearing. The current memorandum is dated 11/3/2011, which may indicate that the SHOs did not know the current standards and benchmarks that warrant a mental health assessment referral.

**Impression:** There was no mitigation in this case. The mental health assessment did not recommend any mitigation of the penalty. The SHO referenced an outdated RVR policy as controlling. The inmate was assessed significant credit loss.

---

## Deuel Vocational Institution (DVI) RVR Review

**SUMMARY OF FINDINGS**

A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at DVI by completing and sustaining all requirements.

B. Mental health assessments were generally timely completed.

C. A majority of the mental health assessments found no nexus between mental health and the actions which lead to the RVR

D. Assessing clinicians did not always provide adequate information for consideration by SHOs in assessing penalties.

E. Several assessing clinicians merely stated the inmate's diagnosis and/or provided inmate statements in lieu of a clinical opinion.

F. There was no quality review of mental health assessments.

G. SHOs documented consideration of mental health assessments.

H. Custody staff indicated concern with the quality and content of some of the mental health assessments.

I. SHOs mitigated penalties in some cases.

J.   In several cases, mental health input during ICC consisted of generalized statements, using canned language.

**INTRODUCTION**

On June 17-18, 2014, the Coleman monitoring team reviewed the RVR process at DVI. At the time of the site visit, DVI housed Reception Center inmates and Level I and II inmates including those requiring 3CMS LOC.  As of March 2014, which covered the period under review, DVI had a total inmate population of 2,609.  Of that population, 581 inmates or 22 percent were on the mental health caseload.

During the site visit, the monitoring team conducted entrance and exit meetings with the Warden, CEO and other executive staff, in addition to interviewing SHOs as well as the mental health clinicians responsible for completing mental health assessments.  For uniformity purposes throughout all CDCR institutions, the monitors utilized the Institution Register and CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections".

The review period covered RVRs issued and/or heard during January, February and March of 2014.  During this timeframe, as reported in "COMPSTAT", there was a total of 339 RVRs written, with 95 or 28 percent issued to inmates on the mental health caseload.  The monitoring team also reviewed ICC actions for several inmates.

**TRAINING**

DVI staff were able to produce proof of practice memoranda dated December 30, 2011 and January 27, 2012 as required by the October 26, 2011 and November 3, 2011 memoranda. The proof of practice memorandums had In Service Training (IST) printouts attached listing staff that attended the training.

In order to determine if all required staff received the training, an alpha roster was provided of all CDOs (CDOs), lieutenants, and sergeants.  Mental health staff provided a list of all staff that completed mental health assessments.  Additionally, IST was asked to produce a report of who attended the required training sessions for each job classification listed above from October 1, 2011 until the present.  The IST reports indicated training was from .25 of an hour to 4.0 hours in length.

DVI was only able to demonstrate adequate compliance with the required one-hour training for social workers and LCSWs.  The one-hour training was received by nine percent of lieutenants, two percent of sergeants and 93 percent of psychologists.  The CC II did not receive the training.  DVI was not able to demonstrate compliance with the required four-hour trainings. None of the CDOs, social workers or the CC II received the four-hour training.  The training was received by 91 percent of lieutenants, 69 percent of sergeants, 86 percent of psychologists and 50 percent of LCSWs.

DVI RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 5 | 0/0% | 0/0% |
| Lieutenants | 22 | 20/91% | 2/9% |
| Sergeants | 51 | 35/69% | 31/2% |
| Social Workers | 4 | 0/0% | 4/100% |
| Psychologists | 13 | 12/86% | 13/93% |
| Licensed Clinical Social Workers | 2 | 1/50% | 2/100% |
| CC-II Appeals | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

The monitors held a series of staff interviews during the course of the two-day site visit. The monitors met with SHOs working second and third watch as well as clinicians responsible for completing the mental health assessments.

**SHOs**

The SHOs described the RVR and assessment practice at DVI. Mental health assessment requests were hand-delivered to mental health staff via a drop box or in person. Mental health staff would then contact custody staff when the assessment was completed. The SHOs indicated there were no issues with timeliness and that mental health staff and custody staff communicated well. They generally agreed on one common problem with some of the mental health assessments, documenting the inmate's requests or statements rather than the clinician's opinion on the mental health assessment form. The SHOs indicated that the mental health input was only valuable to them if the mental health assessments contained clinical input.

As previously stated, SHOs indicated that there was good communication with mental health staff, whom were always responsive when contacted. The SHOs gave examples of why follow-up might be required, such as cases where contradictory information was recorded on the mental health assessment. For example, in one case an inmate received a mental health assessment by two different clinicians for the same RVR offense. Each clinician arrived at a different conclusion. With regard to mitigation, the SHOs said that they have mitigated penalties based on information recorded on the mental health assessment.

The SHOs' responses regarding recommendations to improve the process centered entirely on the quality of the mental health assessments. Officers indicated that it appeared that clinicians weren't doing the background research that would make the mental health assessments meaningful, clinicians were not backing up their recommendations with facts, instead noting what the inmate stated and/or requested and more detail was needed in the areas that required clinicians to explain "yes" responses.

127

**Clinicians**

The clinicians were asked about the mental health assessment process. Clinicians reported that when preparing a mental health assessment, research included speaking with the inmate's PC, reviewing the eUHR and interviewing the inmate. Inmates were ducated for the interview, but if they refused to leave their cell the clinician would perform the interview at cell-front. Clinicians stated they used all of those data sources to make a determination of whether the inmate's mental disorder appeared to contribute to the behavior that led to the RVR and if the inmate was found guilty whether there were any mental health factors the SHO should consider in assessing the penalty.

Clinicians stated they used laypersons terms to document their findings on the mental health assessment form. Some indicated that custody staff requested they be more specific when completing the assessments and use less general terms. All of the clinicians thought that it would be helpful to be aware of the potential penalties in order to do a better job documenting mitigation considerations under question number three. The clinicians stated they didn't know if their input added value to the process because they did not see the final hearing dispositions. DVI did not audit mental health assessments for quality control, a log book was used for tracking purposes.

The clinicians all seemed to have a firm grasp of how the process should work. They accurately described the way in which information should be gathered when completing a mental health assessment as well as how their findings should be documented. However, as noted above, the SHO interviews as well as the monitors' own document review indicated that mental health assessments were not always being completed according to policy, and as such did not provide SHOs with the valuable mental health input intended by the policies put in place.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

The monitoring team reviewed mental health assessments for RVRs to determine if they were being completed within established timeframes, and if adequate and appropriate information was being documented by the clinician as per policy. The mental health assessments were being completed within the required timeframes. The majority of the mental health assessments were completed with a "no" response to all three questions on the form. This appeared appropriate based on the 3CMS LOC of inmates housed at DVI. Generally, when answers were provided to questions number two and three on the assessment form, they were not helpful to SHOs.

There were several mental health assessments where questions number two and three had "yes" responses and the clinician's notes were not helpful or on point. In response to question number two, one clinician documented what the inmate said: "When I'm not on my medication I get angry, agitated. I was up for 2 days – no sleep. Altercation happened 2 days after I arrived at DVI." The clinician also added, "No other 115s". (*See* DVI Inmate A.) In response to question number two on another assessment, the clinician wrote that the inmate did not feel that his refusal to take his medication "played into" the altercation that led to the RVR. In response to

128

question number three the clinician wrote, "(illegible) Xanax use for anxiety.  Don't know if this had anything to do with his actions, but he said no".  (*See* DVI Inmate D.)  These answers are unresponsive and do not provide the SHO with any clinical input.  The answers to the questions should consist of the clinician's opinions, not the inmate's.  The monitors also found examples of the same in other mental health assessments.

In other assessments the monitors found instances where the clinician would just list symptoms of the inmate's illness and/or prior mental health history.  In response to question number two, a clinician wrote in part, "history of PSD with witnessing constant domestic violence."  In response to question number three the clinician wrote, "Paranoid.  History of drug and alcohol since 12 years old.  History of mental health/substance abuse inpatient treatment".  (*See* DVI Inmate E.)  In another assessment, although the clinician indicated that there were mental health factors the SHO should consider were the inmate found guilty, the clinician's note seemed to state the opposite.  In response to question number three, the clinician wrote, "3C LOC.  With no meds IP is stable & denied MH to be a contributory factor for this incidence."  (*See* DVI Inmate C.)  These responses were not of assistance to the SHO in determining guilt or establishing a penalty.

The monitors also found instances where clinicians would make notes where none was required.  For example, inmate statements were also documented on mental health assessments where the answer to question number two was no.  In one example, the clinician's note under question number two read, "Stated he had no mental issues that made him do what he did."  The monitors found several other examples of the same (*See* DVI Inmate B.)  It was unclear why clinicians were making these notes where no response was required.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

Generally, the review of the hearing documents revealed that SHOs were appropriately reviewing the mental health assessments and documenting the review in the hearing disposition as per policy.  All of the RVRs reviewed contained language regarding the mental health assessment and the SHO's consideration of the information.

With regard to mitigation, as reported above, the majority of mental health assessments concluded that the inmate's mental disorder did not contribute to the behavior that led to the RVR.  The review did reveal, however, that in certain cases SHOs elected to mitigate penalties, even in some cases where the clinical input on the mental health assessment was not documented in a way to prove helpful.  For example, on one mental health assessment under question number three, the clinician wrote, "He carries a M.H.D.X. & is treated with medication.  He is CCCMS & EOP group."  The SHO concluded that the inmate's mental health status did not excuse him from his behavior, however the inmate's inability to speak English contributed to his functioning in an institution setting.  The SHO found that the inmate's inability to effectively communicate with staff and other inmates was a mitigating factor and elected to mitigate by assessing the inmate 61 days credit forfeiture, the least amount of time for such an offense.  (*See* DVI Inmate B.)

The RVRs reviewed also reflected the SHOs' ability to reduce or dismiss RVRs based on mental health input, as well as consider the totality of the information provided during the hearing.  In one example, an RVR for "Threats" was issued to a GP inmate.  Due to the behavior being unusual for this inmate a mental health assessment was requested.  The input provided by the mental health assessment was part of the reason the SHO dismissed the RVR.  This was a good example of DVI custody staff referring inmates for mental health assessments due to unusual behavior and the consideration of that input in the SHOs' decision-making process.  (*See* DVI Inmate E.)

## ICC REVIEW

A review of several cases that were referred to the ICC showed that inmates' mental health status was being addressed during committee.  However, the efficacy of the mental health input varied.  The ICC documentation in some cases contained non-committal mental health input consisting of canned language.  For example, in multiple cases the ICC documentation stated in part, "Psych staff indicate Ad Seg placement is a risk factor for general mental health decompensation and the risk may be mitigated by the inmate's agreement with the ICC action and may be exacerbated by the inmate's disagreement with the ICC action."  (*See* DVI Inmates O and N.)  General statements such as these were concerning as they would not prove helpful to the ICC chairperson charged with making a decision regarding housing and/or transfer.

### DVI RVR Case Reviews

**Inmate A**
Date of Violation:  2/23/14
Date of Mental Health Assessment:  4/18/14 (Received from Custody on 4/17/14 - Postponed due to District Attorney Referral)
Date of Disposition:  4/29/14
Charge:  Battery on Inmate with Deadly Weapon – Division A-1 Offense

On 2/23/14, this 3CMS inmate was observed in a physical altercation with another inmate.  A mental health assessment was completed on 4/18/14 with questions number two and three answered in the affirmative.  The response to question number two contained a quote from the inmate which read, "When I'm not on my medication I get angry, agitated.  I was up for 2 days – no sleep.  Altercation happened 2 days after I arrived at DVI."  The clinician also added that the inmate had no other RVRs.  The clinician did not specifically give an opinion as to whether the inmate's mental disorder appeared to contribute to the behavior that led to the RVR.  The response to question number three stated that the inmate had not received his medication for depression, was sleep deprived, and had not had any other incidents since he received his medication.  The clinician did not specifically indicate if there were any mental health factors to consider when assessing a penalty.

On 4/29/14, the inmate appeared before the SHO for a hearing.  The SHO noted the mental health assessment by repeating it verbatim in the hearing document, but it was not considered in assessing guilt or determining a penalty.  The SHO noted that due to insufficient evidence, the inmate was found guilty of battery on an inmate without serious injury, a Division D offense.

The inmate was assessed 90 days forfeiture of credit, the maximum amount of time allowed for a Division D offense, ten days loss of privileges, including yard, and was referred to the ICC for a possible SHU term assessment.

**Impression:**  There was no mitigation in this case.  The clinician's responses to questions number two and three provided no assistance to the SHO in either determining guilt or assessing a penalty.  Although the SHO noted reviewing the mental health assessment, it was unclear how it was considered.  The inmate was assessed significant credit forfeiture.

**Inmate B**
Date of Violation: 3/23/14
Date of Mental Health Assessment:  3/26/14
Date of Disposition: 4/9/14
Charge:  Battery on an Inmate – Division D Offense

This EOP inmate was observed physically assaulting another inmate in their cell.  A mental health assessment was completed on 3/26/14.  Question number one was answered in the affirmative and the inmate was provided with a staff assistant during the hearing.  Question number two was answered in the negative, but the clinician wrote that the inmate stated he had been offended by the other inmate's comments and foul language toward him.  Question number three was answered in the affirmative.  The response to question number three stated that the inmate carried a mental health diagnosis and was treated with medication.  The clinician did not specifically indicate whether there were any mental health factors to consider when assessing a penalty.

On 4/9/14, the inmate appeared before the SHO for a hearing.  The SHO indicated reviewing the mental health assessment in the hearing documents, noting that the mental health assessment reported that the inmate's mental disorder contributed to the behavior.  However, the clinician answered question number two in the negative, so it was unclear how the SHO came to that conclusion.  The SHO also wrote that the inmate's EOP LOC was considered in assessing the penalty, but again it was unclear how.  The inmate was found guilty and assessed 61 days credit forfeiture, consistent with a Division D offense and referred to ICC for SHU term assessment.

**Impression:**  The SHO elected to mitigate in this case, but it was not based on the information provided in the mental health assessment.  The hearing disposition stated, "[Inmate's] ability to speak English contributes to his daily functioning in an institution setting.  His mental health status does not abolish him of his behavior.  However, he is unable to effectively communicate with other inmates and staff and this can and does create frustration due to custom differences.  [Inmate] was honest, forthcoming and accepted responsibility for his actions, therefore the SHO elected to mitigate the charge and took/assessed 61 days forfeiture of credit consistent with a D offense."  The mental health assessment was not completed per policy guidelines and contained an error; in response to question number one, the clinician indicated the inmate did not need a staff assistant by checking the "no" box, but then went on to explain why a staff assistant was needed.  Further, in response to question number two, the clinician checked the "no" box and included an explanation where none was required.  Additionally, as the explanation consisted of

the inmate's reasoning for the behavior that led to the RVR, it left the impression that the inmate's opinion was the sole basis for the response.

## Inmate C
Date of Violation:  1/3/14
Date of Mental Health Assessment:  1/13/14
Date of Disposition:  1/15/14
Charge:  Possession of Inmate Manufactured Alcohol – Division C Offense

During a random cell search, this 3CMS inmate was discovered to be in possession of inmate manufactured alcohol.  A mental health assessment was completed on 1/13/14 with questions number one and two answered in the negative.  Question number three was answered in the affirmative, indicating that there were mental health factors the SHO should consider when assessing a penalty.  However, the explanation provided by the clinician stated that the inmate was at the 3CMS LOC, stable with no medication, and had denied that his mental health status contributed to the behavior that led to the RVR.  By this response the clinician seemed to indicate that there were not any mental health factors to consider when assessing a penalty, which was contrary to the affirmative response to the question.

On 1/15/14, the inmate appeared before the SHO for a hearing.  The SHO noted reviewing the mental health assessment in the hearing documents and documented the contradiction present in the response to question number three.  The SHO wrote, "The SHO notes the contents of the CDC-115 MH, if found guilty of the offense, are there any mental health factors that the SHO should consider in assessing the penalty.  [The clinician] said yes however, the answer stated inmate is not on medication and is stable and denied any Mental Health to be the contributing factor for this Rules Violation Report."  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 120 days forfeiture of credit, 30 days loss of privileges, and was referred to the ICC for required attendance in AA/NA.

**Impression:**  There was no mitigation in this case.  The SHO considered the mental health assessment and did not mitigate any penalties as the clinician did not specifically indicate whether there were any mental health factors to consider in assessing a penalty.  The clinician's response to question number three of the mental health assessment was contradictory and did not provide assistance to the SHO with penalty mitigation.  The inmate was assessed significant credit loss and loss of privileges.

## Inmate D
Date of Violation:  1/27/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  2/8/14
Charge:  Battery on an Inmate – Division D Offense

This 3CMS inmate was observed swinging his arms in a fighting motion in the dining hall and was later found to have injuries to his right hand.  Another inmate was found to have injuries consistent with having been battered.  A mental health assessment was completed on 2/5/14 with question number one answered in the negative and question number two answered in the

affirmative.  The response to question number two stated that the inmate had been refusing medication, but that he did not feel it contributed to the behavior that led to the RVR.  In addition to substituting the inmate's opinion for that of the clinician, this response indicated that the inmate's mental disorder did not contribute to the behavior.  Question number three had both the "yes" and "no" boxes checked, but review of the hearing documents revealed that the SHO concluded the clinician's intention had been to answer in the negative.  The basis for reaching this conclusion is not stated, observing that the clinician's response had the "yes" box underlined and checked and the "no" box also checked, while providing an explanation that seemed inconsistent.  The response to question number three stated that the inmate had a history of Xanax use for anxiety, but the clinician did not know if that contributed to the behavior, but the inmate said it had not.  This explanation was unresponsive to the question and did not give the SHO any factors to consider in assessing a penalty.  In sum, the responses to questions number two and three were confusing, contradictory, and were of no use to the SHO in determining if mental health factors contributed or in mitigating when assessing a penalty.

On 2/8/14, the inmate appeared before the SHO for a hearing.  The SHO gave consideration to the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days forfeiture of credit, the maximum amount of time for a Division D offense.

**Impression:**  There was no mitigation in this case.  The responses provided to questions number two and three on the mental health assessment were contradictory and confusing respectively, providing no assistance to the SHO in determining whether mental health was a factor or in assessing a penalty.  Further, in the response to question number two, the clinician substituted the inmate's opinion rather than offering a clinical opinion as required by RVR policy.  The inmate was assessed significant credit loss.

**Inmate E**
Date of Violation: 2/27/14
Date of Mental Health Assessment:  3/10/14
Date of Disposition: 3/13/14
Charge:  Threats – Division E

While being processed for the DVI reception center, this non-caseload inmate stated that he would harm any inmate who "looks at me sideways" adding, "if I have a cellie, he better not look at me or I will fight him too."  Due to his behavior, he was housed in administrative segregation and issued this RVR.  The inmate was a new arrival and did not have a MHSDS LOC.

A mental health assessment was requested on 3/6/14 due to the inmate's behavior being considered to be bizarre; the assessment was completed on 3/10/14.  Question number one was checked "no" as a staff assistant was not required due to his mental illness.  Question number two was checked "yes" with the following statement: "Hx of Post-Traumatic Stress Disorder (PTSD) with witnessing constant domestic violence.  Thinking tends toward paranoia and argumentative and fixed ideas.  Everyone is his enemy/or suspect.  Inappropriate laughing and excessive speech."  Question number three was checked "yes" with the following statement: "Paranoid.  Hx of drug and alcohol since 12 years old.  Hx of mental health/substance abuse

inpatient treatment.  His thinking is obsessional.  Ruminates about how people are against him especially law enforcement."

The SHO considered the mental health assessment information and utilized it in reaching a disposition.  The inmate was found not guilty.

**Impression:**  There was mitigation in this case.  The mental health assessment contained irrelevant information and diagnostic information.  The answer to question number three was not responsive to the question.  The SHO's decision considered the mental health assessment and found the inmate not guilty.

### Inmate F
Date of Violation:  1/23/14
Date of Mental Health Assessment:  2/5/14 (Received from Custody 1/30/14)
Date of Disposition:  3/7/14
Charge:  Possession of an Inmate Manufactured Weapon – Division A-1 Offense

During laundry exchange, an officer observed this 3CMS inmate in possession of an inmate manufactured weapon.  A mental health assessment was completed on 2/5/14 with questions number one, two, and three answered in the negative.  The inmate appeared for a hearing before the SHO on 3/7/14.  The SHO gave proper consideration to the mental health assessment and found the inmate guilty.  The inmate was assessed 360 days forfeiture of credit, the maximum amount of time for a Division A-1 offense, ten days loss of privileges, including yard, and was referred to the ICC for a SHU term assessment.

**Impression:**  There was no mitigation in this case.  The SHO considered the mental health assessment and did not mitigate any penalties; no mitigation was recommended by the clinician.  The hearing document stated that the inmate was referred for a mental health assessment because the behavior was considered bizarre, unusual, or uncharacteristic.  According to policy, a mental health assessment should be completed for a Division A-1 offense.  The inmate was assessed significant credit forfeiture.

### Inmate G
Date of Violation:  1/13/14
Date of Mental Health Assessment:  1/29/14
Date of Disposition:  2/7/14
Charge:  Battery on staff – Division B

After being treated in the TTA by an RN, this 3CMS inmate became upset and loud, using profanity.  While walking out of the TTA, the inmate flipped a basket full of paper in the air, striking the RN's left shoulder.

A mental health assessment was requested on 1/22/14 and completed on 1/29/14.  Question number one was checked "no," indicating that the inmate did not require a staff assistant.  Question number two was checked "yes," and the clinician wrote, "IP has difficulty remaining

calm when agitated and therefore acting illogically in difficult situations." The clinician answered "no" in response to question number three.

The SHO noted in the disposition section that the mental health assessment indicated that the inmate's mental health condition contributed to the behavior leading to the RVR. The SHO mitigated the penalty by not assessing any privilege loss. However, the SHO found the inmate guilty and assessed 150 days loss of credit, which was the maximum amount of time for a Division B offense.

**Impression:** There was mitigation as the SHO did not assess any loss of privilege, but assessed a significant loss of credit. The mental health assessment was completed timely and adequately.

### Inmate H
Date of Violation: 2/20/14
Date of Mental Health Assessment: 2/28/14 (Sent to Mental Health on 2/25/14)
Date of Disposition: 3/20/14
Charge: Threatening a Peace Officer – Division E Offense

This 3CMS inmate refused to vacate his cell so an officer could conduct a cell search and the sergeant was called. As the inmate vacated the cell, he threatened the officer who was to perform the cell search, stating, "If you tear up my cell I'm gonna come after your ass." A mental health assessment was completed on 2/28/14 with questions number one, two, and three answered in the negative. The inmate appeared for a hearing before the SHO on 3/20/14. He was assigned a staff assistant due to his poor eyesight, which led to difficulty reading the RVR. The SHO gave consideration to the mental health assessment and found the inmate guilty. Although the clinician did not document any mental health factors for consideration in assessing the penalty, the SHO noted consideration of the inmate's mental health factors and imposed the lower end of the penalty for a Division E offense. The inmate was assessed 31 days credit forfeiture and referred to the ICC for a SHU term assessment.

**Impression:** There was mitigation in this case. The SHO considered the mental health assessment. Although the clinician did not document any mental health factors for consideration in assessing the penalty, the SHO noted consideration of the inmate's mental health in imposing the lower end of the penalty for a Division E offense. It was unclear exactly what factored into the decision to mitigate as the SHO did not detail the reasoning behind the decision.

### Inmate I
Date of Violation: 3/7/14
Date of Mental Health Assessment: 3/25/14 (Sent to Mental Health on 3/18/14)
Date of Disposition: 3/28/14
Charge: Possession of a Controlled Substance – Division B Offense

During a search of this 3CMS inmate's personal property delivered from the Sacramento County Sheriffs' Department, a white substance was found which was later identified as methamphetamine. A mental health assessment was completed on 3/25/14 with questions number one and two answered in the negative and question number three answered in the

affirmative.  The response to question number three stated that the inmate had a history of violence, was addressing anger issues in therapy, and had reported trying to become a better person.  The clinician did not specifically indicate if there were any mental health factors to consider when assessing a penalty.

The inmate appeared for a hearing before the SHO on 3/28/14.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 121 days forfeiture of credit, the lower end penalty for a Division B offense, 30 days loss of privileges, 90 days loss of visiting privileges, one year mandatory UA testing, and referral to the ICC for AA/NA attendance.  The SHO stated the decision to mitigate was based on the mental health assessment, noting that the clinician indicated that there were mental health factors to consider in assessing the penalty.  However, the clinician's response to question number three was unresponsive, so it was unclear how it was of assistance to the SHO in assessing the penalty.

**Impression:**  There appeared to be a measure of mitigation in this case, noting assessment at the lower end of available penalties.  The SHO reported considering the mental health assessment and mitigating the penalty.  The clinician's response to question number three provided no assistance to the SHO in the mitigation of penalties.  In addition to the credit forfeiture, the inmate was assessed significant losses of privileges.

### Inmate J
Date of Violation:  1/1/14
Date of Mental Health Assessment:  1/27/14
Date of Disposition:  1/30/14
Charge:  Willfully Detaining a Peace Officer/Refusing to Accept Assigned Housing – Division D

This 3CMS inmate was informed that he would be moved to another cell, as he was then housed in a new intake cell and no longer required housing in such a cell.  However, the inmate refused to move.

A mental health assessment was requested on 1/15/14 and competed on 1/27/14.  The clinician completed the form by checking "no" for the first two questions and checked "yes" for question number three.  Additionally, the clinician wrote the following in response to question number three:  "I/P has anger issues as he feels he is picked on.  Reacts oppositionally.  If he is told why he has to move he can be more cooperative.  Perhaps a 128 is more appropriate due to his chronic anger problems.  He sets himself up for self-defeating behavior."

The SHO correctly reported the mental health assessment information that the inmate's mental illness did not appear to contribute to the behavior.  The SHO found the inmate guilty and reduced the RVR from a Division D to a Division F offense.  The SHO did not take away any behavior credits and assessed ten days loss of yard.

**Impression:**  There was mitigation in this case.  The information on the mental health assessment was inappropriate and not responsive to the questions asked.  The SHO mitigated by reducing the division of the offense, not imposing any credit loss, and assessing minimal privilege loss.

**Inmate K**
Date of Violation:  1/20/14
Date of Mental Health Assessment:  1/28/14
Date of Disposition:  2/9/14
Charge:  Battery on an Inmate – Division D Offense

The 3CMS inmate was involved with another inmate in the beating of a third inmate.  A mental health assessment was completed on 1/28/14 with questions one, two, and three answered in the negative.  On 2/9/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days forfeiture of credit, the maximum amount of time for a Division D offense, and was referred to the ICC for a SHU term assessment.

**Impression:**  There was no mitigation in this case.  The SHO considered the mental health assessment and found that the clinician did not document any mental health factors for consideration in assessing the penalty.  The inmate was assessed significant credit loss.

**Inmate L**
Date of Violation:  1/24/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  1/29/14
Charge:  Disobeying a Direct Order – Division F Offense

This 3CMS inmate refused an order to clear his cell door, preventing an officer from closing and securing it.  A mental health assessment was completed on 2/6/14 with question number one answered in the affirmative and questions number two and three answered in the negative.  The response to question number one stated that the inmate was hearing impaired.  On 1/29/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment, noting that the behavior was not considered bizarre, unusual, or uncharacteristic and therefore the completion of an assessment was not warranted.  The inmate was found guilty and assessed 30 days loss of credit and 30 days loss of yard.

**Impression:**  The SHO considered the mental health assessment and properly noted that one was not warranted in this case.  It was unclear why a mental health assessment was completed.  The inmate was assessed credit forfeiture and privilege losses.

**Inmate M**
Date of Violation:  3/16/14
Date of Mental Health Assessment:  4/2/14
Date of Disposition:  4/9/14
Charge:  Battery on an Inmate – Division D Offense

On 3/16/14, confidential information was received which indicated that this 3CMS inmate committed battery on another inmate.  The inmate was found to have bruises or discoloration to his left and right hands consistent with committing a battery.  The victim suffered a laceration and swelling to his face.  A mental health assessment was completed on 4/2/14 with questions

number one, two, and three answered in the negative.  On 3/16/14, the inmate appeared for a hearing before the SHO.  The SHO gave consideration to the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days forfeiture of credit, the maximum amount of time for a Division D offense, and was referred to the ICC for a SHU term assessment.

**Impression:**  There was no mitigation in this case.  The SHO considered the mental health assessment and did not mitigate any penalties; no mitigation was recommended by the clinician.  The inmate was assessed significant credit loss.

**Inmate N**
Date of Violation: 1/31/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  3/1/14
Charge:  Battery on an inmate with serious injury – Division A-1 Offense

Staff observed this 3CMS inmate strike another inmate in the face causing the other inmate to fall backwards onto the floor.  When ordered to get down, the inmate turned and walked away from staff.  Staff reached him and placed him in handcuffs.

A mental health assessment was requested on 1/31/14 and completed on 2/5/14, which was within mandated time frames.  The mental health assessment indicated a "no" response to all three questions and did not have any written comments by the clinician.

The SHO found the inmate guilty of the RVR and stated in the disposition section, "California law, through the California Penal Code, establishes guidelines which, when considered, provide for fair and just treatment of mentally ill inmates.  The purpose of this hearing is a finding of fact.  Inmate _____ is found guilty of violating CCR, Title 15 CCR Section 3005 (d) (1) Battery on inmate resulting in serious injury."  The SHO assessed the maximum loss of credit of 360 days, but did not take away any privileges.

During the RVR review process, the CDO reduced the RVR from a Division A-1 to a Division D offense as there was insufficient evidence to support the charge of serious injury.  The loss of credit was also modified from 360 days to 90 days.

The actions of the ICC covering the time period that the inmate was housed in administrative segregation pending RVR adjudication were also reviewed.  The ICC chronos dated 2/6/14 and 3/13/14 both included the following statement concerning administrative segregation placement.  "Psych staff indicate Ad Seg placement is a risk factor for general mental health de-compensation and the risk may be mitigated by the inmate's agreement with the ICC action and may be exacerbated by the inmate's disagreement with the ICC action."

**Impression:**  There was no mitigation by the SHO, but there was subsequent mitigation by the CDO.  The mental health assessment was completed within policy guidelines and the SHO documented consideration of the information.  The CDO appropriately reduced the RVR to a Division D offense.  The comment recorded in the two ICC chronos regarding potential

decompensation if retained in administrative segregation was of questionable value to the RVR process and did not appear to be specific to the inmate. This appeared to be a canned response.

**Inmate O**
Date of Violation: 3/12/14
Charge – Battery on Peace Officer – Division B

This 3CMS inmate was charged with battery on a peace officer for head butting an officer and kicking a Senior Registered Nurse (SRN) in the knee. The SHO found the inmate guilty and assessed 150 days loss of credit.

The monitors reviewed the subsequent ICC action and found similar canned language used in another RVR reviewed during the site visit. This ICC language stated: "Psych staff indicate Ad Seg placement is a risk factor for general mental health de-compensation and the risk may be mitigated by the inmate's agreement with the ICC action and may be exacerbated by the inmate's disagreement with the ICC action." This statement was not helpful for ICC members or their decision making requirements.

**Impression:** There was no mitigation in this case. The canned language regarding the ICC was unhelpful and was used in at least one other case. The SHO assessed significant credit loss for this inmate.

### California State Prison, Corcoran (CSP/Corcoran) RVR Review

**SUMMARY OF FINDINGS**

A.    Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CSP/Corcoran by completing and sustaining all requirements.

B.    CSP/Corcoran was not compliant with required training of custody and mental health staff related to the RVR process.

C.    Appropriate and collaborative training between custody and mental health in the RVR process had not occurred.

D.    The institution did not provide to the monitors the current lesson plan related to mental health assessment in the disciplinary process.

E.    The Departmental Operating Manual (DOM) Supplement for Inmate Discipline provided to the monitor was not current with existing policy related to the RVR process and mental health assessments.

F.    Custody staff documented consideration of the mental health assessment in the RVR process.

139

G.      Of the EOP cases reviewed, 11 indicated that mental illness contributed to the behavior that led to the RVR and 12 had affirmative answers to question number three and included written responses.  Only one case was mitigated based in part on mental health factors.

H.      Of the 3CMS cases reviewed, two indicated that mental illness contributed to the behavior that led to the RVR and two had affirmative answers to question  number three with written responses.  No cases were mitigated based on mental health factors.

I.      Some clinicians simply provided diagnoses in response to question number two on the assessment form and one clinician reiterated what the inmate reported rather than formulating an opinion based on independent clinical judgment.

J.      In response to question number three on the assessment form, clinicians provided unresponsive answers which did not indicate appropriate factors for the SHO to consider when assessing a penalty.

K.      SHOs cited the standard of "bizarre, unusual or uncharacteristic     behavior" for  EOP inmates charged with RVRs even though the standard was inapplicable to the EOP LOC.

**INTRODUCTION**

During August 12-13, 2014, the Coleman monitoring team reviewed the Rules Violation Report (RVR) process at California State Prison, Corcoran (CSP/Corcoran).  CSP/Corcoran is designated to house inmates at the Level I, III, and IV custody level and inmates with a mental health designation of 3CMS and EOP.  As of March 2014, CSP/Corcoran had a total inmate population of 4,305.  Of that population, 1,573 had a MHSDS designation, which was 36 percent of the total inmate population.

The team reviewed policies and procedures related to the RVR process at CSP/Corcoran, as well as any training materials provided by the institution to CSP/Corcoran staff.  The monitors met with SHOs and mental health clinicians responsible for preparing mental health assessments. The monitors reviewed RVRs written in the first three months of 2014.  During this period there were a total of 959 RVRs written with 372 or 39 percent of the RVRs issued to inmates with a mental health designation.

**TRAINING**

CSP/Corcoran staff produced two proof of practice memoranda, one dated February 3, 2012 and one dated December 19, 2011, in response to the October 26, 2011 and the November 3, 2011 memoranda.   The lesson plan provided by the institution to the monitors was not the current lesson plan related to mental health assessments in the disciplinary process. Additionally, the institution provided a copy of their DOM Supplement for Inmate Discipline which was not current with existing policy related to the RVR process and mental health assessments.

IST was asked to produce a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda. CSP/Corcoran was able to demonstrate adequate compliance with only one of the required trainings and in only one category – CDO for the one-hour training.

CSP/Corcoran Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 1 | 0/0% | 1/100% |
| Captains | 7 | 5/71% | 3/43% |
| Lieutenants | 31 | 21/68% | 12/39% |
| Sergeants | 91 | 50/55% | 20/22% |
| Appeals Coordinator | 7 | 0/0% | 3/43% |
| Psychologist | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

The SHOs indicated that mental health assessment forms were faxed or hand carried to the mental health department from each yard. They reported that the assessments were completed and returned in a timely manner. When recommending mitigation, the responses provided by mental health staff were specific and understandable. The officers did report that mental health staff was completing question number one on the assessment form for EOP inmates when it was only required for 3CMS and non-MHSDS inmates. They explained that certain violations mandated certain penalties and that regardless of the clinician's recommendations they were unable to mitigate those penalties.

**Clinicians**

The clinicians reported that completion of the mental health assessment form required a review of the inmate's medical record and custody file as well as interviewing the inmate and the PC. A progress note was also completed and included in the inmate's medical record. They believed that question number two on the assessment called for a legal conclusion which should not be determined by them in an administrative process. They felt the question should be deleted from the assessment. They also stated that the entire assessment was based on a presumption of guilt. The clinicians thought it would be beneficial to have collaborative meetings with the SHOs as they do not receive any feedback on the cases. None of the clinicians recalled being contacted by a SHO seeking clarification or further explanation of statements made on the assessment forms.

141

## QUALITY OF MENTAL HEALTH ASSESSMENTS

Of the reviewed assessments for 3CMS inmates, two had affirmative answers for question number two and both were responsive and clearly stated that a nexus existed between the inmate's mental illness and the actions which led to the RVR.  However, the only two affirmative answers to question number three on the assessments were both unresponsive and provided no appropriate factors for the SHO to consider when assessing a penalty. One clinician wrote that the inmate wanted his television.  (*See* CSP/Corcoran Inmate A.)  This was not an independent clinical opinion.  The other affirmative response to question number three merely provided the inmate's diagnosis which would have been a more appropriate response to question number two. (*See* CSP/Corcoran Inmate B.)

Of the eleven affirmative responses to question number two on the reviewed assessments completed for EOP inmates, two were unresponsive.  One response simply contained a diagnosis (CSP/Corcoran Inmate C) and the other response was the inmate's statement about how he felt on the day of the violation and was not the clinician's independent assessment. (*See* CSP/Corcoran Inmate D.)

One inmate was charged with disobeying direct orders resulting in the use of force after attempting suicide in a holding cell and being pepper-sprayed twice.  His limp body was eventually cut down and placed on the floor. (*See* CSP/Corcoran Inmate E.)  The inmate told the social worker who interviewed him shortly after the incident that he had nothing to lose and that he wanted to die which was recorded in the medical report of injury (CDCR Form 7219).  In response to question number two on the assessment, the clinician, who was not the same individual who interviewed the inmate after the incident, checked off "no" and wrote "Not according to the records reviewed."  It was unclear if the clinician interviewed the inmate.

The majority of affirmative answers to question number three on the assessments completed for EOP inmates were unresponsive and contained no useful recommendations for the SHO to consider when assessing penalties.  One clinician provided a mixed recommendation by stating that the inmate needed to have his privileges retained to help improve his mental stability but also needed to grasp the consequences of his actions. (*See* Corcoran Inmate F.)  In a similar mixed message, one clinician reported that the inmate was very paranoid about his property being taken away but then recommended some loss of privileges. (*See* Corcoran Inmate G.)  Two responses simply provided the inmates' diagnoses (CSP/Corcoran Inmates C, H) and a third stated what the inmate wanted rather than providing an independent clinical recommendation. (CSP/Corcoran Inmate I.)  Two recommendations directed the SHO not to impose a penalty that would interfere with EOP treatment.  (*See* CSP/Corcoran Inmates J, K.)  The clinicians clearly were unaware that restricting mental health treatment could not be imposed as a penalty.  Two responses provided clear responses and indicated factors for the SHO to consider when assessing penalties.  (*See* CSP/Corcoran Inmates L, M.)  In general, clinicians' lack of specificity and lack of understanding of question number three on the assessment form was pervasive.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

SHOs routinely mentioned consideration of the mental health assessment in the RVRs reviewed.  In the adjudication, the SHOs repeatedly wrote that the inmates did not display any "bizarre, unusual or uncharacteristic" behavior even when the RVR was for an A, B, C or SHU-able offense or the inmate was at the EOP LOC. More stock language used by the SHO was that penalties imposed were not excessive and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy. In one decision, the SHO incorrectly reported that the assessment indicated that mental health did not contribute to the inmate's behavior when the assessment clearly stated that it was a contributing factor and was quoted verbatim earlier in the decision as being a contributing factor.  (*See* CSP/Corcoran Inmate F.)  Of the EOP cases reviewed in which question number three was answered in the affirmative, only one was mitigated based in part on mental health factors. (*See* CSP/Corcoran Inmate N.)  There were no 3CMS cases reviewed where mitigation occurred based on mental health factors.

## ICC REVIEW

Of the cases reviewed, there was no mitigation at the ICC based on mental health factors. The sample size of the RVRs reviewed was not sufficient to make a determination on the efficacy of the mental health input in the RVR process at the ICC level since the majority of the inmates were already at the highest custody level and no action was taken.

### CSP/Corcoran RVR Case Reviews

**Inmate A**
Date of Violation:  2/12/14
Date of Mental Health Assessment:  2/18/14
Date of Disposition:  3/12/14
Charge:  Falsifying a Document - Division D Offense

On 2/12/14, the property inventory sheet in this 3CMS inmate's folder maintained by custody was found to be different than the property inventory sheet that the inmate had in his possession. The one in the inmate's possession included items not on the custodial property inventory.  Due to the falsification, the officer had to delay distributing packages for 20 minutes.  A mental health assessment was completed on 2/18/14 with question number two answered in the negative and question number three answered in the affirmative.  The response to question number three stated simply "I/P states he needs his T.V."  On 3/12/14, the inmate appeared for a hearing before the SHO.  The SHO considered the assessment and found the inmate guilty of a lesser included Division E offense.  The inmate was assessed 60 days forfeiture of credit and 30 days loss of entertainment appliances.  The SHO stated the penalties were not excessive and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy.

143

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

**Impression**:  The mental health assessment was not specified as playing a role in the SHO's decision.  The inmate lost significant time credit and privileges.  Custody referred to "bizarre, unusual or uncharacteristic" in this case in a General Chrono that appeared perfunctory.

---

### Inmate B
Date of Violation:  3/21/14
Date of Mental Health Assessment:  4/10/14
Date of Disposition:  4/21/14
Charge:  Battery on an Inmate - Division D Offense

On 3/21/14, this 3CMS inmate was involved with an altercation with another inmate on the yard.  He was observed punching the other inmate in the face and upper torso with his fists.  A mental health assessment was completed on 4/10/14, with question number two answered in the negative and question number three answered in the affirmative.  Although the clinician answered "no" on question number two, he stated that the inmate was aware of his actions.  The clinician's affirmative answer to question number three stated that the inmate suffered from mood disorder NOS and that the inmate was on mental health meds and was taking them.  On 4/21/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days forfeiture of credit, 30 days loss of entertainment appliances and ten days loss of administrative segregation yard and was referred to the ICC for program-custody review and SHU term assessment.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

The ICC met on 6/12/14.  The ICC assessed and imposed a three month SHU-term.

**Impression**:  The mental health assessment was not specified as playing a role in the SHO's decision.  The inmate was assessed significant lost time credit and privileges.  Custody referred to "bizarre, unusual or uncharacteristic" in this case in a General Chrono that appeared perfunctory. The clinician's answer to question number three was unresponsive.

---

### Inmate C
Date of Violation:  1/21/14
Date of Mental Health Assessment:  2/13/14
Date of Disposition:  2/18/14
Charge:  Refusing to Provide Urine Sample – Division F Offense

On 1/21/14, this EOP inmate refused to provide a urine sample.  A mental health assessment was completed on 2/13/14 with questions number two and three answered in the affirmative.  Answer number two stated "(1) Hormone Replacement Therapy – Gender Identity Disorder – IP

144

manifested discomfort with his sex and inappropriateness to CO's request (2) IP had medical concerned and he could not use the restroom to urinate.  IP recently came back from outside hospital (Bakersfield)." Answer number three stated "1. Gender Identity Disorder – rejection of urinating near Cos or in a up or sitting position; 2. IP had in addition medical problems which required emergency from outside hospital."  On 2/28/14, the inmate appeared for a hearing before the SHO.  The SHO considered the assessment and found the inmate guilty.  The inmate was assessed 30 days forfeiture of credit, 30 days loss of privileges (specifically dayroom), 90 days loss of visiting privileges followed by 90 days of no contact visiting and was ordered to provide one random drug test per month for one year.  The SHO stated the penalties were not excessive and were imposed to help the inmate understand cause and effect.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be "bizarre, unusual or uncharacteristic."  This standard does not apply to EOP inmates.

**Impression**:  There was minimum if any mitigation in this case. The inmate lost time credit and privileges. The assessment did not provide any guidance regarding the mitigation of any penalties.   The mental health assessment was not specified as playing a role in the SHO's decision. Custody referred to "bizarre, unusual or uncharacteristic," a standard not applicable to EOP inmates.

---

**Inmate D**
Date of Violation: 1/26/14
Date of Mental Health Assessment:  2/3/14
Date of Disposition:  2/8/14
Charge:  Refusing to Provide Urine Sample – Division F Offense

On 1/26/14, this EOP inmate was ordered to provide a urine sample and refused.  A mental health assessment was completed on 2/3/14 with question number two answered in the affirmative and question number three answered in the negative.  Answer number two stated that "IM reports that he was willing to give a urine sample and gave one days later, but feeling very paranoid on the day he was asked to submit one and refused.  This is consistent with IM's history and diagnosis."  On 2/8/14, the inmate appeared for a hearing before the SHO.  The SHO considered the assessment and found the inmate guilty.  The inmate was assessed 30 days forfeiture of credit, 45 days loss of privileges (specifically yard), loss of visits for 90 days followed by no contact visits for 90 days.  He was required to undergo mandatory drug testing once per month for one year and was ordered to attend AA or NA.  He was referred to the UCC for program/custody review.  The committee took no action.

**Impression**:  There was minimum if any mitigation in this case. The inmate lost time credit and privileges.  The mental health assessment was not specified as playing a role in the SHO's decision.

---

**Inmate E**
Date of Violation:  1/22/14
Date of Mental Health Assessment:  1/30/14
Date of Disposition:  2/13/14
Charge:  Disobeying a Direct Order Resulting in Use of Force – Division F Offense

On 1/22/14, this EOP inmate attempted to hang himself in a holding cell, refused orders to stop and was then pepper-sprayed twice.  A mental health assessment was completed on 1/30/14 with questions number two and three answered in the negative.  Answer number two stated "Not according to the records".  On 2/13/14 the inmate appeared for a hearing before the SHO.  The SHO considered the assessment and found the inmate guilty.  The inmate was assessed 30 days credit forfeiture, 30 days loss of privileges (specifically TV and radio), ten days loss of administrative segregation yard and was referred to ICC for program/custody review.  The SHO stated the penalties were not excessive and were imposed to help the inmate understand cause and effect.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

**Impression**:  The RVR was written in response to attempted suicide. The inmate lost time credit and privileges. The mental health assessment was not specified as playing a role in the SHO's decision.  Custody made reference to bizarre, unusual or uncharacteristic behavior, a standard not applicable to EOP inmates.

**Inmate F**
Date of Violation:  1/11/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  2/8/14
Charge:  Battery on Inmate – Division D Offense

On 1/11/14, this EOP inmate put shoe laces around the neck of his cellmate and tried to strangle him.  The shoe laces eventually broke and the celli called for help.  A mental health assessment was completed on 2/6/14 with questions number two and three answered in the affirmative.  The answer to number two stated that "Most definitely so. [Inmate] has long standing MH disorder that renders him paranoid over-reactive and impairs his ability to think clearly especially when under stress."  Answer number three stated that "He needs to have privileges retained that help improve his mental stability while at the same time he needs to grasp consequences of his actions."  On 2/8/14, the inmate appeared before the SHO for a hearing.  The SHO considered the assessment but incorrectly noted that the mental health clinician indicated mental health did not contribute to the behavior when the assessment clearly stated that it did.  The decision also stated that mitigating circumstances were considered but does not indicate if the penalty was mitigated.  The inmate was assessed ten days loss of administrative segregation yard and 30 days loss of entertainment appliances and the SHO stated the penalties were not harsh and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy. The inmate was referred to ICC for SHU term assessment.

146

The ICC met on 4/30/14 and imposed and assessed a three month SHU term and increased his classification score by 18 points. The inmate was already at a custody Level IV. The ICC did consider the assessment.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be "bizarre, unusual or uncharacteristic." This standard does not apply to EOP inmates.

**Impression**: The inmate did not lose any time credit, indicating some measure of mitigation. The mental health assessment was not specified as playing a role in the SHO's decision. Custody referred to bizarre, unusual or uncharacteristic behavior, a standard not applicable to EOP inmates.

**Inmate G**
Date of Violation:  2/19/14
Date of Mental Health Assessment:  2/26/14
Date of Disposition:  3/25/14
Charge:  Fighting Resulting in Use of Force – Division D Offense

On 2/19/14, this EOP inmate was involved in a fight with another inmate. Both inmates refused to cease and were hit with pepper spray. A mental health assessment was completed on 2/26/14 with questions number two and three answered in the affirmative. Answer number two stated that "I/M has a history of mood swings and presents with paranoid thoughts along with depression and anxiety. Denies history of auditory or visual hallucinations. I/M reported he had paranoid thoughts about I/M [XXX] following him." Answer number three stated that the "I/M very paranoid about custody officers taking his property. His clinician would recommend some loss of privileges if he was assessed a penalty." On 3/25/14, the inmate appeared at the hearing before the SHO. The SHO considered the assessment and found the inmate guilty. The inmate was assessed 90 days credit forfeiture and ten days loss of administrative segregation yard. The inmate was not referred to ICC. The SHO stated the penalties were not excessive and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

**Impression**: There was no mitigation in this case. The inmate did lose significant time credit. The mental health assessment was not appropriately responsive to the questions and was not helpful to the SHO. Custody referred to bizarre, unusual or uncharacteristic behavior, a standard not applicable to EOP inmates.

**Inmate H**
Date of Violation: 1/22/14
Date of Mental Health Assessment: 1/30/14
Date of Disposition: 2/8/14
Charge: Destruction of State Property – Division E Offense

On 1/22/14, the inmate broke the window of his cell door valued at $110.00. A mental health assessment was completed on 1/30/14 with questions number two and three answered in the affirmative. Answer number two stated that "Both behavior issues and mental health played a role. IP reported he is hearing voices and he is on several psychotropic medications as well as anti-psychotic." Answer number three stated that "IP included in MHSDS, has mental D/O diagnosis and reported at the time of incident he was hearing voices."

On 2/8/14, the inmate appeared for a hearing before the SHO. The SHO considered the assessment and found the inmate guilty. The inmate was assessed 60 days credit forfeiture, 45 days loss of privileges – specifically dayroom restrictions and was referred to UCC for program/custody review. The SHO stated the penalties were not harsh and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy. The committee took no action.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be "bizarre, unusual or uncharacteristic" and therefore no referral to mental health services was warranted. This standard does not apply to EOP inmates and it was unclear what the lack of a referral to mental health services meant.

**Impression**: There was minimum if any mitigation in this case. The inmate lost time credit and privileges. The assessment did not provide any guidance regarding the mitigation of any penalties. The mental health assessment was not specified as playing a role in the SHO's decision. Custody referred to bizarre, unusual or uncharacteristic behavior, a standard not applicable to EOP inmates.

**Inmate I**
Date of Violation: 1/29/14
Date of Mental Health Assessment: 2/6/14
Date of Disposition: 2/28/14
Charge: Willfully Resisting, Delaying, Obstructing a Peace Officer in the Performance of Their Duty - Division D Offense

On 1/29/14, this EOP inmate claimed that some of his property had been confiscated. During the investigation it was determined that the inmate had added property to his property card and two additional forged property cards were also discovered. A mental health assessment was completed on 2/6/14 with question number two answered in the negative and question number three answered in the affirmative. Answer number three stated that the inmate "Wants his canteen, T.V., everything but yard."

On 2/28/14, the inmate refused to appear before the SHO for a hearing. The SHO considered the assessment and found the inmate guilty. The inmate was assessed 90 days credit forfeiture, 90 days loss of entertainment appliances and ten days loss of administrative segregation yard. The SHO stated the penalties were not excessive and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

The clinician's answer to question number three was inappropriate as it did not provide the SHO with any guidance regarding the mitigation of any penalty. It simply stated what the inmate wanted.

**Impression**: There was no mitigation in this case. The mental health assessment was not specified as playing a role in the SHO's decision. The inmate did lose significant time credit. Custody referred to bizarre, unusual or uncharacteristic behavior, a standard not applicable to EOP inmates. The clinician's answer to number three was unresponsive.

### Inmate J
Date of Violation: 2/4/14
Date of Mental Health Assessment: 2/21/14
Date of Disposition: 2/26/14
Charge: Behavior that Might Lead to Violence – Division F Offense

On 2/4/14, the inmate was involved in a grabbing and pushing incident in his cell with his cellmate. A mental health assessment was completed on 2/21/14 with question number two answered in the negative and question number three answered in the affirmative. Answer number three stated, "EOP LOC. Penalty should not interfere with EOP treatment." On 2/26/14, the inmate appeared at the hearing before the SHO. The SHO considered the assessment and found the inmate guilty. The inmate was assessed 30 days credit forfeiture and ten days loss of privileges (specifically yard). The SHO stated the penalties were not excessive and were imposed to help the inmate understand cause and effect.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

**Impression**: There was no mitigation in this case. The mental health assessment was not specified as playing a role in the SHO's decision. The inmate lost time credit. Custody referred to "bizarre, unusual or uncharacteristic," a standard not applicable to EOP inmates. The clinician appeared to be unaware that penalties cannot include restricting access to mental health treatment.

**Inmate K**
Date of Violation:  3/19/14
Date of Mental Health Assessment:  4/4/14
Date of Disposition:  4/22/14
Charge:  Assault on a Peace Officer Resulting in Use of Force – Division D Offense

On 3/19/14, this EOP inmate became agitated during bed moves while he was cuffed.  He thrashed his body from side to side and began kicking.  A mental health assessment was completed on 4/4/14 with questions number two and three answered in the affirmative.  Answer number two stated, "Psychotic process appears to have contributed to his behavior."  Answer number three stated, "Penalty should not interfere with EOP treatment."

On 4/22/14, the inmate appeared for a hearing before the SHO.  The SHO considered the assessment and found the inmate guilty.  The inmate was assessed 90 days credit forfeiture, ten days loss of privileges (specifically administrative segregation yard), 30 days loss of entertainment appliances and was referred to the ICC for program/custody review and SHU program consideration. The SHO stated the penalties were not harsh and were imposed to help the inmate understand cause and effect.  The ICC met on 6/5/14, considered the assessment, and assessed and imposed a nine-month (aggravated) SHU term based on prior misconduct.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

**Impression**:  The mental health assessment was not specified as playing a role in the SHO's decision.  The inmate lost time credit and privileges.  Custody referred to bizarre, unusual or uncharacteristic behavior, a standard not applicable to EOP inmates.  The clinician appeared to be unaware that penalties cannot include restricting access to mental health treatment.

**Inmate L**
Date of Violation:  2/25/14
Date of Mental Health Assessment:  3/6/14
Date of Disposition:  3/27/14
Charge:  Manipulation of Staff – Division F Offense

On 2/25/14, a CO overheard this EOP inmate tell the licensed psychiatric technician (PT) that he needed to speak to his doctor because he was not being let out of his cell for medication.  When the officer asked the inmate if he was complaining about not receiving his medication, the inmate replied no.  A mental health assessment was completed on 3/6/14 with question number two answered in the negative and question number three answered in the affirmative.  Answer number three stated that "These activities should not be taken away through LOP (Loss of Privilege Status): dayroom and yard – as they positively improve I/M's mental health."  On 3/27/14, the inmate appeared for a hearing before the SHO.  The SHO considered the assessment and found the inmate guilty but ultimately changed the charge to an administrative violation and subsequently dismissed it in the interest of justice and progressive discipline and reported it as custodial counseling.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

**Impression**:  The mental health assessment was not specified as playing a role in the SHO's decision.  The case was dismissed.  Custody referred to bizarre, unusual or uncharacteristic behavior, a standard inapplicable to EOP inmates.

## Inmate M
Date of Violation:  2/19/14
Date of Mental Health Assessment:  3/4/14
Date of Disposition:  3/25/14
Charge:  Fighting Resulting In the Use of Force – Division D Offense

On 2/19/14, this EOP inmate was involved in a fight with another inmate.  Both inmates refused to cease and were hit with pepper spray.  A mental health assessment was completed on 3/4/14 with question number two answered in the negative and question number three in the positive. Answer number three stated that the "Inmate is currently in the EOP program, but restriction of property, yard time, etc. could have profound impact on ability to function as he suffers from a serious chronic illness that could be exacerbated by lack of stimulation and/or increase in seclusion."  On 3/25/14, the inmate appeared at the hearing before the SHO.  The SHO considered the assessment and found the inmate guilty.  The inmate was assessed 90 days credit forfeiture and ten days loss of administrative segregation yard.  The SHO stated the penalties were not harsh and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did not appear to be bizarre, unusual or uncharacteristic.

**Impression**:  The mental health assessment was not specified as playing a role in the SHO's decision.  The inmate lost time credit and privileges.  Custody referred to bizarre, unusual or uncharacteristic behavior, a standard inapplicable to EOP inmates.

## Inmate N
Date of Violation:  2/8/14
Date of Mental Health Assessment:  2/19/14
Date of Disposition:  3/5/14
Charge:  Disobeying a Direct Order – Division F Offense

On 2/8/14, this EOP inmate was walking on the yard after he had already received an LOP pursuant to a previous RVR.  He received the RVR for violating his LOP status.  A mental health assessment was completed on 2/19/14 with question number two answered in the affirmative and question number three in the negative.  Answer number two stated, "I/M reports that he cannot recall this incident.  However, he has been at MHCB for several days.  Is currently paranoid and per the record was acting very agitated, erratic and paranoid in the week prior to this incident."

On 3/5/14, the inmate appeared at the hearing before the SHO. The SHO considered the assessment and found the inmate guilty of the administrative offense of disobeying a direct order. The RVR was reclassified at the beginning of the hearing. The decision to reduce the RVR was based in part on the assessment. The SHO stated the penalties were not excessive and were imposed to help the inmate understand cause and effect and would not impede the inmate's ongoing therapy.

In the section detailing mental health concerns, it was noted that the reviewing custody supervisor completed a General Chrono, which was apparently included in the file, stating the inmate's behavior did appear to be bizarre, unusual or uncharacteristic.

**Impression**: There was mitigation in this case in the form of a reclassification to an administrative offense. The mental health assessment was not specified as playing a role in the SHO's decision. Custody referred to "bizarre, unusual or uncharacteristic," a standard inapplicable to EOP inmates.

### California Substance Abuse Treatment Facility (CSATF) RVR Review

**SUMMARY OF FINDINGS**

A.    Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CSATF by completing and sustaining all requirements.

B.    CSATF was not compliant with required training of custody and mental health staff related to the RVR process.

C.    Appropriate and collaborative training between custody and mental health in the RVR process had not occurred.

D.    Custody staff documented consideration of the mental health assessment in the RVR process.

E.    Generally, mitigation of penalties was not recommended by clinicians at this institution; very few cases indicated a nexus between the inmate's mental health and the conduct which lead to the RVR.

F.    Any mitigation found in the reviewed cases was based on other evidentiary grounds and not mental health factors.

G.    SHOs did not specify why a mental health assessment was completed when the charge was not a Division A, B, C or SHU-able offense or the inmate did not exhibit any bizarre, unusual or uncharacteristic behavior.

**INTRODUCTION**

On August 14-15, 2014, the Coleman monitoring team reviewed the RVR process at California Substance Abuse Treatment Facility (CSATF).  CSATF is designated to house inmates at custody levels II, III and IV and inmates with a mental health designation of EOP and 3CMS.  As of March 2014, CSATF had a total inmate population of 5,576.  Of that population, 2,072 or 37 percent had a MHSDS designation.  The monitoring team met with the Chief of Mental Health, as well as SHOs, disciplinary officers and mental health clinicians responsible for preparing mental health assessments.

The monitoring team reviewed RVRs written during January through March 2014. During this period there were a total of 917 RVRs written with 439 or 48 percent of the RVRs issued to inmates with a mental health designation.

**TRAINING**

CSATF staff produced two proof of practice memoranda, one dated January 5, 2012 and one dated February 2, 2012 in response to the October 26, 2011 and November 3, 2011 memoranda.  IST was asked to produce a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda. The IST reports indicated that training ranged from .25 of an hour to four hours.

In January 2014, one clinician was assigned to complete all mental health assessments. This clinician received a three-hour training regarding mental health assessments in the RVR process on January 31, 2012.  CSATF produced the currently approved lesson plan for review.

<u>CSATF Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 6 | 3/50% | 2/33% |
| Captains | 7 | 4/57% | 0/0%% |
| Lieutenants | 35 | 29/83% | 4/11%% |
| Sergeants | 86 | 42/49% | 7/8% |
| Psychologist | 1 | 0/0% | 0/0% |
| CC-II Appeals | 2 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

The monitors interviewed four SHOs in a group setting.  The SHOs indicated that the RVR and mental health assessment form were faxed or hand carried to mental health for completion.  The SHOs stated that the assessment forms were returned to them in a timely

manner. The SHOs stated that most assessment forms were completed with all three questions being checked "no". The SHOs indicated they had to make decisions based on the totality of the facts without any information regarding the inmate's mental illness.

The SHOs indicated they had received multiple training sessions. They recalled a few assessments which recommended that yard restriction would have a negative impact on the inmate's mental health and chose not to restrict yard access based on the recommendation. The SHOs reported there had been no collaborative meetings with mental health staff regarding the RVR process. However, they did indicate that meeting with mental health staff would be beneficial for improving communication and working as a team.

**Clinicians**

The monitors interviewed in excess of 25 clinicians in a group setting. The monitors were informed that as of January 2014, only one staff member was designated to complete the mental health assessments. It was only when this designated clinician was absent or had a conflict that other clinicians were assigned to complete the assessments. The clinicians appeared to know the policy and process for completing the mental health assessment forms. However, they were unaware of the potential penalties that could be imposed on an inmate after a guilty finding.

The clinicians reported a good working relationship with the officers and sergeants, but believed that the lieutenants were too busy to foster such a relationship. Additionally, they indicated that staff often changed jobs which impeded building relationships with custody staff.

When asked specifically about the questions on the mental health assessment form, the clinicians responded that question number two was vague. The clinician designated to complete the assessments opined that question number three should not even be included on the form and that custody should have complete discretion when meting out penalties. Mental health staff was unaware of the potential penalties that could be assessed after a guilty finding by the SHO. This lack of knowledge regarding the scope of penalties was problematic in response to question number three on the assessment form, which specifically asked for the clinicians' input as to any recommendations when mitigating penalties. This appeared to correlate with the deficiencies in meeting training requirements and the clinician's belief that clinical staff should not be able to recommend mitigation of penalties.

The clinicians stated that it took three to four hours to complete the mental health assessments. One concern was raised by mental health staff regarding the lack of RVRs being issued to EOP inmates. They stated custody staff was not issuing RVRs to EOP inmates for such things as fighting or cheeking medication, which they believed should result in an RVR being issued and adjudicated.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Of all the assessments reviewed by the monitor, only two EOP (*See* CSATF Inmates A, B) and two 3CMS (*See* CSATF Inmates C, D) assessments had affirmative answers to question

154

number two on the assessment and only one assessment (3CMS) had an affirmative answer to question number three (*See* CSATF Inmate D).  The assigned clinician's affirmative responses to question number two were unambiguous and clearly formed a nexus between the inmate's mental health and the behavior that lead to the issuance of the RVR.  The sole response to question number three recommended mitigation of a penalty that the SHO could not impose – restricting the inmate's ability to engage in treatment.  The clinician did not appear to know what penalties could be assessed by the SHO.

Although negative answers to questions number two and three on the assessment did not require explanations, the clinician doing the assessment repeatedly provided written responses to both questions, which were confusing at times, and failed to offer any information the SHO could use.  In one case the clinician checked off "no" to question number three and then wrote that "The I/P has significant resources in EOP to help adjust to possible penalties of this RVR." (*See* CSATF Inmate A.)  Another clinician checked "no" to question number three and wrote that "He appears to have a good rapport with mental health staff on the yard and knows how to access help if he needs help coping."  (*See* CSATF Inmate E.)  Other clinicians felt the need to reiterate that the inmate's mental health did not contribute to the behavior that lead to the RVR after answering question number two in the negative. (*See* CSATF Inmates E, F, G, H.)

There were cases when mental health assessments were ordered for offenses that were not classified as Division A, B or C and the inmate was not referred for a SHU term assessment in the disposition.  SHOs did not specify why a mental health assessment was ordered if the charge was not a Division A, B or C offense or SHU-able and the inmate did not exhibit any bizarre, unusual or uncharacteristic behavior, which meant that the reason for the assessment was not documented.

## CONSIDERATION OF THE MENTAL HEALTH ASSESSMENTS BY THE SHO AND MITIGATION

SHOs routinely mentioned consideration of the mental health assessment in every RVR reviewed.  The SHOs utilized canned language to note their consideration.  The lack of clinical recommendations for mitigation by the clinicians did not provide any data to determine if any mitigation was based on mental health factors.

In the adjudication, SHOs wrote that the inmates did not display any bizarre, unusual or uncharacteristic behavior even when the RVR was a Division A, B, C or SHU-able offense or the inmate was at the EOP LOC. (*See* CSATF Inmates A, H, I, J, K.)  This standard of bizarre, unusual or uncharacteristic behavior was inapplicable to the specific charge and/or the LOC of the inmates in these cases.

## ICC REVIEW

There was no mitigation at ICC based on mental health input, as the mental health assessments generally reflected that mental health issues did not influence the behavior that lead to the RVR.  The number of cases where the clinician found that mental health issues influenced

behavior was not sufficient to make a determination on the efficacy of the mental health input in the RVR process at the ICC level.

## CSATF RVR Case Reviews

**Inmate A**
Date of Violation:  2/21/14
Date of Mental Health Assessment:  3/26/14
Date of Disposition:  4/2/14
Charge:  Out of Bounds – Division F Offense

On 2/21/14, this EOP inmate was found in a cell that was not his assigned cell.  He stated that he had received a bed move but this was not true.  An assessment was completed on 3/26/14 with question number two answered in the affirmative and question number three answered in the negative.  The clinician's answer to question number two stated that "I/P appears to have been in an altered state of perception.  His mental instability appears to have impacted his ability to appropriately function on the day of the incident.  He does appear to have been able to fully appreciate his behavior."  Although the clinician answered question number three in the negative, the clinician stated that "The I/P has significant resources in EOP to help adjust to possible penalties of this RVR."  On 4/2/14, the inmate appeared at the hearing before the SHO. The SHO considered the assessment and found the inmate guilty.  The inmate was assessed no days credit forfeiture and 60 days loss of all yard.

**Impression**:  There was mitigation in this case; however, the SHO did not specifically state why no credit forfeiture was assessed. The SHO gave consideration to the mental health assessment. The inmate was assessed loss of privilege but no credit forfeiture. The answer to question number two on the assessment presented conflicting and confusing information.  The clinician's answer to question number three communicated to the SHO that imposition of any penalties was not an issue as these could be addressed through treatment.

**Inmate B**
Date of Violation:  1/3/14
Date of Mental Health Assessment:  1/21/14
Date of Disposition:  1/22/14
Charge:  Resisting a Peace Officer Resulting in the Use of Force – Division D Offense

On 1/3/14, this EOP inmate was in a holding cell in the CTC and was observed moving his handcuffs from behind him to the front of him.  When the officers unlocked the holding cell and grabbed the inmate by his arm, the inmate pulled away from the officer stating that he was not coming out of the cell.  The inmate eventually had to be forced to the floor to reapply the restraints.  An assessment was completed on 1/21/14 with question number two answered in the affirmative and question number three answered in the negative.  In answer number two, the clinician stated that the inmate's mental disorder appeared to significantly contribute to his behavior and that the inmate was also initiated on a PC 2602 order due to being a danger to others due to his mental illness. In response to question number three, the clinician stated that the inmate had significant mental health resources at the MHCB and at DSH where he was pending a

transfer and that he currently had daily sessions with a psychologist or social worker and additional mental health services through the recreation therapist. The answer to question number three was unnecessary and unresponsive.

On 1/22/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 90 days forfeiture of credits.

**Impression**: There was no mitigation in this case. The SHO gave consideration to the mental health assessment. The clinician's answer to question number three communicated to the SHO that any imposition of penalties was not an issue as these could be addressed through treatment. The inmate was assessed significant credit forfeiture.

**Inmate C**
Date of Violation:  1/8/14
Date of Mental Health Assessment:  2/12/14
Date of Disposition:  2/22/14
Charge:  IDX with Priors – Division D Offense

On 2/8/14, while the PT was performing her rounds, this 3CMS inmate was observed in his cell swaying his hips from side to side with an erect penis.  On 2/12/14, an assessment was completed with question number two answered in the affirmative and question number three answered in the negative.  Answer number two stated that the inmate already had a diagnosis of Exhibitionism and had been recommended for and accepted in the Exhibitionism program at CSP/Corcoran.  In response to question number three, the clinician stated that the inmate appeared able to tolerate possible penalties assessed for the RVR and that he had increased mental health services while in administrative segregation and his mental health team would assist him with coping skills and impulse control skills.

On 2/22/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty of the lesser offense of IDX without a prior conviction.  The inmate's records reflected that he did not have any prior convictions for IDX.  The inmate was assessed 90 days forfeiture of credits and 180 days loss of telephone, canteen, packages, appliances and personal property privileges.

**Impression**: There was no mitigation in this case.  The clinician's answer to question number two merely provided a diagnosis.  The clinician's answer to question number three communicated to the SHO that any imposition of penalties was not an issue as these could be addressed through treatment.  The SHO gave consideration to the mental health assessment.  The inmate was assessed significant credit forfeiture in addition to significant loss of privileges.

**Inmate D**
Date of Violation: 2/19/14
Date of Mental Health Assessment: 6/8/14
Date of Disposition: 6/30/14
Charge: Battery on a Peace Officer Resulting in Use of Force – Division B Offense

On 2/19/14, an emergency cell extraction was ordered for this 3CMS inmate. However, in the RVR there was no indication why the emergency cell extraction was necessary. During the extraction, the inmate rushed at the officers striking the shield and the officers themselves in the process. Given that this matter was referred to the district attorney, the hearing was postponed pending a decision on the district attorney referral. On 6/18/14, an assessment was completed with questions number two and three answered in the affirmative. In the answer to question number two, the clinician indicated that the inmate had a diagnosis of Depression Disorder NOS, rule out traumatic brain injury, Borderline Personality Disorder, that the inmate was easily escalated to episodes of extreme rage, had poor impulse control, was prone to self- injurious behavior, was extremely demanding, followed by threats of serious injury or death to others. The clinician also stated that the inmate could possibly experience dissociative blackout states during rage episodes and that he needed assessment for TBI. This was merely a diagnosis and was unresponsive to the question. The clinician indicated that any penalty that would restrict the inmate's ability to engage in treatment was not recommended. This was the second mental health assessment completed for this inmate as he was at the 3CMS LOC at the time of the incident, and subsequently his LOC was raised to EOP prior to the hearing. The first mental health assessment was not contained in the RVR package.

On 6/30/14, the inmate appeared for a hearing before the SHO. In the decision, the SHO stated that the inmate's actions were not considered bizarre, unusual or uncharacteristic, a standard that did not apply to this situation. The SHO considered the second mental health assessment and found the inmate guilty. The inmate was assessed 150 days loss of behavioral credit, 30 days loss of telephone, vendor packages, personal property, and entertainment appliances and was referred to the ICC with the recommendation of the appropriate SHU term assessment.

**Impression**: There was no mitigation in this case. The SHO gave consideration to the mental health assessment. The clinician's comments on the mental health assessment were not responsive to the questions asked and it appeared that the clinician was unaware that treatment could not be impacted by any penalties. The inmate was assessed credit forfeiture and loss of a privilege.

**Inmate E**
Date of Violation: 2/17/14
Date of Mental Health Assessment: 2/21/14
Date of Disposition: 3/5/14
Charge: Battery on an Inmate – Division D Offense

On 2/17/14, this 3CMS inmate was observed playing basketball with another inmate and was then observed punching the other inmate in the upper left shoulder and neck area with his fist. An assessment was completed on 2/21/14 with questions number two and three answered in the

negative. The clinician indicated in response to question number two that the inmate denied they were fighting and that there were no apparent mental health symptoms related to this RVR. In response to question number three which was also answered the negative, the clinician stated that the inmate appeared to have a good rapport with mental health staff on the yard and knew how to access help if he needed any help coping.

On 3/5/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate not guilty of the Division D offense of battery on an inmate but rather from the inmate guilty of a lesser included Division F offense, namely horseplay.  The inmate was assessed 30 days forfeiture of credit, ten days loss of administrative segregation yard and was referred to the ICC for program-custody review.

**Impression**:  There was mitigation in this case for reasons unrelated to the mental health assessment. The clinician's comments on the mental health assessment were unnecessary and provided no useful information for the SHO. The SHO gave consideration to the mental health assessment. The inmate was assessed credit forfeiture and loss of a privilege.

### Inmate F
Date of Violation:  1/16/14
Date of Mental Health Assessment:  1/21/14
Date of Disposition:  2/5/14
Charge:  Delaying a Peace Officer by Refusing Assigned Housing – Division D Offense

On 1/16/14, this 3CMS inmate was told that he was moving to a different yard.  At first he agreed to go with no issues, but when it was time to move he indicated that he refused to go to the new yard.  He stated that he was afraid that someone was trying to kill him but refused to provide any details.  A mental health assessment was completed on 1/21/14 with questions number two and three answered in the negative.  In response to question number two the clinician stated the RVR did not appear to be related to the inmate's mental disorder and that the inmate reported he refused the housing because of a safety concern.

On 2/5/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 61 days forfeiture of credit, 90 days loss of telephone privileges, 90 days loss of canteen, 90 days loss of vendor packages and special purchases, 90 days loss of personal property, 90 days loss of appliances and was referred to the ICC for program-custody review.

**Impression**:  There was no mitigation in this case.  The SHO gave consideration to the mental health assessment.  The inmate was assessed credit forfeiture in addition to losses of several privileges.

**Inmate G**
Date of Violation:  1/2/14
Date of Mental Health Assessment:  1/9/14
Date of Disposition:  1/17/14
Charge:  Battery on an Inmate Resulting in the Use of Force – Division D Offense

On 1/2/14, this 3CMS inmate, together with another individual, assaulted and battered a third inmate on the yard.  The inmates were fired at twice with rubber 8mm rounds; they were exposed to a pocket tactical grenade; and finally they were exposed to an instantaneous blast pepper spray grenade, at which time they finally complied and got on the ground.  An assessment was completed on 1/9/14 with questions number two and three answered in the negative.  In response to question number two, the clinician stated there was no evidence of cognitive disturbance.  In response to question number three, the clinician stated the inmate was cognitive at the time of the incident.  These comments were non-responsive and unlikely to be helpful to the SHO.

On 1/17/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days forfeiture of credits, ten days loss of administrative segregation yard privileges and was referred to the ICC for custody review/SHU term assessment.

**Impression**:  There was no mitigation in this case. The SHO gave consideration to the mental health assessment. The clinician's comments on the mental health assessment were not responsive and provided no useful information to the SHO. The inmate was assessed significant credit forfeiture in addition to a loss of privileges.

**Inmate H**
Date of Violation:  3/17/14
Date of Mental Health Assessment:  3/21/14
Date of Disposition:  3/25/14
Charge:  Fighting – Division D Offense

On 3/17/14, this EOP inmate was observed striking another inmate who then struck this inmate back.  Both inmates complied when ordered to get down on the ground.  An assessment was completed on 3/21/14.  Questions number two and three were answered in the negative.  For question number two, the clinician stated that while the inmate appeared to have a mental disorder it did not appear to have contributed to this particular RVR.

On 3/25/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment together with all the other evidence and found the inmate not guilty and dismissed the charge in the interest of justice.

**Impression**:  The basis for mitigation in this case was not clearly specified.  The SHO gave consideration to the mental health assessment.  The charge against the inmate was dismissed.

**Inmate I**
Date of Violation:  2/9/14
Date of Mental Health Assessment:  2/14/14
Date of Disposition:  2/27/14
Charge:  Battery on an Inmate Necessitating the Use of Force – Division D Offense

On 2/9/14, this 3CMS inmate was involved with two other individuals in battering another inmate.  After being sprayed with pepper spray, all the inmates got down on the ground.  A mental health assessment was completed on 2/14/14 with questions number two and three answered in the negative.

On 2/27/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days forfeiture of credits, ten days loss of administrative segregation yard and was referred to the ICC for program/custody review.

**Impression**:  There was no mitigation in this case.  The SHO gave consideration to the mental health assessment.  The inmate was assessed significant credit forfeiture.

**Inmate J**
Date of Violation:  2/11/14
Date of Mental Health Assessment:  2/14/14
Date of Disposition:  2/21/14
Charge:  Threatening an Inmate – Division F Offense

On 2/11/14, this 3CMS inmate submitted an emergency request for mental health services stating that he was possibly suicidal or homicidal.  The inmate stated that he did not presently have a cellmate, but that if he was given a cellmate he would hurt or kill that cellmate.  The inmate admitted that he filled out the emergency request form in an attempt to request a single cell chrono.  A mental health assessment was completed on 2/14/14 with questions number two and three answered in the negative.  Although question number two was answered in the negative, the clinician indicated that the inmate denied the allegations that he threatened to hurt or kill a future cellmate.

The inmate appeared for a hearing on 2/21/14 before the SHO.  The SHO considered the mental health assessment and found the inmate not guilty.  The SHO stated that without a specifically identified victim, there was no real threat to anyone and the charge was dismissed in the interest of justice.

**Impression**:  There was mitigation in this case which was not related to the mental health assessment.  The clinician's comments on the mental health assessment were unnecessary and provided no useful information for the SHO.  The SHO gave consideration to the mental health assessment.

**Pleasant Valley State Prison (PVSP) RVR Review**

**SUMMARY OF FINDINGS**

A.      Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at PVSP by completing and sustaining all requirements.

B.      PVSP was not compliant with required training of custody and mental health staff related to the RVR process.

C.      Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D.      Reporting employees often reported the wrong LOC on the RVR.

E.      SHOs generally noted that mental health assessments were considered       and reviewed.

F.      SHOs consistently noted that inmate behavior was not deemed bizarre,       unusual or uncharacteristic for inmates at all levels of care, as well as 3CMS inmates who       were charged with Division A, B, C or SHU-able offenses.

G.      Clinicians inappropriately indicated that inmates receiving EOP and MHCB LOC did not require staff assistants.

H.      For those assessments where the clinician indicated there were mental health factors to consider for assessment of penalties, the narratives were generally nonresponsive, thus not helpful to SHOs.

I.      There was no formalized quality review of the RVR process at PVSP.

**INTRODUCTION**

During November 5-6, 2014, the Coleman monitoring team reviewed the rules violation report (RVR) process at PVSP.  At the time of the visit, PVSP housed Level I and III inmates including those requiring 3CMS LOC and a small number of EOP inmates.  As of March 2014, which covered the period under review, PVSP had a total inmate population of 3,108.  Of that population, 1,951, or 63 percent, had a MHSDS designation.
During the site visit, the team met with the Chief of Mental Health, Health Care Lieutenant, nine SHOs (SHO) and six mental health clinicians responsible for preparing the mental health assessments.

The monitoring team reviewed policies and procedures related to the RVR process at PVSP, training materials provided by headquarters, as well as any local training materials provided by the institution to PVSP staff.  The monitors utilized the PVSP institution register and CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR.  The review period covered RVRs issued and/or heard during January, February, and

March 2014.  During this time frame there was a total of 716 RVRs written with 218, or 30 percent issued to inmates with a mental health designation.

**TRAINING**

PVSP staff produced one proof of practice memorandum dated January 12, 2012 in response to the November 3, 2011 memorandum.  PVSP was not able to provide a proof of practice memorandum in response to the October 26, 2011 memorandum.  PVSP staff was not able to produce a copy of the approved lesson plan or PowerPoint presentation regarding mental health input into the RVR process.

IST was asked to produce a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda. They were not able to demonstrate compliance with the four-hour training; just four out of 129 staff required to receive the training were documented as having attended.  For the one-hour training requirement, 100 percent of the captains, 83 percent of the lieutenants and 69 percent of the sergeants attended the training.  Only seven of the mental health staff members out of 25 were documented as having attended either the four-hour or one-hour training.

PVSP RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 4 | 0/0% | 3/75% |
| Captains | 5 | 0/0% | 5/100% |
| Lieutenants | 24 | 2/8% | 20/83% |
| Sergeants | 70 | 1/1% | 48/69% |
| CC-II Appeals | 1 | 0/0% | 0/0% |
| Psychologists | 17 | 1/6% | 5/31% |
| Social Workers | 8 | 0/0% | 1/13% |

**STAFF INTERVIEWS**

**SHOs**

The SHOs were not able to clearly articulate the policies and procedures regarding which RVRs required a referral for a mental health assessment.  There was significant confusion regarding behavior which was deemed bizarre, unusual or uncharacteristic, and Division A, B, C or SHU-able offenses.  The SHOs indicated that clinicians returned the mental health assessment forms within three days of request.  The SHOs also stated they were able to read the clinicians' handwriting on the assessment forms and understood what the clinicians wrote, as it was generally in laymen's terms.  Additionally, if the SHOs had a question regarding anything on the assessment, they stated they would call the clinicians for clarification.  When they have called mental health staff in the past, clinicians were reportedly responsive to the SHOs.

163

The SHOs indicated that clinicians typically responded "no" for all three questions on the assessment form. The SHOs also added that it was rare to receive a comment in response to questions number two or three. When there was a written response to question three, the SHOs stated it usually spoke to not taking yard, extended stay in administrative segregation would have a negative impact on the inmate, or the clinician repeated the need for the inmate to have a staff assistant during the hearing on the RVR. When there was a written statement, the SHOs stated they did consider the information in the findings and disposition of the RVR. The SHOs reported a good working relationship with mental health staff. They also reported that except for RVRs issued for IEX violations or those issued to DD inmates, inmate clerks typed the RVRs.

**Clinicians**

The clinicians indicated that it took approximately one hour to complete the assessment, including a non-confidential inmate interview, review of the eUHR, C-file and DECS, as well as contact with the inmate's PC. The clinical staff was not able to articulate how to complete the mental health assessment. In fact, several repeatedly offered, "if necessary I would" in reference to what they do when completing the assessment. The clinicians also reported that a progress note (CDCR 7230) was completed as part of the process.

The clinicians confirmed that it was rare for them to check "yes" in response to questions number two or three on the assessment form. However, when they did check "yes", they indicated that they wrote why they believed the inmate's behavior may have been due to mental illness. The examples offered included recent family issues, the inmate stated their mental illness contributed to the behavior, or it was due to a medication change or medication compliance issue. In response to question number three, the clinicians stated they responded by referring the inmate back to mental health services; clearly non-responsive to the question. The clinicians articulated a vague understanding of the potential penalties for the inmate if found guilty of the RVR.

The clinicians reported a good working relationship with custody staff and stated that they received calls from SHOs in the past regarding RVRs. The clinicians indicated an interest in meeting with the SHOs in order to get a better understanding of the RVR process as well as the potential penalties for an inmate if found guilty.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

The majority of assessments were negative for any mental health considerations; however, for the one case wherein the clinician indicated there were mental health factors to consider when assessing penalties, the clinician's explanation was not helpful to the SHO noting only, "I/M insists he did not strike or physically abuse any correction officer." (*See* PVSP Inmate A.) Further, clinicians inappropriately indicated that EOP and MHCB LOC inmates did not require staff assistants. (*See* PVSP Inmates B, C, D.)

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

SHOs generally noted the mental health assessment was reviewed and taken into consideration in the decision.  There were no cases mitigated based on the assessment; however, only one reviewed case indicated mental health factors to consider when assessing the penalties. It was not uncommon for the reporting employee to document the wrong LOC on the RVR, and one indicated that the inmate was in the MHSDS at "any LOC." (*See* PVSP Inmates B, D, E.)

Further, SHOs regularly misused the "bizarre, unusual or uncharacteristic" standard and routinely referenced the standard when wholly inapplicable for EOP, MHCB, and 3CMS inmates who received Division A, B, C or SHU-able offenses.  (*See* PVSP Inmates B, D, F, G.)

There was confusion regarding inmate LOC in reviewed RVRs.  In one case, the SHO inappropriately utilized the inmate's LOC at the time of the hearing as opposed to the time of the offense.  Further, in another reviewed case, the SHO repeatedly referred to the inmate's EOP LOC as "Extended Out Care Patient" in the RVR.  (*See* PVSP Inmates B, D.)

**ICC REVIEW**

The limited number of reviewed cases indicated consideration of the mental health assessment by ICC.

**QUALITY REVIEW**

There was no formalized quality review of the RVR process at PVSP.

**PVSP RVR Case Reviews**

**Inmate A**
Date of Violation:  1/29/14
Date of Mental Health Assessment:  Timely
Date of Disposition:  6/28/14
Charge:  Battery on a Peace Officer Resulting in Use of Force – Division B offense

During an unclothed body search, this 3CMS inmate refused to remove his boxers and was ordered to turn around and cuff up.  The inmate partially turned to his right, the officer grabbed his left wrist to apply the handcuffs and the inmate turned back, pulled his left hand away and then used his right hand to push the officer's right forearm down.  The inmate then took a fighting stance with both fists up.  He was ordered to get down and did not comply.  The officer dispersed one burst of OC spray to the inmate's facial area and the inmate turned away and immediately turned on the water to wash off the spray.  He was again ordered to get down and did not comply.  The officer again sprayed the inmate with OC spray with negative results.  The officer then struck the inmate with his baton, aiming for the thigh, but hit his knee.  The inmate was again instructed to get down and failed to comply.  The baton was used again, this time aiming at his calf; however it hit his shin.  Responding officers utilized their OC spray; however,

the inmate kept his face under the running water making it ineffectual.  After several attempts, the inmate charged out of the shower, struck the officer's left shoulder and the officer fell.  The inmate was eventually subdued, cuffed and transported on a gurney to the medical clinic.  The reporting employee noted that the inmate was a participant in the MHSDS at the 3CMS LOC.

A mental health assessment was completed within one day of delivery from custody; although, nine days after the incident.  The clinician answered "no" to questions number one and two; however, "yes" for question number three.  The response to number three was unresponsive and therefore unhelpful to the SHO noting, "I/M insists he did not strike or physically abuse any correction officer."

The SHO referenced consideration of the mental health assessment in the MHSDS Review and Consideration section of the RVR.  The SHO also reported that the inmate's behavior was not bizarre, unusual or uncharacteristic.

The inmate was found guilty and assessed 150 days forfeiture of credit, ten days loss of yard, and 90 days loss of appliances.  He was referred to ICC for a SHU term assessment.

**Impression**:  There was no mitigation in this case.  The mental health assessment was not helpful as completed and the clinician apparently did not understand the purpose of question number three, underscoring the need for ongoing training.  The SHO referenced consideration of the mental health assessment; however, inapplicable language was also included stating the inmate's behavior was not bizarre, unusual or uncharacteristic.  The offense was a Division B and should automatically trigger a referral for an assessment.

## Inmate B
Date of Violation:  1/15/14
Date of Mental Health Assessment:  Timely
Date of Disposition:  1/29/14
Charge:  Self Admission to Possession of a Controlled Substance – Division B offense

During an investigation for the purpose of alleged safety concerns, this MHCB inmate admitted to buying and using heroin.  He had incurred substantial debt as a result.  The RVR noted that he was a participant in the MHSDS at 3CMS LOC; however, he was actually at the MHCB LOC at the time of the incident.

A mental health assessment was requested and completed timely, and the clinician indicated "no" for question numbers one, two and three.  At the time of the hearing, the inmate had been discharged from the MHCB and was receiving EOP LOC.  Consequently, the SHO referred to his LOC as EOP throughout the hearing report.  The SHO noted, "[Inmate] is a participant in the MHSDS at Extended Out Care Patient (EOP) LOC; however, he did not exhibit any strange bizarre or unusual behavior."  With that statement, the SHO demonstrated confusion around the appropriate standards for 3CMS and EOP inmates.  The SHO reiterated the same language in the MHSDS Review and Consideration section of the report.  The SHO cited the mental health assessment in said section of the report and noted that the "SHO has thoroughly reviewed this

166

assessment prior to the hearing and has taken the Clinician's evaluation into careful consideration during the adjudication process in rendering a finding of guilty."

The inmate was found guilty and assessed 150 days forfeiture of credit, 90 days loss of visiting followed by 90 days non-contact visiting status, one year mandatory drug testing and attendance at substance abuse class. He was referred to UCC for C-status placement as well.

**Impression**: There was no mitigation in this case. The clinician inappropriately checked "no" to whether a staff assistant was needed as all MHCB inmates are required to be assigned staff assistants pursuant to policy. A staff assistant was ultimately provided. The mental health assessment was requested and completed timely. The SHO demonstrated a misunderstanding of the application of the bizarre, unusual or uncharacteristic standard as it does not apply to EOP inmates. The SHO appropriately noted consideration of the mental health assessment in the report. Also, while the inmate was at EOP LOC at the time of the hearing, he was MHCB LOC at the time of the incident. These issues are likely to be addressed through appropriate training and quality improvement in the RVR process.

**Inmate C**
Date of Violation: 3/9/14
Date of Mental Health Assessment: Timely
Date of Disposition: 5/27/14 (the inmate postponed pending outcome of the DA referral)
Charge: Battery on an Inmate with a Deadly Weapon – Division A-1 offense

This EOP inmate was observed striking another inmate on his back with a broom on the dayroom floor. When all inmates were ordered to get down, all inmates complied except for this inmate who then ran towards a wheelchair bound inmate and began striking him in the face with his fists. The inmate then ran towards a cell and assumed a prone position. The RVR noted that the inmate was as participant in the MHSDS; however, it inaccurately noted his level as 3CMS, although he was actually at the EOP LOC.

An assessment was requested and completed timely; however, the custody supervisor also inaccurately reported the inmate's LOC as 3CMS. The clinician answered "no" to questions number one, two and three; however, as an EOP LOC inmate, number one should have been answered in the affirmative, because a staff assistant is mandatory for EOP inmates. For question number two, the clinician answered "no" but wrote, "he has a mental disorder, but it was not a factor in his behavior."

The SHO's documentation contained contradictory information. The report in the section MHSDS Review and Consideration stated: "The defendant is a participant in the MHSDS at the EOP LOC." The next sentence, however, stated: "Although the defendant is a participant in the MHSDS at the CCCMS LOC, the behavior leading up to and during this misconduct observed by staff was not bizarre, unusual or uncharacteristic." The inmate was found guilty, assessed 360 days forfeiture of credit and ten days loss of yard privileges. He was referred to ICC for a SHU placement consideration. The SHO noted under the disposition, "The SHO thoroughly reviewed this assessment prior to the hearing and has taken the clinician's evaluation into careful

consideration during the adjudication process in rendering finding of GUILTY." The inmate was admitted to the MHCB on the night of the incident.

ICC consideration of the mental health assessment was documented on a CDCR 128G dated 6/5/14.

**Impression**: There was no mitigation in this case. The RVR and SHO made contradictory statements regarding the inmate's LOC. The SHO noted bizarre, unusual and uncharacteristic language although the inmate was an EOP LOC inmate. The SHO noted consideration of the mental health assessment in the disposition. The ICC also noted consideration of the assessment. The inmate was assessed significant credit forfeiture loss, and was also assessed loss of privileges.

**Inmate D**
Date of Violation: 1/14/14
Date of Mental Health Assessment: Timely
Date of Disposition: 1/29/14
Charge: Fighting – Division D offense

This EOP inmate was observed fighting with another inmate. When instructed to get down, the inmates failed to comply. Responding staff formed a skirmish line and advanced toward the two inmates while giving multiple orders to get down with negative results. After several additional orders, the two inmates stopped and assumed a prone position. The RVR noted that the inmate was a participant in the MHSDS at 3CMS LOC; however, the inmate was receiving EOP LOC at the time of the incident.

An assessment was requested and completed timely. The clinician noted that the inmate did require a staff assistant as he was receiving EOP LOC. The clinician noted no other mental health considerations and answered "no" to questions number two and three. The SHO noted in the RVR, "Inmate … is a participant in the MHSDS at Extended Out Care Patient (EOP) LOC; however, he did not exhibit any strange bizarre or unusual behavior." Further, the SHO repeatedly incorrectly referred to EOP as Extended Out Care Patient LOC. The SHO referenced the mental health assessment in the MHSDS Review and Consideration section of the RVR. Again, the SHO noted that the inmate was a participant in the MHSDS at the Extended Out Care Patient LOC; however, he did not exhibit any unusual or bizarre behavior during the commission of the alleged misconduct. The SHO further documented, "The SHO has thoroughly reviewed this assessment prior to the hearing and has taken the Clinician's evaluation into careful consideration during the adjudication process in rendering a finding of guilty."

The inmate was found guilty and assessed 90 days forfeiture of credits and 90 days loss of yard, special purchase, quarterly package and food sales.

**Impression**: There was no mitigation in this case. The mental health assessment was timely. The RVR incorrectly noted the inmate's LOC as 3CMS. The SHO noted the accurate LOC as EOP, but repeatedly inaccurately utilized the bizarre, unusual or uncharacteristic standard.

168

Further, the SHO repeatedly referred to "EOP" as "Extended Out Care Patient" as opposed to "Enhanced Outpatient." The inmate was assessed significant credit and privilege losses.

**Inmate E**
Date of Violation: 1/6/14
Date of Mental Health Assessment: Timely
Date of Disposition: 1/31/14
Charge: Self-Admitted to Possession of a Controlled Substance – Division B offense

During an interview regarding safety/enemy concerns, this 3CMS inmate admitted to having a $1,000 drug debt for heroin. When advised that he would be receiving a RVR for possession of a controlled substance, he replied, "I don't give a f---, they're going to hurt me over this drug debt." The RVR noted that the inmate was a participant in the MHSDS at **any** LOC. An assessment was requested on 1/9/14 and the custody supervisor noted the inmate was at the 3CMS LOC.

The assessment was completed timely and the clinician indicated the need for a staff assistant as the inmate had a TABE score of 0.7 NCF. The clinician answered questions number two and three in the negative.

The SHO referenced the assessment in the report, as well as throughout the adjudication process and final decision. The inmate was found guilty and assessed 150 days forfeiture of credit, one year random drug testing, 30 days loss of dayroom privileges, 90 days loss of visiting privileges followed by 90 days non-contact visiting. He was also required to attend a SAP.

**Impression**: There was no mitigation in this case. The RVR did not state the LOC of the inmate, which was required under the RVR policy. The mental health assessment was completed timely and the SHO noted consideration of the assessment in the RVR. The inmate was assessed significant credit forfeiture and losses of privileges.

**Inmate F**
Date of Violation: 1/2/14
Date of Mental Health Assessment: Untimely
Date of Disposition: 1/23/14
Charge: Possession of a Controlled Substance – Division B offense

During a facility search, the K-9s alerted staff to cell 220 occupied by this 3CMS inmate and another inmate. A small bindle of green leafy substance, suspected to be marijuana, was found on the desk in an area easily accessible by both inmates. Both inmates were read their rights and elected not to make statements. The RVR noted that the inmate was a participant in the MHSDS at 3CMS LOC.

An assessment was completed eight days after the incident and the clinician indicated no mental health considerations. The SHO did not document consideration of the assessment in the decision. The inmate was found not guilty based on the testimony and declaration of his cellmate confessing that the substance belonged to him.

169

The mental health assessment was not mentioned by the SHO in the RVR. The SHO only documented that although the inmate was a participant in the MHSDS at 3CMS LOC, the behavior leading up to and during this misconduct observed by staff was not bizarre, unusual or uncharacteristic.

**Impression**: There was no mitigation in this case. The assessment was completed late due to a late request by custody. The assessment was not mentioned as considered in any part of the decision. The sole mention of the inmate's mental health was documenting the inmate's LOC. The SHO also erroneously sought to apply the standard that the behavior was not bizarre, unusual or uncharacteristic, although the offense was a Division B and therefore an assessment was required. The inmate was found not guilty based on the admission of the other inmate.

**Inmate G**
Date of Violation: 1/31/14
Date of Mental Health Assessment: Timely
Date of Disposition: 2/27/14
Charge: Battery on an Inmate with Security Threat Group (STG) Nexus – a Division D offense

This 3CMS inmate was observed fighting with two other inmates, all affiliated with the Sureno Security Threat Group (STG) 2. After numerous orders to get down with negative results, the officer used his OC spray and all three inmates complied and assumed prone positions on the gravel. The RVR noted that the inmate was a participant in the MHSDS at the 3CMS LOC.

A mental health assessment was requested and completed timely and the clinician noted no mental health considerations. The SHO referenced consideration of the assessment in the MHSDS Review and Consideration section of the decision. The SHO also unnecessarily reported that the inmate's behavior was not bizarre, unusual or uncharacteristic.

The inmate was found guilty and assessed 90 days forfeiture of credit.

**Impression**: There was no mitigation in this case. The assessment was requested and completed timely. The assessment was negative for any mental health considerations. The SHO referenced consideration of the assessment; however, he also erroneously added that the behavior was not bizarre, unusual or uncharacteristic. The offense was a potentially SHU-able offense and should automatically trigger a mental health assessment. The inmate was assessed significant credit forfeiture.

# Avenal State Prison (ASP) RVR Review

## SUMMARY OF FINDINGS

A.    Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at ASP.

B.    ASP was not compliant with required training of custody and mental health staff related to the RVR process.

C.    Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D.    Mental health assessment requests were delayed due to the reporting employees' failures to request assessments for all 3CMS inmates who received a Division A, B, or C offense, or an offense with the potential for assessment of a SHU term.

E.    SHOs routinely noted that mental health assessments were considered      and reviewed.

F.    Clinicians' explanations regarding mental health factors to consider in assessment of penalties were generally nonresponsive and therefore not helpful to the senior hearing officers.

G.    There was no formalized quality review of the RVR process at ASP.

## INTRODUCTION

At the time of the monitor's visit, ASP housed Level II inmates including those at the 3CMS LOC.  As of March 2014, which was within the review period, ASP had an inmate population of 3,929, including 1,314 or 33 percent, with an MHSDS designation.  The monitor met with the Chief Deputy Warden, Chief of Mental Health, the Health Care Captain, five SHOs, and four mental health clinicians responsible for preparing the mental health assessment forms.

The monitor reviewed policies and procedures related to the RVR process and training materials provided by headquarters and by the institutions to ASP staff.  The monitor utilized the ASP institution register and CDCR 1154 logs to gather RVR data, which is required to be maintained under CCR, Title 15, "Crime Prevention and Corrections."
The review period was January 2014 through March 2014 for RVRs issued and/or heard during that period.  As reported in COMPSTAT, there were 768 RVRs written, including 253 or 33 percent issued to inmates with a mental health designation.

## TRAINING

ASP staff produced a proof-of-practice memorandum dated December 27, 2011 in response to the October 26, 2011 and November 3, 2011 memoranda requirements.  They also produced the approved PowerPoint presentation on mental health input into the RVR process.

IST was asked to produce an attendance report for the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda. Only two of 138 staff were documented as having attended the four-hour training. For the one-hour training requirement, 85 percent of the sergeants and 68 percent of the lieutenants attended the training. Only one mental health staff member out of 18 was documented as having attended either the four-hour or the one-hour training.

ASP RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 3 | 0/0% | 0/0% |
| Captains | 5 | 0/0% | 4/80% |
| Lieutenants | 33 | 2/6% | 28/85% |
| Sergeants | 78 | 0/0% | 53/68% |
| CC-II Appeals | 1 | 0/0% | 0/0% |
| Psychologists | 11 | 0/0% | 1/9% |
| Social Workers | 7 | 0/0% | 0/0% |

## STAFF INTERVIEWS

### SHOs

The interviewed SHOs were familiar with the policies and procedures regarding mental health input into the RVR process. The SHOs indicated that the mental health assessment forms were returned to custody timely, within five days. They also stated they were able to read the clinicians' handwriting on the mental health assessment forms and understand what they meant as their comments were written in laymen's terms. Additionally, if the SHOs had a question regarding anything on the mental health assessment, they stated that they would call the clinician for clarification. The SHOs were able to provide names of mental health staff that they worked with on a regular basis.

The SHOs indicated that clinicians completed most of the mental health assessment forms with a "no" response for all three questions. However, they also stated that when there was a written statement, they did consider the information in the findings and disposition of the RVR. The SHOs reported a good working relationship with mental health staff. They reported that except for RVRs issued for IDX violations, inmate clerks typed the RVRs at ASP.

### Clinicians

The clinicians indicated that completion of a mental health assessment form took from about a half hour to an hour. This included a non-confidential interview with the inmate, review of the eUHR, CF and DECS, and contact with the inmate's PC. The clinicians stated that a progress note, CDCR 7230, was also completed as part of the process. When the clinicians indicated "yes" on the mental health assessment form in response to question number two, they stated that they wrote the inmate's symptoms which could have contributed to the behavior, or

172

whether there were any changes to his mental health medications or compliance with taking medications.  In response to question number three, clinicians stated they responded to this question with possible risk factors, such as administrative segregation placement that would increase potential for decompensation, or taking away the inmate's yard or phone privileges.  Additionally, clinicians stated that if the response to question three were yes, they usually included the statement, "It is recommended that inmate be permitted to attend groups and all mental health appointments."  This statement indicated a lack of understanding as to what the SHO can impose as a penalty, as access to mental health services cannot be restricted as a result of any RVR finding and disposition.  (*See* ASP Inmates K, L, N.)

Mental health staff reported a good working relationship with custody staff, and stated that they occasionally received calls from them seeking clarification of a mental health assessment form.  The clinicians stated they would be interested in meeting with SHOs in order to better understand the RVR process and what potential penalties an inmate may face if found guilty of an RVR.

**Interview with Chief of Mental Health**

The Chief of Mental Health reported that while there was no formal quality review of the RVR mental health assessment process at ASP, a QIT may be established to address an identified problem.  CDCR policy does not permit unlicensed mental health staff to complete mental health assessment forms without oversight.  The Chief of Mental Health reported that unlicensed mental health staff were allowed to complete mental health assessment forms, and that not all completed by unlicensed clinicians were reviewed and signed by a licensed clinician.

**MENTAL HEALTH ASSESSMENT REQUESTS**

The review showed that mental health assessments were not requested as appropriate, per policy.  For 3CMS inmates, staff consistently noted, "the inmate's behavior was not deemed bizarre, unusual or uncharacteristic, therefore a mental health assessment was not generated," when the inmates' behaviors were in fact a Division A, B, C or SHU-able offense.  (*See* ASP Inmates A, B, C, D, E, F, G, H, I, J.)  Requests to mental health for assessments were routinely untimely.  However, SHOs reported that the assessment forms were returned to custody within five days.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

The majority of assessments were "negative" for any mental health considerations.  However, for the few where the clinician indicated there were mental health factors to consider when assessing penalties, the clinician's reasoning was nonresponsive and therefore not helpful or useful to the SHO.  (*See* ASP Inmates K, L, M.)  One clinician noted only, "I/P is CCCMS", while others provided information that was more responsive to question number two on the assessment rather than question number three which they were responding to.  (*See* ASP Inmate B; *See also* ASP Inmates H, I.)

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

In all reviewed RVR packages, the SHOs noted that the mental health assessment was reviewed and taken into consideration. (*See* ASP Inmate M, O.) Only one reviewed case noted mitigation based on mental health factors. (*See* ASP Inmate H.)

**ASP RVR Case Reviews**

<u>Inmate A</u>
Date of Violation: 1/1/14
Date of Mental Health Assessment: 1/23/14 - late
Date of Disposition: 1/31/14
Charge: Possession of Inmate Manufactured Alcohol (Pruno) – Division C offense

The inmate entered the housing unit with pruno hidden in his jacket. The reporting employee noted that the inmate was a participant in the MHSDS at the 3CMS LOC. It was also noted that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic, and therefore a mental health assessment was not requested. This may have caused the delay in completion of the assessment that was required because it was a Division C offense, but custody did not send the request to the mental health department for 16 days.

The mental health assessment was completed and the clinician indicated no mental health considerations. The mental health assessment was noted in the MHSDS section of the RVR. The inmate was found guilty and the SHO noted that although the original typed report indicated no mental health assessment, one was completed per policy memorandum dated 11/3/11 requiring all 3CMS inmates receiving a Division A, B and/or C RVR to be referred for a mental health assessment.

The inmate was assessed 120 days' forfeiture of credit and 30 days' loss of yard, canteen, packages, and phone privileges. He was also assessed 90 days' loss of visits and one-year of random drug tests, and was assigned to a SAP.

**Impression**: There was no mitigation in this case. The mental health assessment was completed late. The mental health assessment was negative for any mental health considerations, which the SHO specifically noted in the disposition of the RVR. The inmate was assessed significant credit loss and loss of privileges.

**Inmate B**
Date of Violation: 2/7/14
Date of Mental Health Assessment: 2/21/14-late (sent to mental health 2/18/14 with a note to return it to custody by 3/10/14)
Date of Disposition: 2/24/14
Charge: Willful Participation in a Riot – Division D offense

The inmate was involved in a riot between several White and Hispanic inmates. OC spray was used to stop the fighting, and the inmates lay down in a prone position. The reporting employee noted that the inmate was a participant in the MHSDS at the 3CMS LOC. It was also mistakenly noted that no mental health assessment was needed because the inmate's behavior was not deemed bizarre, unusual or uncharacteristic. This mistake probably caused the delay in submission of the case for a mental health assessment, which was required because of the potential assessment of a SHU term for the offense.

The mental health assessment was completed within three days of delivery to the mental health department. The clinician answered "no" to questions number one and two. For question number three, the clinician answered "yes," but his explanation was only "I/P is CCCMS."

The SHO noted consideration of the mental health assessment in the disposition of the RVR. The SHO incorrectly noted that the clinician documented, "there is no mental health factors that hearing official should consider when assessing the penalty." The inmate was found guilty and assessed 90 days' forfeiture of credit. He was referred to UCC for a program/housing review.

**Impression**: There was no mitigation in this case. The mental health assessment was completed two weeks after the incident and was not delivered to the mental health department for 11 days. Assessments for 3CMS inmates must be completed within five working days. The clinician's response to question number three was nonresponsive and not helpful to the SHO when assessing penalties. The SHO noted consideration of the mental health assessment, but misstated the clinician's response. The inmate was assessed significant credit loss.

**Inmate C**
Date of Violation: 2/7/14
Date of Mental Health Assessment: 2/21/14-delivered to MH on 2/18/14 - late
Date of Disposition: 2/27/14
Charge: Willful Participation in a Riot – Division D offense

The inmate was involved in a riot among several white and Hispanic inmates in which OC spray was utilized to stop the riot. The inmates assumed a prone position. The reporting employee noted that the inmate was a participant in the MHSDS at the 3CMS LOC, that his behavior was not bizarre, unusual or uncharacteristic, and that a mental health assessment was not needed. In fact, a mental health assessment was needed because of the potential for assessment of a SHU term.

The mental health assessment was completed within three days of receipt from custody. The clinician noted no mental health considerations. The SHO noted consideration of the

175

assessment, found the inmate guilty, and assessed 90 days' forfeiture of credits and referred the case to the UCC for a SHU term assessment.

**Impression**:  There was no mitigation in this case. The mental health assessment was completed out of time limitations for a 3CMS inmate.  The reporting employee incorrectly noted that there was no referral to mental health because the behavior was not deemed "bizarre, unusual or uncharacteristic," which was not the applicable standard in the case. The mental health assessment was completed within three days after delivery to mental health, and was negative for mental health considerations. The SHO noted consideration. The inmate was assessed significant loss of credits.

**Inmate D**
Date of Violation:  2/7/14
Date of Mental Health Assessment:  2/21/14—delivered by custody on 2/18/14
Date of Disposition:  2/27/14
Charge:  Willful Participation in a Riot – Division D offense

The inmate was involved in a riot between several white and Hispanic inmates in which OC spray was used to stop the fighting.  The inmates assumed a prone position.  The reporting employee noted that the inmate was a participant in the MHSDS at 3CMS LOC and that his behavior was not bizarre, unusual or uncharacteristic and therefore no mental health assessment was needed.   This mistake as to the applicable standard for when a mental health assessment was needed probably led to the delay in completion of the mental health assessment, which was required because of the potential assessment of a SHU term for the offense.

The mental health assessment was completed within three days of receipt from custody.  The clinician noted no mental health considerations.  The SHO noted consideration of the assessment.  The inmate was found guilty and assessed 90 days' forfeiture of credits and referred to UCC for a SHU term assessment.

On 6/12/14, the CDO dismissed the RVR, "in the interest of justice." There was no mention that mental health factors contributed to this dismissal.

**Impression**:  There was no mitigation by the SHO.  Completion of the mental health assessment was late due to delay by custody in delivery to the mental health department. The mental health assessment was completed within three days after receipt by mental health and was negative for mental health considerations.  The SHO noted consideration.  The CDO dismissed the RVR on 6/12/14.  There was no indication that mental health factors contributed to the dismissal.

176

**Inmate E**
Date of Violation: 3/13/14
Date of Mental Health Assessment: 3/20/14 – delivered by custody on 3/19/14 (late)
Date of Disposition: 3/27/14
Charge: Willful Participation in a Riot – Division D offense

The inmate participated in a riot among five inmates. They did not comply when ordered to stop. The CO used an OC instantaneous blast grenade in the directions of the fighting inmates, after which the inmates then complied.

The mental health assessment was completed within one day of receipt from custody and the clinician noted no mental health considerations. The SHO noted consideration of the assessment and the inmate was found guilty. He was assessed 90 days forfeiture of credit.

**Impression**: There was no mitigation in this case. Completion of the mental health assessment was late due to delay by custody in delivery to the mental health department. The mental health assessment was completed within one day after submission to mental health. It was negative for mental health considerations. The SHO noted consideration of the assessment. The inmate was assessed significant loss of credits.

**Inmate F**
Date of Violation: 2/12/14
Date of Mental Health Assessment: 2/21/14—delivered to mental health 2/19/14
Date of Disposition: 2/26/14
Charge: Battery on an Inmate – Division D offense

The inmate was one of two inmates observed repeatedly kicking a third inmate who was lying in a fetal position. The two inmates did not comply when ordered to stop and began punching the third inmate in the head and face. The officer pepper sprayed the inmates but they continued to strike the inmate on the ground. When the officer transitioned to his baton, the inmates stopped and got down in a prone position. The reporting employee noted that the inmate was a participant in the mental health delivery system at 3CMS LOC. However, the employee incorrectly noted that a mental health assessment was not warranted as the inmate's behavior was not considered bizarre, unusual or uncharacteristic. A mental health assessment was required, as a finding of guilt could have resulted in the assessment of a SHU term.

A mental health assessment was completed within two days of receipt from custody, and the clinician indicated no mental health considerations. The SHO noted consideration of the mental health assessment. The inmate was found guilty, assessed 90 days' forfeiture of credit, and referred to UCC for a SHU term assessment.

**Impression**: There was no mitigation in this case. The reporting employee applied the wrong standard and incorrectly noted that a mental health assessment was not required, which led to the mental health assessment being sent back out of timeframes. The SHO noted consideration of the mental health assessment. The inmate was assessed significant loss of credits.

**Inmate G**
Date of Violation:  1/17/14
Date of Mental Health Assessment:  1/29/14—delivered by custody on 1/24/14
Date of Disposition: 2/3/14
Charge:  Participation in a Riot – Division D offense

The inmate was fighting in a riot on the dayroom floor.  The reporting employee noted that the inmate was a participant in the mental health delivery system at the 3CMS LOC, but incorrectly noted that a mental health assessment was not required as the inmate's behavior was not considered bizarre, unusual or uncharacteristic.  In fact, a mental health assessment was required, as a finding of guilt could have resulted in the assessment of a SHU term.

A mental health assessment was completed within five days of receipt from custody.  The clinician indicated no mental health considerations.  The SHO noted consideration of the mental health assessment.  The inmate was found guilty and assessed 90 days' forfeiture of credit.

**Impression**: There was no mitigation in this case.  The reporting employee erroneously noted that a mental health assessment was not required.  The SHO noted consideration of the mental health assessment.   The inmate was assessed significant loss of credits.

**Inmate H**
Date of Violation:  1/17/14
Date of Mental Health Assessment:  1/29/14-delivered by custody on 1/24/14
Date of Disposition: 2/5/14
Charge:  Participation in a Riot – Division D offense

The inmate was involved in a riot on the dayroom floor.  The reporting employee noted that the inmate was a participant in the mental health delivery system at 3CMS LOC and incorrectly concluded that a mental health assessment was not required, as the inmate's behavior was not bizarre, unusual, or uncharacteristic.  In fact, a mental health assessment was required, as a finding of guilt could have resulted in the assessment of a SHU term.  A mental health assessment was completed on 1/29/14, five days after receipt from custody.  The clinician indicated the need for a staff assistant, as the inmate's psychiatric medications had been discontinued for liver tests.  The clinician further noted that the inmate had difficulty with comprehension, confusion, and short-term memory, but he did not indicate that the inmate's mental disorder appeared to have contributed to his behavior.  The clinician answered "yes" to whether there were any mental health factors to consider in assessing the penalty.  He noted that cognitive deficits due to lack of psychiatric medications caused the inmate to have slow cognitive reaction time, which was further exacerbated by the high-stress situation.  This information was entered in response to question number three, while it would have been more appropriate in response to question number two.  The SHO documented consideration of the mental health assessment and noted, "The SHO in assessing the appropriate and mandatory disciplinary actions, has insured that the Subject will be allowed to continue to attend all his mental health groups and appointments as well as be allowed yard privileges pursuant to his established privilege group in order to maintain a stable level of mental health."  The inmate was

178

found guilty and assessed 90 days' forfeiture of credits. He was also referred to UCC for a SHU term assessment.

**Impression**: There was no mitigation in this case. The reporting employee erroneously noted that a mental health assessment was not required. The clinician's response to question number three of the mental health assessment suggested overall confusion over the question. The SHO noted consideration of the mental health assessment and even mitigated the penalty by not assessing loss of yard privileges to maintain a stable level of mental health. However, insuring the inmate continues to have access to his mental health groups and appointments does not amount to mitigation of penalty. The inmate was assessed significant loss of credits.

### Inmate I
Date of Violation: 1/17/14
Date of Mental Health Assessment: 1/30/14 – delivered by custody on 1/24/14
Date of Disposition: 2/3/14
Charge: Participation in a Riot – Division D offense

The inmate was involved in a riot on the dayroom floor. The reporting employee noted that the inmate was a participant in the mental health delivery system at 3CMS LOC and incorrectly noted that no mental health assessment was required because the inmate's behavior was not bizarre, unusual, or uncharacteristic. In fact, a mental health assessment was required, as a finding of guilt could have resulted in the assessment of a SHU term. The mental health assessment was completed six days after receipt from custody, which was late, and the clinician indicated that assignment of a staff assistant was not necessary. The clinician noted that the inmate's mental disorder did appear to contribute to the behavior that led to the RVR and specifically, "according to I/P's diagnosis it may very well have contributed to his reacting to his environment at the time, in which case was the riot." The clinician also answered "yes" to question number three. However, the explanation was not responsive to the question and thus was not helpful to the SHO when considering the penalty. The clinician noted, "Again, it is the undersigned's opinion that I/P may very well have been responding to his surroundings and at the same time feared for his life, due to his diagnosis." This response would have been more appropriately directed to question number two. The SHO noted consideration of the mental health assessment and detailed said consideration in a full explanatory paragraph. The inmate was found guilty and assessed 90 days' forfeiture of credit. He was also referred for a SHU term assessment.

**Impression**: There was no mitigation in this case. The reporting employee erroneously documented that a mental health assessment was not required. The clinician's response to question number three of the mental health assessment was not responsive to that questions, and would have been more appropriate for question number two. The SHO documented consideration of the mental health assessment. The inmate was assessed significant loss of credits.

**Inmate J**
Date of Violation: 1/17/14
Date of Mental Health Assessment: 1/30/14 – delivered by custody on 1/24/14
Date of Disposition: 2/5/14
Charge: Participation in a Riot – Division D offense

The inmate was involved in a riot on the dayroom floor. The reporting employee noted that the inmate was a participant in the mental health delivery system at the 3CMS LOC. The employee incorrectly noted that a mental health assessment was not warranted as the inmate's behavior was not considered bizarre, unusual or uncharacteristic. In fact, an assessment was required, as a finding of guilt could have resulted in the assessment of a SHU term. A mental health assessment was completed six days after receipt from custody. The clinician indicated no mental health considerations. The SHO referenced consideration of the mental health assessment in the RVR. The inmate was found guilty, assessed 90 days' forfeiture of credit, and referred to UCC for a SHU term assessment.

**Impression**: There was no mitigation in this case. The reporting employee erroneously indicated that a mental health assessment was not required. The mental health assessment was negative for mental health considerations. The SHO referenced consideration of the mental health assessment in the RVR. The inmate was assessed significant loss of credits.

**Inmate K**
Date of Violation: 1/15/14
Date of Mental Health Assessment: 1/29/14
Date of Disposition: 2/7/14
Charge: Possession of a Dangerous Weapon - Division A-1 Offense

During a search of the housing unit, a weapon was discovered hidden in the inmate's shoe. A mental health assessment was completed on 1/29/14, with question number two answered "no" and question number three answered "yes." In response to question number three, the clinician recommended that the inmate be permitted to attend MHSDS appointments including groups, and that the inmate be permitted to attend yard. However, the clinician did not provide any reasoning why the inmate should be permitted to attend yard. The inmate's LOC was elevated to EOP prior to the hearing. On 2/7/14, the inmate appeared for a hearing before the SHO. The SHO reported that the actions of the inmate did not constitute bizarre, unusual, or uncharacteristic behavior, which is an inapplicable standard for this A-1 offense. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 360 days' forfeiture of credit -- the maximum amount of time allowable for a Division A-1 offense -- and referred to ICC for SHU term assessment. The SHO specifically stated in the decision that the inmate would be permitted to attend yard based on the recommendation contained in the mental health assessment. The ICC met on 3/13/14 and elected to asses and impose a nine-month initial mitigated SHU term based on no prior similar behavior. However, after discussion with mental health staff, the ICC chose to suspend the SHU term based on a memorandum that authorized inmates with CLO-A custody to be housed at CMC-East on a case-by-case basis. The inmate was endorsed to CMC.

**Impression**:  There was a measure of mitigation in this case based on the mental health assessment and the inmate's mental health status.  The SHO used canned and inapplicable language regarding bizarre, unusual, and uncharacteristic behavior when that standard was inapplicable. Although the clinician recommended mitigation, there was no justification provided for the recommendation (e.g. loss of yard might result in further decompensation).  In addition, the clinician was apparently unaware that treatment and groups could not be taken away from an inmate as a penalty, as he recommended that the inmate be permitted to attend groups and mental health appointments. The inmate was assessed significant credit loss.  The ICC elected to suspend the SHU term and transferred the inmate to CMC East.

**Inmate L**
Date of Violation:  1/25/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  3/18/14
Charge:  Battery on Staff - Division B Offense

When the inmate was receiving his medication in the pill line, he grabbed the nurse's arm. The nurse then pulled her arm away.  The RVR indicated that the circumstances of the violation were not considered to be bizarre, unusual, or uncharacteristic, but then correctly stated that it was Division B offense, which required a mental health assessment.  A mental health assessment was completed on 2/6/14, with question number two answered "no," and question number three answered "yes."  In response to question number three, the clinician recommended that the inmate be permitted to attend MHSDS appointments including groups and that the inmate be permitted to attend yard. The inmate appeared for a hearing on 3/18/14 before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 150 days' forfeiture of credit -- the maximum amount of time allowable for a Division B offense -- and referred to ICC for SHU term assessment.  The SHO specifically stated in the decision that the inmate would be permitted to attend yard based on the recommendation contained in the mental health assessment. The ICC met on 4/24/14.  The committee elected to impose and assess a 12-month expected SHU term.  No factors were used to mitigate the term, given the inmate's short time in CDCR. The remainder of the SHU term was suspended effective 4/24/14.

**Impression**:  There was a measure of mitigation in this case based on the mental health assessment. Although the clinician recommended mitigation, there was no justification provided for the recommendation (e.g. that loss of yard might result in further decompensation).  In addition, the clinician was apparently unaware that treatment and groups could not be taken away from an inmate as a penalty. The inmate was assessed significant credit loss,

181

**Inmate M**
Date of Violation: 2/27/14
Date of Mental Health Assessment: 3/10/14
Date of Disposition: 3/26/14
Charge: Overfamiliarity: Division F Offense

On 2/27/14, this EOP inmate was charged with overfamiliarity after an investigation. The inmate admitted that he had acquired the addresses of officers from the internet when he was last on parole. He also admitted that he had solicited the address of an officer from another inmate (which was actually a bogus address). The RVR indicated that the circumstances of the violation were considered to be bizarre, unusual, or uncharacteristic, which required a mental health assessment even though the inmate was at the EOP LOC, and the assessment was mandatory. A mental health assessment was completed on 3/10/14, with questions number two and three answered "yes." In response to question number two, the clinician reported that the inmate appeared as a person who may have cognitive impairment due to the child-like quality of his thinking and impairment/lack of basis in reality of his judgment and insight. In response to question number three, the clinician reported that the inmate was at the EOP LOC with irrational thinking. This answer was unresponsive to the question and provided no guidance for the SHO when assessing penalties. On 3/26/14, the inmate appeared for a hearing before the SHO. The SHO reiterated the statement from the report that the inmate's bizarre, unusual, and uncharacteristic behavior led to the completion of the mental health assessment. The SHO considered the mental health assessment and stated that he took these factors into consideration in the findings and disposition of the hearing. However, it was never stated how the findings were used in the penalty phase. The inmate was found guilty and assessed 30 days' forfeiture of credit and 30 days' loss of dayroom, telephone, packages, and entertainment appliances.

**Impression:** There was no mitigation in this case. The clinician's response regarding mitigation was not helpful to the SHO. Although the SHO stated that he took the mental health factors into consideration in the disposition, it was not stated in the actual disposition. The inmate was assessed both losses of credit and privilege.

**Inmate N**
Date of Violation: 2/21/14
Date of Mental Health Assessment: 5/23/14
Date of Disposition: 5/28/14
Charge: Willfully Delaying a Peace Officer/Refusing to Accept Assigned Housing - Division D
        Offense

On 3/6/14, the inmate was released from administrative segregation to another housing unit. However, the inmate refused a direct order to pack up his property and move to the new unit. The RVR reported that the inmate did not display any bizarre, unusual, or uncharacteristic behavior at the time of the occurrence. On 5/23/14, a mental health assessment was completed with question number two answered "no," and question number three answered "yes." In response to question number three, the clinician recommended that the inmate be permitted to attend group, individual therapy, and yard, indicating that the clinician did not know that groups and therapy could not be taken away from an inmate as punishment. On 5/28/14, the inmate

appeared for a hearing before the SHO. The SHO included a recitation of the questions and answers from the mental health assessment, but there was no further reference to the assessment in the disposition, nor was the assessment identified as evidence presented at the hearing or considered by the SHO.  The inmate was found guilty and assessed 90 days' forfeiture of credit -- the maximum amount of time allowable for a division D offense.  The inmate was also assessed 45 days' loss of canteen, appliances, vendor packages, telephone privileges, and personal property.  In addition, the inmate was referred to the ICC for possible transfer and SHU term assessment. The ICC met on 6/5/14.  The mental health assessment was considered and the committee elected to assess and impose a six-month SHU term with no mitigation.

**Impression**:  There was no mitigation in this matter.   The RVR referenced an inaccurate standard of bizarre, unusual, or uncharacteristic behavior.  The clinician did not know that groups and therapy could not be taken away from an inmate as punishment. The mental health assessment was not listed as evidence presented at the hearing or considered by the SHO in the disposition as required. The ICC did consider the mental health assessment, and did not mitigate. The inmate was assessed credit loss as well as loss of privilege.

**Inmate O**
Date of Violation:  2/24/14
Date of Mental Health Assessment:  3/4/14
Date of Disposition:  3/10/14
Charge:  Battery on a Peace Officer - Division B Offense

On 2/24/14, the inmate was ordered twice to exit from an "out of bounds" area.  The inmate walked towards the officer who put his arm up to stop the inmate from walking into him.  The inmate walked into the outstretched arm of the officer.  The inmate was then cuffed and escorted away from the area.  The RVR indicated that the circumstances of the violation were considered to be bizarre, unusual, or uncharacteristic, which required a mental health assessment even though it was a Division B offense, and the assessment was mandatory.  A mental health assessment was completed on 3/4/14, with questions number two and three answered "no."  On 3/10/14, the inmate appeared for a hearing before the SHO.  The SHO indicated that the circumstances of the violation were considered bizarre, unusual, or uncharacteristic, but then correctly stated that it was a Division B offense, which required a mental health assessment.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 121 days' forfeiture of credit -- the minimum amount allowable for a Division B offense -- and was referred to UCC for SHU term assessment.  The ICC met on 6/19/14.  The committee elected to assess and suspend a 13-month aggravated SHU term, based on prior and similar behavior.  The committee considered the mental health assessment and determined that the SHU term assessment was appropriate.

**Impression**:  Although the SHO assessed the minimum amount of forfeiture of credit, there was no reason provided nor any indication that the reduction was related to mental health.  The SHO and the ICC documented the presence of the mental health assessment and reported its consideration.  The inmate was assessed significant credit forfeiture.

183

**Salinas Valley State Prison (SVSP) RVR Review**

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011.

B.  Mental health assessments were completed timely.

C.  Some clinicians provided inappropriate and unresponsive answers on the mental health assessments, which provided no useful information to the SHOs.

D.  SHOs cited the standard of "bizarre, unusual and uncharacteristic behavior" even when the offense charged (Division A, B, C or SHU-able) as the controlling factor warranting the completion of a mental health assessment.

E.  Although it appeared from the disposition that the penalty was mitigated in some cases, a number of SHOs did not specifically indicate that mitigation occurred or the reason for the mitigation.

F.  SHOs used the assessments to determine the competency of the inmate at the time of the RVR, which practice was outside the scope of the RVR process.

G.  A mental health assessment was not completed in one case which warranted it.

H.  In a number of cases, responses to the questions on the mental health assessment were based on statements from the PC rather than an independent review by the clinician doing the assessment.

I.  RVRs did not consistently provide the reason for the completion of the mental health assessment when it was not a Division A, B, C or SHU-able offense.

J.  The Special Master's review found more cases of no loss of credit due to failure to comply with timeframes than were reported by COMPSTAT.

K.  One decision made no reference to a completed mental health assessment.

L.  Among the cases reviewed, the ICC did not mitigate any penalties based on mental health factors but increased a number of SHU terms based on the inmates' previous conduct.

**INTRODUCTION**

At the time of the monitor's visit, SVSP housed Level I, III and IV inmates, including inmates at the 3CMS and EOP levels of care.  As of March 2014, SVSP had a total inmate

population of 3,354, including 1,527 or 46 percent of the total population on the mental health caseload.

The monitor met with SHOs and mental health clinicians responsible for preparing the mental health assessments. The monitor also reviewed policies and procedures related to the RVR process, training materials provided to staff by Headquarters and the institution itself, and reviewed any institutional RVR audits. The monitor utilized the SVSP Institution Register and CDCR 1154 logs to gather the data compilation on RVRs which is required under Title 15, CCR, "Crime Prevention and Corrections."

The review period was January through March 2014 for RVRs issued and/or heard. During this period, as reported in "COMPSTAT", there were 577 RVRs written, with 190 or 33 percent issued to inmates on the mental health caseload. The monitor also reviewed ICC actions for several inmates for whom SHU terms were recommended.

**TRAINING**

Staff produced a proof of practice memorandum dated January 3, 2012, as required by the November 3, 2011 memorandum, but none as required by the October 26, 2011 memorandum. IST had the current mental health assessment form in the disciplinary process lesson plan, which was found on the local network and accessible to all staff. IST training attendance reports indicated that training ran between .25 of an hour to four hours.

The institution was not able to demonstrate adequate compliance with either the required one-hour training or the four-hour training. No captains or CDOs attended the four-hour training. Captains had an 86-percent compliance rate and CDOs had a 75-percent compliance rate for attendance at the one-hour training. Records indicated that 14 percent of the lieutenants attended the four-hour training, and 86 percent attended the one-hour training. Institutional reports indicated that no social workers attended either the four-hour training or the one-hour training, and that three percent of the psychologists attended both trainings.

SVSP RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 4 | 0/0% | 3/75% |
| Captains | 7 | 0/0% | 6/86% |
| Lieutenants | 28 | 4/14% | 24/86% |
| Sergeants | 79 | 2/3% | 55/70% |
| Psychologists | 38 | 1/3% | 1/3% |
| Social Workers | 17 | 0/0% | 0/0% |

## STAFF INTERVIEWS

### SHOs

The lieutenants reported that mental health staff completed the assessment forms in a timely manner, and that they followed their recommendations when written on the assessment form and did not remove any privileges from the inmates. They also stated that they would assess low terms for credit loss, but when they did mitigate a penalty, it was typically not a loss of privileges. They also reported that information written by the clinician on the assessment form was clear and was considered in determining if the inmate's guilt. The SHOs stated they had the authority and ability to dismiss or reduce an RVR based on mental health reasons and the totality of the circumstances. They found the information contained on the assessment form valuable and had no recommendations as to how to improve the process.

### Clinicians

The clinicians indicated they received the assessment forms in a timely manner from custody staff. They reported that it took from 1.5 hours to over four hours to complete the assessment form, depending on the charge and the complexity of the case review. The clinician's preparation of the mental health assessment included a review of the eUHR and medication compliance, and conferring with the PC. Clinicians reported that in approximately 95 percent of cases, the inmate's behavior, as documented in the RVR, was unrelated to his mental health. The clinicians stated they did not receive any feedback from the SHO after an RVR was adjudicated, nor were they aware of the potential penalties once the inmate was found guilty of the RVR. Some of the clinicians expressed that knowing potential penalties would assist them in completing question number three on the assessment form.

Both the SHOs and mental health staff reported they saw no benefit in having joint training with mental health staff on the RVR process and role of the mental health assessment.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

There were instances where responses on the mental health assessment form indicated that no staff assistant was necessary even though the inmate was at the EOP LOC. (*See* SVSP Inmate A.)

In response to question number two, clinicians provided diagnoses such as, "Given the patient's level-of-care placement at 3CMS and his mental health diagnosis (Mood Disorder Not Otherwise Specified  with a rule out of Psychotic Disorder Not Otherwise Specified) his mental Disorder MAY have contributed to his behavior." The clinician did not state his findings in layman's terms and did not provide a definitive answer to the question on the assessment form.

Some clinicians' answers to question number three were unresponsive and provided no useful recommendations for the SHO's use in determining mitigation of any penalties. (*See* SVSP Inmates B, C, D, E, F, G, H, I.)  For example, in response to question number three, one clinician wrote that the patient is in the Mental Health Services Deliver System at the EOP LOC

and used an acronym which was unexplained.  (*See* SVSP Inmate F.)  One clinician completed the form by borrowing statements from the PC rather than basing his conclusions on his own independent review of the materials and an interview of the inmate.  (*See* SVSP Inmate C.)

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

At times, SHOs were considering the mental health input and mitigating the penalties based on clinician recommendations.  (*See* SVSP Inmates J, K.)  A number of dispositions assessed low-end loss of credit, while in other dispositions no loss of privileges was assessed.  (*See* SVSP Inmates L, M.)  It appeared that the SHOs were not taking away privileges if the inmate was at the EOP LOC, regardless of the information on the mental health assessment form.

## ICC REVIEW

Review of the eight cases in which the ICC met indicated there was no mitigation based on mental health factors.  Some were mitigated due to lack of prior acts of a similar nature.  (*See* SVSP Inmate O.)  The ICC did consider the mental health assessment and in some cases elicited information from the clinician attending the meeting.  (*See* SVSP Inmates N, O.)  The committee also increased some SHU terms due to prior RVRs.  (*See* SVSP Inmate H, I.)

## SVSP RVR Case Reviews

**Inmate A**
Date of Violation:  2/21/14
Date of Mental Health Assessment:  3/27/14
Date of Disposition:  4/2/14
Charge:  Overfamiliarity – Division F Offense

On 2/21/14, the inmate approached the nurse and medical office and asked the nurse to take a look at his sick slip to make sure that he had filled it out properly.  The nurse stated that she would be available in about ten minutes and that he could hand it to her then, but the inmate slipped the paper under the door to the nurse.  The nurse opened it and found that it contained a handwritten multiple-page letter.  A mental health assessment was completed on 3/27/14 with questions number one, two, and three answered "no."  Since the inmate was at the EOP LOC, he was automatically assigned a staff assistant despite the fact that the clinician had checked "no" to question number one on the mental health assessment.

On 4/2/14, the inmate appeared for a hearing before the SHO.  In his decision, the SHO reported that the circumstances of the RVR did not indicate that the inmate exhibited any bizarre behavior that would raise concerns about his mental health – a standard inapplicable to an EOP inmate being charged with RVR.  The SHO considered the mental health assessment by reporting a recitation of the questions and responses on the mental health assessment.  The inmate was found guilty and assessed 30 days' forfeiture of credit.

**Impression**:  There was no mitigation in this case.  The SHO used canned language reporting the inmate did not exhibit any bizarre behavior that would raise concerns about the inmate's mental health when such language was inapplicable to the case.

**Inmate B**
Date of Violation:  1/29/14
Date of Mental Health Assessment:  2/7/14
Date of Disposition:  3/4/14
Charge:  Threatening a Peace Officer – Division E Offense

On 1/29/14, while undergoing a clothed body search as he exited his unit, the inmate took a bladed stance in front of the officer and used profanity to tell the officer that he would harm him.  The inmate then complied with the officer's request that he turn around to be cuffed.  A mental health assessment was completed on 2/7/14, with questions number two and three answered "yes."  In response to question number two, the clinician simply stated "see below," referencing question number three.  In response to question number three, the clinician stated that the inmate appeared to suffer from a mental illness that could impair his ability to think rationally and logically, leading to misinterpretations of other people's intentions as hostile.  The clinician attempted to combine his answers to questions number two and three, but did not provide any guidance to the SHO concerning the mitigation of any penalty in response to question number three.

On 3/4/14, the inmate appeared for a hearing before the SHO.  The SHO reported that the inmate did not exhibit bizarre, unusual, or uncharacteristic behavior -- a standard inapplicable to an EOP inmate being charged with an RVR.  The SHO considered the mental health assessment by reporting a recitation of the questions and responses on the mental health assessment.  In his decision, the SHO stated that the mental health assessment was reviewed and the SHO elected to hold the inmate accountable for his actions.  The inmate was found guilty and assessed 60 days' forfeiture of credits, the maximum amount allowable for a Division E offense.  The inmate was also placed in Privilege Group C for 30 days and was assessed temporary loss of appliances for 30 days.  The inmate was referred to the ICC for a SHU term assessment.  The ICC met on 4/17/14 and elected to assess and impose a five-month SHU term.

**Impression**:  There was no mitigation in this case.  The SHO used canned language reporting the inmate did not exhibit any bizarre behavior that would raise concerns about the inmate's mental health, which was not applicable in the case.  The clinician's answer to question number three was unresponsive and provided no guidance for the SHO in mitigating any penalty.  The maximum loss of credit for the offense, with loss of privileges, was imposed.

188

**Inmate C**
Date of Violation: 2/5/14
Date of Mental Health Assessment: 2/24/14
Date of Disposition: 3/14/14
Charge: Fighting: Division D Offense

On 2/5/14, the inmate was involved in an altercation with another inmate. After refusing to cease fighting, the inmates were sprayed with pepper spray. A mental health assessment was completed on 2/24/14, with question number two answered "yes" and question number three answered "no." In response to question number two, the clinician stated that "according to his clinician, the inmate may have been paranoid hearing voices which precipitated the fight." The clinician who completed the assessment form based his opinion on a statement from the PC and not through an independent assessment of the inmate.

On 3/14/14, the inmate appeared for a hearing before the SHO. In his decision, the SHO reported that the circumstances of the RVR did not indicate that the inmate exhibited any bizarre behavior that would raise concerns about his mental health – a standard inapplicable to an EOP inmate. The SHO considered the mental health assessment by reporting a recitation of the questions and responses on the mental health assessment. The inmate was found guilty and assessed 90 days' forfeiture of credit, the maximum amount allowable for a Division D offense. The inmate was placed in Privilege Group C for 30 days and was assessed temporary loss of appliances for 30 days.

**Impression**: There was no mitigation in this case. The SHO used canned language reporting the inmate did not exhibit any bizarre behavior that would raise concerns about the inmate mental health, which did not apply to an EOP inmate. The clinician did not perform an independent assessment of the inmate as required. A significant loss of credit and privileges was imposed.

**Inmate D**
Date of Violation: 2/5/14
Date of Mental Health Assessment: 2/10/14
Date of Disposition: 3/14/14
Charge: Fighting – Division D Offense

On 2/5/14, the inmate was involved in an altercation with another inmate. After refusing to cease fighting, the inmates were sprayed with pepper spray. A mental health assessment was completed on 2/10/14 without any written responses to questions number two and three other than "unknown" and "see supplemental note." There was no supplemental note attached to the RVR package.

On 3/14/14, the inmate appeared for a hearing before the SHO. In his decision, the SHO reported that the circumstances of the RVR did not indicate that the inmate exhibited any bizarre behavior that would raise concerns about his mental health – a standard inapplicable to an EOP inmate being charged with RVR. The SHO considered the mental health assessment by reporting a recitation of the questions and responses on the mental health assessment. However, since there were no recommendations made by the clinician and no supplemental note found in

189

the RVR package, there were no recommendations for the SHO's consideration.  The inmate was found guilty and assessed 90 days' forfeiture of credit, the maximum amount of time allowable for a Division D offense.

**Impression**: There was no mitigation in this case.  The SHO used canned language reporting that the inmate did not exhibit any bizarre behavior that would raise concerns about the inmate's mental health.  There was no mental health assessment completed in the RVR package.  A significant loss of credit was imposed.

**Inmate E**
Date of Violation:  3/13/14
Date of Mental Health Assessment:  4/17/14
Date of Disposition:  4/20/14
Charge:  Fighting – Division D Offense

On 3/13/14, the inmate was involved in an altercation with another inmate in the dining hall.  When the inmate refused to prone out, the officer used pepper spray.  A mental health assessment was completed on 4/17/14, with questions number two and three answered "yes."  In response to question number two, the clinician reported that auditory hallucinations that varied in intensity could interfere with the inmate's ability to process information and provide appropriate responses.  In answer to question number three, the clinician wrote that the factors indicated in response to question number two, as they affected stress tolerance in decision-making.  The clinician also wrote that the SHO should take extra steps due to the inmate's auditory hallucinations, as was already done, to ensure that the inmate understood what had happened at the hearing.  The clinician's response to question number three was unresponsive and provided no recommendations for the SHO when assessing a penalty.

On 4/20/14, the inmate appeared for a hearing before the SHO.  In the decision, the SHO indicated that the circumstances of the RVR did not indicate that the inmate exhibited any bizarre behavior that would raise concerns about his mental health.  This standard was inapplicable to an EOP inmate.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 61 days' forfeiture of credit, the minimum amount allowable per a Division D offense, and was placed in Privilege Group C for 30 days.  The inmate was also assessed temporary loss of appliances for 30 days, which consisted of no television, radio, CD player or musical instruments.

**Impression**:  There was no mitigation in this case specifically identified in the decision.  The SHO used canned language, reporting that the inmate did not exhibit any bizarre behavior that would raise concerns about his mental health when such language was inapplicable to this case.  The clinician provided an unresponsive answer to question number three in the mental health assessment.  The inmate was assessed both credit and privilege losses.

**Inmate F**
Date of Violation:  3/1/14
Date of Mental Health Assessment:  3/10/14
Date of Disposition:  5/8/14
Charge:  Battery on Inmate – Division D Offense

On 3/1/14, the inmate was moved to a new cell and immediately began to attack his cellmate.
On 3/10/14, a mental health assessment was completed, with questions number one, two and
three answered "yes."  In response to question number two, the clinician wrote that the inmate
had a mental health diagnosis of 295.3, Schizophrenia, Paranoid Type, which often caused
people to experience auditory hallucinations, paranoia and poor reality testing.  In response to
question number three, the clinician stated that the inmate was in the MHSDS at the EOP LOC
with a mental health diagnosis of 295.3, Schizophrenia, Paranoid Type, with poor reality testing,
paranoia and poor to fair functioning.  Additionally, the clinician stated that extended
administrative segregation housing could significantly exacerbate the inmate's symptomology.
The clinician's answer to question number two was unresponsive and merely provided a
diagnosis of the inmate's mental health condition.  This diagnosis was repeated in answer to
question number three, but the clinician did indicate that extended housing and administrative
segregation would significantly exacerbate the inmate's symptomology.

On 5/8/14, the hearing was held before the SHO in the inmate's absence, as he refused to attend.
In the decision, the SHO indicated that the circumstances of the RVR did indicate that the inmate
exhibited bizarre behavior that would raise concerns about his mental health.  This standard was
inapplicable to an EOP inmate charged with an RVR.  The SHO also quoted some canned
language stating all 3CMS level-of-care inmates issued an RVR classified as a Division C
offense or higher must have a mental health assessment completed -- another standard
inapplicable to an EOP inmate.  The SHO considered the mental health assessment and found the
inmate guilty.  The SHO agreed with the mental health assessment that stated the inmate's
mental disorder did appear to contribute to the behavior that led to the RVR.  The inmate was
assessed zero days' forfeiture of credit due to lack of compliance with timeframes and was
referred to the ICC for possible SHU assessment.

**Impression**:  There was no mitigation in this case.  Although the SHO agreed that the inmate's
mental disorder contributed to the behavior, the SHO did not reference the clinician's concern
that an extended administrative segregation housing could significantly exacerbate the inmate's
symptomology.  The clinician's responses to questions number two and three both contained
diagnoses and used non-layperson's language.  The response to question number three contained
a recommendation.  No forfeiture of credits was assessed due to lack of compliance with
timeframes.

**Inmate G**
Date of Violation:  3/23/14
Date of Mental Health Assessment:  4/11/14
Date of Disposition:  6/27/14
Charge:  IDX with Masturbation – Division D Offense

On 3/23/14, the inmate was observed naked on his MHCB bed, after removing his safety smock, simulating sexual activity in view of staff.  He refused to cease after several verbal requests.  A mental health assessment was completed on 4/11/14, with questions number two and three answered "yes."  In response to question number two, the clinician wrote "see below," indicating the answer to question number three.  In response to question number three, the clinician wrote that the inmate suffered from a mental illness that affected his thinking, mood, and behavior, and that the inmate acted in an odd, unusual, and sometimes impulsive manner.  The clinician further wrote that the inmate's mental illness could also affect his ability to understand the consequences of his actions.  However, the clinician did not provide any recommendations for the SHO to consider when assessing a penalty.  The inmate appeared for hearing on 6/27/14 before the SHO.  In the decision, the SHO considered the mental health assessment but then determined that the inmate should be held accountable for his actions, as the act did occur.  The SHO then noted that the DSH mental health treatment program (DSH being noted in the documentation that was provided) was based on the inmate's behavior where an inmate earns privileges for good behavior as an incentive, and therefore no loss of privileges would be assessed so as not to interfere with the mental health treatment of the inmate while under the care of the DSH program.  The SHO then clarified his decision by stating that any remainder of mandated loss of privileges would be enforced if the inmate returned to GP  prior to the end date of the penalties assessed.  The inmate was found guilty and assessed zero days forfeiture of credit due to failure to comply with timeframes and was referred to the ICC for SHU term assessment.  The inmate was also assessed loss of canteen, appliances, vendor packages, personal property, and telephone privileges for 180 days.

**Impression**:  The SHO indicated there would be mitigation in this case, although it was unclear what privileges the inmate actually had due to his placement in the DSH program.  The SHO then imposed significant loss of privileges -- 180 days -- that would not take effect while in DSH.  If the inmate were discharged before the passage of 180 days, the remaining days of privilege loss would take effect.  The clinician's answer to question number three in the mental health assessment was unresponsive and provided no guidance for the SHO in the mitigation of any penalties.  There was no forfeiture of credits due to lost time constraints.

**Inmate H**
Date of Violation:  3/24/14
Date of Mental Health Assessment:  4/11/14
Date of Disposition:  5/4/14
Charge:  IDX with Masturbation – Division D Offense

On 3/24/14, at approximately 8:30 p.m., the inmate was observed naked sitting on top of his crisis bed and masturbating.  When the psych tech instructed the inmate to stop what he was doing, he complied and put his smock back on.  A mental health assessment was completed on

4/11/14, with questions number two and three answered "yes." In response to question number two, the clinician wrote "see below," indicating the answer to question number three. In response to question number three, the clinician wrote that the inmate suffered from a mental illness that affected his thinking, mood, and behavior and that the inmate was acting in an odd, unusual, and sometimes impulsive manner. The clinician further wrote that the inmate's mental illness could also affect his ability to understand the consequences of his actions. However, the clinician did not provide any recommendations for the SHO to consider when assessing a penalty.

The inmate refused to attend the hearing before the SHO, which was held on 5/4/14. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed zero days' forfeiture of credit due to failure to comply with timeframes. The inmate was also assessed loss of canteen, appliances, vendor packages, personal property and telephone privileges for 180 days. The inmate was referred to the ICC for SHU term assessment. The ICC met on 6/3/14 and elected to assess and impose a nine-month aggravated SHU term. The committee reviewed the mental health assessment and all other clinical comments and elected to hold him accountable for his actions. The SHU term was aggravated due to previous similar behavior for IDX.

**Impression**: There was no mitigation in this case. The clinician's answer to question number three on the mental health assessment was unresponsive and provided no guidance for the SHO in the mitigation of any penalties. There was no forfeiture of credits due to lack of compliance with timeframes.

### Inmate I
Date of Violation – 3/25/14
Date of Mental Health Assessment: 4/11/14
Date of Disposition – 5/4/14
Charge: IDX – Division D Offense

On 3/25/14, while in his cell during 15-minute daily rounds, the inmate opened his safety smock and said words to draw attention to his exposure. A mental health assessment was completed on 4/11/14, with questions number two and three answered "yes." In response to question number two, the clinician wrote "see below," indicating the answer to question number three. In response to question number three, the clinician wrote that the inmate suffered from a mental illness that affected his thinking, mood, and behavior and that the inmate was vulnerable to acting in an odd, unusual, and sometimes unpredictable manner. The clinician further wrote that the inmate's mental illness could also affect his ability to understand the consequences of his actions. However, the clinician did not provide any recommendations for the SHO to consider when assessing a penalty.

On 5/4/14, the inmate refused to attend a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 90 days' forfeiture of credit, the maximum amount of time allowable for a Division D offense. The inmate was also assessed loss of canteen, appliances, vendor packages, personal property and telephone privileges for 180 days. The inmate was referred to the ICC for SHU term assessment.

193

The ICC met on 6/3/14 and elected to assess and impose a nine-month aggravated SHU term. The SHU term was aggravated due to previous similar behavior for IDX. The committee considered the mental health assessment, which indicated that a mental disorder did appear to contribute to the inmate's behavior, but elected to hold the inmate accountable for his actions.

**Impression**: There was no mitigation in this case. The clinician's answer to question number three in the mental health assessment was unresponsive and provided no guidance for the SHO in the mitigation of any penalties. There was significant loss of credits and privileges.

**Inmate J**
Date of Violation: 2/7/14
Date of Mental Health Assessment: 2/24/14
Date of Disposition: 3/24/14
Charge: Threat to Use Force or Violence Against the Person of Another – Threat on an Inmate –
    Division E Offense

On 2/7/14, the inmate informed staff that the voices in his head were telling him to rape inmates who were placed in his cell. The inmate also stated that his cellmate was cute and that if staff placed the cellmate back into the cell, he would be raped. After being informed that he would be placed in administrative segregation to protect other inmates and staff, the inmate informed the staff that he was suicidal and was subsequently placed on suicide precaution in the CTC. A mental health assessment was completed on 2/24/14, with question number one answered "no" and questions number two and three answered "yes." Since the inmate was at the EOP LOC, he was automatically assigned a staff assistant. The clinician's answer to question one was incorrect. In response to question number two, the clinician stated that the inmate's auditory hallucinations were telling him to do things and that his self-report of being anxious about such voices commanding him did contribute to the inmate reporting to custody what those voices were telling him to do and to his suicidal ideations. The clinician concluded that the inmate's mental health did affect the situation that led to the RVR. In response to question number three, the clinician reported that the inmate was currently presenting symptoms of depression and auditory hallucinations of command type which should be considered when addressing any penalties assessed for this RVR.

On 3/24/14, the inmate appeared for a hearing before the SHO. In his decision, the SHO reported that the circumstances of the RVR did indicate that the inmate exhibited bizarre behavior that would raise concerns about his mental health – a standard inapplicable to an EOP inmate being charged with RVR. The SHO considered the mental health assessment by reporting a recitation of the questions and responses on the mental health assessment. The inmate was found guilty and assessed 31 days' forfeiture of credit, the minimum amount allowable for division E offense. The SHO elected to assess no further disposition based on the mental health assessment evaluation.

**Impression**: There was mitigation in this case based on the mental health assessment. The SHO used canned language reporting that the inmate did exhibit bizarre behavior that would raise concerns about the inmate mental health – a standard inapplicable to an EOP inmate being charged with an RVR.

**Inmate K**
Date of Violation:  3/20/14
Date of Mental Health Assessment:  Not Available
Date of Disposition:  5/1/14
Charge:  Disorderly Conduct (Sexual) – Division E Offense

On 3/20/14, the inmate was observed putting his hand in the pants of another inmate while sitting on a bench in the yard, with his left arm going up and down repeatedly.  Although a mental health assessment was not contained within the RVR package, the SHO provided a recitation of questions one, two, and three and the clinician's responses to those questions in his decision. Question number two was answered "no," and question number three was answered "yes."  In response to question number three, the clinician indicated that the inmate reported multiple past offenses in which he felt used by the other inmate to engage in nonconsensual sexual activities that caused him to fear for his safety.

In his decision, the SHO referenced two standards warranting the completion of the mental health assessment, both of which do not apply to an EOP inmate.  The SHO considered the mental health assessment and found the inmate not guilty based on the information contained in the assessment.  All charges were dismissed in the interest of justice.

**Impression**:  There was mitigation in this case based on the information contained in the mental health assessment.  However, the SHO referenced two standards warranting the completion of the mental health assessment both of which were incorrect.  All charges were dismissed.

**Inmate L**
Date of Violation:  2/20/14
Date of Mental Health Assessment:  3/4/14
Date of Disposition:  4/11/14
Charge:  Possession of Controlled Substance – Division B Offense

On 2/20/14, the institution received toxicology results for a substance that was discovered on the inmate's possession on 12/11/13, which tested positive for marijuana.  A mental health assessment was completed on 3/14/14, with questions number two and three answered "no."

On 4/11/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 140 days' forfeiture of behavioral credits and 90 days' loss of privileges, including no family visits, no telephone calls, ¼ canteen draw, no quarterly packages, and no special purchases.  He was also ordered to submit to monthly random drug testing for one year and ordered to attend Narcotics Anonymous or a SAP, if available.

**Impression**:  Although the inmate was assessed a loss of credits which was less than the maximum amount of time allowable for a Division B offense, the SHO did not indicate that he was mitigating the penalty.

**Inmate M**
Date of Violation:  1/25/14
Date of Mental Health Assessment:  2/25/14
Date of Disposition:  3/3/14
Charge:  Willfully Obstructing/Delaying Peace Officer – Division D
          Offense

On 1/25/14, the inmate covered the cameras inside his cell and refused to remove the material obstructing the camera after several orders to do so by the officer.  The inmate reportedly stated to the officer that he was going to make the officer write every day that he was on his shift.  A mental health assessment was completed on 2/25/14, with question number one answered "yes" and questions number two and three answered "no."  Although the inmate was at the MHCB LOC and required a staff assistant, the clinician recommended that a staff assistant be provided to the inmate due to his EOP LOC.  Question number one clearly indicates that a response is required only for 3CMS inmates and non-mental health inmates, and therefore it did not require an answer for this inmate.

On 3/3/14, the inmate appeared for a hearing before the SHO.  In his decision, the SHO provided a recitation of the questions and answers from the mental health assessment.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 61 days' forfeiture of credit, the minimum amount allowable for Division D offense.  The SHO also indicated that he considered the mental health assessment and mitigated with no loss of privileges due to the inmate's participation in the mental health program.  However, it is unclear what privileges the inmate actually had, due to his placement in a crisis bed, to make not imposing privilege loss a form of mitigation.

**Impression**:  The SHO stated that there was mitigation because no privilege loss was imposed, although it was unclear what privileges the SHO could have taken away from the inmate due to his placement in a crisis bed.  The inmate was assessed the minimum credit forfeiture, which the SHO did not indicate was mitigated.

**Inmate N**
Date of Violation:  2/31/14
Date of Mental Health Assessment:  2/25/14
Date of Disposition:  3/14/14
Charge:  Conspiracy to Introduce a Controlled Substance into Institution for Distribution –
          Division A-2 Offense

On 2/3/14, a visitor came to the institution to see the inmate.  The visitor was discovered to be in possession of ten concealed bindles of methamphetamine.  The visitor implicated the inmate as the mastermind behind the plan.  A mental health assessment was completed on 2/25/14 with questions number two and three answered "no."

On 3/14/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The SHO used the correct language when considering question number two when he stated that "clinical staff indicates subject's behavior

196

was not influenced by mental illness." The inmate was assessed 180 days' forfeiture of credit, the maximum amount of time allowable for a Division A-2 offense, 30 days' loss of privileges including ¼ allowable canteen, no family visits, no dayroom, no telephone calls, no special purchases and no quarterly packages. The inmate's visiting privileges were also suspended for one year, followed by two years of no contact visits, and he was required to attend AA/NA per institutional availability. He was referred to ICC for program review. The ICC met on 6/12/14 and elected to assess and impose a mid-range nine-month SHU term due to the inmate disciplinary history. The committee considered the mental health assessment as well as the clinician's statement that continued placement in administrative segregation would not likely decompensate the inmate's mental health condition.

**Impression**: There was no mitigation in this case. The SHO made reference to the mental health assessment in the adjudication. The inmate was assessed significant loss of credit and losses of privileges.

**Inmate O**
Date of Violation: 2/13/14
Date of Mental Health Assessment: 2/28/14
Date of Disposition: 3/15/14
Charge: Willfully Participating in a Riot Resulting in the Use of Force – Division D Offense

On 1/13/14, the inmate was involved in an altercation with another inmate, which then led to two other inmates fighting. Pepper spray was used to stop the inmates' altercation. A mental health assessment was completed on 2/28/14, with questions number two and three answered "no."

On 3/15/14, the inmate appeared for a hearing before the SHO. In reference to the inmate's mental health, the SHO stated that the circumstances of the RVR did not indicate that the inmate exhibited any bizarre behavior that would raise concerns about his mental health. He also reported that the inmate did not demonstrate any strange, bizarre, or irrational behavior at the time of the hearing. The SHO concluded that based on the inmate's behavior and pursuant to a recent change approved by the United States District Court in *Coleman*, a mental health assessment was initiated. The SHO gave consideration to the mental health assessment and found the inmate guilty. The inmate was assessed 90 days' forfeiture of credits, the maximum amount of time allowable for a Division D offense, and was referred to the ICC for possible SHU term assessment. The ICC met on 4/24/14 and elected to assess and impose a mitigated three-month SHU term. The SHU term was mitigated by one month due to no prior acts of the same or a similar nature. The committee did consider the mental health assessment.

**Impression**: There was no mitigation in this case based on mental health reasons. It was clear that the decision contained canned language regarding the behavior of the inmate and an unidentified change allegedly made by the *Coleman* Court. A significant loss of credit was imposed.

## Correctional Training Facility (CTF) RVR Review

**SUMMARY OF FINDINGS**

A.    Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CTF by completing and sustaining all requirements.

 B.    CTF was not compliant with required training of custody and mental health staff related to the RVR process.

C.    Mental health assessments were timely completed.

D.    Some clinicians gave inappropriate and unresponsive answers on mental health assessments and did not provide useful information to the SHOs.

E.    A majority of mental health assessments did not find a nexus between mental health and the actions leading to the RVR.

F.    SHOs cited the bizarre, unusual, or uncharacteristic behavior standard even when  the Division A, B, C or SHU-able offense charged was the controlling factor warranting completion of a mental health assessment.

G.    SHOs considered mental health assessments on a perfunctory basis; many did not  explain how the assessments were considered and believed inmates had to be held  accountable for their actions, notwithstanding their mental health status at the time of the offense.

**INTRODUCTION**

On September 5, 2014, the Coleman monitoring team reviewed the RVR process at California Training Facility (CTF).  At the time of the visit, CTF housed Level I and II inmates, including 3CMS LOC inmates.  As of March 2014, CTF had a total inmate population of 4,954.  Of that population, 1,120 or 23 percent were caseload inmates.

During the site visit, the team met with the warden, chief of mental health and SHOs and mental health clinicians responsible for preparing mental health assessments.

The team reviewed policies and procedures related to the RVR process, headquarters-provided training materials, and local training materials provided by CTF to staff.  The team also reviewed RVR audits completed by the institution.  For uniformity purposes throughout all CDCR institutions, the monitors used the CTF Institution Register and CDCR 1154 logs to gather RVR data which was required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections."

The review period covered RVRs issued and/or heard during January, February, and March 2014.  During this period there were a total of 254 RVRs, with 54 or 21 percent issued to caseload inmates.  The monitors also reviewed ICC actions for several inmates for whom SHU

terms were recommended.  Since CTF's mental health population was solely comprised of 3CMS inmates, the number of mental health assessments at the institution was expected to be lower than at institutions that housed inmates at higher levels of care where RVR mental health assessments were mandatory.

**TRAINING**

CTF was unable to produce proof of practice memoranda as required by the October 26, 2011 and November 3, 2011 memoranda.  Staff indicated that a computer changeover resulted in loss of the documents.

IST produced an attendance report of required training sessions for each job classification identified in the October 26 and November 3, 2011 memoranda, indicating training sessions ranging from 0.15 of an hour to four hours. CTF only demonstrated compliance for the required one-hour training for the CDOs, sergeants, and lieutenants.  Eighty-six percent of captains and 75 percent of psychiatrists, 50 percent of psychologists, and 13 percent of social workers, also attended the one-hour training.  Records indicated zero-percent compliance for attendance by custody and clinical staff at the October 26, 2011 four-hour training.

CTF RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 4 | 0/0% | 4/100% |
| Captains | 7 | 0/0% | 6/86% |
| Lieutenants | 31 | 0/0% | 30/97% |
| Sergeants | 72 | 0/0% | 68/94% |
| Psychiatrists | 4 | 0/0% | 3/75% |
| Psychologists | 14 | 0/0% | 7/50% |
| Social Workers | 8 | 0/0% | 1/13% |

**STAFF INTERVIEWS**

**SHOs**

The lieutenants reported that mental health staff completed assessments in a timely manner and returned them to custody within four to five days.  They indicated that clinical staff wrote legibly and used understandable language.  However, SHOs expressed concern that inmates manipulated clinical staff in an attempt to mitigate penalties; SHOs believed that the longer narratives on the assessments indicated inmate manipulation.  SHOs considered the assessments during the hearings, but based on the totality of the circumstances, still held inmates accountable.

**Clinicians**

Clinicians timely received mental health assessment forms in their mailboxes and OTs' ducated inmates for confidential interviews. Clinical assessment preparation included eUHR and medication compliance review, and conferring with the PC. They estimated that it took from one to two hours to complete an assessment and could not recall an instance when SHOs sought clarification of the assessment. Clinicians indicated difficulty answering question number two, but did not elaborate. They were also conflicted when answering question number three; they understood that custody had to maintain security and were not concerned with guilty findings even in those instances when question number two was affirmatively answered. Clinicians stated it would be beneficial if they were aware of potential penalties that could be assessed against inmates as they would be better equipped to recommend against specific penalties.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

Review of RVRs which required mental health assessments indicated that assessments were processed and completed within established timeframes. However, in the case of CTF Inmate K, the RVR package did not contain the assessment. The majority of assessments also revealed a negative answer to all three questions. However, when clinicians provided answers to questions number two and three they were often unresponsive and of little use to SHOs.

In response to question number three, the clinician for CTF Inmate E wrote that the inmate would react negatively with no medications currently prescribed and that his mother would have nothing to do with him after this; this answer did not provide any information for the SHO to consider during penalty assessment. The answer to question number three for Inmate G stated that he would benefit from more focused treatment to increase coping skills and reduce impulsiveness, but this was a treatment plan issue that the SHO could not address. In two other responses to question number three, one clinician merely referred to CTF Inmate M's ongoing 3CMS treatment, while the response for CTF Inmate N indicated that he suffered from moderate depression and severe chronic Low Blood Pressure (LBP).

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

Reviewed RVR packages, including those for CTF Inmates A, B, C, D, F, G, and J, generally showed SHOs' perfunctory consideration of mental health assessments, but did not demonstrate consideration of clinical opinions. In multiple cases, the SHO did not address mitigation; there were a few cases, however, such as CTF Inmate I, where the SHO mitigated the penalty based on the mental health assessment. Most SHOs' decisions, including those for CTF Inmates B, C, D, E, F, H, I, L, N, and O, included language as to inmates' not exhibiting bizarre, unusual, or uncharacteristic behavior even though the charged offense required completion of an assessment; this language was not the correct standard and was unnecessary.

## ICC REVIEW

Three cases referred to the ICC were reviewed.  CTF Inmate H was assessed an aggravated SHU term based on past violations, while the cases of CTF Inmates I and L resulted in their receiving mitigated SHU terms.  However, this was an insufficient sample size to determine the efficacy of mental health input in the ICC RVR review process.

### CTF RVR Case Reviews

**Inmate A**
Date of Violation: 1/30/14
Date of Mental Health Assessment:  2/15/14
Date of Disposition:  3/4/14
Charge:  Resisting a Peace Officer in the Performance of Duty Resulting in Use of Force - Division D Offense

On 1/30/14, this 3CMS inmate was ordered to submit to an unclothed body search during a cell search.  He repeatedly refused to comply with the officer's instructions and had to be restrained.  While restrained, he pulled a cell phone from his waistband and dropped it on the ground in an attempt to smash it.  A mental health assessment was completed on 2/18/14; questions number two and three were answered in the negative.

On 3/4/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found him guilty.  The inmate was assessed 61 days forfeiture of credit.  The penalties assessed were not included within the "Disposition," but were contained on the RVR's front page.

**Impression**: The SHO considered the mental health assessment, but did not indicate how it was considered or whether there was mitigation.  The inmate was assessed credit loss.

**Inmate B**
Date of Violation: 2/24/14
Date of Mental Health Assessment:  2/27/14
Date of Disposition:  3/11/14
Charge:  Assault on a Peace Officer Resulting in Use of Force - Division B Offense

On 2/24/14, while this 3CMS inmate was in the dining hall, he made a statement to the officers indicating that they had a problem.  When the officer asked him whether there was a problem, the inmate took an aggressive step toward him while clenching his fists.  The officer then placed his hands on the inmate's chest, pushed him back, and ordered him to get down, to which the inmate complied.  On 2/27/14, a mental health assessment was completed; questions number two and three were answered in the negative.  On 3/11/14, the inmate appeared for a hearing before the SHO.

In his written decision, the SHO stated that although the inmate did not exhibit behavior that was bizarre, unusual, or uncharacteristic at the time of the RVR, a mental health assessment was completed due to recent departmental policy.  It is unclear what the officer meant by this

201

statement. The SHO considered the mental health assessment and found the inmate guilty of the lesser charge of conduct conducive to violence, which was a Division F offense. The inmate was assessed 30 days forfeiture of credit and was put on Privilege Group C for 60 days. This restricted his monthly canteen draw, access to recreational and entertainment activities, and access to yard and family visitation; he was also disallowed personal property packages and telephone calls.

**Impression**: The SHO indicated consideration of the mental health assessment, but did not indicate how it was considered or whether there was mitigation. The inmate was assessed credit and privilege losses. The SHO referenced bizarre, unusual, or uncharacteristic behavior, which was inapplicable to this case.

---

**Inmate C**
Date of Violation: 2/26/14
Date of Mental Health Assessment: 3/5/14
Date of Disposition: 3/10/14
Charge: Possession of a Controlled Substance (Methamphetamine) - Division B Offense

On 2/26/14, unit staff received confidential information that this 3CMS inmate possessed methamphetamine. A mental health assessment was completed on 3/5/14; questions number one, two, and three were all answered in the affirmative. In the answer to question number two, the clinician stated that the inmate self-reported that he had not been sleeping for about a month. He had PTSD, which was triggered by fear of conflict between black and Hispanic inmates in his building; otherwise, he was stable. In response to question number three, the clinician stated that the inmate had been working towards his GED, which was an important goal for him, and that he was an active participant in the 3CMS program.

On 3/10/14, the inmate appeared for a hearing before the SHO. Although he was charged with a Division B offense, the SHO indicated that he did not exhibit bizarre, unusual, or uncharacteristic behavior. This language was unnecessary. The SHO considered the mental health assessment and found the inmate guilty. He was assessed 121 days forfeiture of credit and was made Privilege Group C for 30 days, which allowed him one fourth of a monthly canteen draw. The inmate would not have access to recreational or entertainment activities and his yard access was limited to C Privilege. He would also be ineligible for family visits, personal property packages and telephone calls, and could not possess entertainment appliances or musical instruments. He was referred to the ICC for Narcotics Anonymous. The decision further stated that he would be subject to random drug testing once monthly for 12 months and would have no visiting status for 90 days followed by no contact visiting for an additional 90 days. In response to the clinician's recommendation regarding penalty mitigation, the SHO acknowledged that the inmate should be afforded all necessary study material in keeping with the limitations of the ASU; this enabled him to continue studying for his GED.

**Impression**: There was no mitigation in this case. The SHO noted consideration of the mental health assessment, but did not indicate how it was considered or whether there was mitigation. The inmate was assessed significant credit loss and also assessed substantial privilege losses.

The SHO referenced bizarre, unusual, or uncharacteristic behavior, but this was not the applicable standard for this case.

**Inmate D**
Date of Violation:  2/21/14
Date of Mental Health Assessment:  3/5/14
Date of Disposition:  3/10/14
Charge:  Possession of a Controlled Substance (Methamphetamine) - Division B Offense

On 2/26/14, unit staff received confidential information that this 3CMS inmate possessed methamphetamine.  A mental health assessment was completed on 3/5/14, with questions number one, two, and three all answered in the negative.  On 3/10/14, the inmate appeared for a hearing before the SHO.  Although he was charged with a Division B offense, the SHO reported that he did not exhibit behavior that was bizarre, unusual, or uncharacteristic.  This language was unnecessary.

The SHO considered the mental health assessment and found the inmate guilty.  He was assessed 121 days forfeiture of credit and was made Privilege Group C for 30 days, which allowed the inmate one fourth of a monthly canteen draw.  In addition, he would not have access to recreational or entertainment activities and his yard access was limited to C Privilege.  He would also have no family visits, personal property packages, or telephone calls, and could not possess entertainment appliances or musical instruments.  The inmate was referred to the ICC for Narcotics Anonymous.  The decision further stated that he would be subject to random drug testing once monthly for 12 months and would have no visiting status for 90 days followed by no contact visiting for an additional 90 days.

**Impression**:  There was no mitigation in this case.  The SHO noted that consideration was given to the mental health assessment, but did not indicate how it was considered.  The inmate was assessed significant credit loss and also assessed substantial privilege losses.  The SHO referenced the bizarre, unusual, or uncharacteristic behavior standard, which was inapplicable to this case.

**Inmate E**
Date of Violation:  2/26/14
Date of Mental Health Assessment:  3/5/14
Date of Disposition:  3/9/14
Charge:  Possession of Drug Paraphernalia - Division C Offense

On 2/26/14, during lockup of inmates returning from yard, the officer discovered a bindle in the middle of the cell, which turned out to be inmate manufactured syringes.  A mental health assessment was completed on 3/5/14.  Questions number one and three were answered in the affirmative, but question number two was answered in the negative.  In response to question number one, the clinician reported that this 3CMS inmate stated he was innocent of the charges and that the syringes were planted.  The clinician also reported that the inmate felt distressed over the situation and might act out, but denied suicidal ideation intent or plan.

In response to question number three, the clinician stated that the inmate had a history of mood disorder and might react negatively as no medications were currently prescribed. The clinician also reported that the inmate felt his mother would no longer have anything to do with him after this incident. The answers to questions number one and three were unresponsive and did not provide the SHO with any information to consider during penalty assessment.

On 3/9/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and noted that the clinician's response merely stated that the inmate might react negatively as he currently was not prescribed medication. The SHO determined that the issues documented by the clinician were not relevant to the RVR hearing process; therefore, the information would not be considered at any stage of the disciplinary process. The inmate was found guilty and assessed 120 days forfeiture of credit and was put in Privilege Group C for a period of 90 days. He was also ordered to undergo random drug testing four times monthly for one year and was referred to the UCC for endorsement to a SAP.

**Impression**: There was no mitigation in this case. The SHO noted consideration of the mental health assessment, but found the clinician's responses irrelevant to the RVR process. The inmate was assessed significant credit loss and substantial privilege losses. It was observed that the SHO referenced the bizarre, unusual, or uncharacteristic behavior standard, which was inapplicable to this case.

## Inmate F
Date of Violation: 3/27/14
Date of Mental Health Assessment: 4/7/14
Date of Disposition: 5/9/14
Charge: Battery on an Inmate without Serious Bodily Injury - Division D Offense

On 3/27/14, staff received information from a confidential source that this 3CMS inmate had committed battery on another inmate. A mental health assessment was completed on 4/7/14, with questions number two and three answered in the negative.

On 5/9/14, the inmate appeared before the SHO for a hearing. In considering the mental health assessment, the SHO stated that he did not exhibit behavior that was bizarre, unusual, or uncharacteristic at the time of the RVR. This language was unnecessary as the offense potentially carried a SHU term. The SHO considered the mental health assessment and found the inmate guilty. He was assessed 90 days forfeiture of credit and was put on Privilege Group C for 90 days. The inmate was also referred to the ICC for programming housing review.

**Impression**: There was no mitigation in this case. The SHO indicated consideration of the mental health assessment, but did not indicate how it was considered or whether there was mitigation. The inmate was assessed significant credit loss and substantial privilege losses.

**Inmate G**
Date of Violation: 1/7/14
Date of Mental Health Assessment: 1/17/14
Date of Disposition: 1/24/14
Charge: Battery on an Inmate without Serious Bodily Injury - Division D Offense

On 1/7/14, this 3CMS inmate was observed in his cell fighting with his cellmate. A mental health assessment was completed on 1/17/14, with questions number two and three answered in the affirmative. In response to question number two, the clinician wrote that the patient declined the interview but that collateral data documentation chronicled paranoia, poor impulse control, and brain injury. In response to question number three, the clinician stated that the inmate would benefit from focused treatment to increase coping skills and reduce impulsiveness. The clinician's response to question number three did not address the question as it stated that focused treatment would increase the inmate's coping skills; this was strictly a clinical issue and had nothing to do with the custodial side.

On 1/24/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and stated that he took the clinician's opinion into account in only assessing 90 days forfeiture of credit. However, because the penalty range for a Division D offense was from a minimum of 61 days to a maximum of 90 days, no mitigation occurred. The inmate was also referred to the ICC for possible SHU term assessment.

**Impression**: There was no mitigation in this case. The SHO noted consideration of the mental health assessment, but did not indicate how the assessment was considered. Although the SHO stated taking the mental health assessment into account during penalty assessment, the SHO assessed the maximum penalty applicable to the offense.

**Inmate H**
Date of Violation: 2/20/14
Date of Mental Health Assessment: 2/20/14
Date of Disposition: 4/22/14
Charge: Battery on an Inmate with a Weapon - Division A-1 Offense

On 1/20/14, this 3CMS inmate was placed in administrative segregation for battery on an inmate with a weapon, namely, his cane. On 1/21/14, he admitted hitting the other inmate with his cane, but stated it was done in self-defense. A mental health assessment was completed on 2/20/14, with questions number two and three answered in the negative. On 4/22/14, the inmate appeared for a hearing before the SHO. In his decision, the SHO stated that the inmate did not exhibit bizarre, unusual, or uncharacteristic behavior at the time of the RVR. As this was an A-1 offense, such language was unnecessary. The SHO considered the mental health assessment and found the inmate guilty. He was assessed 181 days forfeiture of credit, which was the low end of the penalty, and was referred to the ICC for program review and a possible SHU term. Although the SHO assessed forfeiture of credit at the low end, the SHO did not mention whether he mitigated the penalty in any way.

The ICC met on 5/15/14 as part of this inmate's annual review and to specifically address this RVR.  The mental health assessment was reviewed during committee; it was determined that there were no mental health factors referred for consideration and disposition of the offense.  The ICC elected to assess and impose an 18-month aggravated SHU term.  The term was aggravated three months due to a prior act of the same or a similar nature that occurred in November 2013.

**Impression**:  The SHO noted consideration of the mental health assessment, but did not indicate how the assessment was considered.  The inmate was assessed at the low end of the penalty, but the SHO did not indicate whether the penalty was mitigated.  The SHO also referenced the bizarre, unusual, or uncharacteristic standard, which was not applicable to this case.

### Inmate I
Date of Violation:  3/27/14
Date of Mental Health Assessment:  4/2/14
Date of Disposition:  4/9/14
Charge:  Battery on an Inmate with No Serious Injury - Division D Offense

On 3/27/14, while returning from yard, this 3CMS inmate attacked his cellmate because he was tired of his cellmate trying to control the cell.  The first page of the RVR indicated that he was not a mental health participant at any LOC.  However, the mental health assessment and the SHO's decision stated he was at the 3CMS LOC. The first page of the RVR also stated that the inmate did not exhibit bizarre, unusual, or uncharacteristic behavior at the time of the RVR; since this was a SHU-able offense, this language was unnecessary and not the correct standard.

A mental health assessment was completed on 4/2/14; questions number two and three were answered in the affirmative.  In response to question number two, the clinician reported that the inmate had a close relative who had recently passed away and the inmate was on his last nerve.  The clinician further stated that if this was true this would be an apparent contributing factor.  In response to question number three, the clinician stated that if the inmate was found guilty to please consider not removing yard access as this would likely exacerbate his pre-existing mental health factors.  On 4/9/14, the inmate appeared for a hearing before the SHO, who considered the mental health assessment, but found the inmate guilty.  However, in his decision the SHO considered the clinician's recommendation and assessed the minimum penalty for a Division D offense, which was 61 days forfeiture of credit.  The inmate was also referred to the ICC for program review and possible SHU term assessment.

The ICC met on 5/8/14 to review the inmate's case.  The ICC noted that his mental disorder appeared to contribute to his behavior during the misconduct and that mental health factors were considered in the disposition of the offense.  The ICC assessed a two-month mitigated SHU term due to the inmate's lack of a disciplinary history.

**Impression**:  There was mitigation in this case.  The SHO noted consideration of the mental health assessment, articulated how the assessment was considered, and stated the mitigation in assessing the minimum credit loss penalty.  However, the SHO also referenced the bizarre, unusual, or uncharacteristic behavior standard, which was inapplicable to this case.

**Inmate J**
Date of Violation:  1/23/14
Date of Mental Health Assessment:  2/11/14
Date of Disposition:  2/21/14
Charge:  IDX - Division D Offense

On 1/23/14, while this 3CMS inmate was in the OHU on suicide watch, he removed the blanket that covered his body, fully exposing his genital area, and began to masturbate while looking directly in the eyes of a nurse.  A mental health assessment was completed on 2/11/14, with questions number two and three answered in the negative.

On 2/21/14, he appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  It was noted that the time constraints for this RVR were suspended due to the inmate being housed in the MHCB at CHCF for further observation.  The inmate was assessed 90 days forfeiture of credit.

**Impression**:  The SHO noted consideration of the mental health assessment, but did not articulate how the assessment was considered.  The inmate was assessed significant credit loss.

**Inmate K**
Date of Violation:  3/12/14
Date of Mental Health Assessment:  Not provided for review
Date of Disposition:  3/28/14
Charge:  Possession of a Controlled Substance - Division B Offense

On 2/18/14, confidential information was received that this 3CMS inmate was in possession of heroin and methamphetamine.  On 3/12/14, a memorandum was received ordering reissuance of the RVR since the inmate was on the mental health caseload and had been charged with a Division B offense, but a mental health assessment had not been completed.  Although the decision indicated completion of a mental health assessment, it was not attached to the RVR package.  The SHO nonetheless referred to the mental health assessment and stated there were mental health factors that would cause the inmate to experience difficulty understanding the disciplinary process.  However, this was the only mention of the mental health assessment; there was no reference to questions number two and three and it was therefore impossible to determine whether mitigation occurred.  The inmate was found guilty and assessed 130 days forfeiture of credit and placed on Privilege Group C status.

**Impression**:  There was no mental health assessment in the package.  The SHO noted consideration of the mental health assessment, but did not indicate how the assessment was considered.  The inmate was assessed significant credit loss and assigned to a lower privilege group.

**Inmate L**
Date of Violation:  3/3/14
Date of Mental Health Assessment:  4/9/14
Date of Disposition:  4/10/14
Charge:  Battery on Staff (Gassing) - Division B Offense

On 3/3/14, while escorting another individual to his cell, this 3CMS inmate threw a small paper cup containing an unknown liquid at an officer.  On 4/9/14, a mental health assessment was completed with questions number two and three answered in the negative.  However, the clinician answered "yes" to question number one and stated that since the inmate had no TABE score and was a 3CMS inmate, a staff assistant should be provided to ensure that his interests were represented.

On 4/10/14, the inmate appeared for a hearing before the SHO.  Although this was a Division B offense and a mental health assessment was required, the SHO stated that the inmate did not exhibit behavior that was bizarre, unusual, or uncharacteristic at the time of the RVR.  The SHO also mentioned the mental health assessment and found the inmate guilty. The inmate was assessed 150 days forfeiture of credit, which was the maximum amount.

The ICC met on 5/8/14.  The ICC referenced the mental health assessment, considered the clinician's input, and decided to assess and impose an 11-month mitigated SHU term.  The SHU term was mitigated one month due to there being no prior acts of the same or similar nature by the inmate.

**Impression**:  There was no mitigation in this case.  The SHO referenced the mental health assessment, but did not articulate how the assessment was considered.  The inmate was assessed significant credit loss.  The SHO referenced the bizarre, unusual, or uncharacteristic behavior standard, which was inapplicable to the case.

**Inmate M**
Date of Violation:  3/2/14
Date of Mental Health Assessment:  3/14/14
Date of Disposition:  4/23/14
Charge:  Battery on an a Peace Officer - Division B Offense

On 3/2/14, while explaining to an officer how another officer tried to assault him, this 3CMS inmate became very agitated and bumped his chest into the chest of one of the COs.  The RVR stated that the inmate was at the 3CMS LOC and exhibited behavior that was bizarre, unusual, or uncharacteristic at the time of the RVR, even though this was a Division B offense.  The mental health assessment was completed on 3/14/14, with questions number one, two, and three answered in the affirmative.  The clinician responded to question number one in the affirmative, and indicated that the inmate had a TABE score of zero and needed help understanding the process clearly.

In response to question number two, the clinician wrote that the inmate was chronically paranoid and had chronic symptoms that contributed to a feeling that others were out to get him and might

harm him physically.  In response to question number three, the clinician simply reported the inmate's ongoing 3CMS treatment.  The clinician's answer to question number three provided no helpful assistance to the SHO.  The only reference made by the SHO to the mental health assessment was the clinician's statement that the inmate would need a staff assistant for the hearing.  There was no other reference to the mental health assessment even though the SHO indicated in his decision that the inmate exhibited bizarre, unusual, or uncharacteristic behavior at the time of the RVR.  The SHO completely ignored the mental health assessment and found the inmate guilty.  The inmate was assessed 150 days forfeiture of credit, which was the maximum amount allowed.

**Impression**:  There was no mitigation in this case and the inmate was assessed significant credit loss.  Both the RVR and the SHO referenced bizarre, unusual, or uncharacteristic behavior, which was inapplicable to this case.  The mental health assessment did not appear to be helpful to the SHO.  The SHO did not address consideration given to the mental health assessment, and if and how the assessment was considered.

### Inmate N
Date of Violation:  2/21/14
Date of Mental Health Assessment:  3/5/14
Date of Disposition:  3/12/14
Charge:  Possession of a Controlled Substance (Morphine) - Division B Offense

On 2/21/14, during DOT medication pass, this 3CMS inmate was observed concealing morphine tablets.  The front page of the RVR stated that he did not exhibit behavior that was bizarre, unusual, or uncharacteristic at the time of the RVR.  However, this was a Division B offense and this standard did not apply.  A mental health assessment was completed on 3/5/14 with question number two answered in the negative and question number three answered in the affirmative.  In response to question number three, the clinician stated that the inmate suffered from moderate depression and severe chronic LBP; besides not being responsive to question number three, the clinician used an acronym which was not readily understood.

On 3/12/14, the inmate appeared for a hearing before the SHO.  The SHO stated that the inmate did not exhibit bizarre, unusual, or uncharacteristic behavior at the time of the RVR.  However, the only reference to the mental health assessment was that it did not indicate that the inmate's mental disorders appeared to contribute to his behavior.  The inmate was found guilty and assessed 130 days forfeiture of credit and was ordered to undergo mandatory random drug testing once monthly for a period of 12 months.  The inmate was also ordered to attend NA or a substance abuse education program, if available at the institution.

**Impression**:  There was no mitigation in this case.  The inmate was assessed significant credit loss.  The SHO referenced the mental health assessment.  Both the RVR and the SHO referenced bizarre, unusual, or uncharacteristic behavior, which was not the applicable standard in the case.  The mental health assessment used an acronym that did not appear to be helpful to the SHO.

**Inmate O**
Date of Violation:  3/7/14
Date of Mental Health Assessment:  3/13/14
Date of Disposition:  3/25/14
Charge:  Battery on a Peace Officer without a Weapon - Division B Offense

On 1/20/14, the inmate was ordered to take the coverings off of his cell window so that the inside of his cell could be seen.  When the inmate refused, an officer entered the cell and took the coverings down.  The inmate grabbed two envelopes and threw them at the officer, striking him in the left leg.  A mental health assessment was completed on 3/13/14 with questions number two and three answered in the negative.

On 3/25/14, the inmate appeared before the SHO for the hearing.  In his decision, the SHO indicated that the inmate did not exhibit bizarre, unusual, or uncharacteristic behavior at the time of the RVR.  The SHO also stated that based on the mental health assessment, the inmate did not have a mental disorder that would contribute to the behavior that led to the RVR.  The inmate was found guilty and assessed 150 days forfeiture of credit.

**Impression**:  There was no mitigation in this case.  The inmate was assessed significant credit loss.  The SHO indicated that based on the mental health assessment, the inmate did not have a mental disorder that contributed to the behavior that led to the RVR.  The SHO also referenced bizarre, unusual, or uncharacteristic behavior, which was not this case's applicable standard.

## California Men's Colony (CMC) Review

## SUMMARY OF FINDINGS

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CMC by completing and sustaining all requirements.

B.  CMC was not compliant with required training of custody and mental health staff related to the RVR process.

C.  Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D.  Clinical and custody staff reported good working relationships.

E.  Mental health assessments were appropriately requested.

F.  Mental health assessments were completed timely.

G.  Clinicians rarely provided information regarding mental health factors to consider for mitigation even when they answered "yes" to question number three of the assessment form.

H. Generally, SHOs noted that mental health assessments were considered and reviewed, in a pro forma manner, rarely documenting how it was considered.

I. More than one RVR was issued to individual inmates during documented episodes of psychosis while receiving mental health care level of treatment; one with a pending acute care referral.

J. One SHO inappropriately utilized inmate's mental health status at the time of the hearing as opposed to the time of the incident.

K. An RVR was written for an inmate fashioning a noose to attempt suicide as per the mental health assessment in the MHCB.

L. Maximum credit forfeitures were frequently assessed even after stated consideration of the positive mental health assessment.

M. Additional points to placement scores were added, and increased custody level.

N. ICC did not usually demonstrate consideration of mental health input.

O. Multiple errors were noted in the CDC 1154 log.

P. There were no quality reviews of consideration of the mental health assessments by SHOs conducted at CMC.

Q. An inmate clerk maintained the Institution Registry of RVRs under the supervision of a staff member.


**INTRODUCTION**

On August 18-19, 2014, the Coleman monitoring team reviewed the RVR process at CMC. CMC is designated to house inmates at the custody levels I, II, and III and inmates requiring 3CMS, EOP and MHCB levels of care. The institution has a 50-bed MHCB and a 37-bed General Acute Care Hospital (GACH). As of March 2014, CMC had a total inmate population of 4,482. Of the total population, 1395 or 31 percent of inmates were on the mental health caseload.

The monitoring team reviewed RVRs for January, February and March of 2014. During this period there were a total of 730 RVRs written with 281 of the RVRs, or 38 percent issued to inmates with a mental health designation. The monitoring team reviewed policies and procedures related to the RVR process, as well as any related training materials. The monitors utilized the CMC Institution Register and CDCR 1154 logs to gather RVR data, which are required to be maintained under Title 15 of the CDCR.

There was no quality review of consideration of the mental health assessment by SHOs in the RVR process at CMC. Additionally, there was no quality review of the mental health assessments at the institution.

**TRAINING**

CMC was able to produce two proof of practice memorandum, one dated December 27, 2011 and one dated January 27, 2012, which were in response to the October 26 and the November 3, 2011 requirements. IST was asked to produce a report of who attended the required training sessions for each job classification. The IST reports indicated training ranged from .25 of an hour to four hours. The report identified multiple dates in which training was provided.

CMC was not able to demonstrate compliance with the required one-hour training for designated staff members. The one-hour training was received by 80 percent of CDOs, 100 percent of captains, 97 percent of lieutenants, 88 percent of sergeants, 100 percent of psychiatrists, 88 percent of psychologists and 66 percent of LCSWs. The CC II appeals coordinator did not receive the training. CMC was also unable to demonstrate compliance with the required four-hour training for designated staff members. The training was received by 14 percent of captains, 13 percent of lieutenants, two percent of sergeants and. 13 percent of psychologists. None of the CDOs, LCSWs, the psychiatrist, or the CC II received the training.

CMC RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 5 | 0/0% | 4/80% |
| Captains | 7 | 1/14% | 7/100% |
| Lieutenants | 32 | 4/13% | 31/97% |
| Sergeants | 89 | 2/2% | 78/88% |
| Psychiatrists | 1 | 0/0% | 1/100% |
| Psychologists | 8 | 1/13% | 7/88% |
| Licensed Clinical Social Workers | 3 | 0/0% | 2/66% |
| CC-II Appeals | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

Five SHOs were interviewed in a group setting. They were very experienced SHOs, some of them having been lieutenants for more than ten years. The SHOs indicated that the

mental health assessment process worked well and that established timeframes were generally met.

The SHOs indicated that they did not have any difficulty understanding clinicians' responses on the form as they were written in layman terms. The SHOs also indicated that many of the mental health assessments were answered in the negative, with no additional input offered for consideration. The SHOs stated that there was a good working relationship between custody and mental health staff, in particular on Facility D, where the majority of the EOP inmates were housed.

The SHOs considered the input on the mental health assessment form as well as the totality of the situation on a case-by-case basis. The SHOs stated that at times they knew the inmate better than the clinician who completed the mental health assessment and would make a judgment that the inmate was not truthful with the clinician. The SHOs indicated the mitigation of any penalties as a result of the mental health assessment occurred when the clinician indicated what penalty should be avoided due to the inmate's mental health condition.

**Clinicians**

The monitors met with the three clinicians who completed the majority of mental health assessments at CMC. The clinicians reported no problems with timely delivery of the assessment requests. To complete a mental health assessment, the clinicians reviewed the eUHR and ERMS, spoke to the inmate's treating clinician, and met with the inmate out of cell, unless there was a lockdown or refusal. The clinician who covered administrative segregation noted large numbers of refusals to meet out of cell, consequently, he met with them at cell front.

The clinicians reported an excellent working relationship and good communication with custody staff in the MHCB unit. Further, the clinicians reported that while the ICC did not always agree with and act on their recommendations, the committee did take their assessments into consideration.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Mental health assessments at CMC were completed by three clinicians. Generally, the review showed that mental health assessments were completed timely; however, they often lacked useful/helpful information in response to both questions number two and three. Further, one case revealed an instance where the clinician noted the inmate's mental health condition at the time of the interview, as opposed to the time of the incident, reporting, "i/p's thinking and judgment were impaired during my interview with him." (*See* CMC Inmate E.)

Most problematic was the response, or lack thereof, to question number three regarding whether there were any mental health factors to consider when assessing the penalty if found guilty of the charge. It was not unusual to find cases wherein the clinician noted that the inmate's mental disorder appeared to contribute to the behavior that led to the RVR and that there were mental health factors to consider when assessing the penalty; however, failed to explain the specific factors. In fact, the monitors reviewed mental health assessments where the

clinician checked "yes" to question number three but left the explanation section blank. (*See* CMC Inmates B, E.). Additionally, the monitors reviewed mental health assessments where the clinician noted that the inmate's mental health appeared to impact the behavior; however, indicated that there were no mental health factors to consider in assessing the penalty. (*See* CMC Inmates F, G.).

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

The reviewed RVR packages revealed that overall, the SHO consistently noted that the mental health assessment was reviewed and taken into consideration. However, the SHO most often utilized pro forma language noting consideration, and offered no explanation of how the assessment was actually considered as required by policy. For example, many RVRs noted consideration of the mental health assessment, as well as stating mitigation; however, the inmates were assessed the maximum credit forfeiture allowed for the division of the offense. (*See* CMC Inmates A, B, K, L, N.)

Of notable concern from the reviewed RVRs were two cases where inmates receiving MHCB LOC received two RVRs in one day even when the mental health assessment noted both inmates were "very psychotic" and "psychotic, manic and unmedicated." (*See* CMC Inmates A, B, K, L.) In all of those cases, the clinician clearly documented that the inmates' mental disorder contributed to the behavior that led to the RVRs; however, both inmates were found guilty of all charges and assessed the maximum forfeiture of credits for each charge totaling 150 days and 210 days. One of the RVRs issued to an MHCB inmate was for Obstructing a Peace Officer – Cell Extraction, as the inmate refused his medication. The RVR noted that during the night, the inmate was acting "strangely". By 0800, the inmate had flooded his cell and there was urine and feces on his cell floor. He was repeatedly yelling about Anthrax and the psychiatrist stated that he was going to make him "Keyhea". (*See* CMC Inmate A.) Once the inmate was removed from his cell, custody staff conducted a cell search and found a small hole in his mattress precipitating the second RVR for destruction of state property. (*See* CMC Inmate B.)

The monitors' review also revealed an RVR inappropriately issued for an apparent attempted suicide by an inmate receiving MHCB LOC. (*See* CMC Inmate G.) The inmate received an RVR for destruction of state property; however, the reporting employee noted that the officer discovered a strong blanket hanging from the inside of the cell door. The corresponding mental health assessment noted that the inmate was depressed and tore his blanket to make a noose to hang himself. The inmate was found guilty and assessed credit forfeiture.

Another case revealed application of the wrong standard by the SHO when considering the mental health assessment. While the SHO noted consideration of the mental health assessment, and the clinician's opinion that the inmate's mental illness contributed to the behavior that led to the RVR, the SHO utilized the inmate's mental health status at the time of the hearing (not the incident) to make his determination. (*See* CMC Inmate K.)

Of particular concern was an RVR issued to an inmate receiving MHCB LOC for IDX with masturbation. The reporting employee noted that the inmate's windows were covered with

yellow paper due to previous IDX incidents. The officer noted that he peeled the top corner of the inmate's paper to observe the inmate during count and observed him lying on his mattress masturbating. The inmate did not stop when instructed to do so and was issued the RVR. The mental health assessment noted that the inmate was severely manic and psychotic with unusual behavior and poor impulse control. However, the inmate was found guilty and assessed 121 days credit forfeiture. (*See* CMC Inmate F.) Of noted concern is the total window covering for this inmate while housed in the MHCB.

One inmate's custody level increased due to two RVRs he received as a result of one episode while receiving MHCB LOC. This inmate increased from a Level III to a Level IV institution based on additional classification points due to a guilty finding in both cases. (*See* CMC Inmate A.) The review also revealed a case where a mental health assessment was not requested or completed for an inmate who received an RVR while receiving MHCB LOC. (*See* CMC Inmate D.)

There was one case reviewed which revealed true consideration and mitigation based on the mental health assessment. (*See*, CMC Inmate H.)

A review of CMCs 1154 RVR log indicated multiple errors regarding inmate's mental health status and whether or not a mental health assessment was required or completed. The log inaccurately reflected that there were ten cases for EOP LOC inmates for whom mental health assessments were not requested or completed. Similarly, there were two inmates identified as being on the mental health caseload who were not.

There was an identified reporting problem on one of the facilities where custody staff did not forward the original RVRs for filing in the Institutional Registry as required by Title 15. Further, there were problems with written notification when an RVR was either dismissed or voided on that same facility.

**ICC REVIEW**

Clinical input during ICC was noted on reviewed Form CDC 128Gs; however, utilization of the input varied. Some indicated that the mental health input was reviewed and considered without mention of how the information impacted the committee action, if at all.

**CMC RVR Case Reviews**

**<u>Inmate A</u>**
Date of Violation: 1/13/14
Date of Mental Health Assessment: Not provided for review
Date of Disposition: 2/15/14
Charge: Obstructing a Peace Officer – Cell Extraction – a Division D Offense

During shift change, staff reported that this MHCB inmate was acting "strangely" most of the night. When the sergeant approached his cell at approximately 0800, the inmate was naked and

crouched on his mattress on the floor. The inmate had flooded his cell and there was what was suspected to be feces and urine on the floor. When the sergeant attempted to engage him, the inmate repeatedly stated, "Anthrax can't kill me, I'll kill you before you can kill me, goodbye!" A psychiatrist was informed of the behavior at 0800 and attempted to speak to the inmate with negative results. The psychiatrist informed staff that the inmate had been refusing medications and that he was going to "make him Keyhea." Staff continued attempts to get the inmate to take his medication. The inmate continued to refuse and threatened staff. A cell extraction team was assembled and OC pepper spray was used. The inmate complied after the spray was administered and was removed from the cell. He was decontaminated by shower, his medication was administered via injection and he was placed in a safety cell.

The monitors were unable to determine whether inmate's mental health status was a factor which contributed to the incident, as CMC staff was unable to produce the mental health assessment for review.

The inmate was found guilty and assessed 90 days worktime credit loss. The SHO noted in the disposition that he had taken into consideration the "MHCB/EOP" LOC and the mental health assessment, which noted that the inmate's mental illness did contribute to the behavior leading to the RVR and that the SHO should consider the inmate's mental health factors when assessing the penalties. The SHO noted, "Based on the clinician's input, the SHO elects not to apply the maximum penalties allowed pursuant to CCR Section 3315 and as such, elects to mitigate the disposition."

**Impression**: While the SHO stated there was mitigation, the inmate received the maximum days of credit forfeiture. It was not apparent that the RVR should have been written at all. The inmate was extracted due to decompensation and the need for forced medication while in the MHCB, which indicated his mental health status impacted his behavior. The same inmate received another RVR on the same date due to a cell search where he was assessed additional penalties. (*See* CMC Inmate B.)

---

**Inmate B**
Date of Violation: 1/13/14
Date of Mental Health Assessment: 1/28/14
Date of Disposition: 2/15/14
Charge: Destruction of State Property – a Division E Offense

On the same date that this MHCB inmate received a separate RVR, (*See*, CMC Inmate A), while the inmate was out of his cell (most likely still in safety cell), custody staff conducted a search of his cell. An officer found a 'small hole in the side of the state issued mattress." The stated purpose of the search was to search for any weapons or contraband that may have been in the cell. No weapons or contraband was found.

A mental health assessment was completed on 1/28/14, with questions number two and three answered in the affirmative. The response to question number two stated, "i/p was very psychotic at the time of the incident, placed on court ordered meds related to these behaviors, mentally ill." The clinician did not provide an explanation for question number three.

216

The SHO documented that the mental health assessment had been completed and taken into consideration.  In the disposition, the SHO wrote, "The SHO has noted and taken into consideration the MHCB/EOP LOC and the mental health assessment submitted by clinical staff. Clinical staff have determined [inmate's] mental illness did contribute to the behavior which led to the RVR and if found guilty the SHO should consider [inmate's] mental health factors when assessing the penalty/disposition.  Based on the clinician's input, the SHO "elects not to apply the maximum penalties allowed pursuant to CCR Section 3315 and as such elects to mitigate the disposition and assess the following penalties."  The inmate was assessed 60 days worktime credit loss and $302.00 in replacement costs for the damaged state issue mattress.

**Impression**:  The mental health assessment was incomplete and unresponsive.  While the SHO indicated there was mitigation, this inmate again received a significant number of days forfeiture of credits.  It was observed that the clinician indicated that the inmate was psychotic and was being cell extracted to force medication via Keyhea.  He was previously issued an RVR for obstructing a peace officer, and then received this second charge while he was in the safety cell. The inmate eventually received 150 days total loss of worktime credit loss for these offenses.

**Inmate C**
Date of Violation:  2/21/14
Date of Mental Health Assessment:  3/11/14
Date of Disposition:  3/14/14
Charge:  Possession of another Inmate's Prescribed Medication – a Division F Offense

This MHCB inmate was discovered in possession of six and one half pills that were not prescribed to him.  A mental health assessment was completed on 3/11/14 with questions number one, two and three answered in the negative.

The inmate was found guilty and assessed 30 days credit forfeiture and referral to the ICC due to 14 previous serious RVRs since December 2013.  The SHO mentioned the mental health assessment in the RVR under the section "Mental Health Issues Considered".  The inmate received maximum credit forfeiture.

**Impression**:  There was no mitigation in this case.  The SHO referenced the mental health assessment, but did not indicate if and how it was considered, and did not speak to mitigation. The inmate was assessed the maximum credit forfeiture.

**Inmate D**
Date of Violation:  2/25/14
Date of Mental Health Assessment:  Not completed
Date of Disposition:  3/26/14
Charge:  Refuse Random UA – a Division F Offense

While housed in the MHCB, this inmate was unable to provide a urine sample for a "random UA", even after multiple attempts within the three hours.  At one point, the inmate drank "numerous cups of water," which ultimately caused him to vomit.  The inmate was discharged

217

back to CSP/Solano prior to the hearing of the RVR.  Although the inmate had been receiving MHCB LOC, the SHO at CSP/Solano noted that the inmate was receiving 3CMS LOC, and the circumstances of the RVR did not include evidence of bizarre, unusual or uncharacteristic behavior for the inmate, therefore a mental health assessment was not issued.  The inmate was found guilty and assessed all requisite penalties as a result of an RVR for refusing a UA.  On 4/9/14, the CDO dismissed the RVR stating, "circumstances and findings are not supported."

**Impression**:  A mental health assessment was not requested, although the inmate was in the MHCB at the time of the violation.  The SHO assessed all penalties applicable to the offense, but there was mitigation at the CDO level, by the dismissal of all charges.

**Inmate E**
Date of Violation:  2/6/14
Date of Mental Health Assessment:  2/19/14
Date of Disposition:  2/25/14
Charge:  Behavior which could lead to Violence – a Division F Offense

During school, this EOP inmate became agitated when the GED instructor began speaking to him about taking his GED class.  The inmate began mumbling and rocking back and forth, and he refused to comply with instructions to sit by the instructor's desk and left the classroom, causing a disturbance amongst the other class members on the way out.  The GED instructor sounded his alarm as the classroom became hostile and custody staff arrived.

A mental health assessment was completed on 2/19/14, with questions number two and three answered in the affirmative.  The response to question number two stated, "ip's thinking and judgment were impaired during my interview with him-these factors were likely present during behaviors which occurred during 115, mental health factors involved."  The clinician did not provide an explanation for question number three.

The inmate was found guilty.  The SHO noted in the disposition that the inmate's EOP LOC and the mental health assessment were taken into consideration.  The SHO further noted that based on the clinician's input, the SHO elected not to apply the maximum penalties allowed and instead mitigate the disposition.  The inmate was assessed 30 days worktime credit loss and was referred to ICC for program review.

**Impression**:  There was mitigation in this case.  The mental health assessment was not responsive to question number two.  The SHO noted the mental health assessment, reported it was considered, and elected to mitigate the penalty.  The inmate was assessed credit forfeiture.

**Inmate F**
Date of Violation:  2/28/14
Date of Mental Health Assessment:  3/11/14
Date of Disposition:  3/27/14
Charge:  IDX with Masturbation with Prior PC288 - a Division B Offense

While conducting count in the MHCB, a CO noted that this MHCB inmate had all of his windows covered with yellow paper.  The CO reported that he peeled the top left corner of the paper down just enough to make sure the inmate was safe and observed him lying on his mattress masturbating.  The inmate did not stop when instructed to do so.

A mental health assessment was completed on 3/11/14, with question number two answered in the affirmative and question number three answered in the negative.  The response to question number two stated that on the date of the incident, the inmate was viewed by mental health professionals to be severely manic and psychotic; unusual behavior and poor impulse control were associated with his mental illness.

The SHO noted the mental health assessment in the RVR and wrote the following, "SHO has noted and taken into consideration the EOP/MHCB LOC and the mental health assessment submitted by clinical staff.  Clinical Staff have determined [inmate's] mental illness did contribute to the behavior which led to the RVR.  Therefore, Mental Health mitigating factors will be considered."   The inmate was found guilty and assessed 121 days credit forfeiture and referred to ICC for program review and possible assessment of SHU term.

**Impression**:  While the SHO noted consideration of the mental health assessment when assessing the penalties, he did not indicate how it was considered.  The inmate received the lower end of credit forfeiture for a Division B offense, indicating a measure of mitigation.

**Inmate G**
Date of Violation:  3/4/14
Date of Mental Health Assessment:  3/11/14
Date of Disposition:  3/18/14
Charge:  Destruction of State Property – a Division E Offense

On 3/4/14 a CO was notified by a psych tech in the MHCB that this MHCB inmate was in the process of ripping his strong blanket.  In response to the CO's order, the inmate submitted to handcuffs and was removed from the cell.  The officer discovered one altered strong blanket, and another strong blanket (approximately two feet long) hanging from the inside of the cell door.

A mental health assessment was completed on 3/11/14, with question number two answered in the affirmative and question number three answered in the negative.  In the response to question number two, the clinician noted that the I/P stated he was depressed and tore the blanket to make a noose to hang himself.

On 3/18/14, the inmate appeared before the SHO for a hearing.  He entered a plea of guilty and stated that he made a noose and tried to hang himself.  The SHO noted review of the mental

219

health assessment. The inmate was found guilty, with the SHO noting in the findings that the inmate's statements were a self-admission of guilt. The inmate was assessed 31 days credit forfeiture and assessed temporary Privilege Group C for 90 days. A hold was also placed on his trust account in the amount of $43.35 as reimbursement for the strong blanket.

**Impression**: This case was in violation of the directive not to write RVRs for attempted suicide. Additionally, the clinician's responses effectually provided little assistance to the SHO. The inmate did receive the lower end of Division E offense credit forfeiture, suggesting some level of mitigation.

### Inmate H
Date of Violation: 3/16/14
Date of Mental Health Assessment: 3/18/14
Date of Disposition: 3/21/14
Charge: Behavior that Could Lead to Violence – a Division F Offense.

While walking by this MHCB inmate's cell, a psych tech observed the inmate standing at his cell door yelling obscenities. When the psych tech looked at the inmate, he pointed and yelled, "you better watch yourself [psych tech]! You better watch yourself!" The psych tech asked the inmate if he was threatening her, to which he replied, "You need to do a better job, I want an apology!" Prior to the interaction, the inmate testified that the psych tech placed his fungal cream in a cup on top of his pill.

A mental health assessment was completed on 3/18/14, with questions number two and three answered in the affirmative. The response to question number two stated that the IDTT determined that the inmate had a major mental illness and his poor impulse control was related to this mental illness, and his mental illness played a part in the infraction. The response to question number three stated that loss of yard and canteen would be detrimental to the inmate's mental health.

The mental health assessment was noted in the disposition and the SHO elected not to apply the maximum penalties allowed. The inmate was found guilty; however, the SHO reduced the charge to an administrative level offense based on the testimony of the inmate, the testimony of the psych tech and the accompanying reports. The SHO explained that any reasonable person would be upset by the placing of the pill in the cream and the request for an apology could or would be a reasonable request.

**Impression**: There was mitigation in this case noting that the SHO reduced the offense to an administrative level offense.

### Inmate I
Date of Violation: 3/22/14
Date of Mental Health Assessment: 3/27/14
Date of Disposition: 4/21/14
Charge: Masturbation with Exposure – a Division D Offense

During 15 minute safety checks, while lying on his bunk, this MHCB inmate lifted his safety smock, exposed himself and began "manipulating [himself]". The psych tech ordered the inmate to stop and he refused. A mental health assessment was completed on 3/37/14, with questions number one, two and three answered in the negative

Although the offense took place at CMC, the hearing occurred at CIM. The SHO noted consideration of the mental health assessment, and although the assessment was negative for mental health impacting the behavior and factors to consider, the SHO stated that mental health was considered when assessing the penalty. The inmate was found guilty and assessed 90 days loss of behavioral/work credits, the maximum credit forfeiture for Division D offenses.

**Impression**: There was no mitigation in this case. The SHO did note the mental health assessment and reported it was considered, but did not state how it was considered. The inmate was assessed maximum penalties.

**Inmate J**
Date of Violation: 3/25/14
Date of Mental Health Assessment: 4/3/14
Date of Disposition: 4/29/14
Charge: Masturbation with Exposure – a Division D Offense

During suicide precaution rounds, this MHCB inmate was observed standing at his cell door with his cell lights off masturbating. When instructed by the psych tech to stop, the inmate did not. When an officer approached and ordered the inmate to stop, the inmate refused. A mental health assessment was completed on 4/3/14, with questions number one, two and three answered in the negative.

The SHO noted consideration of the mental health assessment. The inmate was found guilty, assessed 90 days credit forfeiture, 90 days loss of privileges and referred to ICC for a possible SHU term. The case was referred to the District Attorney for possible prosecution.

**Impression**: There was no mitigation in this case. The SHO did note the mental health assessment and reported it was considered, but did not explain how. The inmate was assessed maximum penalties.

**Inmate K**
Date of Violation: 3/27/14
Date of Mental Health Assessment: 4/8/14
Date of Disposition: 7/9/14
Charge: Aggravated Battery on a Peace Officer – a Division B Offense

While housed in the MHCB, this inmate was yelling and banging in his cell. A psych tech approached the cell and the inmate yelled "I want my…meds…" The inmate continued to yell at the psych tech who stated that he would get him his meds. As the psych tech turned to walk away, the inmate yelled that he would gas him. While walking away, the psych tech's smock was hit with a fluid and the inmate yelled, "I got you".

221

A mental health assessment was completed on 4/8/14, with questions number two and three answered in the affirmative. The response to question number two stated, "IP psychotic manic, unmedicated at the time of alleged incident." The response to question number three stated that extended C status was likely detrimental to the inmate's mental health.

The hearing did not occur until 7/9/14 due to the inmate requesting postponement pending the outcome of the referral to the District Attorney. The inmate was found guilty and assessed the maximum penalty of 150 days worktime credit loss, 90 days C-status and referral to ICC for a possible SHU term. The SHO noted consideration of the mental health assessment; however wrote in the disposition that, "Clinical staff have determined [inmate's] mental illness did contribute to the behavior which led to the RVR and if found guilty the SHO should consider [inmate's] mental health factors when assessing the penalty/disposition. However, at the time of the hearing [inmate] was receiving medication and stated he will react in the same manner as he did on the date of the offense. As such, the SHO assessed the disposition…"

**Impression**: There was no mitigation in this case. The SHO decided the disposition inappropriately based on the inmate's mental health status at the time of the hearing rather than at the time of the offense, and assessed the maximum credit forfeiture.

**Inmate L**
Date of Violation:  3/27/14
Date of Mental Health Assessment:  4/2/14
Date of Disposition:  5/2/14
Charge:  Destruction of Property – a Division E Offense

On 3/27/14, this MHCB inmate was discovered ripping his mattress cover while housed in the MHCB. The inmate was cuffed and removed from the cell. His mattress was removed and he was returned to the cell without a mattress. A mental health assessment was completed on 4/2/14, with questions number two and three answered in the affirmative. The response to question number two stated that the inmate was very psychotic at the time of the alleged incident. The response to question number three stated that loss of yard or extended C status would be detrimental to the inmate's mental health.

The SHO noted the mental health assessment in the RVR section "Mental Health Issues Considered". In the "Penalties Assessed" section, the SHO noted that mental health factors would be considered; however, the inmate was found guilty and assessed the maximum 60 days credit forfeiture, as well as 90 days loss of privileges.

**Impression**: There was no mitigation in this case. During the course of one day, the inmate received two RVRs in the MHCB. (*See also* CMC Inmate K.) The mental health assessments stated that the inmate was psychotic and off of his medication at the time of the incidents. While the SHO wrote that he considered the mental health assessment, he did not explain how it was considered. The inmate received maximum penalties for both infractions, accumulating 210 days credit forfeiture which cannot be restored.

222

**Inmate M**
Date of Violation:  1/10/14
Date of Mental Health Assessment:  1/16/14
Date of Disposition:  2/2/14
Charge:  Behavior Which Could Lead to Violence – a Division F Offense

On 1/10/14, this EOP inmate reported to CMC custody staff that he had enemy concerns over canteen debt he incurred on Facility D and feared for his safety.  An investigation concluded which confirmed the inmate's concerns and he was issued an RVR for involvement in conduct which could lead to violence.  A mental health assessment was completed on 1/16/14, with questions number one, two and three answered in the negative.

The inmate appeared before the SHO for a hearing on 2/2/14.  The SHO noted consideration of the mental health assessment and found the inmate guilty.  The inmate was assessed 30 days worktime credit loss, placed in privilege group C for 30 days and referred to ICC for transfer consideration.

**Impression**:  The SHO noted the mental health assessment and reported it was considered, but did not state how, and did not indicate if there was mitigation.  The inmate was assessed credit forfeiture and his privilege group was lowered.

**Inmate N**
Date of Violation:  1/13/14
Date of Mental Health Assessment:  1/28/14
Date of Disposition:  2/14/14
Charge:  Battery on an Inmate without Serious Injury – a Division D offense

After an investigation, it was determined that this EOP inmate hit another inmate in the head with his fist and left the scene.  A mental health assessment was completed on 1/28/14 with questions number two and three answered in the affirmative.  The response to question number two stated the inmate had a chronic mental disorder which resulted in disruptive, dysfunctional and aggressive behavior.  The response to question number three stated, "the IP's mental status is likely to decompensate in the isolative environment of ASU.  He should be released to yard or a higher LOC as soon as possible."

The inmate appeared before the SHO for a hearing on 2/14/14.  The SHO noted consideration of the mental health assessment, specifically in the disposition where he noted, "The SHO elects not to apply the maximum penalties allowed pursuant to CCR Section 3315 and as such elects to mitigate the disposition".  The inmate was found guilty and assessed 90 days worktime credit loss, placed in privilege group C, 40 hours extra duty and referred to ICC for a SHU term assessment and program review.

**Impression**:  There was a measure of mitigation in this case. The SHO noted the mental health assessment and reported it was considered, and specifically stated the mitigation.  The SHO did not take away yard, but assessed significant credit forfeiture, and lowered the inmate's privilege group.

**Inmate O**
Date of Violation:  1/15/14
Date of Mental Health Assessment:  1/30/14
Date of Disposition:  2/1/14
Charge:  Open Display of Disrespect & Contempt Disrupting Orderly - Administrative

On 1/15/14, upon being told by the CO to return to the triage nurse in Facility D to sign a treatment refusal form, this EOP inmate responded "no."  The CO again instructed the inmate to return and sign the form, and the inmate responded by shouting profanities at the officer.  The inmate declined to be interviewed for the mental health assessment and the clinician answered "no" to question numbers one, two and three.

On 2/1/14, the SHO found the inmate guilty.  The inmate was assessed temporary Privilege Group C placement for 30 days, confinement to quarters for ten days and 40 hours extra duty.  The SHO noted consideration of the mental health assessment and noted that no penalties were mitigated.

**Impression**:  There was no mitigation in this case.  The SHO did note the mental health assessment and reported it was considered, but did not indicate how.

### Wasco State Prison (WSP) RVR Review

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at WSP by completing and sustaining all requirements.

B.  WSP data indicated that training on the RVR process and the role of mental health assessments was deficient for clinical and custody staff.

C.  SHOs and mental health staff were aware of the policies and procedures regarding mental health input in the RVR process.

D.  SHOs typically indicated consideration of mental health assessments during RVR adjudication.

E.  In some reviewed cases, although the SHO dismissed the RVR, it was not known whether dismissal was due in whole or in part to mental health factors.

F.  Mental health assessments varied greatly; often they did not provide relevant or useful information for the SHO's consideration.

**INTRODUCTION**

On October 14-15, 2014, the Coleman monitoring team reviewed the RVR process at the WSP Reception Center (WSP). At the time of the site visit, WSP housed Level I, III, and reception center inmates, including those at the 3CMS LOC. As of March 2014, WSP had a total inmate population of 5,132. Of that population, 1,153 or 22 percent were on the mental health caseload.

During the site visit, the monitoring team met with the warden, CEO, CDOs, captains, mental health supervisors, three SHOs, and four mental health clinicians responsible for preparing mental health assessments.

The monitoring team reviewed policies and procedures related to the RVR process, headquarters-provided training materials, and local training materials provided by WSP to staff. The team also reviewed institutional RVR audits. For uniformity purposes throughout all CDCR institutions, the monitors utilized the WSP Institution Register and CDCR 1154 logs to gather RVR data which was required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections."

The review period covered RVRs issued and/or heard during January, February, and March 2014. During this period, as reported in "COMPSTAT," a total of 799 RVRs were issued, with 237 or 30 percent issued to caseload inmates.

**TRAINING**

WSP staff produced proof of practice memoranda dated February 1, 2012 and December 19, 2011 in response to the October 26, 2011 and November 3, 2011 memoranda. The institution also produced the approved PowerPoint presentation and lesson plan concerning mental health input in the RVR process.

IST produced an attendance report of required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda. WSP only demonstrated compliance for the required one-hour training for captains and the inmate appeals coordinator. Eighty percent of captains and 79 percent of lieutenants attended the four-hour training, as did 58 percent of psychologists and fifty percent of social workers.

<u>WSP RVR training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 6 | 5/83% | 4/67% |
| Captains | 5 | 4/80% | 5/100% |
| Lieutenants | 29 | 23/79% | 19/66% |
| Sergeants | 55 | 37/67% | 40/73% |
| CC-II Appeals | 2 | 0/0% | 2/100% |
| Psychologists | 19 | 11/58% | 13/68% |
| Social Workers | 4 | 2/50% | 2/50% |

**STAFF INTERVIEWS**

**SHOs**

SHOs articulated the policies and procedures regarding mental health input in the RVR process. They indicated that mental health assessments were returned to custody within five to seven days for 3CMS inmates and within 15 days for EOP inmates. They stated that at times this put pressure on SHOs in order to meet the due process timelines for RVR hearings. SHOs indicated having difficulty with the legibility of clinician's writing and of sometimes not understanding clinical language. They indicated contacting mental health staff through the mental health OT whenever they had questions regarding mental health assessments.

SHOs reported that because reception center inmates had fewer privileges, there was very little potential for mitigation when an inmate was found guilty of an RVR. SHOs suggested additional cross-training with mental health staff as a means of informing clinicians of the possible penalties that an inmate could receive when found guilty of particular RVRs. SHOs indicated having a good working relationship with mental health staff, who they knew by name.

**Clinicians**

Mental health staff articulated the policies and procedures concerning mental health input in the RVR process. Clinicians indicated that it typically took from five to seven days to complete the mental health assessment and return it to custody. Completion of the assessment included an inmate interview in a non-confidential setting, review of the inmate's C-file and eUHR, and interview of the assigned PC. The evaluating clinician completed a detailed progress note, with the chief of mental health providing input to clinicians on mental health assessment completion. Clinicians indicated that typically there was very little information in the eUHR due to inmates' recent arrival from county jail. It was clinicians' belief that the mental health assessment form should be modified for reception center inmates, as they did not have access to as many privileges as mainline inmates. Mental health staff reported having a good working relationship with custody and of receiving calls from custody on a regular basis due to inmate behaviors.

226

## QUALITY OF MENTAL HEALTH ASSESSMENTS

Review of RVRs requiring a mental health assessment indicated that assessments were not always processed and completed within required time frames. Many mental health assessments also did not provide relevant or useful information for SHOs to consider. For example, for WSP Inmate A, the clinician did not check "yes" or "no" in response to question number two, but indicated "unable to determine;" "yes" was checked in response to question number three, with a further response of "no mental status determination made." For WSP Inmate D, the response to question number two stated, "He thought officers were taking him somewhere to kill him so he began resisting;" the response to question number three for WSP Inmate D stated "inmate needs access to psychiatric medication, 3CMS Services." For WSP Inmate I, the response to question number two reported that the inmate had a safety concern. These answers were not responsive to the questions and were not useful to the SHO in adjudicating the RVR.

There were mental health assessments where clinicians were very specific regarding penalty mitigation. For example, for WSP Inmate E, the answer to question number three indicated that the loss of dayroom or yard might cause the inmate's mental health symptoms to deteriorate. Similarly, for WSP Inmate F, the answer to question number three stated that penalties that increased social isolation, such as the loss of yard or visitation, should be avoided. However, most assessments were not particularly specific regarding penalty mitigation. Overall, mental health assessment quality varied greatly among clinical staff. There were also many cases, including those involving WSP Inmates B, C, G, H, and I, where the mental health assessment answered "no" to questions number two and three.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION

SHOs typically indicated consideration of the mental health assessment in the RVR's findings and disposition. Specific cases indicating the SHO's consideration of the assessment included those involving WSP Inmates A, D, E, H, and J. However, although the SHO indicated assessment consideration, it was not necessarily reported how the assessment was considered. Relatedly, there were RVRs, including those involving WSP Inmate B, where it was unclear whether the SHO's RVR dismissal was due in whole or in part to mental health factors. SHO's consideration of the mental health assessment also did not necessarily result in the imposition of significant credit and/or privilege losses, as in the case of WSP Inmate C.

## ICC REVIEW

The ICC generally noted consideration of the mental health assessment, but no mitigation of credit loss, privileges, or SHU terms occurred.

**WSP RVR Case Reviews**

**Inmate A**
Date of Violation:  1/25/14
Date of Mental Health Assessment:  3/14/14
Date of Disposition:  3/18/14
Charge:  Masturbation with Exposure

On 1/25/14, a CNA watching this EOP inmate, who was on suicide watch, reported that he moved his suicide vest to one side and began masturbating.  He then turned toward her and continued masturbating.  The CNA told him to stop.  The inmate then moved to his bed, laid down, and continued masturbating, while looking through the cell window.  Sometime later the CNA told the control booth officer.  The CNA continued the suicide watch for the inmate without further incidence.  An assessment was sent to mental health and the non-confidential interview occurred on 3/14/14.  Question number one was not checked "yes" or "no," but the clinician wrote in the response area "...Clinician unable to comment on mental health status."  Question number two was also not checked "yes" or "no," and in the response area the clinician wrote "unable to determine."  Question number three was checked "yes" and the response from the clinician was "No mental status determination made."

The RVR packet was complete.  The hearing was held on 3/18/14 with the inmate present.  A staff assistant was assigned.  The verbatim statement from the clinician was documented.  The SHO stated he agreed with the mental health assessment, which stated that the clinician "was unable to determine" whether the inmate's mental health status appeared to contribute to the behavior that lead to the RVR.  Conclusion: "Due to the Subject's mental health status the SHO elects to mitigate the penalties by not imposing any loss of privileges and imposing the low end of credit loss. Classification Referral: Referred to ICC for program review."  The RVR was not heard within thirty days of the initial copy being served.

**Impression**:  The RVR was not heard within required time limits.  The SHO indicated that the penalty would be mitigated through imposition of the low end of credit loss and no loss of privileges.  The clinician's responses were not consistent with RVR policy and were not helpful to the SHO.

**Inmate B**
Date of Violation:  2/23/14
Date of Mental Health Assessment:  4/9/14
Date of Disposition:  4/7/14
Charge:  Destruction of State Property Valued at Less Than $400

On 2/23/14, a custody officer observed this EOP inmate hitting his cell door window with his state issued cup until the window shattered.  The inmate was removed from his cell and told that he would be charged for replacing the window.  An RVR was written for destruction of state property.  The mental health assessment was sent to mental health on 4/8/14 and the interview occurred on 4/9/14.  Questions number two and three were answered in the negative.

228

The RVR was heard on 4/7/14, with the inmate present.  The RVR was served within fifteen days of discovery, but the hearing was not held within 30 days of the service date; this was a due process violation and precluded the loss of credit if the inmate was found guilty.  The inmate pled not guilty, the SHO found him not guilty, and the charges were dismissed.  Under the "Findings" section, it stated that the SHO considered the mental health assessment during the hearing.  It was not clear why the SHO found the inmate not guilty.

**Impression**:  The inmate was found not guilty and the case dismissed, but the SHO did not specifically state the reason for this disposition.  The SHO referenced the mental health assessment and reported consideration without stating how it was considered.  The hearing occurred beyond time limits.

**Inmate C**
Date of Violation:  3/28/14
Date of Mental Health Assessment:  4/29/14
Date of Disposition:  5/6/14
Charge:  Masturbation with Exposure without Priors

On 3/28/14, while conducting a suicide watch, a CNA witnessed this EOP inmate exposing himself.  The CNA ordered him to fasten his vest, but he did not comply.  The inmate then stood on his stool with both feet and moved his hips from side to side while still exposing himself.  The CNA again ordered him to stop, but to no avail.  The CNA then called the floor custody officer to the inmate's cell.  Upon the officer's arrival, the inmate stopped his actions and covered up.

The assessment was sent to mental health on 4/25/14; the interview occurred on 4/29/14.  Question number one was checked "no" even though he was in the MHCB.  Questions number two and three were also answered in the negative.  The hearing occurred on 5/6/14 and the SHO's decision stated that ". . . SHO accepts his determination and finds that mental health evidence does not provide any exonerating evidence.  SHO will, however, consider mental health when assessing the penalty."  The inmate was found guilty and assessed 90 days forfeiture of credit and 90 days loss of privilege in the form of no yard.  The inmate was referred to the ICC for a possible SHU term.

**Impression**:  There was no mitigation in this case.  The SHO applied a standard to the mental health assessment of not providing exonerating evidence that was outside RVR policy.  Although indicating that the inmate's mental health would be considered during penalty assessment, the inmate was assessed significant credit and privilege losses.

**Inmate D**
Date of Violation:  1/10/14
Date of Mental Health Assessment:  1/23/14
Date of Disposition:  1/14/14
Charge:  Resisting a Peace Officer Resulting in the Use of Force

On 1/10/14, an officer was contacted to help escort the inmate to the Facility D holding cell.  The inmate was exhibiting bizarre, unusual, and uncharacteristic behavior that consisted of incoherent babbling.  He was handcuffed and placed in leg restraints.  During the escort, he began to twist, turn, and resist forward movement.  The officers ordered him to calm down, but he continued to resist.  The two officers, using their body weight, forced him to the ground and ordered him to calm down.  Once the inmate calmed down, the two officers helped him to his feet and continued to the Facility D holding cell without further incident.
The assessment was sent to mental health on 1/14/14 and the interview was conducted on 1/23/14.  Question number one was answered in the affirmative; the response to this question was "I/M unfamiliar with CDCR procedures.  Reluctant to ask questions.  Fearful." Question number two was also answered in the affirmative and stated further that "He thought officers were taking him somewhere to kill him, so he began resisting."  However, question number three was answered in the negative, with the following response: "Needs access to Psych Meds 3CMS SVCS."

At the time of the incident, the inmate was in WSP's MHCB.  However, the mental health assessment stated "I/M …is not a part of the MHSDS and does not have a documented TABE score as evidenced by the circumstance portion of the Rules Violation Report (RVR)."  Shortly after the incident on 1/10/14, the inmate was transferred to CHCF's MHCB.  He was then transferred back to WSP and was present for his hearing on 2/13/14.  The RVR decision stated "The SHO considered the clinical judgement of the mental health clinician.  The SHO determined that the subject should be held accountable for his actions as the incident did occur.  SHO believes it is important to have the subjects custody level reflect his potential misbehavior, nevertheless, the SHO did not take away any privileges that would isolate the subject as it would be counterproductive to his mental health treatment."

**Impression**:  There was mitigation in this case.  The SHO documented consideration of the mental health assessment in the disposition and penalty assessment.  It appeared that the inmate was found not guilty and the charges were dismissed, but this was unclear.

**Inmate E**
Date of Violation:  1/4/14
Date of Mental Health Assessment:  1/22/14
Date of Disposition:  1/28/14
Charge:  Fighting

On 1/4/14, a CO observed an inmate punch this EOP inmate without any warning.  The officer announced a Code One and the yard gunner ordered all inmates to get down.  The inmate and the other inmate got down and then jumped back up and continued to fight.  Orders were given again

to get down and the two inmates did not comply.  Both inmates were sprayed in the face with OC, but still did not comply.

The mental health assessment was sent to mental health on 1/7/14 and the non-confidential interview occurred on 1/22/14.  Question number one was answered in the affirmative, and in response, stated "I/M is an EOP LOC, and so is presumed to need staff assistance." Question number two was answered in the negative, but question number three was answered in the affirmative, and stated further that "loss of day room or yard may cause his mental health symptoms to get worse."

The hearing was held on 1/28/14, but the inmate was not present and the SHO entered a not guilty plea on his behalf.  Documentation indicated that the SHO reviewed and considered the mental health interview.  The inmate was found guilty and assessed 61 days forfeiture of credit.  However, the SHO considered the mental health clinical judgment and did not assess any loss of privileges for dayroom or yard.

**Impression**:  There was a measure of mitigation in this case.  The SHO documented review and consideration of the mental health assessment.  The inmate was assessed a loss of credit, but no loss of privileges, which the SHO indicated was due to his mental health status.

**Inmate F**
Date of Violation:  1/13/14
Date of Mental Health Assessment:  1/21/14
Date of Disposition:  2/8/14
Charge:  Assault on a Peace Officer – Division D Offense

On 1/13/14, during pill line, this EOP inmate was ordered to go into his cell, but did not comply.  Instead, he shut his cell door, took off his glasses, and ran aggressively down the stairs toward COs.  Both officers ordered him to stop, but the inmate continued to advance.  When he was approximately six feet away, one officer used an MK-9 to dispense OC, which struck the inmate in the face.  The second officer used his Monadnock Expandable Baton (MEB) and struck the inmate on his back with the power safety tip.  The inmate then got down on the floor.

The assessment was sent to mental health on 1/15/14 and the non-confidential interview was conducted on 1/21/14.  Question number one, which was checked "yes," had a further response that stated "The inmate is currently enrolled in the EOP program and therefore requires a staff assistant."  Question number two was also checked "yes" and further stated that "the patient has a well-documented history of treatment for mental health . . . . . that may have significantly affected his ability to modulate impulse control and mood lability.  These may contribute to this incident."  Question number three was also checked "yes" and further stated in response that "Penalties that increase social isolation and deprive staff of the availability of positive reinforcement such as (i.e. loss of store, yard or visitation privileges) should be avoided."

The inmate was at the EOP LOC with a reading level below 4.0 and a staff assistant was thus assigned.  The mental health clinician's notes were documented in the RVR.  The inmate pled guilty and was found guilty.  He was assessed 90 days forfeiture of credit, ten days loss of yard,

and 30 days loss of entertainment appliances. In the decision, the SHO stated "In doing so none of the penalties were harsh, nor were they meant to be however, the purpose of the penalties are to help the subject understand cause and effect and these penalties will not impede the subject's ongoing therapy."

**Impression**: There appeared to be a measure of mitigation in this case. The SHO did not directly speak to the role of the mental health assessment, but indicated that the penalties would not affect treatment. The inmate was assessed significant credit loss and was also assessed loss of privileges.

**Inmate G**
Date of Violation: 1/24/14
Date of Mental Health Assessment: 2/3/14
Date of Disposition: 2/18/14
Charge: Possession of an Inmate Manufactured Weapon

On 1/24/14, a facility sergeant instructed a custody officer to respond to an incident. When the officer and sergeant entered, another officer informed them that this EOP inmate was in possession of a weapon. The inmate complied with all orders and the officers escorted him out of the building. When on the patio the officer asked the inmate where the weapon was, and the inmate responded that it was on the left side of his waistband. The weapon was recovered and photographed.

The assessment was sent to mental health on 1/25/14 and the non-confidential interview occurred on 2/3/14. Question number one was originally marked "no," but an error notation was made next to the "no" and the response notation was "EOP LOC." Questions number two and three were answered in the negative, but their responses stated "...per review of the ERMS and eUHR the inmate did notify various staff of his safety concerns and fear of returning to WSP building B3 and again the records confirmed the inmate attempted to notify appropriate staff about his concern prior to the incident."

In the RVR part C - Mental Health, it stated "the inmate's mental health condition was not a contributing factor in this RVR and there are no mental health factors that the SHO should consider in assessing the penalty of 'Guilty' finding." The inmate was assessed 360 days forfeiture of credit and 30 days loss of privileges consisting of no canteen and no yard. The case was referred to the ICC for a possible SHU audit review.

**Impression**: There was no mitigation in this case. The mental health assessment did not recommend mitigation. The inmate was assessed significant credit loss and loss of privileges.

**Inmate H**
Date of Violation:  1/26/14
Date of Mental Health Assessment:  2/19/14
Date of Disposition:  2/27/14
Charge:  Fighting

On 1/26/14 a custody officer supervising the pill line heard a "man down" call coming from a cell that was occupied by this EOP inmate and his cellmate. The cellmate was sitting on the top bunk with blood on his shirt and the inmate told the officer that his cellmate had just had a seizure.  The officer asked the cellmate what had happened and he corroborated what the inmate said.  The officer called an LVN to assist.  The officer cuffed the inmate and saw that he had abrasions and blood on his left knuckles.  Both inmates were cuffed and escorted to a Facility B holding cell and both showed marks consistent with a physical altercation.

The assessment was sent to mental health on 1/29/14 and the non-confidential interview was conducted on 2/19/14.  Question number one was answered in the affirmative with a response of "Staff assistant to be provided due to the inmates classification of EOP."  Questions number two and three were answered in the negative.

The hearing was held on 2/27/14.  The hearing decision stated in part that "The SHO reviewed the Mental Health Assessment and considered the recommendation  . . . who formed the opinion that the inmate would benefit from the assignment of a staff assistant . . . ."

The inmate was found guilty and assessed 90 days forfeiture of credit and 30 days loss of yard privileges.  It was also noted that "the inmate shall be permitted to participate in all authorized groups and EOP programs."

**Impression**:  There was no mitigation in this case; the mental health assessment did not recommend mitigation.  The inmate was assessed significant credit loss and loss of privileges. The SHO observed that the inmate's participation in the EOP program would not be affected by the penalties imposed.

**Inmate I**
Date of Violation:  2/3/14
Date of Mental Health Assessment:  2/8/14
Date of Disposition:  2/11/14
Charge:  Willfully Delaying Any Peace Officer by Refusing to Accept Assigned Housing – Division D Offense

On 2/3/14 this EOP inmate refused his assigned housing unit.  When he was asked by custody why he was refusing to go to his housing unit, he remained silent.  There were no other inmates assigned to the cell; the inmate was to be housed by himself.

The assessment was sent to mental health on 2/7/14 and the non-confidential interview was conducted on 2/8/14.  Question number one was not checked nor was there a response.

Questions number two and three were answered in the negative. The response statement to question number two stated "I have safety concern," but was otherwise illegible.

The hearing was held on 2/11/14 and the SHO reviewed the mental health assessment. It was noted that there were no contributing factors to the RVR to consider and no mental health concerns that the SHO should consider in assessing the guilty penalty finding. The inmate pled not guilty, but was found guilty. He was assessed 90 days forfeiture of credit and referred to the ICC for a possible SHU audit review.

**Impression:** There was no mitigation in this case. The clinician's comments merely reproduced what the inmate asserted and were unhelpful and unresponsive. The mental health assessment indicated no contributing or mitigating mental health factors for the SHO to consider. The inmate was assessed significant credit loss.

**Inmate J**
Date of Violation: 2/3/14
Date of Disposition: 2/28/14
Charge: Fighting

On 2/3/14 a CO observed two inmates punching an inmate while he laid on the ground. This officer and another officer ordered the inmates to get down, but they continued to punch the other inmate. Additional officers responded and ordered the inmates to get down and they complied. All three were handcuffed and escorted out of the building.

The assessment was sent to mental health on 2/5/14 and the non-confidential interview was conducted on 2/2/14. Question number one was answered in the negative with a response of "EOP." Questions number two and three were answered in the affirmative. The response to question number two further stated "I/M reality orientation is questionable. Cognitive function is limited. I/M describes himself in the incident as a victim." The response to question number three stated that "I/M cognitive limitations and mental disorder should be considered in assessing the penalty."

The hearing was held on 2/28/14. Mental health information stated that the clinician opined that the inmate would not benefit from a staff assistant, but his mental health disorder appeared to be a contributing factor to the actions leading to the RVR. The RVR disposition indicated that the SHO considered the following mental health factors in assessing a penalty, namely, "I/M cognitive limitations and mental disorder should be considered in assessing the penalty." The case was dismissed.

**Impression:** There was mitigation in this case. The clinician found the inmate's mental health to be a factor and recommended mitigation. The SHO documented consideration of the mental health assessment and mitigated the RVR by dismissing the case due to mental health factors.

**Kern Valley State Prison (KVSP) RVR Review**

## SUMMARY OF FINDINGS

A.     Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at KVSP by completing and sustaining all requirements.

B.     KVSP was not compliant with required training of custody and mental health staff related to the RVR process.

C.     Appropriate and collaborative training between custody and mental health staff in the RVR process had not occurred.

D.     SHOs documented consideration of the mental health assessment in the RVR process, but did not necessarily indicate how the assessment was considered.

E.     SHOs referenced the bizarre, unusual, or uncharacteristic behavior standard for inmates charged with Division A, B, C, or SHU-able offenses and for inmates at the EOP LOC, but this was an inapplicable standard.

F.     At times clinicians checked "no" to question number one on assessments completed for EOP inmates, prompting the SHO to state that the inmate did not need a staff assistant, even though one was in fact provided for the hearing.

## INTRODUCTION

During September 9-10, 2014, the Coleman monitoring team reviewed the RVR process at KVSP.  KVSP was designated to house inmates at Level I and IV and inmates at the EOP and 3CMS levels of care.  As of March 2014, KVSP's total inmate population was 3,775, of which 1,388 or 37 percent were caseload inmates.

In the course of the site visit, the monitors met with SHOs who adjudicated RVRs and mental health clinicians who prepared mental health assessments.
The monitors reviewed RVRs that were issued for the first three months of 2014.  During this period, a total of 684 RVRs were issued, of which 287 or 42 percent were issued to caseload inmates.

## TRAINING

KVSP staff provided two proof of practice memoranda dated December 30, 2011 and January 30, 2012 in response to the October 26, 2011 and November 3, 2011 memoranda.  The lesson plan that KVSP provided was the current plan related to mental health assessments in the disciplinary process.

IST produced an attendance report of required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda.  Mental health staff also

provided copies of IST sign-in sheets for training conducted in September 2014, which indicated that a majority of mental health recently attended the training.
KVSP did not demonstrate compliance with the 2011 trainings.

KVSP RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (four hours) | 11/3/11 (one hour) |
|---|---|---|---|
| CDOs | 2 | 0/0% | 0/0% |
| Captains | 5 | 0/0% | 2/40% |
| Lieutenants | 30 | 8/27% | 19/63% |
| Sergeants | 85 | 4/5% | 38/45% |
| CC-II Appeals | 2 | 0/0% | 0/0% |
| Psychologists | 15 | 1/7% | 2/13% |
| Social Workers | 15 | 0/0% | 1/7% |
|  |  |  |  |

**STAFF INTERVIEWS**

**SHOs**

    SHOs reported that mental health assessments were completed and returned in a timely manner, but were unaware of how assessments were transmitted to mental health for completion; they stated that disciplinary officers took care of that part of the process.  SHOs were knowledgeable about offenses and standards warranting assessment completion.  They reported that it was rare to have an assessment where questions number two or three were answered in the affirmative and also had explanations or recommendations.  They indicated that more details were needed from clinicians regarding privileges that should not be impacted in the penalty phase for assessments with affirmative responses to question number three.  SHOs also stated that Facility C custody staff attempted to avoid issuing RVRs to mentally ill inmates by writing a 128-A or 128-B.

**Clinicians**

    Clinicians reported receiving RVRs and mental health assessments almost immediately after the incident and on occasion informed the inmate before custody that he was receiving an RVR.  The RVR and assessment were usually emailed or faxed by custody to the mental health OT, who scheduled the inmate for a non-confidential interview.  Clinicians indicated that, depending on the case's complexity, it took from one to four hours to complete an assessment.  The assessment included review of the eUHR, confirmation of medication compliance, and at times a discussion with the inmate's PC.  Responses to question number two included diagnoses and behaviors exhibited by the inmate at the time of the RVR.  In response to question number three, clinicians stated being provided with a list of potential privileges that could be impacted by a guilty finding, which they indicated they found helpful.  No instances were reported where a SHO sought clinical clarification regarding assessment information.  Clinicians indicated that it would be beneficial to know the outcomes of RVR adjudications.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

Many reviewed RVRs, including those for KVSP Inmates A, B, C, D, and E, answered "no" to all three assessment questions.  One clinician checked "no" to assessment question number two and then provided a defense for the inmate's actions.  Another negative response to question number two contained a clinical response that the inmate was under the influence of methamphetamine at the time of the offense and was paranoid.  It was unclear what the clinician was attempting to convey with this statement.

There were instances, such as those involving KVSP Inmates A and B, when clinicians answered "no" to question number one even though the inmate was at the EOP LOC and was automatically assigned a staff assistant.  This further confused SHOs, who reported in the decision that a staff assistant was not necessary for the EOP inmate, even though a staff assistant was assigned for all EOP inmates issued an RVR.

The overall quality of mental health assessments could not be determined due to the lack of a sufficient sample of positive findings on the assessments.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

SHOs typically indicated consideration of the mental health assessment, but in some cases, including those involving KVSP Inmates A, D, and E, did not indicate how the assessment was considered.  SHOs at times used the mental health assessment as a form of insanity or competency evaluation by stating that the mental health evidence did not provide exonerating evidence.  Neither this language nor this standard was found on the mental health assessment, which only inquired whether the inmate's mental disorder contributed to the behavior that led to the RVR.

SHOs also used stock language to refer to inmate behavior as not being bizarre, unusual, or uncharacteristic for EOP inmates and for inmates charged with Division A, B, C, or SHU-able offenses. However, this standard did not apply to inmates at the EOP LOC and/or to the offenses charged.  Mental health factors played no role in some reviewed cases that were mitigated/dismissed, such as that for KVSP Inmate B; his case was dismissed based on his EOP LOC.

## KVSP RVR Case Reviews

### Inmate A
Date of Violation:  3/14/14
Date of Mental Health Assessment:  3/28/14
Date of Disposition:  4/16/14
Charge:  IDX with Masturbation - Division D Offense

While housed in the MHCB, a nurse observed the inmate lying on his back with his smock open, while masturbating.  The nurse ordered him to stop and the inmate complied.

The mental health assessment was completed on 3/28/14.  The clinician checked "no" in response to questions number one, two, and three.

In finding the inmate guilty, the SHO considered the mental health assessment.  The SHO noted that "given that an inmate is obligated to protect the privacy of both himself and others within the living areas, any exposure of private parts to staff can be regarded as a deliberate affront."

The SHO assessed 90 days loss of behavior/work credits, which was the maximum, and 90 days loss of privileges, including canteen, special purchases/quarter packages, and entertainment appliances.  The inmate was not referred to the District Attorney, but was referred to the ICC for possible SHU term assessment.

**Impression**:  The SHO indicated consideration of the mental health assessment, but did not report how it was considered.  There was no mitigation in this case.  It was inappropriate for the clinician to answer "no" to question number one, as all EOP inmates were automatically assigned a staff assistant upon receiving an RVR.

### Inmate B
Date of Violation:  3/28/14
Date of Mental Health Assessment:  4/9/14
Date of Disposition:  4/16/14
Charge:  Destruction of State Property - Division E Offense

During a search of this EOP inmate's cell, the officer found three state issued sheets ripped into numerous strips.  The RVR indicated that the inmate admitted destroying them.

The mental health assessment was completed on 4/9/14.  The clinician checked "no" to questions number one, two, and three.  Although the assessment indicated that mental health issues did not influence the behavior resulting in the RVR, the SHO found the inmate not guilty based on his EOP LOC.  The SHO stated "Inmate ____ is EOP.  SHO considers whether inmate ___ not know what was going one based on his EOP LOC and medication requirements."  On 4/16/14, the SHO forwarded a memorandum to the records department indicating that the RVR was dismissed and that all copies of the report and any reports written in support of the RVR should be destroyed.

The RVR inappropriately reported the inmate to be in the MHCB when he was in fact at the EOP LOC. It was inappropriate for the clinician to answer "no" to question number one, as it was only applicable to 3CMS and non-caseload inmates; for RVR purposes, all EOP inmates were automatically assigned a staff assistant.

**Impression**: The SHO reported consideration of the mental health assessment. There was mitigation in the form of dismissal based on the inmate's EOP LOC. However, it was inappropriate for the clinician to answer "no" to question number one, as EOP inmates were automatically assigned a staff assistant for RVR purposes.

**Inmate C**
Date of Violation: 2/8/14
Date of Mental Health Assessment: 2/11/14
Date of Disposition: 4/28/14
Charge: Battery on a Peace Officer - Division B Offense

During meal time, this 3CMS inmate stated that he did not receive enough food. The officer reported that the inmate aggressively lunged forward with his food tray and struck him in the stomach. The inmate then tried to prevent the officer from securing the food port by sticking out his hand.

A mental health assessment was completed on 2/11/14. The clinician checked "no" in response to questions number one, two, and three. The inmate was assigned a staff assistant as his TABE score was 4.0 or below.

The inmate was found not guilty of the charge, but was found guilty of conduct conducive to violence, which was a Division F offense. The SHO did not find that the inmate "willfully" committed battery. The SHO indicated consideration of the mental health assessment. The inmate was assessed zero days loss of behavioral/work credits due to loss of time constraints and ten days loss of privileges, including yard. He was referred to the ICC for program review, and to the District Attorney, who declined the case.

**Impression**: The SHO noted consideration of the mental health assessment and mitigated the RVR by assessing zero days of credit loss.

**Inmate D**
Date of Violation: 2/12/14
Date of Mental Health Assessment: 2/18/14
Date of Disposition: 8/18/14 - Inmate Postponed pending District Attorney Finding
Charge: Battery on an Inmate with SBI - A-1 Offense

While on the yard, this 3CMS inmate and another inmate were in a fight with two other inmates. The reporting officer witnessed the inmate strike first. When ordered to get down, this inmate and the other inmate continued hitting a third inmate. Several 40 mm shots were fired on the yard and staff formed a skirmish line. The two inmates still refused to comply with orders to get down, but complied after a grenade was thrown and chemical agents were used.

A mental health assessment was completed on 2/18/14. The clinician checked "no" in response to questions number one, two, and three. A staff assistant was not assigned.

The SHO noted consideration of the mental health assessment. The inmate was found guilty, but assessed zero days loss of credit due to loss of time constraints. However, he was assessed ten days loss of privileges, including yard. He was referred to the UCC for a SHU term assessment. The District Attorney declined prosecution.

**Impression**: The SHO noted consideration of the mental health assessment, but did not indicate how it was considered. No loss of credit could be assessed due to time constraints.

### Inmate E
Date of Violation: 2/12/14
Date of Mental Health Assessment: 2/18/14
Date of Disposition: 8/19/14 - Inmate Postponed pending District Attorney Finding
Charge: Battery on an Inmate with SBI - A-1 Offense

While on the yard, this 3CMS inmate and another inmate were in a fight with two other inmates. The reporting officer witnessed this inmate's companion strike first. When ordered to get down, both inmates continued striking the other inmate. Several 40 mm shots were fired on the yard and staff formed a skirmish line. The two inmates still refused to comply with orders to get down, but complied after a grenade was thrown and chemical agents were used.

A mental health assessment was completed on 2/18/14. The clinician checked "no" in response to questions number one, two, and three. A staff assistant was not assigned.

The SHO noted consideration of the mental health assessment. The inmate was found not guilty of battery on an inmate with serious injury. However, he was found guilty of the lesser, included offense of battery on an inmate, a Division D offense, as the inmate he struck suffered only minor injuries.

The inmate was assessed zero days loss of credit due to loss of time constraints. He was assessed 90 days loss of privileges, including dayroom and phone. He was referred to the ICC for SHU term assessment and to the District Attorney for prosecution.

**Impression**: The SHO reported consideration of the mental health assessment, but did not indicate how it was considered. No loss of credit could be assessed due to time constraints.

**North Kern State Prison (NKSP) RVR Review**

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the 2011 agreed-to RVR policies and procedures at NKSP.

B.  NKSP was noncompliant with required training of custody and mental health staff related to the RVR process.

C.  Appropriate collaborative training between custody and mental health in the RVR process had not occurred.

D.  Custody staff did not always document consideration of the mental health assessment in the RVR process.

E.  Of the 16 EOP cases reviewed, four indicated that mental illness contributed to the behavior that led to the RVR and recommended mitigation of any penalties. One case was mitigated based on mental health factors but not on the recommendations in the mental health assessment.

F.  Of the 17 3CMS cases reviewed, none indicated that mental illness contributed to the behavior that led to the RVR or recommended mitigation of any penalties. No cases were mitigated based on mental health factors.

G.  The SHOs referenced the standard of "bizarre, unusual, or uncharacteristic behavior" for inmates charged with Division A, B, C or SHU-able offenses and for inmates at the EOP LOC where it was inapplicable.

H.  The SHOs based their decision on the mental health status of the inmate at the time of the hearing rather than at the time of the offense, as documented on the mental health assessments.

I.  The ICC gave a perfunctory review of the mental health assessment during its meetings.

J.  Clinicians repeatedly checked "no" to question number one on the assessments prepared for EOP inmates and provided unresponsive answers to question number three on the assessment.

K.  Clinicians drew conclusions when answering "no" to question number three and then indicated that the inmate was responsible for his actions.

241

**INTRODUCTION**

The monitor reviewed the RVR process at NKSP from September 11-12, 2014. NKSP is designated to house inmates at the Level I, Level III, and reception center custody levels, and inmates with a mental health designation of 3CMS. As of March 2014, NKSP had a total inmate population of 4,694, of whom 931, or 20 percent were on the mental health caseload.

The monitor met with SHOs who adjudicated the RVRs and mental health clinicians who prepared mental health assessments. The review period was January 2014 through March 2014, during which 722 RVRs were written, including 151 or 20 percent issued to mental health caseload inmates.

**TRAINING**

NKSP was able to provide proof-of-practice memoranda, dated December 29, 2011 and January 31, 2012, respectively, in response to the October 26, 2011 and the November 3, 2011 memoranda. The lesson plan provided by the facility was the current plan related to mental health assessment in the disciplinary process.

IST was asked to produce a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda. NKSP was able to demonstrate adequate compliance for three of the job classifications, for the four-hour training for social workers and CDOs, and for the one hour-training for Correctional Counselor Appeals II.

<u>NKSP RVR Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 2 | 2/100% | 1/50% |
| Captains | 6 | 5/83% | 5/83% |
| Lieutenants | 24 | 20/83% | 20/83% |
| Sergeants | 65 | 39/60% | 44/68% |
| CC-II Appeals | 1 | 0/0% | 1/100% |
| Psychologists | 7 | 4/57% | 0/0% |
| Social Workers | 2 | 2/100% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

The SHOs reported that assessments were being completed and returned in a timely manner.  The forms were hand-carried to mental health staff and then delivered to the mental health office tech for logging and processing.  The assessments were processed more quickly if they were specifically requested by custody staff.  They reported that legibility was generally not a problem, but very few assessments had "yes" responses requiring a written statement. The responses to question number two were in laymen's terms and provided the SHOs with relevant information.  In response to question number three, clinicians provided clear direction as to what privileges should be mitigated, such as yard time and dayroom, to maintain socialization skills. The SHOs indicated that RVRs were dismissed or reduced based on mental health assessments. One SHO stated that inmates were assessed at the time of the hearing but the SHO was unable to elaborate on what that meant.

**Clinicians**

Clinicians reported that custody hand-delivered the assessments to the mental health office tech, who then disseminated the forms to the clinicians and scheduled the inmate for a non-confidential interview. To complete the form, clinicians reviewed the inmate's CF for prior similar RVRs, reviewed the eUHR, checked for medication compliance, and spoke to the PC if one was assigned.  At NKSP, only EOP inmates were assigned PCs.  When responding to question number two on the assessment, clinicians noted symptoms that the inmate was experiencing at the time of the incident and did not include a diagnosis.  In response to question number three, clinicians recommended what privileges the SHOs should not take away due to the inmate's mental illness.  However, since the facility was a reception center, there were not many privileges afforded to the inmates which could be taken away.  They could not recall ever being contacted by a SHO for clarification regarding an entry on an assessment. They were aware of RVRs being reduced or dismissed as a result of an inmate's mental illness.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Of the 17 reviewed assessments written for 3CMS inmates**,** none indicated that mental illness contributed to the behavior that led to the issuance of the RVR.  Clinicians checked "no" to question number three, and repeatedly wrote that the inmate was responsible for his actions at the time of the incident.  (*See* NKSP Inmates A, B, C, D.)  The clinicians appeared to utilize a form of competency standard in their assessments, which is not what is sought by question number three.  Other unresponsive answers to question number three included "current and recent past mental health instability, hospitalizations" (*See* NKSP Inmate E), and that the "inmate should be given a little extra time to process information & repeated check-ins to assess if he understands current communications." (*See* NKSP Inmate F.)  Neither answer was responsive to the question or provided any recommendations regarding mitigation of penalties.

After answering "no" to question number two, one clinician reported that the inmate and his peer had made a trade agreement for food and coffee, and when the peer reneged on the

agreement, they argued and came to blows. This answer was unresponsive to the question and completely unnecessary.  (*See* NKSP Inmate G.)

Although the first question on the assessment only applied to non-MHSDS and 3CMS inmates, clinicians repeatedly checked "no" to the question and then provided written responses, appearing to be unaware that EOP inmates are automatically assigned a staff assistant.  One clinician wrote that the inmate "would like EOP staff to accompany him to hearing, if possible." (*See* NKSP Inmate G.)  In other cases involving EOP inmates, the clinicians simply checked "no" to question number one.  (*See* NKSP Inmates H, E.)

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

SHOs reported that EOP inmates would not benefit from a staff assistant, based on the clinicians checking "no" to question number one on the assessment form.  However, this was stock language since staff assistants were assigned in the cases and this information was found later in the decision.   SHOs repeatedly referenced the "bizarre, unusual, or uncharacteristic behavior" standard in cases involving EOP inmates or 3CMS inmates charged with offenses that mandated the completion of a mental health assessment and for which the standard was inapplicable. (*See* NKSP Inmates I, J, K.)

One SHO failed to reference the assessment in the decision and affirmatively stated that an assessment was not completed, when it had been completed, and reported that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic, after acknowledging that the inmate was at the EOP LOC.  (*See* NKSP Inmate L.)  Other decisions simply failed to reference the assessment at all.  (*See* NKSP Inmates A, B.)

SHOs also appeared to disregard the assessments and made decisions based on the inmate's mental status at the time of the hearing rather than at the time of the RVR.  One SHO acknowledged that the assessment indicated a nexus existed between the inmate's mental health at the time of the offense and the behavior that led to the RVR, but openly applied a different standard stating "Nevertheless [at] the hearing, the subject appeared coherent and was able to respond to specific details regarding the alleged offense.  The subject stated he understood the decision reached including its implication. The SHO believes the subject was aware of his actions at the time of the disciplinary hearing and the consequences thereof.  The SHO believes the subject should be held accountable for his actions." (*See* NKSP Inmate M.)  Another clinician also reported that the inmate's mental health disorder appeared to contribute to the behavior that led to the RVR and stated in response to question number two, "The behavior in this RVR was a product of a chronic mental health disorder.  This disorder precluded the IP from following institutional rules." However, the disposition stated "The SHO notes [inmate] offered no reasonable explanation to mitigate his culpability in this matter.  The SHO has taken into consideration that [inmate] is a participant in the MHSDS, assessed at the EOP LOC.  The SHO has taken the Mental Health Assessment (MHA) into consideration. The SHO believes [inmate] is aware and responsible for his actions."  (*See* NKSP Inmate N.)  Another case reflected the same language on the assessment form and virtually the same language in the disposition. (*See* NKSP Inmate O.)

Of the cases reviewed, none were mitigated based on recommendations contained on the mental health assessment.  Mitigation occurred in some cases due to the inmate's cooperation during the hearing or his expressed remorse.  (*See* NKSP Inmate B.)

**ICC REVIEW**

The ICC considered the mental health assessment in the decisions to assess SHU terms, but in a perfunctory manner by simply referring to the assessment and its contents.  There was no mention of clinical input at the actual meeting. The only mitigation that occurred was based on lack of prior disciplinary history.  (*See* NKSP Inmates D, K, N.)

### NKSP RVR Case Reviews

**Inmate A**
Date of Violation:  1/4/14
Date of Mental Health Assessment:  1/21/14
Date of Disposition:  2/4/14
Charge:  IDX/Disruptive Behavior Resulting in Use of Force - Division D Offense

On 1/4/14, during a search of the inmate's locker for contraband, the inmate pulled his pants and boxers down to his knees and exposed himself.  He then grabbed papers from the podium on the dayroom floor and threw them across the room.  The inmate refused to get on the floor as ordered, which prompted the CO to use his pepper spray twice on the inmate.  Although the inmate was not a participant in the MHSDS, a mental health assessment was completed on 1/21/14, with no reason provided for the completion of the assessment.  Questions number two and three on the assessment were both answered "no."  However, the clinician wrote in response to question number three that the inmate was responsible for his actions at the time of the incident.  On 2/4/14, the inmate appeared for a hearing before the SHO.  In his decision, the SHO stated that the inmate did not demonstrate unusual, uncharacteristic, or bizarre behavior and a mental health assessment was not required.  Although it was acknowledged in the decision that the inmate had received a copy of the mental health assessment, the SHO did not consider it.  The inmate was found guilty and assessed 90 days' loss of behavioral-work credits -- the maximum amount of time allowable for a division D offense -- and 60 days' loss of privileges including no yard.

**Impression**:  There was no mitigation in this case.  There was no reason provided for the completion of the mental health assessment.  The clinician included unnecessary comments in the answer to question number three. The SHO noted that a mental health assessment was not required, and did not consider the mental health assessment. The inmate was assessed significant credit loss and loss of privilege.

**Inmate B**
Date of Violation:  1/23/14
Date of Mental Health Assessment:  1/30/14
Date of Disposition:  2/4/14
Charge:  Battery on an Inmate - Division D Offense

On 1/23/14, the inmate was seen striking another inmate in the facial area with his fist.  In the body of the RVR, it stated that the inmate's behavior was not deemed bizarre, unusual or uncharacteristic.  A mental health assessment was completed on 1/30/14, with questions number two and three answered "no."  No reason was provided as to why a mental health assessment was completed when it was not required by policy.  Although the clinician answered "no" to question number three, he stated that the inmate was responsible for his actions at the time of the incident.  On 2/4/14, the inmate appeared for a hearing before the SHO.  The SHO made no mention of the mental health assessment and found the inmate guilty.  The inmate was assessed 61 days' forfeiture of credits due to his cooperation during the hearing.  The inmate was also referred to the ICC for program-custody review and possible SHU term assessment.  The ICC elected to assess and impose a two-month mitigated SHU term based on the inmate's lack of disciplinary history.  The CSR deferred the case, noting that the ICC failed to document and articulate that the committee considered the mental health assessment when assessing the SHU term.

> **Impression**: There was mitigation in this case based on factors other than mental health.  The SHO considered the mental health assessment but there was no reason provided why the assessment was completed. The inmate was assessed credit loss.

**Inmate C**
Date of Violation – 2/15/14
Date of Mental Health Assessment: 2/27/14
Date of Disposition – 3/10/14
Charge:  Masturbation with IDX - Division D Offense

On 2/15/14, while standing in the holding cell, the inmate began to masturbate in front of the RN while smiling at her.  The RVR reported that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic.  A mental health assessment was completed on 2/27/14, with questions number two and three answered "no." Why an assessment was completed was not indicated.  Although the clinician answered "no" to question number three, he stated that the inmate was responsible for his actions at the time of the incident.  This answer was both unnecessary and unresponsive, and not in conformity with the RVR policy.  On 3/10/14, a hearing was held without the inmate present because he refused to attend.  The SHO considered the mental health assessment and found the inmate guilty.  In his decision, the SHO referenced the clinician's answer to question number three on the assessment.  Also contained within the decision was language that stated the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic.  The inmate was assessed 90 days' forfeiture of credit and 90 days loss of canteen, appliances, vendor packages, telephone privileges and personal property.  In his decision, the SHO also stated that masturbating with IDX was a serious threat to the safety of self or others and institutional security, requiring the maximum assessment of forfeiture of credit.  The inmate was referred to the ICC for program-custody review and possible SHU term.

**Impression**:  There was no mitigation in this case.  The clinician's response to question number three was unnecessary and unresponsive, and not consistent with the RVR policy.  The SHO did consider the mental health assessment, but it was unclear why the assessment was completed.  The inmate was assessed significant credit and privilege losses.

**Inmate D**
Date of Violation:  1/28/14
Date of Mental Health Assessment:  1/31/14
Date of Disposition:  2/10/14
Charge:  Battery on an Inmate - Division D Offense

On 1/20/14, the inmate was observed running towards the entrance door to the unit and striking another inmate.  A mental health assessment was completed on 1/31/14, with questions number two and three answered "no."  It was not indicated why a mental health assessment was completed.  Although the clinician answered "no" to question number three, he stated that the inmate was responsible for his actions at the time of the incident.  This language was unnecessary.  On 2/10/14, the inmate appeared for a hearing before the SHO.  Although a mental health assessment was completed, the SHO stated in his decision that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 61 days' forfeiture of credits due to his cooperation during the hearing.  The inmate was also referred to the ICC for a program-custody review and possible SHU term.  The ICC elected to assess and impose a two-month mitigated SHU term based on the inmate's lack of prior disciplinary history.  The committee considered the mental health assessment in its decision.

**Impression**:  There was mitigation in this case based on factors other than mental health.  It was not indicated in the RVR or decision why a mental health assessment form was completed when it was not required. The SHO did consider the mental health assessment in his decision.  The clinician provided comments on the assessment form when no comments were necessary. The inmate was assessed credit loss.

**Inmate E**
Date of Violation:  2/21/14
Date of Mental Health Assessment:  3/7/14
Date of Disposition:  3/13/14
Charge:  Possession of Dangerous Contraband - Division F Offense

On 2/21/14, during a random cell search, the officer discovered a household broom broken in half and two broken shaving razors.  On 3/7/14, a mental health assessment was completed with questions number two and three answered in the negative.  However, in response to question number three the clinician wrote that the inmate was responsible for his actions at the time of the incident.  This statement was both unnecessary and unresponsive to the question, and not consistent with the RVR policy.  In addition, the clinician answered "no" to question number one, which was applicable to 3CMS and non-MHSDS inmates but not to EOP inmates.

247

On 3/13/14, the inmate appeared for hearing before the SHO.  In the decision, the SHO reported that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic, a standard inapplicable to an EOP inmate, which this inmate was.  In the mental health section of the decision, the SHO reported that the clinician determined that the inmate would not benefit from the assignment of the staff assistant as his behavior was not influenced by his mental health status.  However, in the very next section, it was reported that the inmate did meet the criteria for staff assistant.  The SHO did consider the mental health assessment and found the inmate not guilty based on evidentiary reasons, namely that the cellmate pleaded guilty to the offense.  The decision also indicated that the inmate was referred to UCC/ICC for program and/or custody review and possible transfer.

**Impression**:  There was mitigation in this case for reasons other than mental health.  The inmate was found not guilty based on evidentiary reasons.  The clinician's answer to question number three was unnecessary and unresponsive.  The SHO reported that the inmate's behavior was not deemed bizarre, uncharacteristic, or unusual, when that standard was inapplicable to an EOP inmate.  The decision also incorrectly stated that a staff assistant was not warranted in this case.

**Inmate F**
Date of Violation:  1/30/14
Date of Mental Health Assessment:  3/3/14
Date of Disposition:  3/27/14
Charge:  Fighting - Division D Offense

On 1/30/14, the inmate and his cellmate were in the cell when the officer observed that the cellmate had an injury over his left eye.  The cellmate claimed that the inmate had hit him.  The RVR reported that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic, which is a standard inapplicable to an EOP inmate.  On 3/3/14, a mental health assessment was completed with question number two answered in the negative and question number three answered in the affirmative.  The mental health assessment indicated that the inmate's LOC was MHCB.  Although question number two was answered "no," the clinician reported that based on the progress notes of the preceding two days the inmate was stable and not experiencing any hallucinations.  He had no disorganized thoughts, and was not delusional or suicidal.  The clinician further stated that although the inmate was at the EOP LOC, mental health staff observed him as stable and not acting bizarrely or floridly psychotic.  The response to this question was unnecessary and unhelpful to the SHO.  In response to question number three, the clinician wrote that the staff assistant recommended the inmate should be given a little extra time to process information and a repeated check-ins to assess if he understood the current communications.  This answer was also unresponsive to the question.

On 3/27/14, the inmate appeared for a hearing before the SHO.  At the time of the hearing, the inmate's LOC was listed as inpatient.  The SHO also reported that the inmate did not demonstrate any strange, bizarre, or irrational behavior.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed zero days' forfeiture of credits due to failure to comply with timeframes and zero days' loss of privileges based on the mental health assessment.

**Impression**: There was mitigation in this case insofar as no loss of privilege based on mental health factors, but it was not specifically based on recommendations contained in the mental health assessment. The SHO considered the mental health assessment. The RVR referenced a standard inapplicable to EOP inmates. The clinician's answers on the mental health assessment were unresponsive and not helpful to a SHO. The inmate was not assessed any loss of credit due to failure to comply with timeframes.

**Inmate G**
Date of Violation: 2/27/14
Date of Mental Health Assessment: 3/7/14
Date of Disposition: 3/12/14
Charge: Fighting - Division D Offense

On 2/27/14, the inmate stood up from his seat in the dining hall, walked over to another inmate, and struck him with his fist. The inmates then began to fight. A mental health assessment was completed on 3/7/14, with questions number one, two, and three answered "no." Although question number one did not apply to an EOP inmate, the clinician wrote that the inmate would like EOP staff to accompany him to the hearing, if possible. In response to question number two, the clinician wrote that the inmate and his peer had made a trade agreement whereby the inmate provided food and the other inmate was to provide coffee. The inmate wanted coffee, and when the other inmate reneged on the agreement, they argued and then came to blows. Since the clinician answered "no" to this question, no response was necessary. The response in no way pertained to the inmate's mental health.

In the mental health portion of the decision, the SHO wrote that it was the clinician's determination that the inmate would not benefit from assignment of a staff assistant. Not only was this an incorrect statement of what the clinician wrote, but it was also mandated by policy that the inmate be provided a staff assistant due to his mental health LOC. However, in the very next section in the decision, it was reported that the inmate did meet the criteria for the assignment of a staff assistant. The SHO did consider the mental health assessment and found the inmate guilty. The inmate was assessed 61 days' forfeiture of credit -- the minimum amount of time allowable for Division D offense -- due to the fact that he pleaded guilty to the charge and showed remorse at the hearing. The inmate was also referred to the UCC/ICC for possible SHU term assessment and transfer.

**Impression**: Mitigation in this case was not based on any mental health factors. The SHO reported that the inmate's behavior was not deemed bizarre, uncharacteristic, or unusual, but that standard was inapplicable to an EOP inmate. The decision also incorrectly stated that a staff assistant was not needed in this case. The clinician's answer to question number three was unnecessary and unresponsive.

249

**Inmate H**
Date of Violation – 2/27/14
Date of Mental Health Assessment:  3/7/14
Date of Disposition – 3/12/14
Charge:  Fighting - Division D Offense

On 2/27/14, the inmate was sitting in the dining hall when another inmate approached him and punched him in the face.  Both inmates then began fighting in the dining hall.  On 3/7/14, a mental health assessment was completed with questions number one, two, and three answered "no."  Since the inmate was at the EOP LOC, question number one did not require a response.  Although question number three was answered "no," the clinician wrote that the inmate was responsible for his actions at the time of the incident.  This response was unnecessary and unresponsive to the question, and was not consistent with the RVR policy.  On 3/12/14, the inmate appeared for the hearing before the SHO.  The SHO reported that the inmate did meet the criteria for having a staff assistant.  The SHO considered the mental health assessment, found the inmate not guilty, and dismissed the charges in the interest of justice, finding that the inmate was simply defending himself.

**Impression**:  There was mitigation in his case based on factors other than mental health.  The clinician erroneously checked "no" to question number one on the mental health assessment when no response was required since the inmate was at the EOP LOC.  The clinician's response to question number three was unnecessary and unresponsive, and was not compliant with the RVR policy.  The SHO dismissed the charges.

**Inmate I**
Date of Violation – 3/12/14
Date of Mental Health Assessment:  3/24/14
Date of Disposition – 3/30/14
Charge:  Threatening a Peace Officer - Division B Offense

On 3/12/14, after being told that he needed to have clothing on all times while on the dayroom floor, the inmate argued with the officer and threatened him by stating that he was going to kick his ass.  A mental health assessment was completed on 3/24/14, with questions number two and three answered "no."  Although the clinician answered "no" to question number three, he stated that the inmate was responsible for his actions at the time of the incident.  This language was unnecessary and not consistent with the RVR policy.  On 3/30/14, the inmate appeared for a hearing before the SHO.  Although a mental health assessment was completed, the SHO stated in his decision that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic -- an inapplicable standard for a Division B offense.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 120 days' forfeiture of credits due to his cooperation during the hearing.  The inmate was also referred to the ICC for a program-custody review and possible SHU term. The CDO reduced the charge to a Division D offense and reduced the forfeiture of credits from 121 days to 60 days.

**Impression**:  There was mitigation in this case based on factors other than mental health.  The SHO considered the mental health assessment in his decision, and applied the bizarre, unusual,

or uncharacteristic standard which was not applicable to this case.  The clinician provided comments on the assessment form which were en no comments were necessary, and the comments were not in compliance with RVR policy.  The inmate was assessed significant credit loss.

**Inmate J**
Date of Violation:  1/9/14
Date of Mental Health Assessment:  1/21/14
Date of Disposition:  3/29/14
Charge:  Battery on a Peace Officer - Division B Offense

On 1/9/14 at approximately 4:40 p.m., the inmate struck a CO who was escorting him out of the holding cell into a new housing facility.  It eventually took two COs to restrain the inmate.  The RVR reported that the inmate's behavior was not bizarre, unusual, or uncharacteristic.  On 1/21/14, a mental health assessment was completed with questions number two and three answered "no."  In response to question number three, the clinician wrote that the inmate was responsible for his actions at the time of the incident.  This answer was both unnecessary and unresponsive and not in conformity with the RVR policy.  On 3/29/14, the inmate appeared for the hearing before the SHO.  This case was referred to the District Attorney for prosecution.  The SHO also reported that the inmate's behavior was not deemed bizarre, unusual or uncharacteristic.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 150 days' forfeiture of credit, the maximum amount of time allowable for Division D offense, and was assessed 90 days' loss of yard privileges.  The inmate was also referred to the ICC for possible SHU term assessment and transfer.

**Impression**:  There was no mitigation this case. It was not reported why the mental health assessment was completed.  The SHO considered the mental health assessment.  The clinician's answer to question number three was both unresponsive and unnecessary, and not consistent with the RVR policy. The inmate was assessed significant credit loss in addition to loss of privilege.

**Inmate K**
Date of Violation:  1/10/14
Date of Mental Health Assessment:  1/23/14
Date of Disposition:  2/19/14
Charge:  Battery on an Inmate with a Weapon - Division A-1 Offense

On 1/10/14, during an EOP group session in the chapel, the inmate grabbed a cane from another inmate and struck him on the head, breaking the cane into two pieces.  The inmate dropped the cane and continued to strike the other inmate in the upper torso and facial area with his fists and his knees.  The CO used pepper spray to stop the inmate.  The RVR reported that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic, which is a standard inapplicable to an EOP inmate.  On 1/23/14, a mental health assessment was completed with questions number two and three answered "no."

On 2/19/14, the inmate appeared for the hearing before the SHO.  In the consideration of the mental health assessment, the SHO indicated that the clinician reportedly expressed that the SHO

should "not" consider the inmate's mental health status when assessing a penalty if found guilty. However, there was no written comment by the clinician in response to question number three - it was merely checked "no." The inmate was found guilty and assessed 360 days' forfeiture of credit -- the maximum amount of time allowable for Division A-1 offense. The inmate was also referred to the ICC for program review and SHU term consideration. The ICC elected to assess and impose a 15-month SHU term. The committee found no aggravating or mitigating factors. The committee did consider the mental health assessment during the hearing.

**Impression**: There was no mitigation this case. The reviewing clinician used the bizarre, unusual, or uncharacteristic behavior standard which was not applicable to the EOP LOC. Both the RVR and the SHO referenced this inapplicable standard. The SHO interpreted a negative answer to question number three on the mental health assessment form as an affirmative duty to not consider any mental health factors when assessing a penalty, which is not the RVR policy. The inmate was assessed significant credit loss.

**Inmate L**
Date of Violation:  2/13/14
Date of Mental Health Assessment:  2/20/14
Date of Disposition: 2/22/14
Charge:  Fighting - Division D Offense

On 2/13/14, the inmate was involved in an altercation with his cellmate.  The RVR reported that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic -- a standard that is inapplicable to an EOP inmate.  A mental health assessment was completed on 2/20/14 with questions number two and three answered "no."

On 2/22/14, the inmate appeared for a rehearing before the SHO.  In his decision, the SHO also documented that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic and that a mental health assessment was not completed.  There was no mention of the mental health assessment in the decision, nor was the assessment listed as evidence presented at the hearing and considered by the SHO.  The inmate was found guilty and assessed 61 days' forfeiture of credits -- the least amount of time allowable for a Division D offense -- due to the inmate's taking responsibility for his actions.

**Impression**:  There was mitigation in this case based on factors other than mental health.  The RVR and the decision both referenced the inapplicable standard of bizarre, unusual, or uncharacteristic behavior.  The SHO did not realize that a mental health assessment was completed, despite the fact that the inmate was at the EOP LOC, and made no mention of it in the decision.

**Inmate M**
Date of Violation:  2/4/14
Date of Mental Health Assessment:  3/13/14
Date of Disposition:  3/27/14
Charge:  Delaying a Peace Officer in the Performance of Duty - Division D Offense

On 2/4/14, the inmate refused to come out of the shower because he wanted to use nail clippers. Staff was unable to find a pair for him to use. The inmate ultimately delayed the shower program for approximately two hours. The RVR reported that the inmate's behavior was not deemed unusual, bizarre, or uncharacteristic.  On 3/13/14, a mental health assessment was completed with question number two answered "yes" and question number three answered "no."  In response to question number two, the clinician wrote that although the inmate refused the interview, there was ample psychiatric documentation of the inmate having persecutory delusions which could be the basis for the defiant and aggressive behavior.

On 3/27/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment in his decision.  Although the clinician found that the inmate's mental disorder contributed to the behavior that led to the RVR, the SHO reached his conclusion based on the mental health status of the inmate at the time of the hearing.  The SHO believed that the inmate was aware of his actions at the time of the disciplinary hearing and the consequences thereof, and therefore believed that the inmate should be held accountable for his actions.  In effect, the SHO completely disregarded the mental health assessment used to determine the inmate's mental health status at the time of the offense.  The inmate was found guilty and assessed zero days' forfeiture of credits due to failure to comply with timeframes.

**Impression**:  There was no mitigation in this case. The SHO disregarded the mental health assessment and chose to reach his decision based on the mental health status of the inmate at the time of the hearing rather than at the time that the offense occurred, which was not compliant with the RVR policy. The inmate was not assessed credit forfeiture due to failure to comply with timeframes.

**Inmate N**
Date of Violation:  2/23/14
Date of Mental Health Assessment:  4/23/14
Date of Disposition:  4/30/14
Charge:  Battery on an Inmate - Division D Offense

On 2/23/14, the inmate was involved in an altercation with his cellmate.  It took three bursts of pepper spray and the use of a baton to gain compliance by the inmate.  The RVR reported that the inmate's behavior was not deemed bizarre, unusual, or on characteristic, a standard inapplicable to an EOP inmate.  On 4/23/14, a mental health assessment was completed with questions number two and three answered "yes."  In response to question number two, the clinician wrote that the behavior in the RVR was a product of the chronic mental health disorder and that the disorder precluded the inmate from following institutional rules.  In response to question number three, the clinician wrote that the RVR should be mitigated and that the inmate

should be released to a yard setting as soon as possible, as it was likely he would decompensate in administrative segregation.

On 4/30/14, the inmate appeared for rehearing before the SHO. In the decision, the SHO took into consideration the mental health assessment but believed that the inmate was aware and responsible for his actions. The SHO's consideration of the inmate's mental health status was determined by the inmate's actions at the time of the hearing rather than at the time the offense occurred. The inmate was found guilty and assessed zero days' forfeiture of credits due to failure to comply with timeframes. The inmate was also placed on privilege group C status for 60 days and was retained in administrative segregation pending referral to the ICC for possible SHU term assessment. The ICC elected to assess and impose a three-month SHU term since the inmate had less than six months on his sentence. The committee did consider the mental health factors and assessment.

**Impression**: There was no mitigation in this case. The SHO's consideration of the inmate's mental health status was based on the inmate's actions and answers at the time of the hearing rather than at the time the offense occurred, which was not in conformance with the RVR policy. The SHO did not adopt the recommendations made by the clinician. The inmate was not assessed loss of credits due to failure to comply with timeframes.

## Inmate O
Date of Violation:  2/23/14
Date of Mental Health Assessment:  4/23/14
Date of Disposition:  4/30/14
Charge:  Assault on a Peace Officer - Division D Offense

On 2/23/14, while being escorted out of the holding cell and to another facility, the inmate attempted to spit at the CO but missed. The inmate then tried to break away from the escorting officer who was forced to use his baton to gain compliance from the inmate. Another officer also arrived and used pepper spray. The RVR reported that the inmate's behavior was not deemed bizarre, unusual, or uncharacteristic, which is a standard inapplicable to an EOP inmate. On 4/23/14, a mental health assessment was completed with questions number two and three answered "yes." In response to question number two, the clinician wrote that the behavior in the RVR was a product of the inmate's chronic mental health disorder and that the disorder precluded the inmate from following institutional rules. In response to question number three, the clinician wrote that the RVR should be mitigated and that the inmate should be released to yard setting as soon as possible, as it was likely he would decompensate in administrative segregation.

On 4/30/14, the inmate appeared for rehearing before the SHO. In the decision, the SHO took into consideration the mental health assessment but believed that the inmate was aware and responsible for his actions. The SHO's consideration of the inmate's mental health status was determined by the inmate's actions at the time of the hearing rather than at the time the offense occurred, which was not consistent with the RVR policy. The inmate was found guilty and assessed zero days' forfeiture of credits due to failure to comply with timeframes. The inmate was also placed on Privilege Group C status for 60 days and was retained in administrative

segregation pending referral to the ICC for possible SHU term assessment. The ICC elected to assess, impose, and suspend a nine-month aggravated SHU term to run concurrent with the three-month SHU term assessed for an RVR committed on the same date. The committee considered the mental health factors and assessment.

**Impression**: There was no mitigation in this case. The SHO's consideration of the inmate's mental health status was based on the inmate's actions and answers at the time of the hearing, rather than at the time the offense occurred, which was not what the RVR policy provided. The SHO did not apply any recommendations made by the clinician in the disposition. The inmate was not assessed any credit loss due to failure to comply with timeframes, but loss of privilege was imposed.

### California State Prison, Los Angeles County (CSP/LAC) RVR Review

**SUMMARY OF FINDINGS**

A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at California State Prison, Los Angeles County (CSP/LAC) by completing and sustaining all requirements.

B. CSP/LAC was not compliant with required training of custody and mental health staff related to the RVR process.

C. Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D. There was no clear process for mental health assessment requests at CSP/LAC.

E. Reporting employees indicated multiple levels of care and incorrect levels of care for inmates on the RVR.

F. Clinicians inappropriately indicated on the mental health assessments that a staff assistant was not required for inmates receiving MHCB LOC.

G. The quality of the mental health assessments was variable with some clinicians not utilizing layman's terms.

H. SHOs reported handwriting legibility problems by clinicians.

I. SHOs noted that mental health assessments were reviewed and considered; however, in a pro forma fashion utilizing canned language.

J. SHOs applied the mental health assessment in the nature of an "insanity" or "competency" evaluation which is not provided for under the RVR policy, or conducted a "clinical" evaluation of the inmate's mental health status as he appeared to the SHO at the time of the hearing.

K. When mitigation was noted, it was generally a narrow, strict application of the clinician's recommendation.

L. There was no quality review of the RVR process at CSP/LAC.

M. Inmate clerks typed final RVRs which afforded access to confidential MHSDS information contained in the mental health assessment.

N. The ICC considered the mental health assessments in its decisions along with input provided by the clinicians who were present at the meetings. However, there was no mitigation by the ICC based on mental health factors in the cases reviewed.


**INTRODUCTION**

On October 2-3, 2014, the Coleman monitoring team reviewed the RVR process at CSP/LAC. At the time of the site visit, CSP/LAC housed inmates at custody levels I, III, and IV and inmates with a mental health designation of 3CMS, EOP and MHCB. As of March 2014, CSP/LAC had a total inmate population of 3,599. Of the total population, 1,673 or 46 percent of inmates were on the mental health caseload.

The review period covered RVRs issued and/or heard during January, February and March 2014. During this period there were a total of 1,336 RVRs written with 581 or 43 percent issued to inmates on the mental health caseload. There was no quality review of the RVR process at CSP/LAC.

**TRAINING**

CSP/LAC staff was able to produce one proof of practice memorandum, dated March 21, 2012, in response to the November 3, 2011 memorandum requirement. However, CSP/LAC staff was not able to produce any lesson plan or PowerPoint presentation regarding mental health input into the RVR process. IST produced a report listing staff who attended the required training sessions. The IST reports indicated training ranged from .15 of an hour to 4.0 hours.

CSP/LAC was not able to demonstrate compliance with the required four-hour training for designated staff members. The four-hour training was received by 25 percent of CDOs, 75 percent of captains, 80 percent of lieutenants, 49 percent of sergeants and eight percent of social workers. None of the CC IIs or psychologists received the four-hour training. The one-hour training was received by all CDOs, 75 percent of captains, 80 percent of lieutenants, 51 percent of sergeants and eight percent of social workers. None of the CC IIs or psychologists received the one-hour training.

256

<u>CSP/LAC RVR Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 4 | 1/25% | 4/100% |
| Captains | 4 | 3/75% | 3/75% |
| Lieutenants | 24 | 20/80% | 20/80% |
| Sergeants | 67 | 33/49% | 34/51% |
| CC-II appeals | 2 | 0/0% | 0/0% |
| Psychologists | 30 | 0/0% | 0/0% |
| Social Workers | 13 | 1/8% | 1/8% |

**STAFF INTERVIEWS**

**SHOs**

During the site visit, the monitors interviewed eight SHOs in a group setting. The SHOs indicated the process of getting the mental health assessment form to mental health staff for completion and return is completed via the disciplinary officer hand carrying the RVR and mental health assessment form to one location in mental health services. The SHOs indicated the assessments were returned to custody within one to three weeks. The SHOs reported the delay in mental health staff returning the assessment at times resulted in missing time constraints and, in turn, the ability to assess any forfeiture of credit if the inmate was found guilty of the RVR.

The SHOs indicated they had difficulty reading the clinician's responses on the mental health assessment form, as well as deciphering the signature of the clinician completing the form. SHOs reported that the clinicians usually provided very little useful information in response to question number two on the mental health assessment form. For example, the clinician may note, inmate is EOP LOC. In rare circumstances, the clinician stated the inmate was hearing voices or inmate was bi-polar. In response to question number three, SHOs stated that they believed clinicians may be getting manipulated by inmates, resulting in clinicians writing recommendations to not assess loss of canteen, visiting, or dayroom privileges. The SHO who worked on the EOP facility stated that clinical staff always wrote a comment in question number three regardless of which box was checked.

Some SHOs reported they knew the mental health staff based on their assignment. For example, the SHO on the EOP facility knew most of the clinical staff on the facility, while SHOs on non-mental health facilities didn't have any interaction with mental health staff. All of the SHOs reported that they would be comfortable calling mental health staff if needed to clarify a response on the mental health assessment form.

SHOs advised the monitors that RVRs were typed by inmate clerks, except for RVRs issued to DDP inmates and RVRs involving Prison Rape Elimination Act allegations.

**Clinicians**

Four mental health staff were interviewed regarding mental health input into the RVR process.  The staff indicated that copies of the RVR and mental health assessment form were delivered to multiple OTs throughout the institution for logging and assignment to a clinician. This report was different from the process reported above by the SHOs.  Further, the clinicians reported completing and returning the assessments within 24 hours.
The clinicians stated that they interviewed the inmate, reviewed the eUHR and C-file, spoke with the inmate's floor officer, and the PC.  This process reportedly took approximately one hour to complete.

Regarding question number two of the mental health assessment, clinicians stated they tried to determine if the inmate's symptoms were related to the behavior documented on the RVR.  For example, if the inmate was paranoid and refused to accept a cellmate, then the inmate's mental illness may have contributed to an RVR for delaying a peace officer in the performance of their duty by refusing a cellmate.  With regard to question number three of the mental health assessment, some clinicians reported contacting the inmate's PC to determine what, if any privileges may be part of the treatment plan and should not be impacted.  Other clinicians indicated that they asked the inmate what they used as coping mechanisms to possibly include on the assessment form.

The clinicians stated they were never contacted by a SHO regarding an RVR.  The clinicians indicated a meeting/training with SHOs would be beneficial in order to build a better relationship with the SHOs, as there was very little contact between the clinicians and the SHOs. Clinicians stated they interacted with the housing unit floor officers on a regular basis but rarely saw or spoke with a lieutenant.

**MENTAL HEALTH ASSESSMENT REQUESTS**

There were different processes described by the SHOs and clinicians regarding the request for a mental health assessment.  Further, also adding to the confusion was the multiple levels of care noted by reporting employees on several RVRs.  For example, reporting employees noted inmates were receiving 3CMS LOC *and* MHCB LOC or EOP *and* MHCB LOC.  (*See* CSP/LAC Inmates A, B, C, F.)  Also, some RVRs indicated the wrong LOC for the inmates. (*See* CSP/LAC Inmate I.)

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Over half of the reviewed cases indicated no mental health considerations for the SHO. The quality of the assessments varied, with some clinicians appropriately answering questions number two and three; while others did not utilize layman's terms or improperly indicated no need for a staff assistant when the inmate was receiving MHCB LOC.  (*See* CSP/LAC Inmates B, F.)  Of the few reviewed cases that had affirmative answers to question number three, the clinicians' recommendations were specific and detailed regarding the adverse effects of taking away certain privileges.  (*See* CSP/LAC Inmates M, N.)

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

SHOs regularly noted review and consideration of mental health assessments in the RVR; however, in some instances did not indicate how it was considered in the final determinations. (*See* CSP/LAC Inmates A, H.)  Further, SHOs regularly used canned language when noting consideration, specifically, "The SHO has reviewed the Mental Health Assessment and considered the recommendations of the clinician as they pertain to the assessment of penalties." (*See* CSP/LAC Inmates B, C, E, F, G, H, I.)

Several SHOs also applied the mental health assessment in the nature of an "insanity" or "competency" evaluation which is also not provided for under the RVR policy, or conducted a "clinical" evaluation of the inmate's mental health status as he appeared to the SHO at the time of the hearing, noting, "the clinician made no indication that [inmate] was not responsible for his actions at the time of the offense or that he was incapable of understanding right from wrong. [Inmate] appeared at the hearing with a coherent demeanor and appeared to understand all relevant information."  (*See* CSP/LAC Inmates C, E, F, G, I.)

In the occasional case where mitigation was noted based on clinician recommendation, it was very narrowly applied.   For example, a clinician noted that the inmate's mental health may be adversely impacted if restricted from more than two weeks from positive social interaction, i.e. yard privileges.  The SHO noted the recommendation and did not assess loss of yard privileges; however, he did impose 30 days loss of dayroom privileges which would also be considered social interaction.  (*See* CSP/LAC Inmate E.)

In one reviewed case, the SHO lessened the offense from a Division B to a Division E, however, the SHO did not attribute the mitigation to the mental health assessment.  Further, the SHO assessed 90 days forfeiture of credit, more than the allowable maximum of 60 days for a Division E offense.  (*See* CSP/LAC Inmate I.)

In two decisions, the SHO made no reference to the mental health assessment even though question number two or three was answered in the affirmative. (*See* CSP/LAC Inmates J, K.)

In another reviewed case, the SHO concluded that the inmate's conscious decision to skip the hearing indicated the inmate knew what he was doing at the time of the hearing and at the time of the incident even though the clinician found a nexus between the inmate's mental illness and his actions which led to the RVR. (*See* CSP/LAC Inmate L.)

SHOs also referenced the "bizarre, unusual or uncharacteristic" standard when inapplicable to the nature of the charges. (*See* CSP/LAC Inmates D, O.)

One SHO stated that he considered the request of the clinician in response to question number three and *did* assess the penalties the clinician recommended.  The clinician recommended not restricting privileges for more than 30 days. The SHO assessed 30 days loss of

259

yard privileges, dayroom privileges and telephone privileges.  (*See* CSP/LAC Inmate N.)  The SHO clearly misinterpreted the clinician's recommendation.

**ICC REVIEW**

The ICC documented its consideration of the mental health assessments as well as the input from the mental health clinicians present at the meetings. The references to the mental health assessments and clinicians' comments did not appear to be pro forma but rather case and inmate specific. (*See* CSP/LAC Inmate F.)

## CSP/LAC RVR Case Reviews

**Inmate A**
Date of Violation: 1/7/14
Date of Mental Health Assessment:  1/14/14
Date of Disposition:  3/18/14 - delayed hearing due to MHCB exceptional circumstances
Charge:  Willfully Obstructing a Peace Officer in the Performance of Duty – Division D Offense

On 1/7/14, a cell extraction team was formed to remove this MHCB inmate from his cell, as he refused to exit his cell for his court ordered medication.  Prior to actual entry into the cell, the inmate complied.  When escorted to a chair outside of his cell door, the inmate refused to sit, requiring physical force to push him into the chair.  Once seated, the medication was administered.  The reporting employee noted that the inmate was a participant in the MHSDS at the 3CMS and MHCB levels of care.  Inmates cannot be placed in two MHSDS levels of care at the same time.

A mental health assessment was completed on 1/14/14, with questions number two and three answered in the negative.  On 1/27/14, a memorandum noting suspension of hearing time limitations due to exceptional circumstances pertaining to inmates housed in MHCBs was provided by a clinical psychologist at CSP/LAC.  The inmate was discharged from the MHCB on 3/11/14 and the exceptional circumstances time suspension was lifted.

The mental health assessment was noted in the RVR Part C in the Mental Health Information section.  The inmate was found guilty and assessed 61 days forfeiture of credit, ten days loss of yard privileges and referred to ICC for program/housing review.  The SHO noted in the disposition that he reviewed the mental health assessment and considered the recommendations of the clinician as they pertained to the assessment of penalties.

The ICC Classification Chrono CDC 128 G noted that this was not a SHUable offense.

**Impression**:  There was no indication that any mitigation in this case was related to the mental health assessment.  The reporting employee inappropriately noted that the inmate was two levels of care (3CMS and MHCB), but the inmate was at the MHCB level or care.  The clinician answered "no" for question numbers two and three of the mental health assessment.  The SHO noted consideration of the mental health assessment in the findings.  While the SHO assessed a

penalty at the lower end of a Division D offense, he or she did not indicate that mitigation occurred, or if it did, that the mitigation was related to the mental health assessment. This RVR was written and heard prior to the CDCR headquarters directive issued in June 2014 prohibiting issuance of RVRs as a result of cell extractions to administer forced medication. The inmate was assessed credit forfeiture and loss of privileges.

**Inmate B**
Date of Violation: 1/22/14
Date of Mental Health Assessment: 1/29/14
Date of Disposition: 2/11/14
Charge: Refusing to Provide a Urine Specimen – Division F offense

On 1/22/14, this MHCB inmate agreed to provide a random urine specimen; however, he was unsuccessful on first attempt. After several attempts, the inmate stated, "I just can't go". He later called the officer to the cell and notified him that he urinated in a paper cup to which the officer responded that he had to be in the room when he urinated. The inmate never provided a urine sample within the three-hour timeframe and therefore received an RVR. The reporting employee noted that the inmate was a participant in the MHSDS at the 3CMS and MHCB levels of care. However, inmates cannot be placed in two MHSDS levels of care at the same time.

A mental health assessment was completed on 1/29/14, with questions number one, two and three answered in the negative. Question number one should have been answered in the affirmative, as the inmate was receiving MHCB LOC, which automatically triggered the assignment of a staff assistant. A staff assistant was assigned on 1/23/14.

The mental health assessment was noted in Part C in the Mental Health Information section of the RVR. The inmate was found guilty (second offense) and assessed 30 days forfeiture of credit, 30 days loss of yard privileges, 30 days loss of telephone privileges, 30 days loss of dayroom privileges, 90 days loss of visits followed by 90 days non-contact visits, one year mandatory random drug testing, mandatory substance abuse education attendance and was referred to UCC for program/housing review.

**Impression**: There was no mitigation in this case. The reporting employee inaccurately reported the inmate as being two levels of care; the inmate was actually at the MHCB LOC. The clinician inappropriately checked "no" for question number one of the mental health assessment as the inmate was receiving MHCB LOC. The SHO noted the mental health assessment in the RVR, but did not indicate if and how they were considered. The inmate was assessed credit forfeiture and extensive losses of privileges.

**Inmate C**
Date of Violation:  1/29/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  2/25/14
Charge:  Refusing to Provide a Urine Sample – Division F Offense

On 1/29/14, this MHCB inmate refused to provide a urine sample.  The reporting employee noted that the inmate was a participant in the MHSDS at the 3CMS and MHCB levels of care. Inmates cannot be placed in two MHSDS levels of care at the same time.  A mental health assessment was completed on 2/5/14, with questions numbers two and three answered in the negative.  The mental health assessment was noted in Part C in the Mental Health Information section of the RVR.

On 2/25/14, the inmate appeared before the SHO for a hearing.  The SHO documented consideration of the mental health assessment in the findings of the RVR using canned language. The SHO noted that the clinician "made no indication that [inmate's name] was not responsible for his actions at the time of the offense or that he was incapable of understanding right from wrong.  [Inmate's name] appeared at the hearing with a coherent demeanor and appeared to understand all relevant information."  Further, the SHO also used canned language in the disposition stating, "The SHO has reviewed the Mental Health Assessment and considered the recommendations of the clinician as they pertain to the assessment of penalties."

The inmate was found guilty and assessed the penalties for a second offense, including 30 days forfeiture of credit, 60 days loss of yard privileges, 60 days loss of dayroom privileges, 60 days loss of telephone privileges, 90 days loss of visits followed by 180 days non-contact visits, one year mandatory random drug testing, five days confinement to quarters, and mandatory substance abuse education attendance.

**Impression**:  There was no indication that mitigation occurred in this case.  The reporting employee inaccurately reported the inmate as receiving two levels of care, when the inmate was at the MHCB LOC.  The mental health assessment indicated "no" for question numbers two and three.  The SHO reiterated the mental health assessment in the mental health information section of the RVR.  The SHO used canned language when documenting consideration of the mental health assessment in the findings and disposition, which included application of a standard related to the SHO's assessment of the inmate at the time of the hearing, which was not part of the RVR policy. The inmate was assessed credit forfeiture and extensive loss of privileges.

**Inmate D**
Date of Violation:  3/15/14
Date of Mental Health Assessment:  3/26/14
Date of Disposition:  7/22/14
Charge:  Possession of an Inmate Manufactured Weapon - Division A-1 Offense

On 3/15/14, an inmate manufactured weapon was discovered during a random cell search of this 3CMS inmate's cell.  On 3/26/14, a mental health assessment was completed with questions

number two and three answered in the negative. This matter was referred to the District Attorney's Office which declined to prosecute the matter on 7/3/14.

On 7/22/14, the inmate appeared for a hearing before the SHO. In the decision, the SHO reported that the inmate's behavior at the time of the rule violation was not deemed to have been bizarre, unusual, or uncharacteristic - a standard inapplicable to a Division A-1 offense. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 181 days forfeiture of credit, the least amount of time allowable for a Division A-1 offense, and was assessed ten consecutive days loss of yard privileges. The inmate was also referred to the ICC for SHU term assessment.

**Impression**: There was no mitigation in this case. The decision referenced the standard of bizarre, unusual or uncharacteristic behavior - a standard inapplicable to a Division A-1 offense. The SHO noted consideration of the mental health assessment in the decision. The inmate was assessed significant credit loss in addition to loss of privileges.

**Inmate E**
Date of Violation: 2/6/14
Date of Mental Health Assessment: 2/25/14
Date of Disposition: 4/1/14- delayed due to exceptional circumstances
Charge: Threatening a Non-Prisoner – Division F Offense

On 2/6/14, while being escorted back to his cell upon leaving IDTT, this MHCB inmate told the clinician, "I am going to get your ass, I telling you." He was informed that the comments constituted a threat towards staff and could result in a RVR to which he responded, "I will get you man, this is bullshit." The reporting employee noted that the inmate was a participant in the MHSDS at the EOP and MHCB levels of care. Both the EOP and MHCB boxes were checked on the mental health assessment request form as well, but only one box indicating which LOC should have been checked. However, this was an error since the inmate can only be at one LOC and so only one box indicating which LOC should have been checked.

A mental health assessment was completed on 2/26/14, with question number two answered in the negative and question number three answered in the affirmative. The response to question number two stated that although the inmate was impulsive and immature, he was clearly aware of the impact of his actions and behavior and this action was not solely attributed to his mental health status. The response to question number three stated, "the i/p's mental health may be adversely impacted if restricted for more than two weeks from positive social interaction, (i.e. yard privileges)."

The mental health assessment was reiterated verbatim in the RVR-Part C Mental Health Information section. The inmate was found guilty and the SHO noted that the clinician, "made no indication that [inmate's name] was not responsible for his actions at the time of the offense or that he was incapable of understanding right from wrong." The SHO used canned language in the disposition, stating, "The SHO has reviewed the Mental Health Assessment and considered the recommendations of the clinician as they pertain to the assessment of penalties." The SHO assessed 30 days forfeiture of credit (maximum); however, he did not impose loss of yard

privileges, "taking into consideration the Mental Health Assessment submitted at the hearing."
He was also assessed 30 days loss of dayroom privileges, 30 days loss of telephone privileges,
and referred to ICC for program/custody/housing review.

The ICC Classification Chrono CDC 128 G dated 4/10/2104 noted that the RVR did not meet the
threshold for a SHUable offense.

**Impression**:  While there was mitigation based on the mental health assessment, the inmate
received the maximum forfeiture of credit; the SHO only mitigated the specific example (i.e.
yard privileges) given by the clinician in the assessment.  The SHO used a very literal
interpretation of the mental health assessment.  For example, the SHO assessed 30 days loss of
dayroom privileges which could also be considered "positive social interaction."  The SHO used
canned language in the findings and disposition.  The inmate was assessed credit loss and several
losses of privileges.

**Inmate F**
Date of Violation:  2/24/14
Date of Mental Health Assessment:  2/28/14
Date of Disposition:  3/10/14
Charge:  Battery on a Peace Officer – Division B Offense

While being escorted back to his cell from the committee room after his psychiatric interview,
this MHCB inmate informed the escort officer that he needed his wrist braces.  The officer told
the inmate that because of his suicide watch status he could not have his wrist braces returned.
The inmate became agitated and yelled "…the doctor assigned those braces to me so you have to
give them to me."  The officer informed him that his braces would be outside his cell door and
when he was cleared they would be returned to him.  The inmate continued "to rant" and stated,
"if you don't give me the braces, then I don't know about you getting these handcuffs back."
The unit sergeant was notified and the officer placed the inmate's chest against the cell door.
The officer ordered him to lie on his bunk in a prone position and as they turned to the right
towards the inmate's bunk, the inmate jumped on the top of the bunk landing on the mattress
with both feet.  He then dove into the officer causing him to lose his balance and the officer
struck the wall with his right shoulder.  The inmate and officer both fell to the ground.  Two
officers entered the cell to assist and maintained control of the inmate.

The reporting employee noted that the inmate was a participant in the mental health delivery
system at the EOP and MHCB levels of care.  A mental health assessment was completed on
2/28/14, with questions number two and three answered in the affirmative.  The response to
question number two stated, "inmate patient [inmate's name] has a history of conduct issues that
appear to be exacerbated by mood disturbance, impulsivity and paranoid/persecutory beliefs
which have resulted in his current inpatient hospitalization and referral to DSH."  The clinician
did not utilize layman's terms in order to convey useful information regarding the mental health
status of the inmate to the SHO.

In response to question number three, the clinician indicated that the inmate patient programming
was limited in his current treatment setting (MHCB) and prior (Administrative Segregation

264

EOP).  The clinician continued, "However, yard time is beneficial.  Restriction of yard time over 10 days may be a detriment to his mental health."

On 3/10/14, the inmate appeared before the SHO for a hearing.  The mental health assessment was reiterated verbatim in the Mental Health Information section of the RVR-Part C.  The inmate was found guilty.  The SHO noted in his findings that the mental health assessment was reviewed, "which indicated [inmate's name] mental disorder did appear to contribute to the behavior that led to the RVR; however, [inmate's] irresistible impulse does excuse criminal conduct, the statements made by [inmate] at the time of the offense indicates a capacity to understand his actions."  The SHO also noted, "[Clinician] indicated that inmate's mental disorder did appear to contribute to the behavior that led to the RVR; however, made no indication that [inmate] was not responsible for his actions at the time of the offense or that he was incapable of understanding right from wrong.  [Inmate] appeared at the hearing with a coherent demeanor and appeared to understand all relevant information."

The SHO's statements were confusing in that he stated that while the inmate was unable to control his behavior due to "irresistible impulse" which excused his conduct, he was able to understand his actions, therefore he should be held accountable even though he could not control the behavior.  Further, the SHO disregarded the clinician's findings that the inmate's mental disorder contributed to the behavior because the clinician did not indicate in the assessment that he was "not responsible" for his action or incapable of understanding right from wrong.

The SHO used canned language in the disposition, stating, "The SHO has reviewed the Mental Health Assessment and considered the recommendations of the clinician as they pertain to the assessment of penalties."  The SHO assessed 150 days forfeiture of credit (maximum), 30 days loss of dayroom privileges, 30 days loss of telephone privileges, 10 days loss of yard privileges and was referred to UCC for a SHU term referral consideration.  The credit was ineligible for restoration due to the division of the offense.

The ICC Classification Chrono CDC 128 G dated 3/26/14 noted the inmates transfer to DSH at CMF on 3/20/14.  ICC noted review of the mental health assessment and elected to hold the inmate accountable for his actions, "noting Subject's mental health did play a role in Subject's behavior.  Taking everything into consideration ICC elects to assess and impose a 10-month mitigated SHU term with a MERD of 10/19/14."  The SHU term was mitigated due to no similar behavior for battery and for mental health issues and was not aggravated due to not meeting criteria for aggravation."

**Impression**:  There was no mitigation in this case. The reporting employee documented that the inmate was receiving two levels of care, which was wrong.  The inmate was at the MHCB LOC.  The clinician completing the mental health assessment did not utilize layman's terms.  While the SHO reported considering the mental health assessment, it appeared to have been disregarded since it did not specifically indicate that the inmate was not responsible for his actions and/or did not know right from wrong at the time of the incident.  The SHO utilized canned language in the disposition, which included application of a standard related to the SHO's assessment of the inmate at the time of the hearing, which was not part of the RVR policy. The inmate was assessed significant credit loss and losses of privileges.

**Inmate G**
Date of Violation: 2/25/14
Date of Mental Health Assessment: 3/5/14
Date of Disposition: 3/27/14
Charge: Willfully Obstructing any Peace Officer in the Performance of Duty – Division D Offense.

When ordered to submit to cuffs to be escorted to his new cell in administrative segregation, the inmate refused causing the need to assemble an extraction team. Once the team was formed and introduced on video camera, the lieutenant gave him a final order to submit to restraints to which he complied. His initial refusals requiring the assembly of the extraction team interfered with normal CTC operations for approximately two hours. The reporting employee noted that the inmate was a participant in the MHSDS at the EOP LOC. The incident occurred in CTC; however, inmate had been clinically discharged from MHCB and was being escorted to Ad Seg.

A mental health assessment was completed on 3/5/14, with questions number two and three answered in the negative. On 3/27/14, the inmate appeared before the SHO for a hearing. The assessment was repeated verbatim in the Mental Health Information section of the RVR-Part C.

The SHO referenced the mental health assessment in his findings and stated that it indicated that the inmate's mental disorder did not appear to contribute to the behavior that led to the RVR and made no indication that the inmate was not responsible for his actions at the time of the offense or that he was incapable of understanding right from wrong. In the disposition, the SHO further referenced the mental health assessment and noted that he reviewed the assessment and considered the recommendations of the clinician as they pertained to the assessment of penalties. The inmate was found guilty and assessed 90 days forfeiture of credit the maximum for a Division D offense and ten consecutive days' loss of yard privileges.

**Impression**: There was no mitigation in this case. The SHO noted consideration of the mental health assessment; however used canned language when documenting consideration in the finding and disposition. The inmate was assessed significant credit loss in addition to loss of privileges.

**Inmate H**
Date of Violation: 2/27/14
Date of Mental Health Assessment: 3/4/14
Date of Disposition: 8/21/14 – delayed due to DSH admission
Charge: Disrespect with a Potential for Violence – Division E Offense

During a cell-front interview with his clinician, this MHCB inmate used profanity and requested that the clinician "take your ass back to D1 and A4," and then punched the cell door window at the level of the clinician's face. The reporting employee noted that the inmate was a participant in the MHSDS at the EOP LOC. This was inaccurate, because the inmate was in the MHCB. A clinician was the reporting employee.

266

A mental health assessment was completed on 3/4/14, with questions number one, two and three answered in the affirmative. The response to question number two stated, "the i/p has a long history of mental illness that includes paranoia and distortions of reality to match his paranoia which makes him unpredictably violent when unprovoked." The response to question number three stated that the inmate had limited programming in his current treatment setting; however, yard was considered beneficial. Restrictions of yard time over ten days may be a detriment to the inmate's mental health.

On 8/21/14, the inmate appeared before the SHO for a hearing. The mental health assessment was reiterated verbatim in the Mental Health Information section of the RVR-Part C. The inmate was found guilty and the SHO again repeated the clinician's statements in the findings. Further, the SHO noted that the inmate appeared at the hearing with a coherent demeanor and appeared to understand all relevant information.

In the disposition, the SHO used canned language stating that the "SHO has reviewed the Mental Health Assessment and considered the recommendations of the clinician as they pertain to the assessment of penalties." The inmate was assessed 60 days forfeiture of credit (maximum) and 15 days loss of all vendor package privileges.

**Impression**: While the SHO mitigated by not taking yard privileges, he did not specify the mental health assessment as the reason for the mitigation. The SHO used canned language in the disposition, which included application of a standard related to the SHO's assessment of the inmate at the time of the hearing, which was not part of the RVR policy. The clinician wrote an appropriate assessment; however, it appeared that it was largely disregarded. It was observed that a clinician wrote the RVR, which may have the potential of adversely impacting the forming of clinical alliances between mental health clinical staff and patients. The inmate was assessed credit loss and loss of privilege.

## Inmate I
Date of Violation: 3/25/14
Date of Mental Health Assessment: 3/28/14
Date of Disposition: 8/21/14 – delayed due to DSH admission
Charge: Threat of Force or Violence Against a Public Official – Division B Offense

During a cell front interview with his clinician, this MHCB inmate informed the clinician that he was going to gas his case manager if she continued to ask him questions about his problems. The inmate stated, "If you want to write it down, that I am making a threat of hurting her. I am going to gas her if she continues to ask me questions." The clinician informed the inmate that confidentiality would be breached and the identified victim would be notified that a threat was made against her. The reporting employee noted that the inmate was a participant in the MHSDS at the EOP LOC. This was inaccurate, as the inmate was at MHCB LOC.

A mental health assessment was completed on 3/28/14, with question number two answered in the affirmative and question number three answered in the negative. The response to question number two stated that the inmate had a long history of mental illness that included paranoia and distortions of reality to match his paranoia which made him act unpredictably violent when

unprovoked.  Examples of these symptoms lead to his current hospitalization.  The clinician also noted that the inmate was referred to DSH and there was a request for Keyhea (PC 2602).

On 8/21/14, the inmate appeared before the SHO for a hearing.  The mental health assessment was repeated verbatim in the Mental Health Information section of the RVR-Part C.  The SHO utilized canned language regarding consideration of the mental health assessment in the findings.  The SHO wrote, "[Clinician] indicated that inmate's mental disorder did appear to contribute to the behavior that led to the RVR; however, made no indication that [inmate] was not responsible for his actions at the time of the offense or that he was incapable of understanding right from wrong.  [Inmate] appeared at the hearing with a coherent demeanor and appeared to understand all relevant information."  Canned language was also used in the disposition where the SHO noted, "The SHO has reviewed the Mental Health Assessment and considered the recommendations of the clinician as they pertain to the assessment of penalties."  The inmate was found not guilty of the Division B offense, Threat of Violence against a Public Official, but was found guilty of the lesser Division E offense of Threatening a Non-Prisoner or Peace Officer.  The inmate was assessed 90 days forfeiture of credit, (*more than the allowable maximum*) 15 days loss of yard privileges, 15 days loss of all vendor package privileges and referred to ICC for a SHU term assessment consideration.

**Impression**:  There was no mitigation in this case.  The monitor observed that a clinician wrote the RVR for the inmate in the MHCB, which could negatively impact clinician patient alliance.  Although the explanation written by the clinician for question number two of the mental health assessment was appropriate; the clinician wrote nothing for the SHO to consider regarding assessment of penalties.  The SHO utilized canned language throughout the disposition and findings.  The SHO utilized the mental health assessment inappropriately as a determination of responsibility, as well as a determination of whether the inmate knew right from wrong.  The SHO also applied a standard related to the SHO's assessment of the inmate at the time of the hearing, which was not part of the RVR policy. Further, the SHO inexplicably assessed 90 days forfeiture of credit; however, the maximum allowed for a Division E offense is 60 days.  The inmate was also assessed losses of privileges.

**Inmate J**
Date of Violation: 3/25/14
Date of Mental Health Assessment:  4/1/14
Date of Disposition: 4/13/14
Charge:  Refusing to Provide Urine Specimen - Division F Offense

On 3/25/14, the inmate refused to provide a urine specimen for purposes of testing for the presence of controlled substances or the use of alcohol.  A mental health assessment was completed on 4/1/14 with questions number two answered in the affirmative.  The answer to question number two stated the patient was mentally unstable at that time.  Question number three was not answered either yes or no, but had a written response which stated that restricting the patient from more than two weeks of yard could decrease his mental stability further.

On 4/13/14, the inmate appeared for a hearing before the SHO.  Although the mental health information was contained within the SHO's decision, there was no mention by the SHO that the

mental health assessment was considered in the disposition.  The inmate was found guilty and assessed 30 days forfeiture of credit, 30 days loss of dayroom privileges, 30 days loss of telephone privileges, 30 days loss of all vendor package privileges, 90 days loss of visits followed by 90 days no contact visits, one year mandatory random drug testing and was required to attend AA or NA if available at the facility.

**Impression**:  There was no mitigation in this case.  Although the disposition indicated that the inmate was assessed 30 days loss of yard privileges, that particular sentence was scratched out and it was unclear whether or not the inmate actually lost 30 days of yard privileges.  In the decision, there is no indication that the SHO considered the mental health assessment in the disposition and penalty phases.

___

**Inmate K**
Date of Violation:  3/26/14
Date of Mental Health Assessment:  4/1/14
Date of Disposition:  4/13/14
Charge:  Possession of Contraband (Tobacco) - Division E Offense

On 3/26/14, during a random cell search, tobacco was discovered in this EOP inmate's cell.  A mental health assessment was completed on 4/1/14 with question number two answered in the negative and question number three answered in the affirmative.  In response to question number three the clinician stated that the inmate's psychiatric diagnosis suggests that he may become agitated and anxious if loss of privileges extended longer than 30 days.

On 4/13/14, the inmate appeared for a hearing before the SHO.  Although the mental health information was contained within the SHO's decision, there was no mention by the SHO that the mental health assessment was considered in the disposition.  The inmate was found guilty and assessed 60 days forfeiture of credit, 30 days loss of yard privileges, 30 days loss of dayroom privileges, 30 days loss of telephone privileges and 30 days loss of all vendor package privileges.

**Impression**:  There was no mitigation in this case. In the decision, there was no indication that the SHO considered the mental health assessment in the disposition and penalty phases.  The inmate was assessed credit forfeiture and multiple losses of privileges.

___

**Inmate L**
Date of Violation:  3/23/14
Date of Mental Health Assessment:  3/27/14
Date of Disposition:  4/19/14
Charge:  Threatening a Peace Officer - Division B Offense

On 3/23/14, the inmate was walking down the stairs and proceeded to yell "I am an officer can I get a ride out of here".  He also stated that he was going to kill the officer in the name of the law.  On 3/27/14, a mental health assessment was completed with question number two answered in the affirmative and question number three answered in the negative.  In response to question number two, the clinician stated that the inmate had a history of chronic mental illness with symptoms including delusions and paranoia.

On 4/19/14, the inmate refused to appear for a hearing before the SHO. In his decision, the SHO gave proper consideration to the mental health assessment. However, the SHO also stated that the inmate's refusal to attend the hearing led the SHO to believe that the inmate could make a "constant" decision. It is assumed that the SHO meant to say "conscious" decision. The inmate was found guilty and assessed 150 days forfeiture of credit, ten days loss of yard privileges and was referred to the ICC for SHU term assessment.

**Impression**: There was no mitigation in this case. Although the SHO did give proper consideration to the mental health assessment, he interpreted the inmate's refusal to attend the hearing as an acknowledgment that the inmate knew what he was doing both at the time of the incident and at the time of the hearing. It appeared that the inmate's refusal to appear at the hearing outweighed the clinician's opinion in the mental health assessment. The inmate was assessed significant credit loss in addition to loss of privileges.

**Inmate M**
Date of Violation: 3/18/14
Date of Mental Health Assessment: 3/24/14
Date of Disposition: 4/15/14
Charge: Refusing to Provide Urine Sample - Division F Offense

On 3/18/14, this EOP inmate was ordered to provide a urine specimen through the random selection process. The inmate stated that he wanted to refuse to provide the specimen. A mental health assessment was completed on 3/24/14 with question number two answered in the negative and question number three answered in the affirmative. In response to question number three, the clinician stated that the inmate may tolerate sanctions on canteen and family visits but that sanctions on yard movement would interfere with the stated treatment goals.

On 4/15/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 30 days forfeiture of credit, 60 days loss of dayroom privileges, 60 days loss of telephone privileges and 90 days loss of visit followed by 180 days non-contact visits. The inmate was also ordered to undergo one year mandatory random drug testing and was referred for endorsement to a substance abuse education program. Although it was not stated in the disposition, it appeared that the SHO did not assess any loss of yard privileges based on the mental health assessment.

**Impression**: There was no mitigation in this case. The SHO gave proper consideration to the mental health assessment and it appeared that he did not assess any loss of yard privileges based on the mental health assessment but this was not specifically stated. The inmate was assessed credit forfeiture and multiple losses of privileges.

**Inmate N**
Date of Violation: 3/17/14
Date of Mental Health Assessment: 3/26/14
Date of Disposition: 4/6/14
Charge: Possession of Inmate Manufactured Alcohol - Division C Offense

On 3/17/14, this EOP inmate was observed drinking a colored substance from a plastic container which later turned out to be inmate manufactured alcohol. Upon inspection of the inmate's cell, more inmate manufactured alcohol was discovered together with ingredients to manufacture the alcohol. A mental health assessment was completed on 3/26/14 with question number two answered in the negative and question number three answered in the affirmative. In response to question number three, the clinician stated that loss of privileges for longer than 30 days would likely create agitation and oppositional behavior.

On 4/6/14, the inmate appeared for a hearing before the SHO. The SHO noted consideration of the recommendations contained in the mental health assessment, however the SHO wrote that he considered the request of the clinician and therefore DID assess the penalties that the clinician recommended. The SHO misinterpreted the clinician's recommendations and stated that the penalties that the SHO assessed were based on the recommendations of the clinician. The inmate was found guilty and assessed 91 days forfeiture of credit, 30 days loss of yard privileges, 30 days loss of dayroom privileges, 30 days loss of telephone privileges and was ordered to attend mandatory substance abuse education attendance.

**Impression**: The SHO has distorted the intent of the mental health assessment and has attributed the penalties that he assessed as the clinician's recommendations. The clinician's recommendation in response to question number three lacked specificity as to what privileges would have a negative impact on the inmate if taken away. The inmate was assessed significant credit loss and multiple losses of privileges.

**Inmate O**
Date of Violation: 2/11/14
Date of Mental Health Assessment: 2/18/14
Date of Disposition: 3/2/14
Charge: Attempted Homicide on an Inmate with a Weapon - Division A-1 Offense

On 2/11/14, this 3CMS inmate was involved in an altercation with two other inmates on the yard. The inmates refused orders to get down on the ground which necessitated the firing of three sponge rounds and one baton round to gain compliance from the inmates. On 2/18/14, a mental health assessment was completed with questions number two and three answered in the negative.

On 3/2/14, the inmate appeared for a hearing before the SHO. In the decision, the SHO reported that the inmate's behavior at the time of the rule violation was not deemed bizarre, unusual or characteristic - a standard inapplicable to Division A-1. The inmate was found guilty of a lesser A-1 offense of "Battery on an Inmate with a Deadly Weapon" although no weapon was seen during the altercation or found after the altercation. The inmate was assessed 360 days forfeiture

271

of credit, the maximum amount of time allowable for a division A-1 offense and was referred to the UCC for programming /housing review.

**Impression**: There was no mitigation in this case. The SHO noted consideration of the mental health assessment in the decision. The decision referenced the standard of bizarre, unusual or uncharacteristic behavior - a standard inapplicable to a division A-1 offense. The inmate was assessed significant credit loss.

## California Correctional Institution (CCI) RVR Review

### SUMMARY OF FINDINGS

A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CCI by completing and sustaining all requirements.

B. Mental health assessments were completed timely.

C. Most mental health assessments did not indicate a nexus between mental health factors and the actions that led to the RVR.

D. SHOs cited the bizarre, unusual or uncharacteristic behavior standard even when the Division A, B, C, or SHU-able offense charged was the controlling factor warranting completion of a mental health assessment.

E. Mental health assessments were ordered for charges that were not Division A, B, or C offenses or SHU-able charges, but further reasons were not provided.

F. Reviewed cases indicated many instances where the RVR incorrectly stated that a mental health assessment was not required.

G. SHOs used question number two on the mental health assessment to determine whether the inmate's mental health provided exonerating evidence, which was an incorrect standard.

### INTRODUCTION

On September 30 and October 1, 2014, the Coleman monitoring team reviewed the RVR process at CCI. At the time of the visit, CCI housed Level I, II and III inmates, including SHU custody level and 3CMS inmates. As of March 2014, CCI had a total inmate population of 4,359, of which 1,128 or 26 percent were caseload inmates.

During the site visit, the team met with the chief deputy warden, SHOs, disciplinary officers, and mental health clinicians responsible for preparing mental health assessments.

The review period covered RVRs issued and/or heard during January, February, or March 2014.  During this period, a total of 386 RVRs were written, of which 136 or 35 percent were issued to caseload inmates.

**TRAINING**

CCI produced a proof of practice memorandum dated January 17, 2012 in response to the November 3, 2011 memorandum requirement, but did not produce a proof of practice memorandum in response to the October 26, 2011 memorandum.  In-service-training (IST) also produced an attendance report concerning training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda; these reports indicated training ranging from 0.15 to 4.0 hours.  CCI only demonstrated compliance in the CC II appeals category for one of the required trainings.  The lesson plan produced by CCI was the currently approved PowerPoint concerning Inmate Disciplinary Process Mental Health Assessment Training.

CCI RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (four hours) | 11/3/11 (one hour) |
|---|---|---|---|
| CDOs | 3 | 0/0% | 1/33% |
| Captains | 7 | 1/14% | 5/71% |
| Lieutenants | 31 | 2/6% | 24/77% |
| Sergeants | 84 | 1/1% | 43/51% |
| Psychologists | 2 | 1/50% | 0/0% |
| CC-II Appeals | 2 | 0/0% | 2/100% |

**STAFF INTERVIEWS**

**SHOs**

Four SHOs and four disciplinary officers were interviewed in a group setting.  SHOs indicated that the process of sending mental health assessments to mental health staff for completion and return worked as intended.  The disciplinary officer typically emailed the RVR and the mental health assessment to the designated clinician for completion; the assessment was returned by way of email within two or three days.

SHOs indicated not having difficulty understanding clinicians' responses on assessments in the rare instances that questions number two or three were checked "yes."  When the box was answered in the affirmative, clinicians indicated their justification for this response.  However, SHOs further reported that most mental health assessments had both questions number two and three checked "no;" there were thus no comments or input to consider in the findings or in mitigation.

On the rare occasion when the response to question number three was marked "yes," SHOs stated that clinicians were specific concerning the privileges that should not be impacted. Examples included the following: "Don't take entertainment appliances," "Don't confine to cell

for extended periods of time," "Inmate needs to have access to outside/yard." The SHOs stated further that they followed clinicians' recommendations as long as they did not conflict with Title 15's mandated penalties.

Custody staff stated there was a good working relationship between custody and mental health. SHOs and disciplinary officers also knew clinicians by name.

**Clinicians**

During the site visit, the monitors met with the RVR coordinator and the backup RVR coordinator, who was the RVR coordinator for two years prior to January 2014. A third clinician, a licensed social worker, was trained as a "backup to the backup" if and when circumstances so required. The clinicians did not recall attending a collaborative training on mental health assessment use in the RVR process, but reported a comprehensive training on this subject during the past six months. This training did not include custody staff.

Clinicians described an excellent working relationship with SHOs, which included confidence that their mental health assessments were considered and used during the hearing process and at the ICC. They expressed no concern about implications of inmate manipulation of staff and reported that SHOs thanked them for their input.

Clinicians reported that mental health assessment requests were delivered timely by way of email from custody and generally took one to two days to complete. They further reported that the assessment completion process took approximately one to three hours, which included eUHR review, meeting with the PC and housing unit officers, and inmate interview. Inmates were typically interviewed at cell front.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Reviewed mental health assessments did not indicate any mental health factors for SHOs to consider during adjudication.

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

SHOs uniformly considered mental health assessments during RVR adjudication, but often used canned language to note their consideration. All reviewed cases, namely those for CCI Inmates A, B, C, D, E, F, G, H, I, J, K, L, and M, noted that the mental health assessment did not play a role in the SHO's decision. Reviewed cases, including those for CCI Inmates A, B, C, D, E, F, and M, also revealed many instances where the RVR incorrectly stated that a mental health assessment was not required. In cases such as those involving CCI Inmates A, B, C, F, K, and M, it was indicated that these 3CMS inmates did not display bizarre, unusual, or uncharacteristic behavior, but this standard was inapplicable as these cases involved a Division A, B, C, or SHU-able offense.

In cases involving CCI Inmates A, D, E, F, G, H, I, J, K, L, and M, SHOs also incorrectly applied another canned phrase to the RVR disposition; they stated that mental health evidence

did not provide exonerating evidence rather than evaluating clinical responses to determine whether mental health factors contributed to the behavior that led to the RVR. Review also indicated multiple cases, including those for CCI Inmates F, G, and J, where mental health assessments were ordered even though the charge was not a Division A, B, or C or possible SHU-able offense and there was no indication that inmates exhibited bizarre, unusual, or uncharacteristic behavior. In these cases, it was impossible to determine the reason for the mental health assessment.

## ICC REVIEW

Mental health input did not result in mitigation at the ICC, as assessments, including those for CCI Inmates A and B, reflected that mental health issues did not influence inmate behavior. The sample size also was insufficient to determine the efficacy of mental health input in the RVR process at the ICC level.

## QUALITY REVIEW

CCI's mental health department maintained a log of all RVRs issued to caseload inmates. The log included all of the steps in RVR processing, and the result of mental health assessments, findings, and whether there was mitigation based on the mental health assessment. CCI staff used the log to complete quarterly audits of the RVR process and submitted the results to the mental health subcommittee. The "RVR for Coleman Quarterly Audit – April 2014" revealed that 99 percent of the 67 requested mental health assessments were completed timely. One assessment was inappropriately not requested. The audit indicated only four cases where mitigation was possible due to a positive mental health assessment; two cases transferred prior to the hearing and two were not yet heard at the time of the audit. The audit did not review mental health assessment quality.

### CCI RVR Case Reviews

**Inmate A**
Date of Violation: 1/24/14
Date of Mental Health Assessment: 1/30/14
Date of Disposition: 3/15/14
Charge: Possession of Inmate Manufactured Weapon - Division A-1 Offense

On 1/24/14, this 3CMS inmate smashed a table on the ground in the tool room and used a broken piece of wood as a weapon to approach another inmate. The RVR indicated that he did not display bizarre, unusual, or uncharacteristic behavior and therefore a mental health assessment was not required. However, a mental health assessment was completed on 1/30/14 with questions number two and three answered in the negative. On 3/15/14, the inmate appeared for a hearing before the SHO. The SHO correctly considered the mental health assessment by stating that the charge resulting in the RVR was not influenced by mental illness; the SHO also stated that the assessment did not provide any exonerating evidence. The inmate was found guilty and assessed 181 days loss of behavioral/work credits and 90 days loss of privileges, which included

275

telephone, canteen, and special packages.  The inmate was referred to the ICC for a SHU term assessment.

The ICC met on 4/23/14.  The committee reviewed the mental health assessment concerning the RVR and noted that the inmate's mental disorder did not appear to contribute to the behavior leading to the RVR.  The ICC also indicated that there were no mental health factors that the SHO should consider in penalty assessment.  The ICC assessed and imposed a ten month expected SHU term.  The clinician was present at the ICC and interviewed the inmate before the hearing.  The clinician stated that the inmate likely would not decompensate if retained in administrative segregation.

**Impression**:  There was no mitigation in this case. The RVR incorrectly stated that a mental health assessment was not required.  The assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the mental health assessment did not provide any exonerating evidence, which was not the standard for RVR mitigation.  Custody referred to bizarre, unusual or uncharacteristic behavior, which was a standard that was not applicable to this case.  The inmate was assessed significant credit loss.

**Inmate B**
Date of Violation:  2/9/14
Date of Mental Health Assessment:  2/24/14
Date of Disposition:  3/11/14
Charge:  Battery on Inmate - Division D Offense

On 2/9/14, this 3CMS inmate was involved in an altercation with two other inmates.  The inmate was shot with one 40 mm round to gain compliance and get on the ground.  The RVR stated that he did not display bizarre, unusual, or uncharacteristic behavior that warranted completion of a mental health assessment.  However, the inmate's actions constituted a SHU-able offense and a mental health assessment was completed on 2/24/14 with questions number two and three answered in the negative.  On 3/11/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment but reiterated the language regarding bizarre, unusual, or uncharacteristic behavior even though this was not the correct standard for the case.  The inmate was found guilty and assessed 90 days loss of behavioral/work credit and referred to the ICC for a possible SHU assessment.

The ICC met on 4/2/14.  The committee reviewed the mental health assessment and noted that the inmate's mental disorder did not appear to contribute to the behavior that led to the RVR.  The ICC also noted that there were no mental health factors that the SHO should consider in assessing a penalty.  The ICC imposed a six-month aggravated SHU term based on a prior RVR for battery on an inmate.  The clinician was present at the ICC and interviewed the inmate prior to the hearing.  The clinician stated that the inmate was not likely to decompensate if retained in administrative segregation.

**Impression**:  There was no mitigation in this case.  The RVR incorrectly stated that a mental health assessment was not required.  The mental health assessment was not specified as playing a

role in the SHO's decision. Custody referred to bizarre, unusual or uncharacteristic behavior, which was an inapplicable standard to this case. The inmate was assessed significant credit loss.

## Inmate C

Date of Violation: 3/13/14
Date of Mental Health Assessment: 3/20/14
Date of Disposition: 4/4/14
Charge: Possession of Inmate Manufactured Alcohol - Division C Offense

During a search of this 3CMS inmate's cell, four containers of liquid were discovered and determined to be inmate manufactured alcohol. The RVR indicated that the inmate did not exhibit bizarre, unusual, or uncharacteristic behavior. A mental health assessment was completed on 3/20/14 with questions number two and three answered in the negative. On 4/4/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. He was assessed 120 days loss of behavior/work credit and 30 days loss of telephone privileges. The inmate was ordered to undergo monthly drug tests and was required to attend AA/NA meetings if available.

**Impression:** There was no mitigation in this case. The RVR incorrectly stated that a mental health assessment was not required. The mental health assessment was not specified as playing a role in the SHO's decision. Custody referred to bizarre, unusual or uncharacteristic behavior, which was a standard that was inapplicable to this case. The inmate was assessed significant credit loss, as well as loss of privileges.

## Inmate D

Date of Violation: 2/28/14
Date of Mental Health Assessment: 3/6/14
Date of Disposition: 4/23/14
Charge: Willfully Obstructing/Resisting a Peace Officer Resulting in Use of Force - Division C
Offense

On 2/28/14, during a cuffed escort, the inmate took an abrupt step backwards toward the officers. He was placed on the ground and then escorted without further incident. At the time of the incident, he was at the 3CMS LOC, but was elevated to the EOP LOC prior to the hearing. The RVR reported that he was at the 3CMS LOC and did not exhibit bizarre, unusual, or uncharacteristic behavior so a mental health assessment was not warranted. However, a mental health assessment was completed on 3/6/14 with questions number two and three answered in the negative. Prior to the hearing, the inmate's LOC was elevated to EOP and another mental health assessment was ordered and completed with questions number two and three again answered in the negative. Based on his EOP status, the inmate was assigned a staff assistant for the hearing. The inmate appeared at the hearing before the SHO on 4/23/14. The SHO considered the mental health assessments, but determined that the mental health evidence did not provide exonerating evidence and found the inmate guilty. The inmate was found guilty and assessed 90 days loss of behavioral/work credit.

**Impression**:  There was no mitigation in this case.  The RVR incorrectly stated that a mental health assessment was not required.  The mental health assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the mental health assessment did not provide exonerating evidence, which was not the standard for RVR mitigation.  Custody referred to bizarre, unusual, or uncharacteristic behavior, which was a standard that was not applicable to this case.  The inmate was assessed significant credit loss.

**Inmate E**
Date of Violation:  11/28/13
Date of Mental Health Assessment:  12/3/13
Date of Disposition:  2/7/14
Charge:  Battery on an Inmate Causing Serious Bodily Injury - Division A-1 Offense

On 11/20/2013, the inmate was involved in an altercation with his cellmate inside their cell.  Both inmates refused orders to stop fighting and pepper spray was used to gain compliance.  This disciplinary action was reassessed and reheard because a staff assistant should have been assigned to the inmate due to his TABE score.  The RVR noted that the inmate did not display bizarre, unusual, or uncharacteristic behavior that would require a mental health assessment.  However, since this was an A-1 offense, this language was unnecessary.

A mental health assessment was completed on 12/3/2013 with questions number two and three answered in the negative.  On 2/7/14, the inmate appeared for a hearing before the SHO.  In his review of the RVR, the SHO noted that the inmate did not display bizarre, unusual, or uncharacteristic behavior.  Again, this language was unnecessary.  The SHO considered the mental health assessment and found the inmate guilty of the lesser charge of fighting.  The inmate was assessed 90 days forfeiture of credit and 60 days loss of privileges, including entertainment appliances.

**Impression**:  There was no mitigation in this case.  The RVR incorrectly stated that a mental health assessment was not required.  The mental health assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the mental health assessment did not provide exonerating evidence, which was not the standard for mitigation in RVR policy.  Custody referred to bizarre, unusual or uncharacteristic behavior, which was a standard that was inapplicable to this case.  The inmate was assessed significant credit loss.

**Inmate F**
Date of Violation:  1/21/14
Date of Mental Health Assessment:  1/24/14
Date of Disposition:  4/23/14
Charge:  Fighting Resulting on the Use of Force - Division D Offense

On 1/21/14, while yard recall was being conducted, this 3CMS inmate was involved in an altercation with another inmate.  Both inmates were pepper sprayed and struck with batons in order to gain compliance.  The RVR noted that the inmate did not display bizarre, unusual, or uncharacteristic behavior that would require a mental health assessment.  However, an assessment was completed on 1/24/14 with questions number two and three answered in the

negative.  Although it was not stated in either the RVR itself or in the disposition, it is assumed that the mental health assessment was completed because the charge could result in a SHU term. On 2/26/14, the inmate appeared before the SHO for the hearing.  The SHO considered the mental health assessment and determined that it did not provide any exonerating evidence, but indicated that mental health factors would be considered when assessing the penalty.  The inmate was found guilty and assessed 90 days loss of behavioral/work credits.

**Impression**:  There was no mitigation in this case.  The RVR incorrectly stated that a mental health assessment was not required.  The mental health assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the mental health assessment did not provide any exonerating evidence, which was not the standard for RVR mitigation.  Custody referred to bizarre, unusual, or uncharacteristic behavior, a standard that was not applicable to this case.  The inmate was assessed significant credit loss.

**Inmate G**
Date of Violation:  1/22/14
Date of Mental Health Assessment:  Not provided for review
Date of Disposition:  2/22/14
Charge:  Inmate Conduct Requiring the Use of Force - Division F Offense

On 1/22/14, while officers were conducting food tray pick up, this 3CMS inmate refused to remove his hand from the food port.  The officer used pepper spray to gain compliance from the inmate.  The RVR noted that he did not display bizarre, unusual, or uncharacteristic behavior requiring a mental health assessment.  As this offense was classified as a Division F offense, it was unclear why a mental health assessment was completed.

On 2/22/14, the inmate appeared before the SHO for a hearing.  Although a mental health assessment was not found in the RVR package, the SHO stated that the assessment was reviewed during the hearing.  The SHO's decision indicated that the assessment concluded that mental illness did not influence the behavior resulting in the RVR.  The SHO accepted that determination and indicated that mental health evidence did not provide exonerating evidence; however, the SHO nonetheless indicated consideration of the inmate's mental health during penalty assessment.  The inmate was found guilty and assessed 30 days loss of behavioral/work credits and 90 days loss of privileges, which included no special purchases/quarterly packages.

**Impression:**  There was no mitigation in this case.  The mental health assessment was not specified as playing a role in the SHO's decision.  The SHO found that the mental health assessment did not provide exonerating evidence, but this was not the standard for RVR mitigation.  The SHO did not speak to mitigation during penalty assessment.  The inmate was assessed credit loss and loss of privileges.

**Inmate H**
Date of Violation: 1/26/14
Date of Mental Health Assessment: 1/28/14
Date of Disposition: 2/12/14
Charge: Fighting - Division D Offense

On 1/26/14, this 3CMS inmate was involved in an altercation with his cellmate in their cell. When both inmates refused to stop fighting, the officer employed pepper spray and then pepper spray fogger to gain the inmates' compliance. The RVR indicated that the inmate did not display bizarre, unusual, or uncharacteristic behavior that would require a mental health assessment. However, an assessment was completed on 1/28/14 with questions number two and three answered in the negative. On 2/12/14 the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found that the mental health evidence did not provide exonerating evidence, but that mental health would be considered when assessing the penalty. The inmate was found guilty and assessed 90 days loss of behavioral/work credits and 30 days loss of privileges, including no special purchases/quarterly packages.

**Impression**: There was no mitigation in this case. The mental health assessment was not specified as playing a role in the SHO's decision. The SHO also found that the assessment did not provide exonerating evidence, which was not the standard for RVR mitigation. The SHO did not speak to mitigation when assessing the penalty. The inmate was assessed credit loss and loss of privileges.

**Inmate I**
Date of Violation: 1/26/14
Date of Mental Health Assessment: 1/28/14
Date of Disposition: 2/12/14
Charge: Fighting - Division D Offense

On 1/26/14, this 3CMS inmate was involved in an altercation with his cellmate in their cell. When both inmates refused to stop fighting, the officer employed pepper spray and then pepper spray fogger to gain compliance from the inmates. The RVR indicated that the inmate did not display bizarre, unusual, or uncharacteristic behavior that would require a mental health assessment. A mental health assessment was completed on 1/28/14 with questions number two and three answered in the negative. On 2/12/14, the inmate appeared for a hearing before the SHO. In his consideration of the mental health assessment, the SHO determined that the mental health evidence did not provide any exonerating evidence, but that mental health factors would be considered when assessing the penalty. The inmate was found guilty and assessed 90 days loss of behavioral/work credits and 30 days loss of privileges, including no special purchases/quarterly packages.

**Impression**: There was no mitigation in this case. The mental health assessment was not specified as playing a role in the SHO's decision. The SHO also found that the mental health assessment did not provide any exonerating evidence, which was not the standard for RVR mitigation. The SHO did not speak to mitigation when assessing the penalty. The inmate was assessed significant credit loss and loss of privileges.

**Inmate J**
Date of Violation:  1/28/14
Date of Mental Health Assessment:  1/20/14
Date of Disposition:  2/12/14
Charge:  Threat to Kill or Assault Persons - Division F Offense

On 1/20/14, after being informed that he would be receiving a cellmate, this 3CMS inmate stated that he would not accept one and would sexually assault him.  It was unclear why a mental health assessment was ordered and completed since this was a Division F offense.  The RVR noted that the inmate did not display bizarre, unusual or uncharacteristic behavior requiring completion of a mental health assessment.  However, an assessment was completed on 2/10/14 with questions number two and three answered in the negative.  On 2/12/14, the inmate appeared before the SHO for a hearing.  In considering the mental health assessment, the SHO determined that the mental health evidence did not provide exonerating evidence, but that mental health factors would be considered during penalty assessment.  The inmate was found guilty and assessed 30 days loss of behavioral/work credits.

**Impression**:  There was no mitigation in this case.  The mental health assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the assessment did not provide any exonerating evidence, which was not the standard for RVR mitigation.  The SHO did not speak to mitigation when assessing the penalty.  The inmate was assessed credit loss.

**Inmate K**
Date of Violation:  2/13/14
Date of Mental Health Assessment:  2/13/14
Date of Disposition:  3/21/14
Charge:  Battery on a Peace Officer Resulting in the Use of Force - Division B Offense

On 2/13/14, while being escorted to the shower, this 3CMS inmate pulled away from the grasp of the officer and then kicked him in the groin area.  The RVR noted that the inmate did not display bizarre, unusual, or uncharacteristic behavior requiring a mental health assessment.  An assessment was completed on 2/18/14 with questions number two and three answered in the negative.  On 3/21/14, the inmate appeared before the SHO for a hearing.  In considering the mental health assessment, the SHO determined that the mental health evidence did not provide exonerating evidence, but that mental health factors would be considered when assessing the penalty.  The inmate was found guilty and assessed 150 days loss of behavioral/work credits and 90 days loss of privileges, including no television, appliances, or special purchases/quarterly packages.  The inmate was referred to the ICC for possible SHU term assessment.

The ICC met on 4/22/14.  The inmate did not personally attend the ICC hearing, but was interviewed by the clinician prior to the ICC.  At the time of the ICC, he was at the EOP LOC.  The ICC elected to assess and impose an 18-month aggravated SHU term.  The ICC assessed the aggravated SHU term based on similar inmate conduct going back to charges of battery on an inmate in 1999 and battery on a peace officer in 2003.

**Impression**:  There was no mitigation in this case.  The RVR incorrectly stated that a mental health assessment was not required.  The assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the mental health assessment did not provide any exonerating evidence, which was not the standard for RVR mitigation.  Custody referred to bizarre, unusual or uncharacteristic behavior, which was a standard that was not applicable to this case.  The SHO did not speak to mitigation during penalty assessment.  The inmate was assessed significant credit loss and loss of privileges.

**Inmate L**
Date of Violation:  3/4/14
Date of Mental Health Assessment:  3/11/14
Date of Disposition:  4/2/14
Charge:  Unlawful Influence - Division F Offense

On 3/4/14, the staff psychiatrist interviewed this 3CMS inmate.  The inmate told him that he needed medication for his withdrawal from methamphetamine and would commit suicide if he did not obtain it.  He repeatedly told the psychiatrist that he would commit suicide if he had to go back to his cell without medication.  The psychiatrist informed him that he would receive an RVR for manipulation of staff if he continued; the inmate reiterated he would commit suicide if he did not receive this medication.  The RVR indicated that the inmate did not display bizarre, unusual, or uncharacteristic behavior requiring a mental health assessment.  However, a mental health assessment was completed on 3/11/14 with questions number two and three answered in the negative.  On 4/2/14, the inmate appeared for a hearing before the SHO.  In considering the mental health assessment, the SHO determined that mental health evidence did not provide exonerating evidence, but that he would consider mental health factors during penalty assessment.  The inmate was found guilty and assessed 30 days loss of behavioral/work credits and 30 days loss of privileges, including no special purchases/quarterly packages.

**Impression**:  There was no mitigation in this case.  The mental health assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the mental health assessment did not provide any exonerating evidence, which was not the standard for mitigation of RVRs.  The SHO did not speak to mitigation during penalty assessment. The inmate was assessed credit loss and loss of privilege.

**Inmate M**
Date of Violation:  3/30/14
Date of Mental Health Assessment:  4/3/14
Date of Disposition:  4/19/14
Charge:  Battery on a Peace Officer - Division B Offense

On 3/30/14, while retrieving food trays from inmate cells, this 3CMS inmate threw his food tray lid out of the food port and at the officers.  While an officer was spraying pepper spray through the food port into the inmate's cell, the inmate reached out of the food port and grabbed the pepper spray canister.  The inmate was subsequently removed from his cell.  The RVR noted that he did not display bizarre, unusual, or uncharacteristic behavior requiring a mental health

assessment.  On 4/3/14, an assessment was completed with questions number two and three answered in the negative.

On 4/19/14, the inmate appeared before the SHO for a hearing.  The SHO considered the mental health assessment and determined that the mental health evidence did not provide exonerating evidence, but that mental health factors would be considered during penalty assessment.  The inmate was found guilty and assessed 150 days loss of behavioral/work credits and 30 days loss of privileges, including no special purchases or quarterly packages, and no yard and visitation.

**Impression:**  There was no mitigation in this case.  The RVR incorrectly stated that a mental health assessment was not required.  The assessment was not specified as playing a role in the SHO's decision.  The SHO also found that the mental health assessment did not provide any exonerating evidence, which was not the standard for RVR mitigation.  Custody referred to bizarre, unusual or uncharacteristic behavior, a standard that was not applicable to this case.  The SHO did not speak to mitigation when assessing the penalty.  The inmate was assessed significant credit loss and loss of privilege.

## California Institution for Men (CIM) RVR Review

**SUMMARY OF FINDINGS**

A.  RVR policies and procedures that were agreed to in 2011 have not been adequately implemented at CIM.

B.  CIM was noncompliant with required training of custody and mental health staff on the RVR process.

C.  Appropriate and complete collaborative training between custody and mental health on the RVR process had not occurred.

D.  Clinical and custody staff reported having good working relationships.

E.  Mental health assessments were appropriately requested.

F.  Mental health assessments were completed timely.

G.  Clinicians inappropriately indicated on mental health assessments for MHCB inmates that no staff assistant was required.

H.  The quality of the mental health assessments was generally poor.

I.  SHOs noted that mental health assessments were reviewed and considered in the adjudication process.

J.  SHOs applied an "exonerating evidence" standard to mental health assessments that was not provided for in the RVR policy.

K. When mitigation occurred, it generally took the form of loss of privileges while maximum forfeiture of behavioral credits was being considered.

L. Multiple errors were noted in the CDCR 1154 log.

M. There was no quality review of the RVR process at CIM.

N. The ICC considered mental health assessments and factors before imposing SHU terms. However, among the cases reviewed, penalties were mitigated only in cases of no prior similar acts and not based on mental health factors.


**INTRODUCTION**

CIM housed inmates at custody levels I, II and III and has a reception center. It housed inmates who had mental health designations of 3CMS and MHCB. As of March 2014, CIM housed 4,761 inmates, of whom 1,666 or 35 percent were on the mental health caseload.

The monitor reviewed RVRs issued from January through March 2014. According to a COMPSTAT report, during that period 684 RVRs, including 291, or 43 percent were issued to inmates on the mental health caseload. The monitor reviewed policies, procedures, and any training materials on the RVR process. To gather data, the monitor used the Institutional Register and CDCR 1154 logs, which must be maintained under the CCR, Title 15.

**TRAINING**

IST reports on attendance at required training sessions for each job classification, as required by the October 26, 2011 and November 3, 2011 memoranda, were produced. These reports indicated that training ran from .5 to four hours.

CIM staff produced proof-of-practice memoranda, dated January 30, 2012 in response to the October 26, 2011 and November 3, 2011 requirements.

<u>CIM RVR Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 5 | 1/20% | 1/20% |
| Captains | 6 | 5/83% | 1/17% |
| Lieutenants | 22 | 9/41% | 2/9% |
| Sergeants | 87 | 33/38% | 2/2% |
| CC-II Appeals | 1 | 1/100% | 0/0% |
| Psychiatrists | 11 | 11/100% | 0/0% |
| Psychologists | 30 | 29/97% | 1/3% |
| Social Workers | 3 | 1/33% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

The monitor's interviews of SHOs assigned to second and third watch indicated that both groups had received multiple training sessions over the years on mental health input into the RVR process. All appeared familiar with policy requirements. They indicated that mental health staff completed the mental health assessment request form in a timely manner and were flexible in cases where assessments needed to be expedited.

SHOs on second watch stated that if the RVR was a clear violation, then they must find the inmate guilty, even if the answer to question number two on the mental health assessment form indicated the inmate's mental health contributed to the behavior. They reported mitigating penalties based on the assessment, but remained steadfast that the inmate must be held "accountable." SHOs also reported that mental health clinical input on the assessment form was "boilerplate," non-specific, and helpful in only about half of cases. They stated they "just considered" the mental health input, but they reiterated that they held the inmate "accountable" for his behavior.

**Clinicians**

The clinicians indicated that mental health assessment forms from custody staff were received timely. There were rare exceptions for expedited processing. Clinicians were aware of the time limitations for form completion and return to custody.

The clinicians stated they conducted a non-confidential interview with the inmate, reviewed the inmate's eUHR, SOMS, ERMS, and talked with the inmate's primary clinician to complete the mental health assessment form. This took from one to four hours, based on the inmate's acuity level and complexity of the RVR.

The clinicians believed the mental health assessment information was valuable to the SHO but they thought the form should be revised, specifically on question number three. They reported good relationships with the SHOs and at times having been called for additional information or as a witness at a RVR hearing.

Mental health staff reproduced the mental health assessment form in a Word document, which enabled staff to enter their responses directly into the form and allowed the clinician to expand the area for written comments from three lines to as many as needed in order to adequately answer the questions. This also eliminated any legibility issues.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

The quality of mental health assessments at CIM was generally poor. Clinicians routinely improperly indicated that staff assistants were not necessary for cases involving inmates receiving MHCB care. (*See* CIM Inmates A, B, C, D, E, F, G, H.)

285

Clinicians also failed to provide on the mental health assessment form relevant, useful information to the SHOs on question number two and were nonresponsive on question number three. For example, "inmate had some depression regarding loss of his mother," "inmate has some depression as well as safety concerns on the yard," "assessing penalty should be considered in light of the inmate's impairment due to mental health symptoms," and "consideration should be given to the possibility that the inmate's sexual disorderly conduct happened while high on methamphetamine." (*See* CIM Inmates C, E, F, H.) In response to question number three, rather than presenting a clinical recommendation, one clinician stated that the inmate would like to protect his yard time because he relied on it to maintain his mental stability. (*See* CIM Inmate I.) Another clinician was apparently unaware that mental health treatment could not be restricted when he recommended that the inmate should be allowed to continue treatment including individual and group therapy. (*See* CIM Inmate J.)

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

SHOs regularly noted review and consideration of mental health assessments in the RVR. While mitigation did occur, it was generally applied to privileges while maximum forfeiture of credit was being considered. Several reviewed cases indicated no loss of behavioral credits due to the institution's failure to meet due process timelines. Only one reviewed MHCB case indicated mitigation of assessment of behavior credits based on the mental health assessment. (*See* CIM Inmate G.)

The review also identified many cases where SHOs analyzed the mental health assessment form using the "exonerating evidence" standard that does not exist in the RVR policy. SHOs often noted, "The mental health assessment was insufficient to exonerate Inmate," or "mental health evidence does not provide any exonerating evidence," and "SHO reviewed the mental health evidence and found it to be insufficient to exonerate." (*See* CIM Inmates A, C, D, F, G, K.)

## ICC REVIEW

The ICC routinely considered mental health assessments before imposing SHU terms, but it did not mitigate any penalties based on mental health factors. Of the cases reviewed, mitigation occurred only where there was a lack of any prior acts by the inmate of the same or a similar nature. (*See* CIM Inmates L, M.)

## QUALITY REVIEW

There was no quality review of the RVR process at CIM.

# CIM RVR Case Reviews

**Inmate A**
Date of Violation:  2/9/14
Date of Mental Health Assessment:  2/19/14
Date of Disposition:  4/14/14
Charge:  IDX with Masturbation – a Division D Offense

While being observed on suicide watch, the inmate stood at his cell door exposing himself and masturbating while making eye contact with the psych tech.

A psychiatrist completed a non-confidential interview and mental health assessment on 2/19/14. The psychiatrist again answered "yes" to questions number two and three, the same as for an assessment the week before.  The psychiatrist again stated that the inmate's decreased ability to control his impulses due to his mental illness may have contributed to this behavior and that the inmate should have ongoing access to mental health services.

The SHO noted the mental health assessment in the RVR-Part C.  The inmate was found guilty and the SHO noted that the evidence of mental illness was insufficient to exonerate the inmate. However, the SHO mitigated the loss of phone privileges from 180 days to zero days.  He was assessed loss of canteen, appliances, vendor packages and personal property for 180 days.  He was assessed zero loss of behavioral/work credits due to failure to hold the hearing within 30 days.  The inmate was referred to the UCC.

**Impression**:  The SHO mitigated and imposed a penalty. The SHO employed an inappropriate standard regarding the exoneration of the inmate based on the mental health assessment. The inmate did lose significant privileges for six months.  Further, the mental health clinician checked the box "No" for question number one - whether the inmate needed the assignment of a staff assistant when he is in the MHCB - when the assignment is required by policy.

**Inmate B**
Date of Violation:  2/17/14
Date of Mental Health Assessment:  2/19/14
Date of Disposition:  4/16/14
Charge:  IDX with Masturbation – Division D Offense

As the LVN was conducting suicide watch of the inmate, he stood at the front of the cell door staring at her with his suicide smock tied around his waist.  He told the LVN that he was going to wash up, backed up from the door, turned and dropped his smock and exposed himself and began masturbating.  When ordered to stop, he stated that he told her he was going to wash up and stopped.

The mental health assessment, completed on 2/19/14, noted the inmate's mental illness may have contributed to the behavior.  The SHO noted the mental health assessment in the RVR Part C. The inmate was found guilty and the SHO specifically stated that the mental health report noted that there were no mental health factors that would cause the inmate to experience difficulty in

understanding the disciplinary process, there was no need for the assignment of a staff assistant, the inmate's mental illness did appear to contribute to the behavior, and if the inmate were found guilty there were mental health factors to consider when assessing the penalty. The SHO did note that pursuant to CDCR 3315, a staff assistant was assigned based on this inmate's MHCB LOC.

The SHO stated that he took the mental health assessment into consideration, but he also noted:

> SHO discounted the recommendation as [Inmate B] recalled the incident in detail. In addition, [the clinician] stated that [Inmate B] did not need a SA, that he was able to understand the disciplinary process without assistance, therefore it appears [Inmate B] should have known what he was doing was not right and been able to control his impulses. Finally it appears as [Inmate B] did not act on impulse as he had already planned on his defense by telling [Nurse] that he was going to wash up and attempting to use that as a defense at the hearing. Who washes up by standing nude in front of the door with an erected penis stroking it.

In the disposition, the SHO noted consideration of the mental health evaluation. The inmate was assessed 180 days' loss of canteen. He was not assessed any loss of behavioral/work credit due to the due process violation that he was not served with the RVR within 15 days of discovery.

The case was referred to ICC for SHU term assessment.

**Impression**: No credit loss penalty could be assessed because of due process errors in this case. The mental health clinician checked the box "no" for question number one - whether the inmate needed the assignment of a staff assistant while he was in the MHCB. A staff assistant is required. The SHO reported consideration of the mental health assessment. Notably, the SHO inappropriately used the clinician's error against the inmate, who was assessed significant loss of privilege.

---

**Inmate C**
Date of Violation: 2/14/14
Date of Mental Health Assessment: 2/21/14
Date of Disposition: 5/1/14
Charge: Willfully Resisting Delaying Resulting in the Use of Force – a Division D Offense

On the date of the incident, a CO witnessed the inmate moving a "shiny pointy object" back and forth across his left wrist "causing blood to seep from his skin." The inmate refused to comply when ordered to stop after two instructions to stop. The officer blew her whistle and called a Code One response via her radio. The inmate continued his action and the officer administered OC spray through the food port. The inmate submitted to cuffs through the food port and was escorted to the shower area for decontamination. After ten minutes, the inmate was returned to a new cell. The sharp pointy object was never located.

The non-confidential interview and mental health assessment were completed by a psychiatrist on 2/21/14. The psychiatrist checked "no" for question number one - whether there is a need for

a staff assistant. An MHCB inmate cannot waive the assignment of a staff assistant, pursuant to RVR policy. The psychiatrist answered "yes" to questions number two and three and noted that the inmate was trying to cut himself. The psychiatrist further noted for question three that the inmate had some depression regarding the loss of his mother.

The SHO noted the mental health assessment and specifically noted that the inmate did not evidence impairment in his ability to comprehend the nature of the charges and the disciplinary process, but nevertheless a staff assistant was appropriately assigned. The inmate was found guilty. The SHO noted that he reviewed the mental health evidence and found it to be insufficient to exonerate the inmate, although he considered the mental health assessment in assessing the penalty. The inmate was assessed zero days' loss of behavioral credit due to failure to conduct the hearing within the 30-day timeline. The RVR was referred to the UCC. The case was referred to the District Attorney's office and was rejected on 3/24/14.

**Impression**: This mental health assessment was noncompliant with CDCR policy and training. The reviewing clinician recited the obvious – that the inmate was trying to cut himself - and wrongly indicated that this inmate was at the MHCB LOC and did not require the assignment of a staff assistant. The SHO noted consideration of the mental health evidence, but he applied an exoneration standard that does not comport with CDCR's RVR policy. Because of failure to comply with timelines, no loss of credit loss could be imposed.

### Inmate D
Date of Violation:  2/28/14
Date of Mental Health Assessment:  3/7/14
Date of Disposition:  4/9/14
Charge:  IDX

During suicide watch, this inmate removed his suicide smock, made eye contact with the CNA and exposed himself. He then turned, walked towards his bed, put his smock back on and cursed at the CNA. The inmate refused the non-confidential interview. The mental health assessment was completed on 3/7/14. The psychologist checked "no" for question numbers one, two, and three, without explanations.

The inmate was found guilty. The SHO noted in the findings that he reviewed and considered the mental health assessment report and other mental health evidence and concluded that "mental health evidence does not provide any exonerating evidence. SHO will, however, consider mental health when assessing the penalty."

The inmate was assessed 90 days loss of behavioral/work credit, which is the highest amount, and 30 days' loss of privileges, including loss of yard.

**Impression**: The clinician incorrectly checked "no" for question number one as the inmate was at the  MHCB LOC and was required to have a staff assistant. The SHO noted consideration of the mental health assessment, but he applied an exoneration standard that does not comport with CDCR's RVR policy. The inmate was assessed significant loss of credit and privileges.

**Inmate E**
Date of Violation:  3/15/14
Date of Disposition:
Charge:  Refusal to Test for Controlled Substances – Division F Offense

The inmate refused submission to a random drug screen.  The non-confidential interview and mental health assessment were completed by a psychiatrist who checked "no" to questions number one and two, with no explanation.  For question three, the clinician answered "yes" and noted that the inmate has some depression as well as safety concerns on the yard.

The SHO noted consideration of the mental health assessment in his findings.  The inmate was found guilty and assessed 30 days' loss of behavioral/work credits, which is the maximum credit forfeiture for a Division F offense.  The SHO noted that, based on the mental health assessment, he administered a "more lenient disposition which is conducive to his medical care.  The taking of privileges could cause depression."  No loss of privileges was assessed.

**Impression**:  There was mitigation with regard to privileges, but the inmate received the maximum forfeiture of credit. The clinician incorrectly responded to question number one regarding assignment of a staff assistant.  The clinician's answer to question number three was unresponsive.  The SHO noted consideration of the mental health assessment, but he applied an exoneration standard that is inconsistent with CDCR's RVR policy. The inmate was assessed significant loss of credit.

**Inmate F**
Date of Violation:  3/22/14
Date of Mental Health Assessment:  4/8/14
Date of Disposition:  8/2/14
Charge:  Assault on a Peace Officer – Division D Offense

During medication pass, as the inmate's food port was opened, he reached with his left hand for the CO's keys.  The CO struck the back of the inmate's left hand with the bottom of his pepper spray can.  The inmate grabbed the food port and would not let go, refusing to put his arm back in the cell.  The unit sergeant instructed the CO to back away from the cell door and brief him what was happening.  The CO returned to the cell and cuffed the inmate while the sergeant provided coverage.

A non-confidential interview and mental health assessment were completed on 4/8/14.  The LCSW who completed the assessment checked "no" for whether the inmate required assignment of a staff assistant.  The clinician answered "yes" to questions number two and three.  For question two, the clinician noted the inmate's mental health symptoms included poor impulse control and agitation in the face of frustration and bad news.  The inmate appeared to have been disturbed by bad news about his medical condition and had also exhibited disruptive behavior earlier that day.  The clinician only stated that penalty assessment should be considered in light of the inmate's impairment due to his mental health symptoms.

The inmate was found guilty.  The SHO noted that the mental health evidence was insufficient to exonerate the inmate but mitigated the loss of the privileges to ten days.  The inmate was assessed zero days' loss of behavior/work credits due to the lack of adherence to the 30-day timeline for the RVR hearing.  The inmate was assessed ten days' loss of privileges, including telephone except for family emergencies.

The inmate was referred to the District Attorney, and the RVR was submitted to the ICC for possible SHU term assessment.

**Impression**:  The clinician incorrectly checked "no" regarding whether a staff assistant was necessary.  The clinician's response to question number three was unresponsive.  The SHO noted consideration of the mental health assessment, but applied an exoneration standard that is inconsistent with CDCR's RVR policy.  The inmate was not assessed loss of credit because of the untimeliness of the RVR hearing.

**Inmate G**
Date of Violation:  1/20/14
Date of Mental Health Assessment:  2/12/14
Date of Disposition:  3/1/14 at CHCF
Charge:  Willfully Resisting a Peace Officer – Division D Offense

The inmate covered his cell windows and flooded it by clogging the toilet with his shirt.  He was cuffed and removed from the cell.  The "large amount of water on the tier took more than an hour to clean up, delaying the nursing staff and (the writer) from performance of his duties."  The RVR noted that the inmate was not on the mental health caseload, when he was actually at the MHCB LOC.

A non-confidential interview and assessment were completed on 2/12/14.  The psychiatrist checked "no" for questions number one, two, and three.

The inmate was found guilty. The SHO noted that he reviewed the mental health evidence and concluded that it did not provide any exonerating evidence, but that he considered it in assessing the penalty and assessed the lowest range of behavioral/work credit loss.  This inmate was assessed 61 days' loss of behavioral/work credits, which is the lowest for a Division D offense.

**Impression**:  The psychiatrist erroneously checked "no" to question one - whether a staff assistant should be assigned for an MHCB LOC inmate.  The SHO noted consideration of the mental health assessment, but he applied a local "insufficient to exonerate" standard that is inconsistent with CDCR's RVR policy.  The SHO spoke to mitigation and assessed the lowest credit loss for the applicable Division offense.

**Inmate H**
Date of Violation:  1/24/14
Date of Mental Health Assessment:  2/10/14
Date of Disposition:  3/10/14
Charge:  Sexual Disorderly Conduct – Division E Offense

During escort to an appointment with his clinician, the inmate made statements of a sexual nature to the CNA assigned to provide direct observation for his suicide watch. The writer of the RVR noted that the inmate continually displayed disruptive and disrespectful behavior toward female staff. The RVR incorrectly noted he was at the 3CMS LOC when he was actually at the MHCB LOC.

A non-confidential interview and mental health assessment were completed on 2/10/14 by an LCSW. The clinician marked "no" for question number one regarding the need for a staff assistant, and answered "yes" to questions number two and three. For question number two, the clinician indicated that the inmate reported that he was methamphetamine-intoxicated at the time of the incident. The reviewing clinician explained that someone with substance intoxication such as methamphetamine can be sexually disinhibited with low impulse control. For question number three, the clinician explained that consideration should be given to the possibility that the inmate's sexual disorderly conduct happened while high on methamphetamine.

The SHO noted consideration of the mental health assessment in his findings. The inmate was found not guilty of the charge of sexual disorderly conduct, as the evidence did not indicate the aggravating factor of touching without exposure. The inmate was found guilty of the lesser included administrative offense against rights and respect of others. He was assessed 30 days loss of privileges, including no special purchases/quarterly packages and no main yard.

**Impression**: There was no mitigation in this case based on the mental health assessment. The mental health clinician inappropriately checked "no" regarding the need for a staff assistant. The clinician's response did not address the inmate's mental health, but instead spoke to behavior resulting from illegal drug use. The SHO noted consideration of the mental health assessment, but did not state how it was considered. The SHO did not speak to mitigation, and the charge was reduced for reasons unrelated to the mental health assessment. The inmate was assessed loss of privileges.

---

### Inmate I
Date of Violation:  3/10/14
Date of Mental Health Assessment:  3/20/14
Date of Disposition:  3/21/14
Charge:  Possession of Inmate Manufactured Alcohol – Division C Offense

On 3/10/14, a CO entered the inmate's cell due to an odor of inmate-manufactured alcohol emanating from the cell. A clear plastic bag with approximately two gallons of a clear brown liquid was found under the inmate's bed. A mental health assessment request was completed on 3/20/14, with question number two answered in the negative. Question number three was answered "no" and "yes," stating that "P/I would like to protect his yard time because he relies on exercise to maintain his mental stability."

On 3/21/14, the inmate appeared for a hearing before the SHO who considered the mental health assessment and found the inmate guilty. The inmate was assessed 120 days' loss of behavioral/work credit and 30 days loss of yard.

292

**Impression**: There was no mitigation in this case. The answers on the mental health assessment were non-responsive, as the clinician merely re-stated what the inmate wanted during the penalty phase and offered no reason to mitigate any penalties. The SHO noted consideration of the mental health assessment, but did not state how it was considered. The SHO did not speak to mitigation when assessing the penalty. The inmate was assessed significant loss of credit and privilege.

## Inmate J
Date of Violation: 1/6/14
Date of Mental Health Assessment: 1/17/14
Date of Disposition: 2/14/14
Charge: Battery on Inmate - Division D Offense

On 1/6/14, this 3CMS inmate was identified as the individual who had battered another inmate. A mental health assessment was completed on 1/17/14 with questions number two and three answered "no." On 2/14/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 61 days' loss of behavioral/work credit. In his decision, the SHO stated that "the mental health evidence does not provide any exonerating evidence. This SHO will, however, consider mental health when assessing the penalty."

**Impression**: There was mitigation in this case. The SHO noted consideration of the mental health assessment, but he applied an exoneration standard that is inconsistent with CDCR's RVR policy. The SHO spoke to mitigation when assessing the penalty. The inmate was assessed credit loss in the mid-range for the charged offense.

## Inmate K
Date of Violation: 2/3/14
Date of Mental Health Assessment: 2/7/14
Date of Disposition: 3/24/14
Charge: Masturbation without Exposure – a Division E Offense

While performing suicide watch for the inmate, the LVN observed the inmate place his hand under his suicide smock and begin moving his hand back and forth in a rapid motion. The LVN stated that she stood up to verify what she was seeing and "asked him in a frustrated facial expression, `Really?'." She walked to the sergeant in the unit and reported the inmate's behavior.

A psychiatrist completed the mental health assessment on 2/7/14, but there is no indication that a non-confidential interview was conducted. The psychiatrist checked "yes" to questions number two and three. For question number two, the clinician noted that the patient has a decreased ability to control impulses secondary to mental illness and it may have contributed to the above behavior. For question number three, the clinician also explained that the inmate should have ongoing access to mental health services.

The SHO noted the mental health assessment in the RVR. The inmate was found guilty and the SHO noted that the mental health assessment was "insufficient to exonerate the inmate." The SHO further noted, however, that he mitigated the loss of privileges from 90 days to zero days due to the mental health assessment. The inmate was assessed zero days' loss of behavioral/work credits because the hearing was not held within the 30-day timeline. The case was referred to ICC for a SHU term assessment.

**Impression**: There was mitigation in this case. The SHO reported considering the mental health assessment and how it was applied, including toward mitigation of the penalty. While the SHO mitigated the penalty based on the mental health assessment, he used a standard – "insufficient to exonerate the inmate" - that did not conform to CDCR's RVR policy.

**Inmate L**
Date of Violation: 1/30/14
Date of Mental Health Assessment: 2/26/14
Date of Disposition: 3/12/14
Charge: Possession of a Deadly Weapon - Division A-1 Offense

On 1/30/14, a CO received information from a confidential informant that this 3CMS inmate was concealing a deadly weapon in the inmate porter's office which he would use to intimidate other inmates to pay money owed to him. Upon a search of the porter's office, two pens modified into weapons and a cell phone were found. A mental health assessment was completed on 2/26/14, with questions number two and three answered "no."

On 3/12/14, the inmate appeared for a hearing before the SHO who considered the mental health assessment and found the inmate guilty. The SHO stated that the mental health evidence did not provide any exonerating evidence. The inmate was assessed 360 days' loss of behavioral/work credit and was referred to ICC for SHU term assessment.

The ICC met on 5/29/14 and considered the mental health assessment before imposing and assessing a nine-month mitigated SHU term. The term was mitigated because the inmate had not been involved in prior acts of the same or similar nature. Adequate mental health input and information were elicited during the ICC meeting.

**Impression**: There was no mitigation during the hearing. The SHO noted consideration of the mental health assessment, but he applied an exoneration standard that is not consistent with CDCR's RVR policy. The inmate was assessed significant loss of credit.

**Inmate M**
Date of Violation:  1/21/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  2/17/14
Charge:  Leading a Riot – Division D Offense

On 1/21/14, this 3CMS inmate began to fight another inmate in the dining area.  Immediately afterwards, approximately 13 black inmates and 21 Hispanic inmates rose from their seats and began to fight each other.  A mental health assessment was completed on 2/6/14, with question number two answered in the negative and question number three answered in the affirmative. For question number three, the clinician stated that the inmate was diagnosed with a major mental illness that impaired his judgment and reality testing.

On 2/17/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment, found that the evidence did not provide for exoneration and found the inmate guilty.  He assessed the inmate 90 days loss of behavioral/work credits but elected not to suspend any of the inmate's privileges based on the mental health assessment.  The inmate was referred to the ICC for possible SHU term assessment.

The ICC met on 4/23/14, and elected to assess and impose an eight-month mitigated SHU term. The committee mitigated the SHU term based on the inmate's lack of involvement in any prior acts of the same or other similar nature, and not based on any mental health considerations.

**Impression**:  There was mitigation in this case by the SHO, who noted consideration of the mental health assessment.  However, he applied an exoneration standard that is not consistent with CDCR's RVR policy. The SHO did not speak to mitigation when assessing the penalty. The inmate was assessed significant credit loss, but no loss of privilege.

**Inmate N**
Date of Violation:  2/7/14
Date of Mental Health Assessment:  2/19/14
Date of Disposition:  3/18/14
Charge:  IDX with Masturbation – Division D Offense

While performing a routine tier check, the CO observed the inmate lying on his bunk with his back propped against the wall with his underwear pulled down, with a magazine in one hand, and masturbating.  When first instructed to stop, he hesitated but upon a second instruction to stop, he complied.

A psychiatrist completed the non-confidential interview and mental health assessment on 2/19/14.  The psychiatrist checked "yes" for questions number two and three, noting that the inmate was experiencing psychotic symptoms and needed acute emergency treatment according to his team.  Further, for question number three, the psychiatrist stated that at the time of the incident, the mental health team reported that the inmate was experiencing psychotic symptoms and decompensated status, and a note that was not responsive to the question on the mental health assessment form.

295

The inmate was found guilty and assessed 90 days forfeiture of behavioral credits. Page one of the RVR, Part C, noted under mental health assessment, "The SHO elects to find [Inmate N] guilty, however the SHO elects to mitigate the penalties by not imposing any loss of privileges." However, on page four of the RVR, Part C, the SHO noted in the conclusion that, "due to the Subject's mental health status, the SHO elects to mitigate the penalties by not imposing any loss of privileges and imposing the low end of credit loss." This was a Division D offense with a range of 61-90 days' loss of credit, meaning that the SHO actually assessed the high end of credit loss. The RVR was referred to UCC for program review and SHU term assessment.

**Impression**: There was a measure of mitigation in this case. The SHO reported consideration of the mental health assessment, indicated how it was considered, and addressed the issue of mitigation. The mental health clinician was not responsive to question number three on the assessment form. The inmate was not assessed any loss of privileges, but he was assessed the highest credit loss, even though the SHO reported he would impose the credit loss at the low end.

**Inmate O**
Date of Violation: 2/24/14
Date of Mental Health Assessment: 3/12/14
Date of Disposition: 4/1/14
Charge: Conspiracy to Introduce a Controlled Substance into an Institution for Distribution –
        Division A-2 Offense

On 2/21/14, the institution received confidential information that the inmate was conspiring with a visitor to introduce narcotics into the institution. A mental health assessment was completed on 3/12/14, with questions number two and three answered in the negative.

On 4/1/14, the inmate appeared for a hearing before the SHO, who considered the mental health assessment and found the inmate guilty. The inmate also pleaded guilty to the charges. The SHO stated that the mental health evidence did not provide any exonerating evidence. The inmate was assessed 180 days loss of behavioral/work credits and loss of visiting privileges for one year, followed by two years of no-contact visits. He was also ordered to provide one drug test per month and attend AA/NA meetings, and was referred to ICC for possible SHU term assessment. The ICC met on 5/29/14 and considered the mental health factors prior to imposing a ten-month expected SHU term.

**Impression**: There was no mitigation in this case. The SHO noted consideration of the mental health assessment, but applied an exoneration standard that is not consistent with CDCR's RVR policy. The SHO did not speak to mitigation when assessing the penalty. The inmate was assessed significant loss of credit and privileges.

## California Rehabilitation Center (CRC) RVR Review

**SUMMARY OF FINDINGS**

A.    Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CRC by completing and sustaining all requirements.

B.    Training on the RVR process and the role of the mental health assessment for clinical and custody staff was deficient.

C.    Reviewing clinicians provided inappropriate and unresponsive answers on the mental health assessment form, which provided no useful information for the senior hearing officers.

D.    SHOs documented consideration of mental health assessments in the        RVR packages.

E.    SHOs did not document how mental health assessments were        considered in their findings or dispositions of RVRs.

F.    The ICC documented consideration of mental health assessments; however, no mitigation of SHU terms or penalties was found.

G.    Mental health assessments were not always requested timely by custody.

H.    Inmate clerks typed RVRs and had access to confidential inmate information at CRC.

I.    There was no quality review of the RVR process at CRC.


**INTRODUCTION**

On October 20, 2014, the Coleman monitoring team reviewed the RVR process at California Rehabilitation Center (CRC).  At the time of the visit, CRC housed Level I and II inmates including those requiring 3CMS LOC.  As of March 2014, CRC had a total inmate population of 2,970.  Of that population, 1,166 or 39 percent had a MHSDS designation.


During the site visit, the team met with the chief of mental health, the chief psychologist and four SHOs.  The team reviewed policies and procedures related to the RVR process at CRC, training materials provided by headquarters, and local training materials provided by the institution to CRC staff.  The monitors utilized the CRC Institution Register and CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR.

The review period covered RVRs issued and/or heard during January, February, and March 2014. During this time period there was a total of 668 RVRs written with 271 of the or 41 percent issued to inmates with a mental health designation.

## TRAINING

CRC staff did not produce any proof of practice memoranda in response to the October 26, 2011 and November 3, 2011 memoranda requirements. They did, however, produce the approved PowerPoint presentation and lesson plan regarding mental health input into the RVR process.

IST was asked to produce a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda. The report revealed that only the appeals coordinator and senior psychologist specialist positions were compliant with the required four-hour and one-hour training requirements. For the four-hour training requirement, 65 percent of the lieutenants attended and none of the captains attended.

### CRC RVR Training by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 3 | 2/66% | 1/33% |
| Captains | 4 | 0/0% | 3/75% |
| Lieutenants | 23 | 15/65% | 19/83% |
| Sergeants | 56 | 32/57% | 41/73% |
| CC-II Appeals | 1 | 1/100% | 1/100% |
| Senior Psychologist Specialist | 1 | 1/100% | 1/100% |

## STAFF INTERVIEWS

## SHOs

The SHOs were able to articulate the policies and procedures regarding mental health input into the RVR process. The SHOs indicated that assessment forms were returned to custody within three to four days, if the inmate remained housed at CRC. For inmates who transferred to CIM as a result of ASU placement, CIM clinical staff completed the assessments. It was clear this impacted the timeliness of processing the RVRs. The SHOs reported they were able to read and understand the clinicians' responses on the mental health assessment; although it was rare to have anything in response to questions number two and three, as CRC housed low level 3CMS inmates. The SHOs reported considering all information provided on the assessment form. Further, they stated that they had a good working relationship with mental health staff and would contact them with any questions regarding what was written, if necessary.

298

The SHOs reported that all RVRs, including the findings and disposition, were typed by inmate clerks, which allowed the inmate clerks access to other inmates' personal and confidential health information.

**Clinicians**

The clinician responsible for completing all mental health assessments was unavailable for interview; however, the team interviewed his supervisor, the chief psychologist. The chief psychologist explained that for inmates housed at CRC, one clinician completed the assessment; however, if the inmate transferred to CIM, which was designated for administrative segregation placement for CRC inmates, the mental health assessment request was emailed to CIM clinical staff for completion. The chief psychologist explained that there were problems with timely completion of mental health assessments for inmates sent to CIM.

CRC mental health staff tracked all assessments as they were received by and returned to custody staff. Similar to the custody report, the chief psychologist described a good working relationship between mental health and custody staff at CRC.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Fifty percent of the reviewed assessments were completed late due to delayed requests by custody staff. (*See* CRC Inmates A, B, C, D, E.)   For all but two of the reviewed assessments, the clinicians answered "no" to questions number one, two and three. Only two assessments noted mental illness as contributing to the behavior that led to the RVR. (*See* CRC Inmates A, F.) The accompanying explanation by the clinicians in both of these cases was unclear, rendering the assessments unhelpful to the SHOs. While the clinician's professional jargon may have been accurate, it failed to convey meaningful information in "lay person's terms" to the SHO. The clinician used statements such as "impaired reality testing" and "acute thought process and content disturbances produce confusion". In the first case, the clinician's answer to question number three was unresponsive. Review of the inmate's record by the monitor and expert revealed a significant mental health history and decompensation around the time of the incident. Ultimately, the inmate was increased to EOP LOC and referred to DSH ICF. He was admitted to DSH during September, 2014. The inmate incurred the RVR at issue during this documented period of decompensation and was assessed the maximum forfeiture of credit for the division of the offense. (See CRC Inmate A.)

In the second reviewed case, where the clinician noted that the inmate's mental disorder influenced his behavior, the clinician offered what the inmate stated his mental state was at the time of the incident as opposed to the requisite clinical opinion. The clinician noted, "i/p says he was actively psychotic at the time of the incident." (*See* CRC Inmate F.) Further, for the same incident, the clinician noted for question number three that the SHO should consider "his mental state, treatment status at the time of the incident." However, the clinician never opined what it was. The inmate was found guilty and assessed the maximum forfeiture of credit (150 days) allowed for the division of his offense.

CRC did not have a quality management process to ensure that mental health assessments were being completed appropriately.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION

SHOs routinely noted consideration of mental health assessments; however, for one of the two cases wherein the clinicians indicated that the inmates' mental illness influenced his behavior, the SHO did not express how the assessment was considered. (*See* CRC Inmate A.) Further, in the other case, the SHO noted consideration of the inmate's "treatment status at the time of the incident", yet assessed the maximum forfeiture of credit.  The inmate was at an MHCB LOC at the time of the incident. (*See* CRC Inmate F.)

Reporting employees and SHOs often included whether the inmate's behavior was bizarre, unusual or uncharacteristic, even when not the applicable standard. (*See* CRC Inmates A, G.)  Further, in two cases it was noted that the inmate's behavior was NOT bizarre, unusual or uncharacteristic; however, the narrative of both RVRs reflected that the inmates were addressed for the very odd nature of their behavior. (*See* CRC Inmates G, F.)

## ICC REVIEW

Although clinical input during ICC meetings was noted, utilization of the input varied. Some indicated that the mental health input was reviewed and considered without mention of how the information impacted the committee action, if at all.  (*See*, CRC Inmates A, H, I, G, J.) In one case, the inmate stated during ICC that he was suicidal but the ICC chrono did not state what, if any, action was taken as a result of the statement. (*See* CRC Inmate F.)

### CRC RVR Case Reviews

**Inmate A**
Date of Violation:  2/7/14
Date of Mental Health Assessment:  2/20/14
Date of Disposition: 3/4/14
Charge:  Fighting– Division D Offense

On 2/7/14, this 3CMS inmate participated in a fight with another inmate.  The RVR noted that the inmate was a participant in the MHSDS at the 3CMS LOC and that his behavior did not appear bizarre, unusual and/or uncharacteristic.

A mental health assessment was sent to the mental health department on 2/19/14, which was not within five working days as required by policy for 3CMS inmates.  The request was made after his admission to CHCF MHCB bed on 2/11/14.

The mental health assessment was completed by a CHCF clinician on 2/20/14.  The clinician answered "yes" to questions number one, two and three.  For question number two, the clinician noted that the inmate had impaired reality testing related to chronic mental illness and reported

300

poor medication compliance.  The response was not presented in lay person's language and not helpful to the SHO.  In response to question number three, the clinician noted, "Please alert mental health staff for alteration in mood, mentation or behavior." The answer to question number three was also nonresponsive and gave no factors to consider when assessing the penalty.

Three days before the RVR, there was an urgent referral from custody to the mental health department because the inmate was incapable of caring for himself, was confused, had poor attention, was masturbating and staring at others, and displayed unpredictable and bizarre behavior.  The inmate was seen by a clinician on 2/6/14, one day prior to the incident, who described the inmate as lethargic and moving slowly.  This did not appear to be responsive to the specific referral concerns.

The SHO found the inmate guilty and assessed 90 days loss of behavioral credit (the maximum), as well as 90 days loss of yard privileges.  The SHO noted at the time of the disposition that the inmate was receiving EOP LOC.  The SHO noted consideration of the mental health assessment and cited language from the assessment form question number one; however, question number one related to the need for assignment of a staff assistant only.  The SHO again noted the mental health assessment in the "additional information" section of the RVR by reiterating the same clinician statement; however, he did not indicate how the information was actually considered.

The inmate appeared at ICC at MCSP on 3/4/14 following a transfer from CHCF.  The ICC noted the guilty finding for the RVR dated 2/7/14, and acted to place the inmate on Work Group A-1 and in Privilege Group C for a minimum of 30 days.  The ICC did not take any action to mitigate the finding or disposition of the RVR dated 2/7/14.

**Impression**:  There was no mitigation in this case. The RVR noted that the inmate's behavior was not bizarre, unusual or uncharacteristic; however, a mental health assessment was requested. It appeared that the request was most likely due to his transfer to MHCB status and CHCF staff believed/thought it was required.  The mental health assessment as completed was unhelpful and did not utilize layman's terms; it failed to convey meaningful information to the SHO.  Further, the clinician's answer to question number three was unresponsive.  Ultimately, the inmate was increased to the EOP LOC and referred to the intermediate LOC and admitted during September 2014.  It appeared that this inmate incurred the RVR at issue during a documented period of decompensation. The inmate was assessed the maximum forfeiture of credit for the division of the offense.  The ICC did not take any action to mitigate the finding or disposition of the RVR.

## Inmate B
Date of Violation: 1/30/14
Date of Mental Health Assessment:  2/18/14
Date of Disposition:  3/6/14
Charge:  Falsifying Documents/Forged C/O Signature – Division C offense

This 3CMS inmate forged an officer's signature on his extra duty time sheets.  The RVR noted the inmate was a participant in the MHSDS at the 3CMS LOC; however, his behavior did not appear bizarre, unusual and/or uncharacteristic, which was not applicable.  Due to the division of

the offense, a mental health assessment was requested. The assessment was sent to the mental health department on 2/13/14 and completed by a CRC clinician on 2/18/14. The clinician answered "no" to questions number one, two and three.

The inmate was found guilty, and consideration of the mental health assessment was noted in the findings section of the RVR. The inmate was assessed 120 days forfeiture of credits.

**Impression**: The request for a mental health assessment was sent to mental health late. The mental health assessment was negative for any mental health considerations and the assessment was documented as considered in the findings of the RVR by the SHO.

**Inmate C**
Date of Violation:  3/3/14
Date of Mental Health Assessment:  5/21/14 (sent to mental health)
Date of Disposition:  6/2/14—the date the DOJ Forensic Services report returned positive for Marijuana
Charge:  Possession of Narcotics for Distribution and Sales in a State Prison – Division A-2 offense

During a security search of his dormitory, this 3CMS inmate was found in possession of various bindles of suspected marijuana. The samples tested positive for marijuana. The RVR noted the inmate was not a participant in the MHSDS and his behavior did not appear bizarre, unusual and/or uncharacteristic, which was not the applicable standard considering the nature of the charge. However review of the inmate's eUHR revealed that he had been at the 3CMS LOC since 10/10/2013 and thus the referral was required.

A request for a mental health assessment was sent to the mental health department at CIM on 5/21/14. The clinician answered "no" to questions number one, two and three. The inmate was found guilty and assessed 180 days forfeiture of credit, 30 days suspension of main yard and telephone, loss of pay for 90 days from a paid work assignment, 365 days suspension of visiting privileges followed by 730 days non-contact visiting, permanent loss of family visiting privileges and random drug testing for one year. Consideration of the mental health assessment was noted in the findings section of the RVR.

**Impression**: There was no mitigation in this case. The RVR inaccurately reported the inmate was not a participant in the MHSDS, consequently the assessment was completed late. The reporting employee also applied a standard to the RVR which was inapplicable. The SHO documented consideration of the assessment, which indicated no mental health considerations. The inmate received significant credit and privilege losses.

**Inmate D**
Date of Violation:  3/13/14
Date of Mental Health Assessment:  4/14/14
Date of Disposition:  6/22/14 - requested postponement until District Attorney outcome
Charge:  Battery on a Peace Officer Resulting in Use of Force

The reporting employee heard this 3CMS inmate cursing at a RN in an examination room. The officer entered the room and instructed the inmate to sign the refusal paperwork so he could leave to which he replied, "f--- you all." The officer again instructed him to calm down and sign the paper work and he again replied, "f--- you." The officer then instructed the inmate to leave and he complied. While exiting, the inmate stopped and yelled something about a cast, the officer extended his left arm in order to keep from bumping the inmate and the inmate reacted by lifting his right elbow and striking the officer in his shoulder. While the officer ordered the inmate to get down, the inmate continued toward the officer and the officer then "utilized unconventional force" by pushing him in the chest area "in order to gain a safe distance." The officer then applied a burst of OC spray and the inmate immediately got down on his stomach. The RVR noted the inmate was a participant in the MHSDS at the 3CMS LOC. It was documented that the inmate's behavior did not appear bizarre, unusual and/or uncharacteristic.

The mental health assessment was completed late at CIM on 4/14/14 and the clinician answered "no" to questions number one, two and three. The inmate was found guilty and assessed 150 days forfeiture of credits, 90 days suspension of main yard and telephone privileges and was referred to the UCC for program review. The SHO referenced consideration of the mental health assessment in the findings section of the RVR.

**Impression**: There was no mitigation in this case. The mental health assessment was neither requested nor completed timely. The mental health assessment indicated no mental health considerations. The SHO referenced the mental health assessment in the findings of the RVR. The inmate was assessed significant credit and privileges losses.

**Inmate E**
Date of Violation: 1/18/14
Date of Mental Health Assessment:
Date of Disposition: 2/24/14
Charge: Battery on Inmate Resulting in Use of Force – Division D offense

This 3CMS inmate, along with two other inmates, was observed striking another inmate with closed fists to the head and upper torso. The inmates were ordered to stop and get down and they failed to comply. The officers deployed a two-second burst of OC spray to the inmates' faces with negative results. After a second burst of OC spray, the inmates complied, stopped and got "prone out" on his stomach. The reporting employee noted the inmate's participation in the MHSDS at 3CMS LOC. A mental health assessment was requested as it was a SHUable offense.

The mental health assessment was completed late at CIM. The clinician answered "no" to questions number one, two and three. The inmate was found guilty and assessed 90 days forfeiture of credits (the maximum), 30 days confinement to quarters and was referred to ICC for a SHU term assessment. The SHO noted consideration of the mental health assessment in the findings.

**Impression**: There was no mitigation in this case. The request for a mental health assessment was sent to mental health late. The mental health assessment was negative for any mental health

considerations and the assessment was documented as considered in the findings of the RVR. The inmate received the maximum credit loss.

**Inmate F**
Date of Violation: 2/2/14
Date of Mental Health Assessment:  2/13/14
Date of Disposition: 3/9/14
Charge:  Battery on a Peace Officer Resulting in Use of Force – Division B offense

Due to a Code One alarm, this MHCB inmate was instructed to sit in the facility corridor.  The inmate ignored the instructions refusing to leave the medical facility and took an aggressive stance with clenched fists towards the officers.  The inmate was sprayed with OC spray and ordered to get down on the ground; however, he continued towards the officers.  One officer withdrew his M.E.B. baton and struck the inmate's left knee and the inmate still continued toward him.  The officer again struck the inmate's knee with his baton and the inmate continued towards him throwing punches to the officer's upper torso and facial area.  Another officer grabbed the inmate and pulled him down.  He was placed into handcuffs.  The reporting employee noted the inmate was a participant in the MHSDS at the MHCB LOC.

A mental health assessment was requested on 2/12/14 and completed by a Psychiatrist at CIM on 2/13/14.  The clinician answered "yes" to questions number one, two and three; however, it was unnecessary for question number one as the inmate was at MHCB LOC and was automatically entitled to a staff assistant pursuant to policy.  The clinician noted for question number two, "i/p says he was actively psychotic at time of the incident."  For question number three, the clinician stated, "consider his mental state, treatment status at the time of the incident."  Both explanations for question numbers two and three were non-responsive and unhelpful to the SHO.  Question number two specifically stated, "In your opinion" meaning the clinician's opinion, not what the inmate believed at the time of the incident.  Further, the clinician's answer to question number three provided no guidance regarding the assessment of penalties.

The inmate was found guilty and assessed 150 days forfeiture of credit (the maximum), 90 days suspension of main yard, canteen and telephone privileges, and he was referred to ICC for a SHU term assessment.  The SHO noted consideration of the mental health assessment in the findings and documented, "due to [the inmate's] treatment status at the time of the incident and the severity of the incident Inmate… was assessed a penalty by this SHO in regards to the safety and security of staff and the general inmate population."

On 2/6/14, the inmate appeared before the ICC as a result of being placed in administrative segregation following the incident of 2/2/14.  The ICC did not address what action they took, if any, regarding the inmate's statement of being suicidal.  The ICC 128-G chrono also revealed that mental health staff spoke with the inmate regarding his administrative segregation placement and that based on that interaction, determined continued administrative segregation placement was not likely to result in decompensation and recommended the ICC continue.  The ICC 128-G chrono identified the inmate as being at the 3CMS LOC.  The inmate appeared before another ICC on 2/27/14, again before the RVR was adjudicated, at which time the committee elected to retain him in administrative segregation pending the outcome of the RVR.  The ICC 128-G noted

the inmate was at the EOP LOC at that time. A third ICC was conducted on 5/8/14, at which time the ICC elected to assess and impose an 11-month mitigated SHU term with a MERD of 10/10/14. The SHU term was mitigated by one month due to no prior same or similar acts. The ICC 128-G chrono reported what was on the mental health assessment for the RVR, and stated that they considered the information as part of the mitigation and aggravation factors for the SHU term, without stating how it was considered.

**Impression**: There was no mitigation in this case. The mental health assessment was not completed appropriately. The clinician documented what the inmate stated about this mental state during the incident as opposed to the clinician's clinical opinion as required by policy. Further, the clinician's explanation for question number three offered no help to the SHO when assessing the penalties. The inmate was assessed significant credit and privilege losses.

**Inmate G**
Date of Violation: 3/13/14
Date of Mental Health Assessment: 3/20/14
Date of Disposition: 7/31/14- due to DA Referral.
Charge: Battery on a Peace Officer Resulting in Use of Force – Division B offense

During shift change, the unit sergeant informed the reporting CO that this 3CMS inmate had been referred for a psychological evaluation; however, he remained housed in his dorm. Approximately one hour later, numerous inmates approached the officer and informed him that the inmate was in need of help and, "needs to go before there is a problem, that he is not right." The inmates also informed the officer that he had not taken his medications for the last few days. The officer documented calling the psychiatrist on duty; however, there was no answer. He then sent the security patrol officer to the unit to attempt escorting the inmate to medical for evaluation; however, the inmate refused to be escorted. The officers attempted talking to the inmate in an attempt to bring him to get some help. The inmate responded that he was just thinking about things and was fine. The unit sergeant then arrived at the dorm and was apprised of the situation. The reporting officer and sergeant again approached the inmate, asking him if he was okay and informing him that they wanted to bring him for help. At that point, the inmate was standing in a bladed stance with his fists clenched in a fist at his side. He was ordered to turn and cuff up, to which he responded, "I'm not doing nothing you say!" The inmate was again ordered to cuff up and he again took a bladed stance and brought his clenched fists up to his chest. The officers again ordered the inmate to get down, he again refused, and the sergeant sprayed the inmate with OC pepper spray. The inmate then went down on one knee and "proned out." When the officers attempted to cuff the inmate, he again became aggressive and pushed himself back on his feet. He then began throwing punches at the officers. He was again sprayed with OC pepper and went down on one knee, but would not get completely down. The inmate again got to his feet and began throwing punches at the sergeant, striking him in the head. The officer administered another burst of OC pepper spray and the inmate "proned out" on the floor and submitted to handcuffs.

A mental health assessment was sent to the mental health department on 3/18/14 and completed on 3/20/14 at CIM with questions number one, two and three answered in the negative.

The RVR hearing was held at CRC on 7/31/14 via telephone with the assistance of staff from CHCF, as the inmate had transferred from CIM administrative segregation to CHCF. The SHO again noted the inmate's LOC in the Due Process section of the RVR stating, "The SHO reviewed the RVR and stipulates that [Inmate's] behavior does not appear bizarre, unusual and/or uncharacteristic." However, because he was displaying behavior that could result in a SHU term if found guilty, a mental health assessment form was completed.

The inmate was found guilty. The SHO noted the mental health assessment in the findings, stating, "mental health factors did not contribute in any way to the 3/13/14 incident nor do they require any special consideration in how a Penalty for this Offense is Assessed." The inmate was assessed 150 days forfeiture of credit, 90 days suspension of canteen, quarterly packages and main yard privileges. The inmate was referred to ICC for a SHU term assessment.

The inmate appeared before the ICC on 7/3/14 at CHCF, where he had been housed in the CHCF/DSH program at the ICF LOC since 6/27/14. The ICC noted the RVR dated 3/13/14, however no action was taken as the RVR was not heard as yet. A review of the inmate's housing history noted he was paroled on 8/12/14 to "REG 2 Atascadero State Hospital."

**Impression**: There was no mitigation in this case. It was observed that the inmate had been referred for a psychological evaluation due to his behavior just prior to the incident and there were reports of current medication noncompliance; however, the clinician who completed the assessment noted no mental health concerns. Although the inmate received a mental health assessment based on the SHU-able nature of the offense, the SHO noted that his behavior was not bizarre, unusual or uncharacteristic, applying the wrong standard. The inmate ultimately was assessed the maximum allowed forfeiture of credit, as well as significant loss of privileges.

**Inmate H**
Date of Violation: 2/18/14 - actually occurred on 9/5/13, positive marijuana test confirmed by Department of Justice, Bureau of Forensic Services on 2/18/14
Date of Mental Health Assessment: 10/15/13
Date of Disposition: 3/15/14
Charge: Possession of Marijuana with the Purpose of Distribution & Sales in a State
        Prison – Division A-2 Offense

At the conclusion of a narcotics investigation, the Investigative Services Unit at CRC concluded that this 3CMS inmate was in possession of approximately 2.6 grams of suspected marijuana packaged and sealed for distribution. The packages were found during a search of the inmate's cell. The RVR noted the inmate's participation in the MHSDS at the 3CMS LOC and that the behavior was not considered bizarre, unusual or uncharacteristic. However, due to the level of the offense, a mental health assessment was requested on 9/30/2013, which was prior to the RVR actually being issued to the inmate as the results from the Department of Justice were not received until 2/18/14.

A mental health assessment was completed on 10/15/13 (two weeks after requested) by a clinician at CIM. The clinician answered no to questions number one, two and three.

The inmate was found guilty and assessed 180 days forfeiture of credit, 90 days suspension of privileges, one year loss of all visiting privileges, two years loss of contact visiting privileges, three years suspension of family visiting privileges and one year mandatory random drug testing. The SHO documented consideration of the mental health assessment in the Findings of the RVR.

The inmate appeared before the ICC on 4/4/14 at which time the ICC acted to assess an eight month mitigated SHU term. ICC stated "The 115 MH is being considered." ICC then acted to assess and impose the eight month mitigated SHU term with an expired MERD of 3/5/14. The SHU term was mitigated by one month due to no prior acts of same or similar nature. Due to the length of time it took to get the results from the Department of Justice, the inmate was retained in administrative segregation for a month longer than the assessed and imposed SHU term. Additionally, the inmate was retained in administrative segregation until transferred to RJD on 5/9/14.

**Impression**: The request for a mental health assessment was delivered to the mental health department prior to the RVR being issued to the inmate, as the results from the Department of Justice were not received until 2/18/14. The SHO noted consideration of the assessment in the findings section of the RVR.

### Inmate I
Date of Violation: 2/22/14
Date of Disposition: 4/1/14
Charge: Conspiracy to Introduce a Controlled Substance into a State Prison for
        Distribution and Sales – Division A-2 Offense

On 2/22/14, this 3CMS inmate was found in possession of Vaseline when attempting to enter the main visiting area for his approved scheduled visit. Based on this information, the reporting employee determined the inmate was attempting to attain and conceal dangerous contraband and/or narcotics from his approved visitor. The visitor was questioned and searched and narcotics were discovered on her person. The reporting employee noted that the inmate was not a participant in the MHSDS, although the inmate was at the 3CMS LOC. The RVR stated that the behavior was not bizarre, unusual or uncharacteristic, which was not applicable because of the nature of the charge.

The inmate was transferred to CIM administrative segregation where the mental health assessment was completed. The clinician answered "no" to question numbers one, two and three. The inmate was found guilty and assessed 180 days forfeiture of credit, 30 days suspension of main yard, canteen and telephone privileges, one year suspension of visiting privileges, and upon completion of that suspension, an additional 730 day non-contact visiting suspension. A lifetime ban on family visiting privileges was also assessed. The SHO noted consideration of the mental health assessment.

The inmate appeared before the ICC on 5/8/14 at which time the ICC assessed and imposed an eight month mitigated SHU term with a MERD of 8/2/14. The ICC noted consideration of the mental health assessment. The SHU term was mitigated by one month due to no prior acts of same or similar nature. The inmate was transferred to CCI SHU on 5/22/14.

307

**Impression**: There was no mitigation in the case. The inmate's LOC was erroneously stated by the reporting employee. The request for a mental health assessment was delivered to the mental health department late. The SHO noted consideration of the assessment in the RVR without stating how. The inmate was assessed significant privilege losses.

**Inmate J**
Date of Violation: 1/11/14
Date of Mental Health Assessment: 1/17/14
Date of Disposition: 2/20/14
Charge: Battery on a Peace Officer Without Serious Injury – Division B offense

On 1/11/14, the inmate was shouting during dorm count. The behavior was reported to the facility sergeant. After completion of meal, the officer advised the inmate that he needed to discuss his behavior with him and escorted him outside of the dining hall. While speaking with the officer, the inmate displayed unusual behavior and the officer noticed his pupils were dilated. The officer informed the inmate that he believed he was under the influence of a controlled substance to which the inmate responded, "why are you guys picking on me." The inmate was escorted to the program office and placed in a holding cell. The officer asked for his state issued identification card and the inmate threw the identification card through the food port and struck the chest area of the officer. The RVR noted that the inmate was a participant in the MHSDS at the 3CMS LOC. The RVR noted that his behavior was not bizarre, unusual and/or uncharacteristic, which standard was not applicable considering the nature of the charge. A mental health assessment was requested due to the division of the offense.

A mental health assessment was completed by a CIM clinician on 1/17/14. The clinician answered "no" to questions number one, two and three; however, the clinician did note for question number one, "does not need SA but encouraged to ask for summary in basic, non-jargon English if he has trouble understanding."

The inmate was found guilty and assessed 150 days forfeiture of credits and was referred for a SHU term assessment. The SHO referenced consideration of the mental health assessment in the findings of the RVR.

The inmate appeared before the ICC on 3/6/14 at which time the ICC elected to assess and impose a 13-month aggravated SHU term with a MERD of 11/4/14. The aggravated SHU term was due to a prior similar RVR for battery on another inmate which occurred on 2/23/09. The ICC stated, "The 115MH is being considered."

**Impression**: There was no mitigation in this case. The mental health assessment was negative for any mental health considerations. The SHO referenced consideration of the mental health assessment in the findings. The inmate was assessed significant credit loss.

## Richard J. Donovan Correctional Facility (RJD) RVR Review

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at RJD by completing and sustaining all requirements.

B.  RJD was not compliant with required training of custody and mental health staff related to the RVR process.

C.  RJD had a clear process in place for mental health assessment requests.

D.  The quality of the mental health assessments was generally good; however, some clinician's, particularly practicum students, did not provide useful/helpful information to the SHOs.

E.  Clinicians improperly included inmate requests as mental health factors to consider when assessing penalties.

F.  SHOs routinely noted that mental health assessments were reviewed and  considered.

G.  SHOs conducted a "clinical" evaluation of the inmate's mental health status as he appeared to the SHO at the time of the hearing, which was  not consistent with the RVR policy.

H.  Some SHOs misinterpreted the assessments to indicate that they should affirmatively not consider the inmate's mental health status when the clinician noted that there were no mental health factors to consider.

I.  There was a robust quality review of the RVR process at RJD.

J.  The ICC considered the mental health assessments as well as clinical input presented at the meetings.

**INTRODUCTION**

On August 27-28, 2014, the Coleman monitoring team reviewed the RVR process at Richard J. Donovan Correctional Facility (RJD).  RJD is designated to house inmates at the Level I, III and IV custody level and inmates with a mental health designation of EOP, 3CMS and MHCB.  As of March 2014, RJD had a total inmate population of 3,140.  Of that population, 1,933 or 62 percent had a MHSDS designation.

The monitoring team reviewed policies and procedures related to the RVR process at RJD, training materials provided by headquarters, as well as any local training materials provided by the institution to RJD staff.  The monitors utilized the RJD Institution Register and

CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR.

The monitoring team met with the Chief of Mental Health and clinicians who prepared the assessments as well as the SHOs who adjudicated the RVRs. The monitors reviewed RVRs for the first three months of 2014. During this period there were a total of 585 RVRs written with 263 or 45 percent issued to inmates with a mental health designation.

**TRAINING**

IST was asked to produce a report of who attended the required training sessions for each job classification identified in the October 26 and November 3, 2011 memoranda. The lesson plan used at RJD regarding mental health input into the RVR process was the currently approved version. RJD staff was not able to produce proof of practice memoranda as required by the October 26, 2011 and the November 3, 2011 memoranda.

<u>RJD Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 5 | 3/60% | 1/20% |
| Captains | 6 | 6/100% | 0/0% |
| Lieutenants | 24 | 15/63% | 21/88% |
| Sergeants | 76 | 52/68% | 4/5% |
| CC-II Appeals | 2 | 0/0% | 1/50% |
| Senior Psychologist | 1 | 0/0% | 1/100% |
| Psychologists | 6 | 0/0% | 2/33% |

**STAFF INTERVIEWS**

**SHOs**

The SHOs stated the RVR and the mental health assessment form were emailed to mental health services for processing. They stated they were not consistently returned in a timely manner, which at times resulted in time constraints not being met. When time constraints were not met, there could be no loss of credit assessed if the inmate was found guilty. The SHOs utilized existing Title 15 policy to suspend time constraints for inmates housed in the MHCB.

The SHOs reported that they believed inmates often tried to "game" the mental health staff in order to stay at RJD or not have any penalty assessed as a result of an RVR. They also noted that they always considered the information on the assessment, however, it was not helpful when the clinician stated, "Don't take any privileges" in response to question number three regarding mitigation on the form.

The SHOs stated they considered the inmate's behavior/action at the time of the hearing as an indicator of the inmate's understanding of his actions at the time of the RVR, which standard was not consistent with the RVR policy. Also, they said they were required to adhere to Title 15 policy regarding the assessment of penalties for certain offenses regardless of the clinician's recommendation on the assessment.

**Clinicians**

A team of four clinicians, the assessment team, completed all of the mental health assessments at RJD. The assessment and RVR were received by mental health staff via email from all of the facilities at RJD, and the clinicians reported that the requests were sent to mental health services in a timely manner. They stated that an assessment could take anywhere from two to eight hours to complete. Clinicians recommended that potential penalties should be included with the assessment, together with a copy of the RVR, to inform the clinical staff of what to consider when answering question number three on the form. Regarding question number three, the clinicians reported that mitigation by SHOs was typically symbolic in nature and not truly occurring. The institution had an extensive library of resource documents regarding mental health assessments in regard to inmate discipline.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Mental health assessment requests were sent via email from all facilities to the mental health department and then processed by the assessment team. Both custody and clinical staff were familiar with the process at RJD.

The quality of assessments was generally good with some exceptions. Problems were noted with assessments completed by the practicum student. While the student noted the inmate's difficulties, stress and mental disorder, there was no explanation of how the symptoms may have contributed to the behavior that led to the RVR. Further, for question number three on the assessment, the student merely noted that the SHO should consider the inmate's mental health symptoms and recommended that the "charges be dismissed." (*See* RJD Inmates A, B, C.)

Also, at times clinicians noted what the inmate himself identified as factors to consider when assessing the penalty. In one case, as opposed to offering his clinical opinion, the clinician noted, "The inmate identified continued package privileges as most essential to his functioning." (*See* RJD Inmate D.)

Clinicians provided unresponsive or inconclusive answers when determining if there was a nexus between the inmate's mental illness and the behavior leading to the RVR. In responding to question number two, one clinician wrote "If this inmate is found guilty of the behavior alleged in the RVR, the possibility that his mental disorder contributed cannot be ruled out." (*See* RJD Inmate E.)

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

SHOs noted consideration of the assessments in all reviewed RVRs with mitigation noted in several cases. However, at times SHOs conducted a "clinical" evaluation of the inmate's mental health status as he appeared to the SHO at the time of the hearing which was not provided for by policy. (*See* RJD Inmates B, C.) In one case, the clinician documented that the inmate was having difficulty with an apparent mental disorder as well as medical issues which significantly contributed to the behavior; however, the SHO noted, "the inmate acknowledged that he knew he shouldn't have behaved this way and it is the opinion of the SHO that the inmate knew right from wrong during his actions which caused the incident." (*See* RJD Inmate A.) In another case, the clinician also noted how the inmate's mental disorder did appear to contribute to the behavior that led to the incident, yet the SHO noted, "Inmate (X) is capable of understanding the difference between right and wrong and a guilty finding would serve to inform him in the future that refusing an assigned cellmate is not allowed and will result in progressive discipline." (*See* RJD Inmate F.) Both inmates were assessed credit loss. Although one SHO both acknowledged and quoted the clinician's recommendation against restricting yard or dayroom, the SHO felt that a loss of yard would serve as a deterrent for future misconduct and assessed 60 days loss of yard. (*See* RJD Inmate G.)

Further, one SHO demonstrated a complete misinterpretation of the clinical assessment by noting, "the Clinician expressed that the SHO **SHOULD NOT** (bolded and underlined by the SHO) consider (Inmate's) mental health status when assessing the penalty" when the clinician actually wrote, "there **ARE NO** (bolded and underlined by the clinician) mental health factors the SHO should consider in assessing the penalty." (*See* RJD Inmate G.)

However, there were numerous cases where the SHO mitigated penalties based specifically on the recommendations contained on the assessment. (*See* RJD Inmates F, I, J, K.)

**ICC REVIEW**

The ICC considered the assessments as well as the input provided by the clinicians present at the meetings although it did not appear that mitigation, based on mental health factors, occurred at the ICC level. (*See*, RJD Inmates L, M, N.)

**QUALITY REVIEW**

RJD had a robust quality review process of the mental health assessment and its consideration and impact in the RVR process in place. There was a weekly workgroup including the chief psychologist, chief of mental health (when necessary dependent on the issue), CDO and the assessment team unit supervisor regarding mental health input into the RVR process. RJD also performed monthly audits of the assessments. Audits of all areas of the process were performed, including, but not limited to, the timeliness of completion, the quality of clinician input, whether there was a dismissal based on question number two, whether there was mitigation based on the assessment and whether the SHOs utilized psycho-legal language in the

312

RVR. The audits also included consideration of the assessment by the SHOs. Audits were discussed monthly at the Mental Health Program Subcommittee Quality Management review. Data was reported by inmate LOC, number of completed assessments, and the quality of the assessments.

## RJD RVR Case Reviews

**Inmate A**
Date of Violation: 3/6/14
Date of Mental Health Assessment: 4/1/14
Date of Disposition: 4/11/14
Charge: Obstructing a Peace Officer in the Performance of His Duties – Division D Offense

This EOP inmate refused to lock up, yelled profanities at the officers and then took a bladed stance. He then stepped toward the officer with his fists clenched and the officer sprayed one continuous burst of OC at his facial area. The inmate continued forward towards the officer and the officer struck the inmate's left shoulder area two times. The inmate assumed the prone position on the ground and was placed in handcuffs.

The mental health assessment was completed on 4/1/14 by a Practicum Student who noted that the inmate's mental disorder did appear to have contributed to the alleged behavior. The student noted that prior to the documented incident, the mental health record indicated the inmate was having difficulty with an apparent mental disorder and medical problem, which had created increased stress and discomfort in his life at the time of the alleged behavior. As a result a mental disorder had a significant contribution to the behavior. The student further noted that there were mental health factors the SHO should consider in assessing the penalty and explained that the inmate's history of mental health symptoms are clearly documented and it is recommended the charges be dismissed.

The inmate was found guilty. The SHO noted consideration of the mental health assessment, but noted that the inmate acknowledged he knew he should not have behaved this way and it was the opinion of the SHO the inmate knew right from wrong during his actions which caused the incident. The SHO further stated that the inmate had the opportunity to defuse the situation but instead chose to escalate it by making the statements above and displaying aggressive behavior towards staff.

The inmate was assessed 61 days loss of behavioral/work credits.

It was observed that there was a chrono in the inmate's C-file written by a psychiatrist. The chrono noted that the inmate was upset because his counselor told him he was going to transfer to another institution secondary to his points. He told the psychiatrist, "I got to do do something to get a 115." "I do not want to be transferred from this institution because I want to get family visits." When the psychiatrist asked if he was going to hurt himself or someone else, he replied, "No, I just need to get a 115."

**Impression**: The SHO did note the mental health assessment and reported it was considered, but did not state how it may have been used to mitigate. It was observed that a practicum student completed the assessment. The responses in the mental health assessment were not helpful to aiding the SHO in understanding how the mental illness may have contributed to the actions that led to the RVR. Further, simply stating that the charges should be dismissed based on a history of mental illness is not an appropriate response for question number three. The inmate was assessed the low end of credit forfeiture and no privilege loss was imposed.

### Inmate B
Date of Violation: 2/7/14
Date of Mental Health Assessment: 3/11/14
Date of Disposition: 3/17/14
Charge: Refusing to Accept Assigned Housing – Division D Offense

On 2/7/14, this EOP inmate refused to accept his new assigned housing with a cellmate. The RVR reported that the inmate was displaying unusual erratic behavior by banging on the cell door and trying to flood his cell. The inmate stated he should be single celled and that he was not moving in with a cellmate. On 3/11/14, a mental health assessment was completed with question number one answered in the negative, and questions number two and three answered in the affirmative. Question number one was incorrectly marked "no" since the inmate was at the EOP LOC and was automatically assigned a staff assistant. In response to question number two, the clinician reported that the inmate appeared to be in the beginning stages of an episode of decompensation due to the presence of a major mental illness and that he likely became overwhelmed and stressed and his overreaction to the assignment of housing was impulsive. Additionally, the clinician reported that the inmate's judgment appear to be clouded due to the presence of a major mental illness. In response to question number three, the clinician wrote that the SHO should seriously consider dismissal of the charges due to the likelihood that the inmate would be found to be a subject of an involuntary medication order by the court. The clinicians answer to question number three was unresponsive.

On 3/17/14, the inmate appeared for hearing before the SHO. The SHO gave consideration to the mental health assessment and found the inmate guilty. The SHO appeared to disregard the opinion of the clinician when he determined that the inmate was aware of his actions and consequences at the time they occurred. The SHO also reported that the inmate acknowledged understanding that he would be issued an RVR for refusing a cellmate and that he was not designated as a single cell inmate. However, this observation by the SHO was made as of the time of the hearing and not at the time of the violation. The SHO assessed the inmate's mental health status at the time of the hearing rather than at the time of the infraction when making a determination as to whether the inmate's mental health contributed to the behavior that led to the RVR. The inmate was assessed 61 days loss of credits, the minimum amount of time allowable for Division D offense. The SHO elected not to suspend any privileges that might be counterproductive to the inmate's mental health but did not specify what those privileges might be.

**Impression**: Although there appeared to be mitigation in this case, it was not based on the recommendations contained in the mental health assessment. The SHO, when factoring in the

mental health of the inmate, based his decision on the inmate's mental health status at the time of the hearing rather than at the time of the infraction. The clinicians answer to question number three on the mental health assessment was unresponsive.

**Inmate C**
Date of Violation: 2/18/14
Date of Mental Health Assessment: 3/11/14
Date of Disposition: 3/17/14
Charge: Threatening Serious Bodily Injury to an Inmate – Division F Offense

On 2/18/14, this EOP inmate was involved in an altercation with his cellmate in their cell. On 3/11/14, a mental health assessment was completed with question number one answered in the negative and questions number two and three answered in the affirmative. The clinician incorrectly answered "no" to question number one since the inmate was at the EOP LOC and automatically assigned a staff assistant. In response to question number two, the clinician reported that the inmate had a significant history of aggressive and impulsive behavior and appeared to be in the midst of an episode of decompensation resulting from various stressors at the time of the incident. The inmate also appeared to become increasingly agitated prior to the described offense and there was evidence of an underlying mood disorder that could lead the inmate to becoming agitated, aggressive and have difficulty coping with stress and engaging with others in an appropriate manner. The clinician concluded that the major mental illness contributed to the described offense. In response to question number three, the clinician recommended that the SHO should seriously consider dismissal of the charges due to the likelihood the inmate would be found to be the subject of an involuntary medication order. This answer was unresponsive to the question.

On 3/17/14, the inmate appeared for a hearing before the SHO. The SHO appeared to disregard the opinion of the clinician when he determined that the inmate was aware of his actions and consequences at the time they occurred. The SHO also reported that the inmate was capable of understanding the difference between right and wrong and was aware that threatening serious bodily injury to an inmate was not allowed. However, this observation was made of the time of the hearing and not at the time of the violation. The SHO assessed the inmate's mental health status at the time of the hearing rather than at the time of the infraction when making a determination as to whether the inmate's mental health contributed to the behavior that led to the RVR. The SHO elected to reduce the RVR to an administrative charge and further reduced the administrative charge and documented the inmate's behavior on a CDC 128-A based on the recommendation of the clinician.

**Impression**: There was mitigation in this case based on mental health factors. The SHO, when factoring in the mental health of the inmate, based his decision on the inmate's mental health status at the time of the hearing rather than at the time of the infraction. The clinicians answer to question number three on the mental health assessment was unresponsive.

**Inmate D**
Date of Violation:  1/9/14
Date of Mental Health Assessment:
Date of Disposition:  2/6/14
Charge:  Fighting Resulting in Use of Force (OC) – a Division D Offense

This EOP inmate was engaged in a fight in the housing unit with another inmate.  When ordered to stop they did not and OC spray was administered to gain compliance from the inmates.

A mental health assessment was completed and the clinician noted that the inmate's mental disorder did not appear to contribute to the behavior that led to the RVR.  The clinician noted that there were mental health factors that should be considered when assessing the penalty if found guilty.  Specifically, the clinician noted that the inmate had a history of chronic pain and discomfort, both as a result of arthritis and chemotherapy, all of which can weigh heavily on his mood.  The clinician further noted that the underline inmate identified continued package privileges as the most essential to his functioning.

The inmate was found guilty and assessed 90 days loss of behavioral credit forfeiture.  The SHO considered the mental health assessment and noted, "the SHO did not assess any penalties that have to deal with packages."

**Impression**:  There was a measure of mitigation in this case, in that the SHO did not assess any privilege penalties.  The SHO did note the mental health assessment and reported it was considered. The mental assessment was not completed timely.  The mental health assessment was not responsive to question number three because it addressed what the inmate wanted mitigated in the disposition, rather than applying clinical judgment to the assessment.

**Inmate E**
Date of Violation:  2/7/14
Date of Mental Health Assessment:  2/25/14
Date of Disposition:  3/9/14
Charge:  Resisting a Peace Officer in the Performance of his Duties with Use of Force – Division
     D Offense

On 2/7/14, an inmate was undergoing a random unclothed body search on the yard when a group of five inmates began to loiter near this inmate.  A CO ordered the five inmates to walk away from the area.  The yard was ordered down but the inmate only got down on his knees.  When the officer put his hand on the inmate's back to force him into a prone position, the inmate resisted by pushing his body weight backwards against the officer's hand. The officer then used his weight to force the inmate down onto the ground.  On 2/25/14, a mental health assessment was completed with questions number two and three answered in the affirmative. In response to question number two, the clinician wrote that if the inmate was found guilty the possibility that his mental disorder contributed could not be ruled out.  The clinicians answer to this question was not responsive.  In response to question number three, the clinician reported that there were mental health factors that should be considered when assessing a penalty, and that extended

periods of cell confinement, loss of dayroom, phone privileges or visits would have the potential to worsen the inmate's mental health.

On 3/9/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate not guilty of the charges. The SHO relied specifically on the mental health assessment in reaching the not guilty finding.

**Impression**: There was mitigation in this case and the inmate was found not guilty of the offense charged based specifically on the mental health assessment.

**Inmate F**
Date of Violation:  1/7/14
Date of Mental Health Assessment:  2/4/14
Date of Disposition:  2/9/14
Charge:  Refusing Assigned Cellmate – Division D Offense

When the inmate was informed a new cellmate had moved into his cell he responded to the officer that he was "single cell."  The officer informed him that according to the computer data, he was not single cell and the inmate responded that he was "going to take off on him."  The inmate was ordered to turn around and cuff up; however, he instead made a quick movement away from the CO.  The officer grabbed the inmate again and told him to cuff up.  The inmate resisted and dropped to the floor and bundled up locking his hands in front of him.  He was again ordered to cuff up and he continued resisting by locking his hands underneath his torso.  He was eventually cuffed and brought to the MHSDS building.

The clinician completed a mental health assessment on 2/4/14 and noted that the inmate's mental disorder did appear to contribute to the alleged behavior.  Specifically, the inmate becomes tangential and circumstantial (loses track of points and becomes lost in details), which precludes his ability to communicate cogently; especially at times of duress.  He further noted that there were mental health factors to consider in assessing the penalty and explained that the inmate becomes impulsive and aggressive when he feels trapped and confined with other people, per his report.  The clinician noted that the officer may want to consider this information if a change of location or change of program is made.

The inmate was found guilty and the SHO noted consideration of the mental health assessment in the findings.  The SHO further noted consideration of the mental health assessment in the disposition.  He specifically noted that credit forfeiture is mandated and that the SHO is bound to assess credit forfeiture in the range appropriate to the classification of the Rules Violation Report.  The SHO continued by stating that he believed that the inmate is capable of understanding the difference between right and wrong and that a guilty finding would serve to inform him in the future that refusing an assigned cellmate is not allowed and will result in progressive discipline.  The SHO assessed 61 days loss of credit.  He was not assessed any loss of privileges.  It was observed that the SHO indicated that imposition of penalties was mandated, which is not consistent with CDCR' s RVR policies.

**Impression**:  The inmate was assessed loss of credit at the low end of Division D offenses, and was not assessed any loss of privileges. The SHO noted consideration of the mental health assessment in the findings and the disposition.  It appeared that there was a measure of mitigation in this case.

**Inmate G**
Date of Violation: 3/10/14
Date of Mental Health Assessment:  4/8/14
Date of Disposition: 4/13/14
Charge:  Disrespect Towards Staff – Division F Offense

On 3/10/14, the PT was dispensing pills and asked this EOP inmate what pills he wanted. The inmate replied that he wanted her and them protruded and exposed his tongue and licked his upper lip in a slow manner while staring at her. On 4/8/14, a mental health assessment was completed with question number two answered in the negative and question number three answered in the affirmative.  In response to question number three, the clinician reported that the inmate normally tried to get out of the cell as much as possible and that staying in his cell would make the voices worse.  The clinician recommended that if the inmate was assessed penalties, he should not lose access to yard time or to the dayroom.

On 4/13/14, the inmate appeared for hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 30 days forfeiture of credit, the maximum amount of time allowable for a Division F offense.  Although the SHO acknowledged and quoted the clinician's recommendation regarding access to yard or dayroom, the SHO felt that a loss of yard would serve as a deterrent for future misconduct and assessed 60 days loss of yard.

**Impression**:  There was no mitigation in this case. The SHO's assessment of loss of yard was in direct contradiction to the clinician's recommendation.

**Inmate H**
Date of Violation:  2/12/14
Date of Mental Health Assessment:
Date of Disposition:  5/4/14 (inmate postponed awaiting outcome of District Attorney referral)
Charge:  Masturbation w/Exposure – Division D Offense

The CNA providing suicide watch observed this EOP inmate pull his blanket down while masturbating and staring at her.  The mental health assessment was completed on 2/21/14 and was negative for question numbers two and three.

The SHO noted considering the mental health assessment and documented, "The Clinician expressed that the SHO **SHOULD NOT** (bolded and underlined) consider [inmate's] mental health status when assessing the penalty.  In actuality, the clinician wrote, "There **ARE NO** (bold and underlined) mental health factors the SHO should consider in assessing the penalty."

318

The inmate was found guilty and assessed 61 days of behavioral credit forfeiture, 90 days loss of privileges, and referred to ICC for SHU term assessment and "R" suffix custody designation.

**Impression**:  There was no mitigation in this case. It appeared that the SHO construed the explanation to question number three – stating that there are no mental health factors the SHO should consider when assessing penalty to mean that a SHO is prohibited from considering mental health factors in RVR cases.

## Inmate I
Date of Violation:  2/9/14
Date of Mental Health Assessment:  3/3/14
Date of Disposition:  3/9/14
Charge:  Fighting – Division D Offense

On 2/9/14, this EOP inmate was involved in an altercation with another inmate on the yard. Both inmates complied when ordered to lay prone on the ground. On 3/3/14, a mental health assessment was completed with question number two answered in the negative and question number three answered in the affirmative. In response to question number three, the clinician reported that the inmate had a history of significant mental health concerns and that contact with his mother was always of importance to him and that the inmate should not lose any telephone privileges with her or lose the ability to receive visitors. On 3/9/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 61 days credit forfeiture and the SHO elected not to suspend any privileges that would be counterproductive to the inmate's mental health.

**Impression**:  There was mitigation in this case based on the recommendations contained in the mental health assessment and specifically referenced by the SHO. The clinician's response to question number three was responsive and provided the SHO with the necessary information to mitigate penalties.

## Inmate J
Date of Violation:  2/25/14
Date of Mental Health Assessment:  3/13/14
Date of Disposition:  3/21/14
Charge:  Disrespecting Staff – Administrative Offense

On 2/25/14, this EOP inmate was outside of his unit banging on the door repeatedly and excessively in an attempt to enter the unit.  When it was explained to him that he did not need to be banging on the door, the inmate spoke to the CO in statements replete with profanity.  On 3/13/14, a mental health assessment was completed with question number two answered the negative and question number three answered in the affirmative.  Although question number two was answered in the negative, the clinician reported that there was no relationship between the inmate's report of a variably depressed mood and behavior that resulted in the violation.  This response is unnecessary.  In response to question number three, the clinician wrote that the only privilege that appeared to be essential to the inmate's depressed mood was his continuing to have full phone privileges.

319

On 3/21/14, the inmate appeared for hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was placed in Privilege Group C for 30 days. The SHO agreed to the mental health assessment and elected not to take any phone privileges from the inmate.

**Impression**: There was mitigation in this case based on the recommendations contained in the mental health assessment.

**Inmate K**
Date of Violation 3/4/14
Date of Disposition 4/1/14
Charge: Battery on an Inmate with a Weapon – a Division A-1 Offense

This EOP inmate was fighting with another inmate, both utilizing their canes to strike each other. The inmates continued to fight even after several commands to stop, necessitating the use of OC spray. Once the OC was utilized, both inmates complied and submitted to cuffs.

The mental health assessment was completed and the clinician noted that the inmate's mental disorder did not appear to have contributed to the alleged behavior; however, there are factors to consider in assessing the penalty. Specifically, the clinician noted that if the inmate is found guilty and penalties need to be enforced, it is highly recommended that he be given a short stay in the ASU, as significant time in the ASU will likely be detrimental to his mental health. Also, the clinician noted that the inmate should not lose contact privileges with his family as he identifies them as a strong support in his life. The clinician added "other considerations" that the inmate is high risk medical and significant time placed in ASU may also have detrimental effects on this individual's overall health.

The inmate was found guilty; the SHO noted the mental health assessment in his findings as evidence he took into consideration. The inmate was assessed 181 days loss of behavioral/work credit. Also, in consideration of the mental health assessment, the SHO did not suspend visiting privileges as it could be detrimental to the inmate's mental disorder. The inmate was assessed 90 days loss of canteen, dayroom and phone privileges. He was also placed on "C" status for 90 days. He was referred to ICC for SHU term consideration.

**Impression**: The SHO did note the mental health assessment and reported it was considered, indicating that the mitigation was not to assess loss of visiting privileges. The mental health assessment was responsive to the questions asked. The inmate was assessed significant credit forfeiture and privilege losses.

**Inmate L**
Date of Violation:  1/2/14
Date of Mental Health Assessment:
Date of Disposition:  2/16/14
Charge:  Participation in a Riot – Division D Offense

On 1/2/14, this 3CMS inmate was involved in a riot on Facility A yard.  On 1/27/14, the CDO ordered the RVR to be reissued and reheard since the disciplinary hearing was conducted without a mental health assessment being part of the record.  On 2/11/14, a mental health assessment was completed with question number two answered in the negative and question number three answered in the affirmative.  In response to question number three, the clinician reported that the inmate had long reported that working at his job was important and helpful for his mental health and that if the inmate was found guilty and assessed penalties, attention should be given to this factor to allow the inmate to return to his job as soon as possible.

On 2/16/14, the inmate appeared for a hearing before the SHO.  The SHO gave consideration to the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days loss of behavioral credit forfeiture, the maximum amount time allowable for a Division D offense, and was referred to the ICC for SHU term consideration.  In the decision, the SHO reported that at the completion of the inmate's SHU term, the ICC would reevaluate the subject and might place him into a job assignment so as to return to work as recommended by the clinician.  The ICC met on 3/13/14 and elected to assess and impose a three-month mitigated and expired SHU term with a MERD of 3/10/14.  The committee reviewed the mental health assessment and listened to input from the mental health representative present at the hearing.

**Impression**:  There was no mitigation in this case.  Although the SHO indicated that the inmate might be placed into a job assignment upon completion of the SHU term, this remedy was beyond the control of the SHO.

**Inmate M**
Date of Violation:  1/2/14
Date of Mental Health Assessment:  2/11/14
Date of Disposition:  2/16/14
Charge:  Participation in a Riot – Division D Offense

On 1/2/14, this 3CMS inmate was involved in a riot on Facility A yard.  On 1/27/14, the CDO ordered the RVR to be reissued and reheard since the disciplinary hearing was conducted without a mental health assessment being part of the record.  On 2/11/14, a mental health assessment was completed with questions number two and three answered the negative.

On 2/16/14, the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days loss of behavioral credit forfeiture, the maximum amount of time allowable for Division D offense, and was referred to the ICC for SHU term assessment.  The ICC met on 5/1/14 and elected to assess and impose a three-month expired SHU term and released the inmate from administrative segregation as he was no longer a threat to the safety and security of the institution.

**Impression**: There was no mitigation in this case. The SHO considered the mental health assessment in the decision.

**Inmate N**
Date of Violation: 2/7/14
Date of Mental Health Assessment: 3/7/14
Date of Disposition: 3/13/14
Charge: Battery on a Peace Officer – Division B Offense

On 2/7/14, officers were attempting to gain compliance from this EOP inmate who was on the ground with his hands under him. During the attempt to cuff the inmate, the inmate was able to lean his face towards the officer's hand and bite it. A spit mask was then placed over the inmate's face. On 3/7/14, a mental health assessment was completed with questions number two and three answered in the affirmative. In response to question number two, the clinician reported that the inmate had a long history of reacting with rage to certain triggers and that this was due to having a mood disorder where he experienced certain emotions very intensely and directed his rage indiscriminately toward himself and other people. The clinician also reported that the inmate had limited intelligence and did not know how to de-escalate a situation when he was being triggered, or how to avoid them in the first place. The clinician reported that the inmate was having a rage episode prior to the incident which led to this RVR. In response to question number three, the clinician reported that the inmate should be given the least amount of time possible in an ASU and that he would do better with routine and familiar surroundings. Additionally, the clinician reported that if the inmate was not assessed a SHU term, he should not lose his access to dayroom time as he benefited from activities that occurred there.

On 3/13/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 150 days loss of behavioral credit forfeiture, the maximum amount of time allowable for Division B offense, and was referred to the ICC for SHU term consideration. In the decision the SHO indicated that he had no control over a SHU term assessment but that no yard time or dayroom time was assessed as a penalty. The ICC met on 5/21/14 and elected to assess and impose an 11-month mitigated SHU term. The SHU term was mitigated due to no prior similar behavior. The committee reviewed the mental health assessment prior to its decision and considered all comments by clinical staff although there were no notations what those comments were.

**Impression**: There was mitigation by the SHO in this case based on the recommendations in the mental health assessment. The ICC considered the assessment and input from the clinicians present at the meeting.

### Ironwood State Prison (ISP) RVR Review

## SUMMARY OF FINDINGS

    A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at ISP by completing and sustaining all requirements.

B.  Based on the data provided by the institution, training on the RVR process and the role of the mental health assessment was deficient for clinical and custody staff.

C.  ISP did not have any inmates referred for mental health assessments during the review period.  It is noted that ISP is not approved to house inmates with mental health designations.

D.  Although the SHOs were generally aware of the procedure regarding mental health assessment referrals for an RVR, they were unaware of the standards for such referrals.

E.  The mental health staff was aware of the policy and procedures regarding the completion of the RVR mental health assessment form.


**INTRODUCTION**

On 11/12/14, the monitoring team reviewed the RVR process at ISP.  At the time of the visit, ISP housed Level I and III inmates.  As of March 2014, which covered the period under review, ISP had a total inmate population of 3,019.  Of that population, 12 or less than one percent had a MHSDS designation.

During the site visit, the team met with the chief deputy warden, chief of mental health/chief psychologist, four SHOs and three mental health clinicians responsible for completing the mental health assessments.  One of the clinicians split her time between ISP and CVSP.

The team reviewed policies and procedures related to the RVR process at ISP, training materials provided by headquarters, as well as any local training materials provided by the institution to ISP staff.  The team also reviewed any RVR audits completed by the institution.  For uniformity purposes throughout all CDCR institutions, the monitors utilized the ISP Institution Register and CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR.

The review period covered RVRs issued and/or heard during January, February, and March 2014.  During this time period there was a total of 352 RVR written with zero of the RVRs issued to inmates with a mental health designation.

**TRAINING**

ISP staff produced two proof of practice memoranda, dated January 31, 2012, and December 22, 2011 in response to the October 26, 2011 and November 3, 2011 memoranda requirements.  ISP staff produced the approved PowerPoint presentation regarding mental health input into the RVR process.

IST produced a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda. The four-hour training was received by 33 percent of CDOs, 83 percent of captains, 83 percent of lieutenants and 38 percent of sergeants.  None of the psychologists or the CC II received the training.  The one-hour training was received by 33 percent of CDOs, 17 percent of captains, 39 percent of lieutenants, 29 percent of sergeants and 50 percent of psychologists.  The CC II did not receive the training.

### ISP RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 3 | 1/33% | 1/33% |
| Captains | 6 | 5/83% | 1/17% |
| Lieutenants | 23 | 19/83% | 9/39% |
| Sergeants | 65 | 25/38% | 19/29% |
| CC-II appeals | 1 | 0/0% | 0/0% |
| Psychologists | 4 | 0/0% | 2/50% |

## STAFF INTERVIEWS

### SHOs

Due to the fact that no RVR mental health assessments were requested or completed during the review period, information gathered during interviews with SHOs was not the result of any specific findings.  The lieutenants were not able to describe the criteria which mandated a referral to mental health when an inmate had been charged with an RVR.  Their responses included if an inmate was suicidal or had suicidal ideations, if the inmate was acting bizarre or unusual, or if the inmate was at the 3CMS LOC.  None of the SHOs mentioned Division A, B, C or SHU-able offenses as a trigger to refer a 3CMS inmate to mental health.  The officers reported no problems with the timely completion and return of the assessment forms but none of them could ever recall seeing question number two on the assessment answered in the affirmative.

### Clinicians

The monitors interviewed three mental health clinicians along with the chief of mental health/chief psychologist.  The clinicians were knowledgeable about the procedures regarding mental health assessments.  They all reported a good working relationship with custody but were unaware of the potential penalties that could be assessed against an inmate if found guilty of an RVR and thought it would be helpful to know what penalties could be assessed upon a guilty finding.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

No mental health assessments were completed during the review period.

**CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION**

No mental health assessments were completed during the review period.

**ICC REVIEW**

No mental health assessments were completed during the review period for the ICC to consider.

### Calipatria State Prison (Calipatria) RVR Review

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at Calipatria by completing and sustaining all requirements.

B.  Based on provided institutional data, training on the RVR process and the role of the mental health assessment was deficient for clinical and custody staff.

C.  Calipatria, which was not approved to house caseload inmates, did not have any inmates referred for a mental health assessment during the review period.

D.  SHOs were aware of the policy and procedures regarding mental health referrals for RVRs.

E.  Mental health staff was aware of the policy and procedures regarding completion of mental health assessments.

F.  Some reviewed RVRs did not correctly identify inmate's caseload status or LOC.

**INTRODUCTION**

On November 12, 2014, the Coleman monitoring team reviewed the RVR process at Calipatria State Prison (Calipatria).  At the time of the visit, Calipatria housed Level I and IV inmates, but was not designated to house caseload inmates.  As of March 2014, Calipatria had a total inmate population of 3,860.  Of that population, 20 or less than one percent were caseload inmates.

During the site visit, the team met with the warden, chief deputy warden, chief of mental health, the mental health supervisor, and eight SHOs and seven mental health clinicians responsible for preparing mental health assessments.

The monitoring team reviewed policies and procedures related to Calipatria's RVR process, headquarters-provided training materials, and local training materials provided by CAL

325

to staff. The team also reviewed RVR audits that Calipatria completed. For uniformity purposes throughout all CDCR institutions, the monitors used the CAL Institution Register and CDCR 1154 logs to gather RVR data which was required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections."

The review period covered RVRs issued and/or heard during January, February, and March 2014. During this period, as reported in "COMPSTAT," there were a total of 627 RVRs, of which three or less than one percent were issued to caseload inmates.

**TRAINING**

Calipatria staff produced two proof of practice memoranda dated February 3, 2012 and January 11, 2012 in response to the October 26, 2011 and November 3, 2011 memoranda, respectively. Calipatria staff also produced the approved PowerPoint presentation and lesson plan regarding mental health input in the RVR process.

IST produced an attendance report of required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda. Calipatria demonstrated 100-percent compliance for the four-hour training for the CDOs and captains, and 93-percent compliance for lieutenants. Mental health staff demonstrated 67-percent compliance for psychologists, but zero percent compliance for the social worker for the four-hour training requirement. Only six of 112 or five percent of staff required to attend the one-hour training attended this training.

Calipatria RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (four hours) | 11/3/11 (one hour) |
|---|---|---|---|
| CDOs | 3 | 3/100% | 0/0% |
| Captains | 5 | 5/100% | 0/0% |
| Lieutenants | 28 | 26/93% | 4/14% |
| Sergeants | 68 | 45/66% | 2/3% |
| CC-II Appeals | 1 | 0/0% | 0/0% |
| Psychologists | 6 | 4/67% | 0/0% |
| Social Worker | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

Eight SHO's participated in a group interview. They reported that it was rare for mental health assessments to be requested due to the lack of caseload inmates at Calipatria. When an assessment was required, an officer hand-delivered the paperwork to a mental health OT; there was one contact point within mental health for delivery of RVRs and mental health assessment forms. SHOs reported that mental health assessments were generally timely returned to custody

and the assessment's written comments were legible and in layman's terms.  SHOs further indicated they would call mental health when there was some urgency due to RVR hearing time constraints; when this occurred, SHOs reported that mental health immediately responded and delivered the mental health assessment.  SHOs recalled a few RVRs and mental health assessments during the past two years when the assessment suggested mitigation related to yard access and phone calls.

SHOs were aware of the Division offenses that required mental health assessments.  They indicated having a good working relationship with mental health staff and were able to name most CAL clinical staff.  A SHO attended a recent clinician training regarding mental health input in the RVR process to answer custody-related questions.

SHOs' reported that inmate clerks typed RVRs, including the findings and recommendations, following hearings.  The only exception to the use of inmate clerks was for RVRs issued for confidential matters and IDX.

**Clinicians**

Seven mental health clinicians, including one senior psychologist, five psychologists, and one social worker, were interviewed in a group setting.  Clinicians articulated the policy regarding mental health assessment completion, which included review of the eUHR, SOMS, ERMS, DECS, C-file, and prior RVRs, medication compliance and/or changes, and contacting the inmate's PC.

In response to question number two, clinicians indicated they would provide symptom information such as paranoia, thought process, and psychosis, but used layman's language to describe symptoms and their impact on inmate behavior.  They further reported that due to health care confidentiality, they did not use diagnoses.  In response to question number three, they reported penalties that should be avoided; these were penalties that might impact treatment and increase the likelihood of inmate decompensation.

Clinicians liked the mental health assessment's brevity and believed that it addressed any custody concerns regarding inmate mental health issues.  Some clinicians, however, suggested that the form be modified to add direction concerning the fact that an EOP or higher LOC inmate was automatically assigned a staff assistant.  Clinicians also opined on clarification of question number two to make it clearly understood that clinicians determined inmates' state of mind at the time of the RVR.  Definition of the word "bizarre" was also suggested, as it could be defined differently by clinical and custody staff.  Clarification of question number three to indicate that mitigation was relative to an inmate's potential penalties and to specifically identify penalties that should not be used because they could harm the inmate, was also suggested.  Mental health staff indicated having a good working relationship with custody staff.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

Although no mental health assessments were completed during the review period, some reviewed RVRs did not correctly identify inmate's caseload status or LOC.  For example, the RVR for Calipatria Inmate A incorrectly stated he was not a caseload inmate, while the RVR for Calipatria Inmate B did not identify his LOC.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION

Review of the CDCR 1154 logs indicated their orderly maintenance and that they typically indicated inmates' mental health status.  Review of adjudicated RVRs revealed that they stated whether an inmate was on the mental health caseload.  The monitors did not find any RVRs issued to caseload inmates that required a mental health assessment.

## ICC REVIEW

No RVRs were issued to caseload inmates during the review period which required ICC action.

### Calipatria RVR Case Reviews

**Inmate A**
Date of Violation:  1/17/14
Date of Mental Health Assessment:  N/A
Date of Disposition:  1/24/14
Charge:  Disrespect

This 3CMS inmate was charged with disrespect as he cursed and talked back to an officer when ordered to go to the shower.  The RVR stated that he was not a caseload inmate and did not meet the threshold for a staff assistant; his TABE score was above 4.0.  In the "Findings" section of the RVR, the SHO stated that the inmate was at the 3CMS LOC.  A mental health assessment was not requested as the RVR indicated the behavior was not unusual, uncharacteristic, or bizarre.  Due process time constraints were not met as the inmate was transferred to KVSP before adjudication of the RVR.  He was found not guilty of disrespect and, in the interest of justice, the charges were dismissed.

**Impression**:  The RVR incorrectly stated the inmate was not a caseload inmate when he was, as the SHO correctly stated in the RVR's "Findings" section.  Due process timelines were not met, the testimony was determined to be inconclusive, and the case was dismissed.

**Inmate B**
Date of Violation:  3/6/14
Date of Mental Health Assessment:  N/A
Date of Disposition:  3/29/14
Charge:  Battery on an Inmate

Three inmates were observed by the academic staff hitting another inmate in the face, head, and torso with their fists.  Responding staff ordered them to get down, and custody staff handcuffed them and escorted them from the classroom.  All three inmates received RVRs.  This inmate's RVR stated he was a caseload inmate, but did not identify his LOC.

The SHO stated that the inmate was not a caseload inmate at the time of the RVR, but became a participant at the 3CMS LOC on 3/18/14.  A mental health assessment was not requested nor required.  The SHO found the inmate not guilty and dismissed the RVR.

**Impression**:  The inmate was not a caseload inmate when the RVR was issued, but became a 3CMS inmate on 3/18/14.  The inmate was found not guilty.

## Centinela State Prison (CEN) RVR Review

**SUMMARY OF FINDINGS**

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CEN by completing and sustaining all requirements.

B.  Based on the data provided by the institution, training on the RVR process and the role of the mental health assessment was deficient for some custody and clinical staff.

C.  SHOs were aware of the policy and procedures regarding mental health assessment referrals for an RVR.

D.  Multiple RVRs provided conflicting information regarding inmate's LOC.

E.  SHOs did not clearly document consideration or mitigation of penalties based on mental health assessment input.

F.  Mental health staff was aware of the policy and procedures regarding completion of the mental health assessment.

G.  Clinicians were not providing adequate or appropriate responses to the questions on the mental health assessment.

## INTRODUCTION

On November 13, 2014, the Coleman monitoring team reviewed the RVR process at CEN. At the time of the visit, CEN housed Level I and III inmates, excluding caseload inmates at any LOC. As of March 2014, CEN had a total inmate population of 2,864, of which 39 inmates or one percent were caseload inmates.

During the site visit, the monitoring team met with the warden, CEO, chief of mental health, four SHOs and four mental health clinicians responsible for preparing mental health assessments. The monitoring team reviewed policies and procedures related to the RVR process, training materials provided by headquarters, and any local training materials provided by the institution to CEN staff. The team also reviewed any RVR audits that CEN completed. For uniformity purposes throughout all CDCR institutions, the monitors utilized the CEN institution register and CDCR 1154 logs to gather RVR data, which was required to be maintained under Title 15 of the CCR entitled "Crime Prevention and Corrections."

The review period covered RVRs issued and/or heard during January, February, and March 2014. During this time period as reported in "COMPSTAT," there were a total of 801 RVRs, of which 11 or one percent were issued to caseload inmates.

The monitors observed a discrepancy between the reported numbers within COMPSTAT and what was found after review of the CDCR 1154 logs. COMPTAT reported that a total of 11 RVRs were issued to caseload inmates, while review of the CDCR 1154 logs indicated that a total of 24 RVRs were issued to caseload inmates. It appeared that the difference was due to changes in inmates' mental health LOC between the dates of the RVRs and when RVRs were heard.

## TRAINING

CEN staff produced two proof of practice memoranda, dated January 17, 2012 and February 23, 2012, which they indicated were in response to the October 26, 2011 and November 3, 2011 memoranda requirements. However, the proof of practice memoranda did not state which headquarters memorandum they were responding to. Additionally, the February 23, 2012 memorandum stated in part, "This memorandum is to serve as 'Proof of Practice' that the Mental Health Assessment Process for Rules Violation Reports (RVR) Update training for Correctional Counselors has been completed as instructed." It was not clear that the memoranda provided by CEN staff were in fact in response to the October 26, 2011 and November 3, 2011 headquarters memoranda requirements. CEN staff produced the approved PowerPoint presentation and lesson plan regarding mental health input into the RVR process.

IST produced an attendance report regarding the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda. CEN demonstrated 100 percent compliance with the required four-hour training for CDOs, captains, lieutenants, and the LCSW, and 83-percent compliance for psychologists. However, for the one-hour training, only three of the 100 staff required to attend actually had documented training as having attended the one-hour training.

CEN RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (four hours) | 11/3/11 (one hour) |
|---|---|---|---|
| CDOs | 2 | 2/100% | 0/0% |
| Captains | 4 | 4/100% | 0/0% |
| Lieutenants | 26 | 26/100% | 2/8% |
| Sergeants | 60 | 43/72% | 1/2% |
| CC-II Appeals | 1 | 0/0% | 0/0% |
| Psychologists | 6 | 5/83% | 0/0% |
| Social Worker | 1 | 1/100% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

Four SHOs participated in the group interview.  SHOs knew when policy required completion of a mental health assessment.  They also indicated there was one point of contact in mental health services for custody to drop off the mental health assessment form.  SHOs reported that requested assessments were returned within two to three days.  They reported that assessments were typically completed with "no" responses, but stated that there were also written comments.  Mental health assessments were reported to be legible and written in easy to understand layman's terms.  SHOs also indicated knowing clinicians and being comfortable calling them if they had any questions.

Inmate clerks typed the RVRs, including the findings and dispositions, following the hearings.  The exception to using inmate clerks for RVRs was for RVRs that were issued for confidential matters and for IDX, which staff typed.

SHOs indicated that in response to question number three, when clinicians provided comments about issues that should be considered such as phone restrictions or being confined to quarters, they tried to assess another penalty.  SHOs indicated addressing consideration of mental health input in the RVR's findings and disposition sections.

**Clinicians**

A total of four mental health clinicians were interviewed in a group setting regarding completion of the mental health assessment.  They were able to explain the requirements for completion of the assessment.  Staff also indicated that supervisors reviewed the assessments and that areas of improvement had been identified and addressed.  However, this review by mental health supervisors was not a formal review or a quality improvement process.

Clinicians reported having a good relationship with custody and engaging in open dialogue with custody staff.  They also reported wanting to know more about the potential

331

penalties available to SHOs so they could be more specific in their response to assessment question number three. Clinicians also suggested that question number three should be reworded to be more specific and give clearer guidance as to what was being requested.

## QUALITY OF MENTAL HEALTH ASSESSMENTS

Clinicians often provided unresponsive answers to the questions on the mental health assessment. For example, for CEN Inmates K and L, the comments in response to questions number two and/or three were not responsive to the specific assessment questions. For CEN Inmate C, the clinician's response to question number two was not in layman's terms. Also problematic were errors as to whether inmates were on the mental health caseload. RVRs for CEN Inmates A and B incorrectly reported they were not caseload inmates, while there were conflicting statements on RVRs as to whether CEN Inmates F, I and L were caseload participants. The RVR for Inmate E contained canned language as to whether he was on the mental health caseload.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION

Documentation of SHOs' consideration and/or penalty mitigation due to mental health assessment factors was inconsistent. For example, for CEN Inmates K and L, the nonresponsive comments concerning questions number two and/or three did not provide assistance to the SHO during penalty mitigation. There were also cases, such as CEN Inmates A and I, where it was not clear how or if the SHO considered mental health input, and/or whether there was penalty mitigation due to mental health input. Although the SHO for CEN Inmate M reported consideration of mitigating circumstances, it was not indicated how the mitigating circumstances were considered. For CEN Inmate G, the SHO applied an exonerating evidence standard, which was inconsistent with RVR policy.

## ICC REVIEW

There were no ICC cases available for review.

### CEN RVR Case Reviews

**Inmate A**
Date of Violation: 3/7/14
Date of Mental Health Assessment: 3/29/14
Date of Disposition: 5/16/14
Charge: Possession of Controlled Substance with intent to Distribute, a Division A-2 Offense

The inmate was charged with possession of a controlled substance with intent to distribute following receipt of laboratory results from the Department of Justice (DOJ) on 3/7/14. He had been placed on contraband watch, and following a bowel movement a bindle of clear plastic was found in his feces. CEN staff tested the contents of the bindle, which resulted in a positive test for marijuana prior to the contents being sent to DOJ. The RVR stated that the inmate was not a

332

caseload participant.

A mental health assessment was sent to mental health on 3/21/14 and completed on 3/29/14, which was within established timeframes. The LCSW responded "no" to all three questions on the mental health assessment and did not provide any written comments.

The RVR was heard on 5/16/14. The SHO stated that the inmate was at the 3CMS LOC and that an assessment was requested, "To address any potential mental health concerns." The SHO accurately stated the results of the assessment. The inmate was found guilty of the lesser but included charge of possession of a controlled substance in an institution, which was a Division B offense. He was assessed 150 days loss of credit consistent with a Division B offense, plus 30 days loss of dayroom and non-emergency phone calls. He was also assessed 90 days loss of visits followed by 90 days of non-contact visits. The SHO did not mention consideration of mental health assessment information.

**Impression**: There was no mitigation in this case. The RVR erroneously stated the inmate was not on the mental health caseload, when in fact he was. The mental health assessment was completed per policy and the SHO reported the results in the RVR's findings section without mentioning it as a factor in the guilt determination. The inmate was assessed significant credit and privilege losses.

**Inmate B**
Date of Violation: 1/26/14
Date of Mental Health Assessment: Not available
Date of Disposition: 2/4/14
Charge: Fighting, a Division D Offense

Custody staff observed the inmate trying to hit another inmate with his fist. The inmates were ordered to get down, which they complied with, and they were handcuffed and escorted to holding cells. The RVR stated the inmate was not on the mental health caseload, which was an error.

A mental health assessment was not requested or completed, which was within policy guidelines. The RVR was heard on 2/42014, at which time the SHO noted that the inmate became a 3CMS inmate a few days prior to the RVR. A staff assistant was not assigned. The SHO reduced the charge to a Division F offense with a specific charge of "conduct, which could lead to violence." The SHO found the inmate guilty of the Division F offense and assessed 30 days loss of credit and 30 days loss of privileges, including morning and afternoon yard.

**Impression**: A mental health assessment was not required in this case. The SHO documented the inmate's placement on the mental health caseload prior to the RVR. The SHO reduced the charges, but still assessed the inmate credit forfeiture and loss of privileges.

**Inmate C**
Date of Violation:  3/16/14
Date of Mental Health Assessment:  4/7/14
Date of Disposition:  4/11/14
Charge:  Battery on an Inmate, a Division D Offense

During a cell check, an inmate advised custody staff that he needed to see medical staff.  The inmate was observed to be bleeding from his mouth.  Both inmates were removed from the cell and escorted to medical for evaluation.  One inmate was found to have sustained injuries consistent with being battered, with injuries to his face, head, back and elbow.  The other inmate had injuries consistent with being the aggressor with "injuries to his right hand knuckles."  The inmates were double-celled at the time of the incident.

A mental health assessment was requested on 4/6/14 and completed on 4/7/14, which was beyond established timeframes.  Question number one was checked "no" with no written comments.  Question number two was checked "yes" with the following written comment, "Probable automatism."  Question number three was checked "yes" with the following written comment, "It would be harmful to his mental health to deprive him of his familiar distractions namely TV, books, writing materials."

The SHO heard the RVR on 4/1/14, at which time the officer clarified that the inmate became a caseload inmate on 4/1/14, which was 14 days after the RVR.  This would explain the failure to meet the assessment referral timeframes due to the inmate not being a caseload participant at the time of the RVR.  The SHO accurately stated what was written on the mental health assessment and stated that the assessment was taken into consideration when assessing the disposition.  The inmate pled guilty and the SHO found him guilty.  He was assessed 61 days loss of credit consistent with a Division D offense.  No other penalties were assessed.

**Impression**:  There was no mitigation documented by the SHO.  The body of the RVR was correct in reporting that the inmate was not a caseload inmate.  The SHO took appropriate action when it was learned that the inmate had become a caseload participant between the date of the RVR and the hearing.  The response to question number two was not in layman's terms.  The response to question number three identified penalties that the SHO should avoid.  The inmate was assessed credit forfeiture.

**Inmate D**
Date of Violation:  3/13/14
Date of Mental Health Assessment:  4/27/14
Date of Disposition:  4/9/14 and 4/27/14
Charge:  Possession of Alcohol

The inmate received an RVR for throwing a plastic bag full of a brown substance that resembled inmate manufactured "kicker.  He was loud and appeared to be under the influence of alcohol and stated that he was drunk.  He did not meet the threshold for a staff assistant.  The RVR stated he was at the 3CMS LOC, but his behavior was not bizarre, unusual, or uncharacteristic.

334

The RVR was heard on 4/9/14 and the inmate was found guilty and assessed 120 days loss of credit, which was at the top of the range for a Division C offense. He was placed on temporary Privilege Group C for 60 days, five days loss of privileges to include confinement to quarters, and referred to the ICC with a recommendation of program review and housing needs.

On 4/25/14, the CDO ordered the RVR re-issued and re-heard due to the failure to refer the inmate for a mental health assessment. The assessment was completed timely on 4/27/14 with all three questions answered in the negative and no additional written comments. The RVR was re-heard on 4/27/14 with a guilty finding. The inmate was assessed 90 days temporary Privilege Group C and referred to the ICC for a possible program realignment.

**Impression**: There was no mitigation documented in this case. The RVR should have been initially referred to mental health for an assessment due to the Division C offense. However, during the review process, the CDO identified the error and ordered the RVR to be re-issued and re-heard. The inmate was eventually assessed privilege loss.

**Inmate E**
Date of Violation: 3/13/14
Date of Mental Health Assessment: 4/7/14
Date of Disposition: 4/9/14
Charge: Assault on a Peace Officer, a Division D Offense

The inmate threw a clear plastic bag with a pulpy substance at the officer when given an order to enter his cell. He became verbally aggressive and took an aggressive stance while issuing verbal threats.

The mental health assessment was requested but was not completed in a timely manner; the assessment was completed twelve days late. The RVR stated: "Inmate is not a participant in the MHSDS at the 3CMS, EOP or MHCB LOC." It appeared that custody was typing this sentence on all RVRs, but was not circling or crossing out whether the inmate "is" or "is not" on the mental health caseload. The mental health assessment answered "no" to all three questions and did not provide any written comments.
The inmate was found guilty and assessed 90 days loss of credits, which was at the top of the range for a Division D offense. He was also referred to the ICC for housing and program review.

**Impression**: There was no mitigation in this case. The RVR contained canned language regarding the inmate's mental health status. The mental health assessment was not completed timely. The inmate was assessed significant credit loss.

**Inmate F**
Date of Violation:  2/7/14
Date of Mental Health Assessment:  None completed
Date of Disposition:  2/15/14
Charge:  Disobeying a direct order - Division F Offense

The inmate was issued an RVR when he failed to comply with a direct order to return to his assigned housing unit.  He was paged three times with negative results.  The RVR stated that he was not a caseload inmate, but the SHO stated in the findings that the inmate was at the 3CMS LOC.  The RVR's hearing section indicated that it did not appear that mental illness influenced the behavior resulting in the RVR.  However, there was no mental health assessment for the SHO to make such a statement.  The inmate was found guilty and assessed 30 days loss of credit, which was at the top of the range for a Division F offense.

**Impression**:  There was no mitigation in this case.  There were conflicting statements as to whether the inmate was a caseload participant.  No mental health assessment was requested or completed, but the SHO indicated the inmate's mental health did not influence the behavior which resulted in the RVR.

**Inmate G**
Date of Violation:  3/13/14
Date of Mental Health Assessment:  None completed
Date of Disposition:  4/15/14
Charge:  Aggravated Battery on a Peace Officer, a Division B Offense

The inmate was issued an RVR for aggravated battery on a peace officer.  He was escalating, yelling, and cursing at the officer, and then spit on him.

The SHO reported that the inmate received a psychological assessment, but the mental health assessment was not provided by the institution.  The SHO did not indicate what the responses were to the three questions on the mental health assessment, but stated that it did not appear that the behavior resulting in the RVR was influenced by mental illness.  The SHO stated that he reviewed the assessment and concluded that mental health factors did not influence the behavior resulting in the RVR.  He also stated that the mental health evidence did not provide any exonerating evidence, but would consider the inmate's mental health during penalty assessment.  The inmate was found guilty and assessed 150 days loss of credits, which was at the top for a Division B offense.

**Impression**:  There was no mitigation in this case.  The SHO did not state in the RVR's hearing section what the mental health assessment reported in response to the three questions, but concluded that mental health did not influence the inmate's behavior.  The SHO also applied an exonerating evidence standard, which was inconsistent with RVR policy.  There did not appear to be any penalty mitigation based on the credit loss being at the top of the range for a Division B offense.

**Inmate H**
Date of Violation:  2/24/14
Date of Mental Health Assessment:  None completed
Date of Disposition:  3/22/14
Charge:  Threatening Staff Resulting in the Use of Force, a Division F Offense

The inmate was shouting and cursing at an officer.  He started to walk away, but then spun around and with closed fists walked toward staff.  He was ordered to back up and get down and when he refused, he was sprayed in the face with a two-second burst of OC spray.  He was issued an RVR for threatening staff.  He was a caseload participant at the 3CMS LOC.  The report stated he was not assigned a staff assistant and also stated that his mental status was not a factor in his alleged behavior.  He was found guilty of a Division F offense and assessed 30 days loss of credit, which was the top of the range for a Division F offense.  He was also restricted from yard for 30 days.

**Impression**:  There was no mitigation in this case.  The RVR did not indicate that a mental health assessment was requested or completed.  However, the SHO indicated that the inmate's mental health was not a factor in the alleged behavior. It was unclear whether this conclusion was based on an actual assessment or an inappropriate clinical conclusion by custody staff.  The inmate was assessed the maximum credit forfeiture for the division offense.

**Inmate I**
Date of Violation:  1/18/14
Date of Mental Health Assessment:  1/23/14
Date of Disposition:  3/30/14
Charge:  Possession of Dangerous Property (Cell Phone)

The inmate slipped a note to an LVN asking for assistance with a text.  A search was conducted and a cell phone was found in his cell.  The RVR did not clearly state whether the inmate was on the mental health caseload.  The SHO determined during their review that the circumstances of the RVR did not involve bizarre, unusual, or uncharacteristic behavior, but a mental health assessment was nonetheless requested.

The mental health assessment was completed on 1/23/14 with question number one answered "yes."  In response to question number two, the clinician responded "no" and did not provide any further written comments.  The response to question number three was "yes;" the clinician indicated the patient might decompensate without social stimulation and family contact.

The inmate was found guilty, but no loss of credits was assessed as due process time constraints were not met.  The inmate was also assessed 40 hours of extra duty.

**Impression**:  There was no assessment of credit forfeiture due to the failure to meet due process time constraints.  The RVR included contradictions as to the inmate's caseload LOC.  It was not clear how or if the SHO considered mental health input or if there was any penalty mitigation due to mental health input.  The inmate was assessed extra hours of duty.

337

**Inmate J**
Date of Violation:  1/18/14
Date of Mental Health Assessment:  1/23/14
Charge:  Overfamiliarity

The inmate slipped a note to an LVN asking for assistance with a text.  A search was conducted and a cell phone was found in his cell.  The RVR did not clearly state whether the inmate was on the mental health caseload.  The SHO determined during review that the RVR's circumstances did not involve bizarre, unusual, or uncharacteristic behavior, but a mental health assessment was requested.

The mental health assessment was completed on 1/23/14 with question number one answered in the affirmative.  The clinician responded "no" to question number two, but did not provide any further written comments.  The response to question number three was "yes;" the clinician indicated the patient might decompensate without social stimulation and family contact.

During the hearing, the SHO dismissed the RVR to avoid the stacking of charges since there was a relationship between this offense and the RVR for Inmate I for the same offense.

**Impression**:  The RVR was dismissed because issuing two RVRs that were related to the one act of asking an LVN for assistance with a text message was considered stacking RVRs.  The SHO dismissed this RVR.  The stacking appeared indicative of the need for consistent RVR training.

**Inmate K**
Date of Violation:  1/25/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  2/8/14
Charge:  Possession of Inmate Manufactured Alcohol

The inmate was found to have approximately three gallons of a brown pulpy substance in his cell.  A mental health assessment was requested and completed on 2/6/14, which was four working days beyond the mandated timeframe.  The assessment indicated the inmate did not meet the threshold for a staff assistant.  Question number two was checked "no" with no additional written comments.  Question number three was checked "yes" with a written comment that stated, "the inmate is in the 3CMS LOC and he is cooperative with mental health treatment." This written comment was not responsive to the question or helpful to the SHO during penalty mitigation.  The RVR was dismissed in the interest of justice.

**Impression**:  The case was dismissed.  The mental health assessment was not completed within the five working days timeframe.  The written comment to question number three also was not responsive or helpful to the SHO.

**Inmate L**
Date of Violation:  3/21/14
Date of Mental Health Assessment:  3/30/14
Date of Disposition: 4/12/14
Charge:  Attempted Extortion with threat of force on behalf of STG

During ICC, the inmate stated he requested placement on a Sensitive Needs Yard (SNY) in order to collect money from other inmates to pay off his drug debt.  He was placed in administrative segregation based on confidential information that he was threatening and demanding money from other inmates.

A mental health assessment was requested and completed on 3/30/14, which was within established timeframes.  The clinician checked "yes" in response to question number one and a staff assistant was assigned.  In response to question number two, the clinician indicated, "Possibly, yes although I am not able to obtain enough information from I/M to establish an opinion within a reasonable degree of professional certainty."  In response to question number three, which was checked "yes," the written comment was, "I/M should be transferred to an EOP facility."

The SHO indicated in the RVR's hearing section that mental health staff recommended, "If … is found guilty of the offense, there are mental health factors the Senior Hearing Official should consider in assessing the penalty. (Transfer to an EOP Facility)."  The inmate was found guilty and assessed 120 days loss of credit, which was at the top of the range for a Division C offense.

**Impression**:  There was no mitigation in this case.  The responses to questions number two and three were inadequate and not responsive or helpful to the SHO.   The RVR appeared to have conflicting LOC information and placed the inmate at both the 3CMS and EOP levels of care.  The inmate was assessed significant credit loss.

**Inmate M**
Date of Violation:  3/7/14
Date of Mental Health Assessment:  4/7/14
Date of Disposition:  4/12/14
Charge:  Possession of a C/S with intent to distribute

A cell search discovered a bindle wrapped in black electrical tape.  The Department of Justice determined that the substance was marijuana.  The inmate received an RVR for possession of a controlled substance with intent to distribute.  The reporting officer stated that the inmate's behavior did not appear to be bizarre, unusual, or uncharacteristic, but due to the RVR being a Division A-2 offense, a mental health assessment was required.

The mental health assessment was requested and completed on 4/7/14, which was not within mandated timeframes.  All three questions were answered in the negative, and a staff assistant was not assigned.

The RVR was heard on 4/12/14, at which time the inmate was found guilty. The SHO indicated that mitigating circumstances were considered, but did not state what they were. The SHO assessed 180 days loss of credit, which was at the top of the range for an A-2 offense and 90 days in Privilege Group C, including no family visits, one-fourth of the maximum monthly canteen draws, telephone calls on an emergency basis only, yard access limited, no access to recreation or entertainment activities, no accrual of excused time off, no personal property packages, no yard, dayroom, telephone, or quarterly packages, and no special purchases. The SHO also assessed mandatory random drug testing for one year and loss of visits for one year to be followed by two years of non-contact visits.

**Impression**: There was no mitigation in this case. The mental health assessment was not completed within mandated timeframes. The SHO stated that mitigating circumstances were considered, but did not indicate how. The inmate was assessed significant credit and privilege losses.

## Chuckawalla Valley State Prison (CVSP) RVR Review

### SUMMARY OF FINDINGS

    A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CVSP by completing and sustaining all requirements.

    B. Based on the data provided by the institution, training on the RVR process and the role of the mental health assessment was deficient for clinical and custody staff.

    C. CVSP did not have any inmates referred for assessments during the review period. It is noted that CVSP is not approved to house inmates with a mental health designation.

    D. Although the SHOs were generally aware of the procedure regarding assessment referrals for an RVR, they were unaware of the standards for such referrals.

    E. The mental health staff was aware of the policy and procedures regarding the completion of the assessment form.

### INTRODUCTION

    On November 13, 2014 the Coleman monitoring team reviewed the RVR process at CVSP. At the time of the visit, CVSP housed Level I and II inmates. As of March 2014, which covered the period under review, CVSP had a total inmate population of 2,293. Of that population, 20 or less than one percent had a mental health designation.

    During the site visit, the team met with the chief of mental health/chief psychologist, six SHOs and one mental health clinician responsible for completing the mental health assessments. The institution had two clinicians who completed the assessments but one of the clinicians who divided her time between ISP and CVSP was interviewed on the previous day at CVSP.

The team reviewed policies and procedures related to the RVR process at CVSP, training materials provided by headquarters, as well as any local training materials provided by the institution to CVSP staff.  The team also reviewed any RVR audits completed by the institution.  For uniformity purposes throughout all CDCR institutions, the monitors utilized the CVSP Institution Register and CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR.

The review period covered RVRs issued and/or heard during January, February, and March 2014.  During this time period, there was a total of 184 RVRs written with zero issued to mental health inmates.  While on site the monitor was provided with one RVR written during the review period for an inmate at the 3CMS LOC, but he was not referred for an assessment.


**TRAINING**

CVSP staff was not able to produce any proof of practice memoranda as required by the October 26, 2011 and November 3, 2011 memoranda.  The institution did attach a number of IST sign-in sheets in response to the monitor's request.  However, this was not responsive to the request and some of the sign-in sheets did not contain dates.  CVSP staff was able to produce the approved PowerPoint presentation regarding mental health input into the RVR process, but not the training plan.

IST produced a report of attended the required training sessions for each job classification identified in the October 26, 2011 and the November 3, 2011 memoranda.  CVSP was unable to demonstrate adequate compliance with the required four-hour training requirements with only 14 out of 78 staff receiving the training.  For the one-hour training, the CDO attended the training for a 100 percent compliance rate; sergeants had a 90 percent compliance rate and the lieutenants had an 86 percent compliance rate.

<u>CVSP RVR Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDO | 1 | 0/0% | 1/100% |
| Captains | | | |
| Lieutenants | 21 | 6/29% | 18/86% |
| Sergeants | 52 | 8/15% | 47/90% |
| CC-II Appeals | 1 | 0/0% | 0/0% |
| Psychologists | 3 | 0/0% | 1/33% |

**STAFF INTERVIEWS**

**SHOs**

Of the six SHOs interviewed, only three were lieutenants in 2011 when the training was offered and two recalled attending the training. They reported that mental health assessment forms were hand delivered to the OT and that clinicians had two weeks to complete the forms. They were unaware that the form had to be returned within five working days pursuant to Program Guide timelines. They were also unable to specify the criteria for referral to mental health with one lieutenant referencing DDP as a criterion. They indicated that certification as a SHO consisted of watching five hearings and then adjudicating five hearings. One officer recalled mitigating a penalty based on a recommendation written on the mental health assessment. However, they stated that most assessments had questions number two and three on the form answered in the negative with no mitigation recommended. The officers reported having a good working relationship with the mental health clinicians.

**Clinicians**

The one clinician interviewed at CVSP had been at the facility for nine years but had received no formal training. He had been completing the mental health assessments for the past five years. It took the clinician less than one hour to complete the assessment forms which included a review of the inmate's eUHR and a non-confidential interview. The clinician indicated that an affirmative response to question number two on the assessment form was usually the result of psychotic behavior. If the clinician thought that a single cell in administrative segregation would be detrimental to an inmate's mental health, he would recommend against such a penalty. However, he admitted not knowing the types of penalties that could be assessed against an inmate found guilty of a violation.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

No mental health assessments were completed during the review period.

**CONSIDERATION OF MENTAL HEALTH ASSESSMENT BY THE SHO AND MITIGATION**

No mental health assessments were completed during the review period.

**ICC REVIEW**

No mental health assessments were completed during the review period for the ICC to consider.

## California Institution for Women (CIW) RVR Review

### SUMMARY OF FINDINGS

A.  Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CIW by completing and sustaining all requirements.

B.  CIW did not demonstrate adequate compliance with training for all required staff members.

C.  Mental health assessments were generally timely completed.

D.  CIW had an adequate system in place for tracking and requesting completion of mental health assessments.

E.  The assessing clinician did not always provide adequate information for SHOs to consider during penalty assessment.

F.  There was no quality review of mental health assessments.

G.  SHOs mitigated penalties in some cases.

H.  SHOs generally did not document how mental health assessments were considered.

I.  There were problems with the consistency of the assigned staff assistant during the RVR process.


### INTRODUCTION

On August 14-15, 2014, the Coleman monitoring team reviewed the RVR process at the CIW.  At the time of the site visit, CIW housed all custody levels of inmates, including those requiring EOP and 3CMS levels of care, and inmates housed in the MHCB and Psychiatric Services Unit (PSU).  CIW also operated a Psychiatric Inpatient Program (PIP) and a SHU, and was a designated administrative segregation EOP hub.  As of March 2014, CIW had a total inmate population of 2,118, of which 894 or 42 percent were caseload inmates.

During the site visit, the monitoring team met with the chief of mental health, the associate warden of health care, and three SHOs.  The clinician responsible for completing mental health assessments was on vacation and therefore unavailable to be interviewed.  The monitoring team reviewed all policies and procedures regarding the RVR process at CIW and all provided training materials.  The monitors utilized the CIW Institution Register and CDCR 1154 logs to gather RVR data.

The review period covered RVRs issued and/or heard during January, February and March 2014.  During this period, a total of 669 RVRs were written, with 491 or 73 percent

issued to caseload inmates.  Of the 491 RVRs issued to caseload inmates, 121 or 25 percent resulted in the completion of a mental health assessment.  The team reviewed completed RVRs and, using EMRS, ICC actions for several inmates found guilty of SHU-able offenses.

## TRAINING

CIW produced a proof of practice memorandum dated December 30, 2011, as required by the November 3, 2011 memorandum.  Printouts produced by IST listed staff that attended training and indicated that training was from 0.5 of an hour to 4.0 hours.  However, CIW was unable to produce a lesson plan or PowerPoint presentation concerning the Inmate Disciplinary Process Mental Health Assessment Training.

CIW only demonstrated compliance for the required one-hour training for psychologists; this training was received by only 50 percent of CDOs and captains, 80 percent of lieutenants, and 56 percent of sergeants.  The CC II did not receive this training.  CIW also only demonstrated compliance with the required four-hour training for the psychologist; none of the captains, sergeants, or the CC II received this training, while only 25 percent of CDOs and seven percent of lieutenants received it.

CIW RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (four hours) | 11/3/11 (one hour) |
|---|---|---|---|
| CDOs | 4 | 1/25% | 2/50% |
| Captains | 2 | 0/0% | 1/50% |
| Lieutenants | 15 | 1/7% | 12/80% |
| Sergeants | 52 | 0/0% | 29/56% |
| Psychologist | 1 | 1/100% | 1/100% |
| CC-II Appeals | 1 | 0/0% | 0/0% |

## STAFF INTERVIEWS

During the site visit, the monitors met with three second watch SHOs.  Although it was also normally the monitors' practice to meet with clinician(s) who completed mental health assessments, the CIW clinician responsible for their completion was on vacation during the site visit.

## SHOs

SHOs were well-versed regarding inmates who required a mental health assessment following RVR issuance.  They reported that completed mental health assessments were comprehensible and of having a good working relationship with the psychologist responsible for completing assessments.  All interviewed SHOs reported consideration of mental health assessments in their dispositions.  They also did not report any problems with the timely receipt

of completed mental health assessments and indicated that they found value in the mental health assessment process.

However, SHOs voiced concern over the requirement of providing a new mental health assessment in those cases when the RVR was reissued and reheard.  They stated that when an assessment was completed at the time of the initial RVR, administration required completion of a new assessment prior to any rehearing.  SHOs further reported that if an inmate's LOC changed at any point during the RVR process, they were required to obtain a mental health assessment for the inmate, regardless of her LOC at the time of infraction; this was the policy even if the inmate was non-caseload at the time of the RVR.  SHOs also indicated problems with the consistency of staff assistants during the RVR process and stated that they often changed.

**Clinicians**

For the past three years, one psychologist had sole responsibility for mental health assessment completion.  This psychologist did not carry a caseload and received the four-hour training on mental health assessments in the disciplinary process on 11/3/2011.  Two back-up clinicians were also trained in the event of the primary RVR clinician's unavailability.  The monitors were unable to interview the primary responsible clinician during the site visit as he was on vacation.

**MENTAL HEALTH ASSESSMENT REQUESTS**

CIW had an adequate system in place, which included tracking, for requesting completion of mental health assessments.  The monitors did not identify any problems with the process.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

RVR mental health assessments were reviewed to determine whether they were completed within established timeframes and whether the clinician documented adequate and appropriate information.  Assessments were generally completed within required timeframes and review of mental health assessments generally confirmed SHOs' reports regarding assessment clarity and usefulness.  Most assessments used plain language and typically provided suitable guidance as to whether inmate's mental disorder contributed to the behavior leading to the RVR and/or mental health factors to consider during penalty assessment.

However, there were several mental health assessments where questions number two and/or three were answered in the affirmative, yet the clinician's notes were not helpful or on point.  In the case of CIW Inmate L, the mental health assessment was not written in layman's language to assist the SHO, but used mental health acronyms and abbreviations.  In the case of CIW Inmate D, the response to question number two stated that she had a history of psychosis, including paranoid delusions which might lead to assaultive behavior.  However, it was unclear from this response whether it was the clinician's opinion that the inmate's mental disorder contributed to the behavior that led to the RVR; the response was thus not helpful to the SHO.  Several cases, including those of CIW Inmates B, D, and M, were also noted where the clinical

information provided in response to question number three did not address concrete factors for the SHO's consideration.

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

SHOs typically noted consideration of the mental health assessment in the RVR disposition, but there was rarely explanation of how the assessment was considered. Most often, as was the case with CIW Inmates G, H, I, J, and L, SHOs merely reiterated verbatim the clinician's language from the assessment. In other cases, such as those involving CIW Inmates B and F, SHOs only indicated whether the three assessment questions were answered in the affirmative or negative, but neglected to note the clinician's documented reasoning for any affirmative responses. In the case of CIW Inmate A, the SHO did not indicate review of the mental health assessment anywhere in the disposition.

There were only four reviewed cases, namely those of CIW Inmates C, E, H, and K, where mitigation was due to the mental health assessment. As SHOs reported during the site visit, review revealed that most often mitigation was afforded by not taking privileges from inmates. However, in the cases involving CIW Inmates G, I, J, K and L that occurred in the PSU and PIP, the clinician clearly noted that due to the RVR, their privileges had already been addressed and often times reduced through the IDTT meeting. CIW Inmates G, I, J, M, N, and O were assessed the maximum allowable credit forfeiture for the division of the offense. The CDO mitigated the case of CIW Inmate G from 150 to 121 days, which was at the lower end of the allowable credit forfeiture for a Division B offense.

While housed in the PIP, one inmate received two RVRs in two consecutive days based on her behavior while refusing a blood draw; there was a Division B and a Division D offense. The assessment noted that she was experiencing significant mental health challenges, including paranoia and auditory hallucinations, and that due to her psychosis she was not entirely in control of her actions at the time of the RVR. The inmate was nonetheless found guilty and assessed the maximum amount of credit forfeiture for each offense. The following day, this same inmate threw a cup of coffee through the food port, striking a psych tech, and received an RVR for a Division B offense. The mental health clinician used the same mental health assessment and the inmate was again found guilty and assessed the maximum credit forfeiture. As such, within three days, while receiving the highest level of inpatient mental health treatment, she was assessed 390 days forfeiture of credits that were not restorable. (*See* CIW Inmates M, N, and O.)

## QUALITY REVIEW

There was no quality review of mental health assessments written by mental health staff nor of SHOs' consideration of the assessments in the RVR process.

## CIW RVR Case Reviews

**Inmate A**
Date of Violation:  1/13/14
Date of Mental Health Assessment:  1/21/14
Date of Disposition:  4/3/14
Charge:  Possession of a Controlled Substance (Marijuana) – Division B Offense

This 3CMS inmate was taken to a bathroom that had previously been checked for debris for an unclothed body search.  Upon completion of the search, after the inmate left the bathroom, a small bindle was found, which was later identified to contain marijuana.  A mental health assessment was completed on 1/21/14 with questions number one, two, and three answered in the negative.  The inmate appeared for a hearing before the SHO on 4/3/14.  The SHO did not consider the mental health assessment and there was no mention of it in the hearing document.  The inmate was found guilty and there was no mitigation.  She was assessed 150 days loss of credits, consistent with a Division B offense, five weekend days CTQ (confined to quarters), 40 hours of extra duty, one year of mandatory drug testing, 30 days suspension of privileges, 90 days loss of visiting followed by 90 days of non-contact visits, and one year of AA/NA attendance.

**Impression**:  The clinician did not recommend mitigation and there was no mitigation in this case.  The SHO did not indicate review of the mental health assessment in the disposition and did not mitigate the penalty.  The inmate was assessed significant credit forfeiture and loss of privileges.

**Inmate B**
Date of Violation:  1/19/14
Date of Mental Health Assessment:  2/4/14
Date of Disposition:  2/12/14
Charge:  Disrespect of Staff – Division F Offense

After an officer had given a direct order for the unit to lock in, this EOP inmate was observed walking while holding a cup.  The officer informed the inmate that she would be allowed to get water that one time, but that normally the unit was to be locked up at that time.  The inmate became angry and began screaming, cursing, and threatening the officer.  A mental health assessment was completed on 2/4/14 with questions number one and three answered in the affirmative and question number two answered in the negative.  The response to question number one stated that the inmate was at the EOP LOC.  In response to question number three, the clinician wrote, "It is recommended that her canteen not be suspended."  The clinician did not specifically indicate whether there were any mental health factors to consider during penalty assessment.  Although question number two was answered in the negative, the clinician wrote, "She disputes the charge."  This response was not consistent with RVR policy.

On 2/12/14, the inmate appeared before the SHO for a hearing.  She was assigned a staff assistant on 1/25/14, but the staff assistant was not available at the time of the hearing.  The inmate was subsequently assigned another staff assistant on 2/11/14, who was present for the

347

hearing. The SHO indicated consideration of the mental health assessment by noting in the disposition that questions number one and three had been answered in the affirmative and question number two had been answered in the negative. The SHO did not mention the clinician's explanations or detail how the assessment was considered in determining guilt and/or assessing a penalty. The SHO noted reviewing the mental health assessment in the disposition. The inmate was found guilty, but there was mitigation. The SHO reduced the charge to a CDC-128A citing "Progressive Discipline" as the reason and the inmate was counseled and reprimanded.

**Impression**: There was mitigation in this case. The clinician's response to question number three provided no assistance to the SHO in assessing a penalty. However, the SHO made the decision to mitigate, reducing the RVR to a CDC-128A. The SHO did not document how the mental health assessment was considered in determining guilt and/or assessing a penalty.

**Inmate C**
Date of Violation: 1/9/14
Date of Mental Health Assessment: 1/17/14
Date of Disposition: 1/31/14
Charge: Fighting – Division D Offense

On 1/9/14, this EOP inmate was observed in a heated argument with a group of inmates. The inmate and another inmate were later discovered to have injuries consistent with a physical altercation; both inmates admitted to fighting. A mental health assessment was completed on 1/17/14 with questions number one, two, and three answered in the affirmative. The response to question number one stated the inmate was currently in the MHCB. The response to question number two stated that the inmate had an extensive psychiatric history and at the time of the incident had been experiencing auditory hallucinations and paranoia. The response to question number three stated that she was scheduled to be transferred to Patton State Hospital (PSH) on 2/4/14 and recommended that no penalty be imposed that would delay the transfer.

On 1/31/14, the inmate appeared before the SHO for a hearing. The SHO considered the mental health assessment and found the inmate guilty. However, the charge was reduced from a Division D offense to a CDC-128-A. The SHO cited the mental health assessment as the reason, stating in part, "Because the inmate requires a higher LOC, the 115 RVR was reduced from a Division D offense to a CDC 128-A. Imposing a penalty may have delayed the transfer, however the behavior was documented."

**Impression**: There was mitigation in this case. The SHO considered the mental health assessment and reduced the RVR to a CDC 128-A. The SHO indicated penalties were not imposed so as not to delay the inmate's transfer to PSH for treatment at a higher LOC.

**Inmate D**
Date of Violation:  1/27/14
Date of Mental Health Assessment:  2/7/14
Date of Disposition:  2/27/14
Charge:  Fighting with Force and Violence – Division D Offense

On 1/27/14, this EOP inmate was observed exchanging punches with another inmate on the yard.  A mental health assessment was completed on 2/7/14 with questions number one, two, and three answered in the affirmative.  The response to question number one stated that she was at the EOP LOC.  The response to question number two stated that the inmate had a history of psychosis, including paranoid delusions, which might lead to assaultive behavior.  The response to question number three stated that the inmate said she was attacked by the other inmate and was defending herself.  This response was unhelpful and substituted the inmate's statement for a clinical opinion regarding whether there were any mental health factors the SHO should consider during penalty assessment.

On 2/27/14, the inmate appeared before the SHO for a hearing.  She was assigned a staff assistant for the preparation and presentation of her defense on 1/29/14.  However, at the time of the hearing, that staff assistant was unavailable and the inmate was assigned a second staff assistant on 2/17/14, who was present during the hearing.  The SHO considered the mental health assessment and found the inmate guilty.  The inmate was assessed 90 days forfeiture of credit, which was the maximum amount of time for a Division D offense.

**Impression**:  There was no mitigation in this case.  There was no mitigation recommended by the clinician.  The SHO considered the mental health assessment and did not mitigate the penalty.  The clinician's response to question number three provided no assistance to the SHO in assessing the penalty.  The inmate was assessed significant credit loss.

**Inmate E**
Date of Violation:  2/4/14
Date of Mental Health Assessment:  3/5/14 (Untimely – Sent to Mental Health on 2/6/14)
Date of Disposition:  3/18/14
Charge:  Resisting a Peace Officer Resulting in the Use of Force (Physical) – Division D Offense

On 2/4/14, the inmate entered the custody office in the Support Care Unit (SCU) speaking loudly.  She was taken to the dining hall by an officer in an attempt to get her to calm down.  Once in the dining hall, the inmate ignored the officer's command to sit down, pulling away and causing the officer to employ physical force to restrain her.  A mental health assessment was completed on 3/5/14, with questions number one, two, and three answered in the affirmative.  The response to question number one stated that the inmate was at the EOP LOC.  The response to question number two stated that she was highly suspicious of the actions and intentions of others, which led to impulsivity and poor judgment.  At the time of the incident, the inmate believed she was wrongly placed in the SCU.  The response to question number three stated that her mental health needs would be best served in the SCU EOP and recommended the inmate not be placed in administrative segregation.

On 3/18/14, the inmate appeared before the SHO for a hearing. She was assigned a staff assistant on 2/17/14, but that officer was not available at the time of the hearing. The inmate was subsequently assigned another staff assistant on 3/17/14, who was present for the hearing. The SHO gave consideration to the mental health assessment, noting that the clinician's recommendation was considered in assessing the penalty. The SHO found the inmate guilty and assessed her 61 days credit forfeiture.

**Impression**: There was mitigation in this case. The SHO considered the mental health assessment and assessed the inmate 61 days credit forfeiture, which was at the lower end of the penalty for a Division D offense.

**Inmate F**
Date of Violation: 3/14/14
Date of Mental Health Assessment: 3/26/14
Date of Disposition: 4/10/14
Charge: Battery on an Inmate without Serious Injuries – Division D Offense

On 3/14/14, this EOP inmate admitted to an officer that she had slapped another inmate. The other inmate confirmed that this happened. A mental health assessment was completed on 3/26/14 with questions number one, two, and three answered in the affirmative. The response to question number one stated that the inmate was at the EOP LOC and that her psychotic symptoms might interfere with her ability to adequately represent her interests at the hearing. The response to question number two stated that at the time of the incident the inmate was experiencing psychosis and mood challenges partly due to medication non-compliance. The response to question number three stated that prolonged placement in administrative segregation was not recommended as the inmate had significant mental health needs.

On 4/10/14, the inmate appeared before the SHO for a hearing. The inmate was assigned a staff assistant on 3/20/14, but this staff assistant was not available at the time of the hearing. The inmate was subsequently assigned another staff assistant on 4/9/14 who was present for the hearing. The SHO indicated consideration of the mental health assessment by noting in the disposition that questions number one, two, and three had been answered in the affirmative. The SHO did not mention the clinician's explanations or detail how the assessment was considered in determining guilt and/or assessing the penalty. The inmate was found guilty and assessed 61 days credit forfeiture.

**Impression**: There was mitigation in this case. The SHO considered the mental health assessment and assessed the inmate 61 days credit forfeiture, which was at the lower end of the penalty for a Division D offense. In the hearing disposition, the SHO did not mention the clinician's specific recommendations or detail how the mental health assessment was considered in determining guilt and/or assessing a penalty.

**Inmate G**
Date of Violation:  3/24/14
Date of Mental Health Assessment:  4/7/14
Date of Disposition:  4/25/14
Charge:  Battery on a Non-Prisoner - Division B Offense

While being escorted to the PSU Treatment and Medication Room, the inmate lunged forward and kicked the psych tech who was trying to administer her medication.  A mental health clinician interviewed the inmate and completed a mental health assessment on that same date.  The clinician checked "yes" to questions number one, two, and three.  For question number two, the clinician noted, "Extensive psychiatric history.  She was experiencing increased agitation, anger and paranoia around the time of the incident, and her psychiatric medications needed to be adjusted."  For question number three, the clinician noted, "She was already reduced to level 3 of BIP in PSU by her IDTT as a result of this rule violation."

The SHO repeated the assessment verbatim in the body of the RVR under "Mental Health."  The inmate was found guilty and under the "Findings" section, the SHO noted "This SHO considered the Mental Health Assessment in assessment of penalty."  However, nothing demonstrated how the assessment was considered."  The inmate was assessed 150 days forfeiture of credits consistent with a Division B offense.  Further, due to this RVR, the inmate was not eligible for credit restoration of the 61 days forfeiture of credits from the previous RVR dated 2/25/14.

On 5/15/14, the CDO revised the forfeiture of credits from 150 days to 121 days "due to mental health evaluation, which states inmate was experiencing a psychotic episode [@] time of offense."

On 7/10/14, a CDCR Reclassification Score Sheet was completed reflecting additional points for the RVRs dated 2/25/14 and 3/24/14.  The two RVRs resulted in an additional unfavorable 24 points; this increased her placement points from 139 to 163.

**Impression**:  The SHO did not mitigate the penalty, but the CDO reduced the forfeiture of credit days imposed by the SHO.  The SHO employed canned language regarding consideration of the mental health assessment without further explanation.  The inmate was found to be psychotic.  Even with the 29 days of mitigation, she received 182 days forfeiture of credit; this occurred during a period when the clinician noted that the inmate's behavior was affected by her mental illness as she was psychotic and experiencing medication difficulties.

**Inmate H**
Date of Violation:  1/1/14
Date of Mental Health Assessment:  1/16/14
Date of Disposition:  2/6/14
Charge:  Resisting and/or Obstructing a Peace Officer Resulting in Use of Force (Physical)

During an escort in the PIP, the inmate began twisting and pulling away and the officer had to use physical strength and holds to prevent her from pulling away.  A mental health clinician interviewed the inmate on 1/16/14 and completed the mental health assessment on the same date.

The clinician noted in response to question number one that the inmate was in the PIP. "Her psychosis interferes with her ability to adequately participate in the disciplinary process taken against her." For question number two, the clinician checked "yes" and noted, "She is experiencing psychosis leading to impaired judgment and impulsivity." For question number three, the clinician checked "yes," and noted, "Recommend considering reduction to a 128 A or a lesser charge/lower sentence."

The SHO repeated the mental health assessment verbatim in the "Mental Health" section of the RVR. The inmate was found guilty and the SHO used canned language, stating "this SHO considered the Mental Health Assessment in assessment of penalty." However, in the "Disposition" section of the RVR, the SHO wrote, "the charge was reduced to an Administrative CDC 115, for the following reason: The SHO elects to reduce the penalty imposed, based in part on the Mental Health Assessment and Recommendation by the Mental Health Clinician." Further, under the section "Additional SHO Notes," the SHO wrote, "The SHO elected not to assess any penalties or restrictions on Inmate _____; this SHO believes that assessing penalties will only interfere with _____'s treatment for her Mental Health Issues."

**Impression**: There was mitigation in this case, which the SHO related in part to the mental health assessment.

### Inmate I
Date of Violation: 1/18/14
Date of Mental Health Assessment: 1/30/14
Date of Disposition: 2/16/14
Charge: Battery on an Inmate – Division D Offense

While exiting the dining hall, the inmate walked to the table where another inmate was sitting and hit her twice in the face. When ordered to stop, she immediately complied and was cuffed without resistance. A mental health clinician interviewed her on 1/30/14 and completed a mental health assessment on the same date. The clinician answered "yes" to questions number one, two, and three. For question number two, the clinician noted, "She was experiencing psychosis at the time of the violation which resulted in an inability to conform her behavior to the rules and regulations." In response to question number three, the clinician noted, "Recommend a lesser charge or lower sentence. Also recommend not suspending the privileges already granted by the IDTT as part of her stage at PIP."

The SHO noted the mental health assessment verbatim in the "Mental Health" section of the RVR. Further, under the "Findings" section, he stated "This SHO considered the Mental Health Assessment in assessment of penalty." The inmate was found guilty and assessed 90 days forfeiture of credits. The SHO also wrote, "This SHO has taken in to consideration the Mental Health Clinician's recommendation and elected not to assess [penalty's] that would interfere with Inmate _____ treatment plan (PIP stage level)."

**Impression**: There was mitigation in this case by the SHO not assessing any penalty that would interfere with the inmate's PIP stage level. However, the inmate was assessed 90 days forfeiture of credit; this occurred even with the mental health assessment indicating that the inmate

experienced psychosis at the time of the incident and was not capable of conforming her behavior to the rules and regulations.

**Inmate J**
Date of Violation:  1/28/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  4/9/14
Charge:  Battery on an Inmate Resulting in the Use of Force (OC Pepper Spray) – Division D Offense

While on the yard, the inmate ran toward another inmate and struck her in the face with closed fists.  When ordered to stop, she did not and the officer utilized OC spray to stop the fight.  The mental health clinician interviewed her on 2/5/14; the mental health assessment was completed on the same day.  The clinician checked "yes" for questions number one, two, and three.  In response to question number two, it was noted "At the time of violation she was experiencing hallucinations and delusions impacting her behavior."  Further, for question number three, the clinician explained, "Recommend not suspending privileges gr per inmate's stage in PIP."

The SHO noted the clinician's assessment verbatim in the body of the RVR.  Under the "Findings," the SHO indicated that the mental health assessment disclosed that the inmate's mental disorder appeared to contribute to the behavior which led to the RVR.  The inmate was experiencing hallucinations and delusions impacting her behavior.  The inmate was found guilty and assessed 90 days forfeiture of credits.  In the RVR's disposition section, the SHO stated that he considered the mental health assessment in the penalty assessment.  He did not, however, indicate how it was considered.

**Impression**:  There was no mitigation in this case.  The inmate was assessed 90 days forfeiture of credit despite the mental health assessment's indication that she was delusional and experiencing auditory hallucinations.

**Inmate K**
Date of Violation:  2/14/14
Date of Mental Health Assessment:  3/4/14
Date of Disposition:  3/19/14
Charge:  Battery on Inmate – Division D Offense

While in the activity room, the inmate became agitated, reached across the table and struck another inmate on her hand, and stood up aggressively.  The mental health clinician interviewed her on 3/3/14 and completed the mental health assessment on 3/4/14.  The clinician answered "no" to question number two.  However, for question number three, she checked "yes" and explained, "I/P should not have privileges granted by IDTT removed."

The SHO restated the mental health assessment verbatim in the "Mental Health" section of the RVR.  The inmate was found guilty.  The SHO indicated that the mental health assessment disclosed that the inmate's mental disorder did not contribute to the RVR.  However, there were mental health factors that the SHO should consider when assessing the penalty.  The SHO further

noted, "The SHO elected to establish progressive discipline by assessing the lower end of a Division D Offense."  The SHO noted consideration of the mental health assessment in assessing the penalty; the inmate was assessed 61 days forfeiture of credits.
**Impression**:  There was mitigation in this case.

**Inmate L**
Date of Violation: 2/14/14
Date of Mental Health Assessment:  3/4/14
Date of Disposition: 3/19/14
Charge:  Battery on a Non-Prisoner – Division B Offense

The inmate was holding an ice cream between her legs that she had been given during a group function in the activity room.  When the recreation therapist told her to either throw it away or leave it on the table when she left, she threw the ice cream at the recreation therapist and hit her in the abdomen.

The mental health clinician interviewed the inmate on 3/3/14 and completed the mental health assessment on 3/4/14.  The clinician checked "yes" for questions number one, two, and three.  For question number one, the clinician noted, "I/P MH HX and current symptoms significantly impairs I/P's ability to track, interpret information or draw logical conclusions."  For question number two, the clinician explained that "I/P remains psychotic unable to orient to her environment.  I/P is reactive to internal triggers including A/H, V/H and has poor impulse control."  For question number three, the clinician noted, "I/P should not have privileges granted by IDTT removed or to encourage use of behavioral program."

The SHO repeated the mental health assessment in the body of the RVR.  The inmate was found guilty and the SHO again repeated part of the mental health assessment in the RVR's "Findings" section.  In the disposition, the SHO noted, "_____ was assessed 121 days forfeiture of credits consistent with a Division B offense.  The SHO considered the mental health Assessment when assessing the penalty and assessed the lower end of a Division B offense in keeping with progressive discipline."  The inmate was not eligible for credit restoration for a Division B offense.

**Impression**:  There was mitigation in this case, but the inmate was assessed 121 days loss of credit.  The mental health assessment documented that the inmate was actively psychotic, reacting to auditory and visual hallucinations, and unable to interpret information or draw logical conclusions.  The mental health assessment was not written in layman's language to assist the SHO, but used mental health acronyms and abbreviations.

**Inmate M**
Date of Violation: 3/11/14
Date of Mental Health Assessment: 3/27/14
Date of Disposition: 4/9/14
Charge: Battery on a Non-Prisoner – Division B Offense

While having her blood drawn by an RN in a PIP examination room, the inmate hit the RN in the face and neck. The mental health clinician interviewed the inmate on 3/27/14 and completed the mental health assessment on the same day. The clinician answered "yes" to questions number one, two, and three. In response to question number two, the clinician noted, "significant mental health challenges including paranoia and auditory hallucinations." In response to question number three, the clinician wrote, "due to her psychosis, this inmate-patient was not entirely in control of her actions at the time of the instant rule violation."

The SHO repeated the mental health assessment in the body of the RVR. In the findings, the SHO noted, "The SHO elected not to assess a loss of privileges penalty. The mental health team in the PIP is more appropriate in privilege penalties for the purposes of rehabilitation and mental health." The inmate was found guilty and assessed 150 days forfeiture of credits, which were not eligible for restoration.

**Impression**: The clinician's answer to question number three was unresponsive. The mitigation in this case was in the form of no loss of privileges, but the inmate received 150 days loss of credit.

**Inmate N**
Date of Violation: 3/12/14
Date of Mental Health Assessment: 2/27/14
Date of Disposition: 4/9/14
Charge: Assault on a Non-Prisoner – Division D Offense

The inmate attempted to kick a lab assistant as the lab assistant was attempting to draw blood from the inmate in the PIP. The inmate refused an interview and the mental health clinician completed the mental health assessment on 3/27/14. The clinician answered "yes" to questions number one, two, and three. In response to question number two, the clinician noted significant mental health challenges, including paranoia and auditory hallucinations. In response to question number three, the clinician noted that due to her psychosis, the inmate was not entirely in control of her actions at the time of the RVR.

The SHO repeated the mental health assessment in the RVR's "Mental Health" section and also repeated part of this assessment in the "Findings", namely, that "the SHO elected not to assess a loss of privileges penalty. The mental health team in the PIP is more appropriate in privilege penalties for the purpose of rehabilitation and mental health." The inmate was found guilty and assessed 90 days forfeiture of credits; the SHO noted consideration of the mental health assessment when assessing the penalty in the disposition.

**Impression**: The mitigation was in the form of no loss of privileges. This was this inmate's second violation in a row. She lost 240 days of credits over the course of two days and two RVR adjudications.

---

## Inmate O

Date of Violation: 3/13/14
Date of Mental Health Assessment: 3/27/14
Date of Disposition: 4/15/14
Charge: Battery on a Non-Prisoner (Gassing) – Division B Offense

The inmate threw a cup of coffee through the food port and struck the psych tech. The same mental health assessment used for the RVR issued the day before (see above) was used for this RVR.

The mental health assessment was repeated verbatim in the body of the RVR. The inmate was found guilty and the findings included the mental health assessment. The SHO also included the same language in the RVR as in the RVR issued the previous day, namely, that "The SHO elected not to assess a loss of privileges penalty." The inmate was assessed 150 days forfeiture of credits and was ineligible for credit restoration. The SHO noted consideration of the mental health assessment when assessing the penalty in the RVR's "Disposition" section.

**Impression**: The mitigation was in the form of no loss of privileges. The inmate was assessed 150 days forfeiture of credits. Over the course of three days and three RVR adjudications, this inmate was assessed 390 days forfeiture of credits.

---

## Central California Women's Facility (CCWF) RVR Review

### SUMMARY OF FINDINGS

A. Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at CCWF.

B. CCWF was not compliant with required training of custody and mental health staff related to the RVR process.

C. Appropriate and complete collaborative training between custody and mental health in the RVR process had not occurred.

D. Twenty percent of reviewed RVRs were dismissed based on the information provided by the mental health assessment.

E. Ten percent of reviewed RVR penalties were mitigated based on the information provided in the mental health assessment.

F. Mental health assessments were not regularly requested timely.

G.  Mental health assessments were not completed timely.

H.  SHOs routinely noted that mental health assessments were considered and reviewed, but often did not demonstrate or report how the assessments were considered.

I.  Clinicians completing the mental health assessments did not always use laymen's terms.

J.  SHOs indicated that handwriting legibility was problematic.

K.  SHOs utilized canned language to state that the inmate's behavior was not bizarre, unusual, or uncharacteristic when the standard was not appropriate, either due to the inmate's LOC or the Division of the offense.

L.  There were issues at CCWF with the reporting employee noting the wrong LOC on the RVR and completing it inappropriately by checking "no" for whether a staff assistant was necessary for inmates at the EOP LOC.

M.  Clinicians' answers as to whether there were any factors to consider when assessing the penalty were nonresponsive, demonstrating a lack of understanding of the question.

N.  There was no formalized quality review of the RVR process at CCWF.


**INTRODUCTION**

At the time of the monitor's visit, CCWF was designated to house female inmates at all custody levels including reception, and female inmates with mental health designations of 3CMS and EOP levels of care.  As of March 2014, CCWF had a population of 3,634, including 1,349 or 37 percent who had a mental health designation.

The monitor reviewed RVRs for the first three months of 2014.  As reported in COMPSTAT during that period, there were 998 RVRs written with 483 or 48 percent issued to inmates with a mental health designation.  During the site visit, the monitor met with the warden, chief executive officer, chief psychologist, the IST lieutenant, other administrative staff, seven SHOs, staff psychologists, and the sole clinician responsible for completing mental health assessments.

The monitor reviewed policies and procedures on the RVR process at CCWF, training materials provided by Headquarters, and any local training materials provided by the institution to staff.  The monitor used the CCWF Institution Register and CDCR 1154 logs to gather RVR data, which are required under Title 15 of the CCR.

**TRAINING**

IST was asked to produce an attendance report for the required four-hour and one-hour training sessions for each job classification identified in the October 26 and November 3, 2011

357

memoranda. CCWF staff produced a proof-of-practice memorandum dated February 3, 2012 in response to the October 26, 2011 requirement, but it could not locate a proof-of-practice memorandum in response to the November 3, 2011 memorandum. The lesson plan provided by the institution was not the most current lesson plan issued by CDCR headquarters. The lesson plan provided to the monitors did not contain the most recent policy requirements.

CCWF RVR Training, by Job Classification

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 3 | 2/66% | 2/66% |
| Captains | 4 | 3/75% | 3/75% |
| Lieutenants | 24 | 21/87% | 19/79% |
| Sergeants | 57 | 39/68% | 39/68% |
| CC-II Appeals | 1 | 0/0% | 1/100% |
| Psychologist | 1 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

The monitor met with seven SHOs on August 8, 2014. None of the officers reported receiving the four-hour collaborative training. The three lieutenants promoted within the preceding year reported no formalized training regarding the mental health assessment process other than being mentored by SHOs.

All of the SHOs reported that they found value in the mental health assessments and that they always reviewed and considered the information provided. They noted problems before March 2014 with timely completion by clinical staff, largely due to lack of notice of the rotation of clinicians completing the assessments. Since March 2014, the process had been streamlined and was reportedly working better with the assignment of one clinician to complete all of the assessments. However, they also voiced concern about having only one clinician responsible for all assessments with no appropriate back-up coverage if she were absent.

The SHOs also reported delays in processing of the RVRs due to changes in inmates' levels of care. For example, if a GP inmate were issued an RVR with no indicators for a mental health assessment, but at a later date during the RVR process he became a caseload inmate, custody reported that it must stop the process and request a mental health assessment.

**Clinicians**

CCWF did not have a designated RVR coordinator position. Before March 2014, several clinicians completed the mental health assessments on a rotating basis. Due to confusion and delays associated with this rotational process, as noted above, CCWF assigned one clinician to complete all of the mental health assessments. This clinician did not carry a caseload. The

358

monitor met with the clinician who indicated that her supervisor provided on-the-job training that included review of the headquarters-generated PowerPoint training presentation. She noted that it took approximately 1.5 hours to complete each mental health assessment, including the inmate interview, eUHR review, and occasionally speaking with the inmate's primary care clinician. She reported completing approximately 15 to 20 assessments per week. Although the clinician did not receive any feedback on the outcomes of cases, she reported an excellent working relationship with the SHOs and believed that her input was useful and appropriately utilized during the hearings.

Review of the number of mental health assessments processed during the first three months of 2014 -- 158 during January, 161 during February, and 164 during March -- revealed that one clinician would be required to complete an average of seven mental health assessments per day. This workload raised concerns about clinician burnout and, as noted above, about back-up if this clinician were absent from work for even one day.

**MENTAL HEALTH ASSESSMENT REQUESTS**

The system in place for tracking mental health assessment requests and completions was problematic during the review period, but, as noted above, it was streamlined through one clinician. All interviewed staff were familiar with the new process.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Generally, the monitor's review found that mental health assessments were requested pursuant to policy, except in two cases where the assessments were not requested timely by correctional staff. (*See* CCWF Inmates A, B.) Additionally, mental health assessments were not completed timely by clinicians in 15 percent of reviewed cases at CCWF. (*See* CCWF Inmates C, D, E.)

The quality of the mental health assessments varied among clinicians before the one clinician was assigned to complete all assessments. SHOs reported, and case reviews revealed, that clinician legibility was problematic. (*See* CCWF Inmates E, F, G.) Further, there were several cases reviewed wherein the clinician failed to use laymen's terminology. (*See* CCWF Inmates A, C, G, H.) Additionally, some clinicians inappropriately checked "no" for whether a staff assistant was needed when the inmate was receiving EOP LOC. (*See* CCWF Inmates I, J.) Finally, when clinicians answered "yes" to whether there were any factors to consider when assessing the penalty, the explanations were generally not responsive. For example, in one instance, the clinician noted, "The penalties should be simple and concrete to insure inmate understanding the reason for the consequence for her behavior." (*See* CCWF Inmate K.)

**CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION**

In all reviewed RVR packages, SHOs noted that mental health assessments were reviewed and taken into consideration. In 20 percent of the reviewed cases, the SHO dismissed the charges specifically based on the mental health assessment. (*See* CCWF Inmates A, I, L, M.)

359

In another ten percent of cases, the SHO mitigated the penalty and expressly noted that mitigation was based on the mental health assessment. (*See* CCWF Inmates F, K.)

SHOs often utilized canned language that "the inmate's behavior did not appear unusual, uncharacteristic, or bizarre," even when the standard was not applicable. (*See,* CCWF Inmates A, D, E, F, K, N, O.)  In two reviewed cases, the reporting employee noted the wrong LOC for the inmate. (*See* CCWF Inmates I, J.)  While review and consideration of the mental health assessment was routinely noted by the SHOs, they did not indicate how they utilized the information in their findings or dispositions in 20 percent of the reviewed cases. (*See* CCWF Inmates G, H, E.)

## QUALITY REVIEW

There was no quality review of the RVR process conducted at CCWF.

### CCWF RVR Case Reviews

**Inmate A**
Date of Violation:  3/22/14
Date of Mental Health Assessment:  4/29/14
Date of Disposition:  4/30/14
Charge:  Willfully Resisting and Obstructing a Peace Officer in the Performance of Duty – Division D Offense

This MHCB inmate covered her cell window and refused to take it down or respond to the officer.  An emergency entry into the cell was made and the inmate became resistive, flailing her arms and kicking her legs.  A mental health assessment was requested late on 4/28/14 and was completed on 4/29/14.  The clinician answered "yes" to question number two and wrote, "I/P suffers from a major mental health disorder that was not being treated.  At the time inmate was refusing medication.  Currently, she is on a 2602 court order for medication."  The clinician answered "no" to question number three.

The mental health assessment was referenced in the relevant section of the RVR, but the SHO unnecessarily added the language that the described behavior of the inmate as it did not appear to have been unusual, uncharacteristic, or bizarre.

The inmate was found not guilty and the SHO noted that the finding was based on the mental health assessment.

**Impression**:  There was mitigation in this case.  The mental health assessment was requested late by custody.  The clinician did not use laymen's terms when completing the assessment.  The SHO noted unnecessarily that the inmate's behavior was not bizarre, unusual or uncharacteristic, which may have been due to confusion surrounding policies on mental health assessments.  The SHO found the inmate not guilty, specifically based on the mental health assessment.

**Inmate B**
Date of Violation:  1/5/14
Date of Mental Health Assessment:  1/14/14
Date of Disposition:  1/16/14
Charge:  Threatening a Peace Officer – Division D Offense

This 3CMS inmate covered her administrative segregation management cell window with her clothes.  When ordered to remove the window covering, she responded, "No, you are going to have to come in this cell and extract me.  And when you do I am going to punch you in the face."

A mental health assessment was requested late by custody staff.  The clinician who completed it answered "no" to questions numbers one, two, and three.  The assessment was referenced in the relevant section of the RVR.  The inmate was found guilty and was assessed 90 days' loss of behavioral/work credits and 90 days' loss of yard, phone, canteen, quarterly packages and appliances.

**Impression**:  There was no mitigation in this case.  The mental health assessment was requested late by custody staff.  It did not indicate any mental health factors, and the SHO referenced it in the RVR.  The inmate was assessed significant credit and privilege losses.

**Inmate C**
Date of Violation:  1/14/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  2/6/14
Charge:  Disobeying Orders – Administrative Offense

On 1/14/14, this EOP inmate failed to report to pill line for her morning medication.  A mental health assessment was requested on 1/16/14, but it was not completed by clinical staff until 2/6/14.  The clinician answered "no" to questions number two and three, but noted "Per pharmacy, I/P was not prescribed A.M. medication as written in the RVR.  Also, per Medication Administration Record (MAR), she took medication at HS on 1/14/14."

The mental health assessment was referenced in the relevant section of the RVR.  The inmate was found not guilty based on the information provided in the mental health assessment.

**Impression**:  There was mitigation in this case.  The mental health assessment was completed late by the mental health staff.  The clinician did not utilize laymen's terms in the assessment.  The SHO noted consideration of the mental health assessment and the RVR was dismissed based on the information provided by the clinician.

**Inmate D**
Date of Violation:  1/9/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  2/7/14
Charge:  Willfully Resisting, Delaying, or Obstructing a Peace Officer in the Performance of Duty/Refusing to Accept Assigned Housing – Division D Offense.

On 1/9/14, the ICC released this 3CMS inmate from administrative segregation to GP.  The inmate refused and stated that she feared for her safety.  She was again ordered to move and she refused.

A mental health assessment was completed late by the mental health department.  The clinician responded "no" to questions number one, two, and three.  The mental health assessment was referenced in the relevant section of the RVR.  The SHO specifically noted in that section that the request for an assessment was made because the offense could result in a SHU term.  The SHO also noted in that section that the inmate's behavior did not appear unusual, uncharacteristic, or bizarre.

The inmate was found guilty and assessed 90 days' loss of behavioral/work credits and 180 days' loss of yard, phone, canteen, quarterly packages, personal property and appliances because it was the inmate's third offense.

**Impression**:  There was no mitigation in this case.  The mental health assessment was completed late by the clinician.  It did not indicate any mental health factors.  The SHO referenced the assessment in the RVR, but unnecessarily added canned language that the inmate's behavior did not appear bizarre, unusual or uncharacteristic, when that was not the reason for the assessment request.  The inmate was assessed significant loss of credits and privileges.

**Inmate E**
Date of Violation:  1/11/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition:  2/7/14
Charge:  Threats against Staff – Division D Offense

When this 3CMS inmate was approached with her morning medication, she instructed the nurse to return at noon with them.  The nurse informed the inmate that if she did not take them, it would be considered a refusal.  To that, the inmate responded, "I will slap the shit out of you Bitch if you don't leave me alone."  The nurse was the reporting employee for the RVR.

A mental health assessment was requested timely but it was completed late by the mental health department.  The clinician who completed the assessment noted that no staff assistant was required, but answered "yes" to both questions number two and three.  For question number two, the clinician noted, "It appears [illegible] did contribute to the behavior in the RVR."  For question number three, the clinician indicated, "Consider penalties that would allow P/I to continue to work w/ PC and MH group activities to work toward improved coping and decrease verbal aggression."

The mental health assessment was noted in the relevant section of the RVR. The SHO specifically noted in that section that the request for assessment was made because the offense could result in a SHU term. The SHO also noted in that section that the inmate's behavior did not appear unusual, uncharacteristic, or bizarre. The inmate was found guilty and assessed 90 days' loss of behavioral/work credits, and 90 days' loss of yard, phone, canteen and quarterly packages.

**Impression**: There was mitigation in this case. The mental health assessment was not completed timely by the clinician. Further, legibility of the assessment was problematic, as was the information provided for question number two, which did not provide a useful explanation for the SHO. It was unclear whether the clinician was aware that an inmate's clinical programming could not be reduced or negatively affected by assessed penalties. The SHO referenced the assessment in the RVR, but no consideration of it was mentioned in the findings or the disposition. Further, the SHO unnecessarily added canned language that the inmate's behavior did not appear bizarre, unusual, or uncharacteristic, while that was not the reason for the assessment request. The inmate was assessed significant loss of credits and privileges.

**Inmate F**
Date of Violation: 1/24/14
Date of Mental Health Assessment: 2/6/14
Date of Disposition: 2/23/14
Charge: Threatening an Inmate

This EOP inmate was found standing outside a restroom occupied by another inmate stating, "I'm gonna kill you." A mental health assessment was completed timely and the clinician answered "yes" to questions number two and three. For question number two, the clinician noted, "i/p experienced significant symptoms of a severe mental illness prior to RVR. An extensive history of mental illness, [illegible] behavior and psychiatric hospitalization is documented." For question number three, the clinician indicated that due to the nature of her mental illness, restriction of property and yard was not recommended.

The SHO referenced the mental health assessment in the relevant section of the RVR, but the SHO added that the inmate was "fully aware of her behavior and the potential consequences of her actions. SHO notes that the described behavior of Inmate … does not appear unusual, uncharacteristic or bizarre."

The inmate was found guilty and assessed 60 days loss of behavioral/work credits. However, there was no assessment of loss of privileges, based specifically on the mental health assessment.

**Impression**: The penalty was partially mitigated in this case. The mental health assessment was completed timely and all sections were completed appropriately, although some of the comments were not completely legible. The SHO noted unnecessarily that the inmate's behavior was not bizarre, unusual or uncharacteristic. The SHO noted consideration of the mental health assessment and specifically noted it as a basis for not assessing loss of privileges. However, the inmate was assessed loss of credits.

**Inmate G**
Date of Violation: 1/26/14
Date of Mental Health Assessment: 2/11/14
Date of Disposition: 3/3/14
Charge: Battery on an Inmate – Division D Offense

This EOP inmate hit another inmate for not cleaning up after herself after she used the restroom, as she stated it put her health at risk. A mental health assessment was completed timely and the clinician answered "yes" for questions number one, two, and three. For question number two, the clinician noted, "Based on review of record, the inmate-patient has an extensive history of mental illness marked by psychotic affective [illegible] and violent behavior. In the past few months, she has been designated MHCB and EOP LOC on numerous occasions." For question number three, the clinician reported, "Given the nature and severity of symptomatology, restriction of [illegible], property and yard is not recommended."

The SHO referenced the mental health assessment in the relevant section of the RVR. The inmate was found guilty and assessed 90 days loss of behavioral/work credits. While the SHO noted that the mental health assessment was considered when assessing the penalties, it was not indicated how in the disposition.

**Impression**: There was no mitigation in this case. The mental health assessment was completed timely, but legibility was difficult and the clinician did not utilize laymen's terms in the comments. The SHO noted consideration of the mental health assessment when assessing the penalties, and in fact did not assess any loss of privileges, but did not specifically reference the mental health assessment in the disposition. The inmate was assessed significant loss of credits.

**Inmate H**
Date of Violation: 3/9/14
Date of Mental Health Assessment: 3/12/14
Date of Disposition: 4/2/14
Charge: Fighting – A Division D Offense

This EOP inmate was observed fighting with another inmate on the dayroom floor and did not comply when ordered to stop. The inmates complied after the second order to stop fighting. A mental health assessment was completed timely and the clinician indicated "yes" for questions number two and three. For question number two, the clinician noted, "Inmate suffers from psychotic symptoms which are not stabilized." For question number three, the clinician noted "since inmate has both auditory hallucinations and paranoid delusions, seclusion from property, others, and yard may further deteriorate her mental stability."

The SHO referenced the mental health assessment in the relevant section of the RVR. The inmate was found guilty and assessed 90 days loss of behavioral/work credits and loss of canteen privileges for 90 days. The SHO stated that the mental health assessment was considered when assessing the penalty, but did not indicate how it was done.

**Impression**:  There was no mitigation in the case.  The clinician failed to use laymen's terms, notably in response to question number three.  The inmate was assessed significant loss of credits and privileges.

## Inmate I
Date of Violation:  1/6/14
Date of Mental Health Assessment:  1/9/14
Date of Disposition:  1/28/14
Charge:  Behavior which might lead to violence – Division F Offense

While in Facility A clinic, the inmate approached another inmate while swinging her fists at the inmate.  The other inmate did not fight back and took steps backwards to avoid being struck.  When ordered to stop fighting, the inmate complied.

A mental health assessment was requested on 1/7/14; however, the request erroneously identified the inmate as receiving MHCB LOC.  Additionally, the clinician who completed the assessment erroneously checked "no" to question number one regarding the need for a staff assistant, since the inmate was at the EOP LOC.  The clinician answered "yes" to question number two and noted that the inmate had a long history of mental illness and that she had not been on psychiatric medications for six months while she was in county jail before her arrival at CCWF.  The clinician further noted that the inmate was also not on psychiatric medications because she was pregnant and at the time of the RVR.  She also had paranoid delusions that other inmates were planning to separate her from her husband.  The clinician noted, "She was very psychotic at the time of the RVR."  The clinician did not indicate any mental health factors to consider in assessing the penalty.

The SHO noted that the inmate was assigned a staff assistant "due to her EOP status."  The SHO also referenced the mental health assessment in the RVR.  The inmate was found not guilty and the SHO noted, "There is sufficient reason for a finding of not guilty due to inmate …mental health issues noted on the (mental health assessment)."

**Impression**:  There was mitigation in this case.  The mental health assessment request erroneously indicated that the inmate was receiving MHCB LOC.  The clinician who completed the mental health assessment erroneously checked "no" for the assignment of a staff assistant.  The SHO dismissed the charge based on the mental health assessment.

## Inmate J
Date of Violation:  1/11/14
Date of Mental Health Assessment:  2/6/14
Date of Disposition:  2/19/14
Charge:  Disobeying Orders – Administrative Offense

On 1/11/14, this EOP inmate failed to report to pill line for her morning medication.  A mental health assessment request was sent to the mental health department on 1/21/14.  It erroneously identified the inmate as receiving MHCB LOC.  The assessment was completed on 2/6/14 and

365

the clinician erroneously checked "no" for whether a staff assistant was necessary.  The clinician also checked "no" for questions number two and three.

The mental health assessment was referenced in the relevant section of the RVR.  The inmate was found guilty, but the SHO noted that it was reduced to a CDC 128-A based on progressive discipline.

**Impression**:  There may have been mitigation in this case.  The mental health assessment was completed late and erroneously identified the inmate as receiving MHCB LOC.  The mental health assessment was negative for any mental health implications and the SHO referenced the assessment in the RVR.  While the charge was reduced to an administrative one, the SHO did not specifically relate the action to the assessment.

**Inmate K**
Date of Violation: 1/27/14
Date of Mental Health Assessment:  2/11/14
Date of Disposition:  2/23/14
Charge:  Refusing to Submit to a UA – Division F Offense

This EOP inmate refused to submit a urine sample for the mandatory random UA program.  A mental health assessment was completed timely and the clinician answered "yes" to questions number one, two, and three.  For question number two, the clinician noted, "i/m has a severe and persistent mental disorder that significantly impairs her reasoning and judgment even when on medication."  For question number three, the clinician indicated that penalties should be simple and concrete to insure the inmate understands the reason for the consequence for her behavior.

The SHO referenced the mental health assessment in the RVR, but added the language "therefore, the SHO concludes that Inmate… was fully aware of her behavior and the potential consequences of her actions.  SHO notes that the described behavior of Inmate… does not appear unusual, uncharacteristic or bizarre."  This language was unnecessary and inapplicable as the inmate was receiving EOP LOC.  The inmate was found guilty and assessed 30 days' loss of behavioral/work credit.  The SHO noted that based on the clinician's recommendation in the mental health assessment, no loss of privileges was assessed.

**Impression**:  There was mitigation in this case.  The clinician's explanation for question number three was not responsive.  The SHO referenced the mental health assessment in the RVR, but inapplicable canned language regarding the inmate's behavior not being unusual, uncharacteristic or bizarre was used.  This language was inapplicable because the inmate was at the EOP LOC.  The SHO mitigated the penalty, noting that it was based on the mental health assessment.

**Inmate L**
Date of Violation:  2/27/14
Date of Mental Health Assessment:  3/10/14
Date of Disposition:  4/8/14
Charge:  Refusing a Direct Order – Division F Offense

On 2/27/14, this MHCB inmate refused to take her medication, resulting in the assembling of a forced medication team to administer the medication, and a delay in normal operations of the institution.  An RVR was issued.

A mental health assessment was completed timely and the clinician answered "yes" to questions number one, two and three.  The SHO referenced the mental health assessment in the relevant section of the RVR and found the inmate not guilty based on the information provided by the clinician.  The SHO noted that the inmate had a history of mental illness which formed reasonable cause to believe she posed a danger to self and others at the time of the RVR.  The mental health assessment indicated that the inmate's mental health symptoms were increased at the time of the RVR and she was not stable.  Further, the SHO determined that there was sufficient reason for a finding of not guilty based on the inmate's inability to make coherent or reasonable decisions at the time of the RVR.

**Impression**:  There was mitigation in this case.  The SHO dismissed the RVR based on the information provided by the clinician in the mental health assessment.

**Inmate M**
Date of Violation:  1/2/14
Date of Mental Health Assessment:  1/13/14
Date of Disposition:  2/3/14
Charge:  Fighting – Division D Offense

While leaving the dining hall, this EOP inmate approached another inmate and they began fighting.  When ordered to stop and separate, they complied.  A mental health assessment was requested and completed timely.  The clinician answered "no" to questions number two and three.

A mental health assessment was completed timely and the clinician answered "yes" to questions number one, two, and three.  For question number two, the clinician noted, "the I/P experienced symptoms of a prominent mental disorder and lower intellectual functioning marked in part by poor insight/judgment, low frustration tolerance, propensity for aggressive behavior and limited conflict resolution skills."  For number three, the clinician noted, "Restriction of yard is not recommended due to the nature of her symptoms and cognitive deficit."

The inmate was found not guilty and the SHO noted the mental health assessment as one of the justifications for the finding.

**Impression**:  There was mitigation in this case.  The SHO found the inmate not guilty based in part on the mental health assessment.  The charge was dismissed.

**Inmate N**
Date of Violation:  3/4/14
Date of Mental Health Assessment:  3/18/14
Date of Disposition:  3/26/14
Charge:  Battery on a Peace Officer – Division B offense

While being escorted in restraints across the dayroom floor to her cell, this 3CMS inmate became resistive and kicked the officer.  A mental health assessment was completed and the clinician answered "no" to question number one, two, and three.

The mental health assessment was noted in the relevant section of the RVR.  The SHO specifically noted in that section that the request for assessment was made because the offense could result in a SHU term.  The SHO also noted in that section that the inmate's behavior did not appear unusual, uncharacteristic, or bizarre, which was not applicable.  The inmate was found guilty and assessed 150 days' loss of behavioral/work credits and ten days' confinement to quarters.  She was referred to the ICC for a SHU assessment.

**Impression**:  There was no mitigation in this case.  The mental health assessment did not indicate any mental health factors.  The SHO referenced the assessment in the RVR, but unnecessarily added canned language that the inmate's behavior did not appear to have been bizarre, unusual or uncharacteristic, when that was not the reason why the assessment was requested.  The inmate was assessed significant loss of credits.

**Inmate O**
Date of Violation:  3/4/14
Date of Mental Health Assessment:  3/12/14
Date of Disposition:  3/30/14
Charge:  Battery on a Non Prisoner – a Division B offense

During an afternoon medication pass, this 3CMS inmate grabbed and pulled the nurse's arm when she passed the medication through the inmate's food port.  The nurse was able to pull her arm out, but received several bruises and abrasions on her right shoulder as a result.  The nurse was the reporting employee for the RVR.

A mental health assessment was completed and the clinician answered "no" to question number one, two and three.  The mental health assessment was noted in the relevant section of the RVR.  The SHO specifically noted in that section that the request for assessment was made because it was a Division B offense and that it also could result in a SHU term.  The SHO also noted in that section that the inmate's behavior did not appear unusual, uncharacteristic or bizarre, when that was not the reason for the request for the mental health assessment.  The inmate was found guilty and assessed 150 days' loss of behavioral/work credits and 90 days' loss of privileges including phone, canteen, quarterly packages, personal property, and appliances.  She was referred to ICC for a SHU assessment.

**Impression**:  There was no mitigation in this case.  The mental health assessment did not indicate any mental health factors.  The SHO referenced the assessment in the RVR, but unnecessarily added canned language that the inmate's behavior did not appear bizarre, unusual or uncharacteristic, when that was not the reason why the assessment was requested.  The inmate was assessed significant loss of credits and privileges.

## Valley State Prison (VSP) RVR Review

## SUMMARY OF FINDINGS

A.    Defendants have not adequately implemented the RVR policies and procedures agreed to in 2011 at VSP by completing and sustaining all requirements.

B.    VSP was not compliant with required training of custody and mental health staff related to the RVR process.

C.    Appropriate and collaborative training between custody and mental health in the RVR process has not occurred.

D.    Custody staff did not always document consideration of the mental health assessment in the RVR process.

E.    Of the EOP cases reviewed, approximately one-third indicated that mental illness contributed to the behavior that led to the RVR and one-half recommended mitigation of penalties. Numerous cases were mitigated based on mental health factors but other cases which appeared to be mitigated provided no reason.

F.    Of the 3CMS cases reviewed, one-half indicated that mental illness contributed to the behavior that led to the RVR and two-thirds recommended mitigation of penalties. One case was mitigated based specifically on mental health factors but other cases which appeared to be mitigated provided no reasons.

G.    Clinicians' responses on the mental health assessment were not always responsive to the questions asked and thus not helpful to the SHO.

H.    The SHOs referenced the standard of "bizarre, unusual or uncharacteristic behavior" for inmates charged with Division A, B, C or SHU-able offenses and for inmates at the  EOP LOC when it was inapplicable.

I.    Some decisions were based on the mental health status of the inmate at the time of the hearing rather than at the time of the offense as documented on the mental health assessments.

J.      Some decisions provided verbatim recitations of clinicians' comments on the assessment, but did not reference the assessments or mental health factors  in the actual dispositions.

K.      Clinicians checked "yes" to question number one on assessments prepared for EOP inmates and also provided written responses.


**INTRODUCTION**

On October 28-29, 2014, the monitoring team reviewed policies and procedures related to the RVR process at VSP, training materials provided by headquarters, as well as any local training materials provided by the institution to VSP staff.  The monitors utilized the VSP Institution Register and CDCR 1154 logs to gather RVR data, which is required to be maintained under Title 15 of the CCR.

VSP was designated to house inmates at custody Level II and inmates with mental health designations of 3CMS and EOP.  As of March 2014, VSP had a total inmate population of 3,187.  Of that population, 1,358 or 43 percent had a MHSDS designation.  The monitors met with the warden, mental health supervisors, eight SHOs who adjudicate the RVRs and six mental health clinicians who prepared mental health assessments.

The monitors reviewed RVRs written for the first three months of 2014.  During this period there were a total of 318 RVRs written with 176, or 55 percent, issued to inmates with a mental health designation.

**TRAINING**

VSP was not able to provide proof of practice memoranda in response to the October 26, 2011 and the November 3, 2011 memoranda.  The lesson plan provided by the facility was the current plan related to mental health assessment in the disciplinary process.

IST produced a report of who attended the required training sessions for each job classification identified in the October 26, 2011 and November 3, 2011 memoranda.  VSP was able to demonstrate adequate compliance with the four-hour training for CDOs and captains.  Only the CDOs were compliant with the one-hour training requirement.

<u>VSP Training, by Job Classification</u>

| Job Classification | Total staff | 10/26/11 (4 hours) | 11/3/11 (1 hour) |
|---|---|---|---|
| CDOs | 4 | 4/100% | 4/100% |
| Captains | 4 | 4/100% | 1/25% |
| Lieutenants | 20 | 15/75% | 1/5% |
| Sergeants | 61 | 33/54% | 7/11% |
| CC-II Appeals | 1 | 0/0% | 0/0% |
| Senior Psychologists | 6 | 0/0% | 0/0% |
| Senior Psychiatric Social Workers | 2 | 0/0% | 0/0% |

**STAFF INTERVIEWS**

**SHOs**

The SHOs were able to articulate the policies and procedures regarding the mental health input in the RVR process. The assessments for 3CMS inmates were returned to custody within four to five days but the ones for EOP inmates took longer. They reported that no timeframes were missed due to untimely completion and return of assessments. The legibility of the written comments on the assessments was not an issue but the names of the clinicians were sometimes difficult to discern. The comments of the clinicians were easy to understand and written in layman's terms. If there were any questions concerning an assessment, the SHOs would contact the OT to get answers. The SHOs reported a good working relationship with the mental health staff.

**Clinicians**

The chief of mental health advised the monitors that training had not occurred as required by the October and November 2011 memoranda. Staff was knowledgeable about how the assessments were requested, processed, logged and assigned to clinicians. It took from one hour to several hours to complete the form which included a review of the C-file and eUHR and an interview with the inmate and his PC. They also noted that a progress note was included in the inmate's mental health file once the assessment was completed. The clinicians did not recall ever being contacted by officers seeking clarification or additional information relative to an assessment. They stated that there was a culture problem at the facility regarding custody's perceived attitude that mental health should not play a major role in the RVR process. However, they reported that this had improved over time and that the warden was very supportive of mental health.

**QUALITY OF MENTAL HEALTH ASSESSMENTS**

Although the first question on the assessment only applied to non-MHSDS and 3CMS inmates, clinicians checked off "yes" to question number one, appearing to be unaware that EOP

inmates are automatically assigned a staff assistant, and then provided written explanations justifying the assignment of a staff assistant.  (*See* VSP Inmates A, B.)

Clinicians generally provided adequate written answers to question number two which were understandable and indicated a nexus between the inmate's mental illness and the behavior that led to the RVR.

However, responses to question number three were more problematic.  A number of responses to question number three would have been more appropriate answers to question number two.  Clinicians reiterated inmates' mental health factors without recommending any mitigation for the SHO to consider in the disposition. (*See* VSP Inmates B, C.)  One clinician wrote that the "I/P had a previous OHU placement for difficulties with staff on 1/7/14," (*See* VSP Inmate D.) while another clinician wrote that "The PI has a long standing history in the mental health program (local and state hospital)." (*See* VSP Inmate A.)  One answer simply stated "EOP LOC and his difficulty coping with medication" which would not appear to address question number two or three (*See* VSP Inmate E.) while another reported that "I/M was having difficulties with medication."  (*See* VSP Inmate F.)

## CONSIDERATION OF MENTAL HEALTH ASSESSMENTS BY SHO AND MITIGATION

SHOs repeatedly referenced the "bizarre, unusual or uncharacteristic behavior" standard in cases involving EOP inmates or 3CMS inmates charged with offenses that mandated the completion of a mental health assessment and for which the standard was inapplicable. (*See*, VSP Inmates B, G, H.)

One SHO quoted the answers on the assessment which provided a nexus between the inmate's mental illness and the actions that led to the RVR, but apparently disregarded the clinician's opinions and determined the inmate was aware of his actions, which occurred one month prior, at the time of the hearing.  Based on that rationale, the SHO believed the inmate should be held accountable which was not consistent with CCR's RVR policy.  In the decision, the SHO reported "During the hearing, the subject appeared coherent and was able to respond to specific details regarding the alleged offense.  The subject stated he understood the decision reached including its implication.  The SHO believes that subject was aware of his actions at the time of the disciplinary hearing and the consequences thereof.  The SHO believes the subject should be held accountable for his actions."  (*See* VSP Inmate C.)

In other decisions, SHOs provided verbatim recitations of the questions and answers from the assessment, but made no reference that the assessment was considered in the decision and did not list the assessment as evidence produced at the hearing.  (*See* VSP Inmates I, J.)

Some penalties appeared to have been mitigated by the SHOs, but this could not be confirmed since there was no mention of mitigation in the disposition.  (*See* VSP Inmates K, G.)

Other penalties were clearly mitigated and included specific language in the disposition that mitigation occurred as a result of the recommendations in the assessments. (*See* VSP Inmates L, M, N.)

**ICC REVIEW**

The sample size was not sufficient to make a determination on the efficacy of the mental health input in the RVR process at the ICC level. One reviewed case indicated that the ICC considered both the assessment and mental health input at the meeting. (*See* VSP Inmate D.)

**VSP RVR Case Reviews**

**Inmate A**
Date of Violation: 2/5/14
Date of Mental Health Assessment: 2/6/14
Date of Disposition: 2/24/14
Charge: Battery on an Inmate without Serious Bodily Injury – Division D Offense

On 2/5/14, this EOP inmate was involved in an altercation with his cellmate. The RVR stated that the alleged behavior was not deemed bizarre, unusual or uncharacteristic, a standard inapplicable to an EOP inmate. On 2/6/14 an assessment was completed with questions number one, two and three answered in the affirmative. In response to question number one, the clinician reported that the inmate seemed to be familiar with the disciplinary process but due to a history of poor impulse control, poor tolerance to stress and noncompliance with medications, the disciplinary process might be too complicated for the inmate to navigate independently. The clinician appeared to be unaware that EOP inmates were automatically assigned staff assistants. In response to question number two, the clinician reported that the inmate had a history of both psychotic and mood symptoms. In response to question number three, the clinician reported that the inmate had a long-standing history in the mental health program with experiences in both local and state hospitals. The clinician's answers to questions number two and three were unresponsive and provided no information for the SHO to consider during the hearing. On 2/24/14, the inmate appeared for a hearing before the SHO. The SHO considered the mental health assessment but determined that the inmate still had to be held accountable to the rules and regulations of the institution especially when it resulted in violence to another person. The SHO decided to assess the full penalty allowable for credit forfeiture. The inmate was found guilty and assessed 90 days forfeiture of credit and was referred to the ICC for SHU term assessment.

**Impression**: There was no mitigation in this case. The clinician's responses to the questions in the mental health assessment were unresponsive. The SHO, although he acknowledged the concerns raised in the mental health assessment, determined that the inmate had to be held accountable for his actions. The RVR included inapplicable language regarding the bizarre, unusual or uncharacteristic behavior of the inmate. The inmate was assessed significant credit loss.

**Inmate B**
Date of Violation:  2/5/14
Date of Disposition:  3/15/14
Charge:  Battery on an Inmate Without Serious Injury – Division D Offense

This EOP inmate admitted committing the battery and stated that the other inmate had balled up fists to fight him.  The RVR noted that he was a participant in the MHSDS at EOP LOC.  The reporting employee needlessly added that "the alleged behavior has not been deemed to be bizarre, unusual or uncharacteristic in nature."

The clinician completing the mental health assessment answered "yes" to questions number one, two and three.  For question number two, the clinician did not use plain language, and noted, "the PI's thought process is marked by persecutory & hyperreligous delusions, as well as auditory hallucinations."  Additionally, for question number three, the clinician's response was nonresponsive, stating, "the PI has poor insight into his mental health illness, as such what he states about his status and what is reality do not often match up."  This was not helpful to the SHOs in determining if there were factors to consider when assessing the penalty.

The "MHSDS" section of the RVR noted the inmate's LOC and reiterated the assessment verbatim.  Further, the SHO again reiterated the mental health assessment verbatim in the Findings of the RVR.  The inmate was found guilty and assessed 90 days forfeiture of credit (the maximum allowed for a division D offense) and was referred to ICC for consideration of a SHU term.

The inmate was seen by the ICC on 4/11/14.  A referral to the CSR was made for a SHU audit for a three month expired SHU term with active MERD of 4/13/14.  Participation noted by a mental health clinician only included information regarding the inmate's current stability, prescribed medication, current suicidality and whether continued retention in ASU would lead to decompensation.  There was no discussion noted of the mental health assessment or whether the inmate's mental health impacted the RVR at issue.

**Impression**:  There was no mitigation in this case. While the mental health assessment was twice noted in the RVR, it was never documented how it was considered or whether it impacted the penalty assessment.  The clinician completing the assessment did not utilize lay man's terms and the clinician's explanation to question number three was nonresponsive and therefore not helpful.  Further, the reporting employee needlessly added the language of bizarre, unusual or uncharacteristic, as the inmate was at EOP LOC, signaling a potential lack of understanding of RVR standards.  The ICC did not address or consider the mental health assessment. The inmate was assessed loss of credit.

**Inmate C**
Date of Violation: 02/6/14
Date of Mental Health Assessment: Timely
Date of Disposition: 3/13/14
Charge: Assault on a Non-Prisoner - Division D Offense

At the laundry room exchange window, this EOP inmate asked how he could get his boxer shorts replaced. He was instructed to go through his unit CO to receive a ducat documenting what clothing items were needed. He again asked and the instructions were repeated to him. He turned to walk away from the window, abruptly turned back and spit at the employee through the open distribution window. The spit missed the employee but hit an inmate worker. The RVR noted the inmate's participation in the mental health delivery system at the EOP LOC. It was also unnecessarily documented that "the alleged behavior has not been deemed to be bizarre, unusual or uncharacteristic in nature."

The mental health assessment was completed timely and the clinician answered "yes" to questions number one, two and three. For question number two, the clinician noted, "the i/m does have a mental illness in which when under distress can lead to increased paranoia and agitation. I/M had been struggling with managing symptoms prior to incident." For question number three, the clinician's response was unresponsive and therefore unhelpful to the SHO. The clinician stated, "I/M's symptoms seemed to have been increasing just prior to the incident leading to increased reactivity and agitation towards others." This answer did not appropriately respond to question number three.

The SHO reiterated the mental health assessment in the MHSDS section of the RVR. The SHO further documented, "based on the MHA, which indicates that it does appear the subject's behavior was influenced by his mental illness, the SHO ascertained during the disciplinary hearing that the subject did not exhibit any evidence of impairment in his ability to effectively present his position, as evidence by his participation in the hearing process and his answering and asking questions appropriately. During the hearing, the subject appeared coherent and was able to respond to the specific details regarding the alleged offense. The subject stated he understood the decision reached including its implication. The SHO believes the subject is aware of his actions at the time of the disciplinary hearing and the consequences thereof. The SHO believes the subject should be held accountable for his actions." The SHO inappropriately applied clinical judgment by making a determination of the inmate's mental health state and presentation at the time of the hearing as opposed to the clinician's documented opinion of the inmate's mental state at the time of the incident.

The inmate was found guilty and assessed 90 days forfeiture of credit, the maximum allowed for a Division D offense, and was referred to the ICC for assessment of a SHU term. The assessment was not mentioned in the SHO's findings.

The ICC action dated 4/9/14 noted, "Committee considered the clinicians comments that staff should consider Subject's mental health when assessing penalties;" however, there was no indication or notation of whether or how the assessment was considered. Further, a CDCR Reclassification Score Sheet dated 4/8/14 reflected that the inmate was assessed an additional 14

classification points due to the RVR at issue.  Consequently, the inmate's custody level increased from Level II to Level III.

**Impression**:  There was no mitigation in this case.  The reporting employee needlessly added the language of bizarre, unusual or uncharacteristic, as the inmate was at EOP LOC, signaling a potential lack of understanding of RVR standards.  Further, when read in its entirety, the mental health assessment may be helpful to the SHO regarding question number two; however, the lack of appropriate response provided for question number three may illustrate the lack of training and confusion by clinicians regarding this question and overall what information was being asked in the assessment.  The SHO inappropriately utilized the inmate's mental health state and presentation at the time of the hearing as opposed to the clinician's determination.  Further, the mental health assessment was not documented as considered in the findings by the SHO.  Additionally, while ICC stated that the Committee considered the clinician's comments, there was no indication of how it was considered other than the mere statement. The inmate was assessed the maximum credit and his custody level was increased from Level II to Level III due to this RVR.

---

### Inmate D

Date of Violation:  2/3/14
Date of Mental Health Assessment:  2/5/14
Date of Disposition: 2/22/14
Charge:  Threatening a Peace Officer – Division B Offense

On 2/3/14, a CO received an anonymous note stating that an inmate planned on stabbing a CO in the unit.  When confronted, this EOP inmate admitted that he wanted to hurt two officers by stabbing them.  He stated that he did not want to kill them but only wanted to hurt them bad enough so that he would be transferred to another institution and go back to being a Level III inmate.  The RVR stated that the inmate's behavior was not deemed to be bizarre, unusual or uncharacteristic, a standard inapplicable to an EOP inmate. A mental health assessment was completed on 2/5/14 with questions number two and three answered in the affirmative.  In response to question number two, the clinician stated that the inmate had a mental disorder in which he struggled with managing emotions and impulses.  In response to question number three, the clinician wrote that the inmate had a previous OHU placement for difficulties with staff on 1/7/14.  On 2/22/14, the inmate appeared for a hearing before the SHO.  The SHO referenced the mental health assessment by providing a verbatim recitation of the questions and answers.  The inmate was found guilty and assessed 150 days forfeiture of credit, the maximum amount of time allowable for a Division B offense, and was referred to the ICC for consideration of a SHU term assessment.

The ICC met on 3/13/14.  The inmate's mental health status was discussed at committee as was the mental health assessment.  The ICC elected to assess and impose a mid-range SHU term of five months due to the inmate's disciplinary history and the short period of time that had elapsed between his incarceration and receipt of the RVR.

**Impression**:  There was no mitigation in this case.  There was appropriate consideration of the assessment by the SHO.  The RVR referenced the standard of bizarre, unusual or uncharacteristic

behavior which was inapplicable to an EOP inmate charged with an RVR. The inmate was assessed significant credit loss.

**Inmate E**
Date of Violation:  1/14/14
Date of Mental Health Assessment:  1/15/14
Date of Disposition:  2/25/14
Charge:  Battery on an Inmate With No Serious Bodily Injury – Division D Offense

On 1/14/14, it was determined that this EOP inmate was involved in an altercation with another inmate based on confidential information.  The RVR indicated that the inmate's behavior was not deemed to be bizarre, unusual or uncharacteristic, applying a standard that did not pertain to an EOP inmate.  On 1/15/14, a mental health assessment was completed with questions number one, two and three answered in the affirmative.  In response to question one, the clinician wrote "EOP LOC and Diagnosis."  The clinician further wrote that the inmate had not been taking his medication prior to the incident and that the inmate was now taking his medication.  She wrote that the inmate did not agree it was a battery but rather a fight and that he did not consider the other inmate an enemy and that he regrets the incident.  It was unclear why the clinician included any narrative in her response to question number one and why she included the inmate's comments on a mental health assessment, neither of which were appropriate to the clinical assessment process.  In response to question number two, the clinician wrote "EOP LOC & Diagnosis, especially when not on his medication may have decreased his ability to cope with stress in an appropriate manner. He admits if he was taking his meds, he probably would not of hit the other I/P."  In response to question number three, the clinician wrote "EOP LOC and his difficulty coping without medication."  These answers were unresponsive to the questions.  On 2/25/14, the inmate appeared for hearing before the SHO.  The SHO's consideration of the assessment consisted of the verbatim recitation of the questions and answers on the assessment and a statement that the SHO agreed with the assessment.  The SHO also indicated that the penalties were mitigated by not assessing any loss of privileges, although no mitigation was recommended by the clinician.  The inmate was found guilty of the lesser included offense of fighting, a Division D offense, and assessed 90 days forfeiture of credits.

**Impression:**  There was mitigation in this case, apparently unrelated to the mental health assessment. The SHO specifically stated that the penalties were mitigated by not assessing any loss of privileges, but this was not based on a recommendation in the assessment.  The RVR and the decision included inapplicable language regarding the bizarre, unusual or uncharacteristic behavior of the inmate, which standard is not applicable to an EOP inmate. The clinician's responses were unhelpful to the SHO.  The inmate was assessed significant credit loss for the lesser included offense of which he was found guilty.

**Inmate F**
Date of Violation:  1/17/14
Date of Mental Health Assessment:  7/18/14
Date of Disposition:  7/30/14
Charge:  Assault on an Inmate – Division D Offense

On 1/17/14, this 3CMS inmate was observed on the dayroom floor attempting to strike another inmate with a clenched fist.  This matter was referred for criminal prosecution.  The RVR reported that the inmate did not exhibit any bizarre, unusual or uncharacteristic behavior and therefore referral to mental health was not submitted.  However, a mental health assessment was completed on 7/18/14 with questions number two and three answered in the affirmative. In response to question number two, the clinician wrote that the inmate had a mental illness in which he could be reactive towards others and struggled with regulating his mood.  In response to question number three, the clinician wrote that the inmate was having difficulties with medication.  The answer to question number three was unresponsive and provided the SHO with no recommendation when assessing a penalty.  On 7/30/14 the inmate appeared for a hearing before the SHO.  The SHO considered the mental health assessment and found the inmate guilty. The inmate was assessed 61 days forfeiture of credit, the least amount of time allowable for Division D offense and was referred to the ICC for a SHU term assessment.

**Impression**:  Although the SHO assessed the least amount of time for such offense, it could not be determined if this was due to mental health factors.  The clinician's answers were unresponsive to the questions in the mental health assessment.  The RVR also incorrectly indicated that no referral to mental health was made when in fact an assessment was completed. The inmate was assessed the minimum time for the offense.

**Inmate G**
Date of Violation:  3/4/14
Date of Mental Health Assessment:  3/7/14
Date of Disposition:  3/11/14
Charge:  Possession of Inmate Manufactured Alcohol – Division C Offense

On 3/4/14, approximately two-thirds of a gallon of inmate manufactured alcohol was discovered in this 3CMS inmate's cell during a cell search.  The inmate admitted that the alcohol was his. The RVR reported that the inmate did not exhibit any bizarre, unusual or uncharacteristic behavior, an inapplicable standard since the inmate was charged with a division C offense.  On 3/7/14, a mental health assessment was completed with question number two answered in the negative and question number three answered in the affirmative.  In response to question number three, the clinician reported that the inmate was actively participating in mental health treatment, was going to school to get his GED and was goal directed. The clinician also reported that the inmate was remorseful and expressed concern about a possible transfer.  The clinician's answer to question number three was unresponsive and provided no recommendations for mitigating any penalty assessed in this case.

On 3/11/14, the inmate appeared for hearing before the SHO.  The SHO reported that a mental health assessment was mandated as this was a Division C offense.  The SHO gave consideration

to the mental health assessment and found the inmate guilty. The inmate was assessed 91 days forfeiture of credit, the least amount of time allowable for a Division C offense and was assessed 30 days loss of privileges including dayroom and telephone. The inmate was also required to attend AA or NA meetings to the extent that the programs were available. He was also required to provide one random drug test per month for a period of one year. The SHO also elected to refer the inmate to the ICC and recommended that the inmate be removed from the enhanced program facility for failure to meet programming expectations.

**Impression**: Although the inmate was assessed the least amount of forfeiture of credits, the SHO did not indicate if this was done due to mental health factors. The RVR included inapplicable language regarding the bizarre, unusual or uncharacteristic behavior of the inmate since this was a Division C offense. The clinician's answer to question number three in the mental health assessment was unresponsive and provided the SHO with no recommendations for the mitigation of any penalty. The inmate was assessed significant credit loss and loss of privileges

## Inmate H

Date of Violation: 1/28/14
Date of Mental Health Assessment: 2/6/14
Date of Disposition: 2/14/14
Charge: Possession of a Controlled Substance for Distribution (methamphetamine) – Division
        A-2 Offense

On 11/20/13 while performing a search of the inmate's cell with a canine service dog, approximately three grams of methamphetamine were discovered. The positive results were returned to the prison on 1/28/14. On 2/6/14, a mental health assessment was completed with questions number one, two and three answered in the affirmative. In response to question number one, the clinician wrote that the inmate seemed to have difficulty tracking the clinician during the RVR interview and that he was fixated on the details of his CDCR Form 115. The clinician further reported that even after the captain came to the inmate's door to briefly speak with him and alleviate his anxieties about the RVR, the inmate continued to focus and remained disgruntled. In response to question number two, the clinician wrote that the inmate seemed to have difficulty using and working a combination lock and as such he used a shoestring to secure his property in his locker. The clinician further wrote that the inmate maintained that the findings were not his and stated that anyone could have gained entry into his locker. The answer to question number two was unresponsive. In response to question number three, the clinician wrote that the inmate's comprehension, insight and judgment could range from fair to impaired and that from a review of the chart it seemed the inmate was not compliant with his psych meds at the time of the incident. The clinician's answer to question number three was also unresponsive and provided no recommendations for the SHO to consider in the mitigation of any penalty.

On 2/14/14, the inmate appeared for a hearing before the SHO. The SHO did determine that the inmate met the criteria for assignment of a staff assistant. The SHO considered the mental health assessment and found the inmate guilty. The SHO noted that the inmate did not display any bizarre, unusual or uncharacteristic behavior but had a mental health assessment completed due

379

to the inmate being charged with district attorney referable offense.  The inmate was assessed 180 days forfeiture of credit, the maximum amount of time allowable for Division A-2 offense. The inmate was also assessed one year loss of visiting privileges followed by two years of no-contact visits, 60 days loss of dayroom privileges, was confined to quarters for five days, was placed and Privilege Group C for 90 days and was ordered to undergo two random drug tests per month for one year.  The inmate was also referred to the ICC for consideration of placement in work group C, for placement into a substance abuse intervention program and for removal from the enhanced program facility and transfer to a non-enhanced program facility institution.

**Impression**:  There was no mitigation in this case.  The RVR and the disposition both referenced the standard of bizarre, unusual or uncharacteristic behavior when this was not the appropriate standard to determine if the mental health assessment needed to be completed.  The clinician's answers to questions number two and three were unresponsive and provided the SHO with no useful information regarding the mitigation of any penalty. The inmate was assessed significant credit and privilege losses.

### Inmate I
Date of Violation:  1/22/14
Date of Mental Health Assessment:  Timely
Date of Disposition:  2/6/14
Charge:  Possession of Dangerous Property (Loose Razorblades) – Division F Offense

During a clothed body search on the EOP yard, the CO found two loose razorblades which were removed from their plastic casing.  The razorblades were concealed in a state-issued cardboard lunchbox in various pieces of paper.  The RVR noted that the inmate was a participant in the MHSDS at the EOP LOC.  However, the RVR also added the statement that the alleged behavior was not bizarre, unusual or uncharacteristic in nature, which was not required for EOP patients..

The assessment was completed timely and the clinician answered "no" to question number two, and answered "yes" to question number three.  For question number three, the clinician noted that taking yard time away from the inmate could exacerbate mental health "sxs."  The use of the acronym for the term symptoms is problematic as the SHO may not be familiar with clinical acronyms, and the RVR process requires lay person's language.

The responses from the assessment were reiterated verbatim in the MHSDS section of the RVR. The inmate was found guilty and assessed 30 days forfeiture of credit, the maximum allowed for a Division F offense, 30 days loss of dayroom privileges and 30 days loss of telephone calls. There was no mention of consideration of the assessment in the SHO's findings or disposition.

**Impression**:  There was no mitigation in this case. The reporting employee needlessly added the language of bizarre, unusual or uncharacteristic behavior, as the inmate was at EOP LOC.  While the mental health assessment was reproduced verbatim in the body of the RVR, the SHO did not document any consideration of the assessment, specifically in the findings or disposition of the RVR.  The clinician should avoid the use of clinical acronyms. The inmate was assessed the maximum level of credit loss, as well as loss of privileges.

**Inmate J**
Date of Violation:  1/18/14
Date of Mental Health Assessment:  1/24/14
Date of Disposition:  2/4/14
Charge:  Failure to Report to Work – Division F Offense

On 1/10/14, this EOP inmate failed to report to work.  A review of the records indicated that the inmate had not reported to work for 58 consecutive days.  The RVR indicated that the inmate behavior was not deemed to be bizarre, unusual or uncharacteristic, a standard inapplicable to an EOP inmate.  On 1/24/14, a mental health assessment was completed with questions number two and three answered in the affirmative.  In response to question number two, the clinician wrote that for two weeks prior to the incident the inmate had reported increased hallucinations.  In response to question number three, the clinician wrote that the inmate's medications had been adjusted and may have affected his functioning in the negative way.

On 2/4/14, the inmate appeared for hearing before the SHO.  The SHO's consideration of the mental health assessment consisted of a verbatim recitation of the questions and answers on the assessment.  There was no further mention of the assessment in the decision or disposition and the assessment was not listed as being part of the evidence reviewed by the SHO at the hearing.  The inmate was found guilty and assessed 30 days forfeiture of credit, the maximum amount allowable for a Division F offense. The inmate was also assessed 30 days loss of dayroom and telephone privileges.

**Impression**:  There was no mitigation in this case.  Although the SHO recited the questions and answers in the mental health assessment, there was no indication in the decision that consideration was given to the mental health assessment.  The clinician's answer to question number three was unresponsive and provided the SHO with no recommendation for the mitigation of any penalty.  The RVR included inapplicable language regarding the bizarre, unusual or uncharacteristic behavior of the inmate.  The inmate was assessed the maximum credit forfeiture in addition to loss of privileges.

**Inmate K**
Date of Violation:  2/18/14
Date of Mental Health Assessment:  2/24/14
Date of Disposition:  4/20/14
Charge:  Unauthorized Use of Telephone – Division F Offense

On 2/18/14, the inmate was observed utilizing the inmate telephone at a time when he was not scheduled for a telephone call.  The inmate had been previously counseled for unauthorized telephone use.  The RVR reported that the inmate's behavior was not deemed to be bizarre, unusual or uncharacteristic, a standard inapplicable to an EOP inmate.  On 2/24/14, an assessment was completed with questions number two and three answered in the negative.  On 4/20/14, the inmate appeared for a hearing before the SHO.  The delay in the hearing was caused by placement of the inmate into the MHCB.  The SHO considered the assessment and found the inmate guilty but elected to reduce the offense to an administrative offense and then elected to further reduce the RVR and document the misconduct in a custodial counseling chrono.

**Impression**:  There was a reduction in the penalty but it was not specified if mitigation was based on any mental health factors.  The SHO considered the mental health assessment in his decision.  The RVR included inapplicable language regarding the bizarre, unusual or uncharacteristic behavior of the inmate, who was at the EOP LOC.

**Inmate L**
Date of Violation:  2/3/14
Date of Mental Health Assessment:  Timely
Date of Disposition:  2/27/14
Charge:  Resisting Staff Requiring Use of Force (Physical) – Division D Offense

While being escorted in mechanical restraints for being disruptive in his cell, this EOP inmate began resisting the escort by repeatedly twisting and jerking his body.  He was ordered to stop several times with negative results.  The inmate was brought down and the officers gained control of his feet to prevent him from kicking.  He was again ordered to stop resisting and he complied.  The RVR noted that the inmate was a participant in the MHSDS at the EOP LOC.  However, the RVR also needlessly added the statement that the alleged behavior was not deemed bizarre, unusual or uncharacteristic in nature, which is not applicable to EOP inmates.

The assessment was completed timely and the clinician answered "no" to question number two; however, he answered "yes" for question number three.  For question number three, the clinician indicated that the inmate used yard time to alleviate mental health "sx's" and that removal of the yard could negatively affect his mental health functioning.  While the clinician provided helpful information for question number three, the use of clinical acronyms should be avoided as the SHO might not know their meaning.

The SHO referenced the assessment by reiterating it verbatim in the body of the RVR.  The assessment was also referenced in the evidence presented and the findings where again, the SHO simply reiterated the assessment verbatim.  The inmate was found guilty of Resisting Staff Requiring Use of Force (Physical); however, the SHO elected to reduce the offense to Behavior Which Could Lead to Violence, a Division F offense.  The SHO noted the inmate's mental health factors as one of the reasons for this mitigation.  He was assessed zero days forfeiture of credit and counseled.

**Impression**:  There was mitigation in this case. The RVR utilized canned language regarding whether the behavior was bizarre, unusual or uncharacteristic which was not applicable to EOP inmates.  The clinician should avoid using clinical acronyms. The SHO noted consideration of the mental health assessment and how he considered it in the decision to reduce the charges.

**Inmate M**
Date of Violation:  2/26/14
Date of Mental Health Assessment:  3/4/14
Date of Disposition:  3/23/14
Charge:  Disobeying Orders – Division F Offense

On 2/26/14, this EOP inmate refused to report to his priority ducat.  The inmate was informed that if he did not report immediately or sign a refusal he would receive an RVR for disobeying orders.  The RVR reported that the inmate's behavior was not bizarre, unusual or uncharacteristic, a standard inapplicable to an EOP inmate.  On 3/4/14, an assessment was completed with questions number two and three answered in the affirmative.  In response to question number two, the clinician wrote that when the inmate experienced increased symptoms it impaired his ability to attend directives.  In response to question number three, the clinician wrote that consideration should be made not to restrict social interaction as this could lead to increased isolation.

On 3/23/14, the inmate appeared for a hearing for the SHO.  The SHO considered the mental health assessment and found the inmate guilty.  The SHO assessed the inmate 30 days forfeiture of credit but chose not to assess any loss of privileges which would isolate the inmate based on the recommendations contained in the mental health assessment.

**Impression**:  There was mitigation in this case based on the recommendations contained in the mental health assessment, and the inmate was not assessed loss of privileges. The RVR included inapplicable language regarding the bizarre, unusual or uncharacteristic behavior of the inmate, as the inmate was at the EOP LOC.   The inmate was assessed credit loss.


**Inmate N**
Date of Violation:  1/13/14
Date of Mental Health Assessment:  1/22/14
Date of Disposition:  2/6/14
Charge:  Delaying a Peace Officer by Refusing Assigned Housing – Division D Offense

On 1/13/14, this 3CMS inmate was advised that he was going to be rehoused in a different facility. The inmate refused to move to a different facility and claimed that he was threatened by an inmate in the facility, a claim he was unable to substantiate.  The inmate was subsequently rehoused into the ASU.  The RVR reported that the inmate did not exhibit any bizarre, unusual or uncharacteristic behavior and therefore no referral to mental health was made.  However, on 1/22/14 an assessment was completed with question number two answered in the negative and question number three answered in the affirmative.  In response to question number three, the clinician wrote that the inmate seemed to have no other recourse to resolve safety issues.  This answer was unresponsive and provided the SHO with no useful information regarding mitigation of any penalty.

On 2/6/14, the inmate appeared for a hearing before the SHO.  In the decision, the SHO correctly stated that the mental health assessment was completed because a SHU term could result from

this offense.  The SHO considered the mental health assessment and found the inmate guilty but reduced the charge to an administrative level offense.  The SHO specifically stated that the inmate's mental health status contributed to a state of mind at the time of the offense.

**Impression**:  There was mitigation in this case based specifically on the mental health status of the inmate and the mental health assessment.  However, the clinician's answers were unresponsive to the questions in the mental health assessment.  The RVR also incorrectly indicated that no referral to mental health was made when in fact an assessment was completed because it was a SHU-able offense. The RVR was reduced to an administrative level offense resulting in no credit forfeiture or privilege loss.

**Exhibit B**

State of California                                                   Department of Corrections and Rehabilitation

# Memorandum

Date    :    **OCT 26 2011**

To      :    Associate Directors, Division of Adult Institutions
             Wardens
             Regional Directors
             Chief Executive Officers

Subject :    **TRAINING FOR CUSTODY AND CLINICAL STAFF REGARDING MENTAL HEALTH
             INPUT INTO THE INMATE DISCIPLINARY PROCESS**

In 1998, as a result of concerns related to the Rules Violation Report (RVR) process for inmates in the Mental Health Services Delivery System (MHSDS), the California Department of Corrections and Rehabilitation (CDCR) modified many aspects of the disciplinary process. These changes were documented in the August 14, 1998 memo titled, *"Adjudication of Rule Violation Reports Involving Mental Health Services Delivery System Inmate Program Participants/Patients"*. Additional modifications and training were mandated through five additional memoranda issued in 2003. Of specific concern were two memoranda issued on July 1, 2003, titled, *"Rules Violation Report Training as a Result of Coleman Order"*, and November 13, 2003, titled, *"Clarification of the Mental Health Input into the Disciplinary Process"*.

The July 1, 2003 memorandum states, in part, "However, <u>no exemption from the training is acceptable. All staff who either conduct the mental health assessment or conduct the RVR hearing must receive the four-hour course prior to participation in the RVR process.</u>"

Hearing Officer (HO) training is currently conducted in the Sergeant's Academy and Senior Hearing Officer (SHO) training is currently conducted in the Lieutenant's Academy, typically within one year of promotion into the higher classification. Unfortunately, critical elements of the documentation requirements for mental health input into the Inmate Disciplinary Process was excluded from the Department's SHO training. In addition, ongoing training of clinical staff involved in the mental health assessment process has not been presented regularly.

In September of 2011, the RVR training curriculum was updated to reflect the current expectations. To ensure appropriate training is provided to custody and clinical staff responsible for mental health assessments related to the RVR process, the department is mandating the following:

1) All Hearing Officers, Senior Hearing Officers, Captains, Chief Disciplinary Officers, and Appeals Coordinators shall receive four hours of training related to appropriate documentation of mental health input into the RVR process prior to serving in the capacity of hearing officer, or being assigned responsibility for final review of RVR's.

2) All clinical staff responsible for review of RVR's and preparation of the RVR Mental Health Assessment (CDCR Form 115-MH) shall receive four hours of training related to providing mental health input into the RVR process prior to being allowed to prepare 115-MH forms in the RVR process.

Associate Directors, Division of Adult Institutions
Wardens
Regional Directors
Chief Executive Officers
Page 2

The training should be conducted in a manner that allows for custody and clinical staff to be trained together, ensuring that both staff is aware of their responsibilities as well as the responsibilities of the other discipline. This is one-time training, but must be provided to each staff member responsible to perform these roles prior to their involvement in the RVR process, on an ongoing basis.

As it appears this training may not have been sustained, please ensure all current staff in these classifications have received the training, or are immediately scheduled for the training. In addition, please ensure that all new staff hired into the affected classifications is appropriately trained prior to serving in these capacities.

In an effort to ensure the four hour training provided to institutional staff is consistent among all 33 institutions, a specific "Training-for-Trainers" course has been scheduled. The scheduled training is designed to provide each participant the ability to return to their institution and train the identified staff. Each institution is required to send two custody staff, preferably the In-Service Training (IST) Manager and Assistant Manager, and two mental health clinicians to this training. It is expected that all staff attending this training have received the required "Training-for-Trainers" prior to attending this specific course.

Eight training sites have been selected to minimize staff travel time by clustering the training sites to accommodate all institutions. The locations have been selected to insure staff does not incur travel expenses. Each training session will be held between the hours of 1000 to 1400 at the designated institution's IST Classroom. These times will allow staff to travel up to two hours to and from the training, thus minimizing overtime for travel. Below is a chart outlining the dates and locations of the instructor's training.

| Institutions included: | Location of training to be held in (IST Building): | Date: | Time: |
|---|---|---|---|
| CVSP, ISP, CAL, CEN | CAL | 11/02/2011 | 1000-1400 |
| CIM, CIW, CRC, RJD | CRC | 11/03/2011 | 1000-1400 |
| PBSP | PBSP | 11/07/2011 | 1000-1400 |
| HDSP, CCC | HDSP | 11/16/2011 | 1000-1400 |
| CMF, SOL, FOL, SAC | SAC | 11/22/2011 | 1000-1400 |
| SQ, DVI, MCSP, SCC, VSPW, CCWF | MCSP | 11/29/2011 | 1000-1400 |
| CTF, SVSP, CMC, AVE, COR, SATF, PVSP | PVSP | 12/13/2011 | 1000-1400 |
| WSP, NKSP, KVSP, CCI, LAC | KVSP | 12/14/2011 | 1000-1400 |

Associate Directors, Division of Adult Institutions
Wardens
Regional Directors
Chief Executive Officers
Page 3

Institutional training of all current staff in these classifications shall be completed no later than January 30, 2012, with a proof of practice memorandum indicating compliance sent to Correctional Captain Joseph Stein, Audits and Litigation Unit, via email at Joe.Stein@cdcr.ca.gov, no later than February 3, 2012.

Please submit the names of staff members who will be attending the "Training-for-Trainers" course on behalf of your institution to Lieutenant Bryan Wilbur at Bryan.Wilbur@cdcr.ca.gov or by phone at (916) 322-1725. All names must be received by close of business, Friday, October 28, 2011. Please contact Lieutenant Wilbur with questions regarding the training.


SHARON AUNGST
Chief Deputy Secretary
Division of Correctional Health Care Services

GEORGE J. GIURBINO
Director (A)
Division of Adult Institutions

cc: James Scaramozzino, Ph.D., Director, Mental Health Clinical Programs, DCHCS
George J. Giurbino, Director (A), DAI
Richard J. Subia, Deputy Director, Facility Support, DAI
Regional Administrators, DCHCS
Kathleen O'Meara, Chief Psychologist, Clinical Practice, DCHCS
Associate Wardens of Health Care
Cynthia Florez-DeLyon, Chief, Office of Policy Standardization, DAI
Joseph Stein, Correctional Captain, Audits and Litigation Unit, DAI


OCT 26 2011

**Exhibit C**

State of California                                   Department of Corrections and Rehabilitation

# Memorandum

Date  :  NOV 03 2011

To    :  SEE DISTRIBUTION LIST

Subject:  **REVISION TO THE MENTAL HEALTH ASSESSMENT REQUEST PROCESS FOR RULES VIOLATION REPORTS (UPDATE)**

On August 14, 1998, the California Department of Corrections and Rehabilitation (CDCR) initiated a process requiring mental health review of all Rules Violation Reports (RVR) issued to inmates in the Mental Health Services Delivery System (MHSDS). In addition, any inmate receiving an RVR, exhibiting bizarre behavior, was to be referred for mental health review. The results of these reviews were initially documented by the inmate's primary clinician on an Assessment Form.

In 2003, a modification to the RVR mental health assessment requirements was implemented. All Mental Health Crisis Bed (MHCB) and Enhanced Outpatient Program inmates still required generation and completion of a Mental Health Assessment Request (CDCR Form 115-MH). However, the requirement for inmates at the Correctional Clinical Case Management System (CCCMS) level of care, and inmates not in the MHSDS was limited to those demonstrating bizarre, unusual, or uncharacteristic behavior. Additional training was provided to custody and clinical staff involved in the RVR process throughout 2003 to effect this change.

During recent meetings with the _Coleman v. Brown_ Special Master, plaintiff's attorneys, and departmental staff, the monitors and plaintiffs expressed concerns that the number of RVRs issued to inmates at the CCCMS level of care that are referred for mental health assessment are insufficient.

As a result, on May 10, 2011, a memorandum was distributed statewide providing direction to ensure all CCCMS inmates receiving a Division A, B, or C RVR shall be referred for a mental health assessment via CDCR Form 115-MH. CCCMS inmates receiving Division D, E, or F RVRs shall be referred based upon existing guidelines for determining referrals for mental health assessment.

Subsequently, on September 21, 2011, an agreement was made between the _Coleman v. Brown_ Special Master, plaintiff's attorneys, and departmental staff to expand the May 10, 2011 memorandum to include any CCCMS inmates receiving a Division A, B, or C RVR, _and for any rules violation that may result in being assessed a Security Housing Unit term as identified in the California Code of Regulations (CCR) Title 15, Section 3341.5,_ shall be referred for a mental health assessment via CDCR Form 115-MH. The clinical assessment must be considered during the Institutional Classification Committee to ensure the inmate's mental health is considered prior to any committee action. The clinical input must be documented on the CDCR Form 128-G, Classification Chrono.

SEE DISTRIBUTION LIST
Page 2

All custody and clinical staff involved in the inmate disciplinary process shall receive on-the-job training regarding the RVR assessment requirements listed no later than December 30, 2011.

Proof of practice documenting completion of the training for these staff, in the form of a memorandum, shall be submitted to your Associate Director (custody) and your Regional Mental Health Director (clinical) no later than January 2, 2012.

Revised training regarding the *Inmate Disciplinary Process: Mental Health Assessment* requirements will be provided to your In-Service Training Department for ongoing use in training custody and clinical staff involved in the inmate disciplinary process.

For custody questions regarding this change, please contact Joseph Stein, Correctional Captain, Audits and Litigation Unit, Division of Adult Institutions, at (916) 323-2665. For clinical questions regarding this change, please contact Kathleen O'Meara, Chief Psychologist, Clinical Programs, DCHCS, at (916) 323-1163.


GEORGE J. GIURBINO
Director (A)
Division of Adult Institutions

JAMES SCARAMOZZINO, Ph. D.
Director (A), Statewide Mental Health Program
Division of Correctional Health Care Services

DISTRIBUTION LIST:
Associate Directors-Division of Adult Institutions
Wardens
Regional Mental Health Directors-Division of Correctional Health Care Services
Chief Executive Officers
Health Care Managers
Chiefs of Mental Health
Chief Psychiatrists
Chief Psychologists

cc: Sharon Aungst, Chief Deputy Secretary, Division of Correctional
   Health Care Services
  R. J. Subia, Deputy Director, Facility Support, DAI
  Kathleen O'Meara, Chief Psychologist, Clinical Programs, DCHCS
  Cynthia Florez-DeLyon, Chief, Office of Policy Standardization, DAI
  Joseph Stein, Correctional Captain, Audits and Litigation Unit, DAI

**Exhibit D**

## RULES VIOLATION REPORT: MENTAL HEALTH ASSESSMENT REQUEST

### REVIEWING CUSTODY SUPERVISOR

A CDC 115, Rules Violation Report (RVR), has been written on the following inmate, who requires a mental health assessment.

Inmate Name: _____ CDC Number: _____

RVR Log Number: _____ Date of Violation: _____ Housing: _____

Specific Act Charged: _____

The inmate's current Mental Health Level of Care is: (check one)

☐ NOT IN MHSDS PROGRAM*    ☐ CCCMS*    ☐ EOP    ☐ MHCB    ☐ DMH

**\*CCCMS AND NON-MHSDS PROGRAM PARTICIPANTS WILL BE REFERRED FOR A MENTAL HEALTH ASSESSMENT FOR BEHAVIOR THAT IS BIZARRE OR UNUSUAL FOR ANY INMATE, OR THAT IS UNCHARACTERISTIC FOR THIS INMATE.**

Sent to Mental Health: _____ By: _____ / _____
                              Date                    Print Name              Signature

Return this form to: _____ *By: _____
                              Print Name                        Date

**\*(CCCMS and non-MHSDS, 5 working days; EOP/MHCB/DMH, 15 calendar days)**

### MENTAL HEALTH CLINICIAN

Conducted non-confidential interview: _____ (Inmate informed of non-confidentiality).
                                              Date

1. CCCMS/NON-MHSDS only. Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant?  ☐ Yes   ☐ No

   Explain "yes" response: _____
   _____
   _____
   _____

2. In your opinion, did the inmate's mental disorder appear to contribute to the behavior that led to the RVR?
   ☐ Yes    ☐ No    Explain "yes" response: _____
   _____
   _____
   _____

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty?   ☐ Yes   ☐ No   Explain "yes" response: _____
   _____
   _____
   _____
   _____

| INSTITUTION: | CLINICIAN NAME (Print) | SIGNATURE | DATE |
|---|---|---|---|
| RECEIVED BY : | CUSTODY STAFF NAME (Print) | SIGNATURE | DATE |

DISTRIBUTION:
Original : Central File With Adjudicated RVR
Blue     : 115 Unit Health Record
Pink     : Inmate

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

### RULES VIOLATION REPORT:
### MENTAL HEALTH ASSESSMENT REQUEST

**CDCR 115-MH (Rev. 06/06)**
STATE OF CALIFORNIA          DEPARTMENT OF CORRECTIONS AND REHABILITATION

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
**CDCR 115-MH (Rev. 06/06)**

# INSTRUCTIONS

Use this form to assess an inmate/patient whose behavior resulted in a CDC 115, Rules Violation Report (RVR) to determine: 1) if the inmate needs a staff assistant, 2) if a mental disorder contributed and/or influenced the behavior, and 3) if there are factors that should be considered in assessing the penalty.

Enhanced Outpatient Program (EOP) inmate/patient, Mental Health Crisis Bed (MHCB) inmate/patient and the Department of Mental Health (DMH) inmate/patient will always be assigned a staff assistant. Inmate/patients in the Correctional Clinical Case Management System (CCCMS), or those not included in the Mental Health Services Delivery System (MHSDS) who exhibit behavior that is bizarre or unusual for any inmate, or uncharacteristic for this inmate, shall receive a RVR mental health assessment.

## Reviewing Custody Supervisor Responsibilities

A CDCR 115-MH, Mental Health Assessment Request, will be initiated for any inmate/patient in the below listed groups whose misconduct has been documented on an RVR. Attach a copy of the RVR to this request and forward to Mental Health Services.

- Inmate/patient not in the Mental Health Services Delivery System (MHSDS) who exhibits "bizarre, unusual, or uncharacteristic" behavior.
- Correctional Clinical Case Management System (CCCMS) inmate/patient who exhibits "bizarre, unusual, or uncharacteristic" behavior.
- All Enhanced Outpatient Program (EOP) inmates/patients.
- All Mental Health Crisis Bed (MHCB) inmates/patients.
- All Department of Mental Health (DMH) inmates/patients.

The reviewing supervisor will complete all areas of the top portion of the form, under the area designated for the Reviewing Custody Supervisor, prior to forwarding to mental health. The Reviewing Custody Supervisor should contact mental health to ascertain the inmate/patient's level of care. If inmate/patient meets criteria for a mental health assessment, the Reviewing Custody Supervisor shall forward the request, a copy of the RVR and all supplements to the RVR, to mental health staff as soon as possible.

## Mental Health Clinician Responsibilities

The mental health clinician evaluating the inmate/patient shall review the relevant portions of the Unit Health Record (UHR) and any other records deemed appropriate. The clinician will also interview the inmate/patient, who is the subject of the RVR, inform him/her that the interview is non-confidential and that information obtained may be used in adjudicating the RVR.

- Determine if there is a need for a staff assistant. (EOP, MHCB, DMH will automatically be assigned a staff assistant). Evaluate inmate/patient referred from CCCMS and non-MHSDS to determine if he/she has symptoms of a mental disorder that would impair his/her ability to understand the proceedings and to act in his/her own interests in the hearing process.

- Make a determination whether the inmate/patient's mental disorder appeared to contribute to the behavior that led to the RVR and mark the appropriate box. If "yes", explain using "lay terms". If additional space is required for the explanation, please attach an additional sheet of paper.

- Make a determination whether there are any mental health factors that should be considered in mitigating the penalty should the inmate be found guilty. If "yes", explain using "lay terms". If additional space is required for the explanation, please attach an additional sheet of paper.

- Sign, date, and return form to the requesting custody supervisor within five (5) working days for CCCMS and non-MHSDS and within fifteen (15) calendar days for EOP, MHCB and DMH.

Custody supervisor receiving the completed form shall forward to the classifying official after signing and dating the form at bottom.

**Exhibit E**

## TABLE OF ACRONYMS and ABBREVIATIONS

3CMS:                 Correctional Clinical Case Management System

AA:                   Alcoholics Anonymous

ASP:                  Avenal State Prison

ASU:                  Administrative Segregation Unit

C-file:               Central File

CAL:                  Calipatria State Prison

CC I:                 Correctional Counselor I

CC II:                Correctional Counselor II

CCC:                  California Correctional Center

CCI:                  California Correctional Institution

CCR:                  California Code of Regulations

CCWF:                 Central California Women's Facility

CDO:                  Chief Disciplinary Officer

CDCR:                 California Department of Corrections and Rehabilitation

CEN:                  Centinela State Prison

CHCF:                 California Health Care Facility

CIM:                  California Institution for Men

CIW:                  California Institution for Women

CMC:                  California Men's Colony

CMF:                  California Medical Facility

CO:                   Correctional Officer

COMPSTAT:        Computer Statistics Electronic Information Management Tool

CQIT:            Continuous Quality Improvement Tool

CRC:             California Rehabilitation Center

CSATF:           California Substance Abuse Treatment Facility

CSP/Corcoran:    California State Prison/Corcoran

CSP/LAC:         California State Prison/Los Angeles County

CSP/Sac:         California State Prison/Sacramento

CSP/Solano:      California State Prison/Solano

CTC:             Correctional Treatment Center

CTF:             Correctional Training Facility/Soledad

CVSP:            Chuckawalla Valley State Prison

DD:              Developmentally Disabled

DDP:             Developmentally Disabled Program

DOM:             Departmental Operating Manual

DSH:             Department of State Hospitals

DVI:             Deuel Vocational Institution

EOP:             Enhanced Outpatient Program

ERMS:            Electronic Record Management System

eUHR:            Electronic Unit Health Record

Folsom:          Folsom State Prison

FWF:             Folsom Women's Facility

GP:              General Population

HDSP:            High Desert State Prison

ICC:                Institutional Classification Committee

IEX:                Indecent Exposure

I/P:                Inmate/Patient

ISP:                Ironwood State Prison

IST:                In-Service Training

KVSP:               Kern Valley State Prison

LBP:                Low Blood Pressure

LCSW:               Licensed Clinical Social Worker

LOC:                Level of Care

LOP:                Local Operating Procedure/Loss of Privilege Status

LTRH:               Long Term Restricted Housing

MAR:                Medication Administration Record

MCSP:               Mule Creek State Prison

MERD:               Minimum Early Release Date

MHCB:               Mental Health Crisis Bed

MHOHU:              Mental Health Outpatient Housing Unit

MHSDS:              Mental Health Services Delivery System

MHTS:               Mental Health Tracking System

MSW:                Master of Social Work

NA:                 Narcotics Anonymous

NKSP:               North Kern State Prison

NOS:                Not Otherwise Specified

OC:                 Oleoresin Capsicum

| | |
|---|---|
| OHU: | Outpatient Housing Unit |
| OT: | Office Technician |
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PIP: | Psychiatric Inpatient Program |
| PSD: | Post-Traumatic Stress Disorder |
| PSU: | Psychiatric Services Unit |
| PT: | Psychiatric Technician or Psych Tech |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIT: | Quality Improvement Team |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RVR: | Rule Violation Report |
| SAP: | Substance Abuse Program |
| SCC: | Sierra Conservation Center |
| SCU: | Support Care Unit |
| SHO: | Senior Hearing Officer |
| SHU: | Security Housing Unit |
| SNY: | Sensitive Needs Yard |
| SOMS: | Strategic Offender Management System |
| SQ: | San Quentin State Prison |
| SRN: | Senior Registered Nurse |

STRH:                   Short Term Restricted Housing

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TABE:                   Test of Adult Basic Education

TTA:                    Triage and Treatment Area

UA:                     Urinalysis

UCC:                    Unit Classification Committee

UHR:                    Unit Health Record

VPP:                    Vacaville Psychiatric Program

VSP:                    Valley State Prison

WSP:                    Wasco State Prison