DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JEFFREY L. BORNSTEIN – 099358
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DAD<br><br>**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REPORT ON REVIEW OF MENTAL HEALTH STAFFING AND REQUEST FOR FURTHER COURT ORDERS**<br><br>Judge: Hon. Kimberly J. Mueller |

[1538321-6]

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REPORT ON REVIEW OF MENTAL HEALTH STAFFING
AND REQUEST FOR FURTHER COURT ORDERS

In response to this Court's June 19, 2014 Order directed at all Defendants, including California's Governor, Department of Finance, and Department of Corrections and Rehabilitation ("CDCR"), Defendant CDCR alone filed a Report on Review of Mental Health Staffing (Docket No. 5269, hereinafter "Report") that utterly fails to commit the State to take sufficiently firm and measurable steps to "resolve the ongoing problem of mental health staffing shortages and come into compliance with" the existing Court-ordered staffing plan. *See* June 16, 2014 Order (Docket No. 5171) at 4 (referencing June 13, 2002 order, Docket No. 1383). Failures to maintain adequate levels of key mental health staff have "plagued the delivery of mental health care in CDCR prisons for decades, and chronic understaffing and high vacancy rates in mental health staff positions are evidence of an ongoing Eighth Amendment violation." April 5, 2013 Order (Docket No. 4539) at 54 (citing *Brown v. Plata*, 131 S. Ct. at 1926, 1932-33 & n.5). Given the long-standing, entrenched nature of the clinical staffing shortage problem, it is apparent that Defendants are not in compliance with this Court's mandate to take "all steps necessary" to address the problem. *See* June 18, 2009 Order (Docket No. 3613) at 2.

In particular, while the Report describes four methods they propose to use to address their admitted inability to comply with prior staffing orders, Defendants commit to nothing more concrete than "working with the Special Master and his team to assess whether these solutions are effective." Report at 2. Their proposal to immediately roll out the psychiatric medical assistant position systemwide, without even properly defining the scope of the role, appears to be part of a thinly veiled long-term plan to eliminate Court-ordered, but long vacant, psychiatry positions required for minimally adequate psychiatric care. Their plan to try to increase differential pay for psychiatrists at certain institutions by an unspecified amount at some unspecified future date is so vague and non-committal as to be meaningless. Their efforts to expand the current and former internship and fellowship programs strain existing clinical resources and have almost no impact on the massive psychiatry shortage. And their dramatically increased reliance on telepsychiatry is dangerous given that Defendants do not have any policies and procedures governing such

1

remote care, even though they utilize telepsychiatrists for crisis-level care.

In short, Defendants' proposal is insufficient to address this chronic problem. Additional Court orders are warranted.

## I. DEFENDANTS' PROPOSAL REGARDING PSYCHIATRIC MEDICAL ASSISTANTS

Defendants propose to roll out to all 34 CDCR prisons an entirely new category of unlicensed technicians called "psychiatric medical assistants" ("PMAs") in an effort to "improve recruitment and retention of psychiatrists, and permit CDCR psychiatrists to both see more patients and spend more time treating patients." Report at 3. They plan to do so immediately, and on a systemwide basis, by hiring PMAs as contractors from the registry even though they have never even piloted the position in CDCR. *Id.*

While Plaintiffs understand the potential benefit to adding the PMA position to assist psychiatrists, they remain concerned that the position is, at this stage, ill-defined and that Defendants' proposed method of monitoring the effectiveness of the position is inadequate. Defendants have never provided the Special Master or Plaintiffs with a written document outlining the precise responsibilities of the PMA role and should be required to do so before installing these unlicensed technicians at every institution. Besides listing a handful of non-exclusive "quality assurance indicators," Defendants do not commit to any benchmarks or time frame for evaluating the success of the PMAs. *See* Report at 3. Indeed, while Defendants' repeatedly stress that one of the goals of the PMA position is to permit CDCR psychiatrists to "spend more time treating patients," they do not propose to track or measure whether patients are actually spending more time with their psychiatrists – only the total number of encounters by psychiatrist. Report at 3.

