**Kerry C. Hughes, M.D.**
**1579 Monroe Dr., Suite F, Box 612**
**Atlanta, GA 30324**
**dockc99@AOL.com**

**REPORT ON SUICIDES COMPLETED IN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**JULY 1, 2012 – DECEMBER 31, 2012**

## I.      Introduction and Summary of the Findings

This report is the *Coleman* Special Master's expert's review of the 18 suicides by inmates of the California Department of Corrections and Rehabilitation (CDCR) which occurred during the second half of 2012.  It is submitted as part of the Special Master's continuing review of the defendant's compliance with court-ordered remediation in the matter of *Coleman v. Brown*, No. CIV S-90-0520 KJM DAD PC (E.D.Cal).

The 15 suicides which occurred during the first half of 2012 were covered in a report that was filed on March 13, 2013 (ECF 4376), per order of this Court entered January 30, 2013 (ECF 4319).  That report indicated a total of 32 suicides for 2012.  Additional information acquired since that time indicates that an additional CDCR inmate death was caused by suicide, bringing the total number of suicides by CDCR inmates in 2012 to 33.  While the scope of this report is generally dedicated to the 18 suicides which occurred during the latter half of 2012, portions of it cover all 33 suicides where indicated in context below.

A number of significant findings were detected and remain of concern from this reviewer's examination of the 18 suicides in the latter half of 2012.  Among them are the following:

- **In 2012, a CDCR inmate died by suicide every 11.06 days on average.**[1]

- **The rate of CDCR inmate suicides in 2012 was 24.46 per 100,000, based on a reported CDCR inmate population of 134,901 as of midnight June 30, 2012.**[2]  **This was an increase over the rate of 21.01 per 100,000 in CDCR prisons in 2011, and a**

---

[1] The Special Master's Twenty-Fifth Round Monitoring Report (ECF 4298), states on page 17 that "as of the time of this writing, a CDCR inmate dies by suicide, on average, every 10.93 days."  The reason for the discrepancy between the reported figure of 10.93 days in the Twenty-Fifth Round Monitoring Report and the reported 11.06 days cited above is that the former figure was calculated and projected before the end of 2012, when the Twenty-Fifth Round Monitoring Report was written.  The frequency of one suicide every 11.06 days is the actual frequency for 2012.

[2] Source:  CDCR Website, archives, population as of midnight June 30, 2012.

continuation of the pattern of exceeding the rate of suicides per 100,000 inmates across U.S. state prisons, which was 16 suicides per 100,000 in 2012.[3]

- Trend analysis indicates a continuation through 2012 of the ongoing rise in the rate of suicides since 2005.  From 2005 through 2012, the average suicide rate in CDCR was 21.94 per 100,000.  This is compared to the average rate shown by trend analysis for the six-year period of 1999 through 2004, when the average rate of suicides by CDCR inmates was 16.2 per 100,000.

- The CDCR suicide rate also continued to compare unfavorably with the average suicide rates during the period of 2001 to 2012 among the ten largest U.S. state prison systems, and the average rate in U.S. Federal prisons during the same period:

  o <u>North Carolina</u>, 2001-2012: 7 per 100,000
  o <u>Florida</u>, 2001-2012:  8 per 100,000
  o <u>U.S. Federal Prisons</u>, 2001-2012:  9 per 100,000
  o <u>Louisiana</u>, 2001-2012: 9 per 100,000
  o <u>Georgia</u>, 2001-2012:  10 per 100,000
  o <u>Ohio</u>, 2001-2012:  12 per 100,000
  o <u>Michigan</u>, 2001-2012:  14 per 100,000
  o <u>Pennsylvania</u>, 2001-2012:  16 per 100,000
  o <u>Texas</u>, 2001-2012: 16 per 100,000
  o <u>Illinois</u>, 2001-2012:  16 per 100,000
  o <u>California</u>, 2001-2012: 20 per 100,000
  o <u>New York</u>, 2001-2012: 21 per 100,000[4]

## <u>CDCR and U.S. State Prison Suicide Rates per 100,000</u><br><u>1999 – 2012</u>

| <u>Year</u> | <u>CDCR Prisons</u> | <u>U.S. State Prisons</u>[5] |
|---|---|---|
| 1999 | 15.6 | 14 |
| 2000 | 9.3 | 16 |

---

[3] Source:  Noonan, *Mortality in Local Jails and State Prisons, 2000-2012 – Statistical Tables*, Oct. 14, 2014, Website, U.S. Department of Justice, Bureau of Justice Statistics.  The rate of 16 suicides per 100,000 across U.S. state prisons was reported for 2012, which is the most recent year for which the Bureau has published data on suicide rates in the United States.
[4] *Id*.
[5] *Id.*

| 2001 | 19.3 | 14 |
| 2002 | 13.9 | 14 |
| 2003 | 23.1 | 16 |
| 2004 | 15.9 | 16 |
| 2005 | 26.2 | 17 |
| 2006 | 25.1 | 17 |
| 2007 | 19.7 | 16 |
| 2008 | 22.3 | 15 |
| 2009 | 15.7 | 15 |
| 2010 | 21.1 | 16 |
| 2011 | 21.01 | 14 |
| 2012 | 24.46 | 16 |



- **Among the 33 total suicide deaths by CDCR inmates in 2012, one occurred in a Department of State Hospitals (DSH) facility [Salinas Valley Psychiatric Program (SVPP)] and one occurred in an out-of-state facility [Tallahatchie County Correctional Facility (COCF-TCCF) in Mississippi].**

- **Among the 18 reviewed cases, rigor mortis[6] had already begun by the time of the discovery of the inmate's body in seven or 38.8 percent of cases, one of which was in a Psychiatric Services Unit (PSU)/administrative segregation and another of which was in a Security Housing Unit (SHU).  The onset of *rigor mortis* indicates that in these seven cases, at least two to four hours had passed between the time of death and discovery of the bodies, underscoring in the most dramatic and tragic of ways the importance of timely welfare checks and custodial checks.**

- **In 14 or 77.7 percent of the 18 reviewed suicide cases, there was at least some degree of inadequacy in assessment, treatment, or intervention.  This rate is higher than the rate of 73.5 percent for 2011.  Inadequacies included problems in the conduct of suicide risk evaluations (SREs); inadequate treatment planning, treatment, and/or clinical interventions; non-completion of timely custodial welfare checks; lack of appropriate placement into administrative segregation intake cells; lack of referrals to higher levels of care; lack of communication among treating mental health, medical, and custody staff; and lack of potential lifesaving interventions such as administration of CPR or issues with the use of an automated external defibrillator (AED).**

- **In 11 or 61.1 percent of the 18 reviewed cases, the inmate's suicide was either foreseeable or preventable, as those terms are defined in this report.[7]**

- **Failure to conduct SREs or inadequacies in their conduct appeared in six or 33.3 percent of the 18 reviewed cases.**

- **Inadequacies in conduct of mental health assessments or clinical evaluations appeared in nine or 50 percent of the 18 reviewed cases.**

- **Referrals to higher levels of care were not considered or made in six or 33.3 percent of the 18 reviewed cases.**

---

[6] *Rigor mortis* is defined as "the stiffness of joints and muscular rigidity of a dead body, caused by depletion of ATP in the tissues.  It begins two to four hours after death and lasts up to about four days, after which the muscles and joints relax."  COLLINS ENGLISH DICTIONARY (2003 ed.)

[7] See Appendix A, "Terminology and Definitions."

- **Post-mortem suicide reviews revealed that in seven or 38.9 percent of the 18 reviewed cases, mental health staff failed to consult with each other, with medical staff, or with custody with regard to identification and provision of appropriate treatment of inmates.**

- **In five or 27.8 percent of the 18 reviewed cases, custodial welfare checks were not completed appropriately.**

- **Among 11 or 61.1 percent of the 18 reviewed suicides, cardiopulmonary resuscitation, including availability or use of the AED and/or first aid, was not performed in a timely and/or appropriate manner.**

- **Seventeen or 94.4 percent of the 18 suicides were committed by hanging, which remained by far the predominant means by which suicides were committed.**

- **Seven or 38.9 percent of the 18 suicides occurred in segregated housing units (five in administrative segregation, one in condemned housing, and one in a SHU).**

- **In six or 33.3 percent of the 18 suicide cases reviewed, treatment planning was inadequate.**

- **In two or 11.1 percent of the 18 reviewed cases, inmates were not appropriately placed in an intake cell in administrative segregation.**

- **In one or 5.6 percent of the 18 reviewed cases, there was an issue regarding psychiatric medication prescribing practices, and**

- **In ten or 55.6 percent of the 18 reviewed cases, there were problems related to the quality of the CDCR suicide report and/or with implementation or follow-up on the quality improvement plan (QIP).**

## II.   <u>Format</u>:

Like earlier suicide reports by the Special Master's expert, this report is presented in a narrative format, supported by a number of tables and graphs.  It includes a List of Terms and Definitions utilized in this report (Appendix A), a Table of Tracking Timelines for CDCR Departmental Review of Inmate Suicides (Appendix B), Tables of (1) Inmate Demographics,  (2) Assessment/Treatment/Interventions Implemented, (3) Inmate Suicidal History and Event Characteristics, and (4) Identified Issues and Failures with Suicide Prevention and Corrective Action Measures (Appendices C1-C4), a Summary of the Prevalence of Selected Characteristics

among the 18 suicide cases (Appendix D), a Table Indicating the Frequency of the 18 Suicides, by CDCR Institution (Appendix E), Bar Graphs Indicating the Numbers of Suicides by CDCR Inmates, Year by Year, by Institution and collectively (Appendix F), the *Curriculum Vitae* of this Reviewer (Appendix G), and a List of Acronyms and Abbreviations Used in this Report (Appendix H).

## III.   Discussion and Findings

### A.   CDCR's Already-Elevated Suicide Rate Continued to Rise in 2012

In 2012, the rate of suicides among CDCR inmates continued to significantly exceed the national average rate for federal and state prisoner suicides. Suicide rate trend analyses also showed that suicide rates in CDCR worsened over time, as compared to other prisons in the United States.

Suicide rates in CDCR prisons from 1999 through 2012 have been as follows:

1999 - 25 suicides in a population of approximately 159,866[8]
          Completed suicide rate of 15.6/100,000

2000 – 15 suicides in a population of approximately 160,855
          Completed suicide rate of 9.3/100,000

2001 – 30 suicides in a population of approximately 155,365
          Completed suicide rate of 19.3/100,000

2002 – 22 suicides in a population of approximately 158,099
          Completed suicide rate of 13.9/100,000

2003 – 36 suicides in a population of approximately 155,722
          Completed suicide rate of 23.1/100,000

2004 – 26 suicides in a population of approximately 163,346
          Completed suicide rate of 15.9/100,000

2005 – 43 suicides in a population of approximately 164,179
          Completed suicide rate of 26.2/100,000

2006 – 43 suicides in a population of approximately 171,340

---

[8] Population figures for each year are the mid-calendar year population numbers reported by CDCR on its public website.

Completed suicide rate of 25.1/100,000

2007 – 34 suicides in a population of approximately 172,535
Completed suicide rate of 19.7/100,000

2008 – 37 suicides in a population of approximately 165,790
Completed suicide rate of 22.3/100,000

2009 – 25 suicides in a population of approximately 159,084
Completed suicide rate of 15.7/100,000

2010 – 35 suicides in a population of approximately 165,747
Completed suicide rate of 21.1/100,000

2011 – 34 suicides in a population of approximately 161,818
Completed suicide rate of 21.0/100,000

2012 – 33 suicides in a population of approximately 134,901
Completed suicide rate of 24.46/100,000

The total number of suicides in CDCR prisons from 1999 through 2012 was 438, with an annual average number of 31.29 suicides for the 14-year period, or an average of 2.6 suicides per month. On average, there was one suicide every 11.7 days during the 14-year period. For all 14 years reviewed, from 1999 through 2012, the average suicide rate was 19.5 per 100,000.

Trend analysis continued to indicate that from 1999 through 2012, the suicide rate in CDCR prisons worsened. For the years 1999, 2000, 2002, and 2004, the CDCR suicide rate per 100,000 was under 16. In comparison, for six of the eight most recent years (2005, 2006, 2008, 2010, 2011, and 2012), the rate has exceeded 20 per 100,000.

A comparison of CDCR prison suicide rates with those in U.S. Federal Prisons, in all U.S. State prisons, and in ten large state prison systems also illustrates the persistence of the elevated rate in CDCR prisons:

CDCR Suicide Rate Trend Analysis (average suicide rate per 100,000) for 1999-2004:
- Average Suicide Rate 16.2/100,000

*Compare* U.S. Federal and U.S. State Prison Suicide Rate Trend Analyses for 1999-2004:

- Average Suicide Rate for U.S. Federal Prisons 1999-2004[9]:  9.33/100,000
- Average Suicide Rate for U.S. State Prisons 1999-2004[10]:  15.2/100,000

CDCR Suicide Rate Trend Analysis (average suicide rate per 100,000) for 2001-2012:
- Average Suicide Rate 20.64/100,000

*Compare* U.S. Federal Prisons 2001-2012, U. S. State Prisons Suicide Rate Trend Analyses for 2001-2012:

- Average Suicide Rate for U.S. Federal Prisons 2001-2012[11]:  9/100,000
- Average Suicide Rate for U.S. State Prisons 2001-2012[12]:  16/100,000

*Compare* suicide rates per 100,000 in the ten largest U.S. state prisons, for the period of 2001 – 2012[13]:

- o <u>North Carolina</u>, 2001-2012: 7 per 100,000
- o <u>Florida</u>, 2001-2012:  8 per 100,000
- o <u>Louisiana</u>, 2001-2012: 9 per 100,000
- o <u>Georgia</u>, 2001-2012:  10 per 100,000
- o <u>Ohio</u>, 2001-2012:  12 per 100,000
- o <u>Michigan</u>, 2001-2012:  14 per 100,000
- o <u>Pennsylvania</u>, 2001-2012:  16 per 100,000
- o <u>Texas</u>, 2001-2012: 16 per 100,000
- o <u>Illinois</u>, 2001-2012:  16 per 100,000
- o <u>New York</u>, 2001-2012: 21 per 100,000

## B.   <u>Elevated Suicide Rates in Segregated Housing Continued</u>

Historically, CDCR has had a significantly higher suicide rate in its segregated housing units (administrative segregation units, SHUs, PSUs, and condemned units) than in its non-segregated housing units.  Given the persistence of suicides occurring in CDCR's segregated housing units in 2012, it was apparent that improvements to suicide prevention measures in such units remained necessary.  For the entire year of 2012, 14 or 42.4 percent of all 33 suicides occurred in CDCR's <u>segregated</u> housing units.  In 2012, the combined average daily population of CDCR's

---

[9] Noonan, *supra*, note 3.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

segregated units was 11,663.[14]  This resulted in an incidence of one inmate suicide for every 833 inmates in segregated housing units, and a rate of 120 suicides per 100,000 inmates in the segregated housing units.  By contrast, in CDCR's non-segregated units in 2012, there were 19 suicides.  With an average daily population of 123,238 in CDCR's non-segregated units[15], the incidence of inmate suicides in non-segregated units in 2012 was one suicide for every 6,486 inmates, and a rate of 15.4 suicides per 100,000 inmates.

There were additional concerns surrounding the elevated suicide rate in segregated housing units.  Of the 18 reviewed cases:

- All of the suicides that occurred in segregated housing were completed by hanging, as were 94 percent of the 18 reviewed suicides.

- Issues with uncompleted or inadequate custody welfare checks continued, with nearly one third of these cases having had inadequate custody welfare checks.

- Four or 22.2 percent of these cases had not been referred to a higher level of care when it was clinically indicated.

- Two or 11.1 percent of these cases were not housed in an intake cell in administrative segregation when they should have been.

- Two or 11.1 percent of these cases were found in *rigor mortis* at the time of discovery of their deaths.

- Five or 27.8 percent of these cases were noted to have had untimely or inadequate CPR performed.

- Three or 16.7 percent of these cases had inadequate treatment planning.

- In four or 57 percent of the seven reviewed suicide cases that occurred in segregation, the CDCR suicide report or QIPs did not make appropriate recommendations for corrective action, and/or the QIPs were not responsive to the issue identified for inmates who had been housed in segregation.  The suicide report and accompanying QIPs should have identified and appropriately addressed any areas of needed corrective action.

---

[14] Based on data provided by CDCR to the Special Master on March 12, 2015, indicating that in CDCR prisons on June 29, 2012 there were 6,762 inmates in administrative segregation, 3,844 inmates in SHUs, 373 inmates in PSUs, and 684 inmates in condemned units, for a total of 11,663 in segregated housing units.
[15] Based on a total inmate population of 134,901 as of midnight June 30, 2012 (*see* CDCR Website, archives), minus the population of 11,633 in segregated housing as of June 29, 2012, as reported by CDCR to the Special Master on March 12, 2015.

**C.**      **The CDCR Death Review Processes Lacked Psychiatric Input in Review of Suicide Cases**

Participation and involvement of psychiatry in CDCR's death review of the suicides covered in this report was inconsistent, if present at all.  In one case, there was an issue surrounding psychiatric prescribing practices that was identified in the death review.  However, it appeared that the analysis of psychiatric prescribing practices was performed by a non-psychiatric physician in the context of the CDCR Death Review Committee (DRC).  Psychiatric presence and input in the death review process and in the formulation of the CDCR suicide report is critical to appropriate clinical analysis of completed suicides.

**D.**      **There Was a Lack of Coordination Between the Medical Death Review Committee and the Mental Health Suicide Review Committee**

Disparate timelines for completion of suicide/death reviews led to problems with coordination between the mental health suicide review process and the medical Death Review Committee process.  At times the two bodies had divergent and conflicting analyses of completed suicides.  Although a psychologist was reportedly a member of the DRC, this reviewer found instances in which the DRC reached a conclusion that the death was not preventable before the suicide review process was completed, and cases in which the opinions of the suicide review committee and the DRC differed as to whether CPR had been performed.

**E.**      **Development and Follow-Through of Recommendations in CDCR Suicide Reports Was Problematic**

CDCR suicide reports were comprehensive, including important and critical information regarding the inmates' mental health and criminal histories, institutional functioning, stressors that may have led to the suicides, as well as critical analysis regarding causative factors.  These reports also provided recommendations for improvements and corrective actions with regard to identified issues in the course of the care of the deceased inmate.

However, review of the CDCR suicide reports for the 18 deaths identified problems with the provided recommendations and their implementation, and with critical review and follow-up on the developed QIPs.  These problems with the reports and institutional response were noted in ten or 55.6 percent of the 18 reviewed cases.

Of concern was the process by which identified issues in care figured into the development of recommendations for corrective actions.  In some cases, issues that were identified in the suicide report did not result in the development of recommendations and thus were left unaddressed.

10

Any QIPs for corrective actions that were developed were taken only from recommendations in the suicide reports. This left no recourse for other issues that appeared in the suicide reports, thus making the process appear arbitrary and incomplete, minimizing the issues identified, thwarting the development of adequate and necessary corrective actions, and allowing poor practices to continue. It also created an appearance of bias on the part of the CDCR suicide reviewer. The overall effect was to undermine the integrity of an otherwise clinically important suicide reporting and death review process, and prevent the correction of potentially lethal institutional practices.

In several cases, this reviewer noted a lack of finalization of review of the QIP by the CDCR Headquarters Suicide Prevention and Response Focused Improvement Team (SPRFIT). Institutional responses were provided, but there did not appear to be evidence of comprehensive review and critique by the SPRFIT of the institutional responses, even when they had been inadequate or failed to address the specific problem(s) identified. Despite these omissions, the SPRFIT approved and resolved these QIPs. This lack of documentation of critical review by the SPRFIT created an appearance of "rubber-stamping" of QIP responses, implying a lack of self-critical analysis, reliability, and confidence in the CDCR suicide review process.

## F. The Pattern of Inadequate and/or Improperly Completed Suicide Risk Evaluations Continued

Six or 33.3 percent of the 18 reviewed cases were noted to have had inadequate or improperly completed SREs. This has been a long-standing problem. Although CDCR instituted a mentoring program to address it, SREs were not always conducted when clinically appropriate and/or were improperly completed. Assessment of a patient's suicide risk is an important practice for clinicians to assist in the determination of a patient's risk of suicide and to prevent self-harming behaviors.

## G. Treatment Planning Was Inadequate in a Significant Number of Cases

Treatment planning was inadequate in one-third of the 18 suicide cases reviewed. The need for referral to higher levels of care did not appear in treatment plans, even when indicated. Additionally, treatment plans did not address important issues such as treatment adherence, poor response to treatment, and suicide prevention. Some treatment plans were merely repetitions of past plans, evolving and responding little over the course of the patient's treatment despite clinical evidence of his or her poor treatment response.

### H.    Apparent Staff Bias Against Patients Adversely Affected Treatment

In three or 17 percent of the 18 reviewed cases, there was evidence of possible staff bias or negative feelings regarding the inmate, which appeared to adversely affect the care provided.  In each of these cases, staff documented beliefs regarding the inmates which resulted in actions that lead to inadequate care.  These included belief that an inmate was intoxicated, which led to delays in potentially life-saving measures, or belief that an inmate was malingering or attempting to achieve better housing, which resulted in lack of referral to needed treatment and other life-saving interventions.

### I.    Life-Saving Measures and Emergency Response Were Not Provided Timely or Appropriately in a Majority of Reviewed Cases

In 11 or 61 percent of the 18 reviewed cases, basic life-saving measures and emergency response were not completed timely or appropriately.  Issues were noted regarding the appropriateness of performing CPR, delays in initiation of life-saving measures, and lack of response by first-responders.

### J.    Communication Among Mental Health, Medical, and Custody Staff Was Poor

Poor communication among mental health, medical, and custody staff was noted in seven or 39 percent of reviewed cases.  There were issues within the mental health department as well.  Ongoing, bi-directional communication among all staff involved with the inmate is critical to keeping all treating staff informed of issues of concern and to allowing for necessary interventions when indicated.  As noted above, this level of communication and cooperation among staff is also essential to appropriate review of completed suicides.

### K.    Hanging Remained By Far the Predominant Method of Suicide

Hanging remained the predominate method of suicide in the reviewed cases, with 94 percent of reviewed suicides having been completed by that method.  Ninety-four percent of suicides occurred by hanging.  Clearly, then, the issue of making cells suicide-resistant remains an important one.  Undoubtedly, if all general population cells were converted to suicide-resistant cells, it would be an expensive and vast undertaking, given the great number of these units and cells throughout the entire CDCR system.  However, the gravity of the persistent, substantially higher suicide rate/risk of deaths by suicides in CDCR's segregated units[16] calls for a different equation, as the cost of doing nothing may be counted in lives lost.  Furthermore, the number of affected cells in segregation is relatively small compared to the number of general population

---

[16] *See* discussion, Section III B., *infra*  p. 8-9.

cells, concomitantly reducing the cost and inconvenience associated with retrofitting/construction of suicide-resistant cells in segregation.  An investment in suicide-resistant intake cells in segregated housing would be well worth the return of lives saved.

## IV.    **Recommendations**

Through 2012, CDCR persistently maintained a significantly higher suicide rate, at 24.46 per 100,000, than the rate in U.S. state prisons, which was 16 per 100,000 for the same period.  This untoward distinction calls for action yet again.  The recommendations in this report for corrective actions to address this problem are not new.  They have been ongoing and repeated in successive annual suicide reviews by the Special Master's expert, which have been submitted for every year since 1999.

Although this reviewer is aware that, since the time of the deaths discussed in this report, CDCR has worked to address some of the issues identified above, more work needs to be done.  The context for this work should be the Suicide Prevention Management Workgroup.  This group was ordered and tasked by the *Coleman* court to review, under the guidance of the Special Master, suicide prevention measures, suicide deaths, and deaths deemed to be undetermined cause (ECF 4693), and more recently was re-convened and ordered to work with the Special Master on the development of strategies and the implementation of changes and practices contained in a separate expert review of suicide prevention practices in CDCR prisons (ECF 5258, 5271).  This reviewer further recommends that the Suicide Prevention Management Workgroup also ultimately work with the CDCR medical Death Review Committee to address issues with communication and cooperation in the CDCR inmate death review process, as described above.

Respectfully Submitted,


Kerry C. Hughes, M.D.

**<u>APPENDIX A</u>**

*Terminology and Definitions*:

<u>*Suicide*</u>:

The term "suicide," as defined in the sources identified below, was utilized in the CDCR Annual Suicide Report for 2012:

- World Health Organization: Suicide is the result of an act deliberately initiated and performed by a person in the full knowledge or expectation of its fatal outcome.

- National Violent Death Reporting System, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention: Suicide is a death resulting from the intentional use of force against oneself.  A preponderance of evidence should indicate that the use of force was intentional.

CDCR has classified as suicides any deaths under the circumstances described below.  This report utilizes the same definition as CDCR, which follows the definitions utilized by the World Health Organization and the National Center for Injury Prevention and Control, Centers for Disease Control and Prevention:

- A person committed a suicide act and changed his mind, but still died as a result of the act;

- A person intended only to injure rather than kill himself, for example by playing "Russian Roulette" voluntarily with a firearm; Assisted suicide, including passive assistance to the decedent, for example, by supplying only information or the means needed to complete the act;

- Intentional, self-inflicted death committed while under the influence of a voluntarily taken, mind-altering drug;

- Intentional, self-inflicted death committed while under the influence of a mental illness.

According to the CDCR Annual Suicide Report for 2012, deaths under the circumstances below
should *not* be classified as suicides:

- The physical consequences of chronic substance abuse, including alcohol or drugs (natural death);

• Acute substance abuse, including alcohol or drugs, with less than a preponderance of the evidence showing intent to use the substance(s) against oneself (undetermined or unintentional injury or death).

• Death as a result of autoerotic behavior, e.g., self-strangulation during sexual activity (death by unintentional injury).

### *Foreseeable and Preventable Suicides*:

The terms "foreseeable" and "preventable" are used in this report as they have been in previous reports. They describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgments, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides.

The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s). Assessment of the degree of risk may be high, moderate, or low to none. This is an important component in determining foreseeability. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide. Interventions may include but are not limited to changes in clinical level of care, placement on suicide precautions or suicide watch, and changes in housing including utilization of safe cells and transfers to higher levels of care, as well as clinically appropriate treatment and management services which may include but not be limited to increased contacts/assessments by mental health professionals, medication management review and changes, other therapeutic interventions and measures, and/or changes in level of care, including short-term changes such as utilization of MHCBs and/or longer term level-of-care changes including transfer to DSH programs. Individuals evaluated as a "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation with appropriate treatment and management by clinical staff of the potential for self-injury and/or suicidal ideation or activity.

The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required by existing policy, reflected in the Program Guide and/or local operating procedures. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff. The emergency response is reviewed not only by DCHCS mental health staff but also by DCHCS medical staff as part of the death review summary process, as well as by this reviewer.

*Suicide Risk Evaluation (SRE) Program Guide, Chapter 10, "Suicide Prevention and Response," §12-10-7 – 12-10-8.*

All inmates are observed for suicide risk.  Suicide risk assessment is critical to successful suicide prevention.  Inmates-patients enrolled in the MHSDS shall be regularly monitored for risk of suicide as clinically appropriate.  When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk evaluation (SRE) shall be made by collecting, analyzing, and documenting data.  Documentation is achieved by utilizing the CDCR standardized SRE and by clinician notation in the Unit Health Record (UHR).

When an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRE, instead of completing a new SRE.

The following clinicians shall be trained to perform a suicide risk assessment and complete the SRE:

- Psychiatrists
- Psychologists
- Clinical social workers
- Primary care physicians
- Nurse practitioners
- RNs

This shall occur during the specialized training provided for clinical staff who are receiving either the new employee orientation or competing the required annual training module, or when determined necessary by supervisory and/or management staff. When a primary clinician is scheduled to be available on-site, he or she shall be responsible for completing an SRE.  When a mental health clinician is not available, any other staff member who has been trained by CDCR in suicide risk evaluation may complete the SRE.

An RN completing the SRE shall collect data related to suicide risk and protective factors and refer the patient and data collected to a mental health clinician for further evaluation to determine the level of risk.

**At a minimum, a written SRE shall be completed:**

- Every time an inmate has an initial face-to-face evaluation for suicidal ideation, gestures, threats, or attempts, by a clinician trained to complete the SRE.

- By the referring clinician prior to placement of an inmate-patient into an outpatient housing unit (OHU) for continued suicide risk assessment or into a mental health crisis bed (MHCB) for suicidal ideation, threats, or attempt.

- After hours, on weekends and holidays, on-call clinicians shall conduct a face-to-face evaluation for suicide risk prior to releasing an inmate to any housing without suicide watch or precaution.

- After hours, on weekends and holidays, when the referring clinician has not completed an SRE, by the clinician providing coverage, by the next day, for those inmate-patients placed into an OHU or MHCB.

- By the associated interdisciplinary treatment team (IDTT) and/or clinician for all inmate-patients placed into an OHU for mental health reasons, or MHCB for any reason, upon decision to release or discharge.

- Subsequent to release from an OHU placement that was for the purpose of continued suicide risk evaluation, or an MHCB placement for the reasons of suicidal ideation, threats, or attempts, at a minimum of every 90 days for a 12-month period, by a mental health clinician.

- Within 72 hours of return from a Department of State Hospitals (DSH) facility, or within 24 hours if clinically based on new arrival screening.

- Any time the medical and mental health screening of a new arrival at an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.

- Pursuant to the Department Operating Manual (DOM), Article 41, Prison Rape Elimination Act Policy, for victims of sexual assault, within four hours after the required sexual assault forensic examination.

**The clinician shall use the SRE form when documenting a suicide risk evaluation, in addition to making a notation in the UHR.  At a minimum, the following categories shall be used to assess potential risk.**

**Suicide Prevention Measures in Administrative Segregation.  *Program Guide, Chapter 7, "Administrative Segregation," §§ 12-7-1 – 12-7-15***

**Pre-Placement Screening.  *Program Guide, § 12-7-2 - 12-7-3.***  All inmates are screened by medical personnel for possible suicide risk, safety concerns, and mental health problems before placement in administrative segregation (*see* Inmate Medical Services Policy and Procedure, *Volume 4, Chapter 16: CDCR 7219*).  If an inmate screens positive on the CDCR 128-MH7, ASU Pre-Placement Chrono, they are referred to a mental health evaluation on an Emergent, Urgent, or Routine basis, depending on their answers to the screening questions.  After completion, the CDCR Form 128-MH7, *ASU Pre-Placement Chrono*, shall be placed in the mental health chrono section of the Unit Health Record (UHR).  For Urgent and Routine referrals, the medical staff conducting the screening shall complete a CDCR 128-MH5, Mental Health Referral Chrono, and follow the

referral process below.

**Post-Placement 31-Question Screen.**  *Program Guide, § 12-7-6*.  All inmates who are not in the MHSDS and who are retained in administrative segregation shall receive, within 72 hours of placement in administrative segregation, a mental health screening interview utilizing the same 31-question mental health screening questionnaire also used in the Reception Centers.  The interview shall be conducted by a mental health clinician or trained nursing staff in private and confidential settings that afford confidentiality of sight and sound from other inmates and confidentiality of sound from staff.  Screening interview appointments shall be announced by custody staff as "health appointments" to avoid stigmatization and possible retribution by other inmates.  Every effort should be made to encourage inmates to attend these appointments.

The results of the screening are evaluated either by hand-scoring or an approved automated scoring system to determine the need for further evaluation.  The scoring sheet shall be filed in the UHR.  All inmates scoring positive on the questionnaire shall be referred to a mental health clinician to be seen within the clinically appropriate time frame.  Emergent cases shall be seen immediately, urgent cases shall be seen within 24 hours, and all others shall be seen within 5 working days.

All referrals and results of evaluations are documented in the individual inmates' UHRs on approved forms and entered into the institutional MHTS.  Decisions to provide treatment via placement into an outpatient program or an MHCB shall be entered into the distributed data processing system (DDPS).

**30-Minute Welfare Checks for Initial 21 Days of Placement into Administrative Segregation.**  *Defendants' Plan to Address Suicide Trends in Administrative Segregation Units*.  Custody welfare checks shall be conducted at staggered intervals not to exceed every 30 minutes.  They shall be recorded on the 30-Minute Welfare Check Tracking Sheet.

**Daily Psych Tech Rounds in Administrative Segregation.**  *Program Guide, § 12-7-5*.  A mental health staff member, usually a Licensed Psych Tech (LPT), shall conduct rounds seven days per week in all administrative segregation units to attend to the mental health needs of all inmates.  The psych tech shall make initial contact with each inmate placed into administrative segregation with 24 hours of placement.

In order to establish contact and provide information, mental health staff shall attend to developing rapport with new inmates on the first day of mental health rounds.

Those inmates not previously identified as having mental health treatment needs who exhibit possible signs and symptoms of serious mental disorders shall be referred for clinical evaluation.  Interaction shall be sufficient to ascertain the inmate's mental condition particularly during the first ten days.  The psych tech shall maintain an individual record of clinical rounds on both MHSDS and non-patients by initialing next to the inmate's name on the CDCR 114, *Isolation Log Book*, each time the inmate is seen.

Any unusual findings that may require closer observation by custody shall be documented on the CDCR 114A, *Daily Log*, on the same day as the occurrence.  For identified MHSDS inmate-patients, the psych tech shall document a summary of daily clinical rounds on a CDCR 7230, *Interdisciplinary Progress Notes*, in the UHR on a weekly basis.  Notes will be clearly labeled as "weekly summaries of psych tech clinical rounds."  If clinically indicated, the psych tech may provide additional documentation.

**Response to Self-Injurious Behaviors and Suicide Attempts**.  *Program Guide, §12-10-21 – 12-10-23.*  Self-injurious behaviors cause, or are likely to cause, physical self injury.  A suicide attempt is an intentional act that is deliberately designed to end one's own life.  Both are medical emergencies that require immediate and appropriate responses.

Custody Protocol

**In medical emergencies, the primary objective is to preserve life.**  All peace officers who respond to a medical emergency are mandated, pursuant to court order, to provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures.  All peace officers must carry a personal CPR mouth shield at all times.

The officer must assess and ensure it is reasonably safe to perform life support by effecting the following actions:

- o  Sound an alarm (a personal alarm or, if one is not issued, an alarm based on local procedures must be used) to summon necessary personnel and/or additional custody personnel.

- o  Determine and respond appropriately to any exposed blood-borne pathogens.

- o  Determine and neutralize any significant security threats to self or others including any circumstances causing harm to the involved inmate.

- o  Initiate life saving measure consistent with training.

The responding peace officer will be required to articulate the decision made regarding immediate life support and actions taken or not taken, including cases where life support is not initiated consistent with training and/or situations which pose a significant threat to the office or others.

**Upon arrival, responding medical personnel shall relieve the correctional peace office and assume primary responsibility for the provision of medical attention and lifesaving efforts.  Custody and medical personnel together are responsible for the continuance of life saving efforts for as long as necessary.**

**Preservation of life shall take priority over preservation of a crime scene.**

<u>Emergency Response</u>

The following first aid procedures shall be implemented when an inmate attempts suicide by hanging, laceration, or other methods:

<u>Hanging</u>: Medical and custodial staff shall be informed of the nature of the emergency by the most expedient method available.  The cut-down kit shall be transported to the location immediately by custody staff.  Clearing the obstruction to the airway as quickly as possible is critical to saving the life of the inmate who has attempted suicide by hanging.  When it appears safe, a minimum of two staff shall enter the area where the inmate is located, and relieve pressure on the airway by using a stable object for support of the inmate's body or by physically lifting the inmate's weight off the noose.  The inmate shall be cut down by cutting above the knot and then loosening the noose.  Custody staff shall preserve any item for evidentiary value.

Once the inmate is cut down, custody staff shall provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures.

Medical staff, upon arrival, shall assume responsibility for medical care, as outlined in the institution's local operating procedures for emergencies, including any decisions regarding initiating or continuing CPR.

If possible, the inmate shall also be transported to a triage and treatment area.

<u>Laceration</u>: General guidelines;

- Use impervious latex gloves and/or appropriate, personal protective equipment.

- Utilize whatever clean material is available to apply pressure to the wound site.

- Elevate extremities if they are bleeding.

- Transport to a triage and treatment area or an emergency room.

<u>Other methods (overdosing, trauma, swallowing dangerous objects)</u>:

- Provide assistance to medical staff and obtain as much information as possible.

- Staff shall perform the Heimlich maneuver if choking is evident.

<u>Cut-down Kit Availability</u>

Each warden shall ensure that cut-down kits:

- Are maintained within each housing unit.
- Are inventoried and inspected on a daily basis with problems immediately reported to a supervisor.

- Consist of a lockable metal box containing:
    a. One inventory list affixed to the inside of the box door.
    b. One emergency cut-down tool.
    c. One single-patient-use resuscitator (e.g. Ambu Single-Patient-Use Resuscitator).
    d. One CPR mask (e.g., Lardell CPR Mask, for use by CPR-certified staff only)
    e. Minimum of ten latex gloves.
    f. Disposable oral airway.

**<u>APPENDIX B</u>**

## Tracking Timelines for Department Review of Inmate Suicides[1]

The applicable Program Guide timeframes for CDCR's suicide review are summarized as follows:

| **Event/Documents** | **Timeline** |
|---|---|
| 1.  Date of Death | 0 hour |
| 2.  Chief Medical Officer Notice to Death Notification Coordinator | 8 hours from time of death |
| 3.  Initial Death Report by local SPRFIT Coordinator to Death Coordinator | 2 business days from date of death |
| 4.  Death Notification Coordinator Notice to DCHCS SPRFIT Coordinator | 1 business day from Number 3 |
| 5.  DCHCS SPRFIT Coordinator appoints Mental Health Suicide Reviewer | 2 business days from Number 4 |
| 6.  Mental Health Suicide Reviewer completes Preliminary Suicide Report | 30 days from date of death |
| 7.  DCHCS Suicide Case Review Subcommittee forwards completed Suicide Report to Mental Health Suicide Reviewer | 45 days from date of death |
| 8.  Suicide Report signed and issued by Directors of DCHCS and the Division of Adult Institutions | 60 days from date of death |
| 9.  Facility Warden and Chief Medical Officer implement Quality Improvement Plan (QIP) | 120 days from date of death |
| 10. Facility Warden and Chief Medical Officer submit report Of implementation of Quality Improvement Plan | 150 days from date of death |

---

[1] *See* Program Guide, Chapter 10.

**APPENDICES C1-C4**

## Inmate Demographics

| Inmate | Inst. | Age | Gender | Ethnicity | Date of Death | Time of Death | Time Discovered | LOC | Keyhea |
|--------|-------|-----|--------|-----------|---------------|---------------|-----------------|-----|--------|
| A | CIW | 56 | F | C | 7/6/2012 | 22:42 | 22:10 | EOP | N |
| B | SAC | 51 | M | AA | 7/24/2012 | 1:41 | 1:05 | 3CMS | N |
| C | CAL | 36 | M | C | 10/24/2012 | 8:09 | 7:35 | X | N |
| D | SQ | 58 | M | C | 8/26/2012 | 5:25 | 4:53 | X | N |
| E | SCC | 47 | M | H | 7/28/2012 | 3:00 | 2:05 | 3CMS | N |
| F | SVSP | 39 | M | H | 11/20/2012 | 2:39 | 2:20 | EOP | Y |
| G | LAC | 31 | M | A | 12/8/2012 | 6:36 | 6:36 | X | N |
| H | SOL | 50 | M | C | 7/13/2012 | 7:51 | 7:18 | X | N |
| I | COR | 29 | M | H | 8/28/2012 | 17:20 | 16:41 | 3CMS | N |
| J | CIM | 68 | M | C | 10/27/2012 | 17:40 | 17:24 | X | N |
| K | COCF-TCC | 34 | M | H | 7/19/2012 | 6:30 | 4:55 | X | N |
| L | SVSP | 48 | M | H | 10/25/2012 | 14:02 | 13:27 | X | N |
| M | SVSP | 50 | M | C | 8/12/2012 | 0:40 | 0:10 | X | N |
| N | SVSP | 45 | M | NA | 9/17/2012 | 15:11 | 14:37 | 3CMS | N |
| O | DVI | 52 | M | C | 7/25/2012 | 16:19 | 15:50 | X | N |
| P | CMF | 37 | M | AA | 8/17/2012 | 23:10 | 22:37 | EOP | N |
| Q | FSP | 55 | M | C | 11/13/2012 | 8:49:00 AM (discrepancy in timekeeping) | 8:50 | 3CMS | N |
| R | SVPP/SVSP | 35 | M | C | 12/2/2012 | 11/29/12 @ 9:01:00 AM | 10:50 | DSH/ICF | N |

Assessment/Treatment/Interventions Implemented

| Inmate | Assessment Problems? | Treatment Problems? | Interventions Problems? | 5-Day f/u | Rigor Mortis | CPR?/Timely & Appropriate | Intake Cell Issues | Custody Welfare Check Issues | Meds Issues |
|---|---|---|---|---|---|---|---|---|---|
| A | Y | Y | N | n/a | N | Y/Y | N | N | N |
| B | Y | Y | Y | n/a | Y/conflicting information | Y/N | N | N | N |
| C | N | N | Y | n/a | Y | Y/N | N | Y | N |
| D | N | N | N | n/a | N | Y/Y | N | N | N |
| E | Y/poor 5d f/u | Y | Y | Y but poor | N | Y/Y | Y | Y | N |
| F | Y | Y | Y | Y | N | Y/N  16 min delay in medical arrival | N | N | N |
| G | N | N | N | n/a | Y | Y/Y | N | N | N |
| H | N | N | N | n/a | N | Y/Y | N | N | N |
| I | Y | N | N | n/a | Y | N/NA | N | N | N |
| J | N | Y | N | n/a | Y | N/NA | N | N | N |
| K | N | N | Y | n/a | N | Y but not initiated by 1st responders/N | N | Y | N |
| L | Y | Y | N | Y | N | Y/Y | N | N | N |
| M | Y | N | N | n/a | N | Y/Y | N | N | N |
| N | Y | Y | N | N | N | Y/Y | N | N | Y |
| O | N | N | Y | n/a | Y | Y/N | N | Y | N |
| P | N | Y | N | n/a | N | Y/Y | Y | Y | N |
| Q | N | N | N | n/a | Y | Y/Y | N | N | N |
| R | Y | Y | N | n/a | N | Y/Y | N | N | N |

Identified Issues and Failures with Suicide Prevention and Corrective Action Measures

| Inmate | Poor SRE | HLOC Referral Failure | Communication Failures | Treatment Planning Issues | FOR/PREV | Suicide Report/QIP Issues |
|--------|----------|----------------------|------------------------|---------------------------|----------|---------------------------|
| A | Y | Y | N | Y | Y/Y | Y |
| B | N | Y | Y | N | N/Y | Y |
| C | N | N | N | N | N/Y | Y |
| D | N | N | N | N | N/N | N |
| E | Y | Y | Y | Y | N/Y | N |
| F | N | Y | Y | Y | N/N | Y |
| G | N | N | N | N | N/N | N |
| H | N | N | N | N | N/N | N |
| I | Y | N | Y | Y | N/Y | Y |
| J | N | N | N | N | N/Y | N |
| K | N | N | N | N | N/Y | N |
| L | Y | Y | Y | N | N/Y | Y |
| M | Y | N | N | N | N/N | N |
| N | N | N | Y | N | N/Y | N |
| O | N | N | N | N | N/Y | Y |
| P | N | Y | N | Y | N/N | Y |
| Q | N | N | N | N | N/N | Y |
| R | Y | N | Y | Y | Y/Y | Y |

Inmate Suicidal History and Event Characteristics

| Inmate | Method of Death | Housing | Single/Double Celled | MHCB/DSH Hx | R-Suffix | Medical Issues | MH Hx | SB Hx |
|---|---|---|---|---|---|---|---|---|
| A | Hanging | SCU/EOP housing unit | S | Y | N | N | Y | Y |
| B | Hanging | PSU/Ad Seg overflow | S | N | N | N | Y | Y |
| C | Hanging | GP | S | N | N | N | N | N |
| D | Hanging | Condemned | S | N | N | N | N | N |
| E | Hanging | ASU | S | Y/OHU | N | N/pain med changes | Y | N |
| F | Hanging | GP | S | Y | N | N | Y | Y |
| G | Hanging | GP | D/but alone and no one else was assigned as cellmate | N | N | N | N | N |
| H | Hanging | GP/dorm | Dormitory | N | N | N | N | N |
| I | Hanging | SHU | S | N | N | N | Y | N |
| J | Elavil OD | SNY | D/but sole occupant | N | N | N/chronic & stable | Y | N |
| K | Hanging | GP | D | N | N | N | N | N |
| L | Hanging | ASU | S | Y | N | Y | N | N |
| M | Hanging | GP | S | N | N | N | Y | Y |
| N | Hanging | ASU | S | N | N | Y | Y | Y |
| O | Hanging | GP | S | N | N | N | Y | Y |
| P | Hanging | ASU | S | Y | N | N | Y | Y |
| Q | Hanging | GP | S/double cell eligible | N | N | Y/but did not appear to be contributory | Y | N |
| R | Hanging | DSH/modified 180 design | S | Y | N | N | Y | Y |

**<u>APPENDIX D</u>**

**Prevalence of Selected Characteristics Among 18 Suicides By CDCR Inmates
July 1, 2012 – December 31, 2012**

Single Cell Housing

     16 of 18                 (88.9 percent)

Inmates Incarcerated for Sex Offenses ("R" Suffix)

     0 of 18                  (0 percent)

Method

- Hanging: 17 of 18     (94.4 percent)
- Overdose:  1 of 18     (5.6 percent)

History of Suicidal Behavior

     7 of 18                  (38.9 percent)

History of Past Mental Health Treatment

     12 of 18                 (66.7 percent)

Housed in Infirmary, Mental Health Crisis Bed (MHCB), Outpatient Housing Unit (OHU), or Department of State Hospitals Facility (DSH)

     1 of 18                  (5.6 percent)

Housed in Administrative Segregation Unit (ASU), Psychiatric Services Unit (PSU), Security Housing Unit (SHU), or Condemned Unit

- ASU: 4 of 18       (22.2 percent)
- PSU:  1 of 18      (5.6 percent)
- SHU: 1 of 18       (5.6 percent)
- Condemned: 1 of 18   (5.6 percent)

Housed in Special Needs Yard (SNY)

     SNY: 1 of 18       (5.6 percent)

Inmates on Keyhea Order for Involuntary Medication

1 of 18                    (5.6 percent)

<u>Concomitant Severe, Life Threatening, Medical Illness</u>

4 of 18                    (22.2 percent)

<u>On Mental Health Services Delivery System (MHSDS) Caseload at Time of Death</u>

9 of 18 (50 percent)

- EOP: 3 of 18          (16.7 percent)
- 3CMS: 5 of 18         (27.8 percent)
- DSH:  1 of 18         (5.6 percent)

<u>Age Range</u>

Under 18: 0            (0 percent)
18-30: 1 of 18         (5.6 percent)
31-40: 7 of 18         (38.9 percent)
41-50: 5 of 18         (27.8 percent)
50+: 5 of 18           (27.8 percent)

<u>Race</u>

Caucasian: 9 of 18              (50 percent)
Hispanic: 5 of 18               (27.8 percent)
African-American: 2 of 18       (11.1 percent)
Asian: 1 of 18                  (5.6 percent)
Native American: 1 of 18        (5.6 percent)

<u>Gender</u>

Male: 17 of 18         (94.4 percent)
Female: 1 of 18        (5.6 percent)

**<u>APPENDIX E</u>**

**Frequency of Suicides, by CDCR Prison**
**July 1, 2012 – December 31, 2012**

| | |
|---|---|
| **California Institution for Men (CIM)** | **1** |
| **California Institution for Women (CIW)** | **1** |
| **California Medical Facility (CMF)** | **1** |
| **California State Prison, Corcoran (CSP/Solano)** | **1** |
| **California State Prison, Los Angeles County (CSP/LAC)** | **1** |
| **California State Prison, Sacramento (CSP/Sac)** | **1** |
| **California State Prison, Solano (CSP/Solano)** | **1** |
| **Calipatria State Prison (CAL)** | **1** |
| **Deuel Vocational Institution (DVI)** | **1** |
| **Folsom State Prison (Folsom)** | **1** |
| **Salinas Valley State Prison (SVSP)** | **4** |
| **Salinas Valley Psychiatric Program (SVPP)** | **1** |
| **San Quentin State Prison (SQ)** | **1** |
| **Sierra Conservation Center (SCC)** | **1** |
| **Tallahatchie County Correctional Facility (COCF-TCCF)[2]** | **1** |

---

[2] Out-of-state correctional facility















































































**<u>APPENDIX G</u>**

# CURRICULUM VITAE

**KERRY COURTNEY HUGHES, M.D.**
**1579 Monroe Dr., Suite F  Box 612**
**Atlanta, GA  30324**
**FAX: 404-364-9708**
**EMAIL: dockc99@aol.com**

| | |
|---|---|
| **DATE OF BIRTH:** | SEPTEMBER 9, 1960 |
| **PLACE OF BIRTH:** | JACKSON, MISSISSIPPI |
| **CITIZENSHIP:** | U.S.A. |
| **LICENSURE:** | GEORGIA COMPOSITE STATE BOARD OF MEDICAL EXAMINERS |
| **SPECIALTY BOARD CERTIFICATION:** | AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY CERTIFICATE #38864 JANUARY, 1994 |

**EDUCATIONAL BACKGROUND**:

Emory University Affiliated Hospitals, Atlanta, Georgia:  Residency in Psychiatry, July, 1986 - June, 1990

The University of Iowa College of Medicine, Iowa City, Iowa:  Medical Degree, 1982 - 1986

Jackson State University, Jackson, Mississippi:  Bachelor of Science Degree in Biology, 1978 - 1982

Clinton High School, Clinton, Mississippi, 1974 - 1978

**EMPLOYMENT EXPERIENCE:**

Director of Mental Health Services, Fulton County Jail, 901 Rice Street, Atlanta, Georgia, 1993 – May 2004

Staff Psychiatrist, Fulton County Jail, 901 Rice Street, Atlanta, Georgia, 1990 - 1993

1

**CURRICULUM VITAE**

Staff Psychiatrist, West Fulton Mental Health Center, 475 Fairburn Road, S.W., Atlanta, Georgia, 1990 - 2001

Medical Director, Peachtree Alternatives, Incorporated, Outpatient Recovery Program, 5115 New Peachtree Road, Suite 102, Chamblee, Georgia, 1990 - 1994

Psychiatrist, The Behavioral Medicine Institute of Atlanta, Paces Pavilion, Suite 202, 3193 Howell Mill Road, N.W., Atlanta, Georgia, 1990 - 1991

## ACADEMIC POSITIONS:

Assistant Professor of Clinical Psychiatry, Morehouse School of Medicine, 720 Westview Dr., Atlanta, Georgia, 1990 – 2008.

## FORENSIC EXPERIENCE:

Psychiatric Expert for the United States District Court of the Eastern District of California; case Coleman et al. v. Brown et al., April 1998 – present.

Assistant Federal Court Monitor for United States Federal District Court of Illinois, Central Division; case Rasho v. Walker, September 2014 – present.

Mental Health Consultant, Doña Ana County Adult Detention Center, Las Crucas, New Mexico, January 2012 - present.

Mental Health Consultant, Monroe County Jail, Rochester, New York, October 2013.

Neutral Psychiatric Expert, case Jaime Bravo, et al., v. Board of County Commissioners for the County of Doña Ana, the Doña Ana County Detention Center et al., July 2010 – January 2012.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Miami-Dade County Jail, November 2011 – 2013.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Santa Fe County Adult Detention Center, May 2004 – November 2009.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Oahu Community Correctional Center, October 2005 - 2006.

Psychiatric Expert for the United States Department of Justice, Civil Rights Division; Mobile County Metro Jail, September 2003.

CURRICULUM VITAE

Federal Court Monitor for the United States District Court for the District of New Jersey Vicinage of Trenton; case C. F., et al., v. Terhune et al., August 2001 – 2007.

Mental Health Survey Team Leader, Hendry Correctional Institute, Immokalee, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., July 1991

Mental Health Survey Team Leader, Martin Correctional Institute, Indiantown, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., August, 1991

Mental Health Resurvey Team Leader, North Florida Reception Center, Lake Butler, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., December, 1991

Mental Health Resurvey Team Participant, Charlotte Correctional Institute, Punta Gorda, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., December, 1991

**PUBLICATIONS:**

Metzner JL, Hughes K: Suicide Risk Management, in Oxford Textbook of Correctional Psychiatry, Edited by Trestman R, Appelbaum K, & Metzner JL. Oxford University Press, 2015.

Metzner JL, Dubovsky S, Hughes K, et al.: National Commission on Correctional Health Care Task Force Report: Clinical Guidelines for Correctional Facilities, Guidelines for Treatment of Schizophrenia in a Correctional Setting; Chicago IL, National Commission on Correctional Health Care, May 2004.

Patterson RF, Hughes K: Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004. Psychiatric Services. June 2008; Volume 59, Number 6: Pages 676-82.

**RESEARCH:**

A Comparison of Pulmonary and Intestinal Lymphoid Cell Recirculation and Tissue Localization in Sheep, Brookhaven National Laboratory, Medical Department, Supervisor - Daniel Joel, D.V.M., Ph.D., 1982

Minority Access to Research Careers (M.A.R.C.) Project, A Comparison of Infectivity of Three Strains of Codling Moth Granulosis Virus by E.L.I.S.A., University of California at Berkeley, Department of Entomology and Parasitology, Supervisor - Louis Falcon, Ph.D., 1981

**CURRICULUM VITAE**

**PROFESSIONAL ORGANIZATIONS:**

American Medical Association

American Psychiatric Association

American Academy of Psychiatry and the Law

Society of Correctional Physicians

Black Psychiatrists of America

American Correctional Health Services Association

Georgia Psychiatric Physicians Association

Academy of Correctional Health Professionals

Southern Medical Association

American Medical Student Association, 1982 - 1986

Student National Medical Association, 1982 - 1986

**APPOINTMENTS, ACTIVITIES AND ORGANIZATIONS:**

Fellow of the American Psychiatric Association, May 2009

Institutional and Correctional Psychiatry Committee, American Academy of Psychiatry and the Law, 2001 – 2006.

Committee Chairperson, Correctional Psychiatry Committee, Atlanta Chapter of the Black Psychiatrists of America, 2000 – 2005.

Commission on AIDS, American Psychiatric Association, 1988 - 1989

Committee of Black Psychiatrists, American Psychiatric Association, 1989 - 1990

Medical Student Council, 1984

Senior Participant, Senior Clinical Conference for Freshman Students, 1982

**CURRICULUM VITAE**

President of the Pre-Health Society, Jackson State University, 1981

Alpha Phi Alpha Fraternity, Incorporated

Jackson State University Concert Choir and Chorale, 1978 - 1982

Jackson State University Marching Band and Brass-wind Ensemble, 1978 - 1982

University of Iowa Alumni Association

Jackson State University Alumni Association

**AWARDS AND HONORS:**

APA-NIMH Minority Fellowship, 1988 - 1989

Trainee-Consultant, APA-NIMH Minority Fellowship, 1989 - 1990

Magna Cum Laude, Jackson State University, 1982

President's List Scholar, Jackson State University, 1982

Phi Kappa Phi Honor Society, Jackson State University, 1982

Who's Who Among American Universities and Colleges, 1981 - 1982

**COMMUNITY ACTIVITIES:**

South Fulton Running Partners

Atlanta Track Club

**<u>APPENDIX H</u>**

## ACRONYMS and ABBREVIATIONS

3CMS:            Correctional Clinical Case Management System

AA:              African American

AED:             Automated External Defibrillator

ASU:             Administrative Segregation Unit

C:               Caucasion

CAL:             Calipatria State Prison

CDCR:            California Department of Corrections and Rehabilitation

CIM:             California Institution for Men

CIW:             California Institution for Women

CMF:             California Medical Facility

COCF-TCCF:       Community Out-of-State Correctional Facility – Tallahatchie County
                 Correctional Facility

CPR:             Cardiopulmonary Resuscitation

CSP/Cor:         California State Prison/Corcoran

CSP/LAC:         California State Prison/Los Angeles County

CSP/Sac:         California State Prison/Sacramento

CSP/Solano:      California State Prison/Solano

DRC:             Death Review Committee

DSH:             Department of State Hospitals

DVI:             Deuel Vocational Institution

EOP:             Enhanced Outpatient Program

FSP:             Folsom State Prison

GP:                     General Population

H:                      Hispanic

ICF:                    Intermediate Care Facility

LOC:                    Level of Care

MHCB:                   Mental Health Crisis Bed

PSU:                    Psychiatrist Services Unit

QIP:                    Quality Improvement Plan

SCC:                    Sierra Conservation Center

SCU:                    Special Care Unit

SHU:                    Secured Housing Unit

SNY:                    Sensitive Needs Yard

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SRE:                    Suicide Risk Evaluation

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison