1  KAMALA D. HARRIS
   Attorney General of California
2  JAY C. RUSSELL
   PATRICK R. MCKINNEY
3  Supervising Deputy Attorneys General
   ELISE OWENS THORN, State Bar No. 145931
4  MANEESH SHARMA, State Bar No. 280084
   Deputy Attorneys General
5    1300 I Street, Suite 125
     P.O. Box 944255
6    Sacramento, California  94244-2550
     Telephone: (916) 324-5345
7    Fax:  (916) 324-5205
     E-mail:  Elise.Thorn@doj.ca.gov
8
   *Attorneys for Defendants*
9

10         IN THE UNITED STATES DISTRICT COURT

11       FOR THE EASTERN DISTRICT OF CALIFORNIA

12              SACRAMENTO DIVISION

13

14  RALPH COLEMAN, et al.,              2:90-cv-00520 KJM DAD P

15           Plaintiffs,               **PARTIES' JOINT STATUS
                                        CONFERENCE STATEMENT**
16        v.
                                        Judge Kimberly J. Mueller
17  EDMUND G. BROWN, JR., et al.,       Date:   August 19, 2015
                                        Time:   1:30 p.m.
18           Defendants.               Crtrm.:  3

19

20

21

22

23

24

25

26

27

28

[2799290-8]

# TABLE OF CONTENTS

**Page**

I.   DEFENDANTS' REPORT ON INPATIENT CENSUS AND PRIOR PLAN
     IMPLEMENTATION ................................................................................. 1

II.  PLAINTIFFS' STATEMENT ON THE ISSUE OF ACCESS TO
     INPATIENT CARE.................................................................................. 1

     A.   Summary of Plaintiffs' Position ..................................................... 1

     B.   The *Coleman* History of Unconstitutional Denials of Timely Access
          to Inpatient Care ............................................................................ 3

     C.   The Evidence Supports a Court Order to Enforce Existing Court
          Orders and to Remedy the Ongoing Constitutional Violations with
          Respect to Timely Access to Adequate Higher Levels of Care. ................ 14

          1.   Defendants' Population Projections and Inpatient Bed Data
               Make Clear the Urgent Need to Effectively Use All Available
               *Coleman*-Designated Inpatient Beds to Meet Demand. ..................... 15

               a.   ICF Level of Care Beds......................................................... 15

               b.   APP Level of Care Beds......................................................... 16

          2.   Defendants Continue to Fail to Take Necessary Steps to Ensure
               that ICF Patients Are Housed in the Least Restrictive and Most
               Integrated Setting, Contributing to the Large Number of
               Vacant Inpatient Beds. ........................................................................ 16

               a.   DSH's Shadow Review and Deferral Process. ...................... 18

               b.   DSH's Failure to Move Patients to Less Restrictive,
                    More Integrated Settings as They Stabilize in Inpatient
                    Care. ..................................................................................... 20

          3.   Defendant's Failure to Utilize Available Lower-Security ICF
               Beds Creates Significant Bottlenecks Throughout the System
               and Negatively Impacts Other Levels of Care. .................................. 21

               a.   Delays in Access to Acute Care. ............................................. 21

               b.   Delays in Access to MHCB Care............................................. 22

     D.   Defendants' Reporting Lacks Transparency and Tends to Under-
          Count Patients Waiting for Inpatient Care, but Clearly Demonstrating
          a Persistent Problem with Respect to Patients Waiting for Inpatient
          Care.......................................................................................................... 22

     E.   Applicable Constitutional and Statutory Principles Weigh Heavily in
          Favor of this Court Issuing Targeted and Specific Orders Directing
          Defendants to Fill All Available Inpatient Beds and to Ensure Class
          Members Receive Inpatient Care in the Least Restrictive Setting

Appropriate. ................................................. 24

1.  Defendants' Backsliding Demonstrates that They Are Far From
    Achieving a Durable Remedy to the Constitutional Violations
    Regarding Access to Inpatient Care. .................................. 24

2.  Defendants Should Be Ordered to Take Steps to Ensure that
    *Coleman* Class Members Requiring Inpatient Care Receive
    Such Care in the Least Restrictive Setting Appropriate to Their
    Individual Needs. ..................................................... 25

3.  Specific Relief Is Appropriate Here, Where There are Repeated
    and Longstanding Violations. ......................................... 26

F.  Plaintiffs' Request for Relief. ........................................ 28

1.  There Is an Emergent Need for Further Specific Court Orders
    to Remedy These Longstanding Problems. ............................. 28

2.  The Court's Order to Remedy these Deficiencies Should Apply
    to Defendants Equally and Not to Either CDCR or DSH Alone. ...... 28

3.  CDCR's Custodial and Clinical Determinations that a Patient
    Can Safely Program in a Lower-Security Inpatient Program
    Must Govern Placement of That Patient. ............................. 29

4.  Defendants Should Be Ordered to Transfer ICF Patients to
    Unused Less Restrictive Beds at a Specified Rate of Five Per
    Week until All *Coleman*-Designated Inpatient Beds Are Filled. ....... 30

5.  Defendants Must Implement a Sustainable Process for Ongoing
    Review and Movement of Patients to the Least Restrictive,
    Most Integrated Inpatient Settings Appropriate. ..................... 30

6.  Defendants Must Be Required to Provide Complete and
    Accurate Reports that Show the True "Wait List" and
    Timelines for Access to Inpatient Care. ............................. 31

7.  Continued Attention to the Problem of Inadequate Treatment in
    the Inpatient Units Is Also Necessary. .............................. 32

# TABLE OF AUTHORITIES

**Page**

## CASES

*Armstrong v. Schwarzenegger*,
 622 F.3d 1058 (9th Cir. 2010) ....................................................... 28

*Bounds v. Smith*,
 430 U.S. 817 (1977) ....................................................................... 26

*Coleman v. Brown*,
 428 Fed. App'x 743 (9th Cir. 2011) ............................................. 10

*Coleman v. Brown*,
 922 F. Supp. 2d 1004 (E.D. Cal., N.D. Cal. 2013) ....................... 25

*Coleman v. Wilson*,
 912 F. Supp. 1282 (E.D. Cal. 1995) .............................................. 6

*Consumer Advisory Bd. v. Harvey*,
 No. 2:91–CV–00321, 2009 WL 5792159 (D. Me. Oct. 9, 2009) ............ 25

*Cruz v. Beto*,
 405 U.S. 319 (1972) ....................................................................... 27

*Evans v. Fenty*,
 701 F. Supp. 2d 126 (D.D.C. 2010) .............................................. 25

*Feliciano v. Rullan*,
 378 F.3d 42 (1st Cir. 2004) ........................................................... 27

*Hutto v. Finney*,
 437 U.S. 678 (1978) ....................................................................... 27

*LaShawn A. Ex. Rel. Moore v. Fenty*,
 701 F. Supp. 2d 84 (D.D.C. 2010) ................................................ 25

*Lewis v. Casey*,
 518 U.S. 343 (1996) ....................................................................... 26

*Olmstead v. L.C. ex rel Zimring*,
 527 U.S. 581 (1999) ....................................................................... 26

*Plata v. Brown*,
 131 S. Ct. 1910 (2011) ............................................................ 26, 27

## STATUTES

18 U.S.C. § 3626(a)(1)(A) ...................................................................... 28

42 U.S.C. § 12132 ................................................................................................. 26

**REGULATIONS**

28 C.F.R. § 35.104 ............................................................................................... 26

28 C.F.R. § 35.130(d) .......................................................................................... 26

28 C.F.R. § 35.152(b)(2) ...................................................................................... 26

The parties submit this joint status conference statement in response to the Court's August 5, 2015 order setting a status conference to review the status of Defendants' plans to reduce the waitlists for inpatient care. The identification of this statement as "joint" is not an indication that Defendants concur with Plaintiffs' statements, or that Plaintiffs concur with the statements presented by Defendants herein or in the report attached hereto as **Exhibit A**.

## I.    DEFENDANTS' REPORT ON INPATIENT CENSUS AND PRIOR PLAN IMPLEMENTATION

Defendants have prepared a report outlining the status of the implementation of their prior plans to reduce or eliminate the waitlists for inpatient care. The report, which is attached hereto as Exhibit A, also includes the August 10, 2015 inpatient census and waitlist data the Court requested in Paragraph 2 of the August 5 Order. (ECF No. 5333.)

In addition to the attached report, Defendants will appear at the status conference prepared to address the concerns raised by the Court in Paragraph 3 of the August 5 Order.

## II.    PLAINTIFFS' STATEMENT ON THE ISSUE OF ACCESS TO INPATIENT CARE

### A.    Summary of Plaintiffs' Position[1]

The August 19, 2015 status conference regarding the issue of timely access to inpatient psychiatric hospitalization for the *Coleman* class is but the latest in a lengthy history. The Court has undertaken numerous carefully crafted steps to ensure a sustainable remedy for the systemic denial of timely access to adequate inpatient hospitalization, first

---

[1] After the Court issued its August 5, 2015 order directing the part to submit a joint status report on this matter, Plaintiffs attempted repeatedly and in good faith to confer with Defendants to share information in advance of the filing deadline, so as to meaningfully prepare a joint filing for the Court's review. Defendants did not agree to share with Plaintiffs the information requested from them by the Court. As a result, Plaintiffs have been left to prepare their pleadings without up-to-date information or cooperation from Defendants.

1  by relying on Defendants to develop and implement plans to address the identified

2  constitutional violations and where necessary, issue affirmative orders necessary to protect

3  the rights of the *Coleman* class.

4       Defendants' reporting to the Court, the Special Master, and Plaintiffs confirms that,

5  in the short time since the most recent protracted litigation regarding delayed access to

6  inpatient psychiatric hospitalization in 2011 and 2012, Defendants have allowed

7  significant backsliding to occur.  Wait lists of patients referred and accepted for psychiatric

8  hospitalization, but not promptly transferred for care, have reemerged and persisted, both

9  for acute and intermediate hospitalization.  There is no question Defendants have failed to

10  create a durable remedy to address the ongoing denial of timely access to constitutionally

11  adequate inpatient care for *Coleman* class members.  What is more, Defendants' opaque

12  reporting continues to significantly undercount the true number of class members awaiting

13  inpatient hospitalization,  as well as the full length of those waits.

14       The evidence shows that even as class members accepted for psychiatric

15  hospitalization continue to wait for inpatient care, scores of lower-security intermediate

16  care beds sit empty because Defendants simply stopped implementing their own Court-

17  ordered inpatient bed management strategy.  Those vacant beds—including over 100 at

18  Atascadero State Hospital ("ASH")—reveal that Defendants long ago abandoned a critical

19  component of their own plan to reduce and eliminate the inpatient wait lists, which

20  required them to better utilize the more than 300 beds reserved for *Coleman* class members

21  at ASH and Coalinga State Hospital ("CSH").

22       The consequences of Defendants' willful backsliding are dire and echo throughout

23  the system.  Class members continue to wait for clinically indicated psychiatric

24  hospitalization while *Coleman*-designated beds sit empty.  Within the inpatient programs,

25  Defendants refuse to treat class members in the least restrictive, most integrated inpatient

26  setting appropriate to their needs, even after CDCR's clinical and custody systems approve

27  them for lower-security placements.  Meanwhile, the failure to effectively utilize existing

28  *Coleman*-designated inpatient beds is contributing to bottlenecks and delays at other levels

of care in the State's mental health care delivery system.

Defendants' regression on this critical issue demonstrates they are far from achieving the durable remedy necessary to resolve the *Coleman* case. The Court should enforce its existing orders and issue additional affirmative relief to remedy the ongoing constitutional violations. In addition, the Court should order specific, appropriate relief to ensure that class members are housed in the least restrictive, most integrated inpatient settings appropriate to their individual needs, as required by the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act, which are now subject to enforcement in this case.

**B.      The *Coleman* History of Unconstitutional Denials of Timely Access to Inpatient Care**

Defendants' failure to provide timely access to appropriate inpatient psychiatric hospitalization for *Coleman* class members has been an intractable problem stretching over many years of this litigation. Defendants' current inability to provide timely access to inpatient care arises in large part from their refusal to appropriately manage the inpatient psychiatric hospital resources available to them. Rather than fully utilizing available inpatient beds at ASH and CSH, which offer full and rich programs to individuals with serious mental illness including access to education and rehabilitative services, Defendants have chosen unnecessarily to restrict *Coleman* class members to the expensive and limited high-security programs inside CDCR prisons. As the Court's order setting this status conference recognizes, the Court has issued numerous orders over the years and has given Defendants repeated chances to develop a durable remedy to this problem. The time for developing plans only to have them be tossed by the wayside with the passage of time is long past; Defendants must be ordered to implement specific and sustainable remedies.

Throughout the history of this case, Defendants have primarily relied on the Department of State Hospitals ("DSH")[2] to provide long-term and acute inpatient

---

[2] The Department of State Hospitals was known as the California Department of Mental (footnote continued)

1  psychiatric hospitalization to *Coleman* class members. Cal. Penal Code § 2684.  But all

2  Defendants—the Governor, the CDCR Secretary, the Director of the Department of

3  Finance, as well as the Director of DSH—are responsible to bring inpatient care into

4  compliance with constitutional and statutory mandates, regardless of the specific agency

5  tasked by the State with delivery of care to a specific patient.

6       Presently, there are three levels of licensed inpatient psychiatric hospitalization

7  offered to *Coleman* class members.  Mental Health Crisis Beds ("MHCB") are operated by

8  CDCR in licensed Correctional Treatment Centers ("CTC") located inside of CDCR

9  prisons, designed for short-term (10 days or less) emergency stabilization and evaluation.

10 "Acute" (or "APP") inpatient hospitalization is the highest and most intense level of

11 psychiatric hospitalization for the most acutely ill and is operated by DSH for male

12 prisoners at the Vacaville Psychiatric Program ("VPP") inside of California Medical

13 Facility ("CMF") (218 beds) and California Health Care Facility ("CHCF") in Stockton

14 (94 beds).  "Intermediate" (or "ICF") inpatient hospitalization is intended for longer-term

15 psychiatric treatment and rehabilitation, with lengths of stay frequently exceeding a year.

16 ICF care for male prisoners is provided at five locations:  Salinas Valley Psychiatric

17 Program ("SVPP") at Salinas Valley State Prison (246 high-security[3] beds), VPP at CMF

18 (30 high-security beds and 64 low-security beds), CHCF (420 high-security beds,

19 including 28 "isolation rooms" not available to house patients), Atascadero State Hospital

20 (or "ASH") (256 low-security beds), and Coalinga State Hospital (or "CSH") (50 low-

21 security beds).  APP and ICF care for men on death row is provided in a CDCR-operated

22 Psychiatric Inpatient Program at San Quentin State Prison (40 beds).  Finally, APP and

23 ────────────────

24 Health until July 1, 2012, and so is referred to as "DMH" in various older Court orders.

25 [3] "High-security " and "low-security" refer to Defendants' designations of certain
   intermediate inpatient programs for purposes of *Coleman* class members only.  Defendants

26 do not distinguish between high and low custody for any non-*Coleman* patients receiving
   treatment at DSH hospitals, including patients deemed sexually violent predators, mentally

27 disordered offenders, or incompetent to stand trial.  Defendants also do not distinguish
   between high and low custody for *Coleman* class members receiving acute care.

28

1    ICF care for women is provided in the CDCR-operated Psychiatric Inpatient Program at

2    California Institution for Women (40 beds). Declaration of Aaron J. Fischer ("Fisher

3    Decl.") Ex. E.

4         The decision to restrict a class member eligible for the lower-security dorms at

5    ASH, CSH, or VPP to a high-security ICF placement is not a neutral decision. The ICF

6    beds are not equal: There are dramatic differences between the programs. The Special

7    Master recently noted that "at the two exclusively DSH-run programs at ASH and CSH,

8    and at the exclusively CDCR-run program at the CIW PIP, treatment and clinical services

9    were better overall than they [are] at the combined DSH/CDCR-operated programs at

10   SVPP, VPP, and the CHCF." Special Master's Report on Adequacy of Inpatient Mental

11   Health Care for Inmates of the California Department of Corrections and Rehabilitation,

12   5/30/14, Dkt. No. 5156, at 51. The same report documented serious deficiencies in the

13   delivery of care in high-security ICF programs in particular, including highly restrictive

14   rules governing patient movement that lack sufficient clinical or custodial justification,

15   minimal programming for patients on maximum custody status, problems with treatment

16   planning, suicide assessments, insufficient number of groups, insufficient number of

17   regularly scheduled one-on-ones, restricted law library, and restricted visitation. *Id.* at

18   186-87. As just one example, in contrast to the high-security programs, in which patients

19   were found to be initially placed on a highly restrictive status in which "they were held in

20   stripped-down cells, and could attend groups only while handcuffed," low-security

21   program patients at ASH experienced "no stages of programming or treatment … that

22   required patients to move around the hospital or attend any treatment services in

23   handcuffs." *Id.* at 146, 76.

24        Even if Defendants were able to substantially improve the operation of the high-

25   security ICF programs from the present inexcusably poor levels, these programs are

26   *designed* to be more restrictive and provide less freedom of movement, communication

27   and choice than the lower-security programs. Thus, patients would still greatly benefit

28   from transfer, when safe and appropriate, to the less restrictive lower-security ICF

1  programs after they stabilize and are able to benefit from the increased socialization and

2  rehabilitation provided in the lower-security programs.  Providing inpatient care in the

3  least restrictive, most integrated setting appropriate is in fact required by federal disability

4  anti-discrimination law.  *See* Part II.E.2, *infra*.

5       The present crisis is grounded in a lengthy history of seriously mentally ill *Coleman*

6  class members suffering as a result of months upon months of delays in accessing inpatient

7  psychiatric hospitalization, a constitutional violation dating back to the beginning of this

8  case two decades ago, when this Court found "significant and unacceptable delays" in

9  access to appropriate levels of care, requiring prompt remedial action.  *Coleman v. Wilson*,

10  912 F. Supp. 1282, 1308 (E.D. Cal. 1995).  More than a decade ago, the Court recognized

11  that despite order after order seeking to remedy the substantial shortage of inpatient care

12  beds, Defendants still failed "to adequately assess the unmet need for DMH inpatient beds

13  for seriously mentally ill inmates in the state prison population, and the concomitant delays

14  that have attended access to such beds."  Order, 7/9/04, Dkt. No. 1594, at 1-2.

15       Defendants' efforts to exclude *Coleman* class members from available beds at

16  freestanding state hospital facilities dates back as far as 1998, when the State sought to

17  decrease the number of class members treated at ASH (which also treats persons under

18  civil commitments) by opening inpatient hospital facilities within two prisons, VPP and

19  SVPP.  *See* Stipulation and Order, 5/21/98, Dkt. No. 945.  Management of beds in these

20  new facilities and within the state hospitals required close court supervision over the next

21  several years.  In 2001, the Court adopted Special Master recommendations requiring

22  Defendants to assess inpatient bed usage and need throughout the system.  *See* Order,

23  6/27/01, Dkt. No. 1278, at 2.  In 2002, the Court adopted several Special Master

24  recommendations regarding inpatient care in DSH facilities, including a prohibition on the

25  State's planned closure of a DSH-operated inpatient program at CMF. *See* Order, 10/8/02,

26  Dkt. No. 1431. During the same timeframe, Defendants engaged in a further study of need

27  projections for inpatient psychiatric care in the *Coleman* class member population. *See*

28  Special Master Report, 4/16/02, Dkt. No. 1369.

1    The Court then found in July 2004 that further involvement by the Special Master

2   was needed due to "[D]efendants' repeated failure to adequately assess the unmet need for

3   DMH inpatient beds for seriously mentally ill inmates in the state prison population, and

4   the concomitant delays that have attended access to such beds."  Order, 7/9/04, Dkt. No.

5   1594, at 1-2.  The Court prohibited the State from closing two inpatient programs that it

6   had planned to close with the activation of the new 64-bed SVPP unit, and set new

7   deadlines for completion of an "unmet inpatient bed needs" study, as well as other

8   measures regarding needed additional inpatient capacity.  *Id.* at 3-5. The initial study of

9   previously unidentified inpatient needs, completed in March 2005, found over 500 state

10  prisoners who needed inpatient care but who had not been referred.  *See* 15th Report of the

11  Special Master, 1/23/06, Dkt. No. 1746, at 377.

12    By April 2006, it was "undisputed that the [inpatient bed] shortage [was] leaving

13  critically mentally ill inmates languishing in horrific conditions without access to

14  immediately necessary mental health care," creating—in the words of the State's then-

15  Director of Correctional Health Care Services—a "crisis."  Order, 5/2/06, Dkt. No. 1800,

16  at 2.  At that time, with 123 class members awaiting placement into an ICF bed, the Court

17  ordered a number of steps, including prompt activation of 50 ICF inpatient beds at CSH for

18  use by *Coleman* class members.  *Id.* at 5. The Court also ordered that Defendants were not

19  to close any inpatient beds without approval of the Special Master.  Shortly thereafter, the

20  Court added DSH as a defendant because it had become "apparent that, for multiple

21  reasons, DMH is failing to address specific court-ordered remedies," including access to

22  ASH.  Order, 6/28/06, Dkt. No. 1855.

23    Shortly thereafter, severe staffing shortages at the DSH hospitals due to the State's

24  failure to match CDCR pay raises for DSH clinicians led to the de facto closure of ASH

25  beds to the *Coleman* class.  *See* Special Master Report, 1/30/07, Dkt. No. 2121, at 4

26  (noting that patients had been "turned away" from ASH because of staffing shortages).  In

27  May 2007, the Court ordered Defendants to create a plan to remedy pay disparities and

28  otherwise to ameliorate severe staffing shortages at ASH that were artificially limiting the

1   availability of care there.  Order, 5/23/07, Dkt. No. 2236, at 5-6.  In June 2007, the Court

2   addressed the State's "unacceptable" ongoing refusal to admit the many patients

3   "urgent[ly]" waiting for inpatient care to empty beds at ASH. Order, 6/28/07, Dkt. No.

4   2301, at 2-3.  The Court ordered Defendants to submit plans for making the full

5   complement of DSH beds available to the *Coleman* class.  Shortly thereafter, the Court

6   ordered Defendants to implement a plan to raise the population of class members in ASH

7   beds to 125 within four months, and to report on their progress in the interim.  Order,

8   8/2/07, Dkt. No. 2343.

9       In March 2009, the Court held a hearing on bed planning issues including inpatient

10  bed shortages, and directed the Special Master to meet with the responsible officials—

11  including those from DSH—regarding remedial steps.  *See* Order, 3/31/09, Dkt. No. 3556,

12  at 1-3. At these meetings, DSH officials "took an intractable position with respect to the

13  use of [ASH] and [CSH] for part of any necessary solutions," and the Court therefore

14  ordered DSH's director to personally attend the next meetings in order to change

15  Defendants' "intransigence" about providing care at ASH and CSH.  *Id.* at 3.

16      Also in the March 2009 order, the Court ordered the Mental Health Assessment and

17  Referral Project (MHARP), designed to facilitate Defendants' identification of class

18  members in need of DSH inpatient care who had not been properly identified and referred.

19  Order, Dkt. No. 3556, ¶ 7.  By June, initial results of the MHARP showed that there were

20  "a substantial number of *Coleman* class members … who are presently in need of hospital

21  care."  Order, 6/18/09, Dkt. No. 3613, at 3-4.  The Court therefore approved "conversions

22  of hospital beds to provide a full complement of 256 intermediate care beds at ASH to

23  *Coleman* class members" and ordered that Defendants "admit *Coleman* class members to

24  those beds at a rate of not less than ten per week until all 256 beds are filled by *Coleman*

25  class members not later than October 31, 2009."  *Id.* at 4.

26      Defendants sought and received an extension of time for compliance through

27  December 31, 2009, see Dkt. No. 3720, and then moved for relief from the Court's order,

28  claiming that "there has not been enough need to date to fill the 256 ICF low-custody

beds." Defs' Request for Temporary Relief re: 256 Beds, 12/31/09, Dkt. No. 3760, at 3. In ruling on Defendants' request for relief, the Court found that the MHARP had been completed on December 29, 2009, had involved review and assessment of over 1,500 class members, and had resulted in the referral of almost 1,000 patients for inpatient mental health care. Order re 256 Beds at ASH, 1/27/10, Dkt. No. 3787, at 2. Of the 688 inmates referred to DSH through December 15, 2009 as a result of the assessment, 135 were admitted to ASH and 34 were admitted to Coalinga. *Id.* at 3.

The Court also reviewed the evidence regarding a two-year pilot program designed to allow Defendants to refer "to ASH and the VPP dorms, on a case-by-case evaluation, some CDCR inmate-patients whose custody factors would previously have prevented their referral to an ICF low-custody bed." *Id.* at 3-4. The Court noted that "[o]f the 33 inmates referred to ASH pursuant to the first review, none had been admitted as of the time the instant request was filed" although there were still 58 empty beds at ASH. *Id.* at 4-5. Given the ongoing nature of the case-by-case assessments and the recent success of the MHARP in identifying dramatic numbers of previously unidentified class members in need of inpatient care, the Court determined "it is simply too early to consider decreasing the number of beds available for Coleman class members at ASH," *id.* at 6, and specifically ordered Defendants to "fill all of the 256 beds at ASH dedicated to *Coleman* class members" by no later than February 26, 2010. *Id.* at 7.

After reviewing further evidence about the continued delays in access to inpatient care, on March 31, 2010, the Court directed Defendants to "forthwith direct their attention to solving the ongoing, and growing, problem" of access to inpatient care, noting the approximately 574 class members on the ICF wait list and as many as 97 class members on the APP wait list. Order, Dkt. No. 3831, at 2-3. The Court ordered Defendants to develop a plan to "reduce or eliminate the wait lists for inpatient care and, in the interim, to better serve the treatment needs of *Coleman* class members placed on such lists." *Id.* at 3.

While Defendants were dragging their heels on development of this plan, Plaintiffs moved in September 2010 for an evidentiary hearing on delays in opening new temporary

1    DSH-operated inpatient beds at SVPP, known as the C5/C6 units.  Dkt. No. 3907. The

2    Court subsequently found on the basis of evidence presented at the hearing that that "there

3    were over 400 seriously mentally ill inmates waiting for inpatient hospital care due to the

4    severe shortage of such beds that continues to plague the department." Order re C5 and C6

5    Units, October 5, 2010, Dkt. No. 3929, at 1-2.  Deeming the inpatient bed waitlist to be an

6    "emergency," the Court ordered the State to take a number of steps to address the problem,

7    including accelerating admissions to the C5/C6 units at "a rate of not less than ten inmate

8    patients per week." *Id.* at 2, 4.  The Court also "heard testimony at the hearing that there

9    are no *Coleman* class members presently housed in the 50 beds dedicated for *Coleman*

10   class members at [CSH] and that there are vacancies at [ASH] and in the Level III program

11   at VPP." *Id.* at 3.  Given these vacancies, the length of the waitlist, and evidence from the

12   ICF Pilot Program that there were "a significant number [of] inmate patients on the

13   Level IV wait list who are eligible for placement at Level III hospital facilities," the Court

14   ordered Defendants to "evaluate inmates presently housed in all DMH Level IV hospital

15   programs to determine whether there are inmates in such programs who could be

16   transferred to CSH or ASH or the Level III program at VPP." *Id.* at 3.  Defendants

17   ultimately appealed this order and requested an emergency stay, which was denied. The

18   Ninth Circuit affirmed the Court's order, finding that the record "contain[ed] ample

19   evidence of the unconstitutional conditions under which [class members needing inpatient

20   care] languished, as defendants repeatedly failed to comply with the district court's

21   previous orders to provide them with the necessary inpatient hospital care." *Coleman v.*

22   *Brown*, 428 Fed. App'x 743, 744 (9th Cir. 2011).

23          In November, Defendants finally submitted the Plan that had been ordered in

24   March.  Defs' Plan re: Intermediate Care Facility and Acute Inpatient Waitlists, 11/24/10,

25   Dkt. 3962.  Despite the Court's previous orders, the plan contained no provisions to

26   expedite ICF admissions of *Coleman* class members on the waitlist, including taking steps

27   to fill open, unused ICF beds, such as those at ASH and CSH. The Special Master

28   recommended adoption of the plan over Plaintiffs' objections, but suggested the Court

1   hold an evidentiary hearing concerning unused inpatient beds at Coalinga. Special Master

2   Report on Defendants' Plan Re: Intermediate Care Facility and Acute Inpatient Wait Lists,

3   6/13/11, Dkt. 4020, at 54.

4        On July 22, 2011, the Court issued an order adopting certain of the Special Master's

5   recommendations. Dkt. No. 4045.  The Court set an evidentiary hearing at which

6   Defendants were ordered to show cause why the 50 beds at Coalinga State Hospital

7   designated for *Coleman* class members, as well as any other vacant beds at the facility,

8   could not be filled with high-custody CDCR inmates. *Id.* at 10.  Defendants filed a request

9   to vacate the hearing, which the Court denied noting that "defendants have wasted a

10  substantial amount of the special master's time and efforts, and their own, on a plan to

11  reduce or eliminate the wait list that, as it stands, is insufficient."  Order, 8/15/11, Dkt. No.

12  4069, at 4-5.  While the Court recognized that "is impossible to overstate the urgency of

13  this matter," it nevertheless continued the hearing to give Defendants yet another

14  opportunity to conduct a real assessment of inpatient need and develop a real plan to

15  reduce the waitlists, and rest the planned evidentiary hearing to December 2011.  *Id.* at 8.

16  That hearing was later continued and then cancelled after substantial progress was made

17  and the parties agreed instead to meet and confer at six-month intervals to monitor the

18  State's process for ensuring that class members needing inpatient hospitalization receive

19  timely and adequate treatment. *See* Order, 12/12/11, Dkt. No. 4131 (continuing hearing);

20  Order, 7/13/12, Dkt. 4214 (establishing meet and confer process).  Defendants filed several

21  status reports pursuant to this meet and confer process describing their efforts to reduce the

22  waitlists, including opening new treatment units.

23       In June 2012, Defendants filed a request regarding certain modifications to its long-

24  range mental health bed plan.  Defs' Ex Parte Req. re: Revised Long-Range Mental Health

25  Bed Plan, 6/12/12, Dkt. No. 4196.  Among other matters, Defendants asked the Court to

26  modify its long-standing orders requiring the provision of 256 inpatient beds at ASH

27  "because the updated population projections show a reduction in the need for ICF low-

28  custody beds."  *Id.* at 9.  The Court held that Defendants' "request to modify the number of

1  intermediate care facility beds available at Atascadero State Hospital from 256 to 206 is

2  premature" and deferred further consideration of the request to a planned hearing that July.

3  Order, 6/15/12, Dkt. No. 4199, at 3-6.  Defendants later agreed "that reducing these beds

4  now is premature." Defs' Report on Access to Inpatient Care, 7/10/12, Dkt. No. 4208, at 5.

5       Defendants did, however, choose to deactivate 116 ICF beds in late 2013, despite a

6  court order stating that "[n]o currently operating temporary mental health program will be

7  decommissioned unless there is adequate alternative capacity to accommodate future need

8  in that level of care" (Order (6/15/12), Dkt. No. 4199, at 3.a).  *See* Fischer Decl. ¶¶ 13-14,

9  Ex. D (DSH Monthly Report on the Licensure of Intermediate Care Treatment Programs).

10      Although DSH-related litigation in this case in recent years has focused on the

11  quality of care provided in the inpatient programs, it is apparent from the evidence detailed

12  below that delays in accessing inpatient care remain the intractable and life-threatening

13  problem that has been the subject of so many court orders.  Defendants not only fail to

14  consider patients in high-security programs for transfer to ASH and CSH but have erected

15  new barriers to *Coleman* class members approved by CDCR for dorm housing in low-

16  security intermediate programs of even being considered for admission to ASH or CSH.

17  Defendants have forgotten the progress made in the meet and confer process in 2011, and

18  apparently forgotten even their own position that it is premature to reduce the beds

19  available to *Coleman* class members at ASH.

20      As troubling as the evidence regarding Defendants' failures to ensure timely access

21  to inpatient care is the evidence showing the care provided in those programs is

22  inadequate.  The Court recently found serious constitutional deficiencies in the delivery of

23  care at the inpatient psychiatric programs, further evidence of which has been presented in

24  the Special Master's recent monitoring reports on the inpatient programs.  On July 11,

25  2013, after more than three full days of live testimony, this Court found that Plaintiffs had

26  adduced "significant and troubling evidence" of serious deficiencies in core components of

27  Defendants' inpatient programs, which are tasked with treating the very sickest and most

28  vulnerable *Coleman* class members. Order, Dkt. No. 4688, at 10.  The Court ordered the

1   Special Master to investigate conditions in all six of the inpatient programs and to issue

2   two reports regarding the adequacy of the programs, beginning with a report specific to

3   SVPP where the evidence presented at the hearings had shown there were dangerous and

4   life-threatening conditions. *Id.* at 11-14. The Special Master subsequently issued a report

5   on SVPP and recommended that the Court issue remedial orders regarding many emergent

6   problems there; the Court adopted his findings in full and issued orders requiring

7   Defendants to address their dangerous custodial practices and ongoing failures to track and

8   timely transfer class members to inpatient settings. *See* Special Master's Report on the

9   Salinas Valley Psychiatric Program, Dkt. No. 4830; Order, 11/13/13, Dkt. No. 4925, at 20-

10  21. The Special Master then issued a full report on the adequacy of Defendants' inpatient

11  programs, including his second report on SVPP and its compliance with this Court's

12  November 11, 2013 order. Special Master's Report on Adequacy of Inpatient Mental

13  Health Care for CDCR Inmates (5/30/14), Dkt. No. 5156. The Special Master identified

14  particular concerns across the inpatient programs with respect to "apparent deficiencies in

15  the programs' clinical staffing levels" and "seemingly endless discrepancies and

16  discontinuities" as to the programs' security policies. *Id.* at 55. The Court adopted the

17  Special Master's recommendations in full and directed a subsequent review of all inpatient

18  programs, with specific attention to whether Defendants' security policies "designed and

19  implemented, achieve the proper balance between legitimate security needs and access to

20  necessary inpatient mental health care" and with particular concern as to the adequacy of

21  staffing in the inpatient programs. Order, 7/25/14, Dkt. No. 5188, at 4-5.

22      For the last several months, the Coleman parties and the Special Master have

23  dedicated substantial time in 2015 to discussing the issue of Coleman class members'

24  access to inpatient care, including the status of court-approved and court-ordered plans that

25  came out of the 2011 and 2012 proceedings. The parties have met repeatedly to discuss

26  the ongoing problem of scores of patients waiting to receive inpatient psychiatric

27  hospitalization, along with the enduring problem of empty Coleman-designated beds. This

28  extended period has been marked by Defendants' delays and a failure to meaningful

1    address the problem.  *See* Fischer Decl. ¶¶ 2-11.

2         C.    **The Evidence Supports a Court Order to Enforce Existing Court Orders**
             **and to Remedy the Ongoing Constitutional Violations with Respect to**
3             **Timely Access to Adequate Higher Levels of Care.**

4         Because Defendants refused to provide information requested in the August 5, 2015

5    court order to Plaintiffs in advance of the instant joint status report filing deadline,

6    Plaintiffs have not had the opportunity to fully assess the accuracy and implications of

7    Defendants' current report on access to inpatient care.  *See* Fischer Decl. ¶¶ 25-27.

8         What is clear, however, is that there have recently been significant numbers of

9    patients waiting for inpatient care over an extended period of time.  Defendants' own

10   reports to the Special Master and Plaintiffs over the last several months show that scores of

11   patients are waiting for inpatient beds at any given time.  *See* Fischer Decl. ¶¶ 2-8

12   (documenting DSH's reported wait lists for ICF and APP care at several 2015 meetings).

13   At the same time, approximately one hundred lower-security *Coleman*-designated inpatient

14   beds consistently sit vacant and unused.  *See id.* ¶¶ 2-9; Ex. E (showing 118 unused lower-

15   security ICF beds as of July 20, 2015).  Defendants' monthly DSH Bed Utilization

16   Management Reports, filed under seal with the Court, confirm these facts.  *See* Dkt. Nos.

17   5276 (filed 2/13/15), 5291 (filed 3/16/15), 5304 (filed 4/24/15), 5310 (filed 5/20/15), 5327

18   (filed 6/16/15), 5330 (filed 7/15/15).  Such data demonstrate that a durable remedy

19   regarding the timely provision of psychiatric hospitalization has not been achieved.

20        The evidence shows that Defendants' current inpatient care system requires that

21   Defendants effectively use **all** existing *Coleman*-designated inpatient beds in order to meet

22   the treatment needs of the *Coleman* class.  There is simply no room for inefficiency in the

23   form of vacant beds if Defendants are to provide timely access to adequate inpatient care.

24   The evidence also shows that Defendants are failing to ensure that psychiatrically

25   hospitalized class members are being treated in the least restrictive and most integrated

26   setting appropriate for their individual needs.  This failure to move patients to less

27   restrictive inpatient programs contributes to the persistence of vacant beds, negatively

28   impacts the adequacy and appropriateness of care provided to low-custody patients stuck

1    in high-security programs, and violates federal disability anti-discrimination laws that are

2    now part of the *Coleman* case.  Finally, Defendants' data shows that the mismanagement

3    of inpatient beds has created bottlenecks throughout the mental health care delivery system

4    and negatively affects the delivery of other levels of care.

5                    **1.    Defendants' Population Projections and Inpatient Bed Data Make**
                            **Clear the Urgent Need to Effectively Use All Available *Coleman*-**
6                            **Designated Inpatient Beds to Meet Demand.**

7            Defendants' own mental health bed analyses and bed utilization data illustrate how

8    their under-utilization of existing, available lower-security inpatient beds has resulted in

9    wait lists and delayed access to inpatient care for large numbers of class members.

10           Since 2007, Defendants have contracted with Navigant and McManis Consulting to

11   conduct periodic population reviews and make population projections for all State prisoner

12   mental health programs.  *See* Order, 10/20/06, Dkt. No. 1998, ¶ 2.  This process is essential

13   to planning for the provision of mental health program beds at all levels of care sufficient

14   to meet the needs of the *Coleman* class.  The Court recently ordered Defendants to

15   "continue to work with their consultant and the Special Master to forecast and plan for

16   adequate bed and treatment space for the mentally ill population consistent with their

17   current process."  Order, 6/19/14, Dkt. No. 5171 ¶ 2.  Defendants now produce to the

18   Special Master and Plaintiffs the consultant's Mental Health Bed Need Study twice each

19   year, using Spring and Fall population projections.  The most recent version produced to

20   Plaintiffs is the Draft Mental Health Bed Need Study, Spring 2015 Population Projections

21   (May 7, 2015), which is marked as based on "Preliminary" projections.  Fischer Decl.

22   ¶ 12, Ex. C (hereinafter, "Spring MH Bed Need Study").

23                            **a.    ICF Level of Care Beds.**

24           According to the Spring MH Bed Need Study, Defendants operate 1,120 male

25   inpatient ICF beds systemwide for *Coleman* class members. This total includes 390 lower-

26   security beds located at Atascadero State Hospital (ASH), Coalinga State Hospital (CSH)

27   and Vacaville Psychiatric Program (VPP), and 702 high-security beds located at VPP,

28   Salinas Valley Psychiatric Program (SVPP), and California Health Care Facility (CHCF)

1  (not including 28 CHCF ICF beds designated as "isolation rooms" not available to house

2  patients).  *See* Spring MH Bed Need Study at 10-11.  The Spring MH Bed Need Study

3  forecasted for 2015 an ICF bed need of 1,141, which exceeds the total number of existing

4  ICF beds.  Importantly, based on how Defendants currently operate their system, there are:

5  (1) not enough high-security ICF beds to meet demand, and *at the same time*, (2) a

6  projected "surplus" of approximately 40 lower-security ICF beds.  *See* Spring MH Bed

7  Need Study at 10-11.

8      Defendants recently notified Plaintiffs that they planned to activate an additional 30

9  temporary, high-security ICF beds at VPP, in the P3 unit.  Rather than effectively utilizing

10 available and vacant *Coleman*-designated inpatient beds in the State's psychiatric

11 hospitals, Defendants intend to waste more public funds to open another high-security

12 inpatient program inside a prison unit that has extremely limited treatment space and

13 resources to provide inpatient care.

14                    **b.    APP Level of Care Beds.**

15     The Spring MH Bed Need Study forecasts a shortage of two (2) male APP beds in

16 2015 (forecasted bed need of 314 compared to Defendants' operational capacity of 312).

17 *See* Spring MH Bed Need Study at 9.  As of July 20, 2015, Defendants reported that APP

18 beds were filled to approximately 91% capacity (283 of 312 beds filled).  Fischer Decl.

19 Ex. E.  As discussed further in Part II.C.3, *infra*, delays in access to clinically indicated

20 APP level of care also persist.

21     Viewed in the most positive light, Defendants operate a psychiatric inpatient

22 program that allows for essentially no margin for inefficiency and under-utilization.  In the

23 current system, leaving over one hundred *Coleman*-designated ICF beds vacant makes

24 timely access to adequate inpatient care for the *Coleman* class a practical impossibility.

25          **2.    Defendants Continue to Fail to Take Necessary Steps to Ensure
               that ICF Patients Are Housed in the Least Restrictive and Most
26             Integrated Setting, Contributing to the Large Number of Vacant
               Inpatient Beds.**
27

28     The *Coleman* Court has repeatedly ordered Defendants to fully utilize designated

1    lower-security ICF beds, including those at ASH and CSH, for *Coleman* class members.

2    *See* Order, 8/15/11, Dkt. No. 4069; Order, 1/27/10, Dkt. No. 3787; Order, 6/18/19, Dkt.

3    No. 3613.  Yet Defendants' own data shows that, as of July 20, 2015, there were 118

4    unfilled lower-security ICF bed, including 99 of the 256 ASH ICF beds.  Fischer Decl.

5    Ex. E.

6         Alongside this data lies a troubling trend of placing more and more low-custody

7    class members in high-security ICF beds.  Between 2011 and 2015, the number of Level I

8    inmate-patients (CDCR's lowest of four custody classification levels) housed in high-

9    security ICF programs increased by 337.26%, and the number of Level II inmate-patients

10   housed in high-security ICF programs increased by 110.9%.  *See* Spring MH Bed Need

11   Study at 10.  During the same period, the number of Level IV and Level III inmate-patients

12   in the lower-security programs dropped 4.7% and 14.6%, respectively.  *Id.* at 11.

13        Any efforts to move inmate-patients to the least restrictive, most integrated inpatient

14   setting appropriate to their individual circumstances appear to have stopped.  As a result,

15   scores of Level I and Level II inmate-patients—who are generally eligible for low-security

16   dorm housing in CDCR programs—are being housed in high-security ICF units.  Fewer

17   and fewer Level III and IV inmate-patients are being housed in lower-security programs,

18   despite court orders stating that such patients must be considered on an individual basis for

19   such programs.  As a consequence, lower-security ICF beds sit empty, and delays in access

20   to care remain endemic.

21        There are at least two critical drivers of this problematic trend.  First, DSH has

22   constructed an improper shadow process of rejecting the admission of *Coleman* class

23   members in lower-security programs, even after a patient's CDCR treatment team *and*

24   CDCR's custody-side Institutional Classification Committee (ICC) have approved such

25   placement.  Second, Defendants have abandoned the Court-ordered process to review ICF

26   patients and, whenever possible, move them to lower-security ICF programs in order to

27   ensure (a) timely access to care for higher custody patients waiting for ICF admission, and

28   (b) the delivery of care to class members in the least restrictive, most integrated setting

1  appropriate.  These failures, detailed below, violate existing *Coleman* Court orders, have

2  perpetuated the constitutional violations in this case, and violate the federal disability anti-

3  discrimination laws that apply to this action through the Court-ordered merger of the

4  *Hecker* case into *Coleman* (*see* Part II.E.2, *infra*).

5                    **a.    DSH's Shadow Review and Deferral Process.**

6          DSH has implemented an improper shadow process that prevents inmate-patients'

7  admissions to lower-security programs even after approval by the CDCR treatment team

8  and CDCR's custody classification system.  There has long been a process for CDCR

9  clinical and custody teams to review an ICF referral to determine whether the patient can

10  be safely and appropriately housed in a lower-security dorm ICF setting.  But Defendants

11  currently employ a final DSH "paper review" through which DSH staff can—and do—

12  override a lower-security inpatient placement decision.  *See* Fischer Decl. ¶¶ 8,10-11 &

13  Ex. A (March 5, 2015 Letter from Defs.' Counsel (hereinafter "Sharma Letter")).

14  Defendants describe this DSH review process as an additional level of review of the

15  "accepted" patient's paperwork by a clinician at the facility where the patient has been

16  referred; for example, an ASH clinician reviews, and accepts or rejects, a patient referred

17  to (and approved by CDCR for) ICF treatment at ASH.  *Id.*  According to Defendants, if

18  "staff at the program determine the patient is not clinically or medically appropriate for

19  their facility or level of care, they forward the referral to the appropriate DSH facility for

20  review and consideration."  *Id.* at 1-2.

21          The standards applied by the local reviewing DSH clinician in this final review

22  have never been clearly delineated and in fact remain unclear.  The March 5 Sharma

23  Letter, which describes the process by which multiple patients cleared by CDCR for low-

24  security ICF programs were sent instead by DSH to high-security programs, illustrates the

25  point.  For example, CDCR clinical and custodial staff determined based on their

26  experience with one class member referred to ICF care from a CDCR crisis bed that the

27  class member could safely and appropriately be treated in an ASH or VPP dorm.  Fischer

28  Decl. ¶¶ 10-11 & Ex. 8.  But DSH staff overrode that recommendation based on their own

1   "paper" review of a patient they had never treated or (presumably) even met.  DSH staff

2   instead determined the class member in question could be housed only in a high-security

3   ICF program because he was "new to prison, fearful of how to interact with other inmate-

4   patients, and had a prior suicide attempt in county jail."  Fischer Decl Ex. A(Sharma Letter

5   at 2).

6       Nor are the unilateral DSH custody overrides detailed in Defendants' March 5,

7   2015 letter aberrations.  At the July 20, 2015 meeting of the parties and the Special Master

8   regarding this issue, DSH officials admitted that this procedure, whereby DSH staff defer

9   patients approved by CDCR for dorm housing to higher-security ICF settings, is a well-

10  established process, and that numerous patients currently held in high-security ICF beds

11  had been previously recommended for dorm housing by CDCR's custody and clinical

12  staff.  Fischer Decl. ¶ 8.

13      Notably, DSH deferrals of ICF-referred patients appear to go in one direction—that

14  is, to higher-security programs.  For May and June 2015, DSH reports deferring at least

15  seven (7) ICF patients to more restrictive programs, and zero to less restrictive programs.

16  *See* May 2015 DSH Bum Report, Dkt. No. 5327, at 38 (two (2) deferrals to high-security

17  SVPP); June 2015 DSH BUM Report, Dkt. No. 5330, at 38 (five (5) deferrals to high-

18  security SVPP).

19      Approximately three hours before this joint statement was due, Defendants sent

20  Plaintiffs a draft administrative letter entitled "DSH Housing Review – CDCR Inmate

21  Patients in DSH Inpatient Programs" ("Draft Housing Review Policy") that they indicated

22  was pertinent to the Wednesday hearing.  The Draft Housing Review Policy, however,

23  merely codifies the existing DSH paper review deferral process that permits DSH

24  clinicians to unilaterally override the considered recommendation of CDCR custody and

25  clinical staff regarding the least restrictive inpatient setting appropriate for an individual

26  class member. The Draft Housing Review Policy does nothing to address the core issue –

27  Defendants' mismanagement of existing inpatient bed resources, including underutilization

28  of open beds at ASH and CSH.  Indeed, the Policy makes clear that DSH permits clinicians

1    to overtly discriminate against critically mentally ill class members by housing them in

2    higher custody settings because they are developmentally impaired (or "DD2") or

3    displaying unpleasant but unquestionable treatable mental health symptoms.

4          **b.    DSH's Failure to Move Patients to Less Restrictive, More Integrated Settings as They Stabilize in Inpatient Care.**

5          As noted in the Court's August 5, 2015 order, there are long-standing court-ordered

6    plans requiring Defendants to conduct case-by-case reviews of individual ICF class

7    members for transfer to less restrictive, more integrated inpatient settings as they progress

8    through treatment.  Order, 8/5/15, Dkt. No. 5333, at 1-2 (citing Dkt. Nos. 3962, 4020,

9    4045, 4103, 4131, 4132, & 4214).  But there has been little to no such movement after a

10   brief period of success immediately following the 2011 and 2012 litigation.  The DSH

11   BUM Report data shows that, in May 2012, in the wake of the court-ordered plan to

12   address the inpatient wait lists, approximately 57 class members were moved from SVPP's

13   high-security ICF program to ASH's lower-security ICF program so that they could benefit

14   from care in a less restrictive appropriate setting.  May 2012 DSH BUM Report, Dkt. No.

15   4201 (filed under seal).  This progress in 2012 confirms that patients who have

16   demonstrated improvement in an ICF program—by, for example, engaging in group

17   treatment programming, gaining insight into their illness, improving medication

18   compliance, progressing through the behavioral benchmarks (or stages) of the ICF

19   program, or manifesting stabilization in their behavior—can safely transfer to lower-

20   security programs like those at ASH and CSH to continue their ICF treatment.

21         But after the initial wave of movement on the heels of litigation, Defendants'

22   progress in moving ICF patients to less restrictive settings has all but evaporated.  By June

23   2015, only three class members housed at ASH had been transferred from SVPP—and all

24   three had transferred in May 2012 or earlier.  *See* June 2015 DSH BUM Report at 29

25   (Internal Transfers—Atascadero).  After months of negotiations and focused attention on

26   this issue in meet and confers with the Special Master and Plaintiffs, Defendants informed

27   Plaintiffs and the Special Master at a July 20, 2015 meeting that, as of that date, only one

28

1  class member in recent memory had transferred from a high-security ICF program (SVPP)

2  to a less restrictive lower-security ICF program (ASH), despite the over 100 vacant beds at

3  ASH and the other low-custody programs.  Fischer Decl. ¶ 8.

          **3.**      **Defendant's Failure to Utilize Available Lower-Security ICF Beds**
4                    **Creates Significant Bottlenecks Throughout the System and**
5                    **Negatively Impacts Other Levels of Care.**

6        Defendants' failure to effectively utilize existing ICF beds has created bottlenecks

7  throughout the mental health care delivery system and negatively affects the delivery of

8  other levels of care.  Among the most pronounced effects are those on access to APP

9  beds—the highest level of psychiatric care in the system—and Mental Health Crisis Beds

10  (MHCBs)—designed to provide urgently needed crisis care to class members who are

11  suicidal, may have acute symptoms of a serious mental disorder, or may be suffering from

12  a significant or life threatening disability.

13                  **a.**      **Delays in Access to Acute Care.**

14        A substantial number of class members, particularly those in MHCB units, face

15  extended delays in transfer to a clinically indicated Acute bed.  According to the Revised

16  Program Guide, the "MHCB has a length of stay of up to ten days."  *See* Order, 3/3/06,

17  Dkt. No. 1773 (directing Defendants to immediately implement all provisions of the

18  Revised Program Guide, 12-5-1).  However, Defendants' data show that delays in access

19  to higher levels of care for MHCB patients are pervasive.  In June 2015, among the 110

20  class members who were housed in MHCBs awaiting transfer to an APP bed, 106 (96%)

21  had lengths of stay exceeding 10 days—65 of those patients had lengths of stay exceeding

22  20 days, 28 exceeded 30 days, and 10 exceeded 40 days.  Fischer Decl.¶ 24 & Ex. F.

23        Similarly, when DSH staff deem an Acute patient to be clinically appropriate for

24  discharge to ICF, but ICF bed shortages and bed utilization mismanagement prevent that

25  patient's timely transfer, that patient stays in an APP bed due to the bottleneck even while

26  other class members wait for acute care.  *See* June 2015 DSH BUM Report at 34-37

27  (listing dozens of APP patients referred for ICF care in May or June and waiting for as

28  long as several weeks for ICF placement).

1    **b.    Delays in Access to MHCB Care.**

2        Likewise, the backlog of patients waiting for transfer to APP who are housed in

3    MHCBs systemwide impedes access to MHCBs.  Indeed, Defendants' Spring 2015

4    population projections forecast a shortfall of 74 MHCBs for 2015 (bed need of 500 with

5    current MHCB capacity of 426).  *See* Spring MH Bed Need Study at 13.  Defendants' data

6    shows that more than one-quarter of class members requiring transfer to another institution

7    for crisis-level care (97 patients in June 2015 alone) wait beyond the Program Guide-

8    mandated 24 hours.  Patients in crisis who are denied prompt access to MHCB care are

9    housed in "alternative" unlicensed and dangerous housing units, such as Outpatient

10    Housing Units (infirmaries) and holding cells.  Fischer Decl. ¶ 18 & Ex. F.

11        Failures to implement court-ordered plans to address the delays in access to ICF

12    level of care contribute to a larger failure to provide constitutionally adequate access to

13    clinically necessary psychiatric care across Defendants' mental health care system.

14    Further enforcement of existing court orders and additional relief is urgently needed.

15    **D.    Defendants' Reporting Lacks Transparency and Tends to Under-Count**
     **Patients Waiting for Inpatient Care, but Clearly Demonstrating a**
16    **Persistent Problem with Respect to Patients Waiting for Inpatient Care.**

17        An important warning regarding the State's reported numbers:  Defendants' data

18    has long been infected by a lack of transparency and inaccuracies in reporting inpatient

19    wait lists and delays in access to inpatient care.  The true inpatient care wait list numbers

20    (*i.e.*, patients identified as requiring inpatient care and waiting for such placement) are

21    almost certainly significantly higher than what Defendants have reported.

22        A review of Defendants' monthly data strongly suggests that Defendants under-

23    count the inpatient wait lists and delays in access to inpatient care.  In fact, Defendants'

24    monthly DSH Bed Utilization Management report ("DSH BUM Report") no longer

25    identifies which class members are on an inpatient "wait list," as it once did.  Defendants

26    have attempted to cure the "wait list" problem by simply removing the word "wait list"

27    from their documents and changing their method of counting patients and tracking delays.

28        With respect to ICF care, the most recent DSH BUM Report (for June 2015), filed

1  under seal on July 15, 2015 (Dkt. No. 5276), identifies thirty-four (34) class members as

2  having had their ICF referral accepted but no ICF bed yet assigned ("Accepted Referral").

3  The same report shows an additional twenty-six (26) class members who were accepted for

4  ICF and assigned an ICF bed but were still waiting for actual ICF bed placement ("Bed

5  Assigned").  And another twelve (12) class members had ICF referrals "Pending Review"

6  by DSH or on a "medical hold."  Together, as of June 30, 2015, there were thus at least 72,

7  class members for whom DSH had received an ICF referral from CDCR but who were not

8  yet in an ICF bed.

9      But even that number fails to provide a complete picture of how many class

10  members are waiting for inpatient care.  The Court-ordered DSH BUM Report does not

11  provide any information about class members referred for inpatient care by a CDCR

12  treatment team, but for whom the referral has yet to be "released" (*i.e.*, sent) to DSH.

13  CDCR's monthly data, which is not filed with the Court, suggests that there are additional

14  substantial, out-of-Program-Guide-compliance delays with respect to patients waiting for

15  their referrals to be transferred to DSH.[4]  *See* Fischer Decl. ¶¶ 20-23, Ex. H.

16      The Court has recognized previously Defendants' manipulation of data that has the

17  effect of under-reporting the number of class members waiting for an appropriate mental

18  health bed, including for inpatient care.  *See* Order, 11/13/13, Dkt. No. 4925, at 17 ("In

19  defendants' view, the thirty day period runs from the time DSH decides to accept the

20  inmate-patient, not from the date the patient is referred by CDCR.  Defendants base their

21  argument on language in the Program Guide that provides that some inmate-patients may

22  be placed on a wait list after 'acceptance.'  [¶]  The Program Guide is clear.  All inmate-

23  patients accepted for treatment at SVPP, which is an intermediate care facility (ICF), must

24  be transferred within thirty days of referral."); Order re: Inpatient Care, 7/11/13, Dkt. No.

25

26  [4] The DSH BUM Report used to provide the treatment team referral dates for class
    members in a DSH bed or on a wait list, but ceased doing so after May 2013 (*see* Dkt. No.

27  4657, filed under seal), making analysis of Program-Guide compliance on this point
    extremely complicated, costly, and burdensome.

28

1  4688, at 10 n.9 ("Evidence before the court suggests that defendants may not view time on

2  a wait list for intermediate inpatient care as violating the remedial plan, or the Eighth

3  Amendment, unless that time exceeds 30 days.  Evidence also suggests that the calculation

4  of the 30 day period is being improperly adjusted so that it starts at some after referral by a

5  CDCR clinician and, consequently, additional delays attend the start of necessary inpatient

6  care."); *cf.* Order re: Segregation and Use of Force, 4/10/14, Dkt. 5131, at 56 n.39

7  (identifying concerns with the accuracy of defendants' data as to lengths of stay in

8  administrative segregation and segregated housing units).  Nonetheless, Defendants

9  continue to provide and report on inpatient data that is misleading and incomplete at best.

10      Defendants should be ordered to provide complete and accurate information that

11  clearly demonstrates how many class members are waiting for inpatient care and for how

12  long, running from the moment that they are clinically identified by the CDCR treatment

13  team as requiring such care.  Defendants should also be ordered to provide complete and

14  accurate information demonstrating the timeliness of all events that bear on Program Guide

15  compliance measures for access to inpatient care (*e.g.*, Referral Date, Date Referral

16  Released to DSH, Acceptance Date, Bed Assignment Date, and Admission Date).  Without

17  this information, it is impossible to ascertain whether Defendants are meeting their

18  constitutional and statutory mandate to provide class members with timely access to

19  inpatient care in the least restrictive environment appropriate to their needs.

20  **E.    Applicable Constitutional and Statutory Principles Weigh Heavily in**
       **Favor of this Court Issuing Targeted and Specific Orders Directing**
21     **Defendants to Fill All Available Inpatient Beds and to Ensure Class**
       **Members Receive Inpatient Care in the Least Restrictive Setting**
22     **Appropriate.**

23      **1.    Defendants' Backsliding Demonstrates that They Are Far From**
            **Achieving a Durable Remedy to the Constitutional Violations**
24          **Regarding Access to Inpatient Care.**

25      Whatever the progress made in 2011 and 2012 with respect to Defendants' efforts

26  to eliminate wait lists for inpatient care, Defendants have demonstrated that they remain

27  far from achieving a "durable remedy" to their failure to provide timely access to adequate

28  inpatient psychiatric care to the *Coleman* class.

A durable remedy, demonstrated through sustained compliance with court orders and sustainable processes to avoid the recurrence of constitutional violations, is necessary before this case can be brought to a conclusion.  *See Coleman v. Brown*, 922 F. Supp. 2d 1004, 1043 (E.D. Cal., N.D. Cal. 2013).  A "durable remedy" is one "that gives the Court confidence that defendants will not resume their violations of plaintiff's constitutional rights once judicial oversight ends."  *Evans v. Fenty*, 701 F. Supp. 2d 126, 171 (D.D.C. 2010); *see also LaShawn A. Ex. Rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 111 (D.D.C. 2010) (a remedy is durable if it is "unlikely that the prohibited conditions or actions will recur."); *Consumer Advisory Bd. v. Harvey*, No. 2:91–CV–00321, 2009 WL 5792159, at *11 (D. Me. Oct. 9, 2009) (describing a "durable remedy" as the equivalent of having in place "a mechanism for future compliance").

The fact that Defendants appear to have abandoned their own plan—approved and ordered by this Court—shortly after the Court recognized the "remarkable accomplishments to date in addressing the problems with access to inpatient mental health care" and directed a continued meet and confer process, *see* Order, 7/31/12, Dkt. 4214, at 1, demonstrates a failure to achieve a durable remedy on this critical issue and the need for further court orders and vigilant monitoring moving forward.  This Court must ensure that Defendants are utilizing all existing inpatient beds effectively in order to provide constitutionally mandated timely access to the inmate-patients who require it.

>     **2.      Defendants Should Be Ordered to Take Steps to Ensure that *Coleman* Class Members Requiring Inpatient Care Receive Such Care in the Least Restrictive Setting Appropriate to Their Individual Needs.**

In addition to the Eighth Amendment requirement that Defendants ensure timely access to higher levels of psychiatric care, Defendants have a related and equally important imperative under federal disability law to ensure that *Coleman* class members requiring inpatient care are housed and treated in the least restrictive setting appropriate to their individual circumstances.  This issue is squarely within the purview of this Court.  *See* Order for Final Approval of *Hecker* Settlement Agreement, 3/2/15, Dkt. No. 5284-1, Ex. A

(Settlement Agreement & Release) at ¶¶ 21.d, 23 (issue of Systemically Housing Inmates Out of Security Level Due to Psychiatric Disabilities to be resolved through *Coleman* remedial process).

The unnecessary placement of low-security *Coleman* class members in high custody ICF units, without appropriately individualized justification, violates class members' right to be free of discrimination based on disability pursuant to the Americans with Disabilities Act. *See* 42 U.S.C. § 12132. Federal disability anti-discrimination law public entities to "administer services, programs, and activities in the *most integrated setting appropriate* to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added); *see also* 28 C.F.R. § 35.104 (defining disability to include any "emotional or mental illness"). The law specifically requires prisons to "ensure that inmates or detainees with disabilities are housed in the *most integrated setting appropriate to the needs of the individuals*." 28 C.F.R. § 35.152(b)(2) (emphasis added). To place a prisoner in a more-restrictive-than-necessary inpatient setting must be considered "[u]njustified isolation" and "properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999).

### 3. Specific Relief Is Appropriate Here, Where There are Repeated and Longstanding Violations.

Over the multiple decades of the *Coleman* case, the Court has appropriately relied on Defendants to develop and implement plans to remedy identified constitutional violations. *See Lewis v. Casey*, 518 U.S. 343, 361-63 (1996); *Bounds v. Smith*, 430 U.S. 817, 832-33 (1977). Defendants have repeatedly failed in this endeavor. *See, e.g.*, Order Denying Mot. to Terminate, 4/5/13, Dkt. 4539, at 43-46, 65 (finding current and ongoing constitutional violations with respect to several aspects of Defendants' mental health care system); *Plata v. Brown*, 131 S. Ct. 1910, 1923 (2011); Order, Dkt. No. 2320 July 23, 2007, at 6 ("[D]efendants' mental health care delivery system has not come into compliance with the Eighth Amendment at any point since this action began."); Three-Judge Court Op. & Order, 8/4/09, Dkt. No. 3641, at 22 (finding that Defendants "remain[ ]

1   unable to deliver constitutionally adequate mental health care" to seriously mentally ill

2   inmates).  Indeed, in the Court's 2013 order on Defendants' motion to terminate, in the

3   same breath that it noted the "substantial improvement in access to inpatient care" at that

4   time, and the "significant progress in remedying one of the most tragic failures in the

5   delivery of mental health care—the unconscionable delays in access to inpatient care and

6   the sequelae therefrom," the Court made clear that those "gains are new and work

7   remains."  Order Denying Mot. to Terminate, at 50.

8          Defendants' ongoing failure to implement an adequate and durable remedy for the

9   unconstitutional denial of timely access to adequate inpatient care warrants further

10   remedial orders by this Court.  "If government fails to fulfill [its constitutional] obligation,

11   the courts have a responsibility to remedy the resulting Eighth Amendment violation."

12   *Plata*, 131 S. Ct. at 1928 (citing *Hutto v. Finney*, 437 U.S. 678, 687, n.9 (1978)).  While

13   the Court "must be sensitive to the State's interest in punishment, deterrence, and

14   rehabilitation, as well as the need for deference to experienced and expert prison

15   administrators, it "must not shrink from [the] obligation to enforce the constitutional rights

16   of all 'persons,' including prisoners."  *Id.* at 1928 (citing *Cruz v. Beto*, 405 U.S. 319, 321

17   (1972) (per curiam) (internal quotation marks omitted)).  The Court "may not allow

18   constitutional violations to continue simply because a remedy would involve intrusion into

19   the realm of prison administration."  *Plata*, 131 S. Ct. at 1928-29.

20          The time for patience has ended, given the backsliding that has occurred on this

21   critical issue and the enormous risks of serious harm that flow from the delays in access to

22   adequate inpatient care.  *See id.*; *Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir. 2004)

23   (noting that defendants' "record of abject failure" informs the appropriateness of court-

24   ordered relief where defendants had been unable to "cure the constitutional infirmities

25   plaguing the delivery of health care in the correctional system").

26          Further remedial orders are necessary, and should specifically direct Defendants to

27   ensure maximum utilization of their inpatient beds, timely access to adequate inpatient

28   care for class members that require it, and compliance with federal disability law's

1  mandate to ensure that prisoners with disabilities are housed in the least restrictive and

2  most integrated setting appropriate to their individual needs.  Specific and targeted

3  remedial orders are appropriate when supported by the record because "[p]rospective relief

4  for institutions as complex as prisons is a necessarily aggregate endeavor, composed of

5  multiple elements that work together to redress violations of the law."  *Armstrong v.*

6  *Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010).  The relief requested by Plaintiffs is

7  critically needed to address the serious constitutional violations that persist and endanger

8  the lives, safety, and well-being of the *Coleman* class, and is "narrowly drawn," "extends

9  no further than necessary to correct the violation[s]" of class members Constitutional

10  rights, and "is the least intrusive means necessary to correct" those violations.  18 U.S.C.

11  § 3626(a)(1)(A).

12     F.     **Plaintiffs' Request for Relief**

13            1.     **There Is an Emergent Need for Further Specific Court Orders to**
                    **Remedy These Longstanding Problems**

14

15        Defendants must be ordered to immediately implement a real and durable remedy to

16  ensure prompt access to inpatient psychiatric hospitalization in licensed and fully

17  operational programs.  As detailed above, numerous orders over many years allowing

18  Defendants to develop and implement plans within their discretion have failed to result in

19  any permanent and sustainable solutions.  Plaintiffs therefore request that the Court issue

    additional specific orders to assure that this critical remedy is permanently implemented.

20            2.     **The Court's Order to Remedy these Deficiencies Should Apply to**
                    **Defendants Equally and Not to Either CDCR or DSH Alone.**

21

22        Given that there are now sufficient numbers of inpatient beds to address the needs

23  of the population, Defendants must comply with orders to fully utilize those beds by

24  removing artificial and unnecessary barriers to care, such as DSH shadow custodial

25  restrictions that override CDCR clinical and custodial judgment, and by moving patients

26  between DSH programs, from high-security/celled units, to high-security and lower-

27  security dorms, in particular to the underutilized beds at ASH and CSH.  There should not

28  be a wait list for APP or ICF care, and transfer timelines should be met and exceeded, so

1   that patients in need of hospitalization receive care as rapidly as possible.  Both CDCR and

2   DSH are violating transfer timelines for inpatient referrals and both must renew efforts to

3   accelerate the process.

4           As the lengthy history detailed above demonstrates, any order for relief must be

5   directed at the Defendants jointly and equally, rather than to the individual agencies tasked

6   with delivery of care to *Coleman* class members.  The State must stop passing the buck for

7   these problems between CDCR and DSH, and must be focused on its constitutional and

8   statutory obligations to provide this most critical level of psychiatric care to the vulnerable

9   patients that clinicians have referred for hospitalization.

10          **3.      CDCR's Custodial and Clinical Determinations that a Patient**
                      **Can Safely Program in a Lower-Security Inpatient Program Must**
11                    **Govern Placement of That Patient.**

12          The "shadow" review and deferral process, by which DSH clinicians are permitted

13  to override CDCR's custodial and clinical determinations and decline to accept patients

14  who can safely program at DSH facilities, must stop.  The evidence shows that DSH

15  employees have granted themselves the authority to override CDCR's custodial decisions

16  as far back as 2010.  *See* Defs.' Report on CDCR/DMH Mental Health Assessment and

17  Referral Project and Intermediate Care Facility Pilot Program, Ex. B to Decl. of Jane E.

18  Kahn in Support of Pls.' Status Conference Statement Regarding Defs.' Initial Report on

19  the Mental Health Assessment and Referral Project (MHARP) and the ICF Pilot Program,

20  3/24/10, Dkt. No. 3825-2, at 14 (despite receiving a case-by-case HC-POP

21  recommendation for the VPP dorm program and a favorable ICC review, five cases sent to

22  the VPP dorm staff for disposition were "not clinically approved by VPP Dorm program

23  staff for dormitory housing.").

24          This practice has contributed to Defendants' failure to appropriately utilize low-

25  security inpatient beds and to their failure to eliminate the wait lists for inpatient care.

26  Defendants should be ordered to cease this practice.  Once a patient from CDCR is cleared

27  for dorm inpatient placement, he should immediately be placed in a dorm inpatient

28  placement.  Any CDCR patients now in DSH high-security facilities that had previously

1    been cleared for dorm housing should be identified and promptly transferred to ICF dorm

2    housing.  Defendants should be ordered to conduct a full review of patients who have

3    previously been denied transfer to dorm housing based on DSH's "paper reviews" and to

4    transfer all such patients within 30 days.

5                  **4.**          **Defendants Should Be Ordered to Transfer ICF Patients to Unused Less Restrictive Beds at a Specified Rate of Five Per**

6                            **Week until All *Coleman*-Designated Inpatient Beds Are Filled.**

7           Plaintiffs request that the Court enforce its previous orders to fill all 50 CSH beds

8    and all 256 Atascadero State Hospital (ASH) beds designated for *Coleman* class members.

9    Given the continued unmet need for timely access to inpatient care, Plaintiffs further

10   request that Defendants be ordered to admit patients to unused lower-security ICF beds at

11   ASH and CSH at a rate of not less than five per week until all *Coleman*-designated

12   inpatient beds are filled.  Plaintiffs also request that Defendants be ordered to provide a

13   transparent weekly report on the total number of inpatient beds in each DSH and CDCR

14   *Coleman* inpatient mental health program occupied by a *Coleman* class member, and on

15   the total number of inpatients beds in each DSH and CDCR *Coleman* inpatient mental

16   health program not occupied by a *Coleman* class member until such time as the Court

17   deems that Defendants have corrected their misuse of lower-security beds at CSH and

18   ASH.

19          To assure that this remedy is durable, Plaintiffs further request that the five patients

20   per week transfer requirements to ASH and CSH will be reactivated any time the ASH or

21   CSH populations drop below 90% of capacity for a reporting period.

22                 **5.**          **Defendants Must Implement a Sustainable Process for Ongoing Review and Movement of Patients to the Least Restrictive, Most**

23                           **Integrated Inpatient Settings Appropriate.**

24          Despite numerous Court orders mandating the development and implementation of

25   plans to review and transfer individual class members to less restrictive settings,

26   Defendants have failed to implement any sustainable process by which to achieve this

27   critical goal.  The Court should order Defendants to implement a real and sustainable

28   process within 30 days, and should direct such implementation in consultation with the

1   Special Master and Plaintiffs. DSH treatment teams should be required to regularly review

2   and refer patients to less restrictive DSH programs: from single cells to high-security

3   dorms and from high-security dorms to low-security ICF programs at VPP, ASH and CSH.

4   Any patient that reaches the highest step or stage of a high-security DSH ICF program

5   should be presumed ready to transfer to a less restrictive program. Defendants must

6   implement and maintain an adequate timeline to ensure that such transfers occur

7   immediately upon referral, so that high-custody beds may be made available to those on

8   the waitlist.

9          In order to ensure that such a process is actually developed and maintained over

10  time, Defendants should be required to report monthly to the Court on the number of

11  patients reviewed and transferred, to transparently report on the waiting time from review

12  to transfer for each patient, and to provide a rationale for any patients who are not timely

13  transferred.

14         **6.     Defendants Must Be Required to Provide Complete and Accurate**
           **Reports that Show the True "Wait List" and Timelines for Access**
15         **to Inpatient Care.**

16         As described in Part II.D, *supra*, Defendants' methods for reporting the inpatient

17  wait lists and the duration of time spent on a wait list systematically undercount the

18  magnitude of the problem. Defendants should be ordered to provide complete and

19  accurate information that clearly demonstrates how many class members are waiting for

20  inpatient care and for how long, running from the moment that they are clinically

21  identified as requiring such care. Defendants should also be ordered to provide complete

22  and accurate information demonstrating the timeliness of all events that bear on Program

23  Guide compliance measures for access to inpatient care (*e.g.*, Referral Date, Date Referral

24  Released to DSH, Acceptance Date, Bed Assignment Date, and Admission Date).

25         Defendants should also be required to provide complete and accurate reports

26  regarding their compliance with the "Least Restrictive Environment" placement orders

27  requested above.

28         Defendants must also provide accurate and transparent reporting on the extent to

1  which CDCR clinicians contribute to delays in transfer to inpatient care, and must report

2  on the length of time that CDCR clinicians take from initial IDTT referral, through referral

3  to DSH and completion of the DSH referral "package."  The waitlist must be accurately

4  calculated and reported throughout this process and not hidden behind lengthy referral

5  delays.

**7.    Continued Attention to the Problem of Inadequate Treatment in the Inpatient Units Is Also Necessary.**

A related and equally critical issue remains the adequacy of treatment in

Defendants' inpatient programs.  As described above, the Special Master has and continues

to review conditions at the inpatient programs and to find severe and life-threatening

deficiencies in the quality of care at these programs.  Plaintiffs request that the Court

remain just as vigilant in ensuring that the adequacy of inpatient psychiatric care provided

to class members meets constitutional minima, just as the timeliness of access to inpatient

psychiatric care must meet such minima.

Dated: August 17, 2015                 Respectfully submitted,

                                       KAMALA D. HARRIS
                                       Attorney General of California
                                       Patrick R. McKinney
                                       Supervising Deputy Attorney General

                                       By:  */s/ Maneesh Sharma*
                                            MANEESH SHARMA
                                            Deputy Attorney General
                                       *Attorneys for Defendants*

                                       ROSEN BIEN GALVAN & GRUNFELD LLP

                                       By:  */s/ Lisa Ells*
                                            LISA ELLS

                                       *Attorneys for Plaintiffs*

Defendants' Exhibit A

STATE OF CALIFORNIA — DEPARTMENT OF STATE HOSPITALS                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF THE DIRECTOR**
1600 Ninth Street, Room 151
Sacramento, CA 95814



August 17, 2015


**Patrick R. McKinney II**
**Supervising Deputy Attorney General**
**Department of Justice**
**Office of the Attorney General**
**1515 Clay Street, 20th Floor**
**Oakland, CA 94612**

Dear Mr. McKinney:

Attached please find Defendants Department of State Hospitals and California
Department of Corrections and Rehabilitation's joint Report to the Coleman Court on the
Inpatient Census and Prior Plan Implementation, in response to the Court's August 5,
2015 Order.

Sincerely,

Pam Ahlin
Director
Department of State Hospitals

Nicholas Weber
Attorney
Department of Corrections and Rehabilitation


Enclosure:

FOR SUBMISSION TO THE *COLEMAN* COURT

*Defendants' Report on Inpatient Census and Prior Plan Implementation*

## I.

## Introduction

Defendants Department of State Hospitals (DSH) and California Department of Corrections and Rehabilitation (CDCR) submit this joint report in response to the Court's August 5, 2015 Order.  (ECF No. 5333.)  As directed by the Court, Defendants address inpatient waitlists and program census as of August 10, 2015 in Section II and the current status of Defendants' implementation of 2010-2011 plans to reduce or eliminate inpatient waitlists in Section III.  Though not required by the Order, Defendants discuss current and proposed measures to address inpatient waitlists and improve patient movement in Section IV.

Defendants recognize their obligation to reduce or eliminate the waitlists and to admit all patients in need of inpatient care as soon as possible.  As discussed in Defendants' November 24, 2010 filing, Intermediate Care waitlists reached as many as 557 patients and the Acute care waitlist reached a high of 105 patients.  Moreover, many of those patients were forced to wait for extended periods before being placed in an inpatient bed.  Defendants implemented their Court approved November 24, 2010 and October 18, 2011 plans to reduce or eliminate inpatient waitlists and to ensure ready access to adequate inpatient mental health care.  Those plans are now formalized as Defendants' policies and procedures.  Similarly, Defendants' December 13, 2011 plan for sustainable self-monitoring of inpatient referrals has been fully implemented, enabling Defendants to continuously identify and appropriately refer patients to inpatient programs.  Defendants' sustained focus has produced results: the inpatient waitlists have been significantly reduced compared to 2009-2011.  Nevertheless, because of the needs of an ever changing patient population, inpatient bed use can and does wax and wane.  Defendants continue to take appropriate steps to manage use and improve access to inpatient care.  Over the past several months, Defendants have met and conferred with the Special Master and Plaintiffs concerning a number of options to manage inpatient bed use.  Defendants have (1) expanded inpatient bed capacity by adding 30 beds at DSH-Vacaville, (2) updated guidelines for inpatient placement to minimize deferrals and resultant delays in placement, and (3) proposed a formalized housing review procedure, which builds on Defendants' prior plans to ensure continuous patient movement and optimize bed use within DSH programs.

As of August 10, 2015 the Intermediate Care High-Custody waitlist was 12 patients, with 6 of those patients already assigned beds.  The Acute care waitlist was 44 patients, with 23 of those patients assigned beds.[1]  All 12 patients awaiting Intermediate Care Facility placement had been referred less than thirty days before August 10, in compliance with Program Guide requirements.  Similarly, of the 44 patients awaiting Acute care, 30 of them had been referred less than 10 days before August 10, in compliance with Program Guide requirements.  Notably, the 30-bed unit at DSH-Vacaville opened on August 10, 2015 and will be fully activated no later

---

[1] For the purposes of this report, Defendants define "waitlist" as any patient accepted by DSH but not yet transferred to DSH and not subject to a legal or medical hold.  As a result, the waitlists include patients who have been assigned a bed but are pending transfer or placement.

1

than mid-September.  The beds will be filled with both Intermediate Care High-Custody patients pending placement and Acute patients ready to step to down to Intermediate Care, resulting in immediate reductions to the current waitlists.  Defendants propose providing the Special Master with an updated status report in 90 days advising of the status of implementation of these measures.

## II.

### *Coleman* Inpatient Mental Health Care Programs and Bed Census

DSH provides two levels of inpatient mental health care for *Coleman*-patients: Acute Psychiatric treatment and Intermediate Care Facility treatment.  DSH Intermediate Care treatment is divided into High-Custody programs and Low-Custody programs.  CDCR also provides inpatient mental health care treatment in two programs: the San Quentin State Prison Psychiatric Inpatient Program, which serves condemned patients, and the California Institution for Women Psychiatric Inpatient Program, which serves female patients.  Table 1 describes the different inpatient programs:

| Table 1: Psychiatric Inpatient Programs Setting | |
|---|---|
| **Male Acute Care Programs** | |
| DSH-Vacaville | • Within California Medical Facility grounds<br>• Locked, single cell |
| DSH-Stockton | • Within California Health Care Facility grounds<br>• Locked, single cell |
| **Male Intermediate Care Facility High-Custody Programs** | |
| DSH-Vacaville | • Within California Medical Facility grounds<br>• Locked, single cell |
| DSH-Stockton | • Within California Health Care Facility grounds<br>• Locked, single cell |
| DSH-Salinas Valley | • Within Salinas Valley State Prison grounds<br>• Locked, single cell<br>• Locked, multi-cell (two- and four-man cells) |
| **Male Intermediate Care Facility Low-Custody Programs** | |
| DSH-Vacaville | • Within California Medical Facility grounds<br>• Locked, dormitories |
| DSH-Atascadero | • Not within a CDCR Institution<br>• Unlocked, dormitories |
| DSH-Coalinga | • Not within a CDCR Institution<br>• Unlocked, dormitories<br>• Unlocked, single rooms (10) |
| **Male Condemned Program** | |
| San Quentin State Prison-Psychiatric Inpatient Program | • Within San Quentin State Prison grounds<br>• Locked, single cell<br>• Designed specifically for CDCR male condemned population |

2

| Female Programs[2] | |
|---|---|
| DSH-Patton | • Not within a CDCR Institution<br>• Dormitories |
| California Institution for Women-Psychiatric Inpatient Program | • Within California Institution for Women grounds<br>• Locked, single cell |

Patients in need of DSH Intermediate Care are referred to either a High-Custody or a Low-Custody program based on both clinical and custodial factors:

- Intermediate High-Custody programs: patient clinically requires a single cell environment or patient custodially must be in a locked environment and is not dorm eligible.
- Intermediate Low-Custody programs: patient is clinically appropriate for a dormitory and patient is custodially eligible for dorm placement. To be referred for placement at DSH-Atascadero or DSH-Coalinga patient must also be custodially eligible for unlocked housing.

A patient's clinical needs are prioritized over custodial eligibility and therefore a patient who clinically requires a single cell environment may be referred to an Intermediate High-Custody program, even when the patient is custodially eligible for a Low-Custody program. A patient may require single cell placement for clinical reasons, including the following examples:

- Patient has command hallucinations/internal stimuli that severely impact his or her functioning and may result in behaviors that are violent and/or disruptive;
- Patient is paranoid or highly delusion (i.e. believes other are trying to poison or harm them);
- Patient has severe functioning issue that would disrupt other patients and/or pose victimization concerns (i.e. patient is malodorous or exhibits behaviors that cause disruption during night hours);
- Patient has proven history of decompensating in dorm settings, including in inpatient care dormitories; or
- Patient has documented pattern of intimidating or disrupting care for lower-functioning patients.

/ /

/ /

/ /

---

[2] As of July 2012, all female *Coleman* patients are referred to the California Institution for Women-PIP. Patients are only referred to DSH-Patton if there are no available beds within the California Institution for Women-PIP.

Table 2 shows Defendants' census and bed availability as of August 10, 2015 for each inpatient program for *Coleman* patients.

| Table 2: Psychiatric Inpatient Programs Census | | | | | | |
|---|---|---|---|---|---|---|
| Facility | Bed Capacity | Beds Occupied | Beds on hold[3] | Beds redlined[4] | Isolation Rooms[5] | Beds available |
| Male Acute Care Programs | | | | | | |
| DSH-Vacaville | 218 | 206 | 11 | 1 | 0 | 0 |
| DSH-Stockton | 94 | 76 | 12 | 0 | 6 | 0 |
| Total | 312 | 282 | 23 | 1 | 6 | 0 |
| Male Intermediate Care Facility (High Custody) Programs | | | | | | |
| DSH-Stockton | 420 | 373 | 19 | 0 | 28 | 0 |
| DSH-Vacaville | 94 | 64 | 2 | 0 | 0 | 28[6] |
| DSH-Salinas Valley | 202 | 196 | 6 | 0 | 0 | 0 |
| DSH-Salinas Valley Multi-person Cells | 44 | 28 | 0 | 0 | 0 | 16 |
| Total | 760 | 661 | 27 | 0 | 28 | 44 |
| Male Intermediate Care Facility (Low Custody) Programs | | | | | | |
| DSH-Vacaville | 84 | 61 | 1 | 0 | 0 | 22 |
| DSH-Atascadero | 256 | 149 | 0 | 0 | 0 | 107 |
| DSH-Coalinga | 50 | 49 | 0 | 0 | 0 | 1 |
| Total | 390 | 259 | 1 | 0 | 0 | 130 |
| Male Condemned Programs | | | | | | |
| San Quentin-PIP | 40 | 39 | 0 | 0 | 0 | 1 |
| Female Programs | | | | | | |
| DSH-Patton | 30 | 2 | 0 | 0 | 0 | 28 |
| California Institute for Women-PIP | 45 | 44 | 0 | 0 | 0 | 1 |
| Total | 75 | 46 | 0 | 0 | 0 | 29 |
| TOTAL Inpatient Program Capacity and Availability | | | | | | |
| ALL | 1577 | 1287 | 51 | 1 | 34 | 204 |

In accordance with parts 2(e) and (f) of the August 5 order, Table 2 shows total system wide inpatient capacity and bed availability for *Coleman* patients. As noted in Table 1, however, Defendants' inpatient programs provide different levels of care and have differing custodial settings. Accordingly, beds are not interchangeable and a patient referred to and accepted for placement in one program cannot necessarily fill an available bed in another program. As discussed in more detail in Section IV below, Defendants' proposed Housing Review process will optimize bed use by ensuring that patients who are placed into High-Custody programs

---

[3] Beds on hold are reserved for patients pending transfer.
[4] Beds redlined are beds that are temporarily unavailable due to repairs.
[5] Isolation rooms are cells that for licensing reasons physically differ from the other cells in the program, i.e. have showers or restricted sightlines into the cell. As a result these cells are deemed inappropriate for everyday use. Defendants are evaluating whether some of these rooms can be modified to permit everyday use.
[6] These 28 beds are part of the 30 bed-unit that was opened on August 10, 2015 and as of that date had not been reserved.

solely for clinical reasons are appropriately tracked and moved to Low-Custody programs as their clinical symptoms are resolved.

With respect to the Intermediate Care Facility High-Custody waitlist of 12 patients, 6 patients had been assigned a bed as of August 10, 2015. The remaining 6 patients require single celled housing and therefore could not be placed in DSH-Salinas Valley's multi-person cells or into a Low-Custody program. Further, while Table 2 shows 28 unoccupied High-Custody beds at DSH-Vacaville as of August 10, 2015, these beds are part of the 30-bed unit that was activated on that date. As of August 17, these 6 patients have been assigned beds and will be transferred shortly.

With respect to the Acute waitlist of 44 patients, 23 patients had a reserved bed as of August 10, 2015 and have already been admitted or will be admitted shortly. There were no further available Acute beds as of that date, however, as discussed in more detail in Section IV, the recently activated unit at DSH-Vacaville will admit Acute patients as they are ready to step down to Intermediate Care, thereby making more Acute beds immediately available.

## III.

## Current Status of Defendants' 2010 & 2011 Plans to Reduce the Waitlist and 2011-2012 Plan for Sustainable Self Monitoring of Inpatient Referrals

As required by sections 2(a)-(c) of the August 5 Order, Defendants update the Court on the current status of Defendants' implementation of prior plans to address inpatient waitlists and sustainable self monitoring of inpatient referrals. These plans have been fully implemented.

### Defendants' November 24, 2010 Plan

On July 22, 2011, the Court Ordered implementation of parts 2, 3, and 4 of Defendants' November 24, 2010 plan to reduce or eliminate the waitlist. (Order, ECF No. 4045 at 10.) Part 2 of that plan addressed to Utilization Management measures; part 3 addressed expansion of the Intermediate Care Facility Pilot Project to include quarterly reviews of the SVPP waitlist by the Health Care Placement Oversight Program; and part 4 addressed activation of SharePoint, a system allowing CDCR and DSH to share inmate-patient information. (Defendants' November 24, 2010 Plan re: Intermediate Care Facility and Acute Inpatient Waitlists, ECF No. 3962-1 at 4[7].) Part 3 of the plan was modified by Defendants' October 13, 2011 plan, and will be addressed in Defendants' discussion of the October 2011 plan.

### A.     Utilization Management Measures

Defendants' utilization management measures had four components: (1) prospective review to address the appropriateness of referrals before referral and placement in DSH; (2) concurrent review to address current patients with advanced lengths of stay; (3) retrospective reviews for post-DSH discharge and follow up; and (4) additional transition planning. (ECF No. 3962-1 at 8-17.)

---

[7] All pin-cites to electronically filed documents will be to the electronically stamped pagination unless otherwise indicated.

1. Prospective review

DSH and CDCR continue to use the Transition Planning and Continuity of Care Plans and documents described in the November 2010 plan.  CDCR continues to conduct its own psychological assessment, provide Clozapine treatment, and no longer refers patients to DSH based solely on those two factors.  CDCR and DSH continue to provide Positive Behavioral Services to patients to address and manage maladaptive behaviors while in custody and decrease referrals to inpatient care.  CDCR also continues to review patients who have been referred to DSH, but not yet placed, and takes appropriate steps to rescind referrals if no longer clinically necessary.

2. Concurrent review

DSH and CDCR continue to monitor lengths of stay.  Each DSH program treating *Coleman* patients conducts regular reviews and transmits the reviews to CDCR Utilization Management staff.  While the November 2010 plan required Defendants to conduct reviews for Intermediate Care Facility patients with lengths of stay greater than 300 days and Acute patients with lengths of stay greater than 90 days, DSH continues to conduct reviews on an accelerated timeline according to the needs of the individual programs.  For example, DSH-Vacaville reviews Acute patients at 60 days and Intermediate Care Facility patients at 240 days.  *See* Attachment 1.

3. Retrospective Review

DSH and CDCR continue to use the discharge process forms identified in the November 2010 plan, which are shared across agencies through SharePoint.  They also continue to review and monitor patients who have been recently discharged or who have multiple Mental Health Crisis Bed and DSH admissions.

4. Additional transition planning

CDCR and DSH continue to conduct primary clinician visits, monthly DSH Coordinator conference calls, quarterly conference calls, and provide non-formulary medications across DSH and CDCR programs.

B.      Activation of SharePoint

SharePoint has been active since 2010 and has been in continuous use.  (*See* Special Master's Twenty-Fifth Round Monitoring Report, ECF No. 4298 at 24 (noting SharePoint had been "timely implemented").)  It has increased efficiencies in the transfer of patient documentation between agencies for referrals and discharges.  It is the standard method for sharing information across agencies, and is used to share statistical data to help monitor the continuum of the referral process.

Defendants' October 18, 2011 Supplemental Plan

Defendants' October 18, 2011 Supplemental Plan modified part 3 of the November 24, 2010 Plan by applying changed criteria for the Intermediate Care Facility Pilot Program's case-

by-case reviews, memorializing the pilot program into standard policy for inpatient placements, and using the new criteria to begin moving patients within DSH programs.  (Defendants' Supplemental Plan to Reduce or Eliminate the Inpatient Waitlists, ECF No. 4103 at 7.)  The October 18, 2011 plan also included the construction of a 64-bed Intermediate Care facility at DSH-Vacaville and the conversion of L-Wing at DSH-Vacaville to temporary Intermediate Care Facility beds.  (*Id.* at 9-10.)

       A.      Modified Custody Criteria and Case-by-Case Reviews

As described in the October 18, 2011 plan, CDCR's modified custody criteria for the placement of patients in High- and Low-Custody Intermediate Care programs has been made standard policy and promulgated through the Administrative Procedures Act.  (ECF No. 4103 at 7; Cal. Code Regs. Tit. 15 et seq.)  CDCR also continues to use case-by-case reviews to determine whether eligible high-custody patients can be approved for placement in a lower custody DSH environment, including dormitories.

The patient movement plan to use the modified custody criteria to transfer patients within DSH programs has also been implemented.  (ECF No. 4103 at 8.)  DSH continues to transfer patients to the Low-Custody programs at DSH-Atascadero, DSH-Coalinga, and DSH-Vacaville dorms, including 38 patients between January 1, 2015 and August 10, 2015.  Defendants, however, acknowledge that movement of patients to low-custody environments could be further optimized and streamlined.  To ensure that patients are being evaluated for movement on a regular basis, DSH is proposing a new formalized Housing Review process, as described in Section IV below.

       B.      DSH-Vacaville 64-bed Intermediate Care unit

The DSH-Vacaville 64-bed unit for Intermediate Care was activated on February 19, 2012.  It has been in continuous use since that date and is currently fully occupied.

       C.      DSH-Vacaville temporary L-Wing Conversion

The conversion of L-Wing at DSH-Vacaville to Intermediate use involved three units: L-1, L-2, and L-3.  These units were unlicensed and intended to be temporary units pending the construction of new inpatient beds.  Following the activation of newly constructed Intermediate Care units at DSH-Stockton in 2014, L-Wing was converted back to Enhanced Outpatient Programs beds.

<u>Defendants' December 13, 2011 Plan for Sustainable Self-Monitoring of Inpatient Identification, Referral, and Transfer</u>

Defendants' December 13, 2011 filing regarding sustainable self-monitoring of inpatient referrals discussed progress on CDCR's assessment of referrals and non-referrals to inpatient care.  (Defendants' Report on Assessment Process and Plan Re: Sustainable Self-Monitoring, ECF No. 4132.)  As noted in the December 13, 2011 report, the assessment and monitoring process was focused on resolving the concern that CDCR inmates in need of inpatient care were not being appropriately identified and referred to inpatient programs.  (*Id.* at 7.)  Defendants continued to work with the Special Master and Plaintiffs' counsel, and on July 9, 2012

Defendants filed their updated plan for sustainable self monitoring to "identify, refer, and transfer inmate-patients needing DSH inpatient case and internally monitor and improve the process." (Defendants' Report on Access to Inpatient Care, ECF No. 4207 at 4.)

Defendants continue to use the sustainable self-monitoring process described in their July 9, 2012 updated plan. On November 19, 2012, the Special Master's experts conducted a review of CDCR central office's oversight and supervision of the sustainable process and confirmed that compliance with the plan approved by the Special Master was continuing. (ECF No. 4298 at 32.) Defendants' compliance with the sustainable process is ongoing and effective. Using standardized and objective criteria for inpatient referral, CDCR staff conduct monthly, quarterly, and semi-annual audits of referrals and non-referrals to DSH inpatient programs. Referrals and non-referrals that are potentially not appropriate are returned to clinical treatment teams for reconsideration. Institutions where more than 15% of referrals/non-referrals were potentially not appropriate develop remedial plans in conjunction with headquarters and are required to repeat the review process the next quarter. Regional mental health teams and headquarters staff have developed training and guidance documents to improve the quality of reviews.

## IV.

### Current Measures to Address Waitlists and Improve Patient Movement

Defendants, in consultation with the Special Master and Plaintiffs' counsel, have implemented or are implementing additional measures to ensure appropriate placement of patients in inpatient beds.

First, following several discussions with the Special Master's team and Plaintiffs' counsel, Defendants obtained budget approval and activated 30 Intermediate Care beds at DSH-Vacaville on August 10, 2015. The new unit will share treatment space with the newly constructed Enhanced Outpatient Program wing at the California Medical Facility. CDCR has committed to maintaining a cap on the number of Enhanced Outpatient Program patients that will be housed at the California Medical Facility to ensure that there is sufficient treatment space for both programs.

There are currently 6 patients admitted to the unit and DSH will admit five patients a week until the unit is full or there are no patients on the Intermediate Care High-Custody waitlist. While the current Intermediate Care waitlist is smaller than the Acute waitlist, DSH determined that an Intermediate Care unit would better address overall bed utilization based on historic bed usage and population projections. Moreover, several patients admitted to this new unit have and will be Acute patients who are ready to step down to Intermediate Care Facility level of care, opening up Acute beds.

Second, DSH and CDCR are collaborating on updated guidelines for inpatient placement within DSH programs. The purpose of the updated guidelines is to ensure that patients are referred to both the correct level of care and the appropriate housing level. Use of these guidelines is expected to minimize the number of deferrals to different levels of care or higher custody housing units, and therefore decrease delays between the time of referral and placement.

Third, DSH is prepared to implement a formalized Housing Review process to ensure that patients are constantly tracked and moved as appropriate to the least restrictive custodial setting consistent with the patient's clinical and custodial needs. The formalized Housing Review will assign each patient admitted to DSH a Least Restrictive Housing Designation, identifying the patient's pre-approved lowest level of custodial housing. If the patient is placed into a higher custodial setting within DSH, clinical treatment teams will be required to identify the clinical concerns preventing the patient from being placed at his Least Restrictive Housing Designation and develop a treatment plan to address those concerns. The new process will also simplify the monitoring of patient movement by requiring clinical treatment teams to submit regular updates to DSH's Patient Management Unit regarding patient progress towards the Least Restrictive Housing placement. To ensure that all patient movement is clinically sound, Defendants also plan to provide supplemental training to clinical staff regarding the various housing environments available within DSH and the associated clinical acceptance criteria for each type of housing environment. Defendants are currently meeting and conferring with Special Master and Plaintiffs' counsel on the specific terms of the Housing Review policy, and hope to finalize it shortly.

Attachment 1

DEPARTMENT OF STATE HOSPITALS - VACAVILLE
ADMINISTRATIVE DIRECTIVE

SUBJECT: **UTILIZATION MANAGEMENT PLAN**    ADMINISTRATIVE DIRECTIVE:**04.01**

EFFECTIVE DATE: **OCTOBER 1, 2014**    REPLACES: **A.D. 04.01 DATED 11-20-13**

RESPONSIBLE: **PERFORMANCE IMPROVEMENT PROGRAM DIRECTOR**

APPROVED FOR THE GOVERNING BODY:    *Ellen Bachman*

**ELLEN BACHMAN**
**EXECUTIVE DIRECTOR**

## I. POLICY

It is the policy of the Department of State Hospitals-Vacaville (DSH-V) to provide quality psychiatric care by assuring the level of care provided is appropriate to the psychiatric needs of the patient.

## II. AUTHORITY

**A.** DSH/CDCR Memorandum of Understanding

**B.** DSH-V Executive Director

## III. CONFLICT OF INTEREST

A person shall not participate in the utilization management determination if he/she has current principal responsibility for the care of the patient whose case is under review.

## IV. CONFIDENTIALITY

The confidentiality of records and patient identification is to be consistent with State and Federal law.

## V. UTILIZATION MANAGEMENT COMMITTEE (UMC)

### A. ORGANIZATION / COMPOSITION

The UMC is a permanent, standing committee of the DSH-V. The UMC shall be composed of the Chief Psychiatrist or designee; Utilization Management (UM) Coordinator; the Senior Psychiatrist Supervisor(s) or designee(s); the Chief Psychologist or designee; the Performance Improvement Program Director or designee; the Supervising Social Worker or designee; the Rehabilitation Therapy Program Director or designee; the Acute Psychiatric Program Director or designee; the Intermediate Treatment Program Director or designee; the Acute Nursing Coordinator or designee; the Intermediate Treatment Nursing Coordinator or designee; and on an ad hoc basis, the Acute Health Program Coordinator and the Intermediate Health Program Coordinator. The Medical Director or designee shall serve as the UMC Chairperson.

### B. FUNCTION

**1.** The UMC shall meet at least weekly. The UM Coordinator shall determine the date, time, and location of the meetings.

**2.** The UMC shall be responsible for the review of continued stays, coordination of the UM Program, and the duties as specified by these requirements.

**3.** A quorum shall consist of the UMC Chairperson or designee and any three of the members.

**C. MINUTES**

Minutes shall be kept and shall include:

1. Date and time of meeting.
2. Names and titles of members present.
3. Continued stay review discussions.
4. Patient identifying information.
5. Signature of the UM Chairperson or designee.

Minutes shall be circulated to all appropriate staff.

**D. RESPONSIBILITIES**

1. The UMC Chairperson

   a. Has overall accountability for the function of the UMC.
   b. Assures Medical Staff compliance with UM activities.
   c. Ascertains if conflicts of interest are present and assigns alternate Committee members to complete tasks as required.
   d. Reports UM activities to appropriate committees and other designated individuals or groups.

2. The UM Coordinator:

   a. Must be a Registered Nurse, working under the supervision of the Performance Improvement Program Director and under the clinical direction of the Medical Director/UM Chairperson.
   b. Schedules and facilitates the UM Committee meetings.
   c. Conducts systematic reviews of continued stays.
   d. Develops and maintains a UM Committee tracking system of patient reviews.
   e. Initiates and completes evaluations and studies for UM Committee review.
   f. Prepares the UM Committee minutes.
   g. Prepares weekly UM reports, monthly UM summaries and Governing Body reports.

3. UM Committee Members:

   a. Attend program-specific meetings.
   b. Complete assigned projects and responsibilities within approved time frames.
   c. Keep informed of current UM technology to assure quality services.

**VI.  ACUTE PROGRAM UTILIZATION MANAGEMENT REVIEW**

Utilization Management is based on an average length of stay of 30 to 45 days in the Acute Psychiatric Program.    All patients admitted to DSH-V must have justification for continued hospitalization.

**A. ACUTE TREATMENT CONTINUED STAY REVIEW**

1. A review of continued acute treatment is required for all acute patients by their 60th day of stay, or when requested by the UM Committee.  This shall be noted by the inclusion of the patient's name in the UM meeting agenda and "Continued Stay Review" written next to the patient's name.

2. Approximately once every two to three weeks, each acute unit will be scheduled for a Continued Stay Review meeting.

3. Approximately 24 to 48 hours prior to each scheduled acute UM meeting, the treatment team will receive the agenda. The agenda shall include:

   a. Names and CDCR numbers of those patients who have been assigned by the UM Coordinator, usually starting with the highest length of stay patients, and then working downwards.

   b. Names and CDCR numbers of those patients that the treatment team has requested to be discussed. These patients shall have first priority for being placed on the agenda. They shall be requested via e-mail no less than 24 hours prior to the scheduled meeting. In these situations, the UM Coordinator shall update the affected agendas and send them back to the units.

**B. ACUTE CONTINUED STAY REVIEW PROCESS**

1. In preparation for the UM Committee Continued Stay Review meeting, the UM Coordinator will review the unit health records.

2. The treatment teams shall be knowledgeable of the patients being discussed. Areas of expected knowledge include, but aren't limited to, the following:

   a. Current treatment plan and progress towards meeting goals and objectives.

   b. Current medication regime, including medications ordered, routes, dosages, frequency of administration and medication side effects.

   c. Discharge criteria and current status concerning reaching these.

   d. Barriers to discharge and plans to reduce them.

   e. Any other information pertinent to utilization management review, justification for continued stay and discharge planning.

3. In order to be fully prepared for the Continued Stay Reviews, it is recommended that the treatment teams bring the unit health records of the patients being discussed to the UMC meetings.

4. The UMC shall consider all of the information presented and may make a recommendation as to whether the patient meets criteria for discharge or for continued stay.

5. The UM Coordinator shall document the results of the continued stay reviews in the minutes  and forward a copy of the minutes to the treatment team via the Supervising Registered Nurse.

6. If the treatment team concurs with recommendations for discharge, the team members shall initiate their discharge documentation.  The discharge/referral packet shall be submitted to the Clinical Assessment Team (CAT) within 5 business days of the UM Meeting.

7. If the UMC and the treatment team are not in agreement, the case will be referred to the Chief Psychiatrist for discussion and resolution.  A case conference may be recommended.

**VII.  INTERMEDIATE TREATMENT PROGRAM UTILIZATION MANAGEMENT REVIEW**

Utilization Management is based on an average length of stay of 180 to 240 days in the Intermediate Treatment Program.  All patients admitted to DSH-V must have justification for continued hospitalization.

**A. INTERMEDIATE TREATMENT PROGRAM CONTINUED STAY REVIEW**

1. The DSH-V Intermediate Program will complete Continued Stay Review Forms (Attachment A) for all patients with a length of stay of 240 days or more and when requested by the UM Committee.  After completion of the Continued Stay Review Form, the treating psychiatrist shall sign and date the form.

   a. If the form is required due to a UM Meeting agenda, the original copy shall be submitted to the UM Coordinator at the UM Meeting.

    b. If the form was completed as a result of a treatment team conference, the original copy shall be submitted to the UM Coordinator or placed in the UM Coordinator's box in the Medical Director's Office by the end of business on the day of the conference.

    c. For any other situation where the Continued Stay Review Form is required, the original copy of the completed form shall be submitted to the UM Coordinator or placed in the UM Coordinator's box in the Medical Director's office by the end of the fifth business day from the date at the top of page one of the form.

2. Approximately once every four weeks, each ITP unit will be scheduled for a Continued Stay Review meeting.

3. Approximately one week prior to each scheduled ITP UM meeting, the treatment teams will receive the agendas. The agendas shall include:

    a. Names and CDCR numbers of those patients who have been assigned by the UM Coordinator to have continued stay reviews, usually starting with the highest length of stay patients, then working downwards.

    b. Names and CDCR numbers of those patients that the treatment team has requested to be discussed. These patients shall have first priority for being placed on the agenda. They shall be requested via e-mail no less than 24 hours prior to the scheduled meeting. In these situations, the UM Coordinator shall update the affected agendas and send them back to the units.

    c. Those patients who are required to have a completed Continue Stay Review form shall have a box checked on the agenda which reads "UM Form Required". The original copy of the form shall be submitted to the UM Coordinator at the UM meeting.

**B. INTERMEDIATE PROGRAM CONTINUED STAY REVIEW PROCESS**

1. In preparation for the UM Committee Continued Stay Review meeting, the UM Coordinator will review the unit health records.

2. The treatment teams shall be knowledgeable of the patients being discussed. Areas of expected knowledge include, but aren't limited to, the following:

    a. Current treatment plan and progress towards meeting goals and objectives

    b. Current medication regime, including medications ordered, routes, dosages, frequency of administration and medication side effects

    c. Discharge criteria and current status concerning reaching these

    d. Barriers to discharge and plans to reduce them

    e. Any other information pertinent to utilization management review, justification for continued stay and discharge planning

3. In order to be fully prepared for the Continued Stay Reviews, it is recommended that the treatment teams bring the unit health records of the patients being discussed to the UM meetings.

4. The UM Committee shall consider all of the information presented and may make a recommendation as to whether the patient meets criteria for discharge or for continued stay.

5. The UM Coordinator shall document the results of the continued stay reviews in the minutes and forward a copy of the minutes to the treatment team via the Supervising Registered Nurse.

6. If the treatment team concurs with recommendations for discharge, the team members shall initiate their discharge documentation. The discharge/referral packet shall be submitted to the Clinical Assessment Team (CAT) within 5 business days of the UM Meeting.

7. If the UM Committee and the treatment team are not in agreement, the case will be referred to the Chief Psychiatrist for discussion and resolution. A case conference may be recommended.

## VIII. ADMINISTRATIVE DAYS

A. Administrative days are calculated for all patients.

B. The calculation begins when the patient's name appears on the Bed Utilization Management Meeting (BUMM) discharge list. The calculation ends when the patient physically leaves the DSH-V.

C. The UM Coordinator shall maintain aggregate data for administrative days on all patients. This information shall be available to the local Governing Body.

**ATTACHMENT A**
**Department of State Hospitals – Vacaville**
**Intermediate Treatment Program**
**Continued Stay Review Form**

Purpose: The Department of State Hospitals-Vacaville (DSH-V), Intermediate Treatment Program will review all CDCR Division of Health Care Services (DHCS) patients with a length of stay of 240 days or more. See instructions on page two.

Date of Continued Stay Review: _____

Patient's Last, First Name: _____

CDCR #:_____     DSH#: _____

Referring CDCR Facility: _____     Parole Date: _____

DSH Admission Date: _____     LOS (from ITP Admission Date): _____ days

Initial ITP Admission Diagnosis: _____

Current Diagnosis: _____

Initial ITP Admission GAF: _____     Current GAF: _____

Status of Patient's Treatment Outcome Expectations (from ITP referral):

1) _____     ☐ Met     ☐ Not Met

2) _____     ☐ Met     ☐ Not Met

3) _____     ☐ Met     ☐ Not Met

## CURRENT STATUS OF PATIENT

1. Is this patient's major mental disorder stabilized?     ☐ Yes     ☐ No
   If no – what is the DSH treatment plan and is the patient responding to treatment? _____
   _____

1a. If applicable, check box if any of the following resources were utilized.
   ☐ Medication Adjustments                    ☐ Psychological Testing
   ☐ Blood Levels of psychotropic medications  ☐ PBST or Other Behavior Plan
   ☐ Case Conference                           ☐ Other Treatment Resource
   If another treatment resource was utilized please describe:
   _____

2. What is the level of medication adherence?     ☐ Noncompliant     ☐ Compliant

2a. Does the patient have a PC 2602 Involuntary medication order?     ☐ Yes     ☐ No
   If yes what is the expiration date? _____

3. What specific treatment goals does the DSH treatment team expect the patient to achieve in the next 30 days to prepare for discharge? _____

4. List the barriers impeding discharge back to CDCR. _____

5. Recommendation/Status     ☐ Continued Stay     ☐ Recommend Discharge

_____     _____     _____
Signature of DSH Psychiatrist          Printed Name of DSH Psychiatrist          Date Signed

## UTILIZATION MANAGEMENT COMMITTEE RESPONSE

A. ☐     The UM Committee recommends discharge.
         The discharge packet shall be submitted to the Clinical Assessment Team (CAT) within 5 business days from the date of this response.

B. ☐     The UM Committee recommends continued stay for _____ days.

**IF THE TREATMENT TEAM IS NOT IN AGREEMENT WITH THE UM COMMITTEE,**
**THE CASE WILL BE REFERRED TO THE MEDICAL DIRECTOR FOR DISCUSSION AND RESOLUTION.**

_____     _____
Signature of DSH Medical Director or Designee          Date Signed

**ATTACHMENT A**

**Department of State Hospitals – Vacaville**
**Intermediate Treatment Program**
**Continued Stay Review Form**

Instructions

1) All ITP patients at DSH-V will eventually be required to have a Continued Stay Review form completed at their 240 day team conference and when requested by the UM Committee.

2) In order to absorb the initial backlog, the Continued Stay Review forms will be required when noted as such on the Continued Stay Review Agendas, which alert the units of an upcoming UM meeting.

3) Each ITP unit will be scheduled for Continued Stay Review Meetings approximately once every four weeks.

4) Approximately one week prior to each scheduled ITP UM Meeting, treatment team members will receive e-mails containing agendas. The agendas will list approximately four patients per unit, usually starting with the patients who have the highest lengths of stay, and then working downward.

5) Those patients who are required to have a completed Continue Stay Review form shall have a box checked on the agenda which reads "UM Form required".

6) The DSH attending psychiatrist will complete, sign and date the Continued Stay Review form. The original copy of the completed form shall be submitted to the UM Coordinator at the scheduled UM meeting.

7) For cases that are identified for discharge, the treatment teams will submit the discharge packets to the CAT within 5 business days from the date of the UM Committee Response on the Continued Stay Review Form.

8) If the Continued Stay Review indicates a need for continued stay, the case will be set for review again in 30 days.

9) If there is disagreement regarding final disposition, the case will be referred to the DSH Medical Director for discussion and resolution.