1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF CALIFORNIA
2             BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

3                          ---o0o---

4
     RALPH COLEMAN, ET AL.,
5
             Plaintiffs,
6
     Vs.                                  CASE NO. 2:90-CV-520 KJM
7
     EDMUND G. BROWN, JR., ET AL.,
8
             Defendants.
9    _____/

10              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                    RE:   STATUS CONFERENCE
11           WEDNESDAY, AUGUST 19TH, 2015 - 1:30 P.M.

12

13   For the Plaintiffs:   ROSEN, BIEN, GALVAN & GRUNFELD, LLP
                           315 MONTGOMERY STREET, TENTH FLOOR
14                         SAN FRANCISCO, CALIFORNIA  94104
                           BY:  MICHAEL BIEN, ATTORNEY AT LAW
15                         BY:  JANE KAHN, ATTORNEY AT LAW
                           BY:  AARON FISCHER, ATTORNEY AT LAW
16                         BY:  LISA ELLS, ATTORNEY AT LAW
                           BY:  KRISTA STONE-MANISTA, ATTY AT LAW
17

18   For the Defendants:   STATE OF CALIFORNIA, DEPT. OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
19                         13OO I STREET
                           SACRAMENTO, CALIFORNIA  95814
20                         BY:  MANEESH SHARMA, DEPUTY AG
                           BY:  CHRISTINE CICCOTTI, DEPUTY AG
21                         BY:  ELISE THORN, DEPUTY AG

22

23   Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
                    Official Court Reporter USDC, 916-446-6360
                    501 I Street, Room 4-200
24                  Sacramento, California  95814

25
     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

2

 1    SACRAMENTO, CALIFORNIA - WEDNESDAY, AUGUST 19, 2015 - 1:30 P.M.

 2                            ---o0o---

 3            THE CLERK:  Calling Civil Case 90-520, Coleman,

 4    et al., versus Brown, et al.  This is on for status conference.

 5            THE COURT:  Good afternoon.  Appearances, please.

 6            MR. BIEN:  Good afternoon, Your Honor.  Michael Bien

 7    and Jane Kahn, Lisa Ells, Aaron Fischer and Krista

 8    Stone-Manista for plaintiffs.

 9            THE COURT:  Good afternoon.

10            MR. SHARMA:  Good afternoon, Your Honor.  Maneesh

11    Sharma, Elise Thorn and Christine Ciccotti for defendants.  As

12    instructed by the court, we also have Director of Department of

13    State Hospitals, Pam Ahlin, and Deputy Director of Strategic

14    Planning, George Maynard, present today.

15            THE COURT:  All right.  Good afternoon.  Thank you for

16    identifying those additional persons.

17        Then is there also a Miss Cordova and Miss Harrigan,

18    counsel for DSH?

19            MR. SHARMA:  Miss Harrigan is in the room, Your Honor.

20    She's our internal -- our in-house counsel for DSH legal.

21    Miss Cordova has actually -- I don't want to get ahead of

22    myself, but I believe she's leaving or has left the department

23    for another position.

24            THE COURT:  All right.  Let me just -- I have some

25    things I want to cover.  I'm not expecting extensive argument.

1    I just want to clarify some things.

2        If after I have said my piece the parties want to say some

3    things, ask for clarification, they can do that.  I do want to

4    at some point hear briefly from Director Ahlin and Deputy

5    Maynard, if you will allow them to speak to me directly.

6        Here's what I want to clarify.  I haven't met like this

7    with the parties before in this case.  And I inherited this

8    case from Judge Karlton who did, as far as I'm concerned, all

9    the heavy lifting that was needed until his departure from the

10    bench.  He got that plane to the optimum altitude, and then set

11    you all on what I see as a glide path, let the glider go.

12        I am not just a mannequin in the plane.  If I need to fire

13    up the engines again, I'm prepared to do that.  I'm not itching

14    for more litigation.  I'm here if that's what is needed.

15        Everything I have understood is that this case should be on

16    a path toward resolution in our lifetimes, sooner rather than

17    later, but that's only if everything continues to work as

18    anticipated.

19        My main purpose in asking you to appear today is based on

20    my great concern in hearing a brief report from the special

21    master in July of 2015 that suggested to me that he, once

22    again, was having to waste his time in going over ground that

23    should have been perfectly covered previously, that is he was

24    having to bring DSH folks -- or the suggestion was folks from

25    DHS needed to be brought up to speed on what the court had

1   previously ordered, what their obligations are, having been

2   brought into this case.

3      I said to the special master that you are not to be wasting

4   your time doing that.  So that's why you are here, for me to

5   clarify that, to just hear today, hopefully, that steps have

6   been taken to avoid the need for that so that the special

7   master can get back on track.  I'm expressing my concern with

8   what appears to have been some backsliding.  Progress, yes, but

9   some backsliding.

10     Then I want to talk about not only following up on some of

11  the things I asked for in the order setting the status, but

12  three issues I've identified that I think need some special

13  attention to make certain you get back on the glide path,

14  headed in the right direction.

15     So that it is clear, in the joint status -- and I'll make

16  it clear in any future order, if I have to issue a future

17  order.  I'm not saying I have to, but when I ask for a "joint

18  status," I do want real meet and confer.  I want you to meet in

19  person or by phone and have a meaningful conversation.

20     I'm not going to sanction anyone, but generally when I say

21  "joint status," that is going to mean you meet and confer,

22  fully share information so there is not a back and forth,

23  unless there are principled differences in positions that need

24  to be laid out separately.  I have reviewed the joint status --

25  all the status.  I refreshed my recollection on some of the

1    docket.

2        Here's a threshold question for you, Mr. Sharma.  And if

3    now is the time to hear briefly from the director, I don't feel

4    the need to put the director and the deputy under oath here

5    today, but I do think it is appropriate to hear a brief report

6    addressing my concerns in paragraph 3 of the order, just

7    hearing a report on the status of having reviewed the plans,

8    the recommendations, the orders identified in paragraph 3,

9    pages 3 to 4.

10       Then I would like to ask for declarations by the end of the

11   week just confirming that that paragraph has been fully

12   satisfied.  The declarations would also tell me -- provide some

13   meaningful detail on protocols to ensure smooth transitions to

14   prevent this from ever happening again because I gather there

15   has been some transition in staff.  Not uncommon, but every

16   time there is new staff, there needs to be a clear handoff so

17   the relay baton doesn't get dropped.

18       Can I hear from Director Ahlin and Deputy Maynard?

19       And is it Harrington or Harrigan?

20           MR. SHARMA:  Harrigan.

21           THE COURT:  I think those three persons, can I hear

22   from them briefly?

23           MR. SHARMA:  Sure.  I'll just have them come up, Your

24   Honor.

25           THE COURT:  All right.

 1    (The parties come forward.)

 2         THE COURT:  For the record we have?

 3         MS. THORNE:  Good afternoon.  My name is Pamela Ahlin,

 4    A-h-l-i-n, Director of State Hospitals.

 5         THE COURT:  All right.  Why don't you just go first

 6    and tell me -- I just want to know your response to my request

 7    for a certification that you've read all of the documents I

 8    identified in paragraph 3.

 9         MS. AHLIN:  I have read and understood and have done

10    an assessment on our department to ensure we are in compliance

11    with those orders.

12         THE COURT:  All right.  And are you prepared to

13    certify that in a declaration by the end of the week?

14         MS. AHLIN:  Yes, I am.

15         THE COURT:  What about the protocols to cover

16    transitions -- to ensure smooth transitions?

17         MS. AHLIN:  Between the patients, yes, I'm well aware

18    of the housing protocols.

19         THE COURT:  I'm talking about within your own

20    department.  For instance, if you leave tomorrow for a better

21    job, what protocols are in place to make certain that there is

22    no need for the special master to be surprised by a lack of

23    knowledge?

24         MS. AHLIN:  All the protocols that are mentioned in

25    these two reports are actually in policies and procedures at

1   the hospitals and in operation.

2       Also I have a chief deputy director here with me today to

3   ensure that I transition all of our information from our legal

4   department from the orders to a chief deputy director and our

5   deputy director of strategic planning and then with all the

6   executive directors at our hospitals, as well.

7           THE COURT:  You're representing that those ensure that

8   there is a full transfer of information, that any incoming

9   director, deputy, staff below those persons know they have to

10  go read what this court has ordered?

11          MS. AHLIN:  Yes.  The DSH Legal Department is also

12  here, and they also have all the orders.  And they have

13  familiarized themselves with it, as well as the chief counsel,

14  the assistant chief counsel so that we have some -- a broad

15  wealth of depth within our organization from a legal aspect,

16  from an operational aspect, that everybody will understand and

17  adhere to and monitor that they are continuing to be

18  implemented.

19      And you do have my commitment to make sure that we do take

20  the Coleman court orders of serving our mentally ill patients

21  seriously.  And we have -- I've been part of the department for

22  eleven years now, with a small portion of the Coleman patients

23  under my supervision.  So I am familiar with it, and I give you

24  my assurance that all of us take it very seriously.

25          THE COURT:  All right.  We'll get into some details in

1  just a moment.  Let me hear from Deputy Maynard in response to

2  the same questions.

3      Do I have that right?

4      MR. MAYNARD:  Yes.  Deputy George Maynard over the

5  Strategic Planning Department for Department of State

6  Hospitals.

7      THE COURT:  Have you -- can you certify to me that you

8  have read all of the documents identified in my order?

9      MR. MAYNARD:  Yes, I can certify I have read

10  completely through the documents.  I have collaborated with the

11  legal department in the collection of those documents for the

12  sustainability of pass on for succession planning and have

13  implemented the aspects and the implementation of those

14  previous orders into our future endeavors towards Housing

15  Review Policy and additional efforts.

16      THE COURT:  All right.  I understand the Housing

17  Review Policy is an issue.  Are you prepared to certify that in

18  a declaration by the end of the week?

19      MR. MAYNARD:  Yes, I am.

20      THE COURT:  All right.  Then Miss Harrigan?

21      MS. HARRIGAN:  Good afternoon, Your Honor.

22      THE COURT:  I'm not asking you to disclose any

23  attorney-client privileges.

24      MS. HARRIGAN:  Yes.  Just answering the same question.

25      Yes, I can certify that I have read and familiarized myself

1    with all the documents.  And I have been working closely with

2    Director Ahlin and Deputy Director Maynard, as well as many of

3    my colleagues in the legal department and the AG's office.

4        THE COURT:  I gather there is already -- Miss Cordova

5    is moving on, so there is an example of the kind of transition.

6      What steps are taken to make certain that any institutional

7    knowledge Miss Cordova has acquired is transferred to her

8    successor?

9      She'll have a named successor?

10       MS. HARRIGAN:  Yes.  As soon as we learned that

11   Miss Cordova was going to be moving on, the person who is going

12   to be acting in her place until a permanent successor was found

13   started working closely with me and with Francie, as well.

14     (Court Reporter requests name be repeated.)

15       THE COURT:  Miss Cordova's first name.

16       MS. HARRIGAN:  I started working closely with him --

17   or we both started working closely with him to get him up to

18   speed from this point backwards in what has been going on.

19       THE COURT:  All right.  And you're prepared to certify

20   that in a declaration by the end of the week?

21       MS. HARRIGAN:  Yes, Your Honor.

22       THE COURT:  These may seem like basic things, but I

23   think they were -- these kind of transitions and attention to

24   the long history of this case is part of what's gotten us here,

25   a failure to pay attention to some of these transitional

1    details and always keeping in mind the history of the case.

2        I had to familiarize myself with it coming on to the case.

3    I know it is not insubstantial.  It is a substantial case.

4        All right.  You may be seated.  I'll direct my questions to

5    Mr. Sharma now in terms of these three issues I've identified

6    going forward.  If you wish to have these folks return to the

7    podium, that would be fine.

8        Here are the three issues that I'm directing the parties to

9    focus on in the immediate future.  First is the issue of

10   CDCR-DSH interface because it would appear to the court that

11   part of the backsliding is because of an imperfect interface,

12   or at least reasons for delays to creep in in terms of jumping

13   through all of the bureaucratic hoops that currently stand in

14   the way of transfers of individuals that are entitled to and

15   that are ordered to be transferred promptly.

16       I understand, having asked the special master about that

17   issue, that there is currently a MOU being renegotiated?

18           MR. SHARMA:  That's correct, Your Honor.

19           THE COURT:  All right.  That clarifies the roles of

20   the two departments?

21           MR. SHARMA:  I wouldn't say clarifies the roles, but

22   updates.  Obviously, Your Honor, as both agencies have evolved

23   over the years, new processes, more advanced processes come

24   into play so it is ensuring that as those changes come in,

25   they're acknowledged and part of that MOU, rather than, you

1    know, referring to policies that may not be as efficient as new

2    policies would be.

3         THE COURT:  Here's my direction on that, and I'll

4    confirm this in an order.  I don't -- I'm going to avoid as

5    much as I can wading into the weeds myself, but I am directing

6    that the special master be actively involved in the negotiation

7    of that MOU.

8      He's not just to receive courtesy copies at the end of a

9    round, but he's to be allowed to provide input and provide his

10   expertise to identify where issues can be clarified to achieve

11   fulfillment of the court's prior orders that remain in effect.

12     And he will let me know if there are any problems in

13   negotiation of that MOU in terms of standing in the way of the

14   court's orders being complied with.

15     Does that work for you, Mr. Sharma?

16         MR. SHARMA:  If I may, Your Honor, that was a little

17   unexpected.  On defendants' behalf I haven't had the

18   opportunity.  The coordination of the MOU happens both at, you

19   know, the level -- you know, in lower levels, but also at the

20   very highest levels involving, I think, the Secretary of CDCR,

21   Director Ahlin.

22     So without understanding more fully the role that's

23   envisioned for the special master, without having an

24   opportunity to consult and talk to my clients in a little bit

25   more detail about that, I can't give a definite answer to the

1   question the court just posed to me.

2       I'm happy, of course, to go back to my clients and be able

3   to more fully respond to this question as to whether there

4   would be any concern defendants might have about that.  But at

5   this point I just -- without having spoken to both clients on

6   that issue, I'm --

7           THE COURT:  My plan would be to issue an order

8   following this hearing.

9           MR. SHARMA:  Right.

10          THE COURT:  If there is any language that gives you

11  pause, you could bring that to the court's attention.  It will

12  be carefully crafted language keeping in mind, you know, there

13  is a big apple cart here.  But there is a need to focus on just

14  eliminating impediments and getting back to the point where the

15  court can applaud the parties for progress.

16          MR. SHARMA:  Your Honor, if I may, just briefly?

17      (Cocounsel confer.)

18          If I may just have one moment, Your Honor?  I

19  apologize.

20      (Cocounsel confer.)

21          Your Honor, I was just able to speak to my clients

22  with authority, and they said that they've had substantial

23  progress in the MOU and they're happy to have the special

24  master's assistance completing it.

25          THE COURT:  All right.  That's good to hear.  I'll

1    confirm what we've just discussed in my order following the

2    hearing.

3         Secondly, Atascadero.

4         I'm directing the defendants to provide me with a report

5    within 30 days.  I know this issue has been out there for a

6    long, long time.  And I need now to understand, given, again,

7    the long history of the prior representations to the court, the

8    prior progress, why the wait list defined as "created from the

9    time that CDCR makes a referral," why that wait list can't be

10   eliminated at this point using beds available at ASH.

11        Then thirdly, the defense portion of the joint status

12   report included a very helpful table, at least the outlines of

13   a table, Table 2 on page 4 of Exhibit A.

14        Now, there is some definitional issues there, but what I

15   plan to do in my order following this hearing is also include a

16   template based on that table, but asking for some additional

17   information.

18        And I'm going to direct that with the monthly reports

19   currently being filed under seal, that updates of this census

20   be provided to the court on a monthly basis, again, with a few

21   additional bits of information.

22        This is the kind of management tool I need to give me that

23   snapshot and satisfy me, hopefully, that things remain on

24   track.

25        So those are my three issues.  I guess my question would be

1    any questions about either of those two last items, Mr. Sharma?

2            MR. SHARMA:  No, Your Honor.

3            THE COURT:  Let me ask you, Mr. Bien, I have reviewed

4    everything you filed.  I'm not -- just so it is clear, I'm not

5    inviting -- of course I'm here if a motion really needs to be

6    filed.  I'm really trying to do what I can to get the parties

7    back to, even if difficult, meaningful, constructive

8    conversations and additional problem solving as needed.

9         That said, given that you haven't had time to review what

10   the defense had filed, is there anything you would bring to the

11   court's attention that is not already in your portion of the

12   joint status report?

13        I have reviewed that.  I thought about that.  I understand

14   their positions that the plaintiffs take.

15           MR. BIEN:  I think there are a few -- one or two minor

16   points, Your Honor, and it is consistent with the direction

17   that you have stated you intend to go with your order.

18        This court and the special master struggled through this

19   very problem in working with the defendants, both CDCR and DSH,

20   and derived various policies, procedures and orders that it is

21   clear to us have not been followed over, at least, the last

22   year or so.

23        One clear thing that is not being followed is what

24   defendants call the Patient Movement Plan.  This is part of

25   their plan.  It is one of the things the court referenced in

1    the October 18th, '11, Supplemental Plan, Docket 4103, page 7

2    and 8 of that plan, in defendant's -- referred to in

3    defendant's filing.

4        The Patient Movement Plan is movement between DSH-ISF

5    programs, Intermediate Care Programs.  So these are patients

6    that are already in inpatient care.  And one of the solutions

7    to moving people through DSH and getting the waitlist down in

8    2011 and 2012 was encouraging, forcing, cajoling DSH to

9    actually transfer patients who are ready to transfer from their

10   high security programs at Salinas Valley and at Vacaville to

11   the lower security programs, some at Vacaville, and mostly at

12   ASH and Coalinga.  That was the big movement.

13       That movement has stopped.  And there is -- I'll just call

14   it confusion -- in defendant's filing on page 7 of the filing,

15   46 of the joint filing.  It says that 38 patients have moved to

16   lower security programs in the last seven months.

17       We receive reports that show each and every patient and

18   each and every patient movement.  We quickly looked them over.

19   We got another one yesterday from defendants.  We looked it

20   over this morning.

21       There have been movements, but they're movements from the

22   Acute Program, the APP Program, which does not have security

23   levels.  Anyone getting acute care goes to the same place at

24   CMF or at Stockton.

25       There has been -- we found two cases -- two cases that have

1   moved in the last seven months from an intermediate care

2   high-security program to ASH or Coalinga.  One occurred two

3   weeks ago, and one occurred in late June.

4       So it is not 38.  It is one or two.  And maybe -- when I

5   read that, I thought:  Oh, wow.  The dam has burst.  This is

6   what we've been waiting for, is an indication that defendants

7   have remembered that their own plan calls for the transfer of

8   patients between their programs.

9       Not one patient has ever transferred from Stockton, which

10  has 400-plus patients, not one, to ASH or Coalinga.  We know

11  there are lots of Level II patients at Stockton, people who in

12  the CDCR who have never been in anything other than a dorm.

13      So there is a tremendous roadblock.  Whether it is lost --

14  I don't want to point fingers about how it happened or why it

15  happened, but what we're looking for in a plan from defendants,

16  which still does not exist, is a clear statement, not that

17  there will be additional barriers in DSH to transfers, but

18  people who are dorm eligible will be moved.

19      There is no reason for DSH to apply new criteria for people

20  who are dorm eligible.  They just need to be moved.  And

21  they're excluding people based on a review of paper for reasons

22  that are completely beyond what we can tolerate.

23      Someone who is malodorous shouldn't be removed from a dorm.

24  They should get a bath and have nursing care.  This is a

25  hospital.  These are licensed hospitals.  Someone who has a

1    developmental disability isn't excluded from ASH.

2            THE COURT:  I understand the issue.  That's why I

3    asked for the Special Master's greater involvement with the

4    MOU, the report on ASH, assuming that is one --

5            MR. BIEN:  There is a hundred beds there.  That would

6    solve a lot of problems.  And I think --

7            THE COURT:  That's why I want the report on ASH.  But

8    let me -- so first on the 38 patients, on page 7, do you know

9    off the top of your head if that number is a misstatement?  Or

10   can you by the end of the week let me know if it is a

11   misstatement?

12           MR. SHARMA:  I can, Your Honor.  I would point out, to

13   clarify that the acute beds are single celled.  So they are

14   viewed both as a higher level of care and a higher custody

15   setting.

16      So plaintiffs are correct that a number of those patients

17   listed in that 38 were moved from an acute setting to a --

18   directly though, not to a higher custody ICF setting, but to a

19   lower ICF setting when they are ready to step down.

20      For those patients -- those acute patients who are ready to

21   step down, it wasn't a barrier that they could only go to a

22   high custody ICF setting.  They were also allowed to go

23   directly to the lower level ICF -- I am sorry -- to the

24   intermediate care setting.

25           THE COURT:  What's your position on Atascadero's

1    availability for higher level?

2         MR. SHARMA:  Excuse me, Your Honor, for higher custody

3    levels?

4         Your Honor, if I could just correct, I think, some

5    inaccuracies about and give a fuller picture of the prior

6    Patient Movement Plan in 2011.

7         One of the things that happened there, and what we're

8    talking about when we talk about a "modified custody criteria,"

9    is that there was a custody criteria that applied

10   across-the-board to all patients.  And that custodially

11   determines where they would be safe to be housed from a

12   custodial setting.

13        What the new modified custody criteria that's in place

14   today, in the new case-by-case reviews that is in place today,

15   and continues to be in place, is it, one, has lowered that

16   custody criteria so that more patients are from a starting

17   point eligible to go to a dorm setting to receive inpatient

18   care.

19        And second, what the case-by-case review does is it allows

20   CDCR's custody and clinical staff to get together to evaluate a

21   patient before referral to DSH, to Department of State

22   Hospitals, and determine whether this patient, even though he

23   would be considered a high custody patient, could receive a

24   case-by-case review that would say for the purposes of

25   inpatient care they could go to a dorm setting.

1          Now, what's happened with the new Housing Review Policy

2     that has been the subject of a meet and confer for several

3     months with plaintiffs, is it is designed to build off that

4     process and to make patient movement, as plaintiff's have

5     requested, is to make clear that that is the goal of Department

6     of State Hospitals.

7          And I do want to make clear that defendants are committed

8     to moving patients within the system to a lower level of

9     custody.  As both custodially and clinically indicated, is that

10    once a patient is within the Department of State Hospital

11    system, the Department of State Hospitals will now know under

12    this new policy what's the lowest level that this patient

13    custodially can be housed at.

14         And if there are clinical reasons preventing that transfer

15    to that lower level, if there is a clinical reason why that

16    patient needs to be housed in a single cell environment at that

17    time, it is making clear that it is the goal of that clinical

18    treatment team to treat those symptoms so that patient can be

19    moved through the system and can be moved to a lower level of

20    housing.

21         I do think that in terms of when we're talking purely about

22    custodial reasons, the modified criteria that were put into

23    place in 2011 are working.  You still are seeing patients who

24    are being referred to lower levels of housing at both

25    Atascadero and Coalinga.  And patients are being accepted into

1    those lower levels of housing because of the criteria, and we

2    know that custodially it is okay to accept them.  And there is

3    no clinical reason to prevent that.

4        So I think obviously we're willing to continue our meet and

5    confer with plaintiffs to develop this Housing Review Policy

6    that, if you would, closes out the loop to ensure that the

7    patient movement is occurring.

8        It is occurring in a way that can easily be monitored and

9    checked by executive legal staff at DHS.  And it puts the onus

10   on the clinical team to spend time in their clinical treatment

11   of the patient, to move that patient through the system rather

12   than putting it on to an administrative directive that might

13   not be understood correctly.

14       So it is just clarifying that policy, and it is really

15   putting, I think, some key elements of the Patient Movement

16   Plan that need to be in place.  It's, again, a high level.  It

17   is building off what was in place and has been in place into --

18            THE COURT:  I understand those words "building off."

19   I'll reserve judgment, and I'll wait to hear from the special

20   master how that Housing Review Plan does take account of the

21   court's prior orders and what the court has approved.

22            MR. SHARMA:  Right.

23            THE COURT:  In terms of Atascadero, can high-level

24   custody patients go to Atascadero?

25            MR. SHARMA:  No, they cannot.  It is a completely

1   different housing environment.  If we're talking about

2   high-custody inmates, obviously high-custody inmates who

3   receive the case-by-case review can and are referred to both

4   Atascadero and Coalinga.  But as Table 1 in defendant's filing

5   showed, it is a very different environment.  It's an unlocked

6   dorm setting.

7       So right now we think the custody criteria is at the

8   correct level.  We think that the Housing Review Policy will

9   more efficiently promote movement for those patients who, for

10  clinical reasons, are housed in a more secure setting so that

11  they -- once those clinical symptoms are properly resolved,

12  they can be moved down to a dorm setting for the remainder of

13  their treatment.

14          THE COURT:  Aren't there mentally disordered offenders

15  at Atascadero?

16          MR. SHARMA:  There are, Your Honor.

17          THE COURT:  So how can Atascadero accommodate them and

18  not high-level custody?

19          MR. SHARMA:  Your Honor, the Department of State

20  Hospitals has a large obligation.  Several of them are legal

21  obligations to different patients.  But as has been the case --

22  I mean, it's been shown through public articles -- and I don't

23  want to step outside of facts outside the record or kind of

24  speculate, but I would be happy to address this through the

25  report, if that's the more appropriate time.  But there are

1    significant security and safety concerns for both patients

2    within the program and staff within the program.

3         And the modified custody criteria that are in place now,

4    that were developed over 2010 and 2011, I think, were the

5    correct judgment for the patient population that the department

6    is responsible for who are CDCR inmates.

7              THE COURT:  I'll look for full information in that

8    report in 30 days.

9         Just in terms of thinking about the tube of toothpaste,

10   help me understand.  I gather it may be water under the bridge,

11   but some units at SVPP have been closed, and therefore are no

12   longer available for Coleman class D5 and D6, C5 and C6.

13             MR. SHARMA:  Well, C5 and C6 are open and available

14   for Coleman class members.  D5 and D6 were always intended to

15   be, I think, temporary units.  So as Stockton came online,

16   that's DSH Stockton which is at the California Health Care

17   Facility, came online, there was an overall assessment of

18   patient bed need and how many beds can most efficiently be used

19   to serve the patient needs.

20        So D5 and D6, I wouldn't say that they've been deactivated,

21   but they were transferred back to CDCR for their use.  And

22   obviously, as the department is looking at the needs and the

23   current situation as it stands today, they determined that the

24   thing -- that the option that would best serve patients was the

25   activation of a unit at DSH Vacaville to serve those

1   high-custody intermediate care patients.

2          THE COURT:  Shouldn't closure or deactivation, as you

3   call it, of D5 and D6, that's the kind of thing that ought to

4   be preapproved?

5          MR. SHARMA:  Your Honor, with those units I believe

6   there was notification.  There was discussion.  So there

7   wasn't -- again, I want to be clear, it wasn't so much

8   deactivation as a determination that because of the activation

9   of Stockton at that time that those beds were filling the need

10  for high-custody intermediate care patients, that those units

11  could be used then to treat CDCR mentally ill patients.

12         THE COURT:  All right.  Was there any other issue you

13  wanted to identify, Mr. Bien?

14      Again, this is not -- I'm not hearing a motion.  I'm trying

15  to make certain I'm giving you some focused guidance and

16  nipping in the bud any deviation from the path.

17         MR. BIEN:  I would ask the court in requesting

18  information, because I think this is a very difficult problem,

19  that we find out from DSH and CDCR what the current security

20  levels are for everyone who is in the DSH programs now.

21      In other words, it may be -- we think that there are quite

22  a few number of lower security patients who would meet the

23  custody criteria that defendants think is appropriate for ASH

24  who are in the high security programs, but I don't know how

25  many of those are.

1      When we've asked for samples, we've got some information.

2  We've asked several times for a report.  We have never seen a

3  report.  I think it would be very useful for the court and

4  special master to know that information.

5      Before we order them to put the highest security people

6  into ASH, we should find out how many lower security people are

7  still in the system because we think there are quite a few.

8          THE COURT:  And that's part of what the chart you'll

9  see from me, that builds on your Table 2, is going to ask for,

10  for that kind of analytical detail to allow me to see on one

11  dashboard all the key numbers.

12          MR. BIEN:  We have never -- just so you know, they've

13  never had to report that information before on a regular basis.

14  So we don't know how many people are cleared for dorms by CDCR.

15  And we think that's a very important bit of information to

16  have.

17      And if I was a clinician, I would like to know that all the

18  time too.  I think it is part of the new plan, that that

19  information in the future will be reported more regularly.  But

20  I think right now, making these decisions, we really should

21  know how many there are.

22          THE COURT:  I think I'm saying, I want to see those

23  numbers.  I'll give you my template for a chart.  If there is

24  some reason you can't give me that information, you can let me

25  know, and I'll make a final decision.

1      But I do think we're at the stage where there can be a

2 monthly report on the docket.  No names.  You still keep filing

3 the other monthly reports.  And that will allow me to do my job

4 of at least monitoring and being more aware, keeping my finger

5 on the pulse of implementation.

6      All right.  I've covered everything I need to.  Anything

7 else, Mr. Bien?

8           MR. BIEN:  I think as to who is at ASH and the range

9 of patients, you know, ASH is -- we would like an opportunity

10 to perhaps present information too about what we understand the

11 population of ASH to be.

12      There has been a lot of investigation and reports about

13 Atascadero and Coalinga and their security levels.  In fact,

14 this court has commissioned studies.  And I think it is an

15 important factor to take into account.

16           THE COURT:  I'll build in a chance for the plaintiffs

17 to respond, but for now I'm asking initially for a report from

18 the defense.  So that's not a joint report, but then plaintiffs

19 will be able to respond and let me know their position.

20           MR. BIEN:  The only other thing that my team has

21 suggested was something that we raised in our pleadings, more

22 about the transparency of how many people are actually waiting

23 and how defendants combined, CDCR and DSH, are reporting

24 patients waiting both for APP and ICF.

25      It is quite confusing.  We spent a lot of time and money

1    trying to decipher how long people are waiting.  We just think

2    there should be some clarity that meets the program guide as to

3    tracking of these time frames.

4           THE COURT:  Again, the chart I'm going to proposal

5    will include a space to be filled in, and I'm going to define

6    "Waitlist."

7           MR. SHARMA:  Your Honor, if I may, I would like to

8    just point out for the court that the special master has

9    actively had assistance for the parties in developing either

10   any modifications that need to be made to the monthly reports

11   that are provided to the court and the special master.

12     Again, we would be happy to work through that process with

13   the special master to the extent that there is any

14   disagreements over how the reporting is done and return to that

15   meet and confer process.

16          THE COURT:  I don't intend to get in the way of that

17   general process that's been working.  The special master has my

18   ear, as he has mine.

19     All right.  I'm going to issue an order -- a short order

20   summarizing what we've agreed to, what the defense owes me,

21   what the plaintiffs are allowed to file after I receive the 30

22   day report on ASH, and then we'll go from there.  And you'll be

23   hearing from the special master.

24          MR. BIEN:  Thank you, Your Honor.

25          MR. SHARMA:  Thank you, Your Honor.

1            THE COURT:  All right.  Thank you very much.

2            THE CLERK:  Court is in recess.

3        (Off the record at 2:30 p.m.)

4                        ---o0o---

5

6

7

8                    REPORTER'S CERTIFICATE

9                        ---o0o---

10

   STATE OF CALIFORNIA  )
11 COUNTY OF SACRAMENTO )

12

13

14        I certify that the foregoing is a correct transcript

   from the record of proceedings in the above-entitled matter.
15

16

17            IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California.
18

19

20   /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
21       Official United States District Court Reporter

22

23

24

25