Exhibit A

STATE OF CALIFORNIA — DEPARTMENT OF STATE HOSPITALS EDMUND G. BROWN JR., GOVERNOR

**LEGAL SERVICES DIVISION**
1600 Ninth Street, Room 433
Sacramento, CA 95814



October 30, 2015

Danielle O'Bannon
Supervising Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue,
San Francisco, CA 94102

Dear Ms. O'Bannon:

Attached please find Defendants Department of State Hospitals and California Department of Corrections and Rehabilitation's joint Report to the Coleman Court on Current Acute and Intermediate Care Waitlists and Patient Movement, in response to the Court's August 21, 2015 Order.


Sincerely,

*s/ Sean M. Rashkis*                         *s/ Katherine Tebrock*
(Original signature retained by counsel)    (Original signature retained by counsel)
Sean M. Rashkis                              Katherine Tebrock
Assistant Chief Counsel (A)                  Chief Deputy General Counsel, Policy
Legal Services Division                      Office of Legal Affairs
Department of State Hospitals                California Department of Corrections and
                                             Rehabilitation

FOR SUBMISSION TO THE *COLEMAN* COURT

*Defendants' Report on Current Acute and Intermediate Care Waitlists and Patient Movement*

I.      Introduction.

Defendants Department of State Hospitals (DSH) and California Department of Corrections and Rehabilitation (CDCR) respectfully submit this report in response to the Court's August 21, 2015 Order regarding "whether regular and consistent use of the full complement of 256 beds at [DSH-Atascadero] designated for *Coleman* class members is sufficient to permanently eliminate the ongoing waitlist for inpatient care and if not, why not and what alternative plans are in place for waitlisted class members."  (ECF No. 5343.)

*Coleman* class members may be referred for Acute or Intermediate inpatient care, and patients referred for Intermediate care may be designated for a High- or Low-Custody program based on their individual clinical and custodial needs.  Defendants have effectively eliminated the waitlist for Intermediate care.  No patients are currently waiting for a High- or Low-Custody Intermediate care bed to become available, and Defendants have 94 available High-Custody Intermediate care beds.  There are 22 patients who have been accepted and are waiting for an Acute care bed to become available, but these patients cannot be placed at the DSH-Atascadero program because it is a Low-Custody Intermediate dormitory setting and not equipped to serve *Coleman* patients in need of Acute care.  Currently pending discharges from Acute programs will allow Defendants to quickly place 12 of these patients, and Defendants anticipate that further discharges will allow the remainder to be placed in short order.  To continue to address the needs of *Coleman* patients on the Acute waitlist, Defendants are evaluating proposals to increase inpatient bed flexibility by designating a number of beds to be interchangeable between the Acute and Intermediate level of care, as well as a proposal to convert isolation beds.

Although Defendants currently have a surplus of High-Custody Intermediate care beds, Defendants seek to provide clinical care to all patients in the least restrictive custodial environment in a manner consistent with the patient's clinical needs.  To that end, Defendants are implementing a new Housing Review policy that will safely maximize the use of Defendants' inpatient *Coleman* beds throughout the system, including at DSH-Atascadero, by ensuring that patients who are, or who become, custodially eligible for Low-Custody Intermediate care placement are moved to a Low-Custody bed as soon as it is clinically appropriate to do so. Defendants have also developed a new policy for joint CDCR-DSH management of patient movement, with increased coordination between DSH's Patient Management Unit and CDCR's Health Care Population Oversight Program to streamline admissions and discharges.

Informal implementation of the new Housing Review policy has resulted in the movement of 15 patients to Low-Custody programs, including 7 to DSH-Atascadero, 1 to DSH-Coalinga, and 7 to the DSH-Vacaville dorms.  Further, Defendants' referral and patient movement process, as implemented in 2011, lowered custodial criteria for placement in Low-Custody Intermediate programs and has resulted in nearly 1,400 direct admissions to Low-Custody programs to date, including over 860 admissions to DSH-Atascadero.

II.     Waitlists for Inpatient Care Have Been Significantly Reduced and Patients Continue to Receive Timely Access to Care.

Defendants' efforts over the past several years have resulted in significant reductions to waitlists for all levels of inpatient care. In 2010, Intermediate care waitlists were as high as 557 patients and the Acute care waitlist reached 105 patients. Many of those patients waited for extended periods before being placed in an inpatient care bed. Defendants' prior bed management and capacity efforts have significantly reduced waitlists for both levels of care since 2009-2011. Presently, *Coleman* patients are placed on a waitlist for inpatient care from the time a completed referral packet is received by DSH from CDCR. (*See* ECF No. 5343 at 2 n.1.) Patients remain on a waitlist until they are reviewed, accepted or rejected, and transferred to an inpatient program. As licensed care facilities, DSH inpatient programs must first review and evaluate each referral packet prior to acceptance and admission to ensure that the patient can be provided with appropriate treatment for their mental health and medical needs. The Mental Health Program Guide approved by the Court recognizes the need for this review by providing that DSH has "one working day of receipt" of a complete Acute referral packet and "three working days of receipt" of a complete Intermediate referral packet to render a decision on admission. (MH Program Guide 12-6-5 & 12-6-10.) The Mental Health Program Guide also recognizes that patients must be transported from CDCR's institutions to the DSH inpatient program and provides that CDCR has 72 hours to move the patient once the patient has been assigned a bed in a DSH program. (*Id.*)

During the review process, patients continue to be monitored and receive treatment for their mental health needs. Patients in distress are placed in a Mental Health Crisis Bed, where they receive 24-hour nursing care, all necessary medications, daily clinical contacts, therapy and counseling, and Interdisciplinary Treatment Team meetings to adjust their treatment plans as necessary. Similarly, more stable patients continue to be treated in their normal housing unit, which is usually an Enhanced Outpatient Unit, and receive individualized treatment and heightened monitoring that provides for more clinical contact, therapy, and counseling as needed, including regular Interdisciplinary Treatment Team meetings.

As of October 30, 2015, 8 patients are on the waitlist for High-Custody Intermediate care with 3 of those patients accepted and assigned a bed. The remaining 5 patients were referred less than 3 days ago and are in the review process. Similarly, 6 patients are on the waitlist for Low-Custody Intermediate care, with 4 of those patients accepted and assigned a bed. The remaining 2 patients were referred less than 3 days ago and are in the review process. And 49 patients are on the Acute care waitlist, with 20 of those patients accepted and assigned a bed. Of the remaining 29 patients, 22 have been accepted but not yet assigned a bed, and 7 are in the review process, with all 7 reviews addressing co-occurring medical issues. There are 12 discharges currently pending from Acute programs, and Defendants anticipate that further discharges are forthcoming. Further, all but 11 accepted Acute patients on a waitlist are currently under the Program Guide timelines for placement. (MH Program Guide 12-6-5 & 12-6-10 (providing that, if accepted, transfers must take place 10 from the date of referral to an Acute program and 30 days from the date of referral to an Intermediate program.)

III.    Defendants' Current Measures will Adequately Address Fluctuations in Inpatient Bed Need.

To ensure that *Coleman* patients continue to receive timely access to inpatient care in settings appropriate to their individual needs, Defendants are implementing several bed management measures detailed below, and are exploring further increases to bed capacity.

A.    Defendants' new Housing Review process will allow for efficient and clinically sound patient movement consistent with Defendants' patient movement plan from 2011.

Defendants' new Housing Review process enhances the patient movement process to ensure that patients custodially eligible for movement to Low-Custody beds will be moved as soon as is clinically appropriate. Defendants' 2011 patient movement plan was premised on custodial criteria that lowered restrictions for placement in Low-Custody Intermediate programs. This plan allowed Defendants to immediately identify patients in High-Custody Intermediate programs who were custodially eligible for Low-Custody placement. (ECF No. 4103 at 8.) Clinicians from DSH-Atascadero then conducted clinical reviews of these patients to determine whether they were clinically appropriate for placement in a dormitory setting. (*Id.*) The final decision to move a patient was vested in the reviewers' clinical judgment. (*Id.*) Clinical staff from DSH-Atascadero also worked with clinical staff from DSH-Salinas Valley to identify additional patients who were clinically appropriate for movement to the dormitory setting at DSH-Atascadero. (*Id.*) These patients were then referred to CDCR to determine whether they were custodially eligible for placement at DSH Atascadero. (*Id.*)

As a result of the 2011 patient movement plan, Defendants have directly referred and admitted nearly 1,400 *Coleman* patients to Low-Custody Intermediate care beds between October 2011 and September 2015. Despite the large number of direct admissions to Low-Custody programs, Defendants recognized that the 2011 plan could be improved. Patients referred and placed in an Intermediate High-Custody program were reviewed for movement to a Low-Custody program on an ad-hoc basis. Clinical staff treating the patient, however, did not have ready access to information regarding whether a patient was placed in a High-Custody program primarily for clinical or custodial reasons, and therefore would not know whether a patient was custodially eligible for Low-Custody placement. Therefore, these ad-hoc reviews required clinical staff to first determine whether a patient was clinically appropriate for movement to a Low-Custody dormitory program before requesting a custodial review of the same.

The new Housing Review process simplifies patient movement by providing DSH treatment teams with a patient's pre-approved lowest level of custodial housing, or Least Restrictive Housing (LRH) designation. If the patient is placed into a higher custodial setting within DSH for clinical reasons, clinical treatment teams can identify the clinical concerns preventing the patient from being placed at his LRH designation and develop a treatment plan to address those concerns. Defendants are committed to moving patients to their least restrictive housing designation as soon as clinical factors permit such movement. Clinical treatment teams will be trained and required to address the patient's progress on transferring to his LRH designation at each Interdisciplinary Treatment Team meeting. Further, CDCR will continue to conduct custodial reviews for patients housed in DSH to determine whether a patient's LRH

should be adjusted based on the patient's behavior within DSH.  If a patient's LRH is adjusted, the new LRH designation will be immediately communicated to the patient's treatment team.

DSH has created a Clinical Review Team to assist and support local clinical staff in reviewing patients currently identified as custodially eligible for Low-Custody dorm settings.  The Clinical Review Team is a multi-disciplinary team comprised of representatives from DSH Headquarters, DSH-Vacaville, DSH-Salinas Valley, DSH-Stockton, DSH-Atascadero, and DSH-Coalinga.  Using the Clinical Review Team, Defendants have informally implemented the new Housing Review process, and as a result of this process have moved 7 patients to DSH-Atascadero, 1 patient to DSH-Coalinga, and 7 patients to the DSH-Vacaville dorm program.  These patient movements do not include an additional 48 patients who were moved to the DSH-Vacaville dorm because of step-downs from the Acute level of care and the ongoing ad-hoc reviews.  Defendants have identified an additional 12 patients who are custodially eligible for DSH-Atascadero or DSH-Coalinga but have not been moved for clinical reasons.  Consistent with the Housing Review policy, these patients will be reviewed at each Interdisciplinary Treatment Team meeting to determine if movement to a Low-Custody program is clinically indicated.  Informal implementation of the new Housing Review process has also resulted in the movement of 26 patients from single-celled housing to the two- and four-person cells at DSH-Salinas Valley, thus opening up additional single-cell High-Custody Intermediate beds.  The Housing Review policy was incorporated into the updated Memorandum of Understanding between CDCR and DSH and will soon be finalized.  Full implementation of the new Housing Review process will require training and further education of staff to ensure that patient movement occurs at appropriate times and that continuity of care is maintained for patients moving to a new treatment team and new clinical setting.

B.   Defendants' new Memorandum of Understanding will further streamline the inpatient admission and discharge process.

CDCR and DSH, with the Special Master's assistance, negotiated a new Memorandum of Understanding (MOU).  The updated MOU includes a Joint Referral, Admission, and Movement Policy and Joint Discharge Policy.  Under the new policies, DSH's Patient Management Unit and CDCR's Health Care Placement Oversight Program will be more involved in patient admissions and discharges, ensuring that any delays or issues at the local level are quickly elevated and resolved.  Information regarding admission and discharges from the inpatient programs will be simultaneously shared at the local and headquarters level to ensure real-time monitoring of compliance with the 72-hour transfer timelines for accepted or discharged patients.  Further, because discharge information is shared simultaneously, the Health Care Placement Oversight Program can coordinate transportation of a new patient to a bed at same time the discharged patient is being transported back to CDCR.  As result, inpatient beds will be more efficiently filled and transfer timelines reduced.

C.   Defendants Are Evaluating Options for Bed Capacity Increases and Modifications to Increase Flexibility Between Levels of Care.

Defendants are also evaluating several options to increase bed capacity, including an option to modify isolation rooms for regular use, and to designate a number of High-Custody Intermediate care beds as "flex" beds that can accept both Intermediate or Acute level of care

4

patients as needed. Flex beds would be staffed at the Acute level of care to allow Defendants to quickly respond to increased referrals to the Acute or Intermediate levels of care and ensure that patients have timely access to appropriate care. This model has proved successful at Defendants' Psychiatric Inpatient Program for the condemned at San Quentin State Prison, which operates as a "flex" unit that can provide both Intermediate and Acute levels of care.

IV.     Defendants' Existing Referral and Placement Process and new Housing Review Policy is the Most Appropriate Method to Maximize the Use of DSH-Atascadero and other Low-Custody Programs.

Defendants' existing referral and placement criteria is designed to ensure that patients are referred to the lowest custody setting that is most conducive to their clinical needs, while also ensuring the safety of other patients and staff. As described in Defendants' October 18, 2011 filing and patient movement plan, Defendants implemented a modified custody criteria that lowered the custody restrictions for placement in unlocked dorm programs at DSH-Atascadero and DSH-Coalinga and the locked dorm program at DSH-Vacaville.[1] (ECF No. 4103) Under the current custody criteria, all *Coleman* patients are presumed eligible for an unlocked dorm program at DSH-Atascadero and DSH-Coalinga unless they are excluded based on their recent violence, escape risk, or in-custody behavior. Patients who are ineligible for an unlocked dorm program are then evaluated for the locked dorm program at DSH-Vacaville. Only after a patient has been determined to be custodially ineligible for unlocked and locked dorm programs, is the patient custodially referred to a celled, or High-Custody, Intermediate care program.

However, because a patient's clinical needs and custodial eligibility are considered together, a *Coleman* patient who clinically requires a single-cell environment may be referred to an High-Custody Intermediate care program, even when the patient is otherwise custodially eligible for a Low-Custody dorm program. As explained above, Defendants' new Housing Review policy will ensure that these referred patients, as well as patients who later become custodially eligible for Low-Custody programs, will be consistently tracked and moved to lesser restrictive settings as soon as it is clinically indicated.

The modified case criteria have been effective in increasing the use of Low-Custody programs. From October 2011 through September 2015, 1,398 patients were directly admitted to the 390 Low-Custody Intermediate care beds, including 865 patients to DSH-Atascadero, while 2,904 patients were directly admitted to the 730 High-Custody Intermediate care beds.[2] These placements demonstrate that Defendants refer and admit *Coleman* patients to Low- and High-Custody Intermediate care programs at roughly the same rate, with 3.58 admissions per Low-Custody bed and 3.97 admissions per High-Custody bed.

DSH-Atascadero is not appropriate for patients requiring High-Custody Intermediate care because it is designed as a hospital, and the physical plant structure does not provide the same level of protection for staff and other patients as the inpatient programs co-located on prison grounds. Due to licensing restrictions on patient seclusion and restraint, patients are treated in unlocked dorms and are allowed to freely move around the facility. Licensing restrictions also

---

[1] The same eligibility factors apply for placement at DSH-Atascadero and DSH-Coalinga.
[2] Thirty additional Intermediate High-Custody beds were activated between August and September 2015, bringing the present number of Intermediate High-Custody beds to 760.

limit the duration for which a patient may be restrained.  As a result, staff and patients are more vulnerable to patient aggression and DSH-Atascadero has limited ability to separate dangerous patients from others.  The Mental Health Program Guide recognizes that Low-Custody inpatient programs such as DSH-Atascadero cannot safely house and treat *Coleman* patients who become aggressive or violent by allowing for "emergency returns" of patients to CDCR within 24 hours.  (MH Program Guide at 12-6-13.)  Defendants' inpatient programs co-located on prison grounds provide safe, therapeutic treatment that avoids the need for emergency returns that disrupt patient treatment.

In addition, treatment options for *Coleman* patients are not analogous to the options for Mentally Disordered Offenders (MDO), whom DSH is statutorily obligated to admit and treat in its state hospitals.  *See* Cal. Pen. Code §§ 2972, 2974.  DSH currently does not have locked treatment programs for violent MDO patients that are comparable to the High-Custody *Coleman* psychiatric inpatient programs co-located on prison grounds.  As a result, MDOs treated at DSH-Atascadero are housed in unlocked dorm settings and, unfortunately, frequently assault staff.  In the first 8 months of 2015, there were 549 serious incident reports for aggressive behavior at DSH-Atascadero, and MDO patients accounted for 325 of these incidents.  While DSH strives to limit violence in its state hospitals, its physical plant limitations and current licensing requirements pose challenges to the safety of its patients and staff.  To expand the range of available treatment options for violent DSH patients such as MDO patients, the California Legislature recently authorized the creation and pilot of Enhanced Treatment Programs that feature individual patient rooms that can be locked when clinically indicated.  DSH has been authorized to begin submitting proposals for pilot Enhanced Treatment Programs starting in July 2015 and an Enhanced Treatment Program has not yet been implemented at DSH-Atascadero.  Defendants are also considering how to move MDO and *Coleman* patients between its facilities, including DSH-Coalinga, to best balance the security risk posed to the therapeutic environment.

    V.    Conclusion.

Through informal implementation of the Housing Review policy and existing utilization management measures, Defendants have effectively eliminated the waitlist for Intermediate inpatient care, are addressing Acute inpatient needs, and are maximizing the use of inpatient *Coleman* beds throughout the system, including at DSH-Atascadero, by ensuring that patients are moved to a less restrictive custodial setting as soon as it is clinically appropriate to do so.  Defendants are confident that the measures underway and under consideration will effectively address the waitlist for Acute care.