# EXHIBIT A

1         IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   ALEJANDRO MADRID, et al.,

6            Plaintiffs,       NO. C 90-3094 TEH

7          v.            ORDER TERMINATING
                       FORCE-RELATED ORDERS

8   MATTHEW CATE, et al.,      AND DISMISSING CASE

9            Defendants.

10

11      This class action lawsuit was filed in 1990 to challenge the constitutionality of a broad

12 range of conditions and practices at Pelican Bay State Prison. In an order dated January 10,

13 1995, the Court concluded that the California Department of Corrections ("CDC")[1] had

14 "failed to provide inmates at Pelican Bay with constitutionally adequate medical and mental

15 health care," and had "permitted and condoned a pattern of using excessive force, all in

16 conscious disregard of the serious harm that these practices inflict." *Madrid v. Gomez*, 889 F.

17 Supp. 1146, 1279 (N.D. Cal. 1995). The Court ordered that the parties develop a remedial

18 plan to address the constitutional violations and appointed a Special Master to assist in the

19 formulation and execution of a remedy. The Court ordered that it would "retain jurisdiction

20 over this action until such time as the Court is satisfied that all constitutional violations found

21 herein have been fully and effectively remedied." *Id.* at 1283. The case then entered a

22 lengthy remedial phase, in which the Special Master monitored Pelican Bay's provision of

23 medical and mental health care, as well as its supervision of and investigation into the use of

24 force.

25      Some use-of-force monitoring was terminated by orders dated July 12, 2000, and

26

27

28      [1] CDC was reorganized in 2005 and renamed the California Department of
Corrections and Rehabilitation ("CDCR").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

July 10, 2002. The Court has ordered that monitoring of medical and mental health services cease in the *Madrid* context but continue as part of the *Plata v. Brown*, No. C01-1351 TEH (N.D. Cal.), and *Coleman v. Brown*, No. CIV S-90-0520 LKK JFM P (E.D. Cal.), statewide class actions. The final phase of *Madrid* is the monitoring of CDCR's investigations and disciplinary process. As the Court has stated, "effective investigation and discipline systems" are considered "the final cornerstone of Defendants' use-of-force remedy." Order 3, Nov. 16, 2006, ECF No. 2011. The Special Master recommended an end to such monitoring and the termination of the remaining *Madrid* use-of-force orders in his October 16, 2008 report. At that time, Plaintiffs did not object to the cessation of monitoring. However, they argued that orders related to the use of force should not be terminated because Defendants had yet to file notice that they had implemented a statewide use-of-force policy – notice mandated by this Court on May 14, 2008. On August 30, 2010, Defendants notified the Court that the statewide use-of-force policy had been adopted and implemented. In a document filed on January 21, 2011, Plaintiffs stated that they do not oppose termination of force-related orders and dismissal of this case.

At a hearing on March 3, 2011, the Court heard from the parties, the Office of the Inspector General ("OIG"), and Court Expert Michael Gennaco regarding the effectiveness of the remedies in this case and whether current conditions are likely to give way to constitutional violations should the Court withdraw its oversight. CDCR pointed out that it has operated since 2008 without active court monitoring, and that CDCR leadership intends to keep the *Madrid* reforms in place. CDCR stated its commitment to working with OIG's Bureau of Independent Review ("BIR"), which oversees CDCR's personnel investigations and discipline. It also represented to the Court that CDCR has contracted with Mr. Gennaco to provide code-of-silence training to correctional officer cadets. CDCR pledged to continue that training.

At the hearing and in papers filed with the Court, Plaintiffs and OIG expressed concern about the sustainability of the *Madrid* reforms. Plaintiffs stated that BIR oversight is critical to maintaining the progress made during the long history of this case and expressed

**United States District Court**
For the Northern District of California

1 concern about Defendants' commitment to BIR oversight. However, they acknowledged that

2 the conditions at Pelican Bay do not currently violate the constitution.

3      This Court, too, is concerned about a reversion to the unconstitutional practices that

4 once existed at Pelican Bay. The Court is proud of the work done during the life of this case.

5 Pelican Bay was once a place where prison officials used force "for the very purpose of

6 inflicting punishment and pain." *Madrid*, 889 F. Supp. at 1200. BIR's oversight of prison

7 personnel investigations and discipline helped change these conditions. The Court hopes that

8 CDCR will honor its commitment to continue working with BIR, and that it will oppose any

9 effort to dismantle BIR's oversight. But the Court cannot retain jurisdiction to see that this is

10 done. Accordingly, all use-of-force orders in this case are terminated. The Court ends its

11 jurisdiction over this case, which is DISMISSED WITH PREJUDICE. The Court is

12 confident that should the *Madrid* protocols be abandoned and conditions at Pelican Bay

13 devolve to unconstitutional levels, counsel will come forward to challenge those conditions

14 and relate a new lawsuit to this case.

15      The parties agree that Defendants shall pay Plaintiffs' counsel $5,429.45 as the final

16 amount of attorneys fees and costs for their work in this action.

17      The balance of monies being held for this case in the Court Registry Investment

18 System, plus any accrued interest, shall be returned to CDCR. The returned funds are to be

19 made payable to California Department of Corrections and Rehabilitation. They are to be

20 sent to Attention: Accounting Services, P.O. Box 187019, Sacramento, California, 95818-

21 7019.

22

23 **IT IS SO ORDERED.**

24

25 Dated: 3/21/11

26 THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

27

28

# EXHIBIT B

**EMPLOYEE CONTRACT GRIEVANCE / COMPLAINT**

15-N-78-008

CCPOA GV No. 32909

Case 2:09-cv-02445-WBS-AC Document 5394-3 Filed 01/08/16 Page 6 of 147

STD. 630 (Rev. 9/2013)

| BARGAINING UNIT NAME | BARGAINING UNIT NUMBER *(Circle one)* |
|---|---|
| CCPOA | 1  2  3  4  5 ⑥ 7  8  9  10  11  12  13  14  15  16  17  18  19  20  21 |

**Please refer to your bargaining unit's contract for specific information regarding employee grievance procedures and time frame requirements.**

| GRIEVANT'S NAME | HOME TELEPHONE NUMBER *(include area code)* |
|---|---|
| CCPOA Class Action | 916-372-6060 |

| HOME ADDRESS (Number and Street) | (City) | (State) | (Zip Code) |
|---|---|---|---|
| 755 Riverpoint Drive | West Sarcamento | CA | 95605 |

| DEPARTMENT | DIVISION OR FACILITY | SECTION, BRANCH, UNIT, ETC. |
|---|---|---|
| N/A | N/A | N/A |

| POSITION CLASSIFICATION | NORMAL WORKING HOURS | WORK TELEPHONE NUMBER *(include area code)* |
|---|---|---|
| N/A | N/A | N/A |

**REPRESENTATION INFORMATION (Complete if applicable)**

| REPRESENTATIVE'S NAME | ORGANIZATION AFFILIATION | TELEPHONE NUMBER *(include area code)* |
|---|---|---|
| Daniel Lindsay | CCPOA | 916-372-6060 x 210 |

**GRIEVANCE INFORMATION**

| DATE OF ACTION CAUSING GRIEVANCE | DATE OF INFORMAL DISCUSSION WITH IMMEDIATE SUPERVISOR | DATE OF INFORMAL RESPONSE |
|---|---|---|
| October 14, 2015 and ongoing | | |

GRIEVANCE DESCRIPTION *(Clear, concise statement. Attach additional sheets if necessary.)*
See attached.

SPECIFIC ARTICLE(S) AND SECTION(S) OF CONTRACT ALLEGEDLY VIOLATED
2.02, 5.03, 9.09, 9.11

SPECIFIC REMEDY SOUGHT
See attached.

| GRIEVANT'S SIGNATURE | DATE FILED |
|---|---|
| *Daniel M. Lindsay* | November 4, 2015 |

***(For grievance level reviews I through IV, continue on reverse.)***

**EMPLOYEE CONTRACT GRIEVANCE / COMPLAINT**

STD. 630 (Rev. 9/2013) (REVERSE)

## GRIEVANCE REVIEW--LEVEL I

| DATE RECEIVED | LEVEL I REVIEWER (Signature) | RESPONSE DATE |
|---|---|---|
| REVIEWER'S PRINTED NAME AND TITLE | | TELEPHONE NUMBER *(include area code)* |

LEVEL I DECISION

| ☐ I concur and do not appeal to the second review level | ☐ I do not concur and appeal to the second review level *(State reason below)* | GRIEVANT'S SIGNATURE | DATE SIGNED |
|---|---|---|---|

REASON FOR APPEAL

## GRIEVANCE REVIEW--LEVEL II

| DATE RECEIVED | LEVEL II REVIEWER (Signature) | RESPONSE DATE |
|---|---|---|
| ☐ Decision attached | REVIEWER'S PRINTED NAME AND TITLE | |

| ☐ I concur and do not appeal to the third review level | ☐ I do not concur and appeal to the third review level *(State reason below)* | GRIEVANT'S SIGNATURE | DATE SIGNED |
|---|---|---|---|

REASON FOR APPEAL

## GRIEVANCE REVIEW--LEVEL III--DEPARTMENT DIRECTOR OR DESIGNEE

| DATE RECEIVED | DIRECTOR OR DESIGNEE (Signature) | RESPONSE DATE |
|---|---|---|
| ☐ Decision attached | REVIEWER'S PRINTED NAME AND TITLE | |

| ☐ I concur and do not appeal to the third review level | ☐ I do not concur and appeal to the third review level *(State reason below)* | GRIEVANT'S SIGNATURE | DATE SIGNED |
|---|---|---|---|

REASON FOR APPEAL

## GRIEVANCE REVIEW--LEVEL IV--DEPARTMENT OF HUMAN RESOURCES

| DATE RECEIVED | DIRECTOR OR DESIGNEE (Signature) | RESPONSE DATE |
|---|---|---|
| ☐ Decision attached | REVIEWER'S PRINTED NAME AND TITLE | |

I.      CDCR IS BOUND BY THE 2013-2015 MOU.

The California Correctional Peace Officers Association (CCPOA) is filing this grievance as a
class action under MOU Section 6.11 (C).  CCPOA demands Expedited Arbitration and the
immediate selection of an arbitrator who is available to hear this matter as soon as possible.
There is no adequate remedy at law for the harm caused by California Department of Corrections
and Rehabilitation's (CDCR) recent acquiescence to the Office of the Inspector General's (OIG)
directives resulting in the violation of several Correctional Officers' MOU and POBRA rights.
Additionally, CCPOA's MOU rights were violated.

All of the officers worked at High Desert State Prison in the past.  All the officers were forced to
interview without advance notice (or inadequate notice).  They were not given a document
telling them what the topic/subject matter of the interview was or whether they were subjects or
witnesses.  The document most officers received threatened them with contempt (and misstated
the Penal Code section relied upon and the officer's rights under the code) if the officer did not
cooperate.  The officers were given inadequate time to obtain a representative (job steward or
attorney).  When representative(s) attempted to attend and represent the officer during the
interrogation, CDCR employees denied them access to the officer being interrogated.  CDCR
actively cooperated with, and took direction from OIG, in continually violating these officers'
MOU rights.  It is likely this harm will continue.

Admittedly, CDCR is caught on the horns of a dilemma.  It must choose between allowing the
OIG's use of its facilities and personnel to violate Unit 6 employees' constitutional and
contractual rights or it can refuse and comply with the MOU.  It has chosen the former.  CDCR's
passivity in allowing the MOU to be violated is in itself a violation of the MOU.  An arbitrator
cannot interpret the Penal Code but s/he can interpret the MOU and prior arbitral case law
interpreting it.

CCPOA Grievance Number 52951
CDCR Number 15-N-78-008

II.    OIG CANNOT ORDER CDCR TO IGNORE OR VIOLATE THE MOU.

    *a.*  Penal Code Section 6126.5 instructs that the OIG is not bound by a MOU[1].  The OIG does not have the right however, to order CDCR to do so.

    *b.*  CDCR is Bound by the Terms of the 2013-2015 MOU.

        1.  The Legislature did not supersede the BU 6 MOU when it enacted Penal Code Section 6125 *et.seq.*

III.   CDCR VIOLATED THE FOLLOWING SECTIONS OF THE MOU, AND ARBITRAL DECISIONS CONSTRUING THE MOU, WHEN IT FACILITATED THE OCTOBER AND NOVEMBER 2015, OIG INTERVIEWS OF UNIT 6 PERSONNEL AS DISCUSSED IN ARGUMENT IV BELOW:

    *a.*  2.02 – Worksite Access;

    *b.*  5.03 – Protected Activity;

    *c.*  9.09 – Personnel Investigations;

    *d.*  9.11 – Peace Officer Bill of Rights;

    *e.*  The Cohn Award (*CSP- Corcoran Investigations* (Confirmed));

    *f.*  The Bodiford Agreement;

    *g.*  The Weingarten Agreement;

    *h.*  The Cohn Award (*Isaac Williams* construing the Weingarten Agreement);

---

[1] However, POBRA applies to the OIG in certain circumstances. Penal Code Section 6126.5(d)

CCPOA Grievance Number 52951
CDCR Number 15-N-78-008

ATTACHMENT TO CCPOA THIRD LEVEL APPEAL DATED NOVEMBER 4, 2015

IV.    FACTS

   a.  *The October 13, 2015, CSP Lancaster Interviews*

On or about October 13, 2015, an OIG Investigator interviewed three Correctional Officers at
CSP Lancaster located in Lancaster, California.  These officers were told the interviews were
voluntary.  Two officers were represented during the interviews by CCPOA's CSP Lancaster
Chapter President R. Davis.

   b.  *The October 14, 2015, Ironwood State Prison Interview*

On October 13, 2015, Correctional Officer Brian Blue, who works at Ironwood State Prison,
Blythe, California, was directed by Lt. F. Alvarez to report to the Warden's Conference Room at
6:30 a.m. on October 14, for an "informational" interview.  Blue was not told what the subject of
the interview was and whether he was a subject or a witness.  Blue called CCPOA's ISP Chapter
President T. Hammond and told him what happened.  Hammond contacted Lt. Alvarez and asked
him if he had more information about the interview.  Alvarez did not.  Hammond contacted this
writer and requested representation for Blue.

CCPOA Staff Counsel Phillip Murray was assigned to represent CO Blue.  On the morning of
the 14th, Murray accompanied Blue into the Warden's Conference Room where they were
greeted by Deputy Inspector General Michael J. Maddox.  Maddox told Murray he was sorry he
had to fly all the way down, as this was just to be a conversation.  <u>Murray asked Maddox if the
interview was voluntary.  Maddox said yes.</u>  Murray stated Blue would decline to interview.
Maddox expressed some surprise and offered to let Blue and Murray review the questions
beforehand.  Maddox said Blue could decline to answer any question he was uncomfortable with.
Murray again said Blue declined; Blue then said he was declining to give a voluntary statement.
Blue and Murray left the room.  Murray then met another CCPOA attorney who was at ISP
tending to other representational matters.

At 8:47 a.m., Murray received a call from T. Hammond who told him Blue had been ordered to
participate in the interview.  Murray immediately went to the Warden's Conference Room where
he saw Blue and Lt. Alvarez.  Murray told Alvarez he wanted to talk with Blue, and took him
into the hallway.  <u>Blue told Murray Lt. Alvarez had come to him at his Ad Seg worksite and
ordered him (Blue) to participate in the interview.</u>  Ad Seg is about a 12 minute walk from the

ATTACHMENT TO CCPOA THIRD LEVEL APPEAL DATED NOVEMBER 4, 2015

Administration Building; however, Alvarez gave Blue a ride to the Administration Building in his vehicle. During this time, Maddox was off-grounds. Murray waited with Blue in the hallway for approximately 5-10 minutes until Maddox arrived. <u>Maddox told Murray Blue was being ordered to answer questions and that he (Murray) would not be allowed to participate in the interview. Maddox told Murray his superiors told him "to keep the union attorney out of the room."</u> Murray told Maddox that Blue was entitled to a representative and that the Penal Code mandated Blue was entitled to POBRA rights. Maddox again said Murray could not come in, that Blue was not a subject saying "we're not looking at him," and that he would not be facing any disciplinary action against him. Murray told Maddox he (Maddox) was violating the OIG statute. Maddox again said Murray could not come in. During this conversation, Lt. Alvarez was in the hallway. Alvarez said nothing, and did not participate in the conversation, but his position at the doorway to the Warden's Conference Room led Murray to believe he would block his (Murray's) way if he tried to enter.

While Blue was interviewing with Maddox, Murray called Hammond and notified him of the situation. Within a few minutes, Hammond joined Murray in the hallway. Maddox interviewed Blue for approximately 20-30 minutes.

When the interview ended, Murray asked Blue to wait for him. Hammond and Murray went into the interview room and talked to Maddox. Murray asked Maddox who gave the order to keep him out of the room. Maddox replied Roy Wesley. Wesley is the OIG's Chief Deputy Inspector General. Murray explained to Maddox that the interview was "too wide open" for Blue to interview. Maddox agreed, stating "it was wide open." Murray explained that he did not want CO Blue talking unless he was under compulsion. Maddox did not respond.

CCPOA has on information and belief that, after Blue declined to interview, Wesley called ISP's Warden, Neil McDowell, and ordered him to have CO Blue ordered to involuntarily interview with Maddox. McDowell and Alvarez's acts violated the MOU sections listed above.

About the time the compelled interview of Blue occurred, CCPOA's State President Charles Alexander had conversations with senior CDCR management and complained about the MOU

CCPOA Grievance Number 52951
CDCR Number 15-N-78-008

violations. He was told that CDCR would not order officers to attend future interviews; they would leave that to the officers and the OIG.

c.  *The October 29, 2015, California Correctional Center Interviews*

At approximately 8:00 a.m. on October 29, 2015, OIG Agent Maddox arrived at the California Correctional Center (CCC), Susanville, California. He directed, or ordered, an unknown CDCR manager to direct CDCR Watch Sergeant Faris to contact CO Arthur Tovar and order him to report to the ERO's office for an interview at 12:30 p.m. Sgt. Faris obeyed and served Tovar with an Administrative Subpoena devoid of any information regarding the topic/subject matter of the interview. (Attachment A). CCPOA's CCC Chapter President Officer C. Granfield accompanied Tovar to the interview room but was not allowed to enter. Tovar requested representation but the request was denied by OIG agent Maddox.

At approximately 1:15 p.m., Sgt. Hastey reported as ordered to be interviewed by Maddox. Hastey's request for a representative was denied.

At least two other Correctional Officers or Sergeants were involuntarily interviewed and denied a representative.

Again, during the pendency of these involuntary CCC interviews, CCPOA's State President Charles Alexander had conversations with senior CDCR management and complained about the MOU violations. He was again told that CDCR would not order officers to attend the interviews. A senior CDCR manager did call CCC Warden Gower and tell him he was not to order these officers to interview. This directive was too late as the orders had been given, thus violating the MOU sections grieved. Further, CDCR - CCC supervisors and managers violated these directives and the MOU in setting up and facilitating the two camp interviews discussed below.

CCPOA Grievance Number 52951
CDCR Number 15-N-78-008

ATTACHMENT TO CCPOA THIRD LEVEL APPEAL DATED NOVEMBER 4, 2015

    *d.  The October 30, 2015, Salt Creek Conservation Camp Interview*

On October 28, 2015, one of his days off, camp Officer Steven Oschner was verbally notified by a superior that he was being ordered into work at 10:30 a.m. (3 ½ hours early) on October 30, for an investigative interview with an OIG agent Maddox. He contacted CCPOA and requested representation. On the morning of October 30, CCPOA Staff Counsels Phillip Murray and Justin Delacruz met Oschner at Salt Creek Conservation Camp, a facility operated by and under the control of CDCR and CCC. At 10:30 a.m. Oschner, accompanied by attorneys Murray and Delacruz, presented themselves for the interview. After some discussion, Maddox denied Oschner's request that he be represented by the attorneys. Further, Maddox gave Oschner an administrative subpoena threatening punishment of contempt if he did not cooperate. (Attachment B).

    *e.  The November 2, 2015, Washington Ridge Interview*

On October 29, 2015, Correctional Officer James McCloughan was telephonically noticed by a superior that he had an interview with the OIG Monday morning November 2, 2015, at Washington Ridge Camp, a facility operated by and under the control of CDCR. CCPOA retained attorney Doug Foley of Rains, Lucia, Sterns to represent Officer McCloughan. At the set time Foley accompanied McCloughan to the camp. Foley asked Maddox if the interview was voluntary and told him they would be on their way if it was not being compelled. Maddox then served McCloughan with a subpoena and denied him his requested right to be represented by Foley.

<u>Amendment</u>

These investigations are ongoing. CCPOA reserves the right to amend this grievance should further violations occur.

V.      Remedies

    *a.*  Order CDCR to cease and desist in assisting OIG personnel schedule and conduct interviews of Unit 6 employees in violation of the MOU;

    *b.*  A statewide PERB style posting that CDCR violated MOU Sections 2.02, 5.03 and 9.09;

CCPOA Grievance Number 52951
CDCR Number 15-N-78-008

ATTACHMENT TO CCPOA THIRD LEVEL APPEAL DATED NOVEMBER 4, 2015

 

*c.*   MOU training for all CDCR/DJJ Wardens, managers and supervisors regarding the rights provided CCPOA members ordered to interview by outside entities; and

*d.*   All other relevant remedies.

CCPOA Grievance Number 52951
CDCR Number 15-N-78-008

**ATTACHMENT A**

STATE OF CALIFORNIA—OFFICE OF THE INSPECTOR GENERAL
**ADMINISTRATIVE SUBPOENA**
OIG-073a (Rev. 09/24/15)

**ATTORNEY FOR SUBPOENAING PARTY:**
James C. Spurling, Chief Counsel
Office of the Inspector General
10111 Old Placerville Road, Suite 110
Sacramento, CA 95827
Phone: (916) 255-1102

**In the Matter of:** High Desert State Prison Authorized Review

**THE INSPECTOR GENERAL OF THE STATE OF CALIFORNIA, TO:**
   **Name:**      Officer Arthur Tovar

1.    Pursuant to California Penal Code section 6127.3, you are hereby ordered to appear as a witness on **October 29, 2015, immediately,** to provide testimony at:

**California Correctional Center**
**711-045 Center Road**
**Susanville, CA 96127**

### DECLARATION IN SUPPORT OF SUBPOENA

I, Anna Galvan, Sr. Deputy Inspector General for the State of California, state that I am currently assigned to assist in this case, which concerns a confidential review authorized by the Senate Rules Committee. The requested testimony is relevant to this authorized review.

10/20/15
(DATE)

(SIGNATURE OF DECLARANT)

**THIS SUBPOENA IS ISSUED IN CONNECTION WITH A CONFIDENTIAL REVIEW AUTHORIZED BY THE SENATE RULES COMMITTEE. THEREFORE, YOU ARE DIRECTED TO NOT DISCUSS THE CONTENTS OF THIS SUBPOENA EXCEPT WITH PERSONS WHO HAVE A NEED-TO-KNOW.**

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY AN APPROPRIATE COURT. YOU MAY ALSO BE LIABLE FOR ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY THE SUBPOENA, PURSUANT TO CALIFORNIA PENAL CODE SECTION 6127.4.**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

10/28/15
Date Issued

James C. Spurling, Chief Counsel, Office of the Inspector General

**ATTACHMENT B**



STATE OF CALIFORNIA — OFFICE OF THE INSPECTOR GENERAL
**ADMINISTRATIVE SUBPOENA**
OIG-073a (Rev. 09/24/15)

**ATTORNEY FOR SUBPOENAING PARTY:**
James C. Spurling, Chief Counsel
Office of the Inspector General
10111 Old Placerville Road, Suite 110
Sacramento, CA 95827
Phone: (916) 255-1102

In the Matter of: High Desert State Prison Authorized Review

**THE INSPECTOR GENERAL OF THE STATE OF CALIFORNIA, TO:**
Name:    Officer Steven Oschner

1.    Pursuant to California Penal Code section 6127.3, you are hereby ordered to appear
      as a witness on **October 30, 2015, immediately**, to provide testimony at:

            Salt Creek Conservation Camp
            10655 Round Valley Road
            Paskenta, CA 96074

## DECLARATION IN SUPPORT OF SUBPOENA

I, Anna Galvan, Sr. Deputy Inspector General for the State of California, state that I am
currently assigned to assist in this case, which concerns a confidential review authorized
by the Senate Rules Committee.  The requested testimony is relevant to this authorized
review.

_____10/28/15_____                    _____
        (DATE)                                (SIGNATURE OF DECLARANT)

**THIS SUBPOENA IS ISSUED IN CONNECTION WITH A CONFIDENTIAL REVIEW
AUTHORIZED BY THE SENATE RULES COMMITTEE.  THEREFORE, YOU ARE DIRECTED
TO NOT DISCUSS THE CONTENTS OF THIS SUBPOENA EXCEPT WITH PERSONS WHO
HAVE A NEED-TO-KNOW.**

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY AN
APPROPRIATE COURT. YOU MAY ALSO BE LIABLE FOR ALL DAMAGES RESULTING
FROM YOUR FAILURE TO OBEY THE SUBPOENA, PURSUANT TO CALIFORNIA PENAL
CODE SECTION 6127.4.**

I declare under penalty of perjury under the laws of the State of California the foregoing
true  and correct.

_____10/28/15_____                    _____
   Date Issued                           James C. Spurling, Chief Counsel, Office of the Inspector G

## PROOF OF SERVICE

I, Melissa Burkart, declare:

I am over the age of 18 years and not a party to the within action.  I am an employee of the California Correctional Peace Officers Association, located at 755 Riverpoint Drive, Suite #200, West Sacramento, CA 95605-1634.

On November 4, 2015, I served the within document(s):

**THIRD LEVEL APPEAL**
*CCPOA Class Action*
*CCPOA v. CDCR*
MOU Sections 2.02, 5.03, 9.09, 9.11
CCPOA GV No.: 52951; CDCR No.: 15-N-78-008

[  ]   **By Mail:**   I caused such document(s), in sealed envelope(s) with postage thereon fully prepaid, to be placed in the United States mail at Sacramento, California.

[X]   **By Mail:**   I placed the envelope(s) for collection and mailing following our ordinary business practices.   I am readily familiar with this business' practice for collecting and processing correspondence for mailing.   On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

[X]   **By Email:**   I caused the above named document(s) to be transmitted via email to the email address(es) listed below.

Devin Fong, Chief
Office of Labor Relations
Department of Corrections and Rehabilitation
1515 S Street, North Building, Room 109
Sacramento, CA 95811
Devin.Fong@cdcr.ca.gov

Candace Murch
Principal Labor Relations Officer
California Department of Human Resources
1515 S Street, North Building, Suite 400
Sacramento, CA 95811-7258
Candace.Murch@calhr.ca.gov
*(Courtesy copy)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed by me on:

Dated: <u>November 4, 2015</u>

Melissa Burkart, Legal Administrative Assistant

GV 52951

# EXHIBIT C

1   DANIEL M. LINDSAY (SBN 142895)
2   JENNIFER RAGAN (SBN 191711)
    CALIFORNIA CORRECTIONAL
    PEACE OFFICERS ASSOCIATION
3   LEGAL DEPARTMENT
    755 Riverpoint Drive, Suite 200
4   West Sacramento, California 95605-1634
    Telephone: (916) 372-6060
5   Facsimile: (916) 340-9372

6   Attorneys for Petitioner

FILED
Superior Court Of California,
Sacramento
12/24/2015
mchapman3
By_____, Deputy
Case Number:
34-2015-00188266

7

8                    SUPERIOR COURT OF CALIFORNIA

9                         COUNTY OF SACRAMENTO

10  CALIFORNIA CORRECTIONAL          )   Case No.:
    PEACE OFFICERS ASSOCIATION,      )
11                                   )   **PETITION AND APPLICATION FOR AN**
                                     )   **ORDER COMPELLING ARBITRATION**
12          Petitioner,              )   **[C.C.P. § 1281.2]**
    v.                               )
13                                   )
    STATE OF CALIFORNIA, DEPARTMENT )
14  OF HUMAN RESOURCES, STATE OF     )
    CALIFORNIA, DEPARTMENT OF        )
15  CORRECTIONS AND                  )
    REHABILITITATION;  and DOES      )
16  1-10 inclusive                   )
                                     )
17          Respondent(s).           )
                                     )
18                                   )
                                     )
19                                   )
    _____)

20

21          COMES NOW, Petitioner, CALIFORNIA CORRECTIONAL PEACE OFFICERS

22  ASSOCIATION (hereinafter "CCPOA") on behalf of itself and its members, and petitions this Court

23  for an order to compel expedited arbitration.  CCPOA alleges as follows:

24          1.  CCPOA is organized as a California non-profit mutual benefit corporation.  CCPOA

25  represents approximately 25,500 rank-and-file correctional peace officers employed by the State of

26  California, Department of Corrections and Rehabilitation (hereinafter "CDCR").  CCPOA functions

27  as the exclusive bargaining representative for Bargaining Unit 6, which consists of correctional

28  peace officers and their supervisors, in contract negotiations with the California Department of

                                          1

Human Resources (hereinafter "CalHR"). *California Correctional Peace Officers Association v. State of California et al.* (2006) 142 Cal.App.4th 198, 201-202.

2. At all relevant times herein, CCPOA has been the "recognized employee organization" as defined by Government Code § 3513(b) for employees of the State of California assigned to State Bargaining Unit 6 (hereinafter "Unit 6"). CCPOA brings this action on behalf of itself and its members to enforce the rights hereafter alleged. See e.g. *Allee v. Medrano* (1974) 416 U.S. 802; *Professional Firefighters v. City of Los Angeles* (1963) 60 Cal.2d 276; *California Correctional Peace Officers Association, supra,* 142 Cal.App.4th 198.

3. At all relevant times, the State of California (hereinafter "STATE") has been the "State employer" of Unit 6 employees within the meaning of the Ralph C. Dills Act (hereinafter "Dills Act"). Government Code §§ 3512 *et seq.*

4. At all relevant times, Respondent CalHR was an agency of the STATE responsible for bargaining, meeting and conferring, in good faith with recognized employee organizations, such as CCPOA, as the designated representative of the "State employer" pursuant to Government Code § 3513(j).

5. Employment relations between CCPOA and the State employer are governed by the Dills Act, Government Code §§ 3512 *et seq.*

6. Petitioner and Respondent negotiated a collective bargaining agreement or Memorandum of Understanding (hereinafter "MOU") which was ratified by the CCPOA membership and the Legislature of the State of California and signed by the Governor. The MOU governed the terms and conditions of employment for Unit 6 employees and was effective July 3, 2013 through July 2, 2015. The 2013-2015 MOU is a valid and enforceable agreement between the parties. *California Association of Highway Patrolmen v. Department of Personnel Administration* (1986) 185 Cal.App.3d 352, 361.

7. The 2013-2015 MOU contains a grievance and arbitration procedure at Article 6 which includes a series of four levels though which Unit 6 members may process grievances. Under the 2013-2015 MOU when either party has a grievance, that party generally follows each of the four steps. (Attached hereto as Exhibit A is a true and correct copy of Article 6 of the parties' MOU.)

1   8. The MOU at 6.11(C) provides for expedited arbitration in situations where irreparable injury

2   will result and for which there is no adequate remedy at law. (See, Exhibit A.)

3   9. Final and binding arbitration is the end result of the grievance and arbitration procedure set

4   forth in the 2013-2015 MOU. Pursuant to MOU 6.11(C): "An expedited arbitration procedure shall

5   be available in the following limited circumstances; in situations in which irreparable injury will

6   result from threatened action by either party and for which there is no adequate remedy at law..."

7   10. California Government Code § 3517.8(a) provides that once an MOU has expired but a

8   successor MOU has not been agreed to by the parties and the parties have not reached an impasse

9   in negotiations, the expired MOU continues in effect.

10   11. On November 4, 2015, CCPOA filed a grievance with Devin Fong and CDCR's Office of

11   Labor Relations grieving sections 2.02, 5.03, 9.09 and 9.11 of the 2013-2015 MOU. The grievance

12   was filed by Daniel M. Lindsay and it requested Expedited Arbitration pursuant to MOU section

13   6.11(C).

14   12. The grievance alleged serious contractual violations including CDCR's complicity with the

15   Office of the Inspector General's (hereinafter "OIG") denial of CCPOA's members contractual

16   rights to notice prior to an interview, access to a job steward or attorney when ordered to answer

17   questions posed by an OIG agent and CCPOA's right of access to and right to represent its members

18   during these interviews. (See, Declaration of Daniel M. Lindsay filed herewith at ¶ 5).

19   13. No response to the grievance filed with Mr. Fong has been received as of the date of filing

20   of this Petition. (*Id.* at ¶ 14).

21   14. On November 10, 2015, CCPOA Chief Counsel Daniel M. Lindsay and CalHR attorney

22   Frolan Aguiling spoke about whether the November 4, 2015, grievance was appropriate for

23   Expedited Arbitration. (*Id.* at ¶ 7).

24   15. Mr. Lindsay and CalHR Labor Relations Counsel Linda Kelly, to whom the matter was

25   assigned, began discussing whether the grievance was appropriate for Expedited Arbitration and

26   potential arbitrators and arbitration dates on November 20, 2015. (*Id.* at ¶ 12-13, 16-21, 23, 25).

27   16. On December 1, 2015, the grievance was elevated to the Fourth Level as no Third Level

28   response had been received. (*Id.* at ¶ 14).

3

17. Petitioner has attempted to informally resolve the instant matter by repeatedly requesting that Respondent select an arbitrator and dates for arbitration pursuant to MOU section 6.11(C).

18. Respondent has refused and continues to refuse to select arbitration dates as required by the grievance and arbitration provisions of the 2013-2015 MOU, specifically MOU section 6.11(C). (*Id.* at ¶¶ 18, 20, 23).

19. CCPOA has not at any time waived its right to arbitrate this grievance.

20. No grounds exist for revocation of the arbitration agreement between CCPOA and Respondent, or for revocation of the grievance and arbitration procedures within that agreement.

21. There is an action pending in Sacramento Superior Court, Case No. 34-2015-00187125, regarding the constitutional rights of officers to pre-interview notice and representation, however, that action does not address MOU violations; rather, it focuses on violations of the officers' Constitutional rights and violations of the Peace Officer Bill of Rights Act ("POBRA").[1] The underlying grievance only deals with the asserted contractual violations based on the conduct of CDCR and its employees and leaves the issues of constitutional and statutory violations to be addressed via the Sacramento Superior Court action.   Thus, the two actions deal with the same underlying set of facts, but entirely different causes of action.   As such, there is no possibility of conflicting rulings on a common issue of law.

22. This Petition is properly venued in Sacramento County because Respondents Headquarters office and principal place of business are in Sacramento County.

///

///

///

///

///

///

///

---

[1] On December 23, 2015, CCPOA was electronically notified that Sacramento Superior Court Case No. 34-2015-00187125 had been removed to the Eastern District by the Attorney General's office. The Eastern District Case No. is 2:15-at-01331

4

1    WHEREFORE, Petitioner prays for:

2    1. An Order compelling Respondents to arbitrate the controversy pursuant to the grievance and

3    arbitration provisions contained in Article 6 of the MOU and specifically on an expedited basis

4    pursuant to MOU section 6.11 (C);

5    2. An Order compelling Respondents to submit to arbitration on the first available day of an

6    immediately available arbitrator and continue the arbitration hearing outside of normal business

7    hours, nights, holidays and weekends until the arbitration is complete; and

8    3. Any other relief this Court deems just and proper.

9    DATED: December 23, 2015                    Respectfully Submitted,

10
                                                **CALIFORNIA CORRECTIONAL**
11                                              **PEACE OFFICERS ASSOCIATION**
                                                **LEGAL DEPARTMENT**
12

13

14   BY:

15                                              Jennifer L. Ragan, Staff Counsel
                                                Attorney for Petitioner
16

17

18

19

20

21

22

23

24

25

26

27

28

Petition and Application for an Order Compelling Arbitration [C.C.P. § 1281.2]

# EXHIBIT A



# AGREEMENT

Between

## STATE OF CALIFORNIA

AND

## CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION

Covering

## BARGAINING UNIT 6 CORRECTIONS

July 3, 2013

Through

July 2, 2015

## 5.04 Copies of the Memorandum of Understanding

A. CCPOA will print, at CCPOA expense, sufficient copies of this Memorandum of Understanding to supply a copy to each employee. CCPOA will bulk mail sufficient copies to each institution, facility, camp and parole office at CCPOA expense.

B. Three (3) CCPOA Job Stewards at an institution with two hundred (200) or more Bargaining Unit 6 employees shall be given two (2) hours of "Official Business Time" on five (5) locally-negotiated days in order to distribute copies of this Memorandum of Understanding. Three (3) CCPOA Job Stewards at an institution with less than two hundred (200) Bargaining Unit 6 employees shall be given two (2) hours of "Official Business Time" on three (3) locally-negotiated days in order to distribute copies of this Memorandum of Understanding. One (1) CCPOA Job Steward or designee at each camp shall be given one (1) hour of "Official Business Time" on four (4) locally-negotiated days in order to distribute copies of this Memorandum of Understanding. One (1) CCPOA Job Steward per parole region shall be given sixteen (16) hours of "Official Business Time" to travel throughout his/her region to distribute copies of the Memorandum of Understanding and answer questions regarding the contract.

C. The State employer may purchase copies of this Memorandum of Understanding from CCPOA at CCPOA's cost.

## 5.05 Quarterly Labor-Management Meetings

CDCR, CCPOA, CalHR and DSH agree to conduct quarterly labor/management meetings in order to discuss on-going labor relations issues and in order to maintain on-going communications and dialogue regarding but not limited to: contract administration, grievances and items of mutual interest to both parties or of concern to each party in general. Five (5) representatives from each side (five (5) union and five

18

(5) management) shall participate in these meetings and shall include one (1) person each from the management and union's bargaining teams.

## ARTICLE VI
## GRIEVANCE AND ARBITRATION PROCEDURE

### 6.01 Purpose

A. This grievance procedure shall be used to process and resolve formal written grievances arising under this MOU and other employment-related formal written grievances.

B. The purposes of this procedure are:

1. To resolve formal written grievances informally at the lowest possible level.

2. To provide an orderly procedure for reviewing and resolving formal written grievances promptly.

### 6.02 Definitions

A. A "contract grievance" is a dispute between CCPOA and the State, or a dispute of one (1) or more employees against the State, involving the interpretation, application or enforcement of the provisions of this MOU.

B. A "policy grievance" (a non-arbitrable grievance) is a dispute between one (1) or more employees against the State, or a dispute between CCPOA and the State involving subjects not covered by this agreement and not under the jurisdiction of the State Personnel Board (SPB). A policy grievance may be processed only to the Director's level of this grievance procedure unless otherwise capped at a lower level in this agreement (e.g., LOIs/WIDs), and is not arbitrable.

C. A "health and safety" grievance will include, but not be limited to, such matters as:

1. Unsafe structural conditions;

19

2. Defective or unsafe mechanical equipment;

3. Defective or unsafe electrical;

4. Health and environmental hazards including, but not limited to, contained bio-hazard fluids;

5. Vector Control; and

6. Violation of acknowledged custodial rules or procedures which would constitute a danger of safety to the employee, worksite or the public. Health and safety grievances shall be filed directly at Step 2, the Appointing Authority's level.

D. The following are merit system appeals under the jurisdiction of the SPB, and are not grievable or arbitrable under this MOU. Complainants or appellants are placed on notice that these following items should be appealed directly to SPB unless an initial departmental appeals process has been spelled out in the Youth Authority Administrative Manual (YAM) or the CDCR Departmental Operations Manual (DOM):

1. Exam appeals;

2. Adverse Action appeals (Government Code Section 19570, et seq.);

3. Merit complaints;

4. Whistle-blower complaints;

5. Equal Employment Opportunity complaints (see the YAM or DOM);

6. Appointment appeals;

7. Withholds from certification (background investigations).

E. As used in this procedure, the term "immediate supervisor" means the individual, identified by the Appointing Authority, who assigns, reviews and

20

directs the work of an employee.

F. As used in this procedure, the term "party" means CCPOA, an employee or the State.

G. A "CCPOA representative" refers to an employee designated as a CCPOA steward or a paid staff representative.

H. Grievances shall be filed on a mutually negotiated grievance form provided by the State, and made readily accessible at each and every institution, facility, camp and parole office.

6.03    Time Limits

A. Each party involved in a formal written grievance shall act quickly so that the grievance may be resolved promptly. Every effort should be made to complete action within the time limits contained in the grievance procedure. However, with the mutual consent of the parties, the time limitation for any step may be extended. To be effective, time extension requests and responses must be in writing.

B. If there has been no mutually agreed-upon time extension, failure to respond to the grievance within the specified time frames shall allow the grievant to file a grievance at the next level. If this occurs, the higher level must respond to the grievance and may not return it to a lower level.

C. Where mass grievances are filed or arguably frivolous/redundant grievance activity is occurring, the State or CCPOA may temporarily freeze all grievance time frames and processing for those grievances alleged to be in this category. If the State is to invoke this section, the State shall contact CCPOA headquarters, prior to the freezing of the grievances, to arrange a meeting between the local CCPOA Chapter, CCPOA headquarters staff, institutional management staff, and departmental Labor Relations staff, to meet locally on these issues and/or problems associated

21

with the frozen grievances. This shall occur prior to the grievances being unfrozen and the time frames reinstituted. Once this meeting has occurred, the State has fourteen (14) calendar days to respond to the grievances. This also applies to the mini-arb.

### 6.04    Waiver of Steps

A.  The parties may mutually agree to waive the grievance procedure to the appropriate step for resolution.

B.  Where the lower level is able to resolve the issue or issues grieved, the grievance can be redirected from the higher level to the lower level without the higher level answering the merits of the grievance, but the lower level shall answer within the time frames allowed for the higher level, upon receipt of an expedited transmittal. If the grievant is dissatisfied with the lower level response, the grievance can then be advanced to the next level above the higher level which should have responded to the grievance, with a copy to the initial higher level.

### 6.05    Presentation

At any step of the grievance procedure, CCPOA may request that the State representative hold a grievance conference. If the State representative agrees to hold a grievance conference and a grievance conference is scheduled, the grievant and the CCPOA representative may attend without loss of compensation. The grievance conference will not be scheduled on the grievant's RDO.

### 6.06    Employee Rights

Each employee retains all rights conferred by Section 3512, et seq., of the Ralph C. Dills Act.

### 6.07    Informal Discussion - Step 1

A.  An employee grievance initially shall be discussed with the employee's involved supervisor within twenty-one (21) calendar days of the alleged violation or after knowledge of same reasonably

22

should have been acquired. The involved supervisor shall render an immediate response, if possible, or within seven (7) calendar days if he/she requires further research.

B.  If it is clear that the supervisor does not have the authority to grant the grievance, he/she must so state this fact to the grievant immediately on the appropriate worksheet. (See Appendix Item #1)

C.  The involved supervisor's resolution of the grievance at Step 1 shall be non-precedential.

### 6.08    Formal Appeal - Step 2

A.  If a grievance is not resolved at Step 1 to the satisfaction of the grievant, a formal grievance may be filed no later than within seven (7) calendar days of the decision at Step 1.

B.  However, if a CCPOA grievance is not initiated at Step 1, the grievance must be filed within twenty-one (21) calendar days after the event or circumstances occasioning the grievance, or within twenty-one (21) calendar days of the alleged violation or after knowledge of same reasonably should have been acquired.

C.  A formal grievance shall be initiated in writing on the mutually negotiated grievance form provided by the State, and shall be filed with the Appointing Authority or designee. Upon filing of the written grievance, the institution or parole region shall assign the grievance a number in accordance with Appendix Item #2.

D.  If the grievance is not in the scope of authority of the Appointing Authority or designee to grant, the grievant's CCPOA Job Steward may file the grievance directly at Step 3 of the grievance process, unless the grievance alleges a violation of an MOU section which may be appealed to mini-arb pursuant to Section 6.13. These grievances may not be filed directly at the third level under any circumstances.

23

E. Prior to formally responding to the grievance, there shall be a grievance conference between the grievant (if not CCPOA), CCPOA and the Appointing Authority or designee, subject to the provisions of Sections 6.03 and 6.04. The Grievant will attend the grievance conference without loss of compensation and the grievance conference will not be scheduled on the grievant's RDO.

F. Within twenty-one (21) calendar days after receipt of the formal written grievance, the Appointing Authority or designee shall respond in writing to the grievance as the first level of response. Decisions at this level are considered nonprecedential.

G. Regardless of who files the grievance, a copy of the grievance and the response shall be mailed by the Appointing Authority or designee to the appropriate office of CCPOA and a copy hand delivered or mailed to the work address of the local CCPOA representative. The postmark date shall determine the date of the response.

H. This shall be the final level of review for any grievance involving the contents of a LOI or WID, the contents of a performance appraisal, an alleged POBR violation, and all Health and Safety grievances.

## 6.09    Formal Appeal - Step 3

A. If the grievant is not satisfied with the decision rendered pursuant to Step 2, the decision may be further appealed as follows:

1. If the grievance alleges a violation of a section of the MOU listed under Section 6.13, the grievance may be appealed to mini-arb under the rules and procedures specified in Section 6.13. This mini-arb shall be the only and final level of review for all such grievances.

2. If the grievance alleges a violation of any other section of the MOU which may be appealed beyond the second level, the grievance may

be appealed to CDCR/DSH Department Director or Designee as follows:

a. Within twenty-one (21) calendar days of the receipt of the second level response, the grievant and CCPOA may appeal the decision to the Director of the Department or designee.

b. Within twenty-one (21) calendar days after receipt of the appealed grievance, the person designated as third level of appeal shall respond in writing to the grievance, subject to the provisions of Sections 6.03 and 6.04.

c. This shall be the final level of review for all "policy" grievances in that they do not involve the interpretation, application or enforcement of the provisions of this MOU.

d. Regardless of who files the grievance, a copy of the grievance and said response shall be mailed by the Appointing Authority or designee to the appropriate office of CCPOA.

e. If the grievance alleges a violation of the following MOU Sections: 2.03, 2.04, 2.08, 2.09, 5.03, 7.04, 7.05, 7.06, 7.07, 9.03, 9.06, 9.09 (except G.), 10.02 (except D.), 10.08, 10.09, 10.18, 11.02, 11.03, 11.06, 12.04 (except G.), 12.06,14.05, 15.14, 16.02, 16.06, 17.03, 17.06, 17.07, 17.09, 17.10, 17.11 (except F.), 17.13, 17.14, 18.01, 19.01, 19.02, 19.03, 19.06, 20.01, 20.02, 21.01, 22.01, 22.02, 22.03, 24.01, 24.03, 24.07, 24.08, 25.01, 25.02, the grievance may be appealed directly to arbitration after the third level response. The appeal to arbitration shall be made by sending a request for arbitration to the Director of the CalHR, or designee, within twenty-one (21) calendar days of the

third level response. The arbitration shall be conducted in accordance with Section 6.11 of this article.

f. If sections of this MOU subject to arbitration after the third level and after the fourth level are appealed in the same grievance, the grievance shall be subject to arbitration after the fourth level response. Time frames for the third level shall be put in abeyance pending the fourth level response.

## 6.10    Formal Appeal - Step 4

A. If the grievant is not satisfied with the decision rendered at Step 3, the grievant may appeal the decision within twenty-one (21) calendar days after receipt of the decision as follows:

If the grievance alleges a violation of any of the following sections of the MOU: 1.01, 2.01, 2.02, 2.05, 2.06, 2.07, 2.10, 2.11, 2.12, 3.01, 4.01, 4.02, 4.03, 5.01, 5.02, 5.05, all sections in Article VI, 7.02, 8.01, 8.02, 8.05, 8.06, 8.07, 9.04, 9.05 D., 9.07, 9.08, 9.10, 9.13, 9.14, 9.15, 10.01 (except G.),10.06, 10.10, 10.11, 10.12, 10.13, 10.14, 10.17, 11.08, 11.11, 11.12, 12.01, 12.02, 12.03, 13.01, 13.02, 13.03, 13.10, 14.01, 14.03, 14.04, all sections in Article XV (except 15.03,15.04, 15.12, 15.18, 15.20), 16.03, 17.02, 17.12, 19.08, 20.05 except B, 21.02, 26.01 (except K.), 27.01, 27.02, 27.03, 27.05 the grievance must be appealed to the Director of the CalHR, or designee within twenty-one (21) calendar days after receipt of the decision at the third level. Within twenty-one (21) calendar days after receipt of the appealed grievance, the Director of CalHR or designee shall respond in writing to the grievance, subject to the provisions of Sections 6.03 and 6.04.

B. CalHR and CCPOA representatives agree to hold quarterly grievance settlement meetings to facilitate the resolution of specific grievances received at the

fourth level.

C. In the event CalHR renders a grievance response at the fourth level that provides in whole, or in part, a remedy for the contract violation alleged in the grievance, and that remedy is not enforced or implemented in accordance with instructions or directives set forth in the grievance response, the union may compel the enforcement or implementation of the remedy by filing a petition for writ of mandate pursuant to Code of Civil Procedure Section 1085 in a court of competent jurisdiction. The union will be deemed to have exhausted all administrative remedies necessary to the pursuit of a writ of mandate upon providing notice to the CalHR of specific nature of the unenforced or unimplemented fourth level grievance remedy, and upon a showing that the remedy remains unenforced or unimplemented for a period of fifteen (15) days following the date of such notice. A court of competent jurisdiction may issue a writ or order compelling the enforcement or implementation of the remedy prescribed in the fourth level grievance response, and may also award costs and attorneys fees upon a showing that there was no reasonable business justification for the delay or failure to implement or enforce the grievance remedy.

## 6.11    Arbitration

A. Only grievances which involve the interpretation, application or enforcement of the provisions of this MOU may be appealed to binding arbitration.

B. Pursuant to subparagraph A. above, if CCPOA is not satisfied with the decision rendered in Step 3 or in Step 4, only CCPOA may appeal the decision to binding arbitration. Such appeal shall be made by written demand within twenty-one (21) days to the Director of CalHR or designee. Only grievances which exclusively allege violations of those MOU sections listed in subsection 6.09 A (2) e. can be appealed to arbitration directly after the third level of response. CCPOA shall have one hundred

eighty (180) calendar days after appealing the grievance to request in writing CalHR to strike for arbitrators. If the request to strike arbitrators is not made within one hundred eighty (180) calendar days, the grievance shall be considered withdrawn and CCPOA may not proceed to arbitration.

C. An expedited arbitration procedure shall be available in the following limited circumstances: in situations in which irreparable injury will result from threatened action by either party and for which there is no adequate remedy at law (e.g., backpay), the other party may request an expedited arbitration of the matter. The parties will exercise best efforts to secure an arbitrator, to have the arbitration (including arbitrating during non-business hours, e.g., on weekends and holidays) and to receive the decision (written or bench depending upon circumstances) prior to the threatened action or if the action has occurred, as soon as possible after the action. The parties may develop a list of arbitrators who commit to be available for these short-notice, expedited proceedings.

Only grievances pursuant to subparagraph A. above may be so appealed. The arbitrator shall have the powers that normally exist including, but not limited to: (1) order the party initiating the grievance to abide by the time limits provided in this article or, (2) issue an order to the party proposing the action to temporarily defer the action. The arbitrator shall have the power to frame a decision, including those rendered under Section 27.01, provided it does not add to, delete, or alter any provisions of this MOU, or any agreements supplementary thereto, but shall limit the decision to the application and interpretation of its provisions.

D. The parties agree that they intend this arbitration clause to extend beyond the expiration of the MOU and continue until the implementation of a successor MOU or the implementation of the State's last, best and final offer after impasse.

28

The State recognizes its obligation to maintain the terms of this MOU after expiration and before agreement on a new MOU or implementation of the State's last, best and final offer after impasse. Grievances filed during this period will retain the same level of arbitrability as during the life of this MOU.

**6.12      Selection and Authority of Arbitrator**

A. An impartial arbitrator shall be selected from a mutually agreed-upon standing panel of no less than twenty-one (21) arbitrators pre-selected by CalHR and CCPOA. Selection for a particular arbitration shall be made by alternately striking names from the list until one (1) name remains. Such remaining person shall be designated as the arbitrator. The first party to strike a name from the list shall be picked by lot. The parties agree to meet following ratification of this MOU to develop an alternative rotational system for selecting arbitrators which may be implemented by mutual agreement. Within ninety (90) days of ratification of this MOU, the parties shall meet and increase the panel of arbitrators to twenty-one (21).

B. If at any time there are less than ten (10) mutually agreed upon arbitrators impaneled, then either party may unilaterally seek a list of five (5) arbitrators from the American Arbitration Association or the California Mediation and Conciliation Service. Selection for that given arbitration shall be made by alternately striking names from the list of five (5) until one (1) name remains. This person shall be designated as the arbitrator. The first party to strike names from the list shall be determined by lot.

C. The State and CCPOA will use arbitration procedures as described below unless agreed otherwise:

1. A requirement that the arbitrator selected render a written decision within sixty (60) calendar days of the conclusion of the hearing.

29

2. No post hearing briefs unless mutually agreed by the parties.

D. The decision of the arbitrator shall be final and binding.

E. The arbitrator shall have no authority to add to, delete, or alter any provisions of this MOU, or any agreements supplementary thereto, but shall limit the decision only to the application and interpretation of the provisions.

F. The Arbitrator shall have the authority to frame the issue if the parties cannot, or have a default of "Should the grievance be granted? If so, what is the remedy?"

## 6.13    Mini-Arb

A. Grievances exclusively alleging a violation of Sections: 5.04, 7.01, 7.03, 8.04, 9.01, 9.02, 9.05 (except D.), 10.01 G., 10.02 D., 10.07, 10.16, 11.01, 11.04, 11.05, 11.07, 11.10, 11.13, 12.05, 14.02, 14.06, 14.07, 15.03, 15.12 j., 16.01, 16.04, 17.01, 17.04, 17.05, 17.08, 17.11 F., 17.15, 19.04, 19.05, 19.07, 20.05 B., 23.01, 24.02, 24.05, 24.06, 26.02, of this MOU, and where the grievance has not been resolved at the first or second levels of review. CCPOA may appeal the grievance to mini-arb which shall operate under the following rules:

1. The mini-arb shall be held at the local worksite or other mutually agreed upon location.

2. The arbitrator shall be selected from the list of arbitrators agreed upon by the parties.

3. The arbitrator shall review and decide multiple grievances at a time. The mini-arbs will be held at least quarterly, as necessary, or when no less than eight (8) grievances under this section are pending review.

4. Only the grievant, and his/her local CCPOA Job Steward and no more than two (2) local management representatives may

appear before the arbitrator to make an oral presentation. The arbitrator shall make his or her decision solely on the written record in the grievance, the grievance response(s), and any oral presentation made at the arbitration proceeding.

The presentations shall be time-limited, consistent with the intent of this provision to hold multiple grievance reviews in a single day. Only the arbitrator may ask the other side questions. Labor Relations Representatives may represent the State on one (1) grievance in a twelve (12) month period. CCPOA Field Representatives may represent one (1) grievance in a twelve (12) month period. CCPOA Rank and File Vice-Presidents and the CCPOA Executive Vice-President may represent the grievant on an occasional basis related to specific need. If the use of CCPOA Rank and File Vice-Presidents or the CCPOA Executive Vice-President becomes excessive, this issue will be addressed by the Mini-Arbitration Committee.

5. The CCPOA Job Steward and the grievant(s) will attend the arbitration proceeding without loss of compensation. Upon giving reasonable advance notice, but no less than fourteen (14) days, the State shall accommodate a shift change request from a grievant and/or a representative who is scheduled to work first or third watch on the day of the mini-arb.

6. The arbitrator will issue a bench decision on each grievance. The decision of the arbitrator is final and binding, but shall have no precedential value whatsoever.

7. The arbitrator shall have no authority to add to, delete, or alter any provisions of this MOU, or any agreements supplementary thereto, but shall limit the decision to the application of the MOU to the facts and circumstances at hand.

30

31

8. The cost of the mini-arb shall be borne by the loser of each case. Should there be a dispute as to who "lost" the case, the arbitrator shall have the authority to apportion the costs.

9. The State and CCPOA agree that no attorneys shall be used in this mini-arb process. This includes anyone who has graduated from law school, except the grievant.

10. The parties are limited at the mini-arb to presenting only the facts, documents, and arguments presented during the lower levels of the grievance process. Supporting documents may be added after the second level response if said documents are obtained as a result of a written information request submitted prior to the second level response. At the conclusion of the second level grievance conference, for any grievance which has the potential of going to min-arb, the grievance package, including any supporting documentation, will be lettered, i.e., the first page is lettered "A", the second "B", etc. The parties will initial the last page.

11. If during the second level grievance conference either party requests an extension of the second level response time limits to investigate the grievance, the parties will recess the grievance conference. If the grievance conference is recessed, the parties will sign a written waiver form recessing the grievance conference and establishing a date to continue the grievance conference. Time extensions are limited to one (1) and may not exceed fourteen (14) calendar days. If the State refuses to recess the grievance conference, then CCPOA shall have fourteen (14) calendar days to issue a rebuttal to the second level grievance response. This rebuttal shall become part of the grievance package forwarded to the mini-arb. If CCPOA refuses to recess the grievance conference, then CCPOA shall not be allowed to rebut the second level grievance response.

32

12. If the grievance alleges violations of contract sections that are subject to the mini-arb process and contract sections that are not subject to the mini-arb process, the grievant must choose between either: (1) dropping all of the contract sections subject to the mini-arb process and pursuing through the normal grievance process the contract sections not subject to the mini-arb process, or (2) dropping all of the contract sections not subject to the mini-arb process and pursuing the grievance through the mini-arb process. The grievant must make this choice after the second level response.

13. When the decision is made by CCPOA to take the grievance to mini-arb, the parties at the local level will meet and number the pages of the grievance package, 1 of however many pages, 2 of however many pages, etc. The parties will initial the last page.

14. If the second level grievance response contains or relies in part on information that was never discussed or raised in the second level grievance conference, CCPOA shall have fourteen (14) calendar days in which to add a rebuttal to the grievance package.

B. By mutual agreement between CalHR and CCPOA, grievances involving interpretations of other sections of the MOU not listed above may be referred to this process.

C. The Mini-Arbitration Committee established January 2, 1998, will continue to meet on an as-needed basis.

D. The mini-arb shall be requested by CCPOA sending a letter and the grievance package to the CDCR, Labor Relations Office within sixty (60) calendar days of the second level response. The Mini-Arbitration Committee may change the language of this paragraph D., if necessary.

33

### 6.14    Arbitration Costs (Except Mini-Arb)

The cost of regular arbitration shall be shared equally between the parties.

### 6.15    CDCR Decision/Settlement Implementation

A.    Whenever CalHR receives an arbitration decision, or issues a decision or enters into a settlement agreement of a 4th level grievance which provides a remedy in part or whole, and will require an action(s) by CDCR, CalHR shall provide CDCR with the decision. This decision will include a summary that clearly articulates the necessary remedies to be implemented by CDCR for full compliance with the decision.

B.    This summary will include whether the decision/settlement represents a department wide remedy, or a local issue remedy only. The information will be provided directly to the CDCR Chief, Labor Relations Branch (LRB), who will be responsible to notify the respective Chief Deputy Director(s), the Director, and all affected parties to the decision rendered. CalHR decisions relevant to remedy of a 4th Level grievance shall carry the full force and weight of Binding Arbitration. CCPOA, at their discretion, may present such decision/settlement to a competent court of law for confirmation.

C.    Upon receipt of an arbitration or 4th Level grievance decision/settlement which provides a remedy in part or whole, the LRB Chief or designee, acting for the Director, will be responsible to prepare a notification of action necessary to implement the arbitration or grievance remedy. This notice will be recorded at the LRB and sent to the appointing authority of the area(s) affected by the decision. The appointing authority(s) will be required to provide the LRB with confirmation of receipt of the notice. Confirmation shall be sent within two (2) working days of receipt of notice.

D.    The affected appointing authority shall be responsible to implement the necessary actions

34

as detailed by the LRB on behalf of the Director. The appointing authority shall be responsible to provide the Director, via the LRB, confirmation that all required actions have been implemented to satisfy the arbitration or decision/settlement. This notification shall be transmitted to the LRB no later than ten (10) working days from receipt of the initial notification. If, based upon complexity of the issues, completion of all necessary actions are not attainable in this time frame the appointing authority shall be required to submit a notice to the LRB, detailing what action have completed and a time table to achieve full compliance with the decision.

### ARTICLE VII
### HEALTH AND SAFETY

### 7.01    Health and Safety Committee

A.    The State shall attempt to provide a reasonably safe and healthy work environment for State employees. CCPOA acknowledges the need to work with management towards this effort, as do all State employees.

B.    Recognizing this responsibility the parties agree to establish a Health and Safety Committee at each institution and where appropriate, each parole region and camp.

C.    Each Health and Safety Committee shall consist of at least one (1) member from CCPOA at each institution/facility, or when appropriate, parole region or camp.

D.    Any employee designated by CCPOA as representative to the Health and Safety Committee shall suffer no loss of regular pay as a result of attendance at such meetings; however, no overtime compensation will be paid. Normally, meetings will be scheduled Monday through Friday, between the hours of 8 a.m. to 5 p.m.

E.    Meetings of the Health and Safety Committee shall be held a minimum of once each quarter, with a

35

DANIEL M. LINDSAY (SBN 142895)
JENNIFER L. RAGAN (SBN 191711)
**CALIFORNIA CORRECTIONAL**
**PEACE OFFICERS ASSOCIATION**
**LEGAL DEPARTMENT**
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605
Telephone: (916) 372-6060
Facsimile: (916) 340-9372
Attorneys for Petitioner

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SACRAMENTO**

| | |
|---|---|
| CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION | Case No.: |
| Petitioner, | **[PROPOSED] ORDER GRANTING PETITION TO COMPEL EXPEDITED ARBITRATION** |
| v. | |
| STATE OF CALIFORNIA, DEPARTMENT OF HUMAN RESOURCES; STATE OF CALIFORNIA, DEPARTMENT OF CORRECTIONS AND REHABILITITATION; and DOES 1-10 inclusive. | Date:<br>Time:<br>Dept.:<br>Judge: |
| Respondents | |

RECEIVED
DEC 2 4 2015
65
CIVIL

The Petition of Petitioner, California Correctional Peace Officers Association

("CCPOA"), for an order compelling Respondent, State of California, Department of Human

Resources ("CalHR"), came on for hearing in Department ___ of this Court on _____,

2016. _____, appeared on behalf of Respondent, CalHR.

_____ appeared on behalf of Petitioner, CCPOA.

Having read the petition the response to the petition and all supporting papers and having

heard the arguments of counsel, and good cause appearing,

IT IS ORDERED that Petitioner, CCPOA's, petition is granted and that the parties shall

immediately select an available arbitrator and commence the arbitration hearing on the first day

1

1   the selected arbitrator has available and continue the arbitration on successive dates, including

2   after normal business hours, on nights, holidays and/or weekends until complete.

3        IT IS FURTHER ORDERED that Respondent, CalHR, pay monetary sanctions to

4   Petitioner, CCPOA, in the amount of $_____.

5

6   Dated:_____

7                                       Judge of the Superior Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

1  JOAN A. MARKOFF
   Chief Counsel, Bar No. 121787
2  FROLAN R. AGUILING
   Deputy Chief Counsel, Bar No. 235874
3  SANDRA L. LUSICH
   Assistant Chief Counsel, Bar No. 195995
4  JENNIFER M. PEARSON
   Assistant Chief Counsel, Bar No. 232979
5  LINDA M. KELLY
   Labor Relations Counsel, Bar No. 181675
6  NIKOLETTE Y. CLAVEL
   Legal Counsel, Bar No. 289835
7  DAVID M. VILLALBA
   Labor Relations Counsel, Bar No. 258974
8  California Department of Human Resources
   State of California
9  1515 S Street, North Building, Suite 400
   Sacramento, CA 95811-7258
10 Telephone: (916) 324-0512
   Facsimile: (916) 323-4723
11 Email: David.Villalba@calhr.ca.gov

12

   Attorneys for Respondents
13

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                        COUNTY OF SACRAMENTO

16

17  CALIFORNIA CORRECTIONAL PEACE        )  Case No. 34-2015-00188266
    OFFICERS ASSOCIATION,                )
18                                       )  **OPPOSITION TO PETITION TO COMPEL**
         Petitioner,                     )  **ARBITRATION**
19                                       )
    ·v.                                  )  Hearing Date:   January 28, 2016
20                                       )  Time:           9:00 a.m.
    STATE OF CALIFORNIA, DEPARTMENT      )  Dept.:          54
21  OF HUMAN RESOURCES, STATE OF         )  Judge:          Raymond M. Cadei
    CALIFORNIA DEPARTMENT OF             )
22  CORRECTIONS AND REHABILITATION;      )
    and DOES 1-10 inclusive,             )
23                                       )  **Exempt from Fees**
         Respondents.                    )  **(Gov. Code, § 6103)**

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................ 1

II.   FACTS .............................................................................. 1

    A.    Respondents and Petitioner are Subject to a Valid Agreement to Arbitrate Employment Disputes Arising under their Memorandum of Understanding ............................................................................ 1

    B.    Once Informed of the Alleged Contractual Violations, CalHR Immediately Began Working with CCPOA to Schedule Arbitration. ................ 2

    C.    While CalHR Worked to Obtain the Information Needed to Schedule the Arbitration, CCPOA Filed an Action in Superior Court Based on the Same Set of Facts. ................................................................ 3

III.  ARGUMENT ..................................................................... 5

    A.    The Petition to Compel Arbitration Should Be Denied and Arbitration Stayed Pending Resolution of the Related Court Action. ...................... 5

        1.    Both the Arbitration and the Court Action Involve the Same Facts ............................................................................... 6

        2.    Both Actions Raise Common Issues of Law and Fact which Creates a Risk of Conflicting Rulings if One of the Actions is Not Stayed ............................................................................. 6

        3.    Petitioner's Claim that the Actions Involve Different Legal Issues Lacks Merit and Ignores the Many Factual Issues Common to Both Actions. ..................................................................... 9

        4.    Staying the Arbitration is the Most Appropriate Course of Action Given the Nature of the Related Proceedings and the Parties Involved. ...................................................................... 11

    B.    The Petition to Compel Should Also be Denied Because Respondents Have Not Refused Arbitration ...................................................... 12

    C.    In the Event the Court Decides to Grant the Petition, the Appropriate Order is One for Normal, Not Expedited, Arbitration. ......................... 14

IV.   CONCLUSION ................................................................... 15

OPPOSITION TO PETITION TO COMPEL ARBITRATION

1

## TABLE OF AUTHORITIES

2
**Page**

**CALIFORNIA CASES:**

3

*Best Interiors, Inc. v. Millie & Severson, Inc.* (2008)
4
    161 Cal.App.4th 1320................................................................................10, 12

5
*C.V. Starr & Co. v. Boston Reinsurance Corp.* (1987)
    190 Cal.App.3d 1637.......................................................................................12
6

*Fitzhugh v. Granada Healthcare and Rehabilitation Center, LLC* (2007)
7
    150 Cal.App.4th 469........................................................................................11

8
*Henry v. Alcove Investment, Inc.* (1991)
    233 Cal.App.3d 94...........................................................................................10
9

*Korean Philadelphia Presbyterian Church v. California Presbytery* (2000)
10
    77 Cal.App.4th 1069........................................................................................15

11
*Mays v. City of Los Angeles* (2008)
    43 Cal.4th 313...................................................................................................7
12

*Whaley v. Sony Computer Entertainment America, Inc.* (2004)
13
    121 Cal.App.4th 479........................................................................................11

14
**STATUTES:**

15
Code of Civil Procedure section 1281.1 ...............................................................12
Code of Civil Procedure section 1281.2 ............................................... 1, 5, 11, 14, 16
16
Code of Civil Procedure section 1281.2, subdivision (c) ...............................5, 6, 10, 11
Government Code section 3300 ..............................................................................7
17
Government Code section 3301, subdivision (i) ....................................................7
Government Code section 3303, subdivision (i) ....................................................8
18
Government Code section 3512 ..............................................................................1
Government Code section 3513, subdivision (c).....................................................2
19
Government Code section 3517 ..............................................................................2
Government Code section 19815.4, subdivision (g) ...............................................2
20
Penal Code section 6125.......................................................................................9
Penal Code 6126...............................................................................................2, 9
21
Penal Code 6126.5.............................................................................................2, 9
Penal Code 6126.5, subdivision (b).......................................................................2
22
Penal Code 6127.3............................................................................................2, 9

23

24

25

26

27

28

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

# I.

# INTRODUCTION

The petition to compel arbitration should be denied because it fails to meet the foundational requirements of Code of Civil Procedure section 1281.2.[1] Petitioner seeks to litigate common issues of law and fact in two separate actions (an arbitration and a judicial proceeding), thereby creating a risk of inconsistent rulings, which may only be resolved by denying the requested petition and staying the arbitration pending the outcome of the related court action.

Moreover, respondents never refused to arbitrate the present controversy and in fact were actively working with petitioner to schedule arbitration at the time petitioner filed the present petition. Respondents remain willing to resume arbitration of the alleged controversy pending resolution of the related court action. Because respondents never refused to arbitrate this matter, and because immediate arbitration of this matter would contravene the judicial interest in avoiding inconsistent rulings of law and fact in actions arising out of the same set of facts, this Court should deny the petition to compel arbitration and exercise its discretion to issue an order staying the arbitration pending completion of the related civil action.

# II.

# FACTS

**A.    Respondents and Petitioner are Subject to a Valid Agreement to Arbitrate Employment Disputes Arising under their Memorandum of Understanding.**

Employment matters between state employees in Bargaining Unit 6 and the State are governed by the Ralph C. Dills Act (Dills Act.) (Gov. Code, § 3512 et seq.) Under the Dills Act, petitioner California Correctional Peace Officers Association (CCPOA) is the recognized exclusive bargaining representative of State Bargaining Unit 6 (BU 6). Respondent California Department of Corrections and Rehabilitation (CDCR) is an agency of the State of California and is the appointing authority of state employees in BU 6. Respondent California Department of Human Resources (CalHR) is the state agency designated as the representative of the Governor, as the state employer,

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

1  for purposes of dealing with matters relating to employer-employee relations pursuant to

2  Government Code sections 19815.4, subdivision (g) and section 3517.

3      The State of California and CCPOA are parties to a collective bargaining agreement, or

4  Memorandum of Understanding (MOU), which covers the employment relationship between the

5  state employer and state employees in BU 6. The current MOU governing the parties is the

6  Bargaining Unit 6 MOU, effective July 3, 2013 to June July 2, 2015. (Respondents' Request for

7  Judicial Notice (RJN), Declaration of David M. Villalba (Villalba Decl.), Exh. A.) The MOU

8  contains grievance and arbitration procedures for resolving contractual disputes. (Respondents'

9  RJN, Villalba Decl., Exh. A, MOU Art. 6.) The grievance and arbitration procedures consist of four

10  levels of appeal culminating in final and binding arbitration. (*Ibid.*) The MOU also contains an

11  expedited arbitration procedure in which a grievance may bypass the four levels of review and go

12  directly to arbitration. (*Ibid.*)

13      CDCR as the appointing authority of BU 6 employees is subject to the arbitration clause of

14  the BU 6 MOU. CalHR serves as the legal representative of for all state agencies, including CDCR,

15  in any dispute raised to arbitration under the MOU. (See *Ibid.*)

16

17  **B.    Once Informed of the Alleged Contractual Violations, CalHR Immediately Began Working with CCPOA to Schedule Arbitration.**

18      On or about November 4, 2011, CCPOA filed a grievance under the MOU, which alleged

19  multiple violations of the contract arising out of an investigation conducted by the Office of the

20  Inspector General (OIG). (Declaration of Daniel Lindsay in Support of Petition to Compel

21  Expedited Arbitration (Lindsay Decl.), ¶ 5, Attch. 1.) OIG is an independent agency given direct

22  authority to investigate CDCR's policies and procedures. (Pen. Code, §§ 6126, 6126.5, 6127.3.) In

23  the grievance, CCPOA claims that officers at several different CDCR prisons were required to

24  attend OIG's investigatory interviews without proper notice or an opportunity to have a union

25  representative present during the interview. (Lindsay Decl., ¶ 5, Attch. 1.) As an independent

26  investigatory agency, OIG is not subject to the grievance and arbitration procedure in this case, nor

27  can it be joined in the arbitration. (See Pen. Code, § 6126.5, subd. (b); Gov. Code § 3513, subd. (c)

28  [exempting OIG employees from collective bargaining].) Nevertheless, CCPOA claims CDCR

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

1   violated the MOU by allowing OIG to conduct interviews without providing proper notice and
2   union representation.

3       On November 10, 2014, CalHR attorney, Linda Kelly (Kelly) received CCPOA's grievance
4   and immediately began reviewing the union's allegations. (Kelly Decl., ¶ 3.) That same day Kelly
5   emailed CCPOA attorney Daniel Lindsay (Lindsay) to confirm that she was assigned to the
6   grievance and was available to discuss the matter. (*Ibid.*; Lindsay Decl., ¶ 8, Attch 4.)

7       Kelly was subsequently out of the office from November 11 through 17 attending
8   prescheduled work and personal commitments. (Kelly Decl., ¶ 4.) However, she informed Lindsay
9   that she would get back to him the following week. (*Ibid.*; Lindsay Decl., ¶ 9.)

10  **C.    While CalHR Worked to Obtain the Information Needed to Schedule the Arbitration,
11          CCPOA Filed an Action in Superior Court Based on the Same Set of Facts.**

12      Unbeknownst to Kelly, on or about November 24, 2015, CCPOA also filed a complaint for
13  injunctive relief (court action) in Sacramento County Superior Court against CDCR, OIG and
14  others. (Respondents' RJN, Villalba Decl., Exh. C.) This court action is based on the same set of
15  facts alleged in CCPOA's current request for arbitration, namely that certain CDCR employees were
16  required to attend investigatory interviews without proper notice or union representation and that
17  CDCR acted as an agent of OIG in allowing the interviews to proceed. (*Ibid.*)

18      On November 20 and 30, 2015, the parties continued discussing the allegations in the
19  grievance. (Kelly Decl., ¶ 5; Lindsay Decl., ¶ 12-13.) Kelly told Lindsay she was concerned that
20  some of the allegations made by CCPOA were vague and incomplete, including a claim that an
21  "unknown CDCR manager" directed a correctional officer to report for an interview with OIG.
22  (Kelly Decl., ¶ 5.) Additionally, the grievance alleged that on at least two occasions, a CCPOA
23  officer spoke with "senior CDCR management" regarding the interviews and "was told that CDCR
24  would not order officers to attend the interviews." (*Ibid.*) CCPOA provided some of the missing
25  information, but did not provide the identity of the un-named CDCR managers referenced in the
26  grievance. (*Ibid.*)

27      On December 3, 2015, the parties spoke again regarding the appropriateness of expedited
28  versus normal contractual arbitration. (Lindsay Decl., ¶ 16.) Kelly informed CCPOA that no

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

1  further interviews were scheduled by OIG. (Kelly Decl., ¶ 6.) CCPOA acknowledged no

2  interviews were pending, but expressed a concern additional interviews might be scheduled in the

3  future. (*Ibid.*)

4      In an effort to accommodate CCPOA's concerns, Kelly, said that while she would not waive

5  any objection to expedited arbitration, she would make every effort to select arbitrators and

6  schedule the matter for arbitration as soon as possible. (Kelly Decl., ¶ 6.) The parties discussed

7  possible arbitrators and agreed to look for dates sometime in February 2016. (*Ibid.*; Lindsay Decl.,

8  ¶ 16.)

9      On December 4, 2015, Kelly contacted Arbitrator Dan Altemus to request available dates.

10  (Lindsay Decl., ¶ 17.) Subsequently, Kelly reached out to all necessary parties she had been able to

11  identify to ascertain availability for an arbitration hearing in February. (Kelly Decl., ¶ 7.) She

12  attempted to identify the un-named witnesses from the grievance so that she could ascertain their

13  availability as well. (*Ibid.*) Over the next two weeks, Kelly received some of the information she

14  needed from CDCR, but still did not have all the necessary names. (*Ibid.*)

15      On December 18, 2015, CCPOA provided some, but not all, of the names of CDCR

16  supervisors who witnessed or participated in the alleged contractual violations. (Kelly Decl., ¶ 8.)

17  Kelly continued to try to find the names of the remaining witnesses to ascertain their availability to

18  testify at arbitration. (*Ibid.*)

19      On December 23, 2015, Kelly emailed Lindsay again informing him that she was still trying

20  to get the last few names. (Kelly Decl., ¶ 9.) Kelly specifically told him that she still needed the

21  name of the CDCR manager who allegedly ordered Officer McCloughan to attend the interview,

22  and the name of the "senior CDCR manager" who CCPOA allegedly spoke with concerning the

23  event. (*Ibid.*)

24      Kelly informed Lindsay that she would be on vacation from December 24, 2015 to January

25  4, 2016, but that she would continue to work on this case while on vacation in order to commit to

26  dates as soon as possible. (*Ibid.*)

27      On December 24, 2015, CCPOA filed the instant petition to compel expedited arbitration.

28  Throughout the course of CalHR's above discussions with CCPOA, CalHR never indicated a

-4-

1  refusal to arbitrate or a desire to stay the arbitration. CalHR did not even decide that staying the

2  arbitration might be appropriate until after it was provided a complete copy of CCPOA's court

3  action on or about December 15, 2015. (Kelly Decl., ¶ 10.) For the reasons described below, and in

4  light of CCPOA's related court proceeding, which is based on the same facts as the present

5  arbitration, CalHR believes staying the arbitration is now the most appropriate course of action.

6  **III.**

7  **ARGUMENT**

8  **A.    The Petition to Compel Arbitration Should Be Denied and Arbitration Stayed Pending

9        Resolution of the Related Court Action.**

10      Code of Civil Procedure section 1281.2 governs the conditions under which a court may

11  grant a petition compelling arbitration. Generally, an order compelling arbitration is appropriate as

12  long as the petitioning party can allege "the existence of a written agreement to arbitrate a

13  controversy and that a party thereto refuses to arbitrate such controversy." (*Ibid.*) However, section

14  1281.2, subdivision (c) provides that an order compelling arbitration may not be issued if:

15      > A party to the arbitration agreement is also a party to a pending court action or
16      > special proceeding with a third party , arising out of the same transaction or series
17      > of related transactions and there is a possibility of conflicting rulings on a
        > common issue of law or fact.

18      Thus, denial of a petition to compel is appropriate if the following two conditions are met:

19  (1) the arbitration arises out of the same set of transactions as a pending court action; and (2) there

20  is a possibility of conflicting rulings on a common issue of law or fact. (*Ibid.*) If both of these

21  conditions are met, the court has discretion to take any of the following actions:

22      1.    Refuse to enforce the arbitration agreement and order joinder of all parties in a single

23            action;

24      2.    Order joinder as to all or only certain issues;

25      3.    Order arbitration among the parties who have agreed to arbitration and stay the

26            pending court action pending the outcome of the arbitration proceeding; or

27      4.    Stay the arbitration pending the outcome of the court action.

28  (*Ibid.*) As described below, both requirements for section 1281.2, subdivision (c) are met in this

-5-

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

1    case. Further, the court should exercise its discretion to stay the arbitration pending the outcome of

2    the court action, as this provides the most efficient and equitable means of resolving the parties'

3    disputes.

4           **1.     Both the Arbitration and the Court Action Involve the Same Facts.**

5         The general factual dispute in both the arbitration and the court action is the same. In both

6    proceedings, CCPOA alleges that in October and November 2015, several of its members were

7    forced to participate in interviews as part of an OIG investigation of CDCR. (Compare

8    Respondents' RJN, Villalba Decl., Exh. C, (court action) ¶¶ 20-29, with Lindsay Decl. ¶ 5, Attch. 1

9    (Grievance).) CCPOA also alleges in both proceedings that these employees were not given proper

10   notice or afforded the right to union representation. (*Ibid.*)

11        Indeed, CCPOA admits in the petition to compel that the two actions "deal with the same

12   underlying set of facts." (Petition PA's, p. 8:4-5.) Thus, the first requirement for denial of the

13   petition to compel and staying of the arbitration under section 1281.2, subdivision (c) is satisfied in

14   this case.

15          **2.     Both Actions Raise Common Issues of Law and Fact which Creates a Risk of**
16                  **Conflicting Rulings if One of the Actions is Not Stayed.**

17        The second requirement for denial of the petition to compel and staying the arbitration under

18   section 1281.2, subdivision (c) is also met. An examination of the request for arbitration and the

19   related court action reveals that the factual and legal issues to be determined in both actions are the

20   same or significantly similar such that inconsistent rulings could occur if the actions are allowed to

21   proceed simultaneously.

22        CCPOA's request for arbitration is based on several provisions of the parties' MOU as well

23   arbitration awards and agreements which interpret and apply those MOU provisions. (Lindsay

24   Decl., ¶ 5, Attch. 1, Part III.a-h.) These provisions, which incorporate provisions of the "Public

25   Safety Officers Procedural Bill of Rights Act" (POBRA),[2] require CDCR to provide peace officers

26

27         [2] The MOU refers to the "Public Safety Officers Procedural Bill of Rights" by its more
28   commonly-used name: "Peace Officers Bill of Rights." Both references are to the same act, which
    is set forth at Government Code section 3300 et seq. (See *Mays v. City of Los Angeles* (2008) 43
    Cal.4th 313, 317, fn. 1 [using both titles to describe the same act].)

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

with prior notice of any investigatory interviews in which discipline is reasonably likely and to afford the employee the opportunity to secure a union representative for the interview. (*Ibid.*; Respondents' RJN, Villalba Decl., Exh. A, MOU § 9.09.) Consequently, CCPOA's request for arbitration raises several factual issues including, but not limited to:

- Whether CCPOA's members were given prior notice of the OIG interviews,
- Whether there was a reasonable likelihood that discipline or punitive action would result from the interviews;
- Whether the employees requested or received union representation in the interviews; and
- Whether and to what extent CDCR was legally required to override OIG's interrogation of CDCR employees, given the duties and obligations contained in the MOU.

(See Lindsay Decl., ¶ 5, Attch. 1.) The risk of inconsistent rulings on the above issues is high given that these are the exact same issues CCPOA raises in its court action. (Respondents' RJN, Villalba Decl., Exh. C, Court Action.) The court action is based primarily on an alleged violation of POBRA, which requires that peace officers be given prior notice and a representative "whenever an interrogation focuses on matters that are likely to result in punitive action . . . ." (*Id.* at p. ¶ 16 [citing Gov. Code, § 3301, subd. (i)].) As noted above, CCPOA's request for arbitration specifically alleges CDCR violated provisions of the POBRA, which are incorporated into the terms of MOU. (See Lindsay Decl., ¶ 5, Attch. 1, Part III.c. [citing MOU § 9.11 on Peace Officer Bill of Rights].)

The grievance also alleges CDCR and OIG violated several arbitration awards and settlements, including the "Cohn" Awards, and the "Bodiford" and "Weingarten" Agreements. (See Lindsay Decl., ¶ 5, Attch. 1, Part III.e-h.) Each of these awards and agreements are also specifically referenced in the court action. (Respondents' RJN, Villalba Decl., Exh. C.)[3] In the court action, CCPOA alleges, "CDCR knew or should have known that [employee] Blue was denied his right to

---

[3] The references to the arbitration awards and agreements are on unnumbered pages of Exhibit A, which is attached to CCPOA's complaint for injunctive relief.

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

1   representation when they implemented an order compelling Blue to interview in contravention of *an*

2   *Arbitrator's Award*. (Exhibit A.)" (*Id.* at pp. 8:28 – 9:2.)  The Arbitrator's Award attached as

3   Exhibit A to the complaint in the court action is the same one CCPOA claims was violated in its

4   request for arbitration.  (See Lindsay Decl., ¶ 5, Attch. 1, Part III.e.)

5        Further, the grievance alleges violations of section 9.09 of the MOU governing "Personnel

6   Investigations."  Section 9.09 is almost identical to the POBRA provision in Government Code

7   section 3303, subdivision (i) raised by CCPOA in the court action.  MOU section 9.09 reads:

8        If an employee is called to an investigatory interview and the employee
         reasonably believes the subject matter of the investigation is such that the
9        employee could possibly receive discipline, the employee, at his or her request,
         shall be given a reasonable opportunity to secure a representative of his/her
10       choice.

11  (Respondents' RJN, Villalba Decl., Exh. A, MOU § 9.09.)  Both MOU section 9.09 (which is raised

12  in the arbitration) and Government Code section 3303, subdivision (i) (which is raised in the court

13  action) contain almost identical language.  Thus, in addressing whether CDCR or OIG violated

14  these provisions, both the court and the arbitrator will be required to address essentially the same

15  factual issues: namely, whether advanced notice of the interviews was given, whether punitive

16  action was reasonably likely, and whether the employees were afforded adequate representation.  If

17  either the arbitrator or the trial court found there was no reasonable basis to believe that punitive

18  action would result from the interviews, it would have an inevitable and significant effect on the

19  factual findings in the other forum.

20       Furthermore, both the arbitration and the civil action will be required to address the nature

21  of the relationship between OIG and CDCR.  OIG is an independent agency given direct authority

22  to investigate CDCR's policies and procedures.  (Pen. Code, §§ 6126, 6126.5, 6127.3.)[4]  Both the

23  grievance and the court action allege that CDCR either acted in conjunction with or was an agent of

24  OIG.  The grievance states, "CDCR actively cooperated with, and took direction from OIG, in

25

26  _____

27       [4] Penal Code section 6125 establishes the OIG as an independent governmental entity and
    provides for the Inspector General to be appointed by the Governor, subject to Senate confirmation.
28  Penal Code section 6125 also gives OIG general authority to conduct audits and investigations of
    CDCR's policies and procedures.  Penal Code sections 6125.6 and 6127.3 give OIG authority to
    subpoena witnesses and documents in carrying out its investigatory and auditing functions.

-8-

OPPOSITION TO PETITION TO COMPEL ARBITRATION

1  continually violating these officers' MOU rights." (Lindsay Decl., ¶ 5, Attch. 1.) Similarly, the

2  court action alleges that CDCR was "complicit" in OIG's alleged denial of members' rights and that

3  CDCR was acting as an "agent" of OIG. (Respondents' RJN, Villalba Decl., Exh. C, pp. 8:27-28,

4  11:20-24.) Thus, one of the key issues in both cases will be whether OIG's authority over CDCR

5  under the Penal Code supersedes CDCR's obligations under the MOU. As CCPOA notes in its

6  grievance, "CDCR is caught on the horns of a dilemma." (Lindsay Decl., ¶ 5, Attch. 1.) CDCR

7  must choose between cooperating with OIG's investigation and enforcing the requirements of the

8  MOU. (*Ibid.*) What CDCR's legal responsibilities were in light of those competing obligations will

9  of necessity be an issue in both the arbitration as well as the civil action.

10  Given the many factual and legal similarities between the two actions in this case, it is likely

11  if not inevitable, that an arbitrator will be required to rule on the same issues that the trial court will

12  face in the court action. Accordingly, the arbitration should be stayed pending resolution of the

13  judicial proceedings.

14

15  ### 3.  Petitioner's Claim that the Actions Involve Different Legal Issues Lacks Merit and Ignores the Many Factual Issues Common to Both Actions.

16  Petitioner maintains, despite these common issues of law and fact, that the exception in

17  section 1281.2, subdivision (c) should not apply because the court action and the arbitration are

18  based on different laws. (Petition PA's, p. 8:4-6.) Petitioner's contention is both factually and

19  legally incorrect and unsupported by case law.

20  Frist, as explained above, the two actions are based on at least some of the same laws. Both

21  the grievance and the civil matter refer to violations of POBRA. (See Part III.A.2., *supra*.) In

22  addition, both actions refer to violations of several arbitration awards and agreements interpreting

23  the parties' MOU. (*Ibid.*) Thus, CCPOA's contention that the actions are based on different laws is

24  demonstrably untrue.

25  Second, section 1281.2, subdivision (c) precludes arbitration in cases where there is the

26  possibility of conflict as to either "a common issue of law *or fact*." (emphasis added.) In *Henry v.*

27  *Alcove Investment, Inc.* (1991) 233 Cal.App.3d 94, 101, the court held, "The existence of this

28  / / /

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

1   possibility of conflicting rulings *on a common issue of fact* is sufficient grounds for a stay under

2   section 1281.2." (emphasis added.)

3          In *Best Interiors, Inc. v. Millie & Severson, Inc.* (2008) 161 Cal.App.4th 1320, the Court of

4   Appeal affirmed denial of a general contractor's petition to compel arbitration of a dispute with a

5   subcontractor on the basis that the parties were engaged in separate litigation with third-party

6   building inspectors and developers who were not subject to arbitration. (*Id.* at pp. 1329-1330.)

7          Although the claims against the inspectors in the civil litigation and the claims against the

8   general contractor in the arbitration involved different sources of law (there was no contract

9   between the subcontractor and the building inspectors), the court found arbitration was nevertheless

10  inappropriate because the actions involved the same factual issues and could have resulted in

11  inconsistent rulings. (*Ibid.*) The court held, that the issue of whether the inspectors hindered the

12  work of the subcontractor would have to be determined in both forums. (*Ibid.*) This potential

13  conflict as to the common *factual* issue was sufficient grounds for denying the petition to compel.

14  (*Id.* at p. 1329).[5]

15         Similarly, here, even assuming the two actions emanate entirely from different sources of

16  law (which they do not), the trial court may nevertheless stay the arbitration based simply on the

17  common issues of fact between the two actions. As noted above, the common issues of fact in both

18  of the actions include: whether CCPOA's members were given prior notice of the OIG interviews;

19  whether there was a reasonable likelihood that discipline or punitive action would result from the

20  interviews; whether the employees requested or received union representation in the interviews; and

21  whether CDCR was legally required to cooperate with OIG's interrogation. (See Part III.A.2.,

22  / / /

23

24

25  [5] See also *Whaley v. Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th
    479, 486 [employer's petition to compel arbitration of claims brought by terminated employees
26  denied on the basis that conflicting factual determinations could arise in an action involving the
    employer and another terminated employee arising out of the same transaction]; *Fitzhugh v.*
27  *Granada Healthcare and Rehabilitation Center, LLC* (2007) 150 Cal.App.4th 469 475-476
    [denying healthcare provider's petition to compel arbitration of wrongful death claims brought by
28  decedent's survivors, where only one of the survivors was subject to arbitration clause and where
    claims involved common question of fact].)

-10-

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

*supra.*)  These common issues of fact create a risk of inconsistent rulings.  Accordingly, the arbitration should be stayed pending resolution of the court action.

**4.    Staying the Arbitration is the Most Appropriate Course of Action Given the Nature of the Related Proceedings and the Parties Involved.**

As noted above, if the conditions of section 1281.2, subdivision (c) are met, the court has several options, including joining all of the parties in a single action, staying the court action, or staying the arbitration.  (Code Civ. Proc., § 1281.2.)  In this case, the court should exercise its discretion to stay the arbitration pending the outcome of the court action, as this provides the most efficient and equitable means of resolving the parties' disputes.  Joinder of all the parties in one action is neither feasible nor necessary in this case as all of the relevant parties are already joined in the same civil action in superior court.[6]

Rather, staying the arbitration ensures that the court both avoids the risk of inconsistent rulings and avoids exposing OIG—a third party—to liability based on findings in the arbitration to which OIG cannot be joined as a party.  Courts have held that staying the arbitration is appropriate in cases where the arbitration might reach findings of facts that could expose a third party to liability, especially where that third party is unable to defend itself in the arbitration.[7]  This was true of the third-party inspectors in *Best Interiors, Inc., supra*, 161 Cal.App.4th 1320.  There, the inspectors had no way of defending themselves in the arbitration between the general and sub-contractor.  (*Id.* at pp. 1329-1330.)  The court found that it was entirely possible for an arbitrator to find the inspectors acted as agents of one of the parties and thereby expose them to liability in the civil action.  (*Ibid.*)

Similarly, the arbitration in this case will involve factual and legal questions that will necessarily impact OIG's standing in the civil action.  Like the inspectors in *Best Interiors, Inc.*, OIG is a third party that cannot be joined to, nor can it defend itself in, the requested arbitration.

---

[6] The court action has since been removed to federal court.  (Petition, p. 4, fn. 1.)

[7] See also *C.V. Starr & Co. v. Boston Reinsurance Corp.* (1987) 190 Cal.App.3d 1637, 1641-1642 [petition to compel arbitration of claims brought in superior court denied on the basis that there was a risk of conflicting rulings on issue of allocation of settlement award among several insurers who were not subject to arbitration clause.]

-11-

1  The arbitrator could find that OIG did not provide the appropriate notice and representation to

2  employees during the course of its investigation. This could expose OIG to liability in the civil

3  action without affording OIG the opportunity to defend itself in the arbitration. Consequently, for

4  the same reasons articulated by the court in *Best Interiors, Inc.*, CCPOA's petition to compel

5  arbitration must be denied, and the court should exercise its discretion to stay the arbitration

6  pending resolution of the related civil action.

**B.   The Petition to Compel Should Also be Denied Because Respondents Have Not Refused Arbitration.**

9       To obtain an order compelling arbitration petitioner must show respondents refused to

10 arbitrate the controversy. (Code Civ. Proc., § 1281.1) Petitioner failed to allege facts sufficient to

11 demonstrate that either CDCR or CalHR refused to arbitrate in this case. As conceded by

12 petitioner, CalHR and CCPOA were working in good faith toward scheduling arbitration at the time

13 that CCPOA filed the Petition. On December 3, 2015, the parties decided on two possible

14 arbitrators for a potential February 2016 hearing. (Lindsay Decl., ¶ 16, p. 4:23-24.) On December

15 4, 2015, CalHR's attorney, contacted an arbitrator and asked if he was available to hear the matter in

16 February. (Lindsay, ¶ 17, Attch. 14.) After receiving the Arbitrator's available dates, CalHR's

17 attorneys began working immediately to determine who the relevant witnesses were and whether

18 they would be available on any of proposed dates. However, because the information provided by

19 CCPOA about individuals involved in the alleged misconduct was incomplete, CalHR was not

20 immediately able to determine their availability. (See Lindsay Decl., Attch. 13 [omitting names of

21 key CDCR managers].)

22      Respondents' attorney never said anything to CCPOA that would indicate Respondents'

23 unwillingness to proceed to arbitration. (See Lindsay Decl.) In fact, according to petitioner, CalHR

24 was actively making arrangements for arbitration, contacting the arbitrator, and talking to witnesses

25 about their availability. (Lindsay Decl., ¶¶ 8-24.) Despite CalHR's efforts to schedule the

26 arbitration, CCPOA apparently interpreted a few days' delay in CalHR's response, during the week

27 of Christmas, as tantamount to a refusal to arbitrate. Indeed, petitioner appears to concede that

28 CalHR's response to CCPOA's arbitration request was not even required until December 22, 2015—

1   just one day before CCPOA filed the present petition to compel arbitration. (Lindsay Decl., ¶ 25.)

2          Delays are normal in any legal proceeding, especially arbitration. It is not unusual for

3   arbitrations to take years before they are heard. Even arbitrations heard on an expedited basis, may

4   take at least one to two months to schedule. (See Lindsay Decl., Attch. 9 [showing previous

5   expedited arbitration that was not heard until approximately a month and half after the grievance

6   was filed].) A mere delay of several weeks for an expedited arbitration is not unusual and cannot be

7   equated to a constructive refusal to arbitrate, especially whereas here the parties had agreed on

8   arbitrators and a general time frame in which to hear the dispute.[8]

9          To put the matter into perspective, CCPOA delayed filing its own grievance in this matter

10  for a period of 21 days after it became aware of respondents' alleged MOU violations. (Lindsay,

11  Attch. 1.) In contrast, CCPOA gave CalHR only 18 days to schedule the arbitration after the parties

12  had agreed on an arbitrator. If CalHR's 18-day delay was so egregious, given the exigency of the

13  circumstances, why did CCPOA wait just as long if not longer to file its grievance in the first place?

14  It is disingenuous for CCPOA to claim that CalHR's delay in scheduling the arbitration warrants a

15  petition to compel expedited arbitration, when CCPOA waited just as long to file its own grievance

16  in the matter. Petitioner's claim that CalHR's delay is tantamount to a refusal to arbitrate must be

17  rejected.

18         Consequently, petitioner fails to establish a fundamental requirement for an order

19  compelling arbitration under section 1281.2. Respondents have not refused to arbitrate the

20  controversy at issue; therefore, the petition must be denied.

21  / / /

22  / / /

23

24         [8] Nor is CalHR's assertion that the arbitration must be stayed tantamount to a refusal to
    arbitrate. In light of CCPOA's related civil matter, which is based on the same facts as the present
25  arbitration, respondents' position is that a stay is appropriate. CalHR did not even decide that
    staying the arbitration might be appropriate until after it was provided a copy of CCPOA's court
26  action on or about December 15, 2015. (Kelly Decl., ¶ 10.) CalHR never indicated a desire to stay
    arbitration prior to CCPOA's filing of the petition. Moreover, a request to stay arbitration is not
27  tantamount to a refusal to arbitrate the controversy. If other arbitrable issues remain after the
    conclusion of the civil matter, CalHR is not opposed to proceeding to arbitration on those issues.
28  Consequently, it would be inappropriate for petitioner to argue or for the court to find that
    respondents' current request to stay the arbitration is equivalent to a refusal to arbitrate.

1

**C.    In the Event the Court Decides to Grant the Petition, the Appropriate Order is One for Normal, Not Expedited, Arbitration.**

2

3    Petitioner asks the Court for an order compelling "expedited" arbitration under section

4  1281.2. Pursuant to the MOU, "expedited arbitration" is available only in situations in which

5  "irreparable injury will result from threatened action" and for which there is "no adequate remedy at

6  law." (Respondents' RJN, Villalba Decl., Exh. A, MOU § 6.11(C).)

7    CCPOA's basis for claiming "expedited arbitration" is flawed for several reasons. First,

8  CCPOA's initial delay in filing its grievance undercuts Petitioner's claim that the threat of

9  irreparable harm in this case is immediate and requires expedited resolution. After becoming aware

10  of the facts giving rise to the arbitration on or about October 13, 2015, CCPOA waited more than

11  three weeks before filing the grievance. (See Lindsay Decl., Attch. 1, Part IV.B.) CCPOA allowed

12  this delay to occur during an active OIG investigation in which its members rights were allegedly

13  being violated. Such action is inconsistent with CCPOA's claim that its members are suffering from

14  irreparable harm.

15    Second, and moreover, CCPOA's basis for claiming "expedited arbitration" is flawed as

16  there is no current threat of irreparable harm. OIG's investigation concluded on or about December

17  16, 2015, following which a report was issued on the findings of the investigation. (Kelly Decl., ¶

18  11; see also Respondents' RJN, Villalba Decl., Exh. B.) Accordingly, there is no immediate threat

19  of irreparable harm warranting expedited arbitration.

20    Apparently, CCPOA's continued insistence on expedited arbitration even though OIG's

21  investigation has concluded is based on a concern that similar misconduct *might* recur. (Kelly

22  Decl., ¶ 6.) However, the mere possibility of recurrence is not a sufficient basis for establishing a

23  threat of irreparable harm. (See *Korean Philadelphia Presbyterian Church v. California Presbytery*

24  (2000) 77 Cal.App.4th 1069, 1084, as modified (Feb. 9, 2000).) In the context for injunctive relief,

25  which applies essentially the same legal standard as expedited arbitration, courts have held

26  speculation that something might occur in the future is insufficient to establish an irreparable harm.

27  (*Ibid.*) "An injunction cannot issue in a vacuum based on the proponents' fears about something

28

-14-

1 | that may happen in the future. It must be supported by actual evidence that there is a realistic

2 | prospect that the party enjoined intends to engage in the prohibited activity." (*Ibid.*)

3 |     Here, OIG's investigation has concluded. Nothing in CCPOA's petition suggests a "realistic

4 | prospect" that OIG intends to engage in the alleged conduct again. Accordingly, an order for

5 | expedited arbitration is not warranted under the present circumstances.

6 | **IV.**

7 | **CONCLUSION**

8 |     Petitioner has sought to litigate common issues of law and fact in two separate actions and

9 | has thereby created a situation in which it is necessary to deny the petition to compel and stay the

10 | arbitration pending. Allowing arbitration to proceed in this case would contravene section 1281.2,

11 | as well as the judicial interest in avoiding inconsistent rulings in actions based on the same set of

12 | laws and facts. Accordingly, this court should deny the petition to compel expedited arbitration and

13 | stay the arbitration pending resolution of the related court action.

14

15

16 | Dated: January 4, 2016

17

18 |     Respectfully submitted,

19 |     JOAN A. MARKOFF
    Chief Counsel

20 |     FROLAN R. AGUILING
    Deputy Chief Counsel

21

22

23 | By:     _____

24 |     DAVID M. VILLALBA
    Labor Relations Counsel
    Attorneys for Respondent

25

26

27

28

-15-

**OPPOSITION TO PETITION TO COMPEL ARBITRATION**

# EXHIBIT E

VICE-CHAIR
JEAN FULLER

MEMBERS
ANTHONY CANNELLA
CONNIE M. LEYVA
HOLLY J. MITCHELL

**CALIFORNIA LEGISLATURE**

SECRETARY OF THE SENATE
DANIEL ALVAREZ

DEPUTY SECRETARIES
SHERON VIOLINI
BOB RUFFNER
GAIL LANG

COMMITTEE ASSISTANT
JANE LEONARD BROWN



# SENATE RULES COMMITTEE

### KEVIN DE LEÓN
CHAIR

June 25, 2015

Robert A. Barton
Inspector General
Office of the Inspector General
10111 Old Placerville Road, Suite 110
Sacramento, CA 95827

Dear Inspector General Barton:

The Senate Rules Committee authorizes the Office of the Inspector General to review the practices at High Desert State Prison (HDSP) in Susanville with respect to (1) excessive use of force against inmates, (2) internal reviews of incidents involving the excessive use of force against inmates, and (3) protection of inmates from assault and harm by others. We also request that you consult with, and recommend appropriate actions to, the Office of Internal Affairs within the Department of Corrections and Rehabilitation regarding your review and that you provide this Committee with a written report detailing the results of your review.

A number of allegations have surfaced that raise concern about whether some members of HDSP staff are engaged in a pattern or practice of using inappropriate and excessive force against inmates and whether there is adequate protection of inmates from harm at the prison. The following allegations have prompted this authorization for a review:

- A March 2015 incident involving a mobility-impaired inmate who was reportedly assaulted by staff, and consequently required outside medical treatment, for refusing to remove and relinquish footwear worn to assist with his medical condition.

- A March 2015 incident involving a hearing- and speech-impaired inmate who was reportedly wrestled to the ground and severely assaulted after noncompliance with oral instructions from custodial staff even though the inmate was wearing a brightly-colored vest identifying his impairments.

- A March 2015 incident involving an inmate who was attacked by his cellmate after custodial officers allegedly told other inmates that he was a sex offender. Prior to the incident, the

Robert A. Barton, Inspector General
June 25, 2015
Page 2

inmate who was attacked allegedly reported to staff that he was being extorted by other inmates and feared harm from his cellmate.

- The assault of an inmate in late 2014 and early 2015 after he was denied a request to be placed in protective administration segregation because of rumors that he was a sex offender.

In addition to the specific incidents noted above, there have been general allegations asserted that some members of custodial staff refer to inmates as "sodomites" or sex offenders in the presence of other inmates and disclosed inmates' commitment offenses to others; actions which would place inmates at risk of harm from other inmates.

Ensuring the safety of both inmates and staff in our state prison system is amongst the paramount objectives of the Department of Corrections and Rehabilitation. It is vital that the Senate determine, through a review by the Office of the Inspector General, whether there is a pattern or practice among members of the custodial staff at HDSP that contradicts that objective.

The Senate Rules Committee looks forward to working with you on this matter.

Sincerely,

**KEVIN DE LEÓN**
**President Pro Tempore**
**Twenty-Fourth Senate District**

# EXHIBIT F

**Robert A. Barton**
**Inspector General**

# Office of the Inspector General

# 2015
# Special Review:
# High Desert State Prison
# Susanville, CA



**December 2015**

**Fairness ◆ Integrity ◆ Respect ◆ Service ◆ Transparency**

# Office of the Inspector General
# 2015 Special Review:
# High Desert State Prison



Robert A. Barton
*Inspector General*

Roy W. Wesley
*Chief Deputy Inspector General*

10111 Old Placerville Road, Suite 110
Sacramento, CA 95827
Telephone: 916-255-1102
Facsimile: 916-255-1403

December 2015

# Table of Contents

FOREWORD ........................................................................................................ i

    Scope, Methodology, and Objective ...................................................... i

    Summary of Findings .............................................................................. ii

BACKGROUND ............................................................................................... 1

    High Desert State Prison ......................................................................... 1

    Media Attention, Legislative Scrutiny, and Past OIG Reports ............... 3

ENTRENCHED CULTURE ............................................................................. 7

    Remote Location ...................................................................................... 7

    The Susanville "Car" Mentality and Code of Silence ............................. 9

    Peer Review .............................................................................................. 9

    Racism and Implicit Bias ......................................................................... 11

    The Need For Increased Inmate Programming and Staff Resiliency Training ........ 13

    The California Correctional Peace Officers Association ......................... 15

    Recommendations to CDCR ................................................................... 17

SEX OFFENDERS AND THE R SUFFIX ..................................................... 19

    R Suffix .................................................................................................... 19

    SOMS Access .......................................................................................... 20

    Recommendations to CDCR ................................................................... 21

SENSITIVE NEEDS YARDS ......................................................................... 22

    Recommendations to CDCR ................................................................... 26

INMATE APPEALS AND STAFF COMPLAINTS ...................................... 27

    Appeal Collection and Processing .......................................................... 27

    Volume of Appeals at HDSP ................................................................... 28

    Staff Complaints ...................................................................................... 29

    Disincentives to Filing Staff Complaints ............................................... 31

    Recommendations to CDCR ................................................................... 32

USE OF FORCE INCIDENTS ....................................................................... 34

    HDSP Use of Force Frequency ............................................................... 34

    The Need For Cameras in All Inmate Areas ........................................... 36

    The Need to Pilot a Program Using Body Cameras ............................... 37

    Allegations That Staff Are Slow to Respond to Incidents ...................... 38

    Recommendations to CDCR ................................................................... 39

*ARMSTRONG* REMEDIAL PLAN–ADA INMATES....................................................... 40

    Disability Placement Program ........................................................................... 40

    Callous Treatment of DPP Inmates.................................................................. 41

    Internal Compliance Reviews and Plaintiff Tours ........................................... 42

    Recommendations to CDCR............................................................................. 47

INTERNAL AFFAIRS INVESTIGATIONS ................................................................ 48

    Hiring Authority Referrals and Internal Allegation Inquiries.................................. 48

    Allegations of Misconduct Involving HDSP Staff ................................................ 49

    Office of Internal Affairs Resident Agents ....................................................... 53

    Recommendations To CDCR ........................................................................... 54

FINDINGS AND RECOMMENDATIONS................................................................... 55

CONCLUSION .......................................................................................................... 61

APPENDICES ........................................................................................................... 63

    Appendix A–Senate Rules Committee Authorization Letter………………….......64

    Appendix B–CDCR Memorandum: Enhanced Program Facility Institutions….......66

    Appendix C–CDCR Memorandum: Secure Appeal Collection Sites and Related

        Matters.....................................................................................................69

    Appendix D–CDCR Zero Tolerance Regarding the Code of Silence………..….71

    Appendix E–Peer Review–High Desert State Prison……………………..………72

    Appendix F–Police Racial Violence: Lessons From Social Psychology………....89

    Appendix G–Center for Mindfulness in Corrections……………….………..….105

    Appendix H–Average Number of Incidents per 100 Inmates, June 2014-June

        2015……………………………………………….……….…………107

    Appendix I–Average Number of Inmate Disciplinary Actions per 100 Inmates June

        2014-June 2015 ..……….…………………………………….....108

    Appendix J–WCI Taser Body Camera Pilot.....................................…....…………109

# FOREWORD

On June 25, 2015, the Office of the Inspector General (OIG) received a request and authorization[1] from the Senate Committee on Rules, to review the practices at High Desert State Prison (HDSP) in Susanville, California, with respect to:

1. Excessive use of force against inmates,
2. Internal reviews of incidents involving excessive use of force against inmates,
3. Protection of inmates from assault and harm by others, and
4. *Armstrong* class inmates.[2]

In its request, the Senate Committee reported that a number of allegations surfaced that raised concerns about the safety of both inmates and staff. As part of this review, the OIG requested the California Department of Corrections and Rehabilitation's (CDCR or the department) Office of Internal Affairs (OIA) immediately open expedited investigations into each allegation; the OIG is monitoring these investigations. The incidents are discussed later in this report. In addition to these specific incidents, the Senate Committee noted that there have also been general allegations asserted that some members of custody staff at HDSP refer to inmates as "sodomites" or "sex offenders" in the presence of other inmates and disclose inmates' commitment offenses, placing inmates at risk of harm from other inmates.

Ultimately, this review is intended to determine whether there is a culture among the custody staff at HDSP that contradicts the CDCR's paramount objective of ensuring the safety of both inmates and staff in the prison system.

## SCOPE, METHODOLOGY, AND OBJECTIVE

The scope of this special review encompasses the areas of the Senate Committee on Rules' request described above, along with the statutory mandate of Penal Code (PC) Section 6126, which requires the OIG to identify areas of full and partial compliance, or noncompliance, with departmental policies and procedures, specify deficiencies in the completion and documentation of processes, and recommend corrective actions, including, but not limited to, additional training, additional policies, or changes in policy, as well as any other findings or recommendations deemed appropriate.

During the course of its review, the OIG examined applicable laws, policies, and procedures; revisited past reports and media accounts; interviewed staff and inmates formerly assigned to HDSP; reviewed complaints filed by former HDSP staff and deposition testimony from the *Jones v. Cate* litigation; reviewed inmate appeals, disciplinary actions, confidential inmate files, and complaints against staff; reviewed misconduct allegation inquiry reports, internal affairs investigation reports, and death review reports; and actively monitored 20 misconduct investigations involving HDSP staff.

---

[1] A copy of the authorization can be found in Appendix A.
[2] The *Armstrong* class action lawsuit is discussed in detail on page 40 of this report.

# Summary of Findings

There is evidence that a perception of insularity and indifference to inmates exists at High Desert State Prison, exacerbated by the unique geographical isolation, the high stress environment, and a labor organization that opposes oversight to the point of actively discouraging members from coming forward with information that could in any way adversely affect another officer. These aspects coupled with the difficult missions at HDSP have helped create an entrenched culture of self-protection and loyalty to HDSP above everything else.

Accounts from both staff and inmates depict a culture of indifference perpetuated by at least some staff. Reports from inmates of appeals being read and destroyed and officers using profane and derogatory language directed at inmates were corroborated by at least some staff.

The conflicting missions at HDSP make it difficult for vulnerable inmates, whether by commitment offense or disability, to program safely. Hardline officers run some yards with little regard for vulnerable inmates. The most extreme example is the Level IV sensitive needs yard (SNY) facility, which is just as violent as the general population (GP) yards, with gang politics meting out abuse and punishment for drug and gambling debts and extorting vulnerable inmates for protection, all of which is exacerbated by the tacit acquiescence of custody staff.

The department's use of the R suffix to designate the restricted custody of certain inmates has served as a bull's-eye target at HDSP and other prisons, most notably on SNY yards. Based upon this review and observations in prior OIG reports, the continued use of sensitive needs yards merits a complete overhaul.

The inmate appeals system at HDSP is not functioning adequately and the staff complaint process is broken. Very few staff complaints were referred for investigation and those that were referred have not been adequately monitored and tracked for response. Also, HDSP does not have a process for addressing officers who are repeatedly accused of misconduct by different inmates. There are statistical trends, continued complaints, and recent misconduct allegations that cause alarm about the use of force at HDSP.

Finally, the OIG found that the use of resident agents by the Office of Internal Affairs is a poor practice, and should be discontinued, especially at HDSP in light of the issues that arose from the placement of a resident agent at that institution. Additionally, the processes in place for allegation inquiries at HDSP are inadequate, and could be improved statewide. The OIG is monitoring several misconduct investigations that, but for this review, may not have been opened or investigated to the broadest extent appropriate. Because the investigations have not been completed, only the general facts are discussed in this report, but results will be published in a future OIG Semi-Annual Report. The OIG made 7 broad findings and 45 specific recommendations during this review (see pages 55 to 60 for a detailed list).

--- Robert A. Barton, Inspector General

# BACKGROUND

## HIGH DESERT STATE PRISON

In 1995, the department activated High Desert State Prison adjacent to the grounds of the California Correctional Center (CCC), in Susanville, CA. Since its activation 20 years ago, HDSP has undergone continuing changes to its mission, and today each facility houses a population uniquely different from the adjacent yards. According to CDCR's website, the primary mission of HDSP is to provide for the housing[3] and programming of general population and sensitive needs high security (Level IV) and sensitive needs medium security (Level III) inmates. The inmate population consists of three Level IV yards, two of which are 180-degree design buildings (Facility C and Facility D), and one 270 design building (Facility B). Facility B was converted to a sensitive needs yard in October 2007, which houses Level IV SNY inmates.

| HDSP Facility | Housing Type | Custody Level | Number of Housing Unit Buildings |
|---|---|---|---|
| A | SNY | III | 4 |
| | Reentry Hub | III | 1 |
| B | SNY | IV | 5 |
| C | EPF | IV | 8 |
| D | GP | IV | 7 |
| | ASU | III/IV | 1 |
| E | MSF | I | 2 |
| Z | ASU | III/IV | 1 |

In mid-2015, Facility A was converted from a Level III general population yard to a Level III sensitive needs yard. The stated purpose of the conversion was to: 1) assist the department in reducing the number of Level III GP vacancies and reduce current Level III SNY overcrowding; 2) further allow increased Reception Centers (RC) inmate movement, and mitigate potential inmate backlogs in the RC, which impede CDCR's ability to accommodate weekly county intake; and 3) assist in efforts to meet the Level III SNY crowding standard, as outlined in *The Future of California Corrections Blueprint.* Facility A is also the home of the Reentry Hub Facility, which has the goal of providing relevant training and services to eligible and interested inmates in order to facilitate the successful transition back to their communities and reduce their likelihood of reoffending.

---

[3] An inmate's classification determines the type of housing in which he will be placed. Level I or II inmates may be housed in open dormitory settings. Level III and IV inmates are placed in 180-degree design or 270 celled housing units. The number of degrees refers to view from a central elevated control booth. The "180-degree" design is a configuration of the cellblocks (housing units). The cellblocks are partitioned into three separate, self-contained sections, forming a half circle (180 degrees). The partitioning of sections, blocks, and facilities ensures maximum control of movement and quick isolation of disruptive incidents, thereby ensuring effective overall management of inmates.

On January 1, 2014, Facility C became the location of one of CDCR's seven enhanced program facilities (EPF). According to CDCR's EPF activation memo,[4] EPFs are designed to "offer incentives for inmates who, based on their own behaviors and choices, are ready to take full advantage of programming opportunities." The EPFs are designed to provide programs and privileges not readily available on other yards, such as advanced college degree programs, increased canteen draw, and an expanded property allowance, with the goal to incentivize and reinforce positive behavior. While HDSP Facility C has been designated an EPF for nearly two years, it appears to be an EPF in name only, as staff estimate that 95 percent of the inmates in the EPF do not meet the criteria, and are only placed there because they meet the general Level IV housing criteria, with no enemy concerns, and not because they voiced a desire to participate in enhanced programming.

HDSP's Facility E is the minimum support facility (MSF), which houses non-camp eligible Level I inmates who perform job duties in various areas of the institution outside the secure perimeter.

The Administrative Segregation Unit (ASU) was originally located on Facility D, a 180-design housing unit, and consisted of two buildings, D7 and D8. Within the first three years of HDSP's activation, it became apparent that the building originally designed and designated as the ASU was not adequate to meet the demands of the inmate population who require segregated housing. Construction on a new stand-alone ASU began in October 2001. The new unit was named Facility Z and activated in September 2004, but buildings D7 and D8 continued to also serve as ASU beds, until just recently, when building D7 reverted back to GP housing.

Finally, while this area is addressed in depth later in this report, it should be noted that HDSP has been a designated Disability Placement Program (DPP) institution since at least 1997. This means that inmates with verified disabilities impacting their placement (such as wheelchair users or inmates with impairments to their mobility, vision, hearing, or speech) can be housed at HDSP, with the expectation that these inmates will be provided access to programs and services, with reasonable accommodation when required. The requirements of the DPP are laid out in the *Armstrong* court-ordered remedial plan. *Armstrong* is a class action lawsuit brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act in 1994, on behalf of inmates and parolees with disabilities.

No two yards at HDSP have the same mission. According to CDCR, the design capacity for housing inmates at HDSP is 2,324 with a staffed capacity of 3,461.[5] While the actual number of inmates housed at the prison changes daily, the total number of inmates housed at HDSP on November 30, 2015, was 3,482, or 149.8 percent of its design capacity.

---

[4] A copy of the EPF memo can be found in Appendix B.
[5] http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Monthly/TPOP1A/TPOP1Ad1511.pdf

In the last eight years, HDSP has had six different wardens or acting wardens. Suzanne Peery was the acting warden at HDSP from February 2, 2015, until December 1, 2015. Peery has spent her entire corrections career in Susanville, starting at CCC in 1988 before transferring to HDSP in 2006 as the employee relations officer, and ultimately working her way up to Chief Deputy Warden before being named acting warden.

Adjacent to HDSP is the California Correctional Center, which houses approximately 2,196 inmates with responsibility for an additional 1,726 inmates assigned to fire camps, giving it a total population of 3,922 inmates. It is also worth noting that located 37 miles south of Susanville is Federal Correctional Institution, Herlong, a medium security federal correctional institution with an adjacent minimum security satellite camp, which houses approximately 1,445 male offenders.

## MEDIA ATTENTION, LEGISLATIVE SCRUTINY, AND PAST OIG REPORTS

### 2007 PBS documentary: Prison Town, USA

Susanville was the subject of a 2007 PBS documentary titled Prison Town, USA. The program focused on the prison building boom and the common practice of siting prisons in rural towns, due to the "NIMBY" (Not In My Back Yard) policies of large metropolitan cities, coupled with the desire of city officials to generate jobs in rural communities that have suffered an economic downturn due to the closure of anchor employers such as sawmills. The program examined the impact of building HDSP in a town that already had a State prison and a federal prison. The program followed the lives of specific officers (some of whom still work at a Susanville prison) and their families over the course of two years. According to the PBS website:

> The resulting story is one of hard choices and unanticipated consequences. As Susanville's good-hearted country-boys-turned-prison-guards soon learn, life outside the walls is developing eerie parallels to life on the inside. At the correctional officer training academy, officers have to learn new skills and attitudes, often quite foreign to their upbringing. Besides the obvious dangers of the job, the constant tension spills into the [officers'] home lives, changing how they relate to their families and friends. In a sense they, too, are imprisoned — a reality that is hard to shake once they leave work.

According to the documentary's co-director, Katie Galloway, one reason for making the film was: "We hope this film will awaken people to the real consequences of prison expansion, particularly in rural areas that have been so important in forming the history and character of California and the country."

### July 2008 Evaluation of the Behavior Modification Unit Pilot Program at High Desert State Prison, Conducted by CDCR's Adult Research Branch

In July 2008, the department published an evaluation report of its Behavior Modification Unit (BMU) Pilot Program, which was implemented at HDSP on November 21, 2005. This program was developed and implemented to respond to disruptive inmate behavior

that was not serious enough to warrant ASU or Security Housing Unit (SHU) placement, but was disruptive to the general population. The report contained inmate interviews and stated that some of the accounts were rather typical inmate complaints, while others were serious allegations of mistreatment, such as inmates (some clad only in socks and boxer briefs) forced to stand outside in the snow for over two hours. Recurring themes included racism, retaliation for filing appeals, and officers provoking physical altercations.

**May 2010 Sacramento Bee articles, written by Charles Piller, titled: "*Guards accused of cruelty, racism*" and "*California prison behavior units aim to control troublesome inmates*"**

The headline for a two part series in the Sacramento Bee described the report as an "investigation into the behavior units at High Desert State Prison, including signed affidavits, conversations and correspondence with 18 inmates … [which] uncovered evidence of racism and cruelty at the Susanville facility."

**December 2010 California State Senate Review of the BMU at HDSP**

After the publication of the Sacramento Bee articles referenced above, staff working on behalf of the California State Senate reviewed hundreds of documents and conducted numerous interviews to better understand and assess the allegations referenced in the article. The Senate cited the need for improvement in the department's system of accountability to ensure that allegations of abuse and misconduct in correctional institutions are addressed swiftly, systematically, and fairly for all involved. The Senate's review of the circumstances that gave rise to the public scrutiny of conditions at the BMU at HDSP highlighted the importance of making sure that the department's methods for handling reports of inmate abuse or staff misconduct are performing well. The review stated, "Every means by which the department receives information about prison conditions - whether formal or informal, or from an inmate, employee or member of the public is a valuable opportunity for the department to ensure the integrity of its operations. Every observer ought to be regarded as an asset, and every supervisor ought to be empowered as a portal through which information about prison conditions will be shared, evaluated, investigated and addressed." The Senate's review of the BMU allegations suggested that the department would be well served by a recalibration of how it handles complaint allegations, from intake through investigation and resolution.

**September 2011 OIG Special Report: CDCR's Revised Inmate Appeal Process Leaves Key Problems Unaddressed[6]**

In January 2011, CDCR revised its inmate appeal process. One of the primary deficiencies CDCR identified in its appeals process was that appeals are not logged until they reach the Appeals Office and appeals do not have a receipt feature, leading to system-wide allegations that appeals were destroyed or lost, either intentionally or negligently.

---

[6] OIG reports can be accessed at www.oig.ca.gov

CDCR's revised process redirects the inmate to the written "request for interview" process, which does require a copy be given to the inmate; however, this report found that if the inmate bypasses this process or elevates the issue to the formal appeal level, there is still no receipt feature.



As a consequence, CDCR's appeal process still does not address inmate allegations that appeals are routinely discarded or read by custody staff and then destroyed if they contain accusations of misconduct.

In response to this report, the department issued a December 30, 2011, directive[7] to all institutions, which, among other mandates, prohibited the reading or inspecting of appeals by anyone other than Appeals Office staff, and required the installation of secure appeals lock boxes in the housing units, retrieval from which shall only be done by Appeals Office staff and/or staff designated by the warden.

## October 2011 OIG Special Review

Between November 8, 2010, and June 16, 2011, the OIG conducted a review of allegations that HDSP staff violated the civil rights of inmates housed in Facility Z, often referred to as "Z Unit," the institution's stand-alone ASU. After reviewing a dozen different categories of alleged abuses, the OIG determined most of the allegations to be unfounded, but discovered concerns with inconsistent laundry exchange practices, a lack of policy direction regarding cold weather searches, inadequate law library access, and failure to provide the required ten hours of exercise yard time per week.

## May 2012 OIG Special Review: High Desert State Prison

As a result of repeated complaints regarding HDSP staff, the Senate Committee requested the OIG conduct a special review to determine whether staff intentionally or negligently allowed inmates to identify sex offender inmates, thereby subjecting inmates to potential

---

[7] A copy of the directive can be found in Appendix C.

harm. Although the review did not result in enough corroboration to pursue all inmate allegations, the volume and relative consistency among the inmate complaints gave credence to the existence of a problem within the Level IV SNY facility at HDSP. The pervasive complaints and incidents revealed should have at least alerted the department and caused some action to make sure such practices were not occurring. However, it appears that no action was taken. It was evident from the number of inmate victims and assailants making allegations of officer misconduct that there was a culture of hostility toward sex offender inmates at HDSP. In addition, some of the officers interviewed at the time indicated that they believed there were officers at HDSP who would provoke inmates into physical altercations to necessitate the use of force. This raised a concern regarding a culture of abuse and code of silence at HDSP, and some of the inmates interviewed believed that they would be retaliated against just for talking to the OIG or CDCR's Office of Internal Affairs.

**August 30, 2015 BuzzFeed News article written by Albert Samaha, titled: *The Job Made Me Do It. The Prison Guard Who Couldn't Escape Prison, Scott Jones loved being a correctional officer at California's High Desert State Prison. Then he saw his colleagues commit enough abuses that he saw no choice but to break the code of silence, turning himself into a pariah in a neighborhood called C/O Row.***

The BuzzFeed article chronicles the events leading up to an officer's suicide, after he "broke what one former prison guard called 'the green wall of silence' — the code of silence that has turned California's state prisons into insular and isolated facilities of unconstitutional conditions, where what happens on the Inside stays on the Inside. It is an unwritten rule meant to protect the men and women tasked with overseeing the state's 130,000 inmates, and Scott had to pay for violating it."

**August 31, 2015 Rolling Stone Magazine article written by Jessica Pishko, titled: *High Desert Suicide: Was a Prison Guard Hazed to Death? At one of the country's most dangerous prisons, correctional officers face off against murderers, rapists, gangsters and each other.***

The Rolling Stone article explores the events leading up to the 2011 suicide of a High Desert State Prison correctional officer (one of five staff suicides since 2008, according to the article).

None of these prior articles or reviews has had the desired impact of permanently improving HDSP. Instead, they were mere harbingers of continued problems that still exist.

# ENTRENCHED CULTURE

### REMOTE LOCATION

Susanville is located in Lassen County, a remote location in rural northeast California. Susanville is located 86 miles from Reno, Nevada; 112 miles from Redding, California; and 106 miles from Red Bluff, California. The 2014 census population estimate for Susanville was 15,543. HDSP and CCC employ 953 and 871 staff, respectively, making them the largest employers in all of Lassen County.



**California Population Density Map**
**Source: United States Census Bureau data compiled by censusviewer.com**

Due to the remote location and distance from other communities, HDSP and CCC mostly pull staff from the local community of Susanville. More so than any other prison locale, those that work at the prisons also interact outside the prison on a daily basis. According to former HDSP staff, many employees' family members work together, socialize together, grew up together, and went to school together. Interacting with members of the prison staff in the community is part of daily life in Susanville. One former employee who relocated to another part of the State reported that when visiting family in Susanville, she stopped visiting any of the major grocery stores or shopping centers because it was inevitable that she would run into former co-workers. Even in the far reaches of Crescent City and Blythe, where prisons are located, there is still a significant percentage of staff that commute from different outlying areas and towns.

Interviews with other former HDSP staff indicated the majority of long term staff at HDSP are from the local community. Many cadets originally from major metropolitan areas of the State who graduate from the academy and get assigned to HDSP will leave as soon as they can transfer to another institution. Former non-white staff reported that Susanville's lack of diversity made it an undesirable community in which to live and they would not choose to return.

Inmate visiting statistics from the last calendar year for a sampling of institutions demonstrate how isolated Susanville is from the rest of the State. Only Pelican Bay State Prison (PBSP) located in Crescent City has comparable visitation statistics, making PBSP, HDSP, and CCC the least visited institutions of those sampled by almost 6,000 visitors per year. On the other hand, California State Prison, Los Angeles County (LAC) in Lancaster received as many visitors as all three of those prisons combined. Not only has a lack of visitors been tied to increased recidivism rates, but it also cuts down on the number of outlets inmates have to report misconduct. Inmates' friends and family members are valuable confidants for inmates to report issues they are experiencing inside the prison.

All of these attributes frame the picture of a location that presents a unique set of challenges that CDCR should factor into consideration for providing guidance and accountability over the management of the prisons it has sited there and the needs of the inmates they have designated for housing in these locations.

**Visiting Statistics Calendar Year 2014[8]**

| Institution, Location | Number of Visitors |
|---|---|
| Los Angeles County (LAC), Lancaster | 31,070 |
| Pleasant Valley State Prison (PVSP), Coalinga | 28,157 |
| Kern Valley State Prison (KVSP), Delano | 23,764 |
| Mule Creek State Prison (MCSP), Ione | 22,555 |
| Folsom State Prison (FSP), Represa | 22,426 |
| Richard J Donovan (RJD), San Diego | 21,758 |
| Salinas Valley State Prison (SVSP), Soledad | 20,340 |
| California State Prison, Sacramento (SAC), Represa | 17,445 |
| High Desert State Prison (HDSP), Susanville | 11,488 |
| Pelican Bay State Prison (PBSP), Crescent City | 11,373 |
| California Correctional Center (CCC), Susanville[9] | 7,638 |

---

[8] The OIG sampled PBSP due to its remote location, SAC and FSP due to their centralized location near the California capitol, HDSP and CCC due to their location in Susanville, and the remaining institutions because they house SNY inmates in various locations throughout the State.

# THE SUSANVILLE "CAR" MENTALITY AND CODE OF SILENCE

Interviews of staff formerly assigned to HDSP indicated the existence of tight-knit social groups among employees, commonly referred to as "cars" within the correctional community. These groups of employees socialize frequently outside of work and are often comprised both of supervisors and correctional officers who work on the same housing units and during the same shifts. In addition, many of the staff are actually related. Spouses, siblings, and cousins are often employed at one or the other institution, literally creating "family" ties.

On one hand, some staff described these groups as mostly innocuous; they would eat lunch together, get each other things from the cafeteria, and barbecue and have drinks together on weekends. Even these former staff members who did not witness any misconduct indicated that supervisors who belonged to these groups would sometimes display favoritism towards the other members of their "car." One former staff member stated that supervisors would assign members of their "car" to favorable work assignments and working hours, such as administrative posts with weekends off, despite other staff being entitled to the positions by operation of the seniority provisions of the Bargaining Unit 6, Memorandum of Understanding[10] (MOU) (the correctional officers' union contract).

On the other hand, some former staff described the negative consequences that could occur if you were not a member of the "car" or if you spoke out or reported misconduct against a member of the "car." These consequences could include unfavorable job changes, being ostracized and labeled as a "rat," shunning in the community, retaliatory investigations, verbal badgering and abuse, the threat of not responding to an inmate assault on staff, and even physical assault by a custody supervisor.

The actual existence or even the perception of a management "car" can lead staff to participate in a code of silence, for fear that the consequences of reporting misconduct will outweigh the risk of remaining silent. Even though the department has a zero tolerance policy[11] for engaging in a code of silence, the OIG found several examples in the HDSP cases currently being monitored.

# PEER REVIEW

In response to ongoing reports of issues at High Desert State Prison, CDCR sent a four-person team to HDSP to conduct a peer review in April 2015. At one time, peer reviews were conducted on a regular basis, although there is no record of one ever being conducted at HDSP prior to this one. CDCR reports that a HDSP peer review was scheduled to occur in May 2010, but did not occur, due to budget cuts.

---

[9] This statistic only includes visitors to inmates housed at CCC in Susanville, not the 18 Northern California conservation camps associated with CCC.
[10] A copy of the MOU can be found at http://www.calhr.ca.gov/Documents/bu06-20130703-20150702-mou.pdf
[11] A copy of the zero tolerance policy can be found in Appendix D.

The peer review team interviewed selected members of HDSP staff and inmate advisory council (IAC) members representing the HDSP inmate populations; randomly interviewed staff and inmates on each facility; and reviewed a variety of documentation. The peer review team found 18 areas of non-compliance[12] at HDSP, some of which are as follows:

- Multiple infractions related to the requirements pertaining to disciplinary action logs, including failure of management to regularly review and approve.
- Lack of program opportunities on the Facility B sensitive needs yard.
- Inaccurate documentation on ASU isolation logs, reflecting inmates were receiving out-of-cell time, when they in fact were not.
- Multiple infractions related to the processing of inmate appeals, including appeals being screened out at a high rate; failure to follow the inmate appeal collection process outlined in policy; by routing appeals to the mailroom instead of the Appeals Office; several overdue inmate appeal modification orders; and failure of the appeals coordinator to meet with the IAC on a quarterly basis, as required.
- Underutilization of the custody sick leave monitoring process.
- Officers not appropriately completing cell search logs and issuing proper receipts, coupled with supervisors and managers not completing required weekly and monthly tours.
- Officers modifying inmate programs, without prior approval of the area manager or Administrative Officer-of-the-Day (AOD).
- Custody staff not carrying their required equipment.

While HDSP does have some new staff, the majority are tenured staff who should be well versed in CDCR's policies and procedures. The type of errors cited in the peer review are indicative of lax supervision, complacency, and management indifference. The institution completed a corrective action plan for all 18 areas of noncompliance and the overwhelming majority of recommendations made by the peer review team to remedy the infractions were for staff to be provided training, which was completed. However, one has to assume that this training was given previously, or should have been. Unfortunately, by requiring staff only receive one-time training, the department has failed to ensure the infractions will not continue to occur. There are no safeguards built into the peer review process, such as requiring HDSP leadership to provide proof that staff have not slipped back into old behaviors, or requiring the peer review team to conduct a follow-up review in a few months. Additionally, no one was held accountable for the policy violations or lack of training in the first place.

The department reports that it is currently in the process of developing a new peer review process. The OIG recommends that in doing so, in addition to requiring the institution to develop a corrective action plan addressing the deficiencies, the department must include a follow-up plan at the headquarters level, to ensure that the identified issues have been completely remedied and no longer exist. In addition, the tool should include an in-depth examination of areas such as inmate staff complaints, large volumes of appeals in

---

[12] A copy of the peer review report can be found in the Appendix E.

particular categories (such as, in the case of HDSP, property), and mandates such as a measurement of the institution's compliance with Department Operations Manual (DOM) Article 44, CDCR's Prison Rape Elimination Act (PREA) Policy.

## RACISM AND IMPLICIT BIAS

In interviews conducted of inmates formerly assigned to HDSP, a common allegation was the existence of overt racism at HDSP. Several former inmates stated that the racism they experienced at HDSP was far worse than they experienced at any other institution where they had been housed. The following excerpts are summarized from individual inmate interviews, conducted separately over the course of this review:

*.. officers called inmates the N-word or wetbacks. Black inmates wouldn't get enough time to eat; the officers would 'kick' the blacks out of the chow hall first and then the Hispanics. The white inmates didn't have to leave, they were running the kitchen.*

*.. officers were more racist than he experienced at his former prison and the white inmates were usually allowed to go to canteen first, and when it was the black inmates' turn, the yard would sometimes be recalled [not allowing time for canteen purchases].*

*.. never saw such a lack of respect toward black inmates than he experienced at HDSP. Officers called black inmates the N-word and threatened them. This disrespect occurred with free staff as well, including medical staff.*

*.. officers at HDSP were especially disrespectful to black inmates. Officers would search the cells of black inmates more often than those of other races, and often for no apparent reason. The disrespect and corrupt environment was far worse at HDSP than other prisons.*

*.. the staff at HDSP are absolutely racist. They are just a bunch of hateful people at that place. It was very different at HDSP compared to other prisons.*

*.. the white staff were very racist and bigoted, not just towards inmates but also towards officers that were of different a race. Staff would search the blacks more than others after chow. It wasn't the search so much; it was the way they did it. He got that KKK and green wall feeling from HDSP.*

*.. there were a lot of disrespectful staff at HDSP. The staff at HDSP were openly racist. The sergeants and lieutenants were worse than the officers. Blacks were treated very differently: they are on lockdowns a lot longer; they go to the hole for the smallest of reasons; and officers messed with their food.*

*.. officers were racist, called black inmates the N-word, and black inmates were locked down for longer periods of time than other races.*

*.. white inmates were assigned the better jobs.*

*.. officers were racist against black inmates because Susanville was a white community.*

*.. officers try hard to not to appear racist, but when you talk to them in private, they use the N-word when referring to black inmates and use derogatory terms directly to inmates.*

*.. the biggest issues are race-related. Once heard an officer call blacks "skid marks." Regardless of who was involved in an incident, the black population was always held responsible. Since HDSP was run by predominately white staff, the white inmates were favored. White inmates always got the better jobs. Clerical jobs were mainly given to white inmates. Black inmates have to wait at the end of the line during canteen. The canteen manager allows Hispanic and white inmates to run canteen, resulting in the black inmates often not getting a chance to have their canteen orders filled.*

The racial composition of HDSP's inmate population and HDSP's custody staff differ drastically. Although 76 percent of custody staff are white, only 18 percent of the total inmate population identifies as white. Hispanic and Black comprise 79 percent of the inmate population at HDSP, but only 21 percent of the custody staff, which includes officers, supervisors, and managers.

**SEPTEMBER 2015, HDSP RACE/ETHNICITY PERCENTAGES**

|  | HISPANIC | BLACK | WHITE | ASIAN | OTHER* |
|---|---|---|---|---|---|
| HDSP Inmates | 54% | 25% | 18% | 2% | 2% |
| HDSP Custody Officers | 20% | 3% | 74% | 3% | 1% |
| HDSP Custody Supervisors & Managers | 10% | 1% | 89% | 0% | 1% |

*Other includes American Indian, Pacific Islander

OIG interviews highlighted a culture of racism and lack of acceptance of ethnic differences. From the casual use of derogatory racial terms to de facto discrimination, it became apparent to the OIG that there is a serious issue at HDSP and that the institution's leadership appears oblivious to these problems.

In addition, the remote, rural location and lack of diversity in the Susanville population could give the perception that non-white residents are not welcome. One former HDSP staff person stated that he was warned at the academy to be careful in Susanville due to his race. He said that other non-white staff that had formerly worked in Susanville stated they would never go back to Susanville, due to its lack of diversity.

The culture at HDSP could benefit from programs that are becoming more and more prevalent in police departments, which educate officers about the influence of implicit biases. Implicit bias describes the automatic association people make between groups of people and stereotypes about those groups. Under certain conditions, those automatic associations can influence behavior—making people respond in biased ways even when they are not explicitly prejudiced.

Discussions of implicit bias in policing tend to focus on implicit racial biases; however, implicit bias can be expressed in relation to non-racial factors, including gender, age, religion, or sexual orientation. As with all types of bias, implicit bias can distort one's

perception and subsequent treatment either in favor of or against a given person or group. In policing, this has resulted in widespread practices that focus undeserved suspicion on some groups and presume other groups innocent.

Research has shown that it is possible to address and reduce implicit bias through training and policy interventions with law enforcement agencies. Research suggests that biased associations can be gradually unlearned and replaced with nonbiased ones.[13]

In 2015, the US Department of Justice (DOJ) announced six cities to host pilot sites for the National Initiative for Building Community Trust and Justice, which will seek to assess the police-community relationship in each of the six pilot sites, as well as develop a detailed site-specific plan that will enhance procedural justice, reduce bias, and support reconciliation in communities where trust has been eroded. One of the host pilot sites is Stockton, CA. The three-year grant has been awarded to a consortium of national law enforcement experts from John Jay College of Criminal Justice, Yale Law School, UCLA's Center for Policing Equity, and the Urban Institute.

In addition, law enforcement agencies can request training, peer mentoring, expert consultation, and other types of assistance on implicit bias, procedural justice, and racial reconciliation through DOJ's Office of Justice Program's Diagnostic Center. The initiative launched a new online clearinghouse that includes up-to-date information about what works to build trust between citizens and law enforcement.[14]

## THE NEED FOR INCREASED INMATE PROGRAMMING AND STAFF RESILIENCY TRAINING

As described earlier, HDSP houses high security (Level IV) general population and sensitive needs inmates and medium security (Level III) sensitive needs inmates. Three of the institution's four main yards are classified as Level IV housing. HDSP also maintains a stand-alone administrative segregation unit. As a high security institution, HDSP houses the most violent and dangerous male offenders.

Prison populations consisting predominantly of people serving long sentences can be difficult to manage because inmates can have a sense of hopelessness and a "what have I got to lose" attitude that can lead to continued criminality and violent behavior. Couple this with half of the HDSP inmate population[15] needing protection due to vulnerability based on commitment offense or disability, and correctional officers can be unprepared for dealing with these populations. One way to mitigate these behaviors is through meaningful programming opportunities and programs that offer incentives to those who participate, whether that means extra privileges or activities that give a sense of accomplishment. Unfortunately, HDSP's Level IV sensitive needs yard has very few programming opportunities, and the enhanced program facility on its Level IV general population yard, by staff's own account, consists mainly of inmates resistant to

---

[13] An article from the Fordham Law Review related to implicit bias can be found in Appendix F.
[14] The clearinghouse can be found at www.trustandjustice.org.
[15] Two of the four main facilities at HDSP house inmates designated as sensitive needs.

programming. Increasing programming on these yards and ensuring the right population is placed into the EPF could reduce the violence and continued criminality that exists at HDSP.

Working around such dangerous individuals on a daily basis can be a highly stressful experience. CDCR does not have a program that adequately trains its staff or gives them the tools to cope with working in such a stressful environment. Additionally, in the tightknit, rural community of Susanville, where many people work and socialize together, there are few outlets for staff to seek assistance when they feel their complaints of mistreatment are not being addressed by prison leadership. There have been staff suicides reported and some staff reported retaliation for bringing misconduct forward.

There is a staff resiliency training program being developed by the Center for Mindfulness in Corrections,[16] which CDCR is considering piloting at one of its Level IV institutions. The program is geared toward developing consistent and healthy self-care practices and a "safe environment to disengage from negative drama." This type of resiliency program is showing promising results in law enforcement agencies across the country. The department should consider piloting this or a similar program at HDSP, and then expanding statewide.

In addition, CDCR should ensure HDSP is following the requirements of DOM Sections 33010.30 – 33010.30.3, related to staff in high stress assignments. High stress assignments are defined as those in controlled housing units requiring direct and continuous contact with inmates confined therein because they present too great a management problem for housing in general population settings. Such housing unit assignments include, but are not limited to: SHUs, ASUs, psychiatric services units, and protective housing units. The policy requires:

- Employees be carefully evaluated before such assignment.
- Employees to have demonstrated a high degree of maturity, tolerance, and ability to cope with stressful situations.
- Assignments shall be limited to no longer than two years, with exceptions allowed by the warden when the employee indicates a desire to remain, or the employee's performance is completely satisfactory and does not reflect the effect of undue stress.
- Supervisors to evaluate the performance of employees on a continuous basis.
- Supervisors to act promptly to remedy stress-related problems that appear to adversely affect the employee's physical and mental health and effectiveness.
- Supervisors to take remedial action including placement in a less stressful assignment in or outside of the unit.

Increasing meaningful inmate programs and maximizing the EPF participation incentives, with the goal of decreasing inmate criminality and violence, while at the same time giving staff the tools to cope with working in a uniquely stressful environment, should result in improved staff morale and a healthier more resilient staff.

---

[16] An outline of the resiliency program can be found in Appendix G.

# THE CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION

The California Correctional Peace Officers Association (CCPOA) is the labor union representing correctional officers. CCPOA's mission is "to promote and enhance the correctional profession, protect the safety of those engaged in corrections and advocate for the laws, funding and policies needed to improve prison operations and protect public safety."[17] However, during the course of the OIG's Senate-authorized review, OIG staff faced significant opposition from the union, which attempted to impede the OIG's informational, non-disciplinary interviews aimed at uncovering the veracity of allegations that the integrity of the correctional profession and the advancement of public safety at HDSP have been compromised.

Despite PC Section 6126.5's provision that all CDCR employees shall comply with the OIG's requests to be interviewed, with the consequence that failure to comply would be considered a misdemeanor, on October 15, 2015, CCPOA circulated the following instruction to its members:

## ALL Unit 6 Employees…. ALL Unit 6 Employees

ALERT…. ALERT…. ALERT…. ALERT…. ALERT…. ALERT…. ALERT….

Agents of the Office of the Inspector General are interviewing CO's who work or worked at High Desert State Prison.  We do not know what the interviews are about.  The Agents maintain the interviews are "voluntary" however, they are not providing Officers advanced notice, the topic of the interview, or the opportunity to obtain legal representation. In at least one case, an Officer was ordered to interview after refusing to give a voluntary statement.

If you are contacted at work, or home, by Agents of the OIG and asked to interview, CCPOA suggests:

1. Immediately request a representative;
2. Give no voluntary statement; and
3. Do not allow the Agent into your home or have a conversation with them.

If required by OIG or ordered by a CDCR supervisor to participate in the interview do not disobey a direct order BUT DO CONTINUALLY REQUEST THE INTERVIEW BE SUSPENDED UNTIL YOU CAN TALK TO A LEGAL REPRESENTATIVE.

For Northern Institutions Contact:
Janice Shaw – 916-662-4385
Daniel Lindsay – 916-425-8466

For Central Valley Institutions Contact:
Shelley Lytle – 559-250-2862

For Southern Institutions Contact:
Sonia Garcia-Djajich – 909-677-9409

In an effort to maximize its reach, CCPOA e-mailed this instruction as an "Urgent Alert" to all CCPOA members and some CCPOA chapters recirculated the message on their Facebook pages. CCPOA based its advisement on the premise that the OIG's interviews somehow violated its members' rights under the Public Safety Officer Procedural Bill of

---

[17] https://www.ccpoa.org/about-us/

Rights Act [POBR, located at Government Code (GC) Section 3300, et seq.] and the MOU between the State Employer (CDCR) and CCPOA. CCPOA's instruction to its members was not only an inaccurate statement of its members' legal rights, but it also encouraged its members to commit acts qualifying as misdemeanor offenses under the law.

Before beginning the interviews of CDCR employees, the OIG informed the interviewees that the OIG was not conducting an investigation, that the employee being interviewed was not the subject of an investigation, and that the OIG would not use any statements provided during the interviews to initiate an investigation into the interviewee. The OIG did not permit these employees a representative during the interviews in order to prevent compromising the integrity of its review. There is a valid concern that CCPOA representatives were there not to protect any rights of the persons being interviewed, (who were never at peril of adverse action), but rather to find out which staff were telling on others, and what they were saying. In fact, none of the people interviewed still work at HDSP.

Pursuant to GC Section 3303, POBR rights apply only when a peace officer is "under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department." Because the OIG employees who conducted the interviews were not CDCR employees, pursuant to PC Section 6126.5(d), POBR rights did not apply to the OIG interviews unless "it appears that the facts of the case could lead to punitive action" against the officer being interviewed. Because the OIG was not performing an investigation into their misconduct and expressly informed these officers of that fact prior to the interviews, POBR did not provide the employees being interviewed with any rights to representation during the interviews, any right to advance notice of the interview, or to be made aware of the subject matter of the interview. As also set out in PC Section 6126.5(d), the terms of the MOU between the State and CCPOA do not apply to OIG interviews. No actions were ever contemplated and none were initiated against any of the interviewed employees.

CCPOA's State President also attempted to interfere with the OIG's authorized review by calling a member of CDCR's senior management on multiple occasions to complain about the OIG's interviews and CDCR's acquiescence to the OIG's requests to interview its employees. This interference also flies in the face of PC Section 6126.5(d), which requires that "[a]ny employee requested to be interviewed shall comply and shall have time afforded by the appointing authority for the purpose of an interview with the Inspector General or his or her designee."

On November 4, 2015, CCPOA filed a grievance against CDCR claiming CDCR's "acquiescence to the Office of the Inspector General's directives result[ed] in the violation of several Correctional Officers' MOU and POBR rights." Despite every correctional officer being informed prior to the interviews that they were not the subjects of an investigation and that they would not become the subjects of an investigation as a result of information provided during the interviews, CCPOA demanded expedited arbitration of the grievance, claiming that the OIG's interviews were causing its members "irreparable injury … for which there is no adequate remedy at law." As explained above, POBR did not provide the interviewees with any rights during their interviews with the

OIG. Even if officers' POBR rights had been violated, GC Section 3309.5 provides a remedy by authorizing the superior courts with initial jurisdiction to adjudicate alleged POBR violations and issue various forms of injunctive relief, including injunctions and restraining orders to prevent POBR violations from occurring.

On November 23, 2015, CCPOA's State President sent a letter to the Governor and each member of the California State Legislature disparaging the OIG with various unfounded accusations of impropriety in all facets of its operations. The OIG finds the accusations baseless, devoid of any understanding of the OIG's role and function, and disruptive to the provision of independent oversight as initially ordered by the federal court in *Madrid* and later codified by the Legislature. Due to their frivolous nature, the OIG deems CCPOA's allegations unworthy of a substantive response. Rather, the letter is the latest strong-arm tactic CCPOA has elected to deploy in an effort to obstruct the OIG's Senate-authorized review and attempt to discredit the OIG in advance of the release of this report.

Finally, on November 24, 2015, CCPOA filed a lawsuit in Sacramento County Superior Court in which it claims its members' POBR rights were violated, seeking monetary damages and injunctive relief. These actions serve as an attempt to chill the transparent oversight of the correctional system that the department has worked hard to embrace in the wake of the *Madrid* federal lawsuit.

CCPOA's collective actions during the course of the OIG's review cast into doubt the genuineness of its stated organizational mission. The union's staunch opposition to the OIG's review of HDSP demonstrates a clear hostility towards transparency and independent oversight in the prison system. The culture fostered by CCPOA is one of regression to prior periods of the "green wall" and code of silence, when officers were actively encouraged to disrupt and sabotage legitimate inquiries into pressing issues of public policy. This especially exacerbates a situation in a prison with the problems and culture discovered at HDSP.

## RECOMMENDATIONS TO CDCR

- Infuse HDSP supervisory and management positions with culturally diverse staff who have experience working in other institutions and do not have lifelong ties to the community.

- Consider rotating HDSP management staff to other institutions, similar to the rotation required for CDCR headquarters peace officer staff.

- Increase the frequency at which peer reviews are conducted at HDSP.

- Revise the peer review tool to include follow-up measures and tests that better assess areas that could indicate deep-seated issues, such as by adding PREA and ADA compliance components.

- Increase inmate programming, especially on the SNY facilities.

- Ensure inmates housed in enhanced program facilities meet the EPF participation criteria.

- Ensure HDSP is following the DOM requirements related to staff in high stress assignments.

- Require HDSP seek approval from the CDCR Associate Director, prior to extending staff in high stress assignments beyond the initial two years.

- Seek out opportunities to partner with organizations, such as the US DOJ, to conduct research and provide training to custody staff, starting at HDSP, on how to recognize and address implicit bias.

- Implement a mindfulness and wellness program that gives staff resiliency tools to cope with working in a uniquely stressful environment.

# SEX OFFENDERS AND THE R SUFFIX

## R SUFFIX

As part of CDCR's inmate classification process, inmates with a history of sex offenses are designated with an R suffix, signifying restricted custody. According to California Code of Regulations (CCR), Title 15, Section 3377.1(b), the purpose of applying an R suffix is to ensure the safety of inmates, correctional personnel, and the general public by identifying inmates with a history of specific sex offenses. Inmates with an R suffix are automatically assessed a mandatory 19 classification points, which restricts them from being housed or assigned to jobs or programs outside the prison's security perimeter (to reduce the risk of escape).

The R suffix designation follows the inmate for every subsequent incarceration, even if he has served his term on the initial sex offense and is later recommitted for a different, non-sex related offense. Regardless of an inmate's current commitment offense, if that inmate is required to register as a sex offender, pursuant to PC Section 290, for any offense committed in his lifetime, an R suffix is applied (in California, PC 290 sex offender registration is a lifetime registration). In addition, CDCR's policies require every arrest, detention, or charge for an offense that would warrant the inmate to register pursuant to PC Section 290, be evaluated for assignment of an R suffix; the policy is applied liberally.

The mandatory application of 19 classification points is the ONLY requirement tied to the R suffix. However, over the years, the R suffix has come to be automatically associated with the inmate being a sex offender, triggering bias and preconceived beliefs inmates and officers might have related to sex offenders.

In interviews conducted of former HDSP inmates, allegations were raised related to staff disclosing the commitment offense of inmates to other inmates, placing their safety at risk. These former inmates alleged that staff told inmates that other inmates were sex offenders, or had shown them classification documents or let them view the electronic inmate records retained in the Strategic Offender Management System (SOMS), showing that an inmate had an R suffix. Having an R suffix carries a major stigma in prison and can jeopardize an inmate's safety by setting the inmate up for assault or extortion for protection from assault.

The OIG was also told by former HDSP inmates and staff that, more commonly, inmates are told by other inmates to show their paperwork, which includes the inmate's commitment offense. Inmates who are celled together regularly show each other their paperwork. This occurs on general population yards, as well as sensitive needs yards. The document being shared is usually a form provided to the inmate documenting the outcome of their classification committee hearing. Previously, the information was documented on a Classification Chrono, *CDCR Form 128-G*; however, it has been replaced by a printout of the SOMS screen titled Classification Committee Chrono (Chrono). The information provided in the Chrono not only summarizes the classification committee's decisions regarding the inmate's status, such as clearance for double-celling,

and education and work assignments, but it also documents the inmate's case factors including his commitment offense and prior arrest history. It also includes any applicable custody suffix, including an R suffix.

In addition to the Chrono, many CDCR forms include an inmate's commitment offense, arrest history, or custody suffix information, including the Legal Status Summary, the Classification Scoresheet, and Crime/Incident Reports. Although staff may be mindful not to route copies of documents containing sensitive information through inmate mail, and instead hand-deliver the documents to the inmate, once an inmate is in possession of these documents he can be pressured to provide them to other inmates. The OIG recognizes that there are multiple ways inmates can find out about each other's commitment offenses; however, limiting the information provided in hard copies given to all inmates would eliminate one way in which this information is discovered and reduce the pressures faced by inmates which then lead to victimization. The department cites no penological reason that information related to R suffix, commitment offense, or arrest history must appear on the Chrono given to the inmate.

With the implementation of SOMS and staff's ability to review inmate records in real-time, it is recommended that CDCR review any forms and documents that have required the commitment offenses and R suffix information, and determine if including this information is necessary and who has a need to know. CCR, Title 15, Section 3375(h), requires that an inmate be provided a copy of all non-confidential CDCR staff-generated documentation and reports placed in the inmate's central file, unless otherwise requested in writing by the inmate. Inmates who are pressured to provide a document to verify their commitment offense may be placed in a predicament if they request that their documentation not be provided since one can then assume that the inmate is hiding something.

The dangers associated with an inmate's paperwork and R suffix are all too real. In May 2013, on an SNY facility (not HDSP), an officer discovered an inmate lying unresponsive on the floor of his cell with a sheet pulled over him and a classification document resting on top of the sheet. There was a ligature around the inmate's neck, wound tight by a connected State-issued cup, and blood near his head. The classification document found on the deceased inmate noted that his commitment offense was for lewd and lascivious acts with a child under 14 years of age.

Additionally, as recently as December 2015 on an SNY facility (not HDSP), an inmate with a history of in-cell violence and gang affiliation informed an officer that his cellmate was dead. The victim was found face down on the floor and hogtied with multiple injuries and a pen and pencil stabbed in the victim's ear. Written on the victim's t-shirt were derogatory slurs specific to his criminal history. Although the victim's current offense was not a sex offense, he had sex offenses in his history.

## SOMS Access

In the last few years, CDCR has converted from a paper inmate file, to an electronic inmate record. While this has made major improvements, it has come with the unintended consequence of giving staff unfettered access to an inmate's history. In the past, staff

wanting to know if an inmate was a sex offender would have to visit the prison records office, request the inmate's hard copy file, sign in on a log sheet, and sit in the records office to review the file. Now, from just about every housing unit in a prison, with a few key strokes and no admonishment or reminder that the information contained therein is sensitive and confidential, anyone accessing SOMS can instantly know if an inmate has an R suffix. In fact, the very first screen that appears after entering the inmate's CDCR number contains the R suffix information in the header.

In addition, although these SOMS computers are considered to be out of bounds for inmates, their placement throughout the housing units can sometimes be in areas where inmates can see the information on the screen. While the OIG recognizes that there are legitimate penological reasons that custody staff may need to access some information from an inmate's electronic record, for instance, to verify an inmate has no enemy concerns before rehousing him on another yard, custody staff must be mindful of the sensitive information being displayed on the computer monitors. Additionally, most custody officers do not have a need to know most information regarding inmates' commitment offenses.

## RECOMMENDATIONS TO CDCR

- Develop a policy authorizing staff to access an inmate's electronic record on a "need to know" basis only. The policy should add admonishment language to the SOMS login screen, advising against misuse, and the consequence thereof.

- Develop a method of tracking and recording staff access to records in SOMS and other inmate records, and periodically audit access history to identify potential misuse.

- Remove the R suffix information from the SOMS header, as any staff specifically needing this information can find it on another screen.

- Conduct an in-depth review of every form and document that currently requires commitment offense information and R suffix notations, and remove this requirement from all forms and documents where it no longer serves a legitimate purpose.

- Consider providing inmates with only hard copies of certain portions of non-confidential documentation from SOMS or other inmate records, to exclude commitment offenses, R suffix notations, and any other information that may put an inmate at risk.

# SENSITIVE NEEDS YARDS

When sensitive needs yards were first conceptualized in the late nineties, they were developed with the expectation that inmates would volunteer to be housed on a yard where they would pledge to program, in return for a "violence free" environment. There are no policies or procedures related to SNY housing, only a loose set of placement consideration guidelines outlined in a single memo from 2002. Essentially, the department did not want to establish rigid criteria for SNY placement, but rather a case-by-case review of each inmate would be conducted by the classification committee. SNYs do not have additional programming or anything different than general population facilities, as they were perceived to be truly a GP placement for inmates who simply wish to live in a nonviolent environment. The memo grouped inmates appropriate for SNY housing as falling into one of the following general categories:

- <u>Prison Gang Dropout</u> – these inmates had to be validated by CDCR's Office of Correctional Safety as a gang dropout.

- <u>Victim of Assault</u> – these inmates may have been assaulted because of a commitment offense or failure to commit an ordered assault on another inmate.

- <u>Significant Enemy Concerns</u> – these inmates may have provided testimony in open court, or their status as snitches or informants may have become known to the general inmate population.

- <u>Other Safety Concerns</u> – these inmates may be high notoriety, public interest cases, or sex offenders. These inmates might also include those that refuse to recognize inmate-imposed racial or cultural lines and other safety concerns not specifically listed.

The memo instructed staff to take a liberal approach to placing an inmate in an SNY and a conservative approach on any considered action to remove an inmate from an SNY. Additionally, the department foresaw that as the number of inmates receiving and requesting SNY housing grew, so would the need for SNY beds. These facilities "simply become housing for _programming_ inmates who are willing not to prey upon other inmates in exchange for a feeling that they are less likely to be preyed upon" [emphasis added].

Because CDCR considers SNY facilities to be no different than GP facilities, SNY staff have never received any training in supervising vulnerable populations. However, unlike GP facilities, CDCR does not require SNY facilities to have an ethnic balance for inmate program and job assignments, leading many SNY inmates to complain that other races are receiving the best job assignments.

The demand for sensitive needs housing has grown to over 37,000 inmates being designated SNY. CDCR staff no longer wait for inmates to volunteer or request SNY housing. It is common now for classification staff to recommend SNY housing to inmates who have committed a sex offense or other crimes that make them targets for violence. Many vulnerable inmates who accept SNY housing do so expecting a protective environment and it is not always explained to them by classification staff that sensitive

needs yards are still violent, have programming no different from GP yards, and once they are assigned to an SNY, it is very difficult to ever return to a general population yard.

The growing numbers of gang dropouts being placed in SNYs has resulted in numerous new gangs forming and warring with rivals on the SNYs. Gang violence has grown so bad that some SNY inmates have asked to return to mainline yards rather than continue to face the gangs on the SNYs. However, once an inmate has been housed on an SNY facility, he then becomes a target or is labeled as soft, making it very difficult to ever transfer out. In fact, CDCR's SNY guidelines acknowledge that SNY housing in itself adds a label or stigma to the inmate and under no circumstances will an SNY inmate be returned to a GP if it is believed that the inmate's safety would be threatened by such housing, not even inmates who repeatedly assault other SNY inmates.

As one former HDSP staff member stated, *inmates take a very dim view of other inmates who have committed various crimes, mostly sex offenses. And they tend to target them for assaults, for extortion, for a whole variety of negative actions. Many of the assaults that happen, you could probably break down into a couple of categories, inmate-on-inmate assaults that are debts, generated from drugs or protection or bribery or blackmail. Then there's the gang-related assaults that happen when somebody is not toeing the line where they are supposed to, and they need to be removed from the picture from the inmate point of view. And so it's really hard to say the frequency of assaults– it happens all the time.*

To further gauge the amount of violence occurring on sensitive needs yards compared to general population yards, the OIG analyzed CDCR's COMPSTAT[18] reports for the 13-month period from June 2014 through June 2015. The OIG compared the data reported for the *Average Number of Incidents per 100 Inmates* and found that, of the ten facilities with the highest number of incidents per 100 inmates, 80 percent of the institutions housed SNY inmates. The OIG then compared the data reported for the *Average Number of Inmate Disciplinary Actions, per 100 Inmates* and found that of the twenty facilities with the highest number of inmate disciplinary actions per 100 inmates, 70 percent of the institutions housed SNY inmates.[19]

Finally, the OIG compiled the COMPSTAT data for the number of inmate disciplinary actions for specific violent offenses[20] issued at each institution.[21] Unfortunately, CDCR's COMPSTAT data is not broken down by individual facility within a prison, so the OIG is unable to compare individual SNYs within a prison to GP or other yards. However, as indicated in the following table, institutions housing SNY inmates (highlighted in green) have violence prevalence similar to institutions housing GP inmates.

---

[18] COMPSTAT data can be found at www.cdcr.ca.gov
[19] See Appendices H and I for number of incidents and disciplinary actions.
[20] The violent offenses included: assault on staff, battery on staff, assault on inmate, battery on inmate, attempted murder, and murder.
[21] Data was unavailable for the California Health Care Facility and the California City Correctional Facility. Additionally, there are no SNYs at female institutions.

**Inmate Disciplinary Actions (115's) for Specific Violent Acts, June 2014 through June 2015**

| Institution | Total 115s for Violent Acts | Monthly average | June 2015 Inmate Count | June 2015 SNY Pop | All Levels | SNY Levels | Mission |
|---|---|---|---|---|---|---|---|
| WSP | 672 | 51.69 | 4881 | N/A | I, III, RC | N/A | RC |
| NKSP | 612 | 47.08 | 4365 | N/A | I, III, RC | N/A | RC |
| SAC | 572 | 44.00 | 2319 | N/A | I, IV, PSU, SHU | N/A | HS |
| LAC | 562 | 43.23 | 3494 | 896 | I, III, IV | IV | HS |
| SOL | 430 | 33.08 | 3866 | N/A | II, III | N/A | GP |
| CAL | 420 | 32.31 | 3774 | 922 | I, IV | IV | GP |
| CCI | 326 | 25.08 | 3931 | 3186 | I, II, III, IV, SHU | I, II, III, IV | HS |
| HDSP | 324 | 24.92 | 3300 | 1009 | I, III, IV | III, IV | HS |
| SVSP | 323 | 24.85 | 3678 | 1468 | I, III, IV | III, IV | HS |
| SATF | 318 | 24.46 | 5581 | 3156 | II, III, IV | II, III, IV | HS |
| COR | 287 | 22.08 | 4405 | 1850 | I, III, IV, SHU, PHU | III, IV | HS |
| KVSP | 286 | 22 | 3638 | 1578 | I, IV, THU | IV | HS |
| DVI | 235 | 18.08 | 2117 | N/A | I, II, RC | N/A | RC |
| SCC | 222 | 17.08 | 4345 | 788 | I, II, III | III | RC |
| CCC | 212 | 16.31 | 4089 | N/A | I, II, III | N/A | RC |
| PVSP | 209 | 16.08 | 2271 | 1274 | I, III | III | GP |
| CMF | 184 | 14.5 | 2269 | N/A | I, II, III | N/A | FOPS |
| PBSP | 177 | 13.62 | 2742 | N/A | I, IV, PSU, SHU | N/A | HS |
| CEN | 173 | 13.31 | 3489 | 871 | I, III, IV | III | GP |
| CIM | 173 | 13.31 | 3802 | 1810 | I, II, RC | II | RC |
| MCSP | 165 | 12.69 | 2941 | 2778 | I, III, IV | I, III, IV | GP |
| CMC | 154 | 11.85 | 3809 | N/A | I, II, III | N/A | RC |
| ISP | 154 | 11.85 | 3401 | 1561 | I, III | I, III | GP |
| RJD | 142 | 10.92 | 3148 | 2118 | I, III, IV | III, IV | RC |
| SQ | 121 | 9.31 | 3687 | N/A | II, RC | N/A | RC |
| FSP | 114 | 8.7 | 2876 | N/A | I, II, FWF | N/A | FOPS |
| ASP | 112 | 8.62 | 2766 | 2324 | II | II | GP |
| CRC | 89 | 6.85 | 2434 | 784 | II | II | RC |
| VSP | 79 | 6.08 | 3379 | 3326 | II | II | GP |
| CTF | 72 | 5.54 | 5167 | 2668 | I, II | II | GP |
| CVSP | 50 | 3.85 | 2264 | 1178 | I, II | I, II | GP |

Also indicative of the increased violence in SNYs is the proportion of inmate homicides that occur involving victims assigned to SNY housing. In the OIG's October 2014 Semi-Annual Report, Volume II, it reported on the homicides that took place on sensitive needs yards. Of the 11 inmate-on-inmate homicides reported, 10 occurred on Level IV sensitive

needs yards, 8 of which were in-cell homicides. In addition to the 11 homicides, another case reported was an in-cell great bodily injury case that also occurred on an SNY facility, but did not result in death.

In addition to the cases noted above, a 2012 SNY homicide at HDSP involved an inmate strangling his cellmate to death in their cell. The aggressor was convicted for murder and the victim for multiple violent sex offenses. The aggressor had been placed on the sensitive needs facility because he had been attacked during intake, upon his arrival at HDSP. The question later arose as to why a violent murderer had been celled together with a sex offender. Subsequent investigation determined that CDCR has no policies requiring an analysis of housing compatibility on sensitive needs yards.

Also at HDSP, a 2013 SNY homicide involved an inmate with a history of in-cell violence strangling his cellmate to death in their cell. The aggressor was convicted for murder and rape in 1994 and the victim for sex offenses against minors in 2011. They had only been celled together for 16 days.

In the OIG's assessments of these events, it became clear that there are steps that the department can take to lessen such risks. The assumption that placement in SNY housing includes an implied agreement by SNY inmates to co-exist peacefully is no longer a viable premise, especially in light of the fact that CDCR staff no longer wait for an inmate to volunteer before designating him for SNY housing. CDCR does not complete a double-cell housing compatibility review form for SNY inmates. This form is intended to ensure that inmates are properly placed with compatible cellmates and that potential cellmates are given the opportunity to document their agreement to house together or expose reasons why they should not be housed together. Similar forms are not used on GP yards either, but the inherent volatility created by mixing a sex offender and violent gang member (albeit a dropout) does not typically exist on a GP yard.

The OIG further determined that the department's policy for changing an inmate from single-cell to double-cell status is insufficient. The policy states in part: *A classification committee may consider whether an inmate with single-cell designation has since proven capable of being double-celled.* The policy does not provide specific guidelines or examples of how an inmate that previously assaulted cellmates can prove capable of transitioning back to double-cell status. As a result of these findings, in the OIG's October 2014 Semi-Annual Report, Volume II, the OIG issued CDCR the following recommendations:

- Institute compatibility guidelines requiring the completion of *CDCR Form 1882-A, General Population Double Cell Review* and completion of the *CDCR Form 1882-B, Administrative Segregation Unit/Security Housing Unit Double-Cell Review* to help ensure that inmates are properly housed with compatible cellmates.

- Require potential cellmates to document their agreement to house together.

- Provide clear guidelines for transitioning single-cell designated inmates to double-cell status on SNY facilities.

- Require that SNY inmates' central files be reviewed for propensity for violence and prior assaultive behavior before double-celling, or at least prior to placement with a vulnerable cellmate (part of the *CDCR Form 1882-A* process).

The department initially declined to implement any of these recommendations, but later agreed to develop a classification system to identify inmates that are at risk of being assaulted and to identify inmates that are likely to assault other inmates. With this new system, CDCR hopes to ensure inmates from these two groups are not celled together. The new classification system is expected to be implemented in early 2016.

Finally, as heard repeatedly in interviews with former HDSP staff, the lack of quality programs at HDSP is a factor leading to inmates having nothing to do and causing tensions to rise. As stated earlier in this report, one way to mitigate criminality and violence is to increase program opportunities for the inmate population.

## RECOMMENDATIONS TO CDCR

- Address the growing violence on sensitive needs yards by:

    o developing formal policies and procedures related to SNY housing;

    o considering the development of separate SNY housing criteria for vulnerable inmates at risk of assault;

    o transferring aggressors to some other type of housing;

    o re-examining the double cell policy for sensitive needs yards pursuant to previous OIG recommendations;

    o requiring completion of a compatibility review, similar to the *CDCR Form 1882-B*, *Administrative Segregation Unit/Security Housing Unit Double Cell Review*; and

    o reviewing the process for transitioning inmates from single-cell designation to double-cell status, pursuant to prior OIG recommendations.

- Add more meaningful programs to sensitive needs yards, especially Level IV SNYs such as HDSP's Facility B, where programs have been historically lacking.

- Ensure that classification staff designating inmates as requiring SNY placement, inform inmates that SNYs are still violent, have programming no different from GP yards, and once assigned to an SNY, it is very difficult to ever return to a general population yard.

- Require training for SNY staff in supervising vulnerable populations.

- Require racial balance criteria for inmate program assignments in SNY housing, at least at HDSP (similar to general population facilities), to overcome the perception of racial bias.

# INMATE APPEALS AND STAFF COMPLAINTS

## APPEAL COLLECTION AND PROCESSING

The OIG reviewed dozens of complaints, filed by both inmates and staff, related to the processing of inmate appeals. Some of the allegations included:

- Appeals were being destroyed or discarded, never being delivered to the Appeals Office.

- Appeals were being read by officers, and if the appeal contained a complaint against staff, the inmate was subjected to retaliation or the appeal was destroyed.

- Staff complaints were never addressed.

- Appeals were being shredded by Appeals Office staff.

As referenced earlier, the OIG published a review in September 2011 of CDCR's inmate appeals process, finding the process does not provide enough accountability to address inmate allegations that appeals are subject to intentional destruction or negligence. In response to OIG recommendations, the department issued a December 30, 2011, directive to all institutions, which, among other mandates, included the following:

- A secure appeals lock box is required on every yard and in each building, retrieval from which shall only be done by Appeals Office staff and/or staff designated by the warden.

- Reading or inspecting the contents of appeals by anyone outside of Appeals Office staff is prohibited.

At HDSP, neither of these directives were implemented. The OIG's review found that the first watch program sergeant is delegated the responsibility for collecting appeals from the lock boxes and delivering them to the Appeals Office. The key to each lock box is on each program sergeant's key ring, which is passed from the first watch sergeant to the second watch sergeant to the third watch sergeant. This of course means that throughout the course of any given day, many different people have access to read, tamper with, or destroy inmate appeals.

Appeals may also be submitted through the mail. All inmate mail not marked as legal mail, including inmate appeals, is opened, read, and examined for contraband by HDSP officers. As an aside, department managers were unable to explain why a letter addressed to the Appeals Office within the prison needed to be opened and examined for contraband. Once read and examined, instead of routing the appeals directly to the Appeals Office, officers were placing the mail into a mailbag for delivery to the mailroom, where it would once again be subject to review by mailroom staff, before finally arriving at the Appeals Office.

Additionally, inmates housed in the administrative segregation unit or on modified program during a lockdown, cannot personally deposit their appeals in a lock box in any institution. In these situations, the same staff who provide day-to-day supervision of the inmates in their assigned housing units personally collect the appeals from the inmates' cells and are then supposed to deposit them into the lock box on the inmates' behalf. HDSP's appeals collection process allows inmate appeals to pass directly through the hands of those who might have an interest in the complaint, whether that be the officer being accused of misconduct, that officer's friend (or quite possibly neighbor), or a supervisor who may be friends with the accused officer. This process decreases individual accountability and thwarts HDSP's ability to determine who is responsible if the appeals lock box has been tampered with or if an inmate's appeal goes missing.

As reported above, in 2011, the OIG found that the appeal process lacks an accountable means of verifying that appeals are made and lacks an accountable means of delivering appeals. The report recommended CDCR add a receipt feature to its appeal form so that appeals could be tracked; allow inmates to make copies of their appeals; and implement accountability measures, such as requiring Appeals Office staff to directly collect inmate appeals instead of custody staff.

The OIG reiterates its recommendations from its 2011 report, and in addition, the department must address the issue of inmates in ASU or on a modified program during lockdown who are unable to personally place their appeal into a lock box. This can be remedied by mandating Appeals Office staff personally retrieve the appeal from the inmates' cells or instituting some form of secure mobile collection process.

## VOLUME OF APPEALS AT HDSP

During the 18-month period of January 1, 2014 through June 30, 2015, the HDSP Appeals Office logged 5,711 appeals. The following table indicates property complaints are overwhelmingly the most appealed issue, at more than double the amount of the next highest appeal category. Although the topic of lost or destroyed inmate property is not the focus of this review, the sheer volume of property appeals should signal to HDSP management that there are systemic issues related to its handling of inmate property that need to be addressed.

During interviews of inmates and parolees formerly assigned to HDSP, a few stated that staff would take an inmate's property and give it to another inmate in exchange for a favor. One inmate mentioned a particular staff member who was known for giving confiscated inmate property to other inmates as a reward for assaulting inmates. Another inmate said that he had seen staff take property from inmates involved in assaults, place the property on a table, and later allow other inmates to take it.

The OIG found during the course of its review that staff do not always have a clear understanding of the policies and procedures related to the processing and handling of property. In addition, the OIG is currently monitoring an internal affairs investigation related to allegations of officers tampering with inmate property as a ruse to confiscate the property. The OIG will report on the outcome of the case at the conclusion of the investigation.

**HDSP Appeals January 2014 – June 2015**

| Facility | Appeals |
|---|---|
| HDSP-A | 1246 |
| HDSP-ASU | 396 |
| HDSP-B | 1136 |
| HDSP-C | 1127 |
| HDSP-D | 1229 |
| HDSP-E (MSF) | 42 |
| HDSP-H (CTC) | 80 |
| HDSP-Other | 455 |
| Grand Total | 5711 |

| Appeal Issue | Appeals |
|---|---|
| PROPERTY | 1539 |
| CUSTODY/CLASS. | 580 |
| DISCIPLINARY | 510 |
| ADA | 412 |
| LEGAL | 410 |
| STAFF COMPLAINTS | 384 |
| LIVING CONDITIONS | 318 |
| FUNDS | 305 |
| WORK INCENTIVE | 256 |
| MAIL | 253 |
| CASE RECORDS | 228 |
| PROGRAM | 220 |
| TRANSFER | 148 |
| VISITING | 58 |
| MEDICAL | 43 |
| SEGREGATION | 39 |
| RE-ENTRY/PAROLE | 8 |
| Grand Total | 5711 |

In addition to the appeals above, during this same timeframe, over 2,000 health care related appeals were responded to by HDSP's health care services department. The most appealed health care issues were related to medication, disagreements regarding treatment decisions, issues related to reasonable accommodations for ADA inmates, access to care, referrals, and issues related to reasonable accommodation medical devices. Unlike regular appeals, which are stored in an inmate's electronic file, health-care-related appeals, due to HIPAA laws, are kept in the Health Care Appeals Tracking System. If a health care appeal is received in the Inmate Appeals Office by mistake, it is re-routed to the Health Care Appeals Office for response.

## STAFF COMPLAINTS

When an inmate wants to file a complaint against a staff person, it is handled by Appeals Office staff in a manner similar to a regular appeal, with a few exceptions. The policy for processing a staff complaint can be found in CCR, Title 15, Section 3084.9(i), titled *Exceptions to the Regular Appeal Process*. Basically, the policy requires the inmate alleging staff misconduct by a departmental employee to forward the appeal to the appeals coordinator who in turn must forward it to the hiring authority (at a level not below chief deputy warden) with a recommendation on whether to process as a regular appeal or handle as a staff complaint.

If the hiring authority determines it should not be handled as a routine appeal, the hiring authority has the following options:

    (1) If the hiring authority determines the alleged conduct would likely lead to adverse personnel action, the case will be referred for an internal affairs investigation by CDCR's Office of Internal Affairs.

    (2) If the hiring authority determines the alleged conduct does not warrant a request for an internal affairs investigation, a confidential inquiry shall be completed by whomever at the prison the hiring authority designates.

The staff complaint process can be very frustrating for the appellant inmate, as the confidential nature of the proceedings give little feedback to the inmate. The inmate is only informed whether or not the complaint is being referred for an investigation or confidential inquiry and then the final outcome of the investigation or inquiry. The inmate does not receive a copy of the confidential report; however, the accused staff may review the confidential report in the Appeals Office upon approval of the prison's litigation coordinator.

The OIG reviewed the HDSP logs for staff complaints filed at HDSP from January 1, 2014, through June 30, 2015. The OIG found that of the 807 staff complaints filed, only 282 were referred for investigation. This is not uncommon in CDCR, as individual staff complaint determinations tend to come down to the inmate's word versus the word of staff, and allegations of misconduct can be difficult to prove.

| HDSP Staff Complaints - January 1, 2014 - August 18, 2015 | |
|---|---|
| 807 | Total number of staff complaints processed by the HDSP Appeals Office. |
| 34 | Cancelled. Usually due to the issues being identified as duplicative of another appeal. |
| 491 | Processed as a routine appeal after being deemed not to meet the criteria for assignment as a staff complaint. |
| 267 | Processed as a staff complaint. Referred to an Associate Warden for inquiry, due to adverse action being unlikely. |
| 5 | Referred to HDSP's Investigative Services Unit for an allegation review to gather additional information. |
| 10 | Referred to CDCR's Office of Internal Affairs for investigation, based on a reasonable belief that misconduct occurred. |

As illustrated in the table above, in all but ten of the HDSP staff complaints, the hiring authority decided to handle the complaints internally. Only about one percent of all the staff complaints filed were ever reviewed by anyone outside of HDSP. Additionally, in one of the ten cases where HDSP reported it had been referred for an outside investigation, there is no evidence that the complaint ever actually left the institution.

The OIG noted that there were several staff who had multiple staff complaints filed against them from several different inmates. The alarming number of complaints should have triggered HDSP management staff to look more closely at the totality of the

circumstances surrounding the complaints, such as deficiencies in supervision; however, management never correlated multiple complaints against officers.

HDSP is not consistently logging its allegations of misconduct, which is required by DOM Section 31140.13; therefore, it cannot accurately track the status of complaints referred for inquiry or investigation, nor can it easily recognize potential areas of concern related to allegations being lodged repeatedly against the same staff or in the same work area.

## DISINCENTIVES TO FILING STAFF COMPLAINTS

The appeal collection process places inmate appeals directly in the hands of the officers being accused of misconduct. This creates a significant disincentive for inmates to file appeals; knowing that the officers they are accusing of misconduct will be handling or reading the appeals will likely dissuade an inmate from filing a complaint. When an inmate does file a complaint against staff, the inmate is often placed in administrative segregation for their own "protection," which is yet another disincentive.

However, even if the appeals collection process is changed in a manner that precludes custody staff from reading or handling inmate appeals, the CCPOA MOU contains a provision that mandates that officers who are accused of misconduct by inmates be immediately notified of the contents of all inmate complaints filed against them. Section 9.09 of the Bargaining Unit 6 MOU states:

> (D) Whenever a ward/inmate/parolee/patient files or submits a grievance, a 602 (Inmate Appeal), any written complaint, or verbal complaint which is later reduced to writing by either the inmate or the State, which, if found true, could result in adverse action against the employee or contain a threat against the employee, the Department agrees to immediately notice the employee of said filing. The State agrees to provide the affected employee a copy of said document if the employee so requests. This is not intended to preclude the informal level response procedure in the current CDCR Operations Manual. Upon the employee's request, a copy of the outcome of the ward/inmate/parolee/patient's complaint shall be provided, if the complaint has progressed beyond the informal stage. The Employer and CCPOA agree that all video tapes, audio tapes or any other kind of memorialization of an inmate/ward/parolee/patient statement or complaint shall be treated as a writing within the meaning of this subsection. The tapes or writings shall be turned over, regardless of whether the complaint/statement is deemed inmate/ward/ parolee/patient initiated or not.

The department's appeal process fails to protect the identity of the inmate accusing an officer of misconduct and unjustifiably exposes the inmate to retaliation for filing a complaint. The appeal process is the inmate's main avenue for resolving issues and the OIG was repeatedly informed that inmates choose to no longer file appeals for fear of

reprisal. CDCR's own peer review found additional deficiencies in HDSP's appeal processing.

CDCR's headquarters Appeals Office has responsibility for ensuring institutions have the necessary training and assistance needed relative to the appeal system; conducting audits of appeals units; and meeting with CDCR administrators to review policy and procedure needs as revealed by inmate appeals. It does not appear that the headquarters Appeals Office has done any of these related to High Desert State Prison, which could greatly benefit from oversight, training, and assistance.

## RECOMMENDATIONS TO CDCR

- Create a formal policy that reflects the contents of the December 30, 2011, memo titled: *Secure Appeal Collection Sites and Related Matters*, but require appeals in lock boxes be retrieved by Appeals Office staff only.

- Add a receipt feature to the *CDCR Form 602, Inmate/Parolee Appeal*, or assign a log number to all appeals at the point of collection.

- Immediately reiterate that initial appeal content is to be read by Appeals Office staff only, until assigned out for response.

- Provide HDSP staff with training relating to the processing and handling of inmate property and hold officers accountable for failing to abide by the relevant policies and procedures.

- Require institutions to conduct a management review into an employee's performance and worksite when multiple staff complaints are filed by multiple inmates against an individual employee.

- Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

- Require staff performing allegation inquiries into staff complaints receive formal internal affairs investigations training prior to conducting allegation inquiries.

- Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize complete, thorough, and adequate allegation inquiry reports.

- Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140*, *Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13, which requires each allegation of employee misconduct be logged, regardless of whether the allegation is referred for investigation.

- Renegotiate Section 9.09 of the Bargaining Unit 6 MOU to treat inmate appeals in the same manner as any other allegation of staff misconduct.

- Remedy the inability of inmates in ASU or on a modified program to personally place their appeal into a lock box, by mandating Appeals Office staff personally retrieve the appeal from the inmates' cells or instituting some form of secure mobile collection process.

- Dispatch staff from the Appeals Office to conduct an in-depth audit of HDSP's appeal process, provide any remedial training necessary, and report back to CDCR administrators any policy or procedure deficiencies revealed by a review of HDSP inmate appeals, such as property issues and the handling of staff complaints.

# USE OF FORCE INCIDENTS

## HDSP USE OF FORCE FREQUENCY

As part of this review of High Desert State Prison, the Senate Committee specifically requested the OIG review practices related to excessive use of force against inmates, internal reviews of incidents involving excessive use of force against inmates, and protection of inmates from assault and harm by others.

The OIG analyzed and compared a variety of use of force documents and data points, spanning, unless otherwise noted, the 18-month period of January 1, 2014, through June 30, 2015. This included several dozen use-of-force incident packages, staff complaints alleging excessive or unnecessary use of force, disciplinary logs and rules violation reports, confidential inmate files related to force allegations, complaints filed directly with outside stakeholders, and internal affairs investigations. In addition, the OIG interviewed several inmates formerly housed at HDSP.

From the data gathered by the OIG, it developed the following tables to get a snapshot of how HDSP compares to other similar facilities, and how the facilities within HDSP compared to each other.

The table below compares the total number of incidents to the total number of incidents involving use of force, and the percentage of incidents involving use of force, that occurred on Level IV SNY facilities.

### Incident Data, Level IV SNY Facilities[22]

| Facility | Total # of Incidents | Total # of Incidents Involving Use of Force | Percent of Incidents Involving Use of Force |
|---|---|---|---|
| HDSP-B | 227 | 173 | 76% |
| CAL-D | 91 | 49 | 54% |
| COR-03B | 343 | 176 | 51% |
| KVSP-C | 226 | 118 | 52% |
| KVSP-D | 204 | 141 | 69% |
| LAC-C | 217 | 134 | 62% |
| MCSP-A | 334 | 214 | 64% |
| RJD-C | 209 | 98 | 47% |
| SATF-D | 128 | 80 | 63% |

---

[22] SVSP and CCI also have a Level IV SNY; however, they went through their conversions during this timeframe, so comparable data was not available.

This data demonstrates that HDSP's Level IV SNY Facility B had the highest percentage of incidents involving the use of force, compared to other Level IV SNY facilities.

The next table compares the number of inmate disciplinary actions for a variety of serious or violent offenses to the total number of all inmate disciplinary actions, for each yard at HDSP.

**HDSP Inmate Disciplinary Actions**

| Inmate Disciplinary Actions January 1, 2014-July 31, 2015 | HDSP-A | HDSP-B (SNY) | HDSP-C | HDSP-D |
|---|---|---|---|---|
| Inmate Disciplinary Actions for Serious or Violent Offenses | 337 | 805 | 354 | 387 |
| All Inmate Disciplinary Actions | 643 | 1076 | 486 | 548 |
| Percent of Disciplinary Actions for Serious or Violent Offenses | 52% | 75% | 73% | 71% |

This data demonstrates that a significantly higher number of disciplinary actions occurred on Facility B, with a higher percentage involving serious or violent offenses, compared to the other HDSP facilities.

In addition to reviewing incident data, the OIG has been reviewing every use of force incident package and attending every Institutional Executive Review Committee[23] (IERC) meeting since March 2015,[24] where the warden and executive staff review every use of force incident package. Reviews conducted by the OIG find that the majority of the incident packages and staff reports are thorough and the IERC conducts a fair review. It should be noted that IERC reviews are only as thorough as the reports available for review. If fights are instigated or staff are not fully reporting the force used, this will not be apparent in the reports. Additionally, unlike institutions with yard cameras, staff reports are the only source of information related to HDSP use-of-force incidents for the IERC to review.

In the OIG's 2012 report related to sex offender abuses at High Desert State Prison, some of the officers interviewed indicated that they believed there were officers at HDSP who would provoke inmates into physical altercations to necessitate the use-of-force. The inmate interviews conducted by the OIG are consistent with the picture the data paints of High Desert State Prison as an institution with a high level of violence. The interviews are also consistent with inmate complaints the OIG read in appeals and also in letters written to the OIG and received from outside stakeholders.

---

[23] IERC requirements can be found in CCR, Title 15, Section 3268, Use of Force.
[24] Prior to March 2015, the OIG would attend at least one IERC meeting at HDSP per month.

The following excerpts are summarized from individual inmate interviews, conducted separately over the course of this review:

*.. officers are slow to respond to incidents.*

*.. always concerned that an incident could erupt at any time.*

*.. had safety concerns due to his commitment offense.*

*.. officers at times were slow to respond during riots.*

*.. felt less safe than other prisons.*

*.. an officer sent an inmate to attack him, and then the officer and his buddies sat and watched.*

*.. constantly afraid at HDSP, and had never been afraid at any other prison. It was the officers he was afraid of, and not the inmates.*

Additionally, the OIG was told that staff who had previously worked at HDSP and then transferred to CCC were heavy-handed and quicker to "jump" to using force.

The OIG is also currently monitoring a number of internal affairs investigations related to excessive or unnecessary force which are detailed in the ***Internal Affairs Investigations*** portion of this report. The OIG will report on the outcome of these cases at the conclusion of the investigations. All of these incidents currently being monitored allegedly occurred between October 2014 and September 2015.

With an appeals process that is fatally flawed and a staff complaint process that results in only about one percent of complaints getting referred for an outside investigation, coupled with staff's unwillingness to report misconduct for fear of reprisal, it is very difficult to prove excessive or unnecessary use of force. However, inmates continue to utilize all available avenues to report alleged abuses, including writing letters to the CDCR Ombudsman, the OIG, the Prison Law Office, the Legislature, and the Governor. Until the department takes steps to address these issues, outside stakeholders will continue to place a heightened level of scrutiny on HDSP.

## THE NEED FOR CAMERAS IN ALL INMATE AREAS

In the OIG's September 2015 Semi-Annual Report, it was noted that one area where the department agrees but has yet been unable to address, is the placement of cameras on all yards and in all housing units. Such surveillance is invaluable in capturing misconduct, documenting inmate activity, and exonerating employees who have been wrongly accused of misconduct. The OIG monitors all incidents involving the use of deadly force, as well as incidents involving lesser force that may not have complied with departmental policy. Often times there are conflicting accounts of what transpired, making it difficult

to assess whether the force used complied with policy. High quality visual recordings of incidents can serve to resolve these conflicting accounts. In addition, there are many rule violations and crimes inmates commit that visual recordings could memorialize for just resolution. However, most institutions still lack cameras, including HDSP.

Installing cameras at High Desert State Prison should be the department's number one fiscal priority. Allegations of excessive and unnecessary use of force, inmate abuse, and staff misconduct have been relentlessly lodged at HDSP for years, and with evidence of lax supervision and sustained cases of officers failing to report use of force that they observed, cameras are the absolute best tool for CDCR to curtail misconduct and exonerate staff falsely accused of using unnecessary or excessive force.

When deciding on a camera system to install, the OIG recommends that the department look to the system installed at the California Health Care Facility or the California City Correctional Facility, and ensure the cameras are installed in all inmate areas.

## THE NEED TO PILOT A PROGRAM USING BODY CAMERAS

In addition to installing cameras in all inmate areas, CDCR should pilot a program similar to the program piloted by the Wisconsin Department of Corrections (WDOC). According to the WDOC, it partnered with a company known as Taser International to conduct a pilot program using body cameras in its Waupun Correctional Institution (WCI). The pilot was designed to enhance staff professionalism, reduce sexual assault allegations, staff assaults, inmate complaints regarding staff, and use of force incidents. At the conclusion of the pilot, WCI found that there was a reduction in the number of use of force incidents; however, PREA allegations and inmate complaints remained consistent.

WCI found the body cameras to be very effective for interactions at cell doors and when speaking to inmates. They were not effective while escorting inmates; however, the audio provided perspective as to what was taking place.

In the beginning of the pilot, WDOC reported that staff were apprehensive about wearing the cameras, while the inmate population appeared to be playing to the camera, attempting to provoke an unprofessional response from staff. Training regarding professional communication skills was conducted with all staff involved in the pilot and after a couple of weeks, staff were comfortable wearing the cameras and the inmates had adjusted as well. The pilot showed that the cameras enhanced the professionalism of staff and how they communicated with inmates.

Although the number of complaints and PREA allegations did not decrease during the pilot, the camera footage made it easier to review the allegations and determine if an incident occurred. The use of body cameras by police departments has also had a positive

impact of enhanced officer safety and reduced liability, and as the WDOC pilot shows, it appears that similar benefits can also be achieved within correctional settings.[25]

In piloting the use of body cameras, the OIG recommends that CDCR choose at least one building on HDSP Level IV SNY facility. This will enable the department to compare incident and disciplinary data, among other things, to other buildings housing similar inmates. The OIG further recommends that the body cameras be equipped with GPS (global positioning satellite) geotagging technology, which is a common feature in body cameras. This feature could be important to determine the location of staff during incidents at any particular point in time, improving officer safety and possibly disproving staff misconduct allegations.

## ALLEGATIONS THAT STAFF ARE SLOW TO RESPOND TO INCIDENTS

Although the earlier table shows that HDSP has a high percentage of incidents involving the use of force, several inmates previously housed at HDSP said that staff would pick and choose which incidents to respond to with force. Inmates stated officers were sometimes deliberately slow to respond to incidents and intervene when inmates assaulted one another. Two recent incidents occurred at HDSP, where staff reports suggest a delayed response and failure to use force when it appears force was necessary to stop serious injuries to the victims from multiple attackers. The details of these incidents are as follows:

> Staff observed three inmates attacking another inmate on the yard by punching the victim with their fists. One officer reported that it took ten minutes before the inmates finally complied with staffs' orders to get down into a prone position. As staff finally approached the incident, the combatants ceased their attack. Staff reports state that the victim lost consciousness during the incident and was transported to an outside hospital for serious bodily injuries, including a broken nose, broken orbital socket, and stitches to his left eye. Force was not used to stop the attack.

> Staff observed four inmates attacking another inmate on the yard by punching the victim with their fists, while one of them stabbed the victim multiple times with an inmate manufactured weapon. Staff reports state that staff gave multiple orders for the inmates to get down, but the combatants continued their assault. As staff finally approached, the combatants ceased their attack. Staff reports state that the victim was transported to an outside hospital for serious bodily injuries, including more than 30 lacerations and puncture wounds to his face, neck, stomach, head, and back areas. Force was not used to stop the attack.

Allegations that officers are slow to respond to incidents are exceedingly difficult to adjudicate. There is no system currently in use that documents where officers are within

---

[25] A copy of WDOC's pilot report at WCI can be found in the Appendix J.

the prison. One solution would be to use GPS or RFID (radio frequency identification) type tags to document where officers are in the prison. Not only would these types of allegations be easy to resolve, but the use of this type of technology would be a significant enhancement to the safety and security of the individual officers. No officer could ever be isolated without someone knowing their location.

## RECOMMENDATIONS TO CDCR

- Immediately install cameras in all inmate areas, including, but not limited to, the exercise yards, rotundas, building dayrooms, patios, and program offices of HDSP.

- Implement a pilot program in at least one building on HDSP's Level IV SNY facility, requiring custody staff to wear body cameras, similar to the pilot conducted at Wisconsin's Waupun Correctional Institution. Ensure the body cameras are equipped with GPS geotagging technology. Collect, compare, and report the resulting incident, disciplinary, and other relevant data for the buildings with body cameras and the similar buildings without body cameras, for possible statewide pilot program expansion.

- Ensure that HDSP custody supervisors are scrutinizing all incidents where inmates receive serious injuries, and hold accountable officers who fail to timely respond to incidents and fail to use force when appropriate to stop potential deadly attacks.

- Consider using GPS or RFID type technology to document where within an institution an officer is located.

# *ARMSTRONG* REMEDIAL PLAN – ADA INMATES

## DISABILITY PLACEMENT PROGRAM

In 1994, a class action lawsuit (known as *Armstrong*) was brought against the department under the Americans with Disabilities Act and the Rehabilitation Act on behalf of inmates and parolees with disabilities. The resulting court-ordered *Armstrong* Remedial Plan[26] is the department's framework for ensuring inmates are not excluded from programs, services, or activities, and are not discriminated against, due to a disability.

The Disability Placement Program (DPP) is the department's set of plans, policies, and procedures related to *Armstrong*. Inmates with permanent mobility, hearing, vision, and speech impairments, or other disability or compound conditions severe enough to require special housing and programming, are to be placed in a designated DPP facility. HDSP has been a designated DPP facility since at least 1997. Inmates with a permanent impairment of lesser severity may be assigned to any of the department's institutions consistent with their existing classification factors.

The number of DPP inmates at any institution varies from day to day. In October 2015, of the more than 3,000 inmates housed at HDSP, approximately five percent (165) were DPP inmates, who were housed on various yards throughout the institution based on their classification factors.

| HDSP DPP Inmates | |
|---|---|
| Mobility Impaired (not impacting placement) | 58 |
| Full Time Wheelchair User | 30 |
| Hearing Impaired (not impacting placement) | 28 |
| Mobility Impaired | 19 |
| Intermittent Wheelchair User | 17 |
| Vision Impaired | 10 |
| Hearing Impaired | 3 |
| Total DPP Inmates[27] | 165 |

At the designated facilities, the department is required to provide reasonable accommodations or modifications for known physical or mental disabilities of qualified inmates. Examples of reasonable accommodations include: special equipment (such as

---

[26] A copy of the Plan can be found on CDCR's website, at: www.cdcr.ca.gov
[27] In addition, 19 of the 165 DPP inmates also had a secondary disability.

readers, sound amplification devices, or Braille materials), inmate or staff assistance, bilingual or qualified sign language interpreters, modified work or program schedules, or grab bars installed for mobility impaired inmates who require such.

Ultimately, when an inmate requests a durable medical device or an accommodation, custody staff must initially provide the device or accommodation to the inmate and then refer the inmate to a physician to determine whether the accommodation or device is needed for the disability. Custody staff does not have the authority to deny an accommodation or medical device unless there is a demonstrated security concern.

## CALLOUS TREATMENT OF DPP INMATES

During the OIG's review, allegations surfaced that staff callously disregarded an inmate's claimed disability and that a general culture of indifference to the plight of severely disabled inmates exists at HDSP. The OIG is currently monitoring three investigations that illustrate this culture of indifference. HDSP referred one of these investigations on its own; the other two cases would not have been referred for investigation, but for this review.

### Case Number 1

In this case, an inmate who had mobility impairment was virtually ignored by staff for hours. The *Armstrong* issues arose after a use-of-force incident. The inmate, who wore a leg brace to prevent foot drop due to an injury that occurred prior to his commitment to State prison, was confronted about alleged contraband shoes that he was wearing. When he refused to voluntarily relinquish the shoes, the shoes were forcibly removed. When the shoes were removed, custody staff also confiscated his leg brace. During that incident, the inmate received a head injury and a leg injury which required him to be taken to an outside hospital for a higher level of care.

When he returned from the hospital, he was in a wheelchair and was dressed in an orange jumpsuit (the type of jumpsuit inmates wear when outside the prison). He was directed to remove the jumpsuit and to return to his housing unit to pick up his issued blue prison clothing. His wheelchair was also taken from him. He protested that, because of his injuries, he could not walk and needed the wheelchair. By this time, he was only dressed in boxer briefs. He was told by custody staff that he did not have an authorization for a wheelchair and that he needed to walk back to his housing unit to get dressed. It should be noted that prior to the altercation he did walk with a cane and with a leg brace. The inmate protested that he could not walk and needed the wheelchair and was told by custody staff "when you get tired of sitting here you will get up and walk back to your housing unit." He remained outside the housing unit for an extended period of time while custody staff simply ignored him sitting there in his boxer briefs. At some point, a lieutenant noticed him sitting there and asked him why he was simply sitting there. The inmate explained that he could not walk back to the housing unit and, at this point, the lieutenant retrieved a wheelchair and had the inmate delivered to a medical clinic.

The inmate remained in the medical clinic for several more hours, sitting in a holding cell in his boxer briefs. Again, there is no evidence that staff inquired as to what his condition was and why he was sitting there. Finally, the same lieutenant who had delivered him to the medical clinic observed him sitting there and again inquired as to why he was just sitting in the medical clinic. The inmate again informed the lieutenant that he needed help getting back to his housing unit and at that point the lieutenant made arrangements for the inmate's cellmate to take the inmate back to his housing unit in a wheelchair. After finally arriving at his cell, the inmate remained for several days without a wheelchair and was unable to participate in programming. There is no evidence that custody checked on the inmate until he was transferred to another institution several days later.

There appears to have been a complete disregard for this inmate during the hours that he was simply sitting trying to get back to his housing unit and further disregard after he was in his cell.

**Case Number 2**

In this case, a wheelchair-bound inmate resisted being placed in a cell, claiming that he had safety concerns with the other occupant of the cell. The officers disregarded his safety concerns and physically picked him up out of the wheelchair and threw him into the cell. The door to the cell was then closed and the wheelchair was thrown against the door, damaging the wheelchair. Neither the use of force nor the damage to the wheelchair was reported. In addition, an inmate who could not ambulate was left in the cell without his wheelchair.

**Case Number 3**

In this case, a hearing impaired inmate who was wearing a vest noting that he was hearing impaired was slightly injured during a use-of-force incident. The inmate was receiving a package through Receiving and Release and for reasons still not clearly understood; the inmate became upset regarding his package. There was no sign language interpreter and it does not appear that the officer ever tried to establish effective communication.

The account of what happened becomes somewhat confused at this point with officer witnesses claiming that the inmate took a bladed stance and raised his fists while inmate witnesses consistently claim that this inmate turned around to leave and was tackled from behind. What is clear is that no reasonable attempt was made to establish effective communication with an inmate who has been deaf and speechless since birth.

## INTERNAL COMPLIANCE REVIEWS AND PLAINTIFF TOURS

As part of this authorized review, the OIG reviewed CDCR internal *Armstrong* compliance reviews and the reviews done by plaintiffs' counsel. The department has not done an internal compliance review since 2013, while plaintiffs' counsel has done a review within the past few months.

CDCR's 2013 internal *Armstrong* compliance review showed a decrease in compliance from the prior review done in 2011. After the 2013 compliance review, a final corrective action plan was required; however, the corrective action plan was not submitted until March 24, 2015.

In contrast, the most recent plaintiffs' counsel tour and document review at HDSP was conducted from August 18 – 21, 2015. Plaintiffs' counsel conducts yearly tours of each CDCR institution. The most recent Plaintiff *Armstrong* monitoring tour found HDSP significantly out of compliance in several areas. Many of the serious violations identified in this report have been previously identified by Plaintiffs, but never effectively addressed or remedied by the institution. The areas of noncompliance found by Plaintiffs are broadly documented in the following areas:

## I. MANAGEMENT FAILURES PREVENT THE INSTITUTION FROM RECOGNIZING AND REMEDYING VIOLATIONS

Plaintiffs believe that management has not embraced the reforms mandated by the *Armstrong* remedial orders. Plaintiffs allege that prison management fails to identify or stop violations from occurring. Plaintiffs report that inmates who were interviewed have claimed that staff retaliate against prisoners who request disability accommodations. These reports have remained consistent from year to year. What is most troubling is that the department has not investigated these complaints, seemingly dismissing them because they come from inmates.

For several years, a consistent complaint has been that appeals "disappear" or "go missing." Interviews of inmates by Plaintiffs' counsel have been consistent with complaints received by the OIG about appeals that have gone missing or are not acted on. The OIG's review of the appeals system at HDSP noted that the institution is not collecting appeals as directed by a memo authored by a former Director of Adult Institutions, which directed institutions to collect appeals with personnel other than officers who may be subjects of staff complaints. HDSP tasks housing officers on first watch to collect the appeals. This practice sets the department up for allegations that officers who may be the subject of a complaint are interfering with the complaint process.

## II. THE YARDS ARE INACCESSIBLE AND PRISON STAFF DO NOT BELIEVE THERE IS ANY DURABLE REMEDY

Plaintiffs allege that the paths of travel throughout the yards at HDSP are inaccessible to people with mobility and vision impairments. Cracks that appear two or three inches wide and one-half to two inches deep run throughout each of the prison yards, making the yards unsafe for prisoners with significant mobility and vision impairments. Path of travel problems throughout the yards are longstanding, and are the subject of numerous reports and appeals as documented in the Plaintiffs' March 2014 HDSP report.

There appears to be no immediate ongoing remedial plan to improve accessibility of all paved areas at the prison and at all times of year. Although CDCR expects to complete "master plan" repairs to HDSP, those repairs are not expected to begin until mid-2016.

Again, it appears that there is no management emphasis on making the yards accessible in the near term.

## III. VIOLATION OF STATE MOBILITY IMPAIRED VEST POLICY

Prison staff confirmed that the policy at HDSP is to require everyone to sit down on the ground when there is an alarm – including those wearing mobility vests. This is contrary to the statewide policy stated in a February, 25, 2014, Memorandum from the Director of Adult Institutions and the Director of Health Care Operations at the California Correctional Health Care Services (CCHCS) to all wardens, which states that "inmates wearing a MI [Mobility Impaired] Vest are not required to attain a seated position" during alarms. This violation of policy is particularly concerning because the *identical* violation was identified in the Plaintiffs' March 2014 HDSP report.

## IV. LACK OF EFFECTIVE INMATE DISABILITY ASSISTANT PROGRAM

The Inmate Disability Assistant Program (IDAP) is not functioning adequately at HDSP, as IDAP workers are not allowed out of their cells during their work hours unless they are specifically called by a correctional officer to provide help; IDAP workers are not trained; and IDAP workers were instructed to perform inappropriate tasks including carrying canteen items for prisoners and, more troubling, one IDAP worker was instructed to place his cellmate in waist-chain restraints.

## V. FAILURE TO ACCOMMODATE PRISONERS WITH HEARING IMPAIRMENTS

Class members reported that staff failed to allow the use of telecommunication devices for the deaf (TDD) phones, failed to provide sign language interpretation, and failed to communicate alarms and announcements.

## VI. OTHER CUSTODY STAFF FAILURES ALLEGED BY PLAINTIFFS' COUNSEL

### *Failure to maintain ADA cells in working order*
There was water leaking from the ceiling in numerous wheelchair-accessible cells on facility B and the ADA staff had been unaware of these leaks until Plaintiffs raised them. If prison staff had been conducting the safety checks and ADA features checks required by the local operating procedures, staff would have identified and remedied these leaks earlier.

### *Failure to provide orientation materials*
Numerous class members who had recently arrived to the prison reported that they had not received orientation, including information regarding the purpose of the DPP; availability of the CCRs, ARP, and similar printed materials in accessible formats; reasonable accommodations or modifications available to qualified inmates; access to readers or scribes and availability of specialized library equipment.

### *Lack of access to day room showers*
Numerous inmates with disability placement wheelchair (DPW) status throughout B yard reported that they have difficulty accessing the ADA showers because so many non-disabled

prisoners use that shower, and because prisoners with disabilities who have mobility devices, prostheses, or incontinent supplies, often require additional time to complete their showers. This issue has been raised in numerous appeals, and in numerous prior reports.

### Laundry
Incontinent prisoners throughout the institution reported to Plaintiffs' counsel that when they have accidents, they are unable to get clean clothing or laundry. That complaint has been relayed to management with no evidence of management action.

### Lack of knowledge of the new durable medical equipment (DME) policy
Interviews with class members suggest that custody staff still demand Chronos for hygiene supplies, such as toilet paper. Numerous prisoners throughout the institution who are incontinent as a result of their disability also reported that they are denied access to a shower when they have an accident. The same issues were reported last year.

### Failure to provide restroom accommodations in the library
Library staff confirmed that prisoners are not allowed to access restrooms while in C or D facility libraries. This poses a problem for class members who, because of their disability, are incontinent and may need immediate access to a bathroom.

### Mismanagement of prisoner property
Plaintiffs received a number of complaints from class members claiming that prison staff allow other prisoners go through their personal property and, as a result, items are stolen. The OIG has also received the same type of complaints.

## VII. HEALTH CARE STAFF FAILURES ALLEGED BY PLAINTIFFS' COUNSEL

### Delayed provision of durable medical equipment
A number of prisoners complained of improper delays in receipt of ordered durable medical equipment. A review of the DME logs and receipts indicate additional delays.

### Wheelchair repair problems
Although the local operating procedures require HDSP staff to evaluate each wheelchair each day to determine if it is in safe working order, it is apparent that this is not occurring. Nor are staff taking appropriate steps to ensure that broken wheelchairs are repaired. This same problem was reported last year.

### Erroneous charges for durable medical equipment supplies
Plaintiffs identified numerous instances where class members were inappropriately charged for wheelchair gloves and hearing aid batteries.

### Failure to provide needed toileting supplies
Monitors received reports that disabled inmates had not received needed toileting supplies, such as colostomy supplies, gloves, chux, tape, or bio bags.

*Confusing or incomplete documentation of disabilities and failure to ensure effective communication*
Plaintiffs received reports that medical staff failed to ensure effective communication with hearing impaired prisoners.

## VIII. APPEALS STAFF RESPONSIBILITIES

HDSP recently implemented the Reasonable Accommodation Panel (RAP) process for addressing requests for disability accommodations and/or allegations of disability discrimination.

*Inappropriately identifying requests as "non-ADA"*
RAP responses continue to include language inappropriately identifying ADA accommodation requests as "non-ADA". For example; an inmate reported that R&R staff made him choose whether to transfer with his wheelchair or with his property. The RAP response inappropriately states that this issue is "non-ADA related" even though failing to transfer prisoners with their ADA assistive devices is a violation of the ADA and Remedial Plan.

*Failure to identify accountability issues raised in appeals*
Multiple appeals alleged *Armstrong* violations on the part of staff members were not flagged for *Armstrong* accountability investigations.

*Improperly construing access issues*
Plaintiffs' counsel identified a tendency on the part of the RAP to narrowly construe the definition of equal access to programs, services, and activities. For example, one inmate stated that he was in special education previously and is now "unable to focus on things or take knowledge in." He requests transfer to a prison that will help him learn properly. The RAP response form inappropriately states that "no issues were identified with access to program, services, or activities." Access should not be construed as physical access only; it also includes barriers resulting from communication and learning difficulties.

## IX. ACCOUNTABILITY

This report and prior tour reports allege violations of the ADA, the *Armstrong* Remedial Plan, and *Armstrong* Court orders. Pursuant to the August 22, 2012, order, CDCR must "track any allegation that any employee of the Department of Corrections and Rehabilitation was responsible for any member of the Plaintiff class not receiving access to services, programs, activities, accommodations or assistive devices required by" the ADA, the Court's Orders, or the Remedial Plan. "All such allegations shall be tracked, even if the non-compliance was unintentional, unavoidable, done without malice, done by an unidentified actor or subsequently remedied." The order contains detailed requirements regarding the timing and content of investigations and investigation reports. Plaintiffs' counsel reviewed the CDCR and CCHCS "Employee Non-Compliance Logs" for the months of January – May 2015. Defendants recorded a total of 423 incidents during those months. Of those, investigations are still ongoing in 76 cases. Of the cases where investigations were completed, employee non-compliance was confirmed in 325 (or 77 percent of) cases. In

addition, Plaintiffs' counsel found seven allegations of non-compliance in appeals that did not appear in the logs, but should have.

**DEPARTMENT RESPONSE**

After the Plaintiff tour and report, the department provided a response that, for the most part, acknowledges the deficiencies found by Plaintiffs. The almost universal response by the institution management to these deficiencies is that "staff will be trained."

This response does not address the underlying concerns about why staff has not already been trained, and who is accountable for the lack of training. For example, one deficiency found in the August 2015 tour was that mobility-impaired inmates were being required by HDSP custody staff to prone out on the yard when an alarm was sounded. The directive excusing mobility impaired inmates from this requirement was published by the Director of Adult Institutions in February 2014. The underlying concern is why staff is not already trained in this area and who should be held accountable for the lack of training. Prison managers have not been held accountable for these lapses.

The above information documents a profound lack of management and custody staff emphasis on ADA issues in a facility designated to house disabled inmates. Staff is not sensitive to the needs of disabled inmates nor does staff appear to consider ADA accommodation to be an important aspect of custody duties.

The OIG's review found evidence that insensitivity to these issues still exists.

## RECOMMENDATIONS TO CDCR

- Move the DPP inmates to another *Armstrong*-designated institution, if paths of travel and accessibility cannot be immediately fixed at HDSP.

- Revise the ADA tab in the SOMS computer system to:

    o Better capture details of an ADA inmate's accommodation needs. For instance, instead of only stating that an inmate has an accommodation for "shoes," insert a detailed description, or even a picture of the shoes.

    o Include a place to record the doctor's name.

    o When applicable, describe the specific restraint accommodation needed, such as "waist restraint."

- Train staff on *Armstrong* Remedial Plan and ADA requirements, document the training, and when new violations occur, hold both the offending officers and their supervisors accountable for failure to follow or enforce the training.

# INTERNAL AFFAIRS INVESTIGATIONS

Over the past few years there have been a significant number of misconduct complaints levied against staff at High Desert State Prison. However, especially over the last 12 months, there have been numerous instances in which the hiring authority has failed to refer cases of serious misconduct to CDCR's Office of Internal Affairs for investigation. Additionally, a concern has arisen regarding CDCR's assignment of "resident special agents," particularly at High Desert State Prison. Resident agents are OIA special agents, but they do not work out of the Office of Internal Affairs; instead their office is located within the prison they are assigned to investigate. Thus, they are enmeshed into the culture of the prison and not in an independent office at a centralized location away from the prison, like the majority of the other OIA special agents.

## HIRING AUTHORITY REFERRALS AND INTERNAL ALLEGATION INQUIRIES

DOM Chapter 3, Article 14 sets forth the department's policies regarding internal investigations. Section 31140.14 gives the hiring authority the discretion to direct "locally designated investigators approved by the OIA or OIA investigators [special agents]" to conduct an allegation inquiry when there is an allegation of misconduct, which if true could lead to adverse action, and the subject(s), allegation(s), or both are not clearly defined or more information is necessary to determine if misconduct may have occurred.

The locally designated investigator is often times a sergeant or higher ranking member of the institution's Investigative Services Unit (ISU).

The hiring authority is required to maintain a log on a *CDCR Form 2140*, of all allegations of staff misconduct, regardless of whether the allegation is referred for investigation. The log must also state whether or not an allegation inquiry is being conducted and the resulting action from the allegation inquiry (e.g., referred to OIA for investigation, processed as a *CDCR Form 602*, *Inmate/Parolee Appeal Form*, or found to not have merit).[28]

If sufficient evidence is known or obtained through an allegation inquiry to warrant an internal investigation, the hiring authority is to refer a *CDCR Form 989, Confidential Request for Internal Affairs Investigation*.[29] Upon receipt of a referral, the Office of Internal Affairs decides whether to open an investigation, refer the case to another entity for an investigation, return the case to the hiring authority without an investigation for direct disciplinary or corrective action, return the case for further inquiry, or determines that no action is necessary. Pursuant to PC Section 6133, the OIG is responsible for the

---

[28] DOM, Chapter 3, Article 14, Section 31140.13.
[29] DOM, Chapter 3, Article 14, Sections 31140.4.10 and 31140.4.14, and 31140.4.15.

contemporaneous public oversight of the investigations conducted by the Office of Internal Affairs and for advising the public regarding the adequacy of each investigation and whether discipline of the subject of the investigation is warranted.

During the review of HDSP, several areas of concern arose related to allegation inquiries. First, HDSP is not keeping a consistent *CDCR Form 2140, Internal Affairs Allegation Log*. This makes it very difficult for HDSP to identify staff who have repeated allegations of misconduct made against them and this lack of transparency makes it difficult to determine what action, if any, High Desert State Prison management has taken regarding specific allegations of misconduct made against HDSP staff.

Second, when allegation inquiries are conducted, one route that can be taken is to close the case, without referring the case to OIA for an investigation, if the person conducting the allegation inquiry finds that the allegation has no merit and the hiring authority agrees. Unfortunately, there actually is no process for OIA to appoint "a locally designated investigator," so the persons conducting allegation inquiries are appointed by the hiring authority with no "designation" from the Office of Internal Affairs. Additionally, there is no required training for persons conducting allegation inquiries, and there is no training for hiring authorities to recognize what is an adequate enough allegation inquiry to deem it unnecessary to refer to OIA for an investigation. Therefore, the quality of allegation inquiries varies widely, and without a consistent Allegation Log, it is difficult to determine what the hiring authority has decided to do when allegations of misconduct become known. One thing we do know for sure is that there were many allegations of staff misconduct that HDSP management chose not to refer for investigation (please refer to the following).

## ALLEGATIONS OF MISCONDUCT INVOLVING HDSP STAFF

The OIG learned of several allegations of misconduct involving HDSP staff and urged both HDSP and CDCR's Office of Internal Affairs to take action. The cases described below are examples of staff misconduct allegations the HDSP hiring authority did not refer for investigation, and would not have been investigated, but for this review.

- An officer allegedly directed expletives at inmates including derogatory language and racial slurs. The officer's misconduct placed inmates and staff in a dangerous situation, and as inmates became agitated, two additional officers heard the statements and failed to report the officer's misconduct. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- An officer allegedly threatened an inmate that he would be assaulted if the inmate refused to sign a form declaring that the inmate did not have enemy concerns on the yard. The officer allegedly had the inmate assaulted by other inmates. The Office of Internal Affairs investigation is still in progress.

- An officer allegedly called an inmate a "baby killer" and disclosed the inmate's criminal history to other inmates, creating a serious security risk for the inmate. The same officer allegedly pulled an inmate's pants and underwear up to the middle of his back during a routine search. The officer also attempted to humiliate the inmate in front of others, and threatened him. In retaliation for the inmate's complaint regarding this incident, that officer and another officer allegedly conducted a search of the inmate's cell and wrote false rules violations reports against the inmate and his cellmate for possession of inmate manufactured alcohol. The second officer also allegedly falsely attested that a sergeant confirmed that alcohol was found in the cell. The sergeant allegedly neglected his duty when he signed the rules violation report before completing a review of the document. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Officers allegedly provided confidential criminal history about an inmate to other inmates, after which the inmate was assaulted. The Office of Internal Affairs concluded its investigation and forwarded its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- An officer allegedly yelled abusive comments toward an inmate and then directed the control booth officer to turn the power off on the lower tier. The control booth officer allegedly turned the power off on the lower tier, and placed the inmate in jeopardy when he announced to the other inmates that the power outage was due to the inmate. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Two officers allegedly falsely claimed that an inmate's property had another inmate's name on it and confiscated it as contraband. An officer allegedly removed security screws from an inmate's television as a ruse to confiscate the property as contraband. The Office of Internal Affairs investigation is still in progress.

- An officer allegedly used physical force to take a hearing-impaired inmate to the ground and repeatedly slammed his head onto a concrete floor. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- A nurse issued non-standard shoes to an inmate as a medical accommodation. The shoes had a red stripe. A captain, without resolving the medical accommodation needs of the inmate, allegedly determined the shoes were contraband and ordered officers to seize the shoes from the inmate. The officers also seized a leg brace from the inmate. When the officers attempted to seize the shoes, the inmate resisted and officers used physical force and allegedly injured the inmate during

the incident. The inmate suffered an injury to his pre-existing disabled leg and a cut to his forehead necessitating medical attention at an outside hospital. When the inmate was returned to the institution the same day, officers initially refused to assist him to his cell with a wheelchair. The inmate was left to remain on a patio and then in a medical holding cell for several hours without proper attire considering the weather conditions. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Prison officials allegedly failed to respond to safety concerns expressed by an inmate. Subsequently, the inmate was assaulted. The Office of Internal Affairs concluded its investigation and forwarded its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Two officers and a sergeant allegedly solicited an inmate to commit assaults on another inmate who had masturbated in front of a female sergeant. The Office of Internal Affairs investigation is still in progress.

- Several officers allegedly disclosed an inmate's confidential criminal history to other inmates. Subsequently, the officers allegedly approached the inmate's cell, cursed at him, discussed his case, and said that he "deserves to die." An officer then allegedly arranged for the inmate to be assaulted. The Office of Internal Affairs investigation is still in progress.

In the following instances, the hiring authority identified possible misconduct and referred the cases to the Office of Internal Affairs:

- An officer allegedly told an employee, she should join the green team, inmates are not human, and that the institution is a zoo. The officer also allegedly slammed his baton onto the counter and stated, "I have my own version of progressive discipline." The Office of Internal Affairs determined that an investigation was not necessary, as there was sufficient evidence of misconduct, and returned the case to the hiring authority to take direct action. The hiring authority imposed a salary reduction.

- An officer allegedly taunted an inmate in a mental health crisis bed, banged the door to the inmate's cell with his baton, and then covered the inmate's window with paper. The Office of Internal Affairs investigation is still in progress.

- Six officers allegedly responded to an inmate's safety concerns by physically picking him up out of his wheelchair, throwing him into a cell, and then damaging the wheelchair by throwing it against the closed cell door. The six officers also allegedly failed to report their use of force. A seventh officer who was working in the control booth in the building failed to report the force that he observed. The Office of Internal Affairs investigation is still in progress.

- An officer allegedly failed to report a second officer's use of force. During the incident, the control booth officer allegedly failed to maintain observation of the officers and inmates. The Office of Internal Affairs investigation is still in progress.

- An OIA resident agent released confidential information regarding multiple internal investigations, including information regarding a pending criminal investigation. The hiring authority demoted the special agent, who returned to his former lieutenant position at High Desert State Prison. Shortly after his return, the HDSP acting warden at the time placed him in an acting captain position.

- An employee relations officer allegedly failed to report that an OIA special agent had improperly divulged confidential information. The special agent allegedly falsely advised the employee relations officer that he had reported his misconduct to a senior special agent. The employee relations officer allegedly withheld information during an interview with the Office of Internal Affairs. The OIA concluded its investigation and the hiring authority imposed a salary reduction against the employee relations officer, who resigned before the penalty was served.

- Two non-custody staff allegedly released confidential information pertaining to the internal investigations of several employees. One of the employees was allegedly dishonest during an interview with the Office of Internal Affairs and allegedly discussed the interview with another employee after being ordered not to do so. The hiring authority sustained the allegations, dismissed the dishonest employee, and imposed a salary reduction against the other.

- An officer allegedly subjected another officer to threats and intimidation for failing to use lethal force on inmates during a prior incident when the inmates assaulted custody staff. The Office of Internal Affairs investigation is still in progress.

Several of these investigations involve allegations meriting dismissal if sustained. It should be noted that there are some officers involved in multiple cases.

## OFFICE OF INTERNAL AFFAIRS RESIDENT AGENTS

CDCR's Office of Internal Affairs has started assigning "resident agents" to institutions located in hard-to-reach areas. In addition to the recent retirement of the resident agent assigned to the California Men's Colony (CMC) in San Luis Obispo, resident agents were assigned to the following institutions:

- Chuckawalla Valley State Prison – Blythe, CA
- California State Prison, Centinela – Imperial, CA
- High Desert State Prison – Susanville, CA
- California Correctional Center – Susanville, CA
- Pelican Bay State Prison – Crescent City, CA
- Salinas Valley State Prison – Soledad, CA
- San Quentin State Prison – San Quentin, CA

As part of the regular monitoring of the discipline process, the OIG has previously criticized this practice, and the OIA responded by ending the San Quentin assignment, and does not plan to assign a resident agent to CMC in San Luis Obispo. However, the others have remained in place.

Routinely, resident agents have an office physically located within the prison they are tasked with investigating. In all of the current assignments, the resident agent worked at least part of their career, if not their entire career, at one of the institutions they now "reside" at for work. While the OIG understands the department is attempting to remedy a recruiting issue, the assignment of resident agents can lead to bias or the perception of bias. In addition, the assignment of resident agents runs counter to the recently codified[30] *Madrid* mandate, which to facilitate contemporaneous oversight and transparency, requires OIG staff be physically co-located with OIA staff.

Recent events at High Desert State Prison highlight the problems that assigning a resident agent can cause, not only for the resident agent, but also for the friends and coworkers the agent encounters. As described in a previous section, a special agent assigned to HDSP was demoted after he released confidential information regarding multiple internal investigations, including information regarding a pending criminal investigation. His demotion caused him to be placed back at HDSP. Shortly thereafter, he was promoted. This leaves the perception that he was being rewarded by HDSP management for his actions as an OIA special agent, and his loyalty to HDSP.

Additionally, an officer from CCC was disciplined for receiving confidential information from the resident agent pertaining to another employee's internal investigation and then failing to report that he had received the information. Staff from HDSP released confidential information pertaining to the internal investigations of several other employees.

---

[30] PC Section 6133.

On a separate but similar note, the OIA routinely assigns investigations to non-resident agents at institutions where they recently worked. While special agents are required to sign a conflict of interest form, disclosing any conflict in the cases they are assigned to investigate, the Office of Internal Affairs assigns an overly narrow interpretation to the concept of a "conflict of interest." While OIA contends it can be valuable for a special agent to be familiar with a prison (in particular, its processes, layout, etc.) when conducting investigations, it is important that all possible conflicts be duly considered, as an effective investigation and employee discipline process must be free from bias or the perception of bias. OIA's conflict form requires only a self-assessment by the assigned agent with little or no additional scrutiny by a supervisor unless the agent indicates a potential conflict.

## RECOMMENDATIONS TO CDCR

- Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

- Require allegation inquiries be conducted only by staff who have received formal internal affairs investigation training.

- Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize a complete, thorough, and adequate allegation inquiry report.

- Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140, Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13.

- Cease the practice of assigning resident agents.

- Carefully review and consider conflict of interest forms completed by special agents prior to assigning investigations, especially when contemplating assigning investigations to special agents who formerly worked at the institution where the misconduct allegations arose.

# FINDINGS AND RECOMMENDATIONS

## FINDING 1 – ENTRENCHED CULTURE

There is evidence that a perception of insularity and indifference to inmates exists at High Desert State Prison, exacerbated by the unique geographical isolation, the high stress environment, and a labor organization that opposes oversight.

## RECOMMENDATIONS TO CDCR

1.1 Infuse HDSP supervisory and management positions with culturally diverse staff who have experience working in other institutions and do not have lifelong ties to the community.

1.2 Consider rotating HDSP management staff to other institutions, similar to the rotation required for CDCR headquarters peace officer staff.

1.3 Increase the frequency at which peer reviews are conducted at HDSP.

1.4 Revise the peer review tool to include follow-up measures and tests that better assess areas that could indicate deep-seated issues, such as by adding PREA and ADA compliance components.

1.5 Increase inmate programming, especially on the SNY facilities.

1.6 Ensure inmates housed in enhanced program facilities meet the EPF participation criteria.

1.7 Ensure HDSP is following the DOM requirements related to staff in high stress assignments.

1.8 Require HDSP seek approval from the CDCR Associate Director, prior to extending staff in high stress assignments beyond the initial two years.

1.9 Seek out opportunities to partner with organizations, such as the US DOJ, to conduct research and provide training to custody staff, starting at HDSP, on how to recognize and address implicit bias.

1.10 Implement a mindfulness and wellness program that gives staff resiliency tools to cope with working in a uniquely stressful environment.

# FINDING 2 – SEX OFFENDERS AND THE R SUFFIX

The R suffix has served as a bull's-eye target on some inmates at HDSP and other prisons, some of whom have never been convicted of a sex offense.

## RECOMMENDATIONS TO CDCR

2.1 Develop a policy authorizing staff to access an inmate's electronic record on a need-to-know basis only. The policy should add admonishment language to the SOMS login screen, advising against misuse, and the consequence thereof.

2.2 Develop a method of tracking and recording staff access to records in SOMS and other inmate records, and periodically audit access history to identify potential misuse.

2.3 Remove the R suffix information from the SOMS header, as any staff specifically needing this information can find it on another screen.

2.4 Conduct an in-depth review of every form and document that currently requires commitment offense information and R suffix notations, and remove this requirement from all forms and documents where it no longer serves a legitimate purpose.

2.5 Consider providing inmates with only hard copies of certain portions of non-confidential documentation from SOMS or other inmate records, to exclude commitment offenses, R suffix notations, and any other information that may put an inmate at risk.

# FINDING 3 – SENSITIVE NEEDS YARDS

Based upon this review and observations in prior OIG reports, the use of sensitive needs yards merits a complete overhaul.

## RECOMMENDATIONS TO CDCR

3.1 Address the growing violence on sensitive needs yards by:

a) developing formal policies and procedures related to SNY housing;

b) considering the development of separate SNY housing criteria for vulnerable inmates at risk of assault;

c) transferring aggressors to some other type of housing;

d) re-examining the double cell policy for sensitive needs yards pursuant to previous OIG recommendations,

e) requiring completion of a compatibility review, similar to the *CDCR Form 1882-B*, *Administrative Segregation Unit/Security Housing Unit Double Cell Review*; and

f) reviewing the process for transitioning inmates from single-cell designation to double-cell status, pursuant to prior OIG recommendations.

3.2 Add more meaningful programs to sensitive needs yards, especially Level IV SNYs such as HDSP's Facility B, where programs have been historically lacking.

3.3 Ensure that classification staff designating inmates as requiring SNY placement, inform them that SNY yards are still violent, have programming no different from GP yards, and once assigned to an SNY, it is very difficult to ever return to a general population yard.

3.4 Require training for SNY staff in supervising vulnerable populations.

3.5 Require racial balance criteria for inmate program assignments in SNY housing, at least at HDSP, similar to general population facilities, to overcome the perception of racial bias.

## FINDING 4 – INMATE APPEALS AND STAFF COMPLAINTS

The inmate appeals system at HDSP is not functioning adequately and the staff complaint process is broken.

## RECOMMENDATIONS TO CDCR

4.1 Create a formal policy that reflects the contents of the December 30, 2011, memo titled: *Secure Appeal Collection Sites and Related Matters*, but require appeals in lock boxes be retrieved by Appeals Office staff only.

4.2 Add a receipt feature to the *CDCR Form 602, Inmate/Parolee Appeal*, or assign a log number to all appeals at the point of collection.

4.3 Immediately reiterate that initial appeal content is to be read by Appeals Office staff only, until assigned out for response.

4.4 Provide HDSP staff with training relating to the processing and handling of inmate property and hold officers accountable for failing to abide by the relevant policies and procedures.

4.5 Require institutions to conduct a management review into an employee's performance and worksite when multiple staff complaints are filed by multiple inmates against an individual employee.

4.6 Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs

investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

4.7 Require staff performing allegation inquiries into staff complaints receive formal internal affairs investigation training prior to conducting allegation inquiries.

4.8 Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize complete, thorough, and adequate allegation inquiry reports.

4.9 Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140*, *Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13, which requires each allegation of employee misconduct be logged, regardless of whether the allegation is referred for investigation.

4.10 Renegotiate Section 9.09 of the Bargaining Unit 6 MOU to treat inmate appeals in the same manner as any other allegation of staff misconduct.

4.11 Remedy the inability of inmates in ASU or on a modified program to personally place their appeal into a lock box by mandating Appeals Office staff personally retrieve the appeal from the inmates' cells or instituting some form of secure mobile collection process.

4.12 Dispatch staff from the Appeals Office to conduct an in-depth audit of HDSP's appeal process, provide any remedial training necessary, and report back to CDCR administrators any policy or procedure deficiencies revealed by a review of HDSP inmate appeals, such as property issues and the handling of staff complaints.

# FINDING 5 – USE OF FORCE INCIDENTS

There are statistical trends, continued complaints, and recent misconduct allegations that cause alarm about the use of force at HDSP.

## RECOMMENDATIONS TO CDCR

5.1 Immediately install cameras in all inmate areas, including, but not limited to, the exercise yards, rotundas, building dayrooms, patios, and program offices of HDSP.

5.2 Implement a pilot program in at least one building on HDSP's Level IV SNY facility, requiring custody staff to wear body cameras, similar to the pilot conducted at Wisconsin's Waupun Correctional Institution. Ensure the body cameras are equipped with GPS geotagging technology. Collect, compare, and report the resulting incident, disciplinary, and other relevant data for the

buildings with body cameras and the similar buildings without body cameras, for possible statewide pilot program expansion.

5.3  Ensure that HDSP custody supervisors are scrutinizing all incidents where inmates receive serious injuries, and hold accountable officers who fail to timely respond to incidents and fail to use force when appropriate to stop potential deadly attacks.

5.4  Consider using GPS or RFID type technology to document where within an institution an officer is located.

# FINDING 6 – *ARMSTRONG* REMEDIAL PLAN – ADA INMATES

In light of the *Armstrong* federal court's ongoing monitoring, the OIG expressly refrains from making findings in this area, and has reserved comment to those areas where OIG's review has supported the Plaintiffs' last review and the department's inadequate responses. We make the following recommendations in light of these comments.

## RECOMMENDATIONS TO CDCR

6.1  Move the DPP inmates to another *Armstrong*-designated institution, if paths of travel and accessibility cannot be immediately fixed at HDSP.

6.2  Revise the ADA tab in the SOMS computer system to:

a) Better capture details of an ADA inmate's accommodation needs. For instance, instead of only stating that an inmate has an accommodation for "Shoes," insert a detailed description, or even a picture of the shoes.

b) Include a place to record the doctor's name.

c) When applicable, describe the specific restraint accommodation needed, such as "waist restraint."

6.3  Train staff on *Armstrong* Remedial Plan and ADA requirements, document the training, and when new violations occur, hold both the offending officers and their supervisors accountable for failure to follow or enforce the training.

# FINDING 7 – INTERNAL AFFAIRS INVESTIGATIONS

The use of resident agents is a poor practice and should be discontinued, especially at HDSP in light of the issues that arose from the placement of a resident agent at that institution. Additionally, the processes in place for allegation inquiries at HDSP are inadequate, and could be improved statewide. The OIG is monitoring several misconduct investigations that, but for this review may not have been opened or investigated to the broadest extent appropriate.

# RECOMMENDATIONS TO CDCR

7.1 Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

7.2 Require allegation inquiries be conducted only by staff who have received formal internal affairs investigation training.

7.3 Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize a complete, thorough, and adequate allegation inquiry report.

7.4 Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140*, *Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13.

7.5 Cease the practice of assigning resident agents.

7.6 Carefully review and consider conflict of interest forms completed by special agents prior to assigning investigations, especially when contemplating assigning investigations to special agents who formerly worked at the institution where the misconduct allegations arose.

# CONCLUSION

First, we want to note that there are dedicated, hardworking, and conscientious staff that make up the vast majority of the workforce at HDSP. They come to work every day and do the best they can in a very difficult job. However, as a famous quote states:

*"All that is necessary for the triumph of evil is that good men do nothing."*
-Edmund Burke

Many of the specific instances of misconduct and even some of the pervasive indifferent treatment of inmates can be narrowed down to a small percentage of active participants, many of whom are currently under investigation. But how is it that they have been able to continue this conduct without interference by others or management? How is it that the sister institution CCC does not have the same problems and complaints? The answers may lie in the very design and mission of HDSP and the environment in which it has been placed.

HDSP has a myriad of missions and houses the highest security level of inmates. The same is not true at CCC. Officers at HDSP are constantly on high alert, and enter the prison with an "us versus them" mindset. This translates into a culture where "if you aren't for us, you're against us." Add to that a labor organization that values the brotherhood of silence over the professionalism of its members, and you add another level of legitimacy to a negative culture. The irony is that this very culture endangers the staff working at HDSP as much as anything else. When you deprive inmates of procedural justice, and there is no recourse for mistreatment because the appeals process is broken and there is a perception that staff misconduct is not addressed, there should be no surprise that violence erupts.

Unlike any other locale, HDSP staff live in a true "prison town" where they cannot disassociate from the job. The pressure to conform to the prevailing norm is tremendous. One of the differences in a lower security prison such as CCC is that staff see the inmates trying to make a difference, and "deserving" of a chance to do so. There is less violence, more programs, less stress, and therefore not the same negative mentality.

The department could change the population of HDSP, and concede that the other forces at work prevent it from ever curing its dysfunction in the current mode. That would be the most drastic of solutions.

However, with the support of the CDCR Administration, and the right leadership from management and in the ranks, HDSP can change these perceptions, if they choose to do so. The department can implement recommendations from this review, weed out the problem individuals, and provide hope for the future.

The department is now being presented with yet another opportunity to fix the problems at HDSP that have plagued the institution for over a decade. Otherwise, this review will

have been for naught and another review will almost assuredly follow in the very near future.

To their credit, CDCR leadership had staff conduct a peer review, which was a start. The department has now instituted additional *Armstrong* training at HDSP, as well as a comprehensive management review and training plan, to be led in December and January by the newly placed acting warden. The OIG has met with CDCR's OIA to discuss the use of resident agents, and while CDCR has not agreed to discontinue their use, OIG's concerns were heard, and the department agreed in theory that hiring agents from the prisons they are assigned to is not a best practice. The OIA is considering steps to mitigate bias, such as moving agents to offices outside the institution. But even that measure will not cure the problems with using a resident agent at HDSP.

Nonetheless, these recent efforts signal that a desire for change exists within CDCR leadership. The OIG has a sincere hope that they will be successful.

# APPENDICES

Appendix A– Senate Rules Committee Authorization Letter………………….………64

Appendix B– CDCR Memorandum: Enhanced Program Facility Institutions……...……66

Appendix C– CDCR Memorandum: Secure Appeal Collection Sites and Related

          Matters..........................................................................................................69

Appendix D– California Department of Corrections and Rehabilitation Zero Tolerance

          Regarding the Code of Silence…………….………………………………..71

Appendix E– Peer Review High Desert State Prison…………………………………72

Appendix F– Police Racial Violence: Lessons From Social Psychology…………..……89

Appendix G– Center for Mindfulness in Corrections…………………………....…..105

Appendix H– Average Number of Incidents per 100 Inmates, June 2014-June 2015....107

Appendix I– Average Number of Inmate Disciplinary Actions per 100 Inmates June

          2014-June 2015…………...…..………………………………………....…108

Appendix J– WCI Taser Body Camera Pilot…………………….…………..…………109

# EXHIBIT G

1   DANIEL M. LINDSAY (SBN 142895)
2   PHILLIP MURRAY (SBN 213352)
    JAMES HARRISON (SBN 194979)
3   JENNIFER RAGAN (SBN 191711)
    JUSTIN DELACRUZ (SBN 285274)
4   CALIFORNIA CORRECTIONAL
    PEACE OFFICERS ASSOCIATION
5   LEGAL DEPARTMENT
    755 Riverpoint Drive, Suite 200
6   West Sacramento, California 95605-1634
    Telephone: (916) 372-6060
7   Facsimile:  (916) 340-9372

8   Attorneys for Plaintiffs

FILED
Superior Court Of California,
Sacramento

11/24/2015

ahall2

By_____, Deputy

Case Number:

34-2015-00187126

9                 SUPERIOR COURT OF CALIFORNIA

10                  COUNTY OF SACRAMENTO

11   BRYAN BLUE, JASON HASTEY,          )   Case No.:
     STEVEN OSCHNER, ARTHUR TOVAR,      )
12   JAMES MCCLOUGHAN,                  )   **COMPLAINT FOR INJUNCTIVE RELIEF**
     CALIFORNIA CORRECTIONAL            )   **AND OTHER EXTRAORDINARY RELIEF**
13   PEACE OFFICERS ASSOCIATION         )   **PURSUANT TO POBRA AND U.S.C § 1983**
                                        )
14          Plaintiffs,                 )
15   v.                                 )
                                        )
16   CALIFORNIA OFFICE OF THE           )
     INSPECTOR GENERAL; ROBERT A.       )
17   BARTON, Inspector General, ROY     )
     WESLEY, Chief Deputy Inspector General )
18   MICHAEL J. MADDOX, Deputy Inspector )
     General, CALIFORNIA DEPARTMENT OF  )
19   CORRECTIONS AND REHABILITATION;)
     JEFFREY BEARD, Ph.D, Secretary, DOES )
20   1-100                              )
                                        )
21          Defendants._____  )

22           **JURISDICTION, VENUE, AND PARTIES**

23   1.  Venue is proper in the Superior Court of the State of California, for the County of

24       Sacramento in that Defendant California Office of the Inspector General ("OIG") has its

25       main office located in the City and County of Sacramento.  The Superior Court has

26       jurisdiction over the present matter because, as set forth in this Complaint, the nature of the

27       claims and the amount in controversy meet the requirements of jurisdiction in the Superior

28       Court.  The Superior Court is empowered with initial jurisdiction to hear suits brought

                                    1

                              COMPLAINT

1    pursuant to California Government Code § 3300, et seq. and has concurrent jurisdiction to

2    entertain suits under the Federal Civil Rights Act, 42 U.S.C. § 1983.

3    2.  Government Code § 3309.5 allows Plaintiffs to initiate this suit without first having

4        exhausted all administrative remedies, and therefore Plaintiffs assert that they have

5        exhausted all administrative remedies to the extent that any are required of them.

6                                        **PARTIES**

7    3.  Plaintiff California Correctional Peace Officers Association ("CCPOA") is the exclusively

8        recognized employee organization representing approximately 28,342 state employees in

9        Bargaining Unit Six, including, among others, correctional officers employed at Ironwood

10       State Prison, California Correctional Center, Salt Creek Conservation Camp, Washington

11       Ridge Conservation Camp, and High Desert State Prison. Plaintiff CCPOA brings this

12       action on behalf of its members and has standing to do so under the doctrine set forth by

13       the United States Supreme Court in *Allee v. Medrano*, 416 U.S. 802 (1974). CCPOA seeks

14       injunctive relief prayed for in this Complaint on behalf of its members who are plaintiffs in

15       this case as well as other members who may be adversely affected by the actions of

16       Defendants described hereafter.

17   4.  Plaintiff Bryan Blue is a Correctional Officer employed by the California Department of

18       Corrections and Rehabilitation ("CDCR") at Ironwood State Prison, an institution operated

19       under CDCR Adult Operations at Blythe, California.  As such, Blue is a peace officer

20       described in California Penal Code § 830.5.  Blue is member of CCPOA.

21   5.  Plaintiff Jason Hastey is a Correctional Sergeant employed by CDCR at California

22       Correctional Center, an institution operated under CDCR Adult Operations at Susanville,

23       California.  As such, Hastey is a peace officer described in California Penal Code § 830.5.

24       Hastey is a member of CCPOA.

25   6.  Plaintiff Arthur Tovar is a Correctional Officer employed by the CDCR at California

26       Correctional Center, an institution operated under CDCR Adult Operations at Susanville,

27       California.  As such, Tovar is a peace officer described in California Penal Code § 830.5.

28       Tovar is a member of CCPOA.

                                        2

7. Plaintiff Steven Oschner is a Correctional Officer employed by CDCR at Salt Creek Conservation Camp, a fire camp jointly operated by CDCR Adult Operations and the Department of Forestry and Fire Protection at Paskenta, California. As such, Oschner is a peace officer described in California Penal Code § 830.5. Oschner is a member of CCPOA.

8. Plaintiff James McCloughan is a Correctional Officer employed by CDCR at Washington Ridge Conservation Camp, an institution operated under CDCR Adult Operations at Nevada City, California. As such, McCloughan is a peace officer described in California Penal Code § 830.5. McCloughan is a member of CCPOA.

9. The correctional officers in Bargaining Unit Six are all peace officers as defined in California Penal Code § 830.5 and as such are protected by the Public Safety Officers Procedural Bill of Rights Act ("POBRA") set forth in Government Code § 3303 et seq.

10. Defendant California Office of the Inspector General ("OIG") is a state agency responsible for contemporaneous public oversight of internal affairs investigations and the disciplinary process of the CDCR. The OIG reviews CDCR policies, practices and procedures at the request of the Governor, the Senate Rules Committee, or the Speaker of the Assembly.

11. Defendant Robert Barton is the duly appointed Inspector General and was so at the time of the allegations set forth herein. He has such powers and duties as are vested in him under the statutes and regulations of the State of California.

12. Defendant Roy Wesley is the duly appointed Chief Deputy Inspector General of OIG and was so at the time of the allegations set forth herein. He has such powers and duties as are vested in him under the statutes and regulations of the State of California.

13. Defendant Michael Maddox is a Deputy Inspector General with OIG and was so at the time of the allegations set forth herein. He has such powers and duties as are vested in him under the statutes and regulations of the State of California.

14. Defendant California Department of Corrections and Rehabilitation is the duly constituted body created and existing under the statutory authority of the State of California for the purpose of administering California's adult correctional system. CDCR has custody of

COMPLAINT

1    people convicted of crimes under California law and sentenced to terms in California

2    correctional facilities and as such is the appointing authority and employer of Plaintiffs.

3    15. Defendant Jeffrey A. Beard, Ph.D is the duly appointed Secretary of CDCR. He has such

4    powers and duties as are vested in him under the statutes and regulations of the State of

5    California.

6    16. Defendants, and each of them, are believed to have intentionally violated Plaintiffs' rights

7    under Government Code Section 3303(i) as made applicable to Defendant OIG by way of

8    Penal Code § 6126.5(d).

9    17. Defendant CDCR violated Plaintiffs' POBRA rights despite being ordered in an arbitration

10    award to cease and desist from depriving employees of requested Memorandum of

11    Understanding rights at interviews whenever the adverse action might result to the

12    employment relationship. (A True and correct copy of Confirmed Arbitrator's Opinion and

13    Award in *California Correctional Peace Officers Association v. State of California* is

14    attached as Exhibit "A.")

15    18. Defendants, and each of them, are believed to have intentionally violated Plaintiffs' rights

16    under Government Code § 3303(i) as made applicable to Defendant OIG by way of Penal

17    Code § 6126.5(d).

18    **FACTS**

19    19. On or about October 13, 2015, Deputy Inspector General Harman Sufi interviewed two

20    correctional officers, Brian J. Rodriguez and Mark Rosales, at California State Prison, Los

21    Angeles County in what Sufi described as an authorized review of pattern at practice at

22    High Desert State Prison being conducted by OIG. Sufi allowed Rodriguez and Rosales to

23    have representation during the interviews. The two officers were represented by Robert

24    Davis, the president of the California State Prison, Los Angeles County CCPOA chapter.

25    20. On or about October 15, 2015, Deputy Inspector General Michael Maddox traveled to

26    Ironwood State Prison ("ISP") in Blythe, California for the purpose of interviewing ISP

27    Correctional Officer Bryan Blue. Blue reported for the interview at approximately 6:30

28    a.m. with his representative CCPOA Staff Legal Counsel Phillip Murray. Murray asked

4

1      Maddox if the interview was voluntary, and Maddox stated that the interview was

2      voluntary. Based on this statement, Blue declined to interview.

3    21. On or about October 15, 2015, after Blue declined to voluntarily interview, Chief Deputy

4      Inspector General Roy Wesley telephoned ISP Warden Neil McDowell and directed

5      McDowell to order Blue to submit to the interview. Warden McDowell then telephoned

6      ISP Correctional Lieutenant Felipe Alvarez and instructed Alvarez to order Blue to

7      interview with OIG. Lieutenant Alvarez then contacted Blue and ordered Blue to

8      interview with OIG. Alvarez then escorted Blue from his post in the ISP Administrative

9      Segregation Building, driving him in a CDCR vehicle to the interview room and waited

10     with Blue until Maddox returned.

11   22. On or about October 15, 2015, before interviewing Blue, Maddox excluded Murray from

12     the interview and told Murray that his superiors had instructed him "to keep the union

13     attorney out of the room." Maddox then interviewed Blue, denying Blue legal

14     representation throughout the interview despite Blue's request for a representative made at

15     the beginning of the interview. After Blue's interview, Maddox confirmed to Murray that

16     the order to exclude Murray from the interview had come from Roy Wesley.

17   23. On or about October 29, 2015, Maddox interviewed Correctional Officer Arthur Tovar at

18     California Correctional Center ("CCC") in Susanville, California without a representative,

19     despite Tovar's repeated requests for representation. Prior to Tovar's interview, Casey

20     Granfield, president of the CCC CCPOA Chapter asked Maddox if the interview was

21     voluntary. Maddox stated the interview was voluntary but if Tovar declined to participate,

22     Maddox would serve him a subpoena compelling Tovar to interview.

23   24. Granfield informed Maddox that he would be representing Tovar and Correctional

24     Sergeant Jason Hastey. Maddox stated that neither Tovar nor Hastey could have

25     representatives present in the room when they interviewed. Tovar followed Maddox into

26     the interview room. Tovar asked Maddox again if the interview was voluntary and

27     Maddox stated that the interview was voluntary but that Tovar could not leave and that he

28     would serve Tovar a subpoena. Maddox stated "either way, it ends up the same" and gave

1    Tovar a subpoena. Tovar asked again for a representative by stating "I still don't get an

2    attorney or a representative?" Maddox replied that was in fact so, that Tovar would not be

3    allowed a representative. Tovar then read a statement from an advisement of rights card.

4    That statement, in effect, stated that Tovar was answering questions under compulsion and

5    was not waiving any statutory or constitutional rights. Maddox then compelled Tovar to

6    interview without a representative present despite several requests from Tovar to a

7    representative and despite Tovar's concerns that the subject matter of the discussion

8    carried the potential for punitive employment action or even criminal liability.

9    25. On or about October 29, 2015, Maddox interviewed CCC Correctional Sergeant Jason

10    Hastey without a representative despite Hastey's repeated requests for a representative.

11    Just before the interview began, Hastey asked Maddox for a subpoena, and Maddox gave

12    him a subpoena. Hastey then requested a union representative, but Maddox denied the

13    request for a representative. Hastey then protested that he had not received adequate notice

14    as to the subject matter of the interview. Hastey stated his belief that the answers he

15    provided to questions had the potential to negatively affect Hastey's employment and that

16    he was concerned about punitive action. Maddox stated that he was conducting a "review"

17    and not an interview and that because of this distinction, Hastey was not entitled to a

18    representative. Hastey stated that he did not understand Maddox's distinction between a

19    review and an interview as they were one in the same to Hastey's mind. Hastey again

20    requested a representative, and Maddox again denied the request, this time telling Hastey

21    that if Hastey did not answer questions he would be "sanctioned for not cooperating." At

22    the end of the interview, Hastey again stated his concerns about the potential for punitive

23    action and again protested the denial of representation. Maddox responded by saying "I

24    am just doing what I am told to do."

25    26. On or about October 30, 2015, Maddox interviewed Correctional Officer Steven Oschner

26    at Salt Creek Conservation Camp in Paskenta, California without a representative despite

27    Oschner's repeated requests for a representative. Oschner met Maddox with his

28    representatives, CCPOA Staff Legal Counsels Phillip Murray and Justin Delacruz. Murray

1    asked if the interview was voluntary, and Maddox stated that it was voluntary but that he

2    would present Oschner a subpoena should Oschner decline to interview. Oschner declined

3    to interview, and Maddox then served Oschner with a subpoena. Maddox then stated that

4    Oschner could not have a representative during the interview and denied Oschner's request

5    to record the interview. At the beginning of the interview, Oschner asked for a

6    representative stating that he feared the potential for punitive action. Maddox again denied

7    Oschner's request for a representative. Oschner then read a statement from an advisement

8    of rights card. That statement, in effect, stated that Oschner was answering questions

9    under compulsion and was not waiving any statutory or constitutional rights. Maddox then

10   compelled Oschner to interview without a representative present despite several requests

11   from Oschner for a representative and despite Oschner's concerns that the subject matter of

12   the discussion carried the potential for punitive employment action.

13   27. On or about November 2, 2015, Maddox interviewed Correctional Officer James

14   McCloughan at Washington Ridge Conservation Camp in Nevada City, California without

15   a representative despite McCloughan's repeated requests for a representative.

16   McCloughan arrived at the interview site accompanied by his legal counsel, Douglas

17   Foley. Foley asked Maddox if the interview was voluntary. Maddox stated that the

18   interview was voluntary, but if McCloughan declined to interview, Maddox when then

19   present him with a subpoena compelling him to interview. Maddox stated that

20   disregarding the subpoena would be grounds for insubordination. Foley stated that he was

21   McCloughan's legal counsel retained by CCPOA to represent McCloughan and demanded

22   to be present in the interview to represent McCloughan. Maddox then telephoned his

23   superiors. After a brief conversation on the telephone, Maddox informed Foley that OIG

24   deemed Foley to "be no different than a CCPOA attorney." Maddox denied Foley's

25   demand and McCloughan's request for representation.

26   28. On or about October 20, 2015, OIG caused to be served an administrative subpoena on

27   Michael Jones, a retired Correctional Officer residing in Susanville, California. That

28

COMPLAINT

1    subpoena commanded Jones to report to the High Country Inn in Susanville, California on

2    November 4, 2015 for the taking of a sworn deposition.

3    29. On or about November 4, 2015, Jones appeared at the High Country Inn at the designated

4    time with CCPOA Staff Legal Counsel Phillip Murray and CCPOA Staff Legal Counsel

5    Justin Delacruz. Jones was met by OIG Chief Counsel James Casey Spurling, who then

6    took Jones's deposition with Murray and Delacruz present during the deposition. Spurling

7    allowed Murray to participate in the deposition, to raise objections, and to ask clarifying

8    questions.

9    **FOR A FIRST CAUSE OF ACTION FOR RELEIF PURSUANT TO GOVERNMENT**

10   **CODE § 3309.5**

11   30. Plaintiffs hereby incorporate by reference paragraphs 1 through 29 as if fully set forth

12   herein.

13   31. Pursuant to California Penal Code § 6126.5(d), Plaintiffs are entitled to the right to

14   representation granted to them by Government Code Section 3303 whenever the OIG

15   interviews CDCR employees in a matter that could lead to punitive action. The

16   determination as to when a matter could lead to punitive action is for the CDCR employee

17   to make. OIG, its agents, servants, employees, and each of them determined that no

18   punitive action could result from interviews and disregarded the reasonable fears and

19   concerns of the Plaintiffs that answers provided had the potential to result in punitive

20   action or criminal liability. By disregarding Plaintiffs' concerns, OIG, its agents, servants,

21   employees circumvented Plaintiffs' POBRA rights.

22   32. Plaintiff Bryan Blue was ordered by CDCR to participate in an interview with OIG without

23   any written or oral notice of the subject matter. Plaintiff Blue was denied the right to

24   representation guaranteed by Penal Code § 6126.5(d) and Government Code § 3303(i).

25   Plaintiff Blue was not provided any admonishment shielding his answers from use in a

26   criminal action. Despite his request for a representative, Plaintiff Blue was denied his right

27   to representation. CDCR was complicit in this denial of rights because agents, servants,

28   and employees of CDCR knew or should have known that Blue was denied his right to

8

1  representation when they implemented an order compelling Blue to interview in

2  contravention of an Arbitrator's Award. (Exhibit "A.").

3  33. Plaintiff Arthur Tovar was compelled to participate in an interview with OIG without any

4  written or oral notice of the subject matter based upon a subpoena issued to him moments

5  before his interview.  Plaintiff Tovar was not provided with an opportunity to test the legal

6  sufficiency of that subpoena.  Plaintiff Tovar was denied the right to representation

7  guaranteed by Penal Code § 6126.5(d) and Government Code § 3303(i).  Plaintiff Tovar

8  was not provided any admonishment shielding his answers from use in a criminal action.

9  Plaintiff Tovar's repeated requests for a representative were denied.

10  34. Plaintiff Jason Hastey was compelled to participate in an interview with OIG without any

11  written or oral notice of the subject matter based upon a subpoena issued to him moments

12  before his interview.  Plaintiff Hastey was not provided with an opportunity to test the

13  legal sufficiency of that subpoena.  Plaintiff Hastey was denied the right to representation

14  guaranteed by Penal Code § 6126.5(d) and Government Code § 3303(i) despite his

15  statements that he believed answers provided could result in punitive action or criminal

16  liability. Plaintiff Hastey was not provided any admonishment shielding his answers from

17  use in a criminal action.  Plaintiff Hastey's repeated requests for a representative were

18  denied.

19  35. Plaintiff Steven Oschner was compelled to participate in an interview with OIG without

20  any written or oral notice of the subject matter based upon a subpoena issued to him

21  moments before his interview.  Plaintiff Oschner was not provided with an opportunity to

22  test the legal sufficiency of that subpoena.  Plaintiff Oschner was denied the right to

23  representation guaranteed by Penal Code § 6126.5(d) and Government Code § 3303(i).

24  Plaintiff Oschner was not provided any admonishment shielding his answers from use in a

25  criminal action.  Plaintiff Oschner's repeated requests for a representative were denied.

26  36. Plaintiff James McCloughan was compelled to participate in an interview with OIG

27  without any written or oral notice of the subject matter based upon a subpoena issued to

28  him moments before his interview.  Plaintiff McCloughan was not provided with an

9

1     opportunity to test the legal sufficiency of that subpoena. Plaintiff McCloughan was

2     denied the right to representation guaranteed by Penal Code § 6126.5(d) and Government

3     Code § 3303(i). Plaintiff McCloughan was not provided any admonishment shielding his

4     answers from use in a criminal action. Plaintiff McCloughan's repeated requests for a

5     representative were denied.

6     37. It is believed that the above articulated violations were proximately caused by the

7     defendants and each of their deliberate indifference to its violations of POBRA and the

8     failure to train and control their officers, agents, servants, and employees of the provisions

9     of POBRA. The violations set forth above were caused by the practices, policies, and

10    decisions of the defendants, and each of them. Despite the fact that these defendants knew

11    or should have known of the facts that these acts, omissions, decisions, practices, customs,

12    and policies were being carried out by its agents and employees, and defendants have not

13    to the best of Plaintiffs' knowledge taken steps or efforts to stop this course of conduct nor

14    make redress to these Plaintiffs injured thereby and have failed to redress violations of

15    POBRA.

**FOR A SECOND CAUSE OF ACTION FOR RELIEF PURSUANT**

**TO 42 U.S.C. § 1983**

18    38. Plaintiffs hereby incorporate by reference paragraphs 1 through 29 as if fully set forth

19    herein.

20    39. This cause of action is brought pursuant to Fourth, Fifth, Sixth, and Fourteenth

21    Amendments to the United States Constitution and other state and/or federal laws which

22    would entitle Plaintiffs to recover damages for violation of their constitutional rights.

23    40. 42 U.S.C. § 1983 provides in pertinent part that every person who, under color of any

24    statute, ordinance, regulation, custom, usage, of any State subjects, or causes to be

25    subjected, any citizen of the United States or other person with the jurisdiction thereof to

26    the deprivation of any rights, privileges, or immunities secured by the Constitution and

27    laws, shall be liable to the party injured in an action in law, suit in equity or other

28    proceeding for redress.

41. Plaintiffs allege that their right under the Fifth and Sixth Amendments to the United States Constitution were violated because they were denied their right to legal counsel and denied an advisement of their rights during custodial interrogations. Plaintiffs allege that their respective interviews with Maddox conducted under threat of insubordination, and in the case of Plaintiff Blue by order of CDCR, under the threat of civil contempt by way of administrative subpoenas in the cases of Plaintiffs Tovar, Hastey, Oschner, and McCloughan were custodial interrogations because their freedom was curtailed and dependent upon their willingness to answer questions. Plaintiffs were deprived of their right to consult counsel during interviews, the nature of which were not made clear and the nature of which could have raised risk of criminal liability, in violation of their Sixth Amendment right to counsel. Plaintiffs were not advised of their constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Plaintiffs allege that the interviews were in fact interrogations that were reasonably likely to result in incriminating responses.

42. Plaintiffs Tovar, Hastey, Oschner, and McCloughan allege that their right to be secure in their persons against unreasonable searches under the Fourth Amendment to the United States Constitution was violated when Defendants issued legally deficient administrative subpoenas and demanded immediate compliance under threat of civil contempt without first providing Plaintiffs the opportunity to seek judicial relief or to otherwise seek a judicial determination as to the validity of the subpoenas.

43. At all times relevant herein, Defendants were agents and/or employees of Defendant OIG and CDCR and in carrying out the acts alleged herein were acting in their individual capacity but under color of their authority as such and under color of the statutes, regulations, customs, and usages of State law and pursuant to a set pattern, practice, and official policy of each respective governmental entity. As a direct and proximate result of the aforementioned policies, procedures, customs, and practices of defendants, Plaintiffs have suffered injuries and damages in an amount to be proven at the time of trial.

COMPLAINT

44. Plaintiffs are informed and believe and there upon allege that Defendants have conspired with one another for the purpose and intent to violate the rights of Plaintiffs as alleged herein.

45. Each of the individual Defendants acted in concert, acted outside the scope of his or her jurisdiction and without authorization of law, and each of the individual Defendants, separately and in concert, acted willfully, knowingly, and with reckless disregard and deliberate indifference to the known consequences of their acts and omissions and purposefully with the intent to deprive Plaintiffs of their federally protected rights and privileges and did, in fact, violate those rights and privileges, entitling Plaintiffs to punitive and exemplary damages in an amount to be proven at the time of trial of this matter.

46. Despite the fact that the Defendants knew or should have known of the facts these acts, omissions, decisions, practices, customs, and policies were being carried out by their agents and employees, defendants have taken no step or efforts to order a halt to this course of conduct, nor make redress to Plaintiffs thereby and have failed to take any disciplinary actions whatsoever against its employees and agents.

47. As a direct result of these actions, Plaintiffs have suffered harm in an amount to be determined according to proof at time of trial.

48. Plaintiffs are entitled to and demand costs, attorney fees, and expenses pursuant to 42 U.S.C. § 1988.

49. Plaintiffs demand a trial by jury for this cause of action.

## LEAVE TO AMEND

50. Plaintiffs respectfully request leave to amend this Complaint as other facts become known.

## PRAYER

Plaintiffs pray that judgment be entered against Defendants, and each of them, as follows:

1. For an order requiring Defendants State of California, Office of the Inspector General, Department of Corrections and Rehabilitation, Jeffrey Beard, Ph.D, Robert A. Barton, Roy Wesley, and Michael Maddox to show why they should not be enjoined as hereinafter set forth during the pendency of this action;

12

2. For a Preliminary Injunction and a Permanent Injunction Enjoining Defendants, their agents, servants, and employees and all persons acting in concert with them or for them from:

    a.  Continuing to deny the right to representation to employees represented by CCPOA in the present and in the future in exercising their rights to representation guaranteed by Penal Code § 6126.5(d) and Government Code § 3303(i);

    b.  Interviewing or interrogating any member of Bargaining Unit Six under penalty or threat of insubordination or civil contempt without affording the right to adequate notice to consult with a union representative or legal counsel and to have a union representative or legal counsel present upon the request of the Bargaining Unit Six member or denied the opportunity to seek judicial relief and/or advisement on any subpoena.

    c.  Making any statements, written or oral, intended to chill or have the effect of chilling Plaintiffs' and CCPOA members' exercise of their constitutional and statutory rights to representation

    d.  Threatening or coercing or retaliating or taking any punitive action against Plaintiffs for exercise of their constitutional and statutory rights to representation.

3. An order excluding any statements or answers made by Plaintiffs' in their respective interviews from use by Defendant OIG and/or CDCR;

4. Any and all actual, consequential, and incidental damages according to proof suffered by plaintiffs;

5. Attorneys' fees pursuant to California Code of Civil Procedure Section 1021.5, Government Code section 800 or otherwise;

6. Costs of suit incurred herein; and

7. Such and further relief as the Court deems just and proper.

DATED: November 24, 2015

By: _____

Phillip Murray, CCPOA Staff Counsel
Attorneys for Plaintiffs

13

# EXHIBIT H



California Correctional
Peace Officers
Association

**CCPOA**

REPRESENTING
CDCR PEACE OFFICERS
"THE TOUGHEST
BEAT IN THE STATE"

755 Riverpoint Dr., • West Sacramento, CA 95605-1634 • (916) 372-6060

November 23, 2015

The Honorable Edmund G. Brown Jr.
Governor, State of California
State Capitol, Suite 1173
Sacramento, CA 95814

Re:    Overreach of the Office of Inspector General

Dear Governor Brown:

        I write on behalf of the 29,000 hardworking Correctional Peace Officers CCPOA represents to alert you to a number of serious issues within the Office of Inspector General (OIG). First among those is the unprecedented encroachment upon the authority and discretion of CDCR's internal affairs (IA) investigators, institutional assigned attorneys, called Vertical Advocates (VA), and Wardens. OIG's original mission, as set forth in Penal Code Section 6133, was to provide "contemporaneous public oversight" of CDCR's investigative and disciplinary processes. The common understanding of this "contemporaneous public oversight" is the duty to monitor, observe and then report to the public CDCR's compliance with its policies and procedures.

        The current Inspector General, however, is pursuing a form of "mission creep" in which OIG is abandoning its oversight function and, instead, taking on a prosecutorial function by wresting control of CDCR's investigations of alleged employee misconduct. OIG has actively inserted itself into the investigation intake analyses. It dictates how CDCR is to investigate misconduct, overrules the recommendations of CDCR's VA's, and usurps proposed Skelly (due process) decisions of Wardens. OIG frequently pressures CDCR investigators to expand the scope of their investigations, to target unnecessary subjects, and to add vaguely supported dishonesty charges against officers.

        This prosecutorial mindset, which we have heard is manifested internally at the OIG as a "burn a cop a week" policy, completely disregards the Legislature's intent in establishing the OIG, ignores sound investigation practices, and flies in the face of the state's policy of fair and progressive discipline.

        In a second closely related and even more important issue, the OIG -through direction from its top leadership - has recently, and repeatedly violated the rights and protections guaranteed officers by state and federal law during investigations. The Rights OIG has violated include the very rights the OIG is tasked with protecting as part of its oversight role. CCPOA will soon file an action in Superior Court seeking to enjoin the OIG from violating Government Code section 3303 et seq. - The Peace Officer Procedural Bill Of Rights Act. Recently, officers were compelled to cooperate in what the OIG termed an "authorized review." Originally

The Honorable Edmund G. Brown Jr.
November 23, 2015
Page 2

presented as voluntary interviews, when the officers declined to speak, they were quickly ordered to participate in the interview, denied the right to counsel, or indeed any representation. Other than a grand jury, I can think of no other process where someone who believes they could be subjected to adverse action can be denied legal representation. In another recent case, the OIG signed off on a matter as a "good investigation and prosecution" *only after* the State Personnel Board found that CDCR failed to turn over exculpatory evidence. Even after the employees were exonerated and CCPOA filed charges against the investigators and prevailed, the OIG stood by its investigation rating. These instances are troubling because either many OIG Investigators do not have experience or knowledge of investigative best practices, or choose to ignore them, yet they direct or inappropriately influence the course of law enforcement investigations.

The final, and most insidious, issue by which the OIG usurps the role of the Appointing Authority in discipline cases is through the use of the Wardens' vetting and confirmation process, and the Executive Review process which are being used as a mechanism to control CDCR's Wardens. In what appears to be a clear conflict of interest, any acting Warden who disagrees with the position of the OIG is in jeopardy of having his or her confirmation negatively affected. Confirmed Wardens, and CDCR attorneys are threatened with a negative Executive Review when they recommend not pursuing disciplinary charges against an employee, suggest a lighter penalty, or propose settling an appeal of the employee's disciplinary action. The end result of OIG's expansion of control is internal state conflict, confusion, waste and inefficiency as the OIG devolves into a redundant investigative body, one in which the OIG has determined the rules don't apply to them. On many CDCR disciplinary matters it seems the OIG has seen fit to appoint themselves as judge, jury, and executioner.

By revising its own responsibilities, OIG is rapidly assuming control and power the Legislature never envisioned. All this done in what can only be explained as an effort to justify the existence of the Office or to promote the political career of the Inspector General. The time has come for the elimination of the OIG or, at a minimum, a review and redefinition of OIG's function in its public oversight of CDCR.

Very truly yours,

Charles Alexander
President
CALIFORNIA CORRECTIONAL
PEACE OFFICERS ASSOCIATION

Cc:     California Attorney General Kamala D. Harris
        California Legislature