**A Re-Audit and Update on Suicide Prevention Practices
in the Prisons of the California Department of
Corrections and Rehabilitation**

Lindsay M. Hayes, M.S.
January 13, 2016

I.    <u>Background</u>

Per order of the *Coleman* court (ECF 5271, filed February 3, 2015), this report is submitted as an update to this reviewer's initial report, "An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation."  (ECF 5259, filed January 14, 2015)  The initial report covered this reviewer's findings from his audit of suicide prevention practices at all 34 prisons of the California Department of Corrections and Rehabilitation (CDCR or the Department), which began on November 12, 2013 and ended on July 24, 2014.  This report covers his recent re-audit of suicide prevention practices at 18 selected CDCR prisons, which began on February 2, 2015 and concluded on July 24, 2015.

The context of these audits and reports is the long-standing problem of inmate suicides in CDCR prisons.  A brief recap of the recent effort to address this problem illustrates the reason for these audits.  The initial audit and report were ordered and completed in response to serious concerns expressed by the *Coleman* court about persistently elevated rates of suicides by CDCR inmates.   In its order denying the defendants' motion to terminate federal court oversight in this matter, the *Coleman* court noted the gravity and seeming intractability of the problem of inmate suicides in CDCR prisons.  It found that:

> . . . for over a decade a disproportionately high number of inmates have committed suicide in California's prison system. Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR.  Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy these inadequacies.  The evidence shows they have not done so. In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not.  An ongoing constitutional violation therefore remains.

Order, entered April 13, 2013 (ECF 4539).

Two months later, on July 12, 2013, the *Coleman* court entered a further order directed toward resolving the problem of inmate suicides. (ECF 4693)  Among other things, it ordered defendants to "establish a suicide prevention/management workgroup comprised of CDCR clinical, custody, and administrative staff, Department of State Hospitals (DSH) staff, the Special

Master's experts, plaintiffs' counsel and, as appropriate, the *Plata* Receiver to work under the guidance of the Special Master to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause." (ECF 4693)

Shortly thereafter, the Suicide Prevention Management Workgroup (SPMW) was organized. After its first three meetings, on July 31, August 21, and October 17, 2013, the members agreed that an expert assessment of current suicide prevention practices in all 34 CDCR prisons was needed to provide a foundation on which to identify the reasons for inmate suicides and to develop strategies to prevent them. As a result, this reviewer was engaged to conduct the initial audit and to report on his findings.

After the filing of this reviewer's initial report and an accompanying report by the Special Master on January 14, 2015 (ECF 5258), the *Coleman* court ordered that

1. Defendants shall adopt the recommendations contained in the Special Master's Report on his Expert's Audit, ECF No. 5258, and shall work with the Special Master in the Suicide Prevention/Management Workgroup and otherwise as may be necessary on the development of strategies and the implementation of the changes in practices contained in those recommendations; and

2. The Special Master shall provide an update to the court on defendants' progress in implementing suicide prevention policies and practices either in his Twenty-Six Round Monitoring Report or in a companion report to be filed herewith.

Order, entered February 3, 2015 (ECF 5271)

This report is submitted in response to paragraph two (2) of the foregoing order. As noted above, it covers this reviewer's re-audit of 18 selected prisons. The details and methodology of the re-audit/review process are discussed in Part II, below. Part III covers the status of Defendant's progress with implementation of each of this reviewer's 32 specific recommendations and the several additional miscellaneous issues that appeared in his initial report and in the accompanying report by the Special Master. Part IV covers this reviewer's conclusions and recommendations. Part V presents a prison-by-prison discussion of this reviewer's findings at each of the 18 re-audited prisons, together with his non-clinical case reviews[1] of any recent inmate suicides in those prisons. Part VI covers this reviewer's non-

---

[1] For purposes of this report, all reviews of eUHRs, Suicide Reports, QIPs, and CCHCS "Combined Death Review Summary" reports do <u>not</u> include critiques of clinical judgment. Rather, these reviews are based upon critiques of implementation and use of suicide prevention practices set by the *Coleman Program Guide* (2009 revision) and generally applicable standards of care.

clinical case reviews of recent suicides that occurred in various CDCR prisons other than the 18 that were re-audited.

## II.    **Methodology**

This reviewer's selections of 18 CDCR prisons for on-site re-auditing were based on his findings during the initial audit that their suicide prevention practices were problematic, as well as their elevated numbers of inmate suicides, and/or their significant inmate populations on the Department's Mental Health Services Delivery System (MHSDS) caseload. As in the initial audit, this reviewer's re-audit consisted of a two-day on-site examination of suicide prevention practices at each of the prisons.  The re-audit began on February 4, 2015 and concluded on July 24, 2015.  The 18 re-audited prisons and the dates of their on-site assessments were:

1. California State Prison, Sacramento (CSP/Sac): February 2-3, 2015
2. Salinas Valley State Prison (SVSP): February 18-19, 2015
3. North Kern State Prison (NKSP): February 24-25, 2015
4. Kern Valley State Prison (KVSP): February 26-27, 2015
5. Valley State Prison (VSP): March 10-11, 2015
6. Central California Women's Facility (CCWF): March 12-13, 2015
7. Mule Creek State Prison (MCSP): March 24-25, 2015
8. Deuel Vocational Institution (DVI): March 26-27, 2015
9. Pelican Bay State Prison (PBSP): April 8-9, 2015
10. Richard J. Donovan Correctional Facility (RJD): April 22-23, 2015
11. San Quentin State Prison (SQ): May 5-6, 2015
12. California State Prison, Solano (CSP/Solano): May 7-8, 2015
13. California Institution for Women (CIW): May 19-20, 2015
14. Folsom State Prison (Folsom)/Folsom Women's Facility (FWF): May 21-22, 2015
15. California State Prison, Corcoran (CSP/Cor): June 9-10, 2015
16. Pleasant Valley State Prison (PVSP): June 11-12, 2015
17. California Correctional Institution (CCI): June 23-24, 2015
18. California Health Care Facility (CHCF): July 23-24, 2015

At each site, this reviewer examined the prison's performance in the areas of staff training on suicide prevention, degree of privacy afforded during the intake screening process, suicide risk assessments/evaluations, custody rounds and psych tech (PT) practices in specialized housing units, use of suicide-resistant cells for new-intake inmates in administrative segregation units, treatment planning for suicidal patients, Mental Health Crisis Bed (MHCB) practices, use of alternative housing for patients awaiting transfer to MHCBs, appropriate follow-up services provided to patients discharged from MHCBs or alternative housing, and review of meeting minutes of the institutional Suicide Prevention and Response Focused Improvement Teams (SPRFITs). In addition, all inmate suicides which occurred during the review period for the re-

audit, i.e. late 2014 and 2015, were reviewed through examination of these inmates' Electronic Unit Health Records (eUHRs),  CDCR Suicide Reports, Quality Improvement Plans (QIPs), and California Correctional Health Care Services' (CCHCS) Combined Death Review Summary reports.

In response to paragraph one (1) of the February 3, 2015 order, the Special Master re-convened the SPMW meetings concurrently with the re-audit to work with CDCR on its adoption of the recommendations and to address the miscellaneous issues identified in the initial report.  Participants in the SPMW included the Special Master and members of his expert and monitoring staff, *Coleman* plaintiffs' counsel, and various CDCR officials in both the mental health and custodial areas of the Department.   Since entry of the February 3, 2015 order, the SPMW has met seven times, on February 3, February 13, March 11, April 6, May 14, July 20, and September 30, 2015. As of the latest meeting, CDCR had agreed to adopt and implement 29 of the 32 specific recommendations in the initial report, and had made progress toward addressing the other identified miscellaneous issues.  The details of CDCR's response are discussed below.

## III.    Progress Report on CDCR's Responses to Recommendations and Miscellaneous Identified Issues

The following provides (1) a summary of each of the 32 recommendations and the identified miscellaneous issues that were presented in the initial report, and (2) a status report and/or timetable for CDCR's adoption and implementation of the recommendations and its responses to the miscellaneous identified issues, and, (3) a summary of current suicide prevention practices with regard to the recommendations.

### A)    Suicide Prevention Training

**Basis for the Recommendations:**

At the time of the initial audit, review of the *MHSDS Instructor Guide* that was used at CDCR's pre-service Training Academy found that it had very good content, covering crisis intervention, emergency mental health referrals, stressors and internal/external factors affecting suicidality, interaction with the suicidal inmate, levels of suicide observation, and response to suicide attempts (SAs) while in progress.  The *Instructor Guide* did not cover (1) self-injurious v. suicidal behavior and effective ways to deal with inmates perceived as manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) ineffectiveness of "contracting for safety," (4) updated research on CDCR suicides, (5) identified problem areas and corrective actions from previous CDCR Suicide Reports, or (6) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices. The curriculum for the annual in-service training was an abbreviated version of the curriculum for pre-service training.  The annual training was only one hour in duration and was lacking several key components. Most

importantly, despite an MHSDS *Program Guide* (*Program Guide*) requirement that all CDCR employees receive annual suicide prevention training, many non-custody personnel were *not* being trained annually.  Therefore, this reviewer's recommendations were:

1) ***Expand the length and content of the <u>pre-service</u> "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.***

2) ***Expand the length and content of the <u>annual</u>  "Crisis Intervention and Suicide Prevention" training workshop to  include the topics described above;***

3) ***Ensure that <u>all</u> custody and health care staff receive both pre-service and annual suicide prevention training; and***

4) ***Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.***

<u>**Status of Recommendations**</u>**:**

CDCR agreed to revise both its pre-service and annual suicide prevention training curricula to include the recommended topics, expand the annual suicide prevention training from one to two hours, mandate that all custody and health care (medical and mental health) staff receive annual training, and require that pre-service and annual suicide prevention training be conducted by a qualified mental health professional. CDCR did *not* agree to expand the length of the pre-service suicide prevention curriculum beyond 2.5 hours.

At SPMW meetings, CDCR provided periodic updates on the timetable for revisions to the training curricula.  In July 2015, it provided its revised annual suicide prevention curriculum, which included many of this reviewer's recommended topics.  On September 24, 2015, CDCR sent its revised pre-service training curriculum to this writer for review.  The adequacy of the 2.5-hour pre-service training curriculum cannot be further assessed until this reviewer has examined the revised curriculum in conjunction with observing a pre-service training session utilizing it.

<u>**Current CDCR Practices**</u>**:**

This reviewer's re-audit found that although problems in the area of suicide prevention training have continued, CDCR has made progress toward resolving them. It extended the annual

suicide prevention training to two hours during 2014.  The revised training curriculum was not finalized until July 2015, and relatively few staff have been trained on its final content.

This reviewer observed three annual suicide prevention workshops, at NKSP on February 15, 2015, at VSP on March 10, 2015, and at CCI on June 25, 2015. During the NKSP workshop, the instructor was very informative and professional, but instruction on perceived manipulative inmate behavior was limited.  Interaction among participants was also limited, as required small-group case vignettes were not presented.  The VSP workshop lasted only 80 minutes and consisted of only a lecture format. The CCI workshop was conducted by an informative and enthusiastic instructor who presented all of the required material but no small group presentations.

Finally, compliance rates for annual suicide prevention training in the 18 re-audited prisons varied from zero to 100 percent.  Collectively, 94 percent of custody staff, 69 percent of medical staff, and 63 percent of mental health staff received annual suicide prevention training in the 18 re-audited prisons during 2014.[2]  Compliance rates for training of both medical and mental health staff remained problematic.

### B)    Initial Health Screening and Receiving and Release Unit Environment

**Basis for the Recommendations:**

In this reviewer's initial audit, two areas of intake screening in receiving and release units (R & Rs) were examined.  The areas were (1) adequacy of the intake screening form and assurance that all questions were asked during the process, and (2) adequacy of inmate privacy and confidentiality during the process.

The Initial Health Screening form (CDCR Form 7277) used by nursing staff contains several questions pertaining to identification of suicide risk and mental illness.  Several versions of the screening form were used during the past several years.  Notably, a May 2014 version did *not* contain any inquiry regarding whether the inmate was currently at risk for suicide. Earlier audits by this reviewer found that nursing staff were not always asking all intake questions as required. Moreover, privacy and confidentiality of initial mental health assessments conducted by both nurses and mental health clinicians in the intake process were often compromised for various reasons. These ranged from the door to the nurse's office remaining open, officers stationed inside the office or at the door, intake screenings conducted outside the nurse's office in open areas close to officers and other inmates, and multiple intake screenings and initial mental health assessments conducted simultaneously as inmates sat in close proximity to each other. Therefore, this reviewer's recommendations were:

---

[2]Data for 2014 was used because some prisons had not completed their 2015 training at the time of this reviewer's on-site re-audits.

5) *The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?";*

6) *Intake screening should be conducted only in the nurse's office within an R & R unit;*

7) *The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and*

8) *Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.*

**Status of Recommendations:**

CDCR agreed to implement all of the above recommendations. During the past year, the Initial Health Screening form (CDCR Form 7277) was revised at least twice, in October 2014 and June 2015, to eliminate compound questions and strengthen others. In addition, CDCR officials reported during SPMW meetings that chief nurse executives (CNEs) at each prison had been instructed to develop interim and long-term corrective action plans (CAPs) to resolve privacy and confidentiality issues. On September 30, 2015, CDCR reported that all of the prisons had finalized their CAPs. CDCR also reported that several prisons required renovation of their R & R units to comply with the recommendations for privacy and confidentiality. Completion of these renovation projects was projected for mid-2016 to 2017. On October 30, 2015, CDCR submitted an interim CAP report on each R & R unit to the Special Master.

**Current CDCR Practices:**

This reviewer found varying levels of compliance with these recommendations during the re-audit. In most of the prisons, the latest version of the Initial Health Screening form (CDCR Form 7277) was being used correctly. In a few prisons, privacy and confidentiality during the intake process were afforded by keeping the door to the nurse's office closed, with the inmate sitting inside and the officer remaining in the hallway, or with the inmate in a therapeutic module inside the nurse's office and the officer in the hallway.

This reviewer found that 14 of 18 or 78 percent of the re-audited prisons were using the correct intake screening form, but only seven of 18 or 39 percent had adequately resolved

privacy and confidentiality issues. This was exemplified by current practices at SQ. During its re-audit on May 6, 2015, this reviewer observed a nurse conducting the intake screening process in the nurse's office, but the door remained open and an officer was seated outside in the hallway, causing privacy and confidentiality to be compromised.  This reviewer also found that mental health clinicians were completing initial mental health assessments at SQ and at other reception centers (RC) in environments of privacy and confidentiality.  For example, after the nurse's screening at SQ described above, the same inmate then walked down the hallway and into the private office of a clinical psychologist. The door was closed, and the same officer who had been seated outside the nurse's office with the door open also walked down the hallway and relocated himself outside the closed door of the clinician's office, thus providing a private setting for the psychologist's initial mental health assessment of this inmate.

### C)    <u>Suicide Risk Evaluations</u>

**<u>Basis for the Recommendations</u>:**

This reviewer found during his initial audit that although all emergency mental health referrals for reported suicidal ideation (SI) and self-injurious behavior resulted in nearly immediate response from mental health clinicians, these emergency referrals did not always result in completion of required suicide risk evaluations (SREs). In addition, despite a well-established seven-hour SRE training and mentoring program, the *quality* of completed SREs was deficient.

Inadequacy of SREs has been identified consistently in CDCR Suicide Reports during the past several years. Corrective actions including re-training of clinicians did not appear to have been successful in resolving this problem. This reviewer's examination also found that institutional SPRFITs were not adequately monitoring and evaluating the SREs completed at their prisons.  They were collecting only quantitative but not qualitative monthly data on completion of SREs. Therefore, this reviewer's recommendations were:

9)  *CDCR should revise its SRE Mentoring Program to*
   i.  *eliminate its "graduation" component after completion of two adequate assessments,*
   ii.  *conduct ongoing mentoring throughout the year, and*
   iii.  *audit clinicians' SREs on a regularly scheduled basis*

10)  *Each facility's SPRFIT should audit the <u>quality</u> of completed SREs on a monthly basis.*

**<u>Status of Recommendations</u>:**

CDCR agreed with this reviewer's initial finding that the quality of completed SREs throughout CDCR was problematic and agreed to implement both of these recommendations. During SPMW meetings, CDCR presented several remedial strategies, including a revision of the SRE mentoring program to include an audit every six months of an SRE conducted by each CDCR mental health clinician. In addition, mental health officials notified individual SPRFIT coordinators that they were responsible for auditing both the quantity and quality of SREs conducted by their clinicians.  Mental health supervisory staff at CDCR headquarters would be required to audit approximately 50 SREs per month, with an approximate ten percent overlap with the local audits conducted by the institutional SPRFIT coordinators.  In addition, SREs would be audited through use of the Continuous Quality Improvement Tool (CQIT). Any clinicians found struggling with conducting adequate SREs would be re-enrolled in the SRE mentoring program. Finally, clinicians assigned to MHCB units and responsible for regularly completing SREs would be required to complete the SRE mentoring program annually.

The foregoing strategies were formalized in a document entitled "Revision to the Suicide Risk Evaluation (SRE) Mentoring Program" and presented in draft form to the Special Master in July 2015.  After a review of the draft at a recent SPMW meeting, it was recommended that CDCR revise the draft to increase specificity of timelines and frequency of SRE audits.  On October 30, 2015, CDCR forwarded a revised version of the "Revision to the Suicide Risk evaluation (SRE) Mentoring Program" memorandum, dated September 28, 2015, to the Special Master.  The revised memorandum is still in need of slight revision to include the requirement that each mental health clinician will have a completed SRE audited every six months. CDCR projected that the revised SRE mentoring program will be implemented in January 2016.

**Current CDCR Practices:**

This reviewer's re-audit found varying levels of compliance with completion of SREs following emergency mental health referrals.  Compliance rates ranged from 66 to 100 percent, with a collective compliance rate of 87 percent for all 18 re-audited prisons, which was problematic.  A related concern was this reviewer's finding that required SREs were not being completed for patients discharged from MHCB or alternative housing placements for suicidal behaviors.  Finally, this reviewer found that compliance rates for completion of the required seven-hour SRE training and the SRE mentoring programs improved, with 90 percent of mental health clinicians having completed these programs.

    **D)**    **30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs and Condemned Units**

**Basis for the Recommendations:**

In 2006, CDCR instituted required welfare checks at no more than 30-minute intervals for the first 21 days of inmates' stays in administrative segregation.  These checks were

documented manually into housing logs until 2014, when CDCR implemented the Guard One system of electronic recording of these checks. Per memorandum dated May 28, 2013 and co-authored by the CDCR Director of the Division of Adult Institutions (DAI) and the Director of the Division of Health Care Services, "Custody staff assigned to the Security Housing Units (SHU), administrative segregation units (ASU), and Psychiatric Services Units (PSU) on First, Second, and Third Watch shall complete security/custody rounds at least every 30 minutes to ensure *all* inmates are accounted for within their assigned housing units." (emphasis added) Further, per memorandum dated May 9, 2014 from the CDCR Director of DAI, use of the Guard One system was expanded to require welfare checks of all inmates in administrative segregation units, SHUs, PSUs, and Condemned Units, to be done at staggered intervals twice per hour, not to exceed 35 minutes between checks, for the entire lengths of inmates' stays in these units. This expansion was a significant and commendable policy change.

This reviewer's initial audit found high compliance rates for use of Guard One, with most prisons achieving rates above 90 percent. Before issuance of the May 9, 2014 memorandum, there were problems with documentation of the checks, despite advance notice to the prisons that this reviewer would be examining their housing unit logs for documentation of the checks. Therefore, this reviewer's only recommendation was:

11) *Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at PBSP and at the CHCF (Phase 3, per the directive).*

**Status of Recommendations:**

CDCR agreed to implement this recommendation. While implementation of Guard One at PBSP was initially delayed because of that prison's unique physical plant and multiple SHUs, CDCR notified the Special Master that Guard One was fully implemented in the administrative segregation units and SHUs at PBSP on August 1, 2015. On October 23, 2015, CDCR notified the Special Master that it was reducing the frequency of welfare checks during the second and third watches in the SHUs at PBSP, from 30-minute to 60-minute intervals. This issue remains unresolved as of this writing.

**Current CDCR Practices:**

This reviewer's re-audit found varying rates of compliance with use of Guard One, ranging from 73 to 100 percent. Except for PBSP and CCWF[3], the overall compliance rate found in the re-audit was 91 percent across the other 16 prisons.

---

[3]At CCWF, in addition to numerous Guard One violations, a useful compliance rate could not be calculated because of a unique local practice at CCWF which resulted in a lack of common denominator with the other CDCR prisons. Unlike at the other prisons, the administrative segregation unit also contained the women's Condemned Unit, which

E)      **Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units**

**Basis for the Recommendations:**

Pursuant to CDCR policy, for the first 72 hours of all inmates' stays in administrative segregation, they must be housed in cells that have been retrofitted to be suicide-resistant, i.e. having no features conducive to the commission of a suicide by hanging. The 72-hour timeframe was based on earlier CDCR data indicating that risk of suicide was elevated during inmates' initial 72 hours of placement. After the initial 72 hours, inmates were then to be reassigned to other cells in administrative segregation.

This reviewer's initial audit found several problems with housing of newly-arrived inmates in the administrative segregation units.  Fewer than all were housed in suicide-resistant cells, and not all of the suicide-resistant cells housed newly-arrived inmates.

In addition, CDCR policy and practice did not require newly-arrived inmates in administrative segregation to be housed in retrofitted cells if they were double-celled with a compatible inmate.  Notably, such double-celling was in a *non-retrofitted cell*. The apparent underlying theory was that assigning a newly-arrived inmate to a compatible cellmate provided more protection from suicide than assigning the inmate to a single suicide-resistant, retrofitted cell.  This premise was flawed for several reasons -- the cellmate may be out of the cell, or had recently transferred out, or was asleep during an SA.  Accordingly, double-celling should *not* be considered a protective factor against suicide.  In fact, CDCR's own data indicated that 34 percent of all CDCR inmate suicides from 2012 through 2014 took place in double-celled administrative segregation cells, general population (GP), or Sensitive Needs Yard (SNY) housing.

Finally, in this reviewer's initial audit, he examined several cases in which the inmate was placed on suicide observation in an Outpatient Housing Unit (OHU) or MHCB, stabilized, and then returned to the same environment (usually an administrative segregation unit) where he or she had been housed before the OHU or MHCB placement. In all of these cases, the inmate was re-housed in an unsafe, non-retrofitted cell. Although CDCR initiated a policy several years ago to provide five-day clinical follow-up and custody checks to these inmates to help ensure their stability following MHCB discharges, it did not extend this policy to require housing in

---

was comprised of 22 single cells.  Seventeen of these cells were located in an enclosed program area on the first floor of the unit, and five cells were located outside the enclosed program area. A local practice at CCWF was to electronically record only Guard One checks on condemned inmates housed *inside* the fenced program area during first watch, and *not* use Guard One for the five condemned unit cells outside the program unit at any time.

retrofitted cells for inmates returning from MHCB or alternative housing stays to their housing units. Therefore, this reviewer's recommendations were:

12) *CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).*

13) *CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.*

14) *Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan;*

15) *Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted cells.*

16) *Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.*

**<u>Status of Recommendations</u>:**

To date, CDCR has agreed to implement Recommendations 12 and 13 above, but not Recommendations 14, 15, and 16. During SPMW meetings, CDCR reported that, based on inmate population trends, it estimated that it needs 60 additional suicide-resistant retrofitted cells to house newly-placed inmates in administrative segregation, and that it was developing a management plan to determine which of its prisons would receive these new cells.  CDCR also reported that it was developing a CAP to ensure that only newly-placed inmates would be housed in retrofitted cells and to immediately re-house any inmates who remained in retrofitted cells beyond their initial 72 hours in administrative segregation.

With regard to Recommendations 14, 15, and 16 above, CDCR stated several reasons why it was reluctant to embrace them.  First, it said that the low number of suicides within 24 hours of discharge from either an MHCB or alternative housing during the past two years did not

justify a state-wide policy to require that all inmates be placed in suicide-resistant retrofitted new-intake cells during their first 24 hours after discharge.  Second, notwithstanding the data indicating that 34 percent of all CDCR inmate suicides during 2012 to 2014 occurred in double-cells (with and without other inmates assigned to these cells), CDCR stated that double-celling still offered a "protective factor" against suicide. Third, CDCR stated that although it agreed that inmates' first 72 hours in administrative segregation was no longer the highest-risk period, and given that the average stay there before a suicide was approximately 54 days, there was insufficient data to indicate that extending stays in suicide-resistant retrofitted cells beyond the initial 72 hours would significantly reduce the number of suicides in administrative segregation. It should also be noted that, if CDCR agreed to implement Recommendations 14, 15, and 16, it would need to retrofit significantly more than the 60 cells it has currently committed to retrofit.

During the SPMW meeting on July 20, 2015, the Special Master asked that CDCR make is final decisions on these recommendations and to consider alternative proposals if it did not agreed to implement them.  After further discussion during the September 30 meeting, the Special Master deferred further discussion on Recommendations 14, 15, and 16 for six months.

**Current CDCR Practices:**

Overall, the housing of newly-placed inmates in unsafe, non-intake administrative segregation cells had remained problematic throughout CDCR.  This reviewer's re-audit found varying rates of compliance with placement of newly-arrived inmates in suicide-resistant retrofitted cells in administrative segregation during their initial 72 hours there. For example, only six of 17[4] or 35 percent of the re-audited prisons correctly housed newly-placed inmates in suicide-resistant retrofitted cells during these inmates' initial 72 hours in administrative segregation.  In most locations where this was accomplished, census in the units was low.  In addition, 11 of 17 or 65 percent of prisons had designated new-intake cells that remained non-suicide-resistant and/or they continued to house newly-placed inmates in unsafe, non-intake cells.

**F)**    **Treatment Planning for Suicidal Inmates**

**Basis for the Recommendations:**

Each inmate placed on suicide observation status should be provided with an individualized treatment plan which includes provision of follow-up services.  The treatment plan should be developed by qualified mental health staff in conjunction with the inmate and

---

[4]Shortly before this reviewer's on-site re-audit of CSP/Solano, an inmate riot there resulted in incremental movements of 70 inmates into the administrative segregation unit.  In this reviewer's opinion, it would have been unreasonable under those conditions to audit the sufficiency of CSP/Solano's administrative segregation new-intake cells. Accordingly, this aspect of the re-audit was conducted in 17 of the 18 prisons.

medical and correctional staff.  It should cover the signs, symptoms, and circumstances under which the inmate's risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions to be taken by the inmate and staff if SI reoccurs.

This reviewer's initial audit found that the vast majority of treatment plans for suicidal patients were grossly inadequate, often simply reciting *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-day follow-up by Primary Clinician (PC), provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce inmates' suicide risk. In addition, there was little concordance between treatment planning strategies and subsequent progress notes written by clinicians to justify treatment plan objectives.

As a result of this reviewer's initial suicide prevention audits, CDCR created a 60-slide PowerPoint webinar-based training presentation entitled "Safety/Treatment Planning for Suicide Risk Assessment" in June 2014.  Webinars were conducted on four occasions and were attended by approximately 50 percent of all CDCR mental health clinicians on a voluntary basis. Therefore, this reviewer's recommendations were:

17) ***CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning  contained in the SREs section above; and***

18) ***CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above.***

**Status of Recommendations:**

CDCR agreed with this reviewer's initial assessment that treatment planning for suicidal inmates was problematic and that it should implement the foregoing recommendations. In addition to revising the SRE mentoring program, as discussed earlier in this report, CDCR mandated that all remaining mental health clinicians complete the webinar training program "Safety/Treatment Planning for Suicide Risk Assessment."  During the SPMW meeting in July 2015, CDCR announced that this training presentation had been expanded to 86 slides, and that mandatory training workshops were scheduled for August 31, September 10, September 22, and October 1, 2015. This reviewer observed the two-hour webinar on September 22, 2015 and found it to be very good, with a thorough and comprehensive presentation by the instructor. As of this writing, the percentage of CDCR mental health clinicians who had received this mandatory training was unavailable.

**Current CDCR Practices:**

This reviewer's re-audit found varying degrees of adequacy of treatment planning. It would be premature to opine conclusively on the effectiveness of the "Safety/Treatment Planning for Suicide Risk Assessment" webinar training, as only approximately 50 percent of clinicians were scheduled to receive this training after completion of the re-audit. The re-audit found continued problems with adequacy of treatment planning for patients previously identified as suicidal. Problems were found at *all* 18 re-audited prisons. At only the CHCF, initial treatment planning was found adequate, but concordance was lacking between treatment planning and subsequent five-day follow-up progress notes or other subsequent notes by primary clinicians. In a few prisons including RJD, treatment planning was discussed adequately during Interdisciplinary Treatment Team (IDTT) meetings, but not reflected in either mental health treatment plans (MHTP) or SREs.

Treatment planning for suicidal inmates should be included in the safety plan sections of discharging SREs. This reviewer found overall that clinicians developing treatment planning for suicidal patients continued to simply recite *Program Guide* requirements rather than provide specific plans to reduce inmates' risk of suicide. Although this reviewer did not re-audit California Institution for Men (CIM), a recent suicide at that prison exemplifies the continuing problem with safety planning and the tragic consequences that can result. On May 4, 2015, this transgendered inmate was placed in an MHCB for several days after having been observed engaging in self-injurious behavior by cutting her forearm. She reported both depression and anxiety exacerbated by recent safety and interpersonal issues related to her transition from male to female. This inmate also had a history of suicidal behavior that included prior placement on Suicide Precaution status following an SA by hanging in 2011. Three days into her MHCB stay, on May 7, 2015, she was reassessed as being both a low chronic and acute risk for suicide and was discharged from the MHCB. Her safety plan with discharge failed to address reduction of any reoccurrence of suicidal and/or self-injurious behavior: "Discharge at CCCMS LOC (level of care), 5-day F/U (five-day clinical follow-up), clinician to clinician contact for continuity of care, and assist with I/P's (inmate/patient's) adjustment issues, particularly of being a transgender in men's prison." This inmate committed suicide on May 9, 2015, two days after discharge from the MHCB.

### G)    Perception of Suicidal Inmates as Manipulative

**Basis for the Recommendation:**

During this reviewer's initial audit, he found at every prison a misguided mindset among a small but formidable faction of mental health clinicians who perceived *all* inmate self-injurious behaviors as manipulative and believed that inmates feigned SI for secondary gain. This reviewer observed that as a result, some prisons prohibited some MHCB patients from having mattresses, overused safety smocks, and/or temporarily placed patients in Correctional Treatment

Center (CTC) observation and seclusion cells rather than MHCBs in order to "weed out suspected manipulative behavior." At CCWF, custody staff were observed placing inmates perceived to be feigning SI on a "modified property issue" status in administrative segregation, with little, if any, collaboration with mental health clinicians. Therefore, this reviewer's recommendation was:

19) *The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.*

**Status of Recommendation:**

CDCR agreed to implement the foregoing recommendation and revise both the pre-service and annual suicide prevention training curricula to include additional instruction regarding the misguided perception that suicidal inmates are manipulative. This reviewer's examination of the revised annual suicide prevention training of July 2015 found that it contained adequate instruction on this issue. Finally, CDCR has developed a "Differential Diagnosis" PowerPoint presentation to address clinical instruction on inmates perceived to be manipulative. Several workshops have been conducted, but as of this writing, the total number of clinicians who had received this training was unavailable.

**Current CDCR Practices:**

This reviewer's re-audit found several improvements in this area.  For example, although the overuse of safety smocks remained problematic (as addressed in another section of this report), almost all prisons were observed to have discontinued automatic prohibition of the issuance of safety mattresses in MHCBs. In addition, this reviewer's re-audit of CCWF in March 2015 found that the ill-conceived "modified property issue" status had been eliminated.

H)   **Psych Tech Practices**

**Basis for the Recommendation:**

According to the *Program Guide*, PTs are required to conduct daily rounds in all administrative segregation units and weekly rounds in the SHUs to attend to all inmates' mental health needs. (*See Program Guide*, Chapter 7, "Administrative Segregation," Part E., "Clinical Rounds and Screening," p. 12-7-5; *Program Guide*, Chapter 8, "Security Housing Unit," Part F., "Sources of Referral for Mental Health Services, Clinical Rounds" p. 12-8-7).  Their observations of each MHSDS inmate must be documented on Psych Tech Daily Rounds forms.

16

This reviewer's initial audit found problems and inconsistencies in PT rounding in administrative segregation units and the SHUs, ranging from "drive-by" rounds with little interaction with caseload inmates, to PT practices such as documenting rounds on the daily rounds forms after the rounds had been finished, rather than upon completion of each inmate contact. Given obvious difficulties with recollection of the details of each inmate's mental health status by the time daily rounds had been finished, this practice raised concerns about the accuracy of the documentation on the forms. Therefore, this reviewer's recommendation was:

20) ***CDCR should develop a CAP to ensure that supervising nursing staff regularly audit PT practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.***

**Status of Recommendation:**

CDCR agreed to implement the foregoing recommendation and initiated a CAP during the initial audit, which resulted in improved practices during the nearly nine-month initial audit period. CDCR also developed a process for quarterly auditing and assessing 15 rounds per PT per year.

**Current CDCR Practices:**

The re-audit found that 12 of 17[5] or 71 percent of prisons demonstrated very good PT practices in which staff communicated adequately with all inmates and documented rounds of MHSDS inmates on the Psych Tech Daily Rounds forms while at cell-side, as required. In the remaining five of 17 or 29 percent of re-audited prisons, this reviewer found discrepancies among the administrative segregation units with the adequacy of PT rounds. Overall, from the initial audit to the re-audit, the quality of PT rounds had improved dramatically.

I)    **Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates**

**Basis for the Recommendations:**

This reviewer's initial audit found that many CDCR prisons were using practices referred to as "psychiatric observation" or "crisis evaluation" statuses to manage suicidal patients in either their MHCBs or alternative housing cells. These practices were used by mental health clinicians to avoid the more stringent requirements of Suicide Precaution/Suicide Watch, or as a form of "step-down" while transitioning a previously-suicidal patient back to his housing unit. The result of these practices was that suicidal patients were being observed at 30-minute and 60-

---

[5]Due to a schedule conflict, psych tech rounds were not observed in one of the 18 prisons during the re-audit.

minute intervals, which do not satisfy the accepted timeframes nor *Program Guide* requirements. Therefore, this reviewer's recommendations were:

21) ***CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.***

22) ***CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.***

**Status of Recommendations:**

CDCR agreed to implement the foregoing recommendations. During several SPMW meetings, CDCR reported that a memorandum would be developed and distributed to each Chief of Mental Health (CMH) who oversees an MHCB unit to reiterate the *Program Guide* requirements that Suicide Precaution and Suicide Watch are the *only* authorized observation levels for suicidal patients. In addition, CDCR reported that CMHs would be permitted the flexibility to develop/revise their local operating procedures (LOPs) and select their own observation levels, including operational titles and definitions, for non-suicidal patients. At the latest SPMW meeting, on September 30, 2015, CDCR reported that the draft memorandum would be forwarded to the Special Master on October 2, 2015. As of this writing, the draft has not yet been received.

**Current CDCR Practices:**

This reviewer's re-audit found that 14 of the 18 prisons had MHCB units. All of these prisons appeared to have appropriate practices for observing suicidal patients, on either Suicide Precaution or Suicide Watch status.

Given the flexibility accorded by CDCR to the individual CMHs, there were problematic practices insofar as management of MHCB patients who were *not* on Suicide Precaution and Suicide Watch status. This was best exemplified by current practices at CSP/Solano, where the LOP for the MHCB unit was revised to delete the term "psychological observation" and replace it with "clinical observation." The term "clinical observation" was not defined sufficiently to guide the clinician as to which behaviors warranted this level of observation. In addition, the definition of "clinical observation" in the LOP included references to both 15-minute and 30-minute observations, with either "full issue" or "limited issue" clothing and possessions. This reviewer examined records of several MHCB patients for whom CSP/Solano clinicians had ordered limited issue, such as "approve for socks, T-shirts, and shorts," and 30-minute

18

observation. These orders were self-contradictory, as a clinical order for limited issue indicates that the clinician deemed the patient still at risk for suicide, which in turn would indicate that the patient should be on 15-minute rather than 30-minute observation.  Barring extraordinary circumstances that are clearly documented in the eUHR, a clinical order that reflects a need for limited issue of clothing and possessions should also call for observation no less frequently than every 15 minutes.

In at least five of 14 or 36 percent of the re-audited prisons which have MHCB units, all patients were observed at 15-minute intervals, regardless of whether they were suicidal. Although this level of observation may provide enhanced observation for otherwise non-suicidal patients, it caused many clinicians to be confused about LOP requirements and to order limited issue clothing and other possessions for non-suicidal patients, the same as if they were assessed as being suicidal. The result was that no distinction was made between suicidal and non-suicidal patients in these MHCB units.  A clarifying memorandum from CDCR headquarters remains urgently needed to resolve this confusion by allowing by allowing 15-minute observation of non-suicidal patients with full clothing and other possessions.

### J)    Use of "Alternative Housing Cells" and OHUs for Suicidal Inmates

**Basis for the Recommendations:**

CDCR directives, including a December 12, 2012 memorandum entitled "Alternative Housing Cell Prioritization," did *not* address the frequency of observation nor any requirement of suicide-resistant cells for inmates placed in alternative housing cells while awaiting admission to MHCBs.  During earlier SPMW meetings, CDCR officials referred to "expectations" that inmates would be placed in suicide-resistant cells and observed continuously until transferred to MHCBs.  This reviewer's initial audit found that in many CDCR prisons, such "expectations" were not being met.  Inmates were being placed in either unsafe OHU or alternative housing cells, and were often observed at only 15-minute intervals. In addition, many suicidal patients were housed in OHUs for up to 72 hours or longer, and forced to sleep on a mattress on the floor, exacerbating the suffering of these patients.  Therefore, this reviewer's recommendations were:

23) *The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide-resistant.*

24) *Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.*

25) *Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.*

26) *Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.*

## Status of Recommendations:

CDCR agreed to implement the foregoing recommendations. During a March 2015 SPMW meeting, CDCR announced that it was adopting a policy in which all suicidal patients in alternative housing, including OHUs, would be placed on continuous one-to-one observation until they were transferred to an MHCB. The policy, "Housing of Inmate-Patients (I/Ps) Pending Mental Health Crisis Bed (MHCB) Transfer," was adopted on April 9, 2015. This commitment to place all patients on continuous one-to-one observation negated the necessity that all OHUs and alternative housing cells be suicide-resistant.

With regard to the recommendation that all patients housed in an OHU for over 24 hours be provided with a suicide-resistant bed, CDCR agreed to consider OHU housing of suicidal patients as alternative housing and to install suicide-resistant beds in all alternative housing cells that did not have them. Because an OHU housing a suicidal patient would now be considered alternative housing, the patient must be transferred to an MHCB or discharged to his original housing unit within 24 hours of placement. On October 30, 2015, CDCR reported to the Special Master that 140 portable suicide-resistant beds, known as "stack-a bunks," were ordered on October 20, 2015.  Based on these recent initiatives, the April 9, 2015 version of the "Housing of Inmate-Patients (I/Ps) Pending Mental Health Crisis Bed (MHCB) Transfer" memorandum was revised and reissued on October 15, 2015.

Finally, because of problematic practices in an OHU in an administrative segregation unit at MCSP, CDCR agreed to decommission that unit as an OHU and use it as alternative housing. This requires that suicidal patients placed there must be under continuous one-to-one observation and must be transferred out within 24 hours of placement.  In response to concerns voiced by the *Coleman* plaintiffs, CDCR reported that it was also examining OHU-type housing in administrative segregation units at RJD, California State Prison/Los Angeles County (CSP/LAC), and DVI.  During the SPMW meeting on September 30, 2015, CDCR reported that the units at CSP/LAC and DVI were decommissioned as OHU-type housing and that RJD officials were reviewing alternative housing options there.

In conclusion, CDCR's commitment to improving OHU and alternative housing environments for suicidal patients was significant and commendable.

**Current CDCR Practices:**

This reviewer's re-audit found that, although portable suicide-resistant beds had not yet been installed in any alternative housing cells, 14 or 18 or 78 percent of re-audited prisons were following clear and consistent practices for observing all inmates in alternative housing on a continuous one-to-one basis. In four of 18 or 22 percent of the 18 re-audited prisons, there appeared to be confusion as to whether or not the OHU was considered alternative housing and whether it was required to provide continuous observation. In the OHUs of those four prisons, observations were being done at 15-minute intervals.

K)    **OHU/MHCB Discharge and Efficacy of Five-Day Clinical Follow-Up and 60-Minute Custody Welfare Checks**

**Basis for the Recommendations:**

The *Program Guide* requires that patients discharged from MHCBs receive daily clinical assessments for five consecutive days following the discharge. It also requires custody staff to conduct hourly checks of discharged patients during the first 24 hours after discharge. After the initial 24-hour period, a mental health clinician must determine whether the hourly custody checks should be continued. At present, the *Program Guide* does *not* require placement of these discharged inmates into suicide-resistant cells.

This reviewer found the efficacy of these *Program Guide* requirements questionable. The form used to document the follow-up clinical contacts ("Interdisciplinary Progress Note – 5-Day Follow-Up," CDCR MH 7230B), forced clinicians to write five days' progress notes in five small boxes on a *single* page. This allowed far too little space to document the contacts adequately, even assuming the clinician was operating from an adequate treatment plan. In addition, placement of a discharged inmate in a non-suicide-resistant cell and requiring observation at one-hour intervals during the first 24 hours, or at two-hour and four-hour intervals on subsequent days, clearly was insufficient as a protective measure against suicide so early following the patient's discharge from an MHCB or alternative housing. Likewise, subsequent observation of these inmates "every two hours, or every four hours for the next 24-48 hours" clearly had no added protective value. It also appeared that CDCR was advancing inconsistent suicide-prevention approaches: it implemented the Guard One system to conduct mandatory 30-minute rounds in its special housing units, yet at the same time it continued to require rounds at one-hour, two-hour, and four-hour intervals for inmates recently discharged from MHCBs or alternative housing. Finally, in at least one prison, mental health clinicians appeared to consider five-day clinical follow-up assessments and hourly checks by custody staff for the initial 24 hours to an acceptable *alternative* to MHCB admission.

Therefore, this reviewer's recommendations were that CDCR, under the guidance of the Special Master, completely revise the current Five-Day Follow-up/Hourly Custody Check protocol. At a minimum:

27) *The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the "Interdisciplinary Progress Note" utilized at California Training Facility (CTF) that allows clinicians to use a separate sheet for each day of follow-up.*

28) *All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.*

29) *The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan.  No other frequency of observation should be authorized.*

30) *Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing SI and/or engaging in self-injurious behavior.*

## Status of Recommendations:

CDCR agreed to implement all of the foregoing recommendations. During several SPMW meetings, CDCR offered various revised versions of the five-day follow-up form. As these versions were cumbersome and impractical for use, CDCR was asked to streamline the form so that a clinician could utilize one sheet per each day of the follow-up.  The revised form also needed adequate space for a summary of the patient's treatment plan to reduce SI.  It also needed an instruction that the patient should not be removed from follow-up until a clinician, rather than a PT, conducted the fifth and final day of the follow-up and completed the associated form.

Initially, CDCR was reluctant to embrace Recommendation 28 for custody observation at 30-minute intervals rather than hourly, regardless of the housing units to which discharged inmates were transferred.  It later agreed to implement Recommendation 28 during the SPMW meeting in April 2015.  At the following SPMW meeting, in May 2015, CDCR distributed a draft memorandum entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy."  It summarized the new requirement that inmates discharged from an MHCB must be checked at 30-minute intervals rather than at hourly intervals during their first 24 hours post-discharge. Following discussion, CDCR also agreed to clarify the requirement to provide five-

day clinical follow-up assessments to suicidal patients who were discharged from alternative housing back to their housing units, regardless of whether they had been admitted to an MHCB. The policy also would be modified to require automatic referral back to an MHCB for any patient who still required 30-minute checks more than 72 hours after having been discharged from an MHCB or alternative housing.

The SPMW approved the revised Five-Day Follow-Up Progress Note form on September 30, 2015. According to CDCR, the new form would be implemented no later than November 15, 2015. CDCR also estimated that the revised memorandum would also take effect on November 15, 2015, although as of this writing, it has not been received by the Special Master.

**Current CDCR Practices:**

Although the revised five-day follow-up form and memorandum were not yet implemented, the re-audit found that practices regarding existing *Program Guide* requirements for five-day clinical follow-up of assessments continued to be problematic.  For example:

- At KVSP, this reviewer observed two clinicians separately conducting very brief follow-up assessments that were approximately two minutes in duration.  They were conducted cell-side in an administrative segregation unit.  In one case, the inmate's cellmate was actively listening to the exchange between the clinician and the inmate.

- At DVI, this reviewer observed a clinician who had confused two inmates' follow-up assessments with each other because he did not have their discharge SREs and treatment plans available for review.

- At PVSP, an LOP that had been recently developed in February 2015 contained the following problematic directive regarding patients discharged from an MHCB/Triage and Treatment Area (TTA): "The following modification shall be made to the I/P's program for the first 24-48 hours at the discretion of the MH PC: no yard, no dayroom, and cell feed." This protocol was commonly referred to as "confined to quarters" (CTQ) by PVSP clinicians, and was routinely found as an extension of five-day follow-up orders. It was anti-therapeutic and inconsistent with *Program Guide* requirements.

- At CCI, a recently-revised LOP contained an inaccurate directive regarding requirements for five-day follow-ups: "Mental health clinician shall not discontinue the 5-day step-down until at least 24 hours have passed since initiation."  Under *Program Guide* requirements, after the patient's first 24 hours post-discharge, a clinician may evaluate whether the custody checks should continue, but the clinician does not have the discretion to shorten the full five-day period for clinical follow-up assessments.

With regard to Recommendation 30, this reviewer's re-audit did not find any clinicians using the five-day follow-up process as an alternative to MHCB admission. As of this writing, Recommendations 27, 28, and 29 regarding improvements to the five-day follow-up process cannot be implemented until CDCR has finalized and implemented the "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy."

**L)** **Local SPRFITs**

**Basis for the Recommendation:**

Each local SPRFIT is required to meet at least monthly and carry out various responsibilities to ensure compliance with all CDCR suicide prevention policies and procedures, including five-day clinical follow-ups, treatment planning, etc. This reviewer's initial audit found at each prison that there was little discussion of overall suicide prevention strategies during SPRFIT meetings. Most meeting minutes reflected recitations of monthly statistics on compliance rates for five-day follow-ups and use of the Guard One system. There were few meaningful discussions about challenging cases such as inmates on the "high risk" list, or struggles with SREs and treatment planning, etc. Any discussions of SREs reflected in the minutes were quantitative rather than qualitative in nature. Attendance by some required SPRFIT members, particularly psychiatrists, was inconsistent at many prisons. Most importantly, many of the deficiencies identified by this reviewer were easily observable and should have already been found and resolved by the local SPRFITs before this reviewer's audits were conducted. Although the concept of local SPRFITs was a valuable tool in CDCR's suicide prevention program, the SPRFIT process appeared to have lost its way and needed to be revitalized. Therefore, this reviewer's recommendation was:

**31)** *CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.*

**Status of Recommendation:**

CDCR agreed to implement the foregoing recommendation. During several SPMW meetings, CDCR reported that its institutional SPRFITs would be reviewing serious SAs in their own prisons and presenting best-practice case studies during regular monthly meetings. It also proposed a more significant role for the SPRFITs in auditing the quality of SREs at each prison. CDCR reported that it would be re-examining the overall mission of its local SPRFITs and seeking input from each prison's CMH during an upcoming CDCR suicide prevention summit.

As of this writing, the Special Master has not received any communications from CDCR with regard to any proposed mission changes for the local SPRFITs. CDCR has indicated that the revision process has been deferred to early 2016.

**Current CDCR Practices:**

      This reviewer's re-audit found few positive changes in SPRFIT practices at the prisons. Eight of 18 or approximately 44 percent of local SPRFITs still fell short of attaining a quorum at their monthly meetings, with chief psychiatrists or their designees frequently absent. This lack of psychiatric leadership in suicide prevention remains problematic.  In addition, reviewed minutes indicated that some SPRFIT meetings were only 15 to 30 minutes in duration.  SPRFITs overall continued to collect data that was more quantitative than qualitative, although there were exceptions.  At MCSP, minutes reflected that most SPRFIT meetings had good attendance, including the chief psychiatrist at most meetings, with 90-minute meetings that covered discussions of several case studies of serious self-harm. At CHCF, thorough meeting minutes indicated that there were case presentations during meetings, and at NKSP, problems with attendance had been resolved by scheduling the monthly meetings immediately after the warden's morning meetings.

      **M)**     **Other Miscellaneous Issues**

**Basis for the Recommendation:**

      This reviewer's initial audit also found several additional practices that were problematic. These practices and this reviewer's specific findings in these areas were:

      a.  **Inaccurate Documentation on Inmate Observation Forms.**  Contrary to *Program Guide* requirements for observations at staggered 15-minute intervals, many prisons were using observation forms that bore pre-printed 15-minute intervals.  Other concerning practices included use of observation forms with time intervals that were not up-to-date, updating of forms as this reviewer was touring the unit, and keeping of observation sheets at the nurses' station instead of on each MHCB room door, thus creating opportunity for these sheets to be filled in without rounds having been performed.

      b.  **Non-Suicide-Resistant Beds in MHCB Units.**  Although most MHCBs were suicide-resistant, some were not.  They contained a handicap railing with a several-inch gap between the railing and wall, and square-shaped stainless steel sinks protruding from the wall, both of which could be used as attachment points for a noose and thus were conducive to SAs by hanging.

      c.  **Lack of Privileges for Patients in MHCBs**.  There were disparities between practices involving privileges allowed to medical patients versus privileges allowed to mental health patients in the prisons' CTCs. Patients

admitted to CTCs for medical reasons were generally eligible for recreation, visits, or telephone calls, but such privileges were generally prohibited for MHCB patients. In fact, most "recreation" for MHCB patients was merely time spent with the recreation therapist outside patient's room, and rarely, if ever, included yard time. Many clinicians appeared to be indifferent to this or dismissed it as a "custody" issue.

d. **Informal Recommendations in CDCR Suicide Reports.**  Various "deficiencies" and/or "concerns" noted in CDCR Suicide Reports for 2012-2014 did *not* result in recommendations for corrective actions.  It appeared that the CDCR suicide reviewers were simply identifying problems and informally relaying them back to the prisons for resolution. This was problematic because, without a CAP, identified deficiencies were not subject to any formal corrective oversight by CDCR headquarters.

e. **Frosting of Exterior Cell Windows and Sensory Deprivation in Administrative Segregation Units.**  Many of the administrative segregation units examined by this reviewer had exterior cell windows that were frosted, which prevented natural light from entering the cells.

f. **High Refusal Rates for New-Intake Screens in Administrative Segregation.**  Many prisons reported high refusal rates for mental health screenings of newly-placed inmates in administrative segregation inmates.

With regard to these findings, this reviewer's only recommendation was:

32) *CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues.*

**Status of Recommendation:**

CDCR agreed to implement the foregoing recommendation that it examine and consider reasonable corrective actions to address these concerns. Its response is summarized below, practice-by-practice:

a. **Inaccurate Documentation of Observation Forms:**  CDCR reported in April 2015 that it had reiterated to all CMHs that the only authorized suicide-prevention observation form was the "Suicide Watch/Suicide Precaution Record" form (CDCR 7365).

b. **Non-Suicide Resistant MHCBs:** CDCR reported in March 2015 that its Facilities Maintenance Division had initiated a program for inspection of all MHCBs system-wide to determine which, if any, were not suicide-resistant. Initially, the inspection program included review of OHUs, but because they came to be considered alternative housing, which requires one-to-one continuous observation, MHCB units became the exclusive focus of this effort. On October 30, 2015, CDCR notified the Special Master that it had completed its inspection program and identified MHCB units in 19 prisons that required various degrees of retrofitting to ensure that they were suicide-resistant. CDCR estimated that all work would be completed by June 2016.

c. **Lack of Privileges for Patients in MHCBs:** CDCR's initial response in March 2015 was that it would "survey" the prisons' CMHs to determine the extent of this problem, if any. In May 2015, CDCR agreed that MHCB patients should be afforded privileges that were commensurate with their treatment needs, as determined by their IDTTs. In July 2015, following this reviewer's finding during his re-audit that there were inconsistent practices and confusion among clinicians, it was recommended during an SPMW meeting that CDCR issue a directive to clarify and enforce *Program Guide* requirements regarding privileges afforded to MHCB patients. During the SPMW meeting on September 30, 2015, CDCR agreed to develop such a directive. As of this writing, the directive has not been received by the Special Master.

d. **Informal Recommendations in CDCR Suicide Reports:** CDCR reported in April 2015 that it had issued a November 2014 memorandum that required only formal recommendations in CDCR Suicide Reports.

e. **Frosted Exterior Cell Windows and Sensory Deprivation in Administrative Segregation Units:** Based on perceived security concerns, CDCR was initially reluctant to remove frosted screening from exterior administrative segregation cell windows. It reconsidered its position and reported in May 2015 that frosted screening had been removed from exterior windows in all affected administrative segregation units.

f. **High Refusal Rates for New Admission Screens in Administrative Segregation:** CDCR initially stated that it would "survey" each prison to determine its refusal rate for the 31-item mental health screening that was required for each non-MHSDS inmate's placement in administrative segregation. During that period, CDCR was piloting a new 12-item form for mental health screening to replace the 31-item form, with the goal of reducing the refusal rate.

In May 2015, CDCR issued its report entitled "Summary of ASU Screening Pilot Project," which indicated that the 12-item screen had a slightly higher "positive predictive value" for identifying mental illness than the 31-item screen.  In July 2015, the Special Master approved the 12-item form, which CDCR projected would be implemented system-wide in February 2016.

**Current CDCR Practices:**

The status of CDCR's response with regard to items (d) through (f) is noted above, item-by-item. This reviewer's re-audit also found the following with respect to the practices covered in items (a) through (c) above:

   a. **Inaccurate Documentation of Observation Forms:**  The correct the "Suicide Watch/Suicide Precaution Record" form (CDCR 7365) was being utilized. In four of 14 or 29 percent of re-audited prisons that had MHCB units, observation forms continued to be placed at the nurse's station or on a desk, rather than more appropriately on the doors of each patient's room. In two prisons, documentation of observations on appropriate forms was either not up-to-date or was found to have been falsified.

   b. **Non-Suicide Resistant MHCBs:**  Most of the 14 MHCBs examined during the re-audit continued to be nearly completely suicide-resistant, but certain potential hazards remained. At SVSP during February 2015, this reviewer was informed that an inmate had recently attempted to hang himself by affixing a noose to a horizontal slit known as an "anti-squirt slit" in the sink faucet inside the inmate's MHCB room. Subsequent inspections at seven other CDCR prisons found the same anti-squirt slits in their MHCB rooms. Also found in four prisons were square-shaped stainless steel sinks that protruded from MHCB room walls.  These sinks could be conducive to SAs by hanging because a noose could be attached to them.  Two other prisons' MHCB units had unsafe ventilation grates to which a noose could be attached.  Apart from the recently-discovered potentially hazardous "anti-squirt slits," this reviewer had previously reported to CDCR his identification of these other non-suicide-resistant features of MHCB units.

   c. **Lack of Privileges for Patients in MHCBs:**  This reviewer's re-audit found overall that significant problems persisted with granting of possessions and privileges to patients in MHCB units.  To address these problems, CDCR has recently agreed to develop relevant memoranda, as described below.

   Several of the re-audited prisons continued self-contradictory practices with regard to possessions afforded to suicidal patients.  For example, at MCSP this

reviewer examined several physicians' orders for issuance of *both* safety smocks and limited issue clothing, including undershorts, t-shirt, and socks, commonly referred to as "whites." A clinician should never order both limited issue *and* a safety smock. With the exception of underwear, which should be ordered in all cases unless highly unusual circumstances exist, limited issue is properly ordered when a clinician believes the patient's behavior has stabilized. A safety smock is properly ordered when the patient is at high risk of suicide. Accordingly, orders for both limited issue and a safety smock were problematic. If a clinician's assessment of a patient's risk for suicide is low enough to justify issuance of standard issue clothing, then a safety smock is not warranted and should not be ordered. Complicating this issue was a recent LOP at MCSP dated February 2015. It stated that "If an Inmate-Patient is progressed to be issued white clothing, it is permissible to offer the no-tear smock for modesty and environmental comfort for the Inmate-Patient." This directive was problematic because the safety smock should *only* be utilized to prevent self-harm, not to ensure "modesty and environmental comfort." This LOP would allow for ordering of both a safety smock and limited issue for the same patient, which would potentially provide a suicidal patient with limited issue items with which he could hang himself.

This reviewer found similar self-contradictory practices in at least six other re-audited CDCR prisons. At CSP/Cor and KVSP, *all* MHCB patients -- *regardless of whether or not they were on suicide observation status* -- were required to be clothed in only a safety smock. In addition, patients at CSP/Cor were also given "partial issue" clothing such as socks and t-shirts. When this reviewer asked why a patient would be clothed in a smock to prevent a suicide attempt by hanging yet at the same time be issued a t-shirt which could be utilized in a SA by hanging, a CSP/Cor clinician replied, "It's custody's choice." Although clinicians should always invite input from other IDTT members including custody staff, such response from the clinician was patently incorrect, as it is the clinician's and not custody's responsibility to make such determinations. In another case, when this reviewer asked a clinician why his patient was still clothed in a safety smock after 21 days in an MHCB, the clinician's response was "because he put feces in a milk carton."

Continued problems with telephone and yard access were also found in some of the re-audited prisons. This reviewer was informed that MHCB patients at CSP/Cor were not afforded telephone privileges "because there was no telephone access" in the MHCB area, yet it was later determined that medical patients in the very same CTC had telephone access. At CHCF, some clinicians were unaware that they could exercise clinical judgment to order yard privileges for a patient

that were consistent with his custody classification. In fact, this reviewer learned that patients in the CHCF MHCB were rarely allowed out of their rooms and into the yard for a variety of reasons, including an over 20-day backlog even for eligible patients to access the yard that was based upon recreation therapist schedules. At PBSP, this reviewer observed that *all* patients were on Suicide Precaution status, despite the fact that many had not been assessed as suicidal. As a result of this designation, all patients -- *regardless of whether they were at risk for suicide or had been admitted into a MHCB for other reasons* -- were placed under restrictions including no access to the yard.  A recreation therapist informed this reviewer that all patients in the MHCB were prohibited from going to yard because they were on Suicide Precaution status, despite the fact that there is no such blanket limitation on yard access in the *Program Guide*. Privileges such as yard access and others are determined individually for each patient, based on clinical judgment. Finally, at CHCF, clinicians were issuing standing orders for Suicide Precaution status at ten-day intervals, as found, for example, in a boilerplate physician's order form that stated simply "Continue Suicide Precautions for 24 hours x 10 days." This practice resulted in clinicians not having to make clinical judgments about patients' access to possessions and privileges for periods lasting at least ten days.

## IV.    **Conclusion and Recommendations**

In the estimation of this reviewer, CDCR's cooperation and commitment throughout the SPMW process to improve its suicide prevention program has been commendable and merits acknowledgment.  As noted above, CDCR embraced all but three of this reviewer's 32 specified recommendations which appeared in his initial report and a companion report by the Special Master.  (ECF 5259, 5258).  During the past several months, CDCR headquarters and prisons' officials and staff have begun to implement corrective actions in response to the order of the *Coleman* court directing CDCR to adopt those recommendations.  (ECF 5259)  As found in this reviewer's re-audit in 2015 of 18 selected CDCR prisons, implementation of these corrective actions has begun, albeit at differing rates.  Several previously-identified problematic practices and conditions have been resolved, resulting in improved effectiveness of PT rounding, elimination of informal recommendations in CDCR Suicide Reports, and elimination of frosted exterior cell windows in the administrative segregation units.  CDCR also implemented the Guard One program for electronic recording and verification of checks on inmates housed in administrative segregation units, SHUs, PSUs, and the condemned units throughout CDCR prisons. At the same time, resolution of problems in other areas, including adequacy of SREs, treatment planning, and ensuring privacy and confidentiality during the intake screening process, have proved more challenging and progress has been slow.

During the same timeframe, both the number of suicides and the suicide rate appeared to have decreased slightly during the last two years. For example, CDCR held 132,827 inmates and experienced 30 suicides during 2013, resulting in a suicide rate of 23 deaths per 100,000 inmates. In 2014, CDCR held 126,619 inmates and experienced 23 suicides, resulting in a decreased suicide rate of 18 deaths per 100,000 inmates. As of December 24, 2015, CDCR prisons housed 122,427 inmates and experienced 23 inmate suicides, resulting in a suicide rate of 19 deaths per 100,000 inmates.[6]

While the data appears encouraging, any assumptions of possible relief from the elevated rate of suicides in CDCR prisons must still be tempered with caution.  Annual suicide rates are more meaningful and reliable when viewed over a sustained period of time.  As stated in this reviewer's initial report, while numbers and corresponding rates of inmate suicides in any prison system may be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured.  The best methodology for determining whether a correctional system has fully implemented a sound suicide prevention program is to (1) assess suicide prevention practices within each of its prisons, and (2) review each inmate suicide in relation to the practices in the prison where it occurred and determine its degree of preventability.

In conclusion, this reviewer recommends that CDCR continue to fully adopt this reviewer's recommendations,[7] per order of the *Coleman* court entered February 3, 2015 (ECF 5271), and continue its cooperative undertaking with the Special Master in the Suicide Prevention Management Workgroup on the following initiatives, to which CDCR has committed and which remain outstanding at this time:

- A CDCR memorandum and/or CAP regarding current physical plant concerns for intake screening in R & R Units at each prison, to include interim and long-term CAPs.

- A draft memorandum regarding *Program Guide* requirements for observation of patients in MHCBs who are *not* on Suicide Watch or Suicide Precaution statuses, to include a "step-down" process, clear definitions in LOPs regarding types of behavior necessitating an observation status for non-suicidal patients, and guidance on avoidance of misuse/overuse of safety smocks.

---

[6]By comparison, the suicide rate in state prison systems throughout the country is approximately 15 deaths per 100,000 inmates.  See Noonan, M., Rohloff, H. and S. Ginder (2015), *Mortality in Local Jails and State Prisons, 2000-2013 - Statistical Tables*, Washington DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

[7]As indicated above, the Special Master announced at the SPMW meeting on September 30, 2015 his decision to postpone for six months further discussion on the three remaining unresolved issues, which are found in Recommendations 14, 15, and 16.

- Clarifying CDCR memoranda to resolve confusion and uncertainty surrounding the issuance of possessions and privileges to MHCB patients based on clinical judgment.

- Clarifying CDCR memoranda and timetables for implementation of the Revised Interdisciplinary Progress Note - Five-Day Follow-Up Form for use by clinical staff and the 30-Minute Observation Form for use by custody staff.

- A revised draft of the "Mental Health Crisis Bed Discharge Custody Checks Policy," to include clarification of requirements for providing five-day clinical follow-ups for suicidal inmate/patients discharged from their placements in alternative housing back to their housing units without having been admitted into MHCBs, and clarification that those inmate/patients who require 30-minute checks beyond their initial 72 hours post-discharge must be automatically referred back to an MHCB.

- Installation of "stack-a-bunks" in alternative housing cells.

- Issuance of a revised "SRE Mentoring Program," to include the requirement that one SRE completed by every mental health clinician be audited every six months.

- A draft CDCR proposal to revise the mission of the SPRFIT.

- Implementation of new 12-item mental health screening form to be used in administrative segregation units.

- Issuance of a "Revised Administrative Segregation Unit Intake Cell Procedure."

- An update on OHU-type housing in administrative segregation units at RJD.

Finally, it is recommended that those prisons which chronically struggle with their suicide prevention programs, as well as almost all prisons that contain MHCB units, undergo continued re-inspection. This would allow for the provision of continued guidance and assistance to help bring these prisons' suicide prevention programs up to standards. It would also provide a means by which to gauge the sustainability of the CDCR's corrective actions and the efficacy of its emerging CQIT for suicide prevention. Most importantly, in the estimation of this reviewer, it would result in continued reduction of the number and rate of inmate suicides throughout CDCR prisons.

## V.    Findings and Non-Clinical Case Reviews at the 18 Re-Audited Prisons

### 1)    California State Prison - Sacramento (CSP/Sac)

**Inspection**:  February 4-5, 2015 (previous suicide prevention audit was on November 20-21, 2013)

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process on February 5, 2015.  The nurse assigned to the Receiving and Release (R & R) Unit was using the most current version of the Initial Health Screening CDCR Form 7277 (revised October 2014).  The nurse was observed to be asking all of the required questions on the form.  The process was only semi-private because the door to the Nurse's Office remained open with an officer standing in the doorway just outside the room.

The CMH, who was observing the intake screening process with this reviewer, stated that CDCR Form 7277 had been slightly revised to include a concluding question asking the inmate whether he/she had any health care concerns that needed to be addressed in a private, confidential setting.  The CMH stated that this question had recently been added to the screening form in an attempt to correct the previous deficiency identified by this reviewer in the November 2013 audit of intake screening occurring in the presence of a correctional officer (CO).  After observing the semi-private nature of the screenings taking place, the CMH acknowledged that all questions on the form were of a confidential nature that required a private setting.  The CMH subsequently informed this reviewer that she and the CNE would collaborate to further address this deficiency.

Due to scheduling conflicts, this reviewer was only able to observe daily PT rounds in one of the administrative segregation units (A-5) on February 5.  PT rounds were performed appropriately, with the PT completing the Psych Tech Daily Rounds sheet after conversing with each caseload inmate.

**Housing**:  CSP/Sac had two CTCs.  CTC-1 had 16 beds and CTC-2 had 12 beds, of which 20 were designated as MHCBs.  The rooms and the beds within each unit were suicide-resistant.  All cells in the 20-bed Mental Health Crisis Bed Unit (MHCBU) were designated as providing unlicensed MHCB level of care (LOC).  Each cell was suicide-resistant, and had safe beds, ventilation grates, and light fixtures.  As reported in November 2013, the environment of the MHCBU remained sterile.  Cells still appeared dirty and dark, and offered limited visibility of their interiors.

Unlike this reviewer's previous tour, "alternative housing" beds were used on a regular basis throughout the facility on February 4-5, 2015.  There were approximately 50 inmates on suicide observation status at CSP/Sac on February 4, with 25 in the CTCs, 20 in the MHCBU, and five in the OHU and alternative housing cells (including ZZ cells).  This reviewer observed that although inmates in the ZZ cells were being observed on a continuous basis, an inmate in a non-suicide-resistant OHU cell was on suicide precaution status and being observed at 15-minute intervals.  Such a practice was contrary to numerous CDCR directives that required inmates in non-suicide-resistant cells to be under continuous observation.

As previously observed by this reviewer in November 2013, designated cells in the OHU were not suicide-resistant and had dangerous ventilation grates and gaps between bunk railings and walls that could be used for suicides by hanging.  Upon return to the OHU in February 2015, this reviewer observed that although ventilation grates appeared suicide-resistant, there remained gaps between bunk railings and walls in the designated cells (211-214).  Of interest, according to SPRFIT meeting minutes from November 2014, the retrofitting of designated OHU cells had been an agenda item since December 2013, shortly after this reviewer's previous audit. According to these meeting minutes, "Per email dated 11-17-2014, Mr. ....reported:  All the retrofitting in OHU had been completed."  Such information was inaccurate and the designated OHU cells remained dangerous.  To add, there appeared to be confusion amongst staff as to which OHU cells were designated to house suicidal inmates.  For example, whereas custody and mental health officials suggested that OHU Cells 111-120, 211 and 220 were designated for alternative housing, OHU line staff stated that the designated cells were 211-214.  Most importantly, suicidal inmates assigned to the OHU were observed at 15-minute intervals, not the required 1:1 continuous observation of inmates placed in unsafe cells.

Similar to what was reported in November 2013, there continued to be no clinician offices in either the MHCBU or OHU in which assessments could be conducted privately.  Assessments were conducted either cell-side in the OHU, or cell-side or in therapeutic modules in the MHCBU.  The MHCBU modules were located in a high traffic area of the dayroom that offered very limited privacy and confidentiality.  A review of several medical charts of MHCBU inmates found that many clinical interviews were conducted cell-side.

Finally, although this reviewer was not able to inspect all designated new intake cells in the administrative segregation units, the six new intake cells in the Short-Term Restrictive Housing Unit (formally the old administrative segregation Stand-Alone Unit), as well as the three new intake cells in the GP administrative segregation unit (B-3) were suicide-resistant.  The designated new intake cells (106-109) in A-5, the administrative segregation unit for Enhanced Outpatient Program (EOP) inmates, were not suicide-resistant in that they contained metal grates on the inside of both the cell doors and exterior windows.  Significantly, this reviewer did not observe any new intake inmates in non-retrofitted cells in these units.

**Observation**:  Although this reviewer found slightly different versions of the CDCR Suicide Watch/Suicide Precaution Record observation form being used for documentation of required observation of suicidal inmates in the CTCs and MHCBU, all of the forms appropriately did not contain pre-printed time intervals.  Review of observation forms in CTC-2 and the MHCBU found they were accurate and up-to-date, whereas review of forms in CTC-1 found that they had not been updated within the previous 30 minutes (i.e., this reviewer reviewed the forms at approximately 10:30am and they had not been updated since 10:00am).  In addition, the practices in each of the three units was for nursing staff to attach each observation form to a clipboard which was kept at the Nurse's Station.  Because these observation forms were not attached to each inmate's door, such a practice allowed for the possibility that the sheets were completed at the Nurse's Station without rounds having been performed.  This issue was discussed with the CMH who subsequently informed this reviewer that, in collaboration with the CNE, the observation sheets would be attached to each inmate's door.

Finally, a review of Guard One data for a 24-hour period in administrative segregation unit A-5 found only 82-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the Mental Health Tracking System (MHTS) from October 1, 2014 through January 31, 2015. A total of three emergency referrals were listed during this four-month time period, an obvious error. A subsequent request for referrals based upon "crisis appointments" resulted in a MHTS report of over 100 emergency referrals for SI. The significance of this finding is that a CQI audit of the mental health staff response to emergency referrals cannot be performed if the requested data is inaccurate and/or difficult to produce. Although TTA logs could not be reviewed due to time constraints, as a review of those logs would have been cumbersome, it would have resulted in more accurate data.

This reviewer reviewed eUHRs of ten inmates referred to mental health staff on an emergency basis for SI. The reviewed charts indicated that inmates referred to mental health were seen on a timely basis, with required SREs completed in each case.

In addition, this reviewer examined several charts of inmates recently discharged from a MHCB. The review found problems with the quality of treatment planning as contained within SREs. Two cases best exemplified problems. In the first case (Sac 1), the inmate was discharged from a MHCB on January 6, 2015 with the following treatment plan contained within the discharging SRE: "I/P will be discharged from the CTC-2 today and returned to PSU-1 until he can be transferred to CCCMS; program senior will be notified of discharge and will receive a copy of this evaluation via email; I/P will receive 5/8 mental health follow-up per CDC protocol; medication management per staff psychiatrist; recommendations for further treatment should include anger management and accountability." Simply reciting CDCR protocols and vague recommendations for "anger management and accountability" treatment to address reduction of SI and/or even perceived manipulative behavior did not exemplify treatment planning.

In the second case (Sac 2), the inmate was discharged from Suicide Precaution status and transferred from CTC-1 to the MHCBU on January 28, 2015 with the following treatment plan contained within the discharging SRE: "1) Medications per psychiatry...; 2) DBT informed treatment to help IP develop increased frustration tolerance and alternatives to SIB; 3) Supportive interventions aimed at increasing IP's coping skills; 4) Establishment of relationship with primary PC to begin working on 'unresolved' issues and grief." This treatment plan showed promise by offering specific interventions to address SI and self-injurious behavior, but when the inmate was discharged from the MHCBU a few days later on February 3, the discharging SRE contained the following treatment plan: "IP will be discharged today return to EOP/LOC placement. IP will participate in an IDTT and will work on the signed treatment plan goals. IP will participate in weekly 1:1 sessions with assigned primary clinician, 10 hours of groups, as well as structured yard time. In addition, IP will meet with a psychiatrist a minimum of twice weekly. MHCBU clinical team recommends IP continue to work on processing on the recent grief and loss of family members." This treatment plan was not consistent with the treatment plan developed three days earlier on January 28 and did not address specific strategies to reduce SI. The following day, on February 4, the inmate met with his primary clinician who completed an SRE with the following treatment plan: "Case will be presented at up-coming

35

IDTT; suicide prevention will be discussed; coping skills for depression and SI will be reviewed in detail; custody officers will be consulted regularly; values and goals will be explained in effort to identify meaningful goals and pursuits to assist with remainder of prison term sentence." In sum, with little, if any consistency, three different treatment plans were developed by three different clinicians on January 28, February 3, and February 4, 2015.

Finally, this reviewer observed the IDTT processes in CTC-1, CTC-2, and the MHCBU on February 5, 2015. The IDTT sessions in CTC-2 and MHCBU were similar, with very little suicide risk inquiry of each inmate in a MHCB for SI. The IDTT in CTC-1 was better, with a much more robust discussion of suicide risk for each inmate.

The IDTT for one particular inmate in the MHCBU on February 5 was problematic. The inmate (Sac 3) stood out because he arrived for the meeting dressed in both a safety smock and standard issue of undershorts, t-shirt, and socks. Immediately prior to his arrival, his primary clinician informed IDTT observers that the team had already decided to discharge the inmate from the MHCBU. After the inmate arrived, the meeting lasted only a few minutes, with a review of his medication compliance and a brief suicide risk inquiry. After he departed, this reviewer asked the team why the inmate was clothed in both a safety smock and standard issue of undershorts, t-shirt, and socks. One clinician subsequently responded that the inmate had received his standard issue because his behavior had improved. When this reviewer asked why it was then necessary to keep him in a safety smock, another clinician stated that the inmate remained in the safety smock because he was cold. Of course, if the inmate was cold and clinical staff believed him to be safe enough to have the standard issue of undershorts, t-shirt, and socks, then he could have received a state-issued jumpsuit.

This reviewer reviewed the inmate's medical chart. He had arrived at the MHCBU on January 27, 2015 after reporting severe depression and auditory hallucinations (AH) to kill himself. An SRE was completed as required. He was seen the following day, on January 28, by a psychiatrist, his medications were adjusted and his diagnoses were listed as Schizoaffective Disorder and Anti-Social Personality Disorder. He received "limited issue" of only a safety smock, safety blanket, and mattress. On January 29, a Physician's Order was written by his primary clinician that continued the Suicide Precaution status and ordered both a safety smock and standard issue of undershorts, t-shirt, and socks. There were *not* any mental health progress notes in the eUHR for January 29 and the inmate was apparently not seen by mental health staff that day to assess his level of suicide risk or alleged complaint of being cold. He attended his initial IDTT the following day on January 30 and a treatment plan goal of "IP will not endorse SI for 72 hours or until next IDTT" was established. His diagnoses was changed to Psychotic Disorder, Not Otherwise Specified (NOS) and Anti-Social Personality Disorder. The inmate continued to be seen on a daily basis by mental health staff from January 31 through February 4, when he was seen by the psychiatrist. According to the psychiatric note, the inmate "endorsed AH of a non-command nature," and denied any current SI. The psychiatrist continued Suicide Precaution status with "limited issue" (which was a contrary order to previous orders granting both the safety smock and standard issue). The inmate was *not* seen again until his IDTT meeting the following day, February 5, when the primary clinician informed observers that the team had already decided to discharge him prior to the meeting. Such a decision was made *without* an assessment of the inmate or documentation in any progress note. An updated MHTP

dated February 5 remained the same with the treatment plan goal of "IP will not endorse SI for 72 hours or until next IDTT." The inmate was discharged from the MHCBU later that afternoon. A discharging SRE was *not* completed, therefore, an adequate treatment plan to ensure continuity of care was *not* completed. The inmate was subsequently seen February 6 in the EOP yard by his assigned clinician. He denied any SI. Only three of the five-day follow-up progress notes were in the eUHR as of February 16, 2015.

Another inmate (Sac 4) arrived for his IDTT clothed only in a safety smock and had remained in this garment continuously since his MHCBU arrival on December 17, 2014 (after two days in alternative housing), for a total of 53 consecutive days. He had been referred to intermediate inpatient care at DSH in early January 2015. It was unclear from the eUHR why an inmate clothed only in a safety smock for 53 days would still be in a MHCB bed and why his projected level of care remained intermediate inpatient care.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambulatory Bag Used for Cardiopulmonary Resuscitation (Ambu bag), and cut-down tool.

**SPRFIT Meetings**: A review of four months of SPRFIT meeting minutes found that monthly meetings failed to reach a quorum in all months between November 2014 and January 2015. The issue of "poor SPRFIT meeting attendance" had been a monthly agenda item since 2012. Quorums were primarily not reached due to the absence of the chief psychiatrist and designee, as well as custody staff. The chronic absence of psychiatric and custodial staff was disappointing.

**Training**: According to training records, approximately 99 percent of custody staff and 98 percent of nursing staff were currently certified in Cardiopulmonary Resuscitation (CPR). In addition, 98 percent of custody staff had received annual suicide prevention training during 2014, but only 69 percent of medical and 62 percent of mental health staff received comparable suicide prevention training during 2014. Although the completion percentages for annual training were much lower for health care staff, they were vastly improved from 2013 when almost none of the health care staff received annual suicide prevention training. Finally, as of January 2015, 87 percent of mental health clinicians had completed the SRE mentoring program, but only 64 percent had received the seven-hour SRE training. The completion rates for SRE training were significantly lower than those found during the November 2013 audit (when rates were at 97 percent).

**Recent Suicides**: There were four inmate suicides at CSP/Sac during the review period. In the **first** case (Sac 5), the inmate was found hanging from the light fixture of his PSU cell by a sheet during the afternoon of July 7, 2014. The cell door window had been covered internally by a piece of cardboard. The inmate entered the CDCR system in December 1997 to serve a 40-year to life sentence for second-degree murder (of his fiancée). He had approximately 30 RVRs (Rule Violation Report) during his CDCR confinement, the most recent of which occurred on June 17, 2014 and involved battery on a peace officer, whereby he refused to get on the CDCR bus for transfer from LAC to SAC. The inmate was transferred to SAC on June 20, 2014.

The inmate did not report a history of mental illness, nor any family history of mental illness. He did have a traumatic brain injury (TBI) that occurred as a result of an automobile accident in 1994. He experienced a Seizure Disorder as a result of the TBI and was being medically treated during confinement. The inmate appeared to have family support through telephone calls and letter correspondence, but last received a family visit in 2004.

He was originally placed in the MHSDS in December 2002 and given a diagnosis of Schizoaffective Disorder. He was raised to EOP level of care on March 27, 2014 after appearing emotionally withdrawn and stating he "no longer had a reason to live." According to the CDCR reviewer in this case, the inmate's mental health presented with signs and symptoms that were very complex and confusing, making diagnosis extremely difficult." He had various diagnoses over the years, with the most recent diagnosis of Mood Disorder, NOS.

The inmate had a limited history of suicidal behavior. Other than self-reporting that he "had no longer had a reason to live" in March 2014 that was later recanted and thought to be based upon frustration dealing with his Seizure Disorder, and an alleged SA by drug overdose (heroin) in 2012, the inmate's previous SREs consistently assessed a "moderate" chronic risk and "low" acute risk for suicide. (A previous report of SI in June 2014 turned out to be a fabricated mental health referral from another inmate.)

Upon arrival at CSP/Sac on June 20, 2014, the inmate was placed in the PSU as a result of a SHU term imposed in 2013 for the stabbing of another inmate. During his intake screening, he self-reported that his father had died in January 2014 and "I'm trying to deal with this." He also reported AHs. This information was not verified nor addressed in the subsequent CDCR Suicide Report. He met with his primary clinician on June 25 and then again briefly on July 2 prior to his initial IDTT meeting, and five days before his death. According to the progress note, the primary clinician noted that the inmate was cooperative, but "appeared internally preoccupied and suffering from AHs. I/P was observed whispering and carrying on another conversation. His motor activity appeared slow. He was easily distracted. His concentration appeared preoccupied. I/P presented with flat affect. Upon review of previous evaluations, I/P had not presented with [any] reported AHs. I/P symptoms have appeared to have exacerbated and coincide with recent medication change and medication change was related to seizure disorder." Review of several weeks of Psych Tech Daily Rounds forms, including those shortly before his death, were unremarkable and showed a mental status within normal limits. The inmate appeared compliant with his psychotropic medication, although he refused one of his anti-seizure medications the day before his death following a disagreement with his primary physician.

The CDCR reviewer in this case did not offer any possible precipitating factors for the suicide, and no suicide note was found. The reviewer found a few deficiencies in the emergency medical response to the suicide, as well as questioned why a scheduled Guard One check occurred in the midst of the emergency response at 4:16pm. The Suicide Report contained two recommendations for corrective action through a QIP: both involved the absence and/or acknowledgment of Ambu bag use at the scene of the emergency. Ironically, although the CDCR reviewer questioned why a Guard One check occurred in the midst of the emergency response at 4:16pm, the reviewer did not inquire as to when the inmate was last observed by

custody staff, and/or determined how long the inmate's cell window had been blocked internally by a piece of cardboard.

In the **second** case (Sac 6), the inmate was found hanging from the ceiling sprinkler head by a sheet in his administrative segregation unit cell during the late afternoon of March 11, 2015.  The inmate entered the CDCR system on February 9, 2001 to serve a life sentence without parole for two counts of murder and robbery.  He had over 30 RVRs during his confinement, the last of which occurred on the day of his death and involved a threat against another inmate.  He also had a pending charge of drug possession.  The inmate was not known to be gang-affiliated, and had limited family support (with his last visit occurring more than ten years earlier in January 2004).

Although the inmate was known to be a very inconsistent historian, he was said to have had an extensive history of mental health treatment in the community, including psychiatric hospitalization for both "paranoid schizophrenia and major depression."  In addition, he began abusing drugs at age 12.  The inmate was enrolled in the MHSDS at Correctional Clinical Case Manager System (3CMS) level of care shortly after his entry into the CDCR in 2001.  In July 2008, he began receiving EOP services.  The inmate had two DSH admissions, the first from August through November 2008, and the second from March 2012 through January 2013.  In 2013, his diagnoses were Major Depressive Disorder, Recurrent, Moderate; Poly-Substance Dependence (active); Anti-Social Personality Disorder; and Narcissistic Personality Disorder.  In January 2015, his diagnoses were changed to Bipolar Disorder (most recent episode mixed); Polysubstance Dependence; and Anti-Social Personality Disorder.  The inmate had been on involuntary medications since July 9, 2014.

The inmate also had an extensive history of suicidal and self-injurious behaviors.  His first SA occurred when he was approximately nine-years-old and said to be related to the death of his twin brother, physical abuse by his mother, and/or sexual abuse by a babysitter.  He also reported that both his aunt and grandmother committed suicide when he was a teenager. Although his reporting of prior behavior was inconsistent, the inmate listed multiple methods of attempted suicide and self-injurious behavior, including poisoning, jumping from a highway overpass, drug overdose, wrist cutting, and attempted hanging at a county jail.  Within CDCR, the inmate was placed in a MHCB for SI or self-injurious behavior (e.g., cutting, burning, starving himself) on six separate occasions, including from June 12, 2001 through June 29, 2001; June 9, 2005 through June 11, 2005; March 25, 2010 through April 5, 2010; July 19, 2011 through July 28, 2011; December 6, 2014 through December 8, 2014; and December 20, 2014 through December 24, 2014.  Following his discharge from a MHCB on December 24, 2014, he was transferred to an EOP housing unit at CSP/Sac.  Although there were many discrepancies in the inmate's multiple SREs during his CDCR confinement, particularly regarding chronic risk factors and prior SAs, he was consistently assessed as a "moderate" chronic risk of suicide.

The inmate had a limited medical history within CDCR, with treatment for both asthma and toenail fungus.  There were not any medical issues that were said to be attributable to his eventual suicide.

In the days leading up to his suicide on March 11, 2015, the inmate was seen by his primary clinician on both March 3 and March 9 and reported that his mood was "8 out of 10" and "9 out

of 10," respectively (with ten being the worst). According to several inmates interviewed by the CDCR reviewer following his death, the inmate was said to be recently upset regarding a romantic relationship with an inmate in another EOP housing unit. He had been trying without success to get reassigned to the other inmate's housing unit. On March 9, he was informed by custody officials that he was not eligible for transfer to that particular housing unit. The inmate then informed custody officials that he had an enemy in his current housing unit, as well as telling them that he would assault the alleged enemy if he was not transferred. Unexpectedly, during the early afternoon of March 11, the inmate was transferred to administrative segregation based upon the alleged threat of assault on another inmate. Soon thereafter, a nurse completed the required "Administrative Segregation Unit Pre-Placement Chrono (128-MH7). Although the inmate denied any current SI, he answered "yes" to the question "Have you ever tried to kill yourself because you were placed in administrative segregation." Based upon the response, the inmate was required, pursuant to Form 128-MH7, to be referred to a mental health clinician on an emergent basis for a mental health evaluation, and the inmate was prohibited from being placed in administrative segregation until the evaluation was completed. According to the CDCR reviewer's Suicide Report in this case, "The SAC mental health clinician cleared him for ASU via phone with nursing staff." The inmate was found hanging in his cell a few hours later.

Although the CDCR reviewer did not offer any specific precipitating factors to the suicide, and several suicide notes to family members were vague in content, the reviewer noted that "From a review of the records, the inmate appeared chronically ready to commit suicide. He was impulsive and had fragile coping skills. Throughout many of his mental health contacts he said he would not commit suicide on that day, but always clarified he was taking one day at a time. It was evident in mental health documentation he had thought about suicide for many years, battled negative thinking, and used drugs, alcohol, and self-injurious behaviors (cutting, burning, starving himself) to escape and manage his pain and frustration."

The Suicide Report cited numerous deficiencies by medical and mental health staff resulting in six recommendations for corrective action through a QIP:

> 1) SAC SRE ..... (and treatment planning) documentation did not adequately reflect the inmate's risk level or provide satisfactory justification to retain at EOP level of care. A referral to DSH had been recommended by the sustainable process team. The regional team appeared to integrate critical historical information, chronic suicide risk factors, and recent RVRs within its recommendation;

> 2) SRE documentation during the inmate's MHCB at California Medical Facility (CMF) stay from December 20, 2014 until December 24, 2014 did not reflect the inmate's risk level. Chronic risk factors were missing such as family history of emotional, physical, and sexual abuse, chronic pain, history of SAs, and history of poor impulse control. Most notably, the history of SAs section was not completed and documentation about his past SAs was not reviewed. Providers reviewing historical information on this case may have come to risk formulations that included higher ratings of suicide risk level;

3)  .... During the inmate's stay at the CMF MHCB in December 2014, there was no CDCR 7386 or 7386 update completed, only reference to a IPE and CDCR 7387.  The CMF MHCB should complete a CDCR 7386 or CDCR 7386 add-a-page update per policy;

4)  ..... Headquarters clinical staff should review current policy and best practices for the CDCR 7386 for MHCB inmates to ensure quality documentation is being produced with the least amount of redundancy (in considering the completion of the IPE or CDCR 7387 as alternative forms;

5)  The inmate was discovered hanging from a sprinkler head in his ASU retrofitted intake cell.  Additional information is needed about the types of sprinkler heads placed in intake cells to ensure this incident is not repeated;[8] and

6)  Per the Nursing Death Review Summary, there were four nursing concerns identified requiring follow-up" (i.e., the Automatic External Defibrillator (AED) was not brought to the scene of the emergency, and documentation was missing from prior nursing staff interactions with the inmate).

In addition to the deficiencies noted in the Suicide Report, this reviewer found three additional issues that were not addressed. *First*, the most recent SRE completed for the inmate on January 6, 2015 by a CSP/Sac mental health clinician was replete with the same deficiencies as noted by the CDCR reviewer in criticisms of the CMF clinicians.  A recommendation for additional SRE training for CSP/Sac clinician(s) appeared appropriate.  *Second*, the inmate was found hanging in his cell at approximately 4:54pm on March 11, 2015, and first responding correctional officers did not enter the cell and initiate CPR until seven minutes later at 5:01pm.  This emergency response time was excessive and outside the standard of care (of four minutes) and should have resulted in a QIP.

*Third*, and more importantly, based upon an affirmative response on the "Administrative Segregation Unit Pre-Placement Chrono (128-MH7) on March 11, 2015, the inmate was required to be seen immediately by a mental health clinician for an evaluation prior to his admission into administrative segregation.  Instead, a nurse conferred with a mental health clinician who telephonically cleared the inmate for administrative segregation admission without a face-to-face evaluation.  It should be noted that, although the inmate was seen by his primary clinician earlier in the afternoon on March 11 in a holding cell (presumably in the EOP housing unit), the interaction was brief and did not include an evaluation.  In fact, the primary clinician's subsequent progress note stated the following:

I saw I/P _____ sitting in a holding cell in the breezeway.  I asked Mr. ____why he was in the holding cell.  He responded, 'I don't know.' I went into the office and

---

[8]It should be noted that the retrofitted new intake cells had breakaway sprinkler heads that activated (i.e. rushing water) upon tampering.  Although the incident reports generated in this case were vague in regard to what part of the sprinkler head was attached by a sheet, it is possible that the inmate attached the sheet to the pipe in the ceiling rather than to the sprinkler head.  In other words, the issue might not be the "type" of sprinkler head available in retrofitted new intake cells, but an anchoring device surrounding the sprinkler head.

asked Custody why Mr. _____ was in the holding cell and asked if he was suicidal. Custody responded, no, he was in the holding cell pending allegations of assault. As I was leaving Custody was talking with Mr. ___. Therefore, I had no further contact with Mr. ____ ....  Due to brief interaction with I/P, PC was unable to assess IP's orientation.

It was abundantly clear from this progress note that the clinician had limited interaction with the inmate, did not even ask the inmate if he was suicidal, and did not conduct a mental status exam. In fact, it appeared that this brief interaction occurred prior to the nurse's Administrative Segregation Unit Pre-Placement Chrono and that the primary clinician was unaware that the inmate was being admitted into administrative segregation.  Therefore, this primary clinician's progress note could certainly not be interpreted as a mental health evaluation.  An inquiry regarding why a face-to-face mental health evaluation was not conducted, as well as why telephonic clearance for administrative segregation admission was permitted, should have resulted in an additional QIP.

In the **third** case (Sac 7), the inmate was found hanging from the ventilation grate by a sheet in his Short-Term Restrictive Housing (STRH) unit cell during the early afternoon of May 23, 2015.  The inmate entered the CDCR system on October 3, 2001 to serve a 22-year sentence for assault with force likely to produce great bodily injury and assault with a deadly weapon on a peace officer.  He had six RVRs during his current CDCR term (as well as 19 additional RVRs from prior CDCR confinements).  The inmate's most recent RVR was issued on June 17, 2014 for conspiracy to commit murder, and he was facing a 26-month SHU term.  The charge was related to an incident that occurred on February 25, 2012 when the inmate and another co-defendant allegedly murdered another inmate at FSP who had been identified as a suspected child molester.  The inmate was found guilty of murder on May 21, 2015, two days before his suicide.  There was inconsistent documentation that the inmate was either sentenced on that date to a sentence of 45 years to life or that he was facing a life sentence of that length. He had been transferred to CSP/Sac on September 24, 2014 and was periodically out to court for his pending case.  The inmate was known to be gang-affiliated with a white supremacist group, and had good family support from his father, brother and teenage son.

The inmate's medical history included hypertension, hyperlipidemia, hiatal hernia, chronic lower back pain, GERD, and migraines.  According to the CDCR reviewer in this case, these medical ailments did not appear to be precipitants to his eventual suicide.

The inmate did not report any history of mental illness while in the community, although he acknowledged a significant history of substance abuse.  He was placed in the MHSDS in December 2001 at the 3CMS level of care with a diagnosis of Adjustment Disorder with depressive mood.  The inmate stated that he had been "depressed all of my life."  He was stabilized and discharged from the MHSDS in July 2002.  During the ensuing years, he was in and out of the MHSDS when his depressive symptoms became unmanageable.  For example, he was placed back on 3CMS level of care from January 2009 through January 2013, and then again from July 22, 2014 until his death.  He had been housed in the administrative segregation since March 1, 2012 pending the murder charge, and became increasingly depressed.  According to a July 22, 2014 treatment plan, "I/P referred himself to MH due to increased depression as a result

of stress related to being in ASU for more than two years in facing conspiracy to commit murder. I/P reports poor sleep, depressed feelings, negative rumination, and passive SI. I/P vehemently denies a plan to kill himself. I/P reports that he 'cannot do that to my son'." The inmate's most recent diagnosis was Major Depressive Disorder, Recurrent, Moderate.

Although the inmate did not have a history of suicidal behavior in the community, nor a family history of suicide, he reported a prior SA by hanging while incarcerated at a county jail in 2001. The inmate appeared to have "intermittent thoughts of suicide" throughout his CDCR confinement. Various progress notes from clinicians over the years often stressed "passive suicidal ideation," "intermittent thoughts of suicide but no plan or intent," "chronic SI," "transient SI," "continue to monitor for acute SI," etc. SREs completed on the inmate during 2014 and 2015 assessed his chronic risk for suicide as "moderate" and his acute risk as "low".

Of interest, the inmate's last SRE was completed on February 18, 2015, with the clinician stating: "I/P is never been to the crisis bed at SAC and stated he has no intention of ever going that's why it's hard for him to talk about his actual state of mind because he's afraid staff will send him if he mentioned suicidal ideation."

The inmate appeared to openly discuss his death with various clinical staff. For example, a psychiatrist wrote in an October 17, 2014 progress note that:

> 'I want to die.' I/P is awaiting court in December for murder, and is facing going back to High Desert after his court date. He denies feeling upset or anxious about it. He states that he has had severe depression for a long time and that he has been thinking of suicide for a while. His proposed plan is to have a cellie kill him (he is now single cell), and states that if they don't kill him, he might kill somebody. States that his sleep is restless at night. His appetite is poor and he believes he has lost weight. He states that he hears a voice inside his head saying that it would be better if he would kill himself. Also says that he sees 'death images,' like witches and ghosts across the hall. He does have a history of suicide attempts by hanging, but states he doesn't think he would try that now.

Despite the inmate's continuing rumination about suicide, a review of his various SREs and treatment plans found little evidence of any clinical strategies to reduce SI. The inmate's second to last clinical contact with his primary clinician occurred on May 14, 2015 when his primary clinician wrote that "I/P is on trial for a murder case and worries that if he is found guilty he may get life. I/P said that if he gets life he may not be able to stop himself from actually completing suicide."

One week later on May 21, 2015, the inmate was returned from court after being found guilty of murder (and possibly sentenced to a 45-year-to-life term). According to an escorting officer who was interviewed by the CDCR reviewer after the inmate's death, "the inmate's final words to the officer were, 'I'm going to talk to _____ (another inmate's name) about killing himself.'" The escorting officer indicated that he informed nursing staff that the inmate had received bad news in court. According to a "Court Return Assessment" form completed by a nurse, "Per custody, I/P received bad news he was found guilty, I/P denies receiving bad news, smiling, I'm okay."

Although not noted on any documentation, the nurse apparently contacted an on-call psychiatrist who cleared the inmate to return to administrative segregation without a face-to-face assessment.

Of interest, the eUHR contained a psychiatric progress note purportedly dated May 22, 2015 (the day before the inmate's death) and scanned into the medical record on May 26, 2015. The psychiatric note was Subjective Objective Assessment and Plan (SOAP) formatted by the psychiatrist and summarized his telephone conversation with the nurse on May 21. According to the psychiatric note:

> I requested that Nurse _____ perform a careful screening evaluation. <u>Objective</u>: According to Nurse _____, IP denied having anxious mood or depressed mood. He denied all psychotic symptoms. He denied suicidal ideation or homicidal ideation. Nurse _____ indicated that IP displayed normal and euthymic affect. He was described as having no agitation, being calm with normal speech and with normal eye contact; he was fully cooperative on interview. Nurse _____ reviewed with him the availability of mental health services; IP indicated willingness to follow up with his primary clinician on the yard. Nurse _____ also discussed the availability of crisis triage screening and assistance at any time after he returns to assigned housing. Nurse _____ indicated that IP did not have visual emotional [sic] about being found guilty; IP indicated that he had not yet been sentenced thus his case was not yet complete. Nurse _____ indicated that IP's denials of current psychiatric symptoms including denial of suicidal ideation appeared credible.....<u>Assessment</u>:.... While I appreciate Dr. _____ expressing concern about elevated chronic suicide risk given pending homicide related prosecution, I note that IP stated that he has not yet been sentenced thus the condition under which was [sic] concerned about potentially losing self-control over suicidal ideation is not currently present. Accordingly, his acute suicide risk does not appear to be significant he changed from previous evaluations from Dr. _____. Nurse _____ performed careful screening evaluation; she found IP to be a credible historian. Accordingly, IP is cleared to return to assigned housing where he will likely follow up with Dr. _____ as he is a participant in the CCCMS program.

As noted by the CDCR reviewer in this case, "There was no evidence in nursing documentation that the many symptoms stated above were assessed or the conditions for decreased suicide risk were not present." In fact, the totality of the nurse's "Court Return Assessment" narrative was the following:

> Per custody, I/P received bad news he was found guilty, I/P denies receiving bad news, smiling, I'm okay. (-) SI, (-) HI, (-) AH, (-) dep.... He denied receiving bad news, he's alert 0x3... No S/S of any acute distress, smiling, I'm okay, at 1835 notified POC, 'I/M found guilty' he denies any bad news.

Finally, as confirmed by the inmate's primary clinician, a mental health referral was not generated by either the nurse or the psychiatrist to the inmate's primary clinician. In fact, even though the primary clinician briefly saw the inmate cell-side on May 22, the clinician was not made aware of the inmate's most recent conviction the previous day until after his death.

The CDCR reviewer also interviewed the inmate's co-defendant in the homicide case who revealed that the inmate had often talked about committing suicide if he received a life sentence, and stated the inmate told him that he would commit suicide because "this is no life to live, wasn't happy with food, waking up to this environment, he wanted to deprive the DA of sentencing him to life in prison."  The Suicide Report noted numerous mental health, nursing, and custody deficiencies resulting in nine recommendations for corrective action through a QIP:

1)  While at FSP, the inmate was placed in the CCCMS level of care on July 22, 2014.  No mental health evaluation was completed....;

2)  The inmate arrived to High Desert State Prison (HDSP) on August 26, 2014.  During this time no mental health evaluation was completed....;

3)  The inmate arrived to SAC on September 24, 2014.  During this time at SAC, no mental health evaluation was completed....;

4)  Mental health documentation by the inmate's clinician did not monitor his reported suicide risk or include a specific plan to decrease conditional suicide risk.  Notes appeared virtually identical.  Treatment plan documentation did not include a plan to address refusals, medication noncompliance or provide justification to retain in CCCMS level of care;

5)  The psychiatrist received a call from nursing staff on May 21, 2015, notifying him of the 'bad news.'  The psychiatrist wrote a note, dated May 22, 2015, justifying his decision to clear the inmate in R & R.  There was no indication of communication to the inmate's primary clinician about the 'bad news.'  The primary clinician also saw the inmate on May 22, 2015 and may have benefited from hearing this information;

6)  The inmate had reported medication side effects in his December 4 and December 9, 2014 cell front contacts.  His clinician documented that a referral to psychiatry was submitted but there was no referral in the unit health record.  The inmate submitted two referrals dated [sic] but was not seen until December 17, 2014 by psychiatry....;

7)  Prior to the time of discovery, a total of 55 minutes had elapsed since the last security/welfare check had been completed.  Policy requires the assigned officer to conduct a security/welfare check on each cell, twice an hour not to exceed 35 minutes between checks;

8)  Upon entry in the cell, the shield officer pinned the inmate against the cell wall as an additional officer utilized the cut-down tool to cut the noose.  This response is outside the policy established by the 2009 MHSDS *Program Guide* because the inmate's weight should have been supported prior to cutting the noose; and

9)  Per the Nursing Death Review Summary, there were three nursing concerns
identified requiring follow-up" (documentation issues that were not related to the
death.

In addition to the deficiencies noted in the Suicide Report, additional inquiry was necessary
regarding the dialogue between the escorting officer and nurse on May 21, 2015 and whether, in
fact, the officer notified the nurse that the inmate had threatened suicide, as well as the accuracy
of the dubious and elaborately SOAP-formatted psychiatric note dated May 22, 2015.

In the **fourth** case (Sac 8), the inmate was found hanging from the ventilation grate by a sheet in
his SHU cell during the afternoon of May 23, 2015.  The emergency medical response, including
initiation of CPR, was delayed for approximately 16 minutes due to custody staff being unsure
the inmate was in his cell because a sheet was obstructing visibility into the cell.  The inmate
entered the CDCR system for the fourth time in October 1995 to serve a 75-year to life sentence
plus 42 years for robbery, assault, and false imprisonment, all with a firearm.  He had eight
RVRs during his current CDCR term, the most recent of which occurred four years earlier in
2011.  The inmate was transferred to CSP/Sac in May 2005.  He had limited family support, with
no telephone calls and his last visit having occurred in 2010.

The inmate grew up in a violent and dysfunctional family environment.  Several of his siblings
were either currently or previously incarcerated in CDCR and California Youth Authority
(CYA).  He had a history of substance abuse, but did not have a history of either mental illness
or suicidal behavior.  In addition, there was no reported family history of either mental illness or
suicidal behavior. Within CDCR, he always screened negative for mental health problems and
was never included in the MHSDS.  In addition, he never expressed any SI nor engaged in any
self-injurious behaviors.  His medical history within CDCR included "sick sinus" syndrome
(resulting in a pacemaker in 2005), hypertension, and degenerative joint disease.  According to
the CDCR reviewer in this case, these medical ailments did not appear to be precipitants to his
eventual suicide.

The inmate had an extensive history of gang involvement within the community that continued
during his CDCR confinements.  He was validated as a gang member in September 2005. In
December 2013, the inmate notified custody officials that he wanted to disassociate himself from
his gang.  He was entered into the debriefing program and re-housed in the SHU. By March
2015, the inmate was reconsidering the debriefing program because of notification from gang
members that his family would be targeted for retaliation if he remained in the program.  In a
March 15, 2015 interview with a gang investigator, he formally requested to exit the program.

Although the CDCR reviewer in this case did not offer any specific precipitating factors to the
suicide, the reviewer cited the inmate's suicide note that expressed frustration regarding both the
content and length of the debriefing program, as well as his belief that he and other inmates in
the program were easily identified and targeted by gang members.  The Suicide Report contained
four recommendations for corrective action through a QIP: "1) Per the Nursing Death Review
Summary addendum, there was one nursing concern identified requiring follow-up (the AED
was not applied until the inmate arrived at the TTA); 2) Incident report documentation indicated
that at 2:30pm, custody staff noticed the inmate's cell window had a privacy screen.  Custody

staff did not enter his cell until 2:50pm when they discovered him hanging; 3) The cut-down kit was not brought to the cell by custody at any point ....; and 4) A CO grabbed the noose with both hands and yanked, allowing the inmate to fall to the floor. The inmate's body was not supported and the cut-down tool is not utilized."

### 2)    Salinas Valley State Prison (SVSP)

**Inspection**: February 19-20, 2015 (previous suicide prevention audit was on February 6-7, 2014)

**Screening/Assessment**: This reviewer observed several new admissions during the intake screening process on February 19, 2015. The nurse assigned to the Receiving and Release (R & R) Unit was utilizing the most current version of the Initial Health Screening CDCR Form 7277 (revised October 2014). The nurse was observed to be asking all of the required questions on the form. The process was not private and/or confidential because the door to the Nurse's Office remained open, with the inmate situated in a chair straddling the doorway and hallway, and an officer frequently standing in the immediate area.

In addition, daily PT rounds in one of the administrative segregation units (D-8) were observed on February 19. The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**: SVSP had a 22-bed CTC, with ten designated MHCBs and four alternative housing cells in the CTC to temporarily house suicidal inmates prior to transfer to an MHCB. All the MHCB rooms were clean and mostly suicide-resistant, but some physical hazards were observed. For example, each room contained square-shaped stainless steel sinks protruding from the wall that could be conducive to SAs by hanging. Triangle-shaped stainless steel shelving (found in other CDCR facilities) should be attached to each side of the existing sinks so that any ligature would slide off during a SA. In addition, MHCB clinicians informed this reviewer that an inmate recently attempted to hang themselves from a horizontal slit (known as "anti-squirt slits") located on the sink faucet. A work order was in the process of being issued to replace all sink faucets in the MHCBs. In addition, hazards in several MHCBs which contained handicapped railing with gaps between the railing on the wall, as well as bookshelves, had been corrected with the railing modified and the bookshelves removed from the affected rooms on November 25-26 2014.

The four administrative segregation units had a total of 20 new intake cells that had been retrofitted to be suicide-resistant; the only exception was administrative segregation unit Z-9, where the holes in the wall ventilation grates of two cells (No. 107 and 108) were too large and conducive to suicide by hanging. These dangerous ventilation grates were previously identified during the February 2014 audit.

There continued to be problematic issues concerning the housing of newly admitted inmates in administrative segregation. Specifically, not all inmates within their first 72 hours of administrative segregation housing were in retrofitted cells, while not all retrofitted cells housed newly admitted inmates. For example, D-8 had four new intake cells that were full during the

audit period, but an additional five new intake inmates were housed in non-intake cells.  In the Z-9 stand-alone unit, in addition to two inmates housed in Cells 107 and 108 (see above), five new intake inmates were housed in non-intake cells. The new intake cells in Units D-1 and D-2 were full and there were no new intake inmates observed in any non-intake cells during the audit.

**Observation**:  Nursing staff were observed to be utilizing the correct Suicide Watch/Suicide Precaution Record observation form in the MHCBs.  Each form was located on the outside of each inmate's room door and found to be up-to-date.  This was a dramatic improvement from the February 2014 audit which found use of forms containing pre-printed 15-minute intervals.  Several IDTT meetings in the CTC were observed on February 19, 2015.  As shown in the next section, treatment planning for reducing SI/behavior remained problematic within SVSP.  Finally, review of Guard One data for a recent 24-hour period in all four administrative segregation units overall found 90-percent compliance with required checks that did not exceed 35-minute intervals: D-1/D-2 (89 percent), D-8 (86 percent), and Z-9 (96 percent).

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period January 1, 2015 through February 20, 2015.  A total of 16 emergency mental health referrals were listed.  A review of the TTA log for the same time period found an additional 16 emergency mental health referrals, an indication that the required "MH-5 Mental Health Referral Chrono" was probably not being completed and entered into the MHTS as required.  The significance of this finding was simply that a CQI audit of the mental health staff response to emergency referrals cannot be performed if the requested data is inaccurate.  This reviewer's eUHR review of 16 emergency referrals for SI/behavior revealed that clinical staff completed the required SREs in *each* case.

Other matters were problematic.  This reviewer's previous audit in February 2014 found problems regarding the low percentage of inmates placed in a MHCB following demonstration of SI and/or suicidal behavior.  Although there was slight improvement observed during this most recent audit, there continued to be concerns regarding the quality of SREs completed as a result of emergency mental health referrals for SI/suicidal behavior.  For example, in at least two cases, inmates were discharged back to their housing units from the TTA immediately after attempting suicide.  In one case (SVSP 1), the inmate was observed by a PT to be ingesting multiple pills (including at least 20 Vistaril pills) on February 2, 2015 because he "was depressed and stressed out."  He was transported to the hospital and later returned to the facility.  When assessed by a clinician at the TTA the following afternoon, his acute risk for suicide was estimated as "low" and he was discharged back to his D-8 housing unit.  In the second case (SVSP 2), the inmate expressed SI and had superficially cut both of his wrists with a razor on the afternoon of January 4, 2015.  He was brought to the TTA, medically treated, and temporarily housed on suicide watch in an alternative housing cell.  The following morning (January 5), the inmate was discharged back to his D-8 housing unit *without* an SRE being completed.  Within minutes of his arrival back on the housing unit, the inmate informed custody staff that he was "feeling suicidal and will make another attempt to commit suicide and this time will be successful at it."  A clinician was called, an SRE was completed, and he was returned to the TTA and subsequently placed in a MHCB.

Treatment planning for reducing SI/behavior was especially problematic.  In almost all of the discharging SREs reviewed, the treatment planning section ("safety/risk reduction plan") was grossly inadequate with many containing the following narrative in its entirety:  "discharged back to housing with a 5-day F/U and 24-hour observation" in case SVSP 3, or "discharged from MCHB" in case SVSP 4, or "discharged" in case SVSP 5.

In another case (SVSP 6), the inmate lacerated both wrists on January 8, 2015 and was placed in a MHCB.  No admitting SRE was found in the eUHR.  The inmate remained on suicide observation until his discharge on January 16, with the discharging SRE recommending the following treatment plan:  "IP discharged from MHCB on 24-hour custody wellness checks and 5-day clinical f/u.  IP will benefit from therapy groups focused on depression management, distress tolerance and social skills."  Four days later on January 20, the inmate was returned to the TTA after being observed with approximately 50 superficial cuts on his leg.  An SRE was completed the following day and the clinician noted that "TTA medical staff noted that IP stated repeatedly that he was not suicidal.  It was suspected that IP has been engaging these behaviors in order to gain EOP LOC.... IP reported that he was making 2-5 cuts per day over the past five days with a paperclip to "relieve stress."  The inmate stated that "I don't want to go there (CTC).  You will do just discharge me with no help."  The inmate was not admitted into a MHCB and the treatment plan section of his SRE stated that the inmate was to be "discharged on 5-day clinical follow-up and 24 hour observation.  Consult with the MHCB team and his PC regarding EOP.  Due to escalation and behavior in recent self-harm, is recommended that IP be placed in EOP LOC as determined by his PC and IDTT on the yard.  It is recommended that appropriateness for EOP is monitored for participation and appropriate use of the EOP program..... IP will benefit from therapy groups focused on depression management, distress tolerance, and social skills."  (This last sentence was repeatedly found in many SREs reviewed by this reviewer at SVSP.)  One week later on January 27, another SRE was completed by another clinician with the following treatment plan: "Refer to EOP."  Three days later on January 30, 2014, yet another SRE was completed by another clinician and contained the following treatment plan: "Patient will be brought to IDTT and groups and PC will be assigned."  The reasons for these additional unhelpful SREs was unclear.  None of them contained treatment plan strategies to reduce the inmate's self-injurious behavior that was self-reported to be caused by stress.

Finally, it was noteworthy that review of SPRFIT meeting minutes from November 2014 through January 2015 found the following statement contained within each month's minutes: "The SPRFIT Coordinator continues to conduct random reviews of SREs completed throughout the institution by varied mental health clinicians."  The review of SRE quality appears to be dubious at best.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes found that psychiatric staff (either the chief psychiatrist or senior psychiatrist) failed to regularly attend the monthly meetings.   However, the SPRFIT coordinator should be commended for creating a SPRFIT News bulletin that had been distributed to all health care staff on a regular basis since

July 2014 (at least quarterly).  The bulletins provided brief information on suicide prevention and upcoming training opportunities.

**Training**:  According to training records, approximately 92 percent of custody staff and 100 percent of nursing staff were certified in CPR.  In addition, 92 percent of custody staff had received annual suicide prevention training during 2014, as well as 100 percent of nursing staff.  Mental health staff did *not* report any data regarding annual suicide prevention training.  Finally, as of February 2015, 87 percent of mental health clinicians had completed the SRE mentoring program, and 88 percent had received the seven-hour SRE training.  These completion rates were below the acceptable 90-percent threshold.

**Recent Suicides**:  SVSP had one inmate suicide during the review period.  In that case (<u>SVSP 7</u>), the inmate was found to have asphyxiated himself with a plastic bag in his administrative segregation unit cell during the late afternoon of October 18, 2014.  The inmate re-entered the CDCR system on May 10, 2013 to serve a 30-year-to-life sentence (4th strike) for arson and robbery.  He was transferred to SVSP's EOP Hub on July 24, 2013, and then to the CHCF's DSH program on November 1, 2013.  He returned to SVSP on October 17, 2014, the day before his death.  He was immediately placed in the administrative segregation pending initial classification due to two RVRs from September 2013 involving battery on staff (gassing).  The inmate did not appear to be gang-affiliated.  In addition to the two RVRs from his most current CDCR term, he had multiple RVRs during a prior CDCR confinement.

According to records, the inmate was raised by his mother in a chaotic household that included prostitution, substance abuse, as well as several SAs (by the mother).  Because of his mother's instability and financial difficulty, she frequently left him home alone.  In addition, while living with his aunt, he frequently witnessed incidents of domestic violence.  Although the inmate did not report any history of mental illness in the community, his cousin told the CDCR reviewer for this case that he was "always mentally unstable" growing up.  The inmate also had an extensive history of substance abuse.

The inmate first entered the CDCR in December 2000 to serve a 12-year term for attempted second-degree murder.  He was scheduled for parole in May 2010, but refused to sign his parole papers on several occasions.  Finally, on January 24, 2013, he was officially released from custody.  The inmate told staff that he wanted to spend the rest of his life in prison and was going to violate his parole soon after release.  In fact, he committed the instant offense on the same day of his release and was returned to custody the next day.

The inmate spent the majority of his current and prior incarceration in the MHSDS system.  He was placed in 3CMS level of care on December 27, 2000, and was placed in a MHCB in January 2001.  The following month (February 2001), his level of care was changed to EOP because he was "unstable with depression and aggressive thoughts."  He was returned to 3CMS level of care in August 2001 following a period of stability.  He was referred back to the MHSDS and placed in EOP in March 2003.  His diagnosis at the time was Schizoaffective Disorder and a Rule Out (R/O) of Bipolar Disorder.  In April 2003, the inmate was transferred to a MHCB on involuntary medication.  His diagnosis at that time was listed as Psychotic Disorder, NOS.  In January 2004, he was returned to 3CMS.  During this time, the inmate often refused to come out of the cell,

citing safety concerns.  He was frequently placed in the administrative segregation unit.  In April 2005, he was elevated to EOP with diagnoses of Psychotic Disorder, NOS, Schizoitypal Personality Disorder, and Schizoid Personality Disorder.  In September 2005, the inmate was returned to 3CMS level of care.  In October 2006, the inmate was discharged from the MHSDS because he was found to be stable and symptom-free for over six months.

Four years later in February 2012, the inmate was referred to mental health by custody staff because he was observed as being incapable of caring for himself and having poor hygiene.  A clinician reported that he showed signs of paranoid behavior, poor daily living skills, refused to come out of his administrative segregation unit cell where he had been housed for over a year, and appeared to be decompensating.  He was placed in 3CMS level of care and later elevated to EOP in March 2012.  When he was returned to CDCR in May 2013, he was placed in EOP and housed in the administrative segregation unit, although he denied any mental illness and refused the program or take psychotropic medication.  He continued to exhibit odd behavior (e.g., storing feces and urine milk cartons and refusing to shower) and paranoid thinking.  On July 12, 2013, the inmate was placed in a MHCB because of a SA by suffocation.  He was diagnosed with Schizophrenia, Paranoid Type.  He was discharged from the MHCB on July 24, 2013 and returned to the SVSP's administrative segregation EOP Hub.  He continued to refuse programming or come out of the cell, and exhibited paranoid thinking that other inmates and custody staff would harm him.

On September 4, 2013, following two incidents of gassing staff, the IDTT decided to refer the inmate to intermediate inpatient care at CHCF.  He was transferred to the program on November 1, 2013.  In August 2014, he was involuntarily medicated for grave disability.  Soon thereafter, he began to voluntarily take his prescribed psychotropic medication and seemingly improved and became more cooperative.  On October 17, 2014, the inmate was transferred from the CHCF-DSH program to SVSP and housed in an administrative segregation unit on a five-day follow-up schedule.  The following morning (October 18), he was seen by a PT during regular administrative segregation rounds and appeared "pleasant," denying any SI.  There was no documentation that he was assessed by a mental health clinician pursuant to requirements of the five-day follow-up.

The inmate had a history of suicidal behavior and, except for a reported SA by cutting himself when he was a teenager, all of the behavior occurred within CDCR.  In July 2013, he was placed in a MHCB for 11 days for an alleged SA by suffocation.  In April 2014, the inmate was placed on suicide watch status while at the DSH-intermediate care program after expressing SI.  A DSH assessment completed on June 24, 2014 suggested that "he appears to see the world as a threatening place, yet at the same time he desires interpersonal closeness.  In other words, the inmate has a need for intimacy but does not trust anybody to accept him or refrain from mistreating him.  This conflict on his part, as well as the other features described above, elevate the inmate's risk for engaging in suicidal behavior.  At present, in fact, his Rorschach profile suggests that he is currently at risk for attempting suicide." Most of the inmate's multiple SREs assessed his chronic risk for suicide as either "low" or "moderate," and his acute risk as "low."  An SRE dated October 17, 2014, the day before his suicide, assessed a "moderate" chronic risk and "low" acute risk for suicide.

Of interest, during a session with a DSH psychologist February 6, 2014, the inmate claimed to have coined "a new term he made up from reading and watching other patients called 'Reverse Malingering.' Patient explained that he made up term as a situation where a patient under-reports to get out of the watchful eye of a hospital setting just to go back to prison to commit suicide."

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, and a suicide note was not found. In addition, the reviewer did not find that the inmate had any significant medical issues that would have contributed to his death. The reviewer noted that SVSP mental health staff found that the inmate had looked remarkably stable and barely recognizable when he returned following his DSH treatment on October 17, 2014, commenting that he looked appreciably younger, no longer dirty or disheveled, wearing clean clothes, and denying any current SI.

The reviewer cited a few deficiencies in the delivery of mental health services, as well as the emergency medical response. The Suicide Report contained three recommendations for corrective action through a QIP: 1) There was no five-day follow-up entries by either nursing or mental health staff on October 18, 2014; 2) The inmate was able to obtain a plastic bag while housed in a retro-fitted, new-intake administrative segregation cell; and 3) DSH/CDCR documentation indicated that SVSP received two notifications on October 16, 2014 that the inmate would be discharged from DSH and transported to SVSP, yet SVSP appeared unaware of the transfer until the inmate arrived at the R & R Unit on October 17, 2014.

This reviewer found two additional issues *not* raised by the CDCR reviewer. *First*, the DSH medical chart indicated that the inmate was also placed on Suicide Watch on August 29, 2014 for suicidal/homicidal statements, noting that "the inmate does explain that his recent medication adjustment could be a contributor to increased feelings of suicidal ideation." The following day, his observation was reduced to Suicide Precaution. On September 2, an on-call psychiatrist discontinued the Suicide Precaution without an SRE or other documentation of an assessment of suicide risk. Although available for review in the DSH chart, this most recent episode of SI was *not* contained in the DSH Comprehensive Integrated Psychiatric Discharge Summary and apparently unknown to SVSP mental health clinicians. *Second*, the DHS medical chart contained a Treatment Plan that included a goal to "reduce or eliminate suicidal ideation....Patient will develop list of at least four coping skills he can utilize in EOP level of care upon discharge and he will continue practicing those coping skills when he experiences paranoia." Reference to this Treatment Plan was *not* contained in the SRE completed at SVSP on October 17, 2014.


### 3)    North Kern State Prison (NKSP)

**Inspection**: February 24-25, 2015 (previous suicide prevention audit was on March 27-28, 2014)

**Screening/Assessment**: This reviewer observed two new admissions during the intake screening process in the RC on February 25, 2015. Due to the low volume of intakes for that

day, only one nurse was assigned to the area.  The nurse was *not* utilizing the most current version of the Initial Health Screening CDCR Form 7277 (revised October 2014). Instead, an earlier version (May 2014) of the form was being used that did *not* include inquiry regarding *current* suicide risk.  Fortunately, the nurse was observed asking each inmate if they were currently suicidal.  As previously reported during the March 2014 audit, the Nurse's Office within the RC still did *not* allow for privacy and/or confidentiality because two nurses were frequently conducting screening adjacent to each other, separated only by a small partition with two inmates receiving intake screening in close proximity to each other.  In addition, an officer was situated inside the office in close proximity to the inmates.  This reviewer was informed that there were preliminary plans to relocate one of the nurses to a nearby holding cell that would be retrofitted into a satellite nurse's station.  Such corrective action was *not* imminent, with an estimated completion date within two years.  Although not observed during the tour, this reviewer was informed that the facility still maintained an excellent practice of stationing a psychiatrist in the RC to expedite mental health evaluations and assessment of medication needs.

In addition, this reviewer toured the Diagnostic Building and observed that the assigned diagnostic clinicians had been relocated into three separate offices in the building.  During the previous audit, this reviewer had observed two psychologists assigned to the diagnostic process sitting in close proximity to each other in one narrow room, separated only by a small partition. A third staff member was working at another desk.  Privacy and confidentiality were obviously compromised during this process.  The corrective action taken to relocate these diagnostic clinicians into private offices was highly commendable.

Finally, daily PT rounds in the administrative segregation unit (D-6) were observed on February 25.  The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  NKSP had a 16-bed CTC, with ten designated MHCBs.  In addition, alternative housing cells were designated in A-4 Unit to temporarily house suicidal inmates prior to transfer to a MHCB.  All the MHCB rooms were clean and mostly suicide-resistant, but a physical hazard was observed.  Each room contained wall ventilation grates with holes that were larger than the industry standard 3/16 inch diameter allowing for the possibility of being conducive to SAs by hanging.  The ventilation grates should be replaced with grates comparable in size to those found in new intake cells of the administrative segregation unit.  In addition, Cells 101 through 110 in A-4 Unit were still designated for alternative housing.  These cells were *not* suicide-resistant, and contained metal screens with perforated holes on cell-fronts that could easily be used as an anchoring device in SA by hanging.  In addition, not all of these designated cells contained retrofitted ventilation grates.  The dangerousness of these cells was offset by the fact that NKSP officials had since revised their policies and practices on observation and staff were now required to observe suicidal inmates housed in these cells on a 1:1 or 1:2 basis.  (This reviewer had previously observed 30-minute rounds being conducted in this unit as of March 2014.)  It should also be noted that this reviewer reviewed the A-4 Unit Alternative Housing Log from December 26, 2014 through February 24, 2015 and found that most inmates were housed in the unit for more than 24 hours, with approximately 11 percent housed for between 48 and 72 hours.

Finally, the administrative segregation unit (D-6) had a total of nine new intake cells that had been retrofitted to be suicide-resistant. During the audit, this reviewer observed that all nine new intake cells were full, with one additional new intake inmate housed in an unsafe, non-new intake cell. A custody supervisor commented that additional new intake cells were required because the unit often had more than 15 new intake inmates coming into the unit from the RC. It should also be noted that this reviewer's previous audit in March 2014 found that several D-6 cells, including that in which a suicide occurred in December 2013, had contained exposed sprinkler head pipes. These cells had since been retrofitted by covering the sprinkler heads.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. A previous practice of utilizing "psychiatric observation" was eliminated, and all other inmates were required to be observed at 15-minute intervals. Nursing staff were observed to be utilizing the correct Suicide Watch/Suicide Precaution Record observation form in the MHCBs. With one exception, each form was located on the outside of each inmate's room door and found to be up-to-date. The one exception was an inmate not on suicide observation status, but required to be observed at 15-minute intervals, and had not been observed for over 30 minutes when this reviewer first arrived on the unit (i.e., the reviewer arrived at 10:49am and the observation form had not been updated since 10:10am.) This reviewer rechecked the form a short time later and found that it had been falsified to indicate checks at 10:25am, 10:38am, and 10:50am.

Several IDTT meetings in the CTC were observed on February 25, 2015. As shown in the next section, treatment planning for reducing SI/behavior remained problematic within NKSP. It should be noted that when this reviewer asked the IDTT to describe a treatment plan for one particular inmate that included "increased exercise" to relieve stress, the response was that he was being encouraged to "exercise in place" within his MHCB room. Although the CTC was budgeted for a full-time recreational therapist (RT), only a part-time RT was available one night per week. Finally, a review of Guard One data for a recent 24-hour period found that the level of compliance with required checks not exceeding 35-minute intervals was 100 percent for D-6 Unit.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for a recent three-month time frame. A total of 18 emergency referrals were listed from January 1, 2015 through January 31, 2015. A review of the TTA log for the same time period found an additional 10 emergency mental health referrals, an indication that the required "MH-5 Mental Health Referral Chrono" was probably not being completed and entered into the MHTS as required. The significance of this finding was simply that a CQI audit of the mental health staff response to emergency referrals cannot be adequately performed if the requested data is inaccurate. This reviewer's eUHR review of 13 emergency referrals for SI/behavior revealed that clinical staff completed the required SREs in *each* case.

Other matters were problematic. The treatment plan sections of nine discharging SREs of inmates released from a MHCB during December 2014 and January 2015 were reviewed. All were problematic and contained inadequate strategies for reducing SI. Most treatment plans simply recited *Program Guide* requirements, e.g.: "1) discharge to EOP LOC; 2 ) initiate

*Coleman* follow-ups; 3) initiate custody follow-ups; 4) IDTT per EOP program; 5) monitor medication and treatment compliance; 6) PC contact within one week; 7) 1:1 clinical contact should initially focus on building rapport, assessing impact of symptoms on daily functioning, and reality testing; 8) develop strategies for dealing with stressors in the housing unit." In addition, the treatment plan sections of discharging SREs from the A-4 alternative housing unit were worse, and generally included the following boiler plate narrative: "CM to f/u per protocol, psychiatry to f/u per protocol, return to _____ for programming, return to yard."
Finally, NKSP clinicians typically placed a mental status examination (MSE) template in the upper box of the SRE's second page, thereby not allowing room for any narrative that summarized chronic risk, acute risk and protective factors from the first page, as well as other pertinent historical and/or clinical information.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  This reviewer was able to attend the monthly SPRFIT meeting held on February 24, 2015.  Although the meeting only lasted 30 minutes, NKSP routinely scheduled these monthly meetings to occur immediately after the Warden's morning meeting, an excellent practice that resulted in high attendance (including multiple custody supervisors).

**Training**:  According to training records, approximately 100 percent of custody and nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff had received annual suicide prevention training during 2014, as well as 99 percent of both medical and mental health staff.  Finally, as of February 2015, 88 percent of mental health clinicians had completed the SRE mentoring program, and 96 percent had received the seven-hour SRE training.

It should also be noted that this reviewer attended a two-hour annual In-Service Training (IST) suicide prevention training on February 25, 2015.  The instructor was a NKSP senior psychologist who presented the material in a very professional manner.  This reviewer's critique of the most recently revised IST suicide prevention lesson plan was discussed in the Suicide Prevention Training section of this report.

**Recent Suicides**:  NKSP did not have any inmate suicides during the review period.


### 4)    <u>Kern Valley State Prison (KVSP)</u>

**Inspection**:  February 26-27, 2015 (previous suicide prevention audit was on April 22-23, 2014)

**Screening/Assessment**:  This reviewer observed two new admissions during the intake screening process in the R & R Unit on February 26, 2015.  The nurse was utilizing the most current version of the Initial Health Screening CDCR Form 7277 (revised October 2014), and observed to be asking all of the required questions.  As previously reported during the April 2014 audit, the Nurse's Office still did *not* allow for privacy and/or confidentiality because the door to the office remained open, with the inmate situated in a chair straddling the doorway and hallway, and an officer frequently standing in the immediate area.  KVSP officials were aware of this

problem and demonstrated to this reviewer the prototype of a Lexan shield that had been developed in an attempt to resolve the privacy issue. The shield, approximately 60 by 24 inches, was to be placed between the inmate and the hallway. This reviewer discouraged these officials from continuation of this proposed project and encouraged them to focus on renovation of the Nurse's Office to adequately accommodate the inmate while providing staff safety.

In addition, daily PT rounds in two administrative segregation units (B-1 and B-2) were observed on February 26-27. The rounds in B-1 were unremarkable and the PT correctly completed the PT Daily Rounds Form at cell-front for all caseload inmates. The rounds in B-2 were not as adequate because the PT was not very communicative with caseload inmates and it was hard to imagine how Psych Tech Daily Rounds Forms could be adequately completed based on the level of communication demonstrated.

Finally, this reviewer briefly observed two mental health clinicians conducting five-day follow-ups in B-2 Unit on February 27. These encounters were problematic, with each clinician spending less than two minutes with each observed inmate, as well as not offering to conduct the assessments outside their cells in a private setting. In fact, one encounter occurred with the cellmate of one inmate observing the process.

**Housing**: KVSP had a 20-bed CTC, with 12 designated MHCBs. In addition, alternative housing cells were designated in B-1 Unit and throughout the institution to temporarily house suicidal inmates prior to transfer to a MHCB. All the MHCB rooms were clean and mostly suicide-resistant, but a physical hazard was observed. Each room contained square-shaped stainless steel sinks protruding from the wall that could be conducive to SAs by hanging. Triangle-shaped stainless steel shelving (found in other CDCR facilities) should be attached to each side of the existing sinks so that any ligature would slide off during a SA.
Each room contained wall ventilation grates with holes that were larger than the industry standard 3/16 inch diameter allowing for the possibility of being conducive to SAs by hanging. The ventilation grates should be replaced with grates comparable in size to those found in new intake cells of the administrative segregation unit. In addition, although not all B-1 cells, as well as other cells throughout the facility designated for alternative housing were suicide-resistant, this reviewer was informed that all suicidal inmates placed in alternative housing were required to be observed on a 1:1 basis.

Finally, three of the administrative segregation units (B-1, ASU-1, and ASU-2) contained 20 retrofitted cells for inmates on new intake status. During the tour of B-1 Unit on February 26, this reviewer observed that nine of the ten new intake cells were full, with two additional new intake inmates housed in unsafe, non-new intake cells. This finding was an improvement from the April 2014 tour in which ten new intake inmates were housed in unsafe cells.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. A previous practice of utilizing "psychiatric observation" was eliminated and, although all other inmates not on suicide observation status were being observed at 30-minute intervals, mental health officials were awaiting direction from headquarters for the proper terminology for using step-down. Nursing staff were observed to be utilizing the correct Suicide Watch/Suicide

Precaution Record observation form in the MHCBs. Each form was located on the outside of each inmate's room door and found to be up-to-date.

This reviewer observed a troubling practice within the CTC. All inmates in the MHCBs were clothed in safety smocks, regardless of whether or not they were on suicide observation status. The issue of safety smocks was raised during this reviewer's observation of several IDTT meetings in the CTC on February 26.

In one case (KVSP 1), the inmate had been admitted to a MHCB on February 20 and placed on Suicide Precaution, then stepped-down to observation at 30-minute intervals on February 25. When this reviewer asked during the February 26 IDTT why he was still clothed in a smock, both the primary clinician and sergeant stated the inmate had just recently been downgraded and custody staff had not had an opportunity to return his "whites" (i.e., shorts and a shirt). A subsequent review of this inmate's eUHR found that clinical staff had ordered him to be clothed in *both* a safety smock and "whites" a day earlier on February 25. In another case (KVSP 2), the inmate was neither suicidal nor homicidal, and was housed in a MHCB on 30-minute observation due to a hunger strike (involving lost/stolen property). He was also clothed in only a safety smock. The protective value of a safety smock for a hunger strike was unclear. In fact, this reviewer reviewed all the eUHRs of five inmates in MHCBs on 30-minute observation on February 26 and 27 and found that clinical staff routinely circled all allowable clothing and possessions on the Physician's Order forms for inmates on 30-minute observation, including a safety smock.

If a clinician determines that the inmate is not suicidal and, therefore, not appropriate for either Suicide Watch or Suicide Precaution, there is no justification for placing the inmate in a safety smock. In addition, an order that allows an inmate to be clothed in both a safety smock and clothing on 30-minute observation offers little protection against suicide by hanging and is nonsensical.

There were other problems observed during the IDTT meetings. Overall, only the primary clinician and psychiatrist spoke during the meetings, with little or no interaction from the CC I, nurse, or sergeant. A recreational therapist was *not* present for the meeting. In one case (KVSP 3), the inmate had a significant history of ingesting multiple foreign objects and had recently returned from DSH. He had not been issued a mattress because the psychiatrist believed that he had allegedly swallowed pieces of a mattress at DSH several months earlier. Although the initial withholding of a mattress might have been clinically justifiable, the inmate inquired several times during the meeting if he could be issued a mattress and the team did not offer any treatment plan goals that needed to be achieved prior to being issued the mattress. In another case (KVSP 4), the inmate had been admitted to a MHCB on February 25 and placed on Suicide Precaution for self-injurious behavior. An SRE completed before the IDTT on February 26 found him to be at "moderate" acute risk for suicide and Suicide Precaution status was continued. The psychiatrist had completed a psychiatric note before the IDTT meeting that stated the inmate would be downgraded to 30-minute observation. During the IDTT meeting later that morning, there was no discussion about the inmate's observation level and/or differences in clinical judgment.

Finally, one particular case (<u>KVSP 5</u>) was very problematic.  The inmate was brought to the TTA during the late afternoon of February 24 after expressing SI.  The nurse subsequently received a Physician's Order for him to be housed in alternative housing.  He was seen by the psychiatrist the following morning (February 25) and admitted to a MHCB on Suicide Precaution.  Neither an SRE nor psychiatric note were completed for that date (although an SRE dated February 25 was later scanned into the eUHR on March 2).  On February 26, the inmate was seen again by the psychiatrist who completed a psychiatric note indicating that Suicide Precaution was to be continued.  During the IDTT meeting on February 26, although the inmate continued to express SI, there was little, if any, discussion regarding initial treatment planning to reduce SI.  Following the meeting, the psychiatrist wrote a Physician's Order that downgraded the inmate from Suicide Precaution to 30-minute observation.  The psychiatrist also wrote a psychiatric note on February 26 that ordered the inmate to remain on Suicide Precaution.  The inmate was seen the following day (February 27) by the psychiatrist who again wrote a psychiatric note indicating that he would remain on Suicide Precaution.  The inmate remained on 30-minute observation during this time period.

Finally, a review of Guard One data for a recent 24-hour period found that the level of compliance with required checks not exceeding 35-minute intervals in the four administrative segregation units to be 92 percent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for a recent three-month time frame.  A total of 11 emergency referrals were listed from December 1, 2014 through December 31, 2014.  A review of the TTA log for the same time period found an additional 18 emergency mental health referrals, an indication that the required "MH-5 Mental Health Referral Chrono" was probably not being completed and entered into the MHTS as required.  The significance of this finding was simply that a CQI audit of the mental health staff response to emergency referrals cannot be adequately performed if the requested data is inaccurate.  This reviewer's eUHR review of 35 emergency referrals for SI/behavior from August 2014 through January 2015 revealed that clinical staff completed the required SREs in only 80 percent of the cases.

Finally, the treatment plan sections of discharging SREs of most inmates released from a MHCB during January 2015 were reviewed.  All were problematic and contained inadequate strategies for reducing SI.  All treatment plans simply recited *Program Guide* requirements, as well as contained the following:  "Recommend specific Group Therapy participation for enhanced coping skills and problem solving techniques and medication management."

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes found that psychiatric staff (either chief psychiatrist or senior psychiatrist) failed to regularly attend the monthly meetings.  The meetings appeared unremarkable and often lasted only 30 minutes.

**Training**:  According to training records, approximately 95 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 95 percent of custody staff

had received annual suicide prevention training during 2014, as well as 77 percent of medical staff, including only 68 percent of PTs and 86 percent of mental health staff. Finally, as of February 2015, 66 percent of mental health clinicians had completed the SRE mentoring program, and 98 percent had received the seven-hour SRE training.

**Recent Suicides**:  KVSP did not have any inmate suicides during the review period.

### 5)    Valley State Prison (VSP)

**Inspection**:  March 10-11, 2015 (previous suicide prevention audit was on April 10-11, 2014)

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process on March 11, 2015.  The nurse assigned to the Receiving and Release (R & R) Unit was utilizing the most current version of the Initial Health Screening CDCR Form 7277 (revised October 2014).  The nurse was observed to be asking all of the required questions on the form.  The door to the Nurse's Office remained closed, allowing for confidentiality.

In addition, daily PT rounds in the administrative segregation unit (A-4) were observed on March 11.  The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  VSP had a 23-bed OHU that was used almost exclusively for medical patients.  On the few occasions in which the OHU was used for alternative housing of a suicidal inmate, Room 11 in the unit was used and the inmate was on continuous observation until transferred to a MHCB.  Almost all of the inmates identified as suicidal were placed on continuous observation in the administrative segregation unit awaiting MHCB placement.  This observation was confirmed by review of OHU census reports from February and March 2015 in which very few, if any, suicidal inmates were housed in the OHU.  When housed in the OHU, the reports indicated that these inmates were on continuous observation status.  A review of alternative housing logs indicated that the vast majority of inmates were either transported to a MHCB or relocated back to their housing units within 24 hours.  This practice was a significant improvement from the April 2014 assessment in which most suicidal inmates were found to be housed in the OHU in unsafe rooms and without continuous observation.

Finally, the administrative segregation unit contained two retrofitted cells for inmates on new intake status.  These two cells were in excellent condition, and each contained security caulking between the ceiling light fixture and ceiling, tamper-proof light switch on the wall, and a new sink faucet without the anti-squirt slit that could be used as an anchoring device in a hanging attempt.  Although both of the new intake cells were empty during this reviewer's inspection, there was one new intake inmate in an unsafe non-intake cell.

**Observation**:  As stated above, the OHU was rarely used to temporarily house suicidal inmates pending MHCB placement.  When either the OHU or alternative housing were used, continuous observation was required.  Because no inmates were on suicide observation during this reviewer's two-day assessment, observation forms used to document observation could not be examined.  In addition, use of "psychiatric observation" status had been eliminated at the facility.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 100 percent-compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period February 1, 2015 through March 11, 2015.  A total of six emergency mental health referrals were listed.  A review of the TTA log for the same time period found an additional 20 emergency mental health referrals, an indication that the required "MH-5 Mental Health Referral Chrono" was probably not being completed and entered into the MHTS as required.  The significance of this finding was simply that a CQI audit of the mental health staff response to emergency referrals cannot be performed if the requested data is inaccurate.  This reviewer's eUHR review of these 26 emergency referrals for SI/behavior revealed that clinical staff completed the required SREs in only 77 percent or 20 of 26 of the cases.

In many of the cases in which an SRE was not completed as required, the referred inmate recanted their SI when initially triaged by the clinician.  In other cases, inmates continued to endorse SI to the clinician, yet the required SREs were still not completed.  In one case (VSP 1), the inmate was referred to a MHCB, but the initial SRE was never completed by the VSP referring clinician.  In another case (VSP 2), the inmate expressed SI over the weekend of February 6, 2015.  An SRE was not completed, rather the inmate was placed on a five-day follow-up.  The following day (February 7), a clinician wrote a progress note that stated: "Patient placed on a 5-day follow-up for monitoring of SI over the weekend.  He has multiple suicide risk factors.  He was referred by the psychiatrist for a crisis evaluation yesterday.  He reported feeling harassed by peers due to his sexuality and controlling case.  He did not go to the OHU, ASU nor was he referred to MHCB."

Treatment/safety planning for reducing SI/behavior continued to be problematic. For example, in one case (VSP 3), the inmate was placed in alternative housing in the administrative segregation unit for SI and self-injurious behavior (superficially cutting himself 15 times with a razor) on February 9, 2015.  He was assessed by a clinician the following morning (February 10) and an SRE was completed that estimated a "moderate" chronic risk and "low" acute risk for suicide.  The "moderate" chronic risk estimate was based upon an extensive prior history of SAs and self-injurious behaviors, as well as serious mental illness.  The "low" acute risk estimate was based upon a denial of current SI.  The treatment plan section of the discharging SRE stated the following:  "I/P to be released from alternative housing and returned back to housing.  He will be placed on a 5-day follow-up.  He would benefit from continuing to take medication as prescribed.  He would also benefit from learning and applying distraction techniques as well as find the activities to occupy his time.  It appears that he has too much time to ruminate on his thoughts.  Encourage him to stay in contact with family and to continue to attend groups to learn coping skills for managing depression, anxiety, and distress."  One week later on February 17, 2015, an SRE was completed by his primary clinician.  The treatment plan section of that SRE was also unhelpful in targeting a reduction of SI and self-injurious behaviors:  "It is recommended that I/P remain in the EOP LOC and his treatment focus on AH, substance use, coping skills, and medication management, and develop future goal of safe discharged [sic] to CCCMS or paroles out.  IP instructed and verbalized understanding the importance of contacting

MH or custody if he should develop thought [sic] of self-harm or others or in the event of emergent or urgent situation. IP verbalized understanding and has agreed."

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes reflected good attendance, including the presence of psychiatric staff (senior psychiatric supervisor).  The meetings were otherwise unremarkable.

**Training**:  According to training records, approximately 94 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff had received annual suicide prevention training during 2014, but only 31 percent of nursing staff and 30 percent of mental health staff completed annual suicide prevention training.  Finally, as of March 2015, 97 percent of mental health clinicians had completed both the SRE mentoring program and received the seven-hour SRE training.

It should also be noted that this reviewer attended a two-hour annual IST suicide prevention training on March 10, 2015.  The instructor appeared to be a clinical social worker.  There were problems in the delivery of the material, including the fact that the 120-minute workshop lasted only 80 minutes.  This reviewer's critique of the most recently revised IST suicide prevention lesson plan was discussed in the Suicide Prevention Training section of this report.

**Recent Suicides**:  VSP did not have any inmate suicides during the review period.

### 6)    Central California Women's Facility (CCWF)

**Inspection**:  March 12-13, 2015 (previous suicide prevention audit was on April 8-9, 2014)

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the RC on March 13, 2015.  Two nurses were assigned to the area, but conducting only one intake at a time.  Nursing staff were utilizing the most current version of the Initial Health Screening CDCR Form 7277 (revised October 2014).  A previous problem observed during the April 14, 2014 visit of nursing staff not asking the inmate if they were currently suicidal had been corrected, with all questions now being asked. Confidentiality was being maintained because the door to the Nurse's Office remained closed. Due to a scheduling conflict, this reviewer was not able to observe the administration of the 31-item mental health screening form completed by clinical psychologists during the first seven days of the RC process.  A review of the process in April 2014 found it to be adequate.

Finally, daily PT rounds in the administrative segregation unit (D-6) were observed on March 12. The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.  In addition, PTs were now required to conduct daily rounds of inmates housed in the condemned unit of the administrative segregation unit.  This reviewer was informed by a PT that rounds were made throughout the day when condemned

women were outside their cells in the program area of the enclosed condemned unit. This practice was an improvement from the April 2014 assessment when daily PT rounds in the condemned unit were *not* being performed.

**Housing**: CCWF had a 39-bed Skilled Nursing Facility (SNF), with 12 designated MHCBs in eight rooms. All the MHCB rooms were clean and mostly suicide-resistant, although some physical hazards were observed. For example, each room contained a square-shaped stainless steel sink protruding from the wall that could be conducive to SAs by hanging. Triangle-shaped stainless steel shelving (found in other CDCR facilities) should be attached to each side of the existing sinks so that any ligature would slide off during a SA. In addition, the sinks contained faucets with a horizontal slit (known as "anti-squirt slits"). These anti-squirt slits had been used as an anchoring device in a SA by hanging in another MHCB room within the CDCR system.

In addition, alternative housing cells for inmates identified as suicidal and awaiting placement in a MHCB were located in either a TTA holding cell or designated cells in the administrative segregation unit and/or EOP housing unit. Because cells in each of these alternative housing locations were not suicide-resistant, suicidal inmates were required to be observed on a continuous basis until transported to a MHCB.

In addition, the administrative segregation unit contained four retrofitted suicide-resistant cells for inmates on new intake status. During this reviewer's tour of the unit, at least three new intake inmates were housed in non-intake cells. At the time, one of the new intake cells was empty and another new intake cell contained an inmate who was over the 72-hour new intake status period. Although there appeared to be management issues related to the placement of new intake inmates in new intake cells, similar to the April 2014 assessment, because the CCWF has a RC mission and correctional staff had previously stated that new intake inmates were regularly placed in non-retrofitted cells, the current number of four new intake cells appeared to be inadequate.

Finally, the previous inadequate practice of CCWF custody officials utilizing "Modified Property Control Status" (MCPS) that included placement of inmates perceived to be manipulative in safety smocks (with little input from mental health clinicians) in the administrative segregation unit, had been eliminated.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. Nursing staff were observed to be utilizing the correct Suicide Watch/Suicide Precaution Record observation form in the MHCBs. Each form was located on the outside of each inmate's room door and found to be up-to-date. This reviewer also observed one IDTT meeting in the SNF on March 12, 2015. The IDTT was well represented by the primary clinician, psychiatrist, CMH (also a psychiatrist), nurse, recreational therapist, and CC I. The CMH solicited input from each team member regarding the discussed case. The IDTT was observed to be engaging in active treatment planning with the inmate.

Finally, this reviewer attempted to examine Guard One data for a recent 24-hour period within the administrative segregation unit and found over 560 violations. The compliance rate could not be calculated because of the unknown denominator. The administrative segregation unit at

CCWF was unique in that it housed the condemned unit containing 22 single cells. Seventeen of the cells were located within an enclosed program area on the first floor of the administrative segregation unit, with five cells located outside the enclosed program area. According to custody staff, because condemned unit inmates had regular access to the enclosed program area outside their cells, but within the chain-link fenced area, Guard One rounds were *not* conducted except during the First Watch. A May 9, 2014 directive from the DAI Director entitled "Security/ Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures" supported such a practice by citing the "unique design and programs" of the enclosed condemned unit.

Despite this directive, the reviewer would note several suicide prevention concerns. *First*, CDCR's own research indicated that condemned unit inmates had a higher rate of suicide than other GP inmates, thus justifying Guard One surveillance. *Second*, despite custody staff's assurances that condemned unit inmates were adequately observed while in the program area, during this reviewer's inspection of the administrative segregation unit, only a handful of condemned unit inmates (three or four) were out of their cells and visible within the program area, with the vast majority remaining in their cells and outside the view of correctional staff. *Third*, five of the condemned unit cells were located outside of the enclosed program area and adjacent to other administrative segregation unit cells that were subject to Guard One surveillance. There were no practical reasons why these five condemned unit cells should not be subject to Guard One surveillance.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of February 1, 2015 through February 28, 2015. A total of 14 emergency mental health referrals were listed. A review of the TTA log for the same time period found an additional 37 emergency mental health referrals, an indication that the required "MH-5 Mental Health Referral Chrono" was probably not being completed and entered into the MHTS as required. The significance of this finding was simply that a CQI audit of the mental health staff response to emergency referrals cannot be performed if the requested data is inaccurate. This reviewer's eUHR review of these 51 emergency referrals for SI/behavior revealed that clinical staff completed the required SREs in only 86 percent (44 of 51) of the cases.

In many of the cases in which an SRE was not completed as required, the referred inmate recanted their SI when initially triaged by the clinician. In other cases, inmates continued to endorse SI to the clinician and/or exhibited multiple suicide risk factors, yet the required SREs were still not completed. For example, in one case (CCWF 1), an inmate came back from court on February 5, 2015 and informed the R & R unit nurse that "she has daily thoughts of hurting yourself, wasn't feeling as if she wants to hurt herself right now." The inmate was appropriately referred to mental health for assessment, but the clinician did not complete an SRE.

Treatment planning ("safety/risk reduction plan" within discharging SREs) for reducing SI/behavior continued to be problematic. For example, in one case (CCWF 2), the inmate was placed in alternative housing in administrative segregation for SI on two separate occasions on February 16 and February 20, 2015. SREs were completed on both dates, with the inmate

exhibiting multiple chronic risk factors, including history of emotional, physical, or sexual abuse; history of depressive or psychiatric disorders; chronic medical illness; chronic pain problem; history of SAs; perception of loss of social support; history of poor impulse control; history of violence; history of sexual abuse; first prison term, and long or life prison sentence. Despite these 11 chronic risk factors, two separate clinicians estimated the inmate's chronic risk for suicide as being "low." The treatment planning sections of both discharging SREs simply recited Program Guide requirements.

In other reviewed cases, MHCB clinicians developed adequate treatment plans that were not adhered to once the inmate returned to their respective housing units. For example, in one case (CCWF 3), the following safety plan was contained within the discharging SRE dated March 3, 2015:

> Discharge from MHCB to EOP on hourly checks and 5-day f/u; recommend EOP psychiatrist review which mood stabilizer works to better control mood instability and impulsive erotomanic behavior and make adjustments to medication regime to reduce polypharmacy; recommend EOP clinician to continue to work with I/P on managing her impulsive behavior by teaching relaxation skills in implementing a reward system for good behavior; recommend EOP clinician continue to educate I/P on bipolar disorder and the importance of medication compliance; recommend EOP recreational therapist encourage I/P to engage in group activities to observe I/P's social skills and ability to interact with others; recommend EOP clinician refer I/P to group the focus on anger management and substance abuse. I/P is easily bored and would benefit from full EOP schedule of activities.

This thoughtful safety plan was offset by the fact that there was no evidence of concordance between the plan objectives and subsequent five-day follow-up notes and other clinical progress notes. In fact, the inmate's primary clinician in the EOP program wrote the following safety plan in their initial SRE dated March 9, 2015: "I/P to remain in EOP and demonstrate more mental health stability before being considered for transfer. I/P is motivated to be considered for CIW transfer to have closer contact with her mother. I/P likes to have 1:1 attention with PC." There was obviously no concordance between the SREs dated March 3 and March 9, 2015.

**Intervention**: All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes reflected good attendance, including the presence of psychiatric staff (senior psychiatric supervisor) for most meetings. The meetings were otherwise unremarkable.

**Training**: According to training records, approximately 99 percent of custody staff and 100 percent of nursing staff were certified in CPR. In addition, 98 percent of custody staff had received annual suicide prevention training during 2014, as well as only 66 percent of medical staff and 96 percent of mental health staff. Finally, as of March 2015, 96 percent of mental health clinicians had completed the SRE mentoring program, and 98 percent had received the seven-hour SRE training.

**Recent Suicides**:  CCWF did not have any inmate suicides during the review period.


### 7)    Mule Creek State Prison (MCSP)

**Inspection**:  March 24-25, 2015 (previous suicide prevention audit was on June 12-13, 2014)

**Screening/Assessment**:  This reviewer was not able to observe the intake screening process in the R & R unit because there were no new admissions during the two-day audit.  In June 2014, this reviewer found the intake screening process to be problematic because it was conducted without sufficient privacy outside of the Nurse's Office in a large open area used as a custody station.  Upon return to the R & R unit on March 25, 2015, this reviewer conversed with an intake nurse who explained the revised practice, enacted to better ensure sufficient privacy during intake screening.  As explained by the intake nurse, although the Nurse's Office was still not used due to its small size, a newly admitted inmate scheduled to be screened would be temporarily housed alone in a large holding cell adjacent to the Nurse's Office.  All other inmates would be removed from the holding cell and re-housed in other holding cells.  The nurse would then conduct the intake screening from the outside of the holding cell.  Correctional staff were asked to step away from the area to better ensure privacy during the process.  When asked where the screening would occur if all of the large holding cells were occupied, the nurse stated that a small holding cage around the corner from the Nurse's Office would be used.  Nursing staff were said to use the most current version of the Initial Health Screening CDCR Form 7277 (revised October 2014).

This reviewer subsequently conferred with custody staff regarding the intake screening process.  Although custody staff verified that the large holding cell adjacent to the Nurse's Office was primarily used, they contradicted the intake nurse's response by suggesting that the large open area used as a custody station would be used if all the large holding cells were occupied.

Although use of an unoccupied large holding cell might appear to suffice as a temporary solution, conducting intake screening in one large holding cell while other inmates are situated in an adjoining holding cell did not provide sufficient privacy.  In addition, conducting intake screening in a large open area used as a custody station, and requesting that custody vacate the area, did not appear to be a reasonable and consistent alternative.

Finally, daily PT rounds in the administrative segregation unit (Building 12) were observed on March 24.  The rounds were unremarkable and the two PTs correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  MCSP had a ten-bed CTC, with eight designated MHCBs.  All of the MHCB rooms were clean and mostly suicide-resistant.  The exception was the sinks, which contained faucets with a horizontal slit (known as "anti-squirt slits").  These anti-squirt slits had been used as an anchoring device in a SA by hanging in another MHCB room within the CDCR system.  It was noteworthy that the sinks had been previously retrofitted to include triangle-shaped stainless steel shelving that was attached to the side of each sink so that any ligature would slide off during a

SA.  Such a retrofit could be used as a prototype in other MHCBs in the CDCR system with similar square-shaped sinks.

As previously found during the June 2014 audit, the facility had a self-described Mental Health Outpatient Housing Unit (MHOHU), a six-cell section of the overflow administrative segregation unit in Building 13.  The unit was completely mislabeled as a MHOHU because it was neither a mental health unit nor an OHU.  With the exception of the sink/toilet combo, all other fixtures had been removed from each of the six cells.  Despite an LOP signed by the MCSP warden and chief executive officer (CEO) in December 2013 stating "a cement bed with mattress on top is acceptable" for housing in the MHOHU, all beds had been removed from each MHOHU cell.  The reason for this action was unclear because, similar to new intake administrative segregation cells, simply retrofitting the original beds by closing the gap between the bed and the wall would have made these cells suicide-resistant.  As such, all inmates housed in these MHOHU cells were forced to sleep on the floor.  These cells were more sterile than an administrative segregation cell and more closely resembled seclusion cells.  These cells continued to be used on a daily basis.  In fact, according to the MHOHU log, 53 inmates were admitted into the unit on either Suicide Precaution or Suicide Watch between March 1 and March 20, 2015, with 37 or 70 percent subsequently transferred to a MHCB and 16 or 30 percent discharged back to their housing units, generally within 24 hours.  These six MHOHU cells, as well as five other overflow administrative segregation cells in Building 13, were used as alternative housing.

In conclusion, the physical environment of the MHOHU continued to be very problematic, and it was difficult to imagine why a suicidal inmate would continue to endorse SI when subjected to such an anti-therapeutic atmosphere.  In July 2015, CDCR announced that the MHOHU would be decommissioned and the area would be considered alternative housing with a requirement that a suicidal inmate would be under 1:1 continuous observation and required to be transferred within 24 hours.  In addition, beds would be reinstalled into the cells.  This was a commendable corrective action.

Finally, the administrative segregation unit in Building 12 contained three retrofitted suicide-resistant cells for inmates on new intake status.  During the inspection on March 24, this reviewer found that there were at least ten newly admitted inmates (i.e., those housed in the unit for the first 72 hours) that were housed in unsafe, non-retrofitted cells.  This finding was similar to that observed during the June 2014 audit.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  Nursing staff were observed to be utilizing the correct Suicide Watch/Suicide Precaution Record observation form in the MHCBs.  This reviewer observed a poor practice displayed by nursing staff in the CTC.  All observation forms were contained on a clipboard and held by a nursing aide situated at a desk at the end of the hallway, and not located on the outside each inmate's room door.  Placement of the observation forms outside each inmate's room would better ensure that observation occurred as required.  In fact, an examination of the observation forms on March 24 found that the nursing aide had pre-filled each form with two future time intervals that had not yet been conducted.  Although the aide's initials and inmate activities had not been pre-filled on the forms, such a practice was still problematic because time intervals

should not have been documented if they had not yet occurred. This reviewer was unable to observe any IDTT meetings during the audit, as none were scheduled.

In addition, this reviewer's examination of several charts of inmates in both the MHCB and MHOHU found Physician's Orders for issuance of *both* safety smocks and limited issue clothing, including undershorts, t-shirt, and socks, commonly referred to as "whites." Such orders were flawed, i.e., safety smocks should only be ordered to prevent an inmate from attempting suicide by hanging. Issuing undershorts, t-shirt, and socks allows an inmate to attempt suicide by hanging with such items. Should a clinician assess an inmate as being at low risk for suicide to justify providing standard issue clothing, then a safety smock is not warranted. Complicating the issue was a recent LOP from MCSP dated February 2015 which stated that "If an Inmate-Patient is progressed to issued white clothing, it is permissible to offer the no-tear smock for modesty and environmental comfort for the Inmate-Patient." This directive was also flawed because the safety smock should only be used to prevent self-harm, not to ensure "modesty and environmental comfort." As undershorts, t-shirt, and socks could just as easily be used to attempt suicide by hanging as a jumpsuit, if the clinician determined the inmate had progressed to standard issue clothing, then issuing a jumpsuit for modesty and environmental comfort would be appropriate. This LOP should be revised to prohibit issuing a safety smock unless the inmate was assessed as being at either moderate or high-risk for suicide.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit (Building 12) found only 84 percent compliance with required checks that did not exceed 35-minute intervals. This low compliance rate was problematic.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period February 1, 2015 through February 28, 2015. A total of 46 emergency mental health referrals were listed. A review of the TTA log for the same time period found one additional emergency mental health referrals. This reviewer's eUHR review of 38 emergency referrals for SI/behavior revealed that clinical staff completed the required SREs in only 89 percent (34 of 38) of the cases.

In many of the cases in which an SRE was not completed as required, the referred inmate recanted their SI when initially triaged by the clinician. In other cases, inmates continued to endorse SI to the clinician and/or exhibited multiple suicide risk factors, yet the required SREs were still not completed. For example, in one case (MCSP 1), the inmate had a significant prior history of SAs, as well as prior MHCB placements. On an SRE completed in November 2014, the inmate's chronic risk for suicide was rated at "moderate." On January 28, 2015, the inmate was seen in "crisis" by his primary clinician in the administrative segregation unit. He had boarded up both his cell window and food port, thus obscuring visibility into the cell. Custody staff were preparing for an emergency cell extraction. The inmate appeared angry because of a recently received RVR for indecent exposure. Although he denied SI, a subsequent "safety plan" contained within the clinician's progress note included daily rounds by the PT and 30-minute welfare checks by custody staff (both required for all inmates in administrative segregation). In addition, the clinician offered coping skills "to his thought of hurting himself or others." An SRE was *not* completed. Three days later on February 3, the inmate was transported to the TTA after reporting he had swallowed "some kind of object" that was later determined to be a metal

buckle. He also reported SI. The inmate was seen briefly by a clinician, who did *not* complete an SRE, and then was transported to an outside hospital for evaluation and treatment. The inmate was returned to MCSP the following day, February 4, and placed on Suicide Precaution within the MHOHU. An SRE was *not* completed. On February 5, the inmate was transferred to a MHCB at MCSP and remained on Suicide Precaution status. A clinician completed an SRE the same day and assessed the inmate as being both a "moderate" acute and chronic risk for suicide. He remained in the MHCB. Of interest, the clinician wrote on the bottom of the SRE that "this 7447 report is also in response to referral on 1/27/15 and 2/2/15." Not only was this notation inappropriate, but the correct dates of the emergencies requiring completion of SREs were January 28 and February 3.

Treatment/safety planning for reducing SI/behavior ranged from adequate to problematic. For example, in one case (MCSP 2), the clinician developed an adequate safety plan on March 18, 2015 that included the following: "PC will continue to provide opportunity for IP to process his anxiety related to housing issues and his upcoming release date; PC will use MI to reinforce the importance of taking care of his diabetes and helping move IP away from his tendency to use his health care needs as a way to self-harm; and PC/treatment team to work with IP to maintain his current protective factors and maximize their positive impact on his overall level of functioning and ability to manage the stress." An example (MCSP 3) of a problematic SRE included the following flawed and clumsy SRE safety plan: "IP can be safely returned to his regular housing unit, with 5-Day F/U and have suicide watch with 15-minute observation. He should be seen by his PC on his return as soon as time permits." Another clinician who, until recently, had been assigned to the CTC, regularly issued discharging SREs with the following safety plan: "D/C to EOP LOC with 5-day follow-up." Problems were also found with the estimate of risk contained in the SREs of other clinicians, as well as discharging SREs seemingly completed and noted within the MHTS, but *not* contained within the inmate's eUHR.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes reflected good attendance, including the presence of psychiatric staff (chief psychiatrist) for most meetings. The meetings were of extended length (i.e., 90 minutes), and included discussion of several case studies of serious self-harm.

**Training**:  According to training records, approximately 98 percent of custody staff and 100 percent of nursing staff were certified in CPR. In addition, 92 percent of custody staff had received annual suicide prevention training during 2014, as well as 94 percent of mental health staff. Only 25 percent of medical staff received annual suicide prevention training. Finally, as of March 2015, 99 percent of mental health clinicians had completed the SRE mentoring program, and 96 percent had received the seven-hour SRE training.

**Recent Suicides**:  MCSP had one inmate suicide during the review period. In that case (MCSP 4), the inmate was found by his cellmate hanging by a sheet from a ventilation grate in their SNY cell during the late morning of November 2, 2014. The inmate re-entered the CDCR system on June 9, 1998 to serve a 21-year sentence for Lewd and Lascivious Acts on a Child under 14 (his

6-year-old daughter). In 2000, he was involved in a conspiracy to smuggle drugs into the prison and received an additional nine years for that offense. He was transferred to MCSP on March 14, 2014. The inmate had approximately 24 RVRs, including two for attempted suicide in October 1998 and September 2003. His most recent RVR was in October 2014 for possession of excessive medication. The inmate was not known to be gang-affiliated and was housed in the SNY yard due to accumulating significant drug debts and protection against possible extortion.

According to available records, the inmate was raised by parents involved in criminal activity and substance abuse. His chaotic up-bringing included a report of being sexually molested while in foster care at age ten, as well as physical abuse by his grandmother. He did not have any treatment for mental illness in the community, but self-reported a SA by drinking gasoline at 11 years of age. The inmate reported suffering from, but not being treated for, depression throughout his childhood as result of the abuse and chaotic up-bringing.

The inmate had an extensive history of suicidal behavior throughout his CDCR confinement. For example, a few months into his most recent incarceration, he made a lethal SA by cutting his neck, wrists, and inner thigh on October 19, 1998. Of note, his first wife committed suicide in 2000. Other CDCR SAs by the inmate occurred in 2003 (lacerations), 2006 (lacerations), 2010 (hanging), 2011 (not specified), 2012 (hanging), and January 2014 (lacerations). The inmate once described his SAs as "not based on impulse, but carefully considered and plotted out." In 2010, the inmate was placed on involuntary medication for danger to self, which was renewed in 2012. A DSH discharge summary from July 2013 (where he attempted suicide by hanging in January 2013) indicated that he should be considered a significant suicide risk. Most recently, he was transferred to a MHCB at HDSP for approximately two weeks in August 2014 after being found with a noose in his cell and a plan to hang himself. The discharging SRE on August 25, 2014 assessed the inmate as being a "high" chronic risk and "low" acute risk for suicide. A psychiatric progress note dated September 8, 2014, noted the inmate's "daily passive suicidal ideation" without any intent or plan.

The inmate entered the MHSDS at 3CMS level of care upon his CDCR confinement in June 1998. He was elevated to EOP in September 2006 following another SA. His most recent diagnosis given in September 2014 was Major Depressive Disorder, Amphetamine Dependence, and Personality Disorder (Anti-Social and Borderline Traits). He was treated in a DSH intermediate inpatient care program from January 2012 through July 2013, as well as previously from November 2010 through October 2011.

The CDCR reviewer did not offer any specific precipitating factors for the suicide. A suicide note addressed to the inmate's second ex-wife was found and offered an apology, as well as belief that "I'm deeply flawed and don't have the will or determination to do what's necessary to improve ... There really isn't much I can say to make this any easier. I am a tormented soul and would not have added any value to your life." The reviewer did note that his "adjustment to prison as a sex offender, significant substantive abuse, and a tumultuous relationship with his second ex-wife appeared to weigh heavily on the inmate." He had also recently complained of fasciculation, muscle weakness, and muscle atrophy, and was worried that he had either ALS or MS. The Suicide Report did *not* contain any recommendations for a QIP.

This reviewer would offer several comments regarding possible precipitating factors in this case that were either not addressed or inadequately covered in the Suicide Report. *First*, the records in this case were unclear as to the inmate's relationship with his second wife, i.e., whether she was in fact his ex-wife and they were trying to reconcile, whether they were divorced, and/or whether she was ending a previously reconciled relationship. In any event, the inmate appeared to be upset that this woman recently informed him that "she was leaving him," as well as obsessed with her scheduling of weekly visits and/or telephone calls (even requesting to change his EOP treatment schedule to accommodate her Friday calls and visits). Of note, they spoke on the telephone a few days before his death, and she did not show up for her scheduled visit the day before his death. It should also be noted that the inmate not only struggled with "adjustment to prison as a sex offender" (as offered in the Suicide Report), but was growing concerned about being possibly released from prison as a sex offender in 2017, recently stating to a clinician that "getting out and being a registered sex offender in the community with too many restrictions being intolerable." Progress notes from weekly interaction with his primary clinician during the last month of his life included complaints of not getting along with his cellmate, as well as the aforementioned "toxic relationship" with his ex-wife. Further, on October 19, he began refusing his evening psychotropic medication. Several days before his November 2 death, he also began refusing his other psychotropic medication.

*Second*, there were several concerns regarding suicide prevention treatment planning in this case. For example, the inmate had a very significant history of suicidal behavior within CDCR that included at least eight serious SAs, as well as a recent MHCB placement for SI and planned SA. Significantly, the inmate once described his SAs as "not based on impulse, but carefully considered and plotted out." There should have been a discussion as to why, if these prior SAs were so carefully thought out, none were successful and whether they were motivated by attention, desire for treatment, or other reasons. Further, despite this very significant history, the SRE used to discharge the inmate from the MHCB on August 25, 2014 contained the following treatment plan: "DC from MHCB and back to MCSP with a 5-day follow-up; strongly encouraged IP to engage with primary clinician work and on relationships and response to rejection; and encouraged on-going medication compliance with regular follow-up with psychiatry." Such a treatment plan was grossly inadequate and did not contain a strategy to identify the reason(s) behind suicidal thoughts, as well as strategy to reduce SI and suicidal behavior. Because the treatment plan was inadequate, the subsequent five-day follow-up notes were unhelpful.

In addition, although the inmate was seen on a regular, almost weekly basis, by his primary clinician while at the EOP level of care, the progress notes did not contain any documentation that there was an on-going plan to reduce his very significant risk for suicide. Finally, the IDTT developed a Mental Health Treatment Plan on September 9, 2014. Four problem areas were identified, including the areas of "chronic SI/Past SA" and "SIB." The intervention for chronic SI was noted to be "1:1/Group-medication management," with the goal that the "IP will not have any MHCB admissions." Intervention for SIB was "1:1/Group-DBT techniques, including mindfulness and frustration tolerance," with the goal that the "IP will identify two coping skills for distress tolerance." There was little, if any, narrative in subsequent progress notes by the primary clinician that treatment planning for current SI and SIB was occurring.

### 8)    **Deuel Vocational Institution (DVI)**

**Inspection**: March 26-27, 2015 (previous suicide prevention audit was on June 26-27, 2014)

**Screening/Assessment**:  Several new admissions during the medical intake of mental health screening processes were observed on March 26 -27, 2015.  The screening process was conducted with full privacy and confidentiality.  This was a change from the previous audit, when two nurses assigned to the RC were found conducting the process without any privacy or confidentiality because multiple intake screenings occurred simultaneously in a large open area with the nurses and inmates only separated by a small partition.  During the recently observed screening, one nurse was observed conducting the intake screening, with only one inmate in the room at the time and correctional staff stationed outside the area.  If a second nurse was assigned to the area, the practice now required that the second would conduct the screening in the nurse supervisor's office.  It should be noted that, although the correct version of the Initial Health Screening CDCR Form 7277 (revised October 2014) was being used at the time of the audit, an earlier version (revised May 2014) of the form had been used up until the first week of March 2015.  This older version of the form was deficient because it did *not* include a question regarding whether the inmate was a current risk for suicide. With the correct version of the form being used, DVI's intake screening process was much improved from the previous audit.

A clinical psychologist was observed completing initial mental health evaluations, including the initial 31-item mental health screen, on six RC inmates.  All of the evaluations were performed in the privacy of the clinician's office.

Daily rounds by PTs in the K Wing administrative segregation unit were observed.  The PTs appropriately interacted with both caseload and non-caseload inmates, and completed the Psych Tech Daily Rounds Forms for each caseload inmate.

**Housing**:  At the time of the audit, two of the ten OHU rooms had been placed "off-line" for repair and four seclusion cells were decommissioned.  DVI officials were unclear as to the number of cells, if any, that would be eventually brought back on-line.  Although the four remaining OHU cells were still unsafe, a recent headquarters directive required that all inmates housed on suicide observation be observed on a 1:1 continuous basis.  In addition, beginning in early March 2015, beds were placed in cells of inmates on suicide observation status.

Four cells in the L Wing administrative segregation unit were designated for overflow alternative housing.  Because these cells were not suicide-resistant, inmates required one-on-one continuous observation.

As observed during the 2014 audit, the K Wing administrative segregation unit contained 24 retrofitted suicide-resistant cells for new intake inmates.  Sections of the L Wing administrative segregation unit were designated for administrative segregation overflow, OHU overflow, and the Special Program Unit, which was reserved for RC inmates who were likely to be approved for SNY housing.  Due to a low census in both administrative segregation units, this reviewer observed that all new intake inmates were correctly housed in suicide-resistant new intake cells.

**Observation**:  Based upon this reviewer's previous findings from the June 2014 audit, the non-approved use of both "psychiatric observation" and "enhanced suicide precautions" had been discontinued by clinical staff.  Inmates identified as suicidal could be placed on either Suicide Precaution or Suicide Watch, but were managed on Suicide Watch status because they were observed on a continuous, 1:1 basis.  Most inmates housed in either the OHU or alternative housing for suicidal behavior were either transferred to a MHCB or returned to their housing units within 24 to 48 hours.

A review of Guard One data for the K and L Wing administrative segregation units found numerous violations in three reviewed housing floors during multiple 24-hour periods: the two L Units were at 90 percent and 49 percent, and the K Unit was at 78 percent.  Total compliance for the three units was only 73 percent.  Of note, Guard One data from this reviewer's previous audit in June 2014 found only 71 percent compliance during a 24-hour period.  Guard One compliance remained very problematic at DVI.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from October 1, 2014 through March 23, 2015.  From this listing, 19 emergency mental health referrals for suicidal behavior during March 2015 were reviewed.  In addition, this reviewer found an additional 12 emergency mental health referrals for SI during March 2015 that were *not* listed in the MHTS. Of these 31 referrals, all inmates were seen on a timely basis and all but one, or 97 percent, resulted in completion of an SRE.

In addition, this reviewer examined several charts of inmates recently discharged from the OHU and/or transferred back to DVI from another facility's MHCB.  The review found problems with five-day follow-up assessments, as well as the quality of treatment planning as contained within SREs.  For example, this reviewer observed two clinicians separately conducting five-day follow-ups.  The first clinician confused the cases of both inmates they were seeing (DVI 1 and DVI 2), i.e., was applying the circumstances surrounding the self-injurious behavior of the first inmate to the second inmate, as well as incorrectly stating the dates that each inmate had returned from the OHU.  It was particularly unhelpful that the clinician did not have a copy of the discharging SRE for each inmate. The five-day follow-up assessment by the second clinician was very different; they were very familiar with the inmate, had a hard copy of the discharging SRE, and accessed the eUHR during the assessment.  The difference in the assessments by these two clinicians was striking.

Treatment/safety planning to reduce suicidal behavior remained problematic.  For example, three SREs completed upon the inmates' return from an MHCB by a particular DVI clinician were reviewed and found similar boilerplate language: "I/P will be released to SPU housing on 5-day follow-up.  He will be placed at EOP LOC per chronic dated 3/18/15.  Treatment goal is to maintain stability in the RC.  Over the next 30 days, I/P will identify two coping skills that can utilize in prison to manage his mood and behavior."

On the other hand, the safety plan (DVI 1) completed by another clinician on March 24, 2015 was quite good:

Clinician consulted with Dr.____today confirmed I/P was included in EOP program and should have been ducated on Monday for group.  Dr.____ will f/up with I/P today to touch base, schedule emergency psychiatric appointment for medication adjustment and speak with scheduler to ensure ducats are issued daily for I/P.  Short-Term Goals: 1) I/P will be discharged from OHU on 5-day watch. He will not report ideation or engage in self-injurious behavior for 5 days.  He will utilize his mental health clinician in EOP LOC to process current stressors. Reduce anxiety to 3 or below on scale of 10 (10= very high) in next 14 days; 2) I/P will utilize coping strategies discussed today to discharge negative affect, i.e., rubber band, punching self and/or punching pillow versus cutting and head banging when impulse toward self-harm arises.  Currently reports at least 2x weekly.  Target symptoms: reduce reckless behavior; 3) I/P will resume clinical contact with Dr.____  and work on treatment goals established on 3/19/15.

Unfortunately, as this reviewer observed in this particular case, the five-day follow-up assessment did not go well on March 27, 2015.

Finally, review of one particular case (DV1 3) was particularly problematic.  The inmate was committed to CDCR and arrived at DVI on March 6, 2015.  During the intake screening process, the inmate reported a history of suicidal behavior and mental illness.  He had most recently attempted suicide at a county jail less than two months earlier on January 6, 2015, an incident that left him paralyzed from the waist down.  He denied any current SI but had several other prior SAs.  The inmate was placed on suicide observation status in the OHU by the after-hours physician.  The following day, March 7, a clinician completed the SRE.  According to the assessment, "IP came from Yuba County Jail from suicide watch.  Today IP denies SI/HI.  He is in jail for lewd and lascivious acts for six years.  He attempted to kill himself and paraplegia was result from waist down.  This happened in January 2015.  IP's cellie attempted suicide which affected IP when he resuscitated him.  From then on, IP became suicidal."  The inmate also reported that he had a family history of suicide (maternal uncle), a history of sexual abuse, history of depressive disorders and three prior SAs.  The clinician noted ten chronic risk factors. In addition, 14 acute risk factors were noted, including recent SI, recent SA, current/recent depressive episode, current/recent psychotic symptoms, current recent anxiety or panic symptoms, agitated, recent serious medical diagnosis (paraplegic), disturbance of mood, recent trauma (cellie hanging), hopelessness helplessness, increasing interpersonal isolation, early in prison term, and safety concerns. Despite these chronic and acute risk factors, the clinician wrote that the inmate's chronic risk was between low to moderate.  "Today, IP's risk is low because not ambulatory (not legible)."  The inmate wrote the following safety plan:

1) Admit to OHU watch because of status in Yuba jail.
2) D/C to 5-day F/U
3) IP to be followed by psychiatrist for possible side effects or behavior changes.

The inmate was discharged from suicide precautions but remained in the OHU because of his paraplegia.  There was *no* documentation in the eUHR that five-day follow-up assessments occurred.  The inmate was *not* seen again by any mental health staff until over one month later when he was seen by the psychiatrist on April 9, 2015.  The psychiatric note indicated that the

inmate was diagnosed with Mood Disorder NOS and had a history of Post-Traumatic Stress Disorder (PTSD). His medication was adjusted and he was to be seen again by the psychiatrist in two weeks. The note also indicated that the inmate was at 3CMS level of care.

**Intervention**: All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings:** A review of three months of SPRFIT meeting minutes reflected good attendance. A previous problem regarding the absence of the chief/senior psychologist and chief/senior psychiatrist was corrected with a senior psychologist appearing live and a senior psychiatrist appearing via teleconference for all three meetings. The meetings were otherwise unremarkable.

**Training**: According to training records, approximately 99 percent of custody staff and 100 percent of medical staff were certified in CPR. In addition, 99 percent of custody staff had received annual suicide prevention training during 2014, but only 47 percent of medical staff and 72 percent of mental health staff had received annual suicide prevention training. Finally, as of March 2015, only 62 percent of the clinicians had completed the SRE mentoring program, but 100 percent of mental health clinicians had completed the seven-hour SRE training.

**Recent Suicides**: DVI had three inmate suicides during the review period. In the **first** case (DVI 4), the inmate was found hanging by a sheet from a ventilation grate in his administrative segregation cell during the evening of October 12, 2015. The inmate was at the 3CMS level of care. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

In the **second** case (DVI 5), the inmate was found hanging by a sheet from a ladder in his RC cell during the early morning of October 18, 2015. The inmate was at the 3CMS level of care. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

In the **third** case (DVI 6), the inmate was found hanging by a sheet from a ladder in his RC cell during the early morning of October 31, 2015. The inmate was not in the MHSDS. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

### 9)    **Pelican Bay State Prison (PBSP)**

**Inspection**: April 8-9, 2015 (previous suicide prevention audit was on July 23-24, 2014)

**Screening/Assessment**: This reviewer was not able to observe the intake screening process in the R & R unit as there were no new admissions during the two-day audit. The problem found during the previous audit -- nursing staff conducting intake screening in large holding cells with

two officers straddling the inmate -- had been corrected.  Since that time, a holding cage had been positioned in a room housing a large piece of photo identification equipment.  The newly admitted inmate was secured in the holding cage and correctional staff vacated the area prior to the nurse's intake screening.  The door to the room remained closed, thus ensuring privacy and confidentiality.  This was a vast improvement from prior practices and such a corrective action very commendable.  This reviewer also verified that nursing staff were using the correct Initial Health Screening CDCR 7277 Form.

The observation of daily PT rounds in administrative segregation Building A-2 indicated "fair" rounding and although the Psych Tech Daily Rounds Forms were completed for each caseload inmate, there was not much distinction noted between the PT's interactions with caseload versus non-caseload inmates.

**Housing**:  With one minor exception, all CTC cells were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging SA.  The sinks contained faucets with a horizontal slit (known as "anti-squirt slits").  These anti-squirt slits had been used as an anchoring device in a SA by hanging in another MHCB room within the CDCR system.

In addition, alternative housing cells for inmates identified as suicidal and awaiting placement in a MHCB were identified as various medical "swing" beds located in the CTC.  They were said to be rarely used.  Because these rooms were not suicide-resistant, suicidal inmates were required to be observed on a continuous basis until transported to a MHCB.

The three administrative segregation units contained a total of nine cells identified by CDCR as retrofitted for new intake inmates.  An inspection of units A-1 and A-2 on April 8 found that there were only two inmates on new intake status and each were in retrofitted new intake cells.

**Observation**:  During this reviewer's previous audit, several deficiencies were noted regarding the use of 30- and 60-minute levels of observation for suicidal behavior that were in excess of CDCR-authorized levels of observation for suicidal inmates.  In an effort to correct this deficiency, PBSP mental health officials issued a directive indicating that all inmates admitted to a MHCB, whether for suicidal behavior or mental illness, would be observed at a minimum of 15-minute intervals (i.e., Suicide Precaution status).  Suicide Watch status would also be used for inmates at acute risk for suicide.  On April 8-9, 2015, this reviewer observed that all inmates in the CTC were on Suicide Precaution status.  As a result of this designation, all inmates regardless of whether they were at risk for suicide or had been admitted into a MHCB for other reasons, had restrictions placed on both their possessions and privileges.  For example, this reviewer was informed by the recreation therapist that all inmates in the MHCB were prohibited from going to the yard because they were on Suicide Precaution status.  This was an incorrect interpretation of the Program Guide.  Such decisions regarding yard access, as well as other privileges and possessions, were to be individualized based upon clinical judgment.

In addition, this reviewer was provided with a newly revised copy of the facility's "CTC Policy and Procedure Manual" (March 2015) that indicated the following:  "For an I/P on full issue in the MHCB who has a completed CDCR MH-7447 with current information noting an acute risk as moderate or lower, a qualified clinician may order 30 or 60-minute interval checks by

nursing." This directive was also incorrect. An inmate housed in a MHCB that was at any level of suicide risk must be observed on either Suicide Precaution (15-minute observation) or Suicide Watch (continuous observation).

Finally, this reviewer observed problematic nursing practices in the CTC. Review of observation sheets of inmates on Suicide Precaution status for April 8 found that documentation of checks were not staggered. More importantly, one nursing staff member had already printed a time interval on an observation sheet for a check that had not yet been conducted. Nursing staff also had a poor practice of maintaining the observation sheets on the clipboard in the Nurse's Station, rather than at individual room doors, thus raising the possibility that actual observation would not occur as required. On April 9, this reviewer returned to the CTC to observe several IDTT meetings. Before the meetings started, a PT was observed "catching-up" by documenting various time intervals on several observation sheets. The Chief Nursing Executive was informed of this reviewer's observation of the nursing staff practices noted above.

Guard One data for a recent 24-hour period in the three administrative segregation units found high compliance rates with A-1 Unit at 98 percent, A-2 Unit at 98 percent, and Z (stand-alone) Unit at 92 percent, with an overall average of 96 percent.

The institution's 22 SHUs had still yet to be required to activate the Guard One system at the time of the site visit. PBSP officials reported that the 30-minute welfare check requirement in the SHUs had been suspended in June 2013 due to the "unique physical design" of the units having a "negative impact on staff and inmates at PBSP."[9]

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period January 1, 2015 through March 31, 2015. A total of 22 emergency mental health referrals for suicidal behavior were found. In addition, this reviewer found an additional four emergency mental health referrals from the TTA log for the same period of time. This reviewer's eUHR review of these 26 cases found that mental health clinicians completed the required SREs in only 88 percent or 23 of 26 of the cases. Clinicians' responses to emergency mental health referrals were otherwise timely.

There were continuing problems relating to treatment planning found in the review of 15 SREs of inmates discharged from a MHCB. These problems ranged from treatment plans ("safety risk reduction plan") that simply recited Program Guide requirements - "Increase LOC to EOP. Medication management as directed by Psychiatry. Five-day suicide follow-up to ensure patient is stable and free of suicidal ideation or intent" in one case (PBSP 1), to vastly different treatment plans for the same inmate written by the MHCB clinician discharging the inmate and the outpatient clinician receiving the inmate. For example, in one case (PBSP 2), the clinician wrote the following treatment plan when the inmate was discharged from the MHCB on February 19, 2015:

---

[9]During a Suicide Prevention Workgroup meeting on July 20, 2015, CDCR officials stated that Guard One would be fully implemented in the SHUs at PBSP on August 1, 2015. On October 23, 2015, CDCR notified the Special Master that it was reducing the frequency of welfare checks during the second and third watches in the SHUs at PBSP, from 30-minute to 60-minute intervals. As of this writing, this issue remains unresolved.

> Recommend PTSD de-escalation training treatment for situational stressors, it has
> been noted that he has had negative past interactions with staff and I/P states that
> he gets upset easily and hurt due to past experiences and how he interacts and
> interprets the world due to childhood.  Methods of treatment might include
> positive self-talk, CBT to disarm anxiety and depression.  Enjoy treatment and
> self-development and was able to describe meditations and techniques he's used
> in the past that clinicians have taught.

Six days later, the outpatient clinician developed a vastly different treatment plan for the same inmate:

> Mr.___'s safety plan targets his only acute and modifiable risk factor as suicidal
> ideation, which was documented as being for secondary gain to avoid being
> transferred to PBSP.  Mr.___ will develop two coping strategies to be utilized
> instead of reporting suicidal ideations for secondary gain.  Mr. ___ will also be
> able to verbalize two reasons why saying he's suicidal for secondary gain hurts
> him and others.  Lastly Mr.___ will verbalize two things he can do when he is
> experiencing actual suicidal ideations to keep himself safe and address what
> stressors he is dealing with.

This reviewer's observation of several IDTT meetings also found that adequate discussion of specific treatment planning strategies for reducing SI was marginal at best, and would have been worse had the facility's SPRFIT/DSH coordinator not intervened and attempted to focus the team on treatment planning during this reviewer's attendance.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings:**  A review of three months of SPRFIT meeting minutes reflected good attendance, except for the absence of psychiatric staff.  Although the chief psychiatrist position had been vacant for several months, other psychiatric staff (e.g., senior psychiatrist) had not attended the meetings.  This reviewer attended the SPRFIT meeting of April 8.  There was an acknowledgment of problems regarding the adequacy of safety planning for inmates discharged from a MHCB, with corresponding corrective action of SRE/safety planning training in December 2014, February 11, 2015, and March 15, 2015.  Unfortunately, this reviewer's eUHR review of SREs completed after these training dates did not reflect adequate safety planning.

**Training**:  Training records indicated that 100 percent of custody and nursing staff had CPR certification.  In addition, 100 percent of custody, medical, and mental health staff had completed annual suicide prevention block training during 2014, a vast improvement since the preceding suicide prevention audit.  Finally, 100 percent of mental health clinicians received the seven-hour SRE training and 92 percent had completed the mentoring program.

**Recent Suicides**:  PBSP did not have any inmate suicides during the review period.

### 10)    Richard J. Donovan Correctional Facility (RJD)

**Inspection**: April 22-23, 2015 (previous suicide prevention audit was on December 19-20, 2013)

**Screening/Assessment**: There were no new admissions during the two-day audit to allow for an observation of the intake screening process in the R & R unit. This reviewer's previously-identified problem of inadequate privacy and confidentiality had still *not* been remedied because the facility's proposed corrective action of simply stationing an officer inside the Nurse's Office with the door closed compromised privacy and confidentiality.

Daily PT rounds in the B-6 administrative segregation unit were observed on April 23. The rounds were adequately performed with the PT completing Psych Tech Daily Rounds Forms on all caseload inmates as required.

**Housing**: With one minor exception, all 12 MHCBs were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging SA. The sinks contained faucets with a horizontal slit (known as "anti-squirt slits"). These anti-squirt slits had been used as an anchoring device in a SA by hanging in another MHCB room within the CDCR system.

Both administrative segregation units B-6 and B-7 each contained 12 retrofitted new-intake cells. There were problems with the housing of newly-admitted inmates into the administrative segregation units: 1) not all newly-admitted inmates were housed in retrofitted cells; and 2) not all of the retrofitted cells housed newly admitted inmates.

Finally, the administrative segregation units were used as alternative housing for inmates identified as suicidal and awaiting placement in a MHCB. As observed by this reviewer on April 23, because many of the cells were not suicide-resistant, suicidal inmates were required to be observed on a continuous basis until transported to a MHCB.

**Observation**: Consistent with this reviewer's observation during the previous audit, observation sheets for inmates on suicide observation status were attached to the door of each MHCB cell. This was a good practice that helped facilitate observation at required intervals. All forms appeared to have been documented correctly, with staggered interval notations.

This reviewer also observed several IDTT meetings in the CTC on April 22, 2015. The IDTT meetings were well represented by a psychologist, two psychiatrists, a CC I, a PT, and a recreational therapist. The team engaged in adequate treatment planning with each inmate. Of note, the recreational therapist worked full-time in the CTC and informed this reviewer that they took five to six inmates individually to the yard each day, with the goal of getting each inmate to the yard twice a week.

Finally, a review of Guard One data for two recent 24 hour periods in the administrative segregation units found 97-percent compliance in the B-6 unit on April 18, 2015, and only 88-percent compliance in the B-7 unit on April 21, 2015, with overall compliance at 93 percent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period March 1, 2015 through March 31, 2015.  A total of 25 emergency mental health referrals for suicidal behavior were found.  In addition, this reviewer found an additional 13 emergency mental health referrals from the TTA log for the same period of time.  This reviewer's eUHR review of these 38 cases found that mental health clinicians completed the required SREs in only 87 percent or 33 of 38 of the cases.  Clinicians' responses to emergency mental health referrals were otherwise timely.

There were continued problems regarding the continuum of adequate treatment planning for suicidal inmates discharged from the MHCB.  For example, many treatment plans ("safety risk reduction plans") were more than adequate as shown by the following case (RJD 1):

> Upon return to CCCMS level of care, the following interventions are recommended for inclusion in I/P's treatment plan: initiate 5-day follow-up protocol, follow-up with psychiatry within 10 days, IDTT within 2 weeks; modify treatment plan to include weekly or every other week 1:1 sessions with PC to provide additional support while I/P is facing multiple family stressors; assist I/P with practicing relaxation skills for stress management (deep breathing, meditation, progressive muscle relaxation, visualization ); teach CBT concepts that I/P can use independently to cope with anxiety and stress; I/P to maintain abstinence from substance use; assist I/P in developing a relapse prevention plan including triggers, refusal skills, and alternate outlets to use when cravings arise, consider AA/NA if I/P is eligible; consult with correctional counselor re: potential early release to determine if I/P requires a pre-release planning group; incorporate I/P's goals and priorities into sessions to help I/P stay motivated and focused on positive behavior  (his daughters, his wife, getting out of prison, helping others).

This ambitious treatment plan was offset by the fact that a subsequent treatment plan by the outpatient clinician was not consistent with the above, nor did any of the five-day follow-up progress notes begin to address any of the plan's components.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings:**  A review of four months of SPRFIT meeting minutes reflected good attendance, particularly with the chief psychiatrist and CMH.  Meeting minutes were otherwise unremarkable.

**Training**:  Training records indicated that 91 percent of custody staff and 100 percent of nursing staff were certified in CPR.  In addition, although 99 percent of custody staff completed annual suicide prevention training during 2014, only 68 percent of medical and 72 percent of mental health staff completed such training.  Finally, 95 percent of mental health clinicians received the seven-hour SRE training and 100 percent completed the mentoring program.

**Recent Suicides**:  RJD had three inmate suicides during the review period.  In the **first** case (RJD 2), the inmate was found by a cellmate hanging from the upper locker of their GP cell by a sheet during the evening of August 19, 2014.  The inmate re-entered the CDCR system on September 16, 2010 to serve a seven-year (and eight month) sentence for second-degree robbery.  The inmate had been paroled from CDCR a few months earlier in April 2010.  He had only one RVR during the second CDCR confinement, the result of fighting in June 2012.  He was transferred to RJD on February 25, 2011.  The inmate had a very close relationship with his mother, and they corresponded frequently by letter and telephone.

The inmate did not have a significant history of mental illness while in the community, nor was there any documented history of mental illness in the family.  He did have a history of substance abuse.  The inmate did not have any significant medical problems.  He was not known to be gang-affiliated.  During his first CDCR confinement, the inmate was placed at the 3CMS level of care in October 2009 with a diagnosis of Depressive Disorder, NOS.  At that time, he reported a few prior incidents of suicidal behavior (i.e., "He reported 12 years ago he was hospitalized for mental health care because he attempted to commit suicide" and "reported he attempted to commit suicide four and half months ago and in 1997.")

When re-entering CDCR in September 2010, the inmate was placed at the EOP level of care with a diagnosis of Major Depressive Disorder, Recurrent, Moderate (Provisional).  Over the next few years, his diagnoses included Major Depression, Psychotic Disorder or Schizophrenia.  According to a November 21, 2013 progress report, "I/P reports that he has been experiencing AHs since his mid-20s.  According to him, the AHs continue to disrupt his sleep, prevent him from spending time in the day room.  He denies other symptoms of psychosis.  His ultimate goal was to be discharged from EOP so that he might qualify for a fire camp."

The inmate remained at the EOP level of care until his death.  There were no reports of SI and/or other suicidal behavior during his second confinement, and his only completed SRE of January 30, 2014 indicated both a "low" chronic and acute risk for suicide.  The CDCR reviewer in this case noted that the inmate's chronic risk factors were significant enough to grade his chronic risk for suicide as "moderate."  He was compliant with psychotropic medication.

The CDCR reviewer in this case interviewed the inmate's primary clinician following the suicide.  His "PC described the inmate as a 'slight man that blended into the woodwork.'  He said his group attendance was low.  He was observed at times 'sleeping in the pitch black cell.  He said he had physical complaints such as rheumatoid arthritis.  He was often 'guarded.'  His clinician said that he appeared to want to 'please clinicians' as he was 'agreeable and passive.'"

The clinician also stated that there was discussion among the treatment team regarding decreasing the inmate's level of care to 3CMS, but the team ultimately decided that he should remain in the EOP program due to concerns raised regarding his "vulnerability to be manipulated by the population."  Although there was no documentation to indicate that the inmate suffered from any form of arthritis, several health care services request forms noted complaints regarding persistent headaches and pain in the back of his neck.  He also complained about dizziness and dry mouth.  According to records, medical staff could not diagnose the source of the inmate's physical discomfort.

The CDCR reviewer in this case did not offer any possible precipitating factors for the suicide, and no suicide note was found.  Several inmates in the housing unit were interviewed following the suicide.  Although the inmate's cellmate suspected that he had recently been using heroin, there was no indication that he had been contemplating suicide.  Other inmates commented that although withdrawn with increased symptoms of depression, he did not appear suicidal.  The reviewer noted several significant changes in the inmate's behavior during the months leading to his death.  The inmate's mother was growing concerned about his decompensating behavior following telephone calls and letter correspondence.  As stated in the Suicide Report, "Consistent with his mother's observations, clinical notes revealed his 'euthymic' mood had changed to 'dysphoric' and his physical complaints intensified since May or June 2014.  He was reporting headaches, generalized pain, dizziness, and also reporting that his voice had changed. Despite medical tests and evaluations, he continued to report physical problems.  There was speculation that the physical complaints were of a delusional nature, but there was no explicit indication in documentation other than his antipsychotic medication which was increased on July 14, 2014." There was also speculation that alleged drug abuse was causing a change in his physical and emotional behavior.

The Suicide Report contained one recommendation for corrective action through a QIP:  "Mental health documentation did not provide a description or clear understanding of his AH, delusions or depression.  Documentation should provide individualized details of severity, presentation of symptoms and interventions.  Possibility that his increasing physical complaints might be manifestations of depression, delusions or somatization was not explored in any depth.  The content, frequency and last report of AH were not addressed.  Depressive symptoms were not clearly evaluated or addressed in the documentation."

In the **second** case (RJD 3), the inmate was found hanging by a sheet from the bunk of his administrative segregation cell during the evening of April 18, 2015.  The inmate entered the CDCR system on June 19, 2014 to serve a three-year sentence for assault.  He had three RVRs during his confinement, the most recent of which occurred on December 28, 2014 when he was charged with battery on an officer (which involved hitting an officer on the leg with a milk carton).  He was transferred to RJD on November 7, 2014.  Due to a chaotic and dysfunctional childhood in which he was abused by his mother and other caregivers, the inmate had limited contact with his family.  He was 21-years-old at the time of death, single, with no children.  Although not known to be gang-affiliated within CDCR, the inmate initially requested SNY housing due to past gang involvement.

Although mental health records from the community were incomplete, the inmate was said to have had a significant history of mental illness, beginning at age seven.  An initial mental health screening at CDCR indicated that he self-reported a psychiatric history, including treatment with psychotropic medication.  He also reported prior SAs, as well as AH.  According to the pre-sentence investigation report filed prior to sentencing on the instant offense, the inmate threatened "suicide by cop" when telling arresting officers "I'm dead, I'm dead, shoot me, just shoot me."  The most recent incidence of suicidal behavior occurred when he engaged in self-injurious behavior by cutting his forearm while confined pre-trial in the Los Angeles County Jail.

During his initial psychiatric evaluation on July 29, 2014, he received diagnoses of Schizophrenia and Polysubstance Dependence. He was prescribed psychotropic medication. For reasons that remain unclear, the inmate was not included in the MHSDS until August 25, 2014 when he was placed at the 3CMS level of care and his diagnosis was changed to Major Depressive Disorder, Recurrent, Severe with psychotic features. He continued to see a psychiatrist on a monthly basis and in September 2014 his diagnosis was changed again to Mood Disorder NOS, and Polysubstance Abuse. A few months later in November 2014, his diagnosis was changed to Psychotic Disorder NOS. During this time, he became non-compliant with the psychotropic medication, which was eventually discontinued in mid-December 2014.

During the morning of December 28, 2014, the inmate was referred to mental health after he received an RVR for throwing a milk carton at an officer. He had become upset for unknown reasons, was yelling at staff, acting irrationally by demanding to go home, stating either "let me go home or kill me. That's what you're trying to do anyway." Following a threat of suicide, he was placed on Suicide Precaution status until he could be assessed by a clinician. An SRE was completed that morning indicating a "moderate" chronic risk and "low" acute risk for suicide after the inmate recanted and denied any current SI. He was discharged from Suicide Precaution status and escorted to the administrative segregation unit.

The following week on January 6, 2015, a mental health clinician completed a mental health assessment. According to the clinician, the inmate "indicated to mental health staff that he is concerned about the length of his sentence, and he may have had safety concerns he did not verbalize ....hears voices and there's no point in sharing as it's hard to explain what it's like. He was unable to explain the connection between this symptom and the behavior described in the RVR. He reported he was sleeping poorly in general as a result of the voices.... He denied suicidal feelings at present, and denied he was suicidal on 12/28/14, remarking, 'If I was suicidal, I wouldn't be here.'"

The clinician also indicated that "the I/P's mental disorder does appear to have contributed to the alleged behavior described in the RVR ... The IP was off his medication for some time and his mental health symptoms may have contributed to the events described herein." In a separate document forwarded to the senior hearing officer adjudicating the RVR, the clinician noted that "there are mental health factors the hearing officer should consider in assessing the penalty....penalties that results in extending his sentence by a great amount of time could potentially make mental health symptoms worse."

According to most mental health progress notes, the inmate's behavior continued to deteriorate over the next several months. He refused many out of cell activities and mental health contacts due to his worsening condition. On January 13, 2015, the inmate was elevated to EOP level of care, with the following presenting problems in his treatment plan: "depression, restricted affect, AH, and amphetamine dependence." A few weeks later on January 23, 2015, the inmate was added to the "High-Risk List," necessitating daily contact with mental health staff. There seemed to be some consensus on his treatment team that the "I/P appears to be greatly exaggerating and possibly feigning symptoms." A few days later, on January 26, 2015, inmate met with the psychiatrist who again changed his diagnosis to "Adjustment Disorder, NOS,

Polysubstance Dependence, rule-out Psychotic Disorder, NOS, and cluster B traits (antisocial, borderline)."

On February 19, 2015, the inmate was removed from the High-Risk List, reportedly due to improved sleep, better mood and increase participation in treatment.  Approximately two weeks later, on March 5, 2015, he was returned to the High-Risk List due to worsening symptoms and refusal to come out of the cell.  On March 19, 2015, the inmate met with the psychiatrist who changed both his psychotropic medication and diagnosis to Rule-out Psychotic Disorder NOS, Polysubstance Dependence, Adjustment Disorder with disturbance of emotions and conduct, and Anti-Social Personality Disorder and borderline traits.

On March 23, 2015, the inmate attended his RVR hearing and the senior hearing officer, who wrote that they were mindful of the inmate's mental illness as a mitigating factor, imposed the following penalty:  181 days credit forfeiture, ten days loss of yard, 90 days loss of quarterly packages, and referral to Institutional Classification Committee (ICC) for a SHU-term assessment.  As noted in the Suicide Report completed in this case, the inmate subsequently received a 28-month SHU term as a result of the RVR.  Based upon a review of the eUHR in this case, it appeared that, other than the inmate and an "alternate clinician" who saw the inmate briefly on March 23, no other member of his treatment team was aware of the RVR penalty.

In fact, in a progress note written on April 14, 2015, a few days before his death, the inmate's primary clinician indicated that they asked the correctional counselor for an update on the "pending" RVR and was told that the matter was still pending, a senior hearing officer had not yet been assigned, and a ten-day loss of yard was probably related to another unspecified RVR.  Of course, all of this information was incorrect as the inmate had received his RVR penalty more than two weeks earlier on March 23.  The primary clinician also indicated in the progress note that "Although IP appeared to be greatly exaggerating or possibly feigning sxs upon arrival, IP is consistently reporting non-command AH that is impacting functioning and some related delusional thought processes.  IP has expressed belief that AH is controlling his body and there is religious preoccupation.  IP intermittently shows as below 50% participation on weekly reports, not this week; maintains above 50% on 90-day DHS indicators reports.  IP being retained on high risk lists as he appears to benefit from frequency of contact."

According to both the "Psych Tech Daily Rounds/Weekly Summary" forms and the daily "P/C Cell-Side/Special Follow-up" notes completed during the week prior to his death, the inmate presented with a mental health status within normal limits, was medication compliant and participating in programming, and had "no issues this week."  The P/C Cell-Side/Special Follow-up notes did acknowledge continued hallucinations and delusions.  In contrast, a progress note from the primary clinician dated April 10, 2015 indicated that the inmate "need[s] psychotropic medication review, hears things/sees things imagine things, insomnia sleeps too much with a note of 'poor, interrupted sleep,' and....Wants to discuss medication increase for psychosis."  The inmate was seen the same day (April 10) by a psychiatrist who noted that he appeared "more disorganized" and increased his medication.  Contrary to the reporting of the PTs, other records indicated that the inmate was refusing to come out of the cell for programming and yard (which was restored on April 2).

The CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, and no suicide note was found. The reviewer did note that "The influence of his mental state or true motivations for his final action is unknown. The darkness of his hopelessness, inability to connect, perceived lack of social support, possible safety concerns, and his pending SHU with additional time are conceivable causal factors."

The Suicide Report contained three recommendations for corrective action through a QIP: "1) In review of the inmate's mental health documentation, mental health referrals at Wasco State Prison (WSP) were not seen as timely and/or not generated per the 2009 Mental Health *Program Guide* requirements; 2) Mental health documentation supported the inmate's inclusion into the MHSDS upon his arrival at WSP on June 18, 2014. However, he was not included in the MHSDS until August 25, 2014; and 3) During a review of the Incident Report and photographs, the inmate had manufactured a curtain that was hanging from the upper bunk obstructing the view of his body."

This reviewer would note three other issues in this case that were *not* addressed in the Suicide Report. *First*, the SRE completed on December 28, 2014 following the incident with the officer, emotional outburst, suicide threat, and subsequent placement in administrative segregation was deficient in several areas. For example, there was no narrative contained in the (MSE) section of the assessment that described the circumstances surrounding the emergency mental health referral, and the clinician failed to acknowledge several obvious acute risk factors, including recent change in housing (e.g., administrative segregation), safety concerns, single cell placement, recent negative staff interactions, and recent disciplinary action. In addition, the clinician erroneously noted several protective factors that were *not* supported anywhere in the eUHR, including family support, religious/spiritual/cultural beliefs, interpersonal social support and future orientation/plans for the future.

*Second*, the observations by PTs reflected in "Psych Tech Daily Rounds/Weekly Summary" forms, and to a lesser extent the observations by clinicians reflected in "P/C Cell-Side/Special Follow-up" notes, were inconsistent with observations noted on clinical progress notes, as well as documentation of inconsistent programming and acceptance of psychotropic medication by the inmate. At a minimum, the "Psych Tech Daily Rounds/Weekly Summary" forms were particularly unhelpful in this case.

*Third*, the inmate received a severe disciplinary sanction at his RVR hearing on March 23, 2015 that included 181 days credit forfeiture, ten-day loss of yard, and 90-day loss of quarterly packages. In addition, there was reference in the Suicide Report to his receiving a 28-month SHU term as a result of the RVR. Despite the fact that the inmate was on the High-Risk List and purportedly assessed on a daily basis by mental health staff, neither his primary clinician nor treatment team (including the correctional counselor) were aware of this critical information. While on site at RJD on April 23, 2015, this reviewer conversed with several custody and mental health supervisors following the morning meeting in the administrative segregation unit. These supervisors acknowledged there was a significant lack of communication in this case regarding notification of the RVR sanction to the inmate's treatment team, as well as acknowledgment that it would have been appropriate to notify all staff during the next morning meeting. Because the

issue was not addressed in the Suicide Report, it was unclear to this reviewer whether any corrective action was going to be taken as a result of this lack of communication.

In the **third** case (RJD 4), the inmate was found hanging by a sheet from the bunk of his GP cell during the early morning of May 7, 2015.  The inmate entered the CDCR system on January 16, 1981 to serve a 27-year to life sentence for first-degree murder and two counts of attempted murder.  During 34 years of confinement, the inmate never received an RVR.  He was transferred to RJD on April 25, 1988.  Although he had not had any family visits since 2006, the inmate did have support from his two brothers who provided regular financial support.  He had not had any contact with his only child (a daughter) for over 35 years.  He was not gang-affiliated.

The inmate did not have a history of mental health treatment in the community, but was raised in a very abusive family environment that affected his emotional and educational growth.  In addition, he experienced depression resulting from two failed marriages and financial problems involving a failed business.  He was reportedly despondent at the time of the instant offense on April 22, 1980, and had reportedly taken an overdose of Tylenol in close proximity to the offense.

During his CDCR confinement, the inmate occasionally sought out mental health services during times of emotional turmoil.  Most of these periodic mental health requests were related to becoming anxious following a job change, feeling remorse over the instant offense, and seeking advocacy for continued single cell placement.  For example, following his loss of a clerk's job in July 2009, he severely cut his neck and was placed on Suicide Watch in the MHCB from July 7 through July 10, 2009.  As a result, he was also placed at the 3CMS level of care with a diagnosis of "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct."  The inmate was not a willing participant in the 3CMS program, refused medication, and was only periodically compliant with programming.  According to one clinician, it was "culturally taboo (for this inmate) to reach out for mental health help."  He was discharged from the MHSDS in March 2010.

The inmate, 72-years-old at the time of his death, lived a much regimented life within CDCR.  In addition to never receiving an RVR, he kept to himself and only had a small circle of friends, was well liked by both inmates and staff, and had various jobs during his incarceration, most of them as a clerk.  He also enjoyed single-cell status most of his confinement.  Although the inmate held each job for many years, when his employment status changed, he often reacted with anxiety.  For example, in addition to his SA following a disruption in his employment in July 2009, custody staff issued a mental health referral after he lost a job in November 2001.

Similar to other inmates his age, he had several medical problems, including failing eyesight, lowered energy level, elevated blood pressure, and possible heart problems.  Despite complaints of both neck and joint pain, he continued to maintain employment.

In April 2015, the inmate initiated a mental health request because he needed "his own cell to deal with his guilt" over the 1980 instant offense.  When he last saw a mental health clinician on April 9, it became obvious that the request had more to do with seeking the clinician's advocacy

for continued single-cell placement. He denied any current SI, although mentioned his July 2009 SA as an example of why he needed continued single-cell status. He did not present with any mental health symptoms, and refused to be considered for reenrollment in the 3CMS program. The clinician reminded the inmate that single-cell status was more of a housing issue, not a mental health issue. During this time, the inmate had also been meeting with his correctional counselor because he was due for an annual classification review (a similar review was not held the previous year), and the counselor was reminding him that he probably would be reclassified to a Level II facility and might lose his single cell status. The inmate had been at RJD, a Level III facility, for 28 years. The correctional counselor last saw the inmate on May 4, 2015 and informed him that they would meet again several days later on May 8 (the day after his suicide). He was scheduled to go to the UCC on May 19, 2015. Several inmates subsequently interviewed by the CDCR reviewer in this case noted that the inmate was very anxious about his upcoming UCC meeting and likely transfer to a Level II facility and losing single-cell status.

The CDCR reviewer in this case offered the following possible precipitating factors for the suicide: "The cause of the inmate's suicide appeared to be his anticipation that he would soon lose his single-cell status as well as his ability to retain the majority of his personal possessions, along with his anticipation that he would be transferred to a Level II facility. These anticipated losses, combined with his on-going underlying sense of shame and estrangement from his daughter, appeared to contribute to his decision to die by suicide."

The Suicide Report contained three recommendations for corrective action through a QIP: "1) A central file review was performed which revealed that the inmate was last seen by the UCC in May 2013..... His next UCC should have been occurred in May 2014; 2) The inmate was found to have a very large amount of personal property in his cell.....included rosters of CDCR custody, medical and mental health staff and listings of school addresses. There also were problems with 'hoarding' of property by the inmate at his worksite; 3) Several concerns were identified with the mental health documentation during the inmate's last mental health contact, including an error in documenting the correct date of the contact, a lack of an assessment component to the note, and inadequate information about risk factors and follow-up. Although the inmate did not report current suicidal ideation, the documentation was inadequate in explaining the inmate's subjective complaints and his reference to his 2009 suicide attempt."

### 11)    San Quentin State Prison (SQ)

**Inspection**: May 5-6, 2015 (previous suicide prevention audit was on January 21-22, 2014)

**Screening/Assessment**: The intake and mental health screening processes of one newly admitted inmate was observed on May 6. Although this reviewer observed that the October 2014 version of the Initial Health Screening CDCR Form 7277 was being completed by the nurse, it had only been used in the facility for the past two weeks. Prior to that and for most of the review period, a November 2013 version of the form had been used in the R & R unit. Unlike this reviewer's previous observation of the medical intake screening process in January 2014, a nurse was conducting the screening in the Nurse's Office, but the door remained open and an officer was sitting outside in the hallway. As such, sufficient privacy and confidentiality were compromised. Ironically, following the nurse's screening, the newly admitted inmate then

walked down the hallway into the private office of a clinical psychologist.  The door was closed and the same officer who was sitting outside the Nurse's Office walked down the hallway and relocated himself outside of the closed door of the clinician's office.  As such, the clinical psychologist was able to complete the initial mental health assessment with sufficient privacy and confidentiality.

This reviewer observed a portion of the daily PT rounds conducted in the administrative segregation unit on May 6.  The observed PT was assigned to Tiers 1 and 2 and although they stopped and interacted with each caseload inmate, as well as correctly completed the Psych Tech Daily Rounds Forms, they failed to stop and interact with any non-caseload inmates.  This finding was similar to that observed during the previous audit in January 2014.  In addition, this reviewer had the opportunity to observe completion of the 31-item mental health screening form that was administered to non-caseload inmates upon admission into the administrative segregation unit.  The form was completed by another PT in the privacy of a room located on the ground floor of the administrative segregation unit that was previously used as an officer' station.  The door was closed and there was sufficient privacy and confidentiality.  This reviewer was informed that this new location for conducting mental health screening had been in operation for approximately two weeks.  This corrective action was commendable.

**Housing**:  As part of a SQ mission change, all MHCBs had been converted to psychiatric inpatient program (PIP) beds for condemned inmates.  All non-condemned SQ inmates requiring a crisis level of care were referred to outside MHCBs.  As such, the 17 former MHCBs, as well as 23 other CTC beds, were now used for the PIP.  These former MHCBs continued to be suicide-resistant (and did not contain anti-squirt slits in the sinks) and furnished with suicide-resistant beds.  In addition, alternative housing for inmates identified as suicidal and awaiting placement in a MHCB was located in numerous areas of the Correctional Health Services Building (CHSB), including ten licensed medical beds, TTA cells, and various large holding cells scattered throughout the building.  Because these alternative housing beds and cells were not suicide-resistant, inmates were required to be observed on a 1:1 continuous basis.  It should be noted that when this reviewer was touring the CHSB to inspect the various alternative housing locations, several nursing staff who were interviewed appeared unaware that the ten identified medical beds required continuous observation when inmates were temporarily placed there for alternative housing.

The administrative segregation unit contained approximately 30 new intake cells on the first and second tiers.  Most, but not all, of the cells were retrofitted.  Due to a low census, many of the new intake cells were empty and all new intake inmates were observed to be in retrofitted new intake cells.

**Observation**:  All inmates in the PIP were required to be observed on a Q-15 minute level of observation, unless they were on Suicide Watch status and received constant observation.  Because all inmates were required to be observed at 15-minute intervals, the term "Suicide Precaution" was not used.  Although a different observation form was used in the PIP, review of the forms found that they were all documented at staggered intervals.

This reviewer observed an IDTT meeting on May 5, 2015 in which an inmate (SQ 1) with continuing SI was being referred to the PIP. The team was well represented by a psychiatrist, social worker, recreation therapist, PT, CC I, and three nurses. There was an adequate discussion of treatment planning for this inmate.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit (Carson) found only 88-percent compliance with required checks that did not exceed 35-minute intervals, whereas Guard One data in the condemned unit (East Block) found 96-percent compliance with required checks. The combined compliance rate was 92 percent.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period October 1, 2014 through March 31, 2015. A total of only three emergency mental health referrals for suicidal behavior were found. In addition, this reviewer found an additional 42 emergency mental health referrals for suicidal behavior from the TTA log for a shorter period of February 1 through March 31, 2015. This wide discrepancy in data was an indication that the vast majority of mental health referrals were *not* being entered into the MHTS. This reviewer's eUHR review of these 45 cases found that mental health clinicians completed the required SREs in only 84 percent or 38 of 45 of the cases. In some cases, it appeared that inmates were placed on five-day follow-ups in lieu of completing SREs. Clinicians' responses to emergency mental health referrals were otherwise timely.

One reviewed case (SQ 2) was particularly troubling. The 3CMS inmate submitted a Health Care Services Request form on April 16, 2015 complaining of "mental problems, would like to see my mental health doc, not coping with jail. Depression, really bad, can't sleep, can't eat." The request form was sent to medical and subsequently forwarded to the inmate's primary clinician. When seen later in the day by the primary clinician, the inmate stated:

> Well, I'm depressed. I mean wouldn't you be if you were here. Well let's see. I'm f-----king stuck here in a cell for something I did not do. I can't talk to my family, and everyone including those officers is-------es to us. And look at this place I'm fighting with roaches and bugs and it's just miserable. I don't know I'm going to jump off the second tier. I feel so hopeless. I've nothing to live for anymore.... Yeah I think about it (jumping off the tier) all the time. Am I going to do it? I don't know. Do you even care? What does it matter? No I'm not taking any medication and medications have never helped. I just filled out that form to talk to someone. But I don't think that will even help.

The clinician's progress note indicated that the "IP admits to SI 'all the time' and would not contract for safety." The clinician indicated that his "current risk is high due to suicidal thoughts, plans and history of depression and Mood Disorder NOS." The inmate was subsequently escorted to the TTA for further assessment. Upon arrival, instead of being placed in alternative housing, the nurse again asked the inmate if he was suicidal. The inmate then recanted his SI. The nurse called the on-call clinician, who ordered that the inmate be returned to his housing unit on a five-day follow-up. An SRE was never completed.

The previous suicide prevention audit in January 2014 also found lower completion rates for required SREs in response to emergency mental health referrals for suicidal behavior. This issue continued to be problematic at SQ.

Although the reviewed charts indicated that clinical staff consistently saw inmates daily while on suicide observation status, and inmates referred to mental health were seen timely, several problems were found. Most were related to inadequate treatment planning. For example, this reviewer looked at nine SREs from inmates discharged back to their housing units from alternative housing after displaying SI. In six of the cases, treatment planning was very problematic. For example, in one case (SQ 3), the inmate had arrived at SQ on March 3, 2015 and expressed SI during the intake screening process. He was escorted to the TTA and placed in alternative housing. The following morning, March 4, the inmate was assessed by a clinician who completed an SRE. The inmate stated that "he has thoughts of hurting himself by jumping off tier last night when he arrived SQ. Indicated that he feels depressed and suffers from PTSD. 'I watched my uncle bleed to death in 2008.'..... IP indicated since then he is hearing his uncle's voices, and reliving the accident scene almost daily. IP reported this is his first prison term and his sentence is approximately two years." The inmate denied any current SI and the clinician rated both his chronic and acute risk for suicide as "moderate." The inmate was discharged from alternative housing and returned to his housing unit with the following plan:

> IP should be housed on first-tier due to his past SI (jumping off tier). IP appeared calm at the end of the interview after being able to process and discusses stressors (new environment, psych symptoms). IP was assessed by an on-call psychiatrist on 3/3/2015 for medication. He was rehoused and PC was notified. He has an appointment scheduled with PC on 3/6/15 and IP understands to reach out if he needs additional help. PC is recommended to R/O PTSD, R/O major depression with psychotic....Recommended IP continue to exercise daily to elevate mood - in addition to taking his medication. Adaptive coping strategies were discussed.

The inmate was seen by a clinician on March 6, as well as seen daily as part of the five-day follow-up. None of the notes were indicative of any treatment planning to reduce the inmate's SI. On the fifth day of follow-up, March 9, the clinician noticed that the inmate had a large bruise on his left eye. The inmate stated that "I punched myself in the eye. The voices told me to do it. I keep hearing voices. I'm not sure if it was this morning or last night. I don't know because I'm not sleeping and the medication isn't helping. I'm glad the officer came to check on me. I've been asking for help and they just ignoring me. I keep hearing voices. I've thought about jumping off the bed and hitting my head or throwing myself against the wall or just keep punching myself in the face. If I had a choice, I'd do it. Do you want to help me? Please help me. I need help. All these changes. Everyone has left my side. I've had no contact with my family." An SRE was completed, the inmate was assessed as being at "high" acute risk for suicide, and was subsequently transferred to a MHCB.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings:**  A review of four months of SPRFIT meeting minutes reflected good attendance, particularly with the chief psychiatrist and/or designee.  Meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 100 percent of custody staff and 99 percent of nursing staff were certified in CPR.  In addition, only 71 percent of custody, 46 percent of medical, and ten percent of mental health staff received annual suicide prevention training during 2014.  It should be noted that, following this reviewer's on-site audit, mental health officials forwarded additional suicide prevention training data to suggest that training data for medical and mental health staff was higher than originally reported.  Such data was not considered because it combined 2014 and 2015 data.  As consistently requested in all CDCR facilities, the original training data request was limited to 2014.  Finally, 88 percent of mental health clinicians had received the seven-hour SRE training and 91 percent had completed the mentoring program.  The very low completion rates for annual suicide prevention training for all personnel during 2014 was problematic.

**Recent Suicides**:  SQ had three inmate suicides during the review period.  In the **first** case (SQ 4), the inmate was found unresponsive in his administrative segregation unit cell during the early morning of March 13, 2015.  A subsequent investigation and autopsy found that he had committed suicide by overdosing on blood pressure medication.  The inmate had entered CDCR on September 19, 1996 to serve a 14-year to life sentence for attempted murder of his ex-girlfriend and other charges.  He did not have a prior adult or juvenile record.  The inmate was transferred to SQ on November 9, 2011.  He had only three RVRs during his 19-year confinement, the most recent of which occurred a few days earlier on March 10 when he was found to have 14 morphine pills in his cell.  He had good family support, and was not known to be gang-affiliated within CDCR.

The inmate had not received any mental health treatment in the community, but had substance abuse problems (with methamphetamines) that were primarily responsible for three failed marriages and several other relationships, and unstable employment.  Upon entry into CDCR, the inmate reported receiving psychotropic medication for depression while confined pre-trial in the county jail.  Following an initial assessment in September 1996, he was placed in the MHSDS at the 3CMS level of care with a diagnosis of Adjustment Disorder with Mixed Emotions.  He remained in the 3CMS program until November 2000 when he was discharged for non-participation.  He re-entered the MHSDS in August 2000 after complaining of "a relapse of depression" and was placed in the 3CMS program with a diagnosis of Major Depressive Disorder.  The inmate adequately programmed at the 3CMS level of care for almost 14 years, with most treatment provided without the need for psychotropic medication.  During an IDTT meeting in December 2013, his diagnosis was changed to Adjustment Disorder with Depressed Mood.  By his next IDTT meeting on April 18, 2014, the team decided that based upon improved mood and functioning, a normal mental status exam, and the benefit of programming, the inmate no longer required MHSDS placement and he was discharged from the program.

Upon his most recent placement in the administrative segregation unit on March 10, 2015, a brief mental health screening was performed by a PT the following day.  Although the inmate denied any current SI, he responded affirmatively to several questions (i.e., prior psychotropic

medication, history of weight loss/gain, history of feelings of guilt, worthlessness, or sinfulness for more than a week, believes others knew his thoughts/read his mind) resulting in a routine mental health referral.  He was not seen by a mental health clinician prior to his March 13 suicide.

The inmate had a limited history of suicidal behavior.  During his years in the 3CMS program, he periodically voiced vague SI, including in 1996, 1997, 2000, 2001, 2008, and 2011.  The inmate told a clinician in January 2001 that he had attempted suicide by cutting himself 3 1/2 years earlier (or sometime in late 1997).  The attempt was never reported to health care staff.  It was noteworthy that the CDCR reviewer in this case cited an SRE completed on April 18, 2014 which indicated the inmate had no history of SI or self-injurious behavior.  The reviewer noted the inmate's history was not accurately brought forward from previous assessments.  He did not have any history of MHCB placements.  Finally, it was noteworthy that when the inmate was found to have approximately 14 morphine pills in his cell on March 9, 2015, although denying current SI, he told custody officials that he had collected and retained the morphine pills from July 2014 following an adverse Board of Parole Hearings (BPH) and had planned (but later reconsidered) to commit suicide by overdose.

The inmate reported several medical problems, including chronic back pain and coronary artery disease.  He received medication for both issues. The prescription for morphine to control his back pain was immediately discontinued following the March 9, 2015 incident.

Although the CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, the suicide report noted:

> A number of chronic risk factors were noted about the inmate over time.  He was noted to feel wrongly accused in his life crime, he despaired at his inability to gain a parole date and felt personally mistreated by the BPH.  He had episodes of depression, withdrawal, and anxiety.  He recalled episodes of sexual abuse as a child and reported nightmares that disrupted his sleep.  As he got older, the length of his incarceration (his first and only sentence) wore on him, he lost hope in exoneration, he lost family connections due to deaths (mother) or conflict (daughter), and he experienced increasing medical difficulties and chronic pain.  Additionally, the inmate appeared to have chronic problems with suicidal ideation during periods of stress, depression, or interpersonal conflict.

The Suicide Report contained seven recommendations for corrective action through a QIP:

> 1) The inmate reported to custody staff during a March 11, 2015 RVR interview that he had secreted 15 morphine pills for a planned suicide by overdose in July 2014.  However, no referral was made to medical or mental health staff;

> 2) Significant delays in emergency response appear indicated by available records.  The time delay appears to have been up to 15 minutes in both entering the inmate's cell and notifying medical staff and ambulance of emergency (e.g., an officer conducting Guard One checks found the inmate unresponsive at

1:33am, the officer notified another officer of the unresponsive inmate at 1:40am, and so entry did not occur until at least 1:48am);

3) SRE documentation did not include the inmate's past reports of SI and past reported SA;

4) SREs and mental health evaluation conducted prior to July 2011 were not available to clinicians as these documents were not scanned into the eUHR;

5) Inmate had a large amount of KOP medications in his ASU intake cell. ASU intake cells are specifically designed to reduce suicide risk by hanging. Access to the means to overdose by KOP medication has not been addressed for intake cells;

6) CCCMS services of long duration were discontinued just prior to a BPH and per the inmate's request for removal. This occurred despite information known to mental health staff that the inmate had periods of significant depression, anxiety, and deterioration of mental health around the time of other BPH decisions; and

7) Per the Nursing Death Review Summary, there were two nursing concerns identified requiring follow-up.

In the **second** case (SQ 5), the inmate was found unresponsive in a "swing" medical bed that was used for alternative housing in the CHSB at approximately 3:15pm on May 25, 2015. He had been placed in alternative housing a few hours earlier at 12:00pm after reporting SI, stating "I want to come off this poison" in reference to methamphetamine which he had allegedly been taking for the past three days. He was diagnosed with "drug-induced psychosis with suicidal ideation," and described as both paranoid and delusional. Contrary to alternative housing regulations, the inmate was placed on Suicide Precaution status requiring observation at 15-minute intervals, as opposed to the required 1:1 continuous observation.

At approximately 3:15pm on May 25, the inmate was observed by nursing staff to be asphyxiating himself with an electrical cord in the room. An emergency was called, and both nursing and custody staff responded to the scene. The room door was opened, and the inmate began to yell, curse and become combative with intervening staff. The inmate was placed in a wheelchair and restrained. He became unresponsive a short time later and was subsequently pronounced dead. Although the death was initially reported as "suicide by asphyxiation," the case was subsequently changed to "undetermined." On November 3, 2015, the medical examiner issued the final cause of death as "suicide." The inmate was at the 3CMS level of care and had a history of suicidal behavior.

Due to the circumstances surrounding the case, as well as the fact the inmate was placed on an unauthorized level of observation in alternative housing, a CDCR reviewer was assigned to the case soon after the death. At the time of this reviewer's report, the Suicide Report had not been issued.

In the **third** case (SQ 6), the inmate was found hanging from the door by a sheet in his administrative segregation cell during the early morning of September 13, 2015. The inmate was at the 3CMS level of care. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

*Summary: This reviewer found that SQ was a problematic institution that exhibited numerous poor practices in the area of suicide prevention, including inadequate privacy and confidentiality during the intake screening process, low compliance rates with Guard One in the administrative segregation unit, a PT not briefly conversing with non-caseload inmates in the administrative segregation unit, clinicians not always completing SREs on inmates expressing SI following an emergency mental health referral; inadequate treatment planning for inmates discharged from suicide observation status; low compliance rates with annual suicide prevention training; and the recent death of a suicidal inmate housed in alternative housing despite the requirement for continuous observation.*

### 12)    California State Prison - Solano (CSP/Solano)

**Inspection**: May 7-8, 2015 (previous suicide prevention audit was on January 9-10, 2014)

**Screening/Assessment**: Intake screenings of several new admissions was observed on May 7. The correct Initial Health Screening CDCR Form 7277 was being used by the nurse. Similar to the previous audit, the process was completed with sufficient privacy and confidentiality in the Nurse's Office, with the door closed and custody staff stationed in the corridor.

Daily PT rounds in one of the administrative segregation units (Building 10) were observed on May 8. The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Forms on caseload inmates at cell-front as required.

**Housing**: With one exception, all of the MHCBs were suicide-resistant. The exception was that the sinks contained faucets with a horizontal slit (known as "anti-squirt slits"). These anti-squirt slits had been used as an anchoring device in a SA by hanging in another MHCB room within the CDCR system.

The two administrative segregation units, Buildings 9 and 10, contained a total of ten retrofitted new intake cells. This reviewer chose not to assess the management of these new intake cells because the facility sustained a riot a few days earlier on May 4 and approximately 70 inmates had been incrementally transferred to Building 10 since that date. As result, all of the new intake cells were quickly filled. Because it would not be reasonable for a facility to have a sufficient number of new intake cells available following a major riot, this area was not audited.

Finally, one of the administrative segregation units (Building 10) was used as alternative housing for inmates identified as suicidal and awaiting placement in a MHCB. As observed by this reviewer on May 8, because many of the cells were not suicide-resistant, suicidal inmates were required to be observed on a continuous basis until transported to a MHCB. This reviewer's

review of alternative housing data found that almost all inmates in alternative housing were subsequently transferred to a MHCB, rather than back to their housing units.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form and forms were located on each inmate's door.

This reviewer's previous audit found problematic practices in the MHCB regarding levels of observation and possessions/privileges afforded to inmates.  Although practices somewhat improved during this audit, problems remained.  For example, the LOP for the MHCB (entitled "Mental Health Crisis Bed Policy") was revised to delete the term "psychological observation" and replace it with "clinical observation."  Clinical observation was not sufficiently defined to guide the clinician as to the type of behavior that warranted such a level of observation.  In addition, the definition of "clinical observation" in the LOP included reference to both 15-minute and 30-minute observation, with either "full issue" or "limited issue" clothing and possessions. This reviewer reviewed several charts of MHCB inmates in which the clinician had ordered limited issue ("approve for socks, T-shirts, and shorts") and 30-minute observation.  Such an order is contradictory, i.e., a clinical order for limited issue suggests that the clinician believes the inmate to still be at risk (for suicide), therefore, the inmate should be on 15-minute, not 30-minute observation.  In other words, any clinical order that includes limited issue possessions should also include at least a 15-minute level of observation unless extraordinary circumstances are clearly documented in the eUHR.  The LOP should be revised accordingly.

In addition, this reviewer observed several IDTT meetings in the CTC on May 7-8, 2015.  One case (SOL 1) was interesting.  The inmate was admitted into the MHCB on April 24, 2015 for SI.  During the IDTT on May 8, he remained conditionally suicidal in that he only voiced SI if he was going to be discharged back to the SQ RC. The inmate insisted on bypassing the RC process and being directly committed into the EOP program.  During a thorough discussion of the case, the IDTT decided to recommend that SQ "fast-track" the inmate's RC process.  Part of the plan was to directly contact the appropriate treatment team at SQ.

Another case was problematic.  The inmate (SOL 2) was admitted into the MHCB on April 30, 2014 for SI and delusional behavior.  He began on Suicide Watch (constant observation), was downgraded to Suicide Precaution (15-minute observation) the next day (May 1), and then downgraded to 30-minute observation on May 3 where he remained until his discharge from the MHCB on May 12.  As noted above, although the inmate was on a 30-minute level of observation, during the course of the next couple of days he was incrementally given a book, toothbrush, and the jumpsuit.  There was no documentation in the eUHR as to why those items could not have been provided to the inmate when he was downgraded to 30-minute observation on May 3.  During the IDTT meeting on May 7, there was little discussion regarding treatment planning to reduce SI except for a clinician stating "we're working on it."  As the meeting was ending and the team dispersing, the CMH (who was attending the IDTT with this reviewer) stopped the team from leaving and asked: "What needs to be done for discharge of this patient from the MHCB?"  Were it not for the presence of the CMH, there would not have been any discussion about discharge planning of an inmate who had been in the MHCB for eight days.

94

The inmate was eventually discharged from the MHCB on May 12, 2014 with the following safety plan:

> He is being discharged from MHCB to EOP LOC on a 5-day extended observation. He needs more structure and more intensive treatment that can be provided by an EOP program. Also needs to improve his coping skills and get a deeper understanding of this disorder so he does not go off his medication and he understands relationship between the medication and symptom relief. Until his transfer from Solano to EOP program, he will be seen weekly by his primary clinician and monthly by the psychiatrist, or as needed by both. He did state that he does not want to go to EOP now and was advised to discuss this with his primary clinician for further evaluation. However, given his history and current status, EOP would be appropriate and helpful to him.

The safety plan was not helpful in target strategies to reduce SI.

In addition, this reviewer was informed by the IDTT that SOL employed a full-time recreation therapist that used the CTC yard for MHCB inmates when ordered by a clinician, with telephone call privileges occasionally authorized. If accurate, these were good practices.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation units found 98 percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of March 1, 2015 through April 30, 2015. A total of seven emergency mental health referrals for suicidal behavior were found. An additional four referrals for SI were incorrectly labeled as urgent. In addition, this reviewer and the SOL SPRFIT Coordinator found an additional 19 emergency mental health referrals for suicidal behavior from the TTA log for the period of February 1 through May 2, 2015. This reviewer's eUHR review of these 30 cases found that mental health clinicians completed the required SREs in only 87 percent or 26 of 30 of the cases. Clinicians' responses to emergency mental health referrals were otherwise timely.

In addition, MHCB inmates were consistently seen daily by clinical staff while on suicide observation status. In addition to problems related to limited issue possessions afforded to inmates on 30-minute observation as cited above, continuing problems with treatment planning were found. For example, in one case (SOL 3), the inmate was admitted to a MHCB on February 27, 2015 after allegedly taking a combination of heroin, methamphetamine, and alcohol in a purported SA, stating that he "didn't want to live due to accumulated trauma and loss." He was discharged from the MHCB on March 9, 2015 at "moderate" chronic risk and "low" acute risk for suicide. The safety plan contained within the discharging SRE stated the following:

> Patient will be placed in the Administrative Segregation Unit due to safety issues he created on his yard. In the Administrative Segregation Unit he will be placed on a 5-day Extended Observation with increased clinician contact as indicated while in ASU awaiting transfer to EOP program. Compliance with medications is

recommended.  Patient is expected to benefit from increased therapeutic contact as well as groups to learn to delay gratification, regulate his temper and mood.

The above safety plan did not contain a specific strategy to alleviate continued and/or future SI.

Finally, it should be noted that SOL clinicians used a separate sheet for each day of five-day follow-up progress notes.  This was a very good practice.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings:**  A review of three months of SPRFIT meeting minutes reflected that a quorum was *not* reached at any of the meetings, although the chief psychiatrist attended two of the sessions.  Meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 95 percent of custody staff and 96 percent of nursing staff were certified in CPR.  In addition, 91 percent of custody staff had completed the annual suicide prevention block training during 2014, but only 79 percent of medical and 42 percent of mental health staff had completed the annual training.  Similar low compliance rates for annual suicide prevention training were found during the previous audit.  Finally, 100 percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  SOL had one inmate suicide during the review period.  In that case (SOL 4), the inmate was found by his cellmate hanging from the upper bunk by a sheet in their GP cell during the late afternoon of September 2, 2014.  The inmate entered the CDCR system in October 2007 to serve a 25-year to life sentence for second-degree murder.  He had 11 RVRs during his confinement, mostly for possession of drugs, with the most recent incident occurring on July 23, 2014 involving possession of drugs.  The inmate had a history of gang involvement in the community, but no known gang affiliation in CDCR.  As reflected in both letter and telephone correspondence, he had good family support from his mother and long-term girlfriend.  The inmate was transferred to SOL on June 14, 2011.

The inmate had a history of mental health treatment in the community for both Attention Deficit Hyperactivity Disorder (ADHD) and depression.  Family history of both mental illness and suicidal behavior involved his mother and aunt.  He inconsistently reported two prior SAs at age 15 and 18.  He also had an extensive history of substance abuse.  The inmate was placed in the MHSDS in December 2013 at the 3CMS level of care.  His most recent diagnoses were PTSD and Polysubstance Dependence.

Within CDCR, the inmate was in and out of the MHSDS.  Upon admission in October 2007, he was enrolled in the 3CMS program after self-reporting AHs and depression, as well as a history of PTSD and ADHD.  He was stabilized on medication and discharged from the MHSDS in January 2008.  He returned to 3CMS level of care several months later in July 2008 after reporting symptoms of depression.  He was again removed from the MHSDS in June 2009.  He requested a return to the MHSDS in November 2013 and was re-enrolled in the 3CMS program

the following month (December 2013) with a diagnosis of both Polysubstance Dependence (Provisional) and Mood Disorder, NOS (Provisional).  His diagnoses were revised in July 2014 to Polysubstance Dependence and PTSD.  He had non-emergent medical complaints that the CDCR reviewer did not believe were related to his subsequent suicide.

As previously stated, the inmate inconsistently reported a prior history of suicidal behavior, including two prior SAs at age 15 and 18.  In an SRE completed on November 22, 2013, the inmate denied any current SI or prior history of suicidal behavior, but was assessed at both "moderate" chronic and acute risk for suicide because of "current mood lability and poly drug use."  Another SRE completed on July 16, 2014 also found the inmate to be both "moderate" chronic and acute risk for suicide.  During this assessment, the inmate acknowledged prior SAs at age 15 and 18, and "endorsed recent passive ideation in the form of thoughts about his 'just not waking up' and 'not really caring' if he dies."  In addition, during a July 23, 2014 session with his primary clinician, the inmate self-reported that he "attempted to overdose with heroin on April 20, 2014.  IP stated he had only gotten sick and then felt 'stupid' afterwards and 'decided that was it, I was done with drugs.'"  The clinician later reviewed his medical records, including the medication administration record (MAR), and concluded that the alleged overdose was not believable because the inmate was compliant with the psychotropic medication.  During a July 29, 2014 session with his primary clinician, the inmate again expressed passive SI by fantasizing "about 'what it would be like not to wake up' 1-2 times since last encounter."

On August 20, 2014, the inmate told his primary clinician "that he had told his girlfriend that he had contemplated suicide over the weekend.  He stated he had chosen not to act on his thoughts because his cellie was in the cell.  He indicated that he had planned to follow through the next day when his cellie was out but he 'forgot.'  IP refused to disclose plan.  Denies current ideation, intent, or plan.  Indicated he was glad that he had not harmed himself in any way.  IP reports it was 'weird' when he told his girlfriend because she expressed anger but also concern which was a surprise to IP.  Despite IP's disclosure about apparent SI, all other reported behaviors appear to be future oriented."  The inmate was last seen by his primary clinician on August 27, 2014.  During that session, he reported feeling both "angry and paranoid" regarding issues occurring on the yard involving both custody staff and other inmates.  These issues related to his continued use of drugs, and "he said these emotions are stronger than any feelings of depression.  He could not rate his depression today."  He denied any current SI.  Because the inmate's level of depression seemed to have decreased, the clinician's plan was "to visit every two weeks for now, may increase intervals in the future.  IP remains appropriate for the CCCMS LOC at the time."

Although the inmate was enrolled in the 3CMS program, he was seen by mental health staff on a frequent basis, i.e., weekly during the last two months of his life.  Although not explicitly justified in documentation, the frequency of intervention was thought to be based upon several factors, including the recent endorsement to, and imminent transfer to, a Level IV prison due to high custody points (the result of numerous RVRs); consistent reporting of depressive symptoms; inconsistent compliance with psychotropic medication; and continuing expressions of passive SI.

The CDCR reviewer in this case offered several precipitating factors to the suicide, including his imminent transfer to a Level IV prison, continued use of drugs despite a promise to abstain, poor

relationship with both custody staff and other inmates, and long prison sentence.  He also recently lost visiting privileges because of his continued use of drugs.  Several suicide notes were found in his cell and reflected regret about his life and that "I cannot continue to live my life like a caged animal."  The reviewer also noted the inmate's "expressions of passive suicidal ideation on a few occasions which suggest he considered dying as a way to solve his problems."

The Suicide Report noted numerous deficiencies in mental health care, and contained two recommendations for corrective action through a QIP:

> 1) The inmate reported moderate to severe depressive symptoms, a recent SA by heroin overdose, and then an aborted plan to commit suicide although details were not revealed. The clinician did not complete a new SRE in response to these indications of preparation and planning for suicide, i.e. signs of increased acute risk of suicide;

> 2) Based on his clinical impression, it appears as though consideration of a change in the level of care to an EOP should have occurred.  His treatment plan called for bi-weekly clinical contacts in order to monitor his suicide risk. Prior to his death, he was being seen weekly.  This is a level of service that suggested EOP would have been appropriate.  He had been assessed as a moderate chronic and moderate acute suicide risk and in past months had reported passive SI and moderate to severe depression.  Although many protective factors and inconsistencies in his reporting were documented, there was no discussion of consideration of referral to a higher level of care and the rationale for retaining him in CCCMS was not clearly explicated.

In addition to the deficiencies noted in the Suicide Report, it should also be noted that, although the primary clinician saw the inmate on a weekly basis leading up to his suicide, the only treatment offered was documented as relapse prevention (although the inmate continued to use drugs up until his death) and PTSD (although progress notes did not specify any particular treatment provided).  Treatment planning did not include any specific strategies to reduce the inmate's persistent SI.  Finally, although the CDCR reviewer questioned why the inmate had not been elevated to EOP, there was not a similar inquiry regarding why consideration was not given to MHCB placement based upon his continued moderate acute risk for suicide.  A reasonably articulated treatment plan to reduce the risk for suicide might have been developed had the inmate received MHCB placement.

### 13)    California Institution for Women (CIW)

**Inspection**:  May 19-20, 2015 (previous suicide prevention audit on May 20-21, 2014)

**Screening/Assessment**:  Consistent with the previous audit, this reviewer found adequate privacy and confidentiality provided during the intake screening process on May 19.  The nurse was observed to be utilizing the correct Initial Health Screening CDCR form 7277 and asking all required questions.

In addition, this reviewer observed daily rounds by two PTs assigned to the administrative segregation unit and PSU on May 20.  In the administrative segregation unit, the PT was

observed to be adequately conducting rounds and completing the Psych Tech Daily Rounds form on each caseload inmate at cell-front as required.  In the PSU, which contained only seven inmates, the rounds were very inadequate, with the PT simply asking the following three questions to each inmate: "Did you take your medications this morning?  Did you have breakfast?  Are you going to group?"

**Housing**:  There continued to be ten rooms within the CTC that were designated as MHCBs.  As previously observed in May 2014, although the rooms did not contain any obvious protrusions which could be used in a SA by hanging, each MHCB and other CTC rooms (some of which were used for alternative housing) contained a stainless steel sink that had sharp edges that could be used as an anchoring device in a SA by hanging.  In other CTCs previously assessed by this reviewer, two stainless steel triangles were attached to the wall and both sides of the sink to eliminate the sharp edges.  Such a retrofit was recommended to CIW officials by this reviewer in May 2014.

The institution also used four "swing" medical beds in the CTC as alternative housing cells for inmates identified as suicidal and awaiting MHCB placement.  These rooms also contained the same potentially dangerous sinks as detailed above and a handicap railing that was not suicide-resistant.  Although these alternative housing cells were unsafe, suicidal inmates were required to be observed on a continuous basis until transported to a MHCB.  These alternative housing cells did not contain any beds.

This reviewer previously observed that most inmates on Suicide Precaution were not issued mattresses.  Subsequent review of several eUHRs of these inmates did not find any clinical justification for the removal of mattresses.  Such practices were contrary to the Program Guide, and very problematic.  During the most recent visit, although this reviewer observed that all MHCB inmates on May 19-20, 2015 had been issued mattresses, a review of several recent eUHRs found that a few inmates were not issued mattresses and there was no clinical justification for their removal.  In sum, practices in this area had significantly improved, but had *not* been completely corrected.

Finally, the administrative segregation unit contained eight retrofitted cells for inmates on new intake status.  Due to a low census during the site inspection, this reviewer observed only one of the new intake cells being used.

**Observation**:  Both Suicide Precaution and Suicide Watch were regularly used in the CTC for inmates identified as being suicidal.  A previous problem of suicidal inmates being placed on 30-minute observation had been corrected.  During the site inspection, this reviewer observed that all MHCB inmates were on Suicide Precaution and required to be observed at 15-minute intervals.  In addition, all observation sheets were found to be up-to-date and on each inmate's door, again correcting a previous deficiency of nursing staff keeping all forms on the clipboard in the Nurse's Station.

Further, despite the fact that the facility employed a full-time recreation therapist in the CTC, MHCB inmates rarely were allowed yard privileges.  In fact, the data provided for review showed that only two inmates had received yard privileges in the past month.  When this

reviewer raised the issue during an IDTT meeting, team members could not provide a rational explanation as to why yard privileges were routinely denied to MHCB inmates.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found only 87-percent compliance with required checks that did not exceed 35-minute intervals. Guard One data in the PSU, which contained only seven inmates, found 98-percent compliance with required checks. The combined compliance rate was 93 percent.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period October 1, 2014 through March 31, 2015. A total of only nine emergency mental health referrals for suicidal behavior were found. In contrast, this reviewer found an additional 67 emergency mental health referrals for suicidal behavior from the TTA log *for one month* or over 400 for the six-month period of October 2014 through March 2015. This staggering disparity between the MHTS and TTA data clearly indicated that CIW staff were not completing the required Mental Health Referral Chrono form (CDCR 128-MH5). More importantly, this reviewer's eUHR review of 38 emergency mental health referrals for SI found that mental health clinicians completed the required SREs in only 63 percent or 24 of 38 of the cases. *This compliance rate was the lowest found by this reviewer at any CDCR facility and very concerning given the facility's high rate of suicide in the past few years.* Of note, during this reviewer's May 2014 audit, the compliance rate for required SREs following an emergency mental health referral for SI was only 76 percent.

In addition, it appeared that five-day follow-ups were ordered in lieu of required SREs in many cases. For example, in one case (CIW 1), an emergency mental health referral was initiated by an officer on March 22, 2015 after a 3CMS inmate threatened suicide following an argument with a housing unit sergeant. The inmate was escorted to the TTA and told a nurse that "I said I don't want to be here, I want to hurt myself, I want to talk to my psych doctor." The nurse noted that the inmate appeared angry and was crying. A clinician was called and arrived at the TTA a short time later. Less than 15 minutes later, the inmate was escorted back to her housing unit and the nurse noted in a progress note that a five-day follow-up was ordered by the clinician. A review of the eUHR did *not* find either a progress note or SRE completed by the clinician, although the required five-day follow-up notes were in the chart.

In another case (CIW 2), an inmate with a significant history of suicidal behavior was referred to the TTA on May 13, 2015 after custody staff observed her to be "tearfully sobbing in the rec. yard." She appeared depressed and informed the nurse that "I'm just a little sad... It was my birthday and nobody gave a s---t." The inmate denied any SI. According to the nursing notes, the inmate was "evaluated by Dr. _____ via telephone." The note also indicated that the clinician was notified that the inmate's "suicide risk evaluation states chronic risk high and acute risk high," an apparent reference to an SRE that had been completed two months earlier in March 2015. The clinician did *not* complete an SRE, and their subsequent progress note dated May 13, 2015, stated the following: "1) Offered MHCB, IP refused, no indication for involuntary admission; 2) Offered PRN (as needed), inmate refused, states she felt better; 3) 5-day step down; 4) No psy. Meds." A review of the eUHR indicated that the inmate had multiple MHCB admissions for SI and self-injurious behavior, the most recent of which occurred in March 2015. The inmate had also been hospitalized in the PIP in November 2013. Of note, the

inmate was subsequently admitted to a MHCB less than two weeks later on May 24, 2015 for SI with a plan to cut herself with a razor.

This reviewer also found that several inmates referred to alternative housing for SI did not receive an SRE when discharged back to their housing units.

Finally, continuing problems with treatment planning were found.  One particular clinician was noted to develop adequate treatment plans.  For example, in one case (CIW 3), the following plan was offered:

- 5-day follow-up with EOP/SCU clinician;
- 1:1 with case manager every 30 days or more often if needed;
- Inmate is aware of her stress triggers as related to her relationship with her bunkies and stated that she is willing to work on these issues EOP/SCU PC;
- Substance abuse treatment if possible;
- Maintain contact with elder parents to buffer chronic moderate risk for suicide;
- Individual treatment on relationship issues both personal and with custody due to acute risk could elevate quickly, depending on her relationships with others. If she perceives mistreatment from custody she may have reoccurrence of hostile behavior;
- Enrollment in social skills/dialectical behavioral therapy (DBT) if offered;
- Pre-parole planning with social worker

This reasonable treatment plan was in contrast to the vast majority of treatment plans that simply recited Program Guide requirements and/or were otherwise vague in offering specific strategies to reduce future SI.  For example, in one case (CIW 4), the inmate had been housed in the MHCB for 14 days for self-injurious behavior.  It was her third MHCB admission within the past six months.  A *Keyhea* order had been initiated due to her continuous self-injurious behavior. The safety plan section of the discharging SRE, which contained more of a mental status summary than a treatment plan, stated the following:

> I/P was alert and oriented in all spheres.  Her mood was good and her affect was mood congruent.  Eye contact was good.  I/P denied current suicidal ideation, SIB, and homicidal intent.  Thought process was linear and goal oriented.  I/P was discharged today will continue to be housed in the MHCB pending transport to CCWF.  Recommended future treatment goals are the focus on addressing emotional social and behavioral issues connected to MHCB admission by working on increasing I/P's adaptive skills and to challenge irrational thinking and improve mood regulation.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes found that psychiatric staff (either the chief psychiatrist or senior psychiatrist) failed to regularly attend two

of the three monthly meetings.  Also of note, several standing agenda items were included on the monthly minutes, including one pertaining to the TTA logs:  "Inmate-patients with potentially suicidal or self-injurious behaviors will continue to be tracked for continuity of care by daily review of the TTA/OHU Log provided by the TTA/OHU nursing staff.  These logs are reviewed by area supervisors on a daily basis for any self-injurious/suicidal patients that warrant additional f/u."  Despite the fact that this problem item was listed on the meeting minutes for at least the three consecutive months of February through April 2015, as noted above, this reviewer found an extremely low compliance rate (63 percent) for SRE completion following an emergency referral for SI.

**Training**:  According to training records, 88 percent of custody staff and 100 percent of nursing staff were certified in CPR.  In addition, only 87 percent of custody, 73 percent of medical, and 46 percent of mental health staff had completed  annual suicide prevention block training during 2014.  Although this compliance rate was very low, it was an improvement from the previous audit when none of the medical and mental health staff had received annual suicide prevention block training.  Finally, 88 percent of required mental health clinicians had received the seven-hour SRE training, with 94 percent having completed the mentoring program.

**Recent Suicides**:  CIW had two inmate suicides during the review period.  In the **first** case (CIW 5), the inmate was found by her cellmate hanging from the electrical conduit by a shoelace in her GP cell during the late morning of February 17, 2015.  The inmate entered the CDCR system in April 2005 to serve a 15-year to life sentence for first-degree murder (of her father-in-law).  She did not have any RVRs during her almost ten-year confinement.  The inmate had limited family support from her husband and son.  She was of Chinese descent, had severe language barriers, and could not read or write either Chinese or English.  Due to these barriers, she had limited interaction with both inmates and staff.

According to available records, the inmate did not have any mental health treatment in the community and had only been in the United States for a year prior to the instant offense.  Upon entry into CDCR, she was admitted into the MHSDS at the 3CMS level of care with an initial diagnosis of Major Depressive Disorder, recurrent with psychotic features and alcohol dependence.  She was prescribed psychotropic medication.  Other than a SA immediately after commission of the instant offense, the inmate did not have any prior history of suicidal behavior in either the community or CDCR.

The inmate remained in the MHSDS until April 2012 when she was discharged due to a lack of mental health symptoms and refusal to continue psychotropic medication.  Her diagnosis was changed to "Alcohol Dependence in sustained, full remission."

The 73-year-old inmate had significant medical problems that began in 2009, including diabetes, diabetic peripheral neuropathy causing continuous pain in the toes of her feet, hypertension, and chronic and acute constipation (thought to be attributable to morphine use due to chronic pain).  She had permanent lifting, walking, and standing restrictions during the last few months of her life.  She wore a knee brace and a mobility vest, and used a walker.  In 2011, the inmate had surgery to remove a tissue mass from her right thumb.  As a result of a fall, she fractured her left kneecap in March 2014 and had an arthroscopy on her left knee in December 2014.  In January

2015, the inmate complained of "recurrent chest tightness 4 to 5 months." As described by the Primary Care Physician (PCP), the inmate had "short of breath, can't talk, palpitations with sweating lasting 15 minutes, 3-4 times daily with headache...." She was maintained on numerous pain medications. On February 9, 2015, approximately one week prior to her death, the inmate was hospitalized for two days with severe abdominal pain. On February 12, 2015, an emergency was called when the inmate was found lying on the floor of her cell "eyes closed, awake, responds to name when called, followed directions. Started crying and moaning, but no tears.... Patient complains of pain in both feet. She stated that she had vomited the pain medications she had received at the morning pill line." Her diagnosis was "severe bilateral toe pain, likely secondary to diabetic neuropathy." During *each* of the following days (February 13, 14, 15, and 16), the inmate appeared in the TTA for complaints of pain and requesting stronger pain medication. She was "also exhibiting symptoms suggesting she might be having a seizure." She was examined and subsequently released back to her housing unit on each occasion. On February 13, her PCP added an additional medication (Neurontin) for neuropathic pain. (The CDCR reviewer in this case suggested in the Suicide Report that research has shown that patients taking this medication may develop depression and/or suicidal thoughts.) On February 15, due to repeated trips to the TTA with the same physical complaints, nursing staff began to believe that "something else was going on" and initiated a mental health referral. She was not seen by a mental health clinician prior to her death two days later on February 17.

Although the inmate did not leave a suicide note, the CDCR reviewer noted several identifiable suicide risk factors that "included a life sentence, a first prison term, a history of alcohol dependence, over 35-years-old, a medical condition causing chronic pain, a history of major depression, and a history of violence. More recent factors including social isolation due to cultural and language barriers and likely discouragement over her worsening medical conditions." A cellmate interviewed following the suicide suggested that the inmate had been crying periodically during the last few weeks of her life and suggested that she had simply given up any hope that her chronic pain would lessen. The Suicide Report contained three recommendations for corrective action through a QIP:

> 1) Following a mental health evaluation on August 2, 2013, the clinician indicated in documentation that the inmate's level of care was CCCMS and recommended a Depressive Disorder in partial remission. The inmate was not included in the MHSDS at the time. It was not clear from the documentation whether the evaluating clinician reviewed the inmate's records to determine current level of care and history of mental health treatment;

> 2) Per the Nursing Death Review Summary, there were two medical concerns identified requiring follow-up. (Both of these issues were unrelated to the suicide and involved a more than a two-hour delay in transport to the hospital on September 29, 2014, and a delay in refilling a prescription on November 17, 2014); and

> 3) Cultural manifestations of mental illness may have played a significant role in this case, specifically in the idioms different cultures use to express distress. Additional statewide training on understanding cultural idioms of distress related to suicidality may be beneficial.

In addition, there were two other issues that were *not* addressed in the suicide. *First*, there was no discussion in the Suicide Report as to any inquiry regarding the status of the February 15 mental health referral, i.e., whether the referral was marked as a routine, urgent, or emergent, and whether the inmate would have been seen earlier had she still been in the MHSDS. *Second*, previous CDCR reviews of other inmate suicides that involved the issue of chronic pain management invariably contained a recommendation and corrective action for collaboration between medical and mental health staff in best treating the inmate. It was unclear why such a recommendation was not offered in this case.

In the **second** case (CIW 6), the inmate was found by other inmates hanging from the light fixture by a sheet in her GP cell during the early afternoon of March 6, 2015. (The inmate's cellmate had moved out of the double cell a few days earlier.) The inmate entered the CDCR system in November 2008 to serve an eight-year sentence for petty theft, forgery, burglary and other charges. She had 16 RVRs during her confinement, the last of which occurred on January 15, 2015 when she refused a urinalysis. The inmate had limited family support, and did not have any documented telephone calls with family members. Her mother stated following the suicide that the inmate had routinely called home twice a month (perhaps from a cell phone). She was transferred to CIW in April 2009.

The inmate had a significant history of mental health treatment in the community that was attributable to a dysfunctional family environment that included both physical and sexual abuse, as well as substance abuse. Her first psychiatric hospitalization occurred when she was only 13-years old. As an adult, she was married on two occasions and gave birth to five children. One of the children committed suicide in 2011. It was also noteworthy that sometime during 2015, her second husband filed for divorce and moved out of state with their remaining children.

Upon her entry into CDCR, in October 2008, the inmate was placed in the MHSDS at the 3CMS level of care with a diagnosis of Amphetamine Dependence, Heroin Dependence, Substance Abuse, and a R/O diagnosis of PTSD. Her diagnosis was later changed to Depressive Disorder NOS, and she remained a participant in the 3CMS program until August 2012 when she was removed from the MHSDS. Five months later, in January 2013, she reentered the MHSDS at the 3CMS level of care with a diagnosis of Bipolar Disorder, Manic, Moderate. She was discharged from the MHSDS a month later in November 2013 with a diagnosis of Bipolar Disorder, Manic, in full remission. A few months later in April 2013, the inmate was returned to the 3CMS program with a diagnosis of Bipolar Disorder. In January 2014, she was again removed from the MHSDS, yet returned again several months later in July 2014 at the 3CMS level of care with a diagnosis of Bipolar Disorder, Depressed, Moderate.

On July 29, 2014, the inmate was seen in the TTA when she was found unresponsive in her cell. She was revived and sent to an outside hospital. Upon her return to CIW, she was admitted into the MHCB for only two days despite a determination that the incident was a serious SA in which she had overdosed on heroin, methamphetamine, and the psychotropic medication that she had been hoarding. In August 2014, the inmate was placed on CIW's high-risk list. On January 7, 2014, she was removed from the high-risk list without any clinical rationale provided in the eUHR.

In October 2014, the inmate was downgraded from EOP to 3CMS level of care. Within a month, she was admitted to the MHCB for SI and engaging in self-injurious behavior (cutting on her upper arms). Despite numerous acute risk factors, including SI, current recent anxiety or panic, disturbance of mood lability and hopelessness/helplessness, she was assessed as being at "low" acute risk for suicide and discharged from the MHCB four days later. Her diagnosis was revised to "Bipolar Disorder, most recent episode Depressed, Moderate, Polysubstance Dependence."

The inmate also had a significant history of suicidal behavior. Available records indicated that she had at least five previous incidents of SI and/or SAs in the community, for which she was hospitalized on four occasions. The SAs included an overdose in 1991, a SA by shooting herself in 1994, and suicide attempt by hanging in 2002. In addition, as noted above, one of her sons committed suicide by hanging in 2011 when he was 16-years old. During her CDCR confinement, she had multiple MHCB admissions. As noted above, the inmate overdosed on heroin, methamphetamine, and her psychotropic medication on July 29, 2014. On both October 16 and October 20, 2014, she self-reported engaging in self-injurious behavior. It should also be noted that the CDCR reviewer in this case found numerous discrepancies in the SREs completed for this inmate during her confinement, including inconsistent reporting of chronic suicide risk ranging from "high" in October 2014 to "moderate" in January 2015. The inmate's last SRE was completed on January 21, 2015 and included the following safety plan: "Interventions today include discussions on dealing with depression, Protective factors to keep I/P safe: hope for her future, familial and other support social support, Interventions for the future will include refer to psychiatrist, therapy on Borderline PD issues, as in Dialectical Behavior Therapy."

The inmate was last seen by a mental health clinician on March 5, 2015, the day before her death. According to the progress note, the inmate stated that "I feel exhausted, I've hardly slept since I've been back from court. Plus, I've been more depressed." She denied any current SI. The plan was to "continue with current treatment plan working on issues with depression and mood stability. Follow-up is quarterly."

The inmate had several medical problems, including grand mal seizures, lower back pain, severe hearing loss, and a recent diagnosis of Hepatitis C on February 27, 2015.

The CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, and no suicide note was found. The reviewer cited an "abundance" of chronic risk factors, including the "history of suicide attempts, self-injurious behavior, severe mood disorder, chronic medical issues, chronic drug use that continued into confinement, family history of suicide, family history of serious mental illness, feelings of hopelessness, loss of social and family support, poor emotional and behavioral control, impulsivity, her ethnicity and age, and numerous disciplinary problems."

The Suicide Report noted numerous deficiencies of mental health care, and contained nine recommendations for corrective action through a QIP:

1) The inmate was discharged from the MHCB after only two days following a very serious SA. Given the planning, intensity, and severity of the SA, a longer admission for stabilization and treatment would have been warranted;

2) CIW has a well-developed HRL (high risk list) LOP that was not appropriately followed. The inmate was discharged from the HRL without any apparent discussion or oversight from the supervisor and without properly documenting the reasons for the discharge;

3) A number of concerns were identified with the documentation of the SREs, including multiple clinicians failing to identify warning signs and risk factors. Most significantly, the clinician who completed the SRE dated October 28, 2014 omitted a number of critical risk factors and indicated the inmate was at low acute risk;

4) A number of concerns were identified with the inmate's primary clinician in terms of demonstrating questionable clinical judgment: not referring for a higher level of care, failing to consult, failing to document treatment of critical clinical issues including substance abuse and disciplinary problems, and mental health staff issuing medical lay-ins. Additional concerns arose about the integrated care provided by the IDTT and why these concerns were not addressed by other team members;

5) A number of concerns were identified with clinical documentation, including using old/outdated forms, apparent cutting and pasting of notes, failing to provide a signature on clinical documentation, and date inconsistencies within medical records;

6) The inmate incurred a very high number of RVRs and disciplinary violations, yet was not referred for in-patient care due to narrowly-defined referral criteria;

7) The inmate was able to amass a significant number of Geodon and Zyprexa tablets, which she used in a SA (in conjunction with illicit drugs) on July 29, 2014;

8) Despite the Warden's memo dated August 8, 2014 entitled "Covering of Wickets," the inmate had covered up the window to her cell, rendering it impossible for others to see her from the tier; and

9) Drug and items of contraband were identified in the suicide as a problem.

_Summary: As perhaps best symbolized by the most recent inmate suicide on March 6, 2015, this reviewer found that CIW continued to be a problematic institution that exhibited numerous poor practices in the area of suicide prevention, including extremely low completion of required SREs based upon emergency mental health referrals for SI, several cases in which inmates were discharged from alternative housing without completion of SREs, inadequate treatment planning,_

*low compliance rates for annual suicide prevention training, and multiple inmate suicides during the calendar year.*

### 14)    Folsom State Prison (FSP) and Folsom Women's Facility (FWF)

**Inspection**: May 21-22, 2015 (previous suicide prevention audit was on December 3-4, 2013)

**Screening/Assessment**:  For most of the audit period, FSP used an outdated Initial Health Screening CDCR Form 7277.  This version (May 2014) did *not* have a question regarding whether the inmate was at current risk for suicide.  Approximately two weeks prior to this reviewer's audit, the most recent version (October 2014) of the Initial Health Screening CDCR Form 7277 began to be used.  This reviewer's observation of the intake screening process was problematic.  Privacy was limited because the door to the Nurse's Office remained open.  In addition, the nurse was observed to *not* be asking all of the intake screening questions.

At the FWF, there were no new admissions for this reviewer to observe during the site visit. A nurse explained the intake screening process and stated that although the door to the Nurse's Office remained open, a partition was placed across the doorway.  It should be noted that this doorway emptied into the main corridor of the facility, a very high traffic area.  During the site visit, an inmate was brought to the Nurse's Office for examination.  This reviewer remained in the hallway, the door to the Nurse's Office remained open, and a partition was placed across the doorway.  Privacy and confidentiality was still compromised.

Daily PT rounds in the administrative segregation unit were observed on May 22.  The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Forms on all caseload inmates at cell-front as required.

**Housing**:  Both FSP and FWF did not have any MHCBs and suicidal inmates were placed in alternative housing pending transfer to a MHCB.  At FSP, alternative housing cells were designated in the new intake cells of the administrative segregation unit unless they were previously occupied.  Regardless, all inmates housed in the alternative housing cells were required to be observed on a continuous basis.  At FWF, alternative housing cells were designated in the holding cells in the front of the facility.  All inmates housed in these alternative housing cells were required to be observed on a continuous basis.

Within the administrative segregation unit, the nine new intake cells (B-Side, cells 1-9) were suicide-resistant.  During the audit, despite the fact that the administrative segregation unit had a very low census on May 22 (i.e., only 52 of the 132 cells were filled), this reviewer found that not all new intake inmates were housed in suicide-resistant cells, and not all of the suicide-resistant cells housed newly admitted inmates.  For example, on May 22, two of the nine new intake cells were empty, two contained new intake inmates, and five contained inmates that were beyond their 72-hour new intake confinement status.  In addition, three new intake inmates were in dangerous, non-suicide-resistant cells.

**Observation**:  There were no inmates on suicide observation status in alternative housing cells during the two-day audit period at either facility.

A review of Guard One data for a recent 24-hour period in FSP's administrative segregation unit found 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period October 1, 2014 through May 20, 2015.  A total of four emergency mental health referrals for suicidal behavior were found.  In addition, this reviewer found an additional 32 emergency mental health referrals for suicidal behavior from the TTA log for the same time period.  This reviewer's eUHR review of these 36 cases found that mental health clinicians completed the required SREs in only 89 percent or 32 of 36 of the cases.  Clinicians' responses to emergency mental health referrals were otherwise timely.

In addition to SREs not always being completed in response to a mental health referral for suicidal behavior, this reviewer found several cases in which inmates discharged from alternative housing did *not* have an SRE completed.  For example, in one case (FWF 1), the inmate was placed in alternative housing in one of FWF's holding cells during the evening of April 12, 2015 after expressing SI.  (Of note, the mental health referral from the correctional officer was incorrectly marked "urgent.")  According to a progress note by the on-call psychiatrist, the inmate's level of care had recently been increased from 3CMS to EOP.  She was also complaining of depression and AH.  The following day, April 13, the inmate was seen by another clinician and stated that "there was a misunderstanding" and she was not suicidal.  She complained of sleeping problems due to a recent increase in her psychotropic medication, but reported that her AH had decreased.  She was discharged from Suicide Precaution and placed on a five-day follow-up.  There *was no* SRE completed and, therefore, a safety plan was not completed.

Finally, treatment planning and/or safety planning to reduce SI of inmates released from alternative housing remained problematic.  For example, in one case (FWF 2), the inmate was placed in alternative housing in one of FWF's holding cells for several hours during the morning of April 13, 2015 after reporting SI and other health concerns.  It was later determined that she was intoxicated.  The inmate was seen by a mental health clinician a few hours later and reported feeling nauseous and depressed, but no longer suicidal.  She admitted to often feeling suicidal when consuming alcohol.  The inmate had a history of self-injurious behavior (i.e., burning herself with cigarettes and cutting).  She was assessed as being at "moderate" chronic risk for suicide and "low" acute risk for suicide.  The inmate was released from suicide observation status and the SRE contained the following safety plan:

> 1)  Due to improved MSE, discontinue current MHCB watch (1:1), but continue hourly custody welfare checks, 2) Continue psychotropic medication by latest order/consulted with psychiatry to determine the delirious effects of alcohol with current psy meds, 3) Consulted with nursing to report symptoms related to alcohol and possible side-effects of psychotropic medication interactions, 4) Initiate 5-day

MHCB follow-up to determine need for EOP or higher level of care, 5) Address relapse issues related to need for drug/alcohol treatment.

Although this safety plan reflected the clinician's concern about the interaction of psychotropic medication and alcohol, as well as possible substance abuse treatment, there was an absence of concern with regard to alleviating the inmate's future SI and self-injurious behaviors.

**Intervention**:  With one exception, all housing units toured by this reviewer contained an emergency response bag that included a micro- shield, Ambu bag, and cut-down tool.  The exception was FWF's holding cell area which did not contain either a cut-down tool or Ambu bag, although the Ambu bag and other medical equipment were in close proximity within the Nurse's Office.  This reviewer was informed that a work order would be completed and an Ambu bag and cut-down tool would be placed in a secure box in the holding cell area.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes reflected good attendance from required members.  Of note, the acting chief psychiatrist was the current SPRFIT coordinator.  Meeting minutes reflected that meetings only lasted approximately 15 minutes.  Of interest, monthly agenda items included review of timely MHCB referrals and discharge planning.  One of the cases reviewed during the May 5, 2015 meeting was (FWF 1) noted above.  The SPRFIT noted that the inmate was placed on suicide observation in alternative housing on April 12 and discharged the following day.  Although the SPRFIT noted that the "nursing observation" sheets were not logged into the eUHR, the custody observation, five-day follow-ups, and discharge planning summary forms were all completed as required.  *The SPRFIT missed a critically important requirement, i.e., failure to complete the SRE.*

**Training**:  According to training records, 100 percent of both custody and nursing staff were certified in CPR.  Approximately 97 percent of custody, 86 percent of medical, and 94 percent of mental health personnel received the annual suicide prevention block training during 2014.  Finally, 100 percent of mental health clinicians received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  FSP had one inmate suicide during the review period.  In that case (FSP 1), the inmate was found hanging in his GP cell during the afternoon of September 29, 2015.  The inmate was not a participant in the MHSDS.  At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

### 15)    California State Prison/Corcoran (CSP/Cor)

**Inspection**:  June 9-10, 2015 (previous suicide prevention audit was February 18-19, 2014)

**Screening/Assessment**:  Intake screening of several new admissions was observed on June 10.  The correct Initial Health Screening CDCR Form 7277 was being used by the nurse.  The process occurred with the door to the Nurse's Office remaining open, and the inmate placed in a chair in the hallway alongside an officer.  Privacy and confidential were compromised.

Daily PT rounds in the two administrative segregation units housing MHSDS inmates were observed on June 9.  The rounds were unremarkable and the PTs correctly completed the Psych Tech Daily Rounds Forms on all caseload inmates at cell-front as required.

**Housing**:  With one exception, all 24 MHCBs were suicide-resistant and furnished with suicide-resistant beds.  The exception was Room 11 in the Acute Care Hospital (ACH) that was identified as a MHCB. The room contained a metal bunk-bed that was not suicide-resistant.  The inmate in this room (COR 1) had been on Suicide Precaution status since May 8, 2015, a period of 32 days. The inmate, who also had co-occurring medical problems, was awaiting DSH transfer.  Given the fact that this room was not suicide-resistant, the inmate should have either been moved to a suicide-resistant MHCB or placed on 1:1 continuous observation.  (This reviewer was subsequently informed by the CMH that a work order would be completed for a suicide-resistant bed.)

ASU 1, the stand-alone administrative segregation unit, contained five new intake cells that had been retrofitted to be suicide-resistant.  The unit had been identified as a new STRH unit, but had not been activated at the time of the site visit.  Administrative segregation unit 3A03, which also served as an EOP Hub, had six identified suicide-resistant new intake cells, although at least one of the cells had large gauge ventilation grates, thus rendering it non-suicide-resistant.  Administrative segregation unit 3A04, which mostly housed 3CMS inmates, had ten identified suicide-resistant new intake cells, although at least one of the cells had large gauge ventilation grates, thus rendering it non-suicide-resistant.  This reviewer had previously identified these administrative segregation cells as problematic during the February 2014 audit.

Unlike the previous audit, alternative housing was currently being used on a regular basis at CSP/Cor, with four OHU cells primarily designated for temporary placement of suicidal inmates awaiting a MHCB.  In addition, dry cells in the SHU visiting area were also used.  Other alternative housing cells, including the TTA cells, were identified, but said to be rarely used for that purpose.  Because all of these alternative housing cells were not suicide-resistant, suicidal inmates were required to be observed on a continuous basis until transported to a MHCB.  This reviewer inspected the dry cells in the SHU visiting area and, although informed that inmates were escorted to bathroom facilities upon request, given the fact that alternative housing data from CSP/Cor indicated that the length of stay exceeded 24 hours, the use of dry cells for alternative housing for more than a few hours was problematic.

**Observation**:  Both Suicide Precaution and Suicide Watch were regularly used in the ACH for inmates identified as being suicidal.  During June 9-10, this reviewer observed that all MHCB inmates were on Suicide Precaution status and required to be observed at staggered 15-minute intervals.  In addition, all observation sheets were found to be up-to-date and on each inmate's door.

Similar to a deficiency previously identified during the February 2014 audit, this reviewer again found problems with inmates not being clinically considered for routine privileges and/or possessions during their MHCB stay.  For example, as detailed below, this reviewer spent considerable time watching multiple IDTT meetings on June 9-10, and spoke to several MHCB clinicians and custody staff.  Overall, there was confusion as to whether consideration of

privileges and/or possessions was a clinical or custody responsibility, despite the fact that the Program Guide adequately addressed the issue and required clinicians to "make modifications based on clinical judgment, with documentation of justification.  The IDTT shall review all decisions regarding furniture, clothing, and other materials."

This reviewer found it to be a common practice for almost all MHCB inmates to be clothed in safety smocks during their entire placement, with "full issue" rarely being used.  In addition, many inmates were clothed in smocks *and* other "partial issue" clothing such as socks and t-shirts.  When this reviewer asked why an inmate would be clothed in a smock to prevent a SA by hanging, while at the same time be issued a t-shirt which could be used in a SA by hanging, a clinician responded "It's custody's choice."  Of course, such a response was incorrect, it is the clinician's responsibility to make such a determination, although they should always invite input from other IDTT members, including custody staff.   In another case, when this reviewer asked an inmate's primary clinician why the inmate was still clothed in a safety smock after 21 days in a MHCB, their response was "because he put feces in a milk carton."

In addition, this reviewer was informed that MHCB inmates were not afforded telephone privileges "because there was no telephone access" in the MHCB area, although this reviewer subsequently determined that medical inmates in the ACH had telephone access.  Finally, despite the fact that there was a full-time recreation therapist assigned to the ACH, yard privileges for MHCB inmates were rarely ordered.  When this reviewer toured the outside yard area, it was observed that due to a low roof-line, there could be security concerns by allowing multiple MHCB inmates in the yard without proper supervision.  This reviewer was informed by the CMH that she had previously requested a large therapeutic module be installed in the yard as an alternative to major renovation of the area by raising the roof-line.  To date, there had not been a response to this 2014 request.

As indicated above, several IDTT meetings were observed on June 9-10.  Consistent with the previous site visit, most of them were very problematic.  In addition to clinicians being unfamiliar with their responsibilities to determine both possessions and privileges afforded to MHCB inmates, there was little discussion during the IDTT meetings regarding both assessment of suicide risk and treatment planning.  For example, in one case (COR 2), the inmate had been housed in a MHCB for six days due to SI.  During the meeting, there was no inquiry by the team regarding the inmate's current ideation until he asked for writing material.  In another case (COR 3), a clinician asked leading questions such as "you aren't suicidal are you?" in anticipation of discharging the inmate that day.  In another case (COR 4), the team appeared argumentative with the inmate and inquired about how he had gotten "pruno," with no discussion of treatment planning.  When the inmate became angry at the perceived interrogation, a clinician turned to this reviewer and stated "he has poor frustration tolerance."  Finally, in another case (COR 5), the team only inquired of the inmate's current risk for suicide after this reviewer asked why he was clothed in both a safety smock and t-shirt.

Finally, a review of Guard One data for a recent 24-hour period (June 8) in six administrative segregation units and SHUs found the following low compliance rates:

     ASU 3A03:   79 percent

ASU 3A04:    80 percent
ASU 1:       66 percent
LTRH 4A1L:   81 percent
SHU 4B3L:    89 percent
SHU 4A2L:    80 percent

The overall compliance rate for these six housing units was only 79 percent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period December 1, 2014 through May 31, 2015.  A total of more than 200 emergency mental health referrals were reported.  A comparable number of emergency referrals from the TTA log were found for the same time period.  This reviewer's eUHR review of 22 cases of emergency mental health referrals for suicidal behavior found that mental health clinicians completed the required SREs in 91 percent or 20 of 22 of the cases.  Clinicians' responses to emergency mental health referrals were timely.

Development of safety plans for inmates discharged from a MHCB continued to be problematic.  One clinician used the following boiler plate narrative on safety plans for two different inmates (COR 6 on April 6, 2015 and COR 7 on May 11, 2015):  "Discharge to CCCMS, inform IP how to contact mental health services, IP meds monitored/adjusted by unit psychiatrist, 90-day follow-up after IP discharged from MHCB, encourage IP to develop self/other harm prevention plan and share with clinicians, encouraged to use cognitive behavioral therapy (i.e., reframing) to help eliminate mood disturbance and SI/HI."  Most discharging SREs contained safety plans that simply recited Program Guide requirements and failed to contain specific strategies to reduce future SI and/or self-injurious behavior.  One case was particularly problematic.  The inmate (COR 8) was most recently in a MHCB for 11 days from May 8 through May 19, 2015 for SI.  He was also on the high-risk list for numerous incidents of self-injurious behavior.  The discharging SRE contained the following safety plan: "I/P is being discharged to EOP Ad Seg where he will receive weekly clinical contacts as well as EOP groups, helpful for coping skills."

**Intervention**:  All reviewed housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of four months of SPRFIT meeting minutes reflected good attendance from required members.  The meeting minutes were otherwise unremarkable.

**Training**:  Training records indicated that 80 percent of custody and 95 percent of nursing staff had CPR certification.  In addition, only 71 percent of custody, 78 percent of medical, and 50 percent of mental health personnel completed annual suicide prevention block training during 2014.  Finally, 89 percent of mental health clinicians received the seven-hour SRE training, and 90 percent completed the SRE mentoring program.

**Recent Suicides**:  CSP/Cor had two inmate suicides during the review period.  In the **first** case, the inmate (COR 9) jumped over the second floor handrail in his SNY housing unit on January 8, 2015.  The inmate landed on his head, sustained severe injuries, and was subsequently

pronounced dead at a local hospital a week later on February 6, 2015. The inmate entered CDCR for the fourth time in May 2013 to serve a 26-year to life sentence for first-degree murder. He was transferred to CSP/Cor in September 2013. He received two RVRs during this confinement, the last of which occurred in March 2014 for refusing to submit to a urinalysis. The inmate was placed in administrative segregation for possession of a weapon in November 2013 and was eventually assessed a ten-month SHU term in February 2014. He alternated housing in both the SHU and administrative segregation during this time, and was subsequently released from administrative segregation on January 6, 2015 and transferred to a SNY housing unit as a gang dropout. The inmate was said to have limited family support (from siblings).

He had a dysfunctional childhood, which included shuffling between the homes of his divorced parents. He was introduced to illegal drugs by his father, and reported being both emotionally and physically abused by his stepfather. As an adult, the inmate was married twice and produced three children, two of whom later served time in prison.

The inmate did not have a significant mental health history in the community, and received limited mental health treatment during both his CYA and three previous CDCR terms. Upon entry into CDCR in May 2013, he was admitted into the 3CMS program with a diagnosis of Major Depressive Disorder, Recurrent, Moderate; Polysubstance Dependence, Anti-Social Personality Disorder, and Narcissistic Personality Disorder. In January 2015, his diagnosis was revised to Major Depressive Disorder, Recurrent, and Anti-Social Personality Disorder. The inmate was prescribed psychotropic medication. He was intermittently compliant with both medication and programming during his most recent CDCR confinement. Most of his requests for mental health treatment centered on recurring depression, nightmares, and occasional SI. Of note, the inmate had nine different clinicians during his confinement at CSP/Cor, including four different primary clinicians. Many of these clinicians were providing coverage when his primary clinician was unavailable.

The inmate did not have a history of suicidal behavior in the community, and denied any past SAs. Three SREs were completed during his most recent CDCR confinement, with varying estimates of chronic suicide risk. For example, his chronic risk for suicide was listed as "high" in May 2013, "low" in September 2013, and "moderate" on July 14, 2014. The inmate did not have any MHCB admissions. The SRE of July 14, 2014 was also noteworthy because the assessment was done *without* the participation of the inmate. Two weeks later on July 31, 2014, the inmate initiated a Health Care Services Request form stating that he needed to talk with mental health staff regarding his medication and that he had "been feeling suicidal lately." The referral was triaged by a nurse the following day and referred to a PT, who then referred the inmate to a clinician on August 4. The inmate was eventually seen by the clinician on August 7, 2014, although there was no indication that an SRE was completed. He continued to be seen by clinicians, including a psychiatrist, on a regular basis consistent with his 3CMS level of care.

In addition, the inmate had a significant history of medical problems, including chronic lower back pain, Hepatitis C with end stage liver disease, and bilateral leg edema. He often confided to his mental health clinicians that his life sentence and liver disease made him "ambivalent about living," and he refused to attend a Hepatitis C clinic for pre-treatment consultation several weeks before his death.

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, and a suicide note was not found.  It was surmised that the inmate believed he was going to die in prison before even being eligible for parole, and had continuing safety concerns possibly due to "debt on the yard."  The Suicide Report documented numerous deficiencies in this case and seven recommendations for corrective action through a QIP:

> 1) There was no documented consultation or continuity of care between mental health providers to address the inmate's many refusals.  Providers did not document whether his refusals may be a symptom of decompensation and/or initiate any interventions....;

> 2) SRE documentation was problematic for the following reasons:  past reported SI and plan was not explored or documented in recent SREs, one recent answer he rated the inmate as low chronic risk when criteria endorsed suggested moderate or high, his last SRE did not include an assessment of acute risk factors and there was no follow-up for second attempt to correct the incomplete SRE;

> 3) The inmate submitted a Health Care Services Request form indicating he felt suicidal in August 2014.  He was evaluated by mental health at cell front on August 7, 2014 and no SRE was completed at this time;

> 4)..... During 2013 and 2014, there were four treatment plans completed.... The quality of these plans was [sic] poor and all four plans referred to previous treatment plans but made no reference to problem list progress or symptom presentation at the time of the IDTT;

> 5) Psychiatry staff conducted cell front interviews of the inmate on July 14, 2014 and September 5, 2014.  Psychiatry progress notes state, "lying in bed" and "won't answer" and "I/M lying in darkened room refusing to come to the door." The plan recommended his next psychiatry contact in 90 days and there was no referral generated to his primary clinician or documentation of any consultation with the clinical staff about his symptom presentation or frequent refusals;

> 6) Per Nursing Death Review Summary, there were two medical concerns identified requiring follow-up; and

> 7) The inmate submitted a Health Care Services Request form on July 31, 2014, indicating he was feeling suicidal.  The referral was triaged by nursing on August 1, 2014, and referred to the unit PT for further evaluation.  The form indicated that the PT evaluated the inmate and determined he wanted morphine and that he was not suicidal.  However, the referral should have been forwarded to mental health as emergent or urgent for immediate evaluation.

In the **second** case (Cor 10), the inmate suffocated himself with a plastic bag in his CTC cell during the early morning of October 25, 2015.  The inmate was not in the MHSDS.

At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

### 16)    **Pleasant Valley State Prison (PVSP)**

**Inspection**:  June 11-12, 2015 (previous suicide prevention audit on May 6-7, 2014)

**Screening/Assessment**:  Intake screenings of several new admissions was observed on June 11. The nurse used an outdated Initial Health Screening CDCR Form 7277.  This version (May 2014) did *not* have a question regarding whether the inmate was at current risk for suicide. Privacy and confidentiality were adequately provided because the door to the Nurse's Office was closed.

This reviewer did not have an opportunity to observe daily PT rounds in the two administrative segregation units.  Of note, the unit (D-4) for MHSDS inmates was scheduled to be permanently closed on one of the on-site dates (June 12, 2015), with all caseload inmates transferred to California Substance Abuse Treatment Facility (CSATF).

**Housing**:  With one minor exception, all six MHCBs were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging SA.  The exception were the sinks which contained faucets with a horizontal slit (known as "anti-squirt slits").  These anti-squirt slits had been used as an anchoring device in a SA by hanging in another MHCB room within the CDCR system.

The stand-alone administrative segregation unit had three retrofitted suicide-resistant cells designated for new-intake inmates.  During the on-site tour, the unit was only at approximately one-third capacity and newly admitted inmates were observed to be in new intake cells.

Finally, alternative housing for inmates identified as suicidal and awaiting placement in a MHCB was said to be used infrequently at PVSP, but when used, inmates were primarily housed in CTC medical beds.  This reviewer received alternative housing data that suggested that most of the 11 inmates held in alternative housing from February through June 2015 were in CTC holding cells, not CTC medical beds.  Regardless of whether in CTC holding cells or CTC medical beds, because these locations were not suicide-resistant, inmates were required to be observed on 1:1 continuous observation.

**Observation**:  This reviewer examined the observation forms used to document observation of suicidal inmates housed in the MHCBs and found that all of the forms were up-to-date, with observations documented on a staggered basis.  Rather than being placed on room doors, all observation sheets were found on a clipboard in the Nurse's Station, thus allowing for the possibility that notations could be made on the forms without actually observing inmates in their rooms.  All observation sheets should be on room doors.

This reviewer had an opportunity to observe several IDTT meetings.  The treatment teams were well represented by both mental health, medical, and custody personnel.  Although there was

115

limited discussion on treatment planning to reduce SI, there was good discussion with both the sergeant and CC I regarding custody issues that were upsetting to several inmates. In addition, it appeared that safety smocks were not over-utilized, with several inmates participating in the IDTT meeting in jumpsuits, and both yard and telephone access were available to inmates based upon clinical judgment.  These were good practices.

The reviewer discovered a few troubling practices.  *First*, several cases were reviewed in which an inmate was discharged from Suicide Precaution status, downgraded to a "mental health observation" at 30-minute intervals, but with an order for "partial issue" clothing (shorts, t-shirts, and socks) *without* a jumpsuit.  This order suggested that the clinician(s) was still concerned about the inmate's suicide risk.  If so, the inmate should have remained on Suicide Precaution status.  In addition, there was no LOP which defined "mental health observation," including one that specifically reiterated that such a level of observation was reserved for inmates that were not currently suicidal.

*Second*, a LOP (Operations Procedure No. 41) developed by PVSP and entitled "Observation Requirements for Inmates Discharged from the CTC or Treatment and Triage Area, or any Intermediate or Acute Discharge from an Outside Facility for Mental Health Reasons" (February 2015) contained problematic narrative.  Page three of the LOP contained the following requirements for those inmates discharged from an MHCB/TTA: "The following modification shall be made to the I/P's program for the first 24-48 hours at the discretion of the MH PC: no yard, no dayroom, and cell feed."  Commonly referred to as CTQ or "confined to quarters" by mental health clinicians, it was routinely found as an extension of the five-day follow-up orders.  Such a practice was not consistent with Program Guide requirements and was anti-therapeutic. LOP No. 41 should be revised to delete such narrative.

Finally, a review of Guard One data for a recent 24-hour period in the stand-alone administrative segregation unit found 100-percent compliance with required checks that did not exceed 35-minute intervals.  This compliance rate was excellent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of December 1, 2014 through May 31, 2015.  A total of 21 emergency mental health referrals were reported.  This reviewer found an additional 13 emergency mental health referrals for suicidal behavior from the TTA log for the same time period.  This reviewer's eUHR review of 29 cases of emergency mental health referrals for suicidal behavior found that mental health clinicians completed the required SREs in only 83 percent or 24 of 29 of the cases.  A few of these cases included untimely submissions of SREs.  Clinicians' responses to emergency mental health referrals were otherwise timely.  In addition, this reviewer looked at eUHR charts of 28 inmates admitted into the MHCB.  Of these, only 68 percent were completed on a timely basis (i.e., either at, or within 24 hours of, MHCB admission).

Development of safety plans for inmates discharged from an MHCB continued to be problematic.  In one case (PVSP 1), the inmate was placed in the MHCB on June 5, 2015 due to SI and AH.  Upon arrival at the TTA, he became out of control and needed to be sedated with Haldol.  The inmate was placed on Suicide Watch, assigned to a MHCB, and stabilized over the

next two days.  The inmate was discharged from the MHCB on June 8 with the following safety plan: "groups and continue services from CCCMS will help carry patient through this difficult time and help them to gain the strength and tools he will need to be successful through the rest of his prison stay and into his future outside the prison system." In two other cases, a clinician developed safety plans that simply recited Program Guide requirements, including "Attend IDTT later this morning, discharge from MHCB on OP41 status at CCCMS level of care, inform primary clinician about discharge" for case PVSP 2 and "Patient will be discharged from MHCB and transferred to KVSP at CCCMS level of care.  It is recommended that he be placed on a 5-day follow-up.  It is also recommended that patient be treated for his anxiety and to focus on parole planning" for case PVSP 3.   In a third case (PVSP 4), the inmate was in the MHCB for 36 days (April 8 through May 14, 2015).  He had an extensive history of self-injurious behaviors and SAs, including two overdoses, cutting, and a recent SA by hanging at the CHCF.  Despite this history, as well as 13 other chronic risk factors, the clinician assessed the inmate as being at "low" chronic risk for suicide in the discharging SRE that included the following safety plan: "It was recommended by the team that patient be discharged back to Corcoran at EOP Level of Care. He would benefit from the extra services it provides and it would be a place for him to begin to discuss underlying issues and increase coping skills."

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of four months of SPRFIT meeting minutes reflected spotty attendance from all required members, including the chief psychiatrist or psychiatric designee who failed to attend any meetings.  PVSP had a similar problem reported during the last suicide prevention audit.  The lack of psychiatric leadership attendance continued to be troubling.  In addition, one monthly meeting (March 2015) was canceled.  Although meeting minutes were mostly unremarkable, the June 9, 2015 meeting minutes stated that "Suicide Risk Evaluation (SRE) completion on admission is at 67 percent for initial and 33 percent for discharge.  For the SREs, there will be an audit conducted to see why the numbers are low and what can be done to correct this.  It may be a data entry issue or may be a clinician isn't completing the form."  As reported above, this reviewer's eUHR chart review found SREs were completed at, or within 24 hours of, MHCB admission in only 68 percent of cases.  The review found that many required SREs were not contained within the UHR, thus it was not a data entry issue.

**Training**:  According to training records, 100 percent of both custody and nursing staff were in compliance with CPR training.  In addition, although 100 percent of custody staff received annual suicide prevention block training during 2014, *no medical or mental health staff received the required annual suicide prevention block training*.  Although this reviewer was informed that "there was some confusion in 2014, and suicide prevention training was only offered to custody staff," such confusion was misplaced because this reviewer held an exit briefing during the previous suicide prevention audit at PVSP on May 7, 2014 and reminded facility officials of the low annual suicide prevention training compliance rates by medical and mental health personnel.  Finally, 81 percent of the required mental health clinicians had completed the seven-hour SRE training and 88 percent had completed the mentoring program at the time of the audit.

**Recent Suicides**:  PVSP did not have any inmate suicides during the review period.

17)    **California Correctional Institution (CCI)**

**Inspection**: June 24-25, 2015 (previous suicide prevention audit was on November 14-15, 2013)

**Screening/Assessment**:  Intake screenings for several new admissions was observed in the Facility A on June 24.  The nurse was using the correct Initial Health Screening CDCR Form 7277 at that time.  It should be noted that this reviewer's subsequent review of several eUHRs found that an antiquated version (June 2007) of the Initial Health Screening CDCR Form 7277 was found in several charts as recently as the day before on June 23, 2015.  Although the nurse was observed to be asking all of the intake screening questions in the Nurse's Office (a converted shower room), privacy and confidentiality were partially compromised because there was no door for the room and immediate area was a busy thoroughfare.  Facility B had a similar physical plant for intake screening.

Daily PT rounds in several administrative segregation units were inconsistent.  For example, this reviewer observed a PT performing rounds in Facility A (Building 7) on June 24.  The PT was observed *not* to be completing the Psych Tech Daily Rounds Forms on most of the 12 3CMS inmates on the unit.  The following day, on June 25, two other PTs were observed to be adequately conducting rounds, as well as completing the Psych Tech Daily Rounds Forms cell-side as required.  Of note, whereas this reviewer found in November 2013 that only six PTs were employed at CCI to provide services in numerous administrative segregation and SHUs, it was reported that more than 30 PTs were currently employed at the facility.

**Housing**:  CCI continued to have eight of 16 OHU cells designated to house inmates with mental illness and/or requiring suicide observation.  Similar to the previous suicide prevention audit conducted in November 2013, numerous deficiencies were found.  *First*, despite a recently revised LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Out-Patient Housing Unit-Mental Health"), signed on June 23, 2015 (the day before this reviewer's arrival) that required "patients placed in the OHU on suicide watch shall be assigned to a cell with a safety bed," there continued to be a lack of beds afforded to suicidal patients assigned to OHU cells.  *Second*, there appeared to be confusion from CCI mental health officials regarding whether or not the OHU was considered "alternative housing," thus initiating the requirement that all inmates on suicide observation be observed on a 1:1 continuous basis. *Third*, all inmates on suicide observation status continued to be clothed in only "paper shorts," and not safety smocks.  This reviewer was initially informed that paper shorts were used because the facility did not have any safety smocks.  Custody staff subsequently performed a search of the OHU and found a supply of safety smocks.  An inmate on suicide observation status during this reviewer's tour was subsequently changed out from paper shorts to a safety smock.  Paper shorts are both antiquated and humiliating, and should be discarded from the facility.

In addition, although other alternative housing cells were designated as cells in the R & R Unit, this reviewer was informed that these cells had not been used since September 2014, and all inmates awaiting MHCB placement were temporarily housed in the OHU.

118

Finally, this reviewer toured the three administrative segregation units that had suicide-resistant new intake cells and observed that, due to low censuses, there were no new intake inmates housed in unsafe non-intake cells in any of the three units.

**Observation**:  A deficiency noted by this reviewer during the previous suicide prevention audit in November 2013 in which "psychiatric observation" status was used in lieu of the required Suicide Precaution/Suicide Watch for suicidal inmates had apparently been corrected.  Review of several eUHR charts determined that clinicians initially ordered Suicide Precaution status for each incoming OHU inmate requiring suicide observation.  An observation level entitled "Nursing Q-30" was introduced in the above referenced LOP and defined as "Observation of a patient by nursing every 30 minutes (non-staggered) for reasons other than suicide precaution or suicide will watch as determined by the admitting provider."  Although unclear why this observation level mandated "non-staggered" observation, it was otherwise adequate.

There were continued problems with documentation of observation sheets for OHU inmates.  This reviewer observed that nursing staff kept the observation sheets on a clipboard in the Nurse's Station, thus allowing for the possibility that notations could be made on the forms without actually observing inmates in their rooms.  All observation forms should be on inmate doors.

In addition, the recently revised LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Out-Patient Housing Unit-Mental Health") contained an inaccurate narrative regarding requirements of five-day follow-up assessments.  Page six of the LOP stated that the "Mental health clinician shall not discontinue the 5-day step-down until at least 24 hours have passed since initiation."  Pursuant to Program Guide requirements, reference to "at least 24 hours" should be reserved for a clinician's decision regarding the need for continued observation rounds by custody, *not* a clinician's decision to discontinue the follow-up process short of five days.  The Program Guide does not allow discretion in reducing the length of the five-day follow-up process by clinical staff.  The LOP should be revised accordingly to provide better clarification of this requirement.

Finally, a review of Guard One data for a recent 24-hour period (June 22) in four administrative segregation units and four SHUs found the following low compliance rates:

> Facility A (ASU) Building 5: 77 percent
> Facility A (ASU) Building 6: 91 percent
> Facility A (ASU) Building 7: 72 percent
> Facility A (ASU) Building 8: 65 percent
>
> Facility B (SHU) Building 2: 87 percent
> Facility B (SHU) Building 4: 79 percent
> Facility B (SHU) Building 6: 86 percent
> Facility B (SHU) Building 8: 71 percent

Overall, the average of Guard One compliance in these eight units was 79 percent. Similar problems with low compliance rates were found during the previous suicide prevention audit in November 2013.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of December 1, 2014 through May 31, 2015.  A total of 14 emergency mental health referrals for suicidal behavior were reported.  This reviewer found an additional 28 emergency mental health referrals for suicidal behavior from the TTA log for the same time period.  This reviewer's eUHR review of these 42 cases found that mental health clinicians completed the required SREs in 90 percent or 38 of 42 of the cases.

Development of safety plans for inmates discharged from the OHU back to a CCI housing unit continued to be problematic.  The SREs of eight inmates discharged from the OHU in May 2014 were reviewed.  All were vague and simply recited Program Guide requirements.  Five of the SREs were developed by the same clinician who used the same boilerplate narrative in each of the safety plans:

> Short-term goals:  Discharge inmate from OHU and cleared to go back to yard. LOC:  CCCMS as IP reports that he's programming properly and comfortable with his LOC.  Reduction of acute risks: 5-step downs.  PC and psych MD contacts within 5 days.  Contact MH services as needed.  Changeable risk factors: Encourage compliance with correctional milieu.  Discuss safety plans, cell change with custody.  Enhance protective factors:  Family ties, school /job assignment. Positive coping strategies:  Encouraged IP to exercise, read, write, drawing, GED, and job assignment.  Long-term goals:  Compliance with correctional milieu to be released on time and avoid longer incarceration.  Frequent follow-ups:  Upon release from OHU, 5 days step downs and PC/psych MD contact within 5 days will be initiated.

Finally, there was no concordance with these boilerplate safety plans and five-day follow-up progress notes.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes reflected adequate attendance from most required members, except for psychiatry staff who failed to attend any meetings.  CCI had a similar problem reported during the previous suicide prevention audit.  The lack of psychiatric leadership attendance continued to be troubling.  Of note, although CCI did not have a chief psychiatrist position, there was one full-time psychiatrist and two part-time psychiatrists on-site, as well as three part-time tele-psychiatrists.  All were contracted positions. SPRFIT meeting minutes were brief and unremarkable.

**Training**:  According to training records, approximately 99 percent of custody and 100 percent of nursing staff was certified in CPR.  In addition, approximately 99 percent of custody, medical,

and mental health staff completed the annual suicide prevention block training during 2014. This was a significant improvement from the last suicide prevention audit when it was determined that medical and mental health personnel had not received any suicide prevention training. Finally, 84 percent of required mental health clinicians had completed the seven-hour SRE training, and 94 percent had completed the mentoring program.

It should also be noted that this reviewer attended a two-hour annual IST suicide prevention training on June 25, 2015. The instructor was the current SPRFIT coordinator, a clinical psychologist who presented the material in a professional manner. This reviewer's critique of the most recently revised IST suicide prevention lesson plan was discussed in the Suicide Prevention Training section of this report.

**Recent Suicides**:  CCI experienced three inmate suicides during the review period. In the **first** case (<u>CCI 1</u>), the inmate was found by his cellmate to have ingested multiple prescription pills in their administrative segregation cell during the late evening of September 14, 2014. He was transported to a local hospital and subsequently died on September 19, 2014. The inmate entered CDCR on October 4, 2012 to serve a 20-year sentence for conspiracy to kidnap and murder, as well as an assault weapons charge. He was transferred to CCI on December 5, 2012. The inmate was not known to be gang-affiliated, and incurred only one RVR during his confinement. The RVR occurred on December 9, 2013 and involved conspiracy (with his wife) to smuggle drugs into the facility. As a result, his wife received a permanent visiting ban in September 2013.

The inmate did not report any history of mental illness in the community, nor a history of substance abuse. During the intake screening process in October 2002, he did not report any current or prior SI. During his CDCR confinement, the inmate did not express any symptoms of mental illness until late 2013 when he began complaining about anxiety and depression related to the permanent visiting ban received by his wife. Following his placement in the administrative segregation unit on November 24, 2013, he was referred to mental health and assessed with Adjustment Disorder with Mixed Anxiety and Depressed Mood, as well as Anti-Social Personality Disorder, while also noting "rule out secondary gain." He was enrolled in the 3CMS program in December 2013.

The inmate requested to see a psychiatrist on several occasions to treat depression and sleep problems. In a January 21, 2014 assessment, the psychiatrist noted the inmate's "report of rumination about his problems and particularly his wife." The psychiatric note also stated that the inmate had been "thinking a lot about killing myself - about two weeks - I can handle it no more." An SRE was *not* completed, nor was there an assessment of suicide risk documented in the progress note. Psychotropic medication was prescribed. The inmate continued to be seen by both his primary clinician and the psychiatrist on a regular basis. An SRE completed by his primary clinician on March 27, 2014 rated both his chronic and acute risk for suicide as being "low." On March 20, a psychiatric note stated that the inmate had refused an appointment, as well as that there was "no clinical justification for continuing Remeron." His medication was discontinued. The inmate saw the psychiatrist again on June 24 and his medication was restarted. The inmate continued to be seen on a regular basis by the psychiatrist and primary clinician for treatment of his depressive symptoms.

121

On September 11, 2014, three days before his SA, the inmate met with the psychiatrist. The psychiatric note stated that the interview was "complex" and that the inmate reported he was afraid he "wouldn't survive until his parole date" (which was many years away). He "reluctantly but credibly discloses situational threats to his safety," which the psychiatrist did not believe were imminent. The psychiatrist suggested that the inmate was "almost obsessing" about the infraction (conspiracy to smuggle drugs into the facility) that had resulted in his administrative segregation unit term. The psychiatrist also noted that the inmate disclosed "I got thoughts about killing myself... since I got here, but it's worse. I don't have a plan but I been thinking a lot. But I been talking to my cellie. Only thing I care about is contact with my wife." The psychiatrist changed his psychotropic medication, but again did *not* complete an SRE or other documentation indicating an assessment of risk.

Although the CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, possible causes might have included the permanent visiting ban against his wife, as well as an alleged "fear of his life" after an unknown incident on the yard that resulted in his request for SNY status. In addition, although the CDCR reviewer did not believe that any of the inmate's medical problems, which included treatment for a detached retina, were necessarily precipitants to his suicide, the suicide was the result of ingestion of numerous pills, allegedly including those keep-on-person medications prescribed for these medical problems.

The Suicide Report contained four recommendations for corrective action through a QIP: 1) on September 11, 2014, "the inmate expressed clear suicidal ideation with plan. He also reported worsening depressive symptoms, a fear for his safety, and faltering coping. The psychiatrist who documented these findings did not complete a suicide risk assessment (SRA) and document the results of that assessment as prescribed by the MHSDS *Program Guide*. No safety plan was developed;" 2) there was an undocumented delay between the time of the emergency response and transport out of the facility to the hospital; 3) despite clear communication that the inmate had taken an overdose of unknown medication and had an elevated heart rate, the on-call physician ordered only a van transport rather than ambulance; and 4) the inmate's wife had been issued a permanent lifetime visiting ban (when temporary "visiting restrictions" were available to the warden) prior to a response from the district attorney and before the RVR had been adjudicated by the institution.

The suicide was also reviewed by the CCHCS Death Review Committee resulting in a "Combined Death Review Summary." The committee found that the inmate's death was "possibly" preventable for the following reasons: there was an approximate 1.5 hour delay in transporting the inmate from the facility's TTA to a local hospital, the inmate should have been placed on a cardiac monitor and had his vital signs monitored every 15 minutes in the TTA, an EKG should have been performed at the TTA, and the inmate should have been transported to the hospital by ambulance, not a state vehicle.

In the **second** case (CCI 2), the inmate was found by his cellmate hanging from the upper bunk by a coaxial cable and t-shirt in their SNY cell during the morning of November 30, 2014. He entered CDCR on November 10, 2009 to serve a 25-year-to-life sentence for first degree murder (of his wife). He was a college graduate and had stable employment until the instant offense.

The inmate was transferred to CCI on March 9, 2012. He did not have any RVRs and was not known to be gang-affiliated. The inmate had regular written correspondence and visiting with his parents and brother, but limited correspondence with his adult children (due to the circumstances surrounding the instant offense). Upon entry into the CDCR, he requested and received SNY status due to generalized anxiety of prison life as a first time offender and "being threatened by white inmates in county jail and the lack of knowledge of prison politics."

According to available records, the inmate had received mental health treatment in the community for anxiety, depression, and "amnesia" for approximately two years (2002-2003). There was no indication of a family history of mental illness. Records indicated that he used drugs on "an experimental and/or recreational basis." While confined in the county jail from October 2007 through November 2009, the inmate was diagnosed with Adjustment Disorder with Depressed Mood and Anxiety, Adjustment Disorder NOS, Mood Disorder NOS, history of Depressive Disorder, and Depressive Disorder NOS. He was treated with psychotropic medication.

The inmate was placed in the MHSDS at the 3CMS level of care upon CDCR confinement in November 2009. He was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood. A progress note dated April 19, 2011 listed diagnoses of Anxiety Disorder NOS, R/O Disassociative Disorder NOS, Deferred Rule-Out Obsessive-Compulsive Personality Disorder. A psychiatric note dated July 6, 2011 listed Generalized Anxiety Disorder and R/O Obsessive-Compulsive Disorder "in near remission." He remain compliant with psychotropic medication. During 2013 and 2014, most of his treatment centered around treating his depression, with a December 13, 2013 progress note stating that "I/P says he still experiencing anxiety/stress/depression...I/P said he constantly feels depressed but 'puts on the mask to look normal.'" The inmate stopped taking psychotropic medication in late 2013.

During an IDTT meeting on March 13, 2014, the problem areas of depression and loss of family contact were noted. His diagnosis was changed to Major Depressive Disorder, Recurrent, Mild. In a progress note dated July 22, 2014, the clinician noted that "I/P states he has not been doing well for the last few months...I/P clearly states that he does not want to hurt himself and does want to live but is saddened by the likely possibility that he will spend the rest of his life in prison." Although the inmate was on a schedule to see his clinician on a monthly basis, the next clinical contact did not occur until October 6, 2014 when he stated "not been doing well for the last 6-9 months. He presents with low mood, restricted affect, little motivation to change and is unresponsive to PCs suggestions and interventions...I/P is unwilling to try meds."

An SRE completed on October 6, 2014 assessed the inmate as being a "moderate" chronic risk and "low" acute risk for suicide based upon self-reported SI as a teenager, as well as a reported SA in 2007 when "he poisoned himself after committing a crime to put them in prison." According to the assessment, "I/P reports no SI, intent, plan, or desire to die. He clearly stated to PC that although he is depressed and feels hopeless around his life term, he does not want to die." During his November 3, 2004 session with his PC, the clinician noted that "I/P continues to present with depressed mood, restricted affect, poor sleep, diminished interest in activities, little more motivation to change, and passive SI w/o intent or plan and is unresponsive to PC's

suggestions and interventions. I/P stated that he would never make a SA but reported, 'if the doctor were to tell me I had a week to live I wouldn't mind.'"

The inmate was considered for an EOP level of care by the IDTT a few days later on November 6, 2014, but was retained in the 3CMS program principally because he was programming well, had weekly family visits, worked in the Prison Industry Authority (PIA), did not have any RVRs, and agreed to monthly sessions with his primary clinician. His diagnoses were revised to reflect Dysthymic Disorder and Personality Disorder NOS. Despite the primary clinician's plan to continue monthly sessions, the inmate's MHTP reflected "contact w/PC x 90 days."

The inmate left multiple suicide notes to his family, as well as kept a regular journal of his thoughts. Letters to his family reflected the theme that "I have been dead for years, I'm just making it official." Following review of his journal entries, the CDCR reviewer noted that the inmate "struggled with immense depression, hopelessness, and felt little meaning in his existence." The entries also reflected on-going plans for suicide, including specific plans to overdose on aspirin in January 2014, asphyxiating himself in February 2014, cutting himself in March, May, and June 2014, hanging himself with a coaxial cable in September 2014, as well as reportedly actual multiple SAs by hanging in October and early November 2014. The CDCR reviewer concluded that the journal entries clearly reflected an inmate who "struggled with depression and had been thinking about and planning his suicide for over a year." The reviewer also noted an interesting letter the inmate wrote to his primary clinician that stated, "I am sorry to have deceived you, but no I did not actually lie. When I said 'I can't hurt myself' I implied that 'I could never hurt myself' but the truth is in all the times I've tried I couldn't go through with hurting myself. What I have done is not something you missed, it was something I withheld. You did a good job, please keep it up.'"

The Suicide Report contained one recommendation for corrective action through a QIP: "Clinical documentation should include an explanation of any gaps or changes in treatment as well as specific interventions. Starting in March 2014, the inmate was seen monthly for clinical care due to increasing depressive symptoms. Following his April 2014 and July 2014 clinical sessions, he was not seen monthly. Additionally, his IDTT and Treatment Plan did not explain why his clinical contacts were reduced to every 90 days instead of monthly or why increased clinical contact with not continued. Documentation in Treatment Plans and progress notes should specifically address and individualize clinical interventions."

In the **third** case (CCI 3), the inmate was found to have asphyxiated himself with a sheet his administrative segregation cell during the morning of August 8, 2015. He was not in the MHSDS. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

## 18)    California Health Care Facility (CHCF)

**Inspection**: July 21-23, 2015 (previous suicide prevention audit was on June 24-25, 2014)

**Screening/Assessment**:  Although there were not any new admissions observed during the on-site audit, this reviewer spoke with a nurse assigned to the Patient Management Unit (referred to as the R & R in other CDCR facilities).  The nurse informed this reviewer that the most current version of the Initial Health Screening CDCR 7277 Form (June 2015) was being used and, unlike the previous audit, the door to the Nurse's Office now remained closed during the intake screening process.  The nurse admitted that an officer remained inside the Nurse's Office whenever a maximum-security status inmate was screened, thus impacting privacy and confidentiality.

Daily PT rounds in the administrative segregation unit were observed on July 22.  The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Forms on caseload inmates at cell-front as required.

**Housing**:  Unlike the previous on-site visit, most of the 98 MHCBs in housing units 301A, 301B, and 302B were occupied during this site visit.  All were suicide-resistant and did not have any obvious protrusions which could be used in a hanging SA.  In addition, unlike the previous audit in 2014, alternative housing was regularly used, with several medical cells designated in the OHU.  The medical swing beds were removed from these cells whenever they were used for alternative housing, thus forcing inmates to sleep on safety mattresses on the floor.

The administrative segregation unit had been activated since the previous on-site audit and contained eight new intake cells.  In fact, all of the cells in the unit were virtually identical.  With one exception, all of the cells had been constructed to be as suicide-resistant as possible.  The exception was the horizontal brackets that connected desk stools to the walls. These brackets could potentially be used as an anchoring device in a hanging SA.  This deficiency was identified during the 2014 suicide prevention audit and continued to be very hazardous.

**Observation**:  All MHCB inmates were on either Suicide Precaution or Suicide Watch.  To date, mental health leadership had not designated any other observation level for inmates assigned to a MHCB for non-suicidal reasons.  Observation sheets were kept on room doors, documentation appeared to be up-to-date and reflected observation at staggered intervals as required.

When conversing with nursing staff assigned to observe inmates in alternative housing cells, this reviewer was informed that both 1:1 continuous observation and 15-minute observation could be authorized by clinicians.  Such a practice was contrary to CDCR directives regarding alternative housing in which only 1:1 continuous observation was authorized.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 99-percent compliance with required checks that did not exceed 35 minutes.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period December 1, 2014 through July 21, 2015.  A total of 29 emergency mental health referrals for suicidal behavior were reported.  (It should be noted that this reviewer did not use data from the SEMS logs, referred to as the TTA in other CDCR facilities, because it mostly contained DSH referrals and/or inmates who were already in the MHCB or alternative housing.)  This reviewer's eUHR

review of these 29 cases found that mental health clinicians completed the required SREs in only 83 percent or 24 of 29 of the cases.  A similar low percentage of SRE completion was found during the 2014 suicide prevention audit.  Clinicians' responses to emergency mental health referrals were otherwise timely.

A review of five safety plans for inmates discharged from the MHCB showed that most adequately described specific strategies for continued reduction of SI and or self-injurious behavior.  A review of subsequent five-day follow-up notes, other progress notes, and subsequent SREs of receiving clinicians indicated little concordance with the original safety plan.  For example, in one case (CHCF 1), a MHCB clinician developed the following thoughtful and reasonable safety plan on July 19, 2015:

> DC to EOP, 5-day follow-up, psychiatric follow-up, med. adherence to be observed, labs be may be requested post discharge to monitor med levels in EOP setting.  IP has breathing and meditation rehearsal 2-to-3 x daily and recommended hourly breathing paired with counting/distraction tasks, exercise routines, and reading to target anxiety/paranoia and distract from AH sx.  Long-term relapse may be supported with close work of potential drug abuse relapse using MI.  Nurse reports morning huddle IP had recent CT scan to ensure IP health and adoption from reported injury at SQ.

> It is the recommendation of CHCF MHCB that any long-term considerations for higher LOC be submitted from SQ treatment team to ICF only in the event the IP does not show consistency for motivation to program at EOP, accompanied with increasing signs of psychotic decompensation, IP is presently stable.  IP has no indicators to warrant an acute care placement with APP which may be issued from MHCB in the event sx were to persist and acute psychosis and imminent lethality.

A review of this inmate's eUHR found that he was physically discharged from the MHCB at CHCF on July 23, 2015 and transferred to SQ.  Five-day follow-ups were timely completed, but showed no concordance with the above safety plan.  Another SRE was completed by the inmate's primary clinician at SQ on July 28 and also failed to show concordance with the safety plan.  Two days later on July 30, the inmate was transferred to SVSP and, after reporting AHs for SI, was referred to mental health for assessment.  A subsequent SRE also failed to show any concordance with the CHCF safety plan.

This reviewer also had an opportunity to observe several IDTT meetings in two of the three MHCB units.  Most were problematic.  There was little, if any, attempt at treatment planning for inmates in the MHCB for SI, and interaction between the inmate and clinicians was limited to the primary clinician simply asking each inmate:  "What is your suicidal ideation today between one and ten, did you take your meds this morning, did you have breakfast?"  In one troubling case (CHCF 2), an officer attempted to control the flow of the meeting by interrupting the inmate and instructing him to "answer the clinician's question."

In addition, this reviewer conversed with several clinicians during breaks in the IDTT meetings and determined that there was a great deal of confusion regarding what possessions and privileges were afforded to MHCB inmates. For example, some clinicians did not know the difference between "partial issue" and "full issue," and routinely issued orders for only a safety smock. Other clinicians were unaware that they could use their clinical judgment and order that the inmate be permitted to have yard privileges (consistent with their custody classification). In fact, this reviewer learned that CHCF inmates in the MHCB rarely were allowed out of their rooms and into the yard for a variety of reasons, including the fact that there was more than a 20-day backlog for eligible inmates to even access the yard based upon recreation therapist schedules.

Finally, this reviewer determined following a review of several eUHRs that there was a practice of clinicians issuing standing orders for Suicide Precaution status at ten-day intervals. For example, a Physician's Orders form, with a boilerplate checklist contained the following narrative: "*Continue Suicide Precautions for 24 hours x 10 days*." This Physician's Orders checklist form was found in most eUHRs at CHCF. Such a practice was in direct violation of the Program Guide which required a clinical determination of suicide observation status "at a minimum of every 24 hours." This practice resulted in clinicians not having to make decisions regarding inmates' possessions and privileges for at least ten days.

**Intervention**: All toured housing units contained an emergency response bag that included a micro shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes reflected good attendance from required members, including the chief psychiatrist. In addition, the meeting minutes were robust, and included case presentations. Of note, consistent with this reviewer's finding of problematic five-day progress notes, a SPRFIT review of the accuracy and timeliness of five-day follow-up notes for May 2015 showed only 81-percent compliance.

**Training**: Training records indicated that only 79 percent of custody, but 100 percent of nursing staff, had CPR certification. In addition, 100 percent of custody, 98 percent of medical, but only 78 percent of mental health staff were compliant with annual suicide prevention block training during 2014. Finally, 90 percent of mental health clinicians received the seven-hour SRE training and 95 percent completed the mentoring program.

**Recent Suicides**: There was one inmate suicide at CHCF during the review period. In that case (CHCF 1), the inmate was found hanging by a sheet in his cell during the late afternoon of December 17, 2015. The inmate was at the EOP level of care. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

## VI.    Review of 2014-2015 Inmate Suicides Occurring in CDCR Prisons That Were Not Re-Audited

Several CDCR facilities were not re-audited during the most recent suicide prevention audit period.  This reviewer conducted a review of all inmate suicides that occurred during the review period (September 2014 through November 2015) in CDCR facilities that did not receive an on-site suicide prevention re-audit.  These eight cases are presented below.

## California Correctional Center (CCC)

In this case (CCC 1), the inmate was found hanging by a sheet from the top bunk of his administrative segregation cell during the morning of September 7, 2014.  The inmate had entered the CDCR system on February 4, 2013 to serve a six-year and eight month sentence for threatening a crime with intent to terrorize and use a firearm, obstructing and resisting an officer, and being a felon in possession of a firearm.  He did not have any RVRs, was not gang-affiliated, and was transferred to CCC on May 28, 2013 where he was subsequently designated to a conservation camp.  The inmate escaped from the camp on September 2, 2014, was apprehended on September 4, returned to CDCR custody and placed in the administrative segregation unit at CCC on September 6, 2014.  The inmate was separated from his wife and children, but had both telephone contact and letter correspondence with his mother.

The inmate had a prior history of mental illness in the community that included treatment for anxiety and depression.  He also had a history of substance abuse.  There was no indication of a family history of mental illness.  According to previous police reports regarding two separate incidents in March 2010 and September 2012, the inmate and his wife were involved in a domestic dispute related to financial problems and precipitated by alcohol.  During the course of both of those arguments, he threatened suicide.  During his initial intake screening in February 2013, the inmate reported treatment for both anxiety and depression in the community, as well as during his confinement in the county jail.  He also reported a previous SA.  He was referred to mental health personnel for further evaluation.  Both a MHE and SRE were completed.  An Axis I diagnosis was deferred, with the evaluation stating, "He does not want MH services due to a strong interest in going to the fire camp.  There is some situational depression due to first-time incarceration and many losses as a result of prison."  He was later found not to meet the criteria for inclusion into the MHSDS.  On May 28, 2013 the inmate was again referred to mental health staff for evaluation.  A clinician wrote a progress note on June 6 indicating that the eUHR was reviewed and that the inmate did not meet the criteria for the MHSDS.  The inmate did *not* receive a face-to-face assessment.

During completion of the SRE on March 5, 2013, the inmate denied any current SI or prior history of suicidal behavior.  This response was in contrast to the arrest reports in both March 2010 and September 2012 in which he threatened suicide.  Despite acute risk factors such as depression, anxiety, hopelessness/helplessness, agitated/angry, early in prison term, recent bad news or loss, and recent change in housing, the inmate was assessed as a moderate chronic risk and low acute risk for suicide.  When returned to custody and CCC on September 6, 2014, the

inmate denied any current or prior SI during the 31-item mental health screening (and interestingly, answered "no" to all questions).

The CDCR reviewer provided a thoughtful review of possible precipitating factors to the suicide, noting that:

> Precipitating factors may include the anniversary of this crime (September 2), chronic pain, being returned to prison following his escape, pending charges, feelings of hopelessness, loss of camp eligibility, residual anger about his arrest and the demise of his marriage, and his overall poor adjustment to prison life. A thorough record review presents a picture of a man who had difficulty with impulse control and when his stressors exceed his coping capacity, he could react in a manner threatening to himself and others. Upon entry to prison, the inmate expressed many losses, hopelessness, and even suicidal threats to his wife and the arresting officers. In prison, he appeared to minimize symptoms to mental health staff possibly to go to camp, and then struggled to manage the underlying turmoil, which he did not discuss with others while incarcerated, that ultimately played a role in his escape and eventual suicide.

The Suicide Report listed numerous deficiencies in the delivery of mental health services, including an estimate of suicide risk that should have been revised to be high chronic risk, as well as concerns regarding the emergency medical response and, contrary to CDCR policy, placement in a non-new intake, non-retrofitted administrative segregation cell. Most of these numerous concerns were allegedly addressed informally between CDCR headquarters and CCC officials. The Suicide Report contained three recommendations for corrective action through a QIP: 1) mental health assessments in June 2013 did not include review of central file records; 2) emergency response documentation generated additional questions that were not answered in medical documentation; and 3) contrary to CDCR policy, the inmate was not housed in an administrative segregation retrofitted intake cell on September 6, 2014, one day before his suicide.

This reviewer would note that another deficiency that should have resulted in a corrective action was the alleged June 6, 2013 "assessment" in response to a nursing referral, which was grossly inadequate because it did *not* include a face-to-face assessment with the inmate. It did occur well over a year prior to the suicide and was not related to the proximate cause of the inmate's death. In addition, as this reviewer found during the on-site audit in July 2014, not all inmates who were housed in administrative segregation for their first 72 hours at CCC were housed in retrofitted cells, and not all of the retrofitted cells housed newly admitted inmates.

## CIM

CIM experienced two inmate suicides during the review period. In the **first** case (CIM 1), the inmate was found hanging from the window frame by a sheet in his RC cell during the late afternoon of August 11, 2014. The inmate had entered the CDCR system on July 3, 2014 to serve a four-year and three-month sentence for mayhem, assault, and possession of a controlled dangerous substance. He did not have any RVRs during his short confinement, nor was he gang-

affiliated.  He was said to have a close relationship with his current (second) wife.  Upon entry, he received intake screening and reported several medical and mental health issues, including a prior history of mental illness, current AHs, a prior history of SI, and a SA a month earlier.  He denied any current SI.  A four-page transfer summary from the San Diego County Jail system was also received and noted diagnoses for Psychotic Disorder and Poly-Substance Dependence.  The summary also included a notation regarding the inmate's SA by hanging in the County Jail on December 8, 2013, as well as listing his current medical and psychotropic medications.  The intake nurse initiated a "routine" mental health referral and the inmate was initially placed in RC housing.

Later that same afternoon (July 3), the inmate's mental status began to quickly deteriorate.  As a first time offender, he expressed fear of incarceration and SI.  As a result, the inmate was placed on suicide precaution in an "alternative housing" cell in the TTA pending admittance into a MHCB.  Because the cell was not suicide-resistant (in fact, it was a dry holding cell with only a bench), the inmate was observed under constant observation.  He remained in the alternative housing cell for five days before being placed in a MHCB on July 7. The inmate was seen by a psychiatrist on July 3 and reported a long history of mental illness including "depression, mood fluctuations and new onset AH since 2008 that are present 'all the time.'  He describes multiple SAs and inpatient psychiatric hospitalization.  He estimates 10+ psychiatric hospitalizations with multiple suicide by overdose on pills and hanging.  He states that someone always finds him during his hanging periods.  Onset of SAs in 2005 in which he experienced depressive symptoms.  He estimates his mood as 8/10 out of 0-10 scale with 10 worse.  He describes intermittent suicidal ideation and admits to hoarding 160 pills over a month ago, took them and did not tell anyone.  He did not receive any medical intervention.  The inmate also reported to the psychiatrist that he had a family history of both mental illness and suicide with two of his sisters experiencing prior SAs.  Diagnoses of Schizoaffective Disorder and Poly-Substance Dependence were given, and psychotropic medication was continued.

On July 5, a MHCB clinician completed an SRE.  The inmate appeared "mildly anxious" and his current mood was "depressed all the time" and feeling hopeless.  He described voices "telling me to kill myself," although he denied having a plan to do so.  Although the clinician noted that the inmate denied any prior history of suicidal behavior, as well as any family history of suicide, other available records (i.e., intake screening form, San Diego County Jail system transfer summary, and the July 3 psychiatric evaluation) clearly documented such a history.  The clinician assessed the inmate as being both a "moderate" chronic and acute risk for suicide.  Suicide precaution status was continued in the alternative housing cell and the inmate continued to be seen on a daily basis by mental health staff.  On July 7, another MHCB clinician completed a Mental Health Evaluation.  The assessment noted the inmate's prior history of suicidal behavior, and noted that he "continues to voice being suicidal and depressed due to his recent incarceration."

The inmate was relocated to a MHCB on July 7 and remained on suicide precaution until July 15, 2014.  During this time, he consistently reported anxiety and fear about his incarceration, which contributed to stomach upset and poor sleep. Over time, his SI decreased. On July 15, the inmate told a MHCB clinician that he was no longer suicidal and "I'm ready to get off the smock" "just to think about going to that prison makes me nervous."  Two physician orders

dated less than an hour apart on July 15, 2014 appeared contradictory. At 1:55pm, the psychiatrist ordered that suicide precaution be continued for 24 hours; whereas less than an hour later at 2:30pm, the same psychiatrist discontinued suicide precaution status on the inmate. In any event, the inmate was removed from suicide precaution but remained in the MHCB. He continued to be seen daily by both medical and mental health personnel. Although denying SI, he continued to struggle with the adjustment to incarceration (e.g., "I still feel depressed" and "Can you call Anita for me and tell her that I love her"). On at least one occasion (July 16), the IDTT team discussed a possible DSH referral "because patient in MHCB greater than 10 days" (not including the five days housed in alternative housing).

On July 23, the inmate met with a MHCB clinician and denied any SI, but reported "I'm anxious to be discharged" from the MHCB. An SRE was completed, and still lacked documentation of the inmate's prior history (and family history) of suicidal behavior, and the clinician assessed a moderate chronic risk and low acute risk for suicide. The treatment plan section of the discharging SRE stated the following: "Discharge to EOP LOC, he will be supported in his mental health treatment. I/P will benefit from weekly clinical supportive services by PhD/LCSW/CSW, as well as clinical therapy and psychoeducation if appropriate and available. Recreational therapy will be provided to increase social interaction and increase I/P's coping skills with a goal to increase depression and SI."

The inmate was then transferred to EOP housing in the RC and all of the required five-day follow-up notes were completed with the inmate continuing to report feeling anxious, but denying SI. The follow-up notes did not suggest any concordance with the treatment plan of July 23. On the last day of follow-up (July 28), the inmate denied current SI, but "reported experiencing suicidal ideation yesterday with plan." He was seen later that day by a psychiatrist who noted that the referral was based upon the inmate being "sad, nervous." Although the inmate again denied any SI, an SRE or other adequate assessment of suicide risk was not documented.

The inmate continued to be seen by mental health staff consistent with his EOP status. During each contact, he continued to deny SI, but struggled with his adjustment to incarceration. In an August 6 progress note, a clinician noted that the inmate "presented with anxious mood and congruent affect. Denies depression when asked thru interpreter, but reports anxiety and again pointing to his stomach.... He reported sleep disturbance related to anxiety but no appetite disturbance. Hygiene and grooming poor. Denies current A/H or V/H." He began to refuse his psychotropic medications, including on the day of his August 11 death, complaining of side-effects.

The CDCR reviewer in this case highlighted the fact that the inmate was seen by mental health clinicians "26 times in 21 days" between his MHCB discharge and his death. These contacts included multiple groups (encompassing recreation, music, coloring, and dominoes), psychiatric visits, five-day follow-ups, and contacts with his primary clinician. It should be noted that because the inmate was Spanish-speaking, and spoke very little English, group leaders consistently reported, "communication skills challenged by language." Most clinical contacts were made with the assistance of an interpreter.

The CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, and no suicide note was found.  It would be reasonable to hypothesize following a review of this case that the inmate continued to exhibit a degree of fear and anxiety regarding his CDCR incarceration that remained virtually unchanged during his brief 40-day confinement, and coupled with his recent history of suicidal behavior, made his eventual suicide not surprising.

The Suicide Report contained three recommendations for corrective action through a QIP:  "1) The MHCB IDTT did not refer the inmate to DSH acute care even though he remained on suicide precautions for 18 straight days, given only a safety mattress, safety smock, and safety blanket.  The CDCR Forms 7388B Level of Care Decisions, dated July 17, 2014 and July 21, 2014, did not provide rationale for not referring the inmate to DSH.  Treatment modifications were nominal.  He was continued on suicide precautions, which would indicate that interventions were ineffective and thus a referral to DSH was appropriate; 2) There was no mention of a previous SA in the county jail mentioned in the CIM SRE dated July 4, 2014 or July 23, 2014.  It is important for clinicians to thoroughly review all available records in assessing inmates for suicide risk; and 3) During the course of the inmate's review, importance of the availability and accessibility of the county jail records and/or transfer records was discussed.  The discussion identified a statewide concern in accessing and appropriately documenting these records in a timely way."

There were several other issues *not* addressed by the CDCR reviewer in this case.  First, there was no inquiry regarding why the inmate was housed in an "alternative housing" dry cell with only a bench for five days while awaiting a MHCB.  Second, there was no inquiry as to why two physician orders dated less than an hour apart on July 15, 2014 were contradictory.  (At 1:55pm, the psychiatrist ordered that suicide precaution be continued for 24 hours; whereas less than an hour later at 2:30pm, the same psychiatrist discontinued suicide precaution status on the inmate.)  Third, the treatment plan contained within the July 23 discharging SRE was inadequate, and although the CDCR reviewer highlighted an abundance of interaction between the inmate and mental health staff following MHCB discharge, subsequent five-day follow-ups and other progress notes did not adequately address treatment planning.  In addition, the July 23 treatment plan included inappropriate narrative, i.e., "if appropriate and available."  Only a specific therapy that was appropriate and available should be included in a treatment plan.  Fourth, the inmate was appropriately referred to a psychiatrist after expressing SI on July 28, but the psychiatric encounter did not include documentation of either an SRE or adequate suicide risk assessment.

In the **second** case (CIM 2), the inmate was found hanging by a sheet from the ventilation grate in her RC cell during the late evening of May 9, 2015.  (Of note, the inmate was a male to female transgender who had been receiving hormone therapy since 2008 and had also received breast implants.  As such, female pronouns will be used throughout the summary.)  The initiation of CPR was delayed for approximately six minutes because cell entry did not occur until custody staff located the cut-down tool and brought it to the cell.  The inmate had re-entered the CDCR system for a second term on April 16, 2015 to serve a four-year sentence for possession of an illegal substance and weapon that occurred during pre-trial confinement at a county jail where she had been held for a parole violation.  The inmate did not have any RVRs during her 24-day confinement, nor was she gang-affiliated.  There was no record of any family support.

The inmate was said to have had a very dramatic and dysfunctional upbringing, punctuated by abandonment, sexual and physical abuse, exposure to dramatic events, unstable parental figures, drug abuse, and homelessness. Although reporting that her mother, who died in 2010, had a history of mental illness, the inmate never received any mental health services in the community, and apparently coped with long-term depression and anxiety through substance abuse. During her first CDCR term from 2009 through 2012, the inmate was in the MHSDS at the 3CMS level of care. Her primary diagnosis was Major Depressive Disorder and, according to the CDCR reviewer in this case, records "reflected themes of emotional difficulties surrounding her gender identity, feelings of being threatened, feeling pressure for sex, and her ongoing desire to fully transform into a female." On August 7, 2011, the inmate attempted suicide by hanging herself with a shoelace. She was rescued and placed on suicide precaution in the OHU at CMF for approximately 18 days. The inmate reported a prior SA by wrist cutting in 2005 while in the community.

During her current CDCR term, the inmate denied any mental health concerns, as well as any history of suicidal behavior and was only re-entered into the MHSDS on April 30, 2015 after submitting a request for mental health services that stated: "I used to be CCC. I need meds, I hear whispers." A subsequent mental health assessment resulted in a diagnosis of Gender Identity Disorder, Schizoaffective Disorder, Bipolar Type, PTSD, and Polysubstance Dependence.

On May 4, 2015, the inmate was observed to be engaging in self-injurious behavior by cutting her forearm. Although the injury was not considered life-threatening, she reported that she was planning on using a razor to commit suicide. The incident was classified as a SA and the inmate was placed in alternative housing and subsequently transferred to a MHCB. The initial SRE completed the next day (May 5) was problematic due to numerous incorrect chronic and acute risk factors, as well as incorrect protective factors, including not having a history of SAs, not having a recent SA (despite the previous night's incident), and having family and spousal support. The clinician assessed the inmate as having both a "low" chronic and acute risk for suicide, and stated that the "I/P easily contracts for safety and verbalizes a desire to 'get back to housing'."

The inmate was continued on Suicide Precaution status and assessed by a psychiatrist the following day, on May 6. When asked why she had attempted suicide, the inmate told the psychiatrist that "I got into some kind of situation, people threatening me and trying to have sex with me. I was having a lot of anxiety and looking for the best way possible to get out of the situation.... I was not thinking about killing myself. I just wanted to get out of there." Her diagnoses were revised to Adjustment Disorder NOS, Substance Induced Psychotic Disorder (per history), Substance Induced Mood Disorder (per history), and Polysubstance Dependence. An adjustment to her psychotropic medication was made. The inmate was discharged from the MHCB on May 7 and the discharging SRE contained the same inaccurate chronic and acute risk factors, as well as protective factors recorded on May 5. More importantly, the safety plan contained within the SRE was unhelpful and mostly recited Program Guide requirements: "Discharge at CCCMS LOC, 5-day F/U, clinician to clinician contact for continuity of care, and assist with I/P's adjustment issues, particularly of being a transgender in men's prison."

The CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, although noted that "recent safety threats, combined with interpersonal issues, a new prison sentence, and her transition from male to female, paralleled with depression and anxiety are conceivably reasonable factors." The Suicide Report contained six recommendations for corrective action through a QIP:

> 1) Several suicide risk factors were not included in the inmate's SRE documentation, such as recent and past SAs, substance abuse or transitional stress related to being transgender. Additionally, the S3 did not accurately represent or integrate protective factors;

> 2) The inmate was on hourly checks because of her inmate MHCB discharge. The last custody check was at 2100 hours, with the exception of the 2115 count, the next custody check should have been at 2200 hours. However, there were no annotations of a security check being performed at 2200 hours in the unit logbook. The inmate was discovered at 2253;

> 3) The inmate's property was not available for review during a site visit to CIM following her suicide. It is unclear what happened to her property or what was not available for inspection;

> 4) Following the discovery of the inmate hanging, there was a delayed entry into the cell to cut her down. Custody staff responded to the cell without the cut-down tool;

> 5) The inmate's body was not immediately moved to the TTA and remained on the tier for approximately three hours. There was concern about the length of time the body remained on the tier and whether the reason for the delay was necessary; and

> 6) Per the Nursing Death Review Summary, one nursing concern was identified requiring follow-up" (i.e., documentation of observation by nursing staff while the inmate was on Suicide Precaution status indicated that the checks were not staggered as required.)


There were two other issues *not* addressed by the CDCR reviewer in this case. *First*, the clinician that completed the initial SRE on May 5, 2015 inappropriately used "contracting for safety" with the inmate. As tragically demonstrated in this case where the inmate committed suicide less than five days from "contracting for safety," such contracting has historically been found to have no protective value against suicide and ineffective in the management of suicidal patients. A QIP should have been developed that required the CMH to counsel CIM clinicians against utilizing contracting for safety with inmates. *Second*, although the Suicide Report contained a QIP regarding the inaccuracies in SREs completed for the inmate on May 5 and May 7, 2015, the CDCR reviewer failed to provide any critique of the grossly inadequate safety plan contained in the discharging SRE of May 7, 2015 that simply stated: "Discharge at CCCMS

LOC, 5-day F/U, clinician to clinician contact for continuity of care, and assist with I/P's adjustment issues, particularly of being a transgender in men's prison." The safety plan was unhelpful and resulted in the two follow-up notes of May 8 and May 9 (the day of the suicide) being equally unhelpful. Given the short proximity of the inmate's discharge from the MHCB unit and her suicide two days later, a reasonably developed safety plan might have prevented the death.

## California Men's Colony (CMC)

CMC experienced three inmate suicides during the review period. In the **first** case (CMC 1), the inmate was found unresponsive in his EOP housing cell during the morning of April 19, 2015. The initial cause of death was listed as "unknown" until an autopsy report received by CDCR in July 2015 determined the cause to be "acute amlodipine toxicity," with the manner of death reclassified as a suicide. At the time of his death, the inmate had five KOP medications for various medical ailments. When discovered unresponsive, there were four empty 30-day supply containers of KOP medications his cell. The inmate had entered the CDCR system in November 1992 to serve a 25-year to life sentence for murder (of his third wife). During his 23-year incarceration, he was considered a model inmate who never incurred an RVR. He was involved in a variety of self-help programs and was continuously employed. The inmate was transferred to CMC in January 2009 and, apart from transfers to DSH on multiple occasions for suicidal behavior, remained at CMC until his death. The inmate was not gang-affiliated. He had family support from his mother until her death in 2011, as well as from his adult daughter until 2013, when her letter correspondence ended. There were no records of telephone calls, and the inmate's last visit was in 2003.

According to various records, the inmate's parents divorced when he was three-years-old and he was principally raised by his mother until he left home at age 16. There were some reports of physical and sexual abuse within the home. The inmate served two years in the military and was honorably discharged in December 1975. He then worked in construction for approximately 14 years. The inmate was married three times and each marriage ended in divorce. He fathered two children.

Although the inmate did not report receiving any mental health treatment in the community during his adolescent and teenage years, he reportedly experienced increasing agitation, hostility, and violence in his life that ultimately contributed to his failed marriages. He was said to abuse both alcohol and other substances. In November 1989, two months before the instant offense, he was psychiatrically hospitalized due to a SA by hanging and diagnosed with Adjustment Disorder with Mixed Emotional Features and Polysubstance Abuse, with Marital Discord identified as a stressor. The following month (December 1989), his third wife filed for divorce which ultimately precipitated her murder in January 1990. Immediately following his arrest, the inmate stated: "I just had enough. Can I get the death penalty?" During his initial confinement at the county jail, the inmate attempted suicide by overdose and was diagnosed with Major Depressive Disorder.

Upon entry into CDCR, the inmate initially had limited contact with mental health providers. From 1992 through 2008, he was provided mental health services for periodic depression and SI

caused by incarceration and lack of family support.  He was initially diagnosed with Adjustment Disorder, then Dysthymia.  On June 2, 2008, the inmate attempted suicide by cutting his wrist with a razor and was placed in a MHCB.  He then was transferred to DSH where he remained for approximately six months.  Upon his return to CDCR, he engaged in a suicidal gesture in the transport van and was again placed in a MHCB for a few days.  The inmate was placed at the EOP level of care in January 2009.  His diagnosis was revised to Major Depressive Disorder, Recurrent, in Partial Remission, Polysubstance Dependence, and Anti-Social Personality Disorder.

According to records, the inmate was not only a model inmate who programmed effectively and stayed out of trouble, but he was an active participant in EOP programming and compliant with medication.  Following a BPH session on February 6, 2012 in which he was deferred for parole, the inmate expressed SI and was again placed in a MHCB.  In fact, between March 2012 and November 2013, the inmate was placed in a MHCB and transferred to DSH an additional four times (in March 2012, January 2013, August 2013, and September 2013) for SI and/or SAs.  His DSH stay in March 2012 included another SA.

The inmate also had a significant medical history that included Hepatitis C with cirrhosis, hypertension, non-insulin-dependent diabetes, and prior treatment for both prostate and colon cancer.  In July 2014, he was endorsed to CHCF due to being medically classified as "specialized out-patient."  Because he had been successfully housed at CMC since 2009, the inmate became increasingly agitated and voiced concerns for safety and programming opportunities if he was transferred.  Two months later on September 5, 2014, the inmate voiced SI due to his pending CHCF transfer and was placed on Suicide Precaution status for several days.  An SRE noted both his acute and chronic risk for suicide were assessed as "moderate."  It was noteworthy that the inmate's chronic risk for suicide was noted as "moderate" given his extensive history of suicidal behavior and previous assessment in January and April 2014 indicating a "high" chronic risk for suicide.

During the next several months, the inmate's behavior appeared to stabilize and in a mental health treatment plan (MHTP) dated December 17, 2014, he was quoted as saying "I have SI all the time, but I deal with it: I don't want to die."  The following day, he was placed in the High-Risk Management Program (HRMP) due to his history of suicidal and self-injurious behavior.  Of note, the CDCR reviewer in this case noted that it appeared medical providers who ordered KOP medications for the inmate were unaware that he was in the HRMP.

During a January 29, 2015 contact with a mental health clinician, the inmate reported that he experienced SI "a couple of times a day, but I push them out real quick."  The inmate kept an active journal to cope with his chronic depression and SI.  In a February 23, 2015 entry, he wrote: "Life is such a battle even though I continue to use the skills and coping tools I rely on and use the methods learning [sic] in groups.  No matter what skills I use in this life, the pain and battle has always returned, because in my reality this life is not a life worth living and it's not just being in prison although that is a big part of the problem."

Recurrent themes in his recent EOP treatment were continued anxiety regarding his upcoming parole hearing, medical concerns, pending transfer to CHCF, and lack of family contact.  A

March 6, 2015 progress note described the inmate's frustration with his medical problems, noting that "I'm doing all right, but I just got back from the doctor and even though I've had Hep C since 2006 they haven't done anything for me and now I have cirrhosis of the liver.... it just confirms that they think I'm worthless and I think I'm worthless.... I pray that I die, but I'm not suicidal.  I regret having surgery for colon cancer two years ago.... I'm not in crisis and I'm not suicidal... I'm a religious man and I'd be worried afterwards if I committed suicide."  On April 8, 2015, another clinician noted that the inmate had a reduction in his SI "from 1 to 2 times per day to 1 to 2 times per week."  The following week on April 17, 2015, which turned out to be his last primary clinician contact two days before his death, the inmate stated that he was still "feeling worthless .... The doctor doesn't care about us."  The clinician noted current stressors of medical and work issues, and that the inmate appeared "depressed and agitated about stressors .... Doesn't appear to be using effective skills to manage stressors."

The CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, although noted that "his death occurred after what appeared to be a swift downward spiral .... His last vocalization of suicidal thoughts came after finding out he was endorsed to CHCF, and this was a continuous stressor for him until his death.  He feared for his safety if he left CMC and also was concerned about his loss of programming opportunities.... It appeared as though distress related to his up-coming transfer ultimately led to his final act of suicide."  The Suicide Report contained five recommendations for corrective action through a QIP:

> 1) While at CMC, there were no comprehensive CDCR 7386 Mental Health Evaluations completed per policy;

> 2) The inmate's most recent CDCR 7388 Mental Health Treatment Plan occurred on December 17, 2014....The inmate should have had another MHTP on or before March 17, 2015;

> 3) The inmate was included in the HRMP because of past SAs. Mental health documentation following his inclusion in this program did not reflect his level of suicide risk or discuss whether his suicide ideation was being monitored or tracked.  Further there was no specific safety plan to address his level of risk while in the HRMP.  All notes indicated the same type of therapy, were generic, and did not address actual treatment needs;

> 4) The inmate possessed large amounts of KOP medications in his cell at the time of his death, which is allowed per policy despite being an EOP inmate identified as 'high-risk'; and

> 5) The inmate was pending transfer to CHCF following years of mental health care at CMC.  The looming transfer was a significant stressor for in the inmate.

Of note, this reviewer's examination of the CCHCS "Combined Death Review Summary" found that the inmate's inclusion in the HRMP was *not* noted in his medical records, confirming the CDCR reviewer's concern that medical providers who ordered KOP medications for the inmate were unaware that he was in the HRMP.

In the **second** case (CMC 2), the inmate was found hanging in his GP cell during the afternoon of October 4, 2015. The inmate had been at the 3CMS level of care. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

In the **third** case (CMC 3), the inmate was found hanging by a sheet in his cell during the late afternoon of December 24, 2015. The inmate had been at the EOP level of care. At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer, and the CDCR Suicide Report had not yet been completed.

## CMF

In this case (CMF 1), the inmate was found hanging by a sheet from the ventilation grate in his administrative segregation cell during the evening of March 7, 2015. The inmate had entered the CDCR system on April 25, 2012 to serve an eight-year sentence for assault with a deadly weapon. He accrued five RVRs during his confinement, most recently for an assault on a peace officer on June 2, 2014. The inmate was transferred from CSP/Solano to CMF that day and housed in administrative segregation. He was not thought to be gang affiliated, and enjoyed good family support from his mother through visits and letter correspondence.

The inmate did not have a documented history of mental illness, nor any history of SI and/or self-injurious behavior. He was not in the MHSDS and consistently screened negative for any mental health issues during required intake screening processes during his confinement. The inmate had several medical problems, including Hepatitis C, asthma, constipation, and kidney stones, but none of these ailments were viewed as precipitants to his death.

On December 18, 2014, criminal charges were filed with the local district attorney regarding the inmate's assault on a peace officer. He pled guilty and an additional three years were added to his CDCR sentence. On March 5, 2015, two days before his death, the inmate was notified that an ICC meeting had been scheduled for March 11 to discuss an administrative segregation extension and SHU sanction based upon the RVR.

The CDCR reviewer in this case did not offer any specific possible precipitating factors for the suicide, and the brief suicide note that was found in his cell simply offered an apology to his family and cryptic blame to an officer. The reviewer noted that "It was not clear what motivated his suicide, but likely the additional time he accrued in the prison environment exacerbated any predisposing negative thinking or coping abilities."

The Suicide Report contained two (2) recommendations for corrective action through a QIP: "1) The officer who found the inmate did not activate his personal alarm and it was not clear if he had a personal alarm device on his person. Post orders for the officer's position indicated that the personal alarm should be used in cases of emergency; and 2) per the Nursing Death Review Summary, one nursing concern was identified requiring follow-up (i.e., inaccurate listing of medication on a prior date).

## CSATF

In this case (CSATF 1), the inmate was found hanging by a t-shirt from the light fixture in his administrative segregation cell during the early morning of September 6, 2014.  The inmate reentered the CDCR system in October 1998 to serve a 25-year-to-life sentence for armed robbery, for which he received his third strike.  He had 13 RVRs during this current incarceration, the most recent of which occurred on June 11, 2014 and involved battery on an officer.  At the time of his death, the inmate was awaiting disposition of two RVRs in the administrative segregation unit and was pending transfer to the SHU.  The inmate was gang-affiliated.  He reportedly had family support, principally from his father, but the relationship had been strained in recent months due to the inmate frequently asking for money.  He was transferred to CSATF in November 2006.

The inmate did not report any prior history of mental illness in the community, nor did he have a family history of mental illness.  He did have an extensive history of substance abuse. The inmate was enrolled in the MHSDS in February 2012 after being depressed following a recent break up with his girlfriend.  His initial diagnoses were Adjustment Disorder with Depressed Mood and Alcohol Dependence.  He was not prescribed any psychotropic medication.  Although he requested to be removed from the MHSDS in November 2012, his treatment team decided to retain him at the 3CMS level of care because of his continued drug use and recent mood instability.  In June 2013, he again asked to be removed from the MHSDS, and was discharged in September 2013.

On June 10, 2014, the inmate was placed in administrative segregation after stabbing another inmate on the yard.  The following day (June 11), he got into an altercation with an officer and was charged with battery on a peace officer.  The inmate was assessed by a psychiatrist and given a diagnosis of Mood Disorder NOS, and R/O Adjustment Disorder with Depressed Mood. He was re-enrolled into the 3CMS program.  According to the CDCR reviewer in this case, "The primary clinician conducted his first individual counseling session with the inmate on June 26, 2014, a full two weeks after he entered ASU.  He was seen again on July 3, 2014, but then not again until two weeks later on July 17, 2014.  It should be noted that all these progress notes are nearly identical.  He was not seen again for nearly two weeks on July 30, 2014. It should be noted that the treatment plan was not completed within timelines.  In fact, the inmate did not receive a treatment plan until August 13, 2014, after he had been in ASU for over two months."  The plan indicated that the inmate was experiencing increasing stress and anxiety due to his housing change and was feeling that medical staff were ignoring his symptoms of chest pains (which had subsequently resulted in the altercation with custody staff on June 11).  The CDCR reviewer also noted that the inmate's request to be entered into an anger management group was not followed up in either the treatment plan or subsequent progress notes.

The inmate did not have a history of suicidal behavior in the community, nor did he report any family history of suicide.  An SRE completed in 2012 estimated both a "moderate" chronic and acute risk for suicide based upon his recently severed relationship with his girlfriend, long prison sentence, and history of violence.  Two SREs were completed on June 12 and June 19, 2014, respectively.  The inmate denied any current SI or history of suicidal behavior during both

assessments. The first SRE found the inmate to be a "moderate" chronic risk and "low" acute risk for suicide, whereas the second SRE found the inmate to be both a "moderate" chronic and acute risk for suicide. Despite a finding of moderate acute risk in June 19, the CDCR reviewer opined that several acute risk factors were committed, including "agitated and angry, disturbance of mood/lability, hopeless/helpless, increasing interpersonal isolation, recent negative staff interaction, and recent disciplinary (RVRs)."

The CDCR reviewer did not offer any specific precipitating factors to the suicide, and no suicide note was found. The reviewer noted that the inmate appeared to be exhibiting increased anxiety and agitation, exemplified in his complaints of chest pains, during the last few months of his life. According to his cellmate, the inmate had recently become angry with his family for withholding further financial support until he had repaid a debt to his uncle. The cellmate also stated that the inmate had used methamphetamine all day during the last day of his life. The cellmate, as well as other inmates, did not notice any increased depression or other signs of suicidal behavior. The reviewer noted that the inmate "did not display any overt warning signs of suicide, did not report suicidal ideation, and had no previous suicide attempts."

The Suicide Report detailed numerous deficiencies in the delivery of mental health services for this inmate, and contained four recommendations for corrective action through a QIP:

> 1) The inmate's mental health documentation was not completed in accordance with the Mental Health Program Guide requirement required timelines. The inmate's initial Mental Health Evaluation and initial Mental Health Treatment Plan were not completed within the required time frames. While a Brief Mental Health Evaluation was completed on June 12, 2014, which was said to replace the CDCR 7386, there was no entry for this document in the MHTS. In addition, clinical documentation did not appear to integrate substance use concerns or treatment recommendations provided in this brief evaluation;

> 2) The treatment plan was not completed until two months after the inmate's entry into the CCCMS level of care. It should be noted that when the Mental Health Treatment Plan was completed it did not contain a full diagnosis as required by the Program Guide. It is unclear if his treatment team ever got together and discussed his treatment during the first two months of his stay in ASU. There were two psychiatric evaluations but there was no documentation indicating the primary clinician ever reviewed these evaluations. There was no mention of consideration of substance abuse or dependency;

> 3) The SRE was not completed thoroughly and there was no documented risk reduction plan for his estimated moderate acute and chronic suicide risk. The judgment of moderate risk was based on his long sentence and recent violence. The primary clinician completed an SRE on the inmate on June 19, 2014. Two chronic risk factors were omitted: perception of loss of social support and being male. Several acute risk factors were omitted including: agitated and angry, disturbance of mood/lability, hopelessness and/or helplessness, increasing interpersonal isolation, recent negative staff interaction, and recent disciplinary

(RVR).  The completed SRE estimated his suicide risk as moderate chronic and moderate acute due to recent violence and his long sentence.  Including these additional factors may have elevated his level of risk; and

4) Five mental health progress notes were missing from eUHR.  According to mental health staff, the sessions were completed and the documentation was forwarded to medical records for scanning.  It is unclear why these notes did not get scanned into the records.

## ACRONYMS and ABBREVIATIONS

3CMS:                 Correctional Clinical Case Manager System

ACH:                  Acute Care Hospital

ADHD:                 Attention Deficit Hyperactivity Disorder

AED:                  Automatic External Defibrillator

AH:                   Auditory Hallucinations

AHU:                  Alternative Housing Unit

Ambu bag:             Ambulatory Bag Used for CPR

APP:                  Acute Psychiatric Program at Vacaville

BPH:                  Board of Parole Hearings

C-file:               Central File

CAP:                  Corrective Action Plan

CBT:                  Cognitive Behavioral Therapy

CCC:                  California Correctional Center

CCI:                  California Correctional Institution

CCWF:                 Central California Women's Facility

CDCR:                 California Department of Corrections and Rehabilitation

CEO:                  Chief Executive Officer

CHCF:                    California Health Care Facility

CIM:                     California Institution for Men

CIW:                     California Institution for Women

CMC:                     California Men's Colony

CMF:                     California Medical Facility

CMH:                     Chief of Mental Health

CO:                      Correctional Officer

CPR:                     Cardiopulmonary Resuscitation

CQIT:                    Continuous Quality Improvement Tool

CSATF:                   California Substance Abuse Treatment Facility

CSP/Cor:                 California State Prison/Corcoran

CSP/LAC:                 California State Prison/Los Angeles County

CSP/Sac:                 California State Prison/Sacramento

CSP/Solano:              California State Prison/Solano

CTC:                     Correctional Treatment Center

CTF:                     California Training Facility/Soledad

CYA:                     California Youth Authority

DAI:                     Division of Adult Institutions

DBT:                     Dialectical Behavioral Therapy

DSH:                     Department of State Hospitals

DVI:                    Deuel Vocational Institution

EB:                     East Block

EOP:                    Enhanced Outpatient Program

eUHR:                   Electronic Unit Health Record

FSP:                    Folsom State Prison

GP:                     General Population

HDSP:                   High Desert State Prison

HI:                     Homicidal Ideation

ICC:                    Institutional Classification Committee

ICF:                    Intermediate Care Facility

IDTT:                   Interdisciplinary Treatment Team

I/P:                    Inmate/Patient

IST:                    In-Service Training or Incompetent to Stand Trial

KVSP:                   Kern Valley State Prison

LOC:                    Level of Care

LOP:                    Local Operating Procedure

MAR:                    Medication Administration Record

MCPS:                   Modified Property Control Status

MCSP:                   Mule Creek State Prison

MHCB:                   Mental Health Crisis Bed

MHCBU:              Mental Health Crisis Bed Unit

MHOHU:             Mental Health Outpatient Housing Unit

MHSDS:             Mental Health Services Delivery System

MHTP:              Mental Health Treatment Plan

MHTS:              Mental Health Tracking System

MSE:               Mental Status Examination

NKSP:              North Kern State Prison

NOS:               Not Otherwise Specified

OHU:               Outpatient Housing Unit

PBSP:              Pelican Bay State Prison

PC:                Primary Clinician

PCP:               Primary Care Physician

PIA:               Prison Industry Authority

PIP:               Psychiatric Inpatient Program

PRN:               As Needed

PSU:               Psychiatrist Services Unit

PT:                Psychiatric Technician or Psych Tech

PTSD:              Post-Traumatic Stress Disorder

PVSP:              Pleasant Valley State Prison

QIP:               Quality Improvement Plan

R & R:                    Reception and Receiving

RC:                       Reception Center

RJD:                      Richard J. Donovan Correctional Facility

R/O:                      Rule Out

RT:                       Recreational Therapist

RVR:                      Rule Violation Report

SA:                       Suicide Attempt

SHU:                      Security Housing Unit

SI:                       Suicidal Ideation

SNF:                      Skilled Nursing Facility

SNY:                      Sensitive Needs Yard

SOAP:                     Subjective Objective Assessment and Plan

SPRFIT:                   Suicide Prevention and Response Focused Improvement Team

SQ:                       San Quentin State Prison

SRA:                      Suicide Risk Assessment

SRE:                      Suicide Risk Evaluation

SVSP:                     Salinas Valley State Prison

TTA:                      Triage and Treatment Area

VSP:                      Valley State Prison

WSP:                      Wasco State Prison