# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
    **Plaintiffs**

    **v.**             **No. CIV S-90-0520 KJM KJN P**

**EDMUND G. BROWN, JR., et al.,**
    **Defendants**

## TWENTY-SIXTH ROUND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS

Matthew A. Lopes, Jr., Esq.

Special Master

PANNONE LOPES DEVEREAUX & WEST LLC

317 Iron Horse Way, Suite 301

Providence, RI 02908

(401) 824-5100

Fax: (401) 824-5123

May 6, 2016

## <u>ACRONYMS and ABBREVIATIONS</u>

3CMS:              Correctional Clinical Case Management System

Ambu bag:          Ambulatory Bag Used for CPR

ASH:               Atascadero State Hospital

ASP:               Avenal State Prison

C-file:            Case File

C&PR:              Classification and Parole Representative

Calipatria:        Calipatria State Prison

CAP:               Corrective Action Plan

CAPIC:             California Psychology Internship Council

CC I:              Correctional Counselor I

CC II:             Correctional Counselor II

CCAT:              Correctional Clinical Assessment Team

CCC:               California Correctional Center

CCI:               California Correctional Institution

CCWF:              Central California Women's Facility

CDCR:              California Department of Corrections and Rehabilitation

Centinela:         Centinela State Prison

CHCF:              California Health Care Facility

CIM:             California Institution for Men

CIW:             California Institution for Women

CMC:             California Men's Colony

CMF:             California Medical Facility

CO:              Correctional Officer

CPR:             Cardiopulmonary Resuscitation

CQI:             Continuous Quality Improvement

CQIT:            Continuous Quality Improvement Tool

CRC:             California Rehabilitation Center

CSATF:           California Substance Abuse Treatment Facility

CSP/Corcoran:    California State Prison/Corcoran

CSP/LAC:         California State Prison/Los Angeles County

CSP/Sac:         California State Prison/Sacramento

CSP/Solano:      California State Prison/Solano

CTC:             Correctional Treatment Center

CTF:             Correctional Training Facility

CVSP:            Chuckawalla Valley State Prison

DCHCS:           Division of Correctional Health Care Services

DSH:             Department of State Hospitals

DOT:             Direct Observation Therapy

DVI:                    Deuel Vocational Institution

EOP:                    Enhanced Outpatient Program

ERRC:                   Emergency Response Review Committee

eUHR:                   Electronic Unit Health Record

FIT:                    Focused Improvement Team

Folsom:                 Folsom State Prison

FTE:                    Full-time Equivalent

GACH:                   General Acute Care Hospital

HDSP:                   High Desert State Prison

HPS I:                  Health Program Specialist I

HS:                     *Hora Somni*/Hour of Sleep

ICC:                    Institutional Classification Committee

ICF:                    Intermediate Care Facility

IDTT:                   Interdisciplinary Treatment Team

ISP:                    Ironwood State Prison

KVSP:                   Kern Valley State Prison

LOP:                    Local Operating Procedure

LTRH:                   Long Term Restricted Housing

MAPIP:                  Medication Administration Process Improvement Project

MAR:                Medication Administration Record

MCSP:               Mule Creek State Prison

MHCB:               Mental Health Crisis Bed

MHOHU:              Mental Health Outpatient Housing Unit

MHSDS:              Mental Health Services Delivery System

MHTS.net:           Mental Health Tracking System

MERD:               Minimum Eligible Release Date

MPIMS:              Madrid Patient Information Management System

NKSP:               North Kern State Prison

OHU:                Outpatient Housing Unit

PBSP:               Pelican Bay State Prison

PC:                 Primary Clinician

PSH:                Patton State Hospital

PSU:                Psychiatric Services Unit

PVSP:               Pleasant Valley State Prison

QIP:                Quality Improvement Plan

QIT:                Quality Improvement Team

RJD:                Richard J. Donovan Correctional Facility

RVR:                Rule Violation Report

SCC:                Sierra Conservation Center

| | |
|---|---|
| SHU: | Security Housing Unit |
| SNY: | Sensitive Needs Yard |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRE: | Suicide Risk Evaluation |
| SSI: | Supplemental Security Income |
| STRH: | Short Term Restricted Housing |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| TTA: | Triage and Treatment Area |
| VSP: | Valley State Prison |
| VPP: | Vacaville Psychiatric Program at CMF |
| WSP: | Wasco State Prison |

## TABLE OF CONTENTS

**ACRONYMS and ABBREVIATIONS**                                           i

**THE COLEMAN SPECIAL MASTER'S TWENTY-SIXTH ROUND
MONITORING REPORT**                                                      1

**Introduction**                                                        1

**Overview**                                                            6

**SUMMARY OF THE SPECIAL MASTER'S FINDINGS**                            12

    I.      Mental Health Staffing in CDCR Prisons                 12

    II.    Quality Management                                        27

    III.   Medication Management                                     33

    IV.   Rules Violation Reports                                   41

    V.    Custody/Mental Health Relations                          50

    VI.    Program Access                                           57

    VII.   Construction of Mental Health Treatment Space and Beds for
             Inmates at Various Levels of Care                      65

    VIII.  Access to Higher Levels of Care                          73

         A.    Overview of the Special Master's Findings During the
                  Twenty-Sixth Round                                    73

         B.    The Role of Access to Higher Levels of Care in Coleman
                  Remediation                                           74

         C.    Historical Context of the Access-to-Care Problem in CDCR
                  Prisons                                               75

         D.    The Special Master's Findings on Access to Higher Levels
                  of Care during the Twenty-Sixth Round                  79

    IX.    Administrative Segregation EOP                           86

    X.    CDCR's Continuous Quality Improvement Process: Implications
             for the Quality of Care Delivered in CDCR's Mental Health
             Program                                               94

         A.    The Evolution from Quality Management to Quality
                  Improvement                                           94

         B.    The Special Master's Findings on the Quality of Care

Delivered During the Twenty-Sixth Monitoring Period
Substantiate the Need for a Sound and Durable Quality
Improvement Process in CDCR's Mental Health Program        103
1.    Issues with Use of the Interdisciplinary Treatment
      Team Process                                         104
2.    Treatment Planning Concerns                          107

      a.    Documentation Issues                           107

      b.    Inadequacies of Treatment Plans                108

      c.    Lack of Needed Modifications and Updating
            of Treatment Plans to Respond to Inmates'
            Current Mental Health Issues                   110

      d.    Failures to Implement Designated Treatment
            Interventions                                  111

      e.    Care Was Not Sufficiently Individualized to
            Address Inmates' Clinical Needs                111

**CONCLUSION AND RECOMMENDATIONS**                         118

**APPENDIX A - INSTITUTIONAL SUMMARIES**                   133

California State Prison/ Sacramento (CSP/Sac)              133

Folsom State Prison (Folsom)                               150

California Health Care Facility (CHCF)                     159

Pelican Bay State Prison (PBSP)                            175

High Desert State Prison (HDSP)                            189

California Correctional Center (CCC)                       201

Mule Creek State Prison (MCSP)                             205

Sierra Conservation Center (SCC)                           225

California Medical Facility (CMF)                           231

California State Prison/Solano (CSP/Solano)                247

San Quentin State Prison (SQ)                              259

Deuel Vocational Institution (DVI)                         279

California State Prison/Corcoran (CSP/Corcoran)            293

California Substance Abuse Treatment Facility (CSATF)      312

Pleasant Valley State Prison (PVSP) — 325

Avenal State Prison (ASP) — 339

Salinas Valley State Prison (SVSP) — 350

Correctional Training Facility (CTF) — 366

California Men's Colony (CMC) — 374

Wasco State Prison (WSP) — 389

Kern Valley State Prison (KVSP) — 401

North Kern State Prison (NKSP) — 414

California State Prison, Los Angeles County (CSP/LAC) — 432

California Correctional Institution (CCI) — 443

California Institution for Men (CIM) — 454

California Rehabilitation Center (CRC) — 469

Richard J. Donovan Correctional Facility (RJD) — 475

Ironwood State Prison (ISP) — 498

Calipatria State Prison (CSP) — 503

Centinela State Prison (Centinela) — 508

Chuckawalla Valley State Prison (CVSP) — 513

California Institution for Women (CIW) — 518

Central California Women's Facility (CCWF) — 532

Valley State Prison (VSP) — 544

**APPENDIX B – CLINICAL CASE REVIEWS** — 556

California State Prison, Sacramento (CSP/Sac) — 557

Folsom State Prison (Folsom) — 561

California Health Care Facility — 566

Pelican Bay State Prison (PBSP) — 573

High Desert State Prison (HDSP) — 585

California Correctional Center (CCC) — 595

Mule Creek State Prison (MCSP)                                      601

California Medical Facility (CMF)                                   608

California State Prison, Solano (CSP/Solano)                        623

San Quentin State Prison (SQ)                                       629

Deuel Vocational Institution (DVI)                                  642

California State Prison, Corcoran (CSP/Corcoran)                    649

California Substance Abuse Treatment Facility (CSATF)               666

Pleasant Valley State Prison (PVSP)                                 670

Avenal State Prison (ASP)                                           688

Salinas Valley State Prison (SVSP)                                  702

Correctional Training Facility (CTF)                                708

California Men's Colony (CMC)                                       713

Wasco State Prison (WSP)                                            717

Kern Valley State Prison (KVSP)                                     732

North Kern State Prison (NKSP)                                      739

California State Prison, Los Angeles County (CSP/LAC)              749

California Correctional Institution (CCI)                           753

California Institution for Men (CIM)                                759

California Rehabilitation Center (CRC)                              767

Richard J. Donovan Correctional Facility (RJD)                     771

California Institution for Women (CIW)                              781

Central California Women's Facility (CCWF)                          798

Valley State Prison (VSP)                                           803

**APPENDIX C - IDEAS FOR CONSIDERATION FOR TWENTY-
SEVENTH ROUND MONITORING**                                         807

ix

## THE *COLEMAN* SPECIAL MASTER'S
## TWENTY-SIXTH ROUND MONITORING REPORT

### Introduction

This report covers the Special Master's Twenty-Sixth Monitoring Round review of the defendants' compliance with the plans, policies, and protocols that were provisionally approved by this Court in mid-1997, subsequently revised and re-approved by this Court on March 3, 2006 (Order, ECF 1773), and currently known as the Revised *Coleman* Program Guide (Program Guide). The Special Master's monitor's and expert's[1] institutional site visits for the Twenty-Sixth Monitoring Round began on February 3, 2015 and ended on July 23, 2015. Institutional mental health staff and administrators of the California Department of Corrections and Rehabilitation (CDCR) continued their ongoing full cooperation with the Special Master's monitoring staff at the institutional site visits.

The monitor conducted full on-site visits at all 34 CDCR adult institutions,[2] as it had been approximately two and a half years since the monitor's last on-site prison tour for the preceding monitoring period had ended in late August 2012. Between that time and the Twenty-Sixth

---

[1]Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to collectively as "the monitor." Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

[2]Avenal State Prison (ASP), California Correctional Center (CCC), California Correctional Institution (CCI), California Health Care Facility (CHCF), California Institution for Men (CIM), California Institution for Women (CIW), California Medical Facility (CMF), California Men's Colony (CMC), California Rehabilitation Center (CRC), California State Prison/Corcoran (CSP/Corcoran), California State Prison/Los Angeles County (CSP/LAC), California State Prison/Sacramento (CSP/Sac), California State Prison/Solano (CSP/Solano), California Substance Abuse Treatment Program (CSATF), Calipatria State Prison (Calipatria), Centinela State Prison (Centinela), Central California Women's Facility (CCWF), Chuckawalla Valley State Prison (CVSP), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI), Folsom State Prison (Folsom), High Desert State Prison (HDSP), Ironwood State Prison (ISP), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), San Quentin State Prison (SQ), Sierra Conservation Center (SCC), Wasco State Prison (WSP), and Valley State Prison (VSP).

Monitoring Round, there was a proliferation of orders and projects that were changing the CDCR prison mental health landscape.

A very important project has been, and continues to be, CDCR's development of its continuous quality improvement process (CQI), including its self-auditing tool known at the Continuous Quality Improvement Tool (CQIT). This process has very significant positive implications for the future of mental health care delivery within CDCR's prisons. Thus far, developments in this area appear to indicate that CQI and CQIT are potentially a durable remedy for *Coleman* remediation, with the attendant the hope that they set the course and lead to the conclusion of the *Coleman* case. A detailed discussion of the background and utility of CQI and CQIT is set forth below in Part X of this report.

Other significant activities which occurred since the preceding monitoring period included:

- Litigation and denial of the defendants' motion to terminate *Coleman* federal court oversight;

- Litigation and orders on plaintiffs' post-termination motions for relief in the areas of inpatient treatment, segregated housing, Enhanced Outpatient Program (EOP) administrative segregation hubs, use of force, and inmate disciplinary measures;

- Revision of use-of-force policies and procedures;

- Changes in the use of Guard One in the PBSP SHU;

- Development of plans and policies for changes affecting mental health inmates housed in administrative segregation units;

- Completion and activation of the SQ PIP and the CIW PIP and monitoring thereof;

- Monitoring and reporting by the Special Master on delivery of care to *Coleman* class members in DSH and CDCR inpatient programs;

- CDCR examination and certification of EOP administrative segregation hubs;

2

- Development of CDCR's new mental health staffing plan;

- Monitoring and reporting by the Special Master on implementation of agreed-to changes to Rule Violation Report (RVR) policies and procedures; and

- Settlement of the *Hecker*[3] litigation and transition of surviving *Hecker* issues[4] into *Coleman* monitoring.

Also, since the time when defendants' motion to terminate *Coleman* federal court oversight was denied on April 5, 2013, CDCR's mental health caseload population has surged while its total in-custody population has fallen. As of April 19, 2013[5], CDCR's mental health caseload population was 32,525 and as of April 3, 2013[6], CDCR's total in-custody population was 132,533, making the mental health caseload population comprise 24.5 percent of the total population. As of December, 2015[7], CDCR's average total mental health caseload population had risen to approximately 36,800 and as of February 24, 2016[8], CDCR's total in-custody population declined to 127,303, making the mental health caseload population comprise 28.9 percent of the total population. Stated otherwise, during the same timeframe, CDCR's mental health caseload population rose by approximately 4,275 while its total inmate population fell by

---

[3]*Hecker v. CDCR*, No. 2:05-CV-02441 (E.D. Cal.)
[4]Now referred to as "Program Access" issues.

[5] Closest date to April 5, 2013 for which CDCR's total mental health caseload population was reported; source: CDCR Secure Website, posting covering April 2013.
[6] Closest date to April 5, 2013 for which CDCR's total in-custody population was reported; source: CDCR Public Website, Population Reports.
[7] As of this writing, most recent date for which CDCR's current mental health caseload population has been reported; source: "An Update to the Future of California Corrections, January 2016," p. 12.
[8] As of this writing, the most recent date for which CDCR total in-custody population has been reported; source: CDCR Public Website, Population Reports.

approximately 5,230.  This divergence of populations suggests that a study of the reasons behind it, and whether it is likely to continue, may be in order.

The core monitoring focus areas covered in the Twenty-Sixth Round were institutional mental health staffing levels, quality management, medication management, and transfers to higher levels of care.  Unlike in the past, the monitor did not examine suicide prevention practices at the institutions during this round, as the Special Master's expert Lindsay Hayes was simultaneously conducting a follow-up audit of suicide prevention policies, practices, and procedures, plus individual non-clinical suicide case reviews, in 18 selected CDCR prisons.   His report on the results of his re-audit, and the Special Master's accompanying report, were filed on January 20, 2016 (ECF 5396, 5395)

The monitor also continued to examine the provision of mental health services in the institutions' reception centers, administrative segregation units, administrative segregation EOP hubs, Mental Health Crisis Beds (MHCB), mainline EOPs, and Correctional Clinical Case Management System (3CMS) programs, and reviewed the institutions' use of alternative housing for mental health inmates, referrals of inmates for mental health assessments and treatment, use of force on mental health caseload inmates, staff training on the Rules Violation Reports process, institutional compliance with heat plans, as well as inmate access to mental health appointments, relationships/collaboration between custody and mental health staffs, among other items affecting the delivery of mental health care to inmates.

Since the preceding monitoring period, the Special Master successfully guided the parties in the *Hecker* litigation to a settlement.[9]  By stipulation, the few surviving issues in *Hecker* were merged into *Coleman* monitoring and were reviewed within the Twenty-Sixth Monitoring Round for the first time as part of regular compliance monitoring.  The monitor's findings on these issues are discussed below under the heading of "Program Access."

The format of this report has been modified in order to provide a more streamlined and readable statement of the Special Master's findings.  In previous reports, summaries of the monitor's findings by focus area were attached as Appendix A.  In this report, they are incorporated into the body of the report. They now also include relevant background information to assist the reader's understanding of the subject matter, plus the Special Master's commentary on the monitor's findings and its significance to the overall *Coleman* remedial effort at present. The summaries of the focus areas appear below, as Parts I through X, in the same order in which they are discussed within the individual summaries of the Special Master's findings at each institution.  Appendix A is now comprised of institution-by-institution summaries of the monitor's findings during the Twenty-Sixth Round. The Special Master's expert's clinical reviews of individual inmate cases now appear in Appendix B.  Lastly, some ideas with regard to areas to be monitored in the upcoming Twenty-Seventh Round are presented in Appendix C for consideration and future discussion.

---

[9] Members of the *Hecker* plaintiff class were recipients of mental health services in CDCR prisons and were, by definition, also members of the *Coleman* plaintiff class.  Their *Hecker* claims arose from denial of access for mental health caseload inmates to certain educational, training, and job programs that were available to other, non-disabled CDCR inmates.

**Overview**

In the Twenty-Sixth Round, the monitor found that, since the preceding monitoring period, institutional performance had improved in some areas, remained generally static in other areas, and had regressed in yet others. One area of concern that emerged from the monitor's findings was mental health staffing. [*See* Part I, below]. Chronic understaffing of CDCR mental health positions had not improved, while CDCR's implementation of its most recent mental health staffing plan, which was filed over a year ago on February 2, 2015 (ECF 5269) seems to have stagnated, leaving CDCR somewhat adrift with mental health staffing.

Vacancies in the key mental health clinical disciplines of psychiatry and psychology remained problematic and were nearly unchanged from rates in 1998, when psychiatrists' and psychologists' vacancy rates were 35 percent and 14.8 percent, respectively. In 2015, vacancy rates in these disciplines were 32 percent and 15 percent respectively. The work necessary to resolving the mental health staffing problem needs to be completed quickly and meaningfully, for without adequate staff, even the best of plans for mental health care are at risk of remaining merely an abstraction. Because of the delay in defendants' implementation of their staffing plan, covering it in this report would have been premature. Accordingly, the Special Master recommends that he be directed to report on it in a free-standing report at a later time. *See* Conclusion and Recommendations, below.

The core structure of CDCR's quality management process remained generally in place and functional during the monitoring period, corroborating the Special Master's findings during the preceding monitoring period that it has in fact taken root [*See* Part II, below], and that further development and implementation of CDCR's continuous quality improvement process is indicated. [*See* Part X, below]. In the meantime, because the monitor found that psychiatrists,

6

psychologists, and social workers at some institutions were not all receiving peer review, the Special Master encourages CDCR to take all necessary steps to complete and implement its new peer review process and ensure that all institutional mental health staff in these disciplines receive peer review.

Part III below covers the Special Master's findings in the area of medication management, which continued to indicate that CDCR's improved levels of compliance in this area had continued overall.  It is anticipated that Medication Administration Process Improvement Project (MAPIP) will continue to assist institutional performance in this area.

Part IV below provides an update on developments in the area of the new RVR policies and procedures since the Special Master's January 30, 2015 report on the RVR process.  As the staff training on the revised policies and procedures did not take place until quite late in the Twenty-Sixth Monitoring Round, implementation of the new RVR policies and procedures will be monitored in the upcoming Twenty-Seventh Round, by which time they should have had the opportunity to become established within the prisons.

Twenty-Sixth Round Monitoring found that long-ingrained cultural conflicts between custody and mental health operations still persisted, despite past efforts to address and end this problem.  [*See* Part V, below].  This is a disappointing and very troubling finding.  The problem must be rectified before it interferes with the viability of the mental health program any further.  CDCR should give serious consideration to extending its custody/mental health collaboration training program throughout all of its institutions.  The Special Master will be looking closely at this area during the Twenty-Seventh Round.

The few lingering issues on inmates' access to educational and work assignments that survived settlement of the *Hecker*[10] litigation were incorporated into regular *Coleman* monitoring for the first time in the Twenty-Sixth Round.  [See Part VI, below].  They, along with some new elements of Program Access that are under development, will again be examined in the Twenty-Seventh Round.

After a long history of extended delays, all of the court-ordered construction projects have been completed.  [*See* Part VII, below].  This is an important accomplishment.  However, the CDCR HCFIP and infill projects remain incomplete as of this time.  In 2012, funding was authorized for the HCFIP and three Level II dorm infill projects at existing institutions.  The HCFIP projects which will impact mental health treatment consist of renovations and construction of primary care clinics, mental health clinics, screening rooms, and examination rooms at eleven institutions.  The HCFIP projects are now projected for completion during the summer of 2017.  The infill projects, which will add Level II dorms at MCSP and RJD and increase the number of beds for the Level II EOP population, are slated for completion in May 2016.  A detailed discussion of these projects and their history can be found in Part VII, below.

Finding a solution to the problem of inmate suicides in CDCR prisons has continued to be a matter of concern and a focus of the Special Master's efforts.  On January 18, 2013, when the Twenty-Fifth Round Monitoring Report was filed, 33 CDCR inmate suicides had occurred during the immediately preceding calendar year 2012.  The rate of suicides at that time was

---

[10] *Hecker v. Schwarzenegger*, 2:05-CV-02441 (E.D. Cal.)

24.46 per 100,000, as compared to the rate of 16 per 100,000 across U.S. state prisons at that

time, and a CDCR inmate was dying by suicide every 11.06 days, on average.

As initially referenced in his Twenty-Fifth Monitoring Round Report, the Special Master

proceeded to organize a suicide-prevention work group, known as the Suicide Prevention

Management Workgroup (SPMW), to address this long-standing problem.  The Workgroup

reviewed and reached consensus on nearly all of the many suicide prevention strategies it studied

and considered during the past year. Details of this work and results thus far are covered in Mr.

Hayes' report, "An Audit of Suicide Prevention Practices in the Prisons of the CDCR," filed

January 14, 2015, ECF 5259, and his more recent follow-up report, "A Re-Audit and Update on

Suicide Prevention Practices in the Prisons of the CDCR," filed January 13, 2016, ECF 5396.

In addition, the Special Master's expert has been attending and offering guidance to

CDCR's death review committee in its reviews of inmate suicide cases.  The intent and plan is to

promote CDCR's advancement of its own suicide prevention and review, thereby helping CDCR

move closer to assuming the role of self-monitoring and correcting of its issues in suicide

prevention, i.e. adopting a quality improvement model for its suicide prevention program.  This

is one aspect of the larger, multi-dimensional transition from the quality management model to

the quality improvement model in CDCR.  In the meantime, the Special Master's psychiatric

expert continues to provide his annual CDCR suicide reviews, the most recent of which was filed

on January 15, 2016, "Report on Suicides Completed in the CDCR January 1, 2013 - December

31, 2013," ECF 5399.   Release of the psychiatric expert's annual review of suicides in 2014 is

expected in the near future.

On the subject of inmates' access to higher levels of care, the Special Master reported in

his Twenty-Fifth Monitoring Round Report overall progress with the institutions' use of the

sustainable process for identifying and referring inmates in need of inpatient care.  In the same report, the Special Master also reported that, to the extent the process identified need for MHCBs that was above projections in defendants' Spring 2012 long-range mental health bed plan ("the Blueprint"), defendants were ordered to ensure that the bed plan provided for an adequate number of beds to meet that need.  The Fall 2012 Population Projections, dated November 2012, appeared to indicate that the number of planned MHCBs would be sufficient.

While the two foregoing statements appeared to bode well for access to inpatient care and MHCBs, the Twenty-Sixth Round of monitoring found concerns surrounding Interdisciplinary Treatment Teams' (IDTT) use of CDCR Form 7388B and its associated process for identification and referral of inmates to higher levels of care. Issues found by the Special Master's expert in this important area are discussed below from the standpoints of institutional practices and individual inmate cases in Parts VIII and X, respectively.  Monitoring in the Twenty-Sixth Round also found a downturn in the availability of MHCBs, in contrast to findings during the preceding round which were encouraging, with indications that the numbers of available MHCBs were increasing and the long-persistent shortage of MHCBs was beginning to ease.  During the Twenty-Sixth Round, it appeared that growing wait lists for inpatient care beds was causing a surge in the number of inmates awaiting transfer to inpatient beds as they remained in their MHCBs pending transfer.  The monitor's findings in this regard are discussed in Part VIII, below.

Concerns surrounding the mental health care and treatment of *Coleman* plaintiff class inmates in CDCR segregated housing units have a long history.  In his Twenty-Fifth Round Monitoring Report, the Special Master discussed long-standing concerns with the excessively long stays for EOP inmates in administrative segregation hubs, citing data indicating that as of

10

September 7, 2012, 87 EOP inmates in administrative segregation had been housed there longer than 90 days.[11]  As of April 5, 2013, when the defendants' motion to terminate federal court oversight in this matter was denied, there were 498 EOP inmates in CDCR's administrative segregation hubs.  By February 5, 2016, that number grew to 699, or by nearly 30 percent in less than three years.  The bottom line is that more and more inmates at the EOP level of care are housed in administrative segregation, requiring necessary care and treatment in a setting that has historically been seriously problematic for inmates at that level of care.  Part XIV below discusses the background and status of the various new plans, policies, and procedures that emanated from a comprehensive order entered on April 10, 2014, ECF 5131, and that will hopefully finally resolve the persistent issues in administrative segregation faced by many mental health caseload inmates who are housed there.

Part X below is a discussion of the background, development, and status of CDCR's continuous quality improvement process, which is poised to advance further along toward implementation of the Department's self-monitoring tool known as the Continuous Quality Improvement Tool (CQIT) in CDCR prisons.  Part X also discusses the Special Master's findings and issues surrounding the *quality* of mental health care being provided to individual inmates, particularly in the areas of institutional IDTTs, their development of treatment plans for the mentally ill inmates whose cases come before them, and their use of the sustainable process for identifying and referring inmates in need of higher levels of care.  The Special Master's expert found notable underperformance in the realm of IDTT activities during the Twenty-Sixth Round,

---

[11] Source: CDCR Secure Website, posted November 1, 2012.

as discussed in detail in Part X below.  It is hoped that the monitor's findings and the discussion in Part X will assist CDCR's focus on future use of its promising CQI process generally and its further development and refinement of its CQIT, to improve the institutions' performance in the area of IDTT functions and wherever else improvements to the care are needed.

<u>Summary of the Special Master's Findings</u>

I.    <u>Mental Health Staffing in CDCR Prisons</u>

    A.    <u>History of Mental Health Staffing in *Coleman*</u>

The history of CDCR's struggle to implement a viable staffing plan for the provision of adequate mental health treatment has been long and tortured, and the problem remains unresolved.  In its remedial order of September 1995, the *Coleman* Court ruled, "[t]he overwhelming weight of evidence before this court demonstrates that the California Department of Corrections is significantly and chronically understaffed in the area of mental health care services.  The department does not have sufficient staff to treat large numbers of mentally ill inmates in its custody." *Coleman v. Wilson*, 912 F. Supp. 1282, 1307 (E.D. Cal. 1995).  At that time, the proportion of CDCR inmates suffering from a serious mental disorder constituted approximately 11 to 15 percent of the overall CDCR prison population, according to defendants' expert, Dr. Joel Dvoskin.  *Id.* at 1301.  During the intervening 20 years, today the proportion of CDCR inmates requiring mental health care has soared to approximately 29 percent of the total inmate population[12], for a mental health population of 36,800 inmates.

---

[12] An Update to the Future of California Corrections, January 2016, p. 12.

12

The findings and recommendations of the Magistrate Judge, which were later adopted by the court in its 1995 remedial order, included the following which relate specifically to staffing:

6.  Within (90) days of the order of the district court, defendants shall develop and implement a formula for mental health care staffing ratios at all institutions within the class. Said formula shall be developed in consultation with an expert to be designated by the court after consultation with the Special Master, with defendants to pay the cost of the expert.

7.  Within (90) days of the order of the district court, defendants shall develop and implement a recruitment program, including but not limited to provision of adequate compensation, for the recruitment of mental health staff at every institution in the class. Said program shall be developed in consultation with an expert to be designated by the court after consultation with the Special Master, with defendants to pay the cost of the expert.

8.  Within (90) days of the order of the district court, defendants shall fill those positions presently authorized for the provision of mental health care services. Within (180) days of the order of the district court, defendants shall fill those positions determined to be necessary under the formula developed in paragraph 7, *supra*,

Findings and Recommendations, filed June 6, 1994, ECF 547, p. 80.

The Special Master began his assessment of defendants' staffing ratios in early 1996. His first report on the adequacy of defendants' staffing *ratios* was filed on November 17, 1998, following a hiatus precipitated by Prison Litigation Reform Act-related litigation at that time, and the development of the initial Program Guide. ECF 993. Since 1998, the Special Master has drafted 17 reports that directly or indirectly addressed staffing deficiencies in the mental health program within CDCR.[13] In addition, staffing vacancies have been addressed in all 25 of the Special Master's preceding monitoring reports.

_____

[13] Special Master's Recommendations for Staffing Ratios, (filed 11/20/1998, ECF No.994); Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation, (filed 5/19/1999, ECF No.1033); Special Master's Report on Staffing Vacancies, (filed 5/19/1999, ECF No.1032); Special Master's Recommendations on Defendants' Request for Extension of Time to Staff Administrative Segregation and Expedite Transfers, (filed 2/7/2000, ECF No.1131); Special Master's Recommendation on the Development of a Retention Plan for Psychiatrists, (filed 4/24/2000, ECF No.1149); Special Master's Report and Recommendations on

13

The Special Master's first report specifically addressing staffing *vacancies* was submitted on May 19, 1999. ECF 1032.  A statement by the Special Master at that time still pertains today – "The focus of the defendants' contracting effort is overwhelmingly on psychiatrists." *Id*. at 4.

In 2002, defendants were ordered to maintain a vacancy rate among psychiatrists and case managers[14] of not more than ten percent, including contracted services.  ECF 1383, p. 4. Contemporaneously, the parties began to negotiate the content of an updated set of standards for mental health care which would eventually be codified into the 2006 *Coleman* Revised Program Guide.  It was during that period that CDCR commenced a field study to determine the levels of staffing necessary to implement the new Program Guide revisions.  The California Department of Finance approved only a small portion of the staffing allocations recommended by CDCR. After repeated failures to fund the full complement of the recommended staffing allocations, the court ordered CDCR to prepare and present to a special session in August 2006 of the California Legislature a proposal for no less than 738.65 permanent positions. However, the Legislature

---

Psychiatrist and Psychiatric Social Worker Vacancies, (filed 12/19/2000, ECF No.1227); Special Master's Report on Defendants' Compliance with Staffing Enhancements for Administrative Segregation, (filed 9/25/2001, ECF No. 1206); Special Master's First Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 9/26/2001, ECF No.1304); Special Master's Report on the Defendants' Compliance with October 26, 2001 and December 20, 2001 Court Orders, (filed 2/21/2002, ECF No.1350); Special Master's Second Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 2/26/2002, ECF No.1351); Special Master's Third Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 7/9/2002, ECF No.1392); Special Master's Report on Defendants' Schedule of Differential Pay for Mental Health Clinicians in Specific California Department of Corrections Institutions, (filed 5/6/2005, ECF No.1661); Special Master's Report on the Impact of Defendants' Increases in Differential Pay for Mental Health Clinicians in California State Prison, Corcoran, (filed 2/15/2006, ECF No.1762); Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 6/2/2006, ECF No.1851); Special Master's Supplemental Report on the Status and Sufficiency of the Departments' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 7/28/2006, ECF No.1921); Special Master's Report on Plaintiffs' Response to the Sixteenth Report on Compliance Seeking Salary Enhancements for Department of Mental Health Clinicians, (filed 1/30/2007, ECF No.2121); Special Master's Response to Court's May 17, 2007 Request for Information, (filed 5/31/2007, ECF No.2253).

[14] "Case managers" refers collectively to psychologists and social workers.

14

made appropriations for only a number of positions sufficient to implement the revised Program Guide, which was far less than CDCR's proposal, and requested that CDCR conduct a workload study to determine the necessary level of staffing.

In January 2007, CDCR engaged outside consultants to conduct a statewide mental health staffing workload study. The study was conducted over the course of six months and was presented to CDCR in June 2007. However, it wasn't until April 2008 that a request was submitted to the Legislature for the 404 positions recommended by the workload study. At the time of the request, CDCR was already plagued with an abundance of vacant positions, but the Legislature refused to fund additional allocations until all vacant positions had already been filled.

After reviewing the work load study in July of 2008, the Special Master determined that its concept and model were appropriate, but the data used to calculate the number of allocations was faulty.[15] Given the deficiencies reported by the Special Master and the resistance from the Legislature, the work load study lost its momentum and was abandoned.

Subsequently, in 2009, the defendants were ordered to "continue to take all steps necessary to resolve all outstanding staffing allocation issues," including the development of yet another staffing plan. ECF 3613, p. 2. In response to the court order, the Special Master provided guidance and assistance to CDCR in its development of a workable staffing plan. Members of the Special Master's staff met with representatives of CDCR and its DAI, Department of Finance, the Receiver's Office, and the Department of the Attorney General over

---

[15] Letter dated July 12, 2008 from the Special Master to Robin Dezember, Chief Deputy Secretary, Division of Correctional Health Care Services and Lisa A. Tillman, Esq., Deputy Attorney General.

the course of eight months to develop and refine a comprehensive staffing plan. Defendants submitted their 2009 Staffing Plan to the court on September 3, 2009. ECF 3693. The plan was subsequently endorsed by the Special Master.[16]

In the April 5, 2013 order denying defendants' motion to terminate Coleman federal court oversight, ECF 4539, the court noted at page 57 that the vacancy rates among psychiatrists, staff psychologists, and social workers significantly exceeded the ten-percent maximum for those positions that was ordered by the Court on June 12, 2002. ECF 1383.[17] The court found that "[d]efendants have not met their initial burden of showing that seriously mentally ill inmates in the CDCR no longer face substantial risk of serious harm due to significant shortages in mental health staffing. Chronic understaffing continues to hamper the delivery of constitutionally adequate medical care and is a central part of ongoing constitutional violation in this action." ECF 4539, p. 62.

On March 18, 2014, in an order relating to activation of mental health units at the California Health Care Facility, the Court ordered defendants to review whether the current salary schedule for prison psychiatrists was competitive within California and nationally. ECF 5116, p. 12. In response, defendants reported that their prison psychiatrist salaries were within the range of comparable private and public sector psychiatrists' salaries in California and nationally, and that they had the authority to offer newly-hired psychiatrists salaries in excess of the minimum starting salary in the State pay scale range. ECF 5123, p. 3.

---

[16] Letter dated March 4, 2010 from Matthew A. Lopes. Jr. to Debbie Vorous, Esq., Deputy Attorney General and Michael Bien, Esq., Plaintiffs' Counsel.
[17] In the June 12, 2002 order, the Court identified psychiatrists and case managers. Case managers (now known as primary clinicians) were psychologists and social workers.

16

On June 18, 2014, the court *again* ordered the defendants to revise their existing mental health staffing plan to resolve the ongoing problem of mental health staffing shortages and to come into compliance with the requirements of the court's June 13, 2002 order limiting mental health staff vacancy rates to ten percent.  ECF 5171, p. 4.  The court ordered defendants to "assume primary responsibility for this task, with the Special Master providing guidance and expertise where necessary, to ensure its timely completion, and to ensure that plaintiffs are provided notice and an opportunity for input as appropriate." *Id.* at 3.

On February 2, 2015, defendants filed their "Report on Review of Mental Health Staffing."  ECF 5269.  In this latest plan, defendants reported that they maintained a staffing vacancy rate of less than ten percent, with use of contract staff, for psychologists and social workers.  *Id.* at 6.  However, defendants conceded that even with the use of contract staff, the vacancy rate among psychiatry positions was nearly 20 percent.  *Id.* at 6.  They attributed the difficulty with psychiatry staffing in part to a national shortage of psychiatrists.

To remedy their staffing deficits among both psychiatrists and psychologists, defendants proposed a four-pronged approach:

1.   Creation of a psychiatric medical assistant classification to support psychiatrists by taking on clerical tasks currently performed by the psychiatry staff.

2.   Expansion of its psychologist internship program and reactivating a fellowship program for psychiatrists.

3.   Offer differential pay for civil service psychiatrists and increase contract rates for contract psychiatrists to work in hard to recruit institutions.

4.   Continue CDCR's recently expanded telepsychiatry program.

*Id.* at 6-10.

The Special Master's expert provided comments and input regarding the telepsychiatry program during its development, and in December 2015 visited the location of the telepsychiatry offices and the institutions to observe the effectiveness of the program. Observed use of the telepsychiatry process by IDTTs was found satisfactory as a viable option in the absence of live psychiatrists at the institutions.

On May 15, 2015, the court ordered defendants to proceed with the proposals in their report but to seek the approval of the Special Master and leave of court before making any changes in their existing mental health staffing ratios. ECF 5307, p. 6. The court noted that "inadequate mental health staffing levels have plagued the remedial phase of this litigation since its inception and after almost twenty years of effort this problem must be finally and fully remedied." *Id.* at 5. On November 12, 2015, at the request of the Special Master, the Court ordered him to include in his Twenty-Sixth Round Monitoring Report a report and recommendations on staffing, as required by the order of May 2015. ECF 5377.

On February 1, 2016, defendants submitted their "CDCR Status Update to Report on Court-Ordered Staffing Review" ("status update") to the Special Master. They indicated that additional staffing positions for psychiatrists, psychologists, and social workers had been allocated.[18] Defendants did not provide the actual numbers of clinicians who were hired since they proposed their current staffing plan on February 2, 2015.

It stands to reason that unless current allocated positions are filled with full-time employees, the addition of yet more unfilled positions will be an exercise in futility. This

_____

[18] An incidental effect of adding these unfilled new positions to the existing unfilled positions was an increase in the vacancy rate.

concept should not be unfamiliar to defendants as it was first brought to their attention in 1999 when the Special Master reported that "[c]orrective efforts presently underway should increase by nearly 25 percent the defendants' current allocation of authorized psychiatrists. All of these additional psychiatrist positions, of course, will initially be vacant and equally subject to the difficulties impeding the filling of positions already allocated." *Id* at 11.

Another prong in defendants' staffing plan provided differential pay for civil service psychiatrists and increased contract rates for contract psychiatrists in hard to recruit locations. However, obtaining additional money is subject to legislative approval and has proved to be a barrier in the past.  Seeking pay increases to hire and retain clinicians is not a new strategy and dates back more than fifteen years ago.  As the former Special Master indicated in his report on psychiatric and social worker vacancies, "[p]olitical and bureaucratic complications slowed the allocation of the pay increase . . ." ECF 1227, p.1.  The 2015-2016 budget has come and gone and now defendants must wait until the 2016-2017 budget to determine if additional funds will be appropriated by the legislature to fund new pay increases.  It is uncertain whether defendants have a contingency plan if this request for additional funds is denied by the legislature or if they plan on waiting yet another year to re-submit their proposal.  Defendants did report increased registry hours for psychiatrists at most institutions due the increase of registry pay rates.

Although CDCR continued to hire registry medical assistants as reported in the status update, they still had not received approval to hire full-time medical assistants.  Until such time as medical assistants can be hired as full time employees, psychiatrists will remain burdened with paperwork, scheduling and other non-clinical tasks.  This impacts the amount of time they are able to perform the work for which they were hired – treating patients.  Failure to remove

these non-clinical tasks from the daily workload of psychiatrists will continue to have a chilling effect on the hiring and retention of psychiatrists within CDCR.

Since the submission of defendants' report in November 2015, there has been no change in the number of psychologist interns or psychiatry fellows employed by CDCR. This represented another prong of defendants' plan which did not appear to be yielding any positive results.

CDCR employs 37 full-time telepsychiatrists and they are looking to expand this number.[19] Telepsychiatry was first conceived almost two decades ago as a proposed remedy to alleviate the psychiatry staffing shortage. It is primarily an option for treatment of inmates at the 3CMS level of care, and a less desirable option for inmates at higher levels of care. In 1999, the Special Master reported that in reference to telepsychiatry, the "defendants have developed the capability of putting together both medical and mental health patients with physicians and psychiatrists, whether specialists or generalists, in remote locations." *Id* at 11. In 2015, the Special Master's experts *again* determined that telepsychiatry was a viable method for the delivery of mental health services. The experts' opinions regarding telepsychiatry have not changed since 1999 when the Special Master reported that his "psychiatric experts have viewed the defendants' telemedicine system and believe it has potentially positive uses within the department's overall plans for the delivery of medical and mental health care." *Id* at 11. For some inexplicable reason, time stood still for another 17 years on this issue.

---

[19] It should be noted that this expansion requires the construction of additional space which is expected to take another ten to 12 months, but only *after* a new lease has been signed.

While defendants' latest court-ordered staffing plan was submitted over a year ago, they have demonstrated no sense of the required urgency for a meaningful implementation of the plan. As a result, there has been little to no change in mental health staffing throughout CDCR. In fact, it could be said that defendants' report was actually submitted almost twenty years ago with little to no action taken on those proposed remedies. CDCR should immediately begin executing the plan by whatever means necessary to remedy this longstanding barrier to compliance, and if salaries need to be increased, then it should be done forthwith. These chronic staffing problems cannot be resolved by the mere formulation of new plans; full implementation is required. Multiple plans submitted over the course of 17 years have proven to be ineffective.

Although vacant mental health clinical positions increase and decrease from year to year, unacceptable vacancy rates remain constant. The remedial phase is now over twenty years old and the same problems surrounding clinical vacancies continue to exist and are themselves now over twenty years old.

### B.    Mental Health Vacancy Rates Overall and by Discipline During the Twenty-Sixth Round

As of October 30, 2015, the total number of all established mental health positions for chief, senior, and staff psychiatrists; chief, senior, and staff psychologists; social workers; psych techs; and recreational therapists was 3,029.12.[20] Of these established positions, 2,379.5 were filled by full-time employees. The collective vacancy rate among all of these positions was 21 percent, unchanged from the twenty-fifth monitoring period. The use of contractors reduced the

---

[20] Source: (excluding for psych techs): CDCR Secure Website for Monthly Reports, posted December 2015, covering the period of November 2015. Because staffing data for psych techs was not included in the monthly posting, the data reported herein on psych tech staffing was obtained from the individual institutional reports for the Twenty-Sixth Monitoring Period.

functional vacancy rate among all mental health positions to 17 percent, which was a slight decrease in the functional vacancy rate of 18.3 percent reported in the twenty-fifth monitoring period.   The overall vacancy rate in mental health staffing decreased slightly during the twenty-sixth monitoring period.

Chief Psychiatrists

The vacancy rate among the 19 allocated chief psychiatrist positions decreased from 33 percent to 16 percent since the preceding monitoring period and approached a level not seen since the twenty-third monitoring report.  Contract coverage was not used for any of the vacant positions.  CHCF, CIW and PBSP operated without chief psychiatrists.

Senior Psychiatrists

The vacancy rate for senior psychiatry decreased from 50 percent to twenty-six percent since the twenty fifth round monitoring report and was slightly less than the twenty-nine percent vacancy rate reported in the twenty-third monitoring report.  Of the sixteen institutions with allocated positions, eleven filled all of them.  CHCF filled one of the two positions and SQ filled two of the three positions.  Three other institutions – CCI, CIW and CSP/Sac had 100 percent vacancy rates.  No contractors were used to fill any vacancies.

Staff Psychiatrists

Vacancies for staff psychiatrists remained problematic for CDCR with 181.25 of the 322.3 allocated positions filled resulting in a vacancy rate of 44 percent.  The use of 36.5 contractors reduced the functional vacancy rate to 32 percent.

The eight institutions which had staff psychiatry vacancy rates of ten percent or less were CCC, Calipatria, Centinela and CVSP, each with one allocated position, CIM with 11 allocated positions, DVI with two allocated positions, Folsom with three allocated positions and NKSP

22

with ten allocated positions. Contractors reduced the functional vacancy rate to ten percent or less for one additional institution, CMC. Fourteen institutions – CHCF, CIW, CMF, CMC, CRC, CSP/Solano, CCWF, CTF, MCSP, PBSP, PVSP, RJD, SQ and SCC – had vacancy rates ranging from 11 percent to 50 percent. Six institutions, CSP/Corcoran, CSP/LAC, CSP/Sac, SVSP, VSP and WSP had vacancy rates ranging from 62 percent to 79 percent. ASP, CCI, CSATF, HDSP, ISP and KVSP did not fill any of their line psychiatry allocations with full-time psychiatrists.

Chief Psychologists

The number of allocated chief psychologist positions more than doubled from the preceding monitoring period from 28 to 61 positions. Only CCC and Calipatria did not have any allocated positions for a chief psychologist. The overall vacancy rate increased by more than five-fold from seven percent to 36 percent. No contractual coverage was used.

Of the remaining thirty-two institutions, eleven had zero vacancies – CHCF, CIW, CSP/Sac, CSATF, Centinela, ISP, MCSP, NKSP, PBSP, SVSP and SCC. Eighteen institutions had a 50 percent vacancy rate – ASP, CCI, CIM, CMF, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Solano, CCWF, CTF, DVI, Folsom, HDSP, KVSP, RJD, VSP and WSP. SQ filled two of its three positions but CVSP and PVSP had 100 percent vacancy rates with one and two allocated positions respectively.

Senior Psychologists

The vacancy rates among senior psychologists decreased markedly, from 39 percent to 12 percent, since the preceding monitoring period with 185 of the 209 allocated positions filled by full-time psychologists. No contractors were used to cover any vacancies. Centinela and ISP had no allocated positions.

23

Fifteen institutions – ASP, CCC, CCI, CHCF, CMC, CSP/LAC, Calipatria, CTF, DVI, HDSP, PBSP, RJD, SCC, VSP and WSP – had no vacancies.  CIW, CSP/Sac, KVSP and MCSP had vacancy rates of ten percent or less.  CVSP and Folsom had 100 percent vacancy rates with one and three allocated positions respectively.  The remaining institutions had vacancy rates ranging from 11 percent to 36 percent.

Staff Psychologists

Vacancy rates in staff psychologists decreased slightly since the twenty-fifth monitoring period from 21 percent to 19 percent.  Of the 799 total allocated positions, 647.25 were filled with full-time psychologists and the use of contractors reduced the functional vacancy rate to 15 percent.

CCC, CIM, CSP/Solano, Calipatria, Centinela, and CVSP filled all of their staff psychology positions and another ten institutions – CIW, CMF, CMC, CCWF, CTF, DVI, PVSP, RJD, SQ and VSP had vacancy rates of ten percent or less.  There were nine institutions with vacancy rates ranging from eleven percent to 25 percent – CCI, CHCF, CRC, CSP/Sac, Folsom, ISP, MCSP, PBSP and SVSP.  The remaining institutions – ASP, CSP/Corcoran, CSP/LAC, CSATF, HDSP, KVSP, NKSP, SCC and WSP - had vacancy rates ranging from 26 percent to 44 percent.

Intern Psychologists

There were 27 intern psychologist positions allocated for six institutions.  With 19 positions filled, the overall vacancy rate was 30 percent.  CIM and SQ both filled all four of their positions and CSP/Sac filled each of its allocated two positions.  Seven of the eight positions were filled at RJD as were two of the three positions at VSP.  Of the four allocated positions at CMC, none were filled.

24

Social Workers

The overall vacancy rate among social workers decreased from 24 percent to ten percent since the preceding monitoring period with 395 of the 440 allocated positions filled by full-time employees. Contractors further reduced the vacancy rate to six percent.

Nine of the institutions had filled all of the allocated positions – CCC, CMF, CSP/LAC, Calipatria, Centinela, KVSP, MCSP, PBSP and VSP. Another ten institutions had vacancy rates of less than ten percent – CHCF, CIM, CIW, CMC, CSP/Corcoran, HDSP, NKSP, PVSP, RJD and SQ. With the exception of ASP, which had a vacancy rate of 67 percent, the remaining institutions had vacancy rates ranging from 13 percent to 40 percent.

Psych Techs

Vacancies among all psych techs rose to 21 percent compared to the vacancy rate of 6.5 percent in the twenty-fifth monitoring period. The use of contractors reduced the functional vacancy rate to 17 percent. Of the 888.82 allocated positions, 709.5 were filled with an additional 31.88 positions covered by contractors.

Vacancy rates were ten percent or less at eight institutions – CIM, CIW, CMC, CSP/Corcoran, CSATF, CTF, Folsom and MCSP. Eleven institutions – CHCF, CMF, CSP/LAC, CSP/Sac, DVI, NKSP, RJD, SVSP, SCC, VSP and WSP - had vacancy rates ranging from 11 percent to 25 percent. Another eight institutions had vacancy rates ranging from 31 percent to 55 percent – CCI, Centinela, CCWF, HDSP, KVSP, PBSP, PVSP and SQ. The institutions with the highest vacancy rates were the desert institutions – CCC, CVSP and ISP – with vacancy rates of 62 percent, 81 percent and 62 percent respectively.

Recreation Therapists

25

The overall vacancy rate among recreational therapists was 30 percent. Contractors were used to cover 13.43 positions which reduced the functional vacancy rate to 22 percent. Of the 243.5 allocated positions, 175.5 were filled with full-time employees.

Seven institutions – CCI, CIW, CCWF, DVI, HDSP, PBSP and VSP – filled all of their recreational therapist positions with full-time employees. Among the remaining institutions with allocated positions, two – CHCF and MCSP – had vacancy rates of ten percent or less. At seven institutions – CIM, CMF, CMC, CSP/Sac, RJD, SVSP and SQ – vacancy rates ranged from eleven percent to 30 percent. Vacancy rates at another six institutions – CSP/Corcoran, CSP/LAC, CSATF, KVSP, NKSP and WSP – ranged from 31 percent to 85 percent. CSP/Solano was the only institution that did not fill any of its allocated positions.

<u>Office Techs</u>

Of the 406 allocated office technician positions, 351 were filled for a vacancy rate of 14 percent. No contractors were employed for any vacant positions.

ASP, CCI, CIM, Calipatria, Centinela, CTF, DVI, NKSP, PVSP and SCC filled all of their positions with full-time employees. Of the remaining institutions, CHCF, CMC, CCWF, MCSP, SVSP and VSP had vacancy rates of ten percent or less and six institutions – CIW, CSP/LAC, CSATF, Folsom, HDSP and PBSP had vacancy rates ranging from eleven percent to 20 percent. The remaining eleven institutions had vacancy rates ranging from 21 percent to 40 percent.

The following indicates comparisons between staffing vacancies that existed in 1998 and staffing vacancies during the Twenty-Sixth Round Monitoring period – 17 years later.

26

| Position | Vacancy Rate 1998* | Vacancy Rate 2015* |
|---|---|---|
| Psychiatrists | 35% | 32% |
| Psychologists | 14.8% | 15% |
| Social Workers | 26% | 10% |
| Recreational Therapists | 12.5% | 30% |
| Psych Techs | 15% | 21% |
| Clerical | 11.4% | 14% |

*Does not include contract staff.

Staffing allocations are merely numbers on paper and meaningless unless those positions can be filled with actual clinicians. A plan without the ability to implement it is simply a plan and nothing more. Vacancies in clinical staffing result in the lack of appropriate treatment for mental health inmates and until those clinical vacancies are filled, treatment for inmates suffering from serious mental illness will remain inadequate.

## II.    Quality Management:

From the time *Coleman* remedial efforts began, the development and implementation of an effectual quality assurance system has been documented as a necessary element of the remedial plan. In the June 6, 1994 Report and Recommendations issued in this matter, the Magistrate Judge recommended that defendants develop and implement a system of quality assurance and peer review of mental health care services. Report and Recommendations, ECF 547, p. 80. The recommendation was adopted by the Court in *Coleman v. Wilson,* 912 F. Supp. 1282, 1323-1324 (E.D. Cal. 1995). In August 1998, defendants were again ordered to implement a quality assurance process for the delivery of mental health care services. Order, ECF 964, p. 1.

27

In June 2002, defendants were ordered to develop a plan to speed the implementation of the quality assurance process within all CDCR institutions.  Order, ECF 1384, p. 2.

The efforts around quality management/quality assurance have continued throughout the *Coleman* remedial process.  In its August 30, 2012 Order adopting the Special Master's Twenty-Fourth Round Monitoring Report in full, the *Coleman* Court emphasized "…in particular its complete concurrence with the Special Master's finding that '[a]n important goal of the remedial phase of this case is, …, for CDCR itself to assume the mantle of ultimate responsibility for diagnosing of its own problems, i.e. conduct its own 'qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, and move on to eventual removal from federal court oversight."  Order, ECF 4232, p. 4.

In his Twenty-Fifth Round Monitoring Report, the Special Master followed up on this finding, reporting that work was underway on the development of the new quality improvement process.  During the Twenty-Sixth Monitoring Round, work on the new quality improvement process continued.  As a result, the Special Master's findings and conclusions on quality management discussed in this portion of the report were based on institutional performance under the existing quality management framework.

The core structure of the quality management process remained in place statewide.  However, quality management efforts and compliance levels varied across institutions.  Generally, the appropriate committees continued to meet regularly, maintain minutes and address pertinent mental health program matters.  In addition, a number of institutions chartered QITs or Focused Improvement Teams (FIT) to address problem areas.

However, at several institutions attendance at mental health subcommittee meetings remained problematic.  This has been an ongoing concern as reported in the Twenty-Fourth and

28

Twenty-Fifth Monitoring Rounds.  As stated in the Special Master's Twenty-Fourth Round

Monitoring Report, "attendance and participation by required members at the various committee

meetings is crucial to their effectiveness."  Without participation by appropriately authorized

personnel, the committee meeting process is reduced to a mere formality that does not serve the

objectives of a functioning quality management program.  Interviews with line staff at a number

of institutions revealed a lack of knowledge of and participation in quality management

activities.  For instance, at NKSP and PVSP, few staff were even aware of the existence of the

mental health subcommittee and almost none had participated in a Quality Improvement Team

(QIT).  At PVSP, clinical staff acknowledged the need for additional feedback in order to

improve the quality of clinical practices.  This finding is particularly concerning as the success of

any quality management and/or quality improvement efforts depends on the involvement of the

line staff who are responsible for carrying out the day-to-day operations.  Staff must first be

aware of where performance improvements are needed, in order to improve performance.  The

collective effort of everyone involved in the operation of a program is critical to improvement

and ultimately to the success of the program.  That includes ensuring that line staff are aware of

quality management/quality improvement efforts and are active participants in the process in

whichever role their job classification should dictate.

     During the Twenty-Sixth Monitoring Round, quality management activities at ASP, CCI,

CIW, CMF, CSP/Corcoran, CSP/Sac, RJD and SQ were effective, well-functioning, useful to

staff, and integrated into overall operations.  Institutions showing improvements since the

preceding monitoring period included CCWF, where the quality management program was

modeled to more closely align with the statewide quality management process.  CIM and CMC

also demonstrated some improvement.

At CCC, HDSP, ISP, PVSP and WSP, there were ongoing problems with achieving a quorum at mental health subcommittee meetings.  At CIW, NKSP and PVSP, line staff was not always aware or informed of quality management activities taking place at their institutions.  In addition, at WSP it was unclear whether the mental health subcommittee was functioning as intended or even able to address the operational issues at the institution.

During the reporting period, local governing bodies were reported to be active and meeting regularly at 12 institutions – CHCF, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, CCWF, HDSP, MCSP, PBSP, RJD and SQ.  Most institutions held their meetings on a quarterly basis, the local governing bodies at CHCF, CSP/Corcoran and HDSP met more frequently.  Attendance was reported to generally have been good, except at HDSP, where a quorum was met at just two of six meetings held during the review period.

Quality management committee meetings were scheduled monthly at ASP, CCC, CCI, CHCF, CIM, CIW, CMF, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano CSATF, Centinela, CCWF, DVI, Folsom, HDSP, KVSP, MCSP, NKSP, PVSP, RJD, SCC, SVSP, SQ, VSP and WSP.  Most of these institutions held six meetings during the review period, with the exception of CSATF and VSP which each held five meetings.  The quality management committee at Calipatria met twice during the review period.  CTF's quality management committee met 20 times.  The quality management committees at CVSP and ISP were combined and met twice per week, and at PBSP the committee met weekly.

A quorum was generally reported at quality management committee meetings statewide, with a few exceptions.  At CIW, the format used for the meeting minutes made it difficult to determine who the required members of the committee were.  At HDSP, a quorum was met at five of six meetings held during the review period.  MCSP lacked psychiatry attendance during a

portion of the review period, which was subsequently remedied upon the hiring of a chief psychiatrist.

Generally, monthly mental health subcommittee meetings were scheduled at ASP, CCC, CCI, CIM, CIW, CMF, CRC, CSP/Solano, Calipatria, Centinela, CCWF, CVSP, Folsom, HDSP, ISP, KVSP, NKSP, PBSP, PVSP, RJD, SVSP, SCC, VSP and WSP. However, scheduled meetings did not always occur. At PVSP, only three of five scheduled meetings took place. The mental health subcommittee at DVI met one to two times per month. Meetings were held twice per month at, CHCF, CMC, CSP/Corcoran and CSATF. Weekly mental health subcommittee meetings were held at CSP/LAC and San Quentin. At MCSP, mental health subcommittee meetings were held twice weekly. CSP/Sac held 16 mental health subcommittee meetings during the review period and CTF held ten.

Although critical to the efficacy of the process, mental health subcommittee meeting attendance varied across institutions. A quorum was regularly reported at mental health subcommittee meetings held at: CCI, CHCF, CIM, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, Calipatria, Centinela, CCWF, CTF, Folsom, KVSP, MCSP, NKSP, RJD, SVSP, SQ, SCC, and VSP. Institutions that failed to achieve a quorum at up to two scheduled mental health subcommittee meetings included CIW, CMF, DVI and PBSP. Some institutions failed to attain a quorum at 50 percent or more of scheduled mental health subcommittee meetings. CCC and ISP achieved a quorum at three of six meetings. At CVSP, a quorum was achieved at only two of six scheduled meetings. HDSP achieved a quorum at just one of five mental health subcommittee meetings held during the review period. At PVSP and at WSP a quorum was not achieved at any of the mental health subcommittee meetings, and at ASP, CRC and CSP/Sac, the minutes did not indicate whether a quorum was achieved.

During the review period, QITs were chartered and active at: CCI, CHCF, CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, Calipatria, CCWF, CTF, DVI, Folsom, ISP, KVSP, MCSP, NKSP, PBSP, RJD, SQ, SCC, and VSP. FITs were chartered and active at ASP and SVSP. There were no active QITs at CCC, CRC, Centinela, CVSP, HDSP, PVSP or WSP during the review period.

During the Twenty-Sixth Monitoring Round, CCHCS headquarters was in the process of implementing a standardized peer review process to be used at all 34 CDCR institutions. In December 2014 a memorandum was issued to chiefs of mental health statewide announcing that training would begin on the peer review scoring process in January 2015. As a result, peer review activities varied greatly across institutions, as a number of institutions were in the process of transitioning to the new peer review format.

During the review period, some form of peer review took place at 18 institutions. Peer review was performed for all disciplines at CCI, CIM, CMC, CSP/Sac, CSP/Solano, Centinela, CVSP, DVI, Folsom, HDSP, ISP, MCSP, PBSP, SQ and WSP. At ASP psychiatrists did not participate in peer review for most of the review period due to staffing shortages. CIW conducted peer review for psychiatrists and psychologists, but not social workers. At CMF no documentation of active psychology peer review was provided. There was no psychiatry peer review at CSATF. At SCC the primary clinician (PC) peer review process was on hold pending implementation of the new statewide peer review program.

There was no peer review at CCC, CRC, CSP/Corcoran, CSP/LAC, Calipatria, CCWF, CTF, NKSP, RJD, SVSP or VSP during the review period. CHCF provided a peer review Local Operating Procedure (LOP) dated February 2015. However no other documentation was provided to indicate whether peer review was in place at CHCF, KVSP or PVSP. CRC reported

32

a planned implementation of the statewide peer review process in August 2015. At CSP/LAC, peer review was suspended during the latter half of 2014 and a pilot program was started in December 2014. At RJD, staff had been trained on the peer review process but it had not yet been implemented.

Peer review is an integral part of the quality management/quality assurance process and a key element in the effort to ensure quality of care for class members. As reported above, during the Twenty-Sixth Monitoring Round, defendants were in the process of implementing a standardized peer review process for system-wide use at all institutions, resulting in sporadic peer review activities across the state. Upon implementation of the new peer review process, and going forward, it is vital to the *Coleman* remedial effort that all disciplines, psychiatrists, psychologists and social workers, receive peer review. The Special Master will monitor implementation of the new standardized peer review process during the twenty-seventh monitoring round.

The Special Master's findings regarding quality improvement statewide, demonstrate that the new quality improvement process remains a necessary element for CDCR to achieve and maintain compliance, and reach the ultimate goal of removal from federal court oversight. As exhibited above, although the quality management framework of several years remained in place, a number of institutions continued to struggle in certain areas, some of which remained unchanged from previous monitoring rounds.

## III.  <u>**Medication Management**</u>:

The CDCR has had a long history of problems with medication management. As far back as this Court's decision in *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal. 1995), it was noted that there were "multiple problems with use and management of medication, and

33

inappropriate use of involuntary medications." *Id.* at 1297. The *Coleman* Court elaborated that whether defendants' mental health care delivery system deprived seriously mentally ill inmates access to adequate mental health care focused on the presence or absence of six factors, including administration of psychotropic medication with appropriate supervision and periodic evaluation. *Id.* at 1298, citing *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1577 (D.Idaho 1984). The Court in *Coleman* further noted that defendants' then current medication management practices were unconstitutional as "defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring." *Id.* at 1309.

The *Coleman* Court further noted that some CDCR institutions lacked protocols for involuntary medication use and that involuntary medication was underutilized, resulting in the de facto denial of procedural safeguards to mentally ill inmates. The Court noted this despite evidence that "suggests that in certain instances involuntary medication may be necessary medical treatment for gravely mentally ill inmates." *Id.* at 1312.

Throughout the history of this case, there were many instances when this Court and the Special Master reported the continuing problems with medication management in the provision of treatment to mental health caseload inmates. Ongoing CDCR violations identified by this Court in its July 23, 2007 order resulted in the recommendation that a Three-Judge Court be convened to consider a prisoner release order. Order, ECF 2320. Evidence of prison conditions through August 2008 that was presented to the Three-Judge Court revealed serious continuing

34

constitutional violations in the delivery of mental health care to CDCR inmates, including

inadequate medication management.  Three-Judge Court Order, ECF 3641.

It should also be noted that the *Plata* and *Coleman* Courts recognized the importance of

these cases not assuming redundant or conflicting paths toward resolution of their interrelated

problems.  On January 25, 2007, the *Coleman*, *Plata*, and *Perez* Courts ordered the Special

Master, the Receiver, and the court representatives to "hold monthly meetings for the purpose of

working collaboratively on issues related to coordination of the remedies in each of the . . .

actions."  Order, ECF 2119.  The coordination process has been ongoing since that time.

Relatedly, the significance of an audit tool to a well-functioning medication management

system for both medical and mental health care in the prison system also became apparent.  As

such, the coordinated efforts of the *Plata* receiver's medical staff, the *Coleman* Special Master's

psychiatric experts, and CDCR staff led to the development of a medication management audit

tool through the MAPIP; the *Perez* court representatives were not involved in MAPIP's initial

development.  This audit tool was designed to apply to all medication administration

management, including mental health.  It was initially piloted at CIM, CSP/Corcoran, and

CCWF, and was then rolled out at the various CDCR institutions.  The implementation process

for MAPIP was very variable across institutions, due to differences among "learning curves" and

available expertise.   As of the Twenty-Sixth Monitoring Round, the medication management

audit tool had been implemented at all CDCR institutions except CHCF.

MAPIP should continue to significantly improve CDCR's ability to disseminate and

administer medications, greatly enhance its ability to self-monitor for potential system failures in

medication administration, and encourage early and efficient interventions to restore system

capabilities.  MAPIP's implementation to audit medication management throughout CDCR

35

institutions should make information on medication management readily available in an organized format. The MAPIP audit tool should also continue to advance CDCR's capacity to assume responsibility for self-monitoring of medication management, eventually mitigating the need for outside monitoring in this area.

<u>Medication Continuity for Newly-Arriving Inmates</u>

CSP/Solano, NKSP, and WSP reported compliance with the provision of medications to newly-arriving inmates. Calipatria was compliant and NKSP indicated compliance for five of six months following transfers from community hospitals or DSH inpatient care. ASP reported compliance for the last three months of the review period and for five of six months following discharges from other institution's MHCBs or community hospitals. CTF narrowly missed compliance. DVI medication continuity varied.

Eight institutions - CIM, CSP/Corcoran, CSP/Sac, CVSP, HDSP, KVSP, RJD, and SCC - were noncompliant with medication continuity for new arrivals. Fourteen institutions - CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, CTF, HDSP, KVSP, MCSP, PBSP, RJD, and VSP - reported noncompliance following discharges from community or state hospitals and/or DSH inpatient programs.

<u>Medication Continuity Following Intra-Institutional Transfers</u>

CMC and SQ reported overall compliance following intra-institutional moves, but CMC was noncompliant following moves from administrative segregation and the MHCB. PVSP was compliant except for two months when MHCB discharges were noncompliant. MCSP reported compliance except following MHCB transfers. NKSP was compliant following intra-institutional transfers, but excluding administrative segregation moves. WSP indicated compliance for medication continuity following reception center transfers, but otherwise

36

was noncompliant following intra-institutional transfers.  CSATF inmates stated that prescribed medications typically followed them upon transfer.

Calipatria reported improvement during the review period.  CTF narrowly missed compliance.  CSP/Solano reported both monthly compliance and noncompliance after intra-institutional transfers.

Seventeen institutions - ASP, CCI, CIM, CIW, CRC, CSP/Corcoran, CSP/Sac, Centinela, CCWF, Folsom, HDSP, KVSP, RJD, SVSP, SCC, VSP, and WSP - reported noncompliance for medication continuity following intra-institutional transfers.  However, ASP was compliant following moves into administrative segregation and RJD reported compliance after MHCB discharges.  DVI medication continuity varied.

<u>Medication Administration and Orders</u>

CTF and HDSP reported compliance with medication administration.  CRC indicated compliance except for psychiatric chronic care medications.  RJD was compliant with psychiatrist-prescribed medications.  Calipatria, HDSP, and PVSP reported compliance for chronic care medications.  SCC reported inmate medication compliance.

Five institutions - Calipatria, CVSP, HDSP, PVSP, and SQ - reported compliance with new medication orders; Centinela narrowly missed compliance.  DVI audits revealed that new psychotropic medications were appropriately ordered and administered.  At CCI, new prescription orders and renewals following MHCB and Outpatient Housing Unit (OHU) discharges were compliant.  SQ reported compliance with medication renewals.  MCSP had a process for timely medication renewals.

KVSP and WSP reported noncompliance for medication administration.  Nine institutions - CSP/Corcoran, CSATF, CCWF, HDSP, MCSP, PBSP, PVSP, SQ, and WSP -

37

indicated noncompliance with psychiatry-prescribed medications.  CSP/Corcoran, CSATF, MCSP, PBSP, RJD, and SVSP reported noncompliance for administration of psychiatry chronic care medications.  CSP/Corcoran and RJD noted noncompliance for newly-ordered psychiatric medications.   KVSP reported noncompliance for new medication orders by outpatient providers.

Response to Inmate Medication Noncompliance

CVSP, CTF, and HDSP indicated compliance with the timeliness of mental health follow-up in cases of inmate medication noncompliance.  CMC reported compliance for four of six months.  PVSP was compliant following urgent medication referrals due to inmate noncompliance.  CRC indicated compliance except for urgent referrals following inmate no-shows and/or refusals of certain medications.  DVI audits indicated compliance for some months for Electronic Unit Health Record (eUHR) documentation reflecting psychiatry contacts with inmates for medication noncompliance.

Centinela reported noncompliance.  CIW, CMF, CSP/Corcoran, ISP, SVSP, and SQ indicated noncompliance for responses following certain inmate medication refusals and no-shows.  DVI indicated noncompliance for psychiatry notification of inmate medication noncompliance.  KVSP reported noncompliance for documentation of seven-day provider follow-up after medication noncompliance, while Medication Administration Record (MAR) documentation indicated nonadherence for medication noncompliance referrals.  RJD reported noncompliance for urgent medication referrals following inmate refusals and no-shows.

Pill Lines

Pill line lengths and wait times were appropriate at CIM, CMC, DVI, HDSP, and SQ. EOP inmates at CCWF received medications from a shaded clinic and a cooling mist was provided during heat alerts.

38

Some CTF pill line waits lasted up to one hour.  Pill line waits at PBSP and VSP resulted in some inmates arriving late to groups; VSP staff and inmates also reported excessive pill line waits in the SNY EOP program.  At CCI, protection from inclement weather for outdoor pill lines was problematic.  Many discarded pills were found near D Yard's pill window at CSP/LAC.  Pill lines at CVSP were not audited.

Informed Consent

CCI, CMC, MCSP, and SQ reported compliance for obtaining signed medication informed consent forms from inmates who were prescribed psychotropic medications.

Laboratory Testing

Fourteen institutions - CCI, CMF, CMC, CRC, CSP/Corcoran, CSP/Solano, Calipatria, Centinela, CVSP, ISP, RJD, SQ, SCC, and VSP - reported compliance for laboratory testing of blood levels of inmates prescribed psychotropic medications.  MCSP also indicated compliance, but there were methodological issues with the institution's audits.  ASP, CIW, and CSP/Sac reported compliance for most laboratory testing measures.

CSATF and PBSP reported noncompliance.  HDSP did not provide data.

Direct Observation Therapy (DOT) Medication Administration

CMC reported appropriate implementation of DOT medication administration.  The CCI pharmacy maintained a centralized list of non-MHCB inmates with DOT orders.  MCSP kept a centralized list of inmates with DOT orders.

HDSP provided all psychiatric medications by DOT.  SQ provided all inmates in restricted housing with psychotropic medications by DOT, but staff reported difficulty observing inmates swallowing the medications.

CSP/LAC and KVSP were noncompliant with DOT medication administration. Centinela reported noncompliance for DOT administration of chronic care medications.

Keyhea Process

The administration of involuntary medications typically operated effectively at CIM, CIW, CMC, CSP/Corcoran, CSP/Sac, PVSP, RJD, SVSP, and VSP.  Involuntary medication orders were rare at CCI.  MCSP reported that force was rarely used during involuntary medication administration.

CCWF, HDSP, NKSP, and SQ reported noncompliance for involuntary medication administration.  No inmates at CVSP, ISP, or SCC were prescribed involuntary medications.

*Hora Somni*/Hour of Sleep (HS) Medications

CMC, CCWF, and MCSP reported compliance for HS medication administration no earlier than 8:00 p.m.  HDSP staff reported conflicting times ranging from 7:00 p.m. to 9:45 p.m. for the evening medication pass, but most HDSP inmates indicated receiving HS medications after 8:00 p.m.  SVSP C Yard staff reported that HS medications were distributed at the 5:00 p.m. medication pass.  SQ reported noncompliance with HS-administered medications.

Parole Medications

Parole medications were appropriately provided at ASP, CCI, CIM, CIW, CMC, CSP/Corcoran, Calipatria, HDSP, MCSP, and SQ.  DVI audits revealed that all paroling inmates signed for their medications upon release, but did not indicate the number who received psychotropic medications.  RJD reported noncompliance for medication continuity for paroling inmates.

40

**IV.    <u>Rules Violation Reports</u>**

There is a long history of policies, procedures, and staff training requirements concerning mental health input into the inmate disciplinary process within CDCR prisons that dates back to the *Coleman* remedial order.  In *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D.Cal. 1995), the Court found "substantial evidence in the record of seriously mentally ill inmates being treated with punitive measure by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses."  *Id*. at 1320.  The Court identified the cause of this problem to be inadequate training of CDCR staff on recognition of the signs and symptoms of serious mental illness among inmates who acted out.  *Id.*

The CDCR subsequently took steps to address this problem and to establish a mental health assessment process for disciplinary proceedings for mentally ill inmates.  In August 1998, CDCR modified its existing RVR process by requiring a mental health review of all RVRs issued to CDCR inmates on the mental health caseload.  It also required referral for a mental health review of any inmate who received an RVR and exhibited "bizarre behavior."

Thereafter, in 2003, CDCR further modified its RVR policies by mandating that all mental health caseload inmates who were designated for either the MHCB or EOP levels of care and who had been issued RVRs receive mental health assessments.  Moreover, all 3CMS level of care inmates, and non-mental health caseload inmates who exhibited "bizarre, unusual, or uncharacteristic behavior" and who received RVRs, were required to have mental health assessments as part of the RVR process.  As for staff training, on July 1, 2003, CDCR implemented further changes when it directed that all clinical staff who conducted RVR mental

health assessments and all custody staff who performed RVR hearings were required to take a

mandatory four-hour course prior to taking part in the RVR process, with exemptions allowed.

Meanwhile, the Special Master continued monitoring the use of mental health

assessments in the inmate disciplinary process. In his Seventeenth Round Monitoring Report,

Part B, filed on April 2, 2007, ECF 2180, it was reported that use of mental health assessments in

the RVR process for 3CMS inmates was inadequate. In fact, the Special Master concluded that

the actual purpose of evaluating mentally ill inmates charged with disciplinary infractions was

being overlooked. In response, the Special Master recommended that "defendants be ordered to

develop a plan to identify and develop the changes necessary to broaden the impact of the mental

health assessment process on 3CMS inmates, to test those changes, and then to implement them

system wide." ECF 2180, p. 108-109. The Court adopted the Special Master's recommendations

on August 2, 2007, and ordered defendants to develop a plan within 60 days.

Defendants' submission of a revised plan to the Special Master did not occur until May 1,

2008. Its representations included completion of a pilot of the new plan by August 5, 2008, and

development of an implementation plan by November 1, 2008. However, it was not until May

10, 2011 that defendants actually distributed a new memorandum directing completion of mental

health assessments for 3CMS inmates charged with the most serious disciplinary infractions.

This memorandum instructed staff to refer all 3CMS inmates who received a Division A, B, or C

RVR for mental health assessments. Mental health assessments of 3CMS inmates who received

RVRs for Division D, E, or F violations would still be governed by the "bizarre, unusual, or

uncharacteristic behavior" standard.

In June 2011, following numerous requests by the Special Master, defendants finally

produced a report on their pilot. Unfortunately, the report revealed that major elements of it had

neither been piloted nor implemented. Several ensuing meetings between the *Coleman* parties and the Special Master during the fall of 2011 resulted in the parties' agreement, with the Special Master's approval, on a newly-revised policy for mental health assessments for 3CMS inmates charged with RVRs. On September 21, 2011, the *Coleman* parties and the Special Master concurred on expansion of the policies outlined in the May 10, 2011 memorandum to 3CMS inmates who received an RVR that might result in a SHU term, requiring their referral for a mental health assessment.

On October 26, 2011, defendants distributed their associated staff training memorandum, which reiterated that the four-hour mandated training was a prerequisite for clinical and custody staff involvement in the RVR process. The memorandum directed as follows:

1. The updated September 2011 version of the RVR training curriculum shall be used to train involved staff.

2. All hearing officers, Senior Hearing Officers, Captains, Chief Disciplinary Officers, and appeals coordinators shall receive four hours of training related to appropriate documentation of mental health input into the RVR process.

3. All clinical staff responsible for review of RVRs and preparation of mental health assessments (CDCR Form 115 – MH) shall receive four hours of training related to providing mental health input in the RVR process.

4. The above requirement is to be provided on an ongoing basis prior to staff's involvement in the RVR process.

5. The training is to be collaboratively between custody and mental health.

6. All new staff hired into the applicable classifications were to be trained prior to their involvement in the RVR process.

Defendants directed that training of all staff was to be completed by January 30, 2012.

On November 3, 2011, defendants issued a memorandum as to changes to the form that was used to request a mental health assessment. Among the memorandum's policies and

43

procedures were that all custody and clinical staff participating in the inmate disciplinary process would receive on-site training concerning RVR assessment requirements. This training was to be completed by December 30, 2011.

On December 1, 2011, in his Twenty-Third Round Monitoring Report, the Special Master reviewed defendants' response to the August 2, 2007 order. He noted the significant time lapse before defendants began to respond to this order, and that little had been achieved. In fact, the Special Master reported that defendants appeared to "have lost sight of the original identified problem and the goal of the pilot to resolve that problem." The Special Master also indicated concern, that given the "limited character of what defendants now propose as their plan, appropriate use of the mental health assessments in the disciplinary process for 3CMS inmates may well end up being even more limited than it was before the plan was ordered." The Special Master pointed out that nearly *four years* had passed with "very little progress," indicating that defendants had violated the 60-day time limit in the August 2, 2007 court order "literally by years." ECF 4124.

On May 29, 2013, plaintiffs moved for enforcement of Court orders and affirmative relief related to the use of force and disciplinary process against *Coleman* class members to remedy alleged constitutional violations. ECF 4638. As to the disciplinary process, plaintiffs argued that evidence before the Court demonstrated defendants' pattern of imposing unconstitutional, unduly harsh discipline on inmates for behavior arising from or related to their mental illness. Plaintiffs further maintained that defendants' disciplinary process did not provide sufficient accommodation or consideration of mental illness. Plaintiffs' filing requested targeted remedial orders to redress defendants continued excessive use of force against *Coleman* class members

and to ensure that mentally ill inmates were not further victimized by cruel and inappropriate disciplinary policies and procedures.  ECF 4638.

Thereafter, on April 10, 2014, this Court entered an order in response to plaintiffs' May 29, 2013 motion. ECF 5131.  In this order, the Court reviewed the history of constitutional violations in the defendants' use of disciplinary measures against mentally ill inmates, among other matters.  The Court then directed the Special Master to review defendants' implementation of the 2011 agreed-to plan for mental health input into the RVR process and report within six months whether defendants had adequately implemented the RVR policies and procedures agreed to in 2011.

Pursuant to the April 10, 2014 order and under the Special Master's direction, members of the Special Master's team subsequently conducted an on-site review of the RVR process at all 34 CDCR institutions.  The site visits were conducted from June 2014 through December 2014 and covered the review period of January 2014 through March 2014.

On October 20, 2014, more than three months prior to filing his RVR Report, the Special Master briefed the defendants by teleconference on the preliminary findings of his RVR review, and offered them the opportunity to submit comments.  The Defendants subsequently submitted a written report to the Special Master on January 9, 2015.  In this report, defendants indicated they had started to initiate efforts to address the Special Master's preliminary findings.  Defendants reported that their early efforts included the following:

1. Revision of the form for requesting a mental health assessment to be used in the RVR process and related training of clinicians on the purpose of the form.

2. Development of a clinician's guide to drafting these mental health assessments and a companion guidebook on RVRs for hearing officers.

3. Development of a program for institutional tracking of mental health assessments and corresponding RVRs.

4. Conduct of regular meetings between institutional mental health and custody management regarding RVR hearings that have required mental health assessments.

5. The provision of both separate and joint training to clinicians and custody staff on the new mental health assessment forms and policies.

6. Further refinement of CDCR's quality improvement tool, CQIT, to be used in substantive review of input on the mental health assessment forms, RVR dispositions, and of how senior hearing officers mitigated penalties based on information in the mental health assessments.

On January 30, 2015, the Special Master filed his report on CDCR's implementation of policies and procedures on rules violation reports ("RVR Report"). ECF 5266. A central requirement of both the October 26, 2011 and November 3, 2011 memoranda was that all clinical and custody staff who participated in the RVR process receive designated training using a specific curriculum. The October 26, 2011 memorandum required the four-hour training as a prerequisite for clinical and custody staff involvement in the RVR process. The November 3, 2011 memorandum required custody and clinical staff who participated in the inmate disciplinary process to receive on-site training on the mental health assessment requirements listed in the memorandum, and further, that the revised training be used for ongoing training.

To ascertain whether an institution satisfied the memoranda's training mandates, members of the Special Master's team conducting on-site review of the RVR process obtained a copy of all current staff assigned to positions involved in the RVR process at each institution. This list was then compared to the IST reports which documented staff members' attendance at the required training sessions. The monitor also used data from the IST Fox Pro tracking system to help ensure training information accuracy and completeness.

46

Overall, the RVR Report found that CDCR institutions had not implemented and sustained the RVR policies and procedures that had been agreed to in 2011. In fact, not one institution was able to establish adherence to applicable policies and practices in a consistent and thorough manner. Even more problematic was the fact that seven and one half years had elapsed since CDCR had been ordered on August 2, 2007 to address this problem. ECF 2345. Nonetheless, the same deficiencies that the Special Master reported in his Seventeenth Round Monitoring Report, Part B, namely, errors, inconsistencies, inadequate documentation, and mental health input not being considered in RVR deliberations and dispositions, were again found to be pervasive throughout CDCR institutions.

In addition, no institution was able to provide documentation that indicated whether all clinical and custody staff assigned to the RVR process at their institution had received the mandated training. Training also was not consistently conducted in a collaborative format, i.e., with custody and clinical staff being trained together, nor was it occurring on an ongoing basis.

The Special Master's RVR Report concluded that there were extensive flaws in the execution of the RVR process agreed to in 2011. The Special Master opined that a breakdown in the training elements of the process appeared to be the root of the problem. This resulted in CDCR staff's lack of an understanding of the process and awareness of its purpose, which was to rectify problems with defendants' use of inmate disciplinary measures. As this Court stated nearly 20 years ago, these problems were based on its finding that seriously mental ill inmates "who act out are typically treated with punitive measures without regard to their mental status." *Coleman*, 912 F.Supp. at 1230. The problem appeared to be compounded by the fact that 33 of the 34 CDCR institutions were found to have no quality control or improvement mechanism to detect and address lapses in staff training.

47

The Special Master's RVR Report also reviewed the various initiatives that defendants had begun to undertake following the October 20, 2014 teleconference, when the Special Master reported his preliminary findings. The Special Master's RVR Report indicated that defendants' initiatives revealed "a general awareness, understanding, and willingness on the part of defendants to respond to the problems with the RVR process, for which defendants should be commended and encouraged." ECF 5266.

The Special Master's RVR Report requested that the Court enter an order directing the following:

1. CDCR shall immediately end the practice of using inmate workers in any aspect of the RVR process.

2. CDCR shall devise an RVR quality improvement process for incorporation into its Quality Improvement Tool (CQIT) and conduct regular quality improvement reviews of the RVR process, including but not limited to the staff training aspects of the RVR process, in all of its institutions.

3. Within 243 days, CDCR shall implement, under the guidance of the Special Master, its program of RVR mandatory initial and ongoing training/re-training of all clinical and custody staff who participated in the RVR process.

4. Following the 243-day period for implementation of the staff training/retraining program, the Special Master shall conduct a review of staff training/re-training on the RVR process in all CDCR institutions, and shall report to the Court on his findings no later than 90 days after the completion of his review.

Subsequent to the filing of the Special Master's RVR Report, the parties met-and-conferred with the Special Master's team to discuss the RVR Report's recommendations and the RVR process. These meetings took place on February 19, February 27, March 12, March 17, March 23, April 1, and April 2, 2015. Prior to and during the course of these meetings, it became apparent that additional time was needed to prepare and file the parties' respective responses to the RVR Report. On February 5, 2015, the Court entered a stipulation between the

parties, in agreement with the Special Master, extending the time for the parties to file responses to the RVR Report by 30 days until March 3, 2015. ECF 5273. On March 2, 2015, the Court entered another stipulation between the parties, with the Special Master's agreement, extending the time for the parties to file responses to the RVR Report by another thirty days until April 3, 2015. ECF 5285.

During these meetings, the parties, in coordination with the Special Master, made several modifications to CDCR's RVR policies and procedures. Specifically, the parties agreed to revise the 2011 RVR policies, procedures, and staff training that were the subject of the Special Master's RVR Report. This resulted in the revision of Title 15, Sections 3310(d), 3315(h), 3317, 3317.1, and 3317.2, Departmental Operating Manual Section 52080.5.8, and the Mental Health Assessment Form (115-H). CDCR further agreed to implement a Memorandum entitled "Implementation of Rules Violation Report Exclusions and Documentation of Rules Violations in an Alternate Manner Based on Clinical Input for all Inmate Participants in the Mental Health Services Delivery System."

On May 4, 2015, this Court entered a Stipulated Response and Order on the Special Master's Report on CDCR's Implementation of Policies and Procedures on Rules Violations Reports, ECF 5305, which resulted from the parties' stipulation and the Special Master's concurrence. Consistent with recommendation 1 of the RVR Report, it was agreed that CDCR would eliminate the use of inmate workers in the RVR process entirely by upgrading SOMS. Per recommendation 2, CDCR agreed to revise the CQIT to include a quality improvement process for RVRs and to conduct regular RVR reviews. In alignment with recommendation 3, CDCR agreed to work with the Special Master to develop and implement mandatory training on the revised RVR policies and procedures for clinical and custody staff who were involved in the

49

RVR process.  CDCR agreed to implement these policies and procedures, and necessary training, within the 243-day timeframe that the Special Master's RVR Report recommended.  Consistent with recommendation 4, it was agreed that the Special Master would review and report on CDCR's training on the revised policies and procedures.

CDCR headquarters subsequently developed and then implemented at the institutions the mandatory training on the revised policies and procedures for clinical and custody staff who were involved in the RVR process.  These trainings were conducted for selected staff at seven training sites during May and June of 2015.  The trained staff subsequently returned to their institutions to train other required staff.  All classifications required to be trained were to be trained by July 7, 2015.

As this RVR training occurred during or after the respective twenty-sixth round institutional monitoring site visits, it was premature to evaluate it or report on the percentage of required staff who were trained.  The Special Master anticipates that this RVR training will have taken root by the Twenty-Seventh Round monitoring tour, at which time it will be evaluated.

## V.    Custody/Mental Health Relations

Issues pertaining to the relationship between custody staff and the delivery of mental health care in the California prisons have been present in the *Coleman* case since its inception. In the June 6, 1994 Report and Recommendations issued in this matter, the Magistrate Judge found that custody staff were inadequately trained in the signs and symptoms of mental illness. Report and Recommendations, filed June 6, 1994, ECF 547, p. 61.  The Magistrate Judge recommended that defendants implement a training program to train correctional officers, among other staff, in the recognition and identification of the signs of mental illness.  *Id*. at 79.  The

50

recommendation was adopted by the Court in *Coleman v. Wilson*.  *Coleman v. Wilson*, 912 F.

Supp. 1282, 1323 (E.D. Cal. 1995)

    These issues have evolved over time.  The topic has been an underlying issue throughout

the remedial process and has surfaced a number of times during the course of the Special

Master's tenure.  In his Twentieth Round Monitoring Report, the Special Master reported on

custody practices at SVSP that were creating obstacles to the provision of mental health care.

"Line officers and custodial supervisors assigned to 3CMS and EOP buildings reportedly taunted

inmates about mental disabilities, enforced rules arbitrarily, restricted utilization of space set

aside for mental health programs in an explicable manner, and failed to properly manage the

priority ducat system.  This dysfunction created tension and animosity between custody and

mental health staffs and discouraged inmate participation in treatment, thereby thwarting access

to mental health programs."  Special Master's Twentieth Round Monitoring Report, ECF 3029,

p. 188.   In response, the *Coleman* Court issued an Order directing defendants to develop a plan

to address the dysfunction found at SVSP.  Order, filed October 6, 2008, ECF 3072.

    In a subsequent Order issued June 17, 2009, the Court disapproved the SVSP plan

submitted by defendants and ordered them to develop a plan under the guidance of the Special

Master.  Order, filed June 17, 2009, ECF 3613.  As a result, defendants, in collaboration with the

Special Master, developed a custody and mental health collaboration training plan.  A copy of

the plan was submitted to the Special Master on October 16, 2009.  Defendants' Notice to Court

of Submission of Plan to Special Master, ECF 3709.  An amended plan was submitted to the

Special Master on October 26, 2009, which identified programs at seven institutions,

CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, RJD, SVSP, and SQ for conduct of the training.

In his Twenty-Third Round Monitoring Report, the Special Master provided the Court with an update on the collaboration training process. Training had been completed in the designated programs at the selected institutions and defendants planned to expand the training institution-wide at the same facilities over a two-year period. Twenty-Third Round Monitoring Report, ECF 4124, p. 31. The Special Master's findings in the Twenty-Fourth Monitoring Round included inmate complaints about demeaning behavior on the part of SVSP custody officers, which echoed findings from the Twentieth Round Monitoring Report. This officer behavior was reportedly a factor in dissuading class members from attending out-of-cell activities. Twenty-Fourth Round Monitoring Report, ECF 4205, p. 129.

The Special Master provided a second update on collaboration training in his Twenty-Fifth Round Monitoring Report. Defendants' outcome evaluation on the training completed in the programs at the seven selected institutions revealed that there had been no significant changes in use-of-force incidents, individual cell-side visits, or treatment cancellations by custody. The evaluation also found that 60 to 90 days after the training there had been no indication of sustained improvement in staff attitudes. Defendants reported that staff had requested increased opportunities for the joint training and indicated their desire to expand the collaboration training to all CDCR institutions. The Special Master requested that defendants provide him with an update on the training program, including whether it was expanded to all institutions. Twenty-Fifth Round Monitoring Report, ECF 4298, p. 48, 49. Defendants did not provide a status update in their objections and comments filed in response to the Twenty-Fifth Round Monitoring Report. Amended Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master, ECF 4347.

52

Despite all of the previous work committed to addressing the issue of custody/mental health relations, and by extension custody interference in the delivery of mental health care, this problem has remained pervasive across several institutions statewide.  Monitoring in the Twenty-Sixth Round revealed varying levels of the effect of poor custody/mental health relations on the delivery of mental health care, as reported below.  In view of the alarming findings in the OIG's recent investigation of the culture at HDSP[21], it is imperative to once again stress the importance of addressing these issues as they relate to the care of *Coleman* class members.  It should be noted that there were sometimes contradictory reports by staff and inmates as to the status of custody/mental health relations and their effect on mental health care.

During the Twenty-Sixth Monitoring Round, reports by both staff and inmates indicated that one of the most reported problems with custody/mental health relations was disrespectful treatment or harassment of *Coleman* class members.  Inmates complained about poor treatment from custody officers due to their mental illness at: CIM, CSP/Corcoran, CTF, HDSP, KVSP, MCSP, PBSP, PVSP, RJD, SVSP, SQ and VSP.  Certain of these reports were particularly concerning as discussed below.

Correlating with the OIG's finding of a culture of indifference towards inmates at HDSP, interviewed 3CMS inmates reported that custody staff routinely did not respond to inmate requests for immediate mental health treatment.  Further, inmates reported knowing of other

---

[21] http://www.oig.ca.gov/media/reports/Reports/Reviews/2015_Special_Review_-_High_Desert_State_Prison.pdf
The Office of the Inspector General released its 2015 Special Review of High Desert State Prison in December 2015.  The investigation revealed allegations of a perpetuated culture of indifference towards inmates, a broken appeals system, difficulty for vulnerable inmates to program safely, and acquiescence of custody staff in gang politics, in addition to other practices which could potentially affect *Coleman* class members.  (Summary of Findings, p. ii.)

inmates who engaged in self-injurious behavior as a result of these delayed responses to requests for mental health treatment.

At KVSP, there were pervasive and consistent reports of custody officer harassment, intimidation and insensitivity by SNY EOP inmates. Interviewed EOP inmates expressed a belief that custody staff unduly influenced mental health staff to remove inmates from the EOP program, and reported being told by custody and clinical staff that they were too high-functioning to remain in the program.

At MCSP, interviewed EOP inmates reported that custody staff remarked negatively on inmates' psychotropic medications, race and/or sexual orientation as well as other custody staff who treated class members more appropriately. In addition, although mental health staff reported good relationships with custody staff, inmates reported a perception that some clinicians were afraid of custody officers and would not talk to them on behalf of their inmate-patients. Inmates also reported housing moves that were perceived as intentional efforts to house certain inmates with incompatible cellmates.

PVSP class members expressed concerns about a recent increase in harassing behavior by certain custody staff. An incident witnessed by the monitor during the site visit seemed to give credence to the claims. A custody officer interrupted the 3CMS inmate interviews, opening the door and abruptly demanding to know whether "everyone was properly tucked in." Upon receiving no response, the officer said, "Shame on me if I find one." The incident was brought to the attention of the warden and addressed at the time of the site visit.

*Coleman* class members in the EOP program at VSP reported intimidation, threats and retaliation by some unit officers. Those reports were confirmed by staff. Groups were reported to begin late due to officers not permitting inmates to timely leave their housing units. Half of

interviewed 3CMS inmates reported disrespectful comments by some custody officers related to inmates' medication and/or level of care, and most of the inmates stated the importance of avoiding certain officers who engaged in racially-based verbal abuse.

A number of institutions reported good working relationships between custody and mental health staff, including, ASP, CHCF, CMC, Calipatria, CTF, Folsom, HDSP, MCSP, NKSP, PVSP and RJD. However, at some of those institutions, staff reports of good relations with custody staff conflicted with inmate reports of poor treatment and/or custody interference with the delivery of mental health care services. Those institutions included, CTF, HDSP, MCSP, PVSP and RJD. Inmate reports at HDSP, MCSP and PVSP were previously discussed above. At CTF, inmates complained about disrespectful treatment from custody officers, but reported that there was no interference with their access to mental health care. At RJD, there were consistent inmate reports across programs of custody officer harassment and interference with mental health services.

At yet other institutions, staff provided mixed reports regarding custody/mental health relations. At CSP/Corcoran, although relations with custody staff were described as fair, some staff reported their belief that custody staff used the MHCB and alternative housing for housing problematic inmates who did not have mental health concerns. At CSATF, while some mental health staff reported good working relationships with custody staff, others reported abrasive attitudes by officers in the EOP overflow unit. WSP mental health staff reported both good and troubled interactions with custody staff.

One of the more disturbing findings was that the cultural issues at SVSP previously reported on in both the Twentieth Round and Twenty-Fourth Round Monitoring Reports were still present and affecting the delivery of mental health care to *Coleman* class members during

the Twenty-Sixth Monitoring Round.  During the February 2015 site visit to SVSP, the monitor's findings were so concerning as to necessitate a second visit, which was completed in June 2015. In the MHCB unit, there was a pattern of increasing numbers of inmates coming in from administrative segregation and not wanting to return there.  The inference from staff was that these inmates were attempting to avoid disrespectful and harassing conduct by custody staff in the unit.  In a meeting convened specifically to discuss the February 2015 findings, institution leadership reported that specific measures had been taken to address the custody-related concerns, including removal of staff from a specific yard and the initiation of OIG investigations.

A good working relationship between custody and mental health staff is fundamental to the delivery of mental health care to *Coleman* class members in the California prisons.  As stated in the Special Master's Twenty-Fifth Round Monitoring Report, "Any breakdown in the custody-mental health relations, and any actions on the part of custody which could have a chilling effect on a mentally ill inmate's willingness to be escorted to a clinical appointment, must be eliminated."  Twenty-Fifth Round Monitoring Report, ECF 4298. p. 49.

Many efforts underway are anticipated to have a positive effect on the role of custody staff in the delivery of mental health services to class members, potentially improving delivery of mental health care system-wide.  As directed by the *Coleman* Court in its April 10, 2014 Order, filed April 10, 2014, ECF 5131, defendants have recently implemented a number of new initiatives, most of which have yet to be fully monitored, which the Special Master anticipates will have an impact on institution culture and custody/mental health relations.  Those initiatives include policies surrounding non-disciplinary segregation, short and long-term restricted housing, unclothed body searches and treatment refusals, 120-day pre-Minimum Eligible Release Date (MERD) case reviews, long-term MHSDS segregation case-by case reviews, use of force,

RVRs, management cell status moratorium, case conferences for DSH discharges returning to a SHU, as well as the EOP ASU Hub monthly certification process.  During the Twenty-Seventh Round monitoring, the Special Master will monitor the implementation of these policies and any culture changes resulting therefrom.

As reported above, CDCR completed the custody/mental health collaboration training in seven of its 35 institutions.

## VI.    <u>Program Access</u>

*Hecker v. CDCR, Schwarzenegger et al.* (2:05-CV-02441) was filed on December 1, 2005.  Plaintiffs alleged that defendants were engaging in policies and practices in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act.  Pursuant to local rules, plaintiffs identified the *Coleman* case as a related case which the Court had already de-certified as to claims originally pleaded under the Rehabilitation Act.  The practices and policies at issue involved the exclusion of class members from participating in employment positions, substance abuse programming and vocational and educational programs.  Others included failing to provide reasonable accommodations to inmates on heat sensitive medications so that they may access programming, excluding qualified class members from conservation and fire camp programs, assigning class members to higher-security housing based upon their need for psychiatric services, failing to give service credits to class members who experience disability-based delays at reception centers, failing to give class members at the EOP level of care classification score deductions for "average or above average performance" in vocational and educational programs, adding four points to the classification scores of incoming class members without lawful basis, and other discriminatory treatment.

On November 17, 2006, defendants moved to dismiss *Hecker* on the ground of preclusion by *Coleman v. Brown*. ECF 38. The motion was heard on February 8, 2007, but not decided. Instead, on February 27, 2007, the Magistrate Judge recommended that the matter be stayed and referred to the *Coleman* Special Master. ECF 65. The *Coleman* Court adopted the recommendation on March 15, 2007 and referred the matter to the Special Master for a report and recommendation as to whether the claims raised in *Hecker* could be resolved within the remedial phase of the *Coleman* case. ECF 71. The Special Master's report was filed June 12, 2007. ECF 72. He found that merger or consolidation of the two cases were not feasible solutions due to the parties' differences.

Plaintiffs filed a motion to lift the stay on December 14, 2007. (ECF 78) Briefing on the motion was completed January 16, 2008, but no ruling on the motion was made. On September 19, 2012, plaintiffs filed a renewed motion to lift the stay; defendants filed an opposition on October 11, 2012. ECF 94, 97. On October 18, 2012, the Court issued an Order denying plaintiffs' motion without prejudice to its renewal, as appropriate, not later than March 1, 2013. ECF 102. The Court directed the parties to meet and confer under the guidance of the Special Master to: 1) identify which, if any, issues raised in the second amended complaint were resolved through the *Coleman* remedial process; 2) identify which, if any, issues raised in the second amended complaint remained in dispute; and 3) as to any issues identified as remaining in dispute, identify which were or could be resolved in the *Coleman* remedial process, and which could not and the reasons why not.

The parties began the meet and confer process in November 2012, holding two sessions prior to defendants' move to terminate federal court oversight in the *Coleman* case. The parties agreed to defer any additional meet and confer sessions pending the disposition of the motion to

terminate.  On March 1, 2013, pursuant to the deadlines established by the October 19, 2012

order, plaintiffs renewed their motion to lift the stay.  ECF 103.  Defendants opposed the motion.

ECF 106.  On April 5, 2013, the *Coleman* Court denied the motion to terminate federal court

oversight.  ECF 4539.  On April 11, 2013, the Magistrate Judge ordered the parties to resume the

meet-and-confer process and complete it by August 16, 2013.  ECF 107.

　　　At the next meet and confer session, held on April 30, 2013, it was agreed that defendants

would produce data from eight designated prisons to verify their assertions about availability of

programs to class members.  The data would be produced jointly by CDCR headquarters and the

eight prisons and would include data points for institutional heat plans, inmate jobs, vocational

and educational programming, access to general population programming for EOP inmates and

substance abuse programs.  The data would be collected for analysis during the Special Master's

pre-scheduled tours of the eight institutions.  The Special Master's site visits began May 22,

2013 and concluded on June 27, 2013.  They were attended by plaintiffs as well as

representatives of CDCR.  Upon completion of the site visits, the Special Master prepared

informal reports on the collected data, which showed wide variability of services to caseload

inmates across the different prisons.  The data was presented to plaintiffs at an all-parties

meeting.

　　　A second round of site visits to examine program access data at the same eight prisons

was conducted and concluded in mid-December 2013.  Two in-person meetings were held in

January and February 2014; the second set of data as well as an updated set of policies related to

*Hecker* issues were presented to plaintiffs.  Plaintiffs submitted comments on the updated

policies.  The parties had informal discussions regarding how to develop a framework to resolve

the remaining issues and were in the process of reviewing each other's proposals for settlement.

By the time of the next meeting, a teleconference on May 13, 2014, the issues had been narrowed significantly and the parties continued to review each other's settlement proposals to incorporate the remaining *Hecker* issues into the *Coleman* case and have them monitored as part of the *Coleman* remedial process.  The parties met again on May 29, 2014, but were unable to reach a resolution of all of the remaining issues, thus requested an extension of several weeks' time in which to complete settlement negotiations.

        With the assistance of the Special Master, the parties were able to reach a settlement agreement averting further litigation – resolving some of the issues related to policies and practices that may have excluded some class members from participating in programs and may have discriminated against other class members.  A Joint Motion for Preliminary Approval of Settlement Agreement was filed on August 5, 2014.  ECF 124.  On March 2, 2015, an Order for Final Approval of Settlement Agreement was issued by the Court.  ECF 148.  The remaining issues, as stipulated by the parties, were incorporated into the *Coleman* remedial process, and the parties directed to continue negotiations facilitated by the Special Master for their resolution.

        As directed, the parties continued to meet with the Special Master, convening four times between May 2015 and September 2015.  Now that negotiations have reached the point where the issues are just about defined, the parties, with the concurrence of the Special Master, have merged discussion of the remaining *Hecker* issues into Coleman all-parties' meetings and into ongoing regular *Coleman* monitoring.  At this time, a number of elements are under development which will come into more focus during the upcoming Twenty-Seventh Monitoring Round.

Full-Time Job Assignments

        There were significant differences in the percentage of inmates with full-time job assignments among institutions, and between caseload and non-mental health caseload inmates.

60

Non-mental health caseload inmates were more likely to have full-time job assignments, while 3CMS inmates were more likely than EOP inmates to have such positions.

As to full-time employment assignments for EOP inmates, CMC and SVSP reported that from 30 to 45 percent of inmates held such positions; at CSP/Corcoran and CSP/Sac, the percentage was between 20 and 29 percent. Five institutions -- CSATF, CCWF, KVSP, PBSP, and VSP – indicated that from 10 to 19 percent of EOP inmates were fully employed. At seven institutions – CHCF, CIW, CMF, CSP/LAC, MCSP, RJD, and SQ -- less than ten percent of EOP inmates had full-time job assignments.

A higher percentage of 3CMS inmates typically held full-time job assignments. ASP, CRC, and NKSP reported that between 50 and 65 percent of 3CMS inmates held such positions. Eight institutions -- CMF, CMC, CSP/Sac, CSP/Solano, CTF, PVSP, RJD, and SCC – indicated that between 40 and 49 percent of 3CMS inmates held full-time positions. Ten other institutions – CCI, CSP/Corcoran, CSATF, CCWF, Folsom, HDSP, ISP, SVSP, SQ, and VSP -- reported that between 30 and 39 percent of 3CMS inmates had full-time jobs. Data from seven other institutions – CHCF, CIM, CIW, CSP/LAC, KVSP, MCSP, and PBSP – revealed that between 20 and 29 percent of 3CMS inmates had full-time employment positions.

As for non-mental health inmates, six institutions – CCI, CMF, CSATF, CTF, PVSP, and SVSP -- reported that between 60 and 75 percent of non-mental health inmates had full-time job assignments. At ASP, CRC, CVSP, and Folsom, from 50 to 59 percent of non-mental health caseload inmates were fully employed. Nine other institutions -- CHCF, CIM, CIW, CSP/LAC, Centinela, CCWF, HDSP, ISP, and PBSP -- reported that between 40 and 49 percent of non-mental health inmates had full-time job assignments.

Milestone Credits

CDCR grants qualified inmates a reduction in their incarceration time when the inmate actively participates in and completes components of in-prison rehabilitation programs, such as academic or vocational training or substance abuse programming.  As the inmate progresses through the program, certain components or "milestones" are completed.  Varying amounts of "credits" are awarded to the inmate upon completion of specific milestones.

There were significant differences in the percentage of inmates who earned milestone credits.  As a general matter, eligible EOP inmates were less likely to earn milestone credits than eligible 3CMS inmates.

Three institutions --- CCI, CMC, and VSP -- reported that between 20 and 31 percent of eligible EOP inmates actually earned milestone credits.  At CSATF, between 10 and 15 percent of eligible EOP inmates received milestone credits.  Fourteen other institutions -- CHCF, CIM, CIW, CMF, CSP/Corcoran, CCWF, KVSP, MCSP, NKSP, PBSP, RJD, SVSP, SQ, and WSP -- reported that ten percent or less of eligible EOP inmates earned milestone credits.  CSP/LAC did not provide pertinent data.

As for 3CMS inmates, VSP reported that approximately 50 percent of eligible 3CMS inmates received milestone credits.  Ten institutions – ASP, CIW, CMC, CRC, CSATF, CCWF, CVSP, Folsom, HDSP, and PVSP -- reported that between 20 and 30 percent of eligible 3CMS inmates earned milestone credits.  Six other institutions – CCC, CIM, CMF, CTF, ISP, and MCSP -- reported that between 10 and 19 percent of eligible 3CMS inmates earned these credits.  Nine other institutions -- CHCF, CSP/Corcoran, KVSP, NKSP, PBSP, RJD, SVSP, SQ, and WSP – reported than ten percent or less of eligible 3CMS inmates actually earned milestone credits.  CSP/LAC and CSP/Solano did not provide relevant data.

As for non-mental health inmates, eight institutions – ASP, CIW, CMC, CRC, CVSP, ISP, PVSP, and VSP -- reported that between 30 and 45 percent of eligible non-mental health caseload inmates received milestone credits.  Five other institutions – CCC, CSATF, Folsom, MCSP, and SCC – indicated that between 20 and 29 percent of eligible non-mental health inmates earned them.  At eight other institutions – CCI, CIM, CSP/Corcoran, Centinela, CCWF, CTF, HDSP, and RJD – from ten to 19 percent of eligible non-mental health caseload inmates earned milestone credits.  Eight more institutions -- CHCF, CMF, KVSP, NKSP, PBSP, SVSP, SQ, and WSP – reported that ten percent or less of eligible non-mental health caseload inmates earned milestone credits.  CSP/LAC and CSP/Solano did not provide relevant data.

Out-of-Level Housing

There were vast differences as to the percentage of inmates who were housed out-of-level at the respective institutions.  As for EOP inmates, CMF and CMC reported that between 70 and 75 percent of inmates were housed out-of-level, while MCSP and RJD indicated that between 35 and 39 percent of EOP inmates were housed out-of-level.  Five institutions -- CHCF, CSP/LAC, CSATF, SVSP and VSP -- reported that from ten to 25 percent of EOP inmates were housed out-of-level.  At CSP/Corcoran, CSP/Sac, and Folsom, less than ten percent of EOP inmates were housed out-of-level.

As for 3CMS inmates, CMF and CMC reported that from 35 to 40 percent of 3CMS inmates were housed out-of-level.  Seven institutions – CSP/Solano, ISP, MCSP, PVSP, RJD, SVSP, and SCC -- reported that between 15 and 26 percent of 3CMS inmates were housed out-of-level.  Nine institutions—CHCF, CIM, CSP/Corcoran, CSP/LAC, CSATF, DVI, HDSP, NKSP, and WSP – indicated that from ten to 14 percent of 3CMS inmates were so housed.  At

ten institutions – ASP, CCC, CRC, CSP/Sac, CTF, Folsom, KVSP, PBSP, SQ, and VSP, less

than ten percent of 3CMS inmates were housed out-of-level.

As for non-mental health inmates, CSP/LAC and HDSP reported that between 11 and 20

percent of inmates were housed out-of-level.  Four institutions -- ASP, CTF, Folsom, and PBSP

– indicated that less than ten percent of non-mental health inmates were housed out-of-level.

CIW and CCWF reported that inmates at custody levels I to IV were housed together.

ADA Reasonable Accommodation and Grievance Procedures

Seven institutions -- ASP, CIW, CMF, CMC, CRC, CSATF, and Folsom -- confirmed

implementation of the ADA reasonable accommodation and grievance procedures.  CHCF,

MCSP, SQ, and SCC reported conducting training.

Six institutions -- CCC, CSP/LAC, CCWF, HDSP, PVSP, and VSP -- had yet to

implement the revised ADA reasonable accommodation and grievance procedures.  NKSP

indicated it was a pilot program.  PBSP reported that it was not on the roll-out schedule; CTF

indicated that this procedure was inapplicable to it, and did not provide data.

CIM and CSP/Solano reported no revisions to the ADA reasonable accommodation and

grievance procedures.  CCI, CSP/Corcoran, KVSP, and SVSP did not provide information as to

the procedures.

Periodic Classification Score Reductions for EOP inmates

Review of CDCR 840s from 13 institutions -- CHCF, CIW, CMF, CMC, CSP/Corcoran,

CSP/Sac, CSATF, Folsom, HDSP, MCSP, RJD, SVSP, and VSP – indicated that EOP inmates

were granted the same semi-annual classification score reductions as non-EOP inmates for

successful programming.  A PBSP correctional counselor reported the same.  CCWF indicated

that CDCR 840 documentation was completed annually and entered into ERMS and SOMS, but sample documentation was not reviewed.

CSP/LAC and KVSP did not provide information regarding periodic classification score reductions.  Seven institutions -- ASP, CCC, CCI, CSP/Solano, CTF, NKSP, and PVSP -- reported not having an EOP program or typically not housing EOP inmates; SQ was not an EOP-designated institution.

## VII.    Construction of Mental Health Treatment Space and Beds for Inmates at Various Levels of Care

2015 saw the completion of the last remaining construction project in a process that began ten years earlier, with numerous court-ordered construction projects that dated back to 2006 and that since 2009 have been tracked and reported by CDCR in monthly activation schedules submitted to the Special Master.  While this is a milestone deserving of acknowledgment, it is not the end of the task -- construction of various Health Care Facilities Improvement Projects (HCFIPs) and the infill construction projects outlined in CDCR's Blueprint[22], described below, remains ongoing but is incomplete at the present time.

The significance of mental health bed construction comes into focus when it is viewed in the larger context of *Coleman* remediation generally over time.  As noted by this Court in denying defendants' motion to terminate *Coleman* federal court oversight in April 2013, the Court stated that "[s]hortages in treatment space and access to beds at each level of mental health care have plagued the entire remedial phase of this action." ECF 4539, p. 53.

---

[22] CDCR's April 2012 bed plan, "The Future of California Corrections:  A Blueprint to Save Billions of Dollars, End Federal Oversight, and Improve the Prison System."

Defendants filed their first Statewide Mental Health Bed Plan on April 17, 2006, ECF

1786, in response to a court order dated March 3, 2006.  ECF 1772.  Between August 2005 and

June 2006, CDCR submitted four mental health bed plans to the court:

- August 2005 - Intermediate Care Facility Bed Plan
- April 2006 - Statewide Mental Health Bed Plan
- June 2006 - Interim Intermediate Care Facility and Mental Health Crisis Bed Plan
- June 2006 - Statewide Mental Health Bed Plan, April 2006 - June 2006 Amendment

Over the next three years, bed plans were changed and modified and a Receiver was

appointed to oversee the provision of medical care in the CDCR.[23]  In his efforts to bring the

medical care provided to CDCR inmates up to constitutional standards, the Receiver formulated

his own bed plan which incorporated the construction of additional mental health beds.  This

added to the confusion and uncertainty as to what bed plan the *Coleman* defendants were

utilizing.

In early 2009, the court was concerned about what bed plan defendants were following

and ordered defendants to file and serve a statement setting forth their present bed plan. ECF

3515.  Defendants sought an extension of time to file their statement and requested 90 days to

prepare an updated bed plan.  The court's frustration with defendants' response echoed

throughout the order which issued shortly thereafter.  ECF 3540.  In its written order the Court

stated:

> To say the least, the court is deeply disappointed and distressed
> with the State's response. This court has been engaged in the
> process of attempting to bring the State in conformance with the
> Constitution of the United States for roughly fourteen years. To
> say now that the State has no current viable plan, is uncertain as

---

[23] *Plata v. Brown*, No. c-01-1351 TEH (N.D.Cal.) ECF 473.

> to when it can be developed in light of changing circumstances,
> and needs at least ninety (90) days to develop such a plan, seems
> to demonstrate an unacceptable lack of commitment to its
> constitutional duty, much less to the orders of this court.

*Id* at 1-2.

Clearly concerned about whether defendants would abide by its order to produce a viable

bed plan, the Court also ordered responsible persons to disclose their identities and activities. To

that end, the Court ordered defendants to produce a progress report within ten days requiring the

following information:

> The report shall specify the names of each person who is responsible
> for development of the plan, and exactly what they have been doing
> from the date of receipt of this order. The response shall also include
> the address of each such person, as well as their title.

*Id* at 2.

The Court's intent was anything but ambiguous.  Following a hearing on March 24, 2009,

the Court ordered defendants to file detailed activation schedules for the completion of all court-

ordered construction projects including the CMC 50-bed MHCB project as well as the SVSP 64-

bed Intermediate Care Facility (ICF) project.  ECF 3556.  The Court continued its resolve to hold

individuals accountable for any inaction and required that each construction project list the

names and addresses of all persons responsible for the approval and/or execution of each stage of

every project along with every step necessary for each project, with timelines for completion of

each stage of each project.

Defendants filed the first activation schedules on May 26, 2009, listing a total of thirteen

construction projects with the last project scheduled for completion on May 10, 2013. ECF

3591.[24]  Of the thirteen projects listed on the activation schedules, three were court-ordered in 2006, nine were court-ordered in 2007, and one was court-ordered in 2008.  The Court approved the schedules on June 18, 2009. ECF 3613.  These activation schedules were subsequently expanded over time to include additional projects proposed by defendants in their long-term bed plan to address the insufficient number of mental health beds that existed system wide.  Other projects were modified as population needs shifted.

On September 24, 2009, defendants filed yet another long-range bed plan which included those projects in the original activation schedules, some which had been modified, as well as additional projects.  The Court approved the majority of the long-range bed plan but did not approve one of the projects, sought additional information on two new projects, converted two existing projects into one single project and ordered defendants to fully activate all of the projects by the end of 2013.[25]  ECF 3761 at 4-5.  In its order, the Court also recognized that a reduction in the prison population might have an effect on defendants' existing bed plan and therefore agreed to consider revisions to the plan if warranted by such a reduction. *Id* at 3.

Over the next two years, the drastic reduction in the prison population due to realignment caused the defendants to reevaluate their long-term bed plan and once again go back to the drawing board.  In April of 2012, CDCR filed a plan entitled "The Future of California

---

[24] SVSP 64-Bed ICF High Custody, ECF 1772 (3/3/06); CSP/LAC EOP Treatment Space, ECF 1998 (10/20/06); CMC 50 MHCB, ECF 1998 (10/20/06); Small Management Yards, ECF 2255 (6/1/07); CMF Treatment Space for EOP ASU, ECF 2461 (10/18/07); CMF 64-Bed ICF High Custody, ECF 2154 (3/1/07); CSP/Sac EOP Treatment and Office Space, ECF 2461 (10/18/07); SVSP 72-Bed EOP ASU, ECF 2461 (10/18/07); SVSP EOP Treatment Space, ECF 2461 (10/18/07); CIW 45-Bed ICF, ECF 2154 (3/1/07); CIW 20-Bed PSU, ECF 2178 (3/28/07); SVSP Treatment Space for Inpatient Care D-5, D-6, ECF 2461 (10/18/07).  The activation schedule for the renovation of 124 cells at CMF in Q1, Q2, Q3, S1 and S2 did not list any court orders.
[25] The Stark EOP project was not approved; additional information was requested for the Consolidated Care Center and the DeWitt-Nelson conversion project; the SVSP 72-bed EOP ASU and the SVSP 96-bed EOP GP projects were converted into one project renamed as the SVSP 300 EOP GP treatment and office space A-Quad project.

Corrections: A Blueprint to Save Billions of Dollars, End Federal Oversight, and Improve the

Prison System" (the Blueprint).   The intent of the plan left no doubt that CDCR was looking to

end the class action litigation.

> This plan builds upon the changes brought by realignment,
> and delineates for the first time, a clear and comprehensive
> plan for the department to save billions of dollars by achieving
> its targeted budget reductions, satisfying the Supreme Court's
> ruling, and getting the department out from under the burden
> of expensive federal court oversight.

Blueprint, Introduction 1.

With the inmate population in decline in the spring of 2012, defendants began discussions

with plaintiffs and the Special Master about a revised long-range mental health bed plan.

Defendants' original long-range mental health bed plan had already been expanded and included

twenty-one construction and conversion projects designed to address the insufficient number of

mental health beds and treatment space for the *Coleman* class members.

After discussions with the Special Master and plaintiffs, defendants filed yet another

revised long-range mental health bed plan on June 12, 2012 and based their updated bed need on

the spring *2012* population projections which were used to determine mental health bed needs

projected out to 2013.[26]  Defendants' revised bed plan relied on the population reductions

achieved by realignment and the facility improvement projects incorporated into the Blueprint.

The court approved the revised bed plan on June 15, 2012 but ordered defendants to continue to

work with the Special Master to ensure that a sufficient number of EOP ASU beds were planned.

---

[26] The 2009 long-range mental health plan was based on spring *2009* population projections to determine the mental health bed needs projected out to 2013

ECF 4199.  Some construction projects were eliminated altogether[27] and other projects were modified to account for the population reduction.  The completion date of the last project in the revised bed plan, the Dewitt Nelson conversion project, (now designated as Facility E at CHCF) was then extended to May 31, 2014.

The Court continued to express its frustration in the prolonged construction process in its denial of defendants' motion to terminate in April 2013 when it stated, "[c]reation of that plan for a constitutionally adequate number of beds has taken years," and "[u]ntil all necessary projects are complete, the state's prison system is operating with a constitutionally inadequate amount of treatment space and a constitutionally inadequate number of beds necessary for adequate care." ECF 4539, p. 53.

As is the case with most construction projects, unexpected delays and circumstances extended the completion dates for a small number of the projects.  However, defendants were diligent in their efforts to remedy those delays and minimize their impact.  The last project from the activation schedules was completed on October 9, 2015.[28]  Although some of the projects were not completed on-time in accordance with the timetables established by the activation schedules, defendants are nevertheless to be commended for their efforts in completing the construction projects, some of which were court-ordered nearly a decade ago.

The Blueprint also provided the impetus behind the enactment of Senate Bill 1022 in 2012 which authorized the Health Care Facility Improvement Program (HCFIP).  The HCFIP projects that impact the treatment of mental health inmates consist of renovations and new

---

[27] Funding for the Estrella and Stark juvenile facility conversion projects was denied by the Joint Legislative Budget Committee.  Both projects were eliminated in the June 12, 2102 revised long-range bed plan.
[28] Treatment and office space for EOP GP inmates at CCWF.

70

construction at eleven institutions.  At three institutions – CMC, MCSP and RJD – the projects

will provide new ASU primary care clinics and ASU EOP mental health clinics.  At CIW, the

GP primary care clinic will be reconfigured and expanded.  At seven other institutions – CIM,

CMC, CSP/Solano, CCWF, DVI, NKSP and WSP – new construction and renovations are

scheduled for the reception centers which include the creation of confidential screening and

exam rooms at certain facilities.  The projected completion dates for these HCFIP projects range

from February of 2016 to the completion of the last project in the summer of 2017.

 Realignment also underscored the shortage of housing for Level II inmates due to the

reclassification from higher custody levels to lower custody levels, an issue that was also

addressed by SB 1022 and the Blueprint.  The enacted legislation authorized the construction of

three new Level II dormitory prisons (Infill Projects) at existing facilities that would add 2,376

beds.  Two of these new dormitory facilities – MCSP and RJD - will each house 264 Level II

EOP inmates and contain treatment and office space.  Both facilities will also have separate

buildings adjacent to the housing units to accommodate additional treatment space and offices.

It is expected that these new facilities will help reduce the lack of Level II beds for EOP inmates.

 On February 3, 2016, defendants notified the Special Master that EOP inmates would be

transferring to the new Level II facility at MCSP beginning February 22, 2016, more than three

months ahead of schedule.  The projected completion date for the facility at RJD is currently

scheduled for May 2016.

Upon request of the Special Master, defendants agreed to provide monthly updates, in the form of activation schedules, to report on the progress of each HCFIP and Infill Project.[29]

In January 2016, CDCR released "An Update to the Future of California Corrections" ("New Blueprint") which served as an update to the original "Blueprint."  Although the New Blueprint reported that CDCR continued to monitor and make adjustments to the housing needs of the mental health population, it also revealed that the mental health population in 2012-2013 was approximately 33,660 and grew to approximately 36,800 by December 2015 constituting roughly 29 percent of the entire prison population.  New Blueprint, p. 12-13.

Although the planned addition of beds may alleviate some persistent bed shortages, defendants must be mindful of the increasing mental health population.  The "Mental Health Bed Needs Study" dated January 8, 2016, forecasts an overall increase in the bed need for male inmates to be in excess of 700 beds in 2016, with the greatest increase in bed need at the APP, GP-EOP and EOP ASU programs.[30]

While defendant's efforts in the completion of construction projects to date is admirable compared to the situation that existed in 2009, their work is not complete.  Despite the overall reduction in the prison population, the mental health population continues to rise.  Defendants have made countless yard changes to account for the shifting needs of the mental health population and the HCFIP and Infill projects are expected to come online in 2017.  Although there is no clear explanation why the mental health population continues to increase, these

---

[29] The first activation schedule covered the reporting period which ended on November 30, 2015. The schedules include information relative to the anticipated start date of each project versus the actual start date, the anticipated completion date versus actual completion date, and a comment section which details the type and percentage of work completed as well as any problems or delays with each project.

[30] The Department of State Hospitals should also be mindful of the increasing bed needs within its facilities and programs.

72

inmates still require adequate housing and treatment space.   "Until all necessary projects are complete, the state's prison system is operating with a constitutionally inadequate amount of treatment space and a constitutionally inadequate number of beds necessary for adequate care. That is an ongoing constitutional violation that must be remedied." ECF 4539 at 53.

## VIII.  Access to Higher Levels of Care:

### A.     Overview of the Special Master's Findings During the Twenty-Sixth Round

Unlike in many other areas of mental health care delivery, CDCR institutions were struggling to provide *Coleman* class members with timely access to higher levels of care during the review period.  Across prisons, there were issues with implementation of the process for identifying and referring inmates in need of higher levels of care (Form 7388B process) and with compliance with applicable timeframes for transferring inmates from CDCR prisons into beds within appropriate inpatient mental health programs.[31]  As these transfers became backlogged, availability of MHCBs declined as inmates awaiting transfer to inpatient programs remained in MHCBs.  In turn, this resulted in longer waits for inmates experiencing mental health crises to access MHCBs and, in some instances, placements in less desirable mental health beds while awaiting crisis level care.  If issues with access to inpatient care remain unresolved, and inpatient beds at Atascadero State Hospital (ASH) that are designated for *Coleman* class members are not utilized, it may become necessary to re-visit the possibility of re-opening closed inpatient beds at other facilities to ease any backlog.

---

[31]Availability of beds and the policies and practices surrounding provision of care within the inpatient mental health programs beds will be covered in a separate upcoming report by the Special Master.

The details of the Special Master's findings during the Twenty-Sixth Round on delays in access to care are presented in Part III below.

**B.    The Role of Access to Higher Levels of Care in *Coleman* Remediation**

The *Coleman* Court addressed the importance of timely access to care, among other things, in its order of April 5, 2013, denying the defendants' motion under the Prison Litigation Reform Act, 18 U.S.C. § 3626(b) to terminate *Coleman* Court oversight.  ECF 4539.  In a 68-page order, the Court expounded in detail on why it denied the defendants' motion, including a discussion of how continuing issues with inmates' access to higher levels of care had historically caused a failure of compliance with the Eighth Amendment to the United States Constitution ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.")  U.S. Const. Amend. VIII. The Eighth Amendment violation found in *Coleman* was defendants' "`severe and unlawful mistreatment' of prisoners with `serious mental disorders,' through `grossly inadequate provision of . . . mental health care.'"  Order, ECF 4539, p. 23, quoting *Brown v. Plata*, 131 S.Ct. 1910, 1922 & 1923 (2011).  With specific regard to access to higher levels of care, the court stated that "Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive necessary higher levels of mental health care, including inpatient care only available from DMH,[32]" is one of the six critically important goals that are necessary to remedy the Eight Amendment violation.  Order, ECF 4539, p 24, *citing* Order Adopting Special Master's Twenty-Fourth Round Monitoring Report, filed August 30, 2012, ECF 4232, p.5, n.3.  Concomitantly, evidence of "an absence of timely access to appropriate levels of care at every point in the system" is evidence of an ongoing

---

[32] Now Department of State Hospitals (DSH).

constitutional violation.  *See* Order, ECF 4539, p. 46, *quoting Brown*, 131 S.Ct. at 1931 [*quoting*

report filed by Special Master in July 2009 (Twenty-First Round Monitoring Report, ECF 3638,

filed July 31, 2009)].   "The relevant requirement (to assessing defendants' constitutional

compliance) is defendants' constitutional obligation to provide `a system of ready access to

adequate (mental health) care.'"   Order, ECF 4539, p. 47, *quoting Hoptowit v. Ray*, 682 F.2d

1237, 1253 (9th Cir. 1982).  The CDCR defendants' remedial plan -- the Revised Program Guide

-- contains "the time frames which CDCR must meet for the transfer of MHSDS inpatient-

patients between levels of care, whether within the same institution or to another institution" . . .

(and) [t]he timeframes in the Revised Program Guide represent defendants' considered

assessment of what is sufficiently `ready access' to each level of care." Order, ECF 4232, p. 47-

48.

## C.    Historical Context of the Access-to-Care Problem in CDCR Prisons

Issues surrounding access to care are all too familiar in the history of *Coleman*

remediation.  Periods of difficulty with access were followed by the emergence of encouraging

trends, only to be followed by reversions to past conditions.  Inmates remained unidentified for

appropriate care, and even once identified, waited for periods far in excess of established

timeframes before actual placement into appropriate programs, as illustrated by the following

historical summary.

Overcoming the obstacles to providing seriously mentally ill CDCR inmates with access

to higher levels of care has been one of the fundament goals of the *Coleman* remedial effort since

its inception.  *See Coleman v. Wilson*, 912 F.Supp. 1282, 1309 (E.D. Cal. 1995). An important

aspect of solving the problem was identifying those inmates in need of inpatient care, while

developing an effective process in order to make identification a regular, ongoing aspect of the

75

CDCR mental health program. To that end, the Special Master recommended several focused projects that were ordered by the *Coleman* Court.

A study known as the Unidentified Needs Assessment (UNA) was ordered by the Court on October 5, 2004. ECF 1607. It resulted in identification of 400 inmates who needed inpatient care, as well as a plan to manage the DSH wait list with provision of level-of-care services to inmates on the wait list and active participation by DSH management and staff, standardization of admission and discharge criteria, oversight of resource utilization, conversion of additional beds for inpatient use, and exploration of new treatment programs and designations to facilitate care of these newly-identified patients. The UNA study and plan were followed by revised plans in 2006, 2007, and 2008.

Despite these efforts, the inpatient care wait list grew. In early 2009, the *Coleman* Court ordered an evidentiary hearing and compliance with all existing *Coleman* bed plan orders by designated deadlines, plus the development of concrete proposals for meeting all remaining short-term, intermediate, and long-range bed needs of the *Coleman* plaintiff class. Order, March 31, 2009, ECF 3556. The result was a joint CDCR/DSH assessment of unmet need and expedited referral of any identified inmates via the project known as the Mental Health Assessment and Referral Project (MHARP). CDCR stated in its March 10, 2010 report on MHARP to the Special Master that, as a result of MHARP, 987 cases were either recommended for referral to DSH inpatient care by the MHARP assessment teams or were directly referred by the institutions. By June 16, 2009, MHARP had identified 561 inmates at 12 selected CDCR prisons for referral to inpatient care. The *Coleman* Court then approved the continuation and expansion of MHARP to all other non-desert CDCR institutions, Order, June 18, 2009, ECF 3613, which went forward during the balance of 2009.

While MHARP was a worthwhile endeavor, it was not by itself the solution. By early 2010, the wait list for inpatient care had grown to 574 men awaiting intermediate level care and 64 men requiring acute level care. Following a status conference on March 31, 2010, the *Coleman* Court directed defendants to work under the guidance of the Special Master "to develop a plan to reduce or eliminate the waitlists for inpatient care and, in the interim, to better serve the treatment needs of the *Coleman* class members placed on such lists." Order, ECF 3831. Defendants submitted their plan on November 24, 2010. ECF 3962. Per order of April 27, 2011, ECF 4004, in June 2011, the Special Master submitted his report. He recommended that defendants' plan be approved and, among other things, that they be ordered to conduct a further assessment of unmet need modeled after MHARP at the original 12 institutions for men and at two of the women's institutions. He also recommended that the *Coleman* Court hold an evidentiary hearing for defendants to show cause why the 50 beds at Coalinga State Hospital (CSH) designated for *Coleman* class members, and any other vacant beds in that hospital, could not be filled with high-custody CDCR inmates.

On July 22, 2011, the *Coleman* Court ordered an evidentiary hearing on the adequacy of Defendants' new assessment process, which differed from MHARP. ECF 4045. Defendants requested that in lieu of an evidentiary hearing, they be granted a 90-day period in which to work with the Special Master on a supplemental plan to reduce the wait list, which they would then submit to the Special Master for his evaluation. If he did not agree with the defendants' supplemental plan, then the evidentiary hearing may go forward. Defendants' request was granted. Order, August 15, 2011, ECF 4069. They were ordered to work with the Special Master over the ensuing 90 days to develop a supplemental plan to reduce or eliminate the wait list, better serve the treatment needs of inmates on the wait list, and implement any step approved

by the Special Master that would make hospital beds immediately available to inmates on the wait list. They were also ordered to work with the Special Master so that an assessment process that met his approval would have been completed by December 9, 2011.  By mid-December 2011, defendants completed the assessment and significantly reduced the inpatient wait list. With the parties' agreement and the Special Master's approval, the *Coleman* Court continued the evidentiary hearing to July 13, 2012.  Order, December 12, 2011, ECF 4131.

On December 13, 2011, defendants submitted their plan for a sustainable self-monitoring process ("the sustainable process") to ensure that inmates in need of inpatient care are timely identified, referred, and transferred to such care.  *See* Defendants Report on Assessment Process and Plan Re: Sustainable Self-Monitoring, filed December 13, 2011, ECF 4132.  On December 15, 2011, the parties reached an agreement on a process for reporting, meeting, and conferring every 45 days for the next six months on the status of the wait list.  Within ten days after each such meeting,  defendants were required to file a status report on the wait list, review of the referral process, and any other issues or developments related to access to inpatient care. Stipulation and Order, ECF 4134.

Beginning in January 2012, the Special Master worked closely with defendants to develop and complete quarterly reviews of the institutions' compliance with the sustainable process.  By the end of June 2012, it was apparent that defendants had substantially implemented the objectives of the sustainable self-monitoring process -- timely identification, referral, and transfer of inmates needing DSH inpatient care -- and to internally monitor and improve the process.  The Special Master and the parties agreed to continue meeting through the rest of 2012, and to have the sustainable process monitored within regular Special Master monitoring activities.  On July 12, 2012, CDCR began accepting inmates into L-Wing at CMF which was

78

converted to house 110 Salinas Valley Psychiatric Program (SVPP) high-custody intermediate

care inmates in as many temporary unlicensed intermediate care beds, with three additional

rooms for observation and restraint.    This allowed CDCR to place high-custody inmates on the

SVPP wait list into inpatient beds.  For the following two years, identification, referral, and

transfers of inmates in need of inpatient care improved significantly overall.  It began to appear

that the problem of long wait times for inmates needing inpatient mental health care was nearing

resolution.  *See* Twenty-Fifth Round Monitoring Report, p. 32-33, 72-83, ECF 4298.

It has now been nearly 12 years since the UNA study was ordered, setting the beginning

of the above-described series of projects on identifying and referring inmates in need of inpatient

care.  While remarkable gains were made with respect to reducing wait lists and improving

timeliness of transfers to inpatient care, they unfortunately have turned out to be short-lived.

Detailed below are the Special Master's expert's findings during the Twenty-Sixth Round, which

indicate that the gains accomplished in 2012 lapsed, and that seriously mentally ill inmates were

again waiting for access to inpatient beds and MHCBs for long periods, out of compliance with

the transfer timeframes embodied in the Program Guide.

### D.    The Special Master's Findings on Access to Higher Levels of Care during the Twenty-Sixth Round

#### 1.    Interdisciplinary Treatment Teams and Use of the Form 7388B Process

IDTTs at only two prisons, CMF and CSP/Sac, were found to be using Form 7388B[33]

appropriately.  At these institutions, non-referrals of inmates indicated that patient assessments

---

[33] Form 7388B evolved from the sustainable process described above.  It refers to the current official CDCR form and associated process by which IDTTs are to identify inmates in need of consideration for referral to higher levels of care. It documents whether the IDTT appropriately undertook the process for assessing whether an inmate meets

and documentation thereof were adequate overall. CMF reviewed its Form 7388Bs for problems

on a monthly basis.

The Special Master's expert found problems with documentation on Form 7388B and

with the conduct of the associated patient assessment process at ASP, CHCF, CIW, DVI, PVSP,

and SQ.  Form documentation was noncompliant at ASP, DVI, PVSP, and CHCF, although

training at CHCF led to improved documentation.  At PVSP, when inmates were identified as

"positive" but not referred, justifications and treatment plan modifications were not documented.

Instead, the entry "initial IDTT" was often noted as the rationale for non-referral, and basic

Program Guide requirements were noted in lieu of appropriate treatment plan modifications.

IDTTs at CIW, CTF, DVI, HDSP, KVSP, NKSP, PVSP, in the MHCB at CHCF, and to a

lesser extent at SQ and in the 3CMS program at CMF, did not use or discuss 7388Bs within the

IDTT process.  Only the PC at PVSP used the form.  The IDTT in the MHCB at KVSP appeared

to leave the decision whether to discuss elevation of the inmate to a higher level of care to the

discretion of the PC, which deviated from CDCR policy on correct use of Form 7388B.

IDTTs' use and discussion of Form 7388B at WSP, CCWF, and NKSP varied, with some

teams having meaningful discussion about the indicators for consideration for higher levels of

care, some having only cursory discussions, and some having none at all.  IDTTs in all programs

at PBSP did not consistently incorporate the Form 7388B process into their team process. At SQ,

it was clear that the PC had completed the form before the IDTT meeting, and that decisions on

whether the inmate met criteria for referral were not being made by the IDTT.  DVI's use of the

---

criteria for consideration for referral to a higher level of care, and if he/she is *not* referred, the rationale and steps
being taken to provide him/her with adequate treatment in the inmate's current setting.

form was overly concrete, with excessive reliance on the objective criteria on the form. Record reviews at DVI found that Form 7388B was also not consistently completed and when it was, it often was not done correctly. Clinicians on some IDTTs at CTF appeared to be unaware of the use of the CDCR Form 7388B and its related process, and at ASP, IDTTs appeared to be unclear on how to properly use the Form. During an IDTT meeting at CMC, a clinician erroneously stated that the Form 7388B process did not apply.

The Special Master's expert's review of eight cases at PVSP found that criteria for consideration for referral were overlooked even though readily available information indicated that these criteria were satisfied. All eight of these patients had had three or more MHCB placements within the preceding six months. Rationales for non-referrals at CIW were inadequate. At SQ, only four percent of considered cases were actually referred, with the most frequent rationale for non-referral being that the inmate was receiving enhanced care at the EOP level.

IDTTs at CIW documented rationales for non-referrals and treatment plan modifications that were inadequate. IDTTs at PBSP did not consistently modify treatment plans for inmates who were not referred to a higher level of care. At SQ, review of records indicated that treatment plans did not consistently meet inmates' needs. Justifications for non-referrals were not always supported by specific, articulated treatment enhancements nor by clinical documentation in inmates' records. Instead, there were "cut and paste" entries in 7388Bs, even when previously acceptable rationales were no longer relevant or adequate. IDTTs failed to offer appropriate alternative interventions that specifically targeted the criteria which trigger consideration of inmates for referral. As inmates' problematic behaviors continued, treatment plans were not being revised to address them.

81

2.    **Transfers to Inpatient Care**

a.    **Adequacy of Referral/Non-Referral Logs**

Referral logs were documented appropriately and were up to date at CHCF, CMC, and CSP/Corcoran. Other institutions did not fare as well, with inadequate or inaccessible rationales logged at CSP/Solano, CCWF, DVI, HDSP, KVSP, and MCSP.

b.    **Transfers to Acute Inpatient Care**

CIW and CSP/Solano were both found fully compliant and CSP/Sac was found 95 percent compliant with timely patient transfers to acute care within ten days of referral.

Sixteen institutions - CIM, CMC, CMF, CSP/Corcoran, CSP/LAC, CSATF, CCWF, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SVSP, and VSP - were noncompliant with the ten-day timeframe. The average compliance rate among these 16 noncompliant institutions was 52 percent, with outliers CSP/LAC and HDSP at 33 percent, and PVSP at 87 percent.

c.    **Transfers to Intermediate Inpatient Care**

ASP, CIW, and PVSP all achieved full compliance with transfer of inmates to intermediate inpatient care within 30 days of referral. RJD was also complaint, at the rate of 93 percent.

Another 16 institutions were noncompliant with the 30-day timeframe for intermediate care transfers. They were CHCF, CIM, CMF, CMC, CSP/Corcoran, CSATF, CSP/LAC, CSP/Sac, CCWF, KVSP, MCSP, NKSP, PBSP, SVSP, SCC and VSP. These institutions' average rate of compliance was 53 percent, with outliers CSP/LAC at 12 percent and SVSP at 78 percent.

82

### d.    Transfers Following Inpatient Bed Assignment

Transfers to inpatient beds within three days of bed assignment were compliant overall at CHCF, CMC, PVSP, and RJD.  Transfers to acute care within three days of inpatient bed assignment were compliant at HDSP.  Transfers to intermediate care within three days of bed assignment were compliant at CMF, SVSP, and VSP.

Transfers to intermediate inpatient beds within three days were noncompliant overall at CSP/Corcoran, MSCP, and NKSP.  Transfers within three days to acute care were noncompliant at CMF and VSP, and transfers to intermediate care within three days were noncompliant at PBSP.

### 3.    MHCBs

### a.    Transfers to MHCBs and Bed Availability

Transfers to MHCBs within 24 hours of referral were compliant at CCC, CIM, CMF, and PVSP.  MCSP improved its compliance rate to 90 percent over the course of the review period.

However, another 23 institutions were found noncompliant with the 24-hour timeframe. These institutions were ASP, CCI, CHCF, CIM, CIW, CMC, CRC, CSP/Corcoran, CSATF, CSP/Sac, Calipatria, Centinela, CCWF, CTF, Folsom, ISP, PVSP, RJD, SCC, CSP/Solano, SQ, SVSP, and VSP.   The average compliance rate among these noncompliant institutions was 51 percent, with outliers Centinela at zero percent and CCWF at 87 percent.

Notably, noncompliance was attributed to lack of MHCB availability at nine of the noncompliant institutions - CCI, CHCF, CIM, CIW, CMC, CSP/Solano, CTF, ISP, and RJD, as well as at MCSP.

### b.    MHCB Lengths of Stay

CIW was compliant with limiting inmates' stays in MHCBs to no more than ten days. Another five institutions were found noncompliant with the ten-day limitation.   These were CHCF, CMF, CSP/Corcoran, CSP/Sac, and SVSP.  The average compliance rate among the noncompliant institutions was 64 percent, with a range of 64 percent to 80 percent.

### 4.    Outpatient Housing Unit Lengths of Stay

Five institutions - CCC, CSP/Corcoran, CSP/Sac, DVI, and SCC were complaint with limiting inmates' stays in OHUs to no more than 72 hours during the review period.[34]

Another five institutions - ASP, CCI, Calipatria, MCSP, and VSP - were noncompliant with the 72-hour timeframe, with an average compliance rate of 80 percent and outliers ASP at 74 percent and VSP at 85 percent.

### 5.    Alternative Housing Lengths of Stay

Four institutions - CCC, CCWF, CVSP, and SQ - were found compliant with the 24-hour time limitation on stays in alternative housing.   Another seven institutions - CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, RJD, and VSP - were found noncompliant with this timeframe, with an average compliance rate of 63 percent with outliers CIW and CSP/LAC both at 53 percent and CMC at 88 percent.

---

[34] During the time of the review period, inmate stays in OHUs were limited to 72 hours.  More recently, OHUs have been designated as alternative housing and must operate under the same 24-hour timeframe for inmate stays as other alternative housing locations.

### 6. Transfers to Psychiatric Services Units (PSU)

Nine institutions were found compliant with the 60-day timeframe after endorsement for transfer to a PSU.  These institutions were CCC, CIM, CMF, CMC, CSP/Corcoran, CSATF, MCSP, RJD, and SCC.  Only CHCF and SVSP were found noncompliant, with compliance rates of 66 percent and 86 percent, respectively.

### 7. Transfers to EOP Administrative Segregation Hubs

Seventeen institutions were found compliant with the 30-day timeframe for transfer to an EOP hub after placement in an administrative segregation unit or after referral to the EOP level of care.  These institutions were ASP, CIM, CIW, CMF, CRC, CSP/LAC, CSP/Solano, CSATF, CVSP, DVI, Folsom, HDSP, NKSP, PVSP, RJD, SCC, and VSP.

Five institutions - CCC, CCI, CSP/Corcoran, ISP, and PBSP - were noncompliant with the 30-day timeframe.  The average compliance rate at the noncompliant institutions was 50 percent, with outliers ISP at zero percent and CSP/Corcoran at 79 percent.  At these two institutions, noncompliance was attributed to lack of beds.

### 8. Transfers to EOPs

Nine institutions - CRC, CSP/LAC, Calipatria, CCWF, CVSP, CTF, Folsom, ISP and KVSP- were found compliant with the EOP transfer timeframes of 21 days following an inappropriate transfer, 60 days following referral to the EOP level of care, or 30 days after referral to the EOP level of care if clinically indicated.

Another nine institutions - ASP, CCC, CCI, CIM, CSP/Solano, HDSP, NKSP, SQ and SCC, - were found noncompliant with the transfer timeframes.  These nine noncompliant

institutions' compliance rates averaged 67 percent, with outliers HDSP at 23 percent and NKSP at 89 percent.

## IX.    Administrative Segregation EOP

Before the filing of defendants' motion to terminate *Coleman* federal court oversight in this matter, the *Coleman* parties and the Special Master were meeting to discuss and address various concerns surrounding the care, treatment, and discipline of *Coleman* class members housed in CDCR's administrative segregation units.  There were long-standing concerns with some elements of the provision of treatment for EOP inmates in administrative segregation, as well as the fact that some EOP inmates' stays in administrative segregation hubs remained excessively long.  As far back as 2007, the *Coleman* Court had been aware of such issues and ordered defendants to address them.  *See* Order filed March 9, 2007, ECF 2158.[35]

The Special Master initiated the meetings in October 2012 to work on resolving persistent issues in the administrative segregation units, including the elevated proportion of inmates in administrative segregation who are mentally ill, reduction of risks of decompensation and/or suicide, alternatives to use of administrative segregation placements for non-disciplinary reasons, access to treatment/mitigation of harshness of conditions in the administrative segregation units, suicide prevention, and reduction of lengths of stay in administrative segregation.  The expectation was that the meetings "would provide a forum for working through

---

[35] ¶ 3: "Defendants shall work with the Special Master's experts to review the provision of EOPs in administrative segregation units. The review process shall conduct an audit of the EOP administrative segregation population and examine more effective ways for reducing the lengths of stay of EOP inmates in administrative segregation; alternative methods for the delivery of mental health treatment, including the use of a different mix of clinical and para-clinical professionals; the use of different housing and/or service models for particular categories of EOP administrative segregation inmates; and any other strategy or approach likely to better serve the treatment needs of EOP administrative segregation inmates. The study shall result in a brief report prepared within ninety days from the date of this order, which shall be shared with parties, counsel and the court."

and resolving the range of issues which continue within the administrative segregation units of CDCR, and that any progress would be covered in subsequent Special Master's reports." The meetings continued into December 2012, but upon the defendants' filing of their motion to terminate on January 7, 2013, ECF 4275, these discussions were suspended.

The *Coleman* Court denied the motion to terminate on April 5, 2013. ECF 4539. Shortly thereafter, the *Coleman* plaintiffs sought relief on a number of issues in areas that figured prominently in the evidence and the Court's findings in connection with its denial of the motion to terminate. Two significant areas in which plaintiffs moved for additional orders were the housing and treatment of mentally ill inmates in CDCR's segregated housing units, ECF 4580, filed May 9, 2013, and the use of force and disciplinary measures against members of the *Coleman* plaintiff class. ECF 4638, filed May 29, 2013.

On April 10, 2014, following extensive evidentiary hearings, the Court granted plaintiffs' motions in part, ordering a multi-pronged set of initiatives to address the concerns raised in plaintiffs' motions. ECF 5131. With regard to the plaintiffs' request for relief in the areas of use of force and disciplinary measures against *Coleman* class members, the Court ordered the following:

- Defendants shall work under the guidance of the Special Master to revise their use of force policies and procedures as required within the following 60 days.

- The Special Master shall report to the court within six months on whether defendants have adequately implemented the RVR policies and procedures agreed to in 2011.

- Defendants shall work with the Special Master on a timeline for completion of their review of the use of management status so that this practice can be reviewed by the Special Master as part of his review of the implementation of defendants' RVR policies and procedures.

87

With regard to plaintiffs' request for relief in the area of segregated housing of *Coleman*

class members, the Court ordered the following:

- Within 30 days, defendants shall file a plan to limit or eliminate altogether placement of class members removed from the general population for non-disciplinary reasons in administrative segregation units that house inmates removed from the general population for disciplinary reasons. Defendants shall be prepared to fully implement the plan within 30 days thereafter. Defendants shall commence forthwith to reduce the number of *Coleman* class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates. Commencing 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants will be prohibited from placing any class members removed from the general population for non-disciplinary reasons for more than 72 hours in administrative segregation units that house inmates removed from the general population for disciplinary reasons.

- Defendants shall work under the guidance of the Special Master to develop a protocol for administrative segregation decisions, including, as appropriate, a plan for alternative housing that will preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

- Defendants shall forthwith provide to the court and the Special Master monthly reports on whether each EOP administrative segregation hub meets Program Guide requirements for an EOP administrative segregation level of care. Commencing 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants shall not admit any *Coleman* class member at the EOP level of care to any EOP administrative segregation hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months. Commencing 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants shall not place any class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP administrative segregation hub beds available unless failure to remove the inmate from the general population presents an imminent threat to life or safety.

- Within 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants shall file a revised policy concerning strip searches in EOP administrative segregation unit hubs.

- Defendants are prohibited from housing any class member at any SHU in California unless that class member's treating clinician certified that (1) the behavior leading to the SHU assignment was not the product of mental illness and the inmate's mental illness did not preclude the inmate from conforming his or her conduct to the relevant institutional requirements; (2) the inmate's mental illness can be safely and adequately managed in the SHU to which the inmate will be assigned for the entire length of the SHU term; and (3) the inmate does not face a substantial risk of exacerbation of his or her mental illness or

decompensation as a result of confinement in a SHU.  In addition, defendants are prohibited from returning any seriously mentally ill inmate to any SHU unit if said inmate has at any time following placement in a SHU required a higher level of mental health care.

The Special Master and expert members of his staff then began working with the parties to develop the plans and attendant policies and procedures to meet the directives of the April 10, 2014 order.  Under the guidance of the Special Master, and with input from plaintiffs, defendants completed several plans with related policies and procedures, to address the identified issues surrounding use of disciplinary measures against class members, placement of class members in segregated housing, and provision of appropriate care to EOP inmates in administrative segregation.

On August 1, 2014 and August 29, 2014, defendants submitted their report and related plans and policies to the Court for review.  On August 11, 2014 and August 29, 2014, the *Coleman* Court ordered CDCR to implement its proposed plans, policies and procedures, under the guidance of the Special Master and to be monitored by him in accordance with his monitoring and reporting duties in the *Coleman* action.  Order filed August 11, 2014, ECF 5196; Order filed August 29, 2014, ECF 5212.

Thus far, CDCR has completed the necessary plans, policies, and procedures required by the Order of April 10, 2014.  The following is a summary of the current status of CDCR's implementation of them, and a brief description of the Special Master's upcoming monitoring of them.

In July 2014, CDCR began measuring compliance by its EOP hubs with Program Guide treatment requirements through its new "Administrative Segregation Hub Certification" process. Each of the hubs was toured for at least two consecutive months by designated CDCR regional

89

staff along with the monitor.  At the conclusion of the inaugural administrative segregation hub certification process, all CDCR hubs except CCWF's were toured and were given initial certification, and CCWF's hub was subsequently certified.

Once a hub has achieved initial certification, it is required to conduct specific monthly audits of Program Guide requirements monthly, and based on the results it shall self-certify its compliance.  The findings are then reviewed by the deputy director of the CDCR Statewide Mental Health Program, who confirms or denies compliance as applicable.  The deputy director then submits a monthly report to the Special Master, with a copy to plaintiffs, documenting those hubs which met Program Guide requirements for the preceding month and those that did not. Institutions unable to be certified for two consecutive months are decommissioned as EOP hubs and are closed to intake of any EOP administrative segregation inmates.  In order to begin receiving new intakes, the hub must subsequently certify for two consecutive months that it has been compliant with Program Guide requirements.

In connection with its commitment to ameliorate the harsh conditions in administrative segregation for EOP inmates, on August 1, 2014, CDCR filed a plan to ban and place a moratorium on the use of management cell status for EOP inmates.  In September 2015, CDCR banned the use of management cell status pending revision of the controlling provision within the California Code of Regulations.  As of this writing, the ban has been made permanent and is still in place.

For 3CMS inmates in segregated housing, CDCR developed Short Term Restricted Housing (STRH) and Long Term Restricted Housing (LTRH).  Following meetings with the Special Master and plaintiff's counsel, the Court approved defendants' STRH and LTRH plans and policies on August 11, 2014.  The objective of both STRH and LTRH is to reduce risks of

90

inmate decompensation among 3CMS inmates in segregated housing, while maintaining institutional safety and security.

The STRH offers enhanced treatment and additional out-of-cell activities to 3CMS inmates before moves to general population or transfers to LTRH.  Inmates in STRH will be offered quarterly psychiatry contacts, 90 minutes of weekly group therapy, weekly out-of-cell contacts with PCs, daily psych tech rounds, and 20 hours of out-of-cell activities, exercise, and recreation, which is double the time offered in administrative segregation units and is in addition to shower and mental health treatment time spent out-of-cell. Reception center and women STRH inmates will also receive in-cell therapeutic activities.  Each STRH inmate will receive one electrical appliance, or a radio if physical plant restrictions do not accommodate an appliance.  STRHs for men were established in the stand-alone administrative segregation units at CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, HDSP, KVSP, PBSP, PVSP, and SVSP, and for RC inmates at CIM, DVI, NKSP, SQ, and WSP.   STRHs for women were established at CIW and CCWF.

The LTRH offers enhanced treatment and additional out-of-cell activities to 3CMS inmates serving SHU terms.  These inmates will be offered 15 hours of weekly out-of-cell exercise and recreational activity, which is 50 percent more than the time offered in administrative segregation units and is in addition to shower and treatment time spent out-of-cell.  LTRH inmates will also receive quarterly psychiatry contacts, 90 minutes of weekly group therapy, in-cell therapeutic activities, weekly-out of-cell clinical contacts with PCs, and daily psych tech rounds.  LTRH inmates will be allowed pen fillers, paper, a calendar, a radio, fiction and non-fiction books,  games, puzzles, crosswords, current event material, and personal

property including notebooks and photographs. LTRHs were located at CIW, CSP/Corcoran, and PBSP.

CDCR also revised its policies regarding mentally ill inmates placed in administrative segregation for non-disciplinary reasons (non-disciplinary segregation or NDS, i.e. safety concerns not related to misconduct), requiring movement of such inmates to appropriate non-segregated housing within 72 hours of the Institutional Classification Committee's (ICC) designation of the inmate as having NDS status. The policy revision also allowed NDS inmates enhanced property and privileges as compared to other inmates in segregated housing.

The memoranda implementing the NDS policies were issued on August 14, 2014 and September 2, 2014. Custody training was completed by September 16, 2014, followed by implementation of the new policy. Training of mental health staff was completed on October 3, 2014, and an "NDS hub" for placement of NDS inmates outside of administrative segregation units was opened at CSP/Sac on October 15, 2014.

In response to the order requiring revision of the policy concerning unclothed body searches in EOP hubs, ECF 5131, CDCR revised its DOM Section 52050.161.6 to apply a new standard requiring all unclothed body searches to be conducted in-cell, unless the physical plant of the institution permitted these searches to be conducted in another area where the process would not be visible to others uninvolved in it.

On February 5, 2015, CDCR issued a Treatment Refusal Memo regarding inmates who refused to leave their cells for treatment. Training related to this policy had begun on December 8, 2014 and was concluded on February 25, 2015. In monitoring the treatment refusal policy during site visits, the monitor will obtain a "high refuser report" and request accompanying CDCR Form 128-Bs to examine whether mental health and custody staff had consulted within

seven days of identification of a high refuser and documented the consultation. They are also required to consider alternate custody arrangements where unclothed searches are identified as the cause of treatment refusal.

To address the issue of long lengths of stay in administrative segregation affecting *Coleman* class members, CDCR issued a memorandum on September 15, 2014 requiring ICCs to review reasons for continuance or non-continuance of segregated housing of all mental health caseload inmates held in such units.  In order to accomplish this, CDCR instructed institutions to complete within 90 days reviews of all qualified mental health inmates held in administrative segregation.  This was to be completed after staff had received training, which concluded on October 17, 2014. For mental health inmates held in PSUs and SHUs, the institutions had 180 days following the training to complete the reviews.  Institutions began their reviews after October 17, 2014.

Another component of CDCR's plan regarding long lengths of stay in administrative segregation was implementation of a requirement that 120 days before an inmate reaches his or her MERD, the ICC is to review the case factors and make a recommendation related to transfer to a non-segregation bed.  The implementing memorandum was issued on September 12, 2014; training was completed on October 13, 2014; and the policy was implemented following completion of the training.

It bears emphasizing that the importance of all of the initiatives described above has not diminished since the time that they were ordered.  If anything, they have become more important, as the number of affected inmates has risen significantly since the time plaintiffs sought this relief.  As of April 5, 2013, when the motion to terminate was denied, the census of EOP inmates in administrative segregation hubs was 498.  As of February 5, 2016, that number

has risen to 699, for an increase by nearly 30 percent in less than three years, as *Coleman*

plaintiff class members are no longer being placed into CDCR Security Housing Units (SHU)

unless the stringent conditions of the exception to that directive, noted above, are all satisfied.[36]

Defendants have expressed interest in addressing this growth in the EOP population in

administrative segregation.  The Special Master hopes and anticipates that in the coming months,

he will meet and work with the *Coleman* parties to address ways to reverse this growth in the

EOP population in segregated housing.

## X.    CDCR's Continuous Quality Improvement Process: Implications for the Quality of Care Delivered in CDCR's Mental Health Program

### A.    The Evolution from Quality Management to Quality Improvement

Since the earliest stages of *Coleman* remediation, development and implementation of an

effective and enduring quality assurance program has been identified as the threshold to CDCR's

eventual assumption of responsibility for self-monitoring and effective management of its

delivery of mental health care to members of the *Coleman* plaintiff class.   As the Special Master

stated in his report dated July 17, 1998:

> A strong quality assurance system is the best, and perhaps the only, long-term
> method for continuing evaluation and enhancement of the quality of mental health
> series delivered by the defendants to seriously mentally disordered prisoners in
> the California Department of Corrections.  If effectively implemented and
> thoroughly institutionalized in the defendants' mental health delivery system, its
> impact will inure to the benefit of the plaintiff class long after the court has ceased
> to monitor this case.  Quality assurance is the critical key to an enduring remedy.

Special Master's Recommended Schedule for Implementation of Defendants' Quality

Assurance Plans, p. 3, filed July 20, 1998, ECF 958.

---

[36] Source: Information provided by CDCR to the Special Master, February 5, 2016.

Early in the remedial effort, CDCR instituted a quality management process for the institutions that generally consisted of a local governing body at each institution, subcommittees for quality management and mental health, quality improvement teams (QITs) to address identified issues, and clinician peer review at the institutions which have mental health missions. The Special Master monitored and reported in his regular compliance reports on defendants' integration of the institutions' quality management practices into their regular operations.  Over time, it was becoming clear that this fundamental quality management structure was taking root and maturing in a number of the institutions.

By the conclusion of the Special Master's Twenty-Fourth Monitoring Round in early 2012, it had become apparent that some CDCR institutions had generally established and were maintaining the basic quality management framework that had been conceived early in the remedial process.  However, while the quality management structure in place at that time was useful, it still did not enable CDCR to diagnose and resolve problems with the quality of care it delivers.  This was related, in part, to the lack of a central office-driven quality improvement process.  CDCR's quality management process had been generally focused on quantification of deficiencies in performance by looking at the presence or absence of various elements -- for example, what percentage of designated forms were completed, or how many inmates received a mental health screening within timeframes, or whether interdisciplinary treatment team meetings were conducted according to established scheduling requirements, to name a few.  Even when some quality improvement processes were implemented, they were done at the institutional level, and did not include important remedies that could only be initiated or developed at the central office level to address issues that were system-wide.  Quality *improvement*, on the other hand, focuses not merely on measuring performance indicators but also on identifying problems and

crafting resolutions with system-wide application, and thus on improving the care that is

delivered throughout CDCR prisons.  As noted by the *Coleman* Court in its remedial order, it is

not merely access to care, but access to *adequate* care that is constitutionally required.  *Coleman*

*v. Wilson*, 912 F.Supp. 1282, 1308 (E.D. Cal. 1995).[37]

Thus, after successive monitoring and reporting cycles, quality assurance emerged in

2012 as a major theme and direction of *Coleman* federal court oversight.  On August 30, 2012,

the *Coleman* Court adopted the Special Master's recommendation in his Twenty-Fourth Round

Monitoring Report that defendants be ordered to review and assess their existing quality

management process, and to develop a central office-based quality *improvement* process.  Order,

August 30, 2012, ECF 4232.  The Special Master's recommendation, and the court's order

adopting it, were based on the Special Master's finding that "over the past several monitoring

periods . . .  CDCR institutions have generally succeeded with establishing and maintaining the

foundation of the quality management framework that was conceived early in the remedial

process.  The initial goals of establishing the basic infrastructure of quality management

appear[ed] to have been realized.  Across institutions, local governing bodies, quality

management committees, and mental health subcommittees [were] in place and [were] generally

meeting regularly and drawing good attendance.  QITs [were] being chartered and used

appropriately.  Peer review [was] generally taking place."  Special Master's Twenty-Fourth

Round Monitoring Report, filed July 2, 2012, ECF 4205, p. 63.

Adopting the Special Master's recommendation, the Court stated:

---

[37]To be clear, the Special Master is not offering any legal opinion or conclusion insofar as what is constitutionally
required, as that determination lies within the sole jurisdiction of the Court.

> [T]he court wants to emphasize in particular its complete concurrence with the Special Master's finding that '[a]n important goal of the remedial phase of this case is . . . for CDCR itself to assume the mantle of ultimate responsibility for diagnosing its own problems, i.e. conduct its own `qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, *and move on to removal from federal court oversight.*

Order, filed August 30, 2012, ECF 4232, p. 4-5, emphasis in original, *quoting* Special Master's Twenty-Fourth Round Monitoring Report, p. 65. The Court ordered as follows:

> Defendants shall review and assess their existing quality assurance process, and . . . . develop an improved quality improvement process by which they can address issues with the quality of the care that is delivered, as described in the Special Master's Twenty-Fourth Round Monitoring Report. The quality improvement process shall be developed from the standpoint of it being the beginning of a transition by CDCR into self-monitoring by its own DCHCS. It shall include, but not be limited to, the development of a process for improved document production for institutional paper reviews, so that the provided information is clear, consistent, responsive to the Special Master's document request, and useful for the assessment of institutional levels of compliance. The defendants' review and assessment of their existing quality assurance process, and the development of an improved quality improvement process, shall be carried out under the guidance of the Special Master and his staff, with participation and input of the *Coleman* plaintiffs, during the six-month period following the entry of this order.

Order, ECF 4232, p. 5-6.

This order had profound implications for the direction of *Coleman* federal court oversight, signaling that the focus was shifting towards the long-term goal of the quality management effort -- eventual transition away from court-supervised external monitoring to assumption by defendants of the responsibility for self-monitoring. It set the stage for development of a more matured and self-sustaining quality management process than what had been in place. Although CDCR had some success with its institutional quality management program, there remained a need for a higher-level, system-wide means to gauge and improve the levels of quality in the mental health care that was being delivered in the prisons. Even when existing processes were consistent with a quality improvement process, they often lacked the

97

capacity to implement needed changes because the required remedy involved system-wide issues that could only be effectively addressed at the centralized health care central office level.

The centralized quality improvement process would require the development of an audit tool with relevant indicators and measurements to capture institutional levels of compliance with *Coleman* Program Guide and other applicable standards in the delivery of mental health care in CDCR prisons.  It would create the methodology for gathering and assessing such information, and using it to implement improvements where and as indicated by CQIT audits conducted by central office.  By using the tool to integrate a quality improvement process into the management of mental health service delivery, CDCR should be, as a result, better positioned to improve mental health services and achieve better mental health treatment results and outcomes.

Work was underway in late 2012 on development of a quality improvement tool for CDCR to self-monitor its special populations, quality of care, safety and cultural considerations, access to care, and utilization and management.  Defendants agreed to create a quality improvement process by which CDCR can identify issues and improve its performance levels in the delivery of mental health care.  The self-auditing tool that was developed is now known as the Continuous Quality Improvement Tool ("CQIT" or "the tool").  Members of the Special Master's staff worked with assigned CDCR officials to work on the development of a quality improvement tool, helping identify performance indicators and compliance metrics.  The tool was intended to not only yield detailed reports on institutional compliance levels, but also to help shape remediation in areas of institutional weakness.

By early January 2013, CQIT key indicators had been identified, and a prototype of the audit tool had been developed.  Plaintiffs' counsel and representatives of the Special Master's staff attended a webinar on the development of the tool on February 8, 2013.  However, due to

the pendency at that time of defendants' motion to terminate *Coleman* Court oversight,

participation by the Special Master's staff and plaintiffs' counsel in the CQIT project was

suspended until the motion was denied by order entered April 5, 2013, ECF 4539, in which the

Court implicitly noted the CQIT project as a remaining task in the remediation effort:

> The Special Master has also observed, correctly, that "[t]he ultimate goal of
> *Coleman* monitoring is to eventually render itself obsolete as more and more
> institutions obtain adequate compliance levels and are prepared to assume self-
> monitoring responsibilities . . .  The hope is that as more and more institutional
> mental health programs progress toward adequately higher levels of functioning,
> they too will be shifted to a self-monitoring and reporting status. If their progress
> proves to be stable and maintainable, the Special Master's oversight will no longer
> be needed, and monitoring and review of institutional performance will eventually
> be turned back over to CDCR.

*Id*. at 31, n.33.

Accordingly, two months after the original six-month timeframe for completion of the

CQIT project had already expired, the *Coleman* Court granted a limited extension of time to July

1, 2013, for the initial form of the tool to be completed.  Orders, filed April 23, 2013, ECF 4561,

4562.  The fledgling CQIT tool was piloted at eight institutions over six consecutive weeks[38],

from May 22, 2013 to June 26, 2013.  Members of the Special Master's staff and *Coleman*

plaintiffs' counsel attended the conduct of the pilot.

On August 2, 2013, the Special Master filed his report on the results of the pilot.  Special

Master's Report on Defendants' Quality Improvement Process.  ECF 5730.  Therein, the Special

Master noted the *Coleman* Court's statement in its remedial order that CDCR develop a program

to ensure the delivery of *adequate* mental health care to remedy the constitutional deficiencies in

---

[38]California Institution for Men (CIM), CSP/Los Angeles County (CSP/LAC), California Men's Colony (CMC),
CSP/Sac, Salinas Valley State Prison (SVSP), Central California Women's Facility (CCWF), California Substance
Abuse Treatment Facility (CSATF), and the California Correctional Institution (CCI).

the delivery of mental health care in the California state prisons at that time.  *Id.* at 2, *citing*

*Coleman v. Wilson*, 912, F.Supp. 1282, 1308 (E.D. Cal. 1995), *citing Grubbs v. Bradley*, 821

F.Supp. 496, 500 (M.D. Tenn. 1993).  He emphasized that "[q]uality *improvement* . . . focuses

not merely on measuring performance indicators but also on identifying problems and crafting

resolutions with system-wide application, and thus on improving the care that is delivered

throughout CDCR prisons."  *Id.* at 3 (emphasis in original).

　　　　With specific regard to the summer 2013 pilot, the Special Master reported that the CQIT

tool appeared to be fundamentally sound and "off to a good start," and that more work remained

to be done to address some issues which were revealed in the course of the pilot.  It was clear

from the pilot that CQIT's capacity to accommodate and utilize information on the *quality* of

mental health care needed expansion in order for the tool to fulfill its purpose of helping CDCR

improve the care being delivered.  Areas identified by the pilot as needing more work included

(1) having the CDCR examiners become familiar with Mental Health Tracking System

(MHTS.net) information before beginning their on-site assessments, (2) having a psychiatrist on

every on-site audit team, (3) increasing CDCR's pre-site visit communication with the

institutions about the assessment process, (4) increasing training of the examiners on use of the

CQIT tool, effective strategies for conducting group surveys of inmates, coordination between

custody and mental health on conduct of the CQIT audits, and conduct of effective exit

conferences at the institutions, (5) ensuring that MHTS.net data - which makes up a significant

part of the information gathered by the CQIT tool- is complete and up-to-date, (6) ensuring that

groups of inmates to be surveyed are assembled efficiently, seated comfortably, and are

sufficiently large in number to provide a meaningful sampling, and (7) observing activities, e.g.

IDTT meetings, being conducted as closely to how they are normally and usually run as possible.

In addition, the tool needed to cover additional parameters including mental health staffing at the institutions, as well as various custody-related matters including heat measures and condition/use of therapeutic modules.  The Special Master recommended that CQIT audit results be published in both system-wide and individual institutional reports, in both dashboard and narrative report-type formats, at regular intervals.

In its order following the Special Master's August 2, 2013 report, the Court noted the need for continuation of work on CQIT until it is completed so that it may accomplish its purpose:

> Rather than set another deadline, the court will reiterate that defendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action.  It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have implemented a *durable* remedy for the Eight Amendment violations in the delivery of that care.  A key component of a durable remedy is the development and implementation of an adequate quality improvement process by which defendants will self-monitor, and as necessary, self-correct inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons.  Defendants are required to work under the guidance of the Special Master, with input from plaintiffs' counsel, on this task until it is completed.

Order, filed February 27, 2014, ECF 5092.

On September 11, 2013 CDCR provided a revised "Continuous Quality Improvement on Site Audit Guidebook" to the Special Master for review by his expert.  The guidebook addressed (1) scheduling a site visit, (2) preparing for the site visit, (3) arrival at the site, (4) substantive mental health audit questions and instructions, (5) substantive custody audit questions and instructions, and (6) post visit instructions.  On September 20, 2013, CDCR conducted a mental health CQI training session related to the Guidebook and attended by the Special Master's expert and plaintiffs' counsel.

During November and December 2013, the Special Master's expert and CDCR staff met and consulted on the CQI process to address further development and refinement of the CQIT. On January 23, 2014, CDCR provided a presentation to plaintiffs' counsel on the CQIT indicators and the chart audit questions in the tool, to which plaintiffs provided feedback.

From February 26, 2014 through February 28, 2014, the Special Master's expert resumed meeting with CDCR staff on further development of the tool, specifically with regard to custodial areas, reviewing draft reports including custodial findings at all of the CQIT-piloted institutions. In addition, the complete CQIT electronic dashboard including its "drill down" capabilities were demonstrated.

In July and August 2014, the Special Master's expert accompanied CDCR mental staff on test runs of the tool at DVI, CSP/Solano, SVSP, CIW, CSP/LAC, CSP/Sac, CMC, CSP/Corcoran, and RJD. CDCR also produced for the Special Master's review August 6, 2014 and September 26, 2014 revisions of the Guidebook, covering the newly modified and added areas described above. Feedback from the Special Master's expert was then provided to defendants.

Subsequently, the *Coleman* parties and the Special Master agreed that CDCR would use the CQIT measures pertaining to administrative segregation in its audits of CDCR's administrative segregation EOP hubs for certification.[39] These audits were conducted during September and October 2014, with the Special Master's expert and plaintiffs' counsel observing the process.

---

[39] The administrative segregation EOP hub certification process is described in Part XIV, below.

Defendants provided a further-revised version of the Guidebook dated July 1, 2015.  On July 21, 2015, plaintiffs' counsel submitted their comments on the report-writing outline that was attached to the revised Guidebook.  Two days later, the issues raised by plaintiffs' counsel were addressed during a meeting with the Special Master's expert, who provided further input.

During July, August, and September 2015, the Special Master's expert, defendants, and plaintiffs' counsel continued their consultation and work on the further revision, development, and refinement of the CQI process and tool.  Plaintiffs were provided ample opportunities during the period to comment and propose revisions, which were appropriately considered by CDCR.

On September 30, 2015, at an all parties' meeting, the CQI process was addressed.  The parties and the Special Master agreed that defendants may proceed with a trial implementation of CQIT in the institutions, with the Special Master and plaintiffs' counsel present to observe during the Special Master's monitoring visits.  The parties and the Special Master also agreed that the CQI indicators will be revised over time as issues and findings may evolve.

On December 9, 2015, CDCR provided an updated CQI presentation to the Special Master for his review and comments.  Another meeting was held two days later, on December 11, 2015, at which time plaintiffs offered their recommendations for changes to CQIT that were subsequently adopted and incorporated into the tool.  CDCR will conduct a trial implementation of the tool at ten selected institutions during the upcoming Twenty-Seventh Monitoring Round, as described in greater detail below.

**B.** **The Special Master's Findings on the Quality of Care Delivered During the Twenty-Sixth Monitoring Period Substantiate the Need for a Sound and Durable Quality Improvement Process in CDCR's Mental Health Program**

Consistent with previous rounds, in the Twenty-Sixth round, the Special Master's expert conducted a comprehensive assessment of offered mental health services, including crisis

interventions and consideration of referrals to higher levels of care. The expert observed IDTT meetings and reviewed inmates' treatment plans, examining treatment of individual inmates to assess its adequacy for these inmates and whether inmates' treatment plans were updated as necessary. The expert examined the treatment services offered by the different clinical disciplines represented on the IDTTs, as well as the appropriateness of custody staff involvement in the IDTT process. The Form 7388B process that is utilized when the inmate's condition deteriorates, or the inmate is not effectively participating in his or her treatment program, or he or she is no longer benefiting from treatment services available at the inmate's current level of care were also observed and assessed.

Overall, the Twenty-Sixth Round Monitoring found widespread improvement with timeliness of IDTT meetings and psychiatric and PC contacts since the preceding monitoring period. However, across institutions and inmates, the Special Master's expert found significant ongoing problems with regard to IDTT meetings, inmates' treatment plans, treatment(s) being provided to individual inmates, and referrals to higher levels of care. As trial implementation of CQIT rolls out, it will be the Special Master's objective to work with the parties to determine and adjust, as necessary, the capacity of CQIT to help CDCR examine and resolve the issues, assess the quality and adequacy of care being delivered, report on it, and develop and implement resolutions to any identified shortcomings or problems. The following discussion of the Special Master's expert's findings indicates areas in which consistent issues were found and which should be addressed from a quality improvement standpoint as an effective function of the CQI process.

1.    **Issues with Use of the Interdisciplinary Treatment Team Process**

In a number of observed IDTT meetings across institutions, meaningful team discussion covering inmates' levels of care, treatment plans, and/or measurable treatment goals were

104

lacking. In some observed meetings, articulated problems and treatment goals were often vague, overly broad, not measurable and/or not responsive to inmates' diagnoses or mental health issues.

At observed IDTT meetings at CIM and PVSP, there was no interdisciplinary discussion about the inmate before his arrival or during his presence at the meeting. IDTTs in CHCF's MHCB had minimal discussion regarding treatment plans, which may have been a reflection of the limited treatment options available to the MHCB inmates due to their essentially locked-down status in those units. Some IDTTs at NKSP discussed inmate behaviors and/or symptoms but did not address them in treatment plans. In the MHCB at CIW, treatment plans were not consistently discussed in the treatment team meetings. In meetings at CTF and Folsom, there was a lack of discussion concerning inmates' level of care. At CSATF, clinical presentations did not include specific and operational treatment plans. During observed IDTTs in the MHCB at SVSP, while overviews of the inmates' presenting problems were provided during the team meeting, there was no discussion about treatment goals or plans or what must occur for the patient to be discharged from the MHCB. In meetings in the EOP SNY and EOP mainline programs at RJD, treatment plans were presented and discussed by all the PCs, but only one of them presented goals that were measurable.

Treatment plans developed for 3CMS inmates at CIW were overly broad, not properly individualized or operationalized, and were missing appropriate clinical interventions. The clinician in an observed IDTT for [CRC Inmate B] did not present measurable treatment goals during the IDTT meeting. For some inmates in the SHU at CSP/Corcoran and CTF, treatment goals in several treatment team meetings were not clearly defined and stated in measurable terms. IDTTs at Folsom did not offer measurable treatment goals and strategies in all cases.

Case presentations at HDSP were sparse, typically lacking inmates' diagnoses and medications.

Treatment planning in the 3CMS program at CSP/Solano was not sufficiently focused on

specific goals or interventions, although the team was clearly attempting to incorporate recently-

received headquarters training concerning IDTTs and treatment planning. At NKSP, there was

appropriate discussion about the inmate's symptoms between treatment team members, but

treatment goals had essentially been determined before the meeting, with no further discussion

about it regardless of the inmate's presence.  In the MHCB at PVSP, records indicated several

inmates diagnosed with Adjustment Disorder being held beyond ten days without

operationalized treatment plans.

Level-of-care decisions were discussed among team members, but not directly with the

inmates at CMC.  All PCs at observed IDTTs at PBSP did not review treatment plans with

inmate-patients.  In several IDTT meetings at CSP/Corcoran, clinical discussions were not

directly addressed to the inmate in the team meetings. In the PSU at PBSP, interactions between

team members and inmates were not consistently therapeutic in tone.  In several IDTT meetings

observed at PVSP, proposed interventions were not actual therapeutic ones directed to individual

inmates. In IDTT meetings observed in the 3CMS program at PBSP, clinicians did not address

inmates' apparent increased anxiety regarding their treatment plans. At an IDTT meeting at

CHCF for a non-English speaking inmate with significant dementia and a long history of

schizophrenia, the patient's resulting communication problems were not addressed by the team.

At CSP/Solano, there was not even minimal discussion in treatment planning about how to better

engage administrative segregation inmates who refused to attend IDTTs.

Review of records and observation of meetings revealed that required disciplines were

not consistently attending IDTT meetings.  CHCF, CCWF, and ASP were noncompliant with the

106

presence of the psychiatrist in their 3CMS programs.  At PBSP SHU IDTT meetings, the

psychiatrist was typically absent.  At multiple IDTT meetings at CSP/Corcoran, only the PC

attended.  In 3CMS administrative segregation at CMF, the SHU at CSP/Sac, and at MCSP,

required disciplines were typically absent.

In a number of institutions, IDTT meetings were conducted in inappropriate and/or

distracting environments.  At the CCC SHU, there were numerous distractions, with team

members having side conversations, or shuffling and passing documents while patients were

speaking; mobile phones rang more than once.  Meeting space at HDSP was inadequate,

requiring staff to stand or sit on tables.  At CSP/LAC, the meeting room lacked a door.  Some

housing areas at RJD had IDTT meetings conducted in a partitioned area on the housing unit

floor that was typically used by custody and lacking in privacy.  During the STRH IDTT

meetings at CSATF, the room provided sufficient privacy but custody staff interrupted meetings

on two occasions to retrieve possessions.  The administrative segregation IDTT meeting at

KVSP was conducted in a non-private room.  Considerable ambient noise hindered staff-inmate

interaction at an observed IDTT meeting at CSP/Solano.   Patient privacy was affected by a

custody officer entering the area to retrieve food items.

### 2.    Treatment Planning Concerns

#### a.    Documentation Issues

Across institutions, the Special Master's expert found treatment plans and progress notes

that did not contain documentation of meaningful clinical intervention being provided to

inmates. For example, neither the treatment plan nor the progress notes for [PVSP Inmate G]

reflected that he was receiving any meaningful clinical interventions.   Other reviewed records

contained unresolved contradictions and discrepancies in clinical documentation, for example, in

the clinical documentation in the eUHR for [RJD Inmate I] which was contradictory. In the case of [CIW Inmate C], records indicated that her treatment team found that she remained highly psychotic and unstable.  However, a second psychiatrist who was not on the treatment team documented completely contradictory information the following day, indicating that the inmate had been under the influence of drugs rather than psychotic. [CCWF Inmate D]'s record contained discrepancies in documentation regarding the status of her referral to the CIW PIP and the delay in her acceptance there.  Information in the record for [CIW Inmate D] indicated 100-percent compliance with medications, while other documentation and the inmate's MAR indicated the contrary.  For [SQ Inmate F], the adequacy of his care could not even be determined because of the paucity of documented information that might have justified his level of care at the time of the site visit or indicated whether his treatment plan was appropriately individualized.

### b.    Inadequacies of Treatment Plans

Multiple record reviews disclosed treatment plans that did not adequately address the inmates' mental health issues.  Review of treatment plans found numerous cases of inadequacies in treatment plans, with failures to address inmates' behaviors and symptoms indicating the need for change in treatment plans, or to address their refusals of treatment.

For example, for [PVSP Inmate E], while his Form 7388B indicated adequate clinical justification for not referring the inmate to a higher level of care, his treatment plan did not include treatment modifications to address the mental health issues that caused him to be considered for a referral.  Instead, it merely restated standard MHCB treatment or referenced a pending PC2602.  [CIW Inmate C] treatment plans did not appropriately target the inmate's serious symptoms and functional impairment.  [ASP Inmate J]'s treatment plan did not address

108

his specific symptoms and behaviors that had resulted in his initial referral to the OHU or his elevation to a higher level of care. The treatment plan for [MCSP Inmate G] did not address his treatment refusal.

Record reviews found treatment plans that were too vague, lacking operationalization and specific, measurable treatment targets or goals. [CIW Inmate D]'s treatment plan was overly broad and vague, making it unclear what the treatment team proposed to do to try to improve the inmate's symptom presentation and functional level. Treatment plan interventions documented in the record of [NKSP Inmate A] were too vague to address targets that were overly broad. The treatment plan in the eUHR of [PVSP Inmate E] was also overly vague and did not include treatment interventions beyond forced medication. [PVSP Inmate D]'s MHCB treatment plan had no operationalized treatment targets or goals and listed only Program Guide standards as interventions. The treatment plan of [NKSP Inmate A] was not properly individualized and operationalized, notwithstanding the extensive detail included in the narrative summary of his chart. On [DVI Inmate D]'s return from an MHCB, his treatment plan was not adequately individualized, without interventions designed sufficiently to treat his serious mental illness. [ASP Inmate G]'s treatment plan was poorly constructed and inadequate for either EOP or 3CMS inmates because it was vague, did not target the primary treatment issue, and did not include specific effective interventions.

[PVSP Inmate D]'s treatment plan in the MHCB had no operationalized treatment targets or goals and listed only Program Guide standards as interventions, and did not address the inmate's reason for returning to the MHCB. In the case of [PVSP Inmate A], his treatment plan remained inadequate after his admission to the MHCB following a very serious suicide attempt. Treatment planning for [CIW Inmate I]'s was inadequate, with chronic fragmented placement of

109

her in the MHCB. [SVSP Inmate D]'s PC notes appeared to be using templates as opposed to an individualized conceptualization and documentation of this inmate's specific treatment needs. While [CCC Inmate D]'s clinical presentation and attention to self-care deteriorated in October 2014, there was no documentation in the record that his treatment team had any clear plan to re-assess his level of functioning.

c.    **Lack of Needed Modifications and Updating of Treatment Plans to Respond to Inmates' Current Mental Health Issues**

Review of treatment plans found that they had not been appropriately revised to address changes in inmates' mental health conditions, including decompensation, increased symptomology, or changes in clinical presentation.  Updated or modified treatment plans that were clinically indicated or required by the Program Guide were not found in multiple records that were reviewed.

The eUHR of [CIW Inmate L] showed that the most recent treatment plan lacked modifications to address her ongoing rule-violating behaviors, nor did it address her request to be treated for severe mood swings.  Even as [PVSP Inmate A] showed early signs of decompensation, the clinical staff did not appear to recognize it as such, and consequently did not modify the treatment plan and clinical interventions appropriately.  There was no modification of [CIM Inmate A]'s treatment plan to target his high risk of violence. When [PVSP Inmate A] reported increased symptoms while still in the 3CMS program, his treatment plan was not modified in response.  [RJD Inmate I]'s medical problems that caused him severe pain were not addressed as part of his mental health treatment plan.  It was not readily apparent that treatment providers modified [KVSP Inmate A]'s treatment plan to attempt to improve the inmate's participation in his mental health programming.  It appeared that the treatment team did

not recognize multiple signs of possible decompensation of [DVI Inmate F], and did not modify his treatment plan appropriately.  At the time of the site visit, there was no formal updated treatment plan for [CMF Inmate H] in his eUHR, as required by the Program Guide.

[NKSP Inmate E] needed a more comprehensive operationalized treatment plan developed that adequately addressed his serious symptoms.  In the case of [CMC Inmate A], although he was decompensating as his symptoms increased, his treatment plan was not modified to address his decompensation.

### d.     Failures to Implement Designated Treatment Interventions

Even when treatment interventions were identified in treatment plans, they were not always implemented.  Review of records for [CIW Inmate C] revealed that specific alternative interventions were not implemented to address those areas that had identified the inmate for consideration for referral to a higher level of care.  For [MCSP Inmate C], the cognitive behavioral therapy included in his treatment plan as an intervention was not provided.  [PVSP Inmate B] presented staff with several reasons underlying his self-injurious behavior that should have been targets of treatment during his initial MHCB admission, but they were not addressed. His treatment plan simply restated Program Guide standards. [KVSP Inmate E]'s treatment plan provided information that was incongruous with the inmate's mental status (i.e. the inmate was non-responsive, yet the treatment modifications included cognitive behavioral interventions).

### e.     Care Was Not Sufficiently Individualized to Address Inmates' Clinical Needs

### i.     Diagnoses in Inmates' Records Lacked Adequate Clinical Supporting Documentation

In several cases reviewed by the Special Master's expert, clinical documentation supporting the diagnoses of record was not found or was inadequate, and/or diagnostic conflicts and discrepancies remained unresolved according to the reviewed records.

The record of [PVSP Inmate G] contained inadequate clinical documentation to support his diagnosis of record. [CMF Inmate L]'s historic diagnosis of major depressive disorder in partial remission was removed from his medical record absent an adequate clinical rationale. The diagnostic rule-out of a substance-induced persistent psychosis in the case of [SVSP Inmate C] was unclear, given documentation of psychosis in the three-month period preceding admission to the MHCB. This did not comport with DSM diagnostic criteria nor did it contain any rationale indicating that the inmate disclosed recent drug use or tested positive for the presence of drugs.

There were cases in which inmates apparently required diagnostic evaluations, but no documentation that they had been completed was found in the record. The diagnostic picture of [KVSP Inmate A] was not clear from a record review, and it appeared that this inmate may have benefitted from a referral to a DSH hospital for diagnostic clarification, but that did not occur. Similarly, it appeared likely that [KVSP Inmate A] would have benefitted from a referral to DSH for diagnostic clarification. Although there may have been a high degree of secondary gain related to [PVSP Inmate B]'s behavior, his presentation of serious and complex symptoms required a comprehensive diagnostic evaluation, which was not conducted. The IDTT for [DVI Inmate E] should have revised his treatment plan and prioritized a diagnostic clarification. For [DVI Inmate E], the treatment team failed to revise his treatment plan prioritizing diagnostic clarification. [NKSP Inmate E] was diagnosed with Hypochondriasis, but staff documentation of symptoms consistent with a psychotic disorder as a primary diagnosis indicated a need for

112

diagnostic clarification, which was not done. The presenting clinician in an observed IDTT for

[CRC Inmate B] did not discuss his level of care. There was no updated mental health

evaluation or suicide risk assessment located in the eUHR of [PVSP Inmate H] at the time of the

review. There was also no mental health evaluation or suicide risk assessment found in the

medical record of [PVSP Inmate G]. [PVSP Inmate A] was not properly evaluated while in the

MHCB and did not receive an accurate Suicide Risk Evaluation (SRE) upon discharge; he had

not received an SRE at admission either. The quality of the initial SRE of [CIM Inmate C] was

poor and his discharge SRE was not individualized.

ii.    **Records Reflected Unresolved Conflicts and Inconsistencies in Diagnoses**

At the time of the site visit, there were inmates in the PVSP MHCB who had clear

histories of specified serious mental illnesses, but who were instead diagnosed with Adjustment

Disorder and prescribed antipsychotic medications and mood stabilizers. Review of the eUHRs

for [NKSP Inmate H] and [NKSP Inmate J] found marked unresolved discrepancies between

their PCs' and psychiatrists' diagnoses. [ASP Inmate B] received differing diagnoses that were

documented in the record but never reconciled. In the cases of [CSP/Corcoran Inmate A] and

[NKSP Inmate I], diagnoses and diagnostic considerations between psychiatry and psychology

were not coordinated or resolved. In the record for [NKSP Inmate H], the rationale for the Rule-

Out of Psychotic Disorder NOS after the completion of the Mental Health Evaluation, as well as

later reference in the eUHR to this inmate's psychotic thoughts, were unclear. [ASP Inmate A]'s

symptoms of Post-Traumatic Stress Disorder (PTSD) were noted by some clinicians, but not

followed through by later clinicians, and this inmates' trauma problems were not addressed.

113

### iii.    Records Did Not Reflect that Inmates Were Receiving Care Aligned with their Mental Health Needs

There were several reviewed medical records documenting inmates who were not receiving clinical services consistent with their mental health needs. A review of [PVSP Inmate G]'s medical records demonstrated that he was not receiving clinical services consistent with Program Guide requirements. EOP inmate [CCWF Inmate A] presented with severe psychotic symptoms, but her record lacked documentation that the psychiatrist was working on treating this patient with needed antipsychotic medications or that the inmate was being educated to help her understand the need for treatment.  [SQ Inmate E] required treatment for suicidality and limited coping skills, but based on available documentation, he was not provided the required treatment. The care provided to [CIW Inmate I] was lacking in meaningful continuity across housing placements, transitional care recommendations from the PSU to the Special Care Unit (SCU), and provision of transitional care while the inmate was in the SCU.

### 3.    Issues With IDTTs' Use of Form 7388B in Consideration of Referrals of Inmates to Higher Levels of Care

As illustrated in the cases discussed below, institutional IDTTs did not consistently utilize CDCR Form 7388B correctly, and in other instances it did not consider referral at all even when it should have.[40]  Across institutions, there were cases in which documentation in inmates' UHRs reflected inappropriate use of Form 7388B in consideration of referral of the inmate to higher levels of care, and in some cases, no consideration of referral of inmates who should have been considered.

_____

[40] This section, like sections A and B above, is focused on quality of care in referrals to higher levels of care from the vantage point of individual inmate cases.  For a related discussion of use of Form 7388B from the vantage point of the IDTTs' workings, see also Part VIII, "Access to Higher Levels of Care," above.

Cases illustrating these concerns include [DVI Inmate E], whose treatment team did not complete Form 7388B during each team meeting, as required. The IDTT did not refer [CIW Inmate L], who had had three RVRs in six months. Her IDTT's rationale for non-referral reflected a misunderstanding of this indicator for triggering consideration for referral, and deviated from sustainable process requirements. In the case of [CMC Inmate A], the PC's statement that discussion of referral of the inmate to a higher level of care was irrelevant due to this inmate's new-arrival status was contrary to the correct process for using Form 7388B. In the case of [KVSP Inmate A], CDCR Form 7388B was used to justify lowering the patient's level of care from EOP based on the fact that he was not "gravely disabled," even though grave disability is not a criterion for placement at the EOP level of care.

[PVSP Inmate D] was not properly considered for referral because the MHCB treatment team failed to take into account his multiple crisis bed placements within the prior six months. The CDCR Form 7388B process for [SQ Inmate E] was not properly completed, with no objective assessment of his need for a higher level of care. Documentation on the Form 7388B of the IDTT's decision to not refer [CHCF Inmate E] to inpatient care was clinically insufficient. Transfer to a higher level of care for [CSP/Solano Inmate D] should have been considered more promptly due to his significant distress and symptoms.

It appeared that while [CIW Inmate D] should have been referred to an MHCB, particularly in light of her risk of suicide, she was instead placed on an apparent *ad hoc* "five-day follow-up" without any preceding discharge from an MHCB or inpatient care. Similarly, in the case of [ASP Inmate E] who decompensated, it appeared that a "five-day follow up" was substituted for MHCB admission and/or consideration for transfer to a higher level of care.

The IDTT for [PVSP Inmate B] documented inappropriate rationales for non-referral on the Form 7388B and did not modify his treatment plan to address the factors which had triggered consideration of him for referral.  Likewise, documentation in the medical records of [CIW Inmate C] did not adequately justify her non-referral, and her treatment plan did not specify alternative interventions implemented to address the reasons why she was not considered for referral.

In the case of [CIW Inmate D], no justification for her non-referral to the EOP level of care was entered on Form 7388B.  For [KVSP Inmate B], the IDTT did not meaningfully consider referral and used clinically inadequate "boilerplate" language on the Form 7388B. [NKSP Inmate E] should have been referred to intermediate care, but was not.  It was unclear from documentation why an earlier referral of [CIW Inmate A] to the CIW PIP had been rescinded, even though it appeared to have been clinically indicated.  For [CCWF Inmate A], an unstable EOP inmate, documentation indicated neither ongoing assessments for referral to a higher level of care nor more aggressive efforts to treat her at the EOP level of care.

C.    **Next Steps for CDCR's Quality Improvement Process**

Given CDCR's demonstration of willingness and capability thus far with developing its quality improvement tool, the time has come for the next step in the progression toward CDCR's eventual assumption of responsibility for self-monitoring its mental health program and correcting any identified deficiencies or problems.  This will mark the beginning of CDCR's implementation of CQIT as an early step in the transition away from court-supervised monitoring of mental health care of inmates within CDCR's prisons.  The Special Master's expert's findings during the Twenty-Sixth Round Monitoring on the quality of mental health care of *Coleman* class members, summarized above, can help define the course for further

116

development and refinement of CQIT so that it can begin to confront and resolve these current issues with *quality* of care and others that may appear over time.

At this stage, the next logical inquiry is how, as a practical matter, CQIT can be applied to help CDCR achieve its intended goal with its CQI process: (1) to continually assess whether provided services provided consistently achieve their desired outcomes in the mental health program, (2) to develop and implement any desired changes, and (3) to refine the capacity of CQIT to identify future opportunities for improvement and implement those improvements as needed. The result will be an effective long-term strategy by which the quality of mental health care in CDCR prisons will flourish and adverse outcomes can be averted.

On December 11, 2015, the Special Master and the parties agreed to a trial implementation of CQIT in the Special Master's upcoming Twenty-Seventh Monitoring Round. The trial implementation will be piloted at one institution early in the monitoring round, on which CDCR will complete a draft report that it will share with the Special Master and plaintiffs' counsel. Subsequently, trial implementation of CQIT will take place at another nine institutions later in the monitoring round. The total ten institutions for the trial implementation are SVSP, Centinela, Calipatria, HDSP, CCC, RJD, NKSP, ISP, CVSP, and CSP/LAC, with the Special Master and plaintiffs' counsel observing the early pilot and the later trial implementation at the remaining nine institutions in a process that is expected to be interactive.[41] This will be done within the context of the Special Master's monitoring of defendants' implementation of the various plans, policies, and procedures which were developed in the areas of mental health care and treatment in administrative segregation units, use of force, and the inmate disciplinary

---

[41]The CQIT process will not be utilized in monitoring of the DSH inpatient programs.

process on mental health caseload inmates[42], per Order filed April 10, 2014, ECF 5131, as well as the sustainable process for identification and referral of inmates in need of higher levels of care. As CDCR moves ahead with its trial implementation of CQIT[43], and subsequently assumes increasingly greater self-monitoring responsibilities, the Special Master will continue to provide his guidance to CDCR to help ensure the progress and success of CQIT's potential toward becoming a durable remedy in *Coleman* remediation, with the hope that it leads to the eventual conclusion of *Coleman* federal court oversight.

## CONCLUSION AND RECOMMENDATIONS

After numerous past staffing plans that have faltered, defendants' current staffing plan needs to be implemented and their staffing problems need to be resolved, for it has some profound implications. The problem pervades the remedial effort, standing in the way of full realization of the benefits of the many improvements in mental health care that have been made in *Coleman*. There is also another aspect to the problem: without staffing sufficient to accommodate the treatment needs of an expanding mental health population, one of the seven key components to ending Court oversight in this matter will not be completed. (*See* below)

_____

[42] For a more detailed background and description of these items, *see* Part XIV, above.

[43] The Electronic Health Record System (eHRS) that was developed by the *Plata* receiver for CDCR's inmate health records, including mental health records, was previously planned to "go live" from January through July 2016 on a rolling schedule. On January 25, 2016, CDCR notified the Special Master that the "go live" roll-out had been delayed primarily to issues with the pharmacy aspect of the eHRS, and that he would be kept advised of a new roll-out schedule when the technical issues were resolved. This suspension of the roll-out may affect whether the trial implementation of CQIT can be carried out as described and/or on the timeframe projected above.

The Special Master believes that the mental health staffing problem calls for a targeted, fast-track approach in the form of monthly meet-and-confer sessions with defendants. These sessions should include, but not be limited to (1) updates to the Special Master on defendants' implementation of their staffing plan; (2) discussion and consideration of across-the-board salary increases, particularly for psychiatrists; and (3) discussion and consideration of clustering of higher-acuity mentally ill inmates within those institutions where historically it has been shown that mental health staff, particularly psychiatrists, can be more readily attracted and retained.

While staffing remains problematic, there is real reason to be encouraged, as defendants' CQI program appears to be on course for continued progress. So far, the CQIT element of the overall CQI program is a notable achievement, both technologically and managerially from a mental health clinical standpoint. It shows great promise for continued evolution into the durable remedy via which CDCR can achieve compliance in *Coleman* remediation and, if utilized correctly, allow CDCR to eventually emerge from *Coleman* Court oversight. As CDCR moves its CQI process forward, the Special Master urges CDCR to keep in mind the findings and issues identified in this report. It is hoped and intended that these findings will help CDCR sharpen the focus of its CQI effort and its CQIT to better identify and analyze the remaining issues, craft the necessary remedies, and achieve lasting solutions to concerns identified above that continue to surround the delivery of mental health care to CDCR inmates. In addition, during the Twenty-Sixth Monitoring Round, CDCR reported that it was working on a new peer review process for implementation system-wide. This is also an encouraging development, as peer review is an important quality improvement tool in improving the quality of care delivered by the clinical disciplines.

119

The upcoming Twenty-Seventh Monitoring Round will mark another step toward CDCR's realization of its goals in CQI. It will mark the first time when, in addition to the Special Master's direct monitoring of mental health care delivery, CDCR will begin to participate in monitoring activities with its trial implementation of CQIT. The *Coleman* parties and the Special Master have agreed to this trial implementation at ten designated institutions, with the first of the ten serving as a pilot of the trial implementation. CDCR will then prepare a draft comprehensive report on the pilot, to be shared with the Special Master and plaintiffs' counsel, who will have 30 days to submit any comments or objections, after which defendants shall file with the Court their finalized report on the pilot. The parties' agreement was conditioned upon and made with the further understanding and agreement that CDCR's trial implementation does not in any way substitute for, or relieve defendants' of, any duties to comply with all orders, stipulations, agreements, plans, policies, or procedures, or any of their other obligations within *Coleman* remediation, nor does it substitute for, or relieve the Special Master of, any of his duties, including but not limited to monitoring and reporting on CDCR's compliance with its duties and obligations within *Coleman* remediation.

In closing, defendants are asked to consider how they would be best advised to direct their efforts and proceed from here on. The Special Master's message to defendants in this regard is the same as it has been since the beginning, and that is to focus on the goal of reaching compliance. This message appeared to have been lost in recent times during the frenzy of an attempt to litigate this matter to an abrupt ending. In the end, that strategy only wasted time and resources that could have been invested in compliance, and set back the eventual conclusion of *Coleman* remediation and court oversight by years. The concluding words of the Special Master in his Twenty-Fifth Round Monitoring report remain as apt today as they were three years ago

120

when that report was issued:  "At this time, any attempt at a more abrupt conclusion to federal court oversight would be, in the opinion of the Special Master, not only premature but a needless distraction from the important work that is being done in the quality improvement project." Special Master's Twenty-Fifth Round Monitoring Report, ECF 4298, p. 51.

Lost time cannot be reclaimed, but the best course for the remainder of CDCR's path to the end should be one directed to compliance as its destination.  This will not be a vague and uncertain course yet to be invented.  The *Coleman* Court has already articulated the goals which must be met in the remedial phase of *Coleman*, stating that "[m]eeting each of [the following] goals is critically important":

(1)    Re-evaluation and updating of CDCR suicide prevention policies and practices;

(2)    Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from DSH;

(3)    Review of, and compliance with, all elements of their Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days;

(4)    Completion of the construction of mental health treatment space and beds for inmates at varying levels of care;

(5)    Full implementation of defendants' new mental health staffing plan;

(6)    Training of staff for greater collaboration between custody and mental health; and

(7)    Refinement and implementation of MHTS.net to its fullest extent and benefit.

Order adopting the Special Master's Twenty-Fourth Round Monitoring Report, filed August 30, 2012, ECF 4232; *see also* Special Master's Twenty-Third Round Monitoring Report, filed December 1, 2011, ECF 4124; Special Master's Twenty-Second Round Monitoring Report, filed March 9, 2011, ECF 3990.

While CDCR previously conducted custody/mental health collaboration training at seven of its institutions, the monitor found issues at a number of institution with mental health/custody relations.  This was a concerning finding, particularly at this stage of *Coleman* remediation.  As noted above, training to overcome the cultural issues between the custody and mental health staffs of the prisons needs to be completed as one of the seven goals of *Coleman* that havwe been adopted and pronounced by the Court.

In addition, as discussed above in Part XIV, the *Coleman* Court has set the parameters of what defendants must accomplish to address identified concerns surrounding specifically the use of force and inmate disciplinary measures against mentally ill inmates, and housing and treatment of mentally ill inmates in CDCR's segregated housing units.  In this vein, the Court ordered the *Coleman* defendants to:

- Revise and implement their use of force policies and procedures as required.

- Work with the Special Master on a timeline for completion of their review of the use of management status so that he may review this practice within his review of implementation of the revised RVR policies and procedures.

- Devise and implement a plan to limit or eliminate non-disciplinary placement of inmates into administrative segregation units that house inmates placed there for disciplinary reasons, and as of June 9, 2014 refrain from all non-disciplinary placements there for longer than 72 hours.

- Develop a protocol for administrative segregation decisions, including a plan for alternative housing that will preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

- Report monthly to the Court and the Special Master on whether each EOP administrative segregation hub meets EOP administrative segregation Program Guide requirements, and as of June 9, 2014, refrain from admitting any *Coleman* class EOP inmate to a hub that failed to meet Program Guide requirements for over two consecutive months or in any administrative segregation unit while there are insufficient EOP administrative

122

segregation hub beds available, unless failure to remove the inmate from general population presents an imminent threat to life or safety.

- As of June 9, 2014, shall file a revised policy on inmate strip searches in EOP administrative segregation hubs.

- Refrain from housing any Coleman class member in any SHU in California unless the class member's treating clinician certifies that (1) the behavior leading to the SHU assignment was not the product of mental illness and the inmate's mental illness did not preclude the inmate from conforming his or her conduct to the relevant institutional requirements; (2) the inmate's mental illness can be safely and adequately managed in the SHU to which the inmate will be assigned for the entire length of the SHU term; and (3) the inmate does not face a substantial risk of exacerbation of his or her mental illness or decompensation as a result of confinement in a SHU.  In addition, defendants are prohibited from returning any seriously mentally ill inmate to any SHU unit if said inmate has at any time following placement in a SHU required a higher level of mental health care.

Order, filed April 10, 2014, ECF 5131.  As noted above, defendants have completed the referenced plans, policies, and procedures required by this order, but they must be fully implemented and maintained for the intent of the Court's order to be fulfilled.

While more work remains to be done, defendants should take well-deserved encouragement from the progress they have made toward compliance.  Overall, while some areas of noncompliance persist, their severity is to a much lesser degree than previously.  Defendants have the capability to address the remaining issues, finish the tasks, and reach the goals.  Their qualified and resourceful staff have demonstrated the expertise necessary to make this happen, but again, the key to success is to keep the focus on compliance.

Undoubtedly, everyone who has touched this effort wants lasting, real solutions to the problems that have been targeted by *Coleman*. There is too much at stake in the welfare of the approximately 36,800 CDCR inmates currently on the mental health caseload for any shortcuts to the end of *Coleman* remediation.  It would make no sense to divert resources away from the real work to be done, costing precious time and potentially deferring the resolution that everyone

123

-- the *Coleman* parties, the Special Master, and most of all the members of the *Coleman* plaintiff class -- want to see happen. It is time for the full benefit of all of the hard work that has been done, and that will continue to be done, to lead to fruition.

On March 1, 2016, the Special Master provided the *Coleman* parties with a draft version of this report. In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft report. Plaintiffs' counsel submitted a written response requesting that the Special Master include in this report three additional recommendations for court orders. The Special Master then held a teleconference with the parties on April 27, 2016 to discuss the plaintiffs' requests.

For reasons discussed more specifically below, the Special Master does not recommend the entry of any of the additional orders sought by plaintiffs. Defendants are presently engaged in a number of projects designed to advance them toward compliance. These projects are being carried out on a variety of fronts, including continuous quality improvement, suicide prevention, and access to inpatient care, among others. Some are court-ordered, while others are the product of multidisciplinary workgroup efforts, but all are aimed at accelerating the attainment of compliance. It is important that any additional projects be carefully drawn so that defendants can remain on pace toward successful completion of the ongoing projects.

The first of plaintiffs' three requested court orders was:

1. **Defendants shall commission and facilitate a study of the population trends that show significant *increases* in the mental health caseload population as compared to *decreases* in the overall in-custody CDCR population. The study shall assess the reasons behind these divergent trends and identify strategies to address them. Such study shall be provided to the Special Maser and the parties, and shall be completed within 120 days of the court's order. (Emphases in original).**

124

In support of this recommendation, plaintiffs correctly state that the draft Twenty-Sixth Round Report cites the divergence of the mental health and non-mental health censuses, and that this divergence "suggests that a study of the reasons behind it, and whether it is likely to continue, may be in order."  During the Special Master's teleconference, plaintiffs noted that understanding the reasons behind the divergence is important to effective policy-making and to managing the implications of the divergence for responding to future demand for mental health beds.  They succinctly framed the issue in their written response: "Defendants' population reduction measures have not led to a meaningful reduction of the CDCR mental health caseload population."  Plaintiffs also raised important, thought-provoking questions -- whether *Coleman* class members experience unintended *de facto* disadvantages and/or discrimination as a result of policies and practices pertaining to criminal charges, security levels, segregated housing, credits, parole, and community diversion.  The Special Master already monitors and covers program access, i.e. inmates' opportunities to obtain job and education credits, in his regular compliance reports.  The other questions raised by plaintiffs are beyond the purview of the Special Master's charge.  While these concerns should not be minimized, and in fact a population study may be indicated, there is no compelling reason why the *Coleman* court should order defendants to commission and facilitate a population study.

The reduction in CDCR's overall inmate population came about through the three-judge court's order in the litigation to resolve claims due to overcrowding of CDCR prisons, *Coleman v. Brown*, No. CIV S-90-0520 KJM KJN P (E.D. Cal.)/*Plata v. Brown*, No. C01-1352 TEH (N.D. Cal.).  Presumably, the divergence between the mental health caseload census and the overall in-custody census was never an intended or projected result of the three-judge court's population reduction order.   Nonetheless, the CDCR prison population problem was brought

125

before that tribunal, which is the proper forum for continued enforcement of the population reduction order and for any derivative inmate population issues. Although the three-judge court was comprised in part by the *Coleman* court, that court is not by itself a substitute or an alternate forum to which inmate population issues should be transferred. If plaintiffs wish to pursue their recommendation that CDCR be ordered to commission and facilitate a population study, the proper forum for a grant of such relief would be the three-judge court.

The second of plaintiffs' three requested court orders was:

**2. Defendants shall work immediately with the Special Master, his experts, and plaintiffs to develop and implement effective policies and procedures that will address the following issues regarding EOP prisoners housed in administrative segregation units:**

    **a) The large number of EOP prisoners in administrative segregation and their excessive lengths of stay in segregated housing units, which contrasts with the decrease in the overall CDCR segregation population.**

    **b) The current and projected unmet bed need for EOP prisoners requiring segregated housing, including the operation of EOP administrative segregation hubs above court-ordered and otherwise established capacities.**

    **c) Compliance with court-ordered staffing ratios and related requirements in the EOP administrative segregation hubs, including the need to integrate a staffing ratio component into the EOP administrative segregation hub certification process.**

This recommendation reflects legitimate concerns with the rising population of EOP inmates in administrative segregation and its effect on these inmates' care, treatment, and lengths of stay in segregation. An aspect of the concern is the disproportionately high rate at which EOP inmates are represented in administrative segregation, where the rate of suicides by *Coleman* class members has been consistently elevated for years.

126

There is a long history in *Coleman* of issues surrounding the placement and treatment of mentally ill inmates in administrative segregation. These issues have not gone unaddressed; they have been targeted repeatedly in a variety of orders including the following:

| | |
|---|---|
| Order 10/26/01, ECF 1309 | Establishing primary clinician staffing ratio of 1:9 in EOP administrative segregation hubs. |
| Order 6/13/02, ECF 1383 | Establishing maximum ten-percent vacancy rates for psychiatrists and case managers. |
| Order 3/9/07, ECF 2158 | Directing Special Master to review/consider more effective means of care delivery to EOP inmates in administrative segregation, including reduced lengths of stay, re-mix of clinical and para-clinical staffing, and use of different housing and/or service models. |
| Order 6/1/07, ECF 2255 | Directing defendants to consider including in their plan (1) required ICC reviews every 45 days for inmates awaiting disposition of DA referrals and all mental health caseload inmates in administrative segregation over 90 days, and (2) transfers of inmates pending processing of DA referrals. |
| Order 4/10/14, ECF 5131 | Ordering defendants to, among other things, develop a plan and related procedures requiring (1) monthly certification of administrative segregation EOP hubs that meet EOP Program Guide requirements; (2) a ban on admission of *Coleman* class members (a) to any hub which has failed to meet Program Guide requirements for more than two consecutive months, (b) to any hub which exceeds its population cap, and (c) to any SHU; (3) conduct of case-by-case reviews of all *Coleman* class members in administrative segregation longer than 150 days[44]; (4) limitation or exclusion from administrative segregation any *Coleman* class members designated for administrative segregation for non- |

---

[44] These case-by-case reviews are intended to promote shorter stays, returns to non-segregated housing, and thus lower census in administrative segregation units.

| | disciplinary reasons if the unit also houses GP inmates for disciplinary reasons, and (5) revision of strip search policy in the hubs. |
|---|---|
| Orders 4/11/14, 4/29/14 ECF 5196, 5212 | Ordering implementation of defendants' plans, policies, and procedures developed in response to April 10, 2014 order. |

During the April 27 teleconference, defendants indicated that they have a number of initiatives that they believe will be responsive to administrative segregation EOP issues and that they wish to share with plaintiffs. An appropriate context for this to be done is already in place. In the fall of 2015, the *Coleman* parties were meeting to discuss EOP administrative segregation issues, among other things. In December 2015, the parties asked the Special Master to participate in their meetings, which he agreed to do but could not begin immediately. At that time, the DSH waitlist issues which emerged during the summer of 2015, plus the Special Master's report-writing duties, had resulted in a flurry of activities in which the Special Master's resources were heavily absorbed. These included the Special Master's experts' case-by-case reviews of *Coleman* class members for placement in their least restrictive inpatient housing settings, observation and critique of training of trainers and then staff training on the new MOU policies, simultaneous with preparation of eight reports including this one, three expert reports on suicides and suicide-prevention practices in CDCR prisons, and a full-scale compliance report on all seven mental health inpatient programs for CDCR inmates.

The Special Master is deeply committed to supporting the parties' willingness to meet on the issues identified by plaintiffs. Because the importance and timeliness of these issues call for

focused attention, the Special Master will convene a work group, to be comprised of plaintiffs, defendants, and members of his own staff, dedicated to addressing administrative segregation EOP issues. In addition, the Special Master will be simultaneously examining the administrative segregation EOPs within the ongoing Twenty-Seventh Round of Monitoring and will cover his findings in his upcoming compliance report on the Twenty-Seventh Round.

Plaintiffs' request at this time for additional court orders directed at the administrative segregation EOP is not necessary. Their concerns are already addressed by existing court orders. What plaintiffs request amounts to an order directing defendants to comply with these existing court orders -- "Plaintiffs request that the Special Master recommend that defendants be ordered to comply with court orders and to end EOP ASU overcrowding forthwith." No such order is necessary. The *Coleman* court need not re-announce its already-issued directives concerning the administrative segregation EOP. The existing orders were all entered to compel compliance by those to whom they were directed. To the extent that defendants have not been complied with these orders, they remain in full force and effect and their requirements must be satisfied.

Of note, however, is the overly-high population at the EOP administrative segregation hub at RJD. It has a court-ordered capacity of 63 (*See* Order, entered July 27, 2004, ECF 1598), but it has held 78 to 110 inmates from August through December 2015.[45] This significant upward departure from the population cap is not only concerning, it is also a clear deviation from defendants' own plan, the implementation of which was ordered by the Court on August 11, 2014 and August 29, 2014 (ECF 5196, 5212). Defendants must comply with and resolve the over-

---

[45] Source: CDCR Monthly Population Data, secure FTP website.

population of the RJD EOP administrative segregation hub forthwith, or they will have to seek and obtain relief from the population cap order.

The third of plaintiffs' three requested court orders was:

**3.    Defendants shall work with the Special Master and plaintiffs to develop and implement a corrective action plan to address deficiencies at California State Prison/Sacramento (CSP/Sac), with specific focus on the PSU program.  Such a plan would address Program Guide compliance failures, staffing requirements, measures to transition segregated class members to less restrictive settings, and segregation lengths of stay.**

During the Special Master's April 27 teleconference, defendants reported that they were working on a number of new initiatives at CSP/Sac, including a step-down program for their PSU.  Plaintiffs have indicated their agreement and support for what they have heard thus far from defendants on this.  Thus, an exchange of views and ideas and the beginning of meaningful response to plaintiffs' concerns with CSP/Sac are underway.

The initiation of a corrective action plan for CSP/Sac, as plaintiffs have requested, would be a step backwards and is unnecessary in any event.  In the early, formative period of *Coleman* remediation, the corrective action plan model was employed on an institution-by-institution basis to help define and focus efforts to resolve identified problems in those institutions.  That was before current problem-identifying and problem-solving strategies had been developed, when the corrective action plan model for trouble-shooting had utility.

Today, the corrective action plan model has outlived its usefulness.  Since 2012, CDCR has been developing its CQI process and its associated tool, the CQIT.  As noted in the Special Master's Twenty-Sixth Round Monitoring Report, CQI has come a long way and continues to show clear promise as part of CDCR's growing capacity to find and fix its issues in mental health care delivery.  It is about to undergo trial runs at ten institutions in the ongoing Twenty-Seventh

130

Monitoring Round.  This is the time for CQI to move ahead, not for the revival of a now-outmoded model such as an institution-specific corrective action plan to be revived.

CSP/Sac continues to be monitored regularly by the Special Master.  It will undergo its usual full-scale review in the ongoing Twenty-Seventh Monitoring Round, and will be covered in the Special Master's compliance report to follow.  There does not appear to be any emergent situation in progress at CSP/Sac that calls for further court intervention at this time.  It should be kept in mind that CSP/Sac in particular has a very complex mental health mission whose growth has been explosive.  Past reports by the Special Master have generally found over time that CSP/Sac has been performing reasonably well.   The institution bears a significant burden in fulfilling its mission; one might say this is the result of its successes in mental health, as it has taken on increasingly greater responsibilities.  In the meantime, the appropriate forum for addressing any issues with CSP/Sac would be the Special Master's quarterly policy meetings with the *Coleman* parties.

In view of all of the foregoing, the Special Master recommends:

- That, due to the urgency of the long-standing mental health staffing issues, the Court order the defendants to provide the Special Master with monthly updates on their implementation of their staffing plan so it may be tracked and monitored by the Special Master the Special Master, and that the Court further order the defendants and the Special Master to meet and confer monthly to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained, all to resolve the problem of mental health staffing in CDCR prisons in a thorough and lasting way;

- That the Court order the Special Master to issue a stand-alone report on the status of mental health staffing and implementation of the defendants' staffing plan, said report to be issued within 120 days of entry of the Court's order;

- That the Court enter an order directing CDCR to complete its new peer review process and implement it so that the mental health clinical disciplines of psychiatry, psychology,

and social work at all 34 CDCR institutions undergo peer review under the new process on a regular basis;

- That the Court enter an order directing defendants and the Special Master to meet and confer to discuss, consider, and develop strategies and initiatives to improve collaboration between custody and mental health.  Strategies may include additional or modified trainings, enhanced communication, and leadership development.  The goal of any training or change in methods of communication across disciplines should be developed with an eye toward long-term and sustainable culture change.

- That the Court enter an order adopting the above-described plan and agreement for CDCR to conduct its trial implementation of CQIT at ten CDCR institutions, in the manner described above, during the Special Master's upcoming Twenty-Seventh Monitoring Round.


Respectfully Submitted,


_____/s/_____

Matthew A. Lopes, Jr., Esq.
Special Master


May 6, 2016

## APPENDIX A

## INSTITUTIONAL SUMMARIES

### California State Prison/ Sacramento (CSP/Sac)
February 3, 2015 – February 5, 2015

Census:

As of February 9, 2015, the total inmate population at CSP/Sac was 2,159 inmates, for a decrease by 534 inmates or 20 percent since the time of the preceding monitoring visit.  The number of mental health caseload inmates dropped from 1,537 to 1,356, for a 12-percent decline.

There were 42 inmates in crisis beds at CSP/Sac on February 9, 2015.  The Enhanced Outpatient Program (EOP) mainline census rose by 28 inmates from 374 to 402.  The Psychiatric Services Unit (PSU) census rose by 85 inmates for a total of 309 inmates, due to a large extent to transfers of PSU inmates from Pelican Bay State Prison (PBSP).  The Securrity Housing Unit (SHU) housed 73 inmates, including 35 inmates who were at the Correctional Clinical Case Management System (3CMS) level of care.  The mainline 3CMS population fell precipitously by 44 percent, from 717 to 405 inmates.

There were 231 inmates in administrative segregation, down from 291 at the time of the preceding monitoring visit.  Forty-four inmates were housed in an overflow unit.  The administrative segregation EOP hub housed 112 inmates.

CSP/Sac reported several mission changes since the preceding monitoring round.  It activated a non-disciplinary segregation (NDS) unit on October 2014, a third mainline EOP unit with 66-bed capacity in December 2014, and a short-term restricted housing unit (STRH) in the stand-alone administrative segregation unit in January 2015.  At the time of the visit, no inmates had been admitted to the NDS unit.

133

Staffing:

CSP/Sac had a total of 302.77 mental health positions, including psych techs and clerical staff. This was an increase by 70.37 positions since the preceding monitoring period. Use of contract staff reduced the 22-percent vacancy rate to a functional vacancy rate of 15 percent.

The chief psychiatrist and both chief psychologist positions remained filled. The senior psychiatrist position remained vacant. Twelve of the 17.4 senior psychologist supervisor positions were filled, for a 31-percent vacancy rate. One of the 1.5 supervising social work positions was filled. All four senior psych tech positions were filled.

The number of staff psychiatrist positions increased from 20.5 to 22 positions since the preceding monitoring period. With 17 filled and one covered by contract staff, there was a functional vacancy rate of 18 percent.

Staff psychologist positions increased from 50 to 62 since the preceding monitoring period. Fifty of the 62 psychologist positons were filled. Contract staff covered 6.25 of the 12 vacancies, for a functional vacancy rate of ten percent.

Twenty-five of the 30 social worker positions were filled. Use of contractors reduced the functional vacancy rate to three percent.

Of the 108.87 established psychiatric technician positions, 85.6 were filled leaving a vacancy rate of 21 percent. Use of 14.88 contractors reduced the functional vacancy rate to 14 percent.

The number of recreation therapist positions increased from 13.54 to 27.5 since the preceding monitoring period. Twenty of the 27.5 positions were filled. The 27-percent vacancy rate was reduced to a functional vacancy rate of 16 percent with use of contractors.

Eighteen of the 25.5 clerical positions were filled, for a vacancy rate of 29 percent.

134

CSP/Sac reported that a proposal to implement telepsychiatry was submitted in December 2014 but no decision had been made by the time of the site visit.

During the review period, CSP/Sac began utilizing a California Psychology Internship Council (CAPIC)-approved pre-doctoral internship and practicum programs for third-year psychology doctoral students.  At the time of the visit, two pre-doctoral psychology interns and two third-year psychology practicum students were working at the institution.

Quality Management:

The quality management process at CSP/Sac continued to function well, consistent with Program Guide requirements.  The local governing body had the same composition and met quarterly during the review period.

The quality management committee met monthly, with membership and attendance compliant.  Useful minutes were maintained.

The mental health subcommittee was chaired by the chief of mental health or designee and remained active during the review period.  A review of minutes for 16 meetings indicated that the subcommittee covered audit results, suicide prevention, IEX guidelines, the key indicator report, and various custody matters.  The minutes did not indicate whether a quorum was achieved. There were active QITs on the Mental Health Tracking System (MHTS.net), group therapy, job satisfaction, treatment plans, Form 7388B evaluations, assessment of primary clinician (PC) workloads, and strategies relevant to use of force.  No formal corrective actions plans had been developed to address deficiencies discovered within the administrative segregation EOP hub certification process.

In March 2014, the institution implemented a new statewide peer review policy that required inter-institutional documentation reviews.  CSP/Sac was paired with California Men's

135

Colony (CMC) for semi-annual review of each other's clinical documentation.  The process was halted until January 2015, when it was implemented on a smaller scale.

Medication Management:

CSP/Sac maintained its robust medication management audit system.  It transitioned to the medication administration process improvement project (MAPIP) format since the preceding monitoring period.  The psychiatry report included quarterly compliance rates for prescribed psychiatric medications and laboratory testing of blood levels for inmates on psychotropic medications.  The monthly nursing report included compliance rates for medication continuity during transfers, patient compliance with prescribed medications, and appropriate medication preparation and administration.  Corrective action plans (CAPs) were established to address medication refusals, retraining of nursing staff on the administration process and documentation, missed medications, and administration-related errors.

Institutional audits found that 78 percent of newly-arriving inmates received their medications timely.  Medication continuity following intra-institutional moves was only 67-percent compliant.  Following discharges from the Mental Health Crisis Bed (MHCB), medication continuity was 67-percent compliant.  After patients' returns from an inpatient program or community hospital, it was 72-percent compliant.  Audits indicated a compliance rate of 67 percent following transfers to locked units.  The compliance rate for administration of involuntary medications exceeded 90 percent.

CSP/Sac conducted audits regarding laboratory testing of inmates' blood levels for anti-psychotics, Depakote, lithium, Clozapine, antidepressants, Lamactil, and Carbamazepine.  Testing was compliant for five of these medications, and CAPs were formed to address noncompliance with the remaining two, Lamactil and Carbamazepine.

Transfers:

The intermediate care and acute care referral logs provided by the institution contained the requisite data with few inconsistencies.  The monitor's expert's review of sample treatment plans generated during Interdisciplinary Treatment Team (IDTT) meetings indicated that form 7388B was being utilized appropriately.

During the review period, of the 1,454 inmates who met one or more criteria for consideration for referral to inpatient care during the review period, eight percent were referred.  CSP/Sac referred 43 inmates to acute care, with 83 percent of these referrals completed within timeframes and posted on SharePoint.  Three acute care referrals were rescinded.  Of the 40 completed referrals, 38 or 95 percent did not transfer within timeframes.

CSP/Sac referred 74 inmates to intermediate care, with 82 percent of these completed within timeframes, as compared to 74 percent during the preceding monitoring period.  Seven intermediate care referrals were rescinded, two had pending Vitek hearings, and one was on the wait list.  Of the 64 completed referrals, 21 percent did not transfer within timeframes.

During the review period, there were no rejections from either acute or intermediate care.  Out of the 37 Vitek hearings, only one inmate prevailed.  One referral did not transfer within 72 hours of bed assignment.

At the time of the site visit, 15 inmates were accepted and awaiting transfer to inpatient programs.  The five awaiting transfer to acute care had wait times ranging from zero days to 13 days.  The ten awaiting transfer to intermediate care had wait times ranging from five days to 43 days.

Staff reported timely uploading of Department of State Hospitals (DSH) discharge summaries that were easy to access and that provided useful information on continuity of care for inmates returning to California Department of Corrections and Rehabilitation (CDCR).

CSP/Sac continued to operate two licensed MHCB units and one unlicensed MHCB unit known as the MHCBU. There were a total of 45 MHCBs at CSP/Sac, including 25 licensed MHCBs and 20 unlicensed MHCBs. In Correctional Treatment Center 1 (CTC-1), there were 13 designated mental health beds, two restraint and seclusion rooms, and two medical beds. Correctional Treatment Center 2 (CTC-2) had 12 designated mental health beds. The MHCBU, in Facility B, had 20 unlicensed crisis beds.

Institutional data indicated a total of 609 admissions to MHCBs, with 347 admissions to CTC-1 and CTC-2 and 262 admissions to the MHCBU. In the CTC MHCBs, the average stay lasted 11.6 days, with a range of 0.5 days to 69.5 days. There were 155 admissions, or 45 percent, with stays lasting longer than ten days during the review period. In the MHCBU, the average stay lasted 12.49 days, with a range of 1.5 to 53.5 days. There were 123 admissions, or 47 percent, with stays lasting longer than ten days during the review period.

Approximately 75 percent of referrals to the crisis bed did not result in admissions. Supervisory staff attributed many of these non-admissions to referrals made after normal work hours, but this issue had not been submitted for any quality management process.

During the review period, CSP/Sac transferred 18 inmates to MHCBs at other institutions. Transfers of six inmates exceeded the 24-hour timeframe, with transfer times ranging from two days to 13 days.

When MHCBs were unavailable, inmates were placed into available medical Outpatient Housing Unit (OHU) beds or alternative housing. Headquarters data indicated 456 placements in

138

alternative housing, with 94 percent of inmates transferred out within 24 hours. Of the 27, or six percent, not transferred within 24 hours, stays lasted from approximately two hours to 25 days.

Pursuant to policy implemented in January 2105, alternative housing was located in the following locations, by order of preference: CTC licensed medical beds, OHU swing beds, OHU overflow beds, two ZZ cells in A-Facility, two ZZ cells in B-Facility, two ZZ cells in C-Facility, two contraband cells in B-Facility, and two contraband cells in C-Facility. Contraband cells were utilized when all of the above cells were filled, as these cells did not have a toilet and sink. If all of these areas were filled, regular cells on housing blocks were utilized with property and standard issue removed from them. CTC holding cells were used as the last resort, with lengths of stay never to exceed four hours.

The monitor reviewed holding cell logs for the period of November 2014 through January 2015. Of the 205 inmates placed in holding cells in Facility-A, only four had stays in excess of four hours. None of the 25 inmates placed in holding cells in Facility-B had stays in excess of four hours. However, it was noted that reviewed logs were not complete and information on 15-minute checks was not entered timely.

Other Issues:

Reception Center:

Observed new intake screenings were not conducted in confidential settings. The inmate was seated in a hallway outside of the nurse's office, with a custody officer standing next to him. The nurse used the current version of the intake screening form and asked all of the questions on the form.

Administrative Segregation EOP:

Administrative segregation intake screenings were 91-percent compliant. Institutional data indicated 90-percent compliance for both initial psychiatry and initial PC contacts. Ongoing psychiatry contacts were 82-percent compliant, which was attributed at least in part to large caseloads. Compliance rates for initial PC contacts and contacts for treatment refusals were 88 percent and 67 percent, respectively. Daily psych tech rounds were 91-percent compliant.

The two psychiatrists had caseloads of 46 and 48, respectively. The six PCs had caseloads ranging from 12 to 14, and two newly-assigned PCs had caseloads of seven and nine, respectively. One PC in the process of advancing to a supervisory position had a caseload of eight.

Provided information indicated compliance with timely initial and follow-up IDTT meetings. Composition of IDTTs was also reportedly compliant.

On average, EOP inmates were offered 13.21 hours of structured therapeutic activities, attended 5.67 hours, and refused 7.54 hours. An average of .40 hours of therapy was cancelled per week. Staff attributed low attendance to housing of inmates in the administrative segregation overflow in PSU-2, increased MHCB admissions, and inmate refusals. Modified treatment hours were not tracked during the review period.

The institution reported a total of 514 non-confidential out-of-cell contacts during the reporting period. Data produced by the institution on cell-front contacts for MHCB, EOP, and 3CMS inmates in administrative segregation indicated that 3,805 were due to refusals, 2,282 to staff decisions, 253 to modified programming, 47 to lack of escorts, and 3,622 to unspecified reasons.

140

During July 2015, the average stay for the 241 EOP inmates in administrative segregation was 105 days. Eighty-five or 35 percent had stays in excess of 90 days. During December 2015, 96 inmates were in administrative segregation. For the 16 whose stays exceeded 90 days, the average stay lasted 140 days. On a monthly basis, CSP/Sac conducted 30-day custody reviews for all EOP inmates who had been housed in administrative segregation over 90 days. A report was generated for each monthly meeting.

3CMS STRH:

The STRH opened in January of 2015, too recently for an assessment of the adequacy of its programming. Restart chairs were being used in the unit and at least one inmate reported access to a television in his cell. Air vents in the cells were suicide-resistant. The yard and space used for out-of-cell structured therapeutic activities were adequate in size.

MHCB:

CSP/Sac reported compliance with timely initial and follow-up IDTT meetings, clinical contacts, and Suicide Risk Evaluation (SRE) requirements. However, data in MHTS.net on clinical contacts and SREs was inconsistent and incorrect. CTC-1 and CTC-2 had 13 and 12 beds, respectively, and shared responsibility for providing care. The two psychiatrists in CTC-1 and CTC-2 each had a caseload of seven. There were 12 PCs in CTC-1 and CTC-2.

In both CTC-1 and CTC-2, clinical contacts were reported to occur in confidential settings. The two units shared a recreation therapist who canvassed eligible inmates for participation, which was reportedly about 50 percent.

CTC-1 and CTC-2 also shared a yard which they used on alternate days from Tuesday through Friday, and on additional days if the recreational therapist was available. Only one inmate was allowed on the yard at any time. Sessions lasted from 30 to 45 minutes. Staff was

141

unable to estimate the weekly number of hours that each inmate was actually offered or received, but refusals were noted by custody staff. There was no official yard log. Inmates' movement and participation were noted in the healthcare chart at the end of each day. Inmates in the MHCB did not have routine access to telephones or visitation privileges, although exceptions could be requested by mental health staff if clinically indicated.

During the review period, there were 54 inmates with three or more admissions to a crisis bed. Thirty-three of these inmates were referred to the Positive Behavioral Support Team (PBST) for interdisciplinary discussion and enhanced treatment planning and management. However, no studies were conducted to compare outcomes between inmates referred to the PBST and those not referred.

The institution reported that staff ratios in the 20-bed MHCBU were the same as in the licensed crisis bed units. The MHCBU had two assigned psychiatrists and seven PCs.

The monitor's expert attended six IDTT meetings in the MHCBU during the site visit. All appropriate disciplines attended and provided input, but the focus of the meetings was more on the inmates' current conditions rather than treatment planning. Confidential treatment space was lacking, and clinical contacts occurred either cell-side or in treatment modules located in high traffic areas in the MHCBU. Although inmates were offered daily out-of-cell contacts in a "confessional" setting, a very small percentage actually came out of their cells. Staff noted that all inmates in the MHCBU were cuffed when escorted out of their cells, in contrast to inmates in the CTCs. The MHCBU utilized part of a SHU yard, and it was reported that inmates with longer stays were more likely to go to yard.

Significant physical plant problems persisted in the MHCBU. The cells appeared dirty and dark, with limited visibility into cell interiors. CSP/Sac continued to exclude from the

142

MHCBU those inmates who needed wheelchair access, were on restraints or seclusion, or were undergoing Clozaril initiation.

A review of the restraint and seclusion log indicated 18 uses of restraints, with durations ranging from 1.45 hours to 48.5 hours. Although compliance with pertinent policies and procedures was not audited, nursing staff used a checklist to facilitate compliance. The monitor's expert reviewed records of seven inmates placed in restraints and found that the restraint policy was being implemented appropriately.

Alternative Housing:

Inmates placed in CTC medical beds or OHU cells were reportedly placed on one-to-one direct visual observation until an SRE was completed and an order was written permitting suicide precautions for CTC medical beds or OHU cells with furniture. Inmates placed in alternative housing pending crisis bed admission were reportedly placed on constant direct visual observation.

At the time of the site visit, there were five inmates in the OHU or alternative housing on suicide observation status. The monitor observed inmates in the ZZ cells to be on continuous observation, but an inmate in a non-suicide resistant OHU cell on suicide precaution status was observed at only 15-minute intervals. Contrary to a statement in Suicide Prevention and Response Focused Improvement Team (SPRFIT) meeting minutes that all designated OHU cells had been retrofitted, these cells continued to have dangerous gaps that could be used as ligature anchors.

CSP/Sac reported that inmates in alternative housing were evaluated daily by a psychologist or social worker, and that inmates in the medical CTC beds may also have been evaluated by a psychiatrist. It had maintained its long-standing Crisis Triage Team consisting of

143

two clinical psychologists and a master's-level social worker who managed the services provided to inmates in alternative housing.  Confidential treatment space was lacking in the OHU, and clinical contacts occurred cell-side.

SHU:

Institutional audits of the SHU indicated that initial psychiatry contacts were noncompliant, but follow-up psychiatry contacts were compliant.  Both initial and follow-up PC contacts were compliant.

Initial and follow-up IDTT meetings were noncompliant.  Audits indicated a compliance rate of only 49 percent for the presence of all required attendees at IDTT meetings.  It was reported that compliance levels in the SHU were adversely affected by SHU staff being redirected to other duties.

PSU:

At the time of the site visit, CSP/Sac had three PSUs.  All new arrivals in the PSU were initially placed in Step 1 of the five-step Behavioral Incentive Program (BIP) for evaluation.  During the reporting period, a total of 1,460 Step actions were taken in the PSU.  Of those, 793 or 54 percent maintained the inmate at his current Step level, 426 or 29 percent increased the inmate's Step level by one or more steps, and 241 or 17 percent decreased the inmate Step level by one or more levels.  The primary reason for inmates being retained at their current levels or having their levels increased was listed as "participation."  A decrease in a Step level was usually attributed to the inmate's receiving a Rule Violation Report (RVR).  The average stay in the PSU lasted 86.63 days, with a range of three days to 229 days.

CSP/Sac was compliant with timely initial and follow-up IDTT meetings in the PSU, but the rate of attendance by all required disciplines was only 79 percent.  Initial psychiatry contacts

144

were 86-percent compliant, and initial PC contacts were 76-percent compliant.  Routine psychiatry contacts were 82-percent compliant, and routine PC contacts were 93-percent compliant.

Institutional data indicated a total of 129 non-confidential out-of-cell psychiatry contacts and 1,545 non-confidential out-of-cell PC contacts during the reporting period.  The institution reported that out of a total of 620 cell-front psychiatry contacts, 390 were due to refusals, 48 to staff decisions, 36 to modified programming, two to no escort, and 144 were unspecified.  Of the reported 3,153 PC cell-front contacts, 867 were due to refusals, 429 to staff decisions, 148 to modified programming, 35 to lack of escort, and 1,674 were unspecified.

Fifty-seven percent of PSU inmates were offered ten hours of group therapy per week.  Institutional data indicated that on average inmates in the PSU were scheduled for 9.84 hours of weekly structured therapeutic activities, offered 9.93 hours, received 5.67 hours, and refused 3.66 or 39 percent of offered hours, with .51 hours of therapy cancelled per week.

The newest PSU unit, PSU-3, opened in October 2013 and was also used as an administrative segregation overflow unit housing 50 inmates.  This reportedly led to problems with clinical contacts, continuity of care, group attendance, increased RVRs, high refusal rates, and higher crisis bed admissions.  PC ratios ranged from 1:14 to 1:16 during much of 2014.  As of February 2015, eleven of the 125 inmates in PSU-3 were on modified programming.

EOP:

CSP/Sac had three EOP mainline programs, identified as A-EOP, B-EOP, and EOP-B2.5.  A-EOP and B-EOP had the capacity to treat 200 inmates.  EOP-B2.5, which was activated in December 2014, had the capacity to treat 66 inmates.

The three psychiatrists had caseloads ranging from 94 to 100. Psychiatry vacancies in other programs caused EOP psychiatrists to be redirected to cover them, detracting from their time in the EOP. Eleven PCs had caseloads of 24 to 30. Two part-time PCs had caseloads of 14 and 22, respectively, and three other PCs had caseloads of ten to 13. PC vacancies resulted in larger caseloads and core groups being conducted by psych techs. There were four recreational therapists. A growing number of newly-hired staff was unlicensed.

The institution was compliant with initial clinical assessments. MHTS.net indicated 85-percent compliance for timely initial psychiatric contacts and 79-percent compliance for ongoing psychiatric contacts. Audits of PC contacts indicated compliance and occurrence in a confidential setting. Data indicated that no inmates were placed on modified treatment programs.

Facility audits indicated compliance rates for initial and quarterly IDTT meetings of 90 percent and 99 percent, respectively. Attendance by required disciplines was 89-percent compliant. At four IDTT meetings observed by the monitor's expert, all appropriate staff and three of the four inmates were present. Discussion was multidisciplinary and treatment plans were discussed specifically with each inmate. Staff had access to SOMS and the Electronic Unit Health Record (eUHR) during the meetings.

Based on MHTS.net data, EOP mainline inmates were offered an average of 13 hours of structured therapeutic activities per week. Approximately one quarter of the inmates who attended structured recreational yard participated in the offered activities, as shown by both MHTS.net data and confirmed by inmate reports. Recreational therapists reported a lack of adequate access to materials such as current movies, magazines and writing instruments for the inmates.

146

As compared to inmates on A-Yard, many inmates on B-Yard had been transferred from administrative segregation or discharged from the PSU, and consequently had a higher rate of gang-related issues or predatory behavior. Some of these inmates on B-Yard no longer needed EOP level of care but were required to remain at that level of care for a minimum of 90 days pursuant to Program Guide requirements.

3CMS:

Compliance with initial psychiatric contacts occurred 89 percent of the time. According to institutional audits, initial PC contacts were only 41-percent compliant. Routine psychiatric contacts were timely 86 percent of the time. MHTS.net information indicated compliance with routine PC contacts.

Initial IDTT meetings were only 70-percent compliant, but follow-up IDTT meetings were compliant. Audits indicated 65-percent compliance for attendance by all required disciplines at IDTT meetings. Supervisory staff attributed this to the need for increased clinical staffing.

Referrals:

CSP/Sac processed 1,706 referrals during the review period. Data indicated that 97 percent of emergent referrals drew a response within the same day. However, only 45 percent of urgent referrals were seen within 24 hours, and only 81 percent of routine referrals were followed up timely.

Heat Plan:

Records were reviewed for the period of May 2014 through October 2014. The institution was compliant with sending monthly reports to headquarters, but data indicated multiple instances of missed temperature readings in various units. The institution reported that

147

weekly lists of heat-risk inmates were generated by pharmacy and distributed to the units. Affected inmates were issued heat cards indicating they were prescribed heat-sensitive medications.

RVRs:

In 2014, CSP/Sac implemented a new operational procedure on the use of mental health assessments.  Documentation provided by the institution reported that some staff received training before the issuance of the new operating procedure, and some after it, leaving it unclear how many staff were actually trained on the new procedure.

Pre-Release Planning:

Audits indicated a compliance rate of 94 percent for providing paroling inmates with a 30-day supply of their medications.

Program Access:

Institutional data indicated that of the 624 available full-time jobs, 383 or 57 percent were filled by non-Mental Health Services Delivery System (MHSDS) inmates, 160 or 26 percent were filled by 3CMS inmates, and 110 or 18 percent were filled by EOP inmates.

Of the 240 part-time academic program assignments, 132 or 55 percent were held by non-MHSDS inmates, 87 or 36 percent were held by 3CMS inmates, and 21 or nine percent were held by EOP inmates.

For the 545 voluntary academic assignments, 256 or 47 percent were filled by non-MHSDS inmates, 120 or 22 percent were filled by 3CMS inmates, and 169 or 31 percent were filled by EOP inmates.

Of the 91 full-time and part-time vocational education positions available, 37 or 41 percent were filled by non-MHSDS inmates, 29 or 32 percent were filled by 3CMS inmates, and 25 or 27 percent were filled by EOP inmates.

The institution had implemented new policies and procedures for evaluating EOP inmates for program assignments and milestone credits, but at the time of the site visit only three EOP clinicians had received training.  The institution had begun collecting data documenting milestone credits within the two week period preceding the site visit, which did not yield enough information to determine the efficacy of the new policies and procedures.

For out-of-level housing of caseload inmates, institutional data indicated that three Level I EOP inmates were placed in Level IV housing, and two Level II EOP and two Level II 3CMS inmates were placed in Level IV housing.

A review of samples of CDC 840 forms and 128-Cs documented the semi-annual reductions in classification scores for completion of programming.  Two reviewed cases documented reference to reduced classification score reductions on the 128-C (ICC committee notes) but one did not.  The monitor was provided with only the Form 840 reclassification score sheet for a fourth case and was unable to determine if the updated score sheet was referenced in the ICC.

Document Production Issues:

MHTS.net continued to be a useful management information tool but at times it was limited by inaccurate data entry.  Staff also expressed concern about the amount of time that data entry detracted from time spent on their work duties.

Although the institution reportedly provided three sources of data relative to alternative housing, only one spreadsheet from headquarters was found in the materials for alternative

149

housing.  The other two spreadsheets were locally generated and covered alternative housing

placements and alternative housing pre-placement and post placement programming.  The

institution was able to identify discrepancies between the headquarters-generated data and the

locally-generated data.

### Folsom State Prison (Folsom)
May 20, 2015 - May 22, 2015

Census:

As of May 18, 2015, Folsom housed 2,962 inmates, for a two-percent increase since the

preceding monitoring period. There were 2,459 male inmates and 503 female inmates in the

Folsom Women's Facility (FWF), which opened in January 2013.  Folsom did allocate mental

health staff separately between its male and female populations.

There were seven male and two female EOP inmates, and 622 male and 141 female

3CMS inmates.

There were 48 inmates, including two EOP inmates pending transfers to EOP hubs and

six 3CMS inmates, in administrative segregation.

Staffing:

One chief psychologist position was filled and the other was kept open per headquarters'

directive for cost-saving reasons.

The senior psychiatrist position and all three psychiatrist positions were filled.

One senior psychologist supervisor and both senior psychologist specialist positions were

vacant.  Six of seven psychologist positions were filled, for a 14-percent vacancy rate.

Three of five social work positions were filled, for a vacancy rate of 40 percent.  One

social worker was unlicensed.

150

The psych tech supervisor position was filled.  Five of 5.3 psych tech positions were filled, for a six-percent vacancy rate.

The Health Program Specialist I (HPS I) position was filled, but the CHSA position was vacant.  Three of five office technician positions were filled.

Quality Management:

The quality management committee met monthly, always attained a quorum, and maintained minutes.  It addressed mental health issues including access to care, staffing, training on use of force, and MHCB referrals.

The mental health subcommittee met monthly, always achieved a quorum, and kept detailed minutes.  It discussed compliance with clinical contacts, staffing, peer review, QITs, audits, and trainings.

QITs addressed SREs, administrative segregation pre-placement screens, MAPIP, timely submission of mental health documents to medical records, documentation of five-day clinical follow-ups, and MHCB referrals.  Availability of Case Files (C-files) during IDTT meetings, five-day clinical follow-ups, effective communication, MAPIP, and eUHR/MHTS.net concordance among other things were audited.

Peer review was conducted by Folsom mental health staff for psychiatry, psychology, and social work.  From October 22, 2014 to April 22, 2015, mental health staff from Centinela State Prison (Centinela) conducted peer review of three Folsom psychiatrists, four psychologists, and one social worker.

Medication Management:

Other than documentation of medication continuity following intra-institutional transfers, medication management was generally compliant, according to psychiatry and nursing audits.

151

<u>Transfers</u>:

During the review period, there were no referrals, pending transfers, or completed transfers of inmates to DSH inpatient programs.  No inmates were returned to Folsom following discharges from inpatient programs.

During the review period, ten male and seven female inmates transferred to MHCBs at other institutions.  Eight of ten male inmates transferred within 24 hours of MHCB referral.  The two untimely transfers occurred after 52 hours.  Nine of ten men had a bed assignment within 24 hours of MHCB referral.  Six of seven female inmates transferred to an MHCB within 24 hours of referral; the one overdue transfer also occurred after 52 hours.  Six of seven female inmates had a bed assignment within 24 hours of MHCB referral.

Twenty-three of 25 or 92 percent of alternative housing placements were within timeframes.

No inmates were transferred to a PSU.

Eighteen of 19 or 95 percent of EOP inmates timely transferred to EOP programs; the one overdue transfer took 63 days.  During the site visit, Folsom's nine mainline EOP inmates had stays averaging 14 days; none exceeded 30 days.

Two EOP inmates housed in administrative segregation timely transferred to EOP hubs.

Folsom was unable to report 3CMS administrative segregation lengths of stays during the review period, but reported that no 3CMS inmates were housed in administrative segregation for more than 150 days.  As such, no case by case reviews were conducted.  Staff reported that male inmate transfers from CSP/Sac's administrative segregation unit to Folsom's segregated unit had not occurred during the review period.

During the site visit, two EOP inmates housed in administrative segregation had stays of 13 and 19 days.  Six administrative segregation 3CMS inmates' stays averaged 41 days and ranged from 17 to 71 days.

Folsom was unable to report the number of male NDS mental health caseload inmates during the review period.  None of the four NDS inmates housed in administrative segregation during the site visit were mental health caseload inmates.

Other Issues:

MHSDS Inmates in Administrative Segregation:

During the site visit, the PC-to-inmate ratio in administrative segregation was 1:8.  A .5 psychiatrist position was also assigned to the unit.

Folsom reported 100-percent compliance with timely initial and follow-up psychiatry contacts and timely initial and follow-up PC contacts.  Folsom also reported a compliance rate of 100 percent for initial and follow-up IDTT meetings.  There was 86-percent compliance for required staff attending IDTT meetings; required staff not in attendance were the psychiatrist and psych tech.

Due to inmate refusals, three of 86 or three percent of psychiatry contacts were cell front. Forty-nine of 450 or 11 percent of PC contacts were cell front.

Group treatment was not offered in administrative segregation during the review period.

Review of 114As indicated that inmates received a minimum of ten hours of weekly yard and three weekly showers.  An interviewed EOP administrative segregation inmate did not express any concerns with provided mental health treatment.

<u>3CMS</u>:

Six PCs assigned to the male 3CMS program had caseloads that averaged 104 inmates. Two psychiatrists were also assigned to this program.

Due to the general population yard's aggressive gang politics, 3CMS inmates who arrived from other institutions and were endorsed to Folsom's minimum security facility (MSF) were initially housed in administrative segregation. After the Institutional Classification Committee (ICC) saw them, they were transferred to the MSF, without initially being housed in the general population. Staff indicated that this procedure reduced gang issues and violence at Folsom.

Folsom reported 99-percent compliance for initial 3CMS inmate psychiatry contacts and a compliance rate of 100-percent for follow-up psychiatry contacts. For PC contacts, there was 99-percent compliance for initial contacts and 100-percent compliance for follow-up contacts. Folsom was 98 percent compliant with conducting initial IDTT meetings and 100-percent compliant with routine IDTT meetings. Required staff attended IDTT meetings 95 percent of the time; correctional counselors consistently attended IDTT meetings.

Observed male inmate IDTT meetings revealed attendance by required staff. Although treatment plans were presented at all meetings, measurable goals, strategies, and levels of care were not always discussed. Treatment team clinicians also did not ask inmates whether they understood the IDTT process or their treatment plans. Some treatment plans were also reviewed and signed during the one-on-one pre-IDTT meeting, instead of during the IDTT meeting in the presence of the treatment team.

All required staff and inmates attended observed FWF IDTT meetings. At these meetings, mental health staff discussed inmates' mental health and related issues, but did not

154

consistently discuss goals, measurable outcomes, or inmates' levels of care.  Clinicians did not

offer groups to inmates during IDTT meetings, but provided a 3CMS program pamphlet that

indicated offered groups.

Folsom offered clinician-led process groups for 3CMS inmates, but the group wait list

identified some inmates who had been waiting for groups since 2013.  Staff reported that groups

were reviewed for clinical appropriateness prior to inmate group assignment or placement on the

wait list.

An observed group for male inmates effectively engaged inmates and was clinically

relevant.  Interviewed group members reported that the mental health program had improved

inmate behaviors and that groups were beneficial, and requested more groups.  However,

interviewed group members also stated that changes in clinicians were problematic and that

custody staff was often disrespectful.

FWF began accepting female 3CMS inmates in June 2014.  Approximately 15 female

3CMS inmates were interviewed concerning the mental health program.  Many indicated

frustration with FWF's clinical services and reported that custody, and not mental health, ran

FWF's mental health program.  They also expressed concern with mental health caseload

inmates' ineligibility to earn half-time credits to reduce prison sentences.  In fact, more than half

of interviewed female inmates stated an intention to leave the 3CMS program in order to earn

such credits.  They also reported other inmates who had stopped prescribed medications in an

attempt to satisfy early release eligibility criteria; some of these inmates wound up in the MHCB

following medication termination.  Many interviewed 3CMS female inmates were unaware of

the availability of groups.

Referrals:

Folsom reported 99-percent compliance for timely response to mental health referrals. There was 100-percent compliance for response to 28 emergent referrals, 98-percent compliance for response to 198 urgent referrals, and 99-percent compliance for response to 994 routine referrals.

Space:

Mental health staff reported insufficient treatment space at FWF, which also was neither confidential nor private. FWF group treatment took place in a non-confidential, multi-purpose room that lacked privacy.

Mental Health/Custody Relations:

Mental health staff typically reported having a good relationship with custody.

Heat Plan:

There were five stage I heat alerts during the review period, but no stage II or III heat alerts. The institution completed heat logs and forwarded them to headquarters. Observed units had appropriate digital thermometers that were located on the tier in locked boxes and enabled a clear viewing of readings.

RVRs:

Documentation indicated that 13 clinicians attended training on mental health input in the inmate disciplinary process on February 19, 2015.

Use of Force:

As of May 20, 2015, Folsom reported that 92 percent of custody staff and 100 percent of mental health staff had completed the controlled use of force training. The immediate use of force training had been implemented through block training.

Access to Care:

Staff reported good access to care and did not indicate any access to care problems. During the review period, Folsom issued 9,798 ducats and add-on appointments for mental health services, of which 9,196 or 94 percent were completed. As to the 602 non-completed ducats, five or less than one percent were due to inmate refusal, 37 or six percent were not completed due to custody reasons, and 560 or 93 percent were not completed due to non-custodial reasons.

Program Access:

Although Folsom did not have an EOP program, all mental health clinicians attended the EOP functional evaluation training in November 2014.

a. Job and Program Assignments:

On May 21, 2015, two EOP inmates had part-time, unpaid academic positions.

Of the 3CMS inmate population, 271 had full-time jobs, of which 197 were paid and 74 were non-paying. An additional 100 3CMS inmates had full-time, unpaid vocational education positions and 28 had part-time, unpaid vocational education positions. One 3CMS inmate had a full-time, unpaid academic position, and 162 had part-time, unpaid academic positions.

As to non-mental health caseload inmates, 1,121 had full-time employment positions, of which 808 were paid and 313 were non-paying. An additional 321 non-mental health caseload inmates had part-time, unpaid academic positions, 164 had full-time, unpaid vocational educational assignments, 63 had part-time, unpaid vocational education positions, and five participated in full-time, paid substance abuse treatment programs.

Five EOP inmates were eligible for work training assignments but were unassigned, as were 100 3CMS and 217 non-mental health caseload inmates.

b.  <u>Milestone Credits</u>:

On March 31, 2015, two of four EOP inmates were eligible to earn milestone credits, with one or 50 percent earning them.  Three hundred one of 793 3CMS inmates were eligible to earn milestone credits, with 86 or 29 percent earning them.  Of 2,143 non-mental health caseload inmates, 705 were eligible to earn milestone credits, with 181 or 26 percent earning them.

c.  <u>Out-of-Level Housing</u>:

There were 24 3CMS and 86 non-mental health caseload custody Level I inmates housed in Level II housing.  There were 89 non-mental health caseload custody Level II inmates housed in Level I housing.  There were also 17 3CMS and 31 non-mental health custody Level III inmates housed in Level II housing.

d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

Folsom implemented the revised ADA reasonable accommodation and grievance procedures during the week of February 23, 2015.

e.  <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

EOP inmates were granted classification score reductions for successful programming.

<u>*Coleman* Postings.</u>

All observed housing units contained *Coleman* postings.

## California Health Care Facility (CHCF)
July 21, 2015 - July 23, 2015

Census:

As of July 18, 2015, the total inmate census at the CHCF was 1,554, of which 841 or 54 percent were on the mental health caseload.

There were 88 patients in the 98-bed MHCB.

The total EOP census was 351, including 258 in mainline. There were 402 inmates at the 3CMS level of care, including 73 in mainline and 12 in the prison work crew.

The OHU housed 21 EOP and 158 3CMS inmates at the time of the site visit.

There were 19 EOP inmates and 159 3CMS inmates in the CTC.

The 50-bed administrative segregation unit was an EOP hub. At the time of the site visit, 43 EOP inmates were housed there.

Staffing:

Positions for the chief psychiatrist and the two chief psychologists were filled. One of the chief psychologists served as the chief of mental health.

The two senior psychiatrist supervisor positions were filled, and according to staff, a third such position had been approved as a "long-term blanket hire" to be paid from funding for a vacant psychiatry position. Fifteen of 22 psychiatry positions were filled, for a 32-percent staff psychiatrist vacancy rate. Funding allocated to two of the psychiatry vacancies was used for a psychiatrist on call and medical officer of the day positions.

The five senior psychologist supervisor positions were filled. CHCF was also authorized to fill an additional senior psychologist supervisor position. Three of the five senior psychologist specialist positions were filled. Of the 39 psychologist positions, 35 were filled, but two were

out on long-term medical leave, creating a 15-percent vacancy rate.   According to the institution, 12 were unlicensed but were appropriately supervised.

The supervising psychiatric social worker and the 11 social work positions were all filled. A contract social worker covered for a social worker who was on long-term sick leave.  Four social workers were unlicensed.

Twenty of the 21 recreation therapist positions were filled, for a five-percent vacancy rate.

In the MHCB, positions for the RN shift leader and 24 RNs were all filled. Twenty of the 24 psych tech positions were filled, as were 14 of the 16 CNA positions, for vacancy rates of 17 percent and 12 percent, respectively.

In administrative segregation and EOP mainline, the 13 RN positions, ten LVN positions, and 27 of the 28 psych tech positions were filled.

The sole CHSA II and the two HPS positions were filled.  The 2.7 AGPA positions were increased to three positions and were filled. One of the 1.8 OSS II positions was filled, for a 45-percent vacancy rate.

Twenty-one of the 22 OT positions were filled, for a 4.6-percent vacancy rate. Registry staff covered for an OT who was out on long-term sick leave.

Use of telepsychiatry in the MHCB, CTC/OHU, administrative segregation, and the EOP mainline had been replaced as a result of aggressive hiring of psychiatrists.  Telepsychiatry was used during the review period for individual clinical contacts and IDTT meetings for EOP mainline inmates only.

Quality Management:

160

The local governing body met monthly and achieved a quorum at each meeting. Meetings were chaired by the institution's CEO and were attended by the chief of mental health, the warden, and the executive director of DSH.  Minutes indicated that the group was involved with approving various mental health-related policies.

The quality management committee met monthly during the review period.  Meeting minutes were maintained.   The committee was chaired by the CEO.  The chief of mental health and the warden attended meetings.  Minutes documented discussions that covered standing committee reports including the mental health program subcommittee reports, among other things.

The mental health quality management subcommittee was chaired by the chief of mental health.  It met twice per month, achieved a quorum, and was very active.  Minutes indicated that it covered custody issues, reports from the QITs, suicide prevention, and compliance-related issues, among other mental health-related topics.

CHCF resolved two QITs, on pending appointments and trends in MHCB referrals, during the review period.  At the time of the site visit, QITs on the SPRFIT, administrative segregation, and effective communication compliance and accountability were active.  The administrative segregation QIT met monthly and covered EOP hub certification-related issues.

A peer review Local Operating Procedure (LOP) dated February 2015 and outlining the peer review process was provided.  No other documentation was provided to indicate that peer review was in place.

Medication Management:

At the time of the site visit, MAPIP was not implemented at the CHCF. No start date was provided. Staff reported that psychiatry and nursing were awaiting MAPIP training by headquarters.

Transfers:

At the time of the site visit, the CHCF had had its SPRFIT coordinator for five months. Referral/non-referral logs were generally complete, except for some cases in which missing data would have affected calculation of transfer timelines. No referrals to DSH programs were rejected. Staff attributed this to on-site consultation with supervisory staff before referrals were submitted. In addition, the DSH coordinator attended IDTT meetings in which DSH referrals were considered and discussed. The Correctional Clinical Assessment Team (CCAT) process was sometimes used before referrals were submitted.

Staff reported that documentation on Form 7388B required improvement. Pre-visit audit results indicated that 60 to 86 percent, or an average of 73 percent, of completed Form 7388Bs were documented appropriately. Training during June 2015 led to improved documentation, according to staff reports.

There were 220 referrals to acute care, of which 13 were rescinded. Ninety-five percent, or 208, of the referral packages were accepted timely by headquarters. Seventy-seven percent, or 170, of the referral packages were submitted timely to DSH. Information on when DSH received the referrals was unavailable. Time spans from the IDTTs' making of the referrals to the patient transfers to DSH ranged from 11 to 74.5 days. The average time from when the CHCF sent the referral to DSH to the time when patients transferred was 13.6 days. Delays in transfers to DSH were attributed to the statewide waitlist and staff unfamiliarity with required transfer timeframes. All of the acute care transfers were completed within 72 hours of bed assignment.

162

Of the 152 intermediate care transfers, eight were rescinded.  Ninety-five percent of the referral packages were timely accepted by headquarters.  Available data for 120 transfers indicated that 90 or 75 percent of transfers to intermediate care complied with the 30-day timeframe.  The delays were attributed to the statewide waitlist and staff unfamiliarity with required transfer timeframes.  All of the intermediate care transfers were completed within 72 hours of bed assignments.

Inmates prevailed at only two of the 78 Vitek hearings during the review period.  At the time of the site visit, two inmates were awaiting transfer to DSH.

According to the DSH non-referral log, 1,029 inmates were considered but not referred to DSH during the review period.  Documentation of reasons was consistent with headquarters' specifications.

DSH discharge summaries were posted timely on SharePoint.  For inmates discharged back to the CHCF, discharge packets were forwarded to the supervising psychiatrist and psychologist to assign the case.  PCs were encouraged to contact DSH for clinician-to-clinician discussions, but this did not occur routinely.  Lack of these communications was attributed to DSH clinicians being difficult to reach and/or not returning phone calls from CHCF staff.

Provided data indicated that there were 1,240 referrals to the MCHB at the CHCF during the review period, and that 1,096 or 88 percent of these resulted in MHCB admissions.   Fifty-five inmates had two or more MHCB admissions during the review period.  Sixty or five percent of the MHCB admissions were from the CHCF.  If no MHCB was available at the CHCF, an order was written for alternative housing, where the inmate was monitored one-to-one. The average MHCB stay lasted 12.4 days, with a range of 11 days to an outlier of 170.4 days, and a second-longest stay of 86.7 days.  Thirty-six percent of stays lasted longer than ten days.  Staff

163

attributed the long stays to a perceived belief by psychiatry that inmates undergoing medication changes required monitoring. Staff training on levels of monitoring outside of the MHCB was planned. Clinical discharges and removals from the MHCB were not tracked for timeliness.

There were only four transfers to outside MHCBs during the review period. Three took longer than 24 hours. The average transfer time was 29.38 hours, with a range of 5.87 hours to 47.10 hours. Reasons for the late transfers included lack of MHCB availability and potential need for Clozapine pending transfer to California Medical Facility (CMF).

Pre-site visit data indicated that there were 86 admissions to alternative housing during the review period. It showed that in 80 percent of cases, inmates were transferred to an MHCB within 24 hours. Late transfers exceeded 24 hours by a range of .1 hour to .9 hours, or an average of .3 hours. At the time of the site visit, inmates placed in alternative housing but not transferred to the MHCB were not being routinely tracked.

During the review period, there were three PSU referrals, two of which resulted in timely transfers. The third was held up by a DSH admission.

Other Issues:

Administrative Segregation EOP:

During the review period, 86 percent of initial screenings were completed within EOP inmates' first five days in administrative segregation.

Data indicated that 96 percent of initial psychiatry contacts and 98 percent of follow-up contacts were timely. The psychiatrist in the hub had a caseload of 37.

Ninety-seven percent of initial PC contacts were timely and preceded inmates' initial ICC meetings. Follow-up contacts were timely 98 percent of the time. Of the five assigned PCs, three had caseloads of eight each, one had seven, and the remaining one had 12.

The compliance rate for timeliness of initial IDTT meetings was 97 percent, and for follow-up meetings it was 98 percent.   Required disciplines attended 97 percent of meetings. Staff reported that inmates who refused over half of offered treatment were evaluated during daily "huddles."  An IDTT meeting would be provided to the inmate if deemed appropriate, and thereafter the inmate would be seen at least weekly, as indicated.

The ICC process was observed during the site visit.   The meeting began on time and was chaired by the warden's designee. Appropriate custody staff, the senior psychologist supervisor, and three PCs attended.   Inmates were given an opportunity to agree or disagree with the committee's findings.   Their mental health histories were discussed.  The mental health clinicians had a significant role in discussing and determining potential risks to inmates' mental health.  Before the inmates were returned to their housing, the clinicians asked each of them if they needed to see a clinician that day and made sure that they understood how to contact mental health if necessary.  The committee chair and custody staff explained the custodial process and the ICC appeal process clearly and allowed inmates to ask questions.

During the review period, EOP inmates were offered an average of 15.3 hours of structured therapeutic activities per week, attended an average of 8.68 hours, and refused an average of 6.64 hours per week.  An average of .89 hours per week were canceled.

Yard time was offered in two-hour increments from 7:00 a.m. to 3:00 p.m., five days per week.  Every two hours, a group of inmates clustered by cell numbers were offered two hours of yard, except on Wednesdays when ICC meetings took place and on one other day during the week.

As of July 22, 2015, 11 inmates had stays longer than 90 days in administrative segregation.  Staff reported that inmates whose stays exceeded 90 days were reviewed every

Monday at a warden's meeting with the inmates' PCs and other mental health staff. On Tuesdays, the unit lieutenant and senior psychologist supervisor met, discussed, and implemented plans for all inmates whose stays exceeded 60 days. It was reported that the senior psychologist presented the results of the reviews at ICC meetings. On July 22, 2015, all four inmates whose stays exceeded 150 days were referred to the CSR and were awaiting transfer.

On July 22, 2015, 14 inmates were on NDS status. One of them was on expedited status but his transfer was delayed due to lack of available Sensitive Needs Yard (SNY) EOP beds. Staff reported that backlogs at Mule Creek State Prison (MCSP) and RJD accounted for extended stays in administrative segregation at the CHCF.

MHCB:

The CHCF had three MHCB units, A1A, A1B, and A2B. Each unit had 30 beds with two respiratory isolation rooms for inmates who were clinically discharged and awaiting transport. Each unit also had two rooms that were not used because they lacked flush toilets. Fifteen to 18 of the rooms in each unit were ADA-compliant.

Each unit had an assigned clinical team consisting of three psychiatrists, six clinicians, and one recreation therapist. One unit had a psychiatric nurse practitioner. There were also "floating" positions for a psychologist, a social worker, and a recreation therapist. Two psychiatrist positions for weekend coverage were vacant at the time of the site visit. The seven psychiatrists in the MHCB had caseloads of ten to 15, and the 19 PCs had caseloads of five to seven. RNs, CNAs, and psych techs were also assigned to the units. There were a total of four Correctional Counselor Is (CC I) allocated to the three units.

Staff reported that newly-admitted inmates received a history and physical within 24 hours, an updated or new mental health assessment (Form 7386), an SRE if admitted for

166

suicidality, and an initial IDTT meeting within 72 hours, with a completed Form 7388B.  Review of provided pre-site information indicated that inmates were being seen daily by the psychiatrist or psychologist, and at least twice per week by the psychiatrist, as reflected in a compliance rate of 94 percent in MHTS.net. These contacts reportedly occurred out-of-cell in a designated interview room.  All inmates in the MHCB were placed on suicide precautions throughout their stays.

Initial and follow-up IDTT meetings were timely in 96 percent of cases, based on MHTS.net data.  All required disciplines attended, and updated treatment plans and Form 7388Bs were completed during the meetings.  Review of a limited sample of charts found good documentation in eUHRs of inmates' courses of treatment in the MHCB.

Seven IDTTs across the three units were observed during the site visit.  All inmates were assigned a staff assistant during the meetings to assist with explaining the process to the inmates. In all cases, the staff assistant was a correctional officer (CO). It was unclear how or why this practice was established.  The psychiatrist asked the inmate about his diagnosis and medications, nursing staff asked about medical issues, the PC provided a summary of the inmate's treatment, and the recreation therapist commented on activities provided to the inmate.  The inmates generally appeared most interested in opportunities for out-of-cell activity.  Discussion of treatment plans was limited, perhaps due to the limited treatment options available in the MHCB. Form 7388Bs were completed by the PCs but were generally not discussed.  Discussions about cuff status varied, and when it was discussed, custody staff were reluctant to recommend uncuffed status, even for Level II and III inmates, as it appeared that MHCB placement was considered a *per se* high-risk factor.  Easing of restrictions was delayed.  On July 21, 2015, no

167

inmates in the MHCB units were on uncuffed status.    Decisions concerning discharges back to sending institutions or referrals to higher levels of care did not overcome avoidable delays.

Inmates were reported to have individual access to the unit recreational area for about two to three hours per week.  A recreation therapist provided activities, usually in-cell, on an individual basis.  Dayroom was not available to MHCB patients, and yard access was less than what medical patients in the CTC received.  Staff reported patient instability, non-classification of inmates from reception centers, and lack of any process for identifying which inmates could co-recreate safely as reasons why MHCB patients were not allowed to access the dayroom or recreate together.  The result was that patients had less out-of-cell time than inmates in administrative segregation and were functionally secluded. The warden agreed to begin a process for assessing patients who were in the MHCB beyond ten days for individual suitability for yard and dayroom with patients.

Review of six sample discharge summaries found that they were legible and clinically meaningful. Staff reported that property, bedding, cuffing, and movement restrictions were reviewed timely and relaxed when appropriate.

Seclusion and Restraint:

During the review period, there was one placement in seclusion.  It lasted less than one hour.  There were four placements in restraints, involving three inmates, with all lasting less than four hours.  Staff identified some problems with adherence to applicable policies and procedures.

Alternative Housing:

Cells in the medical CTC were used as alternative housing for inmates awaiting MHCB placement.  Treatment services were similar to those in the MHCB.  Staff reported that two PCs had caseloads of five to seven patients.  They conducted emergency assessments as needed.  It

was reported that inmates were always placed on one-to-one observation, but information from nursing staff indicated that it was not uncommon for inmates to be placed on 15-minute watch instead.

Inmates in alternative housing were frequently provided with only mattresses, which was similar to conditions for MHCB inmates whose medical needs caused them to be placed in medical CTC overflow cells

At the time of the site visit, staff reported that all 3CMS inmates eligible for Long Term Restricted Housing (LTRH) or STRH were designated for transfer to appropriate hubs.

EOP:

The mainline EOP was located in the E Facility.  It had 375 beds and was at 71 percent of capacity at the time of the site visit.

Initial PC contacts were 93-percent compliant for timeliness, and 94-percent compliant for follow-up contacts. There was one psychiatrist for the program.  Telepsychiatry was provided for 134 inmates.  Six PCs had caseloads of 21 to 26, and another seven PCs had caseloads of 13 to 19.

Timeliness of initial IDTT meetings was 84-percent compliant.  For follow-up meetings it was 99-percent compliant.  Audits indicated that required disciplines attended IDTT meetings in 96 percent of cases.

Group and individual therapy was conducted in the mental health building located on the yard.  It had adequate space for individual and group treatment.  An average of 14.34 hours of group treatment per week were scheduled, 13.82 hours were offered, 8.61 hours were attended, 5.21 hours were refused, and .52 hours were cancelled. An observed group on anxiety was facilitated by a social worker and had ten participants.  It was well run, with active participation

169

by most members.  There was wide diversity of group offerings, which were continuing to expand as the population grew.  For EOP inmates on modified programming, audits indicated that they were scheduled for an average of 7.25 hours per week, offered 6.42 hours, attended 2.55 hours, refused 3.87 hours, and that no hours were cancelled.

Structured recreational yard groups were offered at 8:00 a.m. and 9:00 a.m. Monday through Friday, 10:00 a.m. Monday through Thursday, and at noon on Monday. During Stage 1 heat alerts, all yard groups were re-directed to group rooms in the mental health clinic for indoor recreational activities offered by recreation therapists.  At the time of the site visit, no recreation yard groups were offered to EOP inmates housed in medical units.

EOP inmates also had access to high school equivalency education, college courses, a computer laboratory, and an extensive library. There were waitlists for some of these programs.

Interviewed EOP inmates indicated that generally they were pleased with the mental health services they received at the CHCF.  They reported being seen every other week by their PCs for individual therapy in private settings, and on alternating weeks in group settings.  They were offered at least ten hours of group therapy per week, although some concern was expressed regarding the diversity of group offerings.  They reported that they were offered yard access on the small yard adjacent to the EOP unit daily until 2:30 p.m. and only had access to the large yard for approximately four hours on Saturdays and Sundays. They were concerned that their access to the large yard was markedly less than that which was afforded the general population inmates.  Additionall, they were concerned that the small yard was closed at 2:30 p.m. rather than the reported 4:00 p.m. closing time.  This observation was verified by the Special Master's expert, and this issue was discussed with the facility supervisory staff.  Inmates also voiced concern about some officers who called EOP inmates inappropriate names and at times taunted

170

and/or aggravated them. These issues were discussed in detail with the CEO and the warden, who both indicated that they would be addressed.

EOP inmates who had significant medical issues were housed in medical units, which had assigned psychologists, social workers, psychiatrists, and recreation therapists. During May and June 2015, these inmates were seen monthly by their psychiatrists in private settings in 100 percent of cases, and were seen at least weekly by their PCs in approximately 98 percent of cases.

Initial IDTT meetings were completed within 14 calendar days of inmates' placements. They were preceded by an intake evaluation completed by the psychiatrist. Follow-up IDTT meetings were conducted at least quarterly in 100 percent of cases. They were attended by all required disciplines, with eUHRs and ERMS readily accessible.

Some of the inmates with medical issues received ducats to attend groups, but many were confined to bed, resulting in clinicians conducting treatment at bedside and therapeutic activities on the unit or in the room. Fifteen therapeutic groups were offered. Eighty-eight percent of inmates attended ten or more hours of group treatment per week during June 2015. However, because of some inmates' significant medical issues, it was not uncommon for them to be offered modified programming.

Based on information from staff and MHTS.net data, the EOP program in the medical units appeared to function well. Inmates with dementia were referred to either the EOP for modified programming and/or to the *Clarke* program, as the CHCF did not have an established dementia program. Approximately 25 inmates were reported to have diagnoses of dementia.

3CMS:

171

Rates of completion of intake assessments for 3CMS inmates were 29 percent and 41 percent for May and June, 2015, respectively. A CAP was implemented at the time of the site visit.

Approximately 99 percent of 3CMS inmates prescribed psychotropic medications were seen at least quarterly by a psychiatrist. The psychiatrist assigned to the mainline 3CMS had a caseload of 81 patients, and two other psychiatrists assigned to the OHU and the CTC had caseloads of 121 and 144, respectively, with the larger caseload including some EOP inmates.

Approximately 99 percent of all 3CMS inmates were seen at least quarterly, and often more frequently, by their PCs. Psychiatry and PC contacts took place in private settings, although no data was provided on what percentage, if any, were not conducted in private settings. The three assigned PCs had caseloads ranging from 109 to 111.

Compliance rates for conduct of initial IDTT meetings within 14 working days of inmates' arrivals in May and June, 2015 were 92 percent and 79 percent, respectively. It was reported that intake evaluations were routinely conducted by a psychiatrist before initial IDTT meetings. One-hundred percent of inmates received follow-up IDTT meetings at least annually. The meetings were attended by all required disciplines, with ready access to eUHRs and ERMS.

Over 60 percent of 3CMS inmates were enrolled in weekly group therapies. Some groups had waitlists.

<u>3CMS Inmates in Administrative Segregation</u>:

Generally, 3CMS inmates were not housed in administrative segregation at CHCF, which had an EOP administrative segregation hub. Three 3CMS inmates were housed temporarily in the hub during the review period.

172

Documented PC contacts indicated that initial contacts were timely, and that follow-up contacts were nearly compliant for timeliness.

Presented data indicated that initial and follow-up IDTT meetings were conducted timely, but the rate of attendance by required disciplines was 67 percent for the review period.

Referrals:

Reported compliance rates for timeliness of response to mental health referrals were 100 percent for emergent referrals, 94 percent for urgent referrals, and 90 percent for routine referrals.

Mental Health/Custody Relations:

The CHCF staff did not report problems with custody-mental health relations.

Heat Plan:

Data provided in advance of the site visit indicated one Stage 1 heat alert at the CHCF, during May 2015. During the site visit, Stage 1 of the heat plan was activated. There were no reported Stage II or Stage III heat alerts.

Pharmacy generated a daily list of heat-risk inmates that was accessible to staff.

The heat policy had not been revised to take into account the shaded areas and use of misters in the outdoor recreational areas.

RVRs:

Staff reported that all 325 staff assistants and hearing officers had been trained on the new RVR policies. As of March 1, 2015, 68 mental health staff had been trained.

173

<u>Use of Force</u>:

Institutional data indicated that 99 percent of the 725 line custody staff and 97 percent of supervisory custody staff had been trained on the new use-of-force policies. Ninety percent of mental health clinical staff and 88 percent of mental health supervisory staff had been trained on the new use-of-force policies.

<u>Program Access</u>:

a.     <u>Job and Program Assignments</u>:

According to data gathered on June 15, 2015, paying full-time jobs were held by nine EOP inmates, 84 3CMS inmates, and 334 non-MHSDS inmates.  Four 3CMS inmates and 22 non-MHSDS inmates held full-time jobs that were non-paying.

Paying part-time jobs were held by 30 EOP inmates, 14 3CMS inmates, and 24 non-MHSDS inmates. Non-paying part-time jobs were held by 19 EOP inmates, two 3CMS inmates, and six non-MHSDS inmates.   Non-paying vocational education assignments were held by 14 EOP inmates, 11 3CMS inmates, and 21 non-MHSDS inmates. Non-paying part-time academic assignments were held by six EOP inmates, 32 3CMS inmates, and 66 non-MHSDS inmates. Volunteer assignments were held by 2 EOP inmates, 17 3CMS inmates, and 58 non-MHSDS inmates. There were 120 EOP inmates, 44 3CMS inmates and 40 non-MHSDS inmates who were eligible for full time assignments who did not have them.

b.     <u>Milestone Credits</u>:

CHCF reported that as of May 31, 2015, 331 or 17 percent of its total inmate population of 1,978 inmates were eligible to earn milestone credits.  Of those eligible, 42 or 13 percent were EOP inmates, 38 or 11 percent were 3CMS inmates, and 251 or 76 percent were non-MHSDS inmates.   Among eligible inmates, 2.38 percent of eligible EOP inmates actually earned them;

174

5.26 percent of eligible 3CMS inmates actually earned them, and 7.97 percent of eligible non-MHSDS inmates actually earned them.

c.      Out-of-Level Housing:

CHCF is classified as a Level II facility.  Provided data for June 16, 2015 indicated that 17 EOP Level I inmates and seven 3CMS Level I inmates, 16 EOP Level III inmates and two 3CMS Level III inmates, and two EOP Level IV inmates and one 3CMS Level IV inmate were housed at the CHCF.

d.      ADA Reasonable Accommodation and Grievance Procedures:

 Institutional information indicated that training on ADA reasonable accommodation and grievance procedures was completed on February 9, 2015.

e.      Periodic Classification Score Reductions: EOP Inmates:

Review of six of the eight completed CDC 840s confirmed that EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates for successful programming.

*Coleman* Postings:

*Coleman* postings were observed in the housing units.

**Pelican Bay State Prison (PBSP)**
April 7, 2015 – April 9, 2015

Census:

As of April 6, 2015, PBSP's total inmate population was 2,629, which was down by 16 percent since the preceding monitoring period.

Eight inmates were in the MHCB.  There were 78 mainline EOP inmates and 125 mainline 3CMS inmates.

175

The administrative segregation population of 167 included one EOP inmate pending transfer to an EOP hub and 38 3CMS inmates. Fourteen inmates, including one 3CMS inmate, in administrative segregation were on NDS status at the time of the site visit.

The SHU population of 1,141 included four 3CMS inmates. The PSU population fell to 14 from 120 during the preceding monitoring period.

Staffing:

The chief psychiatrist position remained vacant. The two positions for chief psychologist were filled.

Only one of four psychiatrist positions was filled, for a 75-percent vacancy rate. Use of .6 contractors reduced the functional vacancy rate in psychiatry to 60 percent.

The senior psychologist supervisor position and the two senior psychologist specialist positions were filled. Of 12 staff psychologist positions, 11.5 were filled and the remaining half-vacancy was covered by a contractor. All four social work positions were filled, as were all four recreational therapist positions, although one recreation therapist was on long-term medical leave.

All five mental health clerical positions were filled but one was not covered due to a long-term medical leave. The HPS I position was filled. The CHSA II position was kept open per a cost-saving directive from headquarters. The OSS II position, though eliminated, was filled as a "blanket" position.

Two of three senior psych tech positions and 24 of the 40.7 psych tech positions were filled. Many of these vacant psych tech positions were newly established. With use of one

contract psych tech, the functional vacancy rate was reduced to 39 percent.  Twenty-two of 24.1 LVN positions were filled, for a nine-percent vacancy rate.

PBSP made significant use of telepsychiatry during the review period.

Quality Management:

The local governing body met in October 2014 and addressed numerous items including revised policies and procedures.

Over 25 committees reported to the quality management committee.   It typically met weekly during the review period.  It always reported a quorum, maintained extensive meeting minutes, and addressed issues taken to the committee.

The mental health subcommittee met six times during the review period and reported a quorum for four meetings.  It maintained detailed minutes and addressed such issues as key indicators, QITs, peer review, MHTS.net performance reports, health care access quality reports, alternative housing placements, DSH referrals, and audits.

There were three open QITs during the review period.  One worked on developing a system to improve coordination of telepsychiatry and PC contacts.  Another worked on improving mental health-custody collaboration in the penalty mitigation aspect of the RVR process.  The third QIT addressed coordination among mental health, nursing, and custody to improve treatment hours for EOP inmates.

The institution audited MHTS.net/eUHR concordance, delivery of *Hora Somni*/Hour of Sleep (HS) medications after 8:00 p.m., inmates' receipt of parole medications, referrals to higher levels of care, explanation of medications and obtaining of consent forms from inmates in the MHCB, involuntary administration of injectable medications, and medication continuity following patient transfers.

177

Peer review was convened monthly during the review period.  Psychology and social work peer review were conducted jointly during the first four months, and separately during the last two months of the review period.  Psychology peer review focused on treatment planning, case presentations, and chart reviews.  Social work peer review addressed diagnoses and documentation of Axis I disorders in charts.   With only one staff psychiatrist position filled, no psychiatry peer review was conducted.

Medication Management:

MAPIP audits found noncompliance in the areas of laboratory testing of blood levels of inmates taking psychotropic medications, medication continuity following transfers from community hospitals, inmates' noncompliance with psychiatrist-prescribed medications, and administration of psychiatric chronic care medications.  These findings were consistent with dashboard results and staff reports.

Long pill lines with wait times longer than 20 minutes led to inmates arriving late to group therapy.

Transfers:

Twenty-six of the 27 acute care referral packages were completed timely.  In 13 cases, transfers were within the ten-day transfer time limit.  All but one of the 26 transfers took place within 72 hours of a bed assignment.  At the time of the site visit, five inmates were awaiting transfer to acute care.  Four were within the ten-day time limit, and one had been waiting for 19 days.

During the review period, there were 11 referrals to intermediate inpatient care, two of which were initiated at locations other than PBSP.  Ten referrals were completed timely and two

178

were rescinded.  Three of the nine transfers were within the 30-day time limit, and eight were within 72 hours of a bed assignment.

During the review period, four inmates returned to PBSP from acute care, and 17 returned from intermediate care. The DSH coordinator received email communications on discharges and downloaded from SharePoint discharge summaries that were typically legible, comprehensive, and useful.

There were 133 admissions to the PBSP MHCB among 113 different inmates.  Five inmates transferred to MHCBs at other institutions.  Four of these had a bed assignment within 24 hours of referral.  Three left PBSP within 24 hours of referral and the other two left within 48 hours.

Data indicated that from September 4, 2014 to February 26, 2015, 23 of 26 or 88 percent of transfers of EOP inmates in administrative segregation to EOP hubs were timely.  The three untimely transfers were late by an average of eight days.  Eight of the nine or 89 percent of the caseload inmates in the stand-alone unit were transferred timely, and one was transferred late by 2.9 days.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Administrative segregation at PBSP was not an EOP hub.

Provided data indicated that 51 3CMS inmates were placed in administrative segregation during the review period.  By March 17, 2015, 26 or 51 percent had been removed from administrative segregation and transferred to other CDCR prisons, and one had paroled.  At the time of the site visit, 38 3CMS inmates were in administrative segregation.  The ICC had approved six of them for transfer to other institutions, including four to SHUs and two for safety

179

reasons. Eight were pending resolution of disciplinary charges and ten were pending SHU audits. Of the remaining four, one was nearing conclusion of an investigation and one was held during court proceedings.  The remaining two had not yet appeared before the ICC. At the time of the site visit, eight had been in administrative segregation over 150 days.

For 3CMS inmates in administrative segregation, data indicated that during the review period, all 23 initial psychiatry contacts were timely.  Of the 625 measures of follow-up psychiatry contacts, 605 or 97 percent were read as timely.  Institutional data indicated that from August 31, 2014 to March 1, 2015, 13 psychiatry contacts were at cell front, although provided documentation indicated that approximately half of them were cell-front.  Twelve of these were due to inmate refusals and one was the result of the psychiatrist's decision.

From September 1, 2014 to February 28, 2015, 68 of 69 or 99 percent of initial PC contacts were timely.  Of the 1,284 measures of follow-up contacts, 16 were indicated as late, for a compliance rate of 99 percent. Data also indicated that 41 percent of follow-up PC contacts were at cell front during the review period.  Fifty-three percent of these were due to inmate refusals, and 35 percent were due to staff decision.

Psych tech rounds were audited by the senior psych tech on a monthly basis.  Audits found 100-percent compliance for presence of signatures and initialing, but entries under "reason for visit" were lacking.

Initial and follow-up IDTT meetings were both 97-percent compliant for timeliness.  A full complement of required staff was present at 91 percent of meetings.  Psychiatry was absent from every meeting which had fewer than all required staff.

From December 29, 2014 to March 31, 2015, documentation indicated that for 3CMS inmates in administrative segregation, weekly averages for group therapy were 2.55 hours scheduled, 2.44 hours offered, .15 hours cancelled, .5 hours refused, and 1.91 hours received.

Provided documentation indicated that average weekly offerings of yard ranged from seven to 11.22 hours in September 2014, 9.25 to 13.54 hours in October 2014, 11.66 to 15.50 hours in November, 10.58 to 14.12 hours in December 2014, 8.71 to 16.9 hours in January 2015, and 11.85 to 18.06 hours in February 2015.

Case-by-case reviews were done for seven 3CMS inmates in administrative segregation. Lengths of stay for six of these inmates ranged from 178 to 281 days.

MHCB:

During the review period, patient stays in the MHCB averaged 11.2 days in length. Forty-seven or 35 percent of stays exceeded ten days. At the time of the site visit, there were eight inmates in the ten-bed MHCB. Of the four who had been there longer than ten days, three were awaiting transfer to acute care and had been in the MHCB for an average of 19 days.

The MHCB was supervised by the chief of mental health. It was staffed by one full-time psychiatrist, three full-time psychologists, a half-time senior psychologist supervisor, and a half-time psychologist.

Initial IDTT meetings were timely in 80 percent of cases, and follow-up IDTT meetings were timely in 96 percent of cases. Quality of reviewed treatment plants was varied, although they did improve over the course of the review period. Form 7388Bs did not always indicate appropriate justification of decisions to not refer the inmates to higher levels of care, and were sometimes not incorporated into the IDTT process. IDTTs also did not consistently include appropriate treatment modifications for inmates who were not referred to higher levels of care.

181

Observed IDTT meetings were held in a crowded room. Placement of inmates into a holding cell hindered communication between the inmates and the psychiatrist. Not all PCs reviewed the treatment plans with the inmates.

Alternative Housing:

Provided data indicated the housing of 52 inmates in alternative housing during the review period. Of these, 36 or 69 percent had alternative housing placements that lasted 24 hours or less. The 16 alternative housing stays that lasted longer than 24 hours exceeded it by an average of 0.82 days, and the longest alternative housing stay exceeded 24 hours by an additional 2.83 days. For the months of September, October, and November 2014, the institution produced data indicating that 29 of 32 or 91 percent of alternative housing placements resulted in admissions to the MHCB.

SHU:

Mental health clinicians screened all inmates before placement in the SHU. During the review period, 212 evaluations were completed. Screenings consisted of review of the eUHR to determine whether a reliable 31-item screen or completion of Form 7386 had been done and whether the record reflected a SHU-disqualifying diagnosis. Typically, any clinically disqualified inmates were seen by the ICC and endorsed to an appropriate SHU. If a reliable screening had not already been done, one was completed. After screening, inmates were seen by the ICC.

Initial and follow-up clinical contacts were compliant for timeliness. Sixty percent of them took place in non-private settings.

Rates of timeliness of initial and follow-up IDTT meetings were 57-percent and 98-percent, respectively, though there was no data regarding the number that occurred before the ICC. The psychiatrist and psych tech, both required attendees, were typically absent.

No treatment groups beyond those offered in the PSU were provided.

An assigned PC conducted rounds every other week. Observed rounds were brief, with little to no interaction with inmates. It was unclear how the clinician could identify inmates' mental health needs unless told of them by the inmates.

PSU:

The PSU at PBSP provided mental health services at the EOP level of care. It was supervised by a senior psychologist supervisor and was staffed by a .75 contract psychiatrist, a full-time and a half-time psychologist, two psych techs, and a recreation therapist. Treatment space was adequate.

Rates of timeliness of initial and follow-up psychiatry contacts were 85-percent and 75-percent compliant, respectively.

Initial and ongoing PC contacts were timely in 95 percent and 94 percent of cases, respectively. Staff reported that treatment space was adequate.

Initial and follow-up IDTT meetings were timely in 94 percent and 96 percent of cases, respectively. Attendance by required disciplines at IDTT meetings was 96-percent compliant. No information was provided with regard to whether initial IDTT meetings preceded ICC meetings.

At an ICC meeting, all required staff and mental health supervisors were in attendance. Mental health clinicians' input was appropriate and thorough and was utilized by the chairperson in determining the inmates' housing.

Apart from the four inmates on modified treatment plans, on average 13.2 hours of treatment including group therapy and 10.2 hours of structured therapeutic activity were offered per week. When including inmates on modified treatment plans, the weekly average offerings were 6.4 hours of treatment per week and 2.5 hours of structured therapeutic activity. Three of the four inmates on modified treatment plans were referred to intermediate inpatient care, and one was admitted to an MHCB and subsequently to acute inpatient care. Because of the low census in the PSU, groups were very small and were sometimes consolidated. This led to participants being uncomfortable with disclosure of information to non-regular group members and unfamiliar with group material.

EOP:

At the time of the site visit, 78 EOP inmates, including ten on modified treatment programs, were housed on B-Yard in Building 3. Two of the ten on modified treatment programs were in the MHCB. Most of the psychiatric care was provided by telepsychiatry. There were 4.5 PCs, whose caseloads ranged from ten to 16, and two recreation therapists.

From September 1, 2014 to March 28, 2015, timeliness of initial and follow-up psychiatry contacts was 88-percent and 85-percent compliant, respectively. Approximately 83 percent of psychiatry contacts were by telepsychiatry in private settings, and approximately 17 percent of psychiatry contacts took place in private settings. There were four contacts at cell front due to staff decision or inmate refusal.

From September 1, 2014 to March 28, 2015, all initial PC contacts were timely, and 99-percent of follow-up PC contacts were timely.  From August 31, 2014 to March 1, 2015, 68 percent of PC contacts were in private settings, and 32 percent were at cell front or in other non-private settings.  Reasons for cell-front contacts included staff decision, inmate refusals, and inmates being on modified programs.

Initial IDTT meetings were timely in 86 percent of cases, as were 96 percent of follow-up IDTT meetings.  Attendance by required staff was 99-percent compliant.

During the review period, an average of 11.3 hours of weekly group treatment was offered and an average of 8.8 hours was attended.  For inmates on modified programs, on average 6.6 weekly group hours were scheduled, 6.3 hours were offered, 2.8 hours were attended, 3.5 hours were refused, and 0.35 hours were canceled.

EOP inmates were offered an option of two groups that ran Monday through Friday. They consisted of a clinician-led process group and/or a leisure group led by a recreational therapist.  A psych tech was assigned to provide health-related groups.  An observed clinician-led process group was clinically relevant and engaged all participants.

Interviewed inmates in the cognitive processing group reported that they knew their clinicians, knew how to access services, and benefitted from the mental health program. They confirmed good relationships with clinicians but indicated that some custody officers spoke negatively about inmates taking prescribed medications. They complained that only one hour of daily yard was offered.  Staff reported that offers of yard hours were not formally tracked, but estimated that inmates received 1.5 hours per week. Some group times conflicted with scheduled yard.

For EOP inmates housed in administrative segregation, average weekly group treatment hours were 4.47 hours scheduled, .25 hours cancelled, 4.22 hours received, and 1.94 hours refused.

3CMS:

The 3CMS program at PBSP had a telepsychiatrist who was shared with administrative segregation and had a caseload of 90. The full-time social worker had a caseload of 100. The second social worker was shared with other mental health programs and had a caseload of 27.

All initial psychiatry contacts and 98 percent of follow-up psychiatry contacts were timely. All five cell-front psychiatry appointments were due to inmate refusals.

Ninety-six percent of initial PC contacts and 99.8 percent of follow-up PC contacts were timely. Of the 128 cell-front PC contacts, 62.5 percent were due to inmate refusals, 28 percent were due to staff decision, one percent were due to escort unavailability, and 8.5 percent were due to unspecified reasons. According to staff, treatment space was adequate.

Ninety-two percent of initial IDTT meetings and all follow-up IDTT meetings were conducted timely. Required clinical staff attended 92 percent of meetings, with psychiatry having the highest absentee rate, due to psychiatry staffing vacancies.

Three observed IDTT meetings were attended by the senior psychologist, PC, correctional counselor, and the psychiatrist via telepsychiatry, as well as the inmates. The meetings were clinically-driven. Clinicians presented short-term and long-term goals and discussed inmates' levels of care. Two of the three inmates disagreed with the PC's treatment plans and explained why. In both cases, clinicians re-focused the meetings but did not address these inmates' apparent anxieties about their treatment plans.

186

Staff and inmates reported that groups for 3CMS inmates had not been offered since August 2014 because clinical staff were needed for EOP services.  No date for resumption of groups was provided.

Some interviewed 3CMS inmates reported seeing their clinicians quarterly, but only half reported finding 3CMS services beneficial.  They indicated that group treatment would be helpful.

Referrals:

The institution reported an overall compliance rate of 93 percent for timely response to mental health referrals.  For emergent referrals, timeliness of response was 100-percent compliant.  Urgent referrals drew a timely response in 93 percent of cases, and routine referrals drew a timely response in 94 percent of cases.  Response to referrals for medication referrals was timely in 87 percent of cases.

Heat Plan:

PBSP did not report any Stage I, II, or III heat alerts during the review period.  A list of inmates who were prescribed heat-risk medications was prepared weekly.

Access to Care:

Of the total 16,156 mental health ducats and add-on appointments reported for the review period, 68 percent were completed.  Among the non-completed ducats, 64 percent were due to inmate refusal, two percent were due to custody reasons, and 34 percent were due to otherwise unspecified non-custodial reasons.

Program Access:

a.      Job and Program Assignments:

187

Nine EOP inmates had full-time jobs.  Among 3CMS inmates, 29 had full-time jobs, one was a participant in part-time vocational education, and two were voluntary participants in academic programs.  Another 63 3CMS inmates were eligible for work training assignments, but were unassigned.

Among the non-mental health population, 488 inmates had full-time jobs, two had part-time jobs, 52 participated in part-time vocational education, and six were voluntary participants in academic programs.  Another 380 non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

      b.    <u>Milestone Credits</u>:

Fifteen of 93 EOP inmates were eligible for milestone credits, but none earned them.  Eighteen of 168 3CMS inmates were eligible for milestone credits, and one earned them.  Among the 2,372 non-mental health caseload inmates, 310 were eligible for milestone credits, and 19 earned them.

      c.    <u>Out-of-Level Housing</u>:

Three 3CMS Level III inmates were in Level IV housing.  One non-mental health caseload Level I inmate was in Level IV housing.  There were 26 non-mental health caseload Level II inmates in Level I housing, and two non-mental health caseload Level II inmates in Level IV housing.  Thirty-six non-mental health caseload Level III inmates were in Level IV housing.

      d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

PBSP was not on the roll-out schedule for the revised ADA accommodation and grievance procedure, which includes appeals regarding accommodations for psychiatric disabilities.

188

e.     <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

An interviewed correctional counselor reported that EOP inmates typically were reviewed and received class score reductions similar to non-EOP inmates for successful programming, although not necessarily semi-annually.

<u>*Coleman* Postings</u>:

*Coleman* postings in English and Spanish were observed in all reviewed housing units.

### High Desert State Prison (HDSP)
May 12, 2015 – May 14, 2015

<u>Census</u>:

On May 12, 2015, HDSP housed 3,303 inmates, for a ten-percent decline from the census of 3,762 that was reported for the preceding monitoring period.  There were 871 inmates on the mental health caseload, which had grown by ten percent since the prior monitoring period and comprised 26 percent of the total inmate population.

The MHCB unit housed ten inmates.

There were five mainline EOP and 842 mainline 3CMS inmates; the 3CMS population represented a 27-percent population increase.  The administrative segregation population of 182 included one EOP inmate who was at HDSP for court proceedings and 13 3CMS inmates.  The administrative segregation 3CMS population had decreased by 81 percent since the previous monitoring round.

<u>Staffing</u>:

Positions for one of two chief psychologists were filled.

Both psychiatrist positions were vacant.

189

All three senior psychologist positions were filled.  Of 12 psychologist positions, eight were filled, for a 33-percent vacancy rate.  Two psychologists were unlicensed.

Positions for the supervising social worker, eight social workers, and one recreational therapist were filled.  Six social workers were unlicensed.

The senior psych tech position was filled.  Nine of 14 psych tech positions were filled, for a 36-percent vacancy rate.

The HPS I position was filled, but the CHSA II position was vacant.  Four of seven mental health clerical positions were filled, for a 43-percent vacancy rate; one of the vacant positions was a salary savings that permitted the hiring of an OSS II in the blanket.

Four full-time and two part-time telepsychiatrists served HDSP.  There was an average of 509 monthly individual and IDTT meeting telepsychiatry appointments.

Quality Management:

The local governing body met monthly between September 2014 and February 2015. Maintained meeting minutes only indicated a quorum for two months.  Issues that the local governing board addressed included suicide prevention and alternative housing.

The quality management committee met monthly, kept meeting minutes, and reported a quorum for five of six months.  Numerous subcommittees, including mental health, routinely reported to the quality management committee.

The mental health subcommittee met five times during the review period; minutes indicated a quorum for only one meeting.  The mental health subcommittee addressed many mental health-related issues, including peer review, updating LOP, access to care, dashboard review, audits, and CAPs for mental health matters.

HDSP implemented several CAPs and conducted monthly performance reports. Among other issues, they addressed PC documentation, MHCB/DSH inmate discharges that were not readmitted within 30 days, SREs, five-day follow-up discharges, administrative segregation EOP inmate transfers to EOP hubs, and mental health referrals. An audit on agreement between eUHR records and MHTS.net information indicated 99-percent compliance from September 2014 to February 2015. No QITs were chartered.

The institution conducted internal peer review for one psychologist and one social worker. As peer review was in its infancy, HDSP reported that trends or patterns had yet to emerge.

<u>Medication Management</u>:

The institution did not provide MAPIP data for laboratory testing of inmates who were prescribed mental health medications and there were no other audits of prescribed psychiatric medications.

At 72-percent compliance, nursing transfer measures largely reported noncompliance. There was 98-percent compliance for medication continuity following parole, but no other nursing transfer measures exceeded 90 percent. Medication continuity after MHCB discharge was 86-percent compliant, and medication continuity after discharge from a community hospital or DSH inpatient program was 83-percent compliant.

Other nursing transfer measures reported much lower compliance rates. There was 54-percent compliance for medication continuity upon inter-institutional transfer at R&R, 66-percent compliance for continuity of nurse administered/Direct Observation Therapy (DOT) medication with intra-institutional transfers, and 44-percent compliance for medication continuity after transfer to a locked unit.

Medication compliance measures averaged 86 percent.  There was 92-percent compliance for timely provider visits after refusal or no show.  There was 85-percent compliance with psychiatry-prescribed medications, 81-percent compliance for involuntary medications, and a compliance rate of 86 percent for medical-prescribed medications.

Medication administration measures averaged 90 percent.  There was 99-percent compliance for psychiatric-prescribed chronic care medications, medical-prescribed chronic care medications, and new psychiatric medications.  New medical-prescribed medications averaged 93 percent compliance.  Compliance with chronic care TB medications was noncompliant at 58 percent.

All psychiatric medications were provided DOT.

During the site visit, 308 inmates were prescribed HS medications.  Staff reported conflicting times for the evening medication pass that ranged from 7:00 p.m. to 9:45 p.m.  Most inmates indicated receiving HS medications after 8:00 p.m. and reported pill lines that lasted from 20 to 25 minutes.

Mental health staff were unable to report the percentage of inmates who received psychiatric medication following parole.  The pharmacist estimated that more than 95 percent of inmates received parole medication.

Transfers:

Seven inmates were referred to acute inpatient care.  All referral packets were completed timely.  One was rescinded.  One Vitek hearing did not find in favor of the inmate.  DSH accepted the remaining six acute care referrals, of which two transferred timely.  The four untimely transfers all took place after between 14 and 17 days.  All six transfers were within 72 hours of a bed assignment.  During the site visit, there were no inmates pending DSH transfer.

192

Review of the non-referral log indicated inadequate non-referral rationales. The non-referral rationale for more than 90 percent of entries was that the inmate's current level of care was clinically indicated. The reason for non-referral in the remaining cases was the inmate's assessment in the MHCB. Non-referral log notations were also uninformative as to the clinical rationale why the current level of care was clinically appropriate or concerning MHCB assessment results.

There were 161 MHCB placements, involving 144 inmates.

No inmates housed at HDSP were transferred to a PSU.

Eleven of 12 or 92 percent of EOP transfers to hubs were timely.

Three of 13 or 23 percent of inmates that HDSP identified for EOP level of care timely transferred to mainline EOP programs. The ten untimely transfers averaged 35 days overdue, with a range of one to 130 days; the inmate who transferred after 130 days had a medical hold. Lack of EOP beds was the reason for delays.

During the site visit, one of five of HDSP's mainline EOP inmates had a medical hold. Three of the four remaining inmates were pending transfer to an EOP program for less than 60 days; the fourth inmate was pending transfer for 69 days.

HDSP was unable to report administrative segregation length of stays during the review period. On April 20, 2014, two EOP and 13 3CMS inmates were housed in administrative segregation. The two EOP inmates had stays of 34 and 31 days. The 13 3CMS inmates' stays averaged 66 days and ranged from ten to 230 days. All three mental health caseload inmates housed in the stand-alone administrative segregation unit were transferred within 24 hours of mental health designation.

Other Issues:

<u>MHSDS Inmates in Administrative Segregation</u>:

For administrative segregation 3CMS inmates, HDSP reported 91-percent compliance for initial psychiatry contacts and 96-percent compliance for follow-up contacts.  For PC contacts, there was 90-percent compliance for initial contacts and a compliance rate of 95 percent for follow-up contacts.

Initial IDTT meetings for 3CMS inmates were 92-percent compliant; follow-up meetings were 100-percent compliant.  Data indicated that required staff attended 100 percent of meetings.

Beginning March 2, 2015, HDSP had begun transferring segregated 3CMS inmates to the newly-created STRH, resulting in a significant decrease in the institution's administrative segregation 3CMS population.  Inmates were selected for STRH transfer based on their administrative segregation length of stay; inmates with the longest stays were transferred first.  However, clinicians reported that they were not provided with detailed information about the STRH's functioning or available programming, limiting their ability to adequately prepare inmates for the move.

Observed IDTT meetings revealed attendance by all necessary staff and access to required information.  The meetings were well-run and demonstrated all disciplines' active participation, including telepsychiatry.  However, IDTT meeting space was inadequate; staff had to stand or sit on tables.

Groups for 3CMS inmates had decreased with the declining administrative segregation MHSDS population.  An observed psych tech-led anger management group was adequately conducted.  However, the group treatment space was inadequate; groups took place in a line of holding cells that limited interaction among participants, and lacked auditory and visual privacy.

Interviewed group members reported mental health staff's general accessibility.  They also indicated that psych tech rounds regularly occurred and that mental health staff took adequate time to talk to them and follow-up on their concerns.  They also generally reported good treatment by custody.  However, some expressed a perception of mental health staff's reluctance to provide the intense treatment that they believed they required.

All six inmates who were housed in administrative segregation for 150 days or more on September 22, 2014 had their case by case review and were subsequently released from the unit.

MHCB:

HDSP's CTC had ten designated mental health beds, which were often filled to capacity.  Room 11, which was also used for seclusion and restraint, was the primary overflow cell.  In contrast to the previous site visit, when HDSP provided more than 70 percent of MHCB referrals, during the review period 90 percent of the institution's MHCB referrals originated from facilities other than HDSP.  HDSP mental health staff nonetheless reported good MHCB access as well as good communication with sending institutions regarding clinician-to-clinician contacts and transmittal of relevant documentation.

From October 6, 2014 through April 5, 2015, stays for the 161 MHCB placements averaged seven days.  Thirty or 19 percent of MHCB stays exceeded ten days, with a range of 11 to 37 days.

HDSP reported compliance for initial psychiatry contacts, but only 66-percent compliance for follow-up contacts.  For PC contacts, there was 83-percent compliance for initial contacts and 90-percent compliance for follow-up contacts.  There was only 73-percent compliance for initial IDTT meetings, but a compliance rate of 98 percent for follow-up IDTT meetings.

195

Observed IDTT meetings indicated the presence of required disciplines, active telepsychiatry participation, and good staff rapport with inmates. Necessary information was available. Decisions concerning issue and privileges were discussed with inmates and were made with adequate consideration of inmates' individual risk factors. However, case presentations were sparse and typically did not address inmates' diagnoses, medications, and positive factors for higher level of care consideration, while staff interactions with inmates were often limited.

Inmates arrived to IDTT meetings handcuffed, but the cuffs were removed following inmate placement in the therapeutic module. Inmates, including those in a suicide smock, sat on the bare metal seat in the therapeutic module and it was not cleaned afterwards.

Seclusion and Restraint:

Overall, seclusion and restraint were appropriately used. There were 23 instances of seclusion, involving 15 inmates; one inmate required seclusion four times, two required seclusion three times, and one required seclusion twice. One instance of restraint lasted less than 24 hours.

Alternative Housing:

All 44 alternative housing placements were within timeframes.

3CMS:

For 3CMS inmates, there was 95-percent compliance for initial psychiatry contacts and 94-percent compliance for follow-up contacts. Only 76 percent of initial PC contacts were timely, but 95 percent of follow-up contacts were timely. Mental health leadership reported that PCs were typically directed to meet with inmates at least monthly and to increase contacts as

clinically indicated.  Inmates reported meeting with their PCs anywhere from twice weekly to quarterly and expressed being able to increase these contacts as needed.

Eighty-four percent of initial IDTT meetings were timely, as were 99-percent of follow-up meetings.  Required staff attended IDTT meetings 95 percent of the time.  Of 29 IDTT meetings that all required staff did not attend, the correctional counselor was not in attendance 100 percent of the time, and the psychiatrist missed 23 of 29 or 79 percent of meetings.

3CMS inmates reported telling custody when they needed an immediate appointment with mental health staff, but indicated that custody routinely did not respond quickly to such requests.  Inmates further reported knowing of other inmates who engaged in self-injurious behavior as a result of custody's delayed responses to inmates' requests to meet with mental health staff.  Some inmates reported that their property was damaged when they requested immediate mental health assistance.

Two observed IDTT meetings were conducted in private offices with adequate light and computer access; all required staff attended.  Psychiatry input was minimal during one of the meetings, but was more extensive during the other.  The IDTT meetings demonstrated minimal inmate input as to current level of functioning and treatment goals.  Inmates were asked to sign treatment plans without having reviewed them, which was problematic.

During the site visit, HDSP did not provide groups for 3CMS inmates, although inmates had expressed interest in such groups.

Observed private offices that mental health staff used for 3CMS inmate treatment on B Yard indicated adequate light, space, and computers.  However, staff routinely reported insufficient office space, which compromised confidentiality and interfered with mental health services, requiring collaboration, flexibility, and communication among staff.

197

Mental health staff reported that HDSP's telepsychiatrists had provided a stabilizing influence in the provision of mental health services.  Staff also expressed satisfaction with the availability of telepsychiatry and its treatment team participation.  At the time of the site visit, two telepsychiatrists had visited HDSP.

Referrals:

HDSP reported 92-percent compliance for timely response to 1,123 mental health referrals.  There was 100-percent compliance for response to 64 emergent referrals, 89-percent compliance for response to 46 urgent referrals, and 91-percent compliance for response to 1,013 routine referrals.

Mental Health/Custody Relations:

Mental health staff reported generally good relations with custody staff.

Heat Plan:

There were no stage I, II, or III heat alerts during the review period.  Review of the administrative segregation heat log revealed the recording of temperatures every three hours. HDSP reported inmates who were prescribed heat-sensitive medications on a weekly basis.

Use of Force:

HDSP reported that 100 percent of mental health staff and 58 percent of custody staff had been trained in the new use of force policy.

Access to Care:

HDSP issued a total of 8,999 ducats and add-on appointments for mental health services, of which 7,095 or 79 percent were completed.  As to the non-completed ducats, 1,057 or 56

198

percent were due to inmate refusal, four or zero percent were not completed due to custody reasons, and 843 or 44 percent were not completed due to non-custodial reasons.

Program Access:

a.  Job and Program Assignments:

As HDSP did not have an EOP program, there were no EOP inmates with work training assignments.  Of 3CMS inmates, 284 had full-time jobs, of which 183 were paying and 101 were non-paying positions.  Of eight inmates with part-time employment positions, six were paying and two were non-paying.  There were 87 3CMS inmates with part-time, non-paying academic positions.  There were 22 3CMS inmates with full-time, unpaid, vocational education positions, and 26 3CMS inmates with part-time, unpaid, vocational educational positions.

Of non-mental health caseload inmates, 900 had full-time employment assignments, of which 602 were paying and 298 were non-paying positions.  Another 18 non-mental health inmates had part-time jobs, of which 11 were paying and seven were non-paying.  There were 178 non-mental health caseload inmates with part-time, unpaid, academic positions.  Eight non-mental health inmates were enrolled in full-time vocational educational programs, and 28 were enrolled in part-time vocational education programs, all of which were non-paying.  One EOP, 346 3CMS, and 883 non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

b.  Milestone Credits:

On March 31, 2015, zero of five EOP inmates were eligible to earn milestone credits.  Of 891 3CMS inmates, 142 were eligible to earn milestone credits, of which 34 or 24 percent earned them.  Of 2,484 non-mental health caseload inmates, 538 were eligible to earn milestone credits, with 91 or 17 percent earning them.

c.  <u>Out-of-Level Housing</u>:

One 3CMS custody Level I inmate was housed in Level IV housing and ten non-mental health caseload custody Level I inmates were housed in Level III housing.  There were 37 3CMS custody Level II inmates housed in Level III housing and one 3CMS custody Level II inmate housed in Level IV housing.  There were 66 non-mental health caseload custody Level II inmates housed in Level I housing, 109 non-mental health caseload custody Level II inmates housed in Level III housing, and four non-mental health caseload custody Level II inmates housed in Level IV housing.

There were 50 3CMS custody Level III inmates housed in Level IV housing and 120 non-mental health caseload custody Level III inmates housed in Level IV housing.  There were also three non-mental health caseload custody Level IV inmates housed in Level III housing.

d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

HDSP had yet to implement the revised ADA reasonable accommodation and grievance procedures.

e.  <u>Periodic Classification Score Reductions for EOP inmates</u>:

EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates for successful programming.

<u>*Coleman* Postings:</u>

There were *Coleman* postings in administrative segregation unit D-8 in both English and Spanish.

200

## California Correctional Center (CCC)
May 15, 2015

Census:

As of May 15, 2015, the total inmate population of CCC was 4,135, a six-percent decline since the preceding monitoring period. CCC did not physically house 1,712 of these inmates, who were located at a conservation camp.

At the time of the site visit, no mental health caseload inmates were at CCC. There were 178 inmates in administrative segregation.

Staffing:

The senior psychiatrist position was vacant. Positions for the senior psychologist, four staff psychologists, and the clinical social worker were filled.

Two of 5.2 psych tech positions were filled. Use of one contract psych tech reduced the functional vacancy rate to 42 percent.

The HPS I position was filled. Two of three mental health clerical positions were vacant, leaving a 67-percent vacancy rate.

There were 14 psychiatry telemedicine contacts during the review period.

Quality Management:

The quality management committee met monthly from September 2014 through February 2015, maintained minutes, and always achieved a quorum. Various subcommittees including the mental health subcommittee routinely reported to the quality management committee.

During the review period, the mental health subcommittee held six meetings and achieved a quorum at three. Minutes were maintained. The subcommittee addressed training of

201

medical and nursing staff on suicide prevention, inmate safety, and access to care and other custody-related matters.

CCC implemented CAPs on timeliness of IDTT meetings and PC contacts.  Monthly audits from September 2014 through February 2015 on eUHR/MHTS.net concordance found 100-percent compliance.  No QITs were chartered.

There was no peer review at CCC during the review period.

Medication Management:

At the time of the site visit, no inmates were taking prescribed psychotropic medications. Staff reported that when inmates were prescribed these medications, they were monitored by a psych tech pending transfers to mental health programs at other prisons.

Transfers:

No inmates were referred or transferred to intermediate or acute inpatient care during the review period.  At the time of the site visit, no transfers to inpatient care were pending.

All six transfers to MHCBs at other institutions were done within 24 hours of referral.

All three OHU placements and both alternative housing stays complied with timeframes. One OHU placement and both alternative housing stays resulted in transfers to outside MHCBs.

Transfers of all eight inmates identified at the 3CMS level of care to 3CMS programs at other institutions were completed within timeframes.

Other Issues:

MHSDS Inmates in Administrative Segregation:

CCC reported 100-percent compliance for timeliness of initial and follow-up PC contacts, and initial and follow-up IDTT meetings for 3CMS inmates in administrative segregation.

Discussions with a psych tech and supervisory and line clinical staff indicated inconsistencies in their understanding of some mental health policies and procedures. While all agreed that any incoming inmate exhibiting signs of distress or acute mental illness would receive a mental health referral, there were discrepancies in their understanding of the role of inmates' histories of mental illness in deciding whether to refer inmates to mental health staff for assessment. There was also vagueness surrounding policy and procedure on mental health staff seeing non-mental health caseload inmates.

Alternative Housing:

The OHU at CCC had 14 beds for both medical and mental health inmates. Two psychologists were assigned full-time to the OHU and alternative housing. Two OHU cells, which were also used as contraband cells, were not retrofitted for suicide-resistance. Inmates in the OHU pending MHCB transfers were under direct observation by psych techs.

Eleven additional cells were designated as alternative housing and were used for OHU overflow.

3CMS:

CCC reported 100-percent compliance for timely initial and follow-up IDTT meetings for mainline 3CMS inmates.

Referrals:

The institution reported 100-percent compliance for response to the two emergent referrals, 95-percent compliance for the 22 urgent referrals, and 98-percent compliance for the 185 routine referrals.

Heat Plan:

CCC did not report any stage I, II, or III heat alerts during the review period.

203

RVRs:

The institution reported that CCC mental health clinical staff attended training on the new RVR process on September 4, 2014.

Use of Force:

CCC reported that 100 percent of mental health staff were trained on the new use-of-force policies. As of April 10, 2015, only 39 percent of custody staff had received this training.

Access to Care:

There were 226 mental health ducats and add-on appointments from September 2014 through February 2015. Eight percent there were not completed, due to reasons other than inmate refusals or custody reasons.

Program Access:

a.       Job and Program Assignments:

One thousand thirteen non-mental health caseload inmates had full-time employment positions and two had part-time positions.

Ninety non-mental health caseload inmates had full-time academic positions, 381 had part-time academic positions, 214 had full-time vocational education positions, and 70 participated in part-time substance abuse treatment programs.

One hundred four non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

b.       Milestone Credits:

As of March 31, 2015, no mental health caseload inmates were eligible to earn milestone credits. Of 4,188 non-mental health caseload inmates, 2,694 or 64 percent of inmates were eligible to earn milestone credits, and 26 percent actually earned them.

      c.      <u>Out-of-Level Housing</u>:

No mental health caseload inmates were in out-of-level housing at CCC.

      d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CCC had not yet implemented the revised ADA reasonable accommodation and grievance procedures.

      e.      <u>Periodic Classification Score Reductions - EOP Inmates</u>:

CCC did not house EOP inmates.

**<u>Mule Creek State Prison (MCSP)</u>**
March 23, 2015 – March 25, 2015

<u>Census</u>:

As of March 20, 2015, MCSP housed a total of 2,841 inmates, for a decline by seven percent since the preceding monitoring period.  The mental health caseload population was 1,705 or 60 percent of the total population.  There were 517 inmates in the mainline EOP and 1,062 inmates in the mainline 3CMS.  The MHCB and the Mental Health Outpatient Housing Unit (MHOHU) each held five inmates.

There were 148 inmates in administrative segregation.  Nineteen inmates were on NDS status.  The administrative segregation EOP hub held 64 EOP inmates.  Three EOP inmates were pending transfer to another hub and one was pending transfer to a PSU.  There were 50 3CMS inmates in administrative segregation.

<u>Staffing</u>:

On March 20, 2015, the chief psychiatrist position and two chief psychologist positions were filled.

Of the institution's 12.5 psychiatrist positions, 6.5 were filled, for a vacancy rate of 48 percent. Use of 3.4 Full-time Equivalent (FTE) registry psychiatrists reduced the functional vacancy rate in psychiatry to 21 percent.

Nine of the 11 senior psychologist positions were filled, for an 18-percent functional vacancy rate. MCSP filled 31 of its 40.5 staff psychologist positions, with a resulting vacancy rate of 23 percent that was reduced marginally to a functional vacancy rate of 22 percent with use of a .7 FTE registry psychologist.

The supervising social work position was filled. Seventeen of the 20.5 social work positions were filled. The 17-percent vacancy rate in social work was reduced to a functional vacancy rate of six percent with use of 2.2 FTE registry social workers.

Both senior psych tech positions were filled. Of the 33.6 psych tech positions, 31 were filled, for an eight-percent vacancy rate.

Twelve of the 19 recreation therapist positions were filled, leaving a vacancy rate of 37 percent.

With five of the six administrative support positions filled, the vacancy rate was 17 percent. There were 20 mental health clerical positions of which 15 were filled, leaving a vacancy rate of 25 percent.

Quality Management:

Mental health leadership described the quality improvement process at MCSP as very helpful and continuing to improve. Information on changes in quality improvement functions was disseminated to line staff via meetings and by email.

Review of minutes of a local governing body meeting in October 2014 indicated that required members attended. Activities included updates from the medical executive committee,

206

discussions of policies and procedures, a performance improvement work plan, licensing reports, and construction reports.

Minutes of monthly QMC meetings during the review period indicated attendance by all required disciplines except psychiatry, which later improved upon the hiring of a chief psychiatrist. The committee took up healthcare improvement projects, a healthcare disaster plan, in-fill projects, updates from the institution's CEO, information on policies and procedures, issues surrounding access to care, a performance improvement work plan, review of the dashboard, and reports from the mental health director, nursing director, and chief pharmacist. Minutes of the mental health subcommittee meetings were reviewed. The committee met twice per week with generally good attendance except by psychiatry, which was affected by a staffing vacancy issue. Agendas were broad in scope, including reports on the RVR process, the MHCB, health information management, program-by-program access to care, EOP treatment hours, QITs, DSH, suicide prevention, reports from nursing, and such matters within mental health programs as staffing and performance improvement projects, including the sustainable process for inmate access to higher levels of care. Audits using the mental health dashboard were conducted regularly. Results were used as a management tool, and corrective actions were developed and implemented as needed.

Active QITs during the review period addressed five-day clinical follow-up, timeliness of mental health referrals, in-fill planning, testing of concordance between eUHR s and MHTS.net, and EOP treatment hours. The last two QITs were resolved during the review period. There were active FITs on suicide prevention and the administrative segregation EOP, among others. Documentation of these activities was good.

All psychologists and social workers who had been at the institution for at least six months underwent peer review during 2014.  The process involved both qualitative and quantitative reviews of charts.  The applicable LOP at that time was followed.  Psychiatrists working in the MHCB during the review period underwent peer review, but a new process for psychiatry peer review was being developed at health care services at headquarters.

Medication Management:

Provided results from MAPIP audits generally indicated compliance with continuity of medications following intra-institutional moves.  However, other compliance scores indicated that there were issues with continuity of medications following MHCB transfers and discharges from DSH or community hospitals, inmates' compliance with psychiatrist-prescribed medications, and administration of medications outdoors and in chronic-care situations.  Data was not available on timeliness of new orders, timeliness of renewals after discharges from the MHCB or OHU, or continuity following moves into or out of administrative segregation. It was observed that the methodology employed at MCSP deviated from MAPIP protocol. Samplings were taken quarterly rather than monthly.  It was unclear whether the list of inmates receiving psychotropic medications covered the entire review period.  Data on all nursing measures and two psychiatry measures was missing for the final quarter of 2014.  Some pharmacy results were also absent for December 2014.  It also appeared that the disciplines involved in the MAPIP process did not meet to review the entire MAPIP results.

Staff reported that a process was in place to ensure that medications were renewed in a timely manner.

Medication orders were written for no longer than 90 days, and bridge orders for no longer than 30 days. Inmates on bridge orders were given appointments with the psychiatrist within 14 days.

Written informed consents were being obtained consistent with Program Guide requirements, according to MAPIP results.

MAPIP results generally indicated adherence to protocols for laboratory testing of blood levels for inmates receiving psychotropic medications, although there were some methodological issues with these audits.

Twenty-two inmates were receiving medications via DOT. A centralized list of these inmates was kept, but the process for verifying staff's consultation of the list or MARs was overly informal and vague.

At the time of the site visit, 45 inmates were receiving involuntary medications per 2602 designation. Nine were initiated at other institutions, three were initiated at MCSP, and 20 were renewed during the review period. Staff reported that force was used rarely, if ever, in administration of involuntary medications.

It was reported that HS medications were administered at 8:00 p.m.

Parole medications were being provided to inmates consistently with Program Guide requirements.

Transfers:

At the time of the site visit, MCSP had a full-time DSH coordinator and an acting DSH co-coordinator. Communication between MCSP and DSH about current or returning patients was generally good. MCSP was given adequate notice of returning inmates and legible and

useful discharge summaries. The DSH coordinator attributed any backlog on the DSH waitlist to lack of DSH beds and not to CDCR practices.

The referrals logs contained most of the required information.   In the non-referral logs, there were some entries of "not in best interest of patient."  Headquarters staff had already instructed staff to not use this language, and review of an updated log indicated that it had stopped.

During the review period, MCSP referred 29 inmates to acute inpatient care, all at Vacaville Psychiatric Program at CMF (VPP).  All referral packets except one were completed timely.  Two referrals were rescinded and none were rejected.  Of the 27 patient transfers, six or 22 percent did not transfer within the ten-day time limit, transferring in 11 to 15 days.  Five or 19 percent of patient transfers did not occur within the 72-hour time limit following bed assignment.

MCSP referred 38 inmates to intermediate inpatient care during the review period.  Six referrals were rescinded, one was on medical hold, and none were rejected.  Of the 31 inmates who transferred, seven or 23 percent were transferred later than the 30-day time limitation, waiting from 31 days to 58 days to transfer.  Five or 16 percent were moved later than 72 hours after bed assignment.

At the time of the site visit, one inmate referred to acute care and two referred to intermediate care were awaiting transfer, all still within Program Guide transfer time limits.

There were 146 inmate transfers to outside MHCBs during the review period.  The average time from request to transfer was 32 hours, and the range was 4.77 hours to 105.4 hours.  Ninety-two or 63 percent of transfers were beyond 24-hour time limitation on transfer to an MHCB.  However, transfer times improved significantly over the course of the review period, from a compliance rate of five percent in August 2014 to a compliance rate of 90 percent in

210

January 2015.  For 76 or 83 percent of the 92 late transfers, reasons for the untimely transfers were listed as "no MHCB available," "lack of MHCB," or "bed availability."  Another reported reason was completion of medical clearances.   Staff also reported that earlier in the review period, it was erroneously believed that transfer time was calculated from when HCPOP assigned a bed number, rather than from the time of IDTT referral.  This misunderstanding was cleared up by a headquarters memorandum dated December 23, 2014.  Staff reported that the clinical director and the MHCB clinical supervisor established a work group to expedite medical clearances, and that the chief of mental health and the associate warden for health care were working on streamlining the transfer process.

During the review period, 24 inmates were transferred to a PSU.  Only one transfer exceeded the 60-day time limitation.

There were 363 placements in the MHOHU during the review period.  Of these, 179 did not result in admissions to an MHCB, and 23 percent exceeded the 72-hour timeframe for transfer out of the MHOHU, with the average overly-long stay .2 days overdue and the longest stay lasting five days.  Among the 184 MHOHU placements which resulted in transfers to MHCBs, 21 percent exceeded the 24-hour transfer time limit, with the average overly-long stay exceeding the time limit by .2 days and the longest stay lasting 3.8 days.

Other Issues:

Administrative Segregation EOP:

At the time of the site visit, inmates' stays in MCSP's administrative segregation hub ranged from one to 184 days, with an average stay of 48.2 days

Mental health pre-screens were not completed in 20 percent of cases.  Staff reported that this was due to psych tech training issues, which were subsequently corrected.

211

Only 11 percent of initial mental health assessments were completed before inmates' initial IDTT meetings.  Institutional staff reported that they had been unaware that these assessments should precede the meeting, and that the practice had recently been corrected.

One hundred percent of inmates were seen monthly by a psychiatrist.  Seventy-one percent of these contacts were cell-front.

The eight PCs assigned to the hub had caseloads of five to ten patients.  PC contacts occurred within Program Guide timeframes in 94 percent of cases during the review period.  Forty-seven percent of these contacts were cell front.  Treatment space was inadequate, but this was expected to be remediated by an in-fill project.

Inmates were given follow-up IDTT meetings quarterly, and inmates on modified programming received IDTT meetings monthly.  Required disciplines attended 98 percent of IDTT meetings, although the August 2014 rate for full attendance was reported to have been 15 percent due to psych tech staffing issues.  Access to the eUHR, SOMS, and ERMS was available during the meetings.  At five IDTT meetings observed during the site visit, all required disciplines attended, and two of the five inmates attended.  There was good interdisciplinary discussion among team members.

Staff reported that during the review period, 100 percent of initial IDTT meetings occurred before initial ICC meetings.

Inmates were offered an average of 14.28 hours per week of structured therapeutic activity, and received an average of 7.76 hours.  It was reported that mental health staff received training on new procedures to deal with treatment refusals, and that custody staff would be receiving the training in the near future.  Groups were conducted in the dayroom in the housing

unit, Building 12, with use of therapeutic modules. Three sets of modules were placed in a semi-circle, but one set was significantly lacking in auditory privacy.

Institutional data indicated that 96 inmates, or an average of 16 per month, had been on modified programming during the preceding six months. These inmates' treatment plans called for more frequent IDTT meetings and treatment planning directed at increasing participation in out-of-cell structured therapeutic activity. Five inmates on modified programming moved into full EOP programming during the review period.

Yard was scheduled on a rotation of every other day, including for the walk-alone yards. Staff reported that inmates had access to a minimum of 12 hours of yard or walk-alone time per week. Rates of yard offerings to eligible inmates were reported as 92 percent for August 2014, 39 percent for September 2014 due to power outages, 96 percent for November 2014, 100 percent for December 2014, and 83 percent for January 2015.

Rates of offers of showers to inmates were reported as 97 percent for August 2014, 76 percent for September 2014, 97 percent for December 2014, and 98 percent for January 2015. Electrical entertainment devices were available to inmates in the administrative segregation unit.

MHCB:

Eight of the ten beds in the CTC were used for mental health purposes and were suicide-resistant. The CTC was filled at the time of the site visit. Clinical space for individual contacts was limited but space used by the IDTT was adequate.

There were 86 admissions to the MHCB during the review period. The average stay lasted 17.8 days, with a range of less than one day to 76 days. Fifteen inmates had three or more admissions, including one with seven, one with six, one with five, one with four, and eight with three.

213

The institution reported that 92 percent of initial SREs and 89 percent of follow-up SREs were completed timely.

One psychiatrist was assigned to the MHCB. For the period September 1, 2014 to March 9, 2015, the institution reported that 95 percent of initial psychiatry contacts were timely. Among the reported 214 follow-up psychiatry contacts during the same period, 206 or 96 percent were timely.

From September 1, 2014 to March 9, 2015, 77 or 95 percent of the 81 initial PC contacts were timely. All 221 follow-up PC contacts during that period were timely.

Documentation indicated that IDTT meetings were conducted timely, with all required disciplines present. At observed meetings, clinicians had good rapport with their patients and were familiar with their capabilities. However, multiple inmates were brought in wearing only suicide smocks and were asked to straddle the chair, creating uncomfortable and unsanitary conditions for no apparent justifiable reason.

Seclusion and Restraint:

The restraint log indicated that seven inmates had 12 uses of restraints, lasting from 50 minutes to four days. No documented reasons for these uses were provided at the time of the site visit.

Alternative Housing:

The institution had a designated MHOHU consisting of six modified cells, numbered 110 to 115 located in Building C 13, an administrative segregation unit. Each cell had a call light. These cells were unsuitable for use as a MHOHU, and institutional staff were advised of same. Staff reported that the MHOHU utilized treatment modules for confidential contacts, and treatment modules or clinicians' offices, as available, for all other contacts.

214

There were also five cells, numbered 107 to 109, 116, and 117, also in administrative segregation, designated as MHOHU overflow. Custody reported that the cells on either side of these cells were offline so that mental health inmates would not be housed adjacent to administrative segregation inmates. In addition, there were two alternative housing cells in the Triage and Treatment Area (TTA), four in Receiving and Releasing, and up to two contraband watch cells, if needed. Staff reported that only the MHOHU and MHOHU overflow cells in administrative segregation were used during the review period.

From August 1, 2014 to February 15, 2015, there were 363 reported MHOHU placements. Of these, 184 or 51 percent resulted in referrals to MHCBs. One hundred forty-five or 79 percent of these transfers to MHCBs were timely. There were 41 placements in alternative housing outside the MHOHU, with 93 percent of them resulting in timely discharges or transfers.

EOP:

EOP inmates at MCSP were housed in Building 5 on A-yard and in Buildings 6 and 7 on B-yard.

Three psychiatrists assigned to the EOP had caseloads of 104, 117, and 132 patients, respectively. Another two psychiatrists who amounted to less than two FTEs had caseloads of 66 and 88 patients, respectively. Ninety-four percent of the 2,338 initial psychiatry contacts during the review period were completed timely. Follow-up psychiatry contacts were noncompliant, with only 79 percent of the 31,171 contacts conducted timely. Of the 3,494 total psychiatry contacts during the review period, 508 or 17 percent were conducted via telepsychiatry.

Apart from the telepsychiatry contacts, there were 2,909 psychiatry contacts, 2,812 or 97 percent of which were conducted in private settings and 97 or three percent of which were

215

conducted in non-private settings.  Among the 97 psychiatry contacts in non-private settings, 41 or 42 percent were out of cell.  Of the remaining 56 or 58 percent of psychiatry contacts which were cell front, 28 or 50 percent were due to inmate refusals, 23 or 41 percent were due to staff decisions;  three or five percent were due to "unspecified" reasons, and two or four percent were due to lack of custody escort.

There were 22 PCs assigned to the mainline EOP.  Nineteen had caseloads ranging from 21 to 27 patients, and three PCs who also had other responsibilities in the mental health program had caseloads of 12, 15, and 19, respectively.  MCSP reported that 89 percent of the 1,273 initial PC contacts from August 1, 2014 to February 15, 2015 were completed timely, as were 91 percent of follow-up PC contacts during the same period.

Of the 6,634 PC contacts in non-private settings, 3,780 or 57 percent were cell front and 2,854 or 43 percent were in non-private out-of-cell settings. Of the 3,780 cell-front contacts, 1,903 or 50 percent were the result of staff decision, 1,304 or 34 percent were for unspecified reasons, 337 or nine percent were because of inmate refusals, 233 or six percent were due to inmates being on modified programming, and three or less than one percent were due to lack of custody escort.

Five IDTT meetings were observed during the site visit.  Required staff attended, although the psychiatrists were not the patients' own psychiatrists.  Telepsychiatrists did not attend remotely because the necessary equipment had not yet arrived at the institution.  It was observed that mental health staff did not address or advocate possible treatment interventions with medical and/or custody staff as part of treatment planning.  For example, one psychiatrist erroneously told a patient that he could not receive HS medication because of  "a custody regulation."  This was brought to the attention of mental health and custody supervisory staff

216

who indicated that they would remediate the misunderstanding.  In response to another inmate's complaint of inadequate medical care for his chronic back pain, the meeting facilitator suggested the sleep/pain group to address this inmate's complaint.

During the review period, an average of 14.4 treatment hours per week were scheduled, and an average of two hours were cancelled each week.  Inmates were offered an average of 12.4 weekly treatment hours, attended an average of 7.28 hours, and refused an average of 5.12 hours.  For inmates on modified programming, an average of 12.68 hours per week were scheduled and an average of 11.07 hours were offered.  These inmates attended an average of 4.47 hours and refused an average of 6.6 hours each week.

Interviewed EOP inmates indicated that there were scheduling conflicts among groups, yard, and vocational programs, and that inmates were not credited for group attendance if they arrived more than 15 minutes late.  Inmates also reported that they did not always attend groups because they did not know the time, did not want to deal with custody, and sometimes did not feel like talking about problems.  They requested fewer leisure groups, more clinical groups including peer groups for inmates serving life sentences, a group on current events, and more visual aids to clarify the purpose of groups.  Inmates also requested sensitivity training for custody staff, particularly on first and third watches.  Inmates also reported a perception that some clinicians were afraid of custody officers and would not talk to them on behalf of their patients.  They also expressed concern about multiple clinician changes and believed that some new clinicians were unaware of patients' earlier treatment plans and goals.

3CMS:

Eighty-two percent of intake assessments of 3CMS inmates were completed within ten working days.

217

Caseloads for the three psychiatrists assigned to the 3CMS program ranged from 342 to 379. Ninety-four percent of initial psychiatry contacts were completed within the Program Guide timeframes. Eighty-seven percent of 3CMS inmates taking psychotropic medication were seen at least quarterly by a psychiatrist.

The ten PCs assigned to the 3CMS mainline program had caseloads that ranged from 85 to 116. Two additional PCs who also had other responsibilities had caseloads of five and 53, respectively.

Eighty-nine percent of 3CMS inmates were seen at least quarterly by their PCs. Staff reported that PC and psychiatry contacts took place in private settings except on A-yard, which used cubicles with privacy walls. Space for individual clinical contacts was inadequate on A-Yard.

Ninety-six percent of initial IDTT meetings were held within 14 work days of inmates' arrivals. Ninety-six percent of follow-up IDTT meetings took place at least annually. Documentation indicated that 42 percent of IDTT meetings were attended by the psychiatrist, PC, and correctional counselor. This was attributable in large part to psychiatry staffing vacancies. Custody records but not eUHRs were accessible by computer.

Staff reported that several therapeutic groups were being offered on A-Yard and a group was planned to start on B-Yard, but groups were not being offered on C-Yard. Limited staffing and treatment space were cited as reasons, particularly on B-Yard and C-Yard.

Inmates on C-Yard were interviewed. They expressed reservations about participating in group treatment because of confidentiality concerns. Several inmates had significant complaints regarding how COs were treating them. They described lack of connection between mental health services and custody staff, especially in the RVR context. Their perceptions of the mental

218

health program varied widely. Those inmates receiving psychotropic medications reported no problems with medication continuity and that they saw the same psychiatrist in a private setting approximately every 90 days. They also reported seeing their PCs with similar frequency, and some reported greater frequency. The mental health sick call process appeared to be working adequately.

SNY inmates on A-Yard were also interviewed. Several reported problems with medication continuity. Two reported not being seen by their PCs within the preceding 90 days. All complained about limited access to group therapy and lack of private settings for their clinical contacts, which took place within cubicles in a large room. Review of heath care records for four inmates on A-Yard indicated PC contacts with varying clinicians, failures to implement treatment plans, late follow-ups by psychiatry on initiations of new medications, and frequent absences by psychiatry at inmates' follow-up IDTT meetings.

<u>3CMS Inmates in Administrative Segregation</u>:

The two PCs assigned to the 3CMS administrative segregation program had caseloads of 24 and 25, respectively. Psychiatry and PC contacts were consistent with Program Guide requirements.

Initial IDTT meetings were timely in over 95 percent of cases. However, treatment space in the unit was inadequate but was expected to be improved by an infill project in the near future. 3CMS inmates in administrative segregation were not offered group therapy due to staffing and space limitations.

At the time of the site visit, inmates' stays in administrative segregation averaged 96.3 days and ranged from one to 507 days. Staff indicated that many of the long stays were due to custody-related issues such as investigations, extensions, endorsements, and RVRs.

219

As of March 2, 2015, MCSP has not been directed to transfer any 3CMS inmates in administrative segregation to the STRH or LTRH.

Referrals:

Timeliness of response to the 161 urgent mental health referrals was 94-percent compliant.  Overdue responses were late by 5.2 hours on average.  There were 393 emergent mental health referrals, which drew timely responses in 99 percent of cases.  Late responses were only six minutes overdue on average.  Response to the 2,403 routine mental health referrals was timely in 86 percent of cases, with overdue responses late by 3.6 workdays on average.

Mental Health/Custody Relations:

Staff reported good relationships between custody staff and mental health staff. However, interviewed EOP inmates reported that custody staff was disrespectful and that they remarked negatively on inmates' psychotropic medications, race, and/or sexual orientation. Inmates also reported that some custody officers commented negatively on other officers who treated inmates more appropriately.  Two specific officers on third watch were cited as problematic and were known to institutional and regional staff.  Inmates also expressed concern about cell moves that were perceived as intentional efforts to house certain inmates with incompatible cellmates.

Heat Plan:

The institution's heat plan required that temperature readings be taken every year from May 1 to October 31.  Staff reported that the heat plan was updated with added detail in April 2014 and again in December 2014.

During the site visit, 3CMS units A-1, A-2, and A-5, EOP units B-6 and B7, the MHCB, administrative segregation, and the OHU were reviewed for compliance with the heat plan.  Each

unit had thermometers in the upper officer tower, and all but one unit had thermometers on the walls between the tiers on each side of the housing unit.  Temperature readings in the housing units ranged from 68 to 74 degrees.  Heat plan postings appeared in several areas of the toured units.  It was observed that the large yard inside each facility and the smaller yards for the administrative segregation and MHCB units were uncovered and provided no cooling mist.  Heat plan coordination staff reported that every Monday morning they generated a heat medication list from Maxor and distributed it to every housing unit and facility in the prison.  Staff also reported that they provided heat card passes to affected patients.

Temperatures were not being recorded at the time of the visit because it took place outside of the heat period.  Interviewed custody and nursing staff in each housing unit were able to explain the required process including their roles in monitoring inmates' intake of water and ice and notifying nursing staff when necessary.  Custody staff reported they used the heat list for checking tiers.  Staff reported that at the end of the month, the facility captain reviewed the heat plan logs before they were submitted to the heat plan coordinator.

Eight reviewed daily activity reports contained documentation of activation and deactivation of the heat plan.  The monthly summary reports for August, September, and October 2014 were completed and submitted to the statewide heat plan coordinator.

Access to Care:

MCSP provided its monthly health care access reports for August 2014 through January 2015.  According to those reports, in August 2014, of the 3,867 mental health ducats, 3,044 or 79 percent were completed.  Of the 823 non-completed ducats, 218 or 26.4 percent were due to inmate refusals, 604 or 73.3 percent due to non-custody reasons, and no more than one or less than one percent was due to custody reasons.

In September 2014, of the total of 3,836 mental health ducats, 2,786 or 73 percent were completed.  Of the 1,050 non-completed ducats, 185 or 17.6 percent were due to inmate refusals, 860 or 81.9 percent were due to non-custody reasons, and five or less than one percent were due to custody reasons.

In October 2014, of the total 4,446 mental health ducats, 3,462 or 78 percent were completed.  Of the 984 non-completed ducats, 254 or 26 percent were due to inmate refusals, 666 or 68 percent were due to non-custody reasons, and 64 ducats or five percent were due to custody reasons.

In November 2014, of the total 3,552 mental health ducats, 2,742 or 77 percent were completed.  Of the 810 non-completed ducats, 174 or 21.6 percent were due to inmate refusals, 630 or 77.7 percent were due to non-custody reasons, and six or less than one percent were due to custody reasons.

The reports provided for December 2014 and January 2015 were not analyzed because of data errors.

<u>Construction</u>:

Through an in-fill project, an extension of the original MCSP prison is expected to be built.  It will be surrounded by a separate perimeter lethal fence but will be accessible only through the existing entrance to the prison.  The new facility will have its own R&R and medical clinic but no CTC.  The new D-Yard and E-Yard will be approximately a quarter mile from the main prison and will house 264 Level II inmates in each of three housing units that will be on each of the two yards.  Each unit will be made up of four wings that will hold 66 inmates in each wing.  D-Yard will house only mental health inmates and will have one unit, Building 18, dedicated specifically for 264 EOP inmates.  All three housing units on D yard will be air-

222

conditioned. 3CMS inmates will be housed on both D-Yard and E-Yard and will be interspersed within the other five units.

Program Access:

a.     Jobs and Program Assignments:

Provided data indicated that there were 1,505 available full-time jobs, of which 1,193 or 79 percent were filled by non-MHSDS inmates, 311 or 20 percent were filled by 3CMS inmates, and one or .06 percent was filled by an EOP inmate. There were 435 available part-time jobs, of which 307 or 68 percent were filled by non-MHSDS inmates, 128 or 32 percent were filled by 3CMS inmates, and none were filled by EOP inmates.

The institution reported 61 full-time academic assignments, of which 43 or 70 percent were held by non-MHSDS inmates, 18 or 30 percent were held by 3CMS inmates, and none were held by EOP inmates. Of the 771 part-time academic program assignments, 540 or 70 percent were held by non-MHSDS inmates, 231 or 30 percent were held by 3CMS inmates, and none were held by EOP inmates.

There were 256 vocational education assignments, of which 191 or 75 percent were filled by non-MHSDS inmates and 65 or 25 percent were filled by 3CMS inmates. Of the 68 part-time vocational education assignments, 48 or 61 percent were filled by non-MHSDS inmates and 20 or 29 percent were filled by 3CMS inmates. No full-time or part-time vocational education assignments were filled by EOP inmates.

There were 812 substance abuse treatment assignments, of which 531 or 95 percent were filled by non-MHSDS inmates and 281 or 35 percent were held by 3CMS inmates. There were no eligible EOP inmates.

223

Staff reported that 42 mental health clinical staff attended a PowerPoint training session on IDTT review of EOP inmates' suitability for program assignments and functional evaluation. Participants included psychiatrists, psychologists, social workers, and rehabilitation therapists.

b.    Milestone Credits:

MCSP reported that a total of 431 inmates were eligible for milestone credits. Of those eligible, 217 or 50 percent were non-mental health caseload inmates, 111 or 26 percent were 3CMS inmates, and 103 or 24 percent were EOP inmates. Of those inmates eligible for milestone credits, 20.74 percent of non-mental health caseload inmates earned credits, 12.61 percent of 3CMS inmates earned milestone credits and 8.74 percent of EOP inmates earned milestone credits.

c.    Out-of-Level Housing:

Institutional data indicated that three Level I 3CMS inmates and eight Level I EOP inmates were in Level III housing. Two hundred twenty-one Level II 3CMS inmates and 136 Level II EOP inmates were in Level III housing. One Level II 3CMS inmate and two Level II EOP inmates were in Level IV housing. There were six 3CMS Level III inmates and seven Level III EOP inmates in Level IV housing. There were 29 3CMS Level IV inmates and 30 Level IV EOP inmates in Level III housing.

d.    ADA Reasonable Accommodation and Grievance Procedures:

Staff submitted documentation of training for the reasonable accommodation request process, which was completed by January 26, 2015. MCSP trained 201 custody staff, according to the training records provided for review.

e.    Periodic Classification Score Reductions: EOP Inmates:

Documentation indicated that 29 EOP inmates were granted semi-annual classification score reductions for successful programming.

**Sierra Conservation Center (SCC)**
February 27, 2015

Census:

As of February 24, 2015, SCC housed 4,364 inmates, for a two-percent increase since the preceding monitoring period. The total mental health population was 637, which was 27-percent higher than during the preceding monitoring period.

The administrative segregation unit census was 106, which included 28 3CMS inmates. There were 609 3CMS inmates in mainline.

Staffing:

The senior psychiatrist position was filled. One of the two chief psychologist positions was filled but the other was kept open per a cost-saving directive from headquarters. The senior psychologist supervisor position and one of the two senior psychologist specialist positions were filled.

Two of the three staff psychiatrist positions were filled, resulting in a 33-percent vacancy rate.

The six staff psychologist positions were filled. Of the five social worker positions, three were filled, resulting in a 40-percent vacancy rate.

Three of the 3.5 psych tech positions were filled, for a 15-percent vacancy rate. The recreation therapist position was filled.

Three of the five clerical positions were filled, resulting in a 40-percent vacancy rate.

Quality Management:

225

SCC did not have a CTC. The local governing body met only as needed and did not meet during the review period.

During the review period, the quality management committee met monthly, always attained a quorum, and kept detailed minutes. Agenda items included mental health staffing vacancies and training sessions.

The mental health subcommittee met monthly, with a quorum present at all meetings. Minutes were kept. Agendas contained appropriate mental health-related items.

During the review period, SCC had two ongoing QITs that were chartered in 2013, but no new QITs. One of the ongoing QITs addressed entry of data on administrative segregation pre-screens and 31-item screens into MHTS.net. The other ongoing QIT addressed delays in processing of inmate medication non-compliance chronos and ensuring that inmates were seen by psychiatry within seven days.

An internal psychiatry peer review committee was continuing to meet. The PC peer review process was temporarily on hold. Staff reported that implementation of the new statewide peer review program for psychologists and social workers was scheduled for March or April 2015.

Medication Management:

Generally, inmates' medication compliance was at or above the 90-percent rate. However, compliance rates for continuity of medications were only 58 percent following inter-institutional transfers, and 77 percent following intra-institutional transfers. Staff attributed these rates to inmate medication refusals, and reported that the Pharmacy and Therapeutic committee had formed a QIT to address this concern.

According to MAPIP scores, compliance rates for laboratory testing of blood levels of inmates prescribed psychiatric medications were 90 percent or higher.

There were no inmates on involuntary medication orders during the review period.

Transfers:

There were no transfers to acute or intermediate inpatient levels of care during the review period.

Of the 26 inmates transferred to an MHCB, only ten or 38 percent were transferred timely. Lack of bed availability was cited as the reason for the delays.

According to the data provided, there were 45 OHU admissions during the review period. Four or nine percent of these placements resulted in stays lasting longer than 72 hours. Transfers from all 16 alternative housing placements other than the OHU were timely.

The sole transfer to a PSU during the review period was timely.

During the review period, transfers of the three EOP inmates in administrative segregation to EOP administrative segregation hubs at other institutions were timely. No EOP inmates were in administrative segregation at the time of the site visit.

Five inmates were transferred to mainline EOP programs during the review period. One transfer was late by 36 days. At the time of the site visit, there were no mainline EOP inmates pending transfer.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Compliance rates for psychiatry contacts and initial PC contacts were 100 percent. Follow-up PC contacts were 96-percent compliant.

The institution reported that 100 percent of initial IDTT meetings in administrative segregation were timely, and 95 percent of follow-up meetings were timely. Attendance by required disciplines at IDTT meetings was 79-percent compliant, as there were some absences by the psychiatrist, the CC I, or the psych tech.

Daily psych tech rounds were being conducted.

The institution reported that 15 inmates in administrative segregation for non-disciplinary reasons were identified as eligible to receive property and privileges, but the institution did not report on whether they actually received it. Determinations of eligibility for property and privileges were made by the ICC.

Twenty inmates were identified as meeting criteria for accelerated transfers out of administrative segregation. All but one, who was on a medical hold, were transferred within 72 hours.


Alternative Housing:

SCC had a ten-bed OHU. Psychiatry contacts were conducted weekly. All OHU clinical contacts were reported as taking place in private settings. At the time of the site visit, there were no mental health patients housed in the OHU. There were two alternative housing cells in the administrative segregation unit that were used for OHU overflow.

No inmates were in alternative housing at the time of the site visit.

3CMS:

Initial and follow-up psychiatry contacts were 100-percent compliant and were conducted in private settings. Psychiatry caseloads ranged from 112 to 120.

Initial PC contacts were 86-percent compliant and follow-up contacts were 100-percent compliant.  PCs' caseloads ranged from 58 to 79.

Compliance rates for initial and follow-up IDTT meetings were 79 percent and 100 percent, respectively.

Referrals:

Response to all 16 emergent referrals during the review period was timely.  There were 27 urgent referrals, 93 percent of which drew timely responses.  Responses to the 1,112 routine referrals were also 93-percent compliant.

Heat Plan:

SCC was compliant with the heat plan during the review period.  Monthly heat plan reports and temperature logs were provided for review.  During the heat period, which was July through October 2014, there were 80 Stage I heat plan activations, 202 Stage II heat plan activations, and 35 Stage III heat plan activations.  Inmates were given access to ice and extra showers during Stage II and III heat alerts.  Nursing rounds were conducted during Stage III heat alerts.  The pharmacy updated the list of inmates on heat sensitive mediations Monday through Friday and posted it to SharePoint.

Use of Force:

SCC reported that at the time of the site visit, 100 percent of both custody and mental health staff had received training on the new use-of-force policy.

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that 1,016 or 78 percent of available full-time jobs were filled by non-MHSDS inmates, and 288 or 22 percent were filled by 3CMS inmates.  There were no part-time jobs at SCC.

For part-time academic program assignments, 337 or 82 percent were held by non-MHSDS inmates, one was held by an EOP inmate, and 75 or 18 percent were held by 3CMS inmates.  There were no voluntary academic program assignments at SCC.

Non-MHSDS inmates held 186 or 77 percent of full-time vocational education assignments, and 57 or 23 percent were held by 3CMS inmates.

For part-time substance abuse treatment program assignments, 12 or 63 percent were held by non-MHSDS inmates and seven or 37 percent were held by 3CMS inmates.

      b.    <u>Milestone Credits:</u>

Institutional information indicated that during the review period, 25.64 percent of non-MHSDS inmates and 23.35 percent of eligible EOP inmates earned milestone credits.

Although SCC did not have an EOP program, all PCs and two of the three psychiatrists were trained on functional evaluation of EOP inmates for program assignments.

      c.    <u>Out-of-Level Housing</u>:

With regard to out-of-level housing of caseload inmates, institutional data indicated that on February 12, 2015, there were 14 Level I 3CMS inmates in Level II housing and one in Level III housing.  There were 88 Level II 3CMS inmates in Level III housing.  There were six Level III 3CMS inmates in Level II housing and 23 Level IV 3CMS inmates in Level III housing.  No EOP inmates were housed out of level.

      d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

SCC reported that training for the new reasonable accommodation process was held on February 23, 2015.

*Coleman* Postings:

*Coleman* postings in both English and Spanish languages were found in all buildings toured by the monitor, including the SNY yards and the administrative segregation unit. All postings were placed in areas commonly accessible to *Coleman* class members.

**California Medical Facility (CMF)**
April 14, 2015 - April 16, 2015

Census:

As of April 14, 2015, CMF had a total census of 1,810, including 1,005 inmates on the mental health caseload.

Eighty-eight inmates, including 55 EOP and eight 3CMS inmates, were in administrative segregation. There were two EOP inmates pending transfer to a PSU, one of whom transferred on the first day of the site visit. Forty-nine inmates were in the institution's MHCB known as the Mental Health Crisis Bed Facility (MHCBF).

The mainline EOP census was 417, and the mainline 3CMS census was 476.

Staffing:

The chief psychiatrist and senior psychiatrist positions were filled. One of the two chief psychologist positions was kept open, per a headquarters' cost-saving directive. The 4.5 senior psychologist supervisor positions were filled.

Eleven of the 15.5 staff psychiatrist positions were filled, for a 29-percent vacancy rate. Use of 1.5 FTE psychiatry contractors reduced the functional vacancy rate to 19 percent.

Of the 4.5 senior psychologist specialist positions, 3.5 were filled, resulting in a 22-percent vacancy rate.  The 36 staff psychologist positions were filled.

The supervising social worker position was filled.  Although the number of social work positions was reduced to 15.5 in January 2015, CMF still had 19.5 social workers on staff at the time of the site, with an expected decline to 15.5 over time through attrition.

Of the 18.5 recreation therapist positions, 16.5 were filled and the remaining two were covered by FTE contractors.

The senior psych tech positions was filled. Fifty-three of the 62 psych tech positions were filled, resulting in a 15-percent vacancy rate.

Of the 23 clerical positions, 19.5 were filled, leaving a 15-percent vacancy rate.  One of the two CHSA II positions was filled.

Quality Management:

CMF had an active and effective quality management system.  During the review period, the quality management committee met monthly and maintained minutes.  Meetings were chaired by the CEO and attended by the chief of mental health and other staff. Minutes reflected discussions covering departmental committee reports and any compliance issues that were indicated by the headquarters dashboard.

The mental health subcommittee met monthly except in November 2014. It achieved a quorum at all meetings but one.  Meetings were chaired by the chief of mental health.  Minutes reflected comprehensive discussions on various aspects of the mental health program including compliance levels.   During the review period, the institution conducted monthly audits of MHTS/eUHR concordance.  Audit results were discussed during mental health subcommittee meetings.

232

CMF had several QITs, FITs, and workgroups running during the review period. These included a QIT on reduction of self-harm, and FITs on suicide prevention and administrative segregation. There were also program improvement work plans on group therapy attendance in the EOP, the RVR process, and MHCB re-admissions. All of these were active during the review period and reported to the mental health subcommittee.

CMF appeared to have an active peer review process in place for psychiatry and social work. Although local policies and procedures indicated that psychology peer review was also required, no documentation regarding active psychology peer review was provided.

Medication Management:

Medication management at CMF was monitored through its outpatient medication management committee. It was comprised of mental health, nursing, medical, and custody staff, met weekly, and discussed MAPIP measures.

Medication continuity following transfers from community hospitals and DSH inpatient programs was noncompliant. Staff identified the EOP housing units as areas where this problem appeared. Psychiatry, nursing, and custody reported working with the outpatient medication management committee to address this issue and associated documentation issues.

Urgent medication referrals for refusals and no-shows were noncompliant.

Laboratory testing of blood levels for inmates prescribed psychotropic medications was compliant.

During the review period, 23 inmate outpatients and 18 inpatients were prescribed Clozaril. Monthly nursing audits focused on the ordering and laboratory testing associated with use of Clozaril and found compliance rates of 90 percent or higher.

Transfers:

233

Institutional data indicated that there were 54 referrals to acute inpatient care during the review period.  Of these, 49 or 91 percent resulted in transfer and two or nine percent were rescinded. Of the total 47 transfers, 31 or 63 percent were completed within timeframes, and 84 percent of these transfers took place within 72 hours of bed assignment.

There were 120 referrals to intermediate inpatient care during the review period.  Of these, 105 or 87.5 percent resulted in transfers and 15 or 13 percent were rescinded.  Fifty-six or 33 percent of the transfers were completed within timeframes.  In 90 percent of these transfers, patient movements were completed within 72 hours of bed assignment.

No referrals to acute or intermediate inpatient care were rejected by DSH.  Inmates prevailed on their Vitek challenges to placement into inpatient care in four out of the 17 Vitek challenges.

Form 7388Bs, which are used in the process of identifying inmates in need of referral to higher levels of care, were reviewed monthly by one clinician to identify any problems.  Issues generally included untimely medical clearances and late clinical referrals.

Examination of non-referrals to DSH generally found that assessments had been done appropriately and that decisions to not refer were supported in the record. Documentation associated with DSH referrals was adequate overall.  The DSH coordinator reported that clinical reviews of the DSH referrals were monitored daily.

Staff reported that the DSH coordinator, clinicians, and DSH staff had good collaborative working relationships, although clinician-to-clinician contacts before and after DSH placements generally did not occur. CMF relied instead on DSH discharge documentation.

234

There were 443 admissions to CMF's MHCBF during the reporting period. Of these, 144 or 33 percent lasted longer than ten days, with an average stay lasting 13.1 days. Five MHCB transfers were to outside MHCBs, but only one of these was timely.

All 13 referrals to a PSU resulted in timely transfers.

Presented documentation indicated that all administrative segregation EOP inmates were transferred to an EOP administrative segregation hub timely.

Other Issues:

Administrative Segregation EOP:

CMF had an administrative segregation EOP hub. The units for inmates on the mental health caseload were in I-3 and M-3. Treatment was provided primarily in O-3 within the O-Facility treatment unit, which was new and offered appropriate space. There were three group rooms, each of which held eight treatment modules, as well as one IDTT meeting room. One large conference room was used for ICC and morning meetings between clinical and custody staff. There were also three non-contact interview rooms, and one interview room on each housing unit. No mental health caseload inmates were housed in the Willis administrative segregation unit. It was only partially occupied with inmates occupying a portion of the first of the three floors.

From October 1, 2015 through March 31, 2015, 317 administrative segregation pre-screens were completed. Of these, 312 or 95 percent were reported as compliant.

Institutional data reported that 31-item screens were administered to 55 inmates from September 7, 2014 through March 8, 2015. Thirty-eight of the 55 inmates were GP inmates. The remaining 17 were inmates who had been removed from the mental health caseload for more

than six months. Compliance rates were 90 percent for the GP inmate screenings and 65 percent for the former caseload inmate screenings.

According to institutional reporting, during the review period 107 comprehensive mental health clinical assessments were completed before the inmates' initial IDTT meetings. One hundred two or 95 percent of these were timely. Other data indicated that PCs completed 161 evaluations of inmates within five calendar days of their placements in administrative segregation during the review period. Provided information showed that 135 or 84 percent of these were completed timely.

CMF documented all 87 initial psychiatry contacts and all 1,254 follow-up psychiatry contacts during the review period as completed timely. Interviewed inmates reported consistency with psychiatry contacts and no difficulties with receiving their psychiatric medications. The assigned psychiatrist had a caseload of 63.

Documentation on PC contacts indicated 155 initial contacts, of which 92 percent were completed timely. It also indicated that 1,317 follow-up contacts were completed, with 99 percent of them done timely. Interviewed inmates reported that they received weekly contacts with their PCs. Caseloads for the six PCs ranged from seven to nine.

Institutional data indicated 59 cell-front contacts with inmates in modified programs in administrative segregation. CMF reported that 849 or approximately one-third of all 2,703 psychiatry and PC contacts for inmates not on modified programming were cell-front contacts. Of all 849 cell-front contacts, 566 or 67 percent were due to inmates' refusals, 206 or 24 percent were due to staff decisions, 12 or one percent were due to the lack of escorts, and 65 or eight percent were unspecified. A total of four psychiatry contacts were cell-front. Institutional data

236

also reported that 87 or approximately three percent of the total 2,703 contacts for inmates not on modified programming took place out-of-cell in non-private settings during the review period.

Audits of IDTT meetings indicated that they were in over 90 percent of cases, with necessary disciplines in attendance 88 percent of the time. At an observed IDTT meeting, necessary team members including a psychiatrist, PCs, a correctional counselor, and a psych tech, plus a medical assistant assigned to help the psychiatrist were all present. Computers were available and used by team members. Interdisciplinary discussion and patient involvement were good. Treatment planning and goals were discussed and referrals to higher levels of care were considered.

Staff reported that a significant rise in the hub census during the review period affected the institution's capacity to offer structured therapeutic activities, but that it had levelled off before the site visit. The institution reported that during the review period, it offered a weekly average of 10.94 hours of structured therapeutic activity to patients not on modified programming. On average, patients attended 8.71 hours and refused 2.23 hours per week. Weekly averages for inmates on modified programs were 3.23 hours offered, 2.43 hours attended, and .79 hours refused.

Psych tech rounds in M-3 were also observed. The psych tech was familiar with the inmates on the unit.

Institutional audit reports and proof-of-practice documentation indicated that inmates were receiving ten or more hours of yard time and three showers per week.

The range of monthly average lengths of stay in administrative segregation from September 2014 through January 2015 was 74.2 days to 87 days. During the same period, the number of EOP inmates whose stays exceeded 90 days ranged from 16 to 20. On the first day

of the site visit, the hub held 56 EOP inmates, including seven whose stays exceeded 150 days. There were also 13 3CMS inmates held in the hub.

As of April 14, 2015, 12 EOP inmates were on NDS. One was in acute inpatient care at the time of the site visit. Documentation confirmed that NDS inmates were receiving approved property and privileges at the time of the site visit.

MHCB:

CMF had a 50-bed stand-alone facility for crisis care, known as the Mental Health Crisis Bed Facility or MHCBF. Data indicated that 375 inmates were housed in the MHCBF from September 7, 2014 through March 8, 2015, with an average stay lasting 12.8 days. Sixty six inmates had three or more MHCBF admissions during the review period.

Of the total 695 initial SREs conducted, 676 or 97 percent were timely. All 23 follow-up SREs were timely.

All 392 initial psychiatry contacts were timely, as were 97 percent of the 1,160 follow-up psychiatry contacts. Psychiatrists had caseloads of 12.

Of the total 414 initial PC contacts, 409 or 99 percent were timely. Ninety-seven percent of the 1,151 follow-up PC contacts were timely. PCs had eight inmates on their caseloads.

There were 406 initial IDTT meetings, of which 379 or 93 percent were conducted timely. Ninety-eight percent of the 1,060 follow-up IDTT meetings were timely. At observed IDTT meetings on April 15, 2015 in Units A and B, required staff were in attendance. All inmates were kept cuffed until they were inside the treatment module. All clinicians were well prepared, knowledgeable about inmates' histories and treatment goals, engaged in discussions, and receptive to inmates' expressions of concerns and needs. Input from nursing and the CC was relevant and did not require prompting.

Color-coded magnets were used on the census board in Units A and B to alert staff to inmates on suicide watch. The alerts indicated suicide watch, suicide precaution, and 15-minute checks on inmates not on suicide precaution.  Suicide watch and precaution forms were posted on the inmates' cell doors in all areas.  None were pre-printed or pre-filled out.

Alternative Housing:

Staff reported that the OHU at CMF was used for medical purposes only.  Alternative housing cells were in the MHCBF on Units A and B.  There were four suicide-resistant wet cells, two of which were used for inmates awaiting MHCB placement. Once these four cells were filled, other wet holding cells that were not suicide-resistant on Units A and B unit were used. They were very small, and according to staff, stays in them were limited to 24 hours.  At the time of the site visit, these cells were not in use. They were clean and placed so as to afford visibility into these cells.

Of the 160 stays in alternative housing during the review period, 126 or 79 percent were compliant with timeframes.  Overly-long stays exceeded timeframes by one minute to five days, plus one outlier at ten days.

CMF reported that it had not received authorization from headquarters to transfer inmates to either the LTRH or the STRH.  At the time of the site visit, the institution held several inmates who potentially met criteria for such placements.

EOP:

The EOP housing units were located on M-1, M-2, N-1, N-2, N-3, L-1, and L-2. Programming on the N-1 and L-1 housing units was for Level III inmates, with a program capacity of 447.  It was designed specifically for very low-functioning seriously mentally ill and developmentally delayed patients.

239

With some exceptions, treatment was provided in O-1 and O-2 within the new O-Unit, which provided excellent treatment and office space. On each of the two floors, there were eight group rooms, IDTT meeting rooms, a general interview room, and 19 individual clinicians' offices that were used for private clinical contacts. Each housing unit also had a clinical interview room.

Initial psychiatry contacts were timely in 96 percent of cases. Follow-up psychiatry contacts were timely in 90 percent of cases. Three psychiatrists had caseloads ranging from 110 to 112, and another psychiatrist had a caseload of 60.

The institution reported that 100 percent of initial PC contacts were timely, as were 95 percent of follow-up contacts. Audits indicated that at least 90 percent of psychiatry and PC contacts took place in private settings. Fifteen of the 18 PCs had caseloads ranging from 18 to 29, and the remaining three PCs had caseloads of three, eight, and 12, respectively.

Initial IDTT meetings were 85-percent compliant for timeliness, and follow-up IDTT meetings were timely in 100 percent of cases. Institutional audits found that 88 percent of meetings were attended by required members.

A wide variety of therapeutic groups were offered. On average, inmates were scheduled for 14.37 hours of group per week, offered an average of 12.76 hours, attended an average of 7.69 hours, and refused 5.07 hours. Cancellations accounted for 1.61 hours per week on average. Approximately 91 percent of inmates were scheduled for ten hours per week, 81 percent of inmates were offered at least ten hours, 25 percent attended ten hours, and nine percent refused groups.

Two EOP groups on the O-Unit were observed. One was a long-standing process group that was facilitated by a psychologist and covered various topics. It had 14 participants, in space

240

that was adequate.  Participants were actively involved in group discussion.  Many of them expressed appreciation for the treatment in the EOP, and reported that it had benefitted them greatly.  The second group was for inmates whose primary language was Spanish. It was facilitated by a recreation therapist. Participants in this group likewise expressed appreciation for the quality of groups, in particular because they were facilitated by clinicians and recreation therapists in Spanish.

Audits indicated that 57 percent of EOP inmates on modified programming were offered at least five hours of group treatment per week.  On average, these inmates were scheduled for 7.25 hours per week, offered 6.42 hours, attended 2.55 hours, and refused 3.87 hours.  An average of .83 hours were cancelled.

The heat plan was activated at CMF during September 2014. The institution made some accommodations for patients on heat-sensitive medications.  It tried to maximize these inmates' enrollment in morning yard activities and scheduled them for more than the minimum of ten weekly hours of structured therapeutic activities to compensate for any cancellations.

<u>3CMS</u>:

Treatment for CMS inmates was provided in R-2, U-Wing, and in three medical areas.

Initial psychiatry contacts were 77-percent compliant for timeliness. Follow-up contacts were timely 93 percent of the time.  No psychiatric contacts were cell-front or in non-private settings.  Patients who refused psychiatric contacts were re-scheduled for private office contacts. The psychiatrists also served alternative housing and hospice programs.  Three psychiatrists had caseloads of 60, 183 and 249, respectively.

Audits found initial PC contacts 87-percent compliant and follow-up PC contacts 98-percent compliant for timeliness. During the review period, there were seven cell-front PC

contacts due to inmate refusals and 15 out-of-cell contacts in non-private settings. Three

psychologist-PCs had caseloads ranging from 105 to 118. Two of the three social worker-PCs

each had caseloads of 46, and the third had a caseload of 74.

Provided data indicated that initial IDTT meetings were nearly 85-percent compliant, and

follow-up meetings were 100-percent compliant. However, required staff attended 66 percent of

meetings. A correctional counselor was present in 112 or 35 percent of the total 319 meetings

during the review period.

At an observed IDTT meeting in the G-1 medical area, the inmate's initial treatment plan

was discussed. The program supervisor, psychiatrist, PC, and correctional counselor attended

and contributed to the discussion. Treatment goals were developed by the PC and communicated

to the patient in understandable terms, and the patient's agreement was elicited. Treatment

objectives were reasonable and measurable. The team discussed the patient's level of care

among themselves but not directly with the patient. At six other observed IDTT meetings, all

required disciplines attended. They provided background information on the patient, reviewed

his progress, and communicated directly with the patient about his level of care and responded to

his questions. However, the team did not utilize the Form 7388B in considering any level-of-

care changes, and thus there was no systematic team review of patients' levels of care.

During the review period, there were seven regularly scheduled clinician-facilitated

therapeutic groups for 200 3CMS inmates. On average, these inmates received 2.35 hours to

3.65 hours of group per month. An art therapy group in U-Wing was observed during the site

visit. It was used to mitigate its five participants' depressive symptoms. Participants were

actively involved and responded readily to the facilitator's promptings. Review of these

participants' treatment plans found that 90 percent of them included group interventions to

242

address symptoms associated with diagnoses of mood or depressive disorders. Interviewed participants reported that the group provided them relief from stress. All reported satisfaction with their psychiatrists and PCs and knew how to reach them if necessary.  They also reported that they understood the purpose of the IDTT, knew their mental health diagnoses, and could recite the names of their medications, but none were familiar with their treatment plans.

The monitor's expert also observed a pain management group facilitated by a psychologist.  Patients were assigned to this group by their PCs or their physicians.  Three of the five scheduled inmates were present.  The group used handouts, homework, didactic material, and guided group discussion on the nature of pain and effective strategies for coping with it. This group appeared to have educational rather than therapeutic value to the participants.

3CMS Inmates in Administrative Segregation:

According to institutional data for the review period, all six initial psychiatry contacts and all 162 follow-up contacts for 3CMS inmates during the review period were timely.

Institutional data covering the same period also indicated that all 27 initial PC contacts and all 296 follow-up contacts were timely.

Similarly, the data indicated that all 19 initial IDTT meetings and all 245 follow-up meetings were timely.  Provided data indicated that attendance by required disciplines was 88-percent compliant.  However, staff reported full compliance with attendance.  Review of sample treatment plans suggested that errors with data entry led to the data under-reporting attendance, as the sampled treatment plans bore signatures of all required disciplines.

Referrals:

243

CMF reported a total of 455 mental health referrals. Compliance rates for timeliness of response were 100 percent for the 43 emergent referrals, 96 percent for the 95 urgent referrals, and 94 percent for the 317 routine referrals.

Heat Plan:

CMF was in compliance with the heat plan during the reporting period.  During the two-month heat season of September and October 2014, there were 21 Stage I heat alerts and no Stage II or III heat alerts.  There were no heat-related incidents during the review period.

During the heat season, the pharmacy prepared a list of all inmates taking heat-sensitive medications. It was distributed to the litigation coordinator, facility lieutenants, facility captains, mental health staff, and others via a weekly email and posting on SharePoint.  In all housing units toured by the monitor, including administrative segregation, officers had access to portable thermometers which were used to take temperatures in the units and inside cells.

RVRs:

CMF provided training attendance lists demonstrating that custody and mental health staff had completed mandatory RVR training as of April 2015.

Access to Care:

Staff reported that health care access unit staff were available and assisted with transporting inmates to appointments. A review of CMF's monthly Health Care Access Quality Reports from September 2014 through February 2015 indicated that two percent of issued mental health ducats and add-on appointments were not completed due to custody reasons.

Program Access:

a.    Job and Program Assignments:

Institutional data indicated that 580 or 73.14 percent of available full-time jobs were filled by non-MHSDS inmates, 19 or 2.4 percent were filled by EOP inmates, and 194 or 24.46 percent were filled by 3CMS inmates.

Among available part-time jobs, 23 or 54.76 percent were filled by non-MHSDS inmates, 15 or 35.71 percent were filled by EOP inmates, and four or 9.52 percent were filled by 3CMS inmates.

For part-time academic program assignments, 144 or 68.25 percent were held by non-MHSDS inmates, 13 or 6.16 percent were held by EOP inmates, and 54 or 25.59 percent were held by 3CMS inmates.  There were no voluntary academic program assignments at CMF.

For full-time vocational education assignments, 27 or 64.29 percent were held by non-MHSDS inmates, two or 4.76 percent were held by EOP inmates, and 13 or 30.95 percent were held by 3CMS inmates.

For part-time vocational education assignments, 54 or 72 percent were held by non-MHSDS inmates, five or 6.67 percent were held by EOP inmates, and 16 or 21.33 percent were held by 3CMS inmates.

b.    <u>Milestone Credits</u>:

CMF did not participate in the functional assessment training offered in 2014, but it reported that it had a process in place to assess EOP inmates for job and academic assignments. The institution also established a workgroup and held weekly meetings with custody staff to address any concerns.

Information provided by the institution via health care services at headquarters indicated that during the review period, 6.96 percent of non-MHSDS inmates, 2.68 percent of eligible EOP inmates, and 12.5 percent of eligible 3CMS inmates earned milestone credits.

c.      <u>Out-of-Level Housing</u>:

With regard to out-of-level housing of caseload inmates, institutional data indicated that as of March 27, 2015, there were four Level I 3CMS inmates housed in Level II housing. There were four Level I 3CMS inmates and 24 Level I EOP inmates housed in Level III housing. There were 159 Level II 3CMS and 238 Level II EOP inmates housed in Level III housing. Two Level III 3CMS inmates were housed in Level II housing. There were 15 Level IV 3CMS inmates and 34 Level IV EOP inmates housed in Level III housing.

d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CMF confirmed through provided training materials and examples of completed forms that it had implemented revised ADA accommodation and grievance procedures.

e.      <u>Periodic Classification Score Reductions: EOP Inmates</u>:

At the time of the site visit, staff reported that EOP inmates were being granted the same semi-annual classification score reductions as non-EOP inmates. CMF provided for review a sample of completed reclassification score sheets documenting the institution's implementation of the semi-annual classification score reductions for EOP inmates.

<u>*Coleman* Postings</u>:

The January 2015 revised *Coleman* postings, in both English and Spanish languages, were found in all of the housing units toured by the monitor, including administrative segregation and the buildings housing mainline caseload inmates. All postings were placed in common areas accessible to class members.

## California State Prison/Solano (CSP/Solano)
March 17, 2015 – March 19, 2015

Census:

On March 17, 2015, CSP/Solano's census was 3,851, including 1,420 inmates or 37 percent of the total inmate population who were in the MHSDS. Since the preceding monitoring period, the institution's overall census had fallen by nine percent, and the MHSDS census had increased by 21 percent.

The MHCB held nine patients. Five EOP inmates were awaiting transfers to an EOP program. There were 1,353 inmates in the 3CMS mainline. Administrative segregation held 49 MHSDS inmates, including three EOP inmates pending transfer to a hub.

Staffing:

CSP/Solano's chief psychiatrist and chief psychologist positions were both filled.

There were no senior psychiatrist positions. Five or 83 percent of the six staff psychiatrist positions were filled, for a functional vacancy rate of 17 percent.

The 3.5 senior psychologist supervisor positions and the 14 staff psychologist positions were all filled. One psychologist was not licensed.

The supervising clinical social worker position was filled as were nine of the 13 staff social worker positions, for a vacancy rate of 31 percent. With coverage of an additional 2.5 positions, the functional vacancy rate was reduced to 11.5 percent. Two social workers were unlicensed. PCs' caseloads ranged 54 to 121 across all programs.

The senior psych tech position and all three psych tech positions were filled. One of the two established recreation therapist positions was filled.

The OSS II position was vacant, and the HPS position was filled.

247

Quality Management:

Minutes of the local governing body's December 3, 2014 meeting were provided.  A quorum was present and approved various health-related policies.

During the review period, the QMC met monthly with a quorum in attendance at every meeting.  The QMC addressed mental health issues related to MAPIP, pharmacy, and medical records during the review period, and reviewed reports from other committees including the mental health subcommittee.

Minutes of mental health subcommittee meetings during the review period were provided.  They indicated that the committee met monthly with a quorum present and undertook corrective measures to address issues as appropriate.  Activity was driven according to performance indicators on all aspects of the MHSDS program, including MHTS.net/eUHR concordance, QITs, monthly custody data, alternative housing utilization, SPRFIT matters, and involuntary medications.  Issues were forwarded to the QMC for its consideration as appropriate.

At the time of the site visit, the institution's only ongoing QIT was working on reducing cancellations of appointments.  The QIT was multi-disciplinary and progressing appropriately, according to staff.

CSP/Solano was paired with California Correctional Institution (CCI) for peer review in which CSP/Solano's and CCI's clinicians were assigned to review each other.  During the review period, the peer review committee met once and reviewed one psychiatrist, two psychologists, and one social worker on staff at CSP/Solano.  Feedback had been received and communicated to these staff members via memoranda from the peer review coordinator.  Staff reported that the process was too recently implemented for any detectable trends to have emerged.

Medication Management:

248

Continuity of medications following inter-institutional transfers was 100-percent compliant. Following intra-institutional transfers except for administrative segregation, SHU and PSU transfers, compliance rates for continuity of non-DOT medication ranged from 71.43 percent in July 2014 to 100 percent in October, November, and December 2014.

The institution had implemented MAPIP audits since the time of the preceding monitoring period. Results of quarterly audits were reviewed with the chief psychiatrist at the time of the site visit. They showed that prescribing and monitoring of atypical antipsychotic medications was found 93.75-percent compliant in the September 2014 quarterly audit, and 100-percent compliant in the December 2014 quarterly audit. For prescriptions for Depakote, carbamazepine, Lamictal, and antidepressant medications, the institution reported that it was found 100-percent compliant in both the September and December 2014 quarterly audits. The institution did not prescribe clozapine.

Transfers:

The institution's referral log for the review period indicated that seven inmates were referred to acute inpatient care. All were accepted and transferred timely.

The referral log indicated four referrals to intermediate inpatient care. Three were accepted and transferred timely, but no data was provided regarding the fourth case.

At the time of the site visit, six CSP/Solano patients were in DSH inpatient programs and none were awaiting transfer to a DSH bed.

The institution reviewed its non-referral log for patients who met one or more criteria for consideration for referral to a higher level of care at a DSH facility but were not referred. All but one of these inmates were in the MHCB at the time they met the criteria. At the time of the site visit, four such inmates were in the MHCB. While internal audits found the rationales for non-

249

referral to be adequate in all cases, most of these rationales consisted of only a statement that the inmate's existing level of care was "clinically indicated," and that MHCB staff were adjusting these patients' medications to move them toward stabilization, or that staff planned to continue consideration for DSH placement.

CSP/Solano transferred ten patients to outside MHCBs during the review period. Three were transferred timely. The late transfers were overdue by a range of five hours to three days, or an average of 33 hours overdue. Staff reported that the predominant reason for these delays was unavailability of MHCBs.

During the review period, there 31 total placements in alternative housing pending placement in an MHCB. Stays ranged from .08 days to 5.5 days. Sixteen or 52 percent of stays in alternative housing exceeded timeframes.

CSP/Solano reported that no patients were eligible for transfer to a PSU during the review period.

During the review period, 20 inmates met criteria for transfer to an EOP hub and all transferred within timeframes. Of the three EOP inmates in administrative segregation, one was a transfer from another prison for out-to-court proceedings, and the other two were pending transfer to an EOP hub.

During the review period, 42 inmates were identified as needing EOP mainline housing. Of those, 37 or 88 percent were transferred timely. Transfers of the remaining five inmates were late by a range of two days to 32 days.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Administrative segregation inmates were housed in Unit 10, with Unit 9 utilized for occasional overflow.  Information produced before the monitor's visit indicated only one use of overflow housing during the review period.  Treatment space in administrative segregation remained insufficient.  Three therapeutic modules located on the south side of the building's floor allowed for limited private contacts.  Leadership acknowledged this issue and reported that additional therapeutic modules were on order.

At the time of the site visit, there were a total of 124 inmates in administrative segregation, including 49 3CMS inmates and three EOP inmates.  The institution reported that the average length of stay in administrative segregation was 41.05 days for non-MHSDS inmates, 27.83 days for EOP inmates, and 36.89 days for 3CMS inmates.  It also reported that as of February 19, 2015, two MHSDS inmates had been in administrative segregation longer than 150 days, and that both were engaged in active court cases at that time.

Pre-screenings were conducted timely for 90 percent of the 146 3CMS inmates and for two of the three EOP inmates placed in administrative segregation during the review period.  In comparison, 95 percent of the pre-screenings for the general population inmates placed in administrative segregation were timely.  The late pre-screenings were attributed to difficulties the night shift nursing staff was having with providing screen results to mental health staff.

For the 31-item screens, 91 percent of the total 154 screens were completed within timeframes.

Psychiatry contacts were reported as 100-percent compliant for both the total 162 initial contacts and the total 556 follow-up contacts.  The institution's success with staffing its full-time psychiatry positions was cited as the reason.

According to provided data, 93 percent of the 86 initial PC contacts were timely, as were 98 percent of the 975 follow-up contacts.

A total of 196 cell-front contacts were reported.  Forty-one percent were attributed to staff decision, 34 percent to inmate refusals of a private setting, 14 percent to modified programming, eight percent to "unspecified," and two percent to lack of available escort.  One staff member conducted 96 percent of all of the "staff decision" cell-front contacts, which affected 30 different inmates receiving these non-private contacts.  Many of these contacts occurred on the same day, and in nine cases the inmate was seen four or more times on the same day.  No clear reason was provided.

Initial IDTT meetings occurred within timeframes in 97 percent of cases.  Untimely meetings were late by a range of three days to 38 days.  Ninety-nine percent of follow-up IDTT meetings were conducted within timeframes.  The late meetings were overdue by a range of six days to 34 days.  Required disciplines other than PCs attended 86 percent of IDTT meetings.

Observed IDTT meetings during the site visit were attended by a full complement of staff, with access to necessary information.  Case presentations by PCs ranged from lacking in focus and completeness to being well-conducted.  Staff interaction was generally good.  The space used for IDTT meetings, as well as for ICC meetings, was within a general area shared with custody.  It consisted of a conference table in a space that was separated from the general area by partitions.  Ambient noise interfered significantly with interactions among inmates and the team.  In one instance, a custody officer entered the area to retrieve food items, which compromised the confidentiality of the discussion.  Staff reported that noise and interruptions were usually worse than what was observed.  At meetings which the inmate refused to attend,

there was minimal to no discussion about ways to better engage the inmate in his own treatment planning.

Due to lack of space for therapeutic groups, none were conducted for MHSDS inmates in administrative segregation. Reviewed documents indicated that MHSDS inmates in administrative segregation were being offered only 3.5 hours of yard twice per week, or a total of only seven hours per week. Review of the 114-As for a sample of six MHSDS inmates indicated that most offers of yard were accepted. Inmates were allowed to request return to their cells before the yard sessions ended.

All approvals of inmates for NDS status were logged by the captain or the ICC. Log entries included the inmate's name, CDCR number, level of care, and dates of placements in administrative segregation, administrative review, and issuance of property, but not dates of transfers out of administrative segregation. The institution also did not produce a list of all inmates on NDS during the review period or their transfer dates.

MHCB:

The nine-bed MHCB at CSP/Solano was staffed with one full-time and two part-time psychiatrists, and two full-time and one part-time PCs. Rotating teams of a psychiatrist and psychologists provided 20 hours of coverage on the weekends.

During the review period, there were 95 admissions, approximately two-thirds of which were transfers from other prisons. The average daily census was 7.9, and the average length of stay was 15.8 days. All nine beds were filled at the time of the site visit. It was reported that earlier plans to reduce the number of beds to five had been abandoned because of increased demand for crisis beds.

Both initial and follow-up psychiatry contacts were reported to have been 100-percent compliant. Initial PC contacts were 93-percent compliant, and follow-up contacts were 100-percent compliant.

Initial IDTT meetings were 94-percent compliant, and follow-up IDTT meetings were 100-percent compliant. Based on observed IDTT meetings, post-meeting discussions with the team and the responsible regional psychologist, and on reviews of patient charts and presented data, it appeared that the IDTT in the MHCB needed to explore ways to expedite its assessments of inmates' needs for treatment and transfers to higher levels of care. This observation was echoed by institutional leadership, who indicated that remedial measures in this regard were being undertaken.

SREs were conducted timely in 99 percent of cases. The two SREs that did not comply with timeframes were .5 days and .6 days overdue, respectively.

Once approved by the IDTT, a recreation therapist worked with inmates while in their cells and on the yard during second watch.

Seclusion and Restraint:

Use of therapeutic restraints did not appear to be excessive, with only two instances logged as used during the review period.

Alternative Housing:

The institution used cells numbered 123 through 128 in the administrative segregation unit as alternative housing. These cells were also used for new intakes in administrative segregation. They were located in front of the control booth, which made for ease of continuous direct observation, as required.

<u>3CMS</u>:

Since the preceding monitoring visit, most of the growth in the mental health population at CSP/Solano was in the 3CMS program.  At the time of the site visit, there were 1,353 mainline 3CMS inmates, plus five EOP mainline inmates awaiting transfer.

Ninety-eight percent of both initial and follow-up psychiatry contacts during the review period were reported as compliant.  However, psychiatry had difficulty with responding to referrals for medication noncompliance.  With improved psychiatry staffing, efforts were being made to improve response times.

Initial PC contacts were 74-percent compliant, and follow-up PC contacts were reported as 95-percent compliant.  Some 3CMS inmates were seen more frequently than every 90 days for follow-up contacts.

Data indicated that 92 percent of psychiatry and PC contacts were conducted in a private setting.

Initial IDTT meetings were 79-percent compliant with timeframes, with late meetings averaging four days overdue.  Follow-up IDTT meetings were 99-percent compliant with timeframes.  Required staff attended in 98 percent of cases.  At observed IDTT meetings in D-yard, all required participants were present and necessary information was accessible.  Discussions were good and included useful input from the correctional counselor.  Team members demonstrated good rapport with the inmates and had an excellent working knowledge of each case.  Although the team was clearly attempting to implement recent training from headquarters, treatment planning was not sufficiently focused on specific goals or interventions.

Groups were offered in the 3CMS program, but both staff and inmates reported long wait times for group treatment.  Staff were not regularly able to place inmates into groups in

accordance with their clinical needs. A group dealing with depression was observed at the time

of the site visit. The group was well-conducted, but there were problems with assembling all

participants, the latest of whom arrived a half-hour late. The participants were interviewed after

the session concluded. They reported general satisfaction with mental health services, including

responsiveness and accessibility of staff and continuity of medications. However, they also

expressed some areas of concern which were primarily difficulties with ducats, long wait times

for placement in therapeutic groups, and lack of knowledge of their treatment goals. These

concerns were corroborated by discussions with staff and leadership, as well as by observation of

a 3CMS group.

Referrals:

There were a total of 1,543 mental health referrals during the review period. Response to

all 13 emergent referrals was compliant. Of the 51 urgent referrals, 98 percent were handled

timely, and of the 1,479 routine referrals, 96 percent were handled timely.

Heat Plan:

Six housing units were reviewed for compliance with the institutional heat plan.

CSP/Solano had instituted a local policy requiring housing of all heat-risk inmates in one of six

identified housing units, which were Units 2, 8, 10 (administrative segregation), 16, 19, and 24.

Additionally, heat-risk inmates were given a heat-risk identification card which was used to

expedite their movement into the housing unit once a Stage I heat alert was announced.

All six housing units were compliant with the heat plan. Staff knew the policy,

temperatures were being taken consistently, and lists of heat-risk inmates were readily available

to staff on a weekly basis during the heat plan period of May through October every year.

256

Access to Care:

Institutional monthly health care access reports for August 2014 through January 2015 were provided to the monitor.  The reports indicated that in August 2014, a total of 1,647 ducats were issued for mental health appointments, of which 1,471 or 89 percent were completed.  Of the 176 non-completed ducats, 22 or 12 percent were due to inmate refusals and 154 or 88 percent were due to non-custody reasons.  No non-completed ducats were attributed to custody reasons.

A total of 1,719 ducats were issued for mental health appointments in September 2014.  Of these, 1,516 ducats or 88 percent were completed.  Of the 203 non-completed ducats, 22 or 11 percent were due to inmate refusals, and the remaining 181 or 89 percent were due to non-custody reasons.  None of the non-completed ducats were attributed to custody reasons.

The data for October 2014 indicated that 1,892 ducats were issued for mental health appointments, and that 1,593 or 84 percent of these were completed.  There were 299 non-completed ducats, of which 38 or 13 percent were due to inmate refusals, and 261 or 87 percent were due to non-custody reasons.  No failures to complete any appointments were attributed to custody reasons.

Of the total of 1,290 ducats issued for mental health appointments during November 2014, 1,111 or 86 percent were completed.  Of the 179 non-completed ducats, 11 or six percent were due to inmate refusals, and 167 or 93 percent were due to non-custody reasons.  One ducat was reported as non-completed for custody reasons.

In December 2014, the institution issued 1,551 ducats for mental health appointments, of which 1,211 or 78 percent were completed.  Of the 341 non-completed ducats, 21 or six percent

were due to inmate refusals, 278 or 81 percent were due to non-custody reasons, and 42 or 13 percent were due to custody reasons.

In January 2015, there were 1,522 ducats issued for mental health appointments, of which 1,299 or 85 percent were completed.  Of the 223 non-completed ducats, 33 or 15 percent were due to inmate refusals, 177 or 79 percent were due to non-custody reasons, and 13 or six percent were due to custody reasons.

Program Access:

a.    Job and Program Assignments:

Although CSP/Solano did not have an EOP program, in January 2015 its staff received the mandatory training on evaluation of EOP inmates for program assignments.  A report on job assignments dated February 12, 2015 indicated that three EOP inmates were assigned full-time jobs, two EOP inmates had part-time academic assignments, 554 3CMS inmates had full-time jobs, and 299 3CMS inmates had part-time jobs.

b.    Milestone Credits:

The institution did not provide information on milestone credits.

c.    Out-of-Level Housing:

On February 24, 2015, 33 3CMS Level I inmates were housed in Level II housing and four Level I 3CMS inmates were in Level III housing.  There were 104 Level II 3CMS in Level III housing, four Level III 3CMS inmates in Level II housing, and 63 Level IV 3CMS inmates in Level III housing.

d.    ADA Reasonable Accommodation and Grievance Procedures:

CSP/Solano did not provide information on its ADA Reasonable Accommodation and Grievance Procedures other than reporting that no revisions had been made to its policies and procedures.

      e.     <u>Periodic Classification Score Reductions:  EOP Inmates</u>

CSP/Solano did not have an EOP program.

<u>*Coleman* Postings</u>:

Six housing units and the CTC were checked for the presence of *Coleman* postings. Postings were found in five of the six housing units, but three of them and the one in the CTC were the outdated 2010 version.  CDCR was providing the current 2015 version of the posting in an 8.5 by 11-inch size, which was difficult to read.

**<u>San Quentin State Prison (SQ)</u>**
May 4, 2015 – May 6, 2015

<u>Census</u>:

On May 4, 2015, San Quentin's total inmate population was 3,899.  The mental health caseload population was 1,117 inmates, an increase of 25 percent since the 25th monitoring round.  There were two inmates at the MHCB level of care.  The EOP mainline had a population of 28 inmates.  There were three EOP inmates in administrative segregation.  The 3CMS population totaled 793 inmates, with 62 inmates at the 3CMS level of care housed in administrative segregation.  There were 1,165 inmates in the reception center, including 11 EOP and 277 3CMS inmates.

<u>Staffing</u>:

One of two chief psychologist positons was filled, and served as chief of mental health. At the time of the site visit, San Quentin had an acting chief of mental health as the permanent

259

chief was out on extended leave.  The second chief psychologist position was left vacant as a cost saving measure.

The two chief psychiatrist positions were filled.  The senior psychiatrist position was vacant.  The 12 staff psychiatrist positions were all filled.

Two of the eight senior psychologist specialist positions were vacant for a 25-percent vacancy rate.  All four of the senior psychologist positions were filled.  Of 36 staff psychologist positions, 32.5 were filled for a vacancy rate of ten percent.

Of the two supervising social worker positions, one was filled leaving a 50-percent vacancy rate.   Sixteen of 19 social worker positions were filled leaving a 16-percent vacancy rate.

All seven senior psych tech positions were filled.  Of the 54.5 psych tech positions, 36.6 were filled, leaving a 33-percent vacancy rate.   There were eight recreation therapist positions; six were filled for a 25-percent vacancy rate.

There was no reported use of contractors at San Quentin.

Quality Management:

The quality improvement process at San Quentin remained a thoughtful and useful process.  The local governing body met monthly, and meeting minutes were reviewed.  Agenda items focused on credentialing issues and policies and procedures.  The required attendees were generally present.

The quality management committee met monthly.  Minutes were provided for review. Attendance was good; the agenda regularly covered multiple issues including:  health care appeals and correspondence; primary care and chronic care; emergency response review committee (ERRC); clinic updates; mental health, dental and pharmacy and therapeutic

260

subcommittees; CTC/OHU; reception center and discharge care; death reviews; and the health care access team among others.  Actions taken by the quality management committee included various San Quentin performance improvement work plan initiatives such as addressing polypharmacy, EKG protocol, scheduling and access to care.

The mental health subcommittee met on a weekly basis and had a good attendance rate. Its standing agenda items addressed mental health nursing issues, five-day follow-ups, health record issues, RVR/indecent exposure issues and transfer issues. The subcommittee also deliberated relevant follow-up issues such as PIP updates, and various mental health quality management reports.

Audits performed at San Quentin during the review period included, concordance between MHTS.net and the UHR and the medication administration process improvement plan. The institution also audited components of the healthcare dashboard process and treatment planning.

QITs and FITs were chartered and/or continued during the review period regarding condemned EOP and administrative segregation structured treatment received, in addition to SPRFIT, effective communications, and enhanced IDTT presentations.  The specialized care for the condemned program (SCCP)/Intermediate Care Facility (ICF)/PIP integration QIT was completed during December 9, 2014.  The goal of the QIT was to provide a psychiatric inpatient program to provide acute and intermediate care to the condemned population at San Quentin, including integrating the inmates currently housed in the SCCP.  Policies and procedures were developed in the months preceding the activation which directed the manner in which services were provided on this licensed unit.

At the time of the site visit, San Quentin was in the process of implementing the new statewide peer review policy and coordinating with their paired institution, California Institution for Men (CIM), to begin the new process during the current quarter.  Staff psychologists and social workers completed the two-hour statewide peer review training, which was provided during March 2015.

During the review period, San Quentin mental health staff completed peer reviews according to the LOP.  Peer review committees were in place for psychologists, social workers and for psychiatrists.  The psychologist and social worker peer review committees consisted of three members per committee, who reviewed two to three of their peers at a time.  The psychiatry peer review committee consisted of two members, who each reviewed one peer at a time.  All staff were reviewed on an annual basis.

Peer review committee members received relevant training regarding the process and feedback was presented to those reviewed in written format.  During the review period, twelve psychologists, seven social workers and three psychiatrists were reviewed by their peers, which required a total of five peer review committee meetings.  The peer review process was generally reviewed favorably by the clinicians.

Medication Management:

San Quentin used the medication administration process improvement program (MAPIP) in an effective manner.  Compliance scores of at least 90 percent during the review period, with very few exceptions, were obtained in the following domains:  continuity of medications under the following circumstances:  intra-institutional moves, transfers to administrative segregation, renewals, and new medication orders; informed consent; pill lines; obtaining laboratory tests via

CDCR protocols for psychotropic medications including atypicals, Clozaril, antidepressants and other mental health medications; and parole medications.

A polypharmacy report was generated at the institutional level, which included both medical and psychiatric medications. Less than two percent of all prescribed antipsychotic medications involved polypharmacy.

The maximum length of medication orders for psychotropic medications was 90 days. The maximum length of bridge orders was 14 days. Inmates receiving bridge orders were scheduled for a psychiatric examination prior to expiration of the bridge order.

Approximately ten percent of psychotropic medications were non-formulary.

Analysis of MAPIP findings identified non-compliance with psychotropic medications, excluding PC 2602 ordered medications, which appeared related to timeliness of follow-up psychiatry appointments. There was also non-compliance with PC 2602 ordered medications, which appeared to be related to nursing staff not realizing they were PC 2602 ordered medications, and HS administered medications, which reportedly had been corrected during April 2015.

All inmates in restricted housing units received psychotropic medications on a DOT basis although the physical plant presented notable limitations concerning the DOT process. Specifically, staff advised that it was frequently difficult to adequately observe the inmates swallowing the medication since the cells were not opened during the medication administration process.

At the time of the site visit, 16 inmates were receiving psychotropic medications on an involuntary basis via the PC 2602 process. One PC 2602 process was initiated during the review

period and 15 PC 2602 requests were renewed and upheld.  No PC 2602 processes were discontinued during the review period.

At the time of the site visit, staff reported that 44 inmates were receiving psychotropic medications that were being administered on an HS basis.

Transfers:

A significant portion of the referrals to inpatient care on the DSH referral log were from the 2014 unmet need assessment project of the condemned inmate population and inmates identified in anticipation of that assessment.  There were a total of 37 inmates on the referral log.  Two of those inmates had been identified for referral to inpatient care, refused to consent and prevailed on the *Vitek* hearing.  Of the remaining 35 inmates, four were not identified as part of the unmet needs assessment project or in anticipation of the assessment project of condemned inmates.

The remaining 31 inmates on the referral log were referred to inpatient care as part of the activation process of the SQ PIP, and had been identified as part of the unmet needs assessment project for the condemned or in anticipation of the assessment.  Their referral and transfer timelines were all adjusted due to the time it took to activate the SQ PIP, consequently, calculating timelines for referrals and transfers for these inmates would provide no meaningful information.

The remaining four referrals occurred as any referral would and fit the parameters of what was typically reviewed for referrals to higher levels of care during a review period.  All of the four referrals that were not connected to the assessment project were for intermediate care; three occurred in the month of November 2014 and one in the month of February 2015.  Three were for condemned inmates, while the fourth (February) was for an inmate housed elsewhere at

San Quentin.  All were completed and timely submitted and the response by DSH or SQ PIP was also timely.  Inmates were subsequently transferred to outside crisis beds within 72 hours of bed assignment, 50 percent of the time.  The two inmates who were not transferred timely were transferred to SQ PIP.

Observation of IDTTs during the site visit suggested that not all treatment teams had fully incorporated the CDCR form 7388B into the treatment team process.  Some teams were highly skilled and had incorporated the criteria on the 7388B flawlessly into the team process while others addressed criteria only partially, were stilted or did not review the criteria at all.  It was clear in some teams that the PC had completed the responses to the 7388B prior to the IDTT and that the decisions regarding whether the inmate met any of those items was not essentially a team decision.

The most frequent rationale for a lack of referral was that the current level of care was appropriate and that the inmate was receiving enhanced care at the EOP level of care. However, when reviewing multiple medical records, treatment plans did not consistently meet the needs of the inmates and did not always elucidate the "enhanced" treatment that staff reported as being provided as the justification for the non-referral.

The DSH coordinator noted an anomaly in the non-referral audit form in that there was no "drop down" option for inmates in the condemned program.  The DSH coordinator elected to enter "administrative segregation" for those inmates and noted that in some of the audit forms, it was not noted each month.  It appeared it would be an operationally useful option for "condemned" to be added to the drop-down menu for a more accurate analysis of audit findings of condemned referrals and non-referrals.

It was observed that justifications for non-referral were not consistently specific in nature and supported by the clinical documentation in the medical record.  In some cases it was stated in the 7388B month after month that an inmate who had been refusing treatment groups for months had committed to attending "some" groups or even "three" treatment groups or yard groups as a rationale to not refer the inmate to a higher level of care.  It was noted that while that may be an acceptable rationale for one month when it might represent a change in the clinical presentation for that inmate, when the inmate failed to follow through despite staff repeatedly providing "support" and "encouragement," there might be a need for other clinical intervention and clinical rationale in subsequent months.

In some instances the team had "cut and pasted" in the CDCR form 7388B, even when a prior acceptable rationale was no longer relevant or adequate.  Multiple individual audits did not note this despite medical record confirmation.

In addition, these treatment teams did not offer appropriate alternative interventions that specifically targeted the positive criteria that caused the inmate to be identified for consideration for referral.  It was observed that in these non-referred cases, that as the same problematic behavior continued, the treatment plan was not revised to address them specifically.

Behavioral interventions were rarely utilized when indicated, resulting in no progress over time for multiple inmates or unnecessarily slow progress for others.  It should be noted that a January 21, 2015, San Quentin quality management performance report also noted poor compliance with documentation of reasons for refusal and interventions to increase attendance on treatment plans for high refusing inmates.

Based on staff interviews and discussion, there appeared to be some residual concerns among non-SQ PIP staff regarding the quality of treatment that inmates would actually receive

266

from DSH, which may have translated into a reluctance to refer inmates to DSH. That same January 21, 2015 performance report did note that staff were going to receive additional treatment plan training. It was unclear from the performance report how detailed that training would be and if it would address all problems related to inpatient care.

San Quentin transferred a total of 82 inmates to an outside MHCB during the review period; 44 or 54 percent were transferred within the 24-hour requirement.

There were 376 3CMS transfers from the reception center during the review period. Of those, 201 or 53 percent were over the 90-day Program Guide transfer requirements. There were 77 EOP inmates transferred from the reception center during the review period, of which 36 or 47 percent exceeded the 60-day transfer requirement. At the time of the site visit, there were eight EOP inmates housed in the reception center over 60 days.

Staff reported that there were numerous reasons why inmates were not moving within the established timeframes, particularly 3CMS inmates. The reasons for delay included medical holds, awaiting the completion of the disciplinary process, and specific beds not being available, e.g. SNY.

During the review period there were 67 inmates housed in alternative housing, of which 60 or 90 percent were transferred within 24 hours, and seven or ten percent were housed in the central health care building for a period over 24 hours.

Other Issues:

Reception Center:

San Quentin continued to operate a reception center with services provided by mental health staff referred to as the "RC Team." This team of mental health clinicians included psychologists, social workers, psychiatrists and a recreation therapist. They were responsible for

267

completing initial assessments, comprehensive evaluations and providing ongoing treatment services to 3CMS and EOP inmates until those inmates were moved to their permanent housing locations.

Treatment groups were provided to reception center "enhanced" 3CMS and EOP inmates that included anger management, stress management, substance abuse, process group and recreational therapy. Groups were scheduled daily. The monthly average census of EOP inmates averaged 17 to 30 inmates during the review period. Enhanced 3CMS inmates were designated as such by their treatment teams and eligible for multiple treatment groups and increased PC contacts as determined by the treatment team. 3CMS inmates not designated as "enhanced" received the standard reception center 3CMS services.

There was no data provided on initial mental health screening or evaluations completed or the timeliness of such.

Based on the data provided, initial psychiatric contacts in the reception center EOP program were 98-percent compliant. Routine contacts were completed timely 99.8 percent of the time. Initial PC contacts were compliant for timeliness at 91 percent. San Quentin completed routine EOP contacts in a timely manner 96 percent of the time.

For 3CMS inmates in the reception center, initial PC contacts occurred timely 99.8 percent of the time, and routine contacts were timely completed 99.7 percent of the time. Initial and routine psychiatric 3CMS contacts were reportedly compliant at 100 percent.

The institution did not provide data related to the use of non-confidential space in the reception center.

Group treatment data for the average number of hours offered and attended was not provided for reception center EOP inmates. While specific data was not provided, a quality

268

management performance report indicated that San Quentin consistently was unable to "meet or exceed" performance benchmarks for providing EOP structured treatment opportunities. That performance report specifically cited the reception center population and challenges in treating the reception center population as factors in not meeting the EOP target hours for out-of-cell structured treatment.

MHSDS Inmates in Administrative Segregation:

San Quentin provided some treatment groups to EOP administrative segregation inmates awaiting transfer to an EOP Hub facility. During the review period the number of EOP administrative segregation inmates at any given time ranged from four to 11. The administrative segregation mental health treatment team consisted of psychiatrists, psychologists, social workers, and a recreation therapist to treat 3CMS and EOP inmates.

The EOP treatment group schedule indicated that there were ten different treatment groups and four therapeutic yards offered at the time of the site visit. Topic areas included substance abuse, stress management and emotional regulation. Recreation therapy made up 50 percent of the treatment group schedule. The schedule made use of every day of the week but Saturday. Data reflecting EOP offered and attended hours was not provided.

Compliance with administration of the 31-item screening checklist in administrative segregation was 82 percent for the period of September 29, 2014 through March 29, 2015. There was no information on timely IDTTs prior to ICC. Initial IDTT meetings were held timely when not considering the date of the ICC 98 percent of the time.

Routine IDTTs occurred timely 99.7 percent of the time. While IDTT attendance was reported, staff had not completed appropriate paperwork for each IDTT. For those IDTTs where staff reported on attendance, all required participants attended 94 percent of the time; however,

269

this represented 14 percent of total IDTTs held in administrative segregation during the review period based on the other data provided.  The high compliance rate for team attendance for those IDTTs where data was reported was noted.

Initial PC contacts were compliant at 96 percent and routine contacts were timely 98 percent of the time.  Analysis of the data showed that 46 percent of contacts occurred cell-front. The primary reason for these cell-front contacts was documented as "staff decision."  It should be noted that significant PC contacts occurring cell-front is likely to compromise inmates' access to actual treatment.  This was reflected in the medical record reviews, as many of the reviewed progress notes for administrative segregation indicated that individual contacts frequently appeared superficial, more in line of brief "check-ins" rather than actual therapeutic contacts linked to specific interventions and goals on the treatment plan.

Based on the data presented, psychiatry achieved 100-percent compliance with timely initial and routine appointments.

For psychiatrists, 12 percent of individual contacts were conducted in non-confidential areas, five of which were listed as cell-front due to staff decision.  The majority of those non-confidential contacts were for routine psychiatric appointments, and it was unclear why they had not been ducated to the designated treatment area in the health services building.

Interviewed inmates requested increased treatment availability and time out of their cells. Inmates also expressed concerns regarding distribution of crank radios and what they perceived as inequitable distribution and a failure to comply with policy.  There were also concerns with some custody staff and correctional counselors being disrespectful to inmates and not interacting well with those with a mental illness.  Many of these concerns were supported by staff.  Multiple

270

inmates requested that custody staff who work in the unit receive enhanced training in working with the mentally ill.

During the review period, the average length of stay for 3CMS inmates was 72 days, and for EOP inmates the average was 21 days. There were no EOP inmates held in administrative segregation over 90 days.

During the site visit, there were five inmates designated NDS and each had been authorized to receive authorized property.

MHCB:

San Quentin did not have any formally designated beds for MHCB purposes, although vacant SQ PIP beds could be used for such purposes for condemned inmates. Program Guide requirements were being met for MHCB care provided at San Quentin. During the review period, 14 inmates were admitted to the SQ PIP beds for MHCB purposes. Five of these inmates had lengths of stay longer than ten days with reasonable rationales provided for such length of stay that ranged from 18-42 days. Four of the five inmates were eventually admitted to the SQ PIP. The MHCB census during the review period ranged from zero to two inmates.

New admissions were given a history and physical within 24 hours, an updated or new mental health assessment, an SRE upon admission and discharge, and an initial IDTT review within 72 hours.

Inmates were reportedly seen daily by a psychiatrist, psychologist or social worker and at least twice a week by a psychiatrist. All individual contacts occurred in a private setting unless the inmate refused to leave their cell.

Following the initial IDTT meeting, IDTT reviews were conducted at least weekly with updated treatment plans and access to higher level of care checklists.  All required staff attended the IDTT meetings.

Suicide watch and precaution practices were compliant with Program Guide requirements.  Property, bedding, and movement restrictions were reviewed timely and relaxed as clinically appropriate.

Reviewed logs documented that MHCB inmates were offered daily outdoor recreational time of 60 to 90 minutes per day as well as one out-of-cell group therapy per day.

Discharge summaries were found in the eUHR.  Three records were randomly selected for review.  Timely psychiatric admission notes were found in four eUHRs randomly selected for review.

Seclusion and Restraint:

One inmate was placed in seclusion during the review period, which lasted for a duration of four hours.  No inmates were placed in restraints for mental health purposes during the review period.

Alternative Housing:

San Quentin provided alternative housing in 22 cells in the central health care building. Inmates in alternative housing were constantly observed by nursing staff and daily mental health clinical contacts occurred, which were offered in a private setting. When inmates were discharged from MHOHU/OHU back to their housing unit, appropriate clinical follow-up occurred.

EOP:

272

According to the data provided, the majority of EOP inmates at the institution were housed within the condemned program. A list of activities for condemned EOP inmates was provided and included treatment groups such as dialectical behavior therapy, substance abuse, cognitive restructuring and anger management. There was also an EOP therapeutic yard that condemned inmates could attend. There were fewer therapeutic activities available to inmates housed in the Adjustment Center than those housed in East Block due in part to physical plant and space limitations.

Based on the schedule, there were seven one-hour treatment groups scheduled for EOP inmates housed in the Adjustment Center, while there were a total of 16 two-hour treatment groups scheduled for EOP inmates housed elsewhere. The room used for group treatment in the Adjustment Center was not a confidential space. This created challenges for facilitators in the Adjustment Center and could negatively impact inmate attendance.

The average number of structured out-of-cell treatment offered per EOP inmate was 13.4 hours, while the average number of structured treatment attended per week was 5.8 hours, excluding those on modified program. For just those inmates on modified program, the average number of structured treatment hours offered per week was 8.8 hours while the average number of hours attended per week was 2.4 hours.

The high refusal rates, 43 percent for those not on modified program and 27 percent for those on modified program were concerning to the institution and had been the subject of a QIT and quality management corrective action item as well. A quality management performance report noted that a number of the highest refusers in the condemned EOP program were transferred to the SQ PIP during the review period, leading to expectations that the refusal rate would drop somewhat.

273

It was observed that behavioral interventions as part of treatment planning appeared generally to be underutilized, and was a subject of quality management performance report discussions. Chart reviews indicated that many of the inmates who regularly refused much of their treatment plan appeared to be candidates for behavioral interventions and behavioral plans. This was often not considered as part of the treatment plan. Behavioral interventions would also address the Axis II/personality disorder issues that staff attributed some of the high treatment refusal to as well.

Initial treatment team meetings were 91-percent compliant. Routine EOP IDTTs were completed 99.7 percent of the time. Required staff was present at 93 percent of IDTTs.

Staff reported data errors regarding initial psychiatric contact data. Routine psychiatric contacts were completed timely 98 percent of the time. Initial PC contacts were 100-percent compliant, while routine contacts were compliant 97 percent of the time.

The percentage of appointments that occurred in a non-confidential setting could not be computed because the report provided included aggregated data from several different programs.

IDTTs in the condemned unit were observed for 3CMS and EOP inmates and continued to be well-facilitated. Team members maintained a therapeutic interaction with the inmate throughout the meeting. All members participated in a meaningful way that demonstrated a sophisticated and cohesive team. The criteria from the CDCR form 7388B was more fully incorporated into the team process and had clearly been incorporated into the conceptualization of each case. The SQ PIP was seen as a valuable resource and considered regularly for each inmate.

The inmate was truly a partner in his treatment as demonstrated through plan development. Medical record review indicated that documentation of these treatment plans had

274

improved in the months closest to the site visit. There was clearly significant treatment conceptualization and intervention development occurring at the IDTT, but that was not always captured in the treatment plan itself, particularly in the earlier months of the review period. Documentation of the tremendous efforts of the condemned treatment team for both EOP and 3CMS inmates was very important and stressed to the team during the observation of IDTT.

3CMS:

The mainline 3CMS program was generally consistent with Program Guide requirements. The 3CMS mainline team provided services for approximately 640 3CMS inmates in the non-condemned mainline program. Occasionally, a mainline 3CMS inmate was recommended for EOP, and in those cases, the inmate was provided increased services and a transfer to a mainline EOP facility was expedited.

Ninety-four percent of initial IDTT meetings were held within 14 working days of referral/arrival, and annual IDTTs were reported to be completed timely 100 percent of the time. The institution was compliant with required attendance at 94 percent of IDTT meetings. Access to the eUHR and C-File occurred via computers within the meeting room.

In general, an intake evaluation was completed by a psychiatrist prior to the IDTT.

Data showed that 95 percent of initial PC contacts were timely completed and routine PC contacts were timely 99 percent of the time. Psychiatrists also met with 99 percent of 3CMS inmates receiving psychotropic medications on a quarterly basis.

PCs' and psychiatrists' interviews occurred in confidential settings.

Mainline 3CMS inmates were offered groups, which included: stress reduction and pain management; PTSD veterans; lifers; developing self-compassion; improving relationships; substance abuse and anger management. In general, each group had about ten members. At the

275

time of the site visit, there were about 121 inmates who had been referred for group therapy by their PCs and were on a waitlist dating back to October 2014. Of those on the waitlist, 70 had previously attended groups. Inmates who had not yet attended a group were given priority for future groups.

A significant portion, approximately 50 percent, of the 3CMS caseload was seen more frequently than every 90 days for clinical reasons.

During the site visit, seven randomly selected mainline 3CMS inmates were interviewed in a group setting. Medication continuity problems were not present based on information obtained from these inmates. These inmates confirmed that their mental health appointments were occurring in a confidential setting. The inmates reported that the frequency of their meetings were consistent with the Program Guide requirements. In general, they reported reasonable continuity of care was present relevant to seeing the same psychiatrist and PC.

Several inmates complained about delayed responses to mental health sick call requests. They also indicated that the pill call lines generally took about 30 minutes for a given individual to receive his medication. Three of these inmates had participated in a group therapy, which generally was reported to have been helpful. Several other inmates were on a waitlist for group treatment. The health care records of six of these inmates were reviewed, confirming the information obtained during the group interview.

Referrals:

The institution had four emergent mental health referrals during the review period, of which all were seen timely. There were 40 urgent referrals, of which 36 or 85 percent were timely. The data showed that there were 1,292 routine referrals during the review period, of which 96 percent were seen timely.

276

Space:

There were ongoing space challenges in the reception center due to insufficient space to provide groups. Additionally, staff reported that the use of holding cells in the central health care building for alternative housing disrupted the flow of inmates to clinicians at times when the cells being used were also adjacent to the waiting areas for inmates coming into the area for appointments.

Heat Plan:

Temperature logs were being completed on the units and forwarded according to policy. The institution provided a newly revised Heat Related Pathologies Plan dated May 4, 2015 for review. San Quentin maintained digital thermometers in the units and conducted temperature readings on various areas of the highest tier in the unit every three hours.

RVRs:

San Quentin did not provide information regarding the number of mental health staff and custody officers trained on the revised RVR policies.

Access to Care:

The Associate Warden of Health Care was assigned to review access to care reports and work with medical and mental health leadership to resolve any issues identified as deficiencies. At the time of the site visit, there was an effort to resolve deficiencies in the areas of transfer reporting guidelines for inmates being transferred to MHCB and access to clinical staff in the ducating process.

Program Access:

a.      Job and Program Assignments:

277

Data for April 1, 2015 indicated that one EOP inmate, 257 3CMS inmates and 718 non-MHSDS inmates had full-time job and program assignments at San Quentin.

Full-time job assignments included 242 3CMS inmates and 676 non-MHSDS inmates, of which 204 3CMS inmates and 619 non-MHSDS inmates were paid.  No EOP inmate had a full-time job assignment.

All five non-MHSDS inmates assigned full-time to the academic program were paid.  No EOP or 3CMS inmates held full-time academic program assignments.  There were 109 3CMS inmates and 171 non-MHSDS inmates with part-time, unpaid academic assignments.

The full-time vocational educational program included 15 3CMS inmates and 37 non-MHSDS inmates.  Inmates assigned to the vocational education program were not paid.

Three inmates at the 3CMS level of care held voluntary job assignments.  One EOP inmate, 141 3CMS inmates and 308 non-MHSDS inmates provided voluntary services at San Quentin that were not specifically described.

Five non-MHSDS inmates were in a substance abuse program.

b.      Milestone Credits:

For the period October 1, 2014 - March 31, 2015, San Quentin reported that 233 inmates in its 3CMS program were eligible for milestone credits, of which 9.44 percent actually earned the credit.  Of the four eligible EOP inmates, none earned milestone credits.  There were 745 eligible non-MHSDS inmates during the period, of which 2.42 percent earned milestone credits.

c.      Out-of-Level Housing:

On April 10, 2015, a total of 26 3CMS Level I inmates, 12 Level III 3CMS inmates and one Level IV 3CMS inmate were housed in Level II housing.

d.      ADA Reasonable Accommodation and Grievance Procedures:

278

San Quentin provided documentation of training of staff related to the ADA Reasonable Accommodation and Grievance Procedures.

      e.      <u>Periodic Classification Score Reductions: EOP Inmates</u>:

San Quentin was not an EOP-designated institution.

*Coleman* <u>Postings</u>:

Placement of *Coleman* postings was not reviewed during the site visit.

**Deuel Vocational Institution (DVI)**
February 3, 2015 – February 5, 2015

<u>Census</u>:

On February 2, 2015, DVI housed 2,365 inmates, for a decline by five percent since the monitor's preceding site visit on August 7-9, 2012.  The mental health caseload population of 512 was an increase by three percent since the preceding visit.  There were 18 inmates in the OHU, one EOP inmate in mainline, and 131 3CMS inmates in mainline.  Of the 145 inmates in administrative segregation, three were EOP inmates pending transfer to a hub institution, and 34 were at the 3CMS level of care.

In the reception center, the total census of 1,467 inmates was an increase by 23 percent. The reception center mental health caseload census of 14 EOP inmates and 319 3CMS inmates was an increase by 29 percent.

<u>Staffing</u>:

Of the 49 established mental health positions at DVI, 43 were filled, for an overall vacancy rate of 12 percent in mental health.  Use of contractors reduced the mental health functional vacancy rate to three percent.

Of the two chief psychologist positions, one was filled and functioned as the chief of mental health, while the other position was frozen for budgetary reasons.  The senior psychiatrist position, the senior psychologist supervisor position, and the two senior psychologist specialist positions were all filled.

Both staff psychiatrist positions were filled, and a contractor provided an additional 1.25 FTE staff psychiatrist coverage.  Fifteen of the 16 established staff psychologist positions were filled, but two psychologists were out on long-term sick leave.  With contract coverage of 1.38 positions, the functional vacancy for staff psychologists was ten percent.

Of the seven established social worker positions, six were filled, for a functional vacancy rate of 14 percent.

The senior psych tech position was filled.  Six of the eight psych tech positions were filled, and contractors covered the two vacancies.

The recreation therapist position was filled.  The seven clerical positions, including six office techs and one health program specialist, were filled, although one OT was on long-term sick leave.  The CHSA II position was frozen.

During July and August 2014, DVI also had 20 hours per week of telepsychiatry.

Quality Management:

The quality management committee met monthly during the six-month review period.  It was chaired by the CEO for health care or his designee.  Required members attended and minutes were maintained.  Agenda items included LOP revisions, QIT formation, CQIT audit results, and custody and program area updates.

The mental health subcommittee met once or twice per month during the review period. Minutes of ten meetings indicated a quorum at nine of the meetings, with improved attendance

280

by custody since the preceding review period.  Agenda items included QIT formation, SRE training, performance report results, peer review plan, mental health staffing, and ongoing audits and reports by nursing, custody, and the SPRFIT coordinator.  Because IST was no longer tracking health care on-the-job training, an audit of the tracking of monthly training was conducted in December 2014, resulting in recommendations of best practices for these trackings.

The sole active QIT during the review period was to improve compliance with transfer timelines for 3CMS and EOP inmates housed in the reception center, as the compliance rate was only 38 percent.  The QIT found that transfer delays were caused primarily by bed unavailability and that new chronos were being requested every 90 days, regardless of whether the inmate changed level of care.  The QIT recommended that mental health provide weekly listings of the dates of all EOP and 3CMS inmates' levels of care and that custody staffing for the reception center be increased.

The institution was in the process of statewide standardization of peer review.  The committees were selected and awaiting training and the implementation plan from headquarters. Wasco State Prison (WSP) conducted a peer review of 13 PCs reviewed and five psychiatrists at DVI on August 15, 2014.  It focused on clinicians' documentation in patient progress notes and eUHRs and found that most documentation met or exceeded clinical standards.

Medication Management:

Audits indicated that new psychotropic medications were ordered, noted on the MARs, and administered in accordance with policy guidelines and timeframes.  Continuity of medications appeared to vary across the review period, but the extent to which psychotropic medications were affected was unknown because the audits did not distinguish between medical and psychotropic medications.

281

The compliance rate for notification of psychiatrists of inmate medication noncompliance was low at 25 percent.  Documentation in eUHRs of psychiatric contacts with inmates specifically for medication non-compliance was 90-percent compliant in August and 100-percent compliant in September and October, but it fell to 55 percent in November 2014, according to institutional audits.  No data was available for December.

Medication administration audits throughout the monitoring period indicated that pill lines did not exceed two hours and that no individual inmate's wait time exceeded 30 minutes.

MAPIP audits in August indicated that all released inmates signed for their medications at their times of release, but it did not indicate how many of these were psychotropic medications.

Transfers:

There were no referrals by DVI to acute or intermediate level inpatient programs during the review period.  Six inmates were identified as meeting criteria for consideration for referral to inpatient care.  Two had been identified due to multiple RVRs.  However, the DSH non-referral log indicated that two were identified for participating in less than 50 percent of their treatment and four were identified for three or more crisis admissions, making it unclear whether it was six or eight inmates who had been identified for consideration.  The non-referral log indicated the reasons for non-referral of these inmates as "current LOC is clinically indicated."  The comment boxes in the non-referral log could not be expanded for full viewing, obscuring the reader's view of any rationales for the non-referrals in five of the six cases.  In the sixth case, it appeared that the rationale for non-referral may have been in whole or part that the inmate, who was EOP and housed in administrative segregation, was due to parole.  Non-referral to inpatient

care due to imminence of an inmate's release date is a violation of a *Coleman* court order.  (ECF no. 2927, entered August 7, 2008)

Record reviews indicated that Form 7388Bs were not always completed or were completed incorrectly.  At observed IDTT meetings, CDCR Form 7388B was not discussed within the treatment team process.  An inmate who appeared to be appropriate for referral was not considered.  The team's use of the form appeared to be overly concrete, with over-reliance on the objective criteria on the form.

There were 274 OHU admissions (including some repeat admissions) of which four or one percent lasted longer than 72 hours.  One hundred fifty three or 56 percent of the OHU admissions resulted in MHCB admissions, of which two-thirds were untimely.  Unavailability of beds was cited as the primary reason for late admissions.

No mainline EOP inmates transferred during the reporting period.  At the time of the visit, one had been awaiting transfer since November 19, 2014.  DVI staff was unable to provide an explanation for the delay.

Of the 51 inmates referred to EOP administrative segregation hubs during the reporting period, 44 or 90 percent were transferred timely.  Three were awaiting transfer at the time of the site visit.

There were 79 mainline EOP inmates transferred from the reception center during the reporting period, including 17 or 22 percent which were late.  At the time of the site visit, 14 EOP inmates in the reception center were awaiting transfer.

Of the 696 3CMS inmates transferred from the reception center during the reporting period, 362 or 52 percent were transferred late.  At the time of the site visit, 319 were awaiting transfer.

Other Issues:

    Reception Center:

    The DVI reception center was comprised of two divisions, the reception center and the special processing unit (SPU), which was comparable to a mainline SNY.  Because of this division, plus the fact that inmates were released for their ducats several hours before their appointments, they waited for their appointments for long periods of time outdoors in a small yard until their appointments began.  This led to some appointments not being kept. No clear explanation was provided as to why these inmates were moved and caused to wait so long before their appointments.

    Psychiatric initial evaluations and contacts were 100-percent compliant.  Initial screenings met timeframes 99 percent of the time.  Clinicians reported that most inmate interviews were conducted in a confidential setting, but no summarized confirming data was provided.  Clinicians went to see inmates in the housing units, many of which had confidential space, in cases of appointment "no shows."  Other, non-confidential spaces that were used included the dayroom and chow hall.

    The reception center EOP had four psychiatrists (three of whom were contractors) and two clinicians.  Initial evaluations of EOP inmates were completed timely 95 percent of the time, and inmates were seen by their PCs timely 96 percent of the time.  Compliance rates for timeliness of initial and follow-up IDTT meetings for EOP inmates were 97 percent and 100 percent, respectively.  However, psychiatry attendance was problematic.

    EOP inmates in both the RC EOP and the RC EOP special processing unit were scheduled for daily therapeutic groups.  No data was provided on group hours offered and received in the reception center during the review period.  Record review indicated that use of

pre-printed forms was the predominant means of documenting inmates' progress in groups. SPU inmates reported that they were often forced to choose between simultaneously occurring group and yard time.

For 3CMS inmates in reception center, initial mental health evaluations were 89-percent compliant, and ongoing PC contacts were 99-percent compliant.

MHSDS Inmates in Administrative Segregation:

Based on cell availability, recent intakes were placed throughout K-Wing, L-1, and L-2. K-Wing was preferred because the mental health office was there and had a holding cell in a confidential setting. Part of K-wing was closed for maintenance at the time of the site visit. However, custody officers could not provide a list or other documentation identifying inmates on the mental health caseload, nor could they indicate where to obtain this information.

MHTS.net data indicated that DVI was 88-percent compliant with administrative segregation pre-screening. The 31-item screen was completed timely 87 percent of the time. No data on frequency of completion in a confidential setting was provided. Initial mental health evaluations were completed timely 84 percent of the time, and initial psychiatric contacts occurred timely 100 percent of the time. Initial IDTT meetings were only 54-percent compliant.

Ongoing psychiatric contacts were 100-percent compliant, but ongoing PC contacts were 85-percent complaint. Cell-front contact data was not summarized and was indecipherable. Quarterly follow-up IDTT meetings met Program Guide requirements 95 percent of the time

Although DVI was not an administrative segregation EOP hub, it was providing some group treatment for EOP inmates in administrative segregation. They were offered an average of 4.03 hours per week and received an average of 2.22 hours per week. Group therapy was scheduled within L-1, which had six therapeutic modules, one of which was ADA-accessible.

285

Custody staff reported that yard time ran from 7:30 a.m. to 12:30 p.m. daily.  Inmates could not return to their cells early, except in emergencies.  Eleven caseload inmates' 114-D files were reviewed for documentation of yard offerings of at least ten hours per week for the month of December 2014.  This indicated that a minimum of ten hours per week was offered only 68 percent of the time, and that inmates refused yard 87 percent of the time.

At an observed morning mental health-custody meeting, appropriate staff was present and discussion covered a new arrival and existing inmates.  Staff indicated that a mental health supervisor conducted an audit of these meetings, but it was merely a paper notation indicating "ok" or "not ok" for each day of the month.

Non-Disciplinary Segregation:

No inmates were designated as on non-disciplinary segregation (NDS) status at the time of the site visit.  However, during an observed ICC observation meeting, a non-mental health caseload inmate was placed on NDS status.  This was not noted within the inmate's 114-D file.  When the unit staff sergeant was asked how this information was communicated to unit staff, the sergeant said that he advised them of same.  However, this was an informal process with no documented procedure.

Alternative Housing:

At the time of the site visit, the OHU housed four inmates, three of whom were on suicide precaution status and one was on suicide watch.  There were six psychiatric OHU beds in unit B2.  DVI also had two padded cells that were used for "temporary housing/cool-down" and could not be used for more than four hours.  Four cells previously used for mental health patients had been decommissioned because of their recessed structure.  Two of those were used as alternative "cool down" rooms that were approved for brief placements.  There were also four

286

suicide watch cells in L-Wing, which staff reported had been retrofitted and which appeared to be suicide-resistant.  Visibility into these was only partial.  DVI staff reported that they had requested the same suicide-resistant beds installed statewide in MHCBs but had been denied.  Consequently, inmates were made to sleep on mattresses placed in the middle of the cell floors, some of which were cold and uncomfortable.

When OHU and L-Wing beds were filled, inmates in need of OHU placement would be placed in designated K-Wing administrative segregation cells.  Staff reported that overflow cells in L-Wing, but not the administrative segregation cells, were used at times during the review period.  Use of these cells was driven by the statewide wait list for MHCBs, according to staff reports.  During the review period, two inmates were housed in the overflow cells in L-Wing, one for 37.25 hours and one for 20.35 hours.

The OHU had an assigned psychiatrist seven days per week.  OHU documentation indicated that a psychologist was present for referrals and releases.  There were also back-up clinicians in case of staff absences.  There were some staffing changes during the review period to address problems including repeated failure to track instances of inmate self-harm.  One office was used as clinical office space and for treatment team and inmate interviews, severely limiting treatment opportunities.

OHU clinicians indicated that they contacted HCPOP as soon as it was determined that an inmate required an MHCB for stabilization, or by the second day of an OHU placement, whichever came first.  Inmates returned from an MHCB were seen by OHU staff for an SRE and possible admission back to the OHU.  Three of the four OHU admissions during the site visit were "admit from MHCB."

Inmates could be admitted to and discharged from the OHU by a psychiatrist, psychologist, licensed nurse practitioner or physician's assistant, according to DVI LOP 191. Psychologists admitting inmates must refer them to a psychiatrist for a medication evaluation and to a physician for physical examination. It was unclear whether appropriate nurse practitioners and physician's assistants had received appropriate SRE training that would equip them to admit and discharge inmates from the OHU. It was also unclear whether RNs who were completing evaluations after hours had received appropriate training. While the LOP referenced that a verbal order to admit was required, this might defer the safe placement of an inmate until he could be evaluated by a psychiatrist or psychologist. During the site visit, an inmate referred for possible OHU admission was observed left alone waiting for at least 70 minutes with no staff directly monitoring him. The custody officer stationed at a desk nearby was covering various competing responsibilities which did not allow him to observe the waiting inmate.

According to MHTS.net data, OHU clinicians were compliant with daily clinical contacts and completion of initial, ongoing, and discharge SREs at rates of 93, 98, and 100 percent, respectively. Data indicated that initial PC contacts were 84-percent compliant. Review of a small sample of OHU medical records was consistent with the MHTS.net data, although it did suggest that initial contacts were compliant. No audit data was available for history/physicals, psychiatric contacts/evaluations, or discharge plans.

Treatment in the OHU consisted of primarily the OHU placement itself as a temporary "time-out," medication management, and brief individual contacts with mental health staff there. Staff utilized this time as an assessment opportunity to determine if the inmate required inpatient treatment at a higher level of care. Each morning staff met in a "morning huddle" to discuss cases, administrative issues and review plans for the day.

288

<u>3CMS</u>:

DVI had a Level II mainline 3CMS program with two clinicians who had caseloads of about 1:70. The telepsychiatrist position for the program was lost during the review period.

Initial mental health evaluations were only 63-percent compliant.

Initial and follow-up psychiatric contacts were 100-percent and 99-percent complaint, respectively. For reasons that were unclear, DVI was noncompliant with initial and ongoing PC contacts in the mainline 3CMS program, at 69 percent and 83 percent, respectively.

Initial IDTT meetings were only 22-percent compliant but annual follow-up IDTT meetings were 100-percent compliant. Limited reported data on IDTT meeting attendance indicated compliance rates of 89 percent for October, 85 percent for November 2014, but only 47 or 60 percent for December, which was attributed in part to the extended absence of a psychiatrist.

There was no data provided regarding 3CMS treatment groups. The only group data provided was for administrative segregation and reception center groups.

<u>Referrals</u>:

DVI reported 2,764 mental health referrals. The 71 emergent referrals drew timely responses in 92 percent of cases. For the 74 urgent referrals, the rate of timely response was 95 percent, and for the 1,799 routine referrals, it was 97 percent.

<u>Space</u>:

Mental health leadership indicated long-standing problems with adequacy of treatment and office space. They reported assurance by CDCR headquarters that pending construction will improve the situation.

<u>Mental Health/Custody Relations</u>:

Staff reported that their data did not always correspond with the Access to Care reports completed by custody staff.  Some staff reported that certain custody staff marked the inmates as having appeared for ducats based on escort from the cell, rather than on whether he actually attended his appointment.  Conversely, mental health clinicians would record the appointment as a "no show" if the inmate had returned to his cell before the appointment began, creating inconsistency between mental health's and custody's reports.  Some staff reported that they worked with their custody counterparts to agree on the entry so that Access to Care reports would be consistent and accurate.  The efficacy of this approach varied from area to area, being most successful in administrative segregation and least successful in reception center.  Mental health staff indicated that they had reported this up their supervisory chain.

<u>Heat Plan</u>:

There were no heat-related incidents reported during the reporting period.

During the heat season, indoor and outdoor temperatures were logged and forwarded to the litigation coordinator and a monthly heat report was sent to headquarters.  Housing units received weekly lists of all inmates taking heat-sensitive medications.  Those inmates were given access to cooling measures including fans, ice and extra showers during Stage II and III heat alerts.

Nursing performed rounds in housing units where temperatures reached 95 degrees. There were 21 heat days recorded in July, 12 in August, seven in September, and none in October.  The litigation coordinator reported reviewing inmate housing lists weekly to determine if inmates on heat medications were housed appropriately.  It was also the litigation

290

coordinator's practice to prepare a weekly discrepancy report, listing any failures to follow the heat plan.

Temperature reading sensors were observed in housing units C, D, E, F, G, East Hall, West Hall, J, K, and L wings. The readings were being taken in each housing unit, but the locations of the sensors were problematic in several units. In units D, E, F, G, J, and East Hall, the sensors were located on the third floor, hanging from the bars of the officer's station. In West Hall, the sensor was on the second floor, but it was located within the officer's station and within three feet of an open window. In K-wing, the sensor was located within the officer's station on the second floor. C-Wing had the sensor on the second floor hanging from the officer station bars.

RVRs:

The institution did not provide records of RVR training of custody and mental health staff.

Use of Force:

DVI used the current, headquarters-approved lesson plan for use-of-force staff training. Provided documentation showed that three of the 30 mental health clinical staff for whom training was required were out on long-term sick leave. Of the remaining 27, 25 received the training for a compliance rate of 93 percent. Of the 90 custody managers and supervisors who required training, 76 attended, for a compliance rate of 84 percent. Of the 405 COs, 378 attended, for a compliance rate of 93 percent.

Program Access:

a.    Job and Program Assignments:

291

Because DVI did not have an EOP program, there were no work training assignments assigned to EOP inmates. Data provided by headquarters showed that 84 percent of the full-time available jobs were filled by non-caseload inmates and 16 percent were filled by 3CMS inmates. 56 percent of the part-time available jobs were filled by non-caseload inmates and 44 percent were filled by 3CMS inmates.

For the part-time academic program assignments, 86 percent were held by non-caseload inmates and 14 percent were held by 3CMS inmates. For the voluntary academic assignments, 91 percent were filled by non-caseload inmates and nine percent were filled by 3CMS inmates. Eighty-one percent of the full-time vocational educational assignments were filled by non-caseload inmates and 19 percent were filled by 3CMS inmates. Eighty-two percent of the part-time vocational educational assignments were filled by non-caseload inmates and 18 percent were filled by 3CMS inmates.

b.    Milestone Credits:

The institution had implemented new policies and procedures on the evaluation of EOP inmates for program assignments and milestone credits. Training was completed on October 27 and 28, 2014. Because DVI is a 3CMS mainline institution, there were no inmates who met the criteria for functional evaluation.

c.    Out-of-Level Housing:

For out-of-level housing of caseload inmates, institutional data indicated that one Level III EOP inmate was placed in Level II housing, six Level I 3CMS inmates were placed in Level II housing, eight Level III 3CMS inmates were placed in Level II housing, and two Level IV 3CMS inmates were placed in Level II housing.

*Coleman* Postings:

292

*Coleman* postings were not found in all of the toured units. Postings that were found were not the updated version and were sometimes blocked from view by items placed in front of them. In the K-Wing administrative segregation unit, the 2002 version was located on a wall behind officers' hanging coats, and in D-Unit, the 2002 version was found on a bulletin board accessible to class members. No postings were found in the L-1 and L-2 units or the mainline C-Unit.

**California State Prison/Corcoran (CSP/Corcoran)**
February 17, 2015 – February 20, 2015

<u>Census</u>:

At the time of the site visit, CSP/Corcoran housed a total of 4,059 inmates, for a decline by 685 or 14 percent since the preceding monitoring period. There were 1,651 inmates on the mental health caseload, which had grown by eight percent since the preceding monitoring period and comprised 40 percent of the total inmate population.

The MHCB unit housed 26 inmates. One MHCB inmate was in non-disciplinary segregation.

There were 90 EOP inmates in the administrative segregation hub. The mainline EOP population of 228 had grown by 55 percent since the preceding monitoring period. Twenty-three EOP inmates were housed in 3CMS housing units. Fourteen were in non-disciplinary segregation, and four with SHU terms were pending transfer to a PSU.

There were 852 3CMS inmates in mainline, 359 in the SHU, 70 in administrative segregation, 55 in non-disciplinary segregation, and 22 in Long-Term Restricted Housing. This represented a decline by 58 percent in administrative segregation and an increase by 47 percent in mainline.

293

<u>Staffing</u>:

Excluding nursing and psych techs, only 68 of 106.9 established mental health positions were filled, for a 36-percent vacancy rate. Use of 12.66 contractors reduced the functional vacancy rate to 25 percent.

Positions for the chief psychiatrist, two chief psychologists, five senior psychologist supervisors, and three senior psychologist specialists were filled.

Of the 11 staff psychiatrist positions, only 2.5 were filled, for a 77-percent staff psychiatrist vacancy rate. The institution reported that its staff psychiatrists had caseloads of 65, 122, and 222 inmates, respectively. Use of 5.36 contractors reduced the functional vacancy rate to 29 percent. Caseloads were not provided for registry psychiatrists. Mental health staff reported that the shortage in psychiatry coverage caused the institution to re-direct psychiatrists to programs according to need.

Eighteen of 32 staff psychologist positions were filled, for a 44-percent vacancy rate. Use of 3.49 contractors reduced the functional vacancy rate to 33 percent. Six of the staff psychologists were unlicensed.

The supervising social worker position and 14 of 19.4 clinical social worker positions were filled, for a 28-percent vacancy rate. The functional vacancy rate was reduced to eight percent with use of 3.81 contractors.

The vacancy rate for recreation therapists was 64 percent, with seven of the 11 positions vacant.

Three of four senior psych tech positions were filled, as were 60 of 61.95 psych tech positions, for a three-percent vacancy rate. However, eight psych techs were on extended sick leaves.

Thirteen and a half of the 16.5 mental health clerical positions were filled, for an 18-percent vacancy rate. The three HPS positions and one OSS II position were filled, but the CHSA II position was vacant.

CSP/Corcoran reported telepsychiatry data in terms of actual appointments, as opposed to the number of telepsychiatry hours. During the latter five months of the six-month review period, there were 977 individual and IDTT meeting telepsychiatry appointments.

Quality Management:

Staff interviews and document review indicated that CSP/Corcoran maintained a robust quality management function.

During the review period, the local governing body met four times, always attained a quorum, and addressed approval of mental health-related LOPs, among other things.

The quality management committee met each month of the review period and always reported a quorum. Detailed minutes for five of the six meetings indicated that the committee took up an extensive agenda of numerous mental health-related issues including staff vacancies, telepsychiatry, the populations of the various mental health programs, alternative housing stays, program compliance for PC contacts, IDTT meetings, and mental health-related LOPs and CAPS. The CAPS addressed performance indicators for timely mental health referrals and PC contacts, discharge follow-ups, alternative housing stays, offered EOP treatment hours, and administrative segregation prescreens, among other things. Meeting minutes indicated progress on these CAP items and sustainable process reviews.

The mental health subcommittee met twice each month during all six months of the reporting period and always achieved a quorum. It addressed MAPIP issues including medication continuity audits and programming for the institution's various inmate populations.

295

It also reviewed 7388B audits and DSH referrals, staffing, out-of-cell contacts, PC and IDTT meeting compliance rates, IEX referrals, treatment hours, MHCB admissions and stays, restraint/seclusion, suicide watch, PC 2602 statistics, and QITs, among other things.

Four active QITs at CSP/Corcoran during the review period addressed the EOP hub Treatment Improvement Plan (TIP), MHTS.net/eUHR concordance, mental health document scanning, and five-day clinical follow-up procedures, respectively.  The QIT on the TIP led to meetings among mental health, nursing, and custody staff on improving the EOP hub treatment program.  It also addressed ensuring that nursing pre-screens were completed and entered in the tracking system and adding additional groups when group sessions were canceled due to fog.  A QIT on MHTS/eUHR concordance checked both of these information management systems for consistency.  QITs also examined timeliness of submission and scanning of mental health documentation, and compliance with post-MHCB discharge five-day clinical follow-ups.

During the review period, there was no peer review for psychiatrists, psychologists, or social workers.  The institution began a peer review process in connection with an upcoming accreditation site visit by the American Correctional Association.  It had Salinas Valley State Prison (SVSP) psychiatrists, psychologists, and social workers review files of their professional counterparts at CSP/Corcoran.

Medication Management:

Medication continuity for newly-arriving inmates at the institution was 61-percent compliant, and following intra-institutional moves it was 47.9-percent compliant.  Other medication continuity compliance rates were 55 percent after MHCB discharges, 72.5 percent after transfers to locked units, and 64.6 percent after discharged from a community hospital.

296

Inmate medication compliance rates included 43.6 percent for psychiatrist-prescribed medications, 99.4 percent for involuntary medications, and 49.6 percent following timely provider visits after refusals or no-shows.  Compliance rates for medication administration were 37.38 percent for psychiatrically-prescribed chronic care medications, and 78 percent for compliance with new psychiatric medications.  Staff attributed these low compliance rates to high treatment refusal rates and documentation gaps on MARs.  This was corroborated by review of the refusal tracking logs and MARs.

Laboratory testing of inmates' blood levels for psychotropic medications was 91.2-percent compliant.

The institution was 98-percent compliant with providing parole medications to inmates being released from the prison.

Transfers:

The inpatient care referral log was up-to-date and contained required information for the most part.  There were 500 cases in which IDTTs considered but did not refer inmates to higher levels of care.

There were 25 referrals to DSH acute care, all of which were completed timely and accepted, and one was rescinded by the institution.  Eleven were transferred timely, and 13 transferred within 72 hours of a bed assignment.  At the time of the site visit, two inmates had been awaiting transfer to acute care for eight days.

CSP/Corcoran initiated seven DSH intermediate care referrals for which all packets were completed timely.  Three transferred timely, and five transfers occurred within 72 hours of a bed assignment.  At the time of the site visit, one inmate had been awaiting transfer to intermediate care for 65 days.

297

Thirty-nine inmates returned from inpatient care during the review period.  The DSH coordinator reported receiving email notification of DSH discharges.  DSH discharge summaries were posted to SharePoint and were reported to be legible and useful.

Of 174 inmates transferred to an outside MHCB during the review period, 101 or 58 percent had a bed assignment within 24 hours of referral.  Forty-two or 24 percent were transported within 24 hours of referral.

There were 25 MHCBs in the institution's CTC.  During the review period, 267 inmates were admitted, with an average stay lasting 9.8 days, and a range of zero to 114 days.  One hundred seventeen or 44 percent of stays exceeded ten days.  Twenty-one inmates at CSP/Corcoran had re-admissions, with a range of three to 12 admissions during the review period.  Nineteen of these 21 inmates had stays in two or more MHCBs at other institutions' MHCBs.

Alternative housing consisted of 20 rooms in various areas.  Data showed that 55 percent of 323 alternative housing stays at CSP/Corcoran during the review period did not exceed 24 hours.  On average, alternative housing stays exceeded timeframes by 1.1 days.  Eighteen stays exceeded timeframes by three to ten days, and four stays exceeded timeframes by 25 to 58 days.  Staff attributed these delays to untimely completions of history/physicals, timing of custody's transfers to outside MHCBs, and unavailability of MHCBs through HCPOP.

Of the 94 EOP inmates transferred to an administrative segregation EOP hub, 74 or 79 percent transferred within 30 days.  Among a sample of five inmates, reasons for delays were overpopulation and closure of the CSP/Corcoran hub to new intakes, safety and security concerns, an MHCB admission, and an inmate's refusal to move from his current housing.

All 38 EOP inmates endorsed to a PSU transferred within 60 days of PSU endorsement.

298

Other Issues:

Administrative Segregation EOP:

The administrative segregation EOP hub was located in the 3A yard, a Level IV facility. Program capacity remained at 99 inmates, but it ran approximately 30 percent over capacity and at times reached a high of 140 inmates. Staff reported that the hub was closed to new intakes on December 3, 2014 due to overcapacity. At the time of the site visit, there were 90 inmates in the hub, including 58 whose stays had exceeded 90 days. The institution reported that it did not conduct ICC reviews every 30 days for these inmates, as they were reviewed every two weeks in a regularly-scheduled unit meeting. Lengths of stay ranged from 90 to 512 days. Seven inmates were endorsed for transfer at the time of the site visit.

Initial psychiatric contacts were 92-percent compliant. Eighty-seven percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 30 days.

Initial and weekly PC contacts were 89 and 97 percent compliant, respectively. The PC-to-inmate ratio ranged from one-to-12 to one-to-14 during the review period, and was one-to-eight at the time of the site visit. Ninety-one percent of initial evaluations were completed by PCs within five days of inmates' placement in the hub. Comprehensive clinical assessments before initial IDTT meetings were only 36 percent complaint.

Observed psych tech rounds were well-conducted. Discussion with the psych tech indicated that appropriate decisions were made concerning which inmates required referral to mental health staff for follow up.

Review of minutes for three months of ICC meetings indicated that they were attended by the warden, associate warden, captains, ISU sergeant, Classification and Parole Representative (C&PR), and Correctional Counselor IIs (CC II). Inmates' case factors and housing were

299

reviewed.  Except for some handwritten notes indicating action for a few inmates, there were no other indications of any formalized actions.  Delays in transfer were largely due to pending RVRs (usually for battery and threats) and pending court dates.

Seventy-seven percent of initial IDTT meetings were completed within fourteen calendar days.  Follow-up IDTT meetings took place at least every 90 days 94 percent of the time.  The institution reported an 85-percent compliance rate for appropriate inter-disciplinary attendance at IDTT meetings.  All disciplines who attended had 100 percent compliance with attendance, but psychiatry was present for only one of the 50 IDTT meetings reviewed.

At observed IDTT meetings, required staff were present and necessary documentation was available.  Interaction among the team was good.  PCs' presentations were adequate. Inmates were considered for higher levels of care as indicated.  Treatment goals were discussed, but needed greater alignment with clinical assessments and improved measurability.  EOP inmates with IEX issues could not be transferred to an appropriate treatment program because of a requirement that their RVRs must first be resolved.

 Inmates were offered an average of 12.4 hours of structured therapeutic activities per week, with an attendance rate of 44 percent for receiving ten hours per week.  Apart from inmates on modified treatment plans, on average 20 inmates refused more than half of offered treatment per week.  Institutional data indicated that 90 percent of these inmates were offered at least ten hours of structured therapeutic activities per week, but none attended at least ten hours.

A portion of an observed group on coping skills started on time and had therapeutic modules that were adequately clean and appropriately arranged.  The facilitator had a good rapport with the participants, although additional efforts to facilitate interaction among group members may have been helpful.  In a subsequent group interview of the participants, they

reported that groups were useful, but also that group schedules conflicted with recreational opportunities, that choosing recreation over group would be documented as a group refusal, and that groups were interrupted for medication passes.

 Staff reported that inmates were offered a minimum of 3.5 hours of yard every other weekday.  Yard on Sunday was available for make-up if any inmate had not received ten hours during the week.  This was generally corroborated by documentation, although there were cancellations due to fog and/or vaccinations.

The LOP on unclothed body searches and associated training were not finalized by the time of the site visit.  No interviewed inmates indicated that unclothed body searches would discourage their group attendance.  Staff were trained on dealing with inmates who refused over half of their treatment but expressed frustration with having to investigate reasons for refusals which were already known.

MHCB:

CSP/Corcoran's General Acute Care Hospital (GACH) was converted to a CTC on December 1, 2014.  It had 25 MHCBs and one seclusion and restraint chair.

Initial SREs were completed timely 74 percent of the time.  Initial psychiatric and clinical contacts were 44-percent and 64-percent compliant, respectively.  Follow-up SREs were completed timely 64 percent of the time.  Follow up psychiatric and clinical contacts were 65-percent and 88-percent complaint, respectively.  These low compliance rates were attributed to staff shortages.

Initial IDTT meetings were 86-percent compliant, while follow-up IDTT meetings were only 37-percent compliant.  At observed IDTT meetings, all disciplines attended and all inmates were uncuffed once placed into the treatment module.  Discussions were clinically-driven and

covered treatment plans, goals, and triggers. The facilitating clinician engaged the inmate, who was allowed and encouraged to ask questions. Two of the three inmates had concerns with custody officers. The psychiatrist reported on inmates' medications but did not ask the inmate about side effects or other related concerns.

MHCB inmates did not receive yard time.

Five-day clinical follow-ups post-MHCB discharge were 82-percent compliant.

Seclusion and Restraint:

Staff reported five instances of inmate restraint during the review period, with duration of restraints ranging from four to 23 hours. No reasons for the restraints were documented in the log.

Alternative Housing:

CSP/Corcoran used 20 rooms in multiple areas as alternative housing for MHCB patients. Some were in CTC Unit D, which had an area for confidential contacts and was designated as the priority alternative placement. Other areas used were the SHU visiting area, the TTA, and the administrative segregation unit treatment building. At the time of the site visit, two of the 20 rooms were occupied.

Staff reported that daily clinical rounds were conducted in alternative housing, with particular attention to inmates not transferred within 24 hours. It was reported that 55 percent of the 323 stays in alternative housing exceeded 24 hours, by an average extra 1.1 days. Four stays exceeded timeframes by 25 to 58 days, and 18 exceeded timeframes by three to ten days. Staff attributed this to untimely completion of history and physicals, timing of transfers to outside MHCBs, and unavailability of MHCBs through HCPOP.

302

Mental health staff described mental health-custody relations as fair. Some staff believed that custody used MHCB and alternative housing for placements of problematic inmates who did not have mental health problems.

Cleanliness of the alternative housing area was problematic. PIA took over cleaning responsibility in September 2014. It was reported that cleaning had improved from a completion rate of 65 percent to 75 percent.

3CMS SHU:

At the time of the site visit, there were 40 inmates in the SHU. The average length of stay was 47 days, with a range of one to 143 days. Including preceding stays in administrative segregation, the average total stay was 154 days.

Initial psychiatry contacts were 100-percent complaint, while 97 percent of initial PC contacts were timely. Follow-up psychiatry contacts were 98 percent complaint, and 86 percent of weekly follow-up PC contacts were timely.

Eighty-four percent of initial IDTT meetings were completed timely, and 97 percent of follow-up IDTT meetings were timely. The overall rate of attendance by all required IDTT members was only 61 percent. From a sample of 380 IDTT meetings, attendance rates by discipline were 71 percent for psychiatry, 76 percent for senior psychologists, 82 percent for PCs, 62 percent for psych techs, and 75 percent for correctional counselors.

Ninety-three percent of psychiatric cell-front visits were attributed to inmate refusals. Seventy-five percent of cell-front PC contacts were attributed to inmate refusals and 20 percent were attributed to staff decision.

Treatment of 3CMS inmates in the SHU was reported to have been adversely affected by reductions in staffing allocations and scheduling of escort officers. Leadership reported only

sporadic conduct of groups during the review period. Some staff who had been conducting groups were reassigned to serve the EOP population. Groups were not being offered at the time of the site visit.

Long Term Restricted Housing:

The LTRH program began on January 19, 2015, and 3CMS inmates in the SHU were in the process of being moved there at the time of the site visit.

The LTRH was intended to implement a novel approach to treatment of the 3CMS SHU population. Comprehensive planning for the introduction of this complex unit lacked sufficient inter-disciplinary involvement, although by the time of the site visit, there were indications that it was improving. Leadership indicated that affected inmates received only minimal preparation for their moves, and that mental health staff had only tangential involvement in the order of the moves. Program leadership indicated that treatment space was adequate, although concerns arose about confidential space. The physical plant was adequate for group treatment and was sufficiently clean.

At the time of site visit, it was reported that 69 inmates were in the program. Fifteen PCs were allocated to the LTRH units. Care was provided by several clinicians reassigned from other programs, and interviews were being scheduled.

Provided documentation indicated that provision of in-cell therapeutic activities was determined by the IDTT on an ongoing basis. Arriving inmates received a program booklet, a work/activity book, and a radio if they did not already have an appliance. It was reported that word games and puzzles were provided during regular rounds.

At the time of the site visit, a few inmates had already had IDTT meetings. These meetings were not held soon after their arrivals at the LTRH, but according to their IDTT

schedule while in the SHU.  At observed IDTT meetings, all required staff were present, although not all of them were regularly assigned to the inmate, and required documents were available.  Levels of staff interaction varied and the discussion was generally adequate.  The psychiatrist was led into the discussion only minimally, even regarding medication management issues and meeting with the inmate.  Treatment goals required greater definition and expression in measurable terms.  Factors to consider for potential referral to higher levels of care were not routinely presented or assessed.

Attendance rates for one-to-one contacts averaged 37 percent.  Inmate interviews confirmed that they were offered out-of-cell time and access to showers.  Tracking sheets covering February 2, 2015 to February 22, 2015 indicated only one instance in which an inmate either did not receive, or was offered and refused, two hours of out-of-cell activity.

All inmates on the unit were assigned to groups.  Provided data indicated that group attendance rates during the initial four weeks of the program ranged from 39 percent to 67 percent in week three.  Leadership noted that some recreational activities conflicted with scheduled treatment.  At the time of the site visit, inmates were placed into groups based on group availability, without consideration of clinical indications.  Groups operating at that time included stress management, anger management, coping skills, and IEX.  An observed group on anger management was well-run and drew excellent participation by group members.

The day room had a television and several atoms chairs.  Tracking sheets indicated that inmates were generally offered four hours a week of dayroom activities broken into two-hour segments on two consecutive days.  Some inmates indicated apprehension about going to the dayroom, and tracking data indicated only a 14.5-percent acceptance rate among the only 18 inmates who accepted offers of dayroom.

305

<u>EOP SNY:</u>

The EOP SNY yard was housed on yard 3B in unit 3B01.  It was full to its capacity of 150, plus another 18 inmates in overflow in building 3B02.  There were seven PCs assigned to the 228 inmates, for a clinician-to-patient ratio of one-to-33.  Treatment activities were conducted in two group rooms and six individual session rooms.

Ninety-one percent of initial psychiatrist contacts and 74 percent of initial PC mental health assessments were completed timely.

Ninety-two percent of follow-up psychiatrist contacts and 79 percent of follow-up PC contacts were timely.

At three observed IDTT meetings, appropriate clinical staff, the CC I, and the EOP vocational instructor attended and participated.  A Spanish language interpreter was present as needed.  Discussion appeared disorganized and not addressed to the inmate.  One of the three treatment plans contained the potentially unattainable goal of "inmate will never have suicide ideation," while other treatments plans/goals were read by the clinician but not discussed with the inmate.

At their initial IDTT meetings, inmates were given a list of groups to attend but without discussion of their purpose.  The psychiatrist had not seen one patient because of his orientation status, and made no attempt to see him during the week of the meeting.  The psychiatrist also did not discuss medication side effects with the patients.

Average weekly treatment hours were 19.11 scheduled, 10.11 offered, 7.15 attended, nine cancelled, and 2.96 refused.  Average weekly modified treatment hours were 9.79 scheduled, 5.51 offered, 4.10 attended, 4.28 cancelled, and 1.41 refused.

Groups were conducted five days per week by recreation therapists or psych techs. Average group attendance ranged from six to 20.  There were no core groups or process groups.

Group interviews of eight inmates indicated that all knew and had contacts with their psychiatrists and PCs.  Two reported being told of their treatment plans by their PC before the IDTT meeting, two reported being told about their treatment plans during the meeting, and four reported being told about it after the meetings.  Five said they were not involved in their treatment plans and four inmates said their placement in groups was random.

3CMS:

There were 852 3CMS inmates in mainline.  The 5.5 PCs had caseloads ranging from 100 to 175, and a clinician-to-patient ratio of one-to-16.

Group treatment for 3CMS inmates remained unavailable.  Leadership attributed this to inadequate staffing, which hindered their ability to meet Program Guide requirements.  Further, the presence of approximately 20 EOP inmates on Yard 3C caused mental health staff to have to focus their attention on providing the more frequent clinical contacts required for EOP inmates.

High inmate turnover on Yard 3B led to many intake assessments being done. Leadership also reported increased self-referrals attributed to the inability of staff to provide the intensity of care required by some inmates, which in turn led to difficulties meeting Program Guide requirements, including timely response to referrals and timely completion of both initial and follow-up IDTT meetings.

Administrative Segregation 3CMS:

The administrative segregation 3CMS program was housed in Yard 3A.  It had a census of 70 and five PCs, for a clinician-to-patient ration of one-to-14.  Adequacy of confidential space for clinical contacts was reported to be an ongoing problem.

Staff reported 100 percent of initial psychiatry contacts were timely, and 90 percent of initial PC contacts were timely.  One hundred percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.  Ninety-six percent of inmates received at least weekly contacts with their PCs.

During the review period, 83 percent of initial IDTT meetings were timely.  Follow-up meetings took place at least every 90 days 100 percent of the time.  However, none of the 171 reviewed IDTT meetings had a full complement of required disciplines.  Psychiatry was present at only .06 percent of meetings, and the PC attended only 31percent of meetings.  Psych techs attended 79 percent of IDTT meetings during the review period.  During observed IDTT meetings, factors for possible transfers to higher levels of care were generally considered.  At an observed IDTT meeting, required staff were present and necessary documents were available.  There was good interaction among attendees, although the psychiatrist attended via telepsychiatry and was not regularly introduced to the inmate

Staff reported that inmates were offered yard every other day for a minimum of 3.5 hours each day, five days per week, with Sunday yard as a make-up day for any inmate who had not received ten hours that week.

Referrals:

Of the 229 emergent referrals during the review period, 97 percent drew a timely response.  For urgent referrals, the timely response rate was 85 percent.  Seventy percent of the routine referrals received a timely response.

It was reported that most routine referrals were made for medication-related issues, and that the institution's understaffing in psychiatry contributed to the 67-percent compliance rate for timeliness of response.

Mental Health/Custody Relations:

Mental health staff described relations with custody as fair. Some staff believed that custody used MHCB and alternative housing for housing of problematic inmates who did not have mental health concerns.

Heat Plan:

No heat plan issues during the review period were reported. Heat logs were completed and forwarded to headquarters. Units with multiple thermometers reported the highest temperatures rather than averages. Staff noted that cell temperatures were not checked routinely, but only if there were specific complaints.

Use of Force:

As of December 12, 2014, 98 percent of custody staff received training on the new use of force policy and procedure. No documentation on training of mental health staff was provided.

Access to Care:

There were staff reports of lack of access to inmates, including some indicating difficulties with meeting inmates before 11:00 a.m. Clinicians also reported insufficiency of access-to-care officers which resulted in inability to see mental health caseload inmates for sufficiently long durations, or having to see them at cell front. Reportedly, in the EOP administrative segregation hub, the 10.5 assigned escort teams were often diverted to other health care-related duties.

Monthly Health Care Access Quality Reports for August through December 2014 indicated that only three percent of issued mental health ducats and add-on appointments were

309

not completed due to custody factors, and that 12 percent were not completed due to non-custodial reasons other than inmate refusals.

Program Access:

a.    Job and Program Assignments:

As of January 22, 2015, 46 EOP inmates had full-time employment positions.  The institution was unable to report whether they were paid positions or the number of PIA positions. It was reported that funding was insufficient to offer all pay for all positions, but inmates who excelled at non-paying jobs were given the opportunity to advance to paying positions.  Four EOP inmates had full-time non-paying vocational education positions and 45 EOP inmates participated in part-time academic programming.  An additional 57 EOP inmates were eligible for work training assignments but were unassigned.

A total of 317 3CMS inmates had full-time employment positions, but likewise the institution could not report which positions were paying and/or the number of PIA positions. Another 198 3CMS inmates were enrolled in part-time academic positions, while 29 3CMS inmates participated in part-time substance abuse treatment programming and 23 3CMS inmates were enrolled in full-time vocational education programs. An additional 178 3CMS inmates were eligible for work training assignments but were unassigned.

Among non-mental health caseload inmates, 1,161 had full-time employment positions, 531 had part-time academic positions, 62 participated in part-time substance abuse treatment programs, and 72 participated in full-time vocational education programs.  One hundred seventy eight were eligible for work training assignments but were unassigned.

b.    Milestone Credits:

During the review period, 64 of 331 EOP inmates were eligible to earn milestone credits. Only 3.13 percent earned the credit. Two hundred thirteen of the 1,293 3CMS inmates were eligible, but only 5.63 percent earned milestone credits. For non-mental health caseload inmates, 523 of the 2,518 were eligible, but only 12.24 percent earned the credit.

c.     Out-of-Level Housing:

As of January 20, 2015, no Level I MHSDS inmates were housed as CSP/Corcoran. There were 51 Level II 3CMS and two Level II EOP inmates housed in Level III housing, and one Level II 3CMS inmate was housed in Level IV housing. There were 20 Level III 3CMS inmates and four Level III EOP inmates housed in Level IV housing, and 36 Level IV 3CMS inmates and ten Level IV EOP inmates housed in Level IV housing.

d.     ADA Reasonable Accommodation and Grievance Procedures:

CSP/Corcoran did not provide information regarding its ADA Reasonable Accommodation and Grievance Procedures. The institution reported that it had been informed by CDCR headquarters that this information was compiled for only a limited number of institutions which did not include CSP/Corcoran.

e.     Periodic Classification Score Reductions – EOP Inmates:

Review of a sample of completed CDCR 840s confirmed that EOP inmates were granted classification score reductions for successful programming, although some of the CDCR 840s were conducted only annually.

## California Substance Abuse Treatment Facility (CSATF)
April 27, 2015 – April 29, 2015

Census:

On April 24, 2015, CSATF housed 5,542 inmates, for less than a one-percent increase from the census reported during the prior site visit in July 2012.  There were 2,295 inmates on the mental health caseload, which had grown by 26 percent since the previous site visit and comprised 41 percent of the total inmate population.

The MHCB unit housed 19 inmates.

There were 352 mainline EOP and 1,846 mainline 3CMS inmates.  The administrative segregation population of 224 included three EOP inmates pending hub transfer and 75 3CMS inmates in STRH.

Staffing:

Positions for the chief psychiatrist and two chief psychologists were filled.

All eight staff psychiatrist positions were vacant, leaving a 100-percent vacancy rate. Contractors covered 2.75 psychiatry positions, reducing the functional vacancy rate to 66-percent.

Four senior psychologist supervisor positions were filled.  Three of four senior psychologist specialist positions were filled, for a 25-percent vacancy rate.  Of 34 staff psychologist positions, 26 were filled, leaving a 24-percent vacancy rate.

The supervising social worker position was filled.  Seventeen of 19 social work positions were filled, for an 11-percent vacancy rate.

Positions for three senior psych techs were filled.  Thirty-four of 36.3 psych tech positions were filled, for a six-percent vacancy rate.  Three contractors reduced the psych tech functional vacancy rate of zero.

Only four of 13 recreational therapist positions were filled, for a 69-percent vacancy rate.

One AGPA and three HPS I positions were filled, but the CHSA II position was vacant. Sixteen of 19 clerical positions were filled, leaving a 16-percent vacancy rate.

There were 4,409 individual and IDTT meeting telepsychiatry appointments, for a monthly average of 735 appointments.  Staff reported that turnover in telepsychiatry had resulted in a lack of consistency.

Quality Management:

The local governing body met twice.  Minutes were provided for only one meeting and did not reflect whether there was a quorum.  Mental health-related issues that the local governing body addressed included staffing, the CQIT, EOP inmate treatment, and clinical contacts.

The quality management committee met five times, maintained meeting minutes, and always reported a quorum; one meeting was cancelled.  Addressed issues included the EOP program, cocci, and information technology.  Numerous subcommittees, including mental health, reported monthly to the quality management committee.

The mental health subcommittee met twice monthly, kept meeting minutes, and always achieved a quorum.  It addressed a wide range of matters, including DSH referrals, medication management, parole and involuntary medication orders, staffing, access to care, RVRs, QITS, the MHCB, the EOP and 3CMS programs, suicide prevention, and quality management. Discussed quality management issues included effective communication, MHTS.net/eUHR concurrence, and timeliness of IDTT meetings and SRE follow-ups.

313

There were three active QITS during the review period.  A QIT on timely completion of mental health pre-screens was terminated after compliance rates increased to above 85 percent. Following staff re-training, a QIT on critical contact compliance rates was also closed.  A QIT on improvement in five-day follow-up compliance rates chartered during the reporting period remained active.

CSATF's internal peer review team met in February 2015 and reviewed two psychologists and two social workers.  Of the four clinicians, one was found to exceed standards, two met them, and minor concerns were expressed as to the fourth.  There was no psychiatry peer review. CSATF did not participate in external peer review during the reporting period.

Medication Management:

CSATF staff used MAPIP and the quality management committee to perform medication management audits.  MAPIP audited psychiatry measures that evaluated laboratory blood work and tasks that were performed prior to ordering antipsychotic medications, nursing compliance, and medication administration.

Psychiatry was noncompliant with ordering clinically-indicated laboratory tests of blood levels for inmates on antipsychotic medications.  However, all but three of twenty nursing measures exceeded 90 percent.  The three noncompliant measures were for medication continuity following transfers from community hospitals, medication compliance with psychiatry-prescribed medications, and administration of psychiatric chronic care medication. High inmate refusal rates were the reasons for noncompliance.  Staff further reported that the CEO, CNE, and chief psychiatrist had met and discussed plans to reduce inmate refusals and improve medication management.

Inmates typically reported that prescribed medications followed them upon transfer.

314

Transfers:

There were 19 referrals to acute inpatient care and 24 referrals to intermediate inpatient care. CSATF rescinded one acute and four intermediate care referrals. DSH did not reject any referrals. None of the 30 Vitek hearings found in favor of the inmate.

Of the 18 acute care referrals who transferred, nine or 50 percent were timely. Of the 20 intermediate care referrals who transferred, 11 or 55 percent were timely. During the site visit, one inmate awaited acute care transfer; none awaited transfer to intermediate care.

The DSH coordinator monitored inmate returns from DSH to CSATF. Staff reported that clinician-to-clinician contacts occurred when DSH was untimely in sending discharge reports, or there was a question about inmate behavior or the discharge diagnosis.

There were 182 admissions to CSATF's MHCB. There were also 111 transfers of CSATF inmates to MHCBs at other institutions, of which 51 or 46 percent were timely.

One inmate timely transferred to a PSU.

One hundred six of 108 inmates referred to administrative segregation EOP hubs transferred timely.

CSATF reported housing 43 EOP and 193 3CMS inmates in administrative segregation during the review period. EOP inmate lengths of stay averaged 16 days and ranged from four to 53 days; 3CMS inmate stays averaged 56 days and ranged from one to 215 days.

The institution was unable to report the number of NDS mental health caseload inmates during the review period. At the time of the site visit, there were 17 NDS inmates in the STRH.

Other Issues:

MHSDS Inmates in Administrative Segregation:

For administrative segregation EOP inmates, there was 97-percent compliance for psychiatry contacts, 91-percent compliance for PC contacts, 89-percent compliance for IDTT meetings, and a compliance rate of 47 percent for required staff attending IDTT meetings.

For administrative segregation 3CMS inmates from September 1, 2014 to March 19, 2015, CSATF reported only 71-percent compliance for initial psychiatry contacts, but 90-percent compliance for follow-up contacts. For the same period, for PC contacts there was 89-percent compliance for initial contacts and 98-percent compliance for follow-up contacts. Fifty-eight percent of PC contacts were cell front, while 92 percent of out-of-cell PC contacts were confidential.

There was 65-percent compliance for initial IDTT meetings and 98-percent compliance for follow-up meetings. CSATF reported 30-percent compliance for required staff's attendance at IDTT meetings.

Four of ten mental health caseload inmates in administrative segregation with stays exceeding 150 days on September 22, 2014 were released following their case by case review.

CSATF began transferring inmates to STRH, which was located in the former stand-alone administrative segregation unit, during the week of April 20, 2015. STRH officially opened and commenced programing on April 27, 2015.

One psychiatrist assigned to both the STRH and 3CMS programs had 62 mental health caseload inmates. Four STRH PCs had caseloads that ranged from nine to 21 inmates, and one had a caseload of three inmates. Six additional custody officers were assigned to the unit as escorts. Promoting continuity of care, clinicians and escort officers assigned to STRH had transferred together with inmates from administrative segregation.

316

The STRH program was housed in a building that contained two sides. Each side had two wheelchair accessible cells, a group room with seven ATOM chairs, and four rooms with therapeutic modules for confidential individual contacts. Although the space was sufficient for the STRH's population of 75 3CMS inmates at the time of the site visit, the chief of mental health noted it would be inadequate when the unit was at capacity.

Inmates expressed mixed reactions to the STRH program. None indicated preparation for the move to the unit other than receiving a booklet about the program. Inmates complained about the unit's sensory deprivation; there was no direct sunlight into their cells, while many found the physical plant isolating in comparison to the previous segregation unit. However, some inmates saw the STRH's potential for increased out-of-cell activities and clinical programing. Inmates' views of custody officers ranged from decent to disrespectful.

Observed STRH IDTT meetings revealed required staff to be in attendance and adequate staff interaction and access to information. The IDTT meeting room provided sufficient confidentiality, although on two occasions custody staff interrupted observed meetings.

At the time of the visit, staff was in the early stages of implementing group programming; there were groups on anger management and coping skills. The chief of mental health stated that when the unit's population increased, group frequency and content would also increase. An observed anger management group was adequately conducted.

Interviewed group participants expressed varying reactions to the ATOM chairs. Some appreciated the increased opportunities for interaction that the chairs provided, in comparison with the therapeutic modules; others reported feeling less protected from fellow inmates.

The STRH had 20 stand-alone recreational yards that could accommodate up to 40 inmates. The yards each had a table with two chairs, so that inmates could eat, and a chin-up

317

bar.  Inmates reported being offered sufficient yard.  Staff indicated that all inmates were scheduled for 21 hours of weekly yard with the goal of providing a minimum of 18 weekly hours.  However, inmates expressed concern about the yard's unsanitary conditions, which observation confirmed.  Custody leadership indicated that the ability to maintain clean yards was hampered by water use restrictions, but agreed to explore ways to ameliorate this problem.

MHCB:

CSATF had a 40-bed CTC, of which 20 beds were MHCBs.  Two of the beds were observation rooms which were not used as crisis beds, but housed inmates who needed additional observation.  The MHCB contained two padded cells.  The remaining beds were designated for medical inmates.  MHCB beds were suicide resistant.

The MHCB psychiatrist had a maximum caseload of 25 inmates, which included inmates in alternative housing.  MHCB PCs were each assigned four to five inmates.

During the site visit, all 40 MHCB beds were occupied.  One hundred fifteen of 182 or 63 percent of admissions to CSATF's MHCB during the review period exceeded ten days.  Stays averaged 18 days.

Observed MHCB IDTT meetings were held in rooms that doubled as clinical office space.  Inmates were placed in therapeutic modules during IDTT meetings and were handcuffed based on clinical or other appropriate reasons.  IDTT meetings began on time and were attended by appropriate disciplines, including an impressive lead clinician, while only clinically relevant information was discussed in the inmate's presence.  IDTT meetings discussed treatment plans, measurable goals, and the decision to maintain, increase, or decrease the level of care, among other matters.

A written order from the treating psychiatrist permitted MHCB inmates to participate in yard. Staff reported that such orders were consistently written and that custody complied with them. Individual recreational therapy was also provided to MHCB inmates.

It was reported during the site visit that there had recently been an increase in MHCB admissions due to the transfer of 3CMS inmates to STRH. Staff reported several caseload inmates who had had difficulty adjusting to the unit's lack of stimuli and sensory deprivation.

Seclusion and Restraint:

There were four incidents of restraint during the review period. Audits identified deficits and CAPs were implemented.

Alternative housing:

Four holding cells in the TTA were used for alternative housing. When they were occupied, alternative housing was first provided in a three-bed ward in the TTA and thereafter, in cells in buildings C-3, D-3, or F-1. Staff reported that use of such external alternative housing cells located outside of the CTC or TTA occurred once during the review period. Two alternative housing PCs were assigned five and nine inmates, respectively.

EOP:

CSATF's EOP program was housed in building G. Building G-1 housed most EOP inmates and G-3 was used for overflow housing. Staff and inmates reported staffing shortages and a lack of groups, among other issues with the overflow unit. Staff also noted that inmates discharged from DSH were sometimes transferred to the EOP overflow unit and ended up in the MHCB due to the overflow unit's lack of services.

Psychiatrists in the EOP program had caseloads that averaged 76 and ranged from 52 to 98 inmates. Eleven PCs had caseloads between 24 and 28 inmates. Two other EOP inmate PCs had caseloads of nine and 11 inmates.

From September 1, 2014 through March 19, 2015, only 52 percent of EOP inmate initial psychiatry contacts were timely, while there was 73-percent compliance for follow-up contacts. All psychiatry contacts were confidential; 74 percent were through telepsychiatry.

For EOP inmate PC contacts, there was 97-percent compliance for initial contacts and 90-percent compliance for follow-up contacts. Ninety-six percent of PC contacts were confidential. There was 80-percent compliance for initial IDTT meetings and 99-percent compliance for follow-up meetings. Required staff attended IDTT meetings 72 percent of the time between September 1, 2014 and March 26, 2015.

Between September 22, 2014 and March 22, 2015, weekly treatment hours for EOP inmates who were clinically appropriate for full programming averaged 14.7 hours scheduled, 10.7 hours offered, 8.3 hours attended, four hours cancelled, and 2.5 hours refused by the inmate. During this same period, weekly treatment hours for EOP inmates who were not clinically appropriate for full programming averaged 1.9 hours scheduled, 1.6 hours offered, 1.4 hours attended, 0.3 hours cancelled, and 0.2 hours refused.

An observed process group was clinically relevant and well-attended, with good inmate participation. Interviewed EOP inmates expressed satisfaction with the mental health program, psychiatrists and PCs. Voiced concerns included lack of yard and laundry not being processed weekly.

3CMS:

320

Four psychiatrists assigned to the 3CMS program had caseloads that averaged 223 and ranged from 179 to 279 inmates.  Eight 3CMS inmate PCs had caseloads ranging from 159 to 187 inmates; two others had caseloads of 114 and 116 inmates, and two others had 60 and 74 inmates each.

From September 1, 2014 to March 19, 2015, CSATF reported a compliance rate for 3CMS inmates of 87 percent for initial psychiatry contacts and 95 percent for follow-up contacts; 100 percent were confidential.  For PC contacts, there was 68-percent compliance for initial contacts and 94-percent compliance for follow-up contacts.  Ninety-two percent of PC contacts were confidential.

During this same period, initial IDTT meetings were timely 72 percent of the time and follow-up meetings were timely 99 percent of the time.  There was 73-percent compliance for required staff's attendance at IDTT meetings.

Observed IDTT meetings revealed staff in attendance to include the telepsychiatrist, a medical assistant, mental health clinicians, the 3CMS supervisor, and the correctional counselor. Four of six observed meetings were presented without specific and operational treatment plans. The supervisor, and not the PC, presented treatment goals to inmates, who were not asked whether they understood the process.

Groups were provided for some 3CMS inmates.

Referrals:

CSATF reported 98-percent compliance for timely response to 58 emergent referrals, 96-percent compliance for response to 113 urgent referrals, but only 83-percent compliance for response to 2,233 routine referrals.

<u>Mental Health/Custody Relations</u>:

CSATF mental health leadership reported a good working relationship with custody leadership; mental health staff also generally reported a good relationship with custody staff. However, some mental health staff on G-3, which was the EOP overflow unit, reported abrasive attitudes by some of the unit's officers.

<u>Heat Plan</u>:

There were 33 days during the review period when outside temperatures exceeded 90 degrees, indicating a stage I heat alert. There were no stage II or stage III heat alerts.

During stage I heat alerts, CSATF accommodated inmates prescribed heat-sensitive medications with dayroom activities and night yard. The STRH contained a list of inmates who were prescribed heat-sensitive medications.

<u>RVRs</u>:

CSATF reported that RVR training was provided separately to mental health and custody staff and that custody had recently received training on the mental health RVR process.

<u>Use of Force</u>:

One hundred percent of on-the-job clinical staff received training on the new use of force policy. Overall, 79 percent of custody staff received this training; it was received by 84 percent of lieutenants, 79 percent of sergeants, 79 percent of officers, 83 percent of CCIIs, and 88 percent of CCIs.

<u>Access to Care</u>:

CSATF issued 18,053 ducats and add-on appointments for mental health services, of which 14,209 or 79 percent were completed. As to the non-completed ducats, 531 or 14 percent

were not completed due to inmate refusal, 64 or two percent were not completed due to custody reasons, and 3,249 or 84 percent were not completed due to non-custodial reasons.

Program Access:

CSATF reported that all mental health staff had received training on the functional evaluation process for EOP inmates.

a.    Job and Program Assignments:

Institutional data indicated that 34 or one percent of available full-time jobs were filled by EOP inmates, 612 or 24 percent were filled by 3CMS inmates, and 1,937 or 75 percent were filled by non-mental health caseload inmates.  There were no part-time job assignments.

For part-time academic assignments, 66 or five percent were held by EOP inmates, 361 or 28 percent were held by 3CMS inmates, and 880 or 67 percent were held by non-mental health caseload inmates.  There were no voluntary academic program assignments.

For full-time vocational education assignments, one or 0.25 percent were held by an EOP inmate, 100 or 25 percent were held by 3CMS inmates, and 294 or 74 percent were held by non-mental health inmates.  For part-time vocational education assignments, 20 or 21 percent were held by EOP inmates, 20 or 21 percent were held by 3CMS inmates, and 54 or 58 percent were held by non-mental health caseload inmates.  There were no voluntary vocational education assignments.

For re-entry substance abuse treatment program assignments, 37 or six percent were held by EOP inmates, 152 or 26 percent were held by 3CMS inmates, and 395 or 68 percent were held by non-mental health caseload inmates.

There were 128 EOP, 321 3CMS, and 484 non-mental health caseload inmates who were eligible for work training assignments, but were unassigned.

323

    b.  <u>Milestone Credits</u>:

CSATF added guidelines regarding milestone credit implementation to the LOP for EOP inmates. On February 28, 2015, 145 of 358 EOP inmates were eligible for milestone credits, of which 19 inmates or 13 percent earned them. Of 3CMS inmates, 371 of 1,847 were eligible to earn milestone credits, with 110 3CMS inmates or 30 percent earning them. Six hundred thirty-two of 3,242 non-mental health caseload inmates were eligible to earn milestone credits; 170 inmates or 27 percent earned them.

    c.  <u>Out-of-Level Housing</u>:

On March 16, 2015, there were 48 EOP, 28 3CMS, and 77 non-mental health caseload custody Level I inmates who were housed in Level II housing, and one non-mental health caseload custody Level I inmate in Level III housing. There were seven EOP, 64 3CMS, and 93 non-mental health caseload custody Level II inmates who were housed in Level III housing, and one 3CMS and three non-mental health caseload custody Level II inmates in Level IV housing.

There were ten EOP, 27 3CMS, and 62 non-mental health caseload custody Level III inmates in Level II housing, and 32 3CMS and 85 non-mental health caseload custody Level III inmates in Level IV housing. There was one EOP and two non-mental health caseload custody Level IV inmates housed in Level II housing, and two EOP, 54 3CMS, and 25 non-mental health caseload custody Level IV inmates in Level III housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSATF reported implementation in July 2014 of an ADA reasonable accommodation panel for accommodations and grievances. A facility captain and staff services manager provided training for staff.

    e.  <u>Periodic Classification Score Reduction for EOP Inmates</u>:

EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates, which document review confirmed.

*Coleman* Postings

The January 2015 *Coleman* posters in both English and Spanish were located in all toured buildings, including the STRH.  All posters were located in areas accessible to class members.

**Pleasant Valley State Prison (PVSP)**
April 21, 2105 - April 23, 2015

Census:

As of April 20, 2015, the total inmate population at PVSP was 2,996, a decline by 771 inmates or 20 percent since the preceding monitoring period.  The mental health caseload population of 1,293 inmates was down by 412 or 24 percent since the preceding monitoring period. It made up 43 percent of the total population.

Four patients were in the MHCB unit.

Among the total 115 inmates in the administrative segregation unit were one EOP inmate and 42 3CMS inmates.  All four inmates on NDS status were at the 3CMS level of care.

The mainline EOP population declined from eight to four since the preceding monitoring period.  The mainline 3CMS population of 1,242 had fallen by six percent since the preceding monitoring period.

Staffing:

PVSP and Avenal State Prison (ASP) shared the chief of mental health position, which was filled.  The chief psychiatrist position was filled.  The two chief psychologist positions were vacant.

325

Three of 5.5 psychiatry positions were filled, for a 45-percent vacancy rate. According to mental health staff, this shortage resulted in redirection of psychiatrists to programs where they were needed most.

The two senior psychologist supervisor positions, and one of the two senior psychologist specialist positions were filled. Ten of the 13.5 psychologist positions were filled, for a 26-percent vacancy rate. Use of .34 contractors reduced the functional vacancy rate to 23 percent.

The supervising social worker position and seven of the nine social worker positions were filled, for a 22-percent vacancy rate. Use of .98 contractors reduced the functional vacancy rate to 11 percent. One of the social workers was on long-term leave.

At the time of the site visit, the recreation therapist position was vacant, but a hire was pending.

PVSP had no supervising psych techs at the time of the site visit. Six of the 13.3 psych tech positions were filled, for a vacancy rate of 55 percent.

Seven of the ten mental health clerical positions were filled, as were the two HPS positions and one OSS II positions. The CHSA II position was vacant.


Quality Management:

The quality management committee was chaired by the CEO and met six times, with a quorum present at each meeting during the review period. Minutes were well maintained and reflected meaningful discussions, problem-solving, and reviews of subcommittee reports.

The mental health subcommittee reported to the quality management committee. It's only chartered QIT was on referrals. It did not charter any new QITs during the review period. Many staff reported unawareness that the mental health subcommittee even existed and had not served

326

on a QIT. Clinical staff acknowledged the need for additional feedback to improve the quality of clinical work and practices.  Three of the mental health subcommittee's five scheduled meetings went forward during the review period.  Minutes indicated that at the October 2014 meeting, only half of required members plus two designees were present, and the designees were not prepared for the meeting.  Minutes also indicated that, unlike at other institutions, attendance by the chief of mental health was optional and that the subcommittee was chaired by the HPS I rather than by a mental health supervisor.  For the November 2014 meeting, there were no minutes, attendance sheet, or attachments.  Upon review of the agenda for that meeting, staff recounted that it involved numerous "old business" items that continued to be tabled.  Minutes for the January 2015 meeting indicated that issues with attendance continued. The QIT on referrals was mentioned in the minutes but was tabled until the March 2015 meeting.

No documentation was provided indicating that peer review was in place during the review period.

Medication Management:

Use of MAPIP was generally effective at PVSP.  Continuity of medications was generally compliant, except for two months when compliance rates for continuity following discharges from the MHCB fell to 72.7 percent and 77.7 percent, respectively.

Rates of inmates' compliance with their medications averaged 62.9 percent for medications prescribed by psychiatry and mid-level practitioners during the review period. Compliance rates for both urgent medication referrals due to inmates' noncompliance and for inmates' compliance with involuntary medication orders were consistently above 90 percent.

Administration of both ongoing chronic-care medications and new prescriptions was consistently 100-percent compliant.

Psychiatry measures remained the greatest challenge in medication management, making it difficult to assess prescribing practices. No audit results for psychiatry measures were provided for December 2014, reportedly due to psychiatry staffing vacancies including for the chief psychiatrist position at that time. The only audit of psychiatry measures that was actually completed was for March 2014.

Pharmacy measures were consistently 100-percent compliant, with solid reporting on medication errors, availability of medications in clinics, maintenance of the emergency cart, and after-hours medication supplies.

Transfers:

PVSP had a part-time DSH coordinator whose other responsibilities included assisting the institutional CEO with quality management tasks and coordinating the local SPRFIT.

During the review period, PVSP referred and transferred eight patients to acute inpatient care. One of these referrals was later transferred to intermediate care. All of the inmates referred to DSH inpatient care signed consents to treatment. One of the transfers to acute care was late, but all were within 72 hours of a bed assignment. The subsequent transfer to intermediate care was timely and was made within 72 hours of a bed assignment.

The single APP referral met all timelines in the DSH referral process.

Review of the DSH coordinator's audits of Form 7388Bs revealed some issues with the process of identifying inmates for referral to inpatient care. In November 2014, there were eight cases in which IDTTs failed to identify criteria for consideration of referral to inpatient care, even though the relevant information was readily available. All eight patients had had three or more MHCB placements within the preceding six months. Also, the Form 7388B was not a regular part of IDTT meeting activity. It was usually used by only the PC rather than by the team

328

as a whole. Even when inmates were identified as meeting criteria and the Form 7388B was marked as "positive," appropriate justifications for non-referrals and treatment plan modifications were not documented. Instead, "initial treatment team" was often noted as the rationale for non-referral, regardless of available information. Basic Program Guide requirements were noted in lieu of appropriate treatment modifications. Grounds for the DSH coordinator's findings of appropriateness of treatment plan modifications were not always apparent. Staff indicated that the DSH coordinator had not received any related training or orientation.

During the review period, 72 inmates were admitted to the six-bed MHCB at PVSP. Sixty-eight or 94 percent of these placements were completed within 24 hours of referral. Of the four inmates transferred to outside MHCBs, three had bed assignments and were transferred within 24 hours of referral.

No EOP inmates were transferred to PSUs during the review period.

All six transfers to EOP administrative segregation hubs were completed within 30 days.

Eight inmates who were designated as 3CMS during the review period were transferred timely out of the stand-alone administrative segregation unit to administrative segregation hubs. Transfer times ranged from 52 minutes to six hours. Staff reported that these inmates were not moved to 3CMS STRH or LTRH at other locations, as those programs were being filled from within at those locations. PVSP was slated to have an STRH in the future, pending renovations to increase treatment space.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Audit documentation indicated a compliance rate of 96 percent for daily custody/mental health meetings in all administrative segregation units.

For 3CMS inmates in administrative segregation during the review period, timeliness of initial psychiatry contacts was 77-percent compliant.  Follow-up contacts were 92-percent compliant.  Two psychiatry contacts were cell-front.

Timeliness of initial PC contacts was 94-percent compliant.  Follow-up contacts were 99-percent compliant.  Thirty-six percent of all PC contacts took place in private interview rooms. The four assigned PCs had caseloads of 11 inmates, on average.

Initial IDTT meetings were timely in 87 percent of cases, while follow-up meetings were conducted timely in 99 percent of cases.  Attendance by required disciplines was 96-percent compliant.

Yard-D housed both administrative segregation and general population inmates. In the mental health clinic on Yard-D, Building 3, IDTT meetings for three 3CMS inmates were observed during the site visit.   The PC led the meeting in the absence of the psychiatrist and communicated directly with the inmates about their medications and side effects, and facilitated referrals to psychiatry when requested by the inmate.  There were no team discussions about the inmates before or after the meetings.  Form 7388Bs were not discussed, although record review indicated that they were completed routinely.

At an observed ICC meeting in administrative segregation, mental health input consisted of the inmate being asked how his mood was, whether he had any mental health concerns, and whether he knew how to access mental health staff.  The mental health clinician did not advise the ICC of the inmate's mental health status, level of care, or other mental health-related information.

Group treatment was unavailable to 3CMS inmates in administrative segregation.

Staff reported that mental health caseload inmates in administrative segregation were scheduled for ten hours of yard per week.  Yard was scheduled based on cell assignments and was offered seven days per week in order to provide ten hours.  Review of yard offerings for six randomly selected inmates in the 114-A log for February 2015 found that ten hours were offered 50 percent of the time. The durations of each yard offering and whether the inmate refused or accepted yard were recorded in the log.

At the time of the site visit, four inmates in administrative segregation were on NDS status.  Institutional documentation confirmed that NDS inmates on the mental health caseload were referred for expedited transfer and that inmates received approved property and privileges.

Institutional data indicated that as of the time of the site visit, six inmates in administrative segregation had been there over 150 days.  Two endorsed for transfer to Kern Valley State Prison (KVSP), two had been referred to the CSR for endorsement to transfer, one was referred to the CSR for a CSP/Corcoran SHU audit and transfer, and one was pending an RVR hearing on an attempted murder.

MHCB:

There were 72 admissions to the six-bed MHCB at PVSP during the review period.  The average daily census was 3.9.  The average length of stay was 10.2 days, with a range of one to 42 days.

Compliance rates for timeliness of initial and follow-up psychiatric contacts were only 24 percent and 35 percent, respectively.

Initial and follow-up PC contacts were 92-percent and 99-percent compliant, respectively.

Initial IDTT meetings were 84-percent compliant. Attendance by psychiatry and sometimes by the CC I was insufficient. Follow-up IDTT meetings were 91-percent compliant.

During observed IDTT meetings, team members interacted appropriately but did not elicit input from custody staff. The CC I did not use the computer to provide relevant information and did not otherwise contribute to the process. Treatment planning needed improvement. Articulated problems and treatment goals were often vague, overly broad, and not responsive to patients' diagnoses and mental health issues. Interventions were sometimes merely reiterations of Program Guide minimum standards rather than therapeutic interventions geared to individual patients. Isolation and medication were the apparent primary treatment modalities.

Mental health supervisors reported that compliance with MHCB policy was hindered by repeated changes in staffing, which resulted in ongoing need for staff training, particularly in the areas of conducting mental health assessments and record reviews. Review of MHCB documentation indicated problems with diagnoses in the MHCB. Inmates were diagnosed with adjustment disorders, but were prescribed antipsychotic medications and mood stabilizers, or were held in the MHCB longer than ten days without operationalized treatment plans to address their diagnoses. Some inmates were diagnosed with adjustment disorders despite clear and specific diagnostic histories of serious mental illness. It was unclear whether MHCB clinical staff were reviewing patients' earlier medical records.

Some patients' stays in the MHCB exceeded ten days based on clinical needs such as recent initiation of forced medication orders, or because of referrals to higher levels of care. In other cases, inmates with diagnoses of adjustment disorder were kept for 20 days and inmates asking for cell changes were kept for 22 days. In cases of personality disorders, staff were more likely to allow inmates to remain in the MHCB until they asked to leave. Record review

indicated that numerous inmates were not seen by any clinician on one or more days during their stays. It was unclear whether this was due to lack of seven-day coverage and/or lack of backup coverage in the MHCB.

In the MHCB, all patients were cuffed, regardless of their status. IDTTs did not discuss inmates' cuff status.  Custody staff indicated that all inmates remained cuffed throughout their stays.  Patients were not allowed outdoor yard for recreation therapy or other outside activities. When patients were discharged back to their housing units, on the first day of their five-day follow-ups they were required to be confined to quarters instead of having normal programming.

Seclusion and Restraint:

The institution reported that three inmates were placed into restraints, for an average duration of 5.8 hours. One of these inmates was placed in restraints twice during the review period.

Alternative Housing:

Six rooms in the CTC were used for alternative housing.  If needed, four large wet holding cells in the CTC, two examination rooms in the TTA, and one medical holding cell on each facility were also used as alternative housing.   According to staff, inmates in alternative housing remained on one-to-one watch by an LVN or psych tech for the durations of their stays.

There were 30 alternative housing placements, all within the CTC, during the review period. Ninety-three percent satisfied timeframes.  Two or seven percent of placements exceeded timeframes, by .62 days and 1.62 days, respectively.  Staff attributed this to lack of MHCB availability.

3CMS:

PVSP housed both mainline and SNY 3CMS inmates.

333

Initial psychiatry contacts were 96-percent compliant, and follow-up contacts were 98-percent compliant. All of these contacts took place in private settings, according to institutional data.

Eleven PCs were assigned to the 1,242 mainline 3CMS inmates, for a staff-to-patient ratio of one-to-113. Institutional data indicated that 78 percent of initial PC contacts were timely, and that late ones were overdue by one to 87 days. Follow-up contacts were timely in 98 percent of cases. Nearly all took place in private settings. Of the total eight cell-front contacts during the review period, four were due to patient refusals, one was due to modified programming, and three were for unspecified reasons.

Provided data indicated that 91 percent of IDTT meetings were attended by required disciplines. Absences were predominantly by psychiatrists, due at least in part to staffing vacancies. A CAP addressed IDTT attendance issues during the review period. Provided audit results indicated that only 57 percent of initial IDTT meetings were timely, with overdue meetings late by a range of one to 84 days. Follow-up IDTT meetings were timely in 99 percent of cases.

Eight groups were made available to both mainline and SNY 3CMS inmates as well as to non-mental health caseload inmates. Topics were relevant to participants regardless of their mental health designations. During the review period, 137 inmates received approximately 5.3 hours of group treatment per month. At the time of the site visit, of the 174 inmates on the group wait list, 75 percent were 3CMS inmates.

During the site visit, a portion of group session on victim awareness was observed. It was a two-hour support group that addressed victim empathy. The group consisted of 13 inmates and had been ongoing for 11 months. It was apparent that group norms involving extensive self-

334

disclosure, non-judgmental acceptance, and confidentiality had become well-established over the life of the group.

A written expression group was also observed during the site visit. It was facilitated by a mental health clinician who directed participants to journal various personal topics including family love. Participants read their writings aloud, after which other participants shared their reactions. It was apparent that they had learned how to provide appropriate feedback and that there was a high level of group support among all members.

Interviewed 3CMS inmates indicated overall satisfaction with clinical services. They were knowledgeable about the purpose of IDTT meetings, knew the names of their PCs, and knew how to contact the clinician or psychiatrist for an unscheduled contact if needed. They were satisfied with referral response times, indicating they were generally prompt. Nearly all expressed a desire for more available groups.

During the inmate interviews, a custody officer opened the door and abruptly demanded to know whether "everyone was properly tucked in." When no one responded, the officer said, "Shame on me if I find one." Several inmates expressed concerns about what they described as a recent increase in perceived harassing behavior by a few custody staff. The incident was brought to the attention of the warden and was being addressed at the time of the site visit.

Referrals:

Institutional data indicated that the 15 emergent referrals to mental health all received a timely response. The 14 urgent referrals drew timely responses in 86 percent of cases, as did 89 percent of the 1,039 routine referrals. Seventy-four percent of the 206 referrals for medication refusals received timely responses.

MHTS.net:

335

Staff reported that MHTS.net was used to track inmate arrivals, level-of-care changes, psychiatry and PC contacts, initial and follow up IDTT meetings, mental health and SREs, psych tech rounds, five-day follow-ups, and response to mental health referrals, among other things. Staff reported that MHTS.net was accessible through various work stations.   They were familiar with other information sources including SOMS, ERMS, PHIP, and UHRs.  MHTS.net had the capability to track suicide risk information, and staff reported that they knew how to pull lists of inmates at high risk through the "red alert" feature.  MHTS.net reports could be pulled on demand, and were posted every Monday in the office of the chief of mental health for clinicians to consult.  The DSH referral log was also available electronically.

Mental Health/Custody Relations:

Interviewed mental health and custody line staff reported good working relationships. Examples of collaboration between them were observed during the site visit.  However, health care custody supervisors reported not receiving timely communications from mental health supervisory staff.

Heat Plan:

No heat plan issues were indicated during the review period.  Heat logs were completed and forwarded to headquarters each month, as required. Thermometers were placed directly across from the control booth on the second tier, and also inside the control booth but reading temperatures outside of the booth.  The list of heat-risk inmates was included on the daily movement sheet and was available to all housing unit staff via the local server.

Use of Force:

336

As of February 28, 2015, 762 of 780 or 97.9 percent of custody staff had received training on the new use of force policy and procedure. Twenty-three of 25 or 92 percent of mental health staff had received training.

Access to Care:

Custody staff reported that mental health staff did not use the statewide-approved daily ducat tracking sheet, which increased the time custody staff spent on locating inmates' work assignments, TABE scores, and ethnicities. The ducat-tracking system, which was part of SOMS, was designed to prevent issuance of overlapping ducats for the same inmate, or ducats for inmates who had left the institution. Custody staff reported that mental health staff's failure to use the approved system resulted in issuance of multiple overlapping ducats for the same inmates and for those who had left PVSP, which affected inmates' access to care.

Program Access:

   a.    Job and Program Assignments:

As of March 3, 2015, 556 3CMS inmates had full-time employment positions. The institution was unable to report which of these positions were paid positions. Another 173 3CMS inmates were enrolled in part-time academic positions. Fourteen 3CMS inmates participated in part-time substance abuse treatment programming, and 61 3CMS inmates were enrolled in full-time vocational education programs.

Among non-mental health caseload inmates, 1,212 had full-time employment positions, 422 had part-time academic positions, 120 participated in part-time substance abuse treatment programs, and 156 participated in full-time vocational education programs.

   b.    Milestone Credits:

Provided data indicated that from September 1, 2014 through February 28, 2015, one or 25 percent of EOP inmates, 274 or 20 percent of 3CMS inmates, and 640 or 34.7 percent of non-mental health caseload inmates who were eligible to earn milestone credits actually earned them.

c.    <u>Out-of-Level Housing</u>:

On March 16, 2015, four Level I MHSDS inmates were housed in Level III housing. There were 225 Level II 3CMS inmates housed in Level III housing, and 57 Level IV 3CMS inmates and one Level IV EOP inmate housed in Level III housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

PVSP reported that the revised ADA Reasonable Accommodation and Grievance Procedure had not been implemented at the institution, and that an implementation date had not been determined as of the time of the site visit.

e.    <u>Periodic Classification Score Reductions: EOP Inmates</u>:

PVSP did not had an EOP mainline program.

<u>*Coleman* Postings</u>:

Six of the nine reviewed housing units at PVSP had *Coleman* postings.  One housing unit did not have any *Coleman* postings, and two others had only Spanish language versions of the postings.

**Avenal State Prison (ASP)**
July 21, 2015 - July 23, 2015

Census:

As of July 22, 2015, the total inmate census at ASP was 2,599, which was 48 percent lower than it was during the preceding monitoring period. The mental health caseload population of 922 was 21 percent less than it was during the preceding monitoring period, and constituted 35 percent of the total inmate population.

There were two mainline EOP inmates, 915 mainline 3CMS inmates, and five 3CMS inmates in the OHU for medical reasons.

Staffing:

The senior psychiatrist position was vacant and was covered by a contractor. Positions for the chief psychologist and the two senior psychologist supervisors were filled. The supervising social worker position was vacant.

All five psychiatry positions were vacant. Contractors covered four of these positions, for a functional vacancy rate of 20 percent.

The two senior psychologist specialist positions were filled. Four of 11 staff psychologist positions were vacant but were all covered by registry staff.

Contractors covered all three vacancies among the eight social work positions. The recreation therapist position was filled.

All nine mental health clerical positions and the OSS II and HPS I positions were all filled.

Quality Management:

339

Quality management at ASP was mature, well-established, and integrated into overall operations.

The quality management committee met six times during the review period. Minutes were provided for five of the six meetings and reflected good attendance. Substantive discussions and reviews of reports were supported by use of multimedia.

The mental health subcommittee met monthly during the review period. No new QITs were chartered. There were three active FITs, two of which concerned IDTTs and referrals to mental health. Review of minutes indicated that the mental health subcommittee actively used the performance dashboard, standardized reports, data from statewide database systems, and on-demand reports indicating compliance levels. The minutes did not indicate whether a quorum was achieved at meetings.

Psychologists and social workers underwent peer review at ASP. Because of psychiatry staffing shortages, psychiatrists did not participate in peer review for most of the review period. Peer review consisted of presentation of a case review by the clinician, followed by feedback from five peers. Minutes did not indicate whether the feedback was guided by any objective criteria. In May 2015, ASP implemented the statewide peer review process.

Medication Management:

For a signification portion of the review period, medication continuity following intra-institutional moves was noncompliant except following moves into administrative segregation.

During the final three months of the review period, the institution was compliant with medication continuity following inter-institutional transfers. The institution was compliant for medication continuity for five of the six months of the review period following discharges from MHCBs or community hospitals.

340

The institution reported that due to psychiatry staffing shortages, MAPIP's psychiatry measures were difficult to calculate. These audits were conducted by nursing staff under psychiatry's guidance until psychiatry staffing improved. For December 2014 through February 2015, compliance rates were 66 percent for atypical antipsychotics, 97 percent for Lithium, 99 percent for Lamictal, and 100 percent for measures addressing Depakote, carbamazepine, and antidepressants. No inmates were prescribed Clozaril during that period. There was no improvement plan as a result of these audits. For the period of March through May 2015, audits indicated compliance rates were 99 percent for atypical antipsychotics and Lithium, 100 percent for carbamazepine, 92 percent for Depakote, 80 percent for Lamictal, and 89 percent for antidepressants.

ASP was compliant with providing a one-month supply of medications to paroling inmates.

Transfers:

ASP referred two inmates to intermediate care. Neither required Vitek hearings. Both referral packets were submitted timely to utilization management, but completion of the referral packets did not meet timeframes. For one of the two inmates, once his referral packet was completed and submitted, all other timeframes, including transfer timelines, were met, and he was transferred to Atascadero State Hospital (ASH). The second inmate was admitted to an MHCB during the referral period and was transferred to an EOP program before ultimately being transfered to DSH. His transfer to DSH did not comply with timeframes.

No inmates were pending DSH transfer at the time of the site visit, and none had been discharged back to ASP during the review period.

Two inmates had positive indicators on the Form 7388B and were both appropriately not referred to DSH.

Record reviews indicated that staff were not utilizing Form 7388B correctly. Staff documentation on the Form regarding inmates who did not meet any referral criteria was confusing as to whether applicable criteria were inadvertently not marked.  Documentation that was on the Form appeared in incorrect places.  For example, treatment modifications for a noncompliant inmate were documented on the first page of the Form instead of on the second page where they belonged.

Forty-nine inmates were referred and transferred to MHCBs at outside institutions. Thirty-six or 73 percent of these MHCB transfers occurred within 24 hours of referral.  Late transfers averaged .8 days overdue.  All but one transfer to an MHCB were done within 24 hours of bed assignment.

Fifty-one of 69 or 74 percent of mental health OHU stays met timeframes.  The 18 overly-long stays were overdue by an average of five days.

There were 21 alternative housing placements.  No information was provided with regard to applicable timeframes.

No inmates transferred to a PSU.

All three administrative segregation EOP inmates transferred timely to EOP administrative segregation hubs.

Fifteen of 22 or 68 percent of EOP inmates were transferred timely to EOP programs. The seven late transfers were overdue by an average of 52 days, with a range of nine to 116 days. Delays were attributed to lack of EOP beds.

Other Issues:

<u>MHSDS in Administrative Segregation</u>:

For 3CMS inmates in administrative segregation, initial and follow-up psychiatry contacts were 100-percent compliant for timeliness. One contact was cell-front, due to inmate refusal. No psychiatry contacts took place in non-private out-of-cell areas.

The institution reported 100-percent compliance for timeliness of initial PC contacts and 97-percent compliance for follow-up contacts for 3CMS inmates. There were 195 cell-front PC contacts, and three contacts in non-private out-of-cell areas.

Initial and follow-up IDTT meetings were timely 100 percent of the time. However, attendance by required disciplines was only 24-percent compliant, due largely to absence by psychiatry.

No mental health caseload inmates were housed in the stand-alone unit during the review period.

During the review period, ASP housed 17 mental health caseload inmates on NDS status, all of whom were designated for expedited transfer. Fourteen of the 17 transferred within 72 hours of NDS designation. Two of the remaining three were transferred after six days, and the third was transferred after 13 days. Two of these delays were due to lack of bed availability, and the third was due to a holiday weekend. The institution had a process for identifying NDS inmates to provide them with property/privileges and expedited transfers. The facility captain reviewed all administrative segregation placements for NDS designation. The ICC then reviewed and confirmed the designations, and the inmate was then provided expedited transfer. Privileges were provided to NDS-designated inmates pending their transfers.

One of three mental health caseload inmates housed in administrative segregation for 150 days or more as of September 22, 2014 was released from the unit after his case review. The other two were transferred to another institution.

Alternative Housing:

There were no mental health caseload inmates in the OHU at the time of the site visit.

Each day in the OHU and the TTA, either the senior supervising psychiatrist or assigned psychiatrist was available to provide medication evaluations and/or clinical consultations. Beginning at 5:00 p.m. seven days per week, an on-call psychiatrist provided emergency coverage in the TTA. A clinical psychologist also covered the TTA and OHU from 7:00 a.m. until 4:00 p.m. on the weekend days.

One psychologist covered the TTA and the OHU and was responsible for day-to-day clinical management of inmates in crisis in those areas. This clinician also provided clinical consultation to less experienced PCs for inmates who were difficult to manage. A private office for the clinician in the OHU contained a treatment module. The clinician reported that all inmates were seen in the module, regardless of their custody levels.

The recreation therapist visited the OHU as requested by the OHU clinician. Most recreation therapy activity occurred in cell, with some in the small outdoor concrete yard or in the small television/library room.

Typically, inmates were placed in the OHU for suicidality. SREs following OHU admissions or discharges were not always completed as required. Inmates were placed on 30-minute checks/observation instead of on required suicide precaution/suicide watch statuses. It was reported that approximately two weeks before the site visit, all OHU inmates were placed on suicide watch. At least one of the beds designated as a "swing bed" in the

344

OHU was not suicide-resistant. Cameras in the OHU rooms worked but were not monitored, due to lack of sufficient staff, according to custody staff.

On occasion, the OHU housed inmates whose level of care was raised to EOP but who otherwise could not program on the general population yard.  These inmates were moved to the OHU's long-term care wing, received their property, and participated in yard.  During the site visit, no EOP inmates in the OHU were awaiting transfer. It was unclear how often ASP initiated an expedited transfer for an EOP inmate.  In one reviewed case, the inmate was housed in the OHU pending transfer but it was not expedited despite clear indications to justify it.

There were several mental health caseload inmates receiving medical care in the OHU. All had property.  One was observed on the yard.

3CMS:

ASP reported 100-percent compliance for both initial and follow-up psychiatry contacts for 3CMS inmates.  Seven psychiatry contacts were cell-front.

The two PCs in the general population 3CMS program had caseloads of 59 and 73 inmates, respectively. In the SNY 3CMS program, the 13 PCs had caseloads ranging from 44 to 95 inmates. The institution did not report on the timeliness of initial or routine PC contacts. Forty-five PC contacts were cell-front.

The institution reported a compliance rate of 92 percent for initial IDTT meetings. Overdue IDTT meetings ranged from one to 23 days late.  Follow-up IDTT meetings were 100-percent compliant.  The compliance rate for attendance by required disciplines was 64 percent, due largely to the absence of psychiatry.  The institution reported that recent psychiatry hires had improved IDTT attendance rates.  Correctional counselors attended 97 percent of IDTT meetings.

345

At observed IDTT meetings on B-Yard, required disciplines were present but the psychiatrist was a supervising psychiatrist and not the treating psychiatrist. The meeting space was good. All required documentation was available and accessed by staff when indicated. The team engaged well with each other in thoughtful discussion. Team members also interacted well with the inmates and included them appropriately in treatment planning and goal-setting.

At observed IDTT meetings on C-Yard, the psychiatrist again was a supervising psychiatrist and not the treating psychiatrist. Treatment team members had access to eUHRs and SOMS and consulted them as indicated. The meeting space was also good. Discussion among staff was thorough, and inmates were given ample opportunity to participate and ask questions. However, the meetings required greater focus, structure, and time management. Some inmates needed to have the purpose of the meeting explained to them more clearly. Although treatment goals were measurable, in some follow-up meetings there was minimal discussion of the inmate's progress toward them during the preceding year. While some treatment goals were appropriate, they could not be attained with PC contacts as planned every 60 to 90 days. Treatment goals either should have been modified, or more frequent contacts should have been planned.

A variety of process and didactic groups were available for 3CMS inmates. ASP reported that 54 3CMS inmates were on a wait list for group therapy and 30 of them had been waiting for over six months. On C-Yard, an observed clinician-run group on addictions was well facilitated. Inmates sat around a table in private, air-conditioned space. Rapport between the leader and the group, and among the participants was good. Addressed areas, including the role of trauma and loss in substance abuse, were appropriate. The group was generally well-facilitated, with a few missed opportunities to promote greater interaction among participants.

An observed group led by a recreation therapist was well-structured and well-facilitated. The recreation therapist had initially spent an extensive amount of time developing and preparing for the group, which was a model of what should be expected from a recreation therapy group.

Referrals:

The institution reported 100-percent compliance for timely response to the 42 emergent referrals during the review period. Response to the 73 urgent referrals was 95-percent compliant. The 1,488 routine referrals drew timely responses in 98 percent of cases. The compliance rate for timely response to the 289 referrals for inmate medication noncompliance was 92 percent.

MHTS.net:

Mental health staff reported that any problems with MHTS.net were typically due to data entry errors. They indicated that they generally found MHTS.net more reliable than the dashboard.

Mental Health/Custody Relations:

Mental health staff reported that relations with custody staff were typically very good.

Heat Plan:

There were no Stage II or III heat alerts during the review period. There were eight Stage I heat alerts during May 2015.

RVRs:

ASP reported that 30 of 34 or 88 percent of required mental health staff attended the mandatory training for the revised RVR mental health assessment process. The four staff who did not attend worked only on weekends.

The institution reported that 100 percent of custody staff attended the revised RVR training.

347

<u>Use of Force</u>:

ASP reported that 22 of 24 or 92 percent of mental health clinicians received the mandatory mental health use of force training.

One hundred percent of custody staff received the training.

<u>Program Access</u>:

a.      <u>Job and Program Assignments</u>:

No EOP inmates had work training assignments.  One EOP, 94 3CMS, and 119 non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

Among 3CMS inmates, 558 had full-time jobs, of which 471 were paying and 87 were non-paying positions.  Among non-mental health caseload inmates, 949 had full-time employment assignments, of which 813 were paying and 136 were non-paying.  There were seven 3CMS inmates with part-time, non-paying employment positions.

Twenty-three 3CMS inmates had full-time, non-paying academic positions.  There were 54 non-mental health caseload inmates with full-time, non-paying academic positions.

There were 124 3CMS inmates who had part-time, non-paying academic positions. There were 241 non-mental health caseload inmates with part-time, non-paying academic positions.

One 3CMS inmate was in a full-time, paying substance abuse treatment program.  Ten non-mental health caseload inmates were in full-time, paying substance abuse treatment programs.  There were also two non-mental health caseload inmates who had part-time, paying substance abuse treatment positions.

348

There were 63 3CMS inmates with full-time, non-paying, vocational education positions. There were 108 non-mental health caseload inmates enrolled in full-time, non-paying vocational educational programs.

There were 15 3CMS inmates with part-time, non-paying, vocational educational positions.   There were 32 non-mental health caseload inmates enrolled in part-time, non-paying vocational education programs.

b**.**    <u>Milestone Credits</u>:

As of May 31, 2015, neither of the two EOP inmates at ASP were eligible to earn milestone credits.  Of the 1,046 3CMS inmates, 281 were eligible to earn milestone credits and 74 or 26 percent actually earned them.  Of 1,773 non-mental health caseload inmates, 452 were eligible to earn milestone credits, and 163 or 36 percent actually earned them.

c.    <u>Out-of-Level Housing</u>:

There were 28 3CMS and 69 non-mental health caseload Level I inmates housed in Level II housing.  There were three non-mental health caseload custody Level II inmates housed in Level I housing.  There were 24 3CMS and 22 non-mental health caseload Level III inmates housed in Level II housing.  There were seven 3CMS and four non-mental health caseload Level IV inmates housed in Level II housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

ASP implemented the ADA reasonable accommodation and grievance procedures effective May 15, 2015.

e**.**    <u>Periodic Classification Score Reductions for EOP inmates</u>:

ASP did not have an EOP.

*Coleman* Postings:

*Coleman* postings were prominently displayed in both English and Spanish languages in six observed housing units on C-Yard and D-Yard.

### Salinas Valley State Prison (SVSP)
February 17, 2015 – February 20, 2015
June 12, 2015

Census:

On February 17, 2015, SVSP housed a total of 3,552 inmates, for an increase by 363 inmates or 11 percent since the preceding monitoring period. There were 322 inmates in administrative segregation.

The MHSDS population was 1,654, or 47 percent of the total population. It increased by 294 inmates or 22 percent since the preceding monitoring period.

The mainline EOP census of 463 was 51-percent higher than during the preceding monitoring period. Of these, 49 EOP inmates were in administrative segregation.

There were 1,038 mainline 3CMS inmates, which was an increase by eight percent since the preceding monitoring period. One hundred one of these 3CMS inmates were in administrative segregation.

Staffing:

Of the 155.5 established mental health positions, 116.5 were filled, for an overall vacancy rate of 25 percent. Use of contract coverage reduced the functional vacancy rate to 21.7 percent. Positions for the chief psychiatrist, three chief psychologists, and the supervising social worker were all filled.

Of the seven staff psychiatrist positions, only 2.5 were filled, for a vacancy rate of 64 percent.  Use of 1.75 FTE contract psychiatrists reduced the functional vacancy rate to 39 percent.

Four of the five senior psychologist/supervisor positions were filled, as were three of the 4.5 senior psychologist/specialist positions.  Of the 35 staff psychologist positions, 27 were filled.  Use of 3.5 FTE contract psychologists reduced the functional vacancy rate to seven percent.  Eight of the psychologist positions were filled by unlicensed staff.

Fifteen of the 17.5 social worker positions were filled, for a vacancy rate of 14 percent.  Nine social worker positions were filled by unlicensed staff.

The two senior psych tech positions were filled.  Of the 42.5 psych tech positions, 33 were filled, for a vacancy rate of 22 percent.

Nine of the 14 recreation therapist positions were filled, for a vacancy rate of 36 percent.  One of these positions was filled by unlicensed staff.

Among the 17 office tech positions, 11 were filled, leaving a vacancy rate of 35 percent.  Positions for all three health program specialists, the sole office support supervisor II, and the sole AGPA were all filled, but the correctional health program administrator II position was vacant.

Quality Management:

The institution reported that it was in the process of developing its own quality management support unit.  No information was provided regarding the local governing body.

During the review period, the quality management committee met monthly, achieved a quorum, and maintained minutes for all meetings.  These meetings were chaired by the CEO and attended by the chief of mental health.  Minutes documented discussions that covered areas of

351

concern to mental health including staffing, suicide prevention, program compliance reports, EOP administrative segregation hub certification, and the effect of lockdowns on mental health programming.

Provided minutes for meetings of the mental health subcommittee indicated that it met monthly during the review period. The meetings were chaired by the chief of mental health and achieved a quorum. Minutes reflected discussions on various mental health program areas including program compliance and issues related to the EOP administrative segregation hub certification.

The institution had a Focused Improvement Team (FIT) on administrative segregation which met approximately every two weeks. Minutes indicated that its focus was on parameters related to certification of the administrative segregation unit.

Formal peer review did not occur during the review period.

Medication Management:

The overall compliance rate for medication continuity was 48 percent. Continuity of nurse-administered and DOT medications following intra-institutional transfers was 58-percent compliant for the month of November 2014. Following moves out of an MHCB, the rate of continuity was only 32 percent.

Counseling for inmates who were noncompliant with their medications was provided in only 57 percent of cases. Involuntary medications were 90-percent compliant, according to institutional audit results. Audits of administration of chronic care medications prescribed by a psychiatrist indicated a 26-percent compliance rate.

Overall, psychiatric diagnostic monitoring was 72-percent compliant. Initial psychiatric evaluations were delayed by approximately one month. Psychiatric evaluation and follow-up

were particularly untimely on D-yard, which was in the process of being converted to an SNY. The psychiatric nurse practitioner on D-yard reportedly had a caseload of approximately 150 inmates, which will increase as the conversion is completed.

Staff on C-Yard reported that HS medications were being distributed at the 5:00 p.m. medication pass.

Transfers:

The current DSH coordinator, appointed in January 2015, reported continuing data issues that needed to be resolved. This was evident from missing and incorrect data on the DSH referral logs examined during the site visit.

During the review period, 36 inmates were referred to acute inpatient care. Nine or 25 percent of referral packets were not completed within Program Guide timeframes. One paroled before bed assignment. Seventeen or 49 percent of the remaining 35 inmates transferred outside of Program Guide timeframes, with wait times ranging from 11 to 83 days. No inmates prevailed on any of the eight Vitek hearings. Thirteen of the transfers were beyond 72 hours of a bed assignment. At the time of the site visit, two inmates who had been accepted to a DSH acute care program were awaiting transfer, with wait times of four days and 34 days, respectively.

During the reporting period, 125 inmates were referred to intermediate care. Sixty or 48 percent of referrals were not completed within Program Guide timeframes. By the time of the site visit, two were rescinded, one paroled, one was awaiting bed assignment, and one was pending transfer. Of the remaining 120 inmates who transferred to DSH, 27 or 22 percent were outside of Program Guide timeframes, with wait times ranging from 32 to 62 days, and one outlier at 133 days. No inmates prevailed at any of the 27 Vitek hearings. Only two inmates did not transfer to a DSH facility within 72 hours of a bed assignment. At the time of the site visit,

there were seven inmates accepted to a DSH intermediate care program and awaiting transfer, with wait times ranging from four to 64 days.

Institutional data indicated that 14 inmates transferred to a PSU during the review period. Twelve or 86 percent transferred within Program Guide timeframes.

According to provided data, there were 174 admissions among 155 inmates to the MHCB at SVSP from July 14, 2014 to January11, 2015. Lengths of stay ranged from 1.5 to 46.5 days, including 34 or 20 percent of stays that lasted longer than ten days. There were also 75 transfers to outside MHCBs during the review period. Twelve or 16 percent of these transferred within timeframes. Most cases of delays were attributed to lack of MHCB availability.

SVSP did not have a MHOHU/OHU.

No data on inmate transfers to EOP hubs during the review period was provided. Census data provided on site indicated that 27 inmates were in the EOP hub and 22 were awaiting transfer to an EOP hub at the time of the site visit.

Other Issues:

MHSDS Inmates in Administrative Segregation:

At the time of the site visit, the SVSP EOP administrative segregation hub was not certified. All nine transfers to hubs during the review period were within timeframes.

In the SVSP hub, the compliance rate for the comprehensive mental health clinical assessment before the initial IDTT meeting was only 13 percent. Initial IDTT meetings were timely 86 percent of the time, while follow-up IDTT meetings were timely 94 percent of the time. All required disciplines were routinely present at the meetings.

Initial PC contacts were 91-percent compliant, follow-up PC contacts were 95-percent compliant, and contacts following treatment refusals were 49-percent compliant. The institution

354

reported a total of 3,211 cell-front PC contacts. Among the proffered reasons for conducting these contacts at cell front were inmate refusal (1,589), staff decision (1,037), modified programming (199), and lack of escort (71).

At an observed IDTT meeting in the hub, all required disciplines were present. Treatment planning was good, with identified goals and patient involvement. Possible need for a higher level of care was also discussed.

The institution reported that 11.91 hours per week of group treatment were scheduled. Of these, 10.6 hours were offered, 7.18 hours were attended, 3.42 hours were refused, and 1.32 hours were cancelled. Sixty-six percent of inmates were offered at least ten hours of group per week, and 28 percent attended at least ten hours per week.

For 3CMS inmates, both psychiatry and PC contacts were over 90-percent compliant. However, interviewed patients indicated that approximately half of their PC contacts were cell-front and lacked privacy. Psychiatric contacts were also timely, with a compliance rate of greater than 90 percent. Audits of IDTT meetings for 3CMS inmates found that they were timely and attended by required participants.

NDS inmates were being identified correctly, according to documentation and interviews of the C&PR and other staff. Unit sergeants tracked these inmates on a local server, making the inmates' names, CDCR numbers, dates of NDS designation, placement in administrative segregation, and issuance of property available to all unit custody supervisors. Data provided on site indicated that at the time of the site visit, 27 inmates had NDS designation for determination of privileges and property. Five had been designated as NDS for accelerated transfers. One transferred to DVI, two were granted bus seats and were pending transfer, one was placed in the MHCB before CSR review, and one was pending CSR review.

355

Provided data on mental health caseload inmates in the stand-alone unit indicated that three caseload inmates were housed there during the review period, and that two of them were moved out within timeframes. However, no information on their levels of care was provided. Interviewed staff indicated that no caseload members were in the stand-alone unit at the time of the site visit.

MHCB:

There were ten operational MHCBs at the institution. MHCB staff consisted of one full-time and one half-time psychiatrist, six psychologists, one part-time social worker, and one part-time recreation therapist.

During the reporting period there were 155 admissions to the MHCB, with an average length of stay of 7.9 days and a range of 0.6 to 46.5 days. Thirty-six or 23 percent of inmates, had stays in excess of ten days.

The compliance rate for initial SREs was 88 percent, and for follow-up SREs it was 78 percent. Compliance rates for initial and follow-up psychiatry contacts were 84 percent and 88 percent, respectively. Both initial and follow-up PC contacts were conducted timely, but contacts for treatment refusals were only 49-percent compliant.

Initial and follow-up IDTT meetings were timely. The Special Master's expert observed three IDTT meetings. All required disciplines and the inmates attended these meetings, which were held in a room with adequate space with computer access. Overviews of the inmates' presenting problems were given during the meetings, but they lacked discussions of pertinent clinical issues such as post-head injury auditory hallucinations, treatment planning and goals, and what needed to occur for the inmates to be discharged from the MHCB. One inmate was escorted in cuffs but his cuff status was never discussed during the meeting.

356

At the time of the site visit, there was no yard access due to lack of shade and staff shortages.  Recreation therapy was provided three nights per week and included letter writing, games, and one-to-one contacts.  Staff reported that a dayroom was also available for television viewing.

Staff reported that for the preceding six months, HCPOP was not being notified when inmates were placed in alternative housing after hours.  Instead, psychologists called HCPOP the morning after these placements and sometimes waited for several hours before receiving a reply from HCPOP.  This led to inmates remaining in alternative housing and delays in their treatment.

Seclusion and Restraint:

There were no reported uses of restraints during the reporting period.

Alternative Housing:

There was conflicting data regarding the number of inmates who were placed in alternative housing during the review period.  Documentation provided pre-site visit indicated that 112 inmates were placed in alternative housing and that 75 percent transferred within timeframes.  Documentation provided by the institution at the time of the visit indicated that 257 inmates were placed in alternative housing during the review period and that only 112 or 44 percent transferred to MHCBs.  Staff attributed this low transfer rate to their perception that inmates claimed suicidality to achieve a change of housing or cellmate and then recanted their claims the following day.  It was also reported that some inmates sought placements in alternative housing as a means to obtain psychiatric medications they were not receiving on the yard.

The alternative housing LOP, "Alternative Housing Policy and Procedure Draft 1.5," indicated that alternative housing was comprised of CTC holding cells with and without toilets,

357

and BPH holding cells with and without toilets on the yards. The institutional Mental Health LOP No. 400 indicated different locations, but it appeared that staff were adhering to the draft policy.

The four large holding cells in the CTC were clean and in direct line of sight of the nursing station. They held 16, 15, nine, and eight inmates, respectively. During business hours, these cells are also used for inmates awaiting medical appointments, which created a noisy environment in the unit. The BPH cells in Complex 1 were dimly lighted and dirty. Each had the capacity for one inmate. The BPH cells in Complex 2 were slightly cleaner.

EOP:

On the A-yard EOP, psychiatric contacts were timely 88 percent of the time. The institution reported that 91 percent of initial PC contacts were timely, as were 98 percent of follow-up contacts. The institution reported that 77 percent of clinical EOP contacts occurred in private settings. Initial and follow-up IDTT meetings were compliant with timeframes and attendance by required participants in 90 percent of cases.

Audits of group treatment hours indicated that 86 percent of inmates were scheduled for ten hours of group per week, 71 percent were offered at least ten hours per week, 33 percent attended ten hours, four percent refused group therapy, and two percent cancelled.

The Special Master's expert observed two EOP therapeutic groups run by the participants' own PC on the A-Yard Level III treatment facility. Group sizes ranged from five to six inmates. The groups were well-run, with good participation. Facilitators made efforts to engage patients in group discussions. It was noted that inmates from the A-4 housing unit arrived late by as much as 30 to 45 minutes to the 8:45 a.m. group therapy sessions, and that this was a chronic problem. Delivery of medications by one nurse to both the A-4 and A-5 buildings

appeared to be the cause. Tracking of these group sessions was of concern, as these inmates were not receiving the full scheduled hours.

At the time of the site visit, the EOP D-Yard conversion of the Level IV EOP to an SNY Level IV EOP was 90-percent completed. These SNY EOP inmates were housed in D-3 and D-4. There were deeply significant concerns with the delivery of mental health care on the D-Yard. Clinicians there reported frustration with their inability to provide Program Guide-required care under prevailing conditions. Technically, their caseloads numbered 30 patients, but staff absences and departures made for much larger *de facto* caseloads. This led to the mental health supervisor providing direct care rather than attending to supervisory duties.

Other than a yard group led by a recreation therapist, there was no group therapy occurring on D-Yard. Groups were decreased so that general population EOP inmates and SNY EOP inmates had groups on alternating days, which resulted in inmates being scheduled for half of the groups that they should have received. Facilitators reported that few if any inmates had received group therapy for the preceding several weeks. This paucity of groups was exacerbated by a lack of consistency of facilitators for the few groups that there were. Re-directing of psych techs to other duties led to other psych techs covering groups without preparation, planning, or knowledge of group topics. Group facilitators indicated that no curricula or supplies were available and that they tried to improvise. Group sessions were sometimes counted as completed even when inmates appeared briefly to indicate they would not stay for the entire session due to other activities.

Inmates were kept on orientation status for prolonged periods of time, lasting several weeks or months. These inmates were confined to their cells with no yard or groups. Clinical staff reported that staffing deficiencies related to clinicians' sick absences led to significant

delays with initial and follow-up clinical contacts for these inmates. While inmates received psychiatric services by telepsychiatry with a nurse practitioner, it was reported that the first available appointment for psychiatric evaluation was delayed by four weeks. Interviewed inmates also reported medication lapses.

The Special Master's expert interviewed several inmates on the yard and in their cells on D-4. Many of these inmates expressed frustration, agitation, fearfulness, and confusion due to completed and proposed changes on the yard and the lack of mental health services being provided. Several of these inmates required medication evaluation, clinical assessment, and/or emergency evaluation. Interviewed inmates indicated that because they were frequently released late from their housing units they lost time for groups, yard, and individual treatment sessions. They also reported that they frequently received ducats for groups that had no facilitators, or for groups on days when no groups were scheduled, or during early morning hours before they were released from their housing units. No interviewed inmates reported being offered ten hours per week. No groups were provided for those who spoke only Spanish. Compounding all of these problems were fear and safety issues following the stabbing of any SNY inmate by a general population inmate.

By the time of the June 2015 re-visit, the SNY conversion had been completed and all group rooms were in use. However, interviewed inmates reported concerns with group cancellations, ducating, and a lack of group therapy for Spanish-speaking inmates. Mental health leadership reported that previous data entry errors which had resulted in ducting errors had been addressed and corrected. They also reported that groups had been cancelled because of modified programming due to a riot on the yard that affected group availability for EOP inmates, as well as re-direction of psych techs who had been facilitating groups. Insofar as the lack of Spanish-

360

language groups, it was reported that mental health leadership was investigating the possibility of congregating those inmates to maximize the potential for Spanish-language groups.

It was reported that approximately two-thirds of mental health staff on D-Yard had left between the times of the February and June 2015 site visits, reportedly as a result of difficulties following a staff assault.  It was reported that the change in staff had helped stabilize the unit and improve morale.  The compliance rate for EOP group offerings improved from 43 percent during the February 2015 visit to 78 percent by early June 2015.

3CMS:

At the time of the January 2015 visit, the 3CMS program was staffed with eight PCs. Their caseloads ranged from 70 to 138 and averaged 113 inmates.

Data indicated that clinical intake assessments for 3CMS inmates were being completed within ten days of arrival, as required.  Initial and follow-up psychiatry contacts were 95-percent and 96-percent compliant, respectively.

PC contacts were 100-percent compliant.  Staff on C-Yard reported that most of these contacts, as well as group and telepsychiatry contacts, were conducted in private settings.  Pre-site visit data indicated refusal rates of 4.5 percent for July 2014 and 12 percent for December 2014.  Institutional data varied somewhat, indicating refusal rates of 12 percent from July to September 2014 and 13 percent for September to December 2014.

The institution reported only four cell-front contacts for psychiatry during the review period.  Data indicated 575 cell-front PC contacts during the review period, which were attributed to staff decisions (195), inmate refusals (167), and modified programming (65), among other things.

361

Initial IDTT meetings were held within 14 days of arrival in 95 percent of cases. Annual follow-up IDTT meetings were 100-percent compliant, with all required disciplines in attendance 99 percent of the time. IDTT meetings on B-yard were observed during the site visit. Four inmates were scheduled but three cases were heard in absentia due to inmates' illnesses. All required disciplines attended and staff appeared knowledgeable of the inmates' psycho-social histories and treatment needs.

3CMS groups were provided only on C-yard and were held at 10:00 a.m. and 1:00 p.m. on Monday, Tuesday, Thursday, and Friday. Topics included coping skills, anger management, advanced victim awareness, lifer group, and critical thinking. Groups were cancelled or inmates were unable to attend due to modified programming from June 20, 2014 to July 29, 2014, and from December 4, 2014 to January 9, 2015. During lockdowns or modified programming, priority ducats were issued for appointments but groups were cancelled.

Referrals:

During the review period, 92 percent of the 49 emergent referrals received a response within four hours. Ninety-five percent of the 102 urgent referrals and 94 percent of the routine referrals drew responses within timeframes.

Mental Health/Custody Relations:

At the time of the February 2015 site visit, there were cultural issues among custody, medical, and mental health staff that had a negative effect on staff interactions with inmates and the delivery of mental health care. Staff reported a pattern in the MHCB of increasing numbers of inmates coming in from administrative segregation and not wanting to return there. While there was no direct confirmation by inmates, staff inferred that these inmates were attempting to avoid disrespectful and harassing conduct by custody staff in administrative segregation.

362

At the time of the June 2015 re-visit to follow-up on custody/mental health relations among other things at SVSP, the institution's warden reported that meetings were taking place among supervisory staff for custody, medical, mental health, and dental to address the custody-related concerns. Measures taken included personnel changes including removal of high-level custody staff from D-Yard, initiation of OIG investigations.

Heat Plan:

The monitor reviewed the institution's heat plan LOP, monthly compliance reports to CDCR headquarters, and weekly lists of inmates prescribed heat risk medications. The institutional LOP was current and compliant with CDCR's annual heat plan memorandum. Monthly reports were submitted to headquarters timely and reflected no Stage II or Stage III heat alerts during the reporting period. All inspected units had thermometers located on the second tier.

Use of Force:

Mental health supervisory staff was 75-percent compliant and mental health line staff was 78-percent compliant with receiving mandatory training on use of force. Custody supervisory staff was 89-percent compliant with receiving their four-hour mandatory training, and custody line staff was 92-percent compliant with receiving their one-hour training.

Access to Care:

Review of SVSP's monthly Health Care Access Quality Reports for July through December 2014 indicated that five percent of issued mental health ducats and add-on appointments were not completed due to custody factors, and that 12 percent were not completed for non-custodial reasons other than inmate refusals.

<u>Program Access</u>:

a.     <u>Jobs and Program Assignments</u>:

The institution reported that it had implemented new policies and procedures regarding evaluation of EOP inmates' functionality for program assignments and milestone credits. Provided data indicated that 61 percent of mental health staff had completed the training by December 2014.

Data provided by CDCR indicated that 1,234 or 69 percent of the full-time available jobs were filled by non-MHSDS inmates, 3CMS inmates filled 409 or 23 percent of such jobs, and EOP inmates filled 137 or eight percent of them.

For the part-time academic program assignments, 305 or 67 percent were held by non-MHSDS inmates, 133 or 29 percent were held by 3CMS inmates, and 16 or four percent were held by EOP inmates.

Non-MHSDS inmates held 198 or 71 percent of the voluntary academic assignments. 3CMS inmates held 65 or 23 percent of them, and EOP inmates held 14 or five percent of them.

Fifty-two or 60 percent of the part-time vocational educational assignments were filled by non-MHSDS inmates. There were 27 or 32 percent of these assignments filled by 3CMS inmates, and seven or eight percent filled by EOP inmates.

There were 1,050 eligible unassigned inmates. This included 512 or 49 percent who were non-MHSDS inmates, 360 or 34 percent who were 3CMS inmates, and 168 or 16 percent who were EOP inmates. Of the eligible unassigned EOP inmates, 165 or 98 percent were assigned to work group A-1, which was comprised of inmates diagnosed as totally disabled and therefore incapable of performing an assignment. The remaining two percent were assigned to work group A-2, which was comprised of involuntary unassigned inmates who are defined as willing but

364

unable to perform in an assignment.  These inmates were placed on a wait list pending availability of an assignment.  Of the eligible unassigned 3CMS inmates, 102 or 28 percent were assigned to work group A-1 and 258 or 72 percent were assigned to work group A-2.  Thirteen percent of the non-MHSDS eligible but unassigned inmates were assigned to work group A-1 and 87 percent were assigned to work group A-2.

      b.      <u>Milestone Credits</u>:

Data indicated that from August 1, 2014 to January 31, 2015, 1.96 percent of eligible EOP inmates, 2.27 percent of eligible 3CMS inmates, and 8.18 percent of non-MHSDS inmates earned milestone credits.

      c.      <u>Out-of-Level Housing</u>:

SVSP had a number of caseload inmates in out-of-level housing.  In the Level III housing, there were eight Level I EOP inmates, 66 Level II EOP inmates, 15 Level IV EOP inmates, one Level I 3CMS inmate, 15 Level II 3CMS inmates and 171 Level IV 3CMS inmates.  In the Level IV housing, there was one Level I EOP inmate, five Level II EOP inmates, ten Level III EOP inmates, two Level I 3CMS inmates, three Level II 3CMS inmates, and 27 Level III 3CMS inmates.

      d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

No data on ADA reasonable accommodation and grievance procedures was provided.  Review of the proof-of-practice documents indicated that EOP inmates were granted classification score reductions for successful programming, although some of the CDCR 840s were conducted annually.

*Coleman* Postings:

Inspection of eight housing units for the presence of *Coleman* postings found a posting dated June 2010 in four housing units.  In one of these units, the plaintiffs' counsel's address information was torn from the posting.  One unit had a current Spanish language posting.  The three units had no *Coleman* postings at all.

## Correctional Training Facility (CTF)
April 30, 2015 – May 1, 2015

Census:

As of April 27, 2015, CTF housed 4,875 inmates, for a decline by 13 percent since the preceding monitoring period.  There were 1,432 inmates on the mental health caseload.

One mainline EOP inmate was pending transfer.  There were 1,378 mainline 3CMS inmates in the institution.

The administrative segregation population of 132 included one EOP inmate who was pending transfer to an administrative segregation EOP hub and 40 3CMS inmates. Twelve 3CMS inmates were in the OHU.

Staffing:

The chief psychologist position was filled.

The senior psychiatrist and three of the four staff psychiatrist positions were filled.

Positions for the two supervising senior psychologists, two senior psychologist specialists, and 11 psychologists were all filled.

A contractor filled the vacant supervising social worker position.  Eight of ten social worker positions were filled, for a 20-percent vacancy rate.

The senior psych tech and five psych tech positions were all filled.

The HPS I position was filled.  Six of eight clerical positions were filled, for a 25-percent vacancy rate.

366

Quality Management:

The quality management committee met 20 times during the review period. It maintained detailed minutes and always achieved a quorum. It received reports on mental health matters such as staffing, access to care, SREs, MHCB referrals, QITs, and SPRFIT issues. During the review period, the mental health subcommittee held ten meetings, kept minutes, and always achieved a quorum. It addressed staffing, audits, administrative segregation pre-placement screens, OHU admissions, custody procedures for inmates on one-to-one observation, psych tech responsibilities, DSH referrals, training on controlled use-of-force, inmate appointment arrival times, inmate safety, MHCB referrals, and training on case-by-case reviews. QITs addressed psych tech duties, access to mental health care, and timely mental health information scanning.

Peer review was not conducted during the review period.

Medication Management:

CTF implemented MAPIP in December 2014. Staff reported that MAPIP measures of noncompliance were reported to the quality management committee and mental health subcommittee, and were tracked on the dashboard.

The overall compliance rate for continuity of medications was 86 percent. Continuity of NA/DOT medications following both inter-institutional and intra-institutional moves was 89 percent. For inmates discharged back to CTF from DSH inpatient programs for a community hospital, continuity of medications was 83-percent compliant. Following transfers to locked units, continuity of medications was 66-percent compliant. Staff attributed these medication continuity compliance rates to lack of coordination among custody, nursing, and pharmacy staffs.

367

Compliance rates exceeded 90 percent for both medication administration and response to cases of inmate medication noncompliance.

Waits in pill lines lasted 45 to 60 minutes on the North Facility.  Staff attributed the long waits to changes in psych tech duties and the loss of nursing staff.

Transfers:

There were no referrals or transfers to DSH inpatient programs during the review period.

Twelve of 18 or 67 percent of transfers to outside MHCBs were timely.  The predominant reason for the late transfers was lack of MHCB availability

No inmates transferred to a PSU.

Six of seven or 86 percent of EOP inmates in administrative segregation transferred timely to EOP hubs.

Ten inmates identified for the EOP level of care all transferred timely to mainline EOP programs.

Other Issues:

MHSDS Inmates in Administrative Segregation:

The senior psychiatrist's caseload was 13, while the psychologist's and social worker's caseloads were 38 and 11, respectively.

CTF reported 100-percent compliance for timeliness of initial and follow-up psychiatry contacts for 3CMS inmates from October 1, 2014 to March 31, 2015. Over 99 percent of these contacts were out-of-cell.

From September 1, 2014 to March 23, 2015, the institution was 92-percent compliant with timeliness of initial 3CMS PC contacts and 97-percent compliant with follow-up contacts.  Two percent of initial PC contacts were cell-front, as were 52 percent of follow-up

368

contacts.  Inmates attributed these cell-front contacts to lack of sufficient mental health staff and escort officers, and to avoidance of the discomfort of having contacts while in holding cells. Mental health staff generally attributed cell-front contacts to inmate refusals, insufficient office space, and occasional lack of custody escorts.  Over 99 percent of the out-of-cell contacts took place in private settings.

For 3CMS inmates, from September 1, 2014 to March 23, 2015, timeliness of initial IDTT meetings was 96-percent compliant, and for follow-up meetings it was 100-percent compliant.  Required disciplines attended 100 percent of IDTT meetings from October 1, 2014 to March 31, 2015.

Interviewed inmates reported positive experiences with their IDTT meetings and that as a result they understood their treatment plans.  Some inmates expressed concern with staff reluctance to transfer them to higher levels of care when they expressed need for it.  They also requested group treatment, which was unavailable.

Mental health services for 3CMS inmates were adversely affected by lack of adequate private interview space.  Of three available treatment rooms, one was often used by the ICC and another lacked auditory privacy.  All three had small holding cells instead of therapeutic modules, requiring inmates to use milk crates for seating.  Group treatment space was also insufficient.   Mental health services were also disrupted by a large influx of transfers from other institutions to CTF's administrative segregation unit.  When admissions rose, clinical contacts lagged behind and clinicians from other programs often had to be diverted to administrative segregation in order to comply with requirements.

At the time of the site visit, there were five EOP and 38 3CMS inmates in administrative segregation.  These EOP inmates' stays averaged 64 days and ranged from two to 142 days.

369

These 3CMS inmates' stays averaged 53 days and ranged from one to 177 days. The 87 3CMS inmates who were in administrative segregation at least some point during the review period had an average stay of 78 days, with a range of four to 538 days. Four of five or 80 percent of inmates listed as having been in administrative segregation for 150 days or longer as of September 22, 2014 were released or transferred as a result of case-by-case reviews.

There were also five 3CMS on NDS status at the time of the site visit. The institution did not report the lengths of their stays nor the status of property privileges. Four of these inmates were endorsed to other institutions and were awaiting transfer.

Alternative Housing:

The OHU had 17 medical beds and four observation/mental health beds. The mental health cells had suicide-resistant beds plus a sink and toilet. One was also used for seclusion and restraint and had handrails for mobility-impaired inmates.

Staff reported that the OHU coordinator or another designated mental health clinician evaluated each mental health inmate every day. Three of 22 or 14 percent of OHU stays exceeded 72 hours.

All 17 alternative housing placements were for less than 24 hours. Eight of them resulted in transfers to MHCBs.

3CMS:

CTF reported compliance rates of 99 percent for both initial and follow-up psychiatry contacts from September 1, 2014 to March 23, 2015. The three psychiatrists had caseloads of 179, 215, and 236, respectively.

370

During the same period, initial PC contacts were 83-percent compliant for timeliness, and follow-up contacts were 98-percent compliant. Eleven psychologists' caseloads ranged from 45 to 99, and five social workers' caseloads ranged from 74 to 101.

From September 1, 2014 to March 23, 2015, timeliness of initial IDTT meetings was 79-percent compliant, and for follow-up meetings it was 99-percent complaint. Required disciplines attended 100 percent of meetings from October 1, 2014 to March 31, 2015. At observed IDTT meetings on the North yard, required staff were present and had access to necessary information. Inter-disciplinary discussion was good. The team constructively engaged the inmates in treatment planning. At observed IDTT meetings on the South yard, team members were knowledgeable about inmates and included the inmates in their discussions. However, clinicians were not aware of correct use of the Form 7388B. There was a lack of discussion about inmates' levels of care. While treatment goals were relevant to diagnoses, they were not measurable. Although four clinicians were running groups at the time of the site visit, there were insufficient staff to offer groups to all 3CMS inmates. Many inmates were unaware of the availability of groups.

Some interviewed 3CMS inmates expressed concerns with serial changes of clinicians and their lack of familiarity with inmates' treatment plans and goals. Most of these inmates reported seeing their clinicians quarterly in sessions that typically lasted no longer than ten minutes. Inmates complained of disrespect by custody officers but also reported that custody officers did not interfere with inmates' access to mental health staff when needed.

371

Referrals:

Compliance rates for timely response to mental health referrals were 97 percent for the 32 emergent referrals, 96 percent for the 91 urgent referrals, and 97 percent for the 2,143 routine referrals.

Mental Health/Custody Relations:

Mental health staff reported that their relations with custody staff were generally good and mutually respectful, and that custody leadership emphasized the importance of cooperation with mental health staff.  They also reported that custody officers assigned to administrative segregation were cooperative and capable in the performance of their duties.

Heat Plan:

There were no Stage I, II, or III heat alerts during the review period.  CTF maintained a list of inmates who were prescribed heat-sensitive medications.

RVRs:

The institution did not provide documentation of staff attendance at the training on the new RVR procedures.

Use of Force:

CTF reported compliance rates of 99 percent for training of custody staff and 93 percent for training of mental health staff on the new use-of-force procedures.

Access to Care:

Of the total of 9,918 mental health ducats and add-on appointments, 87 percent were completed.  All 1,319 ducat non-completions were due to non-custodial reasons.

Program Access:

a.      Job and Program Assignments:

No EOP inmates had work training assignments.

Institutional data indicated that 572 or 20 percent of available full-time jobs were filled by 3CMS inmates, and 2,234 or 80 percent were filled by non-mental health caseload inmates.

There were no part-time job assignments at CTF.

For part-time academic program assignments, 239 or 21 percent were held by 3CMS inmates, and 898 or 79 percent were held by non-mental health caseload inmates.

For voluntary academic program assignments, 74 or 21 percent were held by 3CMS inmates, and 275 or 79 percent were held by non-mental health caseload inmates.

For full-time vocational education assignments, 92 or 22 percent were held by 3CMS inmates, and 322 or 78 percent were held by non-mental health caseload inmates.

For part-time vocational education assignments, 16 or 25 percent were held by 3CMS inmates, and 48 or 75 percent were held by non-mental health caseload inmates.

There were no voluntary vocational education assignments at CTF.

For re-entry substance abuse treatment program assignments, 127 or 32 percent were held by 3CMS inmates, and 267 or 68 percent were held by non-mental health caseload inmates.

There were 174 3CMS inmates and 359 non-mental health caseload inmates who were eligible for work training assignments, but were unassigned.

b.     <u>Milestone Credits</u>:

One of two EOP inmates was eligible for milestone credits but did not earn them, as CTF did not have an EOP program.  As of February 28, 2015, of 1,307 3CMS inmates, 336 were eligible for milestone credits.  Sixteen percent of those eligible actually earned milestone credits. Additionally, 727 of 3,319 non-mental health caseload inmates were eligible for milestone credits.  Nineteen percent of those eligible actually earned milestone credits.

  c.  <u>Out-of-Level Housing</u>:

As of March 16, 2015, no EOP inmates were in out-of-level housing at CTF.

There were 47 3CMS and 83 non-mental health caseload Level I inmates in Level II housing.

Seven 3CMS and 39 non-mental health caseload Level II inmates were in Level I housing.

Eighteen 3CMS and 27 non-mental health caseload Level III inmates were in Level II housing.

  d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CTF reported that the ADA Reasonable Accommodation and Grievance Procedure were inapplicable to the institution, and did not provide any pertinent data.

  e.  <u>Periodic Classification Score Reductions: EOP Inmates</u>:

CTF did not have an EOP.

  <u>*Coleman* Postings</u>:

All three floors of the administrative segregation unit at CTF contained *Coleman* postings.

**<u>California Men's Colony (CMC)</u>**
May 26, 2015 – May 28, 2015

<u>Census</u>:

On May 26, 2015, CMC's total inmate population was 3,878, including 1,333 inmates on the mental health caseload.

There were 48 inmates in the MHCB.  The EOP mainline population was 521 and the 3CMS mainline population was 679.

There were 75 EOP inmates in the administrative segregation hub.   Ten 3CMS inmates were in administrative segregation.

374

Staffing:

The chief psychiatrist and chief psychologist positions were filled. Another chief psychologist position was kept open per headquarters' directive for cost savings.

The senior psychiatrist position was filled. Of the 20.3 psychiatry positions, 18.3 were filled, for a ten-percent vacancy rate. With use of a .8 FTE contract psychiatrist, the functional vacancy rate in psychiatry was reduced to six percent.

Eleven of the 11.3 senior psychologist positions were filled. Forty-three of the 46 psychologist positions were filled, for a six-percent vacancy rate. CMC reported utilizing a .79 registry psychologist, which decreased the functional vacancy rate to five percent.

The supervising psychiatric social worker position was filled. Nineteen of the 20 social worker positions were filled, for a five-percent vacancy rate. The institution utilized a .36 registry social worker, thereby decreasing the functional vacancy rate to 3.2 percent.

The unit supervisor position and the three senior psych tech positions were filled. Of the 40 psych tech positions, 39 were filled, leaving a vacancy rate of less than three percent.

Sixteen of the 23.6 recreation therapist positions were filled, for a 32-percent vacancy rate. Use of one registry recreation therapist decreased the functional vacancy rate to 28 percent.

Of the 22.5 MHSDS clerical positions, 19.5 were filled for a 13-percent functional vacancy rate.

Quality Management:

The quality improvement process at CMC was useful. It showed improvement since the preceding monitoring period, with increased staff participation.

The local governing body met twice during the review period. Minutes were provided for review. Agenda items included medical staff reports, peer review, policies and procedures,

375

financial and budgetary data, progress reports on current litigation, the CEO's report, pharmacy reports, and HCFIP.

The quality management committee met monthly, with a quorum at all meetings. Minutes were provided for review. Agenda items included reports from the medical, mental health, and dental subcommittees, policies and procedures, dashboard review, reports/audits/inspections by outside entities, medication management, alternative housing, and ACA audits.

The mental health subcommittee met twice per month, with good attendance. Minutes were provided for review. Agenda items included QIT reports, SPRFIT reports, QMC reports, the Performance Improvement Work Plan (PIWP), and mental health policies. The mental health subcommittee also reviewed results of audits, which appeared to be methodologically sound and related to *Coleman* issues. The mental health subcommittee also implemented and monitored CAPs.

Three QITs were chartered during the review period. One worked on moving alternative housing out of the administrative segregation unit and improving the alternative housing process overall. Another worked on management of high-risk patients and barriers to treatment in the administrative segregation EOP hub. The third QIT addressed the reduction in EOP treatment hours that was related to psych tech staffing allocations. Minutes of these QITs were provided for review and were useful.

An active FIT on suicide prevention addressed audits of five-day clinical follow-ups and reviewed cases of inmates who had attempted suicide.

Other than for the MHCB clinicians, peer review was on hold from October 2014 through February 2015 due to the conversion of CMC's GACH to a CTC and the subsequent

376

reorganization of the medical staff. The LOP establishing the revised peer review process was approved on March 2, 2015. CMC was in the process of developing its peer review committees for psychiatry, psychology, and social work.

The MHCB psychology and social work peer review committee conducted four meetings during January and February of 2015, when it reviewed three psychologists. The MHCB psychiatry peer review committee met on March 3, 2015 and reviewed four psychiatrists. Staff reported that they found the process useful.

Medication Management:

MAPIP was implemented at CMC and was working well to help identify and resolve medication management issues.

Audit results indicated that medication continuity following inmate returns from DSH inpatient programs and community hospitals was noncompliant.

Following intra-institutional moves, compliance rates for continuity of medications were above 90 percent, except following moves out of administrative segregation and discharges from the MHCB, which was attributed to inmate refusals.

The institution's level of compliance with policies and procedures on response to inmate medication noncompliance was above 90 percent for four of the six months of the review period.

Inmates' waits in pill lines were under 30 minutes.

Orders were written for no longer than 90 days, and bridge orders were written for no longer than 14 days.

Audits indicated that signed medication informed consent forms were being obtained.

MAPIP audits indicated compliance with laboratory testing of blood levels of inmates prescribed psychotropic medications.

DOT medication administration was carried out appropriately.

At the time of the site visit, 52 inmates were on orders for involuntary medications. For approximately 30 of those inmates, orders were either initiated or renewed during the review period. No petitions for involuntary medications were denied. Refusals of involuntary medications averaged approximately one per month. They resulted in clinical management or admissions to the CTC or East Clinic for medication administration.

The 278 inmates on HS psychotropic medications were receiving them no earlier than 8:00 p.m.

Provision of 30-day supplies of medications to paroling inmates was over 90-percent compliant.

Transfers:

CMC continued to have a full-time DSH coordinator. The DSH referral and non-referral logs were complete and contained all necessary data. Rationales for the non-referrals entered into the non-referral log were clinically appropriate.

Of the 785 inmates identified as meeting one or more indicators for consideration for DSH referral, 174 or 22 percent were referred to DSH inpatient acute or intermediate care programs.

CMC referred 127 inmates to acute inpatient care. Of these, 115 transferred, eleven were rescinded, and one was awaiting an RVR hearing. Of the 115 who transferred, 95 were sent to VPP and 20 were sent to the CHCF. Completion of 23 or 18 percent of the acute care referral packets did not comply with Program Guide timelines. The average time from referral to transfer was 10.9 days, with 46 or 40 percent noncompliant with the ten-day transfer timeline. Late transfers ranged from 11 days to 45 days and were largely attributed to delays between DSH

378

patient acceptances and bed assignments.  Once bed assignments were made, transfers of five inmates or four percent were not completed within 72 hours of bed assignment.

There were 68 inmates referred to intermediate inpatient care during the review period. Five were rescinded and one was rejected.  Twenty-six or 38 percent of referral packets were not completed within Program Guide timelines.  It was reported that once the packets were sent to headquarters, there were delays in posting them to SharePoint.  Of the 62 inmates who transferred, 45 or 73 percent transferred within 30 days, with an average transfer time of 24.77 days.  Seventeen or 27 percent of inmates were transferred beyond the 30-day timeframe, with transfer times ranging from 31 to 59 days.  The late transfers were attributed primarily to delays between acceptances and bed assignments.  Three or five percent of intermediate care transfers were not completed within 72 hours of bed assignment.

At the time of the site visit, three patients accepted to acute inpatient care and three patients accepted to intermediate inpatient care were awaiting transfer.  Transfer times for two of these acute care referrals were already over 30 days.  The remaining four referrals were still within transfer timeframes.

The DSH coordinator reported that CMC received timely notifications of DSH patient discharges back to the institution.  Discharging DSH programs other than ASH timely posted patients' discharge summaries on SharePoint.  Discharge plans from ASH were usually produced late and did not comport with inmates' behaviors.

Data indicated that during the review period, 24 inmates transferred from CMC to outside MHCBs.  The average transfer time was 25.6 hours, with a range of 3.2 to 48.53 hours.  Twelve or 50 percent of these transfers took longer than 24 hours.  These late transfers were attributed to lack of bed availability.

Documentation indicated that 380 inmates were placed into alternative housing from November 2014 through April 2015.  It also indicated a compliance rate of 88 percent for transfers out of alternative housing within 24 hours.   Overly-long stays lasted beyond the 24-hour timeframe by a range of .04 to 2.5 days.

All 14 transfers to a PSU during the review period were timely.

Other Areas:

Administrative Segregation EOP:

The administrative segregation EOP hub was located on B yard.  Program capacity was 50, but it was running at approximately 67 percent over capacity with an average of 80 inmates during the review period.  The institution planned to increase capacity to 100 by June 15, 2015.

Mental health pre-screen chronos and 31-item questionnaires were conducted timely in more than 90 percent of cases.  Ninety-seven percent of intake assessments were completed within five days of placement in administrative segregation.

Timeliness of initial and follow-up psychiatry contacts was 98-percent compliant.

Ninety-six percent of initial PC contacts and 98 percent of follow-up contacts were timely.  Each of five clinicians had caseloads of 19.  Three other clinicians handled RVRs, modified treatment programs, five-day clinical follow-ups, Level I 602 inmate appeals, crisis intervention, and treatment refusals.

Observed daily psych tech rounds were well-conducted, with appropriate documentation on caseload inmates.

Observed ICC meetings began on time and were chaired by the CMC warden.  Mental health clinicians played a major role at these meetings and explained the purpose of their

presence to the inmates.  The ICC team was knowledgeable, but significant use of custodial terminology during the meetings caused some unnecessary anxiety for the inmates.

For EOP inmates, 96 percent of initial IDTT meetings and 95 percent of follow-up meetings were conducted timely.  Required disciplines attended 92 percent of meetings. According to staff, absences by psych techs were due to recent changes in staffing.   Ninety-six percent of initial IDTT meetings were conducted before initial ICC meetings.

Observed IDTT meetings were well-attended and utilized a team approach throughout the process. Treatment plans and goals were individualized and measurable.  The IDTT process was explained to the inmates, who were given the opportunity to ask questions and be included in the treatment planning process.  The team discussed and reached consensus on inmates' levels of care and treatment goals.

EOP hub inmates were offered an average of 15 hours of structured therapeutic activity per week, refused an average of 6.77 hours, and attended an average of 8.15 hours.  A process group session was observed during the site visit.  It was well-conducted and clinically relevant. Interviewed inmates reported that the mental health program was beneficial and had a positive effect on their behaviors.

The EOP hub was certified for the second consecutive month during September 2015. Thereafter, monthly self-certification reviews were conducted.   The dashboard was also reviewed regularly by supervisory staff and intermittently by line staff.  They identified problems with treatment hours which were corrected by December 2015.

At the time of the site visit, 75 EOP inmates, ten 3CMS inmates, and 77 non-mental health caseload inmates were in the hub.  Fifty-four inmates' stays exceeded 90 days, with a range of 90 to 426 days. Staff reported that pending RVRs and safety concerns were the primary

reasons for the extended stays. ICC meetings were conducted every two weeks or more frequently if needed.

MHCB:

CMC reported 640 admissions to its own MHCB during the review period.  The average stay lasted 12.5 days, with a range of 1.3 days to an outlier of 83.2 days.  The outlier was caused by a variety of reasons including pending parole, possible MDO placement, and medical complications.   Fifteen percent of admitted inmates had had at least two MHCB admissions during the preceding six months.

The MHCB had two wings with 25 beds each.  Each wing had two observation rooms, one seclusion room, two ADA-compliant cells, and two group rooms equipped with three therapeutic modules.  Beds were suicide-resistant.

Audits confirmed that newly-admitted MHCB patients received histories and physicals within 24 hours in 93 percent of cases.  If admitted for suicidality, they received timely SREs 98 percent of the time.

Audits indicated that timeliness of mental health evaluations, psychiatry contacts, PC contacts, IDTT meetings, and development of treatment plans was compliant.  Property, mechanical restraints, and movement restrictions were reviewed timely and relaxed when clinically appropriate, except for inmates who were on SNY status.

Follow-up IDTT meetings were conducted at least weekly.  All required disciplines attended IDTT meetings over 90 percent of the time.  Meetings were held in a multi-purpose room with adequate space and computer access.  The five observed IDTT meetings and the resulting treatment plans were clinically meaningful.

382

There were eight outdoor walk-alone yards and two larger yards designed for group recreation.  Inmates reportedly had access to either group treatment or outdoor recreation three times per week.  Recreation therapy was provided with groups of three inmates in treatment modules.

Legible and clinically meaningful discharge summaries were completed timely.

Seclusion and Restraint:

There was one use of restraints, which lasted for 16 hours during October 2014.  There were four episodes of seclusion, lasting from 15 hours to 120 hours.

Alternative Housing:

Alternative housing was located in the former locked observation unit.  Treatment consisted of daily rounds by either a psychiatrist or psychologist.

EOP:

The EOP was housed on D-Yard in Buildings 7 and 8.  Program capacity was 580.

All initial psychiatry contacts and 95 percent of follow-up contacts were timely.

Initial PC contacts were timely in 96 percent of cases, and follow-up contacts were timely in 98 percent of cases.

Ninety-six percent of initial IDTT meetings preceded ICC meetings.  Staff reported that the compliance rate for timeliness of initial IDTT meetings was 75 percent, due to holidays and increasing influx of new arrivals.  Follow-up meetings were conducted timely 96 percent of the time.  The rate of attendance by required disciplines was 84 percent, due largely to absences by psychiatrists and correctional counselors.

At observed IDTT meetings, clinical and custodial staff engaged inmates in all aspects of the IDTT process.  Inmates' strengths, levels of care, and treatment goals were discussed.  All

team members were given the opportunity to converse with the inmates. However, there were some issues with the team's use of Form 7388B.

On average per week, 13.72 treatment hours were offered, 8.15 were attended, and 5.56 were refused. Observed groups were clinically relevant and well attended. Participating inmates expressed appreciation for the mental health program. Group activities included various types of leisure and process groups for inmates arriving, paroling, and/or serving extended sentences. EOP activities also included multiple vocational programs.

3CMS:

Reviewed audits indicated that psychiatry contacts, PC contacts, IDTT meetings, and mental health treatment plans were completed timely. Both staff and inmates indicated that a significant proportion of 3CMS inmates were seen more frequently than every 90 days for clinical reasons. Psychiatry and PC contacts took place in private settings.

Audits also found that timeliness of mental health evaluations for level-of-care changes from EOP to 3CMS was noncompliant.

Psychiatrists reportedly completed intake evaluations before initial IDTT meetings. Required disciplines attended initial and follow-up IDTT meetings in 96 percent of cases. Computers were accessible and used during the meetings. During five observed IDTT meetings, all required members were present and contributed to the discussion. It appeared that inmates found the process helpful.

Approximately one-third of mainline 3CMS inmates participated in groups. There were 27 weekly process and leisure groups offered to 3CMS inmates, Monday through Friday from 8:00 a.m. to 3:00 p.m. Waitlists ranged from one to 86 and wait times lasted as long as several months. EOP inmates were accorded priority for all group openings.

During the site visit, twenty 3CMS inmates were interviewed in groups of ten. Approximately 25 percent had either attended or were currently in group treatment and another 25 percent were on waitlists. They uniformly described access to their psychiatrists and PCs and their continuity of care as good, and their treatment as helpful. Their most significant request was better access to group treatment and more programming. Review of records of seven of these inmates indicated consistency with the information they reported, and that their treatment plans were adequate.

<u>3CMS Inmates in Administrative Segregation</u>:

The administrative segregation 3CMS program was housed in B yard.

All initial psychiatry contacts and 99 percent of follow-up contacts were timely.

Ninety-eight percent of initial PC contacts and 97 percent of follow-up contacts were timely.

Initial IDTT meetings were timely in all cases. Follow-up IDTT meetings were timely in 96 percent of cases. The compliance rate for attendance by required staff was 96 percent. Staff reported that psych techs' attendance was inconsistent because of changes in psych tech staffing.

Inmates were offered a movie night but not groups.

As of May 27, 2015, 14 inmates had stays over 150 days in administrative segregation. Five of them were on NDS and were granted approved privileges. One was endorsed to a PSU, one was endorsed to the SHU, two were endorsed to an SNY, two were referred to the CSR for endorsement to transfer, one was pending RVR adjudication, one was pending a DA review, and one was pending imminent parole.

STRH had not been implemented as of the time of the site visit.

<u>Referrals</u>:

During the review period, timeliness of response to the 391 emergent referrals was 100-percent compliant. Response to the 178 urgent referrals was 94-percent compliant, and response to the 911 routine referrals was 95-percent compliant.

Heat Plan:

The institution's monthly report for October 2014 that was submitted to headquarters indicated that during the review period there were six Stage I heat alerts and three Stage II heat alerts. Cooling measures were used during the Stage II alerts.

All inspected units had thermometers located on their highest floors. All logs were up to date.

The heat plan produced to the monitor during the site visit was one year out of date.

Use of Force:

As of November 19, 2014, 95 percent of custody staff had been trained on the new use-of-force policies and procedures. Mental health staff were trained in November 2014. Proof-of-practice documentation indicated a compliance rate of 90 percent.

Access to Care:

Mental health staff followed up on appointment "no shows" and refusals by sending staff to find the inmate. Working relationships between mental health staff and access-to-care staff were good.

Construction:

Headquarters information indicated that bids had been received for the construction of an 11,000 square foot building that would accommodate 50 inmates who would receive 14 hours of treatment per week. The building would include four group rooms, an IDTT room, four clinicians' offices, other staff offices, and support areas.

386

Program Access:

a.     Job and Program Assignments:

There were 1,768 full-time job assignments, of which 230 or 13 percent were filled by EOP inmates, 327 or 18 percent were filled by 3CMS inmates, and 1,211 or 69 percent were filled by non-MHSDS inmates.  Of the total 1,768 full-time job assignments, 1,463 were paying positions.  Of these, 153 or ten percent were held by EOP inmates, 274 or 19 percent were held by 3CMS inmates, and 1,036 or 71 percent were held by non-MHSDS inmates.

There were 138 part-time job assignments, of which 36 or 26 percent were held by EOP inmates, 25 or 18 percent were held by 3CMS inmates, and 77 or 56 percent were held by non-MHSDS inmates.

Of the 77 part-time paid job assignments, one or one percent was held by an EOP inmate, 17 or 22 percent were held by 3CMS inmates, and 59 or 77 percent were held by non-MHSDS inmates.

There were no full-time academic work training assignments at CMC.  Of the 582 part-time academic positions, 55 or ten percent were filled by EOP inmates, 83 or 14 percent were filled by 3CMS inmates, and 444 or 76 percent were filled by non-MHSDS inmates.

Of the 212 full-time vocational education positions, 13 or six percent were filled by EOP inmates, 49 or 23 percent were filled by 3CMS inmates, and 150 or 71 percent were filled by non-MHSDS inmates.   All 53 part-time vocational education positions were filled by non-MHSDS inmates.

One 3CMS inmate and seven non-MHSDS inmates participated in full-time substance abuse programs.   Among the 113 participants in part-time substance abuse programs, five or

387

four percent were EOP inmates, 25 or 22 percent were 3CMS inmates, and 83 or 74 percent were non-MHSDS inmates.

The institution reported that 2,005 inmates participated in voluntary education programs. Of these, 119, or six percent were EOP inmates, 309 or 15 percent were 3CMS inmates, and 1,577 or 79 percent were non-MHSDS inmates.

b.    Milestone Credits:

CMC reported that a total of 1,115 inmates were eligible for milestone credits. Of those eligible, 150 or 13 percent were EOP inmates, 157 or 14 percent were 3CMS inmates, and 808 or 72 percent were non-MHSDS inmates.

Data indicated that from October 1, 2014 through April 21, 2015, milestone credits were actually earned by 26 percent of eligible EOP inmates, 24.84 percent of eligible 3CMS inmates, and 41.96 percent of eligible non-MHSDS inmates.

c.    Out of Level Housing:

There were 51 Level III EOP inmates and nine Level III 3CMS inmates in Level I housing. There were 312 Level III EOP inmates and 235 Level III 3CMS inmates in Level II housing. There were 17 Level III EOP inmates and 18 Level III 3CMS inmates in Level IV housing.

d.    ADA Reasonable Accommodation and Grievance Procedures:

Institutional data indicated that training on the ADA Reasonable Accommodation and Grievance Procedures was completed on May 12, 2015. The new procedures were implemented on May 18, 2015. The Reasonable Accommodation Panel (RAP) met weekly if appeals were filed.

    e.    <u>Periodic Classification Score Reductions: EOP Inmates</u>:

A review of eight reclassification sheets found that EOP inmates' classification scores were being reduced upon program completion.

    <u>*Coleman* Postings</u>:

Among all units monitored, one floor within one unit did not have a *Coleman* posting. Many of the postings were outdated.

**<u>Wasco State Prison (WSP)</u>**
March 3, 2015 – March 5, 2015

<u>Census</u>:

On March 1, 2015, WSP housed 4,978 inmates, which was a decline by approximately two percent since the preceding monitoring period. There were 4,053 inmates in the reception center, including 101 EOP inmates and 879 3CMS inmates. There were 109 inmates in administrative segregation.

The mental health caseload population of 1,260 inmates had increased by 100 or nine percent since the preceding monitoring period and comprised 25 percent of the institution's population.

Five inmates were in the MHCB. The sole EOP inmate was in administrative segregation and awaiting transfer to an EOP hub. The mainline 3CMS population was 246. Twenty-three 3CMS inmates were in administrative segregation.

<u>Staffing</u>:

The chief psychiatrist had been on leave since December 2014. The chief psychologist and both senior psychologist supervisor positions were filled. One psychologist supervisor

389

position was vacant for the final two months of the reporting period. One of the two senior psychologist specialist positions was filled.

Only three of ten psychiatry positions were filled, but all were covered by registry staff. The part-time psychiatrist in the mainline 3CMS program had a caseload of 236.

Twenty-seven of 31 psychologist positions were filled, for a 13-percent vacancy rate. Eleven psychologists were unlicensed and one was on long-term leave. The supervising social worker position was filled, as were 12 of 14 social worker positions, for a 14-percent vacancy rate. Use of 0.5 contractors reduced the functional vacancy rate in social work to 11 percent. Nine social workers were unlicensed. The two assigned PCs in the mainline 3CMS program had caseloads of 93 to 111.

Positions for the senior psych tech and 13 of the 15 line psych techs were filled, for a 13-percent vacancy rate.

One of the 2.5 recreational therapist positions was filled, for a 60-percent vacancy rate. Use of 0.25 contractors reduced the functional vacancy rate to 50 percent.

Ten of 10.5 mental health clerical positions were filled. One office tech was on leave during the review period. One HPS I position was filled and the other was covered by a staffer working in an acting capacity. The OSS II position was filled.

Quality Management:

Minutes of five of the six quality management committee meetings during the review period indicated that a quorum was present for all meetings and that the committee had approved several operational procedures related to suicide prevention and medication management. Mental health subcommittee reports were submitted to the quality management committee for two months of the review period.

The mental health subcommittee met six times during the review period. Minutes indicated that fewer than all required members were present during the meetings and that designees did not attend in their stead. Minutes indicated that the subcommittee took up issues in suicide prevention, continuity of care, access and transfers to higher levels of care, and treatment in administrative segregation. The subcommittee did not charter any QITs during the review period. It was unclear whether the subcommittee was functioning as intended or able to address the operational issues at WSP.

WSP was paired with DVI for peer review. Psychiatrists at the two institutions reviewed each other's work, and a DVI supervising psychologist reviewed progress notes for each of the WSP clinicians.

Medication Management:

 Medication continuity for newly-arriving inmates was 97-percent compliant within the reception center, and was 100-percent compliant following transfers from the reception center. Continuity following other moves was variable and noncompliant.

Continuity of NA and DOT medications after intra-institutional transfers other than administrative segregation ranged from 27 percent in October 2014 to 100 percent in January 2015.

Inmates' compliance with their medications was reported as 64.7-percent compliant. Medication administration was reported as 79.3 percent compliant. Staff attributed these rates to the degree of availability of accurate documentation, and timeliness of document preparation, appropriate routing, and scanning of eUHR documents.

391

QITs on medication noncompliance counseling, intra-institutional moves, transfers of inmates with KOP medications, and medical records scanning were chartered. The institution also implemented staff and inmate education to reduce no-shows and refusals.

Transfers:

A senior psychologist specialist position was assigned responsibilities as the DSH coordinator and SPRFIT coordinator, among other things. The DSH referral log was generally complete and significantly improved since the preceding monitoring period, but information on DSH returns was incomplete or missing.

There were 20 referrals to acute inpatient care, two of which were completed untimely. One was rescinded due to the inmate's medical diagnosis. Of the 19 acute care transfers to DSH, seven did not transfer within ten days of referral. The average time from referral to admission was 14.9 days. All but one of the transfers was within 72 hours of a bed assignment.

There were 11 referrals to intermediate inpatient care, three or 27 percent of which were not completed timely. One was rescinded without any rationale provided and one was referred to acute care. Four transferred to DSH during the review period, two were awaiting beds, one was still pending DSH acceptance, and two inmates transferred to other institutions before notice of DSH acceptance. Three of the transfers did not occur within 30 days of referral. The average time from referral to admission was 34.3 days.

Review of the DSH referral log indicated that nine cases remained with CDCR health care services at headquarters for more than one day after submission to utilization management, for an average of 10.4 days and a range of four to 20 days. Reasons were unknown. DSH notified the institution of acceptances within Program Guide timeframes.

The Special Master's expert conducted a review of a random sample of cases in the DSH non-referral log. This review identified various areas of concern with regard to referrals. Overall, the institution appeared to continue to underutilize DSH referrals, although there was more use than during the preceding monitoring period. A significant number of Form 7388Bs were not completed correctly. Observed IDTT meetings indicated a range of teams' levels of performance with use of the form. Some of the teams failed to note objective criteria when present. Except in the MHCB IDTT, subjective criteria were underutilized. When inmates did satisfy criteria for consideration for DSH referral, some IDTTs failed to provide adequate rationales for non-referral and/or adequate treatment modifications to address the reasons why the patient was originally identified.

Of 227 inmates transferred to an outside MHCB during the review period, 146 or 64 percent had a bed assignment within 24 hours of MHCB referral. Seventy-one or 31 percent were transported within 24 hours of referral. Mental health staff reported that MHCB unavailability was the major reason for the delays.

No EOP inmates were endorsed for transfer to the PSU during the review period. From July 1, 2014 to January 25, 2015, 58 of 60 or 97 percent of EOP transfers to hubs were timely. The two late transfers occurred after 46 and 47 days, respectively. One was delayed due to MHCB unavailability and the other was due to the inmate's multiple MHCB admissions.

WSP was unable to accurately report alternative housing stays. This was attributed to inaccuracies in data provided by headquarters that contained MHTS system errors, documentation errors, and data entry errors.

The institution reported that during the review period, the average length of stay for the 412 EOP inmates housed in the reception center was 56 days. From July 1, 2014 to January 25,

393

2015, 336 EOP inmates were moved out of reception center. Two of the eight clinically-indicated transfers were timely. Only 35 percent of the remaining 328 transfers were timely. They ran overdue by an average of 32 days, typically due to bed unavailability. At the time of the site visit, 17 reception center EOP inmates were pending transfer for more than 60 days. These had been pending for an average of 87 days, with a range of 73 to 102 days.

WSP reported that the average stay in reception center for 3CMS inmates during the review period was 65 days. At the time of the site visit, 132 3CMS inmates were pending transfer for over 90 days, with the longest stay at 134 days. Staff attributed the delays to problems with staff training on implementation of SOMS.

Produced data on stays in administrative segregation covered the period of August 1, 2014 to January 31, 2015. Within these limitations, the institution reported that there were 179 inmates in administrative segregation during the review period, including 16 EOP and 39 3CMS inmates. EOP stays averaged 34 days, and the five longer than 30 days lasted from 48 to 87 days. The 3CMS stays averaged 71 days, with the longest at 159 days. By comparison, stays in administrative segregation for non-caseload inmates averaged 77 days. All five 3CMS inmates with stays over 150 days were seen by the ICC, resulting in one being transferred.

Other Issues:

Reception Center:

In the RC EOP, two contract psychiatrists shared a caseload of 107. Initial psychiatry contacts were 90-percent compliant and follow-up psychiatry contacts were 71-percent compliant.

Five PCs had caseloads ranging from 14 to 17, and an additional clinician had a caseload of 14 and also provided pre-release planning services. Initial PC contacts were 86-percent

394

compliant, and follow-up PC contacts were 99-percent compliant.  Staff reported that 84 percent of clinical contacts were conducted in private settings.

Initial and follow-up IDTT meetings for EOP inmates were 91-percent and 100-percent compliant, respectively.  The attendance rate of required staff at IDTT was 97 percent.

EOP inmates in the reception center attended an average of 4.4 hours of weekly group treatment, which represented 73 percent of offered hours.

Initial and follow-up IDTT meetings for reception center EOP SNY inmates were observed.  All required disciplines were present and had computer access to relevant inmate information.  Attendees interacted with each other but less so with the inmates.  Discussion of the Form 7388B involved only the objective indicators.

For 3CMS inmates in the reception center, psychiatric care was provided by a total of four psychiatrists, including one contract psychiatrist, one part-time psychiatrist, and a psychiatrist who was also assigned to another program.  Data indicated that initial and follow-up psychiatry contacts for 3CMS inmate were 100-percent compliant and that initial and follow-up PC contacts were 95-percent compliant.

MHSDS Inmates in Administrative Segregation:

A psychiatrist who also had an assignment to another program had a caseload of eight EOP inmates and 29 3CMS inmates.  The two full-time assigned PCs had caseloads of three to five EOP inmates and 12 to 13 3CMS inmates, and a PC who also had other assignments provided care to five 3CMS inmates.  Staff reported that EOP inmates in administrative segregation were offered six hours per week of structured therapeutic activities and received an average of 4.4 hours.

For 3CMS inmates, institutional data indicated 100-percent compliance for initial psychiatry contacts and 99-percent compliance for follow-up contacts. For PC contacts, the compliance rate for both initial and follow-up contacts was 99 percent.

Initial IDTT meetings for 3CMS inmates were 81-percent compliant, and follow-up meetings were 99-percent compliant. Data indicated that required staff attended 84 percent of meetings, but that psych techs frequently did not attend. Attendance was satisfactory at observed meetings. The psychiatrist and correctional counselor had computer access to patient information. When solicited, the psychiatrist's contribution to the meeting was good. Use of Form 7388B was inadequate, as only one team member reported the results of consideration for a higher level of care, with no further discussion.

Staff further reported that 3CMS inmates were offered three hours of structured out-of-cell activities per week, but they did not track the number of hours received.

No information was provided on whether clinical contacts occurred in private areas.

MHCB:

WSP continued to operate six MHCBs in the CTC. Two additional rooms were used for restraint and seclusion, respectively. Two contract psychiatrists provided care in the MHCB. Seven PCs provided care in the MHCB as well as in alternative housing.

From July 28, 2014 to January 25, 2015, 99 inmates had a total of 133 admissions to the MHCB, including nine with three or more stays. Stays lasted 8.4 days on average. From August 1, 2014 to February 16, 2015, 39 inmates had stays that exceeded ten days. Several inmates who reportedly had significant mental health and medical issues had stays as long as 54 days.

Two treatment teams in the MHCB covered seven-day operations. One psychiatrist and one psychologist were scheduled during the week, and a licensed social worker also worked on

396

weekends.  Staffing documentation indicated that an additional psychologist was assigned to the MHCB.

MHTS.net data indicated that initial psychiatry contacts were 100-percent compliant, although this was not corroborated by review of randomly sampled records.  MHTS.net data further indicated that initial PC contacts were 86-percent complaint and follow-up contacts were 75-percent compliant.  Initial SREs were timely in 63 percent of cases.  Follow-up SREs were completed timely in 67 percent of cases.

IDTT meetings were 77-percent compliant for initial meetings, and 83-percent compliant for follow-up meetings.  At an observed IDTT meeting, the CC I was not the inmate's CC I and did not have the relevant case factor sheets.  Team members did not access patient information by computer until prompted to do so.

Seclusion and Restraint:

Seclusion and restraint were not used during the period of October 2014 through January 2015.  During the entire review period, there were 11 uses of restraint involving two inmates.  Review of a sample of medical records indicated compliance with nursing documentation requirements.  Restraint use averaged five hours in duration.  However, the psychiatrist's orders did not always indicate the maximum duration of the restraint, the behavioral criteria for release from restraint, the inmate conduct that led to the use of restraints, nor the type of restraint used.

There were 13 uses of seclusion during the review period involving four different inmates.  Again, the psychiatrist's orders did not always indicate the maximum duration of the seclusion nor the inmate conduct that led to it.  Uses of seclusion averaged 5.5 hours in duration.  Treatment plans targeted the underlying inmate behaviors while these inmates remained in the MHCB.

397

<u>Alternative Housing</u>:

WSP had two areas that were designated for alternative housing when the MHCB was fully occupied. One was in housing unit B-2, side B, and was used for SNY inmates. They were lower tier cells and began at the cell closest to the officers' office. The other was in housing unit B-6, side A, and was also on the lower tier. These were standard, non-retrofitted cells.

Placement in the overflow/alternative housing cells required a physician's order. Mental health staff had a private office for interviews and clinical contacts on each unit. Inmates were required to be seen daily until admitted to the MHCB or returned to their housing units. While in overflow cells, inmates were on one-to-one observation by a CNA.

<u>Referrals</u>:

There were 9,080 mental health referrals. Headquarter-generated reports indicated 96-percent compliance for referral response times for the 325 emergent referrals, 40-percent compliance for response to the five urgent referrals, 43-percent compliance for response to the 5,720 routine referrals, and 62-percent compliance for response to the 3,030 referrals for medication refusal.

Staff reported that compliance levels were tracked during the review period, but the causes of noncompliance were not identified. Staff attributed this to the amount of time devoted to training, inordinate attention to improving times for response to medication refusals, and logistical problems in the reception center that negatively affected response times.

<u>MHTS.net</u>:

Mental health staff reported that MHTS.net was used to track inmate arrivals, level-of-care changes, PC contacts, IDTT meetings, EOP group offerings and participation, DSH referrals and non-referrals, and response to urgent and routine referrals, among other things. Interviewed

398

mental health staff were familiar with tracking of information related to suicidal behavior, including the red alerts for inmates at high risk.

Staff further reported having access to MHTS.net data through various work stations. However, some staff indicated problems with the accuracy of MHTS.net for some functions, including tracking of alternative housing stays.

Staff also reported familiarity with other information management systems, including SOMS, ERMS, the Portable Health Information Program, Maxor, and eUHRs.

<u>Mental Health/Custody Relations</u>:

Relations between mental health staff and custody varied by area/program, with mental health staff reporting both very good and troubled interactions with custody.

<u>Heat Plan</u>:

There were 64 Stage I heat alerts at WSP during August, September, and October 2014, but no Stage II or Stage III heat alerts. There was only one housing unit that was not air conditioned, where the institution reported it did not house inmates who were prescribed heat-sensitive medications. The institution reported that it maintained a list of, and provided heat-risk accommodations to, those inmates who were prescribed heat-sensitive medications.

<u>Access to Care</u>:

Access to care reports indicated that 26 to 30 percent of ducated inmates refused their mental health appointments, far in excess of refusal rates for medical, dental, and diagnostics/specialty services. Only rarely were appointments canceled due to custody.

Mental health staff stated that when inmates did not appear for their appointments, clinicians went to their housing units to see them. Some clinicians said they notified custody when they completed the appointment.

399

Program Access:

a.      Job and Program Assignments:

WSP reported mental health work training assignments as of February 12, 2015.  On that date, no EOP inmates had work training assignments.

There were 164 3CMS inmates with full-time employment positions, 18 3CMS inmates enrolled in full-time education programs, and 12 3CMS inmates enrolled in full-time substance abuse treatment programs.

There were 536 non-mental health caseload inmates with full-time employment positions, 40 non-mental health inmates enrolled in full-time vocational education programs, and 59 non-mental health inmates enrolled in full-time substance abuse programs.

Eleven 3CMS and 11 non-mental health inmates were eligible for work training assignments, but were unassigned.

b.      Milestone Credits:

From August 1, 2014 to January 31, 2015, 73 of 121 EOP and 669 of 1,211 3CMS inmates were eligible to earn milestone credits, as were 2,349 of 3,656 non-mental health inmates.

WSP reported that the milestone completion credit program for EOP inmates had not been implemented during the review period, and consequently no EOP inmates earned milestone credits.  On February 9, 2015, CDCR headquarters issued a memorandum to initiate the milestone completion credit program for EOP inmates housed in WSP's reception center.

Documentation demonstrated that 2.4 percent of 3CMS inmates and 4.9 percent of non-mental health inmates earned milestone credits.

c.    <u>Out-of-Level Housing</u>:

No EOP inmates were in out-of-level housing.  Among 3CMS inmates, one Level I inmate and 32 Level II inmates were housed in Level III housing.  One Level IV 3CMS inmate was housing in Level III housing.

*Coleman* Postings:

The administrative segregation unit contained *Coleman* postings.

**Kern Valley State Prison (KVSP)**
March 24, 2015 – March 26, 2015

<u>Census</u>:

As of March 23, 2015, KVSP housed a total of 3,732 inmates, which was 452 inmates or 11 percent fewer than during the preceding monitoring period.  The total MHSDS inmate population declined by 32 or two percent to 1,394 inmates since the preceding monitoring period.  There were 119 SNY EOP inmates and six EOP inmates in administrative segregation.  The 3CMS population consisted of 1,102 mainline 3CMS inmates and 150 3CMS inmates in administrative segregation.  Twelve inmates were in the MHCB.

<u>Staffing</u>:

Due to the chief psychiatrist being on long-term sick leave, a full-time staff psychiatrist served as the acting chief while also carrying an active caseload. Of the two authorized chief psychologist positions, one was filled and the other was vacant per direction from headquarters. Of the 4.4 senior psychologist positions, 3.4 were filled, for a 20-percent vacancy rate.

Only one of the nine authorized staff psychiatrist positions was filled, representing an 89-percent vacancy rate.  Contract staff covered five of these vacancies, reducing the functional

401

vacancy in psychiatry to 33 percent.  The institution reported that there were eight contact psychiatrists providing services within the institution, but their caseloads were not specified.

Fifteen of 19 staff psychologist positions were filled, leaving a vacancy rate of 21 percent.  Contract coverage of 2.5 vacancies reduced the functional vacancy rate in psychology to eight percent.

The sole authorized supervising social work position and all 13 staff social work positions were filled.  Seven of the social workers were unlicensed.

Three of the four authorized recreation therapist positions were filled, for a 25-percent vacancy rate.

The senior psych tech position was filled.  Nineteen of the 27.5 psych tech positions were filled, leaving a vacancy rate of 31 percent.  Contract coverage of two vacancies reduced the functional vacancy rate to 24 percent.

Fourteen of the 15 mental health clerical positions were filled, leaving a vacancy rate of seven percent.

The CHSA II position was kept vacant, per headquarters' directive.

Quality Management:

During the review period, the quality management committee met monthly, with a quorum present and minutes kept for all meetings.  Meetings were chaired by the CEO and attended by the chief of mental health.  Minutes reflected discussions including mental health subcommittee reports and headquarters' dashboard compliance issues.

Provided minutes for four of the six meetings of the mental health subcommittee during the review period indicated the presence of a quorum and attendance by the chief of mental

health.  These minutes reflected comprehensive discussion of the various mental health program areas and compliance levels, among other things affecting delivery of mental health services.

KVSP reported five active QITs/FITs during the monitoring period.  They covered MHCB re-admissions within 30 days and repeat admissions due to safety concerns, cancelled appointments, initial contacts, three-day custody and five-day clinical follow–ups, and non-formulary psychotropic medications.  The QIT on non-formulary psychotropic medications was organized because of the large number of non-formulary medications prescribed by psychiatrists, but it appeared that this committee did not meet consistently and did not address the concern by psychiatrists reported during the site visit about delivery delays about these medications.  During August 2014, it was determined that the QITs on cancelled appointments and initial contacts had fulfilled their purposes and were concluded.

Audits of concordance between eUHRs and MHTS.net were conducted monthly.

No documentation indicating peer review during the review period was provided.

Medication Management:

Monthly MAPIP audits indicated that medication continuity following inter-institutional transfers was only 60-percent compliant.  Medication continuity following DSH and community hospital discharges was 86-percent compliant, and following MHCB discharges, it was 87-percent compliant.  Medication continuity after moves into administrative segregation was only 35-percent compliant.

Documentation in MARs of referrals for medication noncompliance was 65-percent compliant.  Seven-day follow-up by the provider after medication noncompliance was documented in only 60 percent of cases.

Audits of continuity of nurse-administered and DOT medication administration indicated a compliance rate of only 35 percent. New medications ordered by outpatient providers were administered timely 75 percent of the time.

Transfers:

During the review period, 20 inmates were referred to acute inpatient care, with one referral rescinded. Seven of the remaining 19 inmates transferred within timelines, for a compliance rate of 37 percent.

Only one of the four inmates referred and accepted for intermediate inpatient care was transferred within timeframes.

Documentation indicated that three headquarters' sustainable process reviews took place during the review period. Recommendations generated from those reviews included having the institutional DSH coordinator attend IDTT meetings in the MHCB, EOP, and administrative segregation, and training IDTTs on composition of indicator-specific treatment rationales and integration of indicators into each inmate's treatment plan.

The monitor's expert examined 14 randomly selected cases from the DSH non-referral log to assess rationales for non-referrals. They found six to be clinically sufficient. In seven cases, at least one of the considerations for referral was selected, but no reasons for non-referral to DSH were provided other than conclusory statements that these inmates' current levels of care were indicated. In one case, the provided documentation offered no explanation for the non-referral.

Data in the DSH referral log indicated that four patients returned from DSH to KVSP during the review period. Three cases were reviewed for assessment of the discharges summaries' legibility, clinical usefulness, and incorporation into the initial IDTT reviews. In one

404

case, the DSH discharge summary was missing from the eUHR, but in the other two cases, the discharge summaries were typed and appeared to be clinically useful.  A review of the eUHRs for these cases indicated that the clinician referenced the discharge summaries and that findings were addressed and incorporated into these patients' treatment plans.

Of the total 146 EOP inmates transferred during the review period, 135 or 92 percent occurred within timeframes.  Eleven EOP inmates were not transferred out of the administrative segregation unit within 90 days.  These stays ranged from one to 37 days over the time limit and were attributed to unavailability of EOP hub beds, medical holds, out-to-court, and lack of action by the ICC.

Other Issues:

MHSDS Inmates in Administrative Segregation:

New intakes in administrative segregation were housed in Unit B-1, cells 116 through 120, for the first three weeks.  These cells had two bunks and were retrofitted and clearly identified.  They were also used as alternative housing cells.  Office and private treatment space were insufficient, and mental health staff did not have assigned offices.  Clinicians conducted individual contacts on the dayroom floors in the pods, with inmates in holding cells that did not provide auditory or visual privacy.  IDTT meetings were held in a room which did not offer sufficient privacy and was overcrowded.

Group treatment space was also inadequate, located in the previous dining area which was noisy and did not provide for privacy of patient-clinician communications.  Individual therapeutic modules located in the same area had the same limitations.  Other therapeutic modules located on the dayroom floor of the housing unit were used primarily for individual clinical sessions, but again, the area provided no visual or auditory privacy.

405

Eight PCs were assigned to the unit and had caseloads ranging from ten to 23 patients, which allowed clinicians to carry out necessary functions and responsibilities. At the time of the visit, mental health programming consisted of weekly PC contacts, psych tech rounds, medication management, and some groups. Audits indicated that psychiatry contacts were timely for EOP and 3CMS inmates. Clinical contacts for 3CMS inmates were timely for initial and weekly follow-up contacts. Inmate interviews indicated that EOP inmates were seen weekly out-of-cell by their PCs, and received psych tech rounds. They reported no medication discontinuity. Group offerings had been initiated during preceding months and appeared to greatly benefit caseload inmates. Inmates had electrical appliances.

IDTT meetings were timely, although no data was provided to indicate whether initial IDTT meetings took place before ICC meetings, as required. In 94 percent of cases, required participants attended IDTT meetings. The entire administrative segregation mental health clinical team attended observed IDTTs. The CC I participated in discussion and provided relevant custody and classification information, and the administrative segregation lieutenant provided significant information on inmates' behavior in the unit. Clinical staff used a projector to display the Form 7388s, which were updated during the meeting based on extensive discussion among the inmate and team members.

Observed psych tech rounds in administrative segregation and in the stand-alone administrative segregation unit were compliant and logged as required. Observed Guard One checks were also conducted as required. The Guard One pipe used on first watch was not audible, but there were inmate complaints and appeals about the noise caused by the checks, of which staff was aware.

406

Review of CDCR 114-As for all EOP inmates indicated that their initial offers of yard were generally delayed by one week pending initial ICC review. Most inmates were offered and attended a minimum of ten hours of yard per week, although all yard offerings were in five-hour increments.

During the review period, 16 inmates housed in the stand-alone unit were identified as MHSDS. Eleven or 69 percent of these inmates were transferred out within timeframes. Stays for the five who were not transferred within 24 hours were overdue by 40 minutes to two days, or by six hours on average.

There were no inmates on NDS status at the time of the site visit. Staff reported that the C&PR notified custody staff of any inmates designated as NDS. The list was provided to the lieutenant who was responsible for ensuring that these inmates received the additional property and privileges attendant to their NDS status pending transfer.

MHCB:

KVSP operated a 12-bed MHCB in its CTC. Institutional data indicated that during the review period, 160 patients were admitted to the MHCB, with an average stay of 7.9 days. View of the MHCB indicated that all beds were suicide-resistant.

The MHCB was staffed by a chief psychiatrist, staff psychiatrist, social worker, and four psychologists, with coverage seven days a week, including for patients in alternative housing areas awaiting MHCB placement. A recreation therapist was assigned to the MHCB during the preceding month.

Institutional data indicated that initial and follow-up psychiatry and PC contacts were 100-percent compliant. Initial SREs were completed timely in 99 percent of cases.

Patients received nursing assessments, physical examinations, SREs, individualized treatment planning, daily clinical monitoring, and twice-weekly psychiatric evaluations for medication issues.  The recreation therapist provided daily contacts, which may be cell-front and consist of a game or exercise activity.  For patients not restrained or under suicide observation, the recreation therapist offered a period of outside activity in three cells.

Institutional data indicated that 97 percent of initial IDTT meetings occurred within 72 hours of admission, as required.  Weekly follow-up IDTT meetings were 100-percent compliant.  At observed IDTT meetings, all required staff and the DSH coordinator were present.  The PC led the meetings and solicited input from other team members who appeared to leave decisions on referrals to higher levels of care to the PC.  The PC reported on the Form 7388B.  A number of patients were elevated to the EOP level of care from their pre-admission 3CMS status, and one non-MHSDS inmate was discharged to 3CMS.

No information on timeliness of discharge SREs was provided.

Seclusion and Restraint:

Staff reported that all uses of five-point restraint and seclusion were in the CTC.  Data indicated that three patients were placed in five-point restraints during the review period.  One placement, due to an attempted hanging, lasted four hours.  Another was due to the patient's self-harming behavior and lasted 3.75 hours.  The third placement was due to the patient's attempt to remove his own pacemaker and lasted 3.25 hours.

The institution indicated that eight inmates were placed in a seclusion cell during the review period.  Durations ranged from three hours and 20 minutes to 17 hours and 35 minutes.

<u>Alternative Housing</u>:

KVSP identified as alternative housing Units B-1 and B-2, C-7 cells 117 through 120, and Unit D-6, cells 114 through 117, but the vast majority of alternative housing placements was in B-1.  HCPOP was contacted timely for new placements into alternative housing.

TTA staff provided inmates in alternative housing with a mattress, blanket, and smock. Institutional staff reported that cells were searched and cleaned before inmates were placed in them.  If the stay lasted overnight, the inmate was escorted in the morning to the health care building for an interview/evaluation with the PC.

Of the 210 inmates placed in alternative housing during the review period, 58 or 28 percent were transferred out within timeframes.  The average overdue stay went six hours over, with the longest stay lasting 3.2 days.  Provided data did not specify whether the discharges were to MHCBs or back to yards.

Institutional data indicated a compliance rate of 96 percent for post-discharge follow-ups for alternative housing, MHCB, and DSH discharges.

<u>SNY EOP</u>:

KVSP had its Level IV SNY EOP in housing unit C8, with a capacity of 96.  On average, another eight inmates were housed in overflow in C7.  The average program census during the review period was 111.  Mental health services were provided in a private setting, but space was limited, resulting in office sharing and dislocations.

Inmates in both housing units received treatment in the mental health building on C-Yard. Inmates in the overflow unit were on modified programming.  Although it was reported that they were offered the same programming as in the main EOP housing unit, information gathered during the site visit indicated otherwise.

Provided data indicated compliance rates of 94 percent for initial psychiatry contacts and 85 percent for follow-up psychiatry contacts. Ninety-two percent for PC contacts were timely.

Compliance rates for IDTT meetings were 99 percent for timeliness and 97 percent for attendance by required disciplines.

Audits of group treatment indicated that 94 percent of inmates on full programming were offered at least the minimum required ten hours per week, but only 57 percent attended at least ten hours. Ten percent of inmates refused group treatment. No groups were cancelled. Two observed group sessions on C-Yard were interactive and didactic, with eight to ten participants and good involvement and encouragement of participation by the facilitator. However, audits indicated that only 51 percent of EOP inmates on modified programming were offered at least ten hours of group treatment per week, only 11 percent attended as many hours, and 15 percent refused group treatment. For this same group, audits of the provision of five hours of group treatment indicated that 60 percent were scheduled for five hours, 60 percent were offered five hours per week, 36 percent attended five hours, 46 percent refused treatment, and six percent of hours were cancelled. This information indicated that the overflow EOP inmates were not offered comparable group therapy in comparison to the EOP inmates housed in the main EOP housing unit.

The six PCs in the EOP had caseloads of 17 to 18. An additional two psychologists and one social worker who also had other assignments had caseloads of one, two, and eight, respectively.

3CMS:

3CMS treatment was provided to mainline 3CMS inmates in Facility A and to 3CMS SNY inmates in Facilities C and D. Patients met with the PC in an office on the housing unit,

410

which provided limited visual privacy, as the ceiling contained an overhead hatch operated by the officer stationed in the above control center. The eight PCs had caseloads ranging from 131 to 143. Interviewed 3CMS inmates indicated concerns about lack of privacy there.

Institutional data indicated that initial psychiatry contacts were 99-percent compliant and follow-up psychiatry contacts were 96-percent compliant. Initial PC contacts were 94-percent compliant, and follow-up PC contacts were 99-percent compliant.

Initial treatment plans were completed timely in 99 percent of cases, while follow-up treatment plans were completed timely 96 percent of the time. Attendance by required staff at IDTT meetings was 94-percent compliant.

At the time of the site visit, there was a pilot program developed and led by a psychologist for selected 3CMS inmates and non-caseload inmates on the SNY in the Transitional Housing Unit (THU). Interviewed inmates voiced concern with lack of any regularly scheduled group therapy, privacy, custody responsiveness without resort to extreme measures to gain their attention, and overall institutional ability to respond to these inmates' needs.

Mental Health/Custody Relations:

There were pervasive and consistent SNY EOP inmate reports of officer harassment, intimidation, and insensitivity. Interviewed EOP inmates expressed a belief that custody staff unduly influenced mental health staff to remove inmates from the EOP. They reported being told by custody and clinical staff that they were too high-functioning to remain in the EOP, although a review of EOP lengths of stay did not indicate significant downgrades to the 3CMS program.

Heat Plan:

All eight reviewed housing units were compliant with the heat plan.  Each housing unit took temperature readings in each pod.  COs were familiar with the inmate heat risk list, which was produced from May through October.

Use of Force:

At the time of the site visit, the current approved lesson plan for use-of-force training was being used.  Provided documentation indicated that all 35 mental health staff received the training.  Of the 134 custody supervisors and managers requiring training, 104 or 78 percent received it.  No data on training of COs was provided.

Collectively, only ten percent of RN supervisors, RNs, LVNs, and psych techs attended use-of-force training.  This included only eight of the 13 RN supervisors, one of the 32 RNs, none of the 38 LVNs, and one psych tech.

Program Access:

a.      Job and Program Assignments:

KVSP provided its MHSDS inmate work training assignments for February 27, 2015.  In total, there were 1,299 full-time job assignments at the institution.  Of these, 18 or one percent were held by EOP inmates, 270 or 21 percent were held by 3CMS inmates, and 1,011 or 78 percent were held by non-MHSDS inmates.  Non-MHSDS inmates held all 36 part-time job assignments.

There were 41 full-time academic assignments, including none held by EOP inmates, seven or 17 percent held by 3CMS inmates, and 34 or 83 percent held by non-MHSDS inmates. Of the 196 full-time vocational education assignments at KVSP, none were held by EOP inmates, 58 or 30 percent were held by 3CMS inmates, and 138 or 70 percent were held by non-

412

MHSDS inmates.  Among the 741 part-time academic assignments, one was held by an EOP

inmate, 178 or 24 percent were held by 3CMS inmates, and 562 or 75.87 percent were held by

non-MHSDS inmates.

       b.        <u>Milestone Credits</u>:

According to provided data, from August 1, 2014 to January 31, 2015, 18 EOP inmates,

148 3CMS inmates, and 381 non-MHSDS inmates were eligible to earn milestone credits.  None

of these EOP inmates, 6.08 percent of these 3CMS inmates, and 7.61 percent of these non-

MHSDS inmates actually earned milestone credits during that period.

       c.        <u>Out-of-Level Housing</u>:

On February 19, 2015, three Level III EOP inmates, and five Level I, 11 Level II, and 74

Level III 3CMS inmates were housed in Level IV housing.

       d.        <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

KVSP did not provide information on its ADA Reasonable Accommodations and

Grievance Procedures.

       e.        <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

KVSP did not provide information related to its Periodic Classification Score Reductions,

EOP Inmates.

    <u>*Coleman* Postings</u>:

All ten reviewed housing units were compliant with *Coleman* postings.

**North Kern State Prison (NKSP)**
March 17, 2015 – March 19, 2015

Census:

Since the preceding monitoring visit, the total population at NKSP declined by 15 percent to 4,034. The total mental health caseload population fell by nine percent to 1,062.

The MHCB held ten inmates at the time of the site visit. There were 115 inmates in administrative segregation, including 24 3CMS inmates and one EOP inmate pending transfer. There were 212 mainline 3CMS inmates, for an increase by 44 percent.

The total reception center population was 3,224. Its 3CMS population fell by 23 percent to 703, while its EOP population increased by 87 percent to 105.

Staffing:

Positions for the senior psychiatrist, the two chief psychologists, and the four senior psychologists were all filled.

Nine of the ten staff psychiatrist positions were filled, and the remaining vacancy was covered by a contractor.

Of the 28 staff psychologist positions, 22 were filled. Contractors covered 3.25 of the vacancies, for a functional vacancy rate of ten percent in psychiatry.

The supervising social worker position was filled. Of the 12 social worker positions, ten were filled. The 17-percent vacancy rate was reduced to a functional vacancy rate of 13 percent with use of a half-time contractor.

The two recreational therapist positions were vacant. With coverage of only .25 of the recreational therapist vacancies, the functional vacancy rate was 88 percent.

414

The two HPS I positions and the OSS II position were filled. Ten of the 12 clerical positions were filled, resulting in a 17 percent vacancy rate, but with one employee working in a "blanket" position, the functional vacancy rate was reduced to eight percent.

Quality Management:

NKSP maintained a QMC that met monthly during the review period, except in November due to the Thanksgiving holiday. Two meetings were scheduled for the month of January 2015. A quorum was documented as present at each meeting. A modified format for QMC meeting minutes made it difficult to determine whether required members had to attend or could send designees. The minutes were sparse and provided little information on committee actions beyond the occasional approval of policies, with no content from reports received by the QMC. They covered primarily information from other committees' minutes, but it was unclear whether the QMC was actually approving or merely accepting the other committees' minutes.

The mental health subcommittee met monthly for a total of six meetings during the review period. Attendance was good, with excellent representation by custody throughout. Meeting minutes were well detailed, indicating that the meetings provided a meaningful forum for identifying operational obstacles and opportunities for improvement that were acted upon by the subcommittee members.

There were four active QITs, all of which had been initiated before the review period. Minutes for three of the QITs were provided. The QIT on alternative housing was chartered on February 13, 2014 and was tasked with bringing alternative housing stays into compliance with Program Guide timeframes. The QIT on completion of Form 128-MH7, which is the administrative segregation pre-placement screen, was chartered on May 28, 2014 and was tasked with resolving problems with tracking relevant forms through the MHTS.net database. The QIT

on MHCB/DSH returns was chartered on April 10, 2014 and was tasked with identifying processes to ensure that inmates returning from MHCB/DSH were initially housed only in the MHCB or alternative housing, as per NKSP operational procedure. Based on provided documentation, the QITs on pre-placement screening for administrative segregation and returns from MHCB/DSH appeared to have completed their missions, with the remaining last step of submission of final paperwork.

Peer review was suspended during the review period pending implementation of a new standardized statewide process by CDCR.

Interviews of supervisory and line staff indicated a lack of feedback to line staff from the work of the quality management process at NKSP. Few staff were aware of the mental health subcommittee, and almost none had participated in a QIT. Among supervisory and administrative support/clerical mental health staff, the quality management process was utilized well, but only two line staff members who attended a meeting with the Special Master's team at NKSP had seen the results of a QIT or mental health subcommittee meeting minutes.

Medication Management:

Without explanation, provided data on medication management covered the period of July through December 2014, which only partially included the review period of August 2014 through January 2015. Regular comparative analysis reports were not included. A cover memorandum provided a broad overview of MAPIP, with some mention of areas of strengths and weaknesses.

Continuity of medications following new arrivals was 90-percent compliant or better throughout the period for which data was provided.

416

Continuity of medications following intra-institutional transfers, including MHCB discharges but excluding administrative segregation, was also 90-percent compliant or better. In September 2014, following transfers to administrative segregation, medication continuity was 80-percent compliant. For inmates returning from DSH inpatient care or from community hospitals, medication continuity was 85-percent compliant for the month of December 2014, but was otherwise at least 90-percent compliant.

The average rate of compliance for involuntary medications from August through December 2014 was 81 percent, with noncompliance during four of these five months.

Transfers:

The number of referrals to DSH inpatient programs had increased since the preceding monitoring period. Review of a sample of eUHRs found no systemic issues related to DSH referrals at NKSP.

There were 40 referrals to acute inpatient care. Thirty-four or 85 percent were submitted to headquarters' utilization management within Program Guide timeframes. Twenty-eight of the 34 were submitted to DSH in accordance with Program Guide timeframes, for an overall compliance rate of 70 percent for timeliness. Seventeen or 43 percent of acute care referrals were admitted timely within ten days of the date of referral. Eight or 20 percent of the acute care referrals were not transferred within the 72 hours of a bed assignment. The inmate did not prevail at the sole Vitek hearing for acute care referrals.

There were 28 referrals to intermediate inpatient care, two of which were rescinded. Twenty-one or 81 percent of intermediate care referrals were submitted timely to headquarters utilization management, but only three or 14 percent were submitted to DSH in accordance with

417

Program Guide timelines, for an overall compliance rate of 12 percent for timeliness. Three or 12 percent of the intermediate care referrals were admitted within 30 days of the referral date. Only four or 15 percent of the intermediate care referrals were not admitted within 72 hours of a bed assignment. The inmates did not prevail at any of the seven Vitek hearings for intermediate care referrals.

According to data provided by the institution, 19 inmates were transferred to a mainline EOP program during the reporting period. Seventeen or 89 percent were transferred timely. There were no mainline EOP inmates pending transfer at the time of the site visit.

Seventy-four inmates were referred to administrative segregation EOP hubs during the review period, with 70 or 96 percent transferred timely. One inmate was awaiting transfer to a hub at the time of the site visit.

Of the 301 EOP inmates transferred from the reception center during the review period, 129 inmates or 43 percent were transferred timely. At the time of the site visit, there were 105 EOP inmates in the reception center, including 51 or 49 percent who had been awaiting transfer for more than 60 days. According to institutional staff, the majority of these delays were attributable to pending CSR and CC II reviews.

Of the 1,690 3CMS inmates transferred from the reception center during the reporting period, 963 or 57 percent were transferred timely. At the time of the site visit, there were 703 3CMS inmates in the reception center, including 252 or 36 percent who had been there for over 90 days.

Other Issues:

Reception Center:

According to staff, EOP inmates were housed on the B-4 mainline housing unit or the D-4 SNY housing unit. The average length of stay in the reception center EOP during the review period was 32.5 days.

Staff reported that access to space for clinical contacts with EOP inmates was sparse, with one private office on the housing units that was shared by the psychiatrist and the PCs. At times, staff could also use the custody officer's office or the multi-purpose room. For groups, they used the chapel in D-building, which was a private space where inmates sat on wooden pews and the group facilitator was at the front of the room.

The institution reported that 8.2 PCs provided clinical services for up to 110 EOP patients, for an average caseload of 13.4 patients per PC. The caseload for the sole assigned psychiatrist was 110 patients.

Initial psychiatry contacts for EOP inmates were timely in 249 of 258 cases, for a 97-percent compliance rate. Late contacts ranged from one to 18 days overdue. Follow-up psychiatry contacts were at 95-percent compliant for timeliness, with 2,423 of 2,540 contacts completed within timeframes. Overdue contacts ranged from one to 59 days overdue.

Provided data indicated that 315 of 320 or 98 percent of initial PC contacts for EOP inmates were timely. The five overdue contacts were seven days past due. For follow-up PC contacts, 2,944 of 2,983 or 99 percent were timely, and the 39 past due contacts were seven days late.

Staff reported that IDTT meetings were conducted every 30 days. Before the initial meeting, staff typically met to discuss the inmates' treatment needs and any pertinent clinical issues. The inmate's first meeting with his assigned psychiatrist was usually at the initial IDTT meeting. Provided data indicated that 295 of the 300 or 98 percent of initial IDTT meetings were

419

timely, and that the five late meetings ranged from one to 19 days late.  Provided data also

indicated that from August 1, 2014 through January 31, 2015, all required staff attended every

IDTT meeting and that 2,875 of 2,880 or nearly 100 percent of IDTT meetings were timely.  The

five overdue follow-up IDTT meetings ranged from one to 29 days late.

At three observed IDTT meetings, the psychiatrist, two psychologists, the psych tech, the

correctional counselor, and at times a custody officer were present.  The PC presented the

inmate's psycho-social history before his arrival.  Once the inmate arrived, he was asked if he

had any mental health concerns.  In each case, the designated level of care appeared appropriate

for the inmate's treatment needs.  Team members discussed the inmate's symptoms, but the

treatment goals had essentially been determined before the meeting and the treatment plan was

not discussed further, regardless of the inmate's presence.  Staff did not discuss all six factors on

the Form 7388B.  Custody staff offered their observations, which appeared to be appropriate and

were well received by clinical staff.  At the end of the meetings, inmates were asked to sign the

last page of their treatment plans.  When asked about this practice, staff explained they discuss

treatment goals with the inmate before the meeting.  However, the inmates had not read the

documents before signing.

Analysis of data provided pre-visit indicated that inmates were offered at least one to two

EOP groups during the week.  Staff reported that 25 to 30 inmates attended EOP groups.

Additional data generated on site indicated that from September 1, 2014 to February 21, 2015,

EOP inmates were offered an average of 8.2 hours of groups and attended an average of six

hours of groups per week.  The cancellation rate was two percent, and the refusal rate was 19

percent.  Inmates on B-yard were offered seven groups per week, including four psycho-

educational groups in the B-yard chapel, two socialization groups in the Facility-B Building 4

420

housing unit, and one on the EOP yard.  Inmates on the D-yard were offered eight EOP groups per week, including four psycho-educational groups held in the D-yard chapel, three socialization groups held in the Facility-D Building 4 housing unit, and one EOP yard.

A group in the D-Yard chapel entitled "Commitment to Change" was observed during the site visit.  It was attended by 20 to 25 inmates.  The inmates were attentive but at times it appeared that the content and language of the group exceeded the educational level of the inmate population.  A few inmates spoke to the psychologist leading the group and at times directed advice to fellow inmates, but overall interaction among group members was limited.  Participants interviewed after the session indicated that they knew how to access mental health services, that they were offered one-hour groups daily, and that mental health or custody staff would sometimes check in with them if they refused groups.  They reported seeing their PCs weekly but estimated that about half of these contacts were in an open area in the dormitory, a non-private space.  Inmates also reported some intimidation by non-EOP inmates on B-yard, which interfered with group attendance and day room use.  Overall, they rated mental health services highly.

 Staff reported that yard and religious activities were also provided to EOP inmates.  Inmates taking heat-sensitive medications were offered dayroom or chapel instead of yard on heat-alert days.  Other information indicated that educational programs, structured substance abuse treatment, vocational education, and job-related activities were not available to the EOP inmates in reception center.

According to staff reports, EOP inmates rarely paroled from reception center and mental health staff were not routinely aware of when an EOP inmate was due to parole.  Data provided on site indicated that 13 inmates paroled from the reception center during the review period.  Re-

entry plans were not done routinely.  Staff reported concern that twice during the preceding month, DSH had discharged two EOP inmates to the reception center within a week of parole and had not done any re-entry planning, leaving CDCR very little time to complete this task effectively.

For 3CMS inmates in reception center, there were 4.5 psychiatrists and 14 PCs. Psychiatry caseloads numbered 156 and PC caseloads numbered 47 during the review period. The average stay for 3CMS inmates in reception center was 54.3 days.

Provided data on psychiatry contacts indicated that all 448 initial contacts and nearly all 90-day follow-up contacts were timely.  The 13 late follow-up contacts ranged from three to 45 days overdue.

For initial PC contacts, provided data indicated that 1,401 of 1,525 or 92 percent were timely during the review period.  Late initial contacts ranged from one to 80 days overdue. Follow-up PC contacts were completed timely in 20,170 or 90 percent of the 20,284 contacts during the review period.  Late follow-up contacts ranged from one to 361 days overdue.

<u>MHSDS Inmates in Administrative Segregation</u>:

There were .67 psychiatrists and 2.67 PCs providing mental health care to the 25 mental health caseload inmates in the administrative segregation unit, yielding caseloads of nine for the PCs.

Pre-placement screens were completed timely in 366 of the 398 total screens, or 92 percent of the time.  The 32 late screens were overdue by a range of one to 61 days.  Provided data on the 31-item screens for 122 inmates indicated a compliance rate of 58 percent for timeliness.

All initial and follow-up psychiatry contacts were timely. Initial PC contacts were conducted timely in 52 or 98 percent of the 53 cases. The sole overdue contact was completed within two days after the due date. For follow-up PC contacts, 818 or 97 percent of the 841 contacts were completed timely. All of the late contacts were seven days overdue.

The area for clinical contacts was observed to have three therapeutic modules where weekly PC contacts were conducted. The modules were separated by partitions on two sides and did not afford full visual and auditory privacy. Clinical staff reported that they could also use the psych techs' office, if available.

There were a total of 645 cell-front contacts during the review period, involving 123 inmates. Over 500 were follow-up contacts, and over 100 were for five-day-clinical follow-ups. The few remaining were crisis contacts, initial contacts, and a PC "special follow-up." Over 500 involved 3CMS inmates, over 90 involved EOP inmates, and four involved inmates at the MHCB level of care. There were 162 cell-front psychiatry contacts among 86 inmates, most of whom were 3CMS. Over 100 of these were follow-up contacts, followed by over 20 initial contacts and over 20 "special follow-up" appointments. The remainder were crisis, medication non-compliance, and medication expiration contacts.

There were 168 out-of-cell non-private psychiatry appointments among 104 inmates during the current round. Staff also reported that the psychiatrist ran a "med line" at which he met with inmates individually to discuss any concerns that arose between their scheduled psychiatry appointments. There were 77 PC contacts among 44 inmates that were conducted out-of-cell in non-private areas.

During the review period, all 49 initial and all 792 follow-up IDTT meetings were completed timely, with all required staff in attendance. At observed IDTT meetings during the

423

site visit, a psychiatrist, two psychologists, the supervising psychiatric social worker, a psych tech, and the correctional counselor were present. Line custody staff were also present for several case discussions. The team essentially decided on treatment goals before the meeting, with no further discussion about treatment planning, regardless of the inmates' presence. Factors on Form 7388B were not discussed. In some cases, discussions covered behaviors/symptoms that were not included as goals in the treatment plan, and rationales for diagnoses did not align with inmates' reported symptoms or mental status. Eight inmates, including three who were absent, were discussed by the team. Two of those absent refused to attend due to gang concerns. The PC presented the inmates' psycho-social histories before they arrived. Once they arrived, they were asked if they had any mental health concerns. Two inmates asked questions about psychiatric medication and were told they would be scheduled for "med line" with the psychiatrist instead of the concern being discussed during the IDTT meeting.

Although the administrative segregation unit was not an EOP hub, staff reported that they provided EOP groups when sufficient numbers of EOP inmates were in the unit. No groups were available for the 3CMS inmates. Offering and documentation of education for inmates needed improvement in the July to September quarter, and improved during the October to December quarter.

Documentation provided by the institution indicated that four psych techs were assigned to administrative segregation. Their office was in the unit, which facilitated observation of inmates throughout the day. It was reported that they checked SOMS, DECS, and the housing roster and identified any new inmates before conducting rounds. Reviewed documents indicated that psych techs attending the custody/mental health morning check-in meetings, took sufficient time while meeting with inmates, and entered their documentation upon completion of each

424

contact.  Documentation of morning check-in meetings indicated all present every day except one.  Staff indicated that while psych techs made verbal referrals to clinical staff, they were being encouraged to document them.

Reception center EOP inmates in administrative segregation stayed for an average of 42 days, and none stayed longer than 90 days.  3CMS inmates in administrative segregation during the review period stayed for an average of 87 days.  Provided data indicated two 3CMS inmates whose stays exceeded 150 days.  Neither were designated as NDS.  One was retained there pending adjudication of an RVR, and the other was retained as a gang member pending the Departmental Review Board process.  Non-mental health caseload inmates in administrative segregation stayed for an average of 96 days.

There was no administrative segregation overflow or STRH at NKSP.

MHCB:

The ten-bed MHCB at NKSP was staffed with one full-time psychiatrist and two full-time PCs.  Although staff reported that most individual contacts were conducted in private settings, treatment space was limited, with one multi-purpose room used for IDTT meetings and individual clinical contacts.  Supervisory staff reported that every morning, mental health, custody, nursing and medical staff met in what was comparable to a "shift-change" meeting in the inpatient programs, wherein staff discussed pertinent patient information and administrative issues.  It was observed to be very valuable and beneficial to patient care for all involved.

According to MHTS.net data, initial and follow-up psychiatry contacts were 100 percent complaint for timeliness.  Initial PC contacts were 93-percent compliant, and follow-up PC contacts were 99-percent compliant.  A sample of eUHRs corroborated compliance for both disciplines, albeit at less than 100 percent for psychiatry.

425

An observed IDTT meeting was well-facilitated, with all disciplines interacting meaningfully with the patient.  The team appropriately utilized the CDCR form 7388B for consideration of referral of the patients to higher levels of care.  Most of the referrals from NKSP to DSH inpatient programs were generated within the MHCB.

No group treatment was provided in the MHCB.  Inmates who remained there beyond ten days were eligible to participate in outside yard.  Staff reported that due to vacancies, the recreational therapist who worked in the MHCB was part-time on the weekends.  Inmates expressed gratitude for this activity and emphasized its value.

Seclusion and Restraint:

The MHCB contained rooms for seclusion and restraint.  Logs indicated 12 uses of restraint from July 2014 through February 2015.  These involved four inmates, two of whom were restrained four times and two of whom were restrained twice.  One inmate, whose restraint order was renewed twice, was kept in restraints over four hours following the second renewal.  Logs indicated seven placements in safety cells, including two inmates placed there twice, from July 2014 through February 2015.

Alternative Housing:

Alternative housing was situated in Facility-A, Building 4, cells one through ten.  They had flushable toilets and running water, but no beds.  Staff reported that, in conjunction with use of staff observation, these cells had been partially retrofitted to reduce risk of suicide.  They were identical to typical double cells throughout the institution, with reduced-size ventilation grates, safety sprinklers, and welded-closed fixtures to inhibit attachment of any ligature.  Overflow would be placed in TTA holding cells, contraband watch cells, diagnostic holding cells, and receiving & release cells.

426

At the time of the site visit, the institution reported that it had 5.25 PCs providing care in alternative housing.  Their caseloads ranged from 0.71 to 2.35 patients.  The institution reported that each patient was required to be under direct visual observation by a health care staff member.

NKSP was noncompliant with the 24-hour timeframe for moving inmates out of alternative housing, with 53 percent of the 600 placements exceeding 24 hours.

<u>3CMS</u>:

A part-time psychiatrist assigned to the 3CMS mainline program was reported to have a caseload of 100 patients.  The two PCs each had an average caseload of 106.  Staff reported that there was one office in the medical clinic and two in the counseling center where they could meet with inmates.

Institutional data indicated for the review period a 100-percent compliance rate for timeliness of the 45 initial psychiatry contacts, and a rate of 97-percent for timeliness of 2,103 of the 2,165 follow-up contacts.  Missed appointments ranged from four to 39 days late.  One psychiatry contact, to address medication noncompliance, was cell-front.  Five psychiatry contacts were in non-private settings and occurred from December 31, 2014 through January 4, 2015.

Provided data also indicated that 77 of 84, or 92 percent of, initial PC contacts were timely.  The seven late initial contacts ranged from two to 33 days late, with two still outstanding at the time of the site visit.  The compliance rate for timeliness of follow-up PC contacts was 92 percent, with 4,848 of 5,255 contacts completed quarterly.  The 407 late follow-up contacts ranged from two to 105 days overdue.  There were four cell-front contacts with three inmates, for three "unspecified" reasons and one inmate refusal.  Three of the four contacts were for five-day

clinical follow-up after discharge from the MHCB.  PCs had 11 non-private contacts among six inmates.  These contacts included seven for five-day clinical follow-up after discharge from the MHCB, and six which occurred from December 5, 2014 through January 28, 2015.

All IDTT meetings during the review period were attended by required staff except one, at which the psychiatrist was absent, for a 99-percent compliance rate.  Initial IDTT meetings were 98-percent compliant for timeliness, with 86 of 88 meetings held timely.  The overdue meetings were one to two days late at the time of the site visit.  Only two of 5,222 follow-up IDTT meetings were late and were held within two days of the due date, for a nearly 100-percent compliance rate.

Staff reported that three groups were provided to 3CMS inmates.  These were a weekly support group, parole planning group, and lifers group, in which seven to eight inmates participated.  They were cancelled during any lockdowns.  There was no wait list for groups.

Referrals:

Of the 151 emergent referrals during the review period, all but one resulted in a timely response.  There were 32 urgent referrals, of which 30 or 94 percent drew a timely response.  The 3,221 routine referrals resulted in timely responses in 2,910 or 90 percent of cases.

MHTS.net:

Staff generally reported no problems with access to or use of MHTS.net.  They suggested adding an alert identifying patients who spoke only foreign languages.

Mental Health/Custody Relations:

Staff reported that the overall institutional climate and the relationships between custody and mental health were positive.  Custodial input and exchange of information that was noted in eUHRs and observed during IDTT meetings promoted good collaborative working relationships

428

at NKSP.  It was observed during the tours of various units that custody and mental health staff knew each other and appeared to communicate comfortably about particular inmates' referrals and functioning levels, among other things.

Heat Plan:

The monthly reports for August through October 2014 were provided for review and indicated 64 Stage-I heat alerts and one Stage-II heat alert.  There were no Stage III heat alerts or heat-related incidents during the review period.

NKSP was compliant with the heat plan during the review period.  Indoor and outdoor temperatures were logged and forwarded to the litigation coordinator during the heat season.  When interviewed during the site visit, the litigation coordinator indicated that, if necessary, the heat plan would be activated during the off-season.  One example of this was the pharmacist's precautionary distribution of a list of inmates on heat-sensitive medications because 90-degree temperatures were expected that week.

Staff reported that the litigation coordinator reviewed the temperature logs daily, and planned to visit the units to ensure temperatures were being logged properly during the upcoming heat season.  Toured housing units had thermometers appropriately placed high on the walls near the ceilings.

During the heat season, the pharmacy generated a daily list of inmates prescribed heat-sensitive medications which was distributed to facility lieutenants, mental health staff, the litigation coordinator, facility captains, associate wardens and medical staff.  Per policy, a monthly heat report was submitted to CDCR headquarters during the heat season.

Use of Force:

NKSP was compliant with use-of-force training for custody and mental health staff.

Access to Care:

Over the course of the review period, the total number of ducats decreased from over 5,000 to fewer than 3,000.  Further, the percentage of mental health ducats that were completed declined through the review period until January 2015 when it rose modestly.  The institution's monthly health care access reports indicated mental health ducat completion rates of 85 percent for August 2014, 83 percent for September 2014, 71 percent for October 2014, 67 percent for November 2014, 66 percent for December 2014, and 72 percent for January 2015.

Program Access:

   a.    Job and Program Assignments:

Institutional data indicated that 441 or 79 percent of the available full-time jobs were filled by non-MHSDS inmates, and 114 or 21 percent were filled by 3CMS inmates.  There were no part-time jobs at NKSP.

For the part-time academic program assignments, 89 or 74 percent were held by non-MHSDS inmates, and 31 or 26 percent held by 3CMS inmates.  There were no voluntary academic assignments at NKSP.

Fifty-one or 70 percent of the full-time vocational educational assignments were filled by non-MHSDS inmates, and 22 or 30 percent were filled by 3CMS inmates.  There were no part-time vocational educational assignments at NKSP.

Provided training materials and attendance sheets regarding functional evaluation of EOP inmates for program assignments indicated that training was completed as of December 4, 2014.

   b.    Milestone Credits:

Information provided via CDCR headquarters indicated that during the review period, 2.82 percent of the 118 eligible EOP inmates, 3.69 percent of the 985 eligible 3CMS inmates, and 4.47 percent of the 3,058 eligible non-caseload inmates earned milestone credits during the review period.

     c.   <u>Out-of-Level Housing</u>:

Institutional data indicated that on February 24, 2015, one Level I 3CMS inmate was housed in Level III housing, 18 Level III 3CMS inmates were housed in Level II housing, and five Level IV 3CMS inmates were housed in Level III housing.

     d.   <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

NKSP reported that the new 1824 process was still a pilot program, and accordingly no policies, training materials, or training rosters were yet available for review.

     e.   <u>Periodic Classification Score Reductions: EOP Inmates</u>

NKSP did not have an EOP mainline program.

    *<u>Coleman</u> <u>Postings</u>*:

The January 2015 revised *Coleman* posters, in both English and Spanish, were found in all of the toured housing units, including administrative segregation and buildings housing reception center EOP and mainline 3CMS inmates. All posters were placed in common areas accessible to class members. *Coleman* posters were also located in mental health office spaces.

431

**California State Prison, Los Angeles County (CSP/LAC)**
February 3, 2015 – February 5, 2015

Census:

On February 4, 2015, CSP/LAC housed 3,491 inmates, for a decline by 11 percent since the preceding monitoring period. The mental health caseload population of 1,667 was two percent lower than during the preceding monitoring period.

Nine inmates were in the MHCB. There were 329 EOP inmates and 1,090 3CMS inmates in mainline.

The administrative segregation population of 311 included 115 EOP inmates in the hub, where one inmate with a SHU term was pending transfer to a PSU. The 124 3CMS inmates in administrative segregation included one with a SHU term pending transfer.

Staffing:

The chief psychiatrist position was filled. One of two chief psychologist positions was filled and the other was held vacant at the direction of CDCR headquarters. All nine senior psychologist positions were filled.

Eight of 12 psychiatrist positions were filled, for a 33-percent vacancy rate. Use of 3.74 contractors reduced the functional vacancy rate to two percent.

Thirty-one of 33 psychologist positions were filled. Use of 3.5 contract psychologists provided full coverage.

The supervising social work position was filled. Seven of 19 social work positions were vacant, for a 37-percent vacancy rate. One social worker was on long-term leave. Two were unlicensed.

Four of 11 recreation therapist positions were vacant, for a 36-percent vacancy rate. Use of contractors reduced the vacancy rate to 14 percent.

The institution reported that it employed a psych tech unit supervisor, two senior psych techs, and 23 psych techs. Three psych tech vacancies were covered by contractors. The total number of positions was not provided.

Of 17 mental health clerical positions, 3.5 were vacant, for a 21-percent vacancy rate. Both OSS II positions were filled, as were all three HPS I positions, and the one CHSA position. The 0.1 AGPA position was vacant.

Quality Management:

The CSP/LAC quality management committee met monthly and achieved a quorum for all meetings during the review period. Representatives of subcommittees including the mental health subcommittee presented information and monthly compliance reports on their respective areas.

The mental health subcommittee met weekly and always achieved a quorum during the review period. It routinely received compliance reports. Agenda items included audits and performance reports for program areas, expedited transfers for EOP inmates, administrative segregation, and suicide prevention.

At the time of the site visit, there were four active QITs and FITs. They addressed peer review, the administrative segregation EOP hub, Guard One checks, custody five-day step-downs, alternative housing, and pre-screens for placements in administrative segregation. No QITs were chartered or resolved during the review period.

Peer review was suspended during the latter half of 2014 due to concerns about effectiveness and lack of anonymity. The institution began a peer review pilot project in

433

December 2014 and was in the process of revising its peer review LOP at the time of the site visit.

Medication Management:

Since the preceding monitoring visit, the institution had fully implemented MAPIP. Audit results indicated that most mental health-related areas reported compliance rates of 90-percent or better.  Medication continuity for DOT and NA medications was 84-percent compliant except following transfers to the MHCB, administrative segregation, the SHU, and the PSU.  A large number of discarded pills were found in the area near the pill window on D-Yard, indicating a significant problem with medication administration at least on that yard.

Transfers:

There were 15 referrals to acute inpatient care and 41 referrals to intermediate inpatient care during the review period.  All 56 referral packets were completed timely.  One acute care referral was rescinded.  DSH accepted the remaining 14 acute care referrals and 36 of the 41 intermediate care referrals.

Of the 12 acute care referrals who transferred during the review period, four were timely. The eight late transfers took 16 days on average.

Thirty of the 36 intermediate care referrals transferred during the review period.  Five of these were timely.  The 25 late transfers took 42 days on average and as long as 51 days.  Of the 11 intermediate care referrals pending at the end of the review period, six were pending transfer and five were pending acceptance.

At the time of the site visit, six inmates were on the DSH wait list.  Four were in the administrative segregation EOP hub, one was in the EOP mainline, and another was in the MHCB.

434

Logs and staff reports indicated that the institution received timely notice of impending DSH discharges and that discharge summaries were available on SharePoint. Formal case conferences between CDCR and DSH clinicians were conducted for inmates discharged to administrative segregation, as per CDCR policy and an LOP. Review of five discharge summaries on SharePoint found that they were legible and clinically useful. They included DSH clinician contact information and digital signatures by all disciplines. The most recent medication reconciliation sheets and MARs were attached. However, it was observed that discharge summaries were not being consistently reviewed and considered in treatment planning.

During the review period, there were 230 MHCB referrals and 165 admissions among 139 inmates. Fifty-nine of these admissions were from other institutions. Eight inmates had three admissions and two had four admissions. Stays averaged 12.1 days.

There were 230 alternative housing placements, of which 122 or 53 percent lasted no longer than 24 hours. Overall, alternative housing says exceeded the 24-hour timeframe by an average of 14.4 hours. MHCB unavailability was the predominant reason for the overly-long stays.

All 28 transfers of EOP inmates to the PSU were completed within 60 days of endorsement.

All 53 transfers to administrative segregation EOP hubs were timely. Fifty-seven of 101 or 56 percent of transfers to EOP programs were timely. The 44 late transfers exceeded timeframes by an average of 59 days, typically among SNY EOP inmates.

The institution did not report lengths of stay in administrative segregation during the review period. On January 5, 2015, 329 inmates including 109 EOP inmates were housed in administrative segregation. The EOP inmates had stays that averaged 120 days, and included 41

435

EOPs whose stays exceeded 90 days.  Those over 90 days were given 30-day reviews, according to interviewed custody staff and reviewed documentation.

There were 127 3CMS inmates in administrative segregation.  Their stays averaged 137 days, and lasted as long as 697 days.

Other Issues:

Administrative Segregation EOP:

The new administrative segregation EOP treatment building provided adequate appropriate treatment and office space.  Interviewed inmates spoke favorably of the program. Group rooms had therapeutic modules, restart chairs, or Colorado tables, which were being piloted.  Inmates reported a preference for use of the therapeutic modules or restart chairs over the Colorado tables.  Custody staff also disfavored the Colorado tables for potential safety reasons.  Plans to discontinue their use were underway.

Monthly psychiatry contacts were 90-percent compliant.  For PC contacts, audits found 90 percent or greater compliance rates for initial and follow-up contacts.  In 84 percent of cases, appointments following inmate treatment refusals were completed.  Psych tech rounds were completed as required.

Audits indicated that IDTT meetings were timely and attended by required members.  At an observed meeting, interaction between clinical and custody staff was good and inmates were involved in their treatment planning.  However, inmates were cuffed and placed in therapeutic modules for their entire meetings.  Supervisory staff indicated that this cuffing practice was not authorized and may have been the result of mistake by new officers.

Ninety percent of inmates were offered at least ten hours of group therapy per week. Thirty percent actually attended at least ten hours.  No reasons were provided for the low

attendance rate, but there were schedule conflicts between groups and individual psychiatry and PC contacts.

For the month of November 2014, daily morning meetings between mental health and custody were only 40-percent compliant. An observed morning meeting in the D-5 housing unit was attended by the PC, psych tech, and sergeant.

Seven ground floor cells were used as both new intake cells and as alternative housing. Staff reported that the number of these cells was insufficient during high intake times, when inmates were either double-celled or placed in non-retrofitted cells into which custody could see.

All cells had working electrical outlets. Inmates were offered adequate yard time.

MHCB:

CSP/LAC operated a 14-bed MHCB. It included one restraint and seclusion cell and one safety cell. The MHCB was staffed by a full-time psychiatrist, a senior psychologist supervisor, and three psychologists. Caseloads were 14 for the psychiatrist, two for the senior psychologist supervisor, and four for each of the psychologists.

Logs indicated compliance with initial and follow-up psychiatry contacts. Initial PC contacts were 60-percent compliant. Follow-up PC contacts and both initial and follow-up IDTT meetings were all compliant.

Alternative Housing:

Psychiatric care was provided in alternative housing on an on-call basis among seven full-time psychiatrists and two contract psychiatrists.

Seclusion and Restraint:

Review of logs indicated that past problems with documentation of number and duration of applications of restraint and seclusion had been corrected.

437

EOP:

Psychiatry and PC contacts were at least 90-percent compliant.  Space for individual treatment was inadequate, resulting in more cell-front contacts.  Staff sometimes waited for office space to become available for treatment sessions.

IDTT meetings were timely, according to audit results.

EOP inmates were scheduled for 14.75 hours of structured therapeutic activities per week.  Approximately 90 percent of these inmates were offered at least ten hours per week, but only 20 percent attended at least ten hours.

At the time of the site visit, 24 EOP inmates designated as SNY were housed on C yard and were on a list for expedited transfer to an SNY EOP.  Review of the wait list indicated average wait times of 177 days with a range of seven to 544 days.  Thirteen inmates had been waiting for over 100 days.  Six interviewed SNY inmates expressed concerns surrounding their proximity to general population inmates.

SNY EOP inmates received weekly PC contacts.  According to audit results, they also received five hours of group therapy per week on a modified program, but this had been reduced by the time of the site visit.  Staff and inmates attributed this to lack of escort officers and group therapy space.  SNY EOP inmates on C yard were provided with groups in the C-Yard gymnasium, but availability of this space was problematic.

One interviewed SNY EOP inmate presented as psychotic and poorly functioning but had not been adequately evaluated for a higher level of care.  During the site visit, he was brought to the attention of supervisory staff for an emergency assessment.

438

<u>3CMS</u>:

3CMS inmates received timely initial and quarterly psychiatry and PC contacts, and more frequent contacts if needed. However, psychiatry contacts took place in an old medical examination room which lacked a door, compromising privacy. With PCs' large caseloads of 157 to 213 inmates, it appeared that they were unable to devote sufficient time to individual inmates' needs.

Annual follow-up IDTT meetings were compliant with timeliness and attendance by required disciplines. Meetings were held in a former dental office in which staff and inmate seating was awkward, and with no door to the room, privacy was compromised. Two observed IDTT meetings were attended by all required staff who were familiar with the inmates, made appropriate introductions, and explained the purpose of the meetings to the inmates. Inmates' progress was assessed through their subjective self-reports and their answers to questions about their daily activities. The psychiatrist followed inmates' medication compliance levels on an available computer. Form 7388B indicators were reviewed. Treatment goals were communicated to inmates in understandable terms, but diagnoses and treatment objectives were communicated in terms that were too general.

Group therapy was not offered. Educational classes and self-help groups were available on A-Yard.

<u>3CMS Inmates in Administrative Segregation</u>:

3CMS inmates in administrative segregation were housed in A-4. Audits and inmate interviews indicated that psychiatry contacts were provided monthly. They also confirmed that PCs saw inmates weekly, out of cell at least once a month but more often at cell-front. IDTT meetings were timely. Required disciplines attended 82 percent of meetings.

439

Group therapy was not provided.  Shortages of clinical and custody staffing were cited as the reason.  Interviewed inmates expressed a desire for group therapy and frustration with lack of treatment.

Working electrical outlets were lacking in A-4.  Staff reported that crank radios were available to inmates, but functionality was unreliable.

Medical Records/MHTS:

Institutional staff used MHTS.net to track clinical contacts, IDTT meetings, EOP group offerings and participation, and DSH referrals and non-referrals.  Staff indicated that they had access to MHTS.net through conveniently located work stations, but that MHTS.net was "slow" at times.  Opened MHTS.net records for inmates at high suicide risk alert bore a red notation at the top of the view.  Staff also used DECS, SOMS, and eUHRs.

Referrals:

Review of referral logs for mainline 3CMS inmates indicated compliance with response to urgent, emergent, and medication refusal referrals, but not for routine mental health referrals.  This was consistent with inmate reports that wait times to see the PC took several weeks.

Mental Health/Custody Relations:

Interviews of staff across disciplines indicated an overall collaborative, problem-solving atmosphere at CSP/LAC.  Custody line staff appeared to have a clear understanding and appreciation of clinicians' value to enhancing institutional safety and security.  Some clinical staff reported that custody was not as responsive to escort needs as clinical staff would have preferred.

440

Heat Plan:

During the site visit, functional thermometers were observed near upper tier cell fronts in housing units.  Documentation indicated no days when inside temperatures exceeded 90 degrees and no Stage III heat alerts during the review period.  The litigation coordinator provided copies of monthly heat reports to headquarters.  Copies of the LOP and lists of all inmates on heat sensitive medications were provided by the litigation coordinator.  Interviewed staff was knowledgeable and well-trained on heat plan protocols.

Use of Force:

At the time of the site visit, CSP/LAC was compliant with the mandatory training on controlled use of force.

Access to Care:

Interviewed line staff reported insufficiency of escorts to clinical appointments.

Program Access:

a.      Job and Program Assignments:

Seventeen EOP inmates had full-time employment positions.  One EOP inmate had a part-time academic position.  An additional 17 EOP inmates were eligible for work training assignments but were unassigned.

Among the 3CMS inmate population, 310 had full-time jobs, 25 participated in full-time vocational education, 19 participated in part-time vocational education, and 103 had part-time academic positions.  An additional 370 3CMS inmates were eligible for work training assignments but were unassigned.

Among the non-mental health caseload inmate population, 791 inmates had full-time jobs, 42 participated in full-time vocational education, 13 participated in part-time vocational

441

education, and 155 had part-time academic positions.  An additional 421 non-mental health inmates were eligible for work training assignments but were unassigned.

CSP/LAC staff were aware of the 2014 memoranda requiring IDTTs to evaluate EOP inmates' ability to participate in program assignments.

b.    <u>Milestone Credits</u>:

Provided documentation indicated the availability of milestone credits for mental health caseload inmates including EOP inmates, but it did not report the number or percentage of inmates who were eligible for, or who had earned, milestone credits.

c.    <u>Out-of-Level Housing</u>:

Two 3CMS and 14 non-mental health caseload Level I inmates were housed in Level III housing.  Three 3CMS and five non-mental health caseload Level I inmates were housed in Level IV housing.

Fifteen 3CMS and 42 non-mental health caseload Level II inmates were housed in Level III housing.  Nine EOP, 11 3CMS, and 28 non-mental health caseload Level II inmates were housed in Level IV housing.   Fifty-five non-mental health caseload Level II inmates were housed in Level I housing.

There were 26 EOP, 80 3CMS, and 71 non-mental health caseload Level III inmates housed in Level IV housing.

Twenty-five 3CMS and 43 non-mental health caseload Level IV inmates were housed in Level III housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSP/LAC had not yet implemented the revised ADA Accommodation and Grievance Procedures to include appeals regarding accommodations for psychiatric disabilities.

e.    <u>Periodic Classification Score Reductions: EOP Inmates</u>:

CSP/LAC did not provide information on periodic classification score reductions indicating whether EOP inmates were granted semi-annual classification score reductions for successful programming.

<b><u>California Correctional Institution (CCI)</u></b>
April 1, 2015 - April 3, 2015

<u>Census</u>:

As of March 30, 2015, CCI housed 4,107 inmates, for a 12-percent decline since the preceding monitoring period.  The mental health caseload population rose by four percent to 1,112.

The administrative segregation population of 284 included 52 3CMS inmates.  There were no EOP inmates pending transfer to an administrative segregation EOP hub.  The SHU population of 1,057 included 118 3CMS inmates.

The two inmates in the OHU for mental health reasons both of whom transferred out on the first day of the site visit.

There were 935 mainline 3CMS inmates and five mainline EOP inmates

<u>Staffing</u>:

The senior psychiatrist position was vacant.  One of the two chief psychologist positions was filled and the other was held open per a cost-savings directive from headquarters.  The unused funds were used to support other positions.  The two senior psychologist positions and the supervising social worker position were filled.

Only one of the five psychiatrist positions was filled.  Use of 2.5 contract psychiatrists reduced the functional vacancy rate to 30 percent.

443

Thirteen of the 15 psychologist positions were filled. One of the two vacancies was covered by contractors, reducing the functional vacancy rate in psychology to seven percent.

All 14 social worker positions were filled.

The two senior psych tech positions and 22 of the 38.9 psych tech positions were filled. The vacancy rate among psych techs was 43 percent.

Of the 2.5 recreational therapist positions, one was filled, resulting in a 60-percent vacancy rate.

The office services supervisor II position and the two office tech positions were filled. Of the seven clerical positions, 5.5 were filled, for a 21-percent vacancy rate.

CCI used primarily telemedicine for its delivery of psychiatric care.

Quality Management:

Quality management at CCI was robust and useful to staff, and showed continued improvement since the preceding monitoring period. Relevant information was disseminated to line staff via supervisors and staff meetings.

As CCI did not have a CTC, there was no local governing body at the institution.

The quality management committee met monthly, with attendance by required staff ranging from fair to good. Comprehensive minutes were maintained. Agenda items included numerous committee reports, LOPs, QIT progress reports, statewide policy updates, dashboard reviews, trends detected via use of MAPIP, and a performance improvement work plan. Corrective actions were taken as indicated and documented.

The mental health subcommittee met monthly and maintained minutes. Agendas included results of MAPIP audits, psych tech rounds, 31-item screens in administrative segregation, audits of eUHR-MHTS.net concordance, review of performance reports, transfer timelines, RVRs, peer

444

review, suicide prevention, and data regarding administrative segregation, SHU, MHCB, and OHU.

Audits of the OHU, MHCB, administrative segregation, the SHU, involuntary medications, MAPIP results, and psych techs were conducted regularly. The mental health subcommittee also took up audit reports on backlogs in psychiatry, medication hoarding, effective communications, census, EOP transfer timelines, and closed appointments. The methodologies in the referenced audits were reviewed by the two mental health subcommittee coordinators, who had significant experience in this area. Audit results were reviewed and CAPs were implemented as appropriate. They were addressed during meetings, as reflected in minutes.

QITs and FITs were used appropriately and were effective. Active QITs at the time of the site visit were addressing exhibitionism, alternative housing, medication distribution, access to narcotics, and health information management.

Peer reviews of one psychiatrist, two psychologists, and one social worker were conducted during the review period. LOPs for peer review were under revision.

Medication Management:

MAPIP was coordinated in part with the mental health subcommittee and was used well. Issues with medication management were identified timely and addressed with CAPs that were implemented.

Continuity of medications following transfers to administrative segregation, the SHU, and the PSU were noncompliant. Corrective actions were being taken.

Medication orders were for no longer than 90 days, and bridge orders were for no longer than 14 days. New prescription orders and renewals upon discharges from the MHCB and OHU were compliant.

445

Protection from inclement weather for outdoor pill lines remained problematic.

Informed consents were being obtained from inmates who were prescribed psychotropic medications.

Laboratory testing of blood levels of inmates prescribed psychotropic medications was compliant.

At the time the site visit, there were 654 inmates receiving medications by DOT. A centralized list of non-MHCB inmates with DOT orders was maintained by the pharmacy. Supervisory staff monitored the process.

Involuntary medication orders were very rare at CCI, and there were no instances during the review period when force was used for administration of involuntary medications. At the time of the site visit, only one inmate was on an involuntary medication order.

Supplies of medications were prescribed and provided to paroling inmates.

Transfers:

According to data provided by the institution, there were no referrals or transfers to acute or intermediate inpatient care during the review period.

Only nine or five percent of the 53 transfers to MHCBs were timely during the review period.  Delays were attributed to lack of bed availability.

Of the 94 placements into OHUs, 17 or 18 percent lasted longer than 72 hours.

The sole inmate referred to a PSU during the review period was transferred timely.

There were 14 EOP inmates in administrative segregation who were referred to EOP administrative segregation EOP hubs.  Ten or 71 percent were transferred timely.  None were awaiting transfer at the time of the site visit.

446

Twenty-four EOP inmates were transferred to mainline EOPs during the review period. Sixteen or 67 percent of these inmates were transferred timely. At the time of the site visit, five EOP inmates were pending transfer to mainline EOPs, including one who had been waiting longer than 60 days due to lack of bed availability at the receiving institution.

Other Issues:

3CMS Inmates in Administrative Segregation:

CCI's administrative segregation unit, in which 3CMS inmates were housed, did not have an STRH or LTRH for 3CMS inmates. The unit was on A-Yard, which was scheduled for conversion to an SNY in May 2015.

During the review period, pre-screens of incoming inmates were completed timely in only 61 percent of cases. This was attributed to a misinterpretation of Program Guide requirements regarding transfers from the SHU to administrative segregation. This problem was addressed and resolved by a QIP within a month or two before the site visit.

The 31-item screens were conducted timely 95 percent of the time.

A contract psychiatrist had a caseload of 26. Close to 100 percent of 3CMS inmates were seen at least quarterly by a psychiatrist, in nearly all cases in a private setting in the chapel building. During the three-month period preceding the site visit, 40 percent of inmates on the psychiatrist's caseload were seen at least twice.

The two PCs had caseloads of 51 and 56, respectively. Ninety-eight percent of 3CMS inmates were seen at least weekly by their PC during the review period. Approximately 68 percent of these contacts were in private office settings in the chapel building. Some contacts were conducted in non-private settings due to inmate refusals. A conversion of the SHU on A-Yard scheduled for May 2015 would make the chapel no longer available as treatment space.

447

The HCFIP process was being explored to come up with replacement space.

Only approximately 20 percent of initial IDTT meetings took place before initial ICC meetings, due to lack of timely notice from custody as to which inmates were scheduled for ICC meetings. Follow-up IDTT meetings were conducted at least quarterly in 98 percent of cases during the review period. Attendance by required disciplines was nearly 100-percent compliant. Meetings were conducted in a board room which was equipped with computers to provide access to UHRs and SOMS.

There was one therapeutic group offering. Increased group offerings were planned to begin in the near future. Group programming space was limited.

Observed psych tech rounds were conducted competently, with good interactions with inmates.

None of the administrative segregation housing units in Buildings 6, 7, and 8 on B-Yard had electrical outlets. Crank radios were supplied to inmates. In Building 5, which was used for administrative segregation and SHU overflows, cells had electrical outlets and inmates had access to radios and televisions.

The warden's administrative segregation population report indicated that 21 NDS inmates were identified as eligible to receive property and privileges and as meeting criteria for accelerated transfer. The institution did not report any obstacles to providing these inmates with property and privileges.

Seclusion and Restraint:

No orders for use of restraints were written during the review period.

448

<u>Alternative Housing</u>:

CCI maintained a 16-bed OHU with eight suicide-resistant beds designated for mental health inmates, plus two medical beds that could be used for mental health care if necessary. During the review period, five inmates had OHU stays, although provided documentation was unclear as to whether the beds were actually in the OHU.

For alternative housing, CCI used two "wet" cells in the medical clinic holding area, and if necessary, two cells in Receiving and Release. Staff reported and verified that no alternative housing was used during the review period, contrary to information appearing in MHTS.net documentation that was produced as proof-of-practice.

Staff reported that all mental health patients placed in designated medical beds in the OHU were seen daily by mental health clinicians. Clinical intakes, and psychiatry and PC contacts in the OHU were all conducted in private settings.

<u>SHU</u>:

During the review period, 278 3CMS inmates were placed in the SHU for an average length of stay of 91 days.

All initial psychiatry contacts and 98 percent of follow-up psychiatry contacts were conducted timely. Psychiatry contacts were conducted in private settings 98 percent of the time. The psychiatrists' caseloads averaged 14 patients on A-Yard, where the SHU was located.

The rate of compliance for timeliness of initial PC contacts was 100 percent. For follow-up contacts it was 99 percent. Eight-eight percent of PC contacts were conducted in private settings. Eighty-three percent of cell-front contacts were due to inmate refusals.

Follow-up IDTT meetings had compliance rates of 100 percent for timeliness and 98 percent for attendance by required members. Ninety percent of meetings were conducted

according to Program Guide requirements, but only 16 percent of initial meetings preceded initial ICC meetings.   At observed meetings, required members attended and participated fully without prompting.  Overall, the meetings were well-conducted except in a few respects. Some team members had "side" discussions and ringing mobile phones, and documents were passed while inmates were speaking.   One clinician did not present a succinct presentation of the concerns which led to the meeting, nor did this clinician address the possible connection between the condition of the inmate's cell and his need for a change of level of care.  The senior psychologist appropriately refocused the meeting.

Therapeutic groups were provided five days a week.

3CMS:

Compliance rates for initial and follow-up psychiatry contacts were 100 percent and 98 percent, respectively. Psychiatrists completed routine, urgent, and emergent referrals within Program Guide timeframes 90 percent of the time.   No information was provided with regard to completion of psychiatry intake evaluations before initial IDTT meetings.

For primacy clinician contacts, compliance rates were 98 percent for initial contacts and 100 percent for follow-up contacts.  Caseloads for PCs averaged 30 inmates.

Psychiatry and PC contacts took place in private settings in 99 percent of cases.

Compliance rates for timeliness of IDTT meetings were 97 percent for initial meetings and 100 percent for follow-up meetings.  Required members attended in 86 percent of cases. Computer access to UHRs and SOMS records was available during meetings.  At observed IDTT meetings on C-Yard, all required members were present, including the telepsychiatrist on-duty. Interdisciplinary discussion was good.  Each inmate was presented with a coherent treatment plan.

450

3CMS inmates on C-Yard were offered two groups, for which there were wait lists.  No groups were offered on D-Yard or E-Yard.

An interview of ten 3CMS inmates on D-Yard revealed that all of them had been seen by a telepsychiatrist, usually the same one.  These inmates were generally satisfied with the telepsychiatry process as well as with their PCs.  They expressed dissatisfaction with access to group therapies and reported that custody staff and, at times, nursing staff's interactions with inmates were provoking.

Ten 3CMS inmates on E-Yard were also interviewed.  They too expressed general satisfaction with the telepsychiatry process, particularly with their current telepsychiatrist. They reported receiving clinical contacts with their PCs generally every 90 days and having good access more frequently if necessary via the sick call process.  Many expressed a desire for group therapy.  Several inmates were involved in the substance abuse program, which they described as helpful. They complained of being called as a group for their telepsychiatry and PC sessions, which resulted in wait times of 25 minutes to four hours.  The ducating process clearly needed to be modified to reduce these long wait times for scheduled mental health appointments.   Inmates also indicated that custody staff were problematic but were unwilling to provide details.  Again, there were reports of provocative comments from COs and nursing staff.

Referrals:

CCI was compliant with timeliness of response to mental health referrals.  Ninety percent of the 29 emergent referrals drew a timely response.  Eighty-eight or 98 percent of the 90 urgent referrals, and 2,422 or 96 percent of the routine referrals also received timely responses.

Heat Plan:

CCI was compliant with the heat plan during the review period.  Monthly heat plan reports and temperature logs were provided for review.  The heat season at CCI was September and October 2014.  There were no Stage II or III heat alerts and no reported heat-related incidents during the review period.  The pharmacy prepared and distributed weekly lists of heat-risk inmates to mental health staff, lieutenants, captains, and C&PRs, among others.

Access to Care:

The institution's monthly Health Care Access Quality Reports from September 2014 through February 2015 indicated that .37 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 52 percent were not completed due to non-custodial reasons other than inmate refusals.

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that 1,217 or 78 percent of available full-time jobs were filled by non-mental health caseload inmates and that 346 or 22 percent were filled by 3CMS inmates.  There were no part-time job assignments at CCI.

For part-time academic assignments, 379 or 75 percent were held by non-mental health caseload inmates and 135 or 26 percent were held by 3CMS inmates.  There were no voluntary academic program assignments at CCI.

For full-time vocational education assignments, 229 or 75 percent were held by non-mental health caseload inmates and 78 or 25 percent were held by 3CMS inmates.  For part-time vocational education assignments, 27 or 75 percent were held by non-MHSDS inmates and nine or 25 percent were held by 3CMS inmates.  Seventy-three or 79 percent of the voluntary

452

vocational education assignments were held by non-mental health caseload inmates and 19 or 21 percent were held by 3CMS inmates.

For full-time substance abuse treatment program assignments, 121 or 80 percent were held by non-mental health caseload inmates and 30 or 20 percent were held by 3CMS inmates.

b.      Milestone Credits:

Institutional information indicated that from August 1, 2014 through January 13, 2015, 13.14 percent of non-mental health caseload inmates, 20 percent of eligible EOP inmates, and 14.93 percent of 3CMS inmates earned milestone credits.

c.      Out-of-Level Housing:

Institutional data indicated that as of February 19, 2015, there were 14 Level I 3CMS inmates in Level II housing and four in Level III housing.  There were three Level II 3CMS inmates in Level I housing and 44 in Level III housing.  There were nine Level IV 3CMS inmates in Level III housing.

There was one Level II EOP inmate in Level III housing.

d.      ADA Reasonable Accommodation and Grievance Procedures:

No information was provided with regard to ADA reasonable accommodation and grievance procedures.

e.      Periodic Classification Score Reductions: EOP Inmates:

CCI did not have an EOP program.

*Coleman* Postings:

*Coleman* postings in both English and Spanish languages were found in all buildings toured by the monitor, including the SHU and the administrative segregation units.  All postings were found in common areas accessible to *Coleman* class members.

453

## California Institution for Men (CIM)
March 10, 2015 - March 12, 2015

Census:

As of March 9, 2015, CIM's total inmate population was 4,138. This included 1,402 MHSDS inmates who made up 33.8 percent of the institution's entire inmate population.

Thirty-three of the institution's 36 MHCBs were occupied. None of the 43 patients in the OHU were there for mental health reasons. There were two EOP inmates in general population, and 1,142 mainline 3CMS inmates.

Among the 626 inmates in the reception center were 24 EOP inmates, 135 3CMS inmates, and five parole violators on the mental health caseload. There were five additional reception center MHSDS inmates housed in administrative segregation, which was being used as reception center overflow.

In administrative segregation, there was one EOP inmate pending transfer to a hub and 47 3CMS inmates among the total population of 106. The sole NDS inmate was not on the mental health caseload.

Staffing:

One of the two chief psychologist positions was filled. The chief psychologist also served as the chief of mental health.

There were no senior psychiatrist positions. The three senior psychologist supervisor and two senior psychologist specialist positions were filled.

Eleven or 84.6 percent of the 13 staff psychiatrist positions were filled, for a functional vacancy rate of 15.4 percent. Staff reported that CIM had recently received approval to utilize registry psychiatrists to cover these vacancies.

454

Thirty-one of CIM's 35 psychologist positions were filled, leaving a vacancy rate of 11.5 percent. The institution was authorized to hire four limited-term psychologist interns in August 2015 to cover two of these vacancies.

The supervising social work position and 17 of the 19 social work positions were filled, resulting in a vacancy rate of 9.5 percent. Additionally, CIM reported that it was authorized to hire four unlicensed social workers, two of whom were already on staff at the time of the site visit.

The position of unit supervisor, who supervised psych techs, and the two senior psych tech positions were filled. Only one of the 36.8 psych tech positions was vacant.

Positions for the OSS II and CHSA and one of the two HPS positions were filled. Sixteen of the 17 clerical workers in the mental health program were also filled, leaving a six-percent vacancy rate.

Quality Management:

The quality improvement process at CIM had improved since the preceding monitoring period and was working well. The chief psychologist provided a summary of the institutional mental health QIP. It addressed completion of SREs, suicide prevention practices, treatment planning, alternative housing issues, 30-day MHCB re-admissions, MHCB discharge planning, treatment refusal rates in administrative segregation, and mental health assessments for use in the RVR process.

The QMC met monthly. Staff reported that all pertinent disciplines including custody attended meetings. Meeting minutes were useful and indicated that this committee reviewed reports from the ERRC, the mental health subcommittee, Quality Improvement Plans (QIT), and the pharmacy and therapeutics committee, among other things. Staff reported finding the QMC

process helpful and that information from the committee was conveyed to line staff during meetings.  QITs on MHCB utilization management, EOP processing, alternative housing, and medication review for newly arriving inmates, among others, were chartered.

The mental health subcommittee met monthly, with good attendance by required staff including high-level custody staff.  Reviewed agendas were comprehensive and often included performance and program dashboard reports, health care access quality reports, the sustainable process for identifying and referring patients to DSH programs, the SPRFIT, MAPIP, special case conferences, revisions to LOPs, mental health department initiatives, QIPs and related QITs, and audits of compliance with Program Guide requirements.  The Program Guide audits were found to be methodologically sound and served both management and quality improvement purposes.

The most recent peer review was conducted during January 2014.  The LOP was revised in December 15, 2014 and required mandatory training on peer review.  Henceforth, peer review was scheduled to be conducted annually.

<u>Medication Management</u>:

MAPIP generally worked very well at CIM.  The few medication management problems at CIM were usually identified by MAPIP, with corrective actions implemented.

With use of MAPIP measures, noncompliance was found in the areas of medication continuity for newly-arriving inmates, following intra-institutional moves into MHCBs and administrative segregation, and following discharges from outside hospitals.  Staff indicated that corrective actions had been developed and implemented to address this.

Pill line wait times lasted up to 30 minutes.

456

Non-formulary medications comprised less than five percent of all prescribed psychotropic medications. Medication orders could be written for up to 90 days. Bridge orders were limited to 14 days. With adequate verification and/or clinical history, prescriptions could be written without patient contact, but under these circumstances timely appointments with a care provider would be made. The chief psychiatrist audited laboratory testing and documentation of prescribing rationales in cases of polypharmacy. Other medication parameters relevant to mental health were audited by nursing staff.

At any given time during the review period, four to seven inmates were on involuntary medication orders on a non-emergency basis.

MAPIP results indicated that parole medications were being provided.

<u>Transfers</u>:

During the review period, CIM referred 27 inmates to DSH acute inpatient care. Documentation indicated that 26 or 96 percent of these referrals were accepted timely by CDCR headquarters. The institution reported that 23 or 85 percent of these referrals were submitted timely to DSH. Two of the 27 referrals were rescinded. Provided data showed that 24 or 89 percent of the acute care referrals were accepted by DSH. Beds were assigned to 22 of the 24 accepted inmates. Eleven of the 22 inmates were transferred within 72 hours of bed assignment. Among the total 22 inmates who were assigned beds, 11 transferred within ten days.

During the review period, CIM referred 53 inmates to DSH intermediate inpatient care. Documentation indicated that 50 of these referrals were accepted timely by CDCR headquarters, two were accepted untimely, and no data was provided on the remaining one. The institution reported that 19 of the referrals were submitted timely to DSH, 30 were submitted late, and no data was provided on the remaining four referrals. Four referrals were rescinded, one was

457

redirected to acute care, one was transferred to another institution, and three paroled. The remaining 44 inmates were accepted by DSH intermediate care during the review period. Beds were assigned to 38 inmates, among whom 23 transferred within 72 hours of bed assignment and 13 did not. No information was provided on the remaining two. Of the total 44 inmates accepted into DSH intermediate care, 34 or 77 percent transferred within 30 days of referral, four or nine did not transfer within 30 days, and six or 14 percent were re-directed to acute care referral.

At the time of the site visit, as of March 9, 2015, the institution provided a list of six inmates who had been referred and accepted for DSH intermediate care and were awaiting placement. One was scheduled to parole as an MDO at ASH on March 10, 2015, one was out to court, one refused transportation on March 9, 2014, one had special transportation arranged for March 11, 2015, and one was re-directed to acute care. All six were still within the 30-day intermediate care transfer timeframe. The inmate re-directed to acute care was beyond the ten-day timeframe, and two other inmates referred directly to acute care were still within the ten-day timeframe. All three were awaiting transfer.

Information gleaned from CIM's referral log for the review period indicated that 118 or 60 percent of the 198 inmates considered for referral to higher levels of care were not referred. The predominant reason for the non-referrals was that the inmate's existing LOC was clinically indicated. Other reasons included assessment for admission to an MHCB, change of medication, discharge planning, and initiation of involuntary medication procedures. CIM reported that some non-referred inmates were provided "enhanced treatment."

CIM reported timely transfers to its internal MHCB for all of its crisis bed referrals. Data on transfers during the review period to outside MHCB beds indicated 36 transfers, of which 15

or 42 percent were timely and the rest were untimely.  The late transfers ranged from 6.5 hours to four days overdue.  Staff reported that the predominant reason for delays in transfers was unavailability of MHCBs.

The institution reported that it had placed 193 inmates in alternative housing pre-crisis bed transfer during the review period.  There were 51 in August, 42 in September, 41 in October, 16 in November, 25 in December, and 18 in January.  All later transferred to an MHCB, either at CIM or at other institutions.  One hundred fifty seven or 82 percent transferred within the Program Guide 24-hour timeframe.  Among the 36 late transfers, 12 or one-third were overdue by one to 5.2 days, or by an average of 2.06 days.  The remaining 24 or two-thirds of overdue transfers occurred within less than one day beyond the 24-hours timeframe, i.e. within 48 hours of placement in alternative housing.

CIM reported one transfer to a PSU, which was timely.

During the site visit, samples holding cell logs were reviewed for compliance with the four-hour time limit and for direct line-of-sight visibility.  These placements included cases of suicidality, psych evaluations, and MHCB admissions.  All of the sampled log entries indicated compliance with timeframes for movement out of the holding cells and documentation of the required observations.

CIM referred 51 inmates to EOP hubs during the review period.  Ninety-four percent transferred within 30 days.  At the time of the site visit, there was one EOP inmate in administrative segregation awaiting transfer to a hub for less than 30 days.  No EOP inmates in administrative segregation during the review period had been there longer than 90 days.

Of the 154 EOP inmates transferred from the reception center during the review period, 43 or 28 percent had waited longer than 60 days.  Overdue stays in reception center ranged from

459

one day to 161 days beyond the 60-day transfer timeframe.  Staff attributed the delays to lack of beds at receiving institutions.  Among the 24 EOP inmates in the reception center at the time of the site visit, none had been there longer than 60 days.

During the review period, 432 3CMS inmates transferred from the reception center.  Of these, 126 or 29 percent were beyond the 90-day timeframe, by a range of one to 154 days.  Staff attributed the late transfers to institutional processing delays.  By the time of the site visit, the process of transferring 3CMS inmates out of reception center had been improved.  At the time of the site visit, there were nine 3CMS inmates in the reception center who had been there longer than 90 days, by a range of two to seven days.

Other Issues:

Reception Center:

No data on timeliness of nurse transfer-screening or medication continuity reviews of reception center inmates was provided.  Staff reported that the 31-item mental health questionnaire was administered within inmates' first 24 hours after arrival.  Patients who had received prior treatment in county jails or while on the CDCR mental health caseload were identified by transfer records or patient self-report.  No data was provided on automatic referrals for mental health evaluations of patients who had prior CDCR treatment histories.  Staff reported that all reception center mental health evaluations were completed timely, but no data was provided.

Most of the EOP inmates in reception center were housed in the Birch, Madrone, and Sycamore housing units.  Initial psychiatry contacts were 99-percent compliant and follow-up psychiatry contacts were 98-percent compliant.  Initial PC contacts were 97-percent compliant, and follow-up PC contacts were 98-percent compliant.

Initial IDTT meetings were timely in 94 percent of cases, and follow-up IDTT meetings were 100-percent compliant.  IDTT composition and attendance complied with Program Guide requirements.  No data was provided on whether initial psychiatric evaluations were completed before initial IDTT meetings, but staff reported that a QIT was working on this.

Minutes of the institution's quality management committee meetings indicated that 93 percent of RC EOP patients were offered at least five hours per week of structured therapeutic activities, and 82 percent actually participated in offered treatment.  Eleven patient contacts were in non-private cell-side settings.  These consisted of ten discharge follow-ups by the psych tech and one PC follow-up contact.  Staff also reported that no reception center EOP patients were released to parole or community supervision during the review period.

 Interviewed EOP inmates in the RC knew how to submit requests for clinical or medical services.  They reported general satisfaction with the quality of their treatment by PCs and psychiatrists, but they also reported several concerns.  Patients reported having to choose between yard and out-of-cell therapeutic activities, not receiving legal or personal mail timely, and having no visiting or telephone privileges.  Senior custody staff corroborated these patients' reports.

3CMS inmates in RC received initial screenings, mental health evaluations, preliminary treatment planning, and psychotropic medication when indicated.  Initial and follow-up psychiatry contacts were both 100-percent compliant.  Initial and follow-up PC contacts were 99-percent and 98-percent compliant, respectively.  IDTT composition and attendance at team meetings satisfied Program Guide requirements.  No information on timeliness of meetings was provided.  Group therapy was not provided to 3CMS inmates during the review period or at the time of the site visit.

The five 3CMS RC inmates housed in overflow in Cypress, an administrative segregation unit, were reported to be receiving mental health care from reception center clinicians and were not subjected to any of the administrative segregation restrictions.

MHSDS Inmates in Administrative Segregation:

In administrative segregation, the assigned psychiatrist had a caseload of 69 and the full-time PCs had caseloads of 13 to 14.  There was one assigned recreational therapist.

Initial psychiatry contacts were 99-percent complaint, and follow-up psychiatry contacts were 100-percent compliant.  Eleven percent, or 128 of 1137, of these contacts were at cell front, which was attributed in all cases to inmate refusals, according to provided documentation.

Initial PC contacts were 96-percent compliant and follow-up PC contacts were 99-percent compliant.  It was reported that 867 of 1661 or 52 percent of PC contacts were at cell front and that 68 percent of these were due to inmate refusals.

Of the total 181 IDTT meetings during the review period, 77 percent of initial meetings and all of the follow-up meetings were timely.  Composition of IDTT was 77-percent compliant, due largely to absence of psych techs.  According to audit results, psychiatrists and psychologists attended all IDTT meetings during the review period.  At observed IDTT meetings for three inmates during the site visit, the team process was found to be generally very good, although there was no discussion about the inmate before or after he joined the meeting.

Cypress Hall and Palm Hall each had a group room.  In Cypress Hall, there were two groups, one of which was held every week and the other was held every other week.  In addition, psych techs provided one group there on Saturdays and on Sundays.

Psych techs were being rotated through housing units weekly, but it was reported that they will be assigned to specific housing units once the post-and-bid process is completed.

462

Observed daily psych tech rounds in Palm Hall were conducted competently.  They were supervised and audited weekly by the psych tech unit supervisor and the supervising psych tech. These audits used both a standardized checklist and qualitative narrative, and were useful.

During the review period, ten inmates had stays in administrative segregation that exceeded 150 days.  Five of them remained there at the time of the site visit.  Prioritized case-by-case reviews of these inmates were performed consistently with applicable CDCR policies and procedures, and results and recommendations were presented to the ICC.

MHCB:

CIM operated a 34-bed MHCB unit in Facility D.  It was staffed by a chief psychiatrist, three full-time psychiatrists, two supervising clinicians, six full-time clinicians, and the equivalent of 50 hours of weekend coverage by two licensed clinicians.  Admissions of both internal and external referrals were managed by HCPOP.

Referrals to the MHCB were screened in the TTA area.  Reports indicated 340 admissions during the review period.  Nine of these patients were admitted three or more times. The average length of stay was 13.6 days.

Audit results indicated that initial psychiatry contacts were 95-percent compliant, and follow-up psychiatry contacts were 85-percent compliant.  They also indicated that initial PC contacts were 89-percent compliant, and follow-up PC contacts were 91-percent compliant.

Patients received daily PC contacts, including one weekly treatment planning meeting.

Based on presented audit results, initial IDTT meetings were 90-percent compliant, and follow-up IDTT meetings were 92-percent compliant.  No data on team composition or attendance was provided, but required staff attended and participated in discussions at observed IDTT meetings.  Staff explained treatment goals to patients in clear, understandable terms and

patients participated actively in discussions of how goals would be measured and met.  Form 7388B was routinely discussed.

Cells in CTC Units 1 and 4 remained non-suicide-resistant and continued to have many potential noose attachment points.  Staff reported that patients placed in these cells were under continuous observation and that headquarters' design standards and services department had recently reviewed these cells for improvements.  Results of this review were still pending at the time of the site visit.

Seclusion and Restraint:

Logs indicated that during the review period, one patient was placed in four-point restraints for approximately 2.5 hours.  This placement resulted from a physician's order based on the patient's self-injurious behavior.

Alternative Housing:

CIM reported that patients referred to the MHCB were placed into alternative housing pending placement confirmation from HCPOP, consistently with CDCR policy and procedure. Infirmary stations 1 and 2 were given priority as alternative housing, followed by the large holding cells without water/toilets that were located at the front of the clinic TTA in Facility D.

Staff reported that pending mental health evaluation, patients were kept on continuous direct visual observation by nursing.  They were evaluated and treated by the physician on call and MHCB clinical staff in a private evaluation/treatment area in the MHCB clinic.  Staff also reported that psychiatry was assigned to treat patients awaiting crisis bed placement.  On weekends, the assigned psychologist or clinical social worker was designated to assist the psychiatrist.  An RN was also required to be on duty at all times and an SRN II was required to conduct rounds.

464

<u>3CMS</u>:

There were four psychiatrists assigned to the 3CMS mainline. They had caseloads ranging from 227 to 388 patients, with an average of 301.4 patients per psychiatrist. There were 12 psychologist-PCs who had caseloads ranging from 56 to 90, with an average of 75 patients per PC. There were another five clinical social worker PCs who had caseloads ranging from 50 to 90 patients, with an average of 62 patients per clinician.

Over 99 percent of inmates prescribed psychotropic medication were seen timely by a psychiatrist for both initial and follow-up contacts. Five of these contacts were conducted in non-private settings.

CIM documentation indicated that 841 of 861 or 98 percent of initial PC initial contacts were completed within ten working days, and 100 percent of quarterly follow-up PC contacts were timely. Less than one percent of these contacts were conducted in non-private settings.

There were 1,141 completed IDTT meetings for 3CMS inmates during the review period. Initial meetings were completed timely 93 percent of the time, and follow-up meetings were completed at least annually, and more often if indicated, 100 percent of the time. CIM reported 88-percent compliance for attendance by required staff. Absences were largely by correctional counselors, who missed 121 or 10.6 percent of the meetings.

During the site visit, a group of seven 3CMS inmates in C-facility, a Level II SNY, were interviewed. All of them described access to their psychiatrist and PC as very good, and said that the sick call process was working well from a mental health perspective and that there were no problems with continuity of their medications. Their most significant recommendation for improving mental health services was to increase "sensitivity" of the correctional staff and to improve communications among health care services.

465

Later the same day, a group of thirteen 3CMS inmates including four serving life sentences in A-facility, also a level II SNY, were interviewed.  At least five of these inmates commented favorably about their PCs.  However, these inmates also had numerous complaints about mental health services, including expirations of medication orders without timely renewals, individual therapy that was not helpful, poor access to group therapy, and disrespectfulness by custody staff.  They also had complaints related to security procedures employed when off-site intervention were needed, for example, being cuffed for many hours on end and not uncommonly being placed in holding cells for up to six hours while awaiting a medical assessment. Nursing staff said they were aware of the concerns surrounding continuity of medications.  They indicated that concerns surrounding expirations and untimely renewals were substantiated, but others were unsubstantiated upon review of inmates' health care records.

Staff indicated that CIM did not have a program for those serving life sentences.  To be considered for parole, these inmates were often required to participate in certain group programs regardless of whether these inmates were on the mental health caseload.  This drove up demand for access to these groups, which affected access for caseload inmates.

Referrals:

CIM reported that there were 2,779 referrals to mental health during the review period. These included four emergent referrals, 24 urgent referrals, and 2,751 routine referrals. Compliance rates for timely response were 75 percent for emergent referrals, 92 percent for urgent referrals, and 95 percent for the routine referrals.

Heat Plan:

The heat plan operational procedure was updated in April 2014.  Monthly heat plan activity reports were prepared and sent to the statewide heat plan coordinator.  Reports for

466

August, September, and October listed inside temperatures above 90 degrees as Stage I heat activations. Indoor temperatures reached 95 degrees or above on multiple days in facilities A, C, and D, with a high of 102 degrees, and were all inaccurately documented as Stage II heat activations. Medical records were documented for completed Stage III heat activations and indicated four heat-related incidents on September 16, 2014.

Interviewed inmates complained of improper implementation of the heat plan, particularly when indoor temperatures reached the heat-alert threshold. Provided documents corroborated these complaints, indicating inadequate implementation of the heat plan on Facility A.

Access to Care:

CIM's monthly health care access reports for August 2014 through January 2015 reported the following findings.

Data for August 2014 showed 80 percent of mental health ducats were completed. Among the non-completed ones, 73 percent were attributed to inmate refusals, 26 percent were attributed to other non-custody reasons, and one percent were attributed to custody reasons.

For September 2014, data showed that 82 percent of mental health ducats were completed. Seventy-five percent of non-completed ducats were attributed to inmate refusals, 23 percent to non-custody reasons, and two percent to custody reasons.

Data for October 2014 indicated a ducat completion rate of 80 percent. The non-completions included 68 percent due to inmate refusals, 29 percent due to non-custody reasons, and three percent to custody reasons.

For November 2014, 82 percent of mental health ducats were completed.  Of those not completed, 77 percent were attributed to inmate refusals and 23 percent were attributed to non-custody reasons.

In December 2014, 82 percent of mental health ducats were completed.  Break-down of the non-completed ducats indicated 70 due to inmate refusals, 29.5 percent due to non-custody reasons, and less than one percent due to custody reasons.

For January 2015, 78 percent of mental health ducats were completed.  Sixty-two percent of non-completed ducats were due to inmate refusals, 35 percent were due to non-custody reasons, and three percent were due to custody reasons.

Program Access:

a.    Job and Program Assignments:

Data for March 10, 2015 showed that one EOP inmate, 311 3CMS inmates, and 1,193 non-MHSDS inmates held jobs at CIM.  There were 128 3CMS inmates and 307 non-MHSDS inmates in part-time jobs.  No information was provided on whether jobs were paid or unpaid.

Eighteen 3CMS inmates and 43 non-MHSDS inmates had full-time academic assignments.  In the part-time academic program, there were 231 3CMS inmates and 540 non-MHSDS inmates.

In the full time vocational educational program, there were 65 3CMS inmates and 191 non-MHSDS inmates. There were 20 3CMS inmates and 48 non-MHSDS inmates in the part-time vocational education program.

The institution reported that as part of its re-entry program, 281 3CMS inmates and 531 non-MHSDS inmates were receiving substance abuse treatment.

b.     <u>Milestone Credits</u>:

CIM reported that for the period of August 1, 2014 to January 31, 2015, 21 EOP inmates were eligible to earn milestone credits, and 4.76 percent of them actually earned the credits. There were also 696 3CMS inmates eligible for milestone credits, 15.52 percent of whom actually earned the credits. Of the 1,248 eligible non-MHSDS inmates, 14.1 percent actually earned the credits.

c.     <u>Out-of-Level Housing</u>:

On February 18, 2015, one Level IV EOP inmate was in Level II housing. There were seven Level IV 3CMS inmates in Level II housing, and three Level IV 3CMS in Level I housing. Fifty Level III 3CMS inmates were in Level II housing. There were 19 Level II 3CMS inmates in Level I housing. Sixty-four 3CMS Level I inmates were in Level II housing.

d.     <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

The only information provided on CIM's ADA reasonable accommodation and grievance procedures was that there had been no revisions.

<u>*Coleman* Postings</u>:

No information on *Coleman* postings was provided at the time of the site visit.

**<u>California Rehabilitation Center (CRC)</u>**
May 12, 2015 - May 14, 2015

<u>Census</u>:

As of May 11, 2015, CRC housed a total of 2,388 inmates, for a 34-percent decline since the preceding monitoring period. The mental health caseload population was 1,136 inmates, an increase by 22 percent since the preceding monitoring period.

Two mainline EOP inmates were pending transfer. There were 1,133 mainline 3CMS inmates.  One 3CMS inmate was in the OHU.

Staffing:

The senior psychiatrist position was filled. Three of four psychiatrist positions were filled, for a 25-percent vacancy rate.

Both positions for supervising senior psychologists and one of the two positions for senior psychologist specialists were filled.  Seven of the nine psychologist positions were filled, for a 22-percent vacancy rate.  With two psychologists out on extended leave, the SNY was adversely affected by a shortage of PCs.

Seven of the nine social worker positions were filled, leaving a 22-percent vacancy rate.

The recreational therapist position and the HPS I position were both filled.

Of the seven clerical positons, six were filled, leaving a 14-percent vacancy rate.

Quality Management:

 The quality management committee met at least monthly during the review period. Minutes were maintained and a quorum was achieved at all meetings.  Discussion topics included mental health-related issues.

The mental health subcommittee met monthly during the reporting period.  Unlike during the preceding monitoring period, they were no longer combined with SPRFIT meetings. Minutes were maintained, but did not indicate whether a quorum was achieved at all meetings. Regular agenda items included review of mental health performance reports, mental health staffing, staff training, SPRFIT issues, mental health program-related audit results, health care access, and status of LOPs.   Regularly audited areas included effective communication, IDTT meeting attendance, OHU documentation, DSH referrals, and medication management.

470

No QITs were chartered during the review period.

No peer review was conducted during the review period.  Staff reported a planned implementation of the statewide peer review process in August 2015.

Medication Management:

Continuity of medications was compliant, except following intra-institutional transfers, for which the compliance rate was 75 percent for the months of November 2014, January 2015, and March 2015.

Response to inmate medication noncompliance was compliant except in cases of urgent referrals for inmates' no-shows and/or refusals of Clozaril, insulin, and HIV medications. Collectively, measures for response to inmate noncompliance with these three medication classes showed compliance rates of 40 percent for October 2014, 50 percent for November 2014, and 60 percent for December 2014.

Medication administration was compliant except for psychiatric chronic care medications, for which rates of compliance were 75 percent for November 2014, 70 percent for January and February 2015, and 85 percent for March 2015.

Laboratory testing of inmates' blood levels for certain psychotropic medications was 99-percent compliant.

Transfers:

There were no referrals or transfers to acute or intermediate inpatient levels of care during the review period.

Twenty-three inmates were transferred to outside MHCBs.  Fifteen or 65 percent of these were timely.  Late transfers were attributed to lack of MHCB availability.

All 39 placements into the OHU were moved out timely. Four of the five stays in alternative housing resulted in timely transfers to MHCBs.

No inmates were transferred to a PSU during the review period.

During the review period, there were four transfers of EOP inmates to an administrative segregation EOP hub, all of which were timely.

All five inmate transfers to mainline EOP programs complied with timeframes.

Other Issues:

OHU:

CRC maintained a ten-bed OHU. Mental health caseload inmates in the OHU were single-celled. None of the cells were suicide-resistant. Patients awaiting evaluations or transfers to MHCBs were placed on one-to-one observation. There were no seclusion and restraint rooms and no padded rooms in the OHU.

OHU mental health staff used a local form to track inmate placement, team conference(s), level of care, mental health contacts, discharge criteria, and disposition. The form also included an OHU checklist.

At the time of the site visit, a 3CMS inmate was housed in the OHU. PC contacts were conducted inside the cell, with a custody officers positioned outside of the cell door to provide security while maintaining patient privacy.

3CMS:

All initial psychiatric contacts for 3CMS inmates were conducted timely. Follow-up psychiatry contacts were 99.7-percent compliant for timeliness. All psychiatry contacts during the review period took place in private settings.

Initial PC contacts for 3CMS inmates were 86-percent compliant for timeliness. Follow-up contacts were 98-percent compliant. All PC contacts for 3CMS inmates during the review period took place in private settings.

The compliance rate for timeliness of initial IDTT meetings was 84 percent. Follow-up IDTT meetings were conducted timely 98 percent of the time. According to provided data, the compliance rate for attendance by required disciplines was 97 percent.

Clinician-led groups were offered on Tuesdays and recreation therapist-led groups were offered Tuesdays through Thursdays. Topics of offered groups included coping skills, healthy relationships, social skills, and leisure tasks.

Referrals:

According to data provided by the institution, the three emergent and six urgent referrals generated during the review period all received a timely response. However, as noted above, MAPIP data indicated that response to urgent referrals for no-shows/refusals of Clozaril was only 40-percent compliant for three months of the review period. Of the 749 routine referrals generated during the review period, 91 percent received a timely response.

Access to Care:

A review of CRC's monthly Health Care Access Quality Reports from October 2014 through March 2015 indicated that .15 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 7.53 percent were not completed due to non-custodial reasons other than inmate refusals.

Program Access:

a.    Job and Program Assignments:

473

Institutional data indicated that one full-time job was filled by an EOP inmate, 631 were filled by 3CMS inmates, and 662 were filled by non-mental health caseload inmates. There were no part-time jobs at CRC.

For full-time academic assignments, five were held by 3CMS inmates and three were held by non-mental health caseload inmates. Of the 525 part-time academic assignments, 271 were held by 3CMS inmates and 254 were held by non-mental health caseload inmates.

For voluntary education assignments, 564 were held by 3CMS inmates and 586 were held by non-mental health caseload inmates.

Of the 134 full-time vocational education assignments, 74 were held by 3CMS inmates and 60 were held by non-mental health caseload inmates. For part-time vocational education assignments, 21 were held by 3CMS inmates and 33 were held by non-mental health caseload inmates.

b.     Milestone Credits:

Information provided by the institution indicated that as of April 1, 2015, 21.6 percent of eligible 3CMS inmates and 31.88 percent of eligible non-mental health caseload inmates earned milestone credits. CRC did not have an EOP program.

c.     Out-of-Level Housing:

Institutional data indicated that as of April 23, 2015, there were 37 Level I 3CMS inmates and 40 Level III 3CMS inmates in Level II housing.

d.     ADA Reasonable Accommodation and Grievance Procedures:

CRC provided confirmation through training sign-in sheets, materials, and sample completed forms that the revised ADA accommodation and grievance procedures had been implemented.

474

Use of Force:

According to data provided by the institution, 89 percent of mental health clinicians and 94 percent of custody staff attended the mandatory use-of-force training.

*Coleman* Postings:

*Coleman* postings in both English and Spanish languages were found in all of the housing units toured by the monitor, including Facilities B, C, and D.  All postings were placed in common areas accessible to *Coleman* class members.

## Richard J. Donovan Correctional Facility (RJD)
April 21, 2015 – April 23, 2015

Census:

On April 20, 2015, RJD housed 3,022 inmates, which was eight percent fewer than during the preceding monitoring period.  The total mental health caseload population was 1,961, which was an increase by 54 or three percent since the preceding monitoring period.  There were three NDS inmates in administrative segregation.

Fourteen inmates were in the MHCB.  There were 313 inmates in the mainline EOP, 213 inmates in the SNY EOP, and 60 EOPs in the administrative segregation hub.  Three EOP inmates with SHU terms were pending transfer to a PSU.

There were 1,364 3CMS inmates.  Of these, 129 were 3CMS mainline, 1,160 in the SNY, and 75 were in administrative segregation.

Staffing:

As of April 22, 2015, the chief psychiatrist and two chief psychologist positions were filled.  One of the chief psychologists was designated as the chief of mental health.  All six senior psychologist specialist positions were filled.

475

Of the 16.5 psychiatrist positions, 16 were filled and one was out on long-term leave, for a functional vacancy rate of nine percent.  Twelve of the psychiatrists had designated caseloads and the remaining four were "floaters" to meet program needs, work in quality management, or cover in the MHCB during weekends, as needed.

The institution had 47.7 psychologist positions of which 43 were filled, for a vacancy rate of nine percent.  At the time of the site visit, four psychologists were on long-term leave, but the institution covered these positions with registry staff.

The supervising social work position and 22 of the 24 social work positions were filled. With three social workers out on long-term leave, the functional vacancy rate in social work was 13 percent.

There were 23.5 established recreational therapist positions, of which 17.7 were filled, leaving a vacancy rate of 21 percent.  Use of one registry recreational therapist reduced the functional vacancy rate to 16 percent.

The two senior psych tech positions and 34 of the 44.2 psych tech positions were filled. Use of three registry psych techs reduced the functional vacancy rate to 16 percent.

The institution had 23.5 mental health clerical positions, of which 12 were filled, resulting in a vacancy rate of 49 percent.  Use of 5.5 registry staff reduced the functional vacancy rate to 26 percent.

The sole OSS II, CHSA II, AGPA, and HPS I positions were all filled.

Quality Management:

Quality management activities continued to improve and made for an overall robust quality management program at RJD.

The local governing body met quarterly with appropriate attendance by required members. The minutes indicated that it took up review/approval policies and procedures and privileging issues, among other things.

RJD also had a health care quality management committee which dealt with some mental health-related matters.  It met monthly, with attendance by all required disciplines.  Covered matters included reports from each clinical discipline, dashboard/PIWG data, specialty services, OHU placements, performance improvement plans, and revisions to LOPs.

Meetings of the mental health subcommittee took place monthly and were attended by required disciplines.  The committee's work included EOP treatment hours, custody wellness checks, clinical contacts, MAPIP results, IEX incidents, QITs, performance reports, and the RVR process.

The mental health program at RJD conducted regular audits for quality management and quality improvement purposes.  They were in addition to audits of the sustainable process for identifying and referring inmates to higher levels of care and the process for certification of the administrative segregation EOP hub. The mental health subcommittee was responsible for implementation and monitoring of any corrective actions which resulted from the mental health program audits.

The institution also implemented a comprehensive performance improvement work plan that was based on a primary care model.  It focused on access to care, continuity of care, medication management, chronic pain management, and the grievance process.  Another project evaluated the MAPIP process.  It held regular meetings among mental health, nursing, and pharmacy staff and reported to institutional leadership and CDCR headquarters.  CAPs were created for medication management areas that were less than 90-percent compliant.

477

Each week, a QIT looked at specified performance indicators including appointment cancellations due to custody issues, readmissions to the MHCB and DSH within 30 days of discharges, MHCB clinical lengths of stay, alternative housing stays, continuity of psychiatric care, timeliness of mental health referrals, and EOP treatment hours offered.

Staff were trained on the new peer review process but it was not yet implemented consistently with the new model developed by CDCR central office.

Medication Management:

According to MAPIP data, RJD's overall compliance rate in the area of continuity of medications following patient transfers was 65 percent.  Continuity of medications for newly-arriving inmates at the institution was 44-percent compliant. Following discharges from the MHCB, medication continuity was 90-percent compliant, but after discharges from a DSH inpatient program or a community hospital, continuity was 59-percent compliant.  For inmates transferred to locked units, continuity of medications was 80-percent compliant. Continuity of NA and DOT medications following intra-institutional transfers and releases was 52-percent compliant.

For psychiatric chronic care medications, the compliance rate for medication administration was 18 percent, and for newly-ordered psychiatric medications it was 20 percent.

Patient compliance with psychiatrist-prescribed medications was 93-percent compliant overall, with a compliance rate of 97 percent for PC 2602 medications.

For cases of refusals and no-shows, the compliance rate for referrals for urgent medications, including Clozapine, was 42 percent.

Laboratory testing of blood levels for inmates taking psychotropic medications was 98-percent compliant.

478

Continuity of medications for paroling inmates was 86-percent compliant.

Transfers:

The institution continued to have a full-time DSH coordinator.  The referral and non-referral logs were complete and contained all necessary data.  Reasons for the non-referrals were clinically adequate.  It was reported, and verified by data review, that referral packets were completed timely by the institution, but once the packets were sent to health care services at CDCR headquarters, transmission of the packets to DSH was delayed, due mostly to case-by-case reviews.

A total of 535 inmates were identified as meeting one or more indicators for consideration for DSH referral.  Of these, RJD referred a total of 95 or 18 percent to DSH inpatient programs.

Sixty-three inmates were referred to acute inpatient care during the review period.  Two were rescinded and the remaining 61 were transferred.  Forty went to DSH-Stockton and 21 went to acute care at VPP.  Three or five percent of referral packets were not completed within Program Guide timeframes.  The average time from referral to transfer was ten days.  Twenty-nine or 39 percent of acute care referrals were transferred later than the ten-day time limit, with a range of 12 days to 26 days.  Eight or 13 percent of referrals were not transferred within 72 hours of bed assignment, but all transferred within 96 hours.

Thirty-two inmates were referred to intermediate inpatient care.  Three were rescinded. Of the 29 who transferred, 11 went to DSH-Stockton, 15 went to Salinas Valley Psychiatric Program (SVPP), three went to ASH, one went to VPP, and two were deferred to DSH-Stockton-Acute Care and VPP acute care.  Sixteen or 55 percent of referral packets were not completed

within Program Guide timelines.  Of the 29 patients who transferred, 27 or 93 percent,

transferred within the 30-day time limit, with an average transfer time of 24.75 days.  The two

late ones transferred on day 31 and after day 60, respectively.  Two or seven percent of patients

did not transfer within 72 hours of bed assignment.

At the time of the site visit, there were nine patients who had been accepted to a DSH

inpatient program and were awaiting transfer.  Two patients designated for intermediate care and

one patient designated for acute care were scheduled to transfer by the end of the site visit.

Another three patients were awaiting transfer to intermediate care, which was still within

Program Guide transfer time limits.  Of the three additional patients awaiting transfer to acute

care, one had been referred by the IDTT on April 10, 2015 and was number 24 on the waitlist.

The other two were referred by the IDTT on March 16 and March 18, 2015 and were numbers 35

and 40, respectively, on the waitlist.

The DSH coordinator reported that the institution was notified timely when patients were

returning from DSH and that discharge summaries were posted timely on SharePoint.  The DSH

coordinator ensured that the appropriate discharge paperwork was completed and that discharges

complied with policy.  The coordinator arranged, tracked, and reported DSH clinician-to-RJD

clinician contacts for all inmates discharged back to RJD.  Reported audit data indicated that 80

percent of discharges had clinician-to-clinician contacts, although the audit sample consisted of

only five cases.

Data indicated that 159 RJD inmates went to outside MHCBs.  The average transfer time

was 24 hours, with a range of 1.53 to 95.33 hours.  Transfers of 57 or 36 percent of patients took

longer than 24 hours and averaged 43.28 hours in duration.  They were attributed to lack of

available MHCBs.

A document detailing alternative housing stays indicated that of 259 inmates placed in alternative housing during the review period, 140 were transferred to an outside MHCB, 101 were placed in a crisis bed at RJD, and 18 were transferred to housing units. Data in the document also indicated a compliance rate of 64 percent for transferring inmates out of alternative housing within Program Guide timeframes. The average stay lasted .928 days. Overdue stays exceeded timeframes by one hour to 6.75 days.

All four transfers of inmates to a PSU during the review period were completed within 60 days of endorsement.

RJD reported 100-percent compliance with transfers of inmates to EOP hub institutions within 30 days of identification.

Other Areas:

Administrative Segregation EOP:

The EOP administrative segregation hub was certified in August 2014. No further CQIT reviews had been conducted as of the time of the site visit. Treatment was provided in Housing Unit 6 on the dayroom floor. Only the IDTT meeting room in Unit 6 offered patient privacy. Individual psychiatry and PC contacts and crisis interventions were provided in shared cubicles. The three group treatment areas were holding cells with sound-proof backing that accommodated up to nine inmates. Treatment modules on the dayroom floor were used for group treatment for EOP and 3CMS inmates. Staff indicated that a treatment building for the administrative segregation EOP hub was planned in the HCFIP, with a projected completion date of May 2016.

The sole psychiatrist in administrative segregation had a caseload of 72 patients. The hub had eight assigned PCs, including one who had additional assignments and one who was part-time. The six full-time PCs and the one who had multiple assignments had caseloads of seven to

481

nine patients, and the part time clinician had a caseload of five patients.  One hub PC was on leave during the site visit.

During the review period, the compliance rate for timely completion of pre-placement screens was 70 percent.  A CAP to improve compliance levels was implemented and reportedly had resulted in compliance by the time of the site visit.  The compliance rate for timely completion of the 31-question screen was 97 percent. Data was unavailable on timeliness of completion of the comprehensive evaluations and the comprehensive mental health assessments before initial IDTT meetings.

Ninety-one percent of inmates prescribed psychotropic medication were seen by a psychiatrist every 30 days.  Eighty-nine percent of these contacts were out-of-cell. Compliance rates for timeliness of initial and follow-up PC contacts were 92 percent and 100 percent, respectively.  Sixty-five percent of PC contacts were out-of-cell.

Initial and follow-up IDTT meetings remained timely, with compliance rates of 97 percent and 100 percent, respectively.  Nearly all inmates who refused treatment were given monthly IDTT meetings.  The rate of attendance by required disciplines was 98 percent.  In five of the six meetings without full attendance, the CC was absent.  At an observed ICC meeting during the site visit, the psychologist provided good mental health input.

On average, EOP inmates in the hub were offered 17.97 hours per week of out-of-cell structured therapeutic activities. All inmates were offered five or more hours of treatment, and 1,216 of 1,235 or 98 percent of inmates were offered ten or more hours.  Sixty-one percent of inmates attended ten or more hours, and 86 percent attended five or more hours.  The treatment refusal rate was 38 percent. A small percentage of inmates were on a modified treatment program during the review period, and at the time of the site visit, eight EOP inmates were on it.

Most of the inmates on modified treatment were receiving five to ten hours per week of out-of-cell structured therapeutic activities.

During the review period, the average length of stay in administrative segregation was 56 days for EOP hub inmates, 51 days for 3CMS inmates, and 52 days for general population inmates. The range of stays for mental health caseload inmates was 39 to 170 days for EOP inmates and 39 days to 512 days for 3CMS inmates.

From September 2014 through February 2015, approximately 36 percent of EOP inmates remained in administrative segregation longer than 90 days. This was an increase over the 32-percent rate that was reported for the preceding monitoring period. Provided documentation indicated that 30-day reviews were being completed for these inmates.

The institution maintained a tracking log that included the inmate's placement date, days in the hub, reason for placement, reason for retention, and date and actions of the most recent ICC meeting. Each month, the CC II reviewed the length-of-stay data from COMPSTAT, updated the tracking log, and forwarded it to the facility captain for review. The CC II and the facility captain contacted the necessary parties for follow-up on completion of items required for moving the inmate out of the hub. After the captain's review, the information was forwarded to the associate warden and then to the warden for review and signature. A report was then emailed to CDCR Headquarters.

Review of three months' data showed that nearly half of cases in which EOP inmates were held in the hub longer than 90 days were due to waits for available SNY beds. Other reasons included pending PSU transfers, investigations by staff, and ICC meetings. No cases were pending CSR review at the time of the site visit.

483

RJD conducted prioritized case-by-case reviews for all mental health caseload inmates housed in administrative segregation longer than 150 days.  Beginning in December 2014, each week the CC II reviewed COMPSTAT data to identify and track any EOP inmates whose stays exceeded 150 days.  Any inmate needing an ICC meeting would be scheduled for a case-by-case review.  If his casework were complete and he was pending transfer, his case would be scheduled for a long-term case conference with the DAI associate director at CDCR headquarters.  At these conferences, RJD custody staff provided reasons for the inmate's placement and retention in administrative segregation, and mental health staff provided information on the inmate's mental health status and treatment needs.

At the time of the site visit, there were four EOP inmates and nine 3CMS inmates whose stays in administrative segregation exceeded 150 days.  Case-by-case reviews were conducted. The monitor's review of the ten who had the longest stays found that two were due to the occurence of additional serious RVRs while in the hub.  A case teleconference with the DAI associate director was scheduled for the week after the site visit, when nine of the 13 cases were scheduled for discussion.  Two were follow-ups from prior case conferences and the remaining seven were initial case conferences.

Twelve inmates in two group settings were interviewed.  They confirmed being offered at least ten hours of out-of-cell structured therapeutic activities per week, and another ten hours of outdoor recreational time which included about 3.5 hours of structured recreational activity. They described these offerings as helpful in addition to the weekly individual clinical contacts with their PC. They reported lack of privacy in the locations of their group and individual treatment and excessive use of force by COs.  Mental health staff dismissed the reliability of these reports about correctional staff.

484

Staff reported that crank radios were available to inmates during their first 21 days in administrative segregation.  Several of the interviewed inmates expressed concern about having to forfeit the radios at the end of the three-week period.  It was reported that inmates could purchase a crank radio for $38.00.

<u>3CMS Inmates in Administrative Segregation</u>:

3CMS administrative segregation inmates lived in Housing Units 6 and 7.  Unit 7 also housed non-mental health caseload inmates.  Inmates were seen for treatment in the housing units in which they lived.

The administrative segregation 3CMS program had three assigned clinicians who had caseloads of 22 to 26 inmates. Individual clinical contacts were provided with use of four therapeutic modules in a non-private setting.

Ninety-eight percent of inmates prescribed psychotropic medications were seen timely by a psychiatrist. Seventy-eight percent of psychiatry contacts were out-of-cell.

Completion of initial and follow-up PC contacts was 99-percent compliant during the review period.  Fifty-eight percent of these contacts were out-of-cell.  Each PC in Unit 7 had a dedicated cubicle and holding cell for individual contacts and crisis interventions, but they were not private settings.

 At the time of the site visit, all IDTT meetings for EOP and 3CMS inmates in administrative segregation were conducted in a private setting in a conference room in Housing Unit 6.  Compliance rates for timeliness of initial and follow-up IDTT meetings were 99-percent and 100-percent, respectively.  The compliance rate for attendance by required disciplines declined to 89 percent, due largely to psych tech absences.  An observed IDTT meeting was attended by all required disciplines.  Discussions were informed by UHRs and C-files that were

485

available through SOMS & ERMS, and were clinically meaningful. Data on the percentage of initial IDTT meetings held before initial ICC hearings was unavailable.

Unit 7 had no group treatment areas, and consequently no groups were provided for 3CMS inmates there. On average, one group per week was provided for 3CMS inmates in Unit 6. However, when the EOP hub population was elevated, group offerings to 3CMS inmates were curtailed.

RJD did not have an STRH in its stand-alone administrative segregation units, an LTRH/SHU unit, or a reception center STRH. The process of transferring 3CMS inmates to an LTRH or STRH had not yet begun during the review period.

On March 2, 2015, RJD amended its OP No. 1 regarding unclothed body searches of inmates. The institution provided documentation of administrative segregation staff training on the implementation of DOM §52050.16.6 regarding such searches.

During February and March 2015, nine inmates were evaluated jointly by custody and mental health staff because of their refusal of 50 percent of offered treatment in a two-month period. Review of sample evaluations indicated that these inmates' custodial, mental health, and personal issues affecting their refusals were being considered, and that plans to address the identified concerns were being documented.

Non-Disciplinary Segregation:

As of April 17, 2015 there were 11 NDS 102 inmates, meaning they were not under consideration for expedited transfer. There were also three NDS 200 inmates, meaning they were accorded accelerated transfer status. Stays for the three NDS 200 cases exceeded 72 hours because of enemy concerns. As of April 23, 2015, one was transferred, one was referred to

HCPOP as "difficult to move," and the third was being discussed with staff at CSP/LAC for possible transfer.

Staff indicated that following the weekly ICC meeting, the CC II was responsible for emailing notice of any NDS cases to the administrative segregation captain and the C&PR. New cases were then added to the administrative segregation facility captain, who reviewed and updated the report twice per week. The CC II, C&PR, and facility captain utilized this to expedite transfers of these inmates whenever possible.

MHCB:

RJD had 14 MHCBs plus two swing beds for mental health use, depending on need. Patients in the MHCB were from RJD and other institutions via HCPOP. The MHCB clinical team shared an office just outside of the CTC. The only private space was a room used for IDTT meetings and clinical contacts. The outdoor yard was also used for clinical contacts as well as for outdoor recreation.

The two psychiatrists assigned to the MHCB had caseloads of nine and six patients, respectively. The three assigned psychologists/PCs had caseloads of three to five patients each and together with the assigned social worker they made up the MHCB clinical team. The clinical director was a senior psychologist specialist. All worked under the direction of the chief psychiatrist.

All new admissions received a history and physical within 24 hours, a new or updated mental health assessment (Form 7386), and an SRE if admitted for suicidal behavior.

Psychiatrists made timely clinical contacts at least twice per week, and usually daily, in 100 percent of cases. Patients received clinical contacts with a psychologist twice per week in 98 percent of cases.

Initial IDTT meetings were conducted for 99 percent of newly-admitted inmates within 72 hours of admission.  Follow-up IDTT meetings were conducted at least weekly, with updating of treatment plans and consideration of referral to higher levels of care.  All required staff reportedly attended IDTT meetings.  At three observed IDTT meetings, all required participants and two of the three inmates were present. There was good interdisciplinary discussion among staff except the CC I, even when input from the CC I might have been helpful.

Recreation therapy in the CTC outdoor yard was available to MHCB inmates individually about a twice per week during the review period. Similar to offers for medical inmates in the CTC, the LOP had recently been revised to allow for group recreational therapy in the yard for up to six inmates at a time.  Other out-of-cell time consisted of individual clinical contacts.

From September 15, 2014 to March 15, 2015, there were 213 MHCB admissions among 167 different inmates.  One inmate had five admissions, two had four, and 13 had three.  The daily census ranged from 12 to 14.  The average length of stay was 11.6 days, but nearly half of admissions stayed longer than ten days.  Sixty percent of stays exceeding ten days were attributed to waits for DSH beds, 32 percent were due to needed additional time to clinically stabilize, and seven percent were due to PC2602 hearings.  One to two extra days for clinical stabilization were found to be effective for reducing readmissions. Once patients were clinically discharged, their stays were not extended by administrative delays.

<u>Seclusion and Restraint</u>:

Restraints were used for mental health reasons on five occasions.  The longest duration was seven hours.  Four inmates were placed in seclusion but the durations were unclear from the seclusion log.  Audits indicated compliance with Program Guide requirements concerning

property, bedding, and timely appropriate review and relaxation of mechanical restraints and restrictions on movement.

Alternative Housing:

RJD did not have a MHOHU or an OHU. Alternative housing for non-SNY inmates was located on Facility A in Cell 28 of Housing Unit 1 and on Facility C in cell 128 in Housing Unit 15. For administrative segregation unit inmates, or when the above-referenced cells were unavailable, alternative housing was provided in cells 123-128 and 222-229 in administrative segregation Housing Unit 6. Additional cells were used according to the policy memorandum and the Program Guide. The average length of stay in alternative housing was .928 days.

All inmates in alternative housing were placed on one-to-one monitoring. Treatment was reported to include daily contact with the PC and contact with the psychiatrist as clinically indicated. Inmates on A or C Yards were sometimes seen for treatment in a private setting in the treatment building and at cell front for other contacts. Inmates in administrative segregation were sometimes seen in a treatment module and at cell front. There was coordination with HCPOP and custody to facilitate efficient transfers to MHCBs at RJD or elsewhere within CDCR.

EOP:

Mainline EOP inmates were housed on Facility A. Unit 14 was being used for EOP overflow, but staff reported that it was scheduled to be designated as an EOP SNY yard as of May 1, 2015. The two psychiatrists assigned to the mainline EOP program had caseloads of 140 and 143 patients, respectively. Institutional data indicated that the mainline EOP had 15 assigned PCs, including ten whose caseloads ranged from 25 to 27 patients, and three who had additional

489

assignments and caseloads ranging from eight to 11 patients.  There were also two post-doctoral psychology interns who had caseloads of eight patients.

SNY EOP inmates were housed in Unit 15 on Facility C.  Two psychiatrists assigned to the SNY EOP had caseloads of 136 and 129, respectively, with the latter including some mainline 3CMS patients.  The SNY EOP had ten assigned PCs, including eight whose caseloads ranged from 22 to 24 patients, plus two who had other assignments and had caseloads of nine and 14 patients, respectively.  In addition, the SNY EOP had one intern who saw one patient, and one clinician who had other assignments and treated two EOP SNY patients.

The institution reported that there were 10,056 total psychiatry contacts during the review period.  Of the total 282 initial psychiatry contacts for EOP inmates, 246 or 87 percent were timely.  Of the 9,774 routine psychiatry contacts, 8,236 or 84 percent were timely.

However, the institution also reported that EOP inmates received a total of 4,267 psychiatry appointments for all mental health services during the review period.[46]  Among these 4,267 reported appointments, 3095 or 91 percent took place in private out-of-cell settings and 218 or five percent took place in non-private out-of-cell settings.  Among the reasons for cell-front psychiatry contacts, 21 were due to unspecified reasons, 15 were due to staff decision, 84 were due to inmate refusals, 24 were due to modified programming, and one was due to lack of escort.

---

[46]This inconsistency in reported data may be due to differences between staff's data entries of 10,056 appointments with regard to the details of these psychiatry contacts themselves, and their entries with regard to the numbers of psychiatry contacts in various settings, i.e. out-of-cell, private versus non-private settings, etc.

Provided data indicated that 99 percent of initial PC contacts and 93 percent of follow-up PC contacts were timely.  Institutional data indicated that for the total 28,321 PC contacts for all mental health caseload EOP inmates, 17,140 or 61 percent took place in private out-of-cell settings, and 7,504 or 26 percent took place in non-private out-of-cell settings.  Among the reasons for cell-front PC contacts, 107 were due to unspecified reasons, 2,810 were due to  staff decision, 593 were due to inmate refusals, 65 were due to modified programming, and 12 were due to lack of escort.

The number of total IDTT meetings for all mental health services was 11,977.  Of the total 364 initial IDTT meetings during the review period, 356 or 98 percent were timely.  Over 99 percent of the 11,613 follow-up IDTT meetings were compliant for timeliness.  Meetings were attended by a full complement of required disciplines in 97 percent of cases.

EOP inmates were offered an average of 12.2 hours of group per week.  Inmates attended an average of 7.23 hours per week and refused an average of five hours per week.  An average of 3.05 hours of scheduled treatment was cancelled.  Inmates on modified treatment plans were offered an average of 9.23 hours of group therapy per week, attended an average of 4.10 hours per week, and refused an average of 5.15 hours per week.  An average of 1.96 hours of their scheduled group treatment was cancelled.

IDTT meetings for EOP mainline and the SNY EOP were observed.  Overall, the meetings were conducted well.  All began timely and were attended by required staff and the inmates. The PCs were knowledgeable about the inmates' histories, treatment plans, and goals. They presented and discussed treatment plans, although only one of the PCs presented treatment goals that were measurable.  The psychiatrist was engaged and knowledgeable about the inmates' medication compliance and answered all questions from inmates and other team

491

members. Medication side effects were discussed.  Recreation therapists, psych techs, and correctional counselors all participated in team discussions without prompting. Inmates and team members were asked if they had any questions before meetings were adjourned.

Review of data for January through March 2015 indicated that among 83 cases, 48 or 58 percent of ICCs and UCCs were conducted within timeframes and 35, or 42 percent, were outside of timeframes.  Custody staff attributed the lateness to staffing shortages in the EOP SNY overflow building.

RJD established a process to track and maintain a list of inmates deemed at high risk of decompensation.  At the time of the site visit, approximately 58 inmates on A-yard, 30 on B-yard, and 30 on C-yard were on the list.  Each month, the coordinator walked the tiers and had face-to-face contacts with the inmates, and met weekly with clinicians to discuss concerns. Staff reported receiving useful input from nursing and custody on observed changes in inmates' behaviors.  Inmates on the list received additional weekly clinical contacts and monthly IDTT meetings.

Interviewed inmates reported that they knew their psychiatrist and PC and that the mental health program was beneficial.  There were concerns about late arrivals at groups because of custody escort issues. About half of interviewed inmates indicated that even if they had ducats, they might not be taken to a mental health appointment because they were not on a list. There were reports of lost property following changes of yard or level of care, and that some housing officers lacked awareness of the impact of mental illness on prisoners and were sometimes disrespectful to inmates.  Inmates expressed a need for groups to assist them with developing skills to function in the community after being released.   They also expressed concerns about

remaining on orientation status longer than designated timeframes and thereby being deprived of certain privileges.

3CMS:

Although issues persisted with contacts in non-private settings due to physical plant limitations, treatment for 3CMS inmates was generally consistent with Program Guide requirements.

Data was not available regarding whether intake assessments were completed within ten working days or whether intake evaluations were completed before initial IDTT meetings, but it was reported that timeframes were met.

The psychiatrist in the mainline 3CMS program had an assigned caseload of 228 inmates. Approximately 99 percent of 3CMS inmates taking psychotropic medications were seen at least quarterly by the psychiatrist.

In the 3CMS program, the two assigned clinicians had caseloads of 126 and127 inmates, respectively. In approximately 95 percent of cases, 3CMS inmates were seen by their PCs at least quarterly during the review period.  According to information obtained from staff and inmates, a significant portion of 3CMS inmates were seen more frequently for clinical reasons.

The Facility-A mental health building had private office space for psychiatrists and PCs assigned to 3CMS inmates on A-yard.  Facility-B had two offices for PCs and one for a psychiatrist, but for safety reasons the doors could not be closed.  In Facility-C, a trailer on the yard housed four PC offices and two psychiatry offices.

Nearly 100 percent of initial IDTT meetings were held within 14 working days of inmates' referrals/arrivals.  Ninety-eight percent of IDTT meetings were attended by all required disciplines.

493

Fifty-six groups were offered to 610 different mainline 3CMS inmates during the review period. Inmates described their group treatment as a helpful process, although long wait lists made it difficult to access groups. They confirmed that their clinical contacts with psychiatrists and PCs were generally helpful and that they had good access to them. However, inmates also described interactions with custody staff that were problematic.

The C-Yard 3CMS SNY program had three designated PCs with caseloads of 123, 147, and 150 patients, respectively. An additional clinician with other assignments provided services to 25 patients in the program. In the B-Yard 3CMS SNY program, two clinicians had caseloads of 148 and 152 inmates, respectively. In the D-Yard 3CMS SNY program, PCs' caseloads ranged from 115 to 147 inmates.

Mental Health Referrals:

RJD had a reliable system for tracking response to mental health referrals. During the review period, RJD staff responded to 60 emergent referrals, 86 urgent referrals and 384 routine referrals, with compliance rates of 100 percent, 97 percent, and 94 percent, respectively, for timeliness.

MHTS.net:

The institution made effective use of MHTS.net for quality management/improvement purposes. The dashboard was utilized efficiently. There were some isolated instances of erroneous data entry, but staff corrected the errors at the time of the site visit.

Mental Health/Custody Relations:

Mental health staff generally described relationships with correctional staff as good. However, inmates reported consistently across programs that COs harassed them and interfered with mental health services.

494

Heat Plan:

EOP Units 1 and 2 on A-yard, Unit 6 on B-yard, and Unit 15 on C-yard were monitored for the presence of working thermometers.  All had thermometer sensors hanging from the ceilings on the second floor, and all thermometers were in working condition.

Monthly reports were sent to CDCR headquarters.  The reports for July and August 2014 indicated that there was no weekly list of heat-risk patients, but the litigation coordinator showed the monitor that the lists had in fact been generated for those months.  It was unclear whether the report indicated that the list was generated or whether it was sent to the units.

Documentation indicated that on at least two occasions when a Stage II alert was activated, there was insufficient ice for all inmates on heat-risk medications in one unit, and that ice was not delivered to all inmates in another unit because the count had not been cleared.

RJD produced an addendum to its LOP no. 54 providing mental health caseload inmates with continued access to programs, services, and activities during extreme hot weather conditions.  This would include modified yard times, night yard, additional dayroom program opportunities, and other recreation programs.

RVRs:

SHOs received a two-hour training on mental health assessments that was co-instructed by clinical and custody staff.

Use of Force:

Formal training on the new use-of-force policies remained ongoing.

Construction:

Staff reported that the infill project at RJD was scheduled for completion in March 2016. It consisted of three units that will house 792 inmates and will have a perimeter fence separate

495

from the institution. One will be designated for 264 Level II EOP inmates and divided into four wings with dormitory-style living arrangements with six inmates per room. Group rooms and clinicians' offices will be located within the unit, with additional treatment space in an adjacent building.

The HCFIP EOP project to provide four group treatment rooms, 11 interview rooms, and clinicians' offices was under construction on B-yard within the existing perimeter. Completion was projected for May 2016.

Program Access:

a.    Job and Program Assignments:

There were no full-time academic work training assignments at RJD. Of the 205 part-time academic positions, 194 or 90 percent were filled by non-mental health caseload inmates, two or one percent were filled by 3CMS inmates, and nine or five percent were filled by EOP inmates.

There were 116 full-time vocational education positions. Of these, 84 or 72 percent were filled by non-mental health caseload inmates, 23 or 20 percent were filled by 3CMS inmates, and nine or eight percent were filled by EOP inmates. Of the 51 part-time vocational education positions, 37 or 78 percent were filled by non-mental health caseload inmates, four or eight percent were filled by 3CMS inmates, and ten or 20 percent were filled by EOP inmates.

Thirty-eight inmates participated in part-time programs to address substance abuse. Twenty-three or 60 percent were non-mental health caseload inmates, five or 13 percent were 3CMS inmates, and ten or 27 percent were EOP inmates.

Of the 1,581 full-time job assignments, 1,026 or 65 percent were filled by non-mental health caseload inmates, 522 or 33 percent were filled by 3CMS inmates, and 33 or two percent were filled by EOP inmates.

b.     Milestone Credits:

RJD reported that a total of 486 inmates were eligible for milestone credits.  Of those eligible, 229 or 47 percent were non-mental health caseload inmates, 166 or 34 percent were 3CMS inmates, and 91 or 19 percent were EOP inmates. Of those inmates eligible for milestone credits, 14.85 percent of non-mental health caseload inmates earned credits, 5.42 percent of 3CMS inmates earned credits, and 5.49 percent of EOP inmates earned credits.

c.     Out-of-Level Housing:

One Level IV and 11 Level III 3CMS inmates were in Level I housing, as were one Level IV and 16 Level III EOP inmates.

There were two Level IV 3CMS inmates, 227 Level III 3CMS inmates, 140 Level III EOP inmates, and 13 Level IV EOP inmates in Level II housing.

In Level III housing, there were 34 Level IV 3CMS inmates and 23 Level IV EOP inmates.

Level IV housing had 57 Level III 3CMS and 12 Level III EOP inmates.

d.     Periodic Classification Score Reductions: EOP Inmates:

The institution produced sample classification score sheets which indicated that inmates' classification scores were being reduced based upon program completion.

*Coleman* Postings:

Monitors' tours of five EOP units found that all five units had *Coleman* postings in visible locations.  There were three postings, dated March 2, 2015, that were 8.5 by 11 inches.  The other two postings, dated June 2010, were larger.

**Ironwood State Prison (ISP)**
February 26, 2015

Census:

As of February 25, 2015, ISP housed a total of 3,138 inmates, for a nine-percent decline since the preceding monitoring period.  The administrative segregation unit held 148 inmates.  There were 33 inmates on the mental health caseload, all at the 3CMS level of care.  One was in administrative segregation and the remainder were in mainline.

Staffing:

Positions for the chief psychologist, the psychiatrist, four psychologists, the senior psych tech, and the HPS I were all filled.  One of the psychologists had been on an extended leave for over three months before the institution was able to cover the position with a contract psychologist.  Two of the 5.3 psych tech positions were filled, for a 62-percent vacancy rate.  Of the three clerical positions, two were filled.

Quality Management:

The combined ISP and Chuckawalla Valley State Prison (CVSP) quality management committee met semi-weekly, with a quorum present at all meetings.  Minutes of meetings were consistently maintained and produced.  Agenda items included changes to policies, training issues, results of Tests of Adult Basic Education (TABEs), staff recruitment and retention, mandatory random urine testing of inmates, ambulance guidelines, need for staff exit interviews, and space issues.

The institution continued its combined monthly mental health subcommittee/SPRFIT meetings with its SPRFIT meetings through October 2014, and thereafter conducted them as separate meetings. A quorum was reached at half of the meetings. Standing agenda items included MHCB transfers, RVRs, mental health audits, transfers of mental health caseload inmates, and mental health staffing.

There were no QITs during the review period.

Because ISP had only one psychiatry staffing allocation, there was no peer review for psychiatrists. Peer review for psychologists was conducted monthly. In the course of the peer review process, it became apparent that a number of records were missing initial progress notes and Forms MH-3 and MH-5. Staff reported that this issue was added to the mental health subcommittee's agenda for resolution.

Medication Management:

Medication continuity following inmate transfers was noncompliant. CAPs were specific but not sustainable, even though multiple trainings were done during the review period.

Follow-ups on medication refusals or no-shows were noncompliant from July through December 2014. Laboratory testing of blood levels of inmates prescribed psychotropic medications was compliant. No inmates were on involuntary medication orders.

Transfers:

There were no referrals or transfers to acute or intermediate inpatient levels of care during the review period.

All inmates requiring placement in an MHCB were placed in the institution's 14-bed OHU while awaiting transfer. There were 34 MHCB transfers, 11 or 32 percent of which were timely. Late transfers were attributed to lack of bed availability.

499

No inmates were transferred to a PSU during the review period.

According to provided data, both of the transfers of inmates to EOPs during the review period were timely.

The sole transfer of an EOP inmate to an administrative segregation EOP hub was late by three days. Lack of an available bed was cited as the reason for the delay. No inmates were pending transfer to a hub at the time of the site visit.

Of the 94 transfers to 3CMS programs during the review period, 86 or 92 percent were timely. Delays were attributed primarily to lack of bed availability. There was one erroneous transfer of a 3CMS inmate to ISP during the review period.

Other Areas:

Alternative Housing:

During the review period, ISP maintained a 14-bed OHU in which mental health patients were reportedly given priority over medical patients. At the time of the site visit, one 3CMS inmate was on suicide precaution in the OHU and scheduled for discharge after a 20-hour stay.

Staff reported that all inmates in the OHU had access to yard. Office space was designated for private contacts with PCs, psychiatry, and other clinical staff. In January 2015, the PIA took over janitorial services and cells were observed to be clean. Logs were in order.

3CMS:

It was reported that 3CMS inmates at ISP during the review period received timely initial and follow-up IDTT meetings, but no corroborating data was provided. No information with respect to psychiatry and PC contacts was provided.

MHDSDS Inmates in Administrative Segregation:

500

It was reported that all psychiatry and PC contacts in the administrative segregation unit were conducted in private settings and that IDTT meetings were held timely. It was also reported that clinical and custody staff worked collaboratively on provision of mental health services in the unit.

At the time of the visit, the sole 3CMS inmate housed in administrative segregation was not prescribed any medications and did not report any mental health concerns.

Referrals:

According to data provided on site, 18 or 69 percent of the 26 emergent referrals during the review period drew a timely response. There were 66 urgent referrals, of which 44 or 67 percent resulted in a timely response. For the 682 routine referrals generated during the review period, 516 or 76 percent resulted in a timely response.

The institution reported that its ability to achieve compliance in this area was hindered by lack of sufficient staff to complete referrals in a timely manner. In addition, the vacancy of one of the three office tech staffing allocations impeded necessary scheduling within the process. Staff reported that mental health referrals in connection with evaluations of inmates returning from out-of-state facilities comprised the majority of emergent and urgent referrals, but existing staffing levels could not keep up with this demand.

Heat Plan:

ISP was compliant with implementation of the heat plan. The pharmacy generated for distribution a list of inmates on heat-risk medications. A review of monthly heat plan summary reports submitted to headquarters indicated 92 Stage I alerts and no Stage II or III alerts from July through October, 2014. There were no heat-related incidents during the review period.

Use of Force:

ISP reported that 100 percent of custody and mental health staff had been trained on the new policy and procedure on use of force. Attendance records for staff training sessions were provided as proof of practice.

Program Access:

a.     Job and Program Assignments:

Institutional data indicated that 1,376 full-time jobs were filled by non-MHSDS inmates and two jobs were filled by 3CMS inmates. There were no part-time jobs at ISP.

For part-time academic program assignments, 512 were held by non-MHSDS inmates and one was held by a 3CMS inmate. There were no voluntary academic program assignments at ISP.

All 158 full-time vocational education program assignments were filled by non-MHSDS inmates, as were all 85 part-time vocational education program assignments.

All four substance abuse treatment program assignments and all 203 re-entry substance abuse treatment program assignments were held by non-MHSDS inmates.

b.     Milestone Credits:

Information provided by the institution indicated that during the review period, 30.11 percent of non-MHSDS inmates and 16.67 percent of eligible 3CMS inmates earned milestone credits. ISP did not have an EOP.

c.     Out-of-Level Housing:

Institutional data indicated that on February 4, 2015, one Level I inmate, six Level II inmates, and one Level IV 3CMS inmates were in Level III housing.

*Coleman* Postings:

502

Coleman postings in both English and Spanish were found in all buildings, including the SNY yards and the administrative segregation unit, toured by the monitor. All postings were placed in common areas accessible to *Coleman* class members.

### Calipatria State Prison (CSP)
February 23, 2015

Census:

On February 20, 2015, Calipatria housed 3,711 inmates, for a four-percent decline from the census of 3,852 on June 30, 2012 that was reported for the preceding monitoring period. The population of 337 inmates in administrative segregation represented a 24-percent increase since the preceding monitoring period. There were six mainline 3CMS inmates and one 3CMS inmate in administrative segregation. No EOP inmates were at Calipatria.

Staffing:

The sole line psychiatrist position was filled.

The senior psychologist position and six of the seven line psychologist positions were filled, for a vacancy rate of 14 percent for line psychologists.

The social work position was filled.

The senior psych tech position was filled, but 5.1 of 10.6 psych tech positions were vacant, for a 48-percent vacancy rate for psych techs. The institution reported that five of these positions were newly-created.

The HPS I position and all 3.5 mental health clerical positions were filled. The 0.5 office tech position was not covered since September 2014 due to a medical leave.

The institution indicated minimal use of psychiatry telemedicine during the early part of the review period, but it did not report the number of hours of use.

503

Quality Management

The QMC met twice during the six-month review period, in November and December 2014, with a quorum present each time.  Minutes for the November 2014 meeting were neither signed nor approved, and minutes for the December meeting were unsigned.  The QMC recommended closure of a QIT to examine discrepancies in welfare checks, and continuation of monthly audits by the administrative segregation lieutenant.

The mental health subcommittee met monthly and always achieved a quorum.  Minutes were kept but not signed.  The subcommittee regularly reviewed pending actions and monthly audit reports, among other things.  Agenda items included training announcements, peer review, administrative segregation, hand-crank radios, and improvements in the processing and delivery of mental health evaluations.

No documentation that peer review took place was provided.  The institution reported that peer review was in transition to the new format.

Medication Management:

Calipatria used MAPIP to track medication administration, and RJD performed the MAPIP audits for Calipatria.  Data provided for the review period indicated that medication continuity following intra-institutional moves fell to 75-percent compliance in September 2014.  However, an improvement plan resulted in improvement to 100-percent compliance which was steadily maintained through December 2014.

All other indicators of medication continuity, including continuity of medications following inter-institutional transfers from community hospitals or DSH, and following paroles/transfers to the community, new medication orders, and chronic care medications, showed that Calipatria was compliant.

504

Completion of laboratory studies associated with use of specific psychiatric medications was also compliant.

Transfers:

Calipatria reported that no inmates met one or more criteria for consideration for DSH referral.  There were no referrals or transfers to DSH during the reporting period.

Review of inmate transfer data that was largely headquarters-generated found coding errors that resulted in erroneous reporting of some transfer data.  Further investigation by the monitor and Calipatria staff resulted in some improved transfer data reporting, but some data inaccuracies and conflicts remained unresolved.

Calipatria reported 30 MHCB referrals and transfers to MHCBs at other institutions.  Of the 30 transfers, 18 were assigned an MHCB bed within 24 hours of referral, and 11 of these left Calipatria within 24 hours of referral.

Institutional data indicated a total of 25 mental health OHU placements during the review period.  Four or 16 percent exceeded the 72-hour stay by an average of 0.8 days.  Conflicting data culled from SPRFIT meeting minutes for the five-month period of July through November 2014 indicated 27 OHU placements.  There were no other mental health alternative housing stays during the review period.

Calipatria identified seven inmates for the EOP level of care.  All transferred within timeframes.  There was conflicting data regarding EOP inmates in administrative segregation.  Some data indicated 11 EOP inmates in administrative segregation, with many returns from court.  Their stays averaged 13 days, and none exceeded 30 days.  Other data indicated that one of eight EOP inmates in administrative segregation was housed there for court proceedings and stayed in administrative segregation for 37 days.

505

The 86 inmates identified for 3CMS level of care all transferred within timeframes. The six identified mainline 3CMS inmates at Calipatria during the site visit had stays ranging from six to 40 days, with an average stay of 21 days, and none exceeding transfer timeframes. The sole 3CMS inmate in administrative segregation had been there for 11 days. For the 25 3CMS inmates in administrative segregation during the review period, stays averaged 17 days, with none exceeding 30 days. Many were returns from court.

The six mental health caseload inmates in the stand-alone administrative segregation unit during the review period were all referred to mental health and were all transferred to Facility A-5 within 24 hours.

Other Issues:

OHU:

Institutional policy on OHU stays was consistent with Program Guide timeframes. OHU stays that were overly long were the result of MHCB unavailability.

Calipatria reported that its OHU was used primarily to house inmates who were dangerous to themselves or others. These inmates were placed on suicide precaution or suicide watch consistent with the Program Guide and required referral to an MHCB.

The OHU was also used to temporarily house inmates suspected of having an acute mental disorder that might require MHCB referral pending a mental health evaluation. These inmates were placed on a status referred to as "psychiatric observation," which is not recognized in the Program Guide. If clinicians were unable to determine the need for referral to an MHCB within the first 24-hours, the OHU placement was extended to a full 48-hour evaluation period and managed under "psychiatric observation." Examples of 48-hour evaluation stays included inmates who were acutely intoxicated or who had ingested illegal substances. It was unclear

506

whether these placements were done in consultation with, or managed by, medical staff in the licensed CTC.  A decision to refer to an MHCB or discharge from the OHU had to be made within the 48-hour evaluation period.  Any decision to refer to an MHCB must result in a transfer within 24 hours of the decision, and thus comply with the 72-hour time limitation for OHU stays.

Review of the OHU census for December 2014 indicated that eight inmates were placed there for danger to self.  Observation logs showed that all were monitored by suicide watch or precaution and none by "psychiatric observation" status.

Referrals:

From July 1, 2014 through January 19, 2015, there were 652 mental health referrals at Calipatria.  The institution reported 100-percent compliance for response to the 23 emergent referrals, 93-percent compliance for the 54 urgent referrals, and 99-percent compliance for the 575 routine referrals.

The Special Master's expert reviewed UHRs of five randomly-selected inmates who had been referred on an urgent basis but not placed on the mental health caseload or placed on suicide watch/precaution.  Many of these referrals were made by housing unit officers.  Review indicated that these inmates did not meet criteria for inclusion on the mental health caseload.  Interdisciplinary progress notes (CDCR 7230-A) were composed for each inmate, and assessments were of adequate quality and contained reasonable conclusions based on available information.  Mental health placement chronos were completed and indicated that these inmates did not meet mental health caseload criteria.

The Special Master's expert also reviewed UHRs for three randomly selected inmates who had been referred on an urgent basis, added to the caseload, placed in the OHU, and referred to an MHCB.  Each was seen timely by a Calipatria clinician, and SREs were completed for

those who endorsed suicidal ideation.  Each of these inmates was placed under the appropriate observation level and was seen daily by clinical staff until transferred.

Mental Health/Custody Relations:

Mental health leadership reported good relations between mental health and custody staff.

Use of Force:

Institutional data indicated 100-percent compliance for mental health use-of-force clinical training.  For training on recent revisions to the use-of-force policy, Calipatria indicated 100-percent compliance for custody managers, supervisors, health care, and mental health clinicians, and 85-percent compliance for custody in-service training.

Program Access:

Calipatria reported that on February 3, 2015, one 3CMS inmate had a full-time employment position, one had a part-time academic assignment, and one had a part-time vocational assignment.  Four 3CMS inmates were eligible for inmate work training assignments but were unassigned.  From August 1, 2014 through January 31, 2015, two of nine 3CMS inmates were eligible for milestone credits, but none were earned.

**Centinela State Prison (Centinela)**
February 24, 2015

Census:

On February 23, 2015, Centinela's total inmate population was 3,251, down by 13 percent from the population in June 2012 that was reported for the preceding monitoring period. There were 128 inmates housed in administrative segregation.  The 17 inmates on the mental health caseload were all in mainline at the 3CMS level of care.

Staffing:

The institution's staff psychiatrist position was filled.

The chief psychologist position and all five line psychologist positions were filled. The sole social worker position was also filled.

The senior psych tech position was filled, but 3.6 of 10.6 line psych tech positions were vacant, for a 34-percent vacancy rate. Centinela reported that some of the vacant psych tech positions were only recently established.

Three of the 3.5 mental health clerical positions and the HPS I position were filled. One office tech position was not covered for the last three months of the review period due to a medical leave.

The institution reported minimal use of telemedicine for psychiatry during July 2014, when there was an unexpected lack of psychiatry coverage.

Quality Management:

The QMC met monthly during the review period and always achieved a quorum for all meetings. Meeting minutes were kept and approved, but five of the six sets of minutes were unsigned. The QMC did not charter any formal QITs during the review period.

The mental health subcommittee met five times and always attained a quorum. Minutes were kept and approved, but were not signed. The subcommittee regularly reviewed pending actions and monthly audit reports. Agenda items included development and/or updates to LOPs for restraint and seclusion, duty to protect, telepsychiatry, replacement of broken crank radios, and requirements for clinician-to-clinician contacts for patients discharged from the MHCB. The subcommittee had two action items in progress, including a revision of the LOP for five-day clinical follow-ups.

509

Peer reviews of one social worker, four psychologists, and one psychiatrist were conducted.

Medication Management:

New medication orders were timely in 87 percent of cases.

Medication continuity following intra-institutional transfers was 80-percent compliant.

Institutional data indicated that practices with laboratory studies associated with psychotropic medications were compliant.

DOT administration of chronic care medications was 73-percent compliant.

MAPIP audits indicated that psychiatrists were not notified timely when patients refused prescribed medications, and as a result psychiatrists were not meeting the seven-day timeframe for follow-up with patients.

Transfers:

Centinela reported that no inmates met criteria for consideration for referral to inpatient care. There were no referrals, transfers, or returns to or from inpatient care during the review period or on the day of the site visit.

During the review period, nine inmates awaiting transfer to MHCBs at other institutions were housed in Centinela's CTC. Four of these patients were assigned MHCBs within 24 hours of the request. None of the nine left Centinela within 24 hours of their referrals. CTC stays averaged 1.8 days, with a range of one to 3.2 days, which mental health staff attributed to MHCB unavailability.

No inmates housed at Centinela during the review period were transferred to a PSU.

There were no transfers of mental health caseload inmates from other institutions to Centinela during the reporting period. Six EOP inmates, including five court transfers, were

510

housed at Centinela during the review period. There were no transfers of EOP inmates identified by Centinela to administrative segregation EOP hubs during the review period. The sole EOP inmate in administrative segregation during the reporting period was there for court proceedings. His stay lasted 34 days.

There were 116 3CMS inmates, including many court transfers, at Centinela during the review period. All were transferred out within timeframes. The 16 mainline 3CMS inmates at Centinela at the time of the site visit had stays ranging from 12 to 48 days, with an average stay of 19.6 days. The sole 3CMS inmate who was erroneously transferred to Centinela had been housed there for 19 days as of the time of the site visit. One of 26 3CMS inmates, who was at Centinela for court proceedings and was housed in administrative segregation during the review period, had a stay of 38 days.

Two mental health caseload inmates, who were housed in the stand-alone administrative segregation unit during the review period and who were subsequently referred to mental health, were both transferred from that unit within 24 hours.

Other Issues:

Referrals:

From July 1, 2014 through January 17, 2015, there were 849 mental health referrals at Centinela. For timeliness of response to these referrals, the institution reported compliance rates of 98 percent for the 42 emergent referrals, 100 percent for the 94 urgent referrals, and 100 percent for the 713 routine referrals.

Heat Plan:

There were 111 Stage I heat alerts during the review period, and no stage II or III heat alerts. For the review period, Centinela produced monthly lists of inmates who were prescribed heat-sensitive medications.

Use of Force:

Centinela indicated 100-percent compliance for mental health staff training, and 99-percent compliance for custody staff training on the recent revisions to the use-of-force policy and the requirement that this training be completed by November 17, 2014.

Program Access:

a.      Job and Program Assignments:

Centinela reported that as of February 3, 2015, no EOP inmates had work training assignments. One 3CMS inmate had a full-time job and another had a part-time academic position. Five 3CMS inmates were eligible for work training assignments, but were unassigned.

Among the non-mental health caseload population, 479 inmates were enrolled in part-time academic positions, 1,044 had full-time jobs, 47 participated in part-time substance abuse programming, and 136 were enrolled in full-time vocational positions. Seven hundred one non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

b.      Milestone Credits:

From August 1, 2014 through January 31, 2015, four of nine 3CMS inmates and no EOP inmates were eligible for milestone credits. One 3CMS inmate earned milestone credits. Nineteen percent of the 763 non-MHSDS inmates who were eligible for milestone credits earned them.

*Coleman* Postings:

512

Centinela's chief deputy warden reported that all housing units and dormitories had *Coleman* postings in both English and Spanish in their dayrooms.  It was further reported that all program offices, law libraries, and both administrative segregation units also contained these postings.

**Chuckawalla Valley State Prison (CVSP)**
February 25, 2015

Census:

As of February 23, 2015, CVSP housed a total of 2,199 inmates, including three mainline 3CMS inmates and one mainline EOP inmate. The total institutional population had declined by 17 percent since the preceding monitoring period.

CVSP's administrative segregation unit had recently become a hub for inmates returning to California after being housed in out-of-state correctional facilities. The population of the unit was 116 including 80 out-of-state returns, making the census in the unit 52-percent higher than it was during the preceding monitoring period.  No mental health caseload inmates were housed in administrative segregation at the time of the site visit.

Staffing:

The sole psychiatrist position was filled.

At the time of the site visit, the senior psychologist position was expected to be filled as of April 1, 2015.  Two of the five psychologist positions were filled, for a 60-percent vacancy rate.

The senior psych tech position and only one of the 5.30 psych tech positions were filled. Two of the three clerical positions were filled.   The HPS I position was filled.

513

Quality Management:

As previously reported, CVSP's and ISP's quality management committees had been merged and alternated their meetings between the two prisons. This combined quality management committee met twice per week during the review period, with a quorum present at all meetings. Agenda items included LOPs, educational development projects, a pill line construction plan, pharmacy summary reports, effective communication audits, subcommittee reports, MAPIP reports, and alternative housing transfers, among other items.

As also previously reported, CVSP's mental health subcommittee and its SPRFIT had been holding joint meetings since March 2012. Six meetings were conducted during the review period, but only two achieved a quorum. Standing agenda items included inmates' compliance with psychotropic medications, transfers of mentally ill inmates, currently-housed inmates who have mental illnesses, requests for mental health assessments, mental health staffing, and audits.

There were no active QITs during the review period.

There was no peer review for the sole psychiatrist. Peer review of psychologists consisted of a monthly review of patient records. It was conducted in a private setting with the clinicians undergoing review present. Results were reported to the mental health subcommittee, and feedback was provided to the clinicians under review. The peer review process also found that observations from psych tech rounds in administrative segregation were sometimes missing from clinicians' progress notes, but it was reported that such gaps, which may have resulted from the use of templates, had been reduced.

Medication Management:

According to MAPIP audits covering the period of July through December 2014, the rate of continuity of medications following inter-institutional inmate transfers was less than 90 percent. Staff reported that a QIT had been recently established to address this.

New orders for psychotropic medications were over 90-percent compliant. Referrals of inmates for noncompliance with their medications were also over 90-percent compliant.

Pill lines were not audited.

Compliance rates pertaining to laboratory testing of blood levels of inmates prescribed psychotropic medications were compliant, with rates higher than 90 percent.

CVSP did not have inmates on PC 2602 medications.

Transfers:

There were no referrals or transfers of inmates to inpatient levels of care at DSH programs or to MHCBs during the review period.

CVSP reported seven inmate stays in alternative housing, all of which ended within timeframes.

Seven inmates identified as requiring the EOP level of care were transferred timely to EOPs at other institutions. Three went to administrative segregation EOP hubs and four went to mainline EOPs.

Sixty-eight of the 71 inmates identified as requiring the 3CMS level of care were transferred timely.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Two EOP inmates and seven 3CMS inmates were placed in administrative segregation during the review period.  At the time of the site visit, there was one 3CMS inmate housed there. No information on psychiatry contacts, PC contacts, or IDTT meetings was provided.

Alternative Housing:

There was no alternative housing designated at CVSP.  Because its OHU was deactivated in September 2013, the institution previously had adopted a process whereby inmates awaiting an MHCB were sent to ISP, were returned to CVSP when MHCB bed assignments were made, and then transported to their MHCBs from CVSP. This process was discontinued before the site visit, so that inmates in need of an MHCB were either transferred directly from CVSP, or were sent to ISP from which they were transported directly to their MHCBs.

Mental Health Referrals:

Provided data indicated that of the 16 emergent referrals during the review period, 81 percent drew timely responses.  Eighty-eight percent of the 58 urgent referrals and 93 percent of the 323 routine referrals drew timely responses.

Heat Plan:

CVSP remained compliant with implementation of the heat plan.  The pharmacy generated a weekly list of inmates on heat-risk medications.  A review of monthly heat plan summary reports submitted to headquarters showed 99 Stage I alerts and no Stage II or III alerts from July through October 2014.  There were no heat-related incidents during the review period.

Program Access:

      a.      Job and Program Assignments:

Institutional data indicated that 1,000 or 99.8 percent of available full-time jobs were filled by non-MHSDS inmates, and one EOP inmate and one 3CMS inmate filled the remaining two jobs.  All 56 or 100 percent of available part-time jobs were filled by non-MHSDS inmates.

Four hundred eighty four or 99.5 percent of part-time academic program assignments were held by non-MHSDS inmates, and the remaining two assignments were held by 3CMS inmates.  There were no voluntary academic program assignments at CVSP.

All 221 full-time and all 49 part-time vocational education program assignments were filled by non-MHSDS inmates.

All seven full-time substance abuse treatment program assignments were filled by non-MHSDS inmates. One of the 224 re-entry substance abuse treatment program assignments was filed by a 3CMS inmate.

   b. <u>Milestone Credits</u>:

CVSP was not a designated EOP program facility.  Information provided by the institution via headquarters indicated that during the review period 20 percent of eligible 3CMS inmates and 38.17 percent of non-MHSDS inmates earned milestone credits.

   c. <u>Out-of-Level Housing</u>:

As of February 4, 2015, no Levels I or II mental health caseload inmates were housed out of their custody levels, and one Level III 3CMS inmate was housed in Level II housing.

*Coleman* <u>Postings</u>:

*Coleman* posting in both English and Spanish were found in all buildings except three on Complex II, one on D-Yard, and two on C-Yard.  They were located in areas commonly accessible to mental health caseload inmates, except in the administrative segregation unit where they were located in a room where committee meetings were held.  When this was brought to the

attention of institutional leadership, they began to work on obtaining more copies of the postings and finding a more centralized location for them.

## California Institution for Women (CIW)
May 19, 2015 – May, 21, 2015

Census:

As of May 19, 2015, the total population at CIW was 1,844, including 796 inmates on the mental health caseload.  There were 81 mainline EOP inmates and 626 mainline 3CMS inmates. The administrative segregation population of 33 included six EOP inmates and 28 3CMS inmates.

Nine inmates were in the MHCB and seven were in the PSU.  The SHU population of 41 included one EOP inmate pending transfer to a PSU and 37 3CMS inmates.

All 28 3CMS inmates in administrative segregation were transferred to the STRH upon its activation on April 27, 2015.

Staffing:

The two chief psychologist positions were filled.

The two senior psychiatrist positions were filled, but one was out on long-term leave.  Of the seven psychiatrist positions, 4.5 were filled and two were covered by contractors, resulting in a seven-percent vacancy rate.

Two of three senior psychologist supervisor positions were filled.  Of 17.5 psychologist positions, 12.5 were filled, resulting in a 29-percent vacancy rate.  Hiring of three additional psychologists following the close of the review period reduced the vacancy rate to 11 percent.

Positions for the supervising social worker and the unit supervisor were both filled.  Eight of the ten social work positions were filled, for a 20-percent vacancy rate. The hiring of an additional social worker after the close of the review period reduced the vacancy rate to ten percent.

The three senior psych tech positions and all 18 psych tech positions were filled.

Four of the six recreational therapist positions were filled, resulting in a 33-percent vacancy rate.  Following the close of the review period, an additional recreational therapist was hired, reducing the vacancy rate to 17 percent.

One of two office services supervisor positions was filled and both HPS I positions were filled.  Six of the nine office tech positons were filled. With contract coverage of one position, the vacancy rate was reduced to 22 percent.

CIW used 40 hours of psychiatry telemedicine per week during the review period.

Quality Management:

The quality management committee scheduled monthly meetings during the review period.  Minutes from five meetings were provided for review.  They were detailed and comprehensive, and indicated that the quality management process was well-developed and well-utilized at CIW.  All areas of health care operations and security concerns of health care staff were covered.  The format used for minutes made it difficult to determine who the required members of the quality management committee were.

The mental health subcommittee met each month except December 2014 during the review period. All meetings achieved a quorum except in October 2014.  Substantive issues were discussed and identified problems were tracked until resolved.  Comprehensive minutes

519

demonstrated that the mental health program at CIW utilized the quality management process effectively in the delivery of services.

Anecdotal interviews with staff indicated that some of them were unaware of quality management activities or the existence of QITs and their recommendations. A suggested solution would be the inclusion of line staff whenever possible and establishment of a means to disseminate findings and discuss quality management activities with all health care staff.

One QIT and two FITs were active during the review period. The two FITs, on suicide prevention and the administrative segregation EOP hub, were required by headquarters and were ongoing. The QIT was established by CIW and focused on improving compliance with completion of Form MH7s, also known as chronos, upon completion of administrative segregation pre-screens.

During the review period, 14 psychiatrists and psychologists underwent peer review within a process that met each month and provided verbal feedback to the clinicians during the meetings. Social workers did not receive peer review. Some trends that needed correcting, particularly among new psychiatrists, were resolved after the feedback was received.

Training on the new statewide peer review process was provided at CIW at the end of March 2015. Work was being done on revising the peer review LOP to comport with the new statewide peer review process.

Medication Management:

CIW had implemented MAPIP. Average rates of compliance for continuity of medications were 77 percent following discharges from the MHCB, 60 percent following transfers to receiving and release from within the prison, and 84.2 percent following discharges

back to the prison from community or state hospitals, and 75.9 percent following intra-institutional transfers to administrative segregation, the SHU, and the PSU.

CIW was compliant with reporting of medication errors and medication availability, including in the emergency cart in the treatment and triage area and after-hours medication supplies.

Response to urgent referrals for inmates' no-shows and refusals of medications was 86.1-percent compliant.

Laboratory blood testing for inmates taking psychotropic medications was compliant in all areas except for the compliance rate of 79.2 percent for carbamazepine in December 2014.

CIW was 100-percent compliant with all nursing observation procedures for medication administration.

The compliance rate for administration of involuntary medications was 94.5 percent.

CIW was 94.4-percent compliant with provision of a 30-day supply of medications to inmates leaving the prison on parole or release.

<u>Transfers:</u>

Review of the log for referrals to inpatient care indicated 13 referrals from other prisons to the CIW PIP, and 16 referrals of CIW inmates to inpatient care.

Of the 16 inmate referrals initiated by CIW, seven were to acute care.   All had referral packets completed timely and all transferred within ten days.

For the nine referrals to intermediate inpatient care, all were completed and transferred timely.

While the number of referrals to inpatient care had risen, issues with the sustainable process persisted.  IDTTs did not discuss Form 7388Bs or the rationales for non-referrals.  Many

reviewed 7388Bs did not have adequate rationales for non-referral and also often had inadequate treatment modifications, yet they were found acceptable by the DSH coordinator.   Refresher training on the roles of the IDTT, Form 7388B, and the stages of the referral process may be helpful.

Provided data indicated that there were 334 admissions to CIW's MHCB during the review period.  The average length of stay was 4.2 days, with 21 or six percent of admissions exceeding ten days.  Of the three admissions to outside MHCBs, one transfer was late due to lack of bed availability.

CIW reported 75 alternative housing placements during the review period.  Thirty-five or 47 percent exceeded 24 hours.  Bed availability was cited as the primary reason for transfer delays.

No inmates were transferred to a PSU during the review period.  At the time of the site visit, one inmate was pending transfer to a PSU.

Four inmates were referred to the administrative segregation EOP hub during the review period.  All transferred timely, and none were awaiting transfer at the time of the site visit.

Other Issues:

Administrative Segregation EOP:

Initial psychiatry contacts were 100-percent compliant for timeliness.  Follow-up contacts were 99-percent compliant.

Data from headquarters indicated that initial PC contacts took place within five days of placement for 93 percent of new intakes.  Follow-up PC contacts were offered to inmates twice per week and were timely 100 percent of the time.  The treatment area consisted of seven

therapeutic modules arranged in a semi-circle and surrounded by a privacy partition. The treatment space afforded visual privacy and some auditory privacy. The environment was noisy.

Headquarters data indicated that comprehensive evaluations were completed before initial IDTT meetings in 67 percent of cases.

Timeliness of initial IDTT meetings and completion of them before initial ICC meetings were both 87-percent compliant. Timeliness of follow-up IDTT meetings was 96-percent compliant. Attendance by required disciplines was 100-percent compliant. Meetings were conducted in a small but adequately sized conference room, with computers available for use.

Inmates deemed suitable for ten hours of structured therapeutic group activity by the IDTT were offered an average of 14.5 treatment hours per week and received an average of 7.9 hours. Inmates deemed unsuitable for the full ten hours were offered an average of 10.8 hours and received an average of 6.9 hours per week.

MHCB:

Ten beds in the CTC were designated as MHCBs and the remaining eight beds were used as "swing beds" for mental health use if needed. Provided data showed there were 334 admissions to the MHCB during the review period, with numerous repeat admissions.

At observed IDTT meetings, much of the treatment team's discussions took place in the inmates' absence.  Inmates were brought in after the discussion had ended, and then the team had an abbreviated discussion with the inmate. The treatment plan was either not discussed, or was discussed to varying extent, depending on the individual PC.

Outdoor recreational yard was rarely offered to MHCB inmates. It was offered twice during the month preceding the site visit. Conversely, medical patients had access to outdoor recreational yard.

523

Patients were discharged from the MHCB as soon as they reported they were no longer suicidal, with little effort to determine the underlying causes of their initial reports of suicidality. Review of eUHRs indicated that patients were discharged from the MHCB without an IDTT meeting or input.

An MHCB LOP dictated the operation of the MHCB program, including the use of Guard One for tracking rounds. Custody staff reported that they tracked rounds using paper documentation rather than Guard One.

Seclusion and Restraint:

There were five uses of seclusion, with one inmate secluded on three occasions and another secluded twice. Record review indicated that these episodes were brief and complied with policy.

SHU:

According to provided data, timeliness of initial psychiatry contacts was 87-percent compliant, and timeliness of follow-up contacts was 97-percent compliant. One psychiatry contact occurred in a non-private area.

PC contacts were timely in 98 percent of cases for initial contacts and 96 percent of cases for follow-up contacts. Thirty-six percent of PC contacts were cell-front or in non-private settings, due primarily to inmate refusals.

Timeliness of initial IDTT meetings was 83-percent compliant. For follow-up meetings, timeliness was 97-percent compliant. Attendance by required disciplines at IDTT meetings was reported as 93-percent compliant. No data was available on whether initial IDTT meetings were conducted before initial ICC meetings. Treatment plans for 3CMS inmates and inmates who

moved between the MHCB and the SHU needed more individualization and appropriate clinical interventions.

No group therapy was provided in the SHU.

<u>3CMS Inmates in Administrative Segregation</u>:

CIW staff reported that 95 percent of initial psychiatry contacts were timely, and that 97 percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.

Audit results indicated that 100 percent of initial PC contacts were timely, and that 92 percent of inmates received at least weekly follow-ups with their PCs.

 Eighty-eight percent of initial IDTT meetings were timely and 92 percent of follow-up IDTT meetings were timely.  Required staff were present at 95 percent of meetings.

Group treatment and non-structured therapeutic activity services were provided in a dayroom area set off by a privacy partition.  It was equipped with television equipment and restart chairs which could accommodate up to 20 inmates.

There were six inmates designated as being on NDS status during the review period. The two designated for accelerated transfer were both transferred timely.

<u>PSU</u>:

CIW operated a 20-bed PSU. It provided mental health services according to a STEP behavioral incentive program.  STEP consisted of four steps through which inmates progressed with demonstration of increasing self-control and positive coping capabilities.  Each step advancement provided the inmate with more privileges and fewer restrictions.  However, none of the inmates on modified programing in the PSU progressed to full programming during the review period.

525

According to institutional audits, 97 percent of PSU inmates received brief mental health assessments within five days of placement.  In 80 percent of cases, inmates received a psychiatric comprehensive clinical evaluation before their initial IDTT meetings. In 61 percent of cases, inmates received both psychiatric and PC comprehensive clinical evaluations before their initial IDTT meetings.

Ninety-two percent of initial IDTT meetings were completed within 14 calendar days of inmates' arrivals, and 100 percent were completed before inmates' initial ICC meetings. Staff composition and attendance at IDTT meetings were consistent with Program Guide requirements.

Staff reported that therapeutic activities were offered in a variety of modalities including psychoeducational groups, recreation therapy groups, and education classes.  There was sufficient program space to permit outside exercise or therapeutic recreational activities in four fenced-in pods that were situated between the two PSU program buildings.

During the review period, the IDTT found 24 inmates clinically appropriate for modified treatment/programming.  Institutional data indicated that 100 percent of these inmates were given monthly IDTT meetings and that 98 percent were seen daily by their PCs.  Inmates on modified treatment programming were scheduled for an average of 10.6 hours of group treatment each week, offered an average of 9.5 hours, refused an average of 4.2 hours, and received 5.2 hours on average.

Eighty percent deemed appropriate by the IDTT for full programming were prescribed psychotropic medications and were seen by a psychiatrist at intervals consistent with Program Guide standards.  Ninety-seven percent received timely follow up IDTT meetings at 60 days, and all had received them at 120 days.  Thereafter, they received quarterly IDTT meetings in 100

526

percent of cases.  At one observed IDTT meeting during the site visit, required staff attended and participated.  The meeting space accommodated all participants, with computer access available. Form 7388B was discussed briefly with the inmate.

Ninety-eight percent of fully-programming inmates received weekly follow up sessions with the PC consistent within program guidelines. They were scheduled for an average of 13 hours, offered an average of 12.3 hours, refused an average of 3.4 hours, and received an average of 8.9 hours.

EOP:

EOP services were provided in the supportive care unit (SCU), which was comprised of two buildings in a secured area with capacity to house and treat 85 inmates.

Data indicated that 96 percent of initial psychiatry contacts were timely and 92 percent of follow-up contacts were timely.  They were conducted in private settings in 99.7 percent of cases.

According to provided data, 93 percent of initial PC contacts were conducted within 14 days of placement into the EOP, and 94 percent of follow-up contacts were conducted in accordance with Program Guide timeframes.  CIW staff reported that 93.8 percent of PC contacts took place in private settings.

Staff reported that psych techs conducted wellness checks on second watch seven days a week.

Audit results indicated that initial IDTT meetings were conducted timely in 78 percent of cases.  Most overdue initial IDTT meetings were late by one day, but delays were as long as 59 days. There was no indication whether they took place before inmates' initial ICC meetings.

527

Follow-up IDTT meetings were timely in 99 percent of cases. Required disciplines attended 93 percent of the time.

Structured therapeutic group activities rotated in eight week cycles. They covered such issues as mood control, anger management, and medication issues, among other things, and also included educational classes. Groups had 16 to 20 participants on average.

Inmates deemed suitable by the IDTT for the full ten hours of group activity were offered an average of 13 treatment hours per week and received an average of 10.3 hours per week. Recreation therapy was also incorporated into treatment when indicated.

Inmates found by the IDTT to be unsuitable for the full ten hours of group activity were placed on modified programming. They were offered an average of 6.9 hours of group per week and received an average of 5.3 hours per week.

3CMS:

Timeliness of both initial and ongoing psychiatry contacts was 97-percent compliant. All took place in private settings, according to these care providers.

Initial PC contacts were 83-percent complaint for timeliness, but follow-up contacts were timely in 97 percent of cases. Nineteen of those contacts occurred in a non-confidential setting but no rationale was provided. Earlier in the review period, staffing vacancies led to difficulties with provision of unscheduled or "walk in" clinical contacts. At the end of March 2015, mental health leadership assigned a clinician to provide these contacts, which resolved the problem.

 Initial IDTT meetings were timely in 79 percent of cases. Follow-up meetings were timely in 99 percent of cases. Attendance by required disciplines was reported as 100-percent compliant, although this figure was based on only about one third of the meetings which took

place, and eUHR reviews indicated that there were IDTT meetings in which the psychiatrist and/or the CC I was absent.

CIW reported that group treatment was provided during the review period, but it did not report the number of groups. At the time of the site visit, there were four treatment groups with 90 inmates on waitlists.

Referrals:

According to provided data, all 28 emergent referrals during the review period drew a timely response. Of the 222 urgent referrals, 201 or 91 percent received a timely response, and of the 2,162 routine referrals, 1,720 or 80 percent received a timely response. A problem with late deliveries of referrals to mental health staff was identified, addressed, and corrected before the end of the review period.

Heat Plan:

There were no heat-related incidents during the review period.

CIW was not fully compliant with heat plan protocols. It was unable to produce a copy of the memorandum that was issued at the beginning of the heat season. The relevant LOP was not updated until November 2014 and was not finalized until December 2014, after the May through October 2014 heat season had already ended.

Review of monthly heat reports sent to headquarters during May through October 2014 found that they did not follow the required statewide format. Instead, they still used an outdated template from 1995, for no apparent reason.

A review of the temperature logs found that temperatures were being logged as required by the heat plan. Thermometers were placed appropriately in all toured housing units. Custody officers in each building had access to hand-held thermometers.

<u>Use of Force</u>:

CIW reported that 100 percent of custody staff and 96 percent of mental health staff had been trained on the revised use-of-force policy.

<u>Access to Care</u>:

A review of CIW's monthly Health Care Access Quality Reports from October 2014 through March 2015 indicated that 65 percent of mental health ducats and add-on appointments were not completed due to non-custodial reasons other than inmate refusals, and that 2.5 percent were not completed due to custody reasons.

<u>Program Access</u>:

a.     <u>Job and Program Assignments</u>:

Institutional data indicated that four or .93 percent of available full-time jobs were filled by EOP inmates, 179 or 42 percent were filled by 3CMS inmates, and 245 or 57 percent were filled by non-MHSDS inmates.

Of the 58 available part-time jobs, seven or 12 percent were filled by EOP inmates, 28 or 48 percent were filled by 3CMS inmates, and 23 or 40 percent were filled by non-MHSDS inmates.

For full-time academic assignments, one or two percent were held by 3CMS inmates and 42 or 98 percent were held by non-MHSDS inmates.

Of the 283 available part-time academic assignments, two or 0.71 percent were held by EOP inmates, 174 or 61 percent were held by 3CMS inmates, and 107 or 38 percent were held by non-MHSDS inmates.

530

For voluntary academic assignments, eight or five percent were held by EOP inmates, 117 or 70 percent were held by non-MHSDS inmates, and 43 or 25 percent were held by 3CMS inmates.

Of the 209 available voluntary education assignments, three or one percent were held by EOP inmates, 62 or 30 percent were held by 3CMS inmates, and 144 or 69 percent were held by non-MHSDS inmates.

For full-time vocational education assignments, 50 or 55 percent were held by 3CMS inmates and 41 or 45 percent were held by non-MHSDS inmates. Of the 29 available part-time vocational educational assignments, 14 or 48 percent were held by 3CMS inmates and 15 or 52 percent were held by non-MHSDS inmates.

For re-entry substance abuse treatment program assignments, 103 or 49 percent were held by 3CMS inmates and 106 or 51 percent were held by non-MHSDS inmates.

     b.    <u>Milestone Credits</u>:

Information provided by the institution indicated that as of March 31, 2015, 8.33 percent of eligible EOP inmates, 24.1 percent of 3CMS inmates, and 29.96 percent of non-MHSDS inmates earned milestone credits.

     c.    <u>Out-of-Level Housing</u>:

Inmates at custody Levels I through IV were housed together at CIW.

     d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CIW provided confirmation of implementation of Revised ADA Accommodation and Grievance Procedures in the form of training sign-in sheets and materials, as well as examples of completed forms.

e.      Periodic Classification Score Reductions:  EOP Inmates:

EOP inmates were being granted the same semi-annual classification score reductions as non-EOP inmates.  During the site visit, CIW provided a sample of completed reclassification score sheets for review.

*Coleman* Postings:

*Coleman* postings in both English and Spanish languages were observed in all toured buildings, including the PSU and the administrative segregation units.  All postings were located in areas accessible to class members.

## Central California Women's Facility (CCWF)
May 27, 2015 – May 29, 2015

Census:

As of May 26, 2015, the total population at CCWF was 3,100, including 1,253 inmates on the mental health caseload. There were eight inmates in the MHCB. The EOP mainline population was 64, and the mainline 3CMS population was 949, which included 13 condemned inmates.

Among the 108 inmates in administrative segregation, three were EOP inmates and 76 were 3CMS inmates.  The total reception center population of 567 included 153 3CMS inmates.

Staffing:

The two chief psychologist positions were vacant.

Positions for the senior psychiatrist and the five senior psychologists were all filled. Seven of the ten psychiatrist positions were filled, leaving a 30-percent vacancy rate.

Twenty-two of the 24 psychologist positions were filled, for a vacancy rate of eight percent.

532

The supervising social work position was filled.  Of the 13 social work positions, 11 were filled, for a 15-percent vacancy rate.

The senior psych tech position was filled, as were 13 of the 23.9 psych tech positions, resulting in a 46-percent vacancy rate.

Three of the four recreation therapist positions were filled, for a 25-percent vacancy rate.

The nurse practitioner and the two SRN II positions were filled.  Of the nine RN positions, eight were filled, for a vacancy rate of 11 percent.

The OSS II position and the 14 clerical positions were all filled.  One of the two HPS I positions was filled.  The CHSA II position was vacant.

Quality Management:

Since the preceding monitoring period, CCWF's quality management program was re-directed from its previous CAP model to more closely align with the statewide quality management process.

The local governing body met quarterly and maintained minutes.

The quality management committee met each month except October 2014 during the review period.  A quorum was achieved at all meetings.  Topics for discussion included mental health-related issues.

The mental health subcommittee met at least monthly during the review period.  Minutes were maintained and a quorum was achieved at all meetings.  The subcommittee addressed issues identified by the regional mental health administrative team as well as other matters including suicide prevention, DSH-related issues, involuntary medications, programming areas, MAPIP, and issues related to administrative segregation EOP hub certification.

533

During the review period, a QIT on the administrative segregation EOP was chartered to address compliance with hub certification-related issues. Although CCWF was not designated as a hub institution, this QIT worked on improving provision of services to EOP inmates during their stays in the CCWF administrative segregation unit.

Peer review was not active at CCWF during the review period.

Medication Management:

Audits found an average compliance rate of 21 percent for continuity of medications following MHCB discharges, and an average compliance rate of 58 percent for continuity of medications following moves into administrative segregation. The compliance rate for continuity of psychiatrist-prescribed medications was 50 percent. For continuity of involuntary medications, the compliance rate was 78 percent.

Administration of HS medications accounted for 25 percent of all psychotropic medication prescriptions. It was compliant, with inmates receiving these medications no earlier than 8:00 p.m.

EOP inmates received their medications at the A-Yard clinic, Building 703, which was shaded and provided with cooling mist during heat alerts.

Transfers:

Inmates in need of inpatient care were transferred to the CIW PIP. All 11 referrals to acute inpatient care were accepted, and six or 56 percent were transferred timely. All seven referrals to intermediate inpatient care were accepted, and four or 57 percent were transferred timely.

According to the non-referral log, 182 inmates were reviewed but not referred to inpatient care during the review period. Documented reasons for these non-referrals did not sufficiently

534

explain their rationales.  The comment section of the log was rarely used to elaborate on the reasons for non-referrals.  Chart reviews during the site visit also found deficiencies in the rationales for not referring inmates to inpatient care.

When inmates were returned to CCWF from inpatient care, the received an evaluation by MHCB staff using Form 7447, five-day clinical follow-up, and hourly checks until the inmate was transferred to the EOP, where five-day follow-up was continued.  Individualized treatment planning was not included as part of this step-down process.

Of the 24 inmates transferred to a MHCB during the review period, 21 or 87 percent were transferred timely, although two of the three late transfers were late by less than an hour. CCWF did not maintain a log of non-referrals to the MHCB.  Although it was reported that this data was tracked daily, it could be captured easily.  Formal tracking of this data in a format that is easily accessible for utilization management purposes is recommended.

No inmates transferred to a PSU during the review period.

CCWF reported that 287 or 92 percent of the total 311 alternative housing placements during the review period ended within 24 hours.

No data was provided on administrative segregation EOP hub transfers.

All 33 EOP inmate moves out of the reception center were timely.  Of the 570 3CMS inmates moved from the reception center, 444 or 78 percent were transferred timely.

Other Issues:

Reception Center:

Average stays in reception center were 1.9 days for EOP inmates, 47.1 days for 3CMS inmates, and 59.7 days for non-MHSDS inmates.  EOP inmates were transferred to the mainline

535

EOP for programming, while 3CMS inmates were placed at CCWF, CIW, or the Folsom Women's Facility.

Data on the timeliness of bus screens, mental health screens, and mental health evaluations was not provided.

For EOP inmates, psychiatry contacts were timely in over 90 percent of cases and PC contacts were timely in 75 percent of cases. Ninety percent of IDTT meetings were timely.

For 3CMS inmates, timeliness of initial and follow-up psychiatry contacts was 100-percent compliant, and timeliness of initial and follow-up PC contacts was 99-percent compliant. No psychiatry contacts were cell-front or in non-private settings. Two PC contacts were cell-front, and one was in a non-private setting.

Timeliness of initial IDTT meetings was 84-percent compliant, and timeliness of follow-up IDTT meetings was 90-percent compliant. Attendance by required disciplines at IDTT meetings was 100-percent compliant.

MHSDS Inmates in Administrative Segregation:

CCWF's administrative segregation unit was located in Building 504. Supervisory staff reported no need for administrative segregation overflow during the review period.

For EOP inmates, audits indicated compliance rates above 90 percent for timeliness of psychiatry contacts. Due to inmate refusals, six psychiatry contacts were cell-front during the review period.

Audits found timely completion of PC contacts for EOP inmates in 93 percent of cases. Limited office space for individual contacts required careful scheduling. Of the total 1,389 cell-front PC contacts, 1,369 or 99 percent were due to inmate refusals and the remaining 20 or one percent were due to modified programming, lack of escort, staff decision, or other unspecified

536

reasons.   There were 189 out-of-cell PC contacts in non-private settings.  Of these, 26 or 14 percent were initial contacts, 130 or 69 percent were follow-up contacts, 23 or 12 percent were "unscheduled," and the remaining five percent were crisis responses and special follow-ups.

Both initial and follow-up IDTT meetings were timely in over 90 percent of cases. Required disciplines were present 95 percent of the time.  At observed IDTT meetings during the site visit, the meeting room was sufficiently large and comfortable.  The required attendees were present and computer access was available.  Collaborative treatment planning and discussion of the criteria for consideration for referral to higher levels of care on Form 7388B could have been improved.  Inmates were not asked to sign their treatment plans.

Provision of group therapy for EOP inmates was driven by the number of EOP inmates in the administrative segregation unit at any given time.  At the time of the site visit, only one EOP inmate was in the unit. Group treatment space in the unit was limited.

At the time of the site visit, no EOP inmate had been in administrative segregation longer than 150 days.

3CMS inmates in administrative segregation were seen timely by their psychiatrists and PCs over 90 percent of the time.  Audits found that IDTT meetings were conducted timely in over 90 percent of cases, but required disciplines were present only 64 percent of the time. Groups were not offered to 3CMS inmates in administrative segregation.

At the time of the site visit, no inmates were on NDS status at CCWF.

MHCB:

The MHCB was licensed for 12 beds.  It had four double cells and four single cells.  The average census during the review period was seven, and the average stay lasted eight days.  Pre-

site visit data indicated that 13 inmates had three or more MHCB admissions during the six-month period before April 19, 2015.

Staff reported that they rarely double-celled patients.  Without an applicable LOP, staff considered custodial and clinical contraindications when deciding whether to double-cell patients.  An LOP to standardize the process and provide clinical guidance is recommended.

Provided data indicated that 92 percent of initial psychiatry contacts were timely and that 99 percent of follow-up psychiatry contacts were timely.

Timeliness of initial PC contacts was only 52-percent compliant.  Follow-up PC contacts were timely 82 percent of the time.

Programming in the MHCB unit also included individual and group activities with the recreational therapist and yard time.

Initial IDTT meetings were 86-percent compliant for timeliness.  Follow-up IDTT meetings were 94-percent compliant for timeliness.  Observed IDTT meetings were conducted in a spacious, well-lighted room that provided access to a computer.  Required attendees were present, and all participants engaged in collaborative, supportive, and therapeutic discussions.

Data indicated a compliance rate of 95 percent for completion of five-day clinical follow-ups post-MHCB discharge.

Seclusion and Restraint:

There were two reported instances of seclusion in October 2014.  Reasons were not documented in the log.  Durations ranged from three hours and 55 minutes to 17 hours.  Data provided via nursing assessment records was handwritten and difficult to read.

Restraints were not used during the review period.

<u>Alternative Housing</u>:

All alternative housing cells had running water and toilets.  They were used after hours and when no MHCBs were available.  Staff reported that usage was high after normal work hours.  Alternative housing cells in Building 503 were also used routinely as housing for reception center inmates.

Inmates placed into alternative housing were required to wear safety smocks and were monitored one-to-one by nursing staff.   MHCB staff reported that contacts with inmates in alternative housing in Building 503 were either cell-front or in a non-private open area.

Staff reported that inmates in holding cells were monitored by custody staff.   During normal working hours, holding cells in Building 501 were used for inmates in crisis. This had a disruptive effect on EOP programming.

<u>EOP</u>:

The mainline EOP was located in two wings of Building 501 on the A-Yard.  Rooms were dormitory style, each housing six to eight persons. The average weekly census during the review period was 67 inmates.  There were concerning reports that the housing of several EOP inmates in the dormitory cells resulted in numerous conflicts, crisis evaluations, and inability of some inmates to tolerate this number of sometimes very mentally ill inmates in the same cell.

The other two wings in Building 501 were occupied by reception center and difficult-to-house general population inmates. Due to the need for segregating the different populations, this resulted in limitations on programming for all populations.  At the time of the site visit, the placement of six EOP women in these dormitory cells appeared to be problematic.

 Initial psychiatry contacts were 90-percent compliant and follow-up psychiatry contacts were 96-percent for timeliness. Initial PC contacts were 97-percent compliant and follow-up PC

contacts were 98-percent for timeliness. Audits indicated that 90 percent or more of psychiatry and PC contacts took place in private settings.

Compliance rates for timeliness of initial and follow-up IDTT meetings were 95 percent and 98 percent, respectively. Audits indicated compliance rates higher than 90 percent for attendance by required disciplines. A mainline EOP IDTT meeting was observed during the site visit. Necessary participants were present and computer access was available. Interdisciplinary discussion about individual patients' treatment goals, progress, and discharge planning was good. However, there was consistent lack of formal discussion about criteria for consideration of referral to higher levels of care.

On average, 18.03 group hours were scheduled per week, 15.55 hours were offered, 9.72 hours were attended, 5.83 hours were refused, and 2.48 hours were cancelled. Approximately 99 percent of inmates were offered at least ten hours per week, 97 percent were scheduled for at least ten hours, 48 percent attended ten hours, 14 percent refused groups, and two percent cancelled.

Several EOP inmates were interviewed during the site visit. Common themes of expressed concerns were dissatisfaction with the six-person dormitories because of occasional conflicts and placements with less stable persons, lack of diversity in group therapy offerings, and downgrading of patients to the 3CMS level of care before stabilization.

For EOP inmates on modified programming, 96 percent of inmates were scheduled for at least five hours of group per week, 57 percent were offered at least five hours, 19 percent attended five hours, 13 percent refused, and none were cancelled. On average, EOP inmates on modified programming were scheduled for 12.79 hours per week, offered 11.94 hours, attended 6.79 hours, refused 5.15 hours, and .85 hours were cancelled.

540

<u>3CMS</u>:

Inmates in the 3CMS program were housed in Facilities B, C, and D.   Programming included individual and group therapy and was offered in Buildings 812 and 813

Provided data on timeliness of initial psychiatry contacts indicated a compliance rate of 95 percent, and for follow-up psychiatry contacts a compliance rate of 89 percent.  There were no cell-front psychiatry contacts during the review period.  There was one follow-up psychiatry contact in a non-private area in administrative segregation.

Initial PC contacts were timely 82 percent of the time.  Follow-up PC contacts were timely 85 percent of the time.  There were 12 cell-front PC contacts among seven different inmates, all in administrative segregation.  Provided data indicated 18 PC contacts in non-private locations among 12 different inmates, all in administrative segregation.

Timeliness of initial IDTT meetings was 76-percent compliant.  Required staff were present 98 percent of the time.

An art therapy group observed during the site visit was informal and unstructured.  Inmates arrived and left as they desired.  They colored and talked among themselves, providing support to each other and/or talking with the group leader, who also provided support and encouragement.

<u>Referrals</u>:

Ninety-six percent of the 337 emergent referrals during the review period drew a timely response.  Of the 367 urgent referrals generated, 94 percent resulted in a timely response.  MHTS.net data showed that 72 percent of the 2,898 routine referrals resulted in a timely response, although several data entry errors were discovered, indicating that the actual compliance rate for response to routine referrals may have been higher than reported.

Heat Plan:

CCWF was compliant with heat plan protocols.

Use of Force:

The institution reported that all staff had completed training on controlled use of force.

Access to Care:

Review of CCWF's monthly Health Care Access Quality Reports for October 2014 through March 2015 indicated that eight percent of issued mental health ducats and add-on appointments were not completed due to custody factors, and that 16 percent were not completed for non-custodial reasons other than inmate refusals.

Construction:

The new EOP mainline and administrative segregation treatment facility was under construction at the time of the site visit. It will serve 54 mainline EOP and ten administrative segregation EOP inmates, and will provide EOP treatment and office space, including group therapy space for EOP administrative segregation inmates. As of this writing, activation was scheduled for September 30, 2015.

CCWF was also slated for a HCFIP project to include renovation of the reception center comprehensive health screening space. Work on this project had not begun as of the time of the site visit.

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that seven or .73 percent of available full-time jobs were filled by EOP inmates, 365 or 38 percent were filled by 3CMS inmates, and 590 or 61 percent were filled by non-MHSDS inmates.

542

Of the 54 available part-time jobs, 23 or 43 percent were filled by 3CMS inmates and 31 or 57 percent were filled by non-MHSDS inmates.

There were no full-time academic assignments at CCWF. For part-time academic assignments, 11 or three percent were held by EOP inmates, 172 or 45 percent were held by 3CMS inmates, and 200 or 52 percent were held by non-MHSDS inmates. Of the ten available voluntary academic assignments, two or 20 percent were held by 3CMS inmates and eight or 80 percent were held by non-MHSDS inmates.

For full-time vocational education assignments, one or .43 percent was held by an EOP inmate, 80 or 35 percent were held by 3CMS inmates, and 153 or 65 percent were held by non-MHSDS inmates.

Of the 54 available part-time vocational education assignments, 18 or 33 percent were held by 3CMS inmates, and 36 or 67 percent were held by non-MHSDS inmates.

Of the 287 re-entry substance abuse treatment program assignments, 160 or 56 percent were held by 3CMS inmates, and 127 or 44 percent were held by non-MHSDS inmates.

b. <u>Milestone Credits</u>:

Information provided by the institution indicated that as of April 21, 2015, 6.25 percent of eligible EOP inmates, 22.78 percent of eligible 3CMS inmates, and 18.77 percent of eligible non-MHSDS inmates earned milestone credits.

c. <u>Out-of-Level Housing</u>:

Inmates at custody Levels I through IV were housed together at CCWF.

d. <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

As of the time of the site visit, the institution was scheduled to implement the new ADA Reasonable Accommodation and Grievance Procedures in June 2015.

543

e.    <u>Periodic Classification Score Reductions: EOP Inmates</u>:

CCWF reported that CDCR-840 documentation was completed annually and entered in ERMS and SOMS.  Sample CDCR-840s were not reviewed during the site visit.

<u>*Coleman* Postings</u>:

Ten monitored housing units were all were in compliance with *Coleman* postings.

**<u>Valley State Prison (VSP)</u>**
March 10, 2015 – March 12, 2015

<u>Census</u>:

On March 9, 2015, VSP housed 3,007 inmates, for an increase by 1,027 or 52 percent since the preceding monitoring period.

There were 275 SNY EOP inmates and 1,083 3CMS inmates.  In administrative segregation, there were five EOP inmates and 20 3CMS inmates.  One inmate was in the OHU for mental health reasons.

<u>Staffing</u>:

VSP had received additional mental health and custody staffing allocations since the preceding monitoring period to assist with its growing mental health caseload population.  Of 75.4 established mental health positions, 65 were filled and 10.4 were vacant, for a 14-percent overall vacancy rate.  VSP did not use contractors.

The senior psychiatrist position, one of the two chief psychologist positions, and four of five senior psychologist positions were filled.

Four of six psychiatrist positions were filled, for a 33-percent vacancy rate.  Staff reported that psychiatry caseloads were overly large at 300 to 500 per psychiatrist, and that they were having difficulty with recruiting psychiatrists.

544

Of 17 psychologist positions, 15 were filled, for a 12-percent vacancy rate. Five psychologists were unlicensed and two were on extended leaves during the review period.

The supervising social worker position was filled, as were ten of 11 social worker positions, for a nine-percent vacancy rate. Three of the social workers were unlicensed.

The senior psych tech position was filled, as were 11 of 12.4 psych tech positions, for an 11-percent vacancy rate.

All four recreational therapist positions were filled, but one was on leave during the final month of the review period and another worked half-time during the final two months.

Ten of 11 mental health clerical positions were filled. Both HPS I positions and the OSS II position were filled, but the CHSA II position was vacant.

Quality Management:

Except in October 2014, the QMC met monthly during the review period, with a quorum present and minutes maintained. Meetings were chaired by the CEO and were generally attended by the chief of mental health. Minutes indicated that discussions covered EOP overcrowding and medications, among other things.

During the review period, the mental health subcommittee met monthly and always achieved a quorum. Meetings were chaired by the chief of mental health. Agendas were comprehensive.

Meeting minutes for a QIT on the EOP indicated that it addressed the institution's gold coat program, group therapy hours, medication-related matters, and programming challenges. This QIT was converted to a committee in October 2014. A QIT on alternative housing met during July and August 2014 and addressed alternative housing placements and program compliance issues. Further meetings of this QIT were placed on hold. A QIT on suicide

545

prevention held its final meeting in August 2014 and transferred its function to the mental health subcommittee and another QIT for resolution.

There was no formal peer review at VSP during the review period.

Medication Management:

Medication continuity following intra-institutional transfers was 70-percent compliant for nurse-administered and DOT medications. Following intra-institutional moves to administrative segregation, medication continuity was 77-percent compliant. Following discharges from community hospitals, it was 71-percent compliant.

Laboratory testing of blood levels for inmates on psychotropic medications was at least 90-percent compliant.

It was reported that pill line times sometimes conflicted with group activities in administrative segregation. Staff attributed long pill lines to medication preparation time, scheduling conflicts with meals and inmate counts, inconsistencies with escorts, early start times of groups, and staffing shortages.

In the SNY EOP, staff and inmate interviews indicated that medication passes were overly long. Morning and evening pill lines were reported to last over an hour, which sometimes resulted in the delayed starts of groups and inmates leaving for meals.

Seven to nine inmates were on involuntary medication orders during at least part of the review period. Staff reported that all court orders were up-to-date and documented in the medical records, and that the inmates were medication-compliant.

Transfers:

VSP maintained DSH referral and non-referral logs, which were accurate and contained required information.

546

During the review period, there were 13 referrals to acute inpatient care, all but one of which were completed timely. Two of these referrals were rescinded by VSP. Of the remaining 11 acute care referrals, four were transferred timely. The average time for the late transfers to acute care was 17 days. Nine of all 11 transfers occurred within 72 hours of a bed assignment.

There were eight referrals to intermediate inpatient care, four of which were rescinded by the institution. Of the three completed transfers, one was timely and the other two took 43 and 55 days, respectively. All three of these transfers occurred within 72 hours of a bed assignment. At the time of the site visit, the sole remaining intermediate care referral had been pending transfer for 56 days and was not yet accepted by DSH.

VSP did not report the number of inmates discharged from DSH back to VSP. The DSH coordinator reported that typically the institution was notified by email of impending DSH discharges and that discharge packets were posted on SharePoint. Discharge summaries were legible, detailed, and clinically useful. A VSP clinician and the DSH discharging clinician communicated about the discharges.

Of 118 inmates who transferred to an MHCB at another institution, 74 or 63 percent were assigned a bed within 24 hours of MHCB referral, and 46 or 39 percent were transported within 24 hours of MHCB referral. Mental health staff reported that unavailability of MHCBs was the predominant reason for the delays.

VSP reported 85-percent compliance for the 91 mental health OHU stays. Of these, 59 or 65 percent were referred to the MHCB.

One set of data provided by VSP indicated 82-percent compliance for 107 alternative housing placements, which averaged only .1 day beyond timeframes. Other provided

547

documentation indicated 76 alternative housing stays, of which 58 or 76 percent resulted in transfers to MHCBs.

No inmates were referred to the PSU during the review period.  One EOP inmate endorsed for PSU transfer was pending transfer.

VSP reported 94-percent compliance for transfers to EOP administrative segregation hubs.  Four of the five overdue transfers occurred at 44 days on average, and the one outlier, who was at VSP because of legal proceedings, transferred at 170 days.  During the site visit, four EOP and 20 3CMS inmates were housed in administrative segregation.  Three of the EOP inmates had been there for an average of 12 days; the fourth inmate had been there for 128 days due to legal proceedings, but was paroling on March 16, 2015.  The 20 3CMS inmates had been there for an average of 69 days, including six that ranged from 133 to 265 days.

Four EOP inmates and seven 3CMS inmates were housed in NDS from August 1, 2014 to March 11, 2015.  These EOP and 3CMS inmate stays averaged 14 days and 23 days, respectively.

Other Issues:

MHSDS Inmates in Administrative Segregation:

VSP's administrative segregation unit was located in A-4, which also housed EOP inmates pending hub transfers.  Mental health programming consisted of weekly psychiatry and PC contacts and daily psych tech rounds, but no group therapy.  At the time of the site visit, the sole assigned PC had a caseload of 25.

One psychiatrist was assigned to administrative segregation, the OHU, and the 3CMS program and had a caseload of 474.  Audits indicated timely psychiatry contacts for both EOP

and 3CMS inmates.  Interviewed inmates reported weekly contacts with the psychiatrist in a private setting and no problems with medication continuity.

Two psychologists had caseloads of 29 each, and another psychologist who was also assigned to the EOP had a caseload of 22. Initial PC contacts for EOP inmates were 83-percent compliant; follow-up contacts were 98-percent compliant.  For 3CMS inmates, initial and follow-up PC contacts were 96-percent compliant.

Audits indicated that IDTT meetings were compliant for both timeliness and presence of required participants.  At an observed IDTT meeting, there was good engagement with the inmate and interdisciplinary discussion of treatment planning and need for higher levels of care. The team was clearly very familiar with the inmates.

Inmates had crank radios and electrical appliances in their cells.  There was space for private one-to-one clinical contacts.  An alternative space for clinical contacts was a treatment module on the dayroom floor, which did not provide adequate privacy.

SNY EOP:

The SNY EOP at VSP had undergone significant expansion and change since the preceding monitoring period, with its census reaching 275 inmates and a projected census at full capacity of 372.  The program received additional staffing allocations in both mental health and custody to help accommodate the expansion.  It had two psychiatrists, with caseloads of 137 and 138, respectively.  It also had one senior psychologist supervisor, and one senior psychologist specialist, eight psychologists, five social workers, and four recreational therapists.

During the review period, the growing program census and staffing vacancies and absences led to cancellations, long pill lines, large group sizes, and delays in the delivery of services.

The institution reported that 86 percent of psychiatry contacts and 90 percent of PC contacts were timely.  Only one percent of clinical contacts were conducted in a non-private setting.

IDTT meetings were timely 91 percent of the time, and included necessary participants more than 90 percent of the time.  However, at an observed IDTT meeting, the team was slow to determine the inmate's need for immediate transfer to a higher level of care, despite his obvious severe psychotic symptoms and inability to function in an outpatient setting.

Audits indicated that 92 percent of inmates were scheduled for ten weekly hours of group treatment.  Of these, 83 percent were offered at least ten hours, and 49 percent attended ten hours.  Only one percent of inmates refused group treatment.  Groups were offered in several locations.  At the time of the site visit, it was unclear whether planned additional group spaces would be sufficient for further expansion of the EOP program.

Two group therapy sessions were observed.  Inmate arrivals were delayed by 20 to 30 minutes, which appeared to be a chronic problem.  One was the initial session of a Dialectic Behavioral Therapy group led by a psychologist.  There was good discussion among its nine participants, who expressed having benefitted from the group.  The other observed group was a music group facilitated by a recreation therapist and a gold coat inmate.  It also had good participation and interaction among its participants.

The institution's gold coat program for higher-functioning inmates who were trained to assist some EOP inmates appeared to be beneficial and well-liked by EOP inmates.  Gold coats received 12 hours of training and assisted with activities of daily living, tutoring, co-facilitating recreation-based groups, and getting inmates to appointments, groups, and medication lines.

550

<u>SNY 3CMS</u>:

The two psychiatrists had caseloads of 327 and 365, respectively. Psychiatry contacts were 91-percent compliant, and PC contacts were 99-percent compliant. PCs reported caseloads of 136.

Cell-front contacts were nearly non-existent. Timeliness of IDTT meetings was 99-percent compliant, and attendance by clinical staff was 100-percent compliant.

Therapeutic groups had been discontinued following the institution's mission change and growth of its SNY EOP. There were 861 inmates on group wait lists and some inmates had initiated their own group meetings. Contract clinicians conducted groups for inmates who would be paroling within specified timeframes.

At observed IDTT meetings, a psychiatrist, senior psychologist, two clinicians, and CC I were in attendance. The meetings were clinically-driven, and the inmates were familiar with the IDTT process and knowledgeable about treatment plans and goals. One of the clinicians covered the necessary topics but gave inordinate attention to completing paperwork rather than to engaging the inmates.

Ten interviewed inmates reported that they knew their psychiatrist and PC and that the program was beneficial to them. Some who had medical problems commended the psychiatrist for addressing both their mental health and medical needs. Several inmates reported not receiving notice of a change of clinician and having had multiple changes during the past year. Others stated that clinicians were not prepared for their sessions. All reported concern about the lack of groups

Referrals:

There were 1,953 mental health referrals during the review period. Compliance rates for response to referrals were 94 percent for emergent referrals, 93 percent for urgent referrals, and 94 percent for routine referrals.

MHTS.net:

Mental health staff reported using MHTS.net to track inmate arrival dates, level-of-care changes, mental health contacts, IDTT meetings, EOP group offerings and participation, and DSH referrals/non-referrals. They were aware that MHTS.net contained information on suicidal behaviors and indicated that they had access to other information management systems including SOMS and DECS.

Mental Health/Custody Relations:

There were reports by staff and EOP inmates of intimidation, threats, and retaliation by some unit officers. It was reported that groups sometimes began late due to officers not permitting inmates to leave their housing units timely.

Likewise, half of interviewed 3CMS inmates reported disrespectful comments by some custody officers concerning these patients' mental health medications and/or their level of care. Most of these inmates voiced the importance of avoiding certain officers who engaged in racially-based verbal abuse.

Heat Plan:

There were no Stage II or Stage III heat alerts during the reporting period.

Use of Force:

Thirty-three of 39 or 85 percent of mental health staff were trained on the new use-of-force policy, as were 445 of 462 or 96 percent of custody staff.

552

<u>Access to Care</u>:

Review of access to care reports for the review period indicated that inmates refused one percent of all mental health ducats and add-on appointments. Ducats were not completed due to custodial reasons less than one percent of the time, and due to non-custody reasons seven percent of the time.

<u>Program Access</u>:

VSP reported that staff training on the functional evaluation process had recently been provided to EOP and 3CMS clinicians.

a.    <u>Job and Program Assignments</u>:

Thirty-one EOP inmates had full-time employment and six had part-time employment. The institution was unable to report whether these jobs were paying or non-paying.

For 3CMS inmates, 373 had full-time employment. One hundred seventeen participated in full-time vocational educational programs, one had a full-time academic position, and 114 had part-time academic positions. Again, VSP was unable to report whether these positions were paying or non-paying.

There were 182 eligible but unassigned EOP inmates, 262 eligible but unassigned 3CMS inmates, and 236 eligible but unassigned non-mental health caseload inmates.

The associate warden for housing reported no conflict between mental health programming and inmate jobs or other positions. He reported that mental health and custody staff worked together to ensure that inmates were not missing groups or other treatment due to employment, vocational, or academic positions.

553

Among non-mental health inmates, 1,091 had full-time employment, six had part-time employment, 244 participated in full-time vocational education programs, two had full-time academic positions, and 371 had part-time academic positions.

b.    Milestone Credits:

VSP reported that EOP inmates were eligible to earn milestone credits as of November 2014. Previously, entry of milestone credit data into SOMS was delayed as mental health staff lacked access to SOMS data entry, but by the time of the site visit, milestone credit data was being entered into SOMS weekly.

VSP reported that 88 of 288 EOP inmates were eligible for milestone credits. Among these 88 inmates, 31 percent actually earned milestone credits. Two hundred thirty nine of 1,154 3CMS inmates were eligible to earn milestone credits, and 49 percent of these 239 inmates actually earned milestone credits.

Of 1,642 non-mental health caseload inmates, 237 were eligible to earn milestone credits and 40 percent of those actually earned them.

c.    Out-of-Level Housing:

There were 38 EOP, 50 3CMS, and 67 non-mental health Level I inmates in Level II housing. There were also six EOP, 17 3CMS, and ten non-mental health Level III inmates in Level II housing.

d.    ADA Reasonable Accommodations and Grievance Procedures:

The revised ADA accommodation and grievance procedure was not implemented at VSP.

e.    Periodic Classification Score Reductions: EOP Inmates:

Review of periodic classification score reductions indicated that EOP inmates were granted semi-annual classification score reductions for successful programming.

_Coleman_ Postings:

All four housing units on A-Yard, which housed EOP inmates, and all four housing units on B-Yard, which housed 3CMS inmates, had _Coleman_ postings in both English and Spanish.

**APPENDIX B**
**CLINICAL CASE REVIEWS**

EXHIBIT A
California State Prison, Sacramento (CSP/Sac)
February 3, 2015 - February 5, 2015

**Inmate A**

This inmate's medical record was reviewed from a list of inmates housed in administrative segregation for longer than 90 days. The inmate arrived at the administrative segregation EOP hub with diagnoses of Mood Disorder NOS and Antisocial Personality Disorder. The target of treatment was stabilization of his moods with CBT. The inmate was prescribed Geodon, Effexor, and Vistaril. According to the administrative segregation length of stay report, the inmate was placed in administrative segregation on 10/12/14 and as of 2/3/15, had a length of stay of 99 days. His eUHR indicated that he went to the MHCB on 10/12/14, and again from 11/19/14 to 11/20/14, and was placed in the OHU on 12/24/14. The Form 7388 treatment plans, the Form 7388B level of care assessments, SREs, and five-day follow-ups were completed according to policy. When the inmate was not in the MHCB or administrative segregation, weekly confidential sessions were conducted. His clinical documentation indicated improvement as he had not been admitted to the MHCB through January 2015.

Findings

The inmate's care and treatment was adequate to address his mental health needs.

**Inmate B**

This inmate arrived in administrative segregation on 10/3/14 with diagnoses of Bipolar I Disorder with psychotic features, and Intermittent Explosive Disorder. He had a length of stay of 123 days as of 2/3/15. He was interviewed during group and stated that the groups did not address his actual diagnosis of Bipolar Disorder; he indicated that he felt that groups should help him to understand triggers for his illness and obtain coping skills.

Treatment plan goals were to refrain from acting on anger, eliminate cognitive distortion, achieve medication compliance, end substance abuse and resist temptation, and process unresolved issues with his mother and women in general. His prescribed mental health medications were Zyprexa, sertraline, and oxcarbazepine.

PC and psychiatry visits addressed current inmate concerns. The inmate's anxiety increased during January 2015 due to his perceived insufficient yard time and his administrative segregation length of stay.

Findings

The inmate's mental health care and treatment appeared to be clinically appropriate.

**Inmate C**

This PSU inmate's healthcare record was reviewed during a group therapy session when he stated that he frequently remained isolated; his goal was to leave his cell for individual and group treatment. He indicated that this isolative behavior had been present for several years.

He was provided with a diagnosis of Schizoaffective Disorder, depressive type. His prescribed medications were Risperdal and venlafaxine. He was a high refuser of treatment and was on a modified treatment plan during the site visit. He verbalized continued auditory hallucinations and increased paranoia. It was noted that his treatment plans repeatedly stated "Encourage EOP Level of Care and encourage to get out for groups and 1:1 contacts," regardless of the subjective findings, behavior changes, or verbalization from inmate of increased auditory hallucinations. It was also noted that psychiatry notes were on the CSP/Corcoran form, rather than CSP/Sac. It was unclear whether these were notes by a visiting psychiatrist or telepsychiatry. There was no change in the inmate's medications during October and November 2014 or documentation of discussion regarding increased auditory hallucinations with his PC.

Findings

The inmate's documented care and treatment were inadequate for his mental health concerns of isolation due to paranoia. While PC notes discussed his willingness or unwillingness to do homework at times, it was unclear from the documentation whether there was any progress using the existing treatment plan. Medical records documentation did not illustrate adequate treatment plans, treatment team consultation, or plans to change treatment even though auditory hallucinations were increasing. The inmate was, however, seen for clinical contacts at the required Program Guide frequencies.

**Inmate D**

This PSU inmate was interviewed while attending a PSU group. He reported wanting to go to a DSH inpatient program, but his clinician wanted him to begin treatment with clozapine. He was concerned with placement in an inpatient area during a clozapine initiation due to fear of blood draws and other inpatient treatments.

The inmate's diagnoses were Psychotic Disorder NOS, Schizoaffective Disorder bipolar type, and Personality Disorder NOS. His prescribed mental health medications were Zyprexa, Zoloft, Trilafon, and Cogentin as needed. He was transferred to PBSP on 10/1/14, and he was admitted to the CTC on 10/12/14. He was discharged from the CTC on 11/13/14 and returned to CSP/Sac on 12/12/14. He complained of medications being administered too early, causing him to lose sleep, and that he did not have a television for over three months. Psychiatry notes addressed his concern regarding treatment with clozapine and his ambivalence about blood draws, but the inmate agreed to consider this treatment alternative.

Findings

The inmate's care was adequate to address his mental health needs; however, further discussion about the benefits of treatment with clozapine and the inmate's desire to go to DSH should have occurred. Psychiatry stated that additional discussion about clozapine would occur. There was, however, no documentation that psychiatry was informed about the inmate's desire to go to DSH.

559

**Inmate E**

This PSU inmate continued to attend groups to maintain his step four status in the hope of obtaining a television that he had purchased after eight months.  He stated "I only want what I am entitled to according to the step program."

The inmate's diagnoses were Major Depressive Disorder, Dementia NOS with psychotic features, and Polysubstance Dependence.  His prescribed medication was Effexor.  The majority of notes stated "thoughts contained delusional content this session," even though delusional behavior was not documented.  Weekly clinical group notes for September 2014 and November 2014 all stated "I/P was alert, attentive and actively participated in group activities and discussion.  He appeared willing to engage in the group process."  Multiple clinical notes also quoted a psychiatrist's statement from "11/27/13 indicating a PT reported hoarding same day.  He is not a PC 2602 order" even though the PC did not discuss medication noncompliance.  The PC contacts, psychiatrist contacts, and IDTT meetings for this inmate were scheduled and occurred according to Program Guide requirements.  He was on step 4 since June 2014 and told the clinician about his concerns about not getting his television.  The clinician tried to redirect him during group.

Findings

The PC and other members of the team met the Program Guide's contact and IDTT meeting requirements.  Although treatment was adequate, progress notes did not clearly show improvement.  It was implied that the inmate was doing well by maintaining step 4 over eight months.  The inmate's continued success might be jeopardized if his focus was on not receiving his television and his perception of lack of support from the mental health team to rectify his problem with custody concerning his television.

EXHIBIT B
Folsom State Prison (Folsom)
May 20, 2015 - May 22, 2015

**Inmate A**

The inmate's healthcare record was reviewed from a list of inmates attending initial and annual IDTT meetings observed during the site visit. He was diagnosed with possible Anxiety Disorder and was not prescribed mental health medications. His documented parole date was 1/22/16.

Clinical individual contacts occurred on 10/9/14, 12/26/14, 4/7/15, and 5/11/15; an IDTT meeting was held on 5/20/15. Clinical contacts occurred at least every 90 days except for between 12/26/14 and 4/7/15, when they exceeded 90 days. The clinical note in both education and plan discussed basic parole issues and the inmate's concern about ADHD, as well as indecision regarding remaining at the 3CMS level of care. Treatment plans for the October 2014, December 2014, and April 2015 contacts indicated that clinical contacts should occur quarterly and/or as clinically indicated.

During observation of the IDTT meeting, the clinician did not discuss with the treatment team any changes that had occurred with the inmate during the past 90 days. Goals were not measurable and, except for the inmate's indecision regarding remaining at the 3CMS level of care, his level of care was not discussed. The inmate also was not asked if the IDTT process was clear or to repeat what was stated as to the treatment plan. There was no referral to psychiatry for anxiety or ADHD.

<u>Findings</u>

The clinical documentation was minimally adequate due to the lack of clarity in the notes. It was unclear what the objectives of any of the documented goals were; and what, if any tools, handouts, or other educational tools were used to reach these goals. There was no documentation of any positive or negatives changes that had occurred during the past 90 days and the treatment plan did not change from 10/14 to 4/15. The IDTT process was inadequate.

**Inmate B**

This inmate was chosen from a list of inmates attending observed IDTT meetings during the site visit. The inmate was present for the initial IDTT meeting. He had arrived at Folsom on 5/1/15. The CDCR Form 7277 indicated that he had medical diagnoses of diabetes mellitus II, hepatitis C, and seizures. He was prescribed metformin, mirtazapine, atorvastatin and Depakote. He was provided with a mental health diagnosis of Mood Disorder; he was prescribed Buspar and Remeron.

On 5/7/15, the clinician had an individual clinical contact with the inmate. The clinical documentation under "Assessment" was, "IP is currently stable. No acute psychological distress is reported/observed. No acute intervention necessary at this time. Sx's are caused/related to ____. Progress is ____."

Portions of the SOAPE note were a template and some spaces had been left blank or non-circled portions had not been filled in.  It was observed that use of a template of this nature likely limited development of individualized treatment plans.

The inmate submitted two CDCR Forms 7362 on 5/6/15 for back pain and medication refills for acetaminophen, atorvastatin, and metformin.  On 5/8/15, he submitted a CDCR Form 7362 for eyeglasses.  A CDCR Form 7362 was also submitted on 5/11/15 requesting a dental exam.  An optometry visit occurred on 5/15/15 and another CDCR Form 7362 was submitted on 5/18/15 for back pain.

The IDTT meeting occurred on 5/20/15, when the inmate made multiple inappropriate comments that the treatment team did not address.  During introductions of treatment team members, he asked if he could get the medications that helped him "to fly like superman;" the treatment team ignored this statement.  There was discussion with custody about possible transfer due to his back pain and inability to walk long distances.  The inmate said he was currently residing on the second or third tier and walked back and forth.  The inmate again stated, "Can I get something to make me walk on the walls and fly?  That would really work for me."  The team again ignored these statements.  The inmate's seizures, which affected his ability to work, were not discussed, nor was his inability to sign the IDTT documents; the inmate stated that he had not received glasses.

The inmate's goals discussed during the IDTT meeting were not measurable, and the team did not discuss his appropriate level of care.  Inappropriate comments were not addressed and medical conditions affecting his ability to get a job were also not discussed.  The regional senior psychologist was also concerned about the IDTT meeting and discussed the concerns with the chief of mental health and clinical staff.

Findings

Clinical timeframes were met according to the Program Guide.  However, the IDTT meeting did not address medical or optometry concerns, the goals were not measureable, and the level of care was not discussed.

**Inmate C**

This EOP inmate's medical record was reviewed as one of two EOP inmates awaiting transfer from administrative segregation to an EOP hub.

The inmate was diagnosed with Psychotic Disorder NOS.  He was prescribed Risperdal.  He had been incarcerated for 18 years over three prison terms at the time of the site visit.

The inmate worked as a porter and was single-celled.  He was placed at the EOP level of care on 5/12/15, after a physical altercation and refusal of a cellmate; he was then placed in administrative segregation.  Previous clinical notes revealed the inmate self-referred due to paranoia and increased anxiety four times over approximately five to six weeks prior to the

incident.  The clinical notes also stated that the PC had planned an IDTT meeting to consider referring him to the EOP level of care.

The inmate was on two group waiting lists.  Clinical documentation reflected his acceptance that he needed help, requested groups, and inquired about "The Delancey Program" approximately one month before the incident.

Findings

Clinical timeframes were met according to the Program Guide.  The inmate self-referred four times within six weeks at the 3CMS level of care.  The responses to the four self-referrals were untimely, resulting in the inadequate provision of mental health care for this inmate.

**Inmate D**

This inmate's healthcare record was reviewed following inmate interviews at Folsom's Women's Facility.  The inmate was diagnosed with Major Depressive Disorder and was prescribed Effexor.  Medical records were reviewed from October 2014 to May 2015.  They indicated that during October 2014, the inmate was reluctant to again move to the 3CMS level of care.  She had a history of trauma, related to a motor vehicle accident, with extensive injuries to her leg and face.  She was married, had a four-year old child, and was serving a four-year sentence.

During December 2014, the inmate reported that her prison time was mistakenly calculated by custody by 50 percent; she learned she had two additional years to serve in prison.  The clinician again noted that the inmate was considering returning to the 3CMS level of care and to psychotropic medication.  The IDTT meeting occurred on 12/30/14; at that time, the inmate was removed from the mental health caseload and was referred to the Transitional Case Management Program (TCMP) to assist with parole planning.

During January 2015, the inmate reported that custody informed her that because she was in the mental health program, her security level had changed from minimum to medium.  She was reported to be stable, but her anxiety was increasing.  The clinical plan "Recommended CCCMS LOC at this time - schedule IDTT - completed 7447."  The clinician had a follow-up in 30 days.

In February 2015, a psychiatry visit indicated that the inmate was prescribed Effexor for depression.  The inmate stated the medication was helping and things were going great.  She reported taking college courses, attending AA meetings, and working as a porter.

During April 2015, clinician notes stated that the inmate asked the psychiatrist to discontinue medications; however, she now wanted to continue medications for a month or two because the classification hearing was occurring in June 2015.  The clinician reported the request to remain on medications to the psychiatrist.  The psychiatry visit in April 2015 supported the clinical findings.

In May 2015, the inmate reported that she was doing well on medications in the program.  She nonetheless felt the need to leave the program to qualify for a time reduction slot if one became available, so that she could return to her family.

Findings
The number of PC and psychiatry contacts exceeded Program Guide requirements.  It was unclear when the inmate entered the mental health caseload and at what level of care.  It was also unclear if any clinical or custodial discussions about the inmate's concern that her mental health placement was negatively impacting an early release ever occurred.

EXHIBIT C
California Health Care Facility
July 21, 2015 - July 23, 2015

**Inmate A**

This 23-year-old man was referred from SCC to the CHCF MHCB on 7/11/15 after acting strangely on the yard and complaining of auditory and command hallucinations to harm somebody.  He had been discharged from the 3CMS program approximately five months earlier.  He also had an episode of fecal incontinence and confusion.

A useful initial psychiatric evaluation assessment was present in his eUHR.  His presentation was consistent with the differential diagnoses of Psychotic Disorder NOS, Mood Disorder NOS, Polysubstance Dependence in remission, history of ADHD, and likely Antisocial Personality traits.  His physical examination, which was completed within 24 hours, indicated that the inmate was stable with well-controlled asthma.

An initial psychologist's progress note was written on 7/12/15 and provided a helpful summary of the inmate's history of present illness.  An IDTT was scheduled for the following day.  The inmate was also placed on suicide watch/suicide precaution status.

The inmate's treatment plan included identifying the stages of death and dying, which appeared related to a problem of "grief/loss" listed in his problem list.  However, documentation in his initial assessments relevant to recent losses was not located.

A 7/13/15 note indicated that he was too mentally unstable to be considered for non-mechanical restraints.  A 7/14/15 psychiatrist note reported there was no objective evidence to suggest dangerousness to self or others or grave disability.  However, the inmate remained on suicide precaution.  Informed consent was documented relevant to the use of psychotropic medications.

Prescribed medications included Zydis.  A 7/17/15 psychiatry progress note indicated good clinical improvement.  There were daily progress notes from a mental health clinician.

The inmate's treatment plan was reviewed on 7/20/15.  He was assessed to be functioning at his clinical mental health baseline.  The plan was to discharge him to the EOP level of care.

A 7/20/15 SRE was completed that assessed him to be at moderate chronic risk and low acute suicide risk.  A 7/20/15 psychiatry progress note indicated a diagnosis of Mood Disorder NOS.  The plan included motivational interviewing to identify stage of change.

<u>Findings</u>

This inmate was seen in a timely manner by the psychiatrist and mental health clinician and his treatment plan was developed in a timely fashion.  However, his treatment plan included grief work specific to death and dying issues despite such issues not being documented in any of his mental health assessments.  Document review indicated his cuffed status was only reviewed once, despite clear clinical improvement that his mental health clinicians documented.  He also remained on suicide precaution despite progress notes indicating he was not a danger to himself

567

or to others.  This inmate was not receiving an appropriate level of mental health treatment due to essentially being locked down within the MHCB.

## Inmate B

This 24-year-old man was transferred from CSP/Corcoran to the CHCF MHCB on 7/12/15 due to being a danger to himself.  He reported experiencing both auditory and visual hallucinations that told him to cut himself, to hang himself, and to bang his head.

Healthcare record review indicated numerous MHCB placements since February 2015.  Prescribed medications included venlafaxine, Remeron, and Trileptal.  The eUHR contained a comprehensive initial psychiatric evaluation that was written on 7/12/15.  The inmate's presentation was consistent with the diagnoses of Mood Disorder NOS, possible Substance Dependence, Impulse Control Disorder NOS, Antisocial Personality Disorder, and Borderline Personality Disorder.

Suicide precautions were initiated.  The treatment plan also included having the inmate's primary psychiatrist review his psychotropic medications.

The eUHR did not contain a history and physical examination report.  An SRE was completed during the day of his admission.  He was assessed to be at moderate chronic and acute suicide risk.

A 7/12/15 psychologist's note indicated the inmate's custody classification was maximum security and that he was "in ASU for IEX and assault of a CO during past year."

An admission nursing assessment was dated 7/12/15.  The inmate's initial treatment plan was dated 7/13/15.  Mood dysregulation with possible psychotic features was listed as the only problem on his problem list.  His treatment modalities were limited related to the lack of access to out-of-cell structured therapeutic activities.  The Form 7388B was completed.

The inmate's clinicians wrote progress notes on a daily basis.  Medications were adjusted during this admission and appropriate laboratory tests were obtained.  The recreational therapist wrote that "RT will facilitate treatment groups/interventions to assist the inmate/patient to identify and learn some coping skills to assist with managing stress."

A 7/14/15 psychologist progress note indicated the inmate appeared to be using the MHCB for a "vacation" since it was assessed that his Axis II symptoms appeared to be driving his MHCB admission.  The Mood Disorder NOS diagnosis was described as being questionable and an Antisocial Personality Disorder diagnosis was made.  His privileges included receiving normal prison attire and yard privileges.  Suicide precautions remained.

On 7/15/15, the psychiatrist included Adjustment Disorder with mixed disturbances of conduct and emotion and Bipolar Disorder as differential diagnoses.  Medication adjustments were also made.

568

The inmate's treatment plan was reviewed on 7/20/15. The Form 7388B was completed. This treatment plan was little changed from the initial treatment plan. Another SRE was completed at that time.

The psychiatrist wrote a mental health discharge summary on 7/20/15. The inmate was to be discharged at the 3CMS level of care.

Findings

A history and physical examination was not documented in the inmate's eUHR. The inmate's treatment was very limited due to the lack of out-of-cell structured therapeutic activities and very limited out-of-cell time. Treatment was essentially restricted to medication management and individual counseling.

**Inmate C**

A 7/5/15 initial psychiatric evaluation indicated that this 22-year-old man was transferred from WSP to the MHCB due to being "highly agitated, hypomanic and reporting suicidal ideation."

His presentation was consistent with the diagnoses of Schizophrenia and possible Substance Induced Psychosis. His history and physical examination was completed on the day of his admission.

The inmate's initial treatment plan was completed on 7/6/15. The provisional diagnosis was Schizoaffective Disorder; his other diagnoses were deferred. His one listed problem was "inmate patient reports chronic headache to which he is responding to with suicidal ideation." Treatment interventions included learning relaxation skills, medication adjustments, and recreational therapy.

The Form 7388B was completed during the IDTT meeting. Progress notes were written by mental health clinicians on a daily basis. An SRE completed on 7/12/15 assessed the inmate to be at low chronic and acute suicide risk.

The inmate's treatment plan was revised on 7/13/15. The plan was to retain him in the MHCB for a standard fifteen minute suicide precaution status and to address his headaches and auditory hallucinations. Interventions included relaxation training, medication evaluation, and recreational therapy.

A 7/20/15 psychiatrist's discharge note indicated that the inmate had reached maximum clinical benefit and was able to function in a less restrictive environment. His treatment goals were reportedly met. Discharge medications included Cogentin, Zyprexa, and Zydis. He was discharged to the EOP level of care.

569

Findings

Although there were concerns about the effectiveness of offered treatment, this inmate received some benefit during his MHCB stay.

**Inmate D**

This EOP inmate's healthcare record was reviewed from a list of inmates housed in administrative segregation for longer than 90 days. His diagnoses were Amnestic Disorder secondary to traumatic brain injury (with vs. without behavioral disturbance), Antisocial Personality Disorder, seizure disorder, traumatic brain injury, and hepatitis C. The inmate was not prescribed psychotropic medications. He was prescribed seizure medications with mood stabilizing benefits. His prescribed medications included Keppra, trileptal, and Topamax. The inmate also had a chrono for and utilized a helmet. He was a DD1 inmate with impaired recent memory by history due to deterioration of cognition and memory skills.

The inmate was transferred from the reception center to CHCF on 2/10/15. On the initial health screening tool dated 2/10/15, nursing reported that he felt depressed and had previous suicide attempts, but he could not remember the dates. The nurse referred him to medical and the inmate was cleared. Mental health staff also saw him on 2/10/15. He denied statements documented on the health screen and stated he was concerned about seizures because he did not receive seizure medication in the morning. The mental health clinician consulted with nursing and was informed he did receive seizure medications in the morning. The clinician assisted the inmate in acclimating to CHCF's administrative segregation unit.

This was the inmate's second prison term; he had been in prison since 5/29/12 and in administration segregation since 1/12/15 for threat to and battery of an inmate. The inmate's expected release date was March 2016. He experienced a closed head injury after a car accident while driving under the influence of alcohol. The date of the car accident was not given. The inmate told CDCR staff that he was in a coma for 907 days, but verification was not provided.

Between December 2014 and July 2015, psychiatry and PCs saw the inmate according to Program Guide timeframes. Clinical notes over the first few months focused on adaptation to CHCF's administrative segregation unit and groups. Clinical notes indicated the inmate initially attended more than 50 percent of groups and yard, but then became "bored." On 5/13/15, a *Clark* hearing was held. Based on the 115 mental health assessment and other information, the ten-day loss of yard privilege was reduced to zero; this decision was based on the inmate's administrative segregation placement and not wanting to increase his isolation, as well as avoiding interference with mental health treatment.

Subsequent clinical notes indicated the inmate's frustration with the noise in administrative segregation; his boredom caused increased frustration, with refusals to attend confidential contacts, groups, or yard. On 7/14/15 the inmate was placed on a modified treatment program, and the clinician initiated a change in groups to support the inmate's needs and to hopefully increase his attendance.

570

On 7/21/15 the expert interviewed the inmate, who complained about not receiving yard. The expert encouraged him to voice these concerns at the ICC hearing, but on 7/22/15 the inmate refused to attend the ICC hearing. The inmate was awaiting transfer, but the transfer was delayed due to backlogs at MCSP, CSP/Corcoran, and RJD. The inmate previously stated the desire to remain close to his family. Custody discussed the backlog as well as the inmate's desire to remain close to his family, and they planned to discuss this with the warden.

Findings

This inmate's mental health care was timely and adequate. However, the 128-G custody forms documented conflicting information in the clinical and committee comments regarding the inmate's DDP and medical status.

**Inmate E**

This 59-year-old inmate was housed on D Yard at the EOP level of care. The May 2015 treatment plan indicated he was diagnosed with Dementia NOS, Alcohol Dependence, and Personality Disorder NOS, with antisocial traits. He was not prescribed any medications. His healthcare record was randomly chosen from the DSH non-referral log to review access to care.

The inmate was admitted to CDCR in 2010, but did not receive mental health services until 2014, when it was determined he needed 3CMS level of care. While in custody, he had a history of depressive symptoms, not attending to his ADLs, and treatment nonadherence. He was admitted to the MHCB in October 2014 due to auditory and visual hallucinations with paranoia. He was again admitted to the MHCB from 2/17/15 to 2/26/15 due to grave disability.

The inmate had a history of daily marijuana and heavy alcohol use. His cognitive decline was attributed to his history of alcohol use.

During the IDTT meeting on 5/28/15, the Form 7388B documented that the inmate attended less than 50 percent of scheduled treatment hours. However, it was decided that a DSH referral would not be completed because he was able to care for himself, was not in crisis, and did not require DSH placement. It was further stated that treatment refusals were the result of a "conscious choice," and not due to mental health issues. Staff reported they would use motivational interviewing to engage the inmate in one weekly treatment activity.

The inmate paroled on 5/30/15 to his sister's house with a plan to receive mental health resources at a county mental health facility.

Findings

Form 7388B documentation regarding the decision not to refer the inmate to DSH was clinically insufficient; more detail was needed. Without sufficient documentation it was difficult to determine whether this inmate's care was adequate. The use of motivational interviewing for an

inmate with dementia was likely to be unsuccessful; behavioral interventions were a more appropriate treatment approach.  While the EOP level of care provided frequent monitoring of mental status, it was not the best fit for an inmate with dementia who was unable to learn new coping skills and reasonably participate in a therapy group (recreational therapy was an exception).  However, it appeared that clinical staff were offering the best care available within the constraints of the system.  The more challenging and pressing systemic issue was the lack of clinical programming and housing for inmates with dementia.

EXHIBIT D
Pelican Bay State Prison (PBSP)
April 7, 2015 - April 9, 2015

**Inmate A**

This 28-year-old was selected as an example of an inmate who had been referred to, treated at, and returned from DSH.  In the DSH referral log, the referral reason was listed as a hunger strike; the inmate met referral consideration criteria two and five (in need of 24-hour inpatient care and multiple crisis placements).  Timelines for referral packet completion and submission were not met by PBSP, but the inmate was timely accepted by the DSH acute care program.

The discharge summary was located in the eUHR and was received timely.  It was typed on 2/23/15 and stamped as received on 2/27/15.  The discharge summary elaborated on the reason for the inmate's DSH referral and indicated that the inmate had refused to speak to his treatment team, resulting in a subsequent MHCB admission.  While in the MHCB, the inmate smeared feces and was found with a wet face after attempting to drown himself in the sink.  He was deemed suicidal and referred to DSH with a diagnosis of Depression NOS; staff reported a prior diagnosis of Malingering.

The inmate had 16 prior MHCB admissions; however, the time period was not provided.  The inmate also had a prior VPP admission in 2012; it was unclear if this admission was to acute or intermediate care.  The author of the discharge summary had only been treating the inmate at DSH for approximately four days prior to writing the discharge summary; not surprisingly there was not a lot of information in the section on the inmate's course of treatment.  The inmate was discharged with diagnoses of Depression by history, Malingering by history, and Antisocial Personality Disorder without any substantiation.  The only psychiatric recommendations were that the inmate's level of care be EOP and that he be monitored for signs or symptoms of mental illness.

Despite this, PBSP staff used the DSH discharge summary in their treatment planning for the inmate on 3/12/15 and specifically referenced the document.  The PBSP treatment plan clinical summary for this inmate was extremely well-done and provided strong support for the diagnoses of Malingering (primary), Depressive Disorder NOS (provisional), and Antisocial Personality Disorder (primary).  The treatment plan targeted appropriate problem areas.  The short term treatment goals required greater operationalization, but overall, the treatment plan for this very challenging case was well-constructed.

<u>Findings</u>

This inmate received adequate mental health treatment and was well-treated by PBSP mental health staff.

**Inmate B**

This 32-year-old EOP inmate was selected for review as an example of an inmate who was referred to, treated at, and discharged from DSH acute care for suicidal ideation and met criterion two (need for inpatient care on the Form 7388B).  He was referred on 11/24/14, and his referral packet was completed and submitted timely; DSH accepted the inmate in accordance with

Program Guide timelines. However, his bed assignment in the DSH acute care program was rescinded at one point because the inmate had a court hearing; he was later admitted when the court hearing was completed based on a brief note in the referral log as no further information was available.

The inmate was admitted to acute care on 12/12/14 and the discharge summary was typed on 1/5/15. The discharge summary elaborated on the reason for referral and explained that the inmate was in the process of being adjudicated for the near-death beating of his cellmate. The referred inmate had wrapped a sheet around his neck and expressed a wish to die. Because his commitment offense was attempted murder, the cellmate-related charge could result in life without parole. However, the inmate learned while admitted to the acute care program (1/3/15) that the charge against him had been dropped. While the inmate denied suicidal intent after learning that news, he continued to question his life's worth and stated that he was tired of life.

The inmate had nine prior documented suicide attempts by multiple means, including overdose, hanging, and cutting. He also had a history of psychiatric hospitalizations beginning as a teenager that included an admission to DSH intermediate care. The DSH treatment team did not recommend intermediate care, and their rationale was unclear and not well-stated. They documented only that it was in the inmate's best interests "not" to be placed in groups where his vulnerability might be triggered and "as evidenced by his psychological testing, may trigger severe violence." The inmate was discharged with diagnoses of Mood Disorder NOS, Impulse Control Disorder, history of Polysubstance Abuse, and Antisocial Personality Disorder. Discharge medications included the following: citalopram 20 mg at night, docusate 200 mg per day, and valproic acid liquid 1000 mg per day. Based on a handwritten note on the discharge summary, the inmate appeared to have been discharged by DSH sometime after 2/20/15.

The inmate was next seen by the PSU treatment team on 3/4/15. He had been in the EOP since 2005. The treatment plan included a comprehensive clinical summary that referenced the discharge summary and actually explained more appropriately and more fully the DSH decision not to refer the inmate to intermediate care. This treatment plan indicated that the inmate's primary diagnoses were Antisocial Personality Disorder, "psychopathic," and Bipolar Disorder NOS, but it was unclear what symptoms of Bipolar Disorder and psychopathy the inmate experienced. The treatment plan identified four problem areas, but then inappropriately grouped them on the treatment plan, and failed to properly operationalize them. While there were some meaningful interventions, the treatment plan required further development for this inmate.

Findings

While treatment plan interventions for this inmate provided adequate treatment, the treatment plan itself required revision so that it met the standards established by CDCR policy and basic treatment plan quality standards.

**Inmate C**

This 30-year-old EOP inmate was selected for review because he was identified as meeting two criteria for higher level of care referral consideration on the Form 7388B while admitted to the PBSP MHCB, but was not referred.  The inmate was identified because he required 24-hour inpatient psychiatric care and had three or more crisis care placement requests in the last six months.  The inmate was not referred at the time according to the non-referral log because an assessment was still in process.  However, the Form 7388B indicated that he had serious safety concerns and was considering harming himself because of the fear of being placed on a yard.  The team further indicated that the inmate had reported suicidality subsequent to being told by the medical doctor that his medical issues were "all in his head."

The inmate had previously been diagnosed with Major Depressive Disorder, Adjustment Disorder, "and/or" Polysubstance Dependence.  He had a history of two suicide attempts.  The team specifically documented that no acute care referral was needed, but did not address intermediate or EOP care.  There were no treatment modifications indicated on the Form 7388B, but the treatment plan included daily clinical contacts to address stress management and develop the inmate's ability to verbalize himself properly so that his needs were met.

The treatment team justified the lack of referral by stating that an assessment was still in process.  While this was the inmate's first MHCB admission at PBSP, it was his third MHCB admission.  There was substantial information in the healthcare record from his prior MHCB admissions.  The inmate may not have required a DSH referral, but EOP treatment was not considered by the treatment team despite the inmate's numerous risk factors; they included safety concerns, medical issues, and feeling that medical staff was nonresponsive.  The treatment plan dated 9/15/14 included problems that were too broad and vague, while the intervention also required greater specificity.  However, the goal was well-specified.

<u>Findings</u>

The lack of higher level of care referral was not properly justified for this inmate.  The inmate was a "new" PBSP admission, but was not new to MHCBs overall.  There was also documentation regarding those admissions that would have provided further background and allowed the treatment team to provide more detail in their clinical justification for non-referral or perhaps would have supported a higher level of care referral.  The team should have considered other levels of care such as intermediate and EOP.  Based on available documentation, this inmate was not adequately treated.

**Inmate D**

This 28-year-old inmate was selected for review because he had been on the non-referral log four times after meeting higher level of care referral consideration criteria.  Specifically, the inmate met criterion two on 9/29/14 and 10/6/14, two and three on 10/27/14, and five and ten on 11/6/14 while in the MHCB.  The inmate was ultimately referred to DSH intermediate care on 11/20/14 due to decompensation (criteria one, five, and six) from the EOP.

The inmate had been on a forced medication order for danger to others since 2010, but in March 2014 psychiatry elected not to renew the forced medication order. The order was allowed to expire. On 10/21/14, a forced medication order was initiated due to danger to self and others, and grave disability. The inmate's initial MHCB placement (9/29/14 treatment plan) was due to psychotic behavior with suicidal and homicidal ideation. The inmate was prescribed benztropine and ziprasidone, but a forced medication order was being considered at that time due to nonadherence. The treatment plan was minimal and not fully applicable given the inmate's acutely psychotic state and inability to fully participate in talk therapy. The rationale provided for not referring him to a higher level of care at that time was that the treatment team wanted more time to allow the interventions to have an effect. The MHCB team appeared to only focus on the acute care program as a referral option. Treatment "modifications" included in the Form 7388B of that date were solely the regular MHCB program; there were no individualized modifications for this inmate. The next treatment plan for the same admission (10/6/14) indicated that the inmate was not referred "to APP" because the team was waiting for medications to take effect. The treatment team also indicated in a treatment plan addendum that if the inmate had not stabilized by the next IDTT, he would be referred to DSH acute care. However, the inmate was discharged back to EOP and not referred to DSH.

The inmate was subsequently readmitted to the MHCB on 10/23/14. He was next seen by the MHCB IDTT on 10/27/14 following the 10/23/14 MHCB admission for danger to others (the inmate spit on another inmate) and decompensation due to disorganized thinking and delusions. The inmate reported feeling overwhelmed and angry prior to admission and had insisted that his auditory hallucinations were real. He was prescribed benztropine, haloperidol, and valproic acid during that admission for a diagnosis of Psychotic Disorder NOS. While the treatment team indicated he met criteria two, three, and seven on the Form 7388B, they did not feel that a referral was justified because it was the inmate's initial IDTT meeting and more time was needed to determine the effectiveness of clinical interventions. The treatment modifications specified on the Form 7388B appeared to be standard MHCB treatment.

The inmate was discharged from the MHCB, but then readmitted on 11/4/14. He was seen by the treatment team on 11/6/14 and identified as meeting criteria two and five, but again not referred. The rationale for no DSH referral was again because it was the inmate's initial IDTT; however, at this point the MHCB staff should have been quite familiar with the inmate. In fact, the treatment plan indicated that discussion with the EOP inmate's PC revealed that the inmate stabilized to a degree during the MHCB stay, but was then unable to maintain in the EOP setting. Despite this, the MHCB did not consider him for a higher level of care referral other than for acute care. The justification was clearly insufficient as were the treatment modifications. Luckily, the EOP treatment team recommended referral to DSH intermediate care on 11/20/14. The inmate was found to meet criteria one, five, and six with all 115 evaluations concluding that the inmate's mental disorder appeared to contribute to the RVR behavior. The inmate was prescribed olanzapine 15 mg at night with haloperidol 10 mg intramuscular injection backup and benztropine mesylate 4 mg per day.

Findings

This inmate should have been considered for higher level of care referral much sooner and during his MHCB admissions.  His deterioration also could have been avoided had the forced medication order not been allowed to expire.  Prior psychiatry staff had clearly detailed a pattern of the inmate's poor adherence with his psychotropic medication regimen and subsequent mental health status and functional decline.  This was what occurred within several months of the order's expiration in 2014.  Once the inmate was admitted to the MHCB, the forced medication order was quickly pursued again.  However, it should not have been allowed to expire in light of the inmate's long poor adherence history when off of a forced medication order and stability when on a forced medication order.  The inmate also had a prior DSH hospitalization at the intermediate level of care which appeared clearly indicated in this case, yet the MHCB seemed to only consider acute care treatment.  The justification for non-referral while admitted to the MHCB was repeatedly documented as "initial IDTT;" this was wholly insufficient, particularly in light of the inmate's repeated admissions.  MHCB treatment staff also failed to include appropriate treatment modifications to address the positive criteria on the Form 7388B and improve the inmate's functioning.  Fortunately, the EOP treatment team eventually appropriately referred the inmate to DSH intermediate care.  This inmate did not receive adequate care from MHCB staff as he required higher level of care referral and adequate treatment to address his acute symptoms.

**Inmate E**

This 33-year-old PSU inmate was selected for review because the inmate was observed in IDTT during the site visit.  The IDTT meeting was not observed to have been a positive experience; the clinician engaged in a power struggle with the inmate and repeatedly interrupted and disrespected the inmate within the clinician's behaviors.  At times the PC appeared to be mocking the inmate and the inmate's self-report.  This behavior was implicitly supported by the supervisor, further risking escalation of the inmate, but the inmate was able to manage his frustration and articulate his emotional reaction and concerns extremely well.

In a treatment plan dated 2/11/15 and completed prior to the site visit, the treatment team noted criterion six of three or more RVRs in the last three months as positive on the Form 7388B.  However, the non-referral rationale was that the team wanted "to allow for a period of assessment."  It appeared that the inmate had been elevated from 3CMS to EOP level of care when he received the most recent RVR on 1/6/15 and that the treatment team wanted to allow sufficient time for treatment interventions to take effect.  As of 4/6/15, the treatment plan remained vague and needed greater specification.  Treatment targets were overly broad with multiple problems grouped together; treatment goals were also grouped together and overly broad, such as decrease symptoms 50 percent, and could not be fully reviewed because the typed sentences did not print fully due to limitations in the plan's print area.  The PC also used atypical abbreviations and acronyms that were not explained, furthering the difficulty in understanding the treatment plan.

578

The treatment team diagnoses in the April 2015 treatment plan were "no diagnosis" on Axis I, but were followed by Factitious Disorder, rule-out Depressive Disorder NOS, and Antisocial Personality Disorder. The non-referral justification listed in the April 2015 Form 7388B appeared to confuse treatment for indecent exposure with inpatient treatment at a higher level of care. There also was some discussion that the inmate was not referred to a higher level of care because the treatment plan had only recently been established, but this rationale did not discuss the interventions that had been employed since the initial RVR and what would be done differently (i.e., treatment modifications). It was insufficient to state that the inmate would be observed and assessed indefinitely as a basis for denying higher level of care access. The treatment interventions were highly technical clinical groups that required trained clinicians to deliver the interventions; this made the listed interventions unrealistic given that group treatment was provided by psych techs and a recreational therapist who were unqualified to provide the level of clinical services outlined in the treatment plan and that the inmate clearly needed.

This inmate was prescribed Remeron 15 mg at night and Effexor XR 150 mg every morning with Zyprexa, unspecified dosage added as needed. The inmate's diagnosis had been "deferred." A psychiatry progress note dated 3/3/15 listed Antisocial Personality Disorder as the diagnosis, although the inmate had been seen at cell front. The inmate had a history of 3CMS level of care for three prior terms and had been provided with a diagnosis of depression at that time. He reported three serious suicide attempts with hospitalization; one was in the community, another occurred while in jail, and one occurred while in prison (2004). There was no discussion of a behavioral plan for this inmate, but one was clearly indicated.

Findings

There was clearly conflict between this inmate and his clinician. The most recent treatment plan in the eUHR was not well-developed; it had overly broad problems and goals and included interventions that could not be implemented with the current treatment program in the PSU. There appeared to be little to no therapeutic relationship between the PC and the inmate when observed in the IDTT and the program supervisor seemed ill-equipped to effectively manage the matter. Adding to the difficulties, the inmate had engaged in multiple IEX incidents with female staff, which made it difficult to transfer him to another PC since there were no other male PCs. This inmate needed a more fully developed individualized treatment plan that included a behavioral plan. His PC required additional supervision or the inmate needed assignment to another male PC so that therapeutic rapport could be established. This inmate was not adequately treated.

**Inmate F**

This 46-year-old inmate was selected for review because he was housed in the PSU for a 30-day evaluation as part of the SHU-exclusion process. The inmate had been identified for further evaluation as part of the SHU screening process. The eUHR contained a lengthy evaluation that referenced psychological testing that was performed as part of the court process, but did not indicate the date of administration. An SRE was also completed and noted several demographic and situational risk factors, but also a high number of protective factors. The inmate reported no

plan or desire to die. Despite some negative interactions with custody, including reported staff assaults that he stated were the result of custody staff harassing him, the inmate indicated that his mood was generally euthymic and that he had been functioning well without mental health services.

A 115 mental health assessment was completed on 3/27/15. The assessment noted that the inmate was classified as 3CMS without a SHU exclusionary diagnosis. He was observed during his ICC meeting. The inmate's case was discussed at length and mental health provided extensive appropriate input to custody staff.

Findings

This inmate was appropriately evaluated in accordance with the SHU exclusion process. He was determined not to have a SHU exclusionary diagnosis based on a thorough evaluation process. The inmate was appropriately returned to the SHU as he requested and as was consistent with CDCR policy.

**Inmate G**

This 56-year-old inmate was selected as an example of MHCB treatment. He was admitted to the PBSP MHCB on 8/27/14 and discharged on 9/29/14. No admission diagnosis was listed on the admitting document, although the inmate was admitted for "danger to others" and was placed on suicide watch. An initial psychiatric evaluation was completed on that date and noted that the inmate was receiving duloxetine 60 mg. In contrast to the admitting paperwork, the initial psychiatric evaluation noted that the inmate reported having given up on life as the chief concern at intake, with prior suicidal ideation and a hunger strike secondary to frustration over perceived lack of medical care. Further record review indicated that the inmate had threatened to harm someone while in the housing unit and had reported having command auditory hallucinations directing him to harm someone. The inmate had concerns about being placed on a mainline yard at PBSP while awaiting transfer to a 270 facility and allegedly stated that he wanted to remain in the MHCB until he could transfer. An SRE was completed for MHCB discharge on 9/29/14, but none were performed during the intervening treatment planning periods. The intake SRE did not address all of the relevant factors that resulted in the admission.

During the initial treatment team meeting on 8/28/14, the team accurately noted that the inmate had three or more MHCB placements within the last six months (criterion five) and also indicated that he met criterion two on the Form 7388B. They did not refer him to DSH because it was the inmate's initial IDTT and the team wanted further observation and an opportunity to implement interventions. However, this standard phrase did not acknowledge that the inmate was on his approximately fifth MHCB admission, most at PBSP; this should have allowed the treatment team to already have gathered a significant amount of information to determine whether a higher level of care referral was indicated or provide a more reasoned clinical non-referral rationale. The treatment plan was not modified to provide for the inmate's needs, but was vague and generic. On 9/5/14, the treatment team saw the inmate again. The treatment plan was not updated and remained inadequate to address the complexities of the inmate's

580

presentation.  The inmate was diagnosed with Mood Disorder NOS, but medications were not listed.  The non-referral reason at that time was that the inmate was making statements of homicidal intent for secondary gain, yet a ten-day MHCB extension was granted.  The inmate was not provided with yard or recreation therapy due to "safety."  The inmate had been smearing fecal matter on his walls based on progress notes, writing "PBSP SUCKS."  He also had smeared feces on his face.

The inmate was prescribed Cymbalta 60 mg every morning.  Daily clinical contacts were typically conducted at cell front and were non-confidential.  The inmate often did not interact with the psychologist or terminated the contacts prior to the end of the session.  The inmate continued to be seen weekly by the treatment team, on 9/18/14 and 9/25/14, until discharged.  The 9/18/14 treatment plan referenced that the MHCB team was awaiting a CCAT and information from a prior DSH admission to determine how to proceed.  This treatment plan also noted a diagnostic change from Mood Disorder NOS to Psychotic Disorder NOS and a change on Axis II from deferred to Antisocial Personality Disorder.  Despite the 9/18/14 treatment team noting that the crisis had quickly resolved, the inmate remained in the MHCB for another week.  It appeared that the CCAT was to consult on how to deal with the inmate's continued manipulations.  A CCAT was eventually held, and it was decided that the inmate would be discharged at the EOP level of care, which was an increase from 3CMS.

Recreational therapy was only ordered for this inmate on 9/24/14.  This was very problematic as PBSP was obviously used to dealing with at-risk inmates and staff had repeatedly documented that they did not actually believe that this inmate was at risk of harm to self or to others.  The inmate should have been provided with recreational therapy, and there was no valid clinical or security justification documented to prevent that.  A behavioral plan for the inmate was never discussed based on treatment plan documentation despite clear indications for such.  The inmate was never cleared for yard; there was no clinical justification for this ongoing restriction in light of staffs' belief that he was not at risk and was simply manipulative.

<u>Findings</u>

This inmate was not adequately treated at PBSP.

**Inmate H**

This 30-year-old 3CMS inmate was selected for review as an example of administrative segregation treatment.  The inmate was evaluated and provided with a diagnosis of Depressive Disorder NOS with a provisional diagnosis of Major Depression, recurrent.  The inmate only received this evaluation on 3/25/15, so he had yet to receive a treatment plan and had theoretically not yet been scheduled for IDTT.  As a result, the inmate's ongoing care could not be more thoroughly assessed.

On 2/13/15, a mental health clinician screened the inmate in a confidential space, and he was found to have no mental health needs at that time or a need for further evaluation.  Four days later, the inmate was seen at cell front in administrative segregation due to a mental health

referral (the source was not noted) and reported that he had not slept or eaten in five days and had "disassociated for one year." The inmate may have initiated the referral himself. Understandably, he denied any mental health concerns in the non-confidential discussion on the tier, particularly as he had been placed in segregation due to safety concerns on the yard and because he had expressed a desire to custody staff to disassociate from gang activity based on the building sergeant's report. Unfortunately, while the clinician took the time to interview the sergeant and obtain that valuable information, s/he still determined that no further intervention was necessary. The 3/25/15 evaluation was the result of a referral by ICC/UCC for being uncooperative. The inmate also requested an interpreter which might explain some of the difficulties during previous encounters with mental health and perceived lack of cooperation.

Findings
This inmate may not have been properly screened. The inmate's English fluency was not determined. If he was not fully fluent in English, this may have negatively impacted his initial mental health screening and caused him to have been inadequately treated. The inmate was definitely not evaluated properly as a result of the 2/17/15 referral, when he was seen at cell front. The clinician knew the inmate had safety concerns and was disassociating himself from gang activity, which placed him in a vulnerable position; however, the clinician chose not to interview him in a confidential setting. This inmate did not receive adequate treatment.

**Inmate I**

This 3CMS inmate's healthcare record was reviewed. He was provided with a diagnosis of Psychotic Disorder NOS. He was prescribed Risperdal, benztropine, and fluoxetine. The inmate was compliant with medications and laboratory testing. The PC discussed a substance abuse program as part of the treatment plan. Although the inmate stated he did not use drugs but sold them for income, the PC continued to discuss a substance abuse program for the inmate.

The senior psychologist refocused the discussion to the inmate's upcoming parole in October 2016. The senior psychologist discussed the role of TCMP and a parole officer to assist the inmate with Supplemental Security Income (SSI) and other parole plans.

PC and psychiatry contacts during the reporting period were reviewed. The PC made comments about the inmate's odor, unkempt, disheveled and/or unclean presentation, but did not document discussions with him. In the October 2014 note, the PC discussed concerns with the new psychiatrist to rule out malingering as a diagnosis because of the inmate's history of coming to prison for drug sales. The PC stated "This raises questions for me whether he actually needs the medication or is he drug seeking." The question was posed after the 8/30/14 contact. On the 8/30/14 progress note, the inmate asked to receive all prescribed medications at once, after the administration of one prescribed medication changed from bedtime to afternoon administration. Review of the medical administration record revealed that medical staff had changed Simvastatin from bedtime to afternoon administration while mental health medications were administered at bedtime.

The PC's contacts were approximately 5 to 15 minutes, and the psychiatrist contacts were approximately 30 minutes.  This inmate had three psychiatrists between June 2014 and April 2015.

Findings

The PC's subjective, objective, assessment, plan, and education (SOAPE) notes did not correlate or support the treatment plans, and the treatment plans did not support the subjective and objective findings.  Further discussion with the inmate should have occurred regarding the change in medication administration time.  In light of the minimal time of PC contacts, multiple psychiatrist changes, and problems with the treatment plan, the care provided to this inmate was inadequate.

**Inmate J**

The inmate's healthcare record was reviewed from a list of inmates who were interviewed.  The inmate did not attend the interviews because he was housed in the MHCB.  The inmate was diagnosed with Bipolar II Disorder.  He was prescribed Remeron.  The inmate arrived at PBSP on 3/25/15 at the EOP level of care after he bit his wrist in frustration after not receiving medications.  His level of care was changed from EOP to 3CMS after the IDTT meeting on 4/2/15.  Daily assessments and IDTT meetings occurred timely.  The inmate verbalized problems with a psychiatrist at PBSP.  The inmate was informed that the psychiatrist no longer worked at PBSP; the note stated that the inmate was visibly relieved to learn this information.

Findings

The inmate's clinical care was adequate.  The initial assessments were complete, MHCB IDTTs were appropriately staffed, and treatment plans addressed the inmate's needs.

**Inmate K**

This 3CMS inmate's healthcare record was reviewed from a list of inmates randomly ducated for 3CMS inmate interviews.  The inmate was diagnosed with Adjustment Disorder with depressed mood.  He was prescribed Remeron.  During the reporting period, clinical contacts were performed timely.  Educational materials given to the inmate were explained well and were appropriate and congruent with treatment plans.  The inmate had not previously been prescribed psychotropic medication and he told the PC that he was concerned that his depression would recur.  The clinician provided the inmate with positive self-talk materials, referred him to psychiatry, and followed up to ensure that the visit occurred.  The inmate was seen within one week and was prescribed Remeron.

Findings

The inmate's clinical care was very well done and was adequate. The PC's documentation was clear, succinct, and supportive of the inmate's needs. Materials and clinical sessions were congruent with treatment plans and with concerns voiced by the inmate.

**Inmate L**

This 3CMS inmate's healthcare record was reviewed from a list of inmates randomly ducated for 3CMS inmate interviews. The inmate was provided with a diagnosis of Mood Disorder NOS. He was prescribed Prozac and Vistaril. He was seen by a psychiatrist on 6/20/14, but refused subsequent mental health services and contacts during the review period; however, he answered questions posed by clinicians at cell front when the inmate signed the refusal forms. After five months of refusals, on 1/5/15 the inmate met with the PC in a confidential setting. The PC documented "...looks like a Mountain man with his long beard." The clinician met with the inmate for 35 minutes, discussed the treatment plans, and handouts were given to him on CES-Depression scale, "building happiness," and another on rumination.

Findings

The PC provided adequate care, but should have avoided biased statements that could be misconstrued or taken out of context. The PC took appropriate time with the inmate, allowed the inmate to assist in care, and worked with him to establish an appropriate plan and treatment goals.

EXHIBIT E
High Desert State Prison (HDSP)
May 12, 2015 - May 14, 2015

**Inmate A**

This inmate's healthcare record was reviewed to assess his treatment while housed in administrative segregation at the EOP level of care while awaiting EOP hub transfer.  He was diagnosed with Schizophrenia, paranoid type. He was prescribed oral Risperdal and Risperdal Consta in the event that oral medications were refused.  He was also diagnosed with pulmonary coccidioidomycosis.  He was housed at HDSP temporarily for court, having initially arrived on 9/16/14.  He was transferred between CSP/Sac and HDSP on various occasions since that time.  He had been treated at the EOP level of care since 4/18/14.

This inmate's history was significant for a recent CTC stay for an acute medical condition and intermediate inpatient care at DSH in August 2013.  He had multiple MHCB admissions; there was one MHCB admission in 2008, one in 2009, two in 2012, and two in 2013.  He reported homicidal ideation, and he had a history of staff assaults associated with paranoid delusions.  He also had an active court order for forced medication, initiated on 9/3/14; at that time he was delusional, assaultive, and refusing medication.

His most recent IDTT in the healthcare record, dated 3/4/15, indicated his refusal to attend mental health sessions.  The plan was to conduct another IDTT meeting in 90 days and to continue the same goals.  However, additional documentation related to this same IDTT indicated that "since coming back to ASU at HDSP on 9/16/2014 the IP has been far more cooperative towards treatment and more willing to attend treatment sessions outside his cell." That note also indicated that he contributed to the goals and treatment plan, but he refused to participate and wished to be removed from the mental health caseload.  The previous IDTT on 11/19/14 contained similar language and seeming contradictions.

An SRE dated 2/24/15 indicated multiple chronic risk factors including a depressive or psychotic disorder, a chronic medical condition, and a history of abuse and poor impulse control.  Acute suicide risk factors included single-cell placement, recent change in housing, and increasing interpersonal isolation.  He was assessed with low chronic and acute suicide risk.  Since placement at the EOP level of care, psychiatry and clinicians regularly approached him for mental health contacts; however, he generally refused to be seen.

Findings

Psychiatry and PCs regularly attempted to conduct clinical contacts with the inmate in accordance with Program Guide requirements.  However, the inmate's treatment was complicated by his refusal of confidential sessions and IDTT meetings which did not sufficiently address his lack of engagement in treatment.

**Inmate B**

This inmate's healthcare record was reviewed because he was housed in administrative segregation at the 3CMS level of care.  His most recent diagnosis was Depressive Disorder NOS.

586

The inmate was not prescribed psychotropic medications at the time of review; however, he was previously prescribed Paxil and Wellbutrin.

This was the inmate's first incarceration.  He reported increased anxiety following administrative segregation placement in September 2014.  His recent history was significant for an MHCB admission in January 2015 related to suicidal ideation.  He also had a history of childhood abuse which was a focus of treatment.

Notes revealed the inmate's attendance and good participation in an anger management group and weekly PC contacts.  During the PC sessions, he discussed his anger and ideas regarding revenge against those who he perceived to have wronged him.

Findings

This inmate was seen in accordance with Program Guide requirements.  Recently, he also received group treatment.

**Inmate C**

This inmate's healthcare record was reviewed because he received 3CMS level of care while housed in administrative segregation.  He was diagnosed with Adjustment Disorder NOS with mixed anxiety and depressed mood.  He was treated with Remeron.  He had received treatment at the 3CMS level of care since 2009.

The inmate's history was significant for two MHCB admissions, mostly recently in April 2013.  It was also significant for a history of childhood abuse, although he denied this on one occasion.  He refused to attend his IDTT of 4/8/15.  Various SREs noted a low suicide risk.

The inmate was generally noncompliant with routine follow-up attempts.  A 3/19/15 psychiatry note indicated he attributed his medication noncompliance to not wanting to wait in the pill line during inclement weather.  He saw the telepsychiatrist on 1/8/15, but refused follow-up appointments on 3/26/15, 4/2/15, and 4/30/15.  The PC generally saw him weekly, but there were gaps between 1/8/15 and 3/19/15.

Findings

This inmate was generally seen within Program Guide requirements although some lapses in contact existed.  His treatment was complicated by his poor medication adherence and follow-up.

**Inmate D**

This 28-year-old inmate's healthcare record was reviewed because he was housed in the MHCB since 5/10/15.  The expert observed his IDTT meeting.

The inmate was given a diagnosis of PTSD; however, he was alternatively diagnosed with Schizoaffective Disorder, depressed type, Adjustment Disorder with anxious and depressed

mood (provisional), and a history of panic attacks. He was primarily prescribed Depakote and Zoloft. Prior to arriving at HDSP, he was housed at PBSP where he had received three RVRs since 3/24/15. He was admitted to the MHCB on 5/10/15 related to suicidal impulses. He was treated at CHCF's MHCB from 4/16/15 to 5/6/15.

The inmate's remote history was significant for abuse and a prior suicide attempt by overdose, although the date was unknown.

Throughout his incarceration, the inmate was regularly treated at the EOP level of care. Documentation from previous institutions indicated he enjoyed attending out-of-cell groups. Problems which were the focus of treatment included depression, anxiety, anger, and auditory hallucinations.

An SRE dated 4/15/15 noted a number of chronic risk factors including depressive or psychotic symptoms, perception of loss of social support, a history of violence and poor impulse control, and a first prison term. Acute factors included suicidal ideation, current depression/anxiety or panic symptoms, agitation, disturbance of mood, recent bad news, hopelessness, increasing isolation, current or recent violence behavior, and a recent RVR. He was noted to have a plan to kill himself and reported a desire to die. At that time he was considered at moderate chronic risk and high acute risk for suicide.

The inmate was assessed by various clinical disciplines upon arrival at the HDSP MHCB. Upon admission, he was assessed as requiring a suicide smock and was issued a mattress and blanket. Plans were to renew and reassess issue every 24 hours. Custody issues and prolonged separation from his mother, who was reported to have multiple serious medical problems, were noted as salient issues to his thoughts of self-harm.

Findings

This inmate was appropriately admitted to the MCHB secondary to concerns about potential suicide risk. He was appropriately assessed by the various clinical disciplines and was assessed for suicide risk and appropriate issue on an individualized and ongoing basis.

**Inmate E**

This 34-year-old inmate's healthcare record was reviewed because he was housed in the MHCB. The expert also observed his IDTT meeting.

He arrived at HDSP on 4/14/15, and he was placed in the MHCB due to an increased risk of suicide. He was provided with a diagnosis of Depressive Disorder NOS; he was alternately diagnosed with Adjustment Disorder with anxious and depressed mood and Malingering (provisional). He was prescribed Remeron, risperidone, and Prozac. Immediately prior to his MHCB admission, he reported command hallucinations and suicidal impulses accompanied by the belief that following a motor vehicle accident, a chip was implanted in his brain. His most recent SRE indicated that his chronic and acute risk for suicide were both low.

588

Prior to MHCB admission, he was housed in administrative segregation at the 3CMS level of care. His history was significant for having been in a coma following a 1997 motor vehicle accident and extensive substance abuse. A pertinent negative was his lack of history of mental health treatment prior to incarceration. More recent issues related to difficulties sleeping and anxiety. Assessments indicated he met the criteria for pedophilia, sexually attracted to females limited to incest non-exclusive type, which was added as a diagnosis; however, this was not discussed in subsequent follow-up documentation.

The inmate received evaluations by various clinical disciplines with a focus on his suicidal ideation and the possibility of malingering of symptoms. He was assessed for full issue, but suicidal precautions were maintained.

Findings

This inmate received timely assessments by the various clinical disciplines and individualized evaluation.

**Inmate F**

This inmate's healthcare record was reviewed because his name was on the non-referral log indicating he had been treated in the MHCB on 10/16/14 when he met a criterion for higher level of care referral consideration, but was not reffered. The review was primarily targeted on the IDTT meeting that determined non-referral to a higher level of care and a treatment assessment he received during his short MHCB stay. In the non-referral log, the listed non-referral rationale was that his current level of care was clinically appropriate.

The inmate had been treated at the 3CMS level of care since 2005 and received various diagnoses, including Bipolar Disorder, Schizoaffective Disorder, Mood Disorder and Bipolar Disorder NOS. He was primarily treated with trileptal. His history was significant for multiple suicide attempts.

At the time of review, the inmate was housed in administrative segregation. He was transferred to the MHCB on 10/13/14 secondary to suicidal and homicidal ideation and returned to administrative segregation on 10/16/14. He had two prior MHCB admissions. Prior to the IDTT meeting, he experienced mood instability, irritability, excessive energy, and other symptoms of mania. At that time, he had incurred four RVRS during the preceding two years. Both his chronic and acute suicide risk were assessed as moderate.

The psychiatric discharge summary indicated that he "relented" on reports of suicidal ideation upon arriving at the MHCB. It was noted that he had a difficult time regulating emotions. Assessments showed an unremarkable mental status exam. It was suggested that he would benefit from individual therapy that focused on anger management and assistance with regulating his emotions. At the time of MHCB discharge, he was not prescribed psychotropic medications.

<u>Findings</u>

This inmate received adequate MHCB treatment.  Although the non-referral log notation was not informative, assessments indicated that the decision not to refer him to a higher level of care was clinically appropriate.

**Inmate G**

This 67-year-old inmate was housed on A Facility, which was a Level III general population/reintegration hub/3CMS yard.  He had been assessed as requiring the EOP level of care.  He was provided with a diagnosis of Mood Disorder due to a general medical condition (metastatic brain cancer).  While he was prescribed psychiatric medication in the past, it was determined that he did not require treatment with psychiatric medication at the time of review.  His healthcare record was reviewed to assess the identification and provision of mental health services for an inmate identified as requiring EOP level of care.

Until recently, the inmate had received CDCR mental health services at the 3CMS level of care since 2000.  He had a history of mania, bizarre behavior, and agitation.  As a 3CMS inmate, mental health staff saw him at least quarterly, but at times his PC saw him monthly. In September 2014, he was referred to mental health due to his bizarre behavior.  During this time, he discontinued psychiatric medication and wanted to discontinue all mental health services, which prompted his PC to refer him to the IDTT.  Documentation indicated that he was placed into the EOP level of care in October 2014.  However, one piece of documentation indicated a return to the 3CMS level of care in January 2015.  The inmate had a history of head trauma and seizures, and at the time of review he had been diagnosed with prostate cancer.

After placement into the EOP at HDSP, the IDTT saw the inmate during January and March 2015.  PC contacts were completed weekly and on some occasions twice weekly; this was due to the PC facilitating psychiatry appointments.  Although not prescribed psychiatric medication, the inmate had bimonthly to monthly telepsychiatry appointments.  It appeared that the inmate's mood, behavior, and functioning had stabilized with increased PC support and EOP level of care.

<u>Findings</u>

This inmate's mental health care was adequate and clinically appropriate.  Staff identified that he was decompensating and increased his level of care in a timely manner.  Once the level of care was increased from 3CMS to EOP, IDTT and PC contacts were conducted in accordance with Program Guide requirements.  However, psychiatry contacts were not completed monthly as specified by the Program Guide.  There was also conflicting documentation in the eUHR concerning the inmate's level of care in January 2015.

**Inmate H**

This 50-year-old inmate was housed on B yard, which was a Level IV general population/SNY/3CMS yard.  He was diagnosed by his PC with Mood Disorder.  The most

recent psychiatry diagnoses indicated Mood Disorder NOS and Adjustment Disorder NOS secondary to a general medical condition (leukemia). Both providers diagnosed the inmate with Antisocial Personality Disorder. He was prescribed Effexor. His healthcare record was reviewed to assess identification of and provision of mental health services once an inmate was designated as requiring the EOP level of care.

Prior to incarceration, beginning in 1982, the inmate had a diagnosis of Schizophrenia, paranoid type. Other diagnoses included Mood Disorder, Psychotic Disorder NOS, Schizoaffective Disorder, Bipolar Disorder NOS, Bipolar Disorder, Malingering and Polysubstance Dependence. He had previously been prescribed Thorazine, Cogentin, Haldol, and Mellaril. He had a history of suicide attempts by hanging, overdose, and cutting. He also had a history of cocaine, marijuana, alcohol, methamphetamine, PCP, and heroin use. He was additionally diagnosed with leukemia.

Since CDCR admission in 1996, the inmate had 34 level of care changes, including MHCB, EOP, and 3CMS. He had eight MHCB admissions; there was one for suicidal ideation in March 2015 and another for self-harm in April 2015. Following his MHCB discharge on 4/21/15, his level of care was changed to EOP. He was discharged from the MHCB with diagnoses of Major Depression, recurrent, with melancholic features, moderate severity and Personality Disorder NOS. The five-day follow-up occurred in a timely manner.

The inmate's IDTT meeting was observed during the site visit. Unfortunately, there was no discussion about his level of care change, how it would impact delivery of mental health services, or transfer to another institution.

Since the inmate's level of care change to EOP, he had a PC contact on 4/26/15, but he missed an appointment on 5/12/15 because he was out of the facility.

<u>Findings</u>

This inmate's mental health care was clinically appropriate. He was returned to the EOP level of care in a timely manner, and Program Guide requirements were met once he was designated EOP. However, an area in need of improvement was discussion of the change in his mental health services following his level of care change. The simultaneous diagnoses of Adjustment Disorder and Mood Disorder were not clinically appropriate.

**Inmate I**

This 30-year-old inmate was housed in B Yard, which was a Level IV general population/SNY/3CMS yard. The psychiatrist's most recent note dated 4/9/15 indicated that the inmate was provided with diagnoses of Adjustment Disorder and Borderline Personality Disorder. He was prescribed Buspar, Zyprexa, and Effexor. His healthcare record was reviewed to assess the provision of services for this 3CMS inmate.

The inmate was admitted to HDSP in April 2014 at the 3CMS level of care.  His first mental health contact occurred prior to incarceration in 2004 due to paranoia from drug use.  He was initially found incompetent to stand trial on the index offense.  He intermittently made reference to a chip being placed in his head and that he was subsequently controlled by the "network."  He had a history of self-injurious behavior and suicide attempts.  Previous diagnoses included Substance Induced Psychotic Disorder, amphetamine with delusions (provisional), Adjustment Disorder with mixed anxiety and depressed mood, Psychotic Disorder NOS, Bipolar I Disorder, most recent episode manic, Antisocial Personality Disorder, and Borderline Personality Disorder. Previous psychotropic medications included Buspar, Zyprexa, and Effexor.  Regarding substance use, he had a history of alcohol, marijuana, methamphetamine, cocaine, and heroin use.  He was also diagnosed with hepatitis C and allergic rhinitis; additionally there was a history of a head injury from a motor vehicle accident.

In September 2014, the inmate was admitted to the MHCB for suicidal threats.  Documentation indicated that these statements were made to facilitate a housing transfer with his partner.  At the IDTT meeting in October 2014, he requested a PC change, which was granted.

Clinical documentation between October 2014 and May 2015 reflected disclosures of feeling harassed by custody officers.  PC contacts occurred monthly, and at times twice every month as his PC facilitated telepsychiatry appointments.  Telepsychiatry appointments occurred monthly.

Findings

This inmate's mental health care was clinically appropriate.  Mental health clinical contacts exceeded Program Guide requirements.

**Inmate J**

This 39-year-old inmate was housed on A unit, which housed Level III general population/reintegration hub/3CMS inmates.  He was provided with a diagnosis of Adjustment Disorder with Anxiety, in remission.  He was not prescribed psychiatric medication at the time of review.  His healthcare record was reviewed to assess the provision of mental health services at the 3CMS level of care.

The inmate's diagnosis following admission was Adjustment Disorder with anxiety.  His level of care while housed at HDSP had been 3CMS.  For the past six months, his mental status was unremarkable.  With the exception of requesting to see mental health due to distress regarding an interpersonal stressor, during the last few PC contacts on 3/3/15, 4/7/15, and 5/5/15, there were no signs or symptoms of mental illness nor documentation of functional impairment.

Findings

This inmate's mental health care was clinically appropriate.  Given his ongoing stability, it was curious that there had not been any discussion to remove him from the mental health caseload.

592

**Inmate K**

This 22-year-old inmate was housed on B yard, which housed Level IV general population/SNY/3CMS inmates.  The psychiatry progress note documented diagnoses of Schizophrenia, residual type, Trichotillomania, Antisocial Personality Disorder and intellectual disability (provisional).  He was prescribed Zyprexa, Remeron, and hydroxyzine.  His healthcare record was reviewed to assess the treatment provided to this inmate who required the EOP level of care.

The inmate was admitted to HDSP from NKSP on 8/14/14.  He had a history of alcohol and marijuana abuse, but there were no major medical issues.

During his initial IDTT on 9/10/14, he was diagnosed with Adjustment Disorder with anxiety.  This diagnosis was continued at his next IDTT (also marked as initial) on 2/11/15.  At that time, his goal was to work on anger management.  During the psychiatry contact in December 2014, his diagnosis was changed to Schizophrenia, residual type due to the presence of negative symptoms.  A plan was outlined to schedule an IDTT to discuss a level of care change to EOP.  In March 2015, another IDTT meeting was held to change his level of care from 3CMS to EOP, as the inmate was perceived as highly vulnerable, easy to manipulate, and likely to be victimized.  Telepsychiatry saw him regularly.  During the time when the inmate was at the EOP and 3CMS levels of care, he was seen almost monthly.

PC contacts occurred on a monthly basis while the inmate was at the 3MCS level of care.  Once he was changed to EOP, he had weekly PC contacts.  A PC note dated 12/23/15 reflected a diagnosis of Adjustment Disorder with anxiety, which contrasted with psychiatry documentation that indicated a diagnosis of Schizophrenia, residual type.  In addition, PC contacts did not routinely focus on target symptoms.

<u>Findings</u>

This inmate's mental health care was clinically appropriate.  However, a primary area of concern was the stark contrast between the PC and psychiatry diagnoses and lack of documentation explaining the discrepancy, particularly given that both providers simultaneously saw the inmate.  In addition, the IDTTs from both September 2014 and February 2015 were noted as initial IDTT meetings.

**Inmate L**

This 40-year-old was housed in administrative segregation.  He communicated to one of the experts that he had not received requested mental health services.  His healthcare record was subsequently reviewed to assess his level of care; at the time of review, he was not included in the mental health caseload.

The inmate had a history of 3CMS level of care from 12/6/99 to 5/12/00 and from 1/29/10 to 4/23/10.  He had been prescribed Depakote and Zoloft, but at the time of review was not

prescribed psychotropic medication. He also had a history of daily marijuana use and continued to use alcohol as it was available. The inmate reportedly lost consciousness as a child after he was hit by a car, and he experienced concussions from injuries while playing football. The mental health evaluation that was conducted in administrative segregation on 4/13/15 indicated that he was provided with diagnoses of Depressive Disorder NOS and Antisocial Personality Disorder. He was referred for an IDTT meeting. SRE results indicated low chronic and acute suicide risk.

On 4/29/15, the IDTT decided to maintain the inmate in the general population. As part of the IDTT meeting's decision that he attend weekly anger management, he attended three anger management group sessions. It was also noted that the psych tech would see him, and the inmate was to access mental health as needed.

During mental health contacts while he was housed in administrative segregation, the inmate complained of an inability to sleep, auditory hallucinations, which included constant screaming for the past few years, racing thoughts, and recurrent nightmares. His symptom reports had escalated since the IDTT meeting, but mental health documentation indicated that he might be exaggerating symptoms. For example, while he reported not sleeping for four days, his mental status was assessed as inconsistent with his self-report. Documentation also addressed discrepancies in his response to psychiatric medication. In addition, during mental health contacts, he was focused on his perception that he had been denied mental health care.

Following the IDTT meeting, the inmate submitted a request to see mental health, stating that he was hearing voices telling him to go to the "other side." When the psych tech directly asked him about self-harm thoughts, he denied any such thoughts. The mental health request was marked as routine and he was seen four days later; during that contact, he reported command auditory hallucinations to hurt himself. The inmate remained in the general population.

<u>Findings</u>

This inmate's mental health care was clinically inappropriate. Of significant concern was the designation of his request to see mental health as routine instead of urgent. While he may have exaggerated his symptoms, he could have also been experiencing genuine distress. Reviewed documentation showed a trend of escalation in his self-report with no change in the provision of services. These concerns were discussed with regional mental health staff to review the case and to reconsider his level of care. It was reported that his level of care would be changed to 3CMS.

EXHIBIT F
California Correctional Center (CCC)
May 15, 2015

**Inmate A**

This 24-year-old inmate's healthcare record was reviewed to assess the process of determining his mental health needs while at CCC, which did not house mental health caseload inmates. At the time of review, the inmate had been housed in the MHCB at HDSP since 5/11/15. He was being treated with olanzapine, Haldol and lorazepam as needed. He received a diagnosis of Psychotic Disorder NOS; additionally, provisional diagnoses of Schizoaffective Disorder, Bipolar type and Schizophrenia, paranoid type were also considered.

The inmate's history was significant for a reported hospitalization in the state of Washington at age 17 for three months because he wanted to hurt his mother. He was treated with Risperdal since age seven along with other medications, including Depakote and Haldol. He reported taking Seroquel while in the community and until he was incarcerated. As described in the healthcare record, his 2014 probation report indicated a history of psychotropic medication treatment and that he received SSI, possibly for a mental disorder. It also indicated that both the inmate and the victim of his crime reported that he became combative and violent when not taking medications.

Since his arrival in CDCR on 6/26/14, he was not included in the mental health program. An SRE dated 2/20/15, connected with an incident which ultimately led to a cell extraction and use of pepper spray, showed multiple chronic and acute risk factors for suicide, and a number of protective factors. He was assessed as being low chronic but moderate acute risk for suicide. However, a notation indicated that the psychologist completing the risk evaluations did not speak directly with the inmate, but spoke with a supervising psychologist who reported that the acute risk was low. At the time of this SRE, the inmate was described as pacing, while talking loudly. Cell extraction protocols were initiated. The plan to reduce risk included daily follow-up contacts in administrative segregation, psychological assessments if the inmate permitted, and for custody to report any unusual behaviors to mental health as soon as possible.

An accompanying progress note of the same date indicated the inmate had refused to acknowledge or speak with the psych tech for five days, slept too much, was withdrawn, showed poor grooming, and refused to shower. A significant substance abuse history was also noted. The psychologist thought it prudent to have his cell searched. Other notes indicated that the psychologist had received approval for the inmate's admission to the MHCB at HDSP; however, the supervising psychologist in charge of the cell extraction did not view this as clinically indicated.

A mental health chrono dated 3/31/15 indicated a sergeant referred the inmate to mental health because he was demanding to be released from prison. The resulting evaluation on 4/3/15 showed that with the exception of the cell extraction in February 2015, the inmate had not left his cell for four months and only minimally interacted with others. The evaluation indicated that during this time, he increasingly exhibited signs of major depression and persecutory delusions. His current delusional statements were considered similar to the ones made six weeks earlier. This evaluation assessed that his ongoing situational stressors since November 2014 may have exacerbated this initial self-reported depression, leading to a major depressive episode. It also

596

noted that his gang affiliation inhibited his involvement in mental health services, although he was seen as having undergone a dramatic decrease in his functional level. He was found to meet criteria for inclusion in the 3CMS program; the plan was to schedule an IDTT as soon as possible and transfer him to a facility with mental health treatment.

The next progress note was by a social worker and was dated 5/1/15. It indicated that a call was received from a senior psychologist because the inmate was not complying with TB testing and was making delusional statements. He was noted to have flat affect, poor hygiene, and no cellmate. He was not oriented to date. It was also noted that he was experiencing depressive symptoms and expressing delusions with auditory hallucinations. An IDTT meeting was to be scheduled to enroll him in the mental health program. He was eventually persuaded to leave his cell for TB testing, incorrectly believing that he spoke to his family and they told him that his charges were dropped and they were coming to get him.

A psychologist evaluated the inmate on 5/5/15 and an IDTT meeting, in which the inmate refused to participate, was conducted on 5/6/15. This IDTT meeting determined that due to a major mental disorder, the inmate was unable to adequately function at his current level of care. He was endorsed to CMF, but on 5/8/15 refused to leave his cell. A prolonged and ultimately successful effort involving mental health and custody collaboration was undertaken to resolve this without the use of force, and the inmate was transferred to the HDSP MHCB.

On 5/13/15, while in the MHCB, the telepsychiatrist conducted an extensive interview in Spanish and acquired significant additional history. The inmate also endorsed suicidal ideation with the intent to get a gun and shoot himself. He was provided with the above mentioned diagnoses. He was also started on Zyprexa, with a one-to-one suicide watch due to active suicidal ideation and erratic behavior.

Findings

This inmate was apparently functioning well until his transfer to administrative segregation, when he experienced a significant decline in functioning. He self-reported depression late in 2014 and was involved in a use of force incident in February 2015, which had been preceded by a deterioration lasting several months. The psychologist and supervising psychologist apparently had divergent views about his need for MCHB admission at that time.

The next evaluation was in early April 2015; it showed ongoing deterioration in his functioning and increased symptoms. He was scheduled for an IDTT meeting so he could be transferred to a 3CMS program, but was not subsequently seen until early May 2015. The IDTT meeting did not occur until after that time and the inmate ultimately required MHCB transfer.

The mental health care provided to this inmate was inadequate. Assessment differences regarding the need for crisis bed admission in February 2015 were not adequately addressed and sufficient follow-up did not subsequently occur. The inmate was assessed as requiring treatment in April 2015, but an IDTT meeting did not occur until a month later. During this time, the inmate was decompensating and deteriorating.

597

**Inmate B**

This 25-year-old inmate's healthcare record was reviewed to assess the provision of mental health services at CCC. He was admitted to CCC in April 2013. Mental health screening documentation from the reception center was not available to review in the eUHR. Documentation from the nurse screening at the time of admission indicated that the inmate denied any mental health history. At the time of the healthcare record review, he was not provided with a mental health diagnosis, was not prescribed psychiatric medication, and was not included in the mental health caseload.

On 10/2/14 the inmate was referred for an evaluation by a CCC psychologist, as he had returned to CCC for administrative segregation placement. The administrative segregation psychologist saw him on the day of referral. Instead of conducting the 31-question mental health screening, a progress note was completed; there was no reference to completion of the 31-item screen. Documentation indicated an absence of mental health symptomatology, and it was recommended that the inmate remain in the general population.

Findings

Available documentation indicated that provided mental health services were inadequate. Staff reported that CCC inmates minimized mental health symptoms. Thus, the clinician's inability to review CDCR records prior to the administrative segregation assessment, due to the lack of a mental health assessment upon CCC admission, along with the absence of the 31-item screen, were problematic.

**Inmate C**

This 22-year-old inmate's healthcare record was reviewed to assess the provision of mental health services at CCC. Mental health screening documentation from the reception center was not available to review in the eUHR. Review of the healthcare record indicated no mental health diagnosis; the inmate was not prescribed any psychiatric medication, and he was not included in the mental health caseload.

Nursing staff received a health care services request (HCSR) form that indicated the inmate was experiencing suicidal ideation on 8/25/14 and command auditory hallucinations to take his life on 8/31/14. On both occasions, he was seen within hours of nursing staff's receipt of the HCSRs. SRE results indicated the risk of chronic and acute suicide risk was low. During both interviews, the inmate claimed that the HCSRs were submitted by peers who were harassing him. Comparison of the inmate's handwriting with that on the HCSRs corroborated that the inmate did not submit the HCSRs. The plan after the first referral was to maintain him in the general population and monitor his needs upon self-referral. After the second HCSR, the inmate remained in the general population with a plan to see mental health as needed. The rationale for the decision to continue monitoring him in the general population was not documented.

598

The inmate submitted three more HCSRs dated 10/24/14, 10/29/14, and 11/19/14 requesting to speak with mental health. During these contacts, he did not indicate that peers had completed the HCSRs. While the HCSRs were not identified as emergent, urgent, or routine, mental health response times ranged from the same day to three days. The inmate was provided with supportive counseling to assist with management of institutional stressors. Homework was given and reviewed, suggesting a plan to continue mental health services. Following each contact, the plan was to continue him in the general population, while accessing mental health as needed. The inmate was transferred to another institution on 12/31/14.

Findings

Overall, this inmate's care was appropriate and timely. However, given that he was seen five times by mental health over a three-month period, it was problematic that staff did not complete a mental health evaluation, consider inclusion into the MHSDS, or convene an IDTT to discuss his treatment needs and level of care.

Of note, no policy dictated the frequency that mental health could see an inmate before deciding to place him on the mental health caseload. This was an area of concern as this inmate was regularly contacting mental health. Since he was not a mental health caseload inmate, the inmate mental health identifier system would not track him if he were transferred to another facility.

**Inmate D**

This 23-year-old inmate's healthcare record was reviewed to assess the provision of mental health services at CCC. Mental health screening documentation from the reception center was not available to review in the eUHR. The inmate was admitted to CDCR on 5/2/14. He had a history of alcohol and marijuana use.

On 8/18/14, nursing staff referred him to mental health after he exhibited odd behavior and refused to talk to staff. Around that same time, the inmate submitted a referral that indicated he was "scared" to be around other people. Based on a mental health evaluation that was completed on 8/20/14, the inmate did not have a mental health diagnosis.

A referral was submitted in September 2014 and the plan was for mental health to see him as needed. On 10/20/14, custody staff submitted a referral indicating the inmate exhibited odd behavior and was not showering, but had to be "bribed" by peers to shower. During the mental health contact, he was observed as unkempt and dirty, and participated minimally in the interview. It was opined that there was no DSM-IV diagnosis present. The inmate was not added to the mental health caseload, but the plan was for mental health to see him as needed.

There was no documentation of mental health contact until 1/25/15, when the inmate was referred to the MHCB for grave disability. Similar to the October referral, custody staff reported that he was odd, neglected self-care, and peers were bribing him with soup to shower.

The inmate had not returned to CCC and was subsequently placed at the EOP level of care.

599

Findings

The mental health care that was provided to this inmate was inadequate.  This inmate was referred to mental health staff several times following transfer to CCC.  While mental health timely responded, the care was poor.  Given his presentation and decline in self-care during October, a major area of concern was the lack of adequate assessment by mental health regarding this inmate's level of functioning.  There was a lack of documentation that this assessment occurred, and he was not seen by mental health until his referral to the MHCB in January 2015.

EXHIBIT G
Mule Creek State Prison (MCSP)
March 23, 2015 - March 25, 2015

**Inmate A**

This 3CMS Level 4 inmate reported that his PC had not seen him for at least 90 days. The inmate's eUHR was reviewed.

This 32-year-old man was serving a 21-year sentence. His most recent treatment plan was written on 7/1/14. His problem list included depression, mood instability, auditory hallucinations, and a sleep disturbance. Interventions included use of antipsychotic and antidepressant medications. The treatment plan did not reference the frequency of planned individual PC contacts. Diagnoses listed included Psychotic Disorder NOS and Depressive Disorder NOS. The psychiatrist was not present at the IDTT meeting that formulated this treatment plan.

Clinical contacts during the review period included assessments by two different psychiatrists on 8/15/14, 11/17/14, 2/4/15, and 3/17/15 and by two different 3CMS clinicians on 11/17/14 and 2/10/14. The inmate was started on a new medication on 11/17/14 and was seen on an untimely basis on 2/4/15 by the psychiatrist. The plan was for the psychiatrist to see him again within three weeks, although he was not seen for over six weeks.

Findings

This inmate did not receive timely psychiatric evaluations related to having been started on a new medication during November 2014 and not being seen as planned within three weeks following his 2/4/15 appointment. His care was further complicated by having a different PC during his two PC contacts and a lack of continuity by his psychiatric provider. The psychiatrist also was not present at his IDTT meeting, where a treatment plan was formulated that did not reference the frequency of PC contacts.

**Inmate B**

This 3CMS Level 4 inmate reported that he had not been seen by his PC for at least the past 90 days. The inmate's eUHR was reviewed.

The most recent treatment plan was dated 6/15/14. The inmate's problem list included depression, anger, auditory hallucinations, and substance abuse. Medications and group therapy were included in the planned interventions. A psychiatrist was not present at the IDTT meeting.

Appointments with the psychiatrist during the review period occurred on 8/22/14 and 1/29/15. Prescribed medications included Remeron, risperidone, and Zoloft. Listed diagnoses included Mood Disorder NOS, Psychosis NOS by history, Polysubstance Dependence, and Antisocial Personality Disorder.

PC contacts occurred on 10/7/14 and 1/13/15.

<u>Findings</u>

This inmate received mental health clinical contacts that were consistent with Program Guide requirements.  However, he did not receive group treatment according to his treatment plan.  In addition, a psychiatrist did not attend his annual IDTT meeting.  This inmate's care was not consistent with his treatment plan.

**Inmate C**

This 47-year-old man, who was at the 3CMS level of care, had his last IDTT on 3/5/15.  His previous IDTT meeting was dated 10/23/14.  His problem list included mood instability and a history of impulsive behavior.  His provisional diagnosis was Bipolar Disorder and Antisocial Personality Disorder.  All required disciplines attended the IDTT meeting.  Treatment interventions included medications and CBT for anger management.

PC contacts were documented on 10/28/14, 1/14/15, when the inmate was housed in administrative segregation, and 1/28/15.  Each of these clinical contacts were with a different PC.  None of the progress notes documented use of CBT.

Psychiatry contacts were documented on 12/10/14, 1/4/15, and 1/26/15, for a 602 appeal related to his non-formulary request for Wellbutrin.  Medication trials in the past included Effexor, Zoloft, lithium, Wellbutrin, Buspar, and Celexa.  He was also noted to have HIV and hepatitis C.  Diagnoses listed were Depressive Disorder NOS, Polysubstance Dependence, and Personality Disorder NOS.  Two different psychiatrists saw him.  Prescribed medications included Remeron.

Two different psychiatrists evaluated the inmate in January and February 2015 to assess whether he met criteria for non-formulary use of Wellbutrin with particular reference to adequate therapeutic trials of antidepressants that were currently on the formulary.

<u>Findings</u>

The treatment plan did not follow the context of providing CBT.  There was a significant lack of continuity of care as three different PCs provided the inmate's PC contacts.  At the time of review, the inmate did not meet formulary exception criteria for the use of Wellbutrin.

**Inmate D**

This inmate was a 49-year-old man who was receiving 3CMS level of care on a Level 4 SNY yard.  He reported being prescribed Cymbalta for depression, but perceived that it was documented in his healthcare record that it was being used for chronic pain, and not depression.  He reported being seen more frequently than every 90 days.  He described his mental health treatment as having been very helpful to him, especially in the context of helping him deal with cancer.  The inmate's eUHR was reviewed.

His last treatment plan was dated 9/17/14.  Listed problems included depression, suicidal

ideation, anxiety, and anger. Interventions included Cymbalta for depression and 90-day case management or as needed. His diagnosis was Major Depressive Disorder, recurrent, moderate by history. He was noted to have chronic back pain and a diabetic neuropathy. All relevant disciplines attended his IDTT meeting.

There were PC contacts on 8/18/14, 9/17/14, 10/24/14, 12/15/14, and 1/20/15.
The 12/15/14 PC progress note referenced that the inmate had a history of his right kidney being removed due to cancer.

During 10/3/14, the inmate received an RVR assessment related to possession of a syringe. His diagnoses included Major Depressive Disorder, recurrent, and opiate dependence. The relevance of the evaluator's 115 RVR assessment to penalty mitigation was unclear.

No psychiatry notes for the review period were located.

Findings

Review of medical progress notes indicated that the inmate was being followed in what appeared to be the equivalent of a chronic pain clinic, which explained the Cymbalta prescription, as it was used for both depression and chronic pain. The inmate was probably accurate that he was not being seen by psychiatry and that the Cymbalta was being prescribed by the medical clinic.

This inmate was receiving supportive psychotherapy on a frequency based on clinical need, which was helpful to him. It was unclear why it was so important to him to have the Cymbalta prescribed by a psychiatrist, in contrast to a non-psychiatric physician. Due to the inmate's depressive disorder, he should be seen by a psychiatrist.

**Inmate E**

At plaintiffs' attorneys' request, this inmate's eUHR was reviewed to specifically assess whether his request to use Wellbutrin, a non-formulary medication, was adequately assessed.

This 42-year-old man had three IDTT meetings since July 2014. He had served six years of his 24-year sentence. He had been receiving EOP level of care and had a long history of self-harming behaviors. His December 2014 treatment plan listed his diagnoses as PTSD, Polysubstance Dependence, and Borderline Personality Disorder. A psychiatrist did not attend any of his IDTT meetings.

A psychiatrist documented in a progress note dated 8/22/14 that he discussed use of Wellbutrin with the inmate. However, Wellbutrin was clinically contraindicated due to the inmate's poorly controlled seizure disorder; Wellbutrin lowers the seizure threshold.

The inmate's psychiatric care had been provided by both a telepsychiatrist and an onsite psychiatrist. At least two psychiatrists agreed that Wellbutrin was contraindicated for reasons previously referenced. The inmate was also offered alternative medications for treatment of his

symptoms.

Findings
This inmate was appropriately assessed relevant to his request for a prescription of Wellbutrin. The decision not to prescribe Wellbutrin was clinically appropriate.

**Inmate F**

The healthcare record of this 25-year-old administrative segregation EOP inmate, who had been housed in segregation for over 160 days, was reviewed at plaintiffs' attorneys' request with specific reference to his current treatment plan.

The inmate was admitted to the MHCB on 1/15/15 due to suicidal ideation with a plan to cut himself. His problem list include auditory hallucinations, mood stability with a thought disorder, and substance dependency. He was paroling soon after serving a four-year sentence.

The inmate's medications included olanzapine, oxcarbazepine, citalopram and lithium carbonate. Diagnoses included Bipolar Disorder.

A 2/18/15 treatment plan indicated that he had been transferred from CSP/Corcoran to MCSP on 2/12/15. He was placed in administrative segregation on that same day due to bed space issues. He described feeling depressed and indicated that his depression had increased since his segregation placement.

Findings

This inmate was housed in administrative segregation for protective custody. Based on eUHR review, it was unclear whether the 160 days of segregation time reported by plaintiffs' counsel was accurate. If so, this placement for nondisciplinary reasons was clinically contraindicated and was not addressed by the inmate's treatment plan.

**Inmate G**

This EOP inmate's healthcare record was reviewed from a list of MHCB initial IDTT meetings held during the site visit. The inmate was diagnosed with Schizoaffective Disorder. He was prescribed Trileptal. During the MHCB IDTT meeting, he was in a suicide resistant smock and was quiet and cooperative. The inmate denied suicidal ideation or auditory hallucinations and agreed with his mental health treatment plan; it included goals of increasing coping skills by verbalizing two self-soothing activities when stressed and two alternative ways of reducing impulsive and other problematic behaviors. The inmate had multiple MHCB admissions that were triggered by family members' hospitalizations and incarceration. He also had received multiple RVRs and was involved in a use of force incident. The IDTT meeting retained the inmate at the MHCB level of care.

The inmate was on a modified treatment program as of 9/26/14, and he stated that he was glad that he was on the high refusers list because the PC visited every Monday.

On 3/10/15, the PC met with him. The inmate discussed concerns about his cellmate's sexual orientation and made a statement about cutting the cellmate's face if the cellmate approached him. The PC reported him to custody. The inmate told the PC that he would end up in the MHCB following the report to custody.

PC and psychiatry contacts timely occurred during the review period.

Findings

Multiple clinicians assessed the inmate during the review period. Although one of the inmate's RVRs was for the purchase of heroin and the MH-115 documented the need to focus on addiction concerns, the PC did not include substance abuse programming as one of the treatment goals. The inmate's MHCB admissions were due to incidents that he orchestrated, but nothing in his treatment plan addressed this behavior. Although his PC saw him more than the required number of contacts, no stated goals addressed his treatment refusal. This inmate did not receive appropriate mental health care.

**Inmate H**

This EOP inmate's healthcare record was reviewed from a list of MHCB IDTT meetings that occurred during the site visit. He was diagnosed with Mood Disorder NOS. He was agitated and concerned about his hepatitis C. He indicated concern about taking mental health medications due to the hepatitis C and liver concerns. He was also concerned about family member contacts because of the high transmission rate of hepatitis C, as well as about issues regarding parole, SSI, and other medical and psychological concerns. Prior to his MHCB admission, he was housed in administrative segregation for safety concerns. Treatment goals were focused on reducing anxiety by using relaxation techniques and other coping skills.

Findings

PC and psychiatry contacts were timely. There was no documentation that addressed the inmate's major concern with hepatitis C or collaboration with medical services concerning his medical issues.

**Inmate I**

This EOP inmate was reviewed from a list of inmates who had modified treatment programs. He was diagnosed with Schizoaffective Disorder, bipolar type and Borderline Intellectual Functioning. He was prescribed Zyprexa, Depakote, and Cogentin and was placed at the EOP level of care on 11/22/14. He had difficulty keeping track of group times and dates as they changed; on many occasions, he showed up for a group for which he was not scheduled. The inmate and his PC worked on group changes, and new times and dates for groups.

606

Findings

Treatment goals focused on group attendance, medication compliance, and grief over the retirement of his assigned psychiatrist.  The PC reevaluated the types of groups for the inmate and explained the purpose and importance of group attendance, and encouraged his participation. The PC established a plan to increase the inmate's group participation by returning him to regular group status.  The inmate' mental health care was adequate.

EXHIBIT H
California Medical Facility (CMF)
April 14, 2015 - April 16, 2015

**Inmate A**

This EOP inmate was housed in administrative segregation.  He transferred to CMF's administrative segregation unit from DVI as an EOP hub transfer.  The inmate had recently paroled from administrative segregation.  He was provided with a diagnosis of Schizophrenia, paranoid type.  He was prescribed hydroxyzine 50 mg per day and Risperdal 2 mg per day.

Progress notes indicated that the inmate had a significant history of mental illness and chronic delusional thinking of paranoid content.  He had a history of receiving medications by court order due to dangerousness to others.

The inmate arrived at CMF on 4/1/15.  At the time of the initial evaluation on the following day, he presented with delusional thinking and report of auditory hallucinations.

This inmate was seen during an initial IDTT meeting.  At the meeting, he presented with cooperative, pleasant demeanor, paranoid delusional thinking, and poor judgment regarding the need for treatment with psychotropic medications.

Findings

There was documentation of timely evaluation upon arrival to CMF administrative segregation.  There was documentation of daily psych tech rounds as well as weekly PC contacts.  Although there was no documentation that the inmate had been seen by the psychiatrist at CMF yet, there was discussion with the attending psychiatrist regarding medications and the need for medication adherence.  It appeared that the care the inmate received at CMF was appropriate.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit.  He was provided with diagnoses of Major Depressive Disorder in partial remission, Opiate Dependence, Cocaine Dependence, Alcohol and Cannabis Abuse, and Personality Disorder NOS.  He was prescribed Paxil 30 mg per day.

Progress notes indicated that the inmate was followed consistently by the PC and the psychiatrist.  The notes detailed discussions regarding the inmate's health-related issues, depression, and medication-related concerns.  There were also discussions regarding transferring him to the 3CMS program; however, this was not pursued due to the inmate's ongoing concerns.

During October 2014, venlafaxine was tapered and eventually discontinued and Paxil was started.  The inmate appeared to tolerate this medication change.  The most recent progress notes detailed the supportive therapy provided after the inmate learned that his brother had recently died.

The inmate was moved to administrative segregation on or about 4/2/15 reportedly due to swallowing narcotics.  A progress note dated 4/8/15 indicated that the facility was awaiting

609

toxicology results and if positive, the inmate would receive an RVR. If the toxicology results were negative, the inmate would be released from administrative segregation.

<u>Findings</u>

The mental health care that was provided to this inmate appeared to be appropriate. He was involved in group therapy and was seen weekly by the PC and monthly by the psychiatrist. The treatment plans were timely and individualized, reflecting the inmate's specific treatment needs. There was also documentation of daily psych tech rounds and that higher levels of care were considered.

## Inmate C

This EOP inmate was housed in administrative segregation. He was provided with diagnoses of Bipolar I Disorder and Borderline Personality Disorder. He was prescribed Zyprexa, Cogentin, Prozac, gabapentin, and hydroxyzine.

The inmate was transferred from a county jail to WSP in November 2014. While at WSP, he was placed on suicide observation in the CTC due to suicidal ideation. He transferred to CMF-DSH in December 2014, and was placed in administrative segregation later that month due to threats to staff after he threatened the psychiatrist. A 115 mental health RVR assessment of the incident indicated that a mental disorder contributed to the RVR behavior; the inmate's mood was described as unstable and psychotic with mood swings and paranoia.

This inmate had a long history of mental health treatment and self-injurious behavior since childhood. He had multiple tattoos, including on his face. He was reportedly a gang drop-out with concerns regarding his safety due to these issues.

The most recent progress notes described the inmate with animated affect and poor insight and judgment. On the day prior to the site visit, he reportedly drank pruno and was noted to be intoxicated.

<u>Findings</u>

The mental health care that was provided to this inmate appeared to be appropriate. He was followed consistently by the PC and psychiatrist. There was documentation of daily psych tech rounds. Medication management generally appeared to be appropriate, but consideration should have been made for treatment with a mood stabilizer, or documentation should have been provided to explain the current medication treatment course.

## Inmate D

This inmate was in the EOP. He was provided with diagnoses of Major Depressive Disorder, recurrent, and Polysubstance Dependence. He was treated with Thorazine on an as needed basis.

610

This inmate was housed in one of the EOP mainline housing units until February 2015, when he was transferred to administrative segregation for refusing to house. He was very briefly moved to alternative housing prior to administrative segregation placement. The inmate was released from administrative segregation by the captain; however, he refused to house and remained in administrative segregation. It appeared that he was eventually moved to the mainline EOP on or about 2/11/15. A 115 mental health evaluation indicated that mental illness played a role in the inmate's behavior. For reasons that were unclear, the inmate was briefly returned to administrative segregation on 2/12/15 and was returned to EOP on 2/20/15.

The most recent treatment plan was dated 3/5/15. This plan appropriately addressed the inmate's symptoms of mood instability, self-harm depression, and psychosis; however, the plan did not address the inmate's reported reluctance to attend treatment activities. The accompanying Form 7388B indicated that the inmate did not meet the criteria for higher level of care referral. The treatment plan noted that he had moderate chronic and low acute risk of suicide.

Although there was documentation that the inmate presented with lability and impulsivity, the most recent progress notes indicated that he was doing well, but with poor group attendance.

Findings

The mental health care provided to this inmate appeared to be appropriate. He was seen weekly by the PC and at least monthly by the psychiatrist. There was documentation of five-day follow-up after MHCB discharge. There was documentation of daily psych tech rounds in administrative segregation. However, treatment planning should also have addressed the inmate's treatment adherence.

**Inmate E**

This EOP inmate was housed in the N-2 housing unit. He was provided with a diagnosis of Schizoaffective Disorder, depressed type. He received his psychotropic medications by court order due to danger to self; the PC 2602 would expire on 8/7/15. He was prescribed Cogentin, Prozac, and Haldol decanoate. The inmate was also prescribed as needed medications in the event of medication refusal.

A treatment plan dated 3/5/15 noted that the inmate was serving a life sentence. His symptoms included depression, low self-esteem, periods of command auditory hallucinations, and a history of psychosis since childhood. He was hospitalized at DSH-APP from 5/9/14 to 6/30/14.

Due to the inmate's symptomatology that also included overwhelming guilt related to his offense and ongoing auditory hallucinations, he was placed in the High Risk Program. The inmate was on modified programming and provided documentation indicated that he was offered 2.5 hours of weekly group therapy. The recent progress notes indicated that he remained with auditory hallucinations that were improved on medications. He was reportedly compliant with medications and was attending groups. He also worked as a porter, which he indicated satisfied him.

611

Findings

The mental health care that this inmate received at CMF appeared to be appropriate. The inmate was appropriately placed into the High Risk Program for increased monitoring for decompensation and support. In addition, he was placed on modified programming due to his inability to tolerate full programming. There was documentation of weekly PC and monthly psychiatry contacts. Treatment planning was individualized. There was also documentation of higher level of care referral consideration.

**Inmate F**

This EOP inmate was housed in the medical unit. His healthcare record was reviewed as he was on modified programming and the information provided indicated that he only received an average of 0.75 hours of weekly groups. He was provided with a diagnosis of Schizophrenia.

The inmate was transferred from ASH to CMF on 11/3/14. His medical issues included diabetes type 2, hepatitis C, hypothyroidism and COPD. He was classified as DPO and was an intermittent wheelchair user.

Progress notes indicated that the inmate remained in the CTC due to medical concerns. He appeared to be stable from a mental health standpoint.

Findings

This inmate was consistently followed by the PC and the psychiatrist. The mental health care that he was provided appeared to be appropriate. The inmate was placed on modified programming due to his medical condition.

**Inmate G**

This 3CMS inmate was reviewed because his initial IDTT meeting was scheduled during the monitoring visit, but the inmate did not attend. The IDTT was held in the medical area and all treatment team members were familiar with the inmate's medical problems. The inmate suffered from seizures and a right hemiparesis, with a history of cerebrovascular accident and craniotomy. He was described as unable to speak clearly, but adequately responded to questions through both speech and gestures.

The inmate had no history of mental health treatment prior to entering CDCR. He met eligibility criteria to participate in the mental health program based on a sleep disturbance associated with depression. He was enrolled in the 3CMS and prescribed mirtazapine to treat symptoms associated with an unspecified depressive disorder.

The inmate discontinued his medication and subsequently met with the psychiatrist to discuss this matter. He expressed not wanting psychiatric treatment because of prison cultural politics.

The inmate's initial IDTT meeting was held during a time when the inmate was in post-operative care. The inmate did not attend due to a two-week headache. He was described as medically compromised. The treatment team appropriately discussed both medical and mental health symptoms and determined that his depression and sleep disturbance were secondary to brain injury. The treatment team scheduled a follow-up meeting in 30 days to review the treatment plan and to assess improvements. The treatment team noted that release planning was important as the inmate would be leaving prison during the following year.

Findings

It appeared that the inmate was receiving mental health treatment at the appropriate level of care in the 3CMS program. He was timely seen by the psychiatrist and PC. Treatment team meetings occurred as required and were scheduled at more frequent intervals as dictated by the inmate's health condition. The focus of treatment appeared appropriate. Overall, the inmate received adequate mental health care.

**Inmate H**

This 3CMS inmate was housed in the G-1 medical area. He was provided with a diagnosis of Major Depressive Disorder, single episode. He was prescribed mirtazapine and hydroxyzine. His healthcare record was reviewed because institutional audits revealed that he had not been timely seen by the PC. The purpose of this review was to assess the adequacy of care provided during the review period.

The inmate had been treated at the 3CMS level of care since arriving in CDCR on 9/5/13. Prominent symptoms were anxiety and sleep disturbances due to case-related issues. The inmate had no history of suicide attempts or treatment for other major mental disorders. On 1/29/14, he transferred to CMF for medical treatment. He was found to be harboring high quantities of gabapentin and morphine. He was placed in administrative segregation where morphine was gradually adjusted until it was discontinued. He was readmitted to the medical area on 9/4/14.

The psychiatrist saw the inmate on 9/4/14. The inmate was mildly depressed and continued to experience disturbed sleep. The psychiatrist adjusted the inmate's medication. The inmate was seen by the 3CMS PC on 9/8/14. The inmate did not participate in mental health caseload groups as reflected in the most current treatment plan. A Form 7388B was completed on 2/11/14, but by the end of this review period, no fully updated mental health treatment plan had been prepared for this inmate.

Medical progress notes indicated that the primary care physician managed the psychiatric medications of Vistaril and Remeron. The inmate was routinely seen by the social worker assigned to the medical CTC. The inmate denied a depressed mood but experienced mild anxiety and sleep disruptions due to ongoing court issues. Overall he was noted to express hope for the future and was deemed a low chronic and acute suicide risk. However, no formal SRE was conducted during this review period.

Findings

The inmate was appropriately identified, screened, and evaluated upon arrival.  He received social work rounds and medication management for symptoms associated with a major psychiatric disorder.  Although the treatment team considered factors relevant to the appropriate level of care, the inmate did not have a full annual treatment plan developed until 4/7/15, which was 19 months following his initial plan.  The inmate was deemed to be in full remission of his psychiatric disorder.

There was no formal updated treatment plan, as required by the Program Guide, for this inmate.  However, the 3CMS level of care treatment that he received was appropriate.

**Inmate I**

This 3CMS inmate was provided with diagnoses of Major Depressive Disorder, recurrent, moderate, in partial remission, Polysubstance Abuse, remitted in a controlled environment, and Antisocial Personality Disorder.  He was prescribed mirtazapine and hydroxyzine to treat symptoms associated with his diagnosed psychiatric disorder.  His healthcare record was reviewed because institutional data indicated the IDTT meeting was 14 days overdue.

Healthcare records indicated this 62-year-old inmate was serving a life sentence and had spent most of the time treated at the 3CMS level of care with a lingering sad mood underlying symptoms of major depression.  There was no evidence of the inmate having been treated at a higher level of care such as DSH, EOP, or MHCB.  He consistently endorsed a suicide attempt by hanging at age 14.  A SRE completed on 10/8/14 estimated a low chronic and low acute risk of suicide.

The inmate was cleared for administrative segregation placement on 9/26/14 for possessing an inmate-manufactured weapon.  Upon completion of a mental health evaluation, the inmate was re-enrolled in the 3CMS and an initial treatment plan was developed on 10/14/14.  The diagnosis of record was carried forward.  The inmate declined to attend 3CMS groups, but agreed to attend weekly PC contacts and to continue current medications.  Treatment goals were delineated in reasonably measurable terms.

The inmate was timely seen in weekly PC contacts and daily psych tech rounds. He routinely declined to leave his cell for PC contacts and was seen at cell front, where he was repeatedly described as appropriately engaged with the PC.  The psychiatrist routinely saw the inmate and found him to be without psychotic symptoms or evidence of mania.  The current medication regimen was maintained.

The inmate discharged from administrative segregation to the 3CMS mainline.  The initial IDTT meeting was 14 days late.  Prior to the treatment conference, the PC had prepared a mental health treatment plan wherein interventions and treatment goals were essentially unchanged.  The Form

614

7388B was completed at the IDTT meeting and no indicators were found to trigger higher level of care referral consideration.

Findings

The inmate appeared to be receiving mental health treatment at the appropriate level of care in the 3CMS program. He appeared to be clinically stable at the time his IDTT was delayed by 14 days, and an updated mental health treatment plan had been prepared and was essentially unchanged. Notwithstanding the late IDTT meeting, the inmate received adequate mental health care.

**Inmate J**

This 3CMS inmate was housed on I wing. He was provided with diagnoses of PTSD, in partial remission and Borderline Intellectual Functioning. He was not prescribed psychiatric medications. His healthcare records were reviewed after the expert observed the inmate's IDTT meeting during the monitoring visit. The purpose of the review was to assess the adequacy and appropriateness of care provided during the review period.

Healthcare records indicated the inmate had been treated in the 3CMS since entering prison in 1992. Historical information revealed a traumatic brain injury that occurred in childhood due to a motor vehicle accident. This injury rendered him a special education student and placement in the CDCR's DD1 program due to low cognitive functioning. However, the diagnosis of Borderline Intellectual Functioning was not supported by psychometric data that was located in the eUHR. The inmate had a history of severe maternal abuse. He had two suicide attempts in his late teens with psychiatric hospitalizations. There was no evidence of prior treatment for a major mental disorder, including psychotic or severe mood episodes. The medical record indicated his mental status had been stable since at least 2011; his last treatment plan was composed on 4/23/14.

The inmate participated in a group activity designed for those experiencing symptoms of PTSD. He also met with the PC at required intervals. Manifestations of symptoms directly linked to his diagnosis and treatment plan were appropriately addressed. Interdisciplinary progress notes reflected adequate attention to trauma-related issues.

The inmate's annual treatment plan was updated on 4/15/14. An SRE update was completed. His chronic suicide risk was deemed moderate based on a history of prior suicide attempts, chronic pain, medical problems, and an overall decline in health. The inmate's acute risk was deemed to be low as he denied any motivation toward harming himself. He was noted to have a strong relationship with the PC, a prison job, strong religious faith, and he expressed hope for the future. He was reviewed for the need for higher level of care referral and was deemed to be appropriately treated in the 3CMS.

Findings

The inmate appeared to receive mental health treatment at the appropriate level of care in the 3CMS program.  The treatment team appeared to provide timely and meaningful clinical services and the inmate was clinically stable.  Overall, the mental health treatment provided to this inmate was adequate.

## Inmate K

This 59-year-old inmate received mental health services at the 3CMS level of care.  He was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed psychiatric medications including Thorazine, Remeron, and Vistaril.  His case was selected for review from a list of inmates whose initial IDTT was overdue.  The purpose of the review was to assess the adequacy of care provided.

The inmate had been psychiatrically hospitalized in another country during his late teens and early 20's.  He reportedly was treated with Electroconvulsive Therapy (ECT).  He came to the United States at 24 years of age, where he was treated with antidepressant medication by county mental health for an unspecified depressive disorder.  He was treated with Haldol during county jail confinement, but had discontinued this treatment before arriving at CDCR.  There was a difference of opinion among forensic examiners as to whether the inmate suffered from a diagnosis within the schizophrenic spectrum of mental disorders.

The inmate arrived at CMF on 8/25/14; an initial IDTT was 14-days late. The inmate reported experiences of auditory hallucinations and depression, but further asserted that perceptual disturbances were adequately controlled by medication.  The diagnosis of record and medication regimen were retained.  The treatment plan was directed at reducing subjective distress through clinical monitoring and treatment groups.

During the review period, no SREs were conducted.  Psychiatry and PC progress notes were timely completed.  There was no documentation showing that the inmate participated in any treatment group as recommended by the IDTT.

The inmate repeatedly complained of problematic relationships with other inmates in the dormitory because of his snoring.  He was evaluated by the primary care physician but found not to require a CPAP.  However, as conflicts persisted, the inmate reported hearing voices with persecutory content.

The clinician responded to the acute situation and found the inmate to be mildly distressed.  He did not report motivation to harm himself or anyone else.  An SRE was not completed.  The clinician documented that there was a plan to coordinate with custody on the matter of a single cell.  The psychiatrist noted the inmate displayed no signs of paranoia or delusional thinking and had been compliant with medication.  The psychiatrist documented that a diagnostic clarification was needed.

At the time of the monitoring visit, healthcare records revealed the inmate had been admitted to a MHCB for six days for suicidal ideation and plan. He had been without sleep for several days and attributed this to being frequently awakened by inmates due to snoring. Initial and discharge SREs were completed. The inmate subsequently admitted he had amplified suicidal statements in the hope of obtaining a single cell. The discharge SRE documented that the inmate would advocate for himself with custody and medical staff concerning his belief that he needed and deserved a single cell. A mental health treatment plan was solo completed by the psychiatrist on discharge; review for higher level of care referral was not completed per the Form 7388B. Five-day clinical follow-up was documented in the medical file; the inmate was noted to be stable and in no apparent distress.

Findings

The initial IDTT meeting was overdue by two weeks, but medication continuity had been maintained and the inmate did not demonstrate any initial adjustment problems to the new prison setting. The initial treatment plan appeared adequate to maintain his stable functioning through the provision of groups, medication, and clinical contacts. Subsequent mental health contacts were timely delivered and the inmate was medication adherent. However, the inmate did not receive group treatment to target problem solving abilities and enhanced correctional adjustment, both of which were promised through the approved treatment plan.

The inmate appeared to have been appropriately treated at the current level of care in the 3CMS. However, conflicts in the dorm environment taxed his ability to cope. As much as the treatment staff may have believed otherwise, the inmate appeared unable to effectively advocate for himself. He received no therapeutic intervention to enhance problem solving abilities. There was no coordinated plan among medical, mental health, and custody staff to address relevant problems. From this vantage point, the care provided to the inmate was inadequate.

**Inmate L**

This 3CMS inmate had been enrolled in the mental health program since 2001. He had a diagnosis of Major Depressive Disorder, recurrent, moderate. He was effectively treated with Paxil during the past three years and his depression was in partial remission. The case was selected for review because institutional audits indicated that his IDTT was 45-days overdue. The purpose of the review was to assess the overall adequacy of care provided to the inmate during the review period.

The inmate's history included child and adolescent mental health services for attention problems and depression. Healthcare records indicated he met DSM-IV-TR diagnostic criteria for Major Depressive Disorder when he entered the CDCR. He was admitted to an MHCB in 2010 after his grandmother died. He had no history of attempted suicide. SREs conducted prior to this review period assessed his chronic and acute risks of suicide as low.

During the review period, the inmate was provided care according to most provisions of the governing treatment plan.  However, treatment interventions were not individualized beyond the provision of medication management, PC contacts, and unspecified group treatment.

The PC saw the inmate in October 2014.  The inmate endorsed experiences of transient visual and auditory hallucinations of non-specific shadows and noises.  The inmate attributed these experiences to prior PCP use.  The inmate did not display objective signs of a psychotic disorder and none was diagnosed.  He was medication adherent without crisis concerns, and he was thought to be coping adequately.

The psychiatrist saw the inmate in September and November 2014; documentation in both instances was nearly identical.  The inmate reported that he was doing well and was not taking prescribed medications on weekends, but still needed the medication.  The inmate was described as stable. When seen again in February 2015, he appeared bored.  There were no recommended medication changes during these months.

There was no documentation that indicated the inmate had been enrolled in or had attended therapeutic groups as reflected in his approved treatment plan.

The inmate was seen for an unscheduled IDTT meeting on 2/12/15.  Several days earlier he had informed the PC that he was still depressed and that his treatment needed to be intensified.  However, during the IDTT the inmate confessed to safety concerns related to an upcoming transfer which he had not previously divulged to the PC.  Treatment team members found no clinical rationale to elevate his level of care and encouraged him to work with the counselor to address safety issues.  The inmate's diagnosis was changed to Adjustment Disorder with mixed anxiety and depressed mood.

At the time of the site visit, the inmate reported improvements in mood, energy, and sleep.  He had resumed psychiatric treatment as prescribed, began an exercise program, and had reunited with an old girlfriend.

Findings

The inmate appeared to be receiving mental health treatment at the appropriate level of care in the 3CMS.  He was seen at intervals that met Program Guide requirements for 3CMS inmates.  Although audit data indicated that the annual IDTT was overdue, this appeared to be inaccurate due to the unscheduled IDTT that took place in February 2014.

During the most recent and unscheduled IDTT meeting, the treatment team added a new diagnosis that was not adequately supported.  More importantly, the historically applied diagnosis of Major Depressive Disorder in partial remission was removed from the healthcare record without adequate clinical rationale.  The hasty addition of one diagnosis and removal of another in an otherwise stable inmate suggested countertransference.  Overall, the care provided to the inmate appeared adequate for medication management.  However, this care was

618

inadequate because it did not implement therapeutic group treatment or give meaningful consideration to diagnostic changes.

**Inmate M**

This 3CMS inmate was provided a diagnosis of Major Depressive Disorder, recurrent, in partial remission. He was prescribed sertraline and buspirone to treat symptoms of agitation and depression associated with his psychiatric disorder. This case was reviewed because results of an institutional audit indicated that a psychiatry contact was 38-days overdue. The purpose of the review was to assess adequacy of care provided to the inmate.

Healthcare records indicated the inmate had been consistently enrolled in the 3CMS program without higher level of care placement. In addition to the current psychiatric disorder, diagnoses of record in recent years included PTSD, Personality Disorder, and Psychotic Disorder NOS due to vague reports of auditory hallucinations. The inmate routinely complained of disturbed sleep, depressed mood, and frustrations related to common stressors in the prison environment. The record indicated he functioned relatively well with minimal clinical intervention and psychiatric medications.

The governing mental health treatment plan of 8/8/14 included quarterly psychiatry contacts. Healthcare record documentation demonstrated that psychiatric contacts occurred timely on 11/4/14 and 1/28/14 during the review period. No changes in medication were ordered as a result of psychiatry contacts. The inmate reported benefitting from psychiatric treatment.

Findings

The inmate appeared to be enrolled in the appropriate level of care for treatment of his psychiatric disorder. Psychiatric contacts occurred at intervals that met or exceeded MHSDS Program Guide requirements. The psychiatric care provided to the inmate appeared to be adequate.

**Inmate N**

This 3CMS inmate was provided with a diagnosis of Major Depressive Disorder, recurrent, in partial remission, and Antisocial Personality Disorder. He was not prescribed psychiatric medications at the time of review. His medical record was reviewed because the expert observed his IDTT meeting during the site visit. The purpose of the review was to assess the adequacy and appropriateness of care provided to him during the review period.

Healthcare records contained no historical information about the inmate receiving psychiatric treatment before entering prison. According to the records, the inmate had been treated at the 3CMS level of care since 2007. Recently, he had received hydroxyzine and mirtazapine to treat symptoms of sad mood, decreased energy, poor concentration, and disturbed sleep. Medications were discontinued in January 2015. An SRE was prepared on 4/15/14 for treatment planning

purposes. The inmate had no history of suicide attempts; he was deemed a low chronic and acute suicide risk.

According to the governing mental health treatment plan dated 4/15/14, the inmate was noted to be stable and had participated in two treatment groups and attended clinical contacts. The mental health treatment plan was timely updated during the site visit. The inmate presented as a small statured 76-year-old male who ambulated in a wheeled walker. His medical history was remarkable for conditions that might contribute to depressive experiences. He was characterized as struggling with end of life issues.

Review of the mental health treatment provided during the review period indicated that clinical and psychiatric contacts were provided at intervals consistent with the Program Guide. The annual updated treatment plan targeted relevant problems concerning the inmate's diminished interest in and enjoyment of activities and his ambivalence about parole. Specific changes were communicated in behavioral terms that were easy to understand, such as keeping a daily log of mood and feelings and identifying negative thoughts that produced sad feelings and replace them with balanced thoughts. The inmate stated that he could accomplish goals in the treatment plan.

Findings

The inmate appeared to be treated at the appropriate level of care. The overall care provided to him appeared to be adequate.

**Inmate O**

This inmate was housed in U wing since arriving at the institution on 1/8/15. He had been enrolled in the 3CMS at the reception center where he was provided with a diagnosis of Major Depressive Disorder, single episode, mild. He declined treatment with psychiatric medication. The case was reviewed because institutional audits indicated the initial IDTT meeting was overdue by 27 days. The purpose of the review was to assess whether the care provided to the inmate was adequate.

This 18-year-old inmate had no history of mental health treatment in the community prior to entering the CDCR. He was initially cleared for the general population. Several weeks later, he requested to meet with the psychiatrist because of trouble sleeping and missing his family. The psychiatrist provided a provisional diagnosis of primary insomnia, and enrolled the inmate in the MHSDS based on a qualifying mental disorder as indicated by the placement chrono. A mental health evaluation, SRE, and initial treatment plan were developed, but the initial IDTT meeting did not convene prior to the inmate's transfer to CMF. A brief mental health evaluation prepared two days before he transferred indicated he did not qualify for an Axis I diagnosis per the DSM-IV-TR.

Upon transfer to CMF, the inmate was timely and appropriately screened by the R&R nurse. The psychiatrist saw him within two weeks and a mental health treatment plan was prepared in anticipation of the initial IDTT meeting. It was apparent that the author of the treatment plan had

reviewed historical information and was aware the inmate had requested removal from the MHSDS. The IDTT was held on 1/28/15. Treatment team members recommended that the inmate be reviewed by the PC in 30 days to assess whether removal from the mental health caseload was warranted.

On 2/19/15 the PC saw the inmate, who reported no longer being depressed. The inmate stated he had established contact with his family and that this contributed to improvement in his mood and with his sleep problems. The inmate had not taken psychiatric medication and showed a stable mental status. His level of care was changed to the general population and the correct mental health removal form was submitted effective 2/15/15.

Findings

Problems related to the inmate's initial placement in the mental health caseload were outside of the scope of this review. The mental health care that CMF clinical staff provided to the inmate was thorough, prudent, and adequate.

**Inmate P**

This EOP inmate's healthcare record was reviewed from a list of EOP inmate's housed in the OHU. The inmate was diagnosed with Major Depressive Disorder and PTSD. He was prescribed fluoxetine. Medical problems consisted of a stroke with contractures of the forefinger, middle finger, and ring finger on the right hand, right foot, hearing impairment, expressive aphasia, diabetes, and hypertension. The inmate declined the psychiatrist's physical therapy recommendation. Weekly PC contacts were timely and adequate. IDTT meetings occurred monthly and included the medical primary care physician and the psychiatrist. Treatment goals were to increase the inmate's ability to regulate mood, improve coping skills, and enhance functioning by 40 percent while also reducing depressive symptoms by 40 percent.

Findings

The mental health clinical care provided to this inmate was adequate. IDTT meetings were attended by psychiatry and medical physicians, and documentation was appropriate.

**Inmate Q**

This EOP inmate's healthcare chart was reviewed from a list of EOP inmates housed in the OHU. The inmate's mental health diagnosis was Major Depressive Disorder and Factitious Disorder. His medical problems included a frozen shoulder, an eye problem, and other somatic symptoms that were intermittent. The inmate was not prescribed any psychotropic medications, but he was prescribed diazepam administered by crush and float method. The inmate viewed medical problems as side effects from previous psychotropic medications. PC contacts occurred weekly, and the PC used cognitive behavioral therapy (CBT) to help the inmate with irrational and depressive thoughts and coping skills.

<u>Findings</u>

The mental health clinical care that was provided to this inmate was adequate.

**Inmate R**

This EOP inmate's healthcare record was reviewed from a list of EOP inmates who were housed in the OHU. The inmate's mental health diagnoses were Depressive Disorder and Borderline Personality Disorder. His medical diagnoses were hypertension, coronary artery disease, COPD, hypothyroidism, and chronic angina and pain. He was previously prescribed mirtazapine in January 2015, but this medication was discontinued because the inmate no longer was depressed. The inmate was prescribed morphine, but he was not prescribed psychotropic medications. The psychiatrist and medical physician attended the IDTT meetings.

<u>Findings</u>

The mental health clinical care that was provided to this inmate was adequate and timely.

EXHIBIT I
California State Prison, Solano (CSP/Solano)
March 17, 2015 - March 19, 2015

**Inmate A**

This 43-year-old inmate was identified as requiring EOP level of care while housed in administrative segregation. His record was reviewed to assess the treatment he received while awaiting transfer and during the reporting period prior to his EOP designation. During the review period, he also required transfer to the MHCB.

His primary diagnoses were Major Depressive Disorder, recurrent, severe with psychotic features and PTSD. He was primarily treated with Remeron, Paxil, and Risperdal. At other times, he was also diagnosed with Mood Disorder NOS.

The inmate's history was significant for two possible suicide attempts, a history of sexual abuse, and having witnessed the death of a close friend. More recently, there were ongoing reports of depression, command hallucinations to commit suicide, and variable medication adherence; there were ongoing CSP/Solano staff concerns about the veracity of his self-reported symptoms and history and the need for MHCB housing for five days in early August 2014.

Between August 2014 and March 2015, IDTT meetings were conducted monthly except for October 2014 and February 2015, when none were documented in the healthcare record. The inmate was admitted to the MHCB on 8/1/14 for suicidal ideation accompanied by feelings of helplessness, depression, and command hallucinations to kill himself. Prior to this MHCB admission, staff reported what was described as "splitting" behavior and poor medication adherence. During his MHCB admission, psychiatry saw the inmate regularly. Following discharge, five-day follow-up was conducted as required.

A treatment plan dated 8/19/14 was developed following his MHCB discharge while he was in administrative segregation awaiting transfer to an EOP hub. During this brief time, he received regular PC contacts.

Staffs' view of the inmate was encompassed in a note memorializing his five-day follow-up where he was described as "characteristically reckless, [showing a] lack of remorse and uncooperative." His behavior was assessed as "founded in perceptions of injustice" and possibly as a function of nonadherence. He refused to attend his IDTT meeting. His treatment plan was to address irritability and anger through weekly PC contacts. Borderline traits were to be addressed by establishing a therapeutic alliance. The need for diagnostic clarification was noted as was his refusal of all medication. He was assessed with moderate acute and chronic risk for suicide; although much of his behavior was viewed as volitional. At this time, his diagnosis was Mood Disorder NOS, Polysubstance Abuse, and Antisocial Personality Disorder. The plan was to monitor him weekly for safety; additionally psychotherapy and medication were to be provided. The treatment plan did not address his medication noncompliance.

CSP/Solano PC notes indicated a focus on the inmate's "manipulative" and "demanding" behavior, complaints of harassment and mistreatment by custody, and noncompliance with prescribed medications. Despite various notes showing attempts to engage the inmate, he refused many sessions.

624

The treatment plan dated 9/11/14 showed that by this time the inmate had been transferred to CMF and indicated that he was well-engaged in treatment with positive results.

Findings

CSP/Solano staff unsuccessfully attempted to engage the inmate and improve his medication compliance. Staff viewed much of his behavior as goal-oriented although the inmate described significant symptoms and a history which raised concerns about suicide risk. His transfer to an EOP hub was apparently beneficial as his engagement in treatment improved. The timing and frequency of his clinical contacts were within Program Guide requirements. While adequate in this respect, staffs' negative attitudes concerning him may have contributed to his unsatisfactory engagement while at CSP/Solano. Despite these limitations, overall treatment was minimally adequate.

**Inmate B**

This inmate was housed in administrative segregation at the 3CMS level of care. His healthcare record was reviewed to assess the treatment he received in that setting during the review period.

The inmate was primarily diagnosed with Major Depressive Disorder, recurrent, severe without psychotic features and PTSD, and he was treated alternately with Prozac, Celexa, and Depakote. He was later diagnosed with Bipolar I Disorder, and the possibility of a learning disability was mentioned. His history was remarkable for Polysubstance Abuse, dyslexia, anxiety, panic attacks, trauma, and losses of social support. A past diagnosis of Schizophrenia, a history of inpatient psychiatric treatment, and a suicide attempt by overdose were also noted in the healthcare record.

Following his transfer to CSP/Solano on 8/28/14, the inmate's initial treatment plan was dated 10/2/14. He was being treated at the mainline 3CMS level of care at that time. His primary symptoms were mood swings, auditory and visual hallucinations, and poor sleep and appetite. Nightmares and night terrors, hypervigilance, and startle responses were also documented. Goals were somewhat generic and called for decreasing his symptoms. No criteria for higher level of care transfer consideration were noted.

A PC note dated 3/4/15 indicated the inmate's transfer to administrative segregation, when he was assessed as not being in psychological distress. He was seen for a complete IDTT meeting on 3/17/15, but that documentation was not present in the medical record at the time of review.

Review of progress notes beginning in February 2015 showed a psychiatry note dated 2/11/15 which noted that the inmate was housed in the general population. The inmate had numerous concerns at that time, including a request for single-cell status and questions about a hearing aid. He was viewed as non-psychotic, "manipulative," and "unreliable," with no apparent difficulty with his hearing. The psychiatrist's diagnosis was Bipolar I Disorder, stable and possible learning disability.

A psych tech note for the week of 2/23/15 contained a reasonable summary of the week's contacts and indicated that the inmate had been transferred to administrative segregation. The next PC note was dated 3/4/15 and reported that the inmate was ambivalent about seeing the psychiatrist; this was a theme which continued in subsequent notes, which also discussed his loss of close friends and family. His diagnosis was Major Depressive Disorder; the PTSD diagnosis was dropped without explanation.

Findings

Psych tech and PC notes indicated different dates for admission to administrative segregation. At the time of review, there was no indication that the psychiatrist had seen the inmate during his first three weeks in administrative segregation, although the inmate had expressed ambivalence about seeing a psychiatrist. When housed in the mainline 3CMS program, the inmate had primarily been seen as "manipulative" and "unreliable." While generally adequate, this inmate's treatment did not sufficiently reconcile this view of him with the diagnoses of Major Depressive Disorder and PTSD, as well as his reported history and symptoms. Treatment goals were not sufficiently individualized or measurable. Psych tech weekly summaries were adequate.

**Inmate C**

This inmate's healthcare record was reviewed to assess his treatment at the 3CMS level of care. His primary diagnosis was Major Depressive Disorder, recurrent, moderate treated without psychotropic medications. He was housed in the general population mainline 3CMS until his recent transfer to administrative segregation.

During the review period, the PC saw the inmate approximately every two months, but there were no indications of psychiatry contacts. The inmate's annual treatment plan occurred prior to the beginning of the review period.

PC notes generally indicated the inmate's interest in discussing philosophy and enjoyment of his work assignment. Except for Vistaril, he was not prescribed psychotropic medication. It was unclear whether a psychiatrist prescribed the Vistaril he took on an as needed basis for anxiety and depression. Later, the inmate discussed his plans to get married.

A PC note dated 1/28/15 indicated the inmate was not able to get married when planned due to his fiancée's job. He was described similarly as in previous notes. His diagnosis was Depressive Disorder NOS. It was again reported that he was prescribed Vistaril.

Following his transfer to administrative segregation, there was a summary psych tech note for the week of 2/23/15. It indicated, as did summary notes for the following two weeks, that he was not on psychiatric medication and had no mental health concerns. At the time of review, there were no psychiatry or PC notes in the records subsequent to his transfer to administrative segregation. However, the inmate had an IDTT meeting observed during the site visit; these notes had not been posted in the eUHR at the time of the review.

Findings

The PC saw the inmate in accordance with Program Guide requirements when he was housed in the mainline 3CMS. His treatment was generally adequate. Although there were no psychiatry notes, the inmate was noted not to be receiving psychotropic medications. It was not clear who prescribed the Vistaril that the inmate was taking for anxiety and depression on an as needed basis. At the time of review, there were no psychiatry or PC notes in the healthcare record following the inmate's transfer to administrative segregation, which psych tech summary notes reported took place during the week of 2/23/15.

**Inmate D**

This inmate's healthcare record was reviewed because he was housed in administrative segregation at the EOP level of care while awaiting EOP hub transfer. He was also mentioned in the plaintiffs' attorneys' monitoring memo, which indicated that he had been admitted to the CSP/Solano MHCB on 1/6/15. The inmate remained in the MHCB until his discharge to CSP/Solano's administrative segregation unit on 2/5/15.

This 27-year-old inmate had a primary diagnosis of Bipolar I Disorder, most recent episode depressed, mild. He was primarily treated with Remeron and Risperdal.

During the review period, he had treatment plans dated 9/17/14, 12/30/14, 1/7/15, and 2/17/15. His treatment plan dated 9/17/14 indicated that he was housed in a mainline setting at CSP/Solano at the 3CMS level of care. He was reported to be a poor historian, and it was noted that the information that he provided was not confirmed. He was originally assigned to the 3CMS level of care for depression, which was not treated with medication. The inmate reported inpatient psychiatric admissions and having seen a psychiatrist while living in the community. Delusional content and loose associations were noted, and he appeared to be responding to internal stimuli.

After transfer to administrative segregation, the inmate received a treatment plan dated 12/30/14. At that time, he was refusing medication. Additional pertinent history that was noted included being found incompetent to stand trial, hospitalization at Napa State Hospital, and previously being on court-ordered medication that included Depakote and Zyprexa. The assault which precipitated the administrative segregation admission was thought to be related to his delusions. He was diagnosed with Psychotic Disorder NOS, and he was thought to likely meet the criteria for Schizophrenia. He was found to need a higher level of care for increased monitoring of his symptoms, and he was referred to the EOP level of care. It was noted that he liked to attend groups as he had done while in the hospital. He was found to be laughing inappropriately, and his thought process was tangential.

A note dated 1/7/15 indicated that the inmate was feeling better, was cooperative, and responding well to medication. It also indicated that he was seen at cell front, but in a "confidential setting."

627

However, he remained delusional, but was not in distress. The plan was for him to be seen weekly until his transfer to an EOP hub.

A treatment plan progress note of 2/17/15 stated that the inmate was discharged from the MHCB on 2/5/15 and five-day follow-up ended on 2/10/15. He continued to present with fixed delusions regarding the military and the CIA. He was not receiving groups because groups were not provided in administrative segregation. He was prescribed and was adherent with Abilify and Remeron, but he continued with inappropriate affect; his cognition could not be assessed.

An SRE dated 1/6/15 conducted around the time of his MHCB admission found numerous chronic risk factors and various acute risk factors. The only protective factor noted was that he exercised regularly. He was viewed as low chronic and acute risk, although the SRE described a psychotic, socially-isolated individual.

The inmate's ICC was completed in absentia as he was housed in the MHCB. A mental health note associated with the ICC dated 1/28/15 reported that he was treated at the 3CMS level of care and was retained in administrative segregation pending a non-"shuable" offense. It did not mention the previous finding that his offense was related to his delusions or EOP transfer. The five-day follow-up notes indicated that the inmate was requesting injectable medications.

While in the MCHB, the inmate was described as bizarre and delusional; this was at least partially a function of his medication nonadherence. His diagnosis was Schizoaffective Disorder, Bipolar type. He was being considered for transfer to the EOP level of care. The inmate refused to come out of his cell on 2/1/15 for a psychiatry contact, but was seen on 2/2/15, when delusions were noted. On 2/3/15, he was somewhat improved and requested sleep medications. A psychiatry note dated 2/24/15 indicated that he was interested in the EOP level of care and wished to have a job as a janitor.

A psychologist's note dated 2/5/15 indicated that the inmate was discharged from the MHCB and would be placed in administrative segregation until his EOP transfer. The importance of expedited transfer was discussed, as were plans to work with custody to facilitate this transfer.

<u>Findings</u>

This inmate at times experienced significant distress and symptoms, but appeared to somewhat respond to MHCB treatment. Although it had previously been helpful, he did not have access to group treatment while housed in administrative segregation at the EOP level of care. From available mental health documentation, it did not appear that the assessment that the inmate's RVR was related to a psychotic process was adequately addressed. The inmate's expedited transfer was eventually pursued, but should have been considered earlier. Transfer to a higher level of care also should have been more promptly considered. Although seen regularly, this inmate's treatment was inadequate during the time he was housed in administrative segregation; he did not have access to group treatment, which history indicated might have been helpful, while consideration of expedited transfer to a higher level of care, including possible inpatient care, needed prompter consideration.

EXHIBIT J
San Quentin State Prison (SQ)
May 4, 2015 - May 6, 2015

**Inmate A**

This 51-year-old EOP inmate was discharged from the PIP on 2/9/15.  He was diagnosed with Asperger's Disorder and Psychotic Disorder NOS.  He was prescribed aripiprazole 30 mg per day.  The inmate received his psychotropic medications by PC 2602 order.  One of the recommendations post-discharge was to regularly monitor his weight as he had a history of weight loss while housed in the PIP.

The inmate was seen timely by the EOP treatment team in East Block on 2/17/15.  The initial treatment plan indicated that the PIP records had been reviewed in the development of the treatment plan.  The treatment plan indicated enhanced EOP services that were characterized by increased PC contacts (twice weekly), increased psychiatry contacts (twice monthly), wellness checks as needed, and daily treatment groups to include EOP yard.  However, the treatment plan confused goals and interventions, and, as a result, did not actually list interventions for some problem areas.  In addition, given the inmate's diagnosis of Asperger's and long-standing psychotic symptoms that could impair treatment engagement, the inmate would greatly benefit from behavioral interventions; however, they were not part of the treatment plan.  While the treatment team noted the inmate's motivation for treatment, the inmate had a long history of poor treatment adherence that should have been factored into the treatment plan.  The PC, psychiatrist, and custody counselor were present for the IDTT meeting, but no supervisory personnel, psych tech, or housing unit officer was present.  A subsequent treatment plan dated 4/14/15 was completed on the revised Form 7388 that was much more comprehensive and well-constructed; it addressed the primary problematic behaviors more thoroughly.

The inmate reported to staff that he did not want to return to the PIP.  He was thus maintaining his ADLs and attending most of his treatment to avoid transfer.  He clearly articulated that his participation and ADL maintenance was due to his desire to remain on East Block.  In fact, if he missed a scheduled activity he would ask during the individual session whether he would be returned to the PIP.  He also stated that he enjoyed the discussions in his treatment group.  Review of multiple PC progress notes indicated that it did not appear that individual contacts actually fulfilled the treatment plan's stated interventions; instead, they were more like check-ins or unfocused sessions guided by the inmate's content.  However, there was a PC change in approximately April 2015; thereafter, the content of individual sessions improved and became more focused and intervention-specific.  Group treatment progress notes indicated that the inmate was an active participant and appeared to benefit from those treatment groups.

<u>Findings</u>

This inmate received increased treatment contacts when discharged from the PIP to the EOP condemned program.  This was clinically appropriate and necessary to assist the inmate in transitioning back to the housing unit and lower level of care.  His initial treatment plan was somewhat nonspecific and confused treatment goals and interventions.  Individual contacts were unfocused and individual treatment was inadequate.  Treatment groups appeared to be targeted to the inmate's needs and he appeared to benefit from these groups, despite his primary motivation of avoiding a return to the PIP.  With a PC change in late March/early April 2015, there was a

630

significant improvement in the treatment plan and individual treatment sessions. As a result of these changes and an improved treatment plan, this inmate received adequate treatment.

## Inmate B

This 42-year-old EOP inmate was reviewed as an example of EOP care in the condemned program. The inmate had been previously identified during the condemned unmet need assessment project. He had been brought to the assessment team's attention because he was experiencing psychotic symptoms, refusing medication, not maintaining his ADLs, and having trouble taking care of himself. He also rarely exited his cell and was not engaged in treatment. At that time his case was reviewed for higher level of care referral consideration, but it was determined that such referral was not necessary. He had been diagnosed with Schizophrenia. The inmate had been observed during IDTT during the monitoring visit. At that time, his affect was considerably brighter and he was able to articulate the benefits of his current EOP level of care, and his likes and dislikes, as well as describing his initial concerns with his EOP designation.

On 10/7/14 there was a PC change and the treatment team increased the inmate's level of care due to his decompensation. The subsequent treatment plan dated 10/21/14 placed the inmate on a modified treatment program with the goal of attending one mental health yard, one rehabilitation therapy group, routine psychiatry contacts, and weekly individual PC contacts. The inmate felt that he was being overwhelmed by mental health staff when on a regular EOP treatment plan; thus the team's decision to place him on a modified program.

The treatment plan dated 10/21/14 was adequate and focused on rapport building and assisting the inmate to gain insight. According to the 11/25/14 treatment plan, the inmate had finally left his cell for one rehabilitation therapy individual session. However, he continued to meet cell front for his PC and psychiatry contacts. That treatment plan continued the inmate in the modified program and identified reinforcers that the PC could use in an effort to have the inmate see the PC in a confidential setting. The PC also began to attend the rehabilitation therapy individual sessions to facilitate rapport and to extend the inmate's participation to PC contacts. The treatment plan was consistently modified over time as the inmate improved. While the plan did not always specifically indicate that behavioral interventions were used, that was in fact what staff was implementing in their efforts to increase rapport and out-of-cell activity. This was fully discovered through the IDTT meeting that was attended during the site visit. The inmate remained on a modified treatment plan until 2/17/15. The treatment team moved the inmate to the full EOP program during the IDTT meeting on that date. The treatment plan used behavioral and cognitive behavioral techniques to continue to increase the inmate's participation in treatment and engagement with treatment providers. Progress notes supported that the treatment plan was being implemented during therapeutic contacts.

Findings

This inmate had been extremely low functioning when identified by staff during the condemned unmet needs assessment project. He remained in the 3CMS program, but he was not receptive to

his PC's efforts to engage him in treatment at that time.  There was a change in his PC and level of care to EOP with treatment plan modifications of using more behavioral-type interventions. The inmate began to slowly respond over time, eventually leaving his cell and engaging with treatment staff.  He was able to progress from the modified EOP program to full EOP programming.  This inmate made tremendous progress and received adequate treatment.  This case was an excellent example of staff effectively using behavioral techniques to progress an inmate from almost no mental health treatment participation to full EOP participation solely through that utilization.  This case could be an example for other providers on the effectiveness of team behavioral intervention.

**Inmate C**

This 42-year-old EOP condemned male inmate was observed at an IDTT meeting during the monitoring visit.  His case was reviewed as an example of EOP care in the condemned program. The inmate had also been identified during the condemned unmet needs assessment project; he was in the mental health program for six or more months and had symptoms that had not responded to treatment, had an MHCB stay exceeding ten days during the prior six months (prior to the data pull), had three or more MHCB admissions in the preceding six months, had at least one DSH referral in the prior year, and had been identified by at least one staff member as a possible higher level of care referral.  The outcome of that assessment was that the inmate was not recommended for higher level of care referral at that time.

Treatment planning primarily used CBT interventions to focus on the inmate's primary symptoms and functional deficits.  The inmate's substance abuse was closely tied to his psychotic symptoms and crisis admissions.  He was diagnosed with Psychotic Disorder NOS, Mood Disorder NOS and Antisocial Personality Disorder.  He was prescribed Geodon, benztropine, and Prozac.  He had low program participation during much of the review period that the treatment team did not document with specific figures.  While the inmate did not meet 50 percent treatment attendance, the team noted that he was missing treatment because he was choosing to go to yard, which the team considered an acceptable alternative.  It was unclear why the treatment team did not change the inmate to other group and individual times that did not conflict with yard, or work with custody so the inmate could attend his appointments and then go to yard even if he would not be able to fully participate in yard.  The Form 7388B treatment modifications for this item also did not change over time or note any such custody or treatment modifications.  The clinical summary did not appear to have changed over time, providing little information about the inmate's actual progress or lack of progress.  While the treatment plan changed on 3/3/15 and improved in terms of the specificity of goals and interventions, it was not modified over time; the inmate continued to participate in less than 50 percent of EOP treatment.

A review of progress notes for the reporting period indicated that the inmate sporadically attended treatment groups; the groups he attended varied and there was no treatment continuity. The PC generally saw him in a confidential setting and appeared to focus on several areas of the treatment plan.  However, the content of PC sessions was somewhat hard to address given the limited information in the progress notes.  Much of the progress notes were cut and pasted from the prior note with only the subjective section being substantially different.  It also did not appear

632

that individual sessions actively addressed the inmate's lack of group treatment participation. The psychiatrist met with the inmate in a confidential setting when the inmate agreed, or cell front when the inmate refused to come out of his cell. It did not appear that the inmate's poor participation was addressed.

When the treatment team discussed the inmate during the monitoring visit, it appeared that there was actually a great deal of work occurring with him that was not documented in the healthcare record. The inmate reported that he was benefitting from treatment and that it had assisted him with substantial skill development that he used to remain calm and not receive RVRs or use MHCB services. Given his history of crisis care, this was a significant improvement.

<u>Findings</u>

This documentation of this inmate's care required substantial improvement. While numerous Form 7388Bs contained extensive detail regarding CBT intervention, the "problem, goal, intervention" section of the treatment plan typically listed only Program Guide standards with little specificity or operationalization of treatment targets and goals. PC progress notes were primarily cut and pasted and provided little information about the apparent substantial therapeutic work occurring in those sessions. However, psychiatry notes were more detailed.

The inmate's failure to participate in group treatment was not adequately addressed in treatment planning, but it appeared that the team felt the inmate did not require that intensity of treatment. However, this should have been directly addressed in the treatment plan and the inmate should have been placed on a modified treatment plan or treatment activities should have been rescheduled so that they did not regularly conflict with yard. Based on the inmate's self-report, review of the 114-D (housing unit inmate-specific log), and staff discussion, the inmate appeared to have been treated adequately. However, treatment documentation required improvement so that it properly documented that treatment, and the treatment plan needed to specifically address group therapy participation.

**Inmate D**

This case was selected for review from the DSH non-referral log and as an example of reception center care. This 41-year-old 3CMS reception center inmate arrived at SQ on 1/7/15. He was screened in a confidential setting on 1/15/15 and referred for further evaluation; this evaluation occurred on 1/23/15. At that time, the inmate was provided with a diagnosis of Bipolar Disorder NOS. The inmate was prescribed mirtazapine, ziprasidone, and Depakote. His SRE of the same date determined that he was at low acute and moderate chronic suicide risk. He was placed into the 3CMS level of care.

The inmate had repeatedly talked with his PC about his desire to receive SSI and his belief that prison staff could assist him in obtaining SSI benefits when he was released even though he had been denied twice. The inmate was placed in "enhanced 3CMS" where he received three weekly treatment groups in addition to his individual PC and routine psychiatry contacts.

Progress note review indicated that the PC and psychiatrist repeatedly reported that the inmate had been stable at the 3CMS level of care. On 2/24/15, the inmate told the PC that he really wanted EOP level of care because other inmates had told him that it would help him get "classes and stuff." The inmate also identified treatment goals such as anger management. The PC scheduled the inmate for an IDTT to reevaluate his level of care. The Form 7388Bs for both IDTT meetings held on 2/18/15 and 3/4/15 indicated the inmate was positive for criterion 3 (chronic symptoms that had not sufficiently responded to at least six months of treatment), but this was based solely on the inmate's self-report of community treatment. However, this was not the intent of this item and the item should not have been marked positive. As such, the inmate was appropriately not referred to DSH.

At the first IDTT meeting held on 2/18/15, the inmate's level of care was considered and it was determined that he was more appropriate for the 3CMS program. That initial treatment plan was adequate and progress notes indicated that individual sessions followed the treatment plan. The next IDTT meeting on 3/4/15 indicated that the inmate was placed into the EOP level of care. The justification for this was that the inmate was receiving enhanced services that would not be available to him at the 3CMS level of care on the mainline (three groups, two PC contacts weekly).

Findings

This inmate was adequately treated and was appropriately not referred to DSH.

**Inmate E**

This case was selected from the DSH non-referral log and was chosen to review administrative segregation care. This 35-year-old EOP inmate was housed in administrative segregation at SQ as a 3CMS inmate prior to having his level of care increased and being transferred. He had multiple MHCB placements while at SQ. The inmate was provided with diagnoses of Schizoaffective Disorder and Obsessive Compulsive Disorder (OCD). He was prescribed aripiprazole 15 mg per day and citalopram 20 mg per day.

The treatment plan dated 10/6/14 indicated that the inmate had an increased level of care secondary to a suicide attempt that required sutures. The inmate's multiple MHCB admissions were due to suicidality and limited coping skills. He experienced substantial anxiety and frustration regarding his OCD symptomatology that would escalate to suicidality as a coping strategy. The treatment team documented numerous significant suicide risk factors on the Form 7388B; despite this, they indicated that he was stable at the EOP level of care. The inmate was on a modified treatment plan "on EOP LOC per ASU protocol," although that was not defined in the treatment plan. While SQ was not an EOP hub, the inmate was offered group therapy including two rehabilitation therapy weekly groups. The treatment plan was adequate, but the goals and problems required greater specification and operationalization.

The Form 7388B dated 10/6/14 properly noted that the inmate had three or more MHCB admissions, but the non-referral rationale directly contradicted earlier information in the

treatment plan. The non-referral rationale was that none of the MHCB admissions were influenced by suicidal or homicidal ideation. However, the clinical summary of the plan clearly documented that the admissions had been due to "…suicidal and limited coping skills. He cut his wrist requiring sutures on 4/2/14…" The non-referral rationale was clearly not appropriate or clinically adequate. The treatment modifications were generally appropriate except for one that stated that the team would address secondary gain issues that resulted in multiple MHCB admissions. The issue of secondary gain and MHCB admissions had not been addressed in the clinical summary or main body of the treatment plan; it was not identified as a problem or treatment target as it should have been if it was going to be addressed in treatment.

The inmate also was not participating in 50 percent of offered treatment. The non-referral justification for this item was that the inmate's lack of participation was not influenced by mental health symptoms, but this was not explained or supported. The treatment team indicated that the inmate had not decompensated, but examples of his functioning were not provided to support this. It was unclear how the treatment team had modified the treatment plan to improve the inmate's ability to function. It also was unclear from documentation that this inmate received an objective assessment of his need for a higher level of care. Rather, it appeared that staff believed he was malingering or otherwise manipulating for some secondary gain; however, documentation did not explain why at least some of the treatment team may have thought this or how they would assess whether it was true.

<u>Findings</u>

This inmate's frequent episodes of decompensation requiring crisis inpatient care were not adequately treated. The Form 7388B also was not appropriately completed. This inmate required treatment for suicidality, limited coping skills, and an objective assessment of the need for a higher level of care. Available documentation indicated that he did not receive adequate mental health treatment.

**Inmate F**

This case was selected from the DSH non-referral log as an example of reception center care. This 26-year-old EOP reception center inmate was diagnosed with Bipolar Disorder NOS and Antisocial Personality Disorder. He was prescribed lithium and Buspar. This was his second prison term and he had been included in the mental health caseload at the 3CMS level of care during the prior term. He had a history of explosive, angry outbursts beginning at the age of 14. He began getting into trouble and ultimately served time in the California Youth Authority. His mother subsequently made him a ward of the court, and the inmate then received treatment for depression, which included medication. The inmate reported multiple suicide attempts, with two occurring at ages 15 and 18, requiring hospitalization.

The treatment team saw the inmate on 2/25/15, when they noted that he had arrived in their care at the 3CMS level of care, but had his level of care increased to EOP. Unfortunately, the justification section of the treatment plan was never fully completed to explain the rationale for increasing the level of care. The clinical summary also did not provide explanation or indication

635

for the level of care increase. Treatment goals did not always appropriately correspond to treatment targets, but otherwise the treatment plan was adequate.

The Form 7388B was not properly completed. Criterion three (chronic symptoms that have not responded to six months of treatment) was marked positive based on the inmate's self-report of community treatment; the inmate had not been in CDCR for six months at that time. In addition, the treatment team did not comply with providing a non-referral justification and treatment modifications after noting an item as positive. There appeared to be some confusion regarding the appropriate utilization of the Form 7388B.

Findings

It was difficult to assess the adequacy of provided treatment due to the paucity of information in the documentation. There was a lack of justification for increasing the inmate's level of care, while sections of the treatment plan were left blank. The inmate's level of care was increased, which would provide an increased level of clinical contact and monitoring by mental health. The inmate should have been seen by his treatment team so that a comprehensive treatment plan could be completed to ensure that the inmate received adequate care. Without more information justifying the current level of care and an appropriately individualized treatment plan, the adequacy of this inmate's care could not be determined.

**Inmate G**

This inmate was treated in the SQ MHCB from 10/22/14 to 10/29/14. His healthcare record was reviewed to determine whether relevant Program Guide requirements were met.

At the time of this 33-year-old man's MHCB admission on 10/22/14, his presentation was consistent with Psychotic Disorder NOS. The initial psychiatrist's examination report occurred two days later. Subsequent psychiatry progress notes were written on 10/25/14 and 10/29/14. Psychologist progress notes were dated 10/26/14 and 10/27/14. A recreational therapist wrote a note on 10/28/14. An updated treatment plan was also present.

A discharge note indicated that the inmate was subsequently discharged when it was determined that his presenting symptoms were not considered to be due to a psychotic disorder, but were due to environmental factors. A discharge summary was not located in the eUHR. An SRE was not located in the inmate's healthcare record nor was there documentation relevant to five-day follow-up.

Findings

Psychiatry and psychology assessments were performed timely, but an SRE was not documented. It nonetheless appeared that the inmate received clinically appropriate treatment.

636

**Inmate H**

This inmate was treated in the SQ MHCB from 11/24/14 to 12/1/14. His healthcare record was reviewed to determine whether relevant Program Guide requirements were met.

The inmate was admitted to the MHCB on 11/24/15 due to increasing suicidal thoughts and racing and persecutory thinking. A PIP referral packet was prepared on 11/26/14.

A psychiatry noted dated 11/27/14 indicated that current medications included Geodon, Zyprexa, propranolol, and Vistaril. His presentation was consistent with Psychotic Disorder and history of Polysubstance Abuse. The inmate was also seen that day by a psychologist.

On 11/28/14, the psychiatrist wrote that the inmate was clinically improving. The inmate continued to be seen for fifteen minute checks. The plan was for daily clinical visits. Daily psychiatry progress notes were also subsequently documented.

A treatment plan dated 11/1/14 was located and was adequate. Diagnoses were Bipolar I Disorder and Antisocial Personality Disorder. The inmate received recreational cell-front therapy on 12/1/14; an SRE was also performed on 12/1/14. On 12/2/14, the inmate was discharged and returned to the EOP.

Findings

This inmate received appropriate mental health treatment that was consistent with Program Guide requirements. The outcome of the PIP referral was unclear from the record review, although it was later learned from staff that the inmate had been transferred to the PIP.

**Inmate I**

This inmate was treated in the SQ MHCB from 1/28/15 to 2/5/15. His healthcare record was reviewed to determine whether relevant Program Guide requirements were satisfied.

This inmate was self-referred for a crisis evaluation on 1/28/15 following a legal visit. An SRE was completed and found him to be at moderate chronic and high acute suicide risk. He was admitted to the MHCB due to suicidal thinking after completion of a crisis assessment by a psychologist. A psychiatrist evaluated the inmate that same day. The inmate reported having used methamphetamine several weeks earlier. His differential diagnosis included Substance Induced Psychotic Disorder, and possible Major Depressive Disorder and Methamphetamine Dependence.

An initial psychiatric evaluation form was completed on 1/29/15. Prescribed medications included olanzapine. The inmate's IDTT meeting was completed on 1/30/15. His recreational/occupational therapy assessment was also completed that day.

The psychiatrist started the inmate on venlafaxine on 1/30/15 and decreased the inmate's clothing restrictions. Daily psychiatry progress notes were present. By 2/1/15, the inmate was noted to have clinically improved. The inmate's methamphetamine-induced symptoms were resolved by 2/2/15. Another SRE was completed on 2/2/15 and indicated that the inmate's chronic suicide risk was high while his acute risk was moderate.

A Form 7388B was again completed on 2/5/15, which coincided with the inmate's MHCB discharge. At this time, another SRE and a discharge summary were completed.

Findings

This inmate received appropriate mental health care while housed in the MHCB.

**Inmate J**

This mainline 3CMS inmate was interviewed in a group setting and his healthcare record was reviewed. The inmate had been incarcerated in CDCR since 1990 and had been housed on the SQ mainline since 2012. His release date was in 2021.

The most recent treatment plan for this 55-year-old man was dated 8/14/14. His presentation was consistent with Depressive Disorder NOS and ADHD. His prescribed medications included Strattera and an antidepressant medication for chronic pain management. The treatment plan was signed by the PC, psychiatrist, and correctional counselor. Interventions included group therapy participation.

The psychiatrist evaluated the inmate on 9/5/14. Due to the inmate's other medications, Prozac was recommended but was not started until EKG results were obtained. The inmate was seen by a covering psychiatrist on 9/24/14, who recommended a mood stabilizer instead of Prozac due to potential cardiac issues. The inmate's EKG had yet to be obtained. The psychiatrist who evaluated the inmate on 10/22/14 deferred the inmate's use of Prozac due to the inmate's EKG and was planning to confer with medical staff as to an increase in his Elavil.

The psychiatrist started the inmate on Prozac on 11/13/14. The psychiatrist noted little clinical change in the inmate on 12/3/14. At that time, Prozac 10 mg three times weekly continued to be prescribed. The inmate had PC contacts on 8/11/14, 8/20/14, 9/30/14, and 11/13/14. Psychiatric nurse progress notes were also regularly written.

The inmate received an RVR for possession of drug paraphernalia in 2015. His mental health assessment on 2/4/15 determined that the RVR was not related to his mental health diagnosis. On 2/23/15, the psychiatrist increased the inmate's prescribed Prozac. The inmate was again seen by his PC on 3/30/15. In April 2015 he received an RVR for morphine possession.

Findings

This inmate received mental health treatment consistent with Program Guide requirements. However, despite his treatment plan, he had yet to be placed in group therapy. His apparent substance abuse disorder also did not appear to have been adequately addressed.

**Inmate K**

This mainline 3CMS inmate was interviewed in a group setting, and his healthcare record was reviewed. The inmate was a 38-year-old man who was serving a 25-years-to-life term since 1999. He had been in his current treatment setting since June 2010. His presentation was consistent with a Substance Induced Psychotic Disorder with auditory hallucinations. Diagnoses included Psychotic Disorder NOS, Schizoaffective Disorder, Polysubstance Dependence in institutional remission, and Antisocial Personality Disorder. The inmate's prescribed medications included aripiprazole.

All appropriate staff signed the IDTT and the Form 7388B was completed. Treatment plan interventions were sparse but adequate. There were PC progress notes dated 11/12/14, 1/29/15, 2/18/15, and 3/18/15. Psychiatry notes were dated 11/12/14, 1/29/15, and 4/24/15. The notes were typed and informative. Psychiatric nursing notes were dated 9/11/14 and 11/12/14.

Findings

This inmate received mental health treatment that was consistent with Program Guide requirements.

**Inmate L**

This mainline 3CMS man was interviewed in a group setting and his healthcare record was reviewed. This 62-year-old man was serving a 16-years-to-life sentence. His last treatment plan was dated 5/19/14. Diagnoses were Depressive Disorder NOS, Alcohol Abuse in remission and Paranoid Personality Disorder. Medications include Risperdal.

Psychiatry progress notes during the review period were dated 10/15/14 and 10/28/14. PC notes were dated 9/30/14, 12/9/14, and 3/3/15. A psychiatric nursing progress note was dated 10/28/14. The documentation provided useful clinical information.

Findings

This inmate was not being seen by psychiatry within Program Guide timeframes.

**Inmate M**

This mainline inmate received 3CMS level of care, and his healthcare record was reviewed.

The most recent treatment plan was dated 9/9/14. This 50-year-old man had been incarcerated for the past 18 years. His diagnosis was Mood Disorder NOS. He did not receive psychotropic medications. All appropriate treatment team members signed the treatment plan. A Form 7388B was completed.

The PC saw the inmate on a quarterly basis. Processes indicated that the intervention was essentially supportive therapy. The inmate was not seen by a psychiatrist since he was not receiving psychotropic medications.

Findings

This inmate received treatment consistent with Program Guide requirements.

**Inmate N**

This mainline 3CMS man was interviewed in a group setting, and his healthcare record was reviewed. This 48-year-old man was in his fifteenth year of incarceration, with a release date of May 2017. The inmate's most recent treatment plan was dated 4/9/15. Diagnoses included Major Depressive Disorder, PTSD, and Alcohol Dependence in institutional remission. He was prescribed Prozac.

During the review period, the PC saw the inmate on a monthly basis through January 2015. The inmate then began participating in a weekly substance abuse therapy group. Psychiatry saw him every one to three months. Progress notes written by his clinicians were clinically useful.

Findings

This inmate received mental health services consistent with Program Guide requirements.

**Inmate O**

This mainline 3CMS man was interviewed in a group setting, and his healthcare record was reviewed. The inmate complained about his mental health treatment because he perceived that he was not receiving assistance with his discharge that was scheduled in four months.
PC and psychiatry notes exceeded the frequency of the Program Guide's timeframes. They also provided useful clinical information. The most recent treatment plan was dated 11/20/14. The main issue with the inmate's treatment plan was that it did not address discharge issues, which was consistent with clinical progress notes.

This inmate also complained about a 40 plus pound weight gain related to his use of Remeron.

<u>Findings</u>

The problem with this inmate's treatment was with the lack of adequate assistance with discharge planning.  Otherwise, the inmate's treatment was consistent with Program Guide requirements.

EXHIBIT K
Deuel Vocational Institution (DVI)
February 3, 2015 - February 5, 2015

**Inmate A**

The expert observed this inmate in a reception center EOP group and interviewed him. He was exhibiting significant psychiatric symptomatology including response to apparent auditory hallucinations and significant grandiose delusional thinking with religious content.

This 27-year old inmate arrived at DVI on 1/13/15, reporting a history of mental illness and treatment, but no information on psychotropic medication treatment was noted. He was screened on 1/14/15, and placed at the EOP level of care on 1/22/15. According to the 1/22/15 placement chrono, he was not prescribed psychotropic medication. On that date, he signed a form indicating that he did not consent to treatment. He was provided with a diagnosis of Psychotic Disorder NOS with no diagnosis on Axis II. His intake history and physical were completed on 1/26/15.

The initial evaluation and SRE were completed timely with the placement chrono on 1/22/15. During the evaluation, the inmate was evasive, with poor eye contact and incoherence at times, and his speech was alternately slow and excessive. His behavior was irrational, his mood was elevated, and his affect was incongruent and labile. He was described as exhibiting very poor judgment with no insight. He had "magical" thinking, believing that others wore masks and impersonated him, while alternately believing he could be other people. His thought processes were tangential and circumstantial with a flight of ideas. His thought content was irrelevant, distorted, and filled with grandiose delusions. While clearly responding to auditory and visual hallucinations in front of the CDCR evaluator, the inmate denied such hallucinations, making his self-report of low credibility.

The inmate refused treatment with psychotropic medications. He had not yet been seen by an IDTT and had no treatment plan. He was offered treatment groups despite having no treatment plan. He initially refused some of those groups but recently had attended on a somewhat regular basis. Group notes did not appear to accurately reflect his participation. The expert observed this inmate during a group session where his participation consisted of primarily tangential commentary, response to hallucinations, and expressions of delusional beliefs. None of these observations were noted in the group notes.

<u>Findings</u>

The mental health care that was provided to this inmate was inadequate. This inmate was extremely mentally ill and acutely psychotic. He had not been adequately treated. He should have been expedited for transfer to an EOP facility and monitored closely for possible DSH transfer. He also should have been closely monitored for possible victimization due to his psychotic symptoms and difficulty containing behaviors that might irritate other inmates. A single cell may have been beneficial for this inmate. His housing status should have been evaluated by mental health with a recommendation made to custody staff.

**Inmate B**

This case was selected for review because the inmate was observed in a reception center EOP treatment group and was interviewed during the site visit.  This 32-year old inmate arrived at DVI from NKSP on 1/9/15.  He had been housed at NKSP since 11/17/14 where he was designated at the EOP level of care on 11/26/14.  In his evaluation at NKSP, he reported multiple community involuntary hospitalizations and one DSH admission during incarceration.  His symptoms included auditory hallucinations, paranoia, magical thinking, thought insertion, and mood liability.  There was a history of suicide attempts; his last attempt occurred in 2008 and the last suicidal ideation reportedly occurred during 2014.

The inmate's first CDCR bus screen indicated that he was HIV positive and noted his history of depression.  The DVI bus screen also indicated that he was positive for HIV and Schizophrenia.  He was reportedly moved to DVI due to susceptibility to valley fever.

Four days after arriving at DVI, staff referred the inmate to mental health services, indicating that he required a medication evaluation.  He had not received an evaluation since his arrival at DVI.  The inmate had already begun treatment groups at that time.  There were no inpatient records in the eUHR.  No treatment plan had been completed since his arrival at DVI.

Based on the healthcare record, the first time this inmate was seen by DVI mental health staff was on 1/12/15 in an EOP group facilitated by the psychologist.  It was unclear how this group could have been considered appropriate for this inmate, who had not yet been evaluated or given a treatment plan.  Notes written over the typed group note suggested that he may have also had a mini-individual session during group, which would have been highly inappropriate.

The inmate was seen in group the following day and was determined to be stable with no apparent clinical justification.  He was finally seen individually on 1/14/15 for a wellness check in the clinician's office because he had refused group.  No intake assessment was completed, and no real intervention occurred.  The inmate was merely encouraged to attend group.  He was seen the next day by a psychologist; this encounter was documented in a rather scattered, difficult-to-read written note.

A handwritten, nearly illegible psychiatry note from 1/20/15 incorrectly indicated that the inmate was at the 3CMS level of care instead of EOP.  The note suggested that the psychiatrist believed the inmate had Major Depressive Disorder.  He was maintained on Prozac 20 mg every morning.  The psychiatry note consisted of many canned phrases with checkboxes next to them.  The psychiatrist wrote across various parts of the page in short, incomplete phrases that were difficult to read, on a poorly designed form for documentation that did not provide the necessary elements of a psychiatric note, even if it had been fully legible.

The inmate did not regularly attend group, citing numerous reasons including fatigue and yard.  Inmates in the reception center SPU had to choose between group and their only outside yard time.  While staff followed up, they developed no comprehensive plan to address this inmate's

644

lack of treatment engagement.  Many of the follow-up contacts occurred at cell front.  Individual contacts appeared to have been in reaction to missed groups.

On 1/28/15, the inmate was seen in response to a staff referral secondary to a trip to the TTA the prior evening.  He had been waiting for his Geodon to be discontinued, as he had discussed with the psychiatrist on 1/20/15, and had become "slightly panicky" because that still had not been done.  Appropriate referrals were made.

Findings

This inmate had been at the EOP level of care in the reception center process for 79 days. Although not all of this time occurred at DVI, he should have been transferred expeditiously to his receiving facility.  He was not being treated adequately at DVI.  He had not been evaluated by DVI staff and was not seen timely by his IDTT based on a review of the healthcare record. The treatment team should have convened immediately, developed an appropriate individualized treatment plan, and implemented this plan.  This inmate's case should have been timely brought to the CSR so this inmate could have been endorsed and transferred expeditiously.

**Inmate C**

This 45-year-old reception center EOP inmate arrived at DVI on 12/31/15 with a history of a seizure disorder, mental illness, and mental health treatment.  He was evaluated on 1/2/15.  An SRE was completed on the same day.  He reported a history of suicide attempts, most by hanging and one by overdose while he was out of prison.  He was assessed with high chronic and low acute suicide risk.  He was recommended for EOP level of care and was scheduled for an IDTT meeting to be re-designated to the EOP level of care.  He had SPU status.

This inmate's diagnosis was Schizoaffective Disorder, with diabetes and hepatitis C.  He reported auditory and visual hallucinations (shadows), with voices worsening after a head injury. He had a prior admission at ASH as an MDO and multiple involuntary community placements for suicidality.

This inmate was seen by his IDTT timely.  His treatment plan was adequate, with appropriate interventions.  His treatment goals required greater specification, but were acceptable for an initial treatment plan.  He was prescribed Zoloft 200 mg per day and Zyprexa 20 mg per day. This inmate was seen untimely by the psychiatrist on 1/22/15.  His PC contacts were weekly for two weeks, then he was not seen for one week, and he was then seen by a different PC whose progress note of 2/2/15 was very fragmented, and difficult to understand due to incomplete sentences, use of check boxes, short phrases, and some unknown abbreviations.  The inmate was seen cell-front frequently when he refused to attend group, but his failure to attend did not result in treatment plan modification.

Findings

This inmate was seen timely for his bus screen, initial mental health evaluation, and SRE.  He was not seen by the psychiatrist for a medical evaluation in accordance with Program Guide timeframes.  The IDTT also saw him in accordance with the Program Guide and developed an appropriate treatment plan.  However, as the inmate failed to engage fully in treatment and refused many of his treatment groups, he should have been brought back to IDTT so that his plan could be reviewed and updated.  On the Form 7388B, staff wrote "…EOP LOC – not a danger to self, others or gravely disabled" as the reason for not referring him to a higher level of care.  While the inmate did not appear to require a referral to a higher level of care at that time, it appeared from this note that staff erroneously believed that inmates could be referred only if they were a danger to self, danger to others, or were gravely disabled.  The Form 7388B also stated the inmate's group attendance incorrectly.  This inmate was adequately treated, but needed a treatment plan modification to address his poor treatment engagement.

**Inmate D**

This case was selected as an example of reception center EOP care apart from the reception center SPU program.  This 45-year old inmate arrived at DVI on 10/28/14, with a colostomy bag and mental health history.  He was reportedly receiving trazodone, Depakote, and Cogentin.  He was screened timely, and received a psychiatric evaluation, a mental health evaluation, and an SRE within Program Guide timeframes.  He was initially designated for 3CMS level of care on 11/4/14, and was elevated to the EOP level of care on 1/7/15.  On 12/27/14, he was transferred to the PBSP CTC MHCB.  He was discharged on 1/7/15, at the EOP level of care, but the bus transfer form, bus screening sheet, and inpatient chart had not been scanned to the eUHR.

As of 1/13/15, the inmate was prescribed benztropine mesylate 2 mg per day, divalproex sodium 500 mg per day, and haloperidol 10 mg per day.  He remained at the EOP level of care.  Upon the inmate's return from the PBSP MHCB, the IDTT saw him and developed the treatment plan.  The clinical summary indicated that he had a long history of mental health care, including inpatient hospitalization in the community, and that his parents had a conservatorship for him from 2005 to 2011.  He had committed crimes against his family, been homeless, received SSI benefits since 2005 (although he had a period of 13 years employment), and had a history of suicidality, auditory hallucinations, and paranoid delusions with religious undertones.  The summary also included a reported history of visual hallucinations.

The inmate was diagnosed with Schizophrenia, undifferentiated type, Methamphetamine Abuse "[history of 2014 (ICE)]," and Axis II deferred.  The identified problem areas were broad and not well-defined, requiring operationalization.  Despite that, some interventions were appropriate with acceptable goals, while others were unreasonable and impractical given the inmate's functional level.  In light of that, the treatment plan was not truly individualized.  At the time of the site visit, the inmate had begun verbalizing that he did not want to be in the EOP and did not want to go to group.  He missed group for a variety of reasons, including choosing yard instead.  This was significant and could have been viewed as an early sign of decompensation, but clinical

646

staff did not appear to recognize it as such and consequently did not modify the treatment plan and interventions appropriately.

Findings

This inmate was seen timely by clinicians for his initial evaluations (intake, medication, and suicide); screens were completed timely, and the IDTT team saw the inmate promptly upon his return from the crisis bed. However, the treatment plan was not properly individualized and interventions were not adequately designed. Consequently, this inmate did not receive adequate mental health treatment.

**Inmate E**

This case was selected for review to illustrate reception center EOP services that were not provided in the SPU program. This 41-year old inmate arrived at DVI on 12/30/14. He had a history of mental illness and mental health treatment. He was prescribed chlorpromazine, divalproex sodium, gabapentin, and perphenazine. He was seen for his mental health evaluation and suicide risk assessment on 1/2/15. He was diagnosed with Schizoaffective Disorder, bipolar type; an alternative diagnosis of Mood Disorder NOS was also considered. He was also provided with additional diagnoses of Polysubstance Dependence (PCP, methamphetamine, cocaine, marijuana, LSD, paint inhalation), and Antisocial Personality Disorder, provisional. The inmate was sentenced to 95-years-to-life, but his sentence was vacated. His old CDCR number was discharged, and he was given a new CDCR number with his new sentence of 29 years.

He had been receiving mental health services at the EOP level of care during his prior CDCR incarceration. The evaluator recommended EOP level of care and an IDTT was scheduled to determine this inmate's level of care. The initial treatment plan was completed 1/6/15, and included the diagnoses listed above. None of the diagnoses was fully supported by the documentation. Diagnostic clarification should have been included in the treatment plan as a top priority; however, this issue was not included in the plan. The treatment plan was not well-developed, as it was overly broad in problem descriptions with treatment modalities listed as interventions and with no individualization. This was an inadequate and unacceptable treatment plan. The IDTT met again on 2/3/15. The treatment plan was not modified, and the Form 7388B was not completed.

Findings

This inmate was not adequately treated. The IDTT needed to revise his treatment plan, prioritizing diagnostic clarification. In addition, the treatment team needed to complete the required Form 7388B at every treatment team meeting.

**Inmate F**

This case was selected as an example of administrative segregation 3CMS treatment. This 28-year old inmate was received at DVI on 4/21/14, after being out to court. He had multiple one-day trips to court since that time for hearings while he remained housed in administrative segregation. A mental health evaluation was completed on 7/7/14, indicating a Mood Disorder NOS and Methamphetamine Disorder with provisional diagnoses of Bipolar Disorder NOS and Opiate Dependence. These diagnoses were only minimally supported by documentation in the healthcare record. There was a reported DSH admission in 2009 for 30 days.

A treatment plan completed in August 2014 when the inmate returned from the hospital after having swallowed a razor, simply listed agitation and depression as problem areas for treatment, rather than the self-injurious behavior. While the inmate denied suicidal intent, stating that he was trying to hide evidence, he had a history of serious attempts when in crisis. Clearly, this type of behavior with poor coping during crisis should have been a primary treatment focus. The interventions provided were simplistic and inadequate. Because of the inmate's acuity, more interventions were indicated. The treatment goals required greater specification. The most current treatment plan, dated 11/12/14, was exactly the same as the previous plan. It included the same information, even stating that the inmate had recently returned from the hospital for swallowing a razor, even though that event occurred three months prior. The psychiatrist was not present at the IDTT meetings.

The inmate was prescribed Effexor ER 75 mg per day and Remeron 30 mg per day. Progress notes suggested that the inmate was not seen weekly by his PC. These contacts typically occurred at cell front due to the inmate's refusal to be seen out of cell. He was seen monthly by psychiatry, also at cell front, possibly at the inmate's request. The inmate consistently refused yard, but it was unclear why this occurred and clinical staff had not questioned the inmate regarding this refusal. Psych tech notes were generic and not clinically useful. The clinician did not always clearly indicate whether the sessions occurred at cell front. This inmate would have benefitted from a behavioral plan. He may have been unable to come out of his cell due to negative symptoms of depression. His treatment plan should have been modified to better reflect current functioning.

Findings

This inmate was adequately treated. The IDTT did not seem to recognize multiple signs of possible decompensation and had not modified his treatment plan appropriately. In fact, the previous treatment plan was merely reused, despite its inadequacy and lack of clinical utility.

EXHIBIT L
California State Prison, Corcoran (CSP/Corcoran)
February 17, 2015 - February 20, 2015

**Inmate A**

This 61-year-old inmate's healthcare record was reviewed to assess his treatment at the EOP level of care while housed in administrative segregation.

The inmate arrived at CSP/Corcoran on 11/14/14. He was diagnosed with Exhibitionism, Depressive Disorder NOS, and Polysubstance Abuse. He was treated primarily with Buspar and Luvox. At other times, he received alternative diagnoses including Schizoaffective and Mood Disorders. His most recent GAF score was assessed at 29.

His history was remarkable for physical abuse, two attempted hangings while incarcerated, a family history of attempted suicide and polysubstance abuse. He had at least two MHCB admissions in 2011 and 2012 and two OHU placements in 2012 and 2013. More recently, he was treated in acute care at VPP. In September 2014 he reported daily thoughts of committing suicide with a plan to cut his throat. At that time he was experiencing stress related to his transfer secondary to IEX rules violations and auditory hallucinations.

Shortly after arrival at CSP/Corcoran, he received an SRE which found him to be a moderate chronic risk and between a low and moderate acute risk for suicide. He was noted to have few protective factors. He reported suicidal ideation and a plan, as well as a desire to give EOP level of care "a chance" prior to acting on that plan, and he was amendable to medication treatment. A new SRE dated 2/20/15 documented numerous chronic and acute risk factors not previously mentioned and additional protective factors. He was rated as a moderate chronic and low acute suicide risk. The plan for risk reduction called for a verbal no suicide contract; reassurance regarding the clinician's availability and interest; reinforcement of the inmate's engagement in various forms of treatment; support for his self-improvement; expediting his transfer to a facility where he could receive treatment for exhibitionism; ongoing CBT for depression; and assistance with accessing care and decision-making with regard to his medical concerns.

A mental health screening conducted upon administrative segregation intake on 11/20/14 indicated the inmate had returned from DSH related to treatment for his suicidal ideation and plan. It was noted that he continued to have suicidal ideation and plan, but no immediate intent. He received two IEX RVRs while at DSH. Five-day follow-up was completed appropriately. A PC note dated 11/20/14 indicated he had a low level of social support while serving a life sentence. He had no visits during the course of his 18-year term. He reported having nothing to live for and that if he had a razor he would cut his jugular vein and "bleed out." He reported poor recent medication adherence and indicated that he viewed IEX as his primary problem. At that time he was referred to the psychiatrist, who saw him at cell front three days later. During this time, he refused to attend groups.

An 11/26/14 progress note indicated the inmate attended his IDTT meeting. He continued to report feelings of hopelessness and suicidal ideation with a plan to cut his jugular vein if EOP treatment was not helpful. At this time three previous suicide attempts were noted, as was the continued connection between his depression and his inability to control his IEX behavior.

650

A 12/1/14 PC note indicated he told his PC that he had been sexually assaulted and was hopeful he would be single-celled. The clinician assessed the inmate as having had dysthymia for a long time with acute exacerbations of depression.

Regular PC notes described the inmate's feelings of guilt and shame related to his IEX behavior, depressive symptoms, and treatment engagement. In December 2014, it was indicated he would have cell-front contacts for the next two weeks due to holidays/vacation coverage and short weeks. Psychiatry continued to discuss issues related to his medications. In January 2015, his PC regularly saw him, during which the inmate's depressive symptoms were noted and were addressed with CBT. Near the end of January 2015, the inmate again engaged in IEX behavior, and the psychiatrist considered a diagnosis of Major Depressive Disorder.

A PC note dated 2/20/15 indicated the inmate felt good about how he presented himself at his recent IDTT meeting. He stated that he was not suicidal, but he had not ruled out the possibility if he did not get the help he needed. IEX and medical issues were discussed, as was an expedited transfer to the PSU.

Portions of the DSH healthcare record were reviewed. The inmate was admitted from CMC on 11/2/14 with a chief complaint of being suicidal with a plan. He noted periodically feeling depressed for years with a worsening of symptoms during the prior seven to eight months. He acknowledged a previous diagnosis of Obsessive Compulsive Disorder. While at DSH he indicated his frustration with continued IEX problems. The discharge summary indicated he met his treatment goals, although this was not explained further. Upon discharge the DSH clinicians indicated he would deteriorate further at the intermediate level of care without explanation. The inmate continued to endorse auditory hallucinations.

<u>Findings</u>

This inmate was generally seen according to Program Guide requirements during the reporting period as to frequency of contacts, although there were some gaps in psychiatry contacts. He presented a challenge to staff as he was engaged in treatment, but a primary focus of treatment needed to be his IEX behavior; no specific IEX interventions were available while he was housed in administrative segregation. His situation required ongoing follow-through on the possibility of an expedited transfer to a PSU where he could receive IEX treatment. This would have required resolution of pending RVRs before he again infracted in connection with his uncontrolled exhibitionism. The treatment provided to him was insufficient because the required treatment was not available in the setting. Given this fundamental limitation, staff provided adequate treatment.

**Inmate B**

This inmate's healthcare record was reviewed to assess the treatment he received at the 3CMS level of care while in administrative segregation following his transfer from ASP to CSP/Corcoran on 7/29/14. The expert also observed this inmate's IDTT meeting on 2/18/14.

The inmate was diagnosed with Adjustment Disorder with anxiety. He was primarily treated with Trileptal for mood stabilization.

The inmate's initial IDTT meeting was conducted on 8/7/14, when he was housed in the SHU. The emphasis of the meeting was on his current crisis related to his wife and children and focused on reducing anxiety and stabilizing mood. He was not receiving psychotropic medications. Other IDTT meetings noted discussion of the possibility that he would be removed from the mental health caseload. It said he was not receiving psychotropic medication; although elsewhere in the record, the inmate's Trileptal was described as being used for its mood stabilization properties.

Another IDTT meeting was conducted on 1/29/15. At that time the inmate refused to attend and the psychiatrist was not available. His lack of adherence to indicated contacts with his PC was noted, as was his reason for non-attendance; he did not want to experience unclothed body searches prior to the contacts. He declined to participate in group therapy.

A follow-up IDTT occurred and was observed by the expert on 2/18/14. During this IDTT meeting, the PC indicated he had spoken to the inmate at cell front on the previous day. Without consulting with psychiatry, the psychologist indicated that the inmate would continue to take medication. Although the psychiatrist was available by way of telepsychiatry, he was not introduced to the inmate.

An initial psychiatric evaluation was conducted on 8/13/14. The note indicated he was seen cell front due to his refusal of a confidential setting. Ongoing notes from psychology and psychiatry indicated his refusal of confidential contacts and revealed different and unreconciled diagnoses.

A PC conducted an initial evaluation on 8/14/14, when the inmate's current housing setting was the SHU and his level of care was 3CMS. It was noted that his CDCR release date was 9/15/15. At that time he was described as very upset at the news that his wife locked their two children in the house and left them at home with her boyfriend. The inmate was also noted to have safety concerns. He reported no history of mental health treatment while in the community. His mental status was mostly unremarkable but he was noted to have limited insight and judgment. A summary of the SRE indicated that he appeared immature and had no regrets regarding the people he hurt.

On 9/9/14 the PC noted the inmate was scheduled for an individual session but had gone to the crisis bed the night before, where he was retained. The plan was to continue current treatment plans without consideration of whether this crisis bed placement required a reevaluation of his treatment plan. The next progress note dated 10/8/14 indicated the inmate reported he was "doing fine" and did not need to talk. The crisis bed admission was not discussed or noted. The note dated 10/27/14 was the same. Ongoing notes indicated his continued disengagement in treatment.

An administrative segregation pre-screen was conducted on 2/10/15. While in administrative segregation the inmate continued to refuse confidential contacts, but a number of his

appointments were also cancelled because the provider was unavailable or "out of time." This occurred for a routine PC appointment on 9/4/14, special PC appointments on 1/27/15, 2/4/15, and 2/11/15, an IDTT meeting follow-up appointment on 10/30/14, and a psychiatric appointment on 1/30/15.

Findings

There were regular attempts to see this inmate during the course of the reporting period. However, the inmate often refused confidential contacts and a number of sessions were cancelled because the provider was unavailable or "out of time." Treatment plans should have focused more on engagement with the inmate, exploring whether the crisis with his family had resolved, and his concerns about unclothed body searches. Despite these concerns, when it was provided the treatment he received was minimally adequate, but the frequency of cancelled contacts was unacceptably high.

**Inmate C**

This inmate's healthcare record was reviewed to assess the treatment he received at the EOP level of care while housed in administrative segregation in a 3CMS unit. He arrived at CSP/Corcoran on 7/1/14 after having been transferred from CMF. During the first week of October 2014, he was treated at CHCF.

The inmate was diagnosed with Adjustment Disorder with mixed disturbance of emotions and conduct. He was treated primarily with Effexor and Remeron. Earlier in 2014 he was prescribed Risperdal, which was discontinued in April of that year, and Zyprexa, which was discontinued in August 2014. His history was remarkable for a history of Mood Disorder with psychotic features and numerous crisis bed admissions.

Since the commencement of the review period at the end of July 2014, the inmate had an IDTT meeting on 8/27/14, when he was treated at the EOP level of care and housed on a general population unit. The Form 7388B did not note any positive indicators for higher level of care consideration; however, it was noted that changes to his psychotropic medications were made the previous month to address psychotic features and he would be monitored to see if he started attending individual sessions and groups. He had six MHCB admissions during the prior 180 days. His level of care was increased to 3CMS on 2/24/14 and to EOP on 6/25/14 after multiple MHCB admissions. Some "brief and minimal" reports of cutting and hanging were noted. He refused to participate in the intake interview.

At the time of his 11/26/14 IDTT meeting, the inmate was housed in administrative segregation at the EOP level of care. He refused to attend this IDTT; no correctional counselor was present at this meeting. The inmate was noted to have the positive indicator for higher level of care referral consideration of multiple MHCB admissions. It was noted that he had a history of depression with auditory and visual hallucinations, and that he was moved from the EOP hub to "3B01" yard and returned to the hub after an incident involving a threat to kill a psych tech. He was noted to have a history of refusing medication and of non-participation in groups and

individual sessions. He was believed to fabricate mental health crises for secondary gains. New Form 7388Bs were completed monthly.

The inmate was housed at CHCF from 9/30/14 to 10/8/14. Otherwise during the review period, he had regular contact with the psychiatrist and multiple follow-up appointments with his PC.

SREs assessed his acute and chronic risk to range from low to medium. At times he would refuse to provide sufficient information to assess suicide risk, and at times he would report that he had multiple suicide attempts. In December 2014 he reported a history of self-injurious behavior dating back to age 15, but he denied an intent to die.

Findings

This inmate was generally seen in accordance with Program Guide requirements, although there were some lapses in contacts with psychiatry and PCs. He proved challenging for staff to manage effectively because he required frequent MHCB transfers and incrementally higher levels of care. Although staff often viewed him as exaggerating symptoms for secondary gain, he continued to present with suicide risk, which required frequent intervention. Overall, the mental health treatment he received was clinically adequate.

**Inmate D**

This inmate's healthcare record was reviewed to assess the treatment he received at the 3CMS level of care, with an emphasis on treatment since his recent transfer to the LTRH unit.

He was diagnosed alternately with Adjustment Disorder with depressed mood and ADHD, hyperactive type. He was prescribed Paxil and Strattera. He was placed in administrative segregation in November 2014, and then apparently in the PSU, with a move to the LTRH program in February 2015.

His history was remarkable for sexual abuse and depressive symptoms, poor impulse control, and polysubstance abuse. More recently, he was noted to have suicidal ideation, anxiety, hopelessness, and disturbance of mood. He had not had contact with his wife since November 2014.

An SRE dated 2/18/15 noted safety concerns and feelings of hopelessness. Notably, the SRE assessor was "unable to assess thought content/process due to time limitations. Unable to assess insight/judgment due to time limitations." However, the inmate was found to not "currently appear to be a danger to himself or others." His chronic and acute suicide risk were determined to be low.

The inmate was recently released from the MHCB after making suicidal statements, but then indicated he was anxious about going to the CSP/Corcoran SHU from a low level prison. There was no evidence of work with mental health staff to assist with this transition by providing information or otherwise addressing his anxiety.

He was seen at CSP/Corcoran on 2/14/15 for a new arrival wellness check. At that time he was refusing his medications and requesting a transfer stating he did not receive his medication and was concerned about side effects. He was referred to the psychiatrist. Five-day follow-up occurred as required.

He was seen at cell front by a PC on 2/18/15 shortly after his transfer to LTRH. The cell-front contact occurred "because of time limitations due to a shortage of available clinicians for one on one contact." The inmate was then seen by the psychiatrist in a confidential setting on 2/19/15, when his medication dosage was lowered. He was diagnosed with Adjustment Disorder with depressed mood and ADHD. He was seen in a confidential setting by a PC on 2/25/15, with a focus on anger and impulsivity.

His IDTT meeting on 2/19/15 showed he had no indicators for higher level of care referral consideration. The focus of treatment was anxiety, impulsivity, and concentration through individual and group treatment using CBT techniques. The healthcare record included an alert for suicide risk. The treatment plan stated that one should review the healthcare record regarding information about medications, and psychiatry was not integrated into the treatment approaches noted to address the symptoms. The plan eliminated the Adjustment Disorder with depressed mood diagnosis.

Findings

This inmate's transition to LTRH was insufficient because of a lack of preparation prior to transfer and by cell front contacts related to staffing issues immediately following transfer to the new unit. His SRE was likewise inadequate because of staff limitations.

**Inmate E**

This inmate's healthcare record was reviewed to assess the treatment he received at the EOP level of care while housed in administrative segregation. He was transferred to CSP/Corcoran from SVSP on 2/4/14. He was diagnosed with Adjustment Disorder with mixed anxiety and depressed mood, and treated alternately with Trileptal, Remeron, and Effexor.

His history was remarkable for anger issues, recent suicide attempts, and a history of physical and emotional abuse. He was seen by the psychiatrist on 2/23/15 pursuant to a 2/19/15 referral. It stated that he felt depressed, was paranoid, and was not attending groups. The psychiatrist added the diagnosis of PTSD with provisional diagnoses of Bipolar Disorder and Major Depressive Disorder. Since his transfer to CSP/Corcoran, he was seen by a PC.

An IDTT meeting occurred on 8/20/14. It was noted that the previous month the inmate overdosed on a controlled substance in what was described as a "probable suicide gesture." He believed he would be in segregation for an extended period of time. His depression and anxiety levels were elevated. He requested a level of care change to EOP. IDTT documentation indicated it would be helpful to have a psychiatry evaluation to determine whether there was a psychotic process, but noted the inmate's major treatment focus had to be danger to self and

others with elimination of violence as the primary goal. The diagnosis was ADHD, with provisional diagnoses of Bipolar Disorder and Adjustment Disorder. The Form 7388B noted the inmate's inability to function adequately at his current level of care due to a major mental disorder as a factor for consideration for higher level of care referral. In response, the inmate was changed to the EOP level of care in August 2014. A psychiatrist did not sign the IDTT, and it was again noted that a psychiatry evaluation would be helpful. All treatment team members signed a second Form 7388B on 9/3/14. The accompanying IDTT noted the inmate had more than ten RVRs and over five SHU terms.

The IDTT meeting on 11/26/14 reported the inmate's ongoing anxiety and depression as well as his difficulty controlling his anger. It noted his motivation for positive change and some progress toward treatment goals such as fewer instances of suicidal thoughts. He was provided with a diagnosis of Mood Disorder NOS with a provisional diagnosis of PTSD. The psychiatrist did not attend the IDTT meeting.

Findings

This inmate presented with a complex picture of significant violence and multiple RVRs in the context of fluctuating psychiatric symptoms. Comprehensive assessment and treatment planning was impeded because psychiatry was not always present at IDTT meetings. Despite these concerns, overall the inmate was moved appropriately through increasingly higher levels of care, and received minimally adequate care which resulted in some improvement during the course of the review period.

**Inmate F**

This inmate's healthcare record was reviewed from a list of inmates housed in SNY/EOP overflow housing. He had a diagnosis of Bipolar I Disorder. He was prescribed lithium, Paxil, and Vistaril. During the first three months of the review period, the PC saw the inmate weekly and the psychiatrist saw him monthly. Discussions centered around the inmate's endorsement to SVSP, ambivalence with the transfer, paranoid thoughts of inmates and staff conspiring against him, annoyance with multiple lockdowns which interfered with yard, and the inmate's need to stay active. His symptoms were managed with medication and therapy.

During the last three months of the review period, the inmate's ingrown toenail caused him extreme pain and discomfort; he was diagnosed on 9/24/14 with onychomycosis and prescribed Lamisil. He discussed the diagnosis with his PC, who encouraged him to continue talking to medical staff. During the next several weeks, the inmate's attention during PC contacts centered on his medical condition.

On 10/24/14, the inmate was transferred to Mercy Hospital and diagnosed with sepsis and severe left leg cellulitis. The medical discharge note stated "extreme cellulitis may be due to onychomycosis." The inmate was discharged on 10/28/14. On 10/29/14 he was categorized as a high fall risk. Subsequent encounters during November 2014 with mental health clinicians continued to focus on his medical condition (concerns with immobility), access to a television

and other property and their influence on his mental health, and notably growing paranoia. This pattern continued in December 2014. A progress note dated 1/2/15 contained the following: "I'm all right … Denies SI/HI/AH/VH/Paranoia. He has nothing else to discuss at cell front."

As of January 2015, the inmate was still using a wheelchair, and he had filed and adjudicated a grievance for usable shoes and a television. The inmate's cell-front contacts also occurred more frequently.

<u>Findings</u>

The psychiatrist and PC regularly saw the inmate. His underlying concerns of pain, immobility, and lack of appropriate shoes, which appeared to aggravate his feelings of paranoia and hopelessness, were not resolved. No consultation between medical and mental health staff occurred to address underlying issues, even after the inmate filed a grievance for shoes. Although he was told how to access medical care, the PC did not seem to recognize the need to advocate with medical staff for the inmate; however, mental health staff advocated with custody for a television. The inmate's immobility coupled with the lack of appliances may have contributed to his mental health condition. The inmate nonetheless received adequate care according to the Program Guide, but he would have benefitted from a consultation between medical and mental health staff.

**Inmate G**

This inmate's healthcare record was reviewed as he was housed in the MHCB and his MHCB IDTT had been observed. He was diagnosed with Schizoaffective Disorder. His prescribed medications included Zyprexa and Imitrex. His healthcare record was remarkable for numerous suicide attempts beginning at age 12 and multiple DSH stays. On 2/4/15, he was transferred from CSP/Corcoran to Mercy Hospital for attempted suicide by hanging using shoestrings. He believed he could not survive outside of prison. An SRE was completed on 2/7/15 and indicated moderate chronic suicide risk and high acute suicide risk.

The initial decision of the MHCB IDTT was to retain the inmate in the MHCB. He returned to the MHCB cell and smeared feces in the cell, writing "I am an Animal Life is Suffering." The psychiatry note dated 2/7/15 addressed his anxiety and significant hearing loss since childhood and indicated that he was awaiting a hearing aid. The psychiatrist prescribed Haldol intramuscular injection, Ativan, and Benadryl.

Between 2/7/15 and 2/17/15 the inmate was seen by at least five different clinicians. Clinical notes outlined continued suicidal ideation, his anxiety regarding his upcoming release in October 2015, fear of a lack of support upon release, depression, feelings of hopelessness, and fear of custody. One clinical note dated 2/8/15 reported "eating and sleeping within normal limits. He reported he will be seen out of cell tomorrow."

Psychiatry notes dated 2/9/15 and 2/10/15 were not in agreement with the note dated 2/16/15. The psychiatrist's note of 2/9/15 reported the inmate's multiple MHCB admissions and multiple

DSH stays. The psychiatrist note dated 2/10/15 acknowledged that the inmate had significant problems adjusting to prison life. The 2/16/15 note indicated suspicion of manipulation for a DSH referral, but did not initiate established protocols related to suspected manipulation. The psychiatrist appeared to imply that early parole might be an impediment to DSH referral, but this was not the policy.

Findings

Although mental health was aware that the inmate needed a hearing aid, there was no documentation of obtaining a hearing aid or follow-up discussion with custody about the inmate's concerns with custody staff. Higher level of care referral was appropriate for the inmate; however, the psychiatrist note dated 2/16/15 was clinically inappropriate and raised questions about the psychiatrist's familiarity with policy regarding suspected manipulation or DSH referral when there was an impending parole.

**Inmate H**

This EOP inmate's healthcare record was reviewed from a list of inmates who participated in a group interview. The inmate was diagnosed with Major Depressive Disorder with psychotic features. He was prescribed fluphenazine, sertraline, and Vistaril. He was admitted to VPP on 3/21/14 for attempted suicide by hanging and discharged to CSP/Corcoran on 6/26/14. PC contacts were mostly conducted at cell front during July and August 2014.

During PC contacts, the inmate stated he was medication compliant even though the Medication Administration Record (MAR) did not support this statement. On 8/27/14, the psychiatrist saw the inmate for medication noncompliance and changed the medication dosages.

Progress notes indicated the inmate continued to believe a judge would release him in the next few months even though his parole year was 2050, and he had been informed of the 2050 parole year by clinicians and custody staff. He was seen in the TTA on 9/1/14 because he had problems with his cellmate who he claimed threatened him. He received five-day follow-up. He was admitted to the CHCF MHCB on 9/16/14 for a problem with his cellmate; he apparently said he was suicidal or homicidal to get out of the cell. He was discharged back to CSP/Corcoran and underwent five-day follow-up. The inmate continued stating that his release date was in the next few months. The inmate was housed with a different cellmate and was reported to be doing well.

Findings

The inmate's clinical care was adequate, but mental health did not seem to have a plan to address his delusions about his release date.

**Inmate I**

This EOP inmate's healthcare record was reviewed from the list of inmates on the restraint log. He was diagnosed with Schizoaffective Disorder, bipolar type and Polysubstance Dependence, in

a controlled environment.  The inmate received his psychotropic medications by court order (PC 2602), including Trileptal, Risperdal Consta, or Zyprexa injection.  The restraint log documented that the inmate was in restraints beginning at 1445 hours on 7/7/14 until 1330 hours on 7/8/14.

The psychiatrist's progress note on 7/2/14 stated "Cancel 5 point hold in crisis unit."  Another note written five minutes later stated "Discontinue the previous order of STAT Zyprexa injection and Risperdal Consta.  Inmate received Risperdal Consta in the yard today."  The restraint log did not indicate the 7/2/14 restraint.

Documentation on another clinical progress note dated 7/2/14, under subjective findings, stated that custody informed the clinician that the inmate refused his PC 2602 medication and refused to comply with instructions.  On a subsequent document also dated 7/2/14, there was a 128C-2 request by custody for pepper spray.

On 7/7/14, staff requested the inmate to allow a laboratory blood test, but he refused.  Documentation indicated the inmate was naked in his cell, refused to cover himself, and became verbally abusive to medical staff and the psychiatrist.  Clinical intervention was attempted and deemed unsuccessful.  Custody requested the OC pepper spray document form; medical risk was scored as "increased risk."  The inmate was extracted from his cell and placed into five-point restraints.

<u>Findings</u>

The inmate appeared to have been restrained on 7/2/14, but this was not documented on the restraint log presented for review, even though it was within the review period.  It did not appear that the 7/2/14 restraint was appropriately documented as required.

659

EXHIBIT M
California Substance Abuse Treatment Facility (CSATF)
April 27, 2015 - April 29, 2015

\

**Inmate A**

This 3CMS inmate's healthcare record was reviewed because he was newly transferred to the STRH to assess the treatment he received while housed in administrative segregation during the period prior to transfer, and during STRH placement.

This 58-year-old male was diagnosed with Major Depressive Disorder, recurrent, moderate. He was prescribed Prozac. He arrived at CSATF on 3/11/14. His remote history was significant for commencing mental health treatment at age nine, a reported court-ordered psychiatric hospitalization, significant substance abuse, a family history of mental illness, a head injury with loss of consciousness at age 15, and three reported suicide attempts in the early 1990s coinciding with his life sentence. At various times during incarceration, he reported auditory hallucinations and required EOP treatment and DSH placement.

The inmate was in administrative segregation following a 3/4/15 incident and subsequently was moved to the STRH. More recently, he experienced depressive symptoms including excessive sleep, low energy, and loss of motivation. During his March 2015 IDTT meeting, he was described as not interested in attending groups, but was noted to be willing to leave his cell for yard and PC weekly contacts.

At the time of his 4/1/15 PC contact, which was conducted at cell front due to "time constraints," he was upset about various issues not directly related to mental health treatment. This contact was not clearly connected with his treatment plan of reducing depression. A telepsychiatry contact on 4/6/15 focused on his history of multiple hospitalizations and PTSD, and noted medication trials of Abilify and Risperdal. Prozac was described as helping him be less angry and he was seen as fairly stable. In subsequent weeks, he refused confidential contacts and was seen at cell front.

There was a group note from the STRH dated 4/22/15 that indicated the inmate participated in group. However, the following day he refused a PC contact stating "I know that you are busy today … I don't have anything to talk about anyways."

Psych tech rounds regularly occurred following STRH transfer, but notes contained limited narrative.

Findings

Mental health staff saw the inmate at required Program Guide intervals. The mental health treatment he received was adequate while housed in administrative segregation and following transfer to the STRH. He apparently responded well to medication. However, his engagement in individual treatment was limited by his refusals and clinical time constraints. There also was no preparation for his transfer to the STRH either before or directly after this transfer. The treatment he received was not clearly connected with the IDTT's stated treatment goals.

**Inmate B**

This inmate's healthcare record was reviewed because he was recently transferred to the newly opened STRH. He was transferred to CSATF at the 3CMS level of care on 12/10/13. He had been treated at that level since 2011 due to anxiety and depression. His diagnosis was Major Depression, recurrent, severe with psychotic features. He was treated primarily with Wellbutrin.

The most recent IDTT meeting dated 4/2/15 did not have a psychiatrist's signature, but noted the inmate would be referred to psychiatry on an as needed basis.

An SRE dated 4/1/15 indicated multiple risk factors including a history of abuse, depressive or psychotic features, chronic medical illness, chronic pain, a history of suicide attempts, violence and substance abuse, and poor impulse control. Acute risk factors included current or recent depressive symptoms, anxiety, mood disturbance, recent bad news, hopelessness/helplessness, current/recent violent behavior, recent change in housing, safety concerns, recent negative staff interactions, and recent disciplinary charge. Protective factors included family support, the inmate's belief system, future orientation, regular exercise, having children at home, insight into his problems, a sense of optimism, and a job assignment. He was assessed with a moderate chronic and low acute suicide risk. An evaluation of the same day noted that he was prescribed Wellbutrin, his mother was sick, his children were being cared for by a sister, and during the preceding year his son was killed in a car accident. The inmate's remote history was significant for childhood trauma and a 2012 admission to Patton State Hospital (PSH) for a competency evaluation.

Progress notes for March and early April 2015 indicated that the inmate was released by committee "back to the yard," was coping well, and did not wish to participate in group treatment. However, on 4/22/15 a psychiatry progress note revealed that he had been returned to administrative segregation, which was a significant stressor for him. His history of self-injurious behavior and his feelings of depression were noted. It was thought that he would benefit from an increase in medication, and the plan was for his continuation in individual and group treatment. A 4/22/15 PC progress note indicated he was feeling stressed and wanted to resume medications again. No mention was made of his move to the STRH, which apparently occurred during a period of increased stress.

<u>Findings</u>

This inmate generally received adequate mental health treatment. However, management of his transition to a new program at a time of increased risk was insufficient.

**Inmate C**

This inmate's healthcare record was reviewed as he was housed in administrative segregation while awaiting EOP hub transfer. At the time of review, institutional documentation indicated he had been waiting 15 days to transfer, but the healthcare record review noted that he had been waiting for approximately four weeks. His record was reviewed to evaluate the treatment he

received during this time.  His diagnoses were Psychotic Disorder NOS and Polysubstance Dependence.

This inmate's history was remarkable for response to internal stimuli and command auditory hallucinations to commit suicide.  His more immediate history was significant for an MHCB admission from 1/8/14 to 1/13/14 due to symptoms of psychosis and mania, which may have been related to substance abuse, and an additional MHCB referral on 2/25/15 for bizarre behavior which did not result in admission.  Recent stressors included learning that his daughter might not be his biological child.  His symptoms also led to confrontational behavior which required multiple housing changes.

The inmate's treatment plan was somewhat generic; it emphasized that his problem was psychotic symptoms and the goal was to decrease them. He was noted in some places to require language translation.  He did not attend his most recent IDTT meeting on 4/22/15.  A 4/9/15 IDTT meeting documented his placement in the EOP on 4/1/15 due to increased psychotic symptoms.  He was noted to be a poor historian, but this was considered to be related to his impaired mental status.

A 4/3/15 PC note indicated that the inmate was not receiving psychotropic medications.  At that time, he was diagnosed with Mood Disorder NOS.  He was noted to have tape on his arm which he described as "activating the flat screen for his computer."  He was described as malodorous, paranoid, illogical, delusional, and responding to internal stimuli.  A PC saw him again on 4/8/15 related to an RVR for a battery on 2/16/15.  At this point, he reported willingness to engage in a medication trial; documentation further indicated he was compliant with medication for 30 days in an effort to reduce symptoms.

During a contact on 4/9/15, he mimicked robot-like movements and delusional content was noted.  On 4/15/15 he refused a telepsychiatry appointment.  He was noted not to be on psychotropic medication at that time, and the psychiatrist informed staff to reschedule as needed.  A 4/16/15 note indicated he was seen at cell front while resting on his mattress; the note indicated a mental disorder contributed to his RVR and that he reported medication compliance but did not appear to be taking medication.  An additional note dated 4/16/15 stated that mental disorder did not appear to contribute to his RVR and if found guilty there were no mental health considerations for penalty mitigation.  The inmate refused to leave his cell on 4/17/15 for an SRE, but was noted to appear stable.  The most recent note at the time of review was dated 4/22/15 and was from an IDTT meeting which neither documented that inmate's level of care nor referenced psychiatry.

Findings

The mental health care that was provided to this inmate was insufficient.  He did not receive sufficiently focused or sustained mental health follow-up or psychiatry referral during the time he awaited EOP hub transfer.  There were conflicting RVR evaluations and differing reports of the start date for administrative segregation placement, while the issue of a possible language barrier with the inmate was not addressed in an ongoing fashion.

**Inmate D**

This inmate's healthcare record was reviewed because he was a 3CMS inmate housed in administrative segregation who was newly transferred to the STRH. He was placed in administrative segregation secondary to enemy concerns. His remote history was significant for substance abuse, child abuse, and witnessing domestic violence at home. While incarcerated, he had a history of conflicts and cutting behavior leading to an MHCB admission in October 2014. He had received various diagnoses, which were well-summarized in a recent IDTT meeting. These diagnoses included PTSD, Bipolar Disorder, Mood Disorder NOS, Anxiety Disorder, Polysubstance Dependence, and ADHD. More recently, he was prescribed Vistaril as needed for sleep. He was provided with diagnoses of Adjustment Disorder NOS and Borderline Personality Disorder. Problems which were to be a focus of treatment included anxiety, decreased sleep, and racing thoughts.

A recent IDTT meeting indicated a short-term goal of having the psychiatrist inquire of the inmate as to past experiences of anxiety, but the psychiatrist did not sign the treatment plan. An IDTT from earlier in the year documented moderately depressed mood and indicated the inmate had weekly PC and monthly psychiatry contacts, and group treatment. Notes from the first quarter of 2015 showed that he was referred to TCMP related to a planned release date in May 2015, and he was seen on 4/1/15 due to an emergency when he was concerned for his safety and stated that he would cut his wrist as needed to address the situation. At that time he was placed in a holding cell. His diagnosis was Mood Disorder NOS and hypothyroidism. Around this time he was transferred to administrative segregation, where he refused a telepsychiatry appointment on 4/6/15, and it was noted his medication would expire on 6/8/15. The ICC saw him on 4/9/15 regarding his safety concerns. He was seen by the telepsychiatrist on 4/14/15, when he was noted to be in no distress and talking about his release the following month. Following his move to the STRH program, he was described as unhappy as he felt more isolated.

<u>Findings</u>

This inmate received minimally adequate mental health treatment which was hampered by a lack of diagnostic clarity and more clearly defined treatment goals. Although he received a TCMP referral regarding a benefits' application, his pending release and preparation for that transition were not sufficiently addressed by his clinical contacts. His healthcare record indicated insufficient attention to his transition to the STRH.

**Inmate E**

This inmate's healthcare record was reviewed because he was recently transferred to the STRH unit.

According to his most recent treatment plan dated 3/4/15, the inmate, who was serving a life sentence without parole, had been transferred to administrative segregation on 2/14/15. He was

diagnosed with Anxiety Disorders NOS and Depressive Disorders NOS.  He was prescribed Remeron.

His history was significant for anxiety, depression, and difficulty functioning in the prison system.  He was assessed with low risk for suicide.

Progress notes from March 2015 indicated that the inmate was upset about his pending transfer to the STRH unit.  On 3/27/15 it was noted that he was depressed because his daughter reportedly stated she would commit suicide if he received a life sentence.  He reportedly felt pressure due to having a new cellmate and the move to the STRH program.  Progress notes later in April 2015 documented his increased anxiety, inability to focus, and generalized feelings of sadness.  A 4/14/15 telepsychiatry note discussed his ongoing depression and again focused on his distress about the pending move to the STRH program.  Remeron was started.  The theme of his distress about changing buildings was again prominent during a 4/17/15 session with his PC. On 4/23/15 a psychiatrist was not present during his IDTT meeting, but the psychiatrist subsequently saw the inmate.

Findings

While overall this inmate received minimally adequate treatment, his difficulty with the transition to the STRH unit was not sufficiently addressed.  The expert observed the inmate attending and making constructive use of a group treatment session during the site visit.

**Inmate F**

This inmate's healthcare record was reviewed because he was newly transferred to the STRH unit.  He was also interviewed by the expert after refusing to attend group.

This 51-year-old arrived in administrative segregation on 2/27/15.  He was subsequently released to the yard, but returned to administrative segregation secondary to enemy concerns.

The inmate was diagnosed with Bipolar Disorder NOS and Borderline Personality Disorder.  His medication history included the following psychotropic medications:  Zoloft, lithium, Haldol, Thorazine, Wellbutrin, and Buspar.  He also received hormone replacement treatment.  He had an extensive psychiatric history that included a number of inpatient hospitalizations, including a 2013 stay at DSH during his incarceration, and outpatient community treatment since early childhood.  His history was also significant for sexual abuse and a family history of schizophrenia.  He reported over 100 suicide attempts, mostly related to a period more than ten years ago when he underwent significant stress related to gender identity issues.

He was assessed with moderate risk for suicide; some mental health assessments also discussed possible Parkinson's disease and signs of dementia.  He was described as resistant to engaging in clinical interviews, but was at times eager to discuss issues related to his confinement, which he found relevant to his emotional well-being.  Relatedly, he requested removal from the mental

health caseload.  Although most suicide attempts occurred during the 1980s, there had been a recent suicidal threats "for secondary gain."

Weekly progress notes for April 2015 revealed that the inmate was seen at cell front after refusing to attend his IDTT meeting.  He attempted to discuss custody issues and requested removal from the mental health caseload.  He also refused a telepsychiatry appointment in March 2015.

<u>Findings</u>

This inmate was offered mental health services on a regular basis, but was not engaged in treatment.  His focus was on issues related to being a transgendered individual in prison and with various custody issues.  Attempts should have been made to engage him regarding these issues. Overall, his treatment was minimally adequate, but efforts were hampered by his ongoing treatment refusal.  There was also a need for diagnostic clarity, which would have helped to better focus his treatment planning.

**Inmate G**

This EOP inmate's healthcare record was reviewed from a quarterly list of inmates discharged from DSH to CSATF.  He was diagnosed with Schizoaffective Disorder, depressed type, and he was prescribed loxapine, Remeron, and Melatonin.

The inmate arrived at CSATF on 2/11/15.  The bus screen was completed and noted that the inmate utilized a wheelchair.  The Form 7230A dated 2/11/15 stated that wellness checks were completed, and the inmate was seen in the TTA treatment modules, retained at the EOP level of care, returned to custody, and sent to the EOP yard.  Five-day follow-up began on 2/12/15.

The inmate was hospitalized at DSH from 8/20/14 to 2/11/15.  He was struck by a car at age ten, sustaining an unspecified brain injury, and thereafter experienced ongoing auditory hallucinations.  He began using illicit drugs and by the age of 20, was addicted to intravenous heroin.  The inmate had received mental health services at all levels of care in the past including DSH stays at Metropolitan Hospital and most recently at ASH.  In the DSH discharge summary, the inmate stated he attempted suicide by overdose on many occasions, but he also told CDCR staff that there were no suicide attempts in the past.  The mental health section of the ASH discharge summary reported that the inmate looked "dis-shelved, unshaven, long uncombed hair, poor grooming." The discharge plan was written and signed on 1/30/15, two weeks prior to the transfer from DSH.

On 2/15/15 the inmate was seen in the TTA for suicidal and homicidal threats.  He reported that voices were telling him that if he was returned to the general population yard, he would kill himself and others if he felt threatened.  The inmate was recommended for MHCB treatment.

<u>Findings</u>

This inmate's clinical documentation was adequate. However, the near two-week lag between the ASH-documented discharge plan and his actual DSH discharge, the inmate's report of ongoing auditory hallucinations, and inadequate monitoring after DSH discharge were problematic.

## Inmate H

This EOP inmate's healthcare record was reviewed from a quarterly list of inmates discharged from DSH to CSATF. The DSH coordinator's roster indicated that he did not receive the mental status exam or SRE within Program Guide timeframes. He was diagnosed with Schizoaffective Disorder, bipolar type. He was prescribed olanzapine, Remeron, Buspar, and chlorpromazine. The Form 7277 was completed on the correct form and the inmate was appropriately referred for mental health services. He arrived at CSATF on 3/17/15 and was seen in the TTA in a treatment module on 3/18/15. The clinician noted his history of significant suicide attempts.

The Form 7388 was completed on 3/26/15. PC contacts were completed on 3/26/15, 4/1/15, 4/6/15, 4/13/15, and 4/20/15. No other scanned documentation was available after the Form 7230A dated 4/20/15. On 4/6/15, the inmate continued to report auditory and visual hallucinations that were not addressed by prescribed medications. The PC documented in the treatment plan that the clinician would work to have the inmate see a psychiatrist. The 4/13/15 PC contact indicated the inmate continued to have auditory hallucinations with paranoia and delusions, but there was no mention of referring him to the psychiatrist for medication evaluation. The 4/20/15 PC note stated the inmate was anticipating leaving prison, noting "I just want to get the last six months over with and get out of here." The clinician reported the inmate had auditory hallucinations with paranoia and delusions. The clinician's plan stated "Continue with EOP level of care and working on reality testing with I/P, work on coping skills to help I/P manage stress related to college and EOP program." There was no mention of a psychiatry referral, and a psychiatry note following DSH discharge was not located in the healthcare record.

Clinical documentation indicated the inmate transferred to Coalinga State Hospital on 2/14/15. There were group notes dated 2/24/15, 2/25/15, 2/26/15, and 2/27/15, and an SRE was completed on 2/23/15. The chief of mental health reported problems with staff documenting that the inmate refused groups even though he had been transferred from the institution. The chief of mental health also reported that the clinician completed the SRE on 3/24/15, not 2/24/15, and that this error would be corrected.

<u>Findings</u>

The clinical care provided to the inmate was inadequate due to the lack of a PC referral of the inmate to psychiatry when he continued to experience auditory hallucinations with only six months to parole. There also was inaccurate documentation of the inmate's group refusal when he was no longer at the institution. The chief of mental health stated that supervisors were correcting group documentation errors.

**Inmate I**

The inmate's healthcare record was reviewed from a list of MHCB inmates awaiting IDTT meetings.  He was admitted to the MHCB on 3/4/15 and was awaiting an acute care DSH bed.  He was diagnosed with Schizophrenia, undifferentiated type; he was prescribed Zoloft and Vistaril, but he was nonadherent with these medications.

On 3/3/15, the PC received a psych tech referral that stated the inmate was confused, disoriented, withdrawn, hearing and seeing things; a recommendation was made for a psychotropic medication review.  The referral stated that the inmate had not taken his medications for several days.  The same note indicated that he stated he had not taken medication for approximately two weeks.  The healthcare record included two clinical notes by the PC with the same date and time that documented the inmate's level of care as 3CMS in one area of the note, and EOP level of care in another section.  The SRE, mental health evaluation, and Form 7320A (referring to MHCB) all completed on 3/5/15 noted the inmate was receiving services at the EOP level of care.  The only documentation dated 3/4/15 was of psych tech daily rounds and a refusal form for Zoloft and Vistaril; there were no clinical notations for 3/4/15, which was the day after the psych tech referral.  The inmate was housed in administrative segregation prior to the MHCB referral.

Prior documentation noted that the inmate heard at least 50 voices.  Some voices were protective of him, while others were trying to hurt him.  He was seen by a clinician and referred to the MHCB on 3/5/15.  A psychiatric progress note dated 3/14/15 noted the inmate reported not wanting to take his medications.  Staff also reported that the inmate exhibited manic and psychotic behaviors when housed in administrative segregation, and this bizarre behavior continued.

On 3/30/15 a DSH referral packet was completed and sent to headquarters.

The progress notes indicated the inmate wanted to return to administrative segregation.  On 4/1/15 he continued to state that he was being held against his will; he was also upset that the usual clinician was not conducting rounds.  On 4/2/15, the clinician completed a 115 mental health assessment, concluding that the inmate's mental illness impacted his behavior.

The healthcare records review noted that either Friday or Saturday progress notes were absent for 4/4/15, 4/10/15, and 4/15/15, indicating that the inmate was not seen daily while housed in the MHCB.

<u>Findings</u>

The inmate's clinical care was inadequate.  Daily MHCB clinical rounds were not consistently conducted in accordance with the Program Guide.

**Inmate J**

This inmate's healthcare record was reviewed following his identification on a MHCB length of stay report. He was admitted to the MHCB on 12/18/15. His DSH referral package for intermediate care was completed on 1/27/15 and sent to headquarters on 2/5/15. A CCAT meeting was held on 3/19/15 and the DSH referral was rejected. The institution appealed the rejection and, at the time of the site visit, a final decision had not yet been received.

The inmate was diagnosed with Schizophrenia, paranoid type. He was prescribed Zyprexa and chlorpromazine. He was referred to the MHCB for suicide ideation, discharged on 4/2/15, readmitted on 4/3/15, and released to the yard on 4/8/15. On 4/21/15, a mental health prescreen was conducted, and the inmate was placed in an alternative housing cell on 4/22/15. The suicide watch reports in the healthcare record indicated that the inmate remained in the alternative housing cell from 4/22/15 to 4/24/15; he was transferred to CHCF on 4/25/15.

The inmate's prior DSH stay occurred from 3/26/14 to 9/22/14, when medication nonadherence was noted. There was a lack of documentation in the healthcare record from 9/22/14 to 10/15/14. Documentation indicated that the inmate returned to CSATF on 10/15/14, when he was placed on the yard for one hour and was then placed into an alternative housing cell for an evaluation. Although he was housed in alternative housing and the MHCB, there were no clinical notes on 10/21/14, 10/23/14, or 10/24/14. A CDCR clinician's verbal report indicated that the inmate had a history of using mental health services for secondary gain to avoid programming, housing refusals, and for safety concerns.

<u>Findings</u>

The inmate's clinical care was inadequate because daily MHCB contacts were not performed and documented as outlined in the Program Guide.

EXHIBIT N
Pleasant Valley State Prison (PVSP)
April 21, 2015 - April 23, 2015

**Inmate A**

This inmate was selected for review as the rationale for his extended MHCB stay was unusual; the rationale was "continued monitoring of behavior given incongruent presentation." This 29-year-old first term inmate was receiving mental health services at the 3CMS level of care prior to his MHCB admission. He had been housed in administrative segregation at PVSP when he was admitted at 1815 hours on 11/18/14, on suicide watch. According to the history and physical completed the next day, he was found in his cell in a pool of blood and had required a transfusion of four units of blood. The CDCR treating physician estimated blood loss due to the cutting of his left arm to be one liter. The inmate also experienced fecal incontinence during his suicide attempt. He was sent to an outside hospital for treatment and was admitted there for ongoing care. He returned to PVSP on 11/18/14, and was admitted to the MHCB.

This inmate was diagnosed with Schizoaffective Disorder. He had previous psychiatry referrals for medication nonadherence after he was prescribed Haldol 10 mg at night on 9/8/14 for auditory hallucinations. He reportedly had feelings of suicidality during September 2014, but he subsequently denied this, stating to the clinician on 9/5/14 that the auditory hallucinations had become severe and he wanted to resume medications. He, however, did not remain medication adherent. A handwritten progress note dated 11/15/14 in the eUHR suggested that the inmate may have been seen due to medication nonadherence. The clinician indicated continuation with the current treatment plan. The treatment plan, however, at that time was inadequate and did not include specific recommendations beyond self-help.

Once admitted to the MHCB, the initial treatment plan was completed within 72 hours. The treatment plan dated 11/20/14 noted the recent death of the inmate's brother. The inmate reported conflicting information regarding his inpatient history prior to CDCR admittance, although that was his first MHCB admission. The treatment plan did not include an actual clinical summary or conceptualization of the inmate's care.

The inmate had had an impending release date of either February or April 2015, but reported feeling anxious about the release date and feeling isolated from his family. The treatment plan merely reiterated the Program Guide MHCB requirements. When seen by the psychiatrist on 11/20/14, the inmate was prescribed Zoloft 50 mg per day in addition to Haldol 10 mg per day and Cogentin 1 mg per day.

The treatment team met with the inmate again on 11/26/14, when he continued to deny a history of substance abuse; this was consistent with the absence of drug-related charges located in his C-file. He reported improvement to the treatment team, although they acknowledged his self-report was not consistent with his history and the serious suicide attempt. This was clearly what was referenced when the treatment team decided to retain the inmate beyond ten days. However, the final treatment plan dated 12/1/14 was identical to the previous one dated 11/26/14; it appeared to be cut and pasted with minimal changes, merely providing Program Guide standards in lieu of actual treatment interventions. The Form 7388B noted that the inmate met criterion four of more than ten days in an MHCB, but further stated that he was only maintained in the MHCB to allow

671

for the removal of sutures. However, it was observed that this reason was contradicted in other documents and that the sutures were removed on 11/19/14. While no SRE was completed upon the inmate's admission, one was completed at discharge; the inmate was assessed with moderate chronic and low acute suicide risk. This assessment, however, appeared to be based on incorrect information and it appeared more likely that he had a higher acute suicide risk.

Based upon the progress notes by the psychologist, it appeared that the eUHR was not reviewed or that communication with the psychiatrist occurred. For example, on 11/23/14 the psychologist stated the inmate was not taking psychotropic medication when he had been prescribed Zoloft since 11/20/14; the inmate had been refusing Haldol and Cogentin. The inmate was not seen at all on 11/25/14 or 11/26/14. Most of the psychology progress notes appeared to have been cut and pasted, including the same information each day, with little relevant clinical content and no documentation that appropriate treatment had occurred. Despite the severity of the inmate's suicide attempt, the report of his brother's death as a trigger and the seeming relationship of the increase in hallucinations to the timing of the suicide attempt, document review indicated that MHCB clinical staff never addressed these important issues during the inmate's treatment. Eventually the inmate's level of care was increased, and he was transferred to another facility.

Findings

This inmate received inadequate treatment while housed at PVSP. He did not have an appropriate treatment plan while at the 3CMS level of care. When he reported increased symptoms while still in the 3CMS program, the treatment plan was not modified in response. His treatment remained inadequate once he was admitted to the MHCB following a very serious suicide attempt. The treatment plan was minimal and contained only the Program Guide minimum standards for clinical contact rather than actual therapeutic interventions. He was not properly evaluated while in the MHCB and did not receive an accurate SRE upon discharge; he received no SRE at admission.

**Inmate B**

This 34-year-old 3CMS inmate was selected for review as his length of stay in the MHCB exceeded ten days. He was housed in the MHCB for 20 days due to initial "non-compliance." He was admitted on 1/28/15, with an admission diagnosis of Adjustment Disorder with mixed anxiety and depressed mood. The nursing admission assessment and history and physical were completed timely. An SRE was completed at admission which assessed moderate acute and chronic suicide risk. An initial psychiatric evaluation completed on 1/29/15 noted that he was admitted after reporting that he had been cutting on his arm the day prior to admission. He was angry because his original release date was during that time, but an RVR had extended that date. He reported conflict on the yard that he had reported to custody which had not been resolved, and increased isolation due to reduced programming status. He was not prescribed psychotropic medication.

672

The initial treatment plan dated 1/29/15 included Program Guide standards as interventions and did not operationalize treatment targets or goals. It did not address the inmate's poor frustration tolerance. The treatment team saw him next on 2/2/15, and the clinical summary in the treatment plan dated 2/2/15 was cut and pasted from the prior treatment plan dated 1/29/15. In fact, the entire treatment plan was identical to the initial treatment plan. This was also true for the subsequent treatment plan dated 2/9/15. The Form 7388B for 2/9/15 indicated the reason for DSH non-referral was that the inmate "became accepting of treatment one day prior to this IDTT." However, there were no treatment modifications or indications of a difference in the inmate's behavior. The inmate was also not seen on 1/30/15.

At the time of review, the inmate had less than 60 days until parole; he was concerned because he had only 24 points, but he was on a Level III yard. He stated that he felt he had previously been mistreated when he received five months of "c status" for fighting due to what he considered an act of self-defense. The inmate expressed a desire to serve the remainder of his time in MHCB. He reportedly planned to spend the remainder of his time in his cell except for meals. Progress notes documented no acute symptoms and high functional ability. There appeared to be no clinical reason to maintain this inmate in the MHCB. However, mental health staff did not address his anxiety regarding problems on the yard which interfered with his release or work with custody staff prior to his return to the yard as would have been indicated. The inmate admitted that the self-inflicted injury on his arm was due to frustration and was not an attempt to kill himself.

On 2/7/15, restraints and emergency medications (Haldol 10 mg injection and Cogentin 1mg injection) were ordered due to agitation and yelling with blood present on the floor and on the inmate. He verbally refused medication and an evaluation. It was ultimately determined that he had a 1 cm self-inflicted injury on his elbow. He was not immediately removed from restraints; although he met removal criteria. While the order clearly allowed the inmate to be removed once he met criteria, nursing notes documented a request for an order to release prior to removing the inmate; this resulted in the inmate remaining in restraints longer than necessary. He also had a dystonic reaction from Haldol involving his tongue; this was treated with Benadryl.

Following the restraint episode, the inmate reported to his treatment team that he had been struggling with depression since his father's death approximately one year prior. Custody staff reported that he was increasingly isolative with poor hygiene since that time. The psychiatrist initiated a trial of Geodon 40 mg twice per day.

After days of improvement, the inmate asked to speak to the psychologist and shared delusional thoughts that he was the planet Neptune and other thoughts about his tattoos being affected by inmates from other institutions. He also was described as ruminating on his case and his release from prison. The psychology progress note suggested that the inmate was not psychotic and might be expressing what he believed were delusional thoughts in an effort to remain in the MHCB. Documentation did not support that an adequate assessment of these new symptoms occurred. The inmate maintained some of these delusional beliefs with the psychologist, but there was no evidence that he reported them to the psychiatrist, although the psychiatrist

673

maintained a provisional diagnosis of Psychosis NOS. The progress notes did not support continued MHCB placement prior to the delusional symptoms or a reason why the inmate was not discharged with a plan for diagnostic clarification within the 3CMS or EOP.

No actual treatment occurred during the MHCB admission and the underlying reason for the inmate's MHCB admission was never addressed. The discharge treatment plan dated 2/17/15 remained the same as the initial treatment plan, except it stated that the inmate was being discharged. While it indicated the inmate was of sufficient stability for discharge, it contained no further information to support the discharge decision or to distinguish it from prior treatment plans. Not surprisingly, the inmate was readmitted on 2/18/15, yet he was not seen by the treatment team until 2/23/15. That treatment plan noted that the inmate lied about planning to cut himself if not released from prison that day because he wanted to get off the yard for his safety. It was unclear how the team determined that the inmate was lying. His safety concerns were noted to possibly be valid. Although the clinician indicated that the inmate had genuine delusions, the diagnosis remained Adjustment Disorder with mixed anxiety and depressed mood and only a rule-out diagnosis of Delusional Disorder. There was a high degree of secondary gain that this inmate had readily admitted to and he required a comprehensive diagnostic evaluation. There was no such evaluation located in his eUHR, and no treatment plan was located beyond that in the MHCB.

Findings

This inmate was not adequately treated. While he had a high degree of secondary gain, he also presented with serious and complex symptoms that required a comprehensive diagnostic evaluation, which did not occur. He also presented staff with several reasons underlying his self-injurious behavior that should have been a treatment target during his initial MHCB admission, but were not. There really was no treatment plan as the plan itself simply restated Program Guide standards. Progress notes documented that no treatment occurred until far into the MHCB admission when medication was initiated and medication management began. The lack of treatment was blamed on the inmate according to the Form 7388B dated 2/9/15, but documentation indicated that it was actually due to the lack of a treatment plan. The inmate was then maintained in the MHCB beyond ten days without clinical justification when documentation indicated that he was stable.

If the inmate did not have a major mental illness and was trying to manipulate staff for secondary gain to remain off the yard, this made it all the more important that a targeted treatment plan be developed and implemented. If he was experiencing acute mental illness symptoms, then proper higher level of care referral consideration should have occurred; however, this did not occur based on available documentation such as the Form 7388B. The staff used inappropriate justifications for non-referral and did not modify treatment to address the factor(s) that initially resulted in referral consideration. The inmate was also maintained in restraints longer than necessary because nursing staff would not remove them until they had a physician's order; despite the original order allowing removal when the inmate met specific criteria.

**Inmate C**

This case was selected for review because it had been included in the DSH coordinator's audits of Form 7388Bs. The inmate was admitted to the MHCB on 2/2/15 and he remained there for 11 days due to transport problems with his sending facility. He was a treat and return from WSP who had been clinically discharged on his tenth day of admission. His initial treatment plan was completed timely on 2/5/15 and included Program Guide requirements, as well as an effort to address one of the underlying causes of his MHCB admission, which was his anxiety over his impending release. The treatment plan identified in the audit (2/12/15) noted criterion four, which was ten or more days in the MHCB, although the inmate was being discharged that day. He was prescribed Buspar and venlafaxine. He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood. The justification for retaining him in the MHCB was that staff wanted to observe him after his antipsychotic (Risperdal) medication was discontinued on 2/5/15.

Findings

This inmate received appropriate care while at PVSP's MHCB. His medication regimen was reviewed and modified based on his reported symptoms. The treatment plan, while still inappropriately including Program Guide requirements, addressed one of the underlying areas of concern that precipitated his MHCB admission and was a focus of treatment during the MHCB admission. The inmate's length of stay appeared appropriate in light of treatment and was supported by clinical documentation.

**Inmate D**

This case was selected as an example of MHCB care and an audit case from the PVSP DSH coordinator. This 24-year-old EOP inmate was admitted to the MHCB on 12/30/14 and discharged on 1/5/15 after swallowing two razor blades. His SRE indicated that this was his fifth MHCB admission during 2014. However, the Form 7388B dated 1/2/15 did not note the multiple MHCB admissions within 6 months (criterion five). The inmate's nursing assessment and history and physical were completed timely. The SRE and initial psychiatric evaluation were performed on the day after admission. No SRE was completed at discharge, as required. The initial psychiatric evaluation indicated the inmate had the razor blades removed by an outside hospital prior to arriving at PVSP.

The inmate had a long history of self-injurious behavior and prior suicide attempts. He was prescribed oxcarbazepine and risperidone  He was provided with a diagnosis of Adjustment Disorder with mixed emotions and conduct chronic with a provisional diagnosis of Schizoaffective Disorder, bipolar type. Only one treatment plan was located during the review period which included only Program Guide requirements, rather than actual interventions. There was no discharge treatment plan, which suggested that the inmate was discharged without the treatment team convening. The MHCB treatment team diagnosis remained Adjustment Disorder despite the inmate's EOP level of care and symptomatology. The EOP treatment team had

675

previously provided the inmate with diagnoses of Major Depressive Disorder, moderate and Antisocial Personality Disorder (CDCR 7388 addendum 12/03/14).

Findings

This inmate was not properly considered for a higher level of care because the MHCB treatment team failed to recognize his multiple crisis placements within the last six months. In addition, he was not adequately treated while in the MHCB. He had multiple crisis placements and his self-injurious behavior continued to escalate to the point that he required medical intervention. Nonetheless, his MHCB treatment plan included no operationalized treatment targets or goals and listed only Program Guide requirements as interventions. It did not address his reason for returning to the MHCB. The inmate needed an improved treatment plan and consideration for DSH level of care. This inmate did not receive adequate treatment.

**Inmate E**

This 59-year-old EOP inmate was selected for review because he had been in the PVSP MHCB and was listed in the DSH coordinator's audits because he had been in the MHCB for more than ten days. He was admitted to the MHCB on 12/21/14 and was physically discharged on 1/16/15. He had been extremely disruptive at his home institution, refusing to wear clothes, laughing loudly to himself and engaging in conversations with himself, and urinating on the floor, with erratic mood swings. He had reportedly been nonadherent with medication because he had wanted to prove that he could function without them. He had a history of acutely psychotic behavior when not taking psychotropic medication that dated back three decades.

While in the MHCB the inmate became increasingly agitated during a medical exam on 12/24/14 and assaulted an officer, necessitating the use of restraints with Haldol and Benadryl injections. He was started on emergency medication on 12/26/14 for danger to others after refusing medication on 12/25/14. He was prescribed Risperdal and Cogentin with intramuscular backup if oral medications were refused. This was changed on 12/29/14 to Haldol and Cogentin, and a PC 2602 order was granted on 1/15/15. All initial assessments were completed timely. An SRE was also completed at discharge. The inmate was diagnosed with Schizoaffective Disorder.

The inmate's treatment plan was inappropriate for the MHCB because it provided 3CMS Program Guide requirements as interventions. The treatment plans remained unchanged throughout the inmate's MHCB stay. The Form 7388B dated 1/8/15 indicated that a DSH referral was not initiated because the PC 2602 was pending. No treatment modifications were listed, only the continued same treatment interventions that had been in place since the prior treatment plan (12/29/14); however, the DSH coordinator had incorrectly indicated that this Form 7388B listed treatment modifications. The next Form 7388B, dated 1/15/15, continued with the same limitations and the associated 7388B (positive criteria two and four) noted that the inmate remained in the MHCB so the treatment team could observe the effects of involuntary medication and await a PC 2602 hearing. The explanation also indicated that the team would continue to assess the inmate's baseline with medications to determine whether EOP or DSH was the most appropriate level of care and that the inmate would next be seen by the IDTT on

676

1/20/15. However, the inmate was never seen again by the treatment team. There were no actual treatment modifications, but audit results incorrectly indicated that the Form 7388B had included treatment modifications.

Findings

Involuntary medications were appropriately initiated for this inmate while he was housed in the PVSP MHCB; however, his treatment plan did not include other appropriate interventions and was overly vague. The treatment plans did not change over time and were simply cut and pasted for each treatment team meeting. The Form 7388B provided adequate clinical justification for not referring the inmate to a higher level of care, but did not include treatment modifications; instead it simply restated the standard MHCB treatment or the pending PC 2602. The DSH coordinator's audit findings were inaccurate. With the exception of medication management and initiation of the PC 2602, this inmate's treatment while in the MHCB was inadequate.

**Inmate F**

This case was selected as an example of MHCB care and a case that was audited by the DSH coordinator. This 49-year-old EOP inmate was admitted to the MHCB on 10/10/14 and discharged on 10/20/14. The nursing assessment was timely conducted, but the history and physical was completed late. The initial psychiatric evaluation was completed by a psychologist. No SRE was conducted upon MHCB admission, but one was performed at discharge.

The inmate's initial treatment plan dated 10/13/14 included a clinical summary that could not be fully viewed. The inmate had a history of state hospital admissions with two occurring at ASH and one occurring at Napa State Hospital; the longest hospitalization occurred for six years. He also had four community hospitalizations for Welfare and Institutions Code 5150. The treatment team diagnosed him with Schizoaffective Disorder, depressed type, and identified depression and psychosis as problem areas. Short term treatment goals were actually Program Guide requirements for mainline 3CMS inmates. The treatment plan was clearly inadequate. The Form 7388B indicated the inmate had three or more MHCB admissions and should be considered for higher level of care referral. The clinical justification for not referring him to DSH was that it was his initial IDTT meeting; given the volume of available information, this was an inadequate justification. There were no treatment modifications, but only the standard MHCB treatment was listed.

The subsequent treatment plan dated 10/20/15 contained the same limitations as it was cut and pasted without changes. The Form 7388B indicated that he met criteria four and five (MHCB admission for ten or more days and three or more MHCB admissions). The reason provided on the Form 7388B for non-referral was generally appropriate, although somewhat confusing; the rationale was that he was stable and had responded to treatment. The treatment team also reported the inmate had exhibited no acute symptoms during his admission. It was unclear why the team believed that a ten-day hospital stay was necessary if the inmate demonstrated no acute symptoms, and the rationale did not address his multiple MHCB placements. As this was a discharge IDTT, the listed treatment modifications were actually standard discharge orders.

Findings

This inmate's treatment was adequate. However, it was unclear whether he should have been referred to a higher level of care because the non-referral rationales were not clinically sound. If the inmate truly did not need a higher level of care, then the treatment team should have more appropriately documented the clinical rationale and addressed the positive criteria. The same was true for the treatment modifications. The treatment plan was poor and did not specify any actual therapeutic interventions beyond medication management. The inmate responded well to psychotropic medication and improved during his MHCB admission.

**Inmate G**

This case was randomly selected from the PVSP roster of inmates at the 3CMS level of care. The purpose of the review was to assess the mental health care provided to this inmate during the review period.

The inmate was housed on D-3. He was provided with a diagnosis of Adjustment Disorder with depressed mood and was not prescribed psychiatric medication.

Medical records indicated the inmate received mental health counseling for child behavior problems. There was no history of psychiatric hospitalization before coming to prison in 2004. He was initially enrolled in the 3CMS in 2005 when he was prescribed Paxil to treat symptoms of depression following his grandmother's death. He was routinely re-enrolled in the 3CMS based on a diagnosis of Adjustment Disorder with depressed mood.

During the review period, the inmate was seen by the PC on 9/11/14 and 12/18/14. Progress notes on both dates were brief and identical to one another. On 1/22/15, a progress note consisted of checked boxes. Treatment team members retained the inmate at the 3CMS level of care and directed the reader to an undated Form 7386. However, no Form 7386 was located among available records. A Form 7388B note was completed.

The inmate's annual mental health treatment plan of 1/22/15 was sparse. It documented a normal mental status. The diagnosis of record was retained. Although inmate progress was not discussed, review of past treatment plans indicated he had been functioning adequately without medications since 2011. The current plan did not refer to other adjunct services which might benefit him. His name was not included on any of the eight group treatment waiting lists. No evaluation of suicide potential or violence was found in the medical record. There was no discussion of whether the inmate's Adjustment Disorder had been effectively resolved.

Findings

There was no meaningful review of the inmate's progress to ascertain the need for his repeated re-enrollment at the 3CMS level of care. It was not apparent from review of the treatment plan or progress notes whether any meaningful clinical intervention was being provided. There was inadequate clinical documentation to support the diagnosis of record. There was no mental

678

health evaluation or suicide risk assessment found in the healthcare record. The inmate was not receiving clinical services consistent with Program Guide requirements.

## Inmate H

This case was randomly selected from the PVSP roster of inmates enrolled in the 3CMS during the site visit. The purpose of the review was to assess mental health care provided to the inmate. According to chronological records as far back as 2007, the inmate was enrolled in the 3CMS based on a qualifying diagnosis of Bipolar Disorder. He was treated with antidepressant medication. On 3/4/08, he was cleared for placement in the general population; he was removed from the mental health caseload on 10/8/08.

On 1/15/15, the inmate was placed in administrative segregation due to a kite on the yard. A pre-placement chrono was timely completed and he was cleared for administrative segregation placement. He was either unable or unwilling to participate in routine mental health screening. He was referred for further evaluation, but no mental health evaluation was located in the eUHR.

On 1/16/15, the inmate submitted a healthcare request stating he was stressed out and needed to get back on his medication. He described his mood as depressed. All other aspects of mental status were documented within normal limits. He was placed in the 3CMS program pending IDTT approval with a diagnosis of Major Depressive Disorder, moderate. He was seen in regular psych tech rounds until 1/22/15, when he transferred to the yard. A formal SRE was not located in the eUHR.

The IDTT met on 4/16/15. The inmate's inclusion in the 3CMS was affirmed based on a diagnosis of Bipolar Disorder. This diagnosis appeared predicated on historical experiences of depression, anger, mood swings, and a 25-year history of methamphetamine use. During the team meeting, the inmate reported stable symptoms, and the treatment team noted he did not appear to be in acute psychiatric distress. No psychotic symptoms were observed or reported.

Findings

The inmate received timely psych tech rounds and PC contacts consistent with the Program Guide. However, there was no updated mental health evaluation or suicide risk assessment. The inmate's current inclusion in the 3CMS program appeared predicated on historical factors. Conflicting diagnoses were offered, but there was no discussion of efforts to reconcile them, or plan to evaluate further. The inmate did not continue to report stress or significant mood problems. He declined treatment with psychiatric medication, and none was prescribed. Records did not contain documentation of symptoms that met diagnostic criteria for a major mental disorder. Based on these factors, it was not possible to determine whether this inmate had been appropriately placed in the mental health caseload or whether provided care was adequate.

**Inmate I**

This case was reviewed because the expert attended the inmate's IDTT meeting. The inmate also participated in a group interview conducted by the expert. The purpose of the review was to assess mental health care provided to the inmate.

The inmate was housed on D-3. He was provided a diagnosis of Major Depressive Disorder, recurrent, mild. He declined treatment with psychiatric medication.

The inmate was previously treated in the 3CMS program from 2011 to 2013. This followed admission to the crisis bed in July 2011 for suicidal ideation. His history included a 2007 attempted hanging and an attempted overdose at age 13. He was prescribed Risperdal and Zoloft to treat a Major Depressive Disorder with psychotic features. By 2012, the psychiatric disorder was in full remission. He was removed from the mental health caseload on 10/3/13. Since that time, he had participated in institutional groups consisting of art therapy, writing, and poetry. He also participated in a religious group activity and held a prison job in the dining hall.

The inmate's re-enrollment in the 3CMS was predicated on results of a mental health evaluation which diagnosed recurrence of depressed mood associated with family problems and an upcoming prison transfer. He was noted to dwell on negative thoughts and isolated himself when depressed. He presented with a sad mood and appeared to be continually on the verge of tears throughout the IDTT meeting. There was no psychiatrist in attendance, but the clinician offered him a psychiatric referral, which he declined. A treatment plan was developed with goals written in language that he could understand. Factors indicating the need for more intensive care in the EOP or DSH were not directly discussed with him, but were considered and placed in the record. The clinician appropriately addressed the inmate's concern about continuity of treatment once he arrived in the new prison. The PC offered to meet with him more frequently prior to his transfer. The CC I attempted to provide him with an anticipated transfer date. The inmate positively received both interventions.

<u>Findings</u>

The inmate was appropriately enrolled at the 3CMS level of care to treat a recurrent episode of Major Depressive Disorder. The mental health care provided to the inmate was adequate.

**Inmate J**

This case was randomly selected from the PVSP roster of inmates enrolled in the 3CMS at the time of the site visit. The purpose of the review was to assess the mental health care provided to the inmate.

The inmate was housed on D-2. He was provided a diagnosis of Bipolar Disorder, most recent episode unspecified. He was prescribed Celexa to treat symptoms of his psychiatric disorder.

The inmate was initially enrolled in the 3CMS on 3/18/13 predicated on a diagnosis of Bipolar Disorder.  Records reflected a 10-year history of community psychiatric treatment, including several emergency detentions per W&IC 5150 and outpatient medication management.  Past psychiatric medications included Lamictal, Remeron, Vistaril, and Abilify.  An initial SRE assessed a low chronic risk of suicide, with the inmate denying a history of suicide attempts, and a low acute suicide risk.  There was no history of treatment in the MHCB, EOP, or DSH during this prison term.

The governing mental health treatment plan was prepared on 7/22/14.  The inmate was noted to have benefitted from current psychiatric medications.  Long-term and short-term goals reflected the inmate's educational aspirations, such as completing college level courses.  He was on the waiting list for an anger management group.  Treatment team members reviewed indicators that could suggest consideration for higher level of care treatment.  There were no positive indicators and his level of care was reaffirmed at 3CMS.

A psychiatric consultation on 9/5/14 included a diagnosis of Mood Disorder NOS, which was not consistent with the diagnosis of record.  The psychiatrist considered a possible diagnosis of Bipolar Disorder, noting the inmate had self-reported the diagnosis and attributed it to a single manic episode while on cannabis.

A medication adjustment was made due to reported side effects.  Psychiatric follow-up on 9/26/14 noted the inmate was satisfied with medication changes.  Follow-up on 12/2/14 reflected that he continued to benefit from prescribed medications.

The clinician saw the inmate on 10/3/14.  He reported that he was doing well, but was experiencing undefined stress and anxiety.  The clinician's plan was to continue with treatment goals as developed in the IDTT meeting and follow-up with the inmate in 90 days.

He was seen by the clinician on 12/31/14.  There was relatively little new information and the inmate complained mostly of pain problems that he believed CDCR was ineffectively treating.

On 1/28/15, the inmate signed the informed consent form for mental health care.  He was seen in psychiatric follow-up on 2/8/15.  He reported continuing to do well on the current medication regimen.

<u>Findings</u>

The inmate was appropriately treated at the 3CMS level of care.  Clinical and psychiatric contacts occurred at timely and responsive intervals.  The inmate was satisfied with the care he received and appeared to benefit from it.  The mental health care provided to him was generally consistent with the Program Guide.  The inmate received adequate mental health care.

**Inmate K**

This case was reviewed because the expert attended the inmate's annual IDTT meeting. The purpose of the review was to assess the care provided to the inmate.

This 3CMS inmate was housed on D-3. He was provided a diagnosis of Adjustment Disorder with mixed anxiety and depression. He was prescribed Prozac to treat his psychiatric disorder.

According to medical records, the inmate had a history of prior treatment in the 3CMS. He purportedly cut his wrist in 2013 to seek attention, but without an intention to commit suicide. He reported a history of taking psychiatric medication to treat depression and anxiety. No symptoms were elaborated.

The governing treatment plan was prepared on 5/22/14. The mental status exam was unremarkable in all aspects. Long term goals were noted as improving depressed mood and everyday functioning as evidenced by the absence of RVRs and interpersonal conflicts. Short-term goals were documented in behavioral terms.

The PC saw the inmate on 9/29/14. The inmate stated he had been doing okay but missed his daughter. He was seen again on 12/1/14, when he expressed sadness about missing his daughter. He participated in an institutional program known as YAAP. The PC saw him on 1/26/15. The inmate reported problems managing anger and discussed coping strategies with the clinician.

The inmate saw the psychiatrist at intervals that were consistent with the Program Guide. He was adherent to his medication regimen.

The inmate actively participated in the IDTT meeting. An SRE assessed him as a low chronic and acute suicide risk. The inmate stated his depressive symptoms were less intense due to meetings with the PC and working on his catastrophic thoughts. He kept in contact with his family and benefited from these contacts. His enrollment in the 3CMS was reaffirmed.

Findings

The inmate was appropriately placed at the 3CMS level of care to treat his psychiatric condition. He was timely seen in clinical contacts and the annual IDTT meeting. He appeared to benefit from psychiatric and psychosocial interventions. The mental health care provided to him was adequate for the symptoms of his mental disorder.

**Inmate L**

This 3CMS inmate was housed on A-2. He was provided a diagnosis of Mood Disorder NOS according to the governing treatment plan of 10/13/14. He was not treated with psychiatric medication at the time of the site visit, but had been prescribed Vistaril during the review period. The Form 7388B showed no positive indicators to trigger higher level of care referral consideration.

682

Healthcare records indicated that he had an extensive substance abuse history and received counseling during childhood. Also noted was a contributing social history that included being placed in the care of an aunt during infancy after his father murdered his mother. Reportedly, he was subjected to primitive forms of abuse. He was removed from that environment and raised in foster care. There was a history of two suicide attempts in the 1990s. He had no history of treatment at the EOP level of care, or in the MHCB or DSH.

Current mental health symptoms included a persistently sad mood, feelings of hopelessness, lack of motivation and low energy, loneliness, feelings of uselessness, sleep disturbance, and racing thoughts, all of which occurred three times weekly. The treatment plan included long-term goals that were written in behavioral terms and could be objectively measured. The inmate was involved in institutional programs, including a variety of therapeutic and rehabilitative groups.

An SRE dated 10/3/14 assessed moderate risk of suicide on both the chronic and acute levels. Chronic risk factors included suicide of an older brother, chronic pain due to migraines, and history of impulsive behavior. Acute risk was predicated on a plan to overdose on heroin if he were to be unsuccessful in court-related petitions and appeals.

The inmate signed the CDCR consent for mental health care. He was seen by the PC at timely intervals. Discussions addressed topics that were relevant to mood fluctuation.

Findings

The inmate was appropriately treated at the 3CMS level of care. Record review indicated he received adequate care. He reported a conditional suicide plan pending the outcome of his legal case. Proper care required that the details and nature of suicide risk be carefully monitored, carried forward in subsequent documentation, and clearly addressed in future clinical contacts.

**Inmate M**

This 3CMS inmate was housed on C-4. He was provided a diagnosis of Psychotic Disorder NOS and Polysubstance Dependence remitted in a controlled environment. He was prescribed Haldol and Vistaril to treat symptoms associated with his psychiatric disorder. There was a history of treatment with Zyprexa.

According to the governing treatment plan dated 6/22/14, the inmate had no history of evaluation or treatment for a psychiatric disorder before coming to prison. He was cleared for the general population based on the reception center screening in May 2013.

The inmate referred himself for mental health evaluation on 12/11/13. He reported seeing a lonely man who wanted the inmate to talk to him. The inmate said he had previously experienced perceptual disturbances while using methamphetamine as early as age 13. The clinician described the inmate as confused and internally preoccupied. He was enrolled in the 3CMS program and referred for psychiatric evaluation.

683

The psychiatrist saw the inmate on 10/1/14 following staff referral for his refusal of Haldol. The inmate said he disliked the medication and that auditory hallucinations had decreased. The psychiatrist discontinued Haldol at the inmate's request.

On 10/22/14, the inmate said he continued hearing voices at night and seeing a ghostlike figure who talked to him. Treatment with Haldol was resumed as the inmate stated he benefitted from the medication.

On 10/31/14, the inmate told the psychiatrist he was taking Haldol as prescribed and said it was helpful in reducing hallucinations. He reported working as a custodian and stated he was able to get his job done without being distracted by visual or auditory hallucinations.

On 1/6/15, the inmate again reiterated that auditory hallucinations were not intrusive since he resumed antipsychotic medication. The psychiatric diagnosis was Substance Induced Psychotic Disorder (methamphetamine) with consideration of an alternative diagnosis of Schizophrenia.

The PC routinely saw the inmate. On 2/26/15, he reported that hallucinations prevented him from focusing on his school work. The inmate was noted to understand the clinician's questions and responded appropriately.

The following day, on 2/27/15, the inmate told the psychiatrist he always heard voices and if symptoms became unbearable, he would cope by staying in his room or going to yard. The inmate continued to report that he did well at his job as a clinic porter.

<u>Findings</u>

The inmate was appropriately placed in the 3CMS to treat symptoms of his psychiatric disorder. He was followed at required intervals and mental health staff responded promptly to his needs and to staff referrals. The annual treatment plan had not yet been updated at the time of the site visit. The mental health care provided to him was adequate. Prudent care suggested that the treatment team attempt to clarify the inmate's diagnosis at the annual update.

**Inmate N**

This 3CMS inmate was housed in administrative segregation. He was provided a diagnosis of Adjustment Disorder with depressed mood at a desert institution. He transferred to PVSP on 12/24/14. The initial IDTT meeting was held 17 days late on 1/26/15. The purpose of the review was to assess the adequacy of the mental health care provided to the inmate.

According to the mental health treatment plan prepared at the sending institution, the inmate presented himself for evaluation four months after returning to California from an out-of-state institution. Presenting problems included initial and middle insomnia, weight loss, impaired concentration, and depressed mood due to the distance from his family. There was no history of

suicide attempts and no mental health treatment before coming to prison. The psychiatric evaluation did not indicate any medications.

After arriving at PVSP, the inmate participated in an initial IDTT meeting on 1/26/15. He reported that depressed feelings had been resolved now that he was physically closer to his family. He endorsed no symptoms of depression. However, the mental health treatment plan was incomplete and did not include treatment goals or interventions.

The inmate was seen for psychiatric evaluation on 2/7/15. He declined psychiatric medications and was described as stable by the psychiatrist.

Findings

The inmate was appropriately placed in the 3CMS for treatment of his psychiatric disorder. It appeared that his symptoms were situational and resolved once he transferred to an institution closer to his family. No psychiatric treatment was indicated. His initial IDTT meeting was not timely, but the inmate had communicated by telephone with the chief psychologist at the sending institution after he transferred. The inmate reported that his needs had been met. The inmate's care at the current institution was minimally adequate.

**Inmate O**

This 3CMS inmate was housed on D-3. He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood. He was not treated with psychiatric medication.

The inmate reported a history of depression, anxiety, and difficulty trusting others. His best friend committed suicide by gunshot to the head when the inmate was 12 years old. His father left the family when he was a child. He used multiple substances over a long time period to cope with anxiety and depression. He did not receive mental health care before coming to prison and had no history of suicide attempts.

Healthcare records indicated the inmate was active in group treatment programs. He maintained ties with his family. He participated in yard activities. Progress notes indicated a tendency to dwell on the negative when he was depressed or frustrated. These were associated with treatment targets as outlined in his mental health treatment plan.

Findings

The inmate was appropriately placed in the 3CMS to treat a psychiatric disorder. He received adequate care.

**Inmate P**

This 3CS inmate was housed on B-2.  He was provided with a diagnosis of Dysthymic Disorder according to the governing treatment plan dated 6/17/14.  Current psychiatric medications included Zoloft to treat depressed mood and Vistaril for night time anxiety.

Medical records indicated the inmate denied a history of inpatient or outpatient psychiatric treatment in the community before coming to prison.  However, he was treated with antidepressant medication during periods of confinement in federal prison and the county jail. He had no history of suicide attempts.

He was enrolled in the 3CMS program based on his daily experiences of sadness, despair, hopelessness, regret, and apathy since teenage years. The initial SRE assessed low chronic and acute suicide risk.  The inmate had many protective factors including a support system, religious beliefs, and adequate coping skills.  Treatment goals included improvement in overall mood and reduction in depressive experiences as reflected by the inmate's self-report.  Short-term goals included maintaining spiritual activities and increasing exercise and social activities.

On 9/3/14, the inmate told the psychiatrist he experienced excessive guilt and nighttime rumination.  The psychiatrist made an upward medication adjustment.  On 9/18/14, the psychiatrist further adjusted medication administration times based on the inmate's request.

On 10/6/14, the psychiatrist documented the inmate's continued report of fatigue with a request for further medication adjustment.  The psychiatrist indicated the inmate would need to be seen to rule out SSRI induced hypomania symptoms.  In a follow-up on 10/29/14, the inmate reported experiencing the same depression with dark thoughts and a gray outlook on life.  He said he thought he would be all right.  The psychiatrist discontinued Paxil and started the inmate on Zoloft.

On 1/26/15, the inmate's psychiatric medications included Vistaril and Zoloft.  The inmate reported the change had been helpful.  He was experiencing a better outlook on life and stated that racing thoughts at bedtime had diminished.

The PC saw the inmate on a monthly basis from September to December 2014.   The inmate reported symptoms and medication issues in detail and the PC appropriately followed-up by referring him to the psychiatrist.  Progress notes were detailed and related to the inmate's governing treatment plan.

Findings

The inmate was appropriately placed in the 3CMS program to treat his psychiatric disorder.  The mental health treatment plan was developed with detail sufficient to address his treatment needs. Short-term goals were written in behavioral terms which could be objectively measured.  The PC met with him at intervals beyond requirements of the Program Guide as determined by the inmate's needs.  Psychiatric contacts were frequent as determined by inmate requests and needs.

The psychiatrist was responsive to inmate concerns and symptoms. Medication adjustments were made in accordance with inmate wishes and psychiatrist opinions. The inmate appeared to benefit from the treatment and was described as stable by the end of the review period.  The care provided to the inmate was adequate.

EXHIBIT O
Avenal State Prison (ASP)
July 21, 2015 - July 23, 2015

**Inmate A**

This inmate was one of two EOP inmates housed at ASP at the time of the site visit. His healthcare record was reviewed to assess the treatment he received while awaiting transfer to an institution which could provide EOP treatment. At the time of review, he was housed in a mainline program with an SNY designation. He arrived in CDCR on 3/27/14 and at ASP on 07/23/14; on 5/20/15 he was assessed as requiring EOP level of care. His diagnosis was Schizophrenia, paranoid type and Amphetamine Dependence, treated primarily with risperidone. His history was remarkable for having been sexually abused as a child, multiple risk factors for suicide, and a reported history of hallucinations since age six. More recently, he experienced suicidal ideation and fantasies concerning suicide and hallucinations. He had a pending release on 8/1/15.

An SRE dated 5/19/15 indicated that he showed a number of chronic risk factors. These risk factors included a family history of suicide, a history of abuse, a depressive or psychotic disorder, a history of suicide attempts with the first occurring in 2012 when he was in the county jail, a perception of loss of social support, a history of poor impulse control, being older than 35 and male, having a history of violence and substance abuse, serving a first prison term, and being a sex offender. Acute factors included suicidal ideation, a current or recent depressive episode, current or recent psychotic symptoms, current and recent anxiety or panic symptoms, and demonstrated hopelessness or helplessness. Protective factors were assessed to include the inmate's belief system, interpersonal support, having a future orientation, engaging in regular exercise, positive coping skills, having a job or school assignment, and being active and motivated for treatment.

At the time of the SRE, the inmate had thoughts of committing suicide twice daily that lasted about 30 minutes. He endorsed auditory hallucinations concerning self-harm, but described them as passive thoughts and demeaning statements. The voices also told him that if he ended his life "halfway" he would go to heaven. The summary indicated that he found suicide morally and religiously acceptable and an option should he become emotionally overwhelmed; this required consideration in the context of the assessment that his belief system would be protective of suicide. He reported five suicide attempts and noted that he would be "more happy" if he committed suicide. Both his chronic and acute suicide risk were considered moderate. The SRE noted that he had no family support. A subsequent note indicated that he socialized with two other inmates on the yard but preferred to isolate. An IDTT was planned for 5/20/15 to consider transfer to the EOP level of care. The plan was to engage the inmate, to develop rapport and trust, and to develop an understanding of precipitants of thought hallucinations and delusions and depression. Issues of medication adherence were also to be explored.

The IDTT was conducted on 5/20/15 and found that, due to a major mental disorder, the inmate was unable to function adequately at the 3CMS level of care and that transfer to EOP care was required. In the meantime, the plan was for him to be housed with other EOP inmates and be seen by his PC to develop trust and rapport. He was to have weekly PC meetings, daily groups, quarterly IDTT meetings, and "meetings with his psychiatrist." There was no specific plan to

monitor his suicidal ideation and risk or to improve his medication adherence.  A PC saw him on 5/20/15.

Since the decision to transfer the inmate to the EOP level of care, he received the following treatment.  He attended a group on 5/22/15 that focused on coping strategies and was found to have participated well.  He attended group on 5/28/15, arriving late after a session with his PC, 6/3/15, but only for ten minutes, 6/5/15, 6/11/15, 6/18/15, and 6/19/15, when he was noted to have auditory hallucinations.  He also attended group on 6/25/15, 7/2/15, and 7/10/15, when he was described to be in good spirits, and on 7/16/15.

The PC assessed the inmate on 5/28/15, when the inmate expressed concern about transferring to EOP, as he might be committed to inpatient care as an "MDO" following release.  In discussing his plans following a possible pending release in August 2015, he noted a lack of family support and not having a place to live.  He endorsed fantasies about hanging himself and reported that two weeks prior, the voices were telling him to hang himself; however, he could not find a place to do it.  Risperdal had helped to reduce the hallucinations and thoughts of self-harm.  He was seen again on 6/4/15 when he appeared more stable with respect to hallucinations.  He was also seen on 6/10/15, when he reported feeling better and that the medications were working well.  He enjoyed attending groups.  The PC saw him on 6/17/15, when he denied having suicidal thoughts or hallucinations.

During a 6/24/15 contact with his PC, the inmate again expressed concern about civil commitment.  If released, he noted that he would go to his mother's house but that it would be transient.  Other notes indicated that he had no contact with her.  The provisional PTSD diagnosis from the psychiatric note was not continued or addressed.  The inmate was thought to be improving.  On 7/1/15 the inmate noted that he had no means of transportation if released.  His constricted affect was not congruent with his description of how he was feeling.  On 7/9/15 the psychologist discussed the inmate's desire to get a job upon release.  Passive suicidal thoughts continued.  He was seen by his PC on 7/16/15, when his upcoming release date was discussed.  The MDO evaluation was discussed.  His hallucinations continued but were decreased, as was his depression.

The inmate was seen by a psychiatrist on 5/30/15, at which point he did not endorse depression, but noted that voices always asked him to hurt himself.  He also heard the voice of a priest who abused him for two years.  He noted having nightmares about those incidents.  He again was evaluated by the psychiatrist on 6/13/15.  The provisional diagnosis of PTSD was noted, but these issues were not directly addressed in the treatment plan.  Hallucinations instructed the inmate to hurt himself, but he stated he would not do it.  Risperdal was continued with a plan to follow-up in one month.  The inmate was seen by a different psychiatrist on 7/6/15 regarding pre-release follow-up and parole medication.  He was reported to be eager for release and to be doing well.  He found Risperdal helpful and was open to receiving it in the community.  He continued to have auditory hallucinations and paranoia, but they were improved on medications. The provisional PTSD diagnosis was not continued.

690

A request for transportation upon release was made on 7/7/15. On 7/8/15, a note was included in the record indicating that transitional case management was to assist with the Medi-Cal application.

Findings

This inmate was at an elevated risk for suicide, and his suicide risk assessment contained some inconsistencies with other documentation. However, he was somewhat stabilized on medication, which was effective in reducing but not entirely controlling his auditory hallucinations and self-harm thoughts. He was seen regularly by a PC and psychiatrist while awaiting transfer, and he regularly attended group. Some attention was paid to pre-release planning for this inmate, who was due for release imminently, but given the severity of his needs it did not appear to be of sufficient intensity. Given his elevated risk and pending release, his transfer to EOP should have been expedited as he was assessed as requiring EOP level of care on 5/20/15 and was scheduled for release on 8/1/15. Some clinicians noted PTSD symptoms but this provisional diagnosis was not continued by subsequent clinicians, and trauma issues were not addressed. The reviewer discussed this case and these concerns with CDCR regional headquarters staff. Overall, while the frequency of his mental health contacts were within minimal Program Guide requirements, the care and attention to transfer to a higher level of care he received was insufficient to address his situation and risk.

**Inmate B**

This 40-year-old inmate's healthcare record was chosen at random to review to assess the 3CMS level of care treatment he received during the review period. His expected release date was 9/28/15. He was primarily diagnosed with Depressive Disorder NOS and Anxiety Disorder NOS. He was treated with Prozac. He was alternatively diagnosed with Mood Disorder NOS and Amphetamine Dependence in a controlled environment, and Adjustment Disorder with mixed symptoms with a provisional diagnosis of PTSD.

The psychiatrist saw the inmate on 5/17/15, when he was noted to have high anxiety and increased depression. His Prozac was increased. A SRE was conducted on 5/21/15 in conjunction with his annual review. It showed a number of chronic risk factors including a history of abuse, depression or psychosis, chronic medical illness, a history of suicide attempts including an attempt in 2012 when dealing with parole issues, a perception of loss of social support, a history of poor impulse control, violence, and substance abuse, and being a sex offender. Acute factors included a current or recent depressive episode and anxiety, disturbance of mood, recent bad news, and hopelessness or helplessness. Protective factors included a future orientation, regular exercise, positive coping skills, children at home, insight, having a job or school assignment and sense of optimism, and being motivated for treatment. At the time, his focus was on trying to obtain SSI, Medi-Cal, and transitional housing before his release. His acute and chronic risk for suicide was rated as moderate. There was no mention of the connection between the current parole-related issues he was attempting to address and the percipient of his most recent attempt, which was related to parole issues. The plan was to see him in between 60 and 90 days, or as needed, to continue treatment at the 3CMS level of care, to

take medication, to monitor his mood, and to practice coping skills, and for the inmate to contact the PC in an emergency.

A PC assessment dated 5/21/15 found the inmate to be feeling depressed and "struggling to get through each day." He was feeling stress related to obtaining SSI, Medi-Cal, and transitional housing. He wrote to a housing provider, but he had not received a response. He noted that he had no family support upon release.

The inmate's IDTT meeting was conducted on 5/27/15, when he was not thought to meet any of the criteria for higher level of care referral consideration. Also noted was his history of childhood abuse and parental abandonment. He was seen as having a profound lack of trust in others and as reluctant to actively engage in treatment, although treatment motivation was listed as a protective factor in the SRE. The diagnosis was changed to Mood Disorder NOS and Amphetamine Dependence in a controlled environment. Problems listed were depression and substance abuse. Although this was noted to be an update, there was no indication whether he made progress toward these goals during the previous period. A noted strength was that he was motivated for treatment, in contrast to documentation that indicated he was reluctant to engage in treatment. There was no mention of his recent SRE indicating moderate acute and chronic suicide risk.

On 5/30/15 the inmate refused his morning dose of Prozac. On 6/8/15 nursing referred him to the psychiatrist because he was exhibiting a pattern of medication nonadherence, and he had missed 50 percent of medication or showed a pattern of unexplained missed medications. The psychiatrist saw him on 6/10/15 when he indicated he wanted to cope with his depression without medication. He reported few symptoms except for a general distrust or paranoia, and he denied suicidal ideation. The diagnosis was changed to Adjustment Disorder with mixed symptoms.

The inmate was next seen by a different psychologist on 7/12/15, when he again reported being anxious about his post-release plans. He discussed how difficult parole was for him the last time he attempted to adjust to community living and how he cut himself in an effort to obtain mental health treatment. He discussed possible triggers for traumatic memories, not being in crisis but having anxiety regarding his future, experiencing difficulty trusting others, and re-experiencing trauma. The psychologist noted PTSD symptoms and that Prozac was discontinued at the inmate's request. Possible PTSD was added as a diagnosis. His PC saw him on 7/17/15, when the inmate reported that he was ineligible for SSI but was able to receive Medi-Cal. He also reported that the homeless shelters he contacted did not accept sex offenders, and that he had no family support. Although he denied suicidal ideation, suicide risk was not assessed in light of the SRE findings that he was at moderate risk. At this point, he was diagnosed with Depressive Disorder NOS. He was provided with mental health resources, but no concrete assistance in exploring options for treatment or housing.

Findings

This inmate was evaluated as having a moderate acute and chronic suicide risk; his most recent attempt was connected with his parole difficulties. He was expected to parole in September 2015. He received assistance with Medi-Cal and was provided with some mental health resources. He remained concerned about his lack of family support and of being undomiciled upon release. His IDTT, which was conducted shortly after the SRE, did not specifically address suicide risk reduction. At his request, Prozac was discontinued. Different clinicians gave different diagnoses, without efforts to reconcile. One psychologist appropriately noted the possibility of PTSD, but this was not subsequently followed. The inmate was seen in accordance with Program Guide requirements with respect to the frequency of mental health contacts. However, the assessed moderate suicide risk was not adequately targeted in treatment in light of his pending parole. Treatment was otherwise adequate.

**Inmate C**

This inmate's healthcare record was chosen at random to assess the treatment provided at the 3CMS level of care. This 40-year-old inmate transferred to ASP on 6/15/15 with a diagnosis of Adjustment Disorder with depressed mood. He previously was treated with Remeron. He was not receiving psychotropic medication at the time of review. He was scheduled for release from prison on 9/1/16.

The inmate signed a consent for mental health treatment on 6/16/15, and an SRE was conducted on that day. Chronic risk factors included a history of abuse, chronic pain, a history of poor impulse control, a history of violence and substance abuse, and this being a first prison term. The sole acute risk factor was a recent housing change. Many protective factors were present. He was thought to be adjusting well to ASP, had no history of suicide attempts, and was married with seven children.

The inmate's history was significant for Polysubstance Abuse, and he was receiving SSI for a learning disability. He had no community mental health treatment history or suicide attempts. He was treated at the 3CMS level of care since December 2014 without MHCB admissions. Past medications included Remeron and Xanax. He declined group therapy and requested that he be removed from the 3CMS level of care as he was stable. The plan was to continue him at the 3CMS level of care, but to consider discontinuation after three to six months. He was to be seen every 60 to 90 days, during which time his symptoms would be monitored.

A treatment plan dated 7/2/15 indicated that his committing offense was for inflicting corporal injury on his spouse. He reported that his parents were alcoholics and abusive and that although the SRE noted his wife and children to be a source of support, he was in the process of getting divorced. He had been on suicide watch in the county jail, but had no suicide attempts. He appeared to be asymptomatic and contrary to the SRE report, and he was not prescribed psychotropic medications.

693

Findings

This inmate was assessed following transfer to ASP and request for removal from the 3CMS level of care. An appropriate plan for monitoring followed by consideration of removal from the 3CMS program was made. The inmate's treatment was adequate and within Program Guide requirements.

**Inmate D**

This 38-year-old inmate's healthcare record was randomly selected to assess the 3CMS level of care that he received. He was primarily diagnosed with Major Depressive Disorder, recurrent, moderate, which had historically been treated with Wellbutrin, Seroquel, and risperidone. However, at the time of review, the inmate had not been prescribed psychotropic medication for a number of years.

During his incarceration, the inmate experienced depressive symptoms with intermittent psychotic features. He was treated alternatively at the 3CMS and EOP levels of care. He also required MHCB placement. His history was significant for sexual abuse around the age of 12 and an extensive history of mental health treatment since 2000. He reported a suicide attempt by overdose in 2001 related to the pressure of homelessness.

The inmate had a number of chronic risk factors for suicide including a history of abuse and depressive or psychotic disorder, chronic pain, perceived loss of social support, a history of suicide attempts in 2001 due to the overwhelming pressure of becoming homeless, a history of substance abuse, and being a sex offender. His single acute risk factor was a depressive episode. Protective factors included his belief system, regular exercise, positive coping skills, having insight into his problems, being actively involved in treatment, and having a sense of optimism. His acute risk for suicide was assessed as low and his chronic risk as moderate. The plan to reduce risk included more frequent contacts with mental health as needed or requested.

An assessment dated 3/3/15 indicated that the inmate was making good adjustment to ASP.

The psychologist saw him on 5/9/15. He was described as talkative with acute memory for details of his life history and was seen as making an adequate adjustment to ASP. A history of sexual molestation by a family member at age 13 was noted. He believed that his mother was aware of this, but did not protect him because she loved him "the least." He described himself as mentally incapable of holding a job for long and was noted to have chronic paranoid ideation, which interfered with his relationships. He was reported to have chosen to be homeless to lessen his stress. He received diagnoses of Major Depressive Disorder by history, Alcohol Dependence in remission and possible Paranoid Personality Disorder. The plan was for the PC to see the inmate in 90 days.

<u>Findings</u>

This inmate received mental health contacts in accordance with minimum Program Guide requirements during the reporting period. His overall mental health treatment was adequate.

**Inmate E**

This inmate's healthcare record was reviewed after being randomly chosen to assess the treatment he received at the 3CMS level of care. He had a history of depression, anxiety, and ADHD symptoms. He was diagnosed with Mood Disorder NOS, possible Delusional Disorder, persecutory type, and Amphetamine Dependence. He was previously diagnosed with ADHD, and was prescribed Zoloft and Strattera. He required hearing aids and a walker to ambulate.

A psychiatrist saw the inmate on 5/17/15, when he was reported to be "stressed" by COs but not depressed. He received an RVR on 4/19/15 for "striking someone." His mental status examination was generally within normal limits. Mental health staff saw him on 6/3/15, in what was referred to as a re-referral session. He was interested in being removed from the 3CMS program, and he had custody-related concerns. The clinician and the inmate had not met since the time of his treatment plan as he was seen according to this note by another clinician during the PC's absence. He was informed that he would need to be seen at least once again in 90 days and that providing he was symptom-free and remained off of medications, he would be eligible for removal. The note did not discuss history or what had occurred during his absence. The diagnosis of Major Depressive Disorder, recurrent, moderate was continued. An IDTT meeting was not considered to be the forum for this decision to be made. The plan continued to use CBT with an emphasis on making better decisions and minimizing the inmate's depressive symptoms.

The inmate was seen on 6/5/15 by a psychologist, when he reported no major distress. His speech was pressured, but his thought process was coherent.

On 7/8/15 a correctional counselor referred the inmate to mental health, noting that he appeared confused, engaged in unprovoked hostility, exhibited bizarre behavior, showed poor self-control, and believed that he worked for the internal affairs division. His sleep was poor, and he was reportedly bothering other inmates. A psychologist saw him later that day and stated that the inmate believed that custody had targeted him for many years. He was admitted to the TTA for further assessment for medical conditions or psychotic symptoms. An SRE was conducted in conjunction with this evaluation. The inmate was noted to have a number of chronic suicide risk factors including chronic medical conditions, chronic pain, a history of poor impulse control, a history of violence and substance abuse, a long sentence, and being a sex offender. His only acute factor was a recent disciplinary action. Multiple protective factors were noted including family support, treatment motivation, a future orientation, and his belief system. He was assessed with moderate acute and chronic suicide risk. He was admitted to the TTA for further assessment.

The inmate was seen in the OHU later that day where he described what the clinician noted to be "many conspiracy theories." He reported staying up late at night because "something fishy" was

going on. He exhibited hyperverbal speech with loose associations and paranoia. His mood was described as "very good." The inmate "was cleared to return to his unit at a 3CMS level of care with five day follow up to provide additional support." The OHU clinician noted that the inmate would be discussed with his PC, as would the possibility of EOP level of care if it appeared to be warranted. It was noted that the inmate preferred 3CMS treatment to transfer. This planned discussion was not documented in the healthcare record at the time of review.

The inmate was seen on 7/9/15 for the first day of five-day follow-up after returning from what was described as the MHCB. He was referred to mental health by custody, and mental health referred him to the TTA for "continuation of care." The inmate stated that he spoke with a clinician at the TTA, who reduced his stress and transferred him to another building.

The inmate was seen on 7/10/15 for the second day of five-day follow-up. He reported good sleep and appetite, involvement with prayer, and no acute symptoms. He was also seen on 7/11/15 for five-day follow-up, when he stated that he was doing well but had "got at the CO the wrong way." It was noted that he had Meniere's disease. The plan was to continue with the 3CMS treatment plan. He was seen on 7/13/15 for what was described as five-day follow-up. He had recently been transferred to a new building and was described as stable.

The psychiatrist saw the inmate on 7/13/15, when he was described as stable. Prior to that, he had last been seen by "psych" on 3/25/15. The plan was to see him again in two months and to continue medication.

Findings

In a brief period of time, this inmate went from requesting removal from the 3CMS program to requiring crisis care intervention following apparent decompensation. He was assessed with moderate acute and chronic risk for suicide, and he was referred to the TTA for admission. Upon arrival and interview, he apparently felt calmer, and he was released with five-day follow-up and plans for clinician-to-clinician discussion concerning possible transfer to the EOP. An SRE was not performed in conjunction with the TTA assessment, although one was conducted upon referral. The five-day follow-up was not an adequate substitution for MHCB admission and/or consideration of higher level of care transfer. One planned follow-up was not documented in the healthcare record at the time of review. Although the inmate stabilized, the response to his apparent decompensation was insufficient.

**Inmate F**

This inmate's healthcare record was reviewed to assess the treatment he received at the 3CMS level of care. This 47-year-old inmate was diagnosed with Adjustment Disorder with mixed anxiety and depressed mood, chronic, and Polysubstance Abuse. He was prescribed psychotropic medications at the time of review.

An SRE was conducted on 4/2/15. Chronic risk factors included a history of depressive or psychotic disorder, perception of loss of social support, being older than 35 and male, and a

history of violence and substance abuse. One acute factor present was that the inmate was agitated or angry. Numerous protective factors were present. His acute and chronic suicide risk were assessed as low. An SRE dated 7/17/15 found similar chronic risk factors with one acute factor, namely, a housing change. All listed protective factors were noted. The primary reason for this inmate's inclusion in the 3CMS program was related to his reaction to his mother dying from a heart attack in 2013 and the associated depression he experienced.

A treatment plan developed at VSP on 4/14/15 indicated that the inmate, who was scheduled for release on 1/18/18, had a history of psychiatric treatment as a child for attention-related issues. In 2014 he was depressed secondary to missing his family and the possibility he would be transferred out of state. At that time, he required MHCB admission due to passive suicidal ideation. Problems noted on the April 2015 treatment plan included sadness, anxiety concerning family relation conflicts, and substance dependence.

Upon transfer to ASP, the inmate received an updated mental health assessment. At that time, he had an unremarkable mental status examination. The primary mode of individual treatment was to be Gestalt psychotherapy in conjunction with a Gestalt group. Additionally, CBT would be used in conjunction with home assignments and literature handouts.

Findings

The inmate responded well to 3CMS level of care intervention. The mental health care that was provided to him was clinically adequate.

**Inmate G**

This case was selected for review because the inmate had been identified on the DSH non-referral log. This 51-year-old EOP SNY sixth-term sex offender was seen in IDTT on 1/20/15 and identified as meeting criterion seven, for attending less than 50 percent of treatment, on the Form 7388B. He was not referred to DSH because the treatment team thought he was functioning well, and he was going to be considered for a possible level of care reduction. Specific criteria were discussed with him to demonstrate his stability, and he was going to be brought back before the IDTT in one week following a case consultation for consideration of the level of care reduction. No treatment modifications were listed. On a corrected Form 7388B of the same date, this section was completed, and included appropriate treatment modifications; however, under treatment modification on the first page (1-6B), none of the items on that page were positive. The entry on the first page should have been included in section 7B.

The inmate's treatment plan was vague and did not include treatment interventions that matched the stated problem area. The plan was poorly developed and did not target the primary issue. Specifically, the inmate was refusing treatment, but this was not identified as a treatment target, and interventions listed required a cooperative and engaged client. The inmate's suicide risk level was based on outdated information (7/30/14). The inmate was provided with a diagnosis of Psychotic Disorder NOS with a deferred diagnosis on Axis II. The treatment plan also noted that

697

the inmate only participated with the treatment planning process because he had been hoping to have his level of care reduced.

The treatment team again saw the inmate on 1/27/15, and his treatment plan was unchanged. However, documentation on the Form 7388B described him as continuing to exhibit bizarre and perseverative behaviors with no insight and an unwillingness to participate in treatment, including a refusal to take medication. Custody staff reported to the treatment team that he functioned adequately without troublesome behavior. As the treatment team saw the inmate as relatively stable, his level of care was reduced to 3CMS. However, the discharge section of the treatment plan was confusing with noted 3CMS and EOP levels of car without further narrative discussion or justification. This was extremely confusing and made determination of the inmate's level of care unclear. If the inmate was being reduced to 3CMS, his treatment plan should have been modified in accordance with that level of care.

Findings

This inmate was appropriately not referred to DSH. However, his level of care was unclear due to contradictory information in the treatment plan. It appeared that his level of care had been reduced to 3CMS from EOP, but there was insufficient clinical rationale to justify such a reduction. The inmate's treatment plan was also poorly constructed and inadequate for either level of care. It was vague, did not target the primary treatment issue, and did not include specific effective interventions. This inmate was not adequately treated.

**Inmate H**

This case was selected for review from the DSH non-referral log. This 62-year-old divorced EOP SNY inmate was serving his third term. The IDTT saw him on 1/20/15, when he was identified as meeting criterion seven on the Form 7388B for not participating in 50 percent or more of treatment. The inmate's treatment plan was confusing as it indicated that it may have been more beneficial to refer him to DSH to address his current symptoms and treatment nonadherence, but the plan also stated that he was functioning adequately at the current level of care. He refused to attend treatment groups and to take psychotropic medications. He was placed in the EOP due to a lengthy mental health history that included community outpatient and inpatient treatment, delusions regarding medical treatment, and treatment nonadherence. The Form 7388B indicated that he was functioning adequately at the current level of care and provided specific examples. Treatment modifications were appropriate and specific to the inmate, but were unfortunately not incorporated into the actual treatment plan.

The treatment plan was overly broad and vague; it relied on treatment adherence by the inmate and did not appear to be realistic given his refusal to engage and lack of insight. The treatment plan did not address the primary treatment issue of treatment nonadherence. An SRE was not completed; rather, one completed three months prior was used to determine that the inmate was at low acute and moderate chronic suicide risk. He was provided with a diagnosis of Schizophrenia, undifferentiated type.

Progress notes suggested that the inmate was receiving care that was more consistent with descriptions in the Form 7388B documentation than the vague and inappropriate treatment plan interventions.

Findings

This inmate was appropriately not referred to DSH. His treatment plan required modification so that it was more individualized and specific. The Form 7388B actually contained more detailed treatment interventions than the treatment plan. The treatment plan could have included the same information and would have been adequate. Based on review of progress notes, the inmate received adequate mental health treatment.

**Inmate I**

This case was selected for review at the request of plaintiffs' attorneys due to concerns regarding the mental health care provided. This 32-year-old 3CMS inmate arrived in CDCR on 2/20/15. He was admitted twice to the OHU; on one occasion, he stayed beyond 72 hours without an MHCB referral.

The inmate was evaluated on 5/10/15, following OHU admission on 5/9/15. The admission on 5/9/15 was due to a report of suicidality, reportedly in part because he was being pressured for money by other inmates on the yard (progress note 5/9/15). However, it was nursing that reported that he was being pressured for money, and it was unclear where that information originated. It was also uncertain from healthcare records documentation whether staff understood that this issue could actually be a risk factor for suicide, increasing rather than reducing his suicide risk. The inmate was placed on 30-minute staggered checks by the psychiatrist-on-call beginning at 2241 hours, pending evaluation. He was placed in a cell with no metal bed frame. It appeared that he was placed in cell 01, which had a concrete bed. This was ultimately discontinued at 1220 hours on 5/10/15 by the evaluating OHU psychologist.

An interdisciplinary progress note dated 5/11/15 indicated that the inmate had been assaulted on the yard. The incident occurred after he found some of his paperwork, which he had locked in his locker, left on his bed. He reported having a trust slip showing $10,000 in his trust account, and he was told that he needed to give some inmates money or his throat would be cut. The primary extorting inmate was perceived by this inmate to have friends from different gangs and also have an "in" with a corrupt custody sergeant. The OHU psychologist seemed to conclude in this progress note that the inmate was not at acute risk of suicide because the statement was due to safety issues. The clinician noted that he appeared to have possible grandiose and paranoid delusions. A history of outpatient and inpatient treatment with a Bipolar Disorder diagnosis was also reported.

The inmate also reported a history of significant depression and mood swings but denied any current symptoms. He was diagnosed with Psychotic Disorder NOS; a diagnosis of Mood Disorder NOS was also considered; there was clearly a need for diagnostic clarification. While this progress note initially indicated that the inmate had been discharged from the OHU at the

3CMS level of care on the prior day, the plan was to place him into the EOP and maintain him in the OHU pending transfer.  He had refused to return to the yard because he did not trust the yard sergeant that he would have to speak to about his concerns.  He indicated that he would continue to report suicidal ideation, to stop eating, and to throw "piss and blood" on the COs in an effort to not return to the yard.

A progress note dated 5/13/15 indicated the inmate was seen for IDTT, and his endorsement to VSP was discussed.  The treatment team planned to retain him in the OHU pending VSP transfer.  The Form 7388B was completed on that date, but a full 7388 treatment plan was not located in the healthcare record.  The Form 7388B indicated that he had been at the EOP level of care and was recently downgraded to 3CMS.  The Form 7388B also explained that maintaining him in the OHU would allow for closer monitoring of symptoms and address his safety concerns.  Only the psychologist and CC I were present at this IDTT meeting.  The inmate also refused to see the psychiatrist for his appointment.  On 5/15/15, the inmate attended the IDTT meeting and a treatment plan was completed.  This treatment plan was well-constructed with well-conceived goals and interventions.

Review of mental health chronos revealed that the inmate was admitted to the OHU on 5/9/15, discharged to the 3CMS level of care on 5/10/15, placed into the EOP level of care for medical necessity while still housed in the OHU on 5/11/15, and placed into the EOP without qualifiers on 5/15/15.

According to a progress note dated 5/18/15, the inmate began to request a return to the yard so he could access canteen after he was told it could be several weeks before he could receive canteen in the OHU.  A handwritten progress note documented psychiatric contact on 5/20/15.  Psychotropic medications were not prescribed, and the diagnosis could not be identified due to legibility difficulties.  The inmate had incidents in the OHU when he covered his cell window twice on 5/22/15.  It was determined that it would be best to release him to a yard where the inmate did not feel that his safety was threatened.  The inmate agreed with this plan.  According to a progress note dated 5/23/15, he was seen the following day for follow-up when he reported no safety or suicidality concerns.  However, on 5/24/15, the on-call psychiatrist received a report from nursing staff that the inmate had told custody that he would cut himself.  Once at the TTA, he denied suicidality.  However, the psychiatrist ordered admission to the OHU for a crisis evaluation.  He was evaluated on 5/25/15 and discharged from the OHU following that evaluation.

<u>Findings</u>

This inmate was placed into the EOP during his initial OHU stay.  However, the documentation in this case was poor and not always accurate.  The inmate was retained in the OHU pending endorsement to an EOP institution.  He had concerns about going to the mainline yard, but did not require acute crisis placements.  Consequently, he did not need to be admitted to an MHCB or to acute care, both of which targeted self-injurious behaviors.  The inmate received minimally adequate care, but the documentation of care was poor.  Documentation needed to be reviewed

and a comprehensive clarification progress note entered into the healthcare record to summarize the complicated history for subsequent providers.

## Inmate J

This case was selected for review as an example of OHU care and because the plaintiffs' attorneys had identified the case due to concerns regarding the care provided. This 62-year old inmate was admitted to the OHU on 3/26/15. An SRE completed by the yard clinician on that date indicated he had multiple chronic, two acute, and several protective factors for suicide with no plan or desire to die. He was found to be at low acute and chronic suicide risk. He exhibited pressured, circumstantial speech with daily visual and auditory hallucinations and slightly depressed mood. He was referred to mental health due to increasingly bizarre behavior, including defecating in his pants, touching his feces, increased aggression, poor self-control, and "bothering" others. A mental health evaluation completed in the OHU on an add-a-page dated 3/26/15 noted that the inmate had originally been referred by correctional staff to the yard clinician, who subsequently made the OHU referral. The inmate reported that he had accidentally defecated in his pants. He was diagnosed with Major Depression, moderate, recurrent, by history with Axis II deferred. He was prescribed mirtazapine 15 mg per day. He was admitted to the OHU for further evaluation.
.
On 3/27/15, the inmate was placed into the EOP for medical necessity but was maintained in the OHU pending transfer due to poor adaptive functioning in his assigned housing. The transfer was not expedited. Psychiatric observation was initiated by the OHU psychologist on 3/26/15 at 1800 hours (staggered checks not more than 30 minutes apart) and was terminated at 1245 hours on 3/27/15. Based on review of the observation sheet, namely the Form 7385, the checks exceeded 30 minutes on multiple occasions without explanation. The treatment team saw the inmate on 4/2/15. The treatment plan focused on appropriate symptomatology, but did not address the primary symptoms and behaviors that resulted in the initial referral, the need for increased level of care, and OHU retention pending transfer. The treatment plan also did not address the inmate's hallucinations. The Form 7388B of that same date indicated that the inmate was being retained in the OHU so he could be observed more closely and provided with more support. According to the Form 7388B, if the inmate was doing well, he could be considered for transfer to ASP Facility C pending EOP transfer. While in the OHU pending transfer, the recreation therapist provided in-cell activities, but based on the progress notes, clinical contacts did not appear to adhere to the treatment plan.

### Findings

This inmate's EOP transfer should have been expedited. His treatment plan did not address the specific symptoms and behaviors that resulted in the initial OHU referral and level of care increase. This inmate did not receive adequate treatment.

EXHIBIT P
Salinas Valley State Prison (SVSP)
February 17, 2015 - February 20, 2015
June 12, 2015

**Inmate A**

This EOP inmate was housed in the administrative segregation EOP hub. He was provided with a diagnosis of Schizophrenia, residual type. He was housed in administrative segregation due to the battery of an officer and was pending transfer.

A treatment plan dated 11/24/14 noted the inmate exhibited intermittent agitation with disorganized thinking, tangential content, and loose associations. The problem list noted psychosis and poor anger management; Program Guide requirements for clinical contacts were the provided interventions. The Form 7388B did not note any criteria for higher level of care referral consideration.

The inmate was housed in administrative segregation for the entire review period. Progress notes indicated the PC saw him weekly and that most sessions occurred out of cell. A psychiatry contact dated 12/9/14 indicated the inmate presented predominately with negative symptoms and disorganization. He previously had not been prescribed psychotropic medications. At that time, he was prescribed 2 mg of Haldol at night. The most recent progress notes indicated that he had shown improvement and was stable.

<u>Findings</u>

The inmate appeared to be receiving mental health services at the appropriate level of care. The treatment plan was individualized with good identification of problem issues and treatment interventions. Documentation indicated that he consistently participated in group therapy. There was also documentation of consistent psych tech rounds.

**Inmate B**

This EOP inmate was housed in the EOP program on D yard. He was provided with a diagnosis of Schizophrenia, paranoid type. He was prescribed hydroxyzine and Invega.

A treatment plan dated 12/11/14 noted the inmate had psychotic symptoms, but was treatment adherent with decreased distress due to "whispering and buzzing" that he experienced. He was actively involved in 79 percent of his scheduled treatment groups and consistently attended individual therapy. Treatment goals and interventions were clinically appropriate. The Form 7388B did not note criteria for higher level of care referral consideration.

Progress notes indicated the PC saw the inmate consistently, but not weekly. The psychiatrist also followed the inmate consistently, and there were occasional medication adjustments to address symptoms, including nightly auditory hallucinations. Some psychiatry contacts occurred by way of telepsychiatry.

Findings

The mental health care provided to this inmate was generally adequate, but there were noted lapses in weekly PC contacts. The psychiatrist consistently followed the inmate with appropriate medication management to address his persistent psychotic symptoms.

**Inmate C**

This inmate's healthcare record was reviewed to assess the adequacy of his level of care. CDCR data provided prior to the site visit indicated he was admitted to the MHCB more than three times during the review period. He arrived at the SVSP MHCB from ASP as a psych and return on 12/12/14. While in the MHCB, he was delusional and paranoid and made threats that if housed with another inmate he would kill him. He was diagnosed with Psychotic Disorder NOS with provisional diagnoses of substance induced persisting psychosis and Schizophrenia for consideration. Medication initiated at the MHCB included Risperdal, benztropine mesylate, and buspirone. On 12/26/14, the inmate was referred to acute care. The discharge summary in the eUHR indicated that he was discharged from the MHCB on 1/27/15, but conflicting documentation indicated that he was in the MHCB until 1/30/15.

ASP background data indicated that the psychotic symptoms were evident in September 2014, but the inmate had refused psychiatric medication. His level of care remained 3CMS until he was transferred to the MHCB. ASP documentation from October 2014 supported a diagnosis of Bipolar Disorder by history with a rule-out of Schizophrenia, paranoid type, and 3CMS care was continued. A largely illegible psychiatric note dated November 2014 indicated that the inmate refused psychiatric medication. He was referred to psychiatry on 12/10/14 due to psychosis with a plan to discuss moving him to the EOP level of care. That same day he was seen for a crisis referral due to psychosis, and he was referred to the MHCB.

Findings

There was a discrepancy between provided documentation and the eUHR. The data indicated that the inmate had three separate MHCB admissions, but the eUHR indicated only one MHCB admission. The diagnostic rule-out of a substance induced persisting psychosis was unclear given the documentation of psychosis in the three months prior to MHCB admission, which was not consistent with diagnostic criteria for this diagnosis and provided no rationale (i.e. no documentation supporting that the inmate disclosed recent drug use or tested positive). Overall, the level of care for this inmate, while delayed, was appropriate. The date of DSH referral exceeded the 10-day Program Guide timeframe, and the rationale for the delay was unclear. The date of DSH acceptance and the reason for the delay in transfer to DSH from the MHCB were also unclear.

**Inmate D**

This inmate's eUHR was reviewed at plaintiffs' attorneys' request, who expressed concern that he had been in the SVSP administrative segregation EOP for 501 days. He had been in acute care at DSH-Stockton from 3/19/14 to 5/29/14, when he was transferred to intermediate care. He was discharged on 8/6/14. To facilitate increased family support, a transfer close to Sacramento was recommended.

At the time of discharge the inmate was prescribed Mirtazapine. He was discharged to the EOP level of care. He was subsequently placed in administrative segregation on 8/22/14 after he received an RVR for indecent exposure. He remained in administrative segregation on D2 yard at the EOP level of care.

The inmate was provided with diagnoses of Borderline Personality Disorder and Major Depressive Disorder, recurrent, severe without psychotic features. He had a history of manipulating staff through splitting and had made mental health complaints to facilitate housing changes. He had a history of self-harm behavior, including head banging and cutting, as well as suicidal ideation and two near lethal suicide attempts. In the past, he indicated that he was unsure if he would disclose suicidal ideation. It was recommended that all self-harm attempts be taken seriously.

While at SVSP, he attended his IDTT on 9/3/14 and a treatment plan was completed. There was some confusion in the healthcare record as both treatment plans dated 9/3/14 and 11/13/14 were marked as initial. He did not attend the IDTT meeting on 11/13/14. Treatment team members at the 11/13/14 IDTT meeting were his PC and correctional counselor; the psychiatrist was not present.

The inmate was placed on suicide watch on 11/3/14 in the CTC. This was initiated due to concerns that he posed a danger to himself and had mood lability. He was not admitted to the MHCB. Since his placement at SVSP, he had a pattern of refusing groups. This was discussed at his IDTT meeting on 1/21/15, which was attended by his PC, correctional counselor, telepsychiatrist, and psych tech. Since his last IDTT on 11/13/14, he had refused 72 percent of groups and intermittently attended individual sessions. His group treatment refusal was reportedly due to being ashamed of wearing the IEX jumpsuit. A referral to a higher level of care was considered but not made with the rationale that he was functioning adequately and attending to his ADLs. He was placed on a modified treatment plan. The plan was unclear but indicated that the inmate would attend one or more of the scheduled weekly groups. The short-term objective was having him attend 50 percent or more of scheduled weekly groups over 30 days or more by 2/25/15, 4/15/15, and 8/30/15.

PC weekly clinical contact progress notes appeared to be based upon the use of templates. For example, under the stated reason for treatment refusal, documentation indicated that he "reported he had been having a difficult week, but that he was going to start going back to groups." This documentation was present in a random sampling of group notes dated 11/25/14, 12/19/15, 1/2/15, 2/6/15, and 2/10/15. The inmate was prescribed Clonidine.

Findings

The inmate had been in the administrative segregation EOP since 8/22/14. The timeliness of IDTT meetings was within the Program Guide's 90-day timeframe. As documented on the treatment plan, attendance of all treatment team members was not consistent. While the EOP level of care was appropriate for this inmate, given his ongoing pattern of treatment noncompliance that occurred in close proximity to his DSH discharge, a modified treatment plan should have been considered sooner than 1/21/15. The treatment plans dated 9/3/14 and 11/13/14 were both marked as initial, while PC notes used templates as opposed to an individualized conceptualization and documentation of the inmate's specific treatment needs, which was problematic.

**Inmate E**

This case was reviewed due to inconsistent MHCB staff reports for the reason for alternative housing placements during the site visit. This EOP inmate had a prior MHCB placement from 9/18/14 to 9/22/14 due to a threat that he would kill himself if he were returned to his then-current housing. He later recanted the suicidal statement. It was apparent to staff that he was having safety concerns which he was having difficulty managing. Staff reviewed his coping skills. He was provided with diagnoses of Major Depressive Disorder and Mood Disorder NOS. He was prescribed Effexor ER and Risperdal.

On 2/17/15, the inmate was on one-to-one suicide watch in the CTC in an alternative housing cell. When MHCB staff was asked about his status, it was reported that he was not on suicide watch but was placed on one-to-one due to a PREA security policy. Monitors and regional headquarters staff were told that a copy of the PREA policy would be provided. It was later learned that a policy was being developed through QMSU and there was no current LOP. The DOM (S4040.8) required that when an inmate disclosed a PREA incident, a nurse shall request an urgent suicide assessment and until it was completed, the inmate was placed on suicide precaution status. This must occur within four hours of the nurse's assessment. There was no mention of a security watch.

A nursing note on the triage and treatment services flow show sheet indicated that the inmate was placed on suicide watch on 2/16/15 at 8:50 p.m. in the CTC. It was unclear if HC-POP was notified. On the morning of 2/17/15, the inmate told mental health staff he was not suicidal and disclosed a PREA incident. He was evaluated at an outside hospital that afternoon and returned to the CTC on 2/17/15 at 9:20 p.m. and the suicide watch was continued. He reported to mental health staff that he was suicidal with a plan. MHCB staff reported that HC-POP was not notified until 2/18/15. The inmate was transferred to an MHCB at CSP/Solano on 2/18/15.

Findings

While there was confusion about the logistics of this case, the inmate's care was appropriate. The reason for the suicide watch was unclear to MHCB staff.  There was delay in the notification to HC-POP.  There was also confusion regarding the PREA policy, which at the time of review did not exist, that warranted a security watch.

EXHIBIT Q
Correctional Training Facility (CTF)
April 30, 2015 - May 1, 2015

**Inmate A**

This inmate's healthcare record was reviewed because he was identified as being housed in administrative segregation while at the EOP level of care and awaiting transfer to an administrative segregation hub. He was diagnosed with Bipolar I Disorder, most recent episode hypomanic, and Polysubstance Abuse. A previous diagnosis of PTSD was discontinued. He was treated unsuccessfully with Geodon, which he did not take regularly.

Overall the inmate had an extensive history of mood and thought disorder accompanied by depression and aggressive behavior and what was noted in the record as "unmanaged psychosis." His history was significant for over twenty suicide attempts, some related to auditory hallucinations, starting at age nine; the most recent was a near fatal attempt in 2014 which resulted in the inmate lapsing into a coma and requiring intensive care unit treatment. Chronic daily suicidal ideation was noted, although the inmate reported that generally he did not inform staff as he did not want to be sent to an OHU/MHCB. His history was also significant for sexual abuse and multiple head injuries with loss of consciousness. He was described as a motivated and active treatment participant and as adherent with medications, although other documentation indicated that his compliance with medications was inconsistent. He was scheduled for CDCR release on 12/21/15.

A 4/3/15 psychiatry note indicated that the inmate started refusing medication two days earlier and that he was not going to yard. At the time of his 4/7/15 IDTT meeting, he was treated at the 3CMS level of care. At that time, it was noted that he did not want medication and felt that staff was trying to torture him. A 4/15/15 PC note indicated weekly 3CMS contacts but also that the inmate remained in bed with a sheet pulled over his face and would not get out of his bed, and communicated by nodding. He was changed to the EOP level of care at his 4/28/15 IDTT meeting. At that time, he was noted to have "refractory command hallucinations that told him to assault others." His chronic suicidal ideation was noted. It was also reported that he had been tried on an antipsychotic medication but found it uncomfortable and did not want to continue taking it in his current setting. Staff noted he would benefit from increased group interactions. The risk of danger to self and others was found to be too high for him to be managed at the 3CMS level of care, resulting in the change to the EOP level of care. A diagnosis of Schizoaffective Disorder was added.

Findings

This inmate was being transferred to the EOP level of care. This was an appropriate decision although, given his history, symptoms, and treatment non-adherence, the inmate would have likely benefitted had it been made earlier in his course of treatment. However, once designated as EOP, the inmate's management plan was insufficient in that it did not provide for intensive monitoring and efforts for an expedited transfer to a higher level of care.

**Inmate B**

This inmate's healthcare record was reviewed because he was treated in administrative segregation at the 3CMS level of care.  He also indicated during a group interview that he became paranoid and requested EOP level of care from his treatment team, but their response was to offer him higher dosages of medications.

The inmate was diagnosed with Schizophrenia, paranoid type.  He was treated primarily with Effexor and Haldol.  He also had been treated with Zyprexa, Abilify, Wellbutrin, and Geodon.

The inmate was scheduled for release on 9/27/15.  His treatment plan indicated no need or indications for a higher level of care.

The inmate's history was significant for witnessing what he described as a massacre when he was younger; this marked the beginning of his auditory hallucinations.  He reported multiple suicide attempts starting at age 11.  More recently, he reported numerous fights with cellmates and was assessed as paranoid with persecutory auditory hallucinations.  His plan after parole was to live with his brother or sister.

Findings

This high risk inmate was seen frequently and monitored closely while housed in the CTC's administrative segregation unit.  While he continued to require intensive treatment and ultimately a higher level of care and more intensive parole planning, his treatment was adequate as of the date of review.

**Inmate C**

The inmate's healthcare record was reviewed from a list of inmates having an initial IDTT meeting.  His EPRD was 11/20/15.  The inmate was housed on the South Facility.  He was diagnosed with Anxiety Disorder NOS and Polysubstance Abuse in a controlled environment with a provisional diagnosis of PTSD.  He had the medical condition of hypertension.  The inmate was prescribed a low dose of Prozac and ranitidine.

On 3/19/2015 the inmate self-referred because of anxiety.  He had a history of long-term drug and alcohol use; his father was diagnosed with Bipolar Disorder and was prescribed psychotropic medications.

On 3/25/15 the inmate submitted a Form 7362, and nursing saw him for bowel movement urgency and painful stool evacuation.  He was referred to a nurse practitioner that day and then seen on 4/6/15 by a physician who ordered laboratory testing to address this issue.

On 4/2/15 another Form 7362 was submitted to see the psychiatrist for anxiety.  Mental health had previously seen the inmate on 3/17/15, and he was concerned because the clinician had

stated that the inmate would be seen in one week about a medication referral. The inmate was seen on 4/6/15. The clinician informed the inmate that there was a staff shortage and that this was the reason for the delayed appointment. The clinician stated "The IM appeared to receive this information without emotional upset." The session included discussions about positive and negative factors concerning life outside of prison, the inmate's low self-esteem, and concerns about the inmate's ability to keep a job. The clinician referred the inmate to a psychiatrist. The IDTT pre-interview was scheduled for 4/15, and the IDTT meeting was scheduled for 4/23.

The inmate was informed on 4/14/15 that medical test results were negative. The inmate was seen on 4/15/15 for an initial mental health evaluation and SRE as scheduled. He reported that Prozac was helping with depression, but that anxiety was still very high because of his fear of not remaining sober after parole. The inmate's IDTT meeting occurred as scheduled on 4/23/15 and the inmate stated that the mental program was helping him with anxiety concerns. The inmate's medical and mental health concerns were intertwined due to physical and mental anxiety symptoms.

<u>Findings</u>

The 3CMS inmate's clinical care was appropriate. He was seen more frequently than every 90 days and was placed in one of the few groups that was offered to 3CMS inmates. He was also seen by psychiatry. Regional staff were informed about staff inappropriately discussing staffing shortages with inmates seeking support. This inmate would benefit from a medical/mental health case conference.

## Inmate D

This 3CMS inmate's healthcare record was reviewed from a list of inmates having IDTT meetings on South facility during the site visit. The inmate was diagnosed with PTSD and ADHD. He was prescribed Zoloft and Strattera.

The inmate had previously sued CDCR for medication mismanagement for ADHD and won. He used the money to start a marijuana dispensary. The inmate had arrived in CDCR on 1/07/15 and had a release date of 11/20/15. He had a history of methamphetamine use as well as alcohol and marijuana use to offset the effects of the methamphetamine. His symptoms included difficulty focusing, flight of ideas, distractibility, and impulsivity. The inmate was under the influence for all of his three term offenses. On average he was seen every four to six weeks by the PC and monthly by the psychiatrist.

<u>Findings</u>

The inmate's clinical care was adequate. He was seen more often than the Program Guide required.

**Inmate E**

The inmate's healthcare record was reviewed following a request from plaintiffs' counsel.  The inmate was admitted to the OHU on 1/9/15 due to grave disability and he was discharged on 1/12/15 at the 3CMS level of care.  He was then admitted to the MHCB on 1/23/15 and discharged five days later.  Following MHCB discharge, he was seen for five-day follow-up. The inmate was again admitted to the OHU on 2/1/15 with a diagnosis of Psychotic Disorder. Other diagnoses during the OHU stay were Generalized Anxiety Disorder and the latest diagnosis of Adjustment Disorder with anxiety symptoms, along with drug and alcohol dependency.  The only medication he was prescribed was Vistaril as needed.  The SRE was completed on 2/2/15 and indicated low acute and chronic suicide risk.

The inmate had a history of chronic drug and alcohol abuse for more than 20 years.  His clinical care between February and March 2015 was appropriate, focusing on the problems of finding appropriate housing and security level of care changes.  He was designated EOP level of care due to bizarre behavior and an inability to program on South facility yard and to adjust to prison life.  The clinicians attended the UCC and ICC meetings and advocated for appropriate and prompt placement of the inmate.  The clinicians also reached out to family members to assist in understanding the family and societal dynamics that affected the inmate's mental status.  He was seen daily for five-day follow-up, and weekly or more frequently as needed.  The inmate was housed in the OHU for housing purposes, but not for mental health purposes.

The OHU coordinator reported that it was very difficult to find appropriate housing for this inmate due to his security level and EOP status.  The inmate went from a custody level 1 to level 2 and then to level 3, and then back to level 2.  He also transitioned from the 3CMS to EOP level of care.  As bed availability was extremely problematic, the inmate was housed in the OHU until 3/11/15, when he was transferred to CMC.

<u>Findings</u>

The inmate received appropriate mental health care while housed in the OHU.

EXHIBIT R
California Men's Colony (CMC)
May 26, 2015 - May 28, 2015

**Inmate A**

The inmate's medical record was reviewed from a list of EOP inmate IDTT meetings that were observed during the site visit.  The inmate's diagnosis was Adjustment Disorder with mixed and depressed mood.  He was not prescribed psychotropic medication.

The inmate arrived at CMC on 5/8/15.  His IDTT goals focused on depression as it related to adjustment to prison life and defiant behavior toward custody.  On a scale of one to ten, the plan was to reduce depression below five and reduce anxiety below four within 90 days.  The inmate's last SRE was completed on 2/12/15.

The inmate's mental health history began at age 12 when he witnessed a fellow passenger being shot to death.  He stated he had no other mental health treatment until his second prison term.  He told the IDTT treatment team of winning an appeal to overturn a third strike conviction, resulting in a new release date in November or December 2015.  Custody was not aware of the appeal or new release date.

There was no discussion during the IDTT meeting or documentation about the death of the inmate's grandmother one week prior to his arrival at CMC.  On the progress note dated 5/20/15, the clinician reported being unable to give clinical input on the inmate's medication compliance even though the medication noncompliance was documented.  The clinician also stated the Form 7388 discussion regarding level of care was not necessary because the inmate was a new arrival.

Findings

The clinical assessment and IDTT occurred timely.  However, lack of discussion during the IDTT meeting of the immediate stressor of the inmate's grandmother dying the week prior to arrival, lack of review and utilization of information gleaned from previous documentation, and the statement that the higher level of care discussion was not relevant due to the inmate's new arrival status made this assessment inadequate.

**Inmate B**

This inmate's medical chart was reviewed from a list of EOP inmate IDTT meetings that were observed during the site visit.  The inmate's diagnosis was Schizophrenia Paranoid Type.  Prescribed mental health medication was Risperdal and Cogentin.

The inmate was serving a ten-year sentence for burglary and had amphetamine and PCP abuse and dependency.  He had a history of inpatient hospitalization and intermittent auditory and visual hallucinations, and in the past, was observed responding to internal stimuli.  At a previous prison, gang members pressured him not to take mental health medications and to support gang activities.  Review of previous notes revealed that he was observed snorting something, and these concerns were discussed with him.  However, no other discussion or observation of any illicit drug use was discussed in successive notes.

714

The inmate had been housed in CMC's ADL housing for low functioning EOP inmates, but was recently transferred to regular housing. The treatment plan addressed a history of psychotic symptoms; one goal was to reduce auditory hallucinations from three to one on a scale of one to ten. The inmate reported not having auditory hallucinations for more than nine months. A second goal was to increase positive learned coping skills by identifying and performing three positive coping skills; the inmate maintained more than three positive coping skills for more than six months. The third goal, which was also met, was to maintain sobriety.

The SRE dated 3/3/15 indicated low risk for acute and chronic suicide risk.

Since the last 90-day follow-up IDTT meeting, the inmate received milestone credits, resulting in a four-week sentence reduction. He was reported to have attended 17 weekly hours of treatment. He also had not experienced any psychotic symptoms for almost one year according to the Forms 7388 and 7388B dated 3/3/15. The inmate worked as a dining room porter and attended stress management, substance abuse, documentary films, and depression management groups, as well as yard. He stated at the IDTT meeting that he had recently joined AA.

<u>Findings</u>

The primary care and psychiatry contacts were conducted timely for the reporting period and the IDTT meeting was appropriate. Clinical staff would benefit from a reevaluation of new goals for the inmate; previous goals were met over six months ago.

**Inmate C**

This EOP inmate's healthcare record was reviewed from a list of inmates housed in administrative segregation for longer than 90 days. His diagnosis was Psychotic Disorder NOS, and he was prescribed Thorazine.

The inmate was discharged from the MHCB and arrived at CMC on 1/30/15. He denied any history of mental illness or contact with the mental health system prior to prison, but also reported previously receiving SSI for mental health disability. His mental illness began in his late 20s with a bipolar diagnosis and six involuntary admissions due to being "stressed out," two MHCB admissions while in prison for bizarre behavior, and hearing voices. Custodial charges included sexual battery and administrative segregation placement in response to a 115 on 3/11/15 for battery of a peace officer and IEX. He had two prior 115s for IEX. The MH-115 indicated the clinician assessed the inmate's insight and judgment "appear to be impaired by a chronic mental disorder and mental illness was a factor in the inmate's behavior." An SRE indicated a previous documented suicide attempt, but the inmate denied it in subsequent clinical sessions. The history also included an intermediate care referral on 4/22/15 and consistent refusal to come out of his cell for confidential PC contacts.

<u>Findings</u>

The inmate's clinical care was adequate.  The MH-115 was also completed timely and was clinically relevant based on sound clinical judgement.

**Inmate D**

This EOP inmate's healthcare record was reviewed from a list of inmates who were housed in administrative segregation for longer than 90 days.  His diagnosis was Adjustment Disorder, with mixed disturbance of emotions.  He was prescribed Remeron and Vistaril.  He was an undocumented 27-year-old DD2 inmate.  He had been housed in multiple administrative segregation units for 426 days.  He was placed on NDS 102 status on 3/19/15.  He also had a long history of suicidal ideation and immediate recanting of suicidal ideation upon MHCB admission.  His latest MHCB admission was from 3/14/15 to 3/16/15; prior MHCB admissions during this review period were from 12/4/14 to 12/11/14, 1/20/15 to 1/28/15, 3/1/15 to 3/3/15, and 3/6/15 to 3/9/15.  The medical record indicated the inmate was not referred to a higher level of care due to his immediate recanting of suicidal ideations.  The inmate received two IEXs in three months.

An interpreter was used during most contacts as the inmate spoke very limited English.  Treatment goals were to improve insight, treatment compliance, and coping skills.  Psychoeducational materials were provided in Spanish.  In April 2015, the inmate stopped taking medication with a goal of moving to the 3CMS level of care.  The clinician suspected peer pressure, but the inmate adamantly denied any peer pressure.  According to the medical record, the inmate was victimized and housed for safety concerns along with IEX 115s.  The inmate was transferred to RJD on 5/8/15.

<u>Findings</u>

The inmate's clinical care was adequate and he was seen consistently while housed in administrative segregation.

EXHIBIT S
Wasco State Prison (WSP)
March 3, 2015 - March 5, 2015

**Inmate A**

This case was selected for review because the inmate had been identified as meeting DSH referral criteria on at least three different occasions, but was not referred to DSH. This 26-year-old EOP inmate reported a history of mental health treatment. He was placed into the EOP at the time of intake. By the time of the inmate's first treatment team meeting, his treatment participation had already fallen below 50 percent; it was noted that his auditory hallucinations had increased and that he chose to lay down on his bunk to try to control the voices and to cope with them. The PC accommodated the inmate by developing homework for him to make up for the group time he missed, to increase individual contacts to twice weekly, and to work on increasing coping skills to address the auditory hallucinations. At that time, no information was located in the healthcare record regarding medications or discussions with the psychiatrist about the auditory hallucinations.

The inmate had been diagnosed with Schizoaffective Disorder, Amphetamine Dependence, and Cannabis Abuse. He was prescribed Depakote, olanzapine, and hydroxyzine. The Form 7388Bs completed on 8/5/14, 8/12/14, and 9/9/14 were identical and clearly cut and pasted. The treatment plan was not revised when the inmate did not improve, and the treatment team referred to the inmate's lack of an intent to harm self or others as though this were the only criterion for DSH referral consideration. The inmate clearly stated to his PC that his symptoms were worsening, but the treatment plan was not modified; however, the inmate was eventually referred to the psychiatrist for a medication evaluation for a possible medication adjustment. This should have occurred when the inmate first disclosed an increase in auditory hallucinations. The treatment plan indicated that the inmate would be seen twice weekly by his PC, but the progress notes did not support this frequency of clinical contacts. The PC also apparently did not review the objective data (on-demand reports) available regarding the Form 7388B items (i.e.., treatment participation) as the PC simply accepted the inmate's statement that he had returned to groups; this despite the fact that the on-demand reports indicated that he continued to refuse more than 50 percent of treatment. The treatment plan also remained unchanged even though several items on the plan should have been achieved (e.g., see psychiatrist and complete specific homework assignment).

By the end of August 2014, the two weekly PC visits were finally implemented. Despite the inmate's report to the PC that he would attend groups and evidence to the contrary, the treatment plan was not modified to address the inmate's lack of participation and decompensation.

<u>Findings</u>

The inmate was decompensating as his symptoms increased. His treatment plan was not modified to address this decompensation. The inmate should have been considered for DSH referral. At a minimum, the treatment team should have revised the treatment plan to adequately address the decompensation. This inmate did not receive adequate mental health treatment.

**Inmate B**

This case was reviewed because the inmate was identified as meeting criteria for DSH referral consideration on four different occasions, each time for treatment participation of less than 50 percent, but the inmate was never referred. The 54-year-old EOP inmate was admitted to the MHCB at CSP/Corcoran on 7/25/14, and he was not discharged until 8/12/15. The inmate had suicidal ideation at the time of admission with grandiose delusional thinking and manic behaviors. He was provided with a diagnosis of Bipolar I Disorder, most recent episode manic by history, Alcohol Dependence, institutional remission, and Cannabis Dependence, institutional remission. He was prescribed Risperdal, Vistaril, Depakote, and Zyprexa.

The inmate's treatment plan dated 8/26/15 was somewhat confusing in that it referenced the inmate seeing the PC twice weekly "until he transfers to DSH;" however, another section in the plan stated that no DSH referral was indicated. The treatment plan also indicated that the inmate would be placed at the EOP level of care. The Form 7388B of that date did not indicate a DSH referral.

The next treatment plan was dated 9/23/14. At this treatment team meeting, the inmate clearly had not improved and was not attending group treatment due to symptoms of his mental illness. This treatment plan was unchanged from the plan one month prior; the plan even included the confusing "DSH" statement previously described. The reason provided for DSH non-referral was that the inmate was able to care for and advocate for himself. However, in the same treatment plan, the clinician noted that the inmate's speech was frequently tangential and repetitive and that he had poor memory; these findings brought into question whether the inmate actually could adequately advocate for himself in the prison setting. The clinician also stated that the inmate was programming normally when in actuality he was not. The treatment plan's narrative clearly stated that the inmate was not attending treatment groups and that he spent much of his time telling people that he was God and had created the world, among other grandiose statements. The rationale provided for non-referral was clinically inadequate. The clinician also did not appear to recognize that the inmate's stated reasons for avoiding groups were reflective of his mental illness (e.g., avoidance, religious preoccupation).

The next treatment plan dated 10/21/14 included some changes; this plan added delusions and upcoming parole to the plan, but again portions were cut and pasted including previously described working. Some aspects of the additional treatment targets and interventions were clinically relevant, but they required greater specification and operationalization. Based on handwritten notes in the treatment team document, the inmate was very psychotic during the IDTT meeting and was actively responding to internal stimuli. Overall, this was not reflected in the document, but the inmate was apparently scheduled for psychiatric contact later in the week. It was unclear why the inmate was not seen by the psychiatrist later that day given the acute nature of his symptoms. Again, the exact same reasons were provided for DSH non-referral as were provided the prior month. There were no new treatment plan modifications, despite the failure of prior interventions and the inmate's continued decompensation.

719

The treatment plan dated 11/18/14 was identical to the October 2014 treatment plan. The DSH non-referral rationale was unchanged, and the treatment plan appeared to be cut and pasted from prior treatment plans. It should also be noted that the DSH coordinator determined that the November Form 7388B was acceptable during the DSH audit procedures; however, when this expert utilized the same criteria for audit, the Form 7388- B was determined to be unacceptable as it was not completed appropriately.

Findings

This inmate did not receive adequate mental health treatment. Treatment planning was poor. The inmate was not adequately considered for DSH referral for which he met criteria consideration. The Form 7388B was not appropriately completed as evidenced by the use of the cut and paste process, and by the failure to utilize appropriate clinical interventions and to adequately address the inmate's continued decompensation.

**Inmate C**

This case was selected for review because the inmate had been identified three times as meeting DSH referral criteria but had not been referred. This 33-year old reception center EOP inmate was not referred because he was reportedly programming appropriately despite meeting criterion seven as he had refused more than 50 percent of his treatment. He was prescribed Celexa, trileptal, Clonidine, and Prolixin. The treatment plan dated 9/10/14 revealed that the inmate stated that he was not attending treatment groups because the groups occurred at the same time as day room time. On the Form 7388B, the non-referral reason indicated that the inmate was programming appropriately when in actuality he was not. In the modifications section of the treatment plan, it was noted that the inmate would receive one extra weekly PC session "as needed" because he had not been attending group as much due to self-reported increases in depression and social anxiety. The inmate would also be provided with "resource materials" related to anxiety and depression instead of groups. The plan was silent, however, regarding how these materials would be beneficial in addressing these issues. Subsequent treatment plans dated 10/8/14 and 11/4/14 were unchanged even though the inmate did not improve and may have actually decompensated.

Findings

The Form 7388B was not appropriately completed or revised, despite the inmate's failure to improve over time. This inmate did not receive adequate mental health treatment.

**Inmate D**

This case was selected for review because the inmate had been identified eight different times as meeting criteria for DSH referral, but was never referred. The inmate had been admitted to DSH on 6/25/14, but he was immediately clinically discharged because he reported to staff that he had used suicide to obtain a housing change and that he wanted to do his time in a hospital instead of

720

a prison.  The initial documentation at WSP noting possible DSH referral consideration occurred during September 2014.

This 28-year-old EOP inmate was placed on a PC 2602 order due to danger to self on 10/1/14. He had multiple MHCB admissions dating back to April 2014.  He was frequently admitted with a diagnosis of Adjustment Disorder, and clinical staff typically noted that the inmate had secondary gain for the admission.  However, the 8/19/14 psychiatry discharge summary indicated that psychological testing revealed the inmate had a psychotic disorder with prominent delusional thinking.  He was provided with a diagnosis of Psychotic Disorder NOS and Personality Disorder NOS with antisocial, narcissistic, and borderline traits.  The inmate remained in the MHCB for two months, reportedly in part because clinical staff was attempting to obtain a PC 2602.  The inmate's diagnoses were also changed during that admission to Bipolar Disorder, most recent episode manic, severe with psychosis and Antisocial Personality Disorder with borderline and narcissistic traits.  The inmate was described as manic for one month during this time in the MHCB; he exhibited grandiose and bizarre delusions.  The inmate clearly met criteria for acute care during those 30 days.  He subsequently demonstrated significant depressive symptoms; again, sufficient rationale for referral for acute care.  It was of concern that this inmate was maintained in the MHCB for this prolonged period of time when he required referral to a higher level of care.

A PC 2602 was finally initiated on 10/1/14; at that time, the inmate was described as more stable.  He was discharged to the EOP level of care with a recommendation for a single cell. However, the inmate returned to the MHCB within two days.  His primary diagnosis was changed from Bipolar Disorder to Psychotic Disorder NOS.

The MHCB treatment plans were inadequate.  On 8/25/14, the Form 7388B was not appropriately completed; no rationale was provided for DSH non-referral despite the fact that the inmate met multiple criteria, and no treatment modifications were listed as the Form required. On 9/3/14, the rationale for non-referral was not clearly explained.  The treatment modifications were little more than required treatment.  The subsequent treatment plan, which was dated 9/10/14, included more information, but it was not well-organized with interventions, treatment goals, treatment targets, and progress in the correct areas.  The associated Form 7388B did not provide an adequate non-referral justification, but indicated that the inmate stated he would remain suicidal for his entire sentence because he was unable to accept the current sentence and suffered from Bipolar Disorder, yet he declined medication.  The Form 7388B indicated that the treatment plan continued to be "revised."  These two sections were cut and pasted and remained identical on 9/16/14, 9/23/14, and 9/30/14.

The Form 7388B of 10/7/14 was handwritten but was effectively the same as the prior Form 7388B.  The only addition was that the inmate had recently been prescribed medications, but should be noted that the inmate also completely refused treatment.  There was no clear clinical rationale for DSH non-referral.  Due to the cut and paste nature of the Form 7388Bs, there was no accurate assessment of the number of MHCB placements, although there were clearly more than three.  The Form 7388B of 10/15/14 was nearly complete, but there was no treatment plan that accompanied it.  On 10/27/14, the treatment plan included interventions that were

721

unavailable within the MHCB, which made the plan obsolete and inadequate; this plan was developed at another facility. The 11/4/14 treatment plan was much more thoroughly developed, although some of the interventions also were not available in the MHCB. The associated Form 7388B was also more clinically appropriate and adequate. The inmate had since transferred to CSP/Corcoran.

Findings

While the decision not to refer the inmate to DSH may have been clinically appropriate, the documentation to justify that decision was inadequate. Documentation varied between describing the inmate as a malingerer with an Adjustment Disorder to an extremely mentally ill inmate with Bipolar I Disorder who at times exaggerated his symptomatology to cope with some of his fears and difficult situations. At one point the inmate was maintained in the MHCB for two months due to his acute symptoms, which clearly justified acute care referral. It was during that time that clinical staff finally sought and acquired a PC 2602 for the inmate. This inmate did not receive adequate mental health treatment.

**Inmate E**

This case was selected for review because the inmate was identified as meeting criteria for DSH referral on at least five different occasions, but was never referred. This 54-year-old reception center EOP inmate was diagnosed with Schizophrenia, paranoid type. He was prescribed risperidone, mirtazapine, and hydroxyzine. The inmate's treatment plan dated 8/6/14 was generally adequate except that it referenced "weekly" groups rather than daily group therapy. The Form 7388B did not explain why the DSH referral was not made, but only stated that the inmate did not meet DSH criteria and did not attend groups because he wanted to view his cell at all times. It appeared that the only treatment modification was the addition of homework assignments; it was unclear from the documentation whether the inmate benefited from them.

The next treatment plan, dated 9/3/14, indicated that treatment participation had decreased from approximately 37 percent to 26 percent, but the treatment plan remained unchanged. The Form 7388B was unchanged from prior months, with obvious cut and pasted sections. This pattern was repeated for the two subsequent treatment plans of 10/1/14 and 10/29/14, despite the inmate's decreasing participation of 23 percent and 13 percent, respectively. These treatment plans remained unchanged despite the inmate's paranoia, continued withdrawal from treatment and ever-worsening clinical condition. By 11/25/14, the inmate's treatment participation had decreased to 11 percent; however, there were no substantive changes made to the treatment plan or the Form 7388B. The same was true for the 12/22/14 treatment plan, when participation remained at 11 percent, and effectively the same for 1/20/15, when participation was 12 percent. This was of extreme concern because the inmate was clinically deteriorating in his cell while his negative symptoms dominated and interfered with his ability to access treatment. It was unclear why the mental health staff failed to recognize the connection between the inmate's paranoia, refusal to engage fully with treatment, and rationale for refusing treatment ("I want to see my cell at all times…somebody put a knife in my cell when I was at Chino."). Staff continued to "encourage" the inmate to participate in treatment for six months, despite the lack of efficacy of

this method of prompting. This inmate would have benefitted from a behavioral intervention; however, this was not provided by the treatment team.

<u>Findings</u>

This inmate should have been referred to DSH for a higher level of care. He did not receive adequate mental health care at WSP. The inmate's treatment plan was clinically inadequate based on his serious symptoms and continued lack of treatment engagement. This inmate was discussed with supervisory staff to address the issues identified.

**Inmate F**

This case was selected for review as an example of MHCB care. This 57-year-old inmate was admitted to the MHCB on 2/26/15, with a provisional diagnosis of Schizoaffective Disorder. His discharge diagnosis was Schizophrenia, paranoid type and Depressive Disorder NOS. The inmate was admitted to the MHCB due to experiencing suicidal ideation and auditory hallucinations. The history and physical was completed timely, but the psychiatric intake evaluation was performed one day late. The initial treatment team timely saw the inmate on 2/26/15. That treatment plan noted that the inmate had multiple suicide attempts in his history and monthly attempts while at WSP, in November and December 2014, and January and February 2015. However, some staff did not view the suicide attempts as genuine, but rather as a way for the inmate to obtain placement in a state hospital. There was only one recreational therapist note in the healthcare record from the MHCB admission. Otherwise, the inmate was only seen by the psychologist and psychiatrist during his stay. The psychologist progress notes did not always indicate whether the contact was in a confidential setting, although the psychiatry notes did.

The inmate was prescribed Depakote, Remeron, Risperdal Consta, and oral Risperdal (on a tapering dosage regimen) and Cogentin. A progress note dated 2/27/15 by the MHCB psychologist indicated that the psychologist incorrectly believed that DSH placement might add time to the inmate's overall prison term. This issue was brought to the attention of the DSH coordinator to address with staff training. The documentation of MHCB treatment suggested that clinical contacts with the psychologist and psychiatrist were brief in duration and did not occur daily. The most recent treatment plan dated 3/2/15 mischaracterized the inmate as a 49-year-old man, and it was unclear whether the treatment plan was for this inmate or another individual. The Form 7388B did not properly identify the inmate as having had three MHCB placements in the numbered criteria, although it was noted in the narrative section. An adequate non-referral rationale was not provided, and no treatment modifications were listed.

<u>Findings</u>

MHCB treatment primarily involved isolation and medication management. Clinical contacts did not occur daily based upon documentation in the healthcare record. Consequently, this inmate did not receive adequate mental health treatment.

**Inmate G**

This case was selected for review at the request of the plaintiffs' attorneys. This 22-year-old 3CMS inmate complained about his placement in the reception center after returning from out of state as a mainline 3CMS inmate. While housed in the reception center, which was a WSP practice for returning out of state inmates, the inmate did not have access to the phone or to his property. Mental health staff saw the inmate frequently; there were eight visits immediately following his return in April 2014, one monthly in May, June, July and August 2014, and then every other month during October, December 2014 and February 2015.

The inmate had no history of prior mental health treatment, but he reported vague auditory hallucinations and symptoms of depression. His diagnosis was Mood Disorder NOS, and he was prescribed Trazodone and Benadryl.

The initial treatment plan dated 5/7/14 was clinically inadequate. The most recent treatment plan dated 1/14/15 was handwritten and was difficult to read; although improved from the previous treatment plan, this plan also was clinically inadequate. The treatment plan required measureable goals, greater specificity with interventions and treatment targets, and realistic interventions given the expected frequency of contacts. The inmate did not attend the IDTT, and the reason provided for his absence was nonsensical, namely, that he "was not present due to COCF." The most recent psychiatry contact progress note was handwritten and mostly illegible.

<u>Findings</u>

This inmate was seen timely for clinical contacts; however, the inmate was not appropriately treated as his initial treatment plan was inadequate, and the subsequent plan had not been fully implemented.

**Inmate H**

This case was selected for review at the request of plaintiffs' attorneys. This 49-year-old inmate complained that he had difficulty being seen by a psychiatrist. There were bridge orders written for mirtazapine 15 mg at night and fluoxetine 20 mg on 11/21/14. He was scheduled to be seen on 12/9/14, but the provider cancelled that appointment. The inmate was next scheduled to be seen on 12/11/14, but he did not did not show for the appointment. The provider generated a refusal form, but the inmate refused to sign it.

The inmate was provided with a diagnosis of Major Depressive Disorder. On 1/20/15, he was scheduled to be seen by his PC for a 90-day contact, but he refused. While signing the refusal, he mentioned to his PC that he did not have a refill of his medication. According to the PC, his medication was discontinued on 12/4/14. The PC did not generate a referral to psychiatry. The inmate was seen on 2/12/15 as the result of an inmate request to be seen. The PC noted mild depressive symptoms and that the inmate reported that he believed he was functioning well without medication at that time. A psychiatric referral was not generated. As the inmate was

housed in the reception center, there was no treatment plan.  This case was discussed with mental health management, and the inmate was scheduled for a psychiatric medication evaluation.

<u>Findings</u>

This inmate was not seen as indicated by psychiatry.  He was not appropriately seen for follow up evaluation, and his medications were discontinued without a face to face evaluation and without his knowledge. There was no information why the inmate refused to sign the refusal form and it did not appear that the psychiatrist attempted to obtain his signature.  As such, the inmate did not receive adequate mental health treatment.

**Inmate I**

This 49-year-old first term inmate had multiple MHCB admissions beginning in July 2014.  This case was selected for review to review his restraint placement; at times there were only hours or even minutes between restraint episodes for this inmate.  During July 2014 he swallowed a razor blade, requiring treatment at an outside hospital for removal.  The inmate had a significant history of this behavior, beginning at age 20, and he was receiving SSI in the community for depression.  He was diagnosed with Mood Disorder NOS, Adjustment Disorder with depressed mood, and Borderline Personality Disorder.  He was prescribed Zyprexa, Depakote, and Prozac. The inmate was readmitted to the MHCB on 8/21/14 after hearing voices telling him to "do something…to swallow razor."  The inmate swallowed a small pencil and then removed his indwelling Foley catheter.  He also swallowed a metal clamp from the Foley catheter.

The physician's orders for restraints did not always include the release criteria.  The restraint log revealed that one episode of restraints included what appeared to be a standing order for restraints use, which was not clinically appropriate.  It also appeared that the only release criterion documented was when the inmate was sleeping.  Another restraint episode had release criteria that was too vague (i.e., when inmate "calm(s) down").  The underlying behaviors prompting the use of restraints appeared to be appropriate, and it appeared that nursing staff removed the inmate from restraints as soon as was clinically indicated.

<u>Findings</u>

The inmate was not treated adequately in light of the documentation errors regarding restraint orders.  Nursing documentation was in accordance with policy.  The inmate was also an appropriate candidate for DSH intermediate care referral consideration.

**Inmate J**

This case was randomly selected from a list of EOP inmates identified as high refusers in order to review the care provided.  Jail transfer records noted the inmate's history of psychiatric hospitalization since five years of age, receipt of SSI benefits based on psychiatric impairment, treatment in the county mental health system prior to coming to prison, and a record of PC 1370

725

commitment. The inmate arrived at the WSP reception center on 5/30/14.  He was treated with ziprasidone upon arrival from the county jail; continuity of care was effectively achieved.

On 6/3/14, a custody officer referred the inmate on an emergency basis to the psychiatrist.  The inmate had refused to enter the housing unit, and the officer found his manner to be bizarre.  The inmate told the psychiatrist he was experiencing auditory hallucinations.  The inmate further expressed the belief that he could become violent if forced to live in dorm housing.  The psychiatrist recommended 3CMS level of care and scheduled a follow-up in seven days.

Several days later, the inmate threatened his cell mate.  He reported being unable to contain violent urges.  An SRE was attempted, but the inmate was vague or non-responsive.  The inmate told the evaluator he had no wish to die and no plan to kill himself.  The evaluation was inconclusive about the inmate's level of suicide risk because of the inmate's inability or unwillingness to participate in the interview.

On 6/8/14, the inmate was admitted to the crisis bed and placed on suicide precautions.  He maintained a bizarre presentation throughout his 22 days in the CTC.  He was noted to frequently speak gibberish.  He appeared unable or unwilling to converse intelligently.  He was variably described as mumbling, smiling, or animated.

An initial treatment plan dated 6/11/14 provided a diagnosis of Psychotic Disorder NOS and Adjustment Disorder.  A level of care decision documented no positive indicators to suggest that a DSH referral should be considered.

A treatment plan prepared on 6/18/14 indicated no progress.  Treatment team members were unable to state whether the inmate suffered from a psychotic disorder or displayed exaggerated symptoms of mental illness for other purposes.

A treatment plan dated 6/25/14 concluded the inmate was unable to function in the MHCB.  The treatment team referred him to DSH.  While on the waiting list, an interim treatment plan provided for him to be offered psychosocial groups and stated that he could receive individual therapy if he requested it.

On 6/30/14, the inmate was admitted to acute care at VPP.  The initial treatment plan considered the CDCR's findings of his bizarre presentation, minimal cooperation, lack of progress in the CTC, and held out as a possibility that the inmate's presentation could be motivated due to housing concerns.  His acute risk for self-harm was assessed as low; chronic risk was assessed as moderate.  The inmate was considered an unreliable historian.  He was eating meals and completing some ADLs, but he stood in the shower without cleaning himself.  He was malodorous.

The inmate was diagnosed with Schizophrenia, undifferentiated type, Alcohol and Cannabis Dependence, and Antisocial Personality Disorder.  The Axis I diagnosis was predicated on numerous factors, including disorganized thought process, thought blocking, and tangential speech.  Psychiatric documentation indicated the inmate had a pattern of consenting to

726

psychiatric medications and then refusing to take them on 7/3/14, 7/7/14, 7/23/14, 7/25/14, 7/30/14, and 8/1/14. On 8/5/14, a PC 2602 was filed. While awaiting the hearing, the inmate became compliant on olanzapine following considerable staff prompting. A hearing was held on 9/4/14 and because the inmate appeared much better, the petition was denied.

On 11/5/14 the inmate discharged to CDCR's EOP SNY. DSH discharge information showed that the inmate had not displayed major behavioral problems and had continued to comply with recommended psychiatric treatment. He was better able to communicate his needs, but remained fearful about programming with other inmates. The risk was noted that if he did not continue with treatment, he could easily return to a paranoid state.

Six days later, the inmate received two RVRs for fighting, resulting in 90 days loss of credit. He began a pattern of refusing antipsychotic medication. He was routinely seen by the PC, but the documentation was not meaningful and shed no light on what was being done to avert a further downward spiral. The inmate was seen by the psychiatrist, but the notes had no clear plan of action other than to prescribe the same medication.

Findings

Significant problems were noted regarding the mental health care provided to this inmate. The inmate entered prison with a substantial history of psychiatric impairment, but this was not taken into consideration during the first emergency psychiatric contact. He was appropriately referred to DSH, but the interim treatment plan inappropriately left the decision for PC contacts in the hands of this severely disturbed MHCB inmate. There was a lack of continuity upon the inmate's return from DSH. It was not clear whether the CDCR providers considered the DSH discharge summary. The inmate became medication nonadherent very soon after he returned to CDCR. The RVRs which were committed soon after his return should have been mitigated by medication nonadherence and his deteriorating mental state. The PC documentation was written in boilerplate fashion and consisted of little more than serial mental status examinations. The psychiatric response to medication nonadherence was inarticulate. A thorough review of the inmate's course of DSH treatment clearly showed how his medication nonadherence had improved. This information was neither noted nor considered by CDCR providers.

**Inmate K**

This case was randomly selected from a list of inmates who attended their IDTT in the administrative segregation unit. The inmate was a 28-year-old male who came to prison on 12/29/14. Jail transfer records showed he had not received mental health treatment in jail. The inmate denied a history of suicidal ideation or attempt, denied any current experience of psychiatric symptoms, had not received bad news, and reported that he had not been treated for a mental health problem.

The inmate was screened by the reception center mental health clinician within several days of arrival. The reception center clinician referred the case for further evaluation based on responses to selected screening items; these included the inmate's report of an alcohol-related

727

hospitalization at age 15, prior treatment with Remeron in Juvenile Hall, and endorsement of prior experiences of racing thoughts, guilt feelings, and the decreased need for sleep.

Based on a mental health evaluation in which the inmate refused to participate, the clinician concluded that he warranted the diagnosis of a severe mental disorder and met enrollment criteria for treatment in the 3CMS. The assigned diagnosis was not supported by the inmate's report of current symptoms or the clinician's observation of active symptoms. His enrollment was based solely on results of mental health screening and a brief inmate evaluation. The inmate signed a refusal to receive mental health treatment or meet with the psychiatrist. He politely explained his rationale as owing to an ethnic affiliation and the associated prohibition concerning mental health treatment.

The inmate was issued an RVR and placed in administrative segregation. A pre-placement screening was negative for suicide risk or decompensation, and he was cleared for segregated housing.

The inmate's first mental health treatment plan was prepared on 3/4/15, a date which was outside the scope of this review. Noteworthy, however, was documentation in the treatment plan which indicated the inmate's history of depression, mania, euphoria, mood lability, restlessness, insomnia, racing thoughts, and irritability. While further noting that the inmate displayed a stable mood and neither reported nor showed active symptoms of a psychiatric disorder, treatment goals were elaborated. These included such things as reducing emotional distress, learning coping skills to manage symptoms, and changing disordered thoughts. The inmate was described as denying acceptance of treatment.

Findings

The inmate was enrolled in CDCR's mental health program by qualifying mental disorder without adequate justification. The inmate's self-reported lifetime experiences on a prison screening tool did not constitute a substantial basis to diagnose a serious psychiatric disorder. The clinician did not include a progress note describing efforts made to complete the evaluation and a recommendation about how to proceed as stated in the Program Guide. Maintaining inaccurate or unsubstantiated diagnostic information without discussion of the provider's attempt to clarify the diagnosis harmed the inmate in the long run. This inmate was characterized as not accepting the need for treatment of a condition that had not been competently established. The treatment team could have included him in the mental health treatment program, based on medical necessity, with the aim of clarifying the diagnosis.

**Inmate L**

This case was randomly selected from a list of EOP inmates identified as high refusers. The inmate arrived in prison on 10/03/14 and was timely screened by the R&R nurse. Transfer records indicated the inmate arrived under treatment with Zyprexa. He endorsed symptoms of racing thoughts and insomnia. The nurse noted inappropriate responses to questions.

The inmate was seen for an SRE on 10/8/14. Mental health history was noted for at least one temporary involuntary medication order to treat symptoms of paranoia, grandiose delusions, and agitation during a previous term. The inmate was deemed a low acute risk and moderate chronic risk of suicide. The risk reduction plan was to provide brief cognitive behavioral therapy to reduce anger and aggression, and teach stress management.

The inmate was seen timely for his mental health evaluation. He was noted to have prior treatment in CDCR including treatment in DSH in 2006 and multiple MHCB admissions from 1999 to 2010.

The inmate was enrolled in the EOP based on a qualifying mental disorder. This was predicated on his psychiatric treatment history and current display of delusional thinking and magical beliefs. Treatment interventions consisted of medication management and psychosocial groups. Risk reduction strategies from the SRE were not carried forward in the inmate's treatment plan.

The inmate began a pattern of refusing psychiatric medications soon after his enrollment in the treatment program. Numerous referrals were made to mental health which were scheduled with the psychiatrist, but the inmate refused to attend. Timely psychiatry notes were prepared, but it was not always clear that the inmate was present. The psychiatrist frequently referred the reader to past documentation to indicate that the inmate was not doing well and should be referred to DSH. However psychiatric recommendations were not explicitly reflected in the level of care decisions associated with monthly treatment plans. Through the end of 2014, the treatment team consistently rated the inmate as showing no indicators for DSH referral consideration.

On 10/27/14, the inmate was placed on a high refuser list which in CDCR customarily implied that the treatment team should consider whether the treatment plan required modification. The documentation did not clearly indicate that the inmate was placed on a modified treatment plan. During subsequent clinical contacts, the inmate continued to refuse psychiatric treatment but told the clinician he was attending groups. Record review showed that he regularly refused to attend groups, but the clinician appeared to accept his word anyway.

On 1/6/15, the IDTT documented that the inmate was unable to adequately function in the EOP and had not responded sufficiently to treatment of psychotic symptoms. The treatment team referred the inmate to DSH noting his steady decompensation over the past three months; this included refusal to shower, being malodorous in person and cell, circumstantial thought process, and increasing paranoia that interfered with his ability to conduct himself in common areas.

The treatment team noted that he would be placed on a modified treatment plan with twice weekly PC contacts until his admission to DSH. The inmate was transferred to intermediate care at CHCF on 2/11/15.

Findings

The inmate was appropriately transferred to DSH based on his refusal of psychiatric treatment, poor participation in psychosocial activities, and decompensation leading to grave disability.

The inmate should have been considered for modified treatment once he was identified as a high refuser of psychiatric medications in light of his significant CDCR treatment history. Psychiatric recommendations were not readily identified in the level of care decisions and the PC accepted the inmate's word without verification. The lack of treatment team cohesiveness contributed to delay of his higher level of care transfer. It was apparent that the inmate was not benefitting from offered EOP treatment services very soon after his arrival.

**Inmate M**

This case was randomly selected from a list of EOP inmates identified as high treatment refusers. The inmate arrived in the reception center on active treatment with valproic acid for an unspecified Mood Disorder. The inmate was timely screened and referred for evaluation based on medication status and prior treatment in the MHSDS.
The inmate's history included a one year involuntary medication order from 2013 to 2014. He had been previously hospitalized at VPP for grave disability and danger to others. He had been variably enrolled in the 3CMS and EOP during a prior term and was treated with limited treatment adherence.

The intake SRE indicated no current motivation toward suicide. The inmate denied a history of prior suicide attempts, but was guarded and would disclose only limited personal information. He was deemed a low suicide risk on both the acute and chronic level.

The inmate was enrolled in the MHSDS at the EOP level of care. Members of his institutional treatment team provided a diagnosis of Schizophrenia, paranoid type, by history. This was predicated on his treatment history and receipt of antipsychotic medications inclusive of court-ordered treatment and current evidence of paranoid ideation.

The inmate was classified as DDI due to problems understanding basic directions and an inability to cope with the pressures of prison life. Healthcare record information indicated that he had poor stress tolerance due to significant deficits in cognitive ability.

Within the first 30 days of arrival, the inmate showed increasing signs of anxiety and pressured speech. His hygiene deteriorated. He discontinued psychiatric treatment and refused to meet with the psychiatrist. He became gravely disabled and smeared feces in the cell, leading to a fight with his cellmate. The inmate was admitted to the MHCB on 6/12/14, but was unable to achieve stability. An involuntary medication order was granted on 7/2/14.
The inmate was admitted to acute care at VPP on 7/28/14. His admission medications were Invega Sustenna, Cogentin, and Thorazine every eight hours for agitation. He remained on this regimen through discharge on 9/9/14. He was discharged to the EOP reportedly having gained maximum benefit from treatment.

On return from DSH, the inmate was seen in five-day follow-up where he complained that his cellmate was looking at him in sexually inappropriate ways. He expressed suicidal thoughts and a plan. On 9/26/14, he was placed on suicide watch in alternative housing upon results of an SRE.

On 10/8/14, he was admitted to the MHCB but minimized suicidal ideation soon after. He expressed the belief that he could now function in the EOP because he was no longer with his cellmate. The treatment team considered his long history of psychiatric impairment and treatment nonadherence and concluded that he should remain in the MHCB to ensure his stability.

The inmate discharged on 10/15/14. He returned to the reception center at WSP where PC 2602 medication continuity was initially problematic. As a result, his initial readjustment to the reception center was poor. He required readmission to the MHCB on 11/7/14 with an expected short term stay. On 11/12/14, he discharged to the EOP, where he was seen for five-day follow-up. The discharge SRE recommended a risk reduction plan that included stress management techniques to improve impulse control.

He was seen by the psychiatrist on 12/10/14 where he was noted to be adherent with medications. He offered no mental health complaints. There was no evidence that recommendations from the most recent SRE had been implemented.

On 12/17/14, treatment team members considered the inmate's multiple MHCB admissions during the last six months. The treatment team decided not to refer him to DSH based on his adherence with court-ordered medications and improvement in attending group and individual clinical services.

On 1/8/15, the inmate was admitted to the MHCB after he endorsed suicidal ideation with a plan in the context of his cellmate exposing himself and propositioning him. After admission, the inmate quickly retracted any motivation toward suicide. He did well on court-ordered medications and within one week expressed the belief that he was ready to discharge and involve himself in the EOP.

Findings

This chronically mentally ill inmate was unable to achieve any substantial period of stability over the nine months he remained in the reception center. This was largely due to numerous transfers to the MHCB and an acute care DSH treatment facility. The transfers to a higher level of care were appropriate responses to his diminished capacity to cope in the prison environment. His diminished capacity to cope was influenced by symptoms of his severe mental disorder. Poor medication continuity during transfer contributed to decompensation in the CDCR on one occasion. Documentation showed that higher level of care referral consideration was inadequate. There was no consideration of recommending a single cell for the inmate. The omission of such a recommendation was striking in light of his numerous MHCB admissions related to cellmate issues and his extended stay in a temporary housing area such as the reception center.

EXHIBIT T
Kern Valley State Prison (KVSP)
March 24, 2015 - March 26, 2015

**Inmate A**

This case was selected for review as the inmate had participated in less than the minimum number of weekly structured treatment hours for an EOP inmate. Review of the Form 7388B indicated that on 1/18/15 a DSH referral was considered due to his participation in less than 50 percent of offered structured therapeutic activities. However, the inmate was not referred. The provided rationale was that the current level of care was clinically indicated. This review's purpose was to determine whether information on the Form 7388B was clinically adequate.

The inmate had been variably diagnosed with Mood Disorder NOS, Major Depressive Disorder, Psychotic Disorder NOS, Schizophrenia, paranoid type, and Borderline Personality traits. There had been no reconciliation of these varying diagnoses over the course of his treatment.

The inmate's history was positive for three suicide attempts and DSH admissions. According to the psychiatric discharge summary for the most recent DSH treatment, he had modest improvement in mood and psychotic symptoms with a recommendation for discharge to the CDCR's EOP program.

The inmate arrived at the KVSP EOP on 10/28/14. He repeatedly showed little motivation to participate in offered treatment. On 11/29/14, he was brought to the TTA after complaining of hearing voices. He was admitted to an alternate housing cell and placed on suicide watch under direct one-to-one observation and prescribed medications. On 11/30/14, he was discharged to the yard because he was taking medications as prescribed and denied any motivation toward suicidal behavior. He received timely five-day follow-ups, where he reported doing well.

Throughout December 2014, he continued a pattern of refusing mental health treatment; he answered his PC's questions by denying problems and symptoms. His living area was routinely described as neat and orderly and he was attending to ADLs without difficulty. Consistent mental health contacts continued during December 2014 and January 2015. He refused contact with the psychiatrist or medications, but was found to be in no acute distress and was described as mentally stable.

On 1/28/15, the treatment team concluded that the inmate had reached maximum benefit from the EOP and was not gravely disabled because his ADL functioning was adequate. On this basis, the team concluded that he no longer met EOP enrollment criteria. The team acknowledged his non-participation on the Form 7388B, but did not summarize specific treatment modifications to improve his ability to function at the current level of care. The team's recommendation was to immediately reduce him to the 3CMS level of care.

Findings

This case involved an inmate with a significant CDCR treatment history that included involuntary medications and two transfers to the state hospital involving a total of approximately 15 months of higher level of care treatment. The diagnostic picture was not clear. The inmate may have benefitted from a DSH referral for diagnostic clarification. It was not readily apparent

that treatment providers modified the inmate's treatment plan to improve his participation. The Form 7388B was used to justify reduction of his care based on the inmate not being gravely disabled, but grave disability was not an inclusion criterion for EOP enrollment. Form 7388B documentation was not clinically adequate and offered insufficient justification for a lower level of care for this inmate. The inmate did not receive appropriate care.

**Inmate B**

This inmate's case was randomly selected for review from a list of inmates on the DSH non-referral log. The Form 7388B dated 1/5/15 indicated consideration of DSH referral based on the inmate requiring 24-hour nursing due to a mental health disorder. However, the inmate was not referred; the provided rationale was that the MHCB assessment was in process. The Form 7388B dated 1/8/15 again noted consideration of a DSH referral, noting the inmate's participation in less than 50 percent of offered structured therapeutic activities. Again, the inmate was not referred; the rationale was that the current level of care was clinically indicated. The purpose of this review was to determine whether Form 7388B documentation was clinically adequate.

The inmate was placed in alternative housing on 1/1/15 for suicidal and homicidal ideation. An initial SRE noted high chronic suicide risk, but marked the checkbox as low. His acute risk was assessed as high. He was placed on suicide watch under direct one-to-one observation and admitted to the MHCB on 1/2/15.

The initial mental health treatment plan was developed on 1/5/15. Members of the institutional treatment team provided a diagnosis of Schizoaffective Disorder, bipolar type. The inmate was prescribed psychiatric medications including Remeron, Zyprexa, and Trileptal. A level of care decision form completed the same day indicated he required inpatient psychiatric care with 24-hour nursing supervision due to his major mental disorder. The rationale for the decision not to refer him to DSH was that interventions would be provided in the MHCB. These interventions included daily clinical contact using CBT to target admission symptoms, psychiatric medication management, nurse monitoring, and suicide precautions.

The PC saw the inmate regularly and educated him with CBT to improve coping strategies. The psychiatrist regularly met with him, documented symptoms, and made needed medication adjustments. Levels of suicide observation were assessed and appropriately adjusted.

On 1/8/15 members of the treatment team completed the level of care decision form to evaluate whether the inmate should be referred to a higher level of care in DSH. The form was a duplicate of that prepared on 1/5/15 and continued to indicate that he required 24-hour nursing care due to his severe mental disorder. The rationale for the decision not to refer was not individualized and was a duplicate of the previous form.

A discharge SRE dated 1/11/15 still reflected the aforementioned incongruence in chronic risk assessment. The acute risk was assessed as low based on the inmate's denial of suicidal thoughts

734

and noted improvement in depression and anxiety symptoms. Risk reduction plans were not individualized. Homicidal ideation was not addressed.

The inmate was discharged to the 3CMS level of care on 1/11/15. He received timely daily follow-ups.

Findings

The inmate was stabilized and received adequate observation for potential threat to self during his MHCB stay. Medication adjustments were made and appeared to contribute to his stability at discharge. However, Form 7388B documentation was not clinically adequate. The treatment team did not meaningfully consider higher level of care referral and boilerplate language was used in the documentation.

**Inmate C**

This case was selected for review from the DSH non-referral log because the inmate had three or more MHCB admissions during the last six months, but was not referred to a higher level of care. IDTT documentation dated 12/24/14 concluded that he was an unreliable reporter and historian of his mental health symptoms. He had a strong history of feigning mental health symptoms for secondary gain due to custody-related safety concerns.

The inmate was previously enrolled at the EOP level of care, but was found to have reached maximum benefit on 6/25/14. He had numerous MHCB admissions from 10/6/14 to 12/11/14 and his level of care was reviewed six times during that period. Each time the treatment team concluded that the current level of care was clinically indicated and the inmate was discharged from the MHCB to the 3CMS level of care. Following his admission on 12/6/14, he was elevated to the EOP level of care. In a level of care review on 12/24/14, the treatment team decided to retain him in the EOP with a focus on helping him to improve impulse control and learn effective ways of communicating safety concerns to custody staff. The treatment goal was to reduce the number of times he relied on the MHCB as a way of coping with stress.

Subsequent mental health progress notes indicated that the inmate was treated with Mirtazapine, risperidone, and Trileptal to manage symptoms associated with a diagnosis of Bipolar I Disorder, most recent episode depressed. Psychiatric consultation on 1/17/15 indicated he was semi-compliant with medications and adjustments were made with the inmate's agreement and consent.

During weekly clinical sessions, the inmate reported an increase in depressed mood associated with discontinuing his antidepressant medication. The clinician described him as able to collaborate with treatment and noted he had been exercising as a way to improve his mood. He did not express any motivation toward harming himself or require transfer to a crisis bed in the weeks following his last discharge.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care. Referral to a higher level of care in DSH did not appear to be clinically indicated.

**Inmate D**

This case was selected for review as the inmate had recently returned from DSH. The purpose of the review was to evaluate continuity of care upon his return to prison.

The inmate was admitted to DSH on 10/1/14 from the KVSP MHCB, where he had been treated for depressed mood, suicidal ideation, and a suicide attempt that involved cutting both forearms and required sutures. He also reported command hallucinations telling him to kill himself. He was treated with bupropion, olanzapine, and oxcarbazepine associated with a diagnosis of Bipolar I Disorder, most recent episode mixed with psychotic features. At the time of discharge on 11/25/14, the inmate continued to experience auditory hallucinations, which were disturbing and of a command nature. He also had racing thoughts at various times, but denied any motivation to harm himself.

Recommendations at discharge were to place the inmate at the EOP level of care and monitor mood swings, signs of social isolation, irritability, and racing thoughts. The current plan at discharge was to reduce antidepressant medication as it might be destabilizing his condition. It was suggested that he might qualify for a diagnosis of ADHD, which might warrant treatment.

On returning to KVSP, there was no documentation that the inmate received five-day follow-up. A completed SRE assessed moderate chronic and acute suicide risk. The risk reduction plan considered DSH discharge recommendations and noted the inmate's connection with the PC who was known to him. The PC completed an addendum to a mental health evaluation which she had authored in July 2014. The PC discussed with the inmate that the treatment plan would introduce other ways of coping that did not rely on interaction with custody staff. The inmate was cooperative and in agreement with the plan.

The inmate attended most of his groups led by the clinician and recreation therapist. He was described as variably involved in discussions.

Psychiatry notes indicated the psychiatrist had reviewed medications and the DSH discharge summary and also monitored medication changes made by other psychiatrists. The inmate appeared capable of expressing his needs and frustrations with the PC and discussed mood issues associated with not hearing from his family. He expressed no suicide motivation and was not transferred to a crisis bed in the two months following his return from DSH.

Findings

The DSH discharge summary was available and considered by key members of the inmate's treatment team. Continuity was established in terms of medication and a strong connection was

established with the PC. According to the healthcare record, the inmate did not receive a period of follow-up visits after his return from DSH. This aside, he otherwise appeared to receive adequate care in the EOP and there was good treatment continuity between the DSH facility and KVSP.

**Inmate E**

This case was selected for review because the inmate was on the DSH non-referral list on 12/25/14 and 1/5/15; on both dates, it was noted that he required 24-hour nursing due to a mental health disorder. The non-referral rationale was that an MHCB assessment was in process. This review's purpose was to determine whether Form 7388B documentation was clinically adequate.

The inmate was admitted to the MHCB on 12/24/14 after discharge from an outside hospital, where he was evaluated for altered mental status. Findings from the hospital discharge report included altered mental state with global amnesia, uncertain etiology, right basal ganglia calcification, and evidence of amphetamine and cannabinoid abuse on the toxicology screen. When he returned to the crisis bed, he remained in an altered state and was unable to provide any information.

An initial treatment plan was timely developed on 12/25/14. The inmate did not attend the IDTT meeting. The provisional diagnosis was Neurocognitive Disorder NOS. The interventions and goals on the problem list were left blank because the inmate could not participate in treatment planning due to his mental status. The Form 7388B indicated higher level of care referral consideration. Specific modifications to the treatment plan to improve the inmate's ability to function were not individualized. His status was documented as suicide watch.

The inmate was transferred back to the hospital on 12/26/14 and returned to the crisis bed on 12/29/14. He continued under one-to-one observation for suspected seizure activity and then medically cleared for MHCB placement due to complaints of depression and suicidal ideation. When seen by the psychiatrist, he denied any suicidal motivation and denied violent ideations and psychotic symptoms. He was placed on suicide watch in the MHCB.

A treatment plan developed on 1/1/15 noted the inmate was alert, oriented, and coherent. He reported no memory of events leading up to the MHCB admission or time spent in the hospital. The diagnosis of record was retained. Again, interventions and goals on the treatment plan were left blank. The Form 7388B was completed on 1/5/15, one day prior to his discharge on 1/6/15. However, it was a duplicate of the Form 7388B composed on 12/25/14 and did not realistically conclude whether the inmate would be referred to a higher level of care.

Findings

Form 7388B documentation dated 12/25/14 was clinically adequate as a higher level of care referral assessment was underway. However, the form was deficient in terms of documenting treatment plan modifications because it provided information that was incongruous with the

737

inmate's mental status; the inmate was non-responsive, but treatment modifications included cognitive behavioral interventions.

Documentation on the Form 7388B dated 1/6/15 was deficient and was a duplicate of that composed on 12/25/14.  There was no conclusion of the assessment presumably underway in the MHCB.  Any future treatment provider who wished to know whether the inmate had been considered for higher level of care transfer during this MHCB treatment would not be able to obtain this information by examining the documentation.  The treatment team did not meaningfully document higher level of care referral consideration.

EXHIBIT U
North Kern State Prison (NKSP)
March 17, 2015 - March 19, 2015

**Inmate A**

This 35-year-old male inmate was reviewed because he had more than three alternative housing placements and at least one MHCB referral due to self-injurious behavior or suicidal ideation during the review period. He had also been referred to the DSH acute care psychiatric program in early July 2014 due to depression and command auditory hallucinations to harm himself. He was admitted to DSH, returning to CDCR at the EOP level of care on 9/15/14. He was placed in alternative housing on 9/23/14 due to scratches across his lower arm that his PC observed. When evaluated by alternative housing staff, he stated he was not suicidal but was feeling depressed because he had received news that his father had been hospitalized. He expressed that he was looking forward to seeing his father when he was released from prison after Christmas. He was reported to have been "inconsistent" in reports of prior attempts and was returned to regular housing.

On 10/8/14, the inmate was in alternative housing again for danger to self with scratches and abrasions on his wrist that were made with a plastic toothpick. He reported that his aunt had recently died. The alternative housing log indicated he was there from 10/6/14 to 10/8/14. He was then transferred to the MHCB at CHCF. There was no documentation in the inpatient section of the eUHR from CHCF to indicate how long he was housed in their MHCB.

The inmate was again placed in alternative housing on 11/5/14 due to a cut on his wrist secondary to feelings of stress and depression. When evaluated 30 minutes later he stated that he felt better and just wanted to go back to his cell. He had multiple abrasions and superficial cuts. He was maintained in alternative housing and placed on suicide watch. He was returned to housing on 11/6/14 and was continued at the EOP level of care.

The inmate returned to alternative housing on 11/29/14, following ingestion of Tylenol that necessitated a trip to an outside hospital. He was released later that day. He was again placed in alternative housing on 12/16/14, for danger to self, though the initial placement nursing note did not indicate suicidal ideation. The inmate stated he was "just going through some stuff." He was released from alternative housing the next morning, on 12/17/14, and returned to his cell.

The inmate was prescribed Buspar 45 mg per day, Prozac 20 mg per day, and Zyprexa 20 mg per day; he was provided with a diagnosis of Schizoaffective Disorder, bipolar type. The healthcare record also documented additional diagnoses of Psychotic Disorder NOS and Major Depressive Disorder with psychotic features. His 9/25/14 treatment plan referenced a recommendation by the NKSP MHCB in July 2014 that he would benefit from placement in a DSH intermediate care facility following acute care treatment at DSH. DSH did not address this recommendation in their discharge paperwork. The 9/25/14 treatment plan from the reception center EOP, while detailed, did not sufficiently operationalize goals or target behaviors. Interventions were too vague to address the overly broad treatment targets. The treatment plan also did not address the recommendation for intermediate care.

The next treatment plan, dated 11/20/14, was overdue as the IDTT was to see the inmate monthly. The clinical summary noted his history of rapid decompensation without any obvious

740

precipitants. This would underscore the inaccuracy in the clinician's perception of the inmate's stability and highlight the need for enhanced treatment in light of his frequent crisis placements. The treatment plan continued to reference the intermediate care facility referral recommendation from the MHCB, but did not address the need for such a referral. The Form 7388B did not note this inmate's multiple crisis placements, so he did not appear on the non-referral log. This was also true for the final treatment team meeting on 12/18/14. It was unclear whether the crisis placements resulted in a call to HC-POP to request an MHCB. If staff did not call HC-POP, the inmate might not appear on the on-demand report. The clinical summary for that treatment plan indicated that the inmate had decompensated but again, no consideration of DSH referral was documented.

Findings

This inmate should have been referred to DSH intermediate care. His treatment plan was not properly individualized and operationalized, despite the extensive detail included in the narrative summary. There may have been issues with staff appropriately tracking his alternative housing placements. The inmate was not adequately treated.

**Inmate B**

This 28-year-old inmate was selected for review because he had more than three crisis placements in alternative housing and two MHCB referrals during the review period. NKSP clinical staff properly noted that he met criterion five on the Form 7388Bs in December 2014, January 2015, and February 2015. The inmate had a PC 2602 forced medication order, and he was prescribed Haldol 20 mg per day, Cogentin 2 mg per day, Vistaril 50 mg every six hours as needed and Depakene elixir 750 mg per day. He was provided with diagnoses of Bipolar Disorder NOS and Antisocial Personality Disorder. He was initially referred to DSH acute care during the review period, in September 2014; however, this referral was initiated by CHCF. The inmate had three prior state hospital admissions, including two for competency restoration.

The inmate had an extensive history of self-injurious behavior and substance abuse as reported in his treatment plans. Initial treatment plans, dated 12/11/14 and 1/8/15, developed upon his return included helpful interventions, but required greater operationalization of treatment targets and goals. The most recent treatment plan dated 2/5/15 was more fully operationalized in its treatment goals and well-developed, but did not include operationalized treatment targets. The Form 7388B provided generally adequate justification for DSH non-referral. The most recent Form 7388B, dated 2/5/15, included the clinically justified rationale.

Findings

This inmate was appropriately referred to DSH acute care in September 2014. NKSP mental health staff appropriately did not refer him to DSH at treatment team meetings held in December 2014, January 2015, and February 2015. The inmate was appropriately treated by NKSP.

**Inmate C**

This 25-year-old EOP inmate was selected for review because he had three or more crisis placements in alternative housing, but no MHCB referrals despite multiple MHCB placements. There were no treatment plans in the outpatient section of the medical record. Based on review of eUHR documentation, on at least one occasion, on 12/2/14, he was moved to the CTC from alternative housing. A progress note indicated the inmate was moved to the MHCB following HC-POP assignment. He had been housed in the CHCF MHCB and in the MHCB at NKSP immediately upon return from the MHCB at CHCF. He had tried to assault an officer while in the TTA upon his return from the CHCF MHCB. Staff had to extract him to move him to the NKSP MHCB.

While in the MHCB, where he was admitted on 12/3/14, the inmate was observed responding to internal stimuli, refused to dress properly and often remained naked, was "posturing" (e.g., bending over and touching his toe, raising his arms up), and exhibiting periods of mutism, while at other times he made illogical statements or demonstrated delusional beliefs. He had not completed the reception center process, but during a prior incarceration had been evaluated as DD2. He refused at times to engage with mental health staff. By 12/10/14, he was considered to have improved sufficiently that, although still considered a danger to others, he could be discharged at the EOP level of care.

The inmate was readmitted to the MHCB on 12/15/14 due to statements to officers that he was going to hang himself. He was provided with diagnoses of Psychotic Disorder NOS as the referring diagnosis and Adjustment Disorder with mixed disturbance of emotions and conduct. He was properly identified by staff as meeting criterion five on the Form 7388B, though the on-demand report did not identify him. MHCB clinical staff also noted that he met subjective criterion two. They did not indicate the reason for not referring him to DSH on 12/15/14, but only indicated he was being reassessed. He was to receive daily clinical contacts and ongoing psychiatry contacts for medication management. On 12/19/14, the treatment team met with him, and a DSH acute care referral was initiated.

Findings

This inmate was appropriately referred to DSH. His treatment pending DSH referral was adequate.

**Inmate D**

This 44-year-old EOP inmate was selected for review because he was listed on the NKSP DSH non-referral log three times in October for criteria one, two, four, and five on the Form 7388B. He was diagnosed with Psychotic Disorder NOS and Antisocial Personality Disorder. He was not prescribed any psychotropic medication; they were discontinued due to cheeking and noncompliance. While housed in the NKSP MHCB, the IDTT regularly saw him in accordance with the Program Guide; treatment plans were adequate. The inmate was provided outdoor

742

recreation when available on weekends with a recreational therapist. He was expected to parole on approximately 10/19/14.

While the inmate continued to meet multiple criteria for DSH referral consideration, MHCB staff felt he needed continued treatment at a lower level of care to address his inappropriate fear of other inmates, suspected to be due in part to his prior sex offense. Clinical staff did not believe that he required a higher level of care; the inmate readily acknowledged that threatening to harm himself if forced to room with a cellmate was due to this fear. Given that he was scheduled to be picked up on 10/21/14 by Immigration and Customs Enforcement officers, clinical staff chose to retain him in the MHCB pending parole to address his fear and anxiety regarding other inmates in an effort to maintain his stability.

Findings

This inmate was appropriately not referred to DSH. He received adequate treatment while housed in the MHCB at NKSP.

**Inmate E**

This case was selected for review because the inmate was identified twice on the DSH non-referral log. This 26-year-old EOP inmate was identified as having three or more MHCB admissions. However, he was not referred to DSH because he was increasing his EOP participation and becoming more engaged with his treatment providers. He was seen as improving. He was diagnosed with Hypochondriasis, but was not medicated because the inmate feared heart complications from the psychotropic medications. The documentation indicated bizarre delusions such as glass in his brain, blood poisoning following an unexplained tooth infection, brain damage from a contusion, an enlarged heart, and the ability to control all of these symptoms with his mind. The inmate stated that some of his five prior MHCB admissions were due to people not believing that he was sick and that he had a heart attack. The treatment plan dated 10/2/14 was not appropriate in light of the severity of the symptoms, and the diagnosis was also questionable. The inmate appeared to have a psychotic disorder with somatic delusions, not Hypochondriasis.

At his next treatment team meeting on 10/30/14, the PC believed the inmate was more receptive to factual contrary evidence regarding his delusional beliefs about his health concerns. However, progress notes indicated that he was strongly maintaining his delusional somatic beliefs and added a belief regarding an enlarged blood vessel that might burst, causing him to get very little sleep. He also shared that he believed he was dying and worried about getting released so that he could see his family first. He reported hearing screaming in his mind. He was described as having blunted affect with loose and circumstantial thought process at times. However, these observations were contrary to the treatment team's decision to maintain a diagnosis of Hypochondriasis and to eliminate Delusional Disorder as a diagnosis. The inmate appeared psychotic. He did seem to be engaging more with his treatment providers and had been stable with no MHCB admissions for almost two months.

The treatment plans dated 10/2/14 and 10/30/14 required greater specification in the interventions, problem targets, and goals to be adequate. The treatment plan developed in November 2014 was not adequate for this inmate. It continued with rule out or provisional diagnoses and listed Program Guide requirements and referrals as interventions. The inmate was eventually transferred to CMC.

<u>Findings</u>

This inmate should have been referred to intermediate care. His treatment plan at NKSP required substantial improvement. He needed to be seen by the treatment team and have a more comprehensive operationalized treatment plan developed that adequately addressed his serious symptoms. He also required diagnostic clarification. Staff documented symptoms that were consistent with a psychotic disorder as the primary diagnosis. The inmate did not receive adequate treatment at NKSP.

**Inmate F**

This case was selected as an example of DSH non-referred cases reviewed by the DSH coordinator to assess the adequacy of this aspect of the sustainability process. This 25-year-old EOP inmate was in the MHCB during the month of December 2014, when he was identified as a possible DSH referral based initially on criterion two of the Form 7388B. The initial treatment plan dated 12/26/14 was thoughtfully constructed, though the treatment targets were overly broad, as were some of the treatment goals. However, the MHCB treatment team provided an adequate non-referral rationale, and treatment modifications were adequate in light of the inmate's early stage of admission.

<u>Findings</u>

The inmate was appropriately not referred to DSH. The treatment plan required greater specification but included appropriate treatment interventions. The inmate was appropriately treated.

**Inmate G**

This case was selected for review as an example of an inmate who was identified as a possible DSH referral, but was not referred. The case was reviewed by the DSH coordinator and documents were determined to have been appropriately completed.

This 29-year-old EOP inmate was seen by his treatment team on 12/18/14 and identified as a possible DSH referral due to multiple MHCB admissions in accordance with criterion five of the Form 7388B. His treatment plan indicated diagnoses of Psychotic Disorder NOS, Depressive Disorder NOS, Amphetamine Dependence in a controlled environment, Alcohol Dependence in a controlled environment, and Axis II was deferred.

The treatment plan dated 12/18/14 included overly broad treatment targets that were not properly operationalized; although treatment goals were measurable.  Some of the treatment interventions were too vague (i.e., "Group Therapy – various"), but the treatment plan documented the inmate's progress status.  On the Form 7388B, the non-referral rationale included that the inmate had not had another MHCB admission "since his return."  However, he had only recently returned on 12/9/14 and this was really not a non-referral rationale.  The treatment team indicated that the clinician would see the inmate twice weekly instead of once weekly.  However, this section of the Form 7388B also added "as needed," which suggested that the PC might not always have the increased contact with the inmate as the treatment plan indicated; this effectively resulted in no treatment modifications at all.  The Form 7388B thus required further clarification.

The subsequent treatment plan dated 1/15/15 failed to note that the inmate met criterion five and should have been reviewed for possible DSH referral.  The clinical summary for that treatment plan included a tremendous amount of redundant information that had been cut and pasted and which obscured the updated pertinent information.  While treatment targets were still broad, the goals were properly operationalized and measurable; treatment progress was noted, and interventions were specified.  The inmate was prescribed Effexor 75 mg per day and Abilify 10 mg per day.  Progress notes indicated that he was improving in the reception center EOP.

Findings

While the inmate appeared to have been appropriately not referred to DSH, the documentation supporting that non-referral was inadequate.

**Inmate H**

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines.  He was admitted to NKSP on 1/4/14.  The mental health screen, which was not conducted in a confidential setting, was completed on 4/3/14.  The inmate was screened positive, and the mental health evaluation was completed on 5/1/14.  He was placed into the 3CMS program, and he was provided with a diagnosis of Mood Disorder NOS with a provisional diagnosis of Psychotic Disorder by the clinician.  The psychiatrist saw him on 5/10/14, but a diagnosis was not provided.  The PC saw him on 7/24/14 as a documented 90-day follow-up and again on 10/24/14.  Overall, the inmate was viewed as stable.  A diagnosis of Mood Disorder was provided, and he was continued at the 3CMS level of care.  He remained at NKSP due to a medical hold.  On 1/7/15, he was seen for a PC contact.  At that time he was provided with a diagnosis of Mood Disorder NOS; there was also a reference to the presence of psychotic thinking.

Findings

Clinical services during the intake process were inadequate because the mental health screen was not completed in a confidential setting.  Moreover, the mental health screen, mental health evaluation, and 30-day PC follow-up were not completed in accordance with the Program Guide.  Reasons for the delay were not documented.  However, ongoing treatment was completed within

appropriate timeframes.  Among areas in need of improvement were the rationale for the provisional diagnosis of Psychotic Disorder NOS after completion of the mental health evaluation, while the reference on 1/7/15 to psychotic thinking was unclear.  There also was marked discrepancy between the clinician's and the psychiatrist's diagnoses.

**Inmate I**

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines.  Upon admission to NKSP on 2/12/15, he was referred to emergency mental health by the nurse and sent to the HDSP MHCB for suicidal ideation.  The MHCB admission note indicated he was experiencing suicidal ideation with a plan to cut himself.  He was described as irritable, and he was provided with a diagnosis of Psychotic Disorder NOS.

The inmate was discharged from the MHCB on 2/24/15; at that time he was given a diagnosis of Mood Disorder NOS.  He was assessed as requiring the 3CMS level of care.  He returned to NKSP on 2/25/15, and five-day follow-up was completed.  During five-day follow-up, the inmate requested to be returned to the EOP level of care as he had been an EOP inmate during a previous incarceration.  On 3/2/15, the last day of the five-day follow-up, he disclosed auditory hallucinations and presented as disheveled.

The inmate was seen on 3/4/15 following a routine self-referral, and it was determined that he required an EOP referral.  On 3/12/15, due to suicidal ideation, he was referred to the MHCB after he was not accepted into the EOP.  On 3/12/15, the mental health screen and mental health evaluation were completed.  The inmate was diagnosed with Mood Disorder NOS, and it was determined that he would remain at the 3CMS level of care.  Psychiatry also saw him on 3/12/15 and provided him with a diagnosis of Psychosis NOS; although he denied any hallucinations or delusions, and his behavior was described as appropriate.  The inmate was prescribed Vistaril 100 mg per day, perphenazine 8 mg per day, and Risperdal 1 mg per day.

<u>Findings</u>

This inmate's urgent mental health needs were appropriately addressed.  While the ongoing mental health care was appropriate, there was a delay in completion of the mental health screen and mental health evaluation, which were not completed in accordance with the Program Guide.  Also problematic was the rationale for the psychiatrist's diagnosis of Psychosis NOS, which contrasted with the clinician's diagnosis.  The diagnostic discrepancy between the psychiatrist and psychologist needed resolution.

**Inmate J**

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines.  He was admitted to NKSP on 11/13/14 for attempted murder (second term), and his ERPD was 2020.  The mental health screen was completed on 11/14/14; he screened positive, and the mental health evaluation was completed on 12/9/14.  The inmate's level of care was 3CMS.  He reported symptoms of crying, decreased appetite and sleep, and

overactive thinking.  He had a history of numerous suicide attempts; the most recent was two months ago.  He had a history of EOP level of care and a prescription for Prozac, but he was not prescribed psychiatric medication at the time of admission.  He was diagnosed with Major Depressive Disorder and referred to the psychiatrist.  The clinician indicated a plan to see him in three weeks.  The psychiatrist evaluated him on 12/12/14, when he complained about feeling anxious, but he was described as calm with no evidence of depression or anxiety.  He asked for medication and was prescribed Buspar.  He was provided with a diagnosis of Anxiety Disorder NOS.

The clinician saw the inmate for a 30-day follow-up on 1/6/15.  During that appointment, the inmate reported seeing moving shadows and hearing things moving, while he was noncompliant with Buspar.  He reported that two days prior he experienced suicidal ideation with a plan to save pills and overdose.  His mood was depressed, and he was described as anxious and hyperverbal. His sleep and appetite were adequate.  He was diagnosed with Psychotic Disorder NOS and referred for an EOP evaluation due to his history of suicide attempts and recent suicidal ideation.

The inmate was seen for his initial PC session on 1/14/15.  He reported auditory hallucinations and presented as disheveled, but was compliant with psychotropic medication.  The unit officer described him as disruptive on the unit, stating that he needed to be redirected multiple times. The officer reported that he intermittently went to the dayroom and to yard.  The inmate reported suicidal ideation a week earlier with a plan of cutting himself with a razor he had in his cell.  At mental health's request, custody staff searched the cell, but no razor was found.

The psychiatrist met with the inmate on 1/18/15 when Buspar was increased and Remeron was added to address depressive symptoms.  He was diagnosed with Anxiety Disorder NOS.  He was seen again on 1/20/15 by his PC.  At that time there was no report of hallucinations, and the inmate was compliant with psychiatric medication.  The custody officer indicated he was adequately programming.  There was no bizarre behavior.  He was diagnosed with Psychotic Disorder NOS.

The IDTT met on 1/22/15 to address the EOP referral.  The inmate was described as sleeping all day, but there was no indication of bizarre behavior by custody staff.  It was determined that he was adequately using services provided by the 3CMS level of care and was not appropriate for the EOP level of care.  He was diagnosed with Psychotic Disorder NOS due to vague reports of psychotic symptoms, and further evaluation was warranted.  The plan was for the reception center clinician to see him in 30 days to monitor his stability.  This follow-up was conducted on 2/2/15, when he presented with improved coping and mood.  The psychiatrist met with him on 2/21/15.  At that time, he denied anxiety and depression.  He was provided with a diagnosis of Anxiety Disorder NOS.

Findings

There was good communication between custody and mental health staff.  While there was a delay in completion of the mental health evaluation, overall the level of care provided exceeded Program Guide requirements.  However, given the inmate's reported symptoms, the frequency of

mental health contacts was clinically inadequate.  There was also a marked discrepancy between clinician and psychiatrist diagnoses, which was problematic and needed resolution.

**Inmate K**

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines.  He was admitted to NKSP on 1/6/15 and had a release date of 8/6/15.  The mental health assessment was completed in a confidential setting on 1/8/15.  The inmate screened positive, and the mental health screen was conducted on 1/15/15.  He reported intermittent depression.  He had been prescribed amitriptyline for sleep, which was discontinued on 1/13/15.  He was provided with a diagnosis of Adjustment Disorder with depressed mood, and he was receiving mental health services at the 3CMS level of care.

On 2/9/15, during the 30-day follow-up, the inmate reported feeling anxious, tired, and waking early.  He reported talking in his sleep and experiencing nightmares.  He was diagnosed with Anxiety Disorder NOS and referred for a psychiatric evaluation.  The psychiatrist saw him on 2/18/15, but the handwriting was difficult to read.  The inmate's mental status assessment indicated that his mood and thoughts were within normal limits, and he denied hallucinations and paranoia.  The psychiatrist's impression was that there was no evidence of PTSD, but the inmate had mild anxiety and evidence of a thought disorder.  The diagnosis was "no signif/thought as mood disorder."  Psychiatric medication was not prescribed.

Findings

The level of care for this inmate was appropriate.  The mental health screening, mental health evaluation, and 30-day PC follow-up were completed in accordance with the Program Guide.  The psychiatrist's evaluation exceeded the five-day timeframe mandated by the Program Guide for routine referrals.  Also problematic was the rationale provided for the presence of a thought disorder which was unclear and contrasted with the inmate's mental status assessment.

EXHIBIT V
California State Prison, Los Angeles County (CSP/LAC)
February 3, 2015 - February 5, 2015

**Inmate A**

This SNY EOP inmate was housed on C yard, which was a general population SNY yard.  He was provided with a diagnosis of Psychotic Disorder NOS and Polysubstance Abuse.

An IDTT meeting dated 1/29/15 indicated he was placed at the EOP level of care in December 2014; he exhibited poor insight and judgment, odd affect, and difficulty expressing himself.  On 1/26/15 there was a fire in his cell for which he received a 115 for arson.  The Form 7388B nonetheless indicated that he was able to adequately function at his current level of care and did not include any criteria for higher level of care referral consideration.

A treatment plan dated 12/31/14 noted the inmate had previously been in the 3CMS program and was recently discharged from administrative segregation, where he had been placed for fighting.  He had a history of multiple MHCB admissions and was prescribed Zyprexa for reduction of psychosis and auditory hallucinations, but he later refused to take psychotropic medications.  He was referred to mental health as he was refusing medications for valley fever.  The clinician noted that his refusal was probably due to paranoia, and custody reported that he isolated himself in his unit.  The Form 7388B did not indicate any DSH referral criteria.

A progress note dated 1/28/15 reported that the inmate was referred to the psychiatrist on call after he set a fire in his cell.  The lieutenant was told that the psychiatrist advised the nurse to send the inmate back to his cell and that he would be seen in the morning.  The progress note indicated that this was a non-encounter record review.  The clinician indicated that this was not his/her patient, but that he was stable and the fire-setting incident could have been accidental.  The inmate was not prescribed psychotropic medications at the time of the site visit.

The inmate was seen in a group interview.  He presented with flat, odd affect, poverty of speech, disorganization, and uncooperative behavior.  He left the interview prior to completion.  His insight and judgment were poor.

Findings

This EOP inmate required a higher level of care.  However, he was maintained in a general population setting with insufficient treatment and poor crisis intervention.  Treatment planning was poor.  A recommendation was made to mental health supervisory staff that he be evaluated for a higher level of care and that housing him in the general population was inappropriate and dangerous.

**Inmate B**

This 3CMS inmate was provided with a diagnosis of Bipolar II Disorder, Antisocial Personality Disorder, and Narcissistic Personality Disorder.  He was housed in the general population.  His healthcare record was reviewed at the request of plaintiffs' attorneys regarding his prolonged stay in administrative segregation and to assess his level of functioning.  He had a long history of treatment at the EOP and 3CMS levels of care.  It appeared that he continued to receive

750

additional 115s for "gassing" and IEX. The most recent administrative segregation treatment plan dated 11/6/14 indicated that he appeared to be in a hypomanic state. He was reportedly compliant with medications, ADLs, meals, and yard time. He was treated with Trileptal and Vistaril. The IDTT determined he would remain at the 3CMS level of care. The Form 7388B indicated he met no criteria for DSH referral consideration.

It appeared that the inmate was moved from administrative segregation on or about 1/22/14 to the general population. The most recent progress note indicated he had some concerns regarding his property after returning from court as the district attorney picked up his case for battery. He was seen in response to a referral from the R&R nurses, who noted that he had recently received bad news, namely, the district attorney referral. He was not suicidal at that time and expressed a desire to obtain better control of his impulsivity.

Findings

The inmate was no longer housed in administrative segregation; he had been moved to the general population. The most recent progress note indicated that he was upset regarding a recent district attorney referral and clothing issues, but was not suicidal. Nursing staff appropriately referred him to mental health after the receipt of bad news.

## Inmate C

This case was selected for review to address whether institutional treatment staff reviewed and considered DSH discharge information to plan treatment for returning inmates. This 29-year-old inmate had previously been treated at the EOP and 3CMS levels of care. His institutional history was notable for resistance and minimal cooperation with treatment. There was a reported history of prior admissions to DSH as well as hospital admissions in the community pursuant to W&IC 5150. He was a high school graduate with a history of foster care and substance abuse.

The inmate was admitted to the MHCB at CHCF from CSP/LAC on 7/29/14 for suicidal ideation secondary to the death of his mother. He received diagnoses of Mood Disorder NOS and Personality Disorder NOS. He was treated with psychiatric medications including Effexor, Tegretol, Amitriptyline, and Vistaril; and he declined psychiatric recommendations to add an atypical antipsychotic medication.

The inmate had an extended stay in the MHCB due to his adamant refusal to accept psychosocial interventions that were not to his liking. He repeatedly expressed the desire to be treated at the intermediate level of care. During the course of his stay, he cut his wrist with a piece of hard plastic. He received an RVR following a physical altercation with correctional staff. Members of his treatment team felt he would do better in a setting where he could establish a therapeutic alliance while receiving long term care to resolve issues with trauma and characterological pathology.

The inmate was transferred to acute care at DSH Stockton on 9/8/14 to treat chronic depression and an ongoing expressed intention to die. Improvements were gradually noted over several

weeks as he began to participate in treatment and agreed to add Olanzapine to his medication regimen. On 9/30/14, he threatened to bite a custody officer while resisting stabilization. On 10/2/14, he was elevated to maximum custody status, which limited his program participation to weekly one-to-one individual contacts with treatment providers. He was not able to attend groups and began to refuse prompts to participate in yard and television time.

On 10/17/14, the inmate refused to attend his 30-day IDTT meeting. The treatment team submitted a referral for intermediate care treatment at VPP.

The inmate was discharged from DSH Stockton on 10/23/14. He was transported to CSP/LAC on 11/14/14, where he was re-enrolled at the EOP level of care. A psychiatrist saw him within 24 hours on 11/15/14. The inmate stated he felt well-treated at DSH and was glad to be back at CSP/LAC.

On 11/18/14, the inmate boarded up his cell, fashioned a noose, and expressed the wish to die. He required a cell extraction and was sent to the TTA for further evaluation. A SRE assessed a high acute and chronic suicide risk. He was admitted to the MHCB on 11/19/14 and placed on suicide watch. He was evaluated by the treatment team three times, on 11/20/14, 11/26/14, and 12/1/14. The Form 7388Bs associated with the treatment plans of 11/20/14 and 11/26/14 showed no endorsement of indicators, suggesting that the team should consider higher level of care referral. It was not until 12/1/14 that the treatment team concluded that a higher level of care referral was indicated, including a reassessment for acute care readmission. There was no documentation indicating that the treatment team had been aware of the VPP intermediate care referral, which had been initiated by DSH Stockton on 10/20/14.

Institutional logs indicated that CSP/LAC sent a complete DSH referral packet to CDCR headquarters on 12/3/14, and the referral was forwarded by CDCR headquarters to DSH on 12/4/14. Logs maintained by CSP/LAC indicated the inmate had been placed. At the time of the site visit, the inmate's name was not found on the CSP/LAC housing roster.

Findings

This inmate was clinically discharged from DSH Stockton, but not transferred for 22 days. It was unclear what, if any, treatment he received during this administrative hiatus. Moreover, he was transferred to a lower level of care at CDCR even though an intermediate care referral was in place. There also was no evidence that CDCR treatment staff reviewed or considered the DSH Stockton psychiatric program treatment recommendations. There was no documentation indicating that the IDTT was aware that a VPP referral had been established on 10/20/14. The CDCR treatment team improperly conducted two reviews of referral to higher level of care. The inmate decompensated in a crisis state upon returning to CDCR and required an extended MHCB stay until the treatment team initiated an intermediate care referral 19 days later. This case represented a deficiency in inmate treatment continuity of care.

EXHIBIT W
California Correctional Institution (CCI)
April 1, 2015 - April 3, 2015

**Inmate A**

This inmate was randomly selected for eUHR review.  Treatment plans for this 45-year-old man housed in administrative segregation were dated 9/18/14, 12/15/14, and 3/9/15.  The December 2014 treatment plan listed current problems as mood instability and program compliance.  Interventions included weekly PC contacts to assist him dealing with administrative segregation isolation.  All appropriate clinicians attended the IDTT meeting, as well as the CC I; however, the inmate refused to attend.  The Form 7388 was appropriately completed.  The inmate had recently been transferred to administrative segregation after completing his SHU term.  He was awaiting transfer to a general population housing unit, making him a non-disciplinary segregation (NDS) inmate.  He was receiving mental health services at the 3CMS level of care.  Diagnoses included Major Depressive Disorder, recurrent, mild and Amphetamine Dependence.

Progress notes documented weekly PC contacts, which generally were at cell front, because the inmate refused to come out of his cell for a private interview.  Daily psych tech rounds were also documented.

Findings

This inmate was receiving mental health services consistent with Program Guide requirements.

**Inmate B**

This 37-year-old man was placed in the SHU as an administrative segregation overflow inmate on 1/31/15.  He had completed his SHU term for weapon possession and was classified as an NDS inmate at the time of review.  He had been evaluated on 2/2/15 following a call from his mother, who reported that he was suicidal.  His 2/6/15 treatment plan listed his only problem as "self-reported negative thoughts and worries as a result of being incarcerated away from his family and uncertainty regarding his pending transfer." The treatment plan outlined as an intervention that PC contacts would occur at least every 30 days to further monitor and evaluate the inmate's mental health symptoms, suicide risk, and protective factors.  All members of the treatment team were present at the IDTT meeting, and the Form 7388 was appropriately completed.

A treatment plan dated 10/9/14 was reviewed.  The inmate was receiving mental health services at the 3CMS level of care at that time, and he was housed in administrative segregation.  The treatment plan included "continue weekly contact with LPT, see PC on a monthly basis (at minimum) see psychiatrist PRN and as scheduled."

The psychiatrist evaluated the inmate on 10/21/14, when Zoloft was increased.  Diagnoses were Adjustment Disorder with depressed mood and Antisocial Personality Disorder.  The plan was to see the psychiatrist again in ten weeks.  The inmate was again seen by the psychiatrist on 10/16/14.  It appeared he was intermittently noncompliant with his medications, and appropriate laboratory tests were ordered.  The inmate was noted to be an unreliable historian.  The plan was to taper and discontinue the Zoloft.

A 12/30/14 progress note by the same psychiatrist was reviewed. The history that the inmate reported was considered to be inconsistent and unreliable. His depression was assessed to be in remission. He was to be seen again in three weeks. There were no other psychiatric progress notes in the eUHR for the reporting period.

On 10/30/14, the PC saw the inmate, who was on NDS status at that time. The inmate was serving four life sentences. He was assessed not to have current programming needs. The plan was to see him again in 30 days. He was again seen by his PC on 11/25/14 when he was noted to be doing well. The PC saw him again on 12/16/14. The inmate refused an out of cell PC contact the following week. A 12/31/14 PC progress note indicated incorrectly that the inmate was still taking Zoloft. He was seen in a non-confidential setting due to "staff decision." During January 2015, the PC saw the inmate in a confidential setting. Subsequent PC contacts occurred every one to two weeks.

A 12/11/14 Form 7230-A documented that the inmate had previously received mental health services at the 3CMS level of care until he was removed from the caseload in July 2014. He subsequently self-referred in October 2014 and was again placed on the mental health caseload due to depression symptoms.

Daily psych tech mental health rounds were documented.

Findings

It was unclear why the PC did not see the inmate on a weekly basis when the inmate was in segregation, even though he was on NDS status. The inmate was not receiving mental health services that were consistent with Program Guide requirements related to the frequency of his PC meetings.

**Inmate C**

A 1/23/15 treatment plan from Folsom State Prison indicated that this 31-year-old man had a release date the following month, and he was requesting to remain at the 3CMS level of care. He had a history of Schizophrenia, but was refusing medications. His problem list included paranoia/racing thoughts and poor judgment/coping. Notably, the problem list did not address medication noncompliance. All appropriate IDTT members were present at the treatment team meeting.

Another IDTT meeting was held on 2/6/15. The mental status examination indicated that the inmate was responsive to internal stimuli and was feeling paranoid. Diagnoses were Paranoid Schizophrenia and Polysubstance Dependence (provisional). His level of care was changed to EOP with the plan to have him seen weekly and referred for pre-parole planning services.

The inmate was subsequently transferred to administrative segregation at CCI on 2/12/15 for reasons that were unclear based on eUHR review. A 2/13/15 Form 7230-A indicated that he was discussed during the administrative segregation morning meeting. An email was sent on 2/13/15

from a CCI clinician to mental health services at Folsom State Prison in order to receive a transfer summary. A response received five days later indicated that the 2/6/15 IDTT progress note was attached. A 2/19/15 progress note indicated the inmate was paroling in two days; he paroled on 2/21/15.

<u>Findings</u>

This inmate received mental health treatment consistent with Program Guide requirements.

**Inmate D**

An 8/25/14 IDTT meeting indicated this 56-year-old man was housed in administrative segregation due to safety concerns. He was prescribed Celexa for depression. The problem list only included a "history of depression." Diagnoses included Adjustment Disorder with depression and anxiety and Alcohol Dependence. All appropriate IDTT members were present. The Form 7388B was completed appropriately. A 2/9/15 IDTT meeting provided a similar history and noted very little change.

An 8/6/14 psychiatrist's note indicated that current medications prescribed included Buspar, Celexa, and Vistaril. Diagnoses were as already referenced. Informed consent had previously been obtained relevant to the inmate's medications. The plan was to see him again in four weeks. He was again seen by the psychiatrist on 8/19/14. The inmate reported being in administrative segregation after allegedly threatening a nurse. He was noted to need significant support. His Buspar was discontinued, and Celexa was tapered with the plan to discontinue it. The rationale for these medication changes was not documented. He was again seen by the psychiatrist on 9/10/14. The inmate's Vistaril dosage was increased at his request.

Subsequent psychiatry progress notes were dated 12/3/14, 2/4/15, 2/6/15, and 2/18/15. The inmate was started on Remeron on 12/3/14. He remained in administrative segregation at that time. A 2/18/15 typed progress note, which was more legible than previous handwritten progress notes, provided a useful summary of the inmate's history of present illness. Personality Disorder NOS was added to his diagnoses.

A PC note dated 8/26/14 reported that the inmate was in administrative segregation for safety concerns. He also reported multiple medical issues. Weekly PC contacts were subsequently documented; they generally occurred at cell front due to the inmate's refusal to meet in a private setting.

Psych tech rounds were documented in the eUHR.

<u>Findings</u>

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

**Inmate E**

This 26-year-old man was serving his first prison term.  He was admitted to CDCR on 1/25/11.  He was placed in the CCI SHU on 12/14/11 to serve a SHU term for battery on an inmate with a weapon at NKSP.  There was a history of feigning mental health symptoms while in the county jail.

The inmate was placed at the 3CMS level of care on 11/20/14 after returning from the OHU, where he was placed on suicide precaution for two days beginning on 11/18/14 after he was found in a cell with a tourniquet on his legs.  He reported that he was pending SNY transfer.  His primary diagnosis was Antisocial Personality Disorder.

This problem list only reported the following problem: "Not consistently communicating mental health symptoms."  All appropriate disciplines attended his IDTT meeting.  The Form 7388B was completed.

There were PC progress notes dated for a total of eight days from November 2014 to February 2015.  A SRE was completed on 11/19/14.  The inmate denied suicidal thinking. Following consultation with treatment team members, he was released to the general population with five-day follow-up, which was implemented based on eUHR review.  PC contacts generally occurred at cell front because the inmate refused to come out of his cell.  The plan was to see him at least every 30 days.  Diagnoses were Adjustment Disorder with mixed disturbance of emotions and conduct and Antisocial Personality Disorder.

A psychiatrist evaluated the inmate on 11/21/14.  Diagnoses were as above along with Polysubstance Dependence.  The psychiatrist indicated that psychotropic medication was not indicated.

There was documentation of SHU psych tech rounds.

<u>Findings</u>

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

**Inmate F**

This 26-year old inmate was serving a long sentence for second-degree murder.  He was housed in the SHU after threatening a peace officer and gassing a peace officer with urine.  Diagnoses included an Impulse Control Disorder and Adjustment Disorder with anxiety.  Bipolar II Disorder was also in the differential diagnosis, and he was additionally diagnosed with an Antisocial Personality Disorder.

The most recent treatment plans for the review period were dated 12/4/14 and 12/18/14.  The inmate's problem list included depression/anxiety and a history of false claims of mental health symptoms for secondary gain.  All appropriate disciplines attended his IDTT meeting.

Clinical contacts were dated 11/26/14, 12/1/14, 12/8/14, 1/7/15, and 2/3/15.

The inmate was transferred from the OHU to a general population yard on 11/26/14. Five-day follow-up was subsequently implemented. On 12/1/14, he announced that he was about to start a hunger strike. Although the PC note indicated that he did not require a psychiatrist, a psychiatrist saw him that same day. He was provided with a diagnosis of Antisocial Personality Disorder, and it was determined that he did not require treatment with psychotropic medications.

On 12/8/14, the inmate reported that he continued to "be stressed out". He reported on 2/3/15 that he received SNY status. On 2/26/15, he reported doing well during a PC contact.

There was documentation of SHU psych tech rounds.

Findings

The inmate received 3CMS level of care consistent with Program Guide requirements.

**Inmate G**

This 49-year-old inmate, who was interviewed in a group setting, complained that he had three different PCs during the past year. He described his symptoms as being exacerbated due to these changes, which occurred without advance notice. He reported that at his most recent IDTT meeting, his PC was not present and he did not understand his treatment plan. He also stated that his newest PC indicated that he would be seen every 90 days, in contrast to the previous frequency of at least monthly contacts.

The inmate's eUHR was reviewed. He was incarcerated in CDCR for the seventh time and was transferred from NKSP to CCI on 11/25/14. His problem list included depression and mood swings. Diagnoses included Bipolar I Disorder, recently depressed type, severe without psychosis, Polysubstance Dependence, and Antisocial Personality Disorder. Medications were not prescribed at the inmate's request.

The inmate's PC was not present at his IDTT meeting.

PC contacts during the review period were dated 12/10/14, 12/17/14, 2/17/15, and 2/26/15. Progress notes indicated he would at least be seen on a monthly basis.

The psychiatrist evaluated the inmate on 10/13/14, who agreed with his decision not to receive psychotropic medications at that time. The inmate's Mood Disorder NOS was assessed to be in remission.

Findings

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

758

**Inmate H**

This 38-year-old man, who was interviewed in a group setting with other 3CMS inmates, essentially stated that CCI's mental health services had not significantly changed during the past five years. He did not think that offered treatment was very helpful.

The inmate's eUHR was reviewed. His most recent treatment plan was dated 8/27/14. The only problem listed was depression; planned intervention was CBT. Diagnoses included Bipolar Disorder, now resolved, Polysubstance Dependence, and Antisocial Personality Disorder; Alcoholics Anonymous was a planned intervention as well. All required IDTT treatment team members were present at his last treatment meeting.

PC progress notes were dated 7/29/14, 8/25/14, 8/27/14, 11/4/14, and 1/23/15. However, the inmate was seen by four different clinician's during this time period.

Findings

This inmate received treatment within Program Guide timeframes; however, the reason why he did not find mental health treatment useful was apparent due to the lack of continuity of care. Specifically, he essentially had a different PC every time he had clinical contact. Such treatment was not consistent with the spirit of the Program Guide.

**Inmate I**

This 31-year-old man was interviewed in a group setting with other 3CMS inmates. He indicated global problems with COs, but was not comfortable providing more specific details. The inmate's eUHR was reviewed.

The inmate's most recent IDTT meeting occurred on 12/10/14. Listed problems included substance abuse, depression, and psychosis. Medications included Zyprexa and Remeron. Diagnoses were Major Depressive Disorder and Polysubstance Dependence. All required treatment team members were present at the IDTT meeting.

A psychiatrist evaluated the inmate on 10/15/14, 11/3/14, 11/26/14, 12/21/14, and 2/24/15. Clinical progress notes were dated 12/2/14, 12/24/14, and 2/17/15.

Findings

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

759

EXHIBIT X
California Institution for Men (CIM)
March 10, 2015 - March 12, 2015

**Inmate A**

This inmate was randomly selected for review from a list of reception center EOP inmates who were not timely seen by their PC.

The inmate arrived at CIM from DSH-Stockton on 3/19/14. The initial health screen showed that when he arrived he was prescribed olanzapine, sertraline, and carbamazepine. A detailed DSH discharge summary indicated he had been admitted to intermediate care on 8/2/13 for unremitting symptoms of PTSD associated with a self-reported rape at another prison in 2010. He attempted suicide at RJD in 2012. In 2013, he cut his arm when his single cell status was about to expire. This led to an RVR and crisis bed placement, and ultimately led to the admission to DSH-Stockton.

A discharge SRE prepared by DSH on 2/28/14 recommended CDCR treatment in the EOP on single cell status, continued safety precautions, medication management, and frequent check-ins with his treatment team. The evaluator noted that the mere idea of being placed in a double cell was traumatic for the inmate and could lead to rapid decompensation.

The inmate was discharged to CDCR with documentation of his persistent intention to kill his cellmate if he were placed in a double cell. Psychology and psychiatric discharge recommendations included retaining him in single cell status upon return to prison. Discharge diagnoses were PTSD and Antisocial Personality Disorder.

On 3/28/14, a SRE assessed a moderate chronic and low acute risk of suicide. However, the inmate was described as agitated, hopeless, and concerned with his safety to the degree that he was very preoccupied with not letting anyone rape him. Treatment recommendations included encouraging him to come out of the cell twice weekly to make contact.

Throughout April and May 2014, the inmate repeatedly told the clinician he would kill anyone who was put in a cell with him. He expressed thoughts of suicide depending on whether he would receive a life sentence for killing his next cellmate.

On 4/1/14, the inmate told the psychiatrist he wanted to discontinue prescribed medications; the psychiatrist asked him to wait until he could review the DSH discharge summary, but adjusted his medications. The psychiatrist noted that the inmate appeared fragile. The PC stated that the inmate was concrete in thinking and of apparent lower intellectual functioning, and increased contacts to two times weekly. The inmate's group attendance was sporadic.

On 5/13/14, an interdisciplinary progress note indicated that there was no clinical basis to grant continuation of single cell status, with the clinician reporting the inmate was not homicidal. There was no documentation to indicate the clinician had considered the DSH estimation of the inmate's high chronic risk of causing serious physical harm to others. The inmate requested copies of his file, which he said he would use when he went to court for cutting his cellmate.

761

On 6/4/14, the inmate was placed in administrative segregation for threatening to harm any cellmate.  On 7/28/14, a staff referral was made, resulting in restoration of the inmate's single cell status until 8/4/14.

A mental health evaluation completed on 8/5/14 recommended adding a diagnosis of Psychotic Disorder NOS, without elaboration.  On 8/13/14, the inmate was classified as SNY EOP.  He continued to express the belief that everyone wanted to harm him.  He was willing to work on these issues if he felt safe.  A Form 7388B completed on that date was negative for indicators that could trigger DSH referral consideration.

On 9/25/14 the inmate transferred to the San Diego County Jail.  He threatened to kill himself by heroin overdose if he were to learn of his son's rejection of him during the course of the child's scheduled custody hearing.  The PC notified medical staff at the San Diego County Jail.

Findings

The inmate did not receive a timely clinical contact on a date that coincided with his transfer to the county jail.  However, the primacy clinician contacted the jail nurse to advise of threats and the single cell issue.  It was unclear how closely CDCR staff considered DSH discharge recommendations in planning the inmate's treatment environment.  The inmate was destabilized as loss of his single cell status loomed.  There was no evidence that members of his treatment team considered the contribution of his mental disorder to the behavior leading to his placement in administrative segregation.  An SNY housing designation appeared to be the intervention of choice for this chronically unstable inmate, rather than addressing the underlying mental health issues.  There was no modification of the treatment plan to target the inmate's high risk of physical violence.  This inmate did not receive adequate care.

**Inmate B**

This inmate was randomly selected from a list of reception center EOP inmates who were not timely seen by their PC.

The inmate arrived from county jail on 10/9/14 and had not been prescribed psychiatric medication during jail confinement.  An initial nursing screen reflected the inmate's denial of a mental health treatment history except for two suicide attempts during early adolescence.

An SRE was timely completed.  The inmate was assessed as a moderate chronic risk of suicide and a low acute risk.  On 10/15/14, he underwent a mental health evaluation based on positive screening results that suggested a mood disorder.  He met eligibility requirements for mental health care at the EOP level of care.

Members of the institutional treatment team provided a diagnosis of Major Depressive Disorder, moderate and Anxiety Disorder NOS.  The inmate was treated with antidepressant medication.  Over the next two weeks, he showed gradual improvement as he continued to cope with an impending divorce and the reality of a life term.

On 11/6/14, the inmate was noted to be attending and participating in group treatment. He reported mood variability, especially at night, with occasional displays of anger and frustration which were characterized as congruent with his life circumstances.

A level of care decision associated with his treatment plan on 12/4/14 showed no positive indicators to trigger DSH referral consideration. The inmate continued to adhere to prescribed medications. By 1/5/15 he continued to display reasonable coping skills in light of family circumstances.

On 1/14/15, clinical documentation indicated that the inmate was seen at cell front, but the reasons were unclear. He was noted to be on a modified program for reasons not readily apparent from the healthcare record documentation. The psych tech saw the inmate daily.

The PC saw the inmate on 11/21/14. On 12/4/14, the inmate presented to the IDTT for a 30-day follow-up. The PC note indicated the inmate was programming at an appropriate level and was relatively stable. On 1/30/15 the inmate was transferred to the mainline EOP.

Findings

It appeared that the inmate was receiving mental health treatment at the appropriate level of care in the reception center. Although a PC contact was seven days overdue on 11/23/14, the inmate was seen by a substitute clinician in the PC's absence and continuity of care was achieved. Psychiatry and initial and follow-up IDTT meetings were timely completed and attended by required staff. Treatment team members routinely opined that there were no indicators that suggested that a higher level of care should be considered. It was appropriate for good treatment planning that the reason for modified treatment be clearly stated in the healthcare record.

**Inmate C**

This inmate was randomly selected for review from a list of inmates who were discharged from the MHCB and required five-day follow-up.

The inmate was a 3CMS inmate housed in the reception center, where he was being treated for Bipolar I Disorder, most recent episode depressed. He was prescribed Risperdal and Vistaril.

On 11/10/14, the inmate told the psychiatrist he had experienced suicidal thoughts since he was 17-years-old and more frequently during the past two to three weeks; he reported that they often lasted all day. He stated that he was able to tolerate these thoughts and indicated that he was not inclined to act on them. Psychiatry follow-up was scheduled for four weeks.

On 12/4/14, the inmate was seen in the TTA for depressed mood and suicidal ideation. He reported experiencing racing thoughts, paranoia, and severe depression all week and wanted to hang himself. A SRE was completed, but the evaluation contained no risk assessment; however, it documented that the inmate had been admitted to the MHCB. The SRE referred the reader to

763

multiple other documents for information on mental status, estimate of risk, and a risk reduction plan. The SRE was not appropriately completed.

The inmate was on that same day admitted to a crisis bed and placed on suicide watch on continuous one-to-one observation. A mental health treatment plan was timely completed on 12/5/14. The IDTT convened on that date and signed the treatment plan, absent the presence of the PC and correctional counselor.

On 12/11/14, a psychiatry note indicated that suicide precautions had been discontinued. The inmate was adherent with prescribed medications, with no side effects, and showed symptom improvement in sleep and motivation. On 12/12/14, documentation indicated that he was being considered for an increase in level of care to EOP. He was not seen as a candidate for DSH referral.

On 12/15/14, the PC described the inmate as alert and oriented, with linear thinking. An antidepressant medication had been added to the medication regimen. He rated himself as less depressed and he no longer experienced suicidal thoughts.

On 12/16/14, the IDTT recommended the inmate's discharge to the reception center 3CMS, rejecting the level of care change to EOP due to the likelihood that this would prolong the inmate's reception center stay. The treatment team determined it would be more beneficial for the inmate's mental health to discharge him to the 3CMS in order not to delay the endorsement process. This was in keeping with the inmate's expressed desire. A discharge SRE assessed the inmate with high chronic and low acute suicide risk. Safety/risk reduction recommendations were not individualized.

In sum, the inmate was treated in the crisis bed for 11.8 days and discharged on 12/16/14. The treatment team recommended that he be considered for an increase to the EOP level of care once he arrived at his new institution. Upon discharge, the inmate was timely seen in follow-up for the required five days.

Findings

An SRE should have been completed following the 11/10/14 psychiatric contact, and the reason for its absence was not discussed in the record. The inmate was scheduled for follow-up in four weeks, but this was pre-empted by his MHCB admission with suicidal thoughts and uncontrollable crying. The quality of the initial SRE was poor. The discharge SRE was not individualized. The treatment team inappropriately made a discharge decision that discounted mental health needs in favor of expediting the inmate's transfer. Despite these omissions, overall the inmate received appropriate care.

**Inmate D**

This inmate was randomly selected for review from a list of reception center EOP inmates who were not timely seen by their PC.

764

The inmate entered the reception center on 10/23/14. The initial nurse screening found that he did not have a mental health history, had no previous psychiatric treatment in the county jail, and had no suicide history. On the same day, a mental health evaluation recommended the inmate's placement on the mental health caseload with a diagnosis of Major Depressive Disorder, recurrent.

The inmate saw the psychiatrist on 10/28/14. The inmate reported sad mood, intermittent sleep, obsessive thoughts, and occasional nightmares. He ruminated about wanting to be a good person. A history of marijuana and alcohol use was noted. The inmate declined treatment with psychotropic medication.

On 10/29/14, a staff referral indicated the inmate wanted a medication review. A timely psychiatry response resulted in treatment with an antidepressant medication to target sleep disturbance symptoms.

The inmate was seen timely for initial and follow-up IDTT meetings. Treatment plan reviews repeatedly did not document indicators for higher level of care referral consideration. The inmate continued to receive timely PC and psychiatry contacts. The inmate received regular recreational therapy services and therapeutic group activities while in the reception center. Psych tech rounds often noted fair hygiene and cell condition with the inmate showing poor eye contact, a negative attitude, and requiring redirection.

Findings

The inmate was not timely seen for one clinical contact, but continuity of care was not significantly impacted. The inmate received adequate mental health care in the reception center.

**Inmate E**

This inmate was randomly selected for review from a list of inmates discharged from the MHCB for whom five-day follow-ups were overdue.

The inmate was admitted to the MHCB three days after arriving in prison. He was enrolled in the mental health caseload with a diagnosis of Bipolar I Disorder, most recent episode depressed, and Cocaine Abuse. He had a history of mild to severe depression beginning in childhood. He threatened suicide when he was charged with his crime and was treated with antidepressant medication in the county jail.

The inmate was assessed as having low chronic and acute suicide risk in the reception center. Three days after arrival, he was brought to the TTA for evaluation of suicidal ideation. He was admitted to the OHU pending MHCB placement. He was placed on suicide precautions including one-to-one continuous observation as per policy. An SRE conducted on 11/24/14 again determined low acute and chronic suicide risk.

765

Members of the IDTT provided diagnoses of Major Depressive Disorder, recurrent, moderate, ADHD, inattentive type, and Sexual Abuse of a Child. There were no indicators suggesting that referral to a higher level of care should be considered.

During MHCB treatment, the inmate was timely seen by the PC and psychiatrist. He was treated with psychiatric medication to target symptoms of depression and attentional problems. He began feeling better but continued to worry that people were talking about him because of his crime.

Discharge treatment planning indicated that the inmate was unable to function in the 3CMS and required treatment at the EOP level of care. A discharge SRE noted minimal acute and chronic risk factors. The inmate was temporarily stepped down to the OHU pending transfer to a mainline EOP. Five-day follow-ups were timely delivered. The inmate was rehoused in the reception center EOP pending transfer. There was evidence of good PC intervention in delivering CBT interventions and the inmate was positively engaged and appeared to benefit.

The inmate was transferred to a mainline EOP on 2/2/15.

Findings

There was no evidence in the eUHR to indicate untimely five-day follow-up following the inmate's MHCB discharge. There was one five-day follow-up contact on 1/2/15 which was not associated with a crisis bed admission. Overall, the inmate received adequate care in the MHCB and appropriate follow-up care in the reception center until his transfer to the EOP.

EXHIBIT Y
California Rehabilitation Center (CRC)
May 12, 2015 - May 14, 2015

**Inmate A**

This inmate's healthcare record was reviewed from a list of 3CMS inmate initial IDTT meetings during the site visit.  According to the CDCR Form 7277 bus screen completed with the required chrono, the inmate arrived at CRC on 4/29/15.  He was diagnosed with Schizoaffective Disorder with depressive features.  Previously prescribed medications were Remeron and Zyprexa, but the inmate was noncompliant with them.

This was the inmate's first prison term.  His mother was diagnosed with Schizophrenia, and his father was an alcoholic.  He was hospitalized in 2001 and 2007 for auditory and visual hallucinations and depression.  Since 2005, he had dealt with multiple losses of family and friends.

The treatment plan addressed decreasing auditory and visual hallucinations from multiple times daily to two times daily over the course of the next three months.  It also sought reduction of depressive symptoms to between one and two on a zero to ten scale through medication compliance, CBT, and monthly clinical contacts.

The clinician allowed the inmate to voice his concerns and discuss his strengths and weakness, which were addressed during monthly contact visits.

Findings

The clinician clearly defined and outlined the IDTT's purpose and benefit to the inmate.  Relevant clinical history was discussed and the clinician praised the inmate for taking the first step of beginning the process of healing through mental health services.  The IDTT meeting was appropriate.

**Inmate B**

This 3CMS inmate's healthcare record was reviewed from a list of 3CMS inmate initial IDTT meetings that were conducted during the site visit.  The inmate arrived at CRC on 4/22/15 from a reception center, and the initial IDTT meeting was timely held 5/12/15.  The inmate was provided with a diagnosis of Schizophrenia, paranoid type.  He was prescribed Remeron and Geodon.

On 5/6/15, the PC conducted a mental health evaluation that included signing the informed consent for mental health services and ensuring all forms were completed according to the Program Guide.  The inmate met criteria for entering the mental health caseload on 1/8/15 at the reception center due to medical necessity.  While at the reception center, he verbalized symptoms of anxiety, tearfulness, anger, agitation, paranoia, auditory hallucinations, and other unmanageable symptoms.  He was referred to psychiatry.  The inmate met with a psychiatrist, but declined medications.  On 4/15/15, he was seen by psychiatry and was prescribed Remeron and Risperdal.

According to a psychiatry note dated 5/4/15, the inmate had a poor response to Remeron. He stated that Risperdal helped control anger but caused facial twitching, and he stopped taking it. Previous documentation indicated the inmate told the reviewer there were shadows and a lot of evil spirits in the dorm. The inmate also received messages through the radio. The psychiatrist added Geodon for psychotic symptoms, and Risperdal was discontinued.

During the IDTT meeting, the inmate voiced concern about mental health medications interfering with his ability to get a job. He had been accepted as a taxi driver, but was removed from the list because he was taking heat risk medications. He also felt penalized for being in the mental health system because the custody classification and criteria under Minimum B stated "None in the Mental Health Services Delivery System." The CC I agreed and stated he was ineligible for half-time status due to his participation in the MHSDS. The inmate agreed to attend groups and work with psychiatry. The recreational therapist verbalized the importance of groups, particularly those that addressed the inmate's symptoms; he was provided with a group schedule and was advised regarding successful group therapy participation.

During the IDTT meeting the clinician explained the IDTT meeting's purpose and, based on the inmate's diagnosis, introduced a general plan and goals for the following year. The clinician, however, did not state clear, measurable goals to address the inmate's symptomatology over the next 90 days, nor was the inmate's current or future levels of care discussed. The presenting clinician was not the inmate's PC; the senior psychologist facilitating the IDTT explained that the PC was out and the clinician present was covering until the PC returned. The treatment plan was signed by all; however, discussion of medications that interfered with the taxi driver position and concerns about the inmate not receiving half-time status due to receiving mental health services were not documented.

Findings

The clinical care noted during the IDTT meeting was inadequate as the clinician did not discuss the inmate's level of care and did not address measureable goals; additionally, IDTT documentation did not fully reflect discussions that occurred during the IDTT meeting. Without adequate documentation of the IDTT meeting, the returning PC might miss the salient points discussed or rehash them during the next session, which was unlikely to be beneficial. However, clinical timeframes for clinical contacts and other paperwork requirements were consistent with Program Guide requirements.

**Inmate C**

This 3CMS inmate's healthcare record was reviewed from a list of 3CMS inmate initial IDTT meetings during the site visit. The inmate was diagnosed with Depressive Disorder NOS, and he was prescribed Remeron.

The inmate was included in the MHSDS on 11/26/14, and he arrived at CRC on 4/22/15 from the reception center. He reported two psychiatric hospitalizations as a teen for outbursts and verbal threats.

769

On 5/6/15, the PC completed the Form 7386-B, which contained standard language for the subjective, plan, and education portions of the progress note.  The Forms 7230-D and 7388 were completed timely.  It was noteworthy that the first paragraph, addressing subjective findings of the plan and education documentation were identical to the previously reviewed healthcare record entry; the only difference was the objective findings reported.

Findings

Clinical care was appropriate.  Clinical notes were timely documented, but the lack of individualized documentation was problematic.

**Inmate D**

The inmate's healthcare record was reviewed from a group of inmates interviewed during the site visit.  The inmate was diagnosed with Major Depressive Disorder, recurrent with psychotic features, and he was not prescribed psychotropic medications.

The PC evaluated the inmate on 12/16/14.  The inmate stated that he was pleased to have received the ducat for the PC visit due to feelings of being overwhelmed; such feelings were possibly due to medical concerns, and the inmate did not know how to make an appointment with the clinician.  He denied any significant depressive symptoms.  He discussed enjoying his job as a dorm porter, and he enjoyed and benefitted from the social skills and leisure groups he attended.  The PC explained to him how to access mental health services.

On 3/17/15 the inmate saw a different clinician for an individual clinical contact; however, the documentation of this encounter was sparse.  The subjective findings stated "I was referred to Health Relationships Group.  I just wanted to know what it is all about.  I would like to come to group."  The objective findings were appropriate except for mood and affect.  His mood was described as sad, depressed, anxious, pleasant, and flexible with anhedonia; and his affect was described as congruent with his mood.  The assessment indicated that the inmate was a suitable candidate for the health relationship group that commenced on 3/24/15.  The inmate was assessed with a GAF score of 65.  The plan was to schedule him for the healthy relationship group, and the clinician discussed this group's expectations.

Findings

The 12/16/14 clinical contact was appropriate, but the 3/17/15 clinical note was inadequate.

770

EXHIBIT Z
Richard J. Donovan Correctional Facility (RJD)
April 21, 2015 - April 23, 2015

**Inmate A**

The inmate's eUHR was reviewed at plaintiffs' attorneys' request. The inmate had received multiple RVRs in March 2015 based on his reports of mental health symptoms.

This 28-year-old male was serving a 12-year sentence; this was his first prison term. He was admitted to RJD on 12/18/14 and had been prescribed Trileptal for mood instability and Zoloft for depression. Zoloft was subsequently discontinued due to the inmate's nonadherence. His diagnosis was Major Depressive Disorder with psychotic features. He was subsequently prescribed Celexa.

The psychiatrist saw the inmate on 1/6/15 due to his nonadherence with Trileptal, which had been discontinued. His request for Abilify and Wellbutrin was not granted. On 2/28/15, he again requested Wellbutrin. He was subsequently prescribed Strattera for concentration difficulties.

The inmate was admitted to the CTC on 3/4/15, where he remained for six days. His Strattera was subsequently discontinued.

He received an RVR on 3/4/15 when he informed a clinical psychologist that he was feeling homicidal and wanted to kill a nearby social worker. A CO subsequently charged him with threatening a staff member. A 115 mental health assessment completed on 3/26/15 recommended mitigation.

A psychiatric examination was completed on 3/4/15 in the CTC. The inmate reported feeling suicidal and homicidal for "a while now." He described auditory command hallucinations. A history of a substance abuse disorder was present. Diagnoses were history of Major Depressive Disorder with psychotic features, Adjustment Disorder, and Antisocial Personality Disorder. The evaluation note did not indicate the medications that were subsequently prescribed.

The next day this inmate, who was still in the CTC, received another RVR after informing a nurse that "he was going to kill [her] because his voices did not like [her]." The nurse felt threatened and reported the incident to her supervisor, resulting in an RVR. A mental health assessment completed on 3/26/15 in connection with this RVR appropriately indicated that there were mitigating mental health factors the hearing officer should consider during penalty assessment. Specifically, the inmate was experiencing active psychiatric symptoms typically associated with a mental disorder at the time of the offense, and there was a direct connection between the active psychiatric symptoms and the inmate's alleged behavior.

The inmate was admitted to administrative segregation on 3/10/15 due to the pending RVRs that were being investigated. At the time of the 3/13/15 treatment plan, he was described as being depressed and experiencing psychotic symptoms that included auditory hallucinations and delusional thinking. There was a history of six crisis bed placements and one DSH placement and of a suicide attempt on 12/17/14 that involved swallowing 200 pills. He had a prior suicide attempt by hanging in October 2010. However, he was not prescribed psychotropic medications

772

at the time of his treatment plan's development; although it included a psychiatry referral for medication evaluation. Diagnoses included Major Depressive Disorder, recurrent, severe with psychotic features and Antisocial Personality Disorder. He was assessed to continue to need EOP level of care.

On 3/20/15, the psychiatrist again saw the inmate, noting that he had some significant depressive symptoms at that time. His diagnoses remained unchanged. Abilify was started, and Strattera was discontinued.

On 4/23/15, the inmate learned that his second RVR hearing had resulted in another 128-B. At the ICC, the initial plan was to transfer him to another prison since the nurse requested this transfer. The ICC postponed the transfer decision for one week to explore various options.

Findings

The RVR process that occurred during this inmate's CTC stay was very concerning, as was his continued administrative segregation stay even after the RVR disposition resulted in a 128-B disciplinary chrono. The expert discussed this case in detail with pertinent custody and mental health staff.

**Inmate B**

The healthcare record of this administrative segregation EOP inmate was randomly selected for review with specific reference to the timeliness of psychiatry clinical contacts. The most recent treatment plan was dated 1/14/15. This 52-year-old inmate was serving a three-year sentence. During a past incarceration, he was placed on a court order for involuntary medications. He had a history of substance abuse. His diagnoses were Schizoaffective Disorder, Polysubstance Abuse, and Antisocial Personality Disorder.

A psychiatrist evaluated the inmate on 8/12/14 due to his complaint of gynecomastia. The inmate received appropriate information from the psychiatrist and was to be seen again in 28 days. However, his next psychiatric appointment occurred on 10/3/14. His medications were continued at that time, and he was again to be seen in 28 days.

A psychiatry note dated 11/1/14 reported the inmate had very poor hygiene. He described auditory hallucinations. Diagnoses were consistent with Schizoaffective Disorder, tardive dyskinesia, and Antisocial Personality Disorder. Medications included Cogentin, Depakote, Remeron, and Risperdal. He continued to receive mainline EOP care.

Group treatment progress notes were present on a regular basis.

Another psychiatrist's note was dated 12/16/14. The inmate reportedly stopped taking his medication several days earlier and was becoming agitated and talking to himself. On that same day, a psychologist described him as being very agitated and psychotic. He apparently was going to be admitted to the CTC. He was discharged from the CTC on 12/30/14 and

773

subsequently received five-day follow-up.

On 1/15/15 the inmate remained in the mainline EOP.  He continued to experience auditory hallucinations.  Medications remained as previously summarized.  Little change was noted by the psychiatrist during the 2/12/15 mental health contact.  The plan was to see him again in 28 days or sooner if clinically indicated.

The inmate was transferred to administrative segregation on 3/13/15 after he assaulted a staff member with a retractable needle.

Findings

This inmate's healthcare record was reviewed with specific reference to assessing whether psychiatry visits were timely and clinically appropriate.  The inmate was seen on a regular basis by psychiatry, but on two occasions the appointments were more than 30 days apart. Otherwise, his treatment was consistent with Program Guide requirements.

**Inmate C**

This 26-year-old administrative segregation EOP inmate's eUHR was randomly selected for review with a focus on his treatment plan and its implementation.  The only treatment plan during the review period was dated 11/12/14; the inmate was housed at CSP/Corcoran at that time.  He had initially been placed at the 3CMS level of care during September 2008 due to an adjustment disorder.  He requested discharge from mental health services and was assessed to meet discharge criteria.  A Form 7388B was completed.  His level of care was changed from 3CMS to no mental health treatment.  Diagnoses were depression, resolved and Antisocial Personality Disorder.

A discharge summary from acute care at DSH-Stockton indicated that the inmate was admitted on 1/23/15 due to suicidal ideation and auditory hallucinations.  He had attempted to stab himself with a knife and a pen, which resulted in an RJD CTC admission for about six weeks prior to transfer to DSH-Stockton.  The transfer was precipitated by his continued symptomatology at the CTC.  Significant medical problems included asthma, a left below the knee amputation, status post multiple gunshot wounds, right leg weakness, and possible traumatic brain injury.  Prescribed medications included risperidone, gabapentin, Prozac, and Remeron.  His listed diagnosis was Major Depressive Disorder with psychotic features.

The next mental health progress note was dated 3/24/15.  A 3/25/15 treatment plan indicated that the inmate had arrived at RJD on 3/18/15 and was now receiving EOP level of care in administrative segregation.  He apparently attempted to kill himself about one month after being removed from the mental health caseload, which resulted in an apparent DSH transfer on 1/23/15.  His diagnoses at that time were Depressive Disorder NOS, Cannabis Dependence in sustained remission, and Antisocial Personality Disorder.  Stressors included a pending RVR and his brother's recent death.  Planned interventions included medication management, cognitive

therapy, and skills building. The major problem with this treatment plan was the lack of reference to the discharge summary and records from DSH.

Group therapies that the inmate attended included criminal thinking and addiction, pre-release planning, and social skills training. Individual clinical contacts were consistent with treatment plan interventions.

<u>Findings</u>

The inmate received treatment that was consistent with his treatment plan. However, the treatment plan was problematic from the perspective of not referencing his most recent treatment at DSH and the DSH discharge summary recommendations.

**Inmate D**

The record of this inmate, who had recently been treated in the CTC, was randomly selected for review to focus on treatment surrounding his MHCB admission.

This 57-year-old inmate had a diagnosis of Major Depressive Disorder, severe with psychotic features. He was admitted to the CTC on 3/18/15 and remained there for almost one month. He was noted to have had multiple recent crisis bed admissions due to suicidal thinking that had been exacerbated by his transition from the jail to prison system. He was subsequently transferred to DSH for further stabilization due to his multiple crisis bed admissions over a short time period.

Review of a prior CTC admission note indicated that the inmate had been transferred from WSP-RC to RJD on 2/27/13. Due to his reception center status and multiple CTC admissions, the only mental health notes for 2015 were from the CTC. However, there was a large back file of mental health notes from 2011 and earlier.

<u>Findings</u>

Review of this inmate's CTC record indicated that the inmate's treatment was consistent with Program Guide requirements.

**Inmate E**

This 3CMS SNY inmate was interviewed in a group setting. He generally was complimentary regarding the mental health treatment that he was received, but was very critical about interactions with COs; he believed that custody staff interfered with mental health treatment.

The inmate's eUHR was reviewed. The most recent treatment plan was dated 3/12/15. The inmate was described as a 44-year-old fourth termer. He reportedly expressed suicidal thinking in the past to obtain medications. He was provided with a diagnosis of Depressive Disorder

NOS and Axis II was deferred. His treatment plan included medications for treatment of depression and CBT for managing depression.

PC contacts during the review period were dated 9/16/14, 11/19/14, and 12/10/14. Psychiatry contacts were dated 8/22/14, 11/3/14, and 1/5/15. Group therapy contacts were dated 9/25/14, 10/30/14, 11/20/14, 12/11/14, 12/18/14, and 12/19/14. The progress notes were informative in the context of describing his mental health treatment and issues.

Findings

This inmate received mental health treatment consistent with Program Guide requirements.

**Inmate F**

This SNY 3CMS inmate was interviewed in a group setting. He described his mental health treatment as being helpful. The inmate's eUHR was also reviewed.

The most recent treatment plan was dated 7/25/14. It was the third term for this 52-year-old inmate. Diagnoses included Schizoaffective Disorder, bipolar type, Polysubstance Dependence, and Antisocial Personality Disorder. He received treatment at the 3CMS level of care.

Clinical contacts were dated 9/25/14 and 12/5/14. Due to several medical issues, psychiatry notes were more frequent; psychiatry contacts were dated 10/6/14, 12/9/14, 1/2/15, 1/6/15, and 3/10/15. Progress notes and documentation were good.

Findings

Review of the inmate's eUHR supported his report of good access to mental health care treatment. The treatment was also consistent with Program Guide requirements.

**Inmate G**

This 3CMS inmate was interviewed in a group setting on Facility A. He was fairly quiet during the interview process. His eUHR was also reviewed.

The inmate's most recent treatment plan was dated 12/10/14. This 76-year-old man was reported to have numerous medical difficulties. A wheelchair was generally used for ambulation. He had been 3CMS since 2009 due to mild depression, anxiety, chronic pain, and a sleep disturbance. Medications included an antidepressant and narcotic medications for chronic pain. Treatment interventions included individual and group therapies and medication management. Remeron was prescribed. Diagnoses were depression, mild, situational and narcissistic and borderline features.

Psychiatry notes were typed and summarized relevant clinical findings. They were dated 10/18/14, 11/26/14, 12/3/14, 2/12/15, and 3/12/15. Clinician notes were dated 8/4/14, 11/17/14,

12/10/14, and 2/24/15 and were comprehensive in nature. However, group therapy notes were not located.

<u>Findings</u>

This inmate received adult treatment consistent with Program Guide requirements. However, his treatment plan was not followed concerning group therapy participation, which likely was a reflection of current waiting lists.

**Inmate H**

This 3CMS inmate was interviewed in a group setting on Facility A. He was quiet during the interview. His eUHR was also reviewed.

The inmate's most recent treatment plan was dated 8/13/14. This 69-year-old inmate was serving a life sentence without parole. He was a lower leg amputee from a motorcycle accident and also had other significant medical problems. Diagnoses included Delusional Disorder, Polysubstance Dependence, and Antisocial Personality Disorder. His treatment plan included individual treatment, therapy, and medication management. Vistaril was prescribed as an anti-anxiety agent.

Psychiatry progress notes were dated 8/25/14, 12/3/14, 2/12/15, and 3/12/15 and were comprehensive in nature. Clinician notes were dated 8/29/14, 9/5/14, 10/13/14, 11/29/14, and 2/23/15. These notes were also comprehensive in nature and included at least one response to an urgent referral.

<u>Findings</u>

This inmate was receiving 3CMS treatment that was consistent with Program Guide requirements. Except for planned group therapy, his treatment plan had been implemented.

**Inmate I**

The inmate's healthcare record was chosen from a list of inmates who did not receive a timely initial IDTT; his was 13 days late. The inmate had been transferred from DSH to RJD. He was diagnosed with Major Depressive Disorder with psychotic features and prescribed Zoloft, Remeron, and Trileptal. His medical diagnoses included chronic neutropenia and thrombocytopenia, hepatitis C, both lower extremity cellulitis, coronary artery disease, hypertension, hypothyroidism, chronic obstructive pulmonary disease, lumbago, ventral hernia, and morbid obesity. Due to his physical condition, he used a wheelchair and walker.

The inmate had a history of Bipolar I Disorder, with hypomania. The healthcare record noted an allergy to Depakote. He was hospitalized at DSH from 12/12/13 to 10/17/14. He transferred to RJD on 10/17/14 and was housed in the CTC as a DSH medical return. Although the bus screen was completed on 10/17/14, , the incorrect form was used and the inmate was not referred to

777

mental health even though two mental health questions were answered in the affirmative. An SRE was completed on 10/18/14 and indicated moderate acute and chronic suicide risk levels. The treatment plan focused on suicide prevention, individual and group CBT therapy for depression, anxiety, and anger. A mental health examination was also completed on 10/18/14.

On 10/21/14, another SRE was completed and indicated high chronic and moderate acute suicide risk. The SRE reported the inmate's DSH stay as 12/2/13 to 9/27/14, which was a different time period than other eUHR records indicated. The inmate was also being weaned from methadone. He complained of severe pain. The IDTT completed on 11/13/14 was two weeks late. Mental health PC notes from 10/22/14 to 11/13/14 were not available in the eUHR for review during the site visit. The inmate was transferred to VSP on 12/17/14.

Findings

This inmate's care was inadequate. His initial IDTT following DSH discharge was untimely. His medical problems that caused severe pain were not addressed by his mental health care as part of his treatment plan. There was no collaboration between medical and mental health to manage the inmate. Documentation in the eUHR was contradictory and not up-to-date.

**Inmate J**

This SNY/EOP inmate's healthcare record was chosen from a list of inmates who had initial IDTT meetings. He was diagnosed with Bipolar 1 Disorder with mixed psychotic features. Prescribed psychotropic medications were Zyprexa, lithium, and Vistaril. The initial PC contact occurred on 4/16/15; the only documentation on the note was, "Psychology note. 1:1 interview in C yard 3CMS mental health clinic unless otherwise indicated. The inmate was seen today for IDTT prep. IDTT will be this week".

The inmate's initial IDTT meeting was observed on 4/21/15; all of the appropriate staff were in attendance. The inmate discussed a special accommodation for shoes due to a sprained ankle and flat feet. The treatment goal was to learn to recognize, accept, and cope with feelings of mood disorder using an intensity scale. Adherence with prescribed medications at least 90 percent of the time was also a goal. In addition, as part of the treatment plan, the PC would use CBT to reduce negative thoughts and increase positive ones.

Findings

The PC's documentation regarding the 4/16/15 contact was of little clinical value. The clinician did not explain the IDTT meeting's purpose or benefit to the inmate. The clinical presentation during the IDTT meeting was mostly about the inmate's criminal and mental health history, with no substantive discussion about his treatment plan. The clinician stated multiple times during the IDTT meeting that "we are both new." According to the Form 7388, the next IDTT meeting would occur in twelve months. The documentation and IDTT presentation were both inadequate.

**Inmate K**

This mainline EOP inmate's healthcare record was identified for review from a list of inmates who had follow-up IDTT meetings during the site visit.  He attended the IDTT meeting in a wheelchair.  He was diagnosed with Major Depressive Disorder with psychotic features, severe.  The medical diagnoses included scoliosis, seizures, and hypertension.  The inmate received his psychotropic medications by PC 2602 court order.  He was prescribed Prozac, Haldol (with PC 2602 back up), and benztropine (also with PC 2602 back up).  The inmate had support from a brother in Los Angeles who visited frequently.

The PC spoke the inmate's first language and praised him for good group attendance, medication adherence, and for leaving his cell to attend PC contacts.  The PC stated the inmate's major problem was depression; the inmate corrected the PC and stated that the main problem was chronic pain due to scoliosis.  The psychiatrist reported that the inmate was not medication adherent and did not believe he was psychotic at any time.  The psychiatrist discussed the inmate's behavior when not taking psychotropic medications as disheveled, unkempt, and malodorous, and that he failed to bathe.  The inmate and psychiatrist discussed the different views, and the psychiatrist stated that the discussion would continue after the IDTT.  The correctional counselor told the inmate that he was endorsed to CHCF and would go to the Special Outpatient Program.  The recreation therapist arrived 15 minutes late and did not speak during the IDTT meeting, but signed the Form 7388.

Findings

The PC was bilingual and alternated between languages while engaging the team and the inmate, explaining the IDTT meeting's purpose and benefit to the inmate.  The psychiatrist also spoke the inmate's native language and communicated well with him and the team.  It was concerning that the inmate's transfer to Stockton could negatively impact the inmate's support system.  The inmate's mental health care was appropriate.

**Inmate L**

This mainline EOP inmate's healthcare record was chosen from the IDTT meeting follow-up list.  The inmate's diagnosis was Depressive Disorder, and the prescribed medication was Prozac.

The inmate's first interaction with the mental health system occurred in February 2014 while housed in administrative segregation for threatening staff.  The inmate stated that he wanted to leave administrative segregation.  He also reported having three MHCB admissions.  The first admission occurred after his sister committed suicide, and the other two stays reportedly occurred in an attempt to leave administrative segregation.

The inmate's parole date was July 2015, but he had a pending RVR which could delay his release.  The psychiatrist reported that the inmate was prescribed psychotropic medications at the time of arrival to RJD, but he was uncertain whether he needed the medication.  The inmate

779

asked that Prozac be discontinued; the psychiatrist agreed and scheduled an appointment with the inmate to discuss this further.  A pre-release treatment plan was conducted on 3/19/15.

<u>Findings</u>

This inmate's clinical care was appropriate.

## Inmate M

This SNY EOP inmate's healthcare record was chosen from a list of interviewed inmates who were housed in the EOP overflow building during the review period.  He was diagnosed with Adjustment Disorder with mixed disturbance of emotions and conduct.  He arrived at RJD on 3/19/15 from CHCF.  His mental health history included an MHCB admission on 12/24/14 due to suicidal thoughts; at that time, he was placed on the mental health caseload at the 3CMS level of care.  The most recent MHCB admission occurred on 3/19/15; the inmate reported that this admission occurred after he reported being suicidal and that this was an attempt to avoid a fight.  The treatment plan indicated that the inmate should use two adaptive coping skills, namely relaxation techniques and medication adherence to manage depression.

The inmate was concerned that he had not been seen by the ICC to be removed from orientation status so he could receive all of his property.  He also stated that a package was inadvertently sent to another institution.  During the weekly PC contact, he was concerned that he was still on orientation status and wanted to know why the clinician had not addressed this issue during the IDTT meeting.  The inmate also indicated that the 3CMS level of care was his appropriate level of care.

The PC spoke to the correctional counselor on 4/21/15, who stated that he was working on getting the inmate's paperwork ready.  As of 4/23/15, the inmate still was not scheduled for ICC due to a backlog, and he remained on orientation status.

<u>Findings</u>

The inmate's clinical care was adequate.  The PC advocated for the inmate with custody to complete the ICC paperwork so he could be removed from orientation status.

EXHIBIT AA
California Institution for Women (CIW)
May 19, 2015 - May 21, 2015

**Inmate A**

This case was selected for review because the inmate had been identified at least once on the facility's log as having met one or more criteria for inpatient care referral, but was not referred. This 22-year-old EOP DD2 inmate received her psychotropic medications by court order granted on 1/16/15 due to danger to others. She had received an RVR on 12/23/14 for aggravated battery on a peace officer (gassing). The mental health assessment, completed 1/13/15, indicated that she was experiencing psychosis at the time of the RVR due in part to nonadherence with psychotropic medications; she was initiated on involuntary medications on 12/31/15. The evaluator reported the inmate had significant mental health needs that would best be served at the EOP level of care or in the PSU, and prolonged administrative segregation placement was not recommended. No associated progress note was included in the healthcare record for that mental health assessment. There also was no associated progress note for the forced medication initiation. However, on 12/31/14, there was a physician's order by the chief psychiatrist for fluphenazine 5 mg every morning and 5 mg every afternoon with fluphenazine 2.5 intramuscular ordered for medication refusal. The inmate was found guilty of the RVR and she was assessed a penalty that included a loss of 181 days forfeiture of credit. At some point, the RVR was ordered reissued and reheard during March 2015, and the outcome was pending at the time of this review. The matter was also referred to the district attorney. The inmate was out to court during the monitoring visit.

The inmate's diagnoses were Schizophrenia, undifferentiated type and Amphetamine Dependence. She had an extensive history of mental illness, including psychiatric hospitalizations in the community. She was quickly admitted to the MHCB following her arrival at CIW from the county jail. The CIW MHCB had referred her to the CIW PIP, but on 6/14/14 the referral was rescinded; however, reviewed records did not indicate the reason for referral. The inmate had a history of medication nonadherence, poor activities of daily living (ADLs), paranoia, persecutory delusions, aggressive and erratic behaviors, and depression. She had difficulty engaging with others due to her psychotic symptoms. She was described by clinicians as requiring frequent prompts to finish sentences; she often stopped midsentence or trailed off.

The treatment team saw the inmate on 12/30/14, when she was identified as meeting criterion one (unable to function at the current level of care due to a mental disorder) and three (chronic psychiatric symptoms that have not responded to at least six months of treatment). The non-referral rationale was inadequate. Alternative interventions were considered and some were implemented. The treatment team indicated that the inmate had been re-evaluated for the *Clark* developmental disability program and was determined to meet the criteria for DD2 status. The treatment team also noted that she was being considered for a forced medication order.

The IDTT saw the inmate again on 1/9/15. The treatment plan from this encounter indicated that the DDP re-evaluation was in response to the inmate's low functioning and poor ADLs. Due to her DD2 status, she would have more daily contact and support with ADLs and basic tasks. The inmate was described as very guarded when discussing her mental illness. Her treatment plan required greater specification and operationalization of treatment targets and goals, but otherwise was adequate. The Form 7388B of that same date noted that criterion three was met (chronic

psychiatric symptoms that had not sufficiently responded to at least six months of treatment). The non-referral rationale included the same reasons as the Form 7388B of 12/30/14 (pending interventions), none of which properly addressed the indicator or non-referral rationale. While the non-referral may have been appropriate, the rationale was inadequate. The treatment modifications were also inadequate. The treatment team generally indicated what would be addressed and what the inmate was receptive to; however, given that the inmate's symptoms had been resistant to treatment for at least six months, specific interventions should have been identified in this section.

This inmate continued to function poorly and to deteriorate. She was admitted to the MHCB twice, from 3/1/15 to 3/4/15 and from 3/30/15 to 4/1/15; she again returned to the MHCB on 4/1/15, at 1700 hours, and was hospitalized there until 4/2/15. A progress note in the eUHR stated the inmate was also seen in the MHCB on 3/11/15, but a SOMS review indicated that she was not there on that date. Review of progress notes since January 2015 indicated the inmate had not improved and appeared to have worsened; this suggested that a CIW PIP referral was indicated.

Findings

This inmate was not adequately treated. It was unclear from documentation why the original CIW PIP referral was rescinded when it appeared to be clinically indicated. The inpatient referral did not require a forced medication order, but the inmate certainly benefitted from that order and revised DD2 status. Despite these treatment modifications, the inmate continued to experience serious psychiatric symptoms that interfered with her ability to function within the prison setting, which clearly necessitated a referral for inpatient care. This inmate's treatment plans were not sufficiently developed, and they did not include appropriate specific goals and interventions to address the very serious symptoms and functional impairments that she experienced. Consequently, she did not receive adequate treatment. The behavior underlying her RVR (throwing a damp sponge at an officer) was determined to be due to mental illness. She was subsequently hospitalized and a forced medication order was initiated.

**Inmate B**

This case was identified for review as the inmate met at least one or more criteria for higher level of care referral consideration, but was not referred. This 34-year-old 3CMS SHU inmate was admitted to the MHCB on 3/11/15 for suicidality. She had a history of prior MHCB admissions for self-injurious behaviors. She had been housed in the CIW SHU since November 2013 for battery on a non-peace officer and she was functioning well. She was medication adherent; she was prescribed Cymbalta, Buspar, and Vistaril. She was provided with diagnoses of Depressive Disorder NOS and Amphetamine Dependence in a controlled environment.

The MHCB treatment team met on 3/13/15 and developed an appropriate treatment plan. On the Form 7388B, the team identified that the inmate had three or more MHCB admissions during the last six months (criterion five). The non-referral rationale was clinically adequate. Treatment modifications could have been better articulated, but were adequate. The 3CMS treatment team

783

evaluated the inmate after her return from the MHCB on 3/25/15 and treatment planning was adequate. However, the treatment team did not use the most recent version of the Form 7388B, so there were some improvements that were needed that would have been corrected with the use of the most recent version. The Form 7388B indicated that the inmate met criterion five (multiple MHCB placements), but did not have an appropriate non-referral rationale or treatment modifications.

Findings

This inmate was appropriately treated. The 3CMS treatment team did not, however, appropriately document their decision not to refer the inmate to a higher level of care. They also did not appropriately document the alternative interventions that would be used to target the reason (Form 7388B, item five) that identified her for higher level of care referral consideration.

**Inmate C**

This 43-year-old EOP inmate was admitted to the MHCB on 1/24/15 for bizarre, hostile, and agitated behavior; she remained there for 17 days. She had a history of multiple community psychiatric hospitalizations for suicidal ideation and suicide attempts, as well as psychotic symptoms. She also had a history of marijuana and methamphetamine abuse with her first incarceration, for assault of her mother, which reportedly occurred while she was under the influence of methamphetamine. She had a brother with schizophrenia and had received social security disability insurance since she was 18 years of age. She had poor hygiene and was described as responding to internal stimuli and experiencing delusions. She experienced both visual and auditory hallucinations. She had eight suicide attempts, with the last one occurring in 2013.

The MHCB intake nursing assessment and history and physical were timely completed, as was the admission and discharge SRE. The initial SRE completed on 1/25/15 indicated high chronic risk and low acute suicide risk. The treatment plan, which was dated 2/2/15, identified one treatment target, mood instability, and overly broad treatment goals. The only treatment interventions listed were daily treatment team contact and medication adjustment; these interventions were clearly inadequate to address the inmate's mood instability. The inmate was provided with a diagnosis of Psychotic Disorder NOS. She was prescribed benztropine mesylate 2 mg per day, divalproex sodium ER 2000 mg per day, olanzapine 40 mg per day, and hydroxyzine 150 mg per day.

On 2/2/15, the treatment team noted that the inmate met criterion two (requiring highly structured inpatient psychiatric care) for higher level of care referral consideration, but she was not referred. The non-referral rationale was adequate, but the team did not thoroughly articulate the treatment modifications beyond the typical MHCB program standards that would be provided to her to address the positive criterion. The inmate was next seen on 2/9/15 by the treatment team; the team noted that while improving slightly, her mood was still labile with rapid fluctuations from calm to manic and she continued to have acute psychotic symptoms. The treatment team had added the problem area of psychosis to the treatment plan, but treatment

goals were unrealistic given her current level of functioning. There was no documentation indicating that she was going to be discharged, but the inmate in fact was discharged the following day. The team indicated on the Form 7388B dated 2/9/15 that the inmate met criterion two, which required 24-hour structured inpatient care, and criterion four, for being in the MHCB for ten days or more, but the inmate was not referred to a higher level of care. The non-referral reason was the same as the reason from the prior Form 7388B, namely, that the team continued to wait for the medication changes to take effect. However, this was only minimally sufficient given the descriptions of the inmate's behavior at that time. While there had been medication changes, the inmate's behavior continued to necessitate a higher level of care referral. Ongoing medication adjustments could have been addressed in the inpatient setting. The treatment plan included no treatment modifications; instead the standard treatment provided to MHCB inmates was listed in the modification section. The lack of appropriate documentation on the last Form 7388B dated 2/9/15 was of particular concern given that the inmate was discharged the following day when there was no documentation that this discharge was imminent or clinically appropriate.

On 2/9/15, a psychiatric note indicated that the inmate appeared "heavily under the influence of drugs upon admission" by a psychiatrist who had not seen her on the day of admission nor soon after. She was given drug screens on 1/24/15 and 2/4/15; both were negative. In the 2/9/15 psychiatric progress note, the psychiatrist noted that the inmate wanted to return to yard and was upset when she learned she would not be discharged that day. In the psychiatric plan, the psychiatrist noted that she might be discharged early that week, but did not provide a clinical rationale since it was not congruent with the clinical picture in all other treatment documents at that point. In the psychiatric discharge summary dated 2/10/15, the psychiatrist wrote that she had improved "significantly" and her thinking was clear, coherent, organized, and logical, and she was calm. This directly contradicted documentation from the treatment team conducted the day before, on 2/9/15. There was significant contradiction throughout the documentation related to this inmate's discharge.

Findings

This inmate was not appropriately treated. She had a clear and lengthy mental health history that resulted in community hospitalizations for suicidality and psychotic symptoms. Treatment plans did not appropriately target her serious symptoms and functional impairment. Documentation did not adequately justify the reason for non-referral to a higher level of care; it also did not specify the alternative interventions implemented to address those areas that identified the person for higher level of care referral consideration. There were also some contradictions within the MHCB record where the primary treatment team indicated that she remained highly psychotic and unstable as of 2/9/15; yet a second psychiatrist documented completely contradictory information the following day and appeared to believe that she had been under the influence of drugs rather than psychotic. Test results noting that the inmate had been tested twice and was negative for multiple substances were readily available in the healthcare record. Despite this, she was abruptly discharged on 2/10/15. This inmate did not receive adequate care and did not appear appropriate for discharge.

**Inmate D**

This 39-year-old mainline 3CMS inmate was selected for review because she was identified as having met one or more criteria for higher level of care referral, but was not referred. She was discharged from the CIW PIP to the SHU at the 3CMS level of care on October 2014. She was originally admitted to the PIP after a serious suicide attempt by hanging, which required Cardiopulmonary Resuscitation (CPR).

Medical record documentation indicated the inmate had multiple stressors prior to her most recent suicide attempt, including a parental death within the last year, an inmate friend who died by suicide, and a long-time cellmate, who was also her girlfriend, who paroled within the last six months. The inmate had two other prior suicide attempts when she was in her 20s. She had a history of extreme mood fluctuations between depression and anger with poor impulse control and aggressive behaviors. She had been aggressive toward staff and peers and had a history of poor problem-solving skills and self-injurious behaviors.

Once in the SHU, her initial treatment plan dated 10/29/14 noted she had reported to the treatment team that she was "in a good place;" however, the healthcare record documented frequent fluctuations between positive and negative reports in rapid succession. The treatment plan was an "enhanced" 3CMS plan that included weekly PC contacts, daily psych tech contacts, and placement on the CIW high risk list. Some of the treatment goals were too broad to formulate an actionable plan, but the treatment plan at least acknowledged her high risk for suicide and decompensation. It was unclear why the inmate was not placed into the EOP level of care, particularly since the "enhanced" plan was consistent with EOP care with the addition of placement on the high risk list.

The inmate was diagnosed with Mood Disorder NOS, Opiate Dependence, with institutional use, Amphetamine Dependence, institutional use, and Antisocial Personality Disorder. The Form 7388B correctly noted criterion five of multiple MHCB admissions as positive, but she was not referred for a higher level of care. The rationale for non-referral appeared to be her recent PIP discharge, medication adherence, and motivation to work toward treatment goals. As the Form 7388B addressed referrals to all higher levels of care, the rationale for EOP non-referral was necessary and absent. The rationale provided was inadequate and needed to more clearly articulate how the inmate was otherwise stable at the 3CMS level of care. The treatment modifications were appropriate. Based on review of the healthcare record and treatment progress notes, the PC did not consistently see the inmate weekly as outlined in the treatment plan. This was of significant concern given the inmate's high level of risk and treatment needs. Some of the initial PC contacts indicated the PC was addressing issues from the treatment plan and these contacts were not merely "check-ins," but were meaningful clinical contacts. Daily psych tech contact documentation suggested they were superficial contacts; it was unclear how they would further the treatment plan and reduce risk.

The inmate's initial psychiatric contact after discharge from the PIP on 11/21/14 was the first time that the EOP level of care was discussed. During this clinical contact, the inmate reported that she was not happy to be alive and made other statements suggesting suicidal ideation. There

786

was no associated SRE or clear assessment of suicide risk. The psychiatrist included a "5-day step down" in the plan of this progress note. The inmate was never referred for evaluation for MHCB admission nor was the decision not to refer her to the MHCB justified. The five-day step down was not an authorized procedure for CIW or any other CDCR facility, and it appeared to be utilized as an alternative to MHCB referral. The psychiatrist clearly recognized this inmate's risk level to commit suicide or engage in other self-injurious behavior, but inexplicably chose not to refer or admit her to the MHCB; however, there was no clinical justification for the decision not to refer. The psychiatrist's action suggested that the inmate was not safe enough to remain in the setting under normal circumstances, but appropriate protocol was not implemented.

The subsequent treatment plan dated 12/3/14 was an initial treatment plan for administrative segregation after the inmate was moved from the SHU. This treatment plan contained information that contradicted other information in the healthcare record (e.g., the inmate had been 100-percent compliant with medications while other documentation and MARs indicated this was inaccurate). This treatment plan remained the same as the prior plan, dated 10/29/14, with the addition of substance abuse as a problem area. The treatment plan required actual interventions, but instead only listed treatment modalities such as individual and group therapies. Treatment goals also required better specificity and operationalization. As such, the treatment plan was overly broad and vague, making it very unclear what the treatment team would do to improve the symptom presentation and functional level of the inmate. The Form 7388B indicated that the inmate met criterion five, but the inmate was not referred to a higher level of care. The non-referral rationale provided was the inmate's treatment adherence, active treatment participation, and stability. Although the non-referral rationale was clinically reasonable, given the continued weekly PC and daily psych tech contacts with the intention of releasing her to a 3CMS yard, it was unclear why EOP level of care was not considered. The inmate clearly did not appear stable at the 3CMS level of care and contradictory information wsa present in the healthcare record as to treatment adherence. The treatment modifications were appropriate.

<u>Findings</u>

The inmate did not receive adequate care. If she had received all the care indicated in the first treatment plan following discharge from the CIW PIP on 10/29/14, with enhanced clinical contacts and monitoring, the care may have been adequate. However, available documentation indicated that this level of care did not occur.

It was unclear why the inmate was not treated at the EOP level of care. The level of clinical contact and monitoring she received was standard for an EOP, not 3CMS, level of care. She was also inappropriately placed on a five-day "stepdown" or follow-up without having been housed in alternative housing or the MHCB and with no SRE completed. It appeared that she required MHCB referral, particularly in light of her suicide risk, but was instead placed on a procedure of a "five-day follow-up" that did not follow inpatient discharge. The treatment plans were minimally adequate only because of the frequency and general areas of focus; they needed greater specification and operationalization of treatment goals and greater specification of interventions. While the inmate may not have required inpatient care referral, the justification

was inadequate and no justification for a failure to refer to the EOP was provided on the Form 7388B.

**Inmate E**

This case was selected for review in part because of an inquiry by plaintiffs' counsel, but also as an example of MHCB care where the inmate returned quickly after discharge. This 28-year-old first-term inmate had multiple MHCB admissions, and available healthcare records indicated that these admissions averaged almost monthly since December 2014. SREs were not consistently completed at each admission and discharge.

The first initial mental health evaluation located in the inpatient healthcare record (3/1/15) was from the inmate's third MHCB admission within six months at CIW, where she had transferred due to CCWF MHCB lack of capacity. The nursing assessment, history and physical, initial mental health evaluation, initial psychiatric evaluation, and SRE were all completed timely. The reason for admission was a suicide attempt by overdose; the inmate had recently learned of a grandparent's death. She had a long history of impulse control problems and mental health issues dating back to when she was 13 years old. She reported multiple suicide attempts and had visible scars on her arms and neck. She was provided with a diagnosis of Mood Disorder NOS and was prescribed Thorazine 300 mg per day, trileptal 200 mg per day, and Vistaril 50 mg per day.

The initial treatment plan dated 3/2/15 was clinically appropriate and Borderline Personality Disorder was added as a diagnosis. The Form 7388B noted correctly that the inmate met criterion five (multiple MHCB admissions), but the inmate was not referred to a higher level of care. The non-referral rationale was that the MHCB admissions were initiated by situational stress and avoidance of administrative segregation housing. The inmate had also agreed to start taking an antidepressant and her mood had improved; these rationales were clinically adequate. No treatment modifications were included, but instead listed the standard MHCB program.

On 3/9/15, the treatment team saw the inmate again. The treatment plan was unchanged from the previous one and appeared to be cut and pasted. The Form 7388B continued to identify criterion five and used the same rationale without providing updated information regarding medication changes. This treatment plan indicated the inmate was going to be discharged that date to the EOP level of care. The treatment modification section included recommendations for the EOP treatment team. The inmate was not physically discharged until the afternoon of 3/11/2015. Despite being discharged from the MHCB at the EOP level of care, the inmate received a 31-item screen upon arrival in administrative segregation. She was treated by the psych tech as if she were a non-mental health caseload inmate; the psych tech's progress note reported that the inmate had screened positive and a mental health referral would be completed. The psych tech also appeared to have some misconceptions regarding the PIP and recommended that the inmate be considered for the program.

The inmate was seen by a different psych tech on the following day. The inmate was acting oddly, screaming while placed into a therapeutic module, shouting she wanted a dog, yelling

about hearing voices and that she did not want to hurt herself. She yelled that she did not want to go to the MHCB and would not hurt herself. She became increasingly agitated, banging her head and hands against the module, and biting on her wrists, causing indentations. After the staff provided her with space and time to calm down, she was escorted to the CTC and was eventually readmitted to the MHCB.

The inmate was readmitted to the MHCB on 3/12/15 and, except for the initial psychiatric evaluation, all admitting documents were completed timely. Upon arrival at the MHCB, she was banging her head, biting herself, and attempted to swallow a spoon. She was placed into seclusion and was provided with intramuscular emergency medications. After approximately 90 minutes she had calmed sufficiently and was escorted to her room. The following day she covered her window, was biting herself, and engaged in other problematic behaviors, necessitating emergency medication and seclusion again. She was demanding to staff that she not be returned to administrative segregation. The treatment team saw her on 3/13/15 and changed her diagnosis to Major Depressive Disorder without psychotic features, PTSD, and Borderline Personality Disorder. The treatment plan was the same as the prior MHCB admission and in light of the inmate's rapid return, should have been revised and not cut and pasted into this treatment plan. The Form 7388B of this date indicated the inmate met criteria two (required highly structured inpatient care) and five (multiple MHCB admissions), but the inmate was not referred to a higher level of care. The rationale for non-referral included some of the same reasons from the last MHCB admission and was inadequate. However, the treatment modifications were acceptable.

The treatment team next saw the inmate on 3/23/15. The clinical summary indicated that a forced medication order had been initiated on 3/15/15, despite the fact that the previous treatment plan reported the inmate to be medication adherent. The forced medication order was sought due to danger to self and others and was granted on 3/26/15 for one year. The clinical summary in this treatment plan did not note the initiation of forced medication, and the treatment plan remained unchanged from the prior plan. The forced medication order was noted in the medication section. The Form 7388B noted that the inmate met criteria four (MHCB stay of 10 or more days) and five (three or more MHCB admissions in the last six months), but the inmate was not referred to a higher level of care. The non-referral rationale was appropriate; it noted that after placement on involuntary medications, the inmate's mood had improved and she had not engaged in any subsequent self-injurious behavior. The treatment modifications were also appropriate.

Findings

While documentation was problematic and needed significant improvement, the inmate was adequately treated. There was contradictory information in the healthcare record that needed to be remedied, such as the documentation that the inmate was medication adherent when an involuntary medication order was sought. In addition, treatment plans were too frequently cut and pasted, including outdated treatment plans and treatment summaries that were no longer relevant for the inmate. There also needed to be better specification and operationalization in the

treatment plans so that treatment could be clearly identified and progress notes linked back to the treatment plan.  Despite these limitations, this inmate was adequately treated.

## Inmate F

The inmate was housed in the PSU, where she was serving a term for battery of a peace officer and gassing.  The Special Master's expert interviewed her at cell front as she had declined to participate in a group interview.  The purpose of this review was to assess mental health care provided during the review period.

The inmate received inpatient psychiatric treatment before entering CDCR and was treated three times in PSH per PC 1370 during this incarceration.  She was treated at the EOP level of care since 2009.  Immediately prior to PSU placement, she was treated for eight months in the PIP.  She required court-ordered medications to target persecutory delusions about imaginary custody staff, hostile behavior, and threats.

Healthcare record documentation indicated the PSU treatment team reviewed the PIP discharge report and incorporated recommendations made therein, including renewal of PC 2602 medications.  She was maintained on olanzapine 30 mg per day to treat symptoms of her historically diagnosed mental disorder, Schizophrenia, paranoid type.

The inmate was adherent with court-ordered treatment and participated in full PSU programming at the highest level even though she continued to harbor paranoia about correctional staff.  She was eager to participate in PSU programming to avoid discharge to the EOP where she claimed to feel unsafe without the protective barrier afforded by treatment modules.

In January 2015, she exhibited increased paranoia and refused to attend treatment groups due to what was described as increased chaos in the housing unit.  Her refusal to attend treatment groups was based on irrational beliefs associated with her severe mental illness, i.e. housing officers planned to injure her.  On that basis, she was placed on a modified treatment plan consisting of four weekly groups.

According to subsequent treatment records, the inmate successfully accomplished the modified treatment goals, but was retained on the modified plan without explanation.  The Special Master's expert interviewed her on 5/19/15.  She was grossly psychotic as characterized by healthcare records and oral staff reports.  She continued to express delusional beliefs about custody staff, whom she believed wanted to harm her.

<u>Findings</u>

The inmate was appropriately placed in the EOP to treat a chronic and severe mental illness.  Within the limits of the review period, the care provided appeared adequate.  Treatment plan meetings were timely held, as were PC and psychiatry contacts and psych tech rounds.  The inmate's persistent psychosis was managed at the EOP level of care within restricted PSU housing and augmented by court-ordered medication.  These parameters appeared necessary to

790

reduce the intensity of symptoms and eliminate assaultive behaviors.  However, the issue of treatment interventions needed to return the inmate to a less intense level of care as required by the Program Guide (12-9-6) was not directly considered by the treatment team.

**Inmate G**

This case was randomly selected from the roster of PSU inmates at the time of the site visit.  The purpose of the review was to assess the mental health care provided to the inmate during the time she received EOP level of care treatment in the PSU.

Healthcare record review noted the inmate's long history of psychosis, amphetamine abuse, and numerous psychiatric hospitalizations in the community.  Past psychiatric medications included Seroquel, Abilify, Haldol, Buspar, Prozac, Vistaril, Risperdal, and Cogentin.  Her history was notable for seven suicide attempts, with the most recent occurring three years earlier in the county jail.

The inmate was previously treated in the EOP, but transferred to the PIP after receiving three RVRs within a six-month period.  The treatment team provided a diagnosis of Schizoaffective Disorder based on reported experiences of auditory hallucinations, paranoid thinking, mood instability, and poor self-care.  She was prescribed Zyprexa to treat symptoms of her severe mental disorder.  She discharged to the EOP on 10/29/14, but went to administrative segregation on 1/8/15 for fighting.  She was placed in the PSU on 2/12/15.

Upon arrival in the PSU, an initial brief evaluation, a comprehensive clinical assessment, and the initial IDTT were completed within Program Guide timeframes.  The institution did not track whether the initial IDTT occurred prior to the initial ICC.

The initial treatment plan dated 2/17/15 identified problem areas and provided relevant clinical interventions.  However, it did not contain specific discharge plans or recommendations for discharge to a less restrictive level of care as required by the Program Guide (12-9-6).

During her first month in the PSU, the inmate participated in full PSU/EOP programming with sufficient documentation.  PC contacts were provided as required by the Program Guide.  However, the inmate was immediately concerned about reducing her level of treatment to the 3CMS; this topic was allowed to monopolize the discussion in all clinical contacts during the first month, despite there being no clinical plan in place for discharging her to a less intensive level of care.

During March 2015, the PC timely saw the inmate.  She had an initial contact with the psychiatrist, which was overdue.  The inmate wanted to discontinue medication, but was amenable to striving for a six-month period of no hallucinations and optimal personal functioning before discussing future medication changes.  She continued to actively participate in group treatment and remained focused on reducing level of care to 3CMS.

The follow-up IDTT occurred on 3/17/15 and was attended by all required participants. The inmate was unkempt and presented with anxious mood, blunted affect, and evidenced paranoid delusions. Treatment progress was discussed. The inmate denied experiences of perceptual disturbances; insight was deemed poor. The Form 7388B stated the opinion of the clinical team that there were no indicators suggesting higher level of care referral should be considered.

Findings

The inmate appeared to be appropriately placed in the EOP for treatment of her serious mental disorder. Most Program Guide requirements were met, except for inclusion of an initial discharge plan that was incorporated into the initial treatment plan. The psychiatrist's intervention was paramount in gaining the inmate's acceptance of behavioral and symptom changes needed before less intensive care could be considered. Overall, the inmate received adequate care in the PSU during the brief period reviewed.

**Inmate H**

This inmate was housed in the PSU. She was repeatedly diagnosed with Mood Disorder NOS by institutional treatment teams. She was treated with lamotrigine and olanzapine to target symptoms of her psychiatric disorder. A rule out diagnosis of Substance Induced Mood Disorder was considered due to her frequent drug use while incarcerated.

Healthcare records indicated the inmate had no history of mental health treatment before coming to prison. She began receiving treatment at the 3CMS level of care in 2003. She was admitted to the MHCB from administrative segregation for suicide gesture and volatility. On 2/26/15, she discharged to the PSU because her level of care was elevated to EOP.

Upon arrival in the PSU, she received a comprehensive clinical assessment and initial clinical contact within Program Guide timeframes. An initial SRE assessed a moderate chronic and acute suicide risk. Justification for acute risk appeared to be based on recent MHCB discharge and a history of gestures and using suicidal ideation for secondary gain. A meaningful and individualized risk reduction strategy was recommended.

The initial treatment plan was timely completed and included appropriate considerations regarding inclusion on the high risk list and level of care decisions. Suicide risk reduction recommendations were incorporated into the treatment plan. Follow-up treatment plans identified problem areas, included relevant and measurable goals, and provided succinct and useful information on inmate progress to date.

The psychiatrist and inmate worked collaboratively to address the inmate's medication concerns. The psychiatrist skillfully worked with her to engage her motivation.

The inmate's two-week review IDTT meeting was observed on 5/19/15. The treatment team meeting included attendance by all required staff. Staff introductions were made and the reason for the meeting was reviewed with the inmate. The PC summarized her recent history and

progress during the review period. The inmate aptly summarized treatment progress in her own words. Future goals were also discussed in language she could understand. Team members provided positive feedback to her about progress to date. Eligibility for early release under Prop 47 was discussed and noted attention to release planning issues.

Findings

The inmate was appropriately enrolled at the EOP level of care. She received adequate care because timelines were consistently met, treatment goals were individualized and included parole release planning, and treatment team members used a collaborative approach which was successful with this inmate.

**Inmate I**

This inmate was treated in the EOP and housed both in the PSU and the Special Care Unit (SCU) during the review period. The purpose of this review was to assess the overall care provided with special attention to continuity of care and treatment planning.

Healthcare records revealed the inmate's longstanding documented history of serious mental illness that included three admissions to PSH pursuant to PC 2684, 13 months in the PIP during 2012 and 2013, and a history of involuntary medication with the most recent order terminating on 11/20/14. There was a documented history of fixed erotomanic delusions, mood lability, assaultive and aggressive behavior toward staff, and paranoid delusions.

During the course of EOP treatment, the inmate required two MHCB admissions in May and June 2014. After transfer to the PSU on 9/12/14, she was admitted to the MHCB on 10/4/14 for agitation and suicidal threats. Following release to the SCU on 2/19/15, she had two MHCB admissions in March 2015. She was readmitted to the crisis bed in April 2015, prior to the monitoring visit.

Members of the inmate's IDTT routinely provided a diagnosis of Bipolar Disorder, mixed type, severe with psychotic features. Diagnoses on Axis II were intermittently noted as Borderline and Antisocial Personality Disorders. Prescribed medications under an involuntary order included Abilify, lithium, and Zyprexa as needed for medication refusal.

A renewal of involuntary medication notice was prepared on 10/28/14 recommending that the inmate be free of crisis mental health visits for one year before involuntary medications were discontinued. This recommendation was made in the context of her significant history of refusing medications even though she could articulate positive intentions. The medical opinion was that her mental state rapidly deteriorated when she was not medicated, resulting in a risk of danger to others. The petition to renew per PC 2602 was denied on 11/20/14.

Treatment plans composed from October 2014 to January 2015 identified three problem areas, including suicide gestures and attempts for secondary gain, mood instability with psychosis, and

high utilizer and inappropriate MHCB use for secondary gain. Interventions were measurable, and appropriate to problem areas, but progress was reported in only very general terms.

Follow-up treatment plans reflected a general upward progress, with a temporary setback in December 2014 which the inmate managed adequately. By January 2015, the inmate had not endorsed suicidal ideation, been admitted to the MHCB, or exhibited significant mood instability for three months. She was adherent with prescribed psychotropic medications and demonstrated insight regarding the need for medication adherence.

Inappropriate use of the crisis bed was removed from the treatment plan problem list on 2/17/15 without documented discussion. This change was made notwithstanding a psychiatric recommendation to retain as a treatment goal for one year.

On 2/19/15 the ICC suspended the remainder of the inmate's SHU term and released her to the SCU. A clinical assessment was completed prior to the initial EOP IDTT meeting as required by the Program Guide. Her initial treatment plan was timely prepared. The diagnosis of record was retained, as were the treatment goals, absent the goal related to inappropriate use of the crisis bed.

The inmate was admitted to the MHCB 17 days after arriving in the SCU. The admission was based on threats to harm staff, anxiety, and fear about returning to the cell. The psychiatrist discontinued psychiatric medications based on the inmate's wishes. A discharge treatment plan was not located in the inmate's healthcare record.

On 3/25/15 the inmate was readmitted to the MHCB because of agitation and manic behavior after not having taken psychiatric medications for two weeks. She admitted she had become out of control and agreed to restart treatment. Discharge occurred on 4/2/15 without a discharge treatment plan.

On 4/20/15 the inmate was readmitted to the MHCB when she was discovered with underwear tied around her neck because of threats made by another inmate. She had been adherent with her medications and there were no manic or psychotic symptoms during this admission. No medication changes were made, and she was discharged on 4/22/15.

Findings

The inmate was appropriately enrolled in the EOP to treat a serious mental illness. The care provided to her was inadequate due to a lack of meaningful continuity across housing placements, lack of transitional care recommendations from the PSU to SCU, and no transitional care provided in the SCU as per Program Guide 12-4-8. Treatment planning as to her chronic MHCB use was fragmented and inadequate. The PSU clinician did not document recommendations as to the inmate's specific treatment needs or express concerns about how to facilitate her successful transition to the general population as Program Guide 12-4-8 required.

**Inmate J**

This case was randomly selected for review from the roster of 3CMS inmates housed in administrative segregation. The inmate was diagnosed with Major Depressive Disorder, recurrent, mild, Bulimia Nervosa, Panic Disorder with Agoraphobia, and Amphetamine Dependence. Psychiatric medications included hydroxyzine as needed at bedtime to treat insomnia and anxiety.

The inmate was timely cleared for administrative segregation placement on 3/26/15. She was timely screened for mental health issues and referred for further evaluation based on positive screening results.

A mental health evaluation addendum was timely completed. The inmate was already included in the 3CMS. She appeared mildly distressed due to the lockup but without exacerbation of psychiatric symptoms. She was followed in daily psych tech rounds upon her immediate placement. Documentation indicated she was typically observed laying on her bed and she reported that she was doing well.

Findings

The inmate appeared to be appropriately enrolled in the 3CMS for treatment of a psychiatric disorder. Treatment protocols governing administrative segregation placement were followed. Review of the inmate's healthcare record indicated she received adequate mental health care.

**Inmate K**

This 3CMS inmate was randomly selected for review from a roster of inmates housed in administrative segregation. She was provided diagnoses of PTSD, chronic, Impulse Control Disorder NOS, and Polysubstance Dependence with institutional drug use. The inmate was prescribed Zoloft to treat depressed mood and Vistaril to treat insomnia.

The inmate was referred to the psychiatrist for medication nonadherence. Medication adjustments were made to achieve better adherence.

The psych tech regularly saw the inmate during rounds. She was described as reclusive to the cell, not attending yard or treatment groups, and laying on her bed with limited interaction with staff.

The PC saw the inmate at intervals consistent with the Program Guide. She was capable of engaging in therapeutic discussion. Among other topics, she addressed issues of getting along with cellmates, RVR circumstances, and minimizing conflict with custody staff. The observations of the psych tech were not incorporated into discussions with the clinician.

This brief review covered the period of 2/24/15 to 3/31/15. Prior to administrative segregation placement, she was treated at the 3CMS level of care in the general population. She had been placed on C/C status for a history of multiple RVRs. The inmate had fair insight into her difficulties maintaining emotional stability.

Findings

The inmate was appropriately placed in the 3CMS for treatment of her psychiatric disorders. She received adequate but not optimal care in the 3CMS in administrative segregation. It was noted that full programming for STRH had not been implemented during the review period.

**Inmate L**

The inmate was housed in administrative segregation at the 3CMS level of care. She was provided diagnoses of Depressive Disorder NOS, Polysubstance Dependence with institutional drug use, and Personality Disorder with antisocial and borderline features. She was most recently prescribed Remeron, Vistaril, and Zoloft.

The healthcare record review indicated a history of five or six suicide attempts beginning at seven years of age. She had two psychiatric hospitalizations during early and late adolescence and was diagnosed with Bipolar Disorder and Schizotypal Personality Disorder. Past medications included Zoloft, Abilify, Depakote, lithium, Seroquel, and Remeron.

The inmate's treatment response was consistently poor since initial enrollment in 2010, exemplified by long periods of medication refusals and chronic refusals to attend mental health appointments. She was never considered for transfer to a higher level of mental health care, and had one MHCB admission in 2013 for suicidal thinking.

The inmate was placed in C/C status and complained of rapid and severe mood swings and requested to be placed on medication. The psychiatrist recommended Zydis 7.5 mg and lithium carbonate 300 mg, but the inmate refused to attend pill line and follow-up appointments and labs.

The inmate required outside medical treatment for a head injury. She frequently refused follow-up medical appointments. She was reevaluated for psychotropic medication at her own request due to ongoing severe mood swings. Zoloft and Remeron were recommended. She was informed of the institution's random drug screening policy. She subsequently refused recommended treatment.

In February 2014, the inmate refused to attend groups in the 3CMS administrative segregation unit. She refused to attend the IDTT and refused to be interviewed for a 115 mental health assessment. The PC planned to meet with her at least weekly to address anger issues; there was no plan in place to consider the chronically poor treatment alliance.

The inmate received three RVRs from January to March 2015, for fighting, distribution of drugs, and indecent exposure. These were noted on the Form 7388B dated 4/22/15. She was

considered for a higher level of care referral, but a referral was not made.  The rationale offered was that the behaviors leading to the RVR were not due to the inmate's mental disorder.

<u>Findings</u>

The inmate was appropriately enrolled in the 3CMS to treat a psychiatric disorder.  However, her chronic refusal to participate in treatment services, even after requesting treatment for severe mood swings, was not adequately addressed by the treatment team.  The IDTT's rationale for not referring her to a higher level of care based on three RVRs in six months showed a faulty understanding of this indicator and was not in keeping with Program Guide requirements.  The most recent treatment plan lacked modifications to address the RVR behaviors.

The inmate floundered in the mental health program during the review period.  She would have benefitted from a trial in a more intense treatment environment paying attention to substance abuse, therapeutic alliance, decreased motivation, and resistance.

EXHIBIT BB
Central California Women's Facility (CCWF)
May 27, 2015 - May 29, 2015

**Inmate A**

This EOP inmate was housed in the mainline EOP housing unit. She was provided with a diagnosis of Schizophrenia, paranoid type. She was not prescribed psychotropic medications at the time of the site visit.

The inmate arrived at CCWF on 4/21/15 from a county jail. She was described as challenging, angry, and aggressive. She had a long history of treatment with psychotropic medications, but was not taking medication at the time of arrival. She paroled from CIW in January 2015 and had been medication noncompliant since that time. She was previously treated with Depakote and Trilafon.

A treatment plan dated 4/29/15 provided the above diagnosis. Goals included mood management with interventions that included "cooperate with psychiatrist and taking medications daily, attending anger management groups, working out and developing coping skills." The problem list included "explosive anger and behaviors as active problems on 4/29/15."

A psychiatric progress note dated 4/29/15 indicated the inmate was disorganized and unable to tell the day and date. She had not been on psychotropic medications, "but believes she needs them." The psychiatrist indicated at that time that the inmate was not on any medications and "feels fine without them." There was no documentation that the psychiatrist attempted to prescribe psychotropic medications, or to convince the inmate regarding the need for treatment.

Subsequent progress notes indicated that the inmate expressed concern regarding sexual behavior among her dorm mates and had periods of agitation and continued psychosis.

<u>Findings</u>

The mental health care provided to this EOP inmate was inadequate and of concern. She presented with severe psychotic symptoms. There was a lack of documentation that the psychiatrist worked to treat the inmate with needed antipsychotic medications as well as education aimed at helping her understand the need for treatment.

There was also a lack of documentation that there was ongoing assessment for referral to a higher level of care or more aggressive attempts to stabilize this unstable EOP inmate. The inmate was seen during a group therapy session where she presented with inappropriate, loud laughter, loud cursing with response to auditory hallucinations, and disorganized thinking and behavior.

**Inmate B**

This EOP inmate was housed in the mainline EOP housing unit.  She was provided with a diagnosis of Schizoaffective Disorder, bipolar type.  Her healthcare record was reviewed due to concerns that she would be prematurely downgraded to the 3CMS program.
Progress notes indicated that she presented with constricted affect, but with calm behavior.  She did not exhibit evidence of delusional thinking, but her memory was impaired.  She was recently discharged from the CIW PIP and, on the most recent treatment plan dated 5/13/15, was identified with an inability to function in a complex social setting.  The medical record contained documentation regarding plans for her transfer to the 3CMS program; the inmate indicated her desire for such transfer during an EOP group therapy session.

The most recent Form 7388B dated 5/13/15 indicated that she did not meet higher level of care referral criteria.  She was placed on a modified treatment plan due to her inability to fully participate in programming on 11/26/14; her group participation ranged from 5.5 to 10.75 weekly hours from March to April 2015.

The treatment plan indicated that she would not be downgraded to the 3CMS program at that time, and the treatment team would continue to prepare her for that goal.

<u>Findings</u>

There was documentation that the PC saw the inmate weekly.  Treatment planning was clinically appropriate.  This inmate was appropriately placed in the EOP and there did not appear to be immediate plans to downgrade her to the 3CMS level of care.

**Inmate C**

This 21-year-old inmate was housed on B yard, which was a mainline 3CMS yard.  She was provided with a diagnosis of Mood Disorder NOS.  She was prescribed Effexor and Abilify.  Her healthcare record was chosen from the DSH non-referral log to assess access to a higher level of care due to her multiple MHCB admissions.

There was a report of intermittent depression since early adolescence, which coincided with foster care placement.  The inmate had a history of a suicide attempt by overdose.  There was no history of mental health treatment until she was admitted to CDCR.  She also had a history of alcohol and methamphetamine use.

While in the mental health program, she had multiple MHCB admissions; they were typically initiated by a report of suicidal ideation to custody staff combined with complaints about her medication.  While in the MHCB, she had multiple medication changes involving Prolixin, Geodon, Zyprexa, Prozac, Effexor, and Buspar over several months.  Symptom complaints were generally documented as anxiety, depression, and auditory hallucinations; however, specific symptoms were not documented.  Overall, MHCB documentation did not routinely explain the rationale for the decision not to refer her to the CIW PIP.  Diagnoses included Adjustment

Disorder and Psychotic Disorder. Treatment goals were directed at the inmate abstaining from self-injurious behavior, managing impulsive behavior, and depressed mood.

The inmate had three MHCB admissions in October 2014, and each time she was discharged to the 3CMS level of care. After her fourth MHCB admission, in early November, she was discharged to the EOP level of care. While she was in the EOP, she stabilized; there were no subsequent MHCB admissions, and she discontinued psychiatric medications in December 2014. In February 2015, she was discharged from the EOP after she was involved in an altercation. However, just prior to the discharge, there was documentation supporting her need for continued treatment at the EOP level of care. However, a progress note indicated she had been informed that she did not require EOP level of care, but staff maintained her at the EOP to continue parole planning.

When the inmate was told that EOP level of care would be discontinued, she superficially cut her wrist with a razor. During two more subsequent MHCB admissions; although documentation revealed that the inmate requested EOP level of care, a referral was not made. The plan was to continue the patient at the 3CMS level of care as she would parole in less than one month.

Findings

This inmate's care was generally adequate in that she did not appear to require inpatient level of care. However, the delay in change from 3CMS to EOP level of care and subsequent change from EOP back to 3CMS after fighting was questionable. In addition, the lack of documentation regarding specific symptomatology was problematic and did not support documented diagnoses. There also was a lack of documentation that the inmate was educated about facilitating medication changes through routine referrals, as opposed to MHCB admissions. Lastly, the inmate exhibited some behaviors consistent with Borderline Personality Disorder, and this diagnosis was worth consideration.

## Inmate D

This 35-year-old inmate was currently at DSH. Her healthcare record was reviewed to assess access to a higher level of care given her multiple MHCB admissions. She was diagnosed with Schizoaffective Disorder.

The inmate had a long history of mental health treatment prior to CDCR admission, including ten psychiatric hospitalizations and outpatient mental health treatment since the age of 20. She had a history of alcohol, methamphetamine, Klonopin, Valium, Soma, and Norco abuse.

Shortly after admission to CCWF in May 2014, she was admitted to the MHCB. She was deemed a danger to others due to delusions and engaging in inappropriate sexual behavior. She was discharged to the EOP level of care. However, due to her sexual aggression, she could not be maintained in EOP housing where six inmates were in each room. She was subsequently placed in administrative segregation reportedly for her own and others' protection.

She exhibited similar behavior in October 2014, resulting in another MHCB admission.  A referral to intermediate care was submitted on 10/3/14.  There was a discrepancy in the documentation about the referral's status; documentation showed that the CIW PIP rejected the referral on 10/15/14, but also indicated that acceptance was pending clinical consultation and recommendation of a trial stay in the EOP.  During the IDTT meeting on 10/16/14, it was documented that the inmate's mental status had stabilized during MHCB admission, and the team did not appeal the CIW PIP's decision.  The inmate was discharged to the EOP level of care.  She subsequently returned to the MHCB on 10/23/14, where she remained until 10/30/14, when she was discharged back to the EOP.  Another MHCB admission occurred on 11/13/14 after she had attempted suicide by hanging.  She was accepted to the PIP on 11/14/14, and she was admitted on 11/17/14.  During the site visit, she was hospitalized at the CIW PIP.

<u>Findings</u>

This inmate's care was inadequate.  The discrepancies in documentation regarding the status of the CIW PIP referral and delay in acceptance to the PIP were areas of concern.  Furthermore, the decision to house her in administrative segregation due to behavior stemming from her mental illness was of grave concern.

EXHIBIT CC
Valley State Prison (VSP)
March 10, 2015 - March 12, 2015

**Inmate A**

This 3CMS inmate's healthcare record was reviewed from a list of inmates housed in the administrative segregation overflow unit who were on suicide watch and awaiting transfer to a MHCB during the site visit. The inmate's diagnosis was Major Depressive Disorder NOS and Major Depressive Disorder with psychotic features. His prescribed mental health medications were mirtazapine, risperidone, and Buspar. A CNA was seated in front of the cell, maintaining good visual sight of the inmate. The behavioral documentation appeared adequate and accurate. The CNA was able to answer all questions regarding the inmate's behavior.

During the review period, the inmate was housed in the MHCB from 8/13/14 to 8/26/14 for suicidal ideation and danger to self. He was again placed in the MHCB from 2/1/15 to 2/26/15 for suicidal ideation and danger to self, and in the OHU awaiting MHCB transfer on 3/10/15, also for suicidal ideation and danger to self.

The inmate's original parole date was 3/14/15, but it was extended to May 2015 due to an RVR that was given to all inmates in the housing pod for pruno production. He stated that he would prefer to go into a diabetic coma and die rather than to remain in prison longer. He arrived in the administrative segregation overflow unit on 3/9/15 after making suicidal statements and refusing insulin and meals. The nurse practitioner educated him about the dangers of medication noncompliance, and he agreed to have his blood glucose checked and take the insulin. His blood glucose level was 258; normal values were from 60 to 100. He was accepted to MCSP on 3/10/15, and he timely transferred to the MHCB.

Findings

Psychiatry notes were very detailed and succinct; treatment goals addressed the use of conflict resolution skills to minimize the number of monthly conflicts and use of appropriate coping skills that did not put the inmate's health at risk. Psychoeducational plans correlated with treatment goals and were appropriate for the inmate's diagnosis, history, and future release. The PC's treatment goals monitored symptoms of depression according to CBT and supportive therapy strategies, and focused on parole planning. This inmate received appropriate mental health care.

**Inmate B**

This EOP inmate's healthcare record was reviewed from the list of inmates housed in the administrative segregation overflow unit who were on suicide watch during the site visit. He was provided with a diagnosis of Schizoaffective Disorder, depressive type. His prescribed mental health medications were Vistaril, Zyprexa, and Zoloft. He had a history of auditory and visual hallucinations; the latter appeared as legions, demons, and/or Satan. He believed the demons channeled through people of color and told him to hurt himself. The inmate had numerous perceptual disturbances, resulting in admission to the MHCB in August 2014 and again on 3/10/15. He was evaluated on 3/9/15 for suicidal ideation and danger to self, and he was accepted to the CHCF MHCB on 3/10/15.

Findings

The PC's progress notes were very thorough and consistent, documenting discussion with the inmate regarding education of the disease process. Treatment goals focused on medication compliance and use of coping skills to help manage auditory hallucinations. This inmate received appropriate mental health treatment.

**Inmate C**

This inmate's healthcare record was reviewed from the list of 3CMS inmates who had annual IDTT meetings at the time of the site visit. His diagnosis was Mood Disorder NOS; in addition, he had diabetes mellitus and a colostomy. Prescribed medications were Trileptal and Prozac. He was previously treated with lithium; however, reportedly this medication caused seizures, and it was discontinued. The documented treatment goals were to address ongoing anxiety issues and stress due to medical issues, and management of prison life through the coping skills of deep breathing and thinking before acting. The inmate remained at the 3CMS level of care and was praised for his positive mental health programming. He had an intestinal rupture in 2009 and an attempted resection with complications. He was scheduled for a colostomy reversal on 3/27/15, and he hoped this would alleviate many of his medical and mental health stressors.

Findings

The PC and psychiatry notes were adequate. The psychoeducational plans focused on self-monitoring, identifying triggers, applying coping strategies and positive self-talk. The inmate received appropriate mental health care.

**Inmate D**

This 3CMS inmate's healthcare record was reviewed from a list of annual IDTT meetings. He was diagnosed with Anxiety Disorder NOS and Generalized Anxiety Disorder. He was prescribed Vistaril and Zoloft. The inmate was alert and talkative during the annual IDTT meeting. He expressed concern about losing work and of being idle. The treatment team was beneficial in providing the inmate with helpful advice regarding this issue. The inmate was serving a life sentence.

PC contacts were timely and adequate, but the clinician was informed that the inmate was having problems obtaining chronic care medical appointments. The PC documented the need to discuss these medical delays with a supervisor.

Findings

PC and psychiatry care was adequate. The treatment team provided appropriate interventions to assist the inmate find another job, and medical concerns were elevated and resolved. The inmate received appropriate mental health care.

**Inmate E**

This EOP inmate's healthcare record was reviewed from a list of inmates receiving PC 2602 involuntary medications. The inmate was diagnosed with Schizoaffective Disorder, bipolar type. He was prescribed Depakote, lithium, Cogentin, Haldol as well as Haldol injectable, if required. During the review period, he attended groups 80 percent of the time and was compliant with medications 90 percent of the time. He did not receive any RVRs, and did not have any MHCB admissions. Clinical and psychiatric documentation throughout the reporting period supported findings of internal stimuli due to either auditory or visual hallucinations, but the inmate continued to deny any mental illness. Involuntary medications were not given to the inmate during the review period.

<u>Findings</u>

Clinical, psychiatry, and group documentation reviewed were adequate. The inmate had received PC 2602 involuntary medications since 2010; court orders were in place, and the last renewal occurred during March 2015. The inmate was compliant with medications and groups. He denied auditory hallucinations and having a mental illness; however, during clinical contacts and IDTT meetings, clinicians and treatment teams noted that he displayed behaviors indicative of response to internal stimuli with incongruent affect and mood. Treatment goals were focused on reality-based strategies of obtaining trusted supports to ground the inmate and help him to distinguish reality from non-reality. The inmate received appropriate mental health care.

# APPENDIX C

The following are offered for discussion and consideration for monitoring by the Special Master in the Twenty-Seventh Round:

1. The status of implementation each of the plans, policies, and protocols which emanated from the Order entered April 10, 2014 concerning use of force and the inmate disciplinary process against mentally ill inmates and the use of segregated housing for mentally ill inmates.

2. Regarding EOP administrative segregation:

a. Compliance with Program Guide requirements in the EOP administrative segregation hubs.

b. CDCR's process for monitoring conduct of case-by-case reviews to reduce the lengths of EOP inmates' stays in administrative segregation.

c. Examination of ICCs' chronos for EOP inmates with long stays in administrative segregation to determine whether the evaluations required by the September 15, 2014 memorandum were conducted timely and whether ICCs' decisions were documented with appropriate rationales.

d. Examination of whether mental health input was provided and considered at ICC meetings, including whether the CDCR Form MH-10 or ICC chronos documented review of mental health factors influencing the inmates' behaviors at the time of rules violations and issuance of RVRs, and whether appropriate treatment plans were developed and implemented to address the behaviors at issue.

e. Examination of lengths of stay of NDS cases, including review of CDCR Form 114-As and tracking sheets for property and privileges in administrative segregation units, and assessment of NDS patient classification chronos in SOMS.

f. Examination of cases of high numbers of treatment refusals attributed to custody issues, including determination of whether a plan of action to address these issue was documented, and interviews of staff to gauge their awareness of the high-refusal policy and its requirements.

g. Regarding the requirement of 120-day pre-MERD reviews, examination of the warden's administrative segregation unit report indicating inmates' projected MERDs and sampling of ICC chronos for inmates within 120 days of their MERDs to assess compliance with the pre-MERD review.

807