# centerforconstitutionalrights

*on the front lines for social justice*

May 2, 2016

Honorable Claudia Wilken
United States District Court
Northern District of California
1301 Clay Street
Oakland, CA 94618-5212



Honorable Kimberly J. Mueller
United States District Court
Eastern District of California
501 I Street
Sacramento, CA 95814

**Re:** *Ashker et al. v. Brown et al.*, N.D. Cal. Case No. 09-cv-05796 CW; *Coleman, et al., v. Brown, et al.*, E.D. Cal. Case No. 90-cv-00520-KJM-KJN.

Dear Judge Wilken and Judge Mueller:

We submit this letter with a sense of urgency regarding the security/welfare checks at the Security Housing Unit (SHU) at Pelican Bay State Prison as ordered by the *Coleman* Court. The unintended consequence of these checks (now 40 per day per prisoner) has been massive sleep deprivation. Sleep is a basic human need protected by the Eighth Amendment's prohibition against cruel and unusual punishment. Conditions that deprive a prisoner of a single basic need, such as sleep, may violate the Eighth Amendment. See *Wilson v. Seiter*, 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Gordon v. Cate*, No. 11-CV-03593-JST (PR), 2014 WL 848212 (N.D. Cal. Feb. 28, 2014) ("excessive noise" throughout a plaintiff's approximately one-month stay in administrative segregation could set forth Eighth Amendment violation); *Garrett v. Thaler*, 560 F. app'x 375, 379 (5th Cir. 2014) (alleged sleep deprivation including *inter alia* prisoners being routinely awakened during night hours for "head counts" sets forth an Eighth Amendment violation). In *Walker v. Schult*, 717 F.3d 119 (2d Cir. 2013), the Second Circuit made a similar finding. See also, *Shepherd v. Ault*, 982 F.Supp. 643, 648 (N.D.Iowa 1997) ("Constant illumination can undoubtedly cause sleep deprivation . . . . -- and sleep is certainly an 'identifiable human need.' "). The persistent loud noise caused by these checks deprives these prisoners of needed sleep.

As counsel for hundreds of *Ashker* class members currently being subjected to, and harmed by, these checks, we write to (a) urge immediate modification of the applicable court order to further reduce the night-time frequency of the checks and (b) seek the inclusion of the *Ashker* litigation team in any *Coleman* proceedings that address the security/welfare checks at Pelican Bay SHU. Alternatively, we urge the Coleman Court to order an immediate hearing to determine whether the application of the Court order/stipulation to the Pelican Bay SHU violates the Eighth Amendment rights of prisoners incarcerated there and therefore must be modified.

**GENERAL BACKGROUND**

At the request of the Special Master, the *Coleman* Court ordered security/welfare checks every thirty minutes for prisoners in segregated housing. The purpose of the checks is to reduce suicides of segregated prisoners. We have no objection to these checks being performed throughout the state; however, it must be recognized that Pelican Bay SHU is uniquely different, for two reasons: its architecture and its population. First, the Pelican Bay SHU was constructed to maximize social isolation. Unlike other SHUs and Ad Segs, there are only eight cells per pod, with four cells on the lower tier and four cells on the upper tier. Checking each cell requires the opening and closing of a loud pod door and climbing a metal staircase. There are six pods per unit and the prisoners in each pod can hear the opening and closing of all six pod doors. Prisoners who have experienced the checks at Corcoran and Tehachapi SHUs report to us that the checks at Pelican Bay SHU are much louder and more sleep-disruptive than at the other SHUs.

Second, unlike other SHUs and Ad Segs, *Coleman* class members (EOP and CCCMS prisoners) are excluded from Pelican Bay SHU under the *Madrid* case. Thus, at Pelican Bay SHU, the suicide rate has been low – only one suicide over the past ten years. As a result of these two factors, the cost-benefit analysis of these frequent checks is very different at Pelican Bay SHU than at other segregated housing units.[1]

Finally, plaintiffs' counsel in *Ashker* are particularly suited to raise these concerns in that there are no Coleman class members at the Pelican Bay SHU, and *Ashker* counsel has represented the prisoners at Pelican Bay SHU on Eighth Amendment issues for four years. While the *Ashker* settlement did not specifically address sleep, the deprivation of sleep, like the deprivation of other basic human needs such as food, does affect the prisoners' ability to engage in exercise, programming and education which are covered by the *Ashker* settlement. It also affects their mental health and ability to function generally. The *Ashker* settlement was implicitly premised on the condition that CDCR would not undertake policies which would significantly harm prisoners' ability to engage in the privileges set forth in the agreement.

**HARM TO PELICAN BAY SHU PRISONERS**

Starting in early August 2015, correctional officers began conducting security/welfare checks at Pelican Bay SHU with the use of the Guard One device every half hour. Both prisoners and correctional officers immediately protested. The prisoners were being woken up every 15 minutes and the officers were stressed by the added work which involved constant stair-climbing. In October, 2015, *Ashker* counsel obtained and provided to the parties the attached statements from nationally recognized sleep experts Dr. Jamie Zeltzer and Dr. Thomas Roth, and from psychiatrist and solitary confinement expert Dr. Terry Kupers, regarding the harmfulness of sleep deprivation. The experts agree it is elementary that sleep deprivation can increase the likelihood of suicide, as well as other serious mental and physical harms.

On December 2, 2015, *Coleman* and *Ashker* counsel, representatives of the Special Master, and Magistrate Vadas participated in a tour of the SHU. The result of that investigation was (1) the *Coleman* parties' stipulation to a reduced frequency of Third Watch (10 pm to 6 am) checks, and (2) CDCR's commitment to investigate mechanical means to reduce the noise from the opening and closing of the pod doors.

---

[1] Frequent checks of prisoners in isolation is not a mandatory guideline, but rather is discretionary only. (American Correctional Association Standards for Adult Correctional Institutions, 2014 Standards Supplement, 4-4257.)

center for constitutional rights

*on the front lines for social justice*

CDCR has recently reported that the doors cannot be made to function more quietly and now proposes to retain acoustics experts to explore other possible noise mitigation measures. The *Coleman* parties are discussing the extension of the prior court order for some number of months for this investigation to occur.

## THESE PRISONERS NEED IMMEDIATE RELIEF

*Ashker* counsel have been in continuous contact with our clients in the Pelican Bay SHU (via in-person visits and letters) since these checks began in August 2015. We made three investigative trips (in October 2015, January 2016 and February 2016) to interview a range of prisoners throughout the SHU, and prepared three reports (attached hereto) on the impact of these checks on them. Most report that their sleep is "very poor." They are not able to sleep for very long before being woken up by the loud banging noise of the doors opening and slamming shut, and/or the loud noises of many guards, who stomp up the stairs and slam the metal Guard One device on the sensors next to the cells. It is no hyperbole to state that sleep deprivation is inhumane, and therefore in violation of the Eighth Amendment. We have raised this issue within the monitoring function of the *Ashker* case for six months. We and our clients have been waiting for CDCR to resolve the problem.

It is now almost nine months that these prisoners have been enduring these extreme and intolerable conditions. They should not have to endure this any longer while CDCR explores *possible* mitigation. Anecdotally, we have heard of one prisoner going on an individual hunger strike due to his inability to handle the sleep disruption. Other prisoners have reported serious physical and mental health concerns which they believe are related to their lack of sleep. We are aware of various grievances filed by Pelican Bay SHU prisoners challenging this new policy of wellness checks subsequent to August 2015 as harmful to their wellbeing.

We thus urge that until and unless CDCR can develop a mechanism to engage in these welfare checks in a manner that is not noisy and does not awaken the prisoners throughout the night, that they be dramatically reduced to the frequency before August 2015. While we understand that there may be logs recording hourly checks at night before August 2015, our clients report that the actual checks prior to August were much less frequent. It is undisputed that prior to August 2015, the prisoners at Pelican Bay SHU were not complaining about the nightly checks, whereas post August 2015 there have been many such complaints and grievances. Both counsel and members of our class have suggested various mechanisms that CDCR could use to greatly reduce the noise from these checks at night—such as keeping the pod doors open at night—but CDCR has rejected all of these suggestions. Until CDCR can find some means of conducting these checks quietly, the frequency of these checks must be substantially reduced. The sleep of our clients cannot continue to be disturbed while CDCR awaits some unspecified solution to a clear and serious problem.

## ASHKER COUNSEL SHOULD BE INCLUDED IN THIS MATTER

The prisoners in Pelican Bay SHU are not the clients of plaintiffs' counsel in *Coleman*, as none of them are designated EOP or CCCMS. Therefore, the prisoners directly affected by these court-ordered procedures do not have representation in the *Coleman* litigation. Undersigned counsel represent these prisoners in the *Ashker* case, which concerns Eighth Amendment issues at Pelican Bay SHU.

For over four years, undersigned counsel has been representing this group of prisoners to achieve some level of relief from the harshness of the SHU. We have waited patiently while CDCR investigated whether the doors

666 broadway, 7 fl, new york, ny 10012
t                    f                    www.CCRjustice.org

center for constitutional rights

*on the front lines for social justice*

at Pelican Bay SHU could be modified to reduce the noise. CDCR has now concluded that the doors cannot be modified. It is of great concern to us that the conditions of daily living there have *significantly worsened* pursuant to the court order at issue here. *Ashker* counsel has been diligently investigating and advocating for these sleep-deprived prisoners, both as a function of the monitoring component of the *Ashker* case, as well as informally attempting to influence this matter in the *Coleman* case.

For these reasons, we seek to be included in the discussions of this issue with the Special Master and in any hearings that may be held on it in the *Coleman* case. We also urge that these security/welfare checks be further reduced in frequency until they can be conducted quietly, or that a hearing be scheduled immediately to address these welfare checks. The current frequency and practice is unconstitutional and should not be allowed to continue.

Sincerely,

*Jules Lobel*

Jules Lobel

cc:  Magistrate Nandor J. Vadas
 Jay Russell
 Adriano Hrvatin
 Matthew Lopes
 Michael Bien
 Steven Fama
 Maneesh Sharma

Enclosures

To: To Whom It May Concern

From: Thomas Roth PhD

RE: "Wellness" checks at PB SHU

Date: October 23, 2015

My name is Thomas Roth. I am the Director of The Sleep Disorder and Research Center at Henry Ford Hospital. I hold the rank of Professor at Wayne State University School of Medicine and Clinical Professor at the University of Michigan College of Medicine. I have been doing human sleep research since 1970. My research has encompassed effects of sleep deprivation, sleep fragmentation as well as sleep disorder pathophysiology and morbidity.

I have been asked to comment on the " Wellness" checks at PB SHU. It is my understanding while the goal of the program is well intentioned, it has resulted in prisoners being awoken on repeated occasions during the night. Specifically most prisoners are awoken in association with these checks. In addition, often when the prisoner is awoken he takes 10-15 minutes to fall asleep. This has the potential for resulting in sleep deprivation and sleep fragmentation. Sleep deprivation refers to the actual loss of sleep. Thus if an individual was awoken 16 times during the night and takes 10 minutes to fall back to sleep he would be deprived of almost 2.5 hours of sleep nightly. This level of sleep has been shown to have profound effects on cognitive performance, memory, mood, immune function, pain sensitivity, metabolism, and other parameters. This has been demonstrated in otherwise healthy individuals. Importantly these effects accumulate across time. Thus as these

1

checks are done nightly their negative effects will become greater across time. Even if some prisoners do not stay awake after the awakening, their sleep is still fragmented. Sleep is a continuous process as such it is critical to have continuous sleep without interruption. In the presence of sleep fragmentation (i.e. repeated interruptions of sleep) individuals are not able to get to the deeper and more restorative stages of sleep (i.e. slow wave sleep and REM sleep). Thus, sleep fragmentation is functionally the same as sleep deprivation. Many of the behavioral and physiological consequences of sleep deprivation have been repeated by simply arousing normal individuals repeatedly during sleep. Similarly many sleep disorders (e.g. sleep apnea and restless legs syndrome) have significant morbidity associated with their repeated arousals from sleep. Sleep apnea is a disorder where individuals stop breathing when they fall asleep. To resume breathing they must arouse. These arousals lead to increases in circulating norepinephrine levels, which are associated with negative cardiovascular effects. This effect has been shown in people with different sleep and medical disorders, and in normal people.

It is further important to recognize that this sleep disruption does not inherently reflect poor behavior on the part of guards (I have no information on this). Checking on individuals repeatedly during the night will lead to sleep problems. There is much research on disturbed sleep in Intensive Care Units in hospitals. Checking on patients for their safety has resulted in many ill effects. Today there are many initiatives to overcome the negative effects of this safety monitoring. These include, decreasing the frequency of checks, sound abatement, remote

2

monitoring and other initiatives. All of this work attests to the negative impact of "safety checks."

Based on my experience as a sleep researcher, and the extensive literature of sleep deprivation, sleep fragmentation, sleep disorders, and sleep in Medical Intensive Care Units, I would recommend that the nighttime "safety checks" for PB SHU should be suspended until their impact on health and quality of life can be evaluated and methods to minimize these negative effects can be determined.

Thomas Roth, Ph.D.
Chief, Division Head
Sleep Disorders and Research Center
Henry Ford Hospital
2799 West Grand Blvd, CFP-3
Detroit, Michigan 48202-2691
Phone:(313) 916-5172
Cell : (313) 510 7861
Email: troth1@hfhs.org

## REPORT OF DR. JAMIE ZEITZER

This report is being written by Jamie Zeitzer, PhD. I have a dual appointment as an assistant professor of Psychiatry and Behavioral Sciences at Stanford University and a health science specialist at the VA Palo Alto Health Care System. I am recognized world-wide as an expert in sleep and circadian rhythms. I have published more than 60 articles and lectured internationally on these topics. I have been conducting research on sleep and circadian rhythms for 20 years at Harvard University, the University of California at Los Angeles, and Stanford University. This report represents my opinion of the best evidence as supported by the totality of the scientific literature.

Chronic sleep loss is well known to cause a host of physical and psychiatric problems. There is, however, scant empirical evidence that bears upon the sleep of prisoners kept in either the general population or in isolation units, such as the Security Housing Units (SHU) of the Pelican Bay State Prison. During December 2014 through January 2015, I assisted Ms. Strickman, Staff Attorney with Legal Services for Prisoners with Children, with a retrospective and prospective examination of sleep of prisoners who had been housed in the SHU for ten years or more. We had the opportunity to examine their overall sleep using the Pittsburgh Sleep Quality Index[1], a well-validated and extensively used questionnaire that examines overall sleep quality. Scoring above 5 on this questionnaire is well-associated with having a clinically significant disruption of sleep. Of the 24 randomly selected prisoners in the SHU, 18 had scores above 5 on this questionnaire. In other words, three-quarters of the prisoners housed in the SHU would likely have been diagnosed as having clinically disrupted sleep. We also had the opportunity to prospectively examine the sleep in these inmates by having them complete a standardized sleep diary[2] on which they tracked their sleep patterns for 1-2 weeks. As with the retrospective examination of sleep, these diaries revealed poor sleep among them. Some were awakened on average six times per night, some spent nearly 1 ½ hours awake during the night, and some spent as little as 57% of their night actually sleeping. Many indicated that the thrice nightly checks by the guards, especially the noise associated with such checks, was highly disruptive to their sleep. Both the prospective and retrospective examinations of sleep provide empirical evidence for what is mostly self-evident - most prisoners housed in the SHU for prolonged periods have poor sleep.

On August 3, 2015, the Pelican Bay State Prison changed their patrolling routine, checking on each inmate every 30 minutes, 24-hours per day. I understand that, previously, the checks, both

---

[1] The Pittsburgh Sleep Quality Index was originally published in: Buysse, D. J., Reynolds, C. F., Monk, T. H., Berman, S. R., & Kupfer, D. J. (1989). The Pittsburgh Sleep Quality Index: a new instrument for psychiatric practice and research. *Psychiatry Research, 28*(2), 193-213. It has been cited by more than 8,000 different published articles.
[2] We used the Consensus Sleep Diary - Core. This was developed as a standardized sleep diary through the partnership of several major researchers in the sleep field and was originally published in: Carney, C. E., Buysse, D. J., Ancoli-Israel, S., Edinger, J. D., Krystal, A. D., Lichstein, K. L., & Morin, C. M. (2012). The consensus sleep diary: standardizing prospective sleep self-monitoring. *Sleep, 35*(2), 287.

during the day and night, were conducted much less frequently (approximately every 3-4 hours). While this was instituted as a safety measure, including the prevention of suicides, it has created an even more disrupted sleep environment, one that will actually lead to an *increase* in suicidal ideation. We have not had the opportunity yet to formally examine the sleep of these inmates, but according to the report provided by Ms. Strickman ("Report on Prison Interviews about Guard One 30 Minute Cell Checks"), there is a further decline in the quality and amount of sleep that the inmates are receiving and this has resulted in an increase in reported headaches, fatigue, loss of concentration, loss of appetite, irritability, and depression.

These symptoms and others are consistent with an extensive literature that demonstrates the causal relationship between disrupted sleep and decrements in both physical and psychological health. An extensive literature that covers the gamut from animal studies to highly controlled studies in humans to epidemiologic studies of many different populations from around the world all come to the same conclusion - there are serious ramifications of sleep loss on both physical and mental health. Common disturbances associated with chronic sleep disruption include metabolic disruption, worsened memory, severe changes in mood (irritability, depression, anxiety), and a greater likelihood of developing diseases such as cancer and Alzheimer's. A recent series of studies in Veterans has further pointed to the strong connection between suicidality and sleep, so much so that treatment of sleep problems in Veterans is considered part of the first line of treatment in reducing the risk of suicides. The negative health consequences of inadequate sleep has been extensively documented and nowhere in the literature is there a report on as severe a disruption in sleep as is occurring in the Pelican Bay SHU.

Normal sleep consists of cycling between different stages, defined as "rapid eye movement sleep" (REM sleep) and "non-rapid eye movement sleep" (NREM sleep). NREM sleep is further defined by three different stages (N1, N2, N3), each of which have different functions and can be thought of as progressively "deeper" sleep. On average, it takes approximately 90 minutes to cycle through these different stages and such a cycle is thought to be necessary for the proper functions of sleep to be accomplished. Most studies of sleep disruption, both those occurring in the laboratory and those occurring in society at large, address chronic loss of hours per night (e.g., regularly sleeping 5 hours instead of 8 hours) or sporadic loss of a large number of hours on specific nights (e.g., an individual with insomnia who might get 3 hours on several consecutive nights and then 8 hours on several consecutive nights). There are no studies that examine the intentional disruption of the natural cycle of sleep to the extent to which inmates in the SHU have their sleep disrupted. In specific neurologic conditions (e.g., Alzheimer's and Parkinson's disease), there can be severe fragmentation of sleep, such as occurs in the inmates in the SHU. The occurrence of this fragmentation in these diseases can be associated with even more rapid progression of the disease course, psychotic features, and hallucinations. There have been no direct studies of intentionally waking an individual every thirty minutes every night for days, weeks, or months, as doing so would be considered highly unethical in a research environment.

The every 30-minute, noisy checks on the inmates in the SHU, while well intentioned, are likely to have serious physical and psychological consequences. Most of the empirical evidence for the negative effects of sleep loss are obtained from individuals in which there are at least some nights on which good sleep is obtained, on some nights where 90 minute sleep cycles are completed, on some nights in which maybe even 8 or more hours of sleep is obtained. None of this is the case in those in the SHU. Not all prisoners are affected. Some can inure themselves to the intermittent noise. While this is more typical in the non-incarcerated population when the noise is composed to single frequencies (e.g., a creaky house) or occurs at a regular time (e.g., a train whistle), some individuals are just better able to sleep through such noise. Most individuals, however, will be deeply disturbed by the type of noise reported by Ms. Strickman. The somewhat random timing, the mixed sound frequencies and types of sounds, all lead to increasing the likelihood of the brain identifying the sound as "novel" or "important" and signaling the brain into an aroused state. In the field of sleep medicine, there are various approaches that would be recommended to mitigate the effects of the type of noise to which the inmates are exposed. These countermeasures, however, are either impractical (carpeting the SHU) or likely pose security issues (using a camera to check the inmates or having loud white noise generators abate the external noise).

**Conclusion.** The current practice of 30 minute wellness checks of inmates housed in the SHU is likely a cause of severe sleep disruption. This type of sleep disruption is likely worse than anything that has been provocatively studied in a laboratory. The known consequences of chronic sleep loss, including disruptions to metabolism, memory, mood, and health, are likely even more severe in these individuals. The mandated purpose of these wellness checks (i.e., suicide prevention) is, in fact, likely to have the opposite effect and inadvertently increase suicidality in these individuals.

October 25, 2015

## STATEMENT OF DR. TERRY KUPERS REGARDING NIGHT SAFETY CHECKS

### October 25, 2015

1.     I am a board-certified psychiatrist. I was retained as an expert witness by the plaintiffs in this matter to interview named plaintiffs and others and to conduct an investigation for the purpose of testifying at trial regarding conditions of confinement at the Pelican Bay Security Housing Unit (SHU), plaintiffs' mental health, and related issues. I am an Institute Professor in the Graduate School of Psychology at The Wright Institute, a Distinguished Life Fellow of the American Psychiatric Association and the recipient of the 2005 Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI). My expert qualifications are listed in the two Reports and the April, 2013 Declaration I submitted in this matter, and in my C.V. previously filed. Subsequent to settlement, I am asked to comment about the effects of the twice-per-hour safety checks on prisoners in S.H.U. at Pelican Bay State Prison.

2.     In preparation for opinions expressed in this Declaration, I reviewed the August 3, 2015 Memorandum from the Department of Corrections and Rehabilitation, "Addendum to Operational Procedure 222, Security Housing Unit, Security/Welfare Checks Using the Guard One System." I also reviewed an August 31, 2015 Memo from Michael Bien to Elise Thorn et al., "Subject: Coleman – PBSSP SHU Guard One Implementation Problems: Urgent!," as well as the "Report on Prison Interviews About Guard One 30 Minute Cell Checks" prepared by plaintiffs' counsel. With regard to this report, I find the sections on (a) Impact on sleep, (b) Impact on ability to function, and (c) Impact on mental state, as well as the remainder of the report, to be entirely consistent with what I know as a psychiatrist about sleep, sleep deprivation and mental functioning.

3.     It is my understanding that currently quite a few prisoners in the S.H.U. at PBSP are complaining to counsel and others that their sleep is very disrupted by the twice-per-hour Security/Welfare Checks using the Guard One system. The prisoners complain that there is much noise as the officers open and close pod doors, climb stairs in their pod, walk by with the hardware they carry on their belts clanging, and use their pipe sensor to register on the Guard One sensors on or near each cell door. Evidently the acoustics in the small pods at PBSP S.H.U. tend to make the noise louder than

1

in other prison living units, and many prisoners complain that they are waken by officers effecting the Security/Welfare Checks. Many are unable to get more than a half hour sleep at a time, a some have difficulty falling back to sleep after they are waked repeatedly, and there is a great amount of sleep deprivation. I am assuming these facts in offering the opinions that follow.

4.    Sleep deprivation is a very important problem in psychiatry. Many mental disorders include sleep disturbances and insomnia. For example, individuals suffering from anxiety often have difficulty falling asleep. Individuals suffering from depression often wake early in the morning and cannot fall back to sleep. Individuals suffering from Bipolar Disorder, during a manic phase, are prone to stay up all night and disconnect from their natural diurnal cycle (night and day).

5.    Individuals with known mental disorders are precluded from housing at the Pelican Bay S.H.U. per the *Madrid* decision, but even individuals who are not diagnosed with a serious mental illness per *Madrid* experience a certain amount of emotional symptoms. Anxiety, depression, mood instability and other emotional symptoms are widespread in the population of prisoners in the S.H.U. at PBSP (I enumerated many of those symptoms in the sample of prisoners I interviewed and examined in preparation for my Reports and Declaration in this matter). Prisoners may not "reach the bar" for a diagnosis of mental illness per *Madrid*, or may not seek mental health treatment for such a diagnosis to be made, but suffer nonetheless from these symptoms.

6.    Sleep problems are not only symptomatic of emotional conditions and problems, but also sleep deprivation and troubled sleep exacerbate emotional problems. A depressed individual who loses sleep will experience worse depression; an anxious person who is sleep-deprived will experience heightened anxiety; and a person with mood lability and altered diurnal rhythms will experience worse problems in these areas the more sleep deprivation there is.

7.    Suicide is a very big problem in prisoners consigned to solitary confinement. An important study found that approximately 60% of completed suicides in the CDCR involve prisoners in some form of isolated confinement.[1] Sleep deprivation and poor quality sleep are well known to play a

---

[1] *See* Patterson, R.F. & Hughes, K. (2008). Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, *Psychiatric Services,* 59(6), 676-682.

role in suicide, and mental health clinicians are concerned enough about this tendency to check carefully on the quality of sleep in patients who are prone to suicide and self-harm. While the twice-per-hour safety checks are designed to diminish the risk and prevalence of suicide in the S.H.U., paradoxically, to the extent that sleep disturbances and sleep deprivation are caused by the noise involved in accomplishing the twice-per-hour safety checks, the safety checks may well increase the risk of suicide. In other words, the sleep deprivation caused by noise generated during the safety checks may actually make prisoners more at risk of self-harm.

8.    Insomnia and other sleep disorders are among the most frequently reported problems experienced by prisoners in solitary confinement. Thus, even prisoners who do not obviously suffer from serious mental illness (and are thus not disqualified from Pelican Bay S.H.U. housing) are prone to sleep disruptions, and the noise involved in the safety checks makes this problem significantly worse.

9.    In terms of remedy, several come to mind. First, not all prisoners in S.H.U. are at heightened risk of suicide. Some are more at risk than others. For example, individuals who speak about hopelessness or who have made previous attempts to harm or kill themselves are at higher risk than those who have no such history. In other words, one size does not fit all, and custody staff and mental health staff might well identify prisoners at heightened risk and then limit the twice-per-hour checks to those at higher risk. Alternatively, if the checks are necessary at all (and the question of their necessity warrants serious consideration), there are a number of steps the CDCR can take to decrease the disturbance of sleep in the affected prisoners. These include training of officers to do the checks as quietly as possible; having the officers who perform the checks wear padded and muffling material over their boots so as not to make as much noise climbing stairs and walking in the pod; leaving the outer doors open so the noises associated with opening and closing the doors are eliminated; and making the Guard One mechanism completely silent. These are only a few ideas off the top of my head.

10.    What is needed is a process to determine ways to diminish noise. Such a process should include meetings between custody and mental health staff, and the involvement of experts on noise levels and on sleep and sleep deprivation. There is also a need for rigorous training of officers on how damaging the noise can be and how to minimize noise at night as they perform their duties. Considering

3

how long this issue has been going on (close to three months) and how long it may take to determine and implement effective solutions, for the mental well-being of the SHU prisoners I recommend stopping or reducing the frequency of these 30 minute checks, particularly in the nighttime hours.

*Terry Kupers, M.D.*
*484 Lake Park Avenue, #338*
*Oakland, California 94610*
*510-654-8333*

4

**Report on Prison Interviews about Guard One 30 Minute Cell Checks**

### 1. Summary

Recent interviews with 13 prisoners at Pelican Bay SHU, from 13 different SHU sections, reveal widespread sleep disruption due to the institution of cell checks 48 times per day of each SHU prisoner. This practice began on August 3, 2015. For a variety of reasons, the process is loud. As a result, these prisoners are getting much less sleep, persistently interrupted sleep, and a significantly lower quality of sleep than they had enjoyed before these checks started. They are suffering from headaches, fatigue, inability to concentrate, loss of appetite, irritability, depression and other symptoms. The sentiment reported by two of the men reflected the general view: "The method and noise from the checks is torture"; "The every 30-minute checks have to be stopped or people are going to get sick or worse." In addition, they report that regular prison programs have been negatively impacted.

### 2. Physical layout of Pelican Bay SHU

Each housing unit consists of 6 pods of 8 cells each, 4 on the bottom tier and 4 on the top tier. The construction material is primarily concrete: floors, walls and ceilings. The pods are set up like spokes on a wheel radiating from a central elevated guard post. The configuration of the housing is intentionally constructed so that the Correctional Officers have knowledge and control over activity in each of the 6 pods they oversee. They can hear and see much of what is going on in each of the pods in their unit. Noise travels, not only to the control booth, but also to some greater or lesser degree between the pods. The pod and cell doors are made of metal. The pod door is very heavy. All doors are electronically controlled from the control booth. There is a metal staircase inside the pod to access the top tier. To check each cell, the Correctional Officer must enter each pod and check each cell on both tiers.

### 3. Nature of the noises

The prisoners described the various noises associated with these checks:

(a) Sounds of the metal lock and chain hitting the metal pod door. To open the pod door, a CO must first unlock it manually. There is a metal lock attached to a short chain which is affixed to the pod door. The CO unlocks the lock and then releases it, causing the metal lock and chain to hit the metal door.

(b) Sounds of the pod door opening electronically . The pod door is operated electronically. The sound of it opening is akin to the sound of an electric gate opening.

(c) Sounds of keys jangling: COs carry a large number of keys attached to their belt. As they walk or jog through the pod, the keys make a jangling sound as they hit nearby hard objects such as spray canisters.

(d) Sounds of COs' boots stomping through the pod, and particularly going up and down the metal stairs to the upper tier. The sounds on the stairs can be heard in the adjoining pod.

(e) Sounds to activate the Guard One device. The CO has to touch the metal pipe to the metal sensor device which is attached to the metal cell door. Performed slowly, deliberately and

1

respectfully, the touching of the pipe to the sensor makes a click. During the two day shifts (2nd and 3rd watches, from 6 am to 2pm, and 2 pm to 10 pm), there is also a high-pitched beeping sound each time the sensor is activated. These sounds can be heard throughout the pod. One interviewee reported that guards use their fingers to touch the sensor, so that is quiet.

(f) Excessive banging of the Guard One pipe: Whether as a matter of protest, speed, carelessness or disrespect, some guards hit or slam the metal pipe to the metal door, which makes a very loud banging. A prisoner's cell door may be banged several times per check. One interviewee estimated that 75-80% of the guards are rude or loud.

(g) Slamming sounds of the pod door closing. The heavy metal doors make a loud slam when they close shut, which reverberates throughout the unit and can be heard by prisoners in other pods.

(h) Sounds of metal chain and lock as the lock is refastened.

(i) COs talking: If two COs per pod are on duty at night, their talking outside of the pod can be heard inside the pod. COs generally do not speak to the prisoners during the checks.

(j) Flashlight shining on one's face: Several prisoners noted that the COs sometimes shine their flashlight into the prisoners' faces or eyes, to get them to prove that they are alive. In one pod, a particular prisoner is asked to do this regularly (not the interviewee).

The prisoners described the following attributes of these procedures and their environment:

(a) They are woken up before the CO gets to their cell door, and even before the CO opens their pod door. They can hear other pod doors opening before and after their pod door is opened. One prisoner likened the distant sound to that of an approaching monster, like Frankenstein or Shrek. The COs seem to start with A pod, then go to B pod, C pod, etc. and finishing with F pod, so a prisoner's experience would differ somewhat depending on what pod he is in. Every prisoner may not hear the doors to all 6 pods open, but generally will hear the nearest doors open and close.

(b) Once they are woken up, they generally stay awake until the cycle for their unit is finished.

(c) They estimate that it takes about 10-15 minutes for the entire 6-pod unit to be checked. Some officers go more quickly; others take more time.

(d) Prisoners whose cells are closest to the pod door may hear more than those whose cells are further down the tiers.

(e) The sounds echo or reverberate in the concrete and metal environment.

(f) One volunteered that the majority of the guards do not look into the cell at all. A second interviewee made a similar comment and concluded that "the device does not prove what it is supposed to prove."

The interviewees had differing views on whether these 30 minute checks could be done quietly enough that their sleep would not be interrupted. They recognized that a lot of changes would have to occur, and they had ideas about each.

4. **Impact on prisoners**

(a) <u>Impact on sleep</u>:

For almost every prisoner, these checks are having a dramatic, negative impact on their ability to sleep. Each described the quality of his sleep in the past month to be "very poor." Most of the interviewees wake up every time, or almost every time. They report staying awake until the COs complete their circuit and the noises stop. A few have difficulty falling back to sleep after being awakened by the noise. One red-eyed man, who reports getting only one hour of sleep per night, was anxious and agitated during the interview. He appeared to the interviewer to be on the verge of physical and mental collapse. Two other prisoners had sleep issues before the checks started: one had previously had a sleep study and was formerly on the mental health caseload; the other had interrupted sleep from a traumatic experience. Their sleep has been made worse by these checks.

A typical report was to get 20 good minutes of sleep *at most* at a time; one prisoner counted himself lucky if he was able to sleep through one or two cycles, which he could only do once or twice a week. They have tried different strategies to aid sleeping: standing up all day, trying to do more exercise, staying up very late in the hopes of crashing out, trying to nap during the day, and using earplugs. By and large, these strategies have not helped. Only two prisoners reported that they were able to nap during the day. The interviewees report sleeping 1 hour per night, 1 ½ hours, 2 ½ to 3 hours, 3 hours at most, 3 – 3.5 hours, up to 5 or 6 hours per night. Only one prisoner reported that his sleep was "pretty normal" and that the checks did not have much impact on him.[1]

(b) <u>Impact on ability to function</u>:

All but one report low energy, exhaustion and fatigue. Five prisoners reported having headaches and one reported having migraine headaches every morning. One prisoner (age 33) reported that he has developed a rapid heart beat. SHU prisoners often have a regular exercise regime. These men are finding that they are unable to complete their usual exercise regime. One man described a 20 pound weight gain, which he linked to his lack of exercise. One stated that he had become weak and was afraid he would faint in the yard. Another described a loss of balance, including running sideways into the yard wall. Some say they are "light-headed", "in a stupor", "reckless" or "clumsy." One reported "slurred speech." Three described a loss of appetite, and weight losses of 5 pounds and 10 pounds.

Most state that they have trouble concentrating. They try to read, but they nod off and/or can't remember what they have read. Their writing is much slower ("I can't think to write"). The three prisoners enrolled in GED or other courses are now struggling to keep up.

One prisoner reported that there is "more sickness in the pod," including himself. Many are "coughing, sneezing, clearing your throat."

---

[1] This man got 5 or 6 hours of sleep a night.

Four of these men sought medical attention. Two were given Tylenol or aspirin. One was told, "That's all we can do. Get used to it." One was told, "There's nothing we can do, it's a policy issue." One was told to get more exercise and drink less coffee.

### (c) Impact on mental state:

All but one prisoner reported a negative impact on their mental state. They reported irritability, crankiness, moodiness, being "on edge", feeling depressed, experiencing heavy anxiety and fierce agitation, being less social, feeling frustrated and annoyed, being "quick to anger," and "stressed". One reported deteriorating relationships between people in the pod. Two prisoners remarked that they were disturbed by the reduction in personal privacy, particularly with respect to their toilet and bathing activities, with a guard coming to their cell door 48 times a day.

One man, who at age 31 has spent six years in segregated housing, said, "This is the worse I have ever felt since being in SHU."

### (d) Impact on other prisoners in their pod:

No one is unaffected, stated one man. He reported hearing things drop, like cups, when he had never heard that sound there before. He expressed concern for someone in another pod who has noise sensitivity – "I don't know how he is faring." However, he noted that the ear plugs had provided some benefit.

One reported, "No one is falling apart or losing his mind, but it could happen. People do have their pride. They don't want to be seen as crazy." One man gave us the name of the prisoner in his pod who is having the most difficulty – that prisoner can't sleep at all and is up all night. Another man reported that a few people in his pod mentioned feeling delirious and were "thinking of fictional things" – which may be a form of hallucination. He states that the group mood is no longer one of camaraderie, but rather they no longer give each other help or talk to each other. Another interviewee reported that a man in his pod could not speak clearly at his ICC hearing, and thinks that this is documented. When that other man told the mental health guy that he should do something about the checks, the mental health guy ignored him.

Another stated that the majority in his pod had gone to the clinic and received Tylenol. Another said, "They all complain to each other. They all hate it." One prisoner reports, "Some are adjusting; some are not." Another prisoner expressed concern for the new arrivals to Pelican Bay SHU. He states that they are already having a really hard time adjusting to the confines of the SHU, and on top of that, they are now being subjected to these checks, which causes even more suffering.

Some pod mates of one interviewee are complaining of constipation because of the very stressful interruption of their routine, and the absence of sleep, and how that affects digestion. Another stated that his peers are "already super sensitive to sound" and the extreme sleep deprivation exacerbates this.

4

5. **Impact on programs:**

While this survey was specifically focusing on sleep deprivation and its effects, some prisoners volunteered information about the negative impact on programs of these frequent checks.

Yard policy and practice has changed. Yard is 1.5 hours a day. Since the checks began, the normal schedule is backed up and delayed. Two men reported that previously, the "yard call" procedure was for men who want to return to their cell to alert the guard, and the door would be opened for him to re-enter the pod. Now, there is no assurance that you can leave the yard in a timely manner; some have had to wait for an hour or more. This can be distressing, especially if they have to use the toilet. Previously, if you chose less time, they would release yard to the next guy. Now, they won't, because of the checks. Often, when they want to go to yard, they are told to "Stand by." Although the yard is open for longer hours (until 7:30 at night), it is too cold then, so the men don't use it. Men don't go to yard because their normal programming schedule has been totally upset.

Access to showers has apparently been reduced. One man used to shower around four times a week, but now is limited to fewer days. One man reported that the showers are not being cleaned according to the regulations. They are supposed to be washed six times a week, and now it is just two times a week. Men are increasingly getting Athlete's Foot as a result.

Programs are being delayed – the officers don't want to start visits until food trays are picked up. Meals have been delayed. One man reported delays of over two months in giving property back to prisoners transferred into Pelican Bay from other prisons. He himself has been waiting over a month for a television he ordered. There was a group 602 about program delays.

6. **Conclusion**

Sleep is a basic human need protected by the Eighth Amendment's prohibition against cruel and unusual punishment. Conditions having the mutually reinforcing effect of depriving a prisoner of a single basic need, such as sleep, may violate the Eighth Amendment. See *Wilson v. Seiter*, 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In *Harper v. Showers*, 174 F.3d 716 (5th Cir. 1999), the Fifth Circuit held that sleep deprivation could constitute cruel and unusual punishment ("[S]leep undoubtedly counts as one of life's basic needs."). In *Walker v. Schult*, 717 F.3d 119 (2d Cir. 2013), the Second Circuit made a similar finding. See also, *Shepherd v. Ault*, 982 F.Supp. 643, 648 (N.D.Iowa 1997) ("Constant illumination can undoubtedly cause sleep deprivation  .   .   . -- and sleep is certainly an 'identifiable human need.' ").

The "wellness" checks as currently practiced at the Pelican Bay SHU have caused widespread and serious sleep deprivation for almost three months. While the underlying purpose of these checks is commendable, their current implementation must be condemned as a constitutional violation. At this juncture, the only reasonable course of action is for the current practice of 48 wellness checks a day to be temporarily suspended, pending a thorough investigation as to whether they can be reinstituted at the Pelican Bay SHU consistent with the prisoners' physical and mental well-being.

Dated: October 22, 2015.

By: Carol Strickman, Staff Attorney
Legal Services for Prisoners With Children

## Addendum: Survey Method

On October 13 and 14, 2015, attorneys Anne Weills and Carol Strickman conducted confidential in-person interviews with 13 Pelican Bay SHU prisoners about the 30 minute checks and completed survey questionnaires for each.[2] All of our interviewees are members of our 8th Amendment or Due Process classes. They were selected to represent 13 different SHU units: C1, Č5, C7, C9, C10, C11, D1, D3, D4, D5, D8, D9, and D10. We wrote them in advance that we were coming for this purpose. Because CDCR does not make public prisoners' cell numbers, and has refused in the past to provide us with cell numbers of our class members, we selected prisoners who had written to the litigation team (which gave us their cell addresses). However, only one of these men had written to us about this issue. We developed and used the identical survey form for each interview. Some prisoners brought us written statements or related documents which we have incorporated into this report.

---

[2] We visited a total of 16 prisoners, representing 15 pods. However, we were not able to complete the survey questionnaire with three of these individuals, due to time constraints and the importance of discussing other matters with them.

**Follow-Up Report on Cell Checks at Pelican Bay SHU**

### 1. Introduction and Summary

This report is a follow-up to my October 22, 2015 report regarding the impact of cell checks every thirty minutes on SHU prisoners at Pelican Bay. That report was based on interviews with 13 SHU prisoners in mid-October, 2015, representing 13 different SHU units, in both C and D buildings. Since that time, there was an inspection on December 2 of the practice; Warden Ducart issued a December 11 memo to staff to minimize noise during the checks; and the *Coleman* court issued an order on December 28 to reduce the night shift checks to hourly. We conducted these interviews to determine whether and to what extent these directives have impacted SHU prisoners.

This report is based on interviews with 14 SHU prisoners and one former SHU prisoner now in General Population at Pelican Bay, conducted on January 19 and 20, by attorney Eva DeLair and undersigned counsel. Eight of the SHU prisoners interviewed in January had also been interviewed last October, so we have comparative data for them. The other six SHU prisoners were interviewed for the first time this month. These prisoners reside throughout the SHU, in Units C1, C4, C5, C6, C7, C10, D1, D2, D4, D7, D8, and D9. We also interviewed a former SHU prisoner who had, unbeknownst to us, been transferred to GP in September.

The nature of the noises described in the October report, and the ways that those noises disrupt sleep and impact the prisoners, have not fundamentally changed and will not be repeated here. While some improvement in the ability to sleep was noted by some prisoners, SHU prisoners generally still regard their sleep as "very bad" or "fairly bad." Noise from opening and closing pod doors continues to be cited as the biggest source of sleep disturbance. Some improvement in the behavior of some guards was also noted; however, unnecessary and excessive noise on the part of guards continues to be a serious problem. Notably, three prisoners in three different units in C building report that the nightly checks *have not been reduced* from every 30 minutes to hourly.[1]

### 2. Impact on prisoners

(a) <u>Impact on sleep</u>:

For almost every prisoner, the nightly checks continue to have a dramatic, negative impact on their ability to sleep. That said, five prisoners reported that they are sleeping better. However, this must be viewed in context. For example, we received reports that three prisoners are now able to get 4 hours of sleep per night, as opposed to 1.5 hours, 2 hours or 3 hours. They still rate their sleep as "very poor," and rightly so, not only for its duration but also due to its interrupted nature. Another prisoner reported that his sleep was "sometimes" better. Eight reported that their sleep was no better in January than it had previously been.

---

[1] These reports surprised us and may be disputed. In any event, these three prisoners did not discern any difference in January with the checks on First Watch, so if they are mistaken, the change made no difference.

Significantly, the General Population prisoner reported lingering impacts of this two months' experience with 30 minute checks. He wakes up repeatedly at night now (2 to 3 times per night) when he did not do that before last August in SHU, when the checks began. He has been out of SHU for more than three months. A current SHU prisoner states that he wakes up in between the hourly checks, likening the 30 minute checks to an "alarm clock" that he has now internalized. One prisoner stated that the new hourly policy "looks good on paper, but it is not real."

### (b) Impact on ability to function

No one reported an increase in their ability to function while awake. One prisoner reported that he made a New Year's resolution to get back to his previous program (reading, writing and exercising) but has been unable to summon the energy to do so, even though he reported feeling much better, sleep-wise. Several prisoners reported headaches, and two reported a loss of appetite. Dry eyes and dehydration were also noted.

### (c) Impact on mental state

Some prisoners report feeling somewhat better, though others report no change. They and others in their pod feel particularly bad in the mornings. One person reported feeling more exasperated over time and states that "it has gone on so long, it wears on me." He describes himself as being uncharacteristically "point blank rude." Others report being angrier at noisy guards than before, because they interpret the guards' persistent excessive noise as being intentional. The intrusiveness of regular checks on prisoners who may be nude while bathing in their cells generates negative feelings.

### (d) Impact on other programs

The daily checks interrupt concentration, which is already impaired. One prisoner has quit his GED classes. The yard program is impacted, as prisoners are left in the yard for extended periods because guards are busy elsewhere. This can impact the ability of other prisoners to get to yard that day.

### 3. Factors in amelioration

In addition to the reduction to hourly of the night-time checks, we were informed of other factors which have helped to improve the situation:

- Ear plugs have helped some prisoners somewhat. However, two prisoners reported that they or others have developed ear infections from the ear plugs.
- Some guards are now making an effort to not jingle their keys, presumably in response to the warden's memo with this specific recommendation.
- Some guards are responsive to requests that they try to be more quiet. At least five prisoners commented that the "regular" guards were quieter, and conversely, the newer, younger, and substitute guards were the greater source of excessive noise.
- Being moved to the bottom tier helped one prisoner, as his new cell was darker inside.
- In several pods, all of the prisoners are on the bottom tier and there are no prisoners on the top tier. This eliminates the clomping up and down on the metal stairs.

2

- Having fewer people in a pod shortens the amount of time it takes to check that pod, and the unit as a whole. Prisoners who are awakened by the checks generally can't fall back asleep while their unit is being checked, so having the circuit through each unit generates a longer period of quiet. However, it must be noted that this population reduction has come about as a result of the settlement in the *Ashker* case, and not as a result of anyone's attempt or decision to improve sleeping conditions. This factor is not necessarily permanent, and cannot be relied upon to make permanent policy about frequency of checks in the SHU.
- Hopefulness that one may soon be released from SHU as a result of the *Ashker* settlement has an ameliorating impact on prisoners' mental attitudes. Those prisoners who have been cleared for transfer to GP or whose ICC hearing is imminent were feeling better than other prisoners. Again, this mitigating factor cannot be relied upon by policy makers to justify persistent sleep disruption.

Thus, while there has been some improvement in sleep and in mental attitude since three months ago, there are other factors in addition to the reduction in nightly checks that have contributed to these improvements. Overall, the majority of prisoners still have bad sleep.

### 4. Recommendations

Our over-arching position is that these frequent checks, now at 40 per day, should stop. The frequency of checks should return to the previous schedule. The checks do not, in reality, seem to perform a useful function. Instead, they are causing continuous negative effects on almost all prisoners in SHU.

Failing that, there are specific things that could be done to lessen the noise that are within the purview of the prison administration to direct:

- The loud slamming of the doors, when they open and close, is the biggest problem. However, the pod doors do not have to be made to open all the way, or close all the way. Rather, the control guard has control over how far to open the door. In one pod, the door is not opened all the way to allow a guard to enter, so it does not slam open. In another pod, the door is kept at about 4" open all the time, except when it is opened further to let a guard go in to do the checks. In that pod, the door does not slam open or closed at all.
- Not using the metal locks and chain at night would reduce noise significantly. Alternatively, the chain and locks could be encapsulated in a non-metal material (soft plastic or fabric) so less noise is generated when they are moved, or part of the pod door might be padded to muffle the sound of the lock and chain hitting it.
- There is no good reason to have the Guard One pipes beep at all, when the pipes can use light to activate the sensor. On one pod, the pipe never beeps. The non-beeping pipe should be used for all checks throughout the entire day.
- A training program should be developed to go over specifically how to do these checks with the minimum amount of sound. We were told that some guards are as quiet as "ghosts" or "Ninjas." Apparently, a quiet guard will stop in front of the cell, use two hands to hold the

3

pipe, and gently guide the end of the pipe to lightly touch the sensor. This procedure can be demonstrated and guards can practice doing it until they get it right. Newer guards, replacement or substitute guards, and any other guards who have received complaints against them by prisoners, if not all guards working in the PB SHU, should be put through this training program. As one prisoner said, "Some guards have demonstrated that these checks can be done quietly." The PB administration should hold all guards to this standard.

- Guards should be instructed not to speak loudly and at length at night to the control guard.
- Nor should they engage in targeted awakenings, as we were told some prisoners have experienced.
- Guards should be instructed not to retaliate against prisoners who protest the noise and sleep deprivation. Specifically, guards should not issue "psych" referrals for such prisoners, as has happened to two of the prisoners we interviewed.
- Trainers must be trained to implement this training program. When a noisy guard is told by his supervisor that he is doing a good job, then the problem will continue.
- A new complaint system could be developed concerning the noise issue. The 602 process is not functioning properly. An administrator could be identified to receive complaints about this issue, with the offending guard's name being reported. Currently, some prisoners are filing staff complaints, which can be viewed as provocative acts, as such complaints end up in a guard's permanent file. The exchange of staff complaints and psych referrals is not a productive training and supervising mechanism. Rather, it has developed because proper training and supervision is lacking.
- The Lexan cells could be used creatively to ameliorate the noise. We received one report that a prisoner currently housed in a Lexan cell was happy about that, because of how the Lexan muffles the noise. In the past, our litigation team has protested vociferously about the placement of one of our plaintiffs in a Lexan cell, as these cells have less air circulation, are hotter in the summer, and reduce even further the ability of SHU prisoners to communicate with their pod mates. However, under the current sleep deprivation crisis, some prisoners might appreciate a respite night in a Lexan cell (for example, one night per week). However, we are not recommending the involuntary placement in a Lexan cell for anyone, even for a night.
- The warden's previous memo could be updated to give more specifics, such as the specific directive about keys.

Finally, one prisoner made the excellent suggestion that, on any future inspection tour, those on the tour enter a cell ("any cell, any pod") to experience the sound. We were told that the sound of the door, and other noises, echos in a different way from inside a cell.

Dated: January 25, 2016

By: Carol Strickman, Staff Attorney
Legal Services for Prisoners With Children

4

## Third Report on Cell Checks at Pelican Bay SHU

### 1. Introduction and Summary

This report is a follow-up to my previous reports dated October 22, 2015 and January 25, 2016 regarding the impact of cell checks every 30 or 60 minutes on SHU prisoners at Pelican Bay State Prison.

This report is based on interviews with 11 SHU prisoners and one former SHU prisoner now in General Population at Pelican Bay conducted on March 1 and 2, 2016, by attorney Carmen Bremer and undersigned counsel. Generally, we have selected interviewees based on (1) geographic diversity throughout the SHU and (2) continuity. Of our 12 March interviewees, five prisoners had been interviewed all three times; four had been interviewed in January; and this was the first interview for three. They represented the following blocks: C1, C2, C3, C4, C5, C7, D2, D4, D6 and D10, and GP.[1]

Prisoners in C4 and D10 reported to us that the First Watch checks had not been uniformly cut back to once per hour, per the *Coleman* order. I have provided the details of these reports to plaintiffs' counsel in *Coleman*.

The majority of prisoners still report "very bad" or "fairly bad" sleep. The pod doors slamming open and shut is the most disruptive issue, followed by excessive noise on the part of correctional officers. No one reports "very good" sleep. Those who are reporting better sleep are in pods in which the pod doors are not being completely closed and/or completely opened. One pod had the good fortune of having both no slamming of doors and uniformly quiet correctional officers. This pod (or block) is a model for the rest of the SHU. It demonstrates that these checks *can* be done quietly at PB SHU, but *only* if *both* the doors and officer behavior are adequately addressed.

We are now in the eighth month of these loud and frequent checks which cause radically disrupted and shortened sleep for hundreds of prisoners. It is truly a public health crisis. However, interim measures are readily available: (1) instructions to tower officers not to close or open pod doors all the way during First Watch and (2) training of correctional officers on the importance of conducting these checks quietly and how to do that. A suggested training curriculum is attached.

### 2. Impact on prisoners

#### (a) Impact on sleep:

The prisoners we interviewed gave the following estimates of how much sleep they were getting every day (including naps): 2, 3, 3-4, 4, 4, 4, 4 ½, 5 at most, 6, 7-8 hours. About half cannot or do not sleep at all during the day; about half take short naps or try to (5 minutes, half an hour, less than an hour).

They virtually all report waking up many times during the night. One man said that, even though the checks are now one hour apart at night, he wakes up during *and between* checks, when in the past he

---

[1] We understand that C9, C10, D7 and D8 were vacant at the time of our interviews. The GP prisoner had been in PB SHU for a lengthy period and had been recently released to GP.

slept "pretty well." Many reported that they do not dream at all since the checks began. Six gave their sleep a rating of "very bad," one said "fairly bad", one said "fairly bad or fairly good, depending on the night," and two said "fairly good."

### (b) Impact on ability to function:

We received the same kinds of reports as previously: difficulty concentrating, falling asleep while trying to read, dropping GED class, inability to complete drawings (when he could draw for many hours a day and complete a drawing in one sitting); sloppy handwriting; becoming inarticulate, inability to recall familiar words; lack of energy or interest in doing normal activities; doing less exercise; not reading any more.

### (c) Impact on mental and physical state:

People reported:

- Panic attacks
- Blacking out (SHU and GP)
- Headaches five times a week
- Pain from earplugs
- Body feels hot
- Weight gain
- Exhaustion
- Anxiety
- Loss of enjoyment in pleasurable activities (reading, writing, TV)
- Loss of one's quick wit
- Lack of sociability
- Anger
- Discomfort when checks occur while one is using the toilet or bathing

### 3. Changes in the last month (since January 19th – 20th visits)

As mentioned above, some pods are still not consistently doing the checks hourly throughout the night. Some pods have filled back up, so checking each block takes longer again, and this keeps people awake for longer periods of time. In D4, where Todd Ashker had been housed, the officers became intentionally louder (with their keys, the door, banging the pipe) after he was transferred out. It was thought that these officers felt emboldened to harass the prisoners even more, now that Ashker was gone, since he would report problems to the lawyers on the solitary confinement case.

On the positive side, three prisoners reported that the tower officers were not opening or closing the pod doors all the way. Notably, these prisoners reported their sleep as "fairly good" all or some of the time. Several prisoners reported that the Guard One pipes were no longer beeping. However, this has made little difference, as this sound did not cause prisoners to awaken; further, some officers are hitting the sensors louder now.

## 4. Correctional officer behavior generally

When asked to rate the percentage of "disrespectful noisy" COs, the majority were rated as "noisy and disrespectful" with one notable exception. The negative rates were 99%, 90-95%, 75%, 67%, 50%, 50%, and 40% (sometimes). Opinions varied, but most prisoners identified the temporary or fill-in COs as the ones who tend to be the noisiest.

A typical report: "The guy on my pod last night was running and stomping on the stairs and down the tiers. He was banging the pipe loudly because he was trying to do it quickly, so he was not stopping at each cell."

In addition, some COs talk loudly with the tower during the night-time hours. One prisoner reported that the COs were so loud at 2 or 3 in the morning, it seemed like they were having a party.

*One* prisoner reported that the vast majority of the COs in his pod were respectful; in that pod, the pod doors are left open; as a result of the combination of the doors being open and the COs being respectful, he and others in his pod have adjusted fairly well. He gets "fairly good" sleep (although he states it is only 3-4 hours with naps). In his pod, a regular CO chastised a non-regular CO for being too loud with the checks. This is the model pod.

Apparently, there has been no training at PB SHU on *how* to conduct these court-ordered cell checks, other than instruction on how the Guard One device works. Nor is the *Coleman* team aware of any such training programs in other states. This is a problem because it gives correctional officers no guidance as to how loud or quietly, and how quickly or slowly, the checks should be conducted. This results in a wide range of implementation of these checks. When the checks were first implemented, some officers would wake prisoners up every half hour, stating that they were required to "determine if you are a living, breathing human being," quoting from an official memo. Fortunately, this specific behavior seems to have stopped.

Attached to this report is an Addendum which outlines training topics for these checks. It is submitted for consideration by the *Coleman* team and by CDCR as a working document. It is not intended to override any general trainings or instructions that CDCR normally gives. I propose 3-5 seconds per cell, but how long an officer should stand at the cell front is a judgment call which should be made by advocates for these checks.

## 5. Futility of 602s

By and large, the prisoners see no useful purpose in continuing to file 602s about their sleep deprivation. Many have already filed them, individually, or in a group 602. These 602s are being denied as a "policy" decision. More recent 602s have been rejected as being untimely, with the Appeals Coordinator stating that the checks started on August 3, which was more than 30 days ago. Appeals are sometimes lost. One prisoner's 602 was sent to Sacramento, but Sacramento has no record of it. Others express fear of retaliation for filing 602s and/or for speaking out and asking officers to be quiet. As a result, prisoners are not currently inclined to file more 602s, even though they continue to suffer.

3

6. **Suggestions for conducting these checks quietly**

- Keep the pod doors open during First Watch
- Alternatively, only open and close the pod doors partway (4" from the ends) on First Watch
- Move two Guard One sensors to a wall at the end of each row of cells, and only activate those two sensors – one up and one down per pod
- Place rubber gaskets around the sensor so the metal-on-metal sound is muffled or eliminated
- Train correctional officers on how to do the checks quietly and effectively

7. **Conclusion**

In order for prisoners to get constitutionally adequate sleep, two basic things must happen:

- The problem of the pod doors has to be effectively addressed. They either have to be modified so that they open and close very quietly, or the pod doors must be kept open entirely, or only partially opened *and* closed, during the night.

- The officers must be trained to conduct the checks quietly and that standard must be enforced.

A CDCR Mental Health Program flyer on suicide prevention offers the following "important protective factors": "connections to family, friends, individuals, community and social activities", "effective mental health care", "family support (i.e., visits, letters and phone calls), "staying involved in hobbies, school or job responsibilities", "healthy habits (such as exercise)". SHU prisoners have a very limited set of activities they can do to maintain their mental health. They are: reading, writing, drawing, exercising, watching TV or listening to the radio, and talking to others in their pod. *All* of these activities have been negatively impacted by these checks. These prisoners are even less productive than ever. A program whose purpose is to maintain mental health should not have such a devastating impact on the few productive and worthwhile activities available to SHU prisoners.

As one prisoner stated, "It is like a construction site all night. It is horrible. It really is torture. I try to block it out mentally since it bothers me to think about it." Another states that, for decades, military and police forces have used "extreme isolation, sleep deprivation and constant banging/noise, to cause mental/physical torment and try to break a person's mind or human will to resist questioning. These are so-called clean torture methods. So CDCR/PBSP cannot possibly claim, 'We did not know the cause or effect of this new program's use of extreme isolation, sleep deprivation, and constant noise/banging.'"

Dated: March 11, 2016

By: Carol Strickman, Staff Attorney
Legal Services for Prisoners With Children

**Addendum**

**Training Outline for Security/Welfare Checks**

- The training on how to conduct these wellness checks to date has been inadequate.
- Even though these checks are considered "best practices" for suicide prevention of prisoners in isolation cells, there apparently is no national or state training curriculum, other than how to use Guard One.
- Important elements of such a program must include:

   **Explanation of the purpose**:
   1. The purpose is to observe the prisoner to determine if he or she appears to be functioning normally, is not in distress and is not in the process of committing suicide.
   2. The purpose is not to disturb, disrupt or awaken a sleeping person.
   3. The purpose is not to punish, harm or distress the prisoner.
   4. The prisoners should be no worse off when you leave the pod than when you entered.

   **Importance of being quiet**
   5. Sleep is a necessary human function and a legal right. Sleep deprivation is associated with suicide.
   6. Therefore it is of utmost importance that the pods are quiet at night. Avoid excessive or unnecessary noise or sound, particularly at night.
   7. Make as little noise as possible if you have to remove the door lock.
   8. Do not run or stomp into the pod or up or down the stairs.
   9. Find a way to make your keys quiet as you move through the pod.
   10. Do not bang the sensor with the pipe. Rather, touch the pipe it to the sensor as quietly as possible.
   11. Do not speak loudly to the tower or to other COs, especially at night.

   **Time considerations**
   12. This is not a race. Speed is not the goal. Doing the checks too quickly is counter-productive to their purpose and generates more noise than is necessary.
   13. It takes 3-5 seconds of observation to determine whether the person is okay.
   14. Stop at each cell for 3-5 seconds and look at the prisoner.
   15. After determining that the prisoner is okay, slowly and methodically press the pipe into the sensor. When the light goes on, you can move to the next cell.

**What not to do**

16. If the prisoner appears to be sleeping, do not wake him up. Do not flash a light in his eyes or on his face. Do not ask him to "show some skin" or make a movement.

17. If you need more light to see if the prisoner is in his bed, you may direct your flashlight on the floor to provide indirect light onto the bed.

18. If a prisoner asks you to be quieter, consider what you can do to be more quiet. Do not react by becoming louder. Do not tell him to "602 it."

**What to do if the prisoner is unwell**

19. If the prisoner is acting in a bizarre manner, appears ill, or seems to be in the process of committing suicide, contact the tower for assistance immediately.

**Conversing with prisoners**

20. Conversing with prisoners who are awake is not prohibited.

21. However, most prisoners probably do not want to be interrupted or to engage in conversation with officers. Do not attempt to engage in conversation with a prisoner who declines to speak with you.

22. A polite greeting at the beginning of your shift on your first round of checks is appropriate, but not mandatory.

23. You may engage in brief conversations with prisoners who initiate them.

- The training program should be hands-on, with trainers demonstrating the correct way to conduct the checks, and incorrect ways.
- COs should then demonstrate that they can do the checks correctly.
- Follow-up should include supervisors checking the Guard One logs regularly to see how long the COs are taking to do the night-time checks. If they are happening too quickly, then there is a danger that those checks are too noisy. Those staff should be monitored, and/or prisoners in those pods can be asked if those checks were too noisy.
- The mental health staff who regularly conduct mental health checks in the pods could routinely ask prisoners whether they are getting enough sleep and whether the checks are too loud in their pod. The mental health staff could be tasked with reporting specific noise problems to the warden or his designee.
- Another staff person could be designated by the warden to receive 22 forms regarding the administration of this program, so that prisoners have a method other than 602s to voice their concerns.
- Depending on effective the initial training is, the level of continuing complaints received, etc., supervisors should continue to monitor the issue.
- New and temporary staff must be provided with this training program before they are tasked with implementing these checks.

6