**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**
    **Plaintiffs,**

    **v.**                                    **No. CIV. S-90-0250 KJM KJN P**

**EDMUND G. BROWN, JR. et al.,**
    **Defendants**

**SPECIAL MASTER'S MONITORING REPORT ON THE MENTAL HEALTH
INPATIENT CARE PROGRAMS FOR INMATES OF THE CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401)824-5123
May 25, 2016

TABLE OF CONTENTS

**INTRODUCTION**     1

**PART I: UPDATE ON ACCESS TO MENTAL HEALTH INPATIENT CARE**     5

A. Response to Re-Emergence of Issues with Access to Inpatient Mental Health Care     5

B. Development of the New CDCR/DSH MOU and a Plan for Patient Access to DSH-Atascadero During the Interim     10

    1. The New CDCR/DSH MOU and a Shift of Responsibility to CDCR for Operation of Three DSH Inpatient Programs Which Treat CDCR Inmates     11

    2. An Interim Process to Expedite Inpatient Admissions to the Least Restrictive Housing that is Clinically and Custodially Appropriate     13

    3. Staff Training on the New MOU and Policies     18

C. History Lessons:  Past Efforts to Resolve the Problem of Inadequate Access to Appropriate Inpatient Placements for Coleman Class Members     19

    1. The Lingering Issues Surrounding Access for CDCR Inmates     21

    2. Plan for CDCR to Assume Responsibility for the Three Existing DSH Psychiatric Programs     37

**PART II: THE SPECIAL MASTER'S FINDINGS AT THE SEVEN INPATIENT PROGRAMS**     41

A. STAFFING     41

B. TREATMENT AND CLINICAL SERVICES: QUALITY MANAGEMENT AND ITS IMPLICATIONS FOR IMPROVING THE QUALITY OF CARE DELIVERED TO CDCR PATIENTS     46

C. PATIENT ACCESS TO TREATMENT     90

D. REFERRALS AND TRANSFERS     100

E. ADMISSIONS AND DISCHARGES     102

F. PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE     104

G. USE OF SECLUSION AND RESTRAINTS     106

H. EMERGENCY RESPONSE, SUICIDE PREVENTION AND THE DEATH REVIEW PROCESS     107

I. END-OF-SHIFT REPORTS     109

J. COLEMAN POSTINGS     110

K.  LAUNDRY AND SUPPLY ISSUES                                    110

L.  VISITATION                                                   112

M. LAW LIBRARY ACCESS                                            113

**CONCLUSION**                                                   113

APPENDIX A1: DSH-Atascadero                                      120

APPENDIX A2: DSH-Coalinga                                        152

APPENDIX A3: DSH-Salinas Valley                                  162

APPENDIX A4: DSH-Vacaville                                       198

APPENDIX A5: DSH-Stockton                                        229

APPENDIX A6: CIW-PIP                                             255

APPENDIX A7: SQ-PIP                                              266

APPENDIX B-1: DSH-Atascadero                                     290

APPENDIX B-2: DSH-Salinas Valley                                 308

APPENDIX B-3: DSH-Vacaville                                      322

APPENDIX B-4: DSH-Stockton                                       331

APPENDIX B-5: SQ-PIP                                             353

**ACRONYMS and ABBREVIATIONS**                                   365

# INTRODUCTION

This report[1] covers the Special Master's comprehensive review of the programs which provide inpatient mental health care to inmates of the California Department of Corrections and Rehabilitation (CDCR).[2]  All seven inpatient programs currently operating -- DSH-Atascadero, DSH-Coalinga, DSH-Vacaville, DSH-Stockton, DSH-Salinas Valley, the San Quentin Psychiatric Inpatient Program[3], and the California Institution for Women Psychiatric Inpatient Program (CIW PIP) -- are covered in this report.  The monitor[4] conducted on-site visits at DSH-Atascadero, DSH-Salinas Valley, DSH-Vacaville, DSH-Stockton, and the SQ-PIP.  DSH-

---

[1] This report follows a number of other very recent reports by the Special Master. During the period from January 13, 2016 through March 29, 2016, the Special Master filed six reports and distributed another report in draft form for the parties' comments.  The reports filed were  : (1) The Special Master's Expert's Re-audit and Update on Suicide Prevention Practices in CDCR Prisons, filed January 13, 2016 (ECF 5396); (2) The Special Master's Report on his Expert's Re-Audit Report, filed January 13, 2016 (ECF 5395); (3) The Special Master's Expert's Report on Suicides by CDCR Inmates during 2013, filed January 15, 2016 (ECF 5399); (4) The Special Master's Report on the 2013 Suicide Report, filed January 15, 2016 (ECF 5398); (5) The Special Master's Expert's Report on Suicides by CDCR Inmates during 2014, filed March 29, 2016 (ECF 5428); and (6) The Special Master's Report on the 2014 Suicide Report, filed March 29, 2016 (ECF 5427).  In addition, the Special Master distributed his Twenty-Sixth Round Monitoring Report in draft form on March 1, 2016.

[2] Prior to this review, the Special Master conducted a previous comprehensive review of all of the inpatient programs for CDCR inmates.  It ran from August 2013 through March 14, 2014, and was covered in both a stand-alone report by the Special Master on DSH-Salinas Valley, filed on September 24, 2013 (ECF 4380), and in a comprehensive report on all of the mental health inpatient programs operating at that time, filed May 30, 2014 (ECF 5156) (corrected citation).  The previous comprehensive review and this one are not the only reports which the Special Master has filed on the inpatient programs for CDCR inmates.  There have been numerous other reports by the Special Master on the inpatient programs, including reports covering DSH care of CDCR inmates, issues with access to inpatient care, and an inpatient "bed swap" which did not come into fruition.

[3] Notably, the SQ-PIP was not activated until October 1, 2014 and consequently was not covered in the Special Master's May 30, 2014 report.  Rather, it was covered in the Special Master's Report on the San Quentin Psychiatric Inpatient Program for Condemned Inmates of the California Department of Corrections and Rehabilitation, filed on December 30, 2014 (ECF 5257).   The five inpatient programs run by the California Department of State Hospitals -- DSH-Atascadero, DSH-Vacaville, DSH-Stockton, DSH-Salinas Valley, and DSH-Coalinga -- were formerly known as Atascadero State Hospital (ASH), Vacaville Psychiatric Program (VPP), the California Health Care Facility (CHCF), Salinas Valley Psychiatric Program (SVPP), and Coalinga State Hospital (CSH).  The SQ-PIP and the CIW-PIP are run by the CDCR and have been known as same throughout.

[4] Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to collectively as "the monitor." Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

Coalinga and the CIW-PIP were monitored by means of paper review, i.e. the monitor and expert conducted their review by examination of documentation concerning operations at these programs during the review period.  The on-site inspections at DSH-Atascadero, DSH-Salinas Valley, DSH- Vacaville, and DSH-Stockton took place in two phases, with each of these four programs receiving a three-day visit within the January 13 - 29, 2015 timeframe, plus a three-day follow-up visit within the June 9 - June 25, 2015 timeframe.   The SQ-PIP was reviewed May 7 - 8, 2015, immediately following the Special Master's Twenty-Sixth Round monitoring visit at San Quentin State Prison.

The monitoring focus areas were:

A.  Staffing

B.  Treatment and Clinical Services: Quality Management and its Implications for Improving the Quality of Care Delivered to CDCR Patients

C.  Patient Access to Treatment

D.  Referrals and Transfers

E.  Admissions and Discharges

F.  Patient Disciplinary Process and the Use of Force

G.  Use of Seclusion and Restraint

H.  Emergency Response and the Death Review Process

I.  End of Shift Reports

J.  *Coleman* Postings

K.  Laundry, Food, and Supply Issues

L.  Visitation

M.  Law Library Access

The Special Master's previous comprehensive report on the inpatient programs covered utilization review and quality management, i.e. the inpatient programs' methodologies for tracking key indicators of program performance.  In this report, the focus on quality management has shifted to quality *improvement* with regard to issues surrounding the quality of the clinical care and services provided to CDCR inmates in the inpatient programs, and the use of quality improvement methodologies to achieve and maintain appropriate standards in delivered care. [*See* Summary of the Special Master's Findings, Part II, B(2), *infra*].

This report is comprised of two major sections.  Part I of this report provides an update on the state of access to mental health inpatient care for CDCR inmates.  Subpart I (A) covers the re-emergence during 2015 of issues surrounding access to mental health inpatient care for CDCR inmates, particularly at DSH-Atascadero, and the response to the problem by the Court, the DSH defendants, and the Special Master.   Subpart I (B) provides an update on the development by CDCR and DSH of a new, updated Memorandum of Understanding (MOU)[5] to improve the efficiencies and appropriateness of inpatient treatment for CDCR patients.  It also covers (1) the development of an interim process, pending completion and implementation of the new MOU, to facilitate utilization of all 256 designated beds at DSH-Atascadero for intermediate inpatient care for CDCR inmates, (2) a discussion concerning potential assumption by CDCR of responsibility for operation of the three DSH psychiatric inpatient programs, i.e. DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton, and (3) staff training on the new MOU policies. Subpart I (C) of this report offers a retrospective look at past efforts to resolve inpatient access problems and to reroute responsibility for some inpatient care to CDCR, and the guidance to be drawn from it for

---

[5] The MOU is the agreement under which the two agencies operate to serve their common populations.

current development of a durable resolution to what hopefully has been the last appearance of wait list issues.

Part II of this report provides the Special Master's summaries of his findings at the seven inpatient programs, presented by focus areas (i.e. items A through M listed above). The findings are further organized according to groupings of the inpatient programs by common characteristics i.e. (1) the hospitals: DSH-Atascadero and DSH-Coalinga; (2) the psychiatric programs: DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton (3) the CDCR-run inpatient programs: CIW-PIP and SQ-PIP.

Appendices A1 - A7 provide the Special Master's individual summaries of his findings at each of the seven inpatient programs. His expert's clinical case reviews for each of the five programs monitored on site are found in Appendices B1 - B5.

On April 22, 2016, the Special Master provided the *Coleman* parties with a draft version of this report. In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft report. Plaintiffs' counsel submitted a written response indicating that they concurred with the Special Master's findings and recommedations in his draft report, and requested greater specificity in his Recommendation No. 3. (*See infra* p. 118). The DSH defendants sent the Special Master suggested corrections, which are incorporated into this report. (*See infra* p. 1, 102, 103, 195, and 198). The CDCR defendants notified the Special Master that they were submitting no objections to the draft report.

# PART I.

## UPDATE ON ACCESS TO MENTAL HEALTH INPATIENT CARE FOR CDCR INMATES

**A.    Response to Re-Emergence of Issues with Access to Inpatient Mental Health Care**

In July 2015, the Special Master learned that the DSH inpatient programs which treat CDCR inmates were not operating according to plans adopted in 2011-2012 to address long wait lists for patient admissions.[6]  Inpatient admissions had declined to low numbers: in April, May, and July 2015, the average monthly number of CDCR inmate admissions to DSH-Atascadero was a mere nine patients.[7]  Although the actual numbers of patients awaiting admission were lower than they had been in the past[8], referrals to inpatient care at appropriate custody levels were lacking.  DSH-Atascadero has 256 low-custody intermediate care beds specifically designated for *Coleman* class members, but over 100 of these beds were reportedly <u>not</u> occupied by *Coleman* class members, thereby not availing these class members access to the more therapeutically beneficial lower-custody, less restrictive beds that were designated for them by court order. [9]

---

[6] *See* ECF 3962, Defendants' Plan Re: Intermediate Care Facility and Acute Inpatient Waitlists; ECF 4020, Special Master's Report and Recommendations on Defendants' Plan; ECF 4045, Order adopting in part Special Master's recommendations and immediate implementation of parts 2, 3, and 4 of defendants' plan and setting evidentiary hearing; ECF 4103, Defendants' Supplemental Plan to Reduce or Eliminate the Inpatient Waitlists; ECF 4131, Order continuing evidentiary hearing; ECF 4132, Defendants' Report on Assessment Process and plan Re: Sustainable Self-Monitoring; ECF 4214, Order noting accomplishments to date on waitlists and directing continued meet-and-confer process.

[7] Source: Monthly Bed Utilization Reports for the DSH, filed under seal. Data for June 2015 was unavailable.

[8] Compare, e.g., the identification of 400 inmates for transfer to inpatient care in March 2005 in the Unidentified Needs Assessment (UNA), and the identification of nearly 1,000 inmates for referral to inpatient care in 2009 in the Mental Health Assessment and Referral Project (MHARP).

[9] On June 17, 2009, the *Coleman* Court ordered that 256 beds at DSH-Atascadero were designated for *Coleman* class members at the intermediate inpatient level of care.  (ECF 3613).

The significance of non-use of the designated 256 DSH-Atascadero beds for *Coleman* class members goes far beyond a diminution of availability of beds at DSH-Atascadero for these patients.  As a low-custody program, when its beds are not being filled by CDCR patients, there is serious interference with patients' access to their clinically and custodially appropriate least restrictive housing (LRH) -- a very important concern from a therapeutic standpoint.   Further, when DSH-Atascadero beds are not open to CDCR patients, there is a resounding ripple effect throughout all of the DSH inpatient programs which treat these patients, creating almost instantly a re-shuffling for other beds at other DSH programs, and at CDCR a back-up of patients awaiting DSH placement.  Stays in mental health crisis beds (MHCB) at CDCR soon become overly long, as patients are waiting for admission and transfers to the inpatient programs they need.  This domino effect -- as avoidable as it is with consistent, appropriate use of the DSH-Atascadero beds -- has been repeated all too often over many years, as discussed in more detail below.

The Special Master immediately notified the Court of these concerns.   It appeared that after some turnover among DSH personnel, many of the new officials responsible for *Coleman* treatment programs were unfamiliar with the relevant extant plans and court orders pertaining to inpatient treatment of *Coleman* class members, and thus were not carrying out the requirements of those plans and orders.

On August 5, 2015, the Court ordered the *Coleman* parties to appear for a status conference on August 19, 2015.  Order (ECF 5333).  The Court was seeking to determine (1) whether and to what extent DSH officials with direct responsibility for *Coleman* matters were familiar with remedial plans presented to and approved by the Court and with court orders requiring specific action by the DSH defendants; (2) whether or to what extent DSH had protocols in place to ensure that new personnel are made aware of relevant court orders and

approved plans and protocols; and (3) whether and to what extent officials were following the plans approved by the Court in 2011 and 2012 to promptly eliminate waitlists for inpatient mental health care and to implement a sustainable process to prevent recurrence of the waitlists. In the same order, the Court directed the *Coleman* parties to file a joint status report no later than August 17, 2015, to include an update on implementation of the referenced plans, and an explanation as to why any inmates would be waitlisted for beds if there were any beds in the designated DSH programs that were not occupied by CDCR inmates. Order, filed August 5, 2015 (ECF 5333).

Before the status conference, the DSH defendants notified the Special Master that they and CDCR were engaged in the process of drafting a new MOU. The MOU is the inter-agency agreement under which CDCR and DSH carry out referral, transfer, and treatment of CDCR inmates in designated DSH inpatient programs. Defendants had already achieved a rough draft of the new MOU and invited the Special Master to participate in the revision process.[10]

As a result of the August 19, 2015 status conference, the Court ordered the Special master to participate in the ongoing MOU re-drafting process. The Court also ordered the DSH director, deputy director, and legal counsel to file sworn declarations confirming their representations made during the August 19 status conference that they had read the plans, the Special Master's report, and orders specified in the August 5, 2015 order, and that protocols were in place so that any successor DSH officials will be informed of their obligations under the remedial plans approved by the Court. The DSH defendants were also ordered to report to the Court on whether the inpatient wait list could be permanently eliminated through regular,

---

[10] The pre-existing MOUs for acute inpatient care and intermediate inpatient care for CDCR inmates expired on June 3, 2008 and September 13, 2013, respectively.

consistent use of the 256 intermediate care beds at DSH-Atascadero designated for *Coleman*

class members, and if not, what alternate plans were in place.  In addition, the Special Master

was ordered to work with the parties to finalize a template to be used by the DSH defendants for

their monthly update reports on elimination of the inpatient waitlist. (The template originated

with a table offered by the DSH defendants in their report of August 17, 2015, and refined by the

Court to align with the information it required in defendants' monthly reports.)  Order, filed

August 21, 2015 (ECF 5343)[11].

---

[11]1.    Commencing forthwith, the Special Master shall be actively involved in the ongoing negotiations to update the memorandum of understanding (MOU) between DSH and the California Department of Corrections and Rehabilitation (CDCR) for provision of inpatient mental health care.

2.    Within thirty days from the date of this order, defendants shall report to the Court on whether regular and consistent use of the full complement of 256 beds at Atascadero State Hospital (DSH-Atascadero) designated for *Coleman* class members is sufficient to permanently eliminate the ongoing waitlist for inpatient mental  health care and if not, why not, and what alternate plans are in place for waitlisted class members. As used in this order, a class member is deemed to be on a waitlist for inpatient care from the time said class member is referred to DSH by CDCR. Said report shall specifically address, as necessary, all relevant parts of the prior remedial plans that were to have been implemented to eliminate the waitlist for inpatient care, including but not limited to the patient movement plan described in defendants' October 18, 2011 Supplemental Plan to Eliminate the Waitlist for Inpatient Care (ECF No. 4103). Plaintiffs may file a written response to defendants' report within thirty days of the filing of that report.

3.    By close of business on August 21, 2015, Pamela Ahlin, Director, Department of State Hospitals, George Maynard, Deputy Director, State Hospitals Strategic Planning & Implementation, and Nicole Harrigan, Esq., shall file declarations confirming their representations at the August 19 status and attesting to the matters set forth in paragraph 3 of the Court's August 5, 2015 order.

4.    The Court is providing a draft template to the Special Master, expanding Table 2 provided by defendants in their August 17, 2015 report to the Court. The Special Master shall work with the parties to finalize the template, while achieving the essential reporting purposes reflected in the Court's draft template. The Special Master shall file the finalized template with the Court on or before September 15, 2015. Thereafter, defendants shall each month complete and file on the public docket an updated report providing all the information provided by the template, filing this report at the same time defendants file under seal their monthly reports concerning individual referrals, pending referrals, rejections and transfer of class members from outpatient to inpatient mental health care.

The DSH officials' declarations were filed on August 21, 2015. (ECFs 5344, 5345, 5346, and 5347).  On September 29, 2015, the Special Master filed the jointly-approved templates for wait list charts, to be completed by the DSH defendants on a monthly basis. (ECF 5363).[12]

As directed by the August 21, 2015 order, on October 30, 2015 the DSH defendants filed their report on the use of DSH-Atascadero during October 2015 to eliminate the intermediate care wait list.  (ECF 5374). The report indicated an average waitlist of 15 high-custody and six low-custody for that month.   It also indicated, among other things, that a new housing review process was under development to facilitate patient movement from higher security beds to lower security beds within the DSH programs and that, together with the MOU, use of the low-custody beds at DSH-Atascadero would be maximized.[13]  The report, however, was lacking in substantiation of its own premise, without the detail necessary to illustrate exactly what was being done to fully address the problem of under-use of the DSH-Atascadero beds.  Data from DSH's own review was not presented in the report. This caused concern to the Special Master, and likewise to the *Coleman* plaintiffs, who were seriously contemplating submitting a pointed response to the inadequacies of the DSH defendants' report.

However, before plaintiffs took that step, the DSH defendants approached the Special Master in an effort to circumvent and resolve the problem.  They offered the Special Master an opportunity to review the clinical case reviews that had been completed as of that time. Plaintiffs were invited to observe that process.  *See* Order, filed December 28, 2015 (ECF 5392).

---

[12] The Special Master held a teleconference on September 10, 2015 with the *Coleman* parties on the integration of their input into the final versions of the templates.  Because additional time was required for the parties to resolve some remaining issues and reach full agreement on the final versions of the templates, the Special Master requested an extension of time to September 29, 2015 to complete, finalize, and file the templates and any other necessary accompanying material. By minute order filed on September 15, 2015, the request for an extension of time was granted.  (ECF 5353).

[13] Other features of the new MOU and accompanying polices are discussed below.

The parties stipulated, with the concurrence of the Special Master, that plaintiffs be given an extension of time to file their response to the DSH defendants' October 30, 2015 report.  Their agreement, adopted by the court, was for plaintiffs' response to be due within 30 days after the filing of the Special Master's report containing his review of the DSH defendants' clinical case reviews. The filing of this report marked, among other things, the beginning of the 30-day period for the filing of plaintiffs' response.  The DSH defendants were given 30 days from the date of plaintiffs' report to file their reply.  Order, filed December 28, 2015 (ECF 5392).

## B.    Development of the New CDCR/DSH MOU and a Plan for Patient Access to DSH-Atascadero During the Interim

From August 2015 through February 2016, the Special Master's resources were dedicated largely to working on the new MOU and associated policies, and to developing a process to be used during the interim for moving clinically suitable patients to DSH-Atascadero before full implementation of the new MOU.  The substance and pace of the work was detailed and intensive.  From August through November, the focus was on the re-drafting of the MOU and policies.  From December through and January, the emphasis shifted to development and implementation of a process to maximize regular, consistent use of all 256 designated beds at DSH-Atascadero, without having to wait until the future implementation of the new MOU.[14]   By February 2016, the Special Master's attention turned to reviewing training modules on the new MOU and providing feedback to the DSH defendants.

---

[14] Consistent with the intent of paragraph two of the Court's order filed August 21, 2015 (ECF 5343).

**1.    The New CDCR/DSH MOU and a Shift of Responsibility to CDCR for Operation of Three DSH Inpatient Programs Which Treat CDCR Inmates**

As noted above, CDCR and DSH had already begun developing a new MOU before the Special Master became aware of the resurgence of inpatient care access issues in mid-2015. While CDCR and DSH had re-visited prior MOUs, this time the MOU was revised in a way that would allow for revival of a concept that had been discussed in the past but never executed. The idea was to draft the language of the MOU so that the relationship between the coordinated but independent CDCR and DSH inpatient care systems would be re-defined and realigned in such a way that *CDCR, as well as DSH*, could acquire responsibility for inpatient care of CDCR inmates that was delivered theretofore by DSH, efficiently and seamlessly. According to the CDCR defendants, an important factor in the realization of this change is that any such transfer of responsibility requires the approval of the California State Legislature. Thus, while there was no guarantee that CDCR would assume any of this responsibility for inpatient care, with the requisite approval by the Legislature, it could be implemented if and as desired.

Programs in mind for this shift of responsibility were the DSH-run inpatient programs for CDCR inmates at DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton. All three of these programs are located within the secure perimeters of three CDCR prisons - Salinas Valley State Prison (SVSP), California Medical Facility (CMF), and California Health Care Facility (CHCF), respectively. This prospective shift was conceived to improve patient access by streamlining the existing process of referral, acceptance, transfer, and admission of seriously mentally ill CDCR inmates to inpatient care at DSH programs. Referred to informally by CDCR officials as a "lift and shift," the new approach was envisioned as a permanent solution to the longstanding cycle of backed-up admissions of *Coleman* class members into inpatient beds at DSH programs and the

resulting surges of long waitlists for patients who are so seriously mentally ill as to require inpatient care.  This concerning and recurring pattern needs to be brought to an end.

CDCR and DSH had self-imposed a deadline of October 31, 2015 to complete the new MOU and its associated policies in order to meet state fiscal and legislative timeframes for inclusion in the California Governor's 2016-2017 budget package.  As noted above, defendants have communicated to the Special Master that there could be no movement of responsibility for inpatient care of CDCR inmates absent legislative approval.  The *Coleman* court ordered the Special Master to be actively involved in the ongoing negotiations between CDCR and DSH to update their MOU for provision of mental health inpatient care to CDCR inmates.  Order, filed August 21, 2015 (ECF 5343).  Defendants requested the Special Master's cooperation with accomplishing this on a fast-tracked pace in order to meet their timeline for submission for inclusion in the 2016-2017 budget package.  He agreed, which of necessity prompted his immediate assignment of multiple clinical experts and monitors on his staff to work with CDCR and DSH on the new MOU. To help assure that the remaining work on the MOU would be completed thoroughly and thoughtfully, the self-imposed deadline was extended through November 2015.

CDCR, DSH, and the Special Master's staff began work within two days after the August 19 status conference, and reconvened on a weekly basis until the MOU and its eleven accompanying policies[15] were completed and formally approved on November 24, 2015.  The

---

[15] The eleven policies which accompany the MOU are (a) DSH Treatment Planning Policy-CDCR Patients in DSH Inpatient Programs, (b) Joint Policy Re: DSH Facility Pre-Release Planning Policy, (c) DSH Rules Violation Reporting Policy - CDCR Patients in DSH Inpatient Programs, (d) Joint Policy Re: Suicide Review, (e) Joint Policy: Discharge, (f) DSH Utilization Management - CDCR patients in DSH Inpatient Programs, (g) Joint Policy and Procedure Re: Referral, Admission and Movement, (h) Joint Policy Re: Medical Cases, (i) DSH Housing Review Policy - CDCR Patients in DSH Inpatient Programs, (j) Joint Policy Re: DSH Referral and Penal Code Section 2602 Management, and (k) Joint Policy Re: Non-formulary Psychotropic Medications.

process involved line-by-line review and re-drafting of the MOU and policies, with input from *Coleman* plaintiffs' counsel, until the documents comprised a clear and cohesive guide to successful access to higher levels of care for CDCR inmates. Under real time constraints, it required unerring attention to the complexities in the draft documents and to ensuring that, as a whole, they were clear and unambiguous.

Defendants advised the Special Master that the prospective re-drawing of DSH's and CDCR's roles in providing inpatient care for CDCR inmates was submitted for inclusion in the Governor's 2016-2017 budget. However, it did not survive the winnowing process and was not included in the approved budget. It appears that CDCR and DSH are deliberating a re-submission for inclusion in the May 2016 revision to the Governor's budget, but again there is no assurance that it will survive the approval process this time either. In the meantime, the required updating of the new MOU has been completed and is in place, should budgetary approval be granted.

  **2.  An Interim Process to Expedite Inpatient Admissions to the Least Restrictive Housing that is Clinically and Custodially Appropriate**

The new MOU policies on Referral, Admission and Movement Policy and on DSH Housing Review for CDCR Patients in Inpatient Programs bear particular importance with regard to the Court's August 21, 2015 order. That order specifically addresses the importance of "regular and consistent use of the full complement of 256 beds at Atascadero State Hospital designated for *Coleman* class members. . ." (ECF 5343). All 256 of those beds are intermediate level *low-custody* beds, meaning that they provide patients with a less restrictive environment than high-custody beds. The purpose of the two above-referenced policies is to place patients in the *least restrictive settings* appropriate to them, based on their clinical and custodial factors, at the times of their admissions and throughout the durations of their stays in the inpatient

programs. The intent is to ensure that patients *not* be placed or kept in programs with housing that is more highly restrictive than necessary according to these patients' clinical and custodial factors, and thus to avoid the unnecessary anti-therapeutic effects of overly restrictive housing on these patients. Historically, there has been tension surrounding the admission and placement of *Coleman* class patients designated as Level IV, i.e. high-custody, to DSH-Atascadero beds. Yet, DSH-Atascadero routinely admits inmates who are classified as mentally disordered offenders (MDO), as well as inmates deemed not guilty by reason of insanity or incompetent to stand trial, without clear distinction as to why these patients would be admitted but high-custody *Coleman* class members would not be admitted.

The clinical importance of avoiding overly-restrictive housing called for interim measures before the requisite training and implementation on the two policies is conducted. Accordingly, an interim process had to be developed to address the underlying concern for patients in the meantime.

Defendants advised the Special Master that they had begun using an interim process to move patients to their LRH unless clinically contraindicated. In December 2015, the Special Master's team and *Coleman* plaintiffs' counsel were invited to DSH headquarters to assess the fledgling interim process on December 1-3 and 16-17, 2015. This invitation was another aspect of the defendants' response to the concerns of the Special Master and *Coleman* plaintiffs' counsel with the paucity of information in the DSH defendants' October 30, 2015 report. Although beforehand the DSH defendants had conducted a teleconference with the Special Master for a preview of their interim process, the information provided during that teleconference differed greatly from what was learned during the actual review at headquarters. The review revealed, at best, a very preliminary work in progress rather than any actual consistent, discernible process.

What the DSH defendants reported was that in August 2015, they had begun reviewing patients already in DSH programs for possible transfer.  It involved a four-part process.

- First, CDCR's Health Care Placement Oversight Program (HCPOP) identified two categories of patients for review: (1) those previously deemed eligible for unlocked dorms, and (2) those deemed eligible for unlocked dorms but reviewed by an Institutional Classification Committee (ICC) and referred for a higher-custody setting based on clinical recommendations.

- Second, a clinical team of DSH program and headquarters staff reviewed the patients to determine clinical appropriateness for DSH-Atascadero, based on information provided at the time of their review, and made written recommendations on the patients' eligibility to DSH-Atascadero.

- Third, an Interdisciplinary Treatment Team (IDTT) reviewed the written recommendations and the patients' files to determine clinical appropriateness for transfer to DSH-Atascadero, and notified the clinical team.  Patients deemed inappropriate for transfer would be re-evaluated for possible transfer on an ongoing basis.

- Fourth, CDCR and DSH clinicians conducted joint quality assurance reviews for patients deemed by the IDTT ineligible for the transfer, assessing the IDTT's responses to the clinical team's recommendations.  The clinical team re-reviewed the patients' files for possible transfer to DSH-Atascadero.

Of the 102 patients HCPOP initially identified as cleared for DSH-Atascadero placement, 13 were double entries, reducing the number to 89 patients.  In October, HCPOP and DAI re-reviewed the list for eligibility and reduced the number of eligible to 46 and the number of ineligible to 43.

For their assessment of the DSH defendants' interim process, the Special Master's staff divided themselves into a clinical expert group and a monitors/custodial group.  For the expert group, the DSH defendants assembled an informational packet for each patient containing all the information reviewed by the clinical and custodial staff responsible for determining the outcome of the patient's placement.  The purpose was for the clinical sub-team to review the same information that CDCR and DSH staff had reviewed in their version of an interim process.  The

clinical experts reviewed files of the 46 patients deemed eligible for DSH-Atascadero after the

second review.  Of the 15 cases[16] identified for ongoing review by CDCR and DSH, the Special

Master's experts concurred with the decisions to not transfer nine of them to DSH-Atascadero.

Another three cases had insufficient information on which to base a decision, leaving three

patients about whom the Special Master's experts disagreed with the DSH defendants and

deemed appropriate for referral to DSH-Atascadero.  The monitors/custodial group also reviewed

the files of the 43 patients deemed no longer eligible for DSH-Atascadero placement.  Twenty-

nine had been discharged, leaving 14 patients for review.  Of the 14, the monitors/custodial

group agreed with the DSH defendants' decisions not to transfer 11 to DSH-Atascadero.  There

was insufficient information to reach a conclusion on the remaining three patients.  At the

conclusion of this review in December 2015, the Special Master's clinical experts and monitors

provided their feedback to the DSH defendants.

  The DSH defendants then requested consultation with the Special Master's staff at DSH-

Vacaville, DSH-Salinas Valley, and DSH-Stockton on practices relating to placement of patients

in their LRH environments.  On January 5-7, 20-21, and 26-28, 2016 at the three programs,

respectively, the Special Master's staff and plaintiffs' counsel observed IDTTs' discussions of

LRH and their decision-making practices.  They also reviewed mental health records of those

patients who were seen in IDTT meetings during the visit and those for whom questions about

clinical implications arose during custodial reviews.  Following each observed IDTT meeting,

the Special Master's staff provided feedback and recommendations on the LRH discussions and

treatment planning to assist with patient transfers to LRH and relevant clinical issues.  Plaintiffs'

---

[16] Of the 46 patients give custodial clearance for DSH-Atascadero, 16 had been discharged or were pending discharge, 14 patients had transferred or were pending transfer to DSH-Atascadero or DSH-Coalinga, and one patient had transferred to DSH-Salinas Valley. This left 15 patients identified for ongoing review.

counsel also observed the IDTT meetings and offered their comments and suggestions after the meetings. ICC meetings were also observed and select ICC documentation was reviewed. At the end of each site visit, the Special Master's staff met with key program staff to offer their observations and any recommendations.  The results of these consultations by the Special Master's staff were as follows:

- DSH-Vacaville:  Twenty-three patients at DSH-Vacaville had been deemed eligible by DSH for unlocked dorms.  As a result of the IDTT reviews, 14 of the 23 were determined to be clinically ineligible for transfer to DSH-Atascadero at that time, four were transferred to DSH-Atascadero on January 8, 2016, and five were pending completion of the transfer process as of January 13, 2015 and were reported to have transferred subsequently.

- DSH-Salinas Valley:  At DSH-Salinas Valley, the Special Master's staff and plaintiffs' counsel observed IDTT meetings for 29 patients. Of the 29, 19 were deemed eligible for intermediate care housing settings other than DSH-Salinas Valley and were referred back to the ICC/UCC for committee action for specification of which LRH outside of DSH-Salinas Valley they were eligible for transfer to.

- DSH-Stockton:  At DSH-Stockton, the Special Master's staff and plaintiffs' counsel observed IDTT meetings for 26 patients, three of whom were cleared for placement in dorm housing but requiring further action by the ICC. The remaining 23 were deemed clinically ineligible for dorm settings. In addition, DSH-Stockton reported that during the visit by the Special Master's staff in January 2016, eight additional patients were transferred to DSH-Atascadero, and two were referred and awaiting completion of referral packages. Another eight patients were already referred to dorms at DSH-Vacaville and awaiting completion of referral packages, and another five patients deemed clinically suitable for LRH were pending action by the ICC at the time of the site visit.

On February 1, 2016, the Special Master's staff met with defendants and plaintiffs to discuss the upcoming CDCR/DSH staff training on the new MOU and its implementation. They emphasized the need for clear timeframes for the training and implementation and for

development of guidelines regulating medical holds. They also covered administrative

procedures governing patient movement, and inmate custody factors, symptomology, and violent

behaviors that may preclude transfers to LRH. They recommended adoption of the concept of

the various DSH programs as a continuum of care that permits patient movement to LRHs. The

Special Master's team also noted the central role of the IDTT in the workings of the new MOU,

observing that the upcoming training on it should include treatment and discharge planning, and

clear documentation of LRH decisions using language that was clear from a behavioral and

measurable standpoint. Management systems, including quality improvement and custodial

issues, were also discussed.

As in the past, following concerted efforts in *Coleman* to open the way for access to

inpatient care, the above-described December 2015/January 2016 review led to a steady increase

in transfers to DSH-Atascadero. On August 31, 2015, the *Coleman* class census at DSH-

Atascadero was 142 patients, but as of November 30, 2015 it had risen to 161 patients, and by

February 12, 2016, there were 230 *Coleman* class patients at DSH-Atascadero. On March 7,

2016, DSH reported the *Coleman* class census at DSH-Atascadero reached 241 patients, with ten

beds on hold for *Coleman* class patients already accepted for admission into the hospital.

### 3.    Staff Training on the New MOU and Policies

Pending staff training on the new MOU and joint policies, DSH operated under the

interim process for placing patients in their LRHs. In February 2016, DSH provided training

modules on the new MOU to the Special Master's staff and plaintiff's counsel for their review

and comments, and on March 16, 2016 it presented them with a "dry run" of the training. The

training modules have been finalized, with the input of the Special Master's staff and plaintiffs'

counsel. Actual training sessions began on April 5, 2016, initially as training-for-trainers,

followed by staff training, with the Special Master's staff and plaintiffs' counsel in attendance. CDCR and DSH advised the Special Master that all training was scheduled to be completed during April 2016.  The MOU and joint policies were implemented on May 1, 2016.

### C.    History Lessons:  Past Efforts to Resolve the Problem of Inadequate Access to Appropriate Inpatient Placements for Coleman Class Members

Providing timely access to appropriate higher levels of care is one of the seven fundamental goals of *Coleman* remediation to be achieved by defendants, as reported by the Special Master in his Twenty-Second and Twenty-Third Round Monitoring Reports. *See* Report, filed March 9, 2011 (ECF 3990); Report, filed December 1, 2011 (ECF 4124)[17] and adopted by this Court.  *See* Order n. 3, filed August 30, 2012 (ECF 4232).   The Court reiterated that this goal -- "Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive necessary higher levels of mental health care, including inpatient care only available from DMH[18]" -- and the six other goals are "`critically important'" goals which are necessary to remedy the Eighth Amendment violation in this action."  Order denying defendants' motion under the Prison Litigation Reform Act, 18 U.S.C. § 3626(b), to terminate *Coleman* Court oversight, filed April 5, 2013 (ECF 4539, p. 24), *citing* Order, filed August 30, 2012, p. 5, n. 3 (ECF 4232).

---

[17]        (1)  Re-evaluation and updating of CDCR suicide prevention policies and practices;
(2)  Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from DMH;
(3)  Review of, and compliance with, all elements of the Administrative Segregation Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in administrative segregation hubs for over 90 days;
(4)  Completion of the construction of mental health treatment space and beds for inmates at varying levels of care;
(5)  Full implementation of defendants' new mental health staffing plan;
(6)  Training of staff for greater collaboration between custody and mental health;
(7)  Refinement and implementation of MHTS.net to its fullest extent and benefit.
[18] Now Department of State Hospitals (DSH).

Lack of access to mental health inpatient care for CDCR inmates is far from a new issue in *Coleman*.  It was identified over two decades ago, and was reported at least two years before entry of the 1995 remedial order.  *Coleman v. Wilson*, 912 F.Supp. 1282, 1309 (E.D. Cal. 1995) (ECF 612).  The Scarlet Carp Final Report[19], which was prepared in 1993 by a consultant for CDCR and was admitted into evidence in *Coleman*, identified a "`major problem' with access to acute inpatient hospitalization . . ." 912 F.Supp. at 1309.   When the remedial order was entered in September 1995, provision of inpatient mental health care for CDCR inmates rested with the California Department of Mental Health (then DMH, now the Department of State Hospitals or DSH).

The reviews conducted by the Special Master's staff in December 2015 and January 2016 were, in essence, the latest in a series of projects under the guidance and supervision of the Special Master to improve access for *Coleman* class members to inpatient care in DSH facilities. Notable past such projects include:

- The Unidentified Needs Assessment (UNA) of 2005,

- The Mental Health Assessment and Referral Project (MHARP) of 2009-2010[20], and

- The Assessment and Referral Project of 2011

While this latest project was somewhat smaller than past projects in terms of the numbers of patients involved, the December 2015/January 2016 reviews obtained good results resembling those of the past projects to mobilize movement into inpatient care programs.

---

[19] California Department of Corrections, Mental Health Delivery System Study, Final Report, February 16, 1993.
[20] Following the formal MHARP, there was also an abbreviated follow-up assessment, informally referred to as the "mini-MHARP," which was done to update, complete, and consolidate the Special Master's findings from the MHARP.  Findings from the mini-MHARP triggered the discussions which led to the Sustainable Self-Monitoring Process, discussed later below in this report on page 21, *infra*.

Following the 2011 assessment and referral project, the CDCR defendants, under the guidance of the Special Master, developed and submitted their "Report on Assessment Process and Plan Re: Sustainable Self-Monitoring." This plan outlined the implementation of a sustainable self-monitoring process ("the sustainable process") to ensure that inmates in need of inpatient care were timely identified, referred, and transferred to such care.[21]  Under the sustainable process in 2012, *Coleman* class patients who needed care were identified, referred and transferred to an appropriate setting to receive the needed care; reducing wait lists and improving timeliness of transfers to inpatient care.  Yet, after the 2011 project and the earlier ones, the gains in access to inpatient care turned out to have been short-lived.  Over time, in each instance, the number of *Coleman* class members in DSH beds diminished, referrals and transfers slowed, and waitlists grew -- just as they did by July 2015.   The process known as the *sustainable* process for identification, referral and transfer of CDCR inmates to inpatient care at DSH unfortunately turned out to be unsustainable.

## 1.    The Lingering Issues Surrounding Access for CDCR Inmates

Access to inpatient care at DSH-Atascadero for CDCR inmates has been particularly problematic throughout the history of *Coleman*.  It was identified in the *Coleman* remedial order of 1995[22] and persists to this day.  A lasting resolution to this problem will be one of the final major accomplishments required to conclude the remedial process.  Defendants need to develop enduring strategies and policies that will create and sustain a regular and effective process of identifying those inmates in need of inpatient care, and who, once identified for such care, do not have to wait for long periods before actual placement into appropriate treatment programs. As

---

[21] *See* Defendants' Report on Assessment Process and Plan Re: Sustainable Self-Monitoring, filed December 13, 2011 (ECF 4132).
[22] 912 F.Supp at 1309.

the *Coleman* Court stated in its order denying the CDCR defendants' 2013 motion to terminate court oversight, evidence of "an absence of timely access to appropriate levels of care at every point in the system" is evidence of an ongoing constitutional violation. Order, entered April 5, 2013 (ECF 4539, p. 46), quoting *Brown*, 131 S.Ct. at 1931 [quoting report filed by Special Master in July 2009 (Twenty-First Round Monitoring Report, filed July 31, 2009 (ECF 3638)]. "The relevant requirement (for assessing constitutional compliance) is defendants' constitutional obligation to provide `a system of ready access to adequate (mental health) care.'" Order, entered April 5, 2013 (ECF 4539, p.47), *quoting Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

In 1998, resistance to treating CDCR inmates at DSH-Atascadero was predicated upon a belief that other populations were vying for beds at DSH-Atascadero, thus limiting the number of beds available to CDCR inmates. To compensate, a three-part plan was formulated by CDCR and DSH to increase the number of intermediate care beds for CDCR patients to 128, and reduce the number of available beds at DSH-Atascadero to 200.[23]

After the merging of the *Gates*[24] and *Coleman* cases in November 1998, the Court approved a plan calling for CDCR and DSH to conduct a study to determine actual need for acute and intermediate care inpatient beds.  Pursuant to the court order, an interim report and recommendation on CDCR's need for inpatient beds (ECF 1143), and a final report (ECF 1172) were filed by the Special Master by mid-2000.  The Special Master specifically recommended that the defendants should seek to utilize at least 90 percent of the 200 intermediate care beds at

---

[23] The increase of 148 intermediate care beds would be accomplished by licensing 84 beds at CMF in the existing day treatment program and 64 beds at SVSP.

[24] *Gates v. Deukmejian*, cv-01636-LKK-JFM (E.D. Cal.).  Prison officials agreed to a consent decree to improve medical care, mental health care and the treatment of HIV positive prisoners at the California Medical Facility.  The parties entered into a stipulation to dismiss the action and to transition the mental health issues into the *Coleman* case.

DSH-Atascadero.  (p. 31, ECF 1172).  His recommendations were adopted and ordered by the court on August 28, 2000. (ECF 1195).

However, issues surrounding exclusionary criteria associated with admissions to DSH-Atascadero were not alleviated and lack of access to intermediate care persisted.  Except for the opening of a 64-bed stand-alone inpatient intermediate care unit at SVSP, plans to facilitate access to inpatient beds were at a standstill by 2003, and by mid-2004, an adequate assessment of inpatient bed usage was yet to be completed.  In March 2005, CDCR reported to the Special Master that the UNA found 400 inmates with unidentified needs for inpatient care but who would not have been referred to higher levels of care but for the UNA.

In an order entered approximately two years later on May 2, 2006 (ECF 1800), although the court stated that defendants' inpatient bed plan was based on outdated population figures, it approved the plan subject to modifications based on new population data. The court ordered defendants to review the list of 123 inmates awaiting intermediate care placement at DSH-Salinas Valley and identify those who would be appropriate for placement at DSH-Atascadero. (Interestingly, this plan would be again resurrected in 2011-2012.)  The court ordered the defendants to conduct a feasibility study to determine the cost of creating 30 intermediate care beds at DSH-Coalinga for Level IV inmates.  This marked the first instance of the court ordering defendants to consider utilizing beds at DSH-Coalinga to alleviate the shortages of intermediate care beds. The concept of placing higher security patients at DSH-Coalinga also re-surfaced in 2011.

As of May 25, 2007, there were only 73 *Coleman* class members at DSH-Atascadero, and by June 8, 2007, that number had fallen to 67.  On June 28, 2007, the court addressed the state of occupation of DSH-Atascadero beds by *Coleman* class members, noting that defendants'

December 2006 bed plan contained a provision for a total of 256 beds at DSH-Atascadero, of which 25 were for acute care, and 231 were for intermediate level care. (ECF 2301)  As a result of defendants' failure to take action to fill the beds at DSH-Atascadero, the Court ordered defendants to file a plan to make available up to 125 intermediate care beds for *Coleman* class members referred to DSH-Atascadero.  Defendants were also ordered to submit to the Special Master no later than November 30, 2007 a plan for making available the full complement of 231 intermediate care beds for *Coleman* class members referred to DSH-Atascadero.  The Court stated that it would not entertain a request to limit the total number of intermediate care beds required by the order, absent a recommendation from the Special Master that fewer beds were required.   This too would not be the last court order directing defendants to fill those beds at DSH-Atascadero.

On November 30, 2007, defendants filed their plan to enable *Coleman* inmates' use of all 231 intermediate care beds at DSH-Atascadero. (ECF 2580)  The plan reported that the census though November 2007 never rose above 96.   DSH reported that it was working with DSH-Vacaville to ensure that any referrals sent there were also reviewed by the DSH-Atascadero correctional case records manager.  DSH-Atascadero staff continued to contact CDCR institutions to remind them that DSH-Atascadero was taking referrals and to help them through the process, as set forth in the MOU in place at that time, for intermediate care services.  DSH-Atascadero reported that its plan for 231 intermediate care beds would be accomplished by over-bedding specific units which had staff available to create 72 additional beds, and by vacating beds by transferring out patients adjudicated by other penal code designations.  DSH reported that by the end of December 2007, intermediate care bed capacity for *Coleman* class members would be 147, and by July 2008 it would be 231.

By February 2009, trial on the prison overcrowding claims in the *Coleman* and *Plata* three-judge court had taken place.  Evidence at the trial showed that the shortage of intermediate care beds persisted, with a lack of 166 such beds, a wait list that reached as high as 173 patients, and wait times that lasted up to a year.  This all led to the Court's entry of an order on February 2, 2009 to show cause why the Court should not require the CDCR defendants to continue operating on a temporary emergency basis all MHCBs at the CIM general acute care hospital (GACH) with staffing levels in existence at that time. (ECF 3505)  One of the resounding effects of this order was that it prompted a request by plaintiffs for an evidentiary hearing on the status of the CDCR defendants' bed plan.  On February 17, 2009, the court found "substantial questions as to what bed plan defendants are presently following," ordered the CDCR defendants to file and serve a statement setting forth the present bed plan within 15 days, i.e. March 4, 2009, and set an evidentiary hearing one week later. (ECF 3515)

The CDCR defendants requested but were denied an additional 90 days to submit their statement on the bed plan on various grounds.  The court directed defendants to immediately work on the development of a plan, and within ten days to provide a written progress report, including the status of the 50-bed MHCB at CMC. (ECF 3540)  The court established that purpose of the evidentiary hearing set for March 24, 2009 would be to consider further steps required to ensure the CDCR defendants' timely compliance.

The CDCR defendants submitted their progress report on their bed plan on March 19, 2009.  The hearing on steps to insure compliance with existing orders was held five days later. The court then entered a comprehensive order on defendants' unfinished mental health bed projects. (ECF 3556).  The order, entered March 31, 2009, addressed the problem in the contexts of existing bed construction orders as well as the defendants' long-range mental health bed

strategy.  It set short-term completion deadlines on the outstanding bed construction orders, directing defendants to proceed with construction of the 50-bed MHCB at CMC and to open the 64-bed intermediate care facility at SVSP no later than June 15, 2009.  It also ordered detailed activation schedules for completion of all other specific court-ordered construction projects.  In the same order, the court specifically addressed DSH's refusal to use both DSH-Atascadero and DSH-Coalinga to reduce the wait list of Level IV inmates referred for inpatient treatment -- a recurring theme since the inception of *Coleman*.  Every time the court turned its focus to other matters, DSH-Atascadero beds were again being underutilized and court intervention was required. The court's frustration was clear:

> Over the course of two days, DMH officials came forward with several proposals for inpatient care in locked units at CDCR institutions targeted at reducing or eliminating the backlog of Level IV inmates awaiting intermediate care.  However, DMH officials took an intractable position with respect to the use of Atascadero State Hospital and CSH for any part of necessary solutions.  The special master made a series of recommendations to the court based on those meetings.  Those recommendations are discussed below. The court is encouraged by the initial report from the special master in all respects with the exception of DMH's position on the use of DSH-Atascadero and DSH-Coalinga.  Such intransigence is not new to this litigation, but it must change.

(ECF 3556, p. 2-3)

The result was the Mental Health Assessment and Referral Project (MHARP), referenced above.  It resulted in the identification of *987 patients who were either recommended for referral to DSH inpatient care by the MHARP assessment teams or were directly referred by the institutions*.  By the time of the June 16, 2009 hearing, *561 inmates from only 12 selected CDCR institutions were identified for referral to DSH inpatient care*.  The Court noted that there appeared to be a substantial number of plaintiff class members above and beyond those identified in population projections who were in need of inpatient-level care.  In the interest of expediting

these transfers, DSH was ordered to explore whether non-*Coleman* patients at DSH-Atascadero could be transferred to DSH-Coalinga in order to open available beds at DSH-Atascadero.

In July 2009, CDCR initiated a pilot program for intermediate care referrals to DSH facilities and programs. The Instructional Memorandum issued on July 16, 2009 was entitled "Pilot Program for Intermediate Care Facilities at Atascadero State Hospital, California Medical Facility, and Salinas Valley State Prison." The goal of the program was to provide access to an intermediate level of care consistent with patient and staff security requirements, based on custody criteria developed specifically for intermediate care placement consideration. One strategy that the program was specifically designed to facilitate was the full utilization of beds available for patients referred to intermediate care. The effort was focused on increasing referrals of patients whose custody factors had previously precluded them from being placed in dorm settings or low custody beds at DSH-Atascadero. (This was the precursor to the expansion of the pilot program included in defendants' plans to address the wait list in 2010 and 2011.) The parties further stipulated that by November 30, 2009, the Health Care Placement Oversight Program (HCPOP) would review all inmates on the DSH-Salinas Valley waitlist, using the criteria developed for the Intermediate Care Pilot Program, to determine if any were eligible for admission to DSH-Atascadero or DSH-Vacaville. (ECF 3720, ¶ 2).

The court approved the continuation and expansion of the inpatient needs assessment to all non-desert CDCR institutions. It also approved the DSH defendants' plan to convert 256 DSH hospital beds to provide intermediate level care at DSH-Atascadero to members of the plaintiff class, with the understanding that DSH would admit plaintiff class members at the rate of no less than ten per week until all the beds were filled by plaintiff class members by October 31, 2009. Defendants were ordered to submit a plan to expedite admissions to DSH facilities and

finalize it under the guidance of the Special Master within 30 days. A status conference on the activation schedules and the short-term and intermediate projects, and further hearing on the defendants' long-range bed plan, was set for September 22, 2009.

In its order entered September 24, 2009 (ECF 3686), the Court ordered defendants to describe all steps that could be taken to expedite completion of the 64-bed intermediate care project at CMF and the conversion of the C-5 and C-6 units at SVSP. These two projects would make available an additional 180 intermediate care high-custody beds. In a stipulation and order filed on November 2, 2009 (ECF 3720), defendants were granted an extension of time to December 31, 2009 to comply with the court's June 18, 2009 order that they fill the full complement of 256 intermediate care beds at DSH-Atascadero with *Coleman* class members. Defendants were also ordered to report to the Special Master on how many additional intermediate care beds, if any, were required at DSH-Atascadero or DSH-Coalinga.

In December 2009, the census at DSH-Atascadero had increased to 198 patients. (ECF 3760). As a result of the modified needs assessment that was conducted from March 2009 through December 2009, 688 inmates were referred to DSH for inpatient care and 135 were admitted to DSH-Atascadero. (ECF 3783).

Defendants moved for temporary relief from the court's June 18, 2009 order requiring DSH to admit members of the plaintiff class to DSH-Atascadero at a rate of not less than ten inmates per week until the full complement of 256 beds were filled. By its order of January 27, 2010, the court granted in part the motion for relief, and ordered the DSH defendants to fill the 256 beds by no later than February 26, 2010 and to admit no less than ten inmates per week. The matter was set for a status conference on March 29, 2010. (ECF 3787). Following the hearing on

March 29, 2010, the court entered its order two days later and directed defendants to draft their waitlist plan.  (ECF 3831).

On October 5, 2010, the Court entered an interim order directing defendants to develop a review program, based on the intermediate care pilot, to determine if any Level IV patients housed in DSH facilities could be transferred to lower-custody level beds at DSH-Atascadero or DSH-Vacaville in an effort to free up higher security beds at DSH-Salinas Valley.  Defendants formulated and implemented a plan, and reported that reviews would be ongoing.

To address the chronic backlog of *Coleman* class members still waiting for access to inpatient care in 2010 and 2011, on August 15, 2011 the Court ordered the CDCR defendants to develop a plan to reduce or eliminate the inpatient wait list. (ECF 4069).  As a result of the defendants' plan in response to the order, 108 patients were admitted to DSH-Atascadero between August 15, 2011 and December 5, 2011, as reported by defendants in a status report to the court dated December 9, 2011. (ECF 4130, p.15).  This was an average of 27 admissions per month.  On August 15, 2011, the court ordered defendants to work with the Special Master to develop a supplemental plan to reduce or eliminate the waitlist.  Defendants sought and were granted an additional 90 days to develop a supplemental plan, which was filed on October 18, 2011.

Notably, a major component of the supplemental plan was to facilitate patient movement through the various DSH programs from higher security intermediate care programs to lower security programs and from DSH-Atascadero to DSH-Vacaville dormitories.  The desired effect was to move patients out of high security beds at DSH-Salinas Valley to reduce the waitlist for patients waiting for those same beds.  In order to accomplish this goal, DSH and CDCR determined that it was possible to modify the custody criteria in the intermediate care Pilot

Program to include case-by-case reviews of inmates who had been previously excluded from consideration for lower security housing because of their custody factors.  This same process would also be utilized for inmates who were on the DSH-Salinas Valley waitlist but had not yet been admitted.

In furtherance of this plan, DSH-Atascadero clinical admissions teams were sent to DSH-Salinas Valley in October of 2011 to evaluate the inpatient population for any possible transfers to DSH-Atascadero.  This team would then use clinical assessments to continue this process to determine the safety and treatment needs of any future potential transfers to DSH-Atascadero with the goal of placing patients in the least restrictive setting and fostering patient movement throughout DSH facilities and programs.

In an effort to reduce the waitlist for intermediate care high-custody patients, CDCR also set forth a plan to convert 113 prison cells in the L-Wing at CMF to 110 temporary intermediate care unlicensed inpatient beds and three observation and restraint rooms for high-custody patients on the DSH-Salinas Valley waitlist.  This conversion was scheduled to take approximately in six months.

In its August 15, 2011 order, the court also ordered the CDCR defendants to file monthly reports on the status of the development of the supplemental wait list plan, starting on September 9, 2011.  In their fourth status report, filed on December 9, 2011, defendants reported that 36 patients had moved into DSH-Coalinga, 38 inmates had transferred to DSH-Atascadero (36 from DSH-Salinas Valley and two from DSH-Vacaville), and 11 patients had transferred or were pending transfer to DSH-Atascadero or DSH-Vacaville dorms.  Defendants also reported that the opening of the 110 beds on the L-Wing at CMF was on schedule for April 2012.

In a stipulation and order filed on December 15, 2011, the parties agreed to meet and confer regarding defendants' plans to address access to inpatient care. Meetings would be scheduled every 45 days commencing on January 16, 2012 and defendants would file reports within ten days after each meet and confer. On June 11, 2012, defendants filed their fourth status report on plans to address access to inpatient care and reported that in the month of March 2012, DSH had transferred 19 patients from DSH-Salinas Valley to DSH-Atascadero, two patients from DSH-Vacaville acute to DSH-Atascadero, seven patients from DSH-Vacaville intermediate to DSH-Atascadero, and nine patients from DSH-Atascadero to Coalinga. At that time it appeared that the DSH patient movement plan was functioning as envisioned.

Against the backdrop of the CDCR defendants' efforts to improve access to inpatient care, they were also re-evaluating their existing long-range bed plan due to the significant population reduction which resulted from the then-recently enacted prison population realignment (i.e. population reduction) laws. The CDCR defendants first notified the court of their intentions to revise the long-range mental health bed plan on January 11, 2012. (ECF 4144). On April 18, 2012, the CDCR defendants presented a new comprehensive plan entitled "The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Court Oversight, and Improve the Prison System" to the Special Master and plaintiffs. The parties then continued to discuss the revised bed plan prior to the CDCR defendants' filing of a modified plan with the court. Although the Special Master generally supported the concept of a revised bed plan, given the recent changes in the prison population, he objected to a proposed reduction in the number of beds available for *Coleman* class members at DSH-Atascadero from 256 to 206. Plaintiffs' objections to the population projections regarding the inadequate number of male MHCB beds and ICF beds, and specifically the request to reduce beds at DSH-Atascadero, were noted in the

CDCR defendants' request to modify the mental health bed plan filed with the court on June 12, 2012.  (ECF 4196).

Although the court allowed the CDCR defendants to modify the long-range mental health bed plan, there were two prohibitions contained in the order that was entered on June 15, 2012. (ECF 4199).  Defendants were not allowed to decommission any temporary mental health program unless there was adequate capacity to accommodate future need at that level of care, and the number of beds available for *Coleman* class members at DSH-Atascadero would not be reduced.

While it appeared briefly in mid-2012 that issues with access and appropriate inpatient placement were finally resolved, once again history has shown that not to be the case.  As noted above in this report, by mid-July 2015, 100 of the 256 intermediate care beds at DSH-Atascadero were not being used by *Coleman* class members, and as of July 31, 2015, only 147 CDCR patients were placed into beds at DSH-Atascadero[25].  In the meantime, efforts to move intermediate care patients into LRH were not occurring.  Yet again, the sustainable process had proven unsustainable.

In addition to this litany of efforts to resolve the seemingly never-ending cycle of intermediate care waitlist and access issues, perhaps the starkest demonstration of the significance of access to inpatient care at DSH-Atascadero is the series of *Coleman* court orders directed at solving this specific problem.  The multiple number of these orders, *spanning 17 years,* emphasizes their importance.  There needs to be an intricate balance in inpatient bed use in order for CDCR patients to be admitted and treated timely.  The orders are critical to that balance being achieved because, once designated beds such as the low-custody beds at DSH-

---

[25] Source: DSH Monthly Bed Utilization Report for July 2015.

Atascadero are not being used for CDCR patients, the system for timely admissions is upset and

bed admissions throughout the DSH programs for CDCR inmates quickly become backed-up,

with surging waitlists. The *Coleman* court has repeatedly ordered DSH to utilize the intermediate

care beds at DSH-Atascadero to treat *Coleman* class members.  Excerpts from the court orders

listed below provide but a glimpse into the frustration and futility that the *Coleman* Court has

expressed over the past two decades:

| | |
|---|---|
| Order 5/21/1998 | "DMH and CDC have, by Interagency Agreement, agreed that DMH would maintain 412 beds at Atascadero State Hospital * * * The parties further agree that the plaintiffs, the Special Master and the Mediator require additional time to review and assess the portion of the plan calling for a reduction in the number of DSH-Atascadero beds available to CDC inmates." (ECF 945). |
| Order 2/10/2000 | During the transition period, the special master shall also monitor closely custody rejections of transfers into CMF's emerging intermediate treatment program (ITP), with its continuing day treatment  program (DTP) component, and from CMF to Atascadero State Hospital (DSH-Atascadero). (ECF 1132). |
| Order 8/28/2000 | "Defendants shall comply with recommendations found at paragraph F(1)-(7) under the heading Acute Care-DMH, and the recommendations found at paragraph F(1)-(6) under the heading Intermediate Care-DMH, all found at pages 29-33 of the Koson Report;" (ECF 1195) [26]. |
| Order 5/2/2006 | "Defendants shall forthwith review the list of 123 inmates presently awaiting placement in the intermediate inpatient bed program at SVSP and shall identify all inmates on said list appropriate for placement in the DMH program at Atascadero State Hospital or Coalinga State Hospital." (ECF 1800). |
| Order 6/28/2006 | It is also apparent that, for multiple reasons, DMH is failing to address specific court-ordered remedies.  DMH's attempts to remedy the shortage of inpatient beds has been marked by delay and difficulty. Adding Dr. Mayberg as a party-defendant to this action, and thereby subjecting DMH to the supervision of the Court and the involvement of the Special Master, is the only way to insure an effective remedy in this case.  (ECF 1855). |

---

[26] "DMH Inpatient Care – A Study of Timely Access to DMH Inpatient Care for Prisoners in CDC Prisons, June 9, 2000".  Dr. Koson recommended that CDCR seek to use at least 90 percent of the then 200 intermediate care beds at DSH-Atascadero designated for *Coleman* class members.

| | |
|---|---|
| Order 5/23/2007 | "Within three weeks from the date of this order, defendants shall consider and report to the court on the feasibility of other options for forthwith remedying the limitation on admission of <u>Coleman</u> class members to Atascadero State Hospital caused by staffing shortages, including but not limited to contracting with outside psychiatrists and other necessary psychiatric staff to provide sufficient staffing for <u>Coleman</u> beds at Atascadero State Hospital." (ECF 2236). |
| Order 6/28/2007 | "2. Within thirty days from the date of this order, defendants shall file with the court a plan for making available up to 125 intermediate care beds for <u>Coleman</u> class members referred to DSH-Atascadero treatment." |
| | "3. On or before November 30, 2007, defendants shall file with the special master a plan for making available the full complement of 231 intermediate care beds for Coleman class members referred to DSH-Atascadero for treatment." (ECF 2301). |
| Order 3/31/2009 | "The court is encouraged by the initial report from the special master in all aspects with the exception of DMH's position on the use of DSH-Atascadero and DSH-Coalinga. Such intransigence is not new to this litigation, but it must change. To that end, the special master recommends that the Director of DMH, Stephen W. Mayberg, be directed to attend any and all meetings set by the special master in connection with the matters that are the subject of this order unless the special master determines that defendant Mayberg's attendance is not required." (ECF 3556). |
| Order 6/17/2009 | "The short-term and intermediate projects approved by this order include conversions of hospital beds to provide a full complement of 256 intermediate care beds at DSH-Atascadero to Coleman class members. That plan is approved subject to the condition that the Department of Mental Health (DMH) will admit Coleman class members to those beds at a rate of not less than ten per week until all 256 beds are filled by Coleman class members not later than October 31, 2009." (ECF 3613). |
| Order 11/2/2009 | "1. The Department of Mental Health shall have up to and including December 31, 2009, to comply with the Court's June 18, 2009 Order that it fill the full complement of 256 intermediate beds at Atascadero State Hospital with *Coleman* class members. |
| | 2. By November 30, 2009, the CDCR Health Care Placement Oversight Program shall review all of the inmates-patients on the waiting list for the Salinas Valley Psychiatric Program at Salinas Valley State Prison using the Pilot Program to determine whether any of the inmate-patients on the list are eligible for admission to Atascadero State Hospital or to the |

34

intermediate care program at Vacaville Psychiatric Program at California Medical Facility; and

3. In accordance with paragraph 11 of the Court's June 18, 2009 Order, Defendants will report to the Special Master by December 31, 2009, on how many additional intermediate care beds, if any, are required for *Coleman* class members at Atascadero State Hospital or Coalinga State Hospital."  (ECF 3720).

Order 1/27/2010    "All outstanding requests for clinical updates made by DMH prior to this order shall be provided within five working days from the date this order is filed, and all inmates eligible for DSH-Atascadero following the updates shall be transferred to DSH-Atascadero not later than 72 hours from bed assignment or twenty days from the date of this order, whichever is earlier." (ECF 3787).

Order  6/15/2012    "Defendants' request to modify the number of intermediate care facility beds at Atascadero State Hospital from 256 to 206 is premature.  Further consideration of the request is deferred until the hearing set for July 13, 2012."  (ECF 4199).

Order  8/21/2015    "Within thirty days from the date of this order, defendants shall report to the court on whether regular and consistent use of the full complement of 256 beds at Atascadero State Hospital (DSH-Atascadero) designated for *Coleman* class members is sufficient to permanently eliminate the ongoing waitlist for inpatient mental health care and if not, why not and what alternate plans are in place for waitlisted class members.  * * * Said report shall specifically address, as necessary, all relevant parts of the prior remedial plans that were to have been implemented to eliminate the waitlist for inpatient care, including but not limited to the patient movement plan described in defendants' October 18, 2011 Supplemental Plan to Eliminate the Waitlist for Inpatient Care (ECF No. 4103)." (ECF 5343).



*The red bars signify time periods during which court orders were issued to address the lack of patients being admitted to ASH. The blue bars indicate initial declines in bed availability at ASH after the issuance of court orders, followed by gradual increases over time resulting in the issuance of further court orders.*

6/18/2009    Court Order directing defendants to comply with the schedule to fill the full complement of 256 ICF beds at ASH and admit Coleman class members at a rate of not less than 10 patients per week until all beds are filled not later than October 31, 2009. (ECF 3613).

7/22/2011    Court Order adopting the recommendations of the special master regarding defendants' waitlist plan which shall be implemented immediately.  Defendants' plans included a modified ICF pilot program, a custody criteria/DMH patient movement plan and case by case placement guidelines for ASH. (ECF 4045).

6/15/2012    Court Order approving defendants' modified bed plan but denying their request to reduce the number of beds at ASH from 256 to 206. (ECF 4199).

8/21/2015    Court Order directing defendants to report to the court within 30 days on whether regular and consistent use of the full complement of 256 beds at ASH is sufficient to permanently eliminate the ongoing waitlist, and if not, why not. The special master is ordered to be actively involved in the drafting of the new MOU and policies. (ECF 5343).

　　　　This roller coaster of non-compliance with utilization of DSH-Atascadero beds must

finally end, and the all too predictable cycle of court intervention must be broken.  The barriers

which defendants claim prevent admission of *Coleman* class members into designated beds at
DSH-Atascadero are not new; they are merely recycled under a different terminology every few
years.  When the problem re-surfaces, it appears in terms of numbers on a waitlist, but it is
anything but a bureaucratic numbers game.  Each time the waitlist inches up, it means that
another seriously mentally ill person is not receiving the care he needs.  If defendants cannot be
expected to adhere to their own sustainable remedies without repeated court intervention, then
failure to provide access to inpatient care will remain the barrier between defendants and
termination of court oversight of this matter.

### 2.    Plan for CDCR to Assume Responsibility for the Three Existing DSH Psychiatric Programs

At least one year ago, CDCR officials began directly re-visiting with the Special Master
the prospect of assuming responsibility for the three DSH psychiatric inpatient programs for
CDCR inmates within the secure perimeters of three CDCR prisons.  By this time, they had
accomplished successes thus far with their two "homegrown" mental health inpatient programs,
the CIW-PIP and the San Quentin Psychiatric Inpatient Program (SQ-PIP).  As their concept for
providing inpatient care had already been resurrected by the time when CDCR and DSH began
work on revising their MOU in 2015, it figured into the revision process with an eye toward
meeting the timeframe communicated to the Special Master regarding inclusion in the
Governor's 2016-2017 budgetary cycle.  By the time the Special Master became intensively
involved in the access-to-care issues in mid-2015, the need for immediate action to meet this
timeframe was apparent, and the Special Master dedicated a significant amount of his resources
to helping CDCR and DSH finish the task ably and in time.

During the December 2015 *Coleman* all parties' quarterly meeting, CDCR openly
indicated that it was considering assuming responsibility for the three DSH psychiatric inpatient

programs for CDCR inmates within the secure perimeters of three CDCR prisons -- SVSP, CMF, and the CHCF. The psychiatric inpatient programs located at those sites are DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton, respectively. Discussion indicated that this proposed change had been submitted to state officials in time for inclusion in the new California state budget, but as noted above, the latest budget did not provide for this change.

The prospect of CDCR taking over responsibility from DSH for inpatient care of inmates is not new. While that in itself may appear benign enough, it is problematic. Each time the concept is raised but not followed through, the time and attention expended on has been wasted. This cycle must end. Time and resources for solving the problems surrounding inpatient care for *Coleman* class members are too precious to be squandered on ideas that wither and lead nowhere.

Over the past ten years, CDCR has had a history of gravitating toward providing inpatient care to its own inmates. In CDCR's December 2006 bed plan, it was to assume responsibility for all acute and intermediate inpatient programs that were being run by DSH at that time. By the time CDCR submitted an amended bed plan in August 2007, it indicated that DSH would continue to operate all inpatient programs conducted at DSH-Vacaville and DSH-Salinas Valley. (DSH-Stockton did not yet exist at that time). However, DSH was to have a key role in the establishment of the initial CDCR-run inpatient programs, participating in the planning and design of program space, training and mentoring of CDCR administrators, and ensuring adequate resources for implementation and maintaining of the programs. Despite some concerns about this aspect of the revised plan and other aspects as well, the Special Master recommended that it go forward without further delay. Special Master's Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan, filed September 24, 2007 (ECF 2432).

In its order filed October 17, 2007, the Court adopted the Special Master's recommendations in full and approved the CDCR defendants' supplemental bed plan. With specific regard to CDCR's plan to assume from DSH responsibility for inpatient care, it ordered CDCR to provide to the Special Master within six months a plan for recruitment and compensation of hospital administrators to develop and run the programs, a MOU on DSH's mentoring and direct service obligations, a plan identifying anticipated clinical and custody staffing needs, and an analysis justifying reduction and/or elimination of MHCBs in the defendants' August 2007 revised plan for all CDCR institutions which were not envisioned to provide care (under a care consolidation plan aspect of the revised bed plan at that time).  Order, filed October 17, 2007 (ECF 2461).

On July 16, 2008, the CDCR defendants submitted their amended long-range bed plan, but the previous plan for CDCR to assume responsibility for delivery of inpatient care was absent from the plan.  During the preceding February, the *Coleman, Plata, Perez* and *Armstrong* courts approved a construction agreement to build approximately 5,000 medical beds and 5,000 mental health beds. (ECF 2696).  CDCR and DSH agreed that DSH would continue to provide all inpatient acute and intermediate mental health services rather than transfer those responsibilities to CDCR.  Consequently, there was no apparent reason to include it in CDCR's amended long-range bed plan of July 2008.

CDCR, however, had not abandoned the concept of providing inpatient care; it changed its direction toward that end by looking toward initiating its own inpatient program.  Its first venture down that road was to address a long-standing concern with limited DSH inpatient care resources for female inmates.  The only inpatient care program for CDCR women inmates was Patton State Hospital, which did not differentiate between acute and intermediate levels of care.

39

CDCR ultimately planned and built its 45-bed inpatient program for women, the CIW-PIP, which was activated in mid-2012. This essentially solid program established that CDCR had the capacity to provide inpatient care with some success, at least on the relatively small scale of a 45-bed program.

CDCR's next step as a provider of inpatient care was by way of addressing the lack of available intermediate care in DSH programs for condemned inmates. An attempt to solve the problem via a specialized care program for these inmates was apparently well intended but it failed. The problem called for, and CDCR was willing to explore, a second inpatient program of its own. The result was the SQ-PIP, to serve exclusively condemned inmates in need of inpatient care. A court-ordered assessment of need for such a program substantiated the need. The SQ-PIP was activated in October 2014. Again, CDCR's development and operation of its second inpatient program, the SQ-PIP, has proven fundamentally sound.

Indications from the CIW-PIP and the SQ-PIP thus far are that they have taken root and are maturing as viable, successful programs.[27] From a more long-term perspective, they indicate some level of promise for CDCR's potential to successfully assume more responsibility for the mental health inpatient care for its inmates. While the CIW-PIP and the SQ-PIP are both relatively new endeavors for CDCR, they demonstrate that, unlike in 2008, CDCR may now be ready to begin assuming responsibility for the inpatient care that has heretofore been provided by DSH at the three psychiatric programs, DSH-Vacaville, DSH-Salinas Valley, and DSH-Stockton. Given the overall success of the CIW-PIP and the SQ-PIP, it is reasonable to assume that in building and maintaining these programs, CDCR has learned much first-hand about operating its

---

[27] Detailed discussions of these programs' performance levels according to monitoring focus areas appear below in Part II of this report, and within individual program summaries in Appendix A of this report.

own inpatient programs at its prisons. The Special Master believes that if CDCR is serious about a "lift and shift" at the three DSH psychiatric programs, now is the time for CDCR to proceed in that direction.

## PART II.

## THE SPECIAL MASTER'S FINDINGS AT THE SEVEN INPATIENT PROGRAMS.

### A.    STAFFING

#### Background

On July 11, 2013, the Special Master was ordered by the court to "complete one round of monitoring the adequacy of all inpatient programs and report to the court thereon not later than March 31, 2014." (ECF 4688 at 13-14).  Following the submission of the Special Master's report (ECF 5156), the court issued an order on July 25, 2014 directing the defendants to re-evaluate their staffing plans.

> 5.  The CDCR and DSH defendants shall, under the guidance of the Special Master and his staff, review and re-evaluate existing clinical staffing levels in the six inpatient programs and their effect on the delivery of treatment to CDCR patients in those programs, and to the extent indicated, develop a plan to adjust clinical staffing levels where necessary to ensure that adequate and sufficient treatment can be delivered to class members at those programs. The Special Master shall report to the court on the results of this review and re-evaluations following its conclusion.  (ECF 5188 at 4-5).

All DSH facilities and programs used a designated clinician to patient ratio of 1:15 for acute care and admissions units.  However, the capacity at the DSH-Atascadero admissions unit was 30 and with only one psychiatrist, non-compliance with the designated ratio was a foregone conclusion.  Although DSH-Coalinga provided intermediate care, it maintained a clinician to

patient ratio of 1:15 for psychologists, social workers and rehabilitation therapists but maintained a ratio of 1:25 for psychiatrists.

For intermediate care, all DSH facilities and programs had a designated clinician to patient ratio of 1:35.  Six units at DSH-Atascadero had population capacities in excess of 40 patients which made compliance with the designated clinician-to-patient ratio untenable when units were operating at capacity.  When ratios are exceeded, treatment is impacted and patients suffer.  Although DSH has designated staff to patient ratios for acute and intermediate care, when a unit is not staffed to meet its population, the provision of treatment for acute care and intermediate care patients will remain inadequate until such time as DSH adheres to its own established ratios.      While the CDCR defendants have undertaken steps in an effort to reduce staffing vacancies and have submitted plans and reports to the court, the DSH defendants informed the Special Master that they will utilize information provided in the CDCR defendants' staffing plan, the Twenty-Sixth round monitoring report as well as any recommendations contained in this report to facilitate the development of a meaningful staffing plan.

### 1.    DSH-Atascadero and DSH-Coalinga

As of June 23, 2015, there were 156 *Coleman* class patients at DSH-Atascadero.  There was little change in psychiatry staffing with a vacancy rate of 68 percent. This was slightly higher than the 61 percent vacancy rate reported in the preceding round.  The use of contractors reduced the functional vacancy rate for staff psychiatry to 37 percent.

Staff reported that staffing allocations related to patient workloads were problematic and documentation of treatment plans suffered due to other workload requirements.  The staff to patient ratio of 1:15 was met in the admission unit at DSH-Atascadero with the exception of psychiatrists, which was 1:30.  In several intermediate care treatment units, the designated

clinician to patient ratio of 1:35 was not generally followed.  The number of staff did not change when the population increased in the individual units.  When the population in the unit was 42, the ratio was 1:42 and for two months one unit reached a ratio of 1:54 due to a social worker vacancy.  These staffing shortages lead to decreased access to structured therapeutic therapy, decreased access to individual therapy and decreased discharge planning.  An increased MDO population mixed with *Coleman* class members in Program V impacted an already heightened workload issue for the clinicians required to treat both populations.  At DSH-Atascadero, vacancy rates for psychologists, social workers and rehabilitation therapists were each at 12.5 percent while registered nurses (RN) and psych techs reported vacancy rates of 25 percent and 18 percent respectively.

As of June 30, 2015, there were 46 *Coleman* class patients at DSH-Coalinga.   Two of the three psychiatry positions and two of the three rehabilitation therapist positions were filled leaving a vacancy rate of 33 percent for each discipline.  RNs had a vacancy rate of 14 percent. The supervising psychologist position was filled as was the supervising social worker position and all three psychologist and three social worker positions.  Thirty of the 32 psych tech positions were filled.  Program 21 at DSH-Coalinga maintained staffing ratios of 1:25 for psychiatrists and 1:15 for psychologists, social workers and rehabilitation therapists.  Senior psych techs, psych techs and RN positions were staffed at a ratio of 1:6.


### 2.    DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton

As of June 2015, DSH-Salinas Valley housed 229 Coleman class patients.  While the vacancy rate in psychiatry was ten percent, only six of the ten allocated positions were full-time employees in the program.  Two positions were covered by contract psychiatrists and another

psychiatrist was on loan.  DSH-Salinas Valley continued to be understaffed in psychologists with a vacancy rate of 20 percent.  Social workers and rehabilitation therapists each had vacancy rates of 30 percent.  It was reported that two additional psychiatrists, two additional psychologists and one additional social worker were scheduled to begin work in the summer of 2015.  Lack of sufficient staffing attributed to low referral rates for individual therapy as well as the underutilization of behavioral treatment plans and interventions.

DSH-Salinas Valley met or exceeded clinical treatment staffing ratios for all disciplines in all programs with the exception of psychology and rehabilitation therapists in TC1.

In June of 2015, there were 337 *Coleman* class patients housed at DSH-Vacaville representing an overall occupancy rate of 92 percent.  With a vacancy rate of 13 percent in psychiatry, the use of contractors reduced the functional vacancy rate to eleven percent.  A 28 percent vacancy rate in psychologists was only slightly reduced to a functional vacancy rate of 26 percent though the use of contractors.  Social workers and rehabilitation therapists maintained identical vacancy rates of 24 percent.

In the DSH-Vacaville acute care program, the staff to patient ratio was 1:15 for psychiatrists, psychologists, social workers and rehabilitation therapists.  Psychiatrists and psychologists maintained this ratio throughout the reporting period and social workers exceeded this ratio once during February when it reached 1:31.  This ratio was exceeded multiple times during the reporting period by rehabilitation therapists when it was 1:29 or 1:30 in various units.  These deficiencies for rehabilitation therapists were attributed to new certification requirements.

In the intermediate care programs, DSH-Vacaville maintained a staff to patient ratio of 1:35 in all disciplines during the reporting period except psychology.

On June 17, 2015, there were a total of 451 patients at DSH-Stockton; 371 at the intermediate care level and 80 at the acute care level.  The programs saw some increases and some decreases in staffing vacancies since the preceding monitoring report.  Twenty-three of the 33 psychiatrist positions were filled for a vacancy rate of 30 percent.  The 28 percent vacancy rate for psychologists represented a decrease from the 36 percent vacancy rate reported in the previous monitoring report.  Social workers experienced a slight increase in the vacancy rate from 17 percent to 21 percent and rehabilitation therapists reported a decrease from 40 percent to 16 percent.  Nursing saw little change in its vacancy rates increasing from eight percent to eleven percent.  Staffing to patient ratios remained constant with a ratio of 1:15 for acute care and 1:28 for intermediate care.

### 3.    CIW PIP and San Quentin Psychiatric Inpatient Program

At the end of the review period, the CIW-PIP was at its maximum capacity of 45 patients. There were no clinical staffing vacancies at CIW-PIP.  Although both intermediate care and acute care patients were treated in the same program, the staff to patient ratio in the program was consistent for an acute level of care.  The one exception was in psychiatry where the ratio was 1:22.5 rather than the 1:15 required for acute care.  Social workers and rehabilitation therapists maintained a ratio of 1:11.25 and the staff to patient ratio for psychologists was 1:15.

In May 2015, the SQ-PIP was at 83 percent of capacity with 33 of the 40 beds occupied. The functional vacancy rate for psychiatry was at zero with all three positions filled by two full-time employees and one contractor.  There were no vacancies in the disciplines of psychology, social workers or rehabilitation therapists.  With ten of the eleven registered nursing positions filled, the vacancy rate was nine percent.  Psych techs had the highest vacancy rate at 21 percent which was a decrease from 62 percent recorded during the last reporting period. SQ-PIP met or

exceeded the staff to patient ratio of 1:15 established for admissions and acute care programs. All clinical disciplines reported a staff to patient ratio between 1:10 and 1:12.

**B.    TREATMENT AND CLINICAL SERVICES: QUALITY MANAGEMENT AND ITS IMPLICATIONS FOR IMPROVING THE QUALITY OF CARE DELIVERED TO CDCR PATIENTS**

    **1.    DSH-Atascadero and DSH-Coalinga**

        **a.    IDTTs**

Overall, DSH-Atascadero IDTTs' discussions of treatment goals and objectives and patients' progress toward them were very limited.  The meetings were appropriately attended, but team members did not introduce themselves, explain the purpose of the meeting to patients, discuss changes in treatment plans or barriers to patients' participation in therapeutic groups, or routinely discuss patients' Hospital Access System (HAS) levels or their treatment objectives and progress.  In pre-meeting discussions before patients arrived, staff did not discuss patients' stages, symptoms, or any changes in mental health status.

Treatment plans changed very little from meeting to meeting, and did not appropriately document any changes in a patient's clinical course nor the treatment objectives.  Where there were stated goals, there was little documentation of any progress toward them. Several staff characterized treatment planning as secondary in priority and not driving the treatment being delivered.

Reviewed behavioral plans were low in number even though clinically indicated for multiple patients. They were not developed collaboratively. Many contained targeted behaviors but lacked incentives to help bring them about.  DSH-Atascadero staff attributed the inadequacies in number and quality of behavioral plans to staffing shortages and insufficient staff training.

46

### b.    <u>Group Therapy</u>

As reported in 2014, treatment at DSH-Atascadero remained primarily in a group therapy format and was generally good. However, it was deficient in quantity of hours offered due to insufficient staffing and was more like group treatment in an Enhanced Outpatient Program (EOP) rather than in an inpatient program. *Coleman* class members were offered on average 5.9 hours of scheduled structured therapeutic activities per week, per patient. They actually received on average 4.99 hours per week.[28]  When combined with work hours and "unscheduled" programming hours (e.g. Alcoholics Anonymous meetings or films), patients were offered an average of 17.44 hours per week.

Groups at DSH-Atascadero continued to consist of core and centralized groups.  Core groups were run by members of a patient's treatment team on his treatment unit.  The group schedule provided to the monitor indicated an active group program, with two to six groups scheduled for each day on all five units that housed *Coleman* class members.   However, clinical staff reported that the range in functioning levels among patients in the core groups sometimes made the group process difficult.  The centralized groups were open to all patients and were facilitated by a variety of hospital staff.  They were held in centralized areas such as the treatment mall, music center, gymnasium, and outdoor courtyards, and were offered much more frequently than core groups, with 61 to 65 groups per day.  Clinical staff reported concern that they were directed as to which groups to facilitate, as the assignments did not necessarily align with these clinicians' training.

---

[28]Staff reported that before a 50-percent reduction in clinical staffing allocations several years ago, patients were offered about 12 hours per week.

At DSH-Coalinga, treatment was delivered primarily via groups, with over 50 offered activities, 99.7 percent of which were treatment interventions. Group offerings and numbers of group treatment actually received both increased since the preceding DSH monitoring period. Weekly group offerings per patient ranged from 8.4 to 16.88 hours, weekly hours delivered per patient ranged from 8.4 hours to 14.15 hours. Some groups, such as Dialectical Behavioral Therapy (DBT), management of mental illness, and stages of change for use in recovery from substance abuse, had a structured therapeutic format, while others were unstructured recreational activities such as listening to music.

### c.     Individual Treatment

DSH-Atascadero staff reported their impression that group treatment was viewed as more efficient than individual treatment at the hospital. Group treatment there was supplemented by individual therapy, as staffing allocations permitted. The IDTT psychologist determined the patient's need for individual treatment. Institutional data indicated that about half of *Coleman* class patients received some form of individual treatment during the review period, averaging 30 minutes in session duration. Provided data showed that 103 *Coleman* patients had a total of 356 individual psychotherapy/counseling sessions during the review period.

### d.     Other Treatment Issues

It was reported that DSH-Atascadero policy required quarterly psychiatry contacts but actual practice was to see patients monthly. Many psychiatry notes appeared to be templates from previous contacts, with minimal changes and a lack of individualization. Psychiatrists confirmed that notes were "re-generated" from previous monthly contacts. Staff discussion and chart reviews indicated that monthly clinical contact notes also often coincided with monthly IDTT meetings, and that there did not appear to be other clinical contacts between meetings.

48

*Coleman* class members were housed in Program V.  The vast majority of non-*Coleman* class members housed there were MDO (PC 2962) patients, which affected the therapeutic milieu of the program and increased clinical staff's workload, as MDO patients required more staff time than *Coleman* class members for reasons including not wanting to be there and often being more difficult to treat.  This resulted in diversion of staff from *Coleman* class patients, which may call for reconfiguration of Program V to have at least some units for only *Coleman* patients.

The hospital reported that as of April 20, 2015, Program V patients were offered at least one hour of courtyard time during the morning and evening shifts.  Access to the main courtyard was offered Saturday and Sunday to all patients including *Coleman* patients at HAS Level 3 and above.  If a patient went to the main courtyard, it was recorded on his "destination card." A reviewed sample of entries in a unit daybook indicated that during a five-week period, one hour or more of yard time was documented as offered for 31 of the 35 days.

DSH-Atascadero reported that it continued to operate an enhanced treatment unit (ETU), but that no *Coleman* class member had ever been placed in it.  The hospital also reported that about 28 percent of all *Coleman* class patients had job assignments of over five hours per week.

### 2.    DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton

#### a.    IDTTs

At DSH-Salinas Valley IDTT meetings, required staff were present.  Psychiatrists in multiple IDTT meetings were observed prescribing medications, and both psychiatrists and psychologists were observing conducting patient assessments during the meetings, thus affecting the clinical milieu of the meetings. Staff confirmed that these patients had not been seen by these clinical disciplines before the meetings.  There was little team discussion in several observed meetings concerning patients' group assignments or expected treatment outcomes, and minimal

49

feedback given to patients.  The teams were also not consistently informed of patients' current

Stage levels.  Patient confidentiality was at risk due to leaving doors of meeting rooms opened.

Discussions were lacking on such important clinical issues as diagnoses, current symptoms,

specific progress or behaviors during the preceding month, treatment goals, indications of need

for individual therapy, current Stage level, and what was required for the patient to advance.  It

was noted that when patients were present, staff were not addressing the full array of clinical

issues that had been discussed during the pre-meetings.

At DSH-Stockton, discussion of treatment plans during IDTT meetings was rare and/or

minimal. Members did not use My Activity Participation Plan (MAPP) or the Patient Wellness

and Recovery Model Support System (PaWSS) during meetings even though they were

accessible. In the acute treatment program (ATP), during observed meetings, clinicians knew

their patients and interacted with them in a therapeutic and respectful manner. These IDTTs,

however, did not follow an established process for referral to an intermediate program or for

review of the patient for dormitory housing.

At DSH-Vacaville, required staff attended IDTT meetings.  As of June 2014, they had

been trained in the PaWSS module for treatment planning in order to improve correlation

between treatment plans and specific interventions. Team members did not always introduce

themselves or identify their roles to patients. Observed meetings varied in quality and content.

While the teams were typically cohesive and included therapeutic interactions with patients,

multiple teams addressed treatment plans only minimally during the meetings. Most observed

teams did not discuss whether individual therapy was indicated or part of the patient's treatment

plan.  They typically did not provide sufficient feedback to the patient. In some meetings,

assessments were being conducted, detracting from team efficacy. Some teams reviewed current

System to Encourage Progress (STEP) levels and the behavioral objectives for STEP advancement, but they also varied in the amount of time spent reviewing patients' STEP levels and the criteria for STEP progression. Many of the teams were unclear regarding criteria for consideration for a less restrictive environment for the patient, with no standardized process.[29]

In one IDTT meeting at DSH-Vacaville, the patient was referred from acute to intermediate care, the clinicians cited insignificant factors to justify clinical deferral of dorm living, for which custody had cleared the patient. It appeared that staff were either uninformed or misinformed and/or were using inapplicable criteria. An observed acute care IDTT meeting was also problematic in that available sources of information, such as contact with referring CDCR clinical staff, were not consulted. Questions surrounding the patient's apparent psychotic symptoms were not adequately addressed. The eventual plan was to refer the patient to intermediate care for "diagnostic clarification."

At DSH-Vacaville, observed high-custody intermediate care IDTT meetings indicated varying degrees of interdisciplinary discussion and patient interaction and engagement. Some indicated familiarity with patient histories and clinical participation in an interdisciplinary manner. The teams typically reviewed patient progress toward treatment goals, although they did not systematically review diagnosis, medications, or specific interventions. They also typically documented patient strengths, focused on short-term objectives, and appropriately addressed discharge issues. In other instances, however, the teams' interaction with patients was problematic, with minimal feedback on achievement of goals. Often there was no discussion about prescribed medications, patients' responses to medication treatment or compliance, or the possibility of movement to dormitory settings or transfer to other DSH facilities. Use of

---

[29]It was reported that DSH headquarters was working on a statewide process at the time of the site visits.

unfamiliar clinical language and jargon by some staff tended to confuse patients and limited their IDTT involvement.

The Positive Behavioral Support Team (PBST) at DSH-Vacaville was a valuable treatment service that helped development of behavioral treatment plans for acute and intermediate care patients. The PBST consulting team included a psychologist, plus another psychologist who specialized in Indecent Exposure (IEX) treatment, and a Medical Technical Assistant (MTA). The PBST interviewed patients, attended IDTT meetings, and developed treatment plans to assist patients. Its caseload consisted primarily of acute care patients and some intermediate care patients.

DSH-Salinas Valley continued to underutilize behavioral plans and interventions even when patients required them. Many behavioral plans that were used were not suitably focused and reasonable in scope, nor based on functional analyses with achievable objectives, nor were they updated or revised to reflect changes in patients. Goals and times for implementation were indeterminate. Documentation was generally poor and did not reflect that plans had been considered completed and resolved.

At DSH-Stockton, quality of treatment plans varied. Some things were adequately documented while others contained overly broad treatment interventions and goals. Some did not account for the reasons for referral. Others were not updated or modified as patients improved and instead contained repeatedly copied chronologies. Many also reflected a "check-the-box" process rather than an interactive therapeutic one. Several documented clinical justifications recommending against dormitory housing were clinically insufficient to support the recommendation. Treatment plans were also infrequently discussed with patients and were not individualized

In the acute program at DSH-Stockton, treatment plans had varied quality. Many were vague, unconnected to treatment targets and goals, and lacking sufficient detail about patients' behaviors and symptoms. New treatment plans repeated earlier treatment plan language and thereby perpetuated outdated and irrelevant information that did not address behaviors underlying the patient's Discretionary Program Status (DPS) or longer stays at Step 1.

At DSH-Vacaville intermediate care, treatment plans were typically vague as to patients' treatment groups and structured enrichment groups. There was no evidence that the plans were correlated with assigned treatment groups. In the acute program at DSH-Vacaville, they were typically limited in scope; many did not address the patient's STEP level.

At DSH-Vacaville, the supervisor of the PBST reported, and record review confirmed, that individual behavioral plans were problematic for quality. They were often not documented in the chart, referenced by the treatment plan, nor referred to by staff. Chart review did not confirm whether behavioral consultations had occurred. Of eight reviewed behavioral plans, several had too many diverse behavioral targets, making the plans scattered and unfocused. Reinforcers were too sparse and not salient to patients in some cases. Staff reported there was a tentative training plan to address these issues.

### b.    Group Therapy

DSH-Salinas Valley reported that patients were placed in groups by psych tech case managers. The number of patients in any given group varied by ongoing discharges and new admissions. Patients were expected to participate in core groups which averaged eight to ten hours per week, but provided data on actual treatment hours revealed that groups often did not last for the reported 12 weeks. Administrative staff expected treatment teams to schedule patients for an additional ten to 12 hours of structured enrichment groups, for an overall average

total of 20 hours, but because treatment plans did not indicate all of the treatment groups and structured enrichment activities in which a patient was engaged, this could not be verified through record review.

Staff reported that DSH-Salinas Valley management, utilizing a curriculum workgroup, had been working to offer evidenced-based treatment whenever possible.  According to staff, the curriculum workgroup made recommendations regarding terms and definitions for utilization at all three of the DSH's psychiatric programs in order to improve consistency in services and data collection among the programs.  The workgroup standardized the classification of out-of-cell activities available to patients into three categories:  (1) treatment, (2) structured enrichment, and (3) unstructured enrichment.  Treatment Groups were those groups focused on educating patients on psychiatric and psychological disorders and/or specific skills for managing them.  These groups followed a specific lesson plan or group protocol with specific objectives for each weekly session, and were documented in each patient's MAPP.   Structured enrichment groups were leisure groups that followed a specific lesson plan or group protocol, with specific objectives for each weekly session.  They may be associated with any focus of treatment, depending on the patient and the treatment team's clinical judgment.  These groups were scheduled in MAPP. Unstructured enrichment activities were leisure activities that had no lesson plan, specific objectives, or desired outcomes.  During these groups, patients were free to structure their time (e.g. yard time) independently; staff may provide loose structure (e.g. games).  These groups were scheduled in the Supplemental Activities Module in PaWSS.

DSH-Salinas Valley maintained manuals containing what they referred to as "lesson plans" and homework assignments for the core groups.  These were kept on each unit, allowing for an alternate facilitator to utilize the same material and attempt to maintain continuity of care.

54

Treatment teams were expected to assign the patient to additional groups based on identified individualized treatment goals.  In addition to core groups, the program offered a variety of centralized, structured treatment groups and supplemental treatment groups.

According to the institution, non-core groups typically ran for 12 weeks, with a one-week break between sessions.  During the one-week break, staff would revise the group schedule based on the treatment needs of the patient population.  When reviewing the reports with "treatment hours provided" data, there was clearly far more unstructured enrichment (i.e. recreation) offered over any other activity.

After the January 2015 site visit, MTAs at DSH-Salinas Valley received training on providing group treatment.  There were ten MTA-facilitated groups in TC1 and five in TC2 at the time of the June 2015 site visit.  MTAs had not begun facilitating treatment groups in Facilities C5 and C6.  At an observed social skills structured treatment group facilitated by two MTAs in TC1, participants appeared to be lower-functioning, some with clear cognitive impairment.  The MTAs did an outstanding job facilitating this group, incorporating all members into the discussion, moving the discussion along, and managing to achieve the goal of the group as well.  The MTAs in TC2 reported that they enjoyed facilitating groups, which was consistent with reports by the supervisor regarding overall MTA group satisfaction.  Interviewed patients in TC2 offered multiple positive comments about the MTAs.

Group therapy continued on the dayroom floor on Facility C5 and Facility C6.  It was inadequate, with significant noise issues and staff movement on the unit, causing distraction from the group process. Private rooms designated for IDTT meetings and individual sessions were available on C5 and C6 but were rarely used for groups due to their small dimensions.

A peer support group in Facility C-6 facilitated by a psych tech was observed.  The psych tech engaged directly with each patient offering positive feedback and support, but did not maintain appropriate boundaries by sharing personal information.  Interaction among patients was minimal.  A group on "Thinking for a Change" was observed on Facility C5 B-Pod. It was facilitated by a very capable, effective and knowledgeable social worker.  Discussion focused on problem-solving and consequences of aggressive behavior, with the facilitator engaged with the patients at a level consistent with their intellectual functioning. The group was held in the dayroom, where there were multiple distractions.  Start of the group was ten minutes late, due in part to the facilitator approaching each patient's cell to ask them to attend.  It was reported that this was typical practice, but staff asserted that it resulted in higher group attendance. Interview of patients in Facility C5 B-Pod found that all reported being scheduled for daily groups but that it was rare to be scheduled for more than three.  Patients and staff reported typical group attendance of 12 to 13 patients.

A group with two patients in TC1 who were low functioning and on DPS or solo programming status was observed.  It appeared to be very beneficial for these patients, who had previously assaulted other patients or staff and/or had been threatened by other patients, and had not previously received adequate programming due to their status.  It was led by a rehabilitation therapist, who appeared to be familiar with them and had good rapport.  Other groups in TC1 were observed.  One on anger management facilitated by a psych tech and one on social development facilitated by two MTAs were both interactive and involved discussions among all participants, who reported finding these groups beneficial.

At DSH-Stockton, scheduled group therapy was sparse for an inpatient program. PAWSS did not yet have the capacity to produce a valid data report on the numbers of treatment

group hours scheduled, offered, and received per patient. Observed groups during the January 2015 site visit lacked group process or dynamic.  The program reported that group treatment opportunities had increased since the preceding monitoring visit.  Core groups on anger management, symptom management, transition and recovery maintenance, overcoming trauma, integrated treatment for co-occurring disorders, social skills training, and cognitive therapy of psychotic symptoms were offered. Each unit also offered additional structured treatment groups and supplemental groups.  During the June 2015 site visit, an observed clinician-led intermediate care group focused on integrated treatment for co-occurring psychiatric and substance abuse disorders. The leader conducted the group skillfully, stimulating discussion among the participants and encouraging reticent members to participate. Materials to facilitate group discussions were utilized well. Pertinent clinical issues such as the relationship between trauma and substance abuse, triggers for substance use, and factors influencing patient motivation and readiness for change were discussed. Interviewed participants expressed appreciation for the treatment, but described it as limited in quantity.  They received one-to-one sessions with their clinicians in connection with IDTT meetings or upon specific request, but not regularly as part of a treatment plan.  However, they reported that requests for more individual treatment were unavailing, and that overall conditions in the program were more prison-like than expected, being confined to their cells "most of the time."

At DSH-Vacaville, treatment groups were defined as therapeutic groups that educated patients about psychiatric and psychological disorders and/or skills to manage them.  All followed a specific lesson plan or group protocol with specific objectives for each weekly session and were documented in MAPP.  Structured enrichment were leisure groups that followed a particular lesson plan or group protocol with specific weekly objectives.

Unstructured enrichment were leisure activities without a lesson plan or specific objectives and desired outcomes.  During unstructured enrichment, patients independently engaged in activities such as yard, or staff provided loose structure through activities such as bingo.  These groups were scheduled in the PaWSS' supplemental activities module.

In April 2014, a workgroup at DSH-Vacaville began developing clinical supplemental groups for the acute care program that MTAs would facilitate.  By July 2014, all acute care units had implemented these clinical supplemental activities.  Groups were limited to eight patients and were held in the dayroom.  Patients' weekly total treatment averaged 10.7 hours scheduled, 10.6 hours offered, and six hours delivered.  Patients' weekly group therapy, which consisted of group therapy and structured enrichment, were 4.1 hours scheduled, 4.1 hours offered, and four hours delivered.  Patients' weekly average unstructured enrichment were 6.1 hours scheduled, 6.0 hours offered, and 1.5 hours delivered.

DSH-Vacaville tracked the intermediate care program's group therapy hours.  It found patients' weekly total treatment hours averaged 33.6 hours scheduled, 31.5 hours offered, and 16.9 hours delivered.  Patients' weekly group therapy hours, which included group therapy and structured enrichment, were 12.6 hours scheduled, 10.5 hours offered, and 9.5 hours delivered. Patients' weekly unstructured enrichment averaged 21 hours scheduled, 21 hours offered, and 7.4 hours delivered.

Patients reported that observed low-custody intermediate care groups benefitted them, but there was an observed need for supervision and training for group therapy facilitators. In the high-custody program, observed treatment groups on symptom management and cognitive behavioral therapy for depression were facilitated by a psychology intern and social worker. Both provided information about their subject matters and indicated broad patient participation.

As both were didactic in nature, there was no evidence that patients' individual treatment plans were the focus of this group participation, nor did the groups provide patients with an opportunity to actively work on their problems.  Patients observed in DPS groups or solo programming sessions in the high custody program at DSH-Vacaville were un-cuffed, and clinicians saw patients without using therapeutic modules.

<strong>c.    Individual Treatment</strong>

DSH-Salinas Valley's curriculum workgroup also developed definitions regarding individual contacts and therapy.  Individual therapy was any therapeutic session where one clinician meets with one patient for more than 15 minutes in sessions that were goal-directed and had specific desired outcomes.  They were part of the patient's treatment plan and were re-occurring.  These sessions were scheduled in MAPP. Individual clinical contacts were any brief unscheduled clinical contacts where one clinician meets with one patient to address emergent issues.  They were recorded in MAPP and required documentation in the patient's medical record.

Staff reported that an individual treatment workgroup met in early 2015 and recommended providing instructions to the staff regarding referral and tracking of individual contacts.  A referral form for individual therapy or individual clinical contact was developed to track scheduled individual sessions in PaWSS.  It was observed that various types of individual therapies, including supportive, cognitive behavioral, crisis oriented and short-term psychotherapies would likely be more beneficial to patients as compared to psychoanalytic psychotherapy, which only a minority of patients might potentially benefit from. It was further observed that if a session was therapeutic, conducted by a clinician, and lasted for one hour but

59

was unscheduled, this ought to be counted as an individual therapy session even if it was unscheduled.

DSH-Salinas Valley also indicated that current staffing levels adversely affected the program's capacity to provide individual therapy. Interviewed patients on C5 reported receiving individual therapy rarely, and believed this was due to limited staff. Interviewed patients in a group setting in TC1 reported concern regarding the lack of individual therapy with their clinicians, that requests for individual sessions were frequently unheeded, and that it frequently required a statement of suicidal intent to achieve individual contacts.

Although the presence of MTAs in individual treatment sessions at DSH-Salinas Valley was optional, during the January 2015 site visit, interviewed clinical staff reported that MTA presence during these sessions had continued to occur. Supervisory staff reported that the clinical staff had been instructed that they may inform the MTAs that their presence during individual sessions was optional. There was no tracking of MTA presence during these individual sessions. It was noted to supervisory staff that tracking these occurrences, and additional staff training, would be beneficial. MTA staff continued to be present in the room for individual therapy sessions, which appeared to be common practice. A clinician on Facility C at DSH-Salinas Valley was observed meeting with two patients, together with MTAs present. There was no discussion between the clinician and the MTAs about their presence inside the room versus outside the door. It was apparent during the June 2015 site visit at DSH-Salinas Valley that heightened concern regarding security by both management and treatment staff had continued since the January 2015 site visit. Patients themselves were aware of this and reported that MTAs were present for individual sessions to keep them and staff safe. They had no awareness that the policy did not require the presence of the MTA. The blanket practice of

having MTAs present during individual therapy sessions did not allow for individual risk assessment and presumed that all patients were dangerous.

At the time of the January 2015 site visit to DSH-Stockton, the insufficiency of individual treatment that had been noted during past monitoring visits persisted in both the acute and ITPs.   The program reported that scheduling and provision of one-to-one clinical sessions was based on individual patients' needs, but it could not track and report the amount of offered and received individual treatment per patient.

The curriculum workgroup at DSH-Vacaville defined individual therapy as a therapeutic session where one clinician met with one patient for more than 15 minutes in goal-directed sessions with specific desired outcomes, on a re-occurring basis and as part of the patient's treatment plan.  MAPP scheduled the sessions. Individual clinical contacts were brief unscheduled contacts where one clinician met with one patient to address emergent issues. MAPP recorded the contact and clinicians documented the session in the patient's medical record.

Acute care weekly individual therapy sessions averaged zero hours for scheduled, offered, and delivered hours.   Patients' weekly individual clinical contact hours averaged 0.48 hours scheduled, 0.48 hours offered, and 0.47 hours delivered. During the January 2015 site visit, interviewed acute care patients reported that individual therapy was not available to them and that, except for occasional cell-front assessments, their meetings with psychiatry did not occur on an individual basis, but only took place within the setting of the IDTT meeting.  This appeared to be predominantly due to the lack of office space for such meetings. From January 1, 2015 through May 31, 2015, in the intermediate care program, patients' weekly individual therapy

averaged 0.21 hours scheduled, 0.18 hours offered, and 0.18 hours delivered.  Weekly individual

clinical contacts averaged 0.02 hours scheduled, 0.02 hours offered, and 0.02 hours delivered.

At the time of the January 2015 site visit, in the high-custody program at DSH-Vacaville,

21 or 32 percent of 59 patients were seen one hour weekly for individual treatment.  In the low-

custody intermediate care program, 29 of 67 or 43 percent of patients received one hour of

weekly individual treatment.  Staff reported that individual therapy was prioritized for patients

who engaged in repetitive self-injurious behavior, were cognitively impaired or on DPS, had

active psychotic symptoms and were unsuitable for groups, or had severe borderline traits.

DSH-Vacaville reported that it continued to work to better track psychiatry contacts.

Completion of initial psychiatry contacts was an area of improvement observed during the 2015

site visits.

d.    **Other Treatment Issues**

Staff reported that needed psychological testing was rarely done at DSH-Salinas Valley

because of lack of sufficient staff.

DSH-Vacaville had a program in which psycho-pharmacologists consulted with DSH

clinicians to assist with medication management in difficult cases.  It was found active and

clinically useful during the site visits.

Although the DSH-Vacaville Program Manual, Policy and Procedure 3.06, called for one

hour of yard per unit each day (weather and security permitting), in its acute care program only

STEP V patients were eligible, and only for a maximum of three hours per week, even though

MTA allocations for yard time had increased.  Staff offered no clinical justification.  Yard access

was also inadequate for low-custody intermediate care patients housed on A2 and A3. These

patients had access to only a covered patio off of both units.

During the January 2015 site visit, DSH-Vacaville staff reported that no acute care condemned patients had been treated there for at least the preceding six months.

During the June 2015 DSH-Stockton site visit, persistent inadequacies with individual assessments were found. Some reviewed assessments were internally inconsistent (e.g. in Suicide Risk Evaluations (SRE) and violence risk (V-Risk) assessments, risk rates appearing in bulleted information differed from risk rates in the narrative within the same assessments) and others were not supported by accompanying narratives.  Some assessments in the ATP were still being completed during IDTT meetings.

In multiple reviewed cases, patients' diagnoses at DSH-Stockton lacked supporting information.  In some cases, discrepancies between diagnoses and patients' symptoms suggested misdiagnoses, and in others diagnoses clearly indicated from the record were not made.  There were also several instances of behaviors deemed volitional when they should have been attributed to patients' mental or cognitive impairments.  Treatment planning and delivery of care were adversely affected by these diagnostic issues.  Continued training, intensive clinical supervision, and a strong peer review process were needed to overcome this problem.

### 3. CIW-PIP and SQ-PIP

#### a. IDTTs

Provided audit results from CIW-PIP indicated that initial and follow-up IDTT meetings were conducted timely.

At the SQ-PIP, patients in the ITP received timely IDTT meetings. Comprehensive treatment plans were developed as part of that process. Patient's Stage Levels were frequently discussed and documented within treatment plans.

b.    __Group Therapy__

In the CIW-PIP, all structured treatment activities were offered in the treatment rooms. Enrichment group activities were offered by housing wing during evenings and weekends. Group sizes ranged from two for DPS groups to as many as 15 patients, with enrichment groups usually being the larger ones.

CIW-PIP program data indicated that for acute care patients, from July through December 2014, structured therapeutic activity offerings per patient, per week, were 18.2 hours scheduled, 15.47 hours offered, 13.23 hours attended, 2.24 hours refused, and 2.34 hours cancelled. During the same period, for intermediate care patients at CIW-PIP, structured therapeutic activity offerings per week were, on average, 16.78 hours scheduled, 14.7 hours offered, 8.8 hours attended, 5.9 hours refused, and 2.1 hours cancelled.

At the SQ-PIP, treatment in the acute care program was predominantly individual rather than group treatment. Staff reported that toward the end of acute care patients' stays they participated in groups with intermediate care patients. Acute care patients also received out-of-cell unstructured recreational time.

In the SQ-PIP intermediate care program, staff continued to maximize use of time, space, and personnel to offer patients a broad array of clinically appropriate group treatment and were responsive to their concerns. Staff reported that structured treatment hours included IDTT meetings; primary clinician, psychiatry contacts and other one-to-one contacts; psychoeducational groups run by psychologists, social workers, psych techs, and recreation therapists; and recreational therapy indoors or in the yard. There were 126 hours of daytime activities and 35 hours of evening structured activities per week. In the daytime program, 57 or 45 percent of groups were facilitated by recreation therapists, 48 or 38 percent by psych techs, 11

or nine percent by social workers and 12 or ten percent by psychologists.  Of the 35 evening groups offered weekly, 25 or 71 percent were facilitated by psych techs and ten or 29 percent by recreation therapists.

Intermediate level groups were organized as cohort groups.  Most of the therapeutic activities were provided to cohort groups designated "A" through "F."  Patients were assigned to these groups by their IDTTs based on clinical determinations, and were then assigned to numerical cohort groups numbered "1" through "5."  The numerical cohort groups included structured enrichment and unstructured activities, in which placements were based on patient requests, recommendations, or staff determinations.

On average, approximately 40 hours of therapeutic activities per week were available to intermediate care patients at SQ-PIP, unless a patient's treatment plan specified otherwise.  From January 1, 2015 through April 30, 2015, SQ-PIP data indicated that, on average, in the intermediate care program, structured therapeutic activities were scheduled for a range of 39 to 44 hours per week, offered for 35 to 40 hours per week, attended for 14 to 16 hours per week, refused for 20 to 24 hours per week, and cancelled for three to eight hours per week.

In addition to offered treatment, cohort group A, B, E, and F patients were offered up to 9.25 hours per week of yard, and cohort C and D patients were offered seven hours of yard.  Further, the numbered cohorts typically added another two hours of activity per day.

During the site visit at SQ-PIP, several groups and individual treatment sessions were observed. The recreation therapists were consistently well-prepared and ran well-structured groups that were therapeutically oriented.  Interviewed psych techs were generally aware of their need for more direction and supervision and requested additional training and resources.  A group facilitator mentorship program and a process for evaluating suitability of staff for group

65

facilitator duties may benefit the program.  Although it was reported that psych techs had received training since the preceding site visit, the quality of psych tech-led groups was variable and in some cases problematic.  Many were less well-structured, therapeutic content was varied, and treatment objectives were lacking.  In one, the television was on and caused significant distraction and interference with the group process.

Since the preceding site visit, the SQ-PIP added a group coordinator who was a licensed clinical social worker responsible for researching best practices for the program population, maintain order and structure of the content of the treatment groups, and standardize the content. The group coordinator assembled a library of resources including copies of all SQ-PIP facilitators' group curricula.

The unstructured activities previously requested by SQ-PIP patients were being offered to them at the time of the site visit.  These included additional unstructured time out of rooms/cells, in yard, and in the dayroom for television watching or socializing.

c.    **Individual Treatment**

Provided data for the CIW-PIP combined the number of individual treatment hours for the acute and intermediate care programs.  It indicated that patients received an average of 4.7 hours of individual therapy per month, or approximately one hour per week.

The SQ-PIP acute care program was conceptualized as an intensive individualized care program that provided services 24 hours a day, seven days a week, with stays lasting 30 to 60 days for stabilization and reintegration into the least restrictive clinical environment. The acute care program did not have a Stage System.  It operated on a primary clinician/secondary clinician model so that if the primary clinician was away on planned or unplanned leave, the secondary

clinician was already familiar with the patient and could immediately step in. This model appeared to be working well.

According to clinical practices in place at the time of the site visit, all patients admitted to the acute care program received individual assessments by psychiatry, psychology, social work, recreational therapy, nursing, and medical. Treatment services included a psychiatry contact at least every 72 hours and daily individual clinical contacts by either social work, psychology, or psychiatry. Individual recreational therapy was also provided to acute care program patients.

Review of individual treatment hours for four acute care patients indicated that each week on average they were offered 16 hours, refused 12 hours, and received four hours.

Two patients in the acute care program and one who had been transferred out were interviewed. Two of the three described the program as helpful, and the third described it as not helpful and did not want any kind of mental health treatment.

Patients in the SQ-PIP intermediate care program were provided with weekly individual therapy, and some were provided with additional contacts if indicated.

### d.    Other Treatment Issues

During the review period, CIW-PIP implemented new medication administration procedures, including a medication line on the A/B wing and one on the C/D wing for patients housed in those areas, except that patients on DPS continued to receive their medications at cell front. Previously, all medications were passed at cell front.

In the SQ-PIP acute care program, 1.25 to 1.5 hours of yard were offered on a daily basis (walk alone yards with other acute and/or MHCB patient/patients). At the time of the site visit, the SQ-PIP scheduling committee was in the process of planning expanding evening yard hours. Construction on the yard and installation of lights were expected to begin in May 2015. Based on clinical assessments, acute care patients had access to phone calls, visiting, dayroom time, law

library kiosks, in-cell activities, television, and radios. Property and clothing "privileges" in the acute program were determined clinically and approved by the IDTT.

All SQ-PIP patients received rounds/observations every 15 minutes, conducted by nursing staff and documented on CDCR Form 7365. These checks were a baseline, separate from any level of observation based on risk of harm or medical condition in accordance with PIP Policy (Volume 19, Chapter 36). At the time of the site visit, policies and procedures specific to the acute care program had not been developed.

It was noted during the SQ-PIP site visit that restart chairs had been installed. Their use was not mandatory. The chairs were placed in one treatment room and in the dayroom area, resulting in approximately two of approximately 40 hours or five percent of available weekly treatment activities potentially provided in restart chairs. Thus, any patient who refused to use a restart chair would still have access to a substantial amount of his treatment activities. This was corroborated by patient interviews and review of provided documentation.

Three patients in the intermediate care program used the restart chairs regularly, and three others used them occasionally. From January 1, 2015 through April 30, 2015, the three regular users were offered 28 to 44 hours of treatment weekly and attended 18 to 35 of those hours. The three occasional users were offered 23 to 47 hours and attended 11 to 35 hours. Many patients had not experienced restart chairs because they refused all treatment groups using them. Interviewed patients who used them had numerous complaints, including that they did not like being in "chains," feeling dehumanized, and finding the chairs punitive because they were not consistent with these inmates' status and were more in keeping with what they would expect if admitted from the San Quentin Adjustment Center. The sole patient observed in a restart chair

during the site visit said he was "fine" with them and had no complaints, but he had limited

English language skills.

4.    **Implications for Improving the Quality of Inpatient Care Delivered to CDCR Inmates**

      a.    **The Evolution in *Coleman* from Quality Management to Quality Improvement**

Since the earliest stages of *Coleman* remediation, development and implementation of an

effective and enduring quality assurance program has been identified as the threshold to CDCR's

eventual assumption of responsibility for self-monitoring and effective management of its

delivery of mental health care to members of the *Coleman* plaintiff class.   As the Special Master

stated in his report dated July 17, 1998:

> A strong quality assurance system is the best, and perhaps the only, long-term
> method for continuing evaluation and enhancement of the quality of mental health
> services delivered by the defendants to seriously mentally disordered prisoners in
> the California Department of Corrections.  If effectively implemented and
> thoroughly institutionalized in the defendants' mental health delivery system, its
> impact will inure to the benefit of the plaintiff class long after the court has ceased
> to monitor this case.  Quality assurance is the critical key to an enduring remedy.

Special Master's Recommended Schedule for Implementation of Defendants' Quality

Assurance Plans, p. 3, filed July 20, 1998, ECF 958.

Early in the remedial effort, CDCR instituted a quality management process for the

institutions that generally consisted of a local governing body at each institution, subcommittees

for quality management and mental health, quality improvement teams (QITs) to address

identified issues, and clinician peer review at the institutions which have mental health missions.

The Special Master monitored and reported in his regular compliance reports on the CDCR

defendants' integration of the institutions' quality management practices into their regular

operations.  Over time, it was becoming clear that this fundamental quality management structure was taking root and maturing in a number of the institutions.

By the conclusion of the Special Master's Twenty-Fourth Monitoring Round in early 2012, it had become apparent that some CDCR institutions had generally established and were maintaining the basic quality management framework that had been conceived early in the remedial process.  However, while the quality management structure in place at that time was useful, it still did not enable CDCR to diagnose and resolve problems with the quality of care it delivers.  This was related, in part, to the lack of a central office-driven quality improvement process.  CDCR's quality management process had been generally focused on quantification of deficiencies in performance by looking at the presence or absence of various elements -- for example, what percentage of designated forms were completed, or how many inmates received a mental health screening within timeframes, or whether IDTT meetings were conducted according to established scheduling requirements, to name a few.  Even when some quality improvement processes were implemented, they were done at the institutional level, and did not include important remedies that could only be initiated or developed at the central office level to address issues that were system-wide.  Quality *improvement*, on the other hand, focuses not merely on measuring performance indicators but also on identifying problems and crafting resolutions with system-wide application, and thus on improving the care that is delivered throughout CDCR prisons.  As noted by the *Coleman* Court in its remedial order, it is not merely access to care, but access to *adequate* care that is constitutionally required.  *Coleman v. Wilson*, 912 F.Supp. 1282, 1308 (E.D. Cal. 1995).[30]

---

[30]To be clear, the Special Master is not offering any legal opinion or conclusion insofar as what is constitutionally required, as that determination lies within the sole jurisdiction of the Court.

Thus, after successive monitoring and reporting cycles, quality assurance emerged in 2012 as a major theme and direction of *Coleman* federal court oversight.  On August 30, 2012, the *Coleman* Court adopted the Special Master's recommendation in his Twenty-Fourth Round Monitoring Report that the CDCR defendants be ordered to review and assess their existing quality management process, and to develop a central office-based quality *improvement* process.  Order, August 30, 2012, ECF 4232.  The Special Master's recommendation, and the court's order adopting it, were based on the Special Master's finding that "over the past several monitoring periods . . .  CDCR institutions have generally succeeded with establishing and maintaining the foundation of the quality management framework that was conceived early in the remedial process.  The initial goals of establishing the basic infrastructure of quality management appear[ed] to have been realized.  Across institutions, local governing bodies, quality management committees, and mental health subcommittees [were] in place and [were] generally meeting regularly and drawing good attendance.  QITs [were] being chartered and used appropriately.  Peer review [was] generally taking place."  Special Master's Twenty-Fourth Round Monitoring Report, filed July 2, 2012, ECF 4205, p. 63.

Adopting the Special Master's recommendation, the Court stated:

[T]he court wants to emphasize in particular its complete concurrence with the Special Master's finding that '[a]n important goal of the remedial phase of this case is . . . for CDCR itself to assume the mantle of ultimate responsibility for diagnosing its own problems, i.e. conduct its own `qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, *and move on to removal from federal court oversight.*

Order, filed August 30, 2012, ECF 4232, p. 4-5, emphasis in original, *quoting* Special Master's Twenty-Fourth Round Monitoring Report, p. 65.  The Court ordered as follows:

Defendants shall review and assess their existing quality assurance process, and  . . . develop an improved quality improvement process by which they can address issues with the quality of the care that is delivered, as described in the Special

Master's Twenty-Fourth Round Monitoring Report.  The quality improvement process shall be developed from the standpoint of it being the beginning of a transition by CDCR into self-monitoring by its own DCHCS.  It shall include, but not be limited to, the development of a process for improved document production for institutional paper reviews, so that the provided information is clear, consistent, responsive to the Special Master's document request, and useful for the assessment of institutional levels of compliance.  The defendants' review and assessment of their existing quality assurance process, and the development of an improved quality improvement process, shall be carried out under the guidance of the Special Master and his staff, with participation and input of the *Coleman* plaintiffs, during the six-month period following the entry of this order.

Order, ECF 4232, p. 5-6.

This order had profound implications for the direction of *Coleman* federal court oversight, signaling that the focus was shifting towards the long-term goal of the quality management effort -- eventual transition away from court-supervised external monitoring to assumption by defendants of the responsibility for self-monitoring.  It set the stage for development of a more matured and self-sustaining quality management process than what had been in place.  Although CDCR had some success with its institutional quality management program, there remained a need for a higher-level, system-wide means to gauge and improve the levels of quality in the mental health care that was being delivered in the prisons.  Even when existing processes were consistent with a quality improvement process, they often lacked the capacity to implement needed changes because the required remedy involved system-wide issues that could only be effectively addressed at the centralized health care central office level.

The centralized quality improvement process would require the development of an audit tool with relevant indicators and measurements to capture institutional levels of compliance with *Coleman* Program Guide and other applicable standards in the delivery of mental health care in CDCR prisons.  It would create the methodology for gathering and assessing such information, and using it to implement improvements where and as indicated by CQIT audits conducted by

central office.  By using the tool to integrate a quality improvement process into the management

of mental health service delivery, CDCR should be, as a result, better positioned to improve

mental health services and achieve better mental health treatment results and outcomes.

Work was underway in late 2012 on development of a quality improvement tool for

CDCR to self-monitor its special populations, quality of care, safety and cultural considerations,

access to care, and utilization and management.  The CDCR defendants agreed to create a quality

improvement process by which CDCR can identify issues and improve its performance levels in

the delivery of mental health care.  The self-auditing tool that was developed is now known as

the Continuous Quality Improvement Tool ("CQIT" or "the tool").  Members of the Special

Master's staff worked with assigned CDCR officials to work on the development of a quality

improvement tool, helping identify performance indicators and compliance metrics.  The tool

was intended to not only yield detailed reports on institutional compliance levels, but also to help

shape remediation in areas of institutional weakness.

By early January 2013, CQIT key indicators had been identified, and a prototype of the

audit tool had been developed.  Plaintiffs' counsel and representatives of the Special Master's

staff attended a webinar on the development of the tool on February 8, 2013.  However, due to

the pendency at that time of the CDCR defendants' motion to terminate *Coleman* Court

oversight, participation by the Special Master's staff and plaintiffs' counsel in the CQIT project

was suspended until the motion was denied by order entered April 5, 2013, ECF 4539, in which

the Court implicitly noted the CQIT project as a remaining task in the remediation effort:

> The Special Master has also observed, correctly, that "[t]he ultimate goal of
> *Coleman* monitoring is to eventually render itself obsolete as more and more
> institutions obtain adequate compliance levels and are prepared to assume self-
> monitoring responsibilities . . .  The hope is that as more and more institutional
> mental health programs progress toward adequately higher levels of functioning,
> they too will be shifted to a self-monitoring and reporting status. If their progress

proves to be stable and maintainable, the Special Master's oversight will no longer be needed, and monitoring and review of institutional performance will eventually be turned back over to CDCR.

*Id*. at 31, n.33.

Accordingly, two months after the original six-month timeframe for completion of the CQIT project had already expired, the *Coleman* Court granted a limited extension of time to July 1, 2013, for the initial form of the tool to be completed.  Orders, filed April 23, 2013, ECF 4561, 4562.  The fledgling CQIT tool was piloted at eight institutions over six consecutive weeks[31], from May 22, 2013 to June 26, 2013.  Members of the Special Master's staff and *Coleman* plaintiffs' counsel attended the conduct of the pilot.

On August 2, 2013, the Special Master filed his report on the results of the pilot.  Special Master's Report on Defendants' Quality Improvement Process.  ECF 5730.  Therein, the Special Master noted the *Coleman* Court's statement in its remedial order that CDCR develop a program to ensure the delivery of *adequate* mental health care to remedy the constitutional deficiencies in the delivery of mental health care in the California state prisons at that time.  *Id*. at 2, *citing Coleman v. Wilson*, 912, F.Supp. 1282, 1308 (E.D. Cal 1995), *citing Grubbs v. Bradley*, 821 F.Supp. 496, 500 (M.D. Tenn. 1993).  He emphasized that "[q]uality *improvement* . . . focuses not merely on measuring performance indicators but also on identifying problems and crafting resolutions with system-wide application, and thus on improving the care that is delivered throughout CDCR prisons."  *Id.* at 3 (emphasis in original).

With specific regard to the summer 2013 pilot, the Special Master reported that the CQIT tool appeared to be fundamentally sound and "off to a good start," and that more work remained

---

[31]California Institution for Men (CIM), CSP/Los Angeles County (CSP/LAC), California Men's Colony (CMC), CSP/Sac, Salinas Valley State Prison (SVSP), Central California Women's Facility (CCWF), California Substance Abuse Treatment Facility (CSATF), and the California Correctional Institution (CCI).

to be done to address some issues which were revealed in the course of the pilot.  It was clear from the pilot that CQIT's capacity to accommodate and utilize information on the *quality* of mental health care needed expansion in order for the tool to fulfill its purpose of helping CDCR improve the care being delivered.  Areas identified by the pilot as needing more work included (1) having the CDCR examiners become familiar with Mental Health Tracking System (MHTS.net) information before beginning their on-site assessments, (2) having a psychiatrist on every on-site audit team, (3) increasing CDCR's pre-site visit communication with the institutions about the assessment process, (4) increasing training of the examiners on use of the CQIT tool, effective strategies for conducting group surveys of inmates, coordination between custody and mental health on conduct of the CQIT audits, and conduct of effective exit conferences at the institutions, (5) ensuring that MHTS.net data - which makes up a significant part of the information gathered by the CQIT tool- is complete and up-to-date, (6) ensuring that groups of inmates to be surveyed are assembled efficiently, seated comfortably, and are sufficiently large in number to provide a meaningful sampling, and (7) observing activities, e.g. IDTT meetings, being conducted as closely to how they are normally and usually run as possible. In addition, the tool needed to cover additional parameters including mental health staffing at the institutions, as well as various custody-related matters including heat measures and condition/use of therapeutic modules.  The Special Master recommended that CQIT audit results be published in both system-wide and individual institutional reports, in both dashboard and narrative report-type formats, at regular intervals.

In its order following the Special Master's August 2, 2013 report, the Court noted the need for continuation of work on CQIT until it is completed so that it may accomplish its purpose:

> Rather than set another deadline, the court will reiterate that defendants'
> development and implementation of an improved quality improvement process is
> fundamental to ending federal court oversight in this action.  It is grounded in this
> court's obligation to end its supervision of defendants' delivery of mental health
> care to members of the plaintiff class when defendants have implemented a
> *durable* remedy for the Eight Amendment violations in the delivery of that care.
> A key component of a durable remedy is the development and implementation of
> an adequate quality improvement process by which defendants will self-monitor,
> and as necessary, self-correct inadequacies in the delivery of mental health care to
> the thousands of seriously mentally ill inmates incarcerated in California's
> prisons.  Defendants are required to work under the guidance of the Special
> Master, with input from plaintiffs' counsel, on this task until it is completed.

Order, filed February 27, 2014, ECF 5092.

On September 11, 2013 CDCR provided a revised "Continuous Quality Improvement on Site Audit Guidebook" to the Special Master for review by his expert.  The guidebook addressed (1) scheduling a site visit, (2) preparing for the site visit, (3) arrival at the site, (4) substantive mental health audit questions and instructions, (5) substantive custody audit questions and instructions, and (6) post visit instructions.  On September 20, 2013, CDCR conducted a mental health CQI training session related to the Guidebook and attended by the Special Master's expert and plaintiffs' counsel.

During November and December 2013, the Special Master's expert and CDCR staff met and consulted on the CQI process to address further development and refinement of the CQIT.  On January 23, 2014, CDCR provided a presentation to plaintiffs' counsel on the CQIT indicators and the chart audit questions in the tool, to which plaintiffs provided feedback.

From February 26, 2014 through February 28, 2014, the Special Master's expert resumed meeting with CDCR staff on further development of the tool, specifically with regard to custodial areas, reviewing draft reports including custodial findings at all of the CQIT-piloted institutions.  In addition, the complete CQIT electronic dashboard including its "drill down" capabilities were demonstrated.

In July and August 2014, the Special Master's expert accompanied CDCR mental staff on test runs of the tool at DVI, CSP/Solano, SVSP, CIW, CSP/LAC, CSP/Sac, CMC, CSP/Corcoran, and RJD.  CDCR also produced for the Special Master's review August 6, 2014 and September 26, 2014 revisions of the Guidebook, covering the newly modified and added areas described above.  Feedback from the Special Master's expert was then provided to the CDCR defendants.

Subsequently, the *Coleman* parties and the Special Master agreed that CDCR would use the CQIT measures pertaining to administrative segregation in its audits of CDCR's administrative segregation EOP hubs for certification.[32]  These audits were conducted during September and October 2014, with the Special Master's expert and plaintiffs' counsel observing the process.

The CDCR defendants provided a further-revised version of the Guidebook dated July 1, 2015.  On July 21, 2015, plaintiffs' counsel submitted their comments on the report-writing outline that was attached to the revised Guidebook.  Two days later, the issues raised by plaintiffs' counsel were addressed during a meeting with the Special Master's expert, who provided further input.

During July, August, and September 2015, the Special Master's expert, the CDCR defendants, and plaintiffs' counsel continued their consultation and work on the further revision, development, and refinement of the CQI process and tool.  Plaintiffs were provided ample opportunities during the period to comment and propose revisions, which were appropriately considered by CDCR.

---

[32] The administrative segregation EOP hub certification process is described in Part XIV, below.

On September 30, 2015, at an all parties' meeting, the CQI process was addressed. The parties and the Special Master agreed that the CDCR defendants may proceed with a trial implementation of CQIT in the institutions, with the Special Master and plaintiffs' counsel present to observe during the Special Master's monitoring visits. The parties and the Special Master also agreed that the CQI indicators will be revised over time as issues and findings may evolve.

On December 9, 2015, CDCR provided an updated CQI presentation to the Special Master for his review and comments. Another meeting was held two days later, on December 11, 2015, at which time plaintiffs offered their recommendations for changes to CQIT that were subsequently adopted and incorporated into the tool. CDCR will conduct a trial implementation of the tool at ten selected institutions during the upcoming Twenty-Seventh Monitoring Round in the CDCR prisons, expected to begin in May 2016.

#### b.    <ins>The Lack of a Continuous Quality Improvement Structure in the DSH Programs</ins>

What the *Coleman* court and the Special Master have said with regard the importance of a sound quality improvement program for the treatment of *Coleman* class members in CDCR mental health programs holds no less true for those class members who are being treated within the DSH inpatient programs.[33] To that end, development of a sound quality improvement program for use within DSH is not only indicated, but is critical to resolving in a lasting way the array of issues with the care delivered in those programs that are discussed in this report. One way would be for DSH to develop its own quality improvement tool/process. Another way, and

---

[33] As inpatient programs developed and operated by CDCR, the CIW-PIP and the SQ-PIP were subject to CDCR's CQI process, including its self-auditing tool known as the Continuous Quality Improvement Tool (CQIT), the history and development of which is discussed above.

perhaps the more useful and efficient way, would be for DSH to coordinate and partner with CDCR's CQI process, which now has nearly four years of development behind it and, as described above, is about to take a significant step closer to full implementation in CDCR prisons.  There is a case to be made that the latter approach is a logical next step in the refinement of the MOU.  It would help further expand the seamlessness between the two agencies' inpatient treatment programs for CDCR inmates that is envisioned by the revised MOU, promoting the delivery of care according to a continuum-of-care model.  It would be particularly timely, with a "lift and shift" of responsibility from DSH to CDCR for the DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton inpatient programs now under consideration.

The existing quality management mechanisms in place in the DSH programs were, on balance, found to be needed and useful.  However, they did not equip DSH with the ability to diagnose and resolve on a lasting basis its problems with the quality of care delivered at its five programs for *Coleman* class members.  They could not systematically measure and assess whether the care provided *Coleman* class members achieved desired treatment outcomes. If they did have these capacities, they were not being used for that purpose.   In short, DSH's quality management structure was not found to be a continuous quality *improvement* structure.  A true quality improvement process can not only capture performance indicators quantifiably, but also can analyze them, identify improvement opportunities, generate meaningful reports on them, and help guide implementation of lasting remedies. To be effective and help DSH achieve its long-term goals for delivery of care, its QI system must also have the dynamic capability, on a continuing basis, to re-assess and adjust as necessary any remedial interventions.  Without that capacity, well-intended but ineffectual remedies will not lead to desired improvements and outcomes.  An effective continuous improvement process must have the capacity to (1)

continually assess whether provided services consistently achieve their desired outcomes in the mental health program, (2) develop and implement any desired changes, and (3) refine the capacity of the process to identify future opportunities for improvement and implement those improvements as needed.  From a more long-term perspective, an effective continuous QI program is a critical step towards assumption of the role of self-monitoring and eventual removal from court oversight.

It was found during the site visits at the DSH programs that its quality management system does not presently have such capabilities, i.e. DSH's quality management system is not an effective continuous quality improvement (CQI) process.  This was readily apparent upon observation of the IDTT process.  IDTTs are responsible for developing and implementing patients' treatment plans and implementing the newly-developed process for placing patients in their LRH.   Reviews of treatment plans revealed multiple issues that would be appropriate for intervention via a CQI process, and that otherwise did not appear amenable to resolution under DSH's current quality management strategies.  Appropriately conducted IDTT meetings that develop and implement effective treatment plans for *Coleman* class members and act vigorously to place patients in their LRH, are essential to the provision of adequate care. As discussed in more detail below, the site visits found systemic problems with IDTTs and treatment plans in all of the DSH programs reviewed by the Special Master.  There was no evidence that DSH's quality management systems presently in place provided the requisite capacity to diagnose and resolve these and other IDTT-related issues.

A CQI process tailored to capture relevant indicators and address identified problems is needed.  It should include methodologies for gathering and assessing information, such as the deficiencies and problems identified by the Special Master's teams and discussed above.  The

result should make DSH better positioned to improve its mental health service delivery and achieve better mental treatment results and outcomes.

### i.      DSH-Atascadero and DSH-Coalinga

The performance improvement structure at DSH-Atascadero was nearly unchanged from what was reported in the "Special Master's Report on Adequacy of Inpatient Mental Health Care for Inmates of the California Department of Corrections and Rehabilitation," filed May 30, 2014 (ECF 5156). All of the hospital's committees continued to report quarterly to the Quality Council, which met weekly. The standing improvement committees covered all treatment and service areas and met at least quarterly. The suicide prevention committee (SPC), program review committee (PRC), and V-Risk management committee (RMC) also met at least quarterly. The standards compliance committee remained responsible for evaluating quality of care using numerous data collection tools. DSH-Atascadero also continued to use WaRMMS to track treatment related activities. Its Incident Management System tracked special incidents, and the Kardex system was used to prioritize patient care needs and provide continuity of care.

DSH-Coalinga had an institutional quality management and utilization review program consisting of several committees including PRC, medical risk management committee (MRMC), facility review committee (FRC) and a utilization management (UM) committee, each of which met regularly and conducted periodic audits.

### ii.      DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton

The Special Master's May 2014 report on inpatient care (ECF 5156) indicated that DSH-Salinas Valley did not at that time have an operational quality improvement or performance indicators process in place, but data from My Activity Plan (MAPP) was available for Treatment Centers (TC) 1 and 2. This remained the case at the time of the Special Master's 2015 site visits.

The program was also working on implementing PaWSS.  DSH-Salinas Valley increased its quality management initiatives through the establishment of its Individual Treatment Workgroup, Curriculum Committee, Standardized Data Reporting Workgroup, DPS Alignment Work Group and PaWSS Data Workgroup. A Utilization Review Committee was also established and met essentially every one to two weeks.

DSH-Vacaville had a very robust but similarly limited quality management system that included a Clinical Management Team (CMT) that addressed scheduling, MAPP rosters, clinician treatment hour expectations, and admissions and discharges, but did not entail a quality improvement component. The Performance Improvement Program (PIP) monitored and tracked multiple issues, notably, admission psychological assessment completion, treatment planning recommendations, language barriers and special accommodations. The Utilization Review Committee addressed issues of patients' concerns regarding lengths of stay, current status, need for continued hospitalization, discharge and follow-up. The Performance Improvement Health Services Specialist conducted audits of records of patients discharged for outside hospital care and who were re-admitted to DSH-Vacaville for ongoing acute or intermediate care.

At the time of the Special Master's May 2014 report, DSH-Stockton had just begun training on PaWSS. During the 2015 site visits, DSH-Stockton was in the process of implementing PaWSS and MAPP, and had developed reports that distinguished between acute and intermediate levels of care. In addition, its Quality Council met monthly, reviewed audits and discussed reports from various committees including risk management, UM and psychological specialist services.

      c.      **Quality of Care Issues in IDTTs and Treatment Planning in the DSH Inpatient Programs**

The Program Guide requires that a "current treatment plan" be developed for all *Coleman* class members during their treatment in DSH inpatient programs. For intermediate care patients, the Program Guide specifically requires an "individualized treatment program" that is "developed from a wide variety of treatment modalities including group and individual psychotherapy" from an array of treatment options. Other treatment options that are required to be available to patients during intermediate care at DSH by the Program Guide include medication management and "modification of maladaptive behavior," among others. According to the Program Guide, treatment plans must be "transferred" with the patient back to their CDCR institution, highlighting why developing and implementing appropriate treatment plans during inpatient treatment are an essential requirement of DSH care. *See* Program Guide, Chapter 6, "Department of Mental Health Inpatient Program," p. 12-6-6, 12-6-7, 12-6-14.  In addition, one of the policies in conjunction with CDCR and DSH's recently revised MOU is the DSH-Treatment Planning Policy, the purpose of which is to "formalize and standardize the Department of State Hospitals' (DSH) treatment and planning procedures in order to provide patient-centered care, treatment and services for California Department of Corrections and Rehabilitation (CDCR) patients receiving inpatient treatment within DSH." The purpose of another MOU policy -- the "DSH Housing Review-CDCR Patients in DSH Inpatient Programs -- is to "formalize the DSH Housing Review process for the movement of CDCR patients who have been clinically placed in higher custody settings within DSH to their Least Restrictive Housing (LRH) designation."

The purpose and objectives of these policies cannot be achieved without effective functioning by IDTTs.  The Special Master's findings on IDTT operations in the DSH programs indicates that the IDTTs need to improve their functioning in order to comply with these policies.

### i.        Observed Inadequacies in the IDTT Process

As discussed above in Part II (B)(1) of this report,  there were multiple inadequacies with IDTTs in the DSH inpatient programs that DSH's existing quality management systems are not capable of identifying, let alone resolving.  IDTTs at DSH-Atascadero did not discuss changes in patients' treatment plans or barriers to patients' participation in group therapy.  At DSH-Stockton and DSH-Vacaville, IDTT discussions of treatment plans were rare or minimal when they occurred.  DSH-Salinas Valley IDTTs did not sufficiently discuss their patients' treatment group assignments or the expected outcomes.

Vital treatment and clinical issues related to patients' Stage or Step levels, current symptoms, diagnoses, identification of problems, treatment goals and objectives, specific interventions, specific progress, specific behavior, and psychotropic medications were either not discussed or minimally touched upon by observed IDTTs at DSH-Atascadero, DSH-Salinas Valley, DSH-Stockton, and DSH-Vacaville.  These IDTTs also lacked any process for reviewing appropriateness of dormitory housing, or did not have clear understanding regarding consideration of a less restrictive environment for patients.

Clinical reviews of specific patient cases underscore the depth of these problems.  The number of patient cases exemplifying the problems with IDTTs at the DSH programs are legion.  For example, records of Patient A (DSH-Atascadero) indicated that while his initial assessments were comprehensive and that he had undergone neuropsychological testing, the IDTT did not use the assessment and test to sufficiently inform treatment goals or interventions.  Patient E (DSH-

Stockton)'s serious symptoms and underlying behavior on which his maximum custody status was based were not adequately addressed. Patient J (DSH-Stockton)'s IDTT did not properly implement his treatment plan. In the case of Patient M (DSH-Stockton), his IDTT failed to address his mental health symptoms that were preventing him from attaining a higher Step level. The record for Patient K (DSH-Salinas Valley) lacked documentation concerning the frequency and specificity of his symptoms. In the case of Patient I (DSH-Vacaville), the IDTT did not provide an intervention that targeted the patient becoming emotionally overwhelmed, which led to his misbehavior. Patient I (DSH-Salinas Valley) was not seen monthly by his IDTT.

The care provided to Patient O (DSH-Stockton) was characterized by inadequate interventions and poor definition of his problems by his IDTT.  For Patient S (DSH-Stockton), his IDTT failed to utilize the full spectrum of available treatment interventions for this patient at the facility. For Patient M (DSH-Salinas Valley), clinical interventions in response to his decline in functioning were inadequate, and his documented symptoms did not support his given diagnosis. Patient M (DSH-Stockton) was prevented from attaining a higher STEP level because of his mental illness, but his IDTT did not address this. The interventions developed for Patient C (DSH-Salinas Valley) by his IDTT were not appropriately revised when the patient showed no improvement.

In the case of Patient G (DSH-Salinas Valley), his IDTT did not implement any therapeutic strategies to address the patient's boredom, which was known to trigger self-injurious behavior.   Once Patient R (DSH-Stockton) was placed on maximum status, his treatment team failed to act timely to ensure that his access to care was not adversely affected by this change in status. The IDTT for Patient F (DSH-Vacaville) did not update his diagnosis to align with his symptomology. There was no documentation that the IDTT discussed or revised the diagnosis of

85

Patient H (DSH-Vacaville) to reflect his current clinical status. The IDTT for Patient B (DSH-Salinas Valley) failed to comply with policy when placing or maintaining him on DPS. For Patient J (DSH-Salinas Valley), a lack of appropriate documentation by his IDTT prevented assessment of the adequacy of his care.  Similarly, in the case of Patient K (DSH-Salinas Valley), the IDTT failed to document the frequency or specifics of his symptoms throughout his hospitalization. The IDTT failed to update Patient F (DSH-Vacaville)'s diagnosis to reflect his symptomology and the treatment being provided to him.

IDTTs for Patient C (DSH-Atascadero) failed to overcome this patient's language barrier and did not adequately address the discrepancies among team members on his diagnoses. Patient D (DSH-Stockton)'s IDTT did not sufficiently focus on avoiding a potential risk of suicide for this patient. For Patient I (DSH-Atascadero), the discrepancy between the diagnosis that the patient reported to the psychiatrist on his IDTT and the diagnosis documented by the social worker was not adequately addressed by the team. The documented symptoms of Patient M (DSH-Salinas Valley) did not support the IDTT's diagnosis. The IDTT for Patient I (DSH-Vacaville) ignored the role of his cognitive impairment in his psychiatric functioning. Although Patient O (DSH-Atascadero) had a record of poor participation in scheduled programming and treatment, his IDTT did not address this problem notwithstanding his apparent minimal clinical improvement.  In the case of Patient E (DSH-Salinas Valley), the IDTT used mechanical restraints rather than therapeutic interventions in its effort to modify this patient's behavior. Continued placement of Patient E (DSH-Vacaville)'s in DPS by his IDTT was not justified by the documentation available in his mental health records.

## ii.    <u>Deficiencies in Treatment Planning</u>

Another major aspect of IDTT deficiencies in the DSH programs involved treatment planning for patients.  The quality of treatment plans varied across the DSH programs, with many lacking updating or modifications to reflect changes in the patient.  There were chronologies that were simply copied and re-copied, perpetuating outdated and irrelevant information. Multiple reviewed treatment plans were apparently developed through a "check-the box-process" rather than through an interactive therapeutic clinical process, or were overly vague and broad, frequently unconnected to treatment targets and goals, and failing to address or provide sufficient details about patients' behaviors and symptoms.

For reasons not made entirely clear during the site visits, multiple staff at DSH-Atascadero viewed treatment planning as "secondary" and reported that it did not drive treatment delivered there. This was amply demonstrated in records reviewed on site.  The treatment plan for Patient A (DSH-Atascadero) did not adequately reflect his assessed needs or address his failure to respond to interventions. In the case of Patient B (DSH-Atascadero), the goals in his treatment plan were generic and not adequately responsive to the precipitants of his hospitalization.  The treatment plan for Patient D (DSH-Atascadero) lacked clear focus, with documentation containing information from earlier plans that were repetitive and extraneous. Patient I (DSH-Atascadero)'s treatment plan did not clearly identify his targeted symptoms. For Patient M (DSH-Atascadero), his treatment plan was neither sufficiently individualized nor consistent with his level of functioning. The treatment plan for Patient O (DSH-Atascadero) did not focus on his sexually inappropriate behaviors or his apparently minimal clinical improvement over time.

Patient A (DSH-Vacaville) was not provided an adequate initial treatment plan, nor was he given timely updated plans. The treatment plan for Patient E (DSH-Stockton) did not adequately address his symptoms nor his underlying behavior that kept him in maximum custody status. In the case of Patient C (DSH-Salinas Valley), his treatment plans lacked sufficient specificity with indicating interventions and had not been revised even after the patient showed no improvement. DSH-Vacaville Patients B and E's treatment plans did not reference these patients' Step levels as required, and failed to address their underlying behaviors that caused these patients to remain at the most restrictive level. The frequency and duration of treatment for Patient G (DSH-Stockton) was not specified in his treatment plan. For DSH-Vacaville's Patient I, his treatment plan did not carry forward his diagnosis of serious mental illness and failed to provide an intervention targeting his emotional issues.

Throughout the hospitalization of Patient K (DSH-Salinas Valley), his treatment services were not reevaluated and adjusted as clinically appropriate to account for his failure to reduce his self-isolation. In the case of Patient J (DSH- Stockton), his treatment plan was not modified even as he decompensated. Similarly, Patient B (DSH-Salinas Valley)'s treatment plan was not modified to take into account his lack of progress.  Patient L (DSH-Stockton)'s treatment plan did not address his presenting issues. Patient H (DSH-Vacaville)'s treatment plan did not target his experiences of psychotic symptoms. Treatment targets, goals and interventions of the current treatment plan for Patient P (DSH- Stockton) were vague and superficial, and had been "cut and pasted" from his prior treatment plan. For Patient H (DSH-Salinas Valley), his treatment plan was also overly vague and broad and did not target his functional deficits.

Patient D (DSH-Vacaville)'s treatment plan was inadequate and remained unchanged over time. In the case of Patient R (DSH-Stockton), his treatment plan did not appropriately

define his treatment targets, goals, or interventions. The treatment plan of Patient F (DSH-Salinas Valley) did not provide any rationale justifying his placement in solo programming and placed him in an inappropriate group given his medication status. For DSH-Vacaville's Patient G, his treatment plan was repetitive; his recent treatment plans did not include specific groups related to his diagnosis, nor was his treatment plan updated to reflect current findings.

### iii.    Deficiencies in Behavioral Plans

The DSH programs generally underutilized behavioral plans and interventions for patients, even when their behaviors required them. In many instances, behavioral plans were found to be inadequate and indeterminate with regard to their goals and the proposed length of time for implementation. Many behavioral plans lacked foci with reasonable scope, or that were based on appropriate functional analysis, or designed with achievable objectives. Others were not integrated into treatment plans. The limited number of behavioral plans available for review at the programs was also a problematic finding.

The behavioral plan for Patient L (DSH-Salinas Valley) was significantly flawed in several respects. It was not collaborative, lacked a baseline of targeted behaviors and a functional analysis, and inappropriately targeted too many behaviors. Further, it did not appear that individualized incentives were offered as part of the behavioral plan. Patient M (DSH-Stockton)'s IDTT failed to develop an individualized behavioral plan on which to base his Step progression. The behavioral plan for Patient C (DSH-Vacaville) was referenced in other documentation in his mental health record, but its adequacy could not be determined because it was unavailable. An individual behavioral plan was clinically indicated for Patient S (DSH-Stockton) but no such plan or intervention was initiated. In the case of Patient G (DSH-Salinas Valley), the behavioral plan found in this patient's record was not properly individualized, was

not current, and failed to address his primary issues of concern.  The behavioral plan for DSH-Salinas Valley's Patient M lacked individualized incentives designed to engage this patient in treatment.

## C.    PATIENT ACCESS TO TREATMENT

The seven inpatient programs all had protocols for patient access to treatment.  These practices allowed for patient advancement through various STEPS/STAGES to obtain more programming and typically, access to additional privileges and property based on patient behavior.

However, significant differences in these programs led to very uneven treatment across the institutions.  The inpatient programs differed as to orientation, number of Steps/Stages or other levels, requirements and timeframes for patient progression to the next Step/Stage or level and/or to fully access treatment, patient privileges, property, and/or restrictions on patient movement, handcuffing, solo programming, and imposition of patient restrictions following behavioral problems and/or disciplinary infractions, among other matters.  These significant program differences resulted in uneven treatment and a lack of continuity across the respective facilities.  As a result of these disparities, the inpatient programs were being reviewed and there was a systemic process in place to standardize STEP/STAGE levels and language across the psychiatric programs.

### 1.    DSH-Atascadero and DSH-Coalinga

DSH-Atascadero's orientation process had not changed.  *Coleman* class members who arrived from CDCR prisons were handcuffed until nursing saw them, which generally took place soon after patient arrival.  Patients subsequently proceeded through the 45 to 90 day admissions process.

90

Following evaluation and stabilization, DSH-Atascadero patients transferred from admissions to a treatment unit, where they entered the HAS, which monitored their progress through five distinct access levels; each level delineated patient supervision and movement with incentives that supported treatment.

New DSH-Atascadero patients were admitted to Level 1, which was assigned to patients deemed a high risk for violence or self-harm, and/or when a patient's mental illness impaired self-care.  Level 1 patients were escorted when leaving their unit.  Level 2 was assigned to patients who could follow unit rules but otherwise needed supervision.  Patients who consistently maintained appropriate behavior were at Level 3; after 90 days they could advance to Level 4. Patients recommended for community placement were at Level 5.  Patients on Levels 3 through 5 could access many areas of the hospital.  Unlike other DSH facilities that provided inpatient care to *Coleman* class members, where patient property and privileges were based on STEP/STAGE levels, at DSH-Atascadero they were not based on HAS level.

No changes appear to have been made to DSH-Coalinga's "hold" status.  This protocol restricted patients to their units until they underwent discipline-specific assessments, but during which they participated in treatment and other unit activities.  However, DSH-Coalinga did not provide summarized information as to the number of patients or durations of "hold" status.

## 2.    DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton

Following the filing of the Special Master's Report on DSH-Salinas Valley in September 2013, the *Coleman* court ordered CDCR and DSH to review and re-evaluate, under the Special Master's guidance, the institution's use of Orientation and Cuff Status.  The goal was to ascertain whether these practices accomplished the proper balance between access to inpatient mental health care and security needs (*See* Order, ECF 4925).

Thereafter, on April 25, 2014, DSH filed an Update to the Court on DSH-Salinas Valley to address several of the issues raised by the Special Master's report on DSH-Salinas Valley (ECF 5142). Defendants' DSH-Salinas Valley Update indicated that its program management tracked all patients on Cuff Status and that there was a weekly Cuff Status meeting. It further indicated that the program had already made some changes regarding Orientation, DPS, and Cuff Status.

During the June 2015 site visit, headquarters' staff reported a DSH-wide process to standardize stage levels and language across all psychiatric programs, including DSH-Salinas Valley. As part of this standardization, DSH-Salinas Valley's STAGE system policies were being reviewed.

Housing and programming advancement at DSH-Salinas Valley were dependent on patients' behavior and programming participation. This STAGE system consisted of four levels: Orientation, Stage 1, Stage 2, and Stage 3. Newly-admitted patients were placed on Orientation status, where they were assessed, single-celled, had their property limited to personal hygiene items, and were handcuffed when outside their cells to program solo or in small groups.

Patients cleared by the ICC and removed from Orientation status proceeded to Stage 1, where they programmed without restrictions. At Stage 1, patients no longer had to be handcuffed when out of cell and were permitted non-contact visitation, some package receipt, and one weekly phone call as staffing permitted. Following successful Stage 1 programming, the patient advanced to Stage 2, where programming continued and increased privileges included two weekly phone calls and basic personal property. Progression to Stage 3 required patient completion of 80 percent of core therapeutic groups. At Stage 3, patients' active involvement in treatment activities and preparation for DSH-Salinas Valley discharge was expected. Stage 3

92

privileges included open telephone access, and eligibility for recreational supplies and any position in patient government.

DSH-Salinas Valley reported implementing various procedures to reduce DPS, which required patients to be handcuffed and therefore limited their access to treatment. The facility had also begun a monthly audit that monitored compliance with use of mechanical restraints/DPS policy to address any non-compliance and also tracked all DPS status patients. The result was a decrease in the number of DPS patients; the average length of time a patient was on DPS from January through May 2015 was nine days, which was significantly lower than during earlier site visits. However, most of the patients in this group who required individualized behavioral plans did not have one, reflecting under-utilization of these plans.

DSH-Salinas Valley's solo programming, where patients received some or all of their activities alone, also influenced patient access to treatment and recreational activities. During the June 2015 site visit, 18 Stage 1 patients were on this programming. Log review indicated they were typically offered solo programming two to three times weekly, but a few who had been on solo programming for more than one month had largely refused it. DSH-Salinas Valley did not track solo status or the length of time that patients spent on solo status. Solo programming treatment plans, and those of DPS, also did not consistently target the underlying symptoms or behaviors that caused this status.

DSH-Vacaville continued using the STEP process for patient privileges and activity access in its acute and intermediate care programs, which was under statewide review during the June 2015 site visit. It was premised on patient advancement through successive STEPs with identified increased privileges and activities. Overall, patient distribution was positive for the intermediate STEP programs, but was bimodal and therefore problematic in the acute care

93

program; too many patients were at either end of the spectrum, and it was concerning for so many patients to be at STEPS 1 and 2.

Newly-arrived DSH-Vacaville acute care program patients were placed on Orientation/STEP 1 and were handcuffed whenever out of cell. As they demonstrated skills and with treatment team approval, they advanced and obtained more property rights and increased opportunities for activities and interaction with other patients. However, staff offered conflicting opinions as to whether patients generally moved quickly through the STEP process.

Intermediate care program advancement at DSH-Vacaville was similar to acute care program progression. The High Custody Intermediate Treatment Center (HCITC) had four levels: DPS/Orientation and STEPS 1, 2, and 3; the low custody intermediate care program started at STEP 1.

DSH-Vacaville patients admitted to the HCITC were initially placed on DPS and observed until cleared by clinical assessment and evaluation. At DPS, patients attended small groups in mechanical waist and ankle restraints and had limited phone use, visitation as per treatment team and custody clearance, and attended yard solo, among other privileges. Patients who engaged in aggressive behavior or had enemy concerns could also be placed on DPS.

After DPS status, HCITC patients progressed to STEP 1, where programming continued, they attended groups without mechanical restraints, and had additional privileges including haircuts, shaving, and canteen. Low custody intermediate care patients at STEP 1 were allowed some property and limited telephone use and visitation per treatment team discretion. Document review revealed that patients who disturbed others, or refused participation in activities or groups, were retained at STEP 1, which was problematic.

Progression to STEP 2 for HCITC patients required attendance at all therapeutic activities, group participation, cell maintenance and personal hygiene, and adherence to community rules, all with minimal prompting; it also required recovery from behavioral lapses without serious treatment plan disruption, medication compliance, and appropriate interaction with others. Additional STEP 2 privileges included in-cell radio eligibility and more canteen privileges. Low custody intermediate care patients' privileges at STEP 2 included telephone use, visitation, eligibility for ward government positions, and gym.

Patients had to wait for their 30-day treatment team meeting before being eligible to progress to STEP 3. Both HCITC and low custody intermediate care patients had to fulfill all required expectations without prompting, be free of disciplinary action for 30 days, and be appropriate group participants. At STEP 3, HCITC patients were also permitted an in-cell television, were eligible for ward government leadership positions, and had increased canteen privileges; low custody intermediate care patients received special events, including movies, were able to check out musical instruments, and had mentorship positions and off-unit activities such as gym.

DSH-Vacaville implemented a pilot program in February 2015 on acute care unit P1 that implemented a distinct treatment structure. The pilot sought to ensure that patient treatment matched clinical needs, conduct the most current empirical treatment groups, and increase treatment hours. It was composed of four different treatment paths that addressed psychosis, impulsivity, anxiety, and hopelessness. The pilot's patients reportedly advanced more quickly through the STEP levels, but there was no data on pilot outcome measurements. The pilot also lacked patient selection criteria and there was no rationale for its six and 12 month evaluation periods.

DSH-Stockton also used a STEPs and STAGEs process of behavioral incentives that promoted socially desirable patient behaviors. The institution's ATP's incentive process had four Step levels. All new acute care patients were placed at Step 1, where they were assessed and allowed to program solo, while handcuffed. Programming safely at Step 1 allowed progression to Step 2, where patients still programmed solo, but without handcuffs. Criteria for Step 2 advancement included attendance at the initial IDTT meeting, the ability to learn and develop new skills, group participation receptivity, and appropriate treatment activity participation. However, at Steps 1 and 2, patients were placed in a highly restrictive, isolating environment, which was contraindicated for many mentally ill patients.

Safe programming at Step 2 permitted advancement to Step 3, where patients received treatment in groups. Patients attained Step 3 through medication compliance, active group participation, exhibiting mental health symptom stability, and demonstrating new knowledge and skills in their interactions. Progression to Step 4 occurred when patients verbalized readiness for discharge and demonstrated the skills necessary to function at a lower level of care.

All acute care beds at DSH-Stockton were fully activated as of the June 2015 site visit. However, acute care patients received minimal out-of-cell treatment; they were offered a weekly average of 1.28 hours, and received an average of .95 hours. Patients were scheduled, offered, and received a weekly average of three minutes of individual clinical contacts.

DSH-Stockton's intermediate treatment incentive program was known as the Stage Behavioral Program (STAGE) and was also a series of progressive levels that began with DPS and had three successively higher levels. These steps permitted patients to earn greater treatment, property privileges, and access to activities by demonstrating pro-social behaviors, while also considering patient risk levels.

Incoming intermediate care patients may begin on DPS, where they were handcuffed and had limited telephone access and visitation at the discretion of custody and the IDTT.  Although policy permitted patient participation in groups of up to four DPS patients, DSH-Stockton lacked treatment modules and/or restart chairs and therefore DPS patients could not attend groups.  The institution did not track treatment hours and out-of-cell time for DPS patients.

Successful completion of DPS permitted advancement to Stage 1, where patients were assessed and demonstrated their coping skills.  Stage 1 patients had the same limited privileges as DPS patients, as well as canteen and outdoor activities, among others, and could attend groups uncuffed.

Advancement to Stage 2 required patients to attend all therapeutic programming, participate in groups, maintain their rooms and personal hygiene, and follow community rules, all with minimal prompting.  In addition to Stage 1 privileges, Stage 2 patients were eligible to use an AM/FM radio.  Progression to Stage 3 required the same conduct as Stage 2 advancement.  Stage 3 privileges included an in-cell television and eligibility for ward government leadership positions.

Unlike Step 1 in the acute care program or intermediate care's DPS, maximum or "max" custody status was not a clinical status, but a custodial status.  Max custody status patients were cuffed when leaving their rooms.  During the January 2015 site visit, chart review for max custody patients revealed generic and vague treatment plans that underutilized behavioral interventions, and typically did not target the behaviors that led to the max custody status placement.  Durations of patients' max custody status were not tracked.

Observation of IDTT meetings during the June 2015 DSH-Stockton site visit indicated requests to suspend patients' max custody status based on strong clinical justifications and

97

appropriate presentations to custody. The process at an observed ICC meeting was complete and thoughtful.

At the time of the June 2015 site visit, DSH-Stockton had a pilot whose objective was to increase patients' individual and group treatment hours. Observation of two IDTT meetings on an intermediate care unit where the pilot was in place indicated the presence of all required disciplines. Staff rapport with patients was very good. The treatment team did not determine whether to remove patients from max custody status. The observed IDTT meetings also required more structure, more effective case presentations, and better focus to devise treatment approaches to specific, measurable goals, while no objective information was used to assess progress toward goals. On a positive note, chart review and patient reports indicated that pilot patients had increased access to treatment, but there remained problems with providing out-of-cell programming to max custody status patients.

During the June 2015 site visit, although the STEP/STAGE level system was under statewide review, no changes had been made at DSH-Stockton. At that time, treatment of DSH-Stockton restricted status patients remained a challenge. One obstacle was that patients were spread across units, each of which had two custody officers, limiting movement of max custody patients. Review of treatment plans indicated that patients on restricted status did not appear to receive treatment that targeted the underlying behaviors of symptomologies which led to their status.

### 3. CIW-PIP and SQ-PIP

New arrivals to the CIW-PIP were placed on Orientation/DPS and were housed in single rooms, where they received medications and meals. The CIW-PIP's Stage system allowed patients to attain graduated privileges based on good behavior. At Stage I, CIW-PIP patients

were permitted canteen, group yard, meals in the dining room, treatment groups, and unit activity privileges, and a state-issued personal radio was allowed. At Stage II, patients were allowed telephone and family visitation privileges. Televisions were permitted at Stage III. Jobs or education classes were not available to CIW-PIP patients.

The SQ-PIP also used a behaviorally-based Stage level system that was designed to incentivize patients with various privileges; there were multiple behavioral objectives that each patient had to attain to advance to the next stage.

During the SQ-PIP site visit in May 2015, although there were more patients at the higher end of the Stage system than during the December 2014 site visit, there were concerns about patients at the system's lower end. Only one of four randomly reviewed DPS or Stage Level 1 patients' treatment plans indicated the patient's Stage Level, while no behaviors or symptoms were specified in the plan or targeted as part of the treatment plan. Effective interventions were not included as part of the treatment plans for lower level patients. Furthermore, as these patients did not advance through the Stage system due to their mental illness and were unresponsive to treatment, their treatment plans were not re-evaluated, and/or effective individualized behavioral plans were not put in place to help them progress.

During the preceding site visit, it had been observed that there was a clustering of patients at the low end of the Stage system whose mental illness prevented them from advancement. In fact, the Stage level system's removal of basic privileges, including visitation and phone access, that patients previously had in the housing units appeared to be a disincentive for some. No clinically justifiable rationale had been offered for automatically denying new patients these basic sources of support.

At the time of the May 2015 site visit, SQ-PIP staff reported that the SQ-PIP Stage Program was under review.  Changes being incorporated into the policy included removing telephone calls, visitation, packages, and canteen from the Stage Program.  Rather, patients would receive the same access in the SQ-PIP as they received in their prior housing unit.  Overall, these changes to the Stage Level System since the preceding site visit were positive.

During the May 2015 site visit, staff reported that security measures in the SQ-PIP remained the same.  As previously reported, all condemned patients were handcuffed during all movements, and were in therapeutic modules or restart chairs during all treatment.  Staff indicated that although CDCR regulations required all condemned patients to be escorted in handcuffs, this did not apply when patients were in treatment settings.  SQ-PIP patients were thus not handcuffed while in therapeutic modules during therapeutic sessions, but were placed in restart chairs or modules, regardless of patients' stage levels.

**D.      REFERRALS AND TRANSFERS**

**1.      DSH-Atascadero and DSH-Coalinga**

Leadership staff at DSH-Atascadero reported that forensic staff had access to the CDCR Electronic Unit Health Records (eUHR) but clinical staff did not have the same access.  During the review period, 88 Coleman class members were referred for transfer to DSH-Atascadero.  Of those 88 referrals, 29 were accepted for placement at other DSH facilities, eight were rescinded and one was rejected.  Of the 50 patients admitted and transferred to DSH-Atascadero from January through May 2015, 98 percent were transferred within the required Program Guide timelines.  Staff reported that referral information submitted by CDCR was vague, inappropriate and at times contradictory.

Thirty-three patients were transferred to DSH-Coalinga from January through June 2015. The average time from referral to admission was 26 days and ranged from eight days to an outlier of 110 days.

### 2.     DSH-Salinas Valley, DSH-Vacaville and DSH-Stockton

Between January 2, 2015 and May 28, 2015, 158 patients were admitted to DSH-Salinas Valley with an average time from referral to admission of 24.5 days.  Ninety-seven percent of patients transferred within 72 hours of bed assignment.  DSH-Salinas Valley leadership reported no rejections during the reporting period.

Of the 355 referrals to the acute care program at DSH-Vacaville, 56 percent transferred within Program Guide timelines.  For patients who transferred to the intermediate care program, 99 percent transferred within Program Guide timelines.  There were two rejections to the acute care program but no rejections to intermediate care.

At DSH-Stockton, there were 163 admissions to acute care and 336 admissions to intermediate care between July 2014 and December 2014.  At the time of the site visit, acute care patients were referred from 17 different CDCR institutions with a majority of referrals from CHCF.  Referrals for intermediate care patients came from 19 different CDCR institutions but a majority were referred from the acute program at DSH-Stockton.  At the time of the June 2015 site visit, the acute care units were at 95 percent capacity and the intermediate care units had no beds available.

### 3.     CIW-PIP and SQ-PIP

Data available for 27 admissions to the CIW-PIP during the review period indicated an average time of 11.6 days from referral to admission.  There were four instances of patients placed on a wait list with an average time of 19.5 days until admission into the program.

Since November 2014, there had been five referrals for admission to the SQ-PIP.

## E.    ADMISSIONS AND DISCHARGES

### 1.    DSH-Atascadero and DSH-Coalinga

DSH-Atascadero admission packets were uploaded to SharePoint and reviewed within two days.  If a patient was rejected, a PRC, which was composed of staff from the referring institution as well as CDCR and DSH headquarters, was requested to obtain additional information or further clarification of the decision to reject the patient.  The lack of a MOU led to the creation of this informal procedure.  Patients with co-morbid medical issues remained in the infirmary or were sent to an outside hospital which rendered them unable to receive mental health treatment.  Patients in need of involuntary medications were accepted on the condition that CDCR pursue a 2602 hearing which then resulted in delayed admissions.

Patient discharge planning was problematic at DSH-Atascadero.  Staff reported that lack of communication and information from CDCR clinicians and DSH coordinators impacted discharges.  DSH-Atascadero staff indicated that patients should be provided with parole planning while at the hospital rather than transferring them to CMC.  This would reduce any stress associated with a change of location and disruption of continuity of care prior to discharge back to the community.  Issues were also identified in the discharge treatment documentation for patients returning to CDCR.

At DSH-Coalinga, there were 33 admissions and 13 discharges during the review period and no data regarding patient rejections.  The average length of stay was 288 days, ranging from 154 days to 430 days.  Length of stay reviews were conducted for patients whose stays exceeded 180 days which resulted in recommendations for discharge or continued stays with follow-up

reviews. A group entitled "Community Reintegration/Parole Planning" was available for patients approaching their parole dates and was attended by 17 patients during the review period.

2.    **DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton**

There were 163 admissions to DSH-Salinas Valley from December 2014 through May 2015 but insufficient data did not allow the monitor to determine if the facility was compliant with Program Guide transfer timelines. Thorough physical exams, which exceeded initial assessments, were completed at time of admission. Eighty-nine percent of patients admitted to DSH-Salinas Valley received an ICC meeting within ten days of admission. There were 151 patients discharged during the review period that ended in June 2015 with an average length of stay of 218 days. Staff continued to rely on the Transitional Case Management Program (TCMP) for pre-release and parole services rather than providing groups in the treatment programs.

From January through May 2015, DSH-Vacaville admitted 355 patients to the acute care program and 111[34] patients to the intermediate care program. On average, intermediate care patients received an ICC within 2.5 days of admission. DSH-Vacaville discharged 299[35] patients from the acute care program during the review period and 94[36] patients from the intermediate care program. The average stays for acute care patients was 81.5 days and 200 days for intermediate care patients.

DSH-Vacaville provided patients with parole planning groups even though they did not parole directly from acute or intermediate care. MDOs with positive evaluations paroled to

---

[34] Corrected from 11, which appeared in draft version of this report.
[35] Corrected from 94, which appeared in draft version of this report.

[36] Corrected from 299, which appeared in draft version of this report.

DSH-Atascadero and did not receive discharge planning.  Of the 87 patients who had parole dates within 90 days during the review period, 14, or 16 percent, participated in parole planning groups.

From August 31, 2014 through December 2014, 71 acute care patients and 294 intermediate care patients were discharged from DSH-Stockton.  From January 31, 2015 through April 30, 2015, a total of 269 patients were discharged.  DSH-Stockton did not provide pre-release planning and inmates scheduled to parole were returned to CDCR for any pre-release planning.

DSH-Stockton had 163 admissions to the acute care unit and 336 admissions to the intermediate care units.  At the time of the site visit, the average length of stay for intermediate care patients was 131 days and 35 days for acute care patients.

### 3.     CIW-PIP and SQ-PIP

From July 1, 2014 through December 31, 2014, CIW-PIP admitted 27 patients and discharged 21 patients.  For sixteen of the patients who were clinically discharged during the reporting period, there was an average of 17 additional days before administrative discharge. Although information was provided to patients regarding pre-release planning, there were no pre-release groups available during the reporting period.

From November 2014 through the reporting period, SQ-PIP admitted five patients and discharged a total of three.

### F.     PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

Following the filing of the Special Master's Rules Violation Report (RVR) report on January 30, 2015 (ECF 5256), the Special Master and the *Coleman* parties met several times. These meetings resulted in several modifications to the policies and procedures.   CDCR

headquarters subsequently developed and then implemented at the institutions the mandatory training on the revised policies and procedures for clinical and custody staff who were involved in the RVR process. These trainings were conducted for selected staff at seven training sites during May and June of 2015. The trained staff subsequently returned to their institutions to train other required staff. All classifications required to be trained were to be trained by July 7, 2015. Given this extended timeframe for training and implementation of the new RVR policies and procedures, it was not possible for the Special Master to examine their implementation within his review covered in this report.

### 1.    **DSH-Atascadero**

DSH-Atascadero reported that during the review period three staff members attended CDCR training on the revised RVR policy and procedures. Previously, as reported in the May 2014 DSH Report, DSH-Atascadero had not used a disciplinary process comparable to the RVR process. Rather, the treatment team had addressed patient behavioral issues.

### 2.    **DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton**

DSH-Salinas Valley conducted RVR training during February and April 2014, but review of training records during the January 2015 site visit revealed that all clinicians had not been trained. This nonetheless represented improvement, as the May 2014 DSH Report revealed staff reporting that the most recent training on the RVR process at DSH-Salinas Valley had occurred approximately two years prior. As of the June 2015 site visit, DSH-Salinas Valley reported that during the review period, 321 DSH staff members, 158 MTAs, 24 psych techs, 29 nursing staff, 53 clinical staff, and 57 administrative staff had received use of force training.

DSH-Vacaville clinicians responsible for preparing RVR mental health assessments received a presentation on RVR mental health assessments two years prior to the January 2015

site visit.  DSH-Vacaville reported ten cell extractions between January 1 and May 31, 2015, of which four were related to PC 2602.  The institution indicated that the training department's Senior Medical Technical Assistant (SMTA) had received training on the new use of force policies.

DSH-Stockton was subject to CDCR's RVR process.  The facility did not provide information regarding RVR training.

### 3.     CIW-PIP and SQ-PIP

CIW-PIP reported that all staff received training on the revised statewide use of force policies.

Data on the SQ-PIP patient disciplinary process and use of force was not reported during the May 2015 site visit.  By agreement, the Special Master will conduct his review of use of force in the upcoming Twenty-Seventh Monitoring Round in the CDCR facilities.

## G.     USE OF SECLUSION AND RESTRAINTS

### 1.     DSH-Atascadero and DSH-Coalinga

DSH-Atascadero's use of seclusion and restraints typically was clinically appropriate. Data provided during the June 2015 DSH-Atascadero site visit indicated 12 cases of seclusion during the review period, involving nine patients and averaging 9.39 hours in duration.  DSH-Atascadero reported 19 cases of restraint between January 1 and May 31, 2015, involving 13 patients and averaging 8.11 hours per episode.

DSH-Coalinga appeared to have correctly used seclusion and restraints as a last resort and only for brief time periods.  During the review period, there were nine episodes of seclusion and seven instances of non-ambulatory restraint.

    **2.**    **DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton**

During the June 2015 site visit, DSH-Salinas Valley reported two restraint episodes involving two patients and 108 instances of seclusion involving 56 patients.

DSH-Vacaville did not indicate any episodes of seclusion, but reported that one acute care patient required five-point restraint.

During the January 2015 site visit, DSH-Stockton reported that no patients had been placed in seclusion during the review period, while nine patients had been placed in restraints. As of the June 2015 site visit, DSH-Stockton reported not using seclusion or observation rooms, or safety cells. Between the January 2015 and June 2015 site visits, four patients were placed in restraints.

    **3.**    **CIW-PIP and SQ-PIP**

CIW-PIP reported five restraint episodes during the review period, with an average duration of 76.6 minutes, but no instances of seclusion.

During the review period, no SQ-PIP inmates were placed in seclusion or restraints for mental health purposes. The SQ-PIP December 2014 Report indicated that no inmates were placed in restraints for mental health purposes since program activation on October 1, 2014 through December 4, 2014.

**H.**    **EMERGENCY RESPONSE, SUICIDE PREVENTION AND THE DEATH REVIEW PROCESS**

    **1.**    **DSH-Atascadero and DSH-Coalinga**

DSH-Atascadero continued to use the National Incident Management System (NIMS) and the Incident Command System (ICS) for emergency management. DSH-Atascadero's comprehensive performance improvement structure included quarterly hospital-wide emergency response drills for every shift. All DSH-Atascadero staff with patient contact received basic first

aid training.  Nursing and medical staff also received American Heart Association basic life support training.

DSH-Atascadero's suicide prevention process was within the standard of care.  The SPC met bi-monthly to review all suicides, serious suicide attempts, and aggregate self-harm data. There were no serious suicide attempts and no completed suicides at DSH-Atascadero for *Coleman* class members during the review period.  DSH-Atascadero psychologists received training on clinically effective suicide risk assessments.

DSH-Coalinga did not report any serious or significant suicide attempts, self-injuries, or deaths during the review period.  The institution's Enhanced Trigger Review Committee (ETRC) reviewed patient self-injuries, suicide threats, aggressive acts, and other incidents that required patient placement on one-to-one observation or other types of precautions.

### 2.    DSH-Salinas Valley and DSH-Vacaville

DSH-Salinas Valley's SPC met monthly, while the PRC reviewed critical incidents. DSH-Salinas Valley also had a death review process.

DSH-Vacaville's Mortality Interdisciplinary Review Committee (MIRC) remained active, with ten distinct workgroups.  Addressed issues included incorporation of a cultural risk formulation as part of the suicide risk assessment and establishment of a SPC.  There were directives regarding suicide prevention training and DSH-Vacaville had an adequate death review process.

### 3.    CIW-PIP

There were no suicides at CIW-PIP during the review period.  Log review revealed six instances of inmate self-mutilation, 12 suicide attempts, and four inmate deaths while in custody. The EERC met monthly; minutes indicated the completion of emergency response drills.

## I.    END-OF-SHIFT REPORTS

### 1.    DSH-Atascadero

Observation of a shift change meeting at DSH-Atascadero revealed a collegial atmosphere, participant input, and review of what appeared to be pertinent information concerning each patient.  However, there did not appear to be clear guidelines or a format for what should be discussed. Many patients were reported as having "no issues."

### 2.    DSH-Salinas Valley and DSH-Vacaville

Observation of a 30-minute shift change meeting on DSH-Salinas Valley's Facility C5 revealed the nurse's review of each patient, but there did not appear to be guidelines or a particular format for patient discussion.  When there was patient discussion, there was minimal input from most participants, though some pertinent issues were addressed.  Observation of a shift change meeting in TC2 of DSH-Salinas Valley revealed patient clinical discussion.

At DSH-Vacaville, an observed end of shift meeting in the acute psychiatric program covered appropriate content, but all staff was not present.  The meeting was otherwise interactive and informative.  Observation of an end of shift meeting in the intermediate care program revealed discussion of all unit patients, including new admissions and upcoming discharges.  An observed end of shift report in the HCITC addressed each patient's condition and any changes to the patient during the shift.

### 3.    SQ-PIP

Observation at SQ-PIP revealed implementation of a formal interdisciplinary third watch end of shift staff briefing that was an improvement over the observed supervisory meeting during the prior site visit.  As reported in the December 2014 SQ-PIP Report, third watch custody staff had previously complained of being insufficiently informed without a briefing by the prior shift.

While policy required nursing staff to have shift change briefings, they were not required to occur among multiple disciplines.

## J.    *COLEMAN* POSTINGS

### 1.    DSH-Atascadero and DSH-Coalinga

A tour of all units at DSH-Atascadero that housed *Coleman* class patients revealed the presence of *Coleman* postings in all units.

Information as to *Coleman* postings at DSH-Coalinga was not provided.  Previously, the May 2014 DSH Report stated that DSH-Coalinga had ordered posters from CDCR detailing *Coleman* class members' rights and attorney-client information.

### 2.    DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton

*Coleman* postings were observed to be appropriately placed and easily accessible to class members at DSH-Salinas Valley and DSH-Vacaville.

During the June 2015 DSH-Stockton site visit, *Coleman* postings in both English and Spanish were found in both ATP and all three ITP units in areas easily accessible to *Coleman* class members.  *Coleman* posting information was also included in the orientation packets that were provided to new patients.

### 3.    CIW-PIP

The CIW-PIP reported that *Coleman* notices were posted on both the A/B and C/D wings.

## K.    LAUNDRY AND SUPPLY ISSUES

### 1.    DSH-Atascadero

At DSH-Atascadero, review of all housing units where *Coleman* class members were housed found the laundry and supply areas to be in good condition and well-stocked with clean clothing, linens, and blankets.  Patients were permitted to exchange clothing twice weekly or

more often when needed.  Supplies, including liquid soap, shampoo, toothpaste, deodorant, and toilet paper, were readily available.

### 2.    **DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton**

DSH-Salinas Valley had undertaken significant steps to remedy the laundry issues that were observed during prior site visits.  Previously, some clothing sent to Prison Industries Authority (PIA) at Avenal State Prison (ASP) through SVSP was not returned to DSH-Salinas Valley, while returned clothing was not consistently of the right size and same condition as what was sent there. DSH-Salinas Valley also had previously reported problems with the tracking and dispersing of adequate clean laundry, towels, and bed linens.  DSH-Salinas Valley had since established a system with PIA that used a direct clothing pick up process from DSH-Salinas Valley, eliminating the need for DSH-Salinas Valley laundry to be handled by SVSP inmate workers.  Interviewed staff and patients reported that the new process was working.  On the other hand, DSH-Salinas Valley patients on Facility C5 and TC2 complained about food quality and quantity.

At DSH-Vacaville, there were no reported issues with laundry, food, or supplies.

At DSH-Stockton, prior problems with laundry and supplies that were reported as having been resolved during the January 2015 site visit remained resolved as of the June 2015 site visit.

### 3.    **CIW-PIP and SQ-PIP**

CIW-PIP reported that prior problems with the return of laundry to patients had been resolved; no other supply problems were identified.  A CIW-PIP patient survey indicated that two thirds of patients reported that food quantities were typically adequate.

At SQ-PIP, no laundry or supply issues were reported following activation on October 1, 2014 through the May 2015 site visit.

L.     **VISITATION**

    1.  **DSH-Atascadero and DSH-Coalinga**

DSH-Atascadero pemitted visitation seven days weekly between 0815 and 1345 hours. *Coleman* class members were permitted contact visits unless there was an identified clinical, safety, or security issue.

    2.  **DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton**

Visitation at DSH-Salinas Valley required approval by the IDTT.  All DSH-Salinas Valley visits were non-contact and implemented by SVSP custodial staff; patients complained about the non-contact visitation policy.

DSH-Vacaville was in the process of revising its visitation policy for the acute care treatment program to permit contact visits.  However, the online visitor processing appointment scheduling system (VPASS) for the CMF did not allow for pre-scheduling of the visitation rooms used for DSH patients, creating crowding and delays on visiting days and sometimes resulting in visits not being completed.  At DSH-Vacaville, family visits in the HCITC were contact visits.

As of June 2015, DSH-Stockton had formally implemented a revised patient visitation policy to permit patient contact visits for both acute and intermediate care patients, based on the decision of the IDTT and ICC.

    3.  **CIW-PIP**

CIW-PIP had revised its policy on patient visitation and telephone use to ensure patients did not lose privileges they had before program admission.

**M.    LAW LIBRARY ACCESS**

1.  **DSH-Atascadero and DSH-Coalinga**

The DSH-Atascadero law library was open five days weekly and was accessible to *Coleman* class members.  Two available computers allowed access to multiple publications, reference materials, and case law.

DSH-Coalinga indicated that patients typically had access to the library for one-hour sessions three times weekly.

2.  **DSH-Salinas Valley, DSH-Vacaville, and DSH-Stockton**

DSH-Salinas Valley patients could access the law library electronically for two hours weekly unless the patient had an active case, when four weekly hours were allowed.

DSH-Vacaville did not report any problems with patient law library access.

As of the June 2015 DSH-Stockton site visit, the law library access policy had been updated to reflect computer availability and access to Lexis.

3.  **CIW-PIP**

At CIW-PIP, patient surveys did not indicate any concerns with law library access.

## CONCLUSION

The roller coaster of non-compliance regarding the utilization of DSH-Atascadero beds must cease and the predictable cycle of court intervention must be broken.  The barriers which the DSH defendants claim prevent the admission of *Coleman* class members into designated beds at DSH-Atascadero are not new and are recycled under a different name every few years.  If the CDCR and the DSH defendants do not demonstrate a reasonable expectation that they will adhere to their own sustainable remedies without repeated court intervention, they cannot reasonably anticipate an end to federal court oversight in the near future.

Given the history of both defendants' records concerning access to DSH inpatient treatment for CDCR inmates, it is time to evaluate the prospect of shifting responsibility of inpatient treatment at the three psychiatric programs - DSH Salinas Valley, DSH-Vacaville, and DSH-Stockton - to CDCR.  The concept is not entirely novel.  In December 2006, defendants submitted their mental health bed plan detailing their clear intention of CDCR assuming responsibility for the provision of all inpatient care:

> This plan proposes that the CDCR have no mental health bed capacity within DMH State Hospitals, and that the CDCR operate all the Acute and ICF beds proposed in this plan, including those beds currently operated by DMH within CDCR prisons.[37]

Based on a recommendation from the Special Master to provide greater details regarding the transfer of inpatient care from DSH to CDCR, defendants filed a supplemental bed plan in August 2007.  Subsequent to the filing of defendants' August 2007 Supplemental Report, the landscape changed drastically.  In February of 2008, the *Coleman, Plata, Perez* and *Armstrong* courts approved a construction agreement to build approximately 5,000 medical beds and 5,000 mental health beds. (ECF 2696).  These changes predicated the filing of yet another mental health bed plan in July of 2008 in which CDCR and DSH changed course and agreed that DSH would continue to provide all inpatient care for CDCR inmates.[38]

As recently as December 2015, defendants informed the plaintiffs and the Special Master that plans were again underway to transfer the provision of inpatient treatment for *Coleman* class members at the three psychiatric programs from DSH to CDCR, but not at the DSH hospitals, i.e. DSH-Atascadero and DSH-Coalinga.  As CDCR has demonstrated its ability to provide inpatient

---

[37] Mental Health Bed Plan, 2006 at 6.  The plan was sealed pursuant to court order. (ECF 2093).
[38] This bed plan was not filed with the Court.

treatment, albeit on a much smaller scale, in its operation of the CIW-PIP and SQ-PIP, it appears that this "lift and shift" should be explored and may well prove efficacious.

With regard to the problem of inadequate access to mental health inpatient mental health care at DSH programs for CDCR inmates, it is once again time to focus on keeping this problem solved for good.  This is not to minimize the progress that has been made since mid-2015; in a matter of a few months, the DSH defendants returned the 256 low-custody beds at DSH-Atascadero designated for *Coleman* class members to use for that purpose.  There is also now a new process for making sure that for patients' greater therapeutic benefit they are placed in their clinically and custodially least restrictive environments, plus a new MOU and associated policies to further bridge the gap between DSH inpatient care and CDCR inpatient care.  These are very positive developments, accomplished as the result of concentrated hard work by all concerned, in a short period of time.  The tensions of the past surrounding movement of CDCR patients into inpatient beds that were specifically designated for their needs must yield to a better working relationship between the DSH and CDCR defendants.  It is time to keep the way open between these patients and the treatment they must have.

Adequate clinical staffing is the *sine qua non* of successful delivery of mental health inpatient care.  The DSH defendants clearly recognize this conceptually, as reflected in their reports and plans submitted to the Court, and by their indications to the Special Master that they intend to utilize information and guidance on staffing gleaned from the CDCR defendants' staffing plan and from the Special Master's Twenty-Sixth Round Monitoring Report.  As a matter of general practice, hospitals have their own established staffing ratios, which they set according to their missions, characteristics of their patient populations, and the staff disciplines they employ, and as reported above, all DSH programs used designated clinician-to-patient ratios of

1:15 for admissions units and acute care and 1:35 for intermediate care. As reported above, DSH-Atascadero, DSH-Salinas Valley, and DSH-Vacaville were unable to satisfy these ratios, to the detriment of its patients. Conversely, staffing at CDCR's two inpatient programs, the CIW-PIP and the SQ-PIP, was very good overall.

When staffing vacancies cause ratios to be unsatisfied, delivery of treatment is affected and patients suffer. However, vacancies alone are not the only barrier to delivery of adequate care. Staffing plans themselves must be drawn so that, when implemented and with positions filled, they enable the inpatient programs to deliver adequate care. The DSH defendants' continued struggle with staffing their inpatient programs for CDCR inmates calls for a renewed focus on solving this problem.

As noted above, the DSH defendants' quality management function essentially consists of an assortment of seemingly *ad hoc* quantitatively-oriented data gathering practices. While well-intended, these quality management activities are limited in scope and effect. Findings at the DSH-run inpatient programs indicate that they are not helping DSH achieve ongoing improvements in the areas where deficiencies have been identified. The roadblock seems to be the limited functionality of the DSH defendants' existing quality management structure.

The DSH defendants would be well served by eschewing their quality management structure that is primarily quantitative, and adopting a quality *improvement* model, as the CDCR defendants have done. While this would be a significant undertaking, there is no need to "reinvent the wheel." CDCR has made substantial progress with its Continuous Quality Improvement Tool, which is about to be given a trial implementation at ten CDCR institutions in the upcoming Special Master's Twenty-Seventh Round of monitoring CDCR prisons. The Special Master believes that the DSH defendants could benefit greatly from the extensive study,

creativity, and adaptability exhibited by CDCR in bringing its CQIT to its present state of capabilities.

As discussed in detail above in Part II. C., "Patient Access to Treatment," all seven inpatient programs had differing systems of protocols under which patients were required to progress in order to access the full complement of treatment available to them and to gain basic privileges such as designated items of personal property. These levels were referred to variously as steps, stages, status, HAS, orientation and cuff status, and the like, depending on the program. Patients' progress through the levels was generally determined by their behavior rather than their clinical progress. If a patient was unsuccessful at progressing through the levels, his or her access to treatment and privileges remained limited, and in some cases, patients' behaviors could lead to downgrading of already-achieved levels and concomitant loss of privileges.

During the June 2015 site visit at DSH-Atascadero, DSH reported that there was a DSH-wide process to standardize the levels and associated terminology across all of the psychiatric programs. However, the Special Master's reviews of the inpatient programs found continued significant differences among the programs' use of levels, which led to very uneven care given to patients across the institutions. The differences were pervasive, affecting many integral aspects of the patients' lives while in treatment --patient orientation, number of Steps/Stages or other levels, requirements and timeframes for patient progression to the next Step/Stage or level and/or full access to treatment, patient privileges, property, and/or restrictions on patient movement, handcuffing, solo programming, and imposition of patient restrictions following behavioral problems and/or disciplinary infractions, among other things. These significant program differences created major unevenness of treatment and lack of continuity across the respective programs. Although, as stated above, DSH reported nearly one year ago that it had a process in

place to standardize the inpatient programs' level systems, the deep impact of these varying

systems on patients ability to receive treatment calls for more immediate action, such as a clear

plan to accomplish the standardization across programs.

In view of the foregoing, the Special Master recommends that the *Coleman* court enter an

order directing the following:

1. The CDCR and DSH defendants and the *Coleman* plaintiffs shall, under the guidance of the Special Master, participate in a meet-and-confer process to convene at intervals of no less than 60 days to track and ensure appropriate inpatient mental health bed utilization that is compliant with all applicable court orders, in both the DSH inpatient mental health programs and the CDCR inpatient programs which treat *Coleman* class members.

2. The DSH defendants shall continue to work on their staffing plan for their inpatient programs which treat *Coleman* class members. The plan should developed coordinately with CDCR's development of its own mental health staffing plan, and within the context of the same meet-and-confer process with the *Coleman* parties, under the guidance of the Special Master. Due to the urgency of the long-standing mental health staffing issues, the DSH defendants shall provide the Special Master with monthly updates on their implementation of their staffing plan so it may be tracked and monitored by the Special Master.

3. Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, the DSH defendants shall develop a plan within 90 days for the creation of a continuous quality improvement process to be utilized in the DSH inpatient programs which treat *Coleman* class members. The DSH defendants shall utilize CDCR as its consultant in this endeavor, availing themselves of the expertise and strategies developed by CDCR staff and the progress achieved thus far by CDCR in its development its own CQI process.[39]

---

[39] In plaintiffs' response to the draft version of this report, they requested that the Special Master's Recommendation No. 3 specify that the DSH defendants' quality improvement program "must include metrics regarding the criticial deficiencies in treatment offerings identified in the draft report," with specific regard to prioritizing the identification and remediation of deficiencies in group treatment hours and lack of individual treatment opportunities. While the DSH defendants are free to take this request from plaintiffs under advisement, the Special Master believes that the identification of necessary metrics may be addressed within the process of developing the recommended plan and the ensuing CQI process. At this time, any order of the Court directing the the DSH defendants to develop the plan need not specify itemized metrics or deficiencies to be addressed within the recommended plan or the DSH quality improvement program. The Special Master does wish to clarify that he recommends that the plan for the creation of a DSH continuous quality improvement process be developed under his guidance and supervision, with input from the *Coleman* plaintiffs as appropriate.

4.   The DSH defendants shall develop within 90 days a plan for the creation of a consistent and uniform patient level system to be utilized across all of its inpatient programs which treat *Coleman* class members. There shall be a system for use across all acute care inpatient programs, and a system for use across all intermediate inpatient care programs.


Respectfully submitted,




_____
Matthew A. Lopes, Jr., Esq.
Special Master


May 25, 2016

<u>APPENDIX A1</u>
DSH-Atascadero

**DSH-Atascadero**
January 13, 2015 – January 15, 2015
June 22, 2015 – June 25, 2015

## I.  SUMMARY OF THE FINDINGS

- **The functional vacancy rate for psychiatrists was 37 percent at the time of the June 2015 site visit.**

- **Registered nursing had a 33-percent functional vacancy rate.**

- **DSH-Atascadero failed to consistently meet staffing ratios in its intermediate care programs.**

- **At the time of the June site visit, non-*Coleman* class members comprised 41 percent of patients housed in the unit designated for them, which affected the therapeutic milieu and heightened workloads for clinical staff.**

- **Discussions related to patients' stages, symptoms, and change in symptoms were not consistent across observed IDTTs.**

- **In several reviewed treatment plans, objectives and progress toward goals were not clearly stated, and barriers to group attendance were not routinely discussed or documented.**

- **Behavioral therapy-based treatment plans were used minimally at DSH-Atascadero and not available to all patients for which they were clinically indicated.**

- **DSH-Atascadero did not audit IDTTs for meeting any standards.**

- **Individualized clinical notes were not prevalent in reviewed charts.**

- **DSH-Atascadero continued to utilize a Level system, with access, property, and privileges not contingent on patients' Levels.**

- **DSH-Atascadero made timely decisions to accept referrals.**

- **DSH-Atascadero staff reported that many referrals did not include behaviorally-anchored outcome measures.**

- **DSH-Atascadero staff reported that it was difficult to make contact with CDCR's institutional DSH coordinators and correctional counselors.**

- **DSH-Atascadero characterized discharge planning as "burdensome" due to the treatment needs of MDO patients.**

121

- **For patients discharging back to CDCR prisons, the absence of consistent clinician-to-clinician contact affected continuity of care.**

- **End-of-shift meetings occurred with good discussions, but they did not routinely cover patients' existing symptoms, functioning, or treatment progress.**

For a summary of the history of access to inpatient care for *Coleman* class members at DSH-Atascadero, the reader is directed to Part I of this report, above.

## II.    CENSUS

The patient census on June 23, 2015 was 1,079.  DSH-Atascadero reported 156 CDCR patients who were at the institution pursuant to California Penal Code (PC) commitment number 2684 ("*Coleman* class member patients or *Coleman* class members").  *Coleman* class member patients were typically housed in Program V and DSH-Atascadero allocated 256 beds to this program by Order of the Court.  Program V consisted of an acute care admissions unit (Unit 13) and five intermediate care facility treatment units (Units 2/3, 31, 32, 33, and 34).

The remaining patients housed at DSH-Atascadero were there pursuant to other California Penal Codes.  These patients included those not guilty by reason of insanity (PC 1026), MDOs (PC 2962), patients who were incompetent to stand trial (PC 1370), and civil commitments (PC 2972).

Of the 156 *Coleman* class members housed at DSH-Atascadero on June 23, 2015, 145 or 93 percent were in Program V.  Six *Coleman* class members were housed in admissions units within Programs III and VI; two class members were housed in the infirmary within Program VI; and the remaining 145 were housed in one of Program V's five intermediate care treatment units. DSH-Atascadero staff reported that housing of the *Coleman* class members in the admissions units and not Program V was due to lack of bed availability.

At the time of the June site visit, the average length of stay for *Coleman* class members

housed in DSH-Atascadero during the review period ranged from 424 days to 456 days. The average length of stay at discharge for the same period of time ranged from 397 days to 451 days.

In addition to housing 145 *Coleman* class member patients, Program V also housed 101 non-*Coleman* class members, for a total of 246 patients. At the time of the site visit, non-*Coleman* class members comprised 41 percent of Program V's patients housed in the unit designated for the *Coleman* class.

There were no *Coleman* class member patients placed in administrative isolation.

## III.    STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

Permanent staff filled three of DSH-Atascadero's five executive positions: executive director, medical director and nurse administrator; the other two executive positions of clinical administrator and hospital administrator had been filled in an acting capacity since January – February 2015. Positions for DSH-Atascadero's chief psychologist, chief social worker, and chief rehabilitation therapist were all also filled with permanent employees. Permanent staff also filled Program V's three management positions of program director, program assistant, and nursing coordinator.

DSH-Atascadero's staffing per discipline was as follows:

Psychiatrists:  The senior psychiatrist position became vacant in 2011, and staff advised that it was unlikely to be filled due to salary issues. There were 9.5 FTE staff psychiatrist positions established of which 6.5 were vacant, for a 68 percent vacancy rate. Three contractors covered vacant psychiatrist positions, reducing the functional vacancy rate for staff psychiatry to 37 percent. Two of the three were long-term contractors and had been working at DSH-

Atascadero since 2008 and 2011.

In a meeting with Program V's four psychiatrists, they reported that morale among psychiatrists remained good, but that staffing allocations related to patient workloads nonetheless remained problematic, especially in the admissions unit and during vacations or sick time by other psychiatrists. Psychiatrists also indicated that, due to other workload requirements, treatment planning efforts documentation was not among their highest priorities.

Physicians and Surgeons: Both physician/surgeon positions were filled.

Psychologists: The senior psychologist position was filled. Of eight allocated psychology positions, seven positions were filled and one was vacant, for a 12.5 percent vacancy rate. One psychologist was unlicensed.

Social Workers: The 0.6 supervising social worker position had been filled in May 2015. Seven of the eight allocated social worker positions were filled for a 12.5 percent vacancy rate. One social worker was unlicensed.

Rehabilitation Therapists: The 0.8 supervising rehabilitation therapist position was filled, as were seven of eight rehabilitation therapist positions, for a 12.5 percent vacancy rate. Two rehabilitation therapists were unlicensed.

RNs: One of the RN positions was a RN shift leader. Of 48 RN positions, 36 were filled, for a 25 percent vacancy rate. Another four RN positions were functionally vacant, vacant due to acting in a supervisory position, or out of count due to injury, illness, or special assignment, resulting in a functional vacancy rate of 33 percent.

Senior Psych Techs: Of the 17 senior psych tech positions, three were vacant, leaving a vacancy rate of 18 percent.

Psych Techs:  Of 105 psych tech positions, four were vacant, leaving a four-percent vacancy rate; another eight psych tech positions were functionally vacant, resulting in an 11-percent functional vacancy rate.  Three additional psych techs were pre-licensed.

Unit Supervisors:  There was one unit supervisor vacancy for each of Program V's six units.

Other:  One of the two positions for health service specialists was filled.

Correctional Staff:  DSH-Atascadero did not use CDCR correctional officers, but employed Department of Police Services (DPS) staff to provide security.  The DPS chief reported directly to the hospital administrator, and was under the supervision of both DSH and DSH-Atascadero.

Non-Program V Staff:

It should also be noted that excluding and apart from Program V, DSH-Atascadero had significant staffing vacancies.  Overall, as of June 29, 2015, of 996.8 allocated clinical positions, (excluding Program V) there were 137.9 vacancies, for a 14 percent vacancy rate.  A total of 9.8 contractors reduced the number of vacancies to 128.1, resulting in a functional vacancy rate of 13 percent.

Staff reported that there were no plans at present to increase the staffing allocations at DSH-Atascadero.

## 2.      Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

 DSH-Atascadero designated clinician to patient ratios were 1:15 for the acute care and admissions units and 1:35 for intermediate care treatment units.  These ratios covered psychiatrists, psychologists, social workers and rehabilitation therapists.  In practice, in several units, these ratios were not generally followed.  DSH-Atascadero assigned one of each clinical

discipline per treatment unit even if the census exceeded 35 patients. For the 30 bed admissions unit (Unit 13), 2.0 FTE psychologists, 2.0 FTE rehabilitation therapists and 2.0 FTE social workers were assigned with 1.0 FTE psychiatrist, meeting the clinician to patient ratio of 1:15 except for the psychiatrist which was 1:30.

The capacities of intermediate care treatment Units 2 and 3 was 42 patients, and Units 31, 32, 33, and 34 each had a capacity of 46 patients, creating a clinician-to-patient ratio range of 1:42 to 1:46 when these units reached capacity. During the June site visit, it was reported that for two months during the review period one unit reached a clinical ratio of 1:54 due to a social worker vacancy.

DSH-Atascadero did not consistently meet its staffing allocations for Program V of a 1:35 ratio for intermediate care units and the 1:15 ratio for the admissions unit. This failure negatively impacted the treatment services offered to *Coleman* class member patients in the following ways: decreased access to scheduled structured therapeutic activities; decreased access to individual therapy; and decreased discharge planning services.

Staff reported that the above problems were exacerbated by the mixing of the MDO and *Coleman* class member patient populations due to the different clinical dynamics and needs of these two populations.

Data for psych tech and nursing-to-patient ratios was reviewed. Nursing staffing was based on the DSH Nursing Acuity Database. Leadership staff reported that nursing staffing was compliant with the required levels based on this database.

### 3.    Staff Training

DSH-Atascadero employees were separated into 16 categories for staff training purposes. Each employee category was required to attend specific new employee orientation classes upon

beginning employment at DSH-Atascadero, and to take particular review courses at stated intervals following initiation of DSH-Atascadero employment; some of these review courses had to be taken annually, while others were to be taken every two or three years. Staff training at DSH-Atascadero covered multiple topics, but not all employees were required to attend training for all topics. For example, administrative services staff was not required to attend CPR, First Aid, Pain Management or Suicide Prevention, but nursing services and clinical services staff were required to attend those classes.

A review of DSH-Atascadero's quarterly training reports for January, February and March 2015 indicated an increase in non-compliance from the previous quarter. Specifically, central medical services (CMS), which included nurse practitioners, physicians, RNs, senior registered nurses (SRN), dentists, and x-ray technicians, did not meet the 90 percent training threshold for eight of the 12 training topics required for them during the quarter. Non-compliance fell below the 90 percent standard by a range of two to eight percent.

Training topics for CMS staff included, Cultural Awareness, First Aid, Infection Control, Med Certification, Patient's Rights, Pain Management, Mandatory Reporting of Abuse and Fire Life and General Safety.

Contract psychiatrists were 33-percent compliant for Therapeutic Strategies and Interventions Training (TSI).

Administrative services, nursing services and clinical services staff all met the 90 percent training threshold in their required 12 training topic areas for the quarter.

**IV.    TREATMENT AND CLINICAL SERVICES**

     **1.      IDTTs**

During the June site visit, several IDTT meetings were observed.   On Unit 33, IDTTs for four patients were observed.  The IDTTs were brief and lasted about 40 minutes.  Some of the IDTTs were identified as a quarterly team meeting, others were classified as monthly meetings. The psychiatrist was out sick and not present; the social worker arrived late, disrupting the team meeting for one patient.  Staff did not introduce themselves or their roles to the patient nor did they explain the role of the treatment team meeting.

Similar to observations made during the January site visit, the treatment team had a reasonable interdisciplinary discussion, prior to the patient's arrival.  The psychologist led the IDTT meeting and discussed aspects of the patient's treatment plan with him; however, there was minimal participation from other team members in the presence of the patient.  Consistent with observations made during the January site visit, an OT projected the current treatment plan on a projection screen and made small additions to it during the meeting.  Treatment team members did not discuss the changes.  At times the OT interjected, which did not seem appropriate, as this was a clinical meeting.  The revised treatment plan was actually little changed from prior treatment plans and did not clearly reflect any changes in the patient's clinical course or treatment plan.

In some reviewed treatment plans, while the "Foci of the Hospitalization" was listed, clear objectives and progress toward goals were not routinely discussed or documented.  This was consistent across patient records reviewed during the June site visit.  Group participation was identified by percentage of attendance, but for patients with less than 90-percent attendance barriers to attendance were not discussed.  Overall, the pre-treatment team discussion and the discussion with the patient was lacking consistent discussion of the patient's stage, symptoms,

and change in symptoms.  At the end of IDTT, each patient was given an appointment card for their next IDTT meeting, which the monitor noted as a positive occurrence.

Patients' monthly IDTT treatment planning meetings on Unit 2 were also observed.  In attendance was psychiatry, rehabilitation therapy, psychology, social work and nursing, (i.e., psych tech).  Staff did not introduce themselves or their roles to the patient nor did they explain the role of the treatment team meeting.  The psychiatrist led the pre-treatment team discussion and IDTT with minimal input from the other staff.  The psychiatrist indicated he was under a time crunch due to a court appointment for another patient and the meeting seemed rushed.  Additionally, he had to leave during the second patient's IDTT which exacerbated that patient's symptomatology.  After the psychiatrist left, team interaction improved.  The psych tech was the designated recorder and typed information into the treatment plan.

Staff discussion prior to patients' arrival was limited and appeared to be more of an update from the psychiatrists' perspective.  During IDTT, patients were asked questions about their current symptoms and program participation.  However, there was limited discussion concerning treatment goals and objectives or patients' progress toward meeting them.

Neither IDTT observed routinely discussed the patient's HAS Level.

DSH-Atascadero reported that it did not conduct performance audits of IDTTs.  It was reported that a statewide audit for this purpose was under development.

An IDTT for treatment planning for four patients was observed on Unit 31.  All of the appropriate clinicians were in attendance.  The team discussed with each patient their current participation in groups and a general overview of other groups they could attend in the near future.  Formal treatment planning occurred once every three months, although the team had

129

chosen to meet with every patient on a monthly basis. The monthly meetings were more of a check-in in contrast to a formal treatment plan review.

Team members were familiar with each patient.  The treatment plan was not provided to the patient.

A monthly review and quarterly treatment planning process on Unit 34 was observed.  A copy of the treatment plan was provided to patients who were receiving a quarterly treatment plan review.  Reasonable interdisciplinary discussion occurred among the team members prior to interviewing the patient.  The psychiatrist could not attend this meeting since she was covering for another unit and had to do a stat and unexpected discharge summary for a MDO patient.

While the observed treatment plan process was adequate, there was room for significant improvement.  The discussion of the treatment plan with the patient was fairly minimal.

## 2.    Group Therapy

Treatment at DSH-Atascadero continued to be delivered primarily through group format, which was supplemented by individual therapy as staffing allocations allowed.  The treatment model continued to use core and centralized groups.

Program V patients were offered, on average, 5.9 hours of scheduled structured therapeutic activities per week per patient and actually received, on average, 4.99 hours per week.  Prior to a 50-percent reduction in clinical staffing allocations several years ago, patients were offered about 12 hours per week of scheduled structured therapeutic activities per week per patient.

When the average 5.9 hours of scheduled structured therapeutic activities per week was combined with work hours and "unscheduled" programming hours such as Alcoholics Anonymous and movies, patients on average were offered 17.44 hours per week.  About 28

130

percent of all *Coleman* class member patients had job assignments that involved more than five hours per week.

Core groups were those run by members of the patient's treatment team on his treatment unit. During a meeting with clinical staff, it was reported that patients in groups had a range of functioning, which could make the group difficult to facilitate at times. Centralized groups were open to all patients at the facility and were facilitated by a variety of hospital staff. These groups were held in centralized areas such as the treatment mall, music center, gymnasium, and outdoor courtyards.

One core group that was repeatedly observed on the treatment plan as an intervention for patients was the "Sponsor Group," although it was not listed on the DSH-Atascadero pamphlet provided for review, which provided descriptions of core and centralized groups.

A review of the group schedule provided during the June site visit yielded a very active group program. Each day, two to six groups were scheduled on each of the five units that housed *Coleman* class member patients. Centralized groups were available more frequently, with a range of 61 to 65 groups a day.

A DBT group was observed, which was excellent. It was clear that the two facilitators had DBT training and were utilizing the training. The group began with a mindfulness exercise and reviewed each patient's diary card. Group leaders were knowledgeable, supportive, validating and empathic. A workbook was used that patients read from during the group and discussed the content. The one observed area in need of improvement was increased interaction between group members.

During a meeting with clinical staff, it was reported that staff were told what groups to facilitate, an area of concern for staff since the assigned group may not be a topic that the

clinician had training in.  This was confirmed during record reviews in which it was evident that a social worker was facilitating a Healthy Living group that focused on stretching and walking.

Consistent with prior assessments, the quality of the treatment offered to patients was generally good and not problematic.  However, due to staffing allocations, the number of hours of structured programming was not adequate and appeared to be similar to an EOP level of mental health care in the prisons rather than an inpatient intermediate care level.

### 3.    Individual Treatment

Data received from institution staff during the June site visit indicated that during the review period about 50 percent of *Coleman* class members received some form of individual counseling that averaged almost 30 minutes in duration.  Provided data showed that 103 patients had a total of 356 individual counseling sessions during the review period.

Staff reported that the need for individual treatment was determined by the psychologist during IDTT.  A referral to, or present involvement in individual therapy, was not discussed in any of the IDTTs that were attended and observed during the site visit.  Staff estimated that less than 25 percent of patients received individual psychotherapy/counseling due to workload issues in contrast to clinical need.  Staff further reported their impression that DSH-Atascadero's cultural mindset was that it was more efficient to facilitate groups.  According to staff, because new staff were in need of individual therapy hours for academic and licensing purposes, this could result in an incremental increase in the provision of individual treatment.

### 4.    Other Treatment Issues

The vast majority of the non-*Coleman* class members housed in Program V were MDOs (PC 2962) patients.  It was observed and staff confirmed that the large number of the non-*Coleman* patients within Program V had impacted the therapeutic milieu of the program.  Staff

also reported heightened workload issues for clinical staff due to the significant differences in requirements between MDO patients and *Coleman* class member patients.

Program V's psychologists, social workers and rehabilitation therapists reported significant milieu and workload issues related to the mixing of *Coleman* class members on units that also housed MDO patients. Staff stated that MDO patients required more staff time than *Coleman* class member patients for several reasons, including not wanting to be there and often being more difficult to treat. The increasing numbers of MDOs on the units that also treated *Coleman* class members meant more staff time was being diverted from *Coleman* class member patients.

It was observed that in order to minimize these issues, Program V may require reconfiguration to have at least several units that only housed *Coleman* patients.

A.    **Treatment Plans and Treatment Planning Meetings**

At the time of the January site visit, both outside reviews and previous *Coleman* site visits had recognized DSH-Atascadero treatment plans as being problematic. During the January site visit, DSH-Atascadero leadership reported that it had undertaken efforts to improve treatment planning and documentation. It was further reported that more focused efforts were awaiting direction from headquarters regarding DSH-wide treatment planning initiatives and development of an electronic medical record. This was confirmed by the monitor's meeting with the staff member leading the group related to treatment planning.

DSH-Atascadero's efforts were spearheaded by the Treatment Planning Performance Improvement team. A review of this group's minutes during the January site visit revealed that it had met on three occasions during the review period. Addressed issues included the advisability of writing treatment plans in language that was understandable and meaningful to

patients, confusion regarding treatment plans' intended audience, the continued relevance of objectives by substance abuse staff, and the inclusion of physical, occupational, and speech therapy information and progress. It was reported that units varied regarding their practice of finalizing or completing treatment plans following patient discharge.

During the June site visit, treatment plans reviewed in multiple charts lacked clear documentation of treatment goals, objectives and progress toward goals, particularly as they related to discharge planning. Several staff indicated that the treatment plan was secondary in their priority, and did not actually direct treatment at DSH-Atascadero. At DSH-Atascadero, specific groups were identified as treatment interventions. Documentation of contact with the psychiatrist, social worker and psychologist, while they typically occurred monthly were not listed as treatment interventions on any of the treatment plans reviewed, while group assignments were designated as the treatment intervention in all cases reviewed. Routine documentation of the patient's HAS Level was not completed in reviewed charts.

At the time of the January site visit, staff reported that behavioral therapy-based treatment plans were almost nonexistent at DSH-Atascadero, although they might be clinically indicated for more patients. During the June site visit, the behavioral plan log indicated that there were five active behavioral therapy-based treatment plans during the review period.

An interview with staff confirmed observations of inadequate behavior management plans found in the charts. Staff agreed with the observation that existing plans were not collaborative, had too many targeted behaviors and incentives to assist with behavior change were lacking. Staff reported that a full day of training on development and implementation of behavior plans occurred in April 2015 to address quality of behavior plans.

134

Staff attributed the low number of behavioral management plans and inadequate quality of existing behavior management plans to staff shortage, a need for more staff training, and the need for more salient incentives responsive to positive patient behaviors.  In addition, although a senior specialist was available for consultation, it appeared that it might be helpful to the quality of care for senior supervisors to review the plans to ensure they were meeting the desired objectives.

### B.    **Clinical Documentation**

Chart reviews demonstrated a prevalent lack of individualized clinical notes.  Many appeared to be templates from previous contacts with minimal changes to the note.  Psychiatric providers reported that the note was "re-generated" from the previous monthly contact.  It was reported that policy dictated that psychiatric staff meet with patients on a quarterly basis, but local practice was to see patients monthly.  Staff discussion and chart reviews showed that monthly clinical contact notes often coincided with monthly treatment team meetings, and in these cases, there did not appear to be other contacts between monthly meetings.

### C.    **Yard**

DSH-Atascadero reported that effective April 20, 2015, Program V patients were offered a minimum of one hour of courtyard time during the AM/PM shifts and that the nursing coordinator monitored a unit daybook that tracked access to the courtyard.

Each unit had courtyard times posted.  Access to the main courtyard was offered Saturday and Sunday to all DSH-Atascadero patients including *Coleman* patients at HAS Level 3 and above.  Unit staff did not record in the daybook the time the main courtyard was open/closed, or the number of patients who attended the main courtyard.  If a patient went to the main courtyard, it was recorded on the patients "destination card".

Courtyard access had improved since the January site visit, as well as the documentation of yard being offered in each unit's daybook.  A sample of entries in a unit's daybook was reviewed to determine when courtyard times were offered, duration and number of patients participating, if recorded.  For the five weeks or 35 days reviewed, one hour or more of yard time was documented as being offered for 31 out of 35 days.

### D.    ETU

DSH-Atascadero reported that it continued to operate an ETU, but that no *Coleman* class member had ever been placed in the ETU.

## V.    PATIENT ORIENTATION, STAGING AND CUFF STATUS

DSH-Atascadero reported that the orientation process remained unchanged.  *Coleman* class member patients arriving at DSH-Atascadero from CDCR prisons remained in cuffs until seen by nursing staff, which occurred shortly after their arrival.  Patients' handcuffs were subsequently removed and they then proceeded with the admissions process, which typically took from 45 to 90 days.  Living quarters were single rooms with doors that were not locked.

The transfer desk coordinated transfers of patients to another unit from admissions based on a waitlist for *Coleman* class member patients and bed availability for that patient's needs (e.g., may need a downstairs unit due to medical needs).  While 90 days was the maximum allowed stay on Unit 13 (the admissions unit), some patients stayed past 90 days contingent on bed availability in the intermediate care units.

Staff reported an apparent dissonance regarding clinical judgment related to patient movement from the admissions unit.  Psychiatric staff reported that since the January site visit, psychiatric consult was no longer an option prior to discharge from the admissions unit; however, admissions staff reported that any clinical staff, including a psychiatrist, may provide

clinical judgment in cases where a patient was assessed as not being stable enough to transfer out of admissions.

HAS

DSH-Atascadero continued to monitor and regulate patient movement through the HAS, which allowed patient advancement through five distinct access levels.  The level determined where the patient could go in the hospital and the level of supervision needed. Change in level was a team decision.  According to policy, while a patient's level could be demoted due to inappropriate behavior, it should not be punitive in nature.

New patients were admitted to Level 1, where they remained for at least seven days. Level 1 was assigned when patients were deemed a high risk for violence, escape, self-harm, criminal activity and/or when a patient's mental illness impaired their ability to adequately care for themselves.  These patients needed a staff escort when leaving their assigned unit.  Level 2 was assigned to patients who could adhere to unit rules but needed supervision when off their unit.  Patients on Levels 1 and 2 were not allowed to go to canteen, but could access canteen via "store orders."  Level 2 patients could not go to the movies or main courtyard without an escort; the gym during free time; or activities that required a "leisure referral."  Level 3 was assigned to patients who have consistently maintained appropriate behavior; after 90 days the patient could be advanced to Level 4.

Patients on Levels 3 through 5 could access any area listed on the approved hospital destination list, which included many areas throughout the hospital.  Level 5 was assigned to patients who had been recommended for placement in the community.  These patients were allowed additional privileges, such as late nights, priority consideration for vocational assignments and jobs and monthly free breakfast furnished by canteen.

137

Unlike other DSH facilities providing inpatient care to members of the *Coleman* class, access to property and privileges (quarterly/annual package, patient funds, and canteen) was not contingent on the patient's level at DSH-Atascadero.

## VI.    REFERRALS AND TRANSFERS

During the review period of January through May 2015, CDCR referred a total of 88 *Coleman* class member patients to DSH-Atascadero for intermediate level of care treatment. DSH-Atascadero met the Program Guide requirement in 71 of 88 or 81 percent of the cases for timely decisions regarding acceptance or rejection.  This was a decrease since the preceding review period when DSH-Atascadero was at 90 percent for timely decisions in this respect.  For referrals that were not decided within three days, timeframes ranged from four to 27 days.  DSH-Atascadero ultimately accepted 50 of the 88 *Coleman* class member patients referred to the institution or 57 percent; 29 referrals or 33 percent were accepted for placement at other DSH facilities.  CDCR rescinded eight referrals; and one referral was rejected.

Analysis of compliance with the 30-day DSH transfer timeframe for the 50 *Coleman* class member patients that were transferred to DSH-Atascadero was completed based on the period of time between the "referral date" and the "date of admission" to DSH-Atascadero.  The result was 49 of 50 or 98 percent of the *Coleman* class member patients were transferred to DSH-Atascadero within the required Program Guide timeframe.  This was a significant improvement since the preceding review period when the transfer timeframe was met just eight percent of the time.  The one patient not transferred within 30 days was admitted to DSH-Atascadero on day 33.  The average length of time from referral to admission at DSH-Atascadero was 13 days, ranging from two to 33 days.

At the time of the January site visit, mental health leadership at DSH-Atascadero indicated ongoing problems with the consistency of CDCR referral paperwork. It was reported that referral paperwork often directed DSH-Atascadero staff to the *Coleman* class member patient's CDCR eUHR, but DSH-Atascadero staff lacked access to this system. During the June site visit, mental health admissions staff reported that the quality of the referral paperwork from CDCR had improved since the January site visit, describing the quality of the paperwork as "sufficient." However, clinical staff also reported that they did not notice any change in information received from CDCR. ASH's clinical staff further reported that CDCR's DSH coordinators and correctional counselors did not respond to attempts to contact them.

Leadership staff reported that select DSH-Atascadero forensics staff had access to the CDCR eUHR, an improvement since the January site visit. Staff noted that access to the eUHR by DSH-Atascadero clinical staff would be beneficial; however, access to the eUHR was determined by CDCR and approval was limited. Clinical staff indicated that the admission packets did not include patients' legal history (police report, arrest record), which would improve the accuracy of the risk assessment. In the absence of this data, staff relied on collateral data provided by family and the patient's self-report.

In an improvement since the January site visit, staff reported that patients who were within days of parole were generally not referred to DSH-Atascadero by CDCR. Another area of improvement was that referrals were not initiated solely based on failure to attend 50 percent of groups (although this may be identified as a factor for referral).

Staff further reported that referral reasons submitted by CDCR were generally "vague," and that 100 percent of CDCR referrals were for "coping skills." At times, referral reasons were considered inappropriate, such as "eliminate dishonest thinking." DSH-Atascadero staff reported

that it would be beneficial for referrals to include behaviorally anchored outcome measures. It was reported that referrals did not include symptoms to support diagnoses and had included patients with deferred diagnoses despite a period of time in treatment that would warrant a diagnosis.

Another issue underlined by DSH-Atascadero staff was the frequent use of "not otherwise specified" (NOS) as a diagnostic specifier. Staff also reported that there was only a limited amount of clinical documentation provided (e.g. two clinical notes for approximately 50 percent of the cases) and that MHCB documentation was not routinely included in the package.

According to DSH-Atascadero staff, contradictory documentation had also been provided in some cases. Lastly, DSH-Atascadero staff indicated that from their point of view, a referral to DSH-Atascadero for 'pain management' was inappropriate. However, upon review of the group schedule at DSH-Atascadero, it was observed that there was a group entitled, "Pain Management through Music Therapy." Further, it was noted that cognitive-behavioral therapy and many of the skills learned in DBT (modalities offered at DSH-Atascadero) could be applied to pain management. It was unclear why the reporting staff held this point of view, and it was not verified whether this was endorsed by supervisory or administrative staff at DSH-Atascadero.

DSH-Atascadero staff further reported that it was their perception that in the absence of a MOU between the CDCR and DSH, CDCR staff used Program Guide standards as the basis for referrals. It was the view of staff that the lack of an MOU had the potential for tension between the departments, and could result in staff on both sides making up rules and processes as they deemed necessary regarding the referral and transfer of patients to the inpatient program.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Admissions

DSH-Atascadero admission requests were uploaded to SharePoint.  Referral packets were then printed and typically reviewed within one to two days.  A decision to accept or reject the patient was then made, if not, a PRC was requested to obtain additional information or clarification regarding the patient.  The PRC was composed of staff from the referring institution and from CDCR and DSH headquarters, including HCPOP staff.  The PRC was not a formal process, but was created to effectively communicate patients' needs and to determine the best placement for him.  Mental health staff reported that the lack of a MOU between CDCR and DSH was one of the reasons for the creation of the informal PRC process.

It was reported that multiple referral packets were sometimes received late Friday afternoon, an area of concern for staff at DSH-Atascadero because of the burdens imposed on staff.

DSH-Atascadero staff reported that rejections were rare, which was affirmed by the data.  Staff pointed out the difficulty with admitting patients with co-morbid medical issues.  When such patients were admitted to DSH-Atascadero, they were referred to an outside medical hospital and/or remained on the infirmary at DSH-Atascadero, and thus, were not able to benefit from the mental health care available at DSH-Atascadero.  DSH-Atascadero staff also noted that for referrals for grave disability, where they assessed the patient as needing psychiatric medications, they did not usually have sufficient data to pursue a PC 2602, but accepted these patients on the condition that CDCR pursue the PC 2602, which resulted in a delay in admissions in some cases.

## 2.    Discharges

During the June site visit, based on information obtained from staff, it appeared that as a result of the workload issues, *Coleman* class member patient discharge planning efforts had

become more burdensome.  Staff reported that discharge planning had particularly decreased related to the mixing of these patient populations.

Staff also reported significant problems in receiving information from CDCR which impacted discharges, especially regarding legal history, and CDCR's DSH coordinators reportedly not responding to phone calls and emails from DSH-Atascadero staff.

3.    **Parole Planning**

a.    Discharge Planning for Parolees

When it was anticipated that a patient was up for parole, the patient was transferred to CMC.  While there, CMC staff was responsible for assisting the patient with housing and mental health aftercare needs.  DSH-Atascadero staff reported that it was their view that it would be more beneficial to patients if CMC staff could meet with the patient at DSH-Atascadero to complete these tasks, reasoning that if it were feasible, the patient would not need to be transferred to CDCR prior to parole.  DSH-Atascadero staff maintained their preference that CMC staff complete aftercare planning because CMC staff were "the experts" for patients going out on parole.

Staff noted that discharge to the community was an anxiety provoking time for the patients and could elevate risk and/or psychiatric decompensation.  DSH-Atascadero staff indicated a concern that a return to CMC, a facility significantly different from DSH-Atascadero, and for some patients, an unknown entity, could exacerbate distress.  They stated that the current system of returning patients to CMC for discharge planning was problematic and disrupted the continuity of care at a critical juncture.  It was observed that this presented issues for resolution by the two departments.

142

b.     Discharge Planning for Patients Returned to CDCR

Examination of discharge planning documentation during the June site visit indicated a number of issues requiring attention.  Chart reviews indicated that there was not routine consistency between the treatment outcome expectations and the patient's mental status upon discharge.  For example, for one patient, the treatment outcome expectations were to reduce hallucinations to a degree he could tolerate and improve depressive symptoms.  Progress toward this expectation was not clear in treatment plans that were completed close to discharge or in the discharge summary.  Another example was a patient who was admitted for auditory hallucinations to kill himself.  During his hospitalization he made a statement that he would kill himself if returned to Wasco State Prison (WSP).  Since staff reported that they were unsure where patients would be discharged to, the completion of a suicide risk assessment was clinically indicated.  The last risk assessment for this patient was completed three months prior to discharge.

Continuity of care and clinician-to-clinician contact were also observed to be areas in need of improvement for patients being discharged to CDCR (this did not include patients who were discharged to CMC for parole planning).  DSH-Atascadero staff reported that a recommended continuity care plan (RCCP), which included a discharge summary was sent to CDCR to alert them that the patient would be discharged to CDCR.  In addition, a clinician-to-clinician contact form was required to be sent to CDCR, putting the onus on the CDCR clinician to initiate contact with DSH-Atascadero staff.

It was reported that this practice was put in place because: 1) it was not good clinical practice to call CDCR about every patient; and 2) DSH-Atascadero staff was not sure which CDCR facility the patient would be returned to.  It was noted that DSH-Atascadero staff offered

no clinical justification for the notion that it was not appropriate to contact CDCR about each patient about to be discharged. DSH-Atascadero staff indicated that they were informed of the CDCR placement within three days of discharge.  With regard to discharge planning, DSH-Atascadero staff reported that CDCR staff were often difficult to reach.

An example of how lack of communication upon discharge could be problematic was observed during a patient chart review.  The patient, who had been admitted for acute psychosis wanted to return to CDCR claiming that he could shower (a coping skill) whenever he wanted at CDCR, which was not the case at DSH-Atascadero.  It was noted that the patient's report to DSH-Atascadero staff was inconsistent with CDCR policy, but given the reported lack of communication between DSH-Atascadero and CDCR, staff were unable to discuss alternative coping skills with the patient who continued to experience auditory hallucinations at the time of discharge.

Even a limited review of charts in which patients had been discharged indicated that a noteworthy percentage were discharged after a recent behavioral incident, creating an area of concern.

## VIII.   PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

### 1.      Patient Disciplinary Process

The institution reported that three DSH-Atascadero staff attended CDCR training regarding the revised RVR policy and procedures during the review period.

## IX.  USE OF RESTRAINT AND SECLUSION

Although some documentation problems were noted, the use of restraints and seclusion at DSH-Atascadero was clinically appropriate.  All Program V units were equipped with one

restraint and one seclusion room each.  Restraints were either non-ambulatory (use of a restraint chair with a Posey restraint) or five-point restraints (use of a restraint bed).

Data provided during the June site visit showed twelve instances of seclusion during the review period, involving nine patients.  Seclusion duration averaged 9.39 hours and ranged from 1.33 to 28.25 hours.

There were 19 instances of restraint use between January 1, 2015 and May 31, 2015, involving 13 patients.  Restraint duration per episode averaged 8.11 hours and ranged from 0.33 to 37.92 hours.  Seventy-four percent of restraint incidents lasted less than seven hours and four exceeded 13 hours.  Forty-two percent of restraint incidents involved five-point restraints, while 58 percent involved non-ambulatory restraints.

An audit of the restraint and seclusion data revealed documentation issues, including less restrictive interventions that were tried prior to the use of restraints or seclusion and interdisciplinary progress note documentation.  The audit results indicated improved documentation as compared to the preceding review period.

A review of serious incident reports (SIR) related to the use of seclusion/restraints were found to be clinically appropriate.

## X.    EMERGENCY RESPONSE, SUICIDE PREVENTION, AND THE DEATH REVIEW PROCESS

ASH's emergency response plans had not changed.  The institution used the NIMS and its component, the ICS, for emergency management.

All staff who had patient contact received basic first aid training.  All nursing and medical staff also received American Heart Association basic life support training.  DSH-Atascadero had a comprehensive performance improvement structure.  This structure included quarterly hospital-wide emergency response drills for every shift, which the MIRC reviewed.

145

The MIRC was also responsible for ensuring that staff followed standardized procedures and conducted a systematic, interdisciplinary review of all patient deaths at DSH-Atascadero.

The suicide prevention process at DSH-Atascadero was within the standard of care. The SPC, which was part of the risk management system, met bi-monthly to review all suicides, serious suicide attempts and aggregate self-harm data to identify performance improvement opportunities. A data review showed that there had been no serious suicide attempts and no completed suicides for *Coleman* class member patients during the review period. There were no performance improvement measures reported to have been implemented regarding suicide prevention.

Minutes from the April 2015 SPC indicated hospital-wide that in the previous 18 months, there were two suicide attempts. None involved *Coleman* class members.

Training on clinically effective suicide risk assessment was an ongoing process for psychologists. They received initial training via the new employee orientation (NEO) program, and upon unit assignment, they received more in-depth training via their program senior psychologists.

Upon admission to the hospital, both psychiatrists and nursing staff completed a suicide risk assessment for patients within 24 hours. Psychologists completed a suicide risk assessment within seven days of admission via the Psychology Admission Psychological Assessment. Ongoing suicide risk assessment needs were tracked monthly by program senior psychologists for completion timeliness and clinical quality.

## XI.    UTILIZATION REVIEW AND QUALITY MANAGEMENT

There was no change in DSH-Atascadero's performance improvement structure, which included a quarterly reporting system to the quality council for all committees in the performance

improvement system.  The quality council, which was chaired by the executive director and

included key administrative and clinical leadership, met on a weekly basis.  The standing

performance improvement committees in place at DSH-Atascadero continued to include the

MIRC, psychiatry services, psychology services, social work services, rehabilitation therapy

services, nursing services, dental services, nutrition services, medical services, and medication

management, in addition to several other relevant committees including the SPC, PRC, and

violence RMC.  Most of these committees met on at least a quarterly basis, although some, such

as the quality council, met weekly.

Staff reported that as of June 23, 2015, the RMC which was now called the

risk/utilization management committee, had yet to have its first meeting.  The standards

compliance department continued to be responsible for the ongoing evaluation of the quality of

care at DSH-Atascadero.  DSH-Atascadero used numerous data collection tools and systems to

assist with these efforts.

DSH-Atascadero also continued with the analysis of data on an individual and aggregate

level.

The use of the Wellness and Recovery Model Support System (WaRMSS) to track

various treatment-related activities, implemented in 2008 as part of the Department of Justice's

enhancement plan was unchanged except for improved information technology support from the

central office.  Key indicator data, which was used to produce morning "trigger" reports that

identified individual patients who might require additional attention and/or interventions,

continued to be used.  The Incident Management System, which was implemented in the 1980s

and tracked all "special" incidents deemed to have "an adverse effect on the safety, care,

treatment and rehabilitation of patients in the hospital," was unchanged from previous site visits.

147

The Kardex system, which was designed to assist in prioritizing patient care needs and provide continuity of care, also included suicide and violent risk factors.

## XII.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS

DSH-Atascadero reported 88 serious incidents during February 1 – May 31, 2015.

## XIII.    END OF SHIFT REPORTS

A shift change meeting on C32 was observed during the June site visit.  The meeting was attended by the psychologist, evening and day shift RNs, morning shift senior psych tech, rehabilitation therapist, psych tech, unit supervisor and program assistant.  The Kardex was projected on the wall and the morning shift senior psych tech reviewed each patient, providing what appeared to be pertinent information (e.g. patient refusing groups and in bed all day; recovering from dental work; observing Ramadan, etc.) regarding each patient.  The atmosphere was collegial and participants provided input.  However, there did not appear to be a clear guideline or format for what should be discussed in this forum.  For example, there was no routine discussion of the patients' current symptoms/functioning and progress in treatment.  Many patients were reported as having "no issues" which was vague.

## XIV.    LAUNDRY AND SUPPLY ISSUES

A review of all housing units where *Coleman* class member patients were housed found the laundry and supply areas to be in good condition and well stocked with clean clothing, linens and blankets.  Patients were permitted to exchange clothing twice a week or more often if needed, at the patient's request.  Supplies were readily available in each unit including, but not limited to, liquid soap, shampoo, toothpaste and toothbrush, combs, deodorant and toilet paper.

## XV.    <u>VISITATION</u>

Visiting at DSH-Atascadero was permitted seven days a week from 0815 until 1345 hours.  *Coleman* class member patients were permitted contact visits unless there was an identified clinical, safety or security issue.  The visiting room had one large open area, three private visiting rooms and one non-contact visiting room.  *Coleman* class member patients were allowed to walk to the visiting room from their unit unescorted unless they were at HAS Level I, which required an escort.

## XVI.   <u>LAW LIBRARY ACCESS</u>

The DSH-Atascadero law library was open five days a week and was accessible to *Coleman* class member patients on those days.  The library was open for operation on Monday, Tuesday and Friday for 6.5 hours each day.  On Thursday, the library was open for 4.5 hours, on Wednesday 7.0 hours.

There were two computers available in the law library for all patients to access multiple publications, reference materials and case law, as required by DSH policy.

With the exception of HAS Level I patients, *Coleman* class member patients were permitted to sign out of their unit and walk to the law library unescorted.  HAS level I patients were required to be escorted to the law library.

## XVII.  <u>PATIENTS' RIGHTS AND CONCERNS</u>

During the June site visit, six *Coleman* class member patients were interviewed in a group setting on Unit 2.  Similar to the January site visit, patients were uniformly positive in their comments regarding ASH's treatment environment and programming, especially in comparison to CDCR.  They described good access to clinical staff when requested.  Patients reported they liked the groups and believed they were connected to the reason for admission to

DSH-Atascadero. Patients reported that they were out of their rooms throughout the day and had access to the day treatment room. They reported that yard was available twice a day and that SPF and hats were available and that sunglasses could be purchased.

Patients also reported good access to the telephone and noted that it cost less than at CDCR. They also reported that access to family was better than at CDCR, but noted that pictures were not allowed on the weekends. According to patients, unlike CDCR, they were not allowed to have appliances or televisions in their rooms at DSH-Atascadero. They reported quicker access to their mail and packages. Lastly, in comparison to a report that a "602 needs to be filed" to access medical and mental health care at CDCR, they reported that their medical and mental health needs were readily addressed.

A large group of Unit 31 patients were interviewed in a community-like setting. Most of these patients indicated that they were attending two 50-minute groups per weekday, which they described as being helpful. They also had very positive statements specific to the therapeutic environment at DSH-Atascadero and the help that they received from staff. They described daily access to the courtyard and at least weekly assess to the large outdoor yard.

Several patients complained that they did not receive copies of their treatment plans on a timely basis and that their treatment plans did not appear to change significantly over time.

Patients who had stays in other DSH facilities described the program at DSH-Atascadero to be the preferred inpatient program for them.

A community meeting which lasted about 30 minutes was observed. Community issues were discussed. Patients described such meetings as being useful.

## XVIII. *COLEMAN* POSTINGS

A tour of all housing units where *Coleman* class member patients were housed found the *Coleman* posting present in all units.

<u>APPENDIX A2</u>
DSH-Coalinga

**<u>DSH-Coalinga</u>**
Paper Review

## I.    <u>SUMMARY OF THE FINDINGS</u>

The Special Master's findings included the following:

- **The DSH-Coalinga intermediate care program for *Coleman* class members had a vacancy rate of 33-percent and a staff-to-patient ratio of 1:25 in psychiatry.**

- **All psychology and social work staffing allocations were filled, with staff-to-patient ratios of 1:15 for these disciplines.**

- **DSH-Coalinga audits of IDTTs indicated appropriate commentary and constructive recommendations by the auditors.**

- **Group therapy was by far the predominant treatment modality, comprising 99.7 percent of treatment interventions.**

- **Patients received a range of 8.4 hours to 14.15 hours of group treatment per week.**

- **While behavioral management plans remained a treatment option at DSH-Coalinga, no patients were on them during the review period.**

- **New patients were place on "hold" status for up to their first seven days at DSH-Coalinga, meaning that they were not permitted off Unit 21 during that period but could participate in programming and other activities within the Unit.**

- **During the review period, the average time from referral to admission was 26 days.**

- **The average length of stay at DSH-Coalinga for patients discharged during the review period was 288 days.**

- **DSH-Coalinga provided patients with pre-release planning in the form of a dedicated therapeutic group.**

- **Seclusion and restraint were used sparingly and appropriately during the review period.**

- **There were no serious or significant suicide attempts, self-injuries, or deaths during the review period.  A process was in place to review any such incidents.**

- **Patients had access to the library at DSH-Coalinga.**

DSH-Coalinga was monitored on site by the Special Master during his earlier comprehensive review of the mental health inpatient care programs for CDCR inmates. For the current review, DSH-Coalinga was examined solely by means of paper review, meaning that the monitor and expert conducted their reviews by examining and analyzing documentation concerning operations at the program during the review period.

## II.    CENSUS

DSH-Coalinga continued to operate Program VII, Unit 21, which was a 50-bed intermediate-level care unit for treatment of *Coleman* class members. From January through June 2015, it admitted a total of 33 patients. Its census as of June 30, 2015 was 46.

## III.    STAFFING

### 1.    Administrative and Clinical Staffing

Clinical Administrator:  The clinical administrator position was vacant but was covered by other staff in an acting capacity.

Chief Psychiatrist: The chief psychiatrist position was vacant but was covered by other staff in an acting capacity.

Executive Director:  The executive director position was filled.

Hospital Administrator:  The hospital administrator position was filled.

Medical Director:  The medical director position was filled.

Program Director:  The program director position was filled.

Program Assistant:  The program assistant position was filled.

Unit Supervisor:  The Unit 21 supervisor position was filled.

Psychiatrist:  Two of the three psychiatrist positions were filled, for a 33-percent vacancy rate.

Supervising Psychologist: The supervising psychologist position was filled.

Psychologist:  All three psychologist positions were filled.

Supervising Social Worker:  The supervising social worker position was filled.

Social Worker:  All three social worker positions were filled.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was vacant but was covered by other staff.

Rehabilitation Therapist:  Two of the three rehabilitation therapist positions were filled, for a 33-percent vacancy rate.

Nursing Coordinator:  The nursing coordinator position was filled.

RN:  Six of seven RN positions were filled, for a 14-percent vacancy rate.

Senior Psych Tech:  All three senior psych tech positions were filled.

Psych Tech:  Thirty of the 32 psych tech positions were filled, for a six-percent vacancy rate.

Correctional Staff:  All custody positons, including three sergeants and 11 police officer positions were filled.

### 2.    Staff-to-Patient Ratios

The staff-to-patient ratio for psychiatrists was 1:25.  For psychologists, social workers, and rehabilitation therapists, the staff-to-patient ratio was 1:15.  Senior psych techs, psych techs, and RN positions were all staffed at ratios of 1:6.

## IV.    TREATMENT AND CLINICAL SERVICES

Unit 21 provided intermediate level care to CDCR inmates who had major mental disorders with active symptoms.  Patients who were a danger to self or others and/or gravely disabled were admitted for structured inpatient treatment, while other patients were admitted as

155

step-downs from acute-level inpatient care. Patients admitted to Unit 21 were kept there for the durations of their stays.

### 1.    IDTTs

Raw data gathered from audits of IDTTS was provided.  Audited treatment criteria included whether "pertinent diagnoses have appropriate focus of hospitalization to address patient's needs," "team addressed patient's input, needs or concerns in a meaningful way," and "treatment plan includes an interdisciplinary summary as to how the patient is responding to current interventions," among other things, all of which were appropriate.  Comments by the auditors were appropriate and included constructive suggestions for improving treatment plans and the IDTT meeting process.  However, no summaries of findings or identified trends or patterns, nor any conclusions, were provided with the raw audit data.

### 2.    Group Therapy

Treatment was delivered primarily in a group format, with a wide variety of over 50 activities.  It far outnumbered individual treatment interventions and comprised 99.7 percent of them. Some groups had a structured therapeutic format, such as DBT, management of mental illness, and stages of change for use in recovery from substance abuse, while others were unstructured recreational activities, such as music for leisure and pet social therapy.

The number of weekly group hours offered and delivered per patient had increased since the preceding DSH monitoring period. Weekly group offerings per patient ranged from 8.4 to 16.88 hours.  Weekly hours delivered per patient ranged from 8.4 hours to 14.15 hours.

DSH-Coalinga audited groups for consistency with standards, found strengths in some cases, and recommended some improvements.  However, no overall summary or narrative of audit findings or conclusions was provided.

### 3.    **Individual Treatment**

Individual therapy constituted only .3 percent of delivered treatment.  When deemed clinically appropriate, individual treatment plans included behavioral interventions for some patients.  No behavioral management plans were completed or implemented during the review period, nor were there any referrals for behavioral management plans.  Nevertheless, the referral process remained an option for those patients for whom such plans would be indicated.

### 4.    **Other Treatment Issues**

No patients attended educational classes or activities more than five hours per week.  The percentage of patients having job/work assignments ranged from 39.5 percent to 68 percent during the review period.  The types of jobs or assignments held were not reported.

## V.    **PATIENT ACCESS TO TREATMENT**

DSH-Coalinga provided information indicating that new patients were placed on "hold" status for up to their first seven days at DSH-Coalinga.  The IDTT reviewed each patient's "hold" status within two business days of his arrival.  "Hold" status meant that a patient was not permitted off the unit while initial assessments were completed, or due to his problematic behavior.  These patients were able to participate in treatment and other activities that were offered within the unit.

No patients were on "hold" status at the time the documentation was prepared.  No summarized information about the number of patients on "hold" status or the durations of their "hold" status was provided.  It did not appear from the provided information that there had been any changes to the "hold" status protocol.

## VI.    <u>REFERRALS AND TRANSFERS</u>

The average time from CDCR referrals to DSH decisions to accept or reject was 16 days, with a range of two to 32 days.  The average time from DSH decisions to accept to posting the decisions on SharePoint as "accepted" was 4.46 days, with a range of same day to 21 days.  The average time from acceptances to actual admissions was 4.75 days, with a range of same day to an outlier of 76 days.  The overall average time from referrals to admissions was 26 days, with a range of eight days to an outlier of 110 days.

Thirty-three patients were admitted to Unit 21 from January through June 2015.  No log of referred patients who were denied admission was provided.

## VII.    <u>DISCHARGES</u>

Dispositions following discharges from DSH-Coalinga may include return to a CDCR prison if the patient is clinically improved, commitment as an MDO if the patient requires continued care at the end of his prison sentence, or release to the community on parole.

Thirteen patients were discharged during the review period.  The average length of stay was 288 days, with a range of 154 days to 430 days.  These patients' discharge dispositions were not reported.

DSH-Coalinga conducted and provided individual length-of-stay reviews.  These were for patients whose stays at DSH-Coalinga exceeded 180 days.  Such cases were reviewed by a psychologist other than the treating psychologist for a determination of whether an extended stay was warranted, or whether the patient was ready for discharge based upon his condition and attainment of his treatment goals.  The reviews examined a number of indicators, including treatment outcomes, medication adherence, treatment goals in preparation for discharge, and any

barriers to discharge.  They concluded with a recommendation for discharge or a continued stay with a timeframe for a follow-up review.

During the review period, there were two patients at DSH-Coalinga who were 90 days or less from their parole dates, and 16 other patients who were within 90 days of their EPRDs and who were discharged from DSH-Coalinga from two weeks to four months before their EPRDs. Seventeen of these eighteen patients participated in a group entitled "Community Reintegration/Parole Planning."  A 12-week lesson plan for this group was provided.  It covered eligibility criteria and applications for benefits from such programs as Supplemental Security Income (SSI) and Medicaid, as well as management of symptoms of mental illness through a wellness and recovery action plan.

## VIII.  USE OF SECLUSION AND RESTRAINT

At DSH-Coalinga, seclusion and restraint interventions appeared to have been used appropriately as a last resort and for only short periods of time.  During the review period, there were nine episodes of seclusion, the longest of which lasted one hour and 27 minutes.  There were seven episodes of non-ambulatory restraint, ranging from 90 minutes to five hours and 25 minutes.  One patient had two episodes of seclusion, and another patient had two episodes of restraint.  The special incident report log indicated that for both patients, other interventions were tried before resort to use of seclusion or restraint.

## IX.  EMERGENCY RESPONSE AND DEATH REVIEW PROCESS

There were no serious or significant suicide attempts, self-injuries, or deaths during the review period.

DSH-Coalinga had an Enhanced Trigger Review Committee (ETRC) that reviewed emergency incidents such as self-injuries, suicide threats, aggressive acts, and any incidents requiring placement of patients on one-to-one observation or other types of precautions.

Provided minutes of ETRC meetings indicated that relevant and case-specific recommendations were made for each incident that triggered ETRC review.  Some recommendations were specific to individual patients' treatment plans and indicated additional clinical interventions.  Other recommendations identified more global interventions for DSH-Coalinga overall.

X.      **UTILIZATION REVIEW AND QUALITY MANAGEMENT**

Unit 21 participated in the DSH-Coalinga institutional quality management and utilization review program.  It consisted of the PRC, ETRC, MRMC, psychology specialist services committee, FRC, and UM committee.   Minutes, plans, audit instruments, and review tools used by these committees were provided.

XI.     **UNUSUAL OCCURRENCES/SERIOUS INCIDENTS**

DSH-Coalinga reported no serious incidents during the review period.

XII.    **LAUNDRY AND SUPPLY ISSUES**

DSH-Coalinga provided no information with regard to any laundry or supply issues.

XIII.   **LAW LIBRARY ACCESS**

DSH-Coalinga reported that patients had access to the library in one-hour sessions three times per week. Patients granted "priority legal user" status were permitted four hours of library access per week.  Unit staff requested and delivered the desired materials to patients who were unable to physically access the library.

## XIV. *COLEMAN* POSTINGS

DSH-Coalinga provided no information with regard to *Coleman* postings.

<u>APPENDIX A3</u>
DSH-Salinas Valley

**DSH-Salinas Valley**
January 13, 2015 – January 15, 2015
June 9, 2015 – June 11, 2015

## I.  SUMMARY OF THE FINDINGS

- **At the time of the June 2015 site visit, the census at DSH-Salinas Valley was 92 percent of operational bed capacity.**

- **In one of DSH-Salinas Valley's four treatment areas, it did not meet established staff-to-patient ratios in psychology and rehabilitation therapy.**

- **Staff attributed underutilization of individual therapy to insufficient staffing and the requirement of MTA escorts.**

- **MTAs were observed in the room during individual therapy sessions.**
- **Psychological testing was not done at DSH-Salinas Valley, even when clinically indicated.**

- **DSH-Salinas Valley reduced the use of DPS and tracked all DPS patients.**

- **Patients on solo programming status did not have access to yard in Facility C5 and Facility C6.**

- **The institution did not track which patients were on solo programming status nor how long they remained on it.**

- **Following the January 2015 site visit, DSH-Salinas Valley began tracking group therapy**

- **Group therapy settings were inadequate in Facility C5 and Facility C6.**

- **IDTT meetings were attended by appropriate disciplines.**

- **Even when clinically indicated, DSH-Salinas Valley underutilized behavioral plans and behavioral interventions.**

- **DSH-Salinas Valley was nearly compliant with meeting ICC timelines.**

- **Discharge logs did not consistently include the reasons for patients' discharges and the prisons to which they were discharged.**

- **Clinical staff received use-of-force training.**

163

- **End-of-shift meetings included all appropriate staff and covered each patient in the treatment area.**

- **Most paroling patients received services from TCMP.**

Since mid-2013, members of the Special Master's team of experts and monitors have conducted a total of three reviews of DSH-Salinas Valley. The first was conducted over the course of three site visits occurring between July 31, 2013 and August 22, 2013.  The Special Master filed his report on that three-visit review on September 24, 2013.  ECF 4830.  It identified a significant number of issues including large caseloads for psychiatrists, assignments to therapeutic groups being driven by housing location rather than treatment needs, limited weekly group therapy for patients at the intermediate level of care, inconsistent quality of group treatment, ranging from poor to excellent, underutilized psychologists and a lack of individualized therapy for most patients, even when clinically indicated.  Additional issues included excessive use of MTAs in clinical settings, zero out-of-cell programming for patients on cuff or orientation status for significant periods of time, failures in the procedures and documentation related to cuff status, excessive transfer times for referrals to DSH-Salinas Valley and problems with issuance and processing of patient RVRs.  On November 12, 2013, the Court adopted the Special Master's findings in full and his recommendations in part.  ECF 4925, p. 20.

The Special Master filed his Report on Adequacy of Inpatient Mental Health Care for Inmates of the California Department of Corrections and Rehabilitation on May 30, 2014.  ECF 5156.  It included the Special Master's re-review of DSH-Salinas Valley over the course of three site visits occurring between December 9, 2013 and March 5, 2014.  The review found that problems remained at DSH-Salinas Valley, some in the same areas as during the previous review, including that staffing remained a challenge, treatment plans were inadequate, individual treatment and counseling was underutilized, group therapy was limited, one-to-one clinical

encounters remained non-confidential, conducted with two MTAs in the room and most transfers to DSH-Salinas Valley were untimely.  DSH-Salinas Valley was in process of developing three administrative directives that would affect cuff status:  AD 6.1 Orientation, AD 6.2 Maximum Custody Status and AD 6.3 DPS.  The number of patients on cuff status had reduced significantly, however DSH-Salinas Valley continued to experience problems with required documentation and appropriate treatment planning related to cuff status.  The Special Master recommended:  1) that he be directed to conduct a further review of DSH-Salinas Valley by on-site monitoring, 2) that defendants, under the Special Master's guidance, be directed to review and re-evaluate the use of orientation, cuff status, DPS, and the steps/stages processes and any variations thereon at the six inpatient programs, and 3) that defendants, under the guidance of the Special Master, review and re-evaluate existing clinical staffing levels in the six inpatient programs.  The Special Master also recommended that he be required to report to the Court on the results and his conclusions which followed therefrom.  On July 25, 2014, the Court adopted the Special Master's recommendations in full.  (ECF 5188).

The following is the Special Master's monitoring report on his third review of DSH-Salinas Valley, which took place in 2015.

## II.    CENSUS

The census on June 9, 2015 was 229 patients, representing 92 percent of the operational capacity of 248 patients.  In TC 1, 11 of 24 beds in the four-person cells were vacant; three of 26 beds in two-person cells were vacant in TC 2A; and three of 58 single cells were vacant in Facility C-6.

III.     **STAFFING**

DSH-Salinas valley reported that among its administrative positions, it was allocated one executive director position which was filled.  The allocated clinical administrator and hospital administrator positions were both vacant, with staff serving in "acting" capacities.  The allocated medical director and senior supervising psychiatrist positions were both filled.  One of the three allocated program director positions was filled.  The two allocated program assistant positions were filled.  Of the two allocated nursing coordinator positions, one was filled and one was vacant, with other staff serving in an "acting" capacity in one of the positions.  Staff reported that each of two program directors were slated to serve as chief of social work and chief of rehab therapy respectively.

      1.     **Administrative, Clinical, and Correctional Staffing**

DSH-Salinas Valley staffing per discipline was as follows:

<u>Psychiatrists</u>:  DSH-Salinas Valley had six psychiatrists on staff, two contract psychiatrists and one on loan.  Four staff psychiatrists provided additional psychiatric services, but the program was unable to determine whether the additional services were the equivalent of one FTE position.  One additional psychiatrist was scheduled to start in June 2015 and another in July 2015.

<u>Psychologists</u>:  DSH-Salinas Valley had eight staff psychologists, including three unlicensed psychologists on its staff.  One staff psychologist had a second assignment at DSH-Salinas Valley.  One additional psychologist was scheduled to start work in July 2015 and another in August 2015.

Social Workers:  There were seven social workers on staff including one unlicensed social worker.  One staff social worker had a second assignment, one social worker was contractual staff.  A staff social worker was scheduled to start in August 2015.

Rehabilitation Therapists:  DSH-Salinas Valley was allocated four rehabilitation therapist positions, six additional positions were funded in the "blanket."  Staff described "blanket positions" as funded but not designated.  Of the ten rehabilitation therapist positions, seven were filled, resulting in a 30 percent vacancy rate.

SRNs:  DSH-Salinas Valley was allocated 19 SRN positions, three additional positions were funded in the "blanket".  Of the 22 SRN positions, 12 were filled, resulting in a vacancy rate of 45 percent.

RNs:  The program reported an allocation of 50 RN positions, of which 44 were filled resulting in a 12 percent vacancy rate.  Another three FTE positions were filled by contract staff, yielding a functional vacancy rate of six percent.

SMTAs:  Of the 30 allocated SMTA positions, 20 were filled, resulting in a vacancy rate of 33 percent.  There were no additional staff serving in that position.

MTAs:  There were 164.70 MTA positions allocated, of which 160 positions were filled and 4.70 were vacant, resulting in a vacancy of three percent.  There were no additional staff serving in that position.

Psych Techs:  The program was allocated 31 psych tech positions, of which 17 were filled and 14 were vacant, resulting in a vacancy rate of 45 percent.  There were two FTE positions filled by contract staff, yielding a functional vacancy rate of 39 percent.

2.      **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

DSH-Salinas Valley had an established ratio of 1:35 for treatment and 1:15 for admissions.  Treatment was provided in the various housing areas: TC1, TC2, Facility C5 (C5), and Facility C6 (C6).

At the time of the June site visit, DSH-Salinas Valley met or exceeded clinical treatment staffing ratios in C5, C6, and TC2, and in psychiatry and social work in TC1, but did not meet the treatment ratios for psychology and rehabilitation therapists in TC1.

3.      **Staff Training**

Staff reported that DSH-Salinas Valley provided suicide training as part of New Employee Orientation during August, October and December 2014.

DSH-Salinas Valley provided specific training to nursing supervisors to address their responsibilities regarding placement and removal of DPS.  The training provided covered DPS, maximum custody status and orientation status and a variety of the processes involved in each.

IV.     **TREATMENT AND CLINICAL SERVICES**

2.      **IDTTs**

During the June site visit, multiple IDTTs were observed in the various treatment areas. Overall, the treatment team meetings were generally improved since the January site visit, with some continued areas of concern.  Documentation provided in advance of the June site visit indicated that DSH-Salinas Valley did not complete IDTT audits.  The institution also did not provide information or data regarding the number of IDTTs that were held, canceled or refused. DSH-Salinas Valley reported future plans to implement an audit process, however did not provide a timeline for implementation.

In attendance at the IDTT observed on the TC1 unit were the psychiatrist, psychologist, psych tech, rehabilitation therapist, nurses and MTAs.  This meeting included discussions with the patient regarding treatment planning and goals, as well as progress in treatment.  There was also discussion regarding placement of patients in the four-man dormitories and the difficulty in finding appropriate patients who were eligible.

There was active involvement of all disciplines in discussions during the meeting in TC1. It was observed that the psychiatrist conducted medication management and prescribing during the treatment team meeting with a deleterious effect on the dynamics of the treatment team and appeared inappropriate to adequate patient care.  It was noted that it would be beneficial for this to occur in a private session during which more extensive discussions could be conducted with the patient regarding medication side effects, risks, benefits and other informed consent related issues.

The treatment plan was unavailable for viewing by the patient.  Staff stated the treatment plan would be provided to the patient sometime after the meeting.

In the observed IDTTs in TC2, there was little to no discussion about the treatment groups that patients would be assigned to and the expected treatment goals to be achieved.  There was also very little positive feedback provided to the patients.  The one team member who did provide constant positive feedback was the rehabilitation therapist, who made sure that each patient who came before the team received positive reinforcement for the gains that he had made since the last treatment team meeting.

Noticeably, the current Stage Level of the patient was not always reported to the team, which appeared to be contrary to the operational policy that Stage Levels were to be regularly reviewed by the treatment team.

During the observed IDTTs in TC2, while some IDTT team members spoke to patients during the IDTT, other team members spoke about patients as if they were not present. In several IDTTs, the psychiatrist and psychologist conducted assessments during the IDTT meeting because the patients had not been seen prior to the IDTT as required. These activities did not promote an effective milieu for treatment team interactions with each other and with the patients.

In attendance at IDTTs observed on Facility C5 were the chief psychiatrist, two MTAs, a psych tech, a psychiatrist, a psychologist, a RN, and a social worker. The room had sufficient space, with computer access but the temperature was warm and the room was stuffy, prompting staff to open the door for several of the IDTT meetings and post-IDTT discussion about patients, raising concerns about confidentiality. The patient was not asked about keeping the door open. Noise in the hallway was distracting to the IDTT process.

The Facility C5 treatment team's atmosphere was generally empathic, but not always collaborative. With the exception of the psych tech, each treatment member briefly checked in with the patient around treatment needs related to their area of expertise. There was minimal discussion of the patient's diagnosis, current symptoms, specific progress/behavior in the past month, treatment goals, need for/participation in individual therapy, current stage and what he needed to do to advance to the next stage. The psych tech rarely participated and typed the discussion into the treatment plan as it occurred. The treatment plan was projected onto a screen on the wall that was visible to all. The MTAs rarely participated.

It was observed that patients were not asked to sign the treatment plan in Facility C5. When staff was asked about this they indicated that it was not routinely done, which was also observed during chart reviews. One staff raised the point that it might not be clinically indicated

for some patients; however, there was also no mechanism to document when signing the treatment plan was contra-indicated.  It was notable that the treatment plan was projected onto a screen that was visible to the patient.  For two patients, a decision to promote the patient to the next Stage was made after the patients left the room.

The Facility C5 team reported that they had a pre-team meeting prior to IDTT, which was not observed during the site visit.  It was reported that during this pre-team meeting, the team discussed yard and group attendance, progress in the past month, current functioning, medication changes, incidents, strengths and weaknesses.  The staff seemed unable to distinguish between the activities of their unofficial pre-team meeting and the required IDTT, noting that these essential treatment issues reportedly discussed in the pre-team meeting were not routinely discussed for the patients whose IDTTs were observed.  Staff reported that if a patient refused to attend IDTT, they met with him cell-front.  This was consistent with documentation in reviewed charts.

Two MTAs in Facility C5 accompanied patients to IDTT meetings and remained in attendance; they escorted the patient back to his housing after the IDTT.  None of the attending patients were in handcuffs during the IDTTs.

During the IDTTs in TC1, several staff voiced their opinion that the four-man dormitories at DSH-Salinas Valley remained unfilled due to ICC designation that few individuals were appropriate for that setting.  It did not appear that the staff was informed that they had a role in requesting that ICC reconsider those patients who were originally designated for two-man dormitories to be considered for four-man dormitories.  In Facility C5, leadership had reported that treatment teams should be discussing moves to the dormitories in IDTT.  During the IDTTs in Facility C5, it was observed that this was not occurring; leadership reminded staff that this

discussion should occur during IDTTs. It was reported that effective July 1, 2015, there would be a prompt in the treatment plans at DSH-Salinas Valley regarding discussion of housing moves.

### 3. Group Therapy

Staff reported that DSH-Salinas Valley management, utilizing a curriculum workgroup, had been working to offer evidenced-based treatment whenever possible. According to staff, the curriculum workgroup made recommendations regarding terms and definitions for utilization at all three of the DSH's psychiatric programs in order to improve consistency in services and data collection among the programs. The workgroup standardized the classification of out-of-cell activities available to patients into the following categories: 1) treatment; 2) structured enrichment; and 3) unstructured enrichment.

Treatment Groups: This term referred to therapeutic groups that focused on educating patients regarding psychiatric and psychological disorders and/or specific skills for managing those disorders. This may include groups focused on mental health education, symptom management, coping skills, social skills, relaxation, stress management, anger management, substance recovery, life skills and problem solving. These groups followed a specific lesson plan or group protocol with specific objectives for each weekly session and were documented in each patient's MAPP.

Structured Enrichment: This term referred to leisure groups that followed a specific lesson plan or group protocol with specific objectives for each weekly session. These groups may be associated with any foci of treatment dependent on the specific patient and the treatment team's clinical judgment. These groups were scheduled in MAPP.

Unstructured Enrichment:  This term referred to leisure activities that do not have a lesson plan or specific objectives and desired outcomes.  During these groups the patients may be free to structure their time independently (e.g. yard time) or staff may provide loose structure (e.g. Bingo).  These groups were scheduled in the Supplemental Activities Module in PaWSS.

At the time of the June site visit, the core groups at DSH-Salinas Valley were "Managing Anger," "Medication Management," "Health and Nutrition," "Thinking for a Change," and "Structured Development through Social Interaction."  Each patient was required to complete "Orientation" and were then assigned to the core groups.

DSH-Salinas Valley maintained manuals containing what they referred to as "lesson plans" and homework assignments for the core groups.  These were kept on each unit.  This allowed for an alternate facilitator to utilize the same material and attempt to maintain continuity of care. Treatment teams were expected to assign the patient to additional groups based on identified individualized treatment goals.  In addition to core groups, the program offered a variety of centralized, structured treatment groups and supplemental treatment groups.

The average number of patients in a given group varied due to ongoing discharges and new admissions.  However, each patient was expected to participate in core groups which averaged eight to ten hours of treatment according to DSH-Salinas Valley management staff.  It was noted that groups often did not last the reported 12 weeks.  This was discovered when reviewing the "actual treatment hours provided" data.

Administrative staff expected treatment teams to schedule patients for an additional ten to 12 hours of structured enrichment groups for an overall total of 20 hours.  However, since treatment plans did not indicate all of the treatment groups and structured enrichment activities a patient was engaged in, this could not be verified through a review of patients' records.

DSH-Salinas Valley reported that patients were placed in a group by the psych tech case managers. According to the institution, non-core groups typically ran for 12 weeks, with a one-week break between sessions. During the one-week break, staff would revise the group schedule based on the treatment needs of the patient population. When reviewing the reports with "treatment hours provided" data, there was clearly far more unstructured enrichment (recreation) offered over any other activity.

DSH-Salinas Valley began tracking group therapy following the January site visit. Staff reported an increase in treatment groups available to patients in the program. Although this was an improvement as compared to prior site visits; provided group therapy hours were low for an inpatient program. Audits indicated that between January 5, 2015 and March 27, 2015, the average hours per patient per week of structured enrichment and therapy groups were as follows: scheduled - 9.94 hours, offered – 9.2 hours and delivered – 6.14 hours. The average hours per patient per week of unstructured enrichment groups were as follows: scheduled – 60.54 hours, offered – 59.1 hours and delivered – 7.29 hours.

Audits between April 13, 2015 and May 17, 2015 indicated that fewer hours were provided. The average hours per patient per week of structured enrichment and therapy groups were as follows: scheduled – 8.4 hours, offered – 6.9 hours and delivered – 5.13 hours. The average hours per patient per week of unstructured enrichment groups were as follows: scheduled – 50.1 hours, offered – 46.43 hours and delivered – 6.69 hours.

After the January site visit, MTAs received training in order to provide group treatment. There were ten MTA groups in TC1 and five in TC2 at the time of the June 2015 site visit (Tuesday, Wednesday, and Thursday). Staff indicated that MTAs had begun facilitating treatment groups in TC1 and TC 2 but had not in Facility C5 and Facility C6.

174

The monitor observed several group activities during the June site visit.  A social skills structured treatment group facilitated by two MTAs in TC1 was observed.  The participants in this group appeared to be lower functioning, some with clear cognitive impairment.  The MTAs did an outstanding job facilitating the group, incorporating all group members into the discussion, moving the discussion along, and managing to achieve the goal of the group as well. The MTAs in TC2 reported that they enjoyed facilitating groups, which was consistent with reports by the supervisor regarding overall MTA group satisfaction.

When interviewed, patients in TC2 made multiple positive comments about the MTAs, far more than had been stated at prior site visits.  Patients reported that the MTAs were very helpful and beneficial to their treatment.  It appeared that this was due in part to the increased clinical contact with MTAs through the group facilitation.

According to a provided schedule, groups occurred on a daily basis on Facility C5 and Facility C6 on each pod.  Groups were facilitated by psych techs, social workers, and psychologists.

Group therapy continued to occur on the dayroom floor on Facility C5 and Facility C6 which was inadequate, noting major issues regarding noise (keys, staff talking with patients in their cell through the food port, toilet flushing) and staff movement on the unit, creating distractions for staff leading the group and for patients participating in the group.  At times, the external noise, in combination with the overall acoustics made it difficult to hear participants.

Private rooms designated for IDTT meetings and individual sessions were available on C5 and C6 but were rarely used for groups.  Staff reported small groups of four to five patients could be held in these rooms but reported that anything larger, most groups were 12 to 13 patients, would create a safety concern.

A peer support group in Facility C-6 facilitated by the psych tech was observed. Seven patients attended and took turns randomly choosing words with a positive connotation ("strength," "communication," "friendship," "achievement," "respect," "believe") and described what the word meant to them, which was a creative approach to facilitating support and participation. The psych tech engaged directly with each patient offering positive feedback and support, but there was minimal interaction between the patients, which could probably be improved with staff training. It was also observed that appropriate boundaries were not maintained by the psych tech who shared personal information.

A "Thinking for a Change" group was observed on Facility C5 B Pod, which was facilitated by a very capable, effective and knowledgeable social worker. Eleven patients attended. A combination of didactic and facilitated conversation between group participants and the social worker occurred throughout the group focusing on problem-solving and consequences of aggressive behavior. The social worker engaged with the patients at a level consistent with their intellectual functioning.

The group was held in the dayroom. There were multiple distractions on the unit (loud music, MTA's doing unit rounds, a phone ringing) during the group. The group began approximately ten minutes past the scheduled time of 2:30 p.m. The social worker attended the end of shift meeting which ended at 2:30 p.m. He then approached each patient's cell and asked them to attend group. This process took about ten minutes, a loss to group time. It was reported that this was typical practice. Staff also asserted that this individual process resulted in larger group attendance.

A brief interview was held with patients in Facility C5 B Pod to discuss access to care. All patients reported that they were scheduled for groups on a daily basis but it was rare to be

scheduled for more than three groups daily. Patients reported that a maximum of twelve patients were allowed to attend a group, more than that number was not permitted. This varied from staff reports that 12 to 13 patients typically attended larger groups.

When a group scheduled on Facility C5 was cancelled because the staff member was out sick, instead of keeping the patients in their cells, the MTAs held an impromptu unstructured enrichment instead, which was a good practice. Ten patients were observed out in the dayroom watching television, playing chess or cards.

A group that included two patients in TC1 who were low functioning and were on DPS or solo programming status was observed. This group appeared to be very beneficial for these individuals who had previously assaulted other patients or staff and/or had been threatened by other patients and had not previously received adequate programming due to their status. This group was led by a rehabilitation therapist, and it appeared the therapist was very familiar with and had a good rapport with these patients as she regularly provided individual and group therapy for them.

Several other groups in TC1 were also observed. One group entitled "Anger Management" was facilitated by a psych tech. Another group was entitled "Social Development" which was facilitated by two MTAs. Both groups were interactive and involved discussions with all of the participants. Both groups included seven patients. When interviewed, group participants indicated that groups had been beneficial for them.

### 4.    **Individual Treatment**

As with structured therapeutic activities, DSH-Salinas Valley's curriculum workgroup also provided definitions regarding individual contacts and therapy:

<u>Individual Therapy</u>:  Individual therapy referred to any therapeutic session where one clinician meets with one patient for more than 15 minutes.  These sessions were goal-directed and had specific desired outcomes.  These sessions were part of the patient's treatment plan and were re-occurring.  These sessions were scheduled in MAPP.

<u>Individual Clinical Contact</u>:  This term referred to any brief unscheduled clinical contact where one clinician meets with one patient to address emergent issues.  This type of contact was recorded in MAPP using the unscheduled session function.  Clinicians must also document the session in the patient's medical record utilizing the IDN (Interdisciplinary Note) form.

Staff reported that an individual treatment workgroup was formed and met on several occasions between January and March 2015.  One of the recommendations included providing instructions to the staff regarding referral and tracking of individual contacts.  A referral form for individual therapy or individual clinical contact was developed to track scheduled individual sessions in PaWSS.

Discussions with facility and headquarters staff indicated that there was some confusion regarding past recommendations regarding the lack of individual therapy that was provided at DSH-Salinas Valley.  The facility interpreted the recommendation to be that psychoanalytic psychotherapy should be provided for all patients.  This recommendation was clarified that various types of individual therapies, including supportive, cognitive behavioral, crisis oriented and short-term psychotherapies should be provided rather than psychoanalytic psychotherapy, which only a minority of patients might potentially benefit from.

There also appeared to be some discrepancy regarding what type of contacts would be included as individual therapy.  The facility determined that only scheduled individual sessions would be counted as individual therapy.  If a session was therapeutic, conducted by a clinician,

and lasted for one hour, but was unscheduled; this would not be counted as an individual therapy session as it was unscheduled.  This issue was clarified with the supervisory and headquarters staff, and recommendations were again provided for the provision of individual therapy for DSH-Salinas Valley patients.  The facility also indicated that the current staffing levels with vacancies played a negative role in the institution's capacity to provide individual therapy.

The presence of MTAs in individual treatment sessions at DSH-Salinas Valley had become optional; however, during the January site visit clinical staff reported during interviews that MTAs presence during these sessions had continued to occur.  Supervisory staff reported that the clinical staff had been instructed that they may inform the MTAs that their presence during individual sessions was optional; however, no tracking of the presence of MTAs during these individual sessions had been implemented in order to determine its frequency, noting the potential of the presence of an MTA to affect the session.  The monitor recommended the supervisory staff begin tracking the occurrence of this issue and address individual clinicians as needed with supervision and additional training.

Staff acknowledged a low referral rate for individual treatment and attributed the low rate to lack of staffing, and the requirement of MTA staff for escorts.  MTA staff continued to be present in the room for individual therapy sessions.  It was reported that the decision to have MTA staff present was at the discretion of the providing staff.  Based on observed therapy sessions, MTA presence during individual contacts appeared to be common practice.

During the June site visit, staff reported that tracking individual therapy began after the end of the review period; therefore no information was available for review.  A clinician on Facility C was observed meeting with two patients together with MTAs present.  The clinician reported that he would count the appointment as an individual therapy session, but disclosed that

he did not complete the form used to track this data. There was no discussion between the clinician and the MTAs about their presence inside the room versus outside the door. Both patients were calm. When asked about the presence of the MTAs regarding one patient, the clinician reported that he had never seen the patient before and elaborated that the patient was on PC 2602 for Danger to Self/Others, had low frustration tolerance, and three weeks before had assaulted three MTAs who had had difficulty subduing him despite restraints.

Based on this observation, heightened concern regarding security at DSH-Salinas Valley by both management and treatment staff appeared to continue since the January site visit. Patients themselves were aware of this and reported that MTAs were present for individual sessions to keep them and staff safe. They had no awareness that the policy did not require the presence of the MTA. The blanket practice of having MTAs present during individual therapy sessions did not allow for individual risk assessment and presumed that all patients were dangerous.

Patients who were interviewed on C5 reported that they rarely received individual therapy (two of 11 patients reported receiving it). Patients believed this was due to limited staff. They believed they could ask for an individual session if needed. Several individuals in a group setting in TC1 were also interviewed regarding individual treatment. They reported that they were concerned regarding the lack of individual therapy with their clinicians. They further reported that requests for individual sessions were frequently unheeded and that it frequently required a statement of suicidal intent to achieve individual contacts. Patients noted that group therapy provision had improved regarding the number of groups and the diversity of group therapy offerings, but they expressed the desire for more individualized therapy.

### 5.    Other Treatment Issues

DSH-Salinas Valley continued to underutilize behavioral plans and behavioral interventions when clinically indicated.  Behavioral treatment was a critical component to care and some patients at DSH-Salinas Valley appeared to be appropriate for this form of treatment.  It was noted that staffing vacancies were not an acceptable justification for not providing these patients with this critical form of care when they needed it any more than it would be acceptable to deny psychotropic medication when indicated.  It was observed that it would probably be beneficial for DSH-Salinas Valley to acquire suitable staff to provide necessary care.

In addition to underutilization of behavioral plans, there was also an issue with access to those plans.  When they were reported to exist, they could not always be located in the chart for review.  It was also not clear that the treatment team was fully aware of the behavioral plans, as they were often not referenced in the treatment plans, IDNs or other progress notes as would be standard clinical documentation practice.  A useful behavioral plan in order to be properly implemented would be expected to have consistency across all staff.  Consequently, it would be expected that references to a behavioral plan would be found in clinical notes.  There was also no documentation indicating that when there was a plan that it actually was implemented.

When plans were located, they did not always seem appropriately focused, reasonable in scope, based on an appropriate functional analysis and designed with a defined objective rather than indefinite in goal and implementation length.  It was unclear from the reviewed plans that salient reinforcers for that patient had been identified and incorporated into the plans.  It was also unclear that unit staff had been part of the plan development so that the plan could be implemented in a consistent manner by all treating staff.  Finally, the plans were not typically updated/revised and there was not documentation that the plans had been completed and were

considered resolved. There was simply extremely poor documentation in each area regarding the behavioral plans that were examined during the June site visit.

Patients on solo programming in C5 and C6 did not have access to the yard. Leadership reported that the yard was shared with CDCR SVSP inmates. Staff indicated that DSH-Salinas Valley did not currently have a way to separate the solo programming patients from the SVSP inmates. Staff reported that if it was anticipated that a patient would be on extended solo programming, the treatment team worked on transferring the patient to the TC where there was more access to yard.

A treatment issue that was observed during the June site visit was the lack of psychological testing. One patient observed in an IDTT apparently would likely have benefitted from diagnostic clarification to better assess a thought disorder versus exaggeration of symptoms/malingering. Staff reported that psychological testing was rarely done because it required a consecutive block of time that was not readily available given the staffing. It was observed however, that psychological testing could be completed across various sessions so long as it was noted as a potential limitation in the evaluation.

Observation cells on C5 and C6 that were used for when a patient was assessed as a danger to self/others did not have toilets. When a patient needed to use the bathroom, he was provided with a bed pan.

IV.    **PATIENT ORIENTATION, STAGING AND CUFF STATUS**

STAGE System

Policies related to the STAGE system were all under review as part of the DSH standardization project. Draft copies were provided for review.

The STAGE system had four levels:  Orientation, Stage 1, Stage 2 and Stage 3.  All patients on Orientation status were expected to be administratively housed in a single cell and their property was limited to just personal hygiene items.  Until cleared from Orientation status by SVSP's ICC to program without restriction, the patient may be brought out in handcuffs to program solo or in small groups.  If a patient had not been cleared within 15 days of admission, the IDTT was to notify the SVSP CCI and program management.  All assessments and evaluations were required to be completed during the Orientation phase.

Once ICC cleared a patient, he was promoted to Stage 1.  In Stage 1, patients were eligible for non-contact visitation.  Patients were allowed an annual package and those who lived in dorms could receive quarterly packages.  Patients were allowed one phone call per week as staffing permitted.  These limitations including packages were of concern, noting the importance of a support system, visits and phone calls to patients; particularly that they were limited for reasons that were not individualized or clinical.

Stage 2 provided for all of the privileges of Stage 1 and added phone calls twice per week as staffing permitted, basic property, and participation in the mentor apprenticeship program.  To progress to Stage 3, the patient must complete 80 percent of the core groups provided at DSH-Salinas Valley. Once the patient had achieved those objectives, the patient then had open access to use the phone, could check out recreational supplies, became eligible for any vacant position in patient government, and could utilize loaner appliances if available and in a dorm setting (or single cell if permitted by ICC).

In discussion with headquarters and program staff, it was observed that DSH-Salinas Valley may want to consider policies during their review of the STAGE system that maintained the same (e.g., phone, packages, property, visits), privileges that the patients had in prison.  It

would be expected that this would reduce limitations that might serve as disincentives for treatment in the psychiatric program.  If DSH-Salinas Valley staff view these privileges as carrying significant reinforcement power, then they might consider providing them to patients in quantities greater than what was available to them at the prison.

DPS

Staff reported that DSH-Salinas Valley had implemented numerous procedures in an effort to reduce the use of DPS, which required a patient to be handcuffed and severely limited access to treatment.

Headquarters' staff present during the June site visit stated that there was a DSH-wide systemic process occurring with the objective to standardize Stage Level systems and language across psychiatric programs including DSH-Salinas Valley.  In addition to that, DSH-Salinas Valley initiated a monthly audit process to monitor compliance with policy on the use of mechanical restraints/DPS to address any non-compliance on a case-by-case basis.

DSH-Salinas Valley also maintained a tracking log of all patients on DPS status regardless of the reason.  Apparently as a result of these measures, there was a decrease in the number of patients on DPS for an extended period of time.  There were three patients on DPS for more than twenty days and two who were on the status for more than 100 days (198 and 317 days at the time of the June site visit).  While the DPS log indicated that both of those long-term DPS patients had behavioral plans, one could not be located in the record and the other was not current.  It was observed that behavioral plans, like any treatment plan, must be updated to reflect progress or lack thereof and modifications to address current issues.

The average length of time a patient was on DPS for January through May 2015 was nine days. When calculating the average for that time period while removing outliers, the average was just seven days, which was significantly lower than what had occurred during earlier site visits. Most of the patients in this group who required individualized behavioral plans did not have one, although a behavioral plan was clinically indicated and would likely have been helpful to the patients' treatment overall. These patients presented further indication of a significant under-utilization of individualized behavioral plans despite policy requiring its use.

Solo Programming

Another status at DSH-Salinas Valley that impacted a patient's access to treatment and recreational activities was referred to as solo programming. Patients on solo programming received some or all of their activities alone. At the time of the June site visit, 11 patients were on solo programming on C5 and seven patients were on solo programming on C6. All were at Stage 1. A review of the log showed that patients were generally offered solo programing two to three times a week, typically for 30 minutes, but at times for an hour. However, a few patients were on solo programming for over a month and refused solo programming the majority of times.

Another area of concern was that some patients were not offered solo programming for several days. For example, for one patient, documentation showed he was offered solo programming on April 3, 2015 but then not again until April 19, 2015, more than two weeks later. Some items on the log were incomplete in that staff signatures and the length of time of solo programming were not documented. One challenge in reviewing the log was that it was not routinely documented when solo programming was initiated and discontinued. For example, if

the last entry was May 27, 2015, it cannot be determined if solo programming was discontinued or if programming had not been offered since them.

DSH-Salinas Valley did not track patients on solo status or the length of time that patients spent on solo status. However, they were receptive to suggestions to begin tracking such information. Patients were getting more out-of-cell opportunities on solo status than they had been receiving in the past. Patients had increased access to the yard and dayroom while housed in TC2. A significant deficit noted with both DPS and solo programming was that treatment plans did not consistently target the underlying symptoms/behaviors that were the cause of the solo status and/or DPS.

## V.    <u>REFERRALS AND TRANSFERS</u>

Data provided by DSH regarding the DSH-Salinas Valley intermediate program showed that there were 158 admissions between January 2, 2015 and May 28, 2015. Data provided by DSH did not allow for the average length of time from CDCR referral to transfer to DSH to be calculated. The average length of time from DSH receipt of the referral to transfer to DSH was 24.5 days. The range was three to 148 days. The average number of days to transfer an inmate once the bed assignment had been made was 2.2 days. Four patients (range of four to seven days) were not transferred within 72 hours following bed assignment, as required by the Program Guide. Of note, date of receipt of the referral was not entered on the log for eleven patients and may have impacted the validity of the data.

The average length of time between receipt of the DSH referral and decision was 2.3 days with a range of zero to 107 days. The decision was made past the three-day timeframe for thirteen patients, with a range of four to 107 days.

Consistent with the January review, at the time of the June site visit, DSH-Salinas Valley leadership reported that there were no rejected referrals. Data provided in advance of the site visit indicated there were no administrative discharges during the review period.

## VI.    ADMISSIONS AND DISCHARGES

DSH-Salinas Valley managed the high custody accepted referral list. There were 49 patients on the accepted referral list as of June 8, 2015. Of the 49 on the list, three were on hold for medical reasons and California PC 2602 hearings; three were slated for competency examination under California PC 1370; 24 had been assigned to a DSH facility (DSH-Stockton, DSH-Vacaville or DSH-Salinas Valley), but had not yet been transferred and 19 were pending assignments.

### 4.    Admissions

Staff reported that patients who arrived at SVSP following admission to DSH-Salinas Valley were processed as any other inmate who arrived at the prison. Following the SVSP process, the patient would then undergo a DSH-Salinas Valley process. DSH administration provided additional information that the initial assessment completed at SVSP was a health questionnaire collected by CDCR nursing staff via interview with the patient upon arrival at Reception & Release at SVSP. During the actual admission process at DSH- Salinas Valley, a thorough physical examination would be conducted beyond an initial assessment and recorded on the DSH-9021 Medical History and Physical Assessment. A review of the CDCR initial assessment information and DSH's Medical and Physical Assessment showed that there was a significant amount of medical information collected and recorded by DSH beyond the CDCR initial assessment completed at time of arrival at SVSP.

DSH-Salinas Valley management staff reported a total of 163 admissions during the review period of December 2014 through May 2015.   Seven or four percent of the admissions were for competency examination under California PC 1370.  The range of days between referral and admission was two to 145 days, with 46 days as the average.

**5.**    **Discharges**

At the time of the June site visit, DSH-Salinas Valley reported it discharged 151 patients during the review period.  The average length of stay for patients discharged during the review period was 218 days with a range of seven to 926 days.  Some of the brief stays were due to pending release (e.g., parole) dates.

Data indicated there was no clinician-to-clinician contact for 67 or 44 percent of these discharges including three patients paroled.  There was clinician-to-clinician contact before the discharge for 26 or 17 percent of the patients and after discharge for 58 or 38 percent of the patients.  The longest period of time prior to a clinician-to-clinician contact occurring was 78 days after discharge.

Similar to the January site visit, it was observed that the discharge log did not consistently include the reason for discharge and the facility to which the patient was discharged. In some cases, the patient was transferred to another DSH facility rather than discharged from DSH care; however, the DSH-Salinas Valley discharge log did not document this.  It was also not clear that staff had received training regarding the requirement of clinician-to-clinician contact for pending discharge patients and there was apparently no system of accountability regarding this requirement.

It was also apparent that full discharge services were not provided to patients with pending parole or other release dates (e.g., maximum term) to the community while housed at

DSH-Salinas Valley. It appeared that DSH-Salinas Valley staff continued to rely heavily on the Transitional Case Management Project (TCMP) to provide such services without fully employing the treatment settings of the intermediate care program in this regard despite obvious significant need.

      **6.**      **ICC**

During the June site visit, DSH-Salinas Valley reported that 187 of 210 or 89 percent of ICC hearings were held within the required ten days. The data indicated that eight of 210 or four percent of ICCs were not applicable, and 15 of 210 or seven percent of ICCs exceeded the ten days, with a range of 11-37 days.

Two ICCs were observed. A clinical staff member attended both ICCs. At one of the ICCs observed, the patient was disengaged and the social worker verbally intervened several times to ensure he heard and understood what the committee was telling him. Due to his response to the intervention during the committee, he was offered medication Take as Needed (PRN). The staff worked well together during the ICC to ensure the patient understood what had happened.

      **7.**      **Parole Planning**

At the time of the June site visit, there were 23 patients who were being treated at DSH-Salinas Valley and had 90 days or less until parole. One patient refused pre-release services, and services could not be initiated for two patients who did not have social security numbers. The rest of the patients either received TCMP services at CDCR facilities, or had applications for SSI and Medi-Cal at CDCR facilities.

**VII.**   **PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE**

      **2.**      **Patient Disciplinary Process**

RVR training was previously conducted in February and April 2014.  Review of training records showed that required RVR training had not been completed for all clinicians at the time of the January site visit.

### 3.    Use of Force

At the time of the June site visit, DSH-Salinas Valley reported that during the review period, 321 DSH staff members, 158 MTAs, 24 psych techs, 29 nursing staff, 53 clinical staff and 57 administrative staff received use of force training.  Training sheets reflected use of force training under these training titles: cell extraction, non-custody new employee orientation, non-custody block (annual) training, health care staff training, revisions memo and mandatory/wardens rap, which was an hour spent by the warden providing updates and answering questions.

## VIII.   USE OF RESTRAINT AND SECLUSION

During the June site visit, DSH-Salinas Valley reported two episodes of restraints involving two patients for a total of five hours and twenty-five (5:25) minutes.  When comparing this usage to the previous review period, there was an increase in restraints by 30 minutes and a decrease by one patient.  The facility also tracked the use of seclusion.  DSH-Salinas Valley reported 108 episodes of seclusion room usage involving 56 patients.  Out of the 56 patients, 21 patients had two or more episodes of seclusion room utilization.

When comparing seclusion room hours per episodes and restraint hours per episodes between site visits, there was a decrease in seclusion room hours between the review periods.  There was also a decrease of 38 patient episodes.

## IX.    EMERGENCY RESPONSE, SUICIDE PREVENTION, AND THE DEATH REVIEW PROCESS

PRC reviewed critical incidents that occurred at DSH-Salinas Valley.  Minutes were provided for meetings during the month of January 2015 and for one meeting during April 2015, which documented the issues that were addressed in the meetings.

The SPC also met monthly; however, minutes were provided for two meetings during February and May 2015.

There was one death that occurred at DSH-Salinas Valley on January 17, 2015.  There was no evidence that this was a suicide; preliminary findings indicated that the cause of death was a heart attack.  The death review process was ongoing at the time of the June site visit.

## X.    UTILIZATION REVIEW AND QUALITY MANAGEMENT

Quality management activities at DSH-Salinas Valley had increased since the January site visit.  In coordination with DSH headquarters staff, DSH-Salinas Valley implemented several quality management initiatives to address identified areas of deficiency.  Some of these workgroups and activities included the following: Individual Treatment Workgroup, Curriculum Committee, Standardized Data Reporting Workgroup, DPS Alignment Workgroup and PaWSS Data Work Group.  In addition, various trainings were conducted to address newly implemented tracking and audits, new forms and curriculum changes.

The Utilization Review Committee (URC) met essentially every one to two weeks.  The URC maintained minutes, which were provided for review.  The minutes indicated that discussions included possible admissions and discharges as well as discussions regarding patients with long lengths of stay.  Meeting minutes did not reflect discussions regarding transfers of patients to four-man dormitories or transfer to other DSH facilities.

A Utilization Review Committee meeting was observed during the June site visit.  The meeting was attended by psychiatrists, clerical and administrative staff, as well as medical

191

physicians.  The majority of the meeting consisted of discussions regarding movement of patients into the four-man dormitories and the consequences of such moves.  A plan was in place to provide a period of observation on the unit of proposed dormitory placement so the treatment team could observe the patients prior to placement and to determine the appropriateness of such placement.  There was discussion regarding the implications of this plan which would affect other areas such as admissions.

When questioned regarding the process by which patients who had been ICC approved for two-man dormitories would be proposed for four-man dormitories, the staff acknowledged that this process had been underutilized.  There was also discussion regarding the movement of patients to DSH-Atascadero if appropriate.

The supervisory staff provided instruction to the staff to discuss in all IDTT meetings whether consideration for four-man dormitories had occurred, and direction that referrals should be made to the ICC regarding requests for four-man dormitory placement for those clinically appropriate individuals.  The staff also requested that CDCR provide this clearance information prior to patient transfer.

Near the end of the site visit, supervisory staff advised that discussions were underway regarding this issue with CDCR headquarters to ensure that patients were timely reviewed for four-man dormitory eligibility by custody staff.  It was noted that it will be important for the clinical staff to formalize the mechanism for review and consistently evaluate patients in treatment team for clinical eligibility.

## XI.    <u>UNUSUAL OCCURRENCES/SERIOUS INCIDENTS</u>

DSH-Salinas Valley tracked unusual occurrences and serious incidents, which were discussed in the Assault Review Committee and the PRC.  A total of 268 incidents were reported

during the June site visit, down by 140 or 34 percent compared to the January site visit, with an average of 53.6 incidents per month down by 14.4 or 21 percent.

A monthly nursing services report was provided for review, and contained documented SIR for each month, including information regarding suicidal behavior, seclusion, restraint use, medication related issues, transfers and other nursing related issues. Fifty-four or 20 percent of the incidents were suicide threats defined as any verbal indications that signal a patient in the psychiatric program was going to make a suicide attempt.


## XII.    END-OF-SHIFT REPORTS

A shift change meeting was observed on Facility C5 during the June site visit.  The meeting lasted about 30 minutes.  The meeting was attended by the psychiatrist, RN, psych tech, social worker, supervising RN, and MTAs.  The nurse reviewed each patient, providing brief highlights regarding each patient.  However, there did not appear to be any guideline or format for what should be discussed in this forum.  For example, there was no routine discussion of the patient's stage, although this may not have been done as it was posted on each patient's cell door (a confidentiality concern).  Many patients were merely reported as having "no issues" which on its face did not appear to be consistent with patients at the intermediate level of care.

When there was discussion, some pertinent issues such as medical needs were discussed, but the importance for the variety of disciplines present was not clearly stated (i.e. patient was reported as having a rash; but no indication of the potential impact of the rash on his mental status/behavior, need for closer monitoring etc.; similarly another patient was reported as experiencing auditory hallucinations but again this was not connected to the potential impact for the next shift).  There was minimal input from most participants.

A shift change meeting was also observed in TC2. This meeting was attended by the departing and arriving nursing, recreation therapy, clinicians and MTA staff. All of the patients on the unit were discussed. Topics included in the discussion were changes in stages, clinical status, medication changes and compliance and other clinically related issues.

## XIII.   LAUNDRY AND SUPPLY ISSUES

DSH-Salinas Valley had undertaken significant steps to remedy the laundry issues observed during previous monitoring tours. The program had dyed all of the underwear and sheets blue and stamped the new laundry items with DSH-Salinas Valley insignia to distinguish DSH clothing from CDCR's. DSH-Salinas Valley had also purchased, assembled and installed new laundry carts for both clean and soiled clothing and linens as part of the remedial steps.

Importantly, DSH-Salinas Valley had established a system with PIA that utilized a direct clothing pick up process from DSH-Salinas Valley, removing the need for DSH-Salinas Valley laundry to be handled by SVSP inmate workers.

Staff had been trained regarding the new method for processing incoming and outgoing clothing under the revised laundry procedure that had been approved and implemented via a December 29, 2014 memo pending a policy revision. Duties were specified for each shift and a one-for-one exchange process for patients at shower was implemented. Staff reported that this procedure was working.

Staff described DSH-Salinas Valley's laundry accountability process as successful, where two MTAs audited and reported any issues to the warehouse manager and DSH management.

ASP continued to do DSH-Salinas Valley's laundry. DSH-Salinas Valley provided a supply of shrink-wrap to ASP so the clothing bins could be wrapped after being laundered, which would aid in keeping DSH-Salinas Valley's laundry separated. Staff and patients were

interviewed and verified the new process was working.  The shrink-wrapped carts were observed after delivery from ASP.

Staff raised a concern that DSH-Salinas Valley's laundry was so voluminous there was growing apprehension that there might not be enough room to store it.

## XIV.  <u>VISITATION</u>

Visitation at DSH-Salinas Valley continued to be governed by the visitation policies of CDCR and SVSP.  Patient visitation must be approved by the IDTT.  All visits were non-contact and implemented by SVSP custodial staff.  Patients complained about the non-contact visitation policy.

## XV.  <u>LAW LIBRARY ACCESS</u>

Patients at DSH-Salinas Valley continued to access the law library electronically.  The policy was two hours per week unless the patient had an active case, wherein four hours per week were allowed.

## XVI.  <u>FOOD ISSUES</u>

Patients on Facility C5 and TC2 complained about the quality and quantity of their food.

## XVII.  <u>PATIENTS' RIGHTS AND CONCERNS</u>

Patients' rights posters were posted in all buildings where they were accessible to the patients.  During the June site visit, institutional data showed that there were 121 CDCR 602 appeals logged for the review period.  There were 39 or 32 percent granted, 39 or 32 percent were denied, 13 or 11 percent were withdrawn and 30 or 25 percent had no response.

The patient council met monthly.  Patient council minutes for January to May 2015 were reviewed.  Meetings were routinely held and used the same format:  announcements, old business and new business.  With the exception of TC2, council officer positions had been

vacant for each unit for the majority of the six months prior to the June site visit. Attendance, including staff and patients, was not documented. Overall, resolution to issues was not routinely documented; a clear plan for each issue was not documented (the issue was being "looked into" or a "work order" was submitted with no definitive timeframe for anticipated response) and some issues continued for two to three months with no clear resolution.

January 2015 minutes for Facility C6 indicated that the patient mentor program was indefinitely on hold. On the other hand, TC2 had an active patient mentor program. Issues were often related to food, which was also raised during an interview with patients on Facility C5. Additional issues were access to incentives or canteen and what appeared to be inconsistencies between CDCR and DSH policies.

Of concern, during the April 2015 Facility C5 meeting, the following item was documented, "We believe rounds were not being done correctly in the pods. We would like to have management look into the rounds to see if this can be resolved. This was the 3rd time we've politely asked to have rounds addressed." The response was, "The issue was moved to Upper Management and they have heard the concerns brought up by patients and this will be addressed via program wide trainings for the staff." A timeframe was not provided. Further, this item was not followed up on during the next month.

Another area of concern was documented in the Facility C5 patient council minutes. It was documented that "They said we were going to get more groups this quarter but we've been getting less and more solos." The response was ineffective, "If patients have issues with their current program and what groups they were being offered, they need to address this with their treatment team."

196

**XVIII. *COLEMAN* POSTINGS**

*Coleman* postings were observed to be appropriately placed and easily accessible to class members.  In each building the posters were placed near the patient telephones.

<u>APPENDIX A4</u>
DSH-Vacaville

**DSH-Vacaville**
January 20, 2015 – January 22, 2015
June 23, 2015 – June 25, 2015

## I.     SUMMARY OF THE FINDINGS

- **DSH-Vacaville reported functional vacancy rates of 12 percent for psychiatry, 26 percent for psychology, 24 percent for social work, and 20 percent for SMTAs, and a 24-percent vacancy rate for rehabilitation therapy.**

- **There was a 39-percent functional vacancy rate for senior RNs and a 70-percent vacancy rate for psych techs.**

- **Except for certain units in rehabilitation therapy and social work, DSH-Vacaville maintained the acute care staff-to-patient ratio of 1:15. There was a 1:35 intermediate care staff-to-patient ratio for all disciplines except psychology.**

- **Numerous DSH-Vacaville administrative and supervisory clinical positions were vacant or filled by staff in acting capacities.**

- **Positions for the clinical administrator, three of four program assistants, and one of two nurse coordinators, were all filled by acting staff.  Of five program director positions, one was filled by an acting employee and another was vacant.[40]**

- **Observed IDTT meetings varied in quality and content, but typically included therapeutic interactions with patients.**

- **IDTT meetings generally indicated the need for greater treatment plan specificity. Acute care program treatment plans generally did not address patients' STEP levels.**

- **Interviewed acute care patients were typically unaware of their treatment plans and STEP levels, reported difficulty obtaining assistance when they were decompensating or experiencing high stress levels, and stated that programming was too restrictive and punitive in nature.**

- **IDTTs often lacked clear criteria on patient placement in the LRH.**

- **Observed HCITC IDTT meetings revealed varying degrees of interdisciplinary patient discussion and patient interaction and engagement.  MTAs participated minimally in treatment team discussions.**

---

[40] The draft version of this report indicated that the health program coordinator position was vacant.  In response to the draft report, the DSH defendants indicated to the Special Master that of two health program coordinator positions, one was filled by a permanent employee and the other was filled by acting staff.

- **DSH-Vacaville had the capacity to track group therapy hours in the acute and intermediate care programs, but tracking system difficulties led to reporting problems.**

- **Observed intermediate care groups were therapeutic and patients reported benefiting from them.**

- **Observed HCITC groups were didactic and not necessarily relevant to patients' specific treatment needs.**

- **Acute care patients reported that individual therapy was not available and, except for occasional cell-front assessments, psychiatry meetings only occurred within the treatment team setting.**

- **Only STEP V acute care patients were eligible for yard. There was inadequate yard access for low custody intermediate care patients housed on units A2 and A3.**

- **DSH-Vacaville continued to use the STEP system for patient program advancement.**

- **The institution was noncompliant with review of acute care referrals within one day of receipt and review of intermediate care referrals within three days of receipt.**

- **Slightly over half of acute care patients transferred timely to DSH-Vacaville, and nearly all intermediate care referrals transferred timely.**

- **Patients did not parole directly from DSH-Vacaville. Most were seen by TCMP prior to DSH-Vacaville discharge, but did not participate in parole planning groups.**

By way of background on the Special Master's review of DSH-Vacaville, he conducted a previous examination of DSH-Vacaville as part of his court-ordered review of the inpatient programs in 2013. Order, filed July 11, 2013 (ECF 4688). DSH-Vacaville was examined over the course of four site visits occurring between September 11, 2013 and March 14, 2014. The Special Master found that while DSH-Vacaville had its own established clinical staffing ratios, they failed to satisfy them in all disciplines in seven acute care and three intermediate care units. In two of the units, ratios were not met in all four disciplines of psychiatry, psychology, social work and rehabilitation therapy. Other findings included, a default practice of cuffing acute care patients behind their backs with MTAs placed next to them in IDTT meetings, a lack of individual treatment to meet the needs of the patient population, the incapacity to track

individual treatment hours, generic and vague treatment plans for intermediate care patients, a lack of group therapy offerings in the acute and intermediate care units and limited, therefore inadequate, treatment space outside of the 64-bed HCITC. No laundry issues were identified. The Special Master's findings from his first review of DSH-Vacaville were contained in his report on the adequacy of all of the inpatient programs treating CDCR inmates, filed on May 30, 2014 (ECF 5156). He found significant variability among the inpatient programs' practices regarding orientation and cuffing of newly admitted class members, DPS and the steps/stages process, indicating the need for a consistent process in those areas statewide. His recommendations included that he be directed to conduct a further review of all inpatient programs, including DSH-Vacaville, and report his findings and conclusions to the Court. On July 25, 2014, the Court issued an Order adopting the Special Master's recommendations in full. ECF 5188.

The following is the Special Master's monitoring report on his findings from his second review of DSH-Vacaville, conducted in 2015.

## II.    CENSUS

On June 23, 2015, DSH-Vacaville had a functional capacity of 366 beds, which consisted of 218 acute care beds, 64 high custody intermediate care beds, and 84 low custody intermediate care beds.

Two hundred seven of the 218 acute care beds were filled, for 95-percent capacity. Three acute care beds had bed pending chronos due to incomplete referral packages from sending institutions; one acute care bed was on hold awaiting an accepted patient's arrival.

Sixty-one of 64 or 95 percent of HCITC beds were filled. The three empty beds were awaiting the arrival of accepted patients. Fifty-six accepted patients were on the HCITC waitlist.

Sixty-nine of 84 beds in the low custody intermediate care program were filled, reflecting 82-percent capacity. Of the remaining 15 beds, two were awaiting accepted patients and 13 dormitory beds were available. No patients were on the low custody intermediate care wait list.

DSH-Vacaville maintained the acute care wait list for all DSH programs and worked closely with SVPP to manage the high custody intermediate care wait list.

## III.     STAFFING

### 1.     Administrative and Clinical Staffing

At the time of the June 2015 site visit, positions for the executive director and hospital administrator were filled. A senior psychologist specialist in an acting position covered the position for the clinical administrator.

Permanent employees filled positions for three of five program directors, for acute and intermediate care, and performance improvement. Acting staff filled the position for the rehabilitation therapist program director. The social work program director position was vacant.

A permanent employee filled only one of four program assistant positions; such positions for rehabilitation services and acute and intermediate care were filled by clinicians in acting capacities.

One of two nurse coordinator positions was filled by a permanent employee; acting staff filled the second position.[41]

Positions for the chief psychiatrist and two senior psychiatrist supervisors were filled. The chief psychiatrist also assumed the medical director's duties; DSH-Vacaville was not

_____

[41] *See* foonote 40, *infra* p. 199.

allocated a medical director.  One senior psychiatrist supervisor was on leave and a staff psychiatrist in an acting capacity covered this position.

Positions for the chief psychologist, two senior psychologist supervisors, and three senior psychologist specialists were filled; one senior psychologist specialist was the acting clinical administrator.  Both supervising social work positions were vacant, but one was filled in an acting capacity.

Psychiatrists.  DSH-Vacaville had hired four psychiatrists since the January 2015 site visit.  As of June 2015, 23.75 of 27.4 psychiatry positions were filled, leaving a 13-percent vacancy rate.  One psychiatrist was the acting senior psychiatrist supervisor.  Two half-time contractors covered one psychiatry vacancy.  Four psychiatrists provided 0.5 FTE additional coverage, for a functional vacancy rate of 11.5 percent.

Psychologists.  Two psychologists promoted to senior psychologist supervisor positions in February 2015.  Nineteen of 26.4 psychologist positions were filled, for a 28-percent vacancy rate.  Four psychologists provided 0.42 FTE additional coverage, reducing the functional vacancy rate to 26 percent.

Social Workers.  Twenty-two of 26.4 clinical social work positions were filled.  Two social workers served in acting positions as a program assistant for intermediate care and a supervising social worker.  Five social workers provided 0.19 FTE additional coverage, for a 24-percent functional vacancy rate.

Rehabilitation Therapists.  Twenty of 26.4 rehabilitation therapist positions were filled, for a 24-percent vacancy rate.  Overtime from rehabilitation therapists provided an additional average of 42 monthly hours of service.  Two filled rehabilitation therapist intern positions provided coverage for the acute and intermediate care units.

MTAs.  Twenty-five of 34.8 SMTA positions were filled, for a 28-percent vacancy rate.
Three MTAs served as SMTAs, reducing the functional vacancy rate to 20 percent.  DSH-
Vacaville reported that three retired annuitants also provided services, but did not indicate their
hours of service.  One hundred ninety-four of 196 MTA positions were filled.

RNs.  Of 24.4 senior RN positions, 12.4 were vacant, for a 51-percent vacancy rate.  Staff
serving in an acting capacity covered three vacant nursing positions, reducing the functional
vacancy rate to 39 percent.  DSH-Vacaville reported one retired annuitant who provided
additional coverage, but did not report the number of hours.  All 70 RN positions were filled.

Psych Techs.  Ten of 33 psych tech positions were filled, for a 70-percent vacancy rate.

Other.  One of two HSS positions was vacant.  Of ten office technician positions, nine
were filled.  One of two positions for psychology post-doctoral interns was filled.

## 2.     Staff-to-Patient Ratios

DSH operated acute care programs with a 1:15 staff-to-patient ratio for psychiatrists,
psychologists, social workers, and rehabilitation therapists.  DSH-Vacaville maintained this
staff-to-patient ratio for psychiatrists and psychologists from January 1 through May 31, 2015.
Social workers exceeded this ratio during February, when it averaged 1:31.

Rehabilitation therapy exceeded the 1:15 staff-to-patient ratio on many occasions.  It was
exceeded throughout the review period in acute care unit P2, when it averaged 1:30.
Rehabilitation therapy also exceeded the staff-to-patient ratio in March, April, and May on acute
care unit Q1, when the ratio was 1:29.  On acute care unit Q3, the ratio was exceeded during
April and May, when it was 1:29.  The institution largely attributed these deficiencies in staff-to-
patient ratios to new certification requirements for rehabilitation therapists, impacting the pool of
qualified candidates.

DSH's intermediate care programs had a staff-to-patient ratio of 1:35.  DSH-Vacaville maintained this ratio during the review period for all disciplines except psychology.  Psychology's staff-to-patient ratio averaged 1:36 in unit A2 during January, and 1:37 in unit A3 during April and May 2015.

### 3.    **Staff Training**

All clinical staff, program management, supervising RNs, and discipline seniors and chiefs for the acute and intermediate care programs underwent PaWSS training.  Staff also participated in the PaWSS data workgroup.  In May 2015, nursing staff received training in treatment planning.  Also during May 2015, an intermediate care treatment team attended four days of advanced DBT training, while rehabilitation therapy service attended two days on DBT-informed treatment modalities for recreation and creative arts therapy groups.  In June 2015, all psychologists attended two days of training on Rorschach test interpretation and scoring.  DSH-Vacaville had also developed an annual nurse training for refreshers and focused training on nursing issues, which included DBT training for nurses.

## IV.    **TREATMENT AND CLINICAL SERVICES**

### 1.    **IDTT**

Observed IDTT meetings varied in quality and content.  Treatment teams were typically cohesive and included therapeutic interactions with patients.  Some projected the treatment plan so the patient could view it, but others did not and only minimally addressed treatment plans.

IDTT meetings typically revealed the need for greater treatment plan specificity, such as indicating patients' treatment groups and structured enrichment groups.  Most treatment teams did not discuss whether individual therapy was indicated for a patient or whether it was part of the treatment plan.  Treatment teams typically did not provide sufficient feedback to the patient,

while assessments were conducted during some meetings, distracting the team's efficacy. Treatment teams also varied in the amount of time spent reviewing patients' STEP levels and as to the criteria for STEP progression. Some, but not all, reviewed current STEP levels and the behavioral objectives for STEP advancement.

Many treatment teams were not clear regarding criteria for consideration of a less restrictive environment for the patient. There was no standardized process for such consideration, although DSH headquarters was working on a statewide process. This was particularly apparent during an IDTT meeting that referred a patient from acute to intermediate care where clinicians cited insignificant factors to justify a clinical deferral of dorm living, for which custody had cleared the patient; staff were either uninformed or misinformed and were using inappropriate criteria. Although the treatment team opined that the patient was appropriate for DSH-Atascadero treatment, it stated that it did not believe he could be referred there for intermediate care treatment, despite previously having received treatment there.

a. **Acute Care**

An observed acute care IDTT meeting was problematic from a clinical perspective in the context of the diagnostic process. Specifically, available sources of information, such as contact with referring CDCR clinical staff, were not obtained, while questions related to the presence or absence of the patient's apparent psychotic symptoms were not adequately addressed. The eventual plan was to refer the patient to intermediate care for "diagnostic clarification." All appropriate clinical staff attended this IDTT meeting and most provided input. The patient was uncuffed and two correctional officers stood beside him.

Acute care treatment plans were typically limited in scope, reflecting the limited programming available in DSH-Vacaville's acute care program, and generally did not address the patient's STEP level.

### b. High Custody Intermediate TC Program

Observed HCITC IDTT meetings typically revealed attendance by required staff, although some MTAs participated minimally. However, treatment team members did not always introduce themselves or identify their respective roles to patients.

HCITC IDTT meetings indicated varying degrees of interdisciplinary discussion and patient interaction and engagement. Some meetings revealed familiarity with patient histories and clinical participation in an interdisciplinary manner. The IDTT meetings typically reviewed patient progress toward treatment goals, although they did not systematically review other aspects of patients' treatment such as diagnosis, medications, or specific interventions. However, treatment teams' typically documented patient strengths, focused on short-term objectives, and appropriately addressed discharge issues.

In other instances, the treatment team's interaction with patients was problematic; patients were questioned about treatment goals, but staff provided minimal feedback as to achievement of goals. Often there was no discussion about prescribed medications, patients' responses to medication treatment or compliance, nor the possibility of patients' movement to dormitory settings or transfer to other DSH facilities. The use of unfamiliar clinical language and jargon by some staff risked confusing patients and limited their IDTT involvement.

Treatment teams had been trained in the PaWSS module for treatment planning as of June 2014 to produce a more robust correlation between treatment plans and specific interventions.

2. **Group Therapy**

DSH-Vacaville's curriculum workgroup made recommendations regarding the use of terms and definitions for all three of DSH's psychiatric programs toward improvement in consistency of services and data collection. Treatment groups were defined as therapeutic groups that educated patients about psychiatric and psychological disorders and/or skills to manage them. They included groups on mental health education, symptom management, coping, life, and social skills, relaxation, stress and anger management, substance recovery, and problem solving. All followed a specific lesson plan or group protocol with specific objectives for each weekly session and were documented in MAPP.

Structured enrichment were leisure groups that followed a particular lesson plan or group protocol with specific weekly objectives. Unstructured enrichment were leisure activities without a lesson plan or specific objectives and desired outcomes. During unstructured enrichment, patients independently engaged in activities such as yard, or staff provided loose structure through activities such as bingo. These groups were scheduled in the PaWSS' supplemental activities module.

Tracking system difficulties resulted in reporting problems for both the acute and intermediate care programs.

a. **Acute Care**

In April 2014, a workgroup began developing clinical supplemental groups for the acute care program that MTAs would facilitate. By July 2014, all acute care units had implemented these clinical supplemental activities. Groups were limited to eight patients and were held in the dayroom.

Patients' weekly total treatment averaged 10.7 hours scheduled, 10.6 hours offered, and 6.0 hours delivered.  Patients' weekly group therapy, which consisted of group therapy and structured enrichment, were 4.1 hours scheduled, 4.1 hours offered, and 4.0 hours delivered. Patients' weekly average unstructured enrichment were 6.1 hours scheduled, 6.0 hours offered, and 1.5 hours delivered.

### b.  **Intermediate Care**

DSH-Vacaville also tracked the intermediate care program's group therapy hours.  For this program, patients' weekly total treatment hours averaged 33.6 hours scheduled, 31.5 hours offered, and 16.9 hours delivered.  Patients' weekly group therapy hours, which included group therapy and structured enrichment, were 12.6 hours scheduled, 10.5 hours offered, and 9.5 hours delivered.  Patients' weekly unstructured enrichment averaged 21 hours scheduled, 21 hours offered, and 7.4 hours delivered.

Observed intermediate care groups were therapeutic.  Patients reported benefitting from group participation, but there was a need for supervision and training of group therapy facilitators.

Observed HCITC treatment groups on symptom management and cognitive behavioral therapy for depression revealed 12 patients in each group, facilitated by a psychology intern and social worker.  Groups were held in a large, bright room organized in a classroom fashion.  Both provided information about their subject matters and revealed broad patient participation. However, both were didactic in nature.  There was no evidence that patients' individual treatment plans were the focus of this group participation, nor did the groups provide patients with an opportunity to actively work on their problems.  Groups assigned homework, but there was no discussion of prior homework or evidence of its integration into the group's work.

During the June site visit, there were two intermediate care patients on DPS status.  DPS groups and/or solo programming were ongoing.  Patients observed in DPS groups or solo programming sessions in the HCITC were uncuffed, and clinicians saw patients without using therapeutic modules.

### 3.  Individual Therapy

The curriculum workgroup also defined individual therapy and clinical contacts. Individual therapy was a therapeutic session where one clinician met with one patient for more than 15 minutes.  The sessions were goal-directed, with specific desired outcomes, and were re-occurring and part of the patient's treatment plan.  MAPP scheduled the sessions.

Individual clinical contacts were brief, unscheduled contacts where one clinician met with one patient to address emergent issues.  MAPP recorded the contact and clinicians documented the session in the patient's medical record.

#### a.  Acute Care

Acute care weekly individual therapy sessions averaged 0 hours scheduled, 0 hours offered, and 0 hours delivered.  Patients' weekly individual clinical contact hours averaged 0.48 hours scheduled, 0.48 hours offered, and 0.47 hours delivered.

During the January site visit, interviewed acute care patients reported that individual therapy was not available to them.  They further reported that, with the exception of occasional cell-front assessments, their meetings with psychiatry did not occur on an individual basis, but only took place within the setting of the treatment team.  This appeared to be predominantly due to the lack of office space for such meetings.

### b.  Intermediate Care

From January 1, 2015 through May 31, 2015, the intermediate care program, patients' weekly individual therapy averaged 0.21 hours scheduled, 0.18 hours offered, and 0.18 hours delivered.  Weekly individual clinical contacts averaged 0.02 hours scheduled, 0.02 hours offered, and 0.02 hours delivered.

At the time of the January site visit, in the HCITC 21 or 32 percent of 59 patients were seen one hour weekly for individual treatment.  In the low custody intermediate care program, 29 of 67 or 43 percent of patients received one hour of weekly individual treatment.  Staff reported that individual therapy was prioritized for patients who engaged in repetitive self-injurious behavior, were cognitively impaired or on DPS, had active psychotic symptoms and were unsuitable for groups, or had severe borderline traits.

### c.  Psychiatry Contacts

DSH continued to work to better track psychiatry contacts; the completion of initial psychiatry contacts was an area of improvement.

### 4.  Other Treatment Issues

### a.  Medical Services

Although access to medical care had been problematic during a prior site visit, there was no evidence to indicate it was a recurring issue.  Reviewed mental health and medical records indicated frequent and consistent medical evaluations and treatment for DSH-Vacaville patients.

### b.  Care of Condemned Patients at Acute Level of Care

During the January site visit, staff reported that there had not been any condemned male patients receiving treatment in the acute care program for at least the prior six months.

### c. **Yard**

The DSH-Vacaville Program Manual, Policy and Procedure 3.06, stated that yard shall be held one hour per day, per unit, weather and security permitting. However, in the acute care program only STEP V patients were eligible for yard, which was held outdoors in relatively large space, but with limited recreational equipment. Even at STEP V, acute care patients were only offered a maximum of three hours of weekly yard. Patients reported that it was common not to receive yard daily. Staff was unable to provide a clinical explanation for restricting yard to STEP V patients. Moreover, previous problems with MTA allocations had decreased since there were additional MTA allocations that were specific for yard time.

During the January site visit, HCITC patients indicated receiving one hour of dayroom every other day and on weekends; yard alternated with dayroom privileges. Patients did not go to yard during inclement weather.

Yard access was inadequate for low custody intermediate care patients housed on A2 and A3; these patients only had access to a covered patio located off of both units.

### d. **PBST**

DSH-Vacaville's PBST consulting team included a psychologist, a second psychologist who specialized in IEX treatment, and an MTA. The PBST was a valuable treatment service that interviewed patients, attended IDTT meetings, and developed treatment plans to assist patients and the IDTT to address behavioral issues including IEX, self-injurious behaviors, and resistance to treatment. The PBST's caseload primarily consisted of acute care patients, but also included intermediate care patients.

There were changes in the PBST during the review period. The PBST's supervisor reported that the quality of individual behavioral plans was problematic, which record review

confirmed.  Specifically, individual behavioral plans often were not documented in the chart, referenced by the treatment plan, nor referred to by staff, while chart review did not confirm whether behavioral consults had occurred.  Of eight reviewed behavioral plans, several had too many diverse behavioral targets, which made the plans scattered and unfocused.  Reinforcers were insufficient in number and frequency and were not salient to patients in all cases.  There was thus a tentative training plan to remedy these weaknesses.

### e.  Medication Management

DSH headquarters had developed a psychiatrist/psychopharmacologist program at DSH-Vacaville where psychopharmacologists consulted with DSH clinicians to assist with medication management of difficult cases.  This program remained active and was clinically useful.

### f.  Education

The California High School Proficiency Examination became available to DSH patients in March 2015.  Ten DSH-Vacaville patients had participated, and one had taken the exam.

### g.  Showers

Administrative staff reported that previous issues with inmate showering, including malfunctioning showers, had been corrected.

## V.  PATIENT ACCESS TO TREATMENT

### 1.  Patient Distribution

DSH-Vacaville continued to use the STEP program to identify each patient's privileges and access to activities at the institution.  However, this behavioral incentive system was under review at the statewide level at the time of the June site visit, although changes had yet to be made.

On June 23, 2015, patient distribution in the STEP program for the acute care program was as follows: there were 41 patients at STEP I, 30 at STEP II, 17 at STEP III, three at STEP IV, and 87 patients at STEP V. Additionally, the acute care pilot program had six patients at STEP I, nine at STEP II, and 14 at STEP III. The HCITC had two patients at DPS, two at STEP 1, 16 at Step 2, and 41 at STEP 3. For the intermediate care low custody program, there were five patients at STEP 1, 16 at STEP 2, and 50 at Step 3.

STEP program patient distribution was encouraging for the intermediate care programs. However, in the acute care program, it was bimodal and therefore problematic as too many patients were at either end of the spectrum; such patient distribution could only partially be explained by a recent influx of admissions. It was positive for so many acute care patients to be at STEP V, but concerning for so many to be at STEPS I and II.

### 2. Acute Care STEP Program

Newly-arrived acute care program patients were placed on Orientation/STEP I, during which nursing staff explained the STEPs to them and patients remained handcuffed whenever they were removed from their cells. As patients demonstrated skills, they advanced through the STEP program, obtaining increased opportunities for activities and interaction with other patients, and additional property rights.

Despite staff reports that STEP progression was based on two successful 30-minute out-of-cell activities, the policy, in APP Manual 03.10, did not indicate objective criteria for STEP progression. Rather, it indicated that STEP advancement was based on patient behavior and treatment team review and approval. Staff also offered conflicting opinions as to whether patients typically moved quickly through the STEP process.

214

### 3. **Intermediate Care Progression**

Advancement in the intermediate care program was similar to acute care program progression. However, the HCITC had four stages instead of five STEPS, namely DPS/Orientation, and STEPs 1, 2, and 3. The low custody intermediate care program did not have DPS/Orientation, but started at STEP 1.

HCITC patients were placed on DPS until cleared by the ICC and addressed by the IDTT. At DPS, the patient attended DPS groups of up to four patients in mechanical waist and ankle restraints. DPS patients had limited phone use, visitation per treatment team and custody clearance, could check out books from the mainline library and in-cell recreation supplies per issue status, and attended yard solo. They had full clothing issue and personal property in their room unless clinically contraindicated by Policy 5.13.

At STEP 1, HCITC patients attended groups without mechanical restraints and had additional privileges that included signing up for haircuts, shaving, and the use of nail clippers, and limited canteen privileges of up to $10.00. Low custody intermediate care patients were allowed property, which was generally limited to personal hygiene items, and limited telephone use at treatment team discretion, but were ineligible for off unit activities such as gym for the first ten days after admission, nor allowed special purchases; visits were per treatment team discretion. Patients were expected to advance out of STEP 1 within ten days. Otherwise, the treatment team was to provide a full clinical rationale in the record, but record review indicated this did not occur.

Progression to STEP 2 for HCITC patients required attendance at all therapeutic activities, group participation, maintenance of personal hygiene and their cell, completion of all assignments, and adherence to community rules, all with minimal prompting. It also required

participation in therapeutic community meetings, recovery from behavioral lapses without serious disruption to the treatment plan, respect for others and their property, appropriate interaction and socialization with other patients and staff, and medication compliance.

Review of DSH-Vacaville documentation indicated that patients who disturbed or provoked others, or refused to participate in scheduled activities, meetings, assessments, or treatment groups, were retained at STEP 1 and evaluated by the treatment team for continued program participation or possible discharge.  However, this was problematic as many intermediate care referrals were for patients who were unable to participate in treatment at their sending facilities.  As mental illness could be the reason for the patient's lack of participation, clinically enhanced treatment, and not program expulsion, was the more appropriate response.

At STEP 2, additional privileges included attendance and participation in all groups, eligibility for an in-cell radio, and an increase in canteen privileges up to $20.00.  At STEP 2, low custody intermediate care treatment program patients' privileges included telephone privileges, visitation, and eligibility for the inter-wing treatment program, ward government positions, and off-unit activities such as gym, as well as the ability to check out a radio.

Patients had to wait until their 30-day treatment team meeting before STEP 3 advancement was possible.  Patients in both the HCITC and low custody ITPs had to fulfill all of the above expectations without prompting and be free of disciplinary action for 30 days, in addition to active and appropriate group participation.  Slightly more social or community activity was expected of low custody intermediate care patients.

At STEP 3, HCITC patients were expected to continue to attend and participate in all groups, and in addition to previously granted privileges, were also eligible for Wii group

privileges, permitted to have an in cell television, were eligible for ward government chairperson or secretary positions, and had increased canteen privileges of up to $35.00.

In addition to the privileges granted at STEP 2, at STEP 3 low custody intermediate care patients received special events, such as movies and special activities, Wii game privileges, the ability to check out musical instruments, eligibility for the inter-wing treatment program, a mentorship position, and off-unit activities, such as gym, and an extra weekly shower.

### 4.  **STEP Reduction**

DSH policy stated there should be substantial documentation regarding STEP level reduction and that patients should clearly know the reasons for any reduction.  Nonetheless, some patients stated being unaware of the reasons for reduction in their STEP level, while also expressing the belief that the STEP system was punitive.  Review of several patients' records demonstrated the inability to locate the rationale for STEP level reduction in one chart, while the rationale was vague and unclear in another.

Review of other records indicated multiple treatment plans that did not identify the patient's STEP level.  For patients on STEP 1/DPS, treatment plans did not target the underlying reasons for these STEP levels.

### 5.  **Pilot Program**

At the time of the June 2015 site visit, a pilot program consisting of a new treatment structure was in operation on acute care unit P1.  The pilot committee had begun meeting in October 2014 and the pilot was implemented in February 2015.  It sought to ensure that patients' treatment matched clinical needs, conduct the most current empirical treatment groups, and greatly increase patient treatment hours.

The pilot was comprised of four different treatment pathways:  psychosis, impulsivity, anxiety, and hopelessness.  Patients were assigned a treatment track that included specific groups based on an assessment during the first ten days.  As such, patients in the psychosis pathway received cognitive therapy for psychosis, social skills training, recreational therapy focused on grounding, and nursing groups.  Impulsivity track patients received dialectical behavior therapy, recreational therapy groups focused on mindfulness, nursing groups, and individual therapy or PBST behavior plan.  Anxiety pathway groups included cognitive behavioral therapy for anxiety/depression, social skills training, recreational therapy groups focused on relaxation, and nursing groups.  Treatment groups for the hopelessness track included cognitive behavioral therapy for anxiety/depression, acceptance and commitment therapy for loss and depression, recreational therapy groups focused on behavioral activation, and nursing groups.  Supplemental groups based on treatment needs, such as parole planning, were also available.  Pilot participants were supposed to receive a copy of their group schedules, but reported not receiving them.

A significant amount of time was spent identifying appropriate treatment for the pilot. However, the pilot initially lacked a methodological design for implementation, and specific outcome measures, although some outcome measures were identified as the pilot progressed. There also was no selection criteria for the pilot's patients.  Eight workgroups were assigned to develop treatment curricula for psychology, social work, and rehabilitation therapists.  The pilot's evaluation periods were after six and 12 months; no rationale was provided to justify the lengthy evaluation period.

Staff reported that the pilot's paranoid patients were developing rapport with one another as they attended groups together, and they were more trusting and engaged in treatment groups. Some staff reported this for other treatment tracks as well.  Staff further reported that pilot

patients' progressed more quickly through the STEP levels, which was one of the pilot's objectives, but there was no data on pilot outcome measurements.

### 6. Unit P3 Conversion

During the site visit, the P3 unit, which had been proposed as a new low custody intermediate care unit, was toured. This 30-bed unit was previously used as an intermediate care unit, but was subsequently retrofitted for acute care; cells had coverings for vents and beds were changed to prevent ligature tie-off points. Rooms had electrical outlets and the unit had interview rooms, clinical office space, and one large group room. However, due to the decrease in the acute care wait list at the time, the unit never opened. Unit O3, which would be used for group therapy for the P3 unit, was also toured.

Review of a proposed schedule for the P3 unit dayroom indicated 22 treatment groups with an average of eight patients per group, which would provide 176 weekly patient hours. The schedule also indicated 15 treatment groups with an average of eight patients each proposed for the O3 unit, providing 120 weekly patient hours. Twelve small DPS groups of up to four patients each would also occur in the P3 dayroom, providing 48 weekly patient hours. Twenty-five hours of individual sessions with the psychiatrist, psychologist, or social worker using an interview room in unit P3 would provide 25 weekly patient hours. This would total 369 weekly patient hours, or an average of 12.3 hours per patient. Additional structured and unstructured enrichment activities included yard, evening and weekend leisure, and other weekend activities. The unit was now scheduled to open in August 2015.

## VI.   ADMISSIONS AND DISCHARGES

### 1. Referrals and Admissions

Of 355 referrals to DSH-Vacaville's acute care program from January to May 31, 2015,

306 or 86 percent were reviewed within one day.  Eighty-five of 111 or 77 percent of

intermediate care program referrals during this time period were reviewed within three days.

DSH-Vacaville rejected two acute care referrals due to medical conditions; no intermediate care

referrals were rejected.

From January through May 31, 2015, DSH-Vacaville admitted 355 patients to the acute

care program, of which 200 or 56 percent transferred within 10 days of referral.  During this

same period, of 111 patients admitted to the intermediate care program, 110 or 99 percent

transferred within 30 days of referral.

Once admitted, DSH-Vacaville tracked relevant data concerning institutional

classification, including any reasons for delays in ICC action on admission.  Review of

intermediate care admissions revealed an average of 2.5 days from admission to ICC; one outlier

of 29 days was for a patient whose file required "SHU clean up" prior to the ICC meeting.

Two ICC meetings for acute care patients were observed.  The warden chaired the

meeting; other attendees included the chief deputy warden, correctional counselor II, DSH

clinician, staff assistant, and escort officer.  ICC committee members were interactive and most

issues were decided collaboratively by the correctional counselor and clinician.  Patients

attended and participated in ICC meetings.

Observation of a HCITC admission revealed two custody officers who were not part of

the treatment team seated outside of the room; an open door created a non-confidential admission

setting, which appeared to be a common practice.

2.  **Discharges**

Between January 1, 2015 and April 30, 2015, acute care program stays averaged 81.5

days and intermediate care stays averaged 200 days.  During this same period, DSH-Vacaville

discharged 299 patients from acute care and 94 from intermediate care.  The average number of administrative days following clinical discharge from the program was three days for both the acute and intermediate care programs.

### 3. Parole Planning

Clinicians identified patients within 60 to 90 days of parole for inclusion in parole planning groups.  Parole planning included contacting the CDCR TCMP approximately 60 days prior to parole for discharge planning, access to a website that provided lists of services such as housing and food banks, and support from a CDCR clinician for patients with disabilities.  Patients were included in parole planning groups each cycle through treatment team referral.

CDCR patients who received acute or intermediate care treatment did not directly parole from DSH-Vacaville.  The DSH-Vacaville Clinical Assessment Team (CAT) also identified patients who required MDO evaluations approximately three months prior to parole.  Patients with positive evaluations paroled to DSH-Atascadero and did not receive discharge planning while at DSH-Vacaville.  The remaining acute and intermediate care patients either transferred back to the EOP program at their sending institution approximately three weeks prior to parole or, if clinically unstable, were sent to the CMF MHCB for evaluation for California Statute 5150 purposes once paroled.

Between January and April 2015, there were 87 DSH-Vacaville patients who had parole dates within 90 days.  Of these patients, 12 were MDO positive and paroled to DSH-Atascadero.  One patient was discharged to an MHCB unit.  Sixty-three of the 87 patients were seen by TCMP prior to discharge from DSH-Vacaville, while 14 of the 87 participated in parole planning groups.

## VII.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

### 1.    Special Incident Reports

Between January 1, 2015 and May 31, 2015, DSH-Vacaville reported 83 unusual occurrence incidents.  Twenty-one patients required medical treatment related to an unusual occurrence; six were due to suicide attempts and nine were due to self-injurious behavior.  The nine self-injurious behaviors involved seven patients; one patient had three incidents, two required hospitalization, and one resulted in medical treatment.  A total of 13 patients required hospitalization.

### 2.    RVRs

Clinicians responsible for preparing RVR mental health assessments were scheduled to receive training on updated assessment procedures.  DSH-Vacaville clinicians also reported having received the CDCR PowerPoint presentation on RVR mental health assessments approximately two years prior to the January site visit.  Staff indicated that new employees received proctoring from senior clinicians, including review of the PowerPoint, but did not receive the formalized training.

### 3.    Cell Extractions

There were ten cell extractions between January 1 and May 31, 2015, of which four were related to PC 2602.  Two cell extractions were reported to have resulted in inmate injury, while four involved staff injury.

### 4.    Use of Force Training

DSH-Vacaville reported that the training department SMTA had received training on the new use of force policies.  The training was incorporated into the annual off-post training for MTAs.

**VIII.   SECLUSION AND RESTRAINT**

There were no episodes of seclusion.

As to restraint, one acute program patient required behavioral five point restraint due to danger to others.  The restraint duration was 0.92 hours, and the patient did not experience any medical complications during or following the use of restraint.  A nursing audit conducted for this sole restraint incident indicated 100-percent compliance.

**XIV.   UTILIZATION REVIEW AND QUALITY MANAGEMENT**

**1.   CMT Committee**

DSH-Vacaville had a robust quality management system.  The clinical director chaired the CMT's weekly meetings and minutes were maintained.  No roster was provided to determine meeting attendance.  Minutes reflected discussion of numerous issues, including O Wing scheduling, MAPP rosters, clinician treatment hour expectations, and admission and discharge topics.

**2.   Performance Improvement Program (PIP)**

The Performance Improvement Program met bimonthly.  Minutes reflected that it was an active group that monitored and tracked various issues and areas for improvement.  Addressed issues included CTC licensure, post-hospitalization audits, seclusion and restraint, migration to the PaWSS incident management module, the O wing pilot, and collaboration with the CMF quality management department.  PIP audits addressed admission psychological assessment completion, treatment planning recommendations, language barrier identification, and special accommodations.

### 3. Utilization Review Committees

The Utilization Review Committees consistently met and produced comprehensive monthly reports. Committees were active in both the acute and intermediate care units. Minutes reflected discussions of individual patients concerning their lengths of stay, current status, need for continued hospitalization, discharge, and follow-up.

### 4. Performance Improvement Health Services Specialist (HSS)

The Performance Improvement Health Services Specialist had primary responsibility for conducting audits of the records of all patients who were discharged to outside hospitalization and then re-admitted to DSH-Vacaville's acute or intermediate care programs for ongoing psychiatric treatment. However, a report was not generated as to this review process. From June through November 2014, DSH-Vacaville documented 12 instances in which patients were admitted to outside hospitalization for medical care and were subsequently re-admitted to DSH-Vacaville for continuing psychiatric care.

## X. EMERGENCY RESPONSE/SUICIDE PREVENTION AND THE DEATH REVIEW PROCESS

DSH-Vacaville's MIRC remained active. Ten separate workgroups addressed issues and developed specific goals. Among them, there was evaluation of the feasibility of the CAT contacting patients' previous DSH facility for specific documentation prior to patient admission and identification of additional documentation that was needed. Also addressed was implementation of environmental suicide risk assessment recommendations, development and implementation of a patient education program, a group therapy refusal protocol, and regular auditing of charts by all disciplines, incorporation of a cultural risk formulation as a standard part of the suicide risk assessment, development of discipline specific training on documentation

requirements, establishment of a SPC, and improvement of documentation and prompt communication between team members.

As to suicide prevention training, there were administrative directives regarding annual mandatory and new employee suicide prevention training. Information was also provided regarding a tracking tool for suicide risk assessments. However, this information was specific to the initial suicide risk assessment that occurred soon after admission and there was no indication that there had been an expansion of the conduct of the suicide risk assessment at other clinically relevant times during the patient's hospitalization.

There were no RMC meetings during the review period. DSH-Vacaville had an adequate Death Review Process.

## XI.    END OF SHIFT REPORTS

An observed end of shift meeting for the acute psychiatric program indicated the covering of appropriate content, but all staff was not present at the meeting; MTAs stood in the hallway. Otherwise, the meeting was interactive and informative.

Observation of an end of shift meeting on unit A2 in the intermediate care program revealed the presence of arriving and departing staff. The shift leader discussed all unit patients, including new admissions and upcoming discharges. Staff discussed patient statuses and concerns that patient property, including glasses, canes, and address books, did not follow CDCR patients. An observed end of shift report in the HCITC discussed each patient's condition and any changes in the patient during the shift.

## XII.    LAUNDRY AND SUPPLY ISSUES

There were no reported laundry or supply issues.

### XIII.  **FOOD ISSUES**

There were no reported issues regarding food.

### XIV.  **VISITATION**

The institution was in the process of revising the visitation policy for the acute care treatment program to permit contact visits.  Final implementation of the policy was expected for July 2015.

The online visitor processing appointment scheduling system (VPASS) did not allow for pre-scheduling of the visitation rooms used for DSH patients.  This created crowding and delays on visiting days and sometimes resulted in visits not being completed.  Accordingly, DSH-Vacaville was in discussions with CMF to create a telephone appointment system which allowed visitors to pre-schedule DSH patient visits.

Family visits in the HCITC were contact visits.  Families who came from a long distance could be granted an extended visiting period with prior approval.  Tour of the visitation area indicated two rooms that were designated for contact visits.  Each room contained a table with four connected stools.

### XV.  **LAW LIBRARY ACCESS**

There were no problems reported with patient law library access.

### XVI.  **PATIENT'S RIGHTS AND CONCERNS**

DSH-Vacaville patients used the inmate appeals process (CDCR 602) to file complaints.  Review of summaries of the appeals data indicated that patients filed appeals related to living conditions, mail, medication, access to care, property, visitation, legal access, staff conduct, program discharge, canteen operations, policy and procedures, diet, and program privileges, among other matters.

Interviewed acute care patients were unaware of their treatment plans and STEP levels. They reported that psychiatry contacts typically occurred during IDTT meetings or at cell front and, as such, stated they were uncomfortable being open with psychiatrists. They also complained about the lack of access to individual meetings with either a mental health clinician and/or their psychiatrist. They all described prior experiences in an EOP program to be much more favorable in comparison to their current DSH-Vacaville placements.

Acute care patients reported that time out of cell was the best part of the program, but the amount of such out-of-cell time was inadequate. They also indicated that it could be difficult to quickly obtain assistance when they were decompensating or experiencing high stress levels; some patients stated having to bang on the door to get the SMTA's attention. Patients also mentioned "alternative programming," which facility reports identified and which patients explained involved their going to the dayroom instead of going outside to yard; patients believed that this occurred when solo yard took place at the same time. They reported preferring increased treatment and indicated limited access to indigent supplies. Patients reported that programming was limited and too restrictive and punitive in nature.

Observation of the community meeting on unit A2 indicated attendance by all patients and most unit staff. Staff and patient leaders co-led the meeting. At this meeting, patients expressed concern with perceived limited visitation and yard. Staff provided information on a new program to obtain a high school equivalency certificate and a workgroup that was examining visitation. The meeting was an adequate vehicle for staff and patients to exchange information and voice concerns. Several interviewed low custody intermediate care patients indicated benefiting from program involvement.

DSH-Vacaville reported surveying 21 acute care treatment patients who had attained STEP III. The survey indicated that 75 percent believed they were at the appropriate level of care, 95 percent were cognizant of prescribed medications, and 85 percent reported that medications were helpful. As to treatment planning, 90 percent were satisfied with staff encouragement to continue participation, and 77 percent reported being involved in the process as much as they desired. Ninety percent rated treatment in the acute care program as good.

DSH-Vacaville also surveyed 79 patients who received intermediate care treatment. The results indicated that 87 percent believed they were at the appropriate level of care, 84 percent were cognizant of prescribed medications, and 84 percent felt that medications were helpful. As to treatment planning, 83 percent reported satisfaction with staff encouragement to continue participation, and 84 percent indicated involvement with the process as much as they desired. Ninety percent rated their intermediate care treatment as good.

## XVII. *COLEMAN* POSTINGS

*Coleman* postings were observed to be appropriately placed in areas accessible to class members.

APPENDIX A5
DSH-Stockton

**DSH-Stockton**
January 27, 2015 - January 29, 2015
June 17, 2015 - June 19, 2015

## I.    SUMMARY OF THE FINDINGS

- **DSH-Stockton had a 30-percent vacancy rate in psychiatry, a 28-percent vacancy rate in psychology, and a 21-percent vacancy rate in social work.**

- **IDTTs did not use a standardized process for reviewing patients' appropriateness for dormitory housing or referral to intermediate care.**

- **During some observed IDTT meetings in the ATP, individual assessments were being conducted during the meeting, which detracted from the effectiveness of the IDTT dynamic.**

- **In numerous reviewed cases in the ATP, diagnoses were assigned to patients without supporting documentation or evidence discernible from the record.**

- **Patients in the ATP continued to receive very little out-of-cell treatment, which is inadequate for patients at that level of care, and particularly so in cases where treatment plans are insufficiently individualized.**

- **Numerous reviewed treatment plans in the ATP were overly vague and could not reasonably be expected to work as a platform for actionable treatment interventions, objectives, and goals.**

- **Staff demonstrated good interaction and rapport with patients during observed IDTT meetings in the ATP.**

- **In the ITP, IDTT meetings were generally not well-structured, with treatment objectives and goals not an important focus of the meetings.**

- **Patients in the ITP described the quantity of treatment they received overall as "minimal."**

- **In some reviewed cases, it was found that patients' symptoms of mental illness were mis-attributed to volitional misbehavior, despite the fact that documentation indicated the symptoms were due to mental illness or cognitive impairment.**

- **Many reviewed treatment plans were neither appropriately individualized nor operationalized through achievable treatment targets and goals.**

- **By the time of the June 2015 site visit, no changes had been made to policies or practices in the Steps and Stages programs, maximum custody status, DPS, or orientation status.**

- **Treatment for patients on restrictive Steps and Stages remained problematic, as it appeared that these patients were not receiving treatments targeted at the underlying causes of their restrictive statuses.**

- **DSH-Stockton reported that it did not provide pre-release planning services to patients.**

- **Seclusion rooms were not used at DSH-Stockton.**

- **Restraints were being used appropriately.**

- **DSH-Stockton continued to use a multi-level quality management system.**

- **No issues with food, laundry, supplies, *Coleman* postings, or access to law library were found.**

- **By the time of the June 2015 site visit, the institutional policy on visitation was modified to allow contact visits for patients deemed appropriate for them.**

A brief history of the origin and history of DSH-Stockton is in order to aid the reader's comprehension of the context and mission of this program, particularly given the uniqueness of its beginnings.  The concept of DSH-Stockton began in July 2008 with the *Plata* Receiver's plan to construct 10,000 new medical and mental health beds to serve the needs of California prisoners.  After several iterations of a court-ordered plan to provide beds at the inpatient level of care to *Coleman* class members, on July 31, 2009 defendants filed a Long-Term Bed Plan Status Report with the *Coleman* Court.  ECF 3639.  Defendants reported that a Correctional Health Care Facility (CHCF) would be built in collaboration with the *Plata* Receiver.  The CHCF would be licensed by the State for 137 MHCBs, 43 acute care beds and 432 intermediate care high-custody beds.  The 514 inpatient level of care beds would comprise what is now known as DSH-Stockton.

Pursuant to a September 24, 2009 Order issued by the *Coleman* Court, (ECF 3686) on November 6, 2009 defendants filed a detailed long-range plan including activation schedules. ECF 3724.  According to the activation schedule for DSH-Stockton, activation of the facility would begin August 20, 2013 and be completed by December 18, 2013.  Patient admissions were scheduled to begin December 19, 2013 and be completed by September 15, 2014.  Defendants indicated that DSH expected to admit just five patients per week "for safety reasons".

On November 30, 2009, plaintiffs filed their response to defendants' long-range bed plan. ECF 3733.  Plaintiffs' suggested that since the DSH-Stockton project had been delayed from Fiscal Year 2011-2012 to the latest projected completion date of September 15, 2014, defendants should attempt to use the "design-build" method of public construction, which could accelerate the project by between eight and 12 months.  Plaintiffs further pointed out that defendants' bed plan was silent on whether DSH or CDCR would operate the licensed psychiatric inpatient beds and requested that the Court order an evidentiary hearing and require defendants to address those issues, among others.

On December 11, 2009, defendants filed a reply to plaintiffs' response to the long-range bed plan and request for an evidentiary hearing.  ECF 3747.  Defendants stated that they had received authorization to build as a "design-build" project.  As a result, defendants expected that patient admissions would start on March 29, 2013 as opposed to December 19, 2013 as previously reported, and be completed by December 24, 2013 instead of September 15, 2014.  Defendants also indicated that DSH was designated to run the inpatient psychiatric programs at DSH-Stockton.

On January 4, 2010, the Court issued an Order approving defendants' proposed plan for DSH-Stockton subject to submission of a new activation schedule that reflected patient

admissions completed to full occupancy by 2013. ECF 3761. On February 3, 2010, defendants

filed a new activation schedule with the Court. ECF 3794. According to the new schedule,

activation was scheduled to begin on January 11, 2013 and be completed by March 12, 2013;

patient admissions would begin on March 13, 2013 and be completed by December 8, 2013.

Five patients per week would be admitted for each licensed unit that was completely staffed.

On June 12, 2012, defendants filed an ex-parte request to revise the long-range mental

health bed plan due to the population reductions occurring as a result of prison realignment.

ECF 4196. The existing bed plan called for 137 MHCBs, 43 acute care beds and 432

intermediate care beds. The revised bed plan would move 39 MHCBs to acute care for a total of

98 MHCBs, 82 acute care and 432 intermediate care beds. Plaintiffs filed an opposition to

defendants' ex-parte request on June 13, 2012, but had no objections to the changes proposed for

DSH-Stockton. ECF 4197. On June 15, 2012, the Court issued an Order allowing defendants to

modify their bed plan as requested. ECF 4199.

The Special Master's initial monitoring tours of DSH-Stockton took place between

August 2013 and January 2014. A series of four site visits were conducted. At that time, DSH-

Stockton was still in the process of activating, with 12 of 17 DSH housing units in operation. By

the time of the Twenty-Sixth monitoring round tours, defendants reported that all inpatient beds

at DSH-Stockton had become fully operational.

The following is the Special Master's report on his findings at DSH-Stockton during the

2015 tours.

## II.    CENSUS

As of June 17, 2015, there were 80 patients in the 88-bed ATP, with three empty beds

already assigned to incoming patients. Among the 80 patients were 14 on max custody status

and 19 receiving involuntary medications.  The 80 patients had been in the ATP for an average of 35 days.

There were 371 patients in the 392-bed ITP, with 21 empty beds already assigned to incoming patients.  Among the 371 patients were 73 on max custody status and 108 receiving involuntary medications.  The 371 patients had been in the ITP for an average of 131 days or 4.4 months.

## III.    STAFFING

### 1.    Administrative Staff

As of June 17, 2015, the executive director position remained vacant, but was covered by the hospital administrator serving in an acting capacity. Positions for clinical administrator, the five program director positions, and the three program assistants were all filled.  The hospital administrator and assistant hospital administrator positions were vacant but covered by other staff in acting capacities.

### 2.    Clinical Staffing

Since the January 2015 site visit, vacant positions for a senior psychiatrist supervisor, a senior psychologist specialist, and a senior psychologist supervisor became filled.  As of June 17, 2015, positions for the chief psychiatrist, chief psychologist, and the two senior psychiatrist supervisors were all filled.  One of the two supervising psychiatric social worker positions was vacant.

Of the 33 staff psychiatrist positions, 23 were filled, for a 30-percent vacancy rate. Twenty-one of the 29 psychologist positions were filled, for a 28-percent vacancy rate. Of the 33 clinical social worker positions, 26 were filled, for a 21-percent vacancy rate.

The two supervising rehabilitation therapist positions and 27 of the 32 rehabilitation therapist positions were filled, leaving a 16-percent vacancy rate.

All five nursing coordinator positons and the supervising RN III position remained filled. Of the 24 supervising RN positions, 18 remained filled, leaving a 25-percent vacancy rate. One hundred fifty-six of the 175 RN positions were filled, leaving an 11-percent vacancy rate.

Of the 40 senior psych tech positions, 30 were filled, leaving a 25-percent vacancy rate. Of the 394 psych tech positions, 367 were filled, leaving a seven-percent vacancy rate.

**3.     Custody Staffing**

The program reported no vacancies in custody staffing.

**4.     Staff-to-Patient Ratios**

Clinical staffing ratios had not changed since the January 2015 site visit. At the time of the June 2015 site visit, the staff-to-patient ratio in the ATP was reported at 1:15, and in the ITP it was reported as 1:28.

Among senior psych techs, line psych techs, and RNs, the staff-to-patient ratio was 1:16 for first watch, and 1:8 for second and third watches.

**5.     Staff Training**

During the January 2015 site visit, institutional documentation indicated that over 95 percent of staff had been trained on the new electronic tracking system, PAWSS. The training covered incident management, treatment planning, MAPIP, supplemental treatment, and risk management, as well as proper use of PAWSS.

Following a patient suicide within 72 hours after he was discharged from DSH-Stockton, the chief psychologist conducted training for all institution psychologists on AD 21.19, "Suicide Prevention." Staff report and documentation indicated that 19 psychiatrists, 29 psychologists,

and 28 social workers, and 26 rehabilitation therapists were trained on goal development in discharge summaries.

Two-day IST training was provided as part of orientation for all new employees and as annual block training for all existing employees.  Training on the new RVR policies was done in conjunction with CSP/Sac to obtain training materials and borrow two psychologists to serve as instructors.  The training was provided to DSH-Stockton psychiatrists, psychologists, and social workers.  There were no changes of practices for TSI training of correctional officers.

The CTC training that was developed for activation of DSH-Stockton continued to be provided. It was guided by CTC licensing requirements and covered staff requirements and roles, prison policies, and boundary-training for staff new to the prison setting.

During the June 2015 site visit, staff reported that training was provided to address concerns with treatment planning, including congruence between treatment plans and clinical assessments. Executive staff also toured the SQ PIP, as recommended at the January site visit.

Staff reported that training on the new use-of-force policies took place on June 12, 2015.

IV.    **TREATMENT AND CLINICAL SERVICES**

At the January 2015 site visit, it was reported that DSH-Stockton did not maintain any reports or logs of durations or reasons for patients' placements on orientation status, max custody status, and Steps or Stages.

1.    **IDTTs**

During the January 2015 site visit, observed IDTT meetings were attended by all required disciplines, with supportive and empathic interaction with patients and solicitation of their input. The teams knew their patients well.  Some team members interacted individually with patients rather than as a team.  Treatment plans were discussed rarely or minimally, which was

corroborated by patient interviews. Team members did not avail themselves of information available through MAPP or PAWSS, and some had to be reminded that they had access to it.

DSH-Stockton did not audit treatment planning.  Examination of a sample of treatment plans found variable quality, ranging from being well-written and well-documented on patient progress to being vague and overly-broad on treatment interventions and goals. In some cases, reasons for referral to DSH were not taken into account in the treatment plan.  Some treatment plans reflected no updating and modification, even though the patients had improved, and contained past chronologies there were merely copied and re-copied.  Overall, the approach to treatment planning in some cases was a check-the-box process rather than the result of a dynamic therapeutic process.  These problems appeared to be the most pervasive for patients on max custody status.

During the June 2015 site visit, observed IDTTs in the ATP knew their patients and interacted with them in a therapeutic and respectful manner.  All members contributed to the IDTT process, although some did so more perfunctorily than others.  IDTTs did not follow a standard process for reviewing appropriateness of dormitory housing or referral to the ITP. Clinical reasons for recommending against dormitory housing were clinically insufficient to justify the recommendation.  Leadership responded to concern with this by issuing a memorandum and a plan for staff training.  Treatment plans were frequently not discussed with patients, which reduced the likelihood of effectiveness.

Reviewed treatment plans in the ATP varied in quality.  Clinicians continued to repeat past treatment plan language, perpetuating outdated and irrelevant information in later treatment plans.  Most of the plans were vague and did not detail patients' documented behaviors and symptoms adequately.  Listed interventions were frequently unconnected to treatment targets and

goals. For patients on max custody status, DPS, and Step 1, treatment plans typically did not address the behaviors underlying these status designations.

### 2. __Group Therapy__

At the time of the January 2015 site visit, DSH-Stockton reported that group treatment opportunities had increased since the preceding monitoring visit. Core groups were offered on anger management, symptom management, transition and recovery maintenance, overcoming trauma, integrated treatment for co-occurring disorders, social skills training, and cognitive therapy of psychotic symptoms. Each unit also offered additional structured treatment groups and supplemental groups. However, the amount of group therapy scheduled was sparse for an inpatient program. PAWSS did not yet have the capacity to produce a valid data report on the numbers of hours scheduled, offered, and received per patient.

Observed groups during the January site visit were all facilitated as if they were individual treatment sessions, with no apparent group process or dynamic. Efforts to engage silent participants varied.

During the June 2015 site visit, a clinician-led group in the ITP was observed. It was attended by five patients and focused on integrated treatment for co-occurring psychiatric and substance abuse disorders. The leader conducted the group skillfully, stimulating discussion among the participants and encouraging reticent members to participate. Materials to facilitate group discussions were utilized well. Pertinent clinical issues such as the relationship between trauma and substance abuse, triggers for substance use, and factors influencing patient motivation and readiness for change were discussed.

Group participants were interviewed following the session. They expressed appreciation for the treatment, but described it as limited in quantity. They received one-to-one sessions with

their clinicians in connection with IDTT meetings or upon specific request, but not regularly as part of a treatment plan.  Requests for more individual treatment were unavailing. They indicated that more clinical staff would be required to provide the full range of needed treatment modalities, and that overall conditions in the program were more like a prison environment than they expected, being confined to their cells "most of the time."

### 3.    Individual Treatment

At the time of the January 2015 site visit, the insufficiency of individual treatment that had been noted during past monitoring visits still persisted in both the ATP and ITP.  The institution could not track and report the amount of offered and received individual treatment per patient.  It did report that scheduling and provision of one-to-one clinical sessions was based on individual patients' needs.

By the time of the June 2015 site visit, inadequacies with individual assessments persisted. Some were internally inconsistent.  For example, in some suicide and V-Risk assessments, the bulleted top section indicated a different risk rate than the narrative section.  In others, the risk assessments were rated consistently but were not supported by the narratives.  In the ATP, some individual assessments were still being conducted during IDTT meetings.

There were continued concerns with individual patient diagnoses. In multiple reviewed cases, diagnoses were made without supporting evidence.  Some patients appeared to have been misdiagnosed, with listed symptoms that were inconsistent with the diagnoses.  In other cases, where the record clearly indicated a diagnosis, the clinician or team did not indicate it.  There were also several instances of symptoms mis-attributed to volitional misbehavior when they were actually caused by mental or cognitive impairment.  Diagnostic problems adversely affected treatment planning and delivery of effective care. Continued training, intensive clinical

supervision, and a strong peer review process were necessary to the provision of adequate care at the institution, given the complexity of the patient population there.

Many reviewed treatment plans were not appropriately individualized, lacking operationalized treatment targets and goals. Individualized behavioral interventions continued to be under-utilized in cases where they were clearly indicated. When behaviors were taken into account in treatment plans, interventions were often inadequate to properly address them. Some treatment plans did not indicate or reference the patients' custody status or Stage levels, but there was less reliance on them than in the past for placing patients on max custody status as part of clinical decision-making. However, it did appear that clinical staff had become more effective at distinguishing between custody levels, max custody status, and clinical statuses such as DPS.

### 4.    **Pilot to Increase Treatment and Out-of-Cell Hours**

At the time of the June 2015 site visit, a pilot to increase patients' individual and group treatment hours and out-of-cell hours was in progress. Its goal was for up to ten weekly treatment hours and six daily out-of-cell hours.

Two IDTT meetings on an ITP unit where the pilot was in place were observed. All required disciplines were present. Goals and objectives were projected onto a screen. The team discussed the patients' conditions before inviting them to join, then conducted the meetings with the patient present, and then met briefly without them. Staff had very good rapport with the patients. The team did not decide whether the patients would be removed from max custody status, but indicated to one patient that they would recommend his removal to his ICC. Nevertheless, the meeting required more structure, a more cogent presentation of the case, and more focus on devising treatment approaches to specific, measurable goals. No objective information was used to assess progress toward goals. For the patient who was about to be

discharged back to CDCR, there was only minimal focus on facilitating a successful transition in order to consolidate and maintain his clinical gains.  Discussion with this patient about his goals did not acknowledge that by the time of his next IDTT meeting, he would probably have already been discharged back to CDCR.

In the ITP unit conducting the pilot, *Coleman* postings were prominently displayed.  Staff reported that patients were provided with information on the *Coleman* case within their orientation packets.  Use of space in the unit had improved so that a number of activities such as an IDTT meeting and outdoor yard could take place simultaneously.  A posted activity schedule showed planned activities from 9:00 a.m. to 4:30 p.m.  Review of charts indicated, and patient reports corroborated, that patients participating in the pilot had increased access to treatment, although there were still challenges with providing out-of-cell programming to patients on max custody status.  Approaches under consideration included congregating patients on max custody status, using re-start chairs and therapeutic modules, and increasing custody staffing to facilitate patient movement and participation in therapeutic and recreational activities.

During the June 2015 site visit, four ITP patients using the concrete outdoor yard were interviewed. They were aware of the pilot and expressed appreciation for having more out-of-cell time, but were concerned that the privileges might be removed at the end of the pilot in late June 2015. They estimated their out-of-cell time at six hours per day, and reported more regular access to clinicians for individual treatment than before the pilot, all of which was consistent with the goals of the pilot.

## V.     PATIENT ACCESS TO TREATMENT

### 1.     Acute Treatment Program - the Step Program

At the time of the January 2015 site visit, there were four Step levels in the ATP.  The system was described as a behavioral incentive program to reward patients for their participation in treatment and positive behaviors. Policy indicated that patients' progress through the levels was based on the levels of their risk to self and others.  Criteria were specific for treatment participation but not for risk behaviors. Outdoor activities were allowed at all Step levels in the ATP. Other activities that may be allowed were television in the multipurpose/group room; visiting on weekends and holidays if approved; therapeutic, leisure and educational groups; and law library access.

At Step 1, for all new ATP admissions, patients were assessed and waiting for their initial IDTT meetings.  They were allowed to program solo, while handcuffed.  At Step 2, patients could program without handcuffs, but still solo, even though the program manual indicated that allowable activities included "therapeutic, educational…and rehabilitative *groups*" (emphasis added).   Program manual criteria for advancement to Step 2 were attendance at the initial IDTT meeting, ability to learn and develop new skills, receptivity to group participation, appropriate participation in treatment activities, and ability to shave themselves with staff or barber present.

Steps 1 and 2 placed patients in a highly restrictive, isolating environment, which is contraindicated for many mental illnesses.  The program manual was not directed at finding safe ways for these patients to interact with other patients.  Extended structured therapeutic and social interaction may be critical to supporting the patient's recovery from acute psychiatric crisis.

At Step 3, patients received treatment in larger groups of up to four to six members, according to staff. Step 3 could be attained by patients who were medication-compliant, actively participating in groups, exhibiting stability of their mental health symptoms, and demonstrating new knowledge and skills in their interactions.  Patients could achieve Step 4 when they

verbalized readiness for discharge and demonstrated the skills necessary to function at lower levels of care such as the ITP or EOP.  Steps 3 and 4 added canteen access and eating in the unit dining area to activities that were permitted at Step 2. According to policy, achievement of Step 4 was not a prerequisite for discharge.

By the time of the June 2015 site visit, all of the acute care beds were fully activated. Excluding the respiratory isolation rooms, there were 88 acute care beds.  None of the respiratory isolation rooms were being used because they had non-visible areas and various protrusions to which a noose could be affixed, and thus were considered too high-risk for suicidality.  These rooms were used only as a last resort in emergency circumstances, with patients under one-to-one observation, per policy. There were staff reports that these rooms were being considered for use as treatment rooms for patients on max custody status.

Acute care patients received very little out-of-cell treatment, scheduled for an average of 1.4 group hours per week, offered an average of 1.28 hours offered, and provided an average of .95 hours.   For individual clinical contacts, patients were scheduled, offered, and received an average of .05 hours or three minutes per week.   Acute care-level patients on Step 1 or max custody status received even less treatment.

    **2.**     <u>**ITP - the Stage Program**</u>

At the time of the January 2015 site visit, the ITP was utilizing an incentive program not unlike the Step program in ATP, known as the Stage behavioral incentive program or the Stage program.  The Stage program was described in the corresponding policy as a series of progressive levels that allow the patient to earn "...greater treatment and property privileges through pro-social behaviors."  It permitted the granting of privileges and access to activities within the unit based on the patient's demonstration of identified behaviors, taking into

consideration the patient's levels of risk and functionality. It was comprised of statuses known as "Discretionary Program Status" (DPS) plus three Stages.

Incoming ITP patients may begin on DPS, and may be later returned to it if staff determine that the patient had engaged in aggressive or assaultive behavior, or due to enemy concerns, among other things, as provided in the policy. Decisions on DPS placement and removal were made by the IDTT, unlike at SVPP where these decisions were made by the SMTA and/or the SRN.

Patients on DPS were kept in handcuffs and had limited telephone access and visitation at the discretion of custody and the IDTT. In-room recreational supplies could be checked out, depending on availability and the patient's issue status. Although policy permitted participation in groups of up to four, patients were not attending groups because DSH-Stockton did not have treatment modules or restart chairs. Although staff referred to some of these contacts as "groups," they were actually individual contacts. Treatment hours and out-of-cell time for patients on DSP were not being tracked. It was noted, however, that since the preceding monitoring period, use of DPS had declined and some clinical interventions were being used to target the behaviors which had led to DPS placements.

Stage 1 was described as a time for assessment and was considered an initial stage at which patients could demonstrate their coping skills. Stage 1 patients had the same limited privileges as DPS patients, plus they could attend groups out of handcuffs, sign up for a haircut, shave and nail clippers, and have canteen and outdoor activities. The IDTT determined Stage advancements or increases in privileges within Stage 1. Although patients were theoretically reviewed daily and may advance at any time, formal Stage-level reviews were conducted every 30 days.

Advancement to Stage 2, according to the program manual, required patients to attend all therapeutic programming, participate in groups, maintain their rooms and personal hygiene, complete and turn in assignments, and follow community rules, all with minimal prompting. They were also required to participate in therapeutic community meetings, recover from lapses in judgment/behavior without serious disruption to treatment plans, respect others and their property, interact and socialize appropriately with other patients and staff, and remain compliant with medications.  In addition to privileges granted for Stage 1, they also were eligible to use an AM/FM radio.

Advancement to Stage 3 required the same conduct as for advancement to Stage 2. Privileges were the same as for Stage 2 plus in-cell television, access to a Wii group, and eligibility for holding positions of ward government chairperson or secretary.

It was concerning that group participation at Stage 2, for example, was considered a "privilege," which implies that it is discretionary.   Group participation is treatment, which is a critical element of treatment program.  Activities or items that may create a more supportive environment are distinct from treatment, and would be more accurately considered program privileges.  Intermingling of treatment activities and other allowable activities, such as leisure groups, can lead to confusion among staff and patients as to what activities and services are required, i.e. are treatment, and what activities and items may be withheld until the patient attains a given stage, i.e. are privileges.

As of the June 2015 site visit, there had been no changes in the ITP.  During a walk-through of the ITP units, it was observed that spaces which could have been used for patients' out-of-cell time were not being used.

245

### 3. <u>Max Custody Status</u>

Unlike Step 1 in the ATP and DPS in the ITP, maximum or "max" custody status is a custodial status and not a clinical status.  As clinical determinations, Step 1 and DPS can be readily implemented and removed by the IDTT, in accordance with the patients' mental status and level of functioning. The same is not true for max custody status, which is determined by the ICC.

At the time of the January 2015 site visit, psychology was conducting patient assessments for risk of dangerousness as part of the initial intake and review process to determine whether patients should remain on max custody status. They used a 20-item tool, the Historical Clinical Risk Management Tool, which is generally recognized as a sound augmentation to clinical judgment of risk.  As compared to what was found during the preceding monitoring visit, review of sample assessments of new admissions found improved use of the tool as well as greater consistency between clinical judgments of risk documented in the records and results found by the tool.

Review of a sample of charts for max custody patients indicated that their treatment plans consistently did not target the behaviors that had led to these patients' placements on max custody status. These treatment plans tended to be generic and overly vague, and underutilized behavioral interventions including individualized behavioral plans.

Escorts for max custody status patients were done with two officers per patient. Issues with custody escorts that were noted generally during earlier site visits appeared to have become limited to max custody cases.  Staff attributed the problem to max custody escort protocols, for example requiring custody officers at the rear of the unit to stay together and complete the escort rather than allowing one to come forward to open the door at the other end of the unit.

During the June 2015 site visit, IDTTs were requesting suspension of patients' max custody status based on strong clinical justifications and appropriate presentations to custody. At an observed ICC meeting where such recommendations were made, the process was thorough, fair, and thoughtful, with significant consideration given to the patient's needs by the chairman of the ICC.

Program staff identified that the number of patients on max custody status was being over-reported in the Bed Utilization Management Report. Durations of patients' max custody status were not tracked, but staff were receptive to tracking this going forward.

At the time of the June 2015 site visit, the Step/Stage level system was under statewide review for standardization across programs and levels of inpatient care. No changes had been made at DSH-Stockton. Provision of treatment to all patients on restricted status at DSH-Stockton remained a challenge. An obstacle was that patients were spread across units, each of which had two custody officers, limiting movement of max custody patients, as described above. Possible strategies included clustering max custody patients in specified housing units. Review of treatment plans found that patients on restricted status still did not appear to be receiving treatment that was targeting underlying behaviors or symptomologies which led to their status. Program management reported that they were examining ways to increase out-of-cell opportunities for patients on max custody status. This was being taken up in clinical operations meetings, custody bi-weekly meetings, and quality council meetings.

## VI.    REFERRALS AND TRANSFERS

The January 2015 site visit was the first visit since all inpatient beds at DSH-Stockton had become fully operational. On January 27, 2015, 79 or 90 percent of the 88 beds in the ATP were occupied. From July 2014 through December 2014, there were a total of 163 admissions to

the ATP.  In the ITP, 374 or 95 percent of the 392 beds were occupied.  From July 2014 through December 2014, there were a total of 336 admissions to the ITP.

As of June 17, 2015, there were five beds available and three on hold in the ATP.  Three acute care patients were accepted, awaiting transfer, and slated for placement in the three beds that were on hold.  There were 80 patients in the ATP.  Their dates of admission ranged from January 13, 2015 to June 16, 2015, with their stays ranging from one to 155 days and averaging 35.08 days or 1.17 months. Patients had been referred and transferred from 17 different CDCR institutions, with the highest numbers from the CHCF, RJD, and CMC, accounting for 43 patients or 54 percent of the ATP census as of June 17, 2015.

In the intermediate care program, as of June 17, 2015, no beds were available and 21 were on hold for the same number of accepted patients, all of whom were discharged from acute care at DSH-Stockton and DSH-Vacaville.  The ITP census was 370, with one patient out to court.  Admission dates ran from April 2, 2014 to June 16, 2015, with stays ranging from one to 441 days and averaging 131.26 days or 4.38 months. Patients were referred and transferred from 19 different programs and CDCR institutions, with 112 or 30 percent from DSH-Stockton ATP, and 41 or 11 percent from DSH-Vacaville. The remaining patients were transferred from CDCR prisons, with CMC, CSP/Sac, CMF, Mule Creek State Prison (MCSP), RJD, and CHCF accounting for 161 or 43 percent of ITP care patients.

### 1.    Waitlists

Provided information dated June 16, 2015 indicated that no accepted patients were awaiting bed assignments in the ATP at DSH-Stockton.  Seven acute care referrals listed as "incomplete/pending referrals" had been referred to the ATP from June 1, 2015 through June 16, 2015, each bearing a "pending" or "incomplete" status.  Of the seven, two were waiting for PC

2602 hearings scheduled for June 25, 2015 and July 1, 2015, respectively. Another two were pending documentation that foreign objects had been "passed." Another one required a diagnostic clarification as to dementia, a second one was pending a medical update, and a third was pending provision of a battery-operated continuous positive airway pressure or CPAP device.

The ITP's waitlist dated June 16, 2015 indicated 16 patients who had been accepted to intermediate care and awaiting admission. These patients had been waiting from seven to 20 days since the times of their acceptances by DSH. Times from the dates that DSH received the referrals to dates of acceptances ranged from zero to two days. Twelve of the 16 patients had received their beds assignments. One of the 12 was subsequently placed on a medical hold, and the remaining 11 were awaiting transport to DSH-Stockton as of the time of the June 2015 site visit. Four of the 16 patients had been assigned to SVPP, but information on whether they had received bed assignment was not available at DSH-Stockton.

## VII.  DISCHARGES

From August 2014 through December 2014, 71 patients were discharged from the ATP, and 294 patients were discharged from the ITP, including 93 returning to the CHCF.

From January 31, 2015 through April 30, 2015, 269 patients were discharged from DSH-Stockton.  On June 16, 2015, during the second site visit, there were six acute care patients and six intermediate care patients who had been clinically discharged from DSH-Stockton but not yet transferred out. The six intermediate care clinical discharges were done from June 9 through June 16, 2015. Three of them were pending transfer to EOPs at CSP/Sac, PBSP, and SQ from June 17 through 19, 2015; one was awaiting an MDO evaluation, and two were awaiting HCPOP

action.  One day later, on June 17, 2015, there were 15 clinically-discharged intermediate care patients at DSH-Stockton awaiting transfer back to CDCR institutions.

At both the January 2015 and June 2015 site visits, DSH-Stockton reported that it did not provide pre-release planning.  Inmates scheduled to parole were discharged back to CDCR institutions where they were to be provided with pre-release planning services.

## VIII.  USE OF SECLUSION AND RESTRAINTS

At the time of the January 2015 site visit, DSH-Stockton reported that no patients had been placed in seclusion and nine patients had been placed in restraints during the review period. Durations of restraints ranged from 18 minutes to four hours and five minutes.  A psychiatrist was required to assess and write any orders for patients placed in restraints within 30 minutes after the placement.

At the time of the June 2015 site visit, DSH-Stockton reported that it did not use seclusion rooms, observation rooms, or safety cells, and consequently there were no corresponding logs or reports.

From January 2015 until the time of the June 2015 site visit, four patients were placed in doctor-ordered/approved restraints during the review period.  None had more than one episode of restraints.  Durations ranged from 55 minutes to two hours and 15 minutes. Two of the episodes were related to self-injurious behaviors.  Documentation indicated that during the longest episode, range-of-motion movement, food, water, and bathroom use were offered to the patient, according to policy.

## IX.  UTILIZATION REVIEW AND QUALITY MANAGEMENT

At the time of the January 2015 site visit, management indicated that it had developed reports to distinguish between the ATP and the ITP, and that it was in the process of

implementing PAWSS and MAPP, which at that time still could not capture individual, group, and unscheduled treatment activities.

At the time of the June 2015 site visit, DSH-Stockton continued to utilize its multi-level quality management system. It was generally implemented through committees operating under and reporting to the Quality Council, which was responsible for overall quality management.

The Quality Council met monthly. It addressed such items as audit results from weekly monitoring of legibility of chart entries and treatment goals and objectives, and attendance requirements of committees. During its February 2015 meeting, the Quality Council discussed findings from the January 2015 *Coleman* site visit, including the need for standardized terminology regarding DPS programming status and modalities, reducing therapeutic group cancellations, increasing hours of out-of-cell programming, and implementing the pilot on increasing treatment and out-of-cell time.

The quality management committees at DSH-Stockton were varied. The RMC reported on aggressive acts, suicidal behaviors, rules violations, hunger strikes, allegations of abuse, and falls. There were committees on UM and psychologist specialist services. IDTTs and completion of group therapy sessions were not being audited by the institution.

A CAP provided by DSH-Stockton addressed results of a January 2015 audit which found that only 62 percent of patients entering the ATP and ITP were provided with required information upon admission. Another provided CAP concerned development of a plan to prioritize emergencies to guide preparedness activities and use of resources.

Provided information on medication issues from January through April 2015 indicated one instance of contraindicated medication being given, two expired medications, nine extra dosings, 46 missed or non-nurse administered medications, six medications not being dispensed

by the pharmacy, 358 missing initial or signatures, 177 transcription errors, six wrong dosages, 14 wrong frequencies, five wrong medications being given, one medication given using the wrong route, three medications given using the wrong technique, 22 medications given at the wrong time, and four unauthorized medications.

DSH-Stockton also participated in CHCF's quality management committee, quality management improvement committee, and local governing body, as well as most of CHCF's quality management subcommittees.

## X.    LAUNDRY, FOOD, AND SUPPLY ISSUES

Past problems with laundry and supplies that were reported as resolved during the January 2015 site visit remained resolved by the time of the June 2015 site visit. DSH-Stockton reported no changes in food services policies since the January 2015 site visit.

## XI.    VISITATION

In January 2015, DSH-Stockton was providing non-contact visits for patients, as governed by CDCR policies and regardless of patients' custody levels.

As of June 3, 2015, DSH-Stockton formally implemented a revised patient visitation policy to allow contact visits for some patients, based on the IDTT's determination of whether the patient was physically, behaviorally, and mentally appropriate to receive such visits. The ICC then determined appropriateness for contact visits from a custodial standpoint.

Both acute and intermediate care patients had been approved and scheduled for contact visits since the revised policy was implemented. Interview rooms C and D in the visiting center were selected for use because they offered line-of-sight from the officer's station.

## XII.    LAW LIBRARY ACCESS

By January 2015, all patients had access to law library services as well as the computer cart.  As of the June 2015 site visit, the policy governing law library access had been updated to reflect the availability of a computer and access to Lexis that was available with use of the computer cart in each building.

## XIII.    PATIENTS' RIGHTS AND CONCERNS

Patients used the CDCR inmate appeals process (Form 602) to lodge complaints. Examination of summaries indicated that patients' appeals concerned reductions of patients' stages by IDTT, staff conduct, discharges, medications, disagreements with treatment, recreational time, processing of sick call forms, program operations, transfers out of DSH, law library access, skipping programming in order to take showers, uncleanliness of shower facilities, and living conditions, among other things.

During the June 2015 site visit, DSH-Stockton reported that it surveyed 34 of the 91 patients discharged from the ATP from January 1, 2015 through March 31, 2015.  Survey results showed that 32 of the 34 rated their overall care in the ATP as a seven on a scale of one to ten, with ten being the best.  An institutional survey of 56 of the 152 patients discharged from the ITP from January 1, 2015 through March 31, 2015 showed that all 56 patients rated their overall care in the ITP as an eight on a scale of one to ten, with ten being the best.

## XIV.    *COLEMAN* POSTINGS

During the January 2015 site visit, the two ATP and the three ITP units all had *Coleman* postings at the rear of the units.

By the time of the June 2015 site visit, *Coleman* postings in both English and Spanish languages were found in all units in areas easily accessible to *Coleman* class members.

Information on the *Coleman* postings was also included in the orientation packets provided to

new patients as part of their orientation.

<u>APPENDIX A6</u>
CIW-PIP

**CIW-PIP**
Paper Review

## I.    SUMMARY OF THE FINDINGS

 The Special Master's findings included the following:

- **There were no clinical staff vacancies at CIW-PIP during the review period.**

- **The staff-to-patient ratios for clinical positions at the CIW-PIP were established for the acute inpatient level of care of 1:15, and were satisfied except in psychiatry.**

- **At four times during the review period, there was a waitlist for admission to CIW-PIP.**

- **Initial and follow-up IDTT meetings were timely, with near compliance for attendance by required disciplines.**

- **It appeared that that initial ICC meetings were conducted within timeframes.**

- **The program reported that patients at the acute level of care were offered an average of 15-plus hours of group therapy per week.**

- **The program reported that patients at the intermediate level of care were offered an average of over 14 hours of group therapy per week.**

- **Patients received an average of approximately one hour of individual treatment per week.**

- **New medication administration procedures, including medication lines in some areas, were implemented during the review period.**

- **No patients had jobs or access to educational classes.**

- **There were no suicides reported during the review period.**

- **Provided information suggested that SREs were completed on a pre-determined schedule rather than based upon clinical indications.**

- **Some patients who were clinically discharged remained in the CIW-PIP.**

- **CIW-PIP provided pre-release planning to paroling patients.**

- **A performance improvement committee met monthly and established performance improvement goals.**

- **Food, laundry, supplies, and law library access were not problematic during the review period.**

- **The policy on visitation and telephone usage was amended to ensure that patients did not lose privileges they had before admission to the program.**

- ***Coleman* postings were present in both wings of the facility.**

As the first of CDCR's two inpatient programs for its inmates, a brief history of its origin and development is helpful to the reader's understanding of how CDCR developed and initiated the delivery of care on the inpatient level for its inmates.

The requirement that defendants provide additional acute and intermediate inpatient beds for women class members has a long history in the *Coleman* case. On March 2, 2006, defendants were ordered to file a plan for the provision of inpatient beds for all seriously mentally ill male and female inmates in CDCR determined to be in need of those levels of care. ECF 1772. Defendants filed a response to the order on April 17, 2006, proposing to add, among other things, 25 acute and intermediate care beds for women. ECF 1786. On May 2, 2006, the *Coleman* Court issued an order approving the plan, subject to modification based on then-current population projections. ECF 1800. Defendants were ordered to file an amended long-term bed plan.

Defendants submitted their amended mental health bed plan on December 19, 2006. In the updated plan, the number of needed additional acute and intermediate care beds for women had been increased to 45. Further, CDCR rather than DSH, would assume responsibility for all inpatient mental health services at CIW.

At the time of the 23rd monitoring round, the Special Master reported that construction of the 45-bed acute and intermediate care inpatient facility was ongoing and was scheduled for completion in March 2012. ECF 4124.

257

In his 24th Monitoring Round Report, the Special Master reported that the 45-bed acute and intermediate care inpatient facility at CIW was 99 percent complete.  ECF 4205.  Licensing activities had begun on May 3, 2012 and patient admissions were expected to begin on July 2, 2012, with admissions to be phased in by wing.  The 24-bed side of the facility was to be activated first, followed by the balance of 21 beds within six months.

In his Twenty-Fifth Monitoring Round Report, the Special Master reported that the 45-bed inpatient care facility at CIW was activated on June 29, 2012.  ECF 4298.  The facility was granted preliminary accreditation by the Joint Commission for services under the Behavioral Health Care Standards on July 9, 2012.  The 24-bed side was fully activated on September 19, 2012.  Activation of the 21-bed side had begun on October 16, 2012.  By December 2012, a total of 33 beds were occupied.

On July 11, 2013, the Court issued an Order directing the Special Master to complete one round of monitoring the adequacy of all inpatient programs and report back to the Court.  ECF 4688.  On May 30, 2014, the Special Master filed his report on the adequacy of inpatient care.  ECF 5156.   The acute and intermediate care programs at the CIW-PIP were examined over the course of three visits, beginning in September 2013 and concluding in February 2014.  At the time of the Special Master's visit in February 2014, there were 38 patients in the CIW-PIP.  The Special Master's recommendations included that he be directed to conduct a further review of the CIW-PIP by means of a paper review and report back to the Court.

The following is the Special Master's monitoring report on the CIW-PIP.

II.     <u>**CENSUS**</u>

As of the end of the review period, CIW-PIP housed 45 patients, which was its full capacity.  Among these 45 patients, six were on DPS, eight were at Stage I, 16 were at Stage II, and 15 were at Stage III.

III.    <u>**STAFFING**</u>

    4.     <u>**Administrative, Clinical, and Correctional Staffing**</u>

Staffing responsibilities at CIW-PIP changed during the review period.  The executive director also functioned as the chief of mental health for not only CIW-PIP but the entire CIW and CRC prisons. The senior psychiatrist served as the chief of mental health for CIW-PIP and for the entire CIW prison since August, 2014.  Overall, staffing was robust at CIW-PIP.

<u>The Chief Psychologist/Executive Director</u>:  The chief psychologist/executive position was filled.

<u>Program Director</u>: The program director position was filled.

<u>Program Assistant</u>:  The program assistant position was filled.

<u>Senior Psychiatrist</u>:  The senior psychiatrist position was filled.

<u>CHSA II</u>: The CHSA II position was filled.

<u>Unit Supervisor</u>:  The unit supervisor position was filled.

<u>Psychiatrists</u>:  The two psychiatry positions were filled.

<u>Psychologists</u>:  The three psychology positions were filled.

<u>Social Workers</u>:  The four social work positions were filled.

<u>Recreation Therapist</u>:  The four recreation therapist positions were filled.

<u>SRN II</u>:  The SRN II position was filled.

<u>RN</u>:  The five RN positions were filled.

CNA:  CIW-PIP began using CNAs for patient observation, rounds, and other duties.  Its newly-allocated CNA positions were not yet funded, but it was using eight contract CNAs in the interim.

Senior Psych Tech:  The senior psych tech position was filled.

Psych Tech:  The 33 psych tech positions were filled.

Administrative Assistant:  The administrative assistant position was filled.

Office Tech:  One of the three office tech positions was filled, for a 66-percent vacancy rate.  Use of one FTE contractor reduced the functional vacancy rate to 33 percent.

**2.        Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

CIW-PIP's staffing ratios were consistent with the provision of acute care services for all patients, whether at the intermediate or acute care levels, except for psychiatrists for whom the staffing ratio was 1:22.5, which did not meet the psychiatry staffing level of 1:15 for acute care patients.  The other staffing ratios were, by discipline, 1:15 for psychologists, 1:11.25 for social workers, and 1:11.25 for recreation therapists.

**3.        Staff Training**

The program provided a calendar of training sessions, but it was unclear as to training content and attendees.  Documentation of annual suicide prevention and SRE training, which occurred outside of the review period, was also provided.

**IV.    TREATMENT AND CLINICAL SERVICES**

**1.        IDTTs**

Provided audit results indicated that initial and follow-up IDTT meetings were conducted timely.   The rate of attendance by correctional counselors was 88.2 percent, with a one-month low of 60 percent.

2.    **Group Therapy**

All structured treatment activities were offered in the CIW-PIP treatment rooms.  In addition, enrichment group activities were offered by housing wing during evenings and weekends.  Group sizes ranged from two for DPS groups to as many as 15 patients, with enrichment groups usually being the larger ones.

Program data indicated that for acute care patients, from July through December 2014, structured therapeutic activity offerings per patient were, on average, 18.20 hours per week scheduled, 15.47 hours offered, 13.23 hours attended, 2.24 hours refused, and 2.34 hours canceled.

For intermediate care patients during the same period, structured therapeutic activity offerings per patient were, on average, 16.78 hours per week scheduled, 14.7 hours offered, 8.8 hours attended, 5.9 hours refused, and 2.1 hours cancelled.

3.    **Individual Treatment**

Provided data on the number of treatment hours was combined for the acute and intermediate care programs.  Patient received an average of 4.7 hours of individual therapy per month, or approximately one hour per week.

4.    **Other Treatment Issues**

During the review period, CIW-PIP implemented new medication administration procedures, including a medication line on the A/B wing and one on the C/D wing for patients housed in those areas.  Previously, medications were passed at cell front.  Patients on DPS continued to receive medications at cell front.

## V.    PATIENT ACCESS TO TREATMENT

Newly-admitted patients were placed on orientation/DPS. They were housed in single rooms, where they received all medications and meals with use of cardboard trays and utensils, and paper or Styrofoam cups.  Issue included two blue pants, two blue shirts, one blue jacket, one loose dress, one nightgown, two sets of underwear and socks, and one pair of shower shoes. unless restricted by doctor's orders.  Also provided were a regular no-tear mattress, two sheets, up to three blankets as needed, two large towels, and one hand towel.  Personal care items were also provided.  Other allowable items included four state-issued crayons, one filler pen, loose paper, two religious and/or personal reading books, and a recreation therapist-issued "coping packet."

At Stage I, patients were allowed canteen, group yard, dining room, treatment groups, and unit activity privileges.  A state-issued or personal radio was allowed.

Telephone and family visitation privileges were allowed at Stage II, and televisions were allowed at Stage III.

No jobs or education classes were available to patients in CIW-PIP.

## VI.    REFERRALS AND TRANSFERS

During the review period, there were nine admissions to acute care and 23 admissions to intermediate care.  One intermediate care referral was rejected and two were deferred.

Data available for 27 admissions indicated an average of 8.7 days from time of referral to bed assignment, and an average of 2.9 days from bed assignment to admission.

There were four times during the review period when there was a waitlist for admission to CIW-PIP.  For patients on waitlists, the average time from acceptance to admission was 19.5 days, with the longest wait lasting 28 days.

## VII.    DISCHARGES

From July 1, 2014 through December 31, 2014, CIW-PIP discharged 21 patients. Provided information did not distinguish between patients at the acute and intermediate levels of care.

Sixteen patients were clinically discharged but remained at CIW-PIP for an average of 17 administrative days, with a range of three days to 32 days.  Ultimately, they were transferred to primarily CCWF and the CIW Psychiatric Services Unit (PSU).

The program provided information on pre-release planning during the review period for two patients.  It indicated that social workers contacted TCMP and local county resources.  No pre-release groups were provided during the review period.

## VIII.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

The program reported that all CIW staff were trained on the revised statewide use-of-force policies.

## IX.    USE OF SECLUSION AND RESTRAINT

During the review period, there were five instances of use of restraints, with an average duration of 76.6 minutes.  PRN or "as needed" medications were utilized in all instances of restraint use.  No patients were injured while being placed into restraints.

Seclusion was not used during the review period.

## X.    EMERGENCY RESPONSE, SUICIDE PREVENTION, AND THE DEATH REVIEW PROCESS

There were no suicides at CIW-PIP during the review period.

Review of a log found indication of six instances of self-mutilation, 12 attempted suicides, and four inmate deaths while in custody.   Tracking of patients' self-injurious behaviors

indicated a total of 169 such incidents, but this figure was among the entire CIW population, and not solely the CIW-PIP.

The EERC met monthly and maintained minutes, which indicated that emergency response drills were completed and that the committee reviewed responses to medical emergencies.

Documentation of annual suicide prevention training was provided.

An SRE log indicated what appeared to be a set schedule for the conduct and frequencies of SREs. This was of concern as it implied that SREs were completed according to a preordained schedule rather than according to patients' clinical indications.

Provided information on a death which occurred outside of the review period indicated that a death review, including a root cause analysis, had been conducted.

## XI.    UTILIZATION REVIEW AND QUALITY MANAGEMENT

No UM committee meetings were held during the review period.  The program had a performance improvement committee which met monthly and established performance improvement goals.

## XII.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS

CIW-PIP reported that from July 1, 2014 through December 31, 2014, there were 66 incidents reported as unusual occurrences.  They included self-injurious behaviors, uses of force, and instances of patient agitation.  Twenty-seven of these occurrences were reported to the California Department of Public Health.

## XII.    LAUNDRY AND SUPPLY ISSUES

CIW-PIP reported that previously-reported problems with return of laundry to patients had been resolved, and that no further supply problems had been identified.

**XIV.   FOOD ISSUES**

A survey of patients' perceptions of care found that 66 percent of patients who responded said that quantities of food were always or usually adequate.  There were some complaints regarding food quality and portion sizes.

**XV.   VISITATION**

CIW-PIP revised its policy on patient visitation and telephone use to ensure that patients did not lose privileges they had before admission to the program.

**XVI.   LAW LIBRARY ACCESS**

No concerns with access to the law library were found in results of the survey of patients' perceptions of care.

**XVII.   *COLEMAN* POSTINGS**

The facility reported that *Coleman* notices were posted on both the A/B wing and C/D wing.

<u>APPENDIX A7</u>
SQ-PIP

**SQ-PIP**
May 4, 2015 – May, 6 2015

## I.    SUMMARY OF THE FINDINGS

- **The SQ PIP continued to improve its treatment offerings and operations.  While there remained some areas for improvement, management staff were monitoring issues and implementing solutions on a real-time basis.**

- **At the time of the site visit, policies and procedures specific to the acute care program had not been developed.**

- **The SQ PIP met or exceeded established clinical staffing ratios.**

- **Patients in the PIP were rounded every 15 minutes for the duration of their stays.**

- **Patients in the acute care program were receiving adequate care.**

- **Patients in the intermediate care program generally received appropriate care.**

- **Structured therapeutic activities were the primary mode of treatment in the SQ PIP; individual therapy was also provided to each patient.**

- **Some treatment plans were not individualized to include specific interventions to address identified mental health issues.**

- **The SQ PIP was not effectively using individual behavioral plans for all patients for whom such plans were clinically indicated.**

- **Each patient was scheduled for one group using restart chairs.**

- **Patients were offered unstructured out-of-cell activities including plans to offer unstructured yard time on completion of proposed construction.**

- **Patients admitted to the PIP retained access to the packages, privileges, and visitation in the PIP they had held in housing units, unless clinically contraindicated.**

- **No inmate was placed in seclusion or restraints during the review period.**

- **Quality improvement in the SQ PIP was evolving positively and effectively.**

- **The SQ PIP conducted effective morning collaborative meetings and end of shift briefings.**

267

- **Unusual occurrences including those involving SQ PIP patients were appropriately documented.**

- **CDCR required condemned inmates to be in handcuffs during all movement but not during treatment in treatment areas.**

- **There were no issues regarding laundry, supplies, and clothing reported or identified during the site visit.**

- **The matter of in-room lighting was guided by specific written policies.**

The SQ-PIP is the second of the two inpatient programs which CDCR provides for the care of its inmates.  As with the CIW-PIP, a brief background on the origin and development of this program is helpful to the reader's understanding of CDCR's experience with developing and delivering inpatient care to its inmates.

Defendants' attempts to respond to condemned *Coleman* class members' need for intermediate level care began in 2010.  Policy barred condemned class members from transfer to DSH intermediate care programs for CDCR inmates.  During an October 2010 *Coleman* policy meeting, defendants agreed to provide the Special Master and plaintiffs with a treatment plan for condemned inmates who may have met indicators for referral to an intermediate level of care.  On January 30, 2011, defendants submitted a plan titled, Specialized Treatment for the Condemned Inmate-Patients at San Quentin State Prison.

Defendants reported that the specialized treatment program was implemented at SQ on November 8, 2010 and had since continued.  The Special Master conducted a review of the program in August 2012 during the Twenty-Fifth monitoring round.  In his Twenty-Fifth Round Monitoring Report, the Special Master reported concerns with regard to the structure and organization of the program, availability of confidential contacts, provision of treatment, inadequate treatment plans, as well as the lack of treatment plans, among other concerns.  ECF

4298.  These concerns gave rise to a re-visit in December 2012 in order to further evaluate the program.  Counsel for the parties were also in attendance.  Included in the Special Master's findings were, many of the condemned inmates in the program had long histories of serious mental illness that had not been treated adequately, group placements were not clinically determined, and groups lacked important elements for specialized treatment.  The Special Master also found that a specialized unit for condemned inmates in the program was clinically indicated.  Defendants agreed to work with the Special Master to draft a written addendum to the draft LOP that would describe the program, including an outline of the criteria for admission to it and the services that it offered.

On April 11, 2013, plaintiffs filed a Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment.  ECF 4543.  Plaintiffs echoed the Special Master's aforementioned concerns and further asserted that the program lacked oversight and accountability, in addition to failing to provide appropriate treatment to condemned inmates in need of an intermediate level of care.  After a lengthy hearing, the *Coleman* Court issued an order on December 10, 2013 directing defendants to: 1) conduct an assessment of unmet need for inpatient care in the condemned inmate population at San Quentin; 2) resume working to establish a durable remedy that provides access to necessary inpatient mental health care or its equivalent for seriously mentally ill condemned inmates; and 3) consider all remedies, including, but not limited to, creation of a hospital unit for condemned inmates only at CMF, SQ, CHCF, or other appropriate facility.  (ECF 4591).  The Special Master was directed to report to the Court within six months on the chosen remedy and the timeframe for its complete implementation.

The San Quentin Assessment Project began December 20, 2013 and was completed on May 7, 2014.  The project included a series of teleconferences and in-person meetings between

the Special Master, his staff of experts and the parties.  The project consisted of four phases, in which the Special Master's experts participated and were observed by counsel for the parties.

In Phase One, a 12-item screening tool was used to evaluate all approximately 720 condemned inmates.  Also included in Phase One was a data review at CDCR DHCS headquarters, attended by representatives of Health Care Services quality management staff, counsel for the parties, and expert and non-expert members of the Special Master's staff.  The 12-item screen identified 127 inmates, 54 of whom were recommended for clinical evaluation.

Phase Two consisted of interviews of key custody and psych tech staff working on the condemned units to help identify potential patients.  At the conclusion of Phase Two, 98 inmates had been identified as appropriate for a clinical evaluation.

During Phase Three, all of the collected information was reviewed by CDCR's regional clinicians to decide which cases should proceed to full clinical evaluation, which included a record review.  Of the 98 evaluated cases, 17 were recommended for referral to inpatient care, and another 17 were recommended for a change in level of care.

Phase Four consisted of IDTT reviews for the inmates recommended for referral to inpatient care.  Of those 17 inmates, 13 were approved for admission to intermediate care, one for acute care, and three were approved for changes in their level of care.  At the conclusion of the assessment project a total of 37 condemned inmates were referred, accepted, and awaiting admission to intermediate care.

On May 22, 2014, CDCR submitted its initial report on the assessment project to the Special Master.  The findings from the assessment project were formally presented to the Special Master and plaintiffs' counsel at an in-person meeting at SQ on May 28, 2014.  Following comments and input during that meeting, CDCR agreed to some modification of its plan.  On

June 3, 2014, CDCR submitted its revised report on the assessment project and its plan for an inpatient mental health program for condemned inmates, to be known as the San Quentin Psychiatric Inpatient Program (SQ PIP). The revised activation schedule was submitted shortly thereafter.

The Special Master submitted his report to the Court on June 10, 2014. ECF 5164. Activation of the SQ PIP was scheduled to begin October 1, 2014 and be completed by November 15, 2014. On June 27, 2014, the Court issued an Order directing CDCR to provide monthly status reports on the SQ PIP until activation began. ECF 5174. In that same Order, the Special Master was directed to report back to the Court on patient admissions and treatment and any other matters or concerns which may have emerged, no later than 90 days following full activation of the SQ PIP.

On December 30, 2014, the Special Master issued his follow-up report to the Court. ECF 5257. Patient admissions to the SQ PIP began as planned on October 1, 2014 with a total of 23 admissions. By November 4, 2014 the total was 31 and by December 3, 2014 the total was 34. All admissions were at the intermediate level of care. The report also included updates on staffing and staff training, treatment and clinical services, patient access to treatment, referrals, admissions and discharges and other treatment issues.

The Special Master found the SQ PIP treatment program promising for inpatient care for condemned inmates, however there were issues remaining to be addressed. Those issues included, a shortage of adequate treatment space pending completion of yard construction and modification of restart chairs, the recasting of family visitation and telephone privileges as incentives to progress through the stage level system, and issues regarding lack of communication and misinformation among patients, between patients and staff, and among staff

271

themselves.  The Special Master recommended the Court issue an order directing him to continue monitoring the SQ PIP as part of his ongoing monitoring of the other inpatient programs and provide a report on the SQ PIP within his comprehensive report on the other inpatient programs.  Neither party filed objections to the Special Master's report.

On February 9, 2015, the *Coleman* Court issued an Order adopting the Special Master's recommendation.  (ECF No. 5274)

The following is the Special Master's monitoring report on his findings at the SQ-PIP during the 2015 site visit.

## II.    CENSUS

On May 6, 2015, the SQ PIP Census was 33 patients; 29 of the 33 patients were admitted to the PIP in October of 2014, two patients were admitted in December of 2014, one patient was admitted in February 2015 and another was admitted in March 2015.  The average daily census between January and April 2015 was 33 patients.

## III.    STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

At the time of the site visit, the executive director position was filled by a senior psychologist supervisor.  The program director and program assistant positions were filled by two supervising psychiatric social workers.

Psychiatrists.  The senior psychiatrist supervisor position and the three line psychiatrist positions were filled; two were FTE staff psychiatrists and one was a registry psychiatrist.

Psychologists.  The senior psychologist specialist position continued to be filled as were all three clinical psychologist positions.

Social Workers.  All four licensed social worker positions were filled.

Recreation Therapists.  All four recreation therapist positions continued to be filled.

RNs.  The SQ PIP utilized nurses as mental health workers and the three supervising RN II positions were filled.  Ten of the 11 RN positions were also filled, for a vacancy rate of nine percent in line nursing staffing.  This was a significant increase over the last reporting period.

Licensed Vocational Nurse (LVNs).  All 10.50 LVN positions were filled with 11 staff, which was a .50 overage.

Psych Techs.  Four of the six senior psych tech positions were filled, for a 24 percent vacancy rate.  Twenty-five of the 31.5 line psych tech positions were also filled, leaving a vacancy rate of 21 percent, which was a significant improvement since the last review period when the vacancy rate was 62 percent.  Staff reported that they were continuing to aggressively recruit staff and were achieving good results.

Staff reported that nursing vacancies (RNs, LVNs, and psych techs) continued to be covered by the following manner, in the order listed: (1) voluntary staff overtime, (2) re-direction of staff (provided that it caused no adverse effect on functioning of the program from which staff was re- directed), (3) mandatory overtime, and (4) use of registry staff.

Correctional Staff.  All 21.2 custody positions, including a correctional counselor I position with a relief factor, continued to be filled.  The SQ PIP did not utilize MTAs.

Administrative Support Staff.  Positions for the correctional health services administrator II, the office technician II, and four office techs continued to be filled.  Each of the training officer and associate government program analyst positions were also filled.

## 2.  **Staff-to-Patient Ratios**

Generally, the SQ PIP continued to be richly staffed and exceeded the mental health clinician staff-to-patient ratio of 1:15 that was appropriate for admissions units and acute

inpatient care programs. The SQ PIP ratio was similar to the ratio that was established by CDCR in its psychiatric inpatient program at the California Institution for Women (CIW PIP).

The SQ PIP was budgeted for three line psychiatrists, for a psychiatrist-to-patient ratio of 1:10 to 1:12. In addition, the use of a fourth psychiatrist continued to enhance the richness of line psychiatry staffing in the program. At the time of the site visit, the staffing ratio for psychologists, social workers and recreation therapists was maintained at 1:10 to 1:12.

The staff-to-patient ratio for RNs at the SQ PIP was 3:18, 3:33 for LVNs, and for psych techs the functional ratio was 1:11.

### 3. Staff Training

Review of the In- Service Training (IST) sheets for the SQ PIP indicated that in January 2015 training was provided on the following topics; CTC orientation, PIP orientation, Therapeutic Strategic Interventions cultural diversity and personality disorders.

Documentation indicated that as of February 2015, 340 employees had attended a minimum of one eight-hour PIP Training session, including custody, nursing and support staff.

## IV.    TREATMENT AND CLINICAL SERVICES

The SQ PIP was accredited by the Joint Commission for both acute and intermediate levels of care. All SQ PIP patients received rounds/observations every 15 minutes conducted by nursing staff and documented on CDCR form 7365 (Q15 Rounds form). This occurred for every patient regardless of reason for admission, status or level of care and was a baseline and separate from any level of observation initiated based on risk of harm or medical conditions in accordance with PIP Policy (Volume 19, Chapter 36).

6.    **Acute Care**

The SQ PIP acute care program was conceptualized as an intensive individualized level of care that provided services 24 hours a day, seven days a week to patients at that level of care. The length of stay in the acute care program was designed to be between 30 and 60 days for stabilization and reintegration into the least restrictive clinical environment.

The acute care program did not have a Stage System.

During January 1, 2015 through April 30, 2015, five patients were treated at the acute level of care in the SQ PIP, one of whom was discharged after two days. The first patient was admitted to the acute care program on January 15, 2015. The census of the acute care program during January and February 2015 was one inmate, with no patients during March 2015 and four patients admitted during April 2015. The census at the time of the site visit was two patients. The length of stay in the program for the three discharged patients was two, 27 and 42 days. All three patients were discharged to the SQ PIP's intermediate care program.

At the time of the site visit, policies and procedures specific to the acute care program had not been developed.

According to clinical practices in place at the time of the site visit, all patients admitted to the acute care program received assessments from psychiatry, psychology, social work, recreational therapy, nursing and medical. Treatment services provided in the SQ PIP included contact with the psychiatrist at least every 72 hours and individual clinical contacts on a daily basis provided by either social work, psychology or psychiatry. Additionally, 1.25 to 1.5 hours of yard were offered on a daily basis (walk alone yards with other acute and/or MHCB patients/patients).

Based on clinical assessments, acute care patients had access to phone calls, visiting, dayroom time, law library kiosks, in cell activities, television, and radios.

Treatment provided to acute care program patients was essentially in an individual setting in contrast to groups.  Individual recreational therapy was also provided to acute care program patients, in addition to out-of-cell unstructured recreational time.  Acute care patients during the latter part of their stay were reported by staff to have been participating in limited group therapies with intermediate care patients.

Analysis of the treatment hours of individual acute care patients indicated that during the first week of admission to acute care, one patient was offered 41 hours, refused 29 hours and attended 12 hours of treatment.  In the second week of acute care, the patient was offered 20 hours, attended 12 hours and refused eight hours.  During the remaining time in acute care, February 5, 2015 through February 25, 2015  the patient was offered a range of eight to nine hours, attended eight to nine hours per week, and did not refuse any treatment hours in that period.

Another patient was in acute care during April 2, 2015 through April 28, 2015.  The patient was offered a range of seven to 11 hours of treatment a week and attended six to eight hours.  He refused a range of 0.5 to three hours per week during his acute care treatment.

In the case of a third acute care patient, who was admitted on April 3, 2015, treatment hours were reviewed through April 16, 2015.  The patient was offered a range of five to nine hours of treatment and attended five to eight hours of treatment, refusing 0.0 to 0.3 hours of offered acute care treatment.

Available data for the fourth patient was for a single week, April 23, 2015 through April 29, 2015 during which he was offered ten hours and attended nine hours, refusing one hour of treatment.

Two patients in the acute care program at the time of the site visit and one inmate who had been transferred from the acute care program were interviewed and their charts reviewed. Two of the patients described the acute care program as having been helpful to them. The one inmate who found the acute care program not to be helpful did not want any kind of mental health treatment.

Property and clothing "privileges" were determined clinically and approved by the IDTT.

2. **Intermediate Care**

a. **Treatment Plans**

Patients were timely seen for their treatment team meetings and comprehensive treatment plans were developed as part of those treatment team meetings. The patient's Stage Level was frequently discussed and documented within the treatment plan. Treatment plans were generally well-constructed with important specific treatment information. However, there were some treatment plans that required greater individualization and specificity in the treatment interventions.

The implementation of the revised CDCR form MH-7388 was clearly beneficial as the quality of the treatment plans improved greatly with the use of that form. There were some cases where behavioral interventions may have facilitated more rapid improvement and at least two cases where an individual behavioral plan was apparently indicated, but was not discussed by the treatment team. It was observed that making full use of behavioral interventions with patients

who fail to progress in treatment or through the Stage system as well as those who regress following improvement is likely to benefit more patients in intermediate care.

### b.  Structured Treatment

The SQ PIP staff continued to maximize their use of available resources (i.e., time, space, personnel) to offer a broad array of clinically appropriate group treatment opportunities for patients and to be responsive to patients' concerns.  Staff reported that structured treatment hours in the SQ PIP included interdisciplinary team meetings, primary clinician and psychiatry contacts, other one-to-one contacts besides primary clinician and psychiatrist, psychoeducational groups provided by psychologists, social workers, psych techs and recreation therapists, as well as recreational therapy programs provided in room or in the yard.

The SQ PIP provided daytime and evening structured activities, which comprised 126 groups and 35 groups per week, respectively.  During the daytime program, 57 groups or 45 percent were facilitated by recreation therapists, 48 groups or 38 percent by psych techs, 11 groups or nine percent by social workers and 12 groups or ten percent by psychologists.  Of the 35 evening groups offered weekly, 25 or 71 percent were facilitated by psych techs and ten or 29 percent by recreation therapists.

Analysis of the group treatment schedule from the preceding site visit showed it was broken down by multiple cohort groups.  Specifically, the bulk of therapeutic activities were provided to cohort groups designated "A" through "F."  Patients were assigned to these groups by their treatment teams based on clinical determination.  Patients were then assigned to numerical cohort groups numbered "1" through "5"; these groups included structured enrichment and unstructured activities in which the patients could participate.  Placements in some of the

enrichment activities were based on patient request or recommendation and others were based on staff determination.

SQ PIP provided structured therapeutic hours data for its intermediate care program for January 1, 2015 through April 30, 2015. During January 1, 2015 through January 27, 2015, the SQ PIP scheduled a range of 33 to 43 hours per week, offered 27 to 37 hours each week, of which patients attended a range of 12 to 15 hours weekly. Patients refused 15 to 22 hours and six to 13 hours per week were cancelled.

In the period of January 29, 2015 through February 25, 2015, scheduled treatment hours were a range of 39 to 49 hours per week, patients were offered 34 to 39 hours each week, of which they attended a range of 16 to 18 hours weekly, and refused 18 to 21 hours. An average of three to ten hours per week were cancelled.

During February 26, 2015 through March 25, 2015, there was a range of 42 to 43 hours of treatment hours scheduled. Patients were offered 39 to 41 hours per week and attended 15 to 17 hours per week. Patients' refusals were in the range of 22 to 26 hours each week and the range for treatment cancellations was three to five hours weekly.

Data for March 26, 2015 through April 29, 2015 indicated that the SQ PIP scheduled a range of 42 to 43 hours per week and offered a weekly range of 39 to 43 treatment hours. Of the offered hours, patients attended an average of 14 hours and refused a range of 24 to 28 hours. Cancellations during the period were in a range of zero to four hours per week.

On average, approximately 40 hours of therapeutic activities were available to intermediate care patients, unless a patient's treatment plan specified otherwise. In addition to offered treatment, cohort group A, B, E, and F patients were offered up to 9.25 hours per week of yard. Cohorts C and D patients were offered seven hours of yard.

In addition, the numbered cohorts typically added two hours of activity per day for a total of 14 hours per week.

During the site visit, several groups were observed, along with what appeared to be treatment groups on the schedule but were actually individual sessions, either due to lack of attendance or because of the patient's status.  Similar to the preceding site visit, it was noted that the recreation therapists were always very well-prepared, their sessions were well-structured and therapeutic in nature.

In interviews, psych techs were typically aware of their technical weaknesses and shortcomings and stated the need for more direction and supervision.  The psych techs requested additional training and resources to assist in facilitating treatment groups.  It appeared that it would benefit the SQ PIP to develop a mentorship program as part of the training for facilitated treatment groups and to use co-facilitation to help develop skills.  It was also observed that the program would likely benefit from including a process for evaluating the appropriateness of staff for facilitation of groups without a co-facilitator prior to allowing him/her to do so.

It was noted that while there had reportedly been training with the psych techs since the preceding site visit, the quality of the treatment groups facilitated by them was variable and many remained problematic.  Many psych tech led treatment groups were not as well-structured, treatment objectives were lacking and therapeutic content was quite varied.  In one group facilitated by a psych tech, the television was left on during the treatment group, causing significant distraction and interference with the group process.

It was noted that the SQ PIP had added a group coordinator since preceding site visit.  This position was filled by a licensed clinical social worker who was responsible for researching best practices for this population and identifying any manualized treatments.  The group

coordinator had established a library of resources that was available to all group facilitators. Group facilitators were also expected to provide the group coordinator with their group curricula so that a copy could be maintained in the group resource library. It was the group coordinator's task to maintain order and structure over the content of the treatment groups and to attempt to standardize some of that content.

### c. Individual Therapy

Individual therapy was provided weekly to each patient in the SQ PIP with some patients receiving additional contacts if indicated. The SQ PIP continued to operate under the guiding principle of primary clinician and secondary clinicians so that when the primary clinician was away on planned or unplanned leave, the secondary clinician could immediately step in and was already familiar with and to the patient, which was apparently working well.

### d. Use of Restart Chairs

During the site visit, it was noted that the SQ PIP had installed and were using restart chairs. Restart chairs were placed in one treatment room and in the dayroom area. This resulted in approximately two hours out of an approximately 40 hours of available weekly treatment activities, or five percent of treatment potentially occurring in restart chairs. If a patient refused to use the restart chair, he would still have access to a substantial quantity of treatment activities.

Analysis of data and staff interviews regarding access to treatment for patients who used restart chairs showed that in the intermediate care program, three patients used the restart chairs regularly, and three other patients had used the chairs on occasion. Treatment hours data for the three regular users were examined. For the three patients who regularly utilized the restart chairs during January 1, 2015 through April 30, 2015, they were offered 28 to 44 hours of treatment weekly and attended a range of 18 to 35 hours of treatment. For the three patients described as

occasional users, they were offered a range of 23 to 47 hours of treatment and attended a range of 11 to 35 hours of structured treatment.

Patients were interviewed during the site visit about the use of the restart chairs. Many of the patients who were interviewed had not experienced the restart chairs because they had refused all treatment groups in the restart chair treatment room and did not have personal experiences with the restart chair. There were numerous complaints from the patients interviewed about the restart chair, including that they did not like the process of being in "chains," feeling dehumanized and expressing the view that that it was punitive because it was not consistent with their status and was more like what they would expect if they had been admitted from the Adjustment Center.

The single patient who was observed in the restart chair indicated that he was "fine" with the restart chairs and had no complaints; however, this patient had limited English skills.

Interviews and a review of the provided documentation confirmed that a small portion of the overall volume of therapeutic opportunities for the patients were offered in restart chairs, and placement in the chairs was not mandatory. Consequently, any patient could refuse using the chair and still have access to substantial treatment activities.

e. **Unstructured Treatment**

During previous site visits, patients had offered feedback indicating that they would appreciate additional time out of their rooms/cells that was not specifically for the purpose of structured treatment. Patients requested unstructured yard time, unstructured dayroom and other unstructured opportunities to socialize, watch television and just be out of their rooms without having to engage in therapeutic activities. Such unstructured activities were being offered to patients at the time of the site visit.

**f.   Yard**

During the site visit, the scheduling committee was in the process of planning for extending evening yard hours to take advantage of daylight hours which were lasting longer into the evening.  Construction on the yard was set to begin at the end of May 2015 with the installation of lights on the yard.  This was expected to improve yard access for patients once completed.

## V.    PATIENT ACCESS TO TREATMENT

During the site visit, there were two patients at DPS, four patients at Stage Level 1, six patients at Stage Level 2 and 19 patients at Stage Level 3 (the remaining two patients were at the acute care level of care).  While there were more patients at the higher end of the Stage System since the December 2014 site visit, there remained concerns about those at the lower end of the system.  Four cases were randomly selected from the six patients at DPS or Stage Level 1.  Three of those four were patients admitted in October 2014; one had his Stage Level mentioned in his treatment plan, and no behaviors or symptoms were specified in the plan or targeted as part of the treatment plan so that the patient could progress to a higher Stage Level as part of treatment.

Finally, no effective interventions were included as part of the treatment plan for the patients at the lower levels.  These patients were extremely ill and were candidates for individual behavioral plans, yet behavioral interventions were not discussed as part of their treatment plans.  It appeared that they were not progressing through the Stage System due to their mental illness.  It was observed that as these patients failed to progress through the Stage Level system and were not responding to treatment, the treatment plans were not reevaluated and modified, nor were effective individualized behavioral plans put in place to assist patients to traverse the Stage Level system.

During the preceding site visit, it was observed that there was a clustering of patients at the low end of the Stage System who were apparently not progressing through the program due to their mental illness.  The Stage Level System as a whole appeared to create a disincentive for some patients due to the removal of basic privileges (e.g., visiting, phone) that they had when in the housing unit.  SQ PIP management staff and San Quentin State Prison's administration were receptive to examining these issues and committed to reviewing the Stage Level System as it was operating.

During the site visit, staff reported numerous changes regarding the Stage Level System, pointing out that the SQ PIP policy, Stage Program (Volume 19, PIP Policies and Procedures, Chapter 8), was under revision at the time of the site visit.  Changes that were being incorporated into the policy included removing telephone calls, visiting, packages and canteen from the Stage Program.  Patients were to receive the same access in the SQ PIP that they received in their prior housing unit.  Patients who were at Grade B status would have a process for phone access that involved the treatment team: the patient would be assessed by his treatment team.  For those patients with a clinical indication for phone privileges, the treatment team would make a referral to the ICC requesting phone call privileges.  Documentation indicated that there had been four Grade B patients who had been referred to ICC for phone privileges and all had been granted those privileges in January 2015.  Two of those patients had eventually been assigned Grade A status as well one month later.

In addition, canteen was no longer incrementally increased and the SQ PIP added canteen-like items that they could use as incentives for patients.  As SQ PIP staff worked to identify other incentives for patients, they were able to purchase tablets for patient use.  The tablets had not arrived by the time of the site visit but were expected soon.  The tablets would

have games, books and movies.  Staff stated that patients who were agreeable were also going to be given plants to care for in their cells.

Overall, the changes to the Stage Level System since the preceding site visit were extremely positive and demonstrated the willingness of the SQ PIP staff to incorporate feedback and continuously improve the treatment program.  They had implemented some creative solutions and were continuing to work to identify additional incentives.

Following the installation of the final restart chair, all available treatment space was utilized.  The group dining program located within the dayroom, had not been implemented. Other activities continued to occur in the dayrooms.  Telephones were in each of the dayrooms as were televisions and patients were allowed to use those rooms.

## VI.    USE OF SECLUSION AND RESTRAINTS

Nursing staff maintained the seclusion/restraint log, both of which contained relevant elements for auditing purposes.  No inmates had been placed in seclusion or restraints for mental health purposes during the review period.

## VII.    REFERRALS, ADMISSIONS AND DISCHARGES

Since November 2014 there had been five referrals for admission to the SQ PIP and three discharges.

## VIII.    QUALITY IMPROVEMENT

The SQ PIP's subcommittee of the quality management committee met on a weekly basis during the review period.  The subcommittee was multidisciplinary and large in number.  The quality improvement process for the SQ PIP continued to evolve in a positive and effective manner.

Minutes of the subcommittee meetings were comprehensive in nature. The standing agenda items have included the following areas: dental training, staff influenza vaccinations, medication error, multidisciplinary fourth floor staff meetings, waist restraints for startup chairs, and patient satisfaction surveys. The agenda also included follow-up items and open forum items such as medical records, license/certification, mission discharge assessments, dietary, pharmacy storage and utilization review.

Audits for management purposes that were reviewed included use of restraints and seclusion, timeliness of the eUHR scanning, and the bed utilization management (BUM) report.

A medication error QIT was chartered during January 2015 as was a scheduling QIT.

Monthly audits were also performed by the SRN II, which focused on a variety of relevant nursing issues such as documentation for PRN medications, antibiotics documentation, various filing issues, nursing care plans, daily census report data, etc.

Plans of corrections developed/reviewed by the SQ PIP subcommittee included, a plan of correction relevant to nursing care plans in the context of an October 15, 2014 CTC licensing survey, and a plan of correction relevant to dietary services related to the same October 15, 2014 licensing survey.

An employee satisfaction survey relevant to the SQ PIP was performed during the review period. A patient satisfaction survey was also conducted during the same time period.

All clinical staff had completed the training relevant to the new headquarters developed peer review process at the time of the site visit.

## IX.    INTER-STAFF COMMUNICATIONS

1.  Morning Collaboration Meeting

The morning meeting was observed during the site visit and it continued to be a well-attended interdisciplinary meeting.  This meeting remained well-structured, informative and useful for all attending.  Staff addressed administrative issues, pending admissions and discharges and bed moves as well as any new business or other outstanding issues.  It was also noted during the meeting that a scheduling committee existed to deal with any scheduling issues, such as yard.  One of the matters that was discussed was extending the evening yard as summer hours extended the daylight hours.

2.  End-of-Shift Briefing

A shift change briefing was attended during the site visit.  On a positive note, the SQ PIP had implemented a formal interdisciplinary third watch end-of-shift briefing for staff, which was an improvement in the process for inter-staff communications over the supervisory meeting that was occurring during the preceding site visit.  While nursing staff were required by policy to have shift change briefings, these meetings were not required to be interdisciplinary despite the enhanced communication and other benefits of interdisciplinary shift briefings.

## X.  UNUSUAL OCCURRENCES

Staff was required to document any unusual occurrences and report them monthly to the mental health subcommittee.  Twelve unusual occurrences were documented for the months of January, February and March 2015.  Examples of the occurrences were as follows: an institutional-wide power outage, verbal abuse towards staff, self-injurious behavior by a patient, and obscene gesture towards staff.

## XI.  SECURITY MEASURES

Staff reported that security measures in the SQ PIP remained the same.  As previously reported, all condemned patients were handcuffed during all movements from place to place, and

they must be in therapeutic modules or restart chairs during all treatment.  Staff pointed out that although CDCR regulations required all condemned patients to be escorted in handcuffs, this rule did not apply while patients were in treatment settings, and accordingly, SQ PIP patients were not handcuffed while in therapeutic modules during therapeutic sessions.  They were, however, placed in restart chairs or modules, regardless of patients' stage levels.  Staff also reported that custody-cleared SQ PIP patients would eventually be allowed to participate in group yard, once construction of the SQ PIP yard was completed to allow for non-therapeutic yard activities.

## XII.    LAUNDRY, SUPPLIES AND OTHER ISSUES

No laundry or supply issues were reported since the preceding site visit.

Two patients assigned to the acute care program were interviewed to determine what property and clothing they had been provided.  Both patients were observed to be clothed in state issued blues with a change of clothing in their cells.  Additionally they had some items of personal property to include drawing pads and personal make-up.  Clinical leadership stated that the determination of what property that would be provided was a decision of the treatment team, which was confirmed by a patient who showed the monitor a list of items that they would be receiving next week when they were anticipating being moved to the intermediate level of care.

## XIII.    IN-ROOM LIGHTING

Patients' complaints regarding lighting in the patients' rooms being left on during sleep hours causing patients to experience difficulty sleeping was examined.  Staff reported adherence to the policies regarding patient room lighting during sleep hours (Volume 9, Chapter 34: Patient Room Lighting – Sleep Hours) and no patient reported problems during interviews.

## XIV.   <u>PATIENTS' REPRESENTATION AND CONCERNS</u>

The patient council had been in its early development at the time of the preceding site visit.  Since that time, much had occurred.  While officers were typically elected to such councils in other settings, the current SQ PIP officers had been appointed by staff.  The SQ PIP team attempted to have the officers be elected; however, the election of council officers did not go well according to staff.  There was reportedly too much conflict with East Block and racial politics intruding.  In the midst of the conflict, by-laws for the council were never written and attendance by patients dropped.  Based on patient interviews, the council was not trusted and much work would need to occur to make the patient council viable.

The issue of an inordinate number of appeals being screened out of the process was also examined.  Senior San Quentin State Prison administrative staff advised that the appeals were being screened appropriately based on the information being inappropriate for the appeal, that patients were advised on how to correct and process errors, and forms were redirected to the appropriate forum for redress when they had been misdirected.

APPENDIX B-1
DSH-Atascadero
January 13, 2015 - January 15, 2015
June 22, 2015 - June 25, 2015

**Patient A**

This patient was admitted to DSH-Atascadero on 7/15/13 due to paranoid ideation and bizarre behavior despite his medication adherence. Additional support provided from the Enhanced Outpatient Program (EOP) team in the California Department of Corrections and Rehabilitation (CDCR) had not adequately increased his coping skills. His diagnoses included Schizophrenia, Alcohol Abuse, Cannabis Dependence, Opioid Dependence, and Cognitive Disorder NOS. His prescribed medications included Zyprexa, Risperdal, and Effexor. Expected outcomes of his hospitalization were improved coping skills, treatment participation, and modification of his medications.

Pertinent history included community-based treatment including hospitalizations and an extensive history of Polysubstance Abuse and a head injury. Upon Department of State Hospitals (DSH) admission, he was cooperative but endorsed auditory hallucinations.

Initial comprehensive assessments by all clinical disciplines were present in the healthcare record. On 7/16/14, Zyprexa was tapered and Risperdal was started due to the patient's partial response to auditory hallucinations and significant weight gain. Side effects led to medication nonadherence.

The psychiatry progress notes in the healthcare record were somewhat repetitive, but they documented updates regarding medical tests, medication adherence, and side effects. The social work notes indicated fluctuating group attendance. Over time, the patient appeared to stabilize and he reported that his auditory hallucinations were "less demanding." Psychology notes indicated that in December 2014, the patient was involved in an incident of mutual fighting. During the prior six months, he had shown gradual improvement and he was socializing with peers.

Attempts at diagnostic clarification were made. In September 2014, the patient underwent testing to determine the extent of neurological damage and to determine whether a possible diagnosis of cognitive disorder was warranted. The findings suggested a diagnosis of Cognitive Disorder NOS provisional, associated with multiple head injuries. It was suggested that the patient's memory issues could be improved by a referral to the Brain Fitness group. The report suggested that the patient's learning and memory deficits could require repetitive verbal cues or written reminders and, where practical, group leaders could utilize the patient's strengths in nonverbal thinking by using examples. The report further stated that tasks should be introduced in small steps. The patient's low motivation level required prompting and encouragement.

The healthcare records that were provided indicated that during the course of the patient's hospitalization, he was seen by psychology three times between August and December 2014. Social work notes indicated monthly contacts between October and December 2014. Since the summer of 2014, the patient was seen monthly by psychiatry. Although the therapeutic goals described in documentation were not met, the approaches and interventions were not subsequently modified.

The patient's treatment plan of 10/9/14 focused on his psychiatric stability, weight gain, and reduced attendance at substance abuse treatment. Measurable goals were not identified and implemented, and it appeared that the details of the recommendations of the psychological assessment conducted during the previous month were not incorporated into treatment planning.

Findings

Initial assessments were comprehensive and neuropsychological testing was completed. However, these useful assessments and the subsequent recommendations did not sufficiently inform treatment goals or interventions. Treatment approaches did not change sufficiently in response to the patient's failure to reach documented goals. Overall, the patient appeared to stabilize and his symptoms became more manageable during the course of the hospitalization, but treatment planning was somewhat insufficient in that it did not adequately reflect assessed needs or failure to respond to interventions.

**Patient B**

This 54-year-old man was admitted to DSH-Atascadero on 12/5/14, after not prevailing in a *Vitek* hearing. He was serving a life sentence. He was diagnosed with Major Depression, recurrent, severe without psychotic features, and Cocaine Dependence. He also had a history of multiple head traumas. He was transferred to DSH-Atascadero with the stated goals of reducing depression symptoms and establishing a sense of worth, purpose, and hope in life. An additional goal was that the patient could be assisted with reducing or eliminating passive suicidal ideation, and improving his coping strategies for improved functioning in the prison setting.

This patient's history was significant for multiple admissions to inpatient care at DSH programs and at least four suicide attempts. While in prison, he had significant depressive symptoms. Prior to his admission he had been scheduled to begin individual treatment with a clinician who left the prison before this occurred, leading to a clinically significant level of disappointment. The patient was also disappointed that he was to begin a mural art program with other patients, which was placed on hold.

The healthcare record documented the presence of comprehensive initial assessments by all clinical disciplines. Psychology noted that the patient experienced various disappointments that appeared to greatly affect this patient's mood and exacerbate his depressive symptoms.

A December 2014 treatment plan documented that the patient was assessed with low risk for violence despite his violent criminal history. The plan noted that he might become more vulnerable after receiving bad news. Upon admission, he reported that he would not inform staff should he feel suicidal, and that staff could not prevent him from committing suicide. He was considered at moderate risk for suicide.

Treatment goals included psychiatric stability and development of coping skills for dealing with his 175-year sentence. He was noted to have had difficulty in attaining Hospital Access System (HAS) Level 2, and being isolative and initially mute. Overall, treatment goals were generic. There was mention of adding a group so the patient could work on art activities. This was

appropriate, given his disappointment in not being able to work on the mural project at CDCR, but there was no notation indicating that he had been placed in an art group. The goals did not sufficiently deal with the initial issue of therapeutic engagement with the patient or with his depression.

Although the patient was disappointed prior to his admission because he could not begin individual treatment as planned, no plans were made for him to be seen for individual therapy while he was at DSH-Atascadero until an incident occurred where he threatened to commit suicide. Although his treatment plan was not updated in response to this incident, he was seen consistently by the psychologist for a period of time, but then this contact ceased without explanation.

<u>Findings</u>

This patient received comprehensive initial evaluations. His treatment planning should have been more responsive to what appeared to have been the precipitants of his hospitalization. The treatment that the patient received was insufficient until he stated that he would commit suicide; however, these interventions were in response to this incident. Treatment planning goals were somewhat generic.

## Patient C

This patient was transferred to DSH-Atascadero on 7/3/14 with diagnoses of Major Depression, recurrent, severe with psychotic features and Alcohol Dependence. He was prescribed Zyprexa, Prozac, and later Wellbutrin. Prior to admission, the patient was admitted to the Mental Health Crisis Bed (MHCB) for depression, suicidal ideation, and auditory hallucinations. The patient reportedly had a history of at least five suicide attempts; the most recent occurred one week before admission.

The healthcare record contained comprehensive initial assessments by all disciplines. There were monthly social work contact notes that generally indicated increasing attendance at groups.

The healthcare record also documented the completion of a comprehensive psychological evaluation which included a recommendation that the patient receive cognitive therapy for psychotic symptoms. A psychologist saw the patient on 7/23/14 as a result of his moderate risk for self-harming behavior. The patient declined a psychologist contact on 7/31/14. On 8/4/14, the treatment team lowered his self-harm rating to "low."

Psychological testing was completed in August 2014 and noted borderline intellectual functioning. Specific recommendations included enrollment in basic language education classes. It was noted that written material should be read out loud to the patient, and that the patient's understanding of that material be assessed through open-ended questions. The treating psychiatrist was notified of the diagnostic changes based on the testing, which were reflected in the subsequent assessment.

Upon transfer to a new unit, the patient was seen briefly by the psychologist on 8/29/14. A note dated 9/2/14 described a 7/12/14 incident in which the patient was assaulted by a peer without provocation. A 9/5/14 team note indicated that the patient would possibly be referred to a language group because of his cognitive impairment. The next psychology note was dated 11/19/14, in response to another patient who reported that the patient had hurt himself.

A 9/5/14 treatment plan indicated that the unit psychologist would check in with the patient weekly until his suicide risk was reduced from moderate to low. The plan was reasonable but did not fully incorporate the recommendations of the psychological testing with respect to accommodations to improve effective communication. The treatment plan dated 9/26/14 more fully acknowledged the recommendations of the psychological testing, but without explanation, this plan and the treatment plan of 11/26/14 failed to include the borderline intellectual functioning diagnosis.

Some monthly group notes indicated that the patient had a minimal understanding of the content of groups to which he was assigned. This was consistent with the patient's use of English as a second language, particularly in the context of his documented cognitive deficits.

The most recent treatment plan of 12/31/14 again noted the observation that the patient did not understand much during group; the plan indicated that the psychologist would check in with him to support his learning. This appeared to indicate that the team was aware that the patient required additional support to achieve treatment goals. There were no psychology notes documented after November 2014, and consistent individual clinical contacts were not provided.

<u>Findings</u>

This patient's healthcare record documented appropriate clinical assessments and appropriate recommendations subsequent to psychological testing, but demonstrated insufficient incorporation of the recommendations into the treatment provided. Language barriers were inadequately addressed in the treatment. Differences in diagnoses between disciplines were not adequately addressed.

**Patient D**

This 58-year-old man was admitted to DSH-Atascadero on 5/15/12. While at CDCR, he was treated at the EOP level of care after he threatened to assault his psychiatrist whom he believed was taunting him. Admission documentation indicated that the patient responded well to medication, but rapidly decompensated when he did not adhere to prescribed medications. His primary diagnosis was Schizophrenia. He was prescribed Haldol depot medication, sertraline, and risperidone.

The patient's history was significant for a hospitalization in 1983 at DSH-Atascadero and at least one hospitalization in the community. He had a significant history of paranoia, auditory hallucinations, and aggression. The patient reportedly set his mattress on fire, but the date was not specified.

The initial treatment plan focused on targeting the patient's hallucinations, paranoia, and depression. More recently, the patient was seen for an annual treatment plan on 5/19/14. He reportedly participated in treatment and had no incidents of violence since his transfer to DSH-Atascadero. The patient refused to meet with the treatment team for treatment planning during March or April 2014.

In a treatment plan dated 8/13/2014, it was noted that the patient quit his job in the laundry because of a "personal problem." He reportedly attended 80 percent of his assigned groups, but was enrolled in only four hours of weekly groups.

There were a total of four progress notes by psychology during 2014, all of which were notations of treatment team reviews.

Findings

This patient appeared to have made an adequate adjustment to DSH-Atascadero. His stability improved during the course of his hospitalization. However, his treatment lacked a clear focus, and documentation of treatment planning sessions appeared to contain extraneous, repetitive information from earlier plans. Despite these observations, overall the patient's treatment was clinically adequate.

**Patient E**

This 31-year-old male was admitted to DSH-Atascadero on 10/14/14 following four MHCB admissions. The patient's transfer to inpatient care occurred to assist with stabilization of depression and auditory and visual hallucinations. Zyprexa and Zoloft, prescribed in the prison, were only partially effective in reducing these symptoms.

The patient was diagnosed with Schizoaffective Disorder and Antisocial Personality Disorder. He had a history of substance dependence. He was treated alternately with Thorazine, Zyprexa, Buspar, and Zoloft. His request for Seroquel and Valium, medications he stated he had previously found beneficial, was denied because he was informed that he could not continue these medications upon return to CDCR.

The patient's history was significant for multiple hospitalizations and multiple suicide attempts. His symptoms reportedly began at age 12, but his mother did not permit him to engage in psychiatric treatment. He had periods of homelessness, reported abuse by his father, and had received Supplemental Security Income (SSI) benefits.

The initial psychiatric assessment noted that psychological testing was required for diagnostic clarification. The initial psychological assessment added the diagnoses of Panic Disorder, Alcohol Abuse, and Borderline Personality Disorder, which were significant additions with implications for treatment interventions.

Progress notes indicated contact with psychology on 10/23/14 to complete testing, an "introductory session" on 12/19/14, and a 1/2/15 contact in response to an incident on 12/25/14

when the patient scratched "DIE" into the back of his left hand, an action he reported was in response to auditory hallucinations. The staff response was to note that the patient would benefit from groups. A comprehensive psychosocial assessment was conducted on 10/30/14. During November 2014, there were weekly social work contacts.

Weekly psychiatry contacts occurred during November 2014. A progress note from 11/13/14 indicated that the patient remained depressed but had improved, that he was still having thoughts of self-harm, and that he continued to hear voices and see faces on the wall. The psychiatrist suggested groups and supportive therapy, especially Dialectical Behavioral Therapy (DBT) and substance abuse. Although borderline personality disorder was mentioned, neither that diagnosis, the substance abuse diagnosis, nor the panic disorder diagnosis added by the psychologist was added to the diagnostic formulation or addressed in the follow-up plan. The 12/11/14 psychiatric note indicated that the patient was medication adherent and cooperative, was preoccupied but able to be re-directed, and noted that he found the DBT group helpful.

The summary note dated 12/11/14 concerning the DBT group indicated that the patient had 100-percent attendance, but he made minimal progress and participated minimally in groups. The treatment plan of 11/13/14 noted only the Schizoaffective Disorder and Antisocial Personality Disorder diagnoses. It noted that the initial Suicide Risk Evaluation (SRE) found the patient's suicide risk to be low. It suggested that the unit psychologist would assist the patient in making use of the DBT skills he was learning in group.

Findings

Comprehensive initial assessments were completed by all disciplines. Overall, the approach of using DBT supplemented by individual follow-up with the unit psychologist was appropriate. The follow-up therapy was not sufficiently consistent or organized and did not reconcile differences in diagnostic assessment by different members of the treatment team. Despite these issues, overall treatment was minimally adequate.

**Patient F**

This 49-year-old man was transferred to DSH-Atascadero on 10/31/13 for "more intensive psychiatric treatment." The patient's history included physical and sexual abuse and prior DSH treatment. Before transfer, he experienced suicidal ideation, depression, racing thoughts, and obsessive thoughts.

The patient was serving a life sentence. The admitting diagnoses were Bipolar Disorder, most recent episode depressed, severe with psychotic features, and Obsessive Compulsive Disorder. He was prescribed lithium, Luvox, Remeron, and Buspar. He was assessed to have moderate risk for suicide and self-injurious behavior. The patient was initially placed on one-to-one observation to discourage his tendency to wash his hands obsessively. On 11/27/13, a substance dependence diagnosis was added.

Beginning 10/8/14, there were regular social work progress notes indicating individual DBT-oriented treatment. These sessions documented excellent work in overcoming some resistance and good effect in assisting the patient manage to thoughts of self-harm.

This patient was seen by psychology almost weekly from June to November 2014, with fluctuating but generally good results. The focus of therapy was on symptom management and reduction in obsessive compulsive behaviors.

Findings

This healthcare record demonstrated a constructive approach to treatment planning and individual follow-up with good clinical results. The patient's treatment was clinically appropriate.

**Patient G**

This 33-year-old man was admitted to DSH-Atascadero on 9/26/014 following a suicide attempt and report of experiencing auditory hallucinations. He reportedly had a history of placement on involuntary medications for three years in the recent past.

Although he denied having mental illness, this patient reported that he was told by a psychiatrist that he had Schizoaffective Disorder. Reported symptoms included auditory hallucinations, paranoid thinking, and a fixed delusional belief. Other symptoms included racing thoughts, mood swings, and intermittent confusion. He also had a history of 20 suicide attempts in the past. A long history of poor treatment adherence associated with violence was also reported.

A history of alcohol and other substance abuse was present. Medical problems included a seizure disorder since age 17 following head trauma. The patient was made a ward of the court at two years of age. His legal history began as a juvenile due to stolen property, robbery, assault with a deadly weapon, and arson.

The precipitant for the patient's admission was biting his forearm on 8/22/14, resulting in the removal of a quarter-sized diameter piece of tissue in an attempt to remove his perceived electronic implant. The patient also threatened to murder his cellmate. There were numerous prior DSH admissions from as early as 2008. A significant history of violent behavior, including setting psychiatric hospitals on fire for revenge, was summarized in the psychiatric evaluation report. Prior diagnoses included Borderline Personality Disorder and Paranoid Personality Disorder. Past medication trials included Clozaril and Zyprexa.

A suicide and violent risk assessment was included in the initial psychiatric examination report. Surprisingly, the patient was assessed as having a suicide and violence risk (V-Risk) assessment of low to moderate risk. His admission diagnoses include Schizoaffective Disorder, bipolar type, Alcohol Abuse, Antisocial Personality Disorder, and Seizure Disorder. His GAF score was assessed at 30. The differential diagnoses included Borderline Personality Disorder and Polysubstance Dependence. The initial treatment plan written by the psychiatrist appropriately focused on psychopharmacological intervention.

297

The initial course of the patient's hospitalization focused on his continued attempts to remove the perceived chip from his forearm. For example, he attempted to insert a pen into his left forearm during the evening of 9/27/14. A very useful weekly psychiatric progress, which was typed, was present in his healthcare record. By 10/24/14, these typed psychiatry progress notes occurred monthly in frequency and were useful in content.

The initial comprehensive treatment plan was dated 10/26/14. The patient's suicide and self-harm risk was rated as moderate/high and his aggression/V-Risk was assessed as moderate. His first treatment plan was reasonably comprehensive in nature. His treatment plan was reviewed on 11/20/14 and finalized on 12/1/14. During his course of treatment, the patient was noted to inconsistently attend groups. He had chronically been on one-to-one observation due to being a danger to himself. This patient initially was involved in six hours of weekly treatment groups with a 75-percent attendance rate. Treatment plan review resulted in little change in the treatment plan, and little clinical progress was noted. The 12/29/14 treatment plan was changed little from the prior treatment plan.

A 12/17/14 psychology progress note indicated that a psychology intern met individually with the patient for an initial individual therapy session. The plan was to have individual sessions on a weekly basis with flexibility, based on the patient's weekly goals. However, no other documentation regarding subsequent individual sessions was located in the healthcare record. A behavioral intervention form was completed but not dated. Comprehensive initial assessments were completed by each clinical discipline.

Findings

Positive aspects of the healthcare record documentation included comprehensive, typed initial evaluations by all clinical disciplines, significantly improved documentation by psychiatry in comparison to the previous monitoring assessment, and initial comprehensive treatment plans. However, subsequent treatment plans were little changed despite the patient not achieving treatment goals.

The patient was included on a provided list indicating that he received individual psychotherapy sessions. He received one individual therapy session on 12/17/14 with a psychology intern. However, no documentation was located indicating that the planned weekly individual therapy sessions subsequently occurred.

The patient did not receive adequate treatment as the care provided was not consistent with the treatment plan. The plan also did not adequately address his continued symptoms and there was minimal progress in achieving treatment plan goals.

**Patient H**

This 38-year-old man was admitted to DSH-Atascadero on 4/17/14 with a chief complaint of auditory hallucinations and depression. His presentation upon admission was consistent with the

diagnosis of Major Depressive Disorder, recurrent, severe, with psychotic features.  The initial treatment plan focused on psychopharmacological approaches.

The DSH 30-day psychosocial assessment was completed on 5/7/14 and was comprehensive in nature.  The DSH integrated assessment rehabilitation therapy section was completed on 5/12/14.  The admission psychological assessment was completed on 4/23/14.  Initial diagnoses were listed as Schizophrenia, paranoid type, Alcohol Dependence in a controlled environment, and Amphetamine Dependence in a controlled environment.  Progress notes or documentation addressing discrepancies in the diagnoses made by the psychiatrist and psychologist were not found.

Monthly psychiatry progress notes provided useful information as to the patient's course of treatment and clinical response.  Group therapy progress notes were less useful, which was related in part to the format (i.e., checkboxes) of the progress note form.  Treatment plans were difficult to follow from the perspective of summarizing the patient's clinical progress and treatment plan changes.

Findings

From the perspective of following this patient's clinical response and course of treatment, the psychiatrist wrote the most useful progress notes.  In this case, it would be useful to simplify the treatment plan to make it a more clinically useful document.

This patient's treatment was adequate, but the previously referenced diagnostic differences should have been clarified in a simplified treatment plan.

**Patient I**

This 48-year-old man was admitted to DSH-Atascadero on 11/7/12.  Comprehensive admission evaluations were completed by all clinical disciplines in a timely manner.  The patient's presenting complaint was depression and auditory hallucinations.  His presentation was noted by the psychiatrist to be consistent with Major Depressive Disorder, severe with psychotic features, and several medical problems that included asthma and hypertension.  However, the admission psychological assessment resulted in diagnoses of Schizophrenia, paranoid type, chronic and Cannabis abuse.  Documentation pertinent to these discrepant diagnoses and discussion of the differences was not found.  The patient's initial treatment plan targeted symptoms of depression, assaultive behavior, self-harm, hallucinations, and anxiety.  Antipsychotic medications were not initially prescribed.

The 11/15/12 finalized treatment plan was similar to his most recent treatment plan dated 11/6/14, but the latter plan did provide relevant information regarding the patient's subsequent course of treatment.

A portion of the healthcare record was apparently missing, which limited this record review.  Review of monthly psychiatry progress notes for 2014 indicated that antipsychotic medication was added to the patient's treatment.  The patient reportedly attended his psychosocial

rehabilitation groups and made progress with his coping skills. Review of psych tech nursing weekly progress notes indicated that the patient may have continued to respond to internal stimuli.

A behavioral intervention form was completed on 5/6/14. Monthly psychology notes were present and indicated that the patient was functioning reasonably well at DSH-Atascadero. However, his group attendance was noted on 1/7/15 to be only 56 percent (eight hours).

Findings

Identified problems included not reconciling via documentation diagnostic discrepancies in the initial comprehensive assessments, treatment plans that did not clearly identify target symptoms (i.e., psychotic symptoms), and organization of the healthcare record, which made it very difficult to coherently follow this patient's course of treatment.

**Patient J**

This 46-year-old man was admitted to DSH-Atascadero on 3/20/14 with a chief complaint of depression and auditory hallucinations. His initial psychiatric examination was consistent with the diagnoses of Major Depressive Disorder, recurrent, severe with psychotic features, and Polysubstance Dependence. The initial treatment plan focused on psychopharmacological management. Other relevant records were present in volume II of his healthcare record, which was not available for review.

A 8/20/14 monthly psychiatric progress note indicated that the patient was participating in nine weekly hours of psychosocial rehabilitation groups. The monthly psychiatric progress notes were frequently repeated verbatim from the previous monthly note. Treatment plans were apparently filed in volume II.

Findings

The major problem identified in this limited healthcare record review was the quality of the psychiatric progress notes, which were largely "cut and pasted" from prior notes.

**Patient K**

This 65-year-old patient was admitted to DSH-Atascadero in February 2015 due to delusional thinking. The treatment outcome expectations were to "foster insight through education; encourage medication compliance; reduce potential for conflict with peers over delusional persecutory beliefs by reducing the severity of these beliefs; evaluate diagnosis further." According to his treatment plan on 5/27/15, his diagnosis was Delusional Disorder, persecutory type. The patient was adherent with Zyprexa and valproic acid. His healthcare record was reviewed to assess the provision of mental health services.

The CDCR referral for DSH admission requested neuropsychological testing to assess the patient for dementia. During the admissions process, the psychologist referred him to neurology, but an

300

evaluation had not been completed at the time of review. After leadership was made aware of this by the reviewer during the site visit, psychiatry staff assessed the patient on 6/25/15 and indicated that the neurology consult was not clinically indicated.

There was no documented mental health history prior to age 61. However, while in CDCR he expressed delusional thinking that other patients were putting acid or powder in his hair that made his hair fall out. While in CDCR, he received mental health services at the EOP level of care. There was no history of a head injury. The patient had a history of alcohol abuse. Medically, he was diagnosed with Crohn's Disease, COPD, and bone deterioration.

Group attendance records were not located in the healthcare record. However, a psychiatric note from June 2015 showed group attendance at 83.3 percent, which was a decrease from the previous month when it was 100 percent. Psychiatric staff met with the patient monthly. Social work staff met with him weekly on Unit 8 and monthly after he was admitted to Unit 31. He had minimal contact with the psychologist.

The patient's quarterly treatment team meeting occurred on 5/27/15. At that time, he reported that he was doing well and denied auditory hallucinations; however, there was no documentation of the status of his delusional thinking.

Treatment goals such as psychiatric stabilization and objectives such as learning skills to manage delusions in prison in January 2015 were generally consistent with the reason for admission. Interventions were generally connected to objectives (Mental Health Awareness Group).

Findings

This patient's care was adequate, but it could have been greatly improved with individualized treatment planning, including specific and behaviorally-based objectives and interventions that were measurable and clearly connected to objectives. Communication regarding the referral to neurology could also have been improved.

**Patient L**

This 31-year-old patient was admitted to DSH-Atascadero in April 2012 from the EOP level of care at WSP. At the time of admission, he was disheveled, malodorous, unkempt, evidenced disorganized speech, and was preoccupied with internal stimuli. Treatment outcome expectations were to "Increase functioning in ADLs…control active psychotic symptoms, increase goal-directed behavior, focus thoughts on reality, normalize speech patterns." The treatment plan dated 4/21/15 documented that the patient's diagnosis was Schizophrenia, disorganized type. He had a history of crack cocaine use. His healthcare record was reviewed to assess the provision of mental health services.

During the review period, the patient had monthly contacts with psychiatry on Unit 32. Social work contacts occurred monthly during April and May 2015; progress notes of previous months were not located in the healthcare record. There was no routine contact with the psychologist.

301

Treatment goals were the same in January and April 2015.  Treatment goals such as symptom stability and the objective of learning skills to manage symptoms of Schizophrenia were generally consistent with the reason for admission.  Interventions were generally connected to objectives (Mental Health Awareness Group).  The group paired music and relaxation and engaged participants with lyric discussion and musical "madlibs."  It was documented that the patient needed prompts to attend groups due to auditory hallucinations and that he made minimal progress toward his objective of learning skills to manage symptoms of Schizophrenia given the groups' focus on improving effective communication skills.

Findings

This patient's care was adequate, but it could have been greatly improved with individualized treatment planning, including specific and behaviorally-based objectives and interventions that were measurable and clearly connected to objectives.  The referral to Mental Health Awareness Group did not appear appropriate given the severity of his symptomatology and his level of functioning.

**Patient M**

This 72-year-old patient was admitted to DSH-Atascadero in December 2014.  He was housed on Unit 34.  He was provided with diagnoses of Schizophrenia, paranoid type, and Antisocial Personality Disorder.  He was prescribed Seroquel.  His healthcare record was reviewed to assess the provision of mental health services.

The patient had been incarcerated in the CDCR since 1981.  He had a history of treatment at the 3CMS level of care, which advanced to EOP in 2008, and multiple MHCB and DSH admissions.  The patient was hospitalized at DSH-Stockton until May 2014, when he was returned to CDCR.  Shortly after his return in June 2014, CDCR pursued PC 2602, which was denied.  The patient was referred to ICF on 9/3/14, and it was recommended that CDCR rescind the referral and resubmit a PC 2602, which was ordered in November 2014.  The patient's symptoms included negative symptoms of Schizophrenia, and he was non-communicative.  Another ICF referral was submitted, and the patient was accepted on 11/17/14.

During the reporting period the patient had monthly psychiatry contact.  However, the psychiatrist was not in attendance at treatment team meetings during March and June 2015.  Documentation indicated that the patient's hygiene and engagement improved; there were no signs of paranoia, and he denied overt psychotic symptoms.  In contrast, monthly contacts with the psychologist and social worker since February 2015 indicated that he remained delusional.  The discrepancy between the denial of overt psychotic symptoms by psychiatry and documentation of delusional thinking by the social worker and psychologist was not addressed clinically.

One of the patient's treatment goals (psychiatric stability) and objectives (to be able to identify his diagnosis, symptoms, and treatment to learn skills to remain safe in CDCR) was too advanced given the patient's significant impairment in functioning upon admission.  Interventions were generally connected to objectives (Mental Health Awareness Group).  At his

last treatment team meeting, it was determined that the patient had gained maximum benefit from this group and that his symptoms interfered with his ability to recognize his illness.  It was recommended that this group be replaced with a group that focused on coping skills; however, there was no documentation that indicated a change in group programming.

Findings

This patient's care was inadequate.  Treatment planning for this severely impaired patient needed to be more individualized and consistent with his functioning.  His inpatient treatment was delayed due to the need to complete a PC 2602 after the referral was made.  A discrepancy between what the patient reported to the psychiatrist (denial of overt psychotic symptoms) and documentation of delusional thinking by the social worker and psychologist was not adequately addressed.

**Patient N**

This 29-year-old patient was admitted to DSH-Atascadero for grave disability on 3/17/14, a month after his referral date.  He was psychotic, not attending to ADL's, and refusing meals.  Treatment outcome expectations included: "be able to care for himself (showers once every other day, increase hygiene and cooperativeness…attend groups once a day and he will not be responding to internal stimuli."  His most recent treatment plan provided a diagnosis of Schizophrenia, paranoid type.  He was prescribed Geodon under PC 2602.  The patient had a history of inpatient psychiatric treatment for Schizophrenia.

During the reporting period, psychiatry saw the patient monthly with the exception of February 2015.  Psychiatry documentation was not individualized.  Social work contacts occurred monthly.  However, two contacts were dated as addressing the previous month.  As an example, the 3/9/15 note was documented as addressing the February monthly contact.  Social work notes were generally descriptive of his functioning during the previous month.  Psychologist documentation was illegible and summarized treatment team contacts.
Treatment team meetings occurred monthly.  According to the most recent team meeting on 6/15/15, the patient's attendance to ADL's and psychotic symptoms had improved.  However, treatment goals were vague, and interventions were not always consistent with the objective.  For example, for the goal of "psychiatric stability," the objective was to "identify his diagnosis, symptoms, and treatment and to learn to stay safe in the CDCR."  During May 2015, the intervention of the mental health awareness group focused on "learning to use humor to cope with stress."

Findings

This patient's care was generally adequate, but it could be greatly improved with individualized treatment planning, including specific and behaviorally-based objectives and interventions that were measurable and clearly connected to objectives.  Individualized documentation for psychiatric contacts was recommended.  The practice of social work contacts documented as 3/9/15, which was the note for the February 2015 contact, and 6/1/15, which was the note for the

May 2015 monthly, was worth revisiting and clarifying; it could not be determined whether this was a "late entry" of the contact as it was past the monthly timeframe.

**Patient O**

This patient was a 37-year-old male admitted to DSH-Atascadero on 4/7/14. His most recent treatment plan was dated 4/7/15. The initial referral was related to receiving "mental health treatment for depression and suicidal ideation."

The patient's controlling offense was a lewd act on a child aged 14 and 15, furnishing a minor with marijuana, possession of firearm by a felon, and carrying a loaded firearm in public. A SRE indicated that he was considered at moderate suicide risk which was related, in part, to a significant past history of multiple suicide attempts.

The patient's treatment plan included learning ways to manage his psychiatric symptoms (depression, command auditory hallucinations, self-harm/multiple suicide attempts), to identify ways of getting others to help support his recovery, to develop social skills, to deal with his sexually inappropriate behaviors, and to address his substance abuse. The patient reportedly participated in approximately six hours weekly of supplemental activities during the three months preceding his April 2015 treatment plan review. His most recent group attendance for scheduled structured activities was only 32 percent. He did not appear to be motivated to engage in his treatment.

A nurse was not present at the patients' most recent treatment plan review. The current treatment plan review included data that was cut and pasted from prior treatment plan reviews that were outdated. For example, his current group attendance in the discharge planning section was noted to be three percent when in fact, at the time of review, it was 32 percent. Based on review of his January 8, 2015 treatment plan, this was not a typographical error.

Diagnoses included Major Depression, recurrent, severe with psychotic features, Polysubstance Dependence, Antisocial Personality Disorder, and Borderline Personality Disorder. During the review period, the patient only met on an individual basis with a psychologist on 3/6/15 and 3/19/15. The focus of these meetings appeared to assess his mental status.

The admitting psychiatric examinations during August 2014 were comprehensive in nature. A 5/6/14 psychosocial assessment present in the record was helpful, as was an SRE dated 8/3/14.

Rehabilitation therapy progress notes were reviewed with the most recent 90-day note dated 4/9/15, indicating that the patient made moderate treatment progress despite attending less than 50 percent of his scheduled groups. He was described as hard to motivate and seemed to be "his worst enemy when it comes to his recovery."

A 4/25/15 annual nursing assessment and evaluation form was completed and reviewed. The patient's medications included Effexor, Zoloft, and lithium; the patient indicated that the medications worked well for him. He continued to display symptoms of Major Depression, including social isolation and lack of treatment motivation.

The admitting psychiatric examination during August 2014 was comprehensive in nature. Monthly psychiatry progress notes during the reporting period were reviewed. During June 2015, the patient demonstrated improvement of his chronic depressive symptomatology.

Progress notes that addressed the patient's history of sexually inappropriate behavior with children were not located. However, monthly social worker notes were present, and weekly psych tech nursing progress notes were reviewed. The patient's social isolation was again documented.

Findings

This patient had poor participation in scheduled programming and treatment, and his treatment lacked focus on his history of sexually inappropriate behaviors and his apparent minimal clinical improvement. The treatment plans did not appear to adequately address these issues.

**Patient P**

A 1/16/14 psychiatric admission note indicated that this 52-year-old man presented at DSH-Atascadero with the chief complaint of auditory hallucinations and loose associations. He was transferred from CSP/Sac where he presented with delusional thinking. He also repeatedly made verbal threats to others and demonstrated manic behaviors. He was subsequently placed on Clozaril. His initial diagnoses were Bipolar I Disorder, Polysubstance Dependence, Antisocial Personality Disorder, and Borderline Personality Disorder.

The most recent treatment plan was dated 4/20/15. The diagnosis had changed to Schizoaffective Disorder without Axis II diagnoses. The foci of his hospitalization included obtaining psychiatric stability and improving impulse control. During the prior 90 days, he was offered a minimum of ten weekly hours of leisure and recreational supplemental activities. During January 2015, he reportedly attended almost 80 percent of his scheduled group therapies.

A 4/16/15 90-day rehabilitation therapy progress note indicated that the patient had been attending his groups and interacting appropriately with other patients. He was described as stable on his medications.

Admission notes by all of the core mental health clinical disciplines were comprehensive and useful. Nursing notes also addressed relevant nursing care treatment plans related to identified medical conditions. Monthly psychiatric progress notes were also reviewed. During May 2015, medications included clozapine, lithium, propranolol and melatonin. Excellent group attendance was reported for the review period. Target symptoms continued to include auditory hallucinations, delusions, mood lability, aggression, and self-injurious behavior when nonadherent with treatment. The patient reportedly met treatment outcome expectations.

Findings

This patient clearly benefited during his hospital stay, as was evidenced by his significant clinical improvement.  Based on document review, it was unclear what criteria the patient should meet for discharge consideration other than "a plan to manage psychiatric symptoms in prison." The patient's treatment was clinically appropriate.

## Patient Q

A 12/20/13 psychiatric admission note indicated that this 51-year-old man was transferred from NKSP due to becoming increasingly "disorganized, disheveled, malodorous, and delusional."  A past history of treatment at Patton State Hospital during October 2012 was reported.

The patient's most recent treatment plan was dated 4/2/15.  Diagnoses included Schizophrenia, undifferentiated type and epilepsy, unspecified.  The foci of the patient's treatment plan included symptom stability, identifying precursors to his aggression in the commission of his crime, substance abuse awareness, and leisure skills development.  During his 4/1/15 treatment team meeting, the patient reported being somewhat depressed.  His group attendance was 37 percent from 2/8/15 to 3/7/15.  He was scheduled for nine hours of weekly group and was also offered a minimum of ten weekly hours of leisure and recreational supplemental activities.  Criteria for discharge included developing coping skills to manage his symptoms safely in prison.

Useful admission assessments by psychology and social worker staff were present in the patient's healthcare record.  A 3/25/15 rehabilitation therapy progress note described perfect attendance in the healthy living group treatment.  He was described as an active participant in groups and was cooperative with staff.  He also began working in the laundry on Unit 20 during 1/26/15, but had trouble with his work responsibilities.

The patient's annual nursing assessment was completed on 1/16/15.  He had overall good group attendance during the previous year.  There were relevant summaries for various medical conditions.  Most of the PSR mall facilitator monthly progress notes documented acceptable progress and independent participation.  Weekly psych tech nursing progress notes indicated variable personal hygiene and general adherence with medications.  The patient was periodically observed to be responding to internal stimuli.

Findings

The patient received clinically appropriate care.

## Patient R

The psychiatric admission evaluation in this patient's healthcare record was not located.  The most recent treatment plan, dated 3/12/15, described him as a 53-year-old man who was admitted to DSH-Atascadero on 3/12/13 from California Medical Facility (CMF) due to self-harm ideation in response to command hallucinations.  There was a history of at least one suicide attempt.  His current diagnoses included Schizophrenia, paranoid type, mild mental retardation, and obesity.

306

Foci of treatment included symptom stability, learning how to better manage his anger and aggressive behavior, improving occupational skills, and leisure skill development. He was offered a minimum of ten weekly hours of supplemental leisure activity. He was enrolled in five weekly hours of group with a participation rate of 74 percent. His word recognition was noted to be at the ninth grade equivalent level. Discharge criterion was "a plan to manage psychiatric symptoms in prison."

There were four notes by a psychologist during the review period; three were related to treatment team reviews and one was for a serious incident review. A 3/28/13 30-day psychosocial assessment report by the social worker was very comprehensive in nature. A 6/12/15 rehabilitation therapy progress note described the patient to be active in rehabilitation therapy treatment groups. He also had again begun working in housekeeping during the current review period.

A 3/12/15 annual nursing assessment and evaluation described the patient's thought processes as coherent and logical, but slowed with some memory difficulty. Current medications included hydroxyzine on an as needed basis and quetiapine. PSR mall facilitator monthly progress notes generally described the patient as making acceptable to very good progress in participating actively and independently in groups.

Findings

This patient was receiving appropriate mental health treatment, but the criteria for discharge were extremely vague.

APPENDIX B-2
DSH-Salinas Valley
January 13, 2015 - January 15, 2015
June 9, 2015 - June 11, 2015

**Patient A**

On 9/10/14, this patient was admitted to DSH-Salinas Valley from the CIM MHCB.  He was housed in the C-5 housing unit.  He was provided with a diagnosis of Schizophrenia, paranoid type.  A treatment plan dated 1/7/15 indicated that the patient was assessed at moderate risk range for suicide.  He was receiving his medications by PC 2602 order since 11/6/14.

Progress notes indicated that the patient presented with delusional thinking, impulsivity, sexually aggressive behavior, and multiple episodes of indecent exposure (IEX).  His behavior was reportedly improved somewhat after medications, but he had continued impulsivity.  He was prescribed Depakote, Zyprexa, Zoloft, and Cogentin.  His room was usually dirty, and he refused to attend groups.

Findings

The treatment team appropriately requested and developed a behavior management plan to address the patient's continued behavioral difficulties.  In addition, he was placed on PC 2602 due to poor insight regarding the need for medication treatment.

**Patient B**

This patient's healthcare record was selected following an interview and observation of the patient.  He felt that he was inappropriately placed at DSH-Salinas Valley and wanted to be returned to a prison or Patton State Hospital (PSH).

The patient appeared sluggish with psychomotor retardation.  When interviewed, he had great difficulty enunciating and was drooling excessively.  This patient was on an involuntary medication order for danger to himself or others.  He was prescribed chlorpromazine, lithium citrate, olanzapine, and sertraline with intramuscular injections ordered in the event of oral medication refusal.

The patient was diagnosed with Schizophrenia, paranoid type, Polysubstance Dependence, in remission, and Personality Disorder NOS with borderline and antisocial features.  He had been extremely delusional, claiming at various times to be pregnant, a hermaphrodite, and missing organs.  He had engaged in self-injurious behavior, including head-banging and ingesting inedible objects.  The patient also had been observed urinating on the floor and smearing feces.  His speech was often rambling and incoherent, and he was not easily redirected.

The patient was placed on Discretionary Program Status (DPS) status on 9/4/14, for threatening physical violence against staff.  The Interdisciplinary Treatment Team (IDTT) review section of the DPS documentation was not completed timely, but it indicated a reasonable rationale for maintaining DPS.  However, there was no further documentation regarding continuation or termination of DPS for this patient.  DSH-Salinas Valley staff were nonadherent with their policy.

The most recent treatment plan was quite cumbersome as it included information from several months of the patient's stay. The team did implement a behavior plan, which was a positive step in the patient's treatment. Otherwise, the treatment plan was lacking in relevance to the patient's presenting symptoms.

Findings

This patient was not adequately treated. A behavioral plan should have been implemented sooner, and the overall treatment plan should have been modified based on the patient's lack of progress. Staff failed to comply with their own policy when placing/maintaining the patient on DPS.

**Patient C**

This case was selected for review because the patient was observed and interviewed as part of the on-site facility monitoring process. The patient had been housed at DSH-Atascadero, but due to violence, he was committed to CDCR under PC 7301. He wanted to return to DSH-Atascadero and asked how that process worked. Management staff were informed of his question and agreed to follow up with the patient to address his concern.

The patient received his psychotropic medications by an involuntary medication order. His medications included olanzapine, sertraline, lithium carbonate, Haldol decanoate, and divalproex. He was provided with diagnoses of Schizoaffective Disorder, Polysubstance Abuse, and Antisocial Personality Disorder. The patient was well known to staff due to a reported history of assaultive and aggressive behavior.

The patient had been on maximum custody status during most of his stay and remained on DPS as a result. He was removed from that status on 12/22/14, although this was not reflected in the DPS log.

While the treatment plans did target the behaviors underlying the cause for maximum status, the interventions listed were actually modalities of treatment rather than true interventions. A more robust treatment plan was needed. That treatment plan should have specified the interventions to be utilized. The treatment plan did change once the patient's custody level was modified, although it remained only minimally adequate. However, it was problematic that despite this patient's violent history of assaultive and/or aggressive behaviors and extended time on DPS, no behavioral plan was developed.

Findings

This patient's custody level was eventually reduced, although it was unclear from the documentation whether his treatment had a directly positive effect on his behavior. The treatment plans needed to be more specific when indicating interventions and required revision when the patient had shown no improvement. However, the treatment plan was revised when the patient's custody status was modified. Review of the healthcare record in totality indicated that this patient was not treated adequately.

310

**Patient D**

This case was reviewed because the patient had been the subject of eight separate uses of force due to medication refusals. The first use of force involved the use of OC spray. The patient had refused medication repeatedly and became increasingly agitated and aggressive throughout the day, eventually yelling threats at staff. He refused to adhere to orders from custody. It was unclear whether clinical interventions were attempted, although nursing staff were interacting with the patient.

Once two disbursements of OC were deployed, the patient complied, and his medications were administered. He was prescribed chlorpromazine and diphenhydramine on an as needed basis and Risperdal with backup medication to be administered intramuscularly in the event of medication refusal.

The patient had three more use of force incidents that followed the same pattern: a refusal of medication including the backup medication, increased agitation and aggression, custody staff use of OC spray, and eventual compliance by the patient. These incidents occurred within a five-day period. The involuntary medication hearing occurred approximately ten days after the final incident, and an involuntary medication order was granted.

The patient had been diagnosed with Bipolar Disorder, with most recent episode mixed, and Polysubstance Dependence. The DPS paperwork was completed appropriately. The treatment plan was adequate and addressed the presenting symptoms.

Findings

This patient was adequately treated. The use-of-force incidents appeared to have been implemented appropriately, although the healthcare record did not contain documentation of clinical interventions. Use-of-force documentation was not available.

The treatment team appropriately requested and developed a behavior management plan to address the patient's continued behavioral difficulties. In addition, he was placed on a PC 2602 order due to poor insight regarding the need for medication treatment.

**Patient E**

This 34-year-old patient was referred from Patton State Hospital. He was provided with diagnoses of Schizophrenia, paranoid type, Alcohol Dependence, Cannabis Abuse, and Adult Antisocial Behavior. Record review indicated that the patient was on conservatorship and was referred to DSH-Salinas Valley as a PC 7301 due to extreme assaultive behavior as a result of his paranoia and delusional thinking. The patient had a history of extreme aggressiveness, and at times exhibited such assaultive behavior that he could not be safely treated at Patton State Hospital or DSH-Atascadero. He was admitted to DSH-Salinas Valley on 6/11/14 and had reportedly been on DPS status since that time.

On 1/8/15, the patient was placed on DPS for kicking a recreational therapist during leisure activity. There was no explanation of the apparent contradiction with log data indicating continuous DPS since 6/11/14. The patient reported to staff that he was feeling paranoid and acted impulsively. He had an average of at least two monthly incidents that resulted in placement in seclusion that were related to auditory hallucinations. These often involved suicidal ideation or self-injurious behaviors (jumping from his bed) or aggressive acts (e.g., resisting escort, kicking toward escort staff or the recreational therapist during leisure activity).

The most recent treatment plan dated 6/4/15 indicated that the patient had not had any episodes of aggression in the last 30 days since he broke his television in his cell when he thought that his neighbor was laughing at him through the television. However, information in the plan contradicted that by indicating that the patient had resisted staff during an escort and attempted to kick one of the Medical Technical Assistant's (MTA). The behavior had been aggressive enough that it required a use of force with staff taking the patient down to the ground and restraining him to gain compliance prior to returning him to his room. There were also multiple monthly incidents where the patient felt suicidal and had to be moved to the observation room and placed on watch status. This treatment plan was a mix of appropriate treatment targets and goals that were far too broad and vague to focus and guide treatment in a meaningful way. The patient did have individual therapy listed as part of his treatment plan, but there was no stated frequency. As the patient continued to be described as actively psychotic and responding to internal stimuli, he seemed to have questionable ability to benefit from individual therapy at this point. The patient was an obvious candidate for a behavioral plan, but that was not addressed in the treatment plan. Treatment interventions were also nonspecific and often inadequate for the behaviors and symptoms that the patient experienced. Given the patient's ongoing active psychosis and difficulty functioning, the lack of a behavioral plan was a significant deficit. The current treatment plan appeared to be comprised more of the desired outcomes of the treatment team than realistic treatment goals, objectives, and interventions. The patient reportedly had a behavioral plan based on the "cuff"/DPS log, but a copy of that plan was not located in his healthcare record.

The patient consistently reported to staff that he had auditory hallucinations that teased him and that he became anxious during escorts. Despite several of the patient's treatment plans indicating that "staff" would meet with him individually, the psychologist appeared to only see the patient when the treatment team met; the social worker met with the patient once in March 2015 and once in May 2015. The patient was prescribed Clozaril 150 mg every morning and 400 mg at night, fluvoxamine 37.5 mg at night, lithium citrate 900 mg at night, Haldol 20 mg twice per day and Cogentin 2 mg per day.

<u>Findings</u>

This patient was not adequately treated. He had been on DPS status since his arrival. While he had engaged in unprovoked, unpredictable aggressive behavior that might justify use of mechanical restraints, the treatment plans were inadequate to address the behavior, and underlying mental illness and possible organicity that were the cause of the behavior. Consequently, the treatment team used mechanical restraints rather than therapeutic interventions in an effort to modify the patient's behavior. The team also failed to use behavioral

interventions, or an individual behavioral plan and did not follow through on aspects of their own plan, such as individual therapy. It appeared that as long as the patient could be placed in handcuffs, the treatment team did not feel compelled or feel any urgency to implement an effective and targeted treatment plan.

**Patient F**

This 33-year-old intermediate care patient was admitted to DSH-Salinas Valley on 4/2/14. This case was selected for review because the patient was placed on DPS at intake while on orientation status and remained on cuff status for 12 days, until 4/14/14. He was admitted with the diagnosis of Bipolar II Disorder, depressed type. The original referral from NKSP was due to multiple Rules Violation Report's (RVR), impulsive behavior secondary to hypomania and paranoia, poor hygiene, lack of engagement in mental health services, and poor insight into his mental illness. The patient also had a reported history of assaultive behavior and violence. He was not prescribed psychiatric medications because he was refusing medications.

The patient was on orientation status upon arrival to the intermediate care facility. He was not released from orientation status until 4/14/14, 12 days after arrival, when the Institutional Classification Committee (ICC) saw him. The reason that the patient was on orientation status for more than ten days was due to the delay in being seen by ICC. Following ICC, the patient was placed at Stage 1, solo yard, solo day room, structured groups, and solo/in-cell dining.

The patient appeared very paranoid, constantly asking staff to show their identification badges prior to speaking to them. He was preoccupied with somatic complaints and wanted his meals and water to be sealed. He did not have a history of aggressive behavior prior to incarceration. Since incarceration, he had received three RVRs within three months; one for battery on a peace officer, one for masturbation with exposure, and one for possession of dangerous contraband for trying to break a food tray. The patient was uncooperative upon arrival at DSH-Salinas Valley.

The most recent treatment plan for this patient, dated 5/7/15, following the 72-hour and 10-day treatment plans, indicated that he had not been interacting with the treatment team except for minimal interactions focused on the patient's CPAP machine. The patient believed that he did not belong at DSH-Salinas Valley. While treatment attendance and participation goals were established in this treatment plan, it was unclear if they were reasonable since no specific data was provided on the patient's current levels of participation and attendance. However, general information in the treatment plan suggested that treatment goals in this area were not reasonable. The patient was placed in medication management group despite being prescribed no psychotropic medications.

Findings

The patient remained in mechanical restraints longer than the ten-day period due to a delayed ICC. The treatment plan did not indicate that the patient was on solo programming though the tracking log did indicate such. The treatment plan did not provide a rationale for solo programming. In light of the access limitations of solo status, the treatment plan should have included a clear rationale with interventions targeting the behaviors underlying the need for solo

programming. The treatment plan was not well-developed for this patient; it placed him in an inappropriate group given his medication status, while treatment goals and targets could not be properly evaluated due to the overall lack of information in the plan. This patient was not adequately treated.

**Patient G**

This 30-year-old intermediate care patient was admitted to DSH-Salinas Valley on 1/23/14 and had been on cuff status since 11/4/14 for assaultive behavior. The patient had a history of extreme self-injurious behavior due to delusional thinking and auditory command hallucinations. He self-extracted ten teeth over several years, because voices told him that his teeth were crooked and needed to be removed. He had removed his toenails on multiple occasions and tried to gouge his eyes out twice as a result of his psychotic thought process. The patient had cut into his arms to carve over tattoos in an effort to cut them out or make them more pronounced. He also had a history of biting his arms. Unfortunately, the behavioral plan log mischaracterized the behavioral plan as targeting the patient's aggressive behavior and DPS status when it did not.

This patient did have a behavioral plan, dated 7/10/14, but it was prior to the DPS implementation. While the plan identified the potential function of the behavior, it did not address the functional basis of this patient's behavior. There was no evidence that an assessment of salient reinforcers had occurred. Consequently, there was no evidence that positive behavior was being reinforced through an appropriate reinforcement schedule using salient reinforcers. These limitations made the behavioral plan appear generic and not individualized as was necessary for a behavioral plan. The plan also was not signed by all treatment team members, which made it unclear whether all team members agreed to the plan and were aware of it.

On 1/2/15, a DPS progress note indicated that the team had referred the patient for a behavioral plan consultation, but there was no further information about that consultation and no behavioral plan update. The behavioral plan was never updated despite the patient's continued DPS placement and lack of progress. The treatment team did review the patient's DPS weekly, but did not appear to coordinate any treatment targeted at the underlying symptoms and behavior that resulted in DPS. Despite repeatedly stating that the patient had been compliant and that there were no behavioral issues during the prior week, the treatment team maintained the patient on DPS. Documentation rarely included a clear justification for DPS continuation; however, on occasion it listed unpredictable assaultive behavior, although progress notes indicated the patient appeared to have been adherent with treatment and calm for weeks.

The patient did begin to attend treatment in the treatment modules during April 2015. He was finally released from DPS on 5/28/15. However, it was unclear from DPS documentation what had occurred to result in this release and how the patient's behavior might have changed to precipitate it. Documentation indicated that the patient had engaged in the same behavior for months; however, on 5/28/15 he was released from DPS for unclear reasons. The documentation needed greater detail and justification for maintaining the patient on DPS for the many months that he was on that status. There also needed to be clear and specific documentation for removing him from that status.

This patient was diagnosed with Schizoaffective Disorder. He was prescribed Clozaril, Clonidine, and Haldol. His treatment plans were all quite similar and did not refer to the behavioral plan once implemented. They also did not properly address the most pressing treatment needs, his DPS and self-injurious behaviors, or the symptoms and behaviors underlying them. For example, the most recent treatment plan dated 6/11/15 identified boredom as a high risk trigger for the patient, as it was a precipitating factor to many of his severe self-injurious behaviors. The patient's DPS severely limited his access to out-of-cell opportunities and increased the likelihood that the patient would be bored. Despite this, the plan did not address the need to create increased out-of-cell opportunities for the patient and increased in-cell activities to reduce this known trigger for self-injurious behavior. While the patient was on DPS for assaultive behavior, this was not addressed at all in the treatment plan, particularly as the plan did not reference the outdated behavioral plan.

Findings

This patient was not adequately treated. While there was a behavioral plan in the patient's healthcare record, it was not current, was not properly individualized, and did not address the primary issues of concern. The treatment plan did not appropriately target the behaviors underlying the patient's DPS status. Most importantly, the treatment team were aware that boredom was a trigger for self-injurious behavior for this patient, yet he was placed on DPS status without implementing any therapeutic strategies to address the boredom that resulted from DPS. The patient appeared to have remained on DPS longer than was necessary based on the healthcare record documentation. He appeared stable and without behavior to justify continued DPS; given the seemingly abrupt and random manner in which he was removed from DPS, it would only seem to lend support to this hypothesis.

**Patient H**

This 53-year-old intermediate care patient was admitted to DSH-Salinas Valley on 2/5/15 and was at Stage 1 during the monitoring visit on 6/9/15. He was selected for review as an example of a patient at Stage 1. He had been referred to DSH-Salinas Valley due to suicidal ideation, depression, isolation, treatment refusal, command hallucinations, persecutory beliefs, and poor capacity for coping. Treatment expectations were that the patient would improve his baseline functioning so that he could cope with the environmental stressors of living in close proximity to others, adhere with medication treatment, maintain his ADLs, not engage in self-harm, and engage in treatment.

The referral indicated that the patient was diagnosed with Schizophrenia, undifferentiated; however, this diagnosis was changed to Schizophrenia, paranoid type at DSH-Salinas Valley. The patient was on an involuntary medication order and was prescribed Risperdal Consta, Cogentin, Haldol, Depakote, and Benadryl. Admission assessments were completed timely by all disciplines. The patient had prior DSH admissions including a six-year admission to DSH-Atascadero and had a lengthy mental health history that included inpatient placements in the community. He also had a history of self-injurious behavior and suicide attempts; the last incident occurred during 2011 by hanging. The patient was placed on DPS once in February 2015 for threatening a peer and once in March 2015 for threatening staff. He had been

315

intermittently cooperative with mental health staff, but he was primarily resistant to treatment. When incidents occurred in which the patient became frustrated or threatening, he resisted all efforts to redirect or suggested coping strategies.

The patient's most recent available treatment plan dated 4/29/15 indicated that he was on Stage 1, solo programming; however, the treatment plan did not appropriately target the behaviors and symptoms underlying the reason for solo placement. Only one goal to "reduce anger and verbal threats to peers" was identified. The objective was that the patient name three coping mechanisms to deal with angry feelings, and the intervention was weekly groups. However, the patient was unable to attend groups because he was on solo programming. The plan also listed "no associated courses." Given this patient's low level of functioning, more active interventions to assist in the development of some basic coping skills were needed with a stepwise progression toward advanced skills. There also needed to be more goals in this area to deal with his range of threatening and aggressive behaviors that resulted in multiple DPS placements. Finally, the behaviors underlying the reason for maintenance on solo programming should have been specifically targeted in the treatment plan. DPS and solo program status severely limited patient access to treatment and needed to be the primary treatment plan target.

Findings

This patient was not adequately treated. His treatment plan was too broad and vague to enable implementation. As a result, the patient remained at Stage 1 four months after admission. The treatment plan also did not fully target the specific behaviors underlying the cause for maintaining the patient on solo status and for his frequent regression to DPS. The treatment plan should have targeted these functional deficits so the patient was able to address them and to have an opportunity to improve and increase his Stage level. Appropriate interventions were not included in his treatment plan. This patient was not adequately treated.

**Patient I**

This 45-year-old intermediate care patient was admitted to DSH-Salinas Valley on 3/11/15. He was discharged from DSH-Atascadero in December 2014. The healthcare record did not explain the reason for the readmission to a high security DSH facility. Upon further inquiry of management staff, it was determined that the DSH-Atascadero placement had been as a mentally disordered offender (MDO) commitment (PC 2962) and not a PC 2684 commitment, though it was still unclear why the patient required a high security placement. The patient was referred from the CIM MHCB due to suicidal ideation, unremitting symptoms of paranoia, and persecutory delusions. The patient believed that his food was poisoned, and this resulted in intermittent agitation and assaultive behavior. He was medication and treatment adherent.

The patient was diagnosed with Schizophrenia, paranoid type. He was prescribed olanzapine, buspirone, and lorazepam. The 72-hour treatment plan was handwritten and extremely difficult to read. There was documentation of one ten-day and two monthly treatment team meetings. The most recent treatment plan dated 4/21/15 was outdated. However, the patient had been participating in treatment and progressing through the Stage program. He was promoted to Stage 2 according to the most recent treatment plan dated 4/21/15. He had achieved Stage 3 by the

time of the monitoring visit based on provided census data. The most recent treatment plan required greater specification in the goals and interventions; it was overly broad and did not provide for sufficient specification required for implementation.

A review of interdisciplinary notes and discipline-specific progress notes indicated that treatment team members were engaged in more specific treatment activities than what was reflected in the treatment plan. These treatment activities were clearly beneficial for the patient, and he appeared to be progressing based on his self-report and staff observations.

Findings

This patient was not seen monthly by his treatment team. In addition, his treatment plan required greater specificity of treatment goals and interventions. However, because of documentation in other areas of the healthcare record, it appeared that this patient was being adequately treated despite these limitations. The treatment team should meet and develop a treatment plan that accurately reflects the treatment provided to the patient.

**Patient J**

This 24-year-old patient resided on C-6. He was diagnosed with Bipolar I Disorder and Antisocial Personality Disorder. He received his psychotropic medications by involuntary medication order. The patient's medications included olanzapine and lorazepam. His healthcare record was reviewed to assess implementation of the behavioral plan and the overall provision of mental health services.

The patient had a history of mental health treatment as an adolescent while in youth authority custody. He had a history of suicide attempts (hanging, cutting, strangulation with a shirt, and head-banging). He was previously admitted to DSH between 7/15/14 and 9/19/14. During that admission he engaged in suicidal gestures in an attempt to have his needs met. On 12/16/14 the patient was admitted from CSP/LAC due to depression, aggressive behavior, and thoughts of self-harm. Medically, he had a history of asthma and gastroesophageal reflux disease (GERD). He also had a history of cannabis abuse.

The patient reported symptoms that were not typically associated with mental illness. For example, shortly after admission he complained of auditory hallucinations of a dog telling him that he was a "killer," as well as visual hallucinations of the dog. In addition, during his psychiatric evaluation, he reported symptoms that were inconsistent with Bipolar Disorder.

The healthcare record included a behavior management plan from September 2014, which presumably was from his last DSH admission. The behavior plan log indicated that a behavior management plan was completed on 5/22/15; however, it was not located in the healthcare record, and there was no reference to it in recent documentation. It was unclear if the September 2014 plan was currently active.

The behavior management plan from September 2014 targeted seven behaviors. However, a functional analysis of each behavior was not completed; the short term goals were not clearly tied to the targeted behavior, and behaviors were not measurable. Further, one short term goal

317

was unrealistic (that the patient would not engage in any assaultive or self-injurious behavior) and one was inappropriate (that the patient would identify the function of his behavior); this was the role of the functional analysis to be completed when designing the behavior management plan. It was unclear that the incentives for improving behavior were meaningful to the patient. Lastly, the expectation for the patient to abstain from problematic behaviors for a week was likely unrealistic; however, in the absence of a functional analysis, this could not be assessed with certainty.

Aggressive behavior, including threats to staff, holding his food port hostage, flooding his cell, and angering quickly when his needs were not met continued throughout his DSH hospitalization. Documentation between December 2014 and January 2015 was sparse, including IDTT documentation. The patient's treatment goals on 6/3/15 were to participate in therapeutic activities, take medications as prescribed, and learn appropriate verbal skills to communicate his needs. There was no clear reference to the behavior plan in the treatment plan or progress notes.

<u>Findings</u>

Lack of documentation of mental health services made it difficult to determine the adequacy of this patient's care. The discrepancy in symptoms typically associated with Bipolar Disorder as well as documentation that his aggressive behavior was willful and a direct reaction to not getting his needs met, suggested a questionable diagnosis of Bipolar Disorder. Based on limited documentation, it appeared that this patient's behavior was more consistent with Antisocial Personality Disorder. Thus, discussions regarding return to CDCR would be indicated. Lastly, the behavior management plan was clinically inadequate.

**Patient K**

This 33-year-old patient was housed on C-5. At the time of review, he was diagnosed with Schizophrenia, disorganized type and Antisocial Personality Disorder. There was an involuntary medication order in place due to grave disability. Medications included olanzapine, lithium, and lorazepam. This healthcare record was selected to review the provision of mental health services.

The patient had a history of mental health treatment as a child. While in CDCR custody he had four MHCB admissions. He was admitted to DSH on 12/24/14 from CSP/LAC due to bizarre behavior, disorganized thought processes, paranoia, and talking to himself. The goal for DSH discharge was "stability and psychotic symptoms will be gained sufficient to warrant clinical return to less restrictive treatment setting." At the time of admission, he was receiving mental health services at the EOP level of care. He had a history of nonadherence with treatment and medications and of suicide attempts by overdose and hanging. Medically, he was diagnosed with hypothyroidism.

The patient's psychiatry contacts and individual contact appointments with the social worker occurred on a monthly basis. IDTT meetings occurred on a monthly basis with the exception of January and February 2015. Treatment goals had consistently been to interact socially with

318

peers, verbalize readiness to return to the EOP level of care, gain insight into his mental illness, and use reality testing to ensure safety in different environments.

Treatment goals for the patient were to gain insight into his mental illness so he would engage in treatment, interact socially with peers, use reality testing to ensure safety in different environments, develop and maintain healthy leisure skills, and verbalize readiness to return to the EOP level of care.  Throughout his hospitalization, there appeared to have been limited progress toward these goals.  The patient continued to exhibit isolative behavior.  He attributed his isolation to DSH not having a Sensitive Needs Yard (SNY); the patient was housed in an SNY while at CDCR.  During his IDTT meeting in May 2015, it was noted that he refused the majority of treatment, yet staff considered discharging him.  Recent documentation indicated that he remained paranoid, but his behavior had not been "particularly bizarre" and he did not exhibit evidence of overt or bizarre delusional thinking.

Findings

This patient's care was inadequate.  Discharge criteria and treatment goals were not adequately connected.  Individualized incentives to engage the patient in treatment were lacking.  Throughout his hospitalization, there was no improvement in his treatment goal to isolate less, and therefore treatment services should have been reevaluated and adjusted as clinically appropriate.  Further, the lack of documentation concerning the frequency of symptoms and specific symptoms throughout the hospitalization made it difficult to determine whether the patient met discharge criteria.

**Patient L**

This 35-year-old patient resided on C-5.  At the time of his most recent treatment plan, his diagnoses were Major Depressive Disorder, Other Specified Disruptive, Impulse Control and Conduct Disorder, and Borderline Personality Disorder.  There was an involuntary medication order in place.  The patient's medications were Trileptal and Ativan.  The patient's healthcare record was reviewed to assess implementation of the behavioral plan and the provision of mental health services.

The patient had a long history of mental health treatment dating back to childhood, including multiple psychiatric hospitalizations.  He had a history of methamphetamine and alcohol use, as well as self-injurious behavior by cutting and ingesting objects.  At the time of DSH referral, the patient was receiving mental health services at the EOP level of care at CSP/Sac.  He was admitted to DSH on 4/29/15 due to an escalation of depressive symptoms and the ingestion of various items, including two spoons, one toothbrush, and three pen fillers.

The patient's treatment outcome expectations were to significantly decrease self-injurious behavior, to learn why he engaged in self-injurious behavior, to develop three coping skills for underlying depressive symptoms, to alleviate depression, and to eliminate ingestion of foreign objects/cutting self.  Treatment goals were consistent with treatment outcomes and included the additional goals of increasing initiation and engagement of meaningful interactions with peers

319

and/or staff, employing methods to remain calm during interactions, and increasing the patient's self-perceived ability to maintain functioning following return to the EOP.

Since admission the patient was seen monthly by the social worker, three times during May 2015 by the psychologist, and at least monthly by the psychiatrist.  A behavioral plan was completed on 5/26/15; it was discussed with the patient after development, and therefore was not collaborative.  The plan included seven targeted behaviors; this number of targeted behaviors was excessive.  The most dangerous behavior, and typically the reason for the plan, was listed last.  The targeted behaviors appeared to be more problematic to others (yelling, interrupting, making demands) than to the patient, while a functional analysis of each behavior was not completed and goals were not measurable.  A timeframe for goals also was not listed, such that a goal of no incidents of aggression including verbal profanities or self-injurious behavior was unrealistic.  There was general reference to changes in behavior such as "increase" or "decrease" frequency.  However, without a functional analysis, one cannot determine a true change in behavior.

In the behavior plan, treatment interventions were noted in terms of psychological terms such as "positive reinforcement," "negative reinforcement," "chaining," "extinction," and "shaping," but were not clearly explained and thus would be unclear to most staff.  Intervention strategies appeared to focus solely on the patient's tendency to be demanding of staff attention, instead of the other targeted behaviors.  Further, the intervention was to allow three staff contacts and then no further contact unless it was an emergency.  If the patient demonstrated positive social interactions for an entire shift, he was given positive feedback from staff.  It was unclear whether this was a meaningful incentive for the patient, and an entire shift may be an unrealistic duration of time for him.  The plan encouraged staff to document all behaviors to "obtain a baseline," but this should have been performed prior to implementation of the behavioral plan.

There was intermittent reference to the behavioral plan in the healthcare record.  Documentation indicated that the patient voiced dissatisfaction with the behavioral plan multiple times.  Further, following the plan's implementation, there was a decline in the patient's functioning including disruptive behavior on the unit, refusing meals/hunger strike, refusing to program, and throwing books outside his door.

Findings

This patient was consistently seen by mental health staff.  Although overall the patient's care was adequate, it could have been greatly improved.  The behavioral plan was inappropriate in that too many behaviors were targeted, a baseline of targeted behaviors was not completed, a functional analysis was not conducted, it was not collaborative, and it did not appear that individualized incentives were offered.  Treatment goals could be improved by using measurable goals and simpler language.

**Patient M**

This 26-year-old patient resided on C-6.  His diagnoses were Major Depressive Disorder and Antisocial Personality Disorder.  He was prescribed mirtazapine, Haldol, and hydroxyzine.  An

active involuntary medication order was in place. The patient's healthcare record was reviewed to assess implementation of the patient's behavioral plan and the provision of mental health services.

The patient had several MHCB admissions between April and July 2012 and a prior DSH admission between July 2012 and April 2013. He was accepted for DSH admission on 6/6/14 from Salinas Valley State Prison (SVSP) due to depression, paranoia, rage, suicidal ideation, and lack of treatment participation. He had a history of self-injury and suicide attempts by cutting, electrocution, and hanging. He had a history of marijuana, Ecstasy, and alcohol use.

Treatment outcome expectations from the DSH referral form were to increase socialization, tolerate being around others as evidenced by appropriate interactions with staff and peers over a 30-day period, and identification and utilization of five or more coping skills to effectively manage symptoms by remaining stable for 60 days or more. Treatment goals since March 2015 focused on socialization and discharge planning. A behavior plan was developed on 9/22/14; however, there was no reference to it in recent documentation, including the June 2015 treatment plan.

There were two different copies of the behavior plan dated 9/22/14 located in the healthcare record; one plan indicated that it would not be shared with the patient, which gave the impression that the plan was not collaborative. The plan was more comparable to a treatment plan than to a behavior management plan. While target behaviors were consistent with the treatment outcome expectation, a baseline of behavior was not documented; the goal of increasing staff interaction thus could not be measured. Furthermore, a functional analysis was not completed, and specific behavioral interventions/reinforcers or consequences to improve behavior were not documented. It was also noted that staff would work with the patient to identify triggers, but this should have been completed prior to implementation of the behavioral plan.

For the month prior to the monitoring visit, there had been a decline in the patient's treatment participation. He had been sleeping more, was withdrawn, intermittently attended groups, and refused yard and day room. During the IDTT meeting in June 2015, there was reference to evidence of a thought disorder, paranoid preoccupation, delusions, and hallucinations. The patient's diagnosis nonetheless remained Major Depression, and it did not reflect the psychotic symptoms. In addition, in one week's time, the patient decreased from Stage 3 to solo programming due to complaints of being threatened and refusing to provide the names of those threatening him.

<u>Findings</u>

The recent provision of services for this patient was inadequate, as exhibited by the lack of clinical intervention in response to his decline in functioning. The behavior plan needed improvement; specifically, individualized incentives to engage the patient in treatment were lacking. Documented symptoms did not support the diagnosis. Lastly, documentation surrounding the patient's change from Stage 3 to solo programming appeared to be punitive.

APPENDIX B-3
DSH-Vacaville
January 20, 2015 - January 22, 2015
June 23, 2015 - June 25, 2015

**Patient A**

This case was selected for review because the patient was included on a DPS/Step level 1 log at Step 1, and remained at this level for 11 days.  This 51-year-old intermediate care patient was referred to Vacaville Psychiatric Program (VPP) for suicidal ideation with a history of suicide attempts by hanging.  The patient had reportedly received bad news while housed at CDCR regarding the death of an aunt whom he was close to, and then he was erratically adherent with his insulin to the point where he apparently received an RVR.  Upon hearing the news of the RVR, he returned to his unit and assaulted another patient "to give them something to write about."  He reported vague homicidal ideation toward other patients while in the MHCB at CDCR.  The patient's most recent MHCB admission had lasted from 12/10/14 to 1/6/15 and was due to a suicide attempt by hanging in the county jail.

The patient was admitted to the VPP acute care program on 4/17/15.  He was subsequently admitted to the VPP intermediate care program on 6/12/15 with diagnoses of Disruptive Mood Dysregulation Disorder, Other/unknown Substance Use Disorder, moderate, and Antisocial Personality Disorder.  He was prescribed Thorazine, Depakote, and Haldol.  The initial (72-hour, undated form, progress note indicated team conducted on 6/15/15) treatment conference form suggested that the treatment conference was more of an assessment than a treatment conference, despite the fact that the patient had been treated locally for two months.  No treatment plan was included.  There also was no discussion of the patient's current Step level or his prior Step level on the acute care unit.  The same was true of the progress notes related to the treatment conference.

The psychological assessment dated 6/22/15 identified the patient as low risk for violence.  At the time of the monitoring visit on 6/23/15, the patient had not been seen by the treatment team for his ten-day conference; this may have been the reason why he remained at Step I.  There was, however, no clinical reason located in the healthcare record to support the continued Step I status.

Findings

This patient was not adequately treated at the intermediate level of care.  He did not have an adequate initial treatment plan, and his treatment plan had not been updated timely.  The patient had been treated for two months at VPP.  He nonetheless was still placed at the lowest and most restrictive Step level when moved to intermediate care without any documented clinical justification.

**Patient B**

This case was selected for review because the patient was included at Step 1 for an unknown length of time on the VPP log of Step levels at the time of the monitoring visit.  The case was also selected for review as the Positive Behavioral Support Team (PBST) had been consulted.

The 33-year-old acute care patient had been referred to VPP for suicidal ideation; he was admitted on 4/17/15.  This was believed to have been his seventh DSH admission and his fourth

admission to VPP. The patient had reportedly been very clear that his suicidality was due to his desire not to have a cellmate. Staff suspected that in prison the patient had experienced difficulties with other patients due to his sexual crimes. He reportedly had two prior suicide attempts by cutting, at least one of which required stitches. The patient was hospitalized for three years as a child due to auditory hallucinations and a reported murder. Mental health staff had differed over time regarding his diagnosis. He had alternately been diagnosed with Major Depression with psychotic symptoms and Malingering. He was not prescribed psychotropic medications. The patient required use of hearing aids.

The VPP discharge summary dated 5/27/15 indicated that the patient was diagnosed with Adjustment Disorder with Disturbance of Emotions, probable Pedophilia, and Antisocial Personality Disorder with Borderline Traits. His initial 72-hour treatment plan, which was undated but signed on 4/17/15, did not address his Step level. The patient's ten-day treatment conference conducted on 4/24/15 included the results of his V-Risk assessment (V-Risk-10). The results indicated that the patient was at low risk for violence but at moderate risk for sexual violence; although his commitment offense was against a minor, staff did not provide victim demographics regarding prior sexual offenses. The treatment plan identified goals that were related to the referral issue in a broad sense, but again did not address the patient's Step level. The treatment plan also targeted his sexual offending behavior, which was an area that required long-term treatment and was completely inappropriate for acute care. Despite the psychiatrist stating that symptoms of depression were not present and medications were not indicated, the treatment plan listed medications as an intervention. Treatment groups were not listed, even though such groups were clearly the indicated treatment for specific target areas. In the patient's monthly treatment conference plan dated 5/14/15, it was documented that the patient had refused to attend treatment or "go through" the Step program. The patient reported to staff that he did not want to leave his room and to program in mechanical wrist restraints. There were no changes to this treatment plan and no mention of a PBST consult.

Review of the healthcare record revealed no documentation of a PBST consultation on 4/20/15 or at any other time.

Findings

This patient was not adequately treated, and documentation did not comply with VPP policies. There were inconsistencies in that the healthcare record did not confirm consultation with PBST, although facility logs indicated that such consultation had occurred. The patient's treatment plans did not reference his Step level as required or address the underlying behaviors causing the patient to remain at the most restrictive level. The treatment plan included treatments (i.e., medication) that had already been ruled clinically inappropriate by team members and did not include clinically appropriate treatments (e.g., group therapy, behavioral interventions).

**Patient C**

This case was reviewed because the patient was listed as having an active behavioral plan established on 5/5/15 according to the VPP behavioral log. This 49-year-old acute care patient was admitted to VPP on 4/17/15 with diagnoses of Mood Disorder NOS, Substance Dependence

324

NOS, and Borderline Personality Disorder. The reason for referral was emotional dysregulation and compulsion to smear human waste on himself. It was unclear why this patient was referred for acute care rather than intermediate care. The patient was prescribed olanzapine and Benadryl.

A psychological admission assessment dated 4/27/15 indicated that the patient had reached maximum benefit from 21 months of treatment at DSH-Coalinga, from which he was discharged on March 2015, and that there did not appear to be much more to be gained from further treatment at VPP. The recommendation was for a behavioral plan to address the patient's fecal smearing and threats of fecal smearing.

The 72-hour treatment plan, which was undated but signed on various dates by team members, indicated that the patient was seen on 4/20/15, and was quite symptomatic at that time. This treatment plan was generally adequate for a 72-hour treatment plan, but it did not reference the PBST. The next treatment plan was developed at the team conference on 4/23/15. This treatment plan indicated that while the patient had been previously diagnosed with Coprophilia, in actuality the patient used his feces in an effort to get his non-sexual needs met. Specifically, staff documented that the patient had smeared feces on himself when demanding transfer to DSH facilities, and CDCR staff subsequently made those referrals, with the patient ultimately being transferred to DSH. The patient also had a history of aggressive and assaultive behaviors against other patients, although the last incident occurred seven years prior. The patient stated to VPP staff that "feces is the only card left I have to play…" He was focused on obtaining sex offender treatment, and he was apparently concerned that he not be committed as a sexually violent predator. There was no reference to the PBST in this treatment plan, and no behavioral plan was located in the healthcare record. However, the discharge summary dated 6/1/15 did reference a PBST consultation and resulting behavioral plan. Individual notes did reference Step level occasionally, and the rehabilitation therapist referenced the behavioral plan in general; however, the date of Step level changes and the specifics of the behavioral plan could not be determined from the healthcare record. Nursing staff did not reference the behavioral plan.

The healthcare record had been disassembled as the patient had apparently been discharged, despite appearing as active and current on the log received one week prior to the monitoring visit. It appeared that the patient was clinically discharged on 6/8/15.

Findings

The adequacy of the behavioral plan could not be determined, as it was unavailable. This was very concerning because it should have been readily available in the healthcare record, particularly given that the patient appeared to have been physically discharged. The patient could not be determined to have received adequate treatment due to the lack of appropriate documentation in the healthcare record. Consequently, the patient was not adequately treated.

**Patient D**

This case was selected for review because the patient remained at Step 1 beyond ten days, since 6/11/15, which required clinical justification. This 33-year-old acute care patient was admitted

on 6/11/15 according to the VPP Step log with diagnoses of Schizoaffective Disorder, bipolar type, and Antisocial Personality Disorder. The patient had an involuntary medication order in place due to danger to others. He was prescribed Prozac, Risperdal, Risperdal Consta, and Cogentin, as well as intramuscular injections in the event of medication refusal. The patient was referred to VPP due to refusal to participate in treatment, refusing meals, ten-pound weight loss in a two-week period, refusal to leave his cell, poor hygiene and ADLs, decreased energy, and excessive sleeping. The patient's involuntary medication order was reportedly implemented after he stabbed his cellmate. He did not want to be admitted to DSH and required a *Vitek* hearing.

At the 72-hour treatment team conference (undated form, all signed 6/12/15), staff described the patient as anxious, appearing internally preoccupied, at times not remembering, refusing meals or activities while housed in EOP, and guarded, with denial of most symptoms. While the treatment plan goal and objectives were broadly appropriate for an initial treatment plan, they were not sufficiently specific and the interventions were inadequate. The patient's Step level was not addressed in this treatment plan. The ten-day treatment plan dated 6/19/15 noted that the patient was in mechanical wrist restraints, but did not note his Step level. Diagnostic justification noted behavioral observations suggestive of psychotic behavior and the patient's distrust of staff and unwillingness to disclose symptoms or participate in treatment as further evidence to support the diagnosis, despite the lack of reported psychotic symptoms. There were no changes to the actual treatment plan from the 72-hour plan, despite the inadequacies of the prior plan and the additional information that should have been gathered over the course of the ten days of admission.

Findings

This patient was not adequately treated. His treatment plans were not adequate and did not change with time. The patient's Step level was not addressed in the treatment plan as required by policy. Given the patient's severity of symptoms, a referral to the PBST should have been considered, because modification of the Step level system might likely have been required to allow this patient access to treatment. The patient's mental illness might prevent him from conforming to all of the expectations of the Step level system. Consequently, the system should have been modified through an existing treatment plan or an individualized behavioral plan, but neither occurred.

**Patient E**

This case was selected for review because the VPP log indicated that this patient was on DPS status. The patient had been cleared by the ICC for unrestrained programming at the discretion of DSH staff on 5/27/15. He was admitted to VPP on 5/15/15. This 63-year-old acute care patient was referred to VPP due to suicidal ideation with a plan to hang himself as a result of command auditory hallucinations. He was described as having poor ADLs, rapid mood swings, poor sleep, selective mutism, anxiety, paranoia, and irritability. He had a chronic history of psychotic symptoms and erratic medication adherence. He had assaulted peers and a peace officer in the past, but his last incident for either occurred during 2013, when he spit on a staff member during an injection.

The patient was identified in the integrated suicide risk assessment with low acute and moderate chronic risk for suicide. The 72-hour treatment team (undated, signatures dated May 15, 2015) indicated that he was disoriented with little insight into his mental illness when seen by the treatment team. The sole goal of this treatment plan was treatment adherence, which was appropriate given the patient's presentation. The patient's diagnosis was Schizophrenia. He was on an involuntary medication order. He was prescribed Zydis, Cogentin, and Vistaril with intramuscular injections ordered in the event of medication refusal.

The ten-day treatment plan dated 5/28/15 occurred after the ICC cleared the patient to program unrestrained. The patient's prior aggressive and assaultive behavior was described as significantly related to his diagnosis. His Step level was not directly addressed by this treatment team, nor was there mention that the patient had been cleared to program unrestrained. When seen by the monthly treatment conference on 6/16/15, the patient was described with continued psychotic symptoms; however, he was programming without incident and wanted to attend groups. The team did not directly address the patient's Step level, and the treatment plan did not address the behavior underlying DPS. It could be inferred that the patient was maintained at DPS since there was one DPS group listed in the plan. However, the treatment plan did not justify continued DPS.

Findings

This patient's continued DPS placement was not justified by documentation in the healthcare record. The treatment plans did not address the patient's Step level as required by policy. They also did not adequately address the underlying behavior requiring maintenance at the more restrictive level. This patient was not adequately treated.

**Patient F**

This patient was housed in the High Custody Intermediate Treatment Center (HCITC). He was provided with diagnoses of Adjustment Disorder with Depressed Mood and Antisocial Personality Disorder. He was prescribed Remeron, Vistaril, Thorazine (as needed), Prolixin, olanzapine, lamotrigine, and Cogentin.

The patient reportedly overdosed on methamphetamine in August 2014 with resulting auditory hallucinations, paranoia, delusional thinking, and agitation. He was treated at the California Men's Colony (CMC) MHCB and was eventually transferred to DSH acute care P2 unit on 10/3/14. He was admitted to DSH intermediate care on 1/29/15.

The healthcare record indicated that the patient had a long and significant history of suicide attempts and gestures. Progress notes indicated that he remained with auditory hallucinations and paranoia. He achieved Step 3.

Findings

The diagnoses included in the treatment plans should have been updated to reflect the patient's symptomatology and the treatment provided. The psychiatrist provided a diagnosis of Bipolar I

Disorder, which was more clinically consistent.  The mental health care provided otherwise appeared to be appropriate.  There was documentation of medical response and treatment after referral for medical concerns.

**Patient G**

The patient was a 27-year-old male housed in the HCITC.  He was accepted from VPP's acute care program on DPS.  He had functioned adequately at the 3CMS level of care in CDCR since 2005.  In 2011, he required frequent admissions to an MHCB, purportedly related to self-injurious behavior.  He was admitted to DSH on 5/28/14 with diagnoses of Major Depressive Disorder and Antisocial Personality Disorder.  He had a history of three suicide attempts during confinement.  One was by attempted hanging without loss of consciousness while in CYA.  In the second, he was found with a towel wrapped around his neck, but no medical intervention was required.  His third attempt involved attempting to swallow a razor blade.  All attempts were accompanied by his expressed intention to die.

An initial psychiatric evaluation was completed within timeframes.  Symptoms on admission included depressed mood, inability to experience pleasure in normally pleasurable acts, and recurrent thoughts about death.  The patient was noted to have a history of childhood sexual abuse and daily cannabis use since age 11.  He was provided with a diagnosis of Major Depressive Disorder.  He was prescribed Thorazine, hydroxyzine, and mirtazapine.

In the V-Risk assessment documentation, the patient's long history of self-injurious behavior was noted and was described as associated with housing concerns.  His acute and chronic risk of violence were assessed as low, based on several factors, including low lethality of prior self-injurious attempts and renewed hope of a sentence modification.

The patient's current placement on DPS occurred in October 2014 when he engaged in an IEX.  He was reportedly attending IEX groups, but the treatment plan of 1/7/15 did not include an intervention of IEX groups while in DPS.  A progress note entered by the social worker on 1/5/15 noted that the patient was addressing his victimization issues.  It was unclear whether this occurred in an individual or group intervention.

Findings

Overall, the treatment plans were repetitive and consisted mostly of objectives related to depression and coping skills.  Recent treatment plans did not include specific topic groups related to depression and lacked updates consistent with current findings.  Documentation in the healthcare record indicated that clinical contacts were used to address sexual victimization when this was not identified as a treatment target.  Furthermore, the record did not clearly identify IEX as a treatment target, nor was a specific group intervention clearly identified as containing IEX content.  This patient was not receiving appropriate care.

**Patient H**

This patient was a 39-year old male who had been a DSH patient for nearly 13 months.  He was admitted to DSH on 1/2/14 from the CMF MHCB, where he had been treated since 9/28/13.  His MHCB admission was predicated on suicidal statements associated with auditory hallucinations.  At the time of this review, the patient was at Step 3 of the HCITC.

An initial psychiatric evaluation was completed timely.  The patient was provided with diagnoses of Major Depression, single episode, unspecified, and Antisocial Personality Disorder.  He was treated with psychotropic medications to target experiences of auditory hallucinations with negative content, paranoid ideation, ideas of reference, nightmares about death, and anxiety.  The patient was also noted to have a history of alcohol abuse and depression.

The patient's treatment plan identified depression and anxiety as problem areas.  The treatment goal was to reduce manifestation of these symptoms, but the objectives were not stated in measurable terms.  Interventions included practicing mindfulness exercises three times per week and attending groups.

The patient was noted to have had difficulty meeting treatment goals in terms of symptom reduction.  A recent SRE assessed the patient at low suicide risk, indicating that an initial goal of reducing suicidal ideation had been met.  Recent progress notes composed on 1/14/15 and 1/15/15 noted the patient was stable and attending all groups on Step 3, and was adherent with psychiatric medications.  Simultaneously, the patient had recently reported current psychotic experiences which he stated were not subjectively distressing.

Findings

The current treatment plan included a DPS socialization group which was irrelevant to the patient's status at Step 3.  The treatment plan included a substance abuse intervention, but substance abuse was not identified as a problem area.  The treatment plan did not target the patient's experiences of psychotic symptoms.  There was no documentation indicating the treatment team discussed or revised the diagnoses specified to describe the current clinical status or features of the current episode.  This patient was not receiving appropriate care.

**Patient I**

The patient was a 35-year-old male serving a life sentence; it was his first prison term.  He had a substantial psychiatric history beginning in childhood; it included head banging, an attempt to strangle himself, and multiple psychiatric hospitalizations in the community for danger-to-self and decompensation in the context of paranoid thoughts and non-adherence with prescribed medications.  He had a history of using multiple substances since age seven.  The patient also had a history of a learning disability.

The patient suffered a traumatic brain injury at age 20 when he ran into traffic in an attempt to kill himself.  He was reportedly in a coma for nine months.  A neuropsychological test battery conducted during this hospitalization found impaired cognitive functioning and was thought to

represent a decline in performance based on his educational attainment. The psychologist provided a diagnosis of Cognitive Disorder NOS. Individual therapy was recommended to help the patient deal with becoming emotionally overwhelmed. Suggestions were made to help the patient recall previously-learned material.

Initial psychiatric, psychological, and psychosocial evaluations were completed timely. The patient had become gradually depressed in the CDCR's EOP and was admitted to VPP acute care on 2/11/14 when symptoms did not improve. On admission to DSH, he presented as melancholic and endorsed intermittent auditory hallucinations and suicidal ideation without a plan. Initial evaluations described him as making slow progress in diminishing psychotic symptoms and depressed mood. He continued to experience passive suicidal ideation and presented as odd and initially disheveled, and expressed the belief that he could predict the future.

The patient was provided with diagnoses in the schizophrenia spectrum, including Schizoaffective Disorder, Schizoid Personality Disorder, and Schizophrenia, Paranoid type. The latter was predicated on his prominent history of hallucinations and delusions specific to sexual identity. He began treatment with Clozaril in July 2014 and had demonstrated a positive response.

The patient's treatment plan identified the goal of emotional regulation. The objective was documented as medication adherence and encouraging the patient to use medications as needed. Specific interventions in the treatment plan included designated groups. The patient had been enrolled at Step 3 in the HCITC since April 2014. As recently as 1/16/15, he reported continued experiences of depressed mood, auditory hallucinations, paranoia, and thought broadcasting. He was described by staff as cooperative, demonstrating fair eye contact, blunted affect, showing indications of thought blocking, and magical thinking.

Findings

According to a log of treatment offered and received in December 2014, the patient was offered 19 hours of a DPS group and received one hour. This group was irrelevant to the patient's status in Step 3. The patient participated fully in one process group, and less fully in another. The treatment plan did not carry forward the diagnosis of Cognitive Disorder NOS and did not appear to provide an intervention targeting the issue of the patient becoming emotionally overwhelmed. There appeared to be little attention given to clarifying the diagnosis. The role of cognitive impairment in his psychiatric functioning appeared to be ignored. This patient was not receiving appropriate care.

APPENDIX B-4
DSH-Stockton
January 27, 2015 - January 29, 2015
June 17, 2015 - June 19, 2015

**Patient A**

This patient's healthcare record was reviewed because he was identified as being treated at the intermediate level of care and being housed on a unit conducting a pilot program aimed at increasing patients' access to treatment and out of room time.

The patient was a 23-year-old male admitted to DSH-Stockton from VPP, where he had been treated on an acute care unit. His referring diagnoses were Delusional Disorder, persecutory type, Substance Abuse, and Polysubstance Dependence in a controlled environment; he was alternately diagnosed with Major Depression, single episode, mild, Major Depression, and possible Bipolar Disorder. He was treated alternately with Risperdal and chlorpromazine for severe agitation, Haldol injection in the event of medication refusal, benztropine, and Vistaril. He did not have a reported history of mental health treatment in the community, but he was treated at the 3CMS level of care while in CDCR. His history was also significant for multiple suicide attempts, an assault on a peer, and an involuntary medication order due to grave disability.

Upon admission, the patient was placed at Stage 1 Solo as he had recently transferred from VPP where he had been treated for between four and five months for suicidal ideation and behavioral problems. He was classified at maximum Level IV custody with 127 points serving a 25-years-to-life sentence for murder.

During his hospitalization, the patient was seen for regular IDTT meetings. An IDTT on 11/4/14 recommended that the patient be removed from maximum custody status; the justification was that he was motivated to engage in programming fully without restriction, and the treatment team agreed that such a recommendation was appropriate at that time. A psychology note dated 1/13/15 indicated that the patient was attending groups and that adherence with program requirements was encouraged. A psychiatry contact in January 2015 documented an unremarkable mental status examination. In February 2015, notes indicated that the patient was participating in collaborative art making and introduction to drumming groups. The social worker saw him at cell front on 2/2/15 and 2/12/15 related to his disruptive behavior in group, including making loud noises. The 2/13/15 psychiatry note was similar to the previous notes, with no significant findings reported.

On 2/19/15 the social worker spoke with the patient at cell front and indicated that she would offer him one-on-one contact to support his goals. A 2/27/15 psychiatry note indicated that the patient slept well and was participating in programming with a plan for him to receive cognitively-oriented supportive psychotherapy. A 2/27/15 social worker note indicated that the patient would be supported in meeting his goals and was expected to program well now that he was no longer on maximum custody status. A 3/2/15 psychologist note documented the patient's visit with his mother and younger sister, which he described as "wonderful." The role play in which he engaged in group therapy was discussed. It was noted that he was practicing adaptive techniques to cope with feelings of being trapped in his room and wanting to scream. The patient indicated that he "faked" mental health symptoms because he was being harassed by a custody officer for spitting in another officer's face. Notes in March 2015 indicated that the patient was participating in yard and watching television. A 3/25/15 psychiatry note indicated

that the treatment plan was to continue group therapy, rehabilitation therapy, and individual therapy, and for the patient to engage in the therapeutic unit milieu.

The patient assaulted another patient during an enrichment group meeting on 4/3/15 related to what he described as disrespect based on his race. Prior to that time, the patient demonstrated improved behavioral control and good results from medication treatment. A V-Risk assessment described his chronic risk as high, his acute risk as low, and his acute risk for serious physical violence as moderate. The healthcare record noted that the "Patient is on MAX custody retention per treatment team recommendation on 4/16/2015." On 5/20/15 the patient physically assaulted a peer due to perceived disrespect. He reportedly voiced regret for his actions and stated that he was working on controlling his anger. He requested consideration of maximum custody suspension through the ICC process. A 4/6/15 social worker note indicated that the social worker would continue to support the patient in working toward his goals, but would have limited contact with him due to his custody status.

Notes through 4/4/15 demonstrated the patient's difficulty with yelling; he attributed this to boredom and efforts to communicate with peers as well as his maximum custody status and issues with him "flashing gang signals" when released to the yard. On 4/20/15 psychology conducted an assessment regarding the patient's RVR. It recounted the various diagnoses the patient had received including Delusional Disorder, persecutory and somatic type, Antisocial Personality Disorder, Substance Use Disorder, and Major Depressive Order. It noted that the other patient involved in the incident was grossly psychotic and used racial slurs. The assessment was that the patient had a mental disorder characterized by delusional ideation about his bodily functions and paranoid ideas that custody staff were poisoning or otherwise attempting to kill him, but that this disorder did not contribute to his RVR. Progress notes during the same period indicated that treatment was to focus on management of the patient's psychosis, specifically his paranoia. His personal goal was to get his television back. At this point, the patient was still diagnosed with Major Depression, single episode mild, with no diagnosis on Axis II. However, this appeared inconsistent with the clinical focus on psychosis and paranoia.

On 4/23/15, the patient was returned to maximum status and was thus limited to one-on-one sessions. He was treated with Risperdal and remained medication adherent. A 4/23/15 social work note indicated that the plan was for the social worker to continue to support the patient in working toward his goals. However, it was noted that due to his new maximum status and the new pilot programming, it was likely that the social worker would have limited contact with him. Subsequent notes in April 2015 indicated that the patient was upset with himself for fighting, resulting in return to maximum status and its negative effect on his ability to program. Notes showed that the team worked to assist him in removal from maximum custody status. Psychiatry saw the patient on 4/29/15, when his risperidone was decreased. The plan was to reconsider his maximum custody status during his next ICC. A psychologist saw the patient on 5/19/15 for an individual confidential session and noted that he regretted assaulting his peer.

A treatment plan dated 5/21/15 showed that the patient was seen for a monthly IDTT. It noted that he was cuffed and escorted by two officers. The patient spoke with the team concerning his "max status" and stated that he had to mind his own business and work on himself to try and act differently. The team encouraged him to try coping strategies to help him deal with conflict and

that a personal goal could be to display behavior which would allow him to leave maximum custody status.

On 5/21/15, a progress note documented that due to his maximum status the patient was dropped from all structured groups and was to have limited treatment team contact. The unit social worker was to assess his progress toward his goals at the following month's treatment conference. Treatment goals included taking antipsychotic medications and developing a list of five coping skills which he could utilize in EOP. It also stated that the unit psychologist would engage the patient using CBT to practice these coping skills and to help manage his angry outbursts though individual psychotherapy.

The psychologist saw the patient on 6/16/15 for an individual session in a confidential setting when the patient reported that he managed the seclusion of maximum status by watching television. At that time, the patient was informed that the treatment team had again recommended maximum custody suspension, but that the ICC would make the final determination. At this time the patient's diagnoses were Delusional Disorder, persecutory/somatic type and Polysubstance Dependence.

A 5/27/15 psychiatry note indicated that the patient's reduced dose of risperidone helped him to be more awake and that he was asked to refrain from using gang signals; otherwise, he would not likely be removed from maximum status. The patient was diagnosed with Delusional Disorder persecutory type. The plan was to maintain him at maximum custody/Stage 3 and to reconsider maximum custody status at the next ICC hearing.

Findings

This patient received regular contact with the psychologist and psychiatrist during this hospitalization. These contacts continued during times when he was placed on maximum custody status. The treatment team attempted to assist the patient as to consideration of removal from this custody status and noted for over two months that they would recommend his removal to the ICC.

Different diagnoses were not sufficiently reconciled and the social work notes indicated that his staff contact would be reduced due to his maximum status and housing on the unit conducting the pilot project. Overall, however, the patient's treatment was adequate and showed initial signs of the pilot improving the frequency of regularly planned contacts with clinicians with the exception of the unexplained plan for reduced contact with social work during a time when the unit was conducting a pilot to increase patients' access to treatment and to increase out of cell time.

**Patient B**

This patient's healthcare record was reviewed at the request of plaintiffs' attorneys, who requested review as to whether his IDTT meetings indicated review for a least restrictive setting. The patient was a 50-year-old divorced man who was admitted to DSH-Stockton on 9/19/14 from the EOP at MCSP due to increasing psychotic symptoms and over two month's refusal of

psychiatric medications. Prior to admission the patient complained of auditory and visual hallucinations, bizarre delusions, and paranoia. He also exhibited disregard for social boundaries, especially with female staff. His baseline affect was described as irritable with intense staring, and his mood ranged from irritable to upbeat. He was diagnosed with Schizoaffective Disorder, bipolar type, and Polysubstance Dependence.

An initial social history noted that the patient, who was serving a 25-years-to-life sentence, had a history of admission to DSH-Atascadero and inpatient psychiatric care while living in the community. The initial psychiatric assessment noted that the patient was refusing Depakote and Risperdal and had a history of MHCB admission in 2007. Past medication trials included Haldol, Cogentin, Depakote, Thorazine, and Vistaril. He also had a history of substance abuse. An integrated suicide risk assessment noted risk factors that included rapid escalation, recent bad news, refusing treatment, and single cell placements. Protective factors including family support and strong religious beliefs. His pattern of violence while intoxicated was noted.

A 10/30/14 treatment plan indicated that the patient was at Stage 3 and was attending groups without incident. A 3/12/15 treatment plan documented that the patient was not on psychotropic medications. The patient experienced auditory hallucinations two to three times weekly, but they were not intrusive. At that time the patient indicated that he would like to begin programming.

The treatment plan dated 4/15/15 noted that the patient was not on psychotropic medications. He attended core activities and leisure groups with peers. The plan was for him to continue at Stage 3. It also noted that he would like to begin programming. The patient continued to show moderate agitation toward staff regarding custody-related issues. He also exhibited intermittent periods of agitation and paranoia during groups and individual contacts, but he responded to redirection. The plan stated that he would return to the EOP at CDCR when he attained his treatment goals.

The patient's treatment plan dated 6/17/15 showed that he was attending and participating in groups and had not engaged in self-injurious behaviors. He had no incidents of aggressive or verbally threatening behaviors, and his current risk for such behavior was assessed as low. At this time he was maintained without medication. Although he reported frequent auditory and visual hallucinations, he did not find them troubling. His sleep and appetite were described as good and he attended to his ADLs. Although he was described at times as irritable and demanding, he was not verbally or physically aggressive. Between 1/28/15 and 3/11/15, he attended 26 of 30 or 87 percent of treatment sessions, and he was not inappropriate during groups. This percentage of group attendance was identical to that reported in numerous previous treatment plans. The patient met the goals of improving appropriate relations with staff, team members, and peers. The plans noted his continued desire to begin programming.

Notes from March 2015 documented differing assessments of the patient's progress and status. On 3/19/15 during a shower, the patient stood at the door naked with his arms and legs spread apart. When directed by the nurse to turn around, he complied and apologized. This incident was not handled as a disciplinary event. On 3/27/15 a psychiatry note indicated that the patient had met most of his treatment goals and was working on interpersonal boundaries. A 4/9/15 psychology note described the patient as agitated and demanding. He was encouraged to contact

his correctional counselor regarding his questions. A 4/16/15 psychiatry noted indicated that the patient's mental status had improved as evidenced by good grooming and hygiene and better cooperation with staff and peers.

During this time there were periodic notes about the patient's group attendance. A 5/22/15 social work note indicated that he attended core groups, and a 4/27/15 note stated that he was an active participant in group discussions. A note dated 3/26/15 reported that the patient exhibited bizarre hand movements during groups.

Findings

The patient was consistently seen by clinicians during this hospitalization, although some clinical notes suggested little recognition of differing observations by other staff. Some data regarding the patient's attendance at treatment activities was repeated in several subsequent treatment plans rather than being updated. The patient was reasonably well-maintained at times without medication. He was not considered for transfer to less restrictive settings. Overall, the patient received adequate treatment despite these observations.

**Patient C**

This patient's healthcare record was reviewed at the request of plaintiffs' attorneys. At the time of review, the patient was clinically discharged. His recent history was significant for having been raped by his cellmate in November 2013 and for decompensation since the discontinuation of Clozaril in 2014. The patient also had various medical problems that included hypertension and severe dental concerns. At the time of admission, he experienced auditory hallucinations, labile mood, was easy to anger, and was tearful. Tardive dyskinesia was noted. The patient was also receiving Depo-Provera as treatment for aberrant sexual behavior. His groups included CBT for psychotic symptoms, music, self-expression, integrated co-occurring disorders, lifestyle, art, social skills, and symptom management.

This patient's hallucinations worsened after Clozaril was discontinued due to tardive dyskinesia. In 1999 he placed a bag over this head in an apparent suicide attempt, and in February 2014 he cut his wrists during a psychotic period after discontinuation of Clozaril. He reported that he was classified as a mentally disordered sex offender which resulted in extended inpatient psychiatric hospitalizations at DSH-Atascadero and Napa State Hospital. He also reported treatment at DSH-Salinas Valley for two years and at VPP for one year; however, the dates of treatment were unclear, and the Electronic Unit Health Records (eUHR) did not document these hospitalizations. The also reported a hospitalization on a locked psychiatric unit in Idaho.

An initial psychiatric assessment dated 9/22/14 noted that the patient was raped in November 2013 and stated that the PREA protocol had been followed. It noted the patient's history of placement in 34 different foster homes and special education, as well as physical and sexual abuse. The preliminary treatment plan documented treatment with lithium and buspirone, individual therapy with the psychologist, and group skill training with the social worker.

This patient arrived at DSH-Stockton after inciting a riot in his housing unit and displaying aggression. He was initially hesitant to accept medication due to fears that he would have side

effects and concern that the medications would be discontinued upon return to CDCR. After increased treatment team engagement, he consented to medications. Despite his condition at the time of admission, he was later reported to have reached and maintained a level of stability. It was noted that he programmed well with his peers, and he was an active participant in all scheduled individual and group activities.

An IDTT meeting on 10/30/14 described the patient's anxiety regarding traumatic events when he was raped in prison. He developed PTSD symptoms that included anxiety, exaggerated startle response, nightmares, and paranoia for which clozapine had not altered. He also reported physical and sexual abuse as a child. Despite these symptoms, PTSD was not diagnosed or considered.

During a treatment planning meeting on 6/16/15, the patient became emotional when he was told that he would continue on Clozaril until discharge and that the treatment team would recommend continuation of this medication upon CDCR return. The patient reportedly enjoyed groups and wrote letters to decrease his anxiety.

<u>Findings</u>

This patient benefitted from clinical interaction with the treatment team, with improved therapeutic alliance and assistance in addressing his complex medication issues. Although the healthcare record did not document consistent individual clinical contacts or sufficient attention to trauma-related issues, the patient was eventually well-stabilized on medications and discharged to the CDCR. Overall, the patient received adequate treatment.

**Patient D**

This patient's healthcare record was reviewed as he was treated on an intermediate care unit and had been on DPS status. He was admitted to DSH-Stockton on 3/30/15. He had an active order for involuntary medication administration due to danger to self which would expire on 9/10/15. The patient had an EPRD of 6/29/18. He was diagnosed with Schizoaffective Disorder, depressed type, Polysubstance Abuse, Borderline Personality Disorder, and Antisocial Personality Disorder. He was treated with Depakote, Remeron, and Geodon. A diagnosis of Bipolar Disorder was also noted. The patient previously was admitted to VPP from 9/14/14 to 12/14/14.

Upon admission the patient presented with dysthymia, including depressed mood and suicidal ideation. After his admission to the hospital, he consistently denied suicidal ideation and did not engage in self-harm. The multiple disciplinary intake assessment noted that the patient should be observed every ten minutes for safety as he "is manipulative and unreliable historian."

The patient's history was significant for depression, auditory hallucinations, and multiple (up to 35) but vague reports of suicide attempts which were not documented in the CDCR healthcare record. This extensive reported history extended to both correctional and community-based treatment settings. Also significant were the patient's reports of having been molested by his

grandfather and life-long depression.  He had a history of substance abuse since age ten and reported a family history of Schizophrenia.

A comprehensive SRE by a psychologist on 4/10/15 assessed the patient with moderate acute and high chronic suicide risk.  A special treatment conference was conducted on 4/16/15 related to the duty to warn.  The patient was feeling paranoid believing that his grandfather was touching him with a laser beam.  His chest was tight, and he could "not think straight."  The subsequent treatment did not focus on these impulses to harm the grandfather, who reportedly abused the patient.

On 4/23/15 the patient engaged in an IEX incident, and on 4/26/15 he was found to have hoarded medications, at which point he reported suicidal ideation.  The patient was periodically placed on suicide watch for scratching himself, once with an eggshell and once with his fingernail.  The most recent incident occurred on 5/15/15; however, as of 5/22/15 he had begun to stabilize and had received full issue but "no sharps."  He was on maximum status at the time of review.

The patient's treatment plan of 4/29/15 noted that the patient would adhere with medication treatment 100 percent of the time and identified five anxiety triggers; in this regard, he would be assisted by the social worker during individual sessions.  The patient attended a special treatment team conference on 4/30/15 where he reported feeling content and ready to "get his stages back."  He reported having been anxious, which he said was triggered by placement on DPS status, which he had not previously experienced.  The team told the patient that he needed to engage in programming and that they would subsequently talk with him about receiving privileges.  The patient was instructed not to expose himself.  He inquired whether he would resume his privileges if he "did good."  The team informed him that stages were not rights, but privileges.  This was a missed opportunity to support prosocial behavior or goals.

The patient was escorted to a 5/6/15 session by officers, when he requested to have his "stages back."  On 5/1/15 a special treatment conference met with him at his cell door; due to a CDCR lockdown, there was no patient movement.  At that time the patient stated that he was ready to be removed from one-to-one suicide watch.  He reported last experiencing auditory hallucinations two days prior and that he was taking his medications.  He was told to trim his nails.

With the patient wearing a safety smock, officers escorted him to a special treatment conference on 5/12/15.  He reportedly had auditory command hallucinations to kill himself, and he requested discharge.  Documentation of a 5/27/15 IDTT meeting described the patient as stable and wanting discharge, but endorsing auditory hallucinations.  The team told the patient that if he continued to improve and maintained stability, he would likely be increased to Stage 2.

Findings

This patient was challenging to treat and accurate history to inform assessment was difficult to obtain.  However, the patient's care was insufficiently focused on avoiding a potential risk for suicide, had some indications that staff may have had a negative view of the patient, was not sufficiently focused on trauma-informed care, and did not sufficiently take advantage of opportunities to support prosocial goals and behaviors.

**Patient E**

This case was selected for review because the patient had been identified by plaintiffs' attorneys based on his retention at maximum custody status for an extended period. The patient was admitted to DSH-Stockton on 12/15/14. An SRE completed on 12/18/14 assessed the patient at moderate chronic risk and low acute risk of suicide. A V-Risk assessment was completed on that same date and assessed the patient at moderate acute and high chronic risk, with moderate risk of physical harm.

The patient received his psychotropic medications by a PC 2602 order at the time of admission. He was provided with a diagnosis of Schizophrenia, undifferentiated type. He received multiple violent RVRs while in CDCR custody, and he had 591 custody points. The last RVR occurred in November 2014 for assault/battery on a peace officer. The patient was described by the psychologist who conducted the assessment as highly assaultive and, per the narrative, at high risk for assaulting custody and nursing staff during his stay; the report cited movement and food or medication passes as particularly dangerous times. In fact, the psychologist indicated that the patient would "remain on MAX custody throughout his stay…" This was not a clinical decision, however, and it was an inappropriate statement. DSH-Stockton supervisory staff indicated that they believed the statement was made in error, and the issue would be handled by additional training.

The patient remained on a PC 2602 order at the time of the monitoring visit. He was prescribed olanzapine, lithium citrate, Risperdal Consta, and benztropine mesylate, with intramuscular injections also ordered in the event of medication refusal.

The patient's most recent treatment plan, dated 12/30/14, noted that a spit mask from CDCR was utilized due to the patient previously spitting on staff. The patient requested to have the spit mask removed, but staff did not note denying or granting the request. They did note that the patient could not be seen in the dental clinic due to the spit mask. The reason for the patient's admission included identifying an optimal medication regimen, developing skills to cope with the demands of an EOP environment, developing alternative coping skills so he did not use suicidal ideation to manage housing issues, minimizing the occurrence of auditory and visual hallucinations, and developing increased mood stabilization skills. The treatment plan did not target the patient's primary symptoms; the goals were too vague, and treatment interventions were inadequate or not included at all. Out-of-cell activities were not identified, and treatment was not provided in a quantifiable way. The patient remained on maximum custody status, but the treatment team did not explain the rationale. He should have been advanced through the level system despite his maximum custody status.

<u>Findings</u>

This patient's treatment plan did not adequately address his serious symptoms. It also did not sufficiently address the underlying behaviors that were responsible for maintenance of maximum custody status, which did appear appropriate based on available information.

**Patient F**

This case was reviewed at the request of plaintiffs' attorneys.  The patient was a Level II patient who was transferred to the DSH-Stockton high security intermediate care program, rather than to a less restrictive setting.  The reason for his placement in a high security setting was unclear from the records.  The patient had been placed on a PC 2602 involuntary medication order on 1/23/14, due to grave disability.  Based on an undated discharge summary, the patient was prescribed Thorazine, Benadryl, Cogentin, Risperdal, and divalproex extended release tablets.  The patient had transferred to VPP's acute care program on 12/23/13, and he was transferred to DSH-Stockton on 5/14/14.  His behavior upon admission was very disorganized and included urinating on the floor, smearing feces on his window, and singing rap songs to his doctor.  He also displayed acute agitation, aggressive demands to staff, and response to hallucinations; these symptoms resulted in the initiation of an involuntary medication order due to medication refusals.

While housed at DSH-Stockton, the patient reportedly programmed well, and he participated in core and leisure treatment groups.  There was just one reported incident on 8/31/14, when the patient "attacked and spit" on a staff member.  Staff alternately reported in the healthcare record documentation that this behavior was possibly to expedite a return to prison; however, it was also noted that there had been medication changes and the patient may have been experiencing an exacerbation of psychotic symptoms.  The medication "changes" included a failure to provide the patient with needed medication that directly contributed to his decompensation.  During this period of decompensation, the patient was observed screaming and hitting his head while standing naked in his cell.  While being escorted for stat medications, he reportedly spit at staff.  The patient was then placed into restraints.  The patient reported command hallucinations at that time telling him to hit himself and others.

It was not clear from the healthcare record why this isolated incident was used to justify extended maximum custody status.  However, maximum custody status was not determined by custody staff, but by clinical staff initially, based on his mental health record.  The patient was clearly in an acute psychotic state and, based on documentation, his behavior appeared to be directly attributable to that psychotic state.  He had previously programmed well.  After the incident, the patient was placed on maximum custody status and solo programming, although he had previously been at Stage 3 with a radio and television.

At the time of the undated note, the patient remained on maximum custody, Stage 2, solo programming.  There was no clinical justification in the treatment plan for maintaining maximum custody status and solo programming.  No alternative interventions were provided, as should have been, given the limitations on the patient's treatment program as a result of this status (e.g., lack of access to group treatment).  The treatment plan included goals that were too broad to properly address his serious symptoms and did not indicate any group therapy.  Once he was placed on maximum custody status, staff did not accommodate this restrictive status by, for example, providing increased individual treatment based on the treatment plan.

Findings

This patient appeared to have been inappropriately housed in a high security setting at DSH-Stockton and not to have been treated in the least restrictive setting considering his Level II custody status. Initial treatment for this patient was uncertain, as early treatment plans were unavailable. However, once an involuntary medication order was implemented, the patient appeared to progress and was able to participate in his treatment. Once staff erred and failed to administer the patient's medications for several days, however, the patient quickly deteriorated. His access to treatment was greatly limited as he was placed on maximum custody status and solo programming due to behavior that occurred when he was in an acute psychotic state that was due at least in part to staff error. The treatment plan developed during this time was inadequate. Clinical staff inadequately referred to a reduced clinical level as "max" status, confusing clinical and custody terms and status. During a significant portion of the patient's stay, he was treated inadequately and did not receive appropriate access to treatment.

**Patient G**

This patient was identified for review at the request of plaintiffs' attorneys because he had been on maximum custody status for an extended period of time. He was admitted to the intermediate care program on 12/16/14 for symptoms of thought process disorganization, thought blocking, poor sleep, mild agitation, and suicidal ideation. The expected therapeutic outcome was that the patient would cope with receiving a second strike, cope with his father's death, stabilize in terms of symptoms, and improve his coping skills, hygiene, and self-care. The patient would also improve his resistance to his impulses to respond to internal stimuli and assault.

The patient had a long history of command auditory hallucinations and paranoid ideation that reportedly led him to act out violently. He refused to leave his cell for anything but individual sessions with his "PC" (it was unclear if that referred to the social worker, psychologist or psychiatrist) and to shower. He had been housed at DSH for many years, at DSH-Atascadero under a PC 1370 order and as a MDO, and at DSH-Stockton; however, he was transferred to CDCR recently before his referral back to DSH-Stockton.

The patient had multiple acute risk factors for violence including poorly controlled psychotic symptoms, mood lability, and chronic impulsivity with poor judgment. The patient's risk was expected to decrease as his medication regimen was fully implemented and he actively engaged in treatment. He reported motivation for treatment. The patient was at maximum custody status with 500 points. He had community hospitalizations as well as a Napa State Hospital admission.

The patient's initial 72-hour treatment plan was acceptable for an initial treatment plan. The subsequent and most current treatment plan, dated 12/30/14, was the patient's ten-day treatment plan. He demonstrated behavior that was consistent with some decompensation and an exacerbation in symptoms, although this was not clearly stated as such by the treatment team. The behaviors were simply described. The treatment plan indicated that the patient stated to the treatment team that he did not enjoy remaining in his room for long periods of time. The treatment plan did target some appropriate symptoms, although not all underlying primary

341

symptoms.  In addition, there were no specific treatment groups listed as interventions, including the core treatment groups allegedly assigned to most patients.

<u>Findings</u>

The patient was appropriately maintained on maximum custody status.  The treatment plan did not note and target most of the issues underlying the cause of continued maximum custody status and included some appropriate interventions.  However, there were no treatment groups identified for the patient.  If treatment groups were not available due to maximum custody status, then that should have been identified and discussed in the treatment plan and alternative treatment modalities specified.  The quantity of treatment, in both frequency and duration, should also have been specified in the treatment plan.

**Patient H**

This patient was reviewed because he was a Level II patient treated in the DSH-Stockton high security intermediate program.  He had been referred to VPP's lower security dorm setting; however, he was ultimately placed in a high security cell in DSH-Stockton.  It was unclear from the records how this occurred.  The patient had requested SNY status due to "prison politics" and an inability to program on a general population yard.  Apparently, the patient had not been classified, and his classification score was unknown as of a committee action on 3/21/14.  That was the basis for the referral to VPP's dorm housing because of the belief that the secure structure there could provide enough safety for him.  The patient voluntarily relinquished his SNY status while in DSH and agreed that it would be reinstated upon his return to prison.

The next committee action occurred at DSH-Stockton and did not explain the change in facility assignment.  Healthcare records also did not indicate any reason for the change in DSH facility.  This patient's treatment plans were well-constructed, changed as the patient progressed through treatment, noted the patient's progress toward treatment goals, and indicated that treatment groups were included in the treatment plan.  The treatment plans also indicated the percentage of participation.

<u>Findings</u>

While it was unclear why the patient was not treated in the least restrictive setting, the patient's treatment plans were well-constructed and properly addressed the patient's presenting symptoms.  This patient was adequately treated.

**Patient I**

This patient was selected for review as he was a Level I/II patient treated in the DSH-Stockton high security program.  He was admitted on 6/30/14 to the intermediate program with the diagnosis of Schizoaffective Disorder, bipolar type.  He had an index offense that was violent as well as a fight with another patient in April 2014.  No other violent behavior was documented.  The patient was referred for psychotic symptoms and paranoia with treatment expectations to stabilize his mood, increase reality testing, decrease residual paranoia, and improve future

orientation and sleep.  The most recent treatment plan indicated that he was prescribed Paxil 40 mg per day for depression.  The patient identified coping skills and communication as desired treatment goals.  His treatment plan did specify treatment groups, as well as the days and times of those groups.  The treatment plan also documented treatment goals and whether those goals had been met.  Because of this patient's progress, the treatment plan should have been further modified.  There was no appropriate V-Risk information in the treatment plan, but the suicide risk information was included.  It was, however, not incorporated into the treatment plan.

Findings

This patient was not treated in the least restrictive setting, but was adequately treated.  However, the patient's treatment plan required updating to reflect changed treatment goals, given the progress he had made with previous treatment goals.

**Patient J**

This case was selected for review as an example of a patient placed on DPS in the intermediate treatment program.  DPS was implemented upon the patient's arrival due to "safety" issues.  The patient was admitted on 8/18/14, but the DPS log indicated that DPS was initiated on 8/29/14 and lasted 81 days, ending on 11/18/14.

The record indicated that this 35-year-old patient had been diagnosed with Schizophrenia, paranoid type, and was "rather" disorganized during his psychiatric evaluation at intake.  The patient was a poor historian, but based on record review and interview he was assessed with low acute and moderate chronic suicide risk.  He was also assessed with high acute and moderate chronic risk of institutional violence.  The patient exhibited intense paranoia and experienced delusional thinking and auditory hallucinations.  He had multiple RVRs for battery on patients and staff, although the risk assessment did not note the dates of those RVRs, which was an important element to the assessment.

The patient's history of aggression was closely tied to delusional thinking, with those beliefs triggering the violence.  Medication nonadherence had resulted in an increase in delusional thinking; consequently, the patient had previously received his medications by an involuntary medication order.  It did not appear that such an order was in place at the time of admission.  The patient reportedly escalated quickly with few warning signs, placing him at high risk of harm, particularly in light of his questionable medication adherence.  He was prescribed Zydis and Haldol.

The patient's treatment plan did not realistically address paranoid symptoms.  The treatment goal and objective pertaining to paranoia should have been modified.  However, the treatment plan did note DPS, and it was clearly clinically supported.  The treatment plan was not modified as the patient continued to refuse to engage in treatment and, as staff noted, exhibited increased incidents of verbal aggression, a sign of decompensation.  This patient would have benefitted from a behavioral plan.  The most recent treatment team meeting on 12/23/14 was attended by the patient.  The patient's level was elevated during this meeting, although he indicated that he did not want to participate in group treatment for fear of getting into a fight with a peer.  He

reportedly had a rope in his cell, but self-harm was not addressed in the treatment plan and no individualized behavior plan or consultation with the PBST was recommended by the treatment team.  Treatment activities were not modified to accommodate the reduced treatment opportunities due to the patient's status on solo programming.

<u>Findings</u>

The patient was appropriately placed on DPS.  However, the treatment plan was only minimally adequate because it only involved medication management.  Other treatments were not properly implemented, and the treatment plan was not appropriately modified as the patient failed to improve and even decompensated.  Treatment interventions were also not modified to accommodate his solo programming status.

**Patient K**

This case was selected for review because the patient was placed at Step 1 for "noncompliance." He was admitted to the acute care treatment program on 11/10/14, and remained at Step 1 for 35 days, until 12/15/14.  This 39-year-old patient was adherent with portions of the intake evaluation process.  He was prescribed venlafaxine, and he remained on an involuntary medication order for danger to self.  He was diagnosed with Schizophrenia, disorganized type. He was described as apathetic with poor motivation for treatment, blunted affect, and poor rapport with staff.  The treating psychiatrist noted that the patient's symptoms might be consistent with his diagnosis of Schizophrenia, disorganized type.  The healthcare record supported the consistency of these negative symptoms with the patient's mental illness and the reason for DSH referral.  This would have been the likely reason why this patient remained at Step 1 for 35 days, as his mental illness appeared to have prevented him from achieving subsequent Step levels.

The initial treatment plan was well-constructed in that it was reasonable and individualized to the patient's functional level.  The patient's inability to establish a therapeutic rapport was attributed to his paranoia.  He did attend his 30-day IDTT meeting and was promoted from Step 1 to Step 3.  It was unclear how he had improved enough to increase by two levels other than reporting decreased auditory, visual hallucinations and paranoia and occasionally showering; although this behavior was erratic in frequency.  The patient wanted to return to the EOP, but the documentation of his behavior in the healthcare record did not support transfer to that level of care.  He seemed much more appropriate for the intermediate level of care, although no discussion of consideration was documented.  An individualized behavioral plan was indicated in this case, but was not utilized.  The treatment plan was also not modified over time.

<u>Findings</u>

The patient was initially appropriately placed at Step 1, but he should have more quickly progressed since his mental illness limited his ability to meet the expectations for progression. The level system is a system of rewards designed to create incentives for the patient to engage in treatment and to display positive behavior.  However, the patient must have the cognitive and functional ability to comprehend the level system and choose to comply with it.  Because of this

patient's mental illness with significant negative symptoms and poor insight regarding his need for treatment (involuntary medication order), he was unable to do so. This resulted in his inability to achieve access to therapeutic activities in a timelier fashion. In addition, he was not provided with an appropriate individualized incentive system to replace the standard level system. This patient was not adequately treated.

**Patient L**

This case was selected for review to evaluate treatment planning adequacy. This 28-year-old patient was admitted to the acute care treatment program on 12/11/14 with diagnoses of PTSD and Schizoaffective Disorder, depressive type. He was referred from the intermediate care treatment program at DSH-Stockton. The reason for admission was to enhance medication adherence, reduce suicidal ideation, and increase coping skills, specifically with managing anger and reducing aggressive sexual behavior.

The initial treatment plan included no interventions for reduction of nightmares. There was one leisure activity listed for reduction in suicidal ideation, and the only responsible staff were rehabilitation therapists and psych techs. It was unclear why there were no interventions involving the psychologist, social worker, and/or psychiatrist. The seven-day treatment plan of 12/19/14 added only that the social worker would ask the patient what helped him shift his focus to reduce suicidal thoughts, which was clearly an inadequate intervention. The most recent treatment plan, dated 1/21/15, proposed diagnoses of PTSD and Antisocial Personality Disorder with narcissistic personality traits, and indicated that the patient would be referred to intermediate care, but without a clear clinical rationale. The treatment plan did not reference group treatment except for book exchange/book cart, so treatment was not adequately specified in the treatment plan. This patient's diagnosis appeared somewhat unclear, but this issue was never adequately clarified.

Findings

The treatment plan did not address the referral issues, nor did it properly address the presenting issues identified by the treatment team. This patient was not adequately treated.

**Patient M**

This case was selected for review as the patient remained at Step 1 for 32 days due to treatment nonadherence. This 44-year-old patient was on an involuntary medication order and he was prescribed clozapine, Geodon, lithium ER, and Prozac. He had been admitted to the acute care program on 12/12/14 with a history of paraplegia, psychosis, and suicidal behavior. He had multiple community hospitalizations and reportedly intractable hallucinations. The reason for referral was to increase his socialization and coping skills while decreasing his suicidal ideation and visual hallucinations. The patient had been diagnosed with Schizoaffective Disorder. He had consistently refused to attend his treatment team meetings and reported longstanding paranoia and suicidality. The treatment plan was not modified, despite the patient's continued refusal to engage in treatment. This patient would have benefitted from a behavioral plan, but

the treatment team did not discuss a PBST consultation or referral for an individualized behavioral plan.

Findings

This patient could not attain a higher step level because the symptoms of his mental illness prevented him from achieving the requirements for it. The treatment team needed to develop an individualized behavioral plan and base the patient's step progression on that behavioral plan. The patient was not treated adequately.

**Patient N**

This case was selected for review as an example of intermediate care treatment planning. This 43-year-old patient was admitted on 4/7/14 with a diagnosis of Schizoaffective Disorder. He was on an involuntary medication order for grave disability, although he had also engaged in two unprovoked attacks on peers. The patient was prescribed valproic acid and ziprasidone, with intramuscular injections ordered in the event of medication refusal. The patient was referred to DSH due to persistent poor treatment adherence with treatment expectations of stabilization. He had been transferred from VPP's intermediate program at Stage 3. It was unclear why the patient transferred, but it may have been due to a unit closure at VPP.

The first treatment plan available in his healthcare record was dated 8/13/14 and it reported that the patient was attending groups. The plan did not list how many or what those groups included. When the patient had not met the goals of that treatment plan, the interventions were not modified. The most recent treatment plan, dated 12/18/14, included a significant amount of information in the "current status" section, some of which was more appropriate for other areas of the plan. Some changes occurred in the patient's treatment plan that were clinically indicated. Goals, objectives, and interventions were changed, although there were insufficient amounts of treatment groups specified.

Findings

This patient was adequately treated overall, but documentation was lacking in numerous areas and at different points in the treatment process. The treatment plan should have been regularly modified as a result of the patient's failure to progress, and this should have been reflected in clear and specific documentation in the treatment plan. The current status section of the treatment plan should have reflected only the patient's current status and his progress or lack thereof since the last treatment team meeting. Instead, information was frequently added to this section from prior updates with few deletions, resulting in a chronology that did not reflect the section title and did not provide for a coherent summary of the patient's progress.

**Patient O**

This case was selected for review because the patient had been placed on maximum custody status since his admission on 4/30/15. This 23-year-old DD1 acute care patient was on an involuntary medication order for danger to self, danger to others, and grave disability. This order

346

was in effect until 10/6/15. The patient was diagnosed with Schizophrenia, catatonic type and was prescribed olanzapine and hydroxyzine at the time of the monitoring visit. The patient was originally referred to DSH acute care because he had begun refusing his involuntary medications, experienced paranoia that could result in violence, and had a history of self-injurious behavior and threats. It also appeared that the patient had been refusing treatment and was attending less than 50 percent of treatment groups at his prior facility. He was a Level III Medium A with 44 points, with no gang affiliation, no placement, and no sex offense or escape history.

The patient had a history of inpatient hospitalizations with a prior admission to CMF APP for approximately three months due to extreme psychosis that included catatonic behavior resulting in a loss of 12 pounds in one week. The involuntary medication order appeared to have been initiated at that time and was in its third year. The healthcare record indicated that the patient had been able to maintain a level of stability until his recent decompensation. According to the multidisciplinary intake assessment dated 5/6/15, he had previously threatened to kill staff and had gassed staff (urine) when "experiencing increased psychosis." No specifics on the alleged gassing incident were provided. This occurred prior to the initiation of the involuntary medication order. In the V-Risk section completed by the psychologist, it was recommended that the patient be placed on solo programming due to affective instability until he had demonstrated treatment adherence and the ability to follow directions for one week. It was also recommended that staff conduct regular cell searches. Since this would be standard operating procedure, it seemed to suggest that this patient would be subjected to enhanced or an increased level of cell searches. This was not supported by the patient's history or V-Risk assessment and would seem to only serve to increase the patient's paranoia and likelihood that he would feel targeted by staff.

The healthcare record indicated that when the patient received appropriate medication therapy, he presented with a completely different presentation, including decreased dangerousness to himself and others, than when not adequately treated. However, the treatment team plan dated 5/7/15 utilized this information only in the danger-to-self section of the plan. When assessing assault and aggression, the team appeared to overestimate risk when the patient was adherent with medications, despite two years of stability exhibited by him since the initiation of the involuntary medication order. The treatment plan dated 5/7/15 was completely inadequate in light of the patient's symptoms and behavioral issues: the medication adherence intervention was simply for the nurse to check the patient's mouth and the treatment goal to decrease aggression involved the psychologist meeting with the patient monthly. These were inappropriate in light of an involuntary medication order and the lack of specific information regarding current aggression. This patient was placed on solo programming which severely limited his access to treatment and activities outside of his cell. This highly restrictive practice should have included clear removal criteria or a plan to see the patient before 30 days, particularly in the acute care setting, but neither occurred in this case.

The next treatment plan dated 5/29/15 was identical to the initial treatment plan and not appropriate to the patient's symptoms and functional level. The assault/aggression section of the treatment plans contained contradictory information. While the section initially noted low current risk, in the body of the narrative acute risk was noted to be moderate. This was very confusing as was the recommendation in the monthly treatment plan dated 5/29/15 for continued

solo programming despite no incidents of aggression or violence. The treatment plan appeared confusing and unsubstantiated regarding this section. The treatment plans also included contradictory information regarding the patient's custody status. While documentation indicated that the patient was Medium A custody level with 44 points, when queried, staff determined that he had arrived at maximum custody status determined by custody. The treatment plan did not adequately address underlying factors for continued maximum custody status.

Despite these issues, the treatment team recommended suspension of maximum custody status on 5/5/15, despite not having met as a team since the last treatment team meeting. The justification provided was that the patient had been adherent with medication treatment since his arrival, and he had demonstrated the ability to program without incident. Based on the record review, which included a copy of the ICC chrono, it appeared that the patient did not have his maximum custody status suspended by the ICC, causing further question as to how maximum custody status had originally been imposed.

Findings

This patient was not adequately treated. His care was characterized by poor treatment planning with inadequate interventions and poor problem definition. Staff also appeared confused regarding the patient's custody level and clearly needed to work more closely with custody to properly identify custody level, to identify the behaviors or behavioral concerns that formed the basis for maximum custody status, and then to develop treatment plans to address those behaviors and to work together toward moving the patient from maximum custody status. The treatment team's conceptualization of this case appeared unclear in light of the patient's diagnosis and treatment plan. Some clarification of these issues should have occurred within a comprehensive diagnostic evaluation and justification. This would form the foundation for development of an adequate treatment plan.

**Patient P**

This 41-year-old acute care patient was selected for review because he was listed on the DPS log as having been placed at Step 1 upon arrival on 5/15/15, and had not been removed as of 5/27/15. The patient was referred to DSH-Stockton from the RJD MHCB due to continued passive thoughts of death. He was at custody Level IV with 92 points with a commitment offense of murder in the second degree. The patient had delusional thinking, believing he was an assassin who had killed thousands of people and that he must kill another before turning 50 years of age to get a younger body. The patient was described as having no insight and was difficult to redirect. The V-Risk assessment narrative did not support the risk level assessments. Specifically, the chronic risk level rating of high was not supported by the narrative that noted very little violence outside of the commitment offense.

The initial 72-hour treatment plan on 5/15/15 indicated that the patient had been diagnosed with Major Depressive Disorder, recurrent with psychotic features. He was prescribed venlafaxine. This treatment plan for this patient mischaracterized depression and hopelessness as V-Risk factors toward others without substantiation and despite a lack of empirical evidence of such. The treatment plan had only medication adherence as a treatment target and included inadequate

348

treatment interventions for this identified treatment target. The patient's seven-day treatment plan on 5/21/15 indicated that the ICC had removed him from maximum custody status that day. He was also increased to Step 2. This was contrary to the DPS and maximum custody logs provided. The seven-day treatment plan did add the reduction of chronic suicidal thoughts; however, the only interventions were monthly contact with the psychologist and music therapy, which clearly were inadequate to address the treatment target. The most recent treatment plan dated 6/11/15 did not indicate that the patient was on maximum custody status nor did progress notes during the same time period, suggesting further that the maximum custody status log was incorrect. That treatment plan indicated that the patient had begun to attend treatment groups, but the level of his attendance was not quantified. Despite repeated IEX incidents, there were no social skill or impulsivity goals in the treatment plan. Treatment problems, goals, and interventions were cut and pasted from the prior treatment plan.

Findings

The patient did not remain on maximum custody status or Step 1 for as long as logs indicated. However, the patient's treatment plan was inadequate as treatment targets, goals, and interventions were vague and superficial at best.

**Patient Q**

This 26-year-old acute care patient was referred to DSH-Stockton due to having swallowed a razor at his sending facility and exhibiting continued suicidal ideation. The patient underwent a colonoscopy to remove the razor. He had a long history of similar behaviors when under stress. The intake assessment indicated that the patient had more than one hundred community inpatient admissions for suicidal ideation and multiple suicide attempts. He was admitted to acute care on 4/9/15.

The patient's diagnosis was Other Specified Depressive Disorder. He was prescribed oxcarbazepine. The patient's first treatment plan dated 4/10/15 was incomplete as no treatment goals were identified by psychology. The plan included a goal to decrease self-injurious behaviors and a second goal to decrease suicidal ideation. The treatment plan was very poorly constructed. The subsequent treatment plan dated 4/16/15 indicated that the patient had complained about not receiving enough out of cell time. That treatment plan was otherwise identical to the previous treatment plan and also indicated that psychology had not identified any goals. Anger management was added as a treatment target. The 5/5/15 treatment plan was unchanged from prior plans. None of these treatment plans indicated whether the patient had been removed from maximum custody status, nor did nursing notes. It was unclear from the record whether the patient was complaining about a loss of freedom due to the overall restrictiveness of the acute care setting and level system, or if his concern was due to placement in mechanical restraints and the limited access to treatment and programming that resulted from that. The most recent treatment plan dated 6/9/15 did not appropriately address the patient's longstanding self-injurious behaviors. The plan was vague and superficial in both the treatment targets and interventions.

The patient had previously been diagnosed with Borderline Personality Disorder and he engaged in behaviors consistent with that diagnosis. No treatment groups specific to those behaviors, depression, or suicidal ideation were part of any treatment plans developed for this patient at DSH-Stockton. There were no treatment groups identified as part of the treatment plan. There were some individual recreational therapy and possible recreational therapy groups that may have been offered, but this was unclear from the record.

<u>Findings</u>

This patient was not adequately treated. He appeared to remain on a restricted status for an extended period of time without justification. Treatment plans for this patient were not properly developed with input from all disciplines and did not include appropriately operationalized treatment targets, goals, and interventions.

**Patient R**

This 28-year-old intermediate care patient was admitted to DSH-Stockton on 10/8/14, for depressive and psychotic symptoms accompanied by suicidal ideation and impulsivity. This case was selected for review because the patient was listed on the maximum status log and also as having been placed on DPS during April 2015 for two days for "safety." The patient was reportedly placed on maximum status on 4/3/15, when he assaulted another patient in an enrichment group. According to documentation, as a result of the patient's maximum status he had received very little actual treatment, including individual therapy. Most of the patient's clinical contact involved very limited cell-front contacts with the social worker. He was unable to access group therapy while on maximum status.

Despite the patient's maximum status, his V-Risk was determined to be low according to the most recent treatment plan dated 6/4/15, although the plan later indicated that his acute risk was moderate. He was reportedly scheduled for ICC to review the treatment team's recommendation to have the maximum custody status suspended. The patient had reportedly shown remorse for the assault and accepted redirection regarding the peer he had assaulted who he felt had disrespected his deceased grandmother. The patient was described as experiencing auditory and visual hallucinations on a daily basis. His thought process was illogical, circumstantial, and irrational. He experienced delusional thinking and paranoia, and had no insight regarding his mental illness. The most recent treatment plan dated 6/4/15 was vague, superficial, and clinically inadequate to address the patient's serious mental health needs. The prior treatment plan dated 5/6/15 noted that the patient had been unable to participate in any treatment groups since his placement on maximum status, which continued through June 2015.

Based on available documentation, the patient was not seen timely by the treatment team for revision of the treatment plan once he was placed on maximum status. Given the significance of this event and how it limited his access to care, the patient should have been seen by the treatment team promptly after the event so that the plan could have been appropriately modified. Although the patient was placed on a pilot unit where the facility was attempting to provide more out-of-cell time, the May and June 2015 treatment plans indicated that this patient actually had less contact with his social worker as a result of the pilot; the reason for this decrease was

unclear. Those treatment plans were slightly modified, but the treatment was inadequate to address the patient's needs and did not address the behavior underlying his placement on maximum status. The treatment plan prior to May was dated 1/6/15, and it indicated that the patient had not been treatment adherent with his medication. Medication compliance, reduction in suicidal ideation, and reduction of auditory hallucinations were all listed as treatment goals. However, these goals were all described in vague and superficial ways, as were the associated interventions. There were only four treatment groups included in the treatment plan, and they were listed for suicidal ideation reduction; it was unclear how the groups listed (anger management, integrated treatment for co-occurring disorders, overcoming trauma, and symptom management) would directly assist this patient in managing his behavior and suicidal ideation.

The patient was diagnosed with Schizophrenia, paranoid type. He was prescribed Cogentin, Risperdal, and Thorazine, as well as medications ordered on an as needed basis.

Findings

This patient was not adequately treated. His treatment plans did not appropriately define treatment targets, goals, and interventions. Once placed on maximum status, his treatment team did not respond timely to modify his treatment plan to ensure that his access to care was not negatively impacted by that status. Instead, he had little to no access to treatment for an extended period of time due to his maximum status as documented in the patient's healthcare record. Staff stated that a pilot program on his unit further negatively impacted his access to care.

**Patient S**

This 39-year-old intermediate care patient was selected for review because he had been on DPS for 100 days. He was admitted to DSH-Stockton on 12/15/14 with a diagnosis of Schizophrenia, paranoid type. The patient had a commitment offense of murder in the first degree for stabbing a homeless man to death in an unprovoked attacked, and he was also found guilty in another knife attack. He was found not guilty by reason of insanity (NGI) in the knife attack, but he received a life sentence for the murder. After spending nine years at DSH-Atascadero for the NGI verdict, the patient was placed in the custody of CDCR, and was then referred to DSH-Stockton. The patient was assessed with moderate acute risk, but high chronic risk of violence according to the intake V-Risk assessment dated 12/19/14. This was supported by the narrative information.

The patient was placed on DPS on 12/29/14. According to the first treatment plan located in the healthcare record dated 3/10/15, the patient had not been able to participate in any treatment groups up to that time. Prior treatment team meetings referenced in this plan indicated that he had become angry on several occasions and had engaged in aggressive behavior, including slamming paper down, resulting in DPS placement. The team had decided during the ten-day IDTT that occurred on 12/20/14 to review the patient's stage daily and to increase the level when his condition "stabilized." No specific criteria were established by the team to determine when the patient was stabilized. Specific criteria would assist clinical rapport with this patient and reduce subjectivity in changing his level.

351

When seen at a January 2015 IDTT meeting, the patient was extremely disorganized and became somewhat agitated.  He was more stable at the IDTT meeting on 3/10/15, although his behavior was erratic with episodes of screaming and cursing.  The patient had no insight regarding his mental illness and he was unable to identify triggers for his aggressive behaviors.  He was an excellent candidate for behavioral interventions and a behavioral plan, yet this was not discussed. The treatment plan was clinically inadequate and inappropriate as evidenced by goal selection and interventions.  The treatment plan identified monitoring psychosis and aggressiveness as a goal with the objective that the patient would be able to name two medications that might be appropriate for his psychiatric difficulties.  The treatment plan was inadequate for this patient's needs.

Subsequent treatment plans did identify underlying behaviors that caused the patient to be on DPS, but only in the vaguest and most superficial manner.  Treatment goals and objectives were so broad that they did not lead to an actionable treatment plan with clear interventions that could be implemented with a likelihood of success for the patient.  He could not participate in treatment groups, so his access to treatment was severely limited by DPS.  A behavioral plan in addition to psychotropic medication was the indicated treatment, yet a behavioral consult was not initiated.  He was prescribed Zyprexa 30 mg per day.  He was on an involuntary medication order due to danger to others.

Findings

This patient was inadequately treated because the full spectrum of available effective treatment interventions was not utilized.  An individual behavioral plan was indicated in this case, but no such plan or intervention was initiated.  The treatment plans that did exist were not appropriate in light of the patient's very serious symptoms and functional impairment.

APPENDIX B-5
SQ PIP
May 4, 2015 – May 6, 2015

**Patient A**

This 32-year-old man was transferred to death row on 1/5/13. He was admitted to the SQ PIP intermediate care program on 10/1/14 for treatment of Bipolar Disorder. A long history of cutting behaviors and anger problems was described. Target symptoms included mood instability, intermittent auditory hallucinations, anxiety, and personality disorder symptoms that included poor impulse control and cutting behaviors. Prescribed medications included Ativan, Wellbutrin, Propranolol, Remeron, and Topamax. He was assessed by the psychiatrist to have chronic psychosis and insomnia secondary to methamphetamine abuse, chronic depression secondary to his death row status, methamphetamine/opiate dependence, and a personality disorder with borderline and antisocial traits. He was also positive for hepatitis C. On 1/10/15, the patient had Stage 1 privileges. His stage level had been reduced two stages the week before due to participating in self-injurious behavior. He was also on suicide precautions.

A 1/16/15 treatment plan was reviewed. The patient was admitted to the acute care program within the PIP at that time due to ongoing threats of suicide and cutting behaviors. During his course of treatment in the intermediate care program, he was described as having been abrasive, threatening, and suicidal. He had been self-referred to the program due to a long history of explosive behavior associated with self-injurious behaviors. His history included having been emotionally, physically, and sexually abused during his childhood years. There was a past history of placement in CYA, treatment at DSH, and multiple MHCB admissions. He was described as frequently defensive and oppositional. Very needy behaviors were also reported. His treatment plan was comprehensive in nature. Zyprexa and Haldol, both on an as needed basis, were added to his medications.

The patient told his psychologist on 1/19/15 that he perceived being placed in the acute care unit was in retaliation for him "standing up for myself." He remained on suicide watch. On 1/20/15, he began taking more responsibility for his actions. At that time, he was receiving olanzapine on a regular basis.

On 1/21/15 he told his psychologist that he had requested that his lawyer get him out of the PIP program because it was not for him. He was complaining about the lack of programming in the acute care program. Two days later he told his psychologist that his cutting behavior had been related to his perceived victimization by one of the correctional officers in the PIP.

The patient received recreational therapy on an individual and regular basis while in the acute care program.

Marked improvement was described by this patient during his 1/26/15 session with the psychiatrist. However, on 1/29/15 he stated that he was no longer going to participate in the program related to his perception that the treatment team was being punitive toward him. However, three days later he left his room for treatment sessions, but not to attend yard. He met with his primary clinician for the twenty-second time since admission to the PIP intermediate care program on 2/1/15.

A SRE on 2/4/15 assessed the patient to continue to remain at high acute and chronic risk. He remained on suicide watch. He reported to his primary clinician on 2/11/15 that he was "doing good."

A 2/12/15 treatment plan was reviewed. Significant clinical improvement was noted. New stimuli were added to his schedule, and it was hoped that he would be discharged from the acute care program in one week. On 2/13/15, the patient was noted to have completed session three of the anger management program.

A 2/20/15 IDTT meeting determined that the patient's programming would increase to include two daily hours of dayroom time, recreational treatment, or yard time, a radio in his room, and a variety of individual therapies. He was to be reviewed again by the IDTT in one week. A 2/20/15 SRE indicated that his acute suicide risk was decreased to moderate, but his chronic risk remained high. The patient continued to be seen by a psychiatrist on at least a twice per week basis.

The patient refused to attend his 2/26/15 IDTT meeting because it was held later in the day than he had expected. The treatment team met with him at cell front and informed him that he was being transferred to the intermediate care program after his almost six-week course of treatment in acute care. An SRE that day indicated that his risk assessment was essentially unchanged from the previous SRE.

During the first week of admission to the PIP acute care program, the patient was offered 41 hours of treatment; he refused 29 hours and attended 12 hours. During the second week in acute care, he was offered 20 hours, attended 12 hours, and refused eight hours. During the remaining time in the acute care program from February 5, 2015 to February 25, 2015, he was offered a range of between eight and nine hours and attended between eight and nine hours weekly. The patient did not refuse any treatment hours from 2/5/15 to 2/25/15.

As of 5/6/15, the patient remained in the PIP intermediate care program. During the afternoon of 5/7/15, the patient was interviewed. He reported that he had been transferred to the acute care program from the ICF due to his erratic behavior which included "cutting myself… boarding up… ." The patient indicated that his seven weeks in the acute program were very helpful to him because it "gave me a timeout to stabilize… ." Since he was the first person admitted to the acute care program and the only person in the program at that time, he stated that his course of treatment was somewhat rough because staff was trying to figure out what his program should be. In summary, the patient described the acute program as having been helpful to him and indicated, retrospectively, that participating in group therapies would have been helpful.

The patient also described the intermediate care program as having "stabled out over time… getting to run smoothly… [now have] consistent group facilitators… ." He thought that there were still too many recreational groups and not enough core therapy groups. The patient thought that the Stage program had improved but was still problematic related to various property/privilege issues.

Findings

This patient received appropriate treatment in the acute care program. However, this treatment could have been enhanced by providing access to group therapy in contrast to only individual therapies. Access to group therapy was logistically difficult related to the lack of other acute care patients during his course of hospitalization and issues related to the precipitating factors that led to his transfer from ICF to acute care.

**Patient B**

This 35-year-old transgender female (male to female) patient had a chronic history of maladaptive behavior associated with depression, suicide attempts and self-injurious behaviors. She had more than 30 admissions to OHUs, MHCBs, and DSH. She was transferred from the ICF on 4/22/15 to the acute care program due to self-injurious behaviors (banging her head repeatedly with the intent to harm herself), where she continued to receive treatment. This patient was placed on one-to-one observation. She had been receiving treatment in the ICF since 10/1/14. Her diagnoses included Gender Identity Disorder, Borderline Personality Disorder, and Antisocial Personality Disorder.

The most recent treatment plan, which was dated 4/29/15, listed her problems to include resistance to treatment, low participation in groups, hygiene problems, and self-injurious behaviors. A 4/29/15 psychiatrist's progress note indicated her diagnoses now included Major Depressive Disorder with psychotic features (resolved).

The patient continued to receive psychotropic medication (i.e., Haldol if she refuses Clozaril) on an involuntary basis. The patient was on a PC 2602 order for at least one year.

During the afternoon of 5/7/15, the patient was interviewed. She described being transferred from ICF to the acute care program related to self-injurious behaviors. She thought it was very likely that she would be transferred back to ICF in about one week. Her stay in acute care was described as having been helpful. She also thought that the intermediate care program was helpful from the perspective of providing useful structure to her, although she wanted to return to East Block due to ICF property issues. Specifically, she complained that she did not have access to a television, radio, or hot pot, it was difficult to talk to her neighbors, and the ICF canteen was limited.

The major difference between the acute care program and ICF was the privileges and the lack of access to group therapies in the acute program. The patient described receiving individual therapy twice daily as well as daily recreational therapy. She was not going to yard since it interfered with the time that she usually made phone contact with her family.

Findings

This patient received appropriate care within the acute care program.

356

**Patient C**

This patient was transferred from the MHCB to the acute care program on 4/3/15. He was interviewed briefly during the afternoon of 5/7/15. The patient stated that he did not want any kind of mental health treatment and did not have a history of mental health treatment prior to his MHCB admission approximately 12 weeks prior. He stated that he attempted to kill himself by cutting his neck after waking up one day and realizing he had been in prison for 25 years. He recalled having told himself years ago that he would not be in prison for more than 25 years. The patient stated that he had little memory of the suicide attempt. He was unwilling to talk further about this issue.

The patient's healthcare record was reviewed. A 2/24/15 treatment plan described the 60-year-old condemned male as having previously been discovered unconscious in his cell on East Block with a neck laceration. He was transported to the TTA and subsequently to Marin General Hospital, where he was assessed and treated for his wounds with sutures. There was no prior history of mental health treatment within CDCR. His motivations and/or intentions related to the self-inflicted wound were unknown at that time and he declined to speak with either nursing or mental health staff since his admission. He was placed on one-to-one observation for suicide precautions.

A 4/1/15 clinical summary and case formulation note indicated that the patient was admitted to the PIP acute care unit following a lengthy MHCB admission; the treatment team was unable to fully assess his risk for harm as he continued to state that he was unable to recall how or why he began cutting himself. He reportedly had taken some amphetamines prior to his MHCB admission that may have contributed to his cutting behavior.

Subsequent weekly treatment plans provided a similar history until 5/5/15. The 5/5/15 treatment plan included the following:

"Patient has been psychiatrically stable since admission. Patient has not indicated any plans or ideas to hurt himself. Patient reports that he looks forward to completing art projects, talking to his adult children, new information/updates on his criminal case, and a possible visit from his adult daughter. Prior to this IDTT, patient reported that he told himself (25 years ago) that if he was still in prison, he would end his life. Since then (via appointments with providers) patient reports he is not thinking of hurting himself nor does he have plans to do so. Patient has responded well to mental health and recreational therapy. Patient meets with providers for all appointments."

A 4/21/15 psychiatry progress note indicated that the current working diagnosis was Amphetamine-Induced Psychotic Disorder (resolved) and Amphetamine Abuse. A 4/23/15 progress note indicated that during the first few days of his MHCB admission, the patient was observed to have some visual hallucinations.

A 4/27/15 psychology progress note indicated that this patient did not know how amphetamines got into his system. The psychiatrist reported the next day that the reason for his continued stay

in the acute PIP was to allow more time for stabilization.  The patient refused a trial of antidepressant medications on 5/2/15.

A 5/4/15 note indicated that a urine toxicology screen while the patient was in the MHCB had a positive result for amphetamines.  On 5/5/15, his property was increased via approval by the IDTT.  He continued to refuse group therapies.

Findings

This patient was receiving appropriate mental health care.  However, the care was very limited due to the patient's refusal to participate in a more intensive program.  The patient's treatment was equivalent to an extended MHCB admission, although he had somewhat more activities available to him than an MHCB environment typically provided.

**Patient D**

This 45-year-old man was transferred from the PIP ICF to the PIP acute care unit on 4/1/15 after seriously cutting his left wrist, which resulted in the loss of one liter of blood.  His diagnoses included Major Depressive Disorder, recurrent and Antisocial Personality Disorder.  He was serving a death sentence for killing his cellmate.  While in the ICF he became increasingly frustrated due to the lack of access to the policies and procedures of the SQ PIP, and he began refusing to meet with his psychiatrist.  A history of a near fatal suicide attempt in 2013 was described.

During his course of treatment within the acute care unit, the patient agreed to take psychotropic medications; he had refused them while in ICF.  The patient was seen on a frequent basis by his psychiatrist and psychologist, as well as by other acute care mental health clinicians.
The most recent treatment plan, which was dated 4/28/15, indicated that the patient had been approved for group therapies and transfer back to ICF.

During the morning of 5/8/15, the patient was interviewed.  He reported that he had been transferred to the acute care program due to cutting his wrist in a serious suicide attempt, which was a combination of many different factors including his 29 years of incarceration.  He described the acute care program as differing from ICF in that no group therapies were offered, a smock was required during hospitalization, and lights were kept on 24 hours per day/7 days per week, although 50 percent of them were turned off during bedtime.  However, acute care staff indicated that smocks were only required when clinically indicated.

The patient reported receiving daily clinical contacts, recreational therapy, and access to an outdoor recreational enclosure on a daily basis for unstructured yard.

The patient described many good things about the ICF program, especially for people with serious mental illnesses who had significant functional impairments.  However, he was much less enthusiastic about the program for patients whose problems were described as being related to chronic injurious behaviors.  His complaints centered on his perception that patients had very

358

little input into their treatment and generally did not understand their treatment plans. He also complained about the incentive program, but acknowledged some improvements.

Findings

This patient received appropriate mental health treatment.

**Patient E**

This patient was selected for review as an example of intermediate care in the PIP. The patient was admitted to the PIP on 12/2/14. He had previously been identified during the unmet needs assessment for the condemned, but was redirected to DSH acute care. When discharged from that program, he was discharged to the EOP and was returned to the Adjustment Center. The discharge diagnoses from DSH were Adjustment Disorder Unspecified and Antisocial Personality Disorder. The patient was subsequently admitted to the SQ MHCB on 11/10/14 for suicidal ideation, possible homicidal ideation, and "highly bothersome" auditory hallucinations. His admitting diagnosis was Psychotic Disorder NOS. The MHCB treatment team decided that a referral to SQ PIP intermediate care was indicated; the patient was accepted and admitted.

According to the initial psychiatric evaluation dated 12/1/14, the patient had a history of multiple MHCB admissions, particularly since his admission to the Adjustment Center. He had an extensive history of substance use, but CDCR toxicology screens had all been negative. His criminal history was quite extensive as was his institutional disciplinary history, with the Adjustment Center placement precipitated by an incident of sexual misbehavior (IEX). The patient was prescribed aripiprazole, Geodon, diphenhydramine, and benztropine. All evaluations were completed timely for this patient. SREs were completed regularly as part of the treatment planning process; these assessments typically determined that the patient had high chronic and varying degrees of acute suicide risk.

The patient was seen timely for his initial and ongoing IDTT meetings. The 72-hour treatment plan dated 12/1/14 focused on the patient's continued assessment. The 10-day treatment plan dated 12/9/14 indicated diagnoses of Psychotic Disorder NOS, Adjustment Disorder with mixed disturbance of emotions and conduct, Borderline Personality Disorder, and Antisocial Personality Disorder. This treatment plan was basic and not well operationalized. It also indicated that the patient had progressed from DPS to Stage 1. The next treatment plan dated 1/15/15 indicated that the patient had progressed to Stage 2 due to his continued engagement in treatment and stabilization. The diagnoses were maintained and the treatment plan was modified as the patient progressed in treatment. However, the treatment objectives required greater operationalization and interventions were at times confused with treatment goals. The next treatment plan, dated 2/5/15, showed improvements in the interventions, but it still required greater operationalization of objectives. The 4/2/15 treatment team incorporated the new CDCR treatment plan Form 7388, but was not fully completed. Consequently, no short term goals or interventions were identified. This was remedied in the most recent treatment plan dated 5/1/15, where the team quantified short term goals and identified interventions. Progress notes were reflective of the treatment plan and indicated that clinical contacts were focused on treatment targets as identified in the treatment plan.

359

Findings

While some of the treatment plans generated for this patient required improvement, the patient received adequate care. The treatment plans were updated as the patient progressed through treatment and stabilized; the patient's Stage level was addressed at each team meeting.

**Patient F**

This 54-year-old patient was selected for review as an example of PIP intermediate care. He was admitted to the PIP during the second week of its activation. The official date of admission was 10/9/14. The patient was admitted for stabilization of ongoing persecutory paranoid ideation and auditory hallucinations and to improve poor mental health treatment participation.

The patient was diagnosed with Schizophrenia, paranoid type, and Cognitive Disorder NOS. He was prescribed chlorpromazine. He had prior state hospital admissions beginning as a child, when he reported that his auditory hallucinations began. The patient reported spending five years at Camarillo State Hospital and indicated having pleasant memories of that time. He reported receiving electroconvulsive therapy on at least two occasions with positive outcomes. He was classified as DD1. He had a long history of negative symptoms and poor engagement in mental health treatment, although he did not have a known history of suicidal behaviors or ideation. He had strong familial relationships and his wife of 35 years regularly drove from Los Angeles every two months to visit him. The patient had been housed in the Adjustment Center for 15 years prior to his admission to the PIP.

The admission evaluations were all completed timely except for a SRE. The initial psychological assessment was handwritten and somewhat difficult to read. There was no documentation in the eUHR of the initial 72-hour IDTT. There was documentation for the 10-day IDTT and the treatment plan was acceptable; however, it required greater operationalization for some problem areas and increased or more appropriate clinical interventions for identified problem areas. The treatment team saw the patient at least every 30 days.

On 11/13/14, the treatment team noted that the patient generally attended his individual sessions, but did not quantify his participation with treatment overall. Consequently, it was difficult to determine whether the patient had improved or the degree of improvement. The treatment plans continued this lack of objective quantification, but included very detailed information regarding patient progress in other areas. The specificity of treatment objectives was improved by the 1/7/15 treatment plan. In the narrative of the mental status exam section of the next treatment plan dated 2/5/15, changes were documented to the treatment plan that would have been better documented in the plan's intervention section and/or the plan development section. Treatment team members were clearly utilizing interventions that were not reflected in treatment plan documentation.

The psychiatric progress notes for this patient were extremely detailed and informative. At the time of admission, the patient was seen at cell front frequently; however, as the patient progressed in treatment, he was more likely seen out of cell. In fact, the patient was more likely to agree to see his psychiatrist in a confidential setting than his other treatment providers. The

360

patient initially participated in treatment groups, but after approximately four weeks, his group treatment participation significantly decreased. The patient was described by some members of the treatment team as appearing to be much more internally preoccupied than the patient reported. The patient did, however, report to staff that when he felt "hyper," he wanted to remain in his room until the feeling passed. He also explained his lack of group attendance as due to not knowing other patients. While there may have been specific interventions targeted to the patient's change in group treatment participation, the treatment plan was not modified to reflect the decreased engagement and inability for other target areas to be addressed until the patient participated more in group therapy. Behavioral interventions would have been very beneficial as this patient's treatment participation decreased. An individualized behavioral plan was clearly indicated. While this patient was offered a great deal of treatment opportunities, the treatment team did not appear to consider modifying the interventions when the treatment plan was not effective. The patient remained at Stage 1 throughout his admission because he was not able to engage further in treatment due in large part to his mental illness.

Findings

This patient had improved his treatment engagement while in the PIP; however, his treatment participation then declined from when he was first admitted. The treatment plan was not properly modified to address the patient's lack of attendance in treatment given his initial participation level. Behavioral interventions were not discussed as part of the treatment planning process. An individual behavioral plan was indicated for this patient, and progression through the stage system needed to be individualized for this patient as a result of his inability to meet benchmarks due to his mental illness. Based on available documentation, this patient was not adequately treated.

**Patient G**

This 44-year-old intermediate care PIP patient was randomly selected for review of mental health care. He had been on an involuntary medication order since at least 2007. This patient was referred to the PIP to increase direct meaningful engagement with others, learn to assert needs through better verbalization, improve insight, and increase confidence. According to the eUHR, he first experienced psychotic and depressive symptoms as a teenager and had multiple hospitalizations. He also received mental health services while in county jail due to psychotic and severely depressive symptoms, as well as suicidal ideation. He had experienced auditory and tactile hallucinations and had engaged in multiple incidents of self-harm including tying a string around his penis, cutting himself, and hair pulling. He had religious delusions, was described as sexually and internally preoccupied, paranoid, disorganized, and he exhibited psychomotor retardation with poverty of thought. His diagnosis was Schizophrenia, paranoid type with a deferred diagnosis on Axis II. The patient was prescribed ziprasidone.

The patient's initial PIP treatment plan dated 10/9/14 was adequate and indicated that he had been admitted to the PIP at Stage 2. This was because he had been a participant in one of the pre-PIP activation CTC-based programs and had already progressed through the level system. The next treatment plan dated 11/5/14 described the patient's current course of treatment as positive with the patient having attended all treatment activities, been cooperative and positively

engaged with all treatment providers, and had responded well to directions. His symptoms were described as stable and he reportedly had good insight. It was unclear from the treatment plan why the patient was maintained in the PIP if he was doing so well. He was advanced to Stage 3, and the treatment goals of increased assertiveness and expression of needs were added to the treatment plan.

On 12/2/14, the treatment team continued to indicate that the patient was stable and had improved on his treatment goals, although he could improve further in assertiveness and initiating conversation with other patients. However, the patient was also noted to have limited English skills, which made him uncomfortable interacting with others. It seemed that the goals required some modification to address the patient's language needs. The next treatment plan, dated 12/29/14, made that accommodation by allowing the patient to bring his English word notes/journal with him to group and yard so that he could better communicate. It was unclear if interpretive services were being used in treatment team meetings. On 1/26/15, the treatment team noted that the increased assertiveness goal had been achieved, yet it was maintained in the treatment plan for an unknown reason. The questionable goal of engaging in discussion with English speaking peers was modified to a goal of seeking understanding of peers about the topic of discussion during group treatment. It was unclear exactly how this goal would be measured as it was defined in a rather vague and abstract manner.

This patient's treatment plan required greater operationalization. His primary problem areas of poor hygiene and withdrawal had shown significant improvement through substantial treatment engagement as evidenced by individual and group treatment attendance and ADLs. The treatment team eventually appropriately modified the treatment plan on 2/23/15 so that the socialization goal focused on increasing English language knowledge and asking peers for help in assistance in understanding group content. This treatment plan was an improvement over past treatment plans. It did appear that the patient required educational services such as an English-as-a-second-language instructor or tutor, which was not discussed as part of the treatment plan. On 3/16/15, the treatment team noted that the patient had been asserting himself more frequently and continuing to advocate for himself until his needs were met. Despite seeming to have met that goal and his hygiene goal, these goals were maintained. The primary focus of treatment appeared to be acquiring English vocabulary and socializing with peers. This was continued in his most recent treatment plan dated 4/13/15.

Progress notes tended to document that the patient was spoken to in a "basic" manner but that no interpretive services were used. This occurred whether the patient was seen in treatment group or individually. The patient's TABE score was listed as less than 4.0, as well as no TABE score, creating some confusion. Group notes documented very limited verbalizations characteristic of someone with limited English proficiency. Staff were clearly aware of the patient's limited proficiency as it was a target of treatment and repeated in the progress notes. Given that, interpretive services should have been provided as part of every interaction. If there was no certified interpreter available, then telephonic interpretive services should have been used. Some group progress notes indicated "full participation," but they rarely provided any detail about that participation to objectively evaluate the degree of participation. Others indicated that the patient could engage in extended verbal communication, although at a basic (elementary) level,

providing examples and significant detail.  The progress notes were consistent with the treatment plan.

Findings

This patient's care was limited by a lack of an assessment of English fluency.  Because of the unique challenges of the condemned population, such assessments are not always possible.  In the absence of such an evaluation, staff should not assume English fluency and provide interpretive services during each therapeutic and other important contacts.  Without those services, it was difficult to determine the adequacy of treatment, despite what appeared to be the patient's progress over time.  It might be that the patient would have made greater progress, more rapid progress, or a combination of both if he could have communicated with staff in his primary language.  In summary, while this patient had improved greatly as a result of his treatment in the PIP, it was likely that treatment would only have been enhanced by the use of necessary interpretive services.

**Patient H**

This 58-year-old PIP patient was selected as an example of intermediate care.  He was admitted to the PIP at the time of activation on 10/1/14.  The patient was referred to the PIP due to dysphoric, anxious, angry moods and to develop adaptive strategies to manage his fear of East Block housing.  He had a history of suicide attempts, mood instability, auditory hallucinations, and delusional thinking.  He had multiple DSH admissions for suicidality and psychotic symptoms.  He had been diagnosed with Delusional Disorder, persecutory type, Polysubstance Abuse in a controlled environment, and Antisocial Personality Disorder with histrionic and narcissistic traits.  He was prescribed Seroquel and Paxil.

The patient's initial treatment plan dated 10/6/14 indicated that he entered the PIP at Stage 2 (he had previously been in one of the CTC inpatient programs prior to activation) and targeted anger management and anxiety, delusions, and paranoid ideation.  Unfortunately, the treatment plan grouped anxiety, delusions, and paranoid ideation into one target area.  Consequently, the treatment plan was somewhat vague.  In the next treatment plan (11/4/14), the patient was determined to have made substantial progress and was elevated to Stage 3.  His goals were retained, particularly as he reported experiencing increased anxiety.  This treatment plan required greater specification on treatment interventions.  On 12/1/14, the treatment team modified his leisure time goal as the patient had improved participation due to assignment to a new cohort group with whom he felt safer.  The patient continued to fear custody staff and experienced high levels of anxiety regarding them.  The treatment plan did not list any behavioral interventions to address that anxiety, despite the effectiveness of these techniques and their usefulness over time.

The patient was seen again on 12/22/14 and a more fully developed treatment plan was implemented by the treatment team.  This treatment plan was updated and contained extensively detailed information about the patient's progress and continued treatment needs, though there needed to be greater specificity in treatment interventions.  Generally, subsequent treatment plans were updated and included modifications as the patient progressed or failed to progress.  There continued to be a need for greater specificity in interventions utilized until the new CDCR

Form 7388 was used.  With use of the new form, the specificity of interventions improved greatly.  Progress notes indicated that treatment was consistent with the treatment plan.

<u>Findings</u>

While there was some need for improvement in the specificity of treatment interventions in the treatment plans, this was improved in the most recent treatment plan.  The treatment plans were updated regularly and patient progress, or lack thereof, was regularly incorporated into the treatment plan.  This patient was adequately treated.

## ACRONYMS and ABBREVIATIONS

| | |
|---|---|
| AD: | Administrative Directives |
| AHA: | Assistant Hospital Administrator |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| ATP: | Acute Treatment Program |
| BUM: | Bed Utilization Management |
| CAT: | Clinical Assessment Team |
| C-file: | Central File |
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CCAT: | Coordinated Clinical Assessment Team |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEO: | Chief Executive Officer |
| CHCF: | California Health Care Facility |
| CIW PIP: | California Institution for Women Psychiatric Inpatient Program |
| CMF: | California Medical Facility |
| CMC: | California Men's Colony |
| CMT: | Clinical Management Team |
| CONREP: | Conditional Release Program |
| COPR: | California Office of Patients' Rights |
| CSH: | Coalinga State Hospital |
| CTF: | Correctional Training Facility |
| DA: | District Attorney |
| DBT: | Dialectical Behavioral Therapy |
| DDPS: | Distributed Data Processing System |
| DGS: | Department of General Services |
| DOM: | Department Operating Manual |

DPS:                    Discretionary Program Status

DSH:                    Department of State Hospitals

EKG:                    Electrocardiogram

EOP:                    Enhanced Outpatient Program

ETU:                    Enhanced Treatment Unit

eUHR:                   Electronic Unit Health Records

FRC:                    Facility Review Committee

HAS:                    Hospital Access System

HCITC:                  High Custody Intermediate Treatment Center

HIPPA:                  Health Insurance Portability and Accountability Act

ICA/PCA:                Intensive Case Analysis/Preventive Case Analysis

ICC:                    Institutional Classification Committee

ICS:                    Incident Command System

IDN:                    Interdisciplinary Note

IDTT:                   Interdisciplinary Treatment Team

IEX:                    Indecent Exposure

IMRC:                   Incident Management Review Committee

IPPA:                   Improvement Practice Performance Appraisal

ITP:                    Intermediate Treatment Program

LLEDS:                  Law Library Electronic Delivery System

LVN:                    Licensed Vocational Nurse

LRH:                    Least Restrictive Housing

MAPP:                   My Activity Participation Plan

MCSP:                   Mule Creek State Prison

MDO:                    Mentally Disordered Offender

MHCB:                   Mental Health Crisis Bed

MIRC:                   Mortality Interdisciplinary Review Committee

MOU:                    Memorandum of Understanding

MRMC:                Medical Risk Management Committee

M&SS:                Materials and Stores Supervisor

MTA:                 Medical Technical Assistant

MTE:                 Milieu, Transition and Evaluation

MVR:                 Medication Variance Reporting

NIMS:                National Incident Management System

OSHA:                Occupational Safety and Health Administration

PaWSS:               Patient Wellness and Recovery Model Support System

PBST:                Positive Behavioral Support Team

PCL-SV:              Hare Psychopathy Checklist Screening Version

PCP:                 Patient Care Plan

PIA:                 Prison Industries Authority

PMU:                 Patient Management Unit

PRC:                 Program Review Committee

PRN:                 Take As Needed

PSU:                 Psychiatric Services Unit

RMC:                 Risk Management Committee

RN:                  Registered Nurse

R&R:                 Receiving and Release

RVR:                 Rules Violation Report

SDI:                 State Disability Insurance

SHO:                 Senior Hearing Officer

SIR:                 Serious Incident Report

SOMS:                Strategic Offender Management System

SPC:                 Suicide Prevention Committee

SRN:                 Senior Registered Nurse

SHU:                 Security Housing Unit

SMTA:                Senior Medical Technical Assistant

SNY:                    Sensitive Needs Yard

SRE:                    Suicide Risk Evaluation

SSI:                    Supplemental Security Income

STEP:                   System to Encourage Progress

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TC:                     Treatment Center

TCMP:                   Transitional Case Management Program

TSC:                    Treatment Support Committee

TSI:                    Therapeutic Strategies and Interventions Training

UCC:                    Unit Classification Committee

UM:                     Utilization Management

VPP:                    Vacaville Psychiatric Program

V-Risk:                 Violence Risk

VRMC:                   Violence Risk Management Committee

WaRMSS:                 Wellness and Recovery Model Support System

WRTT:                   Wellness and Recovery Treatment Team