UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | **ORDER** |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

On May 6, 2016, the Special Master filed his Twenty-Sixth Round Monitoring Report. ECF No. 5439. The report contains five recommendations for orders by this court. Neither party has filed objections to the report or its recommendations.

In the twenty-sixth round of monitoring, the Special Master and his team conducted on-site visits at all thirty-four California Department of Corrections and Rehabilitation (CDCR) prison institutions. ECF No. 5439 at 11.[1] The Twenty-Sixth Round Monitoring Report is a comprehensive report of his findings. As explained in this order, the court is surprised and disappointed by some of the findings and heartened by others. At this juncture, over twenty years after remedial efforts began in this action, the importance of bringing diligence, focus, and constructive action to the tasks that remain necessary to complete remediation and bring an end to

---

[1] In this order, all citations to ECF page numbers are to the page number assigned by the court's Electronic Case Filing (ECF) system and not to specific page numbers within the cited document.

1

federal court oversight cannot be overstated.  The court acknowledges, with an appreciation of the immensity of the remediation project, the enormous efforts of everyone involved – the Special Master and his team, the plaintiffs, and the defendants and all of the state employees who are attending in good faith assiduously to their obligations under the orders of this court.  The court also is acutely aware of the lengthy history of this case, the needs of the plaintiff class for, finally, a complete remedy, and defendants' desire to be relieved of court supervision.

RELEVANT BACKGROUND

As the court explained at a status conference approximately one year ago, this case should be on a path to concluding sooner rather than later, however sooner is defined.  ECF No. 5342 at 3.  It is this court's expectation that, with clearly articulated goals and without unnecessary sidesteps, complete remediation can indeed be achieved in the foreseeable future.  Planning must, however, be accompanied by prompt action.  Repetition of efforts that clearly have failed in the past must be abandoned.  And defendants must take a hard look at where they are housing mentally ill inmates if, as the evidence suggests, there are places and prisons where sufficient staff simply cannot be hired and adequate care cannot be provided.

The road map to the end of federal court oversight is clear.  In 2011, the Special Master identified "seven general goals" for defendants:

> (1) Re-evaluation and updating of CDCR suicide prevention policies and practices;
>
> (2) Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from the Department of Mental Health (DMH)[2];
>
> (3) Review of, and compliance with, all elements of their Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days;
>
> (4) Completion of the construction of mental health treatment space and beds for inmates at varying levels of care;

---

[2] California's Department of Mental Health is now known as the Department of State Hospitals (DSH).

2

>(5) Full implementation of defendants' new mental health staffing plan;
>
>(6) Training of staff for greater collaboration between custody and mental health; and
>
>(7) Refinement and implementation of the Mental Health Tracking System (MHTS.net)[3] to its fullest extent and benefit.

ECF No. 4124 at 85. The Special Master found in 2011 that there had "been progress toward some of these goals." *Id.*

Following extended detours into litigation in 2013, the court issued orders outlining additional remedial obligations regarding adequacy of DSH inpatient programs, ECF No. 4688, access to higher levels of care for California's condemned inmates, ECF No. 4951, policies regarding use of force, disciplinary procedures, and strip searches involving mentally ill inmates, and placement of mentally ill inmates in administrative segregation and segregated housing units. ECF No. 5131. In addition, on March 2, 2015, this court approved a final settlement in *Hecker v. CDCR*, No. 2:05-cv-2441 KJM DAD, a class action brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), which merged some remaining ADA and RA issues into this action and its monitoring process. *See* ECF No. 5439 at 67-75.

Significantly, prior to the 2013 litigation activity, in adopting the Special Master's Twenty-Fourth Round Monitoring Report in 2012, the court "emphasize[d] in particular its complete concurrence with the Special Master's finding that '[a]n important goal of the remedial phase of this case is, . . ., for CDCR itself to assume the mantle of ultimate responsibility for diagnosing of its own problems, i.e. conduct its own 'qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, and *move on to eventual removal from federal court oversight.*" ECF No. 4232 at 4-5 (quoting Twenty-Fourth Round Monitoring Report at 65) (emphasis in order). This finding, blessed by the court, has led to the

---

[3] As the Special Master explained in his Twenty-Third Round Monitoring Report, "A well-functioning MHTS.net is an indispensable [sic] tool for defendants in a number of areas, helping them deliver direct care, assess and manage their own performance, and report on it, with the aid of current and accurate readily available information." ECF No. 4124 at 88.

development of the continuous quality improvement tool (CQIT), which is being used in the administrative segregation EOP hub certification process, and is slated for "trial implementation . . . at ten selected institutions during the upcoming Twenty-Seventh Monitoring Round." ECF No. 5439 at 112-13.  In order to focus on development of CQIT, the Special Master temporarily "suspended" the Twenty-Sixth Monitoring Round, which ultimately began in February 2015.

The state of progress toward the end of federal oversight also is clear in the reports filed by the Special Master.  The last on-site prison tours by the Special Master and his team ended in August 2012, and the results of those tours were reported to the court in the Twenty-Fifth Round Monitoring Report, filed January 18, 2013.  ECF No. 4298.[4]  Therein, the Special Master reported that while defendants had "made significant progress toward achieving their seven general goals, more work remains to be done before all of these goals are met." *Id*. at 50. As the court and the parties know too well, in the three and a half years since that monitoring report was filed, attention was diverted from completion of the remaining goals, with the inevitable consequence of delaying progress toward complete remediation.  That consequence is all too evident in the Twenty-Sixth Round Monitoring Report.  The Report also suggests, however, that the required focus is returning to the remaining remedial tasks.

TWENTY-SIXTH ROUND REPORT

In the Twenty-Sixth Round Monitoring Report, the Special Master has updated the status of six of the general goals identified in 2011, the progress in developing and implementing CQIT, and the program access issues merged in from *Hecker*.  *See* ECF No. 5439 at 22-43 (staffing), 60-67 (custody/mental health relations), 67-75 (program access), 75-83 (construction), 83-96 (access to higher levels of care), 96-104 (administrative segregation EOP), 104-128 (MHTS.net and CQIT).  The program for access to higher levels of care for condemned inmates at San Quentin was completed in December 2014.  ECF No. 5439 at 271.  The other general goal, CDCR's suicide prevention policies and practices, is the subject of a separate report, the latest of

---

[4] Following a court order directing him to review defendants' objections and motion to strike or modify portions of the report, on March 19, 2013, the Special Master filed corrections to that report.  ECF No. 4420.

which was filed January 13, 2016, ECF Nos. 5395, 5396, and adopted in full by this court on April 5, 2016, ECF No. 5429.  The status of inpatient programs is the subject of separate monitoring reports filed by the Special Master, most recently on May 25, 2016.  ECF Nos. 4380, 5156, 5448.  In addition, the Special Master continues to report to the court on completed suicides in the CDCR inmate population.  *See, e.g.,* ECF Nos. 5399 (suicides completed in 2013), 5428 (suicides completed in 2014).  The Special Master also reports, in the most recent Monitoring Report, that defendants have "recently implemented a number of new initiatives" in the areas covered by the court's April 2014 order, ECF No. 5131, and that he will "monitor the implementation of these policies and any culture changes resulting therefrom" in his Twenty-Seventh Round of monitoring.  ECF No. 5439 at 66-67.

The recommendations in the Twenty-Sixth Round Monitoring Report are focused on three key areas:  adequate mental health staffing; necessary collaboration between custody and mental health staff; and extension of the continuous quality improvement tool (CQIT).

### ADEQUATE STAFFING

With respect to staffing, the Special Master recommends that (1) defendants be required to provide him with monthly updates on the implementation of their staffing plan and that they be required to meet with the Special Master monthly "to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health can be more readily attracted and retained, all to resolve the problem of mental health staffing in CDCR prisons in a thorough and lasting way;" (2) that he be ordered to file a stand-alone report on the status of mental health staffing and defendants' implementation of their plan within 120 days; and (3) that defendants be directed to complete and implement the new peer review process.  ECF No. 5439 at 141-42.

In making the foregoing recommendations, the Special Master demonstrates more patience than this court would accept absent his long experience and strenuous efforts in this remedial process.  The Twenty-Sixth Round Monitoring Report describes in great detail the "long and tortured" history of "CDCR's struggle to implement a viable staffing plan for the

1  provision of adequate mental health treatment" and the absence of improvement in the "[c]hronic
2  understaffing of CDCR mental health positions" and the "stagnat[ion]" of "CDCR's
3  implementation of its most recent mental health staffing plan." ECF No. 5439 at 16, 22-43. The
4  Special Master reports that "[v]acancies in the key mental health clinical disciplines of psychiatry
5  and psychology remained problematic and were nearly unchanged from rates in **1998**. . . ." *Id*. at
6  16 (emphasis added).

7  Several factors appear to be at work in defendants' failed efforts to hire and retain
8  sufficient numbers of mental health staff, including but not limited to the geographic locations in
9  which defendants continue to house significant numbers of seriously mentally ill inmates. The
10 ongoing rise in the numbers of mentally ill inmates in California's prisons, *see* ECF No. 5439 at
11 134-135, compounds defendants' difficulties, as staffing levels are based on inmate/staff ratios,
12 *see*, *e.g*., ECF No. 5269 at 6. Defendants have reported to the court that "its pay for psychiatrists
13 is competitive with other private and public employers." ECF No. 5269 at 9. As of February
14 2015, they planned to nonetheless pursue "differential pay" for psychiatrists working in "hard-to-
15 recruit" institutions. *Id*. It is not at all clear to this court that additional pay will solve this deep-
16 seated problem and the court can no longer sanction the continued pursuit of remedial strategies
17 that have not worked in the past. While the court will adopt the Special Master's
18 recommendation, it will give defendants four more months to work with him to devise a
19 meaningful strategy that will, finally, mean mentally ill inmates are located in institutions that are
20 adequately staffed with mental health staff competent to meet their treatment needs. To be clear:
21 the court expects more than a mere plan. The court requires that the report from the Special
22 Master demonstrate clear action in accordance with planned steps and a measurable timeline by
23 which those steps will be completed.

24                    COLLABORATION:  CUSTODY AND MENTAL HEALTH

25  Constitutionally adequate mental health care requires not only sufficient staff. For
26 reasons recognized in the foundational orders in this case, and that have become obvious over the
27 last twenty years, it also requires a collaborative culture between custody and mental health staff
28 in each prison institution that houses mentally ill inmates. The court has recognized the

"inevitable tensions created by the distinct needs of custody supervision and the distinct needs for mental health care," and the consequences that arise from "the fact that California incarcerates tens of thousands of seriously mentally [ill] individuals in its state prison system." ECF No. 5131 at 3 & n.5.  It appears there may be some prison institutions in California that simply are unable to achieve the necessary collaboration.  For example, the Special Master reports that in spite of focused efforts that began at Salinas Valley State Prison (SVSP) in 2009, the cultural concerns at that institution were "so concerning" to the Special Master's monitor in February 2015 "as to necessitate a second visit."  ECF No. 5439 at 61, 65-66.  Intervening monitoring reports had shown ongoing serious problems in the treatment of mentally ill inmates by custody staff at SVSP in spite of training efforts.  *Id*. at 62.  Collaboration training was conducted at seven institutions following submission of an amended plan in October 2009.  Despite this training, the Special Master's 26th Report identifies ongoing culture clashes at five of the seven institutions, including SVSP.  *Id*. at 61, 63, 65.  That seven years have been expended on unsuccessful efforts to train custody staff in the proper treatment of mentally ill inmates cannot be countenanced and should be of concern to every defendant in this action.  The court also notes the report from the Office of the Inspector General (OIG) concerning High Desert State Prison, *id*. at 63 & n.21, which raises grave questions about the viability of mental health programming at that institution.

        The festering problems at some institutions do not obscure the court's ability to see that a number of institutions are successfully creating a collaborative culture between custody and mental health staff.  A successful culture must be established at all institutions where defendants house seriously mentally ill inmates.  To this end, the Special Master recommends an order directing that he and defendants "meet and confer to discuss, consider, and develop strategies and initiatives to improve collaboration between custody and mental health . . . with an eye toward long-term and sustainable culture change."  *Id*. at 142.  The court will adopt that recommendation with the expectation that six months from the date of this order is more than enough time to present a plan that identifies an effective comprehensive strategy recognizing the problems noted above, and to begin its implementation.

## CQIT

Finally, the Special Master's recommendation concerning the plan and agreement for a trial implementation of CQIT at ten CDCR institutions during the next monitoring round will be adopted. As defendants recognize, the successful implementation of CQIT is a key marker of success on the road to ultimate termination of this court's oversight. The court anticipates a favorable report on the trial implementation from the Special Master in his Twenty-Seventh Round Monitoring Report.

## ADDITIONAL CONCERNS

Two additional matters bear noting. The Special Master reported that the EOP administrative segregation hub at Richard J. Donovan Correctional Facility had significantly exceeded its court-ordered capacity from August through December 2015. *Id*. at 139. Given the apparent violation of court orders, the court has checked with the Special Master to determine whether this non-compliance was ongoing. He has reported to the court that defendants have come into compliance with the court's orders and, accordingly, the court will take no further action on this matter at this time.

In addition, while the time lost to implementation of adequate policies and practices in the rules violation process for class members cannot be made up, it must be offset now by focused action, without further delay. The court fully expects RVR training will be completed and taking root by the time of the Twenty-Seventh Round Monitoring Report.

## CONCLUSION

Accordingly, good cause appearing, IT IS HEREBY ORDERED that:

1. Defendants shall provide the Special Master with monthly updates on their implementation of their staffing plan, which implementation shall be tracked and monitored by the Special Master. Defendants and the Special Master shall meet and confer monthly to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained, all to resolve the continuing problem of mental health

/////

staffing in CDCR prisons in a thorough and lasting way.  The Special Master shall include plaintiffs in these meetings as appropriate.

2. Within one hundred twenty days (120) from the date of this order the Special Master shall issue a stand-alone report on the status of mental health staffing and implementation of defendants' staffing plan.

3. The CDCR defendants shall complete their new peer review process and implement it so that the mental health clinical disciplines of psychiatry, psychology, and social work at all 34 CDCR institutions undergo peer review under the new process on a regular basis.

4. Defendants and the Special Master shall meet and confer to discuss, consider, and develop strategies and initiatives to improve collaboration between custody and mental health at all institutions where mentally ill inmates are housed.  The Special Master shall include plaintiffs in these meetings as appropriate.  Strategies may include additional or modified trainings, enhanced communication, and leadership development.  The goal of any training or change in methods of communication across disciplines should be developed with an eye toward long-term and sustainable cultural change.  The court expects identification of a comprehensive strategy and the start of its implementation at the institutions where it is required within six months from the date of this order.

5. The court adopts the plan and agreement described in the Twenty-Sixth Round Monitoring Report, ECF No. 5439, for CDCR to conduct its trial implementation of CQIT at ten CDCR institutions, in the manner described in the Twenty-Sixth Round Monitoring Report, during the Special Master's Twenty-Seventh Monitoring Round.

DATED: August 7, 2016.

_____
UNITED STATES DISTRICT JUDGE