DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone: (415) 433-6830

RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, JR., et al., <br><br> Defendants. | Case No. 2:90-CV-00520-KJM-DB <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' SEPTEMBER 28, 2016 UPDATE TO DEPARTMENT OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF** <br><br> Judge: Hon. Kimberly J. Mueller <br><br> **HEARING** <br> DATE: November 10, 2016 <br> TIME: 2:30 PM <br> LOCATION: Courtroom 3 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT.......................................................................................................................... 2

I.  DEFENDANTS HAVE FAILED TO CREATE A REMEDY FOR THE ONGOING VIOLATIONS OF CLASS MEMBERS' RIGHTS TO TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION. ......................... 2

   A. Defendants' Inpatient Waitlists Are Massive and Growing............................ 3

   B. Defendants' Most Recent Attempt at a Durable Remedy Is Insufficient......................................................................................................... 5

   C. Defendants' Vague Excuses for the Current Iteration of the Inpatient Bed Crisis Fall Flat. ......................................................................................... 7

II. DEFENDANTS MUST BE ORDERED TO IMPLEMENT SPECIFIC AND TRANSPARENT REMEDIES TO THE WAITLIST AND LOW-CUSTODY INPATIENT BED MISMANAGEMENT CRISES............................... 9

   A. Defendants Must Promptly Move Dorm-Cleared and Low-Security Class Members into Low-Custody Inpatient Psychiatric Programs.............. 10

   B. Defendants Must Transfer ICF Patients to Unused Less Restrictive Beds at a Specific and Transparent Rate. ...................................................... 11

   C. Defendants Must Implement a Transparent Process for Ensuring Regular Review and Transfer of Patients to Less Restrictive Programs........................................................................................................ 12

   D. Defendants Must Eliminate the ICF Waitlist by March 2017....................... 12

   E. Defendants Must Eliminate the Waitlist for Acute Psychiatric Inpatient Care By March 2017. ...................................................................... 12

   F. Defendants Must Be Ordered to Study the Mushrooming Mental Health Population. .......................................................................................... 13

[3050284-12]

i                                                                                         2:90-CV-00520-KJM-DB

PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF

# INTRODUCTION

Defendants' September 28, 2016 report to the Court on Department of State Hospitals' ("DSH") inpatient mental health bed utilization and waitlist management issues, Docket No. 5496 ("September 28 Update"), understates the magnitude of the present crisis in long waitlists for inpatient hospital care and in under-use of critical low-custody inpatient psychiatric hospitalization beds at Coalinga and Atascadero State Hospitals. As the Court noted in its October 6, 2016 Order ("October 6 Order"), more than a year after the last status conference on this issue and after focused efforts by the parties and the Special Master to address this persistent problem, "the waitlist is not eliminated and instead reflects a resurgence, beds have remained empty while inmates waited for placement, and the number of inmates waiting for beds now exceeds by over 100 the number of available beds." October 6, 2016 Order, Dkt. 5498 at 2.

The effort to ensure that patients are moved to appropriate inpatient beds in a timely manner has consumed the time and resources of the Court, the Special Master, and the parties for decades. The Special Master's recent inpatient report covers this history vividly and in great detail. *See* May 25, 2016 Special Master's Monitoring Report on the Mental Health Inpatient Care Programs ("Special Master's 2016 Inpatient Report"), Dkt. 5448 at 22-40 of 371. Among these extensive efforts are the 14 prior orders this Court has issued, specifically aimed at filling the dedicated beds at Atascadero State Hospital ("ASH") for CDCR prisoners, all of which have failed. *See id.* at 36-39 of 371.

Defendants' recent filings, including the September 28 Update, claim progress in remedying this long-standing problem based on the May 1, 2016 implementation of the Memorandum of Understanding ("MOU"), a new agreement between CDCR and DSH centered around identifying the least restrictive custody levels for patients in the inpatient programs to facilitate patient movement out of high-custody and to lower-custody inpatient programs. But as discussed further below, Defendants' own reported numbers make clear this process, costing millions of dollars and developed over multiple months in late 2015 and early 2016 with substantial input from the Special Master and Plaintiffs, has not

[3050284-12]

1    2:90-CV-00520-KJM-DB
PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF

succeeded in ensuring that low-custody inpatient beds are filled and inpatient psychiatric hospital waitlists eliminated. As usual, the low-custody occupancies have plummeted and the waitlists skyrocketed the minute the Special Master's attention turned elsewhere.

In the face of this failure, Defendants offer vague excuses and try to pass off recent months' dramatic backsliding as some sort of blip. Indeed, Defendants seem more concerned with raising their "concerns regarding the overall progress of the workgroup meetings" with the Court than with addressing the current evidence of systemic denials of timely access to adequate inpatient hospitalization, which grow more urgent by the day. *See* September 28 Update at 3 of 4. Defendants' lack of commitment to creating a durable remedy for the decades-old crisis in access to inpatient care is self-evident.

The time for patience has long since passed. The Court must take steps immediately to enforce existing orders and issue additional affirmative relief targeting the ongoing constitutional violations. Specifically, Plaintiffs request that this Court enter orders requiring Defendants to, at the least: (1) promptly transfer low-security and dorm-cleared class members into low-custody intermediate care ("ICF") psychiatric programs; (2) transfer ICF patients to unused less restrictive beds at a specific and transparent rate until those beds are filled, and then keep them filled; (3) implement a transparent process for ensuring regular review and transfer of patients to less restrictive programs; (4) eliminate the ICF waitlist by March 1, 2017; (5) eliminate the acute psychiatric program waitlist by March 1, 2017; and (6) commission a study of Defendant's population trends, including an assessment of why the mental health population is surging while the overall prison population drops, as well as identification of strategies to address the problem.

## ARGUMENT

**I. DEFENDANTS HAVE FAILED TO CREATE A REMEDY FOR THE ONGOING VIOLATIONS OF CLASS MEMBERS' RIGHTS TO TIMELY ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION.**

Defendants' recent filings and reported data make clear that the inpatient

psychiatric hospitalization crisis is spiraling out of control, and that Defendants' efforts to date have once again fallen short.

### A.    Defendants' Inpatient Waitlists Are Massive and Growing.

As of September 26, 2016, the total number of class members waiting for crucially needed inpatient psychiatric hospitalization was a massive 187.  *See* September 28 Update at 4 of 4.  Approximately half, or 91, of the 187 class members in dire need of inpatient care languishing on the waitlist had been waiting beyond Program Guide-mandated transfer timelines, as Defendants reported orally to the parties and the Special Master on September 27, 2016, although that fact was omitted from Defendants' September 28 Update.  *See* Declaration of Krista Stone-Manista ("Stone-Manista Decl."), filed herewith, ¶ 4.

Ninety-two of the 187 *Coleman* class members on the waitlist for inpatient care are awaiting admission to an ICF program.  *See* September 28 Update at 4.  Of those, 77 class members are slated for admission to high-custody ICF programs.  *See id*.  Indeed, the number of class members on the waitlist who were "endorsed and pending" transfer to high-custody ICF inpatient care placements—just a subset of the waitlist—has also grown 10-fold, from 8 in June 2016 to a high of 80 waiting patients at one point in September 2016, a month that had on average 74 critically ill class members awaiting transfer. *Compare* Defs.' July 15, 2016 Monthly Census, Waitlists and Trends reports for Inpatient Mental Health Care ("June Inpatient Report"), Dkt. 5468 at 9 of 15, *with* Defs.' October 17, 2016 Monthly Census, Waitlists and Trends Reports for Inpatient Mental Health Care ("October Inpatient Report"), Dkt. 5500 at 9 of 15.  An additional 15 class members were waiting for low-custody beds, plus an unreported number of class members awaiting transfer from a high-custody ICF program to low-custody ICF program as a result of Defendants' determination that a less restrictive setting was appropriate.  *See* September 28 Update at 4 of 4 & starred footnote.

The other 95 of the 187 critically ill class members on Defendants' waitlist were awaiting admission to an acute inpatient psychiatric program ("APP")—the highest level

[3050284-12]

3                                                     2:90-CV-00520-KJM-DB
PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF

of care for the very sickest *Coleman* class members. *See* September 28 Update at 4 of 4. The APP waitlist has grown dramatically over the course of the last few months, when the number of class members actually endorsed and pending transfer to acute care placements—a subset of the total number of class members on the waitlist—has grown from 13 as of the June 2016 monthly data to a high of 86 at one point in September 2016, a month that had on average 72 languishing on the acute waitlist. *Compare* June Inpatient Report at 9 of 15, *with* October Inpatient Report at 9 of 15. The massive APP bed shortage has not only persisted, but mushroomed, even though Defendants recently "swung" two inpatient units at DSH-Stockton (for a total of 60 beds) from providing high custody ICF care to providing acute care. *Compare* June Patient Report at 6 of 15, *with* Defs.' August 15, 2016 Monthly Census, Waitlists and Trends reports for Inpatient Mental Health Care, Dkt. 5481 at 6 of 15.

Of course, the inpatient waitlists are just the tip of the iceberg, as the shortages at the highest levels of care reverberate throughout the system. *See* Special Master's 2016 Inpatient Report at 6 (describing how Defendants' underutilization of available low-custody ICF beds like those at ASH causes failures to provide timely access to adequate care throughout Defendants' mental health system). Data provided by Defendants as of October 1, 2016 aptly demonstrates this point. Almost a hundred class members currently await admission to mental health crisis beds ("MHCBs"); the vast majority have been waiting longer than Program Guide timelines, and many who are referred for this emergency care are never even admitted. *See* Stone-Manista Decl. ¶¶ 6-11. And the problem has gotten worse—not better—since the MOU was implemented earlier this year. *See id.* ¶¶ 9-11.

The current waitlists for both acute and intermediate inpatient psychiatric care, as well as their dramatic growth in recent months, starkly illustrate the fact that Defendants have yet again failed to create a durable remedy to address the ongoing denial of timely access to constitutionally adequate care for *Coleman* class members, as discussed further below.

[3050284-12]

4   2:90-CV-00520-KJM-DB

PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF

**B.      Defendants' Most Recent Attempt at a Durable Remedy Is Insufficient.**

A key reason for the growing waitlists is obvious: Defendants' ongoing failure to ensure appropriate utilization of lower custody ICF hospitalization programs at ASH and Coalinga State Hospital ("CSH"). Despite the dangerous waiting lists outlined above, the process of moving appropriate class members into lower custody ICF beds has broken down, leaving 65 vacant beds in low custody ICF programs at DSH-Vacaville ("VPP"), ASH, and CSH as of September 26, 2016.[1]  *See* September 28 Update at 4 of 4.

For additional critical context, Defendants' monthly filing on waiting lists and trends includes charts that track census numbers in the different inpatient programs on a monthly basis since January 2016.  *See, e.g.*, October Inpatient Report at 11-15 of 15. Those charts, prepared by Defendants, contradict Defendants' assertion to the Court that "census numbers, when viewed in isolation, do not provide a complete picture of the progress being made on the ground." *See* September 28 Update at 3 of 4. In fact, the data in these historical charts shows that far from making progress, Defendants have been standing by as the situation has deteriorated *every single month* since the MOU was deemed fully implemented on May 1, 2016 and the Special Master's focused attention necessarily turned to other pressing matters in this case.

- Between May 2016 and September 26, 2016, the number of beds occupied at ASH fell by 42 beds, from 248 beds to 206 beds.[2]  *Compare* October Inpatient Report at 12 of 15, *with* September 28 Update at 4 of 4. The rate of

---

[1] Defendants' census data from the October Inpatient Report and that reported in the September 28 Update both purport to provide information as of September 26, 2016, but report slightly different numbers, with the October Inpatient Report showing 63 beds instead of 65. It is unclear why this discrepancy exists given that Defendants provided both sets of data as of the same point in time.

[2] Again, the September 28 Update data differs slightly from the October Inpatient Report, although both purport to report a snapshot as of September 26, 2016. The October Inpatient Report indicates ASH has 208 beds occupied rather than 206, as indicated in the September 28 Update.

      occupancy at ASH has declined every month since May 2016 to present. *See* October Inpatient Report at 12 of 15.

- Between May 2016 and September 26, 2016, the number of beds occupied at CSH by CDCR prisoners fell by 10, from 47 to 37 beds. *Compare* October Inpatient Report at 12 of 15, *with* September 28 Update at 4 of 4. Again, the rate of occupancy has dropped or remained static every month since the MOU was implemented in May of this year. *See* October Inpatient Report at 12 of 15.

At least as distressing is the fact that large numbers of low-custody class members remain stuck in high-custody ICF programs despite the growing vacancies in the low-custody ICF programs at ASH, CSH, and the VPP dorms discussed above. As of September 26, 2016, Defendants reported 60 Level I or II class members occupying inpatient psychiatric beds in the high custody ICF program at DSH-Stockton. *See* October Inpatient Report at 6 of 15. Twenty Level I or II class members are locked in high-custody units within the VPP ICF program, and another 25 at DSH-Salinas Valley ("SVPP"). *Id.* All of these people are low-custody class members who are generally eligible for low-security dorm housing in CDCR. Indeed, almost half of all patients in the high-custody ICF programs are housed above their Least Restrictive Housing ("LRH") level (308 class members out of 660). *Id.* These class members should not be held in the restrictive high-custody ICF programs at DSH-Stockton, VPP and SVPP when lower-custody inpatient psychiatric beds are sitting vacant and huge numbers of class members languish on the waitlists who desperately need inpatient hospitalization.

Similarly, another 38 class members in high-custody ICF programs did not even have custody scores as of the October Inpatient Report, and thus presumably also did not have a LRH determination such they could be moved to a low-custody program if appropriate. *See* October Inpatient Report at 6 of 15.

Defendants' continuing underutilization of existing vacancies in low-custody inpatient psychiatric treatment programs is even more inexcusable when viewed in light of

[3050284-12]

6      2:90-CV-00520-KJM-DB

PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF

the current severe overcrowding crisis in many of Defendants' key mental health programs. There are simply too many patients in need of mental health care for Defendants' system to manage effectively, much less treat, and the number of prisoners with serious mental illness only continues to grow. *See* 26th Monitoring Report, Dkt. 5439 at 3 (noting that "since the time when defendants' motion to terminate *Coleman* federal court oversight was denied on April 5, 2013, CDCR's mental health caseload population has surged while its total in custody population has fallen"). The *Coleman* class constitutes, as of September 26, 2016, 38,151 seriously mentally prisoners, or 33.5% of the total prison population. *See* Stone-Manista Decl. ¶ 3. The sheer number of class members, already massive and growing by the day, is simply overwhelming the system. Plaintiffs are attempting to engage Defendants on numerous fronts in efforts to explore and remedy the causes of this systemic overcrowding crisis but have, to date, failed to convince Defendants to face the problem head on. The current inpatient crisis is part and parcel of the explosion of the class size; the former cannot be fully remedied until the latter is adequately understood and addressed.

### C. Defendants' Vague Excuses for the Current Iteration of the Inpatient Bed Crisis Fall Flat.

These figures all show that the inpatient housing situation is getting exponentially worse, not better. Nonetheless, Defendants make various vague excuses in their recent filings in attempt to avoid clearly warranted Court intervention. Defendants repeatedly blame "a number of" unspecified "unforeseen" issues with the MOU implementation coupled with "peak season" increases in referrals for inpatient care for the massive waitlist and concomitant dramatic drop in class members being treated in the low-custody ICF psychiatric programs at ASH and CSH. *See* September 15, 2016 Defs.' Monthly Census, Waitlists and Trends Reports for Inpatient Mental Health Care ("September Inpatient Report"), Dkt. 5490 at 4 of 15; September 28 Update at 3 of 4; October Inpatient Report at 3 of 15.

Defendants never identify or describe what exactly these "unforeseen" problems

are,[3] but from their description of the "numerous steps" they have purportedly taken to mitigate them, the core issue appears to be entirely foreseeable: Defendants' own failure to devote sufficient staff to conduct the LRH assessments—the lynchpin of the MOU—until over four months after the MOU was purportedly fully implemented. *See* October Inpatient Report at 3 of 15 (reporting Defendants "recently add[ed] staff" and completed 971 LRH determinations over the preceding six weeks); *see also* September Inpatient Report at 4 of 15; September 28 Update at 3 of 4. To claim that determining the LRH for all class members in inpatient settings, including those admitted prior to the MOU's implementation date, is an "unanticipated" consequence of the MOU makes a mockery of the entire process and, in particular, the Special Master's herculean efforts in the months leading up to May 2016.

Furthermore, the very fact that Defendants were able to conduct so many LRH reviews in September and early October, after the waitlist had skyrocketed and low-custody bed utilization had plummeted, shows they could have done so (and should have expected to do so) even prior to the official rollout of the MOU on May 1. That Defendants did not until they were under threat of enforcement orders and Court intervention demonstrates their fundamental lack of commitment to ensuring a durable remedy of this urgent constitutional violation. Indeed, with the recent completion of so many LRH determinations in such a short period of time, DSH is now subject to intense pressure under the MOU to schedule and conduct almost a thousand "clinical reviews" and then actually to "transfer patients who are deemed clinically ready for movement." *See* October Inpatient Report at 4 of 15. Defendants' various filings make no mention of hiring additional CDCR and/or DSH staff to perform this critical work, even though those tasks are, like the LRH determinations, entirely foreseeable: They form the core process of

---

[3] While Defendants vaguely claim that "modifications to the Inpatient MOU may be necessary," they have never provided any detail or made any proposal to do so, including at the September 2016 workgroup meetings, despite their reported intent to the Court. *See* September Inpatient Report at 4 of 15.

[3050284-12]

8   2:90-CV-00520-KJM-DB
PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF

the MOU.

Finally, Defendants' own characterization of the increased rate of referrals in recent months as part of an apparent "peak season" cycle shows that issue, too, is well known to Defendants and could have been planned for and anticipated by hiring additional staff to fully implement the MOU.

Defendants' half-formed excuses for the floundering MOU—the only initiative that staved off Court intervention on this very issue a year ago—cannot disguise what this Court, the Special Master, and the parties already know. Defendants cannot or will not solve this most recent iteration of the inpatient psychiatric care crisis without further court orders requiring them to not only comply with the many prior orders on this issue but also providing for additional targeted relief.

## II. DEFENDANTS MUST BE ORDERED TO IMPLEMENT SPECIFIC AND TRANSPARENT REMEDIES TO THE WAITLIST AND LOW-CUSTODY INPATIENT BED MISMANAGEMENT CRISES.

Defendants' ongoing failure to implement an adequate and durable remedy for the unconstitutional denial of timely access to adequate inpatient care warrants further remedial orders by this Court. "If government fails to fulfill [its constitutional] obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687, n.9 (1978)). While the Court "must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators, it "must not shrink from [the] obligation to enforce the constitutional rights of all 'persons,' including prisoners." *Id.* (citing *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam)). The Court "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.*

Specific and targeted remedial orders are appropriate when supported by the record because "[p]rospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir.

2010). Defendants' backsliding on this critical issue and the enormous risks of serious harm that flow from the delays and denials of access to adequate inpatient care more than warrant additional action. *See id.*; *Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir. 2004) (noting that defendants' "record of abject failure" informs the appropriateness of court-ordered relief where defendants had been unable to "cure the constitutional infirmities plaguing the delivery of health care in the correctional system").

The relief Plaintiffs request, detailed below, echoes many of the targeted remedial measure sought just over a year ago. *See* Dkt. 5335 at 28 ("August 2015 Status Statement"). *Coleman* class members and this Court were patient with Defendants' most recent remedial effort, and indeed invested millions of dollars and hundreds of hours of the Special Master's time in the hopes the MOU would prove a durable remedy. But that effort has stalled out and cannot remedy the ongoing constitutional violations. Additional relief is therefore critically needed to address the serious constitutional violations that persist and endanger the lives, safety, and well-being of the *Coleman* class, and is "narrowly drawn," "extends no further than necessary to correct the violation[s]" of class members Constitutional rights, and "is the least intrusive means necessary to correct" those violations. 18 U.S.C. § 3626(a)(1)(A).

### A. Defendants Must Promptly Move Dorm-Cleared and Low-Security Class Members into Low-Custody Inpatient Psychiatric Programs.

As Plaintiffs noted last August, a long-standing practice by which DSH employees overrode CDCR's custodial decisions hindered placements in low-custody inpatient beds as far back as 2010. *See* August 2015 Status Statement at 29-30. Notwithstanding the gains made through the MOU process, obstacles to transferring dorm-eligible patients to such settings remain. Defendants' most recent update indicates that on average in September 2016, 7 patients were endorsed to low-custody ICF beds and pending transfer. *See* October Inpatient Report at 9 of 15. There is no reason that all of the patients eligible for low-custody housing should not be immediately transferred to available low-custody ICF beds, and Defendants should now be ordered to do so post haste. Defendants should also

1 be ordered to transparently report to the Court within 30 days on the remaining barriers to
2 immediate transfers to low-custody ICF programs of patients who are endorsed to such
3 programs, and to identify how they plan to remedy those barriers without further delay.

4       Defendants must also promptly move low-security class members to low-security
5 inpatient beds.  As discussed above, large numbers of class members with low custody
6 scores remain in high-custody ICF programs—as of the October Inpatient Report, 308 out
7 of a total 660 ICF patients were housed out of their LRH as determined by Defendants.
8 October Inpatient Report at 6 of 15.  Defendants should be ordered to move any low-
9 security prisoners currently housed in high-security ICF programs, or awaiting transfer
10 from acute inpatient psychiatric hospital programs, into low-security ICF programs within
11 30 days.  In addition, 38 ICF patients had no custody score determined, yet were housed as
12 high-custody patients.  *Id.*  Defendants must also be ordered to classify these patients,
13 complete their LRH determinations and other reviews, and transfer these class members if
14 clinically appropriate to low-security programs within 10 days of DSH admission.

15 **B.   Defendants Must Transfer ICF Patients to Unused Less Restrictive Beds at a Specific and Transparent Rate.**
16

17       Plaintiffs renew their request for a specific and transparent process by which
18 Defendants will be required to fill unused low-custody beds.  *See* August 2015 Status
19 Statement at 30.  As in August 2015, Plaintiffs request that the Court enforce its previous
20 orders to fill all 50 CSH beds and all 256 Atascadero State Hospital (ASH) beds
21 designated for *Coleman* class members.  Given the continued unmet need for timely access
22 to inpatient care, Plaintiffs further request that Defendants be ordered to admit patients to
23 unused lower-security ICF beds at ASH and CSH at a rate of not less than 10 per week
24 until all *Coleman*-designated inpatient beds are filled.  Plaintiffs also request that
25 Defendants be ordered to provide a transparent weekly report on the total number of
26 inpatient beds in each DSH and CDCR *Coleman* inpatient mental health program occupied
27 by a *Coleman* class member, and on the total number of inpatients beds in each DSH and
28 CDCR *Coleman* inpatient mental health program not occupied by a *Coleman* class member

1  until such time as the Court deems that Defendants have corrected their misuse of lower-
2  security beds at CSH and ASH.  To assure this remedy is durable, the Court should order
3  that the 10-patients-per-week transfer requirements to ASH and CSH will be reactivated
4  any time the ASH or CSH populations drop below 95% of capacity for a reporting period.

5        **C.    Defendants Must Implement a Transparent Process for Ensuring Regular Review and Transfer of Patients to Less Restrictive Programs.**

7        The MOU provides a process by which patients' eligibility for transfer to less
8  restrictive levels of care will be regularly reviewed.  The current under-utilization of lower
9  custody beds demonstrates a need for more intensive review and oversight of Defendants'
10 process.  Plaintiffs therefore renew their request for a court order mandating a fully
11 transparent review process, specifically that Defendants should be required to: report
12 monthly to the Court on the number of patients reviewed and transferred; transparently
13 report on the waiting time from review to transfer for each patient; and provide a specific
14 rationale for any patients who are not timely transferred.  *See* August 2015 Status
15 Statement at 31.  Specific and enforceable time frames for completing each step of the
16 process must be clearly established, reported, and enforced.

17       **D.    Defendants Must Eliminate the ICF Waitlist by March 2017.**

18       Defendants should be ordered to eliminate the waitlist for intermediate psychiatric
19 hospitalization by March 1, 2017.  If this deadline is not met, Defendants should be
20 ordered to expand ICF capacity at ASH and CSH by 50 beds per facility, subject to the
21 95% fill requirement above, and to reopen all high-security ICF units at SVPP that
22 Defendants closed in 2013, including the 116 ICF beds located in D-5 and D-6.

23       **E.    Defendants Must Eliminate the Waitlist for Acute Psychiatric Inpatient Care By March 2017.**

25       There is a serious shortage of acute psychiatric hospitalization beds.  Defendants'
26 own charts in the October Inpatient Report demonstrate that the growing demand for acute
27 psychiatric hospitalization beds now outstrips the supply and continues to grow.  October
28 Inpatient Report at 14 of 15.  Defendants should be ordered to eliminate the waitlists for

acute psychiatric hospitalization by March 1, 2017, either by expanding capacity or by meaningfully addressing the increasing demand, such as by appropriate utilization management efforts or reducing the population.

### F. Defendants Must Be Ordered to Study the Mushrooming Mental Health Population.

As the Special Master recently has noted, "since the time when defendants' motion to terminate *Coleman* federal court oversight was denied on April 5, 2013, CDCR's mental health caseload population has surged while its total in custody population has fallen." 26th Monitoring Report, Dkt. 5439 at 3. The dramatically increasing demand for acute psychiatric inpatient care, combined with the rapidly increasing ICF waitlist, demonstrate that the sharp increase in the mental health caseload in recent years is preventing timely access to adequate care at the very highest levels of clinical need. Defendants' own bed need forecasts point to continued MHSDS population increases for years to come.

Defendants thus far have resisted Plaintiffs' calls for Defendants voluntarily to commission and facilitate a study on these population trends, including an assessment of the reasons the mental health population is surging while the overall CDCR population drops, as well as identification of strategies to address the problem. But the problem is getting worse, not better, and Defendants have no idea why. While multiple factors likely play a role in the rapidly expanding MHSDS program, Plaintiffs have identified various policies and procedures that discriminate against the *Coleman* class, including the deprivation of credits and the loss of opportunities to earn additional credits. An obvious example is the continued use of segregation to warehouse EOP prisoners "for their own safety" or while "waiting for an available bed." While in segregation, EOP patients do not earn day-for-day credits and are ineligible for milestone credits. These and other practices have the effect of increasing the size of the *Coleman* class, and must be fully understood and analyzed, along with additional unknown contributing factors, if the problem is to be addressed. Without such information to guide smart, targeted reforms, a durable remedy to this case, much less the instant inpatient crisis, cannot exist.

[3050284-12]

13    2:90-CV-00520-KJM-DB

PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF

1   This Court should now order Defendants to undertake such a study, to be completed
2  and provided to the Special Master and the parties within 120 days, in addition to any other
3  relief the Court deems necessary and appropriate.

5  DATED: October 20, 2016          Respectfully submitted,

   ROSEN BIEN GALVAN & GRUNFELD LLP

   By: */s/ Lisa Ells*
       Lisa Ells

   Attorneys for Plaintiffs

[3050284-12]

14   2:90-CV-00520-KJM-DB
PLS.' RESPONSE TO DEFS.' SEPT. 28, 2016 UPDATE TO DEPT. OF STATE HOSPITALS' INPATIENT
CENSUS AND PATIENT MOVEMENT AND REQUEST FOR ADDITIONAL RELIEF