KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
JAY C. RUSSELL, State Bar No. 122626
DANIELLE F. O'BANNON, State Bar No. 207095
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
MANEESH SHARMA, State Bar No. 280084
CHRISTINE M. CICCOTTI, State Bar No. 238695
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 323-4025
  Fax: (916) 324-5205
  E-mail: Christine.Ciccotti@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>               Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>             Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO UPDATE TO DEPARTMENT OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT** |

## INTRODUCTION

Defendants' Memorandum of Understanding (MOU)—a comprehensive and sustainable process for evaluating and transferring California Department of Corrections and Rehabilitation (CDCR) inmates to inpatient care provided by the Department of State Hospitals (DSH)—is implemented and beginning to work as Plaintiffs, the Special Master, and Defendants expected. Atascadero's patient population is now increasing, with 223 patients under treatment in October 2016. When previously there had been 107 available beds at Atascadero, there are now only 31.

1

DSH-Vacaville's low-custody dorms are now full. And DSH-Coalinga's 50 beds are similarly fully occupied.

Defendants provided the Court a status report and requested a status conference to discuss issues related to patient movement in Defendants' inpatient programs and other progress made in the case. (ECF No. 5496.) In response, Plaintiffs filed an unnoticed motion prematurely requesting that this Court enter a number of orders. (ECF No. 5503.) Their response ignores that although the new MOU's implementation is ongoing, it is nevertheless a sustainable process for ensuring patients are timely placed in inpatient settings consistent with their custodial and clinical needs.

Defendants look forward to further discussing these issues with the Court at the upcoming status conference.

## I. DEFENDANTS' IMPLEMENTATION OF THE INTERIM HOUSING REVIEW PROCESS DEMONSTRATES THAT IT IS A DURABLE AND EFFECTIVE METHOD TO MAXIMIZE MOVEMENT TO LOW-CUSTODY PROGRAMS.

On August 5, 2015, the Court ordered Defendants to implement a sustainable process consistent with their 2011 and 2012 plans to prevent the reoccurrence of a waitlist for inpatient mental health care. (ECF No. 5333.) Even before the Court issued its August 2015 order, an interim housing review process was being developed that addressed the Court's order to implement a sustainable process. (Decl. P. Ahlin Supp. Defs.' Reply to Resp. to Update to DSH Inpatient Rpt. (Decl. Ahlin) ¶ 10-12.) The interim housing review process was designed to streamline and increase the movement of patients to low-custody inpatient beds. (Special Master's Monitoring Report on the Mental Health Inpatient Care Programs, "Inpatient Care Report," ECF No. 5448 at 13, 16-21.) This interim process was incorporated into the MOU's housing review policy. (Decl. Ahlin ¶ 11.)

During the interim process, CDCR identified patients who were housed in inpatient programs that were custodially eligible to move to lower custody settings because reviews could be completed quickly for these patients. (*Id.* at ¶¶ 12-13.) Then DSH determined whether the patients CDCR identified were clinically eligible to move to a less-restrictive setting. (*Id.*; Decl. K. Tebrock Supp. Defs.' Reply to Resp. to Update to DSH Inpatient Rpt. (Decl. Tebrock) at ¶ 15.)

2

Defendants completed approximately 225 "least restrictive housing" reviews during this interim process. (*Id.*)

The Special Master's team monitored this process, and reported to the Court on their findings. (Inpatient Care Report at 16-21.) The Special Master's team concurred with CDCR's custodial and DSH's clinical decisions regarding whether patients were ineligible for placement in an inpatient setting. (*Id.* at 19.)

While Defendants were implementing the interim process, the census at Atascadero began to rise, reaching a peak of 253 patients in April 2016. (Decl. Ahlin ¶ 12.) This interim process demonstrated that the housing review process could be an effective and durable method to ensure that patients are placed and moved to appropriate inpatient settings based on their individualized custodial and clinical needs.

## II. DEFENDANTS' MOU PROCESS FOR ENSURING TIMELY ACCESS TO INPATIENT BEDS IS SUSTAINABLE, AND ADDITIONAL TIME IS WARRANTED TO FULLY REALIZE THE NEW POLICIES' SIGNIFICANT CHANGES.

At the August 19, 2015 status conference, the Court ordered the Special Master to assist CDCR and DSH in their negotiations on the MOU. (ECF No. 5343.) The Special Master's experts and Plaintiffs' counsel reviewed the proposed MOU and associated policies, provided comments, and suggested various changes. (Inpatient Care Report at 15-16.) In November 2015, three months after the Court's order and after incorporating input from the Special Master's team and Plaintiffs, Defendants finished drafting the new MOU and its eleven associated policies. (*Id.* at 15.) Training modules on the new housing procedures were presented to the Special Master in March 2016, and clinician training was completed in less than four weeks. (*Id.* at 21-22.) The Special Master's team attended all trainings at the DSH facilities and their suggestions on how to improve the training were considered and incorporated. (*Id.*) Plaintiffs' counsel also attended and observed training sessions and provided input. (*Id.*) Apart from the training, Defendants also hired and trained additional staff to review housing assignments, provide housing designations, and monitor housing assignments. (Decl. Tebrock ¶ 16.) The MOU went into effect on May 1, 2016. (Decl. Tebrock ¶ 4.)

The MOU requires Defendants to assign each patient a "least restrictive housing" custodial designation to facilitate placement in the least restrictive and appropriate inpatient setting. (Decl.

3

Tebrock ¶ 9.) The "least restrictive housing" designation is a custodial determination based on three key case-factors: potential for escape, violence, and disruptive behaviors. (*Id.* ¶¶ 9-11.) CDCR analyzes potential for escape by reviewing a patient's history of escape to determine if the patient may make another attempt that may also include violence or hostages. (*Id.* ¶ 11.) The potential for violence is considered by reviewing the patient's arrest and disciplinary reports for a history of violent behaviors, and the likelihood of reoccurrence. (*Id.* ¶ 10.) Disruptive behaviors are analyzed by reviewing disciplinary reports and classification actions for a history of inciting riots or other violent disturbances. (*Id.*) The patient is then assigned a "least restrictive housing" designation of either a low-custody unlocked dorm, a locked dorm, a multi-person cell, or a high-custody single-cell. (*Id.* ¶ 9.)

In addition to this custodial designation, DSH clinicians familiar with the inpatient bed options also ensure that a patient is clinically appropriate for placement consistent with the "least restrictive housing" designation, or if a more structured setting would better suit the patient's treatment needs. (Decl. Ahlin ¶ 7.) In making its recommendation regarding the patient's housing environment, DSH considers CDCR treating team's recommendations, DSH clinicians' review of the patient's mental health records, the patient's victimization concerns, hallucinations or internal stimuli, the presence of delusions resulting in violent or disruptive behavior, any pattern of intimidation of lower-functioning patients, and documented violent incidents within one year of referral. (*Id.*)

The fundamental consideration of Defendants' "least restrictive housing" review and referral process is the patient's mental health and his ability to safely participate in treatment at a DSH facility. (Decl. Tebrock ¶ 12.) Defendants designed the "least restrictive housing" and clinical review processes with the advice and supervision of the Special Master and Plaintiffs' counsel's input, to create a safe and clear way to denote dorm-eligible, intermediate-care patients.

A patient's housing or custody level before transfer to a DSH inpatient bed is not the sole factor in determining appropriate housing when the patient arrives at DSH. (Decl. Ahlin ¶ 2.) Referrals to higher levels of care occur when the patient is experiencing such a significant mental health crisis that he can no longer program in his own CDCR housing unit, and clinical judgment

4

Defs.' Reply to Pls.' Response to Update to DSH Inpatient Census and Patient Movement
(2:90-cv-00520 KJM-DB (PC))

requires movement to a more intensive treatment milieu.  (Decl. Tebrock ¶ 5; Decl. Ahlin ¶ 2.)  The simple fact that the patient was housed in a dorm before his transfer is only one factor considered when determining if he is clinically stable enough during an episode of mental crisis to be housed in a dorm that provides DSH inpatient care.  (Decl. Ahlin ¶ 2.)  Plaintiffs' demand that housing changes be undertaken quickly demonstrates a fundamental misunderstanding of this complex process designed to ensure patient and staff safety.

The MOU creates a sustainable process for inpatient referrals.  Despite Plaintiffs' arguments, there is no evidence that patients have been "languishing" during this period of change – patient referrals, admissions, and discharges are continuing at a rapid pace, and patients are treated and cared for by their dedicated CDCR clinical team until they are moved to DSH facilities and treated at a more intense level of care.  (Decl. Tebrock ¶ 6.)  Indeed, as demonstrated in Defendants' declarations, the housing policy's success is just beginning and additional time will show that it is a sustainable process that will successfully manage the waitlist for inpatient mental health care.  (Decl. Tebrock ¶¶ 21-24; Decl. Ahlin ¶¶ 18-20.)

In fact, the Special Master's team described the MOU's development and implementation as a "clear and cohesive guide to successful access to higher levels of care." (Inpatient Care Report at 13, 16, 22.)  This process took approximately eleven months to complete from the time Defendants began their initial negotiations.  But only five months after substantial policy changes were enacted that radically change the way care is provided in 1,462 licensed DSH beds, Plaintiffs ask this Court to jettison the process they agreed was otherwise satisfactory less than one year ago.  Plaintiffs' premature request to make further changes before the policies' full effects have been realized is unnecessary and should be rejected by the Court.

### III. DEFENDANTS HAVE RESOLVED ISSUES RELATED TO THE MOU'S IMPLEMENTATION.

Even before the MOU was implemented, Defendants' interim housing review process ensured patients were monitored and moved as appropriate to the least restrictive custodial setting consistent with their clinical and custodial needs.  (ECF No. 5335 at 48.)  But challenges arose in keeping the low-custody, intermediate-care beds full, partly because Defendants initially focused

5

Defs.' Reply to Pls.' Response to Update to DSH Inpatient Census and Patient Movement
(2:90-cv-00520 KJM-DB (PC))

on providing "least restrictive housing" reviews to patients identified after the MOU's implementation. (Decl. Tebrock ¶¶ 17-18; Decl. Ahlin ¶ 14.) When the MOU went into effect on May 1, 2016, there were 317 patients in DSH acute-care beds and 905 patients in intermediate-care beds without "least restrictive housing" designations. (Decl. Tebrock ¶ 17.) At the same time, referrals to acute-care beds increased (which commonly occurs in the summer), further increasing the demand for patients ready to be moved out of these beds. (Decl. Tebrock ¶ 19; Decl. Ahlin ¶ 16.) As a result, Defendants' monthly reports reflected a slow decline in the population at Atascadero from June to September 2016 and a slow increase in the waitlist. (Decl. Tebrock ¶ 20; Decl. Ahlin ¶ 17.)

After recognizing these issues in the MOU's implementation, and its impact on using low-custody beds and the waitlist, Defendants worked to resolve these issues. (Decl. Tebrock ¶¶ 21-24; Decl. Ahlin ¶¶ 18-20.) Beginning in June, CDCR began issuing "least restrictive housing" designations for the pre-MOU inpatient population to ensure that all patients custodially eligible for low-custody programs could be transferred as soon as clinically appropriate. (*Id*.) Defendants hired additional staff members to complete over 900 housing reviews for the pre-MOU inpatient population. (Decl. Tebrock ¶ 18.) Presently, 30 patients await a "least restrictive housing" review who are not already in a low-custody, intermediate-care program. (Decl. Tebrock ¶ 22.) Those remaining 30 patients require a more in-depth custodial review because of they have particularly complicated case factors. (*Id*.)

DSH also began reviewing all patients that CDCR determined were eligible for low-custody programs to determine if they are clinically appropriate for movement, based on the patient's acuity. (Decl. Ahlin ¶ 19.) This process continues, and DSH is diligently conducting these clinical reviews. (*Id.*) As soon as a patient is deemed clinically appropriate for a less-restrictive inpatient environment, the patient is moved. (*Id*. at ¶ 18.) As the reviews are completed, Atascadero's population is increasing—to 223 by the end of October 2016. (*Id.* ¶ 19.) When the parties last appeared for a status conference, there were 107 available beds at Atascadero. (ECF No. 5335 at 43.) Now there are 31. (Decl. Ahlin ¶ 28.) Vacaville's dorms (which had 22

6

Defs.' Reply to Pls.' Response to Update to DSH Inpatient Census and Patient Movement
(2:90-cv-00520 KJM-DB (PC))

available beds last August) are now full. (ECF No. 5335 at 43; Decl. Ahlin ¶ 28.) Coalinga's 50 beds for *Coleman* patients are also fully occupied. (Decl. Ahlin ¶¶ 19 & 28.)

Defendants have also implemented a new process to provide preliminary "least restrictive housing" designations to all acute-care patients referred to DSH who are single-celled during their acute treatment so that they can "step down" to an appropriate intermediate-care housing setting more quickly. (Decl. Tebrock ¶ 23.) And patients in intermediate-care programs who are housed at a higher custodial setting than their "least restrictive housing" designation but eligible for unlocked dorms are reviewed by their treatment teams weekly for clinically-appropriate transfers. (Decl. Ahlin ¶ 20.)

By assigning all patients placed in an inpatient program a "least restrictive housing" designation, including pre-MOU and acute-care patients who are eligible to "step down" to intermediate-care, Defendants have resolved this issue in utilization management and do not anticipate that it will recur. (Decl. Tebrock ¶ 24.)

Further, Defendants are constantly assessing the changing demands for different levels of inpatient-care beds and are responding to meet the fluctuating need by converting inpatient-care units from acute to intermediate, or vice versa, based upon demand. (Decl. Ahlin ¶¶ 21-23.)

Defendants have recognized issues arising in the MOU process concerning "least restrictive housing" designations and resolved them. (Decl. Ahlin ¶ 24; Decl. Tebrock ¶ 24.) Going forward, Defendants fully expect the new MOU to work as designed. (*Id*.)

### IV. THE COURT SHOULD NOT GRANT PLAINTIFFS' PREMATURE REQUESTS FOR RELIEF.

With the Special Master's assistance, Defendants developed and implemented a sustainable process to manage inpatient referrals, and Plaintiffs' requested relief is not warranted. Issuing additional orders now to change the recently implemented process risks disrupting the positive changes Defendants have worked hard to create. Despite Plaintiffs assertions, Defendants are not erecting arbitrary barriers to patient treatment in low-custody settings. Last year, the Special Master concurred with DSH's clinical judgment as to whether a patient was clinically ready to

7

Defs.' Reply to Pls.' Response to Update to DSH Inpatient Census and Patient Movement
(2:90-cv-00520 KJM-DB (PC))

move to a dorm setting, and concurred with CDCR's decisions as to which patients were custodially eligible for low-custody housing. (Inpatient Care Report at 21.)

Patients are often referred for inpatient care from CDCR because the patient is not able to interact well with staff or others, is experiencing a crisis, or is refusing to engage in the activities of daily living in a CDCR dorm or low-custody setting. (Decl. Tebrock ¶ 5.) Plaintiffs' demands are premised on filling unlocked-dorm beds without considering whether the patient is custodially eligible, or whether such housing is a clinically appropriate therapeutic location. Indiscriminately moving patients poses a risk to both patients and staff. (Decl. Ahlin ¶ 3.) Defendants must be allowed to make clinical judgments regarding the acuity of their patients and whether patients can safely tolerate dorm housing while receiving inpatient care. (*Id*. ¶ 2-3.) Moving patients into "empty" beds before making a determination of clinical appropriateness does not meet that goal.

Because treatment beds are not interchangeable, the concept that any low-custody bed can be filled by any patient on the waitlist with a low-custody level, without evaluating the patient's state of mental health or acuity, or risk of violence to other patients and staff, is unsafe and unnecessary. (Pls.' Response to Defs.' Sept. 28, 2016 Update, ECF No. 5503 at 8; Decl. Ahlin ¶ 3.) The MOU and housing policy acknowledge the importance of a patient's custodial clinical review before a patient is placed into inpatient housing. (Decl. Tebrock ¶ 5; Decl. Ahlin ¶ 2.)

The purpose of the November 10, 2016 status conference is to discuss the steps Defendants are taking to increase the number of available inpatient beds and eliminate the waitlist. Plaintiffs' request for an order requiring Defendants to undertake a study within 120 days to assess population trends is outside the status conference's scope and purpose. The status conference should focus on inpatient care concerns, and is not the appropriate vehicle to discuss commissioning a study. Even so, Defendants are internally evaluating whether such a study may be appropriate to evaluate these issues.

**CONCLUSION**

Defendants worked cooperatively with the Special Master and Plaintiffs' counsel to develop and implement the new MOU and associated policies, including the housing policy. In the process of implementing these significant changes, Defendants encountered unexpected

8

challenges related to the inpatient population that existed before the MOU's implementation, particularly the proper housing for patients who had not received a "least restrictive housing" designation when the MOU went into effect.  Recognizing the problem, Defendants created additional procedures, added additional staff resources, and continuously coordinated and communicated to review these patients for potential movement.  This utilization management issue was corrected by Defendants, and short-term yet correctable issues should not be permitted to disrupt what was otherwise the MOU's successful implementation.  Because of the processes now in place, and Defendants' consistent oversight, no further orders are necessary to otherwise ensure that clinically appropriate patient movement occurs promptly.  Defendants respectfully look forward to discussing these issues in more detail with the Court at the upcoming status conference.

Dated: November 4, 2016

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
DANIELLE F. O'BANNON
Supervising Deputy Attorneys General

*/s/ Christine M. Ciccotti*
CHRISTINE M. CICCOTTI
*Attorneys for Defendants*

CF1997CS0003
FINAL REPLY BRIEF.doc

9

Defs.' Reply to Pls.' Response to Update to DSH Inpatient Census and Patient Movement
(2:90-cv-00520 KJM-DB (PC))