KAMALA D. HARRIS
Attorney General of California
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
MANEESH SHARMA, State Bar No. 280084
CHRISTINE M. CICCOTTI, State Bar No. 238695
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 323-4025
  Fax: (916) 324-5205
  E-mail: Christine.Ciccotti@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF KATHERINE TEBROCK IN SUPPORT OF DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO UPDATE TO DEPARTMENT OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT** |

I, Katherine Tebrock, declare:

1. I am the Deputy Director of the California Department of Corrections and Rehabilitation's (CDCR) statewide Mental Health Services Delivery System. I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I make this declaration in support of Defendants' Reply to Plaintiffs' Response to Defendants' Update to Department of State Hospitals' Inpatient Census and Patient Movement.

2. I was appointed as Deputy Director of the Statewide Mental Health Program in November 2015. I am familiar with the numerous and complex policies and procedures that

1

govern the prison mental health care delivery system at the institutional level and have visited and evaluated the prisons with mental health care programs. I am also responsible for and supervise the mental health system's headquarters and regional teams, and am familiar with *Coleman* mandates. I previously served as Chief Deputy General Counsel of Policy with CDCR's Office of Legal Affairs, where my duties included management and oversight of the health care legal team, including the *Coleman* class action litigation.

3. CDCR provides care to approximately 38,428 patients in the Mental Health Services Delivery System including outpatient and inpatient beds. CDCR provides inpatient care at the crisis bed level and at the intermediate care level at the California Institution for Women and San Quentin State Prison. Additional inpatient mental health services are provided by the Department of State Hospitals (DSH) under California Penal Code Section 2684 in 1,462 licensed beds at the Vacaville Psychiatric Program, the Salinas Valley Psychiatric Program, and the California Health Care Facility Stockton, and at DSH Hospitals at Coalinga and Atascadero.

4. Defendants' new Memorandum of Understanding (MOU) and the eleven associated policies regarding management and oversight of intermediate and acute-care inpatient programs went into effect May 1, 2016. The new MOU and associated policies fundamentally changed how patient movements and inpatient housing assignments to DSH are managed between the departments.

5. CDCR refers patients to DSH inpatient care programs when clinically indicated, emphasizing the patient's current mental health status and ability to safely engage in DSH treatment. CDCR refers patients to DSH when they are experiencing such a significant mental health crisis that they can no longer program in a CDCR housing unit, and mental health clinicians have determined that they should be moved to a more intensive treatment milieu.

6. While the referral and transfer process is ongoing, patients continue to receive mental health treatment intended to stabilize their condition, whether in Mental Health Crisis Beds or Enhanced Outpatient Program units. Patients in Mental Health Crisis Beds receive 24-hour nursing care, all necessary medications, daily clinical contacts, therapy, and counseling. No

2

Decl. K. Tebrock Supp. Defs.' Reply to Pls.' Response
(2:90-cv-00520 KJM DB (PC)

1   patient awaiting transfer to DSH is deprived of attention and treatment by CDCR's mental health
2   clinicians.

3       7.    Under the MOU, when a patient is referred for inpatient care, his primary clinician
4   completes the referral documentation and notifies the institution's CDCR-DSH Coordinator. This
5   referral packet includes clinical notes, the patient's treatment plan, the most recent suicide risk
6   evaluation, transportation approvals, medical and medication orders (including involuntary
7   medication orders), and the patient's consent to transfer or the results of the due-process hearing.
8   The CDCR-DSH Coordinator confirms the referral package is complete, and sends the package to
9   CDCR's DSH Referral Unit, which also reviews it for completeness and clinical necessity. The
10  DSH Referral Unit transmits the entire package to DSH within one business day for acute
11  referrals and three business days for intermediate referrals.

12      8.    DSH reviews the referral and notifies CDCR of its admission decision together with
13  its determination that the patient should receive either acute or intermediate care. DSH also
14  provides CDCR's Healthcare Placement Oversight Program a clinical decision identifying the
15  appropriate housing level for the patient.

16      9.    While DSH is reviewing the referral package, CDCR's Healthcare Placement
17  Oversight Program reviews each patient's custody factors and determines the patient's "least
18  restrictive housing" designation. This determination informs DSH whether custody believes it is
19  appropriate to house the patient in a low-custody unlocked dorm, a locked dorm, a multi-person
20  cell, or a high-custody single-cell. In conducting this "least restrictive housing" analysis, CDCR
21  assumes every patient is eligible for a low-custody unlocked dorm assignment unless he must be
22  excluded because of a potential for violence, escape risk, or disruptive behaviors.

23      10.    One business day after the Healthcare Placement Oversight Program's receives
24  DSH's level-of-care decision for acute patients and three business days of receipt for intermediate
25  patients, and DSH's clinical decision form identifying clinical factors relevant to housing
26  decisions, the Health Care Placement Oversight Program determines the patient's "least
27  restrictive housing" designation. The "least restrictive housing" designation is a custodial
28  determination based on three key case-factors: potential for escape, violence, and disruptive

3

Decl. K. Tebrock Supp. Defs.' Reply to Pls.' Response
(2:90-cv-00520 KJM DB (PC)

1  behaviors. Escape potential is analyzed by reviewing documents such as the Criminal
2  Identification and Information Report, the Probation Officers Report, and the disciplinary and
3  classification sections of the patient's central file. If the patient is deemed an escape risk, the
4  Classification Staff Representative determines whether an escape attempt from a DSH program is
5  likely, and whether that attempt could include violence or hostage takings. Violence potential is
6  analyzed by reviewing arrest reports and disciplinary reports to determine if the patient has a
7  history of violent behavior. If so, the Classification Staff Representative determines the
8  likelihood that the patient will act out violently or victimize other patients or staff while at DSH.
9  Potential for disruptive behavior is analyzed by reviewing disciplinary reports and classification
10 actions to determine if the patient has a history of inciting riots or other disturbances likely to
11 result in violence.

12      11.  Patients who CDCR finds are ineligible for an unlocked dorm are then evaluated for
13 the locked dorm intermediate-care program at Vacaville. If the patient cannot be placed there,
14 only then they are assigned to a high-custody single cell intermediate inpatient-care bed.

15      12.  Ultimately, the "least restrictive housing" review is an attempt to determine if it is
16 safe and in the best interest of the patient, other patients, staff, and the public to place the patient
17 in an unlocked dorm setting. The process reduces the need for classification committee review,
18 allowing the patient to be placed into a treatment program as quickly and safety as possible.

19      13.  Once CDCR communicates the "least restrictive housing" designation to DSH and an
20 endorsement to specific DSH location, DSH issues an acceptance transfer document, triggering
21 CDCR's obligation to transport the patient to the designated location within 72 hours.

22      14.  The MOU accelerated the time for CDCR to transfer patients to DSH. Acute patients
23 are expected to have an acceptance transfer document issued within 6 business days of DSH's
24 receipt of referral, and 15 business days for intermediate-care patients. In both cases, CDCR has
25 72 hours to transport the patient. Program Guide timelines for transfer remain at 10 days for
26 acute-care patients and 30 days for intermediate-care patients. (MH Program Guide at 12-1-16.)

27      15.  Before the MOU was complete, Defendants created an interim housing review
28 process, with input and comments from the Special Master and Plaintiffs' counsel. The housing

1  review process was (and continues to be) designed to ensure patients are continually tracked and
2  moved to their "least restrictive housing" setting as soon as possible and consistent with their
3  clinical and custodial needs. (ECF No. 5355 at 48.) This process focused on patients whose "least
4  restrictive housing" designation could be completed quickly because the patient was previously
5  assigned to CDCR or DSH dorms, or had a low-custody level. During this interim process,
6  CDCR conducted reviews to identify patients then housed in DSH inpatient programs who were
7  custodially eligible to move to lower custody settings, followed by DSH reviews to determine if a
8  move to a less-restrictive setting was clinically warranted. Defendants completed approximately
9  225 "least restrictive housing" reviews prior to the implementation of the MOU. The Special
10 Master's team monitored this process and reported to the Court on their findings. (ECF No. 5448
11 at 19.)

12      16. In January 2016, I authorized five additional staff positions, knowing work would
13 increase when the MOU was implemented. All these new staff began working by April 11, 2016.

14      17. The MOU required that only newly-referred patients be given a "least restrictive
15 housing" designation. On May 1, 2016—the date the MOU went into effect—there were 317
16 patients in DSH acute-care beds and 905 patients in intermediate-care beds without "least
17 restrictive housing" designations.

18      18. As CDCR began "least restrictive housing" reviews for newly-referred patients under
19 the MOU, they recognized that even more staff and resources were needed to complete them
20 timely. Accordingly, in August 2016, I authorized the Healthcare Placement Oversight Program
21 to hire three additional staff to ensure timely patient reviews. That staff was in place and working
22 that same month.

23      19. At the same time, referrals to acute-care beds began to increase. CDCR saw these
24 referrals increase from a low of 129 in January 2016 to a sustained high of 159 beginning in April
25 and continuing through August. Because patients requiring acute care must be single-celled,
26 these patients were not given a "least restrictive housing" designation for when these patients
27 were treated and subsequently referred to intermediate-care programs. Upon seeing the increase,
28 Defendants prioritized the "least restrictive housing" reviews for acute-care patients ready to

"step down" to intermediate care beds. This freed up acute beds and made full use of intermediate-care beds.

20. Despite these efforts, Defendants' monthly reports showed a slow decline in DSH-Atascadero's patient census from 226 in June 2016 to 208 in September 2016.

21. Defendants are resolving these issues. The resources added to the Healthcare Placement Oversight Program have positively impacted the timeliness of "least restrictive housing" reviews. CDCR's Healthcare Placement Oversight Program has now completed close to 1,000 housing reviews since June 2016. Right now, no patient referred for inpatient care after the MOU's implementation is waiting for a "least restrictive housing" designation.

22. Moreover, although not required under the MOU, the Healthcare Placement Oversight Program also provided "least restrictive housing" designations for nearly all patients housed at DSH before the MOU's implementation to ensure that those custodially eligible for low-custody programs can be transferred as soon as clinically appropriate. Presently, only 30 patients admitted before the MOU implementation are not housed in low custody unlocked dorms and await a "least restrictive housing" review. Those 30 patients require a more in-depth custodial review because of particularly complicated case factors.

23. Further, as of October 3, 2016, CDCR is now assigning preliminary "least restrictive housing" designations for all patients referred to acute single-cell beds to streamline the "step-down" process if these patients are later moved to intermediate-care beds.

24. CDCR's Healthcare Placement Oversight Program continues to monitor bed availability and patient movement. As these reviews are being completed, DSH-Atascadero's population has risen to 223 and continues to increase. By working through patients referred for inpatient care before the MOU was implemented, and providing them "least restrictive housing" designations, Defendants have resolved this issue in utilization management. Defendants

/ / /

6

1 recognized a problem in the policy and system and fixed it.

2     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in Sacramento, California on November 4, 2016.

        /s/ *Katherine Tebrock*

KATHERINE TEBROCK
Deputy Director, Statewide Mental Health Program

*(original signature retained by attorney)*

CF1997CS0003
FINAL TEBROCK DECLARATION.doc

7

Decl. K. Tebrock Supp. Defs.' Reply to Pls.' Response
(2:90-cv-00520 KJM DB (PC)