KAMALA D. HARRIS
Attorney General of California
DANIELLE F. O'BANNON, State Bar No. 207095
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
MANEESH SHARMA, State Bar No. 280084
CHRISTINE M. CICCOTTI, State Bar No. 238695
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 323-4025
 Fax: (916) 324-5205
 E-mail: Christine.Ciccotti@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF PAM AHLIN IN SUPPORT OF DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' UPDATE TO DEPARTMENT OF STATE HOSPITALS' INPATIENT CENSUS AND PATIENT MOVEMENT** |

I, Pam Ahlin, declare:

1. I am the Director of the Department of State Hospitals (DSH). I was the Assistant Hospital Administrator at DSH-Coalinga from May 2005-March 2007, Coalinga's Hospital Administrator from March 2007-March 2008, Coalinga's Executive Director from March 2008-March 2012, DSH-Deputy Director from March 2012-December 2013, and DSH Chief Deputy Director from January 2014 until my appointment as Director in December 2014. I have personal knowledge of the facts stated in this declaration and if called upon to testify to those facts, could and would do so competently. I make this declaration in support of Defendants' Reply to

1

Plaintiffs' Response to Defendants' Update to Department of State Hospitals' Inpatient Census and Patient Movement.

2.  DSH provides inpatient mental health treatment to approximately 2,285 California Department of Corrections and Rehabilitation's (CDCR) patients per year in 1,462 licensed beds at DSH-Atascadero, DSH-Coalinga and in facilities operated within CDCR prisons, specifically the Vacaville Psychiatric Program, the Salinas Valley Psychiatric Program, and the California Health Care Facility at Stockton. Referrals to higher levels of care occur when the patient is experiencing such a significant mental health crisis that he can no longer program in his own CDCR housing unit, and clinical judgment requires transfer to a more intensive treatment milieu. When DSH considers admitting a patient to one of its inpatient-care facilities, it must ensure that the admission is clinically based. To evaluate whether the admission is appropriate, DSH evaluates the patient's current mental status and ability to safely engage in treatment at a DSH facility. A patient's CDCR housing assignment is only one factor clinicians consider when deciding if a patient is stable enough to be housed in a DSH inpatient program in which he can be safely and appropriately treated.

3.  Treatment beds within DSH facilities are not interchangeable. Thus, the concept that any vacant bed can be filled by any patient on the waitlist, regardless of the patient's mental health status or clinical acuity, is not only clinically inappropriate, it is also unduly unsafe for the patient, his peers, and staff. Defendants' housing policy acknowledges the importance of a patient's clinical review before he is placed into any DSH inpatient housing.

<u>Development and Implementation of the Memorandum of Understanding.</u>

4.  Defendants' new Memorandum of Understanding (MOU) and eleven associated policies governing the provision of care to patients referred from CDCR for inpatient care at a DSH facility went into effect May 1, 2016.

5.  The new MOU and related policies fundamentally changed how the two departments transfer, house, and provide inpatient care. To prepare for and manage the MOU's implementation, DSH began centralizing referrals to its headquarters Patient Management Unit to increase efficiency, developed internal tracking processes to assist in overseeing the MOU's

2

Decl. of P. Ahlin Supp. Defs.' Reply to Pls.' Response

implementation, and instituted weekly meetings with each DSH facility's Executive Director and CDCR Mental Health staff to coordinate the anticipated changes.

<u>The New MOU's Revised Referral and Housing Review Process.</u>

6. Under the MOU and associated policies, the new referral procedures applied to referrals made after the MOU's May 1, 2016 implementation.

7. When DSH receives a referral from CDCR, DSH reviews the patient's current mental health status to ensure he meets clinical admission criteria, and DSH facility licensing guidelines. DSH then notifies CDCR if the patient is accepted for admission, identifies the appropriate care level (intermediate or acute), and provides relevant clinical information identifying the appropriate DSH housing environment. In making its housing recommendation, DSH considers its clinicians' review of the patient's mental health records, CDCR treating team's recommendations, the patient's victimization concerns, hallucinations or internal stimuli, the presence of delusions resulting in violent or disruptive behavior, and any pattern of intimidation of lower-functioning patients, and documented violent incidents within one year of referral.

8. CDCR also conducts a custodial review to determine the patient's "least restrictive housing" designation for low-custody unlocked dorms, locked dorms, multi-person cells, or a high-custody single-cell. CDCR's "least restrictive housing" custodial designation is based solely on custodial factors. CDCR then endorses the patient to a specific DSH location based on the custody criteria and DSH's clinical recommendation along with providing the patients' "least restrictive housing" designation. CDCR presumes that all patients are initially eligible for an unlocked-dorm intermediate-care program unless they are custodially excluded based on a history of violence, an escape risk, or in-custody behavior.

9. After DSH receives the "least restrictive housing" designation and endorsement decision from CDCR, DSH issues an acceptance transfer document, and CDCR is required to transport the patient within 72 hours.

<u>Development of the Housing Review Process, Its Challenges and Resolutions.</u>

10. During the MOU's development, Defendants also created an interim housing review process with input and comments from the Special Master and Plaintiffs' counsel. The housing

3

Decl. of P. Ahlin Supp. Defs.' Reply to Pls.' Response
(2:90-cv-00520 KJM-DB (PC))

review process was (and continues to be) designed to ensure patients are continually tracked and moved to their "least restrictive housing" setting as soon as possible and consistent with their clinical and custodial needs. (ECF No. 5355 at 48.)

11. This policy development began in July 2015, and was included in the MOU as the Housing Review Policy and Referral, Admission and Movement Policy. The interim process focused on patients whose "least restrictive housing" designation could be completed quickly because the patient was previously assigned to a dorm, or was a low-custody level patient. During this interim process, CDCR conducted reviews to identify patients then housed in DSH inpatient programs who were custodially eligible to move to lower custody settings, followed by DSH reviews to determine if a move to a less-restrictive setting was clinically warranted. DSH invited Plaintiffs' counsel to observe and the Special Master's team to monitor the effectiveness of this process. The Special Master reported to the Court on his findings. (ECF No. 5448 at 19.)

12. By February 2016, DSH completed the interim process by ensuring that for those patients not in the "least restrictive housing" environment, the patient's treatment team was reviewing clinical readiness each time it met to consider whether the patient was ready to move. This interim process demonstrated that Defendants could successfully identify, treat, and move patients who are eligible for less-restrictive housing. During this interim period, the Special Master reported a census of 230 patients at DSH-Atascadero in February 2016, and 241 patients in March 2016. Defendants' monthly census reports showed 253 patients at DSH-Atascadero in April 2016, and 245 in May 2016.

13. After the MOU was implemented, various challenges impacted the expected results of the new MOU and housing review process.

14. Upon implementing the MOU, Defendants' focused on providing the "least restrictive housing" designations to newly-referred patients. On May 1, 2016, there were already 317 patients in DSH acute-care beds, and 905 patients in DSH intermediate beds without a "least restrictive housing" designation.

15. After the MOU's implementation, DSH quickly and successfully implemented its new Utilization Management Policy, which resulted in the movement, treatment, and discharge of

4

numerous patients. As a result, the number of patients with "least restrictive housing" designations for low-custody inpatient programs dwindled.

16. At the same time, referrals to acute beds increased (which commonly occurs in the summer). Because patients requiring acute care must be single-celled, these patients were not given and did not have "least restrictive housing" designations after they were treated and referred to intermediate-care programs.

17. Given the above, Defendants' monthly reports reflected a slow decline in DSH-Atascadero's patient population, from 226 in June 2016, to 212 in August 2016, and 208 in September 2016.

18. Defendants have resolved these issues. Although not required under the MOU, CDCR has issued "least restrictive housing" designations for all existing acute-and-intermediate care patients to ensure that patients custodially eligible for low-custody programs can be transferred as soon as clinically appropriate.

19. DSH also started reviewing all existing patients who were recently approved for unlocked-dorm housing to determine if such housing was clinically appropriate based upon the patient's acuity. This process continues, and DSH has been diligently conducting clinical reviews for all existing patients who were recently provided a "least restrictive housing" designation. As DSH has completed these reviews, DSH-Atascadero's population increased to 223 and DSH-Coalinga is operating at full capacity.

20. DSH has also increased its oversight of patients whose "least restrictive housing" designation is unlocked dorms but who are housed at a higher custodial setting. These patients are being reviewed weekly to determine if they are stable and clinically ready for transfer to low-custody programs, although the MOU only requires this to be undertaken monthly. DSH has taken this additional step to ensure that patients are moved to less-restrictive environments as quickly as is appropriate.

Response to Fluctuating Level of Care Demands.

21. Defendants also responded quickly when demand for intermediate-care beds increased. In September 2015, DSH activated a 30-bed intermediate-care unit at DSH-Vacaville.

5

22. In response to increased acute referrals DSH, converted one 30-bed intermediate-care unit at DSH-Stockton to an acute-care unit in December 2015, and a second 30-bed unit in July 2016.

23. DSH also began admitting and treating acute, low-custody level patients at DSH-Atascadero in October 2016. DSH and CDCR are converting 16 isolation rooms at DSH-Stockton into intermediate-care inpatient beds. The construction is expected to be complete by March 2017.

24. Defendants recognized issues arising in the MOU process concerning "least restrictive housing" designations and resolved them. Going forward, Defendants fully expect the new MOU to work as designed after this resolution.

25. Since July 2015, DSH has improved efficiencies within its facilities, demonstrated by its ability to serve more patients each month. DSH is working collaboratively with CDCR to implement the full continuum of patient movement, resulting in more patients served annually. During Fiscal Year 2015/16, DSH admitted 2,285 patients, or an average of 190 patients per month. In the first four months of Fiscal Year 2016/2017, DSH admitted 913 patients, or an average of 228 patients per month. Annually, this could increase total admissions by 451 patients, to a total of 2,736. DSH accomplished this by continuing to focus on utilization management, implementing the housing review policy, and reviewing all patients' length of stays.

Current Census and Referral Data

26. On average, each month DSH accepts 149 patients, admits 157 patients to, and discharges 81 patients from acute care at facilities serving CDCR patients. Peak referral months are March, April, and August, with acute referrals reaching 182, admissions at 167, and discharges at 98. Patients stay an average of 65 days in acute care before "stepping down" to intermediate care or discharging. As for intermediate-care patients, in an average month 71 are accepted, 70 are admitted, and 115 are discharged. Again, peak referral months are March, April, and May, with 93 referrals in April and 79 admissions in May 2016. Intermediate-are patients are treated an average of 189 days before discharge. An average of 78 patients "step-down" from acute to intermediate care each month, and 7 patients level-of-care increases. And on average, 15

6

patients "step down" per month from higher to lower custody housing settings, given their clinical readiness to be housed in less restrictive conditions while undergoing inpatient treatment. In February 2016, 36 patients were moved to less restrictive housing conditions in DSH units. DSH is operating at 94.5% capacity this year.

27. Last fiscal year, DSH on average received 126 referrals for acute-care and 75 referrals for intermediate-care per month. This year, DSH is receiving an average of 149 referrals for acute care and 71 for intermediate care, or a net increase of 19 referrals per month. DSH has also manage to reduce the average lengths of stay by 6 days for acute-care patients and 35 days for intermediate care patients.

28. The current census and waitlist is provided in the chart below:

| 29. DSH Psychiatric Inpatient Programs Census[1] | | | | | | |
|---|---|---|---|---|---|---|
| Facility | Bed Capacity | Beds Occupied | Beds on hold | Beds redlined | Isolation Rooms | Beds available |
| Male Acute Care Programs | | | | | | |
| DSH-Vacaville | 218 | 209 | 9 | 0 | 0 | 0 |
| DSH-Stockton | 154 | 136 | 5 | 3 | 10 | 0 |
| Total | 372 | 345 | 14 | 2 | 10 | 0 |
| Male Intermediate Care Facility (High Custody) Programs | | | | | | |
| DSH-Stockton | 360 | 322 | 14 | 0 | 24 | 0 |
| DSH-Vacaville | 94 | 92 | 2 | 0 | 0 | 0 |
| DSH-Salinas Valley | 202 | 188 | 0 | 14 | 0 | 0 |
| DSH-Salinas Valley Multi-person Cells | 44 | 44 | 0 | 0 | 0 | 0 |
| Total | 700 | 646 | 16 | 14 | 24 | 0 |
| Male Intermediate Care Facility (Low Custody) Programs | | | | | | |
| DSH-Vacaville | 84 | 81 | 3 | 0 | 0 | 0 |
| DSH-Atascadero | 256 | 223 | 2 | 0 | 0 | 31 |
| DSH-Coalinga | 50 | 50 | 0 | 0 | 0 | 0 |
| Total | 390 | 354 | 5 | 0 | 0 | 31 |
| TOTAL Inpatient Program Capacity and Availability | | | | | | |
| ALL | 1462 | 1345 | 35 | 17 | 34 | 31 |

| DSH Psychiatric Inpatient Programs Waitlist[2] | | | |
|---|---|---|---|
| Level of Care | Pending Review | Accepted | Total |
| Acute | 19 | 36 | 55 |
| Intermediate High Custody | 8 | 89 | 97 |
| Intermediate Low Custody (DSH-V Locked Dorm) | 3 | 6 | 9 |

---

[1] As of close of business November 3, 2016.
[2] As of close of business November 3, 2016.

7

| | | | |
|---|---|---|---|
| Intermediate Low Custody (DSH-A & DSH-C Unlocked Dorms) | 1 | 3 | 4* |
| ALL | 31 | 134 | 165 |

*Does not include the patients identified for transfer from higher custody Intermediate Care programs as a result of the Least Restrictive Housing policy.

30. DSH's acute-and-intermediate care beds are full, and patients are moved as soon as beds are available. There are 31 patients pending review for both levels of inpatient care. Of the 134 accepted patients, 16 of them are pending a "least restrictive housing" designation and endorsement to a specific program. 118 of them have received a "least restrictive housing" designation, an endorsement, and are awaiting DSH's issuance of an acceptance transfer document, or pending transport. Of these, 3 acute-care patients have waited longer than 10 days, and 37 intermediate-care patients have waited longer than 30 days from receipt of referral. Of the 3 acute-care patients beyond transfer timeframes, 2 have been waiting less than 20 days and of the 37 intermediate-care patients, 18 have been waiting less than 40 days. DSH and CDCR review these numbers daily to ensure continued and consistent patient movement.

31. Defendants' monthly filings demonstrate the very real and persistent trend of increased referrals during the summer months, with the referrals once again waning, as they have each fall. This fluctuation shows a system that must change with the pace and type of referrals. At the end of June 2016, 99 patients referred for acute care were pending DSH's acceptance and transfer; presently, there are 55. The pace of referrals has again slowed, while Defendants maintain their vigilance in timely processing patients for review and transfer, based upon clinical appropriateness.

32. The argument that Defendants are not referring patients to DSH-Atascadero and DSH-Coalinga is inaccurate. When the parties appeared at the August 2016 status conference, 107 beds were available at DSH-Atascadero. Now there are 31. DSH-Vacaville's and DSH-

///
///
///
///

8

Coalinga's dorms are full.  These statistics demonstrate Defendants' commitment to sustainable utilization management of all inpatient housing, including low-custody, intermediate-care beds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in Sacramento, California on November 4, 2016.

                                              */s/ Pam Ahlin*
                                              PAM AHLIN
                                              Director, Department of State Hospitals

                                              (*original signature retained by attorney*)

CF1997CS0003

9

Decl. of P. Ahlin Supp. Defs.' Reply to Pls.' Response
(2:90-cv-00520 KJM-DB (PC))