1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF CALIFORNIA
2

3    RALPH COLEMAN, et al.,        )   Docket No. 2:90-CV-00520 KJM-DB
                                   )
4              Plaintiffs,         )   Sacramento, California
                                   )   November 10, 2016
5         v.                       )   2:20 p.m.
                                   )
6    EDMUND G. BROWN, et al.,      )   Hearing Re:  Status Conference
                                   )
7              Defendants.         )

8
                   TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE KIMBERLY J. MUELLER

10

     APPEARANCES:
11

12   For the Plaintiffs:   ROSEN BIEN GALVAN AND GRUNFELD, LLP by
                           MS. LISA ADRIENNE ELLS
13                         MS. KRISTA MICHELLE STONE-MANISTA
                           MR. MICHAEL BIEN
14                         50 Fremont Street, 19th Floor
                           San Francisco, CA 94105
15                         (415)443-6830

16

     For the Defendants:   DEPARTMENT OF JUSTICE by
17                         MS. DANIELLE FELICE O'BANNON
                           455 Golden Gate
18                         San Francisco, CA 94102
                           (415)703-5735
19
                           HONORABLE KAMALA HARRIS
20                         ATTORNEY GENERAL STATE OF CALIFORNIA by
                           ASSISTANT ATTORNEYS GENERAL
21                         MS. CHRISTINE MARIE CICCOTTI
                           MS. ELISE OWENS THORN
22                         1300 I Street, Suite 11000
                           Sacramento, CA 95814
23                         (415)703-5717
                           MR. MANEESH SHARMA
24                         MR. JAY CRAIG RUSSELL
                           455 Golden Gate Avenue, Suite 11000
25                         San Francisco, CA 94102
                           (415)703-5553

1    ALSO PRESENT:         PAM AHLIN, Director
                          Department of State Hospitals
2

3                    JENNIFER COULTHARD, RMR, CRR
                         Official Court Reporter
4                       501 I Street, Suite 14-243
                           Sacramento, CA 95814
5                        jenrmrcrr2@gmail.com
                            (312)617-9858
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SACRAMENTO, CALIFORNIA, THURSDAY, NOVEMBER 10, 2016
 2                              --oOo--
 3              THE CLERK:  Calling civil matter 90-00520 Coleman,
 4    et al., versus Brown, et al., on for status conference.
 5              THE COURT:  Good afternoon.  My trial schedule has
 6    detained me.  I apologize for keeping you waiting.
 7              Appearances, please.
 8              MS. O'BANNON:  Danielle O'Bannon, on behalf of
 9    defendants.
10              MS. CICCOTTI:  Christine Ciccotti on behalf of
11    defendants along with Elise Thorn, and Maneesh Sharma, and Jay
12    Russell.
13              THE COURT:  And?
14              MS. ELLS:  Lisa Ells for the plaintiffs, and I have
15    here with me Krista Stone-Manista and Michael Bien.
16              THE COURT:  All right.  Good afternoon.  Welcome to
17    you all.
18              So who's speaking on behalf of the Department of State
19    Hospitals?
20              MS. CICCOTTI:  Your Honor, do you mean which witness?
21              THE COURT:  I'm happy to hear from attorneys first.
22              MS. CICCOTTI:  Yes, your Honor.
23              THE COURT:  So that would be you?
24              MS. CICCOTTI:  Yes, your Honor, that would be myself.
25              THE COURT:  And that's -- say your last name again?
```

1          MS. CICCOTTI:  Oh.  I'm sorry.  It's Christine

2     Ciccotti.

3          THE COURT:  Ciccotti.  All right.

4          MS. CICCOTTI:  Yes, ma'am.

5          THE COURT:  And who are the witnesses you have

6     present?

7          MS. CICCOTTI:  Yes, your Honor.  We have with us Pam

8     Ahlin.  She's the director of the Department of State

9     Hospitals.

10         THE COURT:  So that would be the witness who --

11         MS. CICCOTTI:  Yes, your Honor.

12         THE COURT:  -- would testify if required?

13         MS. CICCOTTI:  Yes, your Honor.

14         THE COURT:  Let me ask Ms. Ciccotti to answer a few

15    questions.  And if you want to, in the process of doing so,

16    make proffers --

17         MS. CICCOTTI:  Yes, your Honor.

18         THE COURT:  -- I'm happy to consider those at this

19    time.  And then we'll decide if we want Ms. Ahlin to take the

20    stand.

21         So here's the reason we're convening this afternoon:

22    it's really prompted by looking at the reports on the waitlist

23    that have been supplied to me on a monthly basis.  Just looking

24    back since September 2015, that waitlist has grown from 83 to

25    in September 2016 it's now 297.

JENNIFER COULTHARD - OFFICIAL COURT REPORTER - USDC - (312)617-9858

1              I'm also looking specifically at a CDCR report on

2      mental health services delivery systems from October 17th,

3      2016, and so I'm drilling down and looking at the waitlists

4      there for psychiatric in-patient programs, 44 waitlisted; acute

5      psychiatric programs, 30 for males and then 6 for females.  So

6      you know that report, Ms. Ciccotti?

7              MS. CICCOTTI:  Yes, your Honor, I do.

8              THE COURT:  So it should go without saying the

9      waitlist numbers are extremely concerning to the Court.

10     They're unacceptable.  And so my question is first with respect

11     to the numbers on that MHSDS report.  Why cannot DSH eliminate

12     those numbers by a week from tomorrow?

13             MS. CICCOTTI:  Yes, your Honor.  I think one of the

14     things to take into consideration when you're looking at those

15     numbers, and certainly appreciate the Court's concern in that

16     regard, is that the waitlist started to increase once

17     defendants began to implement the new memorandum of

18     understanding between the Department of State Hospitals and the

19     California Department of Corrections and Rehabilitation.

20             THE COURT:  What was the start date of implementation?

21             MS. CICCOTTI:  Yes, your Honor.  It was May 1st.

22             THE COURT:  All right.

23             MS. CICCOTTI:  And that MOU, as I'll refer to it, was

24     a collaborative process when we were last here in August 2015.

25             THE COURT:  I'm familiar with the history of that.

1          MS. CICCOTTI:  Yes, your Honor.

2          THE COURT:  I know a special master was involved in

3     negotiating the MOU at my order.

4          MS. CICCOTTI:  Yes, your Honor, and we executed that

5     in November, and then it began implementation in May.  And so

6     the MOU was prospective looking, so essentially it looked

7     forward to referrals occurring -- to DSH occurring after May

8     1st, 2016.  There was a gap in those policies in the MOU that

9     did not account for the approximately 1,200 patients that were

10    already in DSH beds prior to the MOU's implementation.  And so

11    when that gap occurred, defendants saw that and quickly

12    recognized it and began to take immediate steps to address the

13    waitlist, as well as the census at DSH Atascadero.  And so some

14    of those steps involved going through the existing patient

15    population and assigning all those patients their least

16    restrictive housing designation.  And all that does is

17    essentially identify what is the lowest custodial setting a

18    patient could go to in in-patient care at DSH.  And so within a

19    few months time, CDCR had issued over 900 of those of

20    designations.

21         And so as those designations were issued, the DSH

22    clinicians began reviewing to see if the patients could go to

23    that setting and patients began moving in more quickly.  So,

24    essentially, we worked through a backlog very quickly to make

25    sure that the waitlist would be reduced and the census at DSH

1    Atascadero could continue to decline, and so at this point

2    we're at 223 patients at DSH Atascadero, and the waitlist has

3    already begun to reduce.

4         THE COURT:  What's the waitlist as of today for acute

5    in-patient in ICF?

6         MS. CICCOTTI:  Yes, your Honor.  As of the filing,

7    there were 36 patients accepted and waiting for acute beds,

8    there were 9 patients waiting for high custody and immediate

9    care beds, and there were 9 patients waiting for intermediate

10   care low-custody beds, and there are a total of 165 patients in

11   the process at various stages of the referral process.

12        THE COURT:  So looking at the numbers on the waitlist,

13   again, my question, why can't the current waitlist be

14   eliminated by a week from tomorrow?

15        MS. CICCOTTI:  Yes, your Honor.  There's 31 available

16   beds at DSH Atascadero, and those are low-custody beds, and

17   there are only three patients waiting for those beds, so at

18   this point we have more patients than we do beds; however, it's

19   important to keep in mind that there's a constant process of

20   discharges at the same time that there's admissions, so DSH

21   admits and discharges almost 200 patients per month, and so

22   there's this constant flux of patients moving in and out of the

23   system.

24        THE COURT:  In the total system, aren't there more --

25   in some cases there are more patients than beds, but if you

1    look at the total beds available, isn't there, at least at this

2    point in time, almost sufficient capacity?

3            MS. CICCOTTI:  Not at the correct custodial level,

4    your Honor.  So when we developed the MOU process with the

5    special master and with the input from plaintiff's counsel, we

6    all agreed that we should look at a patient's custodial level,

7    and we should look at their clinical ability to move to those

8    beds.

9            THE COURT:  I understand that.  So when can the

10   waitlist be -- the current waitlist be eliminated?

11           MS. CICCOTTI:  I think I'd have to consult further

12   with my clients regarding that question.  I think that we're

13   looking at it daily.

14           I've spoken with Ms. Ahlin and Katherine Tebrock, the

15   medical director for mental health services statewide, and they

16   look at those numbers daily to try to move patients as much as

17   possible.  But with 31 available beds in the system that are

18   low-custody beds, it could not be eliminated tomorrow.

19           And one thing to keep in mind, your Honor, is there's

20   always patients in the process, so a CDCR clinician recommends

21   a patient go for in-patient care, be referred to in-patient

22   care; there's several steps in the process before that patient

23   moves.  So you will always have a waitlist because they are in

24   various stages of the process, which we designed and

25   implemented as part of the new MOU.

1          THE COURT:  With respect to the waiting times, they're

2     respectively 10 days, 30 days.

3          MS. CICCOTTI:  Yes, your Honor.

4          THE COURT:  What's the policy or practice?  Maybe

5     they're the same with respect to how those times are treated?

6     Is it an assumption that the institution can always take up to

7     the last day, or is it the assumption that the first day of

8     that waiting period is the goal in every instance?

9          MS. CICCOTTI:  Your Honor, the goal is always to move

10    the patients as expeditiously as possible.  They don't wait up

11    to 10 days, they don't wait to 30 days.  They move them as soon

12    as they have been accepted for care at DSH.  As soon as they

13    have a level of care determined, which is either acute or

14    intermediate, and as soon as they've determined what is their

15    custodially appropriate setting for in-patient care.  So once

16    those decisions have been made, they're on a bus, and they're

17    moving.  So there's -- within the MOU, there's very strict time

18    frames for those decisions to happen that the defendants are

19    always working to meet those time frames, but the 10 and the 30

20    days are the outer limit of what DSH and CDCR try to

21    accomplish, your Honor.

22         THE COURT:  So what is the position of DSH as to what

23    an appropriate number showing on the waitlist is for acute

24    in-patient and ICF?  What's tolerable?

25         MS. CICCOTTI:  Your Honor, if I may, I'm going to

1    refer to my colleague Maneesh Sharma for a moment.

2              THE COURT:  All right, Mr. Sharma.

3              MR. SHARMA:  Good afternoon, your Honor.  One thing I

4    think that's important to remember is the waitlist, as

5    currently defined, a patient is placed on the waitlist as soon

6    as a referral is made.  So of course while both departments

7    strive to move the patient as expeditiously as possible, it's

8    entirely possible that even if there are beds available, if all

9    patients on any given day were referred on that day, a waitlist

10   would have a large showing until the various steps that

11   Ms. Ciccotti detailed can be completed.  So it's not so much

12   that there is a tolerable level.  I think every patient should

13   be moved as quickly as possible.  I think that's the policy of

14   both departments.  It's just a matter of trying to align the

15   flows of available beds as a result of discharges to the flow

16   of admissions.  So it's not so much that there's a tolerable

17   level.  There's always a striving to get that number down to

18   zero.  I think with the waitlist as it's currently defined,

19   there's an understanding that there will always be a waitlist.

20   It's impossible to eradicate it to zero unless there are no

21   referrals from the Department of Corrections, but I don't know

22   that we would proffer any type of tolerable number.  It's

23   always a goal to try to move patients as expeditiously as

24   possible.

25             THE COURT:  So what about capacity?  Either

1    Ms. Ciccotti or Mr. Sharma?  What's going on with isolation

2    rooms?

3              MS. CICCOTTI:  Yes, your Honor.  Those are required by

4    licensing requirements.  DSH operates all its facilities under

5    title 22 licensing standards, which requires a set number of

6    isolation rooms per unit.

7              THE COURT:  Are some of those going to be modified?

8              MS. CICCOTTI:  Yes, your Honor.  At DSH Stockton, they

9    had built more than what was required to the minimums, and so

10   they're converting -- I believe it's in our brief -- I think

11   it's 16 isolation cells to now house intermediate or acute care

12   patients in a single cell environment and that -- the

13   construction schedule, I believe, is for completion in March,

14   your Honor, so that will add 16 more beds to the system.  And

15   it's worth noting that --

16             THE COURT:  And how will those beds be classified?

17             MS. CICCOTTI:  They'll be single cell beds.  They can

18   be used for intermediate care or acute care.

19             THE COURT:  And that's the total number of beds in

20   isolation?

21             MS. CICCOTTI:  16 additional.  Yes, your Honor.

22             THE COURT:  And you were saying something else?

23             MS. CICCOTTI:  Yes.  Last summer when we were here,

24   DSH had also added a P3, which I believe is 30 additional beds.

25   That was last summer.  And then in between last summer and now,

1    DSH was constantly looking at the waitlist and seeing where the

2    demand is.  And so during that time frame, they flexed two

3    units.  So they were originally designed as intermediate care

4    units.  They saw that there was an increasing waitlist for

5    acute care, and so they instead converted those to acute care

6    units, which mainly has to do with staffing requirements and

7    treatment requirements and began using those as acute care

8    units to try to meet demand.  And more recently they also did

9    that with four acute care beds at DSH Atascadero in the locked

10   admissions unit there.  They flipped four beds to acute care

11   beds.  So they have various ways within the system to account

12   for the demand.

13         If I may also speak to their new utilization

14   management policy, your Honor.

15         THE COURT:  Let me actually ask you about the capacity

16   issue, the population growth.  I don't think we can get to the

17   bottom of population growth today.  However, the numbers raise

18   serious questions about capacity.

19         MS. CICCOTTI:  I understand.

20         THE COURT:  Should it be the case that in fact the

21   plans are to provide for a surplus to absorb that capacity,

22   there's some suggestion that projections show this issue will

23   go way by 2017, but how can the Court possibly believe those

24   numbers, given the trends?

25         MS. CICCOTTI:  Yes, your Honor.  Well, I think we have

1    to always consider that this is a system in flux, and referrals

2    wax and wane with seasons and with years and with trends.  As

3    we can look, we just had proposition 57 pass.  That might

4    impact the mental health population at CDCR, which could

5    correspondingly impact the number of beds needed at DSH and

6    reduce that demand, but we won't know until some of that time

7    has passed and that the measure has been implemented.

8         The other things to take into account are DSH's

9    utilization management process, which tries to help make sure

10   that we have enough beds by continuing to review patients in

11   the system to see if they're eligible for discharge.  And so

12   DSH's utilization management process has resulted in them

13   treating on average 40 more patients per month than they were

14   doing last fiscal year.  Projected over a year, that could be a

15   potential 400 more patients.

16        So I think when you look at all these fluctuating

17   systems, before you go and add capacity, one must take into

18   account whether we can use the existing resources that we have

19   to care for these patients.  DSH runs at about 94 percent

20   occupancy, so it's keeping the beds full, but it's utilizing

21   all these various policies it's developed to try to efficiently

22   utilize the beds.

23        Also the --

24        THE COURT:  Do you have the court orders that have

25   been in effect for years?  Doesn't the assumption have to be a

1    worst case scenario, in terms of planning?

2         MS. CICCOTTI:  Well, you know, we do have an

3    agreed-upon method for projecting and forecasting.  That's the

4    John Meisner consultant who comes in and works with CDCR's

5    office of research and develops the mental health bed need

6    study that's published in the fall and spring.  And the spring

7    2016 bed need study did, indeed, show that there were enough

8    in-patient beds.  And so building off that study is what drives

9    whether we ask for additional funding and ask for additional

10   beds.  And that forecasting methodology has been used for

11   several years now, and that's really the way -- one of the ways

12   defendants look at whether they need more beds or not.  But

13   there's lots of things they can do internally to try to better

14   utilize the beds as well, which one of these includes the

15   housing review process where patients are moved down to the

16   low-custody beds to better utilize those beds.

17        THE COURT:  Let me just ask you if plaintiff's

18   counsel -- I'm treating CDCR as an observer here today.  My

19   focus is on the DSH population.  I understand the requests for

20   orders.  I'm not going to -- I'm aware of those.  I'm going to

21   set a further status following this session probably for

22   January.  We'll identify a date before we leave here today.

23   And I'm prepared, if necessary, to entertain those requests for

24   orders then, but does plaintiff's counsel want to say anything

25   based on what it's heard at this point?

1          MS. ELLS:  Yes, your Honor.  The first thing I want to

2    clarify with respect to some of the numbers that you were

3    describing, on the MHSDS report that you referred to from

4    10/17/16, I just want to clarify that the numbers listed for

5    the waitlist here are all people that are past the program

6    guide timelines, so this is not the same from referral date

7    that you have on the other DSH charts --

8          THE COURT:  Right.  So are these people --

9          MS. ELLS:  -- right, so these people are all --

10          THE COURT:  -- the 44 are past 30 days?

11          MS. ELLS:  That's correct.  And the other --

12          THE COURT:  So there are 6, then the 30, and the 6 are

13    past 10 days?

14          MS. ELLS:  That's correct.

15          THE COURT:  That's -- I assume we all know that, but

16    that is correct.

17          MS. ELLS:  And the other thing I wanted to clarify on

18    the updated numbers they provided in the declaration of

19    Ms. Ahlin is that there are actually two categories that are

20    not reported, the first of which is the female population,

21    which as of 10/17 had at least 6 patients on the waitlist.  You

22    can see that the CIW pick is full.  Those 6 patients have been

23    waiting past program guide timelines, and yet none of the beds

24    at the lower custody patent have been opened, and so the

25    waitlist that they're reporting here in the Ahlin declaration

1    is actually higher than what they're reporting because it

2    doesn't include women.  And the other thing I want to clarify

3    is that there is this footnote on page 8 that indicates that

4    the chart also does not include anybody identified for internal

5    transfer from higher custody to lower custody within the

6    program.  And Ms. Ahlin testifies that that's 15 people a

7    month.  So these numbers are actually worse than even the

8    terrible numbers that you see.

9            So while I understand that there are fluctuations,

10   this is far from a fluctuation.  These numbers have been

11   reported now for months.  And I understand that maybe the

12   defendants didn't anticipate going back through all of the

13   1,200 people in the -- in the DSH programs at the time that the

14   MOU was implemented, but they certainly should have, because

15   the entire purpose of the Court's 14 prior orders in this case

16   is to move people into the lower custody beds that are

17   available.  There were available beds then, they could have

18   started planning in January for those beds and for those 1,200

19   people, and yet they didn't.  They didn't start until

20   September.  September is at the height of what they apparently

21   understand is a historically annual cycle of high referrals.

22   They didn't anticipate that by hiring staff.  They waited until

23   the referrals were already in the high point of the year.  And

24   apparently this is something that they know about that happens

25   every year, and yet they didn't have additional staff to plan

1    for that.

2        There's no reporting anywhere in any of their

3    documentation, including the monthly reporting, as to whether

4    or not they're actually meeting the MOU timelines.  The 10 days

5    and 30 days in the program guide are actually modified by the

6    MOU technologies to be much more quick, and we agree with that.

7    The MOU requires movement within 9 business days for acute and

8    within 15 business days for ICF.  And those timelines -- we

9    have no idea if they're being met.  I think you can glean from

10   the declaration of Ms. Tebrock that they were not being met,

11   and that is why they hired people in August.

12        But, again, this process is something that defendants

13   don't seem to be able to plan for, even though they have the

14   accurate information that they need in order to anticipate

15   these things.  And so nothing happens until this Court and the

16   special master are on their backs about it, until the problem

17   creeps up again and the beds decrease or the bed census

18   decreases and the population -- and the waitlist rises, and

19   that's where we are right now.  So we also feel like your

20   question about the buffer is entirely appropriate and,

21   actually, their Meisner bed planning that they discuss

22   anticipates a 10 percent extra capacity.  We know that they

23   don't have 10 percent.  They never have 10 percent.  And, in

24   fact, your Honor, they're perpetually short on beds.

25        So there doesn't seem to be an ability to plan for

1   these kind of things even when they know they're going to

2   happen.  But I think the other important point here is that

3   we -- nobody knew about these ash beds.

4         From what I understand defendants just saying, they

5   never notified the Court, they never notified the special

6   master that, from what I understand, they have taken 204 of the

7   256 beds that were specifically allocated in order from this

8   Court to ICF care in the order dated 6/17/2009.  They didn't

9   inform anybody that they were going to do that, and they did it

10   any way.  And it's kind of a pattern of an inability to plan

11   forward and then to do things on the fly without actually

12   requesting leave of court or necessarily planning.  So what we

13   understand is they've planned for 14 beds between now and

14   March.  There are hundreds of people on the waitlist, and many,

15   many of them had been there past program guide timelines, not

16   to mention the MOU timelines.

17         So, you know, this Court already understands that

18   there is a serious problem with the population, and we feel

19   like this is part and parcel of that conversation and it can't

20   be separated; but at the same time, there are not enough beds,

21   the MOU is not working, and, you know, we just feel like there

22   isn't a sufficient urgency and a forward thinking ability to

23   plan.  There is no plan for how to deal with this even though

24   defendants had weeks to respond to our request for further

25   orders.

1    THE COURT:  So that anticipates a question I do have

2    for Director Ahlin, and I -- if she wants to consult with you

3    first, it doesn't need to be under oath at this point, but I

4    want to hear -- she ultimately is responsible, obviously.

5    MS. CICCOTTI:  Yes, your Honor.

6    THE COURT:  But who -- I want a brief, for now,

7    explanation of the management team that works on these issues

8    and ensures that they get proper attention at all times --

9    MS. CICCOTTI:  Yes, your Honor.

10   THE COURT:  -- because I do -- the image that comes --

11   you know, I realize you may see the Court or she may see the

12   Court, her agency may see the Court as one of those lighthouses

13   where the light sweeps around every so often and, you know,

14   brings into view what's going on, but this Court

15   institutionally needs to know that there is someone or a team

16   on a daily basis making compliance -- there's noncompliance

17   with Court orders -- that is making compliance a top priority.

18   MS. CICCOTTI:  Yes, your Honor.

19   THE COURT:  So I would like to hear her explain to me

20   the management approach that is doing everything it can to

21   comply with court orders.

22   MS. CICCOTTI:  Yes, your Honor, and I can have her

23   come up.  And I would also like an opportunity to address some

24   of plaintiffs' counsel's points, if we can take a moment.  I

25   can put a pin in that if you want to speak to Ms. Ahlin first

JENNIFER COULTHARD - OFFICIAL COURT REPORTER - USDC - (312)617-9858

1    or have me respond to plaintiffs' counsel's comments first.

2            THE COURT:  The bottom line is, I haven't heard a good

3    response to my question.

4            Why can't the waitlist, as defined, showing on the

5    MHSDS report for October 17th, 2016?  Why cannot that be

6    eliminated?  Those are people past 30 days, past 10 days.  Why

7    cannot that be eliminated by a week from Friday to comply with

8    court orders?  I'm prepared to issue an order to show cause and

9    have you respond in writing, but that is my -- fundamentally,

10   that's the -- that's the starting point bottom line question to

11   try to bring some focus to this.

12           Ultimately, the question is does this Court need to do

13   this once a month to -- so it's clear that the Court is paying

14   very close attention and will not continue to tolerate

15   noncompliance?

16           MR. SHARMA:  Absolutely, your Honor.  Definitely there

17   is no intent for noncompliance here.  To address your question

18   about eliminating the waitlist, again, we have to be -- I want

19   to be very precise about how we explain this, your Honor.  So

20   if you were to ask the question as to why this waitlist on a

21   certain date cannot be eliminated, again, we have to recognize

22   that there's a constant flow of patients.  So if you ask the

23   question as to if there are -- I'll just give a not exact

24   number, but if there are 10 patients who are beyond timeline,

25   now we're talking about those individual 10 patients, it's

1    entirely possible that those 10 patients will be admitted

2    within the next day, within the next week.  What will happen,

3    though, is that more patients will be referred.

4              THE COURT:  Those are pipeline issues.

5              MR. SHARMA:  Right.

6              THE COURT:  There have been pipeline issues for a long

7    time, right?  And I realize they're other populations, but

8    it's -- ultimately, the right folks have to be matched up with

9    the right beds.

10             MR. SHARMA:  Absolutely, your Honor.  So, again, if

11   the question -- if the Court's goal is to constantly see a zero

12   waitlist, the only way that will be possible is if all

13   referrals stop from the Department of Corrections.

14             Now, again, if you're talking about how long patients

15   are waiting, it's always the department's -- both departments'

16   goal to move them as quickly as possible.

17             So again, if you're talking about the waitlist on any

18   particular day, it's entirely possible that those patients,

19   those individual patients as of that day will, in fact, be

20   eliminated, and they will no longer be waiting.  They will be

21   admitted into the Department of State Hospitals.

22             THE COURT:  So it's never possible to have a zero list

23   past 30 days, past 10 days?

24             MR. SHARMA:  That is definitely the goal, to have a

25   zero list past 30 and 10, your Honor.  It's something that the

1   departments are striving for definitely.

2          To turn to some of plaintiff's comments, I think one

3   of the main goals of the MOU was to seek that goal and to

4   achieve that goal.  Obviously there were a couple of road bumps

5   in rolling out, but we've seen a lot of positive progress as

6   the departments have resolved those issues.  We've seen that

7   waitlist go down.  The departments do welcome the opportunity

8   to return to the Court in January and present updated data.

9   And the sincere goal and hope of the department is to ensure

10  that all patients are moved within those outer timelines, that

11  any waitlisted patients who are beyond program guide timelines

12  should be met.

13         I will, if I may, your Honor, put one small caveat on

14  that.  There are minor occasions where there are medical issues

15  regarding a particular patient that result in one particular

16  patient or some particular patients being beyond timelines, but

17  the ultimate goal of the departments is always to be able to

18  move acute patients within 10 days and to move intermediate

19  care patients within 30 days.

20         MS. CICCOTTI:  If I may add, your Honor.

21         THE COURT:  Very briefly, and then I'll hear from

22  Ms. Ahlin.

23         MS. CICCOTTI:  Yes, your Honor.  We note in the filing

24  how many patients are indeed beyond the program guide time

25  frame, so I just wanted to clarify that, that there are three

1    acute care patients beyond the 10 days as of the date of our

2    filing and 37 beyond the 30 days.  And those specifically

3    they're looking at daily to try to move those patients as soon

4    as possible.  But we also have to keep in mind that we just

5    rolled out an entirely new process on May 1st.

6             And this was really a sea change in how referrals were

7    handled and processed, and the least restrictive housing

8    designation was a big part of that.  It took 11 months to

9    negotiate, train, and implement that MOU, and so five months

10   later, you know, plaintiff's counsel suggests the MOU is not

11   working, really isn't sufficient time to assess, you know, the

12   success of the MOU.  And we know it can be successful because

13   we ran an interim process that was very successful especially

14   in filling the beds at DSH Atascadero.

15            So I understand the Court's patience is thin, but I

16   think when you look at those big sea changes that happen,

17   sometimes we have to allow additional time to allow those

18   successes to come to fruition.  And I assure you they are

19   looking at them daily, because I see them daily, and they talk

20   to us about it daily.  But certainly we can have Director Ahlin

21   come up and address those questions further.

22            THE COURT:  If she could.

23            MS. CICCOTTI:  Yes, your Honor.

24            THE COURT:  I just want to hear from management.

25            Director Ahlin, just describe to me in summary terms

1    for now the management approach.  I understand there's -- there

2    is a bureaucracy here, but this is about meeting Constitutional

3    standards.

4            MS AHLIN:  Right.

5            THE COURT:  And people have to get out of bureaucratic

6    mindsets.  So tell me what you are doing to have a nimble --

7    even if it's bureaucrats doing the work.  And I have respect

8    for government workers and we need them, the Court needs them,

9    the plaintiffs need them, but what is being done to ensure a

10   nimbleness that is not evident to this Court at this time?

11           MS. AHLIN:  Okay.  Thank you.  From the

12   department's -- let me start with the department management of

13   beds, maybe that's a good place to start.  We have what we call

14   is a patient management unit that is a centralized oversight

15   that works with each of the psych programs to monitor the

16   referrals coming in, the admission packages, and to make sure

17   that they're appropriately designated to the right designation

18   for clinical care of the hospitals.  We track those on a daily

19   basis, and that is pretty much what they do is they look at the

20   package, they make sure that it's complete and the patient gets

21   on the list.

22           THE COURT:  And is someone reporting to you daily?

23           MS. AHLIN:  Yes.  I have a deputy director that

24   reports to me directly.

25           THE COURT:  Daily?

JENNIFER COULTHARD - OFFICIAL COURT REPORTER - USDC - (312)617-9858

1           MS. AHLIN:  To be honest with you, I look at the data

2    daily.  At this point in time, it is that important for me to

3    monitor those patients that are beyond timelines for acute and

4    ICF daily.  I check on them every morning to see how they're

5    mitigating.

6           As Christine has mentioned here that we put in place

7    this MOU and associated policies.  They were directly related

8    to CDCR and DSH and the movement of patients.  It was to

9    improve the timeliness and the access to care.  Those did go

10   into effect May 1st.  There was a lot of work that was done on

11   the front end to make sure that our people in the field were

12   trained on that.  We had training modules, training teams.  Not

13   only did we do the training, we went out and made sure that the

14   referrals from the clinicians actually went to the other sites

15   to see those facilities, that when they were referring

16   patients, they understood the environment and what they could

17   refer to.

18          There was multiple cross-training dates so that we

19   could understand the environment and the processes.  We did the

20   same thing with the Department of Corrections and their

21   population management, which is referred to HIC pop.  They've

22   gone to our site so we better understand the environment and

23   that we could process the patients timely.

24          What I did see and what I was monitoring from a year

25   ago when I came in here, I monitored it on a weekly basis from

1    there on out.  We saw the effects of the interim process.  We

2    knew that was going to work.

3         When the MOU was developed and the associated

4    policies, we had faith in those as well.  As we implemented

5    those, we kept a close eye, including myself.  Yes, I have 8

6    departments to manage, but this was a priority to me, my deputy

7    director, the patient management unit and the executive

8    directors that work at each one of those five sites that treat

9    Coleman patients.

10        So I started monitoring it and we were watching it.

11   We recognized there were gaps.  As we said, the MOU policies

12   were for patients coming into the system.  We recognized the

13   gap in the available beds at Atascadero.  We monitored to see

14   if those beds were filling up.  We had a slide down on those

15   beds as of May 1st, so we looked at what the process was, we

16   looked at the gaps in the system, and Ms. Tebrock and myself

17   got together on a weekly basis and talked about what can we do?

18   Where can we find patients to fill those beds?

19        At the same time, the waitlists were backing up a bit.

20   So at that point, we looked at the patients -- the 1,200

21   patients that were in our system.  We triaged those patients to

22   figure out which ones would be best suitable for that

23   environment from a custodial aspect and from a clinical aspect.

24        So we put our teams together, they worked out and had

25   weekly meetings.  We came up with another process to get the

1    least restrictive housing for all of those in there, in our

2    system.

3         Those are what you're seeing move in that -- slowly we

4    started seeing the Atascadero beds, Coalinga beds, which are

5    low-custody ICF as well climb up.  Coalinga is at max capacity.

6    They are 50 beds, and they are maintaining their 50 beds.

7         We also looked at Atascadero.  We have 31 beds today

8    available in Atascadero.  What we're doing is we're triaging

9    those that can step down within our system.  That's what I'm

10   watching.  I'm also watching the beds fill and the waitlists,

11   both waitlists, acute and ICF.  I watch those that are over

12   program guide.  The acute were my priority to make sure that

13   they got in within the 10 days.  That number has dropped

14   significantly since we started working hand in hand with CDCR

15   and managing the beds.

16        THE COURT:  So is there a system in place to clear the

17   waitlist of everyone over a program guide deadline by a week

18   from tomorrow?

19        MS. AHLIN:  I can't -- there's a system in place, but

20   to clear them that quickly, no, because they have to be

21   clinically stable enough to move into those beds.  The

22   process -- for me, it's the process is what I'm looking at,

23   because I need a process that can be in our system in place and

24   managed by both departments and by us, and then I need the

25   system to level out.  Right now we're in this leveling system.

1          THE COURT:  What does that mean?

2          MS. AHLIN:  In a few months we're seeing --

3          THE COURT:  What do you mean by "leveling"?

4          MS. AHLIN:  The impact of the new MOU, triaging all

5     the patients that are within our system.  We're starting to see

6     the benefits of the MOU.  We're starting to see the benefits of

7     monitoring it regularly, including the utilization management

8     process, the length of stay.  We're collecting the data, we're

9     managing it, we're comparing it.  So right now we're in this

10    transition state.

11         THE COURT:  And what about the issue of planning

12    ahead?

13         MS. AHLIN:  We have to level out the system and then

14    forecast out, and right now we're seeing it shift.  We're

15    seeing the waitlist go down, and we're seeing the population

16    rise, and we're -- and then we will monitor the referrals

17    coming in, monitor the length of stays, the utilization

18    process; and in a few months, we'll be able to see where we're

19    at as a system and monitor it at that point.  I think it's

20    premature to really forecast out our needs at this point in

21    time.

22         THE COURT:  But there's information that the

23    department receives that allows it to see people in the

24    pipeline heading its way --

25         MS. AHLIN:  Absolutely.

1           THE COURT:  -- already.

2           MS. AHLIN:  Yes.  So part of the managing over the

3   past 12, 13 months was us to look and watch the waitlist.  The

4   acute waitlist started to grow.

5           We had worked out with a special master our ability to

6   flex units, very similar to the two programs in CDCR, the

7   massive amount of patients that we see come into our system,

8   it's a unit flip versus bed flips.

9           So what we did was, we were able to manage that, watch

10  it, and actually forecast out two 30-bed units, and we flipped

11  them one at a time to meet the needs of the acute patients.  So

12  that's part of us responding to watching the data, watching the

13  referrals, seeing it, forecasting it and flipping it, flipping

14  those units.

15          THE COURT:  All right.  I am going to issue some kind

16  of order and ask for a written report to -- I'll take into

17  account what you've said here today, but I'm not -- I have not

18  heard what I was hoping to hear, and so I need further clarity.

19  We are going to meet again in January, and at that point I may

20  ask for sworn testimony.

21          Is January 20th available in the Court's calendar?

22          THE CLERK:  January 20th?  Let me see if I can get

23  into -- Friday, yes, ma'am.  You are open that day.

24          THE COURT:  It's not a civil law and motion calendar?

25          THE CLERK:  No, ma'am.

JENNIFER COULTHARD - OFFICIAL COURT REPORTER - USDC - (312)617-9858

1          THE COURT:  So January 20th, unless you're all going

2    to the inauguration, that will be a further status, possible

3    taking of testimony.  I'll issue an order by next week

4    confirming an order to show cause to get to the bottom of the

5    waitlist to the extent the folks are past the program guide

6    deadlines.

7          On the 20th, we'll also -- for now we'll calendar the

8    plaintiff's request for orders, and if I need more on that

9    before that hearing, I'll let you know.

10          I don't have other questions today.  Is there anything

11   to create any kind of record?  This is really the Court's

12   desire to get some sense of what's going wrong with those

13   waitlists.

14          MS. O'BANNON:  Your Honor, Danielle O'Bannon on behalf

15   of the defendants.  Not anything to create the record, but just

16   so if we could add another look or subject to the January 20th

17   status conference.

18          THE COURT:  And that would be?

19          MS. O'BANNON:  While we're working in tandem with the

20   special master and plaintiff's counsel in creating these plans,

21   we've determined that we also need some direction from the

22   Court in regards to how we accomplish or meet the benchmarks of

23   the goals that have been set out in the August 9th, 2016 order,

24   and we just wanted to initiate a discussion with the Court.

25   And maybe we can do a small briefing or have that part of the

1    discussion for January 20th.

2         THE COURT:  All right.  Would that involve meeting and

3    conferring with plaintiffs prior to that date on that subject?

4         MS. O'BANNON:  Yes, your Honor.

5         THE COURT:  All right.  I'm prepared to receive a

6    joint statement from the parties.  Any problem not to approach

7    that this way, Ms. Ells?

8         MS. ELLS:  That seems fine.  I'm not sure what the

9    issue is, but that's absolutely fine.

10        THE COURT:  Can you file in writing --

11        MS. O'BANNON:  Yes, your Honor.

12        THE COURT:  -- your proposed definition of the topic?

13        MS. O'BANNON:  Yes.  Do you have a deadline that you

14   would like for us to submit that?

15        THE COURT:  If you can do that within 14 days.  And

16   the Court will either approve or modify that and then require

17   the joint statement to be filed within 20 -- within 7 days in

18   advance of January 20th.

19        MS. O'BANNON:  Your Honor, I've been informed that 14

20   days from today is Thanksgiving.  Can we --

21        THE COURT:  Make it 13 days.

22        MS. O'BANNON:  Thank you.  I appreciate it, your

23   Honor.

24        THE COURT:  It is a Thursday today.  All right.  So

25   the day before Thanksgiving.

1            MS. O'BANNON:  Thank you, your Honor.

2            THE COURT:  All right.  Anything else, Ms. Ells?

3            MS. ELLS:  Yes, your Honor.  I just want to make one

4    quick point.

5            THE COURT:  And this is for the record.

6            MS. ELLS:  This is for the record.  Two quick points,

7    actually, very quick, the first of which is I want to clarify

8    that the bed plans that the defendants referred to when they

9    said that the forecast predicted plenty of -- plenty of space

10   in the in-patient programs, that is combining the bed planning

11   for high-custody and low-custody ICF.  Only if you utilize both

12   of those is there sufficient capacity.  If you look at just the

13   ICF high custody, there's been a shortage for years and a

14   predicted shortage by a lot of beds, and that is actually --

15   the point here is that the only way this system works is if

16   defendants fully utilize the low-custody beds, and that is what

17   is not happening.

18            There are 31 open beds right now, and there's no good

19   reason not to use them.  There are plenty of level 1 and level

20   2 people in the DSH programs right now who live in dorms in

21   CDCR every day of their lives, and they are in high-custody

22   settings.  There are people that have no custody score at all,

23   and they are in high-custody settings.  And these are the type

24   of people that are sitting waiting for a review, and we don't

25   even know what the timeline of that review is in order to move

1    forward and, you know, until these beds are fully utilized, and

2    that includes and must include the low-custody beds, this

3    problem is never going to be solved.

4            THE COURT:  I understand that issue generally.  I'm

5    aware of it.  Frankly, one thing I'm trying to do and will try

6    to have a better handle on by January is how to merge the

7    various reports.  It's very hard -- even though I've asked for

8    this monthly reporting, I don't think it's giving me the

9    picture I need.  So I am inclined to think plaintiff's point is

10   well taken.  I need to get a better dashboard so I can get a

11   handle on that.  I will do my own work in that regard, but I

12   may ask for the parties' assistance as well in helping me

13   reconcile the reports.  All right.  I'll issue an order.

14           MR. SHARMA:  Your Honor --

15           THE COURT:  Your proposed subject matter for the meet

16   and confer is due the day before Thanksgiving by close of

17   business.

18           Joint statement due seven days before January 20th.  I

19   may issue an order with further direction for preparing for

20   January 20th.

21           And I am going to issue an order to show cause to try

22   to focus DSH's explanation with respect to the waiting list for

23   folks who are past the program guide deadlines.

24           Someone else wanted to say something?

25           MS. CICCOTTI:  Your Honor, we just were seeking some

1    clarification on the joint statement for seven days prior.

2    You're looking for that to further discuss the in-patient

3    census and waitlist process for the January 20th --

4              THE COURT:  Whatever issue --

5              MS. CICCOTTI:  Oh, solely related to Ms. O'Bannon's --

6              THE COURT:  At this point, that's the only thing the

7    joint statement would cover.

8              MS. CICCOTTI:  Yes, your Honor.

9              THE COURT:  I may give you further directions.

10             All right.  We'll see you in January.

11             THE CLERK:  What time, your Honor?

12             THE COURT:  Oh.  10:00 a.m.

13        (Concluded at 3:27 p.m.)

14

15                  C E R T I F I C A T E

16

17        I certify that the foregoing is a true and correct

18   transcript of the record of proceedings in the above-entitled

19   matter.

20
     _/s/ JENNIFER L. COULTHARD_              November 23, 2016
21                                             _____
                                                    DATE
22

23   JENNIFER L. COULTHARD, RMR, CRR
     Official Court Reporter
24

25