KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
DANIELLE F. O'BANNON
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Maneesh.Sharma@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM DB PC<br><br>**DEFENDANTS' RESPONSE TO NOVEMBER 17, 2016 ORDER TO SHOW CAUSE**<br><br>Judge Kimberly J. Mueller |

## INTRODUCTION

The Court ordered Defendant Department of State Hospitals (DSH) to show cause "why the waitlists for inpatient care [defined as patients beyond Program Guide transfer timelines] cannot be reduced to zero by November 23, 2016 at 5:00 p.m. and maintained at zero thereafter." (ECF No. 5519.) Defendants California Department of Corrections and Rehabilitation (CDCR) and DSH jointly and respectfully submit that while obstacles remain, the number of patients waiting beyond *Coleman* Program Guide timelines is decreasing and the changes contemplated by the new Memorandum of Understanding (MOU) are taking hold.

1

1    Defendants have reduced the number of patients waiting beyond *Coleman* Program Guide
2    timelines from thirty acute-care and forty-four intermediate-care patients on October 17, 2016 to
3    nine acute-care and forty-two intermediate-care patients on November 21, 2016. Eighteen of
4    these patients have beds on hold, but Defendants cannot admit all fifty-one patients by 5:00 p.m.
5    on November 23, 2016 without displacing other patients currently receiving necessary inpatient
6    care. As described below, however, recent trends demonstrate that Defendants have improved the
7    new referral and admissions processes in order to ensure overall compliance with Program Guide
8    transfer timelines. Unexpected spikes in need have also caused Defendants to take specific action
9    to address shortfalls in available bed capacity, including by converting intermediate care units to
10   acute units in response to increased acute referrals, admitting appropriate acute care patients to
11   low-custody units at DSH-Atascadero, and, when appropriate, increasing system-wide inpatient
12   capacity. Defendants are continuing to implement the new processes developed collaboratively
13   with the Special Master and Plaintiffs and are also considering other long-term increases to
14   system-wide inpatient capacity. Defendants look forward to further updating the Court before
15   and during the January 20, 2017 status conference, and to the extent the Court is considering
16   further orders in advance of the status conference, Defendants respectfully request the opportunity
17   for additional briefing.

**I.   DEFENDANTS HAVE SIGNIFICANTLY DECREASED THE CURRENT NUMBER OF INMATES WAITING BEYOND PROGRAM GUIDE TIMELINES, BUT CANNOT ADMIT ALL PATIENTS CURRENTLY BEYOND PROGRAM TIMELINES WITHOUT DISPLACING PATIENTS CURRENTLY RECEIVING INPATIENT CARE.**

21   As of November 21, 2016, nine acute care patients have not been placed within ten days of
22   referral, and forty-two high-custody and zero low-custody intermediate care patients have not
23   been placed within thirty days of referral. (Decl. P. Ahlin Supp. Resp. to Nov. 17, 2017 Order to
24   Show Cause (Ahlin Decl.) at ¶ 3.) Of these patients, all nine acute patients have a bed on hold
25   (i.e., a placement that has been designated for that patient and will not be filled by another), and
26   nine intermediate care patients have a bed on hold. (*Id.*) Including these beds on hold,
27   Defendants' acute and high-custody intermediate programs are currently fully occupied, meaning
28   that Defendants cannot admit all high-custody intermediate-care patients beyond Program Guide

2

timelines by 5:00 p.m. on November 23, 2016 without discharging or inappropriately transferring patients currently receiving critical mental health treatment. (*Id.* at ¶ 5.) *Coleman* patients on waitlists, however, continue to receive high levels of mental health care from their CDCR clinicians before, during, and after the referral process, including placement in Mental Health Crisis Bed if needed. (ECF No. 5509-1 at ¶ 6.) There are also currently thirteen discharges pending from acute programs and thirteen discharges pending from high-custody intermediate programs, and Defendants will admit patients from the waitlists as soon as those patients are discharged. (*Id.*)

Multiple factors may affect the timing of patient transfers. (*Id.* at ¶ 7.) These factors include holds for co-occurring medical needs, legal holds to address subpoenas and pending Court matters, lower acuity levels, and lack of an appropriate inpatient bed. (*Id.*) Further, patients are not placed in inpatient beds on a "first-come, first-served" basis, but are instead triaged based on their mental health acuity level. (*Id.*) As a result, patients with high clinical acuity—such as those who are suicidal or are expressing homicidal intent or behavior—are elevated on the waitlist and placed before patients with lower clinical acuity, such as bizarre behavior. (*Id.*) Regardless, Defendants seek to timely admit all patients, taking into account both acuity and referral time in admission decisions. (*Id.*)

Defendants are also working hard to fill available low-custody beds. First, as reported at the November 10, 2016 status conference, Defendants have begun admitting appropriate acute-care patients to available beds at DSH-Atascadero. (ECF No. 5509-2 at ¶ 23.) To safely admit acute patients to DSH-Atascadero's low-custody, unlocked rooms, Defendants must individually review each patient's clinical presentation and stability to ensure that the patient will not decompensate or threaten staff or patient safety. (Ahlin Decl. at ¶ 11.) Defendants review daily patients both currently receiving acute care in DSH programs and all new referrals to determine if they can be safely moved. (*Id.*)

Second, Defendants continue to implement the housing-review process to move high-custody, intermediate-care patients into low-custody intermediate settings. (*Id.*) Placement in an inpatient program is a complex task requiring doctors and correctional staff to ensure both that the

3

patient has been referred to the appropriate level of care based on the patient's mental health needs, and can be safely housed after evaluating enemy and staff safety concerns. (Ahlin Decl. at ¶ 6; Decl. K. Tebrock Supp. Resp. to Nov. 17, 2017 Order to Show Cause (Tebrock Decl.) at ¶ 2.) As a result, Defendants cannot shift a patient from his existing inpatient program to another without conducting a review of the patient's history and considering any safety concerns that may arise with other patients in the new inpatient program. (Tebrock Decl. at ¶ 2.) Having reviewed every patient who is custodially eligible for movement, Defendants' mental health care teams have determined that immediate transfer of these patients is not clinically safe. (Ahlin Decl. at ¶ 11.) Consistent with the housing-review policy, Defendants will continue to monitor these patients and will transfer them as soon as their mental health clinicians agree that movement is appropriate. (*Id.*)

II. **DEFENDANTS TAKE APPROPRIATE STEPS TO MANAGE INPATIENT ADMISSIONS AND MINIMIZE WAIT TIMES, INCLUDING BY EXPANDING CAPACITY, BUT INPATIENT BED NEED IS DYNAMIC AND CANNOT BE PERFECTLY PREDICTED.**

Inpatient waitlists fluctuate because individual patient needs and real time demand cannot be perfectly predicted. (*See* Ahlin Decl. at ¶ 9; Tebrock Decl. at ¶ 4.) While Defendants strive to place patients well before the outer boundaries of the Program Guide, unforeseen spikes may sometimes push patients beyond timelines and require Defendants to take further action. (Ahlin Decl. at ¶ 9.) Despite these spikes, Defendants have demonstrated their ability to manage and triage inpatient admissions. (*Id.*) From January to May 2016, 98% patients referred for intermediate care were placed within the thirty-day Program Guide timeline, and 67% of intermediate patients were admitted less than ten days from referral. (*Id.*)

Defendants have also taken concrete steps to respond to unforeseen fluctuations in patient need and maximize the use of available beds. (*See id.* at ¶ 10.) For example, Defendants converted two high-custody, intermediate-care units at DSH-Stockton to acute-care units in December 2015 and July 2016 order to respond to recent increases in acute-care referrals. (*Id.*; *see also* ECF Nos. 5509-2 at ¶ 22.) Similarly, Defendants are admitting acute-care patients at DSH-Atascadero. (Ahlin Decl. at ¶ 10.) As a result, Defendants are close to eliminating the current waitlist for acute patients beyond Program Guide timelines. (Ahlin Decl. at ¶ 12.)

4

Further, Defendants have added capacity to respond to sustained increases in patient needs, as opposed to temporary spikes. (*See* Tebrock Decl. at ¶ 5.) From 2013 to 2016, Defendants have increased their male inpatient bed capacity from 1,283 to 1,428, including activating a 30-bed intermediate care unit at DSH-Vacaville in September 2015. (Ahlin Decl. at ¶ 10.) The Court-approved McManis projections for inpatient care estimate that Defendants have sufficient capacity for male acute and intermediate-care programs. (Tebrock Decl. at ¶ 4.) Even so, Defendants are currently evaluating trends in inpatient bed use and are again considering increasing capacity. (*Id.* at 5.) Doing so involves fully examining the new Memorandum of Understanding's impact on utilization management, and the long-term affect its newly-implemented processes will have on the time necessary to move patients into inpatient treatment facilities. (*Id.*)

### III. DEFENDANTS WILL FURTHER DEMONSTRATE THEIR PROGRESS IN REDUCING OR ELIMINATING THE WAITLIST FOR PATIENTS BEYOND PROGRAM GUIDE TIMELINES IN COMING MONTHS.

Defendants are committed to providing appropriate and timely inpatient care to *Coleman* class members. (Ahlin Decl. at ¶ 13, Tebrock Decl. at ¶ 3.) Full implementation of Defendants' MOU, including the new housing-review and bed-utilization-management processes, is the best way to minimize patients waiting beyond Program Guide timelines. (*See* ECF No. 5509-2 at ¶ 25 (noting that DSH is admitting more patients per month the first four months of Fiscal Year 2016/2017).) These policies go beyond Defendants' previous plans to address inpatient transfers by requiring that patients be moved to low-custody inpatient beds as soon as is it clinically and custodially safe to do so, and creating more accountability for tracking and managing inpatient bed use. (Ahlin Decl. at ¶ 13, Tebrock Decl. at ¶ 3.) Defendants plan to submit updated census and transfer-timeline data before the January 20, 2017, status conference.

To the extent the Court is considering further orders in advance of the status conference, Defendants respectfully request the opportunity for additional briefing. In that regard, Defendants note that while the Program Guide has been identified as Defendants' remedial plan, temporary deviations from its transfer timelines are not, by themselves, tantamount a constitutional violation. Defendants also ensure that *Coleman* patients waiting for transfer to

5

inpatient programs are properly monitored and continue to receive high levels of mental health care from their CDCR clinicians before, during, and after the referral process, including placement in a Mental Health Crisis Bed if needed. (ECF No. 5509-1 at ¶ 6.)

## CONCLUSION

Defendants continuously admit *Coleman* patients to inpatient care as quickly as possible. While Defendants cannot admit all patients currently beyond Program Guide timelines by 5:00 p.m., November 23, 2016, Defendants' implementation of new policies and flexibility in responding to needs for differing levels of inpatient care has resulted in significant decreases in waitlists for inpatient care that arose earlier this year. Defendants continue to explore all options to meet inpatient bed needs, including possible increases to capacity, and look forward to providing further updates at or before the January 20, 2017 status conference.

Dated: November 22, 2016

Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
DANIELLE F. O'BANNON
Supervising Deputy Attorney General

*/S/ MANEESH SHARMA*
MANEESH SHARMA
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

6

Defs.' Resp. to Nov. 17, 2016 Order (2:90-cv-00520 KJM DB PC)