KAMALA D. HARRIS
Attorney General of California
DANIELLE F. O'BANNON, State Bar No. 207095
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
MANEESH SHARMA, State Bar No. 280084
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD A. STEGEMAN, State Bar No. 225745
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 323-4025
 Fax: (916) 324-5205
 E-mail: Christine.Ciccotti@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF PAM AHLIN IN SUPPORT OF DEFENDANTS' RESPONSE TO THE NOVEMBER 17, 2016 ORDER TO SHOW CAUSE** |

1

I, Pam Ahlin, declare:

1. I am the Director of the Department of State Hospitals (DSH). I have personal knowledge of the facts stated in this declaration and if called upon to testify to those facts, could and would do so competently. I make this declaration in support of Defendants' Response to the Court's Order to Show Cause.

2. DSH cannot reduce the waitlist of all patients currently beyond *Coleman* Program Guide transfer timelines to zero by November 23, 2016 without jeopardizing custodial and clinical needs. However, as discussed in this filing, the number of patients beyond Program Guide deadlines continued to be reduced.

### WAITING PATIENTS CANNOT SIMPLY BE MOVED TO THE NEXT OPEN TREATMENT BED; TREATMENT BEDS ARE NOT INTERCHANGEABLE.

3. Defendants are committed to providing appropriate and timely inpatient care to *Coleman* class members. Defendants have made significant progress in reducing the number of patients waiting beyond *Coleman* Program Guide timelines from thirty acute-care and forty-four intermediate-care patients on October 17, 2016. As of November 21, 2016, nine acute-care patients have not been placed within ten days of referral, and forty-two high-custody, and zero low-custody intermediate care patients have not been placed within thirty days of referral. Of these patients, all nine acute patients have a bed on hold (i.e., a placement that has been designated for that patient and will not be filled by another) and nine intermediate care patients have a bed on hold.

4. In response to the Court's question why the number of patients waiting for acute and intermediate inpatient treatment beds beyond the *Coleman* Mental Health Services Delivery System Program Guide Timeframes of ten and thirty days, respectively, cannot be reduced to zero by close of business on November 23, 2016, the custodial and clinical needs of the patients and type of beds available do not currently correspond to one another. DSH appreciates and shares the Court's concern of patients on the waitlist who are outside of Program Guide timelines for admission. When DSH receives a referral from CDCR, those patients are placed on the waitlist.

2

Decl. of P. Ahlin Supp. Defs.' Resp. to Nov. 17, 2016 Order to Show Cause
(2:90-cv-00520 KJM-DB (PC))

When a treatment bed becomes available at one of DSH's facilities, it cannot be filled arbitrarily with any patient waiting for admission to a DSH facility on the waitlist.

5. Including beds on hold, Defendants' acute and high-custody intermediate programs are currently fully occupied, meaning that Defendants cannot admit all high-custody, intermediate care patients beyond Program Guide timelines by 5:00 p.m. on November 23, 2016, without discharging or inappropriately transferring patients currently receiving critical mental health treatment. However, there are currently thirteen discharges pending from acute programs and thirteen discharges pending from high-custody intermediate programs, and Defendant will admit patients as soon as the patients are discharged.

6. Placement in an inpatient program is a complex task that requires CDCR and DSH to ensure that the patient has been referred to the appropriate level of care, the patient can be safely housed at a particular inpatient program, including evaluation of any enemy concerns, staff safety concerns, escape risk, history of violence, and the patient's mental health status. For instance, if a patient is in crisis and suicidal, he is likely to be placed in an acute-care program, in a room with a single bed. A patient with a history of attempted escapes is unlikely to be placed in an unlocked dorm. A treatment bed in a low-custody dorm setting would not be appropriate. But each of these patients must be evaluated individually on the basis of their own specific mental health status and custodial need.

7. Multiple factors may affect the timing of patient transfers. These factors include holds for co-occurring medical needs, legal holds to address subpoenas and pending Court matters, lower acuity levels, and lack of an appropriate inpatient bed. Further, patients are not placed in inpatient beds on a "first-come, first-served" basis, but are instead triaged based on their acuity level. As a result, patients with high clinical acuity—such as those who are suicidal or are expressing homicidal intent or behavior—are elevated on the waitlist and placed before patients with lower clinical acuity, such as bizarre behavior. Regardless, Defendants seek to timely admit all patients, taking into account both acuity and referral time in admission decisions.

3

Decl. of P. Ahlin Supp. Defs.' Resp. to Nov. 17, 2016 Order to Show Cause
(2:90-cv-00520 KJM-DB (PC))

**STEPS DSH HAS TAKEN TO PROVIDE INPATIENT CONTINUUM OF CARE FOR THE COLEMAN CLASS.**

8. Since July 2015, DSH has improved efficiencies within its facilities serving Coleman patients which are demonstrative by the ability to serve more patients every month. This is accomplished by working collaboratively with CDCR, to implement the full continuum of patient movement resulting in more patients served annually. During Fiscal Year 2015/16 DSH admitted 2,285 patients, or an average of 190 patients per month. In the first four months of Fiscal Year 2016/2017, DSH admitted 913 patients, or an average of 228 patients per month. Annualized, we expect to increase total admissions by 451 patients, to a total of 2,736.

9. The demand for each specific level of care at each custodial housing level is not static. Using historical data, we can forecast increased and decreased demands throughout that year. But forecasting is not a perfect indicator of real demand. Each patient requires individualized evaluation based on a host of clinical and custodial concerns. Sometimes demand forecasting will fall short of real-time demand. That is what happened here, and that is the primary reason why the number of inmate patients waiting beyond Program Guide deadlines cannot be reduced to zero by November 23. While Defendants strive to place patients well before the outer boundaries of the Program Guide, unforeseen spikes may sometimes push patients beyond timelines and require Defendants to take further action. Despite these spikes, Defendants have demonstrated their ability to manage and triage inpatient admissions. From January to May 2016, 98% patients referred for intermediate care were placed within the thirty-day Program Guide timeline, and 67% of intermediate patients were admitted less than ten days from referral.

10. Defendants monitor trends in referrals to meet changing demands for beds based on clinical acuity and custody levels. Overall, from July 2013 to July 2016, the total number of inpatient beds increased from 1282 to 1428, an 11.4% increase in capacity within three years. Where demands have fluctuated from one level of mental health acuity to another, DSH has reacted quickly to make adjustments and created a permanent process to address fluctuations in the future. For an example of Defendants identifying and responding to an increase in capacity and fluctuations for acuity, between September 2015 through October 2016, DSH took the

4

following steps: (1) activated a 30-bed intermediate-care unit at DSH-Vacaville; (2) converted one 30-bed intermediate-care unit at DSH-Stockton to an acute-care unit; (3) converted a second 30-bed unit at DSH-Stockton to an acute-care unit; and (4) reinstituted admission and treatment of acute low-custody level patients at DSH-Atascadero.  As an intermediate response to the bed needs, DSH and CDCR are converting 16 isolation rooms at DSH-Stockton into intermediate-care inpatient beds.  The construction is expected to be complete by March 20, 2017.

11. To safely admit acute patients to DSH-Atascadero's low-custody, unlocked rooms, Defendants must individually review each patient's clinical presentation and stability to ensure that he will not decompensate or threaten staff or patient safety.  Defendants review daily patients both currently receiving acute care in DSH programs and all new referrals to determine if they can be safely moved.  Furthermore, Defendants continue to implement the housing-review process to move high-custody intermediate-care patients into low-custody intermediate settings.  Having reviewed every patient who is custodially eligible for movement, Defendants' mental health care teams have determined that immediate transfer of these patients is not clinically safe.  Consistent with the housing-review policy, Defendants will continue to monitor these patients and will transfer them as soon as their mental health clinicians agree that movement is appropriate.

12. As a result of these actions, Defendants are close to eliminating the current waitlist for acute patients beyond Program Guide timelines.

**THE NEW MEMORANDUM OF UNDERSTANDING AND RELATED PROCESSES ADDRESS LONG-TERM SUSTAINABILITY.**

13. Defendants are committed to providing appropriate and timely inpatient care to Coleman class members.  Accordingly, CDCR and DSH executed the new MOU and eleven associated policies governing the provision of care to patients referred from CDCR for inpatient care at a DSH facility went into effect May 1, 2016.  The MOU and related policies were thoroughly vetted by Defendants, the Special Master team, and Plaintiffs' counsel.  The new MOU and related policies significantly changed how the two departments identify, refer, classify, transfer, house, and provide inpatient care, and will help ensure patients are placed and treated in

5

the most appropriate environment based on custodial and clinical factors. This is expected to provide a more efficient movement of patients through the continuum of inpatient care. As a result, this will reduce time frames for transfers of patients in need of inpatient mental health care, and is expected to supplant the need for periodic ad hoc reviews as have occurred in the past. While the Court and Special Master involvement in the movement of patients through DSH's inpatient continuum of care has historically been addressed through ad hoc reviews of appropriate housing for individual patients, the defendants' current MOU and related policies creates a system for patients to receive a least restrictive custodial housing designations. This allows DSH to identify the proper DSH facility to house a patient, unless a clinical determination recommends placement outside of that housing designation. Housing reviews by DSH clinical staff, which are required and monitored, will allow patients to move to their least restrictive housing designation as soon as clinically appropriate. In December 2015, over a two-week time period, a clinical review of patients occurred with defendants, the Special Master team, and Plaintiffs' counsel to review custodial and clinical housing determinations for patients. This collaboration resulted in all parties agreeing on the general clinical criteria utilized by DSH clinicians when considering the housing designation placement for these patients. In addition, the Utilization Management policy provides further sustainable direction for clinical staff to consistently monitor patient length of stay to ensure the most efficient utilization of inpatient beds. These policies go beyond Defendants' previous plans to address inpatient transfers by requiring that patients be moved to low-custody inpatients as soon as is it clinically and custodially safe to do so, and creating more accountability for tracking and managing inpatient bed use.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Sacramento, California on November 22, 2016.

_s/ Pam Ahlin_
PAM AHLIN
Director, Department of State Hospitals

(*original signature retained by attorney*)

6

Decl. of P. Ahlin Supp. Defs.' Resp. to Nov. 17, 2016 Order to Show Cause
(2:90-cv-00520 KJM-DB (PC))