UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

On November 17, 2016, the Department of State Hospital (DSH) defendants were ordered to show cause in writing, on or before November 22, 2016, why waitlists for inpatient mental health care as reported on the Mental Health Services Delivery System (MHSDS) Management Information Summary (MIS) Report could not be reduced to zero by November 23, 2016 at 5:00 p.m. and maintained at zero thereafter. ECF No. 5519 at 3. On November 22, 2016, defendants filed their response to the order to show cause, asserting they could not reduce to zero the waitlists in the MHSDS MIS Report by the deadline set in the order to show cause. ECF No. 5522 at 2. Defendants provide no concrete timeline for permanent elimination of these waitlists.

As the court discussed in an order over a year ago, the history of the remedial phase of this litigation shows that the efforts to remediate substantial and longstanding problems with access to inpatient care have required significant time and effort for many years. *See* ECF No. 5333 at 1-2 and orders cited therein. More than five years ago, defendants presented the court with plans to

1

eliminate waitlists for inpatient care and implement a sustainable process so the waitlists would not recur. *See id*. at 1 and documents cited therein. Defendants' response displays a failure to understand that the recent year-long recurrence and growth of the waitlists for inpatient care is in violation of longstanding orders of this court. It also demonstrates their failure to understand that the absence of a proven sustainable process to avoid these waitlists is a significant barrier to a complete remedy in this action and to the goal of the court that this action be brought to a successful conclusion sooner rather than later, and without further litigation.

For example, defendants' representation that the problems associated with placement of inmate-patients in inpatient programs is "complex," *see* ECF No. 5522 at 3, misses the point at this late date and reflects a failure to comprehend the court's message distilled in the recent order to show cause. The complexities, particularly in placement of "high-custody" inmates in need of intermediate inpatient care, have been known for over a decade. What is at issue is the failure to plan successfully in light of those complexities.

Moreover, defendants' cavalier suggestion that "temporary deviations" from the transfer timelines in the Program Guide, defendants' remedial plan for this action, "are not, by themselves, tantamount to constitutional violations" also misses the mark. ECF No. 5522 at 5. The record does not support their contention that the waitlists at issue are "temporary deviations." Additionally, defendants have represented to this court that those timelines are "outer limits"; their explanations for the fact that they continue to exceed those outer limits is unsatisfactory.

Third, and of great concern to the court, is defendants' assertion that inmate-patients waiting for transfer to inpatient care "are properly monitored and continue to receive high levels of mental health care from their CDCR clinicians before, during, and after the referral process, including placement in a Mental Health Crisis Bed if needed." ECF No. 5522 (citing ECF No. 5509-1 at ¶ 6). Defendants rely on the November 4, 2016 declaration of CDCR's Deputy Director of Mental Health, ECF No. 5509, to support this assertion. It is not at all clear that the general statements in this declaration are sufficient to assure the court that inmate-patients who have exceeded Program Guide timelines for transfer to inpatient care in fact receive the mental health care the Constitution requires while they are waiting. As the Program Guide makes clear,

each level of the MHSDS has specific admission criteria. *See* Program Guide, 2009 Revision, at 12-1-7 through 12-1-9. Referral to inpatient care "is available for inmate-patients whose conditions cannot be successfully treated in the outpatient setting or in short-term MHCB placements." Program Guide at 12-1-9. By its own terms, defendants' remedial plan makes plain that inmates referred to inpatient mental health care *cannot be successfully treated* at lower levels of care or in MHCBs. MHCBs do, under the Program Guide, provide "*short-term* inpatient care for seriously mentally disordered inmate patients awaiting transfer to a hospital program or being stabilized on medication prior to transfer to a less restrictive level of care." Program Guide at 12-1-8 (emphasis added). MHCBs are not, however, a substitute for the inpatient care provided through DSH programs. Referrals to DSH inpatient care represent the considered judgment of CDCR clinicians that those inmate patients need a higher level of care than is available in CDCR's EOP and MHCB programs. Thus, at most, defendants' representation suggests that efforts are being made to maintain an unacceptable status quo for these inmates while access to essential inpatient care is delayed.

As the history of the remedial phase of this litigation shows, delays in access to inpatient care create backlogs at every layer of the MHSDS. This phenomenon repeats itself in the most recent round of delays. In the Twenty-Sixth Round Monitoring Report, the Special Master reported that only four institutions were compliant with the twenty-four hour transfer requirement for MHCB placement, and one improved to greater than 90 percent compliance during the review period, which began on February 3, 2015 and ended on July 23, 2015. ECF No. 5439 at 11, 93. Twenty-three institutions were "noncompliant with the 24-hour timeframe." ECF No. 5439 at 93.[1] As of October 17, 2016, the MHSDS MIS Report showed 18 male inmates on the waitlist for MHCB care and six female inmates. ECF No. 5519-1. The Health Care Placement Oversight Program (HCPOP) report on MHCB transfers for the month of September 2016, a copy of which is attached as Exhibit A to this order, shows that in that month a total of 448 inmates were

---

[1] Inmates waiting transfer to MHCBs are sometimes placed in Outpatient Housing Units (OHUs) or Alternative Housing. ECF No. 5439 at 94. As defendants acknowledged in 2012, "alternative housing is not a clinically appropriate location for inmates requiring MHCB level of care and should only be used as a last option for inmates awaiting transfer." Ex. B at 1 (attached).

transferred to MHCBs. Ex. A at 12. Of that total, only *nine* inmates were transferred within the twenty-four hour period required by the Program Guide. Three hundred eight inmates waited more than 72 hours for transfer to an MHCB. *Id*. The court should not have to point out, but does, that MHCBs are for individuals in mental health crisis: the diagnostic criteria is "Marked Impairment and Dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or Dangerousness to others as a consequence of a serious mental disorder, and/or dangerousness to self for any reason." Program Guide at 12-1-8.

The October 17, 2016 MHSDS MIS Report also shows that many Enhanced Outpatient (EOP) units are operating well above capacity. ECF No. 5519-1 at 2. It is not clear what impact this is having on the demand for access to inpatient care, but it is a red flag for the court, and should be one for defendants: demand for these services appears to be exceeding the capacity to provide them as well.

Finally, for now, the court is dismayed by defendants' suggestion that spikes in demand for inpatient care could somehow, at this point, be completely "unforeseen." ECF No. 5522 at 4. The very fact of periodic spikes should be obvious to defendants after more than a decade of focused remedial work in this area. Defendants, in consultation with John Misener of McManis Consulting, prepare projected mental health bed needs twice a year, in the spring and in the fall. In addition, for more than a year, the court has required defendants to report specific data to the court on inmates referred for inpatient care, including trends in referrals. *See*, *e.g.*, ECF No. 5517.

Defendants assert that they are "currently evaluating trends in inpatient beds and are again considering increasing capacity." ECF No. 5522 at 5. The backdrop for this evaluation should not be swept under the rug. In 2012, defendants were ordered not to decommission any of their temporary mental health programs unless there was "adequate alternative capacity to accommodate future need in that level of care." ECF No. 4199 at 5. Since then, in 2014, defendants have converted 128 DSH inpatient beds at Salinas Valley Psychiatric Program to EOP beds, and 111 DSH inpatient beds at California Medical Facility to EOP beds. *See* Ex. C. Two
/////

years later, defendants do not have sufficient inpatient capacity, MHCB, or EOP capacity, manifesting in unacceptable delays, once again, in access to necessary inpatient care.

This matter is set for status conference on January 20, 2017. The parties should address the following subjects, which will be discussed at the status conference, in supplemental briefs to be filed simultaneously on or before January 13, 2017:

1. Is every *Coleman* inpatient bed occupied at all times with a *Coleman* class member? If not why not?

2. If the answer to question 1 is yes, why should not defendants be required to immediately reopen a sufficient number of units previously dedicated to inpatient care to eliminate the waitlist for such care?

3. In the alternative, is it feasible to contract with community hospitals to provide inpatient mental health care to class members when DSH capacity is full? If not why not and what are other alternatives available to defendants?

4. What verifiable assurances does the court have, if any, that inmates held in MHCBs or EOP units pending transfer to inpatient care are receiving the care required by the referral?

5. What tools are defendants using to assess whether to increase inpatient capacity?

6. Why should defendants not be required to include in their bed need projections and construction or bed utilization planning some amount of excess inpatient capacity that is available at all times to address spikes in demand without delaying access to inpatient care for any *Coleman* class member? How would the required amount of excess capacity be determined?

7. What are defendants' plans for addressing the shortfall in EOP beds and MHCB beds?

8. What concrete steps do defendants plan to take to ensure that all inmates in need of MHCB care are transferred to such care within twenty-four hours?

The court has reviewed the requests for relief filed by plaintiffs on October 20, 2016. The court will consider any simultaneous briefing the parties want to offer by January 13, 2017 on the remedies proposed by plaintiffs, with any such briefing limited to ten pages each following exhaustion of efforts to meet and confer to identify any mutually agreeable measures. *See* ECF 5503 at 11-14. While the court is allowing this briefing, it notes that at this juncture, the court's

primary focus is on appropriate orders for additional capacity to be created and maintained, rather than on specific orders directed at greater oversight of defendants' processes.

Finally, for reasons set forth in a separate order, the agenda for the status conference on January 20, 2017 will be limited to the matters identified in this order. To the extent participation by CDCR defendants is required to address those issues identified above, their participation will be allowed.

In accordance with the above, IT IS HEREBY ORDERED that the parties shall file supplemental briefing as required or allowed by this order on or before January 13, 2017. The status conference set for January 20, 2017 is confirmed.

DATED: December 8, 2016.

_____
UNITED STATES DISTRICT JUDGE