1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

   MICHAEL W. BIEN – 096891
   JEFFREY L. BORNSTEIN – 099358
   JANE E. KAHN – 112239
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LISA ELLS – 243657
   JENNIFER L. STARK – 267062
   KRISTA STONE-MANISTA – 269083
   JESSICA WINTER – 294237
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   50 Fremont Street, 19th Floor
   San Francisco, California  94105-2235
   Telephone:   (415) 433-6830

   RANJINI ACHARYA – 290877
   K&L GATES LLP
   4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
   Telephone:   (415) 882-8200

   CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
   39 Drumm Street
   San Francisco, California  94111-4805
   Telephone:   (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>    Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER REGARDING INPATIENT ACCESS**<br><br>Judge:   Hon. Kimberly J. Mueller<br>Date:    January 23, 2017<br>Time:    10:00 a.m.<br>Crtrm.:  3, 15th Floor |

[3082536-17]

# TABLE OF CONTENTS

**Page**

I.      IS EVERY *COLEMAN* CLASS INPATIENT BED OCCUPIED AT ALL TIMES WITH A *COLEMAN* CLASS MEMBER?  IF NOT, WHY NOT?............. 1

    A.      The Extent to Which non-*Coleman* Class Members Occupy *Coleman* Beds Differs Across Institutions and Bed-Types. ........................... 1

    B.      Inpatient Beds at ASH, Patton, and CSH Do Not House Only *Coleman* Class Members.................................................................. 3

    C.      Many *Coleman* Low-Custody ICF Beds Are Not Filled With Class Members Because Defendants Have Failed to Transfer Eligible Patients Promptly............................................................................... 4

II.     IF THE ANSWER TO QUESTION 1 IS YES, WHY SHOULD NOT DEFENDANTS BE REQUIRED TO IMMEDIATELY REOPEN A SUFFICIENT NUMBER OF UNITS PREVIOUSLY DEDICATED TO INPATIENT CARE TO ELIMINATE THE WAIT LIST FOR SUCH CARE?.............................................................................................. 7

III.    IN THE ALTERNATIVE, IS IT FEASIBLE TO CONTRACT WITH COMMUNITY HOSPITALS TO PROVIDE INPATIENT MENTAL HEALTH CARE TO CLASS MEMBERS WHEN DSH CAPACITY IS FULL?  IF NOT, WHY NOT, AND WHAT OTHER ALTERNATIVES ARE AVAILABLE TO DEFENDANTS?................................................. 9

IV.     WHAT VERIFIABLE ASSURANCES DOES THE COURT HAVE, IF ANY, THAT INMATES HELD IN MHCB OR EOP UNITS PENDING TRANSFER TO INPATIENT CARE ARE RECEIVING THE CARE REQUIRED BY THE REFERRAL? ........................................................ 11

V.      WHAT TOOLS ARE DEFENDANTS USING TO ASSESS WHETHER TO INCREASE INPATIENT CAPACITY?................................................... 14

VI.     WHY SHOULD DEFENDANTS NOT BE REQUIRED TO INCLUDE IN THEIR BED NEED PROJECTIONS AND CONSTRUCTION OR BED UTILIZATION PLANNING SOME AMOUNT OF EXCESS INPATIENT CAPACITY AVAILABLE AT ALL TIMES TO ADDRESS SPIKES IN DEMAND WITHOUT DELAYING ACCESS TO INPATIENT CARE FOR ANY *COLEMAN* CLASS MEMBER?  HOW WOULD THE REQUIRED AMOUNT OF EXCESS CAPACITY BE DETERMINED?.................................. 17

VII.    WHAT ARE DEFENDANTS' PLANS FOR ADDRESSING THE SHORTFALL IN EOP AND MHCB BEDS?.................................................. 18

VIII.   WHAT CONCRETE STEPS DO DEFENDANTS PLAN TO TAKE TO ENSURE ALL INMATES IN NEED OF MHCB CARE ARE TRANSFERRED TO SUCH CARE WITHIN 24 HOURS?.................................. 20

CONCLUSION............................................................................................... 21

[3082536-17]

i

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

*Coleman v. Schwarzenegger*,
    922 F. Supp. 2d 882 (E.D. Cal., N.D. Cal., 2009) .................................................... 19

*In re Loveton*,
    244 Cal. App. 4th 1025 (2016) .............................................................................. 10

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) ............................................................................................... 7

### STATUTES

Cal. Penal Code § 2933.05 ............................................................................................... 19

Cal. Penal Code § 2970 ...................................................................................................... 5

### REGULATIONS

15 C.C.R. § 2269 ............................................................................................................. 19

28 C.F.R. § 35.152(b)(2) .................................................................................................... 7

[3082536-17]

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER
REGARDING INPATIENT ACCESS

1    Plaintiffs submit this supplemental brief in response to the Court's specific

2   questions in its December 9, 2016 Order, ECF No. 5529.  The measures Defendants have

3   taken to this point have proven, yet again, insufficient to meet class members' need for

4   timely access to critical inpatient psychiatric hospitalization.

5   **I.    IS EVERY *COLEMAN* CLASS INPATIENT BED OCCUPIED AT ALL
        TIMES WITH A *COLEMAN* CLASS MEMBER?  IF NOT, WHY NOT?**

6

7    The short answer to the first half of the Court's question is no, every *Coleman*

8   inpatient bed is *not* occupied at all times with a *Coleman* class member.  The short answer

9   to the second part of the Court's question is that, because many *Coleman* inpatient beds are

10   in free-standing state hospitals that serve various other forensic and non-forensic

11   populations, DSH frequently allows these non-*Coleman* populations to use *Coleman*

12   inpatient beds.  But even without the pressures of these other populations, Defendants'

13   discriminatory security policies consistently result in empty *Coleman* inpatient beds

14   coexisting with numerous class members on long wait lists for those same beds.  This

15   incongruous and dangerous situation—empty inpatient beds at the same time that *Coleman*

16   patients remain on wait lists—is the reality today and has been for many months.

17    **A.    The Extent to Which non-*Coleman* Class Members Occupy *Coleman*
            Beds Differs Across Institutions and Bed-Types.**

18

19    Defendants provide both acute and intermediate levels of inpatient psychiatric

20   hospitalization, *see* Program Guide at 12-6-2, 12-6-6, and Defendants' use of *Coleman*

21   beds differs for each, at least in part because intermediate- and acute-care beds generally

22   are not fungible, *see generally* Defs.' Monthly Census, Waitlists & Trends Reports for

23   Inpatient Mental Health Care, ECF No. 5535 ("December Inpatient Report"), at 6, 7 of 15.

24   Acute care is designed as "short-term, intensive-treatment … with stays usually up to 30

25   calendar days to 45 calendar days provided," Program Guide at 12-6-2, while intermediate

26   care is designed to "provide longer-term mental health … treatment for inmate-patients

27   who have a serious mental disorder," *id.* at 12-6-6.  Intermediate-care stays often exceed

28   six months, and may last more than a year.  Defendants do not differentiate acute-care beds

[3082536-17]

1  as high- and low-security, while they do so differentiate with respect to intermediate-care

2  beds. *Compare id.* at 12-6-2, *with id.* at 12-6-6 to 12-6-7. As discussed below, Defendants

3  have used this distinction between high- and low-custody patients inappropriately to justify

4  empty *Coleman* beds and extensive inpatient wait lists.

5  Acute inpatient care for men is provided in DSH programs run inside two CDCR

6  prisons: The Vacaville Psychiatric Program ("VPP") inside California Medical Facility

7  ("CMF"), and California Health Care Facility ("CHCF"). In addition, at certain times,

8  including the present, Atascadero State Hospital ("ASH"), which is primarily an

9  intermediate-care hospital, has provided acute care for *Coleman* patients in its Admissions

10  Unit.[1] *See* December Inpatient Report at 6 of 15 (showing seven acute-care patients at

11  ASH). Intermediate Care Facility ("ICF") treatment for men is provided in DSH programs

12  operated inside three CDCR prisons, Salinas Valley Psychiatric Program ("SVPP") inside

13  Salinas Valley State Prison ("SVSP"), VPP inside CMF, and CHCF, as well as in two free-

14  standing state hospitals, ASH and Coalinga State Hospital ("CSH").

15  As is the case with its acute-care programs, Defendants do not differentiate between

16  high- and low-security patients for the two women's inpatient psychiatric programs, Patton

17  State Hospital ("Patton"), operated by DSH, and the Psychiatric Inpatient Program at

18  California Institute for Women ("CIW PIP"), operated by CDCR. These two women's

19  inpatient programs, along with the San Quentin State Prison Psychiatric Inpatient Program

21  [1] While Defendants should open *additional* ASH beds to acute patients, treatment for those
22  needing acute psychiatric care should not come at the cost of lost beds for treating those
needing ICF care. *See* Special Master's Monitoring Report on the Mental Health Inpatient
23  Care Programs for Inmates of the California Department of Corrections and Rehabilitation,
ECF No. 5448 ("2016 DSH Report"), at 115 (noting that in 2015, "the DSH defendants
24  returned the 256 low-custody beds at DSH-Atascadero designated for *Coleman* class
members to use for that purpose"); *see also* Pls.' Brief re Remedies, filed herewith, at 4
25  n.2. More problematically, Defendants decided to make this shift unilaterally, without
requesting consent of the Court, or consulting with the Special Master or Plaintiffs.
26  Defendants are obligated to make available 256 ICF beds for class members at ASH, *in
addition to* any acute beds they have added. *See* Order, ECF No. 3613, at 4 (authorizing
27  bed conversions to provide for 256 ICF beds at ASH, to be filled no later than October 31,
2009).

1 ("SQ PIP"), where condemned male patients are treated, also do not differentiate in their

2 reporting between acute and intermediate psychiatric inpatient care. *See generally*

3 December Inpatient Report at 7 of 15; *see also id.* at 7 of 15 n.7. The CIW and SQ PIPs

4 are currently the only CDCR-operated inpatient psychiatric hospitals; they house only

5 *Coleman* class members. Both PIPs are currently at or near capacity. *See* December

6 Inpatient Report at 7 of 15 (showing that, as of November 21, 2016, 39 of 40 SQ PIP beds,

7 and 45 of 45 CIW PIP beds, are filled). While the CIW PIP is at or near capacity, no

8 *Coleman* women have occupied Patton beds for some time, despite the existence of 30

9 *Coleman* beds there and a wait list, as discussed more fully below.

10     **B.     Inpatient Beds at ASH, Patton, and CSH Do Not House Only *Coleman***
11           **Class Members.**

12         In contrast to inpatient facilities at CDCR institutions, the standalone DSH

13 hospitals—ASH, CSH, and Patton—do not house only *Coleman* class members. CSH

14 dedicates one self-contained unit of 50 beds to CDCR patients, *see* 2016 DSH Report at

15 154, but ASH and Patton do not dedicate specific units or beds in the same manner.

16         In fact, DSH informed Plaintiffs and the Special Master on December 7, 2016 that

17 the 30 beds at Patton reported on Defendants' tracking logs as "capacity" for female

18 *Coleman* class members actually are not available to class members: They have been filled

19 with non-*Coleman* patients. *See* Decl. of Jessica Winter in Support of Plaintiffs'

20 Supplemental Brief in Response to Court's December 9, 2016 Order Re Inpatient Access

21 ("Winter Decl."), filed herewith, ¶ 2. Although ASH has 256 ICF beds ostensibly

22 designated for *Coleman* class members, *see* 2016 DSH Report at 5, these are not *dedicated*

23 beds and they are not used solely for class members, as they are at CSH, *see id.* at 121

24 (reporting that, at the time, 41% of *Coleman*-designated beds at ASH were used for non-

25 *Coleman* class members), 133 (stating that, to minimize treatment issues arising from the

26 presence of non-*Coleman* class members in *Coleman*-designated beds, ASH may need to

27 "reconfigur[e] to have at least several units that only house[] *Coleman* patients"). In other

28 words, Defendants frequently use *Coleman*-designated ASH beds for other classes of

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER
REGARDING INPATIENT ACCESS

1  patients.

2      Similarly, because no Patton beds are dedicated solely to *Coleman* class members,

3  at any given time, not all *Coleman* inpatient beds at Patton are filled with class members,

4  although Defendants generally represent them as "available" for that purpose.  *See*

5  December Inpatient Report at 7, 15 of 15.  Indeed, Patton has not housed a single *Coleman*

6  class member since March 2016, despite numerous female class members waiting past

7  Program Guide timelines[2] in the months since then.  *See* Winter Decl. ¶¶ 3-10 & Exs. A-H.

8  "*Coleman*" beds at stand-alone DSH institutions do not house only *Coleman* class

9  members.

10      **C.    Many *Coleman* Low-Custody ICF Beds Are Not Filled With Class**
          **Members Because Defendants Have Failed to Transfer Eligible Patients**
11        **Promptly.**

12      Low-custody ICF beds at ASH, CSH, and VPP also do not hold class members

13  because Defendants have failed to move promptly many inmate-patients to inpatient

14  settings consistent with their appropriate security levels or least restrictive housing

15  designations.  As a result, class members needing inpatient psychiatric hospitalization have

16  been on wait lists or have been housed inappropriately in high-security ICF programs.

17  These practices exacerbate the ongoing shortage of high-custody ICF beds.

18      The percentage of class members housed at higher-than-necessary security levels

19  has increased dramatically over time.  For example, the inpatient data for October 2016

20  shows that a total of 358 male class members in ICF treatment were held above their least

21  restrictive housing designations, including 334 patients in high-custody programs and 24

22  patients in low-custody programs.  *See* December Inpatient Report at 6, 7, of 15.

23  Plaintiffs' data analysis shows that the numbers of out-of-level placements have risen

24  dramatically since April 2016, and that as of November 21, 2016, nearly half (49%) of all

25  _____

26  [2] The actual number of female class members on the wait list is, of course, higher, as it
   includes all inmate-patients waiting *within* Program Guide timelines as well.  *See* Aug. 21,
27  2015 Order, ECF No. 5343, at 2 ("[A] class member is deemed to be on a waitlist for
   inpatient care from the time said class member is referred to DSH by CDCR.").

28

[3082536-17]

1    ICF patients were being held outside their least restrictive housing designation.  *See* Winter

2    Decl. ¶ 11 & Ex. I (Chart, Inmates Out of LRH).  Defendants simply are not following

3    through on their commitment—and constitutional obligation—to ensure patients are

4    moved into empty *Coleman* beds in low-custody ICF programs.

5         Indeed, Defendants have resisted placing class members in beds at ASH, CSH, and

6    Patton, *see, e.g.*, 2016 DSH Report at 115, even when their least restrictive housing

7    designations indicate that such placements would be appropriate.  Defendants contend that

8    those facilities are not equipped to house Level IV *Coleman* class members.  Yet the

9    Special Master has repudiated this contention:

10        Historically, there has been tension surrounding the admission and placement
         of *Coleman* class patients designated as Level IV … to [ASH] beds.  Yet,
11        [ASH] routinely admits [former high-custody CDCR] inmates who are
         classified as mentally disordered offenders[3] … as well as inmates deemed
12        not guilty by reason of insanity or incompetent to stand trial, without clear
         distinction as to why these patients would be admitted but high-custody
13        *Coleman* class members would not be admitted.

14   2016 DSH Report at 14.  Plaintiffs' experts concur.  *See, e.g.*, Decl. Joseph L. McGrath

15   [former warden of Pelican Bay State Prison ("PBSP")] Supp.  Plfs.' Br. on Evidentiary

16   Hearing Regarding Order to Show Cause Why Empty DMH Beds Cannot Be Filled with

17   CDCR Inmates & Supp. Additional Relief, ECF No. 4058, ¶¶ 12-35 (explaining that no

18   legitimate security concerns justify the exclusion of *Coleman* class members from CSH);

19   Winter Decl. ¶ 12 & Ex. J (excerpts of Aug. 15, 2011 Deposition of Joseph L. McGrath)

20   (same); Decl. Pablo Stewart, M.D., Supp. Pls.' Br. on Evidentiary Hearing Regarding

21   Order to Show Cause Why Empty DMH Beds Cannot Be Filled with CDCR Inmates &

22   Supp. Additional Relief, ECF No. 4055 ("August 11, 2011 Stewart Decl."), ¶¶ 136-49.

23   Because of this unjustified resistance, Defendants continue to leave empty many *Coleman*

24   _____

25   [3] Mentally disordered offenders are individuals who must serve their parole term in a state
     mental hospital.  *See* Cal. Penal Code § 2970.  Because of the physical danger they present,
26   many go directly from the highest custody CDCR programs to ASH.  *See id.* § 2970(b)
     (explaining that mentally disordered offenders are those who, due to a severe mental
27   disorder, "represent[] a substantial danger of physical harm to others.").

28

beds at the stand-alone DSH institutions.  *See, e.g.*, December Inpatient Report at 7 of 15 (showing 30 available beds at ASH, not counting the seven additional ICF beds reallocated to acute patients).  If Defendants were required promptly to move all class members to their least restrictive housing designations, these empty beds would fill up and high-custody *Coleman* beds at other programs would become available, reducing the inpatient waitlist overall.

Defendants' exaggerated security-based practices in the high-custody ICF programs are severely detrimental to *Coleman* class members.  Patients newly admitted to inpatient care at SVPP and other ICF programs at CDCR institutions have been subjected to "orientation" and "cuff" status.  *See* Decl. Joel Badeaux, M.D., ECF No. 4544, ¶¶ 24-28.  These practices both equate to near-continuous confinement to inpatient cells, without access to mental health programming, day room, or yard, and with handcuffed escorts for all out-of-cell activities.  *Id.*  The Court has recognized that orientation/cuff-status practices are based on "apparently redundant custodial policies that delay the start of necessary inpatient care and may in fact cause additional harm to class members transferred for such care."  July 11, 2013 Order, ECF No. 4688, at 10.  The use of orientation/cuff status at ICFs within CDCR institutions continues to this day.  *See* 2016 DSH Report at 91-98.  These types of practices at high-security inpatient programs mean that not all *Coleman* beds are created equally, nor should they be treated as such when evaluating whether Defendants are providing class members timely access to adequate inpatient care.

The Court should address Defendants' ongoing resistance to moving class members to ASH, CSH, and Patton, and more importantly in the long-run, their practice of stopping that movement once the Court's attention is focused elsewhere.  *See* 2016 DSH Report at 36; Parties' Joint Status Conference Statement, ECF No. 5335 ("2015 Joint Statement"), at 14.  This will help move the disproportionately large number of high-security class members off the wait list and into *Coleman* ICF beds, and just as critically, will help to move all patients into the more open, therapeutic ASH, CSH, and Patton programs, rather

[3082536-17]

1    than the restrictive, high-security programs inside CDCR institutions.  Moving class

2    members in this way will help Defendants maximize their use of *Coleman* beds for

3    *Coleman* class members and reduce or eliminate the inpatient wait list.

4        The Court should require Defendants to fill rapidly all open beds with class

5    members, and for those needing intermediate inpatient hospitalization, to assure that low-

6    security prisoners are not forced to remain at high-security intermediate-care programs.  In

7    addition, as discussed more fully below, the Court should require CDCR to open additional

8    beds to *Coleman* class members at CSH, which has the capacity and capability to house

9    both high- and low-security class members.

10   **II.   IF THE ANSWER TO QUESTION 1 IS YES, WHY SHOULD NOT
          DEFENDANTS BE REQUIRED TO IMMEDIATELY REOPEN A
11        SUFFICIENT NUMBER OF UNITS PREVIOUSLY DEDICATED TO
          INPATIENT CARE TO ELIMINATE THE WAIT LIST FOR SUCH CARE?**
12

13       Assuming the answer to question 1 is "yes," Plaintiffs ask the Court *not necessarily*

14   to order the reopening of closed inpatient units at SVSP and CMF, and not to do so as part

15   of any permanent solution to this issue.[4]  These now-closed, "temporary" inpatient units

16   were stop-gap, emergency units at SVSP and CMF, with many significant deficiencies,

17   including inadequate confidential treatment space, offices, and day rooms.  And they do

18   not meet licensing or health and safety standards.  Rather, the Court should first order

19   Defendants to open additional available and licensed inpatient beds at CSH, at least.

20       Moreover, the Program Guide and the Americans with Disabilities Act, in

21   accordance with general principles of good mental health care, require treatment of class

22   members in the least restrictive settings possible.  *See* Program Guide at 12-1-1 ("The goal

23   is to provide constitutionally appropriate levels of mental health treatment to the

24   incarcerated serious[ly] mentally ill inmate *in the least restrictive environment*." (emphasis

25   added)); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999); 28 C.F.R. § 35.152(b)(2)

26

27   [4] In making this recommendation, Plaintiffs assume that the Court envisions the closed
     units could be used for either or both acute and intermediate inpatient care.

28

1   ("Public entities shall ensure that inmates or detainees with disabilities are housed in the

2   most integrated setting appropriate to the needs of the individuals."); *see also* Order for

3   Final Approval of Settlement Agreement & Exs., ECF No. 5284 (incorporating into, and

4   applying ADA and Rehabilitation Act claims to, *Coleman*).  Before opening any new high-

5   custody beds in make-shift housing units not designed for inpatient care, and not meeting

6   state licensing standards without Court-ordered waivers, the Court should require

7   Defendants to maximize the opportunities for treating both acute- and intermediate-care

8   patients in the less restrictive, and properly licensed, DSH hospital-based programs—CSH,

9   ASH, and Patton.

10          Assuming the Court is considering ordering the reopening of previously dedicated

11   emergency inpatient units, Plaintiffs ask the Court, first, to order Defendants to move all

12   ICF patients to their least restrictive housing designations, and to make full use of

13   currently available beds for *Coleman* class members at the freestanding DSH hospitals,

14   which will require the ongoing regular transfer of such patients to ASH, CSH, and Patton.

15   *See* Plfs.' Brief re Remedies, filed herewith, at 7-9.  In addition, as explained more fully

16   below, Defendants should find more ways to move acute and intermediate-care patients to

17   ASH, CSH, and Patton, either by opening unused but licensed beds, or by shifting their use

18   of such beds so more are available to the *Coleman* population.  Once Defendants have

19   shown they will consistently fill ASH, CSH, and Patton beds and ensure that patients are

20   housed only in their least restrictive settings, the Court, Special Master, and parties can

21   evaluate whether a shortage of inpatient beds persists.  If so, the parties and Court should

22   then determine whether these closed "temporary" inpatient facilities should be reopened to

23   class members.[5]

24

25   _____

26   [5] In October 2016, Plaintiffs asked the Court to order Defendants to eliminate the wait list
     for intermediate inpatient psychiatric hospitalization by March 1, 2017, and only if that
     deadline is not met, to open 50 beds each at ASH and CSH and reopen the high-security
27   units at SVSP that Defendants closed in 2013.  *See* Pls.' Response to Defs.' September 28,
     2016 Update to Department of State Hospitals' Inpatient Census and Patient Movement
28   (footnote continued)

**III.   IN THE ALTERNATIVE, IS IT FEASIBLE TO CONTRACT WITH COMMUNITY HOSPITALS TO PROVIDE INPATIENT MENTAL HEALTH CARE TO CLASS MEMBERS WHEN DSH CAPACITY IS FULL?  IF NOT, WHY NOT, AND WHAT OTHER ALTERNATIVES ARE AVAILABLE TO DEFENDANTS?**

It is unlikely that CDCR could contract with community hospitals to provide long-term inpatient mental health care when DSH has reached its capacity.  Community hospitals are likely to resist taking forensic patients.  *See, e.g.*, Winter Decl. ¶ 13 & Ex. K, ¶¶ 248-63 (excerpted Declaration of Pablo Stewart, M.D. (Oct. 20, 2016) (filed under seal in *Hedrick v. Grant*, E. D. Cal. No. 2:76-CV-00162-GEB-EFB)).  But, community hospitals potentially could provide some level of acute psychiatric care, with CDCR-provided security.  Elsewhere, CDCR contracts for medical hospitalization on this basis, even for condemned inmates—the highest security patients in CDCR.  *See* Expert Decl. of Jeanne Woodford [former warden of San Quentin State Prison] in Supp. of Plfs.' Opp'n to Defs.' Mot. To Terminate, ECF No. 4380, ¶ 49 (stating that in her "experience and understanding … condemned inmates are routinely transferred from San Quentin to various community facilities for medical care").

In lieu of contracting with community hospitals, Defendants have multiple options.  First, Defendants can do a better job of using their existing ICF beds through proactively and consistently moving class members to their least restrictive housing designations, as described above, and through appropriate utilization management, i.e., assuring that patients are discharged from hospital beds to lower levels of care when proper.

In addition, psychiatric units at various state hospitals, including CSH and ASH, are closed due to staffing shortages and other solvable problems.  *See* Winter Decl. ¶ 14 & Ex. L at C1-C2 (Department of State Hospitals, *Report on Population and Personal Services Fiscal Year 2013-14* ("DSH Report FY 2013-14")).[6]  Those beds could be opened

_____

and Request for Additional Relief, ECF No. 5503, at 12.

[6] This is the most recent publicly available report.  Unfortunately, DSH does not report transparently on the number of licensed, available, and empty beds in its system, so this is
(footnote continued)

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER REGARDING INPATIENT ACCESS

[3082536-17]

1  to *Coleman* class members.  Presumably, it would be less expensive for the State to pay

2  these hospitals to reopen some units to *Coleman* class members than it would be to build

3  new, expensive hospitals.  In addition, even limited new construction is likely to take the

4  State up to five years after authorization to complete.  *See, e.g.*, Twenty-Sixth Round

5  Monitoring Report of the Special Master on the Defendants' Compliance with

6  Provisionally Approved Plans, Policies, and Protocols, ECF No. 5439 ("26th Round

7  Report"), at 8 (describing the projected completion of infill projects in 2016 and 2017,

8  where funding for the projects was authorized in 2012).  Opening hundreds of empty DSH

9  hospital beds to *Coleman* class members makes more sense than does building new

10  facilities.

11      Specifically, Defendants could and should increase the number of *Coleman* beds at

12  CSH, using more than just the 50 beds currently allotted for *Coleman* class members.

13  Such a measure could help to alleviate the inpatient backlogs for both intermediate- and

14  acute-care patients.  The Special Master has long recommended that Defendants make use

15  not only of the 50 designated beds at CSH, but also of "any other vacant beds at the

16  facility" to address inpatient waitlist crises.  *See, e.g.*, Special Master's Report on Defs.'

17  Plan re: [ICF] and Acute Inpatient Waitlists, ECF No. 4020, at 59 of 60.  CSH is a fully

18  licensable inpatient institution, unlike CDCR facilities, which require licensure variances

19  to provide inpatient care.  It has a total of 1,500 licensed beds, *see* Winter Decl. ¶ 14 &

20  Ex. L at A1 (DSH Report FY 2013-14), but only 1,286 are in use, *see* Department of State

21  Hospitals—Coalinga, *available at* http://www.dsh.ca.gov/coalinga/ (accessed Jan. 13,

22  2017).  In addition, CDCR prisoners currently use only 4% of CSH's filled inpatient beds.

23  *See id.*  The other beds are taken up by mentally disordered offenders, sexually violent

24  offenders, those found not guilty by reason of insanity, and civil commitments.  *Id.*; *see*

25  *also, e.g.*, *In re Loveton*, 244 Cal. App. 4th 1025 (2016).

27  also the best data available to Plaintiffs.  Nevertheless, it shows the remarkable disparity
between the number of beds DSH has licensed, and the number it actually uses.

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER
REGARDING INPATIENT ACCESS

[3082536-17]

1       Similarly, Defendants could open additional, licensed beds at ASH to class

2   members, and they could choose actually to staff more or all of DSH hospitals' empty,

3   licensed beds.  *See* DSH Report FY 2013-14 at 4, B1-12.

4       Further, even if it does not currently have "available" *Coleman* beds, DSH has the

5   flexibility to move patients between its various institutions to open up necessary inpatient

6   space to *Coleman* class members.  *See generally id.* at A1-A3, B1-B12 (showing unused

7   licensed capacity at nearly every DSH institution).  DSH has moved patients between units

8   to address such needs in the past, including shifting beds between the non-*Coleman*

9   populations it serves.  *See* Winter Decl. ¶ 15 & Ex. M at 3-4 (excerpts of Response to

10  Order to Show Cause and Request for Extension of Time, filed in *People v. Reyes-Lopez*,

11  No. SS161060A, Superior Court of California, County of Monterey); *see also* Winter Decl.

12  ¶ 16 & Ex. N, ¶ 5 (Declaration of George Maynard in Support of Department of State

13  Hospitals' Response to Order to Show Cause and Request for Extension of Time, filed in

14  *People v. Reyes-Lopez*, No. SS161060A, Superior Court of California, County of

15  Monterey).  The bottom line is that DSH must provide sufficient beds to meet inpatient

16  psychiatric demand, and it currently has the capacity to do so even if it lacks the desire.

17      Accordingly, Defendants can and should take all reasonable steps to contract with

18  community hospitals to provide inpatient care.  Defendants also should move class

19  members to their least restrictive housing designations; open additional beds at CSH and

20  ASH; staff all of the DSH hospitals to meet their licensed capacities; and shift the relative

21  numbers of beds DSH uses at its various hospitals for the different populations it serves.

22  All these measures will allow Defendants to house class members in need of critical

23  psychiatric hospitalization in a timely fashion.

24  **IV.   WHAT VERIFIABLE ASSURANCES DOES THE COURT HAVE, IF ANY, THAT INMATES HELD IN MHCB OR EOP UNITS PENDING TRANSFER TO INPATIENT CARE ARE RECEIVING THE CARE REQUIRED BY THE REFERRAL?**

25

26

27      Inmate-patients held in MHCBs or EOP units pending transfer to inpatient care do

28  not and cannot receive the equivalent of inpatient psychiatric hospitalization while they are

[3082536-17]

1   waiting for admission and transfer to inpatient hospitals.  The Special Master has recently

2   reported on this dangerous situation.  *See, e.g.*, 26th Round Report at 73, 75.

3       While Defendants have repeatedly asserted (without evidentiary support or further

4   explanation) that patients receive appropriate care during their wait for transfer from EOP

5   or MHCB units to inpatient placement, they do not and cannot receive equivalent care in

6   these programs.  *Cf.* Defs.' Response to November 17, 2016 Order to Show Cause, ECF

7   No. 5522, at 3; Decl. of Katherine Tebrock in Supp. of Defs.' Reply to Plfs.' Response to

8   Update to [DSH's] Inpatient Census & Patient Movement, ECF No. 5509-1, ¶ 6.

9       By definition, if class members referred for inpatient care are not in an acute or

10  intermediate inpatient hospital, they are not receiving the treatment their clinicians have

11  determined their mental health conditions presently require.  For example, a patient

12  waiting in an MHCB for transfer who receives MHCB-level care is not receiving treatment

13  in the same therapeutic milieu as that in acute or intermediate inpatient care.  *See* Program

14  Guide at 12-5-13 to 12-5-14, 12-6-6 to12-6-7.  MHCBs are designed for extremely short

15  stays of 10 days or fewer.  *See* Program Guide at 12-5-1.  These units therefore provide

16  little or no group therapy, little or no recreational or occupational therapy, and most lack

17  dayrooms for out-of-cell treatment; even access to yard for recreational activities and

18  exercise has been hard to come by in MHCBs.  *Id.* at 12-5-14; *see also, e.g.*, Lindsay M.

19  Hayes, M.S., *A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the*

20  *California Department of Corrections and Rehabilitation* (Jan. 13, 2016), ECF No. 5396

21  ("2016 Hayes Report"), at 30 (describing a 20-day backlog for eligible patients in the

22  CHCF MHCB to access the yard and an absolute prohibition on MHCB patients' access to

23  the yard at PBSP.  More fundamentally, the therapeutic environment in MHCBs is

24  designed to address different needs than is the inpatient care environment.  *Compare*

25  Program Guide at 12-5-2, *with id.* at 12-6-1, 12-6-2 to 12-6-3, 12-6-6 to 12-6-9.  But in the

26  case of an individual patient who actually received all the mental health treatment he or

27  she needed while housed in an MHCB awaiting transfer to an inpatient hospital, the

28  patient's referral to acute or intermediate care would be rescinded.  *See id.* at 12-5-26 to

12-5-28.  This does and should happen when a patient's mental health stabilizes and significantly improves while in an MHCB.  *See, e.g.*, ECF No. 5533 at 23 (sealed document).  That patients' referrals are not rescinded and DSH has not refused transfer indicates that the vast majority of such patients continue to need a higher level of care.

In fact, patients in MHCBs frequently receive poor care and are at risk of suicide. *See* 2016 Hayes Report at 28, 54 (describing incidents where nurses in MHCBs falsified suicide observation forms), 47 (discussing an attempted suicide, resulting from inadequate suicide precautions, at SVSP), 15-16 (explaining that prison clinical staff working in MHCBs believed that patients were all attempting to manipulate staff for secondary gain, and therefore "prohibit[ing] some MHCB patients from having mattresses, overus[ing] safety smocks, and/or temporarily plac[ing] patients in Correctional Treatment Center (CTC) observation and seclusion cells rather than MHCBs"), 37 (describing a patient held in MHCB for 53 days, having remained in his suicide-resistant smock "continuously" for that time period); 15 (discussing suicide that occurred two days after a patient's MHCB discharge, due to inadequate safety planning and early discharge from MHCB).

The EOP level of care is designed for those "who *do not* require 24-hour … care," a fundamental element of the MHCB, acute, and intermediate inpatient levels of care. Program Guide at 12-4-2 (emphasis added); *cf. id.* at 12-5-3, 12-6-2.  EOP programs do not require medical licensing and do not provide around-the-clock, seven-days-a-week nursing services.  *See id.* at 12-4-1 to 12-4-16.  According to a DSH Program Director, an ICF program should provide patients 35 to 40 hours of weekly treatment.  *See* Decl. of Victor Brewer in Supp. of Defs.' Opp'n to Plfs.' Emergency Mot. for Evidentiary Hearing Regarding the C5/C6 Project at [SVSP], ECF No. 3913-3, ¶ 5 (citing Title 22 requirements for inpatient treatment).  By comparison, EOP patients receive 10 hours of group treatment and a single primary clinician contact weekly, as well as psychiatric review every 90 days. *See* Program Guide at 12-4-8 to 12-4-9.

Defendants must move EOP patients to MHCB or inpatient care if their mental health condition has not improved at those lower levels of care, making plain that the

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER
REGARDING INPATIENT ACCESS

1  Program Guide does not equate the EOP level of care with either MHCB or inpatient care.

2  *See id.* at 12-1-9 ("Referrals to higher levels of care shall be considered when … the

3  inmate-patient is not benefiting from treatment services available at the current level of

4  care.").  Defendants have provided no evidence that they have taken steps to provide wait-

5  listed class members with supplemental treatment above and beyond the EOP or MHCB

6  Program Guide requirements.  Due to Defendants' severe MHCB shortage, *see* Plfs.' Brief

7  re Remedies, filed herewith, at 5-6, many patients awaiting MHCB care are housed for

8  extended periods in alternative settings, which provide substantially less therapeutic

9  treatment than that provided in EOP and MHCB settings, *see* Program Guide at 12-5-5 to

10  12-5-6; *see also* December 9, 2016 Order, ECF No. 5529, at 3 n.1 (noting Defendants'

11  concession that "alternative housing is not a clinically appropriate location for inmates

12  requiring MHCB level of care" (citation omitted)).  These include holding cages, modified

13  or unmodified holding cells, or other placements where patients receive essentially no

14  treatment, aside from observation meant to prevent self-harm or suicide.  *See* Program

15  Guide at 12-5-5 to 12-5-6.

16       In sum, Defendants cannot assure the Court that patients awaiting inpatient care

17  receive treatment adequate to address their mental health acuity during the indefinite

18  period before their transfer, because they do not.

19  **V.    WHAT TOOLS ARE DEFENDANTS USING TO ASSESS WHETHER TO**
   **INCREASE INPATIENT CAPACITY?**

20

21       Defendants use reports developed in conjunction with McManis Consulting to

22  assess their future need for inpatient beds ("McManis Reports").  *See* 2015 Joint Statement

23  at 15.  The McManis Reports rely on CDCR's five-year population projections, and are

24  released every spring and fall.  *See* Winter Decl. ¶ 17 & Ex. O at 4 (Mental Health Bed

25  Need Study, Based on Fall 2016 Population Projections (Jan. 11, 2017) ("Fall 2016

26  McManis Report")).  The McManis Reports largely rely on past demand to predict future

27  needs, using as variables CDCR's actual and projected total population numbers, historical

28  weekly census counts, and historical weekly pending-list counts, with a few additional

[3082536-17]

14

1  measures intended to enhance the accuracy of the projections. Fall 2016 McManis Report

2  at 4-6.

3        Even with the additional measures, however, the reports have inevitable limitations.

4  First, Defendants have chosen, without explanation, to calculate their projected need based

5  on an "occupancy standard" higher than the community standard of 80%, using instead

6  90% for inpatient programs, and 95% for outpatient programs. *Id.* at 5. This means the

7  system has less flexibility and less excess capacity than is true for bed planning in the

8  community, and so is less able to respond to fluctuations in demand.

9        Second, Defendants have chosen to minimize reporting of present and future bed

10  needs by assuming that future increases in capacity will resolve present logjams in the

11  system. For example, Defendants underreport actual need for MHCB beds by assuming

12  that "a substantial percentage" of patients in MHCBs will at some point in the future be

13  correctly housed in acute inpatient programs. *Id.* at 5. But the actual bed capacity

14  necessary to bring Defendants' "trued" bed projections to reality never comes to fruition,

15  resulting in systemic under-projection of need. For example, each bed-need study since

16  spring 2013 has reported higher projections for acute-bed demand than the previous study.

17  Winter Decl. ¶ 18. But Defendants still have not acted to meet even present demand for

18  acute care—much less to plan ahead to meet projected higher, and ever-increasing,

19  demand. *See* Fall 2016 McManis Report at 10 (indicating need for 328 acute beds in 2015,

20  and a projected need for 341 beds in 2017, over the 312-bed capacity). Without accurately

21  predicting actual acute demand, the presumption underlying the "truing" process will

22  always be false.

23        Third, systemic and longstanding delays in access to higher levels of care

24  artificially depress the referral numbers on which the McManis Reports are based, and

25  referral numbers that do not reflect actual need confound the analysis. Specifically, as

26  clinicians learn that their referrals will not result in MHCB or inpatient placements—

27  because of an existing lack of bed capacity, for example—they stop referring patients who

28  need that level of care. *See* 2016 DSH Report at 21; August 11, 2011 Stewart Decl. ¶¶ 52-

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER
REGARDING INPATIENT ACCESS

1  115; *see also, e.g., id.* ¶¶ 42-51. This leads to projections, contrary to the reality, that

2  fewer patients will need inpatient beds. And because the projections are based on prior

3  usage, which does not account for the class's full clinical demand, they necessarily

4  underestimate the future bed need. In fact, when fewer patients receive the crisis care they

5  need, referral numbers may eventually jump, as class members decompensate and fall

6  deeper into crisis. *See id.* ¶¶ 14-41.

7      Even with these limitations, recent McManis Reports have projected an increased

8  demand for MHCB and inpatient beds, as well as for MHSDS beds in the aggregate, at the

9  EOP and higher levels of care. Defendants have not acted to meet any of these long-

10  projected needs. For example, the Fall 2016 McManis Report forecasts an increased need

11  for male acute inpatient beds, MHCBs, and the aggregated MHSDS population at the EOP

12  level of care and higher. *See* Fall 2016 McManis Report at 3, 9, 13, 22. The Fall 2015

13  McManis report forecasted an increased need for all male inpatient beds—at the acute and

14  intermediate high- and low-security levels—as well as for MHCBs, and, in the aggregate,

15  all levels of care higher than CCCMS. *See* Winter Decl. ¶ 19 & Ex. P at 10-12, 23

16  (excerpts from Mental Health Bed Need Study, Based on Fall 2015 Population Projections

17  (Jan. 8, 2016)). And as far back as Spring 2014, Defendants predicted a massive shortage

18  of high-security intermediate-care beds. *See* Winter Decl. ¶ 20 & Ex. Q at 4 (excerpt from

19  Mental Health Bed Need Study, Based on *Preliminary* Spring 2014 Special Population

20  Projections (May 20, 2014)).

21      The Fall 2016 McManis Report now predicts only a minimal shortage of high-

22  custody ICF beds, based on a reported capacity of 700 such beds. *See* Fall 2016 McManis

23  Report at 10. But this reported capacity includes 24 beds currently set aside as isolation

24  rooms in accordance with licensure requirements, meaning that the actual shortage is even

25  greater than reported. *See* December Inpatient Report at 6 of 15. Also, it is difficult to

26  square the McManis Report's comment regarding "decreasing utilization for ICF-High

27  Custody beds" with the extreme wait lists for such beds that have persisted since

28  September. *See* Fall 2016 McManis Report at 10.

16

1    In addition, Defendants' data, in Plaintiffs' graphical representation, shows that

2    since January 2008, Defendants have almost never had sufficient beds to meet even EOP

3    needs.  *See* Winter Decl. ¶ 21 & Exs. R, S (Graph, EOP Bed Capacity Versus Need;

4    HCPOP Report Data, January 2008 to November 2016).

5    Despite these reports and past trends, however, CDCR has chosen to cancel

6    construction projects over time.  In particular, CDCR cancelled a number of projects after

7    the Supreme Court affirmed the Three-Judge Court's population reduction order.  *See The*

8    *Future of California Corrections: A blueprint to save billions of dollars, end federal court*

9    *oversight and improve the prison system* ("Blueprint"), *available at*

10   http://www.cdcr.ca.gov/2012plan/docs/plan/complete.pdf at 15, 16, 19, 28, 30, 32, 38-39

11   (accessed Jan. 13, 2017).  The Blueprint also shows that CDCR has prioritized cost-cutting

12   over ensuring adequate bed space.  *See, e.g.*, *id.* at 1-3 (explaining, first and foremost, that

13   the Blueprint plan will save California billions of dollars).  Until this misguided approach

14   is reversed, the problems with inpatient access will persist, as they have thus far.  *See, e.g.*,

15   2016 DSH Report at 21 ("Defendants need to develop enduring strategies and policies that

16   will create and sustain a regular and effective process of identifying those inmates in need

17   of inpatient care, and who, once identified for such care, do not have to wait for long

18   periods before actual placement into appropriate treatment programs.").

19   The Blueprint and Defendants' reliance on the McManis Reports shows that, no

20   matter the tools Defendants use to predict inpatient bed needs, if the focus is consistently

21   on cost- and corner-cutting, rather than on accurately predicting the need for and providing

22   adequate and timely care, the inpatient bed crisis will not be cured.

23   **VI.    WHY SHOULD DEFENDANTS NOT BE REQUIRED TO INCLUDE IN
         THEIR BED NEED PROJECTIONS AND CONSTRUCTION OR BED**

24   **UTILIZATION PLANNING SOME AMOUNT OF EXCESS INPATIENT
         CAPACITY AVAILABLE AT ALL TIMES TO ADDRESS SPIKES IN**

25   **DEMAND WITHOUT DELAYING ACCESS TO INPATIENT CARE FOR
         ANY *COLEMAN* CLASS MEMBER?  HOW WOULD THE REQUIRED**

26   **AMOUNT OF EXCESS CAPACITY BE DETERMINED?**

27   Defendants *should* be required to maintain a certain amount of slack in bed numbers

28   to account for spikes in demand for inpatient care.  Indeed, considering the lengthy history

[3082536-17]

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER
REGARDING INPATIENT ACCESS

1   of recurrent, inexplicable obstacles to inpatient access in this case, it is imperative that

2   Defendants do so.  As the Court has noted, Defendants concede that spikes are predictable

3   and expected, so Defendants should be able to plan for them.  *See* Dec. 9, 2016 Order, ECF

4   No. 5529, at 4; *see also* Defs.' Monthly Census, Waitlists & Trends Reports for Inpatient

5   Mental Health Care (Sept. 15, 2016), ECF 5490, at 4 of 15; *e.g.*, Defs.' Update to

6   Department of State Hospitals' Inpatient Census and Patient Movement, ECF No. 5496-1,

7   at 4; Defs.' Monthly Census, Waitlists and Trends Reports for Inpatient Mental Health

8   Care, ECF No. 5500, at 11 of 15 (showing seasonal increase in inpatient demand).  Their

9   ability to do so would be improved by adopting the community standard of 80%

10  occupancy for inpatient beds in their bed planning, rather than their arbitrary 90%

11  standard.  *See* Section V, *supra*.  Defendants have provided no cogent reason why

12  retaining a certain level of "excess" bed space is not feasible, and it is constitutionally

13  impermissible for Defendants to refuse to take straightforward, practical steps to ensure the

14  patients in their care are receiving the mental health treatment they require.

15  **VII.   WHAT ARE DEFENDANTS' PLANS FOR ADDRESSING THE
           SHORTFALL IN EOP AND MHCB BEDS?**
16

17       While Defendants have plans to increase the number of EOP beds, hopefully, to

18  meet the currently estimated level of demand, *see* Winter Decl. ¶ 22 & Ex. T at 1-2

19  (excerpt of Defendants' Submission for December 6 and 7, 2016 All-Parties Workgroup),

20  Defendants have no new inpatient beds in the pipeline.  *See, e.g.*, Edmund G. Brown Jr.,

21  *California Five-Year Infrastructure Plan, 2017*, *available at*

22  http://www.ebudget.ca.gov/2017-Infrastructure-Plan.pdf, at 38-45 (showing no plans in the

23  next five years to budget for additional *Coleman* bed needs at ASH, CSH, or Patton, or

24  within CDCR facilities).  The proposed 2017 budget provides preliminary plans for new

25  MHCB beds, but this project would not come to fruition for over four years even assuming

26  arguendo that it is actually passed by the Legislature.  *See id.* at 45; *see also* 2017 Budget

27  Summary: Public Safety, *available at* http://www.ebudget.ca.gov/2017-

28  18/pdf/BudgetSummary/PublicSafety.pdf, at 81 (discussing proposal to build "100

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S DECEMBER 9, 2016 ORDER
REGARDING INPATIENT ACCESS

1  additional mental health crisis beds by summer 2021").

2      But even so, Defendants cannot simply build their way out of their bed shortages.

3  Rather, Defendants must target population reduction measures to reach class members.

4  While the overall population in CDCR institutions has decreased since 2009, when the

5  Three-Judge Court issued its population-reduction order, *see Coleman v. Schwarzenegger*,

6  922 F. Supp. 2d 882 (E.D. Cal., N.D. Cal., 2009), the MHSDS population has dramatically

7  increased in size, particularly at the higher levels of care, *compare, e.g.*, Winter Decl.

8  ¶ 23 & Ex. U (November 4, 2016 *Coleman* Monthly Report, enclosure 6b (showing a total

9  EOP population of 7,242 as of October 17, 2016)), *with* Winter Decl. ¶ 24 & Ex. V (July

10  31, 2009 *Coleman* Monthly Report, enclosure 3 (showing a total EOP population of 4,784

11  as of June 26, 2009)).  Given the disproportionate impact of population reduction measures

12  on the *Coleman* class, Defendants must endeavor to focus efforts on the class.  This is

13  particularly so in light of the fact that California voters recently passed Proposition 57,

14  which grants Defendants significant authority to undertake creative measures to reduce the

15  inmate population.

16      A significant contributor to the problem of the exploding MHSDS population may

17  be the issue of program access.  For example, EOP patients were not allowed to start

18  earning milestone credits for EOP programming until approximately four and a half years

19  after general population inmates were allowed to do so.  *Compare* Cal. Penal Code

20  § 2933.05, *with* Winter Decl. ¶ 25 & Ex. W (CCHCS Memo, *Milestone Completion*

21  *Credits for Participants in the Mental Health Services Delivery System at the Enhanced*

22  *Outpatient Program Level of Care* (July 7, 2014)).  The milestone-credit system allows

23  inmates to earn earlier release from prison, *see* Cal. Penal Code § 2933.05, but because

24  EOP patients were largely excluded from earning milestone credits for *years* after the

25  system was instituted, their ability to reduce their prison terms has been stymied.  Class

26  members at the higher levels of care similarly have been obstructed from access to

27  education and job programming, by which they can earn credits and favorable evaluations

28  from the Board of Parole Hearings.  *See, e.g.*, 15 C.C.R. § 2269 (stating that a prisoner's

conduct in prison contributes to the Board's consideration of the propriety of parole).  All of these barriers significantly slow class members' release from Defendants' institutions. Were Defendants to ensure that class members at the higher levels of care had access to programs comparable to those in the general population, the total MHSDS population would decrease, thereby reducing the pressure on Defendants to continue ramping up their provision of higher levels of care, including inpatient care.

Once again, the solution is not necessarily the building of new beds, so long as Defendants plan for predictable inpatient needs, appropriately and efficiently use the beds they have, and undertake reasonable and known measures to reduce the size of the population at the highest levels of care.

## VIII.  WHAT CONCRETE STEPS DO DEFENDANTS PLAN TO TAKE TO ENSURE ALL INMATES IN NEED OF MHCB CARE ARE TRANSFERRED TO SUCH CARE WITHIN 24 HOURS?

The measures discussed above—better use of existing inpatient beds at appropriate security levels, increased numbers of inpatient beds for *Coleman* class members, and better planning and projecting for bed needs—are concrete steps Defendants can take to increase the likelihood that all patients needing MHCB care are transferred within the Program-Guide-mandated 24-hour timeframe.  Defendants can also "flip" or "swing" acute or ICF inpatient beds like those at CHCF and VPP to MHCB use, as they have done in the past. *See, e.g.*, Twenty-Second Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, ECF No. 3990, at 416 (discussing acute beds at VPP temporarily converted to MHCB beds).

In addition, as a last resort, Defendants have at many times in the past relied on emergency, unlicensed MHCB units, and can do so in the future. *See, e.g.*, Decl. of Rick Johnson in Supp. of Defs.' Mot. Terminate, ECF No. 4276-2, Ex. 2 (showing 114 temporary unlicensed MHCB beds as of January 2012); Winter Decl. ¶ 26 & Ex. X (bed plan provided to Plaintiffs on January 11, 2017, showing 54 temporary, unlicensed MHCB beds).  The Court has ordered the waiving of state licensure requirements to permit operation of such units, and could do so again if no other measures succeed in eliminating

[3082536-17]

1  persistent waitlists.  *See* Dec. 11, 2009 Order, ECF No. 3748, at 2.

2  <center>**CONCLUSION**</center>

3       In light of the foregoing, the Court should order Defendants immediately to begin

4  evaluating and assessing which class members can be moved to housing at lower security

5  levels in ASH, CSH, and Patton, and therefore opening up higher-security inpatient beds to

6  satisfy the current wait list.  Defendants should also be ordered to open CSH and ASH to

7  additional *Coleman* class members, and to study the reasons for the exploding numbers of

8  MHSDS patients housed in their institutions.

9

10  DATED: January 13, 2017       Respectfully submitted,

11                      ROSEN BIEN GALVAN & GRUNFELD LLP

12                      By:  */s/ Michael W. Bien*

13                            Michael W. Bien

14                      Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3082536-17]

<center>21</center>