DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNIFER L. STARK – 267062
KRISTA STONE-MANISTA – 269083
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone: (415) 433-6830

RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, JR., et al., <br><br> Defendants. | Case No. 2:90-CV-00520-KJM-DB <br><br> **PLAINTIFFS' BRIEF REGARDING REQUESTED REMEDIES, IN RESPONSE TO DECEMBER 9, 2016 ORDER RE ACCESS TO INPATIENT CARE** <br><br> Judge: Hon. Kimberly J. Mueller <br> Date: January 23, 2017 <br> Time: 10:00 a.m. <br> Crtrm.: 3, 15th Floor |

[3086199-8]

There is an urgent need for additional Court-ordered remedies to ensure consistent and reliable access to inpatient psychiatric hospitalization for *Coleman* class members. The obstacles to inpatient access described in Plaintiffs' October 20, 2016 brief, *see* ECF No. 5503 ("10/20/16 Brief"), remain intractable and dangerous, and Defendants have yet to meaningfully address them. *See* Order, ECF No. 5529 ("12/9/16 Order"), at 2-3. The orders Plaintiffs have requested are necessary to correct the ongoing violations of class members' rights to timely access to inpatient psychiatric hospitalization. Defendants' failure to understand that the persistent waitlists are a constitutional violation, as well as their "failure to understand that the recent year-long recurrence and growth of the waitlists for inpatient care is in violation of longstanding orders of the court," *id.* at 2, demonstrates that the Court's many prior orders are insufficient to solve this crisis, and that further remedies are both warranted and necessary.

That said, Plaintiffs agree with the Court that the focus must remain on whether Defendants have, and can maintain, adequate capacity in order to ensure timely access to inpatient psychiatric hospitalization. *Id.* at 5-6. Before creating *additional* capacity, particularly in the form of unlicensed temporary inpatient units inside prison blocks, Defendants must first (1) appropriately use *existing* capacity, especially long underutilized state hospital beds allocated for the *Coleman* class; (2) implement measures necessary to address current and looming gaps in capacity; and (3) undertake the analysis necessary to prevent yet another recurrence of this same problem as soon as the parties', Special Master's, and Court's attention turns elsewhere. The six measures requested in the 10/20/16 Brief are targeted to achieve these goals.

Specifically, Plaintiffs' first three requests are targeted at ensuring that Defendants make use of existing capacity in accordance with longstanding Court orders and as necessary to meet class members' needs at all levels of care. Defendants must (1) promptly transfer low-security and dorm-cleared class members into low-custody intermediate care ("ICF") psychiatric programs; (2) transfer ICF patients to unused less restrictive beds at a specific and transparent rate until those beds are filled, and then keep them filled, instead

of allowing them to go empty while waitlists recur over and over; and (3) implement a transparent process for ensuring regular review and transfer of patients housed in higher-security programs to less restrictive programs. *See* 10/20/16 Brief at 10-12. Plaintiffs' fourth and fifth requests would require Defendants to eliminate the current waitlists for both acute and intermediate psychiatric hospitalization, and to "implement a sustainable process so the waitlists would not recur," 12/9/16 Order at 2, including if necessary to provide for additional capacity. *See* 10/20/16 Brief at 12-13. And Plaintiffs' final request, for a study of mental health population trends across Defendants' systems, would provide necessary information to ensure that any course corrections achieved as a result of this round of Court intervention are maintained in the long term. *See id.* at 13-14.

In accordance with the Court's December 9, 2016 Order, the parties met and conferred on January 9, 2017 regarding Plaintiffs' requests for relief but were unable to reach agreement. *See* 12/9/16 Order at 5.

**ARGUMENT**

**I. THE CRISIS IN DELAYED ACCESS TO INPATIENT PSYCHIATRIC HOSPITALIZATION CONTINUES.**

Despite the focused attention of the parties and the Court, Defendants have made only fractional gains in reducing the overall waitlist for inpatient psychiatric hospitalization at all levels, and a segment of the waitlist has actually increased over the past two months.

Defendants' regular monthly data production for October 2016, produced on December 12, 2016 and updated on December 15, 2016 in response to a request from Plaintiffs' counsel, omitted the "Management Information Summary (MIS) Report" usually included in the data production. Declaration of Krista Stone-Manista ("Stone-Manista Decl."), filed herewith, ¶ 2. Despite multiple requests, Defendants have not produced this report as the time of this filing. *See id.* ¶¶ 2-3, 7 & Ex. A. Additionally, Defendants also omitted the MIS Report from the November monthly data production, produced to Plaintiffs on January 12, 2017. *See id.* ¶ 4 & Ex. B.

Defendants provided updated information regarding the inpatient psychiatric care population, and concomitant waitlist for beds, during the parties' January 9, 2017 meet and confer phone call. *See id.* ¶ 5-11. Defendants reported that these numbers, which provided data as of January 6, 2017, were "draft" numbers from the Department of State Hospitals ("DSH"), and were still undergoing verification. *See id.* ¶ 6. Despite repeated requests from Plaintiffs' counsel, Defendants were unable to provide "verified" numbers, or indeed any updated data, to Plaintiffs as of the time of this filing. *See id.* ¶ 7. Plaintiffs therefore must rely on the "draft" numbers provided by Defendants' counsel on January 9.

One hundred and nine (109) patients were waiting for transfer to inpatient care beds as of January 6, 2017.[1] *See id.* ¶¶ 9-11. The waitlist for ICF care has not improved significantly since the Court most recently expressed great concern at the waitlist "resurgence" last October based on September 2016 data. *See* Order, ECF No. 5498 (10/6/16), at 2 of 3. Seventy-two (72) patients were on the waitlist for high custody ICF beds (71 of whom had been endorsed and were pending transfer) as of January 6, 2017, *see* Stone-Manista Decl. ¶ 9, comparable to the 74 patients who were waiting in September 2016. *See* Defs.' Monthly Census, Waitlists and Trends Reports for Inpatient Mental Health Care, ECF No. 5500 (10/17/16) ("October Inpatient Report"), at 9 of 15 (September 2016 data). While the waitlist for high-custody ICF beds remains essentially the same as in September, the waitlist for low-custody ICF beds has slightly increased, from an average of seven on each day in September 2016 to a reported eight on January 6, 2017. *See* October Inpatient Report at 9 of 15; Stone-Manista Decl. ¶ 10.

As to acute inpatient psychiatric hospitalization, 29 patients remained on the waitlist as of January 6, 2017, 27 of whom had been endorsed and were pending transfer to acute

---

[1] While Defendants prefer to report a "waitlist" of only those patients whose waits have exceeded Program Guide timelines, Plaintiffs use the term "waitlist" to refer to the total number of patients awaiting transfer to inpatient care consistent with this Court's orders. *See, e.g.*, Order, ECF No. 5343 (8/21/15), at 2 of 3 ("a class member is deemed to be on a waitlist for inpatient care from the time said class member is referred to DSH by CDCR").

care beds. *Id.* ¶ 11. Six (6) of those patients had been waiting beyond Program Guide timelines (10 days for transfer to acute care). *Id.* While an improvement from previous recent months, Defendants have offered no evidence to demonstrate that this decline will continue, or even that it will remain static. It could as easily be explained as the natural resolution of what Defendants have casually described as "unforeseen spikes" in inpatient demand, ignoring the apparently predictable nature of the spikes in question and their constitutional obligation to plan for truly unexpected changes in demand. *See* Defs.' Response to OSC, ECF No. 5522 (11/22/16), at 4 of 6; *see also* 12/9/16 Order at 2 and 4 of 6 ("The very fact of periodic spikes should be obvious to defendants …"). It also represents 29 class members in need of, but unable to access, the highest level of mental health care in Defendants' system. An improved constitutional violation is still a violation.

Even the limited current data available to Plaintiffs shows that Defendants' intransigent refusal to make full use of available low-custody ICF beds continues. On November 21, 2016, there were 38 available beds at DSH-Atascadero ("ASH") (256 bed capacity minus 218 beds occupied) and three beds open at DSH-Coalinga ("CSH"). Defs.' Monthly Census, Waitlists and Trends Reports for Inpatient Mental Health Care, ECF No. 5535 (12/15/16) ("December Inpatient Report"), at 7 of 15 (data for November 2016). On this same day, when there were 41 open low-custody ICF beds (including 7 ICF beds reallocated for acute patients at ASH without Court approval[2]), there were nine (9) patients endorsed to such beds and awaiting transfer. December Inpatient Report at 7, 9 of 15.

---

[2] Defendants' reporting on ASH is complicated by their continued *ad hoc* reallocation of a portion of the 256 ICF beds this Court has required be made available for *Coleman* class members for acute care instead. *See* December Inpatient Report at 6-7 of 15 (showing 7 ASH acute patients and a total ASH ICF capacity of 249); *see also* Order, ECF No. 3613 (6/18/2009), at 4 of 5 (authorizing bed conversions to provide for 256 ICF beds at ASH, to be filled by no later than October 31, 2009). Reportedly, there were four such acute patients at ASH as of January 6, 2017, but there have been as many as seven in recent months. Stone-Manista Decl. ¶ 8; December Inpatient Report at 6 of 15. While Plaintiffs fully support treating acute class members at ASH, those acute beds cannot be used to reduce the 256 ICF beds set aside for class members without a variance from this Court that Defendants have never requested, much less been granted.

As of January 6, 2017, Defendants report 41 available beds at ASH, 2 available beds at CSH, and 3 available dorm beds at VPP. Stone-Manista Decl. ¶ 8. Meanwhile, on that same day, eight (8) *Coleman* patients were sitting on the waitlist for those very same beds (including one referral pending acceptance). *Id*. ¶ 10. Indeed, it is highly likely that some of these eight (8) patients awaiting transfer to vacant low-custody ICF beds are currently in high-custody ICF beds, although Defendants do not provide data sufficient to ascertain how many. Defendants' failure to move those patients into the many currently open low-custody ICF beds then further delays the transfer of the 71 patients currently on the high-custody ICF waitlist—24 of whom have been waiting past Program Guide timelines. *Id.* ¶ 9.

Further, Defendants refuse to send any female class members to inpatient beds at Patton State Hospital ("PSH"), although there were six (6) female patients awaiting transfer to inpatient care beyond Program Guide timelines as of the October 17, 2016 MIS report. *See* ECF No. 5519-1 at 2 of 2. From August through October, four (4) women waited for longer than three weeks for access to inpatient hospitalization, even while the PSH beds sat empty. *See* Stone-Manista Decl. ¶ 12 & Ex. C. The Psychiatric Inpatient Program ("PIP") at CIW has been either full or within one patient of full capacity since April, indicating that capacity there is fully met. *See* December Inpatient Report at 15 of 15. Defendants continue to represent that there are 30 beds available for *Coleman* class members at PSH—but refuse to make use of these beds. *See id.*; *see also* Pls.' Supplemental Brief, filed herewith ("Pls.' Supplemental Brief"), at 3-4.

It is clear that Defendants' process for moving patients through the system is not working, despite months of promises that a truly functional process was just around the corner. And Defendants, in their actions and in their briefs, have given no reason to believe any modest advances made in the past few months, under intense scrutiny, will be maintained. For example, Defendants have still given no signs that they have hired the staff necessary to conduct clinical reviews and actually transfer patients deemed ready for movement to less-restrictive environments. *See* 10/20/16 Brief at 7-9.

Further, as the Court noted in its Order, "delays in access to inpatient care create backlogs at every layer of the MHSDS." 12/9/16 Order at 3. The Court noted a crisis in access to mental health crisis beds ("MHCBs") in September, *see id.* at 3-4, when only nine (9) class members were transferred within the 24-hour time frame required by the Program Guide, or 2% of all those transferred to MHCBs outside their home institutions. This situation improved somewhat by November, when 244 class members were transferred within 24 hours, out of a total of 387 transferred to outside MHCBs. But more than 37% of MHCB transfers were still delayed beyond 24 hours. *See* Stone-Manista Decl. ¶ 13 & Ex. D. In addition, while Defendants' reporting is not clear, the transfer time listed on the MHCB transfer report appears to be at best the time that transport to the receiving institution began, not when the patient actually arrived in the MHCB. *See id.* ¶ 14 & Ex. E. It therefore seems that as of November, more than one-third of the patients transferred to MHCBs did not even begin their transport to those beds until more than 24 hours had passed. But the Program Guide requires that "movement from an institution to an MHCB bed shall be *completed* by institutional transportation staff via special transport within 24 hours." Program Guide at 12-5-4 (emphasis added). Defendants apparently do not report on how many class members actually make it to an MHCB within 24 hours, as required under their own remedial plan.

Each of these facts supports Plaintiffs' requests for six targeted orders necessary to achieve a transparent and durable remedy to the recurring inpatient access crisis.

## II. SPECIFIC REMEDIES ARE NECESSARY TO ACHIEVE A DURABLE REMEDY TO THE WAITLIST AND LOW-CUSTODY INPATIENT BED MISMANAGEMENT CRISES.

The Court is well aware that Defendants have failed to create a durable remedy to address the ongoing denial of timely access to inpatient psychiatric hospitalization, and that Defendants have a long history of failing to treat this crisis with the gravity it deserves. *See* Order, ECF No. 5333 (8/5/15), at 1-2 and orders cited therein; *see also* 12/9/16 Order at 2 (referring to Defendants' "cavalier" responses to the Court's Order to Show Cause). Plaintiffs' six requests for additional orders are targeted to that end.

Specific and targeted remedial orders are appropriate when supported by the record because "[p]rospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010). Failure to provide timely access to inpatient psychiatric hospitalization is a violation of constitutional magnitude as well as a violation of dozens of orders of this Court, warranting intervention. *See id.*; *Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir. 2004) (defendants' "record of abject failure" informs the appropriateness of court-ordered relief where defendants had been unable to "cure the constitutional infirmities plaguing the delivery of health care in the correctional system"). Despite Defendants' assurances that class members are receiving adequate care in inappropriate settings while awaiting inpatient transfer, there is simply no evidence supporting that conjecture. *See* Pls.' Supplemental Brief at 11-14; *see also* 12/9/16 Order at 2-3. Denial of access to adequate mental health care in appropriate care settings is a constitutional violation at every level.

### A. Additional Orders Are Necessary to Ensure that Defendants Use Existing Capacity in Accordance with Longstanding Court Orders.

The most recent available data supports Plaintiffs' requests in their October 20, 2016 Brief that Defendants be ordered (1) to promptly move dorm-cleared and low-security ICF patients into low-custody inpatient psychiatric programs; (2) to do so at a specific rate now that all lesser measures to ensure compliance with the Court's orders regarding use of low-custody beds have failed; and (3) to openly and transparently report on the functioning of the transfer process in a way that eliminates the cloudiness of the data discussed above. *See* 10/20/16 Brief at 10-12. The Court's concern about ICF capacity cannot be fully addressed until Defendants have complied with past orders about use of existing inpatient beds. *See* Pls.' Supplemental Brief at 4-7, 16-18.

Defendants continue to refuse to fill low-custody ICF beds even while patients are waiting for those beds. Defendants have represented to the Court that "[a]s soon as a patient is deemed clinically appropriate for a less-restrictive inpatient environment, the

patient is moved." Defs.' Reply to Pls.' Response to DSH Update, ECF No. 5509 (11/4/16) ("Defs.' Nov. 4 Reply"), at 6 of 9. But the December Inpatient Report shows that on no day in November did the number of patients endorsed and pending transfer low-custody ICF beds decrease by more than two patients at a time. December Inpatient Report at 7 of 15. The only remaining solution is for Defendants to be ordered to actually comply with their assurances that patients eligible for low-security ICF programs are promptly moved, and to move all such patients without further delay. Defendants stated during the January 9 meet and confer call that although the numbers of patients awaiting transfer often remain static for weeks at a time, there is actually patient movement that is not apparent from the numbers alone. Stone-Manista Decl. ¶ 15. Given the intractability of the waitlist problem, these assurances alone are insufficient. Defendants also must be ordered to transparently report to the Court within 30 days on the remaining barriers to immediate transfers to low-custody ICF programs of patients who are endorsed to such programs, and to identify how they plan to remedy those barriers without further delay.

It also does not appear that the Memorandum of Understanding ("MOU") process is working as intended to facilitate these transfers and the long-overdue filling of ASH and CSH beds as ordered by the Court. The November Inpatient Report showed that 358 male class members were in inpatient settings not consistent with their "Least Restrictive Housing" ("LRH") designations, the pinpoint on which the entire MOU system turns. November Inpatient Report at 6-7 of 15. As discussed further in Plaintiffs' Supplemental Brief, this means that patients are held in unnecessarily restrictive and counter-therapeutic environments. *See* Pls.' Supplemental Brief at 6. Plaintiffs request a fully transparent review of the functioning of the MOU process, including the process for reviewing patients to determine who is ready to transfer, as well as the actual transfer process. This will ensure everyone—including Defendants—understands what obstacles remain to compliance with the Court's orders and achievement of a durable remedy. Defendants mischaracterize this as a request that they "jettison" the MOU process entirely. *See* Defs.' Nov. 4 Reply at 5 of 9. All Plaintiffs ask is that Defendants accurately report on whether

and how the MOU process is functioning, in a way that provides real evidence, not unfounded assertions, about whether it can truly provide a durable remedy to the recurring waitlist crisis. During the January 9 call, the parties discussed ways Defendants might improve their reporting on these issues, including by providing a more transparent report for patients awaiting transfer to low-custody ICF beds, but did not reach agreement on any specific measures. Stone-Manista Decl. ¶ 16.

Further, to the extent that all lesser measures continue to fail, and lower-security ICF beds at ASH and CSH that the Court has ordered be used for *Coleman* class members remain unfilled, Plaintiffs' request for a specific and transparent process for filling these beds appears to be the only viable option. *See* 10/20/16 Brief at 11-12 of 15; *see also* Pls.' Supplemental Brief at 4-7. This is again not a request to get rid of the MOU process that was designed primarily to fill these beds, but which has not achieved that goal. Rather, it is a request that the Court require Defendants to comply with prior court orders regarding the use of these beds.

### B. Defendants Must Eliminate the Waitlists for ICF and Acute Psychiatric Inpatient Care by March 2017.

If Defendants can finally achieve the goal of maximizing their use of available inpatient beds, and can move patients through the system in an efficient way that provides for constitutionally adequate care in the appropriate settings, it may well prove that no additional inpatient psychiatric capacity is needed at this time. To enable a realistic assessment of their need for additional capacity, Defendants should first be ordered to eliminate the waitlists for both acute and intermediate psychiatric hospitalization by March 1, 2017, through any means necessary. *See* 10/20/16 Brief at 11-12. If this deadline is not met, or if demand for inpatient care exceeds Defendants' present capacity, Defendants must then increase capacity. The most readily-available options for increasing capacity include expanding the number of beds dedicated to *Coleman* class members at ASH and CSH, including by continuing to treat acute patients at ASH in addition to (rather than in lieu of) the Court-ordered 256 ICF class member beds, and, as a last resort, by re-

opening the high custody ICF beds that were closed in 2013. *See id.* Any measures taken to increase capacity must do so by increasing total capacity across the system, not by reducing capacity for one population to permit treatment of others.

### C. Defendants Must Study the Growing Mental Health Population and Must More Accurately Predict Future Population Needs.

As the Court has noted, there are presently severe overcrowding problems at multiple levels of the MHSDS, from inpatient psychiatric hospitalization down through the system. *See* 12/9/16 Order at 3-4. As discussed further in Plaintiffs' supplemental brief, and as recent experience shows, the tools and process by which Defendants currently predict future populations are flawed in critical ways. *See* Pls.' Supplemental Brief at 14-18. But even these flawed projection mechanisms demonstrate that the overall mental health population, particularly at the higher levels of care, will continue to grow over time. *See id.* Defendants are unwilling to examine the complex reasons for this continued growth in the mental health population, including various policies that limit credit-earning opportunities for class members. *See* 10/20/16 Brief at 13. Defendants have represented that they are "internally evaluating whether such a study may be appropriate to evaluate these issues." *See* Defs.' Nov. 4 Reply at 8 of 9. Without such an analysis, the Court's questions about the present and future need for inpatient bed capacity can never be honestly addressed. This Court should now order Defendants to undertake such a study, to be completed and provided to the Special Master and the parties within 120 days, in addition to any other relief the Court deems necessary and appropriate.

DATED: January 13, 2017         Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Krista Stone-Manista*
    Krista Stone-Manista

Attorneys for Plaintiffs

[3086199-8]