KATHLEEN A. KENEALY
Acting Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
MANEESH SHARMA, State Bar No. 280084
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD STEGEMAN, State Bar No. 225745
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-4921
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO QUESTIONS POSED IN THE DECEMBER 9, 2016 ORDER** |

## INTRODUCTION

The Governor's Budget proposal for Fiscal Year 2017-18 includes significant immediate and long-term increases in bed capacity within the Mental Health Services Delivery System, and presents a plan to shift responsibility for providing inpatient mental health care within prisons from the Department of State Hospitals (DSH) to the California Department of Corrections and Rehabilitation (CDCR). With these far-reaching changes, CDCR will treat approximately 80

1

1  percent of inmates in need of inpatient care.  By cutting the time between referral and placement,

2  this shift is expected to greatly reduce the time needed to review and accept referrals for inpatient

3  care, and place these patients in available and clinically appropriate beds.  DSH will continue to

4  provide treatment to the remaining approximate 20 percent of patients who are custodially

5  eligible and clinically appropriate for placement in a DSH hospital dormitory setting.[1]

6      On December 9, 2016, the Court requested a response to eight questions concerning

7  inpatient bed capacity and access to care.  Defendants' response to the Court's questions, and

8  further detail concerning the recently released budget proposals, are provided below.

9      **1.      Is every *Coleman* inpatient bed occupied at all times with a *Coleman* class
10            member? If not why not?**

11      No.  *Coleman*-designated beds are not occupied at all times by *Coleman* class members.  It

12  is both CDCR and DSH's policy to treat mental health patients in the least restrictive setting

13  possible.  However, there are times when there are no clinically-appropriate *Coleman* class

14  members to fill the low-custody dorms at DSH facilities.  DSH psychiatric programs offer several

15  levels of clinical care and custodial environments to meet the different needs of the *Coleman*

16  population and create a continuum of care throughout the DSH mental health inpatient system.

17  (Ahlin Decl., ¶ 3.)  Patients' clinical needs range from acute to intermediate, and patients'

18  custody factors range from low risk to high risk, resulting in some patients moving from locked,

19  single cells to multi-person cells, or locked and unlocked dorms.  (*Id.*)  An individualized clinical

20  assessment determines where a patient's mental health needs will be appropriately and optimally

21  met.  (*Id.*)  As a result of pairing patients' clinical needs with their appropriate housing

22  environment, there are circumstances where DSH beds designated for *Coleman* class members

23  are available but not filled.  (*Id.*)  Under those circumstances, when beds at the state hospitals

24  cannot be used for *Coleman* patients, they are used for other patients, also subject to court-

25  ordered commitment, but made available for *Coleman* class members when the need arises.  (*Id.*)

26  ---

[1] DSH currently provides inpatient treatment to approximately 2,285 CDCR patients annually in designated licensed beds at DSH-Atascadero, DSH-Coalinga, and in facilities operated within CDCR prisons.  (Declaration of Pam Ahlin in Support of Defendants' Response to Questions Posed in the December 9, 2016 Order (Ahlin Decl.) at ¶ 2.)

27

28

1    *Coleman* class members, however, maintain their placement priority for such beds.   Thus, if

2    CDCR clinicians refer a *Coleman* class member to an inpatient bed and the *Coleman*-designated

3    space is occupied, DSH makes that bed available to the *Coleman* class member and moves the

4    non-*Coleman* patient.  (*Id*.)

**2.    If the answer to question 1 is yes, why should not defendants be required to immediately reopen a sufficient number of units previously dedicated to inpatient care to eliminate the waitlist for such care?**

7    Although Defendants' answer to Question 1 is "no," Defendants recognize that additional

8    capacity is required to address the urgent problem of inpatient waitlists in high custody settings.

9    The 2017-18 Governor's Budget, and other ongoing CDCR initiatives, address the important

10   issue of waitlists in several ways.

**A.    Defendants Are Increasing Bed Capacity.**

12   First, Defendants are expanding the number of inpatient beds available to *Coleman* class

13   members.  (Declaration of Katherine Tebrock in Support of Defendants' Response to Questions

14   Posed in the December 9, 2016 Order (Tebrock Decl. ¶ 4.)  Specifically, the 2017-18 Governor's

15   Budget describes CDCR's plan to reopen 72 inpatient beds on the first floor of the California

16   Medical Facility's L-Wing, referred to as L1.  (*2017 - 18 Governor's Budget Summary*, at 81;

17   http://www.ebudget.ca.gov/2017- 18/pdf/BudgetSummary/FullBudgetSummary.pdf.)  CDCR

18   intends to convert this unit for immediate use as an intermediate-care facility.  To do so, CDCR

19   must obtain waivers of the following state licensing and building code requirements from this

20   Court:  California Health and Safety Code section 1250(j) and California Code of Regulations,

21   Title 22, sections 79501–79861.  These waivers are identical to the state licensing and building

22   code requirements the Court waived in 2011 in response to Defendants' request to convert cells in

23   the L-Wing into immediate Intermediate Care Facility level of care beds.  (Order, 11/17/11, ECF

24   No. 4120.)  Defendants may also require waivers of certain federal and state accessibility

25   requirements.  28 C.F.R. 35.151(b), (h), (k); and Cal. Code Regs. tit. 24 part 2 §§ 1109B, 1134B.

26   The addition of the 72 high-custody, intermediate inpatient-care beds will increase bed

27   capacity and reduce waiting times for patients in need of this care.  Assuming approval of waivers

28

3

1    of state law, the project is expected to be completed in April 2017.  CDCR will provide the

2    Special Master the activation schedules as soon as they are available.  (Tebrock Decl. ¶ 4.)

3         Second, due to the recent storms and high rain volumes, DSH experienced flooding in its

4    facility at Salinas Valley State Prison.  (Ahlin Decl. ¶ 4.)  As a result, DSH has been unable to use

5    20 high-custody intermediate-care beds since October 2016, and was unable to use an additional

6    34 high-custody intermediate-care beds in January 2017.  (*Id.*)  The temporary loss of these beds

7    has constrained capacity and added to wait times for beds in high demand.  (*Id.*) To off-set the

8    loss of intermediate-care beds, DSH, with the approval of licensing, is using the Isolation Rooms

9    at DSH-Stockton on an emergency basis.  DSH and CDCR are ensuring appropriate staff

10   coverage is provided 24 hours per day, seven days a week while these rooms are in use.  DSH-

11   Stockton will continue to take new admissions from the referral waitlist, utilizing the Isolation

12   Rooms for patients nearing discharge readiness and backfilling with admissions.  Construction

13   has begun and repairs are ongoing.  Currently, it is estimated that the beds at Salinas Valley State

14   Prison should be back on-line and available for use by the middle of March 2017.  DSH and

15   CDCR are taking immediate steps to provide continued mental health services to those patients

16   impacted by the rain damage.

17        Third, the 2017-18 Governor's Budget proposes to construct two 50-bed, flexible use,

18   inpatient units.  (*2017 - 18 Governor's Budget Summary*, at 81; http://www.ebudget.ca.gov/2017-

19   18/pdf/BudgetSummary/FullBudgetSummary.pdf.)  The beds will be utilized primarily as Mental

20   Health Crisis Beds, but can be repurposed for use as acute or intermediate-care beds as needed.

21   (*Id.*)  The construction of these 100 beds will help address the longstanding need for crisis beds in

22   the southern part of the state.  Also, the beds will allow CDCR to meet the dynamic needs of the

23   population by changing the use of the beds from crisis bed, through the continuum of care, to

24   acute.  Defendants expect that this additional resource and investment will help improve care to

25   the patients.  Fifty beds will be located at R.J. Donovan State Prison and 50 beds will be located

26   at the California Institution for Men.  (*Id.*)  The project is expected to be completed by Summer

27   2021.  (*Id.*)  Upon legislative approval, CDCR will provide the Special Master with the final

28

4

1  construction schedule, as well as the monthly activation schedules so that the Court remains

2  informed of the status of this project.  (Tebrock Decl., ¶ 5.)

3        **B.    Shifting Inpatient Services to CDCR Will Decrease Processing and Wait**
           **Times.**

4

5        The 2017-18 Governor's Budget proposes shifting responsibility for operation of inpatient

6  psychiatric programs within CDCR prisons from DSH to CDCR, effective July 1, 2017.  (*2017 -*

7  *18 Governor's Budget Summary*, at 81; http://www.ebudget.ca.gov/2017-

8  18/pdf/BudgetSummary/FullBudgetSummary.pdf.)  In his May 2016 report on inpatient care, the

9  Special Master encouraged Defendants to consider this shift in responsibility.  (Special Master

10 Monitoring Report for Inpatient Care, May 25, 2016, ECF No. 5448 at 14, 40-44.)  His

11 encouragement was supported by CDCR's success in establishing and managing the psychiatric

12 inpatient programs for inmates at the California Institution for Women and condemned inmates at

13 San Quentin State Prison.  These programs have been successful, demonstrating that CDCR can

14 undertake responsibility for providing effective inpatient treatment at facilities presently operated

15 by DSH.[2]  (*Id.* at 43.)

16       CDCR's plan to transfer and manage the inpatient programs will result in significant

17 improvements and efficiencies.  Because CDCR will manage the entire referral and placement

18 process, it projects that referral times in acute-care programs may be reduced by as much 50

19 percent and by as much as 40 percent in high-custody, intermediate-care programs.  (Tebrock

20 Decl., ¶ 6.)  CDCR Inpatient Coordinators will be directly responsible for utilization management

21 of these beds, including making local referrals, determining appropriate-care levels, and

22 managing timeliness and referral quality.  (*Id.*)  Further, CDCR Inpatient Coordinators will

23 receive the least restrictive housing designations much sooner in the process.  (*Id.*)  And because

24 referrals will be an internal CDCR process, CDCR Headquarters staff will be able to review

25

26 [2] In 2012, a 45-bed Psychiatric Inpatient Program (PIP) at the California Institution for Women was accredited and opened.  In 2014, San Quentin's Condemned PIP program—a 40-bed psychiatric inpatient program for condemned

27 male inmates—opened.  (Special Master Monitoring Report for Inpatient Care, May 25, 2016, ECF No. 5448 at 42-44.)

28

1    referrals much more quickly, and the DSH confirmation step will be eliminated. (*Id.*) All these

2    efficiencies will result in faster reviews and placements.

3        The 2017-18 Governor's Budget includes this transition. (*2017 - 18 Governor's Budget*

4    *Summary*, at 81; http://www.ebudget.ca.gov/2017- 18/pdf/BudgetSummary/FullBudgetSummary.

5    pdf.) If approved by the Legislature, CDCR plans to immediately transition the psychiatric

6    inpatient programs from DSH beginning on July 1, 2017, with a full roll-out over a 2-year period.

7    (http://web1a.esd.dof.ca.gov/Documents/bcp/1718/ FY1718_ORG5225_BCP1037.pdf.) The

8    Budget Change Proposal includes an activation schedule and the Special Master will receive

9    updates as the project progresses. (Tebrock Decl., ¶ 7.)

10
11        **C.**    **CDCR Is Adding Capacity and Addressing Demand Through Additional Training and Other Initiatives.**

12        To help manage inpatient care needs, CDCR has implemented a three-phased clinical skills

13    training program for CDCR clinicians who will assist staff in treatment planning and assessment.

14    (Tebrock Decl., ¶ 8.) Case formulation training (the program's first phase), will provide clinical

15    staff better foundation for assessing patient needs and developing treatment plans. (*Id.*)

16    Improved treatment plans result in improved identification of treatment goals and facilitate

17    measuring a patient's progress in achieving those goals. (*Id.*) Mental Health Crisis Bed triage

18    training (the program's second phase) will improve clinicians' ability to recognize crises and

19    prescribe inpatient treatment. (*Id.*) These first two program phases began in 2016. (*Id.*) The

20    training's third phase–Interdisciplinary Treatment Team training—will make interdisciplinary

21    treatment teams more complete, with teams confirming that measurable treatment goals are

22    identified and tracked, and that the teams are working towards patient improvement. (*Id.*) Taken

23    together, these three trainings should promote earlier clinician intervention, prevent patient crisis,

24    and avoid potentially unnecessary hospitalizations. CDCR's three clinical training program

25    phases are expected to be fully implemented by mid-2017. (*Id.*)

26        Unnecessary inpatient hospitalizations interrupt care continuity and disrupt patients'

27    progress made during outpatient treatment. CDCR is undertaking these and other measures and

28

1   initiatives, described below in response to the Court's Question 7, to benefit patients and enhance

2   care.  CDCR expects that these measures will also reduce the need for inpatient care.

3       With the anticipated near-term increase in bed capacity, efficiencies from shifting most

4   inpatient services from DSH to CDCR, and the initiatives described above, an order to reopen

5   inpatient beds is unnecessary.

6       **3.    In the alternative, is it feasible to contract with community hospitals to
                 provide inpatient mental health care to class members when DSH capacity
7                is full? If not, why not, and what are other alternatives available to
                 defendants?**
8

9       Defendants have assessed the option of turning to community hospital beds to provide

10  inpatient mental health services.  Those efforts have demonstrated a lack of community resources.

11      Specifically, in December 2014, DSH distributed a Request For Information to all licensed

12  Institution for Mental Disease facilities in California via direct contact and posting to the State of

13  California's online procurement system – BidSync.  (Ahlin Decl. ¶ 5.)  Over 50 licensed facilities

14  were asked to provide information relative to types of beds available for contract, services

15  provided and security provisions available.  (*Id*.)  Statewide, there were only 3 - 5 empty available

16  beds at any given time.  (*Id*.)  These facilities primarily provide mental health services to patients

17  in the community or conserved under the Lanterman Petris Short Act.  (*Id*.)  The results of this

18  request are indicative of the ongoing shortage of secure mental health beds available outside the

19  boundaries of DSH and CDCR facilities, which is also reflected in the continued increase of

20  Lanterman Petris Short Act patients referred to the state hospitals for treatment.  (*Id*.)

21      CDCR has searched for additional available beds over the course of the past several years,

22  and has not found resources in the community that could serve the inpatient mental health needs

23  for its challenging custodial and clinical population.  While it may be theoretically possible,

24  community hospitals and other private mental health providers have generally been unable or

25  unwilling to take on state prisoners or mentally disordered offenders for a variety of reasons.

26      In 2012 and 2013, the California Correctional Health Care System worked through its

27  Health Net contractor to locate alternative mental health crisis beds.  (Tebrock Decl. ¶ 9.)  Only

28  three hospitals responded.  (*Id*.)  Two of the facilities did not meet security requirements due to

7

1    their location and building designs.  (*Id*.)  These facilities could offer only ten to fifteen beds, and

2    CDCR would have been required to provide staffing.  (*Id*.)  The third potential contractor wanted

3    CDCR to build and staff the unit where the crisis beds would be located.  This facility also failed

4    to meet security requirements.  (*Id*.)  Skilled nursing facilities were also contacted, but those

5    facilities were not willing to have custody officers guarding patients given that they provide

6    services to community families.  (*Id*.)  Finally, the California Correctional Health Care System

7    also contacted hospitals without success.  A few were willing to take patients, but only for a

8    limited number of beds.

9         The California Correctional Health Care System has continued to explore available options

10    to use community hospital beds.  However, given the lack of sufficiently secure treatment beds

11    located in the community, and the high cost of using those beds, the option to utilize community

12    beds to provide inpatient mental health care to *Coleman* class members is simply infeasible.

13    (Tebrock Decl. ¶ 9.)  Instead, as reported here, Defendants have other, more viable and quickly

14    deployable options.

15         **4.    What verifiable assurances does the court have, if any, that inmates held in
              MHCBs or EOP units pending transfer to inpatient care are receiving the
16              care required by the referral?**

17         Patients referred for placement in an Intermediate Care Facility or Acute Psychiatric

18    Program receive mental health treatment while awaiting transfer.  Patients in a mental health

19    crisis bed are receiving care in a licensed inpatient unit and receive, at minimum, daily clinical

20    rounds from their psychiatrist, medication evaluation and management, individualized treatment

21    plans that typically include brief intensive therapy, rehabilitation therapy, weekly

22    Interdisciplinary Treatment Team meetings, and twenty-four hour nursing care.  (Mental Health

23    Services Delivery System Program Guide, 2009 revision, 12-5-11 to 12-5-16.)  For inmate-

24    patients in mental health crisis beds during the last six months of 2016, CDCR met the foregoing

25    Program Guide requirements at a rate of 90 percent or greater.  (Tebrock Decl., ¶ 10.)

26    / / /

27    / / /

28    / / /

8

1    Patients referred to inpatient care from an Enhanced Outpatient Program continue to receive

2    Enhanced Outpatient Program level of care until they are placed at a higher level of care.

3    (Tebrock Decl., ¶ 10.)

4    **5.    What tools are defendants using to assess whether to increase inpatient capacity?**

5

6    Defendants use Court-approved mental health bed projections, internal operational reports,

7    and coordinated inter-departmental communication to assess the need for inpatient beds.

8    Since at least 2006, Defendants have been court-ordered to conduct annual population

9    reviews and update mental health bed need projections.  That process and its studies have been

10   reviewed and reported on by the Special Master and approved by the Court.  (Order regarding

11   Navigant Consulting Contract, 07/09/09, ECF No. 3629.)  On June 19, 2014, Defendants were

12   ordered to "continue to work with their consultant and the Special Master to forecast and plan for

13   adequate bed and treatment space for the mentally ill population consistent with their current

14   process." (Order, 06/19/14, ECF No. 5171.)  The 2016 population projections were released with

15   the 2017-18 Governor's Budget, and the Mental Health Bed Needs Study, which is based on

16   those projections, was submitted to the Special Master and Plaintiffs on January 11, 2017.  (*Id.*)

17   The 2017-18 Governor's Budget reflects a revised projection for the number of inmates requiring

18   intermediate level of care.  Specifically, the Governor's Budget revised the projections to reflect a

19   more recent time period, which led to the budget proposal to provide immediate capacity for this

20   level of care.  The fall 2016 projections forecast an increase in need for low-custody intermediate-

21   care beds and a decrease in the need for high-custody intermediate-care beds.  (*Id.*)  The

22   projections are at odds with the current need, which shows an abundance of low-custody

23   intermediate-care beds and a waitlist for high-custody intermediate-care beds.  (Tebrock Decl., ¶

24   11.)  Given those facts, Defendants do not rely solely on the projections to assess whether to

25   increase capacity in their programs.

26   CDCR monitors bed needs on a daily basis using its mental health performance report, and

27   reports generated by the Health Care Placement Oversight Program, which provide daily census

28   and bed availability for all mental health beds within the system.  These reports help management

9

1    identify pressures in the system and allow patient movement and transfers to available beds.

2    (Tebrock Decl. ¶ 12.)

3         Finally, CDCR and DSH work together through meetings and telephone conferences on a

4    daily basis to monitor census levels at the inpatient programs and to admit patients to those

5    programs as expeditiously as possible under the policies adopted as part of the 2015

6    Memorandum of Understanding between the departments. (Tebrock Decl. ¶ 13.)

7         **6.    Why should defendants not be required to include in their bed need**
         **projections and construction or bed utilization planning some amount of**
8         **excess inpatient capacity that is available at all times to address spikes in**
         **demand without delaying access to inpatient care for any *Coleman* class**
9         **member? How would the required amount of excess capacity be**
         **determined?**
10

11        Defendants agree they must maintain an adequate number of beds for the mental health

12   population and manage the utilization of these beds through proactive patient management to

13   avoid crisis and decompensation. Defendants have put several measures in place to manage the

14   demand and have proposed significant additional resources to increase capacity in the coming

15   years. Defendants anticipate that the additional 100 Mental Health Crisis Beds will provide

16   sufficient flexibility to the system to respond to the dynamic need of the patients. Because mental

17   health bed needs fluctuate, Defendants are taking steps to account for those fluctuations,

18   including the initiatives outlined in responses to Questions 2 and 7.

19        **7.    What are defendants' plans for addressing the shortfall in EOP beds and**
         **MHCB beds?**
20

21        CDCR's plans to address the continuing need for Enhanced Outpatient Program and Mental

22   Health Crisis Beds include adding Enhanced Outpatient Program and crisis beds to the system;

23   reviewing of Enhanced Outpatient Program patients who may be ready for discharge from the

24   program; and improving clinical training and patient therapy to ensure that the patients who

25   require higher levels of care have access to those beds.

26   / / /

27   / / /

28   / / /

1    First, CDCR has substantially increased its Enhanced Outpatient Program and Mental

2    Health Crisis Bed capacity.[3]  In 2016, CDCR opened an additional 450 Enhanced Outpatient

3    Program beds for males and continues to fill new beds at Mule Creek State Prison.  (Tebrock

4    Decl. ¶ 14.)  On December 16, 2016, 175 of Mule Creek State Prison's 264 Enhanced Outpatient

5    Program beds were filled.  (*Id.*)  CDCR also intends to add 1,374 Enhanced Outpatient Program

6    beds for males and an additional 62 Enhanced Outpatient Program beds for females within the

7    next six months.  (*Id.*)  And, as reported above, the 2017-18 Governor's Budget proposes to build

8    an additional 100 Mental Health Crisis Beds in Southern California, which would bring the total

9    available crisis beds to 549.

10    Second, CDCR is developing a policy to ensure that all patients receiving enhanced

11    outpatient level care meet the criteria for that care.  CDCR presented a draft memorandum

12    explaining the proposal for the reviews to the Special Master and Plaintiffs in December, 2016.

13    Once finalized, the policy will require staff to conduct a review of each Enhanced Outpatient

14    Program patient at his or her next appointment to identify patients who meet criteria for discharge

15    from the Enhanced Outpatient Program.  This review will further CDCR's efforts to meet the

16    Program Guide's objective to "provide clinical intervention to the individual in the least

17    restrictive clinical and custodial environment."  (Mental Health Services Delivery System

18    Program Guide, 2009 Revision, 12-4-1.)  (Tebrock Decl. ¶ 15.)  The clinical reviews will be

19    completed within 120 days of the date of the memorandum.  (*Id.*)

20    Third, CDCR is implementing the following to ensure patients requiring inpatient care have

21    adequate access to Mental Health Crisis Beds:

22    a.    A Dialectical Behavior Therapy program at California Medical Facility.  This

23    program is an evidence-based, outpatient treatment program that has been effective with patients

24    who repeatedly require inpatient treatment, and is expected to improve these patients' level of

25    functioning and reduce their need for inpatient services.  (Tebrock Decl. ¶ 16.)

26

27    [3] On January 10, 2017, CDCR submitted an updated bed plan to the Special Master and
the parties as an attachment to its Staffing Plan.  A copy of that bed plan is attached as Exhibit A
to the Tebrock Declaration.)

28

b.      Clinical training program.  CDCR has initiated a three-phase, clinical skills training series that focuses on clinical evaluation and treatment skills.  Training in these skills will assist staff in planning and assessing treatment, which should ultimately reduce inpatient care needs.  (*Id.*)

c.      Crisis Intervention Teams at California Institution for Women and Salinas Valley State Prison.  This effort has been implemented at Salinas Valley State Prison and has already enhanced patient services after hours and resulted in reduced need for inpatient care.  The Crisis Intervention Team program will activate at California Institution for Women on January 30, 2017.  CDCR will evaluate the efficacy of the Crisis Intervention Teams and will consider the use of Crisis Intervention Teams at additional institutions with high numbers of Mental Health Crisis Bed placement and treatment referrals.  (*Id.*)

d.      CDCR and the California Correctional Health Care Services have contracted with a consulting firm, Global Productivity Services, to evaluate 30-day re-admissions.  The assessment project should be completed by Spring 2017.  The goal is to develop systemic processes that will reduce the percentage of 30 day re-admissions and to ensure that patients who are discharged from a Mental Health Crisis Bed continue to improve after discharge so that repeated admissions are unnecessary.  (*Id.*)

e.      CDCR continues to identify best practices to implement statewide.  Currently, best practices developed at Richard J. Donovan State Prison are being implemented at CSP-Sacramento.  These include having clinical staff on site after hours, regular tier walks to improve patient communication and identify those who may require increased services, a behavior incentive program, and a pain management program.  These proactive practices have reduced the need for inpatient services at Richard J. Donovan State Prison.  (*Id.*)

In addition to the foregoing initiatives, California State Proposition 57 passed and is likely to have some impact on the number of inmates receiving mental health services.  CDCR is currently drafting regulations which are anticipated to take effect October 1, 2017. (Tebrock Decl. ¶ 17.)

/ / /

12

**8.    What concrete steps do defendants plan to take to ensure that all inmates in need of MHCB care are transferred to such care within twenty-four hours?**

As reported above in response to Question 7, CDCR has concrete plans in place to ensure patients who need crisis bed care have access to it.  CDCR's plans, some of which have been in the development stage for over a year, stem from CDCR's oversight and identification of the need to address bed need and transfer timelines.  Those initiatives will reduce the waitlist and the time an inmate is pending placement.

In addition to the solutions described in response to Question 7, CDCR already has an entire unit, the Health Care Placement Oversight Program, which monitors bed need, provides projections based upon bed use, projects future need, assigns patients to crisis beds, monitors transfer timelines, and arranges for patient transport.  (Tebrock Decl. ¶ 18.)  CDCR also recently improved clinicians' access to the crisis-bed referral process.  (*Id.*)  On July 29, 2016, the California Correctional Health Care System deactivated the Mental Health Crisis Bed Hotline, a system that was designed to facilitate clinicians' referrals.  However, the hotline was not available 24 hours a day, seven days per week, which limited its usefulness.  The new system has multiple live contacts – both telephone and e-mail – available seven days a week, 24 hours per day, for crisis-bed referrals.  (*Id.*)

Monitoring crisis beds is not limited to the work done by the Health Care Placement Oversight Program.  CDCR's quality management team also monitors transfer timelines and referral numbers daily, and develops solutions with the Division of Adult Institutions, Health Care Placement Oversight Program, and others as necessary, when transfer times exceed those set forth in policy.  (Tebrock Decl. ¶ 19.)

## CONCLUSION

Although placement and treatment challenges continue, the number of patients waiting beyond *Coleman* Program Guide timelines has decreased.  As of January 11, 2017, there were 38 inmate-patients waiting for placement in a crisis bed, 9 of whom were waiting over 24 hours. (Tebrock Decl. ¶ 19.)  As of January 12, 2017, there were 32 inmate-patients waiting for placement in an acute care bed, none of whom were waiting beyond program guide timelines, 10

13

1  inmate-patients waiting for placement in a low-custody intermediate care bed, none of whom

2  were waiting beyond program guide timelines, and 80 inmate-patients waiting for placement in

3  intermediate care beds, 29 of whom were waiting beyond program guide timelines.  (Ahlin Decl.,

4  ¶ 6.)

5      The changes described above will continue to shorten transfer timelines and enhance access

6  to inpatient care.

7  Dated:  January 13, 2017                    Respectfully submitted,

8                                              KATHLEEN A. KENEALY
                                               Acting Attorney General of California
9                                              DANIELLE F. O'BANNON
                                               Supervising Deputy Attorney General
10
                                               /s/ Elise Owens Thorn
11
                                               ELISE OWENS THORN
12                                             Deputy Attorney General
                                               Attorneys for Defendants
13
   CF1997CS0003
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14