KATHLEEN A. KENEALY
Acting Attorney General of California
ATTORNEY GENERAL
WILLIAM C. KWONG
ACTING SENIOR ASSISTANT ATTORNEY GENERAL
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
MANEESH SHARMA, State Bar No. 280084
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD STEGEMAN, State Bar No. 225745
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 324-4921
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **OBJECTIONS TO PLAINTIFFS' REQUESTS FOR FURTHER RELIEF ON INPATIENT CARE** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

**INTRODUCTION**

In its December 9, 2016 order, the Court advised the parties that it would consider any simultaneous briefing the parties want to offer by January 13, 2017, on the remedies proposed in Plaintiffs' Response to Defendants' September 28, 2016 Update to Department of State Hospitals' Inpatient Census and Patient Movement and Request for Additional Relief (Demand, ECF No. 5503.) (Order, 12/09/16, ECF No. 5529 at 5 – 6.) The Court further advised the parties

1

that the "primary focus is on appropriate orders for additional capacity to be created and maintained, rather than on specific orders directed at greater oversight of defendants' processes." (*Id.*)

The parties conferred on January 9, 2017 to identify whether there were mutually agreeable measures that would resolve Plaintiffs' concerns, but they were unable to fully resolve any of Plaintiffs' requests for further relief. As a result, Defendants Department of State Hospitals (DSH) and the California Department of Corrections and Rehabilitation (CDCR) object to Plaintiffs' Demand.

As reported in Defendants' Response to Questions Posed in the December 9, 2016 Order, filed with this brief, Defendants are significantly increasing bed capacity within the Mental Health Services Delivery System, both immediately and in the long term. CDCR intends to assume responsibility for inpatient care to inmates within its prisons, which will reduce referral process timeframes and mitigate wait times for inmate-patients. And initiatives, already underway, will reduce the demand for inpatient beds and waitlist times. The new plans and initiatives described herein will change the landscape of the Mental Health Delivery System and new orders could impact the success of these efforts. As a result of these actions, and for the additional reasons noted below, the relief sought by Plaintiffs is unnecessary, premature, and in some instances is not in the best clinical interests of the *Coleman* class members.

## I. IMMEDIATELY MOVING ALL PATIENTS ELIGIBLE FOR LOW-CUSTODY HOUSING TO AVAILABLE BEDS VITIATES THE ESTABLISHED MEMORANDUM OF UNDERSTANDING PROCESS AND DISREGARDS PATIENT'S CLINICAL ACUITY.

Plaintiffs demand that Defendants "move dorm-cleared and low-security class members into low-custody inpatient psychiatric programs." (Demand at 10, ECF No. 5503.) Plaintiffs clarified on January 9, 2017 that this request is directed to inmate-patients who have been both custodially and clinically approved for placement in low custody inpatient programs. The Memorandum of Understanding and Housing Review Policy explicitly require a clinical assessment of a patient's readiness to move to an unlocked dorm setting. (Declaration of Pam Ahlin (Ahlin Decl.) ¶¶ 2 and 3.) The Special Master team's assessment of DSH reviews in December 2015 found that DSH was exercising appropriate clinical judgment when determining

2

whether a patient was clinically ready to move to a dorm setting. (ECF No. 5448 at 19.) Defendants continue to follow the practice that was assessed by the Special Master team in 2015. Once Defendants identify an inmate as clinically and custodially eligible for unlocked dorm placement, the inmate is promptly moved. (Ahlin Decl. ¶ 5.)

The indiscriminate transfer of patients to a dorm setting when it is not clinically appropriate to do so poses risks to both patients and staff. There are patients in DSH who experience psychotic symptoms, such as, auditory command hallucinations, threatening to kill staff, or are engaging in dangerous self-harming behaviors. (Ahlin Decl. ¶ 4.) These patients are not clinically ready to move to a low-custody setting, despite having a Least Restrictive Housing designation for unlocked dorms. The Court should not tolerate clinically contraindicated movement of such patients to unlocked dorm settings until they are stabilized and determined to be clinically ready for an unlocked dorm environment by their treatment teams.

Defendants have not had and do not have any patients referred to low-custody intermediate care beds waiting for placement beyond program guidelines. This is reflected by the number of available unlocked dorm beds in the system. (Ahlin Decl. ¶ 9.) Defendants cannot use the high-custody waitlist to fill beds at DSH-Atascadero. Although Plaintiffs clarified that they are not seeking an order to move patients who have not been clinically cleared for placement in an unlocked dorm, to the extent they seek any relief requiring movement of any patients to DSH-Atascadero without a proper clinical assessment warranting such movement, such an order would ignore the negotiated terms of the November 2015 Memorandum of Understanding that was vetted by Plaintiffs and the Special Master.

**II. ORDERING DEFENDANTS TO MOVE 10 PATIENTS PER WEEK TO DSH-ATASCADERO AND DSH-COALINGA PRESUMES PATIENTS ARE CLINICALLY STABLE TO TRANSFER TO AN UNLOCKED DORM SETTING.**

Plaintiffs demand that Defendants "transfer ICF patients to unused less restrictive beds at a specific and transparent rate." (Demand at 11, ECF No. 5503.) In making this demand, Plaintiffs incorrectly assume that scores of patients are clinically ready to move to low-custody settings who are otherwise "stuck" in high-custody beds. (Demand at 11-12, ECF No. 5503.) As stated above, this assertion is incorrect. DSH clinicians assess patients who are housed outside their

least restrictive housing level at every treatment team meeting to determine whether that patient is clinically ready to move to an available low-custody bed. (Ahlin Decl. ¶ 5.) If that inmate-patient is clinically ready to move, defendants move him to the available bed. (*Id.*) This movement is a result of proactive action by the treatment teams, not arbitrary quotas untethered to clinical readiness. Again, it is not in the best interests of *Coleman* class members receiving treatment to prematurely transfer them, contrary to their clinical readiness.

Defendants' Memorandum of Understanding and Housing Review Policy implemented a transparent process for regular review and transfer of patients to less restrictive inpatient care. Plaintiffs' request that Defendants "implement a transparent process for ensuring regular review and transfer of patients to less restrictive programs" (Demand at 12, ECF No. 5503) was already implemented in May 2015. The Memorandum of Understanding and Housing Review Policy provide a well-defined process for regular review of patients housed outside of their Least Restrictive Housing level. At the patient's initial Interdisciplinary Treatment Team review at DSH, the treatment team develops a plan with goals and objectives to transition the patient to his Least Restrictive Housing level. (Ahlin Decl., Ex. B, "Housing Review Policy" at 2.) Housing reviews are conducted at each subsequent treatment team review until the patient is housed within his Least Restrictive Housing level. (*Id.* at 3.) Further, if an Institutional Classification Committee determines a patient's current custody factors warrant a change in the patient's Least Restrictive Housing level, DSH's Headquarters Patient Management Unit and the treatment team is notified to conduct a housing review within 10 business days. (*Id.* at 6.)

The foregoing processes were negotiated and agreed to in the November 2015 Memorandum of Understanding, along with the additional measures Defendants have taken to provide continued oversight to this issue. These steps have been sufficient to resolve the issues that have arisen. Further orders are unnecessary.

/ / /

/ / /

/ / /

/ / /

4

To the extent Plaintiffs' request is focused on obtaining reports of the housing review process, detailed, patient-specific reporting is impractical, and would not provide a picture of whether the system is moving patients into the inpatient beds according to the Memorandum of Understanding and the Housing Review. But DSH already has a system in place to track and monitor the inpatient referral and admission process. In accordance with the Housing Review Policy, the DSH Sacramento Patient Management Unit maintains a central database to track and report on Housing Review decisions. This tracking includes ensuring that Housing Review Forms are received by the management unit in accordance with each patient's identified review date, as well as a clinical review of any criteria that is restricting a patient from moving to less restrictive housing. The Patient Management Unit further provides clinical outreach and consultation to the DSH facilities regarding the qualitative factors utilized in reaching housing decisions to ensure that decisions continue to be individualized based on each patient's clinical condition and in conformance with these adopted policies. As a result of these housing review efforts, since the Memorandum of Understanding was implemented in May 2016, a total of 661 patients have obtained appropriate clinical stability to transfer from a more restrictive environment. Of these 661 patients, 97 were to the unlocked dorm environments at DSH-Atascadero and DSH-Coalinga. (Ahlin Decl. ¶ 6.)

Furthermore, the Court has already ordered monthly reports that provide system-wide data on the inpatient referral process.[1] The monthly census, referral/waitlist, and trends reports provide insight into the process of patient referrals and movement. The referral/waitlist chart includes the number of patients in each step of the referral process on both a daily basis and a monthly average. (ECF No. 5535 at 9.) Defendants' monthly inpatient trends report charts the number of inmates pending transfer. (ECF No. 5535 at 11.) Finally, the monthly census report provides immediate visualization into the number of patients housed in a more restrictive setting. (ECF No. 5535 at 7.) In one snapshot, the Court, the Special Master, Plaintiffs, and Defendants

---

[1] On January 12, 2017, Plaintiffs contacted Defendants' counsel to demand that Defendants produce a copy of the Management Information System report (MIS). As Defendants have repeatedly stated to Plaintiffs, that report is currently unavailable due to a change in Defendants' reporting systems.

can determine the number of patients housed outside their Least Restrictive Housing level. (*Id.* at 6-7). Because Defendants' primary clinicians are closely reviewing patients weekly to determine if they are ready for movement, are complying with the Memorandum of Understanding and exceeding its expectations, and are providing the data necessary to the Court and the Special Master to monitor progress, no further orders for relief are necessary.

Notwithstanding the transparency of the policies and clinical review process, Defendants have proposed a new report format to replace the court-ordered monthly inpatient reports which will provide more detailed reporting on available beds and bed movement. On December 20, 2016, the Court issued an order requesting the assistance of the Special Master in determining possible alternative formats for the reports that may be more helpful in identifying and highlighting information the court needs in order to enforce compliance with the remedial plan and other remedial orders. (Order, ECF No. 5537.) Defendants are working with the Special Master to develop revised reports that will enhance the monthly reporting to the Court.

### III. PLAINTIFFS' REQUEST TO IMMEDIATELY ELIMINATE THE WAITLIST IGNORES THE REGULAR VOLUME OF REFERRALS, ADMISSIONS, AND DISCHARGES EACH MONTH.

Plaintiffs' demands to immediately and completely eliminate the Acute and Intermediate Care Facility waitlists (Demand at 12-13, ECF No. 5503) fail to take into account, or just simply ignore, the time needed to transfer necessary information from one Department to another, the need for potential due-process hearings, the time necessary for DSH to ensure that patients meet clinical standards for admission to inpatient care, licensing requirements to ensure Defendants can safely provide the medical care necessary to unique patient needs, the need to understand whether the patient has enemies or other custodial factors impacting a housing decision, and the need to physically transport patients throughout California to the five inpatient programs. In short, the constant movement of patients through the system makes it difficult, if not impossible, to eliminate the waitlist of inmates referred to inpatient programs. Indeed, that is why the Program Guide provides 10 days to process and transfer an acute referral and 30 days for an intermediate care referral in contemplation of the work needed to place an inmate in an inpatient bed.

///

There will always be a pipeline of patients in some stage of the referral process, as demonstrated by Defendants' monthly referral/waitlist chart. Defendants are committed to streamlining and expediting that process as much as possible, as shown by their internal policy that requires patients be moved within six business days of receipt of an acute referral and ten business days of receipt of an intermediate referral plus 72 hours for transport, despite the lengthier timeframes of 10 and 30 days allotted by the Program Guide.

The current census and waitlist data show a vast improvement of patients who have been referred and are waiting for bed placement. As of January 11, 2016, there were 29 inmate-patients referred for acute care and pending placement, with 1 waiting more than 10 days from referral; there were 10 inmate-patients waiting for placement in a low-custody intermediate care bed, none of whom were waiting beyond program guide timelines; and there were 79 inmate-patients waiting for placement in high-custody intermediate care beds, 30 of whom were waiting beyond program guide timelines.

Defendants' goal is to move patients as expeditiously as possible within policy timeframes, and to minimize waitlists to ensure the timely provision of necessary inpatient care. Defendants' recent initiatives, as outlined in their Response to the Questions Posed in the December 9, 2016 Order, are designed to relieve pressures in the inpatient system. Defendants plan to reopen 72 high-custody Intermediate Care Facility beds on the first floor of the L-Wing (L1) at the California Medical Facility to increase capacity where most needed. Defendants are shifting responsibility for inpatient services from DSH to CDCR effective July 1, 2017, which will significantly decrease timeframes in referral processing. Finally, CDCR has initiated clinical skills training to reduce the demand for inpatient beds, including early intervention, crisis prevention, and avoidance of unnecessary inpatient hospitalizations.

///

///

///

Objections to Plaintiffs' Requests for Further Relief on Inpatient Care (2:90-cv-00520 KJM-DB (PC))

## IV. PLAINTIFFS' DEMANDS TO ADD 50 ICF BEDS AT EACH DSH HOSPITAL DISREGARDS CAPACITIES AND WOULD NOT ADDRESS CURRENT NEED.

Plaintiffs' demand to expand DSH's intermediate care capacity by 50 beds at each low-custody DSH hospital is untenable. (Demand at 12, ECF No. 5503.) DSH-Coalinga and DSH-Atascadero treat a multitude of patients, not only *Coleman* class members. These facilities receive patients committed under various provisions of the Penal Code and are unable to reject those patients to make room for 50 additional *Coleman* patients. Further, there is no present demand for low-custody intermediate care beds that would necessitate such measures. Plaintiffs' requests would not further relieve the demand for inpatient care and would harm other patient needs that DSH must meet.

The current bed demand, as reflected by the monthly reports Defendants file, is for high-custody intermediate beds, not low-custody intermediate beds. (ECF No. 5500 at 6-7; ECF No. 5535 at 6-7; Ahlin Decl. ¶ 9.) Defendants continue to actively monitor fluctuations in demands, and have addressed the rising need for acute care beds by changing two units from high-custody intermediate care to acute care. As noted above, CDCR is re-opening 72 high-custody Intermediate Care Facility beds on the first floor of L-Wing (L1) at the California Medical Facility to increase capacity where most needed at the high-custody intermediate level. Further, Defendants are addressing the fluctuating needs between intermediate and acute beds, including adding 100 licensed crisis beds, which will be available as crisis beds or as high-custody intermediate care beds. As a result of these efforts, Plaintiffs' request for 100 additional low-custody intermediate care beds is unnecessary.

## V. PLAINTIFFS' DEMAND FOR A STUDY OF THE MENTAL HEALTH POPULATION HAS ALREADY BEEN REJECTED AND WOULD DUPLICATE COURT-ORDERED STUDIES.

Plaintiffs seek an order requiring Defendants to undertake a study to assess population trends, the reasons the mental health population is "surging" while the overall CDCR population declines, and strategies to address this problem. An identical request was considered and rejected by the Special Master, and Defendants already monitor and study their population trends, and there are standing court orders requiring Defendants to continue those efforts. A further order is

8

unnecessary.

First, the Special Master already considered and rejected Plaintiffs' request that Defendants be ordered to conduct a study. In response to the draft of the Special Master's Twenty-Sixth Round monitoring report, Plaintiffs' counsel submitted a written response requesting the identical relief requested in their Demand. (*Twenty-Sixth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols*, ECF No. 5439 at 134.) The Special Master rejected Plaintiffs' request, noting that Defendants are presently engaged in a number of projects designed to advance them toward compliance and that "there is no compelling reason why the *Coleman* court should order defendants to commission and facilitate a population study." (*Id.* at 135.) The Special Master also stated that a request for an order for the commission of a population study should be made to the three-judge court. (*Id.* at 136.) Plaintiffs did not file any objections to the report.

Second, Defendants already conduct studies to assess population trends and bed needs. Since at least 2006, Defendants have been ordered to conduct annual population reviews and update mental health bed need projections. (Order regarding Navigant Consulting Contract, 07/09/09, ECF No. 3629.) On June 19, 2014, Defendants were ordered to "continue to work with their consultant and the Special Master to forecast and plan for adequate bed and treatment space for the mentally ill population consistent with their current process." (Order, 06/19/14, ECF No. 5171.)

Given the numerous actions currently underway to expand capacity, to reduce referral processing times, and to decrease the demand for inpatient mental health services, all of which are outlined in detail in Defendants' Response to Questions Posed in the December 9, 2016 Order, commissioning a study at this time is premature and wasteful since it will study a changing system.

## CONCLUSION

Plaintiffs' request for further relief does not contain any proposals that would facilitate access to or improvement of inpatient care. Demanding that Defendants move patients into environments simply to increase census numbers without clinical justification is dangerous and

9

not in the best interest of the patients.  In addition to CDCR's plan to provide inpatient care at its institutions, Defendants are increasing inpatient bed capacity and have started multiple new initiatives to facilitate access to inpatient care and decrease waitlist times.  Finally, Defendants are already working with the Special Master to monitor and assess the mental health population and bed needs.  Additional orders would be redundant, and could potentially interfere with the work currently underway to address issues concerning inpatient care.

Dated:  January 13, 2017                                 Respectfully submitted,

KATHLEEN A. KENEALY
Acting Attorney General of California
DANIELLE F. O'BANNON
Supervising Deputy Attorney General

*/s/ Elise Owens Thorn*

ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

Objections to Plaintiffs' Requests for Further Relief on Inpatient Care (2:90-cv-00520 KJM-DB (PC))