1    IN THE UNITED STATES DISTRICT COURT; SACRAMENTO, CALIFORNIA
            FOR THE EASTERN DISTRICT OF CALIFORNIA
2          BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

3  RALPH COLEMAN, et al.,

4                      Plaintiffs,

5              vs.                   No. 2:90-cv-0520 KJM DB P

6  EDMUND G. BROWN, JR., et al.,

7                      Defendants.
   ─────────────────────────────────────
8

9                    REPORTER'S TRANSCRIPT

10           STATUS CONFERENCE/EVIDENTIARY HEARING

11            MONDAY, JANUARY 23, 2017; 10:00 A.M.

12

13

                     APPEARANCES, SEE NEXT PAGE
14

15

16

17

18

19

20

21

22  Court Reporter:          MICHELLE L. BABBITT, CSR#6357
                             Official Court Reporter, USDC
23                           501 I Street, Suite 4-200
                             Sacramento, California 95814
24                           916-448-7938

25       Transcript produced by computer-aided transcription

```
 1                          APPEARANCES

 2                           ---o0o---

 3   For the Plaintiffs:      ROSEN BIEN GALVAN AND GRUNFELD, LLP
                              50 Freemont Street, 19th Floor
 4                            San Francisco, California  94105
                              By:  MICHAEL BIEN
 5                                 LISA ELLS
                                   KRISTA STONE-MANISTRA
 6                                 JESSICA WINTERS
                              Attorneys at Law

 7

 8   For the Defendants:      STATE OF CALIFORNIA
                              DEPARTMENT OF JUSTICE
 9                            OFFICE OF THE ATTORNEY GENERAL
                              1300 I Street, Room 1040-16
10                            Sacramento, California 95814
                              BY:  ELISE OWENS THORN
11                                 CHRISTINE M. CICCOTTI
                              Deputy Attorney Generals
12
                              STATE OF CALIFORNIA
13                            DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
14                            455 Golden Gate Avenue, Suite 11000
                              San Francisco, California 94102-7004
15                            BY:  DANIELLA F. O'BANNON
                                   CHAD STEGEMAN
16

17

18

19

20

21

22

23

24

25
```

```
 1                            INDEX

 2                          ---o0o---

 3   MORNING SESSION                          Pg. 4
     AFTERNOON SESSION                        Pg. 61
 4

 5   WITNESSES

 6   PAMELA AHLIN
     Direct Ex. By Ms. Thorn                  Pg. 11
 7   Cross Ex. By Ms. Ells                    Pg. 36
     Redirect Ex. By Ms. Thorn                Pg. 86
 8

 9   KATHERINE WARBURTON
     Direct Ex. By Ms. Thorn                  Pg. 93
10   Cross Ex. By Mr. Bien                    Pg. 99

11

     KATHERINE TEBROCK
12   Direct Ex. By Ms. O'Bannon              Pg. 119
     Cross Ex. By Ms. Ells                    Pg. 137
13   Redirect Ex. By Ms. O'Bannon            Pg. 165

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   SACRAMENTO, CALIFORNIA, MONDAY, JANUARY 23, 2017; 10:20 A.M.
 2                            ---o0o---
 3            THE CLERK:  Calling civil Case 90-cv-00520, Coleman
 4   versus Brown, et al.   This is on for status conference.
 5            THE COURT:  Good morning.  Appearances.
 6            MS. THORN:  Lisa Thorn on behalf of the defendants
 7   along with Chad Stegeman for the Attorneys General, Danielle
 8   O'Bannon, Christine Cicotti, and Damon McClain.
 9        I also have with me at counsel table witnesses Katherine
10   Tebrock, Deputy Director of the Statewide Medical Health
11   Services, and Pam Ahlin, the Director of the Department of
12   State Hospitals.
13            THE COURT:  All right.  As each person speaks, if you
14   can identify yourself for the record so that we keep a clear
15   record.
16        And for plaintiffs?
17            MR. BIEN:  Good morning, Your Honor.  Michael Bien,
18   Lisa Ells, Krista Stone-Manistra, and Jessica Winters on
19   behalf of plaintiffs.
20            THE COURT:  Good morning to you all.  This is on for
21   a status and also evidentiary, a focused evidentiary
22   proceeding.  Here is what the court has to say about why we
23   are here and how we will proceed.
24        I'm prepared to take a short break after my initial
25   comments to give you a chance to focus and be prepared for the
```

1    eliciting of some testimony.  I think it should be clear, but

2    in case it is not, the court's focus is on putting an end once

3    and for all to unconstitutional delays in this case.

4        That is the sole purpose of this exercise, even

5    recognizing that promising things that are happening out there

6    in the field with secrets starting to be deployed and refined,

7    I understand there's a promising budget proposal, there's some

8    enhanced training, clinical assessments, there's

9    demonstrability at times when the court is paying close

10   attention to shrink wait lists, but the time has come when the

11   defendants need to figure out once and for all -- I don't need

12   to tell you.  You've been here longer than I have.

13       The court over the course of more than 17 years as a

14   Special Master has reviewed and in recent reports to the court

15   been trying to bring pressure to bear to require that the

16   defendants figure out how to solve this problem once and for

17   all and make it durable.  It's not just hitting a number once.

18   It's making it durable.

19       This court is not going to convert the Special Master to a

20   receiver.  This court is also done, frankly, with poking and

21   prodding and issuing orders that try to help steer, from where

22   I sit, even as the Special Master does his day-to-day work.

23       So the opportunities for the party here today is to fill

24   any gaps in the record.  It's a voluminous record, but there

25   are still questions unanswered in the court's mind, given a

fair attempt to get its arms around what is really going on out there.

I think my questions indicate where my primary concerns are, but the bottom line is, as I've been signaling since at least last fall, is there any reason in the very near future not to issue an order to show cause, however that is framed, as to why the defendants should not be held accountable to full compliance with the court's orders?

Doesn't that mean zero wait times beyond the program guide guidelines, the defendants' program guide guidelines?  Please bear that in mind.  This is not a treasurer hunt.  Everything I need to hear today is really focused on that ultimate question.

I do anticipate issuing an order.  There will be a chance for full briefing on some focused questions relating to any order to show cause.  I understand that there are significant questions there, but this court wants an easily administrable mechanism for ensuring that defendants get to the goal line.

Here is my proposal as to how we proceed.  I have the list of defendants -- of witnesses and I would like to start with the DSH witnesses.

I think the order would be Director Ahlin, Mr. Maynard, Dr. Warburton, and the scope of the testimony would be defined by questions in my January 19th order, recognizing you got that just a few days ago, but I'm assuming you know what you

1   need to elicit on exam and cross-exam, and the questions I

2   believe would define any scope of testimony from the DHS

3   witnesses.

4       Looking at my January 19th order, the questions are

5   identified by the following numbers:  Two, four, five, eight,

6   nine, eleven, and twelve.  Some of those questions also would

7   define the scope for any CDCR testimony from Ms. Tebrock.

8       So that is the court's plan, and rather than the court

9   acting as an examiner, my initial plan is for the parties to

10   elicit testimony.  The witness takes the stand, defense goes

11   first, plaintiffs cross-examine, we can go back and forth a

12   little bit, then if I have any remaining questions, I'll ask

13   them.

14       I may ask you to clarify definitions.  If there's terms

15   that you're using that are undefined, I may ask for

16   clarification on that, but my thought would be to stay out of

17   your way and let you do your jobs.  We have today.  I'm

18   prepared to go to the end of the day, 5:00 o'clock, taking

19   breaks as appropriate, including a lunch break.

20       So with that guidance, my thought would be to give you a

21   period of time, 10 to 15 minutes, to meet and confer and give

22   me time limits because that's the only way I think I know to

23   enforce your keeping the required focus and using the time we

24   have.  I think it's sufficient time.

25       So that said, anything else you want to say before I give

1   you that 10 to 15 minutes to meet and confer before we have

2   Director Ahlin take the stand?  Ms. Thorn?

3           MS. THORN:  Nothing further, Your Honor.  We did

4   provide to the plaintiffs this morning updated census numbers

5   for the programs as of January 20 as requested in the court's

6   order.

7       I have copies for the court.  If I may approach?

8           THE COURT:  You may provide those to Ms. Schultz.

9       Anything else?

10          MS. THORN:  No, Your Honor.

11          THE COURT:  Mr. Bien?

12          MR. BIEN:  No, Your Honor.

13          THE COURT:  Is 10 to 15 minutes enough time for you

14  to give me time limits per witness and how you would divide up

15  that time?  I presume the starting point is equal time.

16          MS. THORN:  I think that's sufficient, Your Honor.

17          THE COURT:  So I'll wait for Ms. Schultz to let me

18  know, no later than 15 minutes from now, and then we'll start

19  with some testimony.  Thank you.

20      (A break was taken at 10:27 a.m.)

21      (On the record. 10:48 a.m.)

22          THE COURT:  What is the plan in terms of time?

23      Ms. Thorn, you want to represent what the parties have

24  agreed to?

25          MS. THORN:  I haven't had a chance to confer with Mr.

```
 1   Bien on the time.  I came up with -- our team came up with
 2   some estimate to times for testimony.
 3              THE COURT:  All right.  What are your estimates?
 4              MS. THORN:  On Question Number Two, 10 minutes.
 5       Question Four, 15 minutes --
 6              THE COURT:  Slow down.  Question Two, ten.
 7       Question Four, 15.
 8              MS. THORN:  Question Five, 15 minutes.  Question
 9   Nine, 20 minutes.
10              THE COURT:  There's also Question Eight.
11              MS. THORN:  Your Honor, Question Eight we are going
12   to have covered by Katherine Tebrock for CDCR as Ms. Ahlin
13   doesn't have --
14              THE COURT:  Does CDCR agree it's only CDCR that has
15   information responsive for that question?
16              MS. TEBROCK:  I think I can adequately respond, Your
17   Honor.
18              THE COURT:  All right.  Question Eleven and Twelve?
19              MS. THORN:  Nine, 20 minutes.  Same with Eleven and
20   Twelve.
21              THE COURT:  How are you breaking that down by
22   witness?
23              MS. THORN:  All of those except for Eight are for Pam
24   Ahlin, and we may have Dr. Warburton also testifying as to
25   Question Nine.
```

```
1              THE COURT:  Question Nine is both Ahlin and Dr.
2    Warburton?
3              MS. THORN:  That is correct, Your Honor.
4              THE COURT:  That's an hour and 40 minutes total with
5    those two witnesses.  So Mr. Maynard would not testify?
6              MS. THORN:  That's right, Your Honor.
7              THE COURT:  All right.  Could be subject to being
8    called by the plaintiffs.  So, Mr. Bien, what is your thought
9    having heard those numbers?  Equal time?
10             MR. BIEN:  Equal time I think will do it.
11             THE COURT:  So three hours, 20 minutes.  So that
12   would leave approximately an hour and a half, taking breaks
13   for eliciting testimony from Ms. Tebrock, dividing that
14   equally.  Is that sufficient?
15             MS. THORN:  I believe so, Your Honor.
16             THE COURT:  That works for you, Mr. Bien?
17             MR. BIEN:  Yes, Your Honor.
18             THE COURT:  All right.  The proposal would be, I
19   assume, Ms. Thorn?
20             MS. THORN:  I'm sorry, Your Honor?
21             THE COURT:  The testimony would be in a block.  So
22   you would call Ms. Ahlin, work through all the questions, then
23   after cross and redirect, then Dr. Warburton?
24             MS. THORN:  That's correct.  We can do that, Your
25   Honor.
```

1          THE COURT:  All right.  Anything else to say,

2    Ms. Thorn?

3          MS. THORN:  No.

4          THE COURT:  Mr. Bien?

5          MR. BIEN:  No, Your Honor.

6          THE COURT:  So I'll watch the clock.  Total time for

7    DSH witnesses is 1 hour, 40 minutes.  So you can call Pam

8    Ahlin now.

9          MS. THORN:  Okay.

10                    PAMELA AHLIN, SWORN

11          THE WITNESS:  I do.

12          THE CLERK:  Thank you.  You may be seated.  Please

13    say and spell your first and last name for the record.

14          THE WITNESS:  Pamela Ahlin, P-A-M-E-L-A, A-H-L-I-N.

15          THE COURT:  All right.  My thought would be to go to

16    around noon or breaking point around then, take a lunch break,

17    and then come back.

18          MS. THORN:  That's fine.

19          THE COURT:  All right.  You may proceed.

20          MS. THORN:  Thank you.

21                    DIRECT EXAMINATION

22    BY MS. THORN:

23    Q.   Good morning, Ms. Ahlin.

24    A.   Good morning.

25          THE COURT:  Can we assume you can dispense with any

1    foundational questions?

2                MS. THORN:   Thank you, Your Honor.

3                THE COURT:   Just cut to the chase.

4                MS. THORN:   Okay.  Very well.

5    Q.   Ms. Ahlin, you're aware of the MOU, Memorandum of

6    Understanding, between CDCR and DSH and the Referral Admission

7    and Movement Policy as well as the House and Review Policy

8    entered into in 2015; correct?

9    A.   That is correct.

10   Q.   And as part of that, there is a process to assign out

11   least restrictive housing determination or designation for

12   inmate patients referred to DSH?

13   A.   That's correct.

14   Q.   As of January 20, how many inmate patients in DSH hospital

15   beds with a custody level of above their least restrictive

16   housing designation -- I'm sorry.

17        How many patients with a least restrictive housing

18   designation above their LRH were in DSH beds?

19   A.   351.

20   Q.   Are you able to break that down by program or housing

21   unit?

22   A.   Yes.  Of the 351, there's 95 that are eligible with an LRH

23   of unlocked dorms, 90 eligible for locked dorms, 164 with an

24   LRH of multi-person cell.

25                THE COURT:   And Ms. Ahlin is looking at a document as

1   she testifies?

2           MS. THORN:  That's correct, Your Honor.

3           THE COURT:  Is that one of the documents you gave me

4   this morning?

5           MS. THORN:  Yes, Your Honor.

6           THE COURT:  All right.  Can you identify that by

7   title for the record?

8           MS. THORN:  Ms. Ahlin is referring to the DSH Coleman

9   Census and Waitlist Report as of January 20, 2017.

10  Q.  Is that correct?

11  A.  Yes.  I wrote the notes that came off of the other

12  document.

13          THE COURT:  That's a two-page document?

14          THE WITNESS:  Correct.

15          THE COURT:  All right.

16          MR. BIEN:  Is that the document we have, three pages,

17  given to us this morning?

18          MS. THORN:  There was also a census report, a

19  three-page document, and then there's the Department of State

20  Hospital Report.

21          THE COURT:  There is a two-page horizontal chart?

22          MS. THORN:  That's right.

23          THE COURT:  The court understands you are referring

24  to the two-page horizontal chart?

25          MS. THORN:  That's correct.  We can mark that --

1  actually, the charts that Ms. Ahlin is referring to, if you

2  can confirm this, Ms. Ahlin, is the DSH Coleman Patient Census

3  and Waitlist Report dated as of January 20, 2017.  That's a

4  one-page report.

5      May I approach, Your Honor?

6          THE COURT:  That is a one-page report?

7          MS. THORN:  That's right, Your Honor.  Let's mark

8  this as Exhibit 1, Defendants' Exhibit 1.

9          THE COURT:  All right.  That's one page?

10          MS. THORN:  That's correct, Your Honor.

11          THE COURT:  You have that, Mr. Bien?

12          MR. BIEN:  Yes, Your Honor.

13          THE COURT:  I'll ask, rather than take the time, Ms.

14  Schultz has formal exhibit markers.  On the breaks -- you can

15  keep your handwritten notes for now, but mark them and they'll

16  be made part of the record.

17          MS. THORN:  Thank you, Your Honor.

18  Q.  Ms. Ahlin, of the patients that you referenced having --

19  being in a custody level above the least restrictive housing

20  designation, you mentioned that there are 95 in an unlocked

21  dorm setting?

22  A.  Yes.

23  Q.  And of the patients -- strike that.

24          MR. BIEN:  If this is coming off a document, can we

25  mark the other document?

1          THE COURT:  I gather there are two other documents,

2    another horizontal chart?

3          MS. THORN:  Right.  We'll mark that later when Ms.

4    Tebrock takes the stand, Your Honor, as well as the third

5    document, which is the census report.

6          THE COURT:  So that will be Exhibit 2, the census

7    report?

8          MS. THORN:  Exhibit 2 will be the CDCR Psychiatric

9    Inpatient Program Report as of January 20, 2017.

10      We can mark as Exhibit 3 the Psychiatric Inpatient Program

11   Census Report as of January 20, 2017.

12          THE COURT:  You have that, Mr. Bien?

13          MR. BIEN:  No.

14          THE COURT:  There's a horizontal chart with two

15   bands, and that's Exhibit 3.

16          MS. THORN:  No.  That would be Exhibit 2, Your Honor.

17      Exhibit 3 is the three-page document.

18          THE COURT:  All right.  You have that, Mr. Bien?

19          MR. BIEN:  Yes, Your Honor.

20          THE COURT:  All right.  Next question.

21   BY MS. THORN:

22   Q.  Ms. Ahlin, what are the reasons for the placement of

23   patients in DSH inpatient programs outside of their

24   restrictive housing designation?

25   A.  When patients are referred to the Department of State

1    Hospitals for inpatient care, they are referred for clinical

2    reasons and CDCR also provides us with what we call least

3    restrictive housing, and that means when they are stable, that

4    that would be one of the goals that our treatment team works

5    for, to stabilize them and get them transitioning back to that

6    environment.

7        The reason that we have that is that their clinical

8    presentation doesn't always match their least restrictive

9    housing as if they were programing normally within CDCR and it

10   gives us an opportunity to find the best environment for what

11   clinical presentation they are at that point in time so that

12   they can be successful in treatment.

13       Some examples are if the patient is hallucinating, the

14   patient is suicidal, has bizarre behavior, they're hearing

15   auditory hallucinations.  They may be able to be stepped down

16   into a dormitory setting, but on the initial admission, it's

17   really not the most appropriate environment for them at that

18   point in time.

19       So the clinicians at CDCR review why they're being

20   referred, of course.  CDCR also reviews that and makes the

21   most appropriate setting or housing decision based on their

22   clinical presentation and what environments we have available

23   for them.

24   Q.  And how often do you review patients to determine whether

25   they should remain in a custody setting that's above their

1   least restricted housing designation?

2   A.   They're reviewed upon admission and there's an assessment

3   done at that point in time by their initial IDTT, which is the

4   interdisciplinary treatment team, and then they are required

5   to have a treatment team every 30 days thereafter.

6       So every 30 days they reassess whether or not that patient

7   is suitable to go ahead and step down to a least restrictive

8   environment.

9   Q.   Is DSH successful in moving patients to their least

10  restrictive housing designations based on those reviews?

11  A.   Yes.  The MOU was implemented in May.  This is a fairly

12  new process as far as having the least restrictive environment

13  on the onset of them being admitted to the department state

14  hospitals.

15      Our data is showing that we move -- approximately 90 per

16  month are stepping down from our acute ICF programs into a

17  least restrictive environment.

18  Q.   Can you explain some of the reasons why it's important to

19  place some patients in custody levels that are higher than

20  their least restrictive housing designation, and if you could

21  also identify the programs that some of those patients are

22  placed in.

23  A.   For example, if a patient is paranoid, for example,

24  putting them in a dorm of 50 patients or more would not be an

25  appropriate place, per our clinicians, that we would want to

1   start off with them to have them in a single room and have the

2   treatment team work with them to get their medication, if they

3   need medication stabilized, and then also work to get them to

4   understand that going into small groups, having a roommate, is

5   part of their goal of their treatment plan.  They work with

6   them until such time that they're able to do so.

7        We start with smaller groups.  As soon as they demonstrate

8   that they're able to handle that environment, then we go to

9   larger groups.  Once they maintain stabilization through the

10  larger groups and the interaction, then we go ahead and make

11  sure that they can go into a multi-person cell and then go

12  down into a larger dorm environment.

13       So part of their treatment plan is to stage what goals

14  they can meet at what particular time, and we do it with the

15  complement of the social workers, rehab therapists, nursing

16  staff, psychology, and psychologists.

17  Q.  Thank you.  Now we're going to turn to our next questions

18  which concerns the isolation rooms at the Department of State

19  Hospital Stockton.  That's Question Four from the court's

20  order.

21       The question specifically, (Reading:)

22       Could these beds be made permanent?  If not, why not?

23       First, can you describe what circumstances led to the

24  Department of State Hospitals placing inmate patients in

25  isolation rooms at DSH Stockton?

1    A.   Yes.  At Salinas Valley, with the recent weather

2    conditions, we had some severe rain that was intruding into

3    the cells, coming through the lights and through the

4    electrical outlets, and we were at first able -- there were 20

5    cells that were impacted.

6        Most recently we have an additional 38 cells that have

7    been impacted by that damage which were unsuitable for

8    patients to stay.  What we did was looked at what options we

9    had.

10       We were able to rearrange our patient population from

11   Salinas Valley out of those damaged cells, and we looked at

12   the option of using the available beds at Stockton which are

13   targeted for retrofitting.  They are respiratory isolation

14   rooms, and what we have done was utilized, opened them up with

15   enhanced staffing to make sure that the patients are safe in

16   there.

17       It's not an idea situation at this point in time, but it's

18   an opportunity for us to go ahead and serve the patients since

19   we have 58 beds offline at Salinas Valley.

20   Q.   So as of January 20, '17, you have 58 beds offline as a

21   result of the flooding?

22   A.   That's correct.

23   Q.   Are those beds permanent or temporary, the ones at

24   Stockton?

25   A.   At Stockton they have been offline the entire time.  We

```
 1    have a plan to convert one room in each cell.  There's two in

 2    each unit.  There's two beds in each unit that's opened at

 3    Stockton, one of which has to remain as an isolation room and

 4    the other one is being converted for long-term care, so we do

 5    have a plan in place that 16 of those will remain permanent

 6    and the others will remain as isolation rooms.

 7                THE COURT:  As of when?

 8                THE WITNESS:  The construction for those units began

 9    in April and it will take approximately 60 days.

10                THE COURT:  All right.

11    BY MS. THORN:

12    Q.  What is the plan with respect to the repair and the

13    reopening of the beds at Salinas Valley?

14    A.  CDCR is working on that part of it.  There was major roof

15    damage across the entire building.  It starts in March -- and

16    I believe Ms. Tebrock might be better able to state the

17    timeframe, but I believe the end of March, beginning of April

18    those would be repaired by.  So we will have the 58 beds

19    coming back online between March and April.

20    Q.  So once those beds come back online, you'll then transfer

21    the patients who came from Salinas Valley Psychiatric Program

22    back to those beds?

23    A.  No.  The patients that were transferred from Salinas

24    Valley due to the rain will continue with their current

25    treatment team to continue with the continuum of care.  We do
```

1    not want to traumatize the patients by transferring them back.

2    What Salinas Valley will do with those beds will take them

3    directly off of the waitlist.

4    Q.   Now, you described some enhancements that had to be

5    enacted in order to use the isolation shells on an emergency

6    basis.

7         Can you describe that further?

8    A.   First of all, we -- our clinical team has looked at their

9    current patients on their caseload to determine which ones are

10   best to move internally into a unit that was closer to

11   discharge, so that way we didn't take a direct patient off the

12   waitlist and place them into the isolation room.

13        We have patients that have been at the Stockton facility

14   for some time that are moved into those rooms and we

15   backfilled with the regular ICF treatment rooms for those

16   waiting on the waitlist.  What we do, we have enhanced

17   observations, so it's very staff intensive to make sure that

18   the patients are in the line of sight of staff at all times

19   while they're in those rooms.

20        Again, they weren't built ideally for long-term patients.

21   Q.   What was the impact on the staffing at DSH Stockton as a

22   result of having to move patients in those beds on an

23   emergency basis?

24   A.   They're working overtime throughout the facility, so

25   they're working a lot of overtime.

1  Q.   So in order to use those beds for impatient care per the

2  licensing regulations, what is the length of observation or

3  the time period that they must be observed by staff while in

4  those beds?

5  A.   We follow our normal procedures, that they have to be

6  observed during the normal rounds, but depending on -- it's a

7  case-by-case basis.  Depending what the clinician recommends

8  for that particular patient, they might be on a one-to-one,

9  for example, sitting outside of the room observing them for

10  that particular case.

11      We also had licensing come in as well to make sure that we

12  could use them on an emergency basis.

13  Q.   I'd like to ask you about the capacity and the census of

14  beds at your hospital units or hospital facilities that are

15  not designated for Coleman class members.

16      How many inpatient beds not already designated for Coleman

17  class members are unoccupied at Atascadero State Hospital,

18  Coalinga State Hospital, and Patton State Hospital?

19  A.   Okay.  Start with Patton.  There are 30 designated at

20  Patton and 30 available for female Coleman patients.

21      There's approximately 189 available at Coalinga that are

22  not designated and approximately 91 at Atascadero.  Now, of

23  those beds, about half of them at Atascadero, there's 47 that

24  are on two units that are not occupied at this time.

25      The other remaining beds are offline due to a specialized

services unit.  For example, if the unit is designed for 20
patients and we have 14 on that particular unit, that is due
to aggression reduction, and the other units as well, so
they're spread out amongst all of the units, those 44 beds.

The same at Coalinga.  We have 50 beds offline due to two
units designated for -- when they originally built Coalinga,
it was built for sexually violent predators and there's two
units that were designed not for long-term patients, more of a
pre-conditional release program, very much independent living,
and are not suitable for ICF or acute patients.

The remaining beds at Coalinga, again, are on different
units that are reduced off of each unit as an aggression
reduction.  When we had brought the maximum population on
those units, we had many staff assaults, many
patient-on-patient assaults.  We run 40 mentally disordered
offenders on a 50-bed unit, for example, so those are across
all those units.

All 28 long-term units are open and occupied by patients.
Again, the remaining beds are disseminated among a variety of
units, and it's due to keeping the aggression low on those
units.

Q.  So for the beds that you are identified at Atascadero
State Hospital and Coalinga State Hospital that are not closed
units but open and treating those other patients, are there
any beds that are not filled at those units?

 1        I'm sorry.  I've confused you.  Strike that.

 2            MR. BIEN:  Could you break it down by particular

 3    hospital?  I think the questions are confusing.

 4    BY MS. THORN:

 5    Q.   So at Atascadero State Hospital, beds designated for

 6    non-Coleman patients, how many as of this time are empty?

 7        I think you said -- you stated there were 91 that were

 8    offline?

 9    A.   There's approximately 91 beds at Atascadero offline at

10    this time.

11    Q.   And then there are an additional 44 beds; did you say

12    that?

13    A.   No.  Of the 91 beds, 47 beds are two particular units that

14    are not activated at this time.  I think the remaining, which

15    I think is 44 beds, are spread amongst the rest of the units

16    that are activated, and those are purposefully reduced down

17    due to aggression on those units.

18    Q.   Of the beds, the non-Coleman designated beds in the units

19    not closed or offline, could any of those beds be made

20    available for Coleman class members?

21    A.   No.

22    Q.   Why not?

23    A.   There are units that are dormitory at this point in time.

24    They have mentally disordered defendants incompetent to stand

25    trial, and the amount of patients on those units are designed

1  for their commitment, and if we brought -- when we did bring

2  the population up on those particular units, we saw a lot of

3  aggression on those units, and the environment for those units

4  are designed for those treatment goals for that subset of

5  population.

6       So the beds -- say, for example, if we had a 35-bed unit

7  and we're running it at 30, it's purposefully designed to run

8  for 30 for the aggression.

9       The two units at Atascadero that are closed were closed

10  for fire life safety reasons.  We used them as swing space as

11  we did repairs, and we have some construction targeted for the

12  end of September -- I'm sorry -- the end of 2017 as well for

13  some already pre-approved unit modifications, and the patients

14  will have to move onto those units while we do the

15  modifications on the units.

16  Q.  Also the question asked for the same information regarding

17  Patton State Hospital, whether or not there are available beds

18  not designated for Coleman patients in which Coleman patients

19  could be placed.

20  A.  We understand we have a court order for 30 beds.  If we

21  had referral for those 30 beds or for a female patient, we

22  would accept that referral and place them in an available bed.

23       At this point in time, Patton is operating at max

24  capacity; however, we have discharges every week.  If we

25  received a referral, that person would be placed on the list

1   and come on in in the next available bed.

2   Q.   In the declaration you submitted in support of defendants'

3   response to the court's questions on January 13th, you

4   referenced an individual clinical assessment which is part of

5   the determination as to where an inmate patient will be

6   hospitalized.

7        Do you recall that in your declaration?

8   A.   Yes.

9   Q.   The court has asked a follow-up question, (Reading:)

10       Does this clinical assessment involve more than a

11       determination of whether the inmate patient requires

12       intermediate or acute care?

13       Are you able to answer that question?

14  A.   Yes.  When a referral comes into the Department of State

15  Hospitals, we have a clinical team that reviews the referral,

16  and based on all of information that is provided, whether or

17  not they are receiving -- we admit them as intermediate or

18  acute.

19       We also look at what their current clinical needs are, and

20  based on the variety of services that we have within our

21  designated Coleman beds, the clinicians look at that and make

22  the most appropriate recommendation based off of what needs

23  that individual patient needs to be successful in one of our

24  inpatient beds.

25  Q.   Does the clinical assessment affect the options available

1  for patient placement?

2  A.  Say that again.

3  Q.  Does the clinical assessment affect where DSH can place a

4  patient?

5  A.  The clinical assessment gives the patient the best

6  opportunity to be successful in one of our programs, so if the

7  clinicians feel, based on the behaviors and the referral and

8  the expected outcomes that the referral is based on, yes, they

9  will look at what is the appropriate, not only clinical needs

10  for that patient, but what also is the environmental needs for

11  that patient to be successful.

12      They will make that recommendation and will assess that

13  patient based off that recommendation, and that bed at that

14  facility will be designated for them.  They do take into

15  consideration clinical and housing designation.

16  Q.  How, if you can describe, some of the differences in the

17  housing environments at the Department of State Hospital

18  facilities, how those differ with respect to the option to

19  place an inmate, for example, who is designated for an

20  unlocked dorm versus a high security setting.

21  A.  At the Department of State Hospitals, we have two basic

22  clinical environments for inpatient.  We have intermediate

23  care and we have acute.  We also have options such as high

24  custody and low custody.  Our low custody beds include open

25  dorm setting, open environment, and those are at Coalinga

1    State Hospital and Atascadero.

2        We also have high custody settings which are at our three

3    programs within the prison setting, which is at DSH Stockton,

4    DSH Coalinga, and DSH Vacaville.  At Vacaville we have locked

5    dorms as well, and then at Salinas Valley we have the option

6    of multi-person cells, two-person cells, and four-person

7    cells.

8        So when we look at a referral that comes in, CDCR also

9    provides us with people that are going to be excluded from

10   going to low custody environments based off of custody

11   factors, based off escape and their criteria.

12       So when we look at the assessment, we're looking again at

13   what is the patient demonstrating at that time?  Are they

14   demonstrating bizarre behaviors?  What has led them to this

15   referral?

16       The clinicians at CDCR also make a recommendation on

17   placement based on what they see when they do the referral, so

18   we look at those options.  So we have acute and intermediate

19   at a low custody environment.  We also have acute and

20   intermediate at high custody.

21       Again, based on an individual referral of that patient's

22   referral, we make the best decision as far as where they could

23   be treated based off of their current status, meaning what

24   they're presenting at the particular time, knowing that

25   there's a goal to always move them to their least restrictive

 1  environment.

 2  Q.   Moving to Question Eleven, which states, (Reading:)

 3       What, if any, are the actual obstacles to complete a

 4       permanent elimination of any circumstance in which the

 5       program guidelines timelines for transfers to inpatient

 6       hospitalization are exceeded?

 7       Are you able to identify any immediate obstacles to

 8  elimination of the waitlist for inpatient care?

 9  A.   The immediate obstacle right now is the weather.

10  Unfortunately, we did have 58 cells come offline, and I

11  believe looking at the numbers in one of the exhibits that was

12  passed out, had we had those 58 cells online, we would be

13  meeting the program time guidelines right now.

14  Q.   So I'm going to give you what we've marked as Defendants'

15  Exhibit 1.  Again, that is the DSH Coleman Census and Waitlist

16  Report as of January 20, 2017.

17       If you could identify on Exhibit 1 the bed you're

18  referring to.

19  A.   So if you look down at the last grid, which is titled

20  "Intermediate Care High Custody," if you look all the way over

21  to the right, it says, "Total Patients Awaiting Admission."

22  There's the number 90.  That 90 includes 29 that are beyond

23  program guidelines.

24       The program guidelines for intermediate care is less than

25  30 days.  We strive to get less than that.  If the 58 cells

1    were actively being used, not only would the 29 be eliminated,

2    it would be well into the 90 as well.

3        If you could go to the box right above it, "Intermediate

4    Care For Low Custody to Locked Dorms," those are the Vacaville

5    psych programs.  There are seven patients awaiting admission,

6    none are beyond program guidelines.

7        If you canvas over to the left where it's titled, "Beds on

8    Hold," you can see of those seven, three have -- we posted

9    what we call an admission transfer chrono, and they are -- we

10   post that, DSH does, CDCR receives that, and we start the

11   transportation over.

12       The four remaining are, obviously, getting beds available,

13   and this flows.  Every single day this changes.  So we have

14   zero beyond program guidelines.

15       Go to the box above that and that is our patent facility,

16   our Coalinga facility and Atascadero where it's unlocked dorms

17   in our hospital, and we have four patients that are waiting on

18   admission, zero that are beyond program guidelines, and if you

19   go over to the beds on hold again, there's four.

20       So, actually, as soon as those four are transported, those

21   four will come off, and we've already posted the transfer

22   chronos.

23       If you go up to the acute setting, we have 33 patients

24   awaiting admission, three of which are beyond the program

25   guidelines, which are pretty close to the ten days.  If you

1    look over on the left, we have a total of 18 beds on hold.

2    That means that there's been 18 admission transfer chronos

3    posted.

4        So of the 33, 18 are in the midst of being transported off

5    that waitlist.

6    Q.   Now, let's go back for a minute to the intermediate care

7    high custody beds.  That's obviously a larger number waiting

8    beyond program guideline times.  You referenced the situation

9    of the 58 beds at Salinas Valley impacting the waitlist and

10   the transfer of those inmates.

11       Do you anticipate, based on your earlier testimony, that

12   the waitlist for the intermediate care high custody patients

13   will be reduced when the Salinas Valley issues are resolved?

14   A.   I do.

15   Q.   And then you also testified earlier about the Stockton

16   isolation rooms, the 16 rooms that have been approved for

17   conversion.

18       Will that also impact the waitlist?

19   A.   Yes.  As you can see, we've already posted the beds on

20   hold which will reduce the total number of patients awaiting

21   admission by the 30 beds that are on hold already, and then

22   that is with the isolation rooms being activated, as you can

23   see, the 23 number there.

24       When those 58 beds come back online, of course they're

25   going to be used for acute patients stepping down and also for

1  the admissions from the waitlist, so I do foresee enough

2  capacity to hold us through meeting the program guidelines.

3  Q.  Is there any characteristic about the beds at Stockton

4  that you plan to bring online that will help resolve any

5  issues should there remain Coleman patients beyond program

6  guide timelines for acute care?

7      Is there any characteristic of the beds at Stockton that

8  would allow those patients to be moved to that facility?

9  A.  I don't understand your question.

10 Q.  In other words, you're bringing on the isolation beds and

11 you've said that that will help alleviate any concerns with

12 inmate patients waiting over program time guidelines for the

13 intermediate high custody patients.

14     Is that also true for the acute patients?

15 A.  Yes.  Because they have acute patients waiting for those

16 beds, they will step down into those beds and we will backfill

17 with acute patients off the list.

18 Q.  Is it true that you can use the beds at Stockton both for

19 acute or intermediate care treatment?

20 A.  Yes.  That's one of the things that the defendants have

21 done over the past 18 months was to really look at the high

22 custody needs and the demands throughout the months and be

23 able to have a process in place that we're able to quickly

24 flex the unit if the demand shifts from high custody ICF needs

25 to acute needs, and we were successful over the last 18 months

1    of doing two particular units.  We flipped into acute to

2    respond to that shift.

3        So going back to one of the judge's questions of how we

4    respond, I think that's a significant issue.  As the director

5    of state hospitals, I think that having the ability within an

6    environment to recognize that we can flip those units

7    interchangeably, it helps us respond very timely to the needs

8    of the fluctuating inpatient population.

9        So I think that was a very good thing that we were able to

10   do and work with the folks to understand that the plaintiff

11   and, actually, the Special Master, understanding that internal

12   need of noticing them and understanding, that we flex those.

13   Q.   Thank you.

14       Now we're going to turn to Question Twelve, which asks,

15   (Reading:)

16       What, if any, are the obstacles of keeping all inpatient

17       hospital beds occupied as long as there are inmates who

18       have been referred and approved for transfer to an

19       inpatient level of care?

20       Are you able to identify any obstacles moving patients to

21   open inpatient beds?

22   A.   Well, I think a bed that we -- we have to first recognize

23   that a bed is not a bed.  Although we have, you know, a

24   designated amount of court-ordered beds, all beds serve

25   different purposes.  We have to make sure that we place the

 1    patient in the right bed for them to be successful.

 2        I think the obstacles that we had was being able to flex

 3    units to make sure that we meet the needs of the high custody

 4    and low custody within those band widths.  We're able to do

 5    that now both in the high custody and the low custody area.

 6        We also developed policies and procedures that help

 7    patients flow through the continuum care smoother, and that

 8    was working with the CDCR, the Special Master, and the

 9    plaintiffs in looking at developing some policies, not just a

10    practice we've had in the past, but actually memorializing it

11    and coming upon an agreed-upon policy of moving people.

12        So we have a new admission policy.  We have a New Housing

13    Review Policy.  We also have a Utilization Management Policy

14    which helps really monitor the length of stays of the patient

15    in each individual program, which when you're monitoring them

16    and you have oversight not only at the local level but at the

17    Sacramento headquarters level, the patients move more timely

18    through the system, which allows us to serve more patients in

19    the amount of capacity that we have.

20        We've noticed since the implementation of the MOU and the

21    management policy that we are now serving more people in those

22    beds than we were in the past year.  So with the capacity that

23    we have, we're able to turn and process and discharge patients

24    back to CDCR, back into their environment, back to where they

25    need to go quicker and more efficiently.

1  Q.  Are you able to provide any data on those changes?

2  A.  I think in one of my declarations I did.  We did give the

3  actual numbers.  I don't have it in front of me, but I wanted

4  to say -- it is actually in one of the declarations.  It looks

5  like we're increasing, if we stay on target the first

6  six months of the fiscal year, definitely outpacing the

7  numbers that we treated last fiscal year in the same amount of

8  capacity.

9      So adding the capacity of the 16 beds is really going to

10  help us out as well for that, and then having the ability to

11  flex between intermediate and acute, we could be more

12  responsive quickly.

13  Q.  Are there any other barriers to placing patients in beds

14  as a result of the movement that takes place within the

15  system, transportation of the patients?

16  A.  There's always going to be people on a waitlist.  The

17  judge had mentioned that as well, that she recognizes that

18  there's always going to be people moving through the system.

19  It's beyond the program guidelines, and I think that with

20  those beds, we should be able to manage meeting those

21  guidelines.

22  Q.  Ms. Ahlin, if DSH were ordered to open up more space at

23  Atascadero, Coalinga State Hospital beyond the beds already

24  designated for Coleman patients, would it have an impact on

25  the overall waitlist for patient care?

1    A.   We have beds available at Coalinga and Atascadero right

2    now.  As you can see on Exhibit 1, there aren't any people

3    waiting for that particular level of care and that particular

4    environmental care right now, so there is a not a waitlist for

5    those individual beds.

6    Q.   In fact, you have excess capacity?

7    A.   Yes, we do.

8            MS. THORN:  Thank you.  Nothing further right now.

9            THE COURT:  Mr. Bien, are you cross-examining?

10           MS. ELLS:  Lisa Ells for plaintiff, Your Honor.

11           THE COURT:  All right.

12                          CROSS-EXAMINATION

13   BY MS. ELLS:

14   Q.   Good morning, Ms. Ahlin.

15   A.   Good morning.

16   Q.   So you say in your declaration, docket number 5544-1, that

17   you filled last week at paragraph 4 --

18       Do you need a copy of that?

19   A.   I do, yes.

20           THE COURT:  The court has copies.  To the extent

21   there are documents that are before the court, the court has

22   copies.  Have you marked it as an exhibit?

23           MS. ELLS:  I did, but I'm not planning to introduce

24   it that way because it's in the docket, unless you prefer that

25   I do that.

1          THE COURT:  I don't need that.

2    BY MS. ELLS:

3    Q.   So if you could turn to paragraph 4 of this declaration,

4    you discuss the fact that 20 high custody ICF beds at SVPP

5    have been unusable due to rain damage since October 2016.

6          You appeared in court to address the inpatient waitlist

7    and bed shortage on November 10th, and you filed a declaration

8    in this court on the same issue on November 4th and

9    November 22nd, but you didn't mention in either of those

10   declarations or when you appeared in court that 20 of the high

11   custody beds were offline.

12        Is that correct?

13   A.   I assume so.

14   Q.   And you didn't inform the Special Master either that 20

15   beds in October 2016 were offline and not available for use;

16   is that correct?

17   A.   I'm not sure about that.  I believe that we noted it on

18   the reports that we file each month.

19   Q.   Months later, is that correct, report data in the past?

20   A.   I don't know if they were or were not.

21   Q.   But there was no special effort made to alert the court or

22   the Special Master that 20 of your high demand high custody

23   beds were offline; is that right?

24   A.   I don't know that answer.

25   Q.   Did you personally, as the head of the Department of State

1  Hospitals, alert the court or the Special Master that these

2  beds were offline in October 2016?

3  A.  Not to my knowledge, I did not call the Special Master,

4  no, nor did I notify the court.

5  Q.  It's now three months after that and the beds, the 20

6  beds, are still unavailable for use.

7      Who is in charge of that repair project?

8  A.  CDCR.

9  Q.  And has there been any effort to expedite the repairs on

10  those beds?

11  A.  I will defer to CDCR on that.

12  Q.  But to your knowledge, DSH didn't take any special

13  measures to hire an outside contractor to try to do the work

14  more quickly on an emergency basis.

15      Is that right?

16  A.  No, we did not.

17  Q.  You also stated in your declaration last week that there

18  were 34 more beds that came offline at SVPP as of that date;

19  right?

20      And as of this date, one week later, there are four more,

21  so 58 now total that have been taken offline; is that correct?

22  A.  That's correct.

23  Q.  And the rain storms we've been seeing in California are

24  continuing to occur; is that right?

25  A.  That is correct.

1  Q.   Are you anticipating further reductions in the bed

2  capacity at SVPP?

3  A.   I hope not.

4  Q.   Are these -- the beds that have been lost, are they in

5  particular units where the entire unit was shut down?

6  A.   The entire unit was not shut down.

7  Q.   So certain cells were affected within the particular

8  units; is that true?

9  A.   That is true.

10  Q.   So you say, you testified that you have been using the

11  isolation beds at Stockton to replace, as an emergency

12  measure, to replace these 58 beds.

13       How many beds are you using at Stockton, isolation beds?

14  A.   Full complement of 24.

15  Q.   Are you using any of the 10 in the acute units?

16  A.   No.

17  Q.   Okay.  So those isolation beds remain unutilized?

18  A.   Yes.

19  Q.   So you're using 24 isolation beds, but you lost 58 beds.

20       What are you doing with the other 34 patients?

21  A.   The patients discharged or went down to a least

22  restrictive environment.  We did not admit any new patients

23  back into those rooms.

24  Q.   So did you keep people in the flooded units until they

25  naturally discharged or moved down to their least restrictive

1    housing?

2    A.   We did some internal movement within the state hospital

3    beds, and then with the discharges that were already planned

4    and some that were already planned to be picked up, we were

5    able to mitigate anybody staying in a damaged room.

6    Q.   What do you mean by "internal movement"?

7    A.   We had, I believe, four who transferred to DSH Stockton.

8    We had others go to multi-person cells if they were clinically

9    eligible to do so.  We worked on expediting -- once the team

10   had determined that they were ready for discharge, we

11   expedited the discharge package.  Normally they have five days

12   to complete those.

13       So we looked into who was in the queue, who was already

14   setting up for discharge, and we had the packets done quicker.

15   We worked with CDCR to transfer the patients to the other

16   facilities that they had already been predisposed for another

17   environment.

18   Q.   So you essentially expedited things that were already

19   occurring or would be occurring; is that correct?

20   A.   We expedited, yes.

21   Q.   You expedited discharges that were going to happen anyway?

22   A.   Uh-huh.

23   Q.   You expedited transfers to least restrictive housing

24   environments that would have happened anyway?

25   A.   Yes.

1  Q.   And then you moved people to high custody beds, not the

2  isolation beds at Stockton, but high custody beds at Stockton

3  also four people; is that right?

4  A.   Recently just four.

5  Q.   When did you start taking patients in the isolation rooms

6  at Stockton?

7  A.   I don't have the exact date, but we can get that for you a

8  little bit later.

9  Q.   Do you have the approximate month?

10  A.   Yes.  It was probably January.

11  Q.   So within the last couple of weeks?

12  A.   That would be correct.

13  Q.   So how many -- you're using all of the 24 beds?

14  A.   Yes.

15  Q.   Did you use them all immediately; in other words, did you

16  move 24 patients at once or was it a rollout?

17  A.   I would have to get that transfer timely for you.  I

18  didn't come prepared for that particular information.

19  Q.   So you've described working over time for observation for

20  the isolation cells.  You discussed that in your direct

21  testimony; correct?

22  A.   Uh-huh.

23  Q.   Have you taken any steps to augment the clinical care

24  that's provided for these additional 24 people that you didn't

25  have two weeks ago?

1  A.  There's two units on every -- two beds on every unit.  The

2  clinical staff added one on every caseload.

3  Q.  So it's just absorbed into the existing caseload?

4  A.  That is correct.

5  Q.  Is there any plan to augment any of that staffing?

6  A.  No.

7  Q.  And in terms of the observation that you describe, in your

8  direct testimony you said the observation that was given to

9  these people in these isolation units was determined on a

10  case-by-case basis.

11      Is that right?

12  A.  Uh-huh.

13  Q.  In your declaration --

14          THE COURT:  You need to say "yes" or "no." That was a

15  "yes"?

16          THE WITNESS:  That was a "yes."

17  BY MS. ELLS:

18  Q.  In your declaration filed last week, in that same

19  paragraph that we were just discussing, you say that DSH --

20  lines 22 and 23? -- (Reading:)

21      DSH and CDCR will ensure that appropriate staff coverage

22      is provided 24 hours a day, 7 days a week while these

23      rooms are in use.

24      Are you providing 24/7 coverage on those rooms?

25  A.  We provide 24/7 on every unit.

1    Q.   So why are the isolation beds not appropriate for use on a

2    day-by-day basis right now except in this emergency measure?

3    A.   They were not designed -- there's not the line of sight

4    you would want for a mental health bed.  It has -- we are

5    having modifications to the units to make them safe, as the

6    other beds or rooms are on those particular units.

7    Q.   So they're not safe; is that right?

8    A.   Not as they're designed to be used for long-term care.

9    Q.   There are showers in those cells; right?

10   A.   There are.

11   Q.   And there's a limited line of sight, meaning that people

12   can't see into those cells at all times?

13   A.   Unless you have somebody posted on the outside, yes.

14   Q.   Which you don't have for the time?

15   A.   We may.  As I say, it's on a case-by-case basis, and the

16   clinician determined which ones within their units would be

17   safe to go into that, so we would not put a patient in those

18   units that we felt would be harmful to the patient at this

19   time.  Again, this is an emergency basis; again, to get people

20   off the list and into those rooms.

21        So they are making a clinical determination if they're

22   safe, and then they also provide the appropriate staffing,

23   enhanced observations to ensure that safety of each patient.

24   Q.   What do those enhanced observations look like as a general

25   nature?

1    A.   A variety.  They could have a staff member sitting on the

2    outside, doing rounds.  It would be determined on a

3    clinician's options.

4    Q.   So what I'm trying to ask or understand, I should say, is

5    in your declaration, you discuss 24/7 care, but that's

6    actually just the same care that the unit would provide

7    anyway.

8         Is that true?

9    A.   Not necessarily.  Again, it's on a case-by-case basis.  So

10   if a particular patient needed a little more -- as we would do

11   for any patient admitted in our facility, we are here to

12   provide good quality care to our patients, which we do, so

13   it's up to the clinicians.  They are evaluating a patient on a

14   case-by-case basis.

15        If somebody was not safe to go into that particular room,

16   we would not put them in there.  Maybe it's somebody that has

17   a least restrictive environment of living in a dorm setting

18   and they're getting ready to transfer down to that setting,

19   this would be a great opportunity for us to really demonstrate

20   whether or not they're suitable.

21        But, again, the clinicians have the opportunity to give

22   whatever enhancement, whether it's nursing enhancement,

23   extra -- whatever it is, the clinicians have that option to do

24   so.

25   Q.   So in the example that you just gave, are you actually

1   aware of people in these isolation cells that have been deemed

2   clinically appropriate for a dorm setting and are waiting to

3   be moved?

4   A.   I said, "for example."

5   Q.   So you're not aware of any patients like that right now?

6   A.   Again, I can't answer that question.  I'm not prepared.  I

7   could go do an inventory of who in there and give you which

8   particular patients were identified out of Stockton and which

9   ones are placed in there.  You could look on the report that

10  you get every day and see who is in those rooms.

11  Q.   We get that approximately monthly.  I don't know that that

12  would help us that much, but I appreciate that point.

13  A.   Okay.

14  Q.   Speaking of the BUR Report -- one more question about the

15  isolation beds.

16       So you've discussed the plan to do construction on these

17  16 isolation beds in order to use them full time for ICF.

18       That's the plan; right?

19  A.   That is correct.

20  Q.   In previous declarations, you've anticipated that those

21  beds would be available in March.

22       Is that still the case?

23  A.   I believe that construction will start at the end of

24  March.  It's been delayed due to other contrasted issues.

25  Q.   Do those issues include moving people from other places

1  into those isolation cells?

2  A.   I don't understand your question.

3  Q.   These SVPP displaced people, are those people being in the

4  isolation cells affecting your ability to engage in

5  construction?

6  A.   No.

7  Q.   Please explain that.  There are people living in the

8  cells; right?

9  A.   That is correct.

10  Q.   So you're able to do construction at the same time --

11  A.   I get your question.  No, there will be a construction

12  plan to minimize the impact on the 24.  They will only work on

13  one or two at a time.  We do not have the construction plan

14  yet, but that is the goal, to make sure that we have two at a

15  time go offline for the construction modification so that we

16  do not take all 24 offline at a time and significantly impact

17  people being admitted.

18      Is that what you were asking?

19  Q.   Yes.

20  A.   Okay.

21  Q.   So for that construction plan, you don't actually have one

22  yet; is that right?

23  A.   I have not seen the plan.  I know they are targeted to

24  start, but I was talking to Mr. Maynard earlier in the week to

25  make sure what does the construction plan look like, and his

1  goal was to make sure that we had the minimum impact on those

2  24 so that we can forecast utilizing those through the

3  construction phase.

4  Q.  And so your earlier projections to convert those 16 cells,

5  the construction timeline would -- is it safe to say the

6  construction timeline would have proceeded more quickly if

7  there were not people in the beds?

8  A.  I can't answer that question.  I'm not sure on their staff

9  available to modify.  I don't imagine they would go into all

10  units at one time.  They usually have a set amount of crew

11  that would go through.  I can't answer that.

12      We could definitely get you the construction plan.

13  Q.  So you've testified that the construction is likely to

14  begin in late March or early April.

15      Do you have a projection -- are you aware of the

16  projection from the bed plan when the construction will

17  complete for patient activation?

18  A.  I will come back to you on that one.  I want to say it's

19  60 days, but I'm not sure.

20  Q.  So we're talking June; does that sound reasonable?

21  A.  That sounds correct if I'm correct.

22          THE COURT:  That was the testimony on direct.

23          THE WITNESS:  Okay.

24  BY MS. ELLS:

25  Q.  Do you have any reason to believe there will be additional

1    delays in that construction?

2    A.   I do not have anything that would make me think that they

3    would delay any further.

4    Q.   But to be clear, it is the delay from when we were in

5    court last November; is that correct?

6    A.   That is correct.

7    Q.   What is the reason for that delay?

8    A.   Again, I don't have those details.  Mr. Maynard would be

9    able to speak more clearly on that.

10   Q.   Why are you converting 16 beds when there are 24

11   available?

12   A.   We're required to have one per unit remain as an isolation

13   room.

14   Q.   And why did you choose not to convert any of the acute

15   beds?  There are ten of those, right?

16   A.   That's correct.

17   Q.   And what is the rationale for not converting any of those

18   ten?

19   A.   I do not have an answer for that question.

20   Q.   So I'd like to look now at the Bed Utilization Report,

21   which I will refer to as the BUR.  DSH last filed this under

22   seal with the court on 1-17[17.

23        Do you need a copy of that report?

24   A.   Yes.

25             MS. THORN:  Your Honor, we did not use that on direct

1  examination, so I would ask for an offer of proof and what

2  counsel intends to do.

3       THE COURT:  All right.  That's fair.  How does this

4  relate to one of the questions defining the scope?

5       MS. ELLS:  In a couple of ways.  First is that there

6  has been testimony that certain patients are not appropriately

7  placed at ASH and Coalinga and we'll provide some testimony

8  that shows that Coleman patients in high custody ICF settings

9  have been discharged in the last month and immediately

10  admitted to ASH as mentally disordered offenders.

11     We would also like to show the court documentation that in

12  addition to people moving down into least restricted housing,

13  they also move back up out of least restricted housing into

14  higher custody settings.

15     And, finally, we would just like to review with the court

16  some of the patients that sat with accepted ICF admissions and

17  beds that were supposed to be available to them that

18  ultimately had rescinded referrals after waiting on the

19  accepted waitlist for two months.

20       THE COURT:  All right.  Any reason that Director

21  Ahlin can't respond to those types of questions?

22       MS. THORN:  No, Your Honor, to the extent she has

23  that information at hand through the document or personal

24  knowledge.

25       THE COURT:  I'll allow the questions within the time

```
 1   limit that we've agreed to.  I'll give you a time calculation
 2   when we break.
 3       How long will you need with that report?
 4           MS. ELLS:  Not long.  To be clear on the time limits,
 5   though, are we restricted to the amount of time that
 6   defendants actually used on direct or the amount of time we
 7   discussed?
 8           THE COURT:  Total time.  So for DHS defendants --
 9           MS. ELLS:  An hour and 40 minutes.
10           THE COURT:  Correct.  How many minutes do you
11   estimate with this?
12           MS. ELLS:  Approximately 15.
13           THE COURT:  What is the docket reference?
14           MS. ELLS:  It was filed under seal.  Unfortunately, I
15   don't have the docket number, but it was filed on
16   January 17th.
17           THE COURT:  You have a courtesy copy for the defense?
18           MS. THORN:  Thank you.  This is a sealed document, so
19   I think the record will just need to be sealed.
20           MS. ELLS:  Yes.  I'd just like to discuss the fact
21   with the witness that all of the information in this document
22   is sealed, so when I refer you to specific people in here and
23   particular line item, I'll describe them as patient A, B, C,
24   et cetera.  I'd appreciate it if you don't use any identifying
25   information as well.
```

 1          THE COURT:  But no testimony needs to be sealed?

 2          MS. ELLS:  No.  Testimony does not need to be sealed.

 3          THE COURT:  15 minutes, then we'll take our lunch

 4  break.

 5  BY MS. ELLS:

 6  Q.   This is DSH's bed utilization report and it covers the

 7  period from December 1st through December 31, 2016.

 8       Is that correct?

 9  A.   That's correct.

10  Q.   And you're familiar with this report?

11  A.   Well, I am now, yes.

12  Q.   You are now?

13  A.   Yes.

14  Q.   Have you seen this report before?

15  A.   I have seen this report.

16  Q.   Generally?

17  A.   Generally, yes.

18  Q.   You're familiar with the contents?

19  A.   Yes.

20  Q.   I'd like to direct your attention to page 8.  I've tried

21  to highlight some information because it's a very difficult

22  report to see and also so that we can be sure not to describe

23  patient names in order to alert you to the particular people

24  that I'd like to discuss.

25       I've done that in all of the copies, but please let me

1  know if you need additional information in order to understand

2  what I'm asking you about.

3      So there is a highlighted name within the section header,

4  "Salinas Valley Unit C6."  I apologize.  I should have brought

5  larger versions of this document.

6      Ms. Ahlin, that's a high custody unit; is that correct?

7  A.  Yes.

8  Q.  It's as high as your least restrictive housing gets;

9  correct?

10  A.  Yes.

11  Q.  So in that Section V from the bottom, there's a person

12  that I would like to discuss.  That's patient A.

13      Now, this patient was treated for over two months at SVPP

14  in this high custody ICF bed; right?

15  A.  Yes, 72 days.

16  Q.  Yes.  And just a couple of weeks ago on December 30th,

17  that patient was released from CDCR and immediately admitted

18  to ASH as a mentally disordered offender; correct?

19  A.  Yes.

20  Q.  And under your MOU process, if that person had been

21  qualified to move to a least restrictive environment under the

22  MOU, they would be, is that right?

23  A.  When they were clinically ready, yes.

24  Q.  So this person would be in a lower custody setting if DSH

25  thought he was able to be in that setting under the MOU

 1  guidelines; is that right?

 2  A.   Yes, as long as he had --

 3          MS. THORN:  Objection.  Calls for facts not in

 4  evidence.

 5          THE COURT:  That's noted for the record.  You can

 6  answer to the extent you're able.

 7          THE WITNESS:  Can you repeat your question?

 8  BY MS. ELLS:

 9  Q.   So the MOU requires DSH to move people -- there's a

10  housing review process where the IDTT determines whether or

11  not somebody can move to a lesser restricted housing

12  environment, and that determination is made at least every 30

13  days.

14      Is that right?

15  A.   Yes.

16  Q.   And the stated goal of the MOU, and as you've discussed,

17  is to promptly move people into those least restrictive

18  housing environments as promptly as possible.

19      Is that right?

20  A.   When they're clinically stable enough to do so, yes.

21  Q.   So if this person is in the highest custody setting, is it

22  safe to say that under your MOU that they cannot safely be in

23  a least restrictive environment under your MOU process?

24  A.   First of all, I need to know whether or not they had a

25  least restrictive housing designation to move.

1  Q.   Is it possible that they didn't have a least restrictive

2  housing setting at all?

3  A.   In December we should have had least restrictive housing

4  on all patients.

5  Q.   So are there any patients in DHS right now in ICF, at

6  least, who do not have a least restrictive housing

7  designation?

8         MS. THORN:  I'm sorry?  Can you restate that

9  question?

10 BY MS. ELLS:

11 Q.   You just testified that you think that because this is

12 from December that this person must have had a least

13 restrictive housing designation of some sort, not indicating

14 what it would have been, but they have one.

15      Is that true?

16 A.   They should have one, yes.

17 Q.   And does everybody that is in an ICF bed right now have a

18 least restrictive housing designation?

19 A.   I would say yes.  Yes.  We get them when they move into

20 ICF.  It does change, but we do get least restrictive housing

21 on every patient in ICF beds.

22 Q.   What about ones that preexisted the MOU, do those all have

23 least restrictive housing designations at this point?

24         MS. THORN:  Calls for speculation.

25         THE COURT:  Overruled.  You may answer if you're

1    able.

2         THE WITNESS:  It is my understanding that they do,

3    that our CDCR HCPOP did go back and account for all of them.

4    BY MS. ELLS:

5    Q.   So back to this individual patient, which I'll refer to as

6    patient A.  So he's in the highest custody setting in your

7    program, is that correct, when he's discharged?

8    A.   Yes.

9    Q.   And, according to your testimony, he should have had a

10   least restrictive housing designation; correct?

11   A.   Correct.

12   Q.   If that least restrictive housing designation had said he

13   could be at a lower level of care, it's safe to assume that

14   your staff did not find him clinically appropriate to move to

15   that setting, because under the MOU, he would have been moved

16   promptly if he was found to be clinically appropriate to be

17   moved to somewhere lower and he was eligible to be moved

18   somewhere lower.

19        Is that right?

20         MS. THORN:  Objection.  Calls for facts not in

21   evidence.

22         THE COURT:  Overruled.  You may answer if you're

23   able.

24         THE WITNESS:  In theory, yes.

25   /////

1    BY MS. ELLS:

2    Q.    In theory, yes.  Is there a reason in fact that may not be

3    the case?

4    A.    No.  I'm saying the MOU requires us to do that every 30

5    days.  They are clinically assessed, yes, and he would have

6    been moved if the clinical team felt that he was appropriate

7    and had an LRH of Atascadero.

8    Q.    Or anywhere lower; right?

9    A.    If the LRH designated, yes, he could have been in a

10   multi-person cell and he could have had a locked dorm or

11   unlocked dorm.

12   Q.    Right.

13   A.    And if he was clinically eligible, he would have moved.

14   Q.    So this person spent two months in your highest custody

15   setting, and then on 12-30-2016 he discharged from CDCR and on

16   the same day was admitted to ASH as a mentally disordered

17   offender.

18       Is that right?

19   A.    That's what this document says, yes.

20   Q.    So the only change in this patient in that one day was his

21   legal status from a Coleman class member to a mentally

22   disordered offender?

23               MS. THORN:  Objection.  Calls for speculation.

24               THE COURT:  Overruled.

25               THE WITNESS:  That's what this document says, yes.

1  BY MS. ELLS:

2  Q.   And once his legal status changed in that way we just

3  discussed, ASH accepted him for inpatient psychiatric

4  treatment?

5  A.   Yes, and that's very unfortunate in the sense that with

6  our Coleman patients, we have a broader continuum of care --

7  Q.   I think that was a "yes" or "no" question.  I understand

8  you might want to explain the reasons for that, but that was a

9  "yes" or "no" question.

10      The only thing that you see changed is his legal status

11  from a Coleman class member to a mentally disordered offender?

12  A.   Yes.

13  Q.   And that made him eligible for admission at ASH?

14  A.   Unfortunately, yes.

15  Q.   Now, I'd like to turn you to page 12 of the same document.

16  In the section header entitled, "Stockton Intermediate,"

17  again, this is your highest custody setting.

18      Is that accurate?

19  A.   What page?

20  Q.   Page 12.  You're there?

21  A.   I'm there.

22  Q.   So in the section header entitled, "Stockton

23  Intermediate," again, that is your highest custody setting.

24      Is that correct?

25  A.   Yes.

1    Q.   And seven from the bottom, there is a class member who was

2    treated for approximately six months from 6-15-16 through

3    12-16-16 in this highest custody setting.

4         Do you see that person?  I've highlighted --

5    A.   There are two highlighted.

6    Q.   I apologize.  This is the one --

7              THE COURT:  It's seven up.

8    BY MS. ELLS:

9    Q.   Length of stay was 184 days.  Do you see that person?

10   A.   Yes.

11   Q.   Again, under the MOU, this person should have had an LRH

12   by December; is that true?

13   A.   Yes.

14   Q.   And this person, if they were eligible to move to a lower

15   custody setting and if your clinicians deemed him clinically

16   stable enough to move to a lower setting, he would have under

17   the MOU; correct?

18   A.   Yes.

19   Q.   On the 16th of last month, his legal status changed and he

20   was discharged and immediately admitted at ASH as a mentally

21   disorder offender.

22        Is that right?

23   A.   According to this log, yes.

24   Q.   The BUR Report does not contain a patient's LRH, does it?

25   A.   No.

1   Q.  In fact, the court has no way of knowing from the

2   documentation that you provide the court for any individual

3   patient whether they are actually in their LRH.

4       Is that right?

5   A.  No, I don't see that on here.  I think there is a goal to

6   have that incorporated in here.

7   Q.  And so is that information that you have on an

8   individualized basis that you look at regularly?

9   A.  Our patient management unit does have it, yes, on a

10  regular basis.

11  Q.  Do they have it in their bed utilization report?  Is it a

12  column that already exists in this document?

13  A.  I can't answer that question.

14  Q.  But they have it available to them on an individualized

15  basis?

16  A.  Yes.

17  Q.  And from this document, there's no way of knowing whether

18  or not a patient discharged from their least restrictive

19  housing designation or not.

20      Is that true?

21  A.  From this document, no.

22  Q.  And there's also no way of knowing from this document if

23  they were discharged higher than their LRH.

24      Is that true?

25  A.  Could you say that again?

```
 1   Q.   In addition to not knowing -- I guess it's the same
 2   question.
 3        I previously asked you, there's no way of knowing on an
 4   individualized basis from this document whether somebody was
 5   discharged from their least restrictive housing?
 6   A.   That would be correct.
 7   Q.   Okay.  And you don't -- so far as you're aware, you don't
 8   produce any other document to this court or a Special Master
 9   that would allow anybody to know that for an individual
10   patient.
11        Is that true?
12            MS. THORN:  Objection.  Vague.  Know what?
13   BY MS. ELLS:
14   Q.   Know what somebody's LRH designation was on a
15   individualized patient-by-patient level?
16   A.   That is correct.  I believe the report that is produced to
17   the court has a group, a number.
18            THE COURT:  That's essentially 15 minutes.  Let's
19   take our lunch break.  The defense with respect to DHS
20   witnesses would have 47 minutes left, the plaintiffs, 35.
21   That means we'll go to about 3:15 when we come back.  Let's
22   come back at 1:15.  We will go to about 3:15 with DHS
23   witnesses and start with Ms. Tebrock no later than 3:30 to get
24   done today by 5:00.  See you at 1:15.
25        (The luncheon break was taken at 12:14 p.m.)
```

```
 1    SACRAMENTO, CALIFORNIA, MONDAY, JANUARY 23, 2017; 1:18 P.M.

 2                          ---o0o---

 3         THE COURT:  We're back on the record.

 4      In terms of time, I show that plaintiffs have used

 5    35 minutes, defendants have used 47 minutes.  So you have the

 6    balance.  So plaintiffs have about 65 minutes left.

 7      One question, do you want me to give you a warning?  Are

 8    you going to manage that time?  Because there's at least one

 9    other DSH witness to call.

10         MS. ELLS:  How much time left?

11         THE COURT:  Total 65 and 53 for the defense.

12         MS. ELLS:  Could you let me know when I have half an

13    hour left?

14         THE COURT:  All right.  You may proceed.

15      We're back on the record with Director Ahlin who has been

16    previously sworn.

17                   PAM AHLIN, PREVIOUSLY SWORN

18                   CROSS-EXAMINATION (CONTINUED)

19    BY MS. ELLS:

20    Q.   Hello again, Director Ahlin.

21      To clarify one thing on the record, the BUR Report that we

22    have been referring to, I didn't have the docket number

23    earlier, but it's docket number 5547 is the notice of filing

24    under seal of that document, just for the record.

25      Director Ahlin, in addition to some people moving into
```

1  lower security settings in DSH, you also move people out of

2  less restrictive housing environments and into higher

3  restrictive housing environments.

4      Is that correct?

5  A.  Yes, that's correct.

6  Q.  How often do you do that?

7  A.  I don't have that information in front of me at this point

8  in time.

9  Q.  Do you have any idea how many total have moved out of the

10  lower custody setting into a higher custody setting since

11  May 2016?

12  A.  Not in front of me, no, but we do have that information.

13  Q.  You track that?

14  A.  Yes, we do.

15  Q.  Do you look at that every day or how often do you look at

16  that information?

17  A.  I look at it monthly.

18  Q.  And is there any scenario in which you look for trends or

19  anything like that that you might want to address with that

20  information?

21  A.  Yes.  We do look at that across month-by-month comparison

22  as well as compared to last year.

23  Q.  And have you noticed any trends in that number?

24  A.  Nothing jumped out at me, no.

25  Q.  So you also testified in direct testimony that 90 people

1  per month move from a higher security to a lower security

2  setting within DSH.

3      Did that number include both ICF and acute?

4  A.   Yes, it does.

5  Q.   How many of those people, those 90 a month, were acute

6  patients?

7  A.   Again, I don't have that number in front of me, but that

8  is available.

9  Q.   So you also don't know how much of those are ICF of those

10  90 a month?

11  A.   The 90 per month is a combination of acute ICFs, stepping

12  down to ICF as well.

13  Q.   Okay.  I'm sorry.  To clarify, so the first category is

14  acute to ICF?

15  A.   Correct.

16  Q.   Is that -- if somebody goes from acute setting where you

17  don't distinguish between custody levels and goes to high

18  custody ICF, is that considered a step down within those 90

19  per month?

20  A.   It's a combination, yes.

21  Q.   So people that go from acute setting into the highest

22  custody of the high custody ICF beds are included in that 90

23  per month?

24  A.   Yes.  There is a change in level of care stepping down

25  from acute to ICF.

1   Q.   Okay.  So that's considered a lower custody setting for

2   your purposes?

3   A.   It's a lower treatment setting.  So we have 90 per month

4   stepping down.

5   Q.   In your declaration that we've already been discussing,

6   which is docket number 5546-1, you say that 661 patients,

7   quote, have obtained -- I'm sorry.  Paragraph 6, (Reading:)

8        661 patients, quote, have obtained appropriate clinical

9        stability to transfer from a more restricting environment

10       since May 2016.

11       Are you, again, referring to both people moving from acute

12   to ICF in addition to people within ICF?

13   A.   I don't think I have that document in front of me.

14   Q.   I'm sorry.  Previously we were discussing your other

15   declaration.  This is document 5546-1.  I'd like to direct you

16   to paragraph 6, the last few lines in this paragraph.  You

17   say, (Reading:)

18       Since May 2016 a total of 661 patients have obtained

19       appropriate clinical stability to transfer from a more

20       restrictive environment.

21       Are you including people that moved from acute to ICF in

22   that number?

23   A.   Yes.

24   Q.   And do you know how many of that 661 were people moving

25   from acute to ICF?

1    A.   Not based on this document, but we do have the detail.

2    Q.   And when you say that they have obtained appropriate

3    clinical stability to transfer, does that mean that they

4    actually transfer?

5    A.   Where are you referencing?

6    Q.   Line 15 and 16.

7    A.   Yes, they did transfer.

8    Q.   And when you discuss the 97 on lines 16 of those 661

9    patients, 97 were to the unlocked dorm environments at DSH

10   Atascadero and DSH Coalinga, again, are you including people

11   moving from an acute setting directly into Atascadero and

12   Coalinga in that 97 number?

13   A.   Yes.  When they are getting ready to discharge from the

14   acute setting, they're reassessed.  We get an LRH at that

15   point in time, and if they are stabilized enough to go into

16   that environment, they will go directly from acute to

17   Atascadero and Coalinga.

18   Q.   And how many total patients were admitted to ICF between

19   May and December of 2016?

20   A.   I don't believe that's in my document.  I would have to go

21   back and look at that information.

22   Q.   It's not.  Okay.

23        When you say that 97 people moved into Coalinga and ASH,

24   you have also begun recently putting acute patients at ASH.

25        Is that correct?

1  A.   That is correct.

2  Q.   And so where in these numbers would those acute patients

3  going to ASH as acute patients, would those people be included

4  in this 97 figure?

5  A.   I'll have to check on that for you.

6  Q.   In your previous declaration that we were discussing

7  earlier, document number 5541-1, you say in paragraph 3,

8  (Reading:)

9      When DSH beds designated for Coleman class members are

10     filled with non-Coleman patients, DSH moves those

11     patients to makes space for a Coleman class member who

12     needs inpatient care.

13     Is that accurate?

14  A.   Yes.

15  Q.   Has Patton received any referrals for inpatient care since

16  March 2016?

17  A.   No.

18  Q.   No referrals of any sort?

19  A.   No, DSH has not received any referrals.

20  Q.   Speaking again of the acute patients that you've begun

21  treating at ASH as acute patients, when did you start moving

22  patients for acute care to ASH in 2016?

23  A.   I don't have the exact date in front of me, but we can

24  give it to you.

25  Q.   Can you give me an approximate month?

1  A.  No, I can't.

2  Q.  Did you provide notice of your decision to begin treating

3  ASH acute patients to the court or to the Special Master at

4  any point?

5  A.  I don't believe there is a formal notification that we

6  did.

7  Q.  And have you developed any sort of plan for when it's

8  appropriate to treat acute patients at ASH?

9  A.  Our clinicians that were treating acute patients at the

10  other facilities looked at each of their cases to see which

11  would be appropriate and had an LRH of Atascadero or Coalinga

12  unlocked dorms and were they ready to transition there.

13      We also looked at all the referrals coming in, and if they

14  were appropriate and had a custody or housing review with an

15  LRH at Atascadero, the clinicians at Atascadero looked at

16  those for acceptance at well.

17  Q.  Is that something, a new process that you've developed, or

18  is that something you've done in the past as well?

19  A.  From my understanding, there were acute patients at one

20  point in time treated at Atascadero.

21  Q.  But this process you're describing, is that something

22  you've previously utilized?

23  A.  The process itself is what we utilize for all patients

24  that we admit into our system or that are ready to step down.

25  What we did was we had available beds at Atascadero and we

1  also looked at the unit there, and Atascadero felt that it was

2  appropriate to utilize a space that was available for possible

3  patients on the acute, or if they were ready to step down,

4  almost transiting to ICF but still needed a more acute unit,

5  which our admissions go on to.

6      So it was looking at the environment that's there, looking

7  at the bed availability, looking at who is waiting to get into

8  a lower environment, whether it's ICF or acute, and looking at

9  who needs those beds and moving them through our system, so it

10  was the best use of our beds when we came up with that

11  decision.

12  Q.   Is this a process you've utilized in the past or did you

13  start doing this with the MOU, making the assessments that you

14  just described?

15  A.   We do clinical assessments on every referral coming into

16  the Department State Hospitals.

17  Q.   So nobody was eligible to be treated in this acute unit

18  prior to the patients that you sent in the fall of this year.

19      Is that correct?

20          MS. THORN:  Objection.  Vague as to "nobody."  Who

21  are you referring to?

22  BY MS. ELLS:

23  Q.   Prior to the people you started moving in fall of 2016,

24  you say that you had been doing this process to identify

25  people that could go to ASH forever, that you've always done

1   this process.

2      Is that accurate?

3   A.   For intermediate care.

4   Q.   I'm talking about acute care patients at this point.

5   A.   You asked about the process?

6   Q.   Yes, the process for determining whether you would put

7   acute care patients at ASH.

8   A.   We did not consider that before the implementation of

9   this.  We assessed patients on a whole for care.  We only

10  served, as you well know, we only served acute care patients

11  at Stockton and at Vacaville.

12  Q.   Except for in prior periods in this case where you also

13  served them at ASH?

14  A.   I wasn't the director at that time, so I would not be able

15  to speak to that.

16  Q.   But you are aware that that has happened?

17  A.   Yes.

18  Q.   So with the passage of the MOU, did you begin in May with

19  this type of evaluation that you've described to look for

20  people that could be treated in the ASH acute unit?

21  A.   I think I previously stated I'm not sure what month that

22  was.

23  Q.   Did you begin looking, trying to implement this process,

24  not whether or not you actually moved anybody.  I'm trying to

25  figure out when you started this process to identify people

1  that could be treated at ASH as acute patients.

2  A.   I don't have that date.  I don't think the MOU is what

3  triggered it.  I can come back and give you that date, and I

4  can give you that date once I look at my records.

5  Q.   And there is no process in the MOU for moving patients to

6  ASH as acute patients, is there?

7  A.   I don't think it calls out each facility of what level

8  they do in the MOU or associated policy.  It's more of a

9  policy and procedure on how to.

10  Q.   Within the acute, is there a process for determining which

11  acute bed is appropriate for an individual class member within

12  acute?

13  A.   I will go back and look at the MOU and see if that's

14  there.

15  Q.   Okay.  So am I correct that for the entire period in 2016

16  where you have treated patients, acute patients at ASH, have

17  they all been in the same dormitory setting as ICF patients?

18  A.   The patients that are being treated in acute at Atascadero

19  are actually in what we have designated as an acute admissions

20  unit that has single rooms.

21  Q.   And is that a unit that already existed at ASH or is that

22  something that you created for Coleman patients?

23  A.   It was existing as an admission unit, so Coleman patients

24  go there on their admission of ICF.  We opened it up for the

25  acute patients as well.

1  Q.   And for the period that those patients are acute, they

2  remain in that admissions unit?

3  A.   Yes, they remain in there, and of those seven that you're

4  referencing, it was 15 that have been served.  So, for

5  example, of the 15 that have been served in those that we've

6  admitted as acute, 8 of them, I believe, have stepped down to

7  the ICF Program, 4 have been discharged.  They moved through

8  the system.

9  Q.   But for the period that they're acute, do they stay in the

10 admissions unit?

11 A.   Until they're stabilized enough to go into an ICF Program.

12 Q.   Until they're discharged from acute care; correct?

13 A.   Or transitioned to ICF, yes.

14 Q.   Okay.  Is that a separate process discharging from acute

15 and admitting to ICF?

16 A.   Say that again.

17 Q.   You said, "or they're transitioned."

18      Is that a different procedure than discharging from acute

19 and admitting to ICF?

20 A.   It's within the same hospital, so they would transition

21 out of Atascadero, admitted as acute.  It's an easier

22 transition to step them down to ICF rather than being

23 discharged from acute at Stockton or Vacaville.

24      It takes another process, discharge packet, referral, and

25 then step down, so it's much quicker movement if they're

1  eligible and stable enough to go into Atascadero to put them

2  there, because when they do step down to ICF, they're able to

3  do it much quicker.

4  Q.  I'd like to discuss with you an exhibit that I've

5  premarked as Plaintiffs' Exhibit A for identification.  The

6  title is, "The Joint Policy and Procedure Re Referral

7  Admission and Movement."

8      Are you familiar with this document?

9  A.  Yes.

10 Q.  Can you describe it for me?

11 A.  It is a joint policy and procedure that was created by the

12 Department of State Hospitals, CDCR, Special Master experts,

13 and I believe the plaintiffs had input on the development and

14 training of this document.

15 Q.  And this is the portion of the policy that is related to

16 the MOU governing referrals and admissions into inpatient

17 programs.

18     Is that correct?

19 A.  That is correct.

20 Q.  So there are a number of specific timelines for various

21 tasks outlined in this document that DSH is responsible for.

22     Does the MOU -- do you track compliance with those

23 timelines?

24 A.  For referrals admissions?

25 Q.  Yes.

1    A.    Yes.

2    Q.    What percentage of time is DSH compliant with their

3    requirement for the admission and discharge unit to determine

4    the level of care and housing considerations based on clinical

5    evaluation of referral docs and sending those to HCPOP, the

6    CDCR population control unit?

7         This is discussed at page 7 of this document.

8         You have three business days to complete that task for

9    ICF.  What percentage of the time are you compliance with

10   that?

11   A.    I don't have that exact percentage in front of me.

12   Q.    Do you track that information?

13   A.    Yes.

14   Q.    And it's one business day for acute.  Is it safe to say

15   you can't testify as to how compliant you are with that right

16   now either?

17   A.    I cannot testify to either one as far as exact, but my

18   understanding is that they are in compliance with the 72 hours

19   and the 24 hours of review.

20   Q.    And on page 8 of this document, there is a separate

21   procedure that requires you to issue an acceptance transfer

22   chrono within one day business after receiving an endorsement

23   location for HCPOP.

24        How compliant is DSH with that one business day timeline?

25   A.    We post and accept a transfer chrono when there is a bed

1    available.

2    Q.   What does that mean?

3    A.   That means that that chrono triggers the transportation to

4    deliver within 72 hours of the endorsement chrono.  So the

5    chrono itself, the ATC chrono, is created when there is a bed

6    available, when we project out that there's a bed available

7    and the patient will then transfer.

8    Q.   So if there's no bed available, does that mean you don't

9    issue the acceptance transfer chrono after you receive the

10    endorsement location?

11    A.   That is correct.

12    Q.   So how often does that occur?

13    A.   I don't have that data in front of me to show that.

14    Q.   But the requirement under the MOU is that you issue that

15    chrono within one business day for both acute and ICF.

16         Is that correct?

17    A.   Say that again.

18    Q.   The requirement under the MOU is that you have to issue

19    that acceptance transfer chrono within one business day for

20    both acute and ICF after you receive the endorsement location

21    from HCPOP.

22         Is that correct?

23    A.   That is correct, but the MOU was written as if there was

24    no waitlist.  So, in theory, if there were beds as in

25    Atascadero, we follow it as such.  As soon as we accept the

1  patient out of Atascadero and Coalinga, we give the acceptance

2  back within the guidelines for acute in ICF, HCPOP comes back

3  with the final endorsement to that location, and then we post

4  the ATC.

5  Q.   So are you saying you're not currently compliant with this

6  one business day requirement because there is a waitlist?

7  A.   For the high custody ICF, yes.

8  Q.   Are you compliant with it for low custody ICF?

9  A.   Yes.

10 Q.   Are you compliant with it, the one business day

11 requirement for acute?

12 A.   When the bed is available, yes.

13 Q.   So not currently because there's a waitlist.  Is that what

14 you're saying?

15 A.   Yes.  If you go back to the Exhibit 1, then you have --

16 Q.   I need a "yes" or "no."

17     Are you compliant with that for acute?

18         MS. THORN:  Objection.  The witness is attempting to

19 answer the question and should be allowed to do so.

20         THE COURT:  It is a "yes" or "no" question.  There

21 will be redirect.

22     Can you restate the question so the record is clear?

23 BY MS. ELLS:

24 Q.   Is it correct to say that DSH is not compliant with the

25 one business day requirement in the MOU for issuing an

1  acceptance transfer chrono for acute patients because of the

2  waitlist.

3  A.  Not in full compliance, no.

4  Q.  How noncompliant are you?

5  A.  Well, if you look at the exhibit, Exhibit 1, and there's

6  33, there's 3 that you can see that we did not post until over

7  here.  We have beds on hold, 18, so we have 3 out of

8  compliance, but the remainder 15 are well within compliance of

9  the 33.

10 Q.  So of this one day business day, you can testify right now

11 that everybody who is not on that waitlist has received it

12 within one business day for acute?

13 A.  I'm sorry.  The waitlist includes everybody --

14 Q.  Right.

15 A.  All 33.  Could you -- I don't understand your question.

16 Q.  We'll move on.

17     So you discussed a Patient Management Unit.

18     Are you familiar with what that does?

19 A.  Yes.

20 Q.  That unit is responsible for tracking and reporting

21 housing decisions, is that correct, among other things?

22 A.  Among other things, yes.

23 Q.  How long, on average, does it take for a patient to move

24 to the LRH?

25 A.  It varies.

1    Q.   On average, how long does it take for a patient to move to

2    their LRH?

3             MS. THORN:  Objection.  Vague.

4             THE COURT:  Overruled.

5             THE WITNESS:  I don't have the exact information of

6    how long, but what happens is when -- I can tell you the

7    process and the days that are required with the process.

8    BY MS. ELLS:

9    Q.   I appreciate that, but I just want to know how long it

10   actually takes.

11        Can you answer that question?

12   A.   We follow the guidelines for any type of referral

13   admission on --

14   Q.   I'm talking about moving to a lower custody setting within

15   DSH, not the admissions process.

16   A.   Right.  So when a discharge report is done and a treatment

17   team says that this person is ready to transfer to their LRH,

18   they have five days to complete that discharge packet.

19   Q.   Right.  I'm talking before the decision point where there

20   has been a decision somebody should move to an LRH, from the

21   point they are admitted to a higher custody setting within

22   DSH, how long does it take them on average to move to their

23   LRH?

24   A.   Once we post the ATC, 72 hours.

25   Q.   From the date somebody is admitted to an ICF bed that is

 1    higher than their LRH, how long does it take them to move to

 2    their LRH?

 3    A.   That would depend when they are clinically stable enough.

 4    Q.   How long does that take on average?

 5    A.   It depends on an individual --

 6    Q.   How long does it take on average?  Do you know that

 7    information?

 8    A.   I do not know --

 9              MS. THORN:  Objection --

10              THE COURT:  First of all, one at a time.

11              MS. THORN:  Objection.  Calls for speculation.

12    Irrelevant.

13              THE COURT:  Overruled.  The question has been

14    answered.  The witness does not have that information.

15        Next question.

16    BY MS. ELLS:

17    Q.   What percentage of patients have moved to a lower custody

18    setting with DSH even if it's not their LRH since 2016?

19    A.   I don't have that information.

20    Q.   Do you track that information?

21    A.   That does not have an LRH?

22    Q.   No.  What percentage of patients have moved to a lower

23    custody setting within DSH, even if it's not to their full

24    LRH?  For instance, if somebody's LRH is Atascadero and

25    they're in SVPP high custody single cell and perhaps they move

 1  to a locked dorm setting.  It's not their LRH, but it is a

 2  movement down to a less restrictive setting.

 3      So what percentage have actually moved to a lower setting

 4  then where they started when they came into DSH?

 5  A.  I don't have that percentage.  We do track that

 6  information and can provide that to you.

 7  Q.  What percentage of patients were eventually admitted to

 8  their LRH within DSH since 2016?

 9  A.  Again, I don't have that in front of me --

10  Q.  But you do track it?

11  A.  Yes.

12  Q.  What percentage of patients have LRH that would allow them

13  potentially to be treated at ASH or Coalinga?

14  A.  A percentage?  I think I reported at the beginning of this

15  there were approximately 91 that have an LRH of Atascadero or

16  Coalinga.

17  Q.  Out of how many people?

18  A.  Out of 1,100 people in our system.

19  Q.  If a patient is in DSH and is housed above his LRH, his

20  IDTT is required to consider moving him at each IDTT to a

21  lower setting.

22      Is that accurate?

23  A.  That's accurate.  That's part of the discussion.

24  Q.  Do you monitor whether that is occurring?

25  A.  It is tracked through the PMU, yes.

1  Q.   How often are you compliant, your staff compliant with

2  that obligation?

3  A.   We would have to give you that percentage as well.  We

4  have it and we have it tracked, so if you want compliance --

5  Q.   If a patient is in DSH and is housed above his LRH, his

6  IDTT is required to design a treatment plan in order to help

7  facility his move down to a lower setting.

8       Is that accurate?

9  A.   Yes.

10 Q.   Do you monitor the quality of that treatment plan?

11 A.   The senior clinicians at the site do.  The medical

12 director at the site does as well.

13 Q.   Do they report any results of that to you?

14 A.   Of the treatment plan itself?

15 Q.   Of the quality of whether or not the treatment plan to

16 move people to an LRH is sufficient?

17 A.   They do not report that to me.  They report it at a local

18 level.

19 Q.   Do you oversee that at all?

20 A.   The quality of the treatment plan?

21 Q.   Yes.

22 A.   I leave that to the medical directors and we also have a

23 medical director in DSH.

24 Q.   So when -- there is also a procedure for when CDCR changes

25 an LRH while somebody is in a DSH Program through the ICC.

1      Is that accurate?

2  A.   That is correct.

3  Q.   Ten days after that ICC changes somebody to a lower LRH,

4  DSH is supposed to conduct a housing review to determine if

5  that person needs to move.

6      Is that correct?

7  A.   That is correct.

8  Q.   How often does somebody have an ICC change their LRH while

9  they're at DSH?

10  A.   Again, I would have to get that information from our

11  patient management unit because all of that information is

12  passed through them and then they put it into their log.

13  Q.   You track that?

14  A.   That's being tracked, yes.

15  Q.   Do you now how often the ten day timeline is met for that?

16  A.   Again, I would have to check the log.

17  Q.   Do you have any benchmarks or guidelines for how quickly a

18  patient should move to an LRH?

19  A.   We have the policy that talks about the process which

20  would in turn tell you how many days.

21  Q.   I'm talking about the clinical determination that somebody

22  is appropriate to move closer to their LRH.

23      Do you have any guidelines or benchmarks how quickly that

24  should occur?

25  A.   It's a pretty new process.  We started it in May.  We're

1  now watching the data, giving it a baseline, and there we'll

2  start working on what the benchmarks are.

3  Q.  You don't know that baseline right now?

4  A.  No.

5  Q.  Is it okay for somebody to stay above their LRH for the

6  entirety of the ICF treatment?

7  A.  If the clinicians determine that that's in the best

8  interest of the patient.  Again, we're treating them in the

9  best environment that is for that particular patient.  We have

10  some very difficult patients, so some patients may stay in a

11  higher level for what's in the best interest of them.  Yes, it

12  could happen.

13  Q.  Does that happen frequently?

14  A.  I don't have that information.  Again, that LRH started in

15  May, so we're just now tracking it, monitoring it.  We'll vet

16  through the data, look at it.

17  Q.  According to the monthly DSH census reports and actually

18  according to the data you provided this morning -- let's turn

19  to that, actually.  It's more up to date.

20  A.  Okay.  I have one.  Do you have the others?

21  Q.  Which one?

22  A.  I have the DSH Coleman Data Census and Patient Report.

23         THE COURT:  She has Exhibit 1.

24  BY MS. ELLS:

25  Q.  Do you have Defendants' Exhibit 3, the Psychiatric

1  Inpatient Program Census Report?

2  A.  No.

3       MS. ELLS:  Do you have additional copies for your

4  witness?

5       MS. THORN:  I do.

6       THE COURT:  Do you have questions about Exhibit 1 or

7  only questions about Exhibits 2 and 3?

8       MS. ELLS:  Well, a couple of quick questions about

9  Defendants' Exhibit 1, which is the DSH Coleman Census and

10 Waitlist Report.

11 Q.  So in the intermediate care low custody unlocked dorm

12 category, for Atascadero, you list a census of 215 and 40

13 available beds.

14     Are there actually 215 intermediate care beds being used

15 or are some of those actually being used for acute care?

16 A.  That's on one of the footnotes down at the bottom.  Of the

17 215 patients currently residing at DSH ASH, 4 are in the Acute

18 Program.

19 Q.  And so those 4 you're counting are out of the 256 that

20 you're required to have at ASH for ICF beds for Coleman

21 patients?

22 A.  Yes.

23 Q.  And so the number of available beds for ICF patients,

24 using the 256 number ordered by the court is actually 44.

25     Is that correct?

1  A.  We are flexing those beds, so I would say no.  If we had

2  40 available, then we would come to that determination if we

3  needed more low custody beds, but right now, we have enough

4  available to meet the whole 256.

5  Q.  But you're taking the acute beds out of the 256 chunk;

6  it's not in addition to the 256; right?

7  A.  We did not add any more beds to the court order of the

8  256.  We merely flexed of those 256 to meet the clinical need

9  of the low custody patients.

10         THE COURT:  Did you find a copy of that exhibit?

11         MS. THORN:  I did.

12         THE COURT:  You can provide that to Ms. Ells.

13         MS. ELLS:  Does the court have a copy?

14         THE COURT:  Yes.  At this point you have 31 minutes

15  left total time for DSH.

16         MS. ELLS:  Thank you.

17  Q.  So for the male intermediate care high custody programs

18  that you have listed on pages 1 and 2, for the DSH Stockton

19  more than half of the people at DSH Stockton are above their

20  LRH.

21     Is that accurate?

22         MS. THORN:  Objection.  Lack of foundation with this

23  witness as to this document.

24         THE COURT:  Overruled.  You can answer if you're

25  able.

1          THE WITNESS:  The report shows 178 out of LRH.

2   BY MS. ELLS:

3   Q.  And for the DSH Vacaville, is it accurate to say that well

4   above maybe 70 percent, 68 out of 94 are above LRH?

5   A.  68 out of 94.

6   Q.  And so looking through this, is it accurate to say well

7   above 50 percent of these people are housed above their LRH,

8   including the DSH Salinas Valley programs as well?

9   A.  "Out of LRH" means double cell as well and our programs

10  there have just single cells, so it's not that they're all

11  eligible for Atascadero or Coalinga.  They could be --

12  Q.  I understand that, but all of these people are eligible

13  for a lower setting than the setting they're in.

14          Is that correct?

15  A.  They have a lower restricted housing, more than just a

16  single room.

17          MS. ELLS:  Thank you for your time.  That's all I

18  have.

19          THE COURT:  Ms. Thorn, anything further?

20          MS. THORN:  Yes, briefly, Your Honor.

21          THE COURT:  You have one more witness?

22          MS. THORN:  Yes.

23          THE COURT:  Do you want me to tell you when you hit a

24  certain time?  You have a total of 53 minutes.

25          MS. THORN:  30 minutes, Your Honor, is fine.

```
 1              THE COURT:  All right.
 2                    REDIRECT EXAMINATION
 3   BY MS. THORN:
 4   Q.  Ms. Ahlin, counsel for plaintiffs was asking you about the
 5   use of the isolation cells to house the patients who were
 6   moved out of Salinas Valley due to the flooding.
 7        Do you recall that?
 8   A.  Yes, I do.
 9   Q.  Now, were there any reasons why those plaintiffs -- why
10   the Coleman patients who were put in DSH Stockton, why DSH was
11   able to move patients there on an expedited basis?
12   A.  The patients that were moving out of the Salinas Valley or
13   using those cells at DSH Stockton on those particular 24 are
14   because they are for ICF patients, not necessarily acute.  The
15   environment, as we said before is -- I didn't want to put
16   acute patients into those, just because of the environment not
17   being as safe.
18        For ICF it's a lower clinical need than acute.
19   Q.  So with this movement from Salinas Valley to DSH, is it
20   business as usual for DSH?
21   A.  No.  It was an emergency situation that came up on us very
22   quickly.  Again, it was looking at the loss of capacity at
23   Salinas Valley and also what options did we have to continue
24   with the admissions of the ICF patients on the waitlist, so we
25   looked at what options we had, which were the available units
```

1    at Stockton.

2        It was very staff intensive, a lot of observations, not

3    the ideal situation and not something we can sustain for a

4    long time, but we knew there were modifications that were

5    going to happen to those rooms and felt it was in the best

6    interest to go ahead and utilize those beds.

7    Q.   You also testified regarding the increase in staff that

8    was required as a result of that move.

9        Were there any safety concerns regarding the need to

10   increase staff in order to place patients in those isolation

11   rooms?

12   A.   Well, the environment itself was different than the other

13   long-term rooms, so of course we want to make sure that we

14   placed the staff that are needed in those units in those

15   areas.  There's two per unit right now.

16       So, yes, there is additional staffing that we used to

17   observe 24/7 in the unit itself.  It could be on the patient

18   entirely or it could be within the unit, depending on who was

19   moved into those rooms.

20   Q.   Were there any licensing requirements that were complied

21   with as a result of using the units on an emergency basis?

22   A.   Yes.  My Deputy Director of the patient management unit

23   worked with licensing and CDCR to make sure we were able to

24   use those on an emergency basis, temporary basis.

25   Q.   And DSH complied with licensing requirements in that use?

1  A.  Yes.

2  Q.  And is continuing to do so as of today?

3  A.  Yes.

4  Q.  Do you still have in front of you the exhibit that

5  contains the BUR Report?  I don't think it was marked for

6  identification.

7  A.  Yes.

8  Q.  You're looking at it.  Can you just confirm that you're

9  looking at the report as of December 31, 2016?

10  A.  Yes.

11  Q.  Now, Ms. Ells directed your attention to several patients

12  listed on the document.  Do you recall that?

13      Specifically, they are at pages 8, 12, and 13.

14  A.  Yes.

15  Q.  All of those have the designation under level of care as

16  MDOs to ASH; correct?

17  A.  That is correct.

18  Q.  And what was the basis or reason for the movement of those

19  patients as MDOs to ASH?

20  A.  They were no longer a 26 or a CDCR inmate.  They converted

21  over to mentally disordered offender, which is a civil

22  commitment.

23  Q.  How does that happen?

24  A.  Through the court.

25  Q.  How does DSH get notified about the change in the nature

1    of the patient from a Coleman patient to MDO?

2    A.    Through an order.  It's a -- their commitment status

3    changes versus their clinical status.

4              THE COURT:  That's a state court process?

5              THE WITNESS:  That's correct, Your Honor.

6    BY MS. THORN:

7    Q.    What is the time period allowed between the time DSH gets

8    an order from the court for an MDO designation to actually

9    making that move from the patient?

10   A.    I don't have the exact timeframe that we get it.  We get

11   the notification and they have to be moved prior to their

12   discharge date.

13   Q.    You can't tell?

14   A.    No.  You're talking about when we get the MDO order?

15   Q.    That is correct.  Do the MDO orders typically call for

16   immediate movement of that patient?

17   A.    Typically, yes.

18   Q.    And when the Coleman patient is designated as MDO, how

19   does that change the nature of his placement in DSH?

20   A.    Well, the placement is based off the order versus a

21   clinical assessment, so we don't have an option to place them

22   in any other environment but Atascadero or Coalinga or another

23   state hospital, whereas the Coleman patients, we have the

24   option to utilize the environment to better treat the patient

25   versus the MDO where we don't have that option to have a

1    locked environment.

2    Q.   And does the -- strike that.

3        Your earlier testimony about the inmates who stepped down

4    from acute care to ICF care as well as the number of inmates

5    or the percentage of inmates who had an LRH of ASH or were

6    housed outside of that -- do you recall that testimony?

7    A.   Yes.

8    Q.   Just to clarify, earlier you had stated out of 351

9    inmates, there were 91 who had an LRH of ASH but were housed

10   above that.

11       Is that correct?

12   A.   That's correct.

13   Q.   And in your answer for Ms. Ells, you gave a larger number

14   of the overall DSH population; correct?

15   A.   Correct.

16   Q.   So if you look at the numbers, 91 out of 351 Coleman

17   referrals actually were housed out of their LRH?

18            MS. ELLS:  Objection.  Leading.

19            THE COURT:  Overruled.  Do you independently agree

20   with that?

21            THE WITNESS:  Maybe I should clarify.  There's 351

22   patients with an LRH in the DSH system of which 91 are

23   eligible to go to Coalinga or Atascadero when they are

24   clinically stable.

25   /////

1    BY MS. THORN:

2    Q.    Other than those 91, the others are actually housed in the

3    appropriate least restrictive environment?

4           MS. ELLS:  Objection.  Misstates the testimony.

5           MS. THORN:  I'll withdraw it if it's confusing.

6    Withdrawn.

7    Q.    Ms. Ells was asking you whether or not DSH tracks the

8    patient's LRH and the movement of patients within DSH to a

9    lower LRH or higher LRH.

10        Can you explain a little more about DSH's tracking system

11   and how you monitor and provide oversight for the new policies

12   under the MOU.

13   A.    Yes.  On the ICF patients we have an LRH that's provided

14   by CDCR upon referral or admission, and then when we're ready

15   to step a patient down from the acute setting, we request an

16   LRH and get that also available for our patient population.

17        What we do is we have a tracking guide in our patient

18   management unit that tracks everybody's LRH within our system

19   and their corresponding LRH.  That information is also

20   available and sent to the facility that houses the patients.

21        We track that on their initial IDTT, patient management

22   unit, and also 30 days for their additional IDTT and what is

23   required is a housing review form.  That is in accordance with

24   the agreed-upon policy that we came with in reviewing some of

25   the sample cases in DSH.  We make sure that when they're done

1   at the IDTT, we look at the quantity as well as the quality.

2       Patient management units, their clinicians review it to

3   make sure that it meets the agreed-upon criteria for retaining

4   a patient outside of their LRH.  So there's one tracking

5   mechanism of the PMU.  Each facility tracks it as well.  Their

6   admission discharge unit tracks the completion and the

7   timeliness of those, making sure the forms are done.

8       The facilities also reviews for clinical rationale and to

9   make sure those forms are submitted up to Sacramento.  So we

10  have a local oversight to make sure they're done timely and

11  also a headquarters PMU to make sure that they're done and

12  processed.

13  Q.   Based upon that oversight, are you available to say today

14  whether or not DSH is experiencing success in implementing the

15  MOU and the related policies for transfer of inmate patients

16  to your settings?

17  A.   Yes.  I definitely feel like it is working and helping the

18  process flow much smoother as far as placing the patients when

19  their clinical presentation changes, and the treatment team

20  documents that.  The patients do flow through the system and

21  that's where the PMU tracks the amount of patients that are

22  flowing through.

23          MS. THORN:  Thank you.  That's all my questions.

24          THE COURT:  All right.  Any recross, Ms. Ells?

25          MS. ELLS:  No, Your Honor.  Thank you.

```
 1              THE COURT:  All right.  May Director Ahlin step down,
 2    excused for the purposes of this proceeding, Ms. Thorn?
 3              MS. THORN:  Yes, Your Honor.
 4              THE COURT:  Ms. Ells?
 5              MS. ELLS:  No, Your Honor.
 6              THE COURT:  She is not excused?
 7              MS. ELLS:  Yes, Your Honor.  Thank you.  She is
 8    excused.
 9              THE COURT:  You may step down.  You are excused.  We
10    can go for about another half hour before we take a break.
11         Next witness, Dr. Warburton?
12              MS. THORN:  That's right, Your Honor.
13                     KATHERINE WARBURTON, SWORN
14              THE WITNESS:  Yes, I do.
15              THE CLERK:  Please state your name and spell it for
16    the record.
17              THE WITNESS:  My name is Katherine,
18    K-A-T-H-E-R-I-N-E, Warburton, W-A-R-B-U-R-T-O-N.
19              THE COURT:  You may proceed.
20                     DIRECT EXAMINATION
21    BY MS. THORN:
22    Q.  Dr. Warburton, what is your position with the Department
23    of State Hospitals?
24    A.  Medical Director and Deputy Director for Clinical
25    Operations.
```

1  Q.   How long have you held those positions?

2  A.   About five years.

3  Q.   Dr. Warburton, could you describe the different treatment

4  options that are available across the Department of State

5  hospital programs.

6  A.   Yes.  Basically each of our inpatients is treated by an

7  interdisciplinary treatment plan which includes a

8  psychiatrist, a psychologist, a rehabilitation therapist,

9  social work and various levels of nursing, and that

10 interdisciplinary treatment team developed a multi-focal

11 treatment plan based on the needs of that patient.

12      Based on the needs of that patient, interventions are

13 enacted, such as psychopharmacology, individualized therapy

14 and group therapy, which vary, although the general skills

15 that they intend to target remain the same.  They vary in the

16 way they're delivered and the type of therapist who delivers

17 it.

18      So, for example, coping skills taught by a music therapist

19 may vary from coping skills taught by an art therapist, and

20 also making the move based on our understanding of the current

21 literature to move more towards specialized therapies, such as

22 dialectal behavior therapy and cognitive behavior therapy for

23 psychosis.

24 Q.   Now, do the treatment options that you just described, are

25 they the same for Coleman patients as well as the MDO

1    patients?

2    A.   Yes.  I would say that in general all of our inpatient

3    treatment delivery is based on the same inpatient delivery

4    model that you'll find in most inpatient settings, which is a

5    interdisciplinary team develops a multi-level treatment plan

6    and then treatment is delivered in an individualized fashion

7    thereafter.

8    Q.   Clinically then, is there any difference between the way

9    DSH treats the Coleman patients and also treats the MDO

10   patients?

11   A.   The MDO patients that we have in our facilities are a much

12   more volatile and difficult group of individuals to treat.

13   You can ascertain that for yourself looking at our violence

14   data that we post on the internet site.

15       So because we are able to treat Coleman patients in an

16   environment appropriate to their violence risk, we can deliver

17   treatment in a much more meaningful and safe way.

18       Our mentally disordered patients come in sometimes so

19   violent and in a way we can't contain in a freestanding

20   hospital due to our license and joint commission requirements.

21   Oftentimes the MDO treatment is grossly interrupted due to the

22   level of violence on those units and going on with those

23   patients.

24   Q.   How do those characteristics of the MDO patients, how does

25   that impact the ability to house and treat the Coleman

1  patients?

2  A.   I'm sorry?  Can clarify that?

3  Q.   The characteristics of the MDO that you just described,

4  violence and whatnot, how does that impact how the Coleman

5  patients or which Coleman patients, rather, are clinically

6  assessed as able to be treated in the setting and an unlocked

7  dorm setting, such as ASH?

8  A.   What I think you're asking me is that when we ascertain

9  that someone has an unacceptable risk of violence in terms of

10  a Coleman patient, we're able to put them in a custody

11  environment.

12       As a clinician, when I hear the term "low custody

13  environment," I actually think of a custodial environment.

14  Our hospital units are in no way custodial environments.  We

15  don't have custody officers and we can't contain the behaviors

16  of the individuals on those units even if they pose an extreme

17  risk of physical harm unless and until they reach a level

18  which joint commission refers to as "immediate" and licensing

19  standards call "imminent," where, essentially, the assault has

20  to be either happening or we have objective evidence that it's

21  about to happen.

22       So the issue that we have not only with MDOs but also with

23  Coleman patients is that unlike the civilly committed

24  psychotic patients for whom those standards were developed,

25  mentally disordered offenders, including both the 2962s and

1    72s that we get as well as Coleman patients, have a whole host

2    of violence risk factors and perpetrate different types of

3    violence, such as predatory and impulsive violence that those

4    types of standards don't allow us to contain.

5        So, for example, we can have an MDO or a Coleman patient

6    who we know is at an unacceptably high risk, and in the

7    Coleman population, we can place that person in an environment

8    where they can be contained.  In one of our freestanding

9    hospitals, like Atascadero or Coalinga, we simply cannot

10   contain that behavior.

11       We are legally not allowed to contain that behavior.  We

12   can't put them in a room.  We can't ask them to stay in a room

13   with the door shut.  We can't zone them and ask them to stay

14   on a particular part of the unit.  We just have to put them on

15   what we call one-to-one, which we're doing research now --

16   preliminary data includes that all we're doing in that example

17   is providing them with a victim because those particular staff

18   members experience assault from those individuals more

19   often -- or we just confer all the treatment, interventions

20   that we have upon them and hope for the best.

21       So that's the difference between what we're grappling with

22   with the MDO population where we don't have a choice, and by

23   virtue of their commitment criteria, they are a risk of

24   serious harm due to their mental risk.  They already are

25   coming in at an extremely high risk of violence.

1  Q.  So what you've just described, the clinical assessment

2  that's made in determining whether you can place a Coleman

3  patient at an unlocked dorm setting like ASH or at ASH, how

4  does the characteristics of the MDO actually play into that

5  clinical assessment in determining whether the Coleman patient

6  can successfully be treated at an open environment like ASH?

7  A.  Well, I guess I can't make a distinction between Coleman

8  patients and MDOs.  They're the same population but for their

9  sentencing date.

10 Q.  I'm actually asking for when the clinicians are making the

11 determination to place an inmate at ASH, how does that ASH

12 environment, knowing that the MDO population is there and

13 knowing they cannot be secured, how does that play into the

14 decision, the clinical assessment whether or not to --

15 A.  I see what you're asking.  You're asking about

16 victimization.  So for floridly psychotic patients, we don't

17 want them at Atascadero because the acuity in terms of

18 violence is so great.  If you look at our data, it bears it

19 out.  The patient-on-patient assaults in our psychiatric

20 programs are much, much less than in our freestanding

21 hospitals.

22 Q.  So that type of Coleman patient would be an example of a

23 patient who has maybe an LRH for ASH --

24 A.  Absolutely.

25 Q.  -- to place him there, he wouldn't be successful in

1  programing and being treated?

2  A.  Absolutely, and victimization is one of things treatment

3  teams consider when determining placement.

4          MS. THORN:  Thank you.  Nothing further.

5          THE COURT:  Who is cross-examining this witness?

6                    CROSS-EXAMINATION

7  BY MR. BIEN:

8  Q.  Dr. Warburton, do you have Plaintiffs' Exhibit A there?  I

9  can show it to you, the administrative letter?

10 A.  Yes, I do.

11 Q.  If you can look at the back page, attachment B, do you see

12 that clinical placement criteria?  You're familiar with those

13 criteria?

14 A.  Yes.

15 Q.  These are used by DSH to determine what appropriate level

16 of care within DSH a patient can be placed at?

17 A.  Yes.

18 Q.  So CDCR may say that someone is ASH eligible and DSH uses

19 these clinical placement criteria to decide whether or not

20 they agree this patient could go to ASH --

21 A.  Yes.

22 Q.  -- correct?  Now, if I recall, you participated in the

23 process where the Special Master team and DSH clinicians and

24 administrators and plaintiffs' counsel developed these

25 criteria?

1    A.    I was not personally involved in that.  Some of my staff
2    were.
3    Q.    Did you have any representatives from your team that
4    participated?
5    A.    Yes, my assistant medical director.
6    Q.    Do you understand that these criteria require that DSH
7    come up with actual evidence of behavior, not just an opinion
8    about a diagnosis for a patient to get, for example, to be not
9    ASH eligible.
10        So, for example, you were here today when Director Ahlin
11   testified that someone who is paranoid would not be a good
12   example -- somebody shouldn't go to ASH because they're
13   paranoid.
14        You agree the criteria doesn't allow someone to be
15   excluded from ASH because of paranoia?
16   A.    I see what you're saying about the criteria.  I'm sorry
17   it's written that way.
18   Q.    That's correct, though, there has to be a finding, some
19   evidence in the record that this particular patient actually
20   has exhibited behaviors before they can be excluded under
21   these criteria?
22   A.    Yes.  As a forensic psychiatrist, I regret that they're
23   written this way because there are instances where
24   demonstrable behavior is not evidence, but violence risk is;
25   however, for the purposes of the LRH process, I think these

1    are effective enough in that the LRH process in terms of

2    calling out individuals who should not go to an appears to be

3    working.

4    Q.   It's working because there's lots and lots of people

5    eligible under CDCR criteria for ASH and are not going under

6    DSH criteria?

7    A.   Is that a question?

8    Q.   You say it's working because you're able to keep people

9    out of ASH that you want to keep out of ASH; right?

10              MS. THORN:  Objection.  Misstates the testimony.

11              THE COURT:  Overruled.

12              THE WITNESS:  I think it's working because our

13   violent data on the Coleman units has not gone up since the

14   MOU was enacted.

15   BY MR. BIEN:

16   Q.   Is that the only criteria that you use to evaluate whether

17   your programs are working?

18   A.   No.  We look at -- the most objective outcomes that we

19   look at are things like suicide rate, rehospitalization rates,

20   all of those numbers are looking really good right now,

21   self-injurious behavior, more objective outcomes.

22        In my opinion, someone as Atascadero is going to get the

23   same quality of treatment as someone at one of the psychiatric

24   programs and that treatment will confirm the same positive

25   clinical outcomes.

1     The difference really has to do with the -- the clinical

2  difference between Atascadero and one of the psychiatric

3  inpatient beds in one of our psychiatric programs has to do

4  with the ability to contain potentially violent behavior

5  before it happens.

6  Q.   Does -- let me go back to:  Is there another way of

7  evaluating whether or not your programs are working, whether

8  patients are improving in their functioning?

9  A.   Yes.

10 Q.   If someone is on a waitlist, they're not getting any

11 treatment at all; isn't that correct?

12 A.   I do believe they get treatment in the outpatient realm of

13 CDCR, either in a crisis bed or --

14 Q.   But you don't personally know that.  It's not a DSH

15 Program.  They've been referred for DSH and accepted by DSH,

16 but they're getting no DSH care.

17     You don't know how well those patients are doing, do you?

18 Have you evaluated that?

19 A.   I'm trying to think.  No, I don't think we have any data

20 on that.

21 Q.   Do you have to think about that?  Have you ever done a

22 study how patients on a waitlist getting into DSH at CDCR have

23 fared?

24 A.   We do look at the waitlist issues from a clinical

25 perspective such as access to care, so we do know CDCR

1   outpatients have a 10 to 20 percent greater bed availability

2   than the average Californian with mental illness, even if you

3   adjudge for a higher prevalence of mental illness in prison

4   population.  So we do use a lot of clinical data when we think

5   about the waitlist.

6       An opinion is that being in a crisis bed or in an IOP

7   while waiting for an inpatient bed, which we have an

8   abundance, is probably preferable to being in a violent

9   environment where you can be beaten or murdered or perpetrate

10  violence, and, thereby extend your treatment and complicate

11  your treatment further.

12  Q.  I have no idea what you're talking about, but that's

13  interesting.

14      Have you ever done any study on how patients on the actual

15  waitlist, CDCR patients waiting to get into DSH are doing in

16  terms of how their mental health has improved during that

17  period?  Suicide attempts?  Violence?

18          MS. THORN:  Objection.  Beyond the scope of direct.

19          THE COURT:  Overruled.  You can answer.

20          THE WITNESS:  No, we've never done any particular

21  direct scientific studies on those factors.

22  BY MR. BIEN:

23  Q.  And have you ever compared whether those patients would do

24  better in ASH or Coalinga empty beds than they are doing in

25  their current place?

1    A.    Scientifically speaking?

2    Q.    No.  I'm just asking have you ever looked at that?

3    A.    Looked at that with data or looked at that with clinical

4    decisionmaking?

5    Q.    Any way.

6    A.    We do look at it with clinical decisionmaking because we

7    look at the benefit to the patient versus the risk to that

8    patient and other patients in terms of the violence risk.  In

9    that regard, we do balance it.

10        If we just could clear the waitlist by just taking every

11    high custody patient and putting them in an Atascadero bed

12    without putting other patients at risk, that would certainly

13    be the simple solution, but it's a clinically incorrect

14    solution as evidenced by the high rates of violence, including

15    murder, in the MDO patient population.

16    Q.    Sounds like you should talk to the legislature more about

17    the MDO population.

18    A.    We are.  We got successful legislation two years ago to

19    develop a higher level of care for MDOs and 1026s.

20    Q.    And why hasn't DSH implemented that program?

21    A.    We're in the process of building the unit infrastructure

22    out and we're almost done with policy development.

23    Q.    And when will those programs open, these enhanced

24    treatment programs?

25            MS. THORN:  Objection.  This is way beyond the scope

1  of direct examination.

2          THE COURT:  I'll sustain that.

3          MR. BIEN:  Your Honor, she talked all about the

4  violence of MDOs.

5          MS. THORN:  Now you're asking her about future plans

6  that they're in discussion with with the legislature, things

7  that really are not important on Coleman.

8          THE COURT:  I understand the general issue, MDO.  I

9  understand the MDO IST Coleman population issue generally.

10      That objection is sustained.

11          MR. BIEN:  Your Honor, defendants submitted to this

12  court a report about this program on October 30th of 2015,

13  docket number 5374.

14          THE COURT:  How is looking at future plans relevant

15  to what I'm trying to accomplish today?

16          MR. BIEN:  I don't know where they are on this.  I

17  would just like to know when it's going to be open.  One of

18  their arguments is that ASH can't handle people --

19          THE COURT:  So if you ask that focused question,

20  maybe this witness can answer it.

21          MR. BIEN:  Okay.

22  Q.  Do you know when this program, the Enhanced Treatment

23  Program, is going to be available for patients?

24  A.  Not precisely because the process has been complex and

25  ever-changing.  My understanding, it's sometime between the

1    end of this year and early next year, is my best recollection
2    of where things stand now.
3    Q.   Are you part of the process of supervising the DSH
4    clinical placement criteria and how it's being used by
5    clinicians?
6    A.   No.
7    Q.   You don't know whether or not DSH clinicians are properly
8    using this criteria to evaluate Coleman patients?
9    A.   I know that those forms that they fill out when they make
10   that determination are being sent to the PMU to be reviewed by
11   clinicians.  So while I personally don't review them, I
12   believe there's enough oversight to make sure between the
13   medical directors at the facilities and PMU that they're being
14   filled out correctly.
15   Q.   Has DSH evaluated, to your knowledge, whether or not
16   clinicians are applying the appropriate criteria, which is
17   behavior-based, to these Coleman patients?
18   A.   I think that's the purpose of those forms and they're
19   reviewed by the hospital administrators and the PMU to make
20   sure the criteria is being applied appropriately.
21   Q.   And you personally haven't seen any evaluation of that?
22   A.   I don't oversee that audit, no.
23   Q.   Assuming a patient, CDCR patient is going to go back to
24   CDCR and be housed in a dorm setting, do you think that it
25   would be appropriate for part of DSH's treatment of that

1  patient to get them comfortable in a dorm setting before they

2  discharge them back to CDCR?

3  A.   I can't say that categorically.

4  Q.   If that's the place this person has to function when they

5  go back to CDCR, don't you think it's important that DSH work

6  with that patient to get them to appropriately function in the

7  environment that they're about to go back to?

8  A.   Well, I think environment is only one domain of the total

9  clinical picture, so if that particular patient had some

10  behavior abnormality causing them to have interactions

11  inappropriate with their dorm mates, I would say yes.

12      If that person had been admitted simply because they are

13  floridly psychotic and that psychosis had been mitigated

14  through psychotropic medications, I don't think it would

15  necessarily be important to put them in a dorm room prior to

16  sending them back.  Every patient is an individual.

17  Q.   Have you actually visited all of DSH programs that treats

18  CDCR patients?

19  A.   Yes, I have.

20  Q.   Is it your testimony that the treatment is equivalent for

21  patients in, for example, the High Security Salinas Valley

22  Psychiatric Program and at ASH?

23  A.   High security treatment can be different, but I think the

24  quality is the same.

25  Q.   The Salinas Valley patients are locked in their cell;

1    isn't that correct?

2    A.   Parts of the day, yes.

3    Q.   Most of the day, isn't that correct?

4    A.   I would have to look at the data to say definitively how

5    many hours a day.

6    Q.   They don't go to a dayroom as a default, do they?  They're

7    locked in their cell?

8    A.   Right.  Correctional patients have a different level of

9    custody, and that's the thrust of the whole discussion, that

10   to some extent the physical environment and the custodial

11   environment and the Psych Program confer a certain amount of

12   security that --

13        Being able to go to a dayroom is a good thing unless the

14   people in that dayroom are dangerous, and we have to balance

15   those things in the care of forensic patients.

16   Q.   And certainly in that program, you balanced it heavily

17   towards security.

18        Isn't it correct that, for example, patients are cuffed

19   once they come out of their cells?

20   A.   I think Salinas Valley has --

21   Q.   "Yes" or "no"?  Are patients cuffed at Salinas Valley

22   Intermediate Care Program when they come out of their cells?

23   A.   I don't think so any more.  I think that was the finding

24   when everyone came in five years ago, but they've done a

25   tremendous amount of work in their cuffed status in the

 1  psychiatric programs.

 2  Q.   So to your knowledge, Salinas Valley Psychiatric Program

 3  does not use cuffs when patients are outside of their cells?

 4           MS. THORN:  Objection.  Calls for speculation.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  I've been with patients.  I've seen

 7  them walking through the hallways.  I've certainly seen

 8  patients uncuffed at Salinas Valley in various situations.

 9  I'm not an expert in cuff status.

10  BY MR. BIEN:

11  Q.   Are patients at Atascadero cuffed when they're outside of

12  their cells?

13  A.   No.

14  Q.   Never; correct?

15  A.   That's right.  That's exactly the point.  We don't have

16  the ability to contain behaviors at Atascadero.

17  Q.   You have to follow professional, ethical licensing

18  standards at Atascadero?

19  A.   No.  We have to follow licensing standards and joint

20  commission standards related to seclusion and restraint and a

21  need to meet an imminent threshold in individuals who have

22  already demonstrated to be a high risk of violence, which

23  makes it very difficult to contain the violence.

24  Q.   In Atascadero you follow joint commission standards?

25  A.   Yes.

1   Q.   And state licensing standards?

2   A.   Yes.

3   Q.   Those standards prohibit you from cuffing someone unless

4   there's an imminent risk?

5   A.   It prohibits us from cuffing people at all and it

6   prohibits us from doing anything to contain behavior.  Even if

7   someone comes out of a high custody environment at CDCR and we

8   know that they're an extraordinary high risk of violence, we

9   cannot ask that person to stay in the room with their door

10  shut.  We cannot ask them to stay in the dayroom.

11       We cannot to do anything to mitigate that risk in the

12  freestanding hospital, which is problematic when you have the

13  individuals who have the type of violent histories some of

14  these patients have.

15  Q.   That's because you are -- Atascadero and Coalinga are high

16  security inpatient psychiatric facilities and you follow the

17  rules for those facilities?

18  A.   I'm sorry?  Define "high security."

19  Q.   Do you know of a higher security state hospital than

20  Atascadero or Coalinga?

21  A.   Yes.

22  Q.   In California?

23  A.   No.

24  Q.   You guys are at the top in California?

25  A.   I just want to clarify those terms of security pertain to

1  perimeter security only.  When the forensic system was

2  developed in California and they labeled Atascadero a maximum

3  security hospital, it's only as it relates to escape risk.

4  Once you get internal to the hospital, the environments are

5  the same.

6  Q.  Are you a custodial security expert?

7  A.  Well, I'm a violence and psychiatry expert.

8  Q.  So you're a psychiatrist?

9  A.  Yes, I am.

10  Q.  And where in psychiatry did you learn about perimeter

11  security versus some other security?

12  A.  Well, I did an additional year after four years of medical

13  school and four years of general adult psychiatric training, I

14  did an additional forensic fellowship where I got board

15  certified, and we do learn a lot about forensic principles and

16  violence risk there.

17      I've published extensively in peer-reviewed journals on

18  the issue of inpatient violence, and I published a book last

19  year through Cambridge University Press called "Violence and

20  Psychiatry."

21      So in the course of my career as well as being an

22  associate professor at U.C. Davis teaching about principles of

23  inpatient psychiatry, I've come to learn and talk to experts

24  and visit hospitals, both in the United States and other

25  countries, that confer higher levels of physical plant

1  security.  So things like sight lines and perimeter security

2  are things I've studied extensively.

3  Q.  One way of dealing with violence in psychiatric facilities

4  is to increase staffing; isn't that correct?

5  A.  It depends on the type of violence.  If it's predatory

6  violence --

7  Q.  Is that correct, that one way of dealing with violence is

8  increase staffing?  "Yes" or "no"?

9  A.  Yes, in those cases where it's a certain typology of

10 violence, such as psychotic violence.

11 Q.  So, for example, Director Ahlin said that you have -- DSH

12 has reduced the number of patients and certain programs

13 because she wanted to reduce violence in those programs.  So

14 instead of having a 45-or-50-person unit, it's limited to 35.

15     Did you hear her talk about that?

16 A.  Yes.

17 Q.  So that's one way of dealing with violence is to reduce

18 the number of patients in a unit or increase the ratio of

19 staff to patient; correct?

20 A.  Or allow the patients to have their own room or reduce the

21 number of patients in that unit, more stimulation, all of

22 those things, yes.

23 Q.  Correct.  So all of those things are possible at both ASH

24 or Coalinga, and that's some of the things that you're working

25 on?

1    A.   Yes.

2    Q.   And right now there's no program -- you could take a unit

3    at Coalinga and use it for higher security patients using some

4    of those principles, couldn't you, Doctor?

5    A.   It would not be ideal.

6    Q.   It may not be ideal, but it might be better than people

7    who aren't getting any care at all because they're on a

8    waitlist?

9    A.   It would not be ideal because we've tried those

10   principles, as Director Ahlin mentioned, and we still have

11   unacceptable violence on those units.  So for the enhanced

12   treatment unit that is run at Atascadero, we still have

13   violence that's unacceptable, but it's the best we can do

14   under our current licensing and joint and physical plant

15   limitations.

16            THE COURT:  Let's go ahead and take our break.  You

17   have about eight minutes left for DSH, unless you want to

18   reduce your time with Ms. Tebrock.

19            MR. BIEN:  Thank you.

20            THE COURT:  Let's take about a ten-minute break.

21       (A break was taken at 2:45 p.m.)

22            THE COURT:  Just two quick questions.  Do the

23   parties -- you may not know off the top of your head, but is

24   there in the record before the court a map of ASH and of CSH

25   floor plan with legend?  I know Coalinga was litigated.  If

1  that's in the record, I would like to have it pointed out to

2  me.

3      It can be in a filing by the end of the week or I would

4  like those floor plans final by the end of the week.

5          MS. THORN:  We will do that, Your Honor.

6          THE COURT:  Also on MDOs, I'm assuming there's

7  something I can take judicial notice of in terms of the

8  finding to be made in order for someone to be deemed MDO?

9          MS. THORN:  Yes, Your Honor.

10         THE COURT:  The state statute?  I will be looking for

11 that.

12     So you have eight minutes left if you stick with your

13 plan.  Do you want to go for those eight minutes?

14         MR. BIEN:  Yes.

15         THE COURT:  Ready, set, go.

16 BY MR. BIEN:

17 Q.  Doctor, do you agree with the principle that a patient

18 should be treated in the least restrictive environment

19 possible as part of their mental health treatment?

20 A.  If you could clarify, by the term "possible," "least

21 restrictive housing possible," "possible" meaning that's

22 available, no, I don't agree with that.  "Possible" meaning

23 within the confines of that person's violence risk, yes.

24 Q.  So you agree that one goal of mental health treatment

25 would be to move people who are having difficulty controlling

1    their behavior and try to move them to situations where they

2    can practice and be supervised in a safe environment but

3    moving towards freedom and away from restriction?

4        That's a complex question.  Let me start again.

5        Do you agree with the idea as part of the psychiatry that

6    one of the goals of treatment should be to help patients

7    function in a free environment?

8    A.   No, not necessarily.  I believe that functioning is an

9    important domain that we address as psychiatrists.  Freedom is

10   a complex notion based on any number of factors.

11   Q.   Do you agree that under our system of law that there's

12   supposed to be some due process involved before you can take

13   away someone's freedom?

14   A.   Yes.

15   Q.   And that those laws apply also in mental health

16   facilities?

17   A.   In terms of moving someone to and from a less restrictive

18   environment within an inpatient setting?

19   Q.   Yes.

20   A.   Yes, I think due process should always apply.

21   Q.   So, for example, in Atascadero you can't lock someone in

22   their room unless there's a doctor's order, a seclusion order?

23   A.   Not only that, that person has to meet a very high

24   clinical threshold to be locked in their room.

25   Q.   And that has to be an observed behavior?

1   A.   Of imminent danger.

2   Q.   Right.  And that's the process involved in locking that

3   person in the room?

4   A.   Yes.

5   Q.   Are there's a time restriction on how long that person can

6   be locked in the room?

7   A.   That's right.

8   Q.   And the same thing for using restraints at Atascadero and

9   Coalinga, you can't restrain someone unless you follow the

10  procedures for using restraints.

11       Is that correct?

12  A.   Yes.

13  Q.   Is that right?

14  A.   Yes.

15  Q.   And those procedures also include imminent harm to

16  themselves or others that can only be contained in the

17  psychiatrist's opinion by use of constraints?

18  A.   That's right.

19  Q.   But at prison hospital programs, those rules don't apply?

20  A.   That's right.

21  Q.   And in your opinion, the rules that DSH has to operate

22  under at Coalinga and ASH are too restrictive?

23  A.   Not for appropriate patient populations.  Those

24  regulations, those criteria for seclusion and restraint were

25  really developed in the Sixties and Seventies in response to

1  the institutional abuses of civilly committed patients in the

2  middle of the last century.

3      So what the problem with that is, in a forensic

4  population, especially mentally disordered offenders, is that

5  a demonstrable imminent risk as evidenced by behaviors in a

6  civilly committed psychotic patient is a very concrete

7  actionable thing.

8      When you have an individual who has actually been

9  convicted of a violent crime who also has co-occurring

10  criminal genic thinking, who also has traumatic brain injury,

11  who also has some substance abuse, et cetera, et cetera --

12          MR. BIEN:  Your Honor --

13          THE WITNESS:  I just want to finish my thought.  You

14  can't use those same criteria because those people just pose a

15  higher risk in general.

16  BY MR. BIEN:

17  Q.  So you disagree with the California law as it now exists

18  for the MDO patients that you treat at Atascadero?

19      "Yes" or "no"?

20  A.  Which part of the law?

21  Q.  Seclusion and restraint.

22  A.  Well, they are at that point --

23  Q.  "Yes" or "no," do you disagree with the current law that

24  you have to operate under at Atascadero and Coalinga for

25  MDOs --

```
 1   A.   I think for certain MDOs, in my clinical opinion, the
 2   application of the term "imminent risk" before we can contain
 3   what we know to be very high risk of the physical violence
 4   behaviors is problematic.
 5              MR. BIEN:  Thank you.
 6              THE COURT:  Any further questions for this witness?
 7              MS. THORN:  No, Your Honor.
 8              THE COURT:  Is Dr. Warburton excused as a witness in
 9   this proceeding?
10              MS. THORN:  Yes Your Honor.
11              MR. BIEN:  Yes, Your Honor.
12              THE COURT:  You may step down.  Are we ready to move
13   on to Ms. Tebrock?  Any other witness to the extent there's
14   time left on the DSH issues?
15        Ms. Thorn?
16              MS. THORN:  No, Your Honor.
17              THE COURT:  Mr. Bien?  Ms. Ells?  No other DSH
18   witness?
19              MR. BIEN:  No.
20              THE COURT:  So the only witness remaining is Ms.
21   Tebrock?
22              MS. THORN:  Yes.
23              THE COURT:  Is it still the case that 45 minutes each
24   for questioning of Ms. Tebrock to the extent questions in the
25   court's January 19th order relate to CDCR?  45 minutes per
```

```
 1   side?  That works for you, Ms. Thorn?

 2            MS. THORN:  Yes, Your Honor.

 3            THE COURT:  Mr. Bien?

 4            MR. BIEN:  Yes, Your Honor.

 5            THE COURT:  All right.  Ms. Tebrock.

 6                    KATHERINE TEBROCK, SWORN

 7            THE WITNESS:  I do.

 8            THE CLERK:  Say and spell your first and last name

 9   for the record.

10            THE WITNESS:  Katherine Tebrock, K-A-T-H-E-R-I-N-E,

11   T-E-B-R-O-C-K.

12            THE COURT:  All right.  You may proceed.

13            MS. O'BANNON:  Danielle O'Bannon, Your Honor.

14            THE COURT:  All right.  Do you want me to let you

15   know when you have hit a certain time?

16            MS. O'BANNON:  How much time?

17            THE COURT:  45 total.

18            MS. O'BANNON:  15 minutes, Your Honor.

19            THE COURT:  All right.  15 left?

20            MS. O'BANNON:  15 minutes left, yes.

21                    DIRECT EXAMINATION

22   BY MS. O'BANNON:

23   Q.  Ms. Tebrock, can you please state your position with the

24   California Department of Corrections and Rehabilitation,

25   please.
```

1    A.   Deputy Director for the Statewide Mental Health Program.

2    Q.   How long have you been in that position?

3    A.   Approximately one year.

4    Q.   How long have you been employed with the California

5    Department of Corrections in total?

6    A.   Close to a dozen years with a brief stint at the AG's

7    office.

8    Q.   If I could go straight into the court's questions, let's

9    start with Question Number One.

10        I want to do some housekeeping really quickly.  We entered

11   into evidence Exhibit Number 2, which is entitled, "CDCR

12   Psychiatric Inpatient Programs Report and Waitlist Report as

13   of January 20, 2017."  It's marked as Exhibit 2, one page.

14   A.   I do have that up here.  I've got 1, but not 2.  Okay.  So

15   this has two different numbers.  It says 2 and 3.  I'm looking

16   at the "Psychiatric Inpatient Programs Census Report."

17   Q.   I believe that's been marked as exhibit --

18             THE COURT:  This is 2.

19             THE WITNESS:  I'm looking at this one.

20             THE COURT:  We have a courtesy copy of 2 for the

21   witness.

22             MS. O'BANNON:  May I approach, Your Honor?

23             THE COURT:  You may.

24   BY MS. O'BANNON:

25   Q.   I know you're going to testify as to those numbers, but I

1   just want to do some housekeeping.

2       What is an Exhibit 2?

3   A.   Exhibit 2 is the "CDCR Psychiatric Inpatient Programs PIP

4   Coleman Patient Census Waitlist Report as of January 20."

5   Q.   And Exhibit Number 3, what is Exhibit Number 3?

6   A.   It's titled the "Psychiatric Inpatient Census Report as of

7   1-20-2017."

8   Q.   In regards to Exhibit Number 3, are you familiar with this

9   document?

10  A.   Yes.

11  Q.   Do you know who prepares the document?

12  A.   HCPOP does, the Healthcare Population Oversight Program.

13  Q.   And what does the information in this particular report

14  provide us?

15  A.   The document shows us who is -- let me rephrase that.

16      The document shows us what the census is in each

17  Psychiatric Inpatient Program that we have broken out by the

18  custodial levels.

19  Q.   And in Exhibit Number 2, Defendants' Exhibit 2, are you

20  familiar with that particular document?

21  A.   I am.

22  Q.   What does this provide us?

23  A.   This shows us the census numbers and waitlist numbers for

24  the CDCR psychiatric inpatient programs, both at CIW,

25  California Institution for Women, and the state prison at San

1  Quentin lining out the bed capacity as well at the waitlist.

2  Q.   Thank you, Ms. Tebrock.

3       The court's question was:  How many beds are filled as of

4  January 20, 2017?  How many are empty?  Where the empty beds

5  are and why are they empty?

6       So let's roll through some of that information for the

7  court.

8       First, what's the current capacity of the mental health

9  crisis beds?

10 A.   So we have a current capacity of 427 and we have 22

11 women's beds.

12           THE COURT:  So the record is clear, the witness is

13 referencing one of those exhibits?

14           THE WITNESS:  I'm looking at my declaration that has

15 the attachment of the bed plan.

16           THE COURT:  All right.  Your declaration filed on?

17           THE WITNESS:  On the 13th of January.

18           MS. O'BANNON:  Your Honor, it's docket number 5544-2.

19 Q.   Exhibit A, Ms. Tebrock?

20 A.   That's right.

21 Q.   You indicated that mental health crisis bed capacity is

22 427; is that correct?

23 A.   Yes, for the males.

24           THE COURT:  Just so I'm perfectly clear, there is no

25 exhibit equivalent to Exhibit 1 or 2, same format, for the

1    CDCR?  So Exhibit A to the Tebrock declaration has a lot more

2    information on it?

3              MS. O'BANNON:  Correct.

4              THE COURT:  Nothing that boils it down as Exhibit 1;

5    is that correct?

6              MS. O'BANNON:  That's correct.  I don't have Exhibit

7    1 in front of me, but based on my knowledge what the DSH

8    charts look like, CDCR does not have that chart.

9              THE COURT:  All right.  But the information that's in

10   the attachment to Ms. Tebrock's declaration could be used to

11   create such a chart?

12   BY MS. O'BANNON:

13   Q.  Ms. Tebrock?

14   A.  Yes.  And I think that the intent in Exhibit Number 2

15   really is to mirror the report and approach what DSH has in

16   its Exhibit Number 1 or what the court has now as Exhibit

17   Number 1.

18             THE COURT:  Without a full breakdown?

19             THE WITNESS:  You mean between -- these are just the

20   psychiatric inpatient programs.  I do not have the crisis beds

21   on here.

22             THE COURT:  Correct.

23             THE WITNESS:  That's correct.

24             THE COURT:  You may proceed.

25             MS. O'BANNON:  Thank you, Your Honor.

1    Q.   Are there any empty mental health crisis beds as of

2    January 20, 2017?

3    A.   There are.

4    Q.   How many?

5    A.   So there are currently 161 vacant.  That's as of 1-20, so

6    321, if my math is right, currently filled.  There were 39

7    pending and 9 who are over the 24-hour timeframe.

8    Q.   What is your Psychiatric Inpatient Program capacity?

9    A.   The bed capacity at CIW for women is 45 and the bed

10   capacity for San Quentin is 40.

11   Q.   Are there any other empty beds?

12   A.   At the CIW PIP, we have 45 capacity, 45 filled.  So no

13   beds available, one pending referral.  In the San Quentin PIP

14   we have 45 capacity, 38 filled, two beds available.  Both of

15   those I should note, no referrals waiting more than 30 days.

16   Q.   Thank you.  In regards back to the mental health crisis

17   beds, you just testified there are 9 beds available?

18   A.   No.  In the crisis beds, that's 161 vacant, 39 individuals

19   pending placement, but only 9 of those 39 are over 24 hours.

20   Q.   And the 24 hours is the program guide requirement?

21   A.   Yes.

22   Q.   Can you break down the 9?

23   A.   4 of those 9 -- I'm working off memory.  4 of those 9 are

24   women at CCWF.  They would stay at CCWF because they don't

25   have anywhere to go.  The balance are mostly in Southern

1    California.

2       One of the individuals was, in fact, referred on that same

3    day.  The referral was rescinded, but we made an error on the

4    document, so that's actually not an accurate number, but the

5    balance of those are people who have been listed as pending,

6    and there may be beds that are on hold for them and they're

7    just waiting to be transported.

8            THE COURT:  Can we make it clear for the record where

9    the error is?  Which document are you looking at?

10           THE WITNESS:  I'm working off memory, so I can get

11   that name for the court, but I don't have the document in

12   front of me.  That's based on my last review of a document

13   earlier.

14   BY MS. O'BANNON:

15   Q.  You said 9 are over 24 hours, which is program guide

16   requirements?

17   A.  Yes.

18   Q.  On average, how long does it take to transfer a patient

19   that may be over the 24-hour requirement?  How much time are

20   we looking at?

21   A.  So to the extent somebody misses that 24-hour mark for the

22   movement out, we're actually operating very close to the

23   24 hours to the tune of slightly less than half a day so .4 of

24   a day, so less than 12 hours.

25   Q.  Thank you.  Did we discuss whether there were any empty

1    beds in the PIP?

2    A.   I mentioned that there are two beds available in the San

3    Quentin PIP.

4    Q.   Are they over program guide?

5    A.   No.  There are no beds currently available at CIW, but

6    also no referrals over 30 days.

7    Q.   Let's move to Question Number Three.  I know you don't

8    have the questions in front of you, but it helps me.

9         In question Number Three, the court was looking at the

10   exhibit to your declaration, 5544-2.  It had just a few

11   questions.  In Exhibit A, it shows that there may be a

12   decreased capacity of 54 beds, crisis beds, to be exact.

13        Are these beds, the 54 beds, currently being used?

14   A.   Yes, they are.  Those are the beds at CIM and at CSP Sac.

15   I suppose I should clarify for the court.  When we produced

16   this bed plan many years ago, we used a similar approach.  We

17   had identified those unlicensed beds at CIM and Sac in this

18   temporary column.

19        To the extent it alarmed somebody, I apologize.  It wasn't

20   intended to do that.  In fact, we were trying to be consistent

21   with the way we had presented it in years prior.

22        I hope that clarifies that.

23   Q.   I was going to ask you.  Why are they designated,

24   "temporary"?

25   A.   Only because they're unlicensed.

1  Q.  Only because they're unlicensed.  Okay.

2      Does CDCR have any plans to take down these beds?

3  A.  Not at this time.

4  Q.  Does CDCR have any current plans to increase the crisis

5  bed capacity?

6  A.  We do.  The Governor recently released his proposed budget

7  January 10th.  In that proposed budget, the administration is

8  seeking an additional 100 mental health crisis beds, 50 at CIM

9  and 50 at RJD, to be constructed.  If approved by the

10  legislature, they would be built out in 2020, 2021.

11  Q.  Is there currently any funding for those beds?

12  A.  No.  That's the purpose of the legislative request.  It's

13  seeking funding and approval for that expenditure.

14  Q.  Great.  As we sit here today, we don't have any

15  information in regards to whether or not the legislature is

16  going to fund those beds or not; correct?

17  A.  No, I'm hopeful, but I have no indication either way.

18  Q.  Just to be clear, the capacity for the crisis bed has not

19  decreased; is that correct?

20  A.  That's correct.

21  Q.  Let's move on to Question Number Six.  This question is

22  also in reference to your same declaration 552 -- let me

23  double check that -- 5544.  This question is in regards to the

24  community hospital outreach that CDCR had performed in the

25  past.

1          My first question to you:  Do you know when CDCR contacted

2     the community hospital to obtain this information?

3     A.   Yeah, that was in the 2012-2013 timeframe, so several

4     years ago.

5     Q.   Do you know what the inquiry in regards to beds, whether

6     they're for crisis beds or any other types of beds?

7     A.   My understanding it was for inpatient beds generally.  I

8     don't know if there was a further breakdown between crisis

9     beds or not.

10    Q.   I believe in your declaration you indicated that some beds

11    may have been available.

12         Do you happen to know how many?

13    A.   Yeah, there was one institute or facility that was willing

14    to proffer eight beds at that time.  I have no indication,

15    however, today that they remain willing or even have

16    additional beds at this time.

17    Q.   Since 2013, to your knowledge -- I know you weren't

18    present -- but has anyone contacted any community hospitals to

19    see whether they would take -- provide inpatient care to

20    inmates?

21    A.   Recently we have reached out again and we're now going to

22    be communicating as soon as this week with our Health Net

23    contacts to try to identify any potential contractors in the

24    community.  The purpose of the conversation this week is to

25    identify with more specificity what kind of beds we're looking

1    for.

2    Q.   Are the plans to ask for or seek crisis beds or just all

3    beds in general?

4    A.   I think we're going to cast a wide net and see what we can

5    find, and then if there's a flood of beds, maybe we can be

6    picky and choosey, but I'm not sure what we'll get.

7          THE COURT:  Just to clarify on that, at this point no

8    community hospital beds are being used for acute care if

9    needed?

10         THE WITNESS:  Not by CDCR.  That's correct.

11         MS. O'BANNON:  Thank you, Your Honor.

12   Q.   Let's move to Question Number Seven.  Question Number

13   Seven related to the fall projections, just to kind of tweak

14   your memory here.

15   A.   Yes.

16   Q.   Can you describe for the court CDCR's process for

17   forecasting bed need.

18   A.   Sure.  We have a contract with John Misener who gets a

19   cohort of data from us.  That data is weekly census

20   information.  He also gets information from the Office of

21   Research at CDCR related to population projections broadly

22   across the system.  That information is then applied through a

23   court-approved methodology.

24      That approval was obtained, I think, a few years ago here.

25   He applies the vacancy rate that we maintain and then is able

1  to turn out the numbers related to what the projected bed need

2  will be.

3  Q.  When you get the fall projections, fall 2016 projections,

4  what do you guys do with that data?  Do you provide it to

5  Misener?  What does the unit actually do?

6  A.  Sure.  There are ongoing conversations with him that

7  include submission of the weekly data and we also talk with

8  him about changes that we've seen in the system.  As an

9  example, after AB109, he met with the Office of Research and

10 looked at how the population was changing.

11     Some of that forecasting is certainly challenging to do.

12 That piece is of course leveling out.  Now, we don't have

13 information before him yet that includes the changes from the

14 new MOU and the LRH determinations.  That's not yet in the

15 cohort we just realized.  It's in the current data that

16 they're crunching right now.

17 Q.  So we don't have any information based on the LRH and the

18 other information generated?

19 A.  That's right.

20 Q.  But CDCR does plan to provide that information at some

21 point?

22 A.  Absolutely.  He is getting that information.

23 Q.  Let's move on to Question Number Eight about capacity.  I

24 believe that the question was related to the 80 percent

25 capacity versus 90 percent capacity.

1      Do you recall that question?

2  A.   I do.

3  Q.   Has CDCR looked into what the effect would be at

4  80 percent capacity?

5  A.   Yes.  Upon receipt of the court's order, we did look at --

6  we communicated very quickly with John Misener about this

7  point.  One of the things that I think that is important to

8  remember that we're talking about in our submission, my

9  declaration, is proposing a number of different capacity

10  increases that I think may address some of the court's concern

11  related to whether it's a 90 or 80 percent vacancy rate.

12      We were able to get some very quick numbers from John

13  Misener, and it looks, obviously, when you decrease the

14  vacancy rates, you increase the number of beds you need over

15  all.

16      Some of that, I think, is going to be captured in the

17  capacity increases we've already put forward.  Because we

18  didn't have a lot of time between the issuance of the order

19  and today's hearing, we haven't really had a complete

20  conversation with Mr. Misener about the full impact of our

21  proposals and how that would overlay with the vacancy rate,

22  but it certainly does look like when you decrease the vacancy

23  to 80 percent, you increase the expected bed need.

24  Q.   Without taking into consideration any of the programs that

25  are put into place currently, do you know whether or not

1    Misener was able to come up with a quick figure over the

2    conversation you had with him?

3    A.   Yes.  So it looks like it increases the numbers by

4    approximately 12 percent.

5    Q.   And, again, it doesn't account for all other measures that

6    CDCR is putting into place?

7    A.   That's right.

8    Q.   Does CDCR have any plans on providing Misener with that

9    particular information in order to help with the forecasting?

10   A.   Yeah, certainly.  Like I said, we had a very quick

11   conversation with him.  There is additional conversation that

12   should be had, and we will certainly be happy to have that

13   conversation in short order in order to really get a full

14   understanding of what the impact might be of the additional

15   proposed capacity.

16        When you look at 72 beds at CMF as well as the 16

17   additional at CHCF, simply bringing those on and then

18   recognizing that we'll have the capacity to return from

19   Salinas Valley, we may actually be in a place where that is

20   pretty close to what we need.

21   Q.   Great.  Thank you.

22             THE COURT:  Can the witness answer this.  If the

23   80 percent had been used, would it have precluded the Salinas

24   Valley problem?

25             THE WITNESS:  No.  Weather would override in any

1  event, but long term, I'm assuming that the repairs to the

2  Salinas Valley Facility will make those beds usable for the

3  foreseeable future, so I think it's certainly reasonable to

4  anticipate keeping those numbers in the mix.

5  BY MS. O'BANNON:

6  Q.   Do you have any knowledge about when -- I know we had some

7  testimony with Pam, but do you have any other information that

8  you can offer us in regards to when the beds may come back

9  online at Salinas Valley?

10 A.   I have the same information that Pam has, so the contract

11 I know is entered into.  It's looking in the March timeframe

12 they will be getting that started.

13 Q.   Thank you.  I want to move to Question Number Ten.

14 Question Number Ten related to whether there are any actual

15 obstacles to placement of all inmates referred from mental

16 health crisis bed within 24 hours of referral as required by

17 the program guide.

18     We did talk a little bit earlier with regards to how many

19 people were waiting and whether or not they are beyond program

20 guide requirements, and I believe for the crisis beds, there

21 were nine.  We did talk slightly about some of the programs,

22 but let's go into a little bit more detail in regards to that.

23     What are the actual obstacles?

24 A.   I wouldn't really necessary characterize our challenges as

25 obstacles.  We are working diligently in a number of different

1    ways to try to ensure we're putting the right patient in the

2    right bed at the right time.  Part of that means that we need

3    to make sure that were triaging that need for crisis beds.

4        We are trying to address and make sure that the staff

5    understands exactly how to do that.  We've done that through

6    additional training through the staff, implementation through

7    some crisis intervention teams.  We've even done some very

8    simple changes like making sure clinicians are working late

9    into the evening time in order to be able to immediately

10   address some of the concerns raised by the patients.

11       Quality improvement approach, like making sure that you go

12   do the discharges of patients from the crisis beds early so

13   you can make sure to free the bids up for those people who

14   really need those beds, that has helped us better manage the

15   flow into those beds.

16       The other piece is that there are times when there will be

17   delays.  Those delays may have to do with a particular medical

18   concern or something like that, but more often than not, we

19   are able to get folks into those beds quickly.

20   Q.   How about recisions, is that an obstacle?

21   A.   Great point.  We have a fairly high rate of recisions in

22   our system.  While I appreciate everybody wanting to be

23   responsive to the patients, the effect is some people are

24   referred and very quickly that referral is rescinded.  In that

25   intervening time, the patient may have very well been placed

1    in the bed, which, for lack of a better phrase, kind of clogs

2    up the system.

3        Making sure that we're addressing the crisis triage

4    through the training and other oversight mechanisms is really

5    helping to minimize those recisions, and additional training

6    and oversight is the answer to that, but the recisions do have

7    the effect of clogging those beds sometimes.

8    Q.  Do you happen to know what the percentage of recisions

9    are?

10   A.  About 30 percent.  It has gone up as much as 40 in the

11   last year, but closer to 30 now.

12           THE COURT:  Is that information on Exhibit A to the

13   declaration filed on the 13th?

14           THE WITNESS:  I don't think that is in there.

15           MS. O'BANNON:  I don't think it is in there, Your

16   Honor.

17           THE COURT:  That's half an hour, just so you know.

18           MS. O'BANNON:  Thank you, Your Honor.

19   Q.  Really quickly, let's hit Question Number Eleven.  Pam

20   Ahlin may have talked about some things, but there's something

21   I would like you to talk with the court about.

22       Question Eleven discusses obstacles as well.

23       The question specifically was (Reading:)

24       Actual obstacles to complete permanent elimination of any

25       circumstances in which the program timelines for transfer

1      to inmate's hospitalizations are exceeded.

2      Pam Ahlin did a great job of discussing some of those

3  obstacles, but one of the things that was in your declaration

4  that I wanted to kind of highlight and ask you about was the

5  shifting of responsibilities for inpatient care from DSH into

6  CDCR.

7      Can you just talk about that a little bit?

8  A.   Sure.  The Governor has proposed in his January 10th

9  budget, a shifting of responsibility of the in-prison

10  inpatient mental health programs from DSH to CDCR.  This

11  reflects a recognition of CDCR's success at the San Quentin

12  and CIW PIPS and is a recognition also of the will, capacity,

13  and leadership of the CDCR administration to take on this

14  additional responsibility.

15      It is -- what we've put forward is a proposal that

16  actually compresses the timeframes for review that are

17  necessary to get somebody into the inpatient programs.

18  Because we will be effectively eliminating a level of review,

19  we are able to save some time.  That equates to increased

20  access to care and that's good for the patients and system

21  alike.

22      We've been able to identify almost a 40 to 50 percent cut

23  in time, depending on each of the -- the acute and ICF times

24  are a little bit different, but we've been able to put

25  together a proposal that saves a lot of time.

1  Q.   Practically speaking, if you're going to have -- within

2  CDCR, CDCR will have knowledge of when a referral is coming

3  down and whether there's a bed available?

4  A.   Right.  One of the -- that's one of the great benefits of

5  this lift and shift is that we're able to leverage the

6  realtime knowledge that HCPOP has of its beds.  That will

7  affect a more streamline communication from our inpatient

8  units out to the field to make sure we're moving the pieces

9  quickly.

10 Q.   When is that anticipated lift and shift, as you indicated,

11 anticipated to occur?

12 A.   We are -- assuming it's approved by the legislature, the

13 shift would occur on July 1st, but it contemplates a two-year

14 rollout period.  So for the foreseeable future, things will

15 remain the same and we're going to work with folks.  Certainly

16 I'm looking forward to working with the Special Master and

17 plaintiffs to talk about how we will be affecting that.

18           MS. O'BANNON:  Thank you.

19           THE COURT:  That's 34 total, so you have the balance.

20      Who is examining this witness?

21           MS. ELLS:  I am, Your Honor.

22           THE COURT:  So up to 45 minutes.

23                        CROSS-EXAMINATION

24 BY MS. ELLS:

25 Q.   Good afternoon, Ms. Tebrock.  The court asked you earlier

1  whether or not you today have an equivalent census to

2  something akin to Defendants' Exhibit 1.  You said that you

3  don't.

4      Normally in the monthly data you produce the MHS DS

5  Management Information Summary Report to the plaintiff and

6  Special Master every month and that report does show similar

7  census data to the data that's on here, including available

8  beds at every level of care on a given day, including whether

9  people are waiting beyond program guide timelines; right?

10 A.   Yeah.

11 Q.   The court utilized that MIS report dated then 10-17-16 at

12 the November 10th hearing and then attached it to her order

13 that followed that hearing.

14     Is that right?

15 A.   That's right.

16 Q.   After the November 10th hearing, defendants stopped

17 producing that report as part of their monthly document.

18     Is that right?

19 A.   That's correct.

20 Q.   So let's talk about the bed plan a little bit.

21     Do you have that in front of you?

22 A.   I do, yes.

23          THE COURT:  So it's clear for the record, when you

24 say "bed plan" --

25          MS. ELLS:  Exhibit A to Ms. Tebrock's deposition.

```
 1              THE COURT:  All right.
 2   BY MS. ELLS:
 3   Q.  So on the set plan, the high custody ICF Permanent Program
 4   capacity, currently in that it lists 700.  That 700 includes
 5   the 24 isolation beds that DSH said you can't currently use,
 6   except under the emergency circumstances; right?
 7   A.  I believe it does, yes.
 8   Q.  So your actual capacity right now for treatment is 676
 9   beds not 700; right?
10   A.  Well, actually, right now, since they're being used on an
11   emergency basis, this is an accurate number.
12   Q.  Right.  But you subsequently subtract 58 beds from your
13   SVPP number, didn't you?
14   A.  I haven't done that in this.
15   Q.  Right.  So your normal programing capacity with the
16   exception of the lost 58 beds that are currently offline and
17   the addition of 24 beds that you're using on an emergency
18   basis at Stockton right now, that's not reflected?
19   A.  That's not reflected.
20   Q.  Okay.  In the acute male capacity that you have listed,
21   it's 412, but that also counts 10 beds that you cannot use at
22   Stockton because they're isolation beds and you have no plan
23   to convert those into acute beds that you could use, do you?
24   A.  At the moment, no.
25   Q.  So your bed plan here shows in the category on the top
```

1  that says "bed plans number," in the column that says,

2  "over/under need," you show a shortage right now of 122 MHCB

3  beds, is that right, assuming a 90 percent occupancy?

4  A.  I'm sorry.  Hang tight.  All the way to the right?

5  Q.  Sorry.  No.  Not the, "no occupancy standard under/over."

6  It's the third column from the right, the "over/under need for

7  assuming a 90 percent occupancy standard."

8      Is that right?

9  A.  Yes.

10 Q.  Okay.  So 122 male shortage predicted for 2017, assuming a

11 90 percent occupancy rate?

12 A.  Uh-huh.

13 Q.  Your male bed plan includes 78 beds that you said you're

14 planning to open in L1 and CMF; right?

15 A.  72.

16 Q.  I'm sorry.  What did I say?

17 A.  78.

18 Q.  So 72.  This plan reflects the assumption that those beds

19 will be funded and built?

20 A.  Yes.  Well, funded.

21 Q.  Funded and converted?

22 A.  Yes.

23 Q.  But L1 is currently an EOP unit, is it not?

24 A.  It is.

25 Q.  Does the bed plan reflect the loss of those 72 EOP beds?

1    A.   So we would need to move those folks out and I think we've

2    got it captured in our proposed permanent changes in capacity

3    in the table below.  I'm not sure exactly how we've -- if we

4    look --

5    Q.   The CMF should show a negative 72; right?  In table C,

6    "proposed permanent changes and capacity," CMF should show a

7    loss of 72 EOP beds; right?

8    A.   Hang tight.  I marked it positively in the ICF high there,

9    but I don't see the balance.  It may well be contemplated in

10   here, but I may not be seeing it, but your point is fair.  It

11   doesn't look like we've contemplated it here, but I think we

12   contemplated it elsewhere.

13        I'll have to see if I can find out where that was, where

14   those beds went.

15   Q.   We've discussed the McManis fall 2016 bed projections, and

16   those projections predict a drop in demand for high custody

17   ICF.

18        Recent experience has not been consistent with that; is

19   that fair to say?

20   A.   That's fair to say.

21   Q.   So the briefs discuss the fact that different projections

22   essentially were used to justify the Governor's budget request

23   for the 72 beds in L1.

24        Is that accurate?

25   A.   I don't know if it's different projections.  What we used

1  for the last McManis report was a cohort of data that's

2  six months of data, but prior.  I don't have the timeframes.

3  I should probably have that off the top of my head, but I

4  don't have the timeframes for what dates, what date range that

5  captures.

6  Q.  It's typically through June 30th?

7  A.  Yes, first six months, and then we do the second six

8  months.  So it wouldn't have -- his wouldn't have contemplated

9  this because we didn't consider it until considerably later,

10 but when we looked at the proposal on the L Wing, we're

11 mindful of the actual usage that we're seeing more recently in

12 trying to be responsive to the recognized need for the

13 patients.

14 Q.  So is it fair to say the McManis projections were not

15 accurate for the need that you are observing in 2017 for high

16 custody male ICF?

17 A.  Well, I'm going to parse this a little bit.  I think they

18 were an accurate reflection based on the data for that subset,

19 but there is a disconnect.  I absolutely agree between that

20 prior six months and the experience that we've had in the more

21 recent six months and even now.

22      Short answer is, yes, there is a disconnect.

23 Q.  Recent months have also shown an increase need for male

24 beds, is that accurate, since June 30th?

25 A.  Yes.

1  Q.   Is there anything in here that purports to add additional

2  acute beds in the near term?

3  A.   We had flipped -- DSH had flexed one of its unit --

4  Q.   Right.  About a year and a half go --

5  A.   -- and if I'm not mistaken, the actual need right now --

6  Q.   Have you --

7  A.   -- is actually spot on.

8  Q.   Have you had sufficient waitlist for acute care in the

9  last six months?

10  A.   I think we've actually been okay in the last six months.

11  I'd have to go back and look at that, but we've been --

12  recently, we've been quite good about getting people in close

13  to the timeframes.  I can go back and confirm that.

14  Q.   So we agree the McManis projections, because they don't

15  reflect the last six-month period, are not accurate for the

16  ICF high custody beds?

17        MS. O'BANNON:  Misstates the testimony.

18        THE COURT:  You can respond to that.

19        THE WITNESS:  Sure.  I think that, as I said before,

20  they were accurate for the time that they looked at it, but

21  folding it over into today's, there is a disconnect.

22  BY MS. ELLS:

23  Q.   Right.  Are there any -- since you have the available data

24  for the recent six-month period, did you validate all the

25  other projections against what Mr. McManis predicts for 2017?

1    A.    I haven't done that exercise.

2    Q.    Turning to the female bed plan numbers in Exhibit A to

3    your declaration.

4    A.    Yes.

5    Q.    Your bed plan shows that you're projected to be 8 MHCB

6    beds short for women, assuming a 90 percent occupancy rate.

7          Is that accurate?

8    A.    Yes, I do see that.

9    Q.    What is your plan to address that?

10   A.    Part of what we have work to do -- and I mentioned this in

11   my earlier testimony, so this will be repetition -- we are

12   addressing part of the demand side.  The way we do that is by

13   engaging with the staff through a variety of training.  We

14   have a three-prong training approach with the case formulation

15   as well as triage training for crisis and also for the IDTT

16   training.

17        All of those fit together and begin to build a more

18   responsive team for patients who are in need.  At the same

19   time --

20   Q.    So -- go ahead.

21   A.    Hang tight.  So at the same time we have a crisis

22   intervention team that has just started, training just

23   occurred with CIW, to address some of their crisis needs as

24   well as some open lines there, and so when you begin to fold

25   over and layer on the approaches, you begin to understand that

1   you can respond more quickly to people in crisis.

2       So I believe that for the moment we will be able to

3   respond to the need of the patients for the women.

4   Q.   So you currently have 22 MHCB beds for women and you're

5   projected to need an additional 8 more.

6       So do you have a basis to believe that these efforts to

7   shape the demand will reduce your actual need by your

8   projected need by a third?

9   A.   I do.  We have a crisis intervention team, very

10  preliminary results, from Salinas Valley that are very good.

11  We also have some recent practice improvements at other

12  locations, including CSP Sac and at CHCF that are reflecting a

13  much quicker rate than ensuring the flow of the patients

14  through the system.  By that I mean discharging people quickly

15  and making sure that you don't have people on administrative

16  days waiting to be transferred out.  All of that saves

17  tremendously.

18      Do I have data?  I don't have it at my fingertips, but I'm

19  confident about the system and confident about the people who

20  are actually implementing the training that we've provided.

21  Q.   But on January 20th, four of the nine people that were

22  waiting past program timelines were at CCWF --

23  A.   That's correct.

24  Q.   -- and that is where you are; is that right?

25  A.   Yes.

1  Q.   So right now we have people past the program

2  timeline because -- is it accurate to say because you cannot

3  put them in a bed in the same facility that they're at?

4  A.   Yes.  And because they are co-located there, they can move

5  very quickly upon the available beds.

6  Q.   So when a bed opens up?

7  A.   Absolutely.

8  Q.   So, again, in your bed plan, we have the 72 ICF beds

9  projected for L1.

10     Would that unit be run by CDCR?

11  A.   It would.

12  Q.   And have you discussed that proposal at all with a Special

13  Master?

14  A.   During our recent work groups, we have talked about it at

15  some length.  In fact, when we discussed it, we -- soon

16  thereafter, there was a tour of the facility with some of the

17  Special Master's experts to look at the facility.

18  Q.   So you state in your declaration that you expect L1 to

19  open in April of this year for ICF care?

20  A.   It assumes -- the short answer is yes.  That assumes

21  waivers of some licensing requirements.

22  Q.   The Governor's budget asked for 11.4 million dollars for

23  that project.  That money obviously won't be appropriated

24  until July.

25     What is the 11.4 million for?

1  A.   There are some staffing needs.  Because of the

2  configuration of the facility, there are some increased

3  escorts needed to get people out to programing and out to yard

4  and those kind of things.

5  Q.   So what will happen between April and May, assuming that

6  money is eventually appropriated?

7  A.   The Mental Health Program that sufficient funds.

8  Q.   L1 is currently a regular celled prison unit where the

9  cells are in a long tier; is that right?

10  A.   Yes.

11  Q.   And the officers and the dayroom are at one end of the

12  hallway.  There's no dedicated treatment space on that unit;

13  right?

14  A.   No.  That's part of the reason why we're looking at some

15  escort costs, so that we can use some of the additional space

16  that we have in the facility, including the O Wing.

17  Q.   So when DSH operated L Wing as an emergency ICF unit until

18  early 2014 when they shut it down, the Special Master reported

19  that DSH was unable to provide sufficient treatment because of

20  the lack of treatment space.

21      Is that accurate?

22  A.   That's my memory of his report, yes.

23  Q.   At that time, L1 was actually singled celled; right?

24  A.   Yes.

25  Q.   So that was only 36 patients back then?

1   A.   That's correct.

2   Q.   And now you are preparing to double cell with 72 people in

3   that same space that already had treatment space issues?

4   A.   That's the proposal.

5   Q.   So on your bed plan, you have a footnote here that says

6   that, (Reading:)

7        The L1 proposal is preliminary, as site assessments to

8        identify treatment and program space have not been

9        evaluated.

10       Does that mean you haven't identified treatment and

11  program space?

12  A.   No.  We know that we need to escort people from the L Wing

13  over to O Wing and we know that we need to look at the

14  scheduling of the O Wing.  As you recall, that facility is

15  fairly new and it's big.

16       There are gaps in the schedule that I think we can find

17  some efficiencies between the already existing CDCR Mental

18  Program working with our partners in custody and nursing to

19  make sure that we get the right complement of staff available

20  to provide the right care.

21  Q.   And when did treatment space that you're referring to

22  open?

23  A.   The O Wing?  I don't remember the year.  A few years ago.

24  Q.   Was it open when L Wing existed last time?

25  A.   I don't know when it came on.  I would be remiss if I

1  named a date that would be wrong.  The difference here,

2  though, is CDCR is running that program, and so while there's

3  been a historical concern about moving the populations across

4  the facilities, here we don't have that limitation.

5      That's one of the reasons this proposal makes so much

6  sense because you begin to grow CDCR's ability to provide that

7  full continuum of care.  We know that we can draw some

8  efficiencies with DSH by taking some of their patients as well

9  and opening up some other beds there.  We know that we have a

10  DBT Program going into L2, and assuming L1 remains EOP, look,

11  you have a whole continuum of care right there.

12      That is exactly what this case, and, frankly, what the

13  patients deserve because they then can come in and get a full

14  panoply of services.

15  Q.  You're proposing putting 72 people in a prison block, that

16  when you had 36 people there, DSH was unable to provide

17  sufficient treatment hours to and you have not yet identified

18  where or exactly how these people will receive ICF treatment.

19      Is that fair?

20  A.  That's unfair.

21  Q.  How is that?

22  A.  It's unfair because, again, I think I just explained that

23  we have, in fact, identified some space in O Wing.  I did also

24  say we need to work through schedules, but, most certainly,

25  there's a difference here between this proposal and the prior

1  practice, and the difference is that we're able to move people

2  more easily in our own facilities.  That's a simple truth.

3      We're committed to providing the requisite escort that is

4  needed to make sure we get people to the right location for

5  the right care.

6  Q.  O Wing currently treats EOP treatments; is that right?

7  A.  It does.

8  Q.  And does it also provide the care for P3 inpatient

9  programing?

10  A.  I don't believe it provides for P3.

11  Q.  And will the treatment to this DBT Program that you're

12  discussing on O2, where will the treatment for that occur?

13  A.  I think we found some treatment space there.  I need to go

14  back and look at the schedule, but I believe we found some

15  space.

16  Q.  So there are complications to this schedule that you have

17  not worked out at this point, right, as to where and when

18  you'll provide inpatient care to 72 people in a place, where

19  with 36 people, DSH was unable to provide treatment hours?

20  A.  I don't have a daily schedule worked out today, but

21  between now and the implementation of that, I expect to have

22  that all squared away.

23  Q.  Within two months?

24  A.  That is correct.

25  Q.  So you said to operate L1 you're going to need various

1    waivers from the court?

2    A.   That's correct.

3    Q.   And those waivers are because the units can't be safely

4    licensed or licensed at all under state law; right?

5    A.   At this point they can't -- I can't get a license for them

6    right now.

7    Q.   So in your bed plan, you count the 72 as a permanent unit,

8    but you don't yet have the waivers, and you're asking the

9    court to permanently waive health, safety and licensing for a

10   double celled ICF unit on a prison block in a unit that has no

11   dedicated treatment space?

12   A.   I could put that 72 in the same column as temporary

13   capacity.

14   Q.   Do you consider it temporary capacity?

15   A.   I think that while we've listed the CIM and the Sac beds

16   as temporary capacity, we have no current plans to take those

17   beds down.  In the same vein, bringing up 72 beds at CMF L1,

18   we wouldn't have any plans to take those down for the moment.

19   I could certainly put them in another column if that is easier

20   to understand.

21   Q.   I'm just asking you whether or not you plan on running

22   these as permanent units for your ICF Program?

23   A.   I would anticipate they would remain running until further

24   notice.

25   Q.   You'll have to take certain considerations into account

1    when you double cell people in this prison block unit; right?

2    A.   Of course.

3    Q.   Are those going to be similar considerations as to the

4    multi-person cells at SVPP?

5    A.   Yes.  There needs to be a review with IDTT to ensure that

6    you're putting the right folks in the right environment.  This

7    is about putting the right patients in the right bed.

8    Q.   Sure.  DSH typically has more trouble filling those

9    multi-person cells in, for instance, the dorms, the locked

10   dorms as well as the multi-person cells at SVPP than they do

11   other types of housing like single type cells, right?

12   A.   I'm not sure I can speculate --

13   Q.   I can direct you to Exhibit 1, which they produced today,

14   which shows the only available beds outside of ASH and

15   Coalinga and Patton are the multi-person cells at SVPP and the

16   locked dorms at Vacaville.

17       Do you expect to be able to utilize fully all 72 of those

18   beds all the time?

19   A.   I wouldn't be seeking the funding if I did not think we

20   could use the beds.

21   Q.   Let's discuss the lift and shift proposal, including what

22   is, essentially, part of that proposal, which is to run L1 at

23   CDCR -- a CDCR run DSH Program; right?

24   A.   So the lift and shift and L1 proposals are separate

25   because they're both inpatient and --

1  Q.   And they both involve CDCR running inpatient programs;

2  right?

3  A.   Sure.

4  Q.   So this isn't the first time CDCR has proposed a lift and

5  shift; right?

6  A.   I'm aware there have been discussions about lift and shift

7  for a number of years, but I'm not aware that there has been a

8  formal proposal through a Governor's budget to do exactly

9  this.

10  Q.   Are you aware that in 2006 defendants did propose this as

11  part of their bed planning process?

12  A.   I just said I was unaware.

13  Q.   So I'll represent to you that the court in 2007 ordered

14  the defendants to prepare and submit various plans in order to

15  transition any inpatient units, including a plan for

16  recruitment and hospital administrators.

17      Do you have a plan to recruit and retain hospital

18  administrators to run these 1,000 beds?

19  A.   We have a very comprehensive plan that includes everything

20  from labor to facility needs to policy review, training.  It's

21  very comprehensive, but it is also in the early stages of its

22  rollout and development, and so I'm sensitive to the need to

23  share this information, certainly, with yourself and with the

24  Special Master and the court because we literally just

25  released this with the budget.

1    Now is a perfect time to sit down and start having those

2    conversations, but we couldn't have done it until just now.

3    Q.   Fair enough.  But at the same time, you haven't provided

4    these plans to anybody, but yet you're representing to the

5    court this is the solution for the ICF waitlist problem?

6    A.   So what I'm representing is that it is a step towards

7    solving the problem.  I don't think anybody has suggested this

8    is an absolute silver bullet.  I would probably be naive if I

9    said that.

10    We're certainly willing to sit down and talk through what

11   we're doing and how we would like to affect the shift and can

12   do that at the convenience of the plaintiffs and Special

13   Master team.  Until now, we haven't been able to do that.

14   Q.   So are you asking the court to delay consideration of

15   issuing additional orders relating to the ICF waitlist because

16   of these proposals for L1 and lift and shift?

17   A.   I would suggest that orders that may mandate direction of

18   patients artificially from one location to another will

19   require the immediate attention of both my partners at DSH,

20   Director Ahlin, myself, and my staff.  That would most

21   certainly negatively impact our progress on the lift and

22   shift.

23    To the extent that orders are necessary -- strike that.

24   Let me rephrase.  My vast preference is that we be allowed to

25   focus on the lift and shift and I'm really concerned that

1  orders that correct this kind of an artificial movement will

2  actually take away from our ability to make a smooth

3  transition both for patients and staff alike.  We've got a lot

4  of work to do.

5  Q.  And so far you don't actually have any proposals or plans

6  to provide to the Special Master or to the court about exactly

7  what those plans look like?

8  A.  As of today, I do not, but I can get something together

9  fairly quickly.

10  Q.  So the lift and shift proposal on the Governor's proposed

11  budget depends on CDCR's ability to staff the transfer

12  programs, obviously; right?

13  A.  Of course.

14  Q.  But, in reality, CDCR often has a much harder time of

15  tracking and retaining clinic staff than DSH, even when

16  they're at the same facility; right?

17  A.  I'm not sure I agree with that.  There's a lot of flow

18  between DSH and CDCR, and I think you will find if you go to

19  some of the facilities, that many of the staff who currently

20  work at CDCR have worked at DSH facilities and vice versa.

21      So, certainly, we each have our own challenges in

22  staffing.  There's no doubt about that, but I don't know that

23  one location or one agency might be substantially different

24  than the other.

25      To that end we are actually working in realtime to

1    communicate with the teams out in the field so that they

2    understand what we're trying to accomplish and to give them a

3    level of confidence and security in the transaction itself.

4    Q.   Sure.

5        I'd like to pre-mark some exhibits.  Am I on Exhibit B at

6    this point?

7            THE COURT:  Yes.  The only thing you've marked

8    previously is A.

9            MS. ELLS:  Okay.

10           THE COURT:  You've referred to some documents by

11   docket number without marking them.

12           MS. ELLS:  Okay.

13           THE COURT:  You have about 14 minutes left.

14       We have two new exhibits, B and C?

15           MS. ELLS:  Yes.  Exhibit B, that I just premarked and

16   handed to you, is a cover e-mail dated Thursday, January 12,

17   2017, reporting that it is providing the Coleman monthly

18   report for November 2016.

19   Q.   Do you recognize this?

20   A.   I'm sorry.  Say again.

21   Q.   Do you recognize this document?

22   A.   We're looking at Exhibit B?

23   Q.   Yes.  Exhibit B, which is the January 12th, Mike Bien

24   cover e-mail concerning the CDCR staffing data.

25   A.   Yes.

1  Q.  Then Exhibit C is the monthly staffing report for DSH

2  facilities.

3      Have you ever seen this report?

4  A.  I don't look at DSH, but I see it's on their letterhead,

5  so I assume it's correct.

6          THE COURT:  The date of Exhibit C is January 14,

7  2016?

8          MS. ELLS:  Right.

9  Q.  And for Exhibit B, the date of the report is as of

10  November 2016, and, similarly, for Exhibit C, it's

11  November 2016.

12  A.  Okay.

13          THE COURT:  So there is a data typo on the cover of

14  C?

15          MS. ELLS:  Excuse me, Your Honor.  Yes, it was sent

16  on January 4th, but it contained data from November 2016.

17          THE COURT:  It was sent on January 4, 2017?

18          MS. ELLS:  Yes.

19          THE COURT:  Is that stipulated?

20          MS. ELLS:  Yes.

21          THE COURT:  All right.

22          MS. ELLS:  I'm still catching up.

23  Q.  Can I direct you to CHCF, CDCR's data.  Do you see that on

24  page 3 of 22 of Exhibit C?

25  A.  I do.

```
 1   Q.  And can I direct you similarly to the information for CHCF

 2   on Exhibit D, which is page 5?

 3            THE COURT:  Exhibit D?

 4            MS. ELLS:  Of C.  Excuse me.  Exhibit C.

 5            THE WITNESS:  Okay.

 6   BY MS. ELLS:

 7   Q.  So the staffing psychiatry rate for CDCR that you reported

 8   for CHCF is 66.67 for staff psychiatrists on page 4 of 12?

 9            THE COURT:  My Exhibit C has three pages.

10            MS. ELLS:  I'm talking about Exhibit B.

11            THE WITNESS:  I'm on page --

12   BY MS. ELLS:

13   Q.  Page 3 of Exhibit B refers to CHCF, and the data then

14   continues over to the next page for CHCF; right?

15   A.  Yes.

16   Q.  And do you see the line that says, "staff psychiatrist,"

17   referring back to the previous page?  The last column is for

18   percent vacant; correct?

19   A.  The last column is percent vacant, yes.

20   Q.  And "staff psychiatrist," you have 66.67 vacant staff

21   psychiatrist at CHCF right now; right?

22   A.  As of November 2016 --

23   Q.  Right.  Which is the most recently data that you provided

24   us --

25   A.  -- however, I can tell you there is hiring --
```

1    Q.   I appreciate that, but this date November 2016 shows --

2    A.   I'm assuming that is correct, yes.

3    Q.   This is your document, isn't it?

4    A.   It is, but I'm saying that that looks like the number that

5    you're reading, yes, I agree.

6    Q.   Let's turn to Exhibit C, which is DSH data for the same

7    program.

8    A.   Sure.

9    Q.   Page 5, line 2, "psychiatrist vacancy rate, 21.56."

10   Right?

11   A.   Yes.

12   Q.   So that's a dramatic difference within the same

13   institution; is that right?

14   A.   Yes.

15   Q.   So you discussed a lot of efficiencies that are going to

16   be gained with lift and shift, including this -- I think

17   40 percent and 50 percent reductions.

18        So one of the things that's not going to change, however,

19   is the requirement that CDCR actually transport the person

20   within 72 hours into the inpatient bed, right, once they're

21   accepted?  That's currently CDCR's function?

22   A.   Yes.  We're not looking to change that.

23   Q.   That will not change; right?  Okay.  This is an

24   exhibit I'm not entering into on 1-17, docket number 5549.

25        The third page -- the first page of Exhibit A, which is

1    page 6 of 15 of the PDF --

2    A.   Which page?

3    Q.   Page 11 of 15 of the document itself.   It shows a pie

4    chart and it's entitled, "Psychiatric Inpatient Program Trends

5    Acute Intermediate Level of Care."

6         Have you ever seen this document?

7    A.   Yes.

8    Q.   So in the shaded box under the chart on the left, it says,

9    (Reading:)

10        For the periods of May through December 2015, 82 people on

11        average were beyond the 72-hour transfer timeframe for the

12        period.

13        Is that accurate?

14   A.   That's what this report says.

15   Q.   On average, 82 people CDCR was unable to transfer within

16   72 hours into a bed?

17   A.   I actually think our compliance with that 72-hour

18   timeframe is quite good.   The challenge is that the trigger

19   for the 72 hours is, I think, what might be confusing this

20   point.   We have done an inquiry about the compliance with that

21   72-hour timeframe, and my recollection is that we're actually

22   quite compliant with that.   I would have to look.   I don't

23   know what the end is.   I don't know what the denominator is

24   there.

25   Q.   Regardless of the denominator, the average for the time

```
 1   period between May and December, on average, 82 people per
 2   month did not transfer within 72 hours.
 3        Is that accurate?
 4   A.   That's what this says, yes.
 5   Q.   Additionally, you've discussed additional problems with
 6   the MHCB process for getting people into beds.  I believe that
 7   you said that currently there are numerous open beds in the
 8   MHCB.
 9        Did you say 122 open?
10   A.   I believe there are 161 open as of January 20.
11   Q.   Nonetheless, there are 9 people waiting for over 24 hours;
12   right?
13        First of all, how many of those 161 vacant are male?
14   A.   I don't have that number, but I seem to think it is all.
15   Q.   All of them?
16   A.   I believe so.  I can confirm that.
17   Q.   And so there are, nonetheless, at least 5 men that are
18   waiting for over 24 hours to get into these 161 vacant beds?
19   A.   Yes -- actually, that's not true.  I think I mentioned
20   earlier one of those was a data entry --
21   Q.   So four?
22   A.   Four.
23   Q.   That's on one day; right?
24   A.   That's on one day.
25   Q.   Okay.  And how many referrals has CDCR made to Patton for
```

1  admission for a female patient in the last year?

2  A.  Let me go back just for a minute on the prior question.

3      Can you repeat the question?

4          THE COURT:  You need to wrap up in five minutes.

5          MS. ELLS:  I believe -- I don't remember what the

6  question was.

7          THE WITNESS:  I felt like there was something else I

8  needed to say to you.  The answer to your question about

9  Patton, have there been any referrals was your question?

10 BY MS. ELLS:

11 Q.  Yes.

12 A.  The answer is no.

13 Q.  And right now, the exhibit provided this morning that I

14 believe you discussed earlier, which is Defendants' Exhibit 2,

15 shows a census of 45 woman in the CIW PIP?

16 A.  Uh-huh.

17 Q.  And one accepted referral.  Where will that person go?  Is

18 that person referred to the PIP?

19 A.  Yes.

20 Q.  Where will that person go, given that the beds are full?

21 A.  We actually have five people pending discharge, one person

22 out to court.  We will be able to bring that person in quickly

23 and don't anticipate any challenges.

24 Q.  That will be within program guidelines?

25 A.  Admitted as soon as the bed is available.  It may be she

1   may already be in the bed.

2   Q.   But she also may not be and you don't know when that bed

3   will become available; is that right?

4   A.   The five pending discharges were imminent, so because that

5   was as of January 20, by today at 4:30, I would anticipate

6   she's in the bed.  I can't confirm that because I'm obviously

7   here, but I can get you that confirmation quickly.

8   Q.   And in previous months you have recorded multiple women

9   exceeding program guidelines for admission to a female

10  inpatient bed, and in none of those circumstances did you

11  submit a referral to Patton.

12      Is that right?

13  A.   We have communicated about potential needs, but we

14  haven't, in fact, submitted a formal request, in part

15  because --

16  Q.   I'm just asking:  Did you submit a referral for the people

17  that waited over program guide timelines to get in a female

18  inpatient bed?  Did you do that?

19  A.   No.

20  Q.   And are all of the women on the same timeline for program

21  guide or do you differentiate between acute timelines and

22  intermediate timelines for women?

23  A.   There's no differentiation between men and women.

24  Q.   When you report that all of these people are within

25  program guide timelines, are you differentiating as to whether

1    or not they were acute referrals or not?

2    A.   On the census bed here?  Exhibit 2?

3    Q.   Yes.

4    A.   I don't have that broken out here.

5    Q.   You do have a column -- okay.

6    A.   There is a column for less than 10 and less than 30, so

7    zero and zero.

8    Q.   I see that.  Thank you.

9         So you're aware of the program guide requirement to

10   transfer an MHCB patient into a bed within 24 hours of

11   referral; right?

12   A.   Yes.

13   Q.   Does your enclosure C to November to your monthly data,

14   which is your MHCB transfer data -- I can provide it to you if

15   you want to see a sample.

16   A.   Yes.

17              THE COURT:  This will be your last question.

18              MS. ELLS:  Sure.

19   Q.   Are you familiar with this document?  It was filed as an

20   exhibit to the Krista Stone-Manista declaration and provided

21   to us as part of the monthly document.

22   A.   Yes.

23   Q.   You're familiar with this report?

24   A.   Yes.

25   Q.   Is it your understanding that "hours waiting" refers to

1  the amount of time to when the person is actually put into

2  their bed?

3  A.    So it's the time that they are -- it may not be the time

4  they actually arrive, but it is the same time that they await

5  the transfer.

6  Q.    So it's the time they get on the bus?

7  A.    Yes.

8          MS. ELLS:    Thanks.

9          THE COURT:    All right.    Any redirect?    You have up to

10  11 minutes.

11          MS. O'BANNON:    Thank you, Your Honor.

12                      REDIRECT EXAMINATION

13  BY MS. O'BANNON:

14  Q.    Ms. Tebrock, in regards to female patient waiting, why

15  didn't you refer them?

16  A.    Well, good question.    We did communicate some potential

17  need, but I understand that having somebody placed at Patton,

18  because there is a process involved in each of the referrals,

19  it necessarily takes some time.    When we know -- let me

20  backtrack.

21      Our goal is always to get the patient into the right level

22  of care as quickly as possible.    When I know that it will take

23  a number of days to get a patient into Patton but I know that

24  much sooner than that I will be discharging somebody from the

25  CIW PIP so that I can place somebody into that open local PIP

1    bed more quickly, that's what we do.

2        We do it because we want to make sure we put the right

3    patient in the right bed at the right time, which means as

4    quickly as possible.

5    Q.   Currently there are five pending discharge, two ready to

6    go in the bed; correct?

7    A.   Yes.

8    Q.   And there is no referral because you assume pretty quickly

9    a woman will be placed in the bed; is that correct?

10   A.   Yes.

11            MS. ELLS:  Objection.  Leading.

12            THE COURT:  The answer will stand.

13            MS. O'BANNON:  Thank you, Your Honor.

14   Q.   I want to ask a couple more questions on Patton.

15        What are the reasons patients are unable to transfer

16   quickly?

17   A.   I'm not following?  To an inpatient bed?

18   Q.   Correct.

19   A.   There are a myriad issues that could impact timely

20   transfer.  Some of it may be the recisions we discussed, some

21   of it may be in terms of clogging up the system.  It might be

22   medical issues.  It could be any number.

23   Q.   Is the continuity of care considered?

24   A.   Certainly.  One of the things that we've done recently is

25   we've begun to regionalize the crisis beds.  The reason for

1    doing that is multifold.  One of the reasons is to help to

2    ensure that patients stay as local as they can to their home

3    institution.

4        We know the readmission rates to the hospital within 30

5    days is high when you move people away from their care team.

6    So when you begin to minimize the range you send somebody,

7    then if you have people who come back, they begin to learn

8    more about the patient and they're able to respond more

9    quickly to the patient's needs in the same way I like to have

10   my same doctors.

11       I've kept my doctor for many years.  Establishing that

12   continuity of care is important.  If I know that I -- if I can

13   wait an extra hour or two to make sure that the patient's

14   continuity of care is more complete, then I think that's in

15   the best interest of the patient and that's what we're going

16   to do.

17   Q.  That leads me to another question.  Inmates that are on

18   the waitlist, whether patent beds or other beds, are they

19   receiving care while they're awaiting beds?

20   A.  Absolutely.

21   Q.  What kind of care are they receiving?

22   A.  Program guide contemplates placement of the patients into

23   the crisis bed pending admission.  They get the care that they

24   can be afforded in that location.  They're seen every day by

25   clinical staff.  There is very frequent interaction with them

 1   and they're in a safe and secure environment.

 2           THE COURT:  What don't they get that's required by

 3   the program guide?

 4           THE WITNESS:  So in a longer term inpatient setting,

 5   there would be more movement, more programing opportunity

 6   because you would be out in more group settings more

 7   frequently.  There is some limitation in that regard, but

 8   short of that, they're seeing their clinician every week.

 9   They're having daily interaction with clinical staff.

10           MS. O'BANNON:  Thank you.

11   Q.  I'd like to call your attention back to document 5549 that

12   you were questioned about earlier.

13   A.  Yes.

14   Q.  I'd like you to take a look at page 4.  It's actually the

15   paginated numbers from the court docket.

16   A.  Okay.  Page 4 of the court docket?  Yes, got it.

17   Q.  Take a quick moment to look at that first paragraph and

18   familiarize yourself with that.

19           MS. ELLS:  Which document are you referring to?

20           MS. O'BANNON:  5549.

21           THE WITNESS:  Page 4 of 15?

22   BY MS. O'BANNON:

23   Q.  Yes.

24   A.  Okay.

25   Q.  If you could flip back to the chart.

```
 1                THE COURT:  Which page?
 2                MS. O'BANNON:  Page 1 of Exhibit C, same document.
 3                THE COURT:  Page 11 of 15?
 4                MS. O'BANNON:  That's correct, Your Honor.
 5   Q.   I want to call your attention back to the box that says,
 6   "total inpatient program pending list," and at the bottom it
 7   says, "beyond 72-hour transfer timelines average per period
 8   equals 82."
 9        Upon reviewing page 4, the second to the last paragraph,
10   does that refresh your recollection at all in regards to that
11   particular number?
12   A.   Yeah.  What we note in the letter is that in July of last
13   year we agreed to move patients, that patients referred to DSH
14   would be endorsed by HCPOP upon the decision review form, and
15   that the new process, essentially, makes redundant the
16   inpatient referral review.
17        So moving the endorsement date to the referrals process
18   results in more people looking like they're pending beyond the
19   72-hour timeframe, even though inmates are in fact within that
20   requisite timeframe.  This is a data snafu.
21   Q.   So the 82 number has been over-reported; is that correct?
22   A.   That's correct.
23                THE COURT:  You have two minutes left.
24                MS. O'BANNON:  Thank you, Your Honor.
25   Q.   I want to go back really quickly to the 100 crisis beds
```

1    that CDCR plans to build.

2        What are the nature of those beds?  Are they acute?

3    Intermediate?

4    A.   The request is actually to have them built as flexible

5    beds so that they will be used primarily for a crisis bed, but

6    they will also be able to accommodate the needs for the acute

7    or intermediate care need, depending on the need of the

8    population.

9        Of course the population is dynamic and so are the needs,

10   so one of the benefits of this proposal is it allows us to

11   adjust more quickly to the changing needs of the population.

12   It will -- in so doing, we're effectively building a little

13   more square footage and changes the staffing model to make

14   sure we get the right staffing for the higher level of care,

15   but it's a small adjustment for a big positive for the

16   population.

17   Q.   And this will allow you to use the beds that are in need

18   at that time?

19   A.   That's correct.

20   Q.   Just real quickly.  My time is short.

21       The Salinas Valley 58 beds, CDCR isn't going to wait until

22   all the beds are available to roll them out, are they, or are

23   they going to roll them out when ready?

24   A.   What I need to do is go back and look at the construction

25   plan to see how they'll be finished.  I don't anticipate that

1    they would wait until they're all completed.  It depends on

2    how the construction plan is laid out.  I don't have that

3    information in front of me today.

4    Q.   I believe --

5            THE COURT:  Last question.

6    BY MS. O'BANNON:

7    Q.   I believe in your filing, we agreed CDCR would provide the

8    activation schedules?

9    A.   Absolutely.

10           MS. O'BANNON:  Thank you, Your Honor.

11           THE COURT:  That concludes the presentation of

12   testimony.  You may step down.  Ms. Tebrock is excused.

13       Just to review what I would like filed by Friday of this

14   week:

15       First, if you can assist the court by each of you filing

16   an exhibit list clearly identifying your exhibits by the

17   identifiers you used here today with a clear title.

18       Also, if you can file -- you should meet and confer, and

19   if you agree that there is a document in the record that

20   reflects the floor plans for ASH and CSH, you can identify

21   that by a record citation, but if not, if defendants could

22   file those floor plans with a legend by Friday.

23       I'm not hearing any reasons the defendants can't

24   provide -- let's call it Exhibit 2A -- that includes MHCB

25   information.  That will be filed by Friday.  If you want to

1  direct me to information of which I can take judicial notice

2  with regard to MDO, again, meet and confer and see if you

3  agree.  If it's just a statutory citation, that's sufficient.

4      That's what I would direct now and then await a further

5  court order.  I will be calling for some very focused

6  briefing, but I'm going to focus on this.

7      Anything else anyone else needs to say today?  Ms. Thorn?

8          MS. THORN:  Your Honor, defendants, specifically

9  Department of State Hospitals, wants to offer the court the

10  opportunity for a site visit to Atascadero if the court feels

11  that would inform the court as to some of the points

12  defendants have made in their briefing and made today

13  regarding that environment for treatment of inpatient care.

14          THE COURT:  I'm aware of that offer.  I'll let you

15  know once I see the floor plans.

16      Anything else?

17          MR. BIEN:  If you go to Atascadero, Coalinga is near

18  by.

19          THE COURT:  All right.  The matter is submitted once

20  I see what you file on Friday by close of business.

21      (Proceedings concluded at 4:46 p.m.)

22                      ---o0o---

23

24

25

```
 1                        CERTIFICATION

 2          I, Michelle L. Babbitt, certify that the foregoing is

 3   a correct transcript from the record of proceedings in the

 4   above-entitled matter.

 5          Dated:  January 27, 2017.

 6

 7

 8                            /s/ MICHELLE L. BABBITT
                              MICHELLE L. BABBITT CSR #6357
 9                            Official Court Reporter
                              United States District Court
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```