# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
    **Plaintiffs**

    **v.**                       **No. CIV S-90-0520 KJM KJN P**

**EDMUND G. BROWN, JR., et al.,**
    **Defendants**

## SPECIAL MASTER'S REPORT ON THE
## STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION
## OF DEFENDANTS' STAFFING PLAN

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
February 6, 2017

## INTRODUCTION

As stated in the Special Master's Twenty-Sixth Round Monitoring Report, there is a long and tortured history behind CDCR's struggle to implement a viable staffing plan for the provision of adequate mental health treatment.  ECF No. 5439 at 12.  As previously reported, mental health staffing deficiencies within the California prisons were addressed in the *Coleman* Court's 1995 remedial order, when the Court ruled that the prisons were "significantly and chronically understaffed in the area of mental health care services."  *Coleman v. Wilson*, 912 F. Supp. 1282, 1307 (E.D. Cal. 1995).  In early 1996, the Special Master began an assessment of defendants' staffing ratios, filing his first report regarding their adequacy in November 1998. ECF No. 993.  The Special Master filed his first report addressing defendants' staffing vacancies in May 1999.  ECF No. 1032.  Since 1998, the Special Master has consistently reported on defendants' mental health staffing issues, to include 18 reports that directly or indirectly addressed staffing deficiencies[1], in addition to addressing staffing vacancies in all 26 of his monitoring reports.

---

[1] Special Master's Recommendations for Staffing Ratios, (filed 11/20/1998, ECF No.994); Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation, (filed 5/19/1999, ECF No.1033); Special Master's Report on Staffing Vacancies, (filed 5/19/1999, ECF No.1032); Special Master's Recommendations on Defendants' Request for Extension of Time to Staff Administrative Segregation and Expedite Transfers, (filed 2/8/2000, ECF No.1131); Special Master's Recommendation on the Development of a Retention Plan for Psychiatrists, (filed 4/24/2000, ECF No.1149); Special Master's Report and Recommendations on Psychiatrist and Psychiatric Social Worker Vacancies, (filed 12/20/2000, ECF No.1227); Special Master's Report on Defendants' Compliance with Staffing Enhancements for Administrative Segregation, (filed 9/25/2000, ECF No. 1206); Special Master's First Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 9/26/2001, ECF No.1304); Special Master's Report on the Defendants' Compliance with October 26, 2001 and December 20, 2001 Court Orders, (filed 2/22/2002, ECF No.1350); Special Master's Second Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 2/26/2002, ECF No.1351); Special Master's Third Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 7/10/2002, ECF No.1392); Special Master's Report on Defendants' Schedule of Differential Pay for Mental Health Clinicians in Specific California Department of Corrections Institutions, (filed 5/6/2005, ECF No.1661); Special Master's Report on the Impact of Defendants' Increases in Differential Pay for Mental Health Clinicians in California State Prison, Corcoran, (filed 2/15/2006, ECF No.1762); Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 6/21/2006, ECF No.1851); Special Master's Supplemental Report on the Status and Sufficiency of the Departments' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 7/28/2006, ECF No.1921); Special Master's Report on Plaintiffs' Response to the Sixteenth Report on Compliance Seeking Salary Enhancements for Department of Mental Health Clinicians, (filed

A June 13, 2002 *Coleman* Court order directed defendants to maintain the vacancy rate among psychiatrists and case managers[2] at a maximum of ten percent, including the use of contractors. ECF No. 1383 at 4. At around the same time, defendants commenced a field study to determine the necessary staffing levels required to implement recent Program Guide revisions. However, defendants repeatedly failed to fund the full complement of the staffing allocations recommended by the field study. As a result, the Court ordered defendants to prepare and present a proposal for no less than 530.65 permanent positions and 21.2 limited-term positions to a special session of the California Legislature in August 2006. ECF No. 1929 at 3. The legislature made appropriations for far less positions than proposed and requested that defendants conduct a workload study to determine the necessary level of staffing.

Defendants engaged outside consultants and the workload study was conducted over the course of six months in 2007. The completed study, which recommended 404 positions, was presented to defendants in June 2007. However, defendants did not submit a request to the legislature for those positions until April 2008. The legislature declined to fund additional staffing allocations until all vacant positions had already been filled.

After his review of the workload study in July 2008, the Special Master determined that although the concept and model were appropriate, the data used to calculate the number of allocations was faulty. Soon thereafter the workload study lost its momentum and was ultimately abandoned.

---

1/30/2007, ECF No.2121); Special Master's Response to Court's May 17, 2007 Request for Information, (filed 5/31/2007, ECF No.2253); Twenty-Sixth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, (filed 5/6/16, ECF 5439).

[2] "Case managers" refers collectively to psychologists and social workers, which are now referred to as "primary clinicians".

On June 18, 2009, the *Coleman* Court ordered defendants to develop another staffing plan. ECF No. 3613 at 2. As directed by the Court, the Special Master provided guidance and assistance in developing a workable plan. Defendants filed their staffing plan on September 30, 2009. ECF No. 3693. The Special Master endorsed the staffing plan on March 4, 2010. (See, Exhibit A attached hereto.)

In the April 5, 2013 order denying defendants' motion to terminate *Coleman* federal court oversight, the Court found that, "[c]hronic understaffing continues to hamper the delivery of constitutionally adequate medical care and is a central part of the ongoing constitutional violation in this action." ECF No. 4539 at 62. On March 18, 2014, in an order relating to activation of mental health units at California Health Care Facility, defendants were ordered to review whether the current salary schedule for prison psychiatrists was competitive within California and nationally. ECF No. 5116 at 12. In response to that order, defendants reported that their prison psychiatrist salaries were within the range of comparable salaries within California and nationally. ECF No. 5123 at 3. Defendants further reported that they had the authority to offer newly-hired psychiatrists salaries in excess of the minimum starting salary. *Id.*

On June 19, 2014, defendants were ordered to review the 2009 staffing plan, revising it as appropriate, in order to achieve compliance with the June 13, 2002 order. ECF No. 5171 at 4. The Special Master was to provide guidance and expertise where necessary and ensure that plaintiffs were provided notice and an opportunity for input as appropriate. *Id.* at 3. Defendants were ordered to report on the results of their review by September 12, 2014. *Id.*

After receiving an extension of time, defendants filed their "Report on Review of Mental Health Staffing" on February 2, 2015, in which they conceded that the vacancy rate among psychiatry positions, including the use of contract staff, was nearly 20 percent. ECF No. 5269 at

6.  As a remedy for staffing deficits for both psychiatrists and psychologists, defendants

proposed a four-pronged approach, which included:

1.  The creation of a psychiatric medical assistant classification to perform clerical tasks currently performed by psychiatry staff.

2.  The expansion of their psychologist internship program and reactivation of a fellowship program for psychiatrists.

3.  Offering differential pay for civil service psychiatrists and increasing contract rates for contract psychiatrists to work in hard to recruit locations.

4.  Continuing the recently expanded telepsychiatry program.

*Id*. at 6-10.

On May 18, 2015, defendants were ordered to proceed with the proposals in their report

and they were required to seek the approval of the Special Master and leave of Court before

making any changes in their existing mental health staffing ratios.  ECF No. 5307 at 6.  The

Special Master was ordered to report to the Court on the status of the implementation of

defendants' proposals within 180 days of the order.  *Id*.  On November 12, 2015, at his own

request, the Special Master was ordered to include his staffing report and recommendations in

his Twenty-Sixth Round Monitoring Report, in lieu of filing a separate report.  ECF No. 5377.

Defendants submitted their "CDCR Status Update to Report on Court-Ordered Staffing

Review," the first status update to their February 2, 2015 staffing plan proposals, on November

2, 2015.  Defendants submitted a second status update on February 1, 2016, at which time they

indicated that additional staffing positions for psychiatrists, psychologists and social workers had

been allocated, but gave no indication as to how many had been hired since their staffing plan

was proposed on February 2, 2015.

The Special Master filed his Twenty-Sixth Round Monitoring Report on May 6, 2016,

finding that defendants had "demonstrated no sense of the required urgency for a meaningful

implementation" of the February 2, 2015 revised staffing plan, resulting in little to no change in mental health staffing throughout the department. ECF 5439 at 21. As a result, he put forth a number of recommendations, the goal being to facilitate defendants' timely implementation of their staffing plan. *Id*. at 131.

The Twenty-Sixth Round Monitoring Report included the following table comparing staffing vacancies in 1998 to staffing vacancies in 2015 – a 17-year time span. *Id* at 27. The table further illustrates defendants' ongoing staffing problems, demonstrating how static the vacancy rates for psychiatrists and psychologists have remained over time.

| Position | Vacancy Rate 1998* | Vacancy Rate 2015* |
|----------|--------------------|--------------------|
| Psychiatrists | 35% | 32% |
| Psychologists | 14.8% | 15% |
| Social Workers | 26% | 10% |
| Recreational Therapists | 12.5% | 30% |
| Psych Techs | 15% | 21% |
| Clerical | 11.4% | 14% |

* Does not include contract staff.

On August 9, 2016, the Court issued an order adopting the Special Master's Twenty-Sixth Round Monitoring Report recommendations and including the following orders related specifically to staffing:

1. Defendants shall provide the Special Master with monthly updates on their implementation of their staffing plan, which implementation shall be tracked and monitored by the Special Master. Defendants and the Special Master shall meet and confer monthly to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained, all to resolve the continuing problem of mental health staffing in CDCR prisons in a thorough

and lasting way.  The Special Master shall include plaintiffs in these meetings as appropriate.

2.  Within one hundred twenty days (120) from the date of this order the Special Master shall issue a stand-alone report on the status of mental health staffing and implementation of defendants' staffing plan.

ECF No. 5477 at 8-9.

In keeping with the recommendations contained in his Twenty-Sixth Round Monitoring Report, ECF No. 5439 at 131, and a desire to address outstanding issues from the Twenty-Sixth Monitoring Round in a more focused manner than the regular quarterly policy meetings, in June 2016, the Special Master initiated the meet and confer process, convening the first of a series of all-parties workgroup meetings.  In addition to the Special Master and his staff, workgroup meeting participants included, among others, plaintiffs' counsel, representatives of CDCR defendants and defendants' counsel.

In meetings held over a period of seven months, the workgroup discussed the status of implementation of the four proposals in defendants' February 2, 2015 plan.  The workgroup also discussed a multitude of other proposals, including, cash for on-call compensation for all clinicians, dual appointments, psychiatric nurse practitioners, utilization management, establishing a mental health academy for new mental health staff, salary increases for psychiatrists and clustering.

During the course of the meet and confer process, it was determined that certain staffing proposals were complex and thus required additional time to plan and bring into fruition.  This led to a delay in defendants' submission of their final staffing plan.  As a result, on November 23, 2016, the Special Master requested a 60-day extension of time to file his report on staffing. ECF No. 5523.  On December 9, 2016 the Court granted the Special Master's request, ordering that his report on staffing be filed on or before February 6, 2017.  ECF No. 5530.

Defendants submitted their updated staffing plan to the Special Master on January 10, 2017. (See, Defendants' January 10, 2017 Updated Staffing Plan, attached hereto as Exhibit B.) On January 25, 2017, plaintiffs submitted their objections to the plan to the Special Master. (See, Plaintiffs' Objections to Defendants' January 10, 2017 Staffing Plan, attached hereto as Exhibit C.)

What follows is the Special Master's report on the status of mental health staffing and implementation of defendants' staffing plan.

## Defendants' January 10, 2017 Updated Staffing Plan

Defendants' January 10, 2017 updated staffing plan contained the four original proposals from their February 2, 2015 staffing plan, in addition to a number of new proposals that were introduced during the meet and confer process, resulting in a final staffing plan that included the following remedial measures:

- Use of medical assistants to assist psychiatrists
- Internship and Fellowship programs
- Increased pay rates for contract psychiatrists
- Telepsychiatry
- Cash for on-call compensation for all clinicians
- Dual appointments at additional institutions
- Psychiatric Nurse Practitioners
- Utilization Management
- Proposition 57
- Establishment of a Mental Health Academy
- Salary increases for psychiatrists
- Bed planning (clustering)

Generally, defendants' staffing plan is promising. For the reasons set forth below, however, the Special Master recommends that the defendants' staffing plan be adopted by the Court in part and rejected in part.

**I.     Status of Implementation of February 2, 2015 Staffing Plan Proposals**

**A.     Medical Assistants**

8

In an effort to positively impact psychiatrist recruitment and retention, the use of medical assistants was proposed as part of defendants' four-pronged approach to remedy staffing deficits in their February 2, 2015 staffing plan. Medical assistants perform numerous administrative tasks in the support of psychiatrists, including scheduling appointments, sending out physician orders for labs or medication, reminding inmates of appointments, making referrals to therapists and other physicians and meeting with the inmate prior to the appointment and collecting relevant data, among others.

Defendants continued to make sufficient progress on their proposal related to the use of medical assistants.[3] At the time of defendants' February 1, 2016, second status update, they employed 37 registry medical assistants at nine institutions. In their January 10, 2017 updated staffing plan, defendants reported an increase in the number of employed registry medical assistants to approximately 70 working at 18 institutions.

Since the filing of the Twenty-Sixth Round Monitoring Report, defendants have received approval to hire full-time medical assistants. Defendants reported that the California State Personnel Board approved the establishment of the civil service medical assistant classification in August 2016; the civil service exam was under development. All CDCR institutions will be allowed to hire registry medical assistants while the list of eligible candidates is being developed.

Plaintiffs granted that the use of medical assistants was a positive approach that over time may lead to an increase in the retention of psychiatrists.[4] However, plaintiffs expressed certain concerns about the proposal, including defendants' failure to provide the results of studies

---

[3] All references to defendants' January 10, 2017 Updated Staffing Plan, unless otherwise indicated, are the writer's summary of what is contained in Exhibit B.

[4] All references to plaintiffs' Objections to Defendants' January 10, 2017 Staffing Plan, unless otherwise indicated, are the writer's summary of what is contained in Exhibit C.

conducted regarding the position's efficacy.  Indeed, during the meet and confer process defendants committed to providing the workgroup with written results of psychiatrist surveys regarding their experiences with medical assistants.  As of the time of this writing, that information had not been produced.

The Special Master agrees that the use of medical assistants to work with psychiatrists has the potential to positively impact the recruitment and retention of psychiatrists.  However, the proposal has been in development for almost two years and must be implemented without further delay.

The Special Master recommends that defendants be directed to continue with the implementation of this proposal and report to the Special Master regarding statewide implementation of the use of civil service medical assistants on a quarterly basis.  The Special Master also recommends that defendants be directed to provide detailed, written results of the effect medical assistants have had at the institutions where they are used, including whether psychiatrist retention and productivity has improved.

During the recent meet and confer process, defendants admitted that, at times, medical assistants were being pulled away from their psychiatry assignments to work elsewhere.  The Special Master strongly urges defendants to develop a mechanism to ensure that this practice does not continue.  The issue will be monitored during the course of his regular monitoring visits.

**B.  Internship and Fellowship Programs**

In an attempt to increase the candidate pool for full-time psychiatrists and psychologists, defendants proposed psychiatrist fellowship and psychology internship programs at several CDCR institutions as part of their February 2, 2015 staffing plan.  The fellowship program,

which had been re-activated in 2015, employed licensed post-graduate forensic residents to treat inmates.  The psychology internship program provided a source of trained clinicians to work for CDCR upon completion of their internship.

Defendants' reported that both programs had been effective in recruiting new clinicians. However, considerably more progress was made with the psychology internship program.  At the time of defendants' February 1, 2016, second status update, there were two psychiatry fellows at San Quentin State Prison and 21 psychology interns at five institutions.  In their January 10, 2017 updated staffing plan, defendants reported there were two psychiatry fellows at San Quentin State Prison and 31 psychology interns at 11 institutions.  Defendants reported that in the fall of 2016, psychology interns were hired into permanent positions at four institutions, however, they did not report how many.

In their January 10, 2017 updated staffing plan, defendants also reported that they were working to expand the fellowship program as a psychiatry recruitment strategy and had contacted several schools in California and surrounding states that had fellowship programs. Although they indicated that some schools had expressed interest in developing a fellowship program with CDCR, defendants' report was vague; it did not identify the names or the number of schools that were contacted, indicate the status of any negotiations, or provide further specificity.

Plaintiffs expressed that both programs were positive, noting however, that the fellowship program was small, had much less of an impact than the internship program, and that there were not yet any firm plans for its expansion.  As reported above, the fellowship program had not expanded since the February 1, 2016, second status update and remained at two fellows.

The Special Master agrees that the internship and fellowship programs may continue to increase the candidate pool for full-time psychiatrists and psychologists, and recommends that defendants be directed to proceed with both programs, undertaking efforts to significantly increase the number of psychiatry fellows. The Special Master also recommends that defendants be directed to maintain and report to the Special Master on a quarterly basis, the number of fellows and interns who are hired as civil service employees and track the length of their employment.

### C. Increased Rates for Contract Psychiatrists

Increased rates for contract psychiatrists *and* differential pay for civil service psychiatrists in hard-to-recruit institutions was one of the original four proposals in defendants February 2, 2015 staffing plan. However, as discussed in more detail below, despite consistently providing past status updates regarding their efforts around pursuing differential pay for civil service psychiatrists, defendants left out any specific mention of it in their January 10, 2017 updated staffing plan. As a result, this section will primarily cover the surviving part of the proposal, increased rates for contract psychiatrists.

Although defendants reported to the Court in 2014 that their psychiatrist salaries were competitive within California and nationally, (ECF No. 5123 at 3) in their February 2, 2015 staffing plan they nonetheless proposed to increase contract rates for psychiatrists working in hard-to-recruit institutions. In their January 10, 2017 updated staffing plan, defendants reported that during the past 1.5 years they had increased rates for contract psychiatrists at 15 such institutions.[5] At the time of the writing of the Twenty-Sixth Round Monitoring Report,

---

[5] High Desert State Prison, Pelican Bay State Prison, Avenal State Prison, California State Prison, Corcoran, Pleasant Valley State Prison, the California Substance Abuse Treatment Facility, Kern Valley State Prison, Wasco State Prison, North Kern State Prison, Central California Women's Facility, Valley State Prison, Salinas Valley

defendants reported increased registry hours for psychiatrists at most institutions due to increased registry pay rates.  ECF No. 5439 at 19.  However, as plaintiffs pointed out in their objections to defendants' staffing plan, the most recent data available showed a significant fluctuation in overall psychiatry registry usage during the six-month time period between June 2016 and November 2016.[6]  In view of this and other factors, plaintiffs asserted that a dramatic pay raise was needed to boost recruitment and retention for both registry and staff psychiatrists.

The Special Master recommends that defendants be required to provide detailed information about the timing and the amount of the increase in contractor rates.  The Special Master further recommends that defendants be required to monitor the effect of salary rate increases on the usage of registry hours in order to determine whether further rate increases are necessary to assist in the recruitment and retention of psychiatry registry staff and report to the Special Master on a quarterly basis.

As stated above, defendants February 2, 2015 staffing plan also contained a proposal for differential pay for civil service psychiatrists working in hard-to-recruit locations.  In their November 2, 2015 staffing plan update, defendants reported that the proposal was being reviewed "as part of a statewide, multi-departmental initiative" and requested to provide the Special Master with a further update on January 31, 2016.  At the time of their February 1, 2016 second status update, defendants reported that they were working on providing pay differentials to psychiatrists hired at High Desert State Prison, Pelican Bay State Prison, Pleasant Valley State Prison, Avenal State Prison, California State Prison, Corcoran and the California Substance

---

State Prison, California Treatment Facility [*sic*], California Correctional Institute [*sic*] and California State Prison, Lancaster [*sic*]

[6] Source:  CDCR Secure Website for Monthly Reports, covering the period of November 2016.

Abuse Treatment Facility.  Defendants further reported that, "if the pay differential proposal is approved, it will be part of the 2016/2017 California State budget for legislative approval."

By the time the meet and confer process began in June 2016, defendants' position had changed.  In a June 1, 2016 third status update submitted to the workgroup for discussion, defendants reported that the pay differential would be handled through the collective bargaining process and provided no further details.  As stated above, the January 10, 2017 updated staffing plan dropped any specific mention of pursuing pay differentials.  The proposal was not included in a discussion of the original four Court-approved proposals from the February 2, 2015 staffing plan as it had been in all previous staffing plan updates.  Instead, defendants included a section in the plan titled, "Salary Increases for Psychiatrists" and reported on the issue in the vaguest of terms, a complete reversal from their prior positions and commitments to the Court regarding the pursuit of pay differentials for psychiatrists.  This detour from their previous Court-approved approach rendered defendants' proposal incomplete, in addition to proving terribly confusing.  The "Salary Increases for Psychiatrists" section is covered below under item II G.

### D.  <u>Telepsychiatry</u>

The inability to hire and retain on-site psychiatrists has plagued CDCR for the last 19 years and defendants have been unable to remedy this chronic problem.  Unless and until defendants can increase the rate of recruitment and retention of on-site psychiatrists and reduce the vacancy rate to ten percent or less, all options must be explored without sacrificing the ability to provide adequate psychiatric treatment to inmates participating in the MHSDS.

The use of telepsychiatry was first proposed nearly two decades ago as a method of providing mental health treatment to CDCR inmates and was already in use in 12 facilities by October 1999.  ECF No. 974 at 3.

The Statewide Telepsychiatry Program was one of the four original prongs in defendants' approach to reduce staffing vacancies, and employed 28 staff psychiatrists working out of three offices at the time of defendants' submission of their "Report on Review of Mental Health Staffing" on February 2, 2015. By January 2017, the telepsychiatry staff had grown to 48 providing services to 18 institutions with an intended expansion to 100 working in three locations, Elk Grove, San Quentin and Rancho Cucamonga. However, in order to accommodate this expanding program, additional office space is required which will not be fully completed until 2018.

Plaintiffs disagree with the apparent proposed use of telepsychiatry at all levels of care with no limitations or parameters. Plaintiffs also object to anything but a temporary use of telepsychiatry in an MHCB setting, and a limited use of it for EOP level of care inmates. They assert that it should be used as a supplemental measure in addition to on-site psychiatrists, as plaintiffs fear that psychiatrists are merely moving from institutions to call centers, further depleting the existing shortage of on-site psychiatrists. Finally, plaintiffs believe that this remedy will take too long to implement at a time when relief is needed immediately.

Defendants indicated that their preference was to use on-site psychiatrists whenever possible rather than telepsychiatrists – a view shared by the Special Master's experts. Although the Special Master's experts have determined that telepsychiatry is a viable method for the delivery of mental health services, this does not come without admonitions and parameters.

Telepsychiatry should serve as a supplement for on-site psychiatry, not as a substitute and should only be utilized when institutions are unable to recruit psychiatrists to work on-site. In no circumstances should this method of delivering mental health treatment relieve CDCR of their obligation to continue their efforts of recruiting full-time psychiatrists to work on-site at the

facilities.  The convenience of telepsychiatry should also not serve as a reason to allow on-site psychiatrists to migrate to the comfort of remote off-site offices.  It cannot be emphasized enough that telepsychiatry should not replace on-site psychiatry, a concern shared by plaintiffs' counsel.  An example of such a problem would be to allow the use of telepsychiatry at the California Institution for Women and the California Institution for Men by psychiatrists working out of the Rancho Cucamonga offices.  The proximity of those two facilities to the Rancho Cucamonga offices voids any reason for not providing on-site psychiatrists and would undermine the very purpose of the telepsychiatry program.  Similar arguments can be made regarding the use of telepsychiatry at Mule Creek State Prison and the California Health Care Facility given their proximity to Elk Grove, a point plaintiffs raised in their objections to defendants' January 10, 2017 updated staffing plan.

Telepsychiatry is not clinically desirable as a frontline approach to providing psychiatric services for inmates with the most intensive or emergent needs.  The higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment.  For 3CMS level of care inmates, it is an appropriate option with the requirement that the telepsychiatrist work on-site at least twice per year at the designated institutions and more frequently if feasible.  Although the efficacy of telepsychiatry for EOP inmates is not clear or recommended as a permanent solution at this time, it would be recommended that a psychiatrist be on-site at least quarterly to treat EOP inmates, given the frequency of psychiatric contacts required by the Program Guide.  The Special Master's experts observed EOP inmates receiving treatment using telepsychiatry and it appeared to function properly, but additional data would need to be examined before further expansion for EOP inmates could be endorsed.   The use of

telepsychiatry for inmates at the EOP level of care will be monitored by the Special Master during his regular monitoring visits, or more frequently if necessary.

For inmates at the MHCB level of care, telepsychiatry is not an appropriate method of treatment to be used on a regular basis. Telepsychiatry for these higher acuity inmates should only be used as a last resort or in emergency situations when an on-site psychiatrist is not available. On-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing and other mental health staff. This is just not possible with telepsychiatrists. In addition, on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates which often has an important impact on diagnoses and treatment planning. The ease of multidisciplinary interaction on-site is especially important in regards to emergency consultation, which is essential at the higher levels of care and much better accomplished with on-site psychiatrists.

The Special Master recommends the continued expansion of the telepsychiatry program with the caveats expressed above. The Special Master further recommends that defendants be required to report their progress to the Special Master on a quarterly basis.

## II.    **Defendants' New Staffing Plan Proposals**

### A. **Cash for On-Call Compensation for all Clinicians**

CDCR has modified the method of compensation for those clinicians who remain "on-call," including psychiatrists. Clinicians were previously compensated for on-call time with leave credit, or additional time off. Defendants now compensate on-call clinicians with cash payments which should serve as a more attractive incentive for psychiatrists to work additional on-call times with the expectation of improving retention. This change was made as a result of

staff feedback.  Plaintiffs had no objection to this proposal, but did not believe that it would have much of an impact.

Time will tell if plaintiffs are correct, but defendants are nevertheless encouraged to continue with this element of their plan, and report their progress to the Special Master on a quarterly basis.

### B.  Dual Appointments at Additional Institutions

CDCR had a policy in place at three institutions allowing staff psychiatrists to accept a second position at a different institution on a quarter time (.25) basis, on weekends or their regular day off.  As a measure to increase psychiatry fill rates, defendants expanded the use of these dual appointments statewide.  Plaintiffs expressed concerns that working additional days would cause full-time psychiatrists to be less efficient and possibly less effective as clinicians.

As dual appointments were limited to a quarter time (.25) basis, at this stage it is unclear whether there is cause for concern regarding a potential for decline in clinical efficiency and effectiveness.

The Special Master recommends that defendants be encouraged to continue forward with this proposal, reporting to the Special Master on a quarterly basis regarding its effectiveness in decreasing vacancy rates and its impact on staff retention.

### C.  Psychiatric Nurse Practitioners

Defendants proposed to recruit psychiatric or mental health nurse practitioners to provide psychotropic medication management to 3CMS inmates in place of psychiatrists.  A civil service nurse practitioner classification already existed.  In their January 10, 2017 updated staffing plan, defendants reported that they were currently developing a recruitment plan with the goal of

beginning nurse practitioner hiring in early 2017.  Nurse practitioners would be supervised by the institution's chief psychiatrist or senior psychiatrist supervisor.

Plaintiffs agreed that the use of psychiatric nurse practitioners was potentially very helpful.  However, plaintiffs expressed concern that discussions during the meet and confer process revealed that there were a limited number of trained and licensed psychiatric nurse practitioners in California.

The Special Master agrees that the use of psychiatric nurse practitioners could positively impact mental health treatment.  The Special Master recommends that defendants be directed to continue with their proposal to recruit and hire psychiatric nurse practitioners and report their progress to the Special Master on a quarterly basis.

**D.  Utilization Management**

During the recent meet and confer process, defendants admitted that utilization management was not something they had done well.  CDCR's proposed implementation of utilization management to address staffing shortages is designed to reduce the mental health population and in turn reduce caseloads for clinicians so they can service those inmates who meet criteria for inclusion in the MHSDS.

In a workgroup meeting, the Special Master and plaintiffs raised the concept of reducing the 3CMS population through criteria currently existing in the Program Guide which could possibly result in reduced staffing ratios.  Defendants were reminded that objective standards were contained in the Program Guide allowing them to identify a subset of 3CMS inmates to be reviewed for possible discharge from the 3CMS program.  Specifically, the Program Guide states that inmates may be clinically discharged from the 3CMS program if they have been in

continuous remission and are functioning adequately in the mainline program without treatment, including medication, for six months.  MHSDS Program Guide, 2009 Revision, pg. 12-3-13.

Following those discussions, on November 15, 2016, defendants issued a statewide memo to the chiefs of mental health directing them to review inmates at the 3CMS level of care to determine if discharge from the 3CMS program was warranted.  This memo was reviewed by the Special Master, his team of experts and plaintiffs and there were no objections to its adoption and implementation.

Defendants have identified approximately 5,000 inmates statewide at the 3CMS level of care who meet objective criteria for possible discharge from the program.  Although a 3CMS inmate may meet objective criteria for review for possible discharge, a clinician may still determine that the inmate should be retained in the mental health program based on a clinical review and the need for ongoing therapy.  As previously stated, the desired outcome of this process is to remove inmates from the program who no longer meet the standards for inclusion in the 3CMS program, thereby reducing the 3CMS population with a concomitant reduction in caseloads for clinicians.  Defendants will be conducting these reviews quarterly.

It is unclear how much of an impact this measure will have on staffing resources. However, the Special Master recommends that defendants be encouraged to continue in their efforts and report any results to the Special Master and plaintiffs on a quarterly basis.

Defendants have recently proposed a similar approach in regards to the EOP population. However, the manner in which the preliminary concept is presented in defendants' January 10, 2017 updated staffing plan gives the impression that it has been endorsed by the workgroup.  In actuality, during the recent meet and confer process defendants provided the workgroup with a memo for review and comment.  During a discussion of the memo, a myriad of concerns were

raised by plaintiffs and the Special Master's experts, which are codified in plaintiffs' objections, discussed below.  Central to those concerns was that the memo would lead to a wholesale removal of inmates from the EOP program, as the underlying implication of the memo seemed to be that clinicians should seek to remove EOP inmates from their caseloads.

Unlike with the 3CMS level of care, there are no objective criteria codified in the Program Guide to trigger an automatic review of EOP inmates for potential discharge from the EOP program.  Since there is no objectively defined subset of the EOP population that can be identified as warranting a review for possible discharge from the EOP program, this leaves clinicians with no alternative but to review every EOP inmate.  The concern then, turns to how to deliver the message to clinicians in order to avoid any interpretation of the memo as a mandate to reduce the EOP population.  Defendants have previously stated that an informal review yielded no results of inmates being inappropriately placed at the EOP level of care.  It would be more productive for defendants to select an institution with a high EOP population to determine if this type of review produces any measurable results or select another methodology to review a sample of the EOP population.

In their objections to defendants' January 10, 2017 updated staffing plan, plaintiffs state that there is no evidence that defendants are currently providing unnecessary treatment to inmates at the EOP level of care.  Plaintiffs provide examples of various targeted methods to determine if EOP inmates are clinically appropriate to remain at the EOP level of care without the necessity of evaluating every EOP inmate system-wide.

The Special Master shares in plaintiffs' concerns and believes that different methodologies are available to evaluate the proper or improper retention of inmates at the EOP level of care.  Until such time as more information has been provided and the parties have had

the opportunity to thoroughly vet the memo, it is the recommendation of the Special Master that this provision of defendants' plan be rejected at this time and that the parties be ordered to meet and confer to fully explore all options to ensure that all EOP inmates are being treated at the appropriate level of care.

### E.  Proposition 57

The Public Safety and Rehabilitation Act of 2016, or Proposition 57, was passed by the California voters on November 8, 2016 and created certain parole and earned credit changes for CDCR inmates.  In their January 10, 2017 updated staffing plan, defendants advanced Proposition 57 as a remedial measure which they anticipated would reduce the prison population overall, thereby reducing the MHSDS population and resulting in a parallel reduction in staff. While the regulations for the measure are not expected to be implemented until October 1, 2017, defendants have reported that they expect a reduction of the total inmate population by 1,959 in 2017-18.  They did not, however, offer any projection for a reduction in the MHSDS population.

Currently, in addition to the staffing crisis, CDCR is in the midst of a population crisis. The MHSDS population ballooned at the same time that the overall total prison population has dramatically decreased.  To illustrate, in June 2008, at the height of CDCR's population crisis, the total MHSDS population was 34,035.[7]  As of November 2016, the total MHSDS population was 36,645, an increase of almost eight percent.[8]  Simultaneously, in June 2008, the overall total inmate population was 159,488.[9]  As of November 2016, the population had decreased to 117,306, or 26 percent.[10]  As these figures demonstrate, the MHSDS census numbers continue to

---

[7] Source:  CDCR Secure Website for Monthly Reports, covering the period of June 2008.
[8] Source:  CDCR Secure Website for Monthly Reports, covering the period of November 2016.
[9] Source:  CDCR Website, Population Reports, Weekly Archives as of midnight June 18, 2008.  This number only includes inmates housed in the institutions and camps.
[10] Source:  CDCR Website, Population Reports, Weekly Archives as of midnight, November 2, 2016.  This number only includes inmates housed in the institutions and camps.

rise and unless the population drops precipitously this trend will have a distinct impact on staffing, exacerbating yet another crisis.

While defendants should be applauded for their efforts in this regard, it is much too soon to know what the effects of Proposition 57 will be, if any, on reducing the MHSDS population and leading to decreased staffing needs. Considering this, and that the implementation of Proposition 57 is so far in the future, any reliance on future projections at this stage, would be premature.

### F. Mental Health Academy

In an effort to impact staff retention, defendants proposed to develop a Mental Health Academy orientation program for new mental health staff. Defendants reported that the program's objective was to provide "a uniform approach on policies, procedures and expectations when staff is first hired." Defendants indicated that they anticipated the program would have a positive impact on staff retention, but provided few additional details regarding the proposal. The program was reported to be in the early stages of development, with no date set for implementation. Plaintiffs offered no objections to this proposal.

Any program that could potentially result in mental health staff retention should be encouraged. At this level of crisis in staffing, all positive efforts advanced by defendants to aid in solving the chronic problem of staffing vacancies should be encouraged.

Granted, the proposal is in the very early stages of development, making it too soon to consider its potential outcome. Nonetheless, the Special Master recommends that defendants be directed to move forward, updating the Special Master as to their progress on this proposal on a quarterly basis.

### G. Salary Increases for Psychiatrists

As reported above, although in 2014 defendants represented to the Court that CDCR psychiatrist salaries were competitive within California and nationally, they still subsequently proposed and then undertook efforts to increase both registry and civil service psychiatrist salaries at hard-to-recruit institutions. In doing so, defendants effectively admitted through their actions that psychiatrist salaries were actually not competitive enough to impact the recruitment of psychiatrists to work at CDCR institutions. Offering differential pay for civil service psychiatrists (and increasing contract rates for contract psychiatrists) to work in hard-to-recruit locations was one of the original four proposals from defendants' February 2, 2015 staffing plan.

Throughout the recent meet and confer process, defendants repeatedly asserted that the issue of salary increases was being addressed through the collective bargaining process and they could provide no further information on the subject. Through this repeated assertion, defendants implied that the mere act of engaging in the collective bargaining process satisfied their Court-ordered directive to consider salary increases as a measure to recruit and retain psychiatry staff. Indeed, the section on this issue in defendants' January 10, 2017 updated staffing plan read:

> This Court has also directed that CDCR consider increasing the salaries of the psychiatry staff to make the work in its institutions more attractive. CDCR agrees that it should examine salaries and its fulfilling this directive by engaging in the collective bargaining process with the union representing the psychiatrists. The negotiations between the union representing psychiatrists and the state of California are ongoing. As bargaining processes are fluid and confidential,[11] CDCR cannot provide an estimated end date or disclose the substance of the negotiations, but is optimistic about a positive bargaining outcome with psychiatrists. See, Exhibit B at 5.

---

[11] A footnote to defendants' plan read: "Before contract negotiations begin between the state and a union, a formal understanding about the bargaining process is reached. This includes a provision to not speak publicly about proposals at the bargaining table, including those involving salary increases. A violation of this agreement could result in unfair practices charges brought before the Public Employees Relations Board. The Legislature has recognized the confidentiality of the bargaining process by exempting it from the Public Records Act. (See Cal. Gov. Code, § 6254(p).) CDCR also is mindful that if one party violates the terms of confidentiality, it will chill the bargaining process." See, Exhibit B at 5.

Because the details of the ongoing collective bargaining negotiations are confidential, it is impossible for the Special Master to know if the outcome would have a positive effect on the staffing crisis.

This portion of defendants' staffing plan is unacceptable. It does not provide any additional details and does not fulfill the Court's stated directive that defendants present more than a "mere plan" and "demonstrate clear action in accordance with planned steps and a measurable timeline by which those steps will be completed." ECF No. 5477 at 6. Further, the collective bargaining process may not keep pace with salary increases that could occur in the region in years to come. It may be necessary to put a consistent benchmark in place that would lead to regular salary increases.

Alternatively, it may be time for defendants to offer a salary survey for the Court to adopt as they did in 2006. In 2006, CDCR provided the Special Master with a proposed schedule of pay for CDCR mental health clinicians. ECF No. 2081-11 at 11-14. In essence, the proposed schedule of pay was a salary survey, which was adopted by the Court on December 14, 2006. ECF No. 2083. It may be time for CDCR to develop another salary survey that the Court can consider for adoption.

Taking into account defendants' longstanding elevated psychiatry vacancy rates, as well as their past self-reported and subsequently Court-ordered efforts to increase psychiatry salaries, it is not reasonable that they would take their current position and decline to provide any information during the meet and confer process, or in their January 10, 2017 updated staffing plan regarding possible plans to increase salaries.

In their objections to defendants' January 10, 2017 updated staffing plan, plaintiffs indicated that defendants' failure to raise psychiatrist salaries in any significant way was responsible for their inability to recruit psychiatry staff. To illustrate the urgency required in addressing the issue, plaintiffs offered that in the two-year time period between November 2014 and November 2016, the EOP population grew 23 percent, while the number of psychiatrists

working for CDCR grew less than three percent. This resulted in an increase in the number of EOP inmates per psychiatrist from 29.6 to 42.2 during this time period. Plaintiffs expressed strong objections to defendants' position that they could not provide any information regarding plans to increase salaries or studies about pay because the issue was part of the collective bargaining process.

For the aforementioned reasons, defendants' preliminary report regarding salary increases for psychiatrists is woefully incomplete. The Special Master recommends that within 90 days, defendants be directed to inform the Special Master "of the results of final collective bargaining agreements with all categories of mental health and medical staff that impact the delivery of mental health services, with a focus on any changes in existing terms of collective bargaining agreements that may enhance or impede future recruitments in each category," as required by the *Coleman* Court's June 13, 2002 order. ECF No. 1383 at 4. If the collective bargaining process remains ongoing, defendants should be required to develop a benchmark that can be adopted by the Court, or in the alternative, develop a salary survey for the Court to consider.

### H. **Bed Planning (Clustering)**

In its August 9, 2016 order, the Court directed defendants to meet and confer with the Special Master regarding, among other things, clustering higher-acuity mentally ill inmates at institutions that are more readily able to recruit and retain mental health staff as a part of a plan to resolve the longstanding staffing issues facing CDCR. ECF No. 5477 at 8-9.

In response to the Court's order, defendants submitted a plan that has expanded or will expand the number of EOP beds at existing institutions with EOP programs except one, Pelican Bay State Prison, which was closed to EOP inmates because it was at a hard to recruit location.

Defendants' interconnected rationale for its clustering plan as presented are: (1)

26

"overfilling an institution with the most acute patients can have a negative impact on the staff and mental health delivery program" and (2) there is a serious risk of staff fatigue posed by "an overload of difficult cases" at institutions due to "over clustering." Defendants described their bed plan as a "careful compromise between absolute clustering and decentralized services." See, Exhibit B at 7.

Plaintiffs objected to the clustering plan characterizing it as "far too limited in scope and the clustering is at the wrong locations." See, Exhibit C at 7. Plaintiffs pointed out that while closing a small EOP program at Pelican Bay State Prison, defendants' bed expansion plan effectively creates large clustering of EOP beds at several institutions that are already difficult to staff, and the plan will only result in worsening the current staffing problems.

The Special Master agrees that the EOP bed expansion plan as currently designed does not address the core of the Court's order regarding clustering, which is to consider placing "higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained." ECF No. 5477 at 8. True clustering, for example, would be closing a hard-to-recruit institution such as High Desert State Prison to intake, and placing those MHSDS inmates in an institution that has the ability to recruit and retain mental health staff. At its core, all defendants' plan does is dramatically expand EOP beds at a number of institutions that defendants themselves described as hard-to-recruit institutions in their February 2, 2015 staffing plan, particularly in psychiatry, which was discussed earlier. For example, the vacancy rates in November 2016 for both on-site and telepsychiatry for Kern Valley State Prison, California Substance Abuse Treatment Facility, California State Prison/Los Angeles County, and California State Prison, Corcoran were 54 percent, 46 percent, 47 percent,

and 33 percent respectively.[12]  The EOP clustering plan offered by defendants is inadequate; it does not resolve the issue of recruiting and retaining staff in its current iteration.

The Special Master recommends that defendants be directed to develop a *true* clustering plan within 90 days that expressly demonstrates how defendants propose to recruit and retain mental health staff at each designated cluster institution in order to resolve the long-standing staffing problems in CDCR.  The plan should be developed under the guidance and assistance of the Special Master with input from the plaintiffs as appropriate.

## CONCLUSION AND RECOMMENDATIONS

As it applies to staffing, CDCR has historically undertaken a piecemeal approach.  As a result, their efforts are never sufficient or long-lasting.  The Court was clear in articulating what was expected of defendants in terms of their staffing plan.  While the Special Master believes that defendants have put forth a strong effort, as stated above, there are certain elements of defendants' updated staffing plan that are lacking in details or otherwise deficient, and thus cannot be adopted.  However, that does not preclude the adoption of the remaining elements of the plan.

In view of all the foregoing, the Special Master recommends:

- That the Court enter an order directing defendants to proceed with the implementation of their staffing plan proposals related to medical assistants, internship and fellowship programs, increased rates for contract psychiatrists, telepsychiatry, cash for on-call compensation, dual appointments, psychiatric nurse practitioners, utilization management relating to 3CMS inmates, Proposition 57, and the Mental Health Academy, which includes the above recommendations;

- That the Court reject defendants' staffing plan proposals on utilization management related to EOP inmates, salary increases for psychiatrists, and clustering, and that the Court enter an order that defendants be required to develop a supplemental plan to address those areas, which includes the above recommendations;

---

[12] Source:  CDCR Secure Website for Monthly Reports, covering the period of November 2016.

- That the Court enter an order directing the defendants and the Special Master to meet and confer every 90 days until the staffing plan is fully implemented, including plaintiffs as appropriate, to discuss the status of defendants' implementation of the adopted staffing plan proposals as outlined in the recommendations above.

Respectfully Submitted

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

February 6, 2017

EXHIBIT A

*counselors at law*                                                                                    www.pldwlaw.com

March 4, 2010

***VIA ELECTRONIC MAIL***

Debbie Vorous, Esq.                          Michael Bien, Esq.
Deputy Attorney General                      Rosen, Bien & Galvan, LLP
State of California                           315 Montgomery Streets,
Department of Justice                         Tenth Floor
1300 I Street                                San Francisco, CA 94104
Sacramento, CA 94211

RE: Defendant's Staffing Plan

Dear Ms. Vorous and Mr. Bien:

Adequate mental health staffing in the prisons of the California Department of Corrections and Rehabilitation (CDCR) has been one of the core directives of the *Coleman* court since its entry of the remedial *Coleman* order in 1995. To this day, it remains a critical element of CDCR's responsibilities to its inmates who are mentally ill. The *Coleman* court's most recent directive on staffing is embodied in its order dated June 17, 2009, in which the court required defendants:

> to take all steps necessary to resolve all outstanding staffing
> allocation issues. To that end, defendants shall complete a staffing
> plan by the end of August 2009. The plan shall be developed
> under the guidance of the Special Master following the model that
> was used to develop the activation schedules and the short-term
> and intermediate plan before the court.

To facilitate the defendants' task, I selected and appointed a group from my staff to guide and assist CDCR in the development of a workable staffing plan. This group was led by Jeffrey Metzner, M.D., a nationally recognized expert in psychiatric care in the correctional setting, and included *Coleman* Deputy Special Master Mohamedu F. Jones, Esq., mental health experts Raymond Patterson, M.D. and Ted Ruggles, Ph.D., and monitors Patricia Williams, Esq. and Haunani Henry. CDCR participation was headed by Sharon Aungst, Chief Deputy Secretary of Correctional Health Care Services (DCHCS), and included representatives of the CDCR Legal Department, Department of Adult Institutions (DAI), Budget Department, DCHCS, and the *Plata* receiver's nursing staff, as well as the California Department of Finance (DOF) and the California Department of the Attorney General.

Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 2

Ms. Aungst led the development and refinement of the staffing plan from the beginning to the end of the process. She gave the project a scope that was broader than required by the *Coleman* court order, resulting in a plan that is sufficiently comprehensive to address not only the mental health parameters of the court order, but also a number of needs that fall within some of the other inmates' rights cases, including those involving medical care, dental care, and accessibility to care pursuant to the Americans With Disabilities Act. I agree with and support Ms. Aungst's decision to take this more comprehensive approach to the staffing plan. I believe that it will help alleviate many staffing problems in years to come.

The *Coleman*-CDCR workgroup met in-person in Sacramento, beginning on July 1, 2009, and thereafter on July 16, August 4, 13, 25, and September 9, 2009, and by teleconference on August 19, 2009. CDCR produced its plan on September 30, 2009. From December 2009 to February 2010, I and my staff met with defendants, plaintiffs, and other key participants over the course of five more in-person meetings and teleconferences to further refine the plan. The process was arduous but productive. Its end result is a staffing plan that is grounded in a large investment of both clinical and administrative time and talent. I recommended it for adoption and implementation.

## The Process

As stated above, the staffing plan workgroup had its kick-off meeting on July 1. Unlike in the Workload Study ("the Study," also sometimes referred to as the Staffing Analysis Model or SAM), CDCR decided to utilize a straight ratio model for its ease of application and explanation, and to build into the plan a "relief factor" for vacation and sick time. On August 4, 2009, CDCR group members had prepared and presented preliminary working documents, including a purpose-and-background document covering all areas and a breakdown of clinical and non-clinical tasks. CDCR group members reported that they were developing a table that would include all positions needed for each program area, their recommended staffing ratios, and all of the data sources on which they relied.

At the next meeting, on August 13, 2009, CDCR reported significant progress, including having obtained data from six other state correctional systems for comparison purposes. It was decided that all positions other than clinical supervisors will have a relief factor for five-day operations. Staffing ratios were reviewed and discussed for reception center intake (screening and evaluation), the Enhanced Outpatient Program (EOP) for general population, EOP administrative segregation, EOP reception center, EOP condemned, the correctional clinical case management system (3CMS) for general population, 3CMS reception, 3CMS administrative segregation, and 3CMS secured housing unit (SHU) and psychiatric services unit (PSU). The management structure being developed had a director of mental health services, a clinical director for institutions with 500-plus mental health caseload inmates, and a senior psychiatrist for institutions with a mental health crisis bed (MHCB) unit for three or more major mental health programs. The clinical director position would be open to psychiatrists, psychologists, and possibly to social workers at the smaller institutions. Current chief psychiatrists would



Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 3

remain in place, but psychiatry positions would preferably be utilized to meet clinical rather than administrative needs, as they should be.

At its teleconference on August 19, 2009, the group worked on staffing ratios, which did not include positions for central office staff. At an in-person meeting on August 25, 2009, Ms. Aungst presented an overview of the staffing ratios for each program area. She said that the remaining tasks of finishing the ratio spreadsheets and written justifications, sending them to the budget department (which would then include the relief factors), verifying the positions, costing-out the package, and submitting the plan to the Department of Finance for review would consume another month, meaning that CDCR needed a 30-day extension beyond the court's deadline of August 31, 2009. That meeting concluded with a commitment that the ratio spread sheets would be simultaneously submitted to the Budget department and the *Coleman* group, with all justifications, by August 28, 2009. The workgroup met again on September 9, 2009, and CDCR filed its staffing plan on September 30, 2009, having obtained its 30-day extension.

## The Plan

The defendants' staffing plan is comprised of four parts: (1) an overview of clinical and support staff spreadsheets; (2) justification for the clinical and support staff identified in the spreadsheets for each mental health program area; (3) discussion of custody and correctional counselor ratios for the short-term and intermediate-term projects identified in Defendants' May 26, 2009 bed plan; and (4) discussion of the funding aspects of the plan. The most significant and necessary changes over prior staffing plans and/or practices were the use of staff-to-caseload inmate ratios, the inclusion of relief factors for most clinical line staff, and the inclusion of custody staffing which is integral to the mechanics of delivering mental health care but was omitted from the earlier Workload Study. Based on need, CDCR central office will retain the right to allocate line and supervisory staff positions to specific correctional institutions. This allows for actual ratios at any given institution to vary, although total system staff ratios should be consistent with the staffing plan so that the CDCR mental health system as a whole will have an appropriate ratio for each position. When available, staffing data from other systems was used for comparison purposes. My experts considered the resulting ratios and allocations for the 3CMS, EOP, and non-mental health administrative segregation areas to be reasonable as long as they can be re-adjusted based on actual experience and as future analyses unfold.

On November 23, 2009, CDCR submitted a supplement to its plan, covering custody and correctional counselor staffing. Site-specific assessments will be conducted to determine staffing deficiencies that may exist and need to be addressed, given each institution's individual mission, physical plant characteristics, etc. The DAI would initially address workload responsibilities for the correctional officer and correctional counselor allocations per the *Coleman* Program Guide 2009 Revisions. DAI will utilize the Monthly Health Care Access Quality Report (AQR) to determine the current level of access to the mental health programs at the institutions where the mental health short-term and intermediate-term projects will be activated. It will also use the local quality management committee (QMC) process to assess custodial staffing for each program, beginning when each program is activated. Ongoing monitoring of the short-term and intermediate-term bed projects will be completed utilizing the QMC process, monthly review of



Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 4

the AQR, site visits by representatives from headquarters, and conference calls to discuss issues throughout the life of each project. It is anticipated that it will take at least six months from activation of each program to complete the QIT assessment and forward it, along with any recommendations, to the QMC. DAI will provide quarterly updates to me on custody and correctional counselor staffing utilized for each of these projects.

## Participation by Plaintiffs' Counsel

Plaintiffs' counsel vetted their questions and concerns about various aspects of the staffing plan with CDCR and Department of Finance officials who worked on the plan. From December 2009 to February 2010, they spent numerous hours in no less than five teleconferences and in-person meetings with me, my staff, and defendants to work out any differences with the plan. To facilitate plaintiffs' having the benefit of the most accurate and up-to-date details on those aspects of the plan that are within the *Plata* receiver's jurisdiction, I also arranged a teleconference on January 29, 2010 and an in-person meeting on February 10, 2010 among myself, plaintiffs' counsel, and the receiver and his staff. Plaintiffs' counsel have notified me that they will not object to the defendants' staffing plan.

## Why the Staffing Plan and Not the Workload Study

Ms. Aungst said at the initial workgroup meeting that the previously-completed Workload Study would not be utilized for this project due to its various shortcomings. I concur with Ms. Aungst that the Workload Study is unresponsive to current staffing considerations and cannot fulfill the staffing plan mandate that CDCR now faces. It was never refined and developed to a level at which it could now carry the day.

The flaws in the Study are not news. In July 2008, my experts and I reviewed the Study (*see* Letter dated 7/12/08, attached) and found that it was neither sufficiently comprehensive, nor based on reliable data or objective measures. My experts noted specific concerns with the Study insofar as certain time values assigned to various distinctly articulated clinical tasks (Letter, pages 6-9), the Study's omission of some required clinical tasks (Letter, pages 8-9), its failure to take into account so-called "indirect time" [i.e. sick leave, vacation, and time not attributed to direct clinical time with inmates but a necessary part of the workday (Letter, page 9)], and its failure to account for time required to be spent on carrying out other court-ordered mental health tasks (Letter, page 9-10). The Study also left out custody staffing altogether. The latter omission left a significant gap in the Study, as custody functions are an integral and necessary part of the mechanics of delivering mental health care within the prisons. In addition, some critical assumptions underlying the Study caused my experts to pose some direct questions that challenged these assumptions. (Letter, pages 10-11) Answers to these questions have never been provided.

Although the Excel-based spreadsheet framework of the Study initially appeared to have been a functional and appropriately adaptable tool, it still fell short as a solid staffing plan going forward. As I reported in July 2008, in view of the concerns voiced by my experts, the key assumptions and the clinical activities covered by the Study needed to be reviewed; activity grids

Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 5

including *all* tasks typically assigned to mental health staff should be developed; all work tasks identified as sub-tasks should be reviewed for consistency with the *Coleman* Program Guide; the time values used in the Study should be validated; and CDCR mental health staffing needs should be reviewed bi-annually, with the input of the *Coleman* experts. (Letter, page 12) To the best of my knowledge, none of these things were ever done.

My recommendation in July 2008 was not to adopt the Workload Study *carte blanche*, but to persist with refining a better, more responsive staffing model. As I said in my letter back then, because of the dynamic nature of mental health care within CDCR institutions, "it is important to keep in mind that, of necessity, a meaningful Workload Study must be a work in progress." (Letter, page 1) Although I reported at that time that the Excel-based spreadsheet staffing matrix in the Workload Study appeared to be functional, its flaws in a number of important respects led me to conclude that "the Workload Study simply did not go far enough and is incomplete," for the reasons I cited then and summarize above. (Letter, page 11) There has been no indication that this situation has changed or that the Workload Study has ever evolved into a useful tool. It was the consensus among myself and those who worked on the defendants' staffing plan that the Workload Study did not offer much of value and still fell short for the task at hand. Consequently, I endorsed, and continue to endorse, Ms. Aungst's decision to start afresh on this project.

## Recommendation

After extensive consultation with my experts, I have concluded that the staffing plan proposed by the defendants is the best-designed and most comprehensive effort to cover staffing that has been offered to date. It promises to address many lingering staffing problems in an efficient, common-sense, and sustainable way. Accordingly, I recommend the defendants' staffing plan for funding and implementation, subject of course to any necessary modifications as they may become apparent in the future.

If you have any questions, please feel free to contact me.

Sincerely,

Matthew A. Lopes, Jr.

Debbie Vorous, Esq.
Michael Bien, Esq.
March 4, 2010
Page 6

cc:    S. Aungst
        B. Rice, Esq.
        K. Tebrock, Esq.
        M. Stone, Esq.
        D. Specter, Esq.
        S. Fama, Esq.
        E. Galvan, Esq.
        J. Kahn, Esq.
        A. Whelan, Esq.
        Coleman Experts and Monitors

EXHIBIT B

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 10, 2017


VIA EMAIL ONLY

Special Master Matthew Lopes Jr.
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908

Dear Special Master Lopes:

Enclosed please find CDCR's updated Staffing Plan developed in response to the court's August 9, 2016, order.


Sincerely,

Nick Weber
Attorney
Office of Legal Affairs


Enclosure

# CDCR Staffing Plan

## Introduction:

On August 9, 2016, the *Coleman* Court ordered the California Department of Corrections and Rehabilitation (CDCR) "to meet with the Special Master monthly 'to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained, all to resolve the problem of mental health staffing in CDCR prisons in a thorough and lasting way.'" (8/9/16 Order, ECF No. 5477.) With respect to staffing, the Court stated it "can no longer sanction the continued pursuit of remedial strategies that have not worked in the past." (8/9/16 Order at 6.) It urged the parties to "devise a meaningful strategy that will, finally, mean mentally ill inmates are located in institutions that are adequately staffed with mental health staff competent to meet their treatment needs." (*Id.*) Consistent with the Court's order, CDCR met internally, with the Special Master team, and with the plaintiffs to discuss and develop a revised staffing plan.

The following plan is the product of those discussions, and builds on the prior court-approved staffing proposal submitted in February 2015. The revised staffing plan incorporates all of the efforts outlined in the February 2015 plan including: establishing and fully utilizing the Medical Assistant classification (approved August 11, 2016) to aid psychiatrists, enhancing an internship program for psychologists and fellowship program for psychiatrists at several CDCR institutions to increase the pool of candidates for full time employment, increasing salary rates in hard to recruit locations to attract registry psychiatrists, and expanding the use of the statewide telepsychiatry program. CDCR's current plan includes negotiated proposals to modify the "on-call" compensation package for clinicians, increase the use of dual appointments, hire psychiatric nurse practitioners to provide psychiatric services, improve utilization management, and develop a mental health academy for new employees. CDCR continues to explore all viable options that will help the Department deliver the best mental healthcare possible to its patient population. The Department looks forward to ongoing discussions surrounding staffing.

## Current Staffing Level:

Since 2016, CDCR's fill rate for psychologists and social workers meets and, in most cases, exceeds 90%. The rates for filled positions, including registry, are as follows: 92% for psychologists (approximately 5% filled by registry); 73% for psychiatrists, including telepsychiatrists (approximately 14% filled by registry); and 99% for social workers (approximately 6% filled by registry).

## Status of Court Approved Initiatives in CDCR's 2015 Plan:

1. Medical Assistants

CDCR currently employs approximately 70 registry medical assistants at 18 institutions to assist psychiatrists and telepsychiatrists. In August 2016, the California State Personnel Board

1

approved the establishment of the medical assistant civil service classification, and the State is developing the civil service exam. While the list of eligible candidates is being developed, CDCR will allow all institutions to hire registry medical assistants.

Hiring medical assistants to work with psychiatrists will positively impact recruitment and retention of psychiatrists. Medical assistants provide myriad services, including clerical tasks, now handled by psychiatrists within CDCR. Medical assistants remind patients of appointments, send out physician orders for labs or medication, schedule new appointments, make referrals to therapists and other physicians, meet with the patient prior to the appointment, collect relevant data, and take blood pressures and measure weights. In addition, medical assistants help find treatment rooms to meet patients and schedule with correctional staff to bring a patient to the psychiatrist. CDCR hopes that the addition of this resource will improve a psychiatrist's work environment, free up clinical time that can be divided between spending more time with each patient and seeing more patients in a day, and create a clinic-like environment that is more familiar to medical staff in the community. Once this proposal is implemented, it may be necessary to review and, if appropriate, modify the ratios in the 2009 staffing plan.

2. Internship and Fellowship Programs

Among the initiatives that CDCR uses to help recruit and retain clinicians are the psychologist internship and psychiatrist fellowship programs. Both programs have been effective at recruiting new clinicians to work within the correctional setting.

CDCR expanded its internship program for the 2016/2017 school year and currently employs 31 interns at 11 institutions – four at the California Institution for Men, two at California State Prison, Sacramento, seven at R.J. Donovan, four at San Quentin State Prison, three at Valley State Prison, two at Central California Women's Facility, two at California Healthcare Facility, two at California Men's Colony, two at California State Prison, Solano, one at California Medical Facility, and two at California Institution for Women.

Interns in the program are given an opportunity to work in a variety of clinical and custodial settings in order to become familiar with the unique characteristics of working in a correctional setting. The program also allows interns to develop both general clinical skills and a distinct set of assessment and intervention skills tailored to a correctional environment. The program provides a steady source of well-trained, competent clinicians who, following completion of their internship, continue to work in locations that experience chronic difficulties hiring psychologists. For instance, in the fall of 2016, CDCR hired interns into permanent positions at California State Prison, Los Angeles, Wasco State Prison, California State Prison, Sacramento, and Valley State Prison. The program also enhances CDCR's reputation among potential clinicians in the community and provides professional enrichment for licensed clinicians who train and supervise the interns, which should improve CDCR's retention of psychologists.

In 2015, CDCR re-activated its fellowship program for psychiatry and currently has two fellows at San Quentin State Prison. CDCR's fellowship program employs licensed post-graduate forensic residents to treat inmates while also learning the concepts and practices of forensic psychiatry within a prison setting. CDCR is now working to expand the fellowship program as a recruitment strategy for psychiatry. To that end, CDCR has contacted a number of schools in

California and surrounding states, listed by the Accreditation Council on Graduate Medical Education, that have fellowship programs. Some of these schools have expressed interest in developing a formal fellowship program with CDCR. CDCR is following with those schools that have shown interest.

### 3. Increased Rates for Contract Psychiatrists

Over the past year and a half, CDCR has amended its registry contract to increase the psychiatrist-contractor rate at the following institutions: High Desert State Prison, Pelican Bay State Prison, Avenal State Prison, California State Prison, Corcoran, Pleasant Valley State Prison, the California Substance Abuse Treatment Facility, Kern Valley State Prison, Wasco State Prison, North Kern State Prison, Central California Women's Facility, Valley State Prison, Salinas Valley State Prison, California Treatment Facility, California Correctional Institute, and California State Prison, Lancaster.

In addition to increasing the rates at hard to recruit locations, leadership in headquarters are now providing more direct oversight of the contractor recruitment and hiring. CDCR will continue to monitor this recruitment effort.

### 4. Telepsychiatry

Telepsychiatry is a proven method for delivering services to the mentally ill. Consistent with prior agreements with the Coleman Special Master team and Coleman plaintiffs' counsel, telepsychiatrists receive the same training as staff psychiatrists, visit their assigned institution at least twice per year, participate in mental health team meetings, and participate in patients' treatment team meetings. Telepsychiatry services are provided to inmates in a confidential, out of cell setting. Telepsychiatrists currently serve 18 institutions, and CDCR intends to expand the use of telepsychiatry throughout the system.

The program has been helpful to respond to vacancies in hard to recruit areas. Telepsychiatry has also proven to be a useful way to retain staff psychiatrists. Taken altogether, these benefits support the expansion and further reliance on telepsychiatry. To that end, CDCR intends to expand its telepsychiatry team to at least 100 telepsychiatrists. Currently, CDCR has telepsychiatry offices in Elk Grove, San Quentin, and Rancho Cucamonga, California to provide services to the institutions. As of January 9, 2017, CDCR employ 48 telepsychiatry staff which includes 45 staff telepsychiatrists, two Senior Psychiatrist Supervisors, and a chief psychiatrist. Five additional telepsychiatrists have tentative start dates within the next six months and several others are in different stages of the hiring process.

In order to facilitate the expansion of the telepsychiatry team, CDCR plans to add telepsychiatry space in Rancho Cucamonga in Spring 2017 and at San Quentin State Prison in late 2018. Because of the number of telepsychiatry applicants, CDCR is working toward acquiring additional space in easy to recruit areas. As with other prison systems across the country, CDCR's telepsychiatry program is a critical and successful component of its staffing plan.

**Additional Proposals to Augment Already Approved 2015 Initiatives:**

1.  On-Call Compensation for all Clinicians

In response to feedback from staff, and to retain clinicians, CDCR has modified its compensation package for clinicians who remain "on-call." CDCR previously compensated on-call clinicians with leave credit. CDCR has revised its policy and now compensates clinicians with cash, a modification CDCR believes will help retain psychiatry staff.

2. Additional Appointments

To increase psychiatry position fill rates, CDCR has authorized staff psychiatrists to accept a second psychiatric staff position at a different institution on a quarter time basis. This will allow psychiatrists to earn more and help fill vacant positions. Though this program was in place at three institutions, a statewide advertisement was recently released. CDCR will monitor whether this is effective in decreasing vacancy rates and/or has an impact on staff retention.

3.  Psychiatric Nurse Practitioners

In recognition of the national shortage of psychiatrists, CDCR will begin to recruit Nurse Practitioners (Psychiatric or Mental Health) to provide psychotropic medication management in lieu of psychiatrists for the Clinical Correctional Case Management System (CCCMS) population. Their work will be supervised by the institution's senior psychiatrist supervisor or chief psychiatrist. The civil service classification for Nurse Practitioners already exists. CDCR is currently developing the recruitment and hiring plan and hopes to begin hiring applicants that specialize in psychiatry in early 2017.

4.  Utilization Management

CDCR strives to ensure that only appropriate patients receive services in its Mental Health Services Delivery System. To ensure that CDCR is placing the right patient in the right bed at the right time, CDCR has renewed efforts to comply with the Coleman Program Guide discharge criteria established in 2009. On November 15, 2016, CDCR directed the Chiefs of Mental Health at each institution to review CCCMS patients who have been stable and free of psychiatric medication for at least six months to determine whether they have been in continuous remission and are functioning adequately in the mainline without treatment. This type of review will occur quarterly on an ongoing basis. The purpose is to ensure the limited staff resources are servicing the patients meeting criteria for inclusion in the Mental Health Services Delivery System.

CDCR is in the early stages of designing a similar review for the Enhanced Outpatient Program population in order to ensure that the right patients are placed and retained at the EOP level of care. CDCR recognizes that this effort should be implemented with care and consideration for the safety and wellbeing of the patients. To that end, CDCR is committed to working with the Special Master and his team of experts to ensure that the review is implemented appropriately.

5. Proposition 57

On November 8, 2016, the voters passed Proposition 57, the Public Safety and Rehabilitation Act of 2016. Proposition 57 reforms the adult criminal justice system in California by creating a parole consideration process for non-violent offenders who have served the full term for their primary criminal offense in state prison, and authorizes CDCR to award credits earned for good behavior and approved rehabilitative or educational achievements. (*See* http://www.ebudget.ca.gov /for a more detailed discussion.) Proposition 57 allows the state to implement durable solutions to maintain compliance with the court-ordered population cap, and gives the state regulatory authority to eliminate the need for court-ordered population reduction measures.

CDCR is drafting regulations now to implement the proposed parole and credit changes, which will be subject to a certification by the Secretary that they protect and enhance public safety. The Budget assumes that regulations will be implemented on October 1, 2017. Proposition 57 is expected to reduce the average daily adult inmate population by 1,959 in 2017-18. In addition to the staffing proposals included in this plan, CDCR anticipates that Proposition 57 will reduce the number of patients participating in the Mental Health Services Delivery System, and CDCR will achieve a parallel reduction in staff.

6. Mental Health Academy

CDCR understands that its system is only as strong as the staff who implement its requirements. In an effort to further invest in the training and development of staff, CDCR will establish a Mental Health Academy onboarding program for new mental health staff which will provide a broader perspective of the entire system and a uniform approach on policies, procedures and expectations when staff is first hired. CDCR anticipates this will have a positive impact on retention of staff. Because CDCR is in the early stages of development of this program and is collaborating with its partners at CCHCS in its development, no specific date is set for implementation at this time.

## Other Issues:

1. Salary Increases for Psychiatrists

This Court has also directed that CDCR consider increasing the salaries of the psychiatry staff to make the work in its institutions more attractive. CDCR agrees that it should examine salaries and is fulfilling this directive by engaging in the collective bargaining process with the union representing the psychiatrists. The negotiations between the union representing psychiatrists and

the state of California are ongoing.  As bargaining processes are fluid and confidential,[1] CDCR cannot provide an estimated end date or disclose the substance of the negotiations, but is optimistic about a positive bargaining outcome with psychiatrists.

2.  Bed Planning

In its August 9, 2016 order, this Court directed CDCR to consider whether patients in it mental health system can be further clustered in areas where it can more easily recruit and retain staff. Attached as Exhibit A is CDCR's current bed plan for the mental health population, which proposes additional dedicated mental health beds throughout the system.  This proposal has been developed in consultation with the Special Master and his team of experts as well as plaintiffs' counsel during multiple working group sessions.  In an effort to implement the Court's vision, CDCR has worked to add EOP beds at institutions that have existing programs while it has shuttered beds at one hard to staff location.  The plan indicates bed expansions at California State Prison, Corcoran (214), California State Prison, Los Angeles County (150), Kern Valley State Prison (96), R.J. Donovan Correctional Facility (264), California Substance Abuse Treatment Facility (220), California Men's Colony (197), and San Quentin State Prison (233).   Between June 2016 and March 2017, CDCR will add a net 1,820 EOP beds, including 300 at California State Prison, Los Angeles County, activated between June and October 2016, 150 at CSP-COR activated in October 2016, and 62 and Central California Women's Facility activated in December 2016.   CDCR also closed all 90 EOP and Psychiatric Services Unit beds at Pelican Bay State Prison.

| Institution | Level | # of Beds | Date (Estimate) |
|---|---|---|---|
| LAC | IV | 300 | June - October 2016 |
| COR | IV | 150 | October 2016 |
| RJD | II | 264 | December 2016 |
| SATF | II | 220 | January - March 2017 |
| KVSP | IV | 96 | February 2017 |
| COR | IV | 214 | March 2017 |

[1] Before contract negotiations begin between the state and a union, a formal understanding about the bargaining process is reached.  This includes a provision to not speak publicly about proposals at the bargaining table, including those involving salary increases.  A violation of this agreement could result in unfair practices charges brought before the Public Employees Relations Board.  The Legislature has recognized the confidentiality of the bargaining process by exempting it from the Public Records Act.  (See Cal. Gov. Code, § 6254(p).)  CDCR also is mindful that if one party violates the terms of confidentiality, it will chill the bargaining process.

| SQ | II or III | 233 | March 2017 |
|------|------|------|------|
| LAC | III | 150 | TBD |
| CCWF | Female | 62 | TBD |
| CMC | III | 197 | TBD |

Further clustering would require CDCR to close some institutions to the mental health population and concentrate the same population in fewer locations. While CDCR has increased the size of existing EOP programs throughout the system, CDCR and the *Plata* Receiver are cognizant that overfilling an institution with the most acute patients can have a negative impact on the staff and mental health delivery program. CDCR must be careful not to cluster too great a population of hard to treat patients in any one place or risk alienating the very staff it seeks to attract and retain. Even in urban areas where it is easier to hire staff, creating an environment in which the program offers staff only the most difficult and acute types of patients presents a challenge to hiring and retaining staff. Staff fatigue from an overload of difficult cases is a serious risk posed by over clustering. CDCR must be careful to strike a reasonable balance between clustering existing mental health programs while also ensuring that the environment remains an attractive place for employees to work.

CDCR's bed plan represents a careful compromise between absolute clustering and decentralized services. It is ideal for patients to have both continuity of care and location. By creating institutions that offer as many levels of care and housing programs as possible, it increases the chance that the patient will thrive in his or her environment. Likewise, staff in that location will be able to treat a variety of patients with different acuities, reducing the likelihood of staff fatigue and increasing workplace satisfaction. CDCR's current bed plan balances both staff and patient satisfaction with the ability to continue to attract and retain competent clinical staff.

## Conclusion:

CDCR's mental health staff provides quality care to all participants within its Mental Health Services Delivery System. CDCR is committed to regularly reviewing and adjusting the court-ordered 2009 staffing plan and these current plans to meet the needs of the patient population. Through that process, Defendants will continue to explore alternatives to the way care is delivered to patients in CDCR's mental health delivery system. CDCR will continue to work with the Special Master and his team to assess the proposals laid out in this staffing plan. CDCR will also monitor the staffing plans and the system's need through the Continuous Quality Improvement Tool with the ultimate goal of ending court oversight as soon as reasonably practicable.

California Department of Corrections and Rehabilitation
Case 2:90-cv-00520-KJM-SCR   Division of Health Care Services   Filed 02/06/17    Page 46 of 71
Mental Health Program

## MALE BED PLAN
## CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM
### Projections through 2017 - Updated numbers 1/12/17

### Previous Bed Plan Numbers

| Level of Care: | Permanent Program Capacity | + | Temporary Capacity | + | Proposed Changes Capacity: | = | Net Capacity | Mental Health Bed Need Study - McManis Spring 2012 Population Projections - Need to 2013 | over/ (under) need |
|---|---|---|---|---|---|---|---|---|---|
| EOP | 3205 | | 150 | | 448 | | 3,803 | 3,655 | 148 |
| ASU | 519 | | 47 | | -16 | | 550 | 639 | -89 |
| PSU | 384 | | 0 | | 128 | | 512 | 474 | 38 |
| MHCB | 241 | | 114 | | 34 | | 389 | 343 | 46 |
| Acute | 130 | + | 68 | + | 34 | = | 232 | 232 | 0 |
| ICF Low Custody | 390 | | 0 | | -50 | | 340 | 276 | 64 |
| ICF High Custody | 192 | | 382 | | 50 | | 624 | 556 | 68 |
| Total: | 5,061 | | 761 | | 628 | | 6,450 | 6,175 | 275 |

### Bed Plan Numbers

| Level of Care: | Permanent Program Capacity | + | Temporary Capacity | + | Proposed Changes to Capacity: | = | Net Capacity | Mental Health Bed Need Study McManis Fall 2016 Population Projections - Need to 2017: | over/ (under) need | Mental Health Bed Need Study - McManis Fall 2016 Population Projections - Need to 2017 "NO Occupancy Standard" | over/ (under) need |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EOP | 5,830 | | -170 | | 1,037 | | 6,597 | 5,811 | 786 | 5,520 | 1,077 |
| ASU | 585 | | 0 | | 0 | | 585 | 786 | -201 | 747 | -162 |
| PSU | 300 | | 0 | | 0 | | 300 | 390 | -90 | 371 | -71 |
| MHCB | 427 | | -54 | | 0 | | 373 | 495 | -122 | 446 | -73 |
| PIP | 40 | | 0 | | 0 | | 40 | 43 | -3 | 39 | 1 |
| Acute | 412 | + | 0 | + | 0 | = | 412 | 365 | 47 | 328 | 84 |
| ICF Low Custody | 390 | | 0 | | 0 | | 390 | 360 | 30 | 324 | 66 |
| ICF High Custody | 700 | | 0 | | 72 | | 772 | 701 | 71 | 631 | 141 |
| Total: | 8,684 | | -324 | | 1,109 | | 9,469 | 8,951 | | 8,406 | |

### Table #A: Mental health bed capacity as of 1/12/17

| Institution | EOP | ASU | PSU | MHCB | Acute/ PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | 375 | 50 | | 98 | 154 | | 360 | 1,037 |
| CIM | | | | | | | | 0 |
| CMC | 452 | 100 | | 50 | | | | 602 |
| CMF | 447 | 58 | | 50 | 218 | 84 | 94 | 951 |
| COR | 300 | 100 | | 24 | | | | 424 |
| HDSP | | | | 10 | | | | 10 |
| KVSP | 96 | | | 12 | | | | 108 |
| LAC | 600 | 100 | | 12 | | | | 712 |
| MCSP | 774 | 50 | | 8 | | | | 832 |
| NKSP | | | | 10 | | | | 10 |
| PBSP | 66 | | | 10 | | | | 76 |
| PVSP | | | | 6 | | | | 6 |
| RJD | 894 | 63 | | 14 | | | | 971 |
| SAC | 514 | 64 | 300 | 44 | | | | 922 |
| SATF | 352 | | | 20 | | | | 372 |
| SOL | | | | 9 | | | | 9 |
| SQ | | | | | 40 | | | 40 |
| SVSP | 588 | | | 10 | | | 246 | 844 |
| VSP | 372 | | | | | | | 372 |
| WSP | | | | 6 | | | | 6 |
| **Total:** | **5,830** | **585** | **300** | **427** | **412** | **84** | **700** | **8,338** |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | | | | | | 256 | | 256 |
| CSH | | | | | | 50 | | 50 |
| **Total:** | **0** | **0** | **0** | **0** | **0** | **306** | **0** | **306** |

| Grand Total: (DSH + CDCR) | 5,830 | 585 | 300 | 427 | 412 | 390 | 700 | 8,644 |

### Table #B: Temporary Capacity as of 1/12/17

| Institution | EOP | ASU | PSU | MHCB | Acute/ PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | | | | | | | | 0 |
| CIM | | | | -34 | | | | -34 |
| CMC | | | | | | | | 0 |
| CMF | | | | | | | | 0 |
| COR | | | | | | | | 0 |
| HDSP | | | | | | | | 0 |
| KVSP | | | | | | | | 0 |
| LAC | | | | | | | | 0 |
| MCSP | -60 | | | | | | | -60 |
| NKSP | | | | | | | | 0 |
| PBSP | | | | | | | | 0 |
| PVSP | | | | | | | | 0 |
| RJD | -30 | | | | | | | -30 |
| SAC | | | | -20 | | | | -20 |
| SATF | | | | | | | | 0 |
| SOL | | | | | | | | 0 |
| SQ | | | | | | | | 0 |
| SVSP | | | | | | | | 0 |
| VSP | -180 | | | | | | | -180 |
| WSP | | | | | | | | 0 |
| **Total:** | **-270** | **0** | **0** | **-54** | **0** | **0** | **0** | **-324** |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | | | | | | | | 0 |
| CSH | | | | | | | | 0 |
| **Total:** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

| Grand Total: (DSH + CDCR) | -270 | 0 | 0 | -54 | 0 | 0 | 0 | -324 |

### Table #C: PROPOSED Permanent Changes in Capacity

| Institution | EOP | ASU | PSU | MHCB | Acute/ PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | | | | | | | | 0 |
| CIM | | | | | | | | 0 |
| CMC | 190 | | | | | | | 190 |
| CMF | | | | | | 72 | | 72 |
| COR | 214 | | | | | | | 214 |
| HDSP | | | | | | | | 0 |
| KVSP | | | | | | | | 0 |
| LAC | 150 | | | | | | | 150 |
| MCSP | | | | | | | | 0 |
| NKSP | | | | | | | | 0 |
| PBSP | -66 | | | | | | | -66 |
| PVSP | | | | | | | | 0 |
| RJD | | | | | | | | 0 |
| SAC | | | | | | | | 0 |
| SATF | 220 | | | | | | | 220 |
| SOL | | | | | | | | 0 |
| SQ | 233 | | | | | | | 233 |
| SVSP | | | | | | | | 0 |
| VSP | | | | | | | | 0 |
| WSP | | | | | | | | 0 |
| **Total:** | **1,037** | **0** | **0** | **0** | **0** | **0** | **72** | **1,109** |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | | | | | | | | 0 |
| CSH | | | | | | | | 0 |
| **Total:** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

| Grand Total: (DSH + CDCR) | 1,037 | 0 | 0 | 0 | 0 | 0 | 72 | 1,109 |

### Table #D: PROPOSED Net number of mental health beds

| Institution | EOP | ASU | PSU | MHCB | Acute/ PIP | ICF | ICF-H | Total |
|---|---|---|---|---|---|---|---|---|
| CHCF/DNCA | 375 | 50 | | 98 | 154 | 0 | 360 | 1,037 |
| CIM | 0 | | | 0 | | | | 0 |
| CMC | 642 | 100 | | 50 | 0 | | | 792 |
| CMF | 447 | 58 | | 50 | 218 | 84 | 166 | 1,023 |
| COR | 514 | 100 | | 24 | 0 | | | 638 |
| HDSP | 0 | | | 10 | 0 | | | 10 |
| KVSP | 192 | 0 | | 12 | 0 | | | 204 |
| LAC | 750 | 100 | | 12 | 0 | | | 862 |
| MCSP | 714 | 50 | | 8 | 0 | | | 772 |
| NKSP | 0 | | | 10 | 0 | | | 10 |
| PBSP | 0 | | | 10 | 0 | | | 10 |
| PVSP | 0 | | | 6 | 0 | | | 6 |
| RJD | 864 | 63 | | 14 | 0 | | | 941 |
| SAC | 514 | 64 | 300 | 24 | 0 | | | 902 |
| SATF | 572 | | | 20 | 0 | | | 592 |
| SOL | 0 | | | 9 | 0 | | | 9 |
| SQ | 233 | 0 | | 0 | 40 | 0 | | 273 |
| SVSP | 588 | 0 | | 10 | 0 | | 246 | 844 |
| VSP | 192 | 0 | | 0 | 0 | | | 192 |
| WSP | 0 | | | 6 | 0 | | | 6 |
| **Total:** | **6,597** | **585** | **300** | **373** | **412** | **390** | **772** | **9,123** |

**Department of State Hospital Beds:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASH | 0 | 0 | 0 | 0 | 0 | 256 | 0 | 256 |
| CSH | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 50 |
| **Total:** | **0** | **0** | **0** | **0** | **0** | **306** | **0** | **306** |

| Grand Total: (DSH + CDCR) | 6,597 | 585 | 300 | 373 | 412 | 390 | 772 | 9,429 |

1) All proposals are preliminary as site assessments to identify treatment and program space have not been evaluated.
2) CDCR would like to open discussions with the Special Master and Plaintiffs regarding additional open dormitory settings for future program expansion.

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Mental Health Program

## FEMALE BED PLAN
## CALIFORNIA HEALTH CARE FACILITIES - MENTAL HEALTH PROGRAM

**Projections through 2017 - Updated numbers 1/12/17**

### Previous Bed Plan Numbers

| Level of Care: | Current Program Capacity: | + New Capacity: | - Returned Capacity: | = Net Capacity: | Mental Health Bed Need Study - McManis Spring 2012 Population Projections - Need to 2013: | over/(under) need |
|---|---|---|---|---|---|---|
| EOP | 129 | 0 | 0 | 129 | 85 | 44 |
| ASU | 19 | 1 | 0 | 20 | 13 | 7 |
| PSU | 20 | 0 | 0 | 20 | 22 | -2 |
| MHCB | 22 | 0 | 0 | 22 | 8 | 14 |
| Acute/ICF | 30 | 45 | -30 | 45 | 17 | 28 |
| Total: | 220 | 46 | -30 | 236 | 145 | 91 |

### Bed Plan Numbers

| Level of Care: | Permanent Program Capacity: | + Temporary Capacity: | + Proposed Changes to Capacity: | = Net Capacity: | Mental Health Bed Need Study - McManis Fall 2016 Population Projections - Need to 2017: | over/(under) need | Mental Health Bed Need Study - McManis Fall 2016 Population Projections - Need to 2017 "NO Occupancy Standard": | over/(under) need |
|---|---|---|---|---|---|---|---|---|
| EOP | 129 | 0 | 62 | 191 | 183 | 8 | 174 | 17 |
| ASU | 20 | 0 | 0 | 20 | 10 | 10 | 9 | 11 |
| PSU | 20 | 0 | 0 | 20 | 12 | 8 | 12 | 8 |
| MHCB | 22 | 0 | 0 | 22 | 30 | -8 | 27 | -5 |
| Acute/ICF | 45 | 30 | 0 | 75 | 55 | 20 | 50 | 25 |
| Total: | 236 | 30 | 62 | 328 | 290 | | 272 | |

**Table #A: Mental health bed capacity as of 1/12/17**

| Institution | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| CCWF | 54 | 10 | 10 | 12 | | 76 |
| CIW | 75 | 10 | 20 | 10 | 45 | 160 |
| FWF | | | | | | 0 |
| Total: | 129 | 20 | 20 | 22 | 45 | 236 |
| **Department of State Hospital Beds:** | | | | | | |
| PSH | | | | | 30 | 30 |
| Total: | 0 | 0 | 0 | 0 | 30 | 30 |
| Grand Total: (DSH Hospital + CDCR) | 129 | 20 | 20 | 22 | 45 | 236 |

**Table #B: Temporary Capacity as of 1/12/17**

| Institution | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| CCWF | | | | | | 0 |
| CIW | | | | | | 0 |
| FWF | | | | | | 0 |
| Total: | 0 | 0 | 0 | 0 | 0 | 0 |
| **Department of State Hospital Beds:** | | | | | | |
| PSH | | | | | 30 | 30 |
| Total: | 0 | 0 | 0 | 0 | 30 | 30 |
| Grand Total: (DSH Hospital + CDCR) | 0 | 0 | 0 | 0 | 30 | 30 |

**Table #C: PROPOSED Permanent Changes in Capacity as of 1/12/17**

| Institution | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| CCWF | 62 | | | | | 62 |
| CIW | | | | | | 0 |
| FWF | | | | | | 0 |
| Total: | 62 | 0 | 0 | 0 | 0 | 62 |
| **Department of State Hospital Beds:** | | | | | | |
| PSH | | | | | | |
| Total: | 0 | 0 | 0 | 0 | 0 | 0 |
| Grand Total: (DSH Hospital + CDCR) | 62 | 0 | 0 | 0 | 0 | 62 |

**Table #D: PROPOSED Net number of mental health beds**

| Institution | EOP | ASU | PSU | MHCB | Acute/ICF | Total |
|---|---|---|---|---|---|---|
| CCWF | 116 | 10 | 10 | 12 | 0 | 138 |
| CIW | 75 | 10 | 20 | 10 | 45 | 160 |
| FWF | | | | | | 0 |
| Total: | 191 | 20 | 20 | 22 | 45 | 298 |
| **Department of State Hospital Beds:** | | | | | | |
| PSH | | | | | 30 | 30 |
| Total: | 0 | 0 | 0 | 0 | 30 | 30 |
| Grand Total: (DSH Hospital + CDCR) | 191 | 20 | 20 | 22 | 75 | 328 |

**Department of State Hospital Beds:

EXHIBIT C



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email: tnolan@rbgg.com

January 25, 2017

<u>VIA ELECTRONIC MAIL ONLY</u>

<div style="border:1px solid">

**SUBJECT TO
PROTECTIVE ORDERS**

</div>

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908-5600
MLopes@pldwlaw.com

     Re:    *Coleman v. Brown*
            Plaintiffs' Objections to Defendants' January 10, 2017 Staffing Plan.
            <u>Our File No. 0489-03</u>

Dear Special Master Lopes:

After more than 18 months of meetings between the parties and the Special Master on staffing issues, and several hearings before the Court, Defendants have presented their Final Staffing Plan to the Plaintiffs and the Special Master. *See* January 10, 2017 Updated Staffing Plan (hereinafter, "Final Staffing Plan.")

While we appreciate the efforts Defendants have made, their Final Staffing Plan presents an inadequate remedy to the severe current staffing problems -- particularly in the key category of psychiatry staff. Indeed, Defendants' efforts fall far short of the Court's clear mandate in 2009 to "take all steps necessary" to address the "ongoing problem of mental health staffing shortages and come into compliance with" the existing Court-ordered staffing plan. *See* June 18, 2009 Order, Docket 3613, at 2; June 16, 2014 Order, Docket 5171, at 4 (referencing June 13, 2002 Order, Docket 1383). Likewise, Defendants' plan falls short of the Court's more recent mandate in its May 18, 2015 Order, which noted that "inadequate mental health staffing levels have plagued the remedial phase of this litigation since its inception" and which forcefully asserted that "after almost twenty years of effort this problem must be finally and fully remedied." *See* May 18, 2015 Order, Docket 5307, at 5:18-20. While Defendants have made some

[3094548-1]

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 2

progress and have set forth some productive ideas, we do not agree that their current plan will lead to a "final and full" remedy for this problem, without further salary increases for psychiatrists and additional steps.

Also, while the main focus of our objections is on the critical psychiatrist category where the shortfalls are most severe, Defendants' staffing still persistently falls short in the area of Recreational Therapists, and the overall progress Defendants have made in the areas of Psychologist and Social Worker staffing masks some persistent staffing shortfalls in those categories at individual institutions. *See* Section D below.

Defendants' Final Staffing Plan is deficient for many reasons:

- Defendants have failed to make any attempt to address their severe, chronic psychiatry vacancy rates with appropriate, measured salary increases designed to attract and retain more candidates.

- Defendants rely excessively on tele-psychiatrists without appropriate limitations on their use.

- The psychiatrist shortage in the CDCR is getting worse, and the telepsychiatry program appears in part to be merely moving psychiatrists already working for the CDCR from institutions to remote tele-psychiatry call centers.

- The planned expansions of the telepsychiatry programs in Rancho Cucamonga and at San Quentin require construction, so that many of the positions cannot even be filled until 2018 at the earliest, making this approach too slow to bring relief that is needed now.

- The proposed "lift and shift" of inpatient programs from DSH to CDCR is certain to make the psychiatrist staffing problems worse, particularly at SVPP and CHCF, where the DSH staffing levels for psychiatrists and other mental health professionals are *much* higher than the corresponding rates in the parallel CDCR programs.

- Defendants' clustering plan is far too limited in scope and the clustering is at the wrong locations. Defendants are shutting down only one small remote EOP program, and they are adding large "clusters" of EOP beds at a number of very difficult to staff institutions.

- The dramatic ongoing current expansion of EOP beds and other mental health beds will make the current staffing problems worse.

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 3

- Defendants' utilization management efforts are unlikely to yield significant results. Defendants reported during the work group meetings last year that they already reviewed EOPs and found they overwhelmingly need EOP care.

- Defendants' other remedial measures are too small to affect the overall psychiatrist vacancy rate and any other potential vacancy problems in other clinical categories that – given the Department's past record in this area – must be viewed as likely to re-occur in the future.

We discuss each of these significant staffing-related problems in turn below:

### A.     Defendants Should Be Required to Dramatically Boost Pay for Psychiatrists and Possibly for Other Clinical Categories.

The CDCR's staffing problems are well-established and have persisted throughout the life of this case. The original order requiring Defendants to reduce clinical staffing vacancies to 10% or less in each category of clinical staff is now more than 14 years old. *See* June 13, 2002 Order, Docket 1383. Defendants have *never* achieved that benchmark.

As explained in the 26th Monitoring Report, Defendants' vacancy levels for psychiatrists and psychologists in 2015 were essentially unchanged from when monitoring in this case began in 1998. And, "without adequate staff, even the best of plans for mental health care are at risk of remaining merely an abstraction." *See* 26th Report, Docket 5439, at 16.[1]

Despite this lack of progress, Defendants have failed to increase psychiatrist pay in any significant way in recent years. As a result, in the last two years, since November of 2014, the total number of psychiatrists (*including* tele-psychiatrists and registry psychiatrists) working in the CDCR has remained essentially unchanged, growing by only 7 from 251 to 258 between November of 2014 and November of 2016. *See* **Exhibit A** hereto. During that same period of time, the number of EOP patients in the CDCR grew by 23%, from 5938 to 7318.[2] *Id.* As a result, the number of EOP patients per

---

[1] All references for the 26th Round Report and DSH Report are to the docket pagination.

[2] To their credit, during this same period of time the CDCR Defendants were able to significantly increase the headcount of social workers (from 339 to 380), psychologists (from 622 to 675), and Recreational Therapists (from 166.5 to 211).

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 4

psychiatrist in the CDCR has increased during this period from 29.6 to 42.2.  *See* **Exhibit B** hereto.

Moreover, having failed to increase the psychiatrist staffing numbers at the same time that the mental health population has been steadily growing, the overall percentage vacancy rate for CDCR psychiatrists has now been steadily growing for two years.  The following chart includes use of registry psychiatrists but does not include telepsychiatrist use because of insufficient data for the period in question:



Note: the Psychiatric Staffing Rate is taken as the number of Staff Psychiatrists over the number of established Staff Psychiatrist positions, *including* Registry Psychiatrists.

Given the CDCR's inability to expand the total number of psychiatrists using other means, Defendants must now be required to dramatically increase pay for both Registry and Staff Psychiatrists.  Including Registry and Staff Psychiatrists, but not including tele-psychiatrists, the total number of CDCR psychiatrists has actually declined steadily since November of 2014, falling by 35 from 251 to 216 in the two-year period between November of 2014 and November of 2016.  *See* **Exhibit A** hereto.

Moreover, monthly statistical data for the last six months on registry use from the most recent November data package shows that usage rates have been falling slowly and steadily in the last six months for registry clinicians statewide, including individually for

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 5

both psychiatrists and psychologists.  *See* **Exhibit C** hereto.  Indeed, overall, the data shows a marked reduction in registry usage in just the last six months since June 2016, with the overall number of position equivalents used falling from 127.15 in June to 96.52 in October, and then rising to 114.75 in November.  *Id.*

A dramatic pay raise is needed to boost psychiatry recruitment and retention for both Staff and Registry psychiatrists – everything else has failed.

We also strongly object to the position of Defendants throughout the Court-ordered workgroup discussions on staffing issues in the last six months that they cannot share any information about possible plans to increase psychiatrist salaries, or studies about psychiatrist pay, because the issue is currently in the process of collective bargaining negotiations.   The Court's power to remedy the ongoing violations of its staffing orders with pay increases is not in any way inhibited by the collective bargaining process.  By withholding information about possible pay increases, Defendants have simply forced the Special Master and the Court to make a blunt estimate of the pay increase needed to attract more psychiatrists to California's prisons.

B.  **Defendants' Telepsychiatry Policy Does Not Include All Appropriate Safeguards and Will Not Be An Adequate or Timely Remedy for The Chronic Psychiatry Staffing Problem.**

Defendants rely excessively on telepsychiatrists in their Final Staffing Plan, without appropriate limitations on their use.  Defendants should be required to affirm their prior statements that they will *not* use telepsychiatrists in inpatient programs and will only allow their use in MHCB units in urgent off hours circumstances.  Defendants should also be required to limit the percentage of psychiatrists at any given institution who can be telepsychiatrists.

As we noted in our letter on this issue last summer, we agree with the *Coleman* Court's observation in its May 18, 2015 Order that the unrestricted use of telepsychiatry "is troubling, particularly because there may be class members not susceptible to this method of care."  *See* May 18, 2015 Order, Docket 5307, at 5:13-14.  Despite the Court's cautionary statement, Defendants' Telepsychiatry Policy from late 2015 broadly authorizes the use of this treatment method indicating that "IPs shall not be excluded from participation in [the] Telepsychiatry Program based solely on their level of care or their diagnosis."  *See* Defendants' November 1, 2015 Staffing Update, Ex 2 (2015 Telepsychiatry Policy), at 12-12-6.

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 6

We disagree with Defendants' sweeping characterization of the appropriate use and scope of telepsychiatry. We object to this policy as not imposing basic, clearly established limitations on the use of telepsychiatry that have been set forth by the Special Master and/or in professional standards.

First, Defendants' policy should incorporate the Special Master's finding in the 26th Progress Report that telepsychiatry "is primarily an option for treatment of inmates at the 3CMS level of care, and a less desirable option for higher levels of care." *See* 26th Report, Docket 5439, at 30 (emphasis removed). Defendants did not object to this finding. Although the CDCR policy does specify that "[o]nsite providers shall remain the preferred method of psychiatric care in inpatient settings," it expressly permits the use of telepsychiatry in MHCBs when no on site providers are available, and the policy clearly envisions the routine use of telepsychiatry with EOPs. *See* Defendants' 2015 Telepsychiatry Policy at 12-12-1. We object to anything other than temporary, emergency use of telepsychiatrists in MHCBs or ever in any other inpatient units. Limited use of telepsychiatry in EOP programs could be negotiated, with appropriate limitations.

Second, each mental health program must have a stable, onsite contingent of live psychiatrists which is supplemented by telepsychiatry. New monthly staffing reports including telepsychiatry that the parties developed in the workgroup meetings (and that have been made available only since August) provide numbers of on-site staff psychiatrists as well as telepsychiatrists at individual institutions. For example, the November 2016 telepsychiatry data shows that SVSP has only 1.3 on site psychiatrists and 5.3 tele-psychiatrists. SVSP has a 10-bed MHCB unit, where the use of telepsychiatrists should be limited. *See* **Exhibit D hereto** (Monthly telepsychiatry data including staff psychiatrist staffing for same institutions, November 2016)**.** Another example is HDSP, which also has a 10-bed MHCB and which has *no* psychiatrists on site and 4.0 telepsychiatrists. *Id.* How can the institution appropriately care for crisis patients with no on-site psychiatrists? What happens if all the telephone lines go down in a storm, such as the severe rains that eliminated 58 beds at SVPP in the past months?

In addition, with the lack of progress in recent years in hiring psychiatrists, and the steady erosion in the number of staff psychiatrists working in the CDCR, we are concerned that the telepsychiatry program is merely moving psychiatrists already working for the CDCR from institutions to telepsychiatry call centers. Since November of 2014, the number of mission-critical, on-the-ground staff psychiatrists working in CDCR institutions has fallen by 27 from 200 to 173. *See* **Exhibit E hereto.** Thus, the 48 additional tele-psychiatrists hired to date have actually only resulted in an additional 20 clinicians. This is consistent with our observation when the parties visited the

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 7

telepsychiatry offices in Elk Grove last year that two of the three telepsychiatrists we observed had previously worked at CDCR institutions – MCSP and CHCF – located within an hour from Elk Grove.

Finally, the telepsychiatry remedy is too slow and relief is needed now. The planned expansions of the telepsychiatry programs in Rancho Cucamonga and at San Quentin require construction, so that many of the positions cannot even be filled until 2018, making this approach too slow to bring relief that is needed now.

C.     <u>Defendants' Clustering Plan Is Inadequate and the Cluster Locations are Poorly Selected</u>

Defendants' clustering plan is far too limited in scope and the clustering is at the wrong locations. Defendants are shutting down only one small remote EOP program (PBSP with 90 EOP and PSU beds combined), and they are adding significant "clusters" of EOP beds at a number of very difficult to staff institutions. *See* Final Staffing Plan at 6. Defendants are adding the following EOP beds at "cluster" institutions with extremely low psychiatrist staffing rates:

- Defendants are adding 300 EOP beds at LAC, which has 4.0 out of 16.0 allocated psychiatrist positions filled and on site, and which has a 47% vacancy rate *including* tele-psychiatrists and registry coverage. *See* **Exhibit D hereto** (Defendants' November 2016 Allocated and Filled Tele-psychiatry Positions Chart, from December 2016 Monthly Statistics).[3]

- Defendants are adding 220 EOP beds at SATF, which has only 1.0 out of 16 allocated psychiatrist positions filled and on site, and which has a 46% vacancy rate *including* tele-psychiatrists and registry coverage. *Id.*

- Defendants are adding 96 EOP beds at KVSP, which has ***zero*** on site allocated psychiatrist positions filled out of 9.0 positions, which is using a single tele-psychiatrist, and which, including registry usage, has a 54% vacancy rate – one of the very worst in the state. *Id.*

- Defendants are adding 364 EOP beds (in two stages) at CSP-Corcoran, which has a slightly better total vacancy rate overall, including

---

[3] This chart is the only monthly source of staffing levels including tele-psychiatrists in the totals for their institutions.

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 8

>   telepsychiatrists and registry, of 33%, but which only has 2.5 out of 14.5
>   allocated psychiatrist positions filled with staff psychiatrists on the ground.
>   *Id.*

These examples establish that Defendants' approach to clustering has been too limited and has included clusters at institutions certain to be very difficult to staff.

Plaintiffs also object to Defendants' failure to relocate its mental health programs from the troubled HDSP to a location where it can hire clinical staff more easily.  HDSP does not have a single Staff Psychiatrist on site, despite a 10-bed MHCB, and has not for a very long time.  *See* **Exhibit D** hereto.

**D.**     **Defendants' Progress State-Wide in Hiring Psychologists and Social Workers Masks Persistent Problems at Individual Institutions, and Defendants Fall Short of the 10% Benchmark for Recreational Therapists Statewide.**

Defendants are correct that they have made significant progress towards the meeting Court-ordered 10% staffing vacancy threshold for psychologists and social workers state-wide.  *See* June 13, 2002 Order, Docket 1383.  However, that overall progress masks persistent shortages in these categories at a number of critical institutions for mental health care.  The charts below for the five institutions with the most persistent hiring trouble *outside* the staff psychiatrist category  highlights staffing levels below 80% for clinical psychologists, social workers, and recreational therapists in May of 2016 and again in November of 2016:

| Excluding Registry | COR | KVSP | MCSP | SATF | SVSP |
|---|---|---|---|---|---|
| **Clinical Psychologists** | | | | | |
| *May 2016* | 91% | 70% | 77% | 71% | 67% |
| *November 2016* | 97% | 74% | 73% | 86% | 63% |
| **Social Workers** | | | | | |
| *May 2016* | 95% | 100% | 100% | 93% | 88% |
| *November 2016* | 94% | 92% | 93% | 95% | 74% |
| **Rec Therapists** | | | | | |
| *May 2016* | 27% | 80% | 89% | 23% | 74% |
| *November 2016* | 34% | 60% | 88% | 31% | 74% |

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 9

| Including Registry | COR | KVSP | MCSP | SATF | SVSP |
|---|---|---|---|---|---|
| **Clinical Psychologists** | | | | | |
| *May 2016* | 96% | 72% | 77% | 73% | 77% |
| *November 2016* | 100% | 74% | 76% | 89% | 72% |
| **Social Workers** | | | | | |
| *May 2016* | 103% | 100% | 102% | 95% | 88% |
| *November 2016* | 101% | 92% | 97% | 98% | 74% |
| **Rec Therapists** | | | | | |
| *May 2016* | 38% | 80% | 89% | 23% | 74% |
| *November 2016* | 50% | 60% | 90% | 31% | 75% |

The chart shows persistent staffing problems in multiple categories at SVSP, persistent staffing problems for Recreational Therapists at Corcoran, KVSP, SATF and SVSP, and persistent staffing problems for clinical psychologists at KVSP, MCSP and SVSP.

CDCR needs to focus on the addressing the key staffing shortfalls in the psychiatrist category, but they should also be required to develop a headquarters process and additional resources that will assist individual institutions like those above that are struggling to obtain adequate staff in particular clinical categories.

E.    **Defendants' Proposed Lift and Shift Transfer of the Inpatient Hospitals at CMF, SVSP and CHCF Will Make Overall Staffing Problems Worse**.

The proposed "lift and shift" transfer of inpatient programs from DSH to CDCR is certain to make the current psychiatrist staffing problems worse, particularly at SVPP and CHCF, where the DSH staffing levels for psychiatrists (and in other categories) are much higher than the corresponding rates for CDCR clinical staff.  This transfer proposal has been made several times in the past, and has never been implemented.  *See, e.g.,* 10/17/07 Order, Docket 2461.  One of the key reasons for the failure of this idea to progress may be that a significant number of clinicians who are willing to work for a State Hospital Program are not willing to work for the CDCR.  We have heard this anecdotally from DSH clinicians over the years, and current staffing data for the two departments bears out this concern.

Currently at the Salinas Valley State Prison, the staffing rates for the CDCR program and the DSH program show dramatic differences, based on the most recent staffing data in the monthly reports, which is for November of 2016:

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 10

| Position | SVSP (CDCR) Vacancy Rate | SVPP (DSH) Vacancy Rate |
|---|---|---|
| Staff Psychiatrist | 76.11% | 8.7% |
| Clinical Psychologist | 33.07% | 0% |
| Clinical Social Worker | 26.32% | 5.9% |
| Recreational Therapist | 25.11% | 0% |

Similarly dramatically better staffing in DSH programs is also illustrated in the vacancy rates for the two Departments at the new Stockton Hospital:

| Position | CHCF (CDCR) Vacancy Rate | CHCF (DSH) Vacancy Rate |
|---|---|---|
| Staff Psychiatrist | 66.67% | 21.56% |
| Clinical Psychologist | 31.6% | 1.76% |

Given these differences in staffing rates, we recommend against approval of the "lift and switch" proposal without a clear and well established record of improvement in CDCR staffing levels at these critical program sites and a plan for how to maintain adequate staffing. [4]

---

[4] Plaintiffs have limited their comments about the "lift and shift" proposal to only the most relevant issue to the current staffing plan. They do not waive other objections to the proposal but so doing. In particular, Plaintiffs await a promised "rollout" plan, which presumably will include a plan for hiring of sufficient numbers of hospital administrators to handle an additional approximately 1,000 high-acuity patients, as contemplated by the Court's 2007 order. *See* 10/17/07 Order at 2, Docket 2461.

[3094548-1]

SUBJECT TO PROTECTIVE ORDERS
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 11

F.    **Defendants' Utilization Management Proposals Are Vague and
Unlikely to Result in Significant Reductions in Demand for Mental
Health Care.**

Defendants have been reviewing CCCMS patients who are not on medications to
see if they need to stay on the caseload.  They are also "in the early stages" of designing a
similar review process for EOPs.  Defendants' clinical leadership previously reported to
plaintiffs and the Special Master in an all parties meeting last summer that they
informally reviewed EOP class members to see if they were appropriately at that level of
care and found that they were indeed appropriately EOPs.

We will be providing detailed comments and objections in a separate letter to the
draft plan to review EOPs for removal from the program, many of which were already
discussed in previous workgroup sessions.  However, for the purposes of this letter,
Plaintiffs note that there is no evidence that CDCR is currently providing excessive or
unnecessary mental health services to any class members.

G.    **Defendants' Remaining Remedial Measures are Too Small and Timid
to Impact the Overall Vacancy Problems Facing the Department.**

Defendants' other remedial measures are too small to impact the overall
psychiatrist vacancy rate.

(a) *The Internship and Fellowship Program*:  While positive, the Psychiatry
Fellowship program only has two psychiatry residents and there are no firm plans yet for
expansions of this program to other schools or prisons.  In this regard, the Fellowship
program is much smaller and has had much less of an impact than the internship program
for psychologists, which currently employs 31 individuals at 11 institutions.  *See* Final
Staffing Plan at 2.  Defendants should not be given much credit for a program that only
involves two residents at a time.

(b) *Medical Assistants:*  The use of Medical Assistants is also positive and may
over time lead to an increase in psychiatry staff retention.  *See* Final Staffing Plan at 1-2.
However, Defendants have not shown that these positions will reduce the need for
psychiatrists.  Defendants have promised multiple times to provide details on studies they
planned to conduct on the efficacy of the position, but have not.  Indeed, informal reports
at workgroup meetings indicate that the rollout of the position has been spotty. Right
now, based on plaintiffs' counsel's observations of telepsychiatry meetings with a
medical assistant present, the medical assistants mostly seem to be working as assistants

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 12

for tele-psychiatrists.  In that role, they facilitate the tele-psychiatry process itself by helping with scheduling, documenting the meeting and providing a physical staff presence in the room with the patient during meetings with the telepsychiatrists, but their role does not appear likely to speed up clinical contacts or reduce paperwork for the psychiatrists.  For example, the psychiatrist still has to write his or her own progress notes and medication orders.

(c) *Increasing Contract Rates for Registry Workers:*  The increased rates for contract psychiatrists do not appear to have helped increase the use of registry contractors during the last two years.  Indeed, as explained above, in just the last six months the use of registry psychiatrists has fallen from 44.9 to 42.9 position equivalents per month.  *See* **Exhibit C hereto.**  Contract usage has also fallen for other clinical categories during the same period.  *Id.*   Moreover, Defendants have provided no detailed information about the timing or the amount of the increase in contractor rates.  The lack of an increase in registry usage in recent years suggests the rate increases have been too modest.

(d) *On Call Compensation and Double Positions:*   The change in compensation for on call hours from leave credit to cash is positive but unlikely to have much impact. The use of double positions is concerning. Full-time workers will inevitably be less efficient working additional days, and possibly less effective as clinicians.

(e) *Psychiatric Nurse Practitioners:*  This is a potentially very helpful measure, but the workgroup discussions on this issue made clear that there are not many individuals in this category currently trained and licensed in California.  There was discussion about working with Fresno State and other schools starting programs for Psychiatric Nurse Practitioners, but that will take time to develop and to have a meaningful impact on CDCR staffing.

## Conclusion

Defendants are not treating ongoing staffing inadequacies with the required sense of urgency.  As we stated in our staffing letter to Defendants last July, this is a severe staffing crisis that is putting patients' lives at risk.  As found in the 26th Report, although "Defendants' latest court-ordered staffing plan was submitted over a year ago, they have demonstrated no sense of the required urgency for a meaningful implementation of the plan."  *See* 26th Report, Docket 5439, at 31.  At the same time that Defendants face the current staffing crisis, the system's mental health population of 38,356 prisoners as of October 17, 2016 is now significantly larger than it was in July 2008, at the peak of

**SUBJECT TO PROTECTIVE ORDERS**
*Coleman* Special Master Matthew A. Lopes Jr.
January 25, 2017
Page 13

CDCR's overcrowding crisis.[5]  The overall acuity level of class members has also increased dramatically in this timeframe.[6]  This means that Defendants are administering a severely overcrowded mental health treatment system with an acute shortage of psychiatrists and other key mental health staff members.  The time has come for more aggressive remedial action by Defendants on every level.

<div style="text-align:right">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

By:   Thomas Nolan
Of Counsel

</div>

TN:cg
Encl.
cc: Special Master Matthew A. Lopes, Jr.
   *Coleman* Special Master Team
   *Coleman* Co-counsel
   Katherine Tebrock
   Amy Eargle
   Danielle O'Bannon
   Sean Rashkis
   Patrick McKinney
   Tom Gilevich
   Nick Weber
   Elise Thorne
   Christine Ciccotti

---

[5] According to the Monthly Statistical Data package for July of 2008, the total mental health population at that time was 34,035.  *See* Health Care Placement Oversight Report R1-4, June 20, 2008.

[6] On July 21, 2008, the total EOP population was 2,859 in male EOP programs. On November 4, 2016, the mainline male EOP GP population was more than double the 2008 population at 5,946, even though the increase in overall MHSDS population from 34,035 to 36,645 was only about 10%.

[3094548-1]

Exhibit A

## CDCR Total Psychiatrist Staffing Numbers (including Registry), February 2014 – November 2016

Source: *Coleman* Monthly Reports, Enclosure 1b

| Month | Psychiatrists | Psychiatrists (including Telepsychiatrists) |
|---|---|---|
| Feb-14 | 229.74 | |
| May-14 | 219.71 | |
| Jul-14 | 216.08 | |
| Sep-14 | 238.18 | |
| Nov-14 | 251.15 | |
| Feb-15 | 255.11 | |
| May-15 | 253.66 | |
| Aug-15 | 232.39 | |
| Nov-15 | 217.89 | |
| Feb-16 | 228.5 | |
| May-16 | 210.15 | |
| Aug-16 | 218.14 | 255.54 |
| Nov-16 | 216.2 | 258.5 |

Exhibit B

## CDCR Psychiatrist Staffing Rate and Inmates per Psychiatrist, February 2014 – November 2016

Source: *Coleman* Monthly Reports, Enclosure 1b

| Month | Psychiatrist Staffing Rate (Excluding Registry) | Number of Staff Psychiatrists (All) | Number of Staff Psychiatrists (Line) | EOP Inmates per Line Psychiatrist | EOP Population |
|---|---|---|---|---|---|
| Feb-14 | 64.3% | 229.74 | 191 | 27.1 | 5167 |
| May-14 | 61.4% | 219.71 | 184 | 29.7 | 5464 |
| Jul-14 | 60.4% | 216.08 | 181.05 | 31.3 | 5671 |
| Sep-14 | 64.4% | 238.18 | 193 | 30.0 | 5797 |
| Nov-14 | 68.4% | 251.15 | 200.8 | 29.6 | 5937 |
| Feb-15 | 66.4% | 255.11 | 201 | 30.1 | 6050 |
| May-15 | 64.8% | 253.66 | 202 | 30.6 | 6184 |
| Aug-15 | 60.4% | 232.39 | 188.25 | 33.9 | 6375 |
| Nov-15 | 56.1% | 217.89 | 180.25 | 36.1 | 6501 |
| Feb-16 | 56.7% | 228.5 | 188 | 35.7 | 6705 |
| May-16 | 52.4% | 210.15 | 173.75 | 40.1 | 6971 |
| Aug-16 | 53.0% | 255.54 | 171.75 | 41.9 | 7195 |
| Nov-16 | 53.7% | 258.5 | 173.3 | 42.2 | 7318 |

Exhibit C

Correctional Health Care Services

**Six Month Registry Usage Summary**

<u>June - 2016 through November - 2016</u>

**Mental Health**

| REGISTRY USAGE BY GROUP | | | | | | |
|---|---|---|---|---|---|---|
| **GENERAL CLASSIFICATION** | **Jun-16** | **Jul-16** | **Aug-16** | **Sep-16** | **Oct-16** | **Nov-16** |
| PSYCHIATRIST | 44.09 | 45.94 | 46.42 | 35.05 | 35.05 | 42.90 |
| PSYCHOLOGIST | 38.49 | 38.34 | 36.30 | 30.38 | 30.38 | 37.22 |
| SOCIAL WORKER | 25.28 | 21.98 | 23.05 | 14.72 | 14.72 | 19.37 |
| OTHER MH CLINICAL STAFF | 19.29 | 19.10 | 23.05 | 16.38 | 16.38 | 15.29 |
| ALL OTHER SUPPORT STAFF | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **127.15** | **125.36** | **128.82** | **96.52** | **96.52** | **114.78** |



Each position represents 173.33 monthly registry hours.

Source: Summary (from invoices) provided by the institutions

Report Date: 1/5/2017

Report Generated By:

Program Support

Exhibit D

| Division of Health Care Services<br>Statewide Mental Health Program<br>Allocated and Filled Telepsychiatry Positions - November 2016 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Sites** | **Allocated July 2016** | | | **Filled** | | | | |
| | **Site** | **Telepsych** | **Total** | **Site**[1] | **Registry**[2] | **Telepsych**[3] | **Total** | **Percentage** |
| **CCC** | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0% |
| **CCI** | 4.0 | 3.0 | 7.0 | 0.0 | 1.3 | 2.5 | 3.8 | 54% |
| **CCWF** | 9.0 | 2.0 | 11.0 | 7.0 | 0.0 | 0.5 | 7.5 | 68% |
| **CHCF** | 21.0 | 3.0 | 24.0 | 11.0 | 0.4 | 2.1 | 13.5 | 56% |
| **CIW** | 9.0 | 1.0 | 10.0 | 6.0 | 2.1 | 2.1 | 10.2 | 102% |
| **COR** | 10.5 | 4.0 | 14.5 | 2.5 | 4.8 | 2.5 | 9.8 | 67% |
| **CTF** | 6.0 | 1.0 | 7.0 | 3.3 | 0.0 | 1.0 | 4.3 | 61% |
| **CVSP/ISP** | 1.0 | 1.0 | 2.0 | 0.0 | 0.0 | 0.7 | 0.7 | 37% |
| **HDSP** | 2.0 | 4.0 | 6.0 | 0.0 | 0.0 | 4.0 | 4.0 | 67% |
| **KVSP** | 9.0 | 0.0 | 9.0 | 0.0 | 3.1 | 1.0 | 4.1 | 46% |
| **LAC** | 13.0 | 3.0 | 16.0 | 4.0 | 1.5 | 3.0 | 8.5 | 53% |
| **MCSP** | 15.0 | 3.0 | 18.0 | 8.0 | 5.9 | 3.0 | 16.9 | 94% |
| **PBSP** | 2.0 | 2.0 | 4.0 | 2.0 | 0.3 | 1.3 | 3.6 | 90% |
| **RJD** | 16.5 | 3.0 | 19.5 | 5.5 | 1.6 | 4.0 | 11.1 | 57% |
| **SAC** | 20.0 | 3.0 | 23.0 | 10.0 | 2.0 | 1.0 | 13.0 | 56% |
| **SATF** | 9.0 | 7.0 | 16.0 | 1.0 | 2.7 | 5.0 | 8.7 | 54% |
| **SVSP** | 9.0 | 5.0 | 14.0 | 1.3 | 0.1 | 5.1 | 6.4 | 46% |
| **VSP** | 7.0 | 3.0 | 10.0 | 1.0 | 0.3 | 3.0 | 4.3 | 43% |
| **WSP** | 11.0 | 0.0 | 11.0 | 3.0 | 1.2 | 0.5 | 4.7 | 42% |
| **TOTAL** | **174.0** | **49.0** | **223.0** | **65.5** | **27.1** | **42.3** | **134.9** | **60%** |

**Footnote**

1  Source: November 25, 2016 Mental Health Hire Tracking Executive Summary from CCHCS Human Resources

2  Source: November 25, 2016 Mental Health Hire Tracking Executive Summary from CCHCS Human Resources, September 2016 Registry

3  Source:  November 2016 Telepsychiatry Provider list

Exhibit E

## CDCR Total Psychiatrist Staffing Numbers
## (excluding Registry and Telepsychiatry),
## February 2014 – November 2016

Source: *Coleman* Monthly Reports, Enclosure 1b

| Month | Line Psychiatrists |
|---|---|
| Feb-14 | 191 |
| May-14 | 184 |
| Jul-14 | 181.05 |
| Sep-14 | 193 |
| Nov-14 | 200.8 |
| Feb-15 | 201 |
| May-15 | 202 |
| Aug-15 | 188.25 |
| Nov-15 | 180.25 |
| Feb-16 | 188 |
| May-16 | 173.75 |
| Aug-16 | 171.75 |
| Nov-16 | 173.3 |