DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNIFER L. STARK – 267062
KRISTA STONE-MANISTA – 269083
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone: (415) 433-6830

RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,

  v.

EDMUND G. BROWN, JR., et al.,

        Defendants.

Case No. 2:90-CV-00520-KJM-DB

**Plaintiffs' Response and Objections to Defendants' Proposed Census and Waitlist Reports for Inpatient Mental Health Care**

Judge: Hon. Kimberly J. Mueller

On December 20, 2016, the Court requested the Special Master's assistance in modifying Defendants' Court-ordered monthly reports regarding the inpatient mental health care census and waitlists. ECF No. 5537 ("Dec. 20 Order"). Defendants filed their proposed reports on March 15, 2017 (collectively, "Proposed Reports," or individually, "Proposed Exhibit(s) A-C")), in lieu of the reports previously ordered by the Court. ECF

[3113238-7]

No. 5577.[1]  For the reasons detailed below, Plaintiffs request that Defendants be ordered to propose a meaningful replacement for, or revision to, Previous Exhibit B, that would provide the Court with information about whether Defendants' proposed remedy to the inpatient access crisis, their Joint Memorandum of Understanding ("MOU"), is working as promised.  Plaintiffs also request that Defendants be ordered to continue filing the waitlist and census trends information contained in Previous Exhibit C.

## I.  Factual Background

The existing Court-ordered reports were developed and modified over time based on templates suggested by the Court and by Defendants during earlier phases of the most recent attempts to address the ongoing crisis in access to inpatient mental health care.  *See* Order, August 21, 2015, ECF No. 5343, at 3 (directing the Special Master to work with the parties to finalize a template provided to the Special Master by the Court, based on a chart previously filed by Defendants (*see* ECF No. 5335 at 43 of 56)); Order, Oct. 13, 2015, ECF No. 5367, at 2 (approving templates filed by the Special Master, as agreed by the parties, at ECF No. 5363); *see also* Order, June 24, 2016, ECF No. 5458 (modifying templates by agreement of the parties and the Special Master after the MOU).

The Court's directive on December 20, following a status conference regarding the persistent waitlists for access to inpatient care, was to determine "alternative formats for the [inpatient data] reports that may be more helpful in identifying and highlighting information the court needs in order to enforce compliance with the remedial plan and other remedial orders."  *See* Dec. 20 Order at 2.  Defendants provided proposed revised reports to Plaintiffs on February 13, 2017 and the parties have met and conferred, together with the Special Master, on several occasions regarding Plaintiffs' objections to the proposed reports.

---

[1] For clarity, because Defendants filed their Proposed Reports on March 15 rather than filing the reports required by the Court's June 24, 2016 Order (ECF No. 5458), Plaintiffs refer to the latter as the "Previous Reports," collectively, or, individually, "Previous Exhibit(s) A-D", even though the Previous Reports remain Court-ordered.

[3113238-7]

Plaintiffs' objection is not to the content of Defendants' new Proposed Reports, but to what has been omitted. Plaintiffs agree that new Proposed Exhibits A through D, taken in their aggregate, provide a single-day snapshot of the relevant census, bed availability, and least restrictive housing information contained in Previous Exhibit A, and do so in a clearer and more digestible format. But nowhere do Defendants propose to provide any day-by-day accounting of patient movement through the system, as is offered in Previous Exhibit B, nor do they capture trends over time or compliance with the Program Guide's 72-hour transfer requirement for inpatient care, as is set forth in Previous Exhibit C. Plaintiffs have sought more transparent reporting about access to inpatient care issues as one of many needed additional orders to secure a durable remedy in this case. *See* Pls.' Resp. to Defs.' Sep. 28, 2016 DSH Update, Oct. 20, 2016, ECF No. 5503, at 11-12; Pls.' Br. Regarding Requested Remedies, Jan. 13, 2017, ECF No. 5543, at 8-9. Defendants have now proposed revised reports that would significantly diminish the data provided to the Court and, in so doing, make it harder for the Court to determine whether Defendants' internal processes are working to move class members to less restrictive inpatient settings and, concomitantly, whether the waitlist crisis is improving or worsening over time.

## II. Plaintiffs Object to the Omission of Previous Exhibit B Without Proposed Alternatives to Report on MOU Progress and Implementation

Defendants have repeatedly told this Court that the MOU is a durable remedy for the intractable and chronic constitutional violations of *Coleman* patients' right to access timely and adequate inpatient psychiatric hospitalization. *See, e.g.*, Defs.' Reply to Pls.' Resp. to Update to DSH Inpatient Census and Patient Mov't, Nov. 4, 2016, ECF No. 5509, at 5 (the MOU "is a sustainable process that will successfully manage the waitlist for inpatient mental health care"). The MOU is designed around the process of moving patients to their "Least Restrictive Housing" ("LRH"), i.e., the lowest security inpatient setting, consistent with Defendants' obligations under federal law. *See id.* at 3-4 (describing the LRH process); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999); 28 C.F.R. § 35.152(b)(2) ("Public entities shall ensure that inmates or detainees with

disabilities are housed in the most integrated setting appropriate to the needs of the individuals."); *see also* Order for Final Approval of Settlement Agreement & Exs., ECF No. 5284 (incorporating into, and applying ADA and Rehabilitation Act claims to, *Coleman*). This includes the promise of better utilization of the Court-ordered vacant beds for *Coleman* class members at the low-custody ICF programs at Atascadero and Coalinga State Hospitals.

But Defendants' proposed charts fail to provide the Court with any information on how the MOU process is working—including, for example, how many patients have moved to a lower security setting (including, but not limited to, their LRH) within a particular time period, how long such movement is taking on average, what percentage of patients are discharged before ever reaching their LRH, etc.—despite the fact that Defendants track this information. *See* Transcript of Jan. 23, 2017 Hearing, ECF No. 5552 ("Tr."), at 59:1-16, 76:23-80:4 (DSH Director Ahlin discussing the ways in which DSH's Patient Management Unit tracks LRH movement information). Without access to any of this information, the Court has no way to know if and how the MOU process is working, and cannot be sure that it is an effective, much less durable, remedy as Defendants have promised. Yet Defendants propose to eliminate the limited information on the MOU's workings, as well as other important compliance information, provided in the Previous Reports without offering any alternative.

Previous Exhibit B provided a "Psychiatric Inpatient Program Referral/Waitlist" Report for each day of the reporting month, enumerating the number of patients who were waiting at each stage of the process from initial referral to inpatient care, through Defendants' process for determining their least restrictive housing level and endorsement to a particular inpatient bed, through those patients who were pending transfer to an available bed. As noted in Defendants' first report filing following the June 24, 2016 modification of these reports, several of the columns on Previous Exhibit B "reflect the progression of referrals through the new requirements of" the MOU. *See* ECF No. 5468 at 9 of 15. Previous Exhibit B was also the only chart provided to the Court that showed any

1  day-by-day movement information regarding the number of patients transferring through
2  the inpatient care system in the reporting month, rather than capturing data for a single day
3  (Previous Exhibit A) or providing an average by month (Previous Exhibit C).
4      The parties have had multiple discussions about the opacity of the Previous Reports
5  with respect to the functioning of the MOU process, and about ways Defendants might
6  provide a more transparent report about the status of patients awaiting transfer to low-
7  custody ICF beds.  *See, e.g.*, Pls.' Br. Regarding Requested Remedies, Jan. 13, 2017, ECF
8  No. 5543, at 10 of 11 (discussing meet and confer prior to the most recent status
9  conference).  Defendants' response to those earlier discussions is now to eliminate any
10 reporting on whether and how patients are moving towards their least restrictive housing
11 designations, rather than to endeavor to improve previous Exhibit B.  But it is important
12 for the Court to have this information in order to determine whether the MOU is working
13 from month to month.  There are various ways in which this might be accomplished,
14 including by revising Previous Exhibit B to provide the data about the movement of
15 patients towards their LRH designations that Defendants have already represented they
16 internally track and monitor.  *See* Tr. at 59:1-16 and 76:23-80:4.  To date, Defendants have
17 not provided any meaningful proposals for reporting that would accomplish this end and
18 instead seek to simply bury the information with Previous Exhibit B.
19     In discussions about Plaintiffs' objections to the proposed elimination of Previous
20 Exhibit B, Defendants have pointed to the monthly filing of the sealed patient-by-patient
21 Bed Utilization Report ("BUR") as a substitute for the previous Exhibit B chart
22 encapsulating patient movement.  While the BUR would allow the Court to ascertain how
23 a particular patient has moved from prison housing to, and between, inpatient housing, the
24 BUR does not provide information about a patient's least restrictive housing designation,
25 even though Defendants track that information on an individualized basis.  *See* Tr. at
26 58:24-58:6 (Ms. Ahlin discussing the "goal" of incorporating LRH information into the
27 BUR).  As it presently stands, however, there is no way to determine from the BUR
28 whether a patient is at, or ever reaches, his least restrictive housing environment under the

1 MOU. In any event, a time-consuming analysis of a report listing 1,723 patients, as of the
2 report filed on February 28, 2017, is hardly of use to this Court as a way of "identifying
3 and highlighting" critical information. *See* Dec. 20 Order.

4 Defendants have previously told the Court that they "are complying with the
5 Memorandum of Understanding and exceeding its expectations, and are providing the data
6 necessary to the Court and the Special Master to monitor progress," such that there is no
7 need for concern or further orders about the persistent waitlist problem. *See* Defs.' Objs.
8 to Pls.' Requests for Further Relief on Inpatient Care, Jan. 13, 2017, ECF No. 5546, at 6.
9 But their reporting proposal would eliminate this data, and would provide the Court with
10 no means by which to assess whether the MOU is working as intended. This Court should
11 order Defendants to develop an alternate means to report on inpatient movement toward
12 least restrictive housing settings in order to measure if indeed the MOU is the durable
13 remedy Defendants claim it to be.

**III. The Omission of Previous Exhibit C Will Provide the Court With No Way to Measure Trends Over Time**

16 The Court's Order for supplemental briefing prior to the most recent inpatient status
17 conference made the Court's concern about the adequacy of Defendants' existing inpatient
18 capacity clear. *See* ECF No. 5529, Dec. 9, 2016, at 5-6. Previous Exhibit C provided
19 varying charts and graphs setting out "Psychiatric Inpatient Programs Trends" for the
20 reporting period and for the year. This chart was the only report provided to the Court that
21 allowed an at-a-glance view of the average census of, and demand for, each inpatient
22 program over time.

23 Nonetheless, Defendants ask this Court to scrap Previous Exhibit C for two reasons:
24 First, based on their assurance that "the revised templates provide all of the data the Court
25 requires to assess whether Defendants are meeting Program Guide requirements for
26 transfer to inpatient care," and second, because one piece of data contained in Previous
27 Exhibit C purportedly is no longer accurate. *See* ECF No. 5577 at 5 of 15.
28 //

[3113238-7]

1       The first point is manifestly untrue, as Defendants propose to eliminate any
2 reporting on their compliance with the Program Guide requirement to transfer all patients
3 accepted to inpatient programs within 72 hours of bed assignment.  *See* Program Guide at
4 12-6-5.  Defendants reported an average number for the 72-hour transfer timeline
5 requirement in Previous Exhibit C for each of the monthly filings from July 15, 2016
6 through January 17, 2017, and it was the subject of testimony at the January 23, 2017
7 hearing.  *See* Tr. at 159:15-161:4, 169:5-22.  Notably, Defendants eliminated this number,
8 without explanation or leave of the Court, from the next report they filed after the hearing.
9 *Compare* ECF No. 5549 at 11-15 of 15 (January 2017 filing, listing for each program an
10 average of those "Beyond 72-hr Transfer Timeframe Avg for Period") *with* ECF No. 5566
11 at 11-15 of 15 (February 2017 filing, omitting 72-hour information from each chart).
12      Defendants ask this Court to allow them to cease any reporting on the 72-hour
13 transfer timeline requirement, and indeed to scrap the entire Previous Exhibit C, because
14 that single piece of data in their existing template is purportedly no longer accurate due to
15 a July 2016 change in the MOU process.  ECF No. 5577 at 5 of 15.  Now, instead of
16 measuring this 72-hour period from endorsement to a DSH program, Defendants measure
17 it from acceptance of the patient to a specific DSH bed, resulting in a "data snafu" in
18 Previous Exhibit C.  *See* Tr. at 169:5-22.  This Court should simply order Defendants to fix
19 the existing chart to report accurate data, or to propose another way of reporting on that
20 important element of Program Guide compliance.  But unilaterally ceasing to report on the
21 72-hour transfer requirement obscures important remedial information, and the Proposed
22 Reports manifestly do not fill this compliance reporting gap despite Defendants'
23 reassurances to the contrary.  ECF No. 5577 at 5 of 15 (claiming all Program Guide
24 requirements are captured in Proposed Reports).
25      Moreover, Defendants offer no rationale why this Court should eliminate the entire
26 Previous Exhibit C, which originated from their own proposal, because of a data issue
27 affecting one of the many pieces of important remedial information contained in that
28 report.  Because Previous Exhibit C is the only report that shows average trends over time,

eliminating that report will make it harder, not easier, for the Court to place Defendants' monthly reporting in context and to assess whether any progress has been made towards resolving the waitlist crisis. For example, the January 17, 2017 report filing, providing data for December 2016, contained charts in Exhibit C that allowed the quick assessment of how capacity has met, or failed to meet, demand for each inpatient program over the course of 2016. *See* ECF No. 5549 at 11-15 of 15. These charts allowed the Court to see, in one place, that Defendants had not filled all 256 beds at Atascadero on average in any month in 2016 (*see id.* at 12 of 15), that Atascadero and Coalinga's censuses were dropping even as the waitlist was growing (*see id.*), that demand for high-custody ICF beds at the Vacaville Psychiatric Program had exceed supply in all months since August 2016 (*see id.* at 13 of 15), that the census in the San Quentin Psychiatric Inpatient Program ("PIP") had been within one patient of full capacity in all months since August 2016 (*see id.* at 14 of 15), and that the census in the California Institution for Women PIP had been within two patients of full capacity in all months since April 2016 (*see id.*).

Furthermore, providing averages counterbalances the inherent weakness of snapshot data—that the data on a particular day may be an outlier in one direction or another. Defendants' proposal to eliminate this accessible reporting and replace it only with snapshot reports that provide data for one day in a month, one month at a time, will require extra work for the Court to see trends and changes over time and obscures potential data deficiencies endemic to snapshot reporting. This Court should require Defendants to fix the error in Previous Exhibit C to correctly report on their compliance with the Program Guide's 72-hour transfer requirement and to continue providing the report in corrected form, or to propose an alternative report or reports that show both trends over time and compliance with the 72-hour timeline.

In sum, Plaintiffs have no objection to the reports filed on March 15, as far as they go—but they do not go far enough, and do not serve the Court's goal of obtaining more, and more transparent, information about Defendants' progress towards eliminating the DSH waitlists and complying with Program Guide requirements. Plaintiffs therefore

request that Defendants be ordered to (1) propose a meaningful replacement for, or revision to, Previous Exhibit B that would provide the Court with meaningful information about whether Defendants' proposed remedy to the inpatient access crisis—the MOU—is working; and (2) to continue filing Previous Exhibit C after fixing the "data snafu" related to reporting compliance with the 72-hour inpatient transfer requirement.

DATED: March 23, 2017

Respectfully submitted,
ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Krista Stone-Manista*
Krista Stone-Manista

Attorneys for Plaintiffs