UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No.  2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

This matter came on for hearing on January 23, 2017 to address ongoing issues with timely access to inpatient mental health care and mental health crisis beds (MHCBs).  *See* ECF Nos. 5551, 5529.  Prior to the hearing, the parties filed briefs and evidence in response to the court's December 9, 2016 order, ECF No. 5529.  ECF Nos. 5542, 5543, 5544, 5546.  At the hearing, the court heard testimony from Pamela Ahlin, Director of the Department of State Hospitals (DSH), Dr. Katherine Warburton, Medical Director and Deputy Director for Clinical Operations for DSH, and Katherine Tebrock, Deputy Director of the California Department of Corrections and Rehabilitation's (CDCR) Mental Health Services Delivery System (MHSDS). *See* Reporter's Transcript of Proceedings (RT), ECF No. 5560; Decl. of Pam Ahlin, ECF No. 5544-1 ¶ 1; Decl. of Katherine Tebrock, ECF No. 5544-2 ¶ 1.  Following the hearing, defendants filed additional evidence as directed by the court.  ECF Nos. 5558, 5559.

1

1    For several months the court has signaled that defendants' non-compliance with

2    court orders and Program Guide[1] timelines for access to inpatient care must end.  *See, e.g.*, ECF

3    No. 5519 (ordering defendants to show cause why waitlists for inpatient care cannot be reduced

4    to zero); RT 5:1-6:13.  For the reasons explained in this order, defendants will be directed to show

5    cause in writing why they should not be required to come into full and permanent compliance

6    with Program Guide timelines for transfers to acute and intermediate care facility (ICF) hospital

7    beds by May 15, 2017.  In addition, the parties will be directed to brief why defendants should not

8    be required to comply with the Program Guide requirement for transfer to MHCBs within twenty-

9    four hours of referral by the same date, and, if so, whether the court should require full and

10   permanent compliance with that requirement or, instead, whether 90 percent compliance should

11   be required.  Furthermore, the parties will be directed to brief (1) how any subsequent court order

12   requiring compliance with these timelines should be enforced; (2) whether monthly data

13   templates required by this court, *see* ECF No. 5367, with recent proposed revisions currently

14   pending before the court, *see* ECF Nos. 5537, 5577,[2] will provide sufficient data to allow the

15   court to enforce such an order; and (3) whether monetary sanctions are an appropriate remedy for

16   non-compliance with such an order.

17   I.    BACKGROUND

18        In 1995, the court found "substantial delays in access to mental health care for

19   inmates housed in" CDCR in violation of the Eighth Amendment to the United States

20   Constitution.  *Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995).  The court found

21   delays "everywhere within the system," including access to necessary inpatient hospitalization,

22   "and that those delays result in exacerbation of illness and patient suffering. . . ."  *Id*. at 1309.

---

[1] The Mental Health Services System Delivery System Program Guide, 2009 Revision, is the operative remedial plan in this action.  *See Coleman v. Brown*, 938 F. Supp. 2d 955, 961 (E.D. Cal. 2013).  It is called, variously, the Program Guide or the Revised Program Guide.  References in this order to the "Program Guide" or the "Revised Program Guide" are to this document.

[2] The court accepts the most recent monthly report in the form filed, ECF 5577, subject to hearing from the parties in response to this order regarding whether that form will achieve the goals the court now contemplates.

2

1  "To remedy the gross systemic failures in the delivery of mental health care, the court appointed a

2  Special Master to work with defendants to develop a plan to remedy the violations and, thereafter,

3  to monitor defendants' implementation of that remedial plan." *Coleman v. Brown*, 938 F. Supp.

4  2d at 959.  A year and a half after ordering their development, in June 1997, the court gave

5  provisional approval to defendants' remedial plans and directed the Special Master to begin

6  monitoring defendants' implementation and compliance with those plans.  Dkt.[3] No. 858.

7  Defendants' remedial plan is "currently referred to as the Revised Program Guide." *Coleman v.*

8  *Brown*, 938 F. Supp. 2d at 961.  In March 2006, nine years after provisional approval, with

9  limited exceptions not applicable here, the Revised Program Guide was given final approval by

10  the court and defendants were ordered to "immediately implement" all of its provisions.  ECF

11  No. 1773.  "Defendants' remedial plan, the Revised Program Guide, contains 'the time frames

12  which'" must be met for the transfer of class members between levels of the MHSDS, including

13  inpatient care.  *Coleman v. Brown*, 938 F. Supp. 2d at 981.  In relevant part, the Revised Program

14  Guide requires:

15      1.  Any inmate referred to an MHCB be transferred within 24 hours of referral;

16      2.  Any inmate referred to any acute inpatient mental health hospital placement be

17         transferred within ten days of referral, if accepted by DSH,[4] and

18      3.  Any inmate referred to any intermediate care mental health hospital placement be

19         transferred within 30 days of referral, if accepted by DSH.

20  Program Guide, 2009 Revision, at 12-1-16.  These time frames "represent defendants' considered

21  assessment of what is sufficiently 'ready access' to each level of care."  *Coleman v. Brown*, 938

22

---

23       [3] Citations to the court's docket using the convention "Dkt. No." refer to filings made

24  prior to initiation of the court's current electronic filing system.  Citations to electronic filings
using the convention "ECF No."

25       [4] Acceptance of referrals by DSH is governed by standards in an Administrative Letter

26  dated November 2015 and offered into evidence at hearing as Plaintiffs' Exhibit A.  The
January 23, 2017 Status Conference Joint Exhibit List filed by the parties on January 27, 2017, as

27  required by the court, identifies this document as Plaintiffs' Exhibit B.  *See* ECF No. 5557 at 2.  It
was marked as Plaintiffs' Exhibit A at hearing.

28

1   F. Supp. 2d at 981.  Almost twenty-two years after judgment was entered in this action, twenty

2   years after defendants' remedial plans were provisionally approved, and more than a decade after

3   these timelines were given formal approval and ordered "immediately implemented," the record

4   before this court shows the timelines are regularly exceeded as class members wait to receive the

5   highest and most urgent levels of mental health care.  The court does not and has never

6   contemplated endless entanglement with defendants as a result of this case.  As discussed below,

7   the record makes clear that defendants have had sufficient time to develop and implement the

8   capacity and systems to comply with the timelines set forth in their remedial plan.  It is time now

9   for defendants to come into full and permanent compliance with this part of the Program Guide.

10   II.      HISTORY

11            As the court discussed in its December 9, 2016 order, the history of the remedial

12   phase of this action demonstrates clearly that "delays in access to inpatient care create backlogs at

13   every layer of the MHSDS." ECF No. 5529 at 3; *see also Coleman v. Brown*, 938 F. Supp. 2d at

14   980 n.43.  This has been demonstrated repeatedly over the past twenty years, most recently in the

15   increase in waitlists for inpatient care that led to the current proceedings before this court.  In its

16   2013 order denying defendants' motion to terminate this action, the court described the

17   "unconscionable delays in access to inpatient care and the sequelae therefrom, including periodic

18   substantial decline in clinical referrals to necessary hospital care" as "one of the most tragic

19   failures in the delivery of mental health care."  *Coleman v. Brown*, 938 F. Supp. 2d at 982.  While

20   noting that defendants had made "substantial improvement" in such access, the court found that

21   the gains made by 2013 were "new and work remains."  *Id.*

22            Three years later, in a monitoring report on inpatient mental health care for class

23   members, the Special Master described those gains as "short-lived."  ECF No. 5448 at 24.[5]  The

24   findings in that report, which are adopted in full by separate order, include a detailed summary of

25   the history of efforts to remediate this Eighth Amendment violation, the obstacles to compliance,

26

27            [5] All references to page numbers in ECF documents are to the page number assigned by
the court's Electronic Case Filing system and not necessarily to pagination within the document.

28

4

1   and the numerous court orders that have been directed at achieving constitutional compliance.

2   *See id*. at 22-44.   Several things are clear from this summary and the twenty years it encapsulates.

3          An insufficient number of inpatient beds, or delays in placement and transfer of

4   inmates referred for inpatient care, or both, has a chilling effect on identification and referral of

5   class members to necessary hospital care.  *See*, *e.g.*, *id*. 8 & n.8.  Defendants' failure to

6   consistently fill the full complement of designated low-custody inpatient beds has

7   
8   
9   
10
> a resounding ripple effect throughout all of the DSH inpatient programs which treat these patients, creating almost instantly a re-shuffling for other beds at other DSH programs, and at CDCR a back-up of patients awaiting DSH placement. Stays in mental health crisis beds (MHCB) at CDCR soon become overly long, as patients are waiting for admission and transfers to the inpatient programs they need.

11  *Id*. at 9.  Three times in the past twelve years, the Special Master has guided an assessment of

12  unmet needs for identification and referral to inpatient care.  *Id*. at 23.  The first, conducted in

13  2005, resulted in identification of 400 inmates in need of inpatient mental health care.  *Id*. at 8

14  n.8.  The second, in 2009, found almost 1,000 inmates in need of inpatient mental health care who

15  had not been identified or referred to an inpatient program.  *Id*. at 29.  The last assessment,

16  conducted in 2011, led to planning and implementation in 2012 of a so-called "sustainable self-

17  monitoring process ('the sustainable process') to ensure that inmates in need of inpatient care

18  were timely identified, referred, and transferred to such care."  *Id*. at 24.  As the Special Master

19  reported, however,

20  
21  
22  
23
> the gains in access to inpatient care turned out to have been short-lived.  Over time, in each instance, the number of *Coleman* class members in DSH beds diminished, referrals and transfers slowed, and waitlists grew – just as they did by July 2015.  The process known as the *sustainable* process for identification, referral and transfer of CDCR inmates to inpatient care at DSH unfortunately turned out to be unsustainable.

24  *Id*.

25         As described in detail by the Special Master, court orders going back to 1998

26  reflect the myriad efforts to address ongoing problems with access to inpatient care.  *See id*. at

27  36-39.  Defendants have presented several plans to address those problems, including plans for

28  creation of a sufficient number of beds, both through conversion and utilization of beds at DSH

5

hospitals and through construction of additional space at CDCR prison facilities, as well as

review of custody criteria in order to increase "referrals of patients whose custody factors had

previously precluded them from being placed in dorm settings or low custody beds at"

Atascadero State Hospital (ASH). *Id.* at 25-35.  These plans have been approved in whole or in

part by the court and, where approved, ordered implemented.  *Id.* at 36-39.  And yet, by July 2015

the waitlists had swelled again and court intervention has once more been required.  A

particularly telling graph in the report shows three times in the past eight years when increases in

the number of unoccupied *Coleman* beds at ASH have declined after issuance of court orders

aimed at reducing or eliminating inpatient waitlists, followed after approximately three years by

increases in unoccupied ASH beds and then declines again only after court intervention.



*The red bars signify time periods during which court orders were issued to address the lack of
patients being admitted to ASH.  The blue bars indicate initial declines in bed availability at ASH
after the issuance of court orders, followed by gradual increases over time resulting in the
issuance of further court orders.*

*Id.* at 39.

        The latest round of court intervention on this issue began in August 2015

following the re-emergence of waitlists for inpatient care.  *See* ECF No. 5333.  The court held a

status conference on August 19, 2015.  ECF No. 5340.  Following the status conference, the court

issued an order requiring, *inter alia*, defendants to report to the court within thirty days "on whether regular and consistent use of the full complement of 256 beds at Atascadero State Hospital (ASH) designated for *Coleman* class members is sufficient to permanently eliminate the ongoing waitlist for inpatient mental health care and if not, why not, and what alternate plans are in place for waitlisted class members." ECF No. 5343 at 2. The court also ordered the parties to finalize a template for defendants to use to report monthly on the census of their inpatient programs and the status of pending referrals to those programs. *See id.* at 3. On October 13, 2015, the court approved the templates proposed at that time and directed defendants to file them monthly beginning in October 2015. ECF No. 5367. Since then, defendants have been filing templates on or about the 15th of every month. The question for the court at this point is whether the most recent template proposed by defendants, and used to make their most recent monthly filing, will be "more helpful in identifying and highlighting information the court needs in order to enforce compliance with the remedial plan and other remedial orders." ECF No. 5537; *see also* ECF No. 5577.

        After receiving an extension of time, ECF No. 5360, on October 30, 2015, defendants filed their report concerning full bed utilization at ASH. In the report, defendants represented that

> [t]hrough informal implementation of the Housing Review policy and existing utilization management measures, Defendants have effectively eliminated the waitlist for Intermediate inpatient care, are addressing Acute inpatient needs, and are maximizing the use of inpatient *Coleman* beds throughout the system, including at DSH-Atascadero, by ensuring that patients are moved to a less restrictive custodial setting as soon as it is clinically appropriate to do so. Defendants are confident that the measures underway and under consideration will effectively address the waitlist for Acute care.

ECF No. 5374-1 at 8. Less than a year later, on September 28, 2016, defendants filed a document styled "Defendants' Update to Department of State Hospitals' Inpatient Census and Movement." ECF No. 5496. That document showed a total of 187 class members on waitlists for transfer to inpatient care and only 71 beds available. ECF No. 5496-1 at 4. Defendants indicated that they would "welcome the opportunity to further discuss the issue before the Court in a status conference." *Id.* at 3.

1    On October 6, 2016, the court granted plaintiffs fourteen days to file a response to

2    defendants' update, and set the matter for status conference on November 10, 2016.  ECF

3    No. 5498.  Following the status conference, defendants were ordered to show cause in writing

4    why the waitlists for inpatient care could not be reduced to zero by November 23, 2016, at

5    5:00 p.m. and maintained at zero thereafter.  ECF No. 5519 at 3.  On November 22, 2016,

6    defendants reported to the court they would not be able to eliminate the waitlists by the deadline

7    set in the court's order.  ECF No. 5522 at 1.  Defendants also represented that "while obstacles

8    remain, the number of patients waiting beyond *Coleman* Program Guide timelines is decreasing

9    . . . ."  *Id*.  However, they did not provide a "concrete timeline for permanent elimination of these

10   waitlists."  ECF No. 5529 at 1.

11   At the November 10, 2016 status conference, the court set a further status

12   conference for January 20, 2017.  ECF No. 5512.  On December 9, 2016 and January 19, 2017,

13   the court issued orders directing the parties' attention to specific issues to be addressed in

14   supplemental briefing and at the hearing, and indicated it would take testimony over the course of

15   one day, as necessary.  ECF Nos. 5529 and 5551.  The hearing was continued to January 23,

16   2017, and held on that day.

17   After hearing, and review of all the briefing filed by the parties, the court finds the

18   Special Master was correct in his May 25, 2016 assessment that it is time to break "the all too

19   predictable cycle of court intervention" in the rise and fall of inpatient waitlists.  ECF No. 5448 at

20   39.

21   III.    OPTIONS FOR COMPLIANCE WITH ACUTE AND ICF TIMELINES

22   Taken together, the extensive history of remedial efforts in this action and the

23   evidence and testimony presented in connection with the January 23, 2017 hearing convince the

24   court that defendants have sufficient options available to allow them to comply now, fully and

25   permanently, with the timeline requirements of the Program Guide for transfers to acute and ICF

26   inpatient care.

27

28

1    A.    BED CAPACITY AND PROJECTED NEED

2        1.    Capacity

3        At present, defendants report a total capacity for male inmates of 412 acute

4    inpatient care beds, including 40 beds at the San Quentin Psychiatric Inpatient Program (SQ PIP);

5    390 ICF beds; and 700 high custody ICF Beds.  ECF No. 5544-2 at Ex. A.  The 700 high custody

6    ICF beds include 58 beds at Salinas Valley Psychiatric Program (SVPP), which were taken

7    offline in October 2016 and January 2017 due to flooding at SVPP.  ECF No. 5544-1 ¶ 4; RT

8    139:12-14.  Defendants' Census, Waitlists and Trends Report for Inpatient Mental Health Care

9    for January 2017 (January Census Report), filed February 15, 2017, shows a total of 72 ICF high

10   custody beds, 71 at SVPP and 1 at DSH-Stockton (Stockton), that are "temporarily unavailable

11   due to repairs."  See ECF No. 5566 at 6-7.  In order to address the loss of capacity, defendants

12   have started housing class members in 24 isolation beds at Stockton on an emergency basis.[6]  RT

13   139:3-19.  Although it was not entirely clear, it appears repair work on the SVPP units will begin

14   this month.  See RT 20:12-19, 133:6-12.  Until the repairs are completed, it would appear

15   defendants actually have 652 high custody ICF beds available.[7]  Finally, the acute bed capacity

16   number includes ten beds at Stockton that defendants have no plans to use because they are

17   isolation rooms.  RT 139:20-24.  Defendants also propose a permanent addition of 72 high

18   custody ICF beds at California Medical Facility (CMF), ECF No. 5544-2 at Ex. A, and Director

19   Ahlin testified that they plan to convert 16 isolation rooms at Stockton to ICF beds, with

20   construction beginning at the end of this month, March 2017.  RT 45:16-24.

21       [6] The Special Master informs the court that he asked defendants more than a year ago for a
plan for conversion of some or all of those rooms so they could be used as inpatient mental health
22   beds.  To date, defendants have not provided him with a plan, and they did not advise him the
rooms were in use until shortly before the January 23, 2017 hearing.  Director Ahlin testified
23   these rooms were not designed for mental health inpatient care and that safety concerns presented
by their use are currently being addressed with "enhanced staffing."  RT 19:10-19, 43:1-23.
24   Director Ahlin also testified that DSH has "a plan to convert one room in each cell" to long-term
care.  RT 19:25-20:6, 45:16-24.  Defendants are cautioned that a failure to fulfill their obligation
25   to work with the Special Master and his team on all matters that affect remediation in this action
may result in further orders to show cause from this court.
26

27       [7] 700 ICF high custody beds less 72 temporarily unavailable plus 24 emergency beds
equals 652 beds.
28

For female inmates, defendants report a total capacity of 45 Acute/ICF beds.  ECF No. 5544-2 at Ex. A.  They also report a temporary capacity of 30 Acute/ICF beds at Patton State Hospital (Patton), for a net total of 75 female Acute/ICF beds.  *Id.*

2. Projected Need

In 2006, the court ordered defendants to "contract with Navigant Consultants to conduct annual population reviews and updates of their projections for mental health program populations from 2007 through 2009."  ECF No. 1998 at 2.  By order filed July 9, 2009, defendants were directed to renew that contract "and/or execute a contract with John Misener of McManis Consulting" for a period of three additional years.  ECF No. 3629 at 3.  Defendants continue today to contract with John Misener for their mental health program population projections, including bed need.  RT 129:16-19.  On January 11, 2017, defendants published their latest Mental Health Bed Need Study based on Fall 2016 Population Projections.  ECF No. 5542-1 at 103.  That study forecasts inpatient bed need through the end of fiscal year 2021.  *Id.* at 112.

All of the projected need is based on a 90 percent occupancy standard and therefore includes more beds than the projected average daily census for all of the inpatient programs.  *Id.* at 108, 112-115, 121.  The charts below show the projected bed need for 2017 through 2021 and the average daily census on which the projected need is based:

a) Male Acute Psychiatric Program

| YEAR | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|
| Average Daily Census (ADC) | 328.2 | 330.5 | 331.8 | 333.5 | 335.1 |
| Bed Need | 365 | 367 | 369 | 371 | 372 |

/////

/////

/////

/////

10

b)  Male ICF High Custody

| YEAR | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| ADC[8] | 631.5 | 635.5 | 637 | 639.7 | 641.9 |
| Bed Need[9] | 702 | 706 | 708 | 711 | 713 |

c)  Male ICF Low Custody

| YEAR | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| ADC | 324.2 | 327 | 329.4 | 332 | 334.5 |
| Bed Need | 360 | 363 | 366 | 369 | 372 |

d)  Male PIP

| YEAR | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| ADC | 38.5 | 38.6 | 38.8 | 39 | 39.1 |
| Bed Need | 43 | 43 | 43 | 43 | 43 |

e)  Female Acute/ICF

| YEAR | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| ADC | 49.7 | 50 | 50 | 50 | 50 |
| Bed Need | 55 | 56 | 56 | 56 | 56 |

ECF No. 5542-1 at 112-115, 121.

/////

/////

/////

/////

---

[8] Includes 0.6 average pending list for "1370s". *See* ECF No. 5542-1 at 113.  These are individuals found incompetent to stand trial held in DSH hospitals pending restoration of competency. *See* Cal. Penal Code § 1370.

[9] This also includes 1370s. *See* ECF No. 5542-1 at 113; note 6 *supra*.

3.      Capacity Compared to Projected Need

Based on the foregoing, the following table shows defendants' current and proposed bed capacity for 2017 and the projected bed need for the next five years:

| YEAR | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|
| Male Acute Capacity | 372 | | | | |
| Need | 365 | 367 | 369 | 371 | 371 |
| Male ICF HC Capacity | 700 | | | | |
| Need | 702 | 706 | 708 | 711 | 713 |
| Male ICF LC Capacity | 390 | | | | |
| Need | 360 | 363 | 366 | 369 | 372 |
| SQ PIP Capacity | 40 | | | | |
| Need | 43 | 43 | 43 | 43 | 43 |
| Female Acute/ICF Capacity | 75[10] | | | | |
| Need | 55 | 56 | 56 | 56 | 56 |

Using defendants' numbers, the foregoing shows that defendants currently appear to have a sufficient number of male ICF low custody beds, and a sufficient number of female acute/ICF beds unless they remove the availability of the 30 beds at Patton. Defendants' current number of SQ PIP beds is less than their projected need, and the projected need for male acute care beds is slightly above existing capacity. Finally, as discussed above the net number of currently available ICF high custody beds is currently 652, which is lower than the projected need but above the projected average daily census.

4.      Planned Additional Capacity

Defendants have presented evidence that they plan to open an additional 72 male high custody ICF beds at California Medical Facility (CMF) by April of this year. *See* ECF

---

[10] Defendants identify 30 of these 75 beds, located at Patton, as temporary. ECF No. 5544-2 at Ex. A.

No. 5544-2 ¶ 4.  These beds are located in the L-1 unit at CMF, *id*., and are presently used as

Enhanced Outpatient Program (EOP) beds.  RT 140:13-24.  At an earlier stage in these

proceedings, three units in L-Wing at CMF were used for 110 ICF beds.  *See* ECF No. 4103 at

10-11; ECF No. 4120 at 2.  The October 2011 plan for use of L-Wing for high custody ICF

patients called for single cells.  *See* ECF No. 4103 at 10.  At hearing, Deputy Director Tebrock

confirmed that L-1 had single cells and only 36 patients when it was operated as an "emergency

ICF unit" until early 2014.  RT 147:17-148:1.  The plan to open these additional 72 beds at CMF

is described as "preliminary" in defendants' bed plan, ECF No. 5544-2 at Ex. A.  RT 148:5-12.

Defendants are assessing ways to address a shortage of treatment space in the unit, primarily by

escorting inmate patients to O Wing, a "fairly new and . . . big" treatment facility at CMF.

RT 148:5-23.

        In addition, "the 2017-18 Governor's Budget proposes to construct two 50-bed,

flexible use, inpatient units" and to complete construction by summer 2021.  ECF No. 5544-2 ¶ 5.

One unit will be at R.J. Donovan State Prison and one will be at California Institution for Men.

*Id*.  Primarily intended for use as MHCBs, the beds will also be able to "be flexed for use as an

Acute Psychiatric Program or Intermediate Care Facility" as needed.  *Id*.

        Finally, at hearing Director Ahlin testified that defendants have a plan to convert

sixteen isolation rooms at Stockton to ICF beds, with construction beginning at the end of March

2017.  RT 45:14-24.

        The foregoing evidence suggests that, while capacity in several areas is extremely

close to projected need, defendants currently have enough overall inpatient bed capacity to meet

the projected need for the next four years.  That evidence alone suggests defendants should be

able to come into full and permanent compliance with the Program Guide timelines forthwith.

        The re-emergence of waitlists raises some question about defendants' capacity to

meet demand, particularly when need spikes or beds must be taken offline.  Currently, defendants

use a 90 percent occupancy standard for projecting bed need.  *See* ECF No. 5542-1 at 108.  As

explained in the most recent Mental Health Bed Need Study:

1
2
3
4
5
6

> The goal of the Study is to address the adequacy of the capacities in each program so that those who are referred on the basis of a clinical judgment will not encounter barriers caused by inadequate supply.   Occupancy standards were selected to ensure that, on average, capacities would not be exceeded in the future given the forecasted bed requirements.   While the inpatient community standard is approximately 80 percent, the California Correctional Health Care Services decided to apply a 90 percent occupancy standard to all inpatient programs, . . . . The lower occupancy standard increases the probability of having an empty bed available.

7   *Id.* Defendants attribute the latest re-emergence of waitlists to "[u]nexpected spikes," which have

8   required them "to take specific action to address shortfalls in available bed capacity. . . ." and, as

9   discussed, flooding at SVPP this winter has required defendants to take 70 high custody beds

10   offline.  These events, together with the 2015 re-emergence of waitlists, suggest questions about

11   whether use of a 90 percent occupancy standard for planning going forward provides sufficient

12   excess capacity.  Defendants may want to seriously consider using an 80 or 85 percent occupancy

13   standard for bed planning purposes going forward to avoid any shortfall in capacity.  That

14   determination will be for defendants to make as part of their overall responsibility for coming into

15   full and permanent compliance with Program Guide timelines for transfer to inpatient care.

16   In a declaration filed November 22, 2016, Director Ahlin averred that "forecasting

17   is not a perfect indictor of real demand" and that "[s]ometimes demand forecasting will fall short

18   of real-time demand."  Decl. of Pam Ahlin, ECF No. 5522-1 ¶ 9.  She averred this kind of

19   shortfall is what led to the most recent recurrence of waitlists, and why defendants could not, by

20   November 23, 2016, reduce to zero the number of inmate-patients waiting for transfer to inpatient

21   care.  *Id*.  The court credits the testimony that some of the forecasting of bed need "is certainly

22   challenging to do."  RT 130:11.  Ultimately, however, it is defendants' responsibility to maintain

23   an adequate capacity of inpatient mental health beds in order to meet their "constitutional

24   obligation to provide 'a system of *ready* access to *adequate* [mental health] care.'  *Hoptowit v.*

25   *Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982 (emphasis added)…"  *Coleman v. Brown*, 938 F. Supp.

26   2d at 981.  This includes sufficient capacity to manage inevitable spikes in demand.  The record is

27   replete with evidence of options available to defendants, many described by defendants

28

14

1  in recent filings with the court, to transfer all class members in need of inpatient care to the

2  required level of care within the timelines established for doing so.

3         B.     <u>LEAST RESTRICTIVE HOUSING</u>

4        In August 2015, this court held what would be the first in a series of hearings to

5  address the re-emergence of waitlists for inpatient hospital beds for class members. *See* ECF

6  Nos. 5333, 5340. Following the hearings, the court issued an order directing the Special Master

7  to "be actively involved in the ongoing negotiations to update the memorandum of understanding

8  (MOU) between DSH and the California Department of Corrections and Rehabilitation (CDCR)

9  for provision of inpatient mental health care." ECF No. 5343 at 2. The court also directed

10  defendants to report to the court within thirty days "on whether regular and consistent use of the

11  full complement of 256 beds at Atascadero State Hospital (ASH) designated for *Coleman* class

12  members is sufficient to permanently eliminate the ongoing waitlist for inpatient mental health

13  care and if not, why not and what alternate plans are in place for waitlisted class members." *Id*.

14  Defendants subsequently sought and received an extension of time to report to the court on the

15  use of ASH beds on the ground that finalization of the MOU would impact that report. ECF

16  No. 5360.

17        In their response, filed October 30, 2015, defendants reported to the court that they

18  were "implementing a new Housing Review policy that will safely maximize the use of

19  Defendants' inpatient *Coleman* beds throughout the system, including at DSH-Atascadero, by

20  ensuring that patients who are, or who become, custodially eligible for Low-Custody Intermediate

21  care placement are moved to a Low-Custody bed as soon as it is clinically appropriate to do so."

22  ECF No. 5374-1 at 3. This least restrictive housing (LRH) policy builds on a policy implemented

23  by defendants in 2011 that "lowered custodial criteria for placement in Low-Custody

24  Intermediate programs and has resulted in nearly 1,400 direct admissions to Low-Custody

25  programs to date, including over 860 admissions to DSH-Atascadero." *Id*. These efforts are

26  aimed at remediating a longstanding problem with access to inpatient care for inmate-patients

27  with a high custody classification score and a recurring pattern of waitlists for high-custody

28  inpatient beds while low custody inpatient beds, particularly at ASH, are unoccupied.

1    Director Ahlin testified that a patient's "clinical presentation doesn't always match

2    their least restrictive housing . . . and it gives us an opportunity to find the best environment for

3    what clinical presentation they are at that point in time so that they can be successful in

4    treatment." RT 16:7-12.  In such circumstances, the LRH designation serves as a kind of "step

5    down" part of case management; patients are "reviewed upon admission and there's an

6    assessment done at that point in time by their initial IDTT, which is the interdisciplinary

7    treatment team, and then they are required to have a treatment team every 30 days thereafter."

8    RT 17:2-7.  She also testified that "approximately 90 per month are stepping down from our acute

9    ICF [sic] programs into a least restrictive environment." RT 17:15-17.

10   Director Ahlin testified that as of January 20, 2017, 351 patients were housed in a

11   DSH inpatient unit above their LRH classification.  RT 12:17-19.  At hearing, defendants offered

12   as Exhibit 3 a Psychiatric Inpatient Programs Census Report as of 1/20/17.  Defs.' Ex. 3.  This

13   exhibit shows that total as 354 patients.  *See id.*[11]  This represents more than half of the 685

14   patients in units where inmates out of LRH were housed.  *Id.*  At the same time, there were 46

15   unoccupied *Coleman* beds at ASH and 4 unoccupied *Coleman* beds at Coalinga State Hospital

16   (Coalinga), *id.*, while 29 inmates had been waiting more than thirty days for admission to an

17   ICF-High Custody bed.  Defs.' Ex. 1.

18   Defendants have committed themselves to the LRH process both as part of their

19   bed utilization management and efficiency goals and because of clinical considerations.  The

20   evidence before the court suggests that proper use of the LRH process will indeed aid defendants

21   in making complete and efficient use of their full complement of inpatient mental health beds and

22   in complying with Program Guide timelines.

23

24

25   [11] Defendants' January Census Report shows 351 patients housed out of LRH, still
representing over half the 680 patients housed in units where inmates out of LRH were housed.
26   *See* ECF No. 5566 at 6-7.  This report shows 216 patients at ASH, five in an acute care program
and 211 in ICF, with 12 beds on hold and 28 beds available.  *Id.*  There was 1 bed available at
27   Coalinga. *Id.* at 7.

28

C.      ADDITIONAL BED CAPACITY

       1.      DSH Hospitals

The option of adding increased *Coleman* inpatient bed capacity, particularly at ASH and Coalinga, has been raised over the course of the remedial phase of this action as defendants have grappled with the ongoing failure to eliminate waitlists for transfer to inpatient care. *See*, *e.g.*, ECF No. 4069 at 8 (Order resetting evidentiary hearing on why beds at Coalinga cannot be filled with high custody class members in need of inpatient care and granting defendants ninety days to "work with the special master to develop a supplemental plan to reduce or eliminate the inpatient wait list and to better serve the treatment needs of inmates on the wait list.").  At the January 23, 2017 hearing, Director Ahlin testified that there are approximately 189 inpatient beds at Coalinga State Hospital (Coalinga) that are unoccupied and not already designated for *Coleman* class members, and approximately 91 such beds at ASH.  RT 22:16-22. Of those, a total of 47 beds at ASH are "on two units that are not occupied at this time."  RT 22:23-24.  Those two units "were closed for fire life safety reasons" and are used "as swing space" when DSH does construction, repairs or modifications to other units.  RT 25:9-15.  The other 44 beds at ASH have been taken offline "due to aggression reduction."  RT 22:25-23:4. Director Ahlin explained that these beds are found in units where the number of patients has been reduced in order to reduce patient assaults on staff and other patients.  RT 22:25-23:17.  Director Ahlin also testified that at some point in 2016, defendants began treating some inmates in need of acute inpatient care in an admissions unit at ASH.  RT 66:20-67:1.

Dr. Warburton shed further light on this patient management issue.  She testified that DSH facilities are required to treat, among other patients, individuals civilly committed as mentally disordered offenders (MDO patients) and that "[t]he MDO patients [in DSH] facilities are a much more volatile and difficult group of individuals to treat" than the *Coleman* patients admitted to DSH hospitals.  RT 95:8-14.  DSH is faced with "license and joint commission requirements" that prevent clinicians in DSH hospitals from managing violent behavior of MDO patients unless those patients "reach a level . . . where, essentially, the assault has to be either happening or we have objective evidence that it's about to happen."  RT 95:18-96:21.

17

Dr. Warburton testified that those standards were developed for psychotic patients, but that MDOs and *Coleman* patients "have a whole host of violence risk factors and perpetrate different types of violence, . . . that those types of standards don't allow us to contain." RT 96:22-97:4. DSH is able to manage the violence risk of *Coleman* patients by placing high-risk individuals in one of the prison hospital programs where the violence can be contained; in contrast, in ASH or Coalinga, DSH staff "simply cannot contain that behavior" because they are "legally not allowed to. . . ." RT 97:8-11.

In light of the clarified record regarding ASH, it appears there may be some additional capacity available at ASH in the admissions unit currently being used to provide acute inpatient care, although defendants' January Census Report indicates defendants are counting these beds as part of the complement of 256 *Coleman* beds at ASH.  *See* ECF No. 5566 at 6-7. Beyond the admissions unit, safety issues may preclude addition of any further bed capacity for class members at ASH.  Specifically, Director Ahlin's testimony that the only two empty units at ASH have been closed "for fire life safety reasons" raises questions about why those units are used at all, even if not made available to *Coleman* class members. If additional ICF capacity is unavailable at ASH, it would appear that the full complement of 256 ASH beds designated for *Coleman* class members must be fully used at all times.  The court assumes that complete and proper implementation of the LRH policy will mean that there are no unoccupied beds while class members are waiting for necessary inpatient care, particularly when such waits approach the deadlines set in the Program Guide.

Director Ahlin's testimony raises questions about the availability of additional capacity at Coalinga as well, though that is less clear.  She testified that there are 189 undesignated beds available at Coalinga.  RT 22:21-22.  Fifty of those beds are offline because they are in two units "not designed for long-term patients, more of a pre-conditional release program . . . very much independent living" for the sexually violent predators Coalinga was originally built to house, and "not suitable for ICF or acute patients."  RT 23:5-10.  The remaining 139 unoccupied beds apparently are spread across a variety of the 28 long-term units that are open but operating with reduced population as part of "aggression reduction."

1  RT 23:11-21.  Although Director Ahlin's testimony suggests that the two unused units at

2  Coalinga are not immediately available, it is unclear whether those two unused units could, if

3  necessary, be converted to additional inpatient space for *Coleman* class members.  That too is a

4  decision for defendants, not for this court.  For purposes of this order, it is enough to note that

5  there are two units at Coalinga that defendants might consider converting if additional inpatient

6  mental health bed capacity is necessary to meet Program Guide timelines in the future.

7  2.     Community Hospitals

8  In one of two declarations filed in connection with the recent proceedings, Deputy

9  Director Tebrock averred that in 2012 and 2013, "CDCR attempted to secure beds in community

10  hospitals to provide inpatient care to inmates."  ECF No. 5544-2 ¶ 9.  At the hearing, she testified

11  that defendants have "recently . . . reached out again" "to try to identify any potential contractors

12  in the community."  RT 128:17-24.  She was "not sure" what response they will get.  RT 129:2-6.

13  At this juncture, the record is not clear this is a viable option, though the court commends

14  defendants for exploring all possible available resources to ensure that class members no longer

15  wait for necessary urgent mental health care.[12]

16

17

18

---

19  [12] In connection with this issue, plaintiffs have submitted a Declaration of Pablo Stewart, M.D., prepared for and filed in another action in the Eastern District of California, *Hedrick v.*

20  *Grant*, Case No. 2:76-cv-0162 GEB EFB P, together with a request to seal the document.  The *Hedrick* plaintiffs have also requested that the document be sealed.  *See* ECF No. 163-5 in Case

21  No. 2:76-cv-0162 GEB EFB P.  The court has reviewed the declaration and the request to seal.

22  Dr. Stewart's declaration is offered for the proposition that "[c]ommunity hospitals are likely to resist taking forensic patients."  ECF No. 5542.  Review of the declaration shows that it discusses

23  the limited availability of services at one hospital in Yuba County.  The declaration does contain identifying information for inmates at Yuba County Jail, and those parts of the declaration might

24  meet the "high threshold of showing that 'compelling reasons'" require that it be sealed.

25  *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (internal citation omitted).  However, it appears that the declaration is of limited utility in these proceedings; it

26  discusses only one hospital in one California county, the proposition for which the declaration is offered is not disputed in these proceedings, and defendants are nonetheless taking steps to

27  explore community hospital options.  For these reasons, plaintiffs' request to seal will be denied and the declaration will be returned to counsel unfiled.

28

1        D.        LIFT AND SHIFT

2               For the second time in two years, defendants are again exploring the possibility of

3    shifting to CDCR the responsibility for inpatient care of inmate-patients in the prison-based

4    inpatient programs.  This concept was discussed for the first time over a decade ago, and was the

5    subject of an October 2007 court order.  *See* ECF No. 5448 at 41-42; ECF No. 2461.  Currently

6    referred to as "lift and shift," the concept was explored in 2015 as part of the MOU process, but

7    did not come to fruition then.  *See* ECF No. 5448 at 15-16.  It has, however, been included now in

8    the Governor's Fiscal Year 2017-18 Budget proposal, ECF No. 5544 at 1, and, if adopted, will

9    roll out over a period of two years.  RT 137:10-14.  The Special Master has signaled that, given

10   the "overall success" of the two inpatient mental health programs operated by CDCR at

11   California Institution for Women and San Quentin, "CDCR may now be ready to begin assuming

12   responsibility for the inpatient care that has heretofore been provided by DSH at the three

13   psychiatric programs, DSH-Vacaville, DSH-Salinas Valley, and DSH Stockton" and that "if

14   CDCR is serious about a 'lift and shift' at the three DSH psychiatric programs, now is the time

15   for CDCR to proceed in that direction."  ECF No. 5448 at 43.

16              Deputy Director Tebrock testified that this proposal, if adopted and successfully

17   implemented, "compresses the timeframes for review that are necessary to get somebody into the

18   inpatient programs . . . effectively eliminating a level of review," thereby saving time and

19   increasing access to care.  RT 136:15-21.  She estimates that referral times to acute care programs

20   "may be reduced by as much as 50 percent (from six to three business days), and by as much as

21   40 percent in high-custody, intermediate-care programs (from fifteen to nine business days)."

22   ECF No. 5544-2 ¶ 6.  In addition, "CDCR Inpatient Coordinators will receive the least restrictive

23   housing designations much sooner in the process" and "[b]ecause referrals will be an internal

24   CDCR process, CDCR Headquarters staff will be able to review referrals much more quickly, and

25   the DSH confirmation step will be eliminated."  *Id.*  This testimony suggests very significant

26   efficiencies in transfer to inpatient care may be realized through adoption of "lift and shift."  It

27   also suggests there is currently an enormous duplication of effort between CDCR and DSH

28   personnel involved in referral and transfer of inmates to inpatient care.  Unless addressed, this

20

1  duplication of effort will continue even with the adoption of lift and shift because defendants will

2  still use DSH-run inpatient beds at ASH and Coalinga for inpatient care of *Coleman* class

3  members.

4  The specific proposal to implement "lift and shift" is an encouraging development,

5  which has much promise as defendants work toward achieving a lasting and durable remedy.  Of

6  great significance, reduction in the time it takes to transfer inmates to inpatient care may reduce

7  the risk of further decompensation and increased acuity of mental illness, which can accompany

8  delays in transfer to necessary hospital care.  At this point, adoption of "lift and shift" requires

9  passage of the budget and cannot be assumed.  Deputy Director Tebrock testified that if "lift and

10  shift" is "approved by the legislature, the shift would occur on July 1st, but it contemplates a two-

11  year rollout period.  So for the foreseeable future, things will remain the same…." RT 137:13-15.

12  Notwithstanding, all signs are that, in addition to other advantages, "lift and shift" would help

13  maintain compliance with Revised Program Guide timelines.  The court expects the Special

14  Master will be fully involved in the planning for "lift and shift" and, if adopted, its

15  implementation.

16  IV.    MENTAL HEALTH CRISIS BEDS

17  In the December 9, 2016 order, the court expressed great concern about

18  defendants' practice of retaining inmate-patients in MHCBs pending transfer to inpatient care.

19  ECF No. 5529 at 2-3.  MHCBs are, as their name states, for inmate-patients in mental health

20  crisis:  demonstrating "Marked Impairment and Dysfunction in most areas (daily living activities,

21  communication and social interaction) requiring 24-hour nursing care; and/or: Dangerousness to

22  others as a consequence of a serious mental disorder, and/or dangerousness to self for any

23  reason."  Program Guide at 12-1-8.  The Program Guide requires inmate-patients referred to an

24  MHCB to be transferred within twenty-four hours.  *Id*. at 12-1-16.  The Program Guide also limits

25  MHCB stays to ten days absent approval by the Chief of Mental Health or a designee.  *Id*. at 12-

26  1-8.  As the court has found, "the Program Guide makes clear [that] each level of the MHSDS has

27  specific admission criteria."  ECF No. 5529 at 2-3.

28

21

Referral to inpatient care "is available for inmate-patients whose conditions cannot be successfully treated in the outpatient setting or in short-term MHCB placements." Program Guide at 12-1-9. By its own terms, defendants' remedial plan makes plain that inmates referred to inpatient mental health care *cannot be successfully treated* at lower levels of care or in MHCBs. MHCBs do, under the Program Guide, provide "*short-term* inpatient care for seriously mentally disordered inmate patients awaiting transfer to a hospital program or being stabilized on medication prior to transfer to a less restrictive level of care." Program Guide at 12-1-8 (emphasis added). MHCBs are not, however, a substitute for the inpatient care provided through DSH programs. Referrals to DSH inpatient care represent the considered judgment of CDCR clinicians that those inmate patients need a higher level of care than is available in CDCR's EOP and MHCB programs.

*Id.*

In the Twenty-Sixth Round Monitoring Report, the Special Master reported to the court that "growing wait lists for inpatient care beds was causing a surge in the number of inmates awaiting transfer to inpatient beds as they remained in their MHCBs pending transfer." ECF No. 5439 at 20. This in turn was causing delays in the timely transfer of class members to MHCBs, and these inmates are often held in settings that cannot provide them with the emergency care they require to stabilize their mental health crisis.

The record shows that defendants are not in compliance with the Program Guide 24 hour transfer requirement. In September 2016, a total of 448 class members were transferred to MHCBs. ECF No. 5529-1 at 13. The average wait time for transfer was 86.45 hours, and only nine class members were transferred in less than 24 hours. *Id.* In November 2016, there was improvement: 387 inmates were transferred to MHCBs with an average wait time of 25.93 hours. ECF No. 5543-1 at 32. Two-hundred forty-four of those were transferred within 24 hours, while 103 waited between 24 and 48 hours, 25 waited between 48 and 72 hours, and 15 waited more than 72 hours. *Id.* At the evidentiary hearing, the court heard testimony that as of January 20, 2017, there were 39 inmates pending transfer to an MHCB, nine of whom had been waiting longer than 24 hours even though there were 161 vacant MHCBs. RT 124:1-7.

Defendants currently have 427 male MHCBs and 22 female MHCBs. RT 122:8-11. Although defendants have a plan to add 100 additional MHCBs which can also be flexed to serve as acute or ICF inpatient beds by 2021, RT 169:25-170:8, testimony at the

1    evidentiary hearing suggested that factors other than an insufficient number of MHCBs are

2    necessary to eliminate transfer delays.  These factors include:  proper "triaging" of the "need for

3    crisis beds"; quality improvement practices that, among other things, discharge "patients from

4    crisis beds early" to free up the beds for inmates in need of the beds; and efforts to minimize the

5    number of referrals that are quickly rescinded.  RT 133:13-135:11.  These management issues,

6    while real, can no longer serve to excuse non-compliance with Program Guide timeline

7    requirements for transfer to MHCBs.

8         In the court's view, a significant question here is whether 90 percent compliance

9    with the 24 hour transfer requirement is sufficient to achieve constitutional compliance or,

10   instead, whether 100 percent compliance with the requirement, with specific exceptions, is

11   required.  *See* ECF No. 4361 at 9 (Rejecting defendants' objection to the Special Master's use of

12   the term "compliance" as requiring a "'minimal score of 90% against Program Guide

13   requirements'" and finding that "[b]ecause the Revised Program Guide is the operative remedial

14   plan in this action, the degree to which defendants have implemented the requirements of the

15   Revised Program Guide is extremely relevant and useful to assessment of whether they are

16   meeting their constitutional obligations.").  The court will direct the parties to provide

17   supplemental briefing on this question, among others.

18   V.    <u>CONCLUSION</u>

19        Over a decade ago defendants were ordered to "immediately implement" the

20   provisions of the Program Guide.  Nearly seven years ago, defendants were ordered to "come up

21   with a plan to reduce or eliminate the wait list for inpatient care. . . ."  ECF No. 4069 at 2 (citing

22   ECF No. 3831 at 3).  Five-and-a-half years ago the court issued an order outlining the urgency of

23   the problem and describing time wasted developing yet another plan while the waitlists continued

24   to grow.  *See* ECF No. 4069, *passim*.  Nearly four years ago, the court denied defendants' motion

25   to terminate this action in part because defendants had not yet solved the problem of providing

26   class members ready access to inpatient care.  *Coleman v. Brown*, 938 F. Supp. 2d at 982.

27   Despite the court's repeated prodding, defendants have not yet regularly and consistently met

28   Program Guide timelines for transfer to inpatient care and inmates still wait past those timelines

1  to be transferred to necessary hospital care.  As recently as November 2016, defendants once

2  again told this court they could not yet eliminate those wait lists.  *See* ECF No. 5522.

3             The court's patience in the face of waitlists that continue to exceed Program Guide

4  timelines is at an end.  For the past twenty years, under court supervision and court order,

5  defendants have studied and planned myriad ways to meet the requirements of their remedial plan

6  for timely transfer of class members to necessary inpatient mental health care.  They have

7  conducted at least three studies of unmet need, resulting, at different times, in identification and

8  referral of approximately 1500 class members in need of inpatient care.  Under court order, they

9  have contracted with a consultant to project mental health bed capacity need four years into the

10  future.  Under court order, they have presented the court with short-term bed plans and long-range

11  bed plans, they have implemented some of those plans, and they have constructed additional

12  inpatient beds.  At this point it is clear that defendants have sufficient options available to them to

13  meet Program Guide timelines for transfer of all class members referred for inpatient care even if

14  demand spikes or emergencies arise to temporarily reduce capacity.  Those timelines must be

15  complied with and waitlists that exceed those timelines must be completely and permanently

16  eliminated.

17             At the same time, as the court has noted, there are very encouraging signs in the

18  plans defendants have put forward for adding additional bed capacity over the next four years, for

19  making more of their inpatient beds able to flex from acute to ICF and/or MHCB use to meet the

20  changing needs of the mentally ill inmate population, and for shifting responsibility for the

21  prison-based inpatient programs to CDCR.  The court intends any enforcement order to be in

22  support of the goal, that defendants achieve full and complete remediation in the near term; it is

23  this goal that informs the work of the Special Master and, the court presumes, is shared by the

24  parties.  When it is clear to the court that the mechanisms for full compliance are readily available

25  to defendants, as it is with respect to these Program Guide timelines, an order requiring such

26  compliance is intended solely to ensure completion of one of the tasks central to ending court

27  oversight.

28

1         To that end, defendants will be ordered to show cause in writing why they should

2  not be required to come into full and permanent compliance with Program Guide timelines for

3  transfer to acute and ICF inpatient mental health care by May 15, 2017.  The court acknowledges

4  Director Ahlin's testimony that factors including "holds for co-occurring medical needs [and]

5  legal holds to address subpoenas and pending Court matters" "may affect the timing of patient

6  transfers."  ECF No. 5522-1 ¶ 7.  Accordingly, unless any party can show good cause otherwise,

7  the ten, and thirty-day periods in which transfer to inpatient care must occur will, for purposes of

8  enforcement by this court, not include any time a class member referred to inpatient mental health

9  care spends in treatment for medical needs deemed more urgent than the mental health need that

10  led to the inpatient referral, or any time a class member spends on out-to-court status pursuant to

11  a court order or subpoena.

12         In addition, the parties will be directed to brief whether a court order requiring

13  compliance with Program Guidelines for transfer to MHCBs should require 90 percent

14  compliance across CDCR institutions or 100 percent compliance with defined exceptions, as

15  appropriate.

16         Finally, the parties should brief the question of appropriate remedies for violation

17  of any court order enforcing these Program Guide timelines.  This court has made clear it intends

18  to bring this case to a successful conclusion sooner rather than later and that defendants must

19  finish the remaining tasks and achieve a durable remedy.  *See, e.g.*, RT 5:1-18.  The court also has

20  made clear it will not micromanage defendants in this process; and it has no intention of

21  converting the Special Master to a Receiver.  RT 5:19-22.  At this stage of these protracted

22  remedial proceedings, it appears to the court that the only effective remaining consequence of

23  noncompliance with the enforcement order the court anticipates issuing would be a fine of a

24  specific dollar amount.  The court is contemplating a sanction of $1,000 per day for every day any

25  class member waits past a Program Guide deadline for transfer to ICF or acute inpatient care.  A

26  similar fine would seem appropriate for non-compliance with the MHCB transfer timeline.  How

27  to quantify the number of delayed transfers that would give rise to the sanction depends on

28

1   resolution of the question whether 90 percent or 100 percent compliance with a timeline should

2   be required.

3          The court's authority to impose monetary sanctions to compel compliance with a

4   court order is well-established. *See*, *e.g., United State v. United Mine Workers of America*, 330

5   U.S. 258, 303-04 (1947). Where the purpose of a fine is to make defendants comply with a court

6   order, the court is required to "consider the character and magnitude of the harm threatened by

7   continued contumacy, and the probably effectiveness of any suggested sanction in bringing about

8   the result desired." *Id*. at 304. Civil fines "designed to compel future compliance with a court

9   order, are considered to be coercive and avoidable through obedience, and thus may be imposed

10  in an ordinary civil proceeding upon notice and an opportunity to be heard." *International Union,*

11  *United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (1994). The parties will be

12  directed to brief whether the court's anticipated enforcement order is enforceable only through

13  civil contempt proceedings, or, instead, whether compliance with such an order to be issued by

14  this court can be determined by the data provided in future monthly reports, subject to the court's

15  final approval of a revised reporting template, and enforced by imposition of fines clearly defined

16  in the order.

17         In accordance with the above, IT IS HEREBY ORDERED that the required

18  responses and briefs shall be filed and served not later than 4:00 p.m. on April 7, 2017.

19  DATED: March 23, 2017

20

21

22                          UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28