1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493

Attorneys for Plaintiffs

**FILED**

July 1, 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

          Plaintiffs,

      v.

EDMUND G. BROWN, JR., et al.,

          Defendants.

Case No. 2:90-cv-0520 LKK DAD

**CONFIDENTIAL DECLARATION OF AARON J. FISCHER IN SUPPORT OF PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON ADEQUACY OF INPATIENT MENTAL HEALTH CARE FOR CDCR INMATES AND REQUEST FOR ADDITIONAL ORDERS**

Judge:   Hon. Lawrence K. Karlton

[1229831-1]

1     I, Aaron J. Fischer, declare:

2     1.    I am an attorney admitted to practice law in California, a member of the bar

3 of this Court, and an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP,

4 counsel of record for Plaintiffs.  I have personal knowledge of the matters set forth herein,

5 and if called as a witness I could competently so testify.  I make this declaration in support

6 of Plaintiffs' Response To The Special Master's Report On Adequacy Of Inpatient Mental

7 Health Care For CDCR Inmates And Request For Additional Orders.

8     2.    Attached hereto as **Exhibit A** is a true and correct copy of a letter I sent to

9 the *Coleman* Special Master, copying counsel for Defendants, on May 12, 2014.

10     I declare under penalty of perjury under the laws of the United States and the State

11 of California that the foregoing is true and correct, and that this declaration is executed at

12 San Francisco, California this 30th day of June, 2014.

13

14                            */s/ Aaron J. Fischer*

15                            Aaron J. Fischer

16

17

18

19

20

21

22

23

24

25

26

27

28

1
CONFIDENTIAL DECL. OF AARON J. FISCHER ISO PLS.' RESPONSE TO SPECIAL MASTER'S REPORT ON ADEQUACY
OF INPATIENT MENTAL HEALTH CARE FOR CDCR INMATES & REQUEST FOR ADDITIONAL ORDERS

# EXHIBIT A



**ROSEN BIEN**
**GALVAN & GRUNFELD** LLP

315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Aaron J. Fischer
Email: AFischer@rbgg.com

May 12, 2014

VIA E-MAIL

| **SUBJECT TO** |
|:---:|
| **PROTECTIVE ORDERS** |

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI  02908-5600
*MLopes@pldwlaw.com*

> Re:    *Coleman v. Brown*
> Plaintiffs' Comments Regarding Defendant Department of State Hospitals'
> Update to Court on Salinas Valley Psychiatric Program
> <u>Our File No. 0489-3</u>

Dear Special Master Lopes:

We write to raise serious and urgent concerns about Defendant Department of State Hospitals' Update to Court on Salinas Valley Psychiatric Program (Docket No. 5142, filed Apr. 24, 2014), and the concurrently filed Declaration of Dante Karas to Report on the Status of the Department of State Hospitals' Salinas Valley Psychiatric Program Report (hereinafter, "Karas Declaration" or "Karas Decl.") (Docket No. 5142-1) (enclosed).

Plaintiffs' primary concerns, discussed herein, include the following: (1) Defendants' decision to install cages to provide treatment in inpatient settings, for the first time and without notification to Plaintiffs or approval by the Special Master; (2) troubling clinical staffing trends, which are themselves under-reported due to the use of stale data; (3) the ongoing deficiencies regarding group treatment and out-of-cell time; (4) the lack of individual one-to-one clinical contacts; and (5) problems with Defendants' reporting of ICF transfer timelines.

[1177697-9]

Special Master Lopes
May 12, 2014
Page 2

## I.       Installation of Cages at SVPP

Defendants' Status Report states that "SVPP purchased 8 therapeutic modules to be utilized for maximum custody groups, solo programming and confidential therapeutic sessions.  These treatment modules are currently in house and discussions to place the modules in TC1 have begun.  The goal is to have 8 modules in a room, which will provide new admission orientation groups to all newly admitted patients to SVPP." Karas Decl. Ex. A at 2.

The installation and use of cages for ICF treatment would be an enormous step in the wrong direction, given the extensive evidence Plaintiffs have presented that cages impede the delivery of mental health care and discourage class members from participating in treatment.  SVPP has never used cages for its ICF inpatient program, nor to our knowledge has any licensed DSH program in the state.  Even the CDCR-operated Psychiatric Inpatient Program at CIW has adopted DSH's existing "no cages" inpatient model.  Plaintiffs were not previously notified of Defendants' plan to install cages at SVPP, and strongly object.  It is particularly nonsensical and counter-productive for TC1 and TC2 SVPP patients to be placed in cages to receive treatment, as they are living in dormitory-style housing – making the setting for therapy sessions the most restrictive and harsh setting they face at DSH.

Plaintiffs object to the use of cages for mental health care in all instances, and especially in licensed inpatient mental health programs.  We understand that there may be plans to install cages at CMF's Vacaville Psychiatric Program (VPP) as well, and object to such installations in those DSH units as well.

## II.      Troubling Staffing Trends and Defendants' Use of Stale Data

Defendants' April 25, 2014 filing contains a Status Report based on data that is nearly two months old.  *See* Karas Decl. Ex. A.  It is unclear why Defendants chose to provide data from February 27, 2014 for its April 25, 2014 update, given that more recent data has already been reported to Plaintiffs and the Special Master.

The more recent data is worse than what Defendants now report, particularly with respect to staffing.  For example, Defendants' Status Report, using the February 27, 2014 data, represents that there are 9 staff psychiatrists (6 civil service and 3 contractors). Karas Decl. ¶ 5 & Ex. A at 1.  But the situation got worse more recently:  As of March 31, 2014, there were just 7.66 staff psychiatrists (5.05 civil service and 2.61 contractors).  *See* April 1, 2014 DSH SVPP Staffing Report (enclosed).  The average SVPP census for March 2014 was 227 patients, for an average patient:psychiatrist ratio of

Special Master Lopes
May 12, 2014
Page 3

nearly 1:30, not 1:25 (as indicated in Defendants' filing).  The 1:30 clinical staffing ratio remains inadequate for individual clinician caseloads, admission units, and treatment teams, with results that are unproductive and even dangerous.  *See* Special Master's Report on the Salinas Valley Psychiatric Program at 9-11, Docket No. 4830, Sept. 24, 2013 (hereinafter "Special Master's SVPP Report").

In fact, the most recent DSH data reveals troubling SVPP staffing trends in a number of areas – including psychiatrists, clinical social workers, and rehabilitation therapists.  Despite the fact that SVPP's August 2013 clinical staffing rate was found to be dangerously inadequate, staffing is now actually worse.  SVPP now has only the equivalent of 9.10 clinical social workers, down significantly from the already inadequate 14 full-time positions (plus 4 social workers providing "additional" services) that the program had in August 2013.  *Compare* Special Master's SVPP Report at 6-7 *with* April 1, 2014 DSH SVPP Staffing Report.  Similarly, SVPP's rehabilitation therapists dropped by almost half, from 14 full-time equivalent positions in August 2013 to only 8.45.  *Id.*  Notably, clinical staffing decreases since August 2013 have been proportionately much greater than the decrease in SVPP patient population over the same period.[1]

The "shortage of staffing resources" has been a "major obstacle to implementing" necessary improvements to SVPP's treatment program.  Order, Docket No. 4925, Nov. 13, 2013 (hereinafter "DSH Order") at 7.  These recent clinical staffing decreases are dangerous and deeply problematic.

## III.    Ongoing Deficiencies Regarding Group Treatment and Out-of-Cell Time

Defendants' Status Report regarding the "Quantity of Groups" at SVPP is problematic and reveals continued deficiencies.  *See* Karas Decl. ¶ 8 & Ex. A at 2-3. Defendants indicate that group treatment hours as of February 27, 2014 were as follows:

    TC1:  8.23 hours/week scheduled
    TC2:  9.19 hours/week scheduled
    C5:    9.75 hours/week scheduled
    C6:    10.6 hours/week scheduled

---

[1] Defendants' Monthly DSH Licensure Report shows that the SVPP patient population fell from 307 to 227 (-26%) from July 31, 2013 to March 2014.  During the same time period, clinical social worker and rehabilitation therapist staffing levels have fallen approximately 35% and 39%, respectively.

Special Master Lopes
May 12, 2014
Page 4

*See* Karas Decl. Ex. A at 2.

Even assuming that class members actually received all of these scheduled treatment hours, this amount of structured out-of-cell therapeutic treatment remains far from adequate. SVPP's psychiatrists agreed with the Special Master team that "patients should be receiving *four to five hours per day of structured out-of-cell therapeutic activities*," but in fact, for the majority of SVPP ICF patients, weekly treatment hours continue to fall below even EOP level of care Program Guide requirements. *See* Special Master's SVPP Report at 20 (emphasis added). *See* Program Guide 12-4-8.[2]

Moreover, Defendants' data appear to over-represent the actual number of treatment hours provided to SVPP ICF patients. First, the Status Report provides "current hours *scheduled* per week," whereas even Defendants admit that the number of treatment hours actually *offered* is a more appropriate measure. *See* DSH Order at 9-10 n.8 (citing Defs.' Objs. (Docket No. 4868) at 7 & Program Guide at 12-4-8).[3]

Second, the Status Report acknowledges that the scheduled treatment hours data "exclude[s] those patients on solo programming." Karas Decl. Ex. A at 2. Since patients on solo programming receive little to no treatment, the actual average treatment hours are necessarily lower than reported. It is impossible to ascertain by how much, however, as Plaintiffs remain unclear as to how many SVPP ICF patients are on "solo programming" status, or the criteria used for assignment to such status. *See* Special Master's SVPP Report at 18 ("Although solo programming is discussed within SVPP policy within the context of placement on Cuff Status or temporary program restriction, some SVPP staff indicated that it has been applied to some patients who are within neither of those categories.").

Defendants do not currently come anywhere near to providing the amount of treatment that SVPP's clinicians and the Special Master's experts deem necessary, and they do not even aspire to do so: Defendants' stated goal is to "increase total <u>out of cell</u> hours to an average of 16 hours per week (including yard and leisure time) for those patients fully participating in programming." *See* Karas Decl. Ex. A at 3. More work in this area is urgently needed.

---

[2] No data regarding individual treatment hours is provided in Defendants' filing.

[3] The Karas Declaration appears to misstate in paragraph 8 that the data in the Status Report represents "group hours offered."

Special Master Lopes
May 12, 2014
Page 5

## IV.    Lack of Individual One-to-One Clinical Contacts

During last year's SVPP tours, "[i]ndividualized therapy by psychologists and social workers was not provided regularly and occurred rarely for most patients, even when prescribed by an IDTT, when clinically indicated, or when requested by patients." *See* Special Master's SVPP Report at 4.  The report found that "[t]he lack of individual one-to-one clinical contacts is a major component of the overall programmatic problems at SVPP." *Id.* at 18.

Defendants' Status Report is extremely vague as to how many (if any) one-to-one clinical contacts SVPP provides to its ICF patients.  *See* Karas Decl. Ex. A at 4.  The report states that SVPP's "Program Management has designated set times on the units for the clinicians to have individualized therapy sessions in a treatment room versus cell front," and that the "[u]nits are creating a structured schedule for all disciplines so 1:1 time is scheduled on a regular basis." *Id.*  Defendants also claim that SVPP is installing therapeutic modules so that "patients will be more accessible to the clinicians for individual therapy." *Id.*  Defendants' Status Report appears to leave open the possibility that all individual therapy sessions in the SVPP ICF program may be conducted in cages going forward.  (Plaintiffs object to these installations, as discussed above.)

Even though Defendants indicate that they will implement these changes in April 2014, *see* Karas Decl. Ex. A at 4, their April 25 filing provides no information as to whether or to what extent individual therapy is actually being provided to class members at SVPP.

## V.    Problems Regarding Transfer Timeliness for SVPP ICF Admissions

Defendants claim, based on February 2014 data, that they have made significant progress in reducing the "average wait time for admission to SVPP."  *See* Karas Decl. Ex. A at 5.  While Plaintiffs support any efforts to address lengthy wait times for patient transfer to SVPP, Defendants' representation is misleading in a number of ways.

Defendants' Status Report fails to provide data consistent with the Court's directives.  The Court ordered that "Defendants shall forthwith begin tracking all patient bed assignments at SVPP, and admit referred and accepted patients to SVPP as quickly as bed availability permits and in no event beyond seventy-two hours following bed assignment and *thirty days from the date of the referral*."  DSH Order at 17-18 & 21 (emphasis added).  Instead of providing such data, Defendants provide information as to transfer timelines from the date of *acceptance*.  The Court has already considered and rejected Defendants' attempts to use the acceptance date to track compliance.  *See id.* at

Special Master Lopes
May 12, 2014
Page 8

wait list is connected to the activation delays at California Health Care Facility, Defendants nonetheless proceeded to deactivate SVPP's D5 and D6 units, decreasing SVPP's capacity to provide ICF level of care to the dozens of people on the waitlist.

Plaintiffs are pleased with the attention that has been given to addressing deficiencies in the conditions and treatment identified at SVPP and other DSH programs. We look forward to continuing to be a part of efforts to ensure adequate inpatient care at SVPP, as well as in other inpatient units housing *Coleman* class members.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Aaron J. Fischer*

By:   Aaron J. Fischer

AJF:amc
Enclosures
cc:      *Coleman* Special Master Team
         Elise Thorn, Office of the Attorney General
         Jay C. Russell, Office of the Attorney General

[1177697-9]

1   KAMALA D. HARRIS
    Attorney General of California
2   JAY C. RUSSELL
    PATRICK R. MCKINNEY
3   Supervising Deputy Attorneys General
    ELISE THORN, State Bar No.
4   Christine Ciccotti, State Bar No.
    Deputy Attorneys General
5     1300 I Street, Suite 125
      P.O. Box 944255
6     Sacramento, CA 94244-2550
      Telephone: (916) 323-8789
7     Fax: (916) 324-5205
      E-mail: Elise.Thorn@doj.ca.gov
8   *Attorneys for Defendants*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

SACRAMENTO DIVISION

12

13

| | |
|---|---|
| 14  **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK DAD |
| 15                              Plaintiffs, | **DECLARATION OF DANTE KARAS TO REPORT ON THE STATUS OF THE** |
| 16          v. | **DEPARTMENT OF STATE HOSPITALS SALINAS VALLEY PSYCHIATRIC** |
| 17  **EDMUND G. BROWN JR., et al.,** | **PROGRAM** |
| 18                              Defendants. | Judge:      The Honorable Lawrence K. Karlton |
| 19 20 | Action Filed:  1990 |

21

22      I, Dante Karas, declare:

23          1.      I am the Executive Director for Department of State Hospitals – Salinas Valley

24  Psychiatric Program (SVPP). I have personal knowledge of the facts stated in this declaration,

25  except where indicated otherwise, and if called to testify could do so.

26          2.      This declaration and the SVPP Status Report attached hereto as Exhibit A address

27  issues raised by the Special Master's Report on the Salinas Valley Psychiatric Program dated

28  September 24, 2013.

1

3.     As SVPP's Executive Director , I am familiar with the facility's efforts to improve patient care through increased communication, improved policies and practices, and enhanced documentation. I am also familiar with the recruiting efforts that the department and the facility have undertaken to fulfill clinical staffing needs.

4.     SVPP has created a comprehensive system to improve its operations, assisted and supported by both headquarters and the Clinical Operations Advisory Council. This advisory counsel is a comprehensive multi-disciplinary team of clinicians selected from several state hospitals and psychiatric programs. The counsel's goal is to identify best practices and areas needing improvement, and to assist each facility (including SVPP) in making quality-of-care improvements by using a performance improvement model.

5.     SVPP has 10 treatment teams, which assist with providing treatment planning, individual therapy sessions, and clinical groups related to patients' individualized needs. As of March 1, 2014, SVPP employs 9 full-time staff psychiatrists (6 civil service and 3 contractors), with 1 Chief Psychiatrist serving as the Medical Director and 1 full-time Supervising Psychiatrist; 11 full-time clinical psychologists (3 on leave), with 1 Chief Psychologist (Acting), and 1 Senior Psychology Specialist (Acting); 10 full-time social workers (2 on leave), with 1 Chief of Social Work; and 8 full-time rehabilitation therapists, with 1 Supervising Rehabilitation Therapist (Acting). SVPP continues to aggressively recruit clinical staff on a national level to fill any vacancies.

6.     SVPP has implemented the My Activity Participation Plan to assign patients to treatment groups and track group attendance. This plan allows treatment teams—within the treatment planning conference and with patient input—to assign inmate-patients to groups best meeting their individual needs and goals.

7.     The newly implemented Psychiatric and Wellness Support System Program assists clinicians in integrating each patient's scheduled group and individual therapy sessions into his Treatment Plan. This program also tracks group hours by patient, group, focus, program, unit, and facilitator. Additionally, a Curriculum Committee has been established and has developed

2

1    treatment group descriptions.  This committee continues to develop new curricula and course

2    lesson plans to meet each inmate-patient's individual needs.

3       8.    As of January 13, 2014, SVPP has modified its treatment group times to provide

4    afternoon group hours, and to make group times consistent across all units.  Group hours offered

5    are currently as follows: TC1 – 8.23 hours; TC2 – 9.19 hours; C5 – 9.75 hours; and C6 – 10.6

6    hours.  Additionally, a group audit tool has been developed and will be used by supervising

7    clinicians to monitor treatment group quality.  Feedback will be provided to individual clinicians

8    with the goal of improving group therapies and dynamics.  Auditing data will be reported to a

9    Quality Council for on-going performance improvement.

10       9.    SVPP has identified Medical Technical Assistant (MTA) staff levels on each unit

11   sufficient to provide non-cell-front, individual clinical sessions. The units are creating a better-

12   structured schedule for all disciplines, including MTA escorts and coverage, so that "one-on-one"

13   session time is scheduled on a regular basis.  Clinicians are authorized to determine whether

14   MTA supervision is required within groups and individual sessions.

15       10.    SVPP is developing a committee to discuss and define the roles of MTAs, with a goal

16   of shifting their focus from custody procedures to a more clinical approach.  One means identified

17   to achieve this goal is for MTAs to serve as group facilitators and co-facilitators.  Plans, training,

18   and monitoring are being developed to enable and encourage MTAs to serve as group facilitators

19   and co-facilitators.

20       11.    SVPP has adopted  new policies related to the use of handcuffs: Orientation,

21   Discretionary Program Status (DPS), and Maximum Custody.  These policies were discussed

22   during the Special Master team's prior visit and their recommendations were incorporated into the

23   revised policies, dated April 10, 2014. Program Management tracks all patients on cuff status at a

24   weekly status meeting. As of February 27, 2014, there were 15 patients on cuff status (6 for

25   behavioral issues, 7 new admissions, and 2 maximum custody inmates- patients).

26       12.    As of February, 2014, the average wait time for admission to SVPP has been reduced

27   from 43 days to 18 days from the time of referral.

28

3

13. SVPP has established a Laundry Committee, consisting of warehouse personnel, administrative staff, program staff, nursing staff, custody staff and health and safety staff. This committee meets regularly to evaluate the entire laundry process. In addition to this committee, two MTAs have been assigned as Property Officers to oversee the laundry process, and adequate laundry storage areas have been identified. SVPP now maintains an enhanced level of laundry inventory to allow for operational delays, Prison Industry Authority facility lockdowns, transportation issues, holidays and any other unforeseen circumstances that might affect the laundry supply. In addition to processes in place or currently being implemented, SVPP is exploring further measures to improve the laundry process, including: shrink-wrapping laundry to prevent loss; touring the Avenal facility where laundry is cleaned to determine if operational changes are necessary; stenciling all whites (tee shorts, underwear, and socks) to assist with tracking and decrease opportunity for laundry loss; and establishing an inventory database that determines standard supply levels and backup requirements.

I declare under the penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and that this declaration is executed this 23 day of April 2014, at SACRAmento California.

_____
DANTE KARAS

CF1997CS0003

4

# EXHIBIT A

**[DECLARATION OF DANTE KARAS TO REPORT ON THE STATUS OF THE
DEPARTMENT OF STATE HOSPITALS SALINAS VALLEY PSYCHIATRIC PROGRAM]**

Department of State Hospitals -Salinas Valley



# SVPP – Status Report
## ISSUES IDENTIFIED IN SPECIAL MASTER REPORT

February 27, 2014
Census = 227

The executive staff at SVPP have initiated plans as a Quality Improvement measure to address staffing concerns, policy and procedure revisions, clinical roles and responsibilities, access to groups, IDTT, security and custody roles, tracking measures, etc. This Status Report reflects information as of February 27, 2014 with a current inmate/patient census of 227.

### A. STAFFING:
**Current Status:**
SVPP had recommended retaining a compliment of 10 Treatment Team providers who would provide IDT coverage, individual therapy sessions and clinical groups related to their disciplines and patient's needs. SVPP is actively recruiting for all disciplines to reach and maintain 10 complete teams.

Psychiatrists:
- SVPP has 9 Full Time Staff Psychiatrists (6 Civil Service and 3 Contractors).  A job offer is pending to hire an additional Civil Service Psychiatrist.
- Current census is 227 = 1:25 ratio (average)

SVPP also has one Chief Psychiatrist performing the duties of the Medical Director.  A full time Supervising Psychiatrist began employment at SVPP on February 3, 2014.

Psychologists:
- SVPP has 8 Full Time Clinical Psychologists
- Current census is 227 = 1:28 ratio (average)

In addition, SVPP also has a total of 3 Psychologist on leave (2 on medical and 1 on Personal Leave).  We have one Acting Chief Psychologist, and one Senior Psychology Specialist (Acting).

Social Workers:
- SVPP has 8 Full Time Social Workers
- Current census is 227 = 1:28 ratio (average)

In addition, SVPP also has 2 Social Workers on leave (medical).  One CSW is acting Clinical Administrator and supervises the social work department.

Rehabilitation Therapists
- SVPP has 8 Full Time Rehabilitation Therapists
- Current census is 231 = 1:28 ratio (average)

One RT is acting Supervising RT and is not assigned a caseload.

1

Future Plans:

**RECRUITMENT & RETENTION:**

SVPP is actively recruiting full time civil service psychiatrists, contract psychiatrists, and retired annuitants. Tele-psychiatry is available to SVPP, if needed.

Supervising Psychologist interviews were held and a job offer is pending.

**ESTIMATED COMPLETION DATE:**       ONGOING

**B.  GROUP ASSIGNMENT (NEEDS VERSUS HOUSING):**

Current Status:

SVPP implemented the My Activity Participation Plan (MAPP) on TC1 and TC2, and C Yard Is in process of utilizing this module to assign treatment groups and track attendance. Treatment group times were changed and are currently as follows: 0900-1000, 1000-1100, 1430-1530 and 1530-1630. Yard times are 1130-1330 in all areas. This change was implemented on 1/13/14 to assist with providing treatment groups during afternoon hours and increase patient and staff awareness that treatment group times are uniform across all DSH units.

Future Plans:

SVPP will continue to implement the MAPP rollout in C Yard and make changes in TC1 and TC2 schedules as clinically indicated. SVPP is working with Sacramento IT to generate report form PaWSS to assist with the monitoring of treatment groups offered and data entry into MAPP.

**ESTIMATED COMPLETION DATE:**       **MAPP Implementation 4/2014.**

**ESTIMATED COMPLETION DATE:**       **Reports are being developed.**

**C.  QUANTITY OF GROUPS:**

Current Status:

The implementation process began of the new PaWSS Program. This will assist clinicians with all aspects of tying the patients scheduled and individual therapy sessions to their Treatment Plan. The PaWSS Program will also track group hours by patient, group, foci, program, unit, facilitator, time, etc.

Reports from PaWSS are being developed to provide data to track the hours of structured treatment hours scheduled/held/attended, attendance by patient, groups by facilitator, and various reports. This is in the early stages of development.

SVPP purchased 8 therapeutic modules to be utilized for maximum custody groups, solo programming and confidential therapeutic sessions. These treatment modules are currently in house and discussions to place the modules in TC1 have begun. The goal is to have 8 modules in a room, which will provide new admission orientation groups to all newly admitted patients to SVPP.

See above, Section B related to treatment group times. SVPP has been in discussion with the SVSP CTC to discuss the process of installing the Therapeutic Modules.

CURRENT HOURS SCHEDULED PER WEEK:

TC1:     8.23
TC2:     9.19
C5:      9.75
C6:      10.60

The above numbers exclude those patients on solo programming.

2

**Future Plans:**
SVPP will continue strive to increase total <u>out of cell</u> hours to an average of 16 hours per week (including yard and leisure time) for those patients fully participating in programming. SVPP will continue to work with IT to develop reports of average weekly group hours scheduled/held/attended. SVPP is also in discussion to track solo programming and individual therapy sessions.
**ESTIMATED COMPLETION DATE:**        7/2014

A new admission orientation is in draft and will be reviewed for content and suggested improvements. SVPP is attempting to create an admission unit with the intention of providing needed assessments and evaluations to newly admitted patients. As new admissions become centrally located, new admission orientation groups can be focused in one area.
**ESTIMATED COMPLETION DATE:**        5/2014

### D.  QUALITY ASSURANCE AND SUPERVISORY OF GROUPS:
**Current Status:**
The Curriculum Committee developed an initial description of treatment groups. This committee will continue to develop curriculum and course lesson plans. SVPP is in process of completing Sr. Psychology interviews.

**Future Plans:**
SVPP will utilize a group audit tool and supervising clinicians will begin auditing treatment groups for quality assurance and provide feedback to individual clinicians related to improving group therapies. A form will be utilized to measure each group facilitator and provide feedback to improve overall group dynamics.
**ESTIMATED COMPLETION DATE:**        5/2014

### E.  ROLES OF PSYCHOLOGY:
**Current Status:**
Psychologists began facilitating groups on 1/13/14. They are required to facilitate a minimum of 2 hours of groups per week. The group hour requirement will be evaluated again before next quarter to see if the number of hours required could be increased.

**Role of Psychologists –**
Complete a Suicide Risk Assessment within 72 hours of admission.
Complete a Violence Risk Assessment (V-Risk 10) by the 10th day of admission, unless clinically indicated prior to this day. Generally, it would be completed soon after arrival.
Complete an Admission Psychological Assessment by the 10th day of admission.
Meet with patients for 10,30, and monthly IDT's and complete a psychologist progress note following this IDT
Complete any Psychodiagnostic Assessment as requested by the referring institution.
Respond to all crisis on the unit involving self-harm and aggression.
Complete Behavior Plans for patients with significant behavior problems.

3

**F. INDIVIDUALIZED THERAPY SESSIONS:**
**Current Status:**
The Chief of Psychology is actively monitoring the quality and quantity of each psychologist's workload. Expectations have been set that all assessments by psychologists and social workers are completed prior to the IDT meeting. The Program Management has designated set times on the units for the clinicians to have individualized therapy sessions in a treatment room versus cell front. The Units are creating a structured schedule for all disciplines so 1:1 time is scheduled on a regular basis.

**Future Plans:**
Once the therapeutic modules are installed and available for use, patients will be more accessible to the clinicians for individual therapy sessions. The Discipline Supervisors will be monitoring the performance and productivity of their employees and SVPP will implement a monthly audit to ensure prescribed individual therapy sessions are completed. SVPP will pursue hiring a Social Worker and Rehabilitation Supervisor (Chief) permanently.
**ESTIMATED COMPLETION DATE:**        4/2014 – currently working with CTC and Plant
                                                                Operations for installation.

**G. ROLES & USE OF THE MTA CLASSIFCATION:**
**Current Status:**
SVPP identified staffing levels on each unit to allow for non-cell front individual clinical sessions. The Discipline supervisors reinforced non-cell front sessions with their subordinate staff. The units also designated specific time frames for clinicians in order to maximize the staffing resources allocated to each unit. The Units are creating a better-structured schedule for all disciplines so 1:1 time is scheduled on a regular basis, to better utilize MTA's for escorting and coverage.  Various training materials are available to all nursing staff to assist with continuing education.  These trainings are available on the Internet.

**Future Plans:**
A Committee is being developed to discuss the roles of MTAs.  Various staff will participate in this committee in an effort to define the roles of MTAs and improve communication amongst all staff. The expectation is that the MTA's will provide the clinical/nursing perspective along with the core fundamentals for the group, which will allow the custody culture of the MTA to change to a more clinical/nursing role.

**ESTIMATED COMPLETION DATE:**        7/2014

**H. USE OF HANDCUFFS (ORIENTATION, BEHAVIORAL & MAX CUSTODY):**
**Current Status:**
The number of patients required to be placed in handcuffs during programming as of 2/27/14 was 15 patients.  Of these, 6 were on Discretionary Program Status, 7 were new admissions and 2 were MAX custody.   SVPP ordered 8 therapeutic modules to assist with solo programming of patients.

SVPP continues to discuss cuff status policy and procedures.  SVPP has 3 policies related to the use of cuffs: Orientation, Discretionary Program Status and Maximum Custody.  These policies were discussed during the previous Special Master visit and recommendations were incorporated into the policies.  Program Management tracks all patients on cuff status and a weekly cuff status meeting is held.

4

**Future Plans:**
SVPP ordered 8 therapeutic modules with the intensions of utilizing them for solo programming patients. This will allow SVPP to provide group therapy sessions to patients who would otherwise receive solo program by themselves.
Provide training to all staff related to the new policies that discuss Orientation, Maximum Custody and Discretionary Program Status. The SVPP Executive Director continues to discuss the use of handcuffs at DSH.
**ESTIMATED COMPLETION DATE:          6/2014**

I. **DBT THERAPY**

See above regarding Therapeutic Modules.

**Current Status:**
SVPP continues to explore this option.  Training and discussions with COAC continue to occur.
**ESTIMATED COMPLETION DATE:          12/2014**

J. **TRANSFERS WITHIN 30 DAYS OF ACCEPTANCE:**
**Current Status:**
SVPP Admissions & Discharge staff works diligently to manage CDCR referrals into the ICF program as timely as possible. All beds that become vacant are immediately reviewed for the availability of referrals. This includes the evaluation of dorm suitability, internal movement to facilitate appropriate bed placement as well as ongoing evaluation of patients ready for discharge. The infrastructure of dorm beds within the Treatment Centers limits the ability to place all referrals within an empty bed immediately as not all patients are suitable for dorm environment. However, all patients are continually evaluated for placement into open dorm beds to make available additional single room beds for referrals.
During the month of February, the average wait time for admission to SVPP was 18 days.  The average wait time for December 2013 was 43 days and it was also 43 days for January 2014.

**Future Plans:**
Continue to monitor the time of acceptance into the DSH program.

K. **QUALITY OF TREATMENT PLANS:**
**Current Status:**
The Chief of Psychology is actively monitoring the quality and quantity of the IDTT meetings. This includes observing and evaluating teams and additional training of all team members to increase the quality and consistency of the treatment plans. In addition, SVPP has begun the implementation of the PaWSS system to include the use of the electronic treatment plans that can more readily be reviewed, evaluated and revised for quality and consistency. The Standard Compliance Coordinator (RN) from the COAC team also provided additional training on multiple visits for all Nursing Staff.

**Future Plans:**
Work with COAC to develop and implement an audit tool to monitor clinical content in the treatment plan.  Once audit tool is identified, and training is provided to clinical supervisors, a clinical audit of treatment plans will begin.
**ESTIMATED COMPLETION DATE:          7/2014**

5

**L. LAUNDRY:**
**Current Status:**
A Laundry Committee has been established that includes a cross disciplinary team of warehouse personnel, administrative staff, program staff, nursing and custody staff and health & safety staff. This committee's role is to constantly evaluate the supply chain of laundry products across the full spectrum of process - from purchase to issuance, to laundering, to repair, to end of product life. This also includes the establishment of an inventory database, determination of standard supply levels and backup plans.

SVPP has also assigned 2 MTAs as "Property Officers", and laundry is their primary focus. Currently, they have identified storage areas for laundry and are working with SVSP staff on the process of sending out dirty linens, counting items, and restocking units with linens. There has been discussion related to stenciling all whites (tee shirts, underwear and socks) to assist with tracking of the laundry and decrease opportunity for laundry to go missing.

**Future Plans:**
DSH has determined that an enhanced Par level over the CDCR defined levels will ensure that adequate clothing and linens are always available. This will provide for operational delays, PIA facility lockdowns, transportation issues, holidays and any other unforeseen circumstance that could jeopardize the laundry supply. In addition to processes in place or currently being implemented, the following steps will be taken in the coming weeks and months:
- Laundry has been ordered to maintain a level of 16 sets per patient.
- Discussions have occurred with PIA related to the process of sending out dirty laundry and the return of items.
- Discussions have begun to have each patient remove excess clothing from living areas. This is in the discussion phase as new laundry is being inventoried prior to distribution.
- Discussions with PIA also include the possibility of shrink-wrapping DSH laundry to prevent it from being lost.
- SVPP's Hospital Administrator will be visiting the Avenal facility where the DSH laundry is cleaned.
- Laundry Committee continues discussion of identifying a process to insure laundry is accounted for and patient sizing is tracked.
- Evaluate the incentive option for Stage 3 inmate/patients that currently allows for the possession of multiple sets of clothing

**M. RULES VIOLATION REPORTS:**
The disposition of Rule Violation Reports and the penalties assessed are at the discretion of the Chief Disciplinary Officer of the institution, in this case the Senior Hearing Officer (SHO) of Salinas Valley State Prison. The assessment by a mental health professional is standard practice and this assessment is provided to the SHU for consideration when determining appropriate loss of privilege or penalty.

**CDCR provided training to clinical social workers related to the completion of the mental health assessment on 2/20/2014. Additional training is scheduled for psychologists. SVPP will be scheduling an additional training for staff in April 2014.**

**N. PaWSS**

**Current Status:**

PaWSS is an electronic system that allows clinicians to develop and implement real time treatment plans with patient participation. PaWSS is unique in its ability to be utilized during the patient's individualized case conference. Using PaWSS allows the interdisciplinary team and the patient to work together to develop the patient's treatment plan. PaWSS also provides for data collection to include tracking of all significant incidents that occur. Effective tracking and monitoring of significant events allows for immediate responses, elevated levels of program intervention, and the identification of patterns of behaviors that may result in increased risk factors. Current implementation status is as follows:

Treatment Plan          Activated August 2013          Full Implementation – March 2014
Currently, TC1 and TC2 are using the Treatment Plan in PaWSS. C Yard began using the Treatment Plan module in PaWSS in January 2014, with full implementation on 3/1/2014.

Incident Management   Activated October 2013          Full Implementation March 2014
SVPP has been entering special incidents in incident management since 10/1/13 and effective February 10th, 2014 SVPP will be fully transitioned and no more paper special incident reports will be accepted.
Training for incident management has been occurring for the past 90 days and the transition from paper SIR's to incident management in PaWSS. This training is ongoing and will continue to be provided.

Course Outline          Activated November 2013          Full Implementation March 2014
Course outlines are currently being input into the system in order to prepare for the next quarter. The Course Outline will allow clinicians to assign specific individualized group treatment to the patients based on available facility wide courses. The next quarter's course schedule is being developed based on a survey of clinicians of patient needs. The goal is to have all courses entered and MAPP fully utilized for the new quarter beginning in January.

**Future Plans:**

The current implementation will continue until all patients treatment plans are entered into PaWSS; all SIR's are electronic; and all course work and group treatment systems are fully integrated. It is expected that this will be completed within 90 days. As these systems are brought fully online, there will be the ability to print, analyze and utilize data to develop treatment plans, evaluate facility operations and monitor group and individual treatment needs for ongoing process improvement. Future implementation will include the use of PSR Notes (group notes).

DEPARTMENT OF STATE HOSPITALS
Direct Care, Mental Health Treatment Team and Supervising Discipline
Staff Levels for Coleman Patients
March 1, 2014 through March 31, 2014
Report submitted April 1, 2014

| Department of State Hospitals - Salinas Valley | | | | | |
|---|---|---|---|---|---|
| ICF Census [1] | 227 | Acute Census [1] | | | 0 |
| Coleman Related Classifications | Staffing Levels per Census [2] | Permanent Staff Coverage [3] | Staff Coverage via Overtime [4] | Staff Coverage via Contracted Staff [5] | Total Staff Coverage Provided for Reporting Period |
| **Direct Care Nursing Staff** | | | | | |
| Psychiatric Technician | | 5.80 | 0.09 | 0.00 | 5.89 |
| Medical Technical Assistant | | 138.63 | 18.43 | 0.00 | 157.06 |
| Registered Nurse | | 27.32 | 0.99 | 0.00 | 28.31 |
| *Total, Direct Care Nursing Staff* | 133 | 171.75 | 19.51 | 0.00 | 191.26 |
| **Mental Health Treatment Team Staffing** | | | | | |
| Psychologist | 7 | 8.65 | 0.00 | 0.00 | 8.65 |
| Psychiatrist | 7 | 5.05 | 0.00 | 2.61 | 7.66 |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 7 | 9.10 | 0.00 | 0.00 | 9.10 |
| Rehabilitation Therapist | 7 | 8.34 | 0.11 | 0.00 | 8.45 |
| *Total, Mental Health Treatment Team Staffing* | 28 | 31.14 | 0.11 | 2.61 | 33.86 |
| **Discipline Supervising Staff** | | | | | |
| Medical Director | | 1.00 | 0.00 | 0.00 | 1.00 |
| Supervising Psychiatric Social Worker | | 0.00 | 0.00 | 0.00 | 0.00 |
| Supervising Rehabilitation Therapist | | 0.00 | 0.00 | 0.00 | 0.00 |
| Chief Psychologist | | 0.00 | 0.00 | 0.00 | 0.00 |
| Senior Psychologist, Supervisor | | 0.00 | 0.00 | 0.00 | 0.00 |
| Senior Psychiatrist, Supervisor | | 1.00 | 0.00 | 0.00 | 1.00 |
| Senior Medical Technical Assistant | | 14.53 | 3.42 | 0.00 | 17.95 |
| Supervising Registered Nurse | | 9.48 | 0.00 | 0.00 | 9.48 |
| Unit Supervisor | | 0.00 | 0.00 | 0.00 | 0.00 |

**GENERAL REPORT DEFINITIONS**

Direct Care Staffing totals are comprised of: Psychiatric Technician, Senior Psychiatric Technician, Psychiatric Technician Assistant, Pre-Licensed Psychiatric Technician, and Psychiatric Technician Trainee classifications.

Mental Health Treatment Team Psychiatrist totals are comprised of: Staff Psychiatrist (DSH/CDCR) and Senior Psychiatrist (Specialist) (DSH/CDCR)

[1] Census based on average daily patient census for reporting period.

[2] Staffing requirement based on staffing ratio methodology for ICF and Acute.

[3] Permanent staff days and/or hours worked during the reporting period, including temporary help, converted to full time position equivalents. Temporary help is utilized to offset permanent staff vacancies.

[4] Reflects staff hours worked as overtime during the reporting period, converted to full-time equivalent positions. Overtime is utilized to offset permanent staff vacancies.

[5] Contract staff hours worked during the reporting period, converted to full-time equivalent positions. Contract staff are utilized to offset permanent staff vacancies.

[6] The ICF census is high custody and the direct care nursing is staffed at a higher ratio of 1 to 6 for the AM and PM shifts, and 1 to 12 for the night shift.