DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNIFER L. STARK – 267062
KRISTA STONE-MANISTA – 269083
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:    (415) 433-6830

RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      Plaintiffs,

    v.

EDMUND G. BROWN, JR., et al.,

      Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' OBJECTIONS AND REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFENDANTS' STAFFING PLAN**

Judge:   Hon. Kimberly J. Mueller

3115780-9

2:90-CV-00520-KJM-DB

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS .................................................................................... ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 4

I.    DEFENDANTS SHOULD BE REQUIRED TO DRAMATICALLY
      BOOST PAY FOR PSYCHIATRISTS ........................................................... 4

      A.    High Vacancy Rates for Psychiatrists Have Plagued CDCR
            Institutions for Decades, and the Palpable Impacts from the
            Psychiatrist Shortage Are Worsening ................................................... 4

            1.    Psychiatrist Staffing Has Not Significantly Improved ................. 4

            2.    The Harms from Psychiatrist Shortages Are Well Documented ........ 6

            3.    The Effects of Psychiatrist Shortages Are Growing More
                  Dangerous as the EOP Population Grows, and Defendants'
                  Staffing Plan Will Only Exacerbate the Problems .............................. 8

      B.    Starting Salaries for CDCR Psychiatrists Lag Behind Average
            Incomes for California Psychiatrists and Are Inadequate to Recruit
            and Retain Psychiatrists, and the New Employment Contract Will
            Perpetuate This Problem ...................................................................... 11

      C.    Recent Cuts to Retirement Benefits Have Made Recruiting and
            Retaining CDCR Psychiatrists More Difficult ................................... 13

      D.    Defendants' Salary Ranges for Physicians and Surgeons Are Above
            Average and Significantly More Than Salary Ranges for CDCR
            Psychiatrists Even Though Vacancy Rates for Psychiatrists Are Much
            Higher and Even Though Psychiatrists Earn More On Average Than
            Physicians and Surgeons in California ................................................ 15

      E.    Defendants' Other Staffing Proposals, Including Clustering and
            Telepsychiatry, Are Inadequate to Resolve the Severe Psychiatrist
            Staffing Shortages ................................................................................ 19

      F.    Defendants Must Be Ordered to Significantly Increase Minimum
            Psychiatrist Salaries, Offer the 15% Recruitment and Retention
            Differential to Psychiatrists on the Same Terms Offered to Physicians
            and Surgeons, And Devise A Long-Term Plan to Address Staffing
            Shortages .............................................................................................. 22

CONCLUSION .......................................................................................................... 23

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

3115780-9

**TABLE OF ABBREVIATIONS**

| ASP | Avenal State Prison |
|---|---|
| CAL | Calipatria State Prison |
| CalHR | California Department of Human Resources |
| CalPERS | California Public Employees Retirement System |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Management System |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN | Centinela State Prison |
| CHCF | California Healthcare Facility |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison – Corcoran |
| CRC | California Rehabilitation Center |
| CSP-SAC | California State Prison – Sacramento |
| CTF | California Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DSH | [California] Department of State Hospitals |
| DVI | Deuel Vocational Institution |
| EOP | Enhanced Outpatient Program |
| FOL | Folsom State Prison |
| HDSP | High Desert State Prison |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison – Los Angeles County |
| MCSP | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PEPRA | California Public Employee Pension Reform Act |
| PSU | Psychiatric Services Unit |

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

| | |
|---|---|
| **PVSP** | Pleasant Valley State Prison |
| **RJD** | Richard J. Donovan Correctional Facility |
| **SAC** | California State Prison – Sacramento |
| **SATF** | California Substance Abuse Treatment Facility |
| **SCC** | Sierra Conservation Center |
| **SOL** | California State Prison – Solano |
| **SQ** | San Quentin State Prison |
| **SVPP** | Salinas Valley Psychiatric Program |
| **SVSP** | Salinas Valley State Prison |
| **UAPD** | Union of American Physicians and Dentists |
| **VPP** | Vacaville Psychiatric Program |
| **VSP** | Valley State Prison |
| **WSP** | Wasco State Prison |

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

**INTRODUCTION**

Defendants have persistently failed to adequately staff their facilities with psychiatrists and other key categories of mental health staff for over 15 years. While they have made progress in the last two years in hiring clinicians in other categories, psychiatry staffing remains abysmal—as of January 2017, the overall vacancy rate for staff psychiatrists in CDCR was 45.8%, with a 100% vacancy rate at five institutions. *See* Declaration of Thomas Nolan in Support of Plaintiffs' Objections to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan ("Nolan Decl."), filed herewith, ¶ 7, Ex. D (Table of Psychiatrist Staffing Rates and Staffing Rates for Physicians and Surgeons by Institution); ¶ 9, Ex. E (Enclosure 1b to California Department of Rehabilitation and Corrections Staffing Report: Mental Health Classification Vacancies by Institution). As a result, members of the *Coleman* class continue to receive sub-standard mental health care. In fact, over 75% of CDCR psychiatrists who responded to a recent survey by their union reported being concerned about the impact that psychiatrist staffing shortages are having on patient care, and nearly 40% of them reported being "extremely concerned" that current staffing levels are "compromising patient safety" at their institutions. *See* Nolan Decl. ¶ 10, Ex. F (December 2016 CDCR Psychiatrist Job Satisfaction Survey) ("Dec. 2016 Survey"). This concern is not surprising. Defendants have been struggling in recent years with overcrowding in the highest levels of their mental health treatment system at the same time that they have been struggling to hire enough psychiatrists—an inherently dangerous combination.

On February 6, 2017, the Special Master issued his Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan (hereafter "Special Master's Staffing Report"). *See* ECF No. 5564. The Special Master's Staffing Report followed roughly six months of work group meetings between the parties that resulted in Defendants' Final Staffing Plan, which they submitted to the Special Master and Plaintiffs on January 10, 2017. *Id.* at Ex. B ("Final Staffing Plan"). Plaintiffs submitted objections

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1    to Defendants' Final Staffing Plan in a letter to the Special Master on January 25, 2017.

2    *Id.* at Ex. C.

3        Up to the time of the Special Master's Staffing Report, Defendants repeatedly

4    refused to discuss the issue of psychiatrist salaries with Plaintiffs or the Special Master on

5    the grounds that "the issue of salary increases was being addressed through the collective

6    bargaining process" and was therefore confidential.  *See* Special Master's Staffing Report

7    at 23-25.  As a result of this intransigence, the Special Master concluded that "[t]his

8    portion of defendants' staffing plan is unacceptable" and "woefully incomplete."  *Id.* at 25,

9    26.  He recommended that the Court require Defendants to inform the Special Master of

10   the results of the collective bargaining agreement within 90 days.  *Id*. at 26.  He also

11   suggested that in the event the negotiations were not completed by then, "defendants

12   should be required to develop a benchmark that can be adopted by the Court, or in the

13   alternative, develop a salary survey for the Court to consider."  *Id*.  Finally, he

14   recommended that the Court reject Defendants' Final Staffing Plan on the issue of

15   psychiatrist pay raises.  *Id.* at 28.  Plaintiffs fully support and agree with all of the Findings

16   and Recommendations of the Special Master about each of the discrete staffing issues

17   discussed in his report, although we are asking for additional remedies on psychiatrist pay

18   for the reasons explained below.

19       Since the Special Master filed his report, Defendants completed their negotiations

20   with the Union of American Physicians and Dentists ("UAPD"), which represents state

21   psychiatrists, on February 28, 2017 and the employment contract applicable to CDCR

22   psychiatrists through July 1, 2020 was made public ("2/28/17 UAPD Contract").  *See*

23   Nolan Decl. ¶ 11, Ex. G (2/28/17 UAPD Contract and Summary of Contract).  The 2/28/17

24   UAPD Contract reveals Defendants have failed to meaningfully increase psychiatrist

25   salaries across the board.  Furthermore, Defendants chose not to implement targeted pay

26   increases for psychiatrists in hard-to-hire locations, despite Defendants' repeated earlier

27   representations that they were working to include pay differentials in the bargaining

28   process for the 2017–2020 employment contract.  *Compare* Special Master's Staffing

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1  Report at 24, *with* Nolan Decl. ¶ 11, Ex. G (2 28/17 UAPD Contract at § 10.4).  Instead,

2  the 2/28/17 UAPD Contract provides for more of the same meager annual pay increases

3  that CDCR psychiatrists have received in recent years and that history has shown are

4  inadequate to attract and retain psychiatrists.  Under the new contract, CDCR psychiatrists

5  will receive only the very modest general salary increases slated for all physicians working

6  in state service, i.e., a 2% increase upon ratification, a 3% increase on July 1, 2017, a 2%

7  increase on July 1, 2018, and a 2% increase on July 1, 2020.  *See* Nolan Decl. ¶ 11, Ex. G

8  (2/28/17 UAPD Contract at § 10.4).

9  Incredibly, Defendants agreed to provide, in addition to the same increases in base

10  pay over three years,  a 15% across-the-board annual Recruitment and Retention bonus to

11  medical doctors at hard-to-hire CDCR locations—but excluded psychiatrists from that

12  bonus.  *Id.* at pp. 9-10.  The 15% cash bonus will be paid each year over the next three

13  years to CDCR medical doctors working at certain prisons, but not to CDCR psychiatrists

14  working at the same prisons.  *Id.*  Pressure applied by the *Plata* Receiver and *Plata*

15  plaintiffs' counsel during the negotiations was a major factor in the granting of the 15%

16  annual bonus for medical doctors.  Nolan Decl. ¶ 21.

17  In light of these recent events, which occurred after the Special Master filed his

18  Staffing Report, Plaintiffs request additional targeted remedies to address the ongoing

19  psychiatrist staffing crisis beyond those recommended by the Special Master in his report.

20  Plaintiffs request that the Court immediately order targeted extra pay differentials for

21  psychiatrists in hard-to-hire locations similar to those Defendants agreed to for medical

22  doctors in the 2/28/17 UAPD Contract.  Plaintiffs also request that the Court adopt the

23  Special Master's recommendations rejecting the Final Staffing Plan on the psychiatrist pay

24  issue and require Defendants to complete and share a salary/compensation survey, in order

25  to guide future pay and benefit increases designed to attract new hires and retain existing

26  psychiatrists.  Finally, to ensure long-term relief, Plaintiffs also request that the Court set a

27  status conference to devise a durable remedy to this entrenched problem, at which the

28  Court should order representatives from the following agencies to appear: the Department

1  of Personnel Administration, the Department of Finance, CalHR, the Governor's Office,

2  and any other stakeholders Defendants believe to be necessary to craft a comprehensive

3  and durable remedy to address psychiatrist and mental health clinician staffing shortages,

4  without the necessity of close monitoring by the Special Master and additional Court

5  orders.

6  Defendants' efforts in the psychiatrist compensation area fall far short of the

7  Court's previous mandates to "take all steps necessary" to address the "ongoing problem

8  of mental health staffing shortages and come into compliance with" the existing Court-

9  ordered staffing plan. *See* Order, June 18, 2009, ECF No. 3613, at 2; Order, June 16,

10  2014, ECF No. 5171, at 4 (referencing Order, June 13, 2002, Docket 1383).  Likewise,

11  Defendants' Final Staffing Plan falls far short of the Court's more recent mandate in its

12  May 18, 2015 Order to "finally and fully remed[y]" the problem of "inadequate mental

13  health staffing levels [that] have plagued the remedial phase of this litigation since its

14  inception." *See* Order, May 18, 2015, ECF No. 5307, at 5.  Without further salary

15  increases or other efforts to address psychiatrist compensation, history has shown

16  Defendants will never achieve a durable remedy for the chronic shortage of this crucial

17  position.

18  **ARGUMENT**

19  **I.    DEFENDANTS SHOULD BE REQUIRED TO DRAMATICALLY BOOST
         PAY FOR PSYCHIATRISTS**

20

21  **A.    High Vacancy Rates for Psychiatrists Have Plagued CDCR Institutions
           for Decades, and the Palpable Impacts from the Psychiatrist Shortage
22         Are Worsening**

23  **1.    Psychiatrist Staffing Has Not Significantly Improved**

24  CDCR's staffing problems are well-established and have persisted throughout the

25  decades-long life of this case.  The history of this issue has been repeated many times, and

26  is comprehensively set forth in the Special Master's recent Staffing Report.  *See* Special

27  Master's Staffing Report at 2-8.  The original order requiring Defendants to reduce clinical

28  staffing vacancies to 10% or less in each category of clinical staff is now nearly 15 years

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1    old.  *See* Order, June 13, 2002, Docket 1383.  Defendants have never achieved that

2    benchmark and remain out of compliance today.

3        As explained in the Special Master's 26th Monitoring Report, Defendants' vacancy

4    levels for psychiatrists and psychologists in 2015 were essentially unchanged from when

5    monitoring in this case began in 1998.  And, "without adequate staff, even the best of plans

6    for mental health care are at risk of remaining merely an abstraction."  *See* Special Master's

7    26th Round Monitoring Report, May 6, 2016, ECF No. 5439, at 6 ("26th Round Report").

8    Despite the Court's orders and the efforts of the Special Master to encourage Defendants to

9    address this problem comprehensively, since January of 2015, the total number of

10   psychiatrists (including telepsychiatrists and registry psychiatrists) working in CDCR has

11   remained essentially unchanged, growing by less than eleven from 251.19 to 262.18

12   between January of 2015 and January of 2017.  Excluding telepsychiatrists working in

13   locations remote from their patients, whose value is mitigated for a number of clinical

14   purposes by the fact of their remote location, the number of staff psychiatrists has fallen

15   dramatically by 31 positions, from 251.19 to 220.28 during that same period.  *See* Nolan

16   Decl. ¶ 2, Ex. J.; *see also* Special Master's Staffing Report at 16-17 (describing limits on

17   the usefulness of telepsychiatry for higher levels of mental health care).  The falling

18   numbers of staff psychiatrists in this time period contrast sharply with the dramatic

19   increase in the *Coleman* class member population, especially EOP patients.  *See* Nolan

20   Decl. ¶¶ 2-3, Ex. A (discussed further below).  Indeed, CDCR psychiatrists report that

21   telepsychiatry is cannibalizing CDCR on-site psychiatrists, *see* Nolan Decl. ¶ 10, Ex. F.

22   (Dec. 2016 Survey), at Entry #4281, a danger ominously anticipated by the Special

23   Master's warning against allowing "on-site psychiatrists to migrate to the comfort of

24   remote off-site offices."  Special Master's Staffing Report at 16.

25       Furthermore, the distribution of psychiatrist vacancies across institutions amplifies

26   the dire effects of the shortages in this critical clinical role.  Many of the institutions with

27   the highest psychiatrist vacancy rates are also the most vital institutions for mental health

28   care, meaning they have the most complex mental health missions and the largest number

1  of EOP patients.  For example, EOP class members constitute 37.3%, 24.3%, and 18.4% of

2  the total prisoner populations at, respectively, California State Prison – Sacramento ("CSP-

3  SAC" or "SAC"), California Healthcare Facility ("CHCF"), and Salinas Valley State

4  Prison ("SVSP").  *See* Nolan Decl. ¶ 13, Ex. I.  CSP-SAC also has one of the largest

5  collections of MHCB beds in the state, and all three prisons have large and complex

6  mental health missions.  *See* Nolan Decl. ¶ 8, Ex. Q.  These critical institutions are also

7  among CDCR's very worst in terms of psychiatrist staffing rates, with 53% of positions

8  filled at SAC, 60% at CHCF, and 45% at SVSP.  Nolan Decl. ¶ 7, Ex. D.

9  **2.    The Harms from Psychiatrist Shortages Are Well Documented**

10  The harm from deficient psychiatrist staffing is real and it is dire.  Indeed, the

11  Special Master found significant evidence of harm from understaffing in psychiatry

12  throughout the system.  *See generally* 26th Round Report.  The Special Master's 26th

13  Round Report found nine institutions were non-compliant with psychiatry-prescribed

14  medications.  *Id.* at 37-38.  He also found that eight institutions were non-compliant with

15  medication continuity for new arrivals, and that fourteen institutions were non-compliant

16  with medication continuity for individuals discharged back to the CDCR from community

17  hospitals or state hospitals run by DSH.  *Id.* at 36.  The Special Master further reported that

18  fourteen institutions were non-compliant with laboratory testing requirements for blood

19  levels of prisoners prescribed psychotropic medications.  *Id*. at 49.   Medication continuity

20  and medication monitoring are key psychiatrist functions that understaffing strongly

21  impacts.

22  The widespread psychiatrist shortages also manifestly caused harm to class

23  members at some individual institutions with severe staffing-related problems.  At SVSP,

24  the institution that now suffers from one of the worst psychiatrist staffing shortages in the

25  system, the overall medication continuity compliance rate was a stunningly low 48%, and

26  the compliance rate for administration of chronic care medications prescribed by a

27  psychiatrist was a shocking 26%.  *Id.* at 352-53; *see also* Nolan Decl. ¶ 7, Ex. D (staffing

28  rates by prison).  At the California Substance Abuse Treatment Facility, which also suffers

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

from severe psychiatrist shortages, barely half of initial psychiatry contacts for EOP patients were timely. 26th Round Report at 320. At High Desert State Prison ("HDSP"), where both of the psychiatrist positions were vacant, psychiatrists were absent for 79% of Interdisciplinary Treatment Team meetings, at which class members' clinical teams formulate treatment plans and make other critical decisions about their patients' mental health care. *Id.* at 197.

Psychiatrists also play a central role in leading suicide prevention efforts at each institution, and their absence severely impairs this critical, life-saving process. *See* Nolan Decl. ¶ 22; *see also* Lindsay Hayes Re-Audit and Update on Suicide Prevention Practices in the Prisons of the CDCR, Jan. 13, 2016, ECF No. 5396.

Moreover, the situation does not appear to have improved since the Special Master completed his last monitoring round. In recent months, numerous consistent reports from class members at institutions with low psychiatrist staffing rates make clear that problems with medication administrations and missed psychiatrist appointments remain. *See* Nolan Decl. ¶ 14. Indeed, CDCR's own psychiatrists echo the real harm found by the Special Master and reported by class members. Over 75% of the subset of CDCR psychiatrists responding to a recent survey reported concern about the impact that psychiatrist staffing shortages are having on patient care. *See* Nolan Decl. ¶ 10, Ex. F (Dec. 2016 Survey), at Entry #4281, Entry #4290 (SVSP and CHCF psychiatrists reporting, e.g., lack of timely patient contacts and "patients are receiving too little care (not enough care and infrequent care)").

There is also a danger that the psychiatrist staffing shortages at many CDCR prisons have become so severe and entrenched that it will have a "snowball" effect and drive those remaining stressed out, overworked clinicians to seek other work. Multiple CDCR psychiatrists articulated this fear in the recent survey. One frustrated psychiatrist stated, "I'm about to the point to say, F**K THIS JOB because it only gets worse year after year, less staff, more work, higher expectations, NO ONE to advocate for the TWO staff psychiatrists left at PBSP (nine years ago there were seven psychiatrists on staff)." Nolan

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1   Decl. ¶ 10, Ex. F (Dec. 2016 Survey), at 18 of 19, Response #20.  Another reported that

2   "[w]e are losing psychiatrists and it seems impossible to find replacement for the ones who

3   are retiring and it is likely to severely affect patient care and work condition [*sic*]."  *Id.* at

4   18 of 19, Response #25.

5           For example, the psychiatrist staffing shortage at SVSP appears to be nearing a

6   breaking point.  In fact, Defendants informed Plaintiffs during calls with the Special

7   Master on February 7, 2017 and March 9, 2017 about a rash of recent civil service

8   psychiatrist departures from SVSP.  *See* Nolan Decl. ¶ 20.  These departures have real

9   consequences for class members, who are forced to endure unduly long wait times for

10  psychiatric services.  The shortage is so dire that Defendants are taking the drastic step of

11  limiting placement of additional prisoners in the EOP units there moving forward.  *Id.*

12  Harsh working environments are contributing to psychiatrist departures—and concomitant

13  deficiencies in class member care—at other CDCR institutions as well.  For example,

14  during a working group meeting on July of 2016, Defendants explained that several

15  psychiatrists had quit their positions at Richard J. Donovan Correctional Facility ("RJD")

16  in part due to a challenging working environment that was exacerbated when a civil

17  service psychiatrist employed there committed suicide.  *See id.* ¶ 23.  As a result of these

18  departures, psychiatrist staffing at RJD fell by more than fifty percent, from a total of 16

19  staff psychiatrist positions during the 26th Monitoring Round visit by the Special Master's

20  team in 2015, to 7.5 staff positions as of the time of the July 2016 meeting.  *Id.*

21          **3.     The Effects of Psychiatrist Shortages Are Growing More
                     Dangerous as the EOP Population Grows, and Defendants'**
22          **Staffing Plan Will Only Exacerbate the Problems**

23          The effects of psychiatry staffing shortages are growing more dire for several

24  reasons.  First, the EOP population is growing significantly faster than the number of

25  CDCR psychiatrists.  As shown in the following chart, from January 2014 to January 2017,

26  the EOP population grew over 44% while the number of staff and contract psychiatrists

27  working for CDCR grew by less than 14%.  *See id.* ¶¶ 2-3 (explaining data sources and

28  calculation method for chart).  This dynamic has resulted in the number of EOP patients

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1   per staff psychiatrist on site in CDCR prisons growing from 27.1 to 42.6 EOP patients per

2   staff psychiatrist in that same three-year period.  Including both contract/registry

3   psychiatrists and telepsychiatrists, the number of EOP patients per psychiatrist still grew

4   significantly, but slightly more modestly during this period, from 22.3 EOP patients per

5   psychiatrist to 28.4 EOP patients per psychiatrist—a nonetheless significant growth rate of

6   27.4%.

7        The chart set forth below illustrates the growth in the EOP patient population by

8   charting that growth alongside the very modest growth in the number of psychiatrists.  The

9   chart below is also Exhibit A to the Nolan Declaration filed herewith.  The chart includes

10  both staff psychiatrists and contract/registry psychiatrists, but does not include

11  telepsychiatry positions because Defendants did not produce data for telepsychiatry use

12  from before July of 2016.



**EOP Population v. Psychiatrist Staffing Rate, January 2014 - January 2017**

28  *See* Nolan Decl. ¶¶ 2-3, Ex. A.  As this chart shows, the EOP population in CDCR has

3115780-9

1  grown by 2,308 patients in the three-year period between January 2014 and January 2017.

2  At the same time, Defendants' hiring of psychiatrists has faltered.  As noted above, Exhibit

3  A includes contract psychiatrist coverage, but it is notable that, excluding contract workers

4  and telepsychiatrists, the number of staff psychiatrists working for CDCR actually fell by

5  15 individuals during this period.  *See* Nolan Decl. ¶ 2, Ex. J.  A core of staff psychiatrists

6  on the ground is critical for allowing any mental program using contract and telepsychia-

7  trists to function.  *See* Special Master's Staffing Report at 15 ("Telepsychiatry should serve

8  as a supplement to on-site psychiatry, not as a substitute…").

9      As discussed in greater detail below, the impact of these dramatic shortages

10  statewide will be exacerbated by Defendants' current plans to expand their EOP programs

11  at many institutions with severe psychiatrist staffing shortages.  For example, Defendants

12  are in the midst of adding 450 EOP beds at CSP-Los Angeles County, which has a

13  troubled mental health program and a psychiatrist staffing rate of only 54%, *including*

14  contractors and telepsychiatrists.  *See* Special Master's Staffing Report, Ex. B at 6-7; *see*

15  *also* Nolan Decl. ¶ 7, Ex. D (staffing rates by institution).

16      Second, Defendants' proposed "lift and shift" transfer of inpatient psychiatric

17  hospital programs from DSH to CDCR at SVSP, CMF, and CHCF is also certain to make

18  the current psychiatrist staffing problems worse, particularly at SVSP and CHCF, where

19  the DSH staffing levels for psychiatrists (and in other categories) are much higher than the

20  corresponding rates for CDCR clinical staff within the same prison walls.  The chart below

21  setting forth this data is also Exhibit B to the Nolan Decl.  (These staffing rates include

22  contract psychiatrists and, for the CDCR, include telepsychiatrists in the row titled "all.")

| January 2017 | CHCF/Stockton-DSH | SVSP/SVPP | CMF/VPP |
|---|---|---|---|
| DSH Psychiatrist Staffing Rate (Line) | 81.8% | 90.0% | 69.0% |
| DSH Psychiatrist Staffing Rate (All) | 84.8% | 102.1% | 72.4% |
| CDCR Psychiatrist Staffing Rate (Line) | 53.8% | 16.3% | 70.6% |
| CDCR Psychiatrist Staffing Rate (All) | 60.0% | 44.6% | 81.7% |

28  *See* Nolan Decl. ¶¶ 4-5, Ex. B.  The DSH to CDCR management transfer proposal has

1    been made several times in the past, and has never been implemented.  *See, e.g.*, Order,

2    Oct. 17, 2007, ECF No. 2461.  One of the key reasons for the failure of this idea to

3    progress may be, as the data above starkly illustrates, that a significant number of

4    clinicians who are willing to work for a State Hospital program are not willing to work for

5    CDCR—even though Defendants have made clear they are relying on and assuming the

6    DSH clinicians will simply move over to CDCR service as part of their "lift and shift"

7    plan.  Nolan Decl. ¶ 25.  In a survey of psychiatrists working for DSH conducted recently

8    by their union, several psychiatrists indicated that they did not want to work for CDCR

9    because of cultural issues and concerns about the quality of care inside CDCR, as well as

10   the fact that psychiatrists do not lead the treatment teams in CDCR as they do in DSH.  *See*

11   Nolan Decl. ¶ 10, Ex. F., "Proposed Transfer of DSH Psychiatric Programs to CDCR."

12   And the ominous rumblings of the clinicians in the recent surveys are coming to pass:

13   several weeks ago, Defendants informed Plaintiffs and the Special Master that clinicians

14   are already expressing serious concerns about the "lift and shift" plan in town hall-style

15   meetings and, in some cases, considering quitting their jobs in anticipation of CDCR

16   taking over inpatient programs.  Nolan Decl. ¶ 25.

17        These departures would be in addition to the six CDCR staff psychiatrist

18   resignations that Defendants reported as occurring between November 2016 and January

19   2017.  *Id.* ¶ 17.  Without a robust staffing plan including substantial pay and benefit

20   increases to retain and recruit psychiatrists and possibly targeted measures aimed at the

21   DSH psychiatrists, "lift and shift" is doomed to fail.

22        **B.    Starting Salaries for CDCR Psychiatrists Lag Behind Average Incomes
            for California Psychiatrists and Are Inadequate to Recruit and Retain
23          Psychiatrists, and the New Employment Contract Will Perpetuate This
            Problem**

24        Defendants' Final Staffing Plan is simply not good enough on the issue of

25   psychiatry compensation.  Current CDCR salary ranges for CDCR psychiatrists fall short

26   when compared against average incomes for psychiatrists across California.  The Bureau

27   of Labor Statistics reports that the average annual income for California psychiatrists was

28

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1   $250,090 in 2015.  *See* Nolan Decl. ¶ 12, Ex. H (May 2015 State Occupational

2   Employment and Wage Estimates: California, *available at* https://www.bls.gov/oes/

3   current/oes_ca.htm. (last visited Mar. 29, 2017)).  Average psychiatrist incomes are even

4   higher in some urban centers in the state.  For example, in 2015, the average income for

5   psychiatrists was $278,480 in the Los Angeles, Long Beach, and Glendale metropolitan

6   area and $256,130 in the San Jose, Sunnyvale, Santa Clara metropolitan area.  *Id.* ¶ 12,

7   Ex. H (U.S. Census Bureau, May 2015 Metropolitan and Nonmetropolitan Area

8   Occupational Employment and Wage Estimates Los Angeles-Long Beach-Glendale, CA

9   Metropolitan Division, *available at* https://www.bls.gov/oes/current/oes_31084.htm (last

10  visited Mar. 29, 2017)); *id.* (U.S. Bureau of Labor Statistics, May 2015 Metropolitan and

11  Nonmetropolitan Area Occupational Employment and Wage Estimates, San Jose-

12  Sunnyvale-Santa Clara, CA, *available at* https://www.bls.gov/oes/current/oes_41940.htm

13  (last visited Mar. 29, 2017)).  These 2015 average incomes, which are no doubt higher in

14  2017, are significantly higher than starting salaries for CDCR psychiatrists.

15       The following chart, which is also Exhibit C to the Nolan Declaration, filed

16  herewith, shows CDCR staff psychiatrist and CDCR staff physician and surgeon salary

17  ranges, which are roughly comparable to or lower than average salaries statewide for these

18  same categories, using the Bureau of Labor Statistics data discussed above.

|  | Staff Psychiatrists | | Physicians and Surgeons | |
|---|---|---|---|---|
|  | Board Eligible | Board Certified | Lifetime Board Certified | Time-Limited Board Certified |
| Minimum Salary | $237,864.00 | $244,128.00 | $245,268.00 | $258,204.00 |
| Maximum Salary | $285,072.00 | $293,340.00 | $257,532.00 | $271,104.00 |

23  Nolan Decl. ¶ 6, Ex. C.

24       In addition to the hard data showing CDCR psychiatrists are not compensated at

25  competitive levels in California, the very persistence of the CDCR psychiatrist staffing

26  shortages demonstrates that current psychiatrist salaries are inadequate for recruitment.

27  The evidence also indicates that turnover is high for CDCR psychiatrists, which is at least

28  in part due to the fact that psychiatrist compensation is inadequate to retain them.  Six

1  psychiatrists left CDCR in the last quarter alone.  Nolan Decl. ¶ 17.  Nearly 50% of the

2  CDCR psychiatrists responding to a job satisfaction survey conducted by their union in

3  December 2016 had been employed by the State for less than six years.  Nolan Decl. ¶ 10,

4  Ex. F (Dec. 2016 Survey), at 5 of 19.  Individual comments in the survey from

5  psychiatrists at institutions also strongly corroborate high turnover rates.  For example, one

6  CDCR psychiatrist reports *that twenty-seven psychiatrists* have left his institution in the

7  last three years.  *Id.* at 18 of 19, Response #16.

8        **C.    Recent Cuts to Retirement Benefits Have Made Recruiting and
               Retaining CDCR Psychiatrists More Difficult**

9

10        In addition to the insufficient pay, recent changes in California pension law

11  dramatically limiting pensions for new recruits took away one of the key factors attracting

12  psychiatrists to public service with CDCR or DSH.  A state service job is now far less

13  attractive because of the 2013 California Public Employee Pension Reform Act

14  ("PEPRA"), which reduced significantly the value of the CDCR psychiatrist compensation

15  package by reducing the value of pensions for new employees.  *See* Nolan Decl. ¶ 11,

16  Ex. G at 184; *see also* California Public Employees Retirement System, Summary of

17  PEPRA, *available at* https://www.calpers.ca.gov/docs/forms-publications/summary-

18  pension-act.pdf (last visited Mar. 23, 2017).  For example, one of the changes is that

19  PEPRA now imposes a cap on the compensation used to compute pensions for new hires.

20        CDCR psychiatrists report that pre-PEPRA retirement benefits played a critical role

21  in attracting and retaining them.  One psychiatrist surveyed expressed concern that the

22  reductions in pension benefits "have made working for CDCR much less appealing."

23  Nolan Decl. ¶ 10, Ex. F (Dec. 2016 Survey), at 18 of 19, Response #17.  Another

24  psychiatrist reported that he or she was "a classic CalPers employee with 9 years of service

25  credit (10 coming up in May), or [he or she] would already be gone and in the private

26  sector."  *Id.* at 17 of 19, Response #10.  A third stated that "the [pre-PEPRA] retirement

27  benefits that drew me to this job turned out to have been destroyed by PEPRA."  *Id.* at 17

28  of 19, Response #4.

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1    Psychiatrists also reported that they and their colleagues have begun to look for

2    other positions due to inadequate compensation, particularly after learning of the meager

3    salary increases in the 2/28/17 UAPD Contract. *Id.* at 17-18 of 19. One psychiatrist

4    reported that "No raise in 9+ years is now driving me to look elsewhere for

5    employment[.]" *Id.* at 18 of 19, Response #14. Another at Solano State Prison ("SOL")

6    explained that "[t]wo out of our three psychiatrists are looking for other jobs since the

7    recent Bargaining deal was so weak." *Id.* at Entry #4279. A third stated that "[s]alaries

8    need to catch up to other employers like Kaiser[.]" *Id.* at 18 of 19, Response #27.

9    Defendants themselves recognized that significantly increasing the lackluster

10   psychiatrist compensation would be an effective way to address psychiatrist staffing

11   shortages, but nonetheless inexplicably abandoned this approach. Defendants originally

12   proposed differential pay for staff psychiatrists at institutions with psychiatrist recruiting

13   problems in their February 2, 2015 staffing plan update. *See* Defendants' Staffing Plan,

14   February 2, 2015, ECF No. 5269. Then, in February 2016, Defendants reported that they

15   were working on establishing psychiatrist pay differentials at seven institutions. *See*

16   Special Master's Staffing Report at 13-14. However, Defendants appeared to back away

17   from any psychiatrist pay differentials in their June 1, 2016 update. *Id.* at 14. In that

18   update and in the meet and confer process, Defendants began to assert only that they would

19   address salary increases through the collective bargaining process. *Id.* at 24.

20   However, the recently announced employment contract does nothing to address

21   flagging salaries for CDCR psychiatrists. It does not include any pay differentials directed

22   to CDCR psychiatrists or that would indirectly benefit those psychiatrists. Instead, with

23   only 2% and 3% increases, it merely continues the same 2% increases that CDCR

24   psychiatrists have received over the past several years and that have proven inadequate to

25   recruit and retain psychiatrists at institutions with high vacancy rates. Nor does the new

26   contract include any special pay differentials or bonuses for "hard to hire" prisons.

27

28

**D.    Defendants' Salary Ranges for Physicians and Surgeons Are Above Average and Significantly More Than Salary Ranges for CDCR Psychiatrists Even Though Vacancy Rates for Psychiatrists Are Much Higher and Even Though Psychiatrists Earn More On Average Than Physicians and Surgeons in California**

Psychiatrists working for CDCR are part of the same bargaining unit as other physicians, and are included in the same contract.  In order to attract new medical doctors to work in CDCR prisons, the 2/28/17 UAPD Contract provides CDCR physicians and surgeons with a 15% recruitment and retention pay differential at numerous institutions with high vacancies of medical doctors.  Defendants are not providing a comparable pay differential for psychiatrists, even though (1) psychiatrist vacancy rates are actually significantly higher than physician and surgeon vacancy rates at the vast majority of the institutions where CDCR is providing the 15% pay differential to medical doctors, and (2) the psychiatry shortage is more widespread.  *See* Nolan Decl. ¶ 7, Ex. D.

Specifically, Defendants have agreed to pay physicians and surgeons the annual recruitment and retention bonus at SVSP, KVSP, California Substance Abuse Treatment Facility ("SATF"), SAC, and LAC to address staffing shortages at those institutions.  *See* Nolan Decl. ¶¶ 10-11, Exs. F at p. 4 of cover letter, G (Exhibit G includes summary of contract describing the recruitment and retention bonuses for physicians and locations for the bonuses).  However, as the table below demonstrates, including telepsychiatry and contract coverage, the staffing rate is worse for psychiatrists than for medical doctors at each of these institutions.  A thorough review of the state-wide data makes clear that the staffing shortages for psychiatrists in CDCR are more severe than the shortages of primary physicians, and merit larger and more widespread recruitment and retention bonuses.  A true and correct copy of a table listing the vacancy rates for psychiatrists and for physicians and surgeons at all the relevant CDCR institutions is set forth below and attached as Exhibit D to the Nolan Declaration filed herewith.  *See* Nolan Decl. ¶ 7 (explaining data sources and calculation methods).  The first column of the chart gives the staffing rate for staff psychiatrists at each prison in the CDCR.  The second column gives the staffing rate for all psychiatrists (including contract psychiatrists and tele-psychiatrists

1 | assigned to that prison) in the CDCR.  The third column is drawn from the most recent

2 | medical Receiver's report and gives the staffing rate at each prison for doctors in the

3 | "Physician and Surgeon" category.  Those prisons where the UAPD contract provides for a

4 | 15% recruitments and retention bonus are highlighted in orange.

| Institution | Psychiatrist Staffing Rate (Line)* | Psychiatrist Staffing Rate (All)* | Physician and Surgeon Staffing Rate** |
|---|---|---|---|
| CCC | 0% | 0% | 67% |
| CVSP/ISP | 0% | 35% | 78% |
| SVSP | 16% | 45% | 71% |
| KVSP | 0% | 47% | 80% |
| SATF | 10% | 53% | 89% |
| SAC | 53% | 53% | 71% |
| LAC | 31% | 54% | 75% |
| CCWF | 64% | 58% | 82% |
| NKSP | 45% | 59% | 60% |
| CHCF | 54% | 60% | 59% |
| CTF | 55% | 61% | 100% |
| PVSP | 33% | 62% | 60% |
| RJD | 39% | 63% | 73% |
| VSP | 25% | 64% | 100% |
| COR | 24% | 66% | 83% |
| HDSP | 0% | 67% | 100% |
| SOL | 57% | 69% | 82% |
| WSP | 30% | 71% | 100% |
| PBSP | 50% | 75% | 57% |
| CCI | 25% | 79% | 100% |
| CMC | 68% | 79% | 85% |
| CMF | 71% | 82% | 73% |
| CIW | 67% | 84% | 100% |
| SQ | 84% | 85% | 88% |
| MCSP | 57% | 86% | 64% |
| CIM | 83% | 88% | 100% |
| CRC | 92% | 92% | 86% |
| ASP | 0% | 98% | 57% |
| CAL | 100% | 100% | 73% |
| CEN | 100% | 100% | 80% |

3115780-9

2:90-CV-00520-KJM-DB

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

| Institution | Psychiatrist Staffing Rate (Line)* | Psychiatrist Staffing Rate (All)* | Physician and Surgeon Staffing Rate** |
|---|---|---|---|
| FOL | 100% | 100% | 107% |
| SCC | 100% | 100% | 100% |
| DVI | 100% | 122% | 100% |

*Data as of January 2017 (*Coleman* Monthly Report)
**Data as of December 2016 (*Plata* Receiver Tri-Annual Report)
Note: Highlighted Institutions receive a 15% R&R Raise for Physicians and Surgeons

Nolan Decl. ¶ 7, Ex. D.  At 10 of the 13 prisons where recruitment and retention bonuses will be paid to non-psychiatrist physicians under the proposed UAPD contract, the staffing rate for all CDCR psychiatrists (including contractors and telepsychiatry) is currently worse than or roughly equal to the staffing rate for CDCR physicians and surgeons.

Even absent the 15% recruitment and retention differentials paid to physicians and surgeons, minimum salaries for CDCR physicians and surgeons are notably higher than minimum salaries for CDCR psychiatrists.  CDCR's starting salaries for the different categories of board certified physicians and surgeons ranges from $245,268 to $258,204.  Nolan Decl. ¶ 6, Ex. C. Including the 15% recruitment and retention increase, the starting pay for CDCR's medical doctors ranges from $282,058 to $296,935.  *Id.*  Using either set of starting salaries for non-psychiatrist physicians, these starting salaries are significantly higher than the starting salary of $237,864 for board-eligible psychiatrists and $244,128 for board-certified psychiatrists.  *Id.*

The fact that CDCR pays physicians and surgeons significantly more than psychiatrists is even more glaring given that the converse is true in California generally.  According to the Bureau of Labor Statistics, the average salary for psychiatrists in California is $250,090, which is substantially higher than the average income range for California physicians and surgeons of between $203,920 and $238,440.  Nolan Decl. ¶ 12, Ex. H (comparing categories of psychiatrists, surgeons, and physician and surgeons, all other, from May 2015 State Occupational Employment and Wage Estimates: California, *available at* https://www.bls.gov/oes/current/oes_ca.htm. (last visited Mar. 29, 2017)).

CDCR physician and surgeon starting salaries are also well above the $238,440

17

1    average 2015 income for California surgeons and $203,920 average 2015 income for

2    California physicians and surgeons.  *See id.* (U.S. Bureau of Labor Statistics, May 2015

3    State Occupational Employment and Wage Estimates: California, *available at*

4    https://www.bls.gov/oes/current/oes_ca.htm (last visited Mar. 29, 2017).  Thus, it is clear

5    that CDCR has chosen to pay psychiatrists lower starting salaries than physicians and

6    surgeons in a market where, on average, psychiatrists earn more than physicians and

7    surgeons.  The 15% recruitment and retention pay differential for CDCR medical doctors

8    under the 2/28/17 UAPD Contract can only serve to exacerbate this unfair and irrational

9    disparity between the two classes of CDCR healthcare professionals.

10       Although Defendants agreed to provide significant additional compensation to

11   address physician and surgeon staffing shortages, they steadfastly refused to do so for

12   CDCR psychiatrists during negotiations of the new employment contract.  In fact,

13   Defendants actively opposed providing psychiatrists with any pay differentials whatsoever.

14   The UAPD reported to Plaintiffs that at no point during negotiations over the 2017-2020

15   contract for Bargaining Unit 16 (encompassing both psychiatrists and "physicians and

16   surgeons") did CDCR offer to pay psychiatrists more than the small general annual

17   increases provided to all employees in the bargaining unit.  Nolan Decl. ¶ 10, Ex. F at p. 4

18   of cover letter.  Moreover, CDCR rejected UAPD's proposal to pay members of any

19   classification within the bargaining unit a 5% retention differential at institutions with

20   more than a 25% vacancy rate for the classification.  *Id.*  This proposal would have

21   benefited most CDCR psychiatrists.  *See* Nolan Decl. ¶ 7, Ex. D (table of psychiatrist and

22   physician and surgeon staffing rates by institution).  Not only did Defendants abandon

23   promises in 2015 and 2016 to provide targeted pay differentials to address the chronic

24   psychiatrist shortages, they actively fought against such remedial measures when push

25   came to shove—even while acquiescing to provide differential pay to address staffing

26   deficiencies in the parallel *Plata* litigation.  Nolan Decl. ¶ 10, Ex. F at p. 4 of cover letter.

27       On a March 27, 2017 call with Plaintiffs and the Special Master, Defendants

28   identified a psychiatrist salary survey that CalHR conducted in 2014 which found that

1  CDCR paid psychiatrists more than other California public sector employers.  However,

2  this survey is of little value.  First, the survey entirely fails to account for salaries paid to

3  psychiatrists in the private sector.  Nolan Decl. ¶ 19, Ex. R.  A significant share of

4  psychiatrists practice in the private sector, and nothing prevents Defendants from

5  attempting to compete with the private sector for qualified psychiatrists.  Defendants offer

6  no reason why they should ignore compensation available to psychiatrists in the private

7  sector when setting or evaluating compensation paid to CDCR psychiatrists.   Finally, the

8  study is several years old and therefore does not reflect the current market for psychiatrists.

9  *Id*.  On that same call, Defendants asserted that they have commissioned a new psychiatrist

10  salary survey, which is underway, but they offered little detail about the scope of the

11  survey, when it would be available, or why they failed to conduct it in time to inform their

12  recent contract negotiations.  *Id.*

13     **E.     Defendants' Other Staffing Proposals, Including Clustering and
              Telepsychiatry, Are Inadequate to Resolve the Severe Psychiatrist
14            Staffing Shortages**

15        Defendants' clustering plan will exacerbate, not alleviate, the impacts of

16  psychiatrist staffing shortages because, as the Special Master observed, "all defendants'

17  plan does is dramatically expand EOP beds at a number of institutions that defendants

18  themselves described as hard-to-recruit institutions in their February 2, 2015 staffing plan,

19  particularly in psychiatry[.]"  Special Master's Staffing Report at 27.  Defendants are

20  shutting down only one small remote EOP program—PBSP has only 90 EOP and PSU

21  beds combined—and they are adding large "clusters" of EOP beds at a number of very

22  difficult to staff institutions.  *Id.*, Ex. B at 6.  At a minimum, a serious clustering plan

23  responsive to the concerns raised by the Special Master and his team would include the

24  closure of High Desert State Prison ("HDSP") to mental health cases.  HDSP does not

25  currently have a single staff psychiatrist on site, even though there is a 10 bed mental

26  health crisis bed unit there.  Nolan Decl. ¶¶ 7, 26, Exs. D, S; *see* Special Master's Staffing

27  Report at 27.  Indeed, HDSP has had neither a Chief Psychiatrist nor a single staff

28  psychiatrist on site since August of 2014.  Nolan Decl. ¶ 26, Ex. S.

1      Plaintiffs strong support the Special Master's recommendation that Defendants be

2  ordered to devise a new, potentially more effective clustering plan, in consultation with the

3  Special Master and Plaintiffs' counsel, which would need to include a plan to recruit and

4  retain mental health staff, including psychiatrists, at cluster institutions in locations where

5  mental health staff have historically shown a willingness to work.  *See* Special Master's

6  Staffing Report at 28.

7      Similarly, Defendants' telepsychiatry program does not alleviate the need to

8  increase psychiatrist compensation, as that program can do little to address the bulk of the

9  CDCR's psychiatrist staffing shortages.  Telepsychiatry is generally only appropriate for

10  outpatients at the CCCMS level of care.  *Id.* at 16.  It cannot and should not be used in

11  many other treatment situations where psychiatrists are needed throughout the CDCR

12  mental health delivery system.  Plaintiffs agree with the Special Master on this point.  The

13  Special Master's Staffing Report found that telepsychiatry "should serve as a supplement

14  for on-site psychiatry, not as a substitute and should only be utilized when institutions are

15  unable to recruit psychiatrists to work on-site.  In no circumstances should this method of

16  delivering mental health treatment relieve CDCR of their obligation to continue their

17  efforts of recruiting full-time psychiatrists to work on-site at the facility."  *Id.* at 15.  The

18  Special Master further concluded that telepsychiatry is "not clinically desirable as a

19  frontline approach to providing psychiatric services for inmates with the most intensive or

20  emergent needs."  *Id.*  In particular, the Special Master forcefully concluded that

21  telepsychiatry is not appropriate for inmates at the MHCB level of care.  *Id.* at 17.  He also

22  declined to endorse use of telepsychiatry as a long term solution for EOP patients, and he

23  plans to carefully monitor Defendants' use of telepsychiatry to treat EOP class members

24  moving forward.  *Id.* at 16-17.

25      In fact, some of the expansion of telepsychiatry in CDCR has come at the expense

26  of more valuable, in-person and on-site institutional staffing.  When the Plaintiffs and

27  representatives of the Special Master's staff visited the Elk Grove telepsychiatry offices

28  last fall, two of the three telepsychiatrists observed during the visit reported they had left

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1  positions at nearby prisons less than an hour's drive from the telepsychiatry office to

2  become telepsychiatrists. Nolan Decl. ¶ 24. The recent union salary survey included

3  comments suggesting these kinds of moves are common. *See* Nolan Decl. ¶ 10, Ex. F

4  (Dec. 2016 Survey). For example, one CDCR telepsychiatrist noted that

> I had worked at CIW inside the institution until an inmate threatened me. We had a rash of suicides, were understaffed at the time, and morale was horrendous. I transferred to Telepsychiatry which is a different world from working inside prison where inmates assault staff and threaten you. I see inmates at SVSP which is understaffed and inmates are not always being seen in a timely manner and morale is pretty bad.

9  *Id*. at Entry #4281.

10  Unfortunately, Defendants' telepsychiatry push appears to have actually increased

11  the workload, burden, and unhappiness of those psychiatrists who remain in the field. As

12  another psychiatrist working at RJD explained in the salary survey:

> We have been substantially short-staffed with psychiatrists here at RJD for a couple of years. We are considered a mental health hub, which means that we are sent some of the most difficult mental health patients from around the state. Us remaining psychiatrists have been forced to cover multiple extra duties, such as seeing patients on separate yards, switching to different rotations quickly, having to cover ad-seg and the crisis bed often, and taking more calls. It is only a matter of time before an adverse outcome. We see so many patients that it is impossible to know any of them very well. This creates issues with adequate patient care, and leads to less stable inmate-patients who then pose greater risks to employees and the public. The telepsychiatrists and contractors (most of whom have quit) are no substitute for an adequate staff, but these stopgap measures will continue if the State is allowed to do so. Like myself, the remaining staff psychiatrists are all seriously thinking of other options. The fact that pay outside the prison is now comparable to what we earn here means it is only a matter of time before the shortage here worsens, and the recruitment will continue to remain abysmal. We are all feeling the effects of burnout and loss of morale.

22  *Id*. at Entry #4288. Thus, the telepsychiatry remedy, while possibly an important stop-gap

23  measure, is clearly a band aid that in some respects worsens and cannibalizes the morale of

24  line staff in the field.

25  Furthermore, the telepsychiatry remedy is too slow to achieve real changes to the

26  psychiatry shortages in the short term. The planned expansions of the telepsychiatry

27  programs in Rancho Cucamonga and at San Quentin require construction, so that many of

28  the positions cannot even be filled until 2018. Nolan Decl. ¶ 24.

1    Defendants' other proposals, including utilization management, the internship and

2    fellowship program, and medical assistants, are positive but all too small to have a

3    meaningful impact on staffing shortages and in no way change the clear conclusion that

4    Defendants must increase psychiatrist compensation to address staffing shortages.

5    **F.    Defendants Must Be Ordered to Significantly Increase Minimum Psychiatrist Salaries, Offer the 15% Recruitment and Retention Differential to Psychiatrists on the Same Terms Offered to Physicians and Surgeons, And Devise A Long-Term Plan to Address Staffing Shortages**

8    Defendants have previously stated that given the nationwide shortage of

9    psychiatrists, psychiatry staffing shortages at CDCR institutions are inevitable.  However,

10   the existence of any industry-wide psychiatrist shortages merely demonstrates that

11   psychiatrists command market power and that more compensation must be provided to

12   recruit and retain them.  With over 3,100 psychiatrists estimated in California and over

13   24,000 psychiatrists estimated nationwide, it is beyond dispute that there are more than

14   enough psychiatrists available in the community to fully staff CDCR's institutions.  *See*

15   Nolan Decl. ¶ 12, Ex. H (U.S. Bureau of Labor Statistics, Employment and Wages, May

16   2015, 29-1066 Psychiatrists, *available at* https://www.bls.gov/oes/current/oes291066.htm).

17   CDCR must pay psychiatrists starting salaries significantly greater than the average

18   income for California psychiatrists, as it does for physicians and surgeons, in order to

19   attract quality psychiatrists to work in the unusually challenging environments in which its

20   psychiatrists practice.  CDCR salaries must also be high enough to overcome the

21   reluctance of many psychiatrists to work in remote locations, away from the amenities of

22   urban centers.  Instead, Defendants are offering salaries that lag well below the state

23   average for psychiatrists even as they have taken steps in recent years to slash the once-

24   generous pensions that used to be a major draw to state service.  Such an approach is a

25   recipe for exacerbation of existing shortages and further harm to the Plaintiff class in this

26   case.

27   This Court should require Defendants to address the ongoing psychiatrist staffing

28   shortage through both short and long-term measures.  In the short term, the Court can and

should address the currently severe and growing psychiatrist staffing crisis by ordering Defendants to immediately provide the same 15% recruitment and retention pay differentials to psychiatrists on the same terms that it offers the differential to physicians and surgeons, namely at all institutions with psychiatrist vacancy rates greater than 15%. That would include psychiatrists at KVSP, SVSP, SATF, SAC, LAC, Central California Women's Facility ("CCWF"), North Kern State Prison ("NKSP"), CHCF, Correctional Training Facility ("CTF"), RJD, Valley State Prison ("VSP"), Corcoran State Prison ("COR"), HDSP, Solano State Prison ("SOL"), Wasco State Prison ("WSP"), Pelican Bay State Prison ("PBSP"), California Correctional Institution ("CCI"), California Men's Colony ("CMC"), California Medical Facility ("CMF"), and California Institution for Women ("CIW").

In addition, consistent with the Special Master's recommendation, the Court should order Defendants to prepare a psychiatrist salary and overall compensation survey and report its findings to the Court within ninety days. *See* Special Master's Staffing Report at 23-26, 28 (findings and recommendations relevant to psychiatrist pay). The survey should specifically account for the reductions to pensions under recent pension reforms. Based on the results of that survey, the Court should order a schedule of base salary increases for psychiatrists over the next several years to ensure that psychiatrists salaries remain adequate to attract and retain psychiatrists. After all, Defendants are free to increase psychiatrist salaries at any time; they need not wait for future employment contract negotiations.

To ensure long-term relief, Plaintiffs also request that the Court set a status conference to devise a durable remedy. Defendants should be required to bring representatives from the Department of Personnel Administration, the Department of Finance, CalHR, the Governor's Office, and any other State stakeholders necessary to craft a comprehensive remedy to address psychiatrist staffing shortages.

## CONCLUSION

Psychiatrist staffing shortages are a peculiar and persistent problem. All parties

3115780-9

23

2:90-CV-00520-KJM-DB

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN

1  seem to understand that significant increases to psychiatrist compensation would go a long

2  way toward resolving this problem, yet Defendants have repeatedly refused to take this

3  much-needed action even as they agree to do so to remedy deficits in other cases.  The

4  Plaintiff class is already suffering serious deficiencies in mental health care due to the

5  staffing shortages and rising EOP population; "Lift and Shift" and a poorly designed

6  clustering plan will only amplify these problems.  The situation is fast approaching a

7  breaking point, as the stresses of working at understaffed institutions push CDCR

8  psychiatrists who remain to seek employment elsewhere.  The time has come for the Court

9  to order Defendants to substantially increase psychiatrist salaries immediately and to

10  require Defendants to devise a long-term compensation improvement plan so that

11  Defendants can attract and retain psychiatrists and thereby effectively provide the critical

12  care that Plaintiffs require as part of a durable remedy in this case.

13

14  DATED: March 30, 2017                Respectfully submitted,

15                                        ROSEN BIEN GALVAN & GRUNFELD LLP

16
                                         By:  */s/ Thomas Nolan*
17                                            Thomas Nolan

18                                       Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28

PLS' OBJECTIONS & REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE
STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFS.' STAFFING PLAN