XAVIER BECERRA
Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD STEGEMAN, State Bar No. 225745
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 324-4921
  Fax:  (916) 324-5205
  E-mail:  Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFENDANTS' STAFFING PLAN** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

1

# TABLE OF CONTENTS

2

**Page**

3 INTRODUCTION ....................................................................................................... 1

4 CDCR SHOULD BE ALLOWED TO FULLY IMPLEMENT ITS 2017 STAFFING
PLAN ........................................................................................................................... 3

5         A.    All Available Evidence Demonstrates That Telepsychiatry Is an
Effective Tool for Treating All Coleman Class Members. ....................... 3

6         B.    CDCR's Proposal to Review the Enhanced Outpatient Program
Population Is a Reasonable Utilization Management Approach. ............... 7

7

8         C.    Additional Salary Increases for Psychiatrists, on Top of Those That
Defendants Are Already Advancing, Are Not Warranted at This
Time. ....................................................................................................... 9

9         D.    CDCR Has Demonstrated That Despite Vacancies It Is Able to
Provide Adequate Mental Health Care to Class Members. ..................... 11

10

11         E.    The Staffing Plan's Recommendation Regarding Clustering Is
Vague and Unnecessary. ........................................................................ 13

12 CONCLUSION .......................................................................................................... 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

**INTRODUCTION**

This report responds to the *Coleman* Special Master's review of Defendants' most recent Staffing Plan (2017 Staffing Plan), submitted on January 10, 2017.  (ECF No. 5564 at 38-71.) Defendants' 2017 Staffing Plan is robust and sustainable, ensures adequate mental health staffing to deliver constitutional care to the *Coleman* class, and proposes innovative solutions to respond to realities in the job market—particularly the acute shortage of psychiatrists nationwide and in California.  Indeed, the Special Master's Staffing Report embraced most measures in CDCR's staffing plan, including the following elements:

- Establish and fully utilize the Medical Assistant classification to assist psychiatrists.
- Enhance an internship program for psychologists and fellowship program for psychiatrists to increase the pool of candidates for full-time employment.
- Increase salary rates in hard-to-recruit locations to attract registry psychiatrists.
- Expand the use of CDCR's successful telepsychiatry program.
- Modify the "on-call" compensation package for clinicians.
- Increase the use of dual appointments.
- Hire psychiatric nurse practitioners to provide psychiatric services.
- Improve utilization management as related to the Clinical Correctional Case Management Services inmates.
- Implement parole and credit changes, pursuant to Proposition 57, to reduce the number of patients participating in the Mental Health Services Delivery System.
- Develop a mental health academy for new employees.

At the same time, the Special Master's Staffing Report raises questions about the use of telepsychiatry and makes recommendations to delay the proposed review of the Enhanced Outpatient Program population, pursue salary increases as a means to address staffing vacancies for civil service psychiatrists, and force further clustering of patients with serious mental illness.[1] The appropriate use and expansion of telepsychiatry to meet the mental health needs of patients within CDCR's care is a critical part of Defendants' plan and should be embraced by the Court.

---

[1] The Special Master has since clarified with the parties that he supports the Enhanced Outpatient Review concept and that the clustering recommendation refers to removing class members from High Desert State Prison.

1

1   Similarly, CDCR's proposal to review its Enhanced Outpatient Program population is supported

2   by the Program Guide and is an appropriate patient management approach.

3         As Defendants prepared their plans and engaged in discussions with the Special Master and

4   Plaintiffs, an issue emerged that now looms above all others, and requires this Court's

5   consideration.  That is the persistent challenge Defendants face in reaching the court-ordered

6   statewide staffing requirement of ninety percent for psychiatrists based on staffing ratios

7   implemented in 2009.  Over the past three years, CDCR has maintained an average fill rate of

8   ninety-one percent for social workers, eighty-eight percent for psychologists, and seventy-five

9   percent for psychiatrists, including registry (contract staff).  The difficulty in hiring psychiatrists

10  is not new and reflects in large part the acute nationwide shortage of psychiatrists that exists

11  today.  The limited pool of available psychiatrists is exacerbated by the fact that a large portion of

12  California's board-certified psychiatrists are already employed by CDCR and the Department of

13  State Hospitals (DSH).  Those institutions and hospitals alone employ seventeen percent of all

14  psychiatrists in California.  In absolute numbers, Defendants employ more psychiatrists than the

15  number of psychiatrists working in all but ten states.  Average salaries for CDCR and DSH

16  psychiatrists, moreover, are already among the highest in the nation.  *See* Table 1 at p. 11.

17        Defendants are unaware of other health-care systems that require as high a staffing ratio for

18  psychiatrists as the one under which CDCR and DSH operate and respectfully submit that these

19  levels should be revisited.  Defendants can demonstrate that current staffing levels, which will

20  continue to improve with Defendants' 2017 Staffing Plan, are sufficient to deliver constitutional

21  care.  For example, regardless of vacancies in psychiatry, CDCR's systemic, statewide

22  compliance with its medication-administration measures totals ninety-six percent over the past

23  twelve months.  After more than a decade of trying, unsuccessfully, to hire psychiatrists in

24  sufficient numbers to meet the court-ordered benchmark, it is time to reevaluate the need and

25  feasibility of the outdated staffing ratios from the 2009 staffing plan as a means to delivering

26  constitutional care to the *Coleman* class.

27  / / /

28  / / /

2

1    **CDCR SHOULD BE ALLOWED TO FULLY IMPLEMENT ITS 2017 STAFFING PLAN**

2         While the Special Master endorsed most elements of the State's 2017 Staffing Plan, certain

3    concerns and disagreements were raised in his Report about telepsychiatry, a review of the

4    Enhanced Outpatient Program population, and staffing vacancies.  Defendants' positions on each

5    of these issues, and the reasons why the 2017 Staffing Plan should be approved in full, are

6    discussed in the following sections.

7         **A.    All Available Evidence Demonstrates that Telepsychiatry Is an Effective
              Tool for Treating All *Coleman* Class Members.**

8

9         While recommending the continued expansion of CDCR's telepsychiatry program to serve

10   class members and address the difficulty in hiring psychiatrists in certain areas of the state, the

11   Special Master's Staffing Report raised concerns about the efficacy of telepsychiatry for certain

12   classes of patients.  But the available evidence does not support the Special Master's concerns.

13        Telemedicine is used nationwide and is seen "as a tool in medical practice, not a separate

14   form of medicine,"[2] according to the Medical Board of California.  Government and private

15   organizations alike increasingly rely on telehealth services to help meet patient care needs.  For

16   example, the Department of Veterans Affairs has a robust telemedicine program that provides

17   same-day or urgent access mental-health services to patients in rural locations.[3]  The Medical

18   Board of California also supports telemedicine, noting that there "are no legal prohibitions to

19   using technology in the practice of medicine, as long as the practice is done by a California

20   licensed physician . . . .  The standard of care is the same, whether the patient is seen in-person,

21   through telehealth or other methods of electronically enabled health care."[4]  Telepsychiatry is

22   recognized as an alternative means to provide mental health-care services, including the use of

23   coordinated care practices in which psychiatrists serve as consultants to primary care physicians.[5]

24

25        [2] http://www.mbc.ca.gov/Licensees/Telehealth.aspx, last visited on 3-29-17.  *See also*
     Exhibit 1 to the Declaration of Elise Owens Thorn (Thorn Decl.)
26        [3] http://www.ruralhealth.va.gov/programs/telemental-services.asp.  Thorn Decl. Exh. 2.
          [4] http://www.mbc.ca.gov/Licensees/Telehealth.aspx, last visited on 3-29-17.
27        [5] Doris A. Fuller, Research Weekly: *The Perilous Shortage of Psychiatrists*,
     http://treatmentadvocacycenter.org/fixing-the-system/features-and-news/3608.  Thorn Dec. Exh.
     3.
28

                                            3

1    The research literature demonstrates that in most applications, telepsychiatry is as effective

2    as face-to-face or on-site psychiatric treatment, including in prison settings.  (Declaration of

3    Michael Golding, M.D. at ¶ 2.)  The American Psychiatric Association (APA) opines that its

4    "effectiveness is comparable to in-person care in terms of therapeutic engagement, quality of care,

5    validity/reliability of assessment, and clinical outcomes," and "[t]he experience of other mental

6    health clinicians using telemedicine (i.e., telemental health), is consistent with, and further

7    substantiates the diagnostic, therapeutic and outcome evidence base."[6]  The *World Journal of*

8    *Psychiatry* makes similar findings on the reliability of clinical assessments and treatment

9    outcomes by telepsychiatry, noting that they are comparable to those rendered via face-to-face

10    services.  (Golding Decl. ¶ 3, Exh. 2.)  Significantly, the report's authors "uncovered no

11    published reports" to support concerns related to confidentiality or a limited capacity to respond

12    to psychiatric emergencies.  *Id.*

13    As of February 2017, CDCR employs 42.5 telepsychiatrists who provide services to

14    inmates at seventeen institutions.[7]  (Tebrock Decl. ¶ 12.)  As shown in the following photos, the

15    typical experience for both patient and doctor are similar to face-to-face appointments.  The first

16    photo shows a telepsychiatrist's office with a staff member on the screen in place of an inmate.

17    The second photo shows the view of the inmate-patient from the telepsychiatrist's perspective.

18    The third photo shows the view of the telepsychiatrist from the inmate-patient's perspective.  And

19    the fourth photo shows the layout of a treatment team meeting with telepsychiatry participation.

20    / / /

21    / / /

22    / / /

23

24    [6] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/evidence-base (last
visited March 29, 2017).  Thorn Dec. Exh. 4.

25    [7] California Correctional Institution, Central California Women's Facility, California
Health Care Facility, California Institution for Men, California Institution for Women, California

26    State Prison, Corcoran, California Treatment Facility, High Desert State Prison, Kern Valley
State Prison, California State Prison, Los Angeles County, Mule Creek State Prison, Pelican Bay

27    State Prison, R.J. Donovan Correctional Facility, Substance Abuse Treatment Facility, Salinas
Valley State Prison, Valley State Prison, and Wasco State Prison.

28

4

1
2
3
4
5
6
7



8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27



28

Defs.' Response to Special Master's Report on Status of Mental Health Staffing
(2:90-cv-00520 KJM-DB (PC))

1    (Golding Decl. at ¶¶ 4-7.)[8]

2        Telepsychiatry may offer important clinical advantages for inmate-patients.  For instance,

3    telepsychiatry enables patients who are transferred from one institution to another to continue to

4    see the same psychiatrist, despite their transfer.  Such continuity of care is welcome by patients

5    and benefits their treatment.  (Golding Decl. at ¶ 9.)

6        The Special Master has monitored the use of telepsychiatry for years[9] and positively

7    reviewed the program in the *Twenty-Sixth Round Monitoring Report of the Special Master on the*

8    *Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols* (*Twenty-*

9    *Sixth Round Monitoring Report*).  (ECF No. 5439.)  In December 2015, the Special Master's team

10    visited telepsychiatry offices and institutions to observe the effectiveness of the program.  (ECF

11    No. 5439 at 18.)  The Special Master reported that "the observed use of the telepsychiatry process

12    by Interdisciplinary Treatment Teams was found satisfactory as a viable option in the absence of

13    live psychiatrists at the institutions."  (*Id*).  The report summarizes the history of the

14    telepsychiatry program and states, "[t]he experts' opinions regarding telepsychiatry have not

15    changed since 1999 when the Special Master reported that his 'psychiatric experts have viewed

16    the defendants' telemedicine system and believes it has potentially positive uses within the

17    department's overall plans for the delivery of medical and mental health care."  (*Id*. at 20.)  The

18    report monitored positive telepsychiatric care at seven CDCR institutions and included reviews of

19    seven individual inmates, including some in the Enhanced Outpatient Program or crisis bed levels

20    of care.[10]  The report's only criticism of the program was that CDCR was implementing it *too*

21    *slowly*.  (*Id*.)

22        _____
        [8] CDCR's internal chart review of notes and assessments for telepsychiatrists and on-site
23    psychiatrists also shows that telepsychiatry documentation is on par with on-site psychiatrists'
    documentation.  (Golding Decl. at ¶ 10.)
        [9] See for instance, the *Twenty-Fourth Round Monitoring Report of the Special Master on*
24    *the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols and the*
    *Twenty-Fifth Round Monitoring Report of the Special Master on the Defendants' Compliance*
25    *with Provisionally Approved Plans, Policies, and Protocols*, reporting generally on telepsychiatry
    use in several institutions.  (ECF Nos. 4205 and 4298.)
26        [10] *See* Twenty-Sixth Round Monitoring Report (ECF No. 5439 at 160 [California Correctional
    Health Care Facility], 184 [Pelican Bay State Prison], 190 [High Desert State Prison], 215 [Mule Creek
27    State Prison], 295 [Corcoran], 320 [Substance Abuse Treatment Center], and 451 [California Correctional
    Institution]; and individual reviews at 590-93, 597, 597, 661, and 703.

28

                                              6

1      The Special Master's Staffing Report raises concerns about the efficacy of telepsychiatry,

2  but all available evidence demonstrates that telepsychiatry is a proven clinical tool that ensures

3  adequate and appropriate mental-health services for the *Coleman* class.  Telepsychiatry is

4  especially helpful in locations where on-site staff have been difficult to recruit or where staffing

5  levels shift.  (Tebrock Decl. at ¶ 3.)  CDCR is far more effective at hiring and retaining

6  telepsychiatrists to work from its Rancho Cucamonga office than to persuade psychiatrists to

7  move to Salinas Valley or to work out of certain correctional environments.  (*Id.*)  Telepsychiatry

8  can successfully serve patients with intensive and urgent mental health needs.  In addition to

9  CDCR's use of telepsychiatrists to provide crisis bed treatment, DSH uses telepsychiatry to

10  provide inpatient care at Coalinga.  (Declaration of Brandon Price at ¶ 2, Exhibit 1.)  The current

11  assigned telepsychiatrist has a case load of fifteen to seventeen Coleman patients and provides the

12  full spectrum of psychiatric care, including but not limited to, participation in Treatment Team

13  Meetings, one-on-one treatment sessions with their client, prescribing Psychotropic Medications,

14  and ordering enhanced observation.  (*Id.* at ¶4.).  DSH-Coalinga has not received any negative

15  feedback or outcomes as a result of its use of telepsychiatry.  (*Id.* at ¶ 5.)

16      CDCR's telepsychiatry program is an effective means for delivering care to *Coleman* class

17  members at all levels of patient acuity.  The Medical Board of California and research literature

18  confirms that telepsychiatry offers the same standard of care and same patient outcomes as in-

19  person contacts.  Telepsychiatry is also a critical part of Defendants' plan to address psychiatry

20  vacancies and the difficulty of recruiting this highly sought-after profession.  There is little risk,

21  as the Special Master cautions, that telepsychiatry could replace on-site psychiatric services.

22  CDCR's use and expansion of the telepsychiatry program should therefore be adopted by this

23  Court without qualifications.

24      **B.**    **CDCR's Proposal to Review the Enhanced Outpatient Program**
                **Population Is a Reasonable Utilization Management Approach.**

25

26      In its 2017 Staffing Plan, CDCR proposes a review of its Enhanced Outpatient Program

27  population to ensure that the right patients are placed and retained at that level of care.  (2017

28  Staffing Plan at 4, ECF No. 5564 at 42.)  The Special Master's Staffing Report does not disagree

7

1    in principle with CDCR's conclusion that it should conduct a review of its Enhanced Outpatient

2    Program population, but objects to CDCR's written proposal on the ground that a number of

3    concerns have not been addressed.  (ECF No. 5564  20-22.)  CDCR submitted a revised plan to

4    the Special Master and Plaintiffs on March 29, 2017.  (Tebrock Decl. ¶ 5.)

5            One concern expressed in the Staffing Report is that patients will be moved out of the

6    Enhanced Outpatient Program without an evaluation based on "objective criteria."  (ECF No.

7    5564 at 21.)  But the Program Guide already describes objective criteria to review and potentially

8    discharge patients from the Enhanced Outpatient Program, and CDCR does not propose to

9    deviate from that criteria.  (Tebrock Decl. ¶ 4.)

10           The Staffing Report also expresses a concern that issuing a memorandum to CDCR

11   clinicians emphasizing the need to follow these requirements could lead to "wholesale removal of

12   inmates" from that level of care.  But this did not occur when CDCR recently reviewed patients in

13   the Correctional Clinical Case Management System.  To the contrary, CDCR took a thoughtful

14   and considered approach to determining whether patients were placed at the correct clinical level

15   of care.  (Tebrock Decl. ¶ 4.)  CDCR cannot predict what the results of the Enhanced Outpatient

16   Program review will be, but expects that through the process the right patients will be placed in

17   the right level of care.  The ultimate goal of patient care is to stabilize and improve the patient's

18   condition so that they can better function and manage their mental health needs when they are

19   eventually released from prison.

20           CDCR understands the concerns expressed by the Special Master and Plaintiffs about its

21   proposal.  In response, CDCR has revised its proposal to address their concerns with an eye

22   toward ensuring that patients receive appropriate care in the least restrictive clinical and custodial

23   environment, that those patients ready to transition to a lower level of care have a safe transition

24   process, and that staff have adequate training and support for a sustainable review process.

25   CDCR provided a revised draft version of the memorandum to the Special Master and Plaintiffs

26   on March 29, 2017, for their consideration.  Defendants will continue to work with the Special

27   Master and Plaintiffs' counsel on this review.

28

8

Defs.' Response to Special Master's Report on Status of Mental Health Staffing
(2:90-cv-00520 KJM-DB (PC))

**C.    Additional Salary Increases for Psychiatrists, on Top of Those That Defendants Are Already Advancing, Are Not Warranted at this Time.**

Recognizing the challenges posed by a growing nationwide shortage of psychiatrists, CDCR's staffing plan advances a variety of innovative measures to attract and retain qualified psychiatrists.  A number of these measures build on longstanding efforts to improve compensation for psychiatrists in thoughtful, targeted ways.  Proposed measures include increasing salary rates in hard-to-recruit locations to attract registry psychiatrists, changing compensation for clinicians (including psychiatrists) who are "on-call" from leave credit to cash payments, and—per the recently concluded collective bargaining agreement with the psychiatrists' union—raising salaries across the board for civil-service psychiatrists.[11]  CDCR's staffing plan also proposes new staff support positions to help psychiatrists, expanded telepsychiatry and other measures to increase the attractiveness of hiring within CDCR, mental health academies to help new employees navigate the correctional environment, and exit interviews to better understand the reasons for departures.

Yet, before these and other measures in the 2017 Staffing Plan have even been implemented, the Special Master's Staffing Report insists that new benchmarks or salary surveys be considered to raise psychiatrist salaries even further and to make regular raises automatic.  (ECF. No. 5564 at 25-26.)  This push to adopt even more substantial salary increases, on top of what Defendants have advanced, is imprudent for several reasons.

First, reflexively relying on salary increases to address Defendants' staffing needs contradicts guidance issued by this Court.  In its August 9, 2016 Order, this Court advised, "[i]t is not at all clear to this court that additional pay will solve this deep seated problem and the court can no longer sanction the continued pursuit of remedial strategies that have not worked in the past."  (ECF No. 5477 at 6.)  Indeed, there is no evidence that further salary increases will produce better results than simply implementing the measures set forth in CDCR's staffing plan.

---

[11] The agreement, which was concluded after the Special Master's Staffing Report was issued, is available at http://www.calhr.ca.gov/labor-relations/Pages/Unit-16-Physicians-Dentists-and-Podiatrists.aspx.  The agreement is subject to union ratification and subsequent approval by the legislature.

1    Where, as here, an extensive, robust set of measures (including thoughtful, tailored salary

2    enhancements) has been offered to address CDCR's staffing needs, those measures should first be

3    implemented and allowed to work as designed.  Only if it becomes clear that staffing levels are

4    not able to deliver constitutionally adequate care to the *Coleman* class should this Court explore

5    whether further salary enhancements might be necessary.

6        Second, there is no evidence to suggest that the proposal to offer routine, repeated, and

7    automatic salary increases will result in compliance with the court-ordered benchmarks.  More

8    likely is a bidding war with the private market.  There is an acute shortage of psychiatrists

9    nationwide, identified as one of the leading barriers to access to mental health.[12]  According to the

10   Substance Abuse and Mental Health Services Administration, fifty-five percent of U.S. counties

11   have no practicing psychiatrists, psychologists, or social workers.[13]  Perhaps the largest shortage

12   is in the Pacific region, where in 2013 there were on average only 13.3 psychiatrists per 100,000

13   people.  That figure represented a drop of 9 percent since 2003.[14]

14       This trend, moreover, is projected to continue, both nationally and in California.[15]  In 2014,

15   nearly sixty percent of active psychiatrists were fifty-five years or older, and more are retiring

16   every year.[16]  The Association of American Medical Colleges projects physician demand to grow

17   faster than supply, with shortages of up to 32,000 "other specialists", including psychiatrists, by

18   the year 2025.[17]  Given these circumstances, it is unlikely that the limited supply of psychiatrists

19   will keep up with demand.  Raising salaries will never increase this limited pool of available

20   psychiatrists in California.

21

22   [12] National Alliance on Mental Illness, *A Long Road Ahead, Achieving True Parity in Mental Health and Substance Abuse Care*, p. 3, www.nami.org. Thorn Decl, Exh. 5
23   [13] *Id.*
     [14] National Alliance on Mental Illness, *A Long Road Ahead, Achieving True Parity in Mental Health and Substance Abuse Care*, p. 3, www.nami.org.
24   [15] *Id.*
25   [16] In their 2015 Review of Physician and Advanced Practitioner Recruiting Incentives, Merritt Hawkins, a leading medical recruitment firm, states that, "the shortage of psychiatrists is an escalating crisis of more severity than shortages faced in virtually any other specialty.  With
26   many psychiatrists aging out of the profession, and with a preference among psychiatrists for outpatient practice settings, it is becoming increasingly difficult to recruit to inpatient settings."
27   [17] *The Complexities of Physician Supply and Demand: Projections from 2014 to 2025.* (Thorn Decl., Exh. 6.)
28

10

1    This, in turn, raises serious doubts whether the ninety-percent court-ordered staffing

2    requirement for psychiatrists can ever be realistically satisfied.  CDCR and DSH *already* employ

3    a disproportionate share of the limited pool of psychiatrists.  They employ more psychiatrists

4    combined than the number of psychiatrists working in all but ten states, as outlined in Table 1

5    below.  In 2014, the 713 psychiatrists employed by DSH and CDCR represent nearly 17.4 percent

6    of California's board-certified psychiatrists and placed the two agencies as largest employer

7    among all states in the Country.  Table 1 also shows that the salaries CDCR and DSH offer are

8    already among the highest in the nation.

9            Table 1 - U.S. Psychiatrists per State and CDCR/DSH

| # | State | Psychiatry Employment | Mean Annual Wage | # | State | Psychiatric Employment | Mean Annual Wage |
|---|-------|----------------------|------------------|---|-------|------------------------|------------------|
| 1 | California | 4,100 | $206,200 | 15 | North Carolina | 540 | $197,380 |
| 2 | New York | 3,420 | $160,640 | 16 | Maryland | 520 | $179,930 |
| 3 | Texas | 1,080 | $201,320 | 17 | Georgia | 500 | $217,790 |
| 4 | Ohio | 1,060 | $185,110 | 18 | Missouri | 470 | $162,620 |
| 5 | Illinois | 1,040 | $134,270 | 19 | Oregon | 410 | $208,830 |
| 6 | Pennsylvania | 980 | $192,730 | 20 | Colorado | 390 | $196,140 |
| 7 | Connecticut | 930 | $189,870 | 21 | Minnesota | 360 | $205,730 |
| 8 | Massachusetts | 830 | $177,550 | 22 | Arkansas | 350 | $102,390 |
| 9 | New Jersey | 800 | $210,260 | 23 | DSH | 345 | $254,850 |
| 10 | Florida | 790 | $155,670 | 24 | Wisconsin | 310 | $210,480 |
| 11 | Virginia | 680 | $179,720 | 25 | Washington | 300 | $187,050 |
| 12 | Arizona | 610 | $187,920 | 26 | Indiana | 280 | $229,980 |
| 13 | CDCR + DSH | 606 | $254,850 | 27 | CDCR | 261 | $260,394 |
| 14 | Michigan | 570 | $167,050 | | | | |

20    **Source: U.S. Bureau of Labor Statistics, May 2014**

21        Defendants are unaware of other health-care systems that require as rich a staffing level for

22    psychiatrists as is mandated by the *Coleman* Court.  And attaining those staffing targets may not

23    be necessary because CDCR can deliver constitutional care under its existing system and the

24    staffing improvements that will occur with the implementation of its staffing plan.

25        **D.    CDCR Has Demonstrated that Despite Vacancies It Is Able to Provide**
           **Adequate Mental Health Care to Class Members.**

26

27        CDCR is timely meeting the mental health needs for over 38,000 patients diagnosed with

28    mental disorders across a continuum of care.  (Tebrock Decl. ¶ 9.)  CDCR employs 1,668.49

11

clinical psychologists, psychiatrists, licensed social workers, and therapists (including registry and supervisors). (Tebrock Decl. ¶ 10.) These staff serve patients in approximately 6,900 Enhanced Outpatient Program beds, 450 Mental Health Crisis Beds, and eighty-five Inpatient Acute or Intermediate Care beds. (Tebrock Decl. ¶ 9.) Over the past year, inmates were seen timely by their primary clinician ninety percent of the time, by their psychiatrist ninety percent of the time, and by their treatment team ninety-eight percent of the time. (Tebrock Decl. ¶ 10.)

To ensure medication monitoring for its patients, CDCR uses a detailed monitoring tool titled "Medication Administration Process Improvement Process." This tool facilitates necessary and appropriate systemic monitoring of medication management, including blood levels, for the following types of medication: (1) Antipsychotics; (2) Clozapine; (3) Mood Stabilizers, including Carbamazepine, Depakote, and Lithium; and (4) Antidepressants. CDCR clinicians generally maintain high levels of compliance, with most institutions achieving compliance above the ninety-fifth percentile. (Tebrock Decl. ¶ 11, Exh. 1.) CDCR's systemic, statewide compliance with its medication-administration measures totals ninety-six percent over the past twelve months. (*Id.*)

CDCR clinicians, and particularly its psychiatrists, provide quality treatment at very high compliance rates despite the current staffing vacancies. (Tebrock Decl. ¶ 8.) Eleven institutions with staffing-vacancy rates under ninety percent achieved greater than ninety percent compliance for psychiatry services. (*Id. &* Exh. 2.) For example, at Avenal State Prison, despite a twenty-nine percent vacancy rate for psychiatrists, the clinical staff achieved a 100 percent compliance rate for timely psychiatry contacts and medication management. (*Id.*) Similarly, the institution with the highest staffing-vacancy rate for the period, Salinas Valley State Prison, with only 5.8 of thirteen psychiatrist positions filled (a fifty-five percent vacancy rate), again showed satisfactory mental health performance indicators in certain areas: ninety percent for psychiatry continuity of care, ninety percent for medication management and seventy-eight percent for timely psychiatry contacts. (Tebrock Decl. ¶ 8, Exh. 2.)

In describing vacancy rates, the Staffing Report mischaracterizes CDCR's staffing as "static." (Staffing Report at p. 6.) In reality, over the past three years as the population requiring

12

mental health services has grown, CDCR has added approximately 30 psychiatrist positions, 212 psychologist positions, and 47 social worker positions.  (Tebrock Decl., Exh. 3.)  These additional allocations immediately reflect as vacancies, although CDCR is actively recruiting and hiring providers to fill these allocations.  Thus, as demonstrated in Table 2 below, the staffing levels are better understood in the context of substantial increases in allocated positions and additional hirings over the past three years:

Table 2 –Comparison of Staffing Fill Rates – Averages

| Position | Avg. No. of Positions/Fill Rate 2014 | Avg. No. of Positions/Fill Rate 2015 | Avg. No. of Positions/Fill Rate 2016 | 3-Year Average Fill Rate |
|---|---|---|---|---|
| Psychiatrists | 339.1/ 77% | 350.1/ 78% | 370.2/ 68% | 74% |
| Psychologists | 959.2/ 89% | 1040.2/ 89% | 1175.6/ 85% | 88% |
| Social Workers | 411.4/ 88% | 438.2/ 91% | 459.4/ 93% | 91% |

(*Id.*)  For the past three years, an average of seventy-five percent of psychiatrist positions, eighty-eight percent of psychologist positions, and ninety-one percent of social worker positions have been filled.  The ninety percent benchmark as required by the 2002 order has been attained or is within striking distance for mental health positions other than psychiatry.  CDCR's 2017 Staffing Plan addresses this gap and ensures that patients continue to receive adequate care.

**E.    The Staffing Plan's Recommendation Regarding Clustering Is Vague and Unnecessary.**

As part of its 2017 Staffing Plan, CDCR submitted a bed plan that strikes the appropriate balance between patient care and clinical staff retention and satisfaction.  CDCR's bed plan adds more Enhanced Outpatient Program beds at existing Enhanced Outpatient Program institutions while closing one small program at Pelican Bay State Prison.  (Tebrock Decl.  ¶ 13.)  CDCR already clusters its mental health population in various ways.  Inmates requiring mental health services at desert institutions are promptly moved to other prisons, and CDCR's bed plan spreads out the Enhanced Outpatient Program beds across thirteen dedicated male institutions. (Declaration of Jeff Macomber ¶6.)  CDCR is careful not to inappropriately over cluster

13

1    institutions with high acuity patients, such as those in inpatient or Enhanced Outpatient Program

2    beds, to avoid staff burnout, which would, in turn, jeopardize patient care.

3         While the Staffing Report recommended clustering in general, the Special Master recently

4    clarified that his recommendation is intended to move *Coleman* class members out of High Desert

5    State Prison in particular.  As written, the recommendation is vague and it does not clearly

6    express the Special Master's proposal or identify the particular prisons that it contemplates for

7    clustering.  Defendants understand that the recommendation was made to address the Court's

8    order to move "higher-acuity mentally ill inmates" to locations where staff can be recruited and

9    hired.  (08/09/17 Order, ECF No. 5477 at 5.)  CDCR has already moved all Enhanced Outpatient

10   Program patients out of High Desert and, as discussed above, CDCR's telepsychiatry program

11   supports continued housing and treatment of the remaining mental-health patients (Clinical

12   Correctional Case Management Services inmates and inmates admitted to the Mental Health

13   Crisis Bed unit) at High Desert.  These patients receive services from on-site psychology,

14   licensed clinical social workers, and telepsychiatrists.  (Tebrock Decl. ¶ 14.)  No negative patient

15   outcomes have been attributable to telepsychiatry services provided at High Desert, nor have

16   there been any suicides since 2014.  (Tebrock Decl. ¶ 15.)

17        Closing the mental-health program at High Desert despite its efficacy presents serious

18   problems.  Closure will only exacerbate current challenges in finding appropriate and safe

19   housing locations for inmates with a variety of limiting case factors.  For example, if an inmate is

20   in the Mental Health Services Delivery System, is a high-risk-medical inmate, requires a special-

21   needs yard, and has a high security level, there are few institutions in which such an inmate can

22   be safely placed.  Should that same inmate encounter a safety issue at that institution, CDCR must

23   find another institution to house the inmate.  Removing even one institution from the pool of

24   potential housing locations for these types of inmates unnecessarily restricts CDCR's ability to

25   manage its inmate population.  (Macomber Decl.  ¶ 5.)

26        If the clustering recommendation is not limited based on the Special Master's clarification,

27   it must be rejected for additional reasons.  Read broadly, the recommendation would violate the

28   Prison Litigation Reform Act's prohibition on orders requiring construction of prisons.  18 U.S.C.

14

1    § 3626(A)(1)(C). And even if it is read not to require construction, the recommendation is not

2    supported by data or evidence. (ECF No. 5564 at 27-28.) The Staffing Report asserts that

3    closing allegedly hard-to-recruit institutions and placing *Coleman* class members in institutions

4    with low staffing vacancies would result in an increased ability to recruit and retain mental health

5    staff. Defendants are concerned that further clustering of high-acuity patients may negatively

6    impact care, particularly at prisons with more complex missions, and negatively impact the staff.

7    (Tebrock Decl. ¶ 16.)

8         Because CDCR's bed plan represents a reasonable and safe way to manage the population

9    of mentally ill inmates, the Staffing Report's clustering recommendation should be rejected. The

10   Court should not consider an order requiring additional clustering unless the issue is fully briefed

11   and sufficient evidence supporting the clustering concept is submitted to the Court.

12                                          **CONCLUSION**

13        CDCR successfully provides mental health care to over 38,000 inmates despite vacancies

14   based on the 2009 staffing ratios. In light of the care being provided to class members, the

15   advances in technology, the changes in the mental-health job market, and the marked changes in

16   the Mental Health Services Delivery System over the past twenty years, the need and feasibility

17   of maintaining outdated staffing ratios and vacancy rate mandates are outdated and should be

18   reconsidered.

19        In light of the longstanding acceptance of telepsychiatry (and telemedicine) nationwide,

20   CDCR's successful implementation of its own telepsychiatry program, and the Special Master's

21   positive findings of the program in the Twenty-Sixth Round Monitoring Report, CDCR's

22   proposed expansion of the telepsychiatry program should be adopted.

23        Additionally, CDCR should be permitted to continue to work with the Special Master and

24   Plaintiffs on finalizing its Enhanced Outpatient Program review memorandum to ensure that the

25   patients in the program are properly placed.

26        With respect to clustering, CDCR has already proposed a sustainable clustering plan that

27   will ensure patient safety and clinical staff retention and satisfaction. Increasing the number of

28

Defs.' Response to Special Master's Report on Status of Mental Health Staffing
(2:90-cv-00520 KJM-DB (PC))

highly acute class members at any one institution would only serve to jeopardize CDCR's ability to provide adequate care and attract qualified staff to that location.

Finally, with respect to salary increases, the bargained-for psychiatrists' salary increases, which are pending action by the California Legislature, and CDCR's multi-faceted Staffing Plan, which includes other targeted salary increases, should be given time to work.

Accordingly, this Court should reject the Special Master's recommendations on these issues and permit CDCR to proceed with its telepsychiatry program unimpeded, develop and implement an Enhanced Outpatient Program review process, proceed with its bed plan, and analyze whether recently approved salary increases to psychiatrists are sufficient and competitive.

Dated: March 30, 2017                         Respectfully submitted,

                                              XAVIER BECERRA
                                              Attorney General of California
                                              DANIELLE F. O'BANNON
                                              Supervising Deputy Attorney General

                                              */s/ Elise Owens Thorn*

                                              ELISE OWENS THORN
                                              Deputy Attorney General
                                              *Attorneys for Defendants*

CF1997CS0003
32820950.doc

Defs.' Response to Special Master's Report on Status of Mental Health Staffing
(2:90-cv-00520 KJM-DB (PC))