XAVIER BECERRA
Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD STEGEMAN, State Bar No. 225745
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-4921
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DECLARATION OF ELISE OWENS THORN IN SUPPORT OF DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFENDANTS' STAFFING PLAN** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

I, Elise Owens Thorn, declare as follows:

1.      I am a Deputy Attorney General with the California Office of the Attorney General, attorney of record for Defendants in this case, and I am admitted to practice before the courts of the State of California and before this Court. I am competent to testify to the matters set forth in this declaration, and If called upon by this Court, would do so competently. I submit this declaration in support of Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan.

1

1    2.    Attached as Exhibit 1 is a true and correct copy of a pdf print of a page at the

2  following website http://www.mbc.ca.gov/Licensees/Telehealth.aspx (last visited on March 29,

3  2017).

4    3.    Attached as Exhibit 2 is a true and correct copy of a pdf print of pages from the

5  following website http://www.ruralhealth.va.gov/providers/collaborativeaccess.asp (last visited

6  on March 29, 2017).

7    4.    Attached as Exhibit 3 is a true and correct copy of an article titled, Doris A. Fuller,

8  Research Weekly: *The Perilous Shortage of Psychiatrists*, located at

9  http://treatmentadvocacycenter.org/fixing-the-system/features-and-news/3608.

10    5.    Attached as Exhibit 4 is a true and correct copy of a pdf print of a page from the

11  following website:  https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/evidence-

12  base (last visited March 29, 2017).

13    5.    Attached as Exhibit 5 is a true and correct copy of the following article located at

14  www.nami.org.:  National Alliance on Mental Illness, *A Long Road Ahead, Achieving True Parity*

15  *in Mental Health and Substance Abuse Care*, p. 3.

16    6.    Attached as Exhibit 6 is a true and correct copy of the following article downloaded

17  from the internet:  *The Complexities of Physician Supply and Demand: Projections from 2014 to*

18  *2025*.

19    I declare that the foregoing is true and correct.  Executed in Sacramento, California, on

20  March 30, 2017.

21                                                                    */s/ Elise Owens Thorn*

22

23  CF1997CS0003
    32819605.doc

24

25

26

27

28

# Exhibit 1



| 🏠 | Consumers | Applicants | Licensees | About Us |

Home ⋮ Licensees ⋮ **Telehealth**

# Practicing Medicine Through Telehealth Technology

## In California:

**Telehealth (previously called telemedicine) is seen as a tool in medical practice, not a separate form of medicine.** There are no legal prohibitions to using technology in the practice of medicine, as long as the practice is done by a California licensed physician. Telehealth is not a telephone conversation, email/instant messaging conversation, or fax; it typically involves the application of videoconferencing or store and forward technology to provide or support health care delivery.

The **standard of care** is the same whether the patient is seen in-person, through telehealth or other methods of electronically enabled health care. Physicians need not reside in California, as long as they have a valid, current California license.

In 1996, Senate Bill 1665 (M. Thompson; Chap 864, Stats of 1996) enacted the "Telemedicine Development Act of 1996" which imposed several requirements governing the delivery of health care services through telemedicine and also made several changes to different sections of law, which are also related to telemedicine.

Below we have listed a *few* highlights of Senate Bill 1665:

▶ The act shall not be construed to alter the scope of practice of any health care provider or authorize the delivery of health care services in a setting, or in a manner, not otherwise authorized by law.

▶ Exempts out-of-state practitioners, as defined, from the Medical Practice Act when consulting either within this state or across state lines, with a licensed practitioner in California. Prohibits the out-of-state practitioner from having ultimate authority over the care or primary diagnosis of a patient in California.

▶ Requires the practitioner to obtain verbal and written informed consent from the patient prior to delivering health care via telemedicine, and also requires that this signed written consent statement becomes part of the patient's


 License Search

 Public Documents

 Subscriber Alerts

 Outpatient Surgery Settings

 Forms

A-Z Index

## Quick Links

▶ Board and Committee Meeting Dates and Locations

▶ Laws & Regulations

▶ Contact Us

▶ Publications

▶ Website Feedback

▶ License Renewal

▶ LVS Information

▶ Medical Assistants

▶ Precedential

- Provides that no health care service plan contract that is issued, amended, or renewed, on and after January 1, 1997, shall require face-to-face contract between a health care provider and patient for services appropriately provided through telemedicine, subject to all terms and conditions of the contract agreed upon.

In 2011, AB 415 repealed existing law related to telemedicine and replaced this law with the Telehealth Advancement Act of 2011, which revises and updates existing law to facilitate the advancement of telehealth as a service delivery mode in managed care and the Medi-Cal program. This bill repeals and replaces section 2290.5 of the Business and Professions Code to do the following:

- Defines "Asynchronous store and forward" as the transmission of a patient's medical information from an originating site to the health care provider at a distant site without the presence of the patient.

- Defines "Distant Site" as a site where a health care provider is located while providing services via a telecommunications system.

- Defines "Originating Site" as a site where a patient is located at the time health care services are provided via a telecommunications system or where the asynchronous store and forward transfer occurs.

- Defines "telehealth" as the mode of delivering health care services and public health via information and communication technologies to facilitate the diagnosis, consultation, treatment, education, care management, and self-management of a patient's health care while the patient is at the originating site and the health care provider is at the distant site. States that telehealth facilitates patient self-management and caregiver support for patients and includes synchronous interactions and asynchronous store and forward transfers.

- States that this section shall not be construed to alter the scope of practice of any health care provider.

- Provides that all laws regarding the confidentiality of health care information and a patient's rights to his or her medical information shall apply to telehealth interactions.

- This bill also applies the Business and Professions Code Section to the laws relating to Health Care Service Plans and to the Insurance code and requires health care service plans and health insurance companies to adopt payment policies to compensate health care providers who provide covered health care services through telehealth. This bill also applies these requirements to the Medi-Cal managed care program.

In 2015, AB 809 revised the informed consent requirements relating to the delivery of health care via telehealth by permitting consent to be made verbally or in writing, and by deleting the requirement that the health care provider who obtains the consent be at the originating site where the patient is physically located. This bill requires the health care provider to document the consent.

**Physicians using telehealth technologies to provide care to patients located in California must be licensed in California. Physicians are held to the same**

- Recall Notices

- Board of Pharmacy Email Alerts

- Other DCA Professional Boards and Bureaus













standard of care, and retain the same responsibilities of providing informed 3/30/17
consent, ensuring the privacy of medical information, and any other duties
associated with practicing medicine regardless of whether they are practicing
via telehealth or face-to-face, in-person visits.



About Us | DCA | CA.gov | Governor | Get Adobe Reader | Contact
Us | Request a Callback

Copyright © 2016 State of California  Back to Top | Conditions of Use | Privacy
Policy | Accessibility | Disclaimer







# Exhibit 2



U.S. Department
of Veterans Affairs

VA » Health Care » Office of Rural Health » Collaborative Rural Access Solutions

# Office of Rural Health

☰ MENU



## BECOME A VETERANS CHOICE PROVIDER

ORH HIGHLIGHTS    **See The Award Winning Office Of Rural Health Video.**

## Collaborative Rural Access Solutions

The Office of Rural Health (ORH) implements enterprise-wide programs that deliver increased care and support to rural Veterans nationwide in a more uniform manner. The enterprise-wide programs are ORH Rural Promising Practices and Collaborative Rural Access Solutions. Collaborative Rural Access Solutions expand national U.S. Department of Veterans Affairs' (VA) program offices' health care efforts to sites that serve rural Veterans. Initial funding support is available by ORH to support implementation in VA facilities across the country.

**MyVA Access** - This partnership supports rural access redesign at rural VA medical centers to achieve same day access for Veterans to receive primary and mental health care. The partnership with VERC supports the VA Undersecretary for Health's "open access to care" priority.

**National Teleradiology Program** - The program provides rural VA facilities with the highest standard of 24-hour diagnostic image interpretation that includes access to sub-specialty radiologists (e.g., neuroradiology or muscular/skeletal experts not usually on staff at rural facilities).

**Simulation Learning, Education and Research Network (SimLEARN) Rural Coordinators** - This initiative expands infrastructure and provides resources to develop and implement simulation-based training programs to enhance the quality of providers' skills through education and training.

**Tele-Intensive Care Unit** - The program connects VA facilities that do not have intensivists with

intensive/acute inpatient psychiatric services, and increases access to specialty mental health care for rural Veterans.

**National Telemental Health Center** - The program expands expert, subspecialty telemental health services to rural facilities to increase rural Veterans' access to expert clinical recommendations and therapy.

**Rural Health Training Initiative** - This program increases rural clinical training sites for health professions students and residents. Trainees include social workers, nurse practitioners, pharmacists, psychiatrists, optometry students, and dental and family medicine residents.

**Rural Provider and Clinical Staff Training Initiative** - The initiative implements locally based training and education programs for providers and other clinical staff in rural VA facilities

**Telemental Health Hubs** - The program establishes Telemental Health Hubs to connect mental health specialists with rural-serving sites where Veterans require same-day or urgent access to mental health services, where access is limited due to provider shortages or other barriers

**Tele-Stroke Emergency Care** - The program provides emergent telehealth care by qualified stroke neurologists in a timely manner to Veterans presenting symptoms of stroke at VA medical centers. Through telehealth, this program improves Veterans' access to stroke specialists and acute stroke care.

**Veteran Transportation Services** - This program provides medical transportation services for rural Veterans, and includes salaries for trained mobility managers in VA medical centers that serve rural Veterans, leases of vehicles compliant with the Americans with Disabilities Act, and salaries for VA drivers.

**Social Workers in Rural Patient Aligned Care Teams (PACT)** - The program expands the integration of rural social workers into the PACT model to improve care coordination for rural Veterans and their interdisciplinary care teams.

**Telephone Lifestyle Coaching** - The program supports a telephone-based health coaching intervention promoting individual change in a variety of health behaviors, including unhealthy eating, physical inactivity, obesity challenges, tobacco use, stress and unhealthy alcohol use.

**Vets Prevail Web-Based Behavioral Support** - A web-based intervention combines principles of cognitive behavioral therapy with interactive e-learning techniques to provide returning Operation Enduring Freedom (OEF) and Operation Iraqi Freedom (OIF) Veterans suffering from depression and/or post-traumatic stress disorder (PTSD) with tools to overcome mental health challenges.

**Military Sexual Trauma Web-Based Therapy** - This program uses Skills Training in Affective and Interpersonal Regulation (STAIR) to support rural Veterans who experienced military sexual trauma. STAIR meets the needs of rural Veterans by addressing problems of social isolation, low perceived social support, post-traumatic stress disorder, and depression symptoms. The program is delivered via

telemedicine, direction the clinician's own movements, and a web-based version of the program that the mental health provider and the Veteran work on together using a shared screen.

**State Veterans Homes Telehealth Initiative** - This initiative expands existing State Veterans Home (SVH) telehealth programs for Veterans who reside in SVH facilities with the greatest distance from Community Based Outpatient Clinics and VA medical centers; and expands access to direct VA health care services and prevention strategies for SVH residents.

**Support for Caregivers of Veterans** - This program provides caregivers of the most vulnerable rural Veterans with Resources for Enhancing All Caregivers' Health (REACH VA) and telephone support. This extended support is essential as caregivers of Veterans with debilitating chronic disease or combat injuries (e.g., dementia, spinal cord injury/disorders, multiple sclerosis, ALS, post-traumatic stress disorder are faced with challenges in managing behavioral difficulties and their own stress and coping associated with caregiving.

**Increasing Access to Clinical Pharmacy Specialist Providers for Rural Veterans** - This initiative delivers greater access to medication and chronic disease management services to rural Veterans using multiple approaches, such as virtual modalities into the home, within a VA medical center (VAMC), or to Community Based Outpatient Clinics from a VAMC. The Clinical Pharmacy Specialist is an advanced practice provider with a scope of practice that can bridge the gaps to care through the provision of comprehensive medication management services.

**Precision Oncology Program** - This program provides rural Veteran patients access to the latest technology in cancer treatment.  Precision Oncology is molecular analysis of individual patient tumor samples to detect acquired gene mutations in multiple cancer-associated genes.  The results of this test are interpreted with knowledge of the patient and drug efficacy to recommend a specific treatment course (often a targeted drug) for the individual patient.

**Teledermatology** - This program helps establish and expand store-and-forward teledermatology to rural sites where such service does not currently fully meet demand through reading service hubs and primary care training on dermatologic consults and minor procedures.

**Specialty Care Access Network-Extension for Community Healthcare Outcomes Transgender Curriculum** - This program trains rural providers, through online didactic training and case-based consultation, on providing quality treatment to transgender Veterans. The expert transgender Specialty Care Access Network-Extension for Community Healthcare Outcomes (SCAN-ECHO) team includes an endocrinologist, pharmacist, primary care provider, psychologist and social worker. This SCAN-ECHO program is coupled with the Transgender Inter-Facility E-consult program, which enables clinical providers to receive brief, non-urgent consultation from the interdisciplinary team on transgender care for Veterans.

**VA Innovators Network** - This network, in support of the MyVA transformation, engages and provides a safe space for VA employees to test new ideas and partner with stakeholders across the Veteran community to improve the way VA serves Veterans. Ultimately, this will facilitate the creation and implementation of innovations to deliver the best possible customer experience to serve Veterans and their families.

**Tele-Primary Care** - This initiative is part of a comprehensive effort to provide timely access to primary care using telehealth clinical video technology. This effort establishes several tele-primary care hubs and enhances access to primary care by better matching primary care provider supply with demand, especially in rural areas.

**Medical Foster Home (MFH)** - This program provides an alternative to nursing home in a private, personal home, for selected Veterans who need daily personal assistance, are no longer able to safely live independently, and do not have an available family caregiver. The Medical Foster Home (MFH) is a VA-approved personal home chosen by any Veteran with serious chronic disabling conditions that meet nursing home level of care need, but prefer a non-institutional setting for their long-term care at a lower cost than nursing home care.

**Home-Based Primary Care** - The program will help expand home-based primary care patient aligned teams and services to rural areas within a VA medical center or healthcare system area.

**In Development**

- Health Information Exchange and Care Coordination - Rural Health Community Coordinator Outreach Program
- Rural Expansion of Veterans-Directed Home- and Community-Based Services Program
- Clinical Video Telehealth Patient Tablets
- Study of the Need for Long-term Services and Supports for Veterans in Rural or Highly Rural Areas
- Home-Based Primary Care Data Plan Project
- Rural Expansion of ALS Tele-Care
- Nursing Rural Transitions Program
- Telemedicine Outreach for PTSD in Small Rural Community Based Outpatient Clinics
- Genomic Counseling Services for Rural Facilities
- Enhance Rural Access Network for Growth Enhancement
- Engaging Faith-Based Food Pantries in Serving Low-Income, Homeless and At-Risk Veterans in Rural Areas
- Provider Skills Training in Women's Health Education

# Exhibit 3



FOR THE MEDIA 

GET HELP

SIGN UP

DONATE

Eliminating Barriers to the Treatment of Mental Illness

Fixing the System     Evidence & Research     Key Issues     Who We Are     What You Can Do

# RESEARCH WEEKLY: The Perilous Shortage of Psychiatrists

(Aug. 23, 2016) Serious mental illness (SMI) is associated with a multitude of consequences that can shorten and reduce the quality of life for those who have it. Arrest, incarceration, homelessness, victimization, violence including suicide, and a host of similarly catastrophic impacts fall disproportionately on the barely 3% of the population with schizophrenia and severe bipolar disorder.



In any given year, fewer than half the estimated 8.1 million of people with these psychiatric disorders in the United States receive treatment. Count among the many barriers to their treatment an acute and worsening shortage of psychiatrists, as a new report in *Health Affairs* details.

The federal government identifies Health Professional Shortage Areas (HPSAs) based on the ratio of physicians to residents in specific geographic areas. Mental health HPSAs are based on the ratio of psychiatrists to residents. There are approximately 4,000 of these HPSAs in the country. The federal Health Resources and Services Administration estimates only half of them have enough psychiatrists to meet demand.

## Three Questions of Supply

The title of the paper spells out the result: "Population of US practicing psychiatrists declined, 2003-13, which may help explain poor access to mental health care." In the study, Tara F. Bishop and colleagues take on three

question:

- Did the supply of psychiatrists change from 2003 to 2013 and, if so, how much compared with other specialties?
- What regions of the country have the largest and smallest supplies of psychiatrists, per capita?
- What population characteristics are associated with psychiatrist supply?

The research team found that the average number of psychiatrists per 100,000 residents dropped by 9% during the 10-year period, after adjusting for population growth. By comparison, the average number of neurologists increased by 20% and the average number of primary care physicians - also considered a low-supply specialty - increased by nearly 2%. The population-adjusted number of total physicians in the United States grew by 4%, while the number of psychiatrists dropped 0.2%. The reduction "likely limits patients' access" to psychiatric services," the authors said.

Shortages were not geographically distributed. New England enjoyed the highest concentration of psychiatrists at 24.5 per 100,000 residents, while the Pacific region was served by barely half that many: 13.3 per 100,000 people. Of all physician specialties analyzed, psychiatrists were the most unequally distributed by region. Their distribution was influenced by regional education and income with greater psychiatrist supplies in areas with more high school graduates and higher household income. Areas of low population density also may be at "high risk" of shortages, they said.

## Implications of Shortages

"The concern is that if this trend continues, access will worsen over time," the authors conclude. Other mental health professionals - psychologists, psychiatric nurses, social workers and others - are believed to make up 95% of the mental health workforce and also serve psychiatric patients, they said, "However, psychiatrists - because of their medical training and ability to prescribe medications - provide different care than these other providers do."

Among the implications of psychiatrist shortages noted by the authors:

- The supply of psychiatrists "likely limits" access to services by people with serious mental illness and threatens mental health parity as required by the Mental Health Parity and Addiction Equity Act of 2008. It is likely to grow worse unless addressed.
- Policymakers, payers and the community need to develop strategies to recruit and retain psychiatry specialists. Among these is addressing compensation for psychiatrists, among the lowest-paid specialties.
- Because of how much time it would require for such strategies to begin filling the gap, alternative treatment models need to be explored for providing psychiatric care. These include coordinated care practices, in which psychiatrists serve as consultants to primary care physicians or other mental health professionals, and new technologies such as telemedicine, mobile health and computer-based interventions.



**Doris A. Fuller**
**Chief of Research and Public Affairs**

**References:**

- Bishop, T.F. (July 2016). "Population of US practicing psychiatrists declined, 2003-13, which may help explain poor access to mental health care." *Health Affairs.*

## Next Week: Clozapine by the Numbers

*Research Weekly is a summary published as a public service of the Treatment Advocacy Center and does not necessarily reflect the findings or positions of the organization or its staff. Full access to research summarized may require a fee or paid subscription to the publications.*

# Exhibit 4

Evidence Base



🏠  Psychiatrists  Practice  Telepsychiatry

# Evidence Base



☐ The Evidence Base
☐ Donald M. Hilty, M.D.

Full Screen ☐

Telepsychiatry's evidence base is substantial and satisfaction is extremely high among patients, psychiatrists and other professionals.

Its effectiveness is comparable to in-person care in terms of therapeutic engagement, quality of care, validity/reliability of assessment, and clinical outcomes. There are two types of study design: head-to-head comparison or non-inferiority (i.e., as good as).

- The evidence base is formidable for children, adolescents and adults regarding assessment (diagnostic, cognitive, other) and treatment (medication, therapy).
- Preliminary studies in geriatric patients and across cultures are positive. Indeed, it may facilitate cultural, ethnic and language matching between patients and providers.
- The experience other mental health clinicians using telemedicine (i.e., telemental health), is consistent with, and further substantiates the diagnostic, therapeutic and outcome evidence base.
- Care models that have good evidence include direct care, consultation to primary care and collaborative care. It is being studied specifically, now, as a way to leverage psychiatric expertise in stepped and integrated care models, too.

There are a few populations in which it may be preferable to in-person care (e.g., autism spectrum, severe anxiety disorders, geriatric patients with physical limitations, those with significant geographical obstacles).

Telepsychiatrists adjust clinical care in a few ways to make it as personal as in-person care. First, they may project a little more in terms of gestures, just as if one is giving a presentation to a large group. Second, it helps to check-in to see how the patient is experiencing it. Third, verbal communication may replace handshakes, handing a tissue box and such. Finally, if a particular examination item is less facile at a distance, another staff or accompanying person can help.

## References

- Hilty DM, Ferrer DC, Parish MB, et al. The Effectiveness of telemental health: A 2013 review. Telemed J E Health 2013;(19):444-454.
- Myers K, vander Stoep A, Zhou C, et al. Effectiveness of a telehealth service delivery model for treating attention-deficit hyperactivity disorder: results of a community-based randomized controlled trial. J Amer Asso Child Adolesc Psychiatry 2015;54(4):263-74.
- Hilty DM, Yellowlees PM, Parish MB, et al. Telepsychiatry: Effective, evidence-based and at a tipping point in healthcare delivery. Psych Clin N Amer 2015;38(3):559-592.
- Yellowlees PM, Hilty DM, Mucic D: "Global/World Wide Telehealth: International Perspectives of Telepsychiatry and the Future." In Key Issues in e-Mental Health. Eds Mucic D, Hilty DM, Springer Publishing, pp. 233-250, 2015

# Exhibit 5



# A
# **LONG ROAD**
## Ahead ▶

Achieving True Parity
in Mental Health and
Substance Use Care

nami
National Alliance on Mental Illness



National Alliance on Mental Illness

Copyright April 2015, the National Alliance on Mental Illness (NAMI)

NAMI is the National Alliance on Mental Illness, the nation's largest grassroots mental health organization. NAMI provides advocacy, education, support and public awareness so that all individuals and families affected by mental illness can build better lives.

**Acknowledgements and Gratitude**
This report was prepared by the staff at NAMI including Ron Honberg, Sita Diehl and Dania Douglas. NAMI expresses sincere gratitude to Avalere Health for analysis of Qualified Health Plans in the Exchanges and to Christina Van Regenmorter, Centerstone Research Institute, for assistance with the Coverage for Care survey data analysis. We also offer our thanks to public policy interns Jeffrey Roberson, Corinne Ruth and Everly Groves for preparing and implementing the survey. This report is made possible by the leadership of Mary Giliberti, Executive Director. Thank you to Jessica Hart, Emily Cepla, Darcy Gruttadaro, Katrina Gay, Bob Carolla and the others who provided helpful review and comments during the preparation of the report.  We deeply appreciate the 2,720 individuals and family members affected by mental illnesses or substance use disorders who responded to the survey, sharing their experience of health insurance coverage.

This report was made possible by generous support from Eli Lilly and Company, Genentech, Otsuka Pharmaceutical, and a generous NAMI donor who does not wish to be identified.

www.nami.org
HelpLine: (800) 950-NAMI (6264)
Twitter: @NAMICommunicate
Facebook: facebook.com/officialNAMI
NAMI, 3803 N. Fairfax Drive, Suite 100, Arlington, VA 22203

# INTRODUCTION

## A Long Road Ahead – Achieving True Parity in Mental Health and Substance Use Care

For too long, people who need mental health and substance use care have been subjected to pervasive discrimination in health insurance. Health plans for people with pre-existing mental illness, if they included mental health benefits at all, have historically been more expensive, with limited benefits and significant administrative hurdles to obtaining care.

The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act (MHPAEA) enacted by Congress in 2008, was designed to remedy a major piece of the problem.[i] This landmark law applies to employer-sponsored health plans with more than 50 employees, including self-insured and fully insured plans.[ii] MHPAEA does not require insurers to cover mental health and substance use treatment benefits, but if a plan includes these benefits, coverage must be on par with medical and surgical benefits.[iii]

The Patient Protection and Affordable Care Act of 2010 (ACA) strengthened parity requirements set forth in MHPAEA by extending federal parity requirements to individual and small group plans. Further, mental health and substance use disorder services were mandated as one of ten categories of Essential Health Benefits required for all plans sold though the federal health insurance marketplace, or state exchanges.

These two important laws represent a monumental step forward in the long fight to end discriminatory coverage of mental illness and substance use disorders in health insurance policies. However, it is well known that efforts to achieve meaningful social change are far from over when laws are passed. Achieving true equity in accessing mental health and substance use disorder care requires vigilant attention by advocates and public agencies responsible for enforcement.

This report describes a survey conducted by NAMI to assess the experiences of people living with mental illness and their families with private health insurance. The findings of the survey are supplemented with an analysis of 84 health plans in the top 15 states by projected 2014 exchange enrollment. Our findings reveal that while progress is being made in law, we have a long way to go to achieve true parity in mental health and substance use care.

The report describes a number of barriers that people with mental illness and substance use disorders encounter in their efforts to obtain quality care. Some of these barriers appear to be worse for mental health or substance use treatment, while others apply equally to medical care. These barriers include:

- Serious problems in finding mental health providers in health insurance plan networks;
- High rates of denials of authorization for mental health and substance use care by insurers;

- Barriers to accessing psychiatric medications in health plans;
- High out of pocket costs for prescription drugs that appear to deter participation in both mental health and medical treatment;
- High co-pays, deductibles and co-insurance rates that impose barriers to mental health treatment;
- Serious deficiencies in access to information necessary to enable consumers to make informed decisions about the health plans that are best for them in ACA networks.

Although people living with mental illness and substance use disorders are grateful for the steps Congress and the Administration have taken to increase fairness through MHPAEA and the ACA, the problems described in this report must be addressed for the great promise of these landmark laws to translate into improved access to quality care.

## REPORT FINDINGS

**1. Consumers and family members report serious problems with finding mental health providers in their health plans.**

Whether health insurance is obtained through employment or purchased by individuals through health insurance marketplaces, a significant percentage of respondents to our survey reported problems in finding mental health providers in their health plans. The most significant problem identified was difficulty accessing therapists or counselors for outpatient mental health or substance use disorder treatment, followed closely by difficulties accessing psychiatrists. Respondents also reported higher rates of difficulty accessing inpatient psychiatric or residential treatment than they did for accessing medical specialty services, primary care services, or inpatient medical

*"Our rural county has incredible lack of compassionate, effective resources for mental health and substance abuse. My son is on an injectable medication. It was very difficult to find a provider who would administer the medication. The insurance company did find a provider, but he is not in-network."*

treatment. Consumers clearly face more significant barriers to accessing inpatient and outpatient psychiatric or mental health care than they do in accessing inpatient or outpatient medical specialty or primary care.

**Cannot find a provider in the plan's network: all private insurance**




| | |
|---|---|
| Therapist/counselor MH or SU | 22% |
| Psychiatrist/other MH prescriber | 21% |
| Inpatient MH | 12% |
| Residential psychiatric | 15% |
| Inpatient/Residential, SU | 8% |
| Medical Specialist (Non-MH) | 6% |
| PCP/Pediatrician | 4% |
| Inpatient medical | 5% |

**Cannot find a provider in the plan's network: ACA only**



| | |
|---|---|
| Therapist/counselor MH or SU | 26% |
| Psychiatrist/other MH prescriber | 22% |
| Inpatient MH | 11% |
| Residential psychiatric | 14% |
| Inpatient/Residential, SU | 10% |
| Medical Specialist (Non-MH) | 7% |
| PCP/Pediatrician | 4% |
| Inpatient medical | 12% |

Most likely, these barriers are attributable both to severe shortages in qualified mental health professionals in most parts of the country and to inadequate provider networks maintained by health insurance plans. The nationwide mental health workforce shortage is well documented, and these problems are particularly acute in rural regions. According to the Substance Abuse and Mental Health Services Administration (SAMHSA), 55% of U.S. Counties have no practicing psychiatrists, psychologists or social workers.[iv]

Making matters worse, concerns have emerged that a significant number of mental health professionals included in networks of Qualified Health Plans (QHPs) included in health insurance exchanges may not actually be available to plan participants. For example, in January, 2015, the Mental Health Association of Maryland published a study which revealed that only 14% of the psychiatrists listed in QHPs in the Maryland exchange were actually accepting new patients and available for an appointment within 45 days.[v]

*"My insurance will pay my primary care doctor more for a 10-minute appointment for the flu, than it will allow my psychiatrist for an hour-long treatment session. For this reason, my own psychiatrist along with many others, no longer accepts insurance."*

Compounding the problem of mental health workforce shortages is the reality that many practicing psychiatrists do not accept health insurance, confining their clientele to people with the resources to pay out of pocket. A recent study published in JAMA Psychiatry revealed that only 55% of psychiatrists accepted insurance in 2009-2010 as compared to 88.7% among physicians in other medical specialties. The data further revealed significantly lower Medicare and Medicaid acceptance rates among psychiatrists than physicians in other medical specialties.[vi]

A number of reasons are cited for the distressingly low rates of psychiatrists accepting insurance, including lower payment rates for psychiatrists (although the study cited above reveals comparable payments for psychiatrists and other medical specialties), the longer duration of therapy sessions versus medical appointments and the burden of documentation requirements for solo practitioners.[vii]

The difficulties respondents reported accessing mental health therapists and counselors is more surprising. Psychologists, social workers and mental health counselors provide vital psychotherapy and counseling to people with mental illness and/or substance use disorders. The finding that so many respondents had trouble obtaining a therapist who would take their health plan, suggests that these individuals, despite having insurance, may have little or no access to needed services and supports.

A recent report issued by the Commonwealth Fund revealed that premiums on average are significantly lower for people purchasing health insurance through the Marketplaces than originally anticipated. A primary reason for this is that beneficiaries are selecting lower cost plans that also have far more limited provider networks.[viii]

Whatever the reason for the reported difficulties in accessing providers, the goals of mental health and substance use parity will be frustrated

by insufficient access to providers qualified and willing to serve people with mental illness or substance use disorders. In fact, problems with access to services may be exacerbated as demand increases due to more people having insurance through the ACA.[ix]

**2. Insurers are denying authorization for mental health care at higher levels than they are for other types of medical care.**

The parity requirements in MHPAEA apply to both Quantifiable Treatment Limits (QTLs), such as cost sharing, visit limits, or deductibles, and to Non-Quantifiable Treatment Limits (NQTLs), such as medical necessity criteria used by insurance companies and managed care organizations to approve or deny care. "Medical necessity" is a managed care tool intended to evaluate whether care proposed by a provider for a given patient is reasonable, necessary and appropriate, based on evidence-based clinical standards of care. Consumers, family members and providers often complain that mental health or substance use treatment is denied as not medically necessary arbitrarily and without reasonable explanation.[x]

NAMI asked respondents whether their health plan has denied mental health, substance use and/or medical services recommended by their clinician because they were deemed

> "Our health insurance denied all claims for one year retroactively, asking all of my and then all of my husband's providers to refund monies paid, putting my health, my psychiatric health, and my husband's health at risk."

"not medically necessary." Because of MHPAEA's application to NQTLs such as medical necessity, the reasonable expectation is that reported denials of care for mental health, substance use, and medical care would be roughly equal.

However, nearly one third (29%) of respondents reported that they or their family member had been denied mental health care on the basis of medical necessity, more than twice the percentage who reported being denied general medical care. 18% of respondents reported being denied substance use care and 14% denied general medical care. For ACA plans, rates of reported denials based on medical necessity were lower, but denials for mental health care were still nearly twice the rate of denials for general medical care.[1]

**Service denials based on medical necessity criteria: all private insurance**



| | Mental health care | Substance use care | Medical care |
|---|---|---|---|
| Yes | 29% | 18% | 14% |
| No | 45% | 71% | 74% |
| Don't know | 26% | 11% | 13% |

[1]  Only four of the ACA respondents reported seeking substance use care. This was too few to accurately compare responses with other types of care.

**Service denials based on medical necessity criteria: ACA only**



Historically, there has been lack of clarity about the medical necessity criteria used by insurance companies and managed care organizations for mental health and substance use disorder care. [xi] In the absence of uniform criteria, insurers have adopted their own standards and have often not been forthcoming about informing beneficiaries about these standards.[xii] This in turn has sparked concerns that insurance companies and managed care organizations deny claims for mental health care at far higher rates than for other medical care. The results obtained in our survey would appear to reinforce these concerns.

In fact, as this report was being finalized, news broke that Beacon Health Options of New York  has agreed to change the way it handles mental health and drug and alcohol claims and will be fined $900,000. The settlement resolved allegations that the company denies mental health claims at twice the rate it does for medical/surgical claims and denies drug and alcohol claims at 4 times the rate.[xiii] Other media stories have also portrayed exceedingly high rates of claims denials for mental health care.[xiv]

The common use of medical necessity criteria and other utilization management tools to limit care for mental illness is particularly concerning because it is very difficult, if not impossible for consumers and family members to find information on the criteria used to make such decisions. Health insurance policies typically do not include information about medical necessity criteria regarding specific types of care.

This lack of transparency exists as well for summary documents used to provide information about specific plans included in state health insurance marketplaces under the ACA. Without transparent, easily available information, the ability of mental health consumers to make informed choices about plans - or to assert their rights in the face of adverse decisions - is severely hamstrung.

*"Our health plan for medical is great. Their behavioral health arm for prescriptions is not great. They have an appeal process but they never even respond to your appeal and even if the doctor shows that the generic didn't work, they still won't approve branded. Luckily, we can pay out of pocket for the medication, but we, his parents, pay for our 20 year old's medication. He could never afford it. Thank God for the Affordable Care Act; at least he is covered on parent's insurance until age 26."*

**3. There appear to be significant barriers to accessing psychiatric medications in health insurance plans.**

Insurance plans generally cover prescription drugs on a tiered basis. Tier one medications are most easily available and most affordable. Higher tier medications are more expensive and are frequently not available except through specific requests for exceptions or authorizations.

The imposition of specific limitations on psychiatric medications is particularly problematic because these medications are frequently not interchangeable. The National Institute of Mental Health (NIMH) explains that psychiatric "medications work differently for different people." Factors affecting variability include diagnosis; age, sex and body size; genetics; physical illness; diet and others. "Some people get side effects from specific medications, others don't." [xv]

In view of this, decisions about psychiatric medications must be made carefully between the treating clinician and his or her patient. The effectiveness and side effects of the prescribed medication must be carefully monitored. Restrictions imposed by insurance companies through tiered formularies can deprive individuals of these safeguards and upset the often delicate balance of a psychiatric medication regimen.

NAMI contracted with Avalere Health to conduct a review of drug formularies in plans provided through health insurance marketplaces in selected states. Formularies for 84 health plans were analyzed to assess coverage of three classes of psychiatric medications, Antipsychotics, Antidepressants, and SSRIs/SNRIs (selective serotonin reuptake inhibitors [SSRI] and selective norepinephrine reuptake inhibitors [SNRI]) used commonly to treat depression.

The results were troubling, particularly for coverage of antipsychotic medications used in the treatment of schizophrenia and other disorders characterized by psychosis.

For antipsychotics, more than half of the health plans (47) covered fewer than 50% of analyzed drugs, meaning that the majority of antipsychotic medications weren't available to plan participants at all. [xvi] Additionally, although a number of plans covered a higher percentage of anti-psychotic medications, a significant proportion of these medications were available only on a restricted, non-preferred basis with high out of pocket costs. For example, a third (28 health plans) placed at least half of covered antipsychotic medications on Tier 3 of the drug formularies, meaning that these drugs could not be prescribed without being subject to higher cost sharing than generic or 'preferred' branded products.

Coverage of antidepressants was somewhat better, with 22 plans covering at least 70% of these medications. Over half (46 health plans) placed at least 50% of these medications on Tier 1 preferred status. Even so, a number of plans placed a significant number of covered drugs on higher cost tiers, with 13 plans placing at least half of the covered antidepressants on Tier 3 and 11 plans placing more than 20% of antidepressants on Tier 4.

More than a quarter (22 plans) covered at least 70% of SSRIs and SNRIs. Nearly half (42 health plans) placed at least 50% of these drugs on Tier 1, while 16 plans placed at least half on Tier 3, and 13 plans placed more than 20% on Tier 4.

There were broad variations in coverage among specific companies administering these plans. Nearly two thirds (48) of the plans were considered "more restrictive" for at least one class of drug, 21 plans were considered more restrictive for at least two of the three analyzed classes, and 12 plans were considered more restrictive for all three classes. Two companies in particular stood out for the restrictiveness of their plans. Nine of eleven Anthem plans included in the analysis were more restrictive for antidepressants and antipsychotics, the other two Anthem plans were more restrictive for all three classes. Further, all seven Humana plans included in the analysis were more restrictive in all three classes.

In a more positive vein, 12 of the analyzed plans covered 100% of all drugs included in the three classes

There were variations across states as well. In Arkansas, three of the four assessed plans covered fewer than 65% of medications in each class. By contrast, in New Jersey, three of four plans covered 100% of the drugs in each class.

Do the restrictions described above constitute a violation of the federal MHPAEA law? As described earlier in this report, this law applies to all ACA plans offered through state health insurance marketplaces. If an ACA plan covers psychiatric medications at levels lower than medications for other health conditions, this may constitute a violation of MHPAEA. However, we do not have sufficient information to so conclude at this point.

4. **Even when covered, the out of pocket costs of medications may pose a barrier to participating in care.**

NAMI's survey asked respondents whether their health plan covered the cost of medications fully or partly. For those with private coverage, medications for mental health care

## Criteria for Identifying Restrictive Plans

| Antidepressants and SNRIs/SSRIs | Antipsychotics |
|---|---|
| 1. Plan covered 33% or fewer of analyzed drugs within the class.<br>2. At least 70% of analyzed drugs within the class were not covered, or placed on Tier 3 or Tier 4.<br>3. At least 70% of analyzed drugs within the class were not covered, or required Prior Authorization, Step Therapy, or both Prior Authorization and Step Therapy. | 1. Plan covered fewer than 30% of analyzed drugs within the class.<br>2. At least 90% of analyzed drugs within the class were not covered, or placed on Tier 3 or Tier 4.<br>3. At least 90% of analyzed drugs within the class were not covered, or required Prior Authorization, Step Therapy, or both Prior Authorization and Step Therapy. |

analyzed. None of the four Aetna plans or the two Cigna plans were assessed as having more restrictive coverage.

were slightly more likely to be covered fully (10%) or partly (87%), when compared with medications for

*"Once I aged out of my parents' plan (which was very good coverage) the cost of my medications tripled. I could no longer get a three-month supply for meds I had been on for years, only a one-month supply. I chose the plan because of the low advertised cost of prescriptions, but they have yet to be those prices. Increased cost was the reason I stopped all four of my psychiatric medications within two months of each other."*

medical care (fully, 8%; partly 85%). Participants were less likely to know about substance use medications, though full cost coverage lagged slightly behind mental health (8%) and partial coverage was far lower (51%).

Medication cost coverage under ACA plans was similar with medications for mental health care slightly more likely to be covered fully (12%) or partly (88%) when compared with medications for other types of medical care (fully, 11%; partly 83%).

However, partial coverage of medications can result in significant out of pocket costs for beneficiaries, costs that are sometimes so high that people choose to forego needed prescription drugs. This proved to be the case for a number of respondents to our survey.

When asked whether, due to cost, they had been unable to fill a prescription for mental health, substance use, or medical care, 17 percent of respondents reported that they were unable to fill prescriptions for mental health care, 30 percent



**Coverage of medication costs: all private insurance**



**Coverage of medication costs: ACA only**

**A Long Road Ahead** - Achieving True Parity in Mental Health and Substance Use Care

reported that they were unable to fill prescriptions for substance use disorder care and 33 percent reported that they were unable to fill prescriptions for other medical care.

These percentages were even higher with ACA marketplace plans than for insurance plans in general (mental health 32%; general medical 33%). Since the income profiles of respondents in both groups were similar, this suggests that out of pocket costs for prescription drugs are higher in ACA plans than other types of insurance plans.

Co-insurance requirements in health plans can be particularly problematic for consumers. Co-insurance requires beneficiaries to pay a fixed percentage of the costs of the service or medication. Medications on higher tiers in ACA plans are often subject to co-insurance as opposed to a flat fee, or copayment. Consumers who purchased ACA plans may not have been aware of the difference between these two practices, which can mean widely varied out of pocket costs. When the cost of a prescription drug is $900 per month, as is the case

with some antipsychotic medications, a 40% co-insurance requirement requires the person to pay $360 per month out of pocket. Such costs are unsustainable for many consumers and thus may serve as a major barrier to taking needed psychiatric or other types of medications.

5. **Out of pocket costs may present a greater barrier to inpatient and outpatient mental health care than inpatient or outpatient medical specialty care.**





*"My income per month is $860. My co-pays for medical and mental health are often $120-$160. If I cancel mental health appointments because I am broke, the therapist or psychiatrist notes state that I am non-compliant. I pay $120 to $180 on past hospital stays, which had fees before I met my deductible. I pay $400 a month to rent a room. I choose to stay on my meds so I skimp on nutrition."*

More respondents cited out of pocket costs (deductibles, co-pays, coinsurance) as barriers to seeking inpatient or outpatient mental health care than for primary care or inpatient or outpatient medical specialty care. This was true as well for ACA plans. More information is needed to determine whether these differences reflect higher out of pocket costs for inpatient and outpatient mental health care than for other types of medical care, which could constitute non-compliance with the federal parity law.

Also noteworthy is that many of our survey respondents reported having to pay sizable deductibles in their health insurance policies. These deductibles apply to the costs of all care, whether mental health, substance use, or medical care. Although deductibles in ACA plans did not exceed $10,000 as was the case with a few non-ACA plans, 20% of the ACA plans carried deductibles from $2,500 to $5,000, while 22% had deductibles between $5,000 and $10,000. Out of pocket costs of this magnitude may deter people from participating in needed care.

**Cost as barrier to care: all private insurance**



**Cost as barrier to care: ACA only**



**Annual deductible: all private insurance**



| | |
|---|---|
| 0 Deductible | 24% |
| $100 - $499 | 15% |
| $500 - $999 | 14% |
| $1,000 - $2,499 | 25% |
| $2,500 - $4,999 | 13% |
| $5,000 - $9,999 | 7% |
| $10,000 + | 1% |

**Annual deductible: ACA only**



| | |
|---|---|
| 0 Deductible | 17% |
| $100 - $499 | 5% |
| $500 - $999 | 12% |
| $1,000 - $2,499 | 24% |
| $2,500 - $4,999 | 20% |
| $5,000 - $9,999 | 22% |
| $10,000 + | 0% |

6. **When selecting health plans available in State Marketplaces, consumers and family members generally do not have access to information needed to make informed decisions.**

The ACA requires each Marketplace plan to publish a Summary of Benefits and Coverage (SBC) with cost sharing and coverage information. These documents do not include the kind of detailed information about coverage that mental health consumers need to make informed decisions about the plans that are best for them. For example, these documents typically do not include information about provider networks, meaning that a consumer would be unable to determine if his or her psychiatrist is part of the network.[xvii] Additionally, even when provider information is available, for example through the shopping function in Healthcare. gov, the provider directories provided by plans are often inaccurate and outdated.

More detailed information about provider networks, out of pocket

*"It is impossible to figure out the best way to get coverage for the services I know I need. It's always a crapshoot, and the people at the state exchange are too busy signing people up to help me figure out how to get the subsidy that I think I am entitled to. But the rules are so complicated and have so many exceptions. The ACA is a better solution than the system we had before, but it is still too hard to afford, too complicated, and people are still going to fall through the cracks."*

costs, and specific services covered may be found in documents known as Evidence of Coverage (EOC) or Certificates of Coverage. However, these documents are frequently not publicly available. The Avalere analysis of 84 plans revealed that these more detailed plan documents were publicly available for only 15 of the 84 plans analyzed.[xviii] Eight of the 15 plans for which detailed documents were available were in California, which has a state law requiring the publication of detailed documents about plans." [xix]

Even when more detailed documents are available, they are generally quite complicated and may not contain the level of detail required. As noted by Avalere, the more detailed documents are written in different formats and with varying levels of detail. For example, some "plan documents contained broad statements (e.g. 'prior authorization may be required, or services not covered') without additional information." [xx]

The lack of specificity in Summary of Benefits and Evidence of Coverage documents is problematic not only for consumers trying to make informed choices about plans that are best for them. Lack of specificity in these documents also inhibits conducting a detailed assessment of whether plans are complying with requirements of the federal parity law.

A recent study conducted by researchers at Johns Hopkins University illustrates this difficulty. The researchers analyzed plan offerings on the health insurance marketplaces in two states. When trying to assess parity in non-quantitative treatment limits, they observed that, "summary documents do not provide information on how medical management protocols (for example, provider network admission standards, fee schedules, step therapy protocols and medical necessity determinations) are applied to covered benefits." [xxi]

# POLICY RECOMMENDATIONS

**1. Strong enforcement of MHPAEA is needed.**

The enforcement scheme for MHPAEA is complicated. States have primary authority over implementation. However, the U.S. Department of Labor has primary enforcement responsibility for self-insured employee plans (the majority of employees in plans subject to MHPAEA). Further, the U.S. Department of Health and Human Services, through its Center for Medicare and Medicaid Services (CMS) has enforcement authority when states fail to exercise this authority. [xxii]

A complex, multi-faceted enforcement scheme of this kind creates confusion, both among consumers and agencies responsible for enforcement. Federal and state agencies responsible for enforcement should work with consumer and family organizations and other stakeholders to develop an easily accessible mechanism to report incidents of non-compliance with the federal parity law. The two agencies with federal oversight must establish a procedure for monitoring these reports for patterns of non-compliance and develop procedures to help ensure enforcement.

**2. Insurers should be required to publish the clinical criteria they use to approve or deny care.**

Respondents to our survey revealed that insurers deny authorization for mental health care at higher levels than they do for other medical care. It is difficult to prove that disparate levels of denials for mental health care relative to other medical care violate MHPAEA. To do so requires comparisons of the clinical protocols used by insurers for mental health care with those used for medical-surgical care. It also requires assessment of whether insurers are accurately applying these clinical protocols to decisions in individual cases.

It is currently very difficult to access clinical protocols such as medical necessity criteria for purposes of review and comparison. HHS should require all plans participating in health insurance exchanges to publish these clinical protocols in publicly accessible sites such as HealthCare.gov and exchange websites established by states. Additionally, the Substance Abuse and Mental Health Services Administration (SAMHSA), in consultation with the National Institute of Mental Health (NIMH), the Assistant Secretary for Planning and Evaluation (ASPE) and other relevant HHS agencies, should promulgate guidance to health plans on appropriate clinical criteria for insurers to use in approving or denying mental health and substance use care.

**3. Health plans should be required to publish accurate lists of providers, including mental health providers, participating in plan networks and to update those lists regularly.**

Narrow, limited provider networks have been identified nationally as a problem in health insurance exchanges and our survey revealed that this is a problem for mental health care in all types of insurance plans, whether employer based or through the ACA. In recognition of this, the final rule published by CMS establishing Benefit and Payment Parameters for 2016 requires Qualified Health Plans participating in health

insurance marketplaces to publish up-to-date, accurate and complete plan specific provider directories, including information on which providers are accepting new patients. [xxiii]

The National Association of Insurance Commissioners (NAIC) is currently drafting model state network adequacy legislation. This model legislation should include similar requirements as the federal Benefit and Payment Parameters for 2016, with specific focus on ensuring adequacy for specialties that have been historically under-represented in health insurance networks, such as psychiatrists, psychologists and other mental health professionals. NAIC model legislation is not binding on states but frequently serves as a model for state laws.

4. **HHS should require all health plans to provide clear and understandable information about benefits and should be required to make this information easily accessible.**

Health plans should be required to provide sufficiently detailed information in easily understandable language to enable consumers and advocates to compare health and mental health benefits in plans offered through state and federally-facilitated health insurance exchanges. Detailed plan documents should include all information necessary for consumers and advocates to make informed decisions about the best coverage to purchase. At a minimum, information disclosed should include the following:

- an accurate up-to-date provider network listing;
- quantifiable limits on coverage including inpatient and outpatient treatment;

- medical necessity criteria or other utilization review practices;
- prescription drug formularies and the policies for approval;
- information to calculate out-of-pocket costs; and
- types of mental health and substance use benefits covered.

Health plan information should be accessible to consumers before enrollment, through health plan websites or by telephone.   Finally, HHS should develop a uniform system for health plans to report this information to consumers and advocates and make it easy to find.

5. **Congress and the Administration must work together to decrease out of pocket costs in the ACA for low income consumers.**

Out of pocket costs include deductibles, copayments, and co-insurance for covered services.  They do not include the costs of insurance premiums.  Although individuals or families with incomes below 250% of the Federal Poverty Level[xxiv] who purchase Silver Plans are eligible for subsidies to defray out of pocket costs, these costs can still be very high.[xxv] Many respondents to our survey reported very high out of pocket costs, so high that they or their family member sometimes chose to forego needed mental health or medical-surgical care.  As implementation of the ACA moves forward, careful consideration must be given to lowering out of pocket limits, particularly for low income individuals.   Otherwise, the goal of increasing access to care, including mental health and substance use care may be frustrated.

# APPENDIX 1:
## Methodology and Coverage for Care Survey Sample Characteristics

Information for this report derives from two primary sources, a NAMI survey on the experience of health coverage and an analysis of Health Insurance Marketplace and State Exchange Plan benefits performed by Avalere Health under contract with NAMI.

### NAMI Coverage for Care Survey

In September and October of 2014, NAMI released a nationwide online survey of individuals and families of adults or children in need of mental health and/or substance use care. The survey inquired about access to, and out of pocket costs for, services and medications to treat general medical, medical specialty (non-mental health), mental health or substance use conditions. Eligible respondents could have any type of private or public health coverage including insurance obtained through health insurance marketplaces established under the Affordable Care Act (ACA).

### Avalere Health Analysis

Analysis of formularies offered in the Qualified Health Plans relied on the Avalere Health proprietary PlanScape database and examined formulary coverage of mental health drugs by 84 selected Marketplace plans offered in 15 states. Avalere also performed a review of Summary of Benefits and Coverage (SBC) and Evidence of Coverage (EOC) documents to compare coverage of mental and physical health benefits.

### Coverage for Care Survey Respondents

The 2,720 respondents were individuals and family members of adults or children who need mental health or substance use care. Of those who started the survey, 70% followed through to completion. Nearly half (48%) answered for themselves, while 40% answered for a child, including adult children, and less than 5% answered for someone else. Persons who were the subject of responses were typically female, white, non-elderly adults with annual incomes below $25,000. Every state was represented, though most lived in California (577), Colorado (105), Florida (194), Massachusetts (102), Michigan (98), Oregon (105) and Tennessee (108).

A majority of the survey sample (90%) had health coverage, either through private insurance or public programs. The higher than normal overall insured rate, compared to the average insured rate among people with mental illness (76%),[xxvi] is likely because the survey invited respondents to describe their experience of health coverage, rather than enrollment. Mental health and substance use benefits were covered for 2,059 (88%) of the survey population. Almost all children and elderly adults were insured (98%) as were most young adults (90%) and other adults (88%).

Respondents with private insurance coverage (1,225, 45%) are the subject of this report because the final parity rule for private insurance took effect July 1, 2014. Small percentages of the survey sample had Medicaid (5%) or Medicare (10%) in addition to their employer sponsored or individual plan. 220 respondents obtained coverage under the ACA, either through a Qualified Health Plan (121, 4%) or Medicaid expansion (99, 4%).

**Demographic Characteristics**

### Gender



### Race/Ethnicity



### Age

### Annual Income



**Type of Health Coverage**



**Type of Services Used**



# APPENDIX 2:
## How do Parity Laws Apply to Types of Health Plans?

**Two recently enacted federal laws** strengthen health insurance coverage for mental health and substance use disorder (MH/SUD) services with the intention of making care more available to those who need it.

- **The Mental Health Parity and Addiction Equity Act (MHPAEA) of 2008** *does not* require insurers to provide MH/SUD benefits. However, *if* such benefits are provided, the financial requirements and treatment limitations for MH/SUD benefits must be equal to medical and surgical care.

- **The Patient Protection and Affordable Care Act (ACA)** extends parity by requiring some health plans to provide ten categories of Essential Health Benefits (EHB). Under the ACA, MH/SUD benefits *must* be provided through certain types of plans *in compliance with* MHPAEA.

While these policies represent an important step forward, gaps remain. The chart below shows which types of health plans are subject to parity requirements under MHPAEA and the ACA.

| | | Type of Plan | Subject to parity under MHPAEA | Subject to parity under ACA: Essential Health Benefits* |
|---|---|---|---|---|
| **Exchange Plans** | | Individual | No | Yes |
| | | Small group | No | Yes |
| **Non-Exchange Plans** | **New Plans** | Self-insured | Yes** | No |
| | | Large group | Yes** | No |
| | | Small group | No | Yes |
| | | Individual | No | Yes |
| | | Government plans: Non-Federal Small or self-funded++ | No | No |
| | **Grandfathered Plans+** | Self-insured | Yes** | No |
| | | Large group | Yes** | No |
| | | Small group | No | No |
| | | Individual | No | No |
| | | Government plans: Non-federal Small or self-funded++ | No | No |

\* Patient Protection and Affordable Care Act, Section 1302 (a) and (b): http://www.hhs.gov/healthcare/rights/law/index.html

\*\* MHPAEA applies to employer-sponsored health plans with more than 50 employees, including self-insured and fully insured plans: http://www.dol.gov/ebsa/newsroom/fsmhpaea.html

+ MHPAEA does not apply to *non-federal governmental plans* that have 100 or fewer employees or large self-funded non-federal governmental plans that choose to opt out of MHPAEA: http://www.cms.gov/CCIIO/Programs-and-Initiatives/Other-Insurance-Protections/mhpaea_factsheet.html

++ Grandfathered plans are those that were purchased before March 2010 and remain largely unchanged.

# APPENDIX 3:

## Population of Marketplace-Eligible People with Mental Illness

| State | Total Marketplace eligible population[2] | % Marketplace eligible with any mental illness (AMI)[3] | # Marketplace eligible with AMI |
|---|---|---|---|
| Alabama | 463,000 | 19.2% | 88,896 |
| Alaska | 84,000 | 17.4% | 14,616 |
| Arizona | 647,000 | 18.4% | 119,048 |
| Arkansas | 251,000 | 21.0% | 52,710 |
| California | 3,263,000 | 11.0% | 358,930 |
| Colorado | 574,000 | 13.5% | 77,490 |
| Connecticut | 236,000 | 11.1% | 26,196 |
| Delaware | 45,000 | 7.6% | 3,420 |
| District of Columbia | 32,000 | 10.1% | 3,232 |
| Florida | 2,502,000 | 10.6% | 265,212 |
| Georgia | 1,073,000 | 4.9% | 52,577 |
| Hawaii | 53,000 | 20.0% | 10,600 |
| Idaho | 229,000 | 21.6% | 49,464 |
| Illinois | 966,000 | 14.6% | 141,036 |
| Indiana | 673,000 | 15.9% | 107,007 |
| Iowa | 224,000 | 11.3% | 25,312 |
| Kansas | 244,000 | 15.0% | 36,600 |
| Kentucky | 265,000 | 12.7% | 33,655 |
| Louisiana | 506,000 | 16.7% | 84,502 |
| Maine | 124,000 | 11.2% | 13,888 |
| Maryland | 462,000 | 6.4% | 29,568 |
| Massachusetts | 400,000 | 16.2% | 64,800 |
| Michigan | 699,000 | 14.8% | 103,452 |
| Minnesota | 277,000 | 15.6% | 43,212 |
| Mississippi | 293,000 | 16.6% | 48,638 |
| Missouri | 632,000 | 13.4% | 84,688 |
| Montana | 125,000 | 16.5% | 20,625 |
| Nebraska | 237,000 | 20.1% | 47,637 |
| Nevada | 266,000 | 13.5% | 35,910 |
| New Hampshire | 129,000 | 13.9% | 17,931 |
| New Jersey | 586,000 | 15.7% | 92,002 |
| New Mexico | 153,000 | 6.1% | 9,333 |
| New York | 1,214,000 | 10.0% | 121,400 |
| North Carolina | 1,098,000 | 11.8% | 129,564 |
| North Dakota | 80,000 | 18.8% | 15,040 |
| Ohio | 962,000 | 15.1% | 145,262 |
| Oklahoma | 381,000 | 20.8% | 79,248 |
| Oregon | 339,000 | 13.8% | 46,782 |
| Pennsylvania | 1,171,000 | 13.7% | 160,427 |
| Rhode Island | 73,000 | 28.7% | 20,951 |
| South Carolina | 444,000 | 15.1% | 67,044 |
| South Dakota | 100,000 | 13.4% | 13,400 |
| Tennessee | 602,000 | 14.6% | 87,892 |
| Texas | 3,079,000 | 13.3% | 409,507 |
| Utah | 385,000 | 15.4% | 59,290 |
| Vermont | 44,000 | 22.2% | 9,768 |
| Virginia | 816,000 | 20.9% | 170,544 |
| Washington | 517,000 | 14.1% | 72,897 |
| West Virginia | 111,000 | 17.9% | 19,869 |
| Wisconsin | 474,000 | 20.4% | 96,696 |
| Wyoming | 67,000 | 15.0% | 10,050 |

[2] Kaiser Family Foundation (April, 2014) Marketplace Enrollment as a Share of Potential Marketplace Population.
[3] SAMHSA (2013) Enrollment under Medicaid Expansion and Health Insurance Exchanges: 2008-2010 National Survey of Drug Use and Health.

# APPENDIX 4:
## Glossary

**Coinsurance:** When the beneficiary, the person who has health insurance, shares the cost of a covered service. This is calculated as a percent (for example, 20%) of the allowed amount for the service. For example, if the allowed amount for an office visit is $100 and the beneficiary has met their deductible, the co-insurance payment of 20% would be $20. The health plan pays the remaining allowed amount. (http://www.cms.gov/CCIIO/resources/files/downloads/uniform-glossary-final.pdf)

**Copayment:** A fixed amount (for example, $15) the beneficiary pays for a covered health care service, usually at the time of service. The amount can vary by the type of covered health care service. (http://www.cms.gov/CCIIO/resources/files/downloads/uniform-glossary-final.pdf)

**Deductible:** The amount the beneficiary owes for covered health care services before the health insurance begins to pay. For example, if the deductible is $1,000, the plan will not pay for anything except preventive services until the beneficiary has paid $1,000 for covered health care services. The deductible does not apply to preventive services such as annual check-ups or mental health screening, meaning that the plan will pay regardless of whether the deductible has been met. (http://www.cms.gov/CCIIO/resources/files/downloads/uniform-glossary-final.pdf)

**Depression Screening Tools:** Brief questionnaires designed to detect the presence of depression. These tools are not diagnostic, but are used as preventive care to help determine whether the person could benefit from assessment by a mental health professional.

**Formulary:** A list of prescription drugs covered by a prescription drug plan or another insurance plan offering prescription drug benefits. Also called a drug list. (https://www.healthcare.gov/glossary/)

**Out of Pocket Limit:** The amount owed by a beneficiary during a policy period before the health insurance plan begins to pay 100% of the allowed amount. This limit does not include the premium, balance-billed charges or costs for benefits not covered under the plan.

**Network:** The facilities, providers and suppliers the health insurer has contracted with to provide health care services. (http://www.cms.gov/CCIIO/resources/files/downloads/uniform-glossary-final.pdf)

**Preventive Care:** Routine health care that includes screening, check-ups and patient counseling to prevent illnesses, disease or other health problems. Under the ACA, all Marketplace plans and many other plans must cover a list of preventive services without charging a copayment or coinsurance. This is true even before the deductible is met. Depression screening is an example of preventive mental health care.

**Prior authorization:** A decision by the health insurer that a health care service, treatment plan or prescription drug is medically necessary. Sometimes called preauthorization, prior approval or precertification. (https://www.healthcare.gov/glossary/)

**Medically Necessary:** Health care services or supplies needed to prevent, diagnose or treat an illness or condition and that meet accepted standards of medicine. (https://www.healthcare.gov/glossary/)

**Non-Quantitative Treatment Limits (NQTL):** Procedures to limit the scope or duration of benefits that do not involve a numerical value in terms of visits, days or costs. NQTLS may include such practices as prior authorization, step therapy and other utilization management techniques to determine whether a given service is medically necessary. Under the ACA, NQTL may be no more restrictive for mental health or substance use care than for medical or surgical care.

**Prior Authorization (also called Prior Approval):** A cost-containment procedure that requires a physician, facility or program to obtain permission from an insurance company or managed care organization before commencing treatment or prescribing a medication.

**Quantitative Treatment Limits (QTL):** Procedures to limit the scope or duration of benefits that involve a numerical value in terms of visits, days or costs. Examples include the number of visits or inpatient days, copays, coinsurance or annual dollar limits. Under the ACA, QTL may be no more restrictive for mental health or substance use care than for medical surgical care.

**Step Therapy:** Step therapy is a type of prior authorization. With step therapy, in most cases, you must first try certain less expensive drugs that have been proven effective for most people with your condition before you can move up a "step" to a more expensive drug. For instance, your plan may require you to first try a generic prescription drug (if available), then a less expensive brand-name prescription drug on its formulary, before it will cover a similar, more expensive brand-name prescription drug. (https://www.medicare.gov/Pubs/pdf/11136.pdf)

**Tier:** A health insurance term to indicate a level of coverage for a given type of care. For example, beneficiaries would pay more out of pocket costs for prescription drugs placed on higher tiers.

**Utilization Management:** Practices used by insurers to evaluate whether requested care is medically necessary, efficient and in line with accepted medical practice. Examples of utilization management practices include prior authorization and step therapy.

# APPENDIX 5:

## References

i    42. U.S.C. Sect. 300gg-26

ii    U.S. Department of Labor, "The Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA)," http://www.dol.gov/ebsa/newsroom/fsmhpaea.html, accessed 3/19/2015.

iii    JoAnn Dalrymple, "Mental Health Service Access – Are We Ready for the Tide," ABA Health eSource, 2014-2015, October, 2015, www.americanbar.org/publications/aba_esource/2014-2015/october/mentalhealth.html.

iv    Ibid.

v    Mental Health Association of Maryland, "Access to Psychiatrists in 2014 Qualified Health Plans," 1/26/2015, http://mhamd.org/wp-content/uploads/2014/01/2014-QHP-Psychiatric-Network-Adequacy-Report.pdf, accessed 3/21/2015.

vi    T.F. Bishop, et al, "Acceptance of Insurance by Psychiatrists and the Implications for Access to Mental Health Care," *JAMA Psychiatry*, 2014; 71(2); 176-181.

vii    Ibid.

viii    S. Collins, P. Rasmussen and M. Doty, "Gaining Ground: America's Health Insurance Coverage and Access to Care After the Affordable Care Act's First Open Enrollment Period," *The Commonwealth Fund*, July, 2014, p. 15, accessed 3/18/2015, https://kaiserhealthnews.files.wordpress.com/2014/07/1760_collins_gaining_ground_tracking_survey.pdf

ix    G. Fields and J.C. Dooren, "For the Mentally Ill, Finding Treatment Grows Harder," *The Wall Street Journal*," January 16, 2014, http://obits.al.com/obituaries/birmingham/obituary.aspx?n=david-sperling&pid=174303667&, accessed March 5, 2015.

x    S.. Pelley, ; M. Rey, ; O. Zill-de Granados, (12/14/2014) Denied. 60 Minutes. CBS http://www.cbsnews.com/news/mental-illness-health-care-insurance-60-minutes/

xi    S. Rosenbaum, , B. Kamoie, ., D.R. Mauery, , B. Walitt, . (2003). *Medical Necessity in Private Health Plans: Implications for Behavioral Health Care.* DHHS Pub. No. (SMA) 03-3790. Rockville, MD: Center for Mental Health Services, Substance Abuse and Mental Health Services Administration. *https://publichealth.gwu.edu/departments/healthpolicy/DHP_Publications/pub_uploads/dhpPublication_3A45C497-5056-9D20-3DAA24F165B5678A.pdf*

xii    L. Gillespie, "Q&A: Achieving Mental Health Parity in Medicaid Managed Care," *Kaiser Health News*, 2/7/2015, accessed 3/5/2015 on *Medpage Today, http://www.medpagetoday.com/PublicHealthPolicy/Medicaid/49924*

xiii    R. Karlin, "Attorney General, Insurance Company Reach Settlement on Mental Health Coverage," *Albany Times Union*, 3/5/2015, http://www.timesunion.com/news/article/Insurer-fined-900-000-in-settlement-6115886.php

xiv    B. Japsen, "60 Minutes Shows Insurers Deny Mental Health Treatment Despite ACA Rules," Forbes, 12/14/2014, http://www.forbes.com/sites/brucejapsen/2014/12/14/60-minutes-shows-mental-health-claim-denials-persist-despite-obamacare-rules/, accessed 3/5/2015.

xv    National Institute of Mental Health, "Mental Health Medications," http://www.nimh.nih.gov/health/publications/mental-health-medications/index.shtml, accessed 3/6/2015.

xvi    About 25% of the antipsychotic medications assessed by Avalere are often physician administered, so they may be covered under plans medical (non psychiatric) benefits.

xvii    S. McCarty, "Helping States Address Transparency of Health Plan Provider Networks," Center on Health Insurance Reforms, Georgetown University Health Policy Institute, Oct. 10, 2014, http://chirblog.org/helping-states-address-transparency-of-health-plan-provider-networks/, accessed 3/17/2015.

xviii    Avalere Health Planscape@, a proprietary database on health insurance exchange plans.

xix    Ibid.

xx    Ibid.

xxi    Berry, K.N., et al, "A Tale of Two States: Do Consumers See Mental Health Insurance Parity When Shopping on State Exchanges," *Psychiatric Services in Advance*, March 2, 2015, pp2-3; http://ps.psychiatryonline.org/doi/pdf/10.1176/appi.ps.201400582, accessed 3/3/2015; See also, Mental Health America, "Parity or Disparity: The State of Mental Health in America 2015," http://www.mentalhealthamerica.net/sites/default/files/Parity%20or%20Disparity%202015%20Report.pdf, accessed 3/21/2015

xxii    Parity Implementation Coalition, "Detailed Summary of the Final Rule," http://parityispersonal.org/sites/default/files/final%20detailed%20summary.pdf, accessed 3/19/2015.

xxiii    T. Jost, "Implementing Health Reform: 2016 Benefit and Payment Final Rule, Consumer and Provider Provisions," Health Affairs Blog, Feb. 22, 2015, http://parityispersonal.org/sites/default/files/final%20detailed%20summary.pdf, accessed 3/19/2015

xxiv    The Federal Poverty Level (FPL) for 2015 is $11,770 for an individual and $24,250 for a family of 4.

xxv    Out of pocket limits for individuals with incomes between 100 and 200% of FPL are no more than $2,250.   Out of pocket limits for individuals with incomes between 200% and 250% of FPL are no more than $5,200.

xxvi    Substance Abuse and Mental Health Services Administration, *Results from the 2011 National Survey on Drug Use and Health: Mental Health Findings*, NSDUH Series H-45, HHS Publication No. (SMA) 12-4725. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2012. http://www.samhsa.gov/data/NSDUH/2k11MH_FindingsandDetTables/2K11MHFR/NSDUHmhfr2011.htm#Fig2-1



National Alliance on Mental Illness

3803 N. Fairfax Drive
Arlington, VA 22203
(800) 950-6264

www.nami.org
www.facebook.com/officialnami
www.twitter.com/namicommunicate

# Exhibit 6



**2016 Update**

# The Complexities of Physician Supply and Demand: Projections from 2014 to 2025

## Final Report

Prepared for:

**Association of American Medical Colleges**

Submitted by:

**IHS Inc.**

**April 5, 2016**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ....................................................................................................................... iv

  Key Findings .................................................................................................................................. v

  New Research and Analyses ....................................................................................................... viii

  Health Care Utilization Equity Estimates ................................................................................... viii

  Future Directions in Research ...................................................................................................... ix

I.    INTRODUCTION ........................................................................................................................ 1

II.   UPDATED PROJECTIONS .......................................................................................................... 3

  Total Physicians ............................................................................................................................ 4

  Primary Care ................................................................................................................................. 5

  Non-Primary Care ......................................................................................................................... 7

    Medical Specialties ..................................................................................................................... 7

    Surgical Specialties ..................................................................................................................... 8

    Other Specialties ...................................................................................................................... 10

III.  SUPPLY SCENARIOS ................................................................................................................ 12

  Supply Scenarios Modeled ......................................................................................................... 12

  Supply Projections ...................................................................................................................... 13

IV.  DEMAND SCENARIOS .............................................................................................................. 16

  Demand Scenarios Modeled ...................................................................................................... 16

  Demand Projections ................................................................................................................... 19

V.   NEW RESEARCH AND ANALYSES ............................................................................................ 22

  Growth in Supply and Demand for Primary Care–Trained Hospitalists ..................................... 22

  Rapid Growth in Physician Assistant Supply .............................................................................. 23

VI.  PROVIDERS REQUIRED IF U.S. ACHIEVED EQUITY IN HEALTH CARE UTILIZATION ............................. 25

VII. KEY FINDINGS AND CONCLUSIONS ......................................................................................... 27

VIII. FUTURE DIRECTIONS IN HEALTH WORKFORCE RESEARCH ................................................... 30

IX.  TECHNICAL APPENDIX ............................................................................................................ 31

  Synopsis of Study Methods ........................................................................................................ 31

  Supply Model Overview and Updates ........................................................................................ 32

  Demand Model Overview and Updates ..................................................................................... 36

X.   DETAILED TABLES ................................................................................................................... 37

### TABLE OF EXHIBITS

Exhibit 1: Projected Total Supply and Demand for Physicians, 2014-2025 .................................................. 4

Exhibit 2: Total Projected Physician Shortfall Range, 2014-2025 ................................................................ 4

Exhibit 3: Projected Supply and Demand for Primary Care Physicians, 2014-2025 ................................... 5

Exhibit 4: Projected Primary Care Physician Shortfall Range, 2014-2025 .................................................. 6

Exhibit 5: Projected Primary Care Physician Shortfall Range (PC + PC-trained hospitalists).................... 6

Exhibit 6: Projected Supply and Demand for Medical Specialist Physicians, 2014-2025........................... 7

Exhibit 7: Projected Medical Specialist Physician Shortfall Range, 2014-2025 ......................................... 8

Exhibit 8: Projected Supply and Demand for Surgeons, 2014-2025 ........................................................... 9

Exhibit 9: Projected Surgical Physician Shortfall Range, 2014-2025 ......................................................... 9

Exhibit 10: Projected Supply and Demand for Other Specialties, 2014-2025........................................... 10

Exhibit 11: Projected Other Specialist Physician Shortfall Range, 2014-2025 ......................................... 11

Exhibit 12: Projected Supply of Physicians, 2014-2025............................................................................ 14

Exhibit 13: Growth in Physician Supply 2014-2025: 2015 Report vs 2016 Report Scenario Projections . 15

Exhibit 14: Projected Change in Physician Supply by Specialty Category, 2014-2025............................ 15

Exhibit 15: Projected Demand for Physicians, 2014-2025 ........................................................................ 21

Exhibit 16: Growth in Physician Demand 2014-2025: 2015 Report vs 2016 Report Scenario Projections 21

Exhibit 17: Estimated Additional Physicians Needed if U.S. Had Achieved Health Care Utilization Equity
in 2014 ....................................................................................................................................................... 26

Exhibit 18: Age Distribution of Active Physicians, 2014........................................................................... 32

Exhibit 19: Probability Male Physician is Still Active by Specialty and Age ............................................ 35

Exhibit 20: Mean Age of Retiring Physicians (age 50+) ........................................................................... 35

Exhibit 21: Summary of 2015 and 2016 Demand Modeling Data Sources ................................................ 36

Exhibit 22: Summary of Projected Gap between Physician Supply and Demand ...................................... 37

Exhibit 23: Total Projected Physician Supply, 2014-2025 ........................................................................ 38

Exhibit 24: Physician Supply Projection Summary by Specialty Category, 2014-2025 ........................... 38

Exhibit 25: Projected Physician Demand Summary by Scenarios Modeled, 2014-2025 .......................... 39

Exhibit 26: PC-Trained Hospitalist Physician Supply and Demand Projections by Scenario, 2025 ......... 40

Exhibit 27: Health Care Utilization Equity Scenario 1, 2014 .................................................................... 41

Exhibit 28: Health Care Utilization Equity Scenario 2, 2014 .................................................................... 41

IHS Inc., *The Complexities of Physician Supply and Demand 2016 Update: Projections from 2014 to 2025.*

Prepared for the Association of American Medical Colleges. Washington, DC: Association of American Medical Colleges.

© 2016 Association of American Medical Colleges. May be produced and distributed with attribution for educational or noncommercial purposes only.

This report was prepared for the Association of American Medical Colleges by

Tim Dall, Managing Director, Life Sciences

Terry West, Director, Life Sciences

Ritashree Chakrabarti, Consultant

Will Iacobucci, Analyst

IHS Inc.
1150 Connecticut Ave., N.W.
Suite 401
Washington, DC 20036

# EXECUTIVE SUMMARY

The need to assess the capacity of the nation's future health care workforce overall—and physician workforce in particular is more important now than ever for both public and private sectors to act and make the investments needed for a health care system that provides high-quality, cost-efficient health care while also developing the physicians needed to transform the current system and to maximize population health. The pace of change in the world of health care delivery and finance necessitates an almost constant updating and improvement of workforce projections and projections models. That is why in 2015, the Association of American Medical Colleges (AAMC) made a commitment to commission updated national physician workforce projections annually. The purpose is threefold:

- **Update Projections** - Support the ongoing development of up-to-date projections of the physician workforce based on the most recent and best quality data and respond to questions raised by previous reports;
- **Present New Analyses** - Produce research and data on specific topics to further develop the physician workforce projections; and
- **Identify Future Directions for Research** - Identify specific areas for future research, data collection, and analysis that will also strengthen future projections work and support the decision making that guides alignment of the nation's health workforce with its health needs.

Through these efforts, the AAMC intends to invite discussion to continue to develop better projections. In other words, these annual reports seek to advance our collective capacity for developing continually improved health workforce projections with data-based analysis.

This 2016 update to the 2015 report reflects the AAMC's commitment to produce annual, refined physician workforce projections that incorporate the most current and best available evidence on health care delivery. Like the 2015 report, this 2016 report examines five scenarios commonly expected to affect physician supply (e.g., early or delayed retirement of physicians) and six scenarios expected to affect the demand for physician services over the next decade (e.g., changing demographics, greater adoption of managed care models, or greater integration of advanced practice registered nurses and physician assistants). The decision to simulate multiple scenarios is an attempt to demonstrate the complex and evolving health care environment and the inherent uncertainty associated with such an exercise. Though the microsimulation model and supply and demand scenarios are identical to those in the 2015 report, the inputs to them have been updated with the latest data and with improvements suggested by commentators responding to the projections in the 2015 report. We have also added a special section that looks at the implications of potentially unmet need.

This 2016 report compares each supply scenario with each demand scenario to estimate the likely magnitude of the shortfall when looking at each scenario in isolation. Because it is impossible to predict with certainty the degree to which each scenario will manifest, this analysis reports the projected shortfalls as a range (based on the 25th to 75th percentile of the projections) rather than a single projection. The resulting findings therefore offer stakeholders insights into the directional changes

expected in the physician workforce by 2025. All supply and demand projections are reported as full-time-equivalent (FTE) physicians, where an FTE is defined for each specialty as the average weekly patient care hours for that specialty.[1]

## Key Findings

- **Physician demand continues to grow faster than supply leading to a projected total physician shortfall of between 61,700 and 94,700 physicians by 2025. As with the 2015 projections, under every combination of scenarios modeled, an overall physician shortage is projected.** Though this total projected shortfall exceeds the 46,100 to 90,400 physician shortfall estimated by the 2015 study (Exhibits ES-1 and ES-2), the 2016 updated projections of a physician shortfall in 2025 are of a similar magnitude to the 2015 projections. Differences between the 2016 update and the 2015 projections largely reflect the use of more recent data and improvements to methods.

  - **Projected shortfalls in primary care range between 14,900 and 35,600 physicians by 2025.** This is directionally consistent with the 12,500 to 31,100 primary care physician shortfall projected in the 2015 report.[2] As part of the ongoing effort to improve our projections, primary care–trained hospitalists were excluded from primary care projections for the 2016 update. If they had been included (as was done in the 2015 report), the updated estimated primary care shortfall would be in the 1,900 to 22,600 range.

  - **Projected shortfalls in non-primary care specialties range between 37,400 and 60,300 by 2025.** This range is directionally consistent with the shortfall projections in the 2015 report (28,200 to 63,700 physicians).

- **Under virtually all scenarios, the supply of surgical specialists is projected to decline by 2025; in contrast, the supply of primary care physicians, medical specialists, and other specialists is projected to grow over this period in nearly all supply scenarios.** Based on current trends, the supply of several larger surgical specialties (e.g., ophthalmology and urology) will fall, as future attrition is likely to exceed the number of new entrants. In other words, there will be fewer surgical specialists in 2025 than are practicing today (Exhibit ES-3). Yet there continues to be strong projected growth in demand, leading to a projected shortfall of between 25,200 and 33,200 surgeons by 2025. These surgical workforce projections are in the aggregate, and projections for individual surgical specialties may vary significantly.

- **For all specialty categories, physician retirement decisions are projected to have the greatest impact on supply, and over one-third of all currently active physicians will be 65 or older within the next decade.** Physicians between ages 65 and 75 account for 11% of the active workforce, and those between ages 55 and 64 make up nearly 26% of the active workforce. Projected shortfalls for

---

[1] For example, if average patient care hours per week in a particular specialty were 40 hours, but an individual physician in that specialty with a given age and sex was projected to work 35 hours, then that physician would be counted as 0.875 FTEs (=35/40 hours). Average patient care hours worked per week ranged from a low of 35.3 hours for preventive medicine to a high of 54.3 hours for neonatal & perinatal medicine.

[2] One update to the 2016 projections update was to identify and move primary care–trained hospitalists out of primary care and into their own specialty category. If primary care–trained hospitalists were included with primary care physicians (as was done in the 2015 report), the estimated primary care shortfall would be in the 5,600 to 28,300 range.

the Other Specialties category (which includes emergency medicine, neurology, pathology, and psychiatry) are particularly sensitive to retirement assumptions.

- **Demographics—specifically, population growth and aging—continue to be the primary driver of increasing demand, with the older population expected to experience the greatest growth in demand from 2014 to 2025.** During this period the U.S. population is projected to grow by close to 8.6%, from about 319 million to 346 million. The population under age 18 is projected to grow by only 5%, while the population aged 65 and over is projected to grow by 41%. Because seniors have much higher per capita consumption of health care than younger populations, the percentage growth in demand for services used by seniors is projected to be much higher than the percentage growth in demand for pediatric services.

- **Expansions in medical insurance coverage due to the Patient Protection and Affordable Care Act (ACA) and the economic recovery have reduced the number of uninsured. However, ACA-related expanded coverage is only projected to increase demand by another 10,000 to 11,000 physicians (1.2%).** Projections in the 2015 report estimated that expanded medical coverage achieved under ACA once fully implemented would likely increase demand by about 16,000 to 17,000 physicians (2.0%). Because the numbers of uninsured people have continued to drop due to the ACA, the projected future impact is smaller than in the 2015 report.

### Exhibit ES-1: Total Projected Physician Shortfall Range, 2014-2025



*Exhibit ES-1: As complex systems have internal "checks and balances" to avoid extremes, we believe that the 25th to 75th percentile of the shortage projections continues to reflect a likely range for the projected adequacy of physician supply. For this update, that projected shortfall of total physicians is 61,700 to 94,700.*

### Exhibit ES-2: Projected Total Supply and Demand for Physicians, 2014-2025



*Exhibit ES-2: As was the case with the 2015 report, no combination of scenarios avoids a shortage.*

### Exhibit ES-3: Projected change in physician supply by specialty category, 2014 to 2025



*Exhibit ES-3: Under virtually all scenarios, the supply of surgical specialists is projected to decline by 2025.*

## New Research and Analyses

Differences in projections between the 2016 updated projections and the 2015 report reflect updates and improvements to supply and demand data and trends. The 2016 updated projections:

- Use the same microsimulation model and same multiple scenarios used to develop last year's projections;
- Incorporate updates to supply and demand data and trends;
- Integrate more fully the potential impact of a rapidly growing physician assistant workforce;
- Move adult primary care–trained hospitalists out of the primary care projections and into a separate specialty category, since including hospitalists in the primary care projections may overestimate the current and future supply of primary care physicians;
- Reflect refinements to the estimates of annual graduates (with an estimated 28,233 new physicians entering the workforce each year compared with the 29,032 estimate used in the 2015 report); and
- Extrapolate a "2014" level of care delivery compared with the 2015 report's "2013" level of care delivery.

The net effect of these refinements to model inputs and updates was to project a larger total physician shortage by 2025 than estimated by the 2015 report. Better integrating the growing physician assistant workforce into the projections reduced the growth in demand for physicians for some scenarios, but slower projected growth in physician supply is the primary cause for the higher shortfall projections.

## Health Care Utilization Equity Estimates

This year's report also includes a special section on health care utilization equity. Current projections methods only partially account for possible underutilization by those with inadequate access. To further explore this limitation in current methodologies, the health care utilization equity scenarios model the implications for physician demand if currently underserved populations utilized care at a rate similar to that for populations facing fewer sociodemographic, economic, and geographic barriers to care. Therefore, to better gauge the degree of currently unmet need, this special section of the 2016 report includes estimates of the additional workforce needed if currently underserved populations utilized health care at the same rate as the rest of the population under two

*If currently underserved populations utilized health care at the same rate as the rest of the population, an additional 40,100 to 96,200 physicians (5-12%) would be needed in 2014.*

While many other factors would need to be addressed to achieve health care utilization equity—minimizing barriers related to insurance coverage, access, trust, etc.—these figures highlight the potential scale of currently unmet need.

different scenarios. These estimates are ***not included*** in the ranges of projections, as they are estimates for 2014 levels of care only. Moreover, the estimates we put forth are by no means deemed definitive; instead, they are intended to stimulate much-needed discussion and analysis about how best to address health care utilization inequity in future projections.

## Future Directions in Research

Uncertainties abound regarding whether, how, and the speed with which emerging payment and care delivery models might affect physician supply and demand—though evidence to date has not shown a substantial effect on workforce needs. Similarly, a better understanding of how clinicians and care settings will respond to economic and other trends will better inform future projections. We also need to look more closely at specific specialties and conditions that may experience or portend future shortages, including both generalist disciplines (such as mental/behavioral health or primary care) and those focused in areas in which the illness burden is increasing (such as oncology, cardiology, and others). These deficits in the knowledge base present opportunities for ongoing research on the workforce implications of the evolving health care system and underscore the need for timely updates to projections.

## I.   INTRODUCTION

The AAMC published a study in 2008 (updated in 2010) that projected future physician supply and demand and summarized the implications of selected trends and policies likely to affect physician supply and demand. The study concluded that by 2025 demand would likely exceed supply by about 130,600 physicians. Since that report, the number of physicians trained annually has increased, the sizes of the advanced practice registered nurse (APRN) and physician assistant (PA) workforces have greatly increased, the nation has experienced turbulent economic conditions that have affected supply and demand for health care services, the Affordable Care Act (ACA) was enacted with ongoing implementation of new requirements, policies and care models continue to evolve, and new data have become available on the characteristics and projected changing demographics of the U.S. population and the health workforce.

Mindful of these changes, in 2015 the AAMC contracted with IHS Inc. to publish an update to its previous 2010 and 2008 reports. Titled *The Complexities of Physician Supply and Demand: Projections from 2013 to 2025*, that update incorporated the latest microsimulation modeling methods and available data on trends and factors affecting the physician workforce. Key trends likely to affect the supply and demand for health care services were identified under multiple supply and demand scenarios. Projections for individual specialties were aggregated into four broad categories for reporting consistent with American Medical Association–designated specialty groupings. These include primary care, medical specialties, surgical specialties, and "other" specialties.[3] Reflecting new research, a fifth category has been added to this 2016 update, with adult primary care–trained hospitalists moved out of primary care and into their own category.

Overall, the 2015 study found that demand for physicians was projected to increase by 11% to 17% between 2013 and 2025, with population growth and aging (and the accompanying rise in prevalence of chronic conditions such as diabetes and cardiovascular disease) responsible for most of that growth. Continued expansion of medical insurance coverage under the ACA accounted for a small portion of projected demand growth. Physician supply was projected to increase over the same period by only 4% to 12%, suggesting a growing shortage of physicians.

Study findings highlighted how the pace of change in health care delivery is too rapid for projections to be produced infrequently. Accordingly, this 2016 update report reflects the AAMC's commitment to

---

[3] **Primary care** consists of family medicine, general internal medicine, general pediatrics, and geriatric medicine. **Medical specialties** consist of allergy & immunology, cardiology, critical care, dermatology, endocrinology, gastroenterology, hematology & oncology, infectious diseases, neonatal & perinatal medicine, nephrology, pulmonology, and rheumatology. **Surgical specialties** consist of general surgery, colorectal surgery, neurological surgery, obstetrics & gynecology, ophthalmology, orthopedic surgery, otolaryngology, plastic surgery, thoracic surgery, urology, vascular surgery, and other surgical specialties. The **Other Specialties** category consists of anesthesiology, emergency medicine, neurology, pathology, physical medicine & rehabilitation, psychiatry, radiology, and all other specialties. For the 2016 report, **Hospitalists** trained in adult primary care are modeled as their own category and have been moved out of the Primary Care category. Hospitalists trained in non-primary care specialties are modeled within their trained specialty.

produce regularly updated projections focusing on developing and refining scenarios that reflect the best available evidence on trends in health care delivery.

The remainder of this update is organized to present the updated projections (Section II), supply scenarios (Section III), and demand scenarios (Section IV). Additional new research and analyses are addressed in Section V. Section VI features the special content on health care utilization equity. Conclusions are presented in Section VII, and Section VIII discusses possible future directions in the field of health workforce research. A Technical Appendix in Section IX provides additional detail on modeling data and methods. Detailed tables are presented in Section X.

## II.   UPDATED PROJECTIONS

Physician demand continues to grow faster than supply leading to a projected shortfall of between 61,700 and 94,700 physicians by 2025. Projected shortfalls in primary care range between 14,900 and 35,600 physicians by 2025. Projected shortfalls in non-primary care specialties range between 37,400 and 60,300 by 2025, with the shortfalls especially acute in select surgical and other specialties.

The ranges of supply and demand scenarios presented reflect the complexity and evolving nature of the environment within which physicians practice. One scenario alone is inadequate to convey the associated uncertainty. Therefore, this 2016 report examines five scenarios commonly expected to affect physician supply and six scenarios expected to affect the demand for physician services over the next decade. We compared each supply scenario with each demand scenario to estimate the likely range of paired supply and demand projections. The specific supply and demand scenarios modeled are described in detail in Sections III and IV.

The extreme high and low scenarios are least likely to occur—as multiple factors tend to mitigate highs and lows. For example, if physicians were to begin retiring earlier, the growing systemic stresses this could cause as a result of the growing shortfall of physicians would eventually lead some physicians to delay retirement. Given the propensity of such systems-level "checks and balances" to avoid extremes, we believe that the 25th to 75th percentile of the paired projections continues to reflect a likely range.

The updated projections reflect lower estimates of the number of new physicians entering the workforce each year (28,233 versus the estimate of 29,032 used in the 2015 report).[4] Other changes include demand projections that extrapolate a "2014" level of care delivery compared with a "2013" level of care delivery extrapolated for the 2015 report, additional modeling of the growth in PA supply, and other updates to the supply and demand models and data inputs (e.g., AMA Masterfile, American Community Survey, Medical Expenditure Panel Survey, and Behavioral Risk Factor Surveillance System).

 Lastly, the model in this 2016 report assumes that current physician supply and demand are roughly in equilibrium at the national level (i.e., that supply and demand are about equal), with the exception of primary care (8,200 physician shortfall) and psychiatry (2,800 shortfall), based on federally designated Health Professional Shortage Areas.[5] However, this assumption may be conservative because the adequacy of other specialties' supply is not measured by any federal agencies. To the extent that current national shortages exist for other specialties, such as the surgical specialties, then the demand projections are underestimated from 2014 through 2025 by roughly the size of the current national shortage.

---

[4] The 2015 report's estimate of annual physicians graduating double counted graduates from several physician surgical and other specialties where a portion of physicians subspecialize.

[5] For information on HPSA designation, see www.hrsa.gov/shortage.

## Total Physicians

Under all scenarios projected, the total projected demand for physicians exceeds total projected supply (Exhibit 1). Looking at the 25th to 75th percentile projections for total physicians, demand will continue to grow faster than supply leading to a projected shortfall of between 61,700 and 94,700 physicians by 2025 (Exhibit 2). This updated shortfall of 61,700 and 94,700 physicians projected for 2025 is on a scale similar to the 46,100 to 90,400 physician shortfall estimated by the 2015 study.

**Exhibit 1: Projected Total Supply and Demand for Physicians, 2014-2025**



**Exhibit 2: Total Projected Physician Shortfall Range, 2014-2025**



4

## Primary Care

Projected shortfalls in primary care range between 14,900 and 35,600 physicians by 2025. Exhibit 3 (projected supply and demand for primary care physicians by scenario); Exhibit 4 (primary care scenario shortfall range), and Exhibit 5 (primary care scenario shortfall range including hospitalists) summarize the projected supply, demand, and shortfall range for primary care physicians. The demand scenarios modeled project future demand for physicians, but scenarios can differ to the extent that future demand may be met by primary care or non-primary care physicians or other clinicians.

These updated primary care shortfall projections are slightly higher than the 12,500 to 31,100 primary care physician shortfall projected in the 2015 report. The higher shortfall estimates partially reflect moving adult primary care–trained hospitalists out of primary care and into their own category (as the supply of these hospitalists is growing at a faster rate than demand for inpatient services). Including hospitalists in primary care as was done in the 2015 report (Exhibit 5) reduces the projected 2025 shortfall range to between 1,900 and 22,600. These scenarios also reflect a fuller inclusion of impact of the nation's rapid growth in PA supply (as well as growth in primary care nurse practitioner supply).

### Exhibit 3: Projected Supply and Demand for Primary Care Physicians, 2014-2025



### Exhibit 4: Projected Primary Care Physician Shortfall Range, 2014-2025



### Exhibit 5: Projected Primary Care Physician Shortfall Range (PC + PC-trained hospitalists)



*Exhibit 5: Including primary care–trained hospitalists in the updated 2016 projections, as was done in the 2015 report, results in a smaller projected shortage, likely reflecting the impact of the inclusion of the rapidly growing supply of PAs in the updated 2016 projections and an increase in the number of new graduates entering primary care.*

## Non-Primary Care

Exhibits 6 through 11 depict the overall range of supply and demand growth and projected shortfall ranges for non-primary care physicians by specialty category. Under the scenarios modeled, we project a shortfall of between 37,400 and 60,300 non-primary care physicians by 2025 (compared with a range of 28,200 to 63,700 in the 2015 report). Differences between the 2015 and 2016 projected ranges reflect lower estimates of physician supply growth in several specialties and the increasing supply of PAs. As mentioned, this 2016 report aggregates non-primary care specialties into three categories: medical specialties, surgical specialties, and other specialties.

### Medical Specialties

The demand for physicians in medical specialties is growing rapidly, but many physicians are choosing internal medicine subspecialties and pediatric subspecialties so physician supply is also growing in the medical specialties (Exhibit 6). Under the scenarios modeled, this update projects a shortfall range of about 3,600 to 10,200 by 2025 (Exhibit 7), slightly lower than the projected range of 5,100 to 12,300 physicians in the 2015 report.

**Exhibit 6: Projected Supply and Demand for Medical Specialist Physicians, 2014-2025**



**Exhibit 7: Projected Medical Specialist Physician Shortfall Range, 2014-2025**



### Surgical Specialties

Based on current trends, the supply of several larger surgical specialties (e.g., ophthalmology and urology) is not projected to grow as future attrition is likely to exceed the number of new entrants. Yet there continues to be strong projected growth in demand (Exhibit 8). Under the scenarios modeled, we project an updated shortfall of between 25,200 and 33,200 surgeons by 2025 (Exhibit 9), slightly higher than the shortfall of between 23,100 and 31,600 surgeons projected in the 2015 report. These projections represent an aggregation. Projections for individual surgical specialties might vary significantly.

8

## Exhibit 8: Projected Supply and Demand for Surgeons, 2014-2025



## Exhibit 9: Projected Surgical Physician Shortfall Range, 2014-2025



## Other Specialties

For the Other Specialties category, while the demand projections across scenarios modeled are mostly similar, the supply projections vary substantially and are sensitive to retirement assumptions (Exhibit 10). The projected shortfall range of between 22,200 and 32,600 for physicians in this specialty category exceeds the 2015 report projected shortfall range of between 2,400 and 20,200 (Exhibit 11). The main reason for the higher shortfall projections is slower projected supply growth (as graduates for some individual specialties in this category were overcounted for the 2015 report). Specialties with the highest attrition rates fall into this specialty category, including emergency medicine, anesthesiology, and radiology.

**Exhibit 10: Projected Supply and Demand for Other Specialties, 2014-2025**



### Exhibit 11: Projected Other Specialist Physician Shortfall Range, 2014-2025



## III.    SUPPLY SCENARIOS

The supply model used a microsimulation approach to project the future supply of physicians based on the number and characteristics of the current supply, the number and characteristics of new entrants to the physician workforce, hours worked patterns, and retirement patterns at the national, state, and sub-state levels. The model has been extensively documented elsewhere and a brief description of modeling methods may be found in the technical appendix.[6] Below we summarize supply scenarios modeled for this update.

### Supply Scenarios Modeled

To be consistent with the organization of the 2015 report, the status quo, retirement, and hours worked scenarios described below were included in the gap analysis comparing supply and demand to project a range for future adequacy of physician supply. GME expansion was modeled separately as a policy-oriented scenario but was not included in the final shortage projections.

- **Status Quo**: This scenario assumes continuation of the status quo in terms of number and characteristics of physicians newly entering the workforce, hours worked, and retirement patterns.
- **Early Retirement and Delayed Retirement**: Reflecting uncertainty about when physicians might retire in the future, we model scenarios assuming physicians retire two years earlier or two years later, on average, relative to current patterns. Scenario assumptions reflect that physicians might decide to delay or speed retirement for financial, health, and other reasons. The Physician Foundation's 2014 survey reports that "39% of physicians indicate they will accelerate their retirement due to changes in the healthcare system."[7] However, the U.S. Bureau of Labor Statistics reports that, on average, workers are delaying retirement and this trend is likely to continue.[8]
- **Millennial Hours Worked**: As modeled for the 2015 report, this scenario assumes that physicians currently under age 35 will continue to work approximately 13% fewer hours per week relative to earlier cohorts. The 13% reduction assumption is based on analysis by the AAMC's Center for Workforce Studies comparing self-reported weekly hours worked from the 1980 Census to those reported in the 2012-2014 American Community Survey.

---

[6] U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Health Workforce Analysis. 2014. Technical Documentation for HRSA's Health Workforce Simulation Model. Rockville, Maryland: U.S. Department of Health and Human Services. http://bhpr.hrsa.gov/healthworkforce/supplydemand/simulationmodeldocumentation.pdf.

Dall TM, Storm MV, Chakrabarti R. Supply and demand analysis of the current and future US neurology workforce. *Neurology*. 2013; 81(5): 470-478. http://www.neurology.org/content/early/2013/04/17/WNL.0b013e318294b1cf.short.

[7] Accessed at http://www.physiciansfoundation.org/uploads/default/2014_Physicians_Foundation_Biennial_Physician_Survey_Report.pdf.

[8] Closing the deficit: How Much Can Later Retirement Help? Edited by Burtless H and Aaron HJ. Washington DC, Brookings Institute Press, 2013.

Leonesio MV, Bridges B, Gesumaria R, Del Bene L. The Increasing Labor Force Participation of Older Workers and Its Effect on the Income of the Aged. *Social Security Bulletin*. 2012; 72(1). https://www.ssa.gov/policy/docs/ssb/v72n1/v72n1p59.html.

- **GME Expansion**: This scenario assumes a possible expansion of federally funded GME slots. The GME expansion scenario is based on the proposed Resident Physician Shortage Reduction Act of 2015 and assumes increasing approved GME slots by 3,000 annually between 2017 and 2021. Since it is unknown which specialties might gain residency slots, for modeling purposes we assume that all specialties will gain the same proportion of residency slots.

## Supply Projections

Updated annual projections for total physician supply are summarized in Exhibit 12. Under the status quo scenario, total physician supply increases from 782,200 in 2014 to 825,200 physicians in 2025, a 43,000 (5%) increase (Exhibit 13). This is less than both the 8% growth in physician supply expected in the 2015 report and less than the approximately 8.6% projected growth in the U.S. population over this period. The slower growth in supply is primarily due to refined (and lower) estimates of the number of physicians entering the workforce each year (28,233 vs the estimate of 29,032 used in the 2015 report).[9] Growth in total physician supply by specialty category between 2014 and 2025 ranges from a high of 20,500 physicians among medical specialties under a delayed retirement scenario to projected negative growth among surgical specialties of -12,100 physicians under an early retirement scenario (Exhibit 14). Under almost all scenarios, the supply of surgical specialists is projected to decline, whereas primary care and medical specialist supply are projected to grow under all scenarios. The supply of physicians in the Other Specialties category is projected to grow under most scenarios, but this may be somewhat conservative. As it represents a mix of sometime dissimilar specialties, it may mask the effects of high attrition rates within specific specialties, such as emergency medicine, anesthesiology, and radiology.

---

[9] The 2015 report's estimate of annual physicians graduating double counted graduates from several physician surgical and other specialties where a portion of physicians subspecialize.



Exhibit 12: Projected Supply of Physicians, 2014-2025

**Exhibit 13: Growth in Physician Supply 2014-2025: 2015 Report vs 2016 Report Scenario Projections**



**Exhibit 14: Projected Change in Physician Supply by Specialty Category, 2014-2025**



15

## IV.   DEMAND SCENARIOS

This section presents an overview of demand scenarios modeled, updated projections, and comparisons to 2015 study findings. Detailed information about the demand microsimulation model and model validation activities has been published elsewhere, and a brief summary can be found in the Technical Appendix.[10]

### Demand Scenarios Modeled

We projected demand under scenarios that reflect different assumptions regarding use of health care services and care delivery. All scenarios modeled reflect changing demographics from 2014 to 2025. With the exception of the scenario that reflects only changing demographics, all other scenarios modeled include the projected impact of continued expansion of medical insurance coverage under ACA. Similar to the projections in the 2015 report, we modeled the implications of greater use of managed care, retail clinics, and the contribution of PAs and APRNs.

Refinements to the projections include separately modeling demand for adult primary care–trained hospitalists (included with the demand for primary care services in the 2015 report) and the physician workforce implications of the rapidly growing supply of PAs. A set of primary care projections was developed without primary care–trained hospitalists because including them may result in overestimating primary care physician supply. The impact of the current PA workforce was included in the supply projections in the 2015 report, but due to limited data on supply growth by specialty, the implications of PA supply growth beyond the growth required to maintain current staffing levels were not captured in the physician demand projections in the 2015 report. Those limitations were resolved by incorporating PA specialty-specific data from the Health Resources and Services Administration.

- **Changing Demographics**: This scenario extrapolates current health care use and delivery patterns to future populations, taking into account projected future demographics (e.g., age, gender, and race/ethnicity) through 2025. During this period the U.S. population is projected to grow by close to 8.6%, from about 319 million to 346 million. The population under age 18 is projected to grow by only 5%, while the population aged 65 and over is projected to grow by 41%. Percentage growth in demand for services used by seniors, therefore, is projected to be much higher than percentage growth in demand for pediatric services.

---

[10] U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Health Workforce Analysis. 2014. Technical Documentation for HRSA's Health Workforce Simulation Model. Rockville, Maryland: U.S. Department of Health and Human Services.
http://bhpr.hrsa.gov/healthworkforce/supplydemand/simulationmodeldocumentation.pdf.

Dall TM, Gallo PD, Chakrabarti R, West T, Semilla AP, Storm MV. An Aging Population and Growing Disease Burden Will Require A Large and Specialized Health Care Workforce By 2025. *Health Affairs*. 2013; 32:2013-2020.
http://content.healthaffairs.org/content/32/11/2013.abstract.

Dall TM, Chakrabarti R, Storm MV, Elwell EC, and Rayburn WF. Estimated Demand for Women's Health Services by 2020. *Journal of Women's Health*. 2013; 22(7): 643-648. http://www.ncbi.nlm.nih.gov/pubmed/23829185.

- **Growth in Demand Due to ACA Expanded Medical Insurance Coverage**: This scenario models anticipated change in health care use patterns as more people gain medical insurance under the Affordable Care Act. The 2015 report describes the assumptions and methods under which the demand implications of gaining medical coverage under ACA were simulated. By 2014, some parts of ACA had already been implemented and hence are reflected in the starting year demand estimates. The remaining demand scenarios summarized below all build on this scenario and reflect both changing demographics and expanded medical insurance coverage under ACA.

- **Managed Care**: A variety of integrated care delivery models promoted by provisions in the ACA are being implemented for use with both publicly and privately insured populations. Goals include improving the coordination and quality of patient care, reducing inefficiencies, shifting care to lower cost settings and providers as appropriate, improving preventive care efforts, and better controlling medical expenditures. An estimated 23.5 million Americans are currently part of an Accountable Care Organization (ACO), and this number is projected to continue growing.[11] Many of the goals of ACOs are similar to those of other risk-bearing organizations such as Health Maintenance Organizations (HMOs), including incorporating financial incentives for patients and physicians to better manage utilization. Looking historically at the effect of these delivery models on use of services provides insights on what might happen if ACOs and other integrated care models gain greater prominence. Consistent with assumptions guiding the projections in the 2015 report, this scenario models the physician demand implications if 100% of the population were enrolled in risk-based entities as a proxy for the possible implications of increased enrollment in ACOs.

  Well-managed ACOs are often capable of accepting the associated risk and managing care under bundled payment systems in part because they may be well suited to manage patient flows and reengineer care delivery systems to improve efficiency. Yet a more fully developed bundled payment system will take time to develop and diffuse. How that occurs will have implications for care and for the delivery system workforce more broadly, so continued work to assess the impact of ACOs is crucial.

- **Expanded Use of Retail Clinics**: Between 2009 and 2015, the number of retail clinics in operation increased from approximately 1,100 to 2,000.[12] Chief drivers of retail clinic utilization include convenience, after hours accessibility, cost-effectiveness, and coverage by insurance plans. As a result, retail clinics may be an alternative to traditional primary care for many consumers. Described in greater detail in the 2015 report, this scenario explores the demand implications of shifting care from primary care physician offices to retail clinics for 10 conditions typically treated at retail clinics.[13] This scenario assumes the following:

---

[11] Accessed at http://www.brookings.edu/~/media/research/files/papers/2015/05/12-aco-paper/impact-of-accountable-careorigins-052015.pdf

[12] Accessed at http://www.ncsl.org/research/health/retail-health-clinics-state-legislation-and-laws.aspx

[13] Mehrotra A, Wang MC, Lave JR, Adams JL, and McGlynn EA. Retail Clinics, Primary Care Physicians, and Emergency Departments: A Comparison Of Patients' Visits. *Health Affairs*. 2008; 27(5):1272-1282.

- o Patients with chronic conditions will be seen by their regular primary care provider to ensure continuity of care;
- o Care in retail clinics will primarily be provided by nurse practitioners and PAs;
- o For care provided in primary care physician offices, 77% of visits to a pediatrician's office are handled primarily by a physician (reflecting that between nurse practitioners and physicians, 77% of the pediatric workforce are physicians) and 70% of adult primary care office visits will be handled primarily by a physician; and
- o To reflect that the categories of visits modeled tend to be less complex than the average office visit, we used the Management Group Medical Association's estimates for the 75th percentile of annual ambulatory patient encounters to translate the reduction in office visits to reduced demand for physicians.

These assumptions suggest that 7,970 visits by children to a retail clinic rather than a pediatrician's office reduce demand for pediatricians by 1 physician, with 7,855 retail clinic visits by an adult reducing demand for an adult primary care physician by 1 physician.

- **Increased Use of Advanced Practice Registered Nurses and Physician Assistants under "Moderate Use" and "High Use" Assumptions:** These scenarios use the same supply projections used for the 2015 report for certified registered nurse anesthetists (CRNAs), certified nurse midwives (CNMs), and nurse practitioners (NPs). The 2015 report contains a more detailed description of modeling inputs and assumptions. In this 2016 report, these scenarios also model the growth in PA supply, building on work by the Health Resources and Services Administration.

These scenarios include modeling the growth in demand for APRNs and PAs to maintain a 2014 level of care (based on current staffing patterns), and the supply of APRNs and PAs beyond that required to maintain the status quo. Analysis of the American Community Survey, National Plan and Provider Enumeration System, the 2012 National Sample Survey of Nurse Practitioners, and new graduates data from the American Association of Colleges of Nursing suggest that in 2014 there were an estimated 143,300 NPs; 46,400 CRNAs; and 11,300 CNMs. By 2025, taking into account the projected growth in demand for health care services across the settings and specialty areas served by these APRNs, the supply of APRNs could exceed the number required to maintain current staffing levels by approximately 90,100 APRNs. In 2014, there were an estimated 101,200 active PAs.[14] Taking into account the projected rapid growth in PA supply[15] plus the addition of new PA programs[16], by 2025, supply could grow to be approximately 53,500 more PAs than required to maintain current staffing levels. For physician modeling purposes, the uncertainties are to what extent these additional 90,100 APRNs and 53,500 PAs will reduce demand for physicians and which

[14] National Commission on Certification of Physician Assistants. 2015. 2014 Statistical Profile of Certified Physician Assistants. http://www.nccpa.net/Uploads/docs/2014StatisticalProfileofCertifiedPAsPhysicianAssistants-AnAnnualReportoftheNCCPA.pdf.

[15] Hooker RS, Muchow AN. Supply of Physician Assistants: 2013-2026. *Journal of the American Academy of Physician Assistants*. 2014; 27(3):39-45.

[16] Accreditation Review Commission on Education for the Physician Assistant, Inc. Projected growth in accredited programs. http://www.arc-pa.org/documents/current%20and%20project%20growth%204.17.15.pdf.

specialties will likely be most affected. Adding to the uncertainty is that these providers might take on new roles or address currently unmet needs, rather than taking on workload historically provided by physicians.[17]

For modeling purposes, the "high use" scenario assumes that each additional APRN or PA beyond the supply needed to maintain current staffing patterns will ease demand for physicians in their specialty as follows: anesthesiology (60%), women's health (40%), primary care (50%), medical specialties (30%), surgery (20%), and other medical specialties (30%). The "moderate use" scenario assumes the adjustment in physician demand is half of the above amounts. The above percentages make no implications about the value of services provided by APRNs and PAs relative to physicians, but rather about the role these providers will play in the health care system and whether the role fills a currently unmet need versus reducing demand for physicians.

- **Expanded Use of Telemedicine:** Some stakeholders have pointed to telemedicine as one possible strategy for mitigating demand for physician services, a topic we did not address in the 2015 report. We explored the extent to which telemedicine may change the health care use and delivery patterns of patients with diseases for which there is published information on how telehealth has been implemented. Identified extant research questions focused on three areas of potential telemedicine impact:
    - o   Impacts on demand of transferring care for specific conditions to telemedicine,
    - o   Impacts on new demand of expanded geographic access/less constrained supply, and
    - o   Impacts of telemedicine on provider productivity/efficiency.

  However, based on literature provided by the AAMC Center for Workforce Studies as part of its systematic review of the literature on telehealth and its impact on service utilization, we concluded that the empirical evidence currently is insufficient for modeling purposes. More research is needed to explore the impact of telemedicine technologies on current and new service and health workforce demand.

## Demand Projections

As noted in the 2015 report, rapidly changing population demographics are the single factor most affecting future service and physician demand growth. High rates of projected population growth, especially among the "Baby Boomer" population, portend rapidly growing demand for health care services, with highest growth expected for those specialties that disproportionately serve seniors. Because these demographic trends are inevitable, they are incorporated into all the demand scenarios. Between 2014 and 2025, changing demographics alone are projected to increase national demand for physicians by about 111,000 physicians (+14%), with demand for primary care physicians projected to grow 32,100 physicians (+14%), faster growth rates expected among hospitalists (+20%) and medical

---

[17] Auerbach DI, Chen PG, et al. Nurse Managed Health Centers and Patient-Centered Medical Homes Could Mitigate Expected Primary Care Physician Shortage. *Health Affairs.* November 2013; 32(11):1933-1941.

specialists (+19%), and lower growth rates expected among the other specialties (+12%) and surgical specialties (+13%) (Exhibit 15).

The effect of ACA-related expansion in medical insurance coverage had already started by 2014, but between 2014 and 2025, the projected effect is additional demand of about 10,600 physicians, of which 7,600 is specific to non-primary care specialties. The effects of ACA-related medical insurance expansion are incorporated into all but the changing demographics scenario.

The managed care scenario continues to have little impact on overall physician demand but does shift the specialty mix. National demand rises by an estimated 2,300 physicians. However, simulation results suggest that by 2025 demand for primary care physicians would rise by an additional 11,300 physicians; demand for medical specialties would decline by 6,300 physicians; demand for surgical specialties would rise by 3,900 physicians (with growth in obstetrician and gynecology care, general surgery, and ophthalmology accounting for most of the increase); and demand for other specialties would decline by 6,700 physicians (much of this from an observed decline in utilization of radiology and psychiatry[18] services among patients currently enrolled in managed care plans).

Simulated increased use of retail clinics only affected demand for primary care, with demand for primary care physicians declining by 13,600 physicians in 2025 relative to the scenario with ACA plus changing demographics. The impact was larger for general pediatrics (-10,800 physicians) than for adult primary care (-2,800 physicians), reflecting the patient population without chronic conditions and the mix of services likely to be provided in retail clinic settings. This scenario used conservative assumptions on which primary care visits could be provided in a retail clinic, so the impact could be larger than reported here.

The impacts of increased use of APRNs and PAs are potentially significant and will vary depending on physician specialty and assumptions regarding the future level and scope of care delivery provided by these professions. Relative to the scenario with ACA plus changing demographics, the projected physician demand declines by 28,100 physicians between 2014 and 2025 with increased use of APRNs and PAs under the "moderate use" scenario. Alternatively, growth in physician demand between 2014 and 2025 declines by 56,200 physicians under the "high use" scenario.

Exhibit 16 compares projected physician demand growth by scenario between the 2015 report and this 2016 update. The 2016 update projects slightly higher demand growth between 2014 and 2025 under most scenarios modeled. The higher demand growth projections are partially the result of recalibrating the model to a 2014 level of care. For the two scenarios modeling possible effects of APRNs and PAs, the demand projections are now lower for 2025 reflecting that growth in PA supply beyond that needed for current levels of care was added to this scenario.

---

[18] The decline in use of psychiatry services observed among patients in managed care plans is a topic requiring additional research but might partially be explained by greater use of primary care services (where some behavioral health counseling might occur) or perhaps greater controls on access to care.

**Exhibit 15: Projected Demand for Physicians, 2014-2025**



**Exhibit 16: Growth in Physician Demand 2014-2025: 2015 Report vs 2016 Report Scenario Projections**



## V.   NEW RESEARCH AND ANALYSES

New topics analyzed for this update include identifying and moving adult primary care–trained hospitalist physicians into their own category (separate from primary care) and the rapidly growing supply of PAs.

### Growth in Supply and Demand for Primary Care–Trained Hospitalists

Hospital medicine is concerned with the care of acutely ill hospitalized patients, and physicians whose primary professional focus is hospital medicine are called hospitalists. The use of hospitalists allows primary care and specialty physicians to spend more of their time providing office-based care with less time required for hospital rounds. The projections presented here rely on work by the AAMC Center for Workforce Studies to identify hospitalists using Medicare fee-for-service billing records (for those physicians where close to 100% of their Evaluation and Management billing was hospital based) and to link identified hospitalists with the AMA Masterfile. The large majority of hospitalists in the AMA Masterfile are not identified as hospitalists based on self-reported specialty, but rather are listed under the specialty in which they received their training. The AAMC work identified 25,320 hospitalist physicians who were listed in the AMA Masterfile as general internists, family physicians, or geriatricians. Hospitalists trained in pediatrics cannot easily be identified using Medicare billing records. Hospitalists with specialized training in an internal medicine subspecialty or other specialty were categorized under their specialty rather than as a hospitalist for purposes of our modeling (e.g., a neurologist practicing as a hospitalist was categorized as a neurologist). In the remainder of this section, references to hospitalists focus on those whose final GME training was in general internal medicine, family medicine, or geriatric medicine.

The hospitalist workforce tends to be young, so over the next decade, relatively few hospitalists are projected to retire. Analysis by the AAMC Center for Workforce Studies of active physicians who transitioned between hospitalist and non-hospitalist between 2013 and 2014 suggests that the number of hospitalists leaving the hospitalist workforce mid-career is offset by the number of people entering the hospitalist workforce mid-career. Furthermore, comparing exits from the hospitalist workforce for physicians age 55 and older suggests retirement patterns similar to those of general internists. Therefore, we used retirement patterns for general internists because they are based on a larger sample size (especially because the number of hospitalists nearing retirement age is small). Between 2011 and 2013, approximately 1,927 physicians trained in adult primary care entered the hospitalist workforce each year. We modeled future hospitalist supply under a scenario where this annual number of new entrants continues.

As noted previously in the discussion of demand projections, rapidly changing population demographics affect future service and physician demand growth the most. Between 2014 and 2025, changing demographics are projected to increase national demand for hospitalists by about 5,000 physicians (+20%). Although hospitalization rates have fallen over the past decade, rates have remained relatively constant over the past several years, and we project that the rapidly aging population will drive national

rates higher over the next decade. We project virtually no change in demand for hospitalists associated with ACA-related expansion in medical insurance coverage, increased use of managed care or retail clinics. To the extent that there is current unmet need for hospitalists, the health care system might absorb more hospitalists into the system beyond that needed to maintain current staffing levels. This, in turn, could free up primary care physician time that might otherwise be spent in hospital rounds. On the other hand, increased use of APRNs and PAs as hospitalists may affect the demand for hospitalist physicians, or excess future supply of hospitalists could result in physicians choosing other specialties. Further research is needed to better to understand the dynamics of the hospitalist labor market.

## Rapid Growth in Physician Assistant Supply

The National Commission on Certification of Physician Assistants reports that at the end of 2014, the U.S. had an estimated 102,000 certified PAs (up from 95,600 certified PAs at the end of 2013).[19,20] Approximately 27% worked in primary care; 24% worked in surgical specialties; 20% worked in internal medicine subspecialties; and the remainder worked in other practice areas. (This specialty distribution is based solely on those PAs who chose only one practice area in the PA Professional Profile database and excludes responses from PAs who indicate practicing in multiple specialty areas).

*The physician demand projections in this 2016 report incorporate the potential implications of a supply of PAs that is growing faster than the rate of growth in demand for health care services.*

Projected ranges of shortages are still higher mainly because downward adjustments were made to the new numbers of physician graduates relative to the 2015 report.

The projections for physician demand—both from the 2015 report and the updated projections presented here—reflect that a significant portion of patient care is currently being provided by PAs. The physician demand projections in this 2016 report also incorporate the potential implications of a supply of PAs that is growing faster than the rate of growth in demand for health care services. The projected ranges of shortages are still higher, however, because the change in the impact of growing PA supply only reflects that created by growth above and beyond what would be needed to maintain current levels of care, and downward adjustments were made to the new numbers of physician graduates relative to the 2015 report.

---

[19] National Commission on Certification of Physician Assistants. 2015. 2014 Statistical Profile of Certified Physician Assistants. http://www.nccpa.net/Uploads/docs/2014StatisticalProfileofCertifiedPAsPhysicianAssistants-AnAnnualReporttotheNCCPA.pdf.

[20] The number of certified PAs can differ from the number of licensed and active PAs. Using a database of active clinicians based on state licensure data, Hooker and Muchow report that in 2013 an estimated 84,064 PAs had an active license to treat patients. Hooker RS and Muchow AN. The 2013 Census of Licensed Physician Assistants. *Journal of the American Academy of Physician Assistants*. 2014; 27(7):35-39.

Hooker and Muchow (2014) estimated that between 2013 and 2026, PA supply would grow by about 41,800 PAs (50%), and this estimate is likely conservative: since this study was completed, additional colleges and universities have announced plans to open new PA programs.[21] Analysis of the practice areas where PAs work suggests that between 2014 and 2025, overall demand will rise by 15%, equivalent to the need for 15,700 additional PAs, to maintain current staffing levels. Taking into account the rapidly growing supply and new PA programs opening, supply projections for PAs suggest that by 2025 there may be 53,500 more PAs than what will be needed to maintain current staffing levels. Future updates will need to account for continued growth in the PA pipeline, and additional research is also needed to better understand how PAs are integrated into the health care system. In the interim, the physician demand projections presented in this 2016 report make the same assumptions for PAs as for APRNs regarding the degree to which additional clinicians in each practice area might influence demand for physicians under "high use" and "moderate use" staffing scenarios.

---

[21] Hooker RS, Muchow AN. Supply of Physician Assistants: 2013-2026. *Journal of the American Academy of Physician Assistants*. 2014; 27(3):39-45.

# VI.    PROVIDERS REQUIRED IF U.S. ACHIEVED EQUITY IN HEALTH CARE UTILIZATION

The health care utilization equity (HCUE) scenario models the implications for physician demand if currently underserved populations utilized care at a rate similar to that for populations facing fewer barriers to care. ***It is not included in the ranges of scenarios compared above*** that summarize projected gaps between supply and demand across physician specialty categories at the 25th and 75th percentile of projected shortages, but rather is intended as an additional point of consideration when gauging workforce adequacy. This stand-alone scenario illustrates that sociodemographic, economic, and geographic imbalances in the supply of physicians and other barriers to accessing care result in lower levels of care received by historically underserved populations beyond utilization differences that can be explained by differences in disease prevalence and other health risk factors. The estimates we put forth are by no means deemed definitive; instead, they are intended to stimulate much-needed discussion and analysis about how best to address health care utilization inequity in future projections

Two scenarios were modeled to estimate the increase in use of health care services anticipated if underserved populations had similar use patterns as the rest of the population (Exhibit 17, see also Exhibit 27 and Exhibit 28). The first of these (HCUE Scenario 1) estimated 2014 physician shortfalls by specialty category under a hypothetical scenario if people without medical insurance and people living in non-metropolitan areas had equivalent care utilization patterns as their insured peers living in metropolitan areas with similar demographics and health risk factors. (For example, an uninsured person with heart disease living in a rural area was modeled as having the utilization rate of an insured person with heart disease living in a metropolitan area.) Under these assumptions, we estimate a 5% gap in total physician supply in 2014 compared with the number required under this health care utilization equity scenario. Compared with the supply in 2014, an additional 40,100 physicians would be required to enable uninsured, non-metropolitan patients to utilize care in the same manner as other patients. (This estimate for physicians is in addition to the additional PAs and APRNs that would be needed based on current national delivery patterns.)

The second health care utilization equity scenario (HCUE Scenario 2) estimated 2014 physician shortfall by specialty category under a hypothetical scenario wherein we modeled everyone utilizing care as if they had equivalent utilization patterns to white insured populations residing in metropolitan areas. (For example, an uninsured black person with heart disease living in a rural area was modeled as having the utilization rate of an insured white person with heart disease living in a metropolitan area.) Under these assumptions, we estimate a 12% gap between total physician supply in 2014 and the number of physicians required. Compared with the supply in 2014, an additional 96,200 physicians would be needed to provide services at the same level of health care utilization across all populations.

### Exhibit 17: Estimated Additional Physicians Needed if U.S. Had Achieved Health Care Utilization Equity in 2014



26

## VII.    KEY FINDINGS AND CONCLUSIONS

The need to assess the capacity of the nation's future health care workforce overall—and physician workforce in particular—is more important now than ever for both public and private sectors to act and make the investments needed for a health care system that provides high-quality, cost-efficient health care, while also developing the physicians needed to transform the current system and to maximize population health. The pace of change in the world of health care delivery and finance necessitates an almost constant updating and improvement of workforce projections and projections models. That is why the AAMC made a commitment to commission updated national physician workforce projections annually. The purpose is threefold:

- **Update Projections** - Support the ongoing development of up-to-date projections of the physician workforce based on the most recent and best quality data and respond to questions raised by previous reports;
- **Present New Analyses** - Produce research and data on specific topics to further develop the physician workforce projections; and
- **Identify Future Directions for Research** - Identify specific areas for future research, data collection, and analysis that will also strengthen future projections work and support the decision making that guides alignment of the nation's health workforce with its health needs.

Through these efforts, the AAMC intends to invite discussion to continue to develop better projections. In other words, we seek to advance our collective capacity for developing continually improved health workforce projections with data-based analysis. This annual (2016) workforce projections update combined data on the national physician workforce; data on the demographics, socioeconomics, and health risk factors of the population; data from national sources on patient care use and delivery patterns; and health workforce microsimulation supply and demand models to estimate the current and future demand and supply of physicians through 2025. The projections in this analysis are based on available data to date. Further, recognizing the uncertainty inherent to modeling the future workforce, this study presents projections across a variety of scenarios, resulting in a projected range.

Key study findings and conclusions include:

- **Physician demand continues to grow faster than supply leading to a projected total physician shortfall of between 61,700 and 94,700 physicians by 2025. As with the 2015 projections, under every combination of scenarios modeled, an overall physician shortage is projected.** Though this total projected shortfall exceeds the 46,100 to 90,400 physician shortfall estimated by the 2015 study, the 2016 updated projections of a physician shortfall in 2025 are of a similar magnitude to the 2015 projections. Differences between the 2016 update and the 2015 projections largely reflect the use of more recent data and improvements to methods.
  - **Projected shortfalls in primary care range between 14,900 and 35,600 physicians by 2025.** This is directionally consistent with the 12,500 to 31,100 primary care physician shortfall

27

projected in the 2015 report.[22] As part of the ongoing effort to improve our projections, primary care–trained hospitalists were excluded from primary care projections for the 2016 update. If they had been included (as was done in the 2015 report), the updated estimated primary care shortfall would be in the 5,600 to 28,300 range.

- o **Projected shortfalls in non-primary care specialties range between 37,400 and 60,300 by 2025.** This range is directionally consistent with the shortfall projections in the 2015 report (28,200 to 63,700 physicians).

- **Under almost all scenarios, the supply of surgical specialists is projected to decline.** Based on current trends, the supply of several larger surgical specialties (e.g., ophthalmology and urology) is not projected to grow as future attrition is likely to exceed the number of new entrants. Yet there continues to be strong projected growth in demand. Although projections for individual surgical specialties will likely vary, in the aggregate we project an updated shortfall of between 25,200 and 33,200 surgeons by 2025, slightly higher than the 2015 report shortfall of between 23,100 and 31,600 surgeons.

- **For all specialty categories, physician retirement decisions are projected to have the greatest impact on supply, and over one-third of all currently active physicians will be 65 or older within the next decade.** Physicians between ages 65 and 75 account for 11% of the active workforce, and those between ages 55 and 64 make up nearly 26% of the active workforce. Projected shortfalls for the Other Specialties category (which includes emergency medicine, neurology, pathology, and psychiatry) are particularly sensitive to retirement assumptions.

- **Demographics—specifically, population growth and aging—continue to be the primary driver of increasing demand, with the older population expected to experience the greatest growth in demand from 2014 to 2025.** During this period the U.S. population is projected to grow by close to 8.6%, from about 319 million to 346 million. The population under age 18 is projected to grow by only 5%, while the population aged 65 and over is projected to grow by 41%. Because seniors have much higher per capita consumption of health care than younger populations, the percentage growth in demand for services used by seniors is projected to be much higher than the percentage growth in demand for pediatric services.

- **Expansions in medical insurance coverage due to the Patient Protection and Affordable Care Act (ACA) and the economic recovery have reduced the number of uninsured. However, demand is projected to increase by another 10,000 to 11,000 physicians (1.2%) to reflect ACA-related expanded coverage effects still to be realized.** The 2015 projections estimated that expanded medical coverage achieved under ACA once fully implemented would likely increase demand by about 16,000 to 17,000 physicians (2.0%).

These updated projections also integrate more fully the potential impact of a rapidly growing physician assistant workforce, move adult primary care–trained hospitalists out of the primary care projections and into a separate specialty category, and reflect refinements to the estimates of annual graduates. The net effect of these refinements to model inputs and updates was to project a larger total physician

---

[22] One update to the 2016 projections update was to identify and move primary care–trained hospitalists out of primary care and into their own specialty category. If primary care–trained hospitalists were included with primary care physicians (as was done in the 2015 report), the estimated primary care shortfall would be in the 5,600 to 28,300 range.

shortage by 2025 than estimated by the 2015 report. Better integrating the growing physician assistant workforce into the projections reduced the growth in demand for physicians for some scenarios, but *slower projected growth in physician supply is the primary cause for the higher shortfall projections*.

- **If currently underserved populations utilized health care at the same rate as the rest of the population, an additional 53,000 to 96,000 physicians (7-12%) would be needed in 2014.** While many other factors would need to be addressed to achieve health care utilization equity— minimizing barriers related to insurance coverage, access, trust, etc.—these figures highlight the potential scale of currently unmet need.

This year's report also includes a special section on health care utilization equity. Current projections methods only partially account for possible underutilization by those with inadequate access. Therefore, to better gauge the degree of currently unmet need, the health care utilization equity scenario models the implications for physician demand if currently underserved populations utilized health care at the same rate as the rest of the population. These estimates are ***not included*** in the ranges of projections, as they are estimates for 2014 levels of care only. Moreover, the estimates we put forth are by no means deemed definitive; instead, they are intended to stimulate much-needed discussion and analysis about how best to address health care utilization inequity in future projections.

Finally, projections are constantly challenged by the reality that health care is changing at a tremendous pace and in often unpredictable ways. The projected ranges reflect uncertainties regarding how emerging care delivery and financing models might change health care use and delivery patterns, as well as uncertainties regarding physician labor force participation patterns (i.e., retirement and work-life balance decisions) and employment versus independent practice decisions. This high level of uncertainty, combined with the need to incorporate new research and updated data on physician supply and demand, underscores the importance of the AAMC's decision to produce, on an annual basis, ever more sophisticated projections of the nation's physician workforce, address issues that need to be explored, and identify areas of analysis and research that still need to be explored.

## VIII.    FUTURE DIRECTIONS IN HEALTH WORKFORCE RESEARCH

Given the ongoing changes in how health care services are offered and financed, the nation may never arrive at a definitively appropriate mix of providers.[23] Uncertainties regarding how emerging payment and care delivery models might affect clinician supply and demand, uncertainties about how clinicians and care settings will respond to economic and other trends, and improvements in medical and information technology all underscore the importance of future research on the potential implications of the evolving health care system for the nation's supply of physicians.

For example, given that growth in demand for health care services is projected to continue to exceed the growth of physician supply, we need to better understand how this may exacerbate geographic imbalances in supply, thus aggravating extant disparities in geographic distribution. Similarly, although this update has explored the issues to some extent, the implications of future growth in APRN, PA, and hospitalist supply need to be better understood, including how the rapidly growing supply will be integrated into the health care workforce.

Other examples of directions for future research to improve analytic capabilities and advance the field of health workforce modeling, as better data become available, include:

- Continuing to evaluate data from new care delivery and financing models, including the effect on capacity and staffing, though existing research has not demonstrated a mitigation effect on workforce needs;
- Physician workforce retention, productivity, and attrition (due to retirement, lifestyle preferences, and issues related to well-being), including tracking trends in retirement and understanding the drivers of and shifts in physician well-being and their implications for the future physician workforce;
- Telemedicine and digital technology, including their effect on access and capacity;
- Further development of the health care utilization equity scenario and a closer look at its implications for physician workforce needs; and
- Population health initiatives, including their impact on access, workforce demand, and utilization.

We also need to look more closely at specific specialties and conditions that may experience or portend future shortages (and often current crises)—behavioral and mental health, including psychiatry, addiction medicine, and related disciplines; disciplines focused in areas in which the illness burden is increasing, such as oncology, cardiology, and endocrinology; obstetrics and gynecology; and the surgical specialties— to better plan for meeting those more specific physician supply needs. Finally, given the enormity of research and analysis, we need to understand the role that local studies and qualitative analysis can play in helping analysts develop more sophisticated assumptions on which to build projections.

---

[23] Daschle T. Creating a Workforce for the New Health Care World. Health Affairs Blog, March 7, 2013. Available online at http://healthaffairs.org/blog/2013/03/07/creating-a-workforce-for-the-new-health-care-world/.

## IX.    TECHNICAL APPENDIX

This appendix provides a brief overview of the workforce microsimulation models used, the data and assumptions, and information on select model inputs. Extensive technical documentation of the supply and demand models is available elsewhere.[24]

### Synopsis of Study Methods

Consistent with the 2015 physician workforce projections, this 2016 update used a microsimulation approach to project the supply of and demand for health care services and physicians. The supply and demand projection models have been used for health workforce modeling for federal and state governments and for trade and professional associations for physicians and other health occupations.

The supply model, under a status quo scenario, simulated the likely career decisions of physicians, given the current numbers, specialty mix and demographics of new entrants to the physician workforce, retirement and mortality patterns, and patterns of patient care hours worked. The supply model begins with the 2014 American Medical Association (AMA) Physician Masterfile, adds new physicians based on reported numbers of physicians completing their graduate medical education, subtracts estimates of physicians retiring, and accounts for projected differences in average patient care hours worked as the demographics of the physician workforce change. Additional supply scenarios modeled were the implications if physician retirement patterns changed (including delaying retirement or retiring earlier by ± two years); younger physicians (those currently age<35 and new graduates) working fewer patient care hours compared with older cohorts; and a modest expansion of graduate medical education (GME) programs.

The demand projections start by extrapolating current levels of care into the future as the population grows and ages, taking into consideration projected changes in disease prevalence and other health risk factors among the population if health care use and delivery patterns remained unchanged. Then, the implications of continued expansion of medical insurance coverage associated with the Affordable Care Act (ACA) were modeled. To reflect likely changes over the next decade in care use and delivery patterns, we updated scenarios reflecting possibly greater reliance on managed care and retail clinics and rapid growth in supply of advanced practice registered nurses (APRNs). These updated projections also take into account the rapidly growing supplies of PAs and hospitalists.

---

[24] U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Health Workforce Analysis. 2014. Technical Documentation for HRSA's Health Workforce Simulation Model. Rockville, Maryland: U.S. Department of Health and Human Services.
http://bhpr.hrsa.gov/healthworkforce/supplydemand/simulationmodeldocumentation.pdf.

## Supply Model Overview and Updates

**Current Physician Workforce**: Supply modeling starts with the 2014 AMA Physician Masterfile to identify the size and characteristics of the current workforce. In 2014 there were approximately 782,210 physicians under age 75 in active practice who had completed their graduate medical education, compared with about 767,100 in 2013—an increase of about 2 %.[25] Women constituted a third (33%) of the workforce. Physicians within the traditional retirement age between 65 and 75 were 11% of the active workforce, and those between age 55 and 64 made up nearly 26% of the active workforce (Exhibit 18). Therefore, it is possible that a third of all currently active physicians could retire within the next decade.

**Exhibit 18: Age Distribution of Active Physicians, 2014**



The approximately 221,200 active primary care physicians were 28% of the workforce, with another 128,900 (16%) in medical specialties; 156,300 (20%) in surgical specialties; 25,300 (3%) adult primary care–trained hospitalists; and 250,500 (32%) in the remaining specialties. Separation of adult primary care–trained hospitalists into their own category is a change over the projections in the 2015 report where these physicians were categorized as primary care.

**New Entrants**: Under the status quo supply scenario, estimates of the number of physicians completing their GME in individual specialties came from published information on programs accredited by the Accreditation Council for Graduate Medical Education (ACGME) and the American Osteopathic

---

[25] Both the supply and demand models measure full-time equivalents based on number of physicians who have completed GME. To the extent that some physicians-in-training also provide direct patient care, both demand and supply would be adjusted upward by the same amount so any gap between supply and demand would be unchanged.

Association (AOA), taking into account that some programs are dually accredited.[26] The age and sex distribution of new physicians was derived from analysis of the 2014 AMA Physician Masterfile. We estimate approximately 28,233 physicians completed GME between 2014 and 2015. This includes approximately 26,707 physicians completing GME from ACGME-accredited programs;1,981 physicians from AOA-accredited programs; and subtracting out approximately 455 physicians who completed GME in dually accredited programs. In total, approximately 7,259 physicians (26% of new graduates) entered the workforce as primary care providers; 1,930 (7%) entered as adult primary care–trained new hospitalists; 5,422 (19%) entered in internal medicine and pediatric subspecialties; 4,887 (17%) entered in surgical specialties; and 8,735 (31%) entered in other specialties.

**Hours Worked Patterns**: Supply projections take into consideration differences in average hours per week spent in patient care by physician age, sex, and specialty. This component of the model is unchanged since the 2015 report and is based on analysis of bi-annual 2012-2013 survey data (n=18,016) of physicians in Florida who renewed their license and who work at least 8 hours per week in professional activities. The analysis found that, controlling for specialty, hours worked per week were relatively constant through age 59 for men but decreased beyond age 60. Female physicians worked about 5 hours fewer per week than their male counterparts through age 54 but among those age 55 and older, worked only about 1-2 fewer hours per week than males of similar age and specialty. For modeling purposes, we used the Florida survey data because it is a robust sample size, includes current data on physician characteristics, and is reviewed annually by the Florida Department of Health to ensure quality. Analysis of survey data for physicians in Maryland showed similar patterns by age, sex, and specialty.

Analysis by the AAMC's Center for Workforce Studies comparing self-reported hours worked per week from the 1980 U.S. Census to hours reported in the 2012-2014 files of the American Community Survey suggested that male physicians age 26 to 35 worked 5.8 fewer hours per week in 2013 relative to 1980. A decline of 3.9 hours worked per week was observed among women physicians age 26 to 35 when comparing 1980 with 2013 hours worked patterns. The supply scenarios modeled all use current patterns of hours worked to model the implications of changing demographics among the physician workforce, with the exception of the millennial hours scenario described previously.

**Retirement Patterns**: For both the 2015 study and this update, the supply model used age-sex-specialty dependent annual attrition probabilities to simulate providers leaving the workforce. Publicly available sources of data for modeling specialty-specific retirement patterns are unavailable. These supply projections use retirement patterns estimated from data collected through Florida's mandated bi-annual physician licensure survey (2012-2013 data), which asks about intention to retire in the

---

[26] Estimates for graduates from ACGME-accredited programs came from Brotherton SE, Etzel SI. Graduate Medical Education, 2014-2015. *JAMA*. 2015; 314(22):2436-2454.  http://jama.jamanetwork.com/article.aspx?articleid=2474404.

Estimates for graduates from AOA-accredited programs were unavailable, so information on new entrants to these programs were used. https://natmatch.com/aoairp/stats/2015prgstats.html.

upcoming five years. The Florida physician survey is currently among the timeliest and most accurate sources of information available regarding physician retirement patterns and hours worked.

Calculated retirement rates from the Florida survey are generally consistent with estimates derived from analysis of the AAMC's 2006 Survey of Physicians over Age 50 (which collected information on age at retirement or age expecting to retire). The 2006 AAMC survey data were collected before the economic downturn (which occurred from approximately 2008 to 2010), while the Florida survey data were collected during a period of economic recovery. Mortality rates from the Centers for Disease Control and Prevention (CDC), which are specific to each age-gender combination, were combined with rates of intention to retire to calculate overall attrition rates.[27] Johnson et al. found that age-adjusted mortality rates for occupational and technical specialties are approximately 25% lower than national rates for men and 15% lower for women through age 65, so mortality rates for physicians under age 65 were adjusted downward accordingly.[28]

Attrition rates are similar for male and female physicians, but differ by specialty. For example, attrition patterns for male physicians suggest that by age 65, approximately 65% of allergists and immunologists are still active, while only 50% of emergency physicians are still active (Exhibit 19).

From these patterns we estimate the median age of retirement is approximately 67 years old (i.e., about half retire before that age, and half retire after). This estimate of median retirement age is similar to the estimates of the mean age of retiring physicians over age 50 calculated by the AAMC's Center for Workforce Studies using data from the American Community Survey (Exhibit 20). Due to uncertainty, for modeling purposes we simulate future physician supply under scenarios where physicians retire two years earlier or two years later, on average.

---

[27] Arias E.  United States Life Tables, 2008. *National Vital Statistics Reports*. 2012; 61(3).

[28] Johnson NJ, Sorlie PD, Backlund E. The Impact of Specific Occupation on Mortality in the US National Longitudinal Mortality Study. *Demography*. 1999; 36:355-367.

34

### Exhibit 19: Probability Male Physician is Still Active by Specialty and Age



### Exhibit 20: Mean Age of Retiring Physicians (age 50+)



*Source: AAMC analysis of the American Community Survey (2005-2014 data). Note: vertical bars reflect the standard errors for the estimated means.*

35

## Demand Model Overview and Updates

Demand for physicians is calculated based on demand for health care services and staffing patterns for care delivery. For modeling purposes, at the national level we quantify current demand for health care services (and physicians) as equivalent to the level of health care services actually utilized (and current physician supply). Demand projections are thus extrapolating a "2014 level of care," with any imbalances between supply and demand (whether shortfalls or excesses) extrapolated into the future. An exception pertains to federal government estimates that the nation requires approximately 8,200 additional primary care physicians and 2,800 psychiatrists to de-designate the federally designated primary care and mental health professional shortage areas (HPSAs), and for modeling purposes, we assume these 11,000 physicians reflect national shortfalls.[29] To the extent that other shortages already exist in specialties other than primary care and psychiatry, our starting point assumption may be a moderate one.

The demand model used a microsimulation approach that simulates the demand for health care services for a nationally representative sample of the current U.S. population projected to 2025. Then, demand for physicians, APRNs, and PAs are modeled to meet the projected demand for services. A more detailed description of demand modeling methods and data inputs is provided in the 2015 report. Exhibit 21 summarizes, by demand model component, the data sources incorporated in 2015 and this 2016 workforce projections update.

**Exhibit 21: Summary of 2015 and 2016 Demand Modeling Data Sources**

| Model Component | 2016 Projections | 2015 Projections |
|---|---|---|
| National/state population files | 2014 ACS<br>2013 & 2014 BRFSS<br>2004 NNHS | 2013 ACS<br>2011 & 2013 BRFSS<br>2004 NNHS |
| Weights for population projections | 2014 U.S. Census Bureau population projections | 2014 U.S. Census Bureau population projections |
| Health care use equations | 2009-2013 Pooled MEPS | 2008-2012 Pooled MEPS |
| Hospital inpatient day equations | 2013 NIS | 2012 NIS |
| Health care use calibration/validation | 2013 NIS<br>2012 NHAMCS<br>2011 NHAMCS | 2012 NIS<br>2010 NHAMCS<br>2010 NHAMCS |
| Physician staffing ratios | 2014 AMA Masterfile | 2013 AMA Masterfile |

Notes: ACS=American Community Survey; BRFSS=Behavioral Risk Factor Surveillance System; NNHS=National Nursing Home Survey; MEPS=Medical Expenditure Panel Survey; NIS=Nationwide Inpatient Sample; NHANCS=National Hospital Ambulatory Medical Care Survey; AMA=American Medical Association.

---

[29] For information on HPSA designation, see www.hrsa.gov/shortage.

## X.   DETAILED TABLES

The following tables provide more detailed projections of supply, demand, and imbalances between supply and demand across years, scenarios, and specialty categories.

**Exhibit 22: Summary of Projected Gap between Physician Supply and Demand**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Physicians** | | | | | | | | | | | | |
| 75th Percentile | 11,000 | 22,800 | 32,900 | 42,400 | 50,200 | 57,400 | 64,900 | 71,300 | 78,000 | 84,100 | 90,700 | 94,700 |
| 25th Percentile | 11,000 | 18,500 | 24,400 | 31,600 | 36,900 | 41,800 | 46,500 | 50,500 | 54,100 | 56,700 | 58,200 | 61,700 |
| **Primary Care** | | | | | | | | | | | | |
| 75th Percentile | 8,200 | 10,800 | 13,500 | 16,400 | 18,900 | 21,600 | 24,500 | 27,600 | 30,300 | 31,800 | 33,400 | 35,600 |
| 25th Percentile | 8,200 | 7,900 | 7,300 | 7,000 | 7,000 | 8,300 | 9,500 | 10,000 | 11,700 | 12,700 | 14,300 | 14,900 |
| **Non-Primary Care** | | | | | | | | | | | | |
| 75th Percentile | 2,800 | 11,200 | 18,700 | 26,700 | 32,800 | 38,000 | 42,900 | 47,100 | 51,200 | 54,500 | 57,300 | 60,300 |
| 25th Percentile | 2,800 | 9,800 | 15,700 | 21,600 | 25,800 | 29,600 | 32,500 | 33,800 | 35,100 | 35,600 | 35,400 | 37,400 |
| **Medical Specialties** | | | | | | | | | | | | |
| 75th Percentile | - | 1,400 | 2,600 | 4,000 | 5,000 | 5,900 | 6,700 | 7,400 | 8,300 | 8,900 | 9,600 | 10,300 |
| 25th Percentile | - | 800 | 1,200 | 1,800 | 1,800 | 2,700 | 2,800 | 2,700 | 2,700 | 3,000 | 3,300 | 3,700 |
| **Surgical Specialties** | | | | | | | | | | | | |
| 75th Percentile | - | 4,400 | 8,600 | 12,900 | 16,300 | 19,400 | 22,500 | 25,000 | 27,200 | 29,500 | 31,300 | 33,200 |
| 25th Percentile | - | 3,900 | 7,400 | 10,700 | 13,200 | 15,400 | 17,400 | 19,300 | 21,000 | 22,500 | 23,700 | 25,200 |
| **Other Specialties** | | | | | | | | | | | | |
| 75th Percentile | 2,800 | 6,900 | 10,600 | 14,500 | 17,500 | 20,300 | 23,200 | 25,700 | 27,800 | 29,600 | 31,100 | 32,600 |
| 25th Percentile | 2,800 | 5,800 | 8,400 | 10,800 | 12,500 | 14,700 | 16,800 | 18,600 | 20,200 | 20,900 | 21,100 | 22,200 |
| **Hospitalists (adult, primary care– trained)** | | | | | | | | | | | | |
| 75th Percentile | - | (1,200) | (2,500) | (3,600) | (4,800) | (6,000) | (7,000) | (8,200) | (9,100) | (10,200) | (11,100) | (12,000) |
| 25th Percentile | - | (1,300) | (2,700) | (3,800) | (5,000) | (6,300) | (7,500) | (8,800) | (9,800) | (11,000) | (12,100) | (13,200) |

Note: The shortage range for total physicians is smaller than the sum of the ranges for the specialty categories. The demand scenarios modeled project future demand for physician services, but scenarios can differ in terms of whether future demand will be provided by primary care or non-primary care physicians. Likewise, the range for total non-primary care is smaller than the sum of the ranges for the specialty categories. Numbers in parentheses reflect projected excess supply, with numbers not in parentheses reflecting projected shortfalls.

## Exhibit 23: Total Projected Physician Supply, 2014-2025

| Year | Workforce Participation Scenarios | | | | Policy Scenario |
|---|---|---|---|---|---|
| | Status Quo | Retire 2 Years Earlier | Retire 2 Years Later | Millennial Hours | GME Expansion |
| 2014 | 782,200 | 782,200 | 782,200 | 782,200 | 782,200 |
| 2015 | 784,600 | 783,200 | 785,000 | 784,200 | 784,600 |
| 2016 | 787,500 | 783,900 | 789,000 | 786,600 | 787,500 |
| 2017 | 790,000 | 783,900 | 793,400 | 788,600 | 790,000 |
| 2018 | 793,600 | 784,700 | 799,200 | 791,700 | 793,600 |
| 2019 | 797,500 | 785,200 | 805,900 | 795,100 | 797,500 |
| 2020 | 801,600 | 785,500 | 813,400 | 798,700 | 801,600 |
| 2021 | 805,700 | 785,900 | 821,000 | 802,300 | 808,700 |
| 2022 | 810,200 | 786,800 | 829,000 | 806,200 | 815,900 |
| 2023 | 815,000 | 787,300 | 837,500 | 810,700 | 823,900 |
| 2024 | 820,500 | 787,800 | 846,500 | 815,500 | 832,300 |
| 2025 | 825,200 | 791,900 | 852,700 | 820,300 | 840,200 |
| % growth 2014-2025 | 5% | 1% | 9% | 5% | 8% |

## Exhibit 24: Physician Supply Projection Summary by Specialty Category, 2014-2025

| Year | Workforce Participation Scenarios | | | | Policy Scenario |
|---|---|---|---|---|---|
| | Status Quo | Retire 2 Years Earlier | Retire 2 Years Later | Millennial Hours | GME Expansion |
| **2014** | | | | | |
| Total | 782,200 | | | | |
| Primary Care | 221,200 | | | | |
| Non-primary Care | 561,000 | | | | |
| Medical Specialties | 128,900 | | | | |
| Surgical Specialties | 156,300 | | | | |
| Other Specialties | 250,500 | | | | |
| Hospitalists * | 25,300 | | | | |
| **2025** | | | | | |
| Total | 825,200 | 791,900 | 852,700 | 820,300 | 840,200 |
| Primary Care | 231,900 | 222,400 | 239,800 | 230,300 | 235,700 |
| Non-primary Care | 593,300 | 569,500 | 612,900 | 590,000 | 604,500 |
| Medical Specialties | 145,300 | 139,800 | 149,400 | 144,700 | 148,100 |
| Surgical Specialties | 151,000 | 144,200 | 156,800 | 150,200 | 153,700 |
| Other Specialties | 253,900 | 243,000 | 262,900 | 252,500 | 258,500 |
| Hospitalists * | 43,100 | 42,500 | 43,800 | 42,600 | 44,200 |
| **Growth 2014 to 2025** | | | | | |
| Total | 43,000 | 9,700 | 70,500 | 38,100 | 58,000 |
| Primary Care | 10,700 | 1,200 | 18,600 | 9,100 | 14,500 |
| Non-primary Care | 32,300 | 8,500 | 51,900 | 29,000 | 43,500 |
| Medical Specialties | 16,400 | 10,900 | 20,500 | 15,800 | 19,200 |
| Surgical Specialties | -5,300 | -12,100 | 500 | -6,100 | -2,600 |
| Other Specialties | 3,400 | -7,500 | 12,400 | 2,000 | 8,000 |
| Hospitalists * | 17,800 | 17,200 | 18,500 | 17,300 | 18,900 |

* Adult primary care–trained hospitalists identified through analysis of Medicare billing records.

**Exhibit 25: Projected Physician Demand Summary by Scenarios Modeled, 2014-2025**

| | 2014 | 2025 | Growth 2014 to 2025 | % Growth 2014 to 2025 |
|---|---|---|---|---|
| *Scenario 1: Changing Demographics* | | | | |
| **Total** | **793,200** | **904,200** | **111,000** | **14%** |
| Primary Care | 229,400 | 261,500 | 32,100 | 14% |
| Non-primary Care | 563,800 | 642,700 | 78,900 | 14% |
| Medical Specialties | 128,900 | 153,400 | 24,500 | 19% |
| Surgery | 156,300 | 176,400 | 20,100 | 13% |
| Other Specialties | 253,300 | 282,600 | 29,300 | 12% |
| Hospitalists* | 25,300 | 30,300 | 5,000 | 20% |
| *Scenario 2: Changing Demographics + ACA Medical Insurance Expansion* | | | | |
| **Total** | **793,200** | **914,800** | **121,600** | **15%** |
| Primary Care | 229,400 | 264,500 | 35,100 | 15% |
| Non-primary Care | 563,800 | 650,300 | 86,500 | 15% |
| Medical Specialties | 128,900 | 155,000 | 26,100 | 20% |
| Surgery | 156,300 | 179,700 | 23,400 | 15% |
| Other Specialties | 253,300 | 285,100 | 31,800 | 13% |
| Hospitalists* | 25,300 | 30,500 | 5,200 | 21% |
| *Scenario 3: Changing Demographics + ACA + Managed Care* | | | | |
| **Total** | **793,200** | **917,100** | **123,900** | **16%** |
| Primary Care | 229,400 | 275,800 | 46,400 | 20% |
| Non-primary Care | 563,800 | 641,300 | 77,500 | 14% |
| Medical Specialties | 128,900 | 148,700 | 19,800 | 15% |
| Surgery | 156,300 | 183,600 | 27,300 | 17% |
| Other Specialties | 253,300 | 278,400 | 25,100 | 10% |
| Hospitalists* | 25,300 | 30,600 | 5,300 | 21% |
| *Scenario 4: Changing Demographics + ACA + Increased Use of Retail Clinics* | | | | |
| **Total** | **793,200** | **901,200** | **108,000** | **14%** |
| Primary Care | 229,400 | 250,900 | 21,500 | 9% |
| Non-primary Care | 563,800 | 650,300 | 86,500 | 15% |
| Medical Specialties | 128,900 | 155,000 | 26,100 | 20% |
| Surgery | 156,300 | 179,700 | 23,400 | 15% |
| Other Specialties | 253,300 | 285,100 | 31,800 | 13% |
| Hospitalists* | 25,300 | 30,500 | 5,200 | 21% |
| *Scenario 5: Changing Demographics + ACA + Increased Use of Advanced Practice Nurses and PAs ("moderate use" level)* | | | | |
| **Total** | **793,200** | **886,700** | **93,500** | **12%** |
| Primary Care | 229,400 | 250,300 | 20,900 | 9% |
| Non-primary Care | 563,800 | 636,400 | 72,600 | 13% |
| Medical Specialties | 128,900 | 151,800 | 22,900 | 18% |
| Surgery | 156,300 | 177,700 | 21,400 | 14% |
| Other Specialties | 253,300 | 276,900 | 23,600 | 9% |
| Hospitalists* | 25,300 | 30,000 | 4,700 | 19% |
| *Scenario 6: Changing Demographics + ACA + Increased Use of Advanced Practice Nurses and PAs ("high use" level)* | | | | |
| **Total** | **793,200** | **858,600** | **65,400** | **8%** |
| Primary Care | 229,400 | 236,100 | 6,700 | 3% |
| Non-primary Care | 563,800 | 622,500 | 58,700 | 10% |
| Medical Specialties | 128,900 | 148,600 | 19,700 | 15% |
| Surgery | 156,300 | 175,700 | 19,400 | 12% |
| Other Specialties | 253,300 | 268,600 | 15,300 | 6% |
| Hospitalists* | 25,300 | 29,600 | 4,300 | 17% |

Note: * Includes only hospitalists trained in adult primary care. Hospitalists in non-primary care specialties are included with their individual specialty. The use of Medicare payment data for identifying hospitalists precludes identifying pediatric hospitalists.

**Exhibit 26: PC-Trained Hospitalist Physician Supply and Demand Projections by Scenario, 2025**

| Scenario | 2025 | Growth (from 25,300 in 2014) | % Growth |
|---|---|---|---|
| **Supply** | | | |
| Status Quo | 43,100 | 17,800 | 70% |
| Retire 2 Years Earlier | 42,500 | 17,200 | 70% |
| Retire 2 Years Later | 43,800 | 18,500 | 73% |
| Millennial Hours | 42,600 | 17,300 | 68% |
| GME Expansion | 44,600 | 18,900 | 75% |
| **Demand** | | | |
| Changing Demographics | 30,300 | 5,000 | 20% |
| ACA Medical Insurance Expansion | 30,500 | 5,200 | 21% |
| ACA Insurance Expansion + Managed Care | 30,600 | 5,300 | 21% |
| ACA Insurance Expansion + Increased Use of Retail Clinics | 30,500 | 5,200 | 21% |
| ACA Insurance Expansion + Increased Use of Advanced Practice Nurses and PAs ("moderate use" practice level) | 30,000 | 4,700 | 19% |
| ACA Insurance Expansion + Increased Use of Advanced Practice Nurses and PAs ("high use" practice level) | 29,600 | 4,300 | 17% |

40

**Exhibit 27: Health Care Utilization Equity Scenario 1, 2014**

| | Physicians | | | | Additional Providers Required | |
|---|---|---|---|---|---|---|
| | Current Supply | Requirements under Equity Scenario | Current Gap | % Gap | Advanced Practice Nurses | Physician Assistants |
| Total | 785,000 | 825,000 | 40,100 | 5% | 10,300 | 5,100 |
| Primary Care | 221,200 | 233,300 | 12,200 | 5% | 3,200 | 1,900 |
| Non-primary Care | 563,800 | 591,700 | 27,900 | 5% | 7,100 | 3,200 |
|    Medical Specialties | 128,900 | 135,700 | 6,800 | 5% | 1,900 | 800 |
|    Surgery | 156,300 | 164,500 | 8,200 | 5% | 2,300 | 1,200 |
|    Other Specialties | 253,300 | 265,800 | 12,100 | 5% | 2,800 | 1,100 |
|    Hospitalists* | 25,300 | 26,100 | 800 | 3% | 100 | 100 |

Note: * Includes only hospitalists trained in adult primary care. Hospitalists in non-primary care specialties are included with their individual specialty. The use of Medicare payments to identify hospitalists precludes identifying pediatric hospitalists.

**Exhibit 28: Health Care Utilization Equity Scenario 2, 2014**

| | Physicians | | | | Additional Providers Required | |
|---|---|---|---|---|---|---|
| | Current Supply | Requirements under Equity Scenario | Current Gap | % Gap | Advanced Practice Nurses | Physician Assistants |
| Total | 785,000 | 881,200 | 96,200 | 12% | 25,800 | 12,200 |
| Primary Care | 221,200 | 245,700 | 24,500 | 11% | 6,600 | 3,800 |
| Non-primary Care | 563,800 | 635,500 | 71,700 | 13% | 19,200 | 8,400 |
|    Medical Specialties | 128,900 | 140,300 | 11,400 | 9% | 3,100 | 1,400 |
|    Surgery | 156,300 | 180,300 | 24,000 | 15% | 5,500 | 3,600 |
|    Other Specialties | 253,300 | 288,000 | 34,700 | 14% | 10,400 | 3,200 |
|    Hospitalists* | 25,300 | 26,900 | 1,600 | 6% | 200 | 200 |

Note: * Includes only hospitalists trained in adult primary care. Hospitalists in non-primary care specialties are included with their individual specialty. The use of Medicare payments to identify hospitalists precludes identifying pediatric hospitalists.