1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

   MICHAEL W. BIEN – 096891
   JEFFREY L. BORNSTEIN – 099358
   JANE E. KAHN – 112239
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LISA ELLS – 243657
   JENNIFER L. STARK – 267062
   KRISTA STONE-MANISTA – 269083
5  JESSICA WINTER – 294237
   ROSEN BIEN
6  GALVAN & GRUNFELD LLP
   50 Fremont Street, 19th Floor
7  San Francisco, California  94105-2235
   Telephone:   (415) 433-6830
8

9  RANJINI ACHARYA – 290877
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
   Telephone:   (415) 882-8200

   CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
   39 Drumm Street
11 San Francisco, California  94111-4805
   Telephone:   (415) 621-2493

12

13 Attorneys for Plaintiffs

14              UNITED STATES DISTRICT COURT

15              EASTERN DISTRICT OF CALIFORNIA

16

17 RALPH COLEMAN, et al.,

18          Plaintiffs,

19      v.

20 EDMUND G. BROWN, JR., et al.,

21          Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO
MARCH 24, 2017 ORDER RE:
ENFORCEMENT OF TIMELINES
FOR ACCESS TO INPATIENT CARE**

Judge:   Hon. Kimberly J. Mueller

22

23

24

25

26

27

28

[3118495-12]

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................................... 1

I.   PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS
     REGARDING DEFENDANTS' NON-COMPLIANCE WITH PROGRAM
     GUIDE TIMELINES FOR TRANSFERS TO ACUTE AND
     INTERMEDIATE CARE FACILITY HOSPITAL BEDS ........................................ 2

     A.   This Court Should Require Defendants to Come into Full and
          Permanent Compliance with Program Guide Timelines for Acute and
          ICF Transfers by May 15, 2017 ...................................................................... 2

     B.   The Court Should Not Permit A Blanket Exemption to Program Guide
          Compliance Where Class Members Have Co-Existing Urgent Medical
          Care Needs or Are on Out-To-Court Status ..................................................... 4

     C.   The Court Has the Power to Hold Defendants in Contempt and to
          Order Appropriate Relief, Including Monetary Sanctions ............................... 5

          (a)   Legal Requirements for Civil Contempt ................................... 5

          (b)   Remedies for Civil Contempt.................................................... 6

          (c)   Plaintiffs' Proposal For How A Court Order Requiring
                Compliance With Program Guide Timelines Should be
                Enforced, Should the Court Decide to Impose Monetary
                Sanctions ................................................................................... 8

     D.   The Existing Court-Ordered Monthly Data Templates Are Not
          Sufficient to Allow the Court to Enforce Compliance with the
          Program Guide Timelines .............................................................................. 11

II.  PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS
     REGARDING DEFENDANTS' NON-COMPLIANCE WITH PROGRAM
     GUIDE TIMELINES FOR TRANSFERS TO MENTAL HEALTH CRISIS
     BEDS .......................................................................................................................... 12

     A.   The Court Should Order Defendants to Comply with Program Guide
          Timelines for Mental Health Crisis Bed Transfers by May 15, 2017 .......... 12

     B.   The Court Should Require 100 Percent Compliance with the Program
          Guide's Twenty-Four-Hour Timeline For Mental Health Crisis Bed
          Transfers ........................................................................................................ 13

     C.   The Court Should Consider Further Orders on Compliance with
          Mental Health Crisis Bed Transfer Timelines After an Additional
          Status Conference .......................................................................................... 16

          1.   A Status Conference is Needed To Determine Why Female
               Patients Are Being Affected Disproportionately by Significant
               Delays in Accessing Crisis Care .............................................. 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        2.     A Status Conference is Needed Because the Record Indicates that Barriers to Compliance with Program Guide Timelines for Male Prisoners May Be Focused at Certain Troubled Institutions ........................................................................................... 18

        3.     A Status Conference is Needed to Determine Whether Defendants are Reporting Accurately on Compliance with the Program Guide ................................................................................... 18

    D.    The Monthly Data Templates Required By This Court Should Be Clarified or Revised to Permit the Court to Measure Compliance More Accurately ........................................................................................ 20

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Balla v. Idaho State Bd. of Corr.,*
    869 F.2d 461 (9th Cir. 1989) ................................................................... 5

*Bowring v. Godwin,*
    551 F.2d 44 (4th Cir. 1977) ..................................................................... 14

*Cabrales v. Cty. of Los Angeles,*
    864 F.2d 1454 (9th Cir. 1988), *vacated and remanded,* 490 U.S. 1087
    (1989), *reinstated,* 886 F.2d 235 (9th Cir. 1989) ................................... 14

*Carty v. Turnbull,*
    144 F. Supp. 2d 395 (D. V.I. 2001) ...................................................... 8, 10

*Cole v. U.S. Dist. Court For Dist. of Idaho,*
    366 F.3d 813 (9th Cir. 2004) ................................................................. 10

*Coleman v. Brown,*
    428 Fed. App'x. 743 (9th Cir. Apr. 22, 2011) ........................................ 14

*Coleman v. Brown,*
    938 F. Supp. 2d 955 (E.D. Cal. 2013) ...................................................... 1

*Coleman v. Wilson,*
    912 F. Supp. 1282 (E.D. Cal. 1995) ...................................................... 15

*F.T.C. v. Affordable Media,*
    179 F.3d 1228 (9th Cir. 1999) ................................................................. 6

*Gates v. Shinn,*
    98 F.3d 463 (9th Cir. 1996) ..................................................................... 5

*Gifford v. Heckler,*
    741 F.2d 263 (9th Cir. 1984) ................................................................... 6

*Hutto v. Finney,*
    437 U.S. 678 (1978) ............................................................................. 7, 9

*In re Arthur Treacher's Franchisee Litig.,*
    689 F.2d 1150 (3d Cir. 1982) ................................................................... 7

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.,*
    10 F.3d 693 (9th Cir. 1993) ..................................................................... 6

*Inmates of Allegheny Cty. Jail v. Pierce,*
    612 F.2d 754 (3d Cir. 1979) ................................................................... 14

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
    512 U.S. 821 (1994) ........................................................................ passim

1    *Kelly v. Wengler*,
2        822 F.3d 1085 (9th Cir. 2016) .......................................................................... passim

3    *Kelly v. Wengler*,
        979 F. Supp. 2d 1104 (D. Idaho 2013) .............................................................. 11

4    *Lasar v. Ford Motor Co.*,
5        399 F.3d 1101 (9th Cir. 2005) ...................................................................... 6, 9, 10

6    *Lewis v. Casey*,
        518 U.S. 343 (1996) .............................................................................................. 14

7    *Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*,
8        389 U.S. 64 (1967) ................................................................................................ 10

9    *N.L.R.B. v. Trans Ocean Export Packing, Inc.*,
        473 F.2d 612 (9th Cir. 1973) .................................................................................. 6

10   *Perry v. O'Donnell*,
        759 F.2d 702 (9th Cir. 1985) .................................................................................. 6
11

12   *SEC v. Hickey*,
        322 F.3d 1123 (9th Cir. 2003) ................................................................................ 6

13   *Spallone v. United States*,
        493 U.S. 265 (1990) ................................................................................................ 5
14

15   *Stone v. City & Cty. of San Francisco*,
        968 F.2d 850 (9th Cir. 1992) .................................................................................. 6

16   *United States v. Asay*,
        614 F.2d 655 (9th Cir. 1980) .................................................................................. 6
17

18   *United States v. United Mine Workers of Am.*,
        330 U.S. 258 (1947) ...................................................................................... passim

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Defendants' chronic non-compliance with the required timelines for transferring the most vulnerable and acutely ill members of the *Coleman* class to inpatient psychiatric hospitalization and crisis care must end. The Program Guide[1]—Defendants' own remedial plan—lays out clear timeframes for transfer to acute, intermediate care, and mental health crisis bed placements, and these time limits "represent defendants' considered assessment of what is sufficiently 'ready access' to each level of care" under the Constitution. *Coleman v. Brown*, 938 F. Supp. 2d 955, 981 (E.D. Cal. 2013). Given Defendants' persistent violations of these timelines, resulting in dangerous and harmful delays in access to critically needed mental health treatment, this Court can and should issue an order requiring Defendants to meet the Program Guide transfer timelines consistent with their constitutional obligations under the Eighth Amendment by May 15, 2017.

Should Defendants fail to comply with this enforcement order as to inpatient psychiatric hospitalization, the Court should initiate contempt proceedings. Any such proceedings must provide Defendants with clear notice of the potential sanctions, a fair opportunity to be heard, and an opportunity to cure the violations before monetary or other sanctions can ensue. Plaintiffs propose a procedure that both complies with the law and is mindful of the Court's desire to end the constitutional violations in this case while avoiding micromanagement of Defendants' affairs.

As for Defendants' non-compliance with Program Guide timelines for transfers to mental health crisis beds ("MHCBs"), the Court should not permit anything less than 100 percent compliance with the Program Guide's twenty-four-hour timeline. The Court should also set a further status conference to explore the nature and extent of ongoing violations of the MHCB transfer timelines before contemplating sanctions such as

---

[1] References to the Program Guide herein are to the 2009 Revision of the Program Guide, the operative remedial plan in this case. *See Coleman v. Brown*, 938 F. Supp. 2d 955, 961 (E.D. Cal. 2013).

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR ACCESS TO INPATIENT CARE

1  monetary fines.  Further targeted orders may be more appropriate in the first instance to

2  address this problem, and additional reporting is required to enable the Court to properly

3  evaluate the problem and Defendants' compliance.

4  **I.    PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS REGARDING**
   **DEFENDANTS' NON-COMPLIANCE WITH PROGRAM GUIDE**
5  **TIMELINES FOR TRANSFERS TO ACUTE AND INTERMEDIATE CARE**
   **FACILITY HOSPITAL BEDS**

6

7           With respect to acute and intermediate care facility ("ICF") psychiatric

8  hospitalization, the Court requested briefing on the following questions:  (1) whether

9  Defendants should be required to come into full and permanent compliance with Program

10 Guide timelines for acute and ICF transfers by May 15, 2017, *see* March 24, 2017 Order

11 (hereinafter "Order"), ECF No. 5583, at 25; (2) whether the Court should enforce

12 compliance with Program Guide timelines where class members referred for inpatient care

13 are being treated for urgent medical care needs or are on out-to-court status, *id*. at 25;

14 (3) what remedies are appropriate if Defendants violate any court order enforcing the

15 Program Guide timelines for inpatient care, including whether monetary sanctions are

16 appropriate, *id*. at 2, 25-26, and (4) whether monthly data templates required by this Court,

17 *see* ECF Nos. 5367, 5537, 5577, will provide sufficient information to allow the Court to

18 enforce any such order, Order at 2, 26.  Plaintiffs address each question in turn, below.

19         **A.    This Court Should Require Defendants to Come into Full and**
                **Permanent Compliance with Program Guide Timelines for Acute and**
20              **ICF Transfers by May 15, 2017**

21         Decades have passed since this Court first found Defendants' failure to provide the

22 Plaintiff class with timely access to inpatient hospitalization violated the Eighth

23 Amendment and provisionally approved their first remedial plans to cure those

24 constitutional violations.  *See* Order at 3-4.  The Court approved Defendants' proposed

25 timelines for transfer to inpatient psychiatric treatment over ten years ago and ordered

26 them "immediately implemented," but, as noted by the Court, in the ensuing years

27 Defendants regularly exceed the timelines "as class members wait to receive the highest

28 and most urgent levels of mental health care."  *Id*. at 4.

Defendants' intransigent refusal to ensure consistent access to timely inpatient psychiatric hospitalization for *Coleman* class members is well-established. *See id.* at 4-8; *see also* Special Master's Monitoring Report on the Mental Health Inpatient Care Programs, May 25, 2016, ECF No. 5448, at 22-39. Today's crisis is merely the most recent iteration of Defendants' chronic violations of class members' rights. Prior to, during, and since the January 23, 2017 evidentiary hearing, the Court has offered Defendants multiple opportunities to present evidence justifying their continued non-compliance with the Program Guide's requirements to transfer patients referred to acute inpatient psychiatric hospitalization within ten days, and patients referred to ICF inpatient psychiatric hospitalization within thirty days. *See, e.g.*, Oct. 6, 2016 Order, ECF No. 5498 (reviewing persistency of waitlists at that time and setting status conference for November 10, 2016); Defs.' Reply to Pls.' Response to Defs.' Update re Inpatient Census, Nov. 4, 2016, ECF No. 5509; Nov. 17, 2016 Order, ECF No. 5519 (directing Defendants to show cause why the waitlists could not be reduced to zero by November 23, 2016); Dec. 9, 2016 Order, ECF No. 5529 (requesting a response to eight questions regarding inpatient bed capacity and access to inpatient care); Defs.' Response to Questions Posed in the Dec. 9, 2016 Order, Jan. 13, 2017, ECF No. 5544; Defs.' Objections to Pls.' Requests for Further Relief on Inpatient Care, Jan. 13, 2017, ECF No. 5546; Jan. 19, 2017 Order, ECF No. 5551 (directing additional briefing prior to the January 23 hearing); Defs.' Additional Exs. and Info., Jan. 27, 2017, ECF Nos. 5558 & 5559.

Defendants still have not cured the constitutional deprivations of class members' rights, *see* Order at 4, despite the Court's well-founded conclusion that the record establishes that Defendants "have sufficient options available to allow them to comply now, fully and permanently, with the timeline requirements of the Program Guide for transfers to acute and ICF inpatient care." *Id.* at 8. Defendants have both the means and the capacity to resolve the waitlists by May 15, 2017, and a clear and specific order from the Court directing them to do so is both warranted and necessary to prevent continuing harms to the Plaintiff class.

**B.    The Court Should Not Permit A Blanket Exemption to Program Guide Compliance Where Class Members Have Co-Existing Urgent Medical Care Needs or Are on Out-To-Court Status**

In years of Court oversight of inpatient waitlists, Defendants have neither proved, nor sought to prove, that it is impossible to comply with the timeframes set forth in their own Program Guide in any particular case or on a systemic basis.  Nor have Defendants sought to modify the timeframes.  Nevertheless, the Court's March 24 Order proposes to exclude from the Program Guide's ten and thirty-day transfer timelines any time in which a referred class member (1) is on a medical hold, and (2) is on out-to-court status pursuant to a court order or subpoena.  Order at 25.  Plaintiffs object to such a blanket exclusion, and instead recommend that such exemptions from Program Guide compliance be made on an individualized basis.  The testimony of Pam Ahlin upon which the Court relies is a cursory assertion, without explanation or citation to governing policies, that does not warrant a permanent exception to compliance.  *See* ECF No. 5522-1, ¶ 7.  Instead, the Court should, pursuant to Plaintiffs' proposed enforcement scheme outlined in Part I.C. below, permit Defendants to make an individualized showing as to each class member whose transfer to crucially necessary inpatient care is delayed for the aforementioned reasons to ensure such delay is actually warranted.

In particular, Defendants' process for referral, acceptance, and transfer of class members in need of inpatient care involves multiple steps, paperwork, and various inter- and intra-departmental handoffs.  *See* Order at 3 n.4 (referring to the document outlining the inpatient referral and acceptance process).  Defendants should be required to proceed with these steps to ensure a patient with a medical hold or on out-to-court status can transfer on time if his or her medical or legal status changes.  In other words, if a patient referred for clinically necessary ICF care has a temporary medical hold placed by CDCR two days after she or he is referred, but the hold is then released on the tenth day after the referral for ICF care, Defendants should not be permitted to cease processing the referral and preparing to transfer this seriously ill class member within Program Guide timelines for the eight days of the medical hold.  An eight-day delay beyond Program Guide

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR ACCESS TO INPATIENT CARE

[3118495-12]

1  timelines in this case would be inexcusable and unnecessary, and would cause

2  unconstitutional harm to the patient.

3       Finally, the sealed Bed Utilization Report ("BUR") that Defendants file with the

4  Court monthly does not provide sufficient information for the Court or Special Master to

5  identify which, if any, patients have medical or legal statuses that truly make timely

6  transfer to critically needed inpatient care impossible.  *See* Decl. of Krista Stone-Manista

7  Supp. Pls.' Response to March 24, 2017 Order (hereinafter "Stone-Manista Decl."), filed

8  herewith, ¶ 2.  Individualized determinations of the appropriateness of delay past Program

9  Guide requirements for the hypothetical patients Ms. Ahlin describes is necessary and

10  appropriate, given the acutely ill and vulnerable nature of the class members in question.

11  **C.**    **The Court Has the Power to Hold Defendants in Contempt and to Order**
        **Appropriate Relief, Including Monetary Sanctions**

12

13       The Court has the inherent power to enforce compliance with the Constitution and

14  its previous court orders, including the Program Guide's timelines for transfer to ICF or

15  acute inpatient care, through civil contempt proceedings.  Order at 26; *see Spallone v.*

16  *United States*, 493 U.S. 265, 276 (1990) ("courts have inherent power to enforce

17  compliance with their lawful orders through civil contempt." (citation omitted)); *United*

18  *States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947) (holding that a court

19  may impose judicial sanctions in civil contempt proceedings "to coerce the defendant into

20  compliance with the court's order[]" or "to compensate the complainant for losses

21  sustained").

22          **(a)**    **Legal Requirements for Civil Contempt**

23       Prior to holding a defendant in civil contempt, a court must find by clear and

24  convincing evidence that:  (1) a valid court order exists that is sufficiently "specific and

25  definite," *see Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989); *see also*

26  *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996); (2) the defendant had knowledge of the

27  order, the potential penalties for failing to comply with said order, and an opportunity to be

28  heard about the alleged non-compliance, *Int'l Union, United Mine Workers of Am. v.*

5

1  *Bagwell*, 512 U.S. 821, 827 (1994); *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109-10 (9th

2  Cir. 2005); and (3) the defendant failed to take "*all* reasonable steps" to comply with the

3  order, *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original).

4        To be found in civil contempt, Defendants' non-compliance "need not be willful,

5  and there is no good faith exception to the requirement of obedience to a court order."  *In*

6  *re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)

7  (citations omitted); *see also Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985); *Stone*

8  *v. City & Cty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (amended).  Should

9  Defendants seek to defend against a contempt finding by arguing inability to comply,

10  Defendants will be required to show "categorically and in detail" why they are unable to

11  comply.  *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

12  Moreover, impossibility cannot be a valid defense if Defendants are "responsible for the

13  inability to comply."  *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980); *see also*

14  *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (suggesting that

15  impossibility may not be a defense if the inability to comply is self-induced).  "A court has

16  wide latitude in determining whether there has been contemptuous defiance of its order."

17  *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984).

18                    **(b)    Remedies for Civil Contempt**

19        Once a defendant has been found in civil contempt, a court has "broad equitable

20  power to order appropriate relief in civil contempt proceedings."  *SEC v. Hickey*, 322 F.3d

21  1123, 1128 (9th Cir. 2003).  When considering a sanction to make a defendant comply

22  with a court order, a court should consider "the character and magnitude of the harm

23  threatened by continued contumacy, and the probable effectiveness of any suggested

24  sanction in bringing about the result desired."  *United Mine Workers*, 330 U.S. at 304.

25        The Court has the authority to issue monetary sanctions if it determines that such

26  sanctions are necessary to coerce compliance by Defendants.  *Id.* at 303–04 (a contempt

27  fine is considered civil and remedial if it either "coerce[s] the defendant into compliance

28  with the court's order, [or] … compensate[s] the complainant for losses sustained"); *see*

1   *also Bagwell*, 512 U.S. at 829 (explaining that one of the paradigmatic civil contempt

2   sanctions "is a per diem fine imposed for each day a contemnor fails to comply with an

3   affirmative court order").  Should the Court decide to impose non-compensatory civil

4   contempt fines, however, it must afford Defendants an opportunity to reduce or avoid any

5   proposed fine through compliance.  *See id.* ("[A] flat, unconditional fine totaling even as

6   little as $50 announced after a finding of contempt is criminal if the contemnor has no

7   subsequent opportunity to reduce or avoid the fine through compliance." (citation

8   omitted)).

9          There is a risk that imposing fines will discourage Defendants and their clinicians

10  from referring class members to ICF or acute inpatient care, or encourage clinicians to

11  rescind such referrals prior to transfer, in order to avoid sanctions.  *See United Mine*

12  *Workers*, 330 U.S. at 304 (requiring sanctioning court to consider the "probable

13  effectiveness of any suggested sanction in bringing about the result desired"); *cf.* Order,

14  ECF No. 5593, at 4 (citing prior findings that "unconscionable delays in access to inpatient

15  care" cause, *inter alia*, "periodic substantial decline in clinical referrals to necessary

16  care").[2]  As discussed below, careful reporting and monitoring will be required to assure

17  that this unintended and dangerous outcome is avoided.

18

19

20

21  _____

22  [2]  The Court also has the power pursuant to civil contempt proceedings to issue non-
    monetary sanctions to address Defendants' non-compliance with the Program Guide

23  timelines as to ICF and acute inpatient care.  *See Hutto*, 437 U.S. at 690 ("[F]ederal courts
    are not reduced to issuing injunctions against state officers and hoping for compliance.

24  Once issued, an injunction may be enforced."); *see In re Arthur Treacher's Franchisee*
    *Litig.*, 689 F.2d 1150, 1159 (3d Cir. 1982) ("In exercising remedial powers in civil

25  contempt proceedings, courts may require the contemnor to perform various affirmative
    acts, even though these actions were not mandated by the underlying decree."); *cf. Kelly*,

26  822 F.3d at 1097 (affirming a district court's decision to extend by two years a settlement
    agreement involving Idaho state prisoners as a compensatory civil sanction).  Plaintiffs

27  have suggested targeted orders to address the chronic inpatient waitlists for this Court's
    consideration previously.  *See* ECF No. 5503 at 11-16; *see also* ECF No. 5543.

28

1

2

3

        **(c)**      **Plaintiffs' Proposal For How A Court Order Requiring Compliance With Program Guide Timelines Should be Enforced, Should the Court Decide to Impose Monetary Sanctions**

4        Assuming the Court concludes that, after years of protracted remedial proceedings,

5 the most effective remedy for noncompliance with the Program Guide timelines is

6 monetary sanctions, Plaintiffs recommend that the Court issue an order setting forth a

7 framework involving monthly reporting and prospective, presumptive fines that may

8 ultimately be avoided through compliance.  Plaintiffs' proposal is mindful of both the law

9 governing civil contempt sanctions and this Court's desire for a durable remedy that avoids

10 micromanagement of Defendants' affairs.

11        Under Plaintiffs' recommended proposal, the Court's enforcement order should

12 require Defendants, beginning May 15, 2017, to track on a day-by-day basis each person

13 who is forced to wait past a Program Guide deadline for transfer to ICF or acute inpatient

14 care.  For each day in each month, Defendants should be required to report the number of

15 patients waiting beyond ten days for transfer to an acute inpatient psychiatric program and

16 beyond thirty days for transfer to an ICF program, as described in Part I.D below.

17 Defendants should then be required to submit reports to the Court on the fifteenth day of

18 each month, documenting the compliance information from the prior month.

19        This reporting mechanism will allow the Court to determine whether Defendants

20 are in compliance with the Program Guide timelines.  *See, e.g.*, *Carty v. Turnbull*, 144 F.

21 Supp. 2d 395, 398 (D. V.I. 2001) (requiring, as part of ongoing contempt proceedings, that

22 defendants provide plaintiffs with monthly documentation related to their compliance with

23 a consent decree).  At the time of this submission, or on a date certain shortly thereafter,

24 Defendants may also file sworn declarations setting forth all steps taken to comply with the

25 Court's order enforcing the Program Guide timelines, including, for instance, whether a

26 patient's transfer was unavoidably delayed by an urgent medical hold or legal proceeding

27 pursuant to a court order or subpoena.  *See Kelly*, 822 F.3d at 1096; *see also* Part I.B.

28        The Court's enforcement order should also make clear that, for each day that a class

[3118495-12]

1  member is forced to wait past a Program Guide deadline for transfer to ICF or acute

2  inpatient care after May 15, 2017, Defendants may be fined up to $1,000 per day, per

3  person, for each violation. *See Order* at 25. Any such fine should then be held in

4  abeyance for six months, pending future compliance and further proceedings on the

5  appropriateness of such a sanction, in accordance with the Supreme Court's warning that

6  Defendants must be given an opportunity to cure, or purge, their non-compliance before

7  the issuance of monetary sanctions. *See Bagwell*, 512 U.S. at 829.[3]

8       Assuming Defendants are not fully compliant with the Program Guide timelines in

9  the ensuing six months, the Court should then hold a hearing on or around November 15,

10  2017. *See Lasar*, 399 F.3d at 1109-10 (explaining that due process protections of notice

11  and opportunity to be heard are indispensable prerequisites for monetary sanctions or a

12  contempt citation imposed under a federal district court's inherent powers). At this

13  hearing, Defendants should be required to show that they have taken "all reasonable steps"

14  to comply with the Program Guide, subject to the Court's authority to issue monetary

15  sanctions or, if appropriate, additional court orders in lieu of sanctions, should it find that

16  Defendants remain in contempt. *See Kelly*, 822 F.3d at 1096 (emphasis omitted); *see also*

17  *Hutto v. Finney*, 437 U.S. 678, 690 (1978) If the Court deems it necessary or appropriate,

18  this hearing may involve live testimony. In advance of the hearing, the parties should be

19  ordered to submit status conference statements and any further declarations addressing

20  whether Defendants are in contempt, including any explanations or excuses for non-

21  compliance within the period, and the appropriateness of any monetary sanctions or

22  alternate sanctions in light of the record. *Id.*

23  _____

24  [3] One way that Defendants may be able to cure their noncompliance is by preparing
   vacant space at Atascadero State Hospital ("ASH") or Coalinga State Hospital

25  ("Coalinga") as a "swing" unit ahead of future "[u]nexpected spikes" in the waitlist, such
   as those caused by the recent flooding at Salinas Valley Psychiatric Program ("SVPP"), as

26  well as in anticipation of the regular demand cycles that "should be obvious after more
   than a decade of focused remedial work in this area." *See* Order, Dec. 9, 2016, ECF No.

27  5529, at 4; Order at 14. As this Court has found, Coalinga has empty units that it appears
   could be prepared for patient use, *see* Order at 19, and ASH may as well, *see id.* at 18.

28

1    In addition, in order to ensure that the proposed framework outlined above

2 maximizes the "probable effectiveness of [the] suggested sanction in bringing about the

3 result desired," *United Mine Workers of Am.*, 330 U.S. at 304, and does not instead create a

4 perverse incentive for Defendants to refrain from referring patients in need of inpatient

5 psychiatric hospitalization (or to rescind referrals inappropriately), this Court should

6 require Defendants to file detailed reports on the number of referrals and rescissions per

7 month, identifying patients by name, and to order the Special Master to monitor and report

8 on this process.

9    This procedure protects Defendants' due process rights while serving the Court's

10 purpose of taking prompt action to ensure that Defendants come into "full and permanent

11 compliance with Program Guide timelines for transfer to inpatient care." *See* Order at 14.

12 First, the requirements to be laid out in the Court's enforcement order, and the Program

13 Guide timelines to which Defendants will be held accountable, are sufficiently "specific

14 and definite." *Balla*, 869 F.2d at 465. Defendants will therefore "know what the court

15 intends to require and what it means to forbid." *Longshoremen's Ass'n, Local 1291 v.*

16 *Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). Second, this framework puts

17 Defendants on clear notice of what sanctions may issue from failure to comply with the

18 Court's forthcoming enforcement order. *See Cole v. U.S. Dist. Court For Dist. of Idaho*,

19 366 F.3d 813, 821 (9th Cir. 2004) ("It is axiomatic that procedural due process requires

20 notice of the grounds for, and possible types of, sanctions."). Third, by affording

21 Defendants the opportunity to file sworn declarations, submit status conference statements,

22 and appear for an in-person hearing, this framework provides Defendants with an

23 opportunity to be heard. *Bagwell*, 512 U.S. at 827; *Lasar*, 399 F.3d at 1109-1110.

24 Defendants will therefore have several opportunities to demonstrate whether they have

25 taken "all reasonable steps" to comply with the Court' enforcement order. *Kelly*, 822 F.3d

26 at 1096.

27    Further, by providing Defendants with six months before any penalties are issued,

28 this framework provides Defendants with ample opportunity to "purge," *Bagwell*, 512 U.S.

[3118495-12]

1   at 829, and maximizes the "probable effectiveness" of monetary sanctions while

2   minimizing the harm "threatened by continued contumacy."  *United Mine Workers*, 330

3   U.S. at 304; *see Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1117 n.27 (D. Idaho 2013)

4   (noting that a prospective fine schedule is not necessarily punitive because the point is to

5   "*prevent* the fine from reaching millions because Defendants will fix their behavior and

6   begin living up to their promise in the Settlement Agreement.  If a *prospective* fine leads to

7   $2.4 million in penalties, [Defendant Corrections Corporation of America] has no one to

8   blame but itself").  This proposed remedy also serves to compel Defendants to "achieve a

9   durable remedy" without requiring that the Court "micromanage defendants in this

10  process" or "convert[] the Special Master into a Receiver."  Order at 25.

> ### D.    The Existing Court-Ordered Monthly Data Templates Are Not Sufficient to Allow the Court to Enforce Compliance with the Program Guide Timelines

13      Defendants filed their proposed revised monthly reporting on access to inpatient

14  psychiatric hospitalization and mental health crisis beds on March 15, 2017.  ECF No.

15  5577.  Plaintiffs filed objections to the proposed revised reports on March 23, 2017,

16  describing the ways in which the proposed reports fail to provide a complete picture of

17  Defendants' attempts to provide timely access to inpatient care.  ECF No. 5582.  The Court

18  has now indicated that it "accepts the most recent monthly report in the form filed" on

19  March 15, "subject to hearing from the parties in response to this order regarding whether

20  that form will achieve the goals the court now contemplates."  Order at 2 n.2.  Neither the

21  proposed revised reports as filed by Defendants nor the reports requested by Plaintiffs

22  prior to entry of the Court's present Order will provide the Court with the information

23  necessary to enforce compliance with the framework for civil contempt proceedings set

24  forth above.

25      As discussed in further detail in Plaintiffs' March 23 filing, the information

26  contained in previous Exhibits B (capturing day-by-day accounting of patient movement

27  through the system) and C (providing information about trends over time and compliance

28  with the requirement that patients be transferred to inpatient care within 72 hours of

acceptance) remains critical to the Court's understanding of whether and how Defendants' system is working as a durable remedy for Defendants' constitutional violations related to delayed access to inpatient care. *See* ECF No. 5582, at 3-8. Monitoring compliance with the proposed structure for further targeted orders or civil contempt sanctions set forth above will also require the restoration of the now-omitted day-by-day reporting, although in a slightly different format. Therefore, for each day in each month, Defendants will need to report: (1) the number of patients waiting beyond ten days for transfer to an acute inpatient psychiatric program, and (2) the number of patients waiting beyond thirty days for transfer to an ICF program. Plaintiffs envision that such reporting will be most efficiently handled by submission of a chart in calendar format, broken out by acute and ICF, with a total for the month at the end.

## II.  PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS REGARDING DEFENDANTS' NON-COMPLIANCE WITH PROGRAM GUIDE TIMELINES FOR TRANSFERS TO MENTAL HEALTH CRISIS BEDS

With respect to mental health crisis beds, the Court directed briefing on the following questions: (1) whether the Court should issue an order requiring Defendants to comply with the Program Guide timeline of twenty-four hours for transfers to mental health crisis beds by May 15, 2017, Order at 2, 25; (2) whether such compliance should be measured at 90 percent or 100 percent, *id.*; (3) what remedies are appropriate if Defendants violate any court order enforcing the Program Guide timeline for crisis bed care, including whether monetary sanctions are appropriate, *id.* at 2, 25-26; and (4) whether monthly data templates required by this Court, *see* ECF No. 5367, will provide sufficient data to allow the court to enforce any such order, Order at 2 n.2 & 26.

### A.  The Court Should Order Defendants to Comply with Program Guide Timelines for Mental Health Crisis Bed Transfers by May 15, 2017

There is no question that this Court should find that Defendants have failed, and are continuing to fail, to meet their constitutional obligation to timely transfer critically ill class members in urgent need of crisis treatment to an MHCB, and that the Court should consequently order Defendants to comply with the Program Guide's twenty-four-hour

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR ACCESS TO INPATIENT CARE

1    transfer timeline by May 15, 2017.  This Court's findings demonstrating Defendants' non-
2    compliance are sound and not in dispute.  *See* Order at 22.

3    Furthermore, while it is possible that Defendants' non-compliance is actually even
4    worse than currently understood, as discussed in Part II.C. below, Defendants' most recent
5    reported data shows that they continue to violate class members' rights to timely access to
6    crisis care routinely.  According to Defendants' January 2017 Report on MHCB
7    Placements by Institution and Prior Level of Care ("MHCB Transfers Report"), Enclosure
8    7c to Defendant's monthly document production, approximately 172 (or approximately
9    24%) of the 724 patients admitted either internally or to an MHCB at another institution
10   were not transferred within the Program Guide's timelines.  Stone Manista Decl. ¶¶ 3-6 &
11   Ex. A.  Of the 370 patients whose MHCB referrals were ultimately rescinded that month,
12   sixty-four had already waited beyond twenty-four hours before the referral was ultimately
13   rescinded, without ever receiving crisis care.  *Id.*  And Defendants' snapshot census data
14   for February 21 and February 27, 2017 both show a dozen class members waiting past
15   Program Guide timelines on each date.  *See* Stone-Manista Decl. ¶ 7 & Ex. B (MIS Report
16   dated February 21, 2017, provided to Plaintiffs on March 8, 2017); ECF No. 5577 at 11
17   (CDCR MHCB Crisis Bed Census and Waitlist Report as of February 27, 2017).
18   Defendants can and should be ordered to comply with their constitutional obligations to
19   transfer critically ill class members to MHCBs in conformity with the Program Guide's
20   twenty-four-hour transfer timeline by May 15, 2017.

21       **B.    The Court Should Require 100 Percent Compliance with the Program
22                Guide's Twenty-Four-Hour Timeline For Mental Health Crisis Bed
                 Transfers**

23   The Court's Order asks the parties to address whether "90 percent compliance with
24   the 24 hour transfer requirement is sufficient to achieve constitutional compliance or,
25   instead, whether 100 percent compliance with the requirement, with specific exceptions, is
26   required."  Order at 23.  Full compliance, measured at 100 percent, is required for two
27   reasons.  First, delayed transfer to crisis bed care represents a constitutional harm for each

28

1  and every class member held in clinically inappropriate "settings that cannot provide them

2  with the emergency care they require to stabilize their mental health crisis."  Order at 22.

3  Second, the Program Guide represents Defendants' assessment of what is required to

4  provide constitutionally adequate mental health care, and they must be held to their own

5  standards, as this Court has previously held.

6       Under the Eighth Amendment, there is "no underlying distinction between the right

7  to medical care for physical ills and its psychological or psychiatric counterpart."  *Bowring

8  v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *accord Inmates of Allegheny Cty. Jail v.

9  Pierce*, 612 F.2d 754, 763 (3d Cir. 1979); *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454,

10  1461 (9th Cir. 1988), *vacated and remanded*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d

11  235 (9th Cir. 1989).  As would be true for denial of access to emergency room care for

12  medical needs, denial of timely access to crisis and inpatient psychiatric care is a serious

13  and irreparable constitutional violation in each case.  *See Coleman v. Brown*, 428 Fed.

14  App'x. 743, 744-45 (9th Cir. Apr. 22, 2011) (unpublished) (finding that the record of

15  denial of timely access to inpatient psychiatric hospitalization is "more than sufficient to

16  demonstrate that plaintiffs 'have suffered, or will imminently suffer, actual harm'" to

17  warrant emergency injunctive relief under the PLRA (quoting *Lewis v. Casey*, 518 U.S.

18  343, 349 (1996)).  The Court would not countenance Defendants' failure to timely transfer

19  one out of every ten prisoners suffering a medical crisis to an emergency room; neither

20  should it permit Defendants to fail to timely transfer one out of every ten prisoners

21  undergoing life-threatening mental health crises who urgently need treatment in an MHCB.

22       Not only are prisoners in crisis denied their constitutional right to timely access to

23  crisis care when Defendants do not comply with the twenty-four-hour transfer requirement,

24  but this Court found four years ago that many of the places where prisoners await MHCB

25  placement, often for days, are "totally inappropriate."  *See* Apr. 5, 2013 Order, ECF No.

26  4539, at 51-52.  Protracted housing in such conditions worsens patients' state of crisis and

27  makes it impossible to assess continuing suicidality accurately, thus placing them at a

28  significant risk of serious harm.  *See* ECF No. 5259, at 28 (Hayes Audit of Suicide

[3118495-12]

1   Prevention Practices, Jan. 14, 2015).  This is a separate, and additional, constitutional

2   violation.  Four years after the Court's finding about the pervasive use of inappropriate and

3   dangerous alternative housing placements, patients in crisis continue to languish in such

4   cells across the system as CDCR fails to timely transfer them to mental health crisis beds.

5   *See* Dec. 9, 2016 Order, ECF No. 5529, at 3 n.1 (noting Defendants' concession that

6   "alternative housing is not a clinically appropriate location for inmates requiring MHCB

7   level of care" (citation omitted)); Order at 22 (discussing data regarding delayed MHCB

8   access in September and November 2016 and January 2017).

9         Even if a patient awaiting MHCB transfer is not housed in one of the various

10   unacceptable alternative housing options, but is instead left in his or her regular housing

11   unit, he or she is not receiving the mental health care and monitoring deemed necessary by

12   clinicians.  Each and every instance where Defendants fail to provide necessary treatment,

13   including by imposing an alternative housing or in-housing suicide watch program for

14   patients awaiting MHCB placement, represents a constitutional violation.  *See Coleman v.*

15   *Wilson*, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995) (holding that among the minimum

16   elements of a constitutional prison mental health system is "a treatment program that

17   involves more than segregation and close supervision of mentally ill inmates").  As this

18   Court has noted in the context of inpatient referrals, each level of care in Defendants'

19   mental health delivery system has specific admission criteria, and holding patients

20   clinically determined to need a particular level of care—especially inpatient treatment like

21   crisis care—in a setting where lesser care is provided simply "maintain[s] an unacceptable

22   status quo for these inmates while access to essential [MHCB] care is delayed."  Dec. 9,

23   2016 Order, ECF No. 5529, at 3.

24         Even without this clear and recent evidence of ongoing harms and constitutional

25   violations due to delayed MHCB transfers, the Program Guide itself is a measure of what

26   is necessary to avoid constitutional violations.  Defendants previously have objected to the

27   Special Master's reporting on "compliance" with Program Guide requirements as

28   measured by whether Defendants are meeting Program Guide standards in 90% of relevant

[3118495-12]

1    cases on the grounds that his use of the term "compliance" (with the Program Guide) has

2    "nothing to do with constitutional compliance."  ECF No. 4347, at 18 (Defs.' Amended

3    Objections and Mot. to Strike and Modify 25th Round Monitoring Report, Feb. 19, 2013).

4    But as this Court found in rejecting those objections, "the Revised Program Guide

5    represents defendants' considered assessment … of what is required to remedy the Eighth

6    Amendment violations identified in this action and meet their constitutional obligation to

7    deliver adequate mental health care to seriously mentally ill inmates."  Feb. 28, 2013

8    Order, ECF No. 4361, at 3.  Defendants have determined that providing constitutionally

9    adequate mental health care requires that patients in need of mental health crisis bed care

10    be transferred to such care within twenty-four hours of referral.  Program Guide at 12-5-6.

11    Imposing a requirement of less than 100 percent compliance would demean that

12    assessment, diminish the life-preserving importance of timely access to crisis care, and

13    permit Defendants to continue routinely violating class members' constitutional rights to

14    timely access to adequate mental health care.

15    **C.    The Court Should Consider Further Orders on Compliance with Mental Health Crisis Bed Transfer Timelines After an Additional Status Conference**

17    Assuming the Court issues an order fully enforcing the twenty-four hour timelines

18    required by the Program Guide for transfer to mental health crisis beds, additional

19    evidence should be taken about the nature of the problem.  Plaintiffs urge the Court to set a

20    status conference in order to better ascertain the extent and root causes of delayed transfers

21    to MHCBs, to ensure that Defendants' system is currently capable of full compliance with

22    the Program Guide's literal transfer timeline requirements, and, if appropriate, to issue

23    further targeted remedial orders subsequent to that hearing and prior to considering

24    monetary sanctions.

25    The most recent MHCB referral data available to Plaintiffs reveals several clear

26    problems that are contributing disproportionately to the MHCB waitlist, and that may be

27    better served through further targeted remedial orders (rather than broad monetary

28    sanctions) after full development of the record, including a status conference and live

1    testimony, if appropriate.

2    **1.    A Status Conference is Needed To Determine Why Female**
     **Patients Are Being Affected Disproportionately by Significant**
3    **Delays in Accessing Crisis Care**

4          Female class members are being affected disproportionately by long delays in

5    accessing MHCB crisis beds.  *See* Stone-Manista Decl. ¶¶ 3-6 & Ex. A (showing that, for

6    example, sixteen of nineteen patients transferred to MHCBs more than 72 hours after

7    referral were women).  The precise cause of this problem, however, is unclear.  Based on

8    Defendants' new proposed MHCB census and waitlist report, one cause may be that there

9    are far fewer crisis beds available for women than there are for men.  *See* ECF No. 5577, at

10   11 (CDCR Mental Health Crisis Bed Census and Waitlist Report, filed March 15, 2017);

11   *see also* Stone-Manista Decl. ¶ 7 & Ex. B (MIS Report showing 427 male and 22 female

12   MHCBs).  Additionally, as the Court is well aware, Defendants have ceased referring

13   female class members to Patton State Hospital, even when the psychiatric inpatient

14   program at the California Institution for Women ("CIW") is at or near capacity.  *See* ECF

15   No. 5543, at 6 (Pls.' Br. re Requested Remedies, Jan. 13, 2017).  Delays in access to

16   inpatient care appear to be causing exactly the snowballing effect of delayed access to

17   inpatient care at all levels described in the Court's Order.  *See* Order at 22.

18         A status conference is therefore needed to determine why female patients are being

19   affected disproportionately by significant delays in accessing crisis care.  If Defendants'

20   delays in timely transfers of female patients are due to a bed shortage, they should be

21   required to develop a plan to address that issue before any monetary sanctions are

22   appropriate.  If, as the January 2017 data strongly suggests, Defendants can eliminate a

23   substantial percentage of the number of patients waiting for MHCB placement beyond

24   Program Guide timeframes by simply managing the inpatient beds available to women

25   more efficiently, *see* Stone-Manista Decl. ¶¶ 4-6 (showing disproportionately long waits

26   for MHCB placement, and a disproportionately rate of MHCB rescissions after twenty-

27   four hours, for women), Defendants should be ordered to do so immediately.

28

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE

1

2. **A Status Conference is Needed Because the Record Indicates that Barriers to Compliance with Program Guide Timelines for Male Prisoners May Be Focused at Certain Troubled Institutions**

2

3   The barriers to compliance with Program Guide timelines for male prisoners appear

4   to be focused largely at certain troubled institutions rather than a systemic problem.  Based

5   on an analysis of the 236 patients either admitted to an MHCB after twenty-four hours or

6   with referrals rescinded after twenty-four hours in January, it appears that the vast majority

7   of the male patients being forced to wait beyond the Program Guide timelines are coming

8   from Salinas Valley State Prison ("SVSP"), Richard J. Donovan State Prison ("RJD"), and

9   CSP-Corcoran ("COR").  *See* Stone-Manista Decl. ¶¶ 4-5 & Exs. A & B (showing that

10  43.9% of all patients admitted to MHCBs in January 2017 beyond twenty-four hours

11  originated at SVSP, RJD, or COR).  In contrast, even though Mule Creek State Prison

12  ("MCSP") has the largest EOP program in the state, it accounted for only 4.6% of such

13  delayed admissions.  *See id.* ¶¶ 5, 8 & Exs. A & C.  Similarly, the Substance Abuse

14  Treatment Facility and State Prison ("SATF"), which has the largest class member

15  population in the state, accounted for only 2.3% of all MHCB admissions over twenty-four

16  hours.  *Id.*  These statistics strongly suggest a need for targeted interventions focusing on

17  the outlier institutions, such as SVSP, RJD, and COR, in order to effectuate the Program

18  Guide requirement of transfer within twenty-four hours.  A status conference is needed to

19  better assess this problem.

20

3. **A Status Conference is Needed to Determine Whether Defendants are Reporting Accurately on Compliance with the Program Guide**

21

22  Furthermore, a status conference devoted to delays in mental health crisis bed

23  transfers is necessary to ensure that Defendants are reporting accurately on compliance

24  with the literal Program Guide requirements.  The Program Guide requires patients

25  referred to an MHCB to be transferred within twenty-four hours, not merely to have their

26  transportation to a bed *initiated* within that time frame.  Program Guide at 12-1-16

27  (defining "Timeline for Transfer" to an MHCB to be "[w]ithin 24 hours of referral"); *see*

28  *also* Program Guide at 12-3-13 (for CCCMS patients referred for crisis care, "[t]he transfer

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR ACCESS TO INPATIENT CARE

1  to an MHCB shall be accomplished within 24 hours of referral"); Program Guide 12-4-5

2  (for EOP patients referred for crisis care, "[t]ransfers within the same institution of inmate-

3  patients previously identified and treated as EOP or from the institution's MHCB should

4  occur on the same day, or within 24 hours of referral").

5          Defendants, however, have not regularly reported on the lengths of time for actual

6  transport and admission to MHCBs, and the data on which the Court has relied over the

7  past several months appears to reflect time to *disposition*, not time to *placement*. *Compare*

8  Transcript of Jan. 23, 2017 Hearing, ECF No. 5552, at 164:13-165:7 (Ms. Tebrock

9  testifying that MHCB transfer data provided to Plaintiffs and Special Master reports "hours

10  waiting" as how long a patient waits to get on a bus to be transported to an MHCB, not the

11  time the patient actually arrives at the crisis bed), *and* ECF No. 5543, at 7 (Plaintiffs

12  identifying a lack of clarity in Defendants' reporting as to whether transfers to MHCB

13  placements were initiated, or completed, within twenty-four hours), *with* Stone-Manista

14  Decl. ¶ 3 & Ex. A; *id.* ¶ 9 & Ex. D (showing that, for the past two months, Defendants

15  have amended Enclosure 7c, including the MHCB Transfers Report and the "Rescinded

16  MHCB Referrals" report, to now refer to "Hours to Disposition" rather than "Hours

17  Waiting."). Similarly, Defendants' proposed MHCB census chart, filed as ECF No. 5577,

18  reports on the total number of patients whose MHCB referrals have been "pending" for

19  more than twenty-four hours. It is unclear whether the referral is deemed no longer

20  pending when the patients is placed on a bus to transfer, consistent with Defendants' other

21  reported data, or when that patient actually has arrived in the crisis bed. The latter is

22  required by the Program Guide, but it is not clear that Defendants consistently use this

23  measure internally or in their reports to the Court, Special Master, and Plaintiffs.

24          On the data presently in the record, Plaintiffs and the Court cannot assess the true

25  level of compliance with the Program Guide transfer requirements. Nor is it possible to

26  assess whether such compliance would be functionally achievable at this time with

27  Defendants' existing processes and resources in the high-volume short-turn-around context

28  of MHCB placement, and given the far-flung locations of some institutions relative to the

1 largest concentrations of MHCB referrals.  It is possible that additional court orders

2 requiring Defendants to develop a plan to better address transportation issues is an

3 appropriate remedy at this time.  Regardless, this ambiguity in the record should be

4 resolved with evidence and testimony before additional orders, and particularly before

5 monetary sanctions, are issued.

6   **D. The Monthly Data Templates Required By This Court Should Be Clarified or Revised to Permit the Court to Measure Compliance More**

7      **Accurately**

8     Defendants' proposed charts, *see* ECF No. 5577, do not provide the Court with

9 sufficient information to understand the scope of their non-compliance, and are ambiguous

10 about how Defendants are measuring compliance.  Defendants should report, for each day

11 in each month, the number of class members who have been referred for crisis care but

12 have not transferred to a mental health crisis bed within twenty-four hours.  The data

13 should be reported separately for men and women due to the concerns outlined in Part II.C

14 above.  Finally, the Court should specify that the proper measure for compliance with the

15 Program Guide's timeline, and thus inclusion on the chart, is whether the patient's transfer

16 to the MHCB was completed within twenty-four hours of his or her referral, meaning the

17 patient physically reached the crisis bed within the twenty-four-hour window, not just

18 began a process to transfer to that bed.  Finally, further reporting may be warranted after

19 the status conference, such as targeted reporting on specific troubled institutions with

20 disproportionately high rates of non-compliance, depending on the evidence and testimony

21 taken.

22           **CONCLUSION**

23     The Court should require Defendants to come into full and permanent compliance

24 with the Program Guide timelines for acute and ICF transfers by May 15, 2017.  The Court

25 should not permit a blanket exemption to Program Guide compliance for class members

26 who have co-existing urgent medical care needs or are on an out-to-court status.

27 Additionally, in order to address Defendants' past and current violations of the Program

28 Guide timelines for transfer to ICF or acute inpatient care, the Court can utilize civil

1  contempt proceedings to impose monetary sanctions, such as through the framework

2  suggested by Plaintiffs.

3      The Court should also order Defendants to come into full and permanent

4  compliance with the Program Guide timelines for MHCB transfers by May 15, 2017.  The

5  Court should require 100% compliance with the Program Guide's twenty-four-hour

6  timeline for MHCB transfers and should consider further orders on compliance with

7  MHCB transfer timelines after an additional status conference.  Finally, the monthly data

8  templates required by this Court should be clarified or revised to permit the Court to more

9  accurately measure compliance.

11  DATED: April 7, 2017              Respectfully submitted,

12                                   ROSEN BIEN GALVAN & GRUNFELD LLP

13                                   By:  /s/ Michael W. Bien
14                                        Michael W. Bien

15                                   Attorneys for Plaintiffs