XAVIER BECERRA
Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD STEGEMAN, State Bar No. 225745
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 324-4921
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DEFENDANTS' RESPONSE TO THE MARCH 24, 2017 ORDER TO SHOW CAUSE** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

## INTRODUCTION

The list of inmate-patients waiting beyond Program Guide timelines will resolve before May 15, 2017. During the winter of 2016-17, unexpected rain damage forced Defendants to take more than seventy cells offline at the Salinas Valley Psychiatric Program. Defendants are finalizing repairs to the more than seventy beds that were flooded. Only ten cells remain redlined, and repairs will be finalized in the next few weeks. The waitlist for inpatient beds as of April 3,

1

2017, shows twenty[1] inmates waiting beyond Program Guide timeframes for an Intermediate Care Facility bed and two inmates are waiting for an acute bed. Defendants anticipate that reopening the Salinas Valley beds will eliminate the waitlist.

Defendants have taken additional steps to permanently eliminate the waitlist. Significantly, the parties recently filed a stipulation concerning the use of a unit in L-Wing at the California Medical Facility that will provide an additional seventy high-custody Intermediate Care Facility beds within the next sixty days. Conversion of sixteen isolation rooms at DSH-Stockton over the next six months will further bolster capacity at this high-demand level of care. The addition of these beds, together with further implementation of the California Department of Corrections and Rehabilitation (CDCR) and the Department of State Hospital's (DSH) Memorandum of Understanding, the implementation of Defendants' plan to transfer inpatient mental health care from DSH to CDCR, programs implemented pursuant to Proposition 57, significant expansion of Enhanced Outpatient Program capacity, a proposal in the Governor's budget to construct an additional 100 Mental Health Crisis Beds, utilization management, and other efforts focused reducing demand for inpatient care, obviate the need for further intervention by this Court.

The evidence summarized in the Court's March 24, 2017 order shows a system that, while not flawless or one-hundred percent perfect, is working to provide timely access to inpatient care to the majority of *Coleman* class members. Evidence presented to the Court over the past six months clearly demonstrates that inmates are receiving quality mental health care at their referring institutions and the State is making every effort to transfer inmates timely.

Notwithstanding Defendants' concerted, good-faith efforts to address the inpatient waitlist issues, including both long-term and short-term planning and the expenditure of tens of millions of dollars, the Court has suggested that it may use monetary sanctions to resolve any further delays in transferring inmates to inpatient mental health care programs. Defendants are troubled by the possibility of monetary sanctions being imposed where they are unable to achieve perfect or near-perfect compliance with the guidelines set forth in the Mental Health Services Delivery

---

[1] Eighteen of the twenty are waiting for high custody Intermediate Care beds while two are waiting for low custody beds.

System Program Guide (Program Guide). Defendants respectfully submit that perfection in meeting their own policies and guidelines should not be substituted for Eighth Amendment deliberate indifference. The enforcement mechanism suggested by the Court, premised on flawless performance under correctional policies, is not consistent with the constitutional standard or the Prison Litigation Reform Act. Defendants request that the Court discharge the order to show cause because intervention is no longer necessary.

Over the past two years, Defendants have made significant changes to the inpatient referral process under the 2015 Memorandum of Understanding. They have experienced some challenges in the implementation of the new policies, all of which have been brought to the attention of the Court and which have been resolved under the oversight of the Special Master and his experts. Defendants are working as hard as possible, and dedicating significant resources to refine a system that will be durable. The evidence presented to the Court over the past six months clearly demonstrates that inmates are receiving quality mental health care at their referring institutions, including daily clinical contacts, and the State is making every effort to transfer inmates timely. To impose sanctions on a system that provides mental health care to over 30,000 patients on the basis of perfection is unreasonable, and likely unconstitutional.

**I.    DEFENDANTS' IMMEDIATE AND NEAR-TERM PLANS TO INCREASE CAPACITY AND REFINE THE REFERRAL PROCESS WILL IMPROVE PATIENT MOVEMENT AND ELIMINATE THE WAITLISTS.**

Defendants will eliminate waitlists by (1) repairing and re-opening beds red-lined at the Salinas Valley Psychiatric Program (ECF No. 5544 at 4); (2) temporarily re-opening inpatient beds on the first floor of the California Medical Facility's L-wing ( ECF No. 5544 at 3); (3) converting isolation rooms at California Health Care Facility to provide additional high-custody Intermediate Care Facility beds (Order at 13:17-19, ECF No. 5583; Jan. 23, 2016 Hrg. Tr. at 19:25-20:9; ECF No. 5560); (4) enhancing DSH's bed utilization management to promptly discharge patients who have maximally benefited from DSH treatment, thereby freeing beds for patients currently in need of care; and (5) refining the referral process to ensure timely access to care for female patients.

**A.     DSH is Re-opening of Flood-Damaged Units at DSH-Salina Valley.**

During the winter of 2016-2017, more-than-seventy high-custody Intermediate Care Facility beds at DSH-Salinas Valley were temporarily taken offline because of unexpected and severe flooding. Defendants are finalizing repairs to the cells and almost all are currently available for patients. (Ahlin Decl. ¶ 2.) These reopened beds will allow DSH to increase and sustain admission rates over the coming months. (*Id.*) DSH will admit eleven inmates by April 7, 2017, and sixteen additional inmates each week thereafter until the beds are filled. (Ahlin Decl. ¶ 3.) As a result, DSH anticipates that within two weeks all patients on the waitlist beyond Program Guide timelines will be admitted. (*Id.*)

**B.     Proposal to Re-Open L-1 at the California Medical Facility.**

While Defendants will be able to address the current waitlist in part by filling the reopened Intermediate Care Facility units at DSH-Salinas Valley, Defendants also recognize that the needs of the population fluctuate and the DSH-Salinas Valley beds may be insufficient to address the waitlist in the intermediate term. As the Court notes at page 13 of the March 24 order, Defendants have sufficient inpatient bed capacity to meet the projected need for the next four years. (ECF No. 5583 at 13.) While the projected capacity is nearly in line with the projected need, the reality is that the need for a particular level of care bed does not always match the available beds. For example, as of February 27, 2017, there were 34 available unlocked dorm beds at DSH-Atascadero, but only 8 referrals of inmates eligible for placement in the unlocked dorms at DSH-Atascadero. (ECF No. 5577 at 7.) Adding additional low custody beds now, as the Court suggests at pages 17 through 19 of the order, will not address the need for additional high custody beds or help relieve the waitlist. For this reason, Defendants' plans to address the waitlist include adding capacity for high custody intermediate care facility beds and bed utilization measures.

The Court has recognized that the addition of beds at California Medical Facility is an integral part of addressing the immediate need for high-custody Intermediate Care Facility beds. (ECF No. 5583 at 9:17-18; 12:25-13:11.) On April 6, 2017, the parties filed a joint request to waive state licensing and building code requirements. (ECF No. 5592.) CDCR estimates that it

4

will activate L-1 and begin admitting patients within sixty days of the Court's approval of the stipulation. The addition of seventy high-custody Intermediate Care Facility beds to the more than seventy beds re-opened at DSH-Salinas Valley will address waitlist concerns while other long-term efforts take hold.

### C. Conversion of Sixteen Isolation Rooms at DSH-Stockton.

Defendants continue the work to convert sixteen isolation rooms at DSH-Stockton, which will provide additional high-custody Intermediate Care Facility beds. Construction is scheduled to begin on May 30, 2017. These additional beds will provide additional access to care and thereby further alleviate wait times. (ECF No. 5583 at 13:17-19, ECF No. 5583; Jan. 23, 2016 Hrg. Tr. at 19:25-20:9; ECF No. 5560.)

### D. Enhanced Bed Utilization Management.

Since the implementation of the 2015 Memorandum of Understanding between CDCR and DSH, DSH has increased its use of the Utilization Management policies associated with the Memorandum of Understanding. In doing so, it has accelerated the discharge reviews for patients who have reached their maximum benefit at DSH programs. This has allowed additional patients to return to CDCR, and consequently open additional access to care for new patients in need of inpatient level of care. Notably, in late March, 2017, the *Coleman* Special Master team toured DSH-Atascadero and credited the utilization management processes in place. (Ahlin Decl. ¶ 5.)

Additionally, DSH has successfully implemented the Housing Review and Utilization Management policies from the 2015 Memorandum of Understanding. This work has increased the number of inmate-patient discharges (whether to a lower level of care or back to CDCR) and resulted in faster discharges of patients (under the 2015 Memorandum of Understanding discharge packets should be completed within five business days). (Ahlin Decl. ¶ 6.) Focusing on discharges helps to identify patients who can be transferred from an acute or high-custody intermediate care facility bed to a low custody dorm bed, opening up additional high-custody beds and moving patients to their least restrictive environment. (*Id.*) Since at least December 2015, each DSH facility has tracked discharges locally and reported discharges to the Patient

Management Unit to ensure policies and procedures of the 2015 Memorandum of Understanding remain effective. (*Id.*)

### E. Commitment to Admit Females in Need of Inpatient Care.

Finally, as Director Ahlin testified at the recent evidentiary hearing, DSH is committed to admitting up to thirty females for inpatient care at DSH-Patton, when and if such need arises. (Jan. 23, 2016 Hrg. Tr. at 25:20 – 26:1; ECF No. 5560.) DSH and CDCR continue to have a process to ensure timely admission of referrals to DSH-Patton, when needed. When CDCR is unable to immediately admit a female to its psychiatric inpatient program at the California Institution for Women upon referral, it will refer the patient to DSH-Patton, and the patient will be admitted to the first available bed at either the California Institution for Women Psychiatric Inpatient Program or DSH-Patton. The process supports an individualized clinical assessment that takes into consideration continuity of care by keeping the patients at their home institution whenever possible. (Ahlin Decl. ¶ 7.) Under this policy, inmate-patients will remain at their home institutions whenever clinically possible.

## II. LONG-TERM PLANS TO ADDRESS THE WAITLISTS.

Defendants' long-term plans also address the issue of timely access to inpatient care both efficiencies and capacity to help cement Defendants' ability to permanently eliminate the waitlist for inpatient care. Those plans include (1) the "lift and shift," which redirects responsibility for the in-prison psychiatric programs from DSH to CDCR, (2) construction of one-hundred additional flexible inpatient Mental Health Crisis Beds in southern California, and (3) implementation of Proposition 57, which Defendants anticipate will decrease the need for inpatient beds.

The Court's March 24 order summarizes the efficiencies that are expected when CDCR assumes responsibility for the inpatient programs. (ECF No. 5583 at 20-21.) The direct impact on Defendants' ability to comply with the Program Guide timelines include the elimination of a level of review required to refer an inmate to inpatient care, and the elimination of the duplication of efforts between CDCR and DSH. (*Id.*)

CDCR plans to add one-hundred flexible use crisis beds in the southern part of the State which will provide further relief to the system, discussed *infra* in Section IV.

Finally, CDCR anticipates Proposition 57's implementation, which is expected to reduce the overall inmate population, will reduce referrals to needed inpatient beds. (ECF No. 5544 at 6:10-7:5, 12:24-26.)

### III. THE CURRENT SYSTEM FOR INPATIENT REFERRALS PROVIDES ACCESS TO INPATIENT CARE.

Defendants have processes in place to ensure the safe utilization of beds by inmates referred for inpatient care. Inmates referred to inpatient care are placed in available beds that match their Least Restrictive Housing designation. The Least Restrictive Housing process ensures that inmates are safely placed in appropriate beds that match their clinical and custodial needs. As the Court recognizes, the Least Restrictive Housing process was developed and implemented to safely maximize the use of Defendants' inpatient beds by ensuring that patients who are custodially eligible "are moved to a Low-Custody bed as soon as it is clinically appropriate to do so." (ECF No. 5583 at 15.) The Court also recognizes that the Least Restrictive Housing process is based on a 2011 policy that lowered custodial criteria for placement of inmate-patients in the low-custody programs, such as DSH-Atascadero. (*Id.*) The Court concluded that the evidence "suggests that the proper use of the [least-restrictive-housing] process will indeed aid defendants in making complete and efficient use of their full complement of inpatient mental health beds and in complying with Program Guide timelines." (*Id.* at 16.)

Defendants' process was developed under the direction of the Special Master and his team of experts. (ECF No. 5448 at 15-21.) The policies were implemented on May 1, 2016, and there has been no indication from the Special Master or the Court that Defendants should discard the policies because they are invalid or otherwise violate the Eighth Amendment.

As of April 3, 2017, 22 patients were waiting beyond Program Guide timelines for transfer to inpatient care:

Acute Psychiatric Program:        Two waiting beyond 10 days.

7

1       Intermediate Care Facility:      Twenty waiting beyond 30 days.[2]

2 (Tebrock Decl. ¶ 3.) Defendants expect those numbers to decrease, on a permanent basis, as a result of the short-term solutions identified in the record and in the OSC, and due to the additional efforts described in Sections I, II, and IV.

      The combined impact of the increased capacity and operational management improvements listed above will allow Defendants to eliminate the waitlist and maintain Program Guide compliance. There are, however, exceptions to the timely transfer of patients. As the Court has recognized in its order, there are good reasons why Program Guide timelines cannot be strictly enforced. (ECF No. 5583 at 25.) Those reasons include, but are not limited to: retaining an inmate at his home institution to address medical needs; an inmate's stay at an institution to participate in legal proceedings; the removal of inpatient beds in the system for construction; and competing Federal Court obligations.[3]

### IV. DEFENDANTS HAVE UNDERTAKEN SEVERAL INITIATIVES TO REDUCE THE MENTAL HEALTH CRISIS BED WAITLIST.

      Defendants remain committed to eliminating the waitlist for Mental Health Crisis Beds. Referrals to Mental Health Crisis Beds, by nature, are fluid and Defendants acknowledge that they need additional capacity to completely address the needs of the class. To that end, as Defendants have previously informed the court, Defendants have proposed through the Governors' January 2017 budget to construct an additional 100 flexible use crisis beds in Southern California. While that proposal continues to work through the legislature, Defendants continue to work on addressing the demand for crisis beds and have undertaken several initiatives to address that need.

---

[2] Includes eighteen referrals to high custody Intermediate Care and two referrals to low custody intermediate care.

[3] For example, to comply with the *Armstrong* remedial plan, CDCR must retrofit certain crisis bed units to provide disability access. To perform the required retrofits and comply with *Armstrong* court orders and federal law, CDCR will have to temporarily deactivate crisis beds at CSP-Sacramento. (Tebrock Decl. ¶ 4.) Temporary deactivations such as these due to competing court orders may impact CDCR's ability to comply with the timelines, depending on patient need. Clearly, there is no intent to violate these inmates' rights under these circumstances.

Defendants have undertaken several initiatives to ensure that Mental Health Crisis Beds are being appropriately utilized. Among these initiatives are:

- A dialectical behavior therapy program at California Medical Facility. This is an evidence based and effective program aimed at patients who regularly and repeatedly require inpatient treatment. The program is focused on reducing the patients' need for inpatient care.
- Trainings aimed at clinical evaluations and treatment skills, case formulation, triaging patients referred for crisis care, and improving the interdisciplinary treatment teams to ensure treatment goals are identified and tracked.
- Crisis Intervention Teams that provide after-hours services to reduce the demand for after-hours inpatient referrals. The teams are currently at California Institution for Women and Salinas Valley State Prison.
- Evaluating crisis bed readmissions to develop a process to reduce the frequency of readmissions.
- Identifying best practices at local institutions to apply statewide, e.g. staffing clinicians on site after hours to triage potential crises, a behavior incentive program, and a pain management program.
- Using utilization management reviews to improve performance.

These initiatives, along with DSH's full utilization of their inpatient beds, will ensure that patients in need of a crisis bed will be placed in one as expeditiously as possible.

In addition to these initiatives, Defendants are clustering their crisis beds within three geographical regions in California. This initiative is aimed at reducing readmission rates, a heavy driver of all crisis bed admissions, while also reducing the destabilization to a patient by transporting him or her long distances to reach an available crisis bed. By keeping an inmate at his or her home institution, he or she will be treated by clinicians who are familiar to the inmate. This familiarity improves treatment and reduces readmissions. By reducing readmissions, overall demand for crisis beds statewide will drop substantially. If this project is allowed to succeed, it could reap substantial benefits by eventually reducing demand, wait time, and transportation time.

These changes to crisis bed admission procedures were presented to the Special Master and Plaintiffs in late 2016 and no major objections were raised.

As of April 7, 2017, there were 13 inmates referred to a Mental Health Crisis Bed waiting beyond twenty-four hours. (Tebrock Decl. ¶ 3.) While Defendants acknowledge that they may not be able to ensure that no patient is waiting more than twenty-four hours for a Mental Health Crisis Bed by May 15, 2017, monetary sanctions are inappropriate at this time because there are initiatives in place to address current bed need and proposals in front of the legislature to ensure long term sustainability.

Additionally, there are several factors outside CDCR's control that obligate Defendants to deviate from the strict time requirements. For example, to comply with the *Armstrong* remedial plan, CDCR is required to retrofit certain crisis bed units to provide disability access. To perform the required retrofits and comply with *Armstrong* court orders and federal law, CDCR will have to temporarily deactivate crisis beds at CSP-Sacramento. (Tebrock Decl. ¶ 4.) Any attempt to meet the Program Guide timelines under these circumstances would lead to clinically unwarranted results or even violations of federal law. Clearly, there is no intent to violate these inmates' rights under these circumstances.

Further, to assist CDCR in managing the inpatient programs and use of crisis beds, the beds are regularly monitored and are the subject of the Special Master's reports. Until CDCR's policies dictate that performance must meet one-hundred percent of the Program Guide requirements in every case, Defendants should not be held to a perfect performance standard.

V. **SANCTIONS BASED ON FAILURE TO COMPLY WITH PERFECT OR NEAR PERFECT COMPLIANCE ARE INAPPROPRIATE WILL LIKELY VIOLATE THE CONSTITUTION AND THE PRISON LITIGATION REFORM ACT.**

   A. **Contempt Proceedings Are Not Warranted for Failure to Transfer Patients within Program Guide Timelines.**

A contempt order should be issued as a last resort and only when the court believes that the Defendants have not performed all reasonable steps within their power to insure compliance with the court's order. *Stone v. City and Country of San Francisco,* 968 F.2d 850, 856 (9th Cir. 1992).

In a contempt proceeding,[4] whether the contemnors took all reasonable steps to ensure compliance requires a finding that the contemnors failed to make a conscientious effort to comply with court orders. *Stone v. City and County of San Francisco,* at 857, citing *Sekaquaptewa v. MacDonald,* 544 F.2d 396, 404 (9th Cir. 1976), *cert. denied,* 430 U.S. 931 (1977).

Defendants have not acted in bad faith or with deliberative indifference. To the contrary, Defendants are constantly working to address the inpatient bed need and have worked tirelessly to place inmates despite unexpected issues. Here, as noted above and as discussed by the Court in its March 24 order (ECF No. 5583 at 16), CDCR and DSH are referring and admitting patients to inpatient programs based upon the newly implemented Memorandum of Understanding and the Housing Review policy. This system is improving under the Least Restrictive Housing processes. (*Id.*) Unexpected issues—outside of Defendants' control—arose that adversely impacted patient transfer times. Those issues have been and are being corrected, and Defendants are taking additional steps to ensure temporary and permanent solutions by adding additional capacity. The State has taken and continues to take all reasonable steps to comply with the Program Guide in every manner. The issues facing Defendants are complex and require thoughtful long-term planning. Defendants have spent the better part of the past two years developing a process they believe will ultimately relieve pressures on the inpatient waitlist. That process has been endorsed by the Special Master and the Court in its adoption of the *Twenty-Sixth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols* (*Twenty-Sixth Round Monitoring Report*) (ECF Nos. 5439 and 5477.)

**B.   There Is No Basis to Hold Defendants to a Perfect or Near Perfect Standard for Compliance with Their Policies.**

Sanctions should not be imposed here because Defendants are working diligently to comply with this Court's orders. Nor should sanctions be imposed merely because Defendants are not flawlessly adhering to their policies. The Court asks "whether a court order requiring compliance with Program Guidelines for transfer to mental health crisis beds should require ninety percent

---

[4] This Court has not issued a contempt order or held any contempt proceedings.

11

compliance across CDCR institutions or one-hundred percent compliance with defined exceptions, as appropriate." (ECF No. 5583 at 25.) The request conflates the constitutional mandates in this case with the means employed to meet those mandates. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1301 (E.D. Cal. 1995) ("[t]he Constitution does not . . . prescribe the precise mechanisms for satisfying its mandate to provide access to adequate mental health care."). Other federal appellate courts have held that there is no constitutional right to perfect or error-free application of correctional policies. *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989); *Freeman v. Rideout*, 808 F.2d 949, 951-52 (2d Cir. 1986). The Constitution demands due process, not error-free decision-making. *Ricker v. Leapley*, 25 F.3d 1406, 1410 (8th Cir. 1994); *McCrae v. Hankins*, 720 F.2d 863, 868 (5th Cir. 1983.) And whether system-wide constitutional deficiencies exist, does not depend on whether the Court's remedial plan has been fully accomplished. Rather, the question is whether State officials are deliberately indifferent to serious mental-health needs. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) (holding that the Eighth Amendment requires access to "adequate mental health care"). Specifically, the issue is whether they are acting in knowing disregard of excessive risk of serious harm to inmates—the equivalent of criminal recklessness. *Farmer*, 511 U.S. at 837.

Program Guide compliance should not measure whether Defendants have discharged their constitutional obligations to provide adequate mental health treatment to inmate-patients. (ECF No. 4361 at 2.) Instead, the Constitution requires that state officials not be deliberately indifferent to the serious mental health needs of inmates. As an example of Defendants commitment to ensure serious mental health needs of inmates are being considered, they are constantly monitoring the status of patients to ensure that they can move to their least restrictive environment for treatment. Program and executive leadership at each psychiatric inpatient program continue the daily oversight of clinician efforts to identify patients eligible for discharge or step down to a lower level of care or less restrictive housing. This oversight includes coordination of transfers, tracking of discharge/transfer documentation and ongoing status updates to DSH Sacramento leadership. (Ahlin Decl. ¶ 8.)

In a 2013 order, the Court distinguished constitutional standards from the compliance required under the Program Guide: "[T]he Special Master is not tasked with 'assessing whether the state's mental health care system satisfies constitutional standards.' That assessment is for this court. . . . The Special Master's task is to measure the state's compliance with 'any remedial plan that this court may order.'" (ECF No. 4361 at 2, citing Order of Reference at ¶¶ 4-5 (ECF No. 640).) The Court also confirmed that the Program Guide provides the "framework" for remediation of the Eighth Amendment violations identified in the 1995 order, that the Program Guide is subject to revision, and that the degree to which defendants have implemented the Program Guide requirements is relevant to assess whether Defendants are meeting their constitutional requirements. (*Id.* at 6, 9.)

Moreover, the proposed requirement of either ninety or one hundred percent compliance with the Program Guide is not consistent with the Court's stated intent "to bring this case to a successful conclusion sooner rather than later . . . ." (ECF No. 5583 at 25.) To the contrary, such an onerous requirement would consign Defendants to perpetual monitoring and a delayed end to the case. Instead, the Court should assist the Defendants by declaring standards for system-wide performance that must be met to satisfy the Eighth Amendment. Substantial compliance with the Program Guide, based on system-wide performance, should be the standard.

### C. Monetary Sanctions Are Extreme and Do Not Further the Public Policy Espoused by the Court.

In the event that the Court determines monetary sanctions are a proper remedy, such sanctions are only enforceable through civil contempt proceedings, with notice and hearing. The Court's suggestion that sanctions could be based on monthly reports would violate Defendants' right to due process. *See Int'l Union v. Bagwell*, 512 U.S. 821, 833-34 (1994) (summary adjudications of indirect contempt (*i.e.* those that take place out of court) are improper, especially those involving "out-of-court disobedience to complex injunctions.").

Also, the monetary fines proposed by the Court violate the Prison Litigation Reform Act because such relief extends further than is necessary to remedy constitutional violations. The sanctions are directed at Defendants' failure to meet guidelines set forth in their policies and

procedures for every inmate, every day, notwithstanding that the guidelines are complied with the majority of the time.

Further, given Defendants improvements, awarding monetary sanctions for contempt would not "serve any purpose." *Essex County Jail Annex Inmates v. Treffinger*, 18 F.Supp.2d 445, 452 (D. NJ 1998).

To sanction Defendants for failing to carry-out their operational policies with perfection, given the complete absence of any requirement in the remedial plan, is patently unfair and contrary to the law.

### D. Alternative Remedies Are Available that Can Identify and Address Delays in the Access to Inpatient Care.

There are less onerous alternative remedies that would assist Defendants in improving compliance and inform the Court and Plaintiffs about Defendants level of compliance.

First, Defendants are able and willing to provide the Court and the Special Master with comprehensive monthly data for the inpatient referrals to the Psychiatric Inpatient Programs and the Mental Health Crisis Bed units. This report would mirror the monthly Bed Utilization Report filed by DSH. Additionally, Defendants can produce a report that provides the total number of patients waiting beyond Program Guide timelines each month. Further, Defendants welcome the Special Master's input regarding the benefit of additional reporting on the movement of patients to their Least Restrictive Housing, as well as Defendants' ability to meet the Program Guide timeframes for movement within the system to ensure the expeditious movement of through the continuum of care.[5]

Second, if as the Court suggests, the delay in transfers is a management issue, Defendants propose they develop a review process, under the guidance of the Special Master, to identify the root cause for such delays and to develop process improvement plans to remediate deficiencies. Defendants propose that this review process can be incorporated into their Continuous Quality

---

[5] These measures directly address Plaintiffs' concerns outlined in their Response and Objections to Defendants' Proposed Census and Waitlist Reports for Inpatient Mental Health Care (ECF No. 5582). Accordingly, Defendants will not be filing a further response to Plaintiffs' objections.

Improvement processes. This will provide the parties, and the Court, an opportunity to discuss ongoing issues and understand what may be impacting the movement of patients.

**CONCLUSION**

Court intervention is unnecessary. Defendants' plan to place inmate-patients in the California Medical Facility's L-wing, and re-open units at Salinas Valley State Prison, together with further implementation of CDCR and DSH's Memorandum of Understanding, and the implementation of Defendants' plan to transfer patient care from DSH to CDCR, will resolve waiting times for patients to be transferred to appropriate levels of mental health care by May 15, 2017.

Although not perfect, Defendants' system to provide timely access to inpatient care is working. Because perfect or near-perfect compliance with the Program Guide is at odds with the constitutional deliberate indifference standard, the Program Guide's timelines should not be a vehicle to invoke sanctions. As the evidence consistently shows, the existence of a waitlist is a consequence of the constant referrals, admissions, and discharges to the inpatient programs. While Defendants expect that they will be able to meet the Court's May 15, 2017 deadline to completely fulfill the Program Guide transfer timelines for inpatient care, the Court's focus should be on the full spectrum of care inmates are receiving throughout the system and not on the relatively brief periods that inmate-patients wait beyond Program Guide timelines.

Dated: April 7, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
DANIELLE F. O'BANNON
Supervising Deputy Attorney General

/s/ Elise Owens Thorn
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*