XAVIER BECERRA
Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD A. STEGEMAN, State Bar No. 225745
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-4921
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DEFENDANTS' REPLY TO PLAINTIFFS' OBJECTIONS AND REQUEST FOR ADDITIONAL RELIEF RE: THE SPECIAL MASTER'S REPORT ON THE STATUS OF MENTAL HEALTH STAFFING AND THE IMPLEMENTATION OF DEFENDANTS' STAFFING PLAN** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

**INTRODUCTION**

Defendants' Response to the Special Master's Staffing Report established the reasons why Defendants' 2017 Staffing Plan should be implemented in full. The Response further demonstrated that compensation for psychiatrists at the California Department of Corrections and Rehabilitation (CDCR) and Department of State Hospitals (DSH)—which is now scheduled to rise by nine percent—is already among the highest in the nation. Defendants also explained the need to revisit the outdated court ordered staffing ratios from the 2009 staffing plan in light of the

1

nationwide shortage of psychiatrists and the level of care being provided to *Coleman* class members. Ignoring this reality, Plaintiffs insist that more money will solve alleged staff shortages. Instead of advancing innovative solutions to attract and retain psychiatrists and other clinical positions, Plaintiffs ask this Court to set the stage for a bidding war between CDCR and other public and private providers of mental health care. But they offer no evidence that increasing compensation beyond the increases already planned will result in compliance with the court-ordered staffing ratios, and their proposal is an unsustainable solution for providing long term care to mentally ill inmates housed in state prisons.[1]

Beginning in August 2016, Defendants and the Special Master met and conferred "monthly to discuss and consider strategies and initiatives . . . to resolve the continuing problem of mental health staffing in CDCR prisons in a thorough and lasting way." (ECF No. 5477 at 8-9.) Through these workgroups, and the ideas and suggestions provided by the Special Master's team and Plaintiffs' counsel, Defendants developed a multi-faceted Staffing Plan to address hiring and staffing issues. (*See* ECF No. 5591 at 3.) Defendants must be given the opportunity to implement their plan, including full expansion of the telepsychiatry program for every level of care.

Plaintiffs' objections fail to address CDCR's comprehensive approach and, despite the Court's past orders acknowledging that increased salaries alone are not a panacea for staffing issues, nevertheless narrowly focuses on increasing psychiatrists' salaries. The Court should reject this one-size-fits-all approach. Nor is there a need for a status conference. Instead, Defendants should be allowed to implement their 2017 Staffing Plan and work with the Special Master to revisit the previously-ordered staffing ratios to determine if these ratios are feasible or even necessary.

/ / /

/ / /

---

[1] Plaintiffs' objections and procedurally-defective requests for affirmative relief are based on counsel's declaration that is replete with hearsay and speculation. Defendants' accompanying motion to strike sets out the reasons why the Court should strike this improper declaration.

2

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))

**I.   DEFENDANTS' STAFFING PLAN APPROPRIATELY ADDRESSES RECRUITMENT AND RETENTION OF CDCR PSYCHIATRISTS.**

Defendants' Staffing Plan appropriately addresses CDCR's staffing needs and responds to the nationwide psychiatrist shortages by proposing several initiatives aimed at ensuring quality mental health care continues to be provided to class members.  Among those initiatives are hiring medical assistants to assist psychiatrists, expanding the telepsychiatry program, enhancing the fellowship program for psychiatrists, increasing pay rates for registry psychiatrists at hard-to-recruit locations, modifying the on-call compensation package, increasing the use of dual appointments, hiring psychiatric nurse practitioners, and using exit interviews to better understand the reasons for departures.

This Court has already expressed skepticism that further salary increases will result in more psychiatrists seeking employment with CDCR.  (ECF No. 5477 at 6.)  The Court's skepticism is well-founded: Plaintiffs' objections offers no evidence that engaging in a bidding war with the private market will result in a surge of additional hires at CDCR.  On the contrary, evidence suggests that the nationwide shortage of psychiatrists, felt most acutely in the Pacific region, will only worsen in the coming years. (ECF No. 5591 at 12.)  And because CDCR and DSH already employ a significant segment of psychiatrists, it is unrealistic to expect that their share of this limited market can expand as aggressively as Plaintiffs propose.  (ECF No. 5591 at 13.)

### A.   Compensation for CDCR Psychiatrists Is Among the Highest in the Nation and Is Competitive with Compensation Statewide.

As Defendants explained in their response, CDCR and DSH already employ a disproportionate share of the limited pool of psychiatrists. (ECF No. 5591 at 13.) Table 1 below updates the 2014 data provided in Defendants' response.

///

///

3

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))

**Table 1 – Psychiatrists Estimated Salaries per State, CDCR and DSH as of May 2016[2]**

| # | State | Mean Annual Wage | # | State | Mean Annual Wage |
|---|---|---|---|---|---|
| 1 | **CDCR** | **$268,734** | 14 | Texas | $208,220 |
| 2 | **DSH** | **$268,734** | 15 | Oregon | $206,880 |
| 3 | **CDCR & DSH** | **$268,734** | 16 | Virginia | $193,180 |
| 4 | California | $252,030 | 17 | Alabama | $191,400 |
| 5 | Indiana | $235,470 | 18 | Wisconsin | $189,400 |
| 6 | Minnesota | $232,600 | 19 | Ohio | $186,680 |
| 7 | Colorado | $232,520 | 20 | Maryland | $184,890 |
| 8 | Connecticut | $231,260 | 21 | Pennsylvania | $183,450 |
| 9 | New Jersey | $225,950 | 22 | Michigan | $183,250 |
| 10 | Georgia | $225,880 | 23 | New York | $182,830 |
| 11 | Missouri | $215,690 | 24 | Florida | $181,080 |
| 12 | Washington | $213,410 | 25 | Massachusetts | $180,960 |
| 13 | South Carolina | $209,830 | 26 | Illinois | $172,560 |
| 14 | North Carolina | $208,870 | 27 | Arkansas | $110,880 |

The salaries paid to CDCR and DSH are already among the highest in the nation, with a mid-range salary for board certified psychiatrists of $268,734. (*See* Table 1 above.)

Plaintiffs' contention that average compensation is "roughly comparable to or lower than average salaries statewide" (ECF No. 5590 at 16), is simply inaccurate. In support of their arguments, Plaintiffs miscast and cherry-pick salary data in several significant ways:

*First*, even as Plaintiffs acknowledge that California's generous pension benefits for state employees help to attract and retain psychiatrists (ECF No. 5590 at 17-18), their argument that the state's compensation for psychiatrists is inadequate conspicuously ignores the value of these pension benefits. Under the Public Employees' Pension Reform Act of 2013 (PEPRA), new CDCR and DSH psychiatrists earn pensions amounting to millions of dollars over the course of

---

[2] See U.S. Bureau of Labor Statistics, May 2016, at https://www.bls.gov/oes/current/oessrcst.htm (last accessed on April 12, 2017) [1] See U.S. Bureau of Labor Statistics, May 2016, at https://www.bls.gov/oes/current/oessrcst.htm (last accessed on April 12, 2017). The number provided for CDCR and DSH is a mid-range salary for board certified psychiatrists based on the salary range data for open positions at CDCR (https://jobs.ca.gov/CalHrPublic/Jobs/JobPosting.aspx?JobControlId=273) and at DSH (https://jobs.ca.gov/CalHrPublic/Jobs/JobPosting.aspx?JobControlId=57748). Board certified psychiatrists are paid in Range Q per http://www.calhr.ca.gov/Pay%20Scales%20Library/PS_Sec_11_ARC_400-499.pdf.

4

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report (2:90-cv-00520 KJM-DB (PC))

their retirement.[3] Such generous pension benefits are not necessarily available to psychiatrists in the private sector, and provide further evidence that the total compensation packages for state psychiatrists are substantially higher than what psychiatrists can earn on average in California.

*Second*, Plaintiffs erroneously compare *average* salaries in the community with *starting* salaries for CDCR psychiatrists. (ECF No. 5590 at 16:13-14.) It is no surprise that an average salary is greater than a starting salary, but Plaintiffs compound this error by focusing exclusively on community salary averages in major metropolitan areas, including the Bay Area and the greater Los Angeles area, where the cost of living is higher than anywhere else in the state. Plaintiffs omit any reference to community salaries in locations where the majority of CDCR prisons are located.

*Third*, Plaintiffs' own data shows that the maximum salary of $293,340.00 for CDCR staff psychiatrists far exceeds the maximum salary paid to physicians and surgeons.

Finally, Plaintiffs ignore the recent nine percent salary increase negotiated by the state's psychiatrists. Plaintiffs' objections offer no evidence showing that a salary increase will have any effect on vacancies. The fundamental problem cannot be reduced to money. As Defendants pointed out in their response, the nationwide shortage of psychiatrists and CDCR and DSH's present employment of a large share of the state's psychiatrists call into question whether the ninety-percent court-ordered staffing requirement can ever be met. The parties' efforts would be better focused on implementing the 2017 Staffing Plan and revisiting the need for current ratios, instead of requiring Defendants to engage in a bidding war for scarce resources.

**B.    Plaintiffs' Attempt to Blame Defendants for the Product of Confidential Labor Negotiations Is Misplaced.**

On February 28, 2017, the union representing psychiatrists tentatively agreed to a contract that includes a nine-percent General Salary Increase through July 1, 2019.[4] Unhappy with this

---

[3] Agreement between State of California and UAPD Covering Bargaining Unit 16 effective July 1, 2013 through July 1, 2016, http://www.calhr.ca.gov/labor-relations/Documents/mou-20130701-20160701-bu16.pdf at pages 86 and 104.

[4] Based on the mid-range salary $ 268,734 for CDCR psychiatrists presented in Table 1 above, this increase totals $ 24,186 in real dollars. Plaintiffs view this as meaningless or, at best, "meager." (ECF No. 5590 at 2-3, 14.)

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))

increase, Plaintiffs misplace blame on Defendants for the bargain agreed to by the union. Plaintiffs correctly note that the union negotiated various salary differentials for physicians at numerous state institutions, including fifteen percent differentials at several CDCR institutions, Veterans Homes, and Department of Social Services institutions, and twelve percent and seven percent differentials at Department of State Hospitals facilities. The same union represents the state's psychiatrists, and negotiated on their behalf with full knowledge of the differential being offered to physicians, many of whom do not provide care for *Plata* class members. Plaintiffs' speculation about why the union did not bargain for the same differential for psychiatrists should be rejected. (*See* Defs.' Motion to Strike.)

Plaintiffs submit materials they apparently solicited from the union created during the labor negotiations that are inadmissible and irrelevant. (*See* Nolan Decl. Ex. F.) Neither the Court nor Defendants have any means of determining the source or veracity of these statements. The purported survey is unscientific, its methodology is wholly undefined, and it is impossible to evaluate whether the anonymous views expressed are representative of the majority of employees. And Plaintiffs have not made any effort to demonstrate its reliability under *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1315 (9th Cir.), cert. denied, 516 U.S. 869 (1995), which requires a proponent of scientific evidence to establish that the research upon which the proffered evidence is based has been subjected to normal scientific scrutiny through peer review and publication, or explain precisely how the conclusions were reached and point to some objective source to show that the conclusions are based on "scientific method, as it is practiced by (at least) a recognized minority of scientists in the[ ] field." *Daubert*, 43 F.3d at 1318–19.

Even if Plaintiffs could somehow authenticate the survey, they cannot meet the *Daubert* reliability test and the hearsay statements it contains do not support Plaintiffs' assertion that a pay increase will address these anonymous psychiatrists' concerns.

///

///

6

## II. CDCR HAS DEMONSTRATED IT IS PROVIDING CONSTITUTIONAL PSYCHIATRIC CARE TO CLASS MEMBERS AT CURRENT STAFFING LEVELS.

As discussed in Defendants' March 30, 2017 Response, Defendants are providing more than constitutionally adequate care to class members despite vacancies. (ECF No. 5591 at 12; Tebrock Decl. ¶ 8.) In contrast to the vague, cherry-picked, and outdated metrics upon which Plaintiffs rely, Defendants rely on audits from CDCR's "Medication Administration Process Improvement Process," which uses multiple metrics to comprehensively measure the total health of the medication management system. Medication Administration Process Improvement Process audit results show high medication management compliance rates at nearly every prison that houses *Coleman* class members, including ninety-six percent systemic, statewide compliance with CDCR's medication administration measures for the period August 1, 2016 through January 31, 2017. (*See* ECF 5591-2 at 4). Indeed, all but three institutions performed better than ninety percent on their Medication Administration Process Improvement Process audits.[5] (*See* discussion of Medication Administration Process Improvement Process in ECF No. 5591 at 14.)

While Plaintiffs contend that a number of institutions were "noncompliant" in 2015 on several medication-related measures (ECF No. 5590 at 10-12), CDCR's more recent Medication Administration Process Improvement Process audits show that many of these issues have been addressed.[6] Plaintiffs' further references to isolated measures at several institutions also underscore the limits of cherry-picking.

For example, the "medication continuity" metric at Salinas Valley State Prison that Plaintiffs focus on narrowly measures whether staff timely provides a patient his or her medication when he or she either arrives at CDCR or transfers to another institution.[7] However,

---

[5] Two of the other three institutions scored eighty-nine percent, and the third scored seventy-nine percent.

[6] The Special Master does not define the term "compliance" or provide quantifiers for levels of performance that meet compliance standards.

[7] The Program Guide includes no clear measurable standards for medication continuity as applied to psychiatry—for example, Chapter 2 states: "Review of need for continuation of medications prescribed prior to commitment to an institution will *normally* occur within 24 hours of intake." (Program Guide 12-2-7 [emphasis added].) It is unclear whether the reports find a medication review "noncompliant" if it happens to fall outside of this norm.

7

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))

because the medication is typically provided by non-CDCR staff, or nursing or custody staff, and not psychiatry staff, Plaintiffs' reliance on this metric is misleading. (Program Guide 12-2-2.) Likewise, the "chronic care medication" metric Plaintiffs cite does not measure psychiatry at all, but only whether nursing staff have administered medication as ordered over the last three months and took vitals signs as ordered before administration. (ECF No. 5439 at 48.)

Plaintiffs also cite data about whether patients are initially seen by a psychiatrist within twenty-four hours at the Substance Abuse Treatment Facility to make broad arguments about inadequacy of care there, but Plaintiffs' data is limited to the Enhanced Outpatient Program population. In fact, the Special Master found that the prison was ninety-seven percent compliant for initial contacts with patients' primary clinician. (ECF No. 5439 at 320.) Plaintiffs' argument also misleads because the Substance Abuse Treatment Facility was eighty-seven percent compliant for initial psychiatry contacts for Correctional Clinical Case Management System patients. (*Id.* at 321.) Similarly, for High Desert State Prison, Plaintiffs complain about psychiatrists not attending Inter-Disciplinary Treatment Team meetings for the Correctional Clinical Case Management System population. (ECF No. 5590 at 11.) In fact, the Special Master found that "[r]equired staff attended Inter-Disciplinary Treatment Team meetings ninety-five percent of the time" and that "there was ninety percent compliance for initial psychiatry contacts and ninety-four percent compliance for follow-up contacts." (ECF No. 5439 at 196-97.) In any case, these statements do not attribute issues with compliance to staffing vacancy rates, the standard of care for the state's prisons, or patient harm.

Plaintiffs simply presume that a causal connection exists, but they fail to explain why a dozen institutions with staff psychiatrist vacancy rates below ninety percent nevertheless achieved ninety percent or more compliance with timely psychiatry contacts and medication management criteria. (ECF No. 5591-2, Exhibit 2).

Plaintiffs specifically identify Salinas Valley State Prison, California Substance Abuse Treatment Facility, and High Desert State Prison, as institutions that have suffered "harms" as a result of vacancies. (*See* ECF 5590 at 10-11.) But data in Exhibit 2 attached to Defendants'

8

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))

response, summarized in the table below, shows that these institutions are providing more than constitutional-level care over several performance criteria. (*See* ECF 5592-1, Exhibit 2.)[8]

Table 2 – Summary of Performance Report Compliance Data
(ECF No. 5591-2 at 9, Exhibit 2 to the Tebrock Declaration)

| Institution | Timely Psychiatric Contacts (Access) | Psychiatric Continuity of Care (Quality) | MAPIP Results |
|---|---|---|---|
| **HDSP** | 99% | n/a | 94% |
| **SATF** | 95% | 93% | 96% |
| **SVSP** | 78% | 90% | 90% |

Aside from medication management, the only other harm Plaintiffs allege is a spurious argument that an absence of psychiatrists is impacting CDCR's suicide prevention efforts. (ECF No. 5590 at 11.) This argument refers to counsel's opinions and conjecture, rather than admissible facts. Although Plaintiffs cite to a review by the Special Master's expert, Lindsay Hayes, neither this report nor any other statement by the Special Master supports Plaintiffs' claim of patient harm. Although Mr. Hayes notes the absence of psychiatrists from some Suicide Prevention and Response Improvement Team meetings, he does not link these absences to deficits in patient care, but rather makes this observation because attendance is required under the program guides. (ECF No. 5396 at 24-25.)

### III.   CLUSTERING WILL NOT EXACERBATE STAFFING PROBLEMS.

In workgroups held in 2016 and 2017, Defendants worked with the Special Master and Plaintiffs to address issues related to the increase in patients requiring mental health services. CDCR proposed a sustainable clustering plan that will ensure patient safety and clinical staff retention and satisfaction. Plaintiffs were part of the discussions that resulted in the 2017 Staffing Plan, and their untimely objection after the fact should not be entertained. Moreover, for the reasons discussed on pages 16-17 of Defendants' response, there is no sound reason to close the mental-health program at High Desert State Prison.

---

[8] Plaintiffs similarly misplace reliance on the hearsay statements of unknown individuals in the purported survey the union provided to Plaintiffs' counsel. (ECF No. 5590-1, ¶ 10, Exhibit F.) Defendants' objections to this document are discussed in detail in Defendants' accompanying motion to strike.

9

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))

### IV. TELEPSYCHIATRY IS AN EFFECTIVE TOOL FOR TREATING ALL *COLEMAN* CLASS MEMBERS.

CDCR's Response presented evidence showing that telepsychiatry is an effective and essential component of modern medical practice. (ECF No. 5591 at 3-7.) Evidence confirms that telepsychiatry offers the same standard of care and same patient outcomes as in-patient contacts. Telepsychiatry is effective at all levels of patient acuity, and is a critical part of Defendants' plan to address psychiatry vacancies particularly in the context of the nationwide shortage. Plaintiffs offer no evidence to the contrary, but instead parrot the Special Master's expressed concerns about the efficacy of telepsychiatry.[9] Defendants have addressed those concerns, and the evidence cautions against restricting CDCR's use of this proven and widely-used clinical tool.

### V. PLAINTIFFS' SPECULATION THAT STAFFING VACANCIES WILL DOOM THE "LIFT AND SHIFT" TO FAILURE IS UNFOUNDED.

Plaintiffs predict that the "lift and shift" will fail because of staffing vacancy rates. The evidence to support such a pessimistic view of a plan embraced by the Special Master is a series of unsupported statements in the flawed survey attached as Exhibit F to Plaintiffs' counsel's declaration. (ECF No. 5590 at 15:2-11.) Those statements, amounting to little more than rumor and innuendo, have no bearing on the anticipated success of CDCR and DSH's plan to move in-patient care to CDCR facilities.

While it is possible that some staff members may not want to remain in their positions once CDCR resumes responsibility for the psychiatric inpatient programs, any staffing challenges that may arise are speculative. Plaintiffs state that "several psychiatrists indicated that they did not want to work for CDCR." (ECF No. 5590 at 15:7-11.) But based on the nature of the survey questions, it is impossible to discern the psychiatrists' actual intentions. And as fully described in CDCR and DSH's plans, Defendants will account for the changes in work that will necessarily arise from the "lift and shift." Plaintiffs' attempt to use some anonymous employees' concerns

---

[9] Plaintiffs' self-made tables also separate on-site civil service psychiatrists from contract and telepsychiatrists, presenting a misleading picture of staffing levels. (*See* ECF No. 5590 at 14, 19; Nolan Decl. Exhs. B and D.) Plaintiffs' marginalization of telepsychiatrists is arbitrary and unsupported by science, as Defendants have shown that telepsychiatry is equally effective at delivering the full range of care to *Coleman* patients. (ECF No. 5591 at 5-9.)

10

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))

about changes in the status quo to subvert a plan that has been supported by both the Court and the Special Master for several years should not be countenanced.

### VI. A STATUS CONFERENCE IS NOT THE PROPER FORUM TO DEVELOP A PLAN.

A staffing plan must change over time as populations and patient needs change. Defendants have a staffing plan in place and are constantly looking at ways to improve their patient care. As Defendants have stated in their response to the Special Master's staffing report, outdated staffing ratios and vacancy rates should be re-evaluated, particularly given the level of care being provided to class members, the advances in technology, the changes in the mental-health job market, and the marked changes in the Mental Health Services Delivery System over the past twenty years.

A status conference is not the proper forum to develop a long-term plan. The Special Master currently has a process to develop plans and policies. Requiring a status conference to develop a complex staffing plan will not enhance that process in any way.

### CONCLUSION

Plaintiffs' advocacy for more money as the solution to psychiatry vacancies is misplaced. As both the Court and the Special Master have recognized, the actual compensation a psychiatrist receives is only a part of a psychiatrist's decision to work in a correctional setting. Plaintiffs' objections fail to demonstrate that the orders Plaintiffs seek are necessary given CDCR's 2017 Staffing Plan.

CDCR has shown that it is committed to addressing staffing issues for all categories of mental health care providers. The 2017 Staffing Plan and recent nine-percent salary increases are steps in the right direction. Plaintiffs have not provided any justification for the Court to bypass recent developments and issue further orders on staffing.

///

///

11

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report (2:90-cv-00520 KJM-DB (PC))

CDCR is providing adequate care with current resources. Plaintiffs have not demonstrated otherwise. Notwithstanding the Special Master's recommendations to the contrary, the Court should approve CDCR's full implementation of its 2017 staffing plan, including the implementation of its telepsychiatry program, its proposal to conduct a review of its Enhanced Outpatient Program population, and its plans to cluster the Mental Health Delivery System populations.

Dated:  April 13, 2017                                          Respectfully submitted,

XAVIER BECERRA
Attorney General of California
DANIELLE F. O'BANNON
Supervising Deputy Attorney General

*/s/ Elise Owens Thorn*

ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

12

Defs.' Reply to Pl.'s Objections to the Special Master's Staffing Report  (2:90-cv-00520 KJM-DB (PC))