1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California  94710-1916
4   Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNIFER L. STARK – 267062
KRISTA STONE-MANISTA – 269083
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:    (415) 433-6830

9   RANJINI ACHARYA – 290877
    K&L GATES LLP
10  4 Embarcadero Center, Suite 1200
    San Francisco, California  94111-5994
11  Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493

13  Attorneys for Plaintiffs

14              UNITED STATES DISTRICT COURT

15              EASTERN DISTRICT OF CALIFORNIA

17  RALPH COLEMAN, et al.,                    Case No. 2:90-CV-00520-KJM-DB

18          Plaintiffs,                       **PLAINTIFFS' RESPONSE TO
                                              DEFENDANTS' OBJECTIONS TO
19      v.                                    SPECIAL MASTER'S STAFFING
                                              REPORT**
20  EDMUND G. BROWN, JR., et al.,
                                              Judge:   Hon. Kimberly J. Mueller
21          Defendants.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

I.    ABSENT THE SPECIAL MASTER'S RECOMMENDATIONS AND
FURTHER ACTION ON PSYCHIATRIST PAY, DEFENDANTS'
STAFFING PLANS ARE INADEQUATE. .............................................. 3

II.   DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S
STAFFING REPORT MUST EACH BE REJECTED. ............................... 5

      A.    Defendants Must Be Ordered to Increase Psychiatrist Pay At Hard-to-
            Hire Locations and Develop a Long-Term Plan to Monitor and
            Exceed Market Pay for Psychiatrists to Attract New Staff. ..................... 5

            1.    Defendants' Staffing Plan Does Not Meaningfully Address The
                  Need for Psychiatrist Salary Increases, and Defendants'
                  Arguments that Salary Increases Are Unnecessary Are Without
                  Merit. .......................................................................................... 6

            2.    Alteration of Defendants' 2009 Staffing Ratios Is Not
                  Appropriate .................................................................................. 11

            3.    Defendants Are Not Providing Adequate Care to Plaintiffs At
                  Current Staffing Levels, and The Harm From Defendants'
                  Psychiatrist Staffing Shortage Is Severe and Growing Worse .......... 13

      B.    The Special Master's Recommendations Regarding Tele-psychiatry
            Are Critical to Ensure that This Resource Is Used Safely and
            Appropriately ................................................................................... 17

            1.    Defendants' Evidence Does Not Support the Unlimited Use of
                  Tele-psychiatry at All Levels of Care ............................................ 19

            2.    Tele-psychiatry Should Not Be Used For MHCB or Inpatient
                  Level of Care Patients ................................................................. 22

            3.    The Requirement that Telemedicine Should Only Serve as a
                  Supplement to On-Site Psychiatrists is Critical ............................. 24

            4.    The Special Master is Right to Proceed with Caution and
                  Conduct Further Monitoring Before Approving Tele-psychiatry
                  for EOP Patients ......................................................................... 25

      C.    Defendants' Clustering Plan Is Inadequate and The Special Master's
            Recommendation for a New Plan is Appropriate ................................... 27

      D.    The Special Master's Recommendations Regarding Defendants EOP
            Utilization Review Plans Are Appropriate and Defendants Have
            Already Abandoned the Plan He Reviewed. .......................................... 31

CONCLUSION...................................................................................................... 32

**INTRODUCTION**

As underscored by the many concrete recommendations for further action in the Special Master's Staffing Report, CDCR's current clinical staffing crisis is serious, is causing grave harm to the *Coleman* class, and requires bold action from Defendants. *See generally* Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan ("Special Master's Staffing Report"), filed February 2, 2017, ECF No. 5564.

However, rather than taking heed of this Court's demand that they "demonstrate clear action" based on a "meaningful strategy" to fix the severe clinical staffing shortages once and for all, 8/9/16 Order, ECF No. 5477, at 6[1], Defendants have offered yet another deficient staffing plan and now object to the Special Master's Staffing Report, complaining about his recommendations in four key areas—psychiatrist pay, tele-psychiatry, a planned utilization review of the EOP population, and clustering of mental health programs at facilities with a proven record of hiring staff. *See generally* Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing ("Defs' Objections"), filed March 30, 2017, ECF No. 5591.

Defendants' objections to the Special Master's Staffing Report have no merit. First, Defendants' rejection of meaningful compensation increases for psychiatrists is overly fatalistic about solving the problem, and at odds with any common sense understanding of market forces and the laws of supply and demand. The current nationwide psychiatrist shortage makes raising pay even more essential, not futile, as reflected in Defendants' decision to increase compensation for registry psychiatrists and medical doctors in hard-to-hire locations. Second, Defendants' desire for unfettered authorization to use tele-psychiatry for prisoners at all levels of care—including mental health crisis beds and inpatient care—is at odds with professional standards, with their own tele-psychiatry

---

[1] All references to pagination for documents filed with ECF are to pagination of the full PDF document unless otherwise specified.

1   policy's cautionary statements that on-site psychiatrists are preferred for higher levels of

2   care, with this Court's prior admonishment that "there may be class members not

3   susceptible to this method of care," and with their own statewide Chief Psychiatrist's

4   acknowledgement that he and his staff could not locate any good studies on the efficacy of

5   tele-psychiatry in the prison context. *See* 5/18/15 Order, ECF No. 5307, at 5; *see also*

6   Declaration of Michael Golding, M.D. In Support of Defendants' Response to Special

7   Master's Staffing Report ("Golding Decl."), filed March 30, 2017, ECF No. 5591-1 at ¶ 2.

8         Third, Defendants' objection to the Special Master's criticism of their clustering

9   plan must be rejected.  Defendants' bed planning proposal ignores and exacerbates the

10  risks of operating high-acuity mental health programs at facilities that cannot recruit and

11  retain clinical staff, including (1) maintaining a Mental Health Crisis Bed (MHCB)

12  inpatient unit at a prison like High Desert State Prison (HDSP), which has not had a single

13  on-site psychiatrist for many years in addition to one of the highest vacancy rates for

14  psychologists in the state, and (2) dramatically increasing EOP programs at four prisons

15  with dire histories of clinical understaffing, with no concomitant plan to address the

16  shortages in any targeted way.  Finally, Defendants' objection regarding their proposed

17  EOP review memo is moot, as the version about which the Special Master raised concerns

18  has been supplanted by a more recent proposal that the parties and Special Master team are

19  currently evaluating.

20        In short, Defendants' staffing efforts have not been formulated or implemented with

21  the required sense of urgency, and Defendants' objections should be rejected and the

22  Special Master's recommendations adopted.  In particular, the crisis in psychiatrist staffing

23  in CDCR requires prompt pay increases in hard-to-hire locations and a long-term plan to

24  closely monitor psychiatrist pay in the community and to match it to ensure competitive

25  salaries that attract new psychiatrists to work in CDCR.  As the Special Master explained

26  in his 26th Report last June, "[m]ultiple [staffing] plans over the course of 17 years have

27  proven to be ineffective" and "if salaries need to be increased, it should be done

28  forthwith."  5/06/16 Special Master's 26th Monitoring Report on Defendants' Compliance

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S STAFFING REPORT

("26th Monitoring Report"), filed May 6, 2016, ECF No. 5439, at 31. As noted in Plaintiffs' previously filed objections, a status conference on this issue is warranted and should be ordered promptly. *See generally* Plaintiffs' Objections and Request for Additional Relief re: the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Report ("Pls' Objections"), filed March 30, 2017, ECF No. 5590.

## ARGUMENT

**I. ABSENT THE SPECIAL MASTER'S RECOMMENDATIONS AND FURTHER ACTION ON PSYCHIATRIST PAY, DEFENDANTS' STAFFING PLANS ARE INADEQUATE.**

The Special Master's Staffing Report contains many important recommendations for improving staffing. However, perhaps the most notable feature of the Special Master's Staffing Report is his deference to Defendants' own plans in each of the areas where he makes recommendations. *See* Special Master's Staffing Report at 20-21 (discussing the CCCMS utilization management review plan developed by Defendants favorably but raising concerns about a similar EOP plan and asking for more information about the plan), 14 (underscoring the importance of tele-psychiatry as a tool in response to the psychiatrist staffing shortage), 25 (suggesting the CDCR develop *its own* salary survey to use in setting psychiatrist pay), 28 (recommending Defendants develop further remedial plans in the areas he recommends the Court reject Defendants' staffing plan). Moreover, the Special Master repeatedly expresses a willingness to work with Defendants in further developing their remedial plans. *Id.*

Defendants argue that they should be given credit for their efforts in each of the ten aspects of their plan that the Special Master has embraced. *See* Defs' Objections, ECF No. 5591, at 3. While Plaintiffs do not dispute that these efforts have some value, none of them go far enough to address the current severe psychiatrist staffing crisis. For example, although Defendants have advanced a vague plan to expand their psychiatry fellowship program at some unspecified time in the future, that program currently has only two fellows – the same number Defendants had when they submitted their first staffing report

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S STAFFING REPORT

1   in November of 2015. *See* Special Master's Staffing Report, ECF No. 5564, at 11 (noting

2   Defendants had not expanded fellowship program since February 2016 "and remained at

3   two fellows"); 26th Monitoring Report, ECF No. 5439, at 30 ("Since the submission of

4   defendants' report in November 2015, there has been no change in the number of

5   psychologist interns or psychiatry fellows employed by CDCR. This represented another

6   prong of defendants' plan which did not appear to be yielding any positive results.").

7   Thus, it is hardly likely to be a big source of new psychiatrist hires anytime soon.

8   Similarly, Defendants' plan to hire more psychiatric nurse practitioners is unlikely to

9   provide significant relief, since all parties agreed during discussions on this remedy that

10   there is also a shortage of psychiatric nurse practitioners in California. *See* Decl. of Lisa

11   Ells Supp. Pls.' Reply to Defs.' Staffing Objections ("Ells Reply Decl."), filed forthwith,

12   ¶ 2. Similarly, Defendants' plan to develop a mental health academy for new mental

13   health clinical staff members might improve staff retention in the long run, but no

14   timetable or firm plans for the academy have even been presented yet by Defendants. *See*

15   Special Master's Staffing Report, ECF No. 5564, at 23 ("The program was reported to be

16   in the early stages of development, with no date set for implementation.").

17        Defendants' objections to the Special Master's Staffing Report include current

18   psychiatrist staffing data for the last three years that document a very troubling 10%

19   increase in the proportion of psychiatrist positions vacant between 2015 and 2016—

20   meaning the vacancy rate itself has increased by 45% in the last year. *See* Declaration of

21   Katherine Tebrock In Support of Defendants' Response to Special Master's Staffing

22   Report ("Tebrock Decl."), filed March 30, 2017, ECF No. 5591-2, ¶ 11 & Ex. 3 at 11.

23   Indeed, these data show that, *including registry psychiatrists and tele-psychiatrists*, and

24   adjusting for long-term absences, the vacancy rate for all psychiatrists in the CDCR

25   (including Chief Psychiatrists and Senior Psychiatrists) grew from 22% in 2015 to 32% in

26   2016. *Id.* Thus, not only is the psychiatrist staffing shortage severe, it is growing worse

27   over time. This evidence underscores the need for a 15% pay raise for CDCR psychiatrists

28   working at hard-to-hire prison locations, and for the other remedial actions on pay outlined

1  in Plaintiffs Objections to the Special Master's Report.  *See generally* Pls' Objections,

2  ECF No. 5590.

3       As discussed in greater detail in Section II.A., *infra*, Defendants' current staffing

4  plans are too slow and too narrow to remedy the current severe and growing psychiatrist

5  staffing shortage.  The growing national shortage of psychiatrists, well-documented in

6  Defendants' papers, will certainly make the CDCR's psychiatrist staffing problems worse,

7  absent additional remedial action.  The further remedial actions outlined by the Special

8  Master are critical for solving this problem, as is Plaintiffs' request for further action on

9  psychiatrist pay.

10  **II.    DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S STAFFING
          REPORT MUST EACH BE REJECTED.**

11

12       **A.    Defendants Must Be Ordered to Increase Psychiatrist Pay At Hard-to-
               Hire Locations and Develop a Long-Term Plan to Monitor and Exceed**

13               **Market Pay for Psychiatrists to Attract New Staff.**

14       Defendants continue to ignore this Court's clear directive "to devise a meaningful

15  strategy that will, finally, mean mentally ill inmates are located in institutions that are

16  adequately staffed with mental health staff competent to meet their treatment needs" by

17  refusing to consider the most obvious strategy for attracting psychiatrists:  paying them

18  more.  *See* 8/9/16 Order, ECF No. 5477, at 6.

19       As Plaintiffs described in detail in their objections to the Special Master's staffing

20  report, *see generally* ECF No. 5590, and as the Special Master agrees, Defendants' staffing

21  plan does not do enough to attract and retain psychiatrists, given the severe national

22  shortage of psychiatrists documented in Defendants' papers.  Nothing in Defendants'

23  objections changes that clear conclusion, or obviates the needs for a status conference on

24  this specific subject.  In their response to the Special Master's Staffing Report, Defendants

25  simply complain, without foundation, that additional salary increases are unnecessary, that

26  staffing requirements should be reduced because meeting those requirements is difficult,

27  and that their failure to provide sufficient clinical staff under their own plan is not harming

28  the plaintiff class.  As discussed below, Defendants' objections ring hollow.

1. **Defendants' Staffing Plan Does Not Meaningfully Address The Need for Psychiatrist Salary Increases, and Defendants' Arguments that Salary Increases Are Unnecessary Are Without Merit.**

Defendants assert that their staffing plan "build[s] on longstanding efforts to improve compensation for psychiatrists in thoughtful, targeted ways." Defs' Objections at 9. That is simply not true, as Defendants have done nothing to increase compensation for civil service psychiatrists—the primary and most critical providers of psychiatric care at CDCR institutions—beyond the modest general salary increases slated for all state physicians under the February 28, 2017 employment contract ("2/28/17 UAPD Contract") with the Union of American Physicians and Dentists ("UAPD"). *See generally* Pls' Objections, ECF No. 5590; *see* 3/30/17 Nolan Decl., ECF No. 5590-1, ¶ 11 & Ex. G (2/28/17 UAPD Contract). The contract does not include any salary or compensation increases that either directly or indirectly "target" civil service psychiatrists, nor does Defendants' staffing plan. Between their staffing plan and the 2/28/17 UAPD Contract, Defendants have agreed to pay both registry psychiatrists and CDCR medical doctors significantly more money to attract them to work at hard to staff locations, but actively opposed, and ultimately refused, to do so for civil service psychiatrists. *See* Defs' Objections at 11 (touting targeted registry pay increases); Special Master's Staffing Report Ex. B (touting targeted registry pay increases); 3/30/17 Nolan Decl., ECF No. 5591, at ¶ 11 & Ex. G (2/28/17 UAPD Contract) at § 10.4 (providing targeted pay differentials for CDCR medical doctors); *see also* Pls.' Objections, ECF No. 5590, at 22 (noting union demanded, and Defendants' rejected, targeted pay differentials for civil service psychia-trists). It is hard to square this simple fact with Defendants' argument that increased pay for civil service psychiatrists is not necessary: If Defendants did not think offering increased compensation helps to recruit and retain clinical professionals, presumably they would not be implementing that exact plan for addressing shortages of registry psychia-trists and medical doctors. The other measures in Defendants' staffing plan cannot make up for the absence of more substantial pay increases to attract and retain psychiatrists.

1    Defendants then argue that "reflexively" relying on additional salary increases to

2  address psychiatrist staffing shortages contradicts guidance from this Court.  Defs'

3  Objections at 11 (quoting 8/9/16 Order, ECF No. 5477, at 6).  However, Defendants

4  mischaracterize the Court's order and the needed salary increases. This Court's statement

5  that "[i]t is not at all clear to this court that additional pay will solve this deep-seated

6  problem and the court can no longer sanction the continued pursuit of remedial strategies

7  that have not worked in the past" is not a rejection of the need to ever increase salaries – it

8  merely reflects a recognition that staffing shortages are not a function of salary alone.  *See*

9  8/9/16 Order, ECF No. 5477, at 6.  The Court in no way rejected the need for competitive

10  compensation as a necessary component of a multipronged strategy to improve psychiatrist

11  staffing.  *Id*.

12    Defendants also mischaracterize the nature of the desired salary increases.

13  Plaintiffs and the Special Master advocate for thoughtful, not "reflexive," additional

14  compensation increases devised in conjunction with a comprehensive psychiatrist salary

15  survey.  *See* Special Master's Staffing Report at 26; *see also* Plaintiffs' Objections at 23.

16  Instead, Defendants assert that "there is no evidence" that such increases will help while

17  flatly refusing to even empirically assess the truth of that statement through a

18  compensation study.  *See* Defs' Objections at 9.

19    Indeed, Defendants' assertion that there is no evidence that additional salary

20  increases will improve psychiatry staffing is at odds with the record and Defendants' own

21  recent representations.  Defs' Objections at 9-10.  First, the Special Master's 26th Round

22  Monitoring report found that "Defendants did report increased registry hours for

23  psychiatrists at most institutions due [to] the increase in registry pay rates," indicating that

24  increasing pay helps recruit psychiatrists.  26th Round Monitoring Report, ECF No. 5439

25  at 29.  Furthermore, Defendants themselves recently provided evidence indicating that

26  paying psychiatrists more improves staffing.  During a call with the Special Master on

27  February 7, 2017, Defendants explained that they increased the hourly rate paid to registry

28  psychiatrists at Salinas Valley State Prison ("SVSP") to $100 per hour due to a severe

staffing crisis at that prison. Ells Reply Decl. ¶ 3. On a follow up call with the Special Master one month later on March 9, 2017, Defendants reported that the pay increase had in fact worked to attract psychiatrists to perform registry work at SVSP. Ells Reply Decl. ¶ 4. Defendants provide no basis for concluding that similar targeted compensation increases would not work to attract psychiatrists to civil service, and simple logic indicates it would.

Defendants offer the weak excuse that offering salary increases might lead to a bidding war with the private market, citing evidence of an "acute shortage" of psychiatrists. Defs' Objections at 12-13. Yet the acute shortage of psychiatrists, if it demonstrates anything, shows that there is already a bidding war for psychiatrists. Such is the law of supply and demand. When demand is high and supply is low and inelastic, the price of a given service increases. Refusing to pay psychiatrists more simply means that CDCR will continue to voluntarily lose the bidding war. The Bureau of Labor Statistics estimates that there are enough psychiatrists in California alone to fully staff CDCR institutions more than ten times over, so the supply of psychiatrists is not itself a barrier to Defendants' ability to fill their staffing requirements. Ells Reply Decl. ¶ 5, Ex. A (U.S. Bureau of Labor Statistics, Occupational Employment and Wages, May 2016: 29-1066 Psychiatrists); *id.* ¶ 6, Ex. C (CDCR Staffing Report Enclosure 1B Mental Institution Vacancy by Classification (Feb. 2017)). That demand is high and supply is limited merely demonstrates that Defendants and any other employers who wish to recruit and retain psychiatrists must do more to hire them.

Defendants also suggest that further salary increases are unnecessary because CDCR psychiatrists are already highly paid, but this argument is easily refuted by reference to current job postings for psychiatrists in California. Indeed, Defendants are competing with both public and private sector employers that offer California psychiatrists significantly more lucrative compensation packages. Other public employers such as the Santa Clara Valley Health and Hospital System offer psychiatrists salary ranges which top out at levels tens of thousands of dollars above salary ranges offered by Defendants, while Defendants do not even list any real salary details in their job postings. Ells Reply Decl.

1   ¶ 8, Ex. E ("Psychiatrist – $246,900 – $323,000 annually," Psychiatric Times (Apr. 19,

2   2016)); *see also id.* ¶ 11, Ex. H (DSH job posting vaguely offering salaries up "to the high

3   $200,000s").  Private employers offer *minimum* starting salaries tens of thousands of

4   dollars above the *maximum* salaries available to CDCR psychiatrists.  *Compare* Ells Reply

5   Decl. ¶¶ 9-10, Ex. F (Traditions Behavior Health – FT Psychiatrists, Psychiatric Times

6   (May 3, 2013), offering minimum pay of $300,000 up to $500,000), *and id.* Ex. G

7   (Outstanding Inpatient Psychiatry Opportunity, Psychiatric Times (Mar. 7, 2017), offering

8   pay range of $312,000-$468,000), *with* 3/30/17 Nolan Decl. ¶ 6, Exs. C, O (offering

9   maximum salaries of $285,072 and $293,340 for board eligible and certified psychiatrists,

10   respectively)*, and* Ells Reply Decl. ¶ 11, Ex. H (DSH job posting offering pay up "to the

11   high $200,000s").  Private employers also offer signing bonuses, monetary education

12   funds, and relocation assistance, further widening the already enormous disparity with

13   Defendants' psychiatrist pay.  *See, e.g.,* Ells Reply Decl. ¶ 10, Ex. G (Outstanding

14   Inpatient Psychiatry Opportunity, Psychiatric Times (Mar. 7, 2017), offering relocation

15   assistance and signing bonuses); *id.* ¶ 9, Ex. F (Traditions Behavior Health – FT

16   Psychiatrists, Psychiatric Times (May 3, 2013), offering $10,000 bonus); *id.* ¶ 8, Ex. E

17   (Santa Clara offering $4,500 in educational funds); *see also* Ells Reply Decl. ¶ 11, Ex. H

18   (DSH job posting not offering any signing bonuses or educational funds); 3/30/17 Nolan

19   Decl ¶ 6, Ex, O (CDCR job posting not offering relocation assistance, and offering limited

20   bonus only to psychiatrists who have never worked for the state before).

21         Not only do private sector employers offer higher pay, but they also offer practice

22   settings that are more appealing to many than the challenging correctional environments

23   that CDCR psychiatrists face.  In fact, to account for the challenging environment in which

24   CDCR psychiatrists work, Defendants must pay psychiatrists salaries significantly greater

25   than statewide and regional averages and greater than compensation available in the

26   private sector to recruit and retain psychiatrists.  As the U.S. Department of Justice's

27   Office of Inspector General recently found, recruiting medical professionals at prisons is

28   hampered when prisons pay medical professionals compensation that is not competitive

1   with the private sector and that does not account for "the need … to compensate …

2   employees for the safety and security factors intrinsic to working in a correctional setting."

3   Ells Reply Decl. ¶ 12, Ex. I at i, 7 (OIG's March 2016 "Review of the Federal Bureau of

4   Prisons' Medical Staffing Challenges").  Defendants offer no evidence to refute the basic

5   laws of supply and demand prescribing that compensation increases will help recruit and

6   retain the 114.52 psychiatrists needed to reach minimum acceptable staffing levels under

7   their own Court-ordered staffing plan.  Ells Reply Decl. ¶ 6.

8        Furthermore, Defendants' arguments are based on years-old data and compare

9   apples to oranges.  For example, Defendants represent that the average pay for CDCR

10  psychiatrists of $260,394 was higher than the average pay for California psychiatrists in

11  2014 of $206,200, but this comparison is misleading for several reasons.  Defs' Objections

12  at 13.  First, average CDCR psychiatrist pay is of little relevance to recruitment because

13  Defendants ordinarily hire psychiatrists at entry level salaries of $237,864 for board-

14  eligible psychiatrists and $244,128 for board certified psychiatrists, which are far lower

15  than the reported average CDCR psychiatrist pay, average statewide psychiatrist pay, and

16  regional average psychiatrist pay in many metropolitan areas across California.  *See* Pls'

17  Objections at 15-16 (comparing minimum pay for CDCR psychiatrists against Bureau of

18  Labor Statistics 2015 wage data for California psychiatrists); 3/30/17 Nolan Decl. ¶ 6,

19  Ex. C (providing a table of minimum and maximum CDCR psychiatrist pay); *see also* Cal.

20  Gov't Code § 19836 (describing limited circumstances where hiring above minimum

21  salaries is permissible).

22       Second, Defendants offer no reason for comparing current 2017 CDCR psychiatrist

23  compensation to 2014 wage statistics when more recent statistics were available.  *See*

24  Defs' Objections, ECF No. 5591, at 11.  2015 wage data from the Bureau of Labor

25  Statistics was available at the time that the parties briefed their objections to the Special

26  Master's Staffing Report, and on March 31, 2017, the Bureau released 2016 wage data for

27  psychiatrists.  *See* Ells Reply Decl. ¶ 7, Ex. D (U.S. Bureau of Labor Statistics, Schedule

28  of Selected Releases for March 2017).  The 2015 and 2016 BLS wage data shows that

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S STAFFING REPORT

1  average compensation for psychiatrists has grown dramatically from $206,200 in 2014 to

2  $252,030 in 2016—a more than 22% increase.  *Compare* Defs' Objections, ECF No. 5591,

3  at 13 (citing BLS 2014 wage data), *with* Ells Decl. ¶ 5, Ex. A at p. 3 of 10 (BLS 2016

4  wage data); *see also* 3/30/17 Nolan Decl., ECF No. 5590-1, ¶ 12, Ex. H (BLS 2015 wage

5  data).  This track record of income growth also strongly suggests that average psychiatrist

6  pay is even higher in 2017.

7         Rapid income growth for California psychiatrists since 2014 documented by the

8  Bureau of Labor Statistics underscores the need for Defendants to increase CDCR

9  psychiatrist salaries much more significantly than the 2/28/17 UAPD Contract provides.

10 Defendants' reported average CDCR psychiatrist pay is only slightly higher than the

11 average California psychiatrist compensation in 2016 of $252,030.  Ells Reply Decl. ¶ 5,

12 Ex. A at p. 3 of 10 (2016 BLS wage data); *see also* Defs.' Objections, ECF No. 5591, at 13

13 (reporting CDCR average salary).  Furthermore, average 2016 psychiatrist compensation

14 in several regions across California was significantly higher than reported average CDCR

15 psychiatrist pay.  For example, in 2016, average psychiatrist pay was $278,840 in the

16 Sacramento, Roseville, Arden-Arcade metropolitan area, $277,490 in the Stockton-Lodi

17 area, $274,800 in the Riverside, San Bernardino, Ontario area, and $260,710 in the San

18 Jose, Sunnyvale, Santa Clara area.  Ells Reply Decl. ¶ 5, Ex. A at p. 8-9 of 10 (2016 BLS

19 wage data).   Defendants cannot attract and retain qualified psychiatrists located in these

20 areas, much less attract them to much less desirable locations where many of their large

21 mental health programs are located, by offering starting and average salaries that are below

22 regional average pay.

23         **2.     Alteration of Defendants' 2009 Staffing Ratios Is Not Appropriate**

24         Next, this Court should ignore Defendants' in-passing request that they not be held

25 to the Court-ordered staffing plan and ratios they developed.  Defs' Objections, ECF No.

26 5591, at 12-13.  The time for raising objections to the psychiatrist staffing ratios passed in

27 2015, when Defendants submitted their staffing plan in response to the Court's 2014 order

28 directing them to review their 2009 staffing plan, which included the ratios.  Special

1    Master's Staffing Report, ECF No. 5564, at 4-5; *see also* 6/19/14 Order, ECF No. 5171, at

2    3.  Defendants failed to object, nor have they sought approval of the Special Master or

3    Court for revising their own established ratios.  *See generally* Defs' February 2, 2015

4    Staffing Plan, ECF No. 5269; *see also* 5/18/15 Order, ECF No. 5307, at 5.  Defendants

5    have offered no excuse for their delay, nor have they provided any basis for concluding the

6    clinical needs of *Coleman* class members have fundamentally changed in a way that would

7    support modifying the staffing ratios—particularly given the years and significant effort

8    that went into the initial efforts.  *See* Special Master Staffing Report, ECF No. 5564, at 3.

9    Defendants last-minute entreaties to make a major change to these longstanding staffing

10   standards should be rejected.

11        Defendants' arguments amount to nothing more than complaints about the difficulty

12   of hiring (even as they refuse to raise salaries to a competitive level, or even study what the

13   level is).  First, that Defendants already employ hundreds of psychiatrists is undisputed and

14   is not relevant to whether Defendants have sufficient psychiatrists to treat the tens of

15   thousands of CDCR prisoners who require psychiatric care.  *See* Defs' Objections, ECF

16   No. 5591, at 13.  Second, Defendants' bare assertion that they are  "unaware" of other

17   healthcare systems that "require as rich a staffing level for psychiatrists as is mandated by

18   the *Coleman* Court" is not evidence.  *See* Defs' Objections, ECF No. 5591, at 13.  The

19   staffing ratios were not "mandated" by this Court, but rather developed by Defendants

20   themselves and presented to the Court for approval, over Plaintiffs' objections.  *See*

21   Special Master Staffing Report, ECF No. 5564, at 3.  Moreover, Defendants' existing

22   staffing ratios are based on factors unique to Defendants' institutions, so psychiatrist

23   staffing levels at other institutions in other states have little bearing on whether CDCR has

24   an adequate number of psychiatrists.

25        Furthermore, as discussed below, reducing the staffing ratios is inappropriate

26   because Defendants' assertion that they provide adequate psychiatric care to Plaintiffs at

27   current staffing levels is wholly without merit.

28

1

**3.    Defendants Are Not Providing Adequate Care to Plaintiffs At Current Staffing Levels, and The Harm From Defendants' Psychiatrist Staffing Shortage Is Severe and Growing Worse**

2

3    Defendants contend that "[d]espite [v]acancies," CDCR is "[a]ble to [p]rovide

4    [a]dequate [m]ental [h]ealthcare to [c]lass [m]embers," relying on certain statistics

5    reported in the declaration of Katherine Tebrock.   Defs' Objections, ECF No. 5591, at 13-

6    15; *see also* Declaration of Katherine Tebrock in support of Defendants' Response to the

7    Special Master's Report on the Status of Mental Health Staffing and the Implementation of

8    Defendants' Staffing Plan (hereafter "Tebrock Decl."), ECF No. 5591-2, ¶ 6-11, Exs. 1-3.

9    In the many months of focused workgroup meetings on staffing in 2015 and 2016,

10    including Defendants' updates on their staffing plan implementation, Defendants never

11    once raised this claim.  Ells Reply Decl. ¶ 13; *see also* 8/9/16 Order, ECF No. 5477, at 8.

12    It is entirely inappropriate for Defendants to sandbag the Special Master with this

13    argument now, particularly since it is based on selective data available only to Defendants.

14    Even if it were permissible for Defendants to raise this argument for the first time in

15    their objections to the Special Master's report, Defendants' support for their claim amounts

16    to cherry-picked compliance statistics based on inadmissible summaries of their own data,

17    which are neither attached for the Court's review nor available to Special Master or

18    Plaintiffs for verification.[2]  Defs' Objections, ECF No. 5591, at 13-15; *see also* Tebrock

19    Decl. ¶ 6-11, Ex. 2.  Indeed, it is unclear what these statistics communicate concerning the

20    quality of psychiatric care because Defendants failed to explain how they are generated.

21    *Id.*  To the extent that they insinuate that CDCR is providing adequate psychiatric care,

22    they do not paint a complete or accurate picture of the provision of psychiatric care to class

23    members.  In reality, the record is replete with evidence showing that class members are

24    harmed by the psychiatrist staffing shortages.

25    **(a)    Defendants' Cherry-Picked Evidence Is Limited and**

26

27    [2] Plaintiffs' evidentiary objections to Defendants' evidence, including Katherine Tebrock's declaration, were filed concurrently.

28

**Flawed**

Defendants' primary evidence in support of their new argument that they do not need more psychiatrists to provide adequate care, despite non-compliance with their own established ratios, is a chart attached to the declaration of Katherine Tebrock entitled "Mental Health Staff Psychiatrist Staffing vs. Compliance" (hereinafter the "Staffing vs. Compliance Chart"). Tebrock Decl. ¶ 8, Ex. 2. The Staffing vs. Compliance Chart reports on unspecified "compliance" metrics with footnotes indicating that the data is highly selective. The column "timely [psychiatry] contacts" bears a footnote stating that it reports on the percentage of in-person psychiatry contacts "for any patient who has been EOP in the same housing program at the same institution, without interruption, for the past six months." *Id.* That is, this column does not report on continuity of psychiatry contacts for (1) new patients in their first six months at an institution, when developing a relationship with a new clinician would be critical; (2) patients moving back and forth to crisis beds and/or inpatient programs; (3) patients moving between housing units, for example, those placed in administrative segregation; or (4) patients seen by tele-psychiatrists. Although Defendants tout that Salinas Valley State Prison's ("SVSP") compliance in this metric was 90%, there is no total number of compliant encounters stated, and in light of the elimination of the many patients described above from their measurement, this could mean only that a very small number of very stable patients were seen by their most frequent providers. *See* Defs' Objections at 14.

Defendants also tout Avenal State Prison ("ASP") as an example of one which ensures timely psychiatry contacts notwithstanding high vacancy rates. *See* Defs' Objections, ECF No. 5591, at 14. In February 2017, ASP had 974 CCCMS patients, and 1 EOP patient. *See* Ells Reply Decl. ¶ 14, Ex. J (February 2017 monthly data chart). Not every CCCMS patient is on psychiatric medications such that they would even see a psychiatrist; those who are on such medications need to be seen by a psychiatrist only once every 90 days. *See* Program Guide 12-3-11. Again, the Staffing vs. Compliance Chart

does not provide a total number of compliant encounters, but ASP's experience may well mean nothing more than that psychiatrists there saw their low-acuity patients exactly twice in the measured six month period, i.e., at the maximum infrequency allowed for by the Program Guide.  Indeed, CDCR's most recent publicly available "Dashboard" ("January 2017 Dashboard") gives rise to the conclusion that ASP's psychiatry contacts may sacrifice timeliness for quality and substance – psychiatrists there saw an average of 14 patients per day in January 2017, as compared to 6.2 patients per day statewide.  *See* Ells Reply Decl. ¶ 15, Ex. K at page 94 of 277 (January 2017 Dashboard).  More significantly, the Staffing vs. Compliance Chart even read in isolation shows that CDCR's ability to ensure timely psychiatry contacts for higher-acuity patients is much more vulnerable to staffing vacancies.  Compliance at institutions with large EOP programs, where patients should be seen by psychiatry every 30 days, is significantly worse:  66% at SAC, 72% at CHCF, 78% at SVSP, and 78% at RJD, among others.  *See* Tebrock Decl. ¶ 8, Ex. 2.

Comparing the data set forth in the Staffing vs. Compliance Chart to the public "Dashboard" also raises questions as to the selectivity and veracity of the data presented in the chart.  The chart states that SVSP was compliant with 90% of "MAPIP," or medication management, indicators from August 1, 2016 through January 31, 2017.  Tebrock Decl. ¶ 8, Ex. 2.  But this column is also footnoted with cryptic and unexplained caveats, that the data captured does not include indicators "that are baseline, 3 months or triggered by medication dose changes."  *Id*.  Again, this allows an inference that the number of compliant encounters is very small, and may exclude many important or complicated encounters.  This high compliance rate also appears suspect in light of the January 2017 Dashboard's reporting that SVSP was critically non-compliant in numerous medication management indicators, including medication continuity (68% overall) and medication non-adherence counseling (47% overall), and had terrible access to mental health care overall (72%).  Ells Reply Decl. ¶ 15, Ex. K (January 2017 Dashboard – SVSP specific page).

Defendants' selective data reporting also omits mention of case management

indicators related to quality of care and outcomes, which are notably poor statewide, and which reflect that clinical case teams are not working well without the leadership of active and engaged psychiatry staff. At SVSP, for instance, the January 2017 Dashboard reflects only 40% compliance with MHCB/EOP treatment plans; statewide compliance with treatment planning metrics for EOP and MCHB patients was only 64%. Ells Reply Decl. ¶ 15, Ex. K (January 2017 Dashboard – SVSP specific page). Suicide watch planning was similarly poor statewide, with only 29% compliance, including 0% compliance at ASP, Defendants' supposed high-vacancy success story. Ells Reply Decl. ¶ 15, Ex. K (January 2017 Dashboard – ASP specific page).

**(b)    The Special Master Has Found Significant Harm from the Persistent Psychiatry Shortages**

The clinical harms reported in the 26th Report from the shortages of psychiatrists are broadly spread and dangerous to the plaintiff class. *See generally* 26th Round Monitoring Report, ECF No. 5439. As Plaintiffs explained in their initial filing in response to the Special Master's Staffing Report, psychiatrist vacancies have led to a crisis at SVSP in just the last two months, where new transfers into the EOP programs have been halted by Defendants. *See* Pls' Objections, ECF No. 5590, at 12; *see also* 3/30/17 Nolan Decl., ECF No. 5590-1, ¶ 20. Severe staffing-related problems have also been reported at RJD and by class members at LAC. As discussed in detail in Plaintiffs' previous filing on this matter, the 26th Report also found that many institutions were noncompliant with psychiatry-prescribed medications, medication continuity for new arrivals, medication continuity for individuals discharged back to CDCR from DSH hospitals, and laboratory testing requirements for individuals prescribed psychotropic medications. *See* Pls' Objections, ECF No. 5590, at 10; 26th Monitoring Report, ECF No. 5439, at 46-48, 59.

Additional evidence of severe harm can be found throughout the Special Master's recent monitoring reports. For example, the 26th Report found that there was no peer review for psychiatrists at SATF or ASP during the review period and no peer review at all at 11 other prisons, including key mental health prisons CSP-Corcoran, CCWF, RJD,

1   SVSP, and VSP. 26th Monitoring Report, ECF No. 5439, at 42 (also noting no evidence of

2   peer review provided at CHCF, KVSP or PVSP); *see also id.* at 43 ("Peer review is an

3   integral part of the quality management/quality assurance process and a key element in the

4   effort to ensure quality of care for class members").  Similarly, psychiatrists were not

5   attending IDTT meetings at CHCF, CCWF, ASP, in the PBSB SHU, and CSP-Corcoran.

6   *Id*. at 117.  The Special Master's 26th Report also identified broad treatment planning

7   concerns, which likely reflect the psychiatry shortages, given the leading role of psychiatry

8   in treatment planning.  *Id*. at 117-24.  The Special Master's experts conducted records

9   reviews across the CDCR in the 26th Round which "found treatment plans that were too

10  vague, lacking operationalization and specific, measurable treatment targets or goals." *Id*.

11  at 119.  The Special Master also found inconsistent or conflicting diagnoses among

12  treating psychiatrists or between psychiatrists and case managers.  *Id*. at 123-24.  The 26th

13  Report sections on individual case reviews also include numerous findings about excessive

14  turn-over in assigned psychiatrists and resulting poor care.  For example, the Special

15  Master's review of Inmate I at Pelican Bay found that "in light of the minimal time of PC

16  contacts, multiple psychiatrist changes, and problems with the treatment plan, the care

17  provided to this inmate was inadequate."  *Id*. at 593; *see also id.* at 612 (noting that for

18  Case A at MCSP "his care was further complicated by … a lack of continuity by his

19  psychiatry provider" who was also absent from his IDTT meeting).

20         In sum, Defendants' refusal to study and provide appropriate, targeted

21  compensation increases to civil service psychiatrists—even while providing significant

22  increases to registry psychiatrists and medical doctors—is unacceptable after close to three

23  decades of clinical staffing shortages plaguing this case and the Court's demand for a real

24  solution.  As Plaintiffs indicated in their objections, a status conference on this issue is

25  more than warranted in addition to rejecting Defendants' objection.

26         **B.     The Special Master's Recommendations Regarding Tele-psychiatry Are**
               **Critical to Ensure that This Resource Is Used Safely and Appropriately.**

27

28         Given the severe and growing psychiatrist staffing crisis, it is understandable that

1  Defendants want to aggressively expand tele-psychiatry, where they have recently had

2  greater success in hiring clinicians.  And in fact, for this reason, both Plaintiffs and the

3  Special Master approve of the expanded use of tele-psychiatry for lower level of care

4  patients, and have encouraged the use of tele-psychiatry in appropriate circumstances.  *See*

5  Special Master's Staffing Report, ECF No. 5564, at 15 ("Although the Special Master's

6  experts have determined that telepsychiatry is a viable method for the delivery of mental

7  health services, this does not come without admonitions and parameters.").  However,

8  Defendants want the Court to approve their use of tele-psychiatry "without qualifications,"

9  including its use for patients in need of a crisis bed or inpatient level of care.  *See* Defs.'

10  Objections at 9.  Defendants request is inappropriate and must be rejected.

11        First, Defendants have waived this objection by failing to object to similar past

12  findings by the Special Master in connection with the 26th Monitoring Round Report,

13  wherein the Special Master noted that tele-psychiatry "is primarily an option for treatment

14  of inmates at the 3CMS level of care, and a less desirable option for inmates at higher

15  levels of care."  *See* 26th Monitoring Report, ECF No. 5439, at 30.  Defendants did not

16  object to this finding.  Second, expanding the tele-psychiatry program requires building out

17  new office space, and thus it is a slow remedy, with Defendants unable to add new

18  positions until 2018.  *See* Special Master's Staffing Report, ECF No. 5564, Ex. B at 41

19  (plan to add tele-psychiatry space at San Quentin in 2018, and CDCR "working towards

20  acquiring additional space" for tele-psychiatry).  There is no question that faster relief is

21  needed now.

22        Moreover, Defendants' tele-psychiatry policy is flawed in several critical respects

23  addressed directly by the Special Master's Staffing Report.  First, the Special Master

24  makes clear that tele-psychiatry is not appropriate for treating individuals at the MHCB

25  level of care:

26        For inmates at the MHCB level of care, telepsychiatry is not an appropriate
         method of treatment to be used on a regular basis.  Telepsychiatry for these
27       higher acuity inmates should only be used as a last resort or in emergency
         situations when an on-site psychiatrist is not available.  On-site psychiatrists
28       are able to more positively impact the therapeutic milieu by regularly

1

2

> interacting with correctional, nursing, and other mental health staff. This is just not possible with telepsychiatrists. In addition, on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates.

3  Special Master's Staffing Report, ECF No. 5564, at 17. This sensible restriction on the use

4  of tele-psychiatry for emergency care and inpatient settings is well-supported. Second, the

5  Special Master indicates that tele-psychiatry "should serve as a supplement for onsite

6  psychiatry, not as a substitute." Special Master's Staffing Report, ECF No. 5564, at 15.

7  This recommendation reflects both a concern that on site psychiatrists are needed for

8  emergency care and a concern that tele-psychiatry might "allow on-site psychiatrists to

9  migrate to the comfort of off-site offices." Special Master's Staffing Report, ECF No.

10 5564, at 16. Third, the Special Master indicates he wants to examine the current use of

11 tele-psychiatry for EOP patients more closely before endorsing it. *Id.* at 16-17. Each of

12 these concerns and corresponding restrictions is eminently reasonable and should be

13 adopted by the Court.

14

### 1. Defendants' Evidence Does Not Support the Unlimited Use of Tele-psychiatry at All Levels of Care

15

16      Defendants urge this Court to reject the considered recommendation of the Special

17 Master and his experts for limitations on the unfettered use of tele-psychiatry to treat the

18 most acutely ill *Coleman* class members. In support of their argument, Defendant stretch

19 scholarly studies beyond their logical end points, and entirely mischaracterize the

20 testimony of their own headquarters Chief Psychiatrist, Dr. Michael Golding. Defendants

21 claim that "[t]he research literature demonstrates that in most applications, telepsychiatry

22 is as effective as face-to-face or on-site psychiatric treatment, including in prison settings,"

23 citing the testimony of Dr. Golding. Defs.' Objections, ECF No. 5591, at 6. But

24 Dr. Golding says no such thing. In fact, Dr. Golding testifies that, after he and his team

25 searched the literature for studies "on the use and efficacy of telepsychiatry," his team was

26 "*unable* to locate any well-controlled studies evaluating telepsychiatry vs. onsite

27

28

1  psychiatry within a prison setting." Golding Decl. ¶ 2 (emphasis added).[3] In other words,

2  as Dr. Golding admits, tele-psychiatry in prison has not been effectively evaluated in

3  reliable studies.

4      Dr. Golding nonetheless goes on then to extrapolate from studies "on telepsychiatry

5  in other settings" that the unlimited use of tele-psychiatry in CDCR for all levels of care—

6  including crisis and inpatient care—is "useful[]" and "consistent with the idea that *in most*

7  *applications*" tele-psychiatry is just as good as in person care. *Id.* (emphasis added).

8  Dr. Golding does not, of course, explain in what applications tele-psychiatry falls short.

9  *Id.*; *see also id.* ¶ 8 (noting no "consistent" evidence that tele-psychiatry is "absolutely

10 contraindicated" for any patient, but failing to explain the relevant limitations for when it

11 has in fact been found to be contraindicated).

12     Moreover, the list of tele-psychiatry study summaries attached to Dr. Golding's

13 declaration does not include studies of comparable populations to the CDCR's high acuity

14 EOP, MHCB, and inpatient populations. According to Dr. Golding's summaries, the list

15 includes many studies with small sample sizes, studies that involve treating patients in

16 underserved rural areas with limited access to care absent tele-psychiatry, or patients with

17 minor or routine mental health conditions. *See, e.g.*, Golding Decl. ¶ 2, Ex. 1 (summary

18 chart of literature) at 6 (first study: involving 43 patient interviews observed; second

19 study: involving rural Kansas study with focus on access to care for children and

20 adolescents in sparsely populated areas; third study: involving using tele-psychiatry for

21 treating depression in small primary care settings; sixth study: involving use in

22 "geographically isolated" areas); *id.* at 7 (second study: focusing on ADHD). Other

23 studies described involve telepsychology, not telepsychiatry, or focus on populations

24 totally dissimilar to *Coleman* class members, such as children. *See, e.g.*, Golding Decl.

25 ¶ 2, Ex. 1 at 6 (second study: involving child and adolescent psychiatry); *id.* at 7 (second

---

[3] Plaintiffs' evidentiary objections to Defendants' evidence, including Dr. Michael Golding's declaration, were filed concurrently.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S STAFFING REPORT

1    study: focusing on child and adolescent psychology); *id.* at 8 (first study: focusing on

2    geriatric populations and cost effectiveness, not quality of care); *id.* at 10 (first study:

3    studying telepsychology, not telepsychiatry; sixth study: same).  None of the studies, or the

4    study included as Exhibit 2 to Dr. Golding's declaration, appears to involve individuals

5    with severe and chronic Axis I mental illnesses, such as schizophrenia or bipolar disorder,

6    like those that class members at the EOP level of care and higher experience in CDCR.

7    *See* Golding Decl. ¶ 3, Ex. 2 at 16 (reviewing 13 studies "that evaluated treatment

8    outcomes for mental health interventions delivered via telepsychiatry (Table 1).  Seven

9    studies targeted depression, two targeted ADHD, one targeted bulimia nervosa, and two

10   targeted common psychiatric disorders presented in outpatient medical and mental health

11   settings.").

12         Moreover, the authors of many of the studies in the chart acknowledge ties to for-

13   profit companies with interests in expanding tele-psychiatry or other conflicts of interest.

14   *See, e.g.*, Ells Reply Decl. ¶¶ 16-18, Exs. L-O.  Moreover, even the for-profit

15   telepsychiatry companies for whom some of the cited authors work directly counsel

16   against using tele-psychiatry in the ways that Defendants ask this Court to approve, against

17   the Special Master's recommendation.  *See, e.g.,* Ells Reply Decl. ¶ 19, Ex. P

18   (HealthLinkNow website telling patients not to use telepsychiatry if they are suicidal,

19   homicidal, or have an emergency, noting that telepsychiatrists will not prescribe certain

20   medications, requiring informed consent to be treated by telepsychiatry, and requiring an

21   initial consultation before treatment via telepsychiatry).

22         Finally, Dr. Golding's tepid statement that telepsychiatry "*may* offer important

23   clinical advantages for patients" is of no evidentiary worth.  Golding Decl. ¶ 9 (emphasis

24   added).  The single example he cites, involving possible continuity of care advantages, is

25   purely hypothetical.  There is no testimony in the record, nor any documentary support in

26   Defendants' telepsychiatry policy, for the proposition that CDCR actually does ensure that

27   *Coleman* class members continue seeing the same telepsychiatrist when they transfer

28   between institutions.  Similarly, the extremely limited chart review Dr. Golding describes

1  – involving a comparison of only 32 charts, with no criteria listed or described for how the

2  charts were evaluated, and no description as to whether the charts involved class members

3  at higher levels of care--does nothing to undermine the Special Master's legitimate

4  caution.  Golding Decl. ¶ 10.

5        In short, Defendants concede that tele-psychiatry is still experimental in the prison

6  context, but nonetheless ask this Court to allow them to use the very sickest *Coleman*

7  patients as guinea pigs despite the contrary recommendation of the Special Master and his

8  team experts.  This Court should not countenance Defendants' objections, as the Special

9  Master's recommendations are well founded and supported by the evidence and governing

10  professional standards.

11              **2.      Tele-psychiatry Should Not Be Used For MHCB or Inpatient
                         Level of Care Patients**

12

13        The Special Master's recommendation that tele-psychiatry be limited in MHCB and

14  inpatient settings is well-supported and consistent with the relevant key professional

15  standards on the use of tele-psychiatry.  For example, in its official January 2014 *Resource*

16  *Document on Telepsychiatry and Related Technologies in Clinical Psychiatry*, the

17  American Psychiatric Association ("APA") warns about the risks of using tele-psychiatry

18  for emergency management with suicidal patients, and against using it with psychotic or

19  paranoid patients whose mental illness may make tele-psychiatry inappropriate:

20              Emergency Management:  Telemedicine requires particular cautions
            regarding emergency management.  Most sources discourage the use of e-

21          therapy for suicidal patients, for example.

22              Some patient situations require particular caution.  Of course, as part
            of the overall safety and appropriateness assessments, potentially suicidal,

23          violent, or homicidal patients must be considered with particular care.
            Providers may wish to be cautious when treating clients with paranoia,

24          psychosis, or other forms of disordered thinking….

25  *See* Ells Reply Decl. ¶ 20, Ex. Q at 11, 12 (document pagination).  These professional

26  standards underscore the risks to patients at higher levels of care that make tele-psychiatry

27  a less desirable option for their treatment, as noted by the Special Master.

28        The Special Master's recommendation to restrict the use of tele-psychiatry at the

1   MHCB and inpatient levels of care actually mirrors the clear preference for on-site

2   psychiatrists in these settings in CDCR's and DSH's own tele-psychiatry policies.  *See* Ells

3   Reply Decl. ¶ 21, Ex. R (September 2015 CDCR Telepsychiatry Policy) at 12-12-1

4   ("Telepsychiatry shall be used to provide clinical care for Mental Health Crisis Bed

5   (MHCB) and other inpatient settings when there are no onsite providers available" and

6   emphasizing that "[o]nsite providers shall remain the preferred method of psychiatric care

7   in inpatient settings"); *see also* March 30, 2017 Decl. of Brandon Price Supp. Defs.'

8   Response to the Special Master's Report ("Price Decl."), ECF No. 5591-4, Ex. 1 at 4 ("The

9   use of telepsychiatry is restricted to only when in-person psychiatric care is not available,

10  and only as long as necessary.  DSH will not use tele-psychiatry in lieu of in-person

11  psychiatrists for any reason other than a lack of availability of in-person psychiatrists.").

12  The Special Master's somewhat stricter prohibition is a logical extension of these existing

13  policies.

14        Finally, Defendants promote the use of tele-psychiatry for higher-level-of-care

15  patients by pointing to evidence that DSH has used a single tele-psychiatrist at Coalinga

16  State Hospital to treat 15-17 *Coleman* patients.  *See* Price Decl. ¶ 4.  The mere fact that

17  Defendants use tele-psychiatry for inpatient care does not make it clinically appropriate to

18  do so, and certainly does not mean that the Special Master's well-reasoned recommenda-

19  tions for restrictions should be ignored.  The Special Master has never monitored, much

20  less approved, DSH's use of telepsychiatry in its inpatient programs, and Plaintiffs have

21  strongly objected to the practice since first learning of it through the 2016 workgroup

22  meetings even though DSH apparently began using a telepsychiatrist in 2015.  *See*

23  *generally* Special Master's Report on the Inpatient Care, filed May 25, 2016, ECF No.

24  5448 (containing no mention of tele-psychiatry); *see also* Ells Reply Decl. ¶ 22, Ex. S

25  (Nolan 10/19/16 letter).

26        But even assuming DSH's use of a telepsychiatrist for inpatient care were somehow

27  clinically appropriate, this evidence does not undermine the Special Master's point.  The

28  DSH Coalinga Director testifies that the telepsychiatrist may "order[] enhanced

observation," which implies this clinician does not treat patients in crisis or suicidal patients.  Furthermore, Coalinga State Hospital has 15 on-site psychiatrists who can provide care in emergency situations and for particularly difficult cases.  Ells Reply Decl. ¶ 23, Ex. T (January 2017 Staffing Data for Coalinga State Hospital).  Additionally, as noted above, DSH's tele-psychiatry policy clearly restricts the use of this resource to situations when there are no on-site staff available.  Thus, the current use of a tele-psychiatrist at Coalinga violates DSH's own clear policy barring such care when there are on-site clinicians.  Finally, a single clinician with 15 patients is too small a sample to assess of the utility of this resource for inpatient care, and Mr. Price's brief declaration provides no information about whether there are any other formal restrictions on the tele-psychiatrist's practice.

### 3. The Requirement that Telemedicine Should Only Serve as a Supplement to On-Site Psychiatrists is Critical

The Special Master is also right to be concerned about tele-psychiatry becoming the primary mode of psychiatrist-patient interaction, and right to insist that tele-psychiatry be used to supplement rather than replace on-site staff members.  First, this is a safety issue when managing crisis care.  Even the American Telemedicine Association ("ATA"), an industry advocacy group, advises that "Patients receiving treatment through telemental health services should have an active relationship with a prescribing professional in their physical vicinity."  *See* Ells Reply Decl. ¶ 27, Ex. X (The American Telemedicine Association, Practice Guidelines for Video-Based Online Mental Health Services, May 2013) at 14; *see also id.* at 5 (stating that the ATA's mission is "to overcome barriers to the advancement of telemedicine").  This problem is underscored by Defendants' failure to close the ten-bed MHCB at High Desert State Prison (HDSP) as part of their clustering plan.  *See supra* Section II.C (discussing clustering objection).  HDSP has not had a single on-site staff psychiatrist or a chief psychiatrist since at least August of 2014.  *See* 3/30/17 Nolan Decl. ¶ 26.  Running an MHCB unit that treats acutely suicidal prisoners with no staff psychiatrists on site violates this important tele-psychiatry industry safety standard.

1    Moreover, allowing tele-psychiatry to be the major mode of psychiatry service

2    delivery at any one prison without adequate staff on site risks triggering a migration from

3    difficult institutional placements to remote office parks.  *See* Special Master Staffing

4    Report at 16.  Defendants claim, without citation, that "[t]here is little risk … that

5    telepsychiatry could replace on-site psychiatric services."  Defs.' Objections, ECF No.

6    5591, at 9.  But the record (and common sense) belies that bare assertion.  As the evidence

7    in the union psychiatrist surveys attached to Plaintiffs' Objections make clear, over-

8    reliance on tele-psychiatry both increases the burdens on on-site staff psychiatrists and

9    encourages on-site staff to either leave CDCR or move to tele-psychiatry themselves.  *See*

10    Nolan Decl.¶ 10, Ex. F at 41 (reporting that out of 7.5 allocated psychiatrist positions,

11    Solano has "only 3 staff psychiatrists taking call[s], the rest are half time contractors and

12    telepsychiatrists floating in and out of the pool of workers.  No consistency.  Some duties

13    only fall on the State psychiatrists who are burned out … two out of our three psychiatrists

14    are looking for other jobs…"); *id.,* Ex. F at 42 ("I transferred to Telepsychiatry which is a

15    different world from working inside prison where inmates assault staff and threaten you.  I

16    see inmates at SVSP which is understaffed and inmates are not always being seen in a

17    timely manner and morale is bad.  I could not believe that CIW did not get the R & R

18    bonus [given to other physicians].").  As one psychiatrist at RJD explained, "the tele-

19    psychiatrists and contractors (most of whom have quit) are no substitute for an adequate

20    staff" on site.  *Id.*, Ex. F at 46.

21    **4.    The Special Master is Right to Proceed with Caution and Conduct**
       **Further Monitoring Before Approving Tele-psychiatry for EOP**
22    **Patients**

23    Defendants also object to the Special Master's refusal to endorse an unlimited

24    expansion of tele-psychiatry for EOP patients given their high acuity and the limited data

25    and observation available to his experts to date.  Instead, the Special Master reasonably

26    recommends further monitoring the treatment of EOP patients using tele-psychiatrists

27    moving forward, at least in the short term.  *See* Special Master's Staffing Report, at 16-17.

28

1    The Special Master's caution in conducting further examination of CDCR's use of

2    tele-psychiatry for EOP patients is particularly important given that the CDCR tele-

3    psychiatry policy does not require a prior screening of patients to determine if they are

4    appropriate for tele-psychiatry and, unlike DSH's policy, does not even require informed

5    consent for tele-psychiatry. *Compare* Ells Reply Decl. ¶ 21, Ex. R (CDCR tele-psychiatry

6    policy), *with* Price Decl., ¶ 2, Ex. 1 (DSH tele-psychiatry policy) at 7 ( requiring that

7    "[p]rior to any telepsychiatric service, the patient shall provide verbal or written consent"

8    and that "[t]he consent shall be documented," and covering key required elements of the

9    consent).

10    Many professional organizations regard clinical pre-screening of patients assigned

11    to tele-psychiatry as critical, but neither CDCR nor DSH tele-psychiatry policies require

12    this precautionary step. For example, the APA Council on Psychiatry & Law advises that

13    "[p]roviders need to perform an individual assessment to see if tele-psychiatry is

14    appropriate for the case in question." *See* Ells Reply Decl. ¶ 20, Ex. Q (APA Resource

15    Document) at 12 (document pagination). This is because "not all patients will be well

16    suited for … tele-psychiatry" and because "[t]he mental health practitioner will need to

17    rely upon professional judgment to determine the applicability of e-therapy for a particular

18    patient." *Id*; *see also* 5/18/15 Order, at 5 (noting likelihood some class members are not

19    appropriate for tele-psychiatry treatment). Similarly, the American Psychological

20    Association counsels that "before psychologists engage in providing telepsychology

21    services, they are urged to conduct an initial assessment to determine the appropriateness

22    of the telepsychology service to be provided for the client/patient." Ells Reply Decl.¶ 24,

23    Ex. U (American Psychological Association, 10/31/13 Guidelines for the Practice of

24    Telepsychology) at 10. Indeed, in addition to the fact that some class members may not be

25    amenable to treatment through telepsychiatry due to clinical reasons, telepsychiatry may be

26    inappropriate for other reasons, including Defendants' requirement to provide class

27    members with developmental or hearing disabilities with effective communication

28    pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12102 *et seq.*, as well as

their obligations under *Armstrong v. Brown* and *Clark v. Brown*.  *See* 28 C.F.R. §§ 35.160

(ADA effective communication regulations applicable to state and local governments).

For instance, Defendants use video relay interpreting services to provide sign language

interpretation ("SLI") for deaf class members at medical appointments in all of their

institutions, whereby a SLI interpreter translates for a signing prisoner through a video

screen from a remote location.  Ells Reply Decl. ¶ 26, Ex. W (*Armstrong* case management

statement from January 2017); 28 C.F.R. § 35.104 (defining a video relay interpreting

service as an "interpreting service that uses video conference technology over dedicated

lines or wireless technology offering high-speed, wide-bandwidth video connection that

delivers high-quality video images.").  Relying on two remotely located professionals to

interact through two separate computer screens with a deaf class member who has a high

level of mental health acuity about urgent clinical information is not only not effective

communication, it is a recipe for disaster.  In the absence of this screening, the Special

Master's recommended limitations on the use of tele-psychiatry for higher levels of care

patients are even more important to protect patients.

### C.    Defendants' Clustering Plan Is Inadequate and The Special Master's Recommendation for a New Plan is Appropriate

Last summer, as Defendants acknowledge, the Court ordered Defendants to

consider, as part of their staffing plan, the "potential clustering of higher-acuity mentally

ill inmates at those institutions where is has been shown that mental health [staff] can be

more readily attracted and retained."  *See* 8/9/16 Order, ECF No. 5477, at 5.  This directive

was in service of the Court's ultimate demand: that Defendants, with the Special Master's

help, "devise a meaningful strategy that will, finally, mean mentally ill inmates are located

institutions that are adequately staffed with mental health staff competent to meet their

treatment needs."  *Id.*, at 6.  Defendants have not done this.  Instead, they propose (1) to

continue operating a mental health program—including mental health crisis beds—at an

institution that has not had an onsite psychiatrist (including registry) in years and that has

among the worse psychologist vacancy rates in the state, and (2) to double down on

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S STAFFING REPORT

1    existing staff shortages by dramatically expanding EOP programs at hard-to-hire prisons

2    without any specific proposal for addressing those shortages, much less for attracting the

3    influx of psychiatrists that will be needed to treat the hundreds of new EOP patients that

4    Defendants propose to add.  Special Master's Staffing Report Ex. B.  That is not a

5    "meaningful strategy" for ensuring class members are located a prisons with clinical staff

6    available to ensure constitutionally adequate care; it is a recipe for disaster.  *See* 8/9/16

7    Order, ECF No. 5477, at 6.  The Special Master's recommendation that Defendants be

8    ordered to reevaluate their clustering plan so that it "expressly demonstrates how

9    defendants propose to recruit and retain mental health staff at each designated cluster

10   institution" is fully warranted and should be adopted.  Special Master Staffing Report, at

11   28.

12        The Special Master is right to raise concerns about Defendants' decision not to

13   relocate the mental health programs from the troubled HDSP to a location where it can hire

14   clinical staff more easily.  HDSP does not have a single staff psychiatrist on site, despite a

15   10-bed mental health crisis bed unit and a CCCMS population of over 1,000 class

16   members, and has not had one on-site since at least August of 2014.  *See* 3/30/17 Nolan

17   Decl., ECF No 5590-1, ¶ 26.  As of January 2017, Defendants were relying on four tele-

18   psychiatrists (and had no on-site contract/registry psychiatrists) to manage care at the

19   institution.  *Id.* ¶ 5, Ex. N.  As noted above, this dangerous approach violates key tele-

20   psychiatry standards requiring that individuals in tele-psychiatry be initially evaluated in

21   person and have access to on-site prescribers of mental health medication.  *See supra*

22   Section II.B; *see also* Special Master's Staffing Report at 15-16 (recommending

23   telepsychiatry only as a supplement for on-site psychiatry, and stating "[i]t cannot be

24   emphasized enough that telepsychiatry should not replace on-site psychiatry").  It also

25   goes directly against the Special Master's emphatic recommendation that telepsychiatry is

26   not appropriate, and is in fact dangerous, when routinely used for high-acuity patients in

27   mental health crisis.  Special Master's Staffing Report at 17.

28        Furthermore, in Defendants' most recent staffing data, HDSP reported among the

highest psychologist vacancy rates in the system (43.33% of line psychologist positions

vacant, as well as both of the chief psychologist positions), with zero registry coverage to

patch the gaps. Ells Reply Decl. ¶ 25, Ex. V (Feb. 2017 HDSP Mental Health Institution

Vacancies, Summary By Institution by Classification). The data provided by Defendants

in support of their objections corroborates that HDSP had the second-worst psychologist

staffing, including registry, in the state both in 2016 (36% vacant on average) and over the

last three years (29% on average). Tebrock Decl. ¶ 11, Ex. 3 at 12. Indeed, psychologist

staffing at HDSP has devolved significantly in the time since Defendants filed their initial

staffing plan, with psychologist vacancies increasing from 24% to 36% between 2015 and

2016. *Id.* Defendants cannot ensure appropriate clinical staffing at HDSP and have not

been able to do so for years. They have proposed no plan for changing that dangerous

pattern. The Special Master's recommendation that Defendants be ordered to reconsider,

among other changes, their insistence on treating prisoners in mental health crisis and

1,100 CCCMS class members at this remote institution is well supported. *See* 2/06/17

Special Master's Staffing Report, Ex. C at 56.

　　　　Furthermore, Defendants plan to add massive numbers of EOP beds at four

"cluster" institutions with existing EOP programs. *See id.*, Ex. B (Defendants' Final

Staffing Plan) at 44-45. Each of the four already has very poor clinical staffing rates

(especially psychiatrist staffing), yet Defendants have proposed no targeted plan to ensure

these expanded programs are adequately staffed despite the Court's directive. *See* 8/19/16

Order at 6 (requiring Defendants to "devise a meaningful strategy that will, finally, mean

mentally ill inmates are located in institutions that are adequately staffed with mental

health staff competent to meet their treatment needs").

　　　　**LAC**: Defendants plan to open a 450-bed EOP expansion at LAC, which has only

4 out of 16 allocated psychiatrist positions filled and on-site, and which has a 46% vacancy

rate *including* tele-psychiatrists and registry coverage. *See* 3/30/17 Nolan Decl., ECF No.

5590-1, ¶ 7, Ex. P at 425 (psychiatrist vacancy rates from January 2017 Coleman Monthly

Report Enclosure 1k, "Allocated and Filled Telepsychiatry Positions," which includes all

1    staff positions, registry positions and assigned tele-psychiatry positions by institution).

2    LAC also has a troubled history filling social worker positions, with a three-year vacancy

3    average of 21%. *See* Tebrock Decl. ¶ 11, Ex. 3 at 13.

4         **SATF**: Defendants propose a 220-bed EOP expansion at SATF, which has only 1

5    out of 17 allocated staff psychiatrist positions filled and on site, and which has a 47%

6    vacancy rate *including* tele-psychiatrists and registry coverage. 3/30/17 Nolan Decl., ECF

7    No. 5590-1, ¶ 7, Ex. P at 425 (psychiatrist vacancy rates from January 2017 *Coleman*

8    Monthly Report Enclosure 1k, "Allocated and Filled Telepsychiatry Positions"). SATF

9    also has had significant difficulty filling its psychologist and social worker positions, with

10    3 year average vacancy rates of 22% and 12% respectively. Tebrock Decl. ¶ 11, Ex. 3 at

11    12-13.

12         **KVSP**: Defendants are planning a 96-bed EOP expansion at KVSP, which has zero

13    on-site allocated staff psychiatrist positions filled out of 9 positions, which is using a single

14    tele-psychiatrist and 3.2 contract/registry workers, and which, including all three

15    categories, has a 53% vacancy rate—one of the very worst in the state. 3/30/17 Nolan

16    Decl., ECF No. 5590-1, ¶ 7, Ex. P at 425 (psychiatrist vacancy rates from January 2017

17    Coleman Monthly Report Enclosure 1k, "Allocated and Filled Telepsychiatry Positions").

18    Additionally, KVSP's average 2016 psychologist vacancy rate (including supervisory

19    positions and registry) was 24%, having worsened from 20% in 2015. Tebrock Decl. ¶ 11,

20    Ex. 3 at 12.

21         **CSP-Corcoran:** Defendants are opening a 364-bed EOP expansion at CSP-

22    Corcoran ("COR"). While COR has a slightly better total psychiatrist vacancy rate than

23    the other "clusters" at 34% overall (including telepsychiatrists and registry), it only has 2.5

24    out of 14.5 allocated psychiatrist positions filled with staff psychiatrists on the ground.

25    3/30/17 Nolan Decl., ECF No 5590-1, ¶ 7, Ex. P at 425 (psychiatrist vacancy rates from

26    January 2017 Coleman Monthly Report Enclosure 1k, "Allocated and Filled

27    Telepsychiatry Positions"). Furthermore, approximately 41% of COR's line psychologist

28    and 30% of its clinical social worker positions are vacant, including registry, as of

1  Defendants' most recent monthly data.  Ells Reply Decl. ¶ 25, Ex. V (Feb. 2017 COR

2  Mental Health Institution Vacancies, Summary By Institution by Classification).

3         It is clear that Defendants' approach to clustering has been too limited and has

4  included clusters at inappropriate institutions.  In light of this limitation, the Special Master

5  has recommended that he be directed to work with the Defendants on a new clustering plan

6  that specifically includes a focused recruitment and retention plan for each proposed

7  clustered institution.  *See* Special Master's Staffing Report, at 26-28.  This is an

8  appropriate recommendation that gives due deference to Defendants' own planning

9  expertise.  Defendants object to this recommendation, arguing in part that "[r]ead broadly,

10  the recommendation would violate the Prison Litigation Reform Act's prohibition on

11  orders requiring construction of prisons."  Defs' Objections, at 16-17.  This argument is

12  overblown.  The Special Master is not requesting an order demanding that Defendants

13  build a prison.  The recommendation is that Defendants be required to develop a plan to

14  house class members at prisons Defendants can actually staff with appropriate clinical

15  personnel, rather than facilities that are most administratively convenient.  Nothing in the

16  plain text of the PLRA prohibits this, nor do Defendants explain or cite any support for

17  how such a recommendation could possibly run afoul of the statute.

18         **D.    The Special Master's Recommendations Regarding Defendants EOP**
          **Utilization Review Plans Are Appropriate and Defendants Have Already**
19         **Abandoned the Plan He Reviewed.**

20         Defendants' objection to the Special Master's Staffing Report's finding on their

21  planned EOP population review is now moot.  Defendants have already abandoned the

22  version of the EOP review plan that the Special Master rejected in his Report.  *See* Defs'

23  Objections, at 10 ("CDCR submitted a revised [EOP utilization review] plan to the Special

24  Master and Plaintiffs on March 29, 2017.").  Thus, there is nothing for the Court to decide.

25         However, Defendants seem to be asking the Court to affirm that the proper criteria

26  for removal of individuals from the EOP program is the EOP treatment criteria set forth in

27  the Program Guide, apparently misreading a statement in the Special Master's Staffing

28  Report that "[u]nlike the 3CMS level of care, there are no objective criteria codified in the

1   Program Guide *to trigger an automatic review of EOP inmates.*"  Special Master's Staffing

2   Report, at 21(emphasis added) (cited in Defs' Objections, at 10); *see also* 3/30/17 Tebrock

3   Decl., ECF No. 5591-2, ¶ 4 (failing to cite any Program Guide section on removals of

4   patients from the EOP program).  As the quote suggests, the Special Master does not say

5   anywhere that there is no criterion in the Program Guide for assessing *who* should be in the

6   EOP program.  That was not a part of or certainly not the focus of the Special Master's or

7   Plaintiffs' criticism of the earlier EOP review proposal.  As the Special Master clearly

8   explained in his Staffing Report, "the concern, then, turns to how to deliver the message to

9   clinicians in order to avoid any interpretation of the memo as a mandate to reduce the EOP

10  population."  Special Master's Staffing Report, at 21.  Also critical to this issue, as the

11  Special Master explains, is that "Defendants have previously stated that an informal review

12  yielded no results of inmates being inappropriately placed at the EOP level of care." *Id.*

13  Given this earlier report, the Special Master's concern that Defendants' planned EOP

14  review be appropriately crafted and communicated to staff is well-founded.

15                                  **CONCLUSION**

16          For all the foregoing reasons, the Court should reject each of Defendants' requests

17  for modification of the Special Master's Staffing Report recommendations.  In addition,

18  the Court should grant Plaintiffs' request for a 15% pay increase for psychiatrists at hard-

19  to-hire locations.  The Court should also schedule a status conference or set forth some

20  other process to require that Defendants develop a long-term, sustainable process to

21  monitor the market for psychiatrist pay going forward and to offer competitive salaries to

22  attract and retain staff psychiatrists.

23  DATED: April 13, 2017                Respectfully submitted,

24                                       ROSEN BIEN GALVAN & GRUNFELD LLP

25                                       By: */s/ Lisa Ells*
26                                           Lisa Ells

27                                       Attorneys for Plaintiffs

28