More alarmingly, Defendants' clear goal is to use the PMAs to justify a unilateral reduction in the total number of allocated psychiatry positions systemwide. *See* Report at 3 ("Until the effectiveness of the [PMA] program can be established, CDCR will not change any staffing ratios for psychiatrists."). But those psychiatrist positions are based on Defendants' own staffing study, and are required by this Court's orders. *See* June 16, 2014

1  Order (Docket No. 5171) at 4 (referencing June 13, 2002 order, Docket No. 1383). Just
2  because Defendants continue to have difficulty filling critical psychiatry positions does not
3  mean those roles are not needed to provide adequate care to *Coleman* class members.
4  Before Defendants seek to replace Court-ordered psychiatrists with unlicensed, low-level
5  staff, they must justify their request with an appropriate workload study and seek leave of
6  this Court. In the meantime, Defendants must continue to take "all steps necessary" to
7  remedy the urgently needed mass shortage of psychiatry positions. *See* June 18, 2009
8  Order (Docket No. 3613) at 2. It is clear from the rest of their Report that Defendants are
9  not doing so.

## II. DEFENDANTS' PROPOSAL REGARDING PSYCHIATRIST PAY DIFFERENTIALS AT HISTORICALLY UNDERSTAFFED PRISONS

Defendants' proposal to potentially increase the pay of psychiatrists is deficient because it presumes a potentially false premise, and because it is so vague and non-committal as to be meaningless.

First, Defendants' proposal takes as a given that its baseline psychiatry salaries are adequate to attract and retain sufficient numbers of psychiatrists, despite the fact that these Court-ordered positions have never been even close to full. Defendants' support for this proposition is a year-old declaration from CDCR's then-Chief Psychiatrist, Gregory Tarasoff. *See* Report at 1, 5 (citing Defendants' Status Report and Request to Modify Bed Plan at 3 (Docket No. 5123), which relies on Declaration of Gregory Tarasoff in support thereof (Docket No. 5123-4, hereinafter "Tarasoff Decl.")). But in his declaration, Dr. Tarasoff essentially admits his conclusion that current CDCR psychiatrist salaries "fall within the range of" competitive salaries is not based on any actual comparison of CDCR salaries to private sector (or even other public sector) psychiatry jobs, but only his personal (and apparently largely unsuccessful) attempts to recruit and hire psychiatrists for CDCR. Tarasoff Decl. ¶¶ 2-3. Even if Dr. Tarasoff's personal recruiting experience – unconfirmed by any objective market data – provided a sufficient basis for Defendants to rule out consideration of increasing psychiatrist pay across the board in 2014, Defendants

1   make no effort to show it is still valid a year later.

2   Instead of fully and properly evaluating the possible impact of increasing pay for all
3   CDCR (and, necessarily, DSH) psychiatrists, Defendants offer a much more narrow
4   proposal: a plan – at some unspecified date in the future – to seek a pay increase to
5   address CDCR's chronic inability to hire and retain psychiatrists at certain prisons in "less
6   desirable geographical location[s]." Report at 5. But even that half-step amounts to
7   nothing more than a vague promise for possible future action. Defendants provide no
8   information regarding how much of a pay differential or increase they plan to seek, nor
9   how they arrived at the figure. More significantly, Defendants had not at the time of the
10  Report's filing on February 2, 2015 even taken the first of the many sequential steps they
11  state are necessary to hopefully secure the funding at some unspecified future date.

12  Defendants promised as of February 2, 2015 when they filed their Report that they
13  were "in the process of finalizing" the targeted pay increase proposal internally. Report
14  at 5. They then hoped to submit the proposal to CDCR's human resources department "for
15  review and approval" – also purportedly "[b]y early February 2015." *Id*. That second step
16  "should take an additional six weeks." *Id*. After that, Defendants plan to submit the
17  proposal to CalHR, but provide literally no information, much less a commitment,
18  regarding when or at what rate the increase can be expected to take effect. *Id*.

19  Such vague promises of future remedial action to cure this chronic problem are
20  unacceptable and fall far short of complying with this Court's mandate to take "all steps
21  necessary" to address the psychiatry shortage. *See* June 18, 2009 Order (Docket No. 3613)
22  at 2. They fail to reflect the urgency of the particular problems with hiring at these
23  geographically undesirable prisons, which Defendants admit is historically well-
24  established and the subject of multiple previous court orders. Report at 2, 5. Nor should
25  Defendants be permitted to assign blame for their failure to act promptly and decisively to
26  the unpredictability of funding streams and bureaucratic processes: The Department of
27  Finance ("DOF") and Governor are defendants in this case precisely because of similar
28  past attempts to pass the buck to different arms of the same California executive branch.

*See* July 28, 2006 Order (Docket No. 1922).

Defendants – including Governor Brown, CDCR, and DOF – are obligated to take immediate steps to secure the pay differentials they have already identified as necessary. They should be required to file with this Court within 15 days a detailed plan outlining (1) the amount of a pay differential they believe is necessary to increase hiring and retention of psychiatrists at the institutions in question; (2) their basis for arriving at that amount; and (3) the date the pay differential will be in place, which should in no case be no later than the start of the new fiscal year, July 1, 2015.

Defendants should also be required to provide the Special Master with updates on the status of their pay differential proposal every thirty days until it is fully implemented, including a description of all steps they have taken and plan to take to expedite approval and funding of the pay differential, as well as specifying any barriers preventing the differential from taking effect.

Finally, Defendants should be required to file by December 15, 2015 a detailed report as to whether the targeted pay differentials at the six institutions have been sufficient to recruit and retain psychiatrists. The filing should also include a detailed evaluation, based on objective market factors, of whether CDCR's psychiatrist compensation (including both starting salary, bonuses, and other benefits) is in line with private sector and other public sector psychiatrist positions within California and nationwide. Defendants should, in the same filing, inform the Court whether or not the targeted pay differentials for psychiatrists will be changed in any way, whether psychiatrist compensation will be changed for all CDCR psychiatrists, or any other measures they will be recommending to address any ongoing shortages of psychiatrists and other clinical staff.

### III. DEFENDANTS' PROPOSAL REGARDING INTERNSHIPS AND FELLOWSHIPS

Plaintiffs do not object to Defendants' proposal to expand or revive their internship and fellowship programs, so long as adequate additional clinical resources are allocated to provide the necessary supervision and training for these unlicensed staff. Plaintiffs note,

however, that the psychiatry fellowship proposal will not even dent the massive shortage, as it amounts to less than one half-time staff member. Report at 5 (proposal for 2 fellows working 8 hours each per week).

## IV. DEFENDANTS' PROPOSALS REGARDING TELEPSYCHIATRY

Finally, Defendants must be required to work with the Special Master team to develop adequate policies and procedures governing the appropriate use of telepsychiatry. As Defendants admit, their inability to hire on-site psychiatry staff to care for *Coleman* class members in person has led to a rapid increase in Defendants' reliance on remote tele-psychiatry services to fill the gap. *See* Report at 5. Defendants currently utilize tele-psychiatrists at every level of care, including crisis-level care for those class members at immediate risk of serious harm. *See* Report at 6. At some institutions, 100% of psychiatry services are provided remotely via telepsychiatry. Declaration of Lisa Ells in Support of Plaintiffs' Objections to Defendants' Report on Review of Mental Health Staffing and Request for Further Court Orders ("Ells Decl.") ¶ 2.

Even as they have dramatically expanded the telepsychiatry program by hiring "on average, two new telepsychiatrists each month" for the preceding nine months, essentially tripling the program, Defendants have failed to develop any policies or procedures governing the provision of these crucial mental health services. *See* Report at 5 (approximately 18 of 28 telepsychiatrists hired in prior nine months). The only telepsychiatry-specific document Defendants have issued is an Employee Expectations Memorandum that conveys only very basic employment information to the telepsychiatrists, like how to complete timesheets, how often to check email, and where to find the *Coleman* Program Guide. *See* Ells Decl. Ex. A.

By contrast, highly detailed policies and procedures have been developed governing the provision of medical care within CDCR via telemedicine services (hereinafter, "Telemed P&Ps"). *See* Ells Decl. Exs. B & C. The Telemed P&Ps do not discuss telepsychiatry at all beyond noting that the telepsychiatry program is overseen by a different body than the rest of telemedicine. *See* Ells Decl. Exs. B & C. More to the point,

the Telemed P&Ps specifically state that the Receiver's Telemedicine Services department

> is responsible for statewide development, management, oversight, and evaluation of the Telemedicine Program.  This includes development of referral guidelines, program policies and procedures, data collection, analysis and reporting, procurement, maintenance and repair of specialized telemedicine equipment, training on program operation, coordinating service delivery through various service sites, monitoring field operations, as well as the training and support of telemedicine staff at the institutions.

Ells Decl. Ex. C at 2.  By contrast, the Telemed P&Ps merely state that CDCR's mental health program is "responsible for overseeing mental health telepsychiatry services," without any additional detail regarding what that responsibility entails or what oversight is anticipated.  *Id.*; *see also* Ells Decl. Ex. B at 1.  Furthermore, the Telemed P&Ps do not speak to a number of complications specific to the provision of telepsychiatry, such as how the telepsychiatrists and on-site staff will conduct cell-front interactions with class members in mental health crisis beds who cannot or will not come out for treatment, or whether and how telepsychiatrists will be utilized to cover emergencies or be on call.  Additionally, the Telemed P&Ps state that encounters with a telemedical physician appointment will be facilitated by "appropriate licensed health care staff" who are, among other things, qualified to perform "any hands-on exams to complete the encounter successfully."  Ells Decl. Ex. C at 6.  Defendants, however, reported to the Special Master and Plaintiffs that medical assistants – who are unlicensed and not qualified to conduct physical examinations – will perform the on-site role for telepsychiatry appointments.  Ells Decl. ¶ 3; *see also* Report at 3 (medical assistants are "unlicensed technicians").

At the meetings leading up to the filing of Defendants' Report, the Special Master's experts and Plaintiffs repeatedly stated that the adequacy of Defendants' telepsychiatry program could not be fully assessed without seeing the policies and procedures governing the program.  Ells Decl. ¶ 4.  Defendants maintained that they would create the documents, but never did.  Ells Decl. ¶ 4.  Plaintiffs are particularly concerned about Defendants' assertion that telepsychiatry is appropriate for all levels of care, including crisis-level care.  Given Defendants' persistently and disproportionately high rate of suicide, *see* April 5, 2013 Order (Docket No. 4539) at 32-43, remote psychiatry services present an additional

dangerous risk that should not be permitted.

Particularly given the recent rapid expansion of the program, Defendants should be required to develop within 60 days telepsychiatry policies and procedures in consultation with the Special Master team and Plaintiffs to ensure that telepsychiatry is safely and appropriately utilized to provide care to *Coleman* class members.

Finally, Defendants report that "[a]n established senior psychiatrist position will aid" the headquarters-based chief psychiatrist in charge of the telepsychiatry program. Report at 5. They do not state whether the senior psychiatrist position has actually been established, much less whether it has been filled. Given that these two headquarters-based supervising psychiatrists are responsible for overseeing and managing all telepsychiatry staff in lieu of institution-level mental health staff, it is crucial that the telepsychiatry program's senior psychiatrist role be filled. *See* Ells Decl. Ex. A at 2. Defendants should be ordered to report within 15 days on whether the position is budgeted and currently filled, and if not, what steps they are taking to immediately address the problem.

## V. SPECIAL MASTER MONITORING OF DEFENDANTS' STAFFING PROPOSALS

Finally, Defendants claim they are "committed to working with the Special Master and his team to assess whether [the proposed] solutions are effective." Report at 2. More formal oversight is necessary, however, given the entrenched nature of this problem, the planned systemwide roll out of the undefined PMA position in lieu of hiring psychiatrists, and CDCR's increasing reliance on telemedicine without any governing standards. Plaintiffs request that the Special Master be ordered to monitor Defendants' progress in implementing their proposed plan and to file an update with the Court within 180 days.

DATED: February 23, 2015        Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Lisa Ells*
Lisa Ells
Attorneys for Plaintiffs

[1538321-6]

8
PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REPORT ON REVIEW OF MENTAL HEALTH STAFFING AND REQUEST FOR FURTHER COURT ORDERS