DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNIFER L. STARK – 267062
KRISTA STONE-MANISTA – 269083
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:    (415) 433-6830

RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
|---|---|
| Plaintiffs, | **DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS REPLY TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S STAFFING REPORT** |
| v. | |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | Judge:  Hon. Kimberly J. Mueller |

[3120262-5]

2:90-CV-00520-KJM-DB
DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS REPLY TO DEFENDANTS' OBJECTIONS TO
SPECIAL MASTER'S STAFFING REPORT

I, Lisa Ells, do hereby declare:

1. I am an attorney admitted to practice law in California, a member of the bar of this Court, and a partner at the law firm Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this Declaration in Support of Plaintiffs' Reply to Defendants' Response to the Special Master's Staffing Report.

2. Plaintiffs' counsel, the Special Master team, and Defendants have participated in numerous working group and policy meeting discussions over the last two years concerning Defendants' staffing plans. Counsel from my office attended all of those meetings, and I attended most of them. According to contemporaneous notes of the meetings held on July 19, 2016 and September 28, 2016 taken by associates at my office, Defendants and the Special Master team agreed that psychiatric nurse practitioners are rare in California and would be difficult to recruit to CDCR.

3. Plaintiffs' counsel from my office attended a conference call with Defendants and the Special Master on February 7, 2017. I did not attend the call, but reviewed contemporaneous notes recounting the contents of the call drafted by an associate in my office who did attend. During that call, Defendants updated Plaintiffs and the Special Master team concerning a major psychiatrist staffing crisis at Salinas Valley State Prison ("SVSP"), and reported that Katherine Tebrock had authorized an increase in the hourly rate paid to registry psychiatrists from $70-$75 per hour to $100 per hour in an effort to attract registry staff to SVSP.

4. I attended a conference call with Defendants and the Special Master team on March 9, 2017. During that call, Defendants provided a status update to Plaintiffs and the Special Master concerning staffing at SVSP. Defendants reported that they had seen increased interest from registry psychiatrists about working at SVSP in the month since Ms. Tebrock authorized the increase in the hourly pay increase.

5. Attached hereto as **Exhibit A** is a true and correct copy of a psychiatrist wage report titled "Occupational Employment and Wages, May 2016: 29-1066

DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS REPLY TO DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S STAFFING REPORT

Psychiatrists" from the U.S. Bureau of Labor Statistics' ("BLS") website, located at https://www.bls.gov/oes/current/oes291066.htm. This document, which the BLS website notes was last modified on March 31, 2017, was downloaded by a paralegal in my office at my direction on April 13, 2017 and is the most recent wage data for psychiatrists reported by the BLS. The report indicates that there are 3,370 psychiatrists in California. 3,370 is more than ten times the 330.1 authorized CDCR staff psychiatrist positions. To confirm this fact, an associate under my supervision divided 3,370 by 330.1 using the Microsoft Excel 2010 software program and found that 3,370 is divisible by 330.1 10.21 times. This wage report also states that the average annual mean wage for psychiatrists in California was $252,030 in 2016. $252,030 is 22.226% greater than the $206,200 average pay for California psychiatrists that Defendants cited in their objections from the BLS' 2014 Occupational Employment and Wage report. To determine this percentage growth, an associate under my supervision first used Microsoft Excel to subtract $206,200 from $252,030 to determine the difference between the 2014 and 2016 reported average psychiatrist pay. He then divided the difference of $45,830 by $206,200. The report also states that, in 2016, average psychiatrist pay was $278,840 in the Sacramento, Roseville, Arden-Arcade metropolitan area; $277,490 in the Stockton-Lodi area; $274,800 in the Riverside, San Bernardino, Ontario area; and $260,710 in the San Jose, Sunnyvale, Santa Clara area.

6.      On April 7, 2017, Defendants provided their monthly court-ordered data production, providing data to Plaintiffs for February 2017. Attached hereto as **Exhibit B** is a true and correct copy of the email notifying Plaintiffs that the February 2017 Monthly Report ("February Monthly Report") was available on Defendants' file transmission site. Attached hereto as **Exhibit C** is a true and correct copy of Enclosure 1b from the February CDCR Staffing Report included in this data production. It is entitled "Mental Institution Vacancy by Classification." A paralegal under my supervision downloaded the staffing report including Enclosure 1b on Friday April 7, 2017. At my direction, that same paralegal used Enclosure 1b to calculate that CDCR must hire 114.42 civil service

DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS REPLY TO DEFENDANTS' OBJECTIONS TO
SPECIAL MASTER'S STAFFING REPORT

1  psychiatrists to reach the minimum court-ordered staffing levels using civil service

2  psychiatrists.  To calculate this figure, this paralegal first multiplied the total number of

3  allocated CDCR civil service staff psychiatrist positions of 318.8 listed in Enclosure 1b by

4  .9 to determine that CDCR would need to employ 286.92 civil service psychiatrists

5  necessary to staff CDCR institutions at a 90% staffing level.  He next determined the

6  number of psychiatrists that CDCR must hire to reach the 90% staffing level by subtracting

7  172.5, the number of civil service psychiatrists that CDCR currently employs, from the

8  286.92 psychiatrists that CDCR would need to have a 90% staffing rate.

9      7.    Attached hereto as **Exhibit D** is a true and correct copy of a webpage titled

10  "Schedule of Selected Releases for March 2017" from the U.S. Bureau of Labor Statistics'

11  website, located at https://www.bls.gov/schedule/2017/03_sched.htm.  This document,

12  which the BLS website reports was last modified on March 24, 2017, was downloaded on

13  April 13, 2017 by a paralegal under my supervision.  It is the most current version of the

14  webpage available.  It shows that the BLS publicly scheduled the release of its 2016

15  Occupational Employment and Wages report for March 31, 2017.  The Occupational

16  Employment and Wages report contains average annual salaries for psychiatrists.

17      8.    Attached hereto as **Exhibit E** is a true and correct copy of a job

18  announcement for psychiatrists titled "Psychiatrist – $246,900 – $323,000 annually" dated

19  April 19, 2016.  A paralegal under my supervision downloaded this document from the

20  Psychiatric Times website, http://www.psychiatrictimes.com/career/classifieds/california/

21  psychiatrist-246900-323000-annually?GUID=C3DD28AB-1908-44CB-B947-

22  C1A5DFFF289E&rememberme=1&ts=12042017, on April 13, 2017.  The announcement

23  states that the Santa Clara Valley Health and Hospital System offers psychiatrists salaries

24  ranging between $246,900 and $323,000 annually.

25      9.    Attached hereto as **Exhibit F** is a true and correct copy of a job

26  announcement for psychiatrists titled "Traditions Behavior Health – FT Psychiatrists"

27  dated May 3, 2013.  A paralegal under my supervision downloaded this document from the

28  Psychiatric Times website, http://www.psychiatrictimes.com/career/classifieds/california/

[3120262-5]    2:90-CV-00520-KJM-DB
DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS REPLY TO DEFENDANTS' OBJECTIONS TO
SPECIAL MASTER'S STAFFING REPORT

1 | traditions-behavioral-health-ft-psychiatrists?GUID=C3DD28AB-1908-44CB-B947-
2 | C1A5DFFF289E&rememberme=1&ts=12042017, on April 12, 2017.  It states that
3 | Traditions Behavioral Health offers psychiatrists salaries from $300,000 to $500,000 plus
4 | bonuses and benefits.

5 |       10.     Attached hereto as **Exhibit G** is a true and correct copy of a job
6 | announcement for psychiatrists titled "Outstanding Inpatient Psychiatry Opportunity"
7 | dated March 7, 2017.  A paralegal under my supervision downloaded this document from
8 | the Psychiatric Times website, http://www.psychiatrictimes.com/career/classifieds/
9 | california/outstanding-inpatient-psychiatry-opportunity?GUID=C3DD28AB-1908-44CB-
10 | B947-C1A5DFFF289E&rememberme=1&ts=12042017, on April 13, 2017.  It states that
11 | Aligned Telehealth, Inc. offers psychiatrists pay from $312,000 to $468,000, signing
12 | bonuses, and relocation assistance.

13 |       11.     Attached hereto as **Exhibit H** is a true and correct copy of an undated DSH
14 | job announcement for psychiatrists titled "Psychiatrists- Dept of State Hospitals – Quality
15 | of Practice – Quality of Life."  A paralegal under my supervision downloaded this
16 | document from the Psychiatric Times website, http://www.psychiatrictimes.com/career/
17 | classifieds/california/psychiatrists-dept-state-hospitals-quality-practice-quality-life, on
18 | April 13, 2017.

19 |       12.     Attached hereto as **Exhibit I** is a true and correct copy of a document by the
20 | Office of the Inspector General, U.S. Department of Justice, dated March 2016 and titled
21 | "Review of the Federal Bureau of Prisons' Medical Staffing Challenges."  This document
22 | was downloaded on April 8, 2017, by an associate in my office from the website of the
23 | Office of the Inspector General, located at https://oig.justice.gov/reports/2016/e1602.pdf.

24 |       13.     During the approximately two-year period in which the parties and Special
25 | Master have been discussing Defendants' 2015 staffing plan, including numerous meet and
26 | confer and workgroup sessions, Defendants have never contended that they are providing
27 | adequate mental health care despite the massive, chronic psychiatric shortages.  They also
28 | did not describe or provide Plaintiffs or the Special Master the data cited by Ms. Tebrock

1  in her declaration in support of any similar claim.  I either attended each of these meetings

2  personally and took contemporaneous notes, or have reviewed contemporaneous notes

3  recounting the contents of the meetings drafted by associates in my office who attended.

4       14.     A true and correct copy of Enclosure 6a to the February Monthly Report,

5  defined above, is attached hereto as **Exhibit J**.  It shows that Avenal State Prison ("ASP")

6  housed 1 EOP class member and 974 CCCMS class members as of February 28, 2017.

7       15.     Attached hereto as **Exhibit K** is a true and correct copy of the Receiver's

8  Health Care Services Dashboard – January 2017.  A paralegal under my supervision

9  downloaded this document from the California Correctional Health Care Services website,

10  http://www.cphcs.ca.gov/dashboard.aspx, on April 11, 2017.

11       16.     Attached hereto as **Exhibit L** is a true and correct copy of an undated

12  document entitled "TeleSage – The Wise Choice in Behavioral Health Solutions," which

13  was downloaded on April 13, 2017 by a paralegal in my office under my supervision from

14  the website TeleSage, Inc., located at http://telesage.com/.  This document lists Benjamin

15  Brodey, M.D., M.P.H. as the founder and CEO of TeleSage, a for-profit telepsychiatry

16  company.  Dr. Brodey is also the lead author of the first study listed in Dr. Golding's chart,

17  attached as Exhibit 1 to his declaration.

18       17.     Attached hereto as **Exhibit M** is a true and correct copy of an undated

19  document entitled "Peter Yellowlees, MBBS, MD – HealthLinkNow," which was

20  downloaded on April 12, 2017 by a paralegal in my office under my supervision from the

21  website HealthLinkNow, located at https://healthlinknow.com/person/peter-yellowlees/.

22  This document lists Dr. Peter Yellowlees as the board chair and co-founder of

23  HealthLinkNow, a for-profit telepsychiatry company.  Dr. Yellowlees is also the author of

24  four studies listed in Dr. Golding's chart, attached as Exhibit 1 to his declaration.

25  Specifically, Dr. Yellowlees is an author of the fourth and fifth articles summarized on

26  page 6 of Dr. Golding's declaration, as well as the first and second articles summarized on

27  page 9 of the declaration.  Although he is not listed as an author in the "Reference" section

28  of the declaration for the fourth article, entitled "The Effectiveness of Telemental Health:

[3120262-5]

DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS REPLY TO DEFENDANTS' OBJECTIONS TO
SPECIAL MASTER'S STAFFING REPORT

1  A 2013 Review," he is listed as an author on the first page of the article itself.  A true and

2  correct copy of this article, downloaded by a paralegal in my office and under my

3  supervision on April 12, 2017, is attached hereto as **Exhibit N**.

4      18.    Attached hereto as **Exhibit O** is a true and correct copy of a document dated

5  October 1, 2014 entitled "The use of videoconferences with patients with psychosis: a

6  review of the literature," which was downloaded on April 12, 2017 by a paralegal in my

7  office under my supervision from the website of the Annals of General Psychiatry, located

8  at http://www.annals-general-psychiatry.com/content/10/1/14.  This is the full article that

9  is listed third on page 8 of Dr. Golding's summary chart, attached as Exhibit 1 to his

10  declaration.  At page 10 of this article, the three authors disclose that they all work for

11  MedAvanate, Inc., a for-profit company that focuses on centralized ratings services via

12  videoconferencing for clinical trials.

13      19.    Attached hereto as **Exhibit P** is a true and correct copy of an undated

14  document entitled "HealthLinkNow: Questions," which was downloaded on April 13,

15  2017 by a paralegal in my office under my supervision from the website HealthLinkNow,

16  located at https://healthlinknow.com/questions/.  HealthLinkNow is the for-profit

17  telepsychiatry company of which Dr. Peter Yellowlees, author of four of the articles listed

18  in the chart attached as Exhibit 1 to Dr. Golding's declaration, is the co-founder and board

19  chair.  This website tells prospective patients of HealthLinkNow's telepsychiatry services

20  not to use telepsychiatry if they are suicidal, homicidal, or have an emergency, noting that

21  telepsychiatrists will not prescribe certain medications, and noting that the company

22  requires an initial consultation before treatment via telepsychiatry.

23      20.    Attached hereto as **Exhibit Q** is a true and correct copy of a 2015 American

24  Psychiatric Association (APA) "Official Action" document from the APA Council on

25  Psychiatry and Law, entitled "Resource Document on Telepsychiatry and Related

26  Technologies in Clinical Psychiatry."  This document was downloaded by a paralegal in

27  my office under my supervision from http://www.psychiatry.org/psychiatrists/search-

28  directories-databases/library-and-archive/resource-documents on April 6, 2017.

1    21.    Attached hereto as **Exhibit R** is a true and correct copy of the CDCR

2  Telepsychiatry Policy, which was provided to Plaintiffs by CDCR attorney Nick Weber in

3  an e-mail sent on September 30, 2015, in advance of a work group meeting between

4  Defendants, Plaintiffs and the Special Master's team.  To the best of my knowledge, this is

5  the current version of CDCR's policy.

6    22.    Attached hereto as **Exhibit S** is a true and correct copy of a letter my co-

7  counsel, Thomas Nolan, sent to counsel for Defendant Department of State Hospitals

8  ("DSH"), Sean Rashkis, on October 19, 2016 via email.  The letter concerns Plaintiffs'

9  comments on Defendant DSH's staffing status report and telepsychiatry policy.  This letter

10  does not contain any privileged or confidential information, despite the label.

11    23.    Attached hereto as **Exhibit T** is a true and correct copy of the DSH Staffing

12  Report for Coalinga State Hospital, which was produced to Plaintiffs' counsel by the DSH

13  Defendants on March 3, 2017, and which contains data for the month of January 2017.

14    24.    Attached hereto as **Exhibit U** is a true and correct copy of a July 31, 2013

15  document from the American Psychological Association, entitled "Guidelines for the

16  Practice of Telepsychology."  This document was downloaded by a paralegal in my office

17  under my supervision from www.apapracticecentral.org/ce/guidelines/telepsychology-

18  guidelines.pdf on April 5, 2017.

19    25.    A true and correct copy of an excerpt of Enclosure 1f to the February

20  Monthly Report, defined above, is attached hereto as **Exhibit V**.  The report is entitled

21  "Mental Health Program Institution Vacancies – Summary by Institution by Classification"

22  and shows staffing data for Corcoran State Prison ("COR") and High Desert State Prison

23  ("HDSP") as of February 2017.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS REPLY TO DEFENDANTS' OBJECTIONS TO
SPECIAL MASTER'S STAFFING REPORT

26.    Attached hereto as **Exhibit W** is a true and correct copy of a Joint Case Status Statement filed on January 13, 2017, in *Armstrong v. Brown*, Case No. 94-2307 (N.D. Cal.), ECF No. 2660.  On pages 12 and 13 (ECF pagination), it states that CDCR uses video relay interpreting in medical appointments for deaf class members.

27.    Attached hereto as **Exhibit X** is a true and correct copy of a May 2013 document from the American Telemedicine Association, entitled "Practice Guidelines for Video-Based Online Mental Health Services."  This document was downloaded by a paralegal in my office under my supervision from dev.americantelemed.org/docs/default-source/standards/practice-guidelines-for-video-based-online-mental-health-services.pdf?sfvrsn=6 on April 13, 2017.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 13th day of April, 2017.


/s/ *Lisa Ells*
Lisa Ells

# Exhibit A

A to Z Index | FAQs | About BLS | Contact Us   Subscribe to E-mail Updates    **GO**

Follow Us | What's New | Release Calendar | Blog

Search BLS.gov

| Home | Subjects | Data Tools | Publications | Economic Releases | Students | Beta |

# Occupational Employment Statistics

SHARE ON:   OES   FONT SIZE:   PRINT:

**BROWSE OES**

OES HOME
OES OVERVIEW
OES NEWS RELEASES
OES DATA
OES CHARTS
OES MAPS
OES PUBLICATIONS
OES DATABASES
OES FAQS
CONTACT OES

**SEARCH OES**

[          ] Go

**OES TOPICS**

RESPONDENTS
DOCUMENTATION
SPECIAL NOTICES
RELATED LINKS

**Subscribe to the OES Update**

[Email Address]
GO



**BLS SPEAKERS AVAILABLE!**

Read more

## Occupational Employment and Wages, May 2016

## 29-1066 Psychiatrists

Physicians who diagnose, treat, and help prevent disorders of the mind.

National estimates for this occupation
Industry profile for this occupation
Geographic profile for this occupation

**National estimates for this occupation:** Top

Employment estimate and mean wage estimates for this occupation:

| Employment (1) | Employment RSE (3) | Mean hourly wage | Mean annual wage (2) | Wage RSE (3) |
|---|---|---|---|---|
| 24,820 | 3.6 % | $96.26 | $200,220 | 1.9 % |

Percentile wage estimates for this occupation:

| Percentile | 10% | 25% | 50% (Median) | 75% | 90% |
|---|---|---|---|---|---|
| Hourly Wage | $29.48 | $60.37 | $93.63 | (5) | (5) |
| Annual Wage (2) | $61,330 | $125,570 | $194,740 | (5) | (5) |

**Industry profile for this occupation:** Top

Industries with the highest published employment and wages for this occupation are provided. For a list of all industries with employment in this occupation, see the Create Customized Tables function.

Industries with the highest levels of employment in this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Offices of Physicians | 7,990 | 0.32 | $94.80 | $197,190 |
| Psychiatric and Substance Abuse Hospitals | 3,950 | 1.68 | $94.26 | $196,070 |
| Outpatient Care Centers | 3,480 | 0.42 | $103.11 | $214,460 |
| General Medical and Surgical Hospitals | 3,310 | 0.06 | $90.88 | $189,020 |
| State Government (OES Designation) | 1,050 | 0.05 | $105.55 | $219,550 |

Industries with the highest concentration of employment in this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Psychiatric and Substance Abuse Hospitals | 3,950 | 1.68 | $94.26 | $196,070 |
| Outpatient Care Centers | 3,480 | 0.42 | $103.11 | $214,460 |
| Offices of Physicians | 7,990 | 0.32 | $94.80 | $197,190 |
| Residential Intellectual and Developmental Disability, Mental Health, and Substance Abuse Facilities | 650 | 0.11 | $102.21 | $212,590 |
| Offices of Other Health Practitioners | 920 | 0.11 | $96.64 | $201,010 |

Top paying industries for this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Home Health Care Services | 60 | (7) | $118.65 | $246,800 |
| Local Government (OES Designation) | 1,010 | 0.02 | $118.54 | $246,560 |
| State Government (OES Designation) | 1,050 | 0.05 | $105.55 | $219,550 |
| Outpatient Care Centers | 3,480 | 0.42 | $103.11 | $214,460 |
| Residential Intellectual and Developmental | 650 | 0.11 | $102.21 | $212,590 |

**Geographic profile for this occupation:** Top

States and areas with the highest published employment, location quotients, and wages for this occupation are provided. For a list of all areas with employment in this occupation, see the Create Customized Tables function.


Employment of psychiatrists, by state, May 2016

States with the highest employment level in this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| California | 3,370 | 0.21 | 1.19 | $121.17 | $252,030 |
| New York | 3,360 | 0.37 | 2.09 | $87.90 | $182,830 |
| Ohio | 1,370 | 0.26 | 1.45 | $89.75 | $186,680 |
| Illinois | 950 | 0.16 | 0.91 | $82.96 | $172,560 |
| Massachusetts | 940 | 0.27 | 1.53 | $87.00 | $180,960 |

## Location quotient of psychiatrists, by state, May 2016



States with the highest concentration of jobs and location quotients in this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Rhode Island | 320 | 0.67 | 3.79 | $101.32 | $210,760 |
| Vermont | 200 | 0.64 | 3.65 | $95.93 | $199,540 |
| Connecticut | 740 | 0.45 | 2.52 | $111.18 | $231,260 |
| New York | 3,360 | 0.37 | 2.09 | $87.90 | $182,830 |
| Maine | 200 | 0.33 | 1.88 | $66.14 | $137,570 |

## Annual mean wage of psychiatrists, by state, May 2016



Top paying States for this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| South Dakota | 30 | 0.07 | 0.41 | $128.62 | $267,520 |
| California | 3,370 | 0.21 | 1.19 | $121.17 | $252,030 |
| Wyoming | 40 | 0.15 | 0.83 | $120.70 | $251,070 |
| Alaska | 50 | 0.15 | 0.88 | $119.50 | $248,550 |
| Indiana | 280 | 0.09 | 0.53 | $113.20 | $235,470 |





Blank areas indicate data not available.

Metropolitan areas with the highest employment level in this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| New York-Jersey City-White Plains, NY-NJ Metropolitan Division | 2,620 | 0.40 | 2.25 | $89.38 | $185,910 |
| Los Angeles-Long Beach-Glendale, CA Metropolitan Division | 1,290 | 0.30 | 1.73 | $123.36 | $256,600 |
| Chicago-Naperville-Arlington Heights, IL Metropolitan Division | 750 | 0.21 | 1.17 | $75.50 | $157,040 |
| Boston-Cambridge-Newton, MA NECTA Division | 630 | 0.35 | 1.98 | $85.36 | $177,560 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Division | 600 | 0.24 | 1.37 | $95.41 | $198,450 |
| Nassau County-Suffolk County, NY Metropolitan Division | 530 | 0.41 | 2.31 | $85.78 | $178,410 |
| Hartford-West Hartford-East Hartford, CT | 400 | 0.69 | 3.90 | $112.25 | $233,470 |
| Riverside-San Bernardino-Ontario, CA | 380 | 0.28 | 1.60 | $132.12 | $274,800 |
| Baltimore-Columbia-Towson, MD | 360 | 0.27 | 1.53 | $90.46 | $188,170 |
| Providence-Warwick, RI-MA | 340 | 0.61 | 3.44 | $100.95 | $209,980 |

# Location quotient of psychiatrists, by area, May 2016



Blank areas indicate data not available.

Metropolitan areas with the highest concentration of jobs and location quotients in this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Napa, CA | 210 | 2.97 | 16.81 | (5) | (5) |
| Staunton-Waynesboro, VA | 70 | 1.38 | 7.82 | $79.89 | $166,170 |
| Wichita Falls, TX | 50 | 0.80 | 4.53 | (5) | (5) |
| Hartford-West Hartford-East Hartford, CT | 400 | 0.69 | 3.90 | $112.25 | $233,470 |
| Bangor, ME | 40 | 0.67 | 3.81 | (8) | (8) |
| Roanoke, VA | 100 | 0.64 | 3.61 | $86.03 | $178,940 |
| Dothan, AL | 40 | 0.63 | 3.57 | (8) | (8) |
| Waterbury, CT | 40 | 0.62 | 3.52 | $90.62 | $188,500 |
| Providence-Warwick, RI-MA | 340 | 0.61 | 3.44 | $100.95 | $209,980 |
| Stockton-Lodi, CA | 130 | 0.58 | 3.31 | $133.41 | $277,490 |

Case 2:90-cv-00520-KJM-SCR    Document 5603-1    Filed 04/13/17    Page 17 of 308



Annual mean wage of psychiatrists, by area, May 2016

Top paying metropolitan areas for this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Wichita Falls, TX | 50 | 0.80 | 4.53 | (5) | (5) |
| San Rafael, CA Metropolitan Division | 50 | 0.44 | 2.49 | (5) | (5) |
| Oakland-Hayward-Berkeley, CA Metropolitan Division | (8) | (8) | (8) | (5) | (5) |
| Napa, CA | 210 | 2.97 | 16.81 | (5) | (5) |
| Tucson, AZ | (8) | (8) | (8) | $135.47 | $281,770 |
| Sacramento--Roseville--Arden-Arcade, CA | (8) | (8) | (8) | $134.06 | $278,840 |
| Stockton-Lodi, CA | 130 | 0.58 | 3.31 | $133.41 | $277,490 |
| Riverside-San Bernardino-Ontario, CA | 380 | 0.28 | 1.60 | $132.12 | $274,800 |
| Trenton, NJ | 90 | 0.41 | 2.34 | $130.36 | $271,160 |
| San Jose-Sunnyvale-Santa Clara, CA | (8) | (8) | (8) | $125.34 | $260,710 |

Nonmetropolitan areas with the highest employment in this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| North Arkansas nonmetropolitan area | 130 | 1.13 | 6.40 | $58.29 | $121,250 |
| Piedmont North Carolina nonmetropolitan area | 90 | 0.37 | 2.08 | $90.54 | $188,320 |
| Western Wisconsin nonmetropolitan area | 50 | 0.39 | 2.19 | $47.09 | $97,940 |
| Western Pennsylvania nonmetropolitan area | 50 | 0.32 | 1.83 | $103.43 | $215,140 |
| Southwest Montana nonmetropolitan area | 50 | 0.38 | 2.12 | $86.22 | $179,340 |

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| North Arkansas nonmetropolitan area | 130 | 1.13 | 6.40 | $58.29 | $121,250 |
| Southern Vermont nonmetropolitan area | 50 | 0.44 | 2.52 | (5) | (5) |
| Western Wisconsin nonmetropolitan area | 50 | 0.39 | 2.19 | $47.09 | $97,940 |
| Southwest Montana nonmetropolitan area | 50 | 0.38 | 2.12 | $86.22 | $179,340 |
| Piedmont North Carolina nonmetropolitan area | 90 | 0.37 | 2.08 | $90.54 | $188,320 |

Top paying nonmetropolitan areas for this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Southern Vermont nonmetropolitan area | 50 | 0.44 | 2.52 | (5) | (5) |
| Southern Ohio non-metropolitan area | 40 | 0.27 | 1.52 | $130.67 | $271,780 |
| Southwest Virginia nonmetropolitan area | 30 | 0.26 | 1.45 | $118.05 | $245,550 |
| Southeast Minnesota nonmetropolitan area | (8) | (8) | (8) | $118.05 | $245,550 |
| North Texas nonmetropolitan area | 40 | 0.15 | 0.87 | $118.01 | $245,450 |

About May 2016 National, State, Metropolitan, and Nonmetropolitan Area Occupational Employment and Wage Estimates

These estimates are calculated with data collected from employers in all industry sectors, all metropolitan and nonmetropolitan areas, and all states and the District of Columbia. The top employment and wage figures are provided above. The complete list is available in the downloadable XLS files.

The percentile wage estimate is the value of a wage below which a certain percent of workers fall. The median wage is the 50th percentile wage estimate--50 percent of workers earn less than the median and 50 percent of workers earn more than the median. More about percentile wages.

(1) Estimates for detailed occupations do not sum to the totals because the totals include occupations not shown separately. Estimates do not include self-employed workers.

(2) Annual wages have been calculated by multiplying the hourly mean wage by a "year-round, full-time" hours figure of 2,080 hours; for those occupations where there is not an hourly wage published, the annual wage has been directly calculated from the reported survey data.

(3) The relative standard error (RSE) is a measure of the reliability of a survey statistic. The smaller the relative standard error, the more precise the estimate.

(5) This wage is equal to or greater than $100.00 per hour or $208,000 per year.

(7) The value is less than .005 percent of industry employment.

(8) Estimate not released.

(9) The location quotient is the ratio of the area concentration of occupational employment to the national average concentration. A location quotient greater than one indicates the occupation has a higher share of employment than average, and a location quotient less than one indicates the occupation is less prevalent in the area than average.

Other OES estimates and related information:

May 2016 National Occupational Employment and Wage Estimates

May 2016 State Occupational Employment and Wage Estimates

May 2016 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates

May 2016 National Industry-Specific Occupational Employment and Wage Estimates

May 2016 Occupation Profiles

Technical Notes

**Last Modified Date:** March 31, 2017

RECOMMEND THIS PAGE USING:     Facebook     Twitter     LinkedIn

| TOOLS | CALCULATORS | HELP | INFO | RESOURCES |
|---|---|---|---|---|
| Areas at a Glance | Inflation | Help & Tutorials | What's New | Inspector General (OIG) |
| Industries at a Glance | Injury And Illness | FAQs | Careers @ BLS | Budget and Performance |
| Economic Releases | | Glossary | Find It! DOL | No Fear Act |
| Databases & Tables | | About BLS | Join our Mailing Lists | USA.gov |
| Maps | | Contact Us | Linking & Copyright Info | Benefits.gov |
| | | | | Disability.gov |

Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Customer Survey  |  Important Web Site Notices

U.S. Bureau of Labor Statistics | Division of Occupational Employment Statistics, PSB Suite 2135, 2 Massachusetts Avenue, NE Washington, DC 20212-0001
www.bls.gov/OES | Telephone: 1-202-691-6569 | Contact OES

Exhibit B

| | |
|---|---|
| **From:** | Michael W. Bien |
| **To:** | Coleman Team - RBG Only |
| **Subject:** | FW: Monthly Coleman Submission, February 2017 |
| **Date:** | Friday, April 07, 2017 2:26:33 PM |

---

**From:** Owens, Teresa@CDCR
**Sent:** Friday, April 07, 2017 2:26:21 PM (UTC-08:00) Pacific Time (US & Canada)
**To:** Mohamedu Jones; Matt Lopes; Jeff Metzner; Kerry Courtney Hughes, MD; Mary Perrien; Kathryn Burns, MD, MPH; Henry D. Dlugacz; Kerry Walsh; Patricia M. Williams; Michael W. Bien; 'dspecter@prisonlaw.com'; Steve Fama
**Cc:** Laura Ceballos; Nick Weber; Ponciano, Angela@CDCR; Elise Thorn; Rekart, John@CDCR; Tebrock, Katherine@CDCR; 'akirby@prisonlaw.com'; 'Christine Ciccotti'; Caluag, Ashley@CDCR
**Subject:** Monthly Coleman Submission, February 2017

Good afternoon,

The monthly Coleman Report for February, 2017, has been posted to the FTP site.

CDCR staff may view the report at the following link:

\\Hcsegcfile1\public$\Mental Health\A2-PROGRAM INFORMATION\Coleman Reports\2017

Thank you,

Teresa Owens
Health Program Specialist I
DHCS Mental Health Program, Quality Management
916-691-0302

*CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.*



Exhibit C

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF HEALTH CARE SERVICES**
STATEWIDE MENTAL HEALTH PROGRAM
P.O. Box 588500
Elk Grove, California  95758



April 7, 2017

Matthew A. Lopes, Jr. Esquire                        via:  Elise Owens Thorn, Esquire
Office of the Special Master                                Deputy Attorney General
Pannone Lopes & Devereaux LLC                              Department of Justice
317 Iron Horse Point Way, Suite 301                        1300 "I" Street, Suite 125
Providence, RI  02908                                      P. O. Box 944255
                                                           Sacramento, CA  94244-2550


**RE: *COLEMAN* MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the *Coleman* Monthly Report reflective of February, 2017, data (or as otherwise noted).  The following is the list of enclosures:

1. California Department of Corrections and Rehabilitation (CDCR) Staffing Report.
    a. Mental Health Executive Summary.
    b. Mental Institution Vacancy by Classification.
    c. Mental Institution Vacancies Summary by Classification.
    d. Mental Health Month to Month Registry Usage.
    e. Mental Health Six-Month Vacancy Summary.
    f. Mental Health Program Institution Vacancies-Summary by Classification.
    g. Statewide Mental Health Program Compliance Summary Report.
    h. Enhanced Outpatient Administrative Segregation Unit (EOP ASU) Case Manager
        Positions and Vacancies.
    i. Mental Health Hiring Progress Report.
    j. Mental Health Statewide Hire Tracking Summary -- Clinical Positions Only.
    k. Mental Health Telepsych Allocated and Filled Positions Report.

2. Reception Center Monthly Reports.
        a. Reception Center Mental Health Screening Report.
        b. Reception Center Transfer Timelines Report.

3. Continuous Length of Stay Counts for Mental Health Services Delivery Systems (MHSDS) ASU, Secured Housing Unit (SHU), and Psychiatric Services Unit (PSU) report.

Matthew A. Lopes, Jr. Esquire
Page 2

4. EOP Inmates Waiting Transfers to PSU.

5. EOP ASU Hub Trends.

6. Population and Census Reports.
   a. Health Care Placement Oversight Program (HCPOP) Information Report, Summary (R-01)
   b. MHSDS Management Information Summary (MIS).
   c. Weekly EOP/Outpatient Psychiatric Program report.

7. Mental Health Crisis Bed (MHCB) Reports.
   a. Monthly Summary of MHCB Use by Institution (entitled "Inpatient Psychiatric Aging Report").
   b. MHCB Wait List.
   c. Transferred and Rescinded MHCB Referrals by Institution and Level of Care report (all subsections).

8. Department of State Hospitals (DSH) Referral Reports.
   a. Referrals for Transfer to DSH. *Not included – data not available at this time. Report is currently being re-coded, with an estimated completion date of April 30, 2017.*
   b. DSH Monthly Report of CDCR Patients in DSH Hospitals -- Summary and PC 2684.

9. Milestone Credits Report.

10. Work Assignments Report.

11. Out of Level Housing Report.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

KATHERINE TEBROCK, ESQUIRE
Deputy Director, Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

Matthew A. Lopes, Jr. Esquire
Page 3

cc:  Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
      Kerry F. Walsh, Esq., *Coleman* Deputy Special Master
      Jeffrey L. Metzner, M.D., *Coleman* Expert
      Kerry C. Hughes, M.D., *Coleman* Expert
      Mary Perrien, Ph.D., *Coleman* Expert
      Henry A. Dlugacz, Esq., *Coleman* Expert
      Patricia Williams, Esq., *Coleman* Monitor
      Patrick McKinney, Esq., Office of Legal Affairs, CDCR
      Nicholas Weber, Esq, Office of Legal Affairs, CDCR
      Michael Bien, Esq., Rosen, Bien and Galvan
      Donald Specter, Esq., Prison Law Office
      Steve Fama, Esq., Prison Law Office
      Angela Ponciano, Associate Director, Statewide Mental Health Program, Division of
        Health Care Services (DHCS)
      Laura Ceballos, Ph.D., Chief of Quality Management and Field Operations, Statewide
        Mental Health Program, DHCS
      John Rekart, Ph.D., Chief, Quality Management, Statewide Mental Health Program,
        DHCS
      Teresa Owens, Health Program Specialist I, Quality Management, Statewide Mental
        Health Program, DHCS

Correctional Health Care Services

Mental Health Institution Vacancies

**SUMMARY BY CLASSIFICATION (CLINICAL POSITIONS ONLY)**

**As Of February - 2017**

| Inst. | Classification | Class Code | SCO DATA Authorized Per 7A | SCO DATA Established | SCO DATA Filled | SCO DATA Vacant | ADJUSTMENTS 918 | ADJUSTMENTS 920 | ADJUSTMENTS Registry (PY) | ADJUSTMENTS Hires | ADJUSTMENTS Adjusted vacancy | ADJUSTMENTS Percent Vacant |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SW | | | | | | | | | | | | |
| | CHIEF PSYCHIATRIST, CORRECTIONAL AND REHABILITITATIVE SERVICES (SAFETY) | 9774 | 18.00 | 18.00 | 14.00 | 4.00 | 1.00 | 0.00 | 0.00 | 0.00 | 3.00 | 16.67% |
| | CHIEF PSYCHOLOGIST/CF | 9859 | 61.00 | 60.00 | 40.00 | 20.00 | 1.00 | 0.00 | 0.00 | 0.00 | 20.00 | 32.79% |
| | CLINICAL PSYCHOLOGY INTERN | 9851 | 35.00 | 35.00 | 30.00 | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 | 14.29% |
| | CLINICAL SOCIAL WORKER (HEALTH/CF)-SAFETY | 9872 | 434.60 | 464.50 | 368.50 | 96.00 | 12.29 | 0.07 | 25.07 | 0.00 | 28.81 | 6.63% |
| | PSYCH-CLINIC CF | 9283 | 865.20 | 811.00 | 663.60 | 147.40 | 26.81 | 1.82 | 34.81 | 0.00 | 141.80 | 16.39% |
| | REC THERAPIST CF | 9286 | 267.40 | 271.50 | 212.00 | 59.50 | 6.00 | 0.00 | 20.29 | 0.00 | 29.11 | 10.89% |
| | SENIOR PSYCHIATRIST (SUPERVISOR), CORRECTIONAL AND REHABILITATIVE | 9761 | 20.80 | 20.50 | 16.00 | 4.50 | 0.00 | 1.00 | 0.00 | 0.00 | 5.80 | 27.88% |
| | SR PSYCH CF/SP | 9287 | 112.40 | 112.00 | 101.00 | 11.00 | 2.00 | 0.17 | 0.00 | 0.00 | 9.57 | 8.52% |
| | SR PSYCH CF/SUP | 9288 | 107.20 | 104.00 | 93.50 | 10.50 | 12.29 | 0.20 | 0.00 | 0.00 | 1.62 | 1.51% |
| | STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES (SAFETY) | 9758 | 330.10 | 318.80 | 172.50 | 146.30 | 1.00 | 0.00 | 50.19 | 0.00 | 106.41 | 32.24% |
| | SUP PSYCH S WK I CF | 9291 | 23.80 | 24.00 | 21.00 | 3.00 | 1.00 | 0.21 | 0.00 | 0.00 | 2.01 | 8.43% |
| | **Statewide Totals** | | **2275.50** | **2239.30** | **1732.10** | **507.20** | **63.38** | **3.47** | **130.36** | **0.00** | **353.13** | **15.52%** |

**Footnotes:**
1. Data reflected in the Hire column is based on an actual hire with a start date occurring within the last 30 days.
2. Adjusted vacancy figures are calculated as factor of "Auth per 7A."
3. SCO = State Controller's Office (Payroll) Report; NC = Not Calculated
4. Data reflected in the Registry Column is a conversion of hours to PY. The formula is based on 173.33 hours per PY.
5. Positions Filled above the authorized PY are reflected as a negative number in the Adjusted Vacancy Column.
6. Establishment of positions in the SCO data is based on the 607 process, therefore the established amount may reflect a lag.
7. 918 = Salary and Wages Other Positions, Blanket Report. Pending hires and hires of staff being paid without an authorized position are sometimes placed in a blanket.
8. 920 = Long Term Sick Position Blanket Report.
9. Classifications can have more than one Class Code.
10. SCO data is approximately 45 days in arrears and does not include employees hired through various registry services or positions paid from the temporary help blanket (9999), unallocated positions.
11. Occasionally, additional new and certain existing employees are paid using 918 blanket numbers. This is an accounting issue, not a reduction in positions.

Source: 16/17 7A; SCO Reports; MIRS reports; Hire Tracking System

Report Generated By:

Program Support

Exhibit D

# U.S. Bureau of Labor Statistics

[Release Calendar](#)

## March, 2017

Month View | List View

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
| 27 | 28<br>Regional and State Unemployment (Annual) 2016<br>10:00 AM | 1 | 2 | 3 |
| 6 | 7<br>County Employment and Wages<br>Third Quarter 2016<br>10:00 AM | 8<br>Productivity and Costs (R)<br>Fourth Quarter 2016<br>08:30 AM | 9<br>U.S. Import and Export Price Indexes<br>February 2017<br>08:30 AM | 10<br>Employment Situation<br>February 2017<br>08:30 AM |
| 13<br>State Employment and Unemployment (Monthly)<br>January 2017<br>10:00 AM | 14<br>Producer Price Index<br>February 2017<br>08:30 AM | 15<br>Consumer Price Index<br>February 2017<br>08:30 AM<br><br>Real Earnings<br>February 2017<br>08:30 AM | 16<br>Job Openings and Labor Turnover Survey<br>January 2017<br>10:00 AM | 17<br>Employer Costs for Employee Compensation<br>December 2016<br>10:00 AM<br><br>Metropolitan Area Employment and Unemployment (Monthly)<br>January 2017<br>10:00 AM |
| 20 | 21 | 22<br>Employment Situation of Veterans<br>Annual 2016<br>10:00 AM | 23 | 24<br>State Employment and Unemployment (Monthly)<br>February 2017<br>10:00 AM |
| 27 | 28 | 29 | 30<br>Multifactor Productivity Trends<br>Annual 2016<br>10:00 AM | 31<br>Occupational Employment and Wages<br>May 2016<br>10:00 AM |

NOTE: All times on calendar are Eastern Time.

Last Modified Date: March 24, 2017

Subscribe to the BLS Online Calendar

Online calendar subscription — automatically updated:

Case 2:90-cv-00520-KJM-SCR   Document 5603   Filed 04/13/17   Page 29 of 308

If you use several non-calendar e-mail or calendar, you may not be to able subscribe to the online calendar.
See details below for users of different types of calendars.

- **Instructions for Outlook 2007 and Apple iCal Users:**
  - Simply click on this link: webcal://www.bls.gov/schedule/news_release/bls.ics
    (Note: Link may seem to be broken if you do not have Outlook 2007 or Apple iCal installed.)

- **Instructions for Google Calendar, Mozilla, and Evolution Users:**
  - Copy and paste the URL address http://www.bls.gov/schedule/news_release/bls.ics into your calendar.

NOTE: We do not recommend using this online calendar with Outlook 2003 or older versions. The calendar will not update automatically in those applications.

The BLS calendar contains publication dates for most news releases scheduled to be issued by the BLS national office in upcoming months. It is updated as needed with additional news releases, usually at least a week before their scheduled publication date.

---

U.S. Bureau of Labor Statistics | Postal Square Building, 2 Massachusetts Avenue, NE Washington, DC 20212-0001

www.bls.gov | Telephone: 1-202-691-5200 | TDD: 1-800-877-8339 | Contact Us

Exhibit E

Psychiatric Times

## Psychiatrist - $246,900 - $323,000 annually



www.scvmc.org

www.sccmhd.org

**PSYCHIATRIST** $246,900 - $323,000 annually

7 weeks of annual leave

Full benefits & retirement

Santa Clara Valley Health and Hospital System, a public healthcare system in the heart of Silicon Valley, is seeking BE/BC psychiatrists & PGY-III/IVs for a variety of clinical settings, including emergency psychiatric services, inpatient psychiatric services, outpatient behavioral health clinics, and custody health programs. Opportunities for additional moonlighting also exist within our healthcare system.

As the largest public health care system in northern California, we offer comprehensive healthcare resources to a large and diverse patient population. Psychiatrists are part of a robust team of staff that work in collaboration with other medical specialties to provide integrated health care to patients.

Psychiatrists are eligible for numerous benefits including 7 weeks of annual leave, 1 week of educational leave, 12 holidays, $4500 educational funds, health benefits, life insurance and CalPERS retirement plan.

If you are interested in working in a dynamic and collegial work environment, please submit a CV and letter of interest directly to:

Dr. Tiffany Ho

Behavioral Health Medical Director tiffany.ho@hhs.sccgov.org (408) 885-5767 The County of Santa Clara is an Equal Opportunity Employer

California

# Exhibit F

# Traditions Behavioral Health - FT Psychiatrists

Fri, 2013-05-03 09:29 -- jleo



**The doctors of TRADITIONS BEHAVIORAL HEALTH** are the largest provider of MD psychiatric services to adult populations in institutional and community based programs in California. We provide services to the seriously and persistently mentally ill and have openings in the San Francisco Bay Area, Santa Barbara, San Diego and Los Angeles. Overall we plan to add 50 more Fulltime psychiatrists in California to bring our medical staff team to 400 psychiatrists. **Our packages vary from a minimum of $300,000 per year plus $10,000 in bonuses and a benefit package valued at approximately $90,000, to up to $500,000, for the industrious physician.** Our generous benefit package includes almost **7 weeks paid time off per year**. If you are creative and think outside the box, if you value diversity and cultural competency, if you like innovative programs that are patient driven, using a rehabilitative, rather than illness model, if you want more time to work with patients, to get the best results, then TBH is the company for you.

To learn more about the specific job openings and salary and benefit packages, check out our Website at: www.tbhcare.com **[1]** or Email your letter of interest and CV to our company **President, Gary A. Hayes, Ph.D. at: Drhayes3@tbhcare.com** [2]

**TBH is an equal opportunity employer**

**Location:** California [3]



**The doctors of TRADITIONS BEHAVIORAL HEALTH** are the largest provider of MD psychiatric services to adult populations in institutional and community based programs in California. We provide services to the seriously and persistently mentally ill and have openings in the San Francisco Bay Area, Santa Barbara, San Diego and Los Angeles. Overall we plan to add 50 more Fulltime


Case 2:90-cv-00520-KJM-SCR     Document 5608-1     Filed 04/13/17     Page 34 of 308

psychiatrists in California to bring our medical staff team to 400 psychiatrists. **Our packages vary from a minimum of $300,000 per year plus $10,000 in bonuses and a benefit package valued at approximately $90,000, to up to $500,000, for the industrious physician.** Our generous benefit package includes almost **7 weeks paid time off per year**. If you are creative and think outside the box, if you value diversity and cultural competency, if you like innovative programs that are patient driven, using a rehabilitative, rather than illness model, if you want more time to work with patients, to get the best results, then TBH is the company for you.

To learn more about the specific job openings and salary and benefit packages, check out our Website at: www.tbhcare.com or Email your letter of interest and CV to our company **President, Gary A. Hayes, Ph.D. at: Drhayes3@tbhcare.com**

**TBH is an equal opportunity employer**

**Source URL:**
http://www.psychiatrictimes.com/career/classifieds/california/traditions-behavioral-health-ft-psychiatrists?GUID=C3DD28AB-1908-44CB-B947-C1A5DFFF289E&rememberme=1&ts=12042017

**Links:**
[1] http://www.tbhcare.com
[2] mailto:Drhayes3@tbhcare.com
[3] http://www.psychiatrictimes.com/career/classifieds/california

Exhibit G

# Psychiatric Times

Published on Psychiatric Times (http://www.psychiatrictimes.com)

Home > Outstanding Inpatient Psychiatry opportunity

# Outstanding Inpatient Psychiatry opportunity

Tue, 2017-03-07 19:03 -- jleo

Outstanding Inpatient Psychiatry opportunity for an Inpatient Behavioral Health Unit located in San Fernando Valley, CA employed through Aligned Telehealth, Inc. Aligned Telehealth, Inc. is a National Behavioral Health Hospitalist and Telemedicine Company delivering high impact Clinical Services to Hospitals in varied clinical settings including Acute Inpatient, ED, Consult Liaison and Outpatient settings.

Location: San Fernando Valley, CA

Patient Care: Full-Time Opportunity at one of the 36 bed BHU inpatient adult facility located in San Fernando Valley. Provider will be do daily rounding including admissions and discharges and Medical Directorship.

Essential Credentialing Requirements:

· California Medical License

· California DEA Certificate

· Inpatient Psychiatric Care experience and good standing with medical board.

· Board Certified Psychiatrist

Hours of work: Full-time or Part-time.

· Full-time: Evaluating 22 patients weekdays from 8am to 5pm and one weekend of rounding per month.

Compensation for Full-time MD positions:

· Total compensation up to $312K - $468K

· Relocation assistance

· Sign on bonus

Compensation for PT positions:

· 1099 option

· Excellent compensation based on work load

· Can be combined with other opportunities with Aligned, including Telemedicine

Full-time positions could also opt for additional administrative responsibilites of Medical Director for additional compensation

Required experience:

Inpatient experience: of 2 years (can include residency IP experience)

Job Type: Full-time

Required experience:

· Psychiatrist: 1 year

Job Type: Full-time

Required experience:

· Psychiatrist: 1 year

For more information, Please contact Mona Karaguozian at mkaraguozian@alignedth.com [1] or by phone at 818.528-6166.

Location:
California [2]

Outstanding Inpatient Psychiatry opportunity for an Inpatient Behavioral Health Unit located in San Fernando Valley, CA employed through Aligned Telehealth, Inc. Aligned Telehealth, Inc. is a National Behavioral Health Hospitalist and Telemedicine Company delivering high impact Clinical Services to Hospitals in varied clinical settings including Acute Inpatient, ED, Consult Liaison and Outpatient settings.

Location: San Fernando Valley, CA

Patient Care: Full-Time Opportunity at one of the 36 bed BHU inpatient adult facility located in San Fernando Valley. Provider will be do daily rounding including admissions and discharges and Medical Directorship.

Essential Credentialing Requirements:

· California Medical License

· California DEA Certificate

· Inpatient Psychiatric Care experience and good standing with medical board.

· Board Certified Psychiatrist

Hours of work: Full-time or Part-time.

· Full-time: Evaluating 22 patients weekdays from 8am to 5pm and one weekend of rounding per month.

Compensation for Full-time MD positions:

· Total compensation up to $312K - $468K

· Relocation assistance

· Sign-on bonus

Compensation for PT positions:

· 1099 option

· Excellent compensation based on work load

· Can be combined with other opportunities with Aligned, including Telemedicine

Full-time positions could also opt for additional administrative responsibilities of Medical Director for additional compensation

Required experience:

Inpatient experience: of 2 years (can include residency IP experience)

Job Type: Full-time

Required experience:

· Psychiatrist: 1 year

Job Type: Full-time

Required experience:

· Psychiatrist: 1 year

For more information, Please contact Mona Karaguozian at mkaraguozian@alignedth.com or by phone at 818.528-6166.

Source URL: http://www.psychiatrictimes.com/career/classifieds/california/outstanding-inpatient-psychiatry-opportunity?GUID=C3DD28AB-1908-44CB-B947-C1A5DFFF289E&rememberme=1&ts=12042017

Links:
[1] mailto:mkaraguozian@alignedth.com
[2] http://www.psychiatrictimes.com/career/classifieds/california

Exhibit H

# Psychiatric Times

Published on Psychiatric Times (http://www.psychiatrictimes.com)

Home > Psychiatrists - Dept of State Hospitals - Quality of Practice - Quality of Life

# Psychiatrists - Dept of State Hospitals - Quality of Practice - Quality of Life

Wed, 2013-05-29 14:00 -- jleo

California Department of State Hospitals

Quality of practice.

## Quality of life.

Join us! Are you a psychiatrist looking for a team-oriented, collegial practice supported by leading experts in psychopharmacology such as Stephen Stahl, MD., Ph.D.? Look no further than the California Department of State Hospitals. We operate the largest forensic psychiatry hospital system in the nation, offering an unparalleled quality of practice while providing care to some of the most complex patients found anywhere. Email your curriculum vitae to DSH.Recruitment@dsh.ca.gov [1].

We are currently recruiting psychiatrists at our eight locations:

Napa * Vacaville * Stockton * Salinas * Coalinga * Atascadero * Los Angeles * Patton

Practice and Benefits:

- Annual salaries to the high $200,000s
- Flexible workweek options may be available
- Voluntary paid on-call duty
- Substantial continuing medical education
- Generous defined-benefit pension
- Psychopharmacology support by leading experts and established protocols
- Medical, dental and vision benefits
- Private practice permitted
- Retiree healthcare
- Psychiatrist-led treatment teams
- Patient-centric, treatment first environment
- Relocation assistance

Case 2:90-cv-00520-KJM-SCR    Document 5603-1    Filed 04/13/17    Page 41 of 308

To find out more, please contact Laura Dardashti, MD. at (916) 654-2609.

You can also email us at DSH.Recruitment@dsh.ca.gov [1] or visit our website at www.dsh.ca.gov [2]


Location:
<u>California</u> [3]

## California Department of State Hospitals

Quality of practice.

### Quality of life.


Join us! Are you a psychiatrist looking for a team-oriented, collegial practice supported by leading experts in psychopharmacology such as Stephen Stahl, MD., Ph.D.? Look no further than the California Department of State Hospitals. We operate the largest forensic psychiatry hospital system in the nation, offering an unparalleled quality of practice while providing care to some of the most complex patients found anywhere. Email your curriculum vitae to DSH.Recruitment@dsh.ca.gov.


We are currently recruiting psychiatrists at our eight locations:


**Napa** * Vacaville * Stockton * Salinas * Coalinga * Atascadero * Los Angeles * Patton


Practice and Benefits:

- Annual salaries to the high $200,000s
- Flexible workweek options may be available
- Voluntary paid on-call duty
- Substantial continuing medical education
- Generous defined-benefit pension
- Psychopharmacology support by leading experts and established protocols
- Medical, dental and vision benefits
- Private practice permitted
- Retiree healthcare
- Psychiatrist-led treatment teams
- Patient-centric, treatment first environment
- Relocation assistance


To find out more, please contact Laura Dardashti, MD. at (916) 654-2609.

You can also email us at DSH.Recruitment@dsh.ca.gov or visit our website at www.dsh.ca.gov

Source URL: http://www.psychiatrictimes.com/career/classifieds/california/psychiatrists-dept-state-hospitals-quality-practice-quality-life

Links:
[1] mailto:DSH.Recruitment@dsh.ca.gov
[2] http://www.dsh.ca.gov
[3] http://www.psychiatrictimes.com/career/classifieds/california

Exhibit I



**Office of the Inspector General**
U.S. Department of Justice



# Review of the Federal Bureau of Prisons' Medical Staffing Challenges

Evaluation and Inspections Division 16-02                March 2016

# EXECUTIVE SUMMARY

## Introduction

The Federal Bureau of Prisons (BOP) is responsible for incarcerating federal inmates and is required to provide them with medically necessary healthcare. However, recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs. Additionally, medical staff shortages can impact prison safety and security. For example, according to an After-Action Report prepared after a riot at a BOP contract prison, the BOP noted that while low medical staffing levels alone were not the direct cause of the disturbance, they affected security and health services functions.[1]

As of September 2014, the BOP had 3,871 positions in its institutions' health services units to provide medical care to 171,868 inmates. Of those 3,871 positions, only 3,215 positions (83 percent) were filled.[2] Although BOP policy states that the vacancy rate shall not exceed 10 percent during any 18-month period, we found that only 24 of 97 BOP institutions had a medical staffing rate of 90 percent or higher as of September 2014.[3] Further, 12 BOP institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.

Both civilian and uniformed staff hold these 3,215 filled healthcare positions. This includes 2,382 civil service employees and 833 commissioned officers of the U.S. Public Health Service (PHS), an agency of the U.S. Department of Health and Human Services, which provides public health services to underserved and vulnerable populations. The Department of Justice's Office of the Inspector General (OIG) conducted this review to assess challenges the BOP faces in hiring medical professionals and its use of PHS officers as one method of addressing those challenges.

## Results in Brief

The OIG found that recruitment and retention of medical professionals is a serious challenge for the BOP, in large part because the BOP competes with private

---

[1] Department of Justice (DOJ) Office of the Inspector General (OIG), *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015), https://oig.justice.gov/reports/2015/a1515.pdf (accessed February 8, 2016).

[2] This reflects the population in BOP-managed institutions only. Inmates in contract institutions and residential reentry centers are excluded.

[3] There were 121 BOP-managed institutions as of September 2014, but the BOP considers correctional complexes (multiple institutions co-located) to be a single institution when reporting staffing levels. This reduces the number of institutions to 97.

employers that offer higher pay and benefits. We further found that the BOP has not proactively identified and addressed its medical recruiting challenges in a systemic way. Rather, it has attempted in an uncoordinated fashion to react to local factors influencing medical recruiting at individual institutions. Moreover, we found that the BOP does not take full advantage of staffing flexibilities the PHS offers that could assist in addressing some of its most difficult medical staffing challenges.

*The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages*

Multiple factors, including the location of institutions, pay, and the correctional setting, negatively impact the BOP's ability to recruit and retain medical professionals. Civil service employee pay is governed by the General Schedule (GS) pay scale and U.S. Office of Personnel Management policies regarding how positions are classified. We found a significant gap between GS salaries and local average salaries for comparable healthcare positions; these gaps persisted across multiple medical professions and in both urban and rural communities. For example, BOP staff told us that it was particularly difficult to recruit pharmacists and we found that the average pharmacist salary in communities where BOP institutions are located was approximately double the mid-range salary the BOP can offer.[4] In an attempt to narrow these gaps, the BOP has increasingly relied on monetary and nonmonetary incentives and it plans to implement an alternative federal pay system for psychiatrists in fiscal year (FY) 2016. However, we found that these are not always sufficient to reduce the medical staffing vacancies the BOP faces. Faced with continuous understaffing, the BOP uses temporary duty (TDY) assignments and contracted medical providers to ensure that it can continue to provide inmates with necessary medical care. However, both of these options come with additional costs. Additionally, according to BOP officials, the limits of the GS pay scale mean that PHS compensation and benefits are more competitive for some professions.

*The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner*

The BOP's current method of addressing medical recruiting challenges focuses primarily on individual institutions' immediate needs. As a result, the BOP does not strategically assess which vacancies have the greatest overall impact on its ability to provide medical care to inmates. The BOP collects and maintains data that, if analyzed, could help it better assess and prioritize its needs and develop a strategy to meet those needs agency-wide. Such a process would include evaluating vacancies, the use of incentives, the use of TDY assignments, and the cost of outside medical care across all institutions. This would help the BOP identify the vacancies that are most costly to leave unfilled and to prioritize staffing in those locations.

---

[4] We compared average salaries reported by the Bureau of Labor Statistics with salaries in the middle of the range on the General Schedule salary table. For more information, see Appendix 1.

*The BOP Does Not Use the Authority It Has to Assign PHS Officers to Positions Based on Greatest Need*

The conditions of PHS officers' employment make them more mobile than civil service employees, and the PHS has created promotion incentives that benefit PHS officers who change duty stations; but the BOP does not take advantage of these flexibilities to assign PHS officers to positions based on greatest need. BOP officials expressed concerns to us that one method of using those flexibilities, involuntary transfers, could lead to unintended effects, such as PHS officers leaving the BOP for work in other agencies. However, involuntary transfers are not the BOP's only option for determining where PHS officers should work, as the BOP may alternatively require PHS officers to spend their first few years with the BOP filling high-priority positions, which could appeal to PHS officers seeking promotion. We believe the BOP should better utilize PHS officer flexibility to address medical vacancies of greatest impact.

## Recommendations

As the BOP struggles to fill its medical staffing needs, and as medical costs continue to rise, the BOP must collect better information on its priority health services vacancies and find solutions to meet the medical needs of its inmates. In this report, we make two recommendations to help the BOP improve its ability to assess the impact of medical vacancies on BOP operations and to develop a strategy to better utilize PHS officer flexibility to address medical vacancies of greatest impact.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

    The BOP's Responsibility to Provide Medical Care to All Inmates ................. 2

    Scope and Methodology of the OIG Review ............................................... 6

RESULTS OF THE REVIEW ....................................................................................... 7

    The BOP's Compensation and Incentives Offered to Civil Service
    Medical Staff Are Not Sufficient to Alleviate Staffing Shortages ................... 7

    The BOP Does Not Identify or Address Recruiting Challenges in
    an Agency-wide and Strategic Manner ................................................... 16

    The BOP Does Not Use Its Authority to Assign PHS Officers to
    Positions Based on Greatest Need ......................................................... 20

CONCLUSION AND RECOMMENDATIONS ....................................................... 26

    Conclusion .......................................................................................... 26

    Recommendations ............................................................................... 27

APPENDIX 1:  EXPANDED METHODOLOGY ................................................... 28

    Data Analysis ...................................................................................... 28

    Interviews ........................................................................................... 29

    Site Visits ............................................................................................ 29

    Additional Objectives ........................................................................... 29

APPENDIX 2:  THE BOP'S RESPONSE TO THE DRAFT REPORT .......................... 31

APPENDIX 3:  OIG ANALYSIS OF THE BOP'S RESPONSE ................................. 33

# INTRODUCTION

As of September 2014, the Federal Bureau of Prisons (BOP) employed over 2,300 civil service employees and over 800 U.S. Public Health Service (PHS) officers to provide medical care to an inmate population of 171,868 in 121 institutions.[5]  However, these staffing levels fell short of the BOP's staffing goals:  from fiscal year (FY) 2010 to FY 2014, the BOP's total medical staff was approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be "ideal" care.

Staffing shortages are a reflection of the BOP's challenges to recruit and retain medical staff.  Although BOP policy states that "the vacancy rate of staff positions that work directly with inmates shall not exceed 10 percent during any 18 month period," the BOP as a whole is unable to achieve this medical staffing goal, as only 24 institutions had a medical staffing rate of 90 percent or higher as of September 2014.[6]  Further, 12 institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.[7]

The Office of the Inspector General's (OIG) previous report on the BOP's aging inmate population found that understaffing in institutions' health services units limits inmate access to medical care, results in an increased need to send inmates outside the institution for medical care, and contributes to increases in medical costs.[8]  Moreover, the BOP's staffing shortages continue despite significant increases in its spending on medical care.[9]  The BOP's spending on medical care increased 21 percent, from $905 million in FY 2010 to $1.1 billion in FY 2014, while

---

[5]  This reflects the pre-trial and sentenced population in BOP-managed institutions only.  Inmates in contract institutions and residential reentry centers are excluded.

[6]  BOP, Program Statement 3000.03, Human Resource Management Manual (December 19, 2007).  Vacancy rates are calculated as a percentage of positions assigned to an institution.

At a meeting to discuss a working draft of this report, the BOP's Assistant Director for Human Resource Management said that while the BOP advocates for institutions to fully staff their medical positions, budgetary realities often make this unachievable.  As a result, the BOP's Central Office recognizes that institutions must balance staffing needs in all aspects of institution operations.

[7]  This official oversaw the BOP's medical care of inmates during our review, but retired in October 2015.

[8]  DOJ OIG, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, Evaluation and Inspections Report 15-05 (May 2015).  See https://oig.justice.gov/reports/2015/e1505.pdf (accessed February 8, 2016).

[9]  In 1994 the Government Accountability Office (GAO) reported that the BOP acknowledged nursing staff shortages but was unable to recruit staff to fill the positions because its salaries were well below that offered in the community.  GAO, Bureau of Prisons Health Care:  Inmates' Access to Health Care is Limited by Lack of Clinical Staff, GAO-HEHS-94-36 (February 1994).

In response to a working draft of this report, the BOP noted that other costs beside staffing, such as the costs of pharmaceuticals and medical procedures, also contribute to increased medical spending.

1

the BOP's overall budget increased 11 percent over that time, from $6.1 billion to $6.8 billion.

We conducted this review to build on our previous report's findings by further examining the BOP's medical staffing challenges, as well as its use and management of PHS officers as one means to address these challenges. In this section, we describe the BOP's responsibility to provide medical care to inmates in its custody, the government-wide mission and role of the PHS, and the role of PHS officers who provide medical care inside BOP institutions. In addition, we outline the memorandum of understanding (MOU) between the BOP and the PHS and the process used by BOP institutions to hire medical staff.

## The BOP's Responsibility to Provide Medical Care to All Inmates

The BOP is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure. As part of this mission, the BOP provides medical care to federal inmates.[10] Federal inmates receive medical care through institution health units or outside medical providers. In FY 2014, the BOP employed 3,215 medical staff, including 2,382 civil servants and 833 PHS officers, to meet this need. However, many institutions remain understaffed, limiting the amount of care that an institution can provide. Specifically, in FY 2014, 20 BOP institutions had a medical staff vacancy rate of 25 percent or higher and 3 institutions had a vacancy rate of 40 percent or higher. Hiring the medical professionals necessary to maintain the care that institutions must provide has proved challenging for the BOP. We discuss these challenges later in this report.

### Established Health Units in Each BOP Institution Provide Medical Care

To provide medical care to inmates, every BOP institution operates a health services unit. Most units have examination rooms, treatment rooms, dental clinics, radiology and laboratory areas, a pharmacy, and administrative offices. The BOP staffs these health units with medical professionals who provide urgent and routine medical care on an ambulatory or observation basis. These medical professionals, who may be either civil service employees or PHS officers, include physicians, dentists, nurses, pharmacists, and mid-level practitioners.[11] (See Figure below.) For inmates who require more intensive, specialty care than the health services units can provide, the BOP seeks care outside the institution.[12]

---

[10] We conducted a broad review of the BOP's management of inmate medical care in 2008. See DOJ OIG, *The BOP's Efforts to Manage Inmate Healthcare,* Audit Report 08-08 (February 2008), https://oig.justice.gov/reports/BOP/a0808/final.pdf (accessed February 8, 2016).

[11] The BOP also contracts with medical providers to offer clinics and specialty services inside the institutions to complement the primary care offered by the civil service and PHS-employed staff.

[12] For outside medical care, the BOP signs contracts with community hospitals and physicians with close proximity to the institution. The BOP negotiates rates with community hospitals using comprehensive medical contracts whenever possible. The OIG is currently conducting a related review of the effect of these rates on the BOP's budget.

**Figure**

**BOP Medical Staff, Fiscal Year 2010 to Fiscal Year 2014**



Source:   BOP staffing data

Civil service employees constitute the majority of health services staff.  The BOP uses recruitment, retention, and relocation incentives to entice civil service medical professionals to join the BOP.  Typically, the BOP uses incentives for positions that are critical for the operation of health services units or for those that are difficult to fill, allowing the BOP more flexibility in compensation.  For example, the BOP can use a recruitment bonus to increase an employee's annual rate of pay up to 25 percent, in exchange for a 2-year service commitment.[13]  The BOP also uses retention bonuses, relocation bonuses, student loan repayments, annual leave credits, and "above the minimum rate" pay to incentivize employment.[14]  When using any incentive, an institution must prepare a narrative showing that it has a great need for the employee, and that without the incentive the institution would lose an existing employee or be unable to fill a vacancy.[15]  Officials in the BOP's Central Office must approve all incentives before they can be paid to employees.[16]

---

[13]  In response to a working draft of this report, the BOP noted that the BOP Director may approve a shorter service agreement for recruitment bonuses.

[14]  Relocation bonuses are offered to current BOP employees who relocate to a hard to fill location.  Student loan repayment can be awarded up to $10,000 annually for loans covering education required for a position, such as a loan to pay for medical school.  Annual leave credit increases the rate at which one earns annual leave each pay period.  "Above the minimum rate" pay allows an agency to pay a new employee above the initial grade and step that would normally be required by the GS scale to meet the superior qualifications of a candidate.

[15]  The narrative includes information such as the qualifications needed for the position, the qualifications of the candidate, labor market factors that that affect the ability to recruit, and recent turnover, if any.

[16]  The type of incentive determines whether BOP officials in the Health Services Division or Human Resource Management Division approve the incentive.

*PHS Officers Compose the Remainder of the Health Services Staff*

In FY 2014, 833 of the BOP's 3,215 health services staff at the institutions (26 percent) were PHS officers.[17]  The PHS is led by the Surgeon General and is an agency of the U.S. Department of Health and Human Services.  The PHS has commissioned over 6,500 officers who are assigned to 23 federal agencies and the District of Columbia.[18]  PHS officers serve in a variety of positions, treating underserved and vulnerable populations in the areas of public health.  The underserved communities that PHS officers treat include populations such as federal inmates or Native American communities living on remote tribal lands.  Most PHS officers are involved in medical care delivery, disease control and prevention, biomedical research, treatment of mental health and drug abuse, or disaster response efforts.  Within the BOP, PHS officers work both in positions that provide direct clinical care to inmates and in medical care management.

The PHS is part of the uniformed service rather than the civil service.  As such, PHS officers operate under a separate personnel system with additional obligations, and they are paid according to the Uniformed Service Compensation table used for the military rather than the General Schedule table used for civil service employees.  In exchange for their willingness to serve, PHS officers also receive uniformed service benefits, including health insurance at no expense, tax-free housing and subsistence allowances, and access to military base facilities.  The PHS also offers 30 days of vacation per year, financial support for education through the Post-9/11 GI Bill, access to the U.S. Department of Veterans Affairs' home loan program, and retirement eligibility benefits after 20 years of service.

With these benefits come additional responsibilities, such as being on call at all times and deploying on critical public health missions.  PHS officers are considered available for duty at any time and are therefore not eligible to earn overtime pay.  The PHS has several types of response teams that can immediately deploy to regional, national, and international public health emergencies, such as Hurricane Katrina or the Liberian Ebola crisis.  Additionally, PHS officers must continue medical education and maintain professional competence through additional training and certifications.

The BOP's partnership with the PHS to provide medical care to underserved inmate populations dates back to the BOP's creation in 1930.  In 1991, the BOP and the PHS signed an MOU to establish the conditions, responsibilities, and procedures

---

[17]  The BOP also employs both civil service and PHS officer health services staff in its Regional Offices and Central Office.  However, for this review we focused only on health services staff in the institutions.

[18]  Some of these agencies include the BOP, the U.S. Marshals Service, the Food and Drug Administration, the Indian Health Service, the Centers for Disease Control and Prevention, the National Institutes of Health, the Department of Defense, and the District of Columbia Commission of Mental Health Services.

that would guide PHS officers working throughout the BOP.[19]  Under the terms of the MOU, the BOP annually notifies the PHS of the number of PHS officers it needs and is responsible for the cost of PHS officer compensation and benefits.  The BOP transfers funds to the PHS for this purpose quarterly, and the PHS in turn pays and manages PHS officer benefits using these funds.

*Civil Service Employees and PHS Officers Are Considered Equally for Vacant Positions, and Fill the Same Duties Once Hired*

The BOP delegates the hiring of health services staff, including PHS officers, to each BOP institution, with selection authority for most BOP institution staff delegated to the institution's Warden.[20]  Consequently, individual institutions advertise vacancies and institution staffs focus their recruitment efforts primarily on the local community surrounding each institution.[21]  Although civil service employees and PHS officers have two separate personnel systems, their position duties and responsibilities at the BOP are the same.  Hiring officials told us they select and hire qualified candidates without differentiating between the civil service and the PHS, primarily because the need for such staff is greater than the availability of candidates from either type.  One institution's Human Resource Manager told us, "Whoever comes to us, however we get that person, if they are a civilian, and we can meet their needs, we're taking them.  If they are PHS, and we can meet their needs, we are taking them.  Medical is so hard for us to recruit and hire.  If you bring us your credentials and say you're willing to work here, we'll figure it out."

During our review, BOP officials also described the challenges that can arise from having to integrate these two separate personnel systems into their health services operations to provide inmates with medical care.  Among the relevant differences we identified were leave policies, awards, drug testing, and training opportunities.  BOP officials also described how this problem is exacerbated by what they see as discordant legal decisions in response to grievances from unionized BOP employees on the one hand, and PHS officers on the other hand, over issues relating to relative seniority between the two groups.  While we did not focus our review on these challenges, we did note that several BOP officials described the inevitable tensions that can arise in a workforce where staff members share the

---

[19]  The relationship between the BOP and the PHS is also defined by statute.  See 18 U.S.C. § 4005 and 42 U.S.C. § 250.  In response to a working draft of this report, the PHS noted that these two statutes underpin the MOU.

[20]  The Warden has selection authority for all institution staff below the assistant department head level and for medical officers and dental officers in consultation with the BOP Medical Director.  This encompasses all staff members who provide medical care to inmates.  See BOP, Program Statement 3000.03, section 250.1.

[21]  The BOP also advertises nationwide job announcements for some positions, such as nurses.  However, applicants select their preferred locations as part of the online application process.  When institutions have vacancies in positions that were advertised under a nationwide job announcement, the institution receives only the names of applicants who selected as a preferred location the institution.

same jobs, workplace, and mission, yet can receive meaningfully different compensation and benefits.[22]

## Scope and Methodology of the OIG Review

Our review examined the BOP's medical staffing challenges and its use of PHS officers to address those challenges. We also evaluated the BOP's ability to transfer PHS officers to different locations based on staffing needs. We analyzed BOP staffing data for both civil service employees and PHS officers from FY 2010 through FY 2014. Specifically, our review focused on medical professionals and those employees who help the BOP provide direct care inside BOP institutions. For the purposes of this review, we excluded all other staff. We also analyzed the cost data associated with BOP civil service.

Our fieldwork, which we conducted from April 2015 through October 2015, included interviews, data collection and analyses, and document reviews. We interviewed BOP Central Office officials in the Administration, Human Resource Management, and Health Services Divisions, as well as an official in the BOP's union. We also interviewed an official in the PHS Division of Commissioned Corps Personnel and Readiness. We used video teleconference to conduct site visits to five BOP institutions and to interview institution officials. A detailed description of the methodology of our review is in Appendix 1.

---

[22] In Appendix 1, we describe the extent to which we examined these issues, and our decision to focus the review on medical staffing challenges, in more detail.

# RESULTS OF THE REVIEW

**The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages**

Despite the BOP's increased use of incentives for civil service employees, the BOP remains challenged to recruit and retain medical professionals.  Specifically, we found that the salaries and incentives the BOP offers are not competitive with those of the private sector, particularly given the need for the BOP to compensate its employees for the safety and security factors intrinsic to working in a correctional setting.  As of September 2014, the BOP was operating at an 83 percent medical care staffing level, 7 percent below its goal of 90 percent.  As a result, health services units are left understaffed, with increased workloads that limit the amount of medical care that can be provided inside an institution.  The BOP's resulting need to rely on temporary duty (TDY) assignments shifts its staffing resources among institutions, and its reliance on contractors to augment the medical care it can provide contributes to the BOP's overall spending on outside medical care.

*The BOP is Disadvantaged in Its Efforts to Recruit Civil Service Medical Professionals*

While recruitment is a challenging area for many healthcare organizations, it is particularly challenging for the BOP because of its geographic locations and local market competition, the limits on the pay it can offer its medical staff, and its correctional setting.[23]  The BOP's Assistant Director for Human Resource Management said that recruitment is also difficult because the recruiting challenges the BOP faces vary across institutions.  As of September 2014, there were 121 BOP-managed institutions located across the United States, in both urban and rural areas.

We found that in major metropolitan areas, the BOP's greatest recruiting challenge is attracting candidates that are also qualified to work in private organizations, such as hospitals and local medical centers.  For example, at one institution with several major universities in the surrounding area, the BOP has been unable to attract recent graduates who are willing to occupy entry-level positions.  The Human Resource Manager of that institution told us that the major universities have more prestigious medical facilities and offer higher pay.

At the BOP's more rural locations, we found that the remoteness of the institution often deters medical professionals.  A Warden at a more remote institution said that because the area is isolated, most medical professionals are in the area only to work at a particular, respected community hospital.  Staff at another institution told us that being in close proximity to a respected community

---

[23]  In response to a working draft of this report, the BOP noted that there are shortages of medical professionals in a variety of fields, making its challenges not unlike those the general medical community faces.

hospital is both good and bad overall, but definitively unhelpful to recruiting. While the institution can use the hospital for services that cannot be provided inside the institution, it becomes nearly impossible to compete with the hospital for staff, because of the hospital's favorable reputation and higher pay. An Associate Warden at another institution told us that when competing with other organizations, the institution is often unable to attract candidates. He said that when the institution is able to hire employees, they typically leave shortly after they are hired for more lucrative offers.

*Position Grades and Compensation, Even with Incentives, Are Not Competitive with Local Markets*

In many instances, regardless of location, the federal limits on pay and incentives that hiring officials can offer potential employees pose a significant challenge for BOP institutions. BOP hiring officials we interviewed told us that the compensation offered is not enough to competitively attract or retain medical professionals. We found that this is especially true for the positions, such as doctors, pharmacists, and dentists, which are necessary to operate health units.

The BOP is required to classify positions according to the General Schedule (GS) pay scale, and, for physical therapists and pharmacists especially, we found the BOP struggles to offer competitive pay because the assigned grade of the positions limits the salaries they can offer.[24] According to the BOP's Chief of Health Services Staffing and Recruitment, the current grade of physical therapist and pharmacist positions on the GS scale makes it very difficult to hire individuals into civil service positions.[25] Rather, as of September 2014, the majority of medical professionals in those positions at BOP institutions are PHS officers. According to BOP officials, this is because the GS grade levels the Office of Personnel Management (OPM) assigned to these civil service positions are too low and the PHS compensation and benefits are more attractive in comparison. A Warden told us that if the BOP could offer more competitive pay through the civil service, it would be in a much better position when it comes to recruitment.

The BOP's Chief of Health Services Staffing and Recruitment said that attracting candidates for most medical positions in a correctional setting already requires the use of incentives. However, we found that even with incentives, the BOP cannot offer competitive salaries because of the limitations imposed by the current GS pay scale. Using data from the BOP, OPM, and the Bureau of Labor Statistics (BLS), we found that there is a large gap between the salaries the BOP pays its medical employees and those offered for similar positions in the local areas

---

[24] The General Schedule is the position classification and pay system governing the majority of salaried personnel positions within the civil service. OPM is responsible for administering the GS classification standards, qualifications, and pay structure.

[25] Further, he said that most physical therapist positions are at the doctorate level and the BOP's current classification of this position does not account for that. In response to a working draft of this report, the BOP said that this is because the BOP must follow OPM's Classification Standards, in accordance with 5 U.S.C. Chapter 51.

surrounding institutions.[26]  For example, the BLS reports that the average salary for a nurse in the local area is 34 percent higher than step 1 of the highest grade for a BOP nurse.  We found that the gap widens for other positions, with a 60 percent difference for physicians, a 102 percent difference for pharmacists, and a 133 percent difference for dentists.[27]  We also found that the salary gap was significant in both rural and metropolitan areas.  (See Table 1 below.)

**Table 1**

**OPM and the BLS Salary Comparison in Rural and Metropolitan Areas, FY 2014**

| Rural Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP | Metropolitan Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP |
|---|---|---|---|---|---|---|---|
| Nurse | $47,923 | $61,110 | 28% | Nurse | $51,723 | $77,468 | 50% |
| Physician | $114,872 | $187,734 | 63% | Physician | $123,981 | $192,476 | 55% |
| Pharmacist | $57,982 | $120,241 | 107% | Pharmacist | $62,579 | $120,034 | 92% |
| Dentist | $69,497 | $170,508 | 145% | Dentist | $75,008 | $159,368 | 112% |

Note:  This table does not include special pay.  See footnotes.

Sources:  BOP spending data, BLS occupational employment statistics, and OPM classification standards and locality pay tables

The BOP's Assistant Director for Human Resource Management told us that the GS scale does not meet the BOP's current needs because the assigned grades of many medical positions are too low.  The BOP's former Assistant Director for Health Services and Medical Director told us that the system is antiquated and no longer reflects today's reality or position requirements.  The BOP's Personnel Director told us that OPM convened a workgroup to rewrite the classification standards for nurses across the federal government.  However, we found that the BOP's discussions with OPM to restructure position classifications have not produced results.  The Assistant Director for Human Resource Management said that the lack of change was frustrating because nurses, for example, qualify only for a GS-5 classification, which is not competitive.[28]

---

[26]  For this analysis, we used the GS scale and step 1 of the position's highest grade to balance the variance in staff pay based on their status as a new versus more experienced employee.  For example, OPM classification standards state that a non-supervisory pharmacist can be grade 7, 9, or 11, so we used grade 11, step 1 for our analysis.  Neither the OPM data nor the BLS data includes the value of benefits in their calculations.  See Appendix 1 for more information.

[27]  This analysis does not include special pay.  OPM establishes special pay at a rate higher than basic pay for a group or category of positons in certain geographic locations where there are significant hiring challenges.  We found that even when accounting for salary increases from special pay, the gap between the BOP and the local area remains large.  For example, in Lexington, Kentucky, a dentist with special pay can earn $78,000 in the BOP while the BLS average is $176,000.  The BOP's Assistant Director for Human Resource Management said, "OPM works with the BOP on special salary rates but it's a Band-Aid on a much bigger issue."

[28]  According to the 2015 GS pay table, the base salary of a GS-5 position is $27,982.  This figure does not account for locality pay.

Position classifications are also problematic for mid-level practitioners such as physician's assistants and nurse practitioners.  The BOP's former Assistant Director for Health Services and Medical Director said that mid-level practitioners are significantly underpaid and that even incentives do not address the pay disparity.  For example, the Health Services Administrator at one institution in need of a nurse practitioner told us it has been unable to fill the vacancy because the salary is not commensurate with the education and experience required.  Specifically, she said that one of the nurse practitioner applicants to her institution had 6 years of education, but the BOP could offer only a GS-9 salary.[29]  In comparison, she further said that the BOP could offer a similar salary to a paramedic even though, in her state, paramedic qualifications can be obtained with less education.  Citing anomalies such as these, the BOP's Assistant Director for Human Resource Management described the GS scale as a one-size-fits-all system that does not always fit everyone.

In addition, we found that the private sector pays medical professionals who are not working in correctional settings significantly more than BOP civil service employees in the same positions, indicating that the salaries the BOP offers do not factor in the fact that its employees face inherent security risks associated with working in a correctional setting.  The BOP's Assistant Director for Human Resource Management said that many medical professionals do not find working in a correctional setting appealing because it is vastly different from a hospital.  The BOP's former Assistant Director for Health Services and Medical Director agreed, saying not everyone wants to work in a place that could present a threat to his or her well-being.  Despite this challenge, the BOP tries to market the benefits associated with working in a correctional setting.  As law enforcement officers, all BOP employees gain access to the law enforcement federal retirement system, health benefits, and annuity.  Still, the compensation offered to the BOP's medical professionals is less than what is offered in the local community hospitals and medical centers where there are fewer safety risks.

*Since FY 2010, the BOP Has Increased Its Use of Incentives to Recruit and Retain Civil Service Medical Employees*

Like most other federal agencies, the BOP must operate within the GS scale and is limited in what it can offer potential employees by the grade and classification of the position.  However, when the requirements and responsibilities of a position warrant more compensation than its grade and salary, the BOP can supplement compensation with various incentives.  According to BOP data, from FY 2010 to FY 2014, the BOP consistently used incentives for positions for which it had the greatest needs, including clinical nurses, general practice medical officers, and mid-level practitioners.  The BOP's Assistant Director for Human Resource Management, who has been with the BOP for 27 years, said that the BOP did not regularly need to use incentives until approximately 2000.  He said that now the BOP encourages institutions to be aggressive in recruiting for positions that have

---

[29]  According to the 2015 GS pay table, the base salary of a GS-9 position is $42,399.  This figure does not account for locality pay.

been difficult to staff and to offer as much as they can for an acceptance.  We found that more institutions have been requesting incentives to help attract medical employees who provide direct clinical care.  For example, in FY 2010, 70 percent, or 65 of 93 BOP institutions, requested incentives for their medical employees.[30]  We found that this increased to 89 percent in FY 2014, when 87 of 98 institutions requested incentives.

Consequently, from FY 2010 to FY 2014, the number of BOP medical employees receiving at least one incentive increased 74 percent.  Specifically, during FY 2010, the BOP awarded 409 incentives to medical employees, including 219 monetary incentives that were valued at $2.7 million.[31]  During FY 2014, the BOP awarded 712 incentives, including 342 monetary incentives that were valued at $4.5 million.[32]  (See Table 2 below.)

**Table 2**

**Incentives Awarded by Fiscal Year and Type, in Thousands**

| Fiscal Year | Recruitment Bonus | Relocation Bonus | Retention Allowance | Student Loan Repayment | Above Minimum Rate | Annual Leave Credit | Total |
|---|---|---|---|---|---|---|---|
| 2010 | 104 | 4 | 80 | 31 | 93 | 97 | **409** |
| | $1,445 | $60 | $932 | $279 | — | — | **$2,716** |
| 2014 | 101 | 5 | 140 | 96 | 146 | 224 | **712** |
| | $1,752 | $77 | $1,793 | $900 | — | — | **$4,522** |

Notes:  Monetary totals are in thousands.  As noted above, "above the minimum rate" pay allows an agency to set higher pay to meet the superior qualifications of a candidate or the special need of an agency.

Source:  BOP incentives data

According to BOP data, institutions frequently use recruitment and retention bonuses as incentives.  Table 3 below shows our analysis of the incentives offered to employees in positions with the greatest pay disparity when compared to the BLS average.  As noted above, special pay and incentives can help lessen the gap; but overall, BOP salary averages remain low in comparison for recruitment.

---

[30]  The BOP maintains data on correctional complexes in the aggregate, rather than separately for each institution within the complex.  As a result, the total number of locations requesting incentives is less than the overall total of 121 institutions.

[31]  Of the 409 incentives the BOP awarded, 190 were for annual leave credit or above the minimum rate pay.  The BOP does not assign monetary value for these incentives because they vary substantially by employee rate of pay.  For example, hiring officials can increase an employee's leave accrual rate from 4 hours per pay period to either 6 or 8, but the monetary value of that leave would depend on his or her salary.

[32]  Of the 712 incentives the BOP awarded, 370 were for annual leave credit or rate of pay above the minimum.

**Table 3**

**Incentives Awarded by Position, FY 2014, in Thousands**

| FY 2014 | Recruitment Bonus Total | Relocation Bonus Total | Retention Allowance Total | Student Loan Repayment Total | Incentives Total | Average Monetary Incentives per person |
|---|---|---|---|---|---|---|
| Nurse | $603 | — | $227 | $102 | **$932** | $7 |
| Physician | $414 | $25 | $480 | $63 | **$982** | $15 |
| Pharmacist | $10 | — | $59 | — | **$69** | $12 |
| Dentist | $196 | — | $280 | $40 | **$516** | $20 |

Notes:  Totals are in thousands.  For analysis, the category "Physician" combines data for general practice medical officers, internal medicine medical officers, and general medical officers.

Source:  BOP incentives data

For many nurses and medical doctors, student loan repayment is also an attractive incentive.  However, the BOP's Assistant Director for Human Resource Management said that for the BOP, student loan repayment is limited to $10,000 per employee each year.[33]  An additional incentive the BOP can use for some positions is accelerated promotion, which shortens the amount of time between salary increases.  Yet, these incentives, while helpful, have not resulted in bringing BOP medical staffing to sufficient levels.  A Health Services Administrator told us that her institution recently hired a Chief Dentist after 4 years of vacancy and was able to do that only by offering multiple incentives.  The Human Resource Manager at another institution told us that he uses a combination of incentives but even with multiple incentives, recruitment is still difficult.

We also found that institution efforts to obtain approval to use incentives are time-consuming, which sometimes results in the BOP losing candidates to other employers; but Central Office and institution staff do not agree on the reason for the delays.  Central Office staff attributes the long approval process to institution Human Resource Managers' lack of information and knowledge of the requirements for processing incentives.  The BOP's Chief of Health Services Staffing and Recruitment said that institution Human Resource Managers deal with labor relations issues, grievances, performance, and the Union, and that medical recruitment is just one small piece of the puzzle.  However, an institution Health Services Administrator told us that the paperwork required to process each one is extremely cumbersome.

The BOP's incentive approval process requires that each incentive be processed separately, even when a single employee will be receiving multiple incentives.  BOP officials told us that institution staffs wait for incentives to reach the final stages of approval at the BOP's Central Office before offering them to

---

[33] Federal law imposes a $10,000 annual cap per employee and an overall cap of $60,000 per employee.  See 5 U.S.C. § 5379(b)(2).  The BOP's Assistant Director for Human Resource Management also noted that medical school loans are often in the range of six figures and that the amount of student loan repayment the BOP can offer does not compare to that of the private sector.

potential candidates because they are unsure which incentives they can authoritatively present to candidates prior to confirmation. For example, a Human Resource Manager told us that because incentives are not final until approved, he has little room for negotiation and that what he can offer in competition with the local market is initially hypothetical. The BOP's Personnel Director acknowledged that institution hiring officials lack confidence that incentives will be approved. But, he told us, institutions should offer all they can because in practice incentives are rarely denied. The BOP has considered automating the incentive approval process by creating a standard template for every incentive. According to the BOP's Personnel Director, through automation, incentives would be approved more quickly and more information regarding incentive availability would be accessible. However, the BOP has not yet implemented this change.

*Because Incentives Are Not Always Enough, the BOP Has Sought Other Alternatives to Attract Medical Professionals*

The BOP supplements its use of incentives with other alternatives that also have the effect of increasing pay. One of these is the Physicians and Dentists Comparability Allowance Program (PCA Program).[34] The PCA Program allows the BOP to adjust physician and dentist compensation up to $30,000 when it faces difficulty in recruiting.[35] The adjustment for each employee is determined through negotiation with that employee and the BOP Medical Director's approval of the employee's credentials. Eligible physicians or dentists must also enter a 1- or 2-year service agreement with the BOP. The BOP's former Assistant Director for Health Services and Medical Director told us that this program generally makes the civil service a more lucrative option for physicians.[36] However, the higher salary potential under the PCA Program is not always lucrative enough for other positions, such as psychiatrists.

The BOP recently received approval from the Justice Management Division and OPM to determine pay for psychiatrists using the laws governing medical professional compensation in the U.S. Department of Veterans Affairs (Title 38).[37] Under Title 38, the BOP can increase an individual's compensation package up to a maximum of $260,000 per year, based on his or her rating from an approval

---

[34] 5 U.S.C. § 5948(a).

[35] Recruitment difficulty is determined by a number of factors, including length of position vacancy, number of unqualified applicants, number of interviewed but underqualified applicants, and number of physicians rejecting offers of employment and citing inadequate compensation as the reason.

[36] Physicians and dentists can earn up to $203,000 in annual salary under the PCA Program.

[37] The Justice Management Division provides senior management guidance as it relates to DOJ policy for all matters pertaining to organization, management, and administration.

A majority of employees of the federal government are employed under personnel laws contained in Title 5 of the United States Code, which covers administrative law. Title 38, the section of federal law covering veterans' benefits, includes an alternate personnel system for specific occupations such as medical professionals. Under Title 38, employees are paid under separate pay schedules and pay is determined under rules separate from Title 5.

panel.[38]  The panel will determine the salary for each individual from tiers that the Department of Veterans Affairs has established based on resume, tenure, and certifications.  The BOP is also working with the National Finance Center to modify the system for salary payment processing and anticipates implementing Title 38 authority in the spring of 2016.  If the initiative is successful, the BOP told us it will consider expanding Title 38 to other positions that are difficult to staff, such as pharmacists.  BOP officials said that initially there would be minimal budgetary impact because the BOP employs relatively few psychiatrists, but that future budgets would need to incorporate increased costs if the principles of Title 38 were extended to more professions.[39]

Another benefit available to some BOP medical personnel is the opportunity to convert to the PHS from the civil service.  A PHS officer we interviewed told us that she originally took a pay cut when she joined the BOP as a civil service employee, but did so with the prospect of converting to the PHS for greater uniformed service benefits.[40]  She said that she also began her career as a civil service employee and converted to the PHS because the compensation package was more lucrative.[41]  For positions such as registered nurses and pharmacists, for which the BOP is not able to offer competitive salaries within GS constraints, we found PHS officers are likely to fill these positions.  In particular, the BOP's Assistant Director for Human Resource Management said that the BOP staffs a high number of PHS pharmacists because the BOP cannot offer a comparable salary for pharmacists.  In FY 2014, 145 of 194 pharmacists (75 percent) at BOP institutions were PHS officers, rather than civil service employees.[42]

The PHS accepts applications for a commission during defined periods throughout the year, which vary by profession.  The PHS accepts applications from physicians and dentists at any time, but accepts applications from other professions only during limited windows during the year.[43]  The PHS allows agencies employing

---

[38]  The panel will include representatives from the BOP's Health Services Division, the BOP Union, and medical doctors.

In response to a working draft of this report, the BOP estimated that typical compensation packages would not exceed $240,000 per year based on individual factors.

[39]  The BOP reported that, as of November 2015, it employed 25 psychiatrists.

[40]  The BOP allows qualified and eligible employees to convert to the PHS personnel system as long as their application for a commission is approved by the PHS.

[41]  We attempted to compare compensation in the GS and PHS systems but determined that we could not do so because the process of setting PHS officer pay is more individualized than the process of setting civil service employee pay.  For additional information, see Appendix 1.

[42]  We also found that the appeal of joining the PHS is lower when civil service salaries become more competitive.  The Chief of the BOP's Staffing and Recruitment Section told us that a majority of BOP dentists used to be PHS officers until the BOP decided to increase the position grade for dentists. Since that change, he said, he has seen an increase in the number of BOP dentists who are civil service employees.

[43]  In previous years, the PHS application process was open to all professions at all times.  In 2010, the PHS streamlined the application process to allow applications only from certain professions at certain times throughout the year.  For example, in 2015, the PHS opened its application process to
(Cont'd.)

its officers a limited number of waivers that can be submitted outside of the normal application window for applicants that are deemed critical by the agency. However, the BOP's PHS Liaison told us that if an employee stationed at an institution that is already well-staffed wants to convert to the PHS, he or she must transfer to a location where there is a shortage of medical staff. The BOP's former Assistant Director for Health Services and Medical Director said that because the PHS does not commission many new officers during the regular application windows, waivers are consequently very valuable tools. However, the number of waivers the PHS allocates to the BOP each year remains limited: 15 in 2014 and 17 in 2015. At institutions with several vacancies, or at new institutions, the BOP will offer conversions to the PHS as an incentive to transfer between institutions or to stay with the agency. Institution staff we interviewed acknowledged that being able to offer the option to convert to PHS is a recruitment tool they could use for hard to fill positions. We discuss the BOP's management of PHS officers in more detail below.

*Institutions Must Rely on TDY Assignments and Contracted Medical Care because of Continuous Understaffing*

The BOP's inability to recruit and retain medical professionals has led to institutions operating at unfavorable staffing levels. Institution staff told us that when staffing levels are low they depend on TDY assignments and medical contractors for assistance. The BOP uses TDY and Regional Medical Assistance Support Teams to provide additional resources to its six regions. These teams were created in 2011 to assist institutions with critical medical staffing needs. According to BOP officials, these teams are used when institutions' health services units are 30 to 40 percent understaffed. Both civil service employees and PHS officers serve on Regional Medical Assistance Support Teams and enlist on weeklong TDY assignments to assist. An official at one institution in particular told us that even with PHS officers on staff, it relies on TDY from other institutions to accomplish its mission. In FY 2014, this institution had a vacancy rate of 21 percent for medical professionals. However, according to institution staff, relying on TDY for support is a temporary fix and should not replace a permanent solution for staffing shortages. The BOP's Assistant Director for Human Resource Management told us that rather than continuous TDY, it would be more beneficial for the BOP to pay an incentive to hire a full-time employee. With this approach, fewer long-term expenses would stem from the repetitive use of TDY.

We found that staffing shortages lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care. A Human Resource Manager told us that because correctional settings require around-the-clock staffing, all vacancies affect staff morale. He said that because operations never cease, the lower the staffing levels, the greater the need to use mandatory overtime and double shifts. Additionally, staffing shortages increase the workload of those remaining staff. The BOP's PHS Liaison told us that when there are vacancies, the existing staff becomes overworked. A Physician's Assistant told us

---

pharmacists only during the month of August. The BOP PHS Liaison told us that the new application process limits the number of applications the PHS processes each year.

that increased workloads can easily drain staff, which, for him, makes some of the routine care a lower priority.  A Health Services Administrator also told us that when health units do not have the staff to see inmates, they have to send them outside the institution for basic medical care because they are unable to meet their needs inside the institution.  The Warden at the same institution agreed, stating that staffing shortages greatly increase outside medical trips, subsequently resulting in an increase in outside medical spending.

Staff vacancies have an adverse impact on institution health services units and ultimately increase the BOP's outside medical spending when care cannot be provided inside the institution.  In FY 2014, the BOP spent $60 million in overtime payments to salaried employees to transport inmates outside the institution for medical care, an increase of 22 percent from the $49 million spent in FY 2010.  While acknowledging that the BOP faces many challenges to recruit and retain medical staff, particularly because of the geographic locations of institutions, the limitations of the GS scale, and the prison work environment, we believe the BOP could be doing more to proactively identify and address its medical staff vacancies.  In the remainder of this report, we discuss strategies the BOP could adopt to address these challenges.

## The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner

The BOP delegates many of the actions necessary for recruiting and hiring medical staff to its individual institutions.  These actions include conducting recruitment activities in the local labor market, advertising vacancies, interviewing candidates, preparing incentive request paperwork, and managing the institution's staffing budget.  As a result, the BOP's actions to address its recruiting challenges tend to involve reactively addressing specific problems faced by individual institutions rather than proactively identifying, prioritizing, and responding to regional or national trends in a coordinated fashion across all of its institutions.

At the Central Office level, the BOP's Health Services Division has a Staffing and Recruitment Section that has both short-term and long-term responsibilities.  In the short term, the section is responsible for understanding institutions' immediate medical staffing needs, explaining to institution human resources staff the incentives available for medical professionals, and guiding medical professionals through the BOP's hiring process.  In the long term, the section is responsible for increasing the pool of medical professionals who are interested in BOP vacancies.  The section does not advertise vacancies or make hiring decisions; these actions are delegated to each institution.  Further, the Chief of Health Services Staffing and Recruitment told us that institutions must request the section's assistance in addressing recruiting challenges.  Even when an institution requests assistance, it is not required to follow the section's guidance.  This reactive, locally delegated response to recruitment challenges has prevented the BOP from assessing which vacancies have the greatest negative impact on its ability to adequately provide medical care to inmates.

We further found that, even when the BOP has taken steps to address recruitment challenges across all of its institutions, these efforts have not resulted in a uniform approach to the issue.  For example, officials throughout the BOP have designated medical vacancies as hard to fill to justify their use of incentives to enhance recruiting.  However, we found that the BOP does not have a clear definition of this term.  As a result, it cannot easily describe the degree to which any one position is hard to fill and it cannot use this designation to help it set priorities among medical vacancies.  To illustrate, BOP policy identifies the length of time a position has been vacant as one factor that would justify using the Physicians and Dentists Comparability Allowance Program (PCA Program), but it does not give any guidance as to when the length of a vacancy should be considered problematic.[44]  The Assistant Director for Human Resource Management said that a position is considered hard to fill once the Human Resource Manager has communicated to Central Office that all recruitment efforts, absent incentives, have made hiring challenging.  Yet one institution's Human Resource Manager told us that *any* position requiring an incentive is considered hard to fill, while a different Human Resource Manager at another institution said that he considers a position hard to fill if he does not receive any applications after two or three advertisements.  A third Human Resource Manager said that, on paper, none of the positions at her institution is hard to fill; but she went on to tell us that they experienced such difficulty trying to fill a psychiatrist vacancy that the BOP's Central Office eventually reallocated the position to a different institution.

We found that one primary obstacle to the BOP developing a truly proactive, coordinated approach to addressing recruitment challenges is that it does not analyze the data it already collects to assist it in identifying and prioritizing these challenges across all of its institutions.  For example:

- *Vacancy Data:*  The Central Office Staffing and Recruitment Section monitors medical vacancies, but the Chief of Health Services Staffing and Recruitment said that the data they monitor does not differentiate between positions that are vacant because of recruitment challenges and positions that are vacant for other reasons.[45]

- *Incentive Data:*  Although the BOP collects data on the use of recruitment and retention incentives, which could help the BOP identify locations in which institutions have difficulty filling medical vacancies, the BOP does not analyze any of the data it collects on incentives for this purpose.  The BOP's Personnel Director told us that the BOP reserves for Central Office officials final approval authority for recruitment and retention incentives, instead of

---

[44]  BOP, Program Statement 6010.05, Health Services Administration (June 26, 2014), paragraph 17f.

[45]  The Chief of Health Services Staffing and Recruitment explained that, because hiring decisions are decentralized to the institution level, institutions sometimes freeze vacancies instead of filling them to ensure that funds are available in the institution's budget to cover overtime, outside medical expenses, and other costs.  He said that if an institution is not actively attempting to fill a vacancy, he would not consider that position difficult to fill.

delegating that authority to Wardens, in part so that the BOP can collect data on the use of these incentives.[46]  However, she also said that the BOP tracks the use of incentives only to ensure that spending remains within budgetary limits, and not for the purpose of helping to identify the hardest to fill vacancies in the BOP system.

- *TDY Assignment Data:*  The former Assistant Director for Health Services and Medical Director told us that when an institution resorts to requesting TDYs, it is usually because it cannot find anyone to fill the vacancies it is advertising.  Data on institution requests for support through TDY assignments could therefore help the BOP's Central Office identify institutions that are struggling to find permanent staff; but this information is not available at the Central Office level because the Regional Offices manage TDY requests and assignments.

- *Outside Medical Care Cost Data:*  Our May 2015 review of the impact of an aging inmate population found that understaffing in health services units increases the need for outside care.[47]  The cost of this care varies because the BOP signs a separate contract for each institution with local medical providers.[48]  Further, the BOP's care level system means that inmates with more significant medical needs are concentrated in a handful of institutions, with the result that staff vacancies at these institutions can have a more significant impact.[49]  A Health Services Administrator at a BOP

> **Budgetary Impact of Understaffing on Outside Medical Costs**
>
> We identified one complex for which medical staffing dropped from 35 of 46 positions filled (76 percent) in FY 2010 to 25 of 42 positions filled (60 percent) in FY 2014.  Of all BOP institutions, this institution paid the highest rates for outside medical care, with contract costs more than triple the Medicare rate.  We looked at BOP spending data and found that spending on outside medical care at this complex increased 47 percent from FY 2010 to FY 2014 (double the 23 percent increase in this spending seen by the BOP as a whole during that same time).  Given the relatively high cost of obtaining outside medical care in this location, a more proactive assessment of staffing needs could be beneficial to the BOP.
>
> Source:  OIG analysis of BOP staffing data, contract data, and spending data

---

[46]  In response to a working draft of this report, the BOP noted that the Department's Human Resources Order, DOJ 1200.1, states that approval of these incentives may not be delegated below the Personnel Officer level.  The BOP further noted that it is required to collect data on incentives to fulfill reporting requirements to the Department and OPM.

[47]  DOJ OIG, *The Impact of an Aging Inmate Population,* 18.

[48]  These costs also vary depending on whether an inmate requires inpatient or outpatient care.

[49]  The BOP assigns each inmate a care level from 1 to 4 based on documented medical history, with Care Level 1 being the healthiest inmates and Care Level 4 being inmates with the most significant medical conditions.  The BOP also assigns each institution a care level from 1 to 4, based on the institution's level of medical staffing and resources.  For more information about the BOP's care level system, see OIG, *The BOP's Efforts to Manage Inmate Healthcare.*

medical center said that by assessing only staffing levels, the BOP overlooks the needs of high care-level institutions.  We believe this causes the BOP to underestimate the value of filling priority vacancies at high care-level institutions where a greater proportion of inmates are very ill.  The Health Services Administrator emphasized, "The Bureau [of Prisons] is sending us the sickest of the sickest guys to take care of, and if we don't have the staff on board here to do even some of the basics that we need to do with them, then we end up having to send them into the community to get it done."  Because the BOP does not take these variations in medical need or medical cost into account, it does not optimally prioritize filling the positions that cost the most to leave vacant.

We found that the BOP has been aware for some time that its locally delegated, reactive approach is ill suited for the medical staffing challenges it faces.  Yet it has also declined opportunities to establish a more coordinated, proactive approach.  Specifically, in June 2009, a BOP working group established to examine the BOP's medical recruitment challenges recommended that the BOP centralize medical recruitment into the BOP's Consolidated Employee Services Center in Grand Prairie, Texas.[50]  The working group recommended centralization to improve customer service to applicants and to manage many functions, such as preparing incentive requests, that are the responsibility of institution staff.  In support of its recommendation, the working group wrote:  "A dedicated section would allow the agency to aggressively recruit and retain employees in an attempt to proactively address staffing concerns, rather than reactively, which continues to hinder effective operations and negatively impacts existing staff."[51]  At its July 2009 meeting, however, the BOP's Executive Staff decided not to approve any of the options the working group developed.

The working group's June 2009 findings included a section for comments from the BOP divisions most likely to be affected by the working group's proposals.  In its comments, the Health Services Division said that it could not support any of the working group's proposals for several reasons, including a belief at the time that recruitment was improving and could be further enhanced through additional resources rather than through reorganization.  Instead, it recommended hiring someone to verify the professional credentials of candidates for medical vacancies, ensuring that they would be qualified to practice if offered a position.  The former Assistant Director for Health Services and Medical Director confirmed that the BOP now employs a nurse for this purpose.  The Health Services Division also recommended hiring one medical recruiter for each of the BOP's six regions to target hard to fill locations, and the BOP reported that it hired the six regional recruiters in the fall of 2015.

---

[50]  The Consolidated Employee Services Center centralizes some aspects of the hiring process and provides guidance to the institutions on hiring procedures.

[51]  Facilitator, National Health Care Staffing and Recruitment Workgroup, BOP, Executive Staff Paper, National Health Care Staffing and Recruitment Enhancement, June 9, 2009, 14.  In addition to its recommended option, the working group also researched and presented two other options in its report.

Since the 2009 comments, however, we found that the health services vacancy rate has actually risen at BOP institutions, from 15 percent in FY 2010 to 17 percent in FY 2014. The BOP's decision to continue addressing its struggles with medical recruitment by reacting to individual institution requests rather than by developing a strategic, coordinated plan, has not led to improved results. Meanwhile, spending on outside medical care has increased 23 percent, from $351 million in FY 2010 to $434 million in FY 2014.

This lack of strategic planning also means that the BOP cannot fully take advantage of an annual opportunity it has to articulate its staffing priorities to the PHS. The memorandum of understanding (MOU) between the BOP and the PHS requires the BOP to "notify PHS at least annually, and more frequently if necessary, of the number of PHS Commissioned Officers, by training and experience, needed to fulfill the requirements of BOP."[52]  BOP officials told us that, while they respond to the PHS annually with this information, they do not base their response on a systemic assessment of the BOP's medical staffing needs. Instead, they simply report the number of PHS officers already employed in BOP positions. The former Assistant Director for Health Services and Medical Director told us that he did not think increasing the number reported would make a difference. However, we note that the PHS already knows how many of its officers work for the BOP because it pays PHS officers and manages their benefits using BOP funds.[53]  The PHS's Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) told us that the PHS requests this annual projection of need in order to help shape the Commissioned Corps' annual recruitment plan and support limited force planning.

We believe that the BOP is missing an important opportunity by providing the PHS with data it *has* rather than conducting a robust analysis to determine what kind of medical staffing its institutions *need*. If the BOP analyzed its recruitment challenges and prioritized vacancies based on the impact those vacancies have on the BOP's ability to care for its inmate population, this could help the BOP articulate specific numbers and types of PHS officers that would be of greatest benefit to address its staffing challenges.

## The BOP Does Not Use Its Authority to Assign PHS Officers to Positions Based on Greatest Need

Both PHS policy and the PHS officers' sworn oath give the BOP the authority to place PHS officers in positions where they are most needed. PHS officer appointees swear an oath that they are "willing to serve in any area or position or wherever the exigencies of the Service may require." However, the BOP does not

---

[52]  MOU between the BOP, DOJ, and the PHS, Department of Health and Human Services, September 1991, paragraph III.B.

[53]  The BOP's Chief of Budget Execution told us that every month the Department of Health and Human Services generates a payroll report of PHS officers employed at the BOP, which the BOP's Budget Execution Office reconciles to ensure they transfer the appropriate amount of funds to the PHS to pay for these salaries and benefits.

take full advantage of this flexibility because, as noted above, it does not address recruitment challenges in a strategic, coordinated way and therefore does not place PHS officers in positions that maximize their benefit to the BOP.  In the section below, we discuss options that the BOP might consider to increase the efficiency of its assignment of PHS officers.

The PHS encourages its officers to pursue diverse work experiences throughout their careers.[54]  To incentivize transfers, PHS promotion boards place value on an officer's mobility, with multiple moves expected of officers seeking promotion to the higher ranks.  The PHS's Commissioned Corps Personnel Manual, which governs human resources policy for PHS officers, gives the BOP authority to initiate voluntary transfers to meet its needs or the needs of PHS officers.  It also gives the BOP the authority to initiate involuntary transfer of PHS officers at any time to meet the BOP's needs.  We found that the BOP does not currently manage these positions in ways that would encourage PHS officers who are interested in responding to the PHS incentives to transfer in ways that also benefit the BOP.

Specifically, we found that the BOP does not currently use involuntary transfers of PHS officers to address its staffing needs.  BOP officials said that they initiate involuntary PHS transfers only for disciplinary reasons or for instances in which an officer needs to be moved to a location where he or she can receive additional training and oversight.  PHS officers we interviewed at BOP institutions recognized that their status as Commissioned Officers meant that they were potentially subject to a change of duty station, but they also told us that such transfers were not actually used.  Instead, both PHS officers and civil service employees control their own duty stations in the same way:  by deciding whether to apply to an advertised vacancy at a particular institution.[55]  The BOP's Personnel Director told us, "they know where the vacancies are so if they wanted to apply to there, they easily could."  Once hired, PHS officers may also stay in a position for as long as they like, assuming satisfactory performance, just like civil service employees.

We also found that the BOP has not been proactive about using PHS officers to fill vacancies where individual institutions are struggling with particularly challenging medical personnel staffing needs.  Institution staff further told us that lengthy vacancies are common.  For example, staff at one institution told us that their Clinical Director position has gone unfilled for 15 years.[56]  A PHS nurse at

---

[54]  The PHS recommends that officers have at least three different geographic or programmatic assignments during their careers, but it does not have a specific requirement for the frequency of moves.  The BOP's PHS Liaison recommends that officers seeking promotion move every 3 to 5 years and told us that the PHS revised its application process in 2013 to require officers to be more mobile.

[55]  The BOP and the union have an informal agreement that all initial vacancies will be advertised, with both civil service employees and PHS officers eligible to apply.  The former Assistant Director for Health Services and Medical Director said that the BOP made this agreement because it would be unfair to make any vacancy open only to PHS officers.

[56]  The Clinical Director is the lead physician in an institution's health services unit and is responsible for all clinical care provided at the institution.  The Health Services Administrator at this

(Cont'd.)

another institution told us that her position had been vacant for approximately 2 years by the time she was hired and that at the time of our interview her institution had been without a Clinical Director for nearly a year.  The BOP Union President told us that a physician position at a third institution remained vacant for 5 years, which pushed more responsibility onto the mid-level providers who remained on the staff.  He questioned why the BOP allowed that position to remain unfilled instead of transferring a PHS physician from another location.

*More Effective Use of PHS Location Assignments Could Take Multiple Forms*

Multiple BOP and PHS officials told us that the BOP could do more with voluntary and involuntary transfer authorities to better align PHS officers' duty stations with the BOP's greatest needs.  In this section, we outline three options that the BOP could consider to use PHS officers as a means of addressing some of its most challenging medical staffing problems.

<u>Involuntary Transfers</u>

The use of involuntary transfers for all PHS officers would mirror the military's requirement of frequent transfers and reassignments, a process known as "force management."  BOP officials acknowledge that PHS policies give them the authority to implement force management if they choose to do so, but they told us that this would require at least three changes in how BOP institutions are managed:

1. reducing the level of control that Wardens currently have over the selection of employees to fill institution vacancies,

2. matching all PHS officers with positions available, and

3. reducing the control PHS officers currently have over their duty station.

Effectively using involuntary transfers would also require changes in how the BOP as a whole is managed, because the BOP would also need to assess which vacancies are of such high priority that they should be staffed by a transferring PHS officer rather than remaining vacant.  BOP officials told us that they had not implemented involuntary transfers because they were concerned that such a change could reduce employee engagement and increase medical staffing vacancies.  The PHS Deputy Director, DCCPR acknowledged these concerns, recommending that agencies minimize the risk of disengagement by transferring officers for defined periods of time and by giving the officers some say in the

---

institution told us that, in the absence of a Clinical Director, they had a contract physician who visited the institution twice a week, as well as three additional contract physicians who each visited the institution once a month; the Clinical Director of a different institution participated via phone in decisions concerning whether an inmate should be referred for medical care outside the institution. We note, however, that the Clinical Director providing this assistance works at an institution that is 750 miles away from the institution we interviewed, and in a different time zone.  Therefore, the lack of a Clinical Director means that onsite physician care for the 1,268 inmates at this institution is limited.

location of their subsequent transfer.[57]  Regarding the BOP's concern that involuntary transfers would cause PHS officers to leave the BOP for other agencies, he said that while the PHS encourages its officers to be mobile, it also requires a minimum 2-year commitment at each duty station and therefore will not process transfer requests for a PHS officer more frequently.

Targeted Force Management

BOP officials and institution staff suggested to us that the BOP could take better advantage of the PHS requirement for officer mobility by using force management in a targeted, rather than broad manner.  Some institution staff suggested that the BOP require PHS officers to spend their first few years with the BOP working in institutions that have the greatest difficulty filling vacancies.  A PHS Health Assistant Specialist told us that if someone was "hungry" enough for a PHS commission, he or she would go anywhere to take a position.  An institution's Human Resource Manager said that this would be preferable to transferring PHS officers who were already employed in the BOP, which would create a vacancy at the PHS officer's previous institution.  While the BOP told us that it tries to use its limited number of PHS waivers in this manner, we believe it could achieve more effective results if it also used this approach with all PHS officers who are new to the BOP.  In FY 2014, 17 BOP civil service employees converted to the PHS using waivers, but the BOP gained an additional 61 PHS officers in other ways.[58]

We also found that the BOP has a precedent of using targeted force management for some entry-level PHS officers.  Students entering their final year of school or professional training are eligible to apply to the PHS Senior Commissioned Officer Student Training and Extern Program (Senior COSTEP).  Those accepted by the PHS are sponsored by an agency such as the BOP, paid at the entry-level ensign rank while completing their education, and agree to work for their sponsoring agency as a PHS Commissioned Officer immediately following graduation.[59]

---

[57]  BOP officials said that it would be easier for the military to give officers a voice in the location of a subsequent transfer because all military personnel face transfer, making it easier to predict when particular positions and locations will have vacancies.  This would be more difficult in the BOP because medical positions can be also be filled by civil service employees, who cannot be transferred as easily as PHS officers can.

[58]  The BOP reported that in FY 2014, 15 civil service employees who already worked for the BOP converted to the PHS during regular application windows, 21 newly-commissioned PHS officers joined the BOP, and 25 experienced PHS officers joined the BOP from other agencies.

[59]  Ensign is the most junior officer rank in the PHS.  The required PHS service commitment is twice the length of time the Senior COSTEP officer received financial support while in school.  For example, the BOP's COSTEP program statement requires Senior COSTEP officers to serve a minimum of 8 months in training, followed by a minimum 16-month commitment to the BOP.  In 2015, the BOP and the National Institutes of Health were the only agencies who sponsored Senior COSTEP officers.

These officers are referred to as Senior COSTEP officers despite being entry-level because the PHS also has a Junior COSTEP program.  Junior COSTEP officers have more than 1 year left of their schooling and may temporarily work for the BOP, or other agencies that employ PHS officers, during semester breaks.

The BOP's COSTEP Program Statement specifies that assignments for entry-level officers participating in the Senior COSTEP program are based on the BOP's needs.[60]  A PHS officer working at the BOP's Central Office serves in the role of COSTEP Coordinator and is responsible for assessing the BOP's needs for Senior COSTEP officers and for assigning them to institutions.[61]  Institutions request to participate in the Senior COSTEP program with the knowledge that this would result in the assignment of an entry-level PHS officer to their institution rather than the selection of a local candidate after advertising a vacancy.  The COSTEP Coordinator considers the types of vacancies institutions are seeking to fill, whether the institutions asking to participate in the Senior COSTEP program are a good fit for an entry-level medical professional, and the location preferences of the Senior COSTEP officers.[62]  However, the BOP's former Assistant Director for Health Services and Medical Director said that because the BOP's goal with the Senior COSTEP program is to maximize the retention of these officers beyond their initial service commitment, the location preferences of the Senior COSTEP officers and the availability of mentors are often more important than institution needs when determining where the Senior COSTEP officers should be assigned.

If the BOP gave greater priority to institution needs, and broadened its assessment to include positions that should be filled by a more experienced clinician as well as entry-level positions, then its approach to staffing Senior COSTEP officers could be expanded to maximize the efficiency of PHS officer placements more broadly.  Such an expansion could accommodate either a decision to implement force management broadly for all PHS officers or more narrowly for only those PHS officers who are new to the BOP.[63]  However, in order for these assessments to be successful, the BOP would first have to be more strategic about analyzing and prioritizing its overall recruitment needs.[64]

### BOP Needs Aligned with PHS Promotion Incentives

The BOP could also consider better aligning its needs with the PHS's promotion incentives, particularly the PHS's recent emphasis on mobility.  One long-time PHS officer told us that at the time he was commissioned, the PHS promoted as a perk the fact that its officers would not be subjected to involuntary

---

[60]  BOP, Program Statement 6021.04, Commissioned Officer Student Training Extern Program (COSTEP) (August 1, 2003), paragraphs 16, 17.

[61]  In a given year, no more than 30 Senior COSTEP officers are assessed for placement in BOP institutions.

[62]  The BOP PHS Liaison told us that because Senior COSTEP officers are entry level, it would not be appropriate to assign them to an institution where they would have to work independently or be the senior clinician.

[63]  PHS officers who are new to the BOP do not necessarily have to be entry level.  For example, civil service employees who convert to the PHS after they start work at the BOP already have some clinical experience.

[64]  In response to a working draft of this report, BOP officials noted that when making decisions concerning the effective management of PHS officers, they must consider the human resource implications when developing an approach to better utilizing PHS officers.

transfers.  However, the BOP's PHS Liaison told us that in 2013 the PHS revised its application process to require mobility and now screens out applicants who are not willing to move.  As a result of these changes, mobility has become a more important benchmark in the PHS promotion process.[65]

The BOP Union President told us that the BOP historically has not required PHS officers to move and has instead accommodated PHS officers who are promoted in rank by giving them additional responsibilities at their current institutions.  He suggested that the BOP's use of PHS officers would be more effective if PHS officers who needed to take on additional responsibilities due to a promotion were moved to a position in a different institution.  We believe that by encouraging such transfers, the BOP could better staff the locations where need is greatest, while also helping the transferred PHS officer demonstrate continued mobility in his or her next application for a promotion.

Like mobility, receipt of PHS awards is another factor that the PHS promotion board considers when making promotion decisions.  One such award is the PHS's isolated hardship award given to PHS officers who serve at least 180 consecutive days in an area designated as isolated, remote, insular, or constituting a hardship duty assignment.  The BOP has already sought to incentivize PHS officers' transfers by having successfully petitioned the PHS to designate five BOP institutions as "isolated hardship locations" eligible for the award.[66]  The BOP's PHS Liaison told us that a request for a sixth isolated hardship designation for the newly activating Administrative U.S. Penitentiary, Thomson, Illinois, is pending.  We believe the BOP should consider requesting additional isolated hardship designations in the future, although we note that according to the BOP's PHS Liaison, the PHS is in the process of revising its criteria for awarding the designation.

---

[65]  PHS officer promotions in rank are based on the extent to which an officer meets a number of benchmarks, including performance appraisals, awards, history of assuming roles of increasing responsibility, continuing education, mobility, willingness to take on collateral duties, integrity, participation in PHS advisory groups, mentoring, and maintenance of basic readiness standards to respond to public health emergencies.  PHS officers told us that promotions become more competitive at higher ranks because the higher ranks have fewer positions available.  A PHS promotion board, not the BOP, makes PHS promotion decisions.

[66]  The five institutions with the designation as of October 2015 are Federal Correctional Institution (FCI) Safford in Arizona, FCI Manchester in Kentucky, FCI Estill in South Carolina, Federal Prison Camp Yankton in South Dakota, and FCI Three Rivers in Texas.

# CONCLUSION AND RECOMMENDATIONS

**Conclusion**

In addition to the unavoidable challenges within the BOP's correctional setting, the medical staffing challenges the BOP faces stem in part from local market factors and the limitations of the General Schedule (GS) scale and position classifications that the BOP cannot adjust without approval from the Office of Personnel Management (OPM). We found that the BOP has taken a number of steps to address pay disparities and understaffing challenges, particularly by increasing its use of incentives and obtaining approval to use an alternate compensation scale for psychiatrists. However, the approval process for incentives is laborious, time-consuming, and requires extensive knowledge that not all institution staffs possess. Further, we found that the continued reliance on short-term solutions such as temporary duty (TDY) assignments and contracted medical care has an adverse impact on overall medical costs. We believe that in order to be more efficient with resources, the BOP must look at other avenues to increase medical staffing levels.

We also found that the BOP needs to take a more strategic, coordinated, and agency-wide approach to its recruitment challenges. Such an approach should begin by improving the BOP's use of data to identify, prioritize, and address recruitment challenges and medical staffing needs. For example, the BOP does not currently prioritize medical staffing vacancies based on the cost of leaving the vacancies unfilled. These costs can be determined by analyzing the care level of particular institutions, the extent to which institutions rely on TDY assignments, or the cost of contracting for care that would be provided if the vacancy were filled. Similarly, the BOP currently collects position-specific data on the use of incentives but does not analyze it for recruitment purposes. If the BOP were to analyze this data to identify positions and locations that are heavily reliant on incentives, then it could use that information to more accurately identify pay disparities, assess how frequently supplemental pay is required, and compare the cost of applying multiple incentives for lower graded positions with the cost that the BOP would incur if medical positions were reclassified to higher grades. We believe this data would also be valuable in helping the BOP support its position to the Office of Personnel Management that the reclassification of certain positions on the GS scale is necessary for effective recruitment.

Because the BOP has not prioritized medical staffing vacancies through a strategic, national assessment of its needs, it cannot place PHS officers more efficiently throughout its institutions. PHS policy offers the BOP a great amount of latitude in determining where to station PHS officers, but the BOP does not currently take advantage of these flexibilities. The BOP has several options for managing PHS officer placements on a national level, and we believe it can do so in ways that could benefit both the BOP and the individual PHS officers' needs. Better assessment of priority medical vacancies could also help the BOP better articulate its requirements to the PHS when it responds to the PHS's annual request for information on the amount of PHS officers the BOP needs. We acknowledge that

26

with approximately 6,500 total officers working across 23 federal agencies and the District of Columbia, the PHS is not a panacea for the BOP to fill all of its staffing needs.  However, a more thorough analysis of staffing needs throughout the BOP, rooted in a more strategic approach, could help the BOP better describe its challenges to the PHS and identify where additional staff are most acutely needed.

**Recommendations**

To ensure the BOP can recruit and retain the medical professionals that are necessary to provide medical care to the BOP's inmate population, and to foster a proactive, coordinated strategy that will allow the BOP to better use its PHS officers, we recommend that the BOP:

1.  Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

2.  Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

APPENDIX 1

# EXPANDED METHODOLOGY

**Data Analysis**

*Public Health Service and Civil Service Salary Comparison*

We attempted to compare the uniformed service pay scale with the General Schedule, but we determined that we could not accurately compare the salaries because some of the factors that influence Public Health Service (PHS) officer salaries do not have an equivalent in civil service salaries, resulting in great variance.[67] A 2013 University of Maryland study of the PHS found that the costs associated with the PHS could not be easily quantified for comparison to the civil service.[68] Further, the PHS Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) confirmed that because of the variance, the pay scales are too dissimilar to compare.

*Bureau of Labor Statistics Salary Analysis*

We used publicly available data from the Office of Personnel Management (OPM) and the Bureau of Labor Statistics (BLS) to analyze the differences in salaries between medical professionals working at the BOP and the overall salary averages of medical professionals in a given geographic location.[69] We based our selection of geographic locations on counties that were in close proximity to BOP institutions. We then used the county of the institution to select the applicable region for BLS data and the applicable locality for OPM data. When analyzing OPM data, we used the highest available grade, but the lowest step for the given position according to OPM's position classification standards. For example, dentists in the BOP can be either grade 11 or grade 12, so we used the salary of grade 12, step 1 for our analysis. We believe this allowed for a reasonable comparison with the BLS averages because it represented a salary in the middle of the allowable range for that position. In a separate analysis, we examined special pay tables that OPM had established for dentists and pharmacists in some BOP institutions, but we concluded that special pay was not sufficient to address the wage gap we found when comparing locality pay tables with BLS data.

---

[67] Specifically, pay for PHS officers varies based on geographic location, base pay, years of service, dependents, specialty, allowance for subsistence, and rank. The PHS Deputy Director, DCCPR noted that some portions of PHS officer pay are also tax-exempt.

[68] According to the University of Maryland, the effectiveness, efficiency, efficacy, and comprehensive value of the PHS cannot be determined based on cost factors alone because there exist too many variables, inconsistencies, and un-measurable attributes to make a meaningful evaluation. Muhiuddin Haider, *The USPHS Commissioned Corps: A Study on Value and Contributions to DHHS Mission and National and Global Health Priorities and Initiatives* (University of Maryland, 2013).

[69] BOP salary averages are included in the data captured by the Bureau of Labor Statistics.

*Incentives Awarded by Position*

The BOP provided data on recruitment and retention incentives awarded from FY 2010 to 2014.  We used this data to total the number of incentives awarded, and the cost associated with those of monetary value.  Our analysis of monetary incentives compared the incentives by type and position and used position counts to calculate averages.  In determining position counts, we accounted for those individuals who received more than one incentive.

**Interviews**

We interviewed Central Office officials, including the Assistant Directors of the Human Resource Management and Health Services Divisions; the BOP's Personnel Director; the BOP PHS Liaison; the Chief of Budget Execution; and the Chief of Health Services Staffing and Recruitment.

We visited five institutions via video teleconference and, during those visits, we interviewed institution senior management, as well as staff who provide direct clinical care to inmates.  We interviewed four Wardens, one Associate Warden, five Health Services Administrators, five Business Administrators, five Human Resource Managers, a Leave Maintenance Clerk, and BOP and PHS clinical staff, including: an occupational therapist, a health systems specialist, four non-supervisory registered nurses, a physician assistant, a nurse practitioner, and two pharmacists.

At PHS Headquarters, we interviewed an official in the DCCPR.

**Site Visits**

The team conducted video teleconferences with the five following institutions, representing all four healthcare levels:  Federal Medical Center Butner, Federal Correctional Institution (FCI) Danbury, Federal Medical Center Rochester, FCI Sandstone, and Federal Detention Center SeaTac.  We selected these five institutions because they had a combination of a high number or high percentage of PHS staff in FY 2014.  We were also able to use these locations to assess hiring challenges across medical, detention, and standalone institutions, in both rural and metropolitan locations.

**Additional Objectives**

At the outset of this review, we included a report objective examining the BOP's oversight of PHS officer leave, awards, drug testing, and correctional training.  We reviewed BOP and PHS policies related to these topics and asked questions on these topics during Central Office interviews and site visits described above.  However, during these interviews we learned about larger concerns that BOP staff had regarding medical staffing in general.  We met with officials from the BOP's Program Review Division and Health Services Division in September 2015 to formally close the original objective.  At that meeting, we also added a review

objective examining the challenges and limitations the BOP faces in hiring medical professionals to work in its institutions.[70]  The BOP officials we met with in September 2015 said that recruitment and retention of quality medical professionals is the BOP's biggest challenge.

---

[70]  We conducted some of our Central Office interviews after this meeting to discuss the topics raised in our new objective.

**APPENDIX 2**

# THE BOP'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*

*Washington, DC 20534*

March 15, 2016

MEMORANDUM FOR NINA S. PELLETIER
                ASSISTANT INSPECTOR GENERAL
                OFFICE OF INSPECTOR GENERAL
                EVALUATION AND INSPECTIONS DIVISION

*Thomas R. Kane*

FROM:        Thomas R. Kane, Acting Director

SUBJECT:     Response to the Office of Inspector General's (OIG)
                DRAFT Report: OIG Review of the Impact of the
                Federal Bureau of Prisons' Medical Staffing
                Challenges, Assignment Number A-2015-005

The Bureau of Prisons (BOP) appreciates the opportunity to respond to the open recommendations from the draft report entitled OIG Review of the Impact of the Federal Bureau of Prisons' Medical Staffing Challenges.

Therefore, please find the Bureau's response to the recommendations below:

**Recommendations**

To ensure the BOP can continue to recruit and retain the medical professionals that are necessary to provide medical care to its inmate population, and to foster a proactive, coordinated strategy

that will allow the BOP to better use its PHS officers, we recommend that the BOP:

**Recommendation 1:** "Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations."

**Response:** The BOP agrees with this recommendation and will explore options to better assess and provide targeted strategies for medical vacancies, resulting in an identified plan that will be provided to the OIG.

**Recommendation 2:** "Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty."

**Response:** The BOP believes the history and complexity of the relationship between the civil service and Public Health Service (PHS) personnel systems is not adequately detailed in the OIG report, and has a significant impact on BOP's management of those staff. Nevertheless, the BOP agrees with this recommendation, and will explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence.  As discussed during the exit conference for this review, BOP will explore the OIG's proposed solutions in its report, as well as other options that may appropriately address the situation.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

2

**APPENDIX 3**

# OIG ANALYSIS OF THE BOP'S RESPONSE

The Office of the Inspector General (OIG) provided a draft of this report to the Federal Bureau of Prisons (BOP) for comment. The BOP's response is in Appendix 2. Below, we discuss the OIG's analysis of the BOP's response and actions necessary to close the recommendations.

**Recommendation 1:** Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that it would develop a plan by assessing medical vacancies and develop more targeted strategies to fill them.

**OIG Analysis:** The BOP's planned actions are responsive to our request. By June 30, 2016, please provide the BOP's plan illustrating the strategies developed to fill medical vacancies. As part of the plan, please explain how the BOP will prioritize medical vacancies based on the length of vacancies, patterns in institutions' use of incentives, patterns in institutions' use of temporary duty, the cost of outside medical care, and any other sources of data that the BOP believes demonstrate the impact of leaving the positions vacant. Additionally, please describe how frequently the BOP plans to reassess medical vacancies and reconsider their prioritization.

**Recommendation 2:** Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that it would explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence. The BOP further stated that it would explore the options outlined in this report, as well as other options that may appropriately address the situation.

**OIG Analysis:** The BOP's planned actions are responsive to our request. By June 30, 2016, please describe how the BOP plans to better use PHS officer incentives, assignment flexibilities, and temporary duty to fill the highest priority medical vacancies identified through the strategy developed in response to Recommendation 1. As part of this response, please describe how the BOP considered the options discussed in the report.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.  Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig

Exhibit J

STATE OF CALIFORNIA – DEPARTMENT OF CORRECTIONS AND REHABILITATION                                           EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF HEALTH CARE SERVICES**
STATEWIDE MENTAL HEALTH PROGRAM
P.O. Box 588500
Elk Grove, California  95758



April 7, 2017

Matthew A. Lopes, Jr. Esquire                        via:  Elise Owens Thorn, Esquire
Office of the Special Master                                Deputy Attorney General
Pannone Lopes & Devereaux LLC                              Department of Justice
317 Iron Horse Point Way, Suite 301                        1300 "I" Street, Suite 125
Providence, RI  02908                                      P. O. Box 944255
                                                           Sacramento, CA  94244-2550


RE: *COLEMAN* **MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the *Coleman* Monthly Report reflective of February, 2017, data (or as otherwise noted).  The following is the list of enclosures:

1.  California Department of Corrections and Rehabilitation (CDCR) Staffing Report.
    a. Mental Health Executive Summary.
    b. Mental Institution Vacancy by Classification.
    c. Mental Institution Vacancies Summary by Classification.
    d. Mental Health Month to Month Registry Usage.
    e. Mental Health Six-Month Vacancy Summary.
    f. Mental Health Program Institution Vacancies-Summary by Classification.
    g. Statewide Mental Health Program Compliance Summary Report.
    h. Enhanced Outpatient Administrative Segregation Unit (EOP ASU) Case Manager
        Positions and Vacancies.
    i. Mental Health Hiring Progress Report.
    j. Mental Health Statewide Hire Tracking Summary -- Clinical Positions Only.
    k. Mental Health Telepsych Allocated and Filled Positions Report.

2.  Reception Center Monthly Reports.
    a. Reception Center Mental Health Screening Report.
    b. Reception Center Transfer Timelines Report.

3.  Continuous Length of Stay Counts for Mental Health Services Delivery Systems (MHSDS) ASU, Secured Housing Unit (SHU), and Psychiatric Services Unit (PSU) report.

Matthew A. Lopes, Jr. Esquire
Page 2

4. EOP Inmates Waiting Transfers to PSU.

5. EOP ASU Hub Trends.

6. Population and Census Reports.
   a. Health Care Placement Oversight Program (HCPOP) Information Report, Summary (R-01)
   b. MHSDS Management Information Summary (MIS).
   c. Weekly EOP/Outpatient Psychiatric Program report.

7. Mental Health Crisis Bed (MHCB) Reports.
   a. Monthly Summary of MHCB Use by Institution (entitled "Inpatient Psychiatric Aging Report").
   b. MHCB Wait List.
   c. Transferred and Rescinded MHCB Referrals by Institution and Level of Care report (all subsections).

8. Department of State Hospitals (DSH) Referral Reports.
   a. Referrals for Transfer to DSH. *Not included – data not available at this time. Report is currently being re-coded, with an estimated completion date of April 30, 2017.*
   b. DSH Monthly Report of CDCR Patients in DSH Hospitals -- Summary and PC 2684.

9. Milestone Credits Report.

10. Work Assignments Report.

11. Out of Level Housing Report.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

KATHERINE TEBROCK, ESQUIRE
Deputy Director, Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

Matthew A. Lopes, Jr. Esquire
Page 3

cc:  Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
     Kerry F. Walsh, Esq., *Coleman* Deputy Special Master
     Jeffrey L. Metzner, M.D., *Coleman* Expert
     Kerry C. Hughes, M.D., *Coleman* Expert
     Mary Perrien, Ph.D., *Coleman* Expert
     Henry A. Dlugacz, Esq., *Coleman* Expert
     Patricia Williams, Esq., *Coleman* Monitor
     Patrick McKinney, Esq., Office of Legal Affairs, CDCR
     Nicholas Weber, Esq, Office of Legal Affairs, CDCR
     Michael Bien, Esq., Rosen, Bien and Galvan
     Donald Specter, Esq., Prison Law Office
     Steve Fama, Esq., Prison Law Office
     Angela Ponciano, Associate Director, Statewide Mental Health Program, Division of
        Health Care Services (DHCS)
     Laura Ceballos, Ph.D., Chief of Quality Management and Field Operations, Statewide
        Mental Health Program, DHCS
     John Rekart, Ph.D., Chief, Quality Management, Statewide Mental Health Program,
        DHCS
     Teresa Owens, Health Program Specialist I, Quality Management, Statewide Mental
        Health Program, DHCS

# Mental Health Population  By Institution
Download Date: February 28, 2017

CONFIDENTIAL

# SUMMARY OF OUTPATIENT POPULATION
### (ASU, GP, RC and SHU Detail on pages 2-4)

| Institution | CCCMS [1] | | | EOP [2] | | | PSU [2] | | | Inst Total Outpatient Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 1000 | 974 | 97% | | 1 | | | | | 975 |
| CAC | | 2 | | | | | | | | 2 |
| CAL | | 5 | | | | | | | | 5 |
| CCC | | 3 | | | | | | | | 3 |
| CCI | 1600 | 1680 | 105% | | 5 | | | | | 1685 |
| CCWF | 1250 | 1242 | 99% | 64 | 123 | 192% | | | | 1365 |
| CEN | | 6 | | | 1 | | | | | 7 |
| CHCF | 500 | 480 | 96% | 425 | 588 | 138% | | | | 1068 |
| CIM | 1100 | 1065 | 97% | | 29 | | | | | 1094 |
| CIW | 700 | 764 | 109% | 85 | 87 | 102% | 20 | 8 | 40% | 859 |
| CMC | 800 | 733 | 92% | 552 | 522 | 95% | | | | 1255 |
| CMF | 600 | 603 | 101% | 505 | 561 | 111% | | | | 1164 |
| COR | 1200 | 1138 | 95% | 400 | 447 | 112% | | | | 1585 |
| CRC-M | 1100 | 1172 | 107% | | 2 | | | | | 1174 |
| CTF | 1600 | 1535 | 96% | | 7 | | | | | 1542 |
| CVSP | | 25 | | | 2 | | | | | 27 |
| DVI | 550 | 448 | 81% | | 24 | | | | | 472 |
| FOL | 500 | 449 | 90% | | 5 | | | | | 454 |
| FWF | 150 | 158 | 105% | | 5 | | | | | 163 |
| HDSP | 1100 | 1120 | 102% | | 8 | | | | | 1128 |
| ISP | | 14 | | | | | | | | 14 |
| KVSP | 1100 | 993 | 90% | 192 | 220 | 115% | | | | 1213 |
| LAC | 1000 | 1021 | 102% | 700 | 606 | 87% | | | | 1627 |
| MCSP | 1300 | 1268 | 98% | 824 | 867 | 105% | | | | 2135 |
| NKSP | 1150 | 1087 | 95% | | 77 | | | | | 1164 |
| PBSP | 200 | 179 | 90% | | 4 | | | | | 183 |
| PVSP | 850 | 793 | 93% | | 3 | | | | | 796 |
| RJD | 1200 | 1352 | 113% | 957 | 842 | 88% | | | | 2194 |
| SAC | 500 | 448 | 90% | 578 | 589 | 102% | 300 | 248 | 83% | 1285 |
| SATF | 1950 | 1992 | 102% | 352 | 448 | 127% | | | | 2440 |
| SCC | 600 | 518 | 86% | | 2 | | | | | 520 |
| SOL | 1300 | 1229 | 95% | | 4 | | | | | 1233 |
| SQ | 1050 | 916 | 87% | | 55 | | | | | 971 |
| SVSP | 1050 | 972 | 93% | 588 | 619 | 105% | | | | 1591 |
| VSP | 1400 | 1336 | 95% | 372 | 385 | 103% | | | | 1721 |
| WSP | 1150 | 1205 | 105% | | 100 | | | | | 1305 |
| TOTAL | 29550 | 28925 | 98% | 6594 | 7238 | 110% | 320 | 256 | 80% | 36419 |

| Group | CCCMS | | | EOP | | | Subtotal MH Pop | Comments |
|---|---|---|---|---|---|---|---|---|
| Institution | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | | |
| **Administrative Segregation Unit (ASU)** | | | | | | | | |
| CAL ASU | | 0 | | | | | **0** | |
| CCI ASU | | 31 | | | | | **31** | |
| CCWF ASU | | 84 | | 10 | 19 | 190% | **103** | *ASU-EOP Hub* |
| CEN ASU | | 0 | | | | | **0** | |
| CHCF ASU | | 1 | | 50 | 38 | 76% | **39** | *ASU-EOP Hub.* |
| CIM ASU | | 11 | | | | | **11** | |
| CIW ASU | | 21 | | 10 | 7 | 70% | **28** | *ASU-EOP Hub.* |
| CMC ASU | | 10 | | 100 | 88 | 88% | **98** | *ASU-EOP Hub.* |
| CMF ASU | | 10 | | 58 | 50 | 86% | **60** | *ASU-EOP Hub* |
| COR ASU | | 0 | | 100 | 99 | 99% | **99** | *ASU-EOP Hub.* |
| CTF ASU | | 7 | | | 1 | | **8** | |
| CVSP ASU | | 4 | | | 1 | | **5** | |
| DVI ASU | | 38 | | | 6 | | **44** | |
| FOL ASU | | 5 | | | | | **5** | |
| HDSP ASU | | 5 | | | | | **5** | |
| KVSP ASU | | 0 | | | 12 | | **12** | |
| LAC ASU | | 1 | | 100 | 88 | 88% | **89** | *ASU-EOP Hub* |
| MCSP ASU | | 29 | | 50 | 80 | 160% | **109** | *ASU-EOP Hub* |
| NKSP ASU | | 18 | | | 6 | | **24** | |
| RJD ASU | | 20 | | 63 | 66 | 105% | **86** | *ASU-EOP Hub.* |
| SAC ASU | | 4 | | 64 | 57 | 89% | **61** | *ASU-EOP Hub.* |
| SOL ASU | | 9 | | | | | **9** | |
| SQ ASU | | 15 | | | 3 | | **18** | |
| SVSP ASU | | 0 | | | 4 | | **4** | |
| VSP ASU | | 6 | | | 4 | | **10** | |
| WSP ASU | | 27 | | | 4 | | **31** | |
| **Group Total for ASU** | | **356** | | **605** | **633** | **105%** | **989** | |

| Group | CCCMS | | | EOP | | | Subtotal MH Pop | Comments |
|---|---|---|---|---|---|---|---|---|
| Institution | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | | |
| General Population (GP) | | | | | | | | |
| ASP | 1,000 | 974 | 97% | | 1 | | 975 | |
| CAC | | 2 | | | | | 2 | |
| CAL | | 5 | | | | | 5 | |
| CCC | | 3 | | | | | 3 | |
| CCI | 1,600 | 1,649 | 103% | | 5 | | 1,654 | |
| CCWF | 1,150 | 995 | 87% | 54 | 104 | 193% | 1,099 | *Fac A Bldg 501 is partial RC and partial EOP-GP* |
| CEN | | 6 | | | 1 | | 7 | |
| CHCF | 500 | 479 | 96% | 375 | 550 | 147% | 1,029 | *EOP beds in Fac E. Intake began week of 6/23/14.* |
| CIM | 1,000 | 977 | 98% | | 2 | | 979 | |
| CIW | 700 | 723 | 103% | 75 | 80 | 107% | 803 | |
| CMC | 800 | 723 | 90% | 452 | 434 | 96% | 1,157 | |
| CMF | 600 | 593 | 99% | 447 | 511 | 114% | 1,104 | |
| COR | 1,200 | 931 | 78% | 300 | 348 | 116% | 1,279 | *SNY EOP IV=300 beds* |
| CRC-M | 1,100 | 1,172 | 107% | | 2 | | 1,174 | |
| CTF | 1,600 | 1,528 | 96% | | 6 | | 1,534 | |
| CVSP | | 21 | | | 1 | | 22 | |
| DVI | 200 | 128 | 64% | | | | 128 | |
| FOL | 500 | 444 | 89% | | 5 | | 449 | |
| FWF | 150 | 158 | 105% | | 5 | | 163 | |
| HDSP | 1,100 | 1,068 | 97% | | 3 | | 1,071 | |
| ISP | | 14 | | | | | 14 | |
| KVSP | 1,100 | 906 | 82% | 192 | 208 | 108% | 1,114 | *SNY EOP* |
| LAC | 1,000 | 938 | 94% | 600 | 518 | 86% | 1,456 | *SNY EOP IV=150 beds* |
| MCSP | 1,300 | 1,239 | 95% | 774 | 787 | 102% | 2,026 | *SNY EOP caps: Level II-264, Level III-360, Level IV-150* |
| NKSP | 350 | 346 | 99% | | | | 346 | |
| PBSP | 200 | 159 | 80% | | 1 | | 160 | |
| PVSP | 850 | 748 | 88% | | 3 | | 751 | |
| RJD | 1,200 | 1,332 | 111% | 894 | 776 | 87% | 2,108 | *SNY EOP IV=300 beds; PF EOP II=264 beds.* |
| SAC | 500 | 357 | 71% | 514 | 524 | 102% | 881 | |
| SATF | 1,950 | 1,926 | 99% | 352 | 448 | 127% | 2,374 | *EOP-SNY II.  EOP-SNY CoD pop housed in F003.* |

| Group | CCCMS | | | EOP | | | Subtotal MH Pop | Comments |
|---|---|---|---|---|---|---|---|---|
| Institution | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | | |
| **General Population (GP)** | | | | | | | | |
| **SCC** | 600 | 518 | 86% | | 2 | | **520** | |
| **SOL** | 1,300 | 1,220 | 94% | | 4 | | **1,224** | |
| **SQ** | 900 | 723 | 80% | | 29 | | **752** | |
| **SVSP** | 1,050 | 908 | 86% | 588 | 598 | 102% | **1,506** | *SNY EOP III=300 beds; SNY EOP IV=288 beds.* |
| **VSP** | 1,400 | 1,330 | 95% | 372 | 381 | 102% | **1,711** | *SNY EOP* |
| **WSP** | 350 | 283 | 81% | | 1 | | **284** | |
| **Group Total for GP** | **27,250** | **25,526** | **94%** | **5,989** | **6,338** | **106%** | **31,864** | |
| **Non-Disciplinary Segregation (NDS)** | | | | | | | | |
| **SAC NDS** | | 0 | | | 8 | | **8** | *NDS Capacity of 25 designated for CCCMS and EOP pop combined.* |
| **Group Total for NDS** | | | | | **8** | | **8** | |
| **Reception Center (RC)** | | | | | | | | |
| **CCWF-RC** | 100 | 163 | 163% | | | | **163** | |
| **CIM-RC** | 100 | 77 | 77% | | 27 | | **104** | |
| **DVI-RC** | 350 | 282 | 81% | | 18 | | **300** | |
| **NKSP-RC** | 800 | 723 | 90% | | 71 | | **794** | |
| **SQ-RC** | 150 | 178 | 119% | | 23 | | **201** | |
| **WSP-RC** | 800 | 895 | 112% | | 95 | | **990** | |
| **Group Total for RC** | **2,300** | **2,318** | **101%** | | **234** | | **2,552** | |
| **Restricted Housing Long-Term (LTRH)** | | | | | | | | |
| **COR LTRH** | | 121 | | | | | **121** | *Activation in progress; began 1/20/15.* |
| **Group Total for LTRH** | | **121** | | | | | **121** | |

| Group | CCCMS | | | EOP | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| Institution | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Subtotal MH Pop | |
| **Restricted Housing Short-Term (STRH)** | | | | | | | | |
| **COR STRH** | | 86 | | | | | 86 | *Activated 12/30/15.* |
| **HDSP STRH** | | 47 | | | 5 | | 52 | *Activated 12/30/15.* |
| **KVSP STRH** | | 87 | | | | | 87 | *Activated 5/27/15.* |
| **LAC STRH** | | 82 | | | | | 82 | *Activated 7/27/15.* |
| **PBSP STRH** | | 20 | | | 3 | | 23 | *Activated 12/30/15.* |
| **PVSP STRH** | | 45 | | | | | 45 | *Activated 10/6/15.* |
| **SAC STRH** | | 87 | | | | | 87 | *Activated 1/20/15.* |
| **SATF STRH** | | 66 | | | | | 66 | *Activated 4/27/15.* |
| **SVSP STRH** | | 64 | | | 17 | | 81 | *Activated 11/13/15.* |
| **Group Total for STRH** | | **584** | | | **25** | | **609** | |
| **Security Housing Unit (SHU)** | | | | | | | | |
| **CIW-SHU** | | 20 | | | | | 20 | |
| **PBSP SHU** | | 0 | | | | | 0 | |
| **Group Total for SHU** | | **20** | | | | | **20** | |

**Report Footnotes**
(1) CCCMS capacities as of 1/1/2017.  CCCMS GP capacity includes staffing for ASU, NDS, and Restricted Housing programs.

(2) EOP, ASU-EOP, and PSU may not reflect actual program vacancies because beds can be held vacant for inmate-patients temporarily housed in MHCB and OHU.

Exhibit K

# WHAT IS THE HEALTH CARE SERVICES DASHBOARD?

## A MONTHLY REPORT THAT:

✓ Consolidates key performance indicators and other important organization metrics across health care programs and service areas.

✓ Provides information typically monitored by health care organizations, such as patient outcomes, access to care, and utilization and cost.

✓ Helps the organization regularly assess progress in meeting annual performance objectives.

✓ Helps health care executives and managers identify areas that may need improvement.

*Click the icons below for more information:*

**Statewide Dashboard**
*Statewide performance trends*


**Institution Comparison**
*Compare performance for all institutions*


**Glossary**
*COMING SOON*


## INSTITUTION MENU
*Select an institution below for more information:*

| | |
|---|---|
| Avenal State Prison (ASP) | High Desert State Prison (HDSP) |
| California City Correctional Facility (CAC) | Ironwood State Prison (ISP) |
| Calipatria State Prison (CAL) | Kern Valley State Prison (KVSP) |
| California Correctional Center (CCC) | California State Prison, Los Angeles County (LAC) |
| California Correctional Institution (CCI) | Mule Creek State Prison (MCSP) |
| Central California Women's Facility (CCWF) | North Kern State Prison (NKSP) |
| Centinela State Prison (CEN) | Pelican Bay State Prison (PBSP) |
| California Health Care Facility (CHCF) | Pleasant Valley State Prison (PVSP) |
| California Institution for Men (CIM) | R. J. Donovan Correctional Facility (RJD) |
| California Institution for Women (CIW) | California State Prison, Sacramento (SAC) |
| California Men's Colony (CMC) | California Substance Abuse Treatment Facility (SATF) |
| California Medical Facility (CMF) | Sierra Conservation Center (SCC) |
| California State Prison, Corcoran (COR) | California State Prison, Solano (SOL) |
| California Rehabilitation Center (CRC) | San Quentin State Prison (SQ) |
| Correctional Training Facility (CTF) | Salinas Valley State Prison (SVSP) |
| Chuckawalla Valley State Prison (CVSP) | Valley State Prison (VSP) |
| Deuel Vocational Institution (DVI) | Wasco State Prison (WSP) |
| Folsom State Prison (FSP) | |



The Dashboard is intended to support headquarters and institution staff in identifying opportunities for improvement and monitoring progress toward performance objectives. However, there are limitations to the information - California Correctional Health Care Services (CCHCS) has standardized many data collection processes, provided training to promote consistency in data reporting, and invested in information system modifications to improve data quality. However, much of the data featured in the Health Care Services Dashboard is gathered through multiple networked databases or self-reported by institutions, and the data have not been validated or verified. Performance objectives and benchmarks were generated internally for quality improvement purposes and are not necessarily intended to reflect compliance with court mandates or a determination regarding constitutional levels of care.

# HEALTHCARE SERVICES DASHBOARD
## Statewide
*January 2017*

Main Menu



### SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | SW |
|---|---|---|
| **ACCESS** | | |
| Medical Services | | 83% |
| Dental Services | | 95% |
| Mental Health Services | | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | |
| Cancelled Due to Custody | | 0.9% |
| Seen as Scheduled | | 90% |
| **EFFECTIVE COMMUNICATION** | | |
| Effective Communication Provided | | 98% |
| Sign Language Interpreter (SLI) Provided | | - |

### MEDICATION MANAGEMENT

| | 6 Mo. Trend | SW |
|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | |
| Medication Continuity-Transfer | | 80% |
| Medication Non-Adherence Counseling | | 88% |
| Medication Administration | | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | |
| All Medications Received Timely (EHRS) | | 85% |
| **FORMULARY MANAGEMENT** | | |
| Non-Formulary by Psychiatrists | | 4.5% |
| Non-Formulary by Medical Providers | | 4.5% |
| Central Fill Prescriptions | | 43% |

### CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | SW |
|---|---|---|
| Primary Care Provider (PCP) | | 88% |
| Mental Health Primary Clinician | | 82% |
| Psychiatrist | | 86% |

### STAFFING

| | 6 Mo. Trend | SW |
|---|---|---|
| Operational Vacancies | | 8% |
| Average Time to Hire | | - |
| FTE Usage | | - |

### POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | SW |
|---|---|---|
| Asthma Care | | 85% |
| Therapeutic Anticoagulation | | 79% |
| Diabetes Care | | 81% |
| End Stage Liver Disease Care | | 84% |
| Colon Cancer Screening | | 74% |
| Women's Care | | 79% |
| Diagnostic Monitoring | | 91% |
| Utilization Specialty Services | | 89% |
| Polypharmacy Medication Review | | 94% |

### AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | SW |
|---|---|---|
| All Documents | | 75% |
| Specialty Notes | | 85% |
| Community Hospital Records | | 93% |
| Scanning Accuracy | | 94% |
| EHRS Timely Documentation | | 80% |

### COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | SW |
|---|---|---|
| Complete Care Model | | - |
| QM Program | | |
| Patient Safety Program | | - |

### MAJOR COSTS PER INMATE PER MONTH

| | YTD 16/17 | YTD 15/16 |
|---|---|---|
| Total Labor Cost | $1,746 | $1,676 |
| Total Non Labor Cost | $62 | $63 |

### APPEAL PROCESSING

| | 6 Mo. Trend | SW |
|---|---|---|
| Timely Appeals | | 97% |

### CARE MANAGEMENT

| | 6 Mo. Trend | SW |
|---|---|---|
| Appropriate Placement High Risk Patients | | 78% |
| High Risk Patient Care Plan | | |
| Follow-Up After MHCB/DSH Admission | | 91% |
| 30-Day Community Hospital Readmission | | 12.2% |
| 30-Day MHCB or DSH Readmission | | 18% |
| Potentially Avoidable Hospitalizations* | | 1.8 |
| EOP/MHCB Treatment Plan | | 64% |
| Suicide Watch Discharge Plan | | 29% |
| Suicide Risk Evaluation | | 70% |

### RESOURCE MANAGEMENT

| | 6 Mo. Trend | SW |
|---|---|---|
| Specialty Teleservices | | 61% |
| Availability of Medical Equipment | | 59% |
| Health Care Environment | | - |

### WORKLOAD PER DAY

| | 6 Mo. Trend | SW |
|---|---|---|
| Appointments per PCP | | 9.6 |
| Appointments per PCRN | | 6.6 |
| Encounters per Primary MH Clinician | | 5.4 |
| Encounters per Psychiatrist | | 6.2 |

### OTHER TRENDS

| | 6 Mo. Trend | SW |
|---|---|---|
| Hospital Admissions* | | 5.6 |
| Emergency Department Visits* | | 7 |
| Specialty Care Referrals* | | 60 |
| Prescriptions Per Inmate | | 2.7 |
| Diagnostics Per Inmate | | 0.9 |
| Appeals Received* | | 30 |
| Prison Population Capacity | | 131% |

* Rate Per 1,000 Inmates

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/14/2017 2:14:22 PM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

Main Menu

| Scheduling & Access to Care | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medical Services | 83% | 97% | 89% | 90% | 70% | 62% | 77% | 85% | 76% | 95% | 80% | 55% | 86% | 87% | 89% | 93% | 65% | 86% | 91% | 58% | 89% | 95% | 79% |
| RN FTF Triage 1 Day | 96% | 97% | 100% | 100% | 95% | 96% | 95% | 99% | 99% | 98% | 95% | 96% | 100% | 99% | 96% | 99% | 83% | 100% | 98% | 88% | 95% | 97% | 83% |
| PCP Urgent Referrals 1 Day | 82% | 100% | 80% | - | 69% | 29% | - | - | 0% | 100% | 50% | 40% | 100% | 100% | 100% | 83% | - | - | 50% | 50% | 100% | 100% | - |
| PCP Routine Referrals 14 Days | 74% | 95% | 89% | 79% | 61% | 49% | 36% | 57% | 91% | 100% | 97% | 53% | 85% | 66% | 99% | 100% | 48% | 72% | 100% | 37% | 85% | 99% | 65% |
| Chronic Care as Ordered | 74% | 99% | 99% | 55% | 47% | 57% | 31% | 36% | 92% | 95% | 91% | 40% | 78% | 63% | 100% | 98% | 62% | 79% | 100% | 35% | 96% | 97% | 54% |
| High Priority Specialty 14 Days | 64% | 100% | 100% | 100% | 44% | 42% | 100% | 100% | 47% | 71% | 47% | 21% | 60% | 63% | 64% | 87% | 57% | 100% | 100% | 22% | 60% | 79% | 83% |
| Routine Specialty 90 Days | 85% | 88% | 69% | 97% | 76% | 66% | 74% | 98% | 75% | 91% | 82% | 34% | 93% | 96% | 78% | 91% | 79% | 96% | 94% | 69% | 94% | 89% | 70% |
| Return from HLOC 5 Days | 87% | 95% | 71% | 96% | 71% | 70% | 87% | 100% | 93% | 100% | 89% | 71% | 62% | 96% | 100% | 91% | 56% | 63% | 100% | 57% | 71% | 96% | 90% |
| Laboratory Services as Ordered | 93% | 99% | 98% | 100% | 94% | 94% | 92% | 99% | 93% | 97% | 84% | 89% | 97% | 100% | 95% | 88% | 89% | 81% | 99% | 92% | 100% | 99% | 96% |
| Radiology Services as Ordered | 91% | 100% | 97% | 95% | 76% | 55% | 100% | 93% | 98% | 100% | 85% | 53% | 96% | 100% | 72% | 95% | 47% | 100% | 82% | 71% | 100% | 96% | 90% |
| Dental Services | 95% | 98% | 99% | 98% | 96% | 100% | 94% | 100% | 79% | 97% | 100% | 91% | 99% | 97% | 100% | 94% | 86% | 100% | 98% | 96% | 98% | 99% | 96% |
| 7362 Triage 3 or 10 Days | 98% | 99% | 100% | 99% | 93% | 100% | 98% | 100% | 99% | 99% | 95% | 99% | 90% | 98% | 100% | 100% | 91% | 99% | 100% | 95% | 98% | 99% | 97% |
| Treatment within Timeframes | 99% | 100% | 99% | 100% | 100% | 99% | 93% | 100% | 100% | 98% | 99% | 99% | 77% | 100% | 100% | 100% | 95% | 100% | 100% | 96% | 97% | 100% | 97% |
| RC Screening 60 Days | 90% | - | - | - | - | - | 91% | - | 92% | - | - | - | - | - | - | - | - | - | 100% | - | - | - | - |
| Patient Requested Exam 90 Days | 97% | 100% | 100% | 97% | 100% | 100% | 100% | 100% | 100% | 89% | 100% | 92% | 99% | 100% | 100% | 100% | 60% | 100% | 100% | 96% | 100% | 91% | 97% |
| Notice of Exam 50 Y.O. or Chronic Care | 90% | 94% | 98% | 98% | 93% | 99% | 96% | 100% | 19% | 99% | 100% | 88% | 100% | 96% | 100% | 76% | 99% | 100% | 94% | 92% | 100% | 91% | 94% |
| Mental Health Services | 86% | 99% | 100% | 100% | 94% | 81% | 93% | 100% | 86% | 98% | 90% | 74% | 97% | 77% | 90% | 94% | 89% | 95% | 95% | 83% | 100% | 73% | 86% |
| Referral Timeframes | 83% | 98% | 100% | 100% | 94% | 80% | 86% | 100% | 86% | 96% | 95% | 81% | 97% | 76% | 85% | 93% | 79% | 95% | 93% | 69% | 100% | 57% | 80% |
| EOP Structured Treatment | 82% | - | - | - | - | - | 98% | - | 87% | 100% | 77% | 46% | 94% | 66% | - | - | - | 92% | - | - | - | 69% | 83% |
| Contact Timeframes | 93% | 100% | 100% | 100% | 94% | 82% | 93% | 100% | 85% | 99% | 99% | 96% | 99% | 89% | 94% | 95% | 100% | 98% | 98% | 97% | 100% | 93% | 96% |
| Primary Clinician Contact Timeframes | 94% | 100% | 100% | 100% | 88% | 84% | 93% | 100% | 94% | 99% | 100% | 94% | 98% | 95% | 97% | 97% | 100% | 95% | 97% | 95% | 100% | 87% | 99% |
| Psychiatrist Contact Timeframes | 89% | 99% | - | - | - | 70% | 95% | 100% | 62% | 98% | 99% | 96% | 99% | 76% | 86% | 89% | 100% | 100% | 99% | 98% | 100% | 93% | 90% |
| IDTT Contact Timeframes | 97% | 100% | - | 100% | 100% | 93% | 96% | 100% | 99% | 100% | 99% | 98% | 100% | 97% | 99% | 98% | 100% | 99% | 97% | 99% | 100% | 99% | 100% |
| Cancelled Due to Custody | 0.9% | 0.0% | 0.1% | 0.5% | 0.3% | 0.6% | 1.6% | 0.0% | 0.7% | 1.0% | 2.5% | 1.0% | 0.9% | 2.6% | 0.6% | 0.0% | 0.4% | 0.1% | 1.7% | 3.5% | 0.1% | 2.0% | 1.2% |
| Medical Services | 0.4% | 0.1% | 0.0% | 0.4% | 0.2% | 0.1% | 1.7% | 0.1% | 0.2% | 0.3% | 0.3% | 0.1% | 0.2% | 0.5% | 0.1% | 0.0% | 0.3% | 0.4% | 0.3% | 4.2% | 0.1% | 1.1% | 1.5% |
| Mental Health Services | 1.5% | 0.0% | 0.0% | 0.2% | 0.3% | 1.6% | 2.4% | 0.0% | 1.8% | 0.8% | 4.1% | 2.4% | 1.3% | 6.7% | 0.2% | 0.1% | 0.0% | 0.0% | 0.4% | 1.1% | 0.0% | 3.8% | 1.1% |
| Dental Services | 0.9% | 0.0% | 0.2% | 0.0% | 0.3% | 0.0% | 0.6% | 0.0% | 0.2% | 1.8% | 1.5% | 0.6% | 1.2% | 0.7% | 1.5% | 0.0% | 0.9% | 0.0% | 4.3% | 5.2% | 0.1% | 1.1% | 0.9% |

* Rate Per 1,000 Inmates

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*



# DASHBOARD STATEWIDE COMPARISON
All Institutions

| Main Menu | Return to Top |
|---|---|

| Scheduling & Access to Care | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medical Services | 73% | 81% | 94% | 99% | 81% | 92% | 91% | 65% | 76% | 90% | 73% | 94% | 96% |
| RN FTF Triage 1 Day | 97% | 74% | 99% | 100% | 95% | 99% | 99% | 93% | 87% | 96% | 96% | 99% | 98% |
| PCP Urgent Referrals 1 Day | - | - | 100% | 100% | - | - | 93% | 100% | 100% | 100% | 100% | 100% | 100% |
| PCP Routine Referrals 14 Days | 42% | 75% | 98% | 99% | 82% | 89% | 73% | 67% | 57% | 81% | 40% | 95% | 94% |
| Chronic Care as Ordered | 38% | 56% | 97% | 98% | 71% | 80% | 80% | 54% | 77% | 86% | 33% | 88% | 92% |
| High Priority Specialty 14 Days | 54% | 77% | - | 100% | 44% | 91% | 91% | 50% | 30% | 89% | 53% | 71% | 90% |
| Routine Specialty 90 Days | 83% | 80% | 67% | 96% | 83% | 85% | 95% | 68% | 69% | 93% | 77% | 96% | 95% |
| Return from HLOC 5 Days | 74% | 90% | 100% | 100% | 84% | - | 94% | 0% | 86% | 73% | 65% | 100% | 100% |
| Laboratory Services as Ordered | 96% | 97% | 100% | 99% | 94% | 99% | 97% | 60% | 87% | 94% | 100% | 100% | 99% |
| Radiology Services as Ordered | 100% | 95% | 89% | 100% | 90% | 100% | 100% | 97% | 90% | 100% | 93% | 98% | 98% |
| Dental Services | 99% | 87% | 99% | 100% | 97% | 100% | 97% | 99% | 100% | 97% | 94% | 99% | 96% |
| 7362 Triage 3 or 10 Days | 98% | 99% | 100% | 100% | 99% | 98% | 99% | 97% | 100% | 96% | 99% | 100% | 98% |
| Treatment within Timeframes | 99% | 100% | 100% | 100% | 99% | 100% | 99% | 100% | 100% | 100% | 100% | 96% | 100% |
| RC Screening 60 Days | - | 86% | - | - | - | - | - | - | - | 100% | - | - | 86% |
| Patient Requested Exam 90 Days | 100% | 98% | 100% | 100% | 98% | 100% | 97% | 100% | 100% | 100% | 100% | 100% | 97% |
| Notice of Exam 50 Y.O. or Chronic Care | 100% | 50% | 95% | 100% | 91% | 100% | 94% | 100% | 100% | 88% | 78% | 99% | 97% |
| Mental Health Services | 82% | 88% | 94% | 100% | 93% | 87% | 95% | 78% | 96% | 89% | 72% | 92% | 89% |
| Referral Timeframes | 80% | 66% | 98% | 100% | 93% | 88% | 96% | 60% | 97% | 95% | 66% | 94% | 81% |
| EOP Structured Treatment | 73% | 100% | 84% | - | 94% | 92% | 96% | - | - | 73% | 72% | 94% | 88% |
| Contact Timeframes | 93% | 98% | 99% | 99% | 95% | 83% | 93% | 96% | 95% | 98% | 77% | 90% | 98% |
| Primary Clinician Contact Timeframes | 96% | 99% | 99% | 100% | 94% | 89% | 97% | 97% | 97% | 98% | 74% | 88% | 97% |
| Psychiatrist Contact Timeframes | 83% | 97% | 99% | 98% | 93% | 63% | 94% | 98% | 90% | 99% | 78% | 86% | 97% |
| IDTT Contact Timeframes | 100% | 100% | 100% | 100% | 99% | 96% | 94% | 92% | 98% | 98% | 80% | 97% | 100% |
| Cancelled Due to Custody | 0.5% | 0.4% | 0.4% | 0.1% | 0.8% | 1.2% | 0.3% | 1.2% | 0.2% | 0.8% | 0.8% | 0.2% | 0.2% |
| Medical Services | 0.6% | 0.1% | 0.1% | 0.1% | 0.6% | 0.9% | 0.0% | 0.4% | 0.1% | 0.6% | 0.2% | 0.3% | 0.2% |
| Mental Health Services | 0.7% | 0.0% | 0.9% | 0.2% | 1.1% | 0.6% | 0.0% | 0.8% | 0.1% | 1.3% | 1.3% | 0.1% | 0.5% |
| Dental Services | 0.4% | 1.2% | 0.2% | 0.1% | 0.8% | 2.1% | 0.4% | 2.4% | 0.4% | 0.6% | 0.9% | 0.3% | 0.0% |

* Rate Per 1,000 Inmates

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
|---|---|

| Scheduling & Access to Care | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Seen as Scheduled | 90% | 97% | 91% | 93% | 90% | 87% | 82% | 92% | 90% | 95% | 83% | 88% | 93% | 91% | 86% | 91% | 86% | 94% | 93% | 81% | 91% | 89% | 86% |
|    Medical Services | 83% | 96% | 76% | 91% | 76% | 78% | 66% | 91% | 81% | 93% | 73% | 79% | 85% | 95% | 63% | 78% | 75% | 92% | 86% | 65% | 89% | 84% | 78% |
|    Mental Health Services | 94% | 97% | 100% | 98% | 100% | 95% | 89% | 100% | 91% | 98% | 93% | 93% | 97% | 85% | 99% | 100% | 94% | 93% | 98% | 97% | 98% | 92% | 95% |
|    Dental Services | 92% | 97% | 96% | 90% | 93% | 89% | 92% | 87% | 96% | 92% | 84% | 92% | 97% | 94% | 95% | 94% | 89% | 96% | 94% | 81% | 85% | 90% | 85% |
| Effective Communication Provided | 98% | 100% | 100% | 99% | 100% | 99% | 94% | 99% | 98% | 99% | 99% | 98% | 99% | 99% | 99% | 100% | 98% | 100% | 99% | 100% | 98% | 98% | 98% |
|    Medical Services | 99% | 100% | 100% | 100% | 100% | 98% | 89% | 99% | 99% | 100% | 98% | 100% | 100% | 99% | 99% | 100% | 99% | 100% | 99% | 100% | 100% | 100% | 100% |
|    Mental Health Services | 97% | 100% | 100% | 97% | 100% | 100% | 95% | 100% | 94% | 99% | 97% | 97% | 98% | 98% | 99% | 100% | 99% | 99% | 98% | 97% | 100% | 96% | 96% |
|    Dental Services | 97% | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 100% | 100% | 100% | 99% | 100% | 99% | 99% | 97% |
| Sign Language Interpreter (SLI) Provided | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PCP Backlog | - | 2 | 8 | 52 | 276 | 377 | 1,339 | 7 | 37 | 15 | 69 | 683 | 10 | 25 | 9 | 41 | 182 | 12 | 3 | 171 | 15 | 33 | 91 |
| PC RN Backlog | - | 8 | 1 | 4 | 65 | 79 | 168 | 5 | 11 | 21 | 57 | 33 | 1 | 6 | 7 | 29 | 19 | 5 | 7 | 32 | 5 | 6 | 29 |
| MH PC Backlog | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Psy Backlog | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental Backlog | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PCP Volume | - | 1,353 | 898 | 1,248 | 1,062 | 910 | 1,216 | 1,012 | 4,556 | 2,765 | 789 | 778 | 1,937 | 1,255 | 1,068 | 1,217 | 448 | 1,441 | 956 | 525 | 662 | 1,446 | 1,722 |
| PC RN Volume | - | 1,040 | 612 | 739 | 638 | 801 | 1,991 | 981 | 1,364 | 2,516 | 1,539 | 1,246 | 1,564 | 1,116 | 662 | 1,554 | 625 | 1,920 | 1,347 | 694 | 780 | 860 | 1,590 |
| MH PC Volume | - | 711 | 15 | 19 | 45 | 950 | 2,692 | 22 | 4,460 | 1,463 | 1,679 | 3,604 | 3,578 | 4,336 | 617 | 1,216 | 105 | 535 | 535 | 921 | 78 | 1,473 | 4,471 |
| Psy Volume | - | 509 | 1 | 24 | - | 351 | 807 | 19 | 832 | 906 | 818 | 985 | 1,362 | 771 | 347 | 568 | 14 | 612 | 276 | 290 | 15 | 571 | 792 |
| Dental Volume | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

| Population Health Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asthma Care | 85% | 97% | 98% | 94% | 98% | 92% | 94% | 95% | 86% | 97% | 88% | 95% | 83% | 91% | 95% | 94% | 97% | 97% | 95% | 92% | 98% | 96% | 97% |
|    Asthma SABA Utilization | 84% | 97% | 96% | 96% | 95% | 92% | 92% | 96% | 79% | 95% | 86% | 94% | 79% | 89% | 93% | 90% | 98% | 94% | 95% | 94% | 95% | 94% | 98% |
|    Persistent Asthma ICS Treatment | 86% | 97% | 100% | 92% | 100% | 92% | 96% | 95% | 93% | 100% | 91% | 97% | 87% | 94% | 96% | 98% | 96% | 100% | 95% | 91% | 100% | 98% | 97% |
| Therapeutic Anticoagulation | 79% | - | - | - | - | 100% | 100% | 100% | 76% | 90% | 50% | 89% | 76% | 67% | 100% | 83% | 100% | - | 80% | 0% | 0% | 100% | 77% |
| Diabetes Care | 81% | 89% | 89% | 81% | 73% | 75% | 76% | 89% | 84% | 86% | 87% | 79% | 84% | 81% | 87% | 86% | 76% | 93% | 86% | 67% | 91% | 83% | 77% |
|    A1C <8% | 76% | 96% | 96% | 80% | 83% | 76% | 73% | 79% | 72% | 80% | 90% | 81% | 73% | 77% | 83% | 76% | 76% | 82% | 82% | 61% | 69% | 65% | 64% |
|    Blood Pressure <140/90 mm Hg | 70% | 70% | - | 73% | - | - | 83% | 90% | 70% | 77% | 80% | 80% | - | 81% | - | - | 100% | 87% | - | 97% | 93% | 87% | |

* Rate Per 1,000 Inmates

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



| Main Menu | Return to Top |
| --- | --- |

| Scheduling & Access to Care | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Seen as Scheduled | 86% | 91% | 90% | 96% | 89% | 92% | 96% | 85% | 85% | 91% | 84% | 93% | 96% |
|    Medical Services | 80% | 81% | 78% | 98% | 82% | 84% | 97% | 66% | 67% | 81% | 76% | 89% | 94% |
|    Mental Health Services | 86% | 97% | 99% | 99% | 97% | 98% | 98% | 98% | 99% | 97% | 92% | 98% | 98% |
|    Dental Services | 92% | 94% | 92% | 91% | 90% | 94% | 92% | 90% | 89% | 95% | 85% | 93% | 96% |
| Effective Communication Provided | 100% | 97% | 93% | 100% | 98% | 96% | 99% | 100% | 99% | 97% | 99% | 100% | 99% |
|    Medical Services | 100% | 100% | 87% | 100% | 98% | 99% | 100% | 100% | 100% | 99% | 100% | 100% | 100% |
|    Mental Health Services | 99% | 100% | 93% | 100% | 97% | 92% | 98% | 100% | 99% | 97% | 99% | 100% | 97% |
|    Dental Services | 100% | 92% | 98% | 100% | 99% | 97% | 99% | 100% | 97% | 94% | 98% | 100% | 99% |
| Sign Language Interpreter (SLI) Provided | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PCP Backlog | 71 | 244 | 14 | 2 | 36 | 35 | 83 | 671 | 194 | 25 | 128 | 16 | 16 |
| PC RN Backlog | 15 | 39 | 3 | 2 | 31 | 13 | 17 | 20 | 163 | 4 | 33 | 8 | 11 |
| MH PC Backlog | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Psy Backlog | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental Backlog | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PCP Volume | 2,614 | 2,959 | 334 | 1,200 | 3,211 | 842 | 2,433 | 654 | 1,298 | 1,981 | 1,609 | 1,580 | 2,142 |
| PC RN Volume | 1,512 | 1,655 | 346 | 722 | 2,274 | 1,439 | 1,715 | 427 | 959 | 1,687 | 1,790 | 1,010 | 3,468 |
| MH PC Volume | 5,797 | 1,441 | 451 | 788 | 5,918 | 5,682 | 3,792 | 357 | 927 | 1,370 | 2,836 | 2,597 | 1,932 |
| Psy Volume | 1,276 | 735 | 176 | 358 | 956 | 934 | 1,049 | 153 | 429 | 671 | 570 | 676 | 996 |
| Dental Volume | - | - | - | - | - | - | - | - | - | - | - | - | - |

| Population Health Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Asthma Care | 93% | 97% | 82% | 99% | 96% | 94% | 93% | 92% | 93% | 92% | 92% | 97% | 97% |
|    Asthma SABA Utilization | 93% | 98% | 89% | 98% | 93% | 95% | 93% | 93% | 95% | 92% | 93% | 95% | 94% |
|    Persistent Asthma ICS Treatment | 92% | 97% | 75% | 100% | 98% | 93% | 94% | 90% | 91% | 92% | 91% | 99% | 100% |
| Therapeutic Anticoagulation | 68% | 25% | - | - | 92% | 64% | 88% | 100% | 83% | 64% | 79% | 100% | 100% |
| Diabetes Care | 85% | 91% | 79% | 100% | 84% | 85% | 85% | 82% | 80% | 84% | 84% | 90% | 87% |
|    A1C <8% | 77% | 84% | 83% | 100% | 81% | 88% | 73% | 71% | 69% | 70% | 77% | 86% | 75% |
|    Blood Pressure <140/90 mm Hg | 86% | 97% | 58% | 100% | 70% | 80% | 83% | | 75% | 90% | 73% | 83% | 93% |

\* Rate Per 1,000 Inmates

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

Main Menu | Return to Top

| Population Health Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Screened or Treated Nephropathy | 95% | 98% | 100% | 88% | 96% | 97% | 89% | 100% | 99% | 96% | 96% | 88% | 95% | 95% | 95% | 99% | 98% | 97% | 98% | 84% | 100% | 94% | 91% |
| Statin | 81% | 93% | 73% | 82% | 41% | 53% | 60% | 87% | 93% | 93% | 77% | 66% | 88% | 74% | 84% | 87% | 54% | 92% | 78% | 56% | 100% | 79% | 67% |
| End Stage Liver Disease Care | 84% | 100% | 100% | 100% | 83% | 61% | 65% | 87% | 86% | 93% | 90% | 74% | 84% | 87% | 89% | 92% | 100% | - | 66% | 75% | 33% | 57% | 75% |
| EGD for Esophageal Varices | 78% | 100% | - | 100% | 50% | 33% | 67% | 75% | 87% | 97% | 89% | 82% | 58% | 100% | 67% | 80% | 100% | - | 68% | 25% | 0% | 50% | 49% |
| HCC Screening | 91% | - | - | 100% | 100% | 50% | 100% | 83% | 96% | 98% | 83% | 94% | 97% | 100% | 100% | 89% | 100% | - | 95% | 100% | 0% | 100% | 63% |
| NSAID | 96% | 100% | 100% | 100% | 100% | 100% | 94% | 89% | 95% | 100% | 87% | 96% | 98% | 100% | 96% | 100% | 100% | - | 100% | 100% | 100% | 78% | 87% |
| Diagnosis Medication Match | 73% | - | - | - | - | - | 0% | 100% | 65% | 78% | 100% | 25% | 83% | 50% | - | 100% | - | - | 0% | - | - | - | 100% |
| SBP or TIPS with Cipro. or Sulfa. | 57% | - | - | - | - | - | 100% | 50% | 33% | - | - | - | - | 50% | - | - | - | - | 0% | - | - | - | - |
| Ascites with Spironolactone | 69% | - | - | - | - | - | 100% | 63% | 100% | 100% | 25% | 67% | 50% | - | - | - | - | - | 0% | - | - | - | 100% |
| Hepatic Enceph. w/ Lactulose and/or Rifaximin | 94% | - | - | - | - | - | 0% | 100% | 83% | 100% | - | - | 100% | - | - | 100% | - | - | - | - | - | - | - |
| Colon Cancer Screening | 74% | 51% | 88% | 79% | 47% | 73% | 75% | 76% | 79% | 63% | 76% | 76% | 64% | 60% | 73% | 81% | 67% | 83% | 88% | 78% | 72% | 75% | 74% |
| Women's Care | 79% | - | - | - | - | - | 79% | - | - | - | 82% | - | - | - | - | - | - | - | 86% | - | - | - | - |
| Breast Cancer Screening | 87% | - | - | - | - | - | 87% | - | - | - | 90% | - | - | - | - | - | - | - | 86% | - | - | - | - |
| Cervical Cancer Screening | 70% | - | - | - | - | - | 70% | - | - | - | 74% | - | - | - | - | - | - | - | 87% | - | - | - | - |
| Diagnostic Monitoring | 91% | 100% | - | - | - | 92% | 91% | - | 84% | 88% | 95% | 91% | 92% | 94% | 100% | 97% | - | 100% | 98% | 98% | - | 88% | 81% |
| QT Prolongation EKG 12 Months | 77% | 100% | - | - | - | 100% | 71% | - | 83% | 63% | 82% | 71% | 74% | 76% | 100% | 100% | - | 100% | 100% | 67% | - | 67% | 62% |
| Antipsychotics | 94% | 100% | - | - | - | 91% | 95% | - | 92% | 98% | 97% | 97% | 96% | 96% | 99% | 94% | - | 100% | 94% | 92% | - | 92% | 87% |
| Lipid Monitoring 12 Months | 93% | 100% | - | - | - | 83% | 92% | - | 93% | 100% | 91% | 96% | 97% | 94% | 100% | 91% | - | 100% | 95% | 87% | - | 89% | 88% |
| Blood Sugar 12 Months | 96% | 100% | - | - | - | 90% | 99% | - | 97% | 100% | 100% | 97% | 98% | 100% | 100% | 94% | - | 100% | 95% | 94% | - | 94% | 92% |
| EKG 12 Months | 91% | 100% | - | - | - | 100% | 99% | - | 93% | 100% | 100% | 94% | 87% | 100% | 100% | 100% | - | 100% | 100% | 83% | - | 79% | 79% |
| AIMS 12 Months | 90% | 100% | - | - | - | 86% | 89% | - | 81% | 100% | 94% | 99% | 94% | 93% | 99% | 90% | - | 100% | 93% | 87% | - | 95% | 73% |
| Med Consent 12 Months | 93% | 100% | - | - | - | 93% | 97% | - | 84% | 88% | 98% | 94% | 95% | 96% | 100% | 97% | - | 100% | 90% | 98% | - | 95% | 90% |
| CBC with Platelets 12 Months | 94% | 96% | - | - | - | 90% | 96% | - | 93% | 100% | 97% | 97% | 95% | 97% | 87% | - | - | 100% | 90% | 89% | - | 91% | 88% |
| CMP 12 Months | 94% | 100% | - | - | - | 90% | 93% | - | 94% | 100% | 98% | 95% | 98% | 95% | 100% | 93% | - | 100% | 86% | 94% | - | 94% | 89% |
| Thyroid Monitoring 5 Years | 99% | 100% | - | - | - | 97% | 99% | - | 100% | 100% | 99% | 99% | 100% | 100% | 99% | - | - | 100% | 100% | 100% | - | 99% | 98% |
| Clozapine | 97% | - | - | - | - | 100% | - | - | 94% | - | 98% | - | 96% | 98% | - | - | - | - | - | - | - | - | - |
| CMP 12 Months | 99% | - | - | - | - | 100% | - | - | 100% | - | 100% | - | 95% | 100% | - | - | - | - | - | - | - | - | - |

\* Rate Per 1,000 Inmates



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
|---|---|

| Population Health Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Screened or Treated Nephropathy | 93% | 95% | 83% | 100% | 97% | 91% | 98% | 97% | 92% | 97% | 96% | 99% | 93% |
| Statin | 82% | 87% | 90% | 100% | 88% | 82% | 85% | 79% | 82% | 80% | 89% | 91% | 86% |
| End Stage Liver Disease Care | 90% | 100% | 78% | - | 96% | 86% | 83% | 80% | 73% | 84% | 78% | 84% | 100% |
| EGD for Esophageal Varices | 95% | - | 33% | - | 92% | 67% | 92% | 67% | 71% | 83% | 75% | 75% | 100% |
| HCC Screening | 94% | 100% | 100% | - | 98% | 80% | 89% | 90% | 94% | 98% | 43% | 83% | 100% |
| NSAID | 95% | 100% | 100% | - | 100% | 97% | 100% | 85% | 93% | 91% | 92% | 92% | 100% |
| Diagnosis Medication Match | 75% | 100% | - | - | 94% | 100% | 50% | - | 33% | 63% | 100% | - | - |
| SBP or TIPS with Cipro. or Sulfa. | - | - | - | - | 100% | 100% | 50% | - | 0% | - | - | - | - |
| Ascites with Spironolactone | 50% | 100% | - | - | 83% | - | 0% | - | 0% | 25% | 100% | - | - |
| Hepatic Enceph. w/ Lactulose and/or Rifaximin | 100% | 100% | - | - | 100% | 100% | 100% | - | 100% | 100% | - | - | - |
| Colon Cancer Screening | 74% | 77% | 77% | 77% | 82% | 69% | 69% | 39% | 86% | 91% | 66% | 87% | 80% |
| Women's Care | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Breast Cancer Screening | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cervical Cancer Screening | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Diagnostic Monitoring | 91% | 87% | 71% | 99% | 93% | 92% | 93% | 96% | 78% | 99% | 84% | 99% | 74% |
| QT Prolongation EKG 12 Months | 75% | 86% | 0% | 100% | 80% | 87% | 83% | 100% | 44% | 100% | 64% | 100% | 67% |
| Antipsychotics | 94% | 90% | 96% | 97% | 96% | 92% | 96% | 92% | 86% | 97% | 89% | 98% | 72% |
| Lipid Monitoring 12 Months | 91% | 93% | 100% | 95% | 91% | 91% | 97% | 96% | 88% | 95% | 86% | 98% | 73% |
| Blood Sugar 12 Months | 98% | 100% | 100% | 95% | 95% | 94% | 97% | 92% | 91% | 95% | 93% | 99% | 73% |
| EKG 12 Months | 92% | 100% | 100% | - | 100% | 95% | 94% | 100% | 82% | 100% | 71% | 94% | 40% |
| AIMS 12 Months | 85% | 80% | 86% | 100% | 94% | 90% | 93% | 81% | 73% | 98% | 85% | 97% | 85% |
| Med Consent 12 Months | 91% | 60% | 100% | 100% | 98% | 80% | 95% | 81% | 80% | 100% | 92% | 99% | 68% |
| CBC with Platelets 12 Months | 96% | 87% | 93% | 95% | 94% | 93% | 97% | 92% | 83% | 91% | 91% | 97% | 69% |
| CMP 12 Months | 98% | 100% | 93% | 95% | 94% | 93% | 97% | 92% | 87% | 94% | 90% | 98% | 73% |
| Thyroid Monitoring 5 Years | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 100% | 100% | 100% | 99% | 99% | 96% |
| Clozapine | 96% | 88% | - | - | - | 97% | - | - | - | 100% | - | 100% | - |
| CMP 12 Months | 100% | 100% | - | - | 100% | - | - | - | 100% | - | 100% | - |

*\* Rate Per 1,000 Inmates*

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Population Health Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lipid Monitoring 12 Months | 94% | - | - | - | - | - | 100% | - | 100% | - | 100% | - | 95% | 88% | - | - | - | - | - | - | - | - | - |
| Blood Sugar 12 Months | 99% | - | - | - | - | - | 100% | - | 100% | - | 100% | - | 95% | 100% | - | - | - | - | - | - | - | - | - |
| CBC 30 Days | 98% | - | - | - | - | - | 100% | - | 100% | - | 100% | - | 100% | 100% | - | - | - | - | - | - | - | - | - |
| EKG 12 Months | 97% | - | - | - | - | - | 100% | - | 50% | - | 100% | - | 95% | 100% | - | - | - | - | - | - | - | - | - |
| AIMS 12 Months | 92% | - | - | - | - | - | 100% | - | 100% | - | 83% | - | 90% | 100% | - | - | - | - | - | - | - | - | - |
| Thyroid Monitoring 5 Years | 100% | - | - | - | - | - | 100% | - | 100% | - | 100% | - | 100% | 100% | - | - | - | - | - | - | - | - | - |
| Med Consent 12 Months | 98% | - | - | - | - | - | 100% | - | 100% | - | 100% | - | 100% | 100% | - | - | - | - | - | - | - | - | - |
| Mood Stabilizers | 96% | 100% | - | - | - | 84% | 100% | - | 93% | 98% | 99% | 98% | 94% | 98% | 100% | 97% | - | 100% | 100% | 98% | - | 95% | 80% |
| Carbamazepine | 100% | - | - | - | - | - | 100% | - | - | 100% | 100% | - | - | - | - | 100% | - | - | - | - | - | 100% | - |
| CMP 12 Months | 100% | - | - | - | - | - | 100% | - | - | 100% | 100% | - | - | - | - | 100% | - | - | - | - | - | 100% | - |
| Carbamazepine Level 12 Months | 100% | - | - | - | - | - | 100% | - | - | 100% | 100% | - | - | - | - | 100% | - | - | - | - | - | 100% | - |
| CBC 12 Months | 100% | - | - | - | - | - | 100% | - | - | 100% | 100% | - | - | - | - | 100% | - | - | - | - | - | 100% | - |
| Med Consent 12 Months | 100% | - | - | - | - | - | 100% | - | - | 100% | 100% | - | - | - | - | 100% | - | - | - | - | - | 100% | - |
| Depakote | 95% | 100% | - | - | - | 88% | 100% | - | 94% | 95% | 100% | 99% | 96% | 98% | 100% | 96% | - | 100% | 100% | 100% | - | 94% | 85% |
| CMP 12 Months | 97% | 100% | - | - | - | 88% | 100% | - | 97% | 100% | 100% | 100% | 100% | 100% | 100% | 91% | - | 100% | 100% | 100% | - | 96% | 91% |
| Depakote Level 12 Months | 94% | 100% | - | - | - | 88% | 100% | - | 95% | 100% | 100% | 98% | 96% | 93% | 100% | 94% | - | 100% | 100% | 100% | - | 88% | 74% |
| CBC with Platelets 12 Months | 97% | 100% | - | - | - | 100% | 100% | - | 97% | 100% | 100% | 100% | 100% | 94% | 100% | 100% | - | 100% | 100% | 100% | - | 96% | 91% |
| Med Consent 12 Months | 91% | 100% | - | - | - | 75% | 100% | - | 88% | 79% | 100% | 100% | 90% | 100% | 100% | 94% | - | 100% | 100% | 100% | - | 94% | 84% |
| Lithium | 96% | 100% | - | - | - | 84% | 99% | - | 93% | 100% | 98% | 97% | 99% | 98% | 100% | 100% | - | 100% | 100% | 95% | - | 92% | 75% |
| Creatinine & BUN 12 Months | 98% | 100% | - | - | - | 80% | 100% | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | - | 100% | 100% | - | - | 100% | 78% |
| Lithium Level 12 Months | 98% | 100% | - | - | - | 80% | 100% | - | 93% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | - | 100% | 100% | - | - | 100% | 89% |
| Thyroid Monitoring 12 Months | 95% | 100% | - | - | - | 80% | 94% | - | 100% | 100% | 88% | 96% | 93% | 92% | 100% | 100% | - | 100% | 100% | 75% | - | 100% | 78% |
| EKG 12 Months | 91% | 100% | - | - | - | - | 100% | - | 91% | 100% | 100% | 89% | 100% | 100% | 100% | 100% | - | 100% | 100% | 100% | - | 75% | 75% |
| Med Consent 12 Months | 96% | 100% | - | - | - | 80% | 100% | - | 83% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | - | 100% | 100% | 100% | - | 86% | 57% |
| Antidepressants | 88% | 100% | - | - | - | 94% | 89% | - | 60% | 91% | 100% | 99% | 99% | 98% | 100% | 97% | - | 99% | 98% | 95% | - | 96% | 93% |
| EKG 12 Months (Tricyclics) | 75% | - | - | - | - | - | - | - | 0% | - | - | - | - | 100% | - | - | - | - | - | - | - | - | - |
| Med Consent 12 Months | 91% | 99% | - | - | - | 88% | 82% | - | 81% | 83% | 99% | 99% | 96% | 98% | 99% | 95% | - | 98% | 96% | 92% | - | 94% | 90% |

* Rate Per 1,000 Inmates

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
All Institutions

Main Menu | Return to Top

| Population Health Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lipid Monitoring 12 Months | 90% | 0% | - | - | - | 100% | - | - | - | 100% | - | 100% | - |
| Blood Sugar 12 Months | 100% | 100% | - | - | - | 100% | - | - | - | 100% | - | 100% | - |
| CBC 30 Days | 90% | 100% | - | - | - | 100% | - | - | - | 100% | - | 100% | - |
| EKG 12 Months | 100% | 100% | - | - | - | 95% | - | - | - | 100% | - | 100% | - |
| AIMS 12 Months | 86% | 100% | - | - | - | 95% | - | - | - | 100% | - | 100% | - |
| Thyroid Monitoring 5 Years | 100% | 100% | - | - | - | 100% | - | - | - | 100% | - | 100% | - |
| Med Consent 12 Months | 100% | 100% | - | - | - | 88% | - | - | - | - | - | 100% | - |
| Mood Stabilizers | 94% | 94% | 92% | 100% | 99% | 95% | 97% | 97% | 90% | 100% | 92% | 98% | 75% |
| Carbamazepine | 100% | - | - | - | 100% | 100% | 100% | - | - | 100% | 100% | 100% | - |
| CMP 12 Months | 100% | - | - | - | 100% | 100% | 100% | - | - | 100% | 100% | 100% | - |
| Carbamazepine Level 12 Months | 100% | - | - | - | 100% | 100% | 100% | - | - | 100% | 100% | 100% | - |
| CBC 12 Months | 100% | - | - | - | 100% | 100% | 100% | - | - | 100% | 100% | 100% | - |
| Med Consent 12 Months | 100% | - | - | - | 100% | 100% | 100% | - | - | 100% | 100% | 100% | - |
| Depakote | 96% | 88% | 92% | 100% | 98% | 89% | 99% | 94% | 80% | 100% | 94% | 94% | 75% |
| CMP 12 Months | 98% | 100% | 100% | 100% | 100% | 94% | 100% | 100% | 80% | 100% | 100% | 94% | 100% |
| Depakote Level 12 Months | 98% | 100% | 67% | 100% | 94% | 93% | 100% | 100% | 87% | 100% | 90% | 94% | 50% |
| CBC with Platelets 12 Months | 97% | 100% | 100% | 100% | 100% | 94% | 98% | 100% | 73% | 100% | 100% | 91% | 100% |
| Med Consent 12 Months | 89% | 50% | 100% | 100% | 100% | 75% | 97% | 75% | 80% | 100% | 85% | 97% | 50% |
| Lithium | 93% | 100% | - | 100% | 97% | 99% | 93% | 100% | 100% | 100% | 84% | 100% | - |
| Creatinine & BUN 12 Months | 100% | 100% | - | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 85% | 100% | - |
| Lithium Level 12 Months | 100% | 100% | - | 100% | 98% | 100% | 100% | 100% | 100% | 100% | 85% | 100% | - |
| Thyroid Monitoring 12 Months | 97% | 100% | - | 100% | 94% | 100% | 96% | 100% | 100% | 100% | 85% | 100% | - |
| EKG 12 Months | 80% | 100% | - | 100% | 91% | 100% | 77% | 100% | 100% | 100% | 63% | 100% | - |
| Med Consent 12 Months | 89% | 100% | - | 100% | 100% | 95% | 92% | 100% | 100% | 100% | 100% | 100% | - |
| Antidepressants | 96% | 80% | 96% | 100% | 99% | 87% | 95% | 96% | 91% | 98% | 93% | 99% | 81% |
| EKG 12 Months (Tricyclics) | 100% | - | - | - | - | - | - | - | - | - | - | - | - |
| Med Consent 12 Months | 89% | 63% | 96% | 100% | 98% | 75% | 92% | 93% | 83% | 99% | 87% | 97% | 70% |

*Rate Per 1,000 Inmates*

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |

| Population Health Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Thyroid Monitoring 5 Years | 99% | 100% | - | - | - | 99% | 97% | - | 100% | 100% | 100% | 99% | 99% | 99% | 100% | 99% | - | 100% | 99% | 98% | - | 99% | 97% |
| Utilization Specialty Services | 89% | 94% | 92% | 94% | 97% | 80% | 85% | 88% | 74% | 93% | 90% | 87% | 88% | 93% | 97% | 84% | 96% | 92% | 92% | 95% | 97% | 98% | 87% |
| Polypharmacy Medication Review | 94% | 100% | 92% | 100% | 50% | 72% | 87% | 71% | 94% | 100% | 98% | 94% | 94% | 97% | 91% | 89% | 100% | 97% | 86% | 90% | 100% | 100% | 91% |

| Care Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Appropriate Placement High Risk Patients | 78% | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| High Risk Patient Care Plan | | | | | | | | | | | | | | | | | | | | | | | |
| Follow-Up After MHCB/DSH Admission | 91% | 100% | - | 100% | - | 71% | 84% | - | 92% | 100% | 90% | 91% | 92% | 95% | - | 67% | - | 83% | - | 76% | - | 96% | 91% |
| 30-Day Community Hospital Readmission | 12.2% | 2.4% | 0.0% | 2.8% | 0.0% | 0.0% | 12.9% | 2.3% | 23.9% | 7.1% | 7.8% | 5.4% | 9.5% | 7.3% | 18.4% | 1.7% | 18.8% | 10.7% | 2.9% | 5.9% | 2.7% | 8.1% | 12.6% |
| 30-Day MHCB or DSH Readmission | 18% | - | - | - | - | - | 38% | - | 28% | 25% | 16% | 22% | 6% | 29% | - | - | 0% | - | 36% | 100% | 12% | 12% | |
| Potentially Avoidable Hospitalizations* | 1.8 | 6.8 | 3.2 | 4.7 | 2.6 | 5.4 | 9.0 | 6.6 | 84.8 | 23.6 | 13.0 | 10.7 | 30.2 | 13.7 | 3.2 | 4.7 | 2.5 | 17.9 | 2.6 | 0.5 | 3.7 | 4.5 | 14.2 |
| EOP/MHCB Treatment Plan | 64% | 77% | - | 100% | - | 72% | 64% | 100% | 66% | 97% | 63% | 100% | 78% | 43% | 40% | 85% | - | 4% | 67% | - | 67% | 79% | |
| Suicide Watch Discharge Plan | 29% | 0% | - | - | - | 80% | 33% | - | 20% | 80% | 60% | 50% | 20% | 20% | 0% | 0% | - | 40% | 100% | - | - | 25% | |
| Suicide Risk Evaluation | 70% | 73% | - | 100% | - | 100% | 41% | 100% | 59% | 100% | 54% | 88% | 57% | 58% | 29% | 100% | 100% | 50% | 100% | 33% | 20% | - | 84% |

| Continuity of Clinicians & Services | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Primary Care Provider (PCP) | 88% | 93% | 99% | 90% | 100% | 100% | 96% | 93% | 87% | 98% | 95% | 100% | 95% | 88% | 99% | 98% | 100% | 96% | 97% | - | 97% | 94% | 88% |
| Mental Health Primary Clinician | 82% | - | - | - | - | - | 88% | - | 73% | - | 87% | 78% | 90% | 94% | - | - | - | 90% | - | - | - | 79% | 80% |
| Psychiatrist | 86% | - | - | - | - | - | 100% | - | 92% | - | 59% | 89% | 95% | 61% | - | - | - | 71% | - | - | - | 74% | 60% |

| Medication Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medication Continuity-Transfer | 80% | - | - | 90% | - | - | - | - | 83% | - | - | - | 97% | 60% | - | - | - | - | - | - | - | 78% | 81% |
| M5: NA/DOT/KOP Meds Inter-Institutional | 88% | - | - | 94% | - | - | - | - | 100% | - | - | - | 100% | 40% | - | - | - | - | - | - | - | 95% | 75% |
| M6: NA/DOT Meds Intra-Institutional | 75% | - | - | - | - | - | - | - | 68% | - | - | - | 100% | 50% | - | - | - | - | - | - | - | 64% | 92% |
| M7: Mental Health Crisis Bed Transfers | 70% | - | - | - | - | - | - | - | 88% | - | - | - | 94% | 64% | - | - | - | - | - | - | - | 88% | 65% |
| M8: ASU/SHU/PSU Inter-Institutional | 82% | - | - | 75% | - | - | - | - | 61% | - | - | - | 95% | 68% | - | - | - | - | - | - | - | 73% | 97% |
| M9: Discharge from Community Hosp/DSH | 83% | - | - | 100% | - | - | - | - | 100% | - | - | - | 98% | 80% | - | - | - | - | - | - | - | 71% | 76% |
| Medication Non-Adherence Counseling | 88% | - | - | - | - | - | - | - | 95% | - | - | - | 99% | 94% | - | - | - | - | - | - | - | 77% | 85% |
| M11: Non-Adherence MH Prescribed | 84% | - | - | - | - | - | - | - | 90% | - | - | - | 98% | 83% | - | - | - | - | - | - | - | 77% | 70% |

\* Rate Per 1,000 Inmates

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
| --- | --- |

| Population Health Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Thyroid Monitoring 5 Years | 99% | 98% | 96% | 100% | 100% | 99% | 98% | 100% | 99% | 98% | 99% | 100% | 93% |
| Utilization Specialty Services | 89% | 89% | 94% | 86% | 89% | 65% | 92% | 82% | 94% | 95% | 89% | 90% | 83% |
| Polypharmacy Medication Review | 95% | 94% | 83% | 100% | 97% | 95% | 99% | 91% | 93% | 94% | 96% | 97% | 96% |

| Care Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Appropriate Placement High Risk Patients | - | - | - | - | - | - | - | - | - | - | - | - | - |
| High Risk Patient Care Plan | | | | | | | | | | | | | |
| Follow-Up After MHCB/DSH Admission | 99% | 93% | 83% | 89% | 95% | 85% | 95% | - | 0% | 82% | 89% | 96% | 92% |
| 30-Day Community Hospital Readmission | 8.8% | 1.5% | 16.7% | 0.0% | 18.5% | 13.0% | 17.0% | 0.0% | 9.2% | 9.4% | 6.0% | 9.2% | 14.8% |
| 30-Day MHCB or DSH Readmission | 7% | 8% | 20% | 25% | 6% | 13% | 10% | - | 38% | | 4% | 0% | 0% |
| Potentially Avoidable Hospitalizations* | 20.5 | 2.3 | 0.0 | 3.1 | 40.6 | 11.8 | 9.5 | 1.9 | 13.7 | 7.9 | 14.4 | 3.5 | 9.1 |
| EOP/MHCB Treatment Plan | 66% | - | 72% | 77% | 69% | 41% | 90% | 55% | 45% | | 40% | 62% | 76% |
| Suicide Watch Discharge Plan | 0% | 0% | 60% | 60% | 0% | 50% | 20% | 67% | | | 0% | 0% | 0% |
| Suicide Risk Evaluation | 79% | - | 90% | 64% | 85% | 90% | 22% | 33% | 43% | | 80% | 96% | 56% |

| Continuity of Clinicians & Services | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Primary Care Provider (PCP) | 90% | 85% | 100% | 96% | 90% | 86% | 94% | 98% | 98% | 95% | 82% | 89% | 96% |
| Mental Health Primary Clinician | 81% | 63% | 77% | - | 80% | 81% | 91% | - | - | 86% | 84% | 86% | - |
| Psychiatrist | 83% | 86% | 33% | - | 81% | 81% | 96% | - | - | 96% | 89% | 84% | - |

| Medication Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Medication Continuity-Transfer | 64% | 60% | - | 100% | - | 88% | 93% | - | - | - | 68% | 99% | 81% |
| M5: NA/DOT/KOP Meds Inter-Institutional | 71% | 100% | - | 100% | - | 100% | 90% | - | - | - | 80% | 100% | 95% |
| M6: NA/DOT Meds Intra-Institutional | 90% | 35% | - | 100% | - | 67% | 100% | - | - | - | 61% | 95% | 87% |
| M7: Mental Health Crisis Bed Transfers | 27% | 0% | - | 100% | - | 94% | 75% | - | - | - | 78% | - | 60% |
| M8: ASU/SHU/PSU Inter-Institutional | 76% | 72% | - | 100% | - | 100% | 100% | - | - | - | 47% | 100% | 82% |
| M9: Discharge from Community Hosp/DSH | 56% | 90% | - | 100% | - | 81% | 100% | - | - | - | 74% | 100% | 83% |
| Medication Non-Adherence Counseling | 88% | 73% | - | 100% | - | 92% | 92% | - | - | - | 47% | 83% | 97% |
| M11: Non-Adherence MH Prescribed | 100% | 72% | - | 100% | - | 77% | 83% | - | - | - | 58% | 100% | 93% |

*\* Rate Per 1,000 Inmates*

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM

# DASHBOARD STATEWIDE COMPARISON



All Institutions

Main Menu   Return to Top

| Medication Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Referral on MAR | 93% | - | - | - | - | - | - | - | - | 90% | - | - | 100% | 100% | - | - | - | - | - | - | - | 100% | 75% |
| 128 MH5 or 128 C | 88% | - | - | - | - | - | - | - | - | 90% | - | - | 100% | 100% | - | - | - | - | - | - | - | 100% | 70% |
| Progress Note | 70% | - | - | - | - | - | - | - | - | 90% | - | - | 95% | 50% | - | - | - | - | - | - | - | 30% | 65% |
| M12: Non-Adherence PC2602 Meds | 89% | - | - | - | - | - | - | - | - | 100% | - | - | 100% | 100% | - | - | - | - | - | - | - | - | 100% |
| M14: Non-Adherence Insulin/HIV/Clozaril | 90% | - | - | - | - | - | - | - | - | - | - | - | 100% | 100% | - | - | - | - | - | - | - | - | - |
| Medication Administration | 96% | - | - | 92% | - | - | - | - | - | 98% | - | - | 100% | 100% | - | - | - | - | - | - | - | 84% | 97% |
| M22: New Outpatient Orders-Psychiatrist | 92% | - | - | - | - | - | - | - | - | 97% | - | - | 100% | 100% | - | - | - | - | - | - | - | 69% | 94% |
| M23: New Outpatient Orders-Medical | 99% | - | - | 92% | - | - | - | - | - | 100% | - | - | 100% | 100% | - | - | - | - | - | - | - | 100% | 100% |
| All Medications Received Timely (EHRS) | 85% | - | 88% | - | 89% | 89% | 80% | - | - | - | 87% | 88% | - | - | 98% | 85% | 81% | - | 96% | 74% | - | - | - |
| By Transfer Type | | | | | | | | | | | | | | | | | | | | | | | |
| Inter-System | 77% | - | 78% | - | 86% | 76% | 70% | - | - | - | 80% | 73% | - | - | 94% | 86% | 81% | - | 85% | 69% | - | - | - |
| Intra-Institution | 78% | - | 0% | - | 79% | 76% | 79% | - | - | - | 77% | 80% | - | - | 94% | 89% | 0% | - | 84% | 73% | - | - | - |
| Stable Housing | 86% | - | 89% | - | 90% | 89% | 80% | - | - | - | 87% | 89% | - | - | 98% | 84% | 81% | - | 96% | 74% | - | - | - |
| By Administration Type | | | | | | | | | | | | | | | | | | | | | | | |
| KOP | 64% | - | 62% | - | 74% | 62% | 57% | - | - | - | 76% | 21% | - | - | 81% | 89% | 44% | - | 74% | 32% | - | - | - |
| NA/DOT | 87% | - | 95% | - | 92% | 91% | 80% | - | - | - | 87% | 93% | - | - | 99% | 84% | 97% | - | 97% | 76% | - | - | - |
| By Prescription Type | | | | | | | | | | | | | | | | | | | | | | | |
| New | 80% | - | 85% | - | 82% | 82% | 78% | - | - | - | 81% | 76% | - | - | 98% | 82% | 77% | - | 90% | 71% | - | - | - |
| Refill/Renewal | 86% | - | 89% | - | 91% | 89% | 80% | - | - | - | 87% | 89% | - | - | 98% | 85% | 81% | - | 96% | 74% | - | - | - |
| By Medication Type | | | | | | | | | | | | | | | | | | | | | | | |
| Significant Medications | 87% | - | 94% | - | 92% | 91% | 80% | - | - | - | 87% | 90% | - | - | 99% | 85% | 92% | - | 96% | 75% | - | - | - |
| Other Medications | 64% | - | 46% | - | 58% | 47% | 73% | - | - | - | 83% | 57% | - | - | 84% | 80% | 16% | - | 71% | 51% | - | - | - |
| By Provider Type | | | | | | | | | | | | | | | | | | | | | | | |
| Dental: Dental Stock | 67% | - | 52% | - | 74% | 73% | 92% | - | - | - | - | 60% | - | - | - | - | - | - | - | 43% | - | - | - |
| Dental: Non Dental Stock | 81% | - | 100% | - | 78% | 83% | 70% | - | - | - | 87% | 86% | - | - | 99% | 68% | 86% | - | 89% | 64% | - | - | - |
| Medical | 84% | - | 88% | - | 89% | 88% | 79% | - | - | - | 88% | 82% | - | - | 98% | 82% | 81% | - | 94% | 74% | - | - | - |
| Psychiatry | 87% | - | - | - | - | 90% | 80% | - | - | - | 86% | 95% | - | - | 99% | 87% | 89% | - | 98% | 73% | - | - | - |

* Rate Per 1,000 Inmates

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
| --- | --- |

| Medication Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Referral on MAR | 100% | 95% | - | 100% | - | 100% | 80% | - | - | - | 75% | 100% | 100% |
| 128 MH5 or 128 C | 100% | 90% | - | 100% | - | 85% | 80% | - | - | - | 40% | 100% | 100% |
| Progress Note | 100% | 30% | - | 100% | - | 45% | 90% | - | - | - | 60% | 100% | 80% |
| M12: Non-Adherence PC2602 Meds | 97% | 74% | - | 100% | - | 100% | 100% | - | - | - | 35% | 100% | 100% |
| M14: Non-Adherence Insulin/HIV/Clozaril | 67% | - | - | - | - | 100% | - | - | - | - | - | 50% | - |
| Medication Administration | 99% | 100% | - | 100% | - | 100% | 83% | - | - | - | 93% | 100% | 95% |
| M22: New Outpatient Orders-Psychiatrist | 100% | 100% | - | 100% | - | 100% | 66% | - | - | - | 87% | 100% | 91% |
| M23: New Outpatient Orders-Medical | 98% | 100% | - | 100% | - | 100% | 100% | - | - | - | 100% | 100% | 100% |
| All Medications Received Timely (EHRS) | - | - | 86% | - | - | - | - | 93% | 81% | - | - | - | - |
| By Transfer Type | | | | | | | | | | | | | |
| Inter-System | - | - | 85% | - | - | - | - | 70% | 72% | - | - | - | - |
| Intra-Institution | - | - | 81% | - | - | - | - | 84% | 79% | - | - | - | - |
| Stable Housing | - | - | 87% | - | - | - | - | 93% | 81% | - | - | - | - |
| By Administration Type | | | | | | | | | | | | | |
| KOP | - | - | 69% | - | - | - | - | 66% | 69% | - | - | - | - |
| NA/DOT | - | - | 87% | - | - | - | - | 95% | 82% | - | - | - | - |
| By Prescription Type | | | | | | | | | | | | | |
| New | - | - | 81% | - | - | - | - | 84% | 73% | - | - | - | - |
| Refill/Renewal | - | - | 87% | - | - | - | - | 93% | 81% | - | - | - | - |
| By Medication Type | | | | | | | | | | | | | |
| Significant Medications | - | - | 87% | - | - | - | - | 94% | 82% | - | - | - | - |
| Other Medications | - | - | 82% | - | - | - | - | 44% | 49% | - | - | - | - |
| By Provider Type | | | | | | | | | | | | | |
| Dental: Dental Stock | - | - | 57% | - | - | - | - | 57% | - | - | - | - | - |
| Dental: Non Dental Stock | - | - | 93% | - | - | - | - | 78% | 82% | - | - | - | - |
| Medical | - | - | 86% | - | - | - | - | 92% | 82% | - | - | - | - |
| Psychiatry | - | - | 87% | - | - | - | - | 94% | 78% | - | - | - | - |

\* Rate Per 1,000 Inmates

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM

# DASHBOARD STATEWIDE COMPARISON
## All Institutions



[ Main Menu ]   [ Return to Top ]

| Medication Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Non-Formulary by Medical Providers | 4.5% | 2.2% | 1.8% | 1.5% | 2.5% | 4.0% | 7.9% | 4.1% | 5.7% | 4.2% | 9.3% | 4.3% | 7.1% | 5.1% | 2.6% | 1.3% | 1.8% | 3.1% | 3.5% | 6.8% | 1.4% | 3.1% | 5.3% |
| Non-Formulary by Psychiatrists | 4.5% | 1.5% | 0.0% | - | 1.2% | 5.8% | - | 4.3% | 1.8% | 15.6% | 3.3% | 5.9% | 3.9% | 3.0% | 1.8% | 0.0% | 5.9% | 1.3% | 4.2% | 0.0% | - | 2.2% | 2.1% |
| Central Fill Prescriptions | 43% | 64% | 52% | 58% | 41% | 51% | 52% | 53% | 23% | 77% | 41% | 53% | 43% | 13% | 53% | 69% | 81% | 26% | 73% | 58% | 71% | 62% | 36% |
| **Availability of Health Information** | **SW** | **ASP** | **CAC** | **CAL** | **CCC** | **CCI** | **CCWF** | **CEN** | **CHCF** | **CIM** | **CIW** | **CMC** | **CMF** | **COR** | **CRC** | **CTF** | **CVSP** | **DVI** | **FSP** | **HDSP** | **ISP** | **KVSP** | **LAC** |
| All Documents | 75% | 80% | 100% | 79% | 99% | 100% | 100% | 92% | 66% | 83% | 100% | 97% | 74% | 74% | 100% | 100% | 97% | 77% | 99% | 94% | 87% | 69% | 84% |
|    Medical Documents | 76% | 84% | - | 89% | - | - | - | 90% | 78% | 82% | - | - | 84% | 75% | - | - | - | 84% | - | - | 91% | 78% | 75% |
|    Dental Documents | 92% | 84% | 100% | 97% | 99% | 100% | 98% | 81% | 87% | 100% | 97% | 100% | 76% | 97% | 100% | 97% | 98% | 98% | 99% | 94% | 95% | 75% | 88% |
|    Mental Health Documents | 64% | 88% | - | 94% | - | - | - | 93% | 41% | 85% | - | - | 72% | 67% | - | - | 72% | - | - | - | 78% | 48% | 82% |
|    CDCR Inpatient Documents | 71% | 67% | - | 33% | - | - | - | 91% | 63% | 86% | - | - | 81% | 75% | - | - | 50% | - | - | - | 100% | 67% | 89% |
|    Other Documents | 71% | 78% | - | 81% | - | - | - | 88% | 65% | 78% | - | - | 57% | 58% | - | - | 82% | - | - | - | 73% | 78% | 77% |
| Specialty Notes | 85% | 91% | 95% | 94% | 93% | 77% | 92% | 97% | 87% | 92% | 89% | 92% | 77% | 94% | 92% | 92% | 98% | 72% | 97% | 90% | 97% | 87% | 86% |
| Community Hospital Records | 93% | 100% | 100% | 80% | 100% | 100% | 100% | 92% | 95% | 100% | 100% | 100% | 84% | 93% | 89% | 100% | 50% | 100% | 100% | 100% | 100% | 100% | 100% |
| Scanning Accuracy | 94% | 100% | - | 100% | - | 99% | 100% | 98% | - | 91% | - | 92% | 86% | 87% | - | - | 94% | 50% | 97% | 92% | 98% | 86% | 99% |
| EHRS Timely Documentation | 80% | - | 85% | - | 77% | 86% | 74% | - | - | - | 73% | 79% | - | - | 85% | 83% | 88% | - | 82% | 81% | - | - | - |
|    PCP Documentation | 96% | - | 94% | - | 91% | 95% | 98% | - | - | - | 90% | 99% | - | - | 97% | 96% | 99% | - | 98% | 98% | - | - | - |
|    PC RN Documentation | 87% | - | 96% | - | 86% | 84% | 88% | - | - | - | 87% | 89% | - | - | 86% | 84% | 97% | - | 87% | 82% | - | - | - |
|    LVN Documentation | 63% | - | 75% | - | 50% | 79% | 24% | - | - | - | 42% | 51% | - | - | 79% | 67% | 58% | - | 90% | 78% | - | - | - |
|    MH PC Documentation | 82% | - | 93% | - | 98% | 95% | 66% | - | - | - | 85% | 80% | - | - | 94% | 85% | 92% | - | 95% | 89% | - | - | - |
|    MH Psy Documentation | 94% | - | 100% | - | - | 97% | 97% | - | - | - | 85% | 94% | - | - | 98% | 99% | 100% | - | 96% | 85% | - | - | - |
| **Appeal Processing** | **SW** | **ASP** | **CAC** | **CAL** | **CCC** | **CCI** | **CCWF** | **CEN** | **CHCF** | **CIM** | **CIW** | **CMC** | **CMF** | **COR** | **CRC** | **CTF** | **CVSP** | **DVI** | **FSP** | **HDSP** | **ISP** | **KVSP** | **LAC** |
| Timely Appeals | 97% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 89% | 100% | 100% | 100% | 100% | 99% | 100% | 100% | 100% | 100% | 100% | 96% | 100% | 100% | 100% |
| **Resource Management** | **SW** | **ASP** | **CAC** | **CAL** | **CCC** | **CCI** | **CCWF** | **CEN** | **CHCF** | **CIM** | **CIW** | **CMC** | **CMF** | **COR** | **CRC** | **CTF** | **CVSP** | **DVI** | **FSP** | **HDSP** | **ISP** | **KVSP** | **LAC** |
| Specialty Teleservices | 61% | 77% | 50% | 88% | 69% | 56% | 52% | 78% | 56% | 53% | 62% | 31% | 53% | 66% | 59% | 46% | 69% | 60% | 46% | 64% | 84% | 60% | 73% |
| Availability of Medical Equipment | 59% | 0% | 84% | - | 64% | 65% | 52% | - | - | 58% | 2% | - | - | - | 80% | 42% | 1% | - | 49% | 1% | - | - | - |
|    Same Day | 11% | 0% | 68% | - | 28% | 65% | 55% | - | - | 31% | 2% | - | - | - | 59% | 14% | 1% | - | 14% | 1% | - | - | - |
|    Expedited 5 Calendar Days | 57% | - | - | - | 100% | - | 100% | - | - | 33% | - | - | - | - | - | - | 0% | - | - | - | - | - | - |

\* Rate Per 1,000 Inmates

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
| --- | --- |

| Medication Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Non-Formulary by Medical Providers | 5.5% | 1.7% | 3.7% | 1.8% | 6.0% | 5.4% | 3.6% | 3.6% | 3.8% | 6.2% | 5.4% | 2.3% | 5.1% |
| Non-Formulary by Psychiatrists | 4.0% | 2.9% | 3.2% | 0.4% | 3.0% | 4.9% | 3.9% | 3.3% | 1.6% | 11.2% | 6.1% | 3.0% | 8.1% |
| Central Fill Prescriptions | 60% | 44% | 32% | 34% | 33% | 47% | 30% | 58% | 69% | 1% | 17% | 77% | 36% |
| **Availability of Health Information** | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| All Documents | 44% | 74% | 99% | 90% | 78% | 69% | 82% | 99% | 100% | 79% | 65% | 79% | 87% |
|    Medical Documents | 34% | 63% | - | 85% | 84% | 80% | 87% | - | - | 76% | 71% | 87% | 90% |
|    Dental Documents | 61% | 86% | 99% | 91% | 87% | 70% | 92% | 99% | 100% | 94% | 73% | 95% | 97% |
|    Mental Health Documents | 24% | 61% | - | 92% | 71% | 52% | 67% | - | - | 74% | 35% | 73% | 75% |
|    CDCR Inpatient Documents | 66% | 90% | - | 93% | 74% | 82% | 89% | - | - | 66% | 83% | 62% | 86% |
|    Other Documents | 37% | 69% | - | 87% | 75% | 61% | 75% | - | - | 84% | 65% | 80% | 89% |
| Specialty Notes | 72% | 90% | 98% | 90% | 73% | 77% | 91% | 97% | 91% | 64% | 62% | 94% | 89% |
| Community Hospital Records | 83% | 97% | 100% | 67% | 82% | 94% | 90% | 100% | 100% | 71% | 64% | 100% | 93% |
| Scanning Accuracy | 83% | 99% | 96% | 99% | 99% | 93% | 99% | 90% | - | 99% | 99% | 100% | 99% |
| EHRS Timely Documentation | - | - | 85% | - | - | - | - | 81% | 80% | - | - | - | - |
|    PCP Documentation | - | - | 99% | - | - | - | - | 98% | 99% | - | - | - | - |
|    PC RN Documentation | - | - | 80% | - | - | - | - | 83% | 94% | - | - | - | - |
|    LVN Documentation | - | - | 64% | - | - | - | - | 60% | 50% | - | - | - | - |
|    MH PC Documentation | - | - | 91% | - | - | - | - | 94% | 85% | - | - | - | - |
|    MH Psy Documentation | - | - | 96% | - | - | - | - | 93% | 98% | - | - | - | - |
| **Appeal Processing** | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| Timely Appeals | 100% | 100% | 100% | 100% | 100% | 81% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Resource Management** | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| Specialty Teleservices | 60% | 56% | 63% | 38% | 83% | 45% | 75% | 53% | 55% | 38% | 44% | 57% | 59% |
| Availability of Medical Equipment | - | - | 68% | - | - | - | - | 72% | 69% | - | - | - | - |
|    Same Day | - | - | 5% | - | - | - | - | 44% | 6% | - | - | - | - |
|    Expedited 5 Calendar Days | - | - | - | - | - | - | - | 100% | - | - | - | - | - |

* Rate Per 1,000 Inmates



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
|---|---|

| Resource Management | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High Priority 14 Calendar Days | 83% | - | - | - | - | - | - | - | - | - | 67% | - | - | - | - | - | - | - | 100% | - | - | - | - |
| Routine 90 Calendar Days | 86% | - | 100% | - | - | - | 0% | - | - | - | 100% | - | - | - | 100% | 69% | - | - | 83% | - | - | - | - |
| Health Care Environment | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

| Complete Care Model Infrastructure | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| QM Program | | | | | | | | | | | | | | | | | | | | | | | |
| Patient Safety Program | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Complete Care Model | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|   Care Teams | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     RN, PCP, OT Position Filled | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     RN, PCP Same Patient Panel | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     RN, PCP, OT Back-Up in Place | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Total Hours Overlap: PCP, RN, Custody | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Team Co-Located | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     AHR Used | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     All Huddle Topics Covered | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Action Items Covered | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Huddle Attendance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|   Population Health | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Performance Trends Reviewed | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Patient-Level Data Reviewed | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     New/Transfer Patients Reviewed | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     # Actions Taken to Improve Care | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Actions Tracked | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     Population Management Working Sessions Completed | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|   Scheduling | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|     % of Hrs / Week for Open Access | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

\* Rate Per 1,000 Inmates



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
|---|---|

| Resource Management | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High Priority 14 Calendar Days | - | - | 100% | - | - | - | - | 100% | - | - | - | - | - |
| Routine 90 Calendar Days | - | - | 100% | - | - | - | - | - | 100% | - | - | - | - |
| Health Care Environment | - | - | - | - | - | - | - | - | - | - | - | - | - |

| Complete Care Model Infrastructure | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| QM Program | | | | | | | | | | | | | |
| Patient Safety Program | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Complete Care Model | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Care Teams | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RN, PCP, OT Position Filled | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RN, PCP Same Patient Panel | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RN, PCP, OT Back-Up in Place | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Hours Overlap: PCP, RN, Custody | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Team Co-Located | - | - | - | - | - | - | - | - | - | - | - | - | - |
| AHR Used | - | - | - | - | - | - | - | - | - | - | - | - | - |
| All Huddle Topics Covered | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Action Items Covered | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Huddle Attendance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Population Health | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Performance Trends Reviewed | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Patient-Level Data Reviewed | - | - | - | - | - | - | - | - | - | - | - | - | - |
| New/Transfer Patients Reviewed | - | - | - | - | - | - | - | - | - | - | - | - | - |
| # Actions Taken to Improve Care | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Actions Tracked | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Population Management Working Sessions Completed | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Scheduling | - | - | - | - | - | - | - | - | - | - | - | - | - |
| % of Hrs / Week for Open Access | - | - | - | - | - | - | - | - | - | - | - | - | - |

*\* Rate Per 1,000 Inmates*

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

| Main Menu | Return to Top |
|---|---|

| Complete Care Model Infrastructure | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Designated Time Slot: Open Access | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Appt Times: Varied by Patient Needs | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Patient's Preference Considered | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 0% Show Process: Custody Escorted | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PCP Closes Out Appts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ensure Patients are Seen During Lockdown | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CEO Approval for Changes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Designated Scheduling Supervisor | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Superusers Have Access to Make Changes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Review Management Reports | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee Oversight | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Review Scheduling Diagnostic Report | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ensure Accuracy of Scheduling System Data | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Schedulers Provided Desk Procedure | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contains Written Process for Making Changes in MedSATS | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Care Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

| Staffing | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operational Vacancies | 8% | 7% | 5% | 10% | 14% | 10% | 11% | 9% | 9% | 6% | 8% | 6% | 6% | 7% | 8% | 9% | 13% | 8% | 9% | 8% | 12% | 10% | 9% |
| Actual | 6% | 5% | 5% | 6% | 10% | 7% | 7% | 7% | 6% | 4% | 5% | 4% | 4% | 5% | 6% | 6% | 10% | 5% | 7% | 6% | 9% | 6% | 6% |
| Medical Vacancies | 6% | 3% | 5% | 7% | 10% | 6% | 7% | 8% | - | 3% | 3% | 5% | 5% | 5% | 5% | 5% | 11% | 6% | 6% | 6% | 8% | 6% | 6% |
| Admin Support | 7% | 3% | 6% | 6% | 15% | 10% | 7% | 7% | - | 2% | 1% | 6% | 6% | 5% | 7% | 3% | 11% | 14% | 11% | 5% | 7% | 8% | 0% |
| Administration | 23% | 25% | 25% | 40% | 25% | 50% | 0% | 50% | - | 25% | 0% | 0% | 33% | 60% | 25% | 25% | 100% | 50% | 20% | 50% | 20% | 0% | 0% |
| Allied Health | 15% | 0% | 67% | 38% | 38% | 15% | 20% | 7% | - | 0% | 0% | 3% | 0% | 0% | 22% | 18% | 0% | 25% | 27% | 20% | 50% | 20% | 43% |
| Dental | | | | | | | | | | | | | | | | | | | | | | | |
| Dietary Services | 16% | - | - | - | - | 22% | 2% | - | - | 10% | 9% | 21% | 11% | 44% | - | - | - | - | - | 25% | - | 3% | 23% |
| HIM | 5% | 2% | 0% | 0% | 2% | 0% | 0% | 0% | - | 0% | 0% | 0% | 3% | 13% | 0% | 0% | 0% | 0% | 0% | 17% | 0% | 14% | 14% |

* Rate Per 1,000 Inmates

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

**Main Menu**   **Return to Top**

| Complete Care Model Infrastructure | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Designated Time Slot: Open Access | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Appt Times: Varied by Patient Needs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Patient's Preference Considered | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 0% Show Process: Custody Escorted | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PCP Closes Out Appts | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ensure Patients are Seen During Lockdown | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CEO Approval for Changes | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Designated Scheduling Supervisor | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Superusers Have Access to Make Changes | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Review Management Reports | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee Oversight | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Review Scheduling Diagnostic Report | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ensure Accuracy of Scheduling System Data | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Schedulers Provided Desk Procedure | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contains Written Process for Making Changes in MedSATS | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Care Management | - | - | - | - | - | - | - | - | - | - | - | - | - |

| Staffing | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operational Vacancies | 6% | 8% | 13% | 10% | 6% | 4% | 4% | 8% | 9% | 4% | 10% | 12% | 11% |
| Actual | 4% | 5% | 9% | 7% | 4% | 3% | 3% | 7% | 7% | 4% | 6% | 8% | 7% |
| Medical Vacancies | 5% | 6% | 10% | 8% | 5% | 3% | 4% | 9% | 7% | 3% | 6% | 9% | 7% |
| Admin Support | 2% | 11% | 11% | 8% | 6% | 3% | 6% | 14% | 13% | 4% | 5% | 8% | 18% |
| Administration | 40% | 25% | 0% | 25% | 17% | 0% | 0% | 25% | 0% | 50% | 17% | 0% | 0% |
| Allied Health | 11% | 0% | 10% | 33% | 10% | 17% | 16% | 38% | 2% | 2% | 47% | 18% | 2% |
| Dental | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dietary Services | 44% | 32% | 1% | 25% | 1% | 6% | 23% | - | 0% | 5% | 0% | | 42% |
| HIM | 3% | 13% | 20% | 3% | 27% | 20% | 3% | 3% | 4% | 0% | 18% | 0% | 0% |

\* Rate Per 1,000 Inmates

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 3/20/2017 9:04:34 AM

# DASHBOARD STATEWIDE COMPARISON
## All Institutions



| Main Menu | | Return to Top |
|---|---|---|

| Staffing | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Janitorial | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | 0% | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical | 7% | 7% | 5% | 2% | 21% | 9% | 19% | 18% | - | 3% | 13% | 12% | 6% | 14% | -1% | 1% | 6% | 0% | -1% | 12% | 17% | 2% | 1% |
| Mental Health | 0% | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Nursing | 4% | 3% | 2% | 5% | 7% | 4% | 5% | 6% | - | 3% | 3% | 4% | 4% | 3% | 3% | 5% | 7% | 2% | 3% | 3% | 5% | 6% | 6% |
| Pharmacy | 5% | 0% | 0% | 0% | 0% | 1% | 7% | 11% | - | 0% | 10% | 6% | 4% | 1% | 0% | 7% | 25% | 0% | 0% | 0% | 11% | 0% | 0% |
| Mental Health Vacancies | 5% | 16% | 0% | 2% | 13% | 13% | 5% | 0% | 5% | 6% | 10% | 2% | 3% | 4% | 10% | 7% | 15% | 7% | 19% | 9% | 30% | 7% | 4% |
| Admin Support | 10% | 21% | - | 0% | 8% | 30% | 7% | 0% | 6% | 25% | 28% | 3% | 7% | 6% | 32% | 2% | 0% | 14% | 46% | 10% | 33% | 14% | 10% |
| Administration | 167% | - | - | - | - | - | - | - | - | - | 100% | - | - | - | - | - | - | - | - | - | - | - | - |
| Allied Health | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dietary Services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| HIM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Janitorial | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mental Health | 4% | 15% | 0% | 3% | 17% | 8% | 5% | 0% | 5% | 1% | 5% | 1% | 2% | 3% | 3% | 9% | 25% | 5% | 10% | 9% | 29% | 5% | 3% |
| Nursing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pharmacy | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental Vacancies | 5% | 2% | 0% | 4% | 4% | 6% | 15% | 2% | 14% | 6% | 15% | 5% | 5% | 7% | 7% | 9% | 0% | 0% | 8% | 4% | 7% | 3% | 6% |
| Admin Support | 6% | 4% | 0% | 2% | 0% | 14% | 0% | 13% | 8% | 13% | 20% | 8% | 20% | 2% | 0% | 3% | 0% | 0% | 10% | 2% | 0% | 0% | 13% |
| Administration | 7% | 0% | 0% | 0% | 0% | 0% | 50% | 0% | 0% | 0% | 0% | 33% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 0% | 50% |
| Allied Health | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental | 4% | 2% | 0% | 5% | 5% | 4% | 16% | -2% | 18% | 4% | 15% | 0% | 1% | 9% | 10% | 11% | 0% | 0% | 9% | 5% | 5% | 4% | 0% |
| Dietary Services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| HIM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Janitorial | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

* Rate Per 1,000 Inmates

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
All Institutions

| Main Menu | Return to Top |
|---|---|

| Staffing | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Janitorial | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | - | - | - | - | - | - | - | - | - | 0% | - | - | - |
| Medical | 5% | -4% | 22% | 14% | 7% | 3% | 4% | 15% | 9% | 1% | 5% | 11% | 0% |
| Mental Health | - | - | - | - | - | - | - | - | 0% | - | - | - | - |
| Nursing | 4% | 4% | 11% | 4% | 3% | 2% | 2% | 5% | 7% | 2% | 4% | 9% | 5% |
| Pharmacy | 4% | 0% | 0% | 15% | 11% | 10% | 17% | 0% | 0% | 1% | 13% | 8% | 13% |
| Mental Health Vacancies | 5% | 6% | 6% | 8% | 3% | 3% | 2% | 7% | 8% | 5% | 6% | 5% | 4% |
| Admin Support | 2% | 7% | 13% | 10% | 2% | 6% | 1% | 17% | 11% | 14% | 8% | 6% | 8% |
| Administration | - | - | - | - | - | - | - | - | - | 500% | - | - | - |
| Allied Health | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dietary Services | - | - | - | - | - | - | - | - | - | - | - | - | - |
| HIM | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Janitorial | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mental Health | 5% | 5% | 4% | 8% | 3% | 3% | 2% | 4% | 7% | 3% | 5% | 5% | 3% |
| Nursing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pharmacy | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental Vacancies | 1% | 2% | 1% | -1% | -1% | 0% | 0% | 1% | 5% | 0% | 10% | 12% | 11% |
| Admin Support | 3% | 1% | 2% | 0% | 0% | 0% | 1% | 7% | 7% | 5% | 31% | 20% | 0% |
| Administration | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 50% | 0% | 0% | 0% | 0% |
| Allied Health | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dental | 0% | 2% | 1% | -1% | -1% | 0% | 0% | 0% | -1% | -2% | 5% | 10% | 15% |
| Dietary Services | - | - | - | - | - | - | - | - | - | - | - | - | - |
| HIM | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Janitorial | - | - | - | - | - | - | - | - | - | - | - | - | - |

* Rate Per 1,000 Inmates

*Please direct questions or feedback to* QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
All Institutions

| Main Menu | Return to Top |
| --- | --- |

| Staffing | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mental Health | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Nursing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pharmacy | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Functional | 2% | 2% | 0% | 4% | 4% | 3% | 4% | 3% | 3% | 2% | 3% | 2% | 2% | 2% | 2% | 2% | 3% | 3% | 2% | 2% | 3% | 4% | 3% |
| Average Time to Hire | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| VPOS and Cert Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Application Screening Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interview Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Candidate Selection Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tentative Offer Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Employment and Credentialing Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RPA Package Process Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Formal Offer Process Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| FTE Usage | | | | | | | | | | | | | | | | | | | | | | | |

| Major Costs per Inmate per Month | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Total Labor Cost | $1,746 | $666 | $712 | $517 | $463 | $934 | $1,325 | $564 | $4,752 | $1,408 | $2,591 | $1,459 | $2,616 | $1,738 | $795 | $640 | $659 | $1,056 | $743 | $672 | $529 | $817 | $1,219 |
| Medical Staff | $94 | $69 | $84 | $59 | $49 | $86 | $117 | $43 | $432 | $171 | $182 | $110 | $191 | $83 | $80 | $73 | $76 | $106 | $83 | $55 | $53 | $69 | $92 |
| Nursing Staff | $529 | $254 | $347 | $235 | $233 | $467 | $592 | $268 | $3,152 | $612 | $1,446 | $609 | $1,374 | $1,015 | $306 | $275 | $322 | $483 | $326 | $337 | $247 | $393 | $489 |
| Pharmacy Staff | $44 | $35 | $34 | $10 | $11 | $43 | $75 | $17 | $119 | $59 | $88 | $57 | $89 | $52 | $30 | $36 | $12 | $39 | $40 | $19 | $12 | $27 | $38 |
| Dental Clinical Staff | $78 | $97 | $79 | $76 | $66 | $89 | $85 | $78 | $68 | $90 | $84 | $87 | $73 | $87 | $82 | $68 | $86 | $86 | $103 | $72 | $71 | $66 | $82 |
| Mental Health Clinical Staff | $212 | $79 | $11 | $29 | $17 | $110 | $286 | $32 | $549 | $282 | $505 | $427 | $565 | $320 | $151 | $86 | $38 | $184 | $72 | $70 | $17 | $113 | $332 |
| Administration Staff | $34 | $21 | $64 | $29 | $29 | $30 | $39 | $24 | $83 | $33 | $38 | $32 | $46 | $24 | $43 | $23 | $18 | $44 | $29 | $44 | $36 | $39 |
| Administrative Support Staff | $90 | $94 | $80 | $65 | $44 | $78 | $101 | $74 | $217 | $103 | $185 | $100 | $174 | $124 | $80 | $59 | $82 | $108 | $67 | $72 | $70 | $86 | $117 |
| Allied Health Staff | $10 | $7 | $4 | $5 | $5 | $12 | $9 | $10 | $37 | $16 | $20 | $10 | $14 | $10 | $9 | $7 | $10 | $10 | $6 | $8 | $5 | $8 | $11 |
| Dietary Services Staff | $7 | - | - | - | $8 | $12 | $28 | $9 | $69 | $9 | - | - | - | - | - | - | - | - | $5 | - | $7 | $7 |

\* Rate Per 1,000 Inmates

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
All Institutions

| Main Menu | Return to Top |

| Staffing | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mental Health | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Nursing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pharmacy | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Functional | 2% | 3% | 4% | 3% | 2% | 1% | 1% | 1% | 3% | 1% | 4% | 4% | 4% |
| Average Time to Hire | | | | | | | | | | | | | |
| VPOS and Cert Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Application Screening Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interview Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Candidate Selection Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tentative Offer Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Employment and Credentialing Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RPA Package Process Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Formal Offer Process Time in Days | - | - | - | - | - | - | - | - | - | - | - | - | - |
| FTE Usage | | | | | | | | | | | | | |

| Major Costs per Inmate per Month | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Labor Cost | $1,413 | $914 | $1,088 | $739 | $2,026 | $2,380 | $836 | $509 | $786 | $1,445 | $1,218 | $865 | $786 |
| Medical Staff | $115 | $75 | $56 | $70 | $180 | $88 | $62 | $50 | $94 | $109 | $74 | $77 | $73 |
| Nursing Staff | $562 | $436 | $516 | $306 | $906 | $1,072 | $401 | $218 | $327 | $512 | $621 | $380 | $380 |
| Pharmacy Staff | $54 | $33 | $23 | $25 | $81 | $65 | $39 | $13 | $48 | $33 | $64 | $39 | $22 |
| Dental Clinical Staff | $108 | $83 | $90 | $76 | $92 | $83 | $69 | $70 | $67 | $61 | $77 | $65 | $74 |
| Mental Health Clinical Staff | $392 | $167 | $183 | $112 | $557 | $808 | $147 | $67 | $132 | $587 | $230 | $167 | $127 |
| Administration Staff | $27 | $24 | $58 | $43 | $37 | $70 | $22 | $35 | $31 | $27 | $31 | $35 | $22 |
| Administrative Support Staff | $122 | $69 | $119 | $80 | $132 | $150 | $78 | $42 | $59 | $80 | $93 | $83 | $59 |
| Allied Health Staff | $11 | $11 | $10 | $10 | $13 | $12 | $6 | $4 | $11 | $11 | $7 | $9 | $11 |
| Dietary Services Staff | $9 | $7 | $20 | $2 | $13 | $17 | $2 | - | $6 | $6 | $8 | - | $5 |

\* Rate Per 1,000 Inmates

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

Main Menu | Return to top

| Major Costs per Inmate per Month | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HIM Staff | $13 | $12 | $9 | $10 | $8 | $15 | $12 | $9 | $68 | $14 | $14 | $15 | $21 | $14 | $13 | $12 | $11 | $13 | $9 | $6 | $10 | $13 | $12 |
| Janitorial Staff | $0 | - | - | - | - | - | - | - | $15 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance Staff | $0 | - | - | - | - | $3 | - | - | - | - | - | $3 | - | - | - | - | $4 | - | - | - | - | - | $0 |
| Total Non Labor Cost | $62 | $24 | $9 | $18 | $21 | $31 | $48 | $29 | $387 | $133 | $84 | $78 | $204 | $54 | $28 | $41 | $18 | $79 | $27 | $26 | $22 | $39 | $90 |
| Hospital | $109 | $37 | $8 | $36 | $33 | $67 | $67 | $33 | $1,082 | $166 | $158 | $59 | $376 | $52 | $46 | $57 | $24 | $188 | $52 | $34 | $34 | $58 | $102 |
| Emergency Department | $11 | $11 | $2 | $7 | $8 | $13 | $10 | $5 | $24 | $7 | $13 | $9 | $11 | $46 | $6 | $4 | $4 | $6 | $5 | $15 | $5 | $23 | $16 |
| Specialty | $30 | $18 | $20 | $19 | $13 | $20 | $34 | $20 | $115 | $36 | $33 | $40 | $70 | $31 | $16 | $22 | $17 | $23 | $15 | $15 | $20 | $25 | $42 |
| Medications | $138 | $42 | $2 | $15 | $40 | $45 | $93 | $78 | $650 | $410 | $193 | $263 | $528 | $126 | $62 | $109 | $34 | $147 | $51 | $53 | $45 | $77 | $264 |
| Diagnostics | $20 | $11 | $14 | $12 | $9 | $10 | $36 | $9 | $63 | $44 | $23 | $17 | $36 | $17 | $9 | $11 | $10 | $32 | $9 | $11 | $7 | $10 | $25 |

| Workload Per Day | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Appointments per PCP | 9.6 | 13.2 | 11.9 | 11.2 | 10.9 | 6.9 | 10.0 | 9.0 | 7.6 | 8.2 | 3.2 | 4.1 | 11.0 | 11.0 | 7.6 | 7.6 | 4.3 | 8.8 | 5.3 | 3.2 | 7.2 | 11.1 | 13.6 |
| Appointments per PCRN | 6.6 | 9.2 | 5.7 | 5.6 | 5.3 | 4.7 | 12.5 | 6.6 | 3.4 | 5.8 | 9.5 | 5.0 | 9.2 | 8.0 | 3.8 | 7.0 | 4.0 | 8.7 | 5.2 | 5.0 | 6.0 | 6.3 | 9.5 |
| Encounters per Primary MH Clinician | 5.4 | 3.9 | 1.2 | 4.0 | 2.3 | 4.0 | 4.6 | 4.1 | 6.8 | 3.2 | 2.0 | 4.0 | 6.3 | 6.4 | 2.9 | 3.6 | 2.7 | 8.4 | 4.7 | 3.7 | 2.0 | 6.1 | 6.5 |
| Encounters per Psychiatrist | 6.2 | 14.0 | 1.0 | 2.8 | - | 5.9 | 5.0 | 5.1 | 5.1 | 5.8 | 2.9 | 2.5 | 6.7 | 9.3 | 4.2 | 4.9 | 1.7 | 10.8 | 3.6 | 2.7 | 2.5 | 9.6 | 8.4 |

| Other Trends | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hospital Admissions* | 5.6 | 3.0 | 3.7 | 1.8 | 1.4 | 3.2 | 5.4 | 3.6 | 17.6 | 11.3 | 6.6 | 5.6 | 15.3 | 14.9 | 2.9 | 6.0 | 3.1 | 3.1 | 3.1 | 2.7 | 4.2 | 6.1 | 9.0 |
| Emergency Department Visits* | 7 | 4 | 3 | 7 | 2 | 7 | 10 | 3 | 16 | 4 | 11 | 8 | 9 | 20 | 6 | 2 | 1 | 8 | 3 | 4 | 5 | 16 | 14 |
| Specialty Care Referrals* | 60 | 35 | 33 | 51 | 27 | 22 | 70 | 29 | 206 | 83 | 73 | 49 | 145 | 57 | 58 | 45 | 40 | 38 | 46 | 26 | 34 | 44 | 113 |
| Prescriptions Per Inmate | 2.7 | 1.5 | 1.7 | 1.1 | 0.5 | 2.1 | 2.8 | 1.3 | 9.5 | 4.4 | 4.1 | 3.2 | 7.4 | 2.7 | 1.7 | 2.9 | 1.4 | 2.0 | 2.1 | 1.4 | 1.2 | 1.8 | 4.1 |
| Diagnostics Per Inmate | 0.9 | 0.5 | 0.7 | 0.6 | 0.5 | 0.6 | 1.4 | 0.3 | 3.2 | 2.0 | 1.1 | 0.9 | 1.8 | 0.8 | 0.5 | 0.6 | 0.5 | 1.6 | 0.5 | 0.5 | 0.3 | 0.5 | 1.1 |
| Appeals Received* | 30 | 9 | 9 | 6 | 3 | 29 | 30 | 7 | 139 | 22 | 22 | 21 | 54 | 44 | 14 | 31 | 12 | 42 | 15 | 24 | 9 | 39 | 48 |
| Prison Population Capacity | 131% | 115% | - | 165% | 108% | 133% | 146% | 155% | 84% | 118% | 139% | 103% | 105% | 111% | 108% | 159% | 146% | 130% | 116% | 159% | 138% | 153% | 148% |

* Rate Per 1,000 Inmates



# DASHBOARD STATEWIDE COMPARISON
All Institutions

| Main Menu | Return to Top |
|---|---|

| Major Costs per Inmate per Month | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HIM Staff | $14 | $11 | $14 | $11 | $15 | $16 | $9 | $10 | $10 | $19 | $14 | $10 | $12 |
| Janitorial Staff | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance Staff | - | - | - | - | - | - | - | - | - | $2 | - | - | - |
| Total Non Labor Cost | $64 | $66 | $36 | $18 | $111 | $159 | $52 | $46 | $37 | $77 | $35 | $57 | $44 |
| Hospital | $205 | $34 | $12 | $21 | $334 | $212 | $70 | $36 | $106 | $123 | $95 | $52 | $72 |
| Emergency Department | $23 | $9 | $2 | $6 | $22 | $9 | $11 | $3 | $6 | $5 | $14 | $6 | $14 |
| Specialty | $57 | $21 | $4 | $14 | $87 | $33 | $30 | $13 | $30 | $43 | $41 | $25 | $23 |
| Medications | $5 | $219 | $155 | $43 | $74 | $520 | $135 | $169 | $30 | $184 | $4 | $192 | $66 |
| Diagnostics | $32 | $45 | $7 | $9 | $38 | $18 | $14 | $7 | $11 | $30 | $20 | $11 | $46 |

| Workload Per Day | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Appointments per PCP | 11.2 | 17.7 | 3.6 | 13.1 | 14.6 | 4.6 | 14.3 | 4.8 | 6.5 | 7.4 | 13.2 | 14.0 | 14.6 |
| Appointments per PCRN | 4.9 | 12.0 | 2.5 | 4.7 | 7.2 | 5.7 | 9.7 | 2.9 | 4.1 | 4.1 | 10.0 | 6.7 | 16.5 |
| Encounters per Primary MH Clinician | 7.3 | 7.2 | 2.9 | 4.4 | 5.5 | 5.1 | 6.6 | 3.2 | 3.2 | 5.4 | 7.2 | 6.0 | 8.1 |
| Encounters per Psychiatrist | 6.4 | 8.8 | 3.2 | 7.2 | 7.3 | 5.3 | 12.8 | 3.3 | 3.6 | 5.3 | 8.0 | 6.8 | 23.6 |

| Other Trends | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hospital Admissions* | 5.8 | 6.8 | 0.5 | 0.6 | 9.5 | 12.9 | 5.4 | 1.9 | 6.4 | 3.5 | 4.7 | 2.6 | 5.5 |
| Emergency Department Visits* | 18 | 7 | 0 | 4 | 17 | 8 | 5 | 3 | 6 | 4 | 15 | 10 | 6 |
| Specialty Care Referrals* | 148 | 55 | 22 | 31 | 161 | 68 | 56 | 17 | 56 | 80 | 86 | 26 | 36 |
| Prescriptions Per Inmate | 5.7 | 1.7 | 0.6 | 1.4 | 6.2 | 3.7 | 3.1 | 0.8 | 3.6 | 3.7 | 3.6 | 3.2 | 1.4 |
| Diagnostics Per Inmate | 1.2 | 2.5 | 0.2 | 0.4 | 1.6 | 0.8 | 0.6 | 0.4 | 0.4 | 1.4 | 0.7 | 0.5 | 2.1 |
| Appeals Received* | 86 | 15 | 32 | 9 | 54 | 116 | 20 | 8 | 20 | 18 | 65 | 34 | 15 |
| Prison Population Capacity | 109% | 164% | 89% | 138% | 109% | 122% | 161% | 108% | 160% | 127% | 139% | 174% | 167% |

*Rate Per 1,000 Inmates*

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
All Institutions

| Main Menu | Return to Top |
|---|---|

| Institution & Population Characteristics | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High Risk Priority 1 | 4.5% | 0.0% | 0.0% | 0.1% | 0.0% | 0.6% | 4.4% | 0.6% | 42.3% | 13.3% | 7.5% | 5.0% | 20.7% | 2.4% | 0.4% | 1.9% | 0.2% | 1.1% | 2.3% | 0.7% | 0.4% | 0.9% | 6.8% |
| High Risk Priority 2 | 8.0% | 0.4% | 0.5% | 0.6% | 0.4% | 2.4% | 7.8% | 1.0% | 21.0% | 31.0% | 14.1% | 12.2% | 28.4% | 5.5% | 1.7% | 4.8% | 1.9% | 4.4% | 7.0% | 1.7% | 1.4% | 3.7% | 15.8% |
| Medium Risk | 37% | 42% | 16% | 14% | 8% | 56% | 50% | 17% | 28% | 29% | 40% | 40% | 40% | 52% | 49% | 44% | 17% | 35% | 36% | 42% | 15% | 44% | 47% |
| Low Risk | 50% | 58% | 84% | 85% | 91% | 41% | 38% | 81% | 9% | 26% | 39% | 43% | 11% | 40% | 49% | 49% | 81% | 60% | 54% | 56% | 83% | 52% | 30% |
| Mental Health EOP | 6.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 4.7% | 0.0% | 24.1% | 1.0% | 4.7% | 13.3% | 22.4% | 11.9% | 0.0% | 0.1% | 0.0% | 1.2% | 0.2% | 0.3% | 0.1% | 6.0% | 17.8% |
| Patients with Disability (ADA) | 7.8% | 2.5% | 1.2% | 1.1% | 0.5% | 2.4% | 7.8% | 2.5% | 41.2% | 13.9% | 8.2% | 7.4% | 38.6% | 5.3% | 2.1% | 7.5% | 2.6% | 7.3% | 3.4% | 3.8% | 1.6% | 3.4% | 10.1% |
| Inmates 50 Years or Older | 24% | 24% | 17% | 7% | 7% | 20% | 18% | 10% | 53% | 49% | 23% | 36% | 45% | 17% | 16% | 41% | 25% | 20% | 32% | 10% | 12% | 10% | 27% |
| Men and Women Institutions | - | M | M | M | M | M | W | M | M | M | W | M | M | M | M | M | M | M | M/W | M | M | M | M |
| Specialized Health Care Beds | 2,866 | 28 | - | 18 | 19 | 16 | 38 | 13 | 1,867 | 78 | 25 | 87 | 169 | 88 | 10 | 17 | - | 24 | - | 30 | 14 | 22 | 16 |
| Institution Population | 120,543 | 3,362 | 2,159 | 3,850 | 4,204 | 3,733 | 2,968 | 3,609 | 2,501 | 3,627 | 1,968 | 3,963 | 2,486 | 3,501 | 2,716 | 5,296 | 2,551 | 2,240 | 2,876 | 3,695 | 3,063 | 3,758 | 3,453 |

*\* Rate Per 1,000 Inmates*

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 3/20/2017 9:04:34 AM



# DASHBOARD STATEWIDE COMPARISON
All Institutions

| Main Menu | Return to Top |
|---|---|

| Institution & Population Characteristics | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High Risk Priority 1 | 13.4% | 1.0% | 0.2% | 0.0% | 17.1% | 6.4% | 2.4% | 0.4% | 9.1% | 5.5% | 4.0% | 2.0% | 1.2% |
| High Risk Priority 2 | 28.8% | 3.2% | 1.5% | 0.3% | 22.1% | 16.9% | 5.8% | 1.2% | 14.0% | 12.3% | 8.1% | 6.2% | 3.1% |
| Medium Risk | 43% | 37% | 20% | 39% | 48% | 51% | 54% | 20% | 38% | 35% | 52% | 59% | 36% |
| Low Risk | 15% | 59% | 79% | 61% | 13% | 26% | 38% | 78% | 39% | 47% | 36% | 32% | 60% |
| Mental Health EOP | 23.8% | 1.6% | 0.7% | 0.0% | 24.3% | 39.4% | 7.6% | 0.1% | 1.6% | 1.6% | 18.7% | 12.2% | 1.9% |
| Patients with Disability (ADA) | 14.9% | 2.9% | 0.9% | 3.0% | 26.3% | 5.8% | 13.3% | 1.3% | 10.0% | 7.1% | 10.3% | 11.9% | 3.8% |
| Inmates 50 Years or Older | 42% | 13% | 6% | 13% | 40% | 19% | 26% | 11% | 38% | 42% | 18% | 34% | 12% |
| Men and Women Institutions | M | M | M | M | M | M | M | M | M | M | M | M | M |
| Specialized Health Care Beds | 10 | 16 | 19 | 14 | 28 | 66 | 38 | 10 | 15 | 10 | 22 | 23 | 16 |
| Institution Population | 3,603 | 4,533 | 2,116 | 3,204 | 3,271 | 2,252 | 5,516 | 4,265 | 4,227 | 3,991 | 3,435 | 3,466 | 5,085 |

*Rate Per 1,000 Inmates*

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 3/20/2017 9:04:34 AM

# HEALTHCARE SERVICES DASHBOARD
## WSP
*January 2017*



Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 96% | 83% |
| Dental Services | | 96% | 95% |
| Mental Health Services | | 89% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.2% | 0.9% |
| Seen as Scheduled | | 96% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 87% | 81% |
| End Stage Liver Disease Care | | 100% | 84% |
| Colon Cancer Screening | | 80% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 74% | 91% |
| Utilization Specialty Services | | 83% | 89% |
| Polypharmacy Medication Review | | 96% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 92% | 91% |
| 30-Day Community Hospital Readmission | | 14.8% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 0% | 18% |
| Potentially Avoidable Hospitalizations* | | 9.1 | 1.8 |
| EOP/MHCB Treatment Plan | | 76% | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | 56% | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - MAPIP** | | | |
| Medication Continuity-Transfer | | 81% | 80% |
| Medication Non-Adherence Counseling | | 97% | 88% |
| Medication Administration | | 95% | 96% |
| **EHRS INSTITUTIONS - Med Administration** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 8.1% | 4.5% |
| Non-Formulary by Medical Providers | | 5.1% | 4.5% |
| Central Fill Prescriptions | | 36% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| All Documents | | 87% | 75% |
| Specialty Notes | | 89% | 85% |
| Community Hospital Records | | 93% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 59% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 14.6 | 9.6 |
| Appointments per PCRN | | 16.5 | 6.6 |
| Encounters per Primary MH Clinician | | 8.1 | 5.4 |
| Encounters per Psychiatrist | | 23.6 | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 96% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $786 | $732 | $1,746 |
| Total Non Labor Cost | $44 | $42 | $62 |

## OTHER TRENDS

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 5.5 | 5.6 |
| Emergency Department Visits* | | 6 | 7 |
| Specialty Care Referrals* | | 36 | 60 |
| Prescriptions Per Inmate | | 1.4 | 2.7 |
| Diagnostics Per Inmate | | 2.1 | 0.9 |
| Appeals Received* | | 15 | 30 |
| Prison Population Capacity | | 167% | 131% |

## STAFFING

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 11% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## APPEAL PROCESSING

| | 6 Mo. Trend | WSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:44:25 PM

# HEALTHCARE SERVICES DASHBOARD

VSP

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 94% | 83% |
| Dental Services | | 99% | 95% |
| Mental Health Services | | 92% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.2% | 0.9% |
| Seen as Scheduled | | 93% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 99% | 80% |
| Medication Non-Adherence Counseling | | 83% | 88% |
| Medication Administration | | 100% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.0% | 4.5% |
| Non-Formulary by Medical Providers | | 2.3% | 4.5% |
| Central Fill Prescriptions | | 77% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 89% | 88% |
| Mental Health Primary Clinician | | 86% | 82% |
| Psychiatrist | | 84% | 86% |

## STAFFING

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 12% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 90% | 81% |
| End Stage Liver Disease Care | | 84% | 84% |
| Colon Cancer Screening | | 87% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 99% | 91% |
| Utilization Specialty Services | | 90% | 89% |
| Polypharmacy Medication Review | | 97% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| All Documents | | 79% | 75% |
| Specialty Notes | | 94% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 100% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $865 | $868 | $1,746 |
| Total Non Labor Cost | $57 | $45 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 96% | 91% |
| 30-Day Community Hospital Readmission | | 9.2% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 0% | 18% |
| Potentially Avoidable Hospitalizations* | | 3.5 | 1.8 |
| EOP/MHCB Treatment Plan | | 62% | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | 96% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 57% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 14.0 | 9.6 |
| Appointments per PCRN | | 6.7 | 6.6 |
| Encounters per Primary MH Clinician | | 6.0 | 5.4 |
| Encounters per Psychiatrist | | 6.8 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | VSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 2.6 | 5.6 |
| Emergency Department Visits* | | 10 | 7 |
| Specialty Care Referrals* | | 26 | 60 |
| Prescriptions Per Inmate | | 3.2 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 34 | 30 |
| Prison Population Capacity | | 174% | 131% |

* Rate Per 1,000 Inmates

** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:44:08 PM

# HEALTHCARE SERVICES DASHBOARD

SVSP

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 73% | 83% |
| Dental Services | | 94% | 95% |
| Mental Health Services | | 72% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.8% | 0.9% |
| Seen as Scheduled | | 84% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 68% | 80% |
| Medication Non-Adherence Counseling | | 47% | 88% |
| Medication Administration | | 93% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 6.1% | 4.5% |
| Non-Formulary by Medical Providers | | 5.4% | 4.5% |
| Central Fill Prescriptions | | 17% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 82% | 88% |
| Mental Health Primary Clinician | | 84% | 82% |
| Psychiatrist | | 89% | 86% |

## STAFFING

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 10% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Asthma Care | | 92% | 85% |
| Therapeutic Anticoagulation | | 79% | 79% |
| Diabetes Care | | 84% | 81% |
| End Stage Liver Disease Care | | 78% | 84% |
| Colon Cancer Screening | | 66% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 84% | 91% |
| Utilization Specialty Services | | 89% | 89% |
| Polypharmacy Medication Review | | 96% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| All Documents | | 65% | 75% |
| Specialty Notes | | 62% | 85% |
| Community Hospital Records | | 64% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,218 | $1,230 | $1,746 |
| Total Non Labor Cost | $35 | $70 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 89% | 91% |
| 30-Day Community Hospital Readmission | | 6.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 4% | 18% |
| Potentially Avoidable Hospitalizations* | | 14.4 | 1.8 |
| EOP/MHCB Treatment Plan | | 40% | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | 80% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 44% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 13.2 | 9.6 |
| Appointments per PCRN | | 10.0 | 6.6 |
| Encounters per Primary MH Clinician | | 7.2 | 5.4 |
| Encounters per Psychiatrist | | 8.0 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | SVSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 4.7 | 5.6 |
| Emergency Department Visits* | | 15 | 7 |
| Specialty Care Referrals* | | 86 | 60 |
| Prescriptions Per Inmate | | 3.6 | 2.7 |
| Diagnostics Per Inmate | | 0.7 | 0.9 |
| Appeals Received* | | 65 | 30 |
| Prison Population Capacity | | 139% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:43:37 PM

# HEALTHCARE SERVICES DASHBOARD

## SQ

*January 2017*



**Main Menu**

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 90% | 83% |
| Dental Services | | 97% | 95% |
| Mental Health Services | | 89% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.8% | 0.9% |
| Seen as Scheduled | | 91% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 97% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 11.2% | 4.5% |
| Non-Formulary by Medical Providers | | 6.2% | 4.5% |
| Central Fill Prescriptions | | 1% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 95% | 88% |
| Mental Health Primary Clinician | | 86% | 82% |
| Psychiatrist | | 96% | 86% |

## STAFFING

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Operational Vacancies | | 4% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Asthma Care | | 92% | 85% |
| Therapeutic Anticoagulation | | 64% | 79% |
| Diabetes Care | | 84% | 81% |
| End Stage Liver Disease Care | | 84% | 84% |
| Colon Cancer Screening | | 91% | 79% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 99% | 91% |
| Utilization Specialty Services | | 95% | 89% |
| Polypharmacy Medication Review | | 94% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| All Documents | | 79% | 75% |
| Specialty Notes | | 64% | 85% |
| Community Hospital Records | | 71% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,445 | $1,505 | $1,746 |
| Total Non Labor Cost | $77 | $79 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 82% | 91% |
| 30-Day Community Hospital Readmission | | 9.4% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 7.9 | 1.8 |
| EOP/MHCB Treatment Plan | | - | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | - | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 38% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Appointments per PCP | | 7.4 | 9.6 |
| Appointments per PCRN | | 4.1 | 6.6 |
| Encounters per Primary MH Clinician | | 5.4 | 5.4 |
| Encounters per Psychiatrist | | 5.3 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | SQ | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.5 | 5.6 |
| Emergency Department Visits* | | 4 | 7 |
| Specialty Care Referrals* | | 80 | 60 |
| Prescriptions Per Inmate | | 3.7 | 2.7 |
| Diagnostics Per Inmate | | 1.4 | 0.9 |
| Appeals Received* | | 18 | 30 |
| Prison Population Capacity | | 127% | 131% |

*\* Rate Per 1,000 Inmates*
*\*\* Statewide figures exclude HQ positions*

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:43:19 PM

# HEALTHCARE SERVICES DASHBOARD

## SOL

*January 2017*

Main Menu

### SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 76% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 96% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.2% | 0.9% |
| Seen as Scheduled | | 85% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

### POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Asthma Care | | 93% | 85% |
| Therapeutic Anticoagulation | | 83% | 79% |
| Diabetes Care | | 80% | 81% |
| End Stage Liver Disease Care | | 73% | 84% |
| Colon Cancer Screening | | 86% | 56% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 78% | 91% |
| Utilization Specialty Services | | 94% | 89% |
| Polypharmacy Medication Review | | 93% | 94% |

### CARE MANAGEMENT

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 0% | 91% |
| 30-Day Community Hospital Readmission | | 9.2% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 38% | 18% |
| Potentially Avoidable Hospitalizations* | | 13.7 | 1.8 |
| EOP/MHCB Treatment Plan | | 45% | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | 43% | 70% |

### MEDICATION MANAGEMENT

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - MAPIP** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - Med Administration** | | | |
| All Medications Received Timely (EHRS) | | 81% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 1.6% | 4.5% |
| Non-Formulary by Medical Providers | | 3.8% | 4.5% |
| Central Fill Prescriptions | | 69% | 43% |

### AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| All Documents | | 100% | 75% |
| Specialty Notes | | 91% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | - | 94% |
| EHRS Timely Documentation | | 80% | 80% |

### COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

### RESOURCE MANAGEMENT

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 55% | 61% |
| Availability of Medical Equipment | | 69% | 59% |
| Health Care Environment | | - | - |

### WORKLOAD PER DAY

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Appointments per PCP | | 6.5 | 9.6 |
| Appointments per PCRN | | 4.1 | 6.6 |
| Encounters per Primary MH Clinician | | 3.2 | 5.4 |
| Encounters per Psychiatrist | | 3.6 | 6.2 |

### CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 98% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

### MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $786 | $801 | $1,746 |
| Total Non Labor Cost | $37 | $85 | $62 |

### OTHER TRENDS

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 6.4 | 5.6 |
| Emergency Department Visits* | | 6 | 7 |
| Specialty Care Referrals* | | 56 | 60 |
| Prescriptions Per Inmate | | 3.6 | 2.7 |
| Diagnostics Per Inmate | | 0.4 | 0.9 |
| Appeals Received* | | 20 | 30 |
| Prison Population Capacity | | 160% | 131% |

### STAFFING

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Operational Vacancies | | 9% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

### APPEAL PROCESSING

| | 6 Mo. Trend | SOL | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:43:01 PM

# HEALTHCARE SERVICES DASHBOARD

SCC

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 65% | 83% |
| Dental Services | | 99% | 95% |
| Mental Health Services | | 78% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 1.2% | 0.9% |
| Seen as Scheduled | | 85% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 93% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.3% | 4.5% |
| Non-Formulary by Medical Providers | | 3.6% | 4.5% |
| Central Fill Prescriptions | | 58% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 98% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Operational Vacancies | | 8% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Asthma Care | | 92% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 82% | 81% |
| End Stage Liver Disease Care | | 80% | 84% |
| Colon Cancer Screening | | 39% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 96% | 91% |
| Utilization Specialty Services | | 82% | 89% |
| Polypharmacy Medication Review | | 91% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| All Documents | | 99% | 75% |
| Specialty Notes | | 97% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 90% | 94% |
| EHRS Timely Documentation | | 81% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $509 | $437 | $1,746 |
| Total Non Labor Cost | $46 | $19 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 0.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 1.9 | 1.8 |
| EOP/MHCB Treatment Plan | | 55% | 64% |
| Suicide Watch Discharge Plan | | 67% | 29% |
| Suicide Risk Evaluation | | 33% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 53% | 61% |
| Availability of Medical Equipment | | 72% | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Appointments per PCP | | 4.8 | 9.6 |
| Appointments per PCRN | | 2.9 | 6.6 |
| Encounters per Primary MH Clinician | | 3.2 | 5.4 |
| Encounters per Psychiatrist | | 3.3 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | SCC | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 1.9 | 5.6 |
| Emergency Department Visits* | | 3 | 7 |
| Specialty Care Referrals* | | 17 | 60 |
| Prescriptions Per Inmate | | 0.8 | 2.7 |
| Diagnostics Per Inmate | | 0.4 | 0.9 |
| Appeals Received* | | 8 | 30 |
| Prison Population Capacity | | 108% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:42:44 PM

# HEALTHCARE SERVICES DASHBOARD

SATF

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 91% | 83% |
| Dental Services | | 97% | 95% |
| Mental Health Services | | 95% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.3% | 0.9% |
| Seen as Scheduled | | 96% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 93% | 80% |
| Medication Non-Adherence Counseling | | 92% | 88% |
| Medication Administration | | 83% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.9% | 4.5% |
| Non-Formulary by Medical Providers | | 3.6% | 4.5% |
| Central Fill Prescriptions | | 30% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 94% | 88% |
| Mental Health Primary Clinician | | 91% | 82% |
| Psychiatrist | | 96% | 86% |

## STAFFING

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Operational Vacancies | | 4% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Asthma Care | | 93% | 85% |
| Therapeutic Anticoagulation | | 88% | 79% |
| Diabetes Care | | 85% | 81% |
| End Stage Liver Disease Care | | 83% | 84% |
| Colon Cancer Screening | | 69% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 93% | 91% |
| Utilization Specialty Services | | 92% | 89% |
| Polypharmacy Medication Review | | 99% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| All Documents | | 82% | 75% |
| Specialty Notes | | 91% | 85% |
| Community Hospital Records | | 90% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $836 | $769 | $1,746 |
| Total Non Labor Cost | $52 | $46 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 95% | 91% |
| 30-Day Community Hospital Readmission | | 17.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 10% | 18% |
| Potentially Avoidable Hospitalizations* | | 9.5 | 1.8 |
| EOP/MHCB Treatment Plan | | 90% | 64% |
| Suicide Watch Discharge Plan | | 20% | 29% |
| Suicide Risk Evaluation | | 22% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 75% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Appointments per PCP | | 14.3 | 9.6 |
| Appointments per PCRN | | 9.7 | 6.6 |
| Encounters per Primary MH Clinician | | 6.6 | 5.4 |
| Encounters per Psychiatrist | | 12.8 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | SATF | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 5.4 | 5.6 |
| Emergency Department Visits* | | 5 | 7 |
| Specialty Care Referrals* | | 56 | 60 |
| Prescriptions Per Inmate | | 3.1 | 2.7 |
| Diagnostics Per Inmate | | 0.6 | 0.9 |
| Appeals Received* | | 20 | 30 |
| Prison Population Capacity | | 161% | 131% |

* Rate Per 1,000 Inmates

** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta

Report run: 3/16/2017 2:42:26 PM

# HEALTHCARE SERVICES DASHBOARD

## SAC
*January 2017*

Main Menu

| SCHEDULING & ACCESS TO CARE | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| **ACCESS** | | | |
| Medical Services | | 92% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 87% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 1.2% | 0.9% |
| Seen as Scheduled | | 92% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 96% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

| POPULATION HEALTH MANAGEMENT | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Asthma Care | | 94% | 85% |
| Therapeutic Anticoagulation | | 64% | 79% |
| Diabetes Care | | 85% | 81% |
| End Stage Liver Disease Care | | 86% | 84% |
| Colon Cancer Screening | | 69% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 92% | 91% |
| Utilization Specialty Services | | 65% | 89% |
| Polypharmacy Medication Review | | 95% | 94% |

| CARE MANAGEMENT | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 85% | 91% |
| 30-Day Community Hospital Readmission | | 13.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 13% | 18% |
| Potentially Avoidable Hospitalizations* | | 11.8 | 1.8 |
| EOP/MHCB Treatment Plan | | 41% | 64% |
| Suicide Watch Discharge Plan | | 50% | 29% |
| Suicide Risk Evaluation | | 90% | 70% |

| MEDICATION MANAGEMENT | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 88% | 80% |
| Medication Non-Adherence Counseling | | 92% | 88% |
| Medication Administration | | 100% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 4.9% | 4.5% |
| Non-Formulary by Medical Providers | | 5.4% | 4.5% |
| Central Fill Prescriptions | | 47% | 43% |

| AVAILABILITY OF HEALTH INFORMATION | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| All Documents | | 69% | 75% |
| Specialty Notes | | 77% | 85% |
| Community Hospital Records | | 96% | 93% |
| Scanning Accuracy | | 93% | 94% |
| EHRS Timely Documentation | | - | 80% |

| COMPLETE CARE MODEL INFRASTRUCTURE | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

| RESOURCE MANAGEMENT | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Specialty Teleservices | | 45% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

| WORKLOAD PER DAY | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Appointments per PCP | | 4.6 | 9.6 |
| Appointments per PCRN | | 5.7 | 6.6 |
| Encounters per Primary MH Clinician | | 5.1 | 5.4 |
| Encounters per Psychiatrist | | 5.3 | 6.2 |

| CONTINUITY OF CLINICIANS & SERVICES | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Primary Care Provider (PCP) | | 86% | 88% |
| Mental Health Primary Clinician | | 81% | 82% |
| Psychiatrist | | 81% | 86% |

| MAJOR COSTS PER INMATE PER MONTH** | | | |
|---|---|---|---|
| | YTD 16/17 | YTD 15/16 | Statewide |
| Total Labor Cost | $2,380 | $2,405 | $1,746 |
| Total Non Labor Cost | $159 | $93 | $62 |

| OTHER TRENDS | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Hospital Admissions* | | 12.9 | 5.6 |
| Emergency Department Visits* | | 8 | 7 |
| Specialty Care Referrals* | | 68 | 60 |
| Prescriptions Per Inmate | | 3.7 | 2.7 |
| Diagnostics Per Inmate | | 0.8 | 0.9 |
| Appeals Received* | | 116 | 30 |
| Prison Population Capacity | | 122% | 131% |

| STAFFING | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Operational Vacancies | | 4% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

| APPEAL PROCESSING | | | |
|---|---|---|---|
| | 6 Mo. Trend | SAC | Statewide |
| Timely Appeals | | 81% | 97% |

*\* Rate Per 1,000 Inmates*
*\*\* Statewide figures exclude HQ positions*

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:42:05 PM

# HEALTHCARE SERVICES DASHBOARD

RJD

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 81% | 83% |
| Dental Services | | 97% | 95% |
| Mental Health Services | | 93% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.8% | 0.9% |
| Seen as Scheduled | | 89% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 98% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.0% | 4.5% |
| Non-Formulary by Medical Providers | | 6.0% | 4.5% |
| Central Fill Prescriptions | | 33% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 90% | 88% |
| Mental Health Primary Clinician | | 80% | 82% |
| Psychiatrist | | 81% | 86% |

## STAFFING

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Operational Vacancies | | 6% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Asthma Care | | 96% | 85% |
| Therapeutic Anticoagulation | | 92% | 79% |
| Diabetes Care | | 84% | 81% |
| End Stage Liver Disease Care | | 96% | 84% |
| Colon Cancer Screening | | 82% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 93% | 91% |
| Utilization Specialty Services | | 89% | 89% |
| Polypharmacy Medication Review | | 97% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| All Documents | | 78% | 75% |
| Specialty Notes | | 73% | 85% |
| Community Hospital Records | | 82% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $2,026 | $1,841 | $1,746 |
| Total Non Labor Cost | $111 | $168 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 95% | 91% |
| 30-Day Community Hospital Readmission | | 18.5% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 6% | 18% |
| Potentially Avoidable Hospitalizations* | | 40.6 | 1.8 |
| EOP/MHCB Treatment Plan | | 69% | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | 85% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 83% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Appointments per PCP | | 14.6 | 9.6 |
| Appointments per PCRN | | 7.2 | 6.6 |
| Encounters per Primary MH Clinician | | 5.5 | 5.4 |
| Encounters per Psychiatrist | | 7.3 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | RJD | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 9.5 | 5.6 |
| Emergency Department Visits* | | 17 | 7 |
| Specialty Care Referrals* | | 161 | 60 |
| Prescriptions Per Inmate | | 6.2 | 2.7 |
| Diagnostics Per Inmate | | 1.6 | 0.9 |
| Appeals Received* | | 54 | 30 |
| Prison Population Capacity | | 109% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:41:02 PM

# HEALTHCARE SERVICES DASHBOARD

PVSP

*January 2017*



Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 99% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 100% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.1% | 0.9% |
| Seen as Scheduled | | 96% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Asthma Care | | 99% | 85% |
| Therapeutic Anticoagulation | | - | 79% |
| Diabetes Care | | 100% | 81% |
| End Stage Liver Disease Care | | - | 84% |
| Colon Cancer Screening | | 77% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 99% | 91% |
| Utilization Specialty Services | | 86% | 89% |
| Polypharmacy Medication Review | | 100% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 89% | 91% |
| 30-Day Community Hospital Readmission | | 0.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 25% | 18% |
| Potentially Avoidable Hospitalizations* | | 3.1 | 1.8 |
| EOP/MHCB Treatment Plan | | 77% | 64% |
| Suicide Watch Discharge Plan | | 60% | 29% |
| Suicide Risk Evaluation | | 64% | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - MAPIP** | | | |
| Medication Continuity-Transfer | | 100% | 80% |
| Medication Non-Adherence Counseling | | 100% | 88% |
| Medication Administration | | 100% | 96% |
| **EHRS INSTITUTIONS - Med Administration** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 0.4% | 4.5% |
| Non-Formulary by Medical Providers | | 1.8% | 4.5% |
| Central Fill Prescriptions | | 34% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| All Documents | | 90% | 75% |
| Specialty Notes | | 90% | 85% |
| Community Hospital Records | | 67% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 38% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 13.1 | 9.6 |
| Appointments per PCRN | | 4.7 | 6.6 |
| Encounters per Primary MH Clinician | | 4.4 | 5.4 |
| Encounters per Psychiatrist | | 7.2 | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 96% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $739 | $746 | $1,746 |
| Total Non Labor Cost | $18 | $20 | $62 |

## OTHER TRENDS

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 0.6 | 5.6 |
| Emergency Department Visits* | | 4 | 7 |
| Specialty Care Referrals* | | 31 | 60 |
| Prescriptions Per Inmate | | 1.4 | 2.7 |
| Diagnostics Per Inmate | | 0.4 | 0.9 |
| Appeals Received* | | 9 | 30 |
| Prison Population Capacity | | 138% | 131% |

## STAFFING

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 10% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## APPEAL PROCESSING

| | 6 Mo. Trend | PVSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

* Rate Per 1,000 Inmates

** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**

*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:40:37 PM

# HEALTHCARE SERVICES DASHBOARD

PBSP

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 94% | 83% |
| Dental Services | | 99% | 95% |
| Mental Health Services | | 94% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.4% | 0.9% |
| Seen as Scheduled | | 90% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 93% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 86% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.2% | 4.5% |
| Non-Formulary by Medical Providers | | 3.7% | 4.5% |
| Central Fill Prescriptions | | 32% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 100% | 88% |
| Mental Health Primary Clinician | | 77% | 82% |
| Psychiatrist | | 33% | 86% |

## STAFFING

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 13% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Asthma Care | | 82% | 85% |
| Therapeutic Anticoagulation | | - | 79% |
| Diabetes Care | | 79% | 81% |
| End Stage Liver Disease Care | | 78% | 84% |
| Colon Cancer Screening | | 77% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 71% | 91% |
| Utilization Specialty Services | | 94% | 89% |
| Polypharmacy Medication Review | | 83% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| All Documents | | 99% | 75% |
| Specialty Notes | | 98% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 96% | 94% |
| EHRS Timely Documentation | | 85% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Complete Care Model | | | |
| QM Program | | - | |
| Patient Safety Program | | - | |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,088 | $969 | $1,746 |
| Total Non Labor Cost | $36 | $18 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 83% | 91% |
| 30-Day Community Hospital Readmission | | 16.7% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 20% | 18% |
| Potentially Avoidable Hospitalizations* | | 0.0 | 1.8 |
| EOP/MHCB Treatment Plan | | 72% | 64% |
| Suicide Watch Discharge Plan | | 60% | 29% |
| Suicide Risk Evaluation | | 90% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 63% | 61% |
| Availability of Medical Equipment | | 68% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 3.6 | 9.6 |
| Appointments per PCRN | | 2.5 | 6.6 |
| Encounters per Primary MH Clinician | | 2.9 | 5.4 |
| Encounters per Psychiatrist | | 3.2 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | PBSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 0.5 | 5.6 |
| Emergency Department Visits* | | 0 | 7 |
| Specialty Care Referrals* | | 22 | 60 |
| Prescriptions Per Inmate | | 0.6 | 2.7 |
| Diagnostics Per Inmate | | 0.2 | 0.9 |
| Appeals Received* | | 32 | 30 |
| Prison Population Capacity | | 89% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 2:40:16 PM

# HEALTHCARE SERVICES DASHBOARD

NKSP

*January 2017*

**Main Menu**

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 81% | 83% |
| Dental Services | | 87% | 95% |
| Mental Health Services | | 88% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.4% | 0.9% |
| Seen as Scheduled | | 91% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 97% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 60% | 80% |
| Medication Non-Adherence Counseling | | 73% | 88% |
| Medication Administration | | 100% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 2.9% | 4.5% |
| Non-Formulary by Medical Providers | | 1.7% | 4.5% |
| Central Fill Prescriptions | | 44% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 85% | 88% |
| Mental Health Primary Clinician | | 63% | 82% |
| Psychiatrist | | 86% | 86% |

## STAFFING

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 8% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | 25% | 79% |
| Diabetes Care | | 91% | 81% |
| End Stage Liver Disease Care | | 100% | 84% |
| Colon Cancer Screening | | 77% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 87% | 91% |
| Utilization Specialty Services | | 89% | 89% |
| Polypharmacy Medication Review | | 94% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| All Documents | | 74% | 75% |
| Specialty Notes | | 90% | 85% |
| Community Hospital Records | | 97% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $914 | $898 | $1,746 |
| Total Non Labor Cost | $66 | $41 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 93% | 91% |
| 30-Day Community Hospital Readmission | | 1.5% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 8% | 18% |
| Potentially Avoidable Hospitalizations* | | 2.3 | 1.8 |
| EOP/MHCB Treatment Plan | | - | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | - | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 56% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 17.7 | 9.6 |
| Appointments per PCRN | | 12.0 | 6.6 |
| Encounters per Primary MH Clinician | | 7.2 | 5.4 |
| Encounters per Psychiatrist | | 8.8 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | NKSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 6.8 | 5.6 |
| Emergency Department Visits* | | 7 | 7 |
| Specialty Care Referrals* | | 55 | 60 |
| Prescriptions Per Inmate | | 1.7 | 2.7 |
| Diagnostics Per Inmate | | 2.5 | 0.9 |
| Appeals Received* | | 15 | 30 |
| Prison Population Capacity | | 164% | 131% |

* Rate Per 1,000 Inmates

** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta

Report run: 3/16/2017 2:40:01 PM

# HEALTHCARE SERVICES DASHBOARD
## MCSP
*January 2017*

**Main Menu**

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 73% | 83% |
| Dental Services | | 99% | 95% |
| Mental Health Services | | 82% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.5% | 0.9% |
| Seen as Scheduled | | 86% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - MAPIP** | | | |
| Medication Continuity-Transfer | | 64% | 80% |
| Medication Non-Adherence Counseling | | 88% | 88% |
| Medication Administration | | 99% | 96% |
| **EHRS INSTITUTIONS - Med Administration** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 4.0% | 4.5% |
| Non-Formulary by Medical Providers | | 5.5% | 4.5% |
| Central Fill Prescriptions | | 60% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 90% | 88% |
| Mental Health Primary Clinician | | 81% | 82% |
| Psychiatrist | | 83% | 86% |

## STAFFING

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 6% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Asthma Care | | 93% | 85% |
| Therapeutic Anticoagulation | | 68% | 79% |
| Diabetes Care | | 85% | 81% |
| End Stage Liver Disease Care | | 90% | 84% |
| Colon Cancer Screening | | 74% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 91% | 91% |
| Utilization Specialty Services | | 89% | 89% |
| Polypharmacy Medication Review | | 95% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| All Documents | | 44% | 75% |
| Specialty Notes | | 72% | 85% |
| Community Hospital Records | | 83% | 93% |
| Scanning Accuracy | | 83% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,413 | $1,403 | $1,746 |
| Total Non Labor Cost | $64 | $160 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 99% | 91% |
| 30-Day Community Hospital Readmission | | 8.8% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 7% | 18% |
| Potentially Avoidable Hospitalizations* | | 20.5 | 1.8 |
| EOP/MHCB Treatment Plan | | 66% | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | 79% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 60% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 11.2 | 9.6 |
| Appointments per PCRN | | 4.9 | 6.6 |
| Encounters per Primary MH Clinician | | 7.3 | 5.4 |
| Encounters per Psychiatrist | | 6.4 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | MCSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 5.8 | 5.6 |
| Emergency Department Visits* | | 18 | 7 |
| Specialty Care Referrals* | | 148 | 60 |
| Prescriptions Per Inmate | | 5.7 | 2.7 |
| Diagnostics Per Inmate | | 1.2 | 0.9 |
| Appeals Received* | | 86 | 30 |
| Prison Population Capacity | | 109% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:46:55 PM

# HEALTHCARE SERVICES DASHBOARD
## LAC
*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 79% | 83% |
| Dental Services | | 96% | 95% |
| Mental Health Services | | 86% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 1.2% | 0.9% |
| Seen as Scheduled | | 86% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 98% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 81% | 80% |
| Medication Non-Adherence Counseling | | 85% | 88% |
| Medication Administration | | 97% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 2.1% | 4.5% |
| Non-Formulary by Medical Providers | | 5.3% | 4.5% |
| Central Fill Prescriptions | | 36% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 88% | 88% |
| Mental Health Primary Clinician | | 80% | 82% |
| Psychiatrist | | 60% | 86% |

## STAFFING

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Operational Vacancies | | 9% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | 77% | 79% |
| Diabetes Care | | 77% | 81% |
| End Stage Liver Disease Care | | 75% | 84% |
| Colon Cancer Screening | | 74% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 81% | 91% |
| Utilization Specialty Services | | 87% | 89% |
| Polypharmacy Medication Review | | 91% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| All Documents | | 84% | 75% |
| Specialty Notes | | 86% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,219 | $1,135 | $1,746 |
| Total Non Labor Cost | $90 | $75 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 91% | 91% |
| 30-Day Community Hospital Readmission | | 12.6% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 12% | 18% |
| Potentially Avoidable Hospitalizations* | | 14.2 | 1.8 |
| EOP/MHCB Treatment Plan | | 79% | 64% |
| Suicide Watch Discharge Plan | | 25% | 29% |
| Suicide Risk Evaluation | | 84% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 73% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Appointments per PCP | | 13.6 | 9.6 |
| Appointments per PCRN | | 9.5 | 6.6 |
| Encounters per Primary MH Clinician | | 6.5 | 5.4 |
| Encounters per Psychiatrist | | 8.4 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | LAC | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 9.0 | 5.6 |
| Emergency Department Visits* | | 14 | 7 |
| Specialty Care Referrals* | | 113 | 60 |
| Prescriptions Per Inmate | | 4.1 | 2.7 |
| Diagnostics Per Inmate | | 1.1 | 0.9 |
| Appeals Received* | | 48 | 30 |
| Prison Population Capacity | | 148% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:46:30 PM

# HEALTHCARE SERVICES DASHBOARD

## KVSP

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 95% | 83% |
| Dental Services | | 97% | 95% |
| Mental Health Services | | 73% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 2.0% | 0.9% |
| Seen as Scheduled | | 89% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 98% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 78% | 80% |
| Medication Non-Adherence Counseling | | 77% | 88% |
| Medication Administration | | 84% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 2.2% | 4.5% |
| Non-Formulary by Medical Providers | | 3.1% | 4.5% |
| Central Fill Prescriptions | | 62% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 94% | 88% |
| Mental Health Primary Clinician | | 79% | 82% |
| Psychiatrist | | 74% | 86% |

## STAFFING

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 10% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Asthma Care | | 96% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 83% | 81% |
| End Stage Liver Disease Care | | 57% | 84% |
| Colon Cancer Screening | | 75% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 88% | 91% |
| Utilization Specialty Services | | 98% | 89% |
| Polypharmacy Medication Review | | 100% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| All Documents | | 69% | 75% |
| Specialty Notes | | 87% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 86% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Complete Care Model | | | - |
| QM Program | | | - |
| Patient Safety Program | | | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $817 | $749 | $1,746 |
| Total Non Labor Cost | $39 | $34 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 96% | 91% |
| 30-Day Community Hospital Readmission | | 8.1% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 12% | 18% |
| Potentially Avoidable Hospitalizations* | | 4.5 | 1.8 |
| EOP/MHCB Treatment Plan | | 67% | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | - | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 60% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 11.1 | 9.6 |
| Appointments per PCRN | | 6.3 | 6.6 |
| Encounters per Primary MH Clinician | | 6.1 | 5.4 |
| Encounters per Psychiatrist | | 9.6 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | KVSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 6.1 | 5.6 |
| Emergency Department Visits* | | 16 | 7 |
| Specialty Care Referrals* | | 44 | 60 |
| Prescriptions Per Inmate | | 1.8 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 39 | 30 |
| Prison Population Capacity | | 153% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:46:06 PM

# HEALTHCARE SERVICES DASHBOARD

ISP

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 89% | 83% |
| Dental Services | | 98% | 95% |
| Mental Health Services | | 100% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.1% | 0.9% |
| Seen as Scheduled | | 91% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 0.0% | 4.5% |
| Non-Formulary by Medical Providers | | 1.4% | 4.5% |
| Central Fill Prescriptions | | 71% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 97% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 12% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Asthma Care | | 98% | 85% |
| Therapeutic Anticoagulation | | 0% | 79% |
| Diabetes Care | | 91% | 81% |
| End Stage Liver Disease Care | | 33% | 84% |
| Colon Cancer Screening | | 72% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | - | 91% |
| Utilization Specialty Services | | 97% | 89% |
| Polypharmacy Medication Review | | 100% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| All Documents | | 87% | 75% |
| Specialty Notes | | 97% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 98% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $529 | $498 | $1,746 |
| Total Non Labor Cost | $22 | $24 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 2.7% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 100% | 18% |
| Potentially Avoidable Hospitalizations* | | 3.7 | 1.8 |
| EOP/MHCB Treatment Plan | | - | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | 20% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 84% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 7.2 | 9.6 |
| Appointments per PCRN | | 6.0 | 6.6 |
| Encounters per Primary MH Clinician | | 2.0 | 5.4 |
| Encounters per Psychiatrist | | 2.5 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | ISP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 4.2 | 5.6 |
| Emergency Department Visits* | | 5 | 7 |
| Specialty Care Referrals* | | 34 | 60 |
| Prescriptions Per Inmate | | 1.2 | 2.7 |
| Diagnostics Per Inmate | | 0.3 | 0.9 |
| Appeals Received* | | 9 | 30 |
| Prison Population Capacity | | 138% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:41:42 PM

# HEALTHCARE SERVICES DASHBOARD
## HDSP
*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 58% | 83% |
| Dental Services | | 96% | 95% |
| Mental Health Services | | 83% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 3.5% | 0.9% |
| Seen as Scheduled | | 81% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 74% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 4.2% | 4.5% |
| Non-Formulary by Medical Providers | | 6.8% | 4.5% |
| Central Fill Prescriptions | | 58% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | - | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 8% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Asthma Care | | 92% | 85% |
| Therapeutic Anticoagulation | | 0% | 79% |
| Diabetes Care | | 67% | 81% |
| End Stage Liver Disease Care | | 75% | 84% |
| Colon Cancer Screening | | 78% | 79% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 88% | 91% |
| Utilization Specialty Services | | 95% | 89% |
| Polypharmacy Medication Review | | 90% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| All Documents | | 94% | 75% |
| Specialty Notes | | 90% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 92% | 94% |
| EHRS Timely Documentation | | 81% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $672 | $719 | $1,746 |
| Total Non Labor Cost | $26 | $31 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 96% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 76% | 91% |
| 30-Day Community Hospital Readmission | | 5.9% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 36% | 18% |
| Potentially Avoidable Hospitalizations* | | 0.5 | 1.8 |
| EOP/MHCB Treatment Plan | | - | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | 33% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 64% | 61% |
| Availability of Medical Equipment | | 1% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 3.2 | 9.6 |
| Appointments per PCRN | | 5.0 | 6.6 |
| Encounters per Primary MH Clinician | | 3.7 | 5.4 |
| Encounters per Psychiatrist | | 2.7 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | HDSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 2.7 | 5.6 |
| Emergency Department Visits* | | 4 | 7 |
| Specialty Care Referrals* | | 26 | 60 |
| Prescriptions Per Inmate | | 1.4 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 24 | 30 |
| Prison Population Capacity | | 159% | 131% |

\* Rate Per 1,000 Inmates
\*\* Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:41:23 PM

# HEALTHCARE SERVICES DASHBOARD

## FSP

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| ACCESS | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Medical Services | | 91% | 83% |
| Dental Services | | 98% | 95% |
| Mental Health Services | | 95% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 1.7% | 0.9% |
| Seen as Scheduled | | 93% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| NON-EHRS INSTITUTIONS - *MAPIP* | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS -** *Med Administration* | | | |
| All Medications Received Timely (EHRS) | | 96% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 1.3% | 4.5% |
| Non-Formulary by Medical Providers | | 3.5% | 4.5% |
| Central Fill Prescriptions | | 73% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 97% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 9% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Asthma Care | | 95% | 85% |
| Therapeutic Anticoagulation | | 80% | 79% |
| Diabetes Care | | 86% | 81% |
| End Stage Liver Disease Care | | 66% | 84% |
| Colon Cancer Screening | | 88% | 74% |
| Women's Care | | 86% | 79% |
| Diagnostic Monitoring | | 98% | 91% |
| Utilization Specialty Services | | 92% | 89% |
| Polypharmacy Medication Review | | 86% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| All Documents | | 99% | 75% |
| Specialty Notes | | 97% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 97% | 94% |
| EHRS Timely Documentation | | 82% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $743 | $752 | $1,746 |
| Total Non Labor Cost | $27 | $37 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 2.9% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 2.6 | 1.8 |
| EOP/MHCB Treatment Plan | | 67% | 64% |
| Suicide Watch Discharge Plan | | 100% | 29% |
| Suicide Risk Evaluation | | 100% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 46% | 61% |
| Availability of Medical Equipment | | 49% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 5.3 | 9.6 |
| Appointments per PCRN | | 5.2 | 6.6 |
| Encounters per Primary MH Clinician | | 4.7 | 5.4 |
| Encounters per Psychiatrist | | 3.6 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | FSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.1 | 5.6 |
| Emergency Department Visits* | | 3 | 7 |
| Specialty Care Referrals* | | 46 | 60 |
| Prescriptions Per Inmate | | 2.1 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 15 | 30 |
| Prison Population Capacity | | 116% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:40:42 PM

# HEALTHCARE SERVICES DASHBOARD
## DVI
*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 86% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 95% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.1% | 0.9% |
| Seen as Scheduled | | 94% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 5.9% | 4.5% |
| Non-Formulary by Medical Providers | | 3.1% | 4.5% |
| Central Fill Prescriptions | | 26% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 96% | 88% |
| Mental Health Primary Clinician | | 90% | 82% |
| Psychiatrist | | 71% | 86% |

## STAFFING

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Operational Vacancies | | 8% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | - | 79% |
| Diabetes Care | | 93% | 81% |
| End Stage Liver Disease Care | | - | 84% |
| Colon Cancer Screening | | 83% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 100% | 91% |
| Utilization Specialty Services | | 92% | 89% |
| Polypharmacy Medication Review | | 97% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| All Documents | | 77% | 75% |
| Specialty Notes | | 72% | 85% |
| Community Hospital Records | | 50% | 93% |
| Scanning Accuracy | | 50% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,056 | $1,010 | $1,746 |
| Total Non Labor Cost | $79 | $73 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 83% | 91% |
| 30-Day Community Hospital Readmission | | 10.7% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 0% | 18% |
| Potentially Avoidable Hospitalizations* | | 17.9 | 1.8 |
| EOP/MHCB Treatment Plan | | 4% | 64% |
| Suicide Watch Discharge Plan | | 40% | 29% |
| Suicide Risk Evaluation | | 50% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 60% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Appointments per PCP | | 8.8 | 9.6 |
| Appointments per PCRN | | 8.7 | 6.6 |
| Encounters per Primary MH Clinician | | 8.4 | 5.4 |
| Encounters per Psychiatrist | | 10.8 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | DVI | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.1 | 5.6 |
| Emergency Department Visits* | | 8 | 7 |
| Specialty Care Referrals* | | 38 | 60 |
| Prescriptions Per Inmate | | 2.0 | 2.7 |
| Diagnostics Per Inmate | | 1.6 | 0.9 |
| Appeals Received* | | 42 | 30 |
| Prison Population Capacity | | 130% | 131% |

*\* Rate Per 1,000 Inmates*
*\*\* Statewide figures exclude HQ positions*

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:40:20 PM

# HEALTHCARE SERVICES DASHBOARD

## CVSP
*January 2017*

Main Menu

### SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 65% | 83% |
| Dental Services | | 86% | 95% |
| Mental Health Services | | 89% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.4% | 0.9% |
| Seen as Scheduled | | 86% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 98% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

### MEDICATION MANAGEMENT

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | ○ | 81% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 0.0% | 4.5% |
| Non-Formulary by Medical Providers | | 1.8% | 4.5% |
| Central Fill Prescriptions | | 81% | 43% |

### CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 100% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

### STAFFING

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Operational Vacancies | ○ | 13% | 8% |
| Average Time to Hire | ● | - | - |
| FTE Usage | | - | - |

### POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 76% | 81% |
| End Stage Liver Disease Care | | 100% | 84% |
| Colon Cancer Screening | | 67% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | - | 91% |
| Utilization Specialty Services | | 96% | 89% |
| Polypharmacy Medication Review | | 100% | 94% |

### AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| All Documents | | 97% | 75% |
| Specialty Notes | | 98% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 94% | 94% |
| EHRS Timely Documentation | ● | 88% | 80% |

### COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

### MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $659 | $660 | $1,746 |
| Total Non Labor Cost | $18 | $24 | $62 |

### APPEAL PROCESSING

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

### CARE MANAGEMENT

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 18.8% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 2.5 | 1.8 |
| EOP/MHCB Treatment Plan | | - | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | 100% | 70% |

### RESOURCE MANAGEMENT

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 69% | 61% |
| Availability of Medical Equipment | | 1% | 59% |
| Health Care Environment | | | |

### WORKLOAD PER DAY

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 4.3 | 9.6 |
| Appointments per PCRN | | 4.0 | 6.6 |
| Encounters per Primary MH Clinician | | 2.7 | 5.4 |
| Encounters per Psychiatrist | | 1.7 | 6.2 |

### OTHER TRENDS

| | 6 Mo. Trend | CVSP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.1 | 5.6 |
| Emergency Department Visits* | | 1 | 7 |
| Specialty Care Referrals* | | 40 | 60 |
| Prescriptions Per Inmate | | 1.4 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 12 | 30 |
| Prison Population Capacity | | 146% | 131% |

---

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:40:06 PM

# HEALTHCARE SERVICES DASHBOARD

CTF

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 93% | 83% |
| Dental Services | | 94% | 95% |
| Mental Health Services | | 94% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.0% | 0.9% |
| Seen as Scheduled | | 91% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 85% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 1.8% | 4.5% |
| Non-Formulary by Medical Providers | | 1.3% | 4.5% |
| Central Fill Prescriptions | | 69% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 98% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Operational Vacancies | | 9% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Asthma Care | | 94% | 85% |
| Therapeutic Anticoagulation | | 83% | 79% |
| Diabetes Care | | 86% | 81% |
| End Stage Liver Disease Care | | 92% | 84% |
| Colon Cancer Screening | | 81% | 84% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 97% | 91% |
| Utilization Specialty Services | | 84% | 89% |
| Polypharmacy Medication Review | | 89% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| All Documents | | 100% | 75% |
| Specialty Notes | | 92% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | - | 94% |
| EHRS Timely Documentation | | 83% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $640 | $595 | $1,746 |
| Total Non Labor Cost | $41 | $44 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 67% | 91% |
| 30-Day Community Hospital Readmission | | 1.7% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 4.7 | 1.8 |
| EOP/MHCB Treatment Plan | | 85% | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | 100% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 46% | 61% |
| Availability of Medical Equipment | | 42% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Appointments per PCP | | 7.6 | 9.6 |
| Appointments per PCRN | | 7.0 | 6.6 |
| Encounters per Primary MH Clinician | | 3.6 | 5.4 |
| Encounters per Psychiatrist | | 4.9 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | CTF | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 6.0 | 5.6 |
| Emergency Department Visits* | | 2 | 7 |
| Specialty Care Referrals* | | 45 | 60 |
| Prescriptions Per Inmate | | 2.9 | 2.7 |
| Diagnostics Per Inmate | | 0.6 | 0.9 |
| Appeals Received* | | 31 | 30 |
| Prison Population Capacity | | 159% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:39:45 PM

# HEALTHCARE SERVICES DASHBOARD
## CRC
*January 2017*



Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 89% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 90% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.6% | 0.9% |
| Seen as Scheduled | | 86% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 98% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.0% | 4.5% |
| Non-Formulary by Medical Providers | | 2.6% | 4.5% |
| Central Fill Prescriptions | | 53% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 99% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Operational Vacancies | | 8% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Asthma Care | | 95% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 87% | 81% |
| End Stage Liver Disease Care | | 89% | 84% |
| Colon Cancer Screening | | 73% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 100% | 91% |
| Utilization Specialty Services | | 97% | 89% |
| Polypharmacy Medication Review | | 91% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| All Documents | | 100% | 75% |
| Specialty Notes | | 92% | 85% |
| Community Hospital Records | | 89% | 93% |
| Scanning Accuracy | | - | 94% |
| EHRS Timely Documentation | | 85% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $795 | $769 | $1,746 |
| Total Non Labor Cost | $28 | $35 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 18.4% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 3.2 | 1.8 |
| EOP/MHCB Treatment Plan | | 40% | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | 29% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 59% | 61% |
| Availability of Medical Equipment | | 80% | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Appointments per PCP | | 7.6 | 9.6 |
| Appointments per PCRN | | 3.8 | 6.6 |
| Encounters per Primary MH Clinician | | 2.9 | 5.4 |
| Encounters per Psychiatrist | | 4.2 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | CRC | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 2.9 | 5.6 |
| Emergency Department Visits* | | 6 | 7 |
| Specialty Care Referrals* | | 58 | 60 |
| Prescriptions Per Inmate | | 1.7 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 14 | 30 |
| Prison Population Capacity | | 108% | 131% |

*\* Rate Per 1,000 Inmates*
*\*\* Statewide figures exclude HQ positions*

Please direct questions or feedback to QMstaff@cdcr.ca.gov
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:39:05 PM

# HEALTHCARE SERVICES DASHBOARD
## COR
*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 87% | 83% |
| Dental Services | | 97% | 95% |
| Mental Health Services | | 77% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 2.6% | 0.9% |
| Seen as Scheduled | | 91% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 60% | 80% |
| Medication Non-Adherence Counseling | | 94% | 88% |
| Medication Administration | | 100% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.9% | 4.5% |
| Non-Formulary by Medical Providers | | 5.1% | 4.5% |
| Central Fill Prescriptions | | 13% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 88% | 88% |
| Mental Health Primary Clinician | | 94% | 82% |
| Psychiatrist | | 61% | 86% |

## STAFFING

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Operational Vacancies | | 7% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Asthma Care | | 91% | 85% |
| Therapeutic Anticoagulation | | 67% | 79% |
| Diabetes Care | | 81% | 81% |
| End Stage Liver Disease Care | | 87% | 84% |
| Colon Cancer Screening | | 60% | 76% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 94% | 91% |
| Utilization Specialty Services | | 93% | 89% |
| Polypharmacy Medication Review | | 97% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| All Documents | | 74% | 75% |
| Specialty Notes | | 94% | 85% |
| Community Hospital Records | | 93% | 93% |
| Scanning Accuracy | | 87% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Complete Care Model | | | |
| QM Program | | | |
| Patient Safety Program | | | |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,738 | $1,313 | $1,746 |
| Total Non Labor Cost | $54 | $50 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Timely Appeals | | 99% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 95% | 91% |
| 30-Day Community Hospital Readmission | | 7.3% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 29% | 18% |
| Potentially Avoidable Hospitalizations* | | 13.7 | 1.8 |
| EOP/MHCB Treatment Plan | | 43% | 64% |
| Suicide Watch Discharge Plan | | 20% | 29% |
| Suicide Risk Evaluation | | 58% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 66% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Appointments per PCP | | 11.0 | 9.6 |
| Appointments per PCRN | | 8.0 | 6.6 |
| Encounters per Primary MH Clinician | | 6.4 | 5.4 |
| Encounters per Psychiatrist | | 9.3 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | COR | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 14.9 | 5.6 |
| Emergency Department Visits* | | 20 | 7 |
| Specialty Care Referrals* | | 57 | 60 |
| Prescriptions Per Inmate | | 2.7 | 2.7 |
| Diagnostics Per Inmate | | 0.8 | 0.9 |
| Appeals Received* | | 44 | 30 |
| Prison Population Capacity | | 111% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:38:50 PM

# HEALTHCARE SERVICES DASHBOARD
## CMF
*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 86% | 83% |
| Dental Services | | 99% | 95% |
| Mental Health Services | | 97% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.9% | 0.9% |
| Seen as Scheduled | | 93% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Asthma Care | | 83% | 85% |
| Therapeutic Anticoagulation | | 76% | 79% |
| Diabetes Care | | 84% | 81% |
| End Stage Liver Disease Care | | 84% | 84% |
| Colon Cancer Screening | | 64% | 84% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 92% | 91% |
| Utilization Specialty Services | | 88% | 89% |
| Polypharmacy Medication Review | | 94% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 92% | 91% |
| 30-Day Community Hospital Readmission | | 9.5% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 6% | 18% |
| Potentially Avoidable Hospitalizations* | | 30.2 | 1.8 |
| EOP/MHCB Treatment Plan | | 78% | 64% |
| Suicide Watch Discharge Plan | | 20% | 29% |
| Suicide Risk Evaluation | | 57% | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | 97% | 80% |
| Medication Non-Adherence Counseling | | 99% | 88% |
| Medication Administration | | 100% | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 5.9% | 4.5% |
| Non-Formulary by Medical Providers | | 7.1% | 4.5% |
| Central Fill Prescriptions | | 43% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| All Documents | | 74% | 75% |
| Specialty Notes | | 77% | 85% |
| Community Hospital Records | | 84% | 93% |
| Scanning Accuracy | | 86% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 53% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Appointments per PCP | | 11.0 | 9.6 |
| Appointments per PCRN | | 9.2 | 6.6 |
| Encounters per Primary MH Clinician | | 6.3 | 5.4 |
| Encounters per Psychiatrist | | 6.7 | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 95% | 88% |
| Mental Health Primary Clinician | | 90% | 82% |
| Psychiatrist | | 95% | 86% |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $2,616 | $2,434 | $1,746 |
| Total Non Labor Cost | $204 | $192 | $62 |

## OTHER TRENDS

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 15.3 | 5.6 |
| Emergency Department Visits* | | 9 | 7 |
| Specialty Care Referrals* | | 145 | 60 |
| Prescriptions Per Inmate | | 7.4 | 2.7 |
| Diagnostics Per Inmate | | 1.8 | 0.9 |
| Appeals Received* | | 54 | 30 |
| Prison Population Capacity | | 105% | 131% |

## STAFFING

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Operational Vacancies | | 6% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## APPEAL PROCESSING

| | 6 Mo. Trend | CMF | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:38:30 PM

# HEALTHCARE SERVICES DASHBOARD
## CMC
*January 2017*



**Main Menu**

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 55% | 83% |
| Dental Services | | 91% | 95% |
| Mental Health Services | | 74% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 1.0% | 0.9% |
| Seen as Scheduled | | 88% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 98% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Asthma Care | | 95% | 85% |
| Therapeutic Anticoagulation | | 89% | 79% |
| Diabetes Care | | 79% | 81% |
| End Stage Liver Disease Care | | 74% | 84% |
| Colon Cancer Screening | | 76% | 79% |
| Women's Care | | | 79% |
| Diagnostic Monitoring | | 91% | 91% |
| Utilization Specialty Services | | 87% | 89% |
| Polypharmacy Medication Review | | 94% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 91% | 91% |
| 30-Day Community Hospital Readmission | | 5.4% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 22% | 18% |
| Potentially Avoidable Hospitalizations* | | 10.7 | 1.8 |
| EOP/MHCB Treatment Plan | | 100% | 64% |
| Suicide Watch Discharge Plan | | 50% | 29% |
| Suicide Risk Evaluation | | 88% | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - MAPIP** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - Med Administration** | | | |
| All Medications Received Timely (EHRS) | | 88% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 3.3% | 4.5% |
| Non-Formulary by Medical Providers | | 4.3% | 4.5% |
| Central Fill Prescriptions | | 53% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| All Documents | | 97% | 75% |
| Specialty Notes | | 92% | 92% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 92% | 94% |
| EHRS Timely Documentation | | 79% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 31% | 61% |
| Availability of Medical Equipment | | 2% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Appointments per PCP | | 4.1 | 9.6 |
| Appointments per PCRN | | 5.0 | 6.6 |
| Encounters per Primary MH Clinician | | 4.0 | 5.4 |
| Encounters per Psychiatrist | | 2.5 | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 100% | 88% |
| Mental Health Primary Clinician | | 78% | 82% |
| Psychiatrist | | 89% | 86% |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,459 | $1,486 | $1,746 |
| Total Non Labor Cost | $78 | $70 | $62 |

## OTHER TRENDS

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 5.6 | 5.6 |
| Emergency Department Visits* | | 8 | 7 |
| Specialty Care Referrals* | | 49 | 60 |
| Prescriptions Per Inmate | | 3.2 | 2.7 |
| Diagnostics Per Inmate | | 0.9 | 0.9 |
| Appeals Received* | | 21 | 30 |
| Prison Population Capacity | | 103% | 131% |

## STAFFING

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Operational Vacancies | | 6% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## APPEAL PROCESSING

| | 6 Mo. Trend | CMC | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

\* Rate Per 1,000 Inmates

\** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta

Report run: 3/16/2017 1:38:11 PM

# HEALTHCARE SERVICES DASHBOARD
## CIW
*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 80% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 90% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 2.5% | 0.9% |
| Seen as Scheduled | | 83% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Asthma Care | | 88% | 85% |
| Therapeutic Anticoagulation | | 50% | 79% |
| Diabetes Care | | 87% | 81% |
| End Stage Liver Disease Care | | 90% | 84% |
| Colon Cancer Screening | | 76% | 74% |
| Women's Care | | 82% | 79% |
| Diagnostic Monitoring | | 95% | 91% |
| Utilization Specialty Services | | 90% | 89% |
| Polypharmacy Medication Review | | 98% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 90% | 91% |
| 30-Day Community Hospital Readmission | | 7.8% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 16% | 18% |
| Potentially Avoidable Hospitalizations* | | 13.0 | 1.8 |
| EOP/MHCB Treatment Plan | | 63% | 64% |
| Suicide Watch Discharge Plan | | 60% | 29% |
| Suicide Risk Evaluation | | 54% | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 87% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 15.6% | 4.5% |
| Non-Formulary by Medical Providers | | 9.3% | 4.5% |
| Central Fill Prescriptions | | 41% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| All Documents | | 100% | 75% |
| Specialty Notes | | 89% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | - | 94% |
| EHRS Timely Documentation | | 73% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 62% | 61% |
| Availability of Medical Equipment | | 58% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Appointments per PCP | | 3.2 | 9.6 |
| Appointments per PCRN | | 9.5 | 6.6 |
| Encounters per Primary MH Clinician | | 2.9 | 5.4 |
| Encounters per Psychiatrist | | 2.9 | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 95% | 88% |
| Mental Health Primary Clinician | | 87% | 82% |
| Psychiatrist | | 59% | 86% |

## STAFFING

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Operational Vacancies | | 8% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $2,591 | $2,345 | $1,746 |
| Total Non Labor Cost | $84 | $80 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## OTHER TRENDS

| | 6 Mo. Trend | CIW | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 6.6 | 5.6 |
| Emergency Department Visits* | | 11 | 7 |
| Specialty Care Referrals* | | 73 | 60 |
| Prescriptions Per Inmate | | 4.1 | 2.7 |
| Diagnostics Per Inmate | | 1.1 | 0.9 |
| Appeals Received* | | 22 | 30 |
| Prison Population Capacity | | 139% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:37:47 PM

# HEALTHCARE SERVICES DASHBOARD
## CIM
*January 2017*



Main Menu

## SCHEDULING & ACCESS TO CARE

| ACCESS | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Medical Services | | 95% | 83% |
| Dental Services | | 97% | 95% |
| Mental Health Services | | 98% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 1.0% | 0.9% |
| Seen as Scheduled | | 95% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| NON-EHRS INSTITUTIONS - *MAPIP* | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Medication Continuity-Transfer | | 83% | 80% |
| Medication Non-Adherence Counseling | | 95% | 88% |
| Medication Administration | | 98% | 96% |
| **EHRS INSTITUTIONS -** *Med Administration* | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 1.8% | 4.5% |
| Non-Formulary by Medical Providers | | 4.2% | 4.5% |
| Central Fill Prescriptions | | 77% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 98% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Operational Vacancies | | 6% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | 90% | 79% |
| Diabetes Care | | 86% | 81% |
| End Stage Liver Disease Care | | 93% | 84% |
| Colon Cancer Screening | | 63% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 88% | 91% |
| Utilization Specialty Services | | 93% | 89% |
| Polypharmacy Medication Review | | 100% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| All Documents | | 83% | 75% |
| Specialty Notes | | 92% | 85% |
| Community Hospital Records | | 95% | 93% |
| Scanning Accuracy | | 91% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,408 | $1,478 | $1,746 |
| Total Non Labor Cost | $133 | $167 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 100% | 91% |
| 30-Day Community Hospital Readmission | | 7.1% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 25% | 18% |
| Potentially Avoidable Hospitalizations* | | 23.6 | 1.8 |
| EOP/MHCB Treatment Plan | | 97% | 64% |
| Suicide Watch Discharge Plan | | 80% | 29% |
| Suicide Risk Evaluation | | 100% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 53% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Appointments per PCP | | 8.2 | 9.6 |
| Appointments per PCRN | | 5.8 | 6.6 |
| Encounters per Primary MH Clinician | | 3.2 | 5.4 |
| Encounters per Psychiatrist | | 5.8 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | CIM | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 11.3 | 5.6 |
| Emergency Department Visits* | | 4 | 7 |
| Specialty Care Referrals* | | 83 | 60 |
| Prescriptions Per Inmate | | 4.4 | 2.7 |
| Diagnostics Per Inmate | | 2.0 | 0.9 |
| Appeals Received* | | 22 | 30 |
| Prison Population Capacity | | 118% | 131% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:36:49 PM

# HEALTHCARE SERVICES DASHBOARD

CHCF

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 76% | 83% |
| Dental Services | | 79% | 95% |
| Mental Health Services | | 86% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.7% | 0.9% |
| Seen as Scheduled | | 90% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 98% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Asthma Care | | 86% | 85% |
| Therapeutic Anticoagulation | | 76% | 79% |
| Diabetes Care | | 84% | 81% |
| End Stage Liver Disease Care | | 86% | 84% |
| Colon Cancer Screening | | 79% | 74% |
| Women's Care | | | 79% |
| Diagnostic Monitoring | | 84% | 91% |
| Utilization Specialty Services | | 74% | 89% |
| Polypharmacy Medication Review | | 94% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 92% | 91% |
| 30-Day Community Hospital Readmission | | 23.9% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 28% | 18% |
| Potentially Avoidable Hospitalizations* | | 84.8 | 1.8 |
| EOP/MHCB Treatment Plan | | 66% | 64% |
| Suicide Watch Discharge Plan | | 20% | 29% |
| Suicide Risk Evaluation | | 59% | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 4.3% | 4.5% |
| Non-Formulary by Medical Providers | | 5.7% | 4.5% |
| Central Fill Prescriptions | | 23% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| All Documents | | 66% | 75% |
| Specialty Notes | | 87% | 85% |
| Community Hospital Records | | 92% | 93% |
| Scanning Accuracy | | - | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | | |
| Patient Safety Program | | | |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 56% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Appointments per PCP | | 7.6 | 9.6 |
| Appointments per PCRN | | 3.4 | 6.6 |
| Encounters per Primary MH Clinician | | 6.8 | 5.4 |
| Encounters per Psychiatrist | | 5.1 | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 87% | 88% |
| Mental Health Primary Clinician | | 73% | 82% |
| Psychiatrist | | 92% | 86% |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $4,752 | $4,866 | $1,746 |
| Total Non Labor Cost | $387 | $379 | $62 |

## OTHER TRENDS

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 17.6 | 5.6 |
| Emergency Department Visits* | | 16 | 7 |
| Specialty Care Referrals* | | 206 | 60 |
| Prescriptions Per Inmate | | 9.5 | 2.7 |
| Diagnostics Per Inmate | | 3.2 | 0.9 |
| Appeals Received* | | 139 | 30 |
| Prison Population Capacity | | 84% | 131% |

## STAFFING

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Operational Vacancies | | 9% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## APPEAL PROCESSING

| | 6 Mo. Trend | CHCF | Statewide |
|---|---|---|---|
| Timely Appeals | | 89% | 97% |

\* Rate Per 1,000 Inmates

** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov

Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta

Report run: 3/16/2017 1:36:25 PM

# HEALTHCARE SERVICES DASHBOARD

## CEN

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 85% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 100% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.0% | 0.9% |
| Seen as Scheduled | | 92% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | - | 4.5% |
| Non-Formulary by Medical Providers | | 4.1% | 4.5% |
| Central Fill Prescriptions | | 53% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 93% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Operational Vacancies | | 9% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Asthma Care | | 95% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 89% | 81% |
| End Stage Liver Disease Care | | 87% | 84% |
| Colon Cancer Screening | | 76% | 79% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | - | 91% |
| Utilization Specialty Services | | 88% | 89% |
| Polypharmacy Medication Review | | 71% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| All Documents | | 92% | 75% |
| Specialty Notes | | 97% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 98% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $564 | $598 | $1,746 |
| Total Non Labor Cost | $29 | $29 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 2.3% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 6.6 | 1.8 |
| EOP/MHCB Treatment Plan | | 100% | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | 100% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 78% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Appointments per PCP | | 9.0 | 9.6 |
| Appointments per PCRN | | 6.6 | 6.6 |
| Encounters per Primary MH Clinician | | 4.1 | 5.4 |
| Encounters per Psychiatrist | | 5.1 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | CEN | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.6 | 5.6 |
| Emergency Department Visits* | | 3 | 7 |
| Specialty Care Referrals* | | 29 | 60 |
| Prescriptions Per Inmate | | 1.3 | 2.7 |
| Diagnostics Per Inmate | | 0.3 | 0.9 |
| Appeals Received* | | 7 | 30 |
| Prison Population Capacity | | 155% | 131% |

*\* Rate Per 1,000 Inmates*
*\*\* Statewide figures exclude HQ positions*

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:35:14 PM

# HEALTHCARE SERVICES DASHBOARD

## CCWF

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 77% | 83% |
| Dental Services | | 94% | 95% |
| Mental Health Services | | 93% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 1.6% | 0.9% |
| Seen as Scheduled | | 82% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 94% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Asthma Care | | 94% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 76% | 81% |
| End Stage Liver Disease Care | | 65% | 84% |
| Colon Cancer Screening | | 75% | 74% |
| Women's Care | | 79% | 79% |
| Diagnostic Monitoring | | 91% | 91% |
| Utilization Specialty Services | | 85% | 89% |
| Polypharmacy Medication Review | | 87% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 84% | 91% |
| 30-Day Community Hospital Readmission | | 12.9% | 12.2% |
| 30-Day MHCB or DSH Readmission | | 38% | 18% |
| Potentially Avoidable Hospitalizations* | | 9.0 | 1.8 |
| EOP/MHCB Treatment Plan | | 64% | 64% |
| Suicide Watch Discharge Plan | | 33% | 29% |
| Suicide Risk Evaluation | | 41% | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 80% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 5.8% | 4.5% |
| Non-Formulary by Medical Providers | | 7.9% | 4.5% |
| Central Fill Prescriptions | | 52% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| All Documents | | 100% | 75% |
| Specialty Notes | | 92% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 100% | 94% |
| EHRS Timely Documentation | | 74% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 52% | 61% |
| Availability of Medical Equipment | | 52% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Appointments per PCP | | 10.0 | 9.6 |
| Appointments per PCRN | | 12.5 | 6.6 |
| Encounters per Primary MH Clinician | | 4.6 | 5.4 |
| Encounters per Psychiatrist | | 5.0 | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 96% | 88% |
| Mental Health Primary Clinician | | 88% | 82% |
| Psychiatrist | | 100% | 86% |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $1,325 | $1,303 | $1,746 |
| Total Non Labor Cost | $48 | $50 | $62 |

## OTHER TRENDS

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 5.4 | 5.6 |
| Emergency Department Visits* | | 10 | 7 |
| Specialty Care Referrals* | | 70 | 60 |
| Prescriptions Per Inmate | | 2.8 | 2.7 |
| Diagnostics Per Inmate | | 1.4 | 0.9 |
| Appeals Received* | | 30 | 30 |
| Prison Population Capacity | | 146% | 131% |

## STAFFING

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Operational Vacancies | | 11% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## APPEAL PROCESSING

| | 6 Mo. Trend | CCWF | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

\* Rate Per 1,000 Inmates
\*\* Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:33:39 PM

# HEALTHCARE SERVICES DASHBOARD

CCI

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 62% | 83% |
| Dental Services | | 100% | 95% |
| Mental Health Services | | 81% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.6% | 0.9% |
| Seen as Scheduled | | 87% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 89% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 1.2% | 4.5% |
| Non-Formulary by Medical Providers | | 4.0% | 4.5% |
| Central Fill Prescriptions | | 51% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 100% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Operational Vacancies | | 10% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Asthma Care | | 92% | 85% |
| Therapeutic Anticoagulation | | 100% | 79% |
| Diabetes Care | | 75% | 81% |
| End Stage Liver Disease Care | | 61% | 84% |
| Colon Cancer Screening | | 73% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 92% | 91% |
| Utilization Specialty Services | | 80% | 89% |
| Polypharmacy Medication Review | | 72% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| All Documents | | 100% | 75% |
| Specialty Notes | | 77% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 99% | 94% |
| EHRS Timely Documentation | | 86% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $934 | $843 | $1,746 |
| Total Non Labor Cost | $31 | $26 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 71% | 91% |
| 30-Day Community Hospital Readmission | | 0.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 5.4 | 1.8 |
| EOP/MHCB Treatment Plan | | 72% | 64% |
| Suicide Watch Discharge Plan | | 80% | 29% |
| Suicide Risk Evaluation | | 100% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 56% | 61% |
| Availability of Medical Equipment | | 65% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Appointments per PCP | | 6.9 | 9.6 |
| Appointments per PCRN | | 4.7 | 6.6 |
| Encounters per Primary MH Clinician | | 4.0 | 5.4 |
| Encounters per Psychiatrist | | 5.9 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | CCI | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.2 | 5.6 |
| Emergency Department Visits* | | 7 | 7 |
| Specialty Care Referrals* | | 22 | 60 |
| Prescriptions Per Inmate | | 2.1 | 2.7 |
| Diagnostics Per Inmate | | 0.6 | 0.9 |
| Appeals Received* | | 29 | 30 |
| Prison Population Capacity | | 133% | 131% |

* Rate Per 1,000 Inmates

** Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**

*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:33:19 PM

# HEALTHCARE SERVICES DASHBOARD

## CCC

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 70% | 83% |
| Dental Services | | 96% | 95% |
| Mental Health Services | | 94% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.3% | 0.9% |
| Seen as Scheduled | | 90% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Asthma Care | | 98% | 85% |
| Therapeutic Anticoagulation | | - | 79% |
| Diabetes Care | | 73% | 81% |
| End Stage Liver Disease Care | | 83% | 84% |
| Colon Cancer Screening | | 47% | 74% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | - | 91% |
| Utilization Specialty Services | | 97% | 89% |
| Polypharmacy Medication Review | | 50% | 94% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 0.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 2.6 | 1.8 |
| EOP/MHCB Treatment Plan | | - | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | - | 70% |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 89% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | - | 4.5% |
| Non-Formulary by Medical Providers | | 2.5% | 4.5% |
| Central Fill Prescriptions | | 41% | 43% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| All Documents | | 99% | 75% |
| Specialty Notes | | 93% | 93% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | - | 94% |
| EHRS Timely Documentation | | 77% | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 69% | 61% |
| Availability of Medical Equipment | | 64% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Appointments per PCP | | 10.9 | 9.6 |
| Appointments per PCRN | | 5.3 | 6.6 |
| Encounters per Primary MH Clinician | | 2.3 | 5.4 |
| Encounters per Psychiatrist | | | 6.2 |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 100% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $463 | $438 | $1,746 |
| Total Non Labor Cost | $21 | $13 | $62 |

## OTHER TRENDS

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 1.4 | 5.6 |
| Emergency Department Visits* | | 2 | 7 |
| Specialty Care Referrals* | | 27 | 60 |
| Prescriptions Per Inmate | | 0.5 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 3 | 30 |
| Prison Population Capacity | | 108% | 131% |

## STAFFING

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Operational Vacancies | | 14% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## APPEAL PROCESSING

| | 6 Mo. Trend | CCC | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

* Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:24:35 PM

# HEALTHCARE SERVICES DASHBOARD
## CAL
*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| ACCESS | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Medical Services | | 90% | 83% |
| Dental Services | | 98% | 95% |
| Mental Health Services | | 100% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.5% | 0.9% |
| Seen as Scheduled | | 93% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 99% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| NON-EHRS INSTITUTIONS - *MAPIP* | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Medication Continuity-Transfer | | 90% | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | 92% | 96% |
| **EHRS INSTITUTIONS -** *Med Administration* | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 0.0% | 4.5% |
| Non-Formulary by Medical Providers | | 1.5% | 4.5% |
| Central Fill Prescriptions | | 58% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 90% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Operational Vacancies | | 10% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Asthma Care | | 94% | 85% |
| Therapeutic Anticoagulation | | - | 79% |
| Diabetes Care | | 81% | 81% |
| End Stage Liver Disease Care | | 100% | 84% |
| Colon Cancer Screening | | 79% | 79% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | - | 91% |
| Utilization Specialty Services | | 94% | 89% |
| Polypharmacy Medication Review | | 100% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| All Documents | | 79% | 75% |
| Specialty Notes | | 94% | 85% |
| Community Hospital Records | | 80% | 93% |
| Scanning Accuracy | | 100% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Complete Care Model | | | |
| QM Program | | | |
| Patient Safety Program | | | |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $517 | $506 | $1,746 |
| Total Non Labor Cost | $18 | $18 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 100% | 91% |
| 30-Day Community Hospital Readmission | | 2.8% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 4.7 | 1.8 |
| EOP/MHCB Treatment Plan | | 100% | 64% |
| Suicide Watch Discharge Plan | | | 29% |
| Suicide Risk Evaluation | | 100% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 88% | 61% |
| Availability of Medical Equipment | | - | 59% |
| Health Care Environment | | - | - |

## WORKLOAD PER DAY

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Appointments per PCP | | 11.2 | 9.6 |
| Appointments per PCRN | | 5.6 | 6.6 |
| Encounters per Primary MH Clinician | | 4.0 | 5.4 |
| Encounters per Psychiatrist | | 2.8 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | CAL | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 1.8 | 5.6 |
| Emergency Department Visits* | | 7 | 7 |
| Specialty Care Referrals* | | 51 | 60 |
| Prescriptions Per Inmate | | 1.1 | 2.7 |
| Diagnostics Per Inmate | | 0.6 | 0.9 |
| Appeals Received* | | 6 | 30 |
| Prison Population Capacity | | 165% | 131% |

*Rate Per 1,000 Inmates
** Statewide figures exclude HQ positions

Please direct questions or feedback to QMstaff@cdcr.ca.gov
Click Here for Monthly Release Notes

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:24:11 PM

# HEALTHCARE SERVICES DASHBOARD

## CAC

*January 2017*



**Main Menu**

### SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 89% | 83% |
| Dental Services | | 99% | 95% |
| Mental Health Services | | 100% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.1% | 0.9% |
| Seen as Scheduled | | 91% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

### MEDICATION MANAGEMENT

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | 88% | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | - | 4.5% |
| Non-Formulary by Medical Providers | | 1.8% | 4.5% |
| Central Fill Prescriptions | | 52% | 43% |

### CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 99% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

### STAFFING

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Operational Vacancies | | 5% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

### POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Asthma Care | | 98% | 85% |
| Therapeutic Anticoagulation | | - | 79% |
| Diabetes Care | | 89% | 81% |
| End Stage Liver Disease Care | | 100% | 84% |
| Colon Cancer Screening | | 88% | 94% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | - | 91% |
| Utilization Specialty Services | | 92% | 89% |
| Polypharmacy Medication Review | | 92% | 94% |

### AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| All Documents | | 100% | 75% |
| Specialty Notes | | 95% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | - | 94% |
| EHRS Timely Documentation | | 85% | 80% |

### COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

### MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $712 | $616 | $1,746 |
| Total Non Labor Cost | $9 | $11 | $62 |

### APPEAL PROCESSING

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

### CARE MANAGEMENT

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | - | 91% |
| 30-Day Community Hospital Readmission | | 0.0% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 3.2 | 1.8 |
| EOP/MHCB Treatment Plan | | - | 64% |
| Suicide Watch Discharge Plan | | - | 29% |
| Suicide Risk Evaluation | | - | 70% |

### RESOURCE MANAGEMENT

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 50% | 61% |
| Availability of Medical Equipment | | 84% | 59% |
| Health Care Environment | | - | - |

### WORKLOAD PER DAY

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Appointments per PCP | | 11.9 | 9.6 |
| Appointments per PCRN | | 5.7 | 6.6 |
| Encounters per Primary MH Clinician | | 1.2 | 5.4 |
| Encounters per Psychiatrist | | 1.0 | 6.2 |

### OTHER TRENDS

| | 6 Mo. Trend | CAC | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.7 | 5.6 |
| Emergency Department Visits* | | 3 | 7 |
| Specialty Care Referrals* | | 33 | 60 |
| Prescriptions Per Inmate | | 1.7 | 2.7 |
| Diagnostics Per Inmate | | 0.7 | 0.9 |
| Appeals Received* | | 9 | 30 |
| Prison Population Capacity | | - | 131% |

\* Rate Per 1,000 Inmates
\*\* Statewide figures exclude HQ positions

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:23:15 PM

# HEALTHCARE SERVICES DASHBOARD

ASP

*January 2017*

Main Menu

## SCHEDULING & ACCESS TO CARE

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| **ACCESS** | | | |
| Medical Services | | 97% | 83% |
| Dental Services | | 98% | 95% |
| Mental Health Services | | 99% | 86% |
| **APPTS COMPLETED AS SCHEDULED** | | | |
| Cancelled Due to Custody | | 0.0% | 0.9% |
| Seen as Scheduled | | 97% | 90% |
| **EFFECTIVE COMMUNICATION** | | | |
| Effective Communication Provided | | 100% | 98% |
| Sign Language Interpreter (SLI) Provided | | - | - |

## MEDICATION MANAGEMENT

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| **NON-EHRS INSTITUTIONS - *MAPIP*** | | | |
| Medication Continuity-Transfer | | - | 80% |
| Medication Non-Adherence Counseling | | - | 88% |
| Medication Administration | | - | 96% |
| **EHRS INSTITUTIONS - *Med Administration*** | | | |
| All Medications Received Timely (EHRS) | | - | 85% |
| **FORMULARY MANAGEMENT** | | | |
| Non-Formulary by Psychiatrists | | 1.5% | 4.5% |
| Non-Formulary by Medical Providers | | 2.2% | 4.5% |
| Central Fill Prescriptions | | 64% | 43% |

## CONTINUITY OF CLINICIANS & SERVICES

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Primary Care Provider (PCP) | | 93% | 88% |
| Mental Health Primary Clinician | | - | 82% |
| Psychiatrist | | - | 86% |

## STAFFING

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Operational Vacancies | | 7% | 8% |
| Average Time to Hire | | - | - |
| FTE Usage | | - | - |

## POPULATION HEALTH MANAGEMENT

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Asthma Care | | 97% | 85% |
| Therapeutic Anticoagulation | | - | 79% |
| Diabetes Care | | 89% | 81% |
| End Stage Liver Disease Care | | 100% | 84% |
| Colon Cancer Screening | | 51% | 79% |
| Women's Care | | - | 79% |
| Diagnostic Monitoring | | 100% | 91% |
| Utilization Specialty Services | | 94% | 89% |
| Polypharmacy Medication Review | | 100% | 94% |

## AVAILABILITY OF HEALTH INFORMATION

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| All Documents | | 80% | 75% |
| Specialty Notes | | 91% | 85% |
| Community Hospital Records | | 100% | 93% |
| Scanning Accuracy | | 100% | 94% |
| EHRS Timely Documentation | | - | 80% |

## COMPLETE CARE MODEL INFRASTRUCTURE

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Complete Care Model | | - | - |
| QM Program | | - | - |
| Patient Safety Program | | - | - |

## MAJOR COSTS PER INMATE PER MONTH**

| | YTD 16/17 | YTD 15/16 | Statewide |
|---|---|---|---|
| Total Labor Cost | $666 | $672 | $1,746 |
| Total Non Labor Cost | $24 | $25 | $62 |

## APPEAL PROCESSING

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Timely Appeals | | 100% | 97% |

## CARE MANAGEMENT

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Appropriate Placement High Risk Patients | | N/A | 78% |
| High Risk Patient Care Plan | | | |
| Follow-Up After MHCB/DSH Admission | | 100% | 91% |
| 30-Day Community Hospital Readmission | | 2.4% | 12.2% |
| 30-Day MHCB or DSH Readmission | | - | 18% |
| Potentially Avoidable Hospitalizations* | | 6.8 | 1.8 |
| EOP/MHCB Treatment Plan | | 77% | 64% |
| Suicide Watch Discharge Plan | | 0% | 29% |
| Suicide Risk Evaluation | | 73% | 70% |

## RESOURCE MANAGEMENT

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Specialty Teleservices | | 77% | 61% |
| Availability of Medical Equipment | | 0% | 59% |
| Health Care Environment | | | |

## WORKLOAD PER DAY

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Appointments per PCP | | 13.2 | 9.6 |
| Appointments per PCRN | | 9.2 | 6.6 |
| Encounters per Primary MH Clinician | | 3.9 | 5.4 |
| Encounters per Psychiatrist | | 14.0 | 6.2 |

## OTHER TRENDS

| | 6 Mo. Trend | ASP | Statewide |
|---|---|---|---|
| Hospital Admissions* | | 3.0 | 5.6 |
| Emergency Department Visits* | | 4 | 7 |
| Specialty Care Referrals* | | 35 | 60 |
| Prescriptions Per Inmate | | 1.5 | 2.7 |
| Diagnostics Per Inmate | | 0.5 | 0.9 |
| Appeals Received* | | 9 | 30 |
| Prison Population Capacity | | 115% | 131% |

*\* Rate Per 1,000 Inmates*
*\*\* Statewide figures exclude HQ positions*

**Please direct questions or feedback to QMstaff@cdcr.ca.gov**
*Click Here for Monthly Release Notes*

Dashboard Version: 5.0 Beta
Report run: 3/16/2017 1:21:52 PM

Exhibit L

https://telesage.com/

For over 20 years, TeleSage has been providing cutting-edge Behavioral Health Research and Outcomes Solutions to clinicians and researchers around the globe.

Our software is designed to:
- Improve the Rigor and Reliability of Assessments
- Reduce the Placebo Response Rate
- Increase Participation in Clinical Trials and Studies
- Decrease Respondent and Staff Burden
- Identify Evidence-Based Practices



## NETSCID: ADMINISTER THE "GOLD STANDARD FOR BEHAVIORAL HEALTH DIAGNOSIS" ONLINE >

Computerized version of the Structured Clinical Interview for the DSM-5. Licensed by the APA
Research, Clinical and Personality Disorders Versions now available

## TOMS: TRACK CLIENT OUTCOMES AND EVALUATE PROGRESS OVER TIME >

Telesage Outcomes Measurement System
Evaluate Client Progress and Treatment Effectiveness. Identify Best Practices.

**"As a psychiatrist treating patients for many years, I saw the need for technology which could provide rigorous, reliable, efficient screening and diagnoses, and additionally track patients' progress through time. Funded by generous grants from NIMH, Telesage has worked to develop and market advanced behavioral health research tools (both products and services) in order to improve research and clinical practices.**

**Our vision is to partner with clinicians, researchers, patients, universities and corporations to improve the lives of people worldwide affected by behavioral health issues."**

https://telesage.com/



DR. BENJAMIN BRODEY, M.D., M.P.H.
FOUNDER AND C.E.O., TELESAGE

**How can we help you to achieve your clinical or research goals?**



telesage-footerlogo2

*©2017 TeleSage, Inc.*

Exhibit M

https://healthlinknow.com/person/peter-yellowlees/



**Peter Yellowlees, MBBS, MD**

Board Chair & Co-Founder

Dr. Yellowlees has extensive expertise in the clinical, business, policy and technical aspects of the Telemedicine industry. Dr. Yellowlees founded a private Telemedicine company, HealthShare in Australia in 2003. He also developed the Queensland Telemedicine Network beginning in 1995, growing it to over 240 clinical sites across the State.

As a telepsychiatrist for 20 years, Dr. Yellowlees has personally undertaken several thousand video consultations with patients. In recent years he has been using email, telephony and videoconferencing to communicate with patients throughout California. Dr Yellowlees developed and evaluated the first ever worldwide store-and-forward Telepsychiatry program and is arguably the most experienced telepsychiatrist in the world. He has published over 200 articles and book chapters primarily on telemedicine and recently was the primary author on the American Telemedicine Association's Guidelines for Telepsychiatry (www.atmeda.org) which are being adopted nationally.

He is a Board Member of the American Telemedicine Association and chairs the Board of HLN.

Exhibit N

# The Effectiveness of Telemental Health: A 2013 Review

Donald M. Hilty, MD,[1] Daphne C. Ferrer, MD,[2]
Michelle Burke Parish, MA,[2] Barb Johnston, MSN,[3]
Edward J. Callahan, PhD,[4] and Peter M. Yellowlees, MD, MBBS[1,2]

[1]Department of Psychiatry and Behavioral Sciences, University of
California—Davis, Sacramento, California.
[2]Health Informatics Graduate Program, University of California—
Davis, Sacramento, California.
[3]HealthLinkNow, Sacramento, California.
[4]Department of Family and Community Medicine, University of
California—Davis, Sacramento, California.

## Abstract

*Introduction: The effectiveness of any new technology is typically
measured in order to determine whether it successfully achieves
equal or superior objectives over what is currently offered. Research
in telemental health—in this article mainly referring to telepsychiatry
and psychological services—has advanced rapidly since 2003, and a
new effectiveness review is needed. Materials and Methods: The
authors reviewed the published literature to synthesize information
on what is and what is not effective related to telemental health. Terms
for the search included, but were not limited to, telepsychiatry, ef-
fectiveness, mental health, e-health, videoconferencing, telemedicine,
cost, access, and international. Results: Telemental health is effective
for diagnosis and assessment across many populations (adult, child,
geriatric, and ethnic) and for disorders in many settings (emergency,
home health) and appears to be comparable to in-person care. In
addition, this review has identified new models of care (i.e., col-
laborative care, asynchronous, mobile) with equally positive out-
comes. Conclusions: Telemental health is effective and increases
access to care. Future directions suggest the need for more research
on service models, specific disorders, the issues relevant to culture
and language, and cost.*

**Key words:** *telepsychiatry, effectiveness, telemental health, video-
conferencing, telemedicine*

## Introduction

Telemental health, a use of telemedicine to provide mental
health assessment and treatment at a distance, enters its
sixth decade as a well-known practice in the medical field—
it has increased access to care, and patients and providers
are very satisfied with it for a wide variety of services.[1] In this article,
we used the term "telemental health" to refer to telepsychiatry and
other psychological services, as the term has been used in social
science and other fields as well. The American Telemedicine Asso-
ciation (ATA) has published telemental health practice guidelines,[2]
as has the American Association of Child and Adolescent Psy-
chiatry.[3] A new generation of studies on telemedicine has replaced
the "primary" view of telemental health as a new and different way
of providing health services to a contemporary view that it is a
vehicle for providing care that is here to stay. The studies sup-
porting this contemporary view have examined the effectiveness of
telemental health to answer the question "Is telemental health 'ef-
fective' to do 'what' for 'whom' and 'when' at this point in time,
based on its evolution?"

Effectiveness implies that telemental health works. In telemedicine
and telemental health, few authors have explicitly addressed effec-
tiveness[4]; however, research appears to be changing this.[5] The un-
derlying premise of being "effective" is the assurance that the chosen
technology is specific to the objective of the service being offered.[6]

Effectiveness needs to be considered from the perspective of the
patient, provider, program, community, and society as a whole. The
only previous review of telemental health's effectiveness considered
it effective in terms of providing access, improving basic outcomes,
and being well-accepted.[4] Telemental health was judged to have
broad utility for clinical disorders, facilitated empowerment of pa-
tients, and had good educational outcomes. Today, its effectiveness is
better described in terms of the model of telepsychiatry used[7,8] and
the population being served (e.g., rural, underserved, children).

This article discusses telemental health's effectiveness related to
clinical care. There is a review of diagnostic (reliability/validity) or
assessment processes, populations (child, geriatric, and ethnic), new
models, settings (e.g., collaborative care, asynchronous, emergency,
home health), mental health disorders, and cost-related and other
outcomes. Recommendations for further effectiveness studies will be
offered, and future directions for telemental health services will be
discussed.

## Materials and Methods

A comprehensive review of the telepsychiatric literature was
conducted in the MEDLINE, PubMed, PsychInfo, Embase, Science
Citation Index, Social Sciences Citation Index, Telemedicine In-
formation Exchange databases, Centre for Reviews and Dissemina-
tion, and The Cochrane Library Controlled Trial Registry databases
for the period of July 2003 to March 2013. (The previous review[4]
covered 1965 to June 2003). The *Journal of Telehealth and Telecare*
was also manually searched for those years when it was not on
MEDLINE. Key words included telepsychiatry, telemental, health,
telecare, telemedicine, e-health, videoconferencing, effectiveness,
efficacy, access, outcomes, satisfaction, quality of care, rural, mental
health, cost, children/child, cultural/culture, geriatric, population,
home health, medical home, emergency, face-to-face, in-person,

DOI: 10.1089/tmj.2013.0075

reliability/validity, and international; the term "in-person" will be used rather than "face-to-face" in this article.

Article titles and abstracts were reviewed by the authors to see if they were applicable to the theme of effectiveness. Data on effectiveness appear in a wide range of range of case studies, case series, project descriptions, and program evaluations to more formal research trials.[5] Selected articles were pulled, and their references were reviewed to identify additional articles that may have been missed by the keyword search. In total, 755 articles were initially reviewed for this article, with 670 excluded because of little information/data on effectiveness. Although more reviews of the topic or related topics would have been interesting, 15 were chosen as most salient; this left 70 actual studies. Interventions like education, medication management, and most of the therapies were excluded by the words searched.

Effectiveness, overall, was determined on the basis of clinical parameters, the beneficial effects of a program or policy under optimal conditions of delivery, and other data under more real-world conditions.[9] This differs from evidence of efficacy ratings, which is traditionally organized as A (best) to F (least). A key component of effectiveness is feasibility and/or replicability or adaptation to other settings (also known as disseminability). Clinical research trials usually assess effectiveness compared with in-person service, preferably with a design that is randomized. Tips for program effectiveness[4] have been updated and are summarized in *Table 1*; this compilation, however, is not based on research or analysis of studies.

## Measures of Effectiveness
### DIAGNOSIS (VALIDITY AND RELIABILITY) AND ASSESSMENT (*TABLES 2* AND *3*)

Studies of telemental health's reliability and validity started with 128–384 kilobits per second (Kbps) and now occur at 384+Kbps; these of course do not apply to asynchronous and other telephonic options. Diagnoses have been made reliably, with good inter-rater reliability, for a wide range of psychiatric disorders in children, adolescents, and adults; less information is available on geriatric patients, but preliminary results are positive. Limitations have been largely overcome, including patients' difficulties in hearing, concentration, and attention; some rural areas that lack access because of line or satellite technology are more restrictive, but patients often travel to a nearby site.

A wide range of scales has been studied for adults and children/adolescents via videoconferencing, as reviewed by Yellowlees et al.[2] for the ATA and Richardson et al.[5] These include the Brief Psychiatric Rating Scale (BPRS), Scales for the Assessment of Negative and Positive Symptoms (SANS and SAPS, respectively), the Structured Clinical Interview for the Diagnostic and Statistical Manual (DSM) (SCID), Hamilton Depression Rating Scale (HDRS), Diagnostic Interview Schedule (DIS) (initially by telephone), the Abnormal Involuntary Movement Scale (AIMS), and the Yale Brown Obsessive Compulsive Scale (semistructured) (YBOCS). For children/adolescents, the DSM-IV, Schedule for the Assessment of Depression and Schizophrenia (K-SADS), and DIS (DISC) have been used. The Geriatric Depression Scale (GDS) and many neuropsychiatric scales like the Mini-Mental Status Examination (MMSE), CAMCOG (neuropsychiatric test, computerized), National Adult Reading Test, Quick Test, and Adult Memory and Information Processing Battery are effective. The reliability and validity of asynchronous telepsychiatry has been shown using English and Spanish versions of the SCID and Mini-International Neuropsychiatric Interview (MINI).

## COMPARISON WITH IN-PERSON CARE

Since the last review,[4] studies have compared many parameters using traditional comparison and noninferiority studies.[5,10] Some have noted that with some populations (i.e., children and adolescents), telepsychiatry may be better than in-person services because of the novelty of the interaction, direction of the technology, the psychological and physical distance, and the authenticity of the family interaction.[11] Reports have also included reduced length of hospitalization,[12,13] better medication adherence,[12,14] symptom reduction of disorders,[12–15] and effective therapy such as using evidence-based treatments for posttraumatic stress disorder, including group cognitive processing.[16–18]

## SPECIFIC POPULATIONS: CHILD, GERIATRIC, AND THOSE OF CULTURE

The feasibility, acceptability, and sustainability of telemental health for children and adolescents have now been shown,[19,20] and it has been hypothesized that this approach may be better for some disorders, such as autism-spectrum patients, than in-person care.[11] A qualitative study of young people's perspectives on receiving telepsychiatric services revealed that the sessions were helpful, they felt a sense of personal choice during the consultation, and they generally liked the technology.[21] Attention-deficit hyperactivity disorder treatment by telepsychiatry[3,22–24] has been actively studied, and, once again, satisfaction is high among all parties in a variety of settings.[22,23]

Child research in telemental health has progressed into new areas[20] like randomized trials and Web-based data systems, with work from adults being replicated. Diagnosis appeared to be reliable in early studies,[25,26] demonstration of clinical improvement with the use of cognitive behavioral treatment for depression followed,[27] and then primary care patients treated by telemental health showed improvement in terms of depression and subscales of the Child Behavioral Check List.[28,29] Psychiatric consultation leads to newly diagnosed anxiety or mood disorders in almost one-third of patients seen and a change in the patient's medication for 82% of patients at initial assessment, 41% at Year 1, and 46% at Year 3.[30] Collaborative care for adolescent depression is under evaluation.[31]

In terms of geriatric services, the benefits of telepsychiatry are emerging from neuropsychiatric studies (see above) and a few clinical studies. Preliminary studies in nursing homes have mainly focused on depression or dementia, with telemental health evaluation judged as more facile and efficient in terms of the use of consultant time.[32] Assessment, cognitive intervention, and outcomes appear to be similar to in-person results.[32] Telepsychiatry to a rural geropsychiatric inpatient unit yielded positive results in terms of

**HILTY ET AL.**

| Table 1. How to Evaluate the Effectiveness of Telemental Health |
| --- |
| Measures |
| Starting points |
| Case report, series, or mix of patients |
| Project or program description |
| Qualitative analysis: impressions, perceptions, or information to form additional questions |
| Cost, cost comparison, or cost offset, often of "direct" costs |
| Project or program evaluation, sometimes retrospective |
| Small(er) total $n$ |
| Micro- (e.g., one party) analysis |
| Some control of variance or limited interplay of variables |
| Cross-sectional analysis |
| Goals |
| Prospective, question-based |
| Comparison group |
| Study design "same as" or "equal to" |
| Noninferiority trials |
| Study design randomized controlled trial |
| Cost-effectiveness, -benefit analysis with computations of direct and indirect costs |
| Evaluation that "drives" the objectives and prospectively collected |
| Generally, large(r) total $n$ (but not always guarantee "good" study) |
| Micro- (all parties individually) and macro- (system-wide = patient, provider, clinic, health system, community, and other parties) analyses |
| Analysis of variance |
| Longitudinal analysis |
| Access |
| Increased access to care |
| Improved level of, or quality of, existing care |
| Specific to the need (e.g., consultation–liaison rather than management [only] to primary care) |
| Complements or integrates service delivery (or prevents use of more intensive or costly service) |
| Quality of care |
| Reliable/valid |
| Diagnosis and assessment |
| Detection of limitations and process to "control" for them is delineated |
| Improved level of, or quality of, existing care |

| Table 1. *continued* |
| --- |
| Specific to the need (e.g., consultation–liaison rather than management [onl] to primary care) |
| Complements or integrates service delivery (or prevents use of more intensive or costly service) |
| Population |
| Setting |
| Satisfaction and related intangibles (e.g., empowerment) |
| Costs |
| Technology |
| Adequate description of equipment, bandwidth, frames per second, and other parameters |
| Data on failures, problems (i.e., reliability) |
| Time, effort, and other "hidden" costs of "new" technologies (e.g., asynchronous telepsychiatry) |
| Administration |
| Feasibility |
| Level of coordination to initiate, maintain, and financially support |

satisfaction compared with in-person care[34] and in a 5-year study of patients referred for evaluation of potential cognitive impairment, 55%, 14%, and 12% had Alzheimer's disease, another psychiatric illness, or mild cognitive impairment, respectively.[35]

Ethnicity, culture, and language issues affect health,[36] and there is often inadequate access to specialists[37]—inroads to patient needs and preferences that can be met by telemental health are progressing. A recent study of nearly 40 rural health clinics compared impressions of 25 primary care providers (PCPs) and 32 staff impressions of factors important to care: using providers who value differences (5.4 and 7.0, respectively), quality of the provider's care (4.9 and 7.0, respectively), access to care in general (4.5 and 7.0, respectively), and availability of trained interpreters for use with patients (4.4 and 7.0, respectively).[38] Others are studying the specific needs of Hispanics/Latinos,[37,39,40] Asians,[41] Native Americans,[35,43,44] Eastern Europeans,[44] and those using sign language[45]—all using telepsychiatry for service provision. With patients of different cultural backgrounds, using the patients' primary language allows for a more comfortable atmosphere where they may express their genuine feelings and emotions.

## SUMMARY OF OUTCOMES FOR AGE/POPULATION AND SPECIFIC DISORDERS *(TABLE 2)*

Results are encouraging, overall. Videoconferencing appears to be as effective as in-person care for most parameters, such as feasibility, outcomes, age, and satisfaction with a single assessment and consultation or follow-up use. Illnesses studied have been depression,[9,15,31] posttraumatic stress disorder,[16–18] substance use,[46] and developmental disabilities.[30]

**Table 2. Summary of Clinical/Outcome Studies by Population (Age)**

| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
|---|---|---|---|---|---|
| Geriatric | | | | | |
| Lyketsos et al. (2001) | NAP | Geriatric outpatients | NS | United States | Video reduced "unneeded" hospitalizations. |
| Poon et al.[33] (2005) | 22 | Geriatric dementia patients | 1.5 Mb | China | Significant, comparable cognitive improvement in video and in-person; high satisfaction; feasible assessment, intervention, and outcomes |
| Rabinowitz et al.[32] (2010) | 106 | Nursing home residents | 384 | United States | Reduced travel time, fuel costs, physician travel time, personnel costs |
| Weiner et al.[35] (2011) | 85 | Adult and geriatric dementia patients | NS | United States | Feasible alternative to face-to-face care in patients with cognitive disorders who live in remote areas |
| Adult | | | | | |
| Graham et al. (1996) | 39 | Adult outpatients | 768 | United States | Video reduced "unneeded" hospitalizations. |
| Zaylor et al. (1999) | 49 | Adult depressed or schizoaffective outpatients | 128 | United States | Video equals in-person in GAF scores at 6-month follow-up. |
| Hunkeler et al. (2000) | 302 | Adult primary care outpatients | NS | United States | Video by nurses improved depressive symptoms and functioning and had high satisfaction versus in-person. |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384 | United States | Depression outcomes video and in-person equal, as were adherence, satisfaction, cost |
| Manfredi et al.[74] (2005) | 15 | Adult inmates | 384 | United States | Feasibility from an urban university to rural jail; less need for inmate transport |
| Sorvaniemi et al.[59] (2005) | 60 | Adult emergency patients | 384 | Finland | Minor technical problems occurred; assessment and satisfaction fine |
| Modai et al.[76] (2006) | 24/15 | Adult outpatients | NS | Israel | Video greater than in-person cost per service and more hospitalization cost (less available per usual care) |
| Urness et al.[75] (2006) | 39 | Adult outpatients | 384 | Canada | Video less than in-person for encouragement; improved outcomes for both |
| O'Reilly et al.[13] (2007) | 495 | Adult outpatients | 384 | Canada | Video equal to in-person in outcomes, satisfaction; 10% less expensive per video |
| Yellowlees et al.[53] (2010) | 60 | Non-emergency adult patients | NAP | United States | First ATP to demonstrate feasibility |
| Pediatric | | | | | |
| Nelson et al.[27] (2003) | 28 | Children | 128 | United States | Video equals in-person in reducing depression over 8 weeks; satisfaction high, but 15/100 consultations had an issue with technology. |
| Greenberg et al.[77] (2006) | NS | Children | NS | Canada | Video experiences positive; family caretakers and service providers frustrated with limitations of the video |
| Myers et al.[78] (2006) | 115 | Adolescents, incarcerated | 384 | United States | 80% of youth successfully prescribed medications, and they expressed confidence with the psychiatrist's recommendations; youth expressed concerns about privacy. |
| Myers et al.[23] (2010) | 172 | Children and adolescents | 384 | United States | Parents' satisfaction higher with school-aged children and lower with adolescents; adherence high for return appointments |
| Pakyurek et al.[12] (2010) | NAV | Children/adolescents in primary care | NS | United States | Video might actually be superior to in-person for consultation. |

(continued)

## Table 2. Summary of Clinical/Outcome Studies by Population (Age) *continued*

| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
|---|---|---|---|---|---|
| Lau et al.[79] (2011) | 45 | Children and adolescents | NS | United States | Video reaches a variety of children, with consultants providing diagnostic clarification and modifying treatment |
| Jacob et al.[80] (2012) | 15 | Child outpatients | NS | United States | Patient satisfaction was high, and PCPs found recommendations helpful; outcomes pending on follow-up |
| **All ages** | | | | | |
| De Las Cuevas et al.[14] (2006) | 130 | All ages—outpatients | 384–768 | Spain | Video equals in-person, including those in remote areas with limited resources |
| **Depression** | | | | | |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384 | United States | Video equals in-person for adherence, patient satisfaction, and cost. |
| Fortney et al.[15] (2007) | 177 | Adult outpatients | NS | United States | Video can help adapt collaborative care model in small PC clinics, and symptoms improved more rapidly in intervention group versus usual-care group. |
| Moreno et al.[37] (2012) | 167 | Adult patients | NS | United States | Video may close gap in access to culturally and linguistically congruent specialists; improves depression severity, functional ability, and quality of life |
| Fortney et al.[9] (2013) | 364 | Adult patients | NS | United States | Video collaborative care group had greater reductions in severity than usual-care group. |
| **PTSD** | | | | | |
| Frueh et al.[18] (2007) | 38 | Adult male Veterans | 384/NS | United States | Video equals in-person in clinical outcomes and satisfaction at 3-month follow-up; video less comfort versus in-person in talking with therapist post-treatment and had worse treatment adherence |
| Morland et al.[17] (2010) | 125 | Adult male Veterans | 384/NS | United States | Video CBGT for PTSD-related anger is feasible for rural/remote Veterans, with reduced anger. |
| Germain et al.[81] (2009) | 48 | Adult patients | NS | Canada | Video equals in-person in reducing PTSD over 16–25 weeks |
| **Substance abuse** | | | | | |
| Frueh et al.[46] (2005) | 14 | Adult male outpatients | 384/NS | United States | Video had good attendance, comparable attrition, and high satisfaction. |
| **Developmental disability** | | | | | |
| Szeftel et al.[30] (2012) | 45 | Adolescents | NS | United States | Video led to changed Axis I psychiatric diagnosis (excluding developmental disorders) 70%, and changed medication 82% of patients initially, 41% at 1 year, and 46% at 3 years; video helped PCPs with recommendations for developmental disabilities. |
| **Panic disorder** | | | | | |
| Bouchard et al.[82] (2004) | 21 | Adults | 384/NS | Canada | Video 81% of patients panic-free post-treatment and 91% at 6-month follow up via CBT |
| **Hispanic** | | | | | |
| Moreno et al.[37] (2012) | 167 | Adult patients | NS | United States | Video lessens depression severity, raises functional ability and quality of life, and improves access to culturally and linguistically congruent specialists. |
| Chong et al.[40] (2012) | 167 | Adult patients | NS | United States | Video is acceptable to low-income depressed Hispanic patients, but its feasibility is questionable. |
| Yellowlees et al.[55] (2013) | 127 | English- and Spanish-speaking patients | NS | United States | ATP equal for English- and Spanish-speaking patients |

(continued)

| Table 2. Summary of Clinical/Outcome Studies by Population (Age) *continued* | | | | | |
|---|---|---|---|---|---|
| TOPIC, STUDY | *N* | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
| American Indian | | | | | |
| Shore et al.[43] (2008) | 53 | Male adult patients | NS | United States | Video equals in-person assessment, interaction, and satisfaction; comfort level high and culturally accepted |
| European | | | | | |
| Mucic[44] (2010) | 61 | Adult outpatients | 2Mbit (Denmark) 10Mbit (Sweden) | Denmark | Video improved access, reduced waiting time, and reduced travel to see bilingual psychiatrists; high satisfaction video preferred via "mother tongue" rather than interpreter-assisted care |
| Asian | | | | | |
| Ye et al.[41] (2012) | 19 | Adult outpatients | NS | United States | Primary language facilitates expression of feelings, emotional discomfort, or social stressors. |
| Sign language | | | | | |
| Lopez et al.[45] (2004) | 1 | Adult female, deaf since birth | NS | United States | Video communication was fine with ASL interpreter, and psychiatric symptoms improved. |

Those studies before 2003 are not referenced in this regular article since it is not a review; name and year of those not referenced are given in Hilty et al.[4] (2003).
ASL, American Sign Language; ATP, asynchronous telepsychiatry; CBT, cognitive behavioral treatment; NAP, not applicable; NAV, not available; NS, not specified; PC, primary care; PCP, primary care provider; PTSD, posttraumatic stress disorder.

## MODELS AND SETTINGS OF TELEMENTAL SERVICES

*Consultation to primary care versus management.* Past studies showed positive outcomes for patients when using a consultation model of care into primary care sites. Specialists changed the diagnosis and medications in 91% and 57% of cases, respectively, with primary care interventions led to clinical improvements in 56% of cases.[1] Provider knowledge, skills, and complexity of questions improve over time,[47] particularly in rural PCPs.[48] The most intensive model of consultation to primary care is collaborative care, which has now been more formally applied to telemedicine[9,15,31] with encouraging results. The virtual collaborative care team was able to produce better outcomes than the traditional "gold standard" methodology of primary care psychiatry.[9]

Models of care have been thoroughly studied and well articulated.[7] Examples are:

1. Randomized controlled trial for depression in adults, using disease management and telepsychiatric consultation versus usual care over 12 months.[49]
2. Phone and e-mail physician-to-provider consultation system for adults and children with developmental disabilities, using a 24-h warm-line.[50]
3. An integrated program of mental health screening, therapy on site, and telepsychiatric consultation (phone, e-mail, or video), with continuing medical education and training on screening questionnaires.[28,29]
4. Cultural consultation to rural primary care using telemedicine.[38]

5. Disaster response to a bioterrorism attack was evaluated as feasible in terms of training and consultations.[51]
6. Collaborative care via telepsychiatry is co-provision of medication for primary care patients by the telepsychiatrist and PCP in rural communities, based on the earlier models of in-person care to achieve national standards of antidepressant prescriptions.[9,52] This model is often integrated with stepped models of care, which, similar to the above, use "less intensive or expensive interventions" first; then if patients fail to improve, "step it up" to more intensive services.
7. Asynchronous telepsychiatry (ATP) to primary care (described below) is feasible and helpful (described below).[53,54]

*ATP.* ATP services, formerly known as store-and-forward services, have been demonstrated to be feasible, valid, and reliable in English- and Spanish-speaking patients in primary care.[53–55] Asynchronous telemedicine is used in radiology, dermatology, ophthalmology, cardiology, and pathology, and it is now available in psychiatry, where it may also facilitate the "medical home," a patient-centered approach that supports the PCP to improve patient care and health.[56]

ATP works at the patient end via taping a videorecording of local providers and patients, use of a basic questionnaire, and uploading of videos and patient histories for a remote psychiatrist for review in a Health Insurance Portability and Accountability Act (HIPAA)-adherent manner.[57] He or she evaluates the information, diagnoses the patient, and makes two or three treatment recommendations in a report. ATP is specifically designed for patients who can be primarily managed in primary care, but could offer the

**Table 3. Summary of Telemental Health Cost Studies: Since 1998**

| COST | N | PATIENTS | KBPS/ FRAMES | LOCALE | COMMENTS |
|---|---|---|---|---|---|
| Mielonen (1998) | 14 | Adult inpatients | NS | Finland | Savings in healthcare costs, reduction in travel, and ease and speed of consultation |
| Trott (1998) | 50 | Adult and child outpatients | NS | Australia | Substantial savings in healthcare costs from reduction in traveling and patient transfers |
| Alessi (1999) | NAV | Adult forensic inpatients | NAV/NAV | United States | Video is cost-effective. |
| Doze (1999) | 90 | Adults | 336–384/NS | Alberta | Costs break even at 7.6 consultations. |
| Simpson (2001) | 379 | Adult outpatients | 128–384 | Canada | Costs break even at 224 consultations/year; less if used for administration, too |
| Elford (2001) | 30 | Children and parents | 336 | Newfoundland, Canada | Cost $400 per consultation via video or by patient traveling |
| Hailey (2002) | NAP | Adults | NAP/NAP | United States | Reduced costs to rural patients |
| Edwards et al.[83] (2003) | 518 | Adults and children | | United States | Video saved $400/consultation versus in-person |
| Jong[68] (2004) | 71 | NS | NS | Canada | Video saved $2,000/consultation versus in-person and saved government $140,088 in 2003. |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384/NS | United States | Video greater than in-person unless psychiatrist traveled > 22 miles away, and the productivity (increasing number of patients/day) minimized costs. |
| Cluver et al.[63] (2005) | 10 | Adult outpatients | NS | United States | In-home portable video works but costly for the average person |
| Persaud et al.[69] (2005) | 215 | Adults | NS | Canada | Video versus in-person of equal cost, overall, as patient costs more for in-person literal consultation $240–$1,048 (Canadian $) versus telehealth $17–$70, but from societal perspective, video costs more at $1,736–$28,084 versus in-person $325–$1,133. |
| Harley[84] (2006) | 11 | Adults | 128 | United Kingdom | Video in rural areas costs 4 times less than in-person, once a threshold of 5–6 episodes per year is completed. |
| Modai et al.[76] (2006) | 24/15 | Adult outpatients | NS | Israel | Operational video costs greater than in-person, particularly if resulted in hospitalization (223.7% higher); video costs of sessions 32% higher unless travel included (then only 10.6% higher) |
| O'Reilly et al.[13] (2007) | 495 | Adult outpatients | 384/NS | Canada | Video 10% less expensive per patient than service provided in-person |
| Shore et al.[42] (2007) | 53 | Adults | 384/NAP | United States | Video costs lower than in-person |
| Smith et al.[66] (2007) | 1,499 | Children | NS | Australia | Video cost about $600/consultation versus $1,000+ in-person |
| Spaulding et al.[67] (2010) | 257 | Children/adolescents | 384+? | United States | Video cost $168/consult more but only $31 if travel costs included |
| Rabinowitz et al.[32] (2010) | 106 | Nursing home residents | 384/NS | United States | Reduced travel time, fuel costs, physician travel time, personnel costs |
| Pyne et al.[85] (2010) | 395 | Adult outpatients | NS | United States | Video $85,634/QALY for collaborative care |
| Butler and Yellowlees[54] (2012) | 125 | Adult primary care patients | ATP[5] | United States | ATP and video fixed costs $7,000 and $20,000, respectively, and per consultation ATP was $68.18, video was $107.50, and in-person $96.36; this means ATP is most cost-effective at 249 consultations/year. |

Those studies before 2003 are not referenced in this regular article since it is not a review; name and year of those not referenced are given in Hilty et al.[4] (2003).

ATP, asynchronous telepsychiatry; KBPS, kilobits per second; NAP, not applicable; NAV, not available; NS, not specified; QALY, quality-adjusted life years.

opportunity for PCPs to collaborate with psychiatrists to provide specialized care, and it is less costly than video and usual care.[53]

*Emergency room telepsychiatry.* Telepsychiatry emergency services have been slow to develop in psychiatry compared with neurology (e.g., stroke), obstetrics (e.g., fetal monitoring), and other clinical areas. This is surprising despite the consultation models used and the long delays before mental health evaluation may occur on site. The effectiveness of emergency telepsychiatric consultations has rarely been studied; however, one study of patients with mainly depression, bipolar disorder, and schizophrenia revealed that 65% were discharged, 16% were admitted, and 19% were transferred.[58] This study, which examined eight programs, found that most rated themselves as moderately successful (3/5 or 4/5, with 5 best) and patients and emergency physicians rated services at 4.4/5. The same was found in another study.[59] Guidelines on how to be effective in providing emergency telepsychiatry need to be evaluated.[60,61]

*Medical home, home health, and other mobile technology methods.* These services are in development and need to be better studied, although costs are dramatically decreasing. The patient-centered medical home is a concept founded on the presence of inadequate treatment in primary care and/or an inability to access needed services.[56] The patient-centered medical home allows telepsychiatric input at home, still under the general purview of the PCP, and it has been shown to improve patient care and health.[62] Desk-mounted video systems offer great convenience for therapy to cancer patients to avoid travel, but the cost used to be prohibitive for most consumers.[63] Internet-based video technology via personal computers and mobile devices must be HIPAA-adherent. Use of these technologies is increasingly becoming available and will support the move of telepsychiatry to the home, such as programs that are now being implemented by the Veterans Health Administration.[64]

## ACCESS TO CARE

Access appears to have been greatly increased, based on the recent decade's research—with a few exceptions. Patients may have less travel, absence from work, and time waiting, more clinical choice and control, and better outcomes, as summarized previously.[4] Satisfaction, generally, with services is so high that it *de facto* precludes study. Rarely do patients report a less satisfactory interaction via videoconferencing than in-person. A few access-to-care issues remain unresolved for patients: (1) privacy and confidentiality where some patients prefer services delivered from elsewhere (e.g., living on a reservation or wanting total anonymity for personal reasons), (2) cultural and language nuances related to telemental healthcare, and (3) inadequate payment for indigent, rural, and other underserved patients. PCPs and communities are generally happy to "keep" their patients locally for continuity of care.

## COST ISSUES AND IMPLICATIONS

Ideally, costs should be considered for patients, clinics, providers, and society at large—with both direct and indirect costs accounted for. Direct costs include equipment, installation of lines, and other supplies. Fixed costs also include the rental cost of lines, salary and wages, and administrative expenses. Variable costs include data transmission costs, fees for service, and maintenance and upgrades of equipment. Costs may also include projections for travel, transfers in emergencies, waiting times, and more "appropriate" use of other services or, more globally, by rural towns retaining dollars that would have been otherwise lost to suburban centers upon referral.

With regard to cost, there is benefit to delineate between differing types of cost analyses.[65] The cost-offset model, which implies treating mental conditions may reduce other health costs, is widely used. Cost-minimization analysis implies the same effectiveness model, but different (lower) costs. Cost-effectiveness assesses intervention costs versus alternative expenditures; a subtype is cost-utility analysis, which includes data on health-related quality-of-life measures (i.e., quality-adjusted life-years). Cost-benefit analysis values all outcomes by translating them into economic terms to the degree possible and is particularly important when an intervention appears far too expensive at face value (or cross section) but not longitudinally (e.g., a transplant helps someone live and work an additional 50 years; this calculation gets into quality of life-years analysis).

Cost studies have differences in data sought, their collection, and how they are analyzed (*Table 3*). Videoconferencing may be cost-effective if someone does not have to travel or transfers as "expensive" services are avoided. Savings may be shown versus in-person with high consultation rates (e.g., 1,500 consultations total),[66] "break-even" or other thresholds used (e.g., number of consultations/year), or when the patient's travel, time, and food are included.[66,67] A break-even analysis is highly specific to a program, with a range of consultations needed, from 7 to 774 depending on methods of calculation.[66] A comparison of ATP, video, and in-person showed fixed costs were $7,000 for ATP and $20,000 for regular video, and the cost per consultation was $68.18 for ATP, $107.50 for videoconferencing, and $96.36 in-person; this means ATP is most cost-effective at 249 consultations/year.[54] Governments have been tabulating savings, too,[68,69] and an economic evaluation of telehealth data collection with rural populations has been completed.[70]

# Conclusions, Implications, and Recommendations for Future Research

Today, telemental health services are unquestionably effective in most regards, although more analysis is needed. They are effective for diagnosis and assessment, across many populations (adult, child, geriatric, and ethnic), and in disorders in many settings (emergency, home health), are comparable to in-person care, and complement other services in primary care. Overall, better evaluation with formal measures (i.e., randomized trials, lack of inferiority designs) and analysis of variance to predictors of outcomes are necessary. Studies need to be focused on areas where there is currently a relative paucity of information, such as anxiety, substance use, and psychotic and other disorders.

**HILTY ET AL.**

A key area the integration of telepsychiatric models like collaborative care into services in primary care settings. The fact that it worked better than usual models is a key step—it may change our decision-making about how to best do things in the future. Web-based data management[37,71,72] will facilitate services, as can stepped models of care. For example, a new stepped model might have low tier physician-to-provider phone or e-mail consultation followed by ATP, then therapies, and finally videoconferencing.

A plan for assessment and care for patients with ethnic, cultural, and language issues is essential.[54,73] Scientific and policy questions from this discussion include:

- What tools, methods, and measures are needed to assess the patients, providers, and health systems?
- What are the intersections of culture, sociodemographic, geography, and technology in health?
- Will patients' disorder, racial or ethnic identity, or other factors determine whether e-mental health or in-person care is more effective?
- What is the most cost-effective and feasible way to provide language/interpreting support?

Limitations of this article include that it is not a systematic, fully longitudinal review of the literature. Second, the scope was limited to exclude specifics on medication management, the therapies (largely), and other treatments. Furthermore, not all findings apply to all locales or settings therein. Fourth, the landscape of healthcare is rapidly changing, with consumer/patient use of technology—the field will be hard pressed to keep up. Finally, plans that offer the most "adaptability" or "flexibility" of telemental services—beyond this article's scope—will afford the most opportunities for improvement.

## Acknowledgments

We thank the American Telemedicine Association Mental Health Interest Group; the University of California, Davis Center for Health and Technology, Department of Psychiatry and Behavioral Sciences and Health Informatics Graduate Group; telemedicine and telepsychiatry pioneers, authors, organizational leaders, and innovators; and the American Telemedicine Association.

## Disclosure Statement

No competing financial interests exist.

REFERENCES

1. Hilty DM, Marks SL, Urness D, et al. Clinical and educational applications of telepsychiatry: A review. *Can J Psychiatry* 2004;49:12–23.

2. Yellowlees PM, Shore J, Roberts L. Practice guidelines for videoconferencing-based telemental health, American Telemedicine Association. *Telemed J E Health* 2010;16:1074–1089.

3. AACAP practice parameter for telepsychiatry with children and adolescents. *J Am Acad Child Adolesc Psychiatry* 2007;47:1468–1483.

4. Hilty DM, Liu W, Marks SL, et al. Effectiveness of telepsychiatry: A brief review. *Can Psychiatry Assoc Bull* 2003;(Oct):10–17.

5. Richardson LK, Frueh BC, Grubaugh AL, et al. Current directions in videoconferencing tele-mental health research. *Clin Psychol (New York)* 2009;16:323–328.

6. Morland LA, Greene CJ, Rosen C, et al. Issues in the design of a randomized noninferiority clinical trial of telemental health psychotherapy for rural combat veterans with PTSD. *Contemp Clin Trials* 2009;30:513–522.

7. World Health Organization. *Telemedicine opportunities and developments in member states. Results of the second global survey on eHealth.* Geneva: WHO Press, 2011.

8. Hilty DM, Yellowlees, PM, Cobb HC, et al. Models of telepsychiatric consultation–liaison service to rural primary care. *Psychosomatics* 2006;47: 152–157.

9. Fortney JC, Pyne JM, Mouden SP, et al. Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: A pragmatic randomized comparative effectiveness trial. *Am J Psychiatry* 2013;170:414–425.

10. Flay BR, Biglan A, Boruch RF, et al. Standards of evidence: Criteria for efficacy, effectiveness and dissemination. *Prev Sci* 2005. Available at www.ebppc .hawaii.edu/Resources/Standards%20of%20Evidence%5B1%5D.pdf (last accessed February 1, 2013).

11. Morland LA, Greene CJ, Rosen C, et al. Issues in the design of a randomized noninferiority clinical trial of telemental health psychotherapy for rural combat veterans with PTSD. *Contemp Clin Trials* 2009;30:513–252.

12. Pakyurek M, Yellowlees PM, Hilty DM. The child and adolescent telepsychiatry consultation: Can it be a more effective clinical process for certain patients than conventional practice? *Telemed J E Health* 2010;16:289–292.

13. O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face to face psychiatry: Results from a randomized controlled equivalence trial. *Psychiatr Serv* 2007;58:836–843.

14. De Las Cuevas C, Arrendondo MT, Cabrera MF, et al. Randomized controlled trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. *Telemed J E Health* 2006;12:341–350.

15. Fortney JC, Pyne JM, Edlund MJ, et al. A randomized trial of telemedicine-based collaborative care for depression. *J Gen Intern Med* 2007;22:1086–1093.

16. Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: Comparison of remote treatment through telepsychiatry to in-person treatment. *Am J Psychiatry* 2004;161:1471–1476.

17. Morland LA, Greene CJ, Rosen CS, et al. Telemedicine for anger management therapy in a rural population of combat veterans with posttraumatic stress disorder: A randomized noninferiority trial. *J Clin Psychiatry* 2010;71: 855–863.

18. Frueh BC, Monnier J, Yim E, et al. Randomized trial for post-traumatic stress disorder. *J Telemed Telecare* 2007;13:142–147.

19. Morland LA, Hynes AK, Mackintosh MA, et al. Group cognitive processing therapy delivered to veterans via telehealth: A pilot cohort. *J Trauma Stress* 2011;24:465–469.

20. Myers KM, Valentine JM, Melzer SM. Feasibility, acceptability, and sustainability of telepsychiatry for children and adolescents. *Psychiatr Serv* 2007;58: 1493–1496.

21. Myers KM, Palmer NB, Geyer JR. Research in child and adolescent telemental health. *Child Adolesc Psychiatr Clin North Am* 2011;20:155–171.

22. Boydell K, Volpe T, Pignatello A. A qualitative study of young people's perspectives on receiving psychiatric services via televideo. *J Can Assoc Child Adolesc Psychiatry* 2010;19:5–11.

23. Myers KM, Vander Stoep A, McCarty CA, et al. Child and adolescent telepsychiatry: Variations in utilization, referral patterns and practice trends. *J Telemed Telecare* 2010;16:128–133.

24. Palmer NB, Myers KM, Vander Stoep A, et al. Attention-deficit/hyperactivity disorder and telemental health. *Curr Psychiatry Rep* 2010;12:409–417.

25. Pesamaa L, Ebeling H, Kuusimaki ML, et al. Videoconferencing in child and adolescent telepsychiatry: A systematic review of the literature. *J Telemed Telecare* 2004;10:187–192.

26. Elford R, White H, Bowering R, et al. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *J Telemed Telecare* 2000;6:73–82.

27. Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. *Telemed J E Health* 2003;9:49–55.

28. Neufeld JD, Bourgeois JA, Hilty DM, et al. The e-mental Health Consult Service: Providing enhanced primary care mental health services through telemedicine. *Psychosomatics* 2007;48:135–141.

29. Yellowlees PM, Hilty DM, Marks SL, et al. A retrospective analysis of child and adolescent e-mental health. *J Am Acad Child Adolesc Psychiatry* 2008;47:1–5.

30. Szeftel R, Federico C, Hakak R, et al. Improved access to mental health evaluation for patients with developmental disabilities using telepsychiatry. *J Telemed Telecare* 2012;18:317–321.

31. Richardson L, McCauley E, Katon W. Collaborative care for adolescent depression: A pilot study. *Gen Hosp Psychiatry* 2009;31:36–45.

32. Rabinowitz T, Murphy K, Amour JL, et al. Benefits of a telepsychiatry consultation service for rural nursing home residents. *Telemed J E Health* 2010;16:34–40.

33. Poon P, Hui E, Dai D, et al. Cognitive intervention for community-dwelling older persons with memory problems: Telemedicine versus face-to-face treatment. *Int J Geriatr Psychiatry* 2005;20:285–286.

34. Holden D, Dew E. Telemedicine in a rural gero-psychiatric inpatient unit: Comparison of perception/satisfaction to onsite psychiatric care. *Telemed J E Health* 2008;14:381–384.

35. Weiner M, Rossetti H, Harrah K. Videoconference diagnosis and management of Choctaw Indian dementia patients. *Alzheimers Dement* 2011;7:562–566.

36. Chapter 4. Mental health care for American Indians and Alaska Natives. In: Office of the Surgeon General (US); Center for Mental Health Services (US); National Institute of Mental Health (US). *Mental Health: Culture, Race, and Ethnicity: A Supplement to Mental Health: A Report of the Surgeon General.* Rockville, MD: Substance Abuse and Mental Health Services Administration (US); 2001. Available at www.ncbi.nlm.nih.gov/books/NBK44242/ (last accessed February 1, 2013).

37. Moreno FA, Chong J, Dumbauld J, et al. Use of standard webcam and internet equipment for telepsychiatry treatment of depression among underserved Hispanics. *Psychiatr Serv* 2012;63:1213–1217.

38. Hilty DM, Lim RF, Koike AK, et al. Planning for telepsychiatric consultation: A needs assessment for cultural and language services at rural sites in California. *J Rural Ment Health* 2013 (submitted for publication).

39. Nieves J, Stack KM. Hispanics and telepsychiatry. *Psychiatr Serv* 2007;58: 877–878.

40. Chong J, Moreno FA. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. *Telemed J E Health* 2012;18:297–304.

41. Ye J, Shim R, Lukaszewski T, Yun K, et al. Telepsychiatry services for Korean immigrants. *Telemed J E Health* 2012;18:797–802.

42. Shore JH, Savin D, Orton H, et al. Diagnostic reliability of telepsychiatry in American Indian veterans. *Am J Psychiatry* 2007;164:115–118.

43. Shore JH, Brooks E, Savin D, Orton H, Grigsby J, Manson S. Acceptability of telepsychiatry in American Indians. *Telemed J E Health* 2008;14:461–466.

44. Mucic D. Transcultural telepsychiatry and its impact on patient satisfaction. *J Telemed Telecare* 2010;16:237–242.

45. Lopez AM, Cruz M, Lazarus S, et al. Use of American sign language in telepsychiatry consultation. *Telemed J E Health* 2004;10:389–391.

46. Frueh BC, Henderson S, Myrick H. Telehealth service delivery for persons with alcoholism. *J Telemed Telecare* 2005;11:372–375.

47. Hilty DM, Yellowlees PM, Nesbitt TS. Evolution of telepsychiatry to rural sites: Change over time in types of referral and PCP knowledge, skill, and satisfaction. *Gen Hosp Psychiatry* 2006;28:367–373.

48. Hilty DM, Nesbitt TS, Kuenneth TA, et al. Telepsychiatric consultation to primary care: Rural vs. suburban needs, utilization and provider satisfaction. *J Rural Health* 2007;23:163–165.

49. Hilty DM, Marks SL, Wegeland JE, et al. A randomized controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. *Psychiatry* 2007;4:58–65.

50. Hilty DM, Ingraham RL, Yang RP, et al. Multispecialty phone and email consultation to primary care providers for patients with developmental disabilities in rural California. *Telemed J E Health* 2004;10:413–421.

51. Ayers K, Yellowlees P. Mental health considerations during a pandemic influenza outbreak. *Internet J Rescue Disaster Med* 2009;9(1). doi: 10.5580/1481.

52. Katon W, Von Korff M, Lin E, et al. Collaborative management to achieve depression treatment guidelines. *J Clin Psychiatry* 1997;58(Suppl 1):20–24.

53. Yellowlees PM, Odor A, Burke MM, et al. A feasibility study of asynchronous telepsychiatry for psychiatric consultations. *Psychiatr Serv* 2010;61:838–840.

54. Butler TN, Yellowlees P. Cost analysis of store-and-forward telepsychiatry as a consultation model for primary care. *Telemed J E Health* 2012;18:74–77.

55. Yellowlees PM, Odor A, Patrice K, et al. Transcultural psychiatry made simple—Asynchronous telepsychiatry as an approach to providing culturally relevant care. *Telemed J E Health* 2013;19:259–264.

56. Rosenthal TC. The medical home: Growing evidence to support a new approach to primary care. *J Am Board Fam Med* 2008;21:427–440.

57. Yellowlees PM, Odor A, Patrice K, et al. PsychVACS: A system for asynchronous telepsychiatry. *Telemed J E Health* 2011;17:299–303.

58. Williams M, Pfeffee M, Boyle, et al. Telepsychiatry in the emergency department: Overview and case studies. California HealthCare Foundation. 2010. Available at www.chcf.org/publications/2009/12/telepsychiatry-in-the-emergency-department-overview-and-case-studies (last accessed last February 1, 2013).

59. Sorvaniemi M, Ojanen E, Santamäki O. Telepsychiatry in emergency consultations: A follow-up study of sixty patients. *Telemed J E Health* 2005;11:439–441.

60. Shore JH, Hilty DM, Yellowlees PM. Emergency management guidelines for telepsychiatry. *Gen Hosp Psychiatry* 2007;29:199–206.

61. Yellowlees PM, Burke MM, Marks SL, et al. Emergency telepsychiatry. *J Telemed Telecare* 2008;14:277–281.

62. Hollingsworth JM, Saint S, Hayward RA, et al. Specialty care and the patient-centered medical home. *Med Care* 2011;49:4–9.

63. Cluver JS, Schuyler D, Frueh BC, et al. Remote psychotherapy for terminally ill cancer patients. *J Telemed Telecare* 2005;11:157–159.

64. Shore P. VISN 21 Home Based Telemental Health Pilot Project Program. Veteran's Health Administration. Portland, OR, 2011. Available at http://conference.avapl.org/pubs/2012%20Conference%20Presentations/Home%20Based%20Telemental%20Health.pdf (last accessed February 1, 2013).

65. Weinstein MC, Stason WB. Foundations of cost-effectiveness analysis for health and medical practices. *N Engl J Med* 1977;296:716–721.

66. Smith AC, Scuffham P, Wootten R. The costs and potential savings of a novel telepaediatric service in Queensland. *BMC Health Serv Res* 2007;7:35.

67. Spaulding R, Belz N, DeLurgio S, et al. Cost savings of telemedicine utilization for child psychiatry in a rural Kansas community. *Telemed J E Health* 2010;16:867–871.

68. Jong M. Managing suicides via videoconferencing in a remote northern community in Canada. *Int J Circumpolar Health* 2004;63:422–428.

69. Persaud DD, Jreige S, Skedgel C, et al. An incremental cost analysis of telehealth in Nova Scotia from a societal perspective. *J Telemed Telecare* 2005;11:77–84.

**HILTY ET AL.**

70. Shore JH, Brooks E, Savin DM, et al. An economic evaluation of telehealth data collection with rural populations. *Psychiatr Serv* 2007;58:830–835.

71. Unutzer J, Choi Y, Cook IA, et al. A web-based data management system to improve care for depression in a multicenter clinical trial. *Psychiatr Serv* 2002;53:671–678.

72. Geyer J, Myers K, Vander Stoep A, et al. Implementing a low-cost web-based clinical trial management system for community studies: A case study. *Clin Trials* 2011;8:634–644.

73. Yellowlees PM, Marks SL, Hilty DM, et al. Using e-health to enable culturally appropriate mental health care in rural areas. *Telemed J E Health* 2008;14: 486–492.

74. Manfredi L, Shupe J, Batki S. Rural jail telepsychiatry: A pilot feasibility study. *Telemed J E Health* 2005;11:574–577.

75. Urness D, Wass M, Gordon A, et al. Client acceptability and quality of life—Telepsychiatry compared to in-person consultation. *J Telemed Telecare* 2006;12:251–254.

76. Modai I, Jabarin M, Kurs R, et al. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. *Telemed J E Health* 2006;12:515–520.

77. Greenberg N, Boydell K, Volpe T. Pediatric telepsychiatry in Ontario: Caregiver and service provider perspectives. *J Behav Health Sci Res* 2006;33:105–111.

78. Myers K, Valentine J, Morganthaler R, Melzer S. Telepsychiatry with incarcerated youth. *J Adolesc Health* 2006;38:643–648.

79. Lau ME, Way BB, Fremont WP. Assessment of SUNY Upstate Medical University's child telepsychiatry consultation program. *Int J Psychiatry Med* 2011;42:93–104.

80. Jacob MK, Larson JC, Craighead WE. Establishing a telepsychiatry consultation practice in rural Georgia for primary care physicians: A feasibility report. *Clin Pediatr (Phila)* 2012;51:1041–1047.

81. Germain V, Marchand A, Bouchard, et al. Effectiveness of cognitive behavioural therapy administered by videoconference for posttraumatic stress disorder. *Cogn Behav Ther* 2009;38:42–53.

82. Bouchard S, Paquin B, Payeur R, et al. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. *Telemed J E Health* 2004;10:13–25.

83. Edwards MA, Patel AC. Telemedicine in the state of Maine: A model for growth driven by rural needs. *Telemed J E Health* 2003;9:25–39.

84. Harley J. Economic evaluation of a tertiary telepsychiatry service to an island. *J Telemed Telecare* 2006;12:354–357.

85. Pyne JM, Fortney JC, Tripathi SP, Maciejewski ML, Edlund MJ, Williams K. Cost-effectiveness analysis of a rural telemedicine collaborative care intervention for depression. *Arch Gen Psychiatry* 2010;67:812–821.

Address correspondence to:
*Donald M. Hilty, MD*
*Department of Psychiatry and Behavioral Sciences*
*University of California—Davis*
*2230 Stockton Boulevard*
*Sacramento, CA 95817*

*E-mail:* dmhilty@ucdavis.edu

*Received:* March 14, 2013
*Revised:* April 9, 2013
*Accepted:* April 10, 2013

Exhibit O

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

ANNALS OF GENERAL
PSYCHIATRY

**REVIEW**                                                                    **Open Access**

# The use of videoconferencing with patients with psychosis: a review of the literature

Ian R Sharp[1*], Kenneth A Kobak[1,2] and Douglas A Osman[1]

## Abstract

Videoconferencing has become an increasingly viable tool in psychiatry, with a growing body of literature on its use with a range of patient populations. A number of factors make it particularly well suited for patients with psychosis. For example, patients living in remote or underserved areas can be seen by a specialist without need for travel. However, the hallmark symptoms of psychotic disorders might lead one to question the feasibility of videoconferencing with these patients. For example, does videoconferencing exacerbate delusions, such as paranoia or delusions of reference? Are acutely psychotic patients willing to be interviewed remotely by videoconferencing? To address these and other issues, we conducted an extensive review of Medline, PsychINFO, and the Telemedicine Information Exchange databases for literature on videoconferencing and psychosis. Findings generally indicated that assessment and treatment via videoconferencing is equivalent to in person and is tolerated and well accepted. There is little evidence that patients with psychosis have difficulty with videoconferencing or experience any exacerbation of symptoms; in fact, there is some evidence to suggest that the distance afforded can be a positive factor. The results of two large clinical trials support the reliability and effectiveness of centralized remote assessment of patients with schizophrenia.

## Introduction

Technological advances in recent years have made remote psychiatric assessment and treatment significantly more feasible. In particular, the increased availability and affordability of high-speed connections have made the use of videoconferencing (VC) a viable tool for interacting with patients remotely. There is a growing body of literature on telemedicine and the subfield of telepsychiatry. The initial thrust to develop these fields was prompted by attempts to meet demands for mental health services with underserved and difficult-to-serve populations (for example, rural areas, prisons). For instance, extensive telepsychiatry networks in rural Australia and Canada were created to improve access to mental health services. More recently, other VC applications such as the training of mental health professionals and centralized ratings in clinical trials have grown out of this rapidly expanding field. As telepsychiatry evolves, a broader range of patient populations can be served through this medium.

Several factors make the assessment and treatment of psychosis particularly well suited for VC. For one, as psychotic patients are often hospitalized, VC allows patients to be connected with specialists without need for travel. Assessment and treatment using VC is also a potential solution for patients with psychosis living in remote or underserved areas where there is a shortage of specialists. As a tool in clinical research, VC makes it possible to use centralized remote expert raters who are able to remain blind to study design and conditions, therefore decreasing rater bias and improving inter-rater reliability and interview quality [1].

The hallmark symptoms of psychotic disorders might lead one to question the feasibility of using VC with this patient population. For example, are acutely psychotic patients generally willing to be interviewed remotely by videoconference? Does videoconferencing exacerbate delusions, such as delusions of reference? Are scores on symptom severity rating scales and diagnoses obtained remotely by videoconference equivalent to ratings and diagnosis performed face to face, given the complex nature of the disorder and the importance of non-verbal signs, such as negative symptoms? Is treatment conducted remotely by videoconference as effective as

---

* Correspondence: is@medavante.com
[1]MedAvante Research Institute, Hamilton, NJ, USA
Full list of author information is available at the end of the article



© 2011 Sharp et al; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Case 2:90-cv-00520-KJM-SCR    Document 5603-1    Filed 04/13/17    Page 175 of 308

treatment conducted in person? Are evaluations conducted over VC sensitive enough to distinguish active drug from placebo in clinical trials?

In the present work we attempted to provide answers to these questions by conducting a thorough review of the literature. For the purposes of this review, videoconferencing refers to an interactive video connection between two sites. This primarily includes two-way videoconferencing using monitors or computers connected over telephone lines (for example, integrated services digital network (ISDN)), public internet connections, or private networks, but may also include the use of closed-circuit televisions, especially in older studies, for example, Dongier *et al*. [2]. An important variable in evaluating VC studies is bandwidth. In videoconferencing, bandwidth refers to the speed of transmission of data between two points, typically expressed in kilobits per second (kbps). The studies reviewed had a range of bandwidths from narrow (for example, 33 kbps) to broad (for example, 384 kbps). As a rule of thumb, the higher the bandwidth, the better the quality of audio and video. The current VC industry standard bandwidth is 384 kbps. A second important variable in understanding the quality of VC is frame rate. Frame rate refers to the number of frames presented on a monitor, typically expressed in frames per second (fps). The higher the frame rate the better motion is presented in video. A speed of 30 fps provides a continuous picture similar to television quality and generally requires 384 kbps transmission [3]. As found in other reviews [4], this variable was frequently not reported.

## Methods

We reviewed the Medline, PsychINFO, and the Telemedicine Information Exchange databases for literature on videoconferencing and psychosis. We used the following key words: telemedicine, telepsychiatry, televideo, videoconferencing, video conferencing, video and schizophren*, schizoaffective, psychotic, and psychosis. No date restrictions were used. Articles relevant to the use of videoconferencing with persons with psychosis were included in this review. We also reviewed reference sections for additional relevant articles. The literature search was completed in September 2010.

We present our findings in the following categories: clinical interventions (7 articles); assessment (12 articles); satisfaction and acceptance (12 articles); and clinical trials (2 articles). The small number of articles precluded quantitative analysis, but careful review allowed for qualitative assessment, which is the approach of the present manuscript. Please see Additional file 1 for a brief description of each of the references included in the review.

## Results

### Clinical interventions

The majority of articles written about the clinical utility of VC with psychotic patients have been retrospective reports of programs that provided services to remote areas. Dwyer [5] described a series of programs and general clinical uses of a closed circuit interactive television (IATV) system set up, a precursor to VC, between Massachusetts General Hospital and a medical station in Boston. Approximately 5% of all those seen on IATV had severe psychiatric disorders. The author admitted that he 'approached the use of television to interview psychiatric patients with considerable negative prejudice, believing that the degree of personal contact with the patient would be limited and that many of the skills that are useful in a psychiatric interview would be diminished or lost. I was delightfully surprised to discover that this was not true'. The author reported that approximately 30 psychiatrists and an equal number of psychiatric residents and medical students used the television system, and all responded positively to their experiences. The author suggested that, for some patients, communication with a psychiatrist by means of IATV was 'easier' than contact in the same room. It was suggested that this is especially true of patients with schizophrenia. The author also reported that a number of patients with delusions were interviewed and none incorporated the television into his or her distorted thinking.

Graham [6] discussed a program designed exclusively for chronically mentally ill individuals. The project was called APPAL-LINK, the Southwestern Virginia Telepsychiatry Project, and provided services by connecting hospital psychiatrists to patients at two rural community mental health centers. The author reported that 39 patients with a wide variety of diagnoses were followed through the initial 6 months of operation. The majority of these patients had a major psychotic illness such as schizophrenia, bipolar disorder, or schizoaffective disorders. The author reported that the availability of telepsychiatry consultation for crisis intervention led to a decrease in hospitalizations and no significant adverse effects were reported. It was also noted that patients and psychiatrists adjusted well to the VC interaction and that the program provided evidence that VC is 'a safe, effective, and useful method for the outpatient treatment of chronically mentally ill patients'.

In a report of a larger program involving the use of telemedicine, Zaylor [7] reviewed the history of VC at the University of Kansas Medical Center. At the time the article was written, Zaylor reported that the Telepsychiatry Service of the Department of Psychiatry and Behavioral Sciences was providing services to 18 locations throughout the state. One of the programs described was

a group composed of six patients with either schizoaffective disorder or schizophrenia, which met monthly over VC for nearly 3 years. Anecdotally, Zaylor reported that many of the patients' conditions improved and stabilized over time. Other programs reviewed in the article included the use of VC to provide psychiatric services to inmates in a rural county jail clinic and to residents in a rural group home for the chronically mentally ill. Zaylor stated that patients in each program accepted the technology readily and quality of care was not diminished.

In another study, Zaylor [8] completed a retrospective review of patient records comparing clinical outcomes of patients seen by IATV and those seen in person. The IATV condition consisted of PC-based VC equipment with a bandwidth speed of 128 kbps. A global assessment of functioning (GAF) score was generated for each patient in both groups at the initial visit and at subsequent visits, including at 6 months. A total of 49 patients diagnosed with either major depression or schizoaffective disorder were included. No significant difference was found in the percentage change in GAF scores between the two groups, suggesting that clinical outcomes were not negatively impacted by the use of IATV. The authors noted that patients in the IATV group had a better attendance rate and follow-up visits took less than half the time compared with in-person visits. This was viewed as an indication that IATV was an acceptable and efficient method of providing psychiatric services.

Doze and colleagues [9] reported preliminary results of a 9-month pilot project in Alberta, Canada, which used VC to connect a psychiatric hospital to mental health clinics in five rural hospitals. Patients were most commonly referred for assistance with a diagnosed disorder or to establish a diagnosis, but were also referred for behavior management, medication consultation, patient education, follow-up after discharge, and preadmission screening. A total of 109 telepsychiatry consultations were completed with 90 patients, 8 of whom were diagnosed with schizophrenia. Like many of the studies in this review, the authors focused on the usage of telepsychiatry including cost analysis and opinions about its use rather than measured clinical outcomes. However, the authors noted positive anecdotal results, including indications that the telepsychiatry project led to the avoidance of hospitalization for some patients as well as reduced stigma for patients who visited an acute care facility rather than a mental health clinic.

D'Souza [10] documented a telemedicine service in rural Australia developed to treat acute psychiatric inpatients in their local hospitals in order to reduce the need for these patients to be transferred to a psychiatric facility farther away. In all, 28 patients were included in the report; 31% were diagnosed with schizoaffective disorder, 11% were diagnosed with schizophreniform psychosis, and 4% were diagnosed with delusional disorder. The Brief Psychiatric Rating Scale 24 (BPRS-24) [11] was administered by both a rater familiar with the patient and a naïve rater at intake and 4 weeks after discharge. Results indicated a significant improvement in the mean total BPRS-24 scores from intake to follow-up for both raters and inter-rater reliability for the BPRS-24 was good. The authors conclude that these findings support the use of VC in the evaluation of clinical outcomes in treatment.

Kennedy and Yellowlees [12] examined clinical outcomes in the use of VC with 124 patients entering mental health treatment in rural Queensland, Australia. All patients were offered the option of being treated by a psychiatrist using a VC system at 128 kbps and 32 patients (3 of whom were diagnosed with psychotic disorders) chose the VC option. All patients were assessed when entering treatment and then 12 months later. The authors reported significant improvement from pre-assessment to post-assessment as measured by the Health of the Nation Outcome Scale (HoNOS), a clinical outcome scale [13] and the Mental Health Inventory (MHI), a self-report scale of outcome or progress over time [14], but no significant differences were found between the VC and in-person conditions. The authors concluded that there was no degradation in quality of outcome with the use of VC.

Published reports on clinical interventions delivered using VC have shown that patient care via VC is generally equivalent to in person. Further, the advantages of VC have been outlined and include less need for patients and professionals to travel, reduction in hospitalizations, and improvement in reaching patients in rural and challenging settings. There is virtually no evidence that VC has a negative impact on rapport, especially in more recent reports where technology is less likely to be a barrier. Additionally, there is evidence that some patients with psychosis prefer receiving clinical services via VC to in person. Children especially tend to be more forthcoming with telepsychiatry [15]. Most of the clinical intervention reports reviewed were qualitative accounts of clinical work being performed with patients with psychosis via VC. While these papers provide strong evidence of the feasibility of VC with patients with psychosis, additional empirical research (for example, treatment outcome studies) is needed.

## Assessment

Published reports of assessment of psychosis using VC primarily fell into two broad categories: uncontrolled case reports of clinical evaluations, and reports of systematic evaluations of objective instruments of schizophrenia. We also include a published report evaluating rater training with a psychosis scale using live interviews conducted via VC.

Case 2:90-cv-00520-KJM-SCR    Document 5603-1    Filed 04/13/17    Page 177 of 308

Hyler *et al.* [16] conducted a meta-analysis of studies comparing psychiatric assessment via VC to in person. Although not specific to psychosis, they concluded that objective assessments delivered via VC were equivalent to in person in both accuracy and satisfaction.

One of the earliest studies related to VC and assessment involved using closed circuit television (CCTV), a precursor of modern day VC, to conduct psychiatric evaluations. Dongier and colleagues [2] compared psychiatric interviews conducted using CCTV to a control group in which interviews were conducted in person. The study included inpatients and outpatients from a range of diagnostic categories including schizophrenic psychoses (27%), schizophreniform psychoses (6%), and paranoid states (2%). The authors concluded that 'even schizophrenics with ideas of reference including T.V. (example: being talked about on public programs) accepted the CCTV interaction very well and no exacerbation of their delusions was observed'.

In a later description of psychiatric evaluations using VC, Yellowlees [17] presented two case reports in which urgent psychiatric assessments for two psychotic patients were conducted using VC. Without the use of VC, the patients would have had to travel to a psychiatric hospital 800 km away. The author noted that one of the patients with delusional symptoms reported ideas of reference from the television prior to the interview, but accepted the interview and interaction with the assessor as real.

Ball and colleagues [18] presented data from a more controlled study of the use of VC for assessment of psychiatric patients. The authors administered the Folstein Mini-Mental State Examination (MMSE) [19] to 11 patients from an acute psychiatric ward (6 patients were diagnosed with schizophrenia). Each patient was interviewed both in person and over VC. In person assessments were compared to a computer-based low-cost videoconferencing (LCVC) system. The scores between modalities were highly correlated leading the authors to conclude that the MMSE may be reliably performed with patients using LCVC. However, the authors noted that one patient did not complete the second assessment because he developed a delusional belief that the testing was part of a police plot to incriminate him. This appeared unassociated with the LCVC as he had completed that portion (that is, VC) and refused the in person interview.

Several studies have reported on the use of VC using the BPRS [20]. Salzman *et al.* [21] reported the use of VC in administering this instrument to evaluate severely ill inpatients. After establishing inter-rater reliability on the BPRS (0.93) by using in person interviews with patients in the hospital, six psychotic patients were rated using videoconferencing. Patients were simultaneously rated by a psychiatrist via videoconferencing and a psychiatrist who was on site. The reported inter-rater reliability was 0.92. The authors noted that the only frequent rating disagreement was on a self-neglect item and they concluded that some patients' self-neglect was difficult to observe via VC. However, a limitation of this conclusion is that the authors did not report data on the quality or speed of the VC equipment and connection. The patients reportedly enjoyed using VC. The authors concluded that these results add to previous research suggesting that VC is useful in the evaluation of psychotic patients.

Baigent and colleagues [22] also used the BPRS when comparing VC using ISDN connections at 128 kbps to in person interviews. In addition to the BPRS, the authors used a semi-structured clinical interview to generate *Diagnostic and Statistical Manual of Mental Disorders*, 4th edition (DSM-IV) diagnoses. The 2 psychiatrists conducted the assessments with 63 subjects (51% of whom had a diagnosis of schizophrenia). Interviews were conducted in one of three conditions: the interviewer and observer in the same room as the patient, the interviewer connected to the patient via VC and the observer in the same room as the patient, or both the interviewer and the observer connected to the patient via VC. Inter-rater reliability for BPRS total score in the three conditions was 0.54, 0.51, and 0.80, respectively. The authors reported that reliability of diagnoses was equivalent in the three conditions (0.85, 0.69, 0.70, respectively) and concluded that 'much of the 'psychiatry' is not lost in 'telepsychiatry'.

Zarate and colleagues [23] also assessed the reliability of the BPRS in addition to the Scales for the Assessment of Positive/Negative Symptoms (SAPS/SANS) [24] in a sample of 45 patients with a DSM-IV diagnosis of schizophrenia. Assessments were conducted either in person or via VC (at either 128 kbps or 384 kbps). Assessments in the in person condition were conducted with two raters in the same room as the patient with one conducting the interview and the other rating the patient's responses. In the VC condition, one rater conducted the interview remotely and the other rater scored the patient's responses while sitting in the same room as the patient. Results indicated good overall inter-rater reliability on total BPRS scores with both 384 kbps (intraclass correlation coefficient (ICC) = 0.90) and 128 kbps (ICC = 0.84) connections. Excellent reliabilities were also found on the positive symptoms scale (SAPS ICC = 0.97 for both low and high bandwidths). Higher reliabilities were found with the 384 kbps connection (0.85) vs. the 128 kbps connection (0.67) on the SANS. Given that several specific negative symptoms of schizophrenia rely heavily on non-verbal cues, it is understandable that the higher bandwidth would improve agreement on these symptoms. Both raters and patients had high rates of acceptance of the VC condition with patients in the

Case 2:90-cv-00520-KJM-SCR   Document 5603-1   Filed 04/13/17   Page 178 of 308

high bandwidth group being more likely to prefer it to live interviews than those in the low bandwidth group.

In another study examining reliability at different connection speeds, Matsuura and colleagues [25] reported the reliability of the BPRS administered in person or via one of two resolutions of videophone (128 kbps and 384 kbps). In all, 17 subjects were included (9 healthy nursing students and 8 outpatients, 2 of whom had a diagnosis of schizophrenia). The study had three conditions: an in person condition where two raters were in the same room as the patient, a low-resolution VC interview condition where a rater was linked to the patient with a TV phone at 128 kbps and an observer was in the same room as the patient, and a similar condition with a high-resolution TV phone at 384 kbps. Interclass correlation coefficients were very high for all three conditions (0.965, 0.987, 0.996, respectively) and did not differ significantly by condition. Additionally, 80% of the outpatients stated they preferred the VC interview.

Chae and colleagues [26] used a similar methodology to Matsuura and colleagues in a pilot study to evaluate a VC system connected over an ordinary telephone network at 33 kbps. A total of 30 patients with schizophrenia were administered the BPRS (15 using the VC system and 15 in person). Agreement on total BPRS score for the telemedicine group was significantly higher than that of the in person group. However, reliability on the anxiety subscale was very low for the telemedicine group. The authors suggested that the limited image processing capability of the system used may have made it difficult to conduct a detailed analysis of these specific symptoms. Overall, the authors concluded that the low-bandwidth VC system appeared to be as reliable as higher-bandwidth ISDN systems used in previous studies.

Yoshino and colleagues [27] assessed the reliability of the BPRS in 42 patients diagnosed with chronic schizophrenia. Patients were interviewed using videoconferencing with either narrow bandwidth (128 kbps) or broadband (2 Mbps) and compared to an in person interview using test-retest method with no longer than 4 days between the independent interviews. The authors found no significant difference in intraclass correlation coefficients for BPRS total score between the broadband condition (0.88) and the in-person condition (0.87). The ICC was significantly lower in the low bandwidth condition (0.44). It should be noted that the authors reported numerous problems in the narrow bandwidth condition including pauses in audio, problems with patients' speech clarity, highly distorted video images, poor rapport due to lack of eye contact, and almost total inability to observe facial expressions.

Lexcen et al. [28] conducted a study with 72 inpatients from the maximum security forensic unit of Central State Hospital in Petersburg, Virginia. All participants had DSM-IV Axis I diagnoses of severe mental illness; many were diagnosed with schizophrenia or psychotic disorder not otherwise specified (F J Lexcen, personal communication, 5 March 2007, Child Study and Treatment Center, Lakewood, WA). Participants were observed in one of three conditions. The first condition entailed in person administration of the BPRS with observation via video conferencing. The second condition involved administration by VC and observation by an in person rater. In the third condition, both administration and observation occurred in person. Correlations for total scale scores for the BPRS were in the good to excellent range (0.69 to 0.82). The results for the items of the BPRS were consistent with previous studies that found good to excellent reproducibility in experimental conditions using VC. The authors summarized that their results confirmed previous findings of the use of the BPRS for evaluations conducted via VC.

Kobak et al. reported on a National Institute of Mental Health (NIMH)-funded pilot study conducted to evaluate the effectiveness of training raters remotely by VC to administer the Positive and Negative Syndrome Scale (PANSS) [29]. The training involved two components: didactic training delivered via CD-ROM, and applied training delivered through live remote observation of trainees conducting the PANSS via VC. An expert trainer observed the interview and provided individual feedback immediately after the session via VC on the trainees' scoring accuracy and clinical interview skills using the Rater Applied Performance Scale (RAPS) [30]. Pre-training and post-training interviews were videotaped and evaluated by a panel of blinded experts to evaluate whether the training resulted in improvement in the trainees' clinical skills and scoring accuracy. In all, 12 trainees with no prior PANSS experience participated in the study. Results found a significant improvement in trainees' conceptual knowledge and an improvement in trainees' clinical skills (as determined by the RAPS scale). Interestingly, the didactic training (that is, CD-ROM) alone did not improve the trainees' clinical skills; these only improved following the remote video sessions. The agreement in scoring between the trainee and blinded expert (ICC) improved from r = 0.19 prior to training ($P = 0.248$) to r = 0.52 after training ($P = 0.034$). The results of this study are promising for the use of VC in the remote training of raters in schizophrenia.

Based on the studies reviewed, patients with psychosis can be reliably interviewed and evaluated via VC, including using symptom severity scales (for example, BPRS) and diagnostic, clinical, and psychiatric interviews. The reviewed findings suggest that higher bandwidth connections improve reliability and the ability to evaluate nonverbal and negative symptoms. At higher bandwidths, inter-rater reliability with VC is generally equivalent to in

person. Additionally, VC can be used effectively to train raters in the administration of psychosis scales.

## Safety issues

The issue of patient safety has been raised when using VC for remote assessment and intervention with psychotic patients. The American Telemedicine Association has issued a set of practice guidelines for the emergency management of patients when using VC in telepsychiatry [31,32]. These guidelines require that a protocol be established for dealing with psychiatric emergencies when conducting any telepsychiatry procedure. Recommendations are provided in three main areas: (a) administrative issues, including requiring clinicians to conduct a site assessment to obtain information on local regulations and emergency resources, and having an emergency protocol in place that clearly specifies the procedures, roles, and responsibilities in cases of psychiatric emergencies; (b) legal issues, requiring clinicians to be familiar with local civil commitment regulations and have arrangements in place with local staff to initiate and assist in this regard; and (c) general clinical issues, including being aware of how clinicians' perception of diminished control in the clinical encounter compared to in person interaction might impact their interactions with the patient, and the need to be aware of the impact the telepsychiatry interaction might have on local site staff. With these safeguards in place, patient safety has not been reported as an issue when using VC with psychotic patients. In fact, it has been reported that the physical distance afforded by telepsychiatry has allowed patients to express strong affects that may have led to premature termination of in person sessions [32]. Nonetheless, these guidelines are relatively new and still evolving, and require ongoing examination and refinement.

## Satisfaction and acceptance

Many of the studies mentioned previously looking at the use of telepsychiatry in assessment and clinical outcomes also included measures of patient satisfaction. The overall results have been largely positive. Zarate and colleagues [23] asked patients and raters to complete post-interview evaluation and satisfaction questionnaires comparing their VC interview to in person interviews they have had in the past (from 'much below average' to 'much better than average'). A majority of patients rated the VC experience as 'above average', with patients in the higher bandwidth condition being more likely to prefer them to in person interviews. Raters endorsed comfort, ease of expressing one's self, and usefulness of VC as either 'average' or 'above average' as compared to a typical in person interview. Graham [6] indicated that patient acceptance of VC for healthcare delivery was almost universally positive with more than 90% of patients giving positive ratings on the satisfaction survey as it related to

the VC process and treatment received. Similarly, in the Baigent et al. [22] study mentioned earlier, more subjects reportedly found interviews via VC moderately enjoyable to very enjoyable compared to the in person interviews. A majority of participants reported that they would be happy to have VC interviews or would even prefer them to seeing a psychiatrist in their hospital rooms.

Doze et al. [9] included data related to patient satisfaction in their telepsychiatry pilot project. The authors noted that patients were satisfied with and accepted the overall experience of using VC for psychiatric services. Perceived benefits noted by patients included reduced travel time; decreased stress from traveling to appointments; decreased absence from work for both patient and family; more immediate access to a psychiatrist; feelings of confidentiality and privacy; more patient choice and control; improvement in quality of life; and potential for clinical improvement without hospitalization. Perceived disadvantages noted by patients included feeling that their interaction with the psychiatrist was impersonal and the potential for less sensitivity in interviews. The authors noted that there was a strong preference for the use of VC rather than waiting for a consultation or traveling to see a psychiatrist, but patients were split as to whether they would rather use telepsychiatry than see a psychiatrist in person. Perceived benefits of VC noted by participating psychiatrists included the ability to see patients before their symptoms became more severe, to educate local providers, and to reduce amount of unproductive time that could now be used in psychiatric consultation.

In the study examining reliability at different connection speeds mentioned previously, Matsuura and colleagues [25] found that 80% of outpatients preferred telepsychiatry to in person interaction. The authors stated that many of the subjects reported that they could easily relate to the consultants and address problems without difficulty. One patient reported that the sound/picture delay was disturbing but no one reported dissatisfaction with the interview. Many patients reported that they would be happier having VC sessions at home to save time and effort.

Using a similar design, Chae and colleagues [26] asked patients to rate comfort level during the interview, ability to express themselves, quality of the interpersonal relationship, and usefulness of the interview. Total acceptance scores were higher in the VC condition than in the in person condition, although this difference was not statistically significant. Patients' acceptance of the VC interview, in terms of comfort, ease of self-expression, quality of interpersonal relationship and usefulness, was good in most cases. The average acceptance score was nearly twice as high in the telemedicine group as in the in person group. Patients tended to feel more comfortable in the in person condition, but more at ease with expressing themselves in the VC condition. The authors concluded

that in many cases the VC condition was better accepted by patients and suggested that it might be viewed as less threatening than being in the same room in close proximity.

As part of his clinical outcome study, D'Souza [10] asked patients to rate their satisfaction with the service and the use of VC. The patients reportedly expressed high rates of satisfaction with both. Over 81% of patients said that they would use the service again; 88.8% reported high satisfaction with the VC practitioner; 70% were satisfied with receiving a prescription via VC; and 67% were satisfied with confidentiality. However, it should be noted that 26% of patients expressed some dissatisfaction, but the sources of the dissatisfaction were not specifically elaborated on in the report.

Ball and colleagues [33] compared the process and outcome of clinical tasks in an acute psychiatric unit using four different communication modes: in person, telephone, hands-free telephone, and a low-cost video-conferencing system (LCVC). Six doctors and six patients (three with schizophrenia and one with paranoid disorder) were included in the study. The authors report that the VC condition was positively received by both patients and doctors. However, some problems were observed. For instance, some patients found it irritating when the doctor leaned forward and only the top of his head was visible. One patient reportedly felt unable to talk about sexual delusions over the VC, although she felt comfortable discussing it in the other conditions.

Mannion and colleagues [34] presented results from a pilot project in which they used a PC-based VC system (384 kbps) to facilitate emergency consultations between patients on an Irish island and a psychiatrist on the mainland. Over an 8-month period, two patients diagnosed with schizophrenia were evaluated. The authors report that the patients were comfortable with the technology and stated that the system was not a barrier to the establishment of rapport. Additionally, all health professionals who used the link reportedly found it satisfactory. The authors concluded that the VC was acceptable and satisfactory for both patients and staff.

Stevens et al. [35] also conducted a pilot study of patient and clinician satisfaction with VC that included 19 patients with psychosis and 21 non-psychotic patients. Subjects were randomly assigned to either a VC or in person condition where they were assessed by psychiatrists during 90-minute unstructured interviews that were intended to generate *Diagnostic and Statistical Manual of Mental Disorders*, 3rd edition - revision (DSM-III-R) diagnoses and treatment recommendations. Following each interview, the participant and psychiatrist both completed the California Psychotherapy Alliance

Scale [36], a self-report scale to assess ability to work together and develop rapport and the Interview Satisfaction Scale, a scale created for the study designed to assess acceptability of the interview modality. There were no differences on the patient-rated and clinician-rated alliance scale or the patient-rated satisfaction scale between modalities. There was a significant difference on the therapist version of the satisfaction scale with the psychiatrists tending to rate the VC interviews less favorably than the in person interviews; however, overall satisfaction with VC was still positive.

Magaletta et al. [37] examined prison inmates' satisfaction with VC consultations. A total of 75 patients, 17 with diagnoses of 'Schizophrenia and Other Psychotic Disorders', completed at least 1 questionnaire assessing their satisfaction with receiving psychiatric consultation via VC. Patients reported satisfaction with the consultation process, more comfort with the process over time, and a willingness to return for follow-up. A majority of the participants (81%) rated treatment positively, reported that they would come back to be seen by a doctor using VC (83%) and would recommend VC consultations to other inmates (71%). When looking at satisfaction ratings by time point, the results indicated that the participants' perceptions of the VC consultations became more positive over time. Participants with thought disorders had positive perceptions of the VC consultations and reported a higher level of satisfaction compared to in person treatment than did a group of inmates with affective disorders. The authors provided two examples of patients with thought disorders. One patient had consistently expressed delusions of reference from the TV in his housing unit. Despite hesitation on the part of the authors to include this patient in a VC consultation, they proceeded and found the only comment he made was 'See, I told you the television talks to me!'. They concluded that the patient's delusional system was not altered as a result of treatment using VC and that although the use of VC did not exacerbate his delusion, it may have reinforced it. The second example involved a patient with schizophrenia who felt that seeing his picture on the screen (because of a picture-in-picture option where the patient sees a small image of himself in addition to the remote image) confirmed his preexisting delusion that he had an impostor, leading the authors to discontinue the use of picture-in-picture. Despite these interactions between the technology and the delusional systems of several patients, the authors expressed that the patients were still able to receive sound treatment. The article offered possible explanations for the positive perceptions presented by thought-disordered patients. One explanation is that thought-disordered individuals are overstimulated in social and interpersonal relationships and the 'distance' accorded by VC serves to reduce their anxiety and help them feel more comfortable. Further, the

structured and constrained nature of the VC environment also serves to lessen anxiety.

Mielonen et al. [38] conducted a study of inpatient care-planning consultations using VC with 14 patients with psychosis and their family members. Healthcare providers and patients and their relatives completed questionnaires of satisfaction and acceptance after each session. In all, 47% of the healthcare providers rated videoconferencing to be 'as good a form of consultation as a conventional meeting', 48% considered it to be 'almost as good', and only one person (4%) felt that it was notably inferior. The preference for VC was strong with most respondents preferring to have the next session conducted in the modality: 86% of the healthcare personnel, 84% of the patients and 92% of the relatives. The reduced need for traveling by the participants and the ease and speed of the consultations were cited as the most important reasons for preferring VC. Most of the respondents rated the content of the consultation and the interaction in the videoconference as excellent or good and the technical quality of the VC consultations as good or moderate.

In summary, most published reports show clearly that both patients and clinicians have high levels of acceptance and satisfaction with VC, often rating it similarly to in person, and in a number of cases rating it more favorably. There is some evidence that patient ratings of satisfaction with VC increase over time. Additionally, similar to findings with clinical interventions and assessment, higher bandwidth is associated with better outcome with satisfaction and acceptance.

## Clinical trials

While VC has been used widely with patients with psychosis in clinical settings, its use in clinical research with this population has not been extensively explored, but appears to be gaining acceptance. Clinical trials evaluating new medications for schizophrenia and other psychiatric disorders have been faced with an increasing rate of failed trials [39]. Factors associated with clinician assessment, such as expectancy bias, enrollment pressure bias, poor inter-rater reliability, and poor interview quality, have been hypothesized to play a role in this increasing rate [40]. The use of VC enables a potential solution to these problems, by facilitating the use of off-site expert centralized raters. These raters are linked to the various study sites through videoconferencing or teleconferencing, and remotely administer the primary outcome measure to study patients during their regularly scheduled study visit. The use of centralized raters in clinical trials addresses several potential weaknesses associated with clinician ratings described above. Inter-rater reliability is improved by simply reducing the sheer number of raters involved (for example, a 30-site multicenter trial that

employed 60 to 75 raters (that is, 2 or 3 raters per site) could be conducted with 8-10 centralized raters). Rigorous training and calibration procedures can be employed that are not logistically feasible with a larger group of raters at diffuse study sites. Enrollment pressure and bias are minimized, since centralized raters are divorced from the study site and blinded to the study visit number, study protocol, and entrance criteria. Blinding the rater to these factors also minimizes expectancy or other biases at later visits. Using a different rater each week minimizes the potentially confounding therapeutic impact of repeated assessment by the same clinician, as well as minimizing expectancy bias.

Two published clinical trials using centralized raters via videoconferencing were identified. Centralized raters were recently used in a large, phase II, multicenter trial evaluating a new antipsychotic medication for schizophrenia [41]. A total of 289 subjects from 35 sites were randomly assigned to 6 weeks of treatment with 1 of 2 doses of an experimental compound, active comparator (olanzapine), or placebo. Subjects were evaluated weekly using the PANSS by 1 of 18 centralized raters who were connected to the study site by high speed VC at 384 kbps. Different raters typically saw the patient at each visit. Raters were blinded to study visit and study protocol and were provided informant data. Data from the olanzapine and placebo arms were provided by the sponsor to examine the issue of the centralized raters' ability to detect a drug effect.

Centralized raters found a significant difference between olanzapine and placebo starting at week 1, and this difference continued to be significant throughout the study. At endpoint, the mean change for olanzapine-treated participants (14.4 points, SE = 2.43) was significantly greater than the mean change on placebo (2.95 points, SE = 2.43), $P < 0.001$. The mean effect size found at endpoint was 0.52. Internal consistency reliability was high, and remained high throughout the study. Scores at screening were normally distributed, and were not skewed towards the cutoff score, suggesting that little score inflation occurred. Overall, 1,993 remote PANSS assessments were completed by the 18 raters over the 13-month course of the study. No patient refused to be interviewed by VC, although some patients refused to participate in all of the study assessments. Of the 1,993 assessments, 2.2% experienced temporary interruption or an audio/visual quality issue. The issues were resolved and the interviews were completed. In 10 cases (0.3%) the interview could not be completed due to a technical issue and had to be rescheduled.

Centralized raters were also used for efficacy ratings in a randomized, double-blind, placebo-controlled, multicenter phase III trial of the safety and efficacy of three doses of paliperidone palmitate in adults with an acute

exacerbation of schizophrenia [42]. All subjects at US-based sites were evaluated by centralized raters using the PANSS, Personal and Social Performance Scale (PSP), and the Clinical Global Impression - Severity scale (CGI-S) and were connected to the study site by high speed VC at 384 kbps. The overall study had positive findings with each of the three doses of the drug demonstrating statistically significant improvement on the primary efficacy measure (PANSS total scores), and the two higher doses showing significant improvement with PSP and CGI-S scores. This study provides further evidence of the effectiveness of using VC as a tool for assessing participants in clinical trials. There has been rapid growth of adoption of centralized raters in clinical trials and there are currently several additional trials underway.

## Conclusions

Although there is still a paucity of controlled outcome research comparing VC to standard in person care, reports of assessment and treatment via VC have been overwhelmingly positive. Findings generally indicate that patient care via VC is equivalent to in person, but also offers numerous advantages. For example, reports indicate that the use of VC has led to a reduction in the need for patients and professionals to travel, a reduction in hospitalizations, and improvement in reaching patients in rural and difficult settings (for example, prisons), all leading to improved, more efficient care. There is little evidence that VC has a negative impact on rapport, although in some older studies comparing VC to in person, patients and clinicians preferred in person. This finding was generally attributed to poor video quality found with older technology. This preference is not evident in more recent research. In more recent studies [25,26], patients overwhelmingly preferred VC to in person.

Research and clinical work to date indicate that clinical rating scales, psychiatric interviews, and diagnostic assessments can be reliably conducted using VC and are generally equivalent to those performed in person. Continuing improvement in technology has mitigated many of the shortcomings found in older studies. For example, as reported in their small study, Salzman et al. [21] found that the only major source of disagreement on BPRS ratings between VC and in person was on patient self-neglect, which they attributed to difficulty in evaluating this construct with VC. However, Zarate et al. [23] found that ratings of negative symptoms were significantly improved in a high bandwidth condition as compared to a low bandwidth condition. These findings suggest that higher bandwidth and better quality equipment is associated with increased ability to observe negative symptoms and improved inter-rater reliability.

Additionally, higher bandwidth leads to higher rates of acceptance and satisfaction. As both of these studies were reported over a decade ago, the vastly improved picture quality of newer VC equipment, greater accessibility of broadband connectivity, and ability to zoom and scan has made this finding significantly less of an issue. Concluding their review and meta-analysis of the literature comparing psychiatric assessments via VC to in person, Hyler et al. [16] opined, 'over the next few years, we expect telepsychiatry to replace [in person] in certain research and clinical situations in which the advantages outweigh the disadvantages'.

Using VC with psychotic patients has historically been met with skepticism, and rightfully so. Concerns that hallmark symptoms of the disorder including hallucinations, suspiciousness, and delusions of reference would lead patients to reject speaking with someone on a television screen are understandable, but have simply not been borne out. The primary concerns identified by patients were generally related to poor picture or audio quality. Based on a comprehensive review of the literature, there is little evidence that persons with psychosis react negatively to VC or experience exacerbations of symptoms, including patients with specific delusions involving television or being monitored. To the contrary, there is evidence that VC affords some patients a higher degree of comfort in that the perceived distance of the interaction is less anxiety provoking and reduces overstimulation found in some in person interactions [43].

The use of videoconferencing to enable remote, centralized raters in clinical trials is growing. To date, over 30,000 unique rating scale assessments have been administered to over 5,000 patients, across a range of disorders, including mood, anxiety and psychotic disorders [44]. Although there are only two published studies on the use of centralized raters in schizophrenia [41], several other trials are completed or in progress, as well as studies in other psychotic disorders. Results so far have found the methodology well accepted by patients with psychotic disorders, and that centralized ratings using VC can be conducted reliably and effectively in psychosis. Results from ongoing trials will provide additional empirical data on the use of VC in schizophrenia, as well as other disorders.

Historically, a significant concern with the feasibility of VC has been cost [45]. Although this paper was not intended to address cost, it is worth noting that, as with other areas of technology, the cost of VC equipment and connectivity, once prohibitively expensive, continues to decline. For example, Mielonen et al. [38] found in their analysis of cost that at a rate of 20 patients per year, the cost of VC was lower than that of the conventional alternative of traveling, and at a higher rate resulted in significant savings. They concluded that VC

consultation is a cost-saving measure compared with the conventional methods requiring travel.

As noted in other literature reviews of telemedicine [46], limitations on videoconferencing and psychosis include small sample sizes, absence of control conditions, and reliance on descriptive research designs. As improvement in this technology is rapidly advancing, videoconferencing is becoming increasingly affordable, more feasible, and more widely accessible. These advances will facilitate more empirical research in this area and help guide the progress in this promising methodology.

## Additional material

**Additional file 1: Study characteristics**. Study characteristics of articles included in the review.

### Author details
[1]MedAvante Research Institute, Hamilton, NJ, USA. [2]Center for Psychological Consultation, Madison, Wisconsin, USA.

### Authors' contributions
IS conducted the literature review and drafted the manuscript. KK drafted sections of the manuscript. DO drafted sections of the manuscript. All authors read and approved the final manuscript.

### Competing interests
IRS, KAK and DAO are employees of MedAvante, Inc, which provides centralized ratings services via videoconferencing and rater training.

Received: 28 June 2010  Accepted: 18 April 2011
Published: 18 April 2011

### References
1.  Kobak KA, Kane JM, Thase ME, Nierenberg AA: **Why do clinical trials fail? The problem of measurement error in clinical trials: time to test new paradigms?** *J Clin Psychopharmacol* 2007, **27**:1-5.
2.  Dongier M, Tempier R, Lalinec-Michaud M, Meunier D: **Telepsychiatry: psychiatric consultation through two-way television. A controlled study.** *Can J Psychiatry* 1986, **31**:32-34.
3.  Hilty DM, Marks SL, Urness D, Yellowlees PM, Nesbitt TS: **Clinical and educational telepsychiatry applications: a review.** *Can J Psychiatry* 2004, **49**:12-23.
4.  Hilty DM, Luo JS, Morache C, Marcelo DA, Nesbitt TS: **Telepsychiatry: an overview for psychiatrists.** *CNS Drugs* 2002, **16**:527-548.
5.  Dwyer TF: **Telepsychiatry: psychiatric consultation by interactive television.** *Am J Psychiatry* 1973, **130**:865-869.
6.  Graham MA: **Telepsychiatry in appalachia.** *Am Behav Sci* 1996, **39**:602-615.
7.  Zaylor CL: **An adult telepsychiatry clinic's growing pains: how to treat more than 200 patients in 7 locations.** *Psychiatr Ann* 1999, **29**:402-408.
8.  Zaylor C: **Clinical outcomes in telepsychiatry.** *J Telemed Telecare* 1999, **5(Suppl 1)**:S59-60.
9.  Doze S, Simpson J, Hailey D, Jacobs P: **Evaluation of a telepsychiatry pilot project.** *J Telemed Telecare* 1999, **5**:38-46.
10. D'Souza R: **Telemedicine for intensive support of psychiatric inpatients admitted to local hospitals.** *J Telemed Telecare* 2000, **6(Suppl 1)**:S26-28.
11. Lukoff D, Liberman RP, Nuechterlein KH: **Symptom monitoring in the rehabilitation of schizophrenic patients.** *Schizophr Bull* 1986, **12**:578-602.
12. Kennedy C, Yellowlees P: **The effectiveness of telepsychiatry measured using the Health of the Nation Outcome Scale and the Mental Health Inventory.** *J Telemed Telecare* 2003, **9**:12-16.
13. Stein GS: **Usefulness of the Health of the Nation Outcome Scales.** *Br J Psychiatry* 1999, **174**:375-377.
14. Veit CT, Ware JE Jr: **The structure of psychological distress and well-being in general populations.** *J Consult Clin Psychol* 1983, **51**:730-742.
15. Pakyurek M, Yellowlees P, Hilty D: **The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice?** *Telemed J E Health* 16:289-292.
16. Hyler SE, Gangure DP, Batchelder ST: **Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies.** *CNS Spectr* 2005, **10**:403-413.
17. Yellowlees P: **The use of telemedicine to perform psychiatric assessments under the Mental Health Act.** *J Telemed Telecare* 1997, **3**:224-226.
18. Ball CJ, Scott N, McLaren PM, Watson JP: **Preliminary evaluation of a low-cost videoconferencing (LCVC) system for remote cognitive testing of adult psychiatric patients.** *Br J Clin Psychol* 1993, **32**:303-307.
19. Folstein MF, Folstein SE, McHugh PR: **"Mini-mental state". A practical method for grading the cognitive state of patients for the clinician.** *J Psychiatr Res* 1975, **12**:189-198.
20. Lachar D, Bailley SE, Rhoades HM, Espadas A, Aponte M, Cowan KA, Gummattira P, Kopecky CR, Wassef A: **New subscales for an anchored version of the Brief Psychiatric Rating Scale: construction, reliability, and validity in acute psychiatric admissions.** *Psychol Assess* 2001, **13**:384-395.
21. Salzman C, Orvin D, Hanson A, Kalinowski A: **Patient evaluation through live video transmission.** *Am J Psychiatry* 1996, **153**:968.
22. Baigent MF, Lloyd CJ, Kavanagh SJ, Ben-Tovin DI, Yellowlees PM, Kalucy RS, Bond MJ: **Telepsychiatry: "tele" yes, but what about the "psychiatry"?** *J Telemed Telecare* 1997, **3**:3-5.
23. Zarate CA Jr, Weinstock L, Cukor P, Morabito C, Leahy L, Burns C, Baer L: **Applicability of telemedicine for assessing patients with schizophrenia: acceptance and reliability.** *J Clin Psychiatry* 1997, **58**:22-25.
24. Andreasen NC: **Methods for assessing positive and negative symptoms.** *Mod Probl Pharmacopsychiatry* 1990, **24**:73-88.
25. Matsuura S, Hosaka T, Yukiyama T, Ogushi Y, Okada Y, Haruki Y, Nakamura M: **Application of telepsychiatry: a preliminary study.** *Psychiatry Clin Neurosci* 2000, **54**:55-58.
26. Chae YM, Park HJ, Cho JG, Hong GD, Cheon KA: **The reliability and acceptability of telemedicine for patients with schizophrenia in Korea.** *J Telemed Telecare* 2000, **6**:83-90.
27. Yoshino A, Shigemura J, Kobayashi Y, Nomura S, Shishikura K, Den R, Wakisaka H, Kamata S, Ashida H: **Telepsychiatry: assessment of televideo psychiatric interview reliability with present- and next-generation internet infrastructures.** *Acta Psychiatr Scand* 2001, **104**:223-226.
28. Lexcen FJ, Hawk GL, Herrick S, Blank MB: **Use of video conferencing for psychiatric and forensic evaluations.** *Psychiatr Serv* 2006, **57**:713-715.
29. Kobak KA, Opler MG, Engelhardt N: **PANSS rater training using internet and videoconference: results from a pilot study.** *Schizophr Res* 2007, **92**:63-67.
30. Lipsitz J, Kobak KA, Feiger A, Sikich D, Moroz G, Engelhardt N: **The Rater Applied Performance Scale (RAPS): development and reliability.** *Psychiatry Res* 2004, **127**:147-155.
31. American Telemedicine Association: *Practice Guidelines for Videoconferencing-Based Telemental Health* Washington, DC: American Telemedicine Association; 2009.
32. Shore JH, Hilty DM, Yellowlees P: **Emergency management guidelines for telepsychiatry.** *Gen Hosp Psychiatry* 2007, **29**:199-206.
33. Ball CJ, McLaren PM, Summerfield AB, Lipsedge MS, Watson JP: **A comparison of communication modes in adult psychiatry.** *J Telemed Telecare* 1995, **1**:22-26.
34. Mannion L, Fahy TJ, Duffy C, Broderick M, Gethins E: **Telepsychiatry: an island pilot project.** *J Telemed Telecare* 1998, **4(Suppl 1)**:62-63.
35. Stevens A, Doidge N, Goldbloom D, Voore P, Farewell J: **Pilot study of televideo psychiatric assessments in an underserviced community.** *Am J Psychiatry* 1999, **156**:783-785.
36. Barkham M, Agnew RM, Culverwell A: **The California Psychotherapy Alliance Scales: a pilot study of dimensions and elements.** *Br J Med Psychol* 1993, **66**:157-165.
37. Magaletta PR, Fagan TJ, Peyrot M: **Telehealth in the federal bureau of prisons: Inmates' perceptions.** *Prof Psychol Res Pract* 2000, **31**:497-502.
38. Mielonen ML, Ohinmaa A, Moring J, Isohanni M: **Psychiatric inpatient care planning via telemedicine.** *J Telemed Telecare* 2000, **6**:152-157.

Case 2:90-cv-00520-KJM-SCR    Document 5603-1    Filed 04/13/17    Page 184 of 308

39. Khan A, Kolts RL, Rapaport MH, Krishnan KR, Brodhead AE, Browns WA:
    Magnitude of placebo response and drug-placebo differences across
    psychiatric disorders. *Psychol Med* 2005, **35**:743-749.
40. Kobak KA, Feiger AD, Lipsitz JD: Interview quality and signal detection in
    clinical trials. *Am J Psychiatry* 2005, **162**:628.
41. Shen J, Kobak KA, Zhao Y, Alexander MM, Kane JM: Use of remote
    centralized raters via live 2-way video in a multicenter clinical trial for
    schizophrenia. *J Clin Psychopharmacol* 2008, **28**:691-693.
42. Pandina GJ, Lindenmayer JP, Lull J, Lim P, Gopal S, Herben V, Kusumakar V,
    Yuen E, Palumbo J: A randomized, placebo-controlled study to assess the
    efficacy and safety of 3 doses of paliperidone palmitate in adults with
    acutely exacerbated schizophrenia. *J Clin Psychopharmacol* **30**:235-244.
43. Magaletta P, Fagan T, Peyrot M: Telehealth in the Federal Bureau of
    Prisons: Inmates' perceptions. *Prof Psychol Res Pract* 2000, **31**:497-502.
44. Detke MJ: Accelerating clinical drug development: better signal
    detection. *New Clinical Drug Evaluation Unit (NCDEU)* Hollywood, FL; 2009.
45. Werner A, Anderson LE: Rural telepsychiatry is economically
    unsupportable: the Concorde crashes in a cornfield. *Psychiatr Serv* 1998,
    **49**:1287-1290.
46. Williams TL, May CR, Esmail A: Limitations of patient satisfaction studies
    in telehealthcare: a systematic review of the literature. *Telemed J E Health*
    2001, **7**:293-316.

doi:10.1186/1744-859X-10-14
**Cite this article as:** Sharp *et al.*: The use of videoconferencing with
patients with psychosis: a review of the literature. *Annals of General
Psychiatry* 2011 **10**:14.

**Submit your next manuscript to BioMed Central
and take full advantage of:**

• **Convenient online submission**

• **Thorough peer review**

• **No space constraints or color figure charges**

• **Immediate publication on acceptance**

• **Inclusion in PubMed, CAS, Scopus and Google Scholar**

• **Research which is freely available for redistribution**

Submit your manuscript at
www.biomedcentral.com/submit

 **BioMed** Central

Exhibit P

**HealthLinkNow**

# Questions

## What is Telemedicine?

Telemedicine is the provision of health services using a secure video-conferencing system where the health provider and the patient are not in the same physical location but they see and talk with each other in real-time.

## What is a Care Navigator?

Care Navigators are here to guide you through each step of the HealthLinkNow process. Whether you need help setting up your account, or have questions about your doctor or your treatment plan, your assigned Care Navigator is available to help.

Each Care Navigator is extensively trained on our technology system, and is familiar with your needs and your doctor. Think of them as your personal mental health assistant.

FOR ALL MEDICAL EMERGENCIES, IMMEDIATELY CALL 911

## What is Telepsychiatry?

Telepsychiatry is the practice of psychiatry using a secure video-conferencing system. Patients and doctors can both be anywhere they have a secure internet connection.

## What is Telemental health?

Telemental health is the practice of mental health using a secure video-conferencing system which may be provided by psychiatrists, psychologists, or other mental health providers.

## What is the advantage of healthcare provided using telemedicine systems?

Convenience, Time, Cost savings, and often more timely access to healthcare.

## How do you ensure your doctors provide high quality care?

We carefully check all doctor's credentials and have quality review processes in place similar to what happens is other health clinics.

## What kind of doctor or therapist will I see?

It depends on your needs, but all of our patients have to have an initial consultation to establish care with one of our doctors. They will work out a treatment plan with you and will arrange for you to see appropriate professionals.

## Do your doctors have malpractice insurance?

Yes.

## Do you provide me with the necessary videoconferencing equipment?

Case 2:90-cv-00520-KJM-SCR    Document 5603-1    Filed 04/13/17    Page 187 of 308

You must provide your own equipment. Most computers have a webcam and a microphone. You also need a high-speed internet connection. We will provide you with a link to our physicians virtual clinic room prior to your consultation.

## Do I get IT support ?

Yes. We have technical support for patients using HLN to make sure our systems are functioning properly, and we have back-up systems if needed.

## How often can I see a doctor or therapist?

That is a decision that will be made jointly between you and your doctor and/or therapist. Most doctors should be able to tell you approximately how often you will need to be seen, and for how long.

## What if my doctor or therapist is on vacation or sick?

We have other providers who will cover them.

## How do I make an appointment?

You can do it online through this website.

## Why do I have to pay up front for my appointment?

We work in the same way as most specialists in private practice. That means that you have to pay for the full consultation, usually by credit card through our website, at the time of the consultation, and then you will then be able to get a receipt to claim from your insurance company. The charges our doctors make are available on this website and are similar to those charged in private practice.

## Why don't you give a refund if I forget my appointment or fail to give 48 advance notice to cancel?

This is usual practice in most clinics.

## What if I have an emergency?

You must always call 911 for an emergency. You have to provide us with you primary care doctors contact information as part of your registration process so that we can always contact your own family doctor in emergencies. We also have to have a telephone number from you so that we can contact you via phone if there are technical or clinical problems.

## What if I have to cancel an appointment?

You can do so via email or online. Once an appointment is scheduled, you will be expected to pay for it unless you provide 48 hours advance notice that you need to cancel.

## Can I be seen when I'm overseas?

Yes. Remember that you will most likely have to find and buy your medication locally as US prescriptions will not be accepted overseas.

## How does the doctor prescribe medications for me?

Medications are prescribed electronically or called into the pharmacy of your choice. Certain prescriptions do require a paper prescription and in those instances, the doctor will mail you the prescription to you.

# What if I need a physical exam?

We will ask your primary care doctor to do this.

## Why do you require that I give permission to interact with my Primary Care Physician?

To provide high quality care it is essential that our doctors can ensure that if you need a physical exam you have someone to see

## How do your doctors keep records?

We have a sophisticated electronic medical record that all our doctors use.

## Can I see my medical record?

You can request a written summary from your doctor regarding the care that has been given to you. If you wish to have a full copy of your record you have to formally request this in writing through our website.

## How do I communicate with my doctor or therapist, and how do they communicate with me?

Messages can also be exchanged through your personal health record on our website. Some of our doctors do give out their cell phone and other access information.

## Can I record the session?

No.

## Are the consultations confidential?

Yes, HLN consultations are confidential just like in-person consultations. However, just as in the case of in-person healthcare there are circumstances in which information can or must be released. Your psychiatrist may be subpoenaed to testify in a court of law . They also have an ethical duty to break confidentiality if they believe that you are a danger to yourself or others, or if others are at risk from you, where they have a duty to warn those people. If your psychiatrist wishes to communicate with someone, you will normally be asked to sign a "Release of Information" and to specify for how long the release will remain in effect.

## Do you have Standards of Practice?

Yes. In fact our doctors were lead authors in writing the national guidelines published by the American Telemedicine Association which are linked on this site.

## Is it legal to see patients on telemedicine?

Yes. All patients must be given what is called an appropriate prior examination (Business & Professions Code Section 2242 and 2242.1). This examination, however, need not be in-person, if the technology is sufficient to provide the same information to the physician if the exam had been performed face-to-face. Hence telemedicine is completely legal, and physicians practicing via telemedicine are held to the same standard of care, and retain the same responsibilities of providing informed consent, ensuring the privacy of medical information, and any other duties associated with practicing medicine.

## Will HLN doctors prescribe narcotics or other controlled substances?

Case 2:90-cv-00520-KJM-SCP　Document 5603-1　Filed 04/13/17　Page 189 of 308

No. But if you need these, we would refer you to your primary care provider.

## Can I get medical marijuana from your doctors?

No. Our doctors do not prescribe medical marijuana using the HLN telemedicine system.

## If I am suicidal or homicidal, should I use telepsychiatry?

No. Call 911 or go to the local emergency department.

Exhibit Q

# Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry

## APA Council on Psychiatry & Law

**Special Acknowledgment**

Patricia Recupero, M.D., J.D.
Carl Erik Fisher, M.D.

Approved by the Joint Reference Committee
January 2014

The findings, opinions, and conclusions of this report do not necessarily represent the views of the officers, trustees, or all members of the American Psychiatric Association. Views expressed are those of the authors." APA Operations Manual.

**Abstract**

The goal of this resource document is to address the major areas of the use of the internet in communication with patients and the public in the practice of psychiatry. The rate of change of technological capabilities and their implementation is so rapid that the workgroup believes that it would be inappropriate to promulgate fixed rules for constantly changing situations. Rather, we seek to provide some questions to be considered when implementing any new communication technology with patients or the public. This document seeks to address professional use of the internet and does not discuss issues related to psychiatrists' use of social media and social networking sites such as Facebook or Twitter. In order to assist the practitioner, references to resource materials will be given. However, the reference is not an endorsement by either the APA or the members of the work group of the material contained therein.

As with the addition of any relatively new technology, there are complicated legal and ethical issues to consider, and it is beyond the scope of this resource document to provide an exhaustive list of the relevant concerns. This document aims, instead, to provide a general introduction to the use of the internet in clinical psychiatry, to identify some of the key issues arising from the debate, and to provide some starting-point resources for physicians and other practitioners who may be interested in learning more about this developing area in health services. We expect that the prudent practitioner will use this document as a starting point only and that a more thorough investigation or research effort will be conducted before acting. The role of the internet in medicine is an unsettled area of the law. There are few specific appellate court rulings on these issues. Often, reasoning from analogy is applied. The legal implications suggested herein may not be applicable in any or all jurisdictions. This resource document is not intended to be construed as a clinical practice guideline, nor to define a standard of care.

## Introduction to the Available Technology

Technology changes rapidly in today's world. This resource document does not aim to address every relevant technological or internet-related concern in clinical psychiatry. Instead, the discussion seeks to address some of the more frequently asked questions, specifically regarding the use of e-mail, medical practice websites, and e-therapy.

### Telemedicine

Telemedicine typically refers to the use of telecommunications technology to assist in the practice of medicine. In psychiatry, the practice is often termed telepsychiatry. Telemedicine is a broad term that encompasses a variety of physical or psychological treatments at a distance, including, for example, remote computer-assisted surgery, teleconferencing, and videoconferencing. Videoconferencing by internet requires that both the provider and the patient have access to webcam technology and an internet connection. In videoconferencing, both the physician and the patient are able to see one another as they chat. They can chat using their voices (which requires that both parties have microphones and speakers) or through text-based instant messaging. From the psychotherapeutic perspective, because therapy via videoconferencing sends the patient and the practitioner a live video image of the other participant, it may be more similar to traditional psychotherapy than other (e.g., text-based) forms of e-therapy. However, the nature of electronic communication adds unique risks to this form of therapy that are not present in face-to-face communication, which are discussed below.

### Websites

Websites are collections of electronic pages on the internet. A medical practice website is an online resource that provides a convenient mechanism for a physician to communicate with patients and the public. Developing a web presence is an effective way for a physician to provide new and existing patients with administrative information about the practice as well as links to credible healthcare information on the web. Medical practice websites can be classified according to their scope and purpose into basic and interactive sites. A basic website might include the following: an introduction to the practice's care philosophy; physician's bio, CV, and photo; services and procedures summary; contact information; office hours; maps and directions; a list of insurance participation; hospital and professional affiliations; a privacy policy/disclaimer; medical news; and patient education resources. An interactive website may also include: secure patient and physician log in; secure messaging capabilities; secure bill paying; and a secure system for fee-based online consultations.

© Copyright, American Psychiatric Association, all rights reserved.

Providers may also use third-party websites, many of which provide interactive functions. For example, some online scheduling services allow patients to book appointments on-line. There are also "cloud-based" medical record websites (i.e., web-based services in which records are kept on-line), which may also have interactive functions that enable patients to rate their physicians or to access their medical records.

### E-mail

E-mail can be a versatile tool for psychiatrists. Some physicians use e-mail to communicate with patients (physician-patient e-mail), while others choose to use e-mail only for non-clinical matters, such as discussions with colleagues. Issues to consider vary depending upon the way that e-mail is used. Before a psychiatrist considers e-mail correspondence with patients, the psychiatrist should be familiar with the emerging laws concerning the internet and medicine, particularly with respect to HIPAA regulations and current standards of data protection (e.g., encryption, firewalls). Data protection methods will be addressed further in this resource document.

### E-therapy

E-therapy refers to the provision of mental health services online (through the internet). Related terms include cybertherapy, teletherapy, internet counseling, online counseling, and so forth. Among the most common technologies utilized in e-therapy services are live (real-time) videoconferencing, e-mail, instant messaging (IM), chat rooms, and discussion groups through e-mail- or web-based message boards. Despite earlier debate among mental health practitioners about the efficacy of e-therapy, trials comparing e-therapy to traditional psychotherapy have generally found that the efficacy of e-therapy is comparable to traditional, face-to-face therapy (for a partial listing, see bibliography at the end of this document).

One of the most complex issues involves the question of what constitutes the provision of e-therapy, as opposed to other types of physician-patient contact online. At what point does an e-mail from a physician become therapy? The easiest way to gain an understanding of the difference between physician-patient e-mail and e-therapy is to examine the limits of physician-patient e-mail. In physician-patient e-mail, the contents of messages between a physician and a patient are normally restricted to minor "matters of business," such as prescription refill requests, appointment confirmations, and similar issues. These e-mails are similar to the messages a patient may leave with a doctor's office staff when the doctor is not available.

In the case of e-therapy, however, the content of the communications is significantly more psychological. Some form of counseling, advising, or other therapy generally takes place. E-mails that delve into areas of the patient's personal life, emotional issues, or even advice may be considered a form of e-therapy. A physician must be careful to ensure that both the provider and the patient are in agreement regarding the nature of their relationship (e.g., is the physician-patient relationship in place, or is this an unsolicited inquiry from a prospective patient?). As a general rule, any individual providing e-therapy services should also be a qualified and licensed practitioner for face-to-face services. The potential anonymity of internet communications does not reduce professional or ethical obligations. On the contrary, the use of the internet creates for the physician an additional set of responsibilities associated with the risks and benefits of the technology and its novelty.

### Instant messaging and chat rooms

Instant messages, or "IMs," are very similar to e-mail. Whereas in e-mail a sender may wait hours or days for a reply, in IMs both parties are receiving and sending messages at the same time. In this sense, it is similar to a phone conversation, but parties are typing and sending text messages rather than speaking to one another. The provider and patient typically must set an appointment for this type of communication. Many instant messaging software packages enable features such as file sharing, webcams, and audio or "voice chat," in which the clinician and patient (provided each has a microphone and speakers) can talk as if on the telephone.

Live chat rooms are similar to instant messages, but in a chat room, more than two parties are able to chat. Live chat rooms could be used for forms of group therapy, and instant messaging may be used simultaneously to exchange private messages between participants. Unlike face-to-face group therapy, the combination of instant messaging and chat rooms allows members in the group to direct private comments to the therapist or to one another during the group discussion.

Numerous instant messaging applications are available for free downloading or access through websites. Because privacy policies and security features may vary from one application to the next, it is important to read thoroughly the "terms of use" to which one must agree prior to using a particular program. Some medical practice websites have instant messaging and chat room capabilities.

### Texting and mHealth

Recent years have witnessed a dramatic increase in publications about applications for texting and mobile phones (including smartphones) in healthcare. The con-

© Copyright, American Psychiatric Association, all rights reserved.

venience and improved technology of portable electronic devices has led to a significant shift toward mobile computing and away from the traditional desktop personal computer, at least among consumers. Many individuals now access the internet primarily through mobile phones or tablet computers, and this trend appears to be increasing. Potential applications for texting and mHealth (health applications via mobile phones) are numerous and constantly expanding, as developers roll out new health "apps" (applications) on nearly a daily basis. With new apps come new opportunities as well as new risks. Providers interested in using mHealth applications or texting with patients would be well advised to stay current on the emerging research and should take special care regarding the security and legal implications of these new technologies. It may be advisable to consult with one's liability insurance provider, information technology providers or staff, and/or a legal professional prior to initiating the use of such applications with patients, as the relevant risks and security considerations are continually evolving and changing.

## Technological Safeguards and Risk Management

Fortunately, there are many affordable technological measures that can increase the security of electronic communications. If the physician chooses NOT to use any of these security features, the decision not to use them should be discussed along with other risks in the informed consent process. To avoid liability, however, it is not advisable to practice e-therapy or telepsychiatry if one does not have the appropriate technology to ensure reasonable security, confidentiality, and privacy. The informed consent discussion should address not only security risks and safeguards, but also the clinical and practical drawbacks and alternatives, as discussed elsewhere in this document. Below are only some of the options available to decrease risks.

### Passwords

All computers and internet accounts should be protected with passwords for log-on. Some e-mail software enables the user to download e-mail automatically through stored passwords; disabling this feature can increase security. Some internet protection software includes additional password protection features. Interactive medical practice websites can be configured to require secure patient and provider log-ins and passwords in order to activate messaging features. For maximum security, passwords should be case-specific and contain a combination of letters, numerals, and special characters. Users should create different passwords for different applications, and passwords should be changed periodically. Patients and

physicians should not share with others any passwords used for accessing sensitive personal information.

### Screen savers

Most medical offices should set computer screens in a way that prevents passers-by from viewing the contents of the screen during the ordinary course of business. When unattended, computer screens should be obscured by a screen saver program. Ideally, the screen saver program should be supplemented by a security algorithm that automatically logs the user out and requires the next user to log in again. If the physician's computer is in a setting in which others may see the screen as they walk by, a screen saver with password protection may be used. Additionally, for providers who use portable electronic devices such as smartphones or tablets, privacy-enhancing screen protectors can help to lessen the likelihood of an inadvertent confidentiality breach.

### Anti-virus software

Anti-virus software is a must for anyone using the internet. Anti-virus software scans computer files for viruses and other malware (such as Trojan horses) and quarantines infected files. If an essential file is corrupted with a virus, anti-virus software and the virus protection service usually provide resources to help repair the infected file. Additionally, anti-virus software allows the removal of viruses from the computer so that the user may safely resume use of the internet without unwittingly transmitting the virus to other computers. Some anti-virus packages include software that assists in backing up the hard drive onto recovery disks in the event of a systemic shutdown from virus infection. Most anti-virus programs require annual subscription renewals to keep virus definitions up-to-date and effective against newly emerging threats.

### Anti-spyware software

Spyware is software often used by advertising companies to track an individual's online activities. Users are often unaware of the existence of these programs on their computers, and anti-spyware software is usually necessary to detect and remove them. Like anti-virus software, anti-spyware programs scan the computer for malicious software and assist in their removal. Some anti-virus software packages include anti-spyware applications.

### Firewalls

A firewall protects a computer from intrusion attempts, which may come from hackers or harmful software. Firewalls, which are sets of related programs, are located at the level of the gateway server network. Together, they form a security protection system that includes software, hardware, and often a router, which is situated between a private network and outside networks. The firewall screens user names, source addresses, destination addresses, and

© Copyright, American Psychiatric Association, all rights reserved.                                                    3

**TELEPSYCHIATRY IN CLINICAL PSYCHIATRY**

all other information that is entering or leaving the private network. The firewall system allows, denies, or limits access to the private network, depending on the system rules. A customized firewall may firmly deny access to confidential information on a website while permitting open access to the homepage. In medicine, firewalls help to protect electronic patient records and other medical data from outside users or other unauthorized networks. Firewalls can be programmed to protect various components of a computer network so that no incoming request can gain access to segregated data. A simple firewall could be used to keep all electronic patient records on a separate computer or server.

**Encryption**

Encryption programs may greatly enhance the security of electronic communications, particularly doctor-patient e-mail. Encryption provides secure transmission of confidential information as it passes over the internet from a patient's browser to the physician's server. It is a software coding procedure that converts plain text into a disguised file or message using a mathematical algorithm. In order to transform the document back into readable plain text, one must know the key to the code.

The internet standard for encrypting web-based information interchanges is based on two protocols, Secure Sockets Layer (SSL) and Transport Layer Security (TLS). SSL/TLS is a two-key system, involving an encrypt/decrypt key at the browser and an encrypt/decrypt key at the server. The keys for this symmetric encryption are generated uniquely for each connection by a pseudo-random number generator (PRNG) and are related to each other by a complex mathematical formula. The longer the string of digits used in the keys, the harder the encryption is to break. The only method for breaking an encryption is by trying every possible key. The keys only work between the browser and server for the duration of the connection, and the encryption dies when the session is terminated. Length of key structure combined with the short time of operation highlights the effectiveness of encryption as a data security measure.

The patient and physician can discuss whether or not to use encryption technology. The education of the average consumer about encryption technologies and the expenses associated with their use may be too high a barrier for the average consumer and too cumbersome for the physician. Encryption which has not been appropriately established may preclude the doctor from even knowing who is corresponding with the doctor. Furthermore, providers and patients should know that even the highest levels of commercially available encryption cannot guarantee security—the recent disclosure that the United States National Security Agency (NSA) has the capacity to "crack"

most any form of encryption serves as a reminder that motivated parties can achieve access to data even when it is protected by vigorous security measures. Where the use of encryption is impractical, security may be enhanced through other measures discussed elsewhere in this document.

**E-signatures**

Some commentators have suggested that an e-mail may be sent by someone masquerading as the patient, e.g. by a spouse who has access to the patient's e-mail. Other times, a patient may deliberately mislead as to his or her own identity. The Electronic Signatures Act provides a way to have near-perfect authentication and identification. The doctor would then know the identity of the person sending the e-mail. Anonymity would not be possible. Although electronic signature technology has been accepted as legally binding for purposes of contract law, the process of registering an e-signature is cumbersome and may not be practical for individual patients for several reasons, including the expense involved. Nonetheless, as technology evolves, the use of e-signatures may become less costly and more user-friendly over time.

**Audit trails**

Audit trails, similar to their accounting counterparts, are electronic or paper logs that are used to track computer activity. Audit trails can be used to monitor a number of medical office activities, including determining who has had or attempted to have access to patient records, recording of patient contacts, and payment for services. They are also used to investigate the occurrence of hacker activity or other cybercrimes involving medical practices. HIPAA requires that a record of some disclosures of personal health information be maintained and reported to the patient on request. A computer audit trail would help maintain this record of who has had access to the e-mail record.

**Authentication and patient registration**

Security can be increased using a web-based messaging system that requires a secure log-on. This process requires the doctor to establish a website, e.g., through a practice-hosting service. The patient can access a messaging application after logging on and providing a password. Strictly speaking, this is not "e-mail," but it functions in a similar way. The use of this technology provides added security without the cumbersome aspects of encryption. The system may also collect identifying information (such as name, address, date of birth, and telephone number) before the patient is able to access the interactive aspects of the website. As a condition of registration, a patient may be required to acknowledge that he/she has read and

© Copyright, American Psychiatric Association, all rights reserved.

understood the physician's privacy policy and terms of service and is willing to abide by them. Patient registration decreases liability exposure by providing a mechanism to authenticate a patient's identity and to document the patient's consent. Each time that a patient wishes to access the interactive aspects of the website, the patient must sign in with his/her user name and password. This technology authenticates the identity of the correspondents and ensures that confidential information will not be lost or copied in transit over the internet.

### Networks and connection issues

Most employers who provide internet access to staff members do so via a firewall-protected network. However, always-on connections, such as network connections, are more vulnerable to security threats. Anytime a computer is connected to the internet, the computer has what is known as an IP (Internet Protocol) address. The IP address is essentially a digital location of the computer in cyberspace. If the IP address is unchanging, as is often the case on university networks, there is an increased vulnerability to hackers and other intrusion attempts. To combat these threats, in many networks the information technology or information services department may screen employees' e-mail and other electronic data. While having the protection of a dedicated IT department can help to reduce security risks, physicians should familiarize themselves with the IT policy and maintain HIPAA compliance with updated privacy notices if necessary.

### Comprehensive security packages and computer maintenance

Many website-hosting services include sophisticated security tools, and several companies offer comprehensive internet security software packages with subscriptions to ongoing updates for continued protection. These packages may include anti-virus software, anti-spyware software, a firewall, anti-spam software, and password protection. Some provide tools to remove "cookies" and other unwanted files from the computer. Viruses and other malware are continually evolving, and renewed subscriptions are necessary to keep the software up-to-date.

Ongoing computer maintenance also performs a protective function. The physician and patient should both conduct periodic scans of the computer to detect and remove unwanted "cookies" and corrupted files. Subscribing to internet security newsletters and bulletins can confer additional protection. These subscriptions will help to keep the practitioner advised with respect to newly emerging threats so that appropriate safeguards may be used. For example, security alerts may notify the user of viruses for which no virus removal tool yet exists. Tips and suggestions may include temporarily avoiding the use of vulnerable programs until virus definitions and removal tools have been updated. Staying abreast of internet security news will help both the practitioner and the patient to remain safe.

### Data breach prevention and management

The risk of data breaches is an unfortunate but inevitable consequence of the shift toward electronic and remote-storage data access. Data breaches constitute a significant and increasingly expensive source of liability in the health sector. Although a thorough discussion of data breaches and their prevention and management is beyond the scope of this resource document, providers should be aware of the risks and stay informed of new developments, including applicable laws and regulations as well as newer technological safeguards. Keeping antivirus software and security patches up-to-date helps to lessen the risk of a breach through remote access (i.e., hackers), as does restricting mobile access to confidential health information.

The risk of data breaches may be minimized by avoiding the clinical use of mobile storage technology, as theft of USB flash drives and tablet computers represents one common source of data breaches. Many data breaches have resulted from inappropriate staff access to patient electronic records; audit trails, discussed above, can help to mitigate this risk and to identify the source of a breach if one occurs. Providers should also be aware that data breach insurance is available to help cover the expenses associated with a breach, should one occur. Laws such as HIPAA and the HITECH Act have requirements for notifications in the event of a data breach; psychiatrists who use electronic technology to handle patient information should have a policy in place for dealing with potential breaches of confidential data.

## Legal Issues

While information technology offers numerous benefits to physicians and patients alike, it also opens the door to a wide variety of legal concerns. Legal issues may vary depending upon which technology is being used and how it is being used. This document does not aim to address all possible legal concerns related to the use of information technology in clinical psychiatry, but to provide some starting points for further reflection and research. There are several aspects of website management that may benefit from a professional legal consultation. Legal experts can advise physicians on specific details of licensing, jurisdiction, copyright infringement, HIPAA compliance, and disclaimer language.

### Laws and regulations

A familiarity with federal and state laws and other regulations is imperative to ensure compliance with regulations regarding websites and medicine. Some state laws, for example, require that a physician meet with a patient

© Copyright, American Psychiatric Association, all rights reserved.

face-to-face before the physician is authorized to prescribe medicine or treat the patient online. States are permitted to have more restrictive confidentiality rules than the HIPAA rules, and every state has some legal requirement of confidentiality of medical records, particularly with regard to psychiatric records. How these are applied to e-mail is often unclear. Additional commerce, advertising, and communications regulations apply to websites and other uses of information technology in healthcare. This document details some of the more common concerns.

## Licensing

A mental health care provider working from an office in State A, when treating a patient who lives in State B, might need to be licensed and authorized to work as a mental health professional in State B. He/she may also need to be familiar with the applicable laws in State B. Similarly, providing services to patients outside of the United States often necessitates familiarizing oneself with the laws of each patient's country and verifying that one is authorized to provide services via internet in that region. If a physician provides e-therapy services to someone without being licensed in the patient's home jurisdiction, the physician's malpractice insurance company may not be obligated to pay a judgment or even to reimburse associated legal fees if the patient initiates a lawsuit. States and countries have their own laws and regulations for medical and counseling services, and many of the local regulations place additional restrictions on services. In Oklahoma, for example, a physician was sanctioned by the state medical board for conducting appointments via Skype. Online interactions between a physician and a patient are subject to requirements of state licensure. Aside from incidental communications, contact online with a patient outside of the state in which the physician holds a license may subject the physician to increased risk. If either the physician or the patient is traveling, or if by happenstance the physician's office is in a different state than the patient's residence, e-mail contact (like phone calls) would usually be deemed incidental, and the issues of medical licensing may not arise. It bears noting that a local licensing board can be an important resource for information about jurisdictional issues; however, ultimately it is the provider's responsibility to ensure that one is in compliance with the applicable licensing rules.

## HIPAA

Originally enacted in 1996, with subsequent regulations issued for medical confidentiality, HIPAA is a federal law that applies to physicians who are involved in the electronic transmission of patient data. The prudent psychiatrist must remain aware of these regulations and how they may affect one's clinical practice. HIPAA requires physicians to develop a security policy for medical data and to notify patients about the privacy procedures in effect for the practice. If a physician's practice falls within the HIPAA definition, then one's practice website should contain a HIPAA-compliant privacy policy to inform patients how their medical information may be used and disclosed and how the patient can get access to this information. Furthermore, e-mail that contains protected health information would need to meet standards consistent with both the Privacy and Security Rules.

HIPAA also applies to e-therapy if a service provider is otherwise a covered entity subject to HIPAA. HIPAA regulations require that service providers who manage patient data observe rules of privacy and confidentiality and also inform their patients about the procedure, safeguards, and risks to privacy that may be involved. Physicians using electronic applications will need to use the appropriate technological safeguards to ensure confidentiality of patients' protected health information to avoid a violation of HIPAA regulations.

Many providers now use third-party applications (i.e., programs such as Skype, or Apple's FaceTime) for videoconferencing. Some of these services state that they are fully secure and private, but providers need to consider the full scope of HIPAA and other confidentiality practices when considering whether these third-party applications are in fact HIPAA compliant and appropriate for the practice of medicine. For example, while many third-party applications advertise confidentiality, they may not be able to notify you when there is a security breach or be able to generate an audit trail. Such entities, when they have access to PHI, may be defined as "business associates" under HIPAA, thereby triggering the need for specific agreements and HIPAA compliance by the third party.

HIPAA provisions and regulations apply to all electronic communications to some degree, depending upon how the doctor chooses to incorporate information and communications technology into the practice. For example, videoconferencing with a patient may raise certain privacy issues, but unless the interaction is saved on a server it may not trigger comments about storage and retrieval of the conference from the patient's medical record.

The HIPAA omnibus rule (published January 25, 2013, compliance deadline September 23, 2013) requires amendments to existing Notices of Privacy Practices and contains additional provisions regarding access to PHI and data breach notification and mitigation. The specifics of the HIPAA omnibus rule and other HIPAA regulations are beyond the scope of this document, and providers should note that these regulations and requirements may change over time. The best strategy to mitigate risk and ensure compliance is to be proactive about staying informed of

© Copyright, American Psychiatric Association, all rights reserved.

developments in HIPAA and its implementation. HIPAA noncompliance is potentially very costly, with penalties up to $1,500,000.

### Copyright and related issues

A number of practices that are common in the development of websites raise issues related to copyright infringement. Hyperlinking, the practice of linking one website to another, sometimes warrants requesting the permission of the linked website's owner. Many website owners will not permit a link that bypasses the website's home page, a practice known as deep linking. Another practice that raises potential legal issues is called framing. Framing involves pulling content from one website and putting it into a frame on another website without referencing the source. This practice is essentially plagiarism. Content for a website should not be taken from another website without properly recognizing the true source of the information.

Meta-tags are invisible words and software codes embedded in a website which, although invisible to visitors, are detected by web search engines for indexing purposes. Legal issues arise when a company puts the name of its competitors or other trademark names in its meta-tags in an attempt to attract customers. For example, an overzealous physician eager to get new patients may wish to embed the names of common psychotropic medicines as meta-tags on his/her practice website. Although this may seem like a good form of indirect advertisement, the unauthorized use of these names constitutes a trademark infringement. Using prescription medicines to advertise one's medical practice might raise additional ethical concerns. A number of other practices that are common in the design and development of websites can lead to claims related to intellectual property, communications, or commerce regulations. For a detailed explanation of these practices and their risks, consultation with an attorney is advised.

### Evidence in legal proceedings

Electronic communications between doctors and patients, like any other medical records, are subject to discovery and court orders. Unlike a progress note, which can be "sanitized," e-mail and IM transcripts contain the exact words of the participants. Psychiatrists and therapists typically structure their notes to protect patients and third parties from disclosure of inappropriate material such as fantasies. E-mail is more like a complete transcript and therefore is potentially more revealing. When e-mail is sought in discovery, the expense of searching for the e-mail is usually borne by the party obligated to produce the material. This process may be burdensome to an individual practitioner and very expensive to a group practice. The vulnerability of electronic communications to subpoena and search warrant may be especially troubling to patients

who are involved in legal proceedings such as family court (divorce, custody disputes, etc.) or criminal prosecution.

### Liability and malpractice exposure

The addition of any new technology to a clinical practice often affects the physician's liability risk. Care should be taken to avoid the initiation of a physician-patient relationship solely through online interaction, as this can increase liability exposure (Recupero, 2005). Prior to engaging in online communication, a physician should obtain informed consent from the patient regarding the appropriate use and limitations of online communication. A physician may be held responsible for the credibility of any information made available on his/her medical practice website. Information that is provided on a medical practice website should come either directly from the physician or from a recognized and credible source. If a practice website includes links to external sites, then patients will be able to connect to other websites directly from the physician's website. A physician may reduce liability for information on linked websites through the use of security alerts. A security alert pops up when a patient clicks on a link and notifies the patient that they are leaving the physician's secure website.

An interactive website may increase liability exposure by initiating a physician-patient relationship solely through online interaction. If one replies to an e-mail or other communication from someone who is not currently a patient, one should always include a disclaimer to avoid any liability from a perceived physician-patient relationship. Using the telephone, some physicians have been found liable for "advice" they have given members of the public who have contacted the physician even if there was no pre-existing doctor/patient relationship. E-mail and other forms of electronic communication can potentially give rise to similar liability.

Under no circumstances should the physician give advice of any kind to "strangers" who are not already patients of the practice. Even a "strong" disclaimer such as the following can be made moot by giving any advice: "I do not correspond on clinical matters by e-mail. This response in no way creates a doctor/patient relationship between the sender and the recipient." Even giving advice to established patients has risks. When a physician discusses a concern or symptom with a patient, the possibility of continued questioning for purposes of clarification is present. However, in an exchange of e-mail, the physician does not have the ease of communication that face to face or telephonic communication provides. Therefore, the physician should understand the exact nature of the patient's concern before making a recommendation or ordering a treatment. The physician might include in a routine signature a statement instructing the patient to take certain steps if they are in any way concerned with their condition. E-mail provides a documentation of the

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

advice given, which if not followed by the patient may protect the doctor.

In most cases, a therapist-patient relationship will be established by e-therapy. The distinction between providing information and providing advice is not always clear. Disclaimers for many e-therapy websites describe the service as informational or educational, even when the sites serve as portals to counseling services by licensed mental health clinicians. A common disclaimer warns visitors that the service being offered "is not intended to be a substitute for face-to-face professional advice." The depressed person who visits a website's homepage will read the promotional language but may not find the disclaimer in the "Terms and Conditions" link in small print at the bottom of the page. While the website may claim that practitioners offer information rather than advice, the client or consumer may rely upon this information as he would rely upon advice from a face-to-face treatment. Websites should be configured so as to avoid this kind of ambiguity and confusion. Where a clinician touts his credentials (e.g., Dr. G, M.D., Psychiatrist) but provides a service akin to "coaching" rather than psychiatric treatment, he/she may be estopped from further use of those credentials to advertise the practice.

Some malpractice insurance carriers will provide coverage for telemedicine at no additional cost to the insured. However, such coverage often is not automatic; one may need to contact the carrier and specifically request the initiation of coverage for telepsychiatry or e-therapy.

**Disclaimers**

All medical practice websites should have a disclaimer. The disclaimer should include language similar to the following:

> "Users of this website accept full responsibility for use of information from this site and any sites linked to or from it. We do not make any representations to its completeness or appropriateness for a particular purpose. The content of this website is not intended to treat or diagnose any medical or psychological problem. Use of this website is not intended to be used as a substitute for medical or psychological care by a qualified professional. We are neither responsible nor liable for any claim, loss or damage resulting from use of information on this site. The mention of a specific product or service does not constitute a recommendation unless so stated. Check with your healthcare provider before changing your healthcare regimen."

A disclaimer should be located, along with the website's privacy policy, in a prominent and easily accessible place. The disclaimer should state that the content of the website, and any services contained therein, is not intended to, and does not, provide medical advice, diagnosis, or treatment. Ideally, the disclaimer (and privacy policy) should appear the first time users register at the site, requiring them to "agree" (vs. "disagree") to the terms of the service as a precondition to accessing any interactive portions of the website. In all cases, the disclaimer should be prominently displayed and easily accessible from the website home page. Physicians should have a prepared disclaimer to send to those who send e-mail seeking clinical assistance but do not have an established doctor/patient relationship with the physician. The disclaimer should clearly state that no relationship is being created by e-mail. If the doctor suggests that the inquirer make an appointment, the e-mail should remind the potential patient that no doctor-patient relationship will arise until an agreement is made during the appointment.

## Benefits of the Technology

In the sections that follow, which weigh the risks and benefits of various technological aids, this document primarily addresses the direct provision of care (i.e., e-therapy). The interested provider, however, will note that each of the several options available will have its own risk/benefit calculation, which will further be informed by individual patient considerations. Psychiatrists should carefully consider the use of a particular technology not only regarding its specific characteristics but also regarding its application to the specific context in question.

### Convenience

The internet can offer a great deal of convenience to clinicians and patients alike. E-therapy may allow patients access to mental health services during all hours of the day and during every day of the week, which can be helpful to patients who work long hours. E-mail, in particular, can help to eliminate "phone tag" problems, as it can be sent and answered at any hour. Physicians can respond to e-mail from anywhere in the world, and patients can access their doctors from virtually anywhere. The physician and the patient need not be available simultaneously in order to communicate effectively by e-mail.

Through e-mail and an interactive practice website, patients can utilize online appointment requests and reminders, place prescription renewal requests, and contact office staff with other administrative or billing questions, even at night or on weekends. Many providers have begun to use text message-based appointment reminders and confirmations. Some patients appreciate the convenience this affords, but the provider should obtain the patient's permission before sending text messages, and should allow patients to opt-out of receiving such messages, as they may incur additional charges for the patient, depending upon his or her data service plan. Practice websites can also facilitate appointment setting,

© Copyright, American Psychiatric Association, all rights reserved.

confirmations, and cancellations by the patient. A physician can efficiently address many patient requests through electronic communication, reducing the burden of interruptions from non-urgent telephone calls and pages. Some electronic correspondence can be incorporated directly into a patient's electronic medical record or other clinical records, potentially reducing the clinician's paperwork burden.

### Documentation

In most forms of internet communication, a written record is easily (often automatically) created of all communications. Patients and clinicians can have a permanent record of the communication to refer to as needed. This record can be helpful in following through on detailed instructions or giving the patient guidance on when to seek additional medical attention. The automatic documentation can save time previously spent on manual, handwritten documentation and can increase the amount of information retained in the record. As noted later in this document, however, there are potential drawbacks to the automatic creation of detailed transcripts of communication between the psychiatrist and patient.

### Increased range of options for communication

Some individuals are better able to express themselves in writing than verbally. E-therapy can utilize both synchronous (simultaneous, e.g., video conferencing) asynchronous (time delayed, e.g., e-mail) forms of communication. A patient may compose an e-mail or message immediately as a problem occurs instead of waiting for the next scheduled appointment. In e-mail communications, there is no time limit on how long a patient may take to compose and organize a thought, and the physician will have more time to think over the issues before sending a response. Because e-mail is an asynchronous form of communication, both sides are afforded the opportunity to reflect upon messages for extended periods of time without the pressure of filling ―awkward silences‖ in face-to-face interactions. On the other hand, the physician will be unable to interpret awkward silences and other important metacommunications that do not come through in e-mail.

### Increased access to care

Telemedicine enables providers to serve patients who otherwise would not receive care. For example, relief organizations are able to provide e-therapy services to patients in unsafe, war-torn areas, such as refugees in politically unstable regions. Other initiatives provide service to patients and expert consultation to local physicians who are too geographically remote to otherwise receive care. This increases the number of potential patients for a practitioner and also increases patients'

access to needed care. Similarly, electronic therapy can enable psychiatrists and patients who are engaged in a face-to-face treatment to remain in contact when one or both are out of the area due to work or vacation. Telepsychiatry and e-therapy are also accessible to those who for various reasons (disability, agoraphobia, paralysis, chronic disease, etc.) have difficulty leaving their homes. Instant messaging and videoconferencing allow for real-time interaction between a psychiatrist and patient from different time zones. Furthermore, technology may help to increase access for patients suffering from rare conditions or treatment-resistant illnesses, as electronic communication may bridge geographical gaps between these patients and experts and specialists.

A growing number of patients have indicated a preference for internet-based counseling and e-mail access to their physicians' offices. The use of the internet may alleviate some patients' fears about confidentiality and stigma. Some patients are wary of seeking face-to-face mental health services, because they fear that acquaintances may see them and recognize them on their way to and from services. Others may be uncomfortable discussing sensitive topics in person and may avoid seeking help in a face-to-face setting. The perceived anonymity in internet communications may enable some patients to be more forthcoming, thereby facilitating more therapeutic progress.

### Patient education and referrals

Numerous research studies have demonstrated a growing trend for healthcare consumers to conduct health-related research on the world-wide web. Many families use online health plan provider directories when selecting a physician. These directories often include links to physician practice websites. A practice website allows potential new patients to conveniently access detailed information about the doctor's practice (for example, office hours, special areas of expertise, insurance types accepted, etc.) without contacting the office. Medical practice websites can also be important tools for disseminating accurate health information to patients and prospective patients. Websites can be designed to contain a large volume of educational information that cannot be conveyed in a brief, 15-minute office visit. For example, the clinician may wish to include on the website a detailed description of different types of therapy available through the clinic, with links to high-quality medical information on the web if the patient desires to read more in-depth information about his or her condition. Patients often have many questions about their treatment, and an informative website may help them to find answers without unnecessary office visits or phone calls. Web- and mobile phone-based applications also provide opportunities for patient education, for example, by providing easily

© Copyright, American Psychiatric Association, all rights reserved.

accessible references, tools for tracking health-related behaviors (such as nutrition or sleep), or means for cognitive-behavioral assignments.

The internet can facilitate immediate referrals to further reading and adjunctive resources. The psychiatrist can send links to support groups, educational medical websites, or information about prescriptions to support informed consent. Physicians can combat online misinformation and participate in patient education by linking their own websites to various known websites that provide quality content. By supporting patients' use of the internet for self-help and education, psychiatrists can help their patients to become more effective advocates and partners in their own care.

## Risks and Drawbacks to the Technology

The risks associated with the use of the internet in clinical psychiatry vary by context and by the extent of the internet's role in the physician's practice. For example, interactive websites present a greater opportunity for risk (e.g., by compromising confidentiality) than basic, informative websites. E-therapy is among the more controversial uses of the internet, and physicians may be cautious about it for several reasons. For some, the technology is a barrier—learning how to use encryption software may seem tedious and overwhelming, for example. Others are wary of malpractice liability. Some may believe that e-therapy is not an appropriate means of practicing psychotherapy at all. A practitioner should be thoroughly aware of the actual risks and limitations of using information technology in clinical practice so that appropriate safeguards may be used and patients can be fully informed. The following list of risks and limitations is not intended to be comprehensive.

### Confidentiality and security

All forms of communication have a level of insecurity associated with them. Contents of postal mail, telephone messages, and facsimile transmissions all may be revealed in inappropriate ways. Just as physicians are required to use appropriate care in using these traditional forms of communication, due care is required when using electronic communication. However, the elements of due care must be appropriate to the medium of communication and proportional to its risks. While some patients may perceive increased confidentiality in online communication, the reality is that the use of the internet can increase the risk for a breach of confidentiality if practitioners (or patients) are not diligent in the application of security measures. Viruses, hackers, spyware, and other threats are continually evolving alongside the development of security measures. Although it is a criminal offense, a hacker may gain illegal access to remote servers and access patients' protected health information or the office's financial records. Viruses have the capacity to shut down websites and contaminate hard drives. Choosing an internet provider with a secure network and excellent anti-virus software can help guard against these security risks.

Most e-mail is not completely secure, in that it may be monitored, misdirected, or read inadvertently at the sender's or the receiver's computer. If the doctor forwards e-mail to a home account to answer at the end of the day, security issues again arise. The location of the e-mail on another computer system increases the risk of inappropriate disclosure. Although it is relatively more difficult to intercept an e-mail communication than it is to intercept a portable telephonic conversation, most would recommend the use of extra care in case the transmission is misdirected. When a doctor calls a patient's home and does not reach the intended person, no information may be disclosed. In contrast, an e-mail arrives at its destination with all the intended communications visible. It bears noting that similar concerns may arise regarding telephone contact between psychiatrists and their patients. If the psychiatrist calls the patient's home, the doctor's information may appear on the caller ID screen, potentially compromising the patient's confidentiality. In e-mail communication, an inadvertent misspelling or misidentification on the "To" line may send the message to an unintended recipient. Furthermore, providers must be cautious about the use of third-party email services, as some of these may technically "own" the contents of messages on their servers.

Patients should be cautioned never to use an employer's computer, network, or e-mail address for communication with the physician unless the patient wants the employer to be able to see the communication and any response. In many states, an employer can freely access all e-mail in its systems. Similarly, both patients and physicians should try to minimize the risk of intentional or inadvertent interception or viewing of sensitive patient information via shared family computers or accounts.

Virtually all ISPs (Internet Service Providers) and internet nodes screen e-mail for security purposes. Patients who describe delusions of a political nature may find that the government takes an interest in them. Computers and electronic communications belonging to patients involved in the legal system may be subject to search warrants or subpoenas. Although a live person may not be screening all e-mail, there are significant possibilities that the e-mail will not remain strictly between doctor and patient. Will the physician's office staff have access to the e-mail, or will the doctor be the only one to read it? In the usual telephone conversation the patient can censor information being transmitted depending on the

© Copyright, American Psychiatric Association, all rights reserved.

listener. However, with e-mail, the private information may be included for all readers.

The patient needs to know under what circumstances the information contained in electronic communications may be transmitted by the doctor to another agency. For example, the doctor may use the information or even a transcript to document for managed care approvals. A specific release of information should be executed by the patient prior to releasing communications to third parties.

### Misunderstandings and misdiagnosis

Misunderstandings and confusion can occur in electronic communications. The emotional tone of a text-based conversation is often ambiguous, leaving room for intended sarcasm to be interpreted literally or for a gesture of kindness to seem hostile. Furthermore, technical aspects of electronic communication can lead to misunderstandings or other failures in communication. For example, e-mails from a patient may wind up inadvertently blocked by the doctor's spam filters or vice versa. Patients' use of "net slang" or "text-speak," such as "lol" ("laughing out loud"), in communications with the psychiatrist may lead to misunderstandings or difficulties in communication. The provider and patient may wish to discuss and clarify how abbreviations and internet slang will be used in the communications.

The choice of screen names is but one example of many ways in which confusion may arise. Although screen names may provide some anonymity, patients may "sign" their e-mails with a complete name and other pertinent information such as telephone number and street address. This will facilitate rapid contact should it be required, but it may also compromise confidentiality if a message is intercepted or misdirected. The use of a screen name may provide added privacy and security or may increase the possibility of confusion of identities. When an e-mail from a known patient is received in the office, the patient's name may not necessarily be used as the screen name or e-mail address. Casual readers of the screen or the e-mail would not necessarily know the true name of the sender. Conversely, the doctor may not recognize the name and delete the message. The doctor may also confuse screen names between patients and disclose information inappropriately. Patients may have different screen names through different accounts, and this may increase the possibility of confusion.

### Emergency Management

Telemedicine requires particular cautions regarding emergency management. Most sources discourage the use of e-therapy for suicidal patients, for example. Psychiatrists who provide services remotely may not be familiar with local resources in the area of the patient. The internet is extremely limited when emergency intervention is required. In order to practice remotely, clinicians may need to make the extra effort to learn local resources or consult with services in that area.

### Computer Literacy

Patients will require some degree of computer literacy in order to benefit from e-therapy services. They will need to use specific computer services and set up their overall information technology infrastructure reliably in order to maintain continuity of care. Providers also need to assess patients' technological savvy as part of the overall assessment of appropriateness for telemedicine, which creates an extra step in the assessment process. Furthermore, the providers themselves may need to develop proficiency in the practice of telemedicine. Providing care online is in many ways a unique skill. Providers might need practice looking at a camera (i.e., rather than the screen), choosing the optimal backdrop and angle, speaking clearly, and otherwise becoming comfortable practicing online.

## Ethical, Clinical, and Practical Issues

### Content of practice websites

A medical practice website provides a convenient avenue for delivering medical and health care information and resources. It is incumbent on the physician to monitor the credibility of all links available on his/her practice website. Appropriate links will lead the patient to reliable health care information from trusted sources. Appropriate links may include:

- Colleagues' medical practice websites
- Medication information websites from trustworthy sources, such as the National Institutes of Health and the National Library of Medicine (http://www.nlm.nih.gov/medlineplus/druginformation.html)
- Websites for patients' health insurance companies
- Medical news from trustworthy sources, such as the NLM (http://www.nlm.nih.gov/medlineplus/newsbydate.html)
- Professional medical organizations (e.g., APA: www.psych.org)
- Patient education resources on disorders and therapeutic strategies
- General health information resources from respected sources
- Patient advocacy and support organizations, e.g., the National Alliance on Mental Illness (NAMI: www.nami.org)

A physician should take care to avoid linking to medical information sources that serve to endorse products or companies rather than to educate. There are some links that may not be appropriate for a practice website, such as:

- Unrelated commercial websites
- Pop-up or banner advertisements

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

- Pharmaceutical companies or pharmaceutical companies' promotional websites about particular products
- Websites that promote specific treatments to the exclusion of others
- Other websites with evidence of bias

**Scope of issues for e-therapy or telepsychiatry**

Psychiatrists should weigh carefully the decision to publish e-mail addresses on their practice websites or business cards. The provider also has a responsibility to ensure that adequate security measures are taken to protect patients' privacy and confidentiality. Although some physicians will have different ground rules for e-mail, some topics may be considered entirely appropriate for e-mail or instant messaging communications between a physician and patient, such as:

- Setting, rescheduling, and confirming appointments
- Prescription refill requests
- General information, e.g., time to take medication, name and contact info for covering physician when primary psychiatrist is unavailable

Topics that may not be suitable for communication via e-mail, texting, or instant messaging include:

- Suicidal ideation or intent
- Homicidal ideation or intent
- Intent to do violence

Other topics which may not be appropriate for e-mails or IMs, particularly when risks outweigh potential benefits, include:

- Sensitive personal information, such as HIV status, illegal drug use, or criminal or embarrassing behavior
- Names or identities of third parties or information related to third parties
- Requests to become a patient

The physician should develop a message that can supportively indicate to the patient that the issue cannot be dealt with by e-mail or IM response, suggesting instead an office visit or telephone call. In addition, physicians may want to monitor the number of e-mails per patient per time period in order to address over-utilization as a therapeutic issue.

**Scope of issues for e-therapy or telepsychiatry**

Numerous issues have been addressed effectively in e-therapy, with published literature on a variety of conditions including mood disorders, anxiety disorders, substance use disorders, posttraumatic stress disorder, collaborative care for general medical conditions, and others (see bibliography for a partial listing of published studies). Telepsychiatry has also been studied in a range of patient ages, from child and adolescent to geriatric populations. Effectiveness trials have also examined the use of telepsychiatry versus usual face-to-face practice in more naturalistic settings and have found no difference in clinical outcomes (e.g., O'Reilly et al 2007). That said, not all patients will be well suited for e-therapy or telepsychiatry. These modalities would be contraindicated for any patient for whom the risks would outweigh the benefits.

Providers need to perform an individual assessment to see if telepsychiatry is appropriate for the case in question. There may be evidence about telepsychiatry's effectiveness for a particular disorder, and this evidence should be reviewed when considering the appropriateness of the technology. However, the provider must still perform an individualized medical assessment and exercise one's usual clinical judgment regarding diagnosis, prognosis, and treatment. Additionally, such judgments should take into account factors specific to telepsychiatry, such as the client's local resources, technological proficiency, home or organizational environment, and so on. These and related factors should be assessed in an ongoing way during the course of telepsychiatry; for example, if the nature of the environment where someone is receiving care is leading to repeated interruptions, this would need to be addressed.

Some patient situations require particular caution. Of course, as part of the overall safety and appropriateness assessments, potentially suicidal, violent, or homicidal patients must be considered with particular care. Providers may wish to be cautious when treating clients with paranoia, psychosis, or other forms of disordered thinking, though it bears noting that one review (Sharp, Kobak, and Osman 2011) found no evidence for the inferiority of video-conferencing telemental health for patients with psychosis, and one other report concluded that even psychotic patients with delusions pertaining to television were able to respond appropriately to teleconferencing and did not incorporate their telemedicine experience into their delusional system (Dongier et al, 1986). In the more prosaic vein of using e-mail and other text-based communications, patients for whom extensive written records could be problematic (e.g., patients who are facing investigation or litigation, celebrities and public figures) may wish to be cautious about email and text-based communications, even if they are thought to be appropriate in a narrower clinical sense.

The mental health practitioner will need to rely upon professional judgment to determine the applicability of e-therapy for a particular patient. Some providers may have to turn away prospective patients if e-therapy is not advisable and the patient is unwilling to seek face-to-face services. Ethical standards, clinical judgment, and con-

© Copyright, American Psychiatric Association, all rights reserved.

cerns about professional liability can help to guide these decisions. Regarding documentation, in addition to usual practices regarding the informed consent and clinical assessment process, providers should consider documenting their reasons for choosing telemedicine and their thought process regarding the appropriateness of telemedicine for the particular patient.

**Telepsychiatry as "augmenting" versus "stand alone" treatment**

Telemedicine services can be used as an additional tool to enhance an existing face-to-face treatment, or it can stand alone as the sole modality of treatment for a patient. For some patients, it may be reasonable to use telepsychiatry sessions in addition to standard face-to-face visits—for example, to maintain continuity—but not to use telepsychiatry as the sole means of patient contact. Factors such as whether the patient is at their home versus an organizational (i.e., their workplace) or an institutional (i.e., a remote hospital, prison, or jail) setting will significantly affect this consideration. Whether to use telepsychiatry in an "augmenting" or "stand alone" fashion is an important choice that providers should carefully consider in their assessment of treatment appropriateness.

This consideration is particularly important when considering the initiation of treatment. Historically, the APA has issued cautions about the provision of treatment by telephone, letter, or audiotape, presumably applicable to internet-based treatment as well, but these opinions have been withdrawn in light of the progression of telemedicine practices.

There may be some cases in which the requirement of an initial face-to-face interview may prevent a patient from receiving therapy. If an individual contacts a mental health professional online and indicates that he/she is seeking services, the psychiatrist should be careful when wording a reply. Not all who seek e-therapy will be well suited to it. As always, the psychiatrist should assess the patient's suitability for e-therapy before allowing any treatment relationship to develop. In some cases (e.g., agoraphobia), e-therapy could be used in the beginning stages of therapy to work towards traditional face-to-face therapy as the patient's condition improves. In such cases, it may be advisable to establish contact with the patient's PCP or other referring clinician to obtain a history and face-to-face evaluation.

**Psychodynamic and boundary issues**

Although e-mail can afford an opportunity to compose one's thoughts carefully, the perceived anonymity and privacy of internet communication can also reduce inhibitions, prompting hastily written messages that may lack the thought and reflection that go into a letter or face-to-face interchange. Hence, there is a special need to check "knee jerk reactions." There is also a risk that messages may not be adequately proofed and may contain significant typographical errors that may mislead the recipient. Misunderstandings in face-to-face settings may be recognized and corrected more quickly. The "online disinhibition effect" (Suler, 2004) may also affect the doctor-patient relationship, particularly in the areas of boundaries and transference. Bhuvaneswar and Gutheil (2008) discuss psychotherapeutic and psychoanalytic aspects of e-mail and boundaries between psychiatrists and patients.

- Role of transference & countertransference in internet communications
- Professionalism, writing style, etc.
- Physician privacy; patients "Googling" the doctor's screen name or name
- Internet profiles, social networking sites (e.g., Facebook, MySpace)—don't let your patients "friend" you if you have a profile online; is it appropriate for your profile to be searchable through Google, or should you disable this feature?

Some of these issues may be mitigated by improving one's proficiency in providing telemedicine, e.g., by practicing or receiving training in the skills relevant to telemedicine such as using the technology comfortably. Courses and other forms of continuing education are available to providers who wish to improve in this domain.

**Communication Practices and Discussions with Patients**

As noted in the *Legal Issues* section, the psychiatrist has a responsibility to discuss their communication practices with patients, regardless of the scope of technology used. One role of these discussions will be to specifically address the use of technology in one's practice, outlining practices and expectations. The risks and benefits of electronic communication are sufficiently different from postal mail and telephone that the physician and the patient should have a discussion about the communication technology and its risks and benefits.

Regarding text-based communication, instant messaging, texting, the availability of e-mail on smartphones, and other technology may lead a patient to believe that the physician is immediately aware of any message. This belief may lead the patient to act on that assumption. The prudent physician would want to tell patients not to use e-mail or text messaging for any matter that cannot wait at least 72 hours to be addressed. The physician should routinely disclose information such as:

- How often does the physician check e-mail?
- How soon should the patient expect a response?
- That all requests may not be assented to automatically. The physician may want to tell patients that no assumptions should be made based on a lack of

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

response and that patients should follow-up by telephone if they do not receive a response.

The physician also cannot assume that the patient will read or receive an e-mail unless confirmation is received. In contrast with a telephonic contact, the physician has no information about whether a message was left at the patient's answering machine, with a live responsible person, or by direct contact with the patient. Psychiatrists and patients can request ―read receipts‖ on e-mails they send to alert them when the recipient has received the messages.

E-mail may be configured to send an automatic message back to the sender when the message has been read by the recipient. Although there is some risk of many ricochet messages being created when both sender and receiver have auto response working at the same time, some advisors recommend the use of this feature. E-mail can also be configured to indicate to the sender that the recipient will not see the e-mail for a specified period of time and that an alternative form of communication should be attempted for time-sensitive matters. Patients would then know not to expect responses to e-mail for a certain period. The coverage mechanism can also be communicated to the patient. However, patients who routinely use e-mail may have an expectation that the covering physician also uses e-mail. The coverage notice should provide a specific means to access the covering physician.

Both physicians and patients should have adequate mastery of basic computer and e-mail skills. Patients should understand that there are alternatives to internet technologies, each with its own risks and benefits. The patient should be aware that communication can be made via several different ways such as: telephone, office visit, mail, and/or facsimile and that each of these have their own unique risks and benefits. It is incumbent on the physician to educate the patient on the appropriate use of the internet in the physician's practice.

Other issues to consider when discussing the use of technology with patients relate to the risks inherent in the use of technology; e.g., information security, the potential for interruption, etc. Some of these risks and considerations are outlined in the Technological Safeguards section. Telemedicine services will require different considerations for (and safeguards against) potential risks, so providers will need to consider appropriate procedures and local conditions when considering how to communicate these risks and how to fully inform their clients.

Prior to beginning a course of e-therapy, the clinician should educate the patient regarding those risks and benefits and inform the patient of available safeguards and alternative options. Patients should also understand that

psychiatrists are not technology experts and cannot therefore fully educate them about all of the relevant security risks. Before beginning an online counseling practice, the provider may wish to develop informational risks-and-benefits handouts to discuss with potential clients. Physicians will undoubtedly discover new risks, benefits, and safeguards, so it may be helpful to keep a list of these factors so as not to omit important information in the informed consent process.

To minimize risk, the physician should anticipate problems and be sure to have a procedure in place in the event of problems or emergencies. This procedure should be developed prior to the provision of e-therapy, rather than improvised at the last minute when a crisis arises. The physician should also arrange with each patient a plan for what to do in the event of a computer system "crash" or a network failure. Because these technological inconveniences may interrupt services at inappropriate times, patients need to know how to contact the physician. One possibility would be to provide patients with the phone number for the doctor's office.

**Records and documentation**

A physician should adopt a policy concerning online patient communications and medical records documentation. Whenever possible and appropriate, a record of online communications pertinent to the ongoing care of the patient should be maintained as part of the patient's medical record. Just as the prudent physician makes a notation of emergency phone calls and requests for prescription refills, the physician will want to make a record of e-mail communications. Some physicians may elect to insert a hard copy of the e-mail into a paper chart or save the file directly to an EMR, while others may want to enter only a brief summary. An effective storage and retrieval process would be advisable for computer storage. Presumably, the clinical record retention rules for a given jurisdiction would govern as to the length of time the record must be preserved. Some EMR programs may have a feature allowing for effective archiving of e-mails with efficient search inquires for retrieval.

Medical records concerns may emerge in relation to online interactions between doctors and patients. Some e-mail programs and instant messaging software automatically save a written archive of all communications, even if users do not intend for them to do this. The archive may be stored on the user's device or computer; but off-site, "cloud"-based storage at a remote third-party server (or multiple servers) is increasingly common. Cloud-based file storage carries special risks and ethical considerations in the practice of psychiatry (Klein 2011). Electronic communications are often automatically saved in a computer's hard drive or backed up onto a network even after users

© Copyright, American Psychiatric Association, all rights reserved.    **14**

have deleted the files. Computer forensics experts are often able to retrieve the full contents of electronic data long after users believe they have successfully deleted the files. This problem raises issues similar to those associated with audiotaped or videotaped sessions, which create a verbatim record of the physician-patient exchange. This record would not be available in the patient's medical records following an office visit. This could be beneficial, as it allows the physician to study the interaction. However, it can also create problems with protected confidentiality if someone else gains (or desires to gain) access to the written record. To minimize risks, the psychiatrist should develop a policy and follow it carefully.

**Financial considerations**

Like telephone conversations, electronic communications are often considered "incidental" by insurers and are not always reimbursed separately. Some insurers may preclude the charging of a separate fee for e-mail communication. However, fee-for-service electronic consultations and reimbursable "virtual office visits" appear to be gaining ground as viable options. In July, 2004, the American Medical Association assigned a new code (0074T) for reimbursement of online consults, and recently states have begun passing legislation for telemedicine reimbursement. Not all health insurance payers will reimburse e-therapy or other internet-based services, however, and those who do pay for such services sometimes reimburse them at a lower rate than for traditional, face-to-face treatment. If a patient wishes to use his/her health insurance to pay for internet-based services, the provider should obtain the insurance carrier's guidelines regarding claims for online services.

**Services and guidance for the virtual practice**

Because the use of the internet in clinical psychiatry is a relatively new phenomenon involving rapidly changing technology and ongoing research, rules and regulations are continually evolving. It is best to follow a set of ethical guidelines established by professionals in the mental health field. Psychiatrists should consult the practice guidelines and ethical guidance promulgated by professional organizations such as the American Psychiatric Association (www.psych.org) and the American Medical Association (www.ama-assn.org) for opinions relating to the internet and electronic communications technology. Other professional mental health organizations, such as the American Psychological Association, the American Counseling Association, and the National Board for Certified Counselors, can be useful sources of additional information. The International Society for Mental Health Online (ISMHO: www.ismho.org), for example, has published ethical guidelines to assist professionals in the development of ethically sound e-therapy practices.

The American Telemedicine Association (www.americantelemed.org) is an excellent resource and has published numerous practice guidelines and documents to assist physicians who are interested in providing telepsychiatry (e.g., ATA 2009a, ATA 2009b, ATA 2013). The American Association for Technology in Psychiatry (AATP: tecpsych.com/techpsych) is another useful resource with an informative blog. Subspecialty and APA-allied organizations (such as the American Academy of Psychiatry and the Law, the American Academy of Child and Adolescent Psychiatry, etc.) may have their own guidelines and ethical opinions regarding the use of the internet and electronic media in professional practice; a partial list of these organizations and links to their websites can be found through the APA website (psychiatry.org/about-apa-psychiatry/allied-organizations). Finally, the Federation of State Medical Boards (www.fsmb.org) has produced a number of opinions and publications relating to the use of information and communication technologies in medicine.

Some physicians may choose to purchase web design software that will allow them to develop their practice website without a professional consultation. If a professional consultation is desired, there are several options available. Many hospitals and professional organizations offer web design, hosting, and maintenance services to their affiliated physicians. Professional web designers and third-party companies offer extensive web management services. A company with extensive experience in web development for the healthcare industry will understand the practical and legal implications of designing a medical website. As noted previously in this document, consultation with an attorney may be especially helpful to ensure regulatory compliance and to help minimize legal risks.

**Reputation management**

With the popularity of online rating sites such as Healthgrades and Yelp, many doctors have grown concerned about the impact of negative online reviews of their practices. Before seeing a new provider, and even sometimes when deciding whether to continue seeing a current clinician, many patients go online and seek out ratings and reviews posted by other patients. Some healthcare providers, in an attempt to control their web presence, have asked patients to sign no-complaint" agreements promising not to give negative reviews on the web. Such agreements violate the basic ethical tenets of medicine and should be avoided. Similarly, attempting to remove negative comments and negative reviews through legal channels may raise ethical issues, as filing a claim may result in breached medical confidentiality (if the patient's name is revealed). Instead, providers are advised to learn more about ethical forms of reputation management. As a first step, one might perform a basic search on Google or Bing and look for outdated or incorrect information that can be corrected easily. These searches may also reveal errors or lapses in one's privacy settings on

© Copyright, American Psychiatric Association, all rights reserved.

TELEPSYCHIATRY IN CLINICAL PSYCHIATRY

various social networking sites such as Facebook or LinkedIn. If information appears in a Google or Bing search that one would prefer to keep private, it may be time to revisit the privacy settings at the site for which the problematic results appeared. An important aspect of reputation management for psychiatrists is ensuring professionalism in the use of social media (see bibliography for several resources on this subject).

## Staying informed

Because the practices of telepsychiatry and telemental health (and the associated laws and regulations) are changing so rapidly, it is critical for psychiatrists who offer internet-based services of any kind to stay abreast of new developments in empirical research and laws and rules regulating their practices. Fortunately, modern technology offers many options for staying informed. Some providers may appreciate the convenience of subscribing to RSS feeds or e-mail listservs and electronic newsletters pertaining to their topics of interest. Malpractice carriers and law firms often produce helpful, informative, and concise newsletters and blogs that one can follow in order to learn about the critical developments affecting one's practice. A growing number of CME courses cover issues such as telemedicine reimbursement and interpreting the HIPAA rules. One may also set customized alerts in academic research databases (such as PubMed) so that one receives an e-mail anytime a new article is published on a topic of interest.

# Empirical Research

Several studies investigating the efficacy and effectiveness of e-therapy or telepsychiatry for the treatment of several disorders or conditions have recently been published, but this field developing rapidly, and the interested reader should perform a literature review to locate the latest findings. There remains a need for additional research into the use of e-therapy and telepsychiatry in the treatment of various conditions. A selected bibliography follows at the end of this document.

# Implications for the Future

Given the rapid increase in the popularity of the internet for obtaining information about mental health, a growing number of people will become aware of the availability of e-therapy and internet applications in mental health services. As knowledge of these services becomes widespread, the demand for them will likely grow. There are already numerous practitioners of e-therapy and telepsychiatry, and this number will continue to increase. Younger generations may express a preference for internet-enabled communications with their healthcare providers, and patients' preferences must be taken into account in order to provide patient-centered care. As the use of the internet in clinical psychiatry expands, new research studies will surface. The results of these research projects, in conjunction with evolving case law, regulations, and ethical guidelines, will formulate the standard practices and procedures in the growing field of electronic mental health services.

## BIBLIOGRAPHY

Note: References in **BOLD** type are meta-analyses, reviews, or otherwise recommended as especially helpful.

Amarendran V, George A, Gersappe V, et al. The reliability of telepsychiatry for a neuropsychiatric assessment. Telemed e-Health 2011; 17(3):223-225.

**American Academy of Child and Adolescent Psychiatry. Practice parameter for telepsychiatry with children and adolescents. J Am Acad Child Adolesc Psychiatry 2008; 47(12):1468-1483.**

American Medical Association. AMA Code of Medical Ethics, Opinion 9.124: Professionalism in the use of social media. Opinion issued June 2011. Accessed 2 September 2013 from http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion9124.page.

American Psychiatric Association. Telepsychiatry via videoconferencing [Resource Document]. Washington, D.C.: American Psychiatric Association, July 1998.

American Telemedicine Association. Evidence-based practice for telemental health. ATA, July 2009. Accessed 29 August 2013 from http://www.americantelemed.org/practice/standards/ata-standards-guidelines/evidence-based-practice-for-telemental-health.

American Telemedicine Association. Practice guidelines for Videoconferencing-based telemental health. ATA, October 2009. Accessed 29 August 2013 from http://www.americantelemed.org/practice/standards/ata-standards-guidelines/videoconferencing-based-telemental-health.

**American Telemedicine Association. Practice guidelines for video-based online mental health services.** ATA, May 2013. Accessed 29 August 2013 from http://www.americantelemed.org/practice/standards/ata-standards-guidelines/practice-guidelines-for-video-based-online-mental-health-services.

Armfield NR, Gray LC, Smith AC. Clinical use of Skype: a review of the evidence base. J Telemed Telecare 2012; 18:125-127.

Bailey RA. The legal, financial, and ethical implications of online medical consultations. J Tech Law Policy 2011; 16:53-105.

Baker L, Wagner TH, Singer S, Bundorf MK. Use of the internet and e-mail for health care information: results from a national survey. JAMA 2003; 289:2400-2406.

Barak A, Grohol JM. Current and future trends in internet-supported mental health interventions. J Technol Hum Serv 2011; 29:155-196.

**Barak A, Hen L, Boniel-Nissim M, Shapira N. A comprehensive review and a meta-analysis of the effectiveness of internet-based psycho-therapeutic interventions. J Technol Hum Serv 2008; 26(2/4):109-160.**

**Bee PE, Bower P, Lovell K, et al. Psychotherapy mediated by remote communication technologies: a meta-analytic review. BMC Psychiatry 2008; 8:60.** Accessed 29 August 2013 from http://www.biomed central.com/1471-244X/8/60.

© Copyright, American Psychiatric Association, all rights reserved.

16

Bhuvaneswar CG, Gutheil TG. E-mail and psychiatry: some psychotherapeutic and psychoanalytic perspectives. Am J Psychother 2008; 62(3):241-261.

Bosslet GT, Torke AM, Hickman SE, et al. The patient-doctor relationship and online social networks: results of a national survey. J Gen Intern Med 2011; 26(10):1168-1174.

Callens S, Cierkens K. Legal aspects of E-HEALTH. Stud Health Technol Inform 2008; 141:47-56.

Cash CD. Telepsychiatry and risk management. Innov Clin Neurosci 2011; 8(9):26-30.

Center for Connected Health Policy (National Telehealth Policy Resource Center). State telehealth laws and reimbursement policies: a comprehensive scan of the 50 states and the District of Columbia. Sacramento, CA: CCHP, March 2013.

Clemens NA. Privacy, consent, and the electronic mental health record: the person vs. the system. J Psychiatr Pract 2012; 18(1):46-50.

Clinton BK, Silverman BC, Brendel DH. Patient-targeted Googling: the ethics of searching online for patient information. Harv Rev Psychiatry 2010; 18(2):103-112.

Coiera E, Aarts J, Kulikowski C. The dangerous decade. J Am Med Inform Assoc 2012; 19:2-5.

Currie SL, McGrath PJ, Day V. Development and usability of an online CBT program for symptoms of moderate depression, anxiety and stress in post-secondary students. Comp Hum Behav 2010; 26:1419-1426.

Dongier M, Tempier R, Lalinec-Michaud M, Meunier D. Telepsychiatry: psychiatric consultation through two-way television. A controlled study. Can J Psychiatry 1986; 31(1):32-34.

**Farnan JM, Sulmasy LS, Worster BK. Online medical professionalism: patient and public relationships: policy statement from the American College of Physicians and the Federation of State Medical Boards. Ann Intern Med 2013; 158(8):620-627.**

Farrell HM, Mossman D. Practicing psychiatry via Skype: medicolegal considerations. Curr Psychiatry 2011; 10(12):30-39.

**Federation of State Medical Boards of the United States, Inc. Model guidelines for the appropriate use of the internet in medical practice. Dallas, TX: FSMB, 2002.** Accessed 29 August 2013 from http://www.fsmb.org/pdf/2002_grpol_Use_of_Internet.pdf.

**Federation of State Medical Boards of the United States, Inc. Model policy guidelines for the appropriate use of social media and social networking in medical practice. Euless, TX: FSMB, 2012.** Accessed 29 August 2013 from http://www.fsmb.org/pdf/pub-social-media-guidelines.pdf.

**Gabbard GO. Clinical challenges in the internet era. Am J Psychiatry 2012; 169(5):460-463.**

Gabbard GO, Kassaw K, Perez-Garcia G. Professional boundaries in the era of the internet. Acad Psychiatry 2011; 35:168-174.

**García-Lizana F, Muñoz-Mayorga I. What about telepsychiatry? A systematic review. Prim Care Companion J Clin Psychiatry 2010; 12(2):e1-e5.**

Goldstein MM. Health information technology and the idea of informed consent. J Law Med Ethics, Spring 2010: 27-35.

Goodman KW. Ethics, information technology, and public health: new challenges for the clinician-patient relationship. J Law Med Ethics, Spring 2010: 58-63.

**Hilty DM, Ferrer DC, Parish MB, et al. The effectiveness of telemental health: a 2013 review. Telemed e-Health 2013; 19(6):444-454.**

Hunkeler EM, Hargreaves WA, Fireman B, et al. A web-delivered care management and patient self-management program for recurrent depression: a randomized trial. Psychiatr Serv 2012; 63(11):1063-1071.

Hyler SE, Gangure DP. Legal and ethical challenges in telepsychiatry. J Psychiatr Pract 2004; 10(4):272-276.

**Hyler SE, Gangure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. CNS Spectr 2005; 10(5):403-413.**

Institute of Medicine. Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research. Washington, D.C.: National Academies Press, 2009.

Jain S. Googling ourselves: what physicians can learn from online rating sites. NEJM 2010; 362(1):6-7.

Karasz HN, Eiden A, Bogan S. Text messaging to communicate with public health audiences: how the HIPAA security rule affects practice. Am J Pub Health 2013; 103(4):617-622.

Kellermann AL, Jones SS. What it will take to achieve the as-yet-unfulfilled promises of health information technology. Health Aff 2013; 32(1):63-68.

Kenter R, Warmerdam L, Brouwer-Dudokdewit C, et al. Guided online treatment in routine mental health care: an observational study on uptake, drop-out and effects. BMC Psychiatry 2013; 13:43 [epub ahead of print]; doi: 10.1186/1471-244X-13-43.

Klein CA. Cloudy confidentiality: clinical and legal implications of cloud computing in health care. J Am Acad Psychiatry Law 2011; 39(4):571-578.

Lardiere MR. Unlocking and sharing behavioral health records: movement emerges to exchange sensitive records through HIEs. J AHIMA, April 2013. Accessed 29 August 2013 from http://library.ahima.org/xpedio/groups/public/documents/ahima/bok1_050144.hcsp?dDocName=bok1_050144.

**Lexcen FJ, Hawk GL, Herrick S, Blank MB. Use of video conferencing for psychiatric and forensic evaluations. Psychiatr Serv 2006; 57(5):713-715.**

Lo B, Parham L. The impact of Web 2.0 on the doctor-patient relationship. J Law Med Ethics, Spring 2010: 17-26.

Luxton DD, Sirotin AP, Mishkind MC. Safety of telemental healthcare delivered to clinically unsupervised settings: a systematic review. Telemed e-Health 2010; 16(6):705-711.

Menachemi N, Prickett CT, Brooks RG. The use of physician-patient email: a follow-up examination of adoption and best-practice adherence 2005-2008. J Med Internet Res 2011; 13(1):e23.

Mewton L, Wong N, Andrews G. The effectiveness of internet cognitive behavioral therapy for generalized anxiety disorder in clinical practice. Depression Anxiety 2012; 29:843-849.

Midkiff DM, Wyatt WJ. Ethical issues in the provision of online mental health services (etherapy). J Technol Hum Serv 2008; 26(2/4):310-332.

Modahl M, Tompsett L, Moorhead T. Doctors, Patients, & Social Media. QuantiaMD, September 2011.

Moreno FA, Chong J, Dumbauld J, et al. Use of standard webcam and internet equipment for telepsychiatry treatment of depression among underserved Hispanics. Psychiatr Serv 2012; 63(12):1213-1217.

**Mostaghimi A, Crotty BH. Professionalism in the digital age. Ann Intern Med 2011; 154(8):560-562.**

**O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face-to-face psychiatry? results from a randomized controlled equivalence trial. Psychiatr Serv 2007; 58(6):836-843.**

Osunmuyiwa O, Ulusoy AH. Wireless security in mobile health. Telemed e-Health 2012; 18(10):810-814.

**Pho K, Gay S. Establishing, Managing, and Protecting Your Online Reputation: A Social Media Guide for Physicians and Medical Practices. Phoenix, MD: Greenbranch Publishing, LLC, 2013.**

**Recupero PR. Legal concerns for psychiatrists who maintain web sites. Psychiatr Serv 2006; 57(4):450-452.**

Recupero PR. E-mail and the psychiatrist-patient relationship. J Am Acad Psychiatry Law 2005;33(4):465-475.

Recupero PR, Rainey SE. Forensic aspects of e-therapy. J Psychiatr Pract 2005; 11(6):405-410.

Recupero PR, Rainey SE. Informed consent to e-therapy. Am J Psychother 2005; 59(4):319-331.

Reynolds Jr DJ, Stiles WB, Bailer AJ, Hughes MR. Impact of exchanges and client-therapist alliance in online-text psychotherapy. CyberPsychology Behav Soc Networking 2013; 16(5):370-377.

© Copyright, American Psychiatric Association, all rights reserved.

**Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: comparison of remote treatment through tele-psychiatry to in-person treatment. Am J Psychiatry 2004; 161(8):1471-1476.**

Sarasohn-Kahn J. The Online Couch: Mental Health Care on the Web. Oakland, CA: California HealthCare Foundation, June 2012.

Seçkin G. Cyber patients surfing the medical web: computer-mediated medical knowledge and perceived benefits. Comp Hum Behav 2010; 26:1694-1700.

Sharp IR, Kobak KA, Osman DA. The use of videoconferencing with patients with psychosis: a review of the literature. Ann Gen Psychiatry 2011; 10(1):14; doi: 10.1186/1744-859X-10-14.

Shore JH, Savin D, Orton H, et al. Diagnostic reliability of telepsychiatry in American Indian veterans. Am J Psychiatry 2007; 164:115-118.

**Shore JH. Telepsychiatry: videoconferencing in the delivery of psychiatric care. Am J Psychiatry 2013; 170(3):256-262.**

**Siemer CP, Fogel J, Van Voorhees BW. Telemental health and web-based applications in children and adolescents. Child Adolesc Psychiatr Clin N Am 2011; 20:135-153.**

Simon GE, Ludman EJ, Tutty S, et al. Telephone psychotherapy and telephone care management for primary care patients starting antidepressant treatment: a randomized controlled trial. JAMA 2004; 292(8):935-942.

Singh SP, Arya D, Peters T. Accuracy of telepsychiatric assessment of new routine outpatient referrals. BMC Psychiatry 2007; 7:55, doi: 10.1186/1471-244X-7-55.

Spielberg AR. Sociohistorical, legal, and ethical implications of e-mail for the patient-physician relationship, JAMA 1998; 280:1353-1359.

Spielberg AR. Online without a net: physician-patient communication by electronic mail, Am J Law Med 1999; 25(2-3):267-295.

Taitsman JK, Grimm CM, Agrawal S. Protecting patient privacy and data security. NEJM 2013; 368(11):977-979.

Terry M. Medical identity theft and telemedicine security. Telemed e-Health 2009; 15(10):928-932.

Thompson LA, Dawson K, Ferdig R, et al. The intersection of online social networking with medical professionalism. J Gen Intern Med 2008; 23(7):954-957.

Wagner B, Horn AB, Maercker A. Internet-based versus face-to-face cognitive-behavioral intervention for depression: a randomized controlled non-inferiority trial. J Affect Disord 2013; epub ahead of print; doi: 10.1016/j.jad.2013.06.032.

Williams AD, Andrews G. The effectiveness of internet cognitive behavioural therapy (iCBT) for depression in primary care: a quality assurance study. PLoS One 2013; 8(2):e57447.

Wisdom J, Bielavitz S, French R. Psychiatric information systems: an analysis of inpatient and outpatient unit capabilities. J Technol Hum Serv 2008; 26(1):1-17; doi: 10.1300/J017v26n01_01.

Yellowlees PM, Holloway KM, Parish MB. Therapy in virtual environments: clinical and ethical issues. Telemed e-Health 2012; 18(7):558-564.

**Yellowlees PM, Odor A, Parish MB, et al. A feasibility study of the use of asynchronous telepsychiatry for psychiatric consultations. Psychiatric Serv 2010; 61(8):838-840.**

Yuen EK, Herbert JD, Forman EM, et al. Treatment of social anxiety disorder using online virtual environments in Second Life. Behav Ther 2013; 44:51-61.

**Zack JS. How sturdy is that digital couch? Legal considerations for mental health professionals who deliver clinical services via the internet. J Technol Hum Serv 2008; 26(2/4):333-359.**

Zou JB, Dear BF, Titov N, et al. Brief internet-delivered cognitive behavioral therapy for anxiety in older adults: a feasibility trial. J Anxiety Disord 2012; 26:650-655.

*© Copyright, American Psychiatric Association, all rights reserved.*

Exhibit R

< ("telepsych Compose                                    ✎ Compose

Reply    ⌄        👤× ⌄        ❶ ⌄                                    ⋮

## FW: Telepsych Policy

**Jane E. Kahn**
09/30/2015 at 03:00 PM
**To: Coleman Team - RBG Only**   Details ⌄

📎 1 Attachment(s) Total 76.3 KB   View ⌄

_____

From: Weber, Nicholas@CDCR
Sent: Wednesday, September 30, 2015 3:00:36 PM (UTC-08:00) Pacific Time (US & Canada)
To: Aaron Fischer; Jane E. Kahn; Thomas Nolan
Subject: FW: Telepsych Policy

# CHAPTER 12
## Telepsychiatry

## A. INTRODUCTION

The Telepsychiatry Program was developed to provide psychiatric clinical care at a distance to institutions as another means to promote access to care. Psychiatrists providing care in this manner conduct real-time mental health evaluations and treatment of inmate-patient (IPs) via telepresence to help meet the ongoing need for mental health services in outpatient and inpatient settings. Telepsychiatry shall be used to provide clinical care for Mental Health Crisis Bed (MHCB) and other inpatient settings when there are no onsite providers available. Onsite providers shall remain the preferred method of psychiatric care in inpatient settings.

## B. STANDARDS OF CARE

Services provided by the Telepsychiatry Program comply with California Department of Correction and Rehabilitation's (CDCR's) Mental Health Services Delivery System (MHSDS) Program Guidelines. This includes all treatment protocols and confidentiality requirements. Telepsychiatry providers shall conduct care consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.

## C. ITEMS PROVIDED TO TELEPSYCHIATRY PROVIDERS

The telepsychiatry providers shall be provided the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, scanner/printer (can be individual and/or shared), and phone with access to an outside line.

- One individual office that is an enclosed, confidential space with a door, desk, and chair.

- Computer access to all standard programs equivalent to onsite psychiatrists. This includes, but is not limited to, the health record, internet access, Maxor, and any other program needed to provide effective care to IPs.

Cell front equipment shall be provided to all locations receiving telepsychiatry services in MHCBs.

| Telepsychiatry | Mental Health Services Delivery System |
|---|---|

## D. EXPECTATIONS OF FACILITY RECEIVING TELEPSYCHIATRY SERVICES

The receiving facility shall be responsible for providing the following:

- A dedicated telepresenter who is present for all telepsychiatry appointments and presents the IP from the originating site to the telepsychiatry provider and is responsible for providing clinical support and coordination. This includes, but is not limited to reviewing the IP health record prior to the appointment, and remaining with the IP during the appointment.

  The classification of the telepresenter must be a medical assistant, certified nursing assistant, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, psychiatric technician, social worker, psychologist, psychiatrist, or physician. No other work classification is permitted to be a telepresenter. When the telepresenter is a nurse practitioner, social worker, psychologist or a physician, the clinical contact shall be considered a joint appointment.

- A backup telepresenter when the primary telepresenter is on leave or not available.

- Custody staff who can reliably bring IPs to their appointments as needed.

- Support staff who is responsible for scheduling appointments, processing all clinical paperwork as appropriate, to include, but not limited to, IP records, laboratory studies, EKGs, physician orders and clinical notes.

- A contact list of important names and numbers for the institution. This includes, but is not limited to the following:

  1. Laboratory
  2. Pharmacy
  3. Nursing station(s)
  4. Housing unit(s)
  5. Primary Clinician(s)
  6. Medical Provider(s)
  7. Mental Health Supervisor(s)
  8. Chief Psychologist
  9. Chief Psychiatrist
  10. Information Technology (IT) Department
  11. Scheduler
  12. Medical Records Supervisor
  13. Person to contact if orders are not carried out

**Telepsychiatry**                    **Mental Health Services Delivery System**

- A computer, phone, scanner, printer, desk, and chair with a dedicated private office for IP appointments.

- Assigned caseloads and scheduled appointments.

- Local IT department assistance to headquarters IT department for IT matters related to the Telepsychiatry Program.

  Note: The headquarters IT department will provide the monitor, camera, speaker, and microphone to the local institution receiving services. However, if any of the equipment is missing or is not functioning normally, it is the responsibility of the receiving institution to notify the headquarters IT and local IT departments, so that the equipment can be repaired or replaced in a timely fashion. Devices brought from home are not permitted for use in the Telepsychiatry program unless specifically authorized in writing by the CDCR IT department. The Telepsychiatry provider and the receiving institutional staff must comply with the information technology requirements.

- The maintenance of telemedicine connectivity between institutions and providers.

- Contingency plans for a catastrophic loss of primary data center connectivity.

- Telepsychiatry providers that are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.

- Audit reports and compliance of Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.

- Organized tours for the telepsychiatry providers when they visit the institution.

- Onsite staff that can conduct and/or facilitate cell front visits for chronic refusers of Telepsychiatry services, or when a telepsychiatry provider expresses a need for a cell front visit.

- Local Operating Procedures (LOP) for Telepsychiatry. This LOP must be submitted to the Chief of Telepsychiatry for review and approval prior to local implementation or distribution. Current and active LOPs shall be revised annually by the institution and submitted to the Chief of Telepsychiatry at the beginning of each fiscal year (July 1). Any revisions of the LOP for Telepsychiatry must be reviewed and approved by Telepsychiatry Services prior to implementation at the institution.

- Clinical coverage for telepsychiatry providers who are on leave.

- Routine system tests to ensure that equipment is safe, operational, and secure.

- All necessary equipment remains accessible.

- The Armstrong Remedial Plan requirements and Court Orders for effective communication and accommodations are communicated to the provider, achieved, and documented.

## E.  PARTICIPATION IN INTERDISCIPLINARY TREATMENT TEAMS

The Interdisciplinary Treatment Teams (IDTT) is an important part of the provision of psychiatry services. All rooms where the IDTT is held should have camera, microphone, speaker and computer/television screen present. Telepsychiatry providers shall participate in the receiving institutions' IDTTs in the same manner as on-site psychiatrists. Receiving institutions may be required to modify their IDTT schedules to allow telepsychiatry providers to participate in the IDTT. The IDTT should be prepared to review all IPs between psychiatric visits and to discuss behavior and progress of the IP based on the IP's treatment plan and the MHSDS Program Guide. The IP's primary clinician, psychiatry provider, custody staff, and other mental health or health care staff treating the IP will have input on the IP's progress and behavior during the IDTT.

Telepsychiatry providers shall be involved in any decisions to change the level of care of the IP. This includes changes to or from Correctional Clinical Case Management System or Enhanced Outpatient Program and the decision to admit IPs to or discharge from the Outpatient Housing Unit or MHCB unit (except after hours or emergent situations when the telepsychiatry provider is not available). If the primary clinician thinks it is best to transfer an IP to a different level of care, the telepsychiatry provider must be involved in that decision, to the same extent as any on-site psychiatrist.

In addition to IDTT meetings, telepsychiatry providers shall participate to the same extent as onsite psychiatrists in any other meetings relevant to the clinical care of their IPs.  The treatment team members, including the telepsychiatry providers, shall make themselves available during regular business hours for IP care consultation, discussion, and coordination.

## F.  ACCESS TO HEALTH RECORD

**Required Clinical Health Record**

The telepsychiatry provider is expected to access all necessary clinical information via the health record. At a minimum, the facility receiving telepsychiatry services shall ensure that the following information is updated in the health record prior to the IP appointment and any documents that have not yet been made available in the health record will be sent directly to the telepsychiatry provider.

| Telepsychiatry | Mental Health Services Delivery System |
|---|---|

All Levels of Care:

- Mental Health Treatment Plans and Updates for the past 12 months
- Mental Health Interdisciplinary Progress Notes for the past 90 days
- Mental Health Physicians Order forms for the last 90 days
- Medication Administration Record
- Latest Laboratory Results
- Mental Health Evaluations for the past 12 months
- Suicide Risk Evaluations for the past 12 months
- Current Medication Profile - a listing of all current medications, psychiatric as well as medical
- The telepsychiatry provider may request additional information, including information from the Correctional Case Record (C – File) or outside records which telepsychiatry support staff will email, fax, or mail to the telepsychiatry provider.

Additionally, Inpatient Services Require:

- Medical Physician Order forms in the inpatient unit

In addition to the required documents, any pertinent medical information shall be included in the health record.

On a daily basis, the receiving site shall provide any information that was added to the chart during the prior 24 hours by on-site clinical staff.

If any information is updated between the sending date and the date of the appointment, current information must be provided prior to the appointment.

**G. REFUSAL POLICY**

If an IP refuses treatment via telepsychiatry, the IP's treatment team shall determine if telepsychiatry is or is not an appropriate delivery method for the IP. They shall consider mental health reasons, behavioral issues, custodial issues, and any other factors that may be related to the IP's refusal of telepsychiatry services. The treatment team shall work toward resolving whatever issue is contributing to the IP's refusal of telepsychiatry services. This includes visiting the IP's cell front and inquiring why the IP refuses his/her appointments. This also may include having discussions with the housing officer or escort officer regarding possible factors involved in preventing the IP from attending his/her telepsychiatry appointment. The treatment team must assess the general credibility of the reported reasons for refusing his/her appointment.

If the clinical staff cannot determine or validate the reasons why an IP is not attending his/her appointments, an IDTT meeting shall be convened. During this IDTT meeting, the treatment

team shall review the IP history and case factors. The members shall explore and discuss with the IP any potential reasons why the IP is a chronic refuser of telepsychiatry services.

After a discussion of the reasons for refusal, the treatment team shall develop a plan to address the reasons for refusal. Contingency plans shall also be made to provide in-person psychiatric care to the IP when he/she refuses his/her appointment. An IP's refusal of telepsychiatry services may indicate that he/she is decompensating and may need additional attention and treatment. Therefore, the treatment team shall consider a higher level of care if necessary. The treatment team shall also consider a Penal Code 2602 involuntary medication petition if necessary. The discussion must be thoroughly documented in the Interdisciplinary Progress Note (CDCR MH 7230).

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the IP, the team shall report this finding to the Chief Psychiatrist of the institution receiving telepsychiatry services. The Chief Psychiatrist (or designee) of the institution receiving telepsychiatry services shall, in consultation with the treatment team, determine whether it is clinically necessary to assign the IP to an onsite psychiatrist or find an alternate mode of delivering psychiatric care to the IP.

## H. CONTRAINDICATIONS FOR TELEPSYCHIATRY

There are no absolute contraindications for telepsychiatry. IPs shall not be excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. However, in rare cases, a telepsychiatry provider may determine that an IP who needs mental health treatment is not clinically appropriate for telepsychiatry as a treatment modality. For example, IPs with visual and/or hearing impairments may be considered inappropriate for telepsychiatry if effective communication cannot be achieved. In these cases, he/she shall notify the Chief Psychiatrist (or designee) of the institution receiving telepsychiatry services and provide a rationale for why the IP should not be included in the Telepsychiatry Program. Based on input from the treatment team and a review of the clinical factors, the Chief Psychiatrist (or designee) of the receiving facility will determine whether the IP will continue receiving services from the Telepsychiatry Program. If the IP is removed from the Telepsychiatry Program, the Chief Psychiatrist of the institution will find an alternative method for the IP to receive psychiatric care.

If the facility housing the IP has no Chief Psychiatrist, the designee will be the Senior Psychiatrist or Chief of Mental Health.

## I. DOCUMENTATION OF TELEPSYCHIATRY CONSULTATION

The telepsychiatrist shall complete all documentation by the close of each business day and ensure the documentation is available to institutional staff. All documentation shall be filed in the IP's permanent health record. Support staff at the receiving institution is responsible for

reviewing the information to assure that all materials have been received. Support staff is responsible for telephoning, videoconferencing, or emailing the telepsychiatry provider confirming that all materials have been received and notifying the institution of anything missing.

## J.   PROFESSIONAL AND PATIENT IDENTITY

At the beginning of a mental health treatment teleconference (i.e., not at every subsequent encounter unless circumstances warrant re-verification) with an IP, the provider and IP identity must be verified. The name and credentials of the professional and the name of the IP shall be verified. The verification of both the professional and the IP may occur at the receiving institution. Providers may ask IPs to formally verify their identity by showing their CDCR issued photo identification card on the video screen.

## K.  PHYSICAL ENVIRONMENT

Both the professional and the IP's room/environment specifications shall be comparable to community-standard specifications of a standard patient clinic room. Audio or visual recording and the transcription of IP sessions are not permitted. Staff shall ensure privacy so that clinical discussion cannot be overheard by others outside of the room where the service is being provided. If anyone other than the IP, provider, and telepresenter are in either the IP's or the provider's room, both the provider and IP shall be made aware of the other person and must agree to their presence before the appointment can continue.

Seating and lighting should be adjusted to allow maximum comfort to the participants. Both the telepsychiatry provider and IP should have optimum clarity and visibility of each other during the videoconference. Light from windows or light emanating from behind IP or provider should be minimized if it interferes with the video quality. Both telepsychiatry provider and IP cameras should be on a secure, stable platform during the videoconferencing session. To the extent possible, the IP and provider cameras should be placed at the same elevation as the eyes with the face clearly visible to the other person.

## L.  ORGANIZATIONAL STRUCTURE

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

The Senior Psychiatrists, Statewide Telepsychiatry, are the first-line supervisor for Telepsychiatry staff and the Chief of Telepsychiatry is the second-line supervisor.

The executive leadership at the individual institutions does not supervise the telepsychiatry staff.

| Telepsychiatry | Mental Health Services Delivery System |
|---|---|

**M. SITE VISITS**

Telepsychiatry staff are required to visit their receiving institutions every six months. During each visit, the Telepsychiatry staff will be expected to meet with the institutional Chief Psychiatrist/Senior Psychiatrist, Chief Psychologist, Chief of Mental Health, and members of their treatment team. They will tour the institution and see IPs face-to-face during their visit to the institution.

**N. NONFORMULARY REQUESTS**

Nonformulary requests must be made directly to the Psychiatry leadership of the institutions served by Telepsychiatry staff. In the case where there is no Chief Psychiatrist or Senior Psychiatrist at the institution, nonformulary requests will be submitted to the Chief of Telepsychiatry or designee.

**O. JABBER ACCOUNT LOGIN**

Operational need requires telepsychiatry providers to log into their Jabber telepsychiatry video accounts as soon as they arrive to work. They are to remain logged into Jabber throughout the day so that supervisors, colleagues, and institutional staff are able to make video calls to them during work hours. Telepsychiatry providers are expected to log out of Jabber just prior to leaving work.

**P. TRAINING AND CREDENTIALING**

Ongoing mandatory trainings will be required of all telepsychiatry staff. Management will notify telepsychiatry staff of their training obligations and ensure Telepsychiatry staff can attend these trainings. All staff are required to attend trainings as directed.

Telepsychiatry providers are required to be privileged at each licensed or inpatient unit they serve.

Exhibit S



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

October 19, 2016

VIA ELECTRONIC MAIL

> **CONFIDENTIAL**
> **SUBJECT TO**
> **PROTECTIVE ORDERS**

Sean Rashkis
Department of State Hospitals
Division of Legal and Forensic Services
1600 9th Street, Room 435
Sacramento, CA  94814
Sean.Rashkis@dsh.ca.gov

> Re:  *Coleman v. Brown*
>      Plaintiffs' Comments on Defendant DSH's Staffing Status Report and
>      Telepsychiatry Policy
>      Our File No. 0489-03

Dear Sean:

Plaintiffs write regarding Defendants' September 2016 DSH Status Report on Court-Ordered Staffing Review ("Staffing Report") and the DSH Telepsychiatry Policy, which were provided on September 23, 2016, just prior to last month's workgroup meetings.

The staffing problems at DSH are not new, but the urgency of the need to address these issues has been increasing over time, as crowding in the mental health programs in the CDCR is increasingly leading to full inpatient programs at all levels of care in DSH. While we appreciate the ongoing efforts of DSH to address its chronic staffing issues, there is little in the way of new initiatives in the materials presented and the current efforts described in the Staffing Report have already proven to be insufficient.  We also object to the continued reliance on "the blanket" to fund permanent staff positions. Indeed, the Department of Finance document DSH Defendants cited at the July 2016 meeting in support of their position actually makes clear that their use of the blanket is inappropriate.

[3050728-5]

**CONFIDENTIAL**
Sean Rashkis
October 19, 2016
Page 2

We also strongly object to the DSH telepsychiatry policy. As an initial matter, telepsychiatry is inappropriate for use in inpatient hospital programs. Moreover, even if telepsychiatry were acceptable for such patients, the policy as currently written does not include appropriate safeguards and limitations on its use.

A.    **DSH Staffing Problems Are Severe, and the DSH Staffing Efforts Detailed in the Status Report Are Inadequate**

As noted above, we are troubled by the dearth of new initiatives proposed in the Staffing Report to address the longstanding staffing shortages in DSH programs. Many of the staffing initiatives detailed in the Staffing Report appear to have commenced more than two years ago, in July of 2014. Although they generally appear to be sensible recruitment initiatives, they clearly are not doing enough to solve the ongoing staffing problems faced by DSH. Moreover, it is unlikely that increased advertising, better CME programs, or attending more Career Fairs, alone or in combination, are likely to result in significant increases in staffing. We were also disappointed to learn that there are apparently no concrete plans for internship or fellowship programs at DSH facilities that treat CDCR patients. *See* Staffing Report at 4.

Although staffing levels for psychiatrists are generally higher in DSH programs than in many CDCR programs, the functional psychiatrist vacancy rates in the September 1, 2016 DSH staffing data ("September Data"), particularly at ASH (32.45%, with nearly half of the coverage provided by contractors), CSH (34.52%) and CMF (21.45%), are troubling, particularly given the critical importance of psychiatrists in managing inpatient mental health care. We are also concerned about high vacancy rates in some other categories:

- The overall clinical staff vacancy rate at CSH of 41.35%, reported in the September Data, is troubling. The Staffing Report indicates that the CDCR positions at CSH are fully staffed, however. What is the reason for the disparity in staffing levels between the different units at CSH? We would like more information from DSH at the next workgroup about whether clinical staff assigned to the CDCR units at CSH also have duties in other areas of the facility. Also, how many psychiatrist positions are encompassed in the Staffing Report's reported 100% staffing rate of CDCR psychiatrists? Is it just the single telepsychiatry position?

**CONFIDENTIAL**
Sean Rashkis
October 19, 2016
Page 3

- The 38% vacancy rate for psychiatric technicians at SVPP reflected in the September Data is also of great concern. We would like to know more about how this is affecting patient care.

- CHCF Stockton also reports in the September Data high vacancy rates for Social Workers (21.21%) and for Rehabilitation Therapists (18.75%), along with a registered nurse shortage (20.11%). We would also like a report on how these shortages are affecting patient care at the next workgroup.

- Finally, we are troubled by the very high vacancy rate at Vacaville for social workers (32.36%) shown in the September Data and echoed in the Staffing Report. What is being done to address this shortage specifically?

We would also like more specific information about contract rates for various disciplines at DSH facilities and nearby CDCR facilities. *See* Staffing Report at 4. Please provide us in advance of the October meetings, for example, with a comparison of specific hourly contract rates for various clinical positions at CMC, ASH, SVSP, and SVPP. It would also be helpful to know the contract rates at Stockton, CSP-Sacramento, CMF, VPP, MCSP, and Valley State Prison.

Finally, Defendants' Staffing Report provides information on recruitment results for the entire two-plus year period since they implemented their July 2014 recruitment plan, but provide no separate breakdown of the impact of retention efforts and recruitment results in the near term. Staffing Report at 4. Plaintiffs request that Defendants provide focused information on recruitment results from broken out by month for the last 6 months and a total for the last year, rather than the total number of clinicians hired since 2014.

Plaintiffs further request information on how many DSH clinicians in each clinical category have left *Coleman* DSH programs since July 2014, broken out by year and by facility. We also request that any information retained regarding the reasons for each departure be provided (for example, did the departing clinicians retire, did they go to work for the CDCR, or did they go to work for a different state agency?). This information will help identify whether particular programs have special difficulty with retention, which could inform a targeted solution. Furthermore, Plaintiffs request that DSH develop a formal exit program to gather detailed information from departing clinicians about their reasons for leaving, so that retention efforts can be properly focused on the reported problems.

CONFIDENTIAL
Sean Rashkis
October 19, 2016
Page 4

In our July 7, 2016 Letter on staffing issues, we asked a number of additional questions about salary levels and other barriers to recruitment and retention that have not yet been fully answered.  What is the current salary range for DSH psychiatrists and other key clinical categories at each hospital that treats CDCR patients?  How does that salary range compare with salaries for CDCR clinicians in the same categories?  Are these salaries competitive with private employers in California?  Are there other barriers to hiring that can be addressed, such as delays in getting approval to make offers?  Also, do candidates ever decline to take employment in DSH programs out of concern about the durability of blanket positions?

B.     **Plaintiffs Continue to Object to DSH's Use of "the Blanket" to Budget Permanent Positions.**

During the July workgroup meeting, Plaintiffs and the Special Master team expressed serious concerns regarding DSH's longstanding practice of using "blanket" funding for permanent staff positions.  DSH Defendants reported at that meeting that they had specific authority from Defendant Department of Finance for this practice.  After the September 2016 workgroup meeting, Defendants provided Plaintiffs with this purported authority in the form of DOF's Budget Letter 12-03, dated March 12, 2012, available at http://www.dof.ca.gov/budget/budget_letters/documents/BL12-03.pdf.

We have reviewed the proffered letter, which is over four and a half years old, and do not agree with DSH's interpretation of it as providing authorization for maintaining large numbers of positions in the blanket.  The letter contains the following paragraph about the use of the blanket for permanent positions.  Although it authorizes some blanket positions, the letter repeatedly emphasizes that such use of the blanket is a temporary measure:

In addition to the adjustments outlined above, departments will have flexibility to use blanket authority to fill positions beyond approved position authority **on a temporary basis for operational needs**. Because budgeted authorized positions will be based on an average rate of filled positions, departments may hire permanent employees within the blanket if no vacant positions exist; however, the employee must be moved from the blanket once an authorized position becomes vacant. The temporary help blanket can be used for both temporary issues and temporary positions consistent with the requirements outlined in State Administrative Manual Section 6518. The blanket can be used for the following temporary issues: retired annuitants, seasonal staff, or payment of leave balances. **The**

CONFIDENTIAL
Sean Rashkis
October 19, 2016
Page 5

**blanket also can be used for permanent employees on a temporary basis to meet the department's operational needs**. (Emphasis supplied.)

In fact, it appears that DSH's current use of the blanket actually violates several of the guidelines set forth in this section, since DSH uses it for permanent rather than temporary positions and does not limit it to use for retired annuitants, seasonal staff, or payment of leave balances.

We reiterate our request from the July 2016 workgroup meeting, which was echoed by the Special Master, that a representative of Defendant Department of Finance come to the October workgroup meeting to explain the blanket positions and what authorization Defendant DSH has to rely on the blanket for permanent positions year after year in the current manner. The current basis for this practice appears entirely untenable.

## C.    Plaintiffs Object to the DSH Telepsychiatry Policy.

Consistent with our objections to CDCR's use of telepsychiatry, particularly for higher levels of care, telepsychiatry is not appropriate for use in an inpatient hospital care setting. *See* Nolan July 7, 2016 Staffing Letter. This is particularly true for acute care settings.

DSH's telepsychiatry policy not only permits telepsychiatry in all inpatient psychiatric hospitals, it also fails to limit the use of telepsychiatry for particularly vulnerable clinical categories of patients, except for cases of seclusion and restraint.[1] In fact, the policy specifically authorizes the use of telepsychiatry for "psychiatric emergencies." *See* Administrative Letter, AL2016-15 ("DSH Telepsych Policy"), at 2. This flies in the face of the concerns expressed by many professional organizations about the use of telepsychiatry for emergencies, including the APA, whose resource document warns that "[t]elemedicine requires particular cautions regarding emergency management" and notes that "[m]ost sources discourage the use of e-therapy for suicidal patients, for example." American Psychiatric Association, *Resource Document on*

---

[1] We note that the Court also appears to have concerns about this form of psychiatric care. In the May 18, 2015 Order on Defendants' staffing plan, the Court noted that the unrestricted use of telepsychiatry "is troubling, particularly because there may be class members not susceptible to this method of care." *See* May 18, 2015 Order, Docket 5307, at 5:13-14.

CONFIDENTIAL
Sean Rashkis
October 19, 2016
Page 6

*Telepsychiatry and Related Technologies,* January 2014 ("APA Resource Document"), at 11.

　　Furthermore, DSH has provided almost no information about where and how its current telepsychiatrist provides treatment at CSH, or how it plans to expand to ASH. How long has the telepsychiatry program been in place at DSH?  What type of setting does the telepsychiatrist operate out of at Patton?  Where do patients receiving telepsychiatry treatment receive that care at CSH?  Where will they receive care at ASH?  What type of equipment and technology are utilized for this care on both ends?

　　Without conceding that telepsychiatry is ever appropriate for inpatient hospital level of care patients, the DSH Telepsych Policy is also severely deficient for the following reasons:

- It fails to require an initial in person meeting with the tele-psychiatrist and an individualized determination of whether telepsychiatry is appropriate for the patient.  *See* APA Resource Document, *supra* ("providers need to perform an individual assessment to see if telepsychiatry is appropriate for the case in question.");

- It fails to highlight or exempt the category of patients (for example, suicidal or homicidal patients and paranoid patients with ideas of reference) for whom telepsychiatry is or may be found to be inappropriate, or provide for any process for identifying this group of patients.  *See* APA Resource Document, *supra*, at 12 ("Of course, as part of the overall safety and appropriateness assessments, potentially suicidal, violent or homicidal patients must be considered with particular care.");

- It fails to include or cover many of the minimum standards recommended for any comprehensive tele-health policy.  Missing elements that are either standard or required in many states include:

  - Inclusion of technical and procedural requirements to assure clear communication, protect patient privacy, and ensure that the patient is able to clearly see and hear the provider and vice-versa.  *See, e.g.*, New York State Office of Mental Health, Telepsychiatry Regulations, 14 NYCRR Section 599.17 (B)(3)(i) ("All telepsychiatry services must be performed on dedicated secure transmission linkages that meet minimum federal and state

[3050728-5]

**CONFIDENTIAL**
Sean Rashkis
October 19, 2016
Page 7

requirements, including but not limited to 45 C.F.R. Parts 160 and 164 (HIPAA Security Rules), and which are consistent with guidelines of the Office. Transmissions must employ acceptable authentication and identification procedures by both the sender and the receiver.").  The current policy lacks any requirements in this regard at all.

- Culturally competent translation services when recipient and provider do not speak the same language.  *See, e.g.*, 14 NYCRR Section 599.17(B)(3)(iii).

- A written procedure detailing the availability and process for accessing face-to-face assessments in an emergency situation.

- A contingency plan if there is a failure of transmission.

- Acknowledgement that a patient has a right to refuse to participate in telepsychiatry services.

- ADA effective communication requirements must also be addressed, including the process for obtaining sign language interpreter services.

- The procedure calls for the telepsychiatrist to have access to only limited items from the patient's medical record, rather than allowing full access to the entire electronic medical record.  *See* DSH Telepsych Policy, at 3.  We object to providing telepsychiatry services without the remote clinician having full access to the patient's medical records.

Finally, Plaintiffs request the opportunity to tour the telepsychiatry program at DSH on both the transmitting and receiving ends, with the Special Master team.

/ / /

/ / /

/ / /

/ / /

**CONFIDENTIAL**
Sean Rashkis
October 19, 2016
Page 8


     We look forward to discussing these important staffing issues at the next workgroup meetings.  Please feel free to contact us with any questions or concerns or additional information you believe would assist the parties in discussing these issues at this month's meetings.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

By:   Thomas Nolan
       Of Counsel

TN:cg

cc:  Special Master Matthew A. Lopes, Jr.     Nicole Harrigan
     *Coleman* Special Master Team        Christine Ciccotti
     *Coleman* Co-counsel              Elise Thorn
     Katherine Tebrock               Danielle O'Bannon
     Maneesh Sharma                 Nick Weber

Exhibit T

STATE OF CALIFORNIA — DEPARTMENT OF STATE HOSPITALS                                      EDMUND G. BROWN JR., GOVERNOR

**DIVISION OF HOSPITAL STRATEGIC PLANNING AND IMPLEMENTATION**
1600 Ninth Street, Room 400
Sacramento, CA 95814



March 3, 2017

Matthew A. Lopes Jr., Partner          via:     Chad Stegeman
Office of the Special Master                    Deputy Attorney General
Pannone, Lopes, Devereaux, & O'Gara LLC         California Department of Justice
1301 Atwood Avenue                              455 Golden Gate Ave., Suite 11000
Johnston, RI 02919                              San Francisco, CA 94102-5500

## RE: MONTHLY STAFFING REPORT FOR DSH FACILITIES

DSH is providing the following information on *Coleman* related staffing for DSH facilities.

The enclosed report contains data for *Coleman* related positions: total number of authorized positions for direct care staffing and treatment team staffing; positions filled; over-time, full-time equivalent positions; contracted full-time equivalent positions; and the overall percentage of vacancies for January 2017.

If you have any questions or concerns, please feel free to contact Candius Burgess, Patient Management Unit, at (916) 654-0090.

Sincerely,

*George Maynard*

GEORGE MAYNARD
Deputy Director
Hospital Strategic Planning and Implementation Division
Department of State Hospitals

Enclosures

DEPARTMENT OF STATE HOSPITALS
Direct Care, Medical Support Care, Psychiatric and Administrative Staff
Staff Levels for Coleman Patients
January 1, 2017 through January 31, 2017
Report submitted February 1, 2017

| Department of State Hospitals - Atascadero | Facility Totals as of January 31, 2017 - Average Daily Census - 25 Acute 191 Intermediate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Coleman Related Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
| **Mental Health Treatment Team Staffing (5)** | | | | | | | | | |
| Psychologist | 5.00 | 52.70 | 57.70 | 56.54 | 0.00 | 0.00 | 56.54 | 1.16 | 2.01% |
| Psychiatrist | 5.00 | 43.20 | 48.20 | 15.78 | 14.89 | 0.00 | 30.67 | 17.53 | 36.37% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 4.00 | 41.00 | 45.00 | 37.30 | 3.00 | 0.00 | 40.30 | 4.70 | 10.44% |
| Rehabilitation Therapist | 4.00 | 50.00 | 54.00 | 46.00 | 0.00 | 0.15 | 46.15 | 7.85 | 14.54% |
| Total, Mental Health Treatment Team Staffing | 18.00 | 186.90 | 204.90 | 155.62 | 17.89 | 0.15 | 173.66 | 31.24 | 15.25% |
| **Direct Care Nursing Staff (5)** | | | | | | | | | |
| Psychiatric Technician | 803.00 | 0.00 | 803.00 | 746.69 | 0.00 | 79.73 | 826.42 | 0.00 | 0.00% |
| Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Registered Nurse | 296.00 | 0.00 | 296.00 | 225.69 | 2.00 | 24.24 | 251.93 | 44.07 | 14.89% |
| Total, Direct Care Nursing Staff | 1099.00 | 0.00 | 1099.00 | 972.38 | 2.00 | 103.97 | 1078.35 | 20.65 | 1.88% |
| **Administrative Staff** | | | | | | | | | |
| Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 0.00 | 4.00 | 4.00 | 3.00 | 0.00 | 0.00 | 3.00 | 1.00 | 25.00% |
| Supervising Rehabilitation Therapist | 0.00 | 4.00 | 4.00 | 4.00 | 0.00 | 0.00 | 4.00 | 0.00 | 0.00% |
| Chief Psychologist | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychologist, Supervisor | 0.00 | 9.00 | 9.00 | 6.00 | 0.00 | 0.00 | 6.00 | 3.00 | 33.33% |
| Senior Psychiatrist, Supervisor | 0.00 | 9.00 | 9.00 | 2.00 | 0.00 | 0.00 | 2.00 | 7.00 | 77.78% |
| Senior Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Supervising Registered Nurse | 7.00 | 0.00 | 7.00 | 6.00 | 0.00 | 0.00 | 6.00 | 1.00 | 14.29% |
| Unit Supervisor | 35.00 | 0.00 | 35.00 | 32.00 | 0.00 | 0.00 | 32.00 | 3.00 | 8.57% |
| **TOTAL - COLEMAN RELATED CLASSIFICATIONS** | 1160.00 | 213.90 | 1373.90 | 1183.00 | 19.89 | 104.12 | 1307.01 | 66.89 | 4.87% |

(1) Authorized positions are based on the number of positions in the Governor's 2016/17 budget.

(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2016/17 budget. They are established at a point in time based on need of the facilities.

(3) Total filled civil service positions includes employees working second positions, retired annuitants, loaned positions, limited term, permanent intermittent.

(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

(5) Treatment team and nursing staffing is based on the licensing minimums*, escorts, 1-to-1 staff, and treatment team support.

(6) Position data is unable to be isolated for *Coleman* patients only for DSH-Atascadero.

*Treatment Team and Direct Care Licensing Minimums/Staffing Levels Per Census

| | ICF Direct Care | ICF Treatment Team (Per Discipline) |
|---|---|---|
| AM Shift | 1 to 8 | 1 to 35 |
| PM Shift | 1 to 8 | - |
| NOC | 1 to 16 | - |

DEPARTMENT OF STATE HOSPITALS
Direct Care, Medical/Surgical, Treatment Team and Administrative Staff
Staff Levels for Coleman Patients
January 1, 2017 through January 31, 2017
Report submitted February 1, 2017

| Department of State Hospitals - Coalinga | Facility Totals as of January 31, 2017 - Average Daily Census - 48 Intermediate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Coleman Related Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
| **Mental Health Treatment Team Staffing (5)** | | | | | | | | | |
| Psychologist | 16.00 | 52.20 | 68.20 | 32.66 | 0.00 | 0.00 | 32.66 | 35.54 | 52.11% |
| Psychiatrist | 10.00 | 13.00 | 23.00 | 15.00 | 0.87 | 0.00 | 15.87 | 7.13 | 31.00% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 11.00 | 42.50 | 53.50 | 35.00 | 2.61 | 0.00 | 37.61 | 15.89 | 29.70% |
| Rehabilitation Therapist | 14.00 | 40.00 | 54.00 | 33.00 | 0.00 | 0.28 | 33.28 | 20.72 | 38.37% |
| Total, Mental Health Treatment Team Staffing | 51.00 | 147.70 | 198.70 | 115.66 | 3.48 | 0.28 | 119.42 | 79.28 | 39.90% |
| **Direct Care Nursing Staff (5)** | | | | | | | | | |
| Psychiatric Technician | 807.00 | 0.00 | 807.00 | 717.00 | 0.00 | 142.25 | 859.25 | 0.00 | 0.00% |
| Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Registered Nurse | 233.00 | 0.00 | 233.00 | 209.00 | 0.48 | 29.38 | 238.86 | 0.00 | 0.00% |
| Total, Direct Care Nursing Staff | 1040.00 | 0.00 | 1040.00 | 926.00 | 0.48 | 171.63 | 1098.11 | 0.00 | 0.00% |
| **Administrative Staff** | | | | | | | | | |
| Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 0.00 | 4.00 | 4.00 | 4.00 | 0.00 | 0.00 | 4.00 | 0.00 | 0.00% |
| Supervising Rehabilitation Therapist | 0.00 | 4.00 | 4.00 | 4.00 | 0.00 | 0.00 | 4.00 | 0.00 | 0.00% |
| Chief Psychologist | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| Senior Psychologist, Supervisor | 1.00 | 6.20 | 7.20 | 4.00 | 0.00 | 0.00 | 4.00 | 3.20 | 44.44% |
| Senior Psychiatrist, Supervisor | 4.00 | 7.00 | 11.00 | 3.00 | 0.00 | 0.00 | 3.00 | 8.00 | 72.73% |
| Senior Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Supervising Registered Nurse | 6.00 | 0.00 | 6.00 | 3.00 | 0.00 | 0.00 | 3.00 | 3.00 | 50.00% |
| Unit Supervisor | 28.00 | 0.00 | 28.00 | 28.00 | 0.00 | 0.00 | 28.00 | 0.00 | 0.00% |
| **TOTAL - COLEMAN RELATED CLASSIFICATIONS** | 1131.00 | 169.90 | 1300.90 | 1088.66 | 3.96 | 171.91 | 1264.53 | 36.37 | 2.80% |

(1) Authorized positions are based on the number of positions in the Governor's 2016/17 budget.

(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2016/17 budget. They are established at a point in time based on need of the facilities.

(3) Total filled civil service positions includes employees working second positions, retired annuitants, loaned positions, limited term, permanent intermittent.

(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

(5) Treatment team and nursing staffing is based on the licensing minimums*, escorts, 1-to-1 staff, and treatment team support.

(6) Position data is unable to be isolated for *Coleman* patients only for DSH-Coalinga.

*Treatment Team and Direct Care Licensing Minimums/Staffing Levels Per Census

| | ICF Direct Care | ICF Treatment Team (Per Discipline) |
|---|---|---|
| AM Shift | 1 to 8 | 1 to 35 |
| PM Shift | 1 to 8 | - |
| NOC | 1 to 16 | - |

DEPARTMENT OF STATE HOSPITALS
Direct Care, Mental Health Treatment Team and Administrative Staff
Staff Levels for Coleman Patients
January 1, 2017 through January 31, 2017
Report submitted February 1, 2017

| Department of State Hospitals - Patton | Facility Totals as of January 31, 2017 - Average Daily Census - 0 Intermediate |
|---|---|

There are currently no Coleman patients staying at the Department of State Hospitals (DSH), Patton, due to the activation of the Psychiatric Inpatient Program at the California Institution for Women.

DEPARTMENT OF STATE HOSPITALS
Direct Care, Medical/Psychiatric, Clinical and Administrative Staff
Staff Levels for Coleman Patients
January 1, 2017 through January 31, 2017
Report submitted February 1, 2017

| Department of State Hospitals - Salinas Valley | Facility Totals as of January 31, 2017 - Average Daily Census - 167 Intermediate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Coleman Related Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
| **Mental Health Treatment Team Staffing (5)** | | | | | | | | | |
| Psychologist | 4.00 | 6.00 | 10.00 | 9.29 | 0.00 | 0.00 | 9.29 | 0.71 | 7.10% |
| Psychiatrist | 4.00 | 6.00 | 10.00 | 9.00 | 1.21 | 0.00 | 9.21 | 0.79 | 7.90% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 4.00 | 6.00 | 10.00 | 9.40 | 0.00 | 0.00 | 9.40 | 0.60 | 6.00% |
| Rehabilitation Therapist | 4.00 | 6.00 | 10.00 | 10.00 | 0.00 | 0.00 | 10.00 | 0.00 | 0.00% |
| Total, Mental Health Treatment Team Staffing | 16.00 | 24.00 | 40.00 | 37.69 | 1.21 | 0.00 | 37.90 | 2.10 | 5.25% |
| **Direct Care Nursing Staff (5)** | | | | | | | | | |
| Psychiatric Technician | 31.00 | 0.00 | 31.00 | 20.00 | 0.00 | 0.90 | 20.90 | 10.10 | 32.58% |
| Medical Technical Assistant | 165.00 | 0.00 | 165.00 | 144.00 | 0.00 | 26.32 | 170.32 | 0.00 | 0.00% |
| Registered Nurse | 50.00 | 0.00 | 50.00 | 34.00 | 0.00 | 5.43 | 39.43 | 10.57 | 21.14% |
| Total, Direct Care Nursing Staff | 246.00 | 0.00 | 246.00 | 198.00 | 0.00 | 32.65 | 230.65 | 15.35 | 6.24% |
| **Administrative Staff** | | | | | | | | | |
| Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Supervising Rehabilitation Therapist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Chief Psychologist | 1.00 | 1.00 | 2.00 | 1.00 | 0.00 | 0.00 | 1.00 | 1.00 | 50.00% |
| Senior Psychologist, Supervisor | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychiatrist, Supervisor | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Medical Technical Assistant | 30.00 | 0.00 | 30.00 | 17.50 | 0.00 | 4.29 | 21.79 | 8.21 | 27.37% |
| Supervising Registered Nurse | 19.00 | 3.00 | 22.00 | 14.00 | 0.00 | 0.00 | 14.00 | 8.00 | 36.36% |
| Unit Supervisor | 0.00 | 5.00 | 5.00 | 3.00 | 0.00 | 0.00 | 3.00 | 2.00 | 40.00% |
| **TOTAL - COLEMAN RELATED CLASSIFICATIONS** | 313.00 | 35.00 | 348.00 | 274.19 | 1.21 | 36.94 | 311.34 | 36.66 | 10.53% |

(1) Authorized positions are based on the number of positions in the Governor's 2016/17 budget.

(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2016/17 budget. They are established at a point in time based on need of the facilities.

(3) Total filled civil service positions includes employees working second positions, retired annuitants, loaned positions, limited term, permanent intermittent.

(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

(5) Treatment team and nursing staffing is based on the licensing minimums*, escorts, 1-to-1 staff, and treatment team support.

**\*Treatment Team and Direct Care Licensing Minimums/Staffing Levels Per Census**

| | ICF Direct Care | ICF Treatment Team (Per Discipline) |
|---|---|---|
| AM Shift | 1 to 8 | 1 to 35 |
| PM Shift | 1 to 8 | - |
| NOC | 1 to 16 | - |

DEPARTMENT OF STATE HOSPITALS
Direct Care, Medical/Psychiatric, Treatment Team and Administrative Staff
Staff Levels for Coleman Patients
January 1, 2017 through January 31, 2017
Report submitted February 1, 2017

| Department of State Hospitals - Stockton | Facility Totals as of January 31, 2017 - Average Daily Census - 135 Acute 340 Intermediate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Coleman Related Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
| **Mental Health Treatment Team Staffing (5)** | | | | | | | | | |
| Psychologist | 31.00 | 0.00 | 31.00 | 29.00 | 0.00 | 0.43 | 29.43 | 1.57 | 5.06% |
| Psychiatrist | 33.00 | 0.00 | 33.00 | 27.00 | 0.00 | 0.97 | 27.97 | 5.03 | 15.24% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 33.00 | 0.00 | 33.00 | 26.00 | 0.64 | 0.00 | 26.64 | 6.36 | 19.27% |
| Rehabilitation Therapist | 32.00 | 0.00 | 32.00 | 28.00 | 0.00 | 0.00 | 28.00 | 4.00 | 12.50% |
| Total, Mental Health Treatment Team Staffing | 129.00 | 0.00 | 129.00 | 110.00 | 0.64 | 1.40 | 112.04 | 16.96 | 13.15% |
| **Direct Care Nursing Staff (5)** | | | | | | | | | |
| Psychiatric Technician | 430.00 | 0.00 | 430.00 | 394.00 | 0.00 | 0.00 | 394.00 | 36.00 | 8.37% |
| Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Registered Nurse | 174.00 | 0.00 | 174.00 | 146.00 | 0.00 | 0.00 | 146.00 | 28.00 | 16.09% |
| Total, Direct Care Nursing Staff | 604.00 | 0.00 | 604.00 | 540.00 | 0.00 | 0.00 | 540.00 | 64.00 | 10.60% |
| **Administrative Staff** | | | | | | | | | |
| Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 2.00 | 0.00 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Supervising Rehabilitation Therapist | 3.00 | 0.00 | 3.00 | 2.00 | 0.00 | 0.00 | 2.00 | 1.00 | 33.33% |
| Chief Psychologist | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychologist, Supervisor | 3.00 | 0.00 | 3.00 | 2.00 | 0.00 | 0.00 | 2.00 | 1.00 | 33.33% |
| Senior Psychiatrist, Supervisor | 2.00 | 0.00 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Senior Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Supervising Registered Nurse | 23.00 | 0.00 | 23.00 | 20.00 | 0.00 | 0.00 | 20.00 | 3.00 | 13.04% |
| Unit Supervisor | 18.00 | 0.00 | 18.00 | 17.00 | 0.00 | 0.00 | 17.00 | 1.00 | 5.56% |
| **TOTAL - COLEMAN RELATED CLASSIFICATIONS** | 786.00 | 0.00 | 786.00 | 697.00 | 0.64 | 1.40 | 699.04 | 86.96 | 11.06% |

(1) Authorized positions are based on the number of positions in the Governor's 2016/17 budget.

(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2016/17 budget.  They are established at a point in time based on need of the facilities.

(3) Total filled civil service positions includes employees working second positions, retired annuitants, loaned positions, limited term, permanent intermittent.

(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

(5) Treatment team and nursing staffing is based on the licensing minimums*, escorts, 1-to-1 staff, and treatment team support.

*Treatment Team and Direct Care Licensing Minimums/Staffing Levels Per Census

| | Acute Direct Care and ICF High Custody Direct Care | ICF Treatment Team (Per Discipline) | Acute Treatment Team (Per Discipline) |
|---|---|---|---|
| AM Shift | 1 to 6 | 1 to 35 | 1 to 15 |
| PM Shift | 1 to 6 | - | - |
| NOC | 1 to 12 | - | - |

DEPARTMENT OF STATE HOSPITALS
Direct Care, Medical and Psychiatric, Treatment Teams and Administrative Staff
Staff Levels for Coleman Patients
January 1, 2017 through January 31, 2017
Report submitted February 1, 2017

| Department of State Hospitals - Vacaville | Facility Totals as of January 31, 2017 - Average Daily Census - 210 Acute 168 Intermediate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Coleman Related Classifications** | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
| **Mental Health Treatment Team Staffing (5)** | | | | | | | | | |
| Psychologist | 6.00 | 25.00 | 31.00 | 28.11 | 1.20 | 0.00 | 29.31 | 1.69 | 5.45% |
| Psychiatrist | 4.00 | 25.00 | 29.00 | 20.00 | 1.00 | 0.00 | 21.00 | 8.00 | 27.59% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 4.00 | 24.00 | 28.00 | 20.41 | 0.00 | 0.00 | 20.41 | 7.59 | 27.11% |
| Rehabilitation Therapist | 5.00 | 23.00 | 28.00 | 24.60 | 0.00 | 0.58 | 25.18 | 2.82 | 10.07% |
| Total, Mental Health Treatment Team Staffing | 19.00 | 97.00 | 116.00 | 93.12 | 2.20 | 0.58 | 95.90 | 20.10 | 17.33% |
| **Direct Care Nursing Staff (5)** | | | | | | | | | |
| Psychiatric Technician | 33.00 | 0.00 | 33.00 | 26.00 | 0.82 | 9.24 | 36.06 | 0.00 | 0.00% |
| Medical Technical Assistant | 219.00 | 0.00 | 219.00 | 177.18 | 0.00 | 48.75 | 225.93 | 0.00 | 0.00% |
| Registered Nurse | 77.00 | 0.00 | 77.00 | 72.00 | 0.00 | 10.72 | 82.72 | 0.00 | 0.00% |
| Total, Direct Care Nursing Staff | 329.00 | 0.00 | 329.00 | 275.18 | 0.82 | 68.71 | 344.71 | 0.00 | 0.00% |
| **Administrative Staff** | | | | | | | | | |
| Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 2.00 | 0.00 | 2.00 | 1.00 | 0.00 | 0.00 | 1.00 | 1.00 | 50.00% |
| Supervising Rehabilitation Therapist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Chief Psychologist | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychologist, Supervisor | 0.00 | 2.00 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Senior Psychiatrist, Supervisor | 0.00 | 2.00 | 2.00 | 3.00 | 0.00 | 0.00 | 3.00 | 0.00 | 0.00% |
| Senior Medical Technical Assistant | 11.00 | 30.30 | 41.30 | 26.01 | 0.00 | 2.85 | 28.86 | 12.44 | 30.12% |
| Supervising Registered Nurse | 28.00 | 0.00 | 28.00 | 18.00 | 0.00 | 0.00 | 18.00 | 10.00 | 35.71% |
| Unit Supervisor | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| **TOTAL - COLEMAN RELATED CLASSIFICATIONS** | 391.00 | 131.30 | 522.30 | 420.31 | 3.02 | 72.14 | 495.47 | 26.83 | 5.14% |

**(1)** Authorized positions are based on the number of positions in the Governor's 2016/17 budget.

**(2)** Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2016/17 budget. They are established at a point in time based on need of the facilities.

**(3)** Total filled civil service positions includes employees working second positions, retired annuitants, loaned positions, limited term, permanent intermittent.

**(4)** Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

**(5)** Treatment team and nursing staffing is based on the licensing minimums*, escorts, 1-to-1 staff, and treatment team support.

***Treatment Team and Direct Care Licensing Minimums/Staffing Levels Per Census**

| | ICF Direct Care | Acute Direct Care and ICF High Custody Direct Care | ICF Treatment Team (Per Discipline) | Acute Treatment Team (Per Discipline) |
|---|---|---|---|---|
| AM Shift | 1 to 8 | 1 to 6 | 1 to 35 | 1 to 15 |
| PM Shift | 1 to 8 | 1 to 6 | - | - |
| NOC | 1 to 16 | 1 to 12 | - | - |

Exhibit U



# GUIDELINES FOR THE PRACTICE OF TELEPSYCHOLOGY

## Introduction

These guidelines are designed to address the developing area of psychological service provision commonly known as telepsychology. Telepsychology is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies as expounded in the "Definition of Telepsychology." The expanding role of technology in the provision of psychological services and the continuous development of new technologies that may be useful in the practice of psychology present unique opportunities, considerations and challenges to practice. With the advancement of technology and the increased number of psychologists using technology in their practices, these guidelines have been prepared to educate and guide them.

These guidelines are informed by relevant American Psychological Association (APA) standards and guidelines, including the following: *Ethical Principles of Psychologists and Code of Conduct* ("APA Ethics Code") (APA, 2002a, 2010), and the Record Keeping Guidelines (APA, 2007). In addition, the assumptions and principles that guide the APA's "Guidelines on Multicultural Training, Research, Practice, and Organizational Change for Psychologists" (APA, 2003) are infused throughout the rationale and application describing each of the guidelines. Therefore, these guidelines are informed by professional theories, evidence-based practices and definitions in an effort to offer the best guidance in the practice of telepsychology.

The use of the term *guidelines* within this document refers to statements that suggest or recommend specific professional behaviors, endeavors or conduct for psychologists. Guidelines differ from standards in that standards are mandatory and may be accompanied by an enforcement mechanism. Thus, guidelines are aspirational in intent. They are intended to facilitate the continued systematic development of the profession and to help ensure a high level of professional practice by psychologists. "Guidelines are created to educate and to inform the practice of psychologists. They are also intended to stimulate debate and research. Guidelines are not to be promulgated as a means of establishing the identity of a particular group or specialty

1

area of psychology; likewise, they are not to be created with the purpose of excluding any psychologist from practicing in a particular area" (APA, 2002b, p. 1048). "Guidelines are not intended to be mandatory or exhaustive and may not be applicable to every professional or clinical situation. They are not definitive and they are not intended to take precedence over the judgment of psychologists" (APA, 2002b, p. 1050). These guidelines are meant to assist psychologists as they apply current standards of professional practice when utilizing telecommunication technologies as a means of delivering their professional services. They are not intended to change any scope of practice or define the practice of any group of psychologists.

The practice of telepsychology involves consideration of legal requirements, ethical standards, telecommunication technologies, intra- and interagency policies, and other external constraints, as well as the demands of the particular professional context. In some situations, one set of considerations may suggest a different course of action than another, and it is the responsibility of the psychologist to balance them appropriately. These guidelines aim to assist psychologists in making such decisions. In addition, it will be important for psychologists to be cognizant and compliant with laws and regulations that govern independent practice within jurisdictions and across jurisdictional and international borders. This is particularly true when providing telepsychology services.  Where a psychologist is providing services from one jurisdiction to a client/patient located in another jurisdiction, the law and regulations may differ between the two jurisdictions. Also, it is the responsibility of the psychologists who practice telepsychology to maintain and enhance their level of understanding of the concepts related to the delivery of services via telecommunication technologies. Nothing in these guidelines is intended to contravene any limitations set on psychologists' activities based on ethical standards, federal or jurisdictional statutes or regulations, or for those psychologists who work in agencies and public settings. As in all other circumstances, psychologists must be aware of the standards of practice for the jurisdiction or setting in which they function and are expected to comply with those standards.  Recommendations related to the guidelines are consistent with broad ethical principles (APA Ethics Code, 2002a, 2010) and it continues to be the responsibility of the psychologist to apply all current legal and ethical standards of practice when providing telepsychology services.


*Adopted July 31, 2013*

It should be noted that APA policy generally requires substantial review of the relevant empirical literature as a basis for establishing the need for guidelines and for providing justification for the guidelines' statements themselves (APA, 2005). The literature supporting the work of the Task Force on Telepsychology and guidelines statements themselves reflect seminal, relevant and recent publications. The supporting references in the literature review emphasize studies from approximately the past 15 years plus classic studies that provide empirical support and relevant examples for the guidelines. The literature review, however, is not intended to be exhaustive or serve as a comprehensive systematic review of the literature that is customary when developing professional practice guidelines for psychologists.

**Definition of Telepsychology:**

Telepsychology is defined, for the purpose of these guidelines, as the provision of psychological services using telecommunication technologies.  Telecommunications is the preparation, transmission, communication, or related processing of information by electrical, electromagnetic, electromechanical, electro-optical, or electronic means (Committee on National Security Systems, 2010). Telecommunication technologies include but are not limited to telephone, mobile devices, interactive videoconferencing, email, chat, text, and Internet (e.g., self-help websites, blogs, and social media).  The information that is transmitted may be in writing, or include images, sounds or other data. These communications may be synchronous with multiple parties communicating in real time (e.g. interactive videoconferencing, telephone) or asynchronous (e.g. email, online bulletin boards, storing and forwarding information). Technologies may augment traditional in-person  services (e.g., psychoeducational materials online after an in-person therapy session), or be used as stand-alone services (e.g., therapy or leadership development provided over videoconferencing).  Different technologies may be used in various combinations and for different purposes during the provision of telepsychology services. For example, videoconferencing and telephone may also be utilized for direct service while email and text is used for non-direct services (e.g. scheduling). Regardless of the purpose, psychologists strive to be aware of the potential benefits and limitations in their choices of technologies for particular clients in particular situations.

**Operational Definitions:**



*Adopted July 31, 2013*

The Task Force on Telepsychology has agreed upon the following operational definitions for terms used in this document.  In addition, these and other terms used throughout the document have a basis in definitions developed by the following U.S. agencies: Committee on National Security Systems, Department of Health and Human Services, National Institute of Standards and Technology.  Lastly, the terminology and definitions that describe technologies and their uses are constantly evolving, and therefore, psychologists are encouraged to consult glossaries and publications prepared by agencies, such as, the Committee on National Security Systems and the National Institute of Standards and Technology which represent definitive sources responsible for developing terminology and definitions related to technology and its uses.

The term "**client/patient**" refers to the recipient of psychological services, whether psychological services are delivered in the context of healthcare, corporate, supervision, and/or consulting services.  The term "**in-person,**" which is used in combination with the provision of services, refers to interactions in which the psychologist and the client/patient are in the same physical space and does not include interactions that may occur through the use of technologies. The term "**remote**" which is also used in combination with the provision of services utilizing telecommunication technologies, refers to the provision of a service that is received at a different site  from where the psychologist is physically located. The term "remote" includes no consideration related to distance, and may refer to a site in a location that is in the office next door to the psychologist or thousands of miles  from the psychologist. The terms "**jurisdictions**" or "**jurisdictional**" are used when referring to the governing bodies at states, territories, and provincial governments.

Finally, there are terms within the document related to confidentiality and security. "**Confidentiality**" means the principle that data or information is not made available or disclosed to unauthorized persons or processes. The terms "**security**" or "**security measures**" are terms that encompass all of the administrative, physical, and technical safeguards in an information system. The term "**information system**" is an interconnected set of information resources within a system and includes hardware, software, information, data, applications, communications, and people.



*Adopted July 31, 2013*

**Need for the Guidelines:**

The expanding role of telecommunication technologies in the provision of services and the continuous development of new technologies that may be useful in the practice of psychology support the need for the development of guidelines for practice in this area.  Technology offers the opportunity to increase client/patient access to psychological services.  Service recipients limited by geographic location, medical condition, psychiatric diagnosis, financial constraint or other barriers may gain access to high quality psychological services  through the use of technology.  Technology also facilitates the delivery of psychological  services by new methods (e.g., online psychoeducation, therapy delivered over interactive videoconferencing), and augments traditional in-person psychological services.  The increased use of technology for the delivery of some types of services by psychologists who are health service providers is suggested by recent survey data collected by the APA Center for Workforce Studies (APA Center for Workforce Studies, 2008), and in the increasing discussion of telepsychology in the professional literature (Baker & Bufka, 2011).  Together with the increasing use and payment for the provision of telehealth services by Medicare and private industry, the development of national guidelines for the practice of telepsychology is timely and needed.  Furthermore, state and international psychological associations have developed or are beginning to develop guidelines for the provision of psychological services (Ohio Psychological Association, 2010; Canadian Psychological Association, 2006; New Zealand Psychological Association, 2011).

**Development of the Guidelines:**

The guidelines were developed by the Joint Task Force for the Development of Telepsychology Guidelines for Psychologists (Telepsychology Task Force) established by the following three entities: The American Psychological Association (APA), the Association of State and Provincial Psychology Boards (ASPPB) and the APA Insurance Trust (APAIT). These entities provided input, expertise and guidance to the Task Force on many aspects of the profession, including those related to its ethical, regulatory and legal principles and practices. The Telepsychology Task Force members represented a diverse range of interests and expertise that are characteristic of the profession of psychology, including knowledge of the issues relevant to the use of

AMERICAN
PSYCHOLOGICAL
ASSOCIATION

*Adopted July 31, 2013*

technology, ethical considerations, licensure and mobility, and scope of practice, to name only a few[1].

The Telepsychology Task Force recognized that telecommunications technologies provide both opportunities and challenges for psychologists.  Telepsychology not only enhances a psychologist's ability to provide services to clients/patients, but also greatly expands access to psychological services that, without telecommunication technologies, would not be available. Throughout the development of these guidelines, the Telepsychology Task Force devoted numerous hours reflecting on and discussing the need for guidance to psychologists in this area of practice, the myriad, complex issues related to the practice of telepsychology and the experiences that they and other practitioners address each day in the use of technology. There was a concerted focus to identify the unique aspects that telecommunication technologies bring to the provision of psychological services, distinct from those present during in-person provision of services.  Two important components were identified:

1) the psychologist's knowledge of and competence in the use of the telecommunication technologies being utilized; and,

2) the need to ensure the client/patient has a full understanding of the increased risks to loss of security and confidentiality when using telecommunication technologies.

Therefore, two of the most salient issues that the Telepsychology Task Force members focus on throughout the document are the psychologist's own knowledge of and competence in the provision of telepsychology and the need to ensure that the client/patient has a full understanding of the potentially increased risks to loss of security and confidentiality when using technologies.

---

[1] The Telepsychology Task Force was comprised of psychologists with four members each representing the American Psychological Association (APA) and the Association of State and Provincial Psychology Boards (ASPPB), and two members representing the American Psychological Association Insurance Trust (APAIT).  The Co-Chairs of the Telepsychology Task Force were Linda Campbell, PhD and Fred Millán, PhD. Additional members of the Task Force included the following psychologists: Margo Adams Larsen, PhD; Sara Smucker Barnwell, PhD; Colonel Bruce E. Crow, PsyD; Terry S. Gock, PhD; Eric A. Harris, EdD, JD; Jana N. Martin, PhD; Thomas W. Miller, PhD; Joseph S. Rallo, PhD.  APA staff (Ronald S. Palomares, PhD; Joan Freund and Jessica Davis) and ASPPB staff (Stephen DeMers, EdD; Alex M. Siegel, PhD, JD; and Janet Pippin Orwig) provided direct support to the Telepsychology Task Force. Funding was provided by each of the respective entities to support in-person meetings and conference calls of Task Force members in 2011 and 2012.  This draft is scheduled to expire as APA policy, no later than 10 years after the initial date of recognition by the APA.  After the date of expiration, users are encouraged to contact the APA Practice Directorate to confirm that this document remains in effect.

An additional key issue discussed by the task force members was interjurisdictional practice. The guidelines encourage psychologists to be familiar with and comply with all relevant laws and regulations when providing psychological services across jurisdictional and international borders. The guidelines do not promote a specific mechanism to guide the development and regulation of interjurisdictional practice. However, the Telepsychology Task Force notes that while the profession of psychology does not currently have a mechanism to regulate the delivery of psychological services across jurisdictional and international borders, it is anticipated that the profession will develop a mechanism to allow interjurisdictional practice given the rapidity by which technology is evolving and the increasing use of telepsychology by psychologists working in U.S. federal environments, such as, the U.S. Department of Defense and Department of Veterans Affairs.

## Competence of the Psychologist

*Guideline 1: Psychologists who provide telepsychology services strive to take reasonable steps to ensure their competence with both the technologies used and the potential impact of the technologies on clients/patients, supervisees or other professionals.*

**Rationale:**

Psychologists have a primary ethical obligation to provide professional services only within the boundaries of their competence based on their education, training, supervised experience, consultation, study or professional experience. As with all new and emerging areas in which generally recognized standards for preparatory training do not yet exist, psychologists utilizing telepsychology aspire to apply the same standards in developing their competence in this area. Psychologists who use telepsychology in their practices assume the responsibility for assessing and continuously evaluating their competencies, training, consultation, experience and risk management practices required for competent practice.

**Application:**

Psychologists assume responsibility to continually assess both their professional and technical competence when providing telepsychology services. Psychologists who utilize or intend to utilize telecommunication technologies when delivering services to clients/patients strive to obtain relevant professional training to develop their requisite knowledge and skills. Acquiring competence may require pursuing additional educational experiences and training, including but not limited to, a review of the relevant literature, attendance at existing training programs (e.g., professional and technical) and continuing education specific to the delivery of services utilizing telecommunication technologies. Psychologists are encouraged to seek appropriate skilled consultation from colleagues and other resources.

Psychologists are encouraged to examine the available evidence to determine whether specific telecommunication technologies are suitable for a client/patient, based on the current literature available, current outcomes research, best practice guidance and client/patient preference. Research may not be available in the use of some specific technologies and clients/patients should be made aware of those telecommunication technologies that have no evidence of effectiveness. However this, in and of itself, may not be grounds to deny providing the service to the client/patient. Lack of current available evidence in a new area of practice does not necessarily indicate that a service is ineffective. Additionally, psychologists are encouraged to document their consideration and choices regarding the use of telecommunication technologies used in service delivery.

Psychologists understand the need to consider their competence in utilizing telepsychology as well as their client's/patient's ability to engage in and fully understand the risks and benefits of the proposed intervention utilizing specific technologies. Psychologists make reasonable effort to understand the manner in which cultural, linguistic, socioeconomic and other individual characteristics (e.g., medical status, psychiatric stability, physical/cognitive disability, personal preferences), in addition to, organizational cultures may impact effective use of telecommunication technologies in service delivery.

Psychologists who are trained to handle emergency situations in providing traditional in-person clinical services, and are generally familiar with the resources available in their local community

8

to assist clients/patients with crisis intervention. At the onset of the delivery of telepsychology services, psychologists make reasonable effort to identify and learn how to access relevant and appropriate emergency resources in the client's/patient's local area, such as emergency response contacts (e.g., emergency telephone numbers, hospital admissions, local referral resources, clinical champion at a partner clinic where services are delivered, a support person in the client's/patient's life when available).  Psychologists prepare a plan to address any lack of appropriate resources, particularly those necessary in an emergency, and other relevant factors which may impact the efficacy and safety of said service. Psychologists make reasonable effort to discuss with and provide all clients/patients with clear written instructions as to what to do in an emergency (e.g., where there is a suicide risk).  As part of emergency planning, psychologists are encouraged to acquire knowledge of the laws and rules of the jurisdiction in which the client/patient resides and the differences from those in the psychologist's jurisdiction, as well as document all their emergency planning efforts.

In addition, as applicable psychologists are mindful of the array of potential discharge plans for clients/patients when telepsychology services are no longer necessary and/or desirable. If a client/patient recurrently experiences crises/emergencies suggestive that in-person services may be appropriate, psychologists take reasonable steps to refer a client/patient to a local mental health resource or begin providing in-person services.

Psychologists using telepsychology to provide supervision or consultation remotely to individuals or organizations are encouraged to consult others who are knowledgeable about the unique issues telecommunication technologies pose for supervision or consultation. Psychologists providing telepsychology services strive to be familiar with professional literature regarding the delivery of services via telecommunication technologies, as well as competent with the use of the technological modality itself. In providing supervision and/or consultation via telepsychology, psychologists make reasonable efforts to be proficient in the professional services being offered, the telecommunication modality via which the services are being offered by the supervisee/consultee, and the technology medium being used to provide the supervision or consultation. In addition, since the development of basic professional competencies for supervisees is often conducted in-person, psychologists who use telepsychology for supervision

are encouraged to consider and ensure that a sufficient amount of in-person supervision time is included so that the supervisees can attain the required competencies or supervised experiences.

## Standards of Care in the Delivery of Telepsychology Services

***Guideline 2: Psychologists make every effort to ensure that ethical and professional standards of care and practice are met at the outset and throughout the duration of the telepsychology services they provide.***

**Rationale:**

Psychologists delivering telepsychology services apply the same ethical and professional standards of care and professional practice that are required when providing in-person psychological services. The use of telecommunication technologies in the delivery of psychological services is a relatively new and rapidly evolving area, and therefore psychologists are encouraged to take particular care to evaluate and assess the appropriateness of utilizing these technologies prior to engaging in, and throughout the duration of, telepsychology practice to determine if the modality of service is appropriate, efficacious and safe.

Telepsychology encompasses a breadth of different psychological services using a variety of technologies (e.g., interactive videoconferencing, telephone, text, email, web services, and mobile applications). The burgeoning research in telepsychology suggests the effectiveness of certain types of interactive telepsychological interventions to their in-person counterparts (specific therapies delivered over videoteleconferencing and telephone). Therefore, before psychologists engage in providing telepsychology services, they are urged to conduct an initial assessment to determine the appropriateness of the telepsychology  service to be provided for the client/patient. Such an assessment may include the examination of the potential risks and benefits to provide telepsychology services for the client's/patient's particular needs, the multicultural and ethical issues that may arise, and a review of the most appropriate medium (e.g., video teleconference, text, email, etc.) or best options available for the service delivery.  It may also include considering whether comparable in-person services are available, and why services

10

delivered via telepsychology are equivalent or preferable to such services. In addition, it is incumbent on the psychologist to engage in a continual assessment of the appropriateness of providing telepsychology services throughout the duration of the service delivery.

**Application:**

When providing telepsychology services, considering client/patient preferences for such services is important. However, it may not be solely determinative in the assessment of their appropriateness. Psychologists are encouraged to carefully examine the unique benefits of delivering telepsychology services (e.g., access to care, access to consulting services, client convenience, accommodating client special needs, etc.) relative to the unique risks (e.g., information security, emergency management, etc.) when determining whether or not to offer telepsychology services. Moreover, psychologists are aware of such other factors as geographic location, organizational culture, technological competence (both psychologist and client/patient), and, as appropriate, medical conditions, mental status and stability, psychiatric diagnosis, current or historic use of substances, treatment history, and therapeutic needs that may be relevant to assessing the appropriateness of the telepsychology services being offered. Furthermore, psychologists are encouraged to communicate any risks and benefits of the telepsychology services to be offered to the client/patient and document such communication. In addition, psychologists may consider some initial in-person contact with the client/patient to facilitate an active discussion on these issues and/or conduct the initial assessment.

As in the provision of traditional services, psychologists endeavor to follow the best practice of service delivery described in the empirical literature and professional standards (including multicultural considerations) that are relevant to the telepsychological service modality being offered. In addition, they consider the client's/patient's familiarity with and competency for using the specific technologies involved in providing the particular telepsychology service. Moreover, psychologists are encouraged to reflect on multicultural considerations and how best to manage any emergency that may arise during the provision of telepsychology services.

Psychologists are encouraged to assess carefully the remote environment in which services will be provided, to determine what impact, if any, there might be to the efficacy, privacy and/or

11

safety of the proposed intervention offered via telepsychology. Such an assessment of the remote environment may include a discussion of the client's/patient's situation within the home or within an organizational context, the availability of emergency or technical personnel or supports, risk of distractions, potential for privacy breaches or any other impediments that may impact the effective delivery of telepsychology services. Along this line, psychologists are encouraged to discuss fully with the clients/patients their role in ensuring that sessions are not interrupted and that the setting is comfortable and conducive to making progress to maximize the impact of the service provided since the psychologist will not be able to control those factors remotely.

Psychologists are urged to monitor and assess regularly the progress of their client/patient when offering telepsychology services in order to determine if the provision of telepsychology services is still appropriate and beneficial to the client/patient. If there is a significant change in the client/patient or in the therapeutic interaction to cause concern, psychologists make reasonable effort to take appropriate steps to adjust and reassess the appropriateness of the services delivered via telepsychology. Where it is believed that continuing to provide remote services is no longer beneficial or presents a risk to a client's/patient's emotional or physical well-being, psychologists are encouraged to thoroughly discuss these concerns with the client/patient, appropriately terminate their remote services with adequate notice and refer or offer any needed alternative services to the client/patient.

### Informed Consent

***Guideline 3: Psychologists strive to obtain and document informed consent that specifically addresses the unique concerns related to the telepsychology services they provide. When doing so, psychologists are cognizant of the applicable laws and regulations, as well as organizational requirements that govern informed consent in this area.***

**Rationale:**

AMERICAN
PSYCHOLOGICAL
ASSOCIATION

*Adopted July 31, 2013*

The process of explaining and obtaining informed consent, by whatever means obtained, sets the stage for the relationship between the psychologist and the client/patient.  Psychologists make reasonable effort to offer a complete and clear description of the telepsychology services they provide, and seek to obtain and document informed consent when providing professional services (APA Ethics Code, Standard 3.10). In addition, they attempt to develop and share the policies and procedures that will explain to their clients/patients how they will interact with them using the specific telecommunication technologies involved. It may be more difficult to obtain and document informed consent in situations where psychologists provide telepsychology services to their clients/patients who are not in the same physical location, or with whom they do not have in-person interactions. .  Moreover, there may be differences with respect to informed consent between the laws and regulations in the jurisdictions where a psychologist who is providing telepsychology services is located and the jurisdiction in which this psychologist's client/patient resides.   Furthermore, psychologists may need to be aware of the manner in which cultural, linguistic, socioeconomic characteristics, and organizational considerations may impact a client's/patient's understanding of, and  the special considerations required for, obtaining informed consent (such as when securing  informed consent remotely from a parent/guardian when providing telepsychology services to a minor).

Telepsychology services may require different considerations for and safeguards against potential risks to, confidentiality, information security, and comparability of traditional in-person services.   Psychologists are thus encouraged to consider appropriate policies and procedures to address the potential threats to the security of client/patient data and information when using specific telecommunication technologies and appropriately inform their clients/patients about them.  For example, psychologists who provide telepsychology services consider addressing with their clients/patients what client/patient data and information will be stored, how the data and information will be stored, how it will be accessed, how secure is the information communicated using a given technology, and any technology-related vulnerability to confidentiality and security by creating and storing electronic client/patient data and information.

**Application:**



Prior to providing telepsychology services, psychologists are aware of the importance of obtaining and documenting written informed consent from their clients/patients that specifically addresses the unique concerns relevant to those services that will be offered.  When developing such informed consent, psychologists make reasonable effort to use language that is reasonably understandable to their clients/patients, in addition to, evaluating the need to address cultural, linguistic, organizational considerations, and other issues that may impact on a client's/patient's understanding of the informed consent agreement.  When considering for inclusion in informed consent those unique concerns that may be involved in providing telepsychology services, psychologists may include the manner in which they and their clients/patients will use the particular telecommunication technologies, the boundaries they will establish and observe, and the procedures for responding to electronic communications from clients/patients.  Moreover, psychologists are cognizant of pertinent laws and regulations with respect to informed consent in both the jurisdiction where they offer their services and where their clients/patients reside (see Guideline on Interjurisdictional Practice for more detail).

Besides those unique concerns described above, psychologists are encouraged to discuss with their clients/patients those issues surrounding confidentiality and the security conditions when particular modes of telecommunication technologies are utilized. Along this line, psychologists are cognizant of some of the inherent risks a given telecommunication technology may pose in both the equipment (hardware, software, other equipment components) and the processes used for providing telepsychology services, and strive to provide their clients/patients with adequate information to give informed consent for proceeding with receiving the professional services offered via telepsychology. Some of these risks may include those associated with technological problems, and those service limitations that may arise because the continuity, availability and appropriateness of specific telepsychology services (e.g. testing, assessment and therapy) may be hindered as a result of those services being offered remotely. In addition, psychologists may consider developing agreements with their clients/patients to assume some role in protecting the data and information they receive from them (e.g. by not forwarding emails from the psychologist to others).

14

Another unique aspect of providing telepsychology services is that of billing documentation. As part of informed consent, psychologists are mindful of the need to discuss with their clients/patients what the billing documentation will include prior to the onset of service provision. Billing documentation may reflect the type of telecommunication technology used, the type of telepsychology services provided, and the fee structure for each relevant telepsychology service (e.g., video chat, texting fees, telephone services, chat room group fees, emergency scheduling, etc.). It may also include discussion about the charges incurred for any service interruptions or failures encountered, responsibility for overage charges on data plans, fee reductions for technology failures, and any other costs associated with the telepsychology services that will be provided.

### Confidentiality of Data and Information

*Guideline 4: Psychologists who provide telepsychology services make reasonable effort to protect and maintain the confidentiality of the data and information relating to their clients/patients and inform them of the potentially increased risks to loss of confidentiality inherent in the use of the telecommunication technologies, if any.*

**Rationale:**

The use of telecommunications technologies and the rapid advances in technology present unique challenges for psychologists in protecting the confidentiality of clients/patients. Psychologists who provide telepsychology learn about the potential risks to confidentiality before utilizing such technologies.  When necessary, psychologists obtain the appropriate consultation with technology experts to augment their knowledge of telecommunication technologies in order to apply security measures in their practices that will protect and maintain the confidentiality of data and information related to their clients/patients.

Some of the potential risks to confidentiality include considerations related to uses of search engines and participation in social networking sites. Other challenges in this area may include protecting confidential data and information from inappropriate and/or inadvertent breaches to established security methods the psychologist has in place, as well as boundary issues that may

15



arise as a result of a psychologist's use of search engines and participation on social networking sites. In addition, any Internet participation by psychologists has the potential of being discovered by their clients/patients and others and thereby potentially compromising a professional relationship.

**Application:**

Psychologists both understand and inform their clients/patients of the limits to confidentiality and risks to the possible access or disclosure of confidential data and information that may occur during service delivery, including the risks of access to electronic communications (e.g. telephone, email) between the psychologist and client/patient. Also, psychologists are cognizant of the ethical and practical implications of proactively researching online personal information about their clients/patients. They carefully consider the advisability of discussing such research activities with their clients/patients and how information gained from such searches would be utilized and recorded as documenting this information may introduce risks to the boundaries of appropriate conduct for a psychologist. In addition, psychologists are encouraged to weigh the risks and benefits of dual relationships that may develop with their clients/patients, due to the use of telecommunication technologies, before engaging in such relationships (APAPO, 2012).

Psychologists who use social networking sites for both professional and personal purposes are encouraged to review and educate themselves about the potential risks to privacy and confidentiality and consider utilizing all available privacy settings to reduce these risks. They are also mindful of the possibility that any electronic communication can have a high risk of public discovery. They therefore mitigate such risks by following the appropriate laws, regulations and the APA Ethics Code (APA, 2010) to avoid disclosing confidential data or information related to clients/patients.

**Security and Transmission of Data and Information**


*Adopted July 31, 2013*

***Guideline 5: Psychologists who provide telepsychology services take reasonable steps to ensure that security measures are in place to protect data and information related to their clients/patients from unintended access or disclosure.***

**Rationale:**

The use of telecommunication technologies in the provision of psychological services presents unique potential threats to the security and transmission of client/patient data and information. These potential threats to the integrity of data and information may include computer viruses, hackers, theft of technology devices, damage to hard drives or portable drives, failure of security systems, flawed software, and ease of accessibility to unsecured electronic files, and malfunctioning or outdated technology. Other threats may include policies and practices of technology companies and vendors such as tailored marketing derived from email communications. Psychologists are encouraged to be mindful of these potential threats, and take reasonable steps to ensure that security measures are in place for protecting and controlling access to client/patient data within an information system. In addition, they are cognizant of relevant jurisdictional and federal laws and regulations that govern electronic storage and transmission of client/patient data and information, and develop appropriate policies and procedures to comply with such directives. When developing policies and procedures to ensure the security of client/patient data and information, psychologists may include considering the unique concerns and impacts posed by both intended and unintended use of public and private technology devices, active and inactive therapeutic relationships, and the different safeguards required for different physical environments, different staff (e.g. professional versus administrative staff), and different telecommunication technologies.

**Application:**

Psychologists are encouraged to conduct an analysis of the risks to their practice setting, telecommunication technologies, and administrative staff, to ensure that client/patient data and information is accessible only to appropriate and authorized individuals. Psychologists strive to obtain appropriate training or consultation from relevant experts when additional knowledge is needed to conduct an analysis of the risks.

Psychologists strive to ensure that policies and procedures are in place to secure and control access to client/patient information and data within information systems. Along this line, they may encrypt confidential client/patient data for storage or transmission, and utilize such other secure methods as safe hardware and software and robust passwords to protect electronically stored or transmitted data and information. If there is a breach of unencrypted electronically communicated or maintained data, psychologists are urged to notify their clients/patients and other appropriate individuals/organizations as soon as possible.  In addition, they are encouraged to make their best efforts to ensure that electronic data and information remain accessible despite problems with hardware, software and/or storage devices by keeping a secure back-up version of such data.

When documenting the security measures to protect client/patient data and information from unintended access or disclosure, psychologists are  encouraged to clearly address what types of telecommunication technologies are used (e.g., email, telephone, video teleconferencing, text), how they are used, whether telepsychology services used are the primary method of contact or augments in-person contact. When keeping records of email, online messaging and other work using telecommunication technologies, psychologists are cognizant that preserving the actual communication may be preferable to summarization in some cases depending on the type of technology used.

### Disposal of Data and Information and Technologies

***Guideline 6: Psychologists who provide telepsychology services make reasonable efforts to dispose of data and information and the technologies used in a manner that facilitates protection from unauthorized access and accounts for safe and appropriate disposal.***

**Rationale:**

Consistent with APA Record Keeping Guidelines (2007), psychologists are encouraged to create policies and procedures for the secure destruction of data and information and the technologies used to create, store and transmit the data and information. The use of telecommunication

18

technologies in the provision of psychological services poses new challenges for psychologists when they consider the disposal methods to utilize in order to maximally preserve client confidentiality and privacy. Psychologists are therefore urged to consider conducting an analysis of the risks  to the information systems within their practices in an effort to ensure full and complete disposal of electronic data and information, plus the technologies that created, stored, and transmitted the data and information.

**Application:**

Psychologists are encouraged to develop policies and procedures for the destruction of data and information related to clients/patients. They also strive to securely dispose of software and hardware used in the provision of telepsychology services in a manner that insures that the confidentiality and security of any patient/client information is not compromised. When doing so, psychologists carefully clean all the data and images in the storage media  before re-use or disposal consistent with federal, state, provincial, territorial, and other organizational regulations and guidelines. Psychologists are aware of and understand the unique storage implications related to telecommunication technologies inherent in available systems.

Psychologists are encouraged to document the methods and procedures used when disposing of the data and information and the technologies used to create, store, or transmit the data and information, as well as any other technology utilized in the disposal of data and hardware. They also strive to be aware of malware, cookies, etc. and dispose routinely of them on an ongoing basis when telecommunication technologies are used.

**Testing and Assessment**

*Guideline 7: Psychologists are encouraged to consider the unique issues that may arise with test instruments and assessment approaches designed for in-person implementation when providing telepsychology services.*

**Rationale:**


Psychological testing and other assessment procedures are an area of professional practice in which psychologists have been trained and are uniquely qualified to conduct. While some symptom screening instruments are already being administered online frequently, most psychological test instruments and other assessment procedures currently in use have been designed and developed originally for in-person administration.  Psychologists are thus encouraged to be knowledgeable about, and account for, the unique impacts, suitability for diverse populations, and limitations on test administration and on test and other data interpretations when these psychological tests and other assessment procedures are considered for and conducted via telepsychology. Psychologists also strive to maintain the integrity of the application of the testing and assessment process and procedures when using telecommunication technologies. In addition, they are cognizant of the accommodations for diverse populations that may be required for test administration via telepsychology. These guidelines are consistent with the standards articulated in the most recent edition of *Standards for educational and psychological testing* (American Educational Research Association, American Psychological Association, and the Council on Measurement in Education).

**Application:**

When a psychological test or other assessment procedure is conducted via telepsychology, psychologists are encouraged to ensure that the integrity of the psychometric properties of the test or assessment procedure (e.g., reliability and validity) and the conditions of administration indicated in the test manual are preserved when adapted for use with such technologies.  They are encouraged to consider if modifications to the testing environment or conditions are necessary to accomplish this preservation.  For example, access to a cell phone, the Internet or other persons during an assessment could interfere with the reliability or validity of the instrument or administration. Further, if the individual being assessed receives coaching or such information as potential responses or the scoring and interpretation of specific assessment instruments because they are available on the Internet, the test results may be compromised. Psychologists are also encouraged to consider other possible forms of distraction which could affect performance during an assessment and which may not be obvious or visible (e.g., sight, sound, and smell) when utilizing telecommunication technologies.

Psychologists are encouraged to be cognizant of the specific issues that may arise with diverse populations when providing telepsychology and make appropriate arrangements to address those concerns (e.g., language or cultural issues; cognitive, physical or sensory skills or impairments; or age may impact assessment). In addition, psychologists may consider the use of a trained assistant (e.g., proctor) to be on premise at the remote location in an effort to help verify the identity of the client/patient, provide needed on-site support to administer certain tests or subtests, and protect the security of the psychological testing and/or assessment process.

When administering psychological tests and other assessment procedures when providing telepsychology services, psychologists are encouraged to consider the quality of those technologies that are being used and the hardware requirements that are needed in order to conduct the specific psychological test or assessment approach. They also strive to account for and be prepared to explain the potential difference between the results obtained when a particular psychological test is conducted via telepsychology and when it is administered in-person. In addition, when documenting findings from evaluation and assessment procedures, psychologists are encouraged to specify that a particular test or assessment procedure has been administered via telepsychology, and describe any accommodations or modifications that have been made.

Psychologists strive to use test norms derived from telecommunication technologies administration if such are available. Psychologists are encouraged to recognize the potential limitations of all assessment processes conducted via telepsychology, and be ready to address the limitations and potential impact of those procedures.

**Interjurisdictional Practice**

*Guideline 8: Psychologists are encouraged to be familiar with and comply with all relevant laws and regulations when providing telepsychology services to clients/patients across jurisdictional and international borders.*

**Rationale:**

21


*Adopted July 31, 2013*

With the rapid advances in telecommunication technologies, the intentional or unintentional provision of psychological services across jurisdictional and international borders is becoming more of a reality  for psychologists.  Such service provision may range from the psychologists or clients/patients being temporarily out-of-state (including split residence across states) to psychologists offering their services across jurisdictional borders as a practice modality to take advantage of  new telecommunication technologies. Psychological service delivery systems within such institutions as the U.S. Department of Defense and the Department of Veterans Affairs have already established internal policies and procedures for providing services within their systems that cross jurisdictional and international borders. However, the laws and regulations that govern service delivery by psychologists outside of those systems vary by state, province, territory, and country (APAPO, 2010).  Psychologists should make reasonable effort to be familiar with and, as appropriate, to address the laws and regulations that govern telepsychology service delivery within the jurisdictions in which they are situated and the jurisdictions where their clients/patients are located.


**Application:**

It is important for psychologists to be aware of the relevant laws and regulations that specifically address the delivery of professional services by psychologists via telecommunication technologies within and between jurisdictions.  Psychologists are encouraged to understand what the laws and regulations consider as telehealth or telepsychology.  In addition, psychologists are encouraged to review the professional licensure requirements, the services and telecommunication modalities covered, and the information required to be included in providing informed consent. It is important to note that each jurisdiction may or may not have specific laws which impose special requirements when providing services via telecommunication technologies.  The APAPO (2010) has found that there are variations in whether psychologists are specified as a single type of provider or covered as part of a more diverse group of providers. In addition, there is wide diversity in the types of services and the telecommunication technologies that are covered by these laws.


At the present time, there are a number of jurisdictions without specific laws that govern the provision of psychological services utilizing telecommunication technologies.  When providing


telepsychology services in these jurisdictions, psychologists are encouraged to be aware of any opinion or declaratory statement issued by the relevant regulatory bodies and/or other practitioner licensing boards that may help inform them of the legal and regulatory requirements involved when delivering telepsychology services within those jurisdictions.

Moreover, because of the rapid growth in the utilization of telecommunication technologies, psychologists strive to keep abreast of developments and changes in the licensure and other interjurisdictional practice requirements that may be pertinent to their delivery of telepsychology services across jurisdictional boundaries. Given the direction of various health professions, and current federal priorities to resolve problems created by requirements of multi-jurisdictional licensure, (citations e.g., FCC National Broadband Plan, 2010, Canadian Agreement on Internal Trade 1995), the development of a telepsychology credential required by psychology boards for interjurisdictional practice is a probable outcome. For example, nursing has developed a credential that is accepted by many US jurisdictions that allows nurses licensed in any participating jurisdiction to practice in person or remotely in all participating jurisdictions.  In addition, an ASPPB Task Force has drafted a set of recommendations for such a credential.

### Conclusion

It is important to note, that it is not the intent of these guidelines to prescribe specific actions, but rather, to offer the best guidance available at present when incorporating telecommunication technologies in the provision of psychological services. Because technology and its applicability to the profession of psychology is a dynamic area with many changes likely ahead, these guidelines also are not inclusive of all other considerations and are not intended to take precedence over the judgment of psychologists or applicable laws and regulations that guide the profession and practice of psychology.  It is hoped that the framework presented will guide psychologists as the field evolves.

*Adopted July 31, 2013*

# References

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (current edition). *Standards for educational and psychological testing.* Washington, DC: American Psychological Association.

American Psychological Association (2002a). Ethical principles of psychologists and code of conduct. *American Psychologist*, 57, 1060-1073.

American Psychological Association (2002b). Criteria for practice guideline development and evaluation. *American Psychologist*, 57, 1048-1051.

American Psychological Association. 2008. Center for Workforce Studies. Retrieved from http://www.apa.org/workforce/publications/08-hsp/telepsychology/index.aspx.

American Psychological Association (2010). 2010 Amendments to the 2001 "Ethical principles of psychologists and code of conduct." *American Psychologist*, 65, 493.

American Psychological Association (2003). Guidelines on multicultural education, training, research, practice, and organizational change for psychologists. *American Psychologist*, *58*, 377-402.

American Psychological Association (2007). Record keeping guidelines. *American Psychologist*, 62, 993-1004.

American Psychological Association Practice Organization. (2010).  Telehealth: Legal basics for psychologists. *Good Practice, 41*, 2-7.

American Psychological Association Practice Organization. (2012).  Social Media: What's your policy. *Good Practice, Spring/Summer*, 10-18.

24

Baker, D. C., & Bufka, L. F. (2011). Preparing for the telehealth world: Navigating legal, regulatory, reimbursement, and ethical issues in an electronic age. *Professional Psychology: Research and Practice*, 42 (6), 405-411.

Canadian Psychological Association: Ethical guidelines for psychologists providing services via electronic media. (2006). Retrieved from

http://www.cpa.ca/aboutcpa/committees/ethics/psychserviceselectronically/.

Committee on National Security Systems. (2010). *National Information Assurance Glossary*. Washington, DC: Author.

Ohio Psychological Association: Telepsychology guidelines. (2010). Retrieved from

http://www.ohpsych.org/psychologists/files/2011/06/OPATelepsychologyGuidelines41710.pdf.

New Zealand Psychological Association: Draft Guidelines: Psychology services delivered via the Internet and other electronic media. (2011). Retrieved from

http://psychologistsboard.org.nz/cms_show_download.php?id=141.

Reed, G. M., McLaughlin, C.J., & Millholland, K. (2000). Ten interdisciplinary principles for professional practice in telehealth: Implications for psychology. *Professional Psychology: Research and Practice*, 31 (2), 170-178.

U.S. Department of Health and Human Services, Health Resources and Services Administration. (2010). *Special Report to the Senate Appropriations Committee: Telehealth Licensure Report*. Washington, DC: Author.

U.S. Department of Commerce, National Institute of Standards and Technology. (2011). *A Glossary of Key Information Security Terms*. Washington, DC: Author.


U.S. Department of Commerce, National Institute of Standards and Technology. (2008). *An*

*Introductory Resource Guide for Implementing the Health Insurance Portability and*

*Accountability Act (HIPAA) Security Rule*. Washington, DC: Author.

Exhibit V

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                     EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF HEALTH CARE SERVICES**
STATEWIDE MENTAL HEALTH PROGRAM
P.O. Box 588500
Elk Grove, California  95758



April 7, 2017

Matthew A. Lopes, Jr. Esquire                    via:  Elise Owens Thorn, Esquire
Office of the Special Master                             Deputy Attorney General
Pannone Lopes & Devereaux LLC                           Department of Justice
317 Iron Horse Point Way, Suite 301                     1300 "I" Street, Suite 125
Providence, RI  02908                                   P. O. Box 944255
                                                        Sacramento, CA  94244-2550


**RE: *COLEMAN* MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF
VACANCIES**

Dear Mr. Lopes:

Enclosed is the *Coleman* Monthly Report reflective of February, 2017, data (or as
otherwise noted).  The following is the list of enclosures:

1.  California Department of Corrections and Rehabilitation (CDCR) Staffing Report.
    a. Mental Health Executive Summary.
    b. Mental Institution Vacancy by Classification.
    c. Mental Institution Vacancies Summary by Classification.
    d. Mental Health Month to Month Registry Usage.
    e. Mental Health Six-Month Vacancy Summary.
    f. Mental Health Program Institution Vacancies-Summary by Classification.
    g. Statewide Mental Health Program Compliance Summary Report.
    h. Enhanced Outpatient Administrative Segregation Unit (EOP ASU) Case Manager
       Positions and Vacancies.
    i. Mental Health Hiring Progress Report.
    j. Mental Health Statewide Hire Tracking Summary -- Clinical Positions Only.
    k. Mental Health Telepsych Allocated and Filled Positions Report.

2.  Reception Center Monthly Reports.
        a. Reception Center Mental Health Screening Report.
        b. Reception Center Transfer Timelines Report.

3. Continuous Length of Stay Counts for Mental Health Services Delivery Systems
(MHSDS) ASU, Secured Housing Unit (SHU), and Psychiatric Services Unit (PSU)
report.

Matthew A. Lopes, Jr. Esquire
Page 2

4. EOP Inmates Waiting Transfers to PSU.

5. EOP ASU Hub Trends.

6. Population and Census Reports.
   a. Health Care Placement Oversight Program (HCPOP) Information Report, Summary (R-01)
   b. MHSDS Management Information Summary (MIS).
   c. Weekly EOP/Outpatient Psychiatric Program report.

7. Mental Health Crisis Bed (MHCB) Reports.
   a. Monthly Summary of MHCB Use by Institution (entitled "Inpatient Psychiatric Aging Report").
   b. MHCB Wait List.
   c. Transferred and Rescinded MHCB Referrals by Institution and Level of Care report (all subsections).

8. Department of State Hospitals (DSH) Referral Reports.
   a. Referrals for Transfer to DSH. *Not included – data not available at this time. Report is currently being re-coded, with an estimated completion date of April 30, 2017.*
   b. DSH Monthly Report of CDCR Patients in DSH Hospitals -- Summary and PC 2684.

9. Milestone Credits Report.

10. Work Assignments Report.

11. Out of Level Housing Report.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

KATHERINE TEBROCK, ESQUIRE
Deputy Director, Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

Matthew A. Lopes, Jr. Esquire
Page 3


cc:   Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
      Kerry F. Walsh, Esq., *Coleman* Deputy Special Master
      Jeffrey L. Metzner, M.D., *Coleman* Expert
      Kerry C. Hughes, M.D., *Coleman* Expert
      Mary Perrien, Ph.D., *Coleman* Expert
      Henry A. Dlugacz, Esq., *Coleman* Expert
      Patricia Williams, Esq., *Coleman* Monitor
      Patrick McKinney, Esq., Office of Legal Affairs, CDCR
      Nicholas Weber, Esq, Office of Legal Affairs, CDCR
      Michael Bien, Esq., Rosen, Bien and Galvan
      Donald Specter, Esq., Prison Law Office
      Steve Fama, Esq., Prison Law Office
      Angela Ponciano, Associate Director, Statewide Mental Health Program, Division of
         Health Care Services (DHCS)
      Laura Ceballos, Ph.D., Chief of Quality Management and Field Operations, Statewide
         Mental Health Program, DHCS
      John Rekart, Ph.D., Chief, Quality Management, Statewide Mental Health Program,
         DHCS
      Teresa Owens, Health Program Specialist I, Quality Management, Statewide Mental
         Health Program, DHCS

Correctional Health Care Services
Mental Health Institution Vacancies

**SUMMARY BY INSTITUTION BY CLASSIFICATION**
**As Of February - 2017**

| COR | | FY 16/17 | SCO DATA | | | ADJUSTMENTS | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Abbrev Class Title | Class Code | Authorized Per 7A | Established | Filled | Vacant | 918 | 920 | Registry (PY) | Hires | Adjusted Vacancy | Percent Vacant |
| CHIEF PSYCHIATRIST, CORRECTIONAL AND REHABILITITATIVE SERVICES (SAFETY) | 9774 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| CHIEF PSYCHOLOGIST/CF | 9859 | 2.00 | 2.00 | 2.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | -1.00 | -50.00% |
| CLINICAL SOCIAL WORKER (HEALTH/CF)-SAFETY | 9872 | 19.60 | 20.00 | 12.00 | 8.00 | 0.00 | 0.00 | 1.72 | 0.00 | 5.88 | 30.00% |
| CORRECTIONAL HEALTH SERVICES ADMINSTRATOR II, CORRECTIONAL FACILITY | 4912 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| HEALTH PROGRAM SP I | 8338 | 3.00 | 3.00 | 3.00 | 0.00 | 0.00 | 0.24 | 0.00 | 0.00 | 0.24 | 7.94% |
| OFFICE SERVICES SUP II (G) | 1150 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| OFFICE TECH (T) | 1139 | 18.50 | 20.00 | 18.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 2.70% |
| PSYCH-CLINIC CF | 9283 | 63.90 | 47.50 | 37.00 | 10.50 | 0.00 | 0.48 | 1.34 | 0.00 | 26.04 | 40.76% |
| REC THERAPIST CF | 9286 | 15.00 | 14.50 | 5.00 | 9.50 | 0.00 | 0.00 | 4.75 | 0.00 | 5.25 | 35.00% |
| SR PSYCH CF/SP | 9287 | 5.00 | 5.00 | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| SR PSYCH CF/SUP | 9288 | 5.50 | 6.00 | 5.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 9.09% |
| STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES(SAFETY) | 9758 | 10.50 | 10.50 | 2.50 | 8.00 | 0.00 | 0.00 | 4.66 | 0.00 | 3.34 | 31.81% |
| SUP PSYCH S WK I CF | 9291 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| | Totals | 147.00 | 132.50 | 93.50 | 39.00 | 1.00 | 0.72 | 12.47 | 0.00 | 40.75 | 27.72% |
| CRC | | FY 16/17 | SCO DATA | | | ADJUSTMENTS | | | | | |

Wednesday, April 05, 2017
Source: FY 16/17 7A; SCO Reports; MIRS reports; Hire Tracking System

Page 10 of 30

11:32:56 AM
Report Generated By:
Program Supp

Correctional Health Care Services
Mental Health Institution Vacancies

**SUMMARY BY INSTITUTION BY CLASSIFICATION**
**As Of February - 2017**

| HDSP | | FY 16/17 | SCO DATA | | | ADJUSTMENTS | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Abbrev Class Title** | **Class Code** | **Authorized Per 7A** | **Established** | **Filled** | **Vacant** | **918** | **920** | **Registry (PY)** | **Hires** | **Adjusted Vacancy** | **Percent Vacant** |
| CHIEF PSYCHOLOGIST/CF | 9859 | 2.00 | 2.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 | 100.00% |
| CLINICAL SOCIAL WORKER (HEALTH/CF)-SAFETY | 9872 | 9.00 | 10.00 | 9.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| CORRECTIONAL HEALTH SERVICES ADMINSTRATOR II, CORRECTIONAL FACILITY | 4912 | 1.00 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| HEALTH PROGRAM SP I | 8338 | 2.00 | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| OFFICE TECH (T) | 1139 | 8.00 | 8.00 | 7.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 12.50% |
| PSYCH-CLINIC CF | 9283 | 15.00 | 13.00 | 8.50 | 4.50 | 0.00 | 0.00 | 0.00 | 0.00 | 6.50 | 43.33% |
| REC THERAPIST CF | 9286 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| SR PSYCH CF/SP | 9287 | 2.00 | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| SR PSYCH CF/SUP | 9288 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES(SAFETY) | 9758 | 2.00 | 2.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 | 100.00% |
| SUP PSYCH S WK I CF | 9291 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| | Totals | 44.00 | 43.00 | 31.50 | 11.50 | 0.00 | 0.00 | 0.00 | 0.00 | 12.50 | 28.41% |
| **ISP** | | **FY 16/17** | **SCO DATA** | | | **ADJUSTMENTS** | | | | | |
| **Abbrev Class Title** | **Class Code** | **Authorized Per 7A** | **Established** | **Filled** | **Vacant** | **918** | **920** | **Registry (PY)** | **Hires** | **Adjusted Vacancy** | **Percent Vacant** |
| CHIEF PSYCHOLOGIST/CF | 9859 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| CLINICAL SOCIAL WORKER (HEALTH/CF)-SAFETY | 9872 | 1.00 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| HEALTH PROGRAM SP I | 8338 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| OFFICE TECH (T) | 1139 | 3.00 | 3.00 | 2.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 33.33% |
| PSYCH-CLINIC CF | 9283 | 4.00 | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | -0.12 | -3.00% |
| STAFF PSYCHIATRIST, CORRECTIONAL AND REHABILITATIVE SERVICES(SAFETY) | 9758 | 1.00 | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.59 | 0.00 | 0.41 | 41.00% |
| | Totals | 11.00 | 11.00 | 8.00 | 3.00 | 0.00 | 0.00 | 0.71 | 0.00 | 2.29 | 20.82% |

Wednesday, April 05, 2017
Source: FY 16/17 7A; SCO Reports; MIRS reports; Hire Tracking System

Page 15 of 30

11:32:56 AM
Report Generated By:
Program Supp

Exhibit W

1   PRISON LAW OFFICE
    DONALD SPECTER – 83925
2   CORENE KENDRICK – 226642
    RITA K. LOMIO – 254501
3   MARGOT MENDELSON – 268583
    1917 Fifth Street
4   Berkeley, California  94710
    Telephone:  (510) 280-2621
5
    ROSEN BIEN GALVAN & GRUNFELD LLP
6   MICHAEL W. BIEN – 096891
    GAY C. GRUNFELD – 121944
7   PENNY GODBOLD – 226925
    50 Fremont Street, 19th Floor
8   San Francisco, California  94105-2235
    Telephone:  (415) 433-6830
9
    DISABILITY RIGHTS EDUCATION &
10  DEFENSE FUND, INC.
    LINDA KILB – 136101
11  2212 Sixth Street
    Berkeley, California  94710
12  Telephone:  (510) 644-2555
13  Attorneys for Plaintiffs

KATHLEEN KENEALY
Acting Attorney General of the State of
California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON – 207095
Supervising Deputy Attorney General
SHARON A. GARSKE – 215167
Deputy Attorney General
BRYAN KAO – 240242
Deputy Attorney General
JANET CHEN – 283233
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:  (415) 703-5836

Attorneys for Defendants

14

15                    UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17                          OAKLAND DIVISION

18

19   JOHN ARMSTRONG, et al.,                Case No. C94 2307 CW

20          Plaintiffs,                     **JOINT CASE STATUS STATEMENT**

21   v.

22   EDMUND G. BROWN JR. et al.,

23          Defendants.

24

25          The parties submit this Joint Case Status Statement pursuant to the Stipulation and

26   Order entered March 28, 2011 (Docket No. 1868), which provides that "[t]he parties will file

27   periodic joint statements describing the status of the litigation" every other month, beginning

28   on May 16, 2011.

[3084379-1]

# CURRENT ISSUES

### A.    Accommodating Deaf Prisoners with Videophones

Defendants are required to provide reasonable accommodations, including the use of auxiliary aids, to deaf prisoners to ensure equally effective communication with the public. ARP § II.E.1. As stated in prior case management statements, many other state and county correctional systems have installed videophones. *See* Doc. 2655 at 2, n.1. As detailed exhaustively in past case management statements, Plaintiffs have attempted to work collaboratively and in good faith with Defendants for close to six years to have videophones installed to accommodate deaf prisoners. Defendants are committed to installing videophones at all institutions that house hearing-impaired class members and working on this matter with Plaintiffs' counsel.

Defendants reported at the December 19, 2016 meet-and-confer that their contractor is in the process of installing eleven videophones at the Substance Abuse and Treatment Facility (SATF), including replacing the one existing videophone on A yard. Defendants had reported that the installation would be complete by December 30, 2016. The first eight videophones were installed by December 30, 2016. The remaining three videophones were installed the afternoon of January 11, 2017.

However, the deaf class members at SATF have not yet been able to use the new videophones, due to delays caused by negotiations between CDCR and the labor union. Defendants reported to Plaintiffs on January 12 that staff at SATF completed training on how to use the videophones, and that they anticipated that deaf prisoners would be able to start using the videophones within days, following completion of labor negotiations. As of the date of this filing, Defendants were unable to provide Plaintiffs with a date certain that these SATF labor negotiations will be concluded, or by which all questions and objections by labor would be addressed. Thus, Plaintiffs are concerned that deaf class members on the yards that have videophones will not have access to them for the foreseeable future.

Furthermore, Defendants also reported to Plaintiffs on January 12 that they would start the process of statewide labor negotiations to cover the other institutions where they will install

1  videophones.  On January 12, 2017, Defendants sent Plaintiffs' counsel the proposed

2  "Implementation of Video Relay Service Units" memorandum that announces the

3  implementation of Video Relay Service Units at the institutions for their review and comment.

4  The memorandum identifies the institutions where the videophones will be installed and the

5  process and procedures for inmates to use the videophones.

6       Defendants' contractor is also installing videophones at additional institutions, including

7  all of the facilities that currently house deaf prisoners, on the following schedule:

8       March 2017
     California Correctional Women's Facility (CCWF) - 7 Video Relay Systems ("VRS")
9       RJ Donovan State Prison (RJD) – 9 VRS
     California Institution for Men (CIM) – 5 VRS
10

11       April 2017
     California Medical Facility (CMF) - 6 VRS
     California Health Care Facility (CHCF) – 10 VRS
12       CSP Los Angeles County (LAC) -  10 VRS

13       May 2017
     North Kern State Prison (NKSP) – 5 VRS
14       CSP Corcoran (COR) – 7 VRS
     Deuel Vocational Institution (DVI) – 3 VRS
15

16       June 2017
     San Quentin State Prison (SQ) – 5 VRS
17       California State Prison, Sacramento (SAC) – 2 VRS

18       Defendants will continue to work to implement the installation of the videophones

19  pursuant to the above schedule.  Defendants' vendor is scheduled to install 69 additional

20  videophones at the 11 above identified institutions.  Defendants are conducting weekly internal

21  meetings regarding the status of the installation schedule and will regularly update Plaintiffs'

22  counsel on the installation progress.  However, if additional delays continue to arise, Plaintiffs

23  reserve their right to move the Court for its assistance and will ask the Court to order

24  Defendants to provide this accommodation without delay.  Defendants do not believe court

25  intervention is necessary because the parties are engaged in a collaborative effort to address the

26  issues, are actively addressing the labor items with the union, and their vendor is continuing to

27  install the videophone equipment.

   ///

28

### B.   Allegations of Abuse and Violence Against Prisoners

Over the past two years, Plaintiffs have asserted allegations of abuse and violations of the rights of prisoners with disabilities at both High Desert State Prison (High Desert, or HDSP) and the Central California Women's Facility (CCWF).  Plaintiffs issued multiple reports regarding both prisons outlining violations that class members allege are occurring. Plaintiffs requested Defendants take concrete steps to remedy any confirmed violations and change the culture at both prisons.  Plaintiffs allege that many of the allegations of abuse, violence, and retaliation documented in Plaintiffs' reports are directed at class members are evidence of a culture that discourages prisoners from asking for help, which discriminates against people with disabilities.  The parties are collaboratively working together to address the *Armstrong* and non-*Armstrong* related issues at these institutions.

Defendants have implemented several changes at High Desert, including a change to key leadership positions at the institution, as well as staff training and changes to local policies. With respect to Plaintiffs' High Desert physical plant allegations, Defendants have made improvements to provide greater access for prisoners with disabilities, with additional work being prioritized through the Master Plan process[1].  The court expert is monitoring progress in these fields at High Desert.  CDCR has increased the frequency of peer reviews at High Desert, including a baseline review conducted in December 2015, a follow-up review conducted in January 2016, and quarterly reviews thereafter scheduled for April 2016, July 2016, and October 2016.  In addition, CDCR's former Director of the Division of Juvenile Justice has also conducted at least one assessment to make recommendations addressing the "culture" allegations raised by Plaintiffs' counsel.  CDCR also is piloting surveillance cameras on "B" facilities part of a feasibility model study for both High Desert and the state.  The parties continue to work together to identify the necessary changes at High Desert to remedy alleged violations.

---

[1] For a detailed description of the policy and personnel changes put into place at High Desert by CDCR, see Joint Status Statement, Doc. 2655 at 8-9.

1     With regard to CCWF, the parties jointly conducted interviews of approximately 150

2 randomly selected inmates at CCWF on June 20-29, 2016, in an effort to identify systemic

3 problems and any staff who may be violating prisoners' rights.  Plaintiffs' counsel visited the

4 institution again on October 20, 2016 to interview prisoners and found that many of the

5 systemic problems of abuse and violence still exist.  In these interviews, Plaintiffs' counsel

6 focused on problems and incidents that the prisoners reported had occurred very recently,

7 subsequent to management staff and policy changes.[2]  Plaintiffs' counsel observed that the

8 majority of prisoners reported widespread violence and retaliation was still occurring against

9 those who spoke out or sought assistance.  Further, the officers Plaintiffs believe to be

10 especially problematic and abusive as identified after the May and June interviews, were still

11 working in the housing units.  Plaintiffs' counsel provided CDCR a report summarizing the

12 findings of the October interviews on December 8, 2016.

13     Defendants made changes in key Custody and Healthcare leadership positions at the

14 Central California Women's Facility in August 2016.  Defendants ordered an audit of the

15 inmate grievance process, including staff complaints, and as a result, numerous revisions were

16 made to the local Department Operations Manual Supplement to correct areas with deficiencies

17 and ensure integrity of the process.  Defendants also revised the local operational procedure

18 relating to the Inmate Disability Assistance Program, enhancing training for inmate workers

19 and staff as well as creating additional inmate positions to ensure adequate assistance is

20 available to class members.  Defendants have assembled a team of supervisory staff from other

21 institutions to conduct allegation inquiries for claims of staff misconduct brought forward

22 during Plaintiff tours and the subsequent interviews; all sustained allegations of staff

23 misconduct will be addressed through the Employee Discipline process.  Defendants have

24 contracted with experts in the field of Gender Responsive Strategies to identify short comings

25 and recommend improvements to operational procedures and staff training.

26

27     [2] For a detailed description of the policy and personnel changes put into place at CCWF
by CDCR, see Joint Status Statement, Doc. 2655 at 9-11.

28

1      For over three years, Plaintiffs' counsel has raised concerns in tour reports for Salinas

2 Valley State Prison (SVSP) about their observations of problematic staff attitudes toward

3 prisoners with disabilities and disregard of the *Armstrong* Remedial Plan among staff, which

4 Plaintiffs' counsel believe have resulted in a failure to accommodate prisoners with disabilities,

5 and a culture of retaliation. Plaintiffs' counsel's most recent tour of SVSP, in late August

6 2016, reported serious and widespread allegations of staff misconduct throughout the

7 institution, including allegations of retaliation against prisoners for communicating with

8 Plaintiffs' counsel, the opening and reading of legal mail between class members and

9 Plaintiffs' counsel after the monitoring tour,[3] physical and verbal harassment of *Armstrong*

10 class members, and reports of a widespread refusal to provide class members with reasonable

11 accommodations for their disabilities. Plaintiffs' counsel provided Defendants with a detailed

12 SVSP tour report on December 27, 2016, that documents Plaintiffs' counsel's observations of a

13 culture of violence, intimidation, and harassment, perpetuated by some custody officers who

14 fail to intervene in fights, actively harass and threaten prisoners, and operate with impunity.

15 Plaintiffs' counsel has proposed that the parties and the Court's expert conduct joint interviews

16 at SVSP in order to further inquire into these allegations and determine appropriate corrective

17 actions if appropriate. Defendants are reviewing the allegations detailed in Plaintiffs'

18 December 27, 2016 report and they are taking affirmative steps towards addressing confirmed

19 violations. The parties will continue to work collaboratively on improving conditions at these

20 institutions.

21 ///

22

---

23    [3] *See* CDCR Department of Operations Manual Sec. 54010.12.1 (providing that inmates may correspond confidentially with attorneys and legal services organizations, specifically

24 mentioning the Prison Law Office by name). "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on*

25 *other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Legal mail systems are critical to a prisoner's constitutional rights to free speech, to legal counsel, and access to the courts.

26 *Nordstrom v. Ryan*, 762 F.3d 903, 909 (9th Cir. 2014). Interference with prisoners' communications with attorneys also violates the lawyers' First Amendment rights, as these are

27 communications in which "the interests of both parties are inextricably meshed." *Procunier*, 416 U.S. at 408-09.

28

**C.      Parole Planning and Working With Class Members Preparing for Release**

*Plaintiffs' Statement*

Plaintiffs have asserted that Defendants violate the ADA and the *Armstrong* Remedial Plans by excluding prisoners who use wheelchairs from CDCR-funded community placements. See Doc. 2655 at 11-13. Plaintiffs also assert that by failing to provide paroling prisoners with disabilities timely assistance in obtaining Social Security disability benefits and by failing to provide other transition to parole services, "CDCR is operating its services, programs and activities in a manner that inevitably channels person with disabilities into repeated institutional confinement with no realistic opportunity to establish independent living in the community, in violation of the ADA and of the principles set forth in *Olmstead L.C. ex. Rel. Zimring*, 527 U.S. 581 (1999)." *Id.* at 12.

In an October 10, 2016 letter, Plaintiffs requested discovery relating to this issue, including a list of all community programs that house parolees under contract with CDCR along with information about which ones are wheelchair accessible. Plaintiffs also requested a copy of the contract between CDCR and the University of California, San Diego (UCSD) which provides the social workers who are responsible with assisting prisoners prior to release in applying for Social Security disability benefits. Plaintiffs have also sent Defendants correspondence advocating for additional information about and assistance for approximately 7 individual class members nearing parole who had not had their social security applications started in a timely fashion, many of whom were concerned about being homeless on parole as a result.

The parties discussed this issue at length during the December 2016 meet-and-confer, as Plaintiffs are concerned that the CDCR-UCSD contract does not specify the number of case workers assigned to each institution, and at some facilities these workers report high caseloads that do not allow them to work with all class members. Furthermore, Defendants were unable to provide a report detailing which community housing programs funded by CDCR are wheelchair accessible. The parties agreed to work together in a smaller group to address the concerns, and seek the assistance of Mr. Swanson as needed.

1    *Defendants' Statement*

2        Defendants offer pre-parole planning services to all prisoners prior to release from

3 prison, including assistance with medical benefits and at times, assistance with housing.

4 Defendants contract with third-party private entities to provide community housing for

5 parolees with a history of substance abuse, and these third-party entities are contracted to

6 provide housing and programming in accordance with the ADA and the state and federal laws.

7 Defendants are gathering information necessary to respond to Plaintiffs' October 10, 2016

8 letter. Defendants will continue to work with Plaintiffs' counsel and Mr. Swanson to address

9 these concerns. Additionally, Defendants have been actively working with the seven class

10 members identified by Plaintiffs' counsel to address their individualized needs.

11      **D.  Accountability**

12        In January 2016, Plaintiffs outlined their concerns of ongoing problems with

13 Defendants' accountability process, including the failure to: 1) detect patterns of non-

14 compliance; 2) identify systemic failures occurring across multiple prisons; 3) rectify problems

15 that are repeatedly reported at some prisons; and 4) deter violations by ensuring consequences

16 for staff members who are found to be in violation. In response to Plaintiffs' concerns,

17 Defendants developed and presented to Plaintiffs in March 2016, a five-step plan to address

18 these concerns and improve operations related to staff accountability. The plan includes: 1)

19 standardization of the inquiry process; 2) automation of the tracking of data and logs; 3)

20 enhanced focus on the quality of inquiries; 4) a Non-Compliance Review Committee for

21 quality control; and 5) the inclusion of headquarters level accountability to ensure that

22 someone is held responsible when an institution fails to address serious and repeatedly reported

23 problems. Defendants have circulated memoranda and conducted training regarding the new

24 inquiry and reporting process. Defendants conducted the first Review Committee meeting in

25 September 2016, to review cases on statewide noncompliance logs. Defendants continue to

26 hold these meetings at headquarters. Defendants began work with in an information

27 technology contractor in October 2016, to create an automated system to track and log the

28

1  accountability process. Defendants anticipate rolling out the new system in the next few

2  months.

3  　　　　Plaintiffs remain concerned that Defendants' plan does not go far enough in requiring

4  staff to go beyond the individual violations that are recorded on the logs and that are audited by

5  the Non-Compliance Review Committee, to determine whether individual violations are

6  indicative of a potentially larger systemic problem.  The parties continue to meet and confer

7  with the assistance of Mr. Swanson to develop a sustainable and meaningful accountability

8  system that identifies problematic institutions and staff, and that violations of the ADA and

9  *Armstrong* Remedial Plan are remedied swiftly.  The next meeting is scheduled for January 19,

10  2017.

11  　　　　**E.　　Training of Staff on the ADA, ARP, and Disabilities**

12  　　　　Plaintiffs believe that inadequate training of staff on ADA issues is a contributing factor

13  to the cultural problems uncovered at multiple institutions, as well as the failure to provide

14  accommodations that has been documented systematically in tour reports of institutions from

15  across the state.  Furthermore, during monitoring tours, Plaintiffs' counsel have discovered that

16  there are problems with the database systems previously used to track which staff needed

17  training on specific modules, with the result that it is difficult to identify how many or which

18  staff need *Armstrong* training.

19  　　　　Defendants report that the information technology specialists are in the process of

20  updating database systems, so that information regarding which staff members have  received

21  training can be tracked and monitored easily.  Additionally, CDCR is drafted new training

22  modules, with the goal of revamping and overhauling the *Armstrong* training.  Plaintiffs are

23  hopeful that revisions to the training will encourage staff understanding of disabilities and

24  eliminate problems of culture and failure to provide accommodations that have been identified.

25  The parties will work together on changes to current training.  Defendants have agreed to

26  provide drafts of these modules to Plaintiffs and Mr. Swanson in early 2017.

27  ///

28  ///

### F.   Joint Monitoring Audit Tool

The parties continue to work together on drafting a joint audit tool for measuring compliance in this case.  Five trial implementations of five draft sections of the tool have been conducted at California Medical Facility, Salinas Valley State Prison, California State Prison Los Angeles, California Health Care Facility, and Mule Creek State Prison.  Additional trial implementations will be scheduled during 2017 to test revisions to the audit tool and new tool sections.  The parties are meeting on January 18, 2017, with Mr. Swanson to discuss the core components of the case – "big picture" items – that should and should not be included in the audit tool.  The parties will continue to meet in early 2017 to revise the tool as needed.  The parties continue to work collaboratively on identifying areas where revised or additional policies are needed from CDCR in order to adequately audit compliance.  Once the tool and trial implementations are complete and joint monitoring begins, Defendants believe that Plaintiffs' individual monitoring should end.  Plaintiffs disagree that their individual monitoring should end, but will continue to work in good faith towards completion of an adequate joint monitoring tool.

### G.   Alleged Discrimination in Program Assignments

Through letters and monitoring tour reports, Plaintiffs allege that prisoners with disabilities impacting placement are denied equal access to program assignments.  Plaintiffs' counsel also reported, based on class member allegations, that prisoners with disabilities impacting placement do not receive equal access to the most desirable program assignments, including paid program assignments.  Defendants assert that inmates are not legally entitled to paid program assignments.  Plaintiffs requested, and Defendants produced, data showing the numbers of prisoners with program assignments at each prison.  Plaintiffs' counsel notified Defendants in early May 2016 that their analysis of CDCR's data shows that prisoners with disabilities impacting placement are not receiving equal access to program assignments when compared to prisoners without disabilities.  Plaintiffs are also concerned that in addition to a disparity in receiving assignments, there is also a disparity in paid positions received by people with disabilities impacting placement.

1   Defendants disagree with these allegations and have provided further data to support

2   their position.  Defendants maintain that any disparity in assignment to positions is not

3   necessarily attributable to prisoners' disability status, and is related to legitimate operational

4   considerations.  After multiple meetings the parties agreed to enlist the help of Mr. Swanson to

5   resolve the dispute.  The parties agreed to produce letter briefs to Mr. Swanson on January 25,

6   2017.  The parties will meet on February 6, 2017, with Mr. Swanson in an effort to resolve this

7   issue.

8   **H.    Accommodations for Prisoners with Learning Disabilities**

9   In late March 2016, Plaintiffs' counsel notified Defendants that given Plaintiffs'

10   research on the prevalence of learning disabilities among prisoners generally, Defendants were

11   not properly identifying those inmates that had a verified learning disability noted in their file.

12   Further, Plaintiffs' counsel alleged that prisoners with verified learning disabilities were not

13   receiving required accommodations.  Plaintiffs further believe that prisoners with learning

14   disabilities are serving longer sentences because they are unable to reach educational and

15   vocational "milestones" that are necessary to earn credits to reduce their sentence, or that the

16   Board of Parole Hearings want achieved before granting parole.  Defendants contend that the

17   Board of Parole Hearings sometimes recommends inmates participate in education and

18   vocational programming to assist the inmate to succeed when they parole, but does not make

19   this a requirement for parole.  Plaintiffs believe that some Career Technical Educational and

20   Prison Industries Authority training programs have blanket exclusions for people who fall

21   below certain reading levels, without any exceptions or accommodations for prisoners with

22   learning disabilities.

23   The parties met on October 6, 2016 to discuss CDCR's plan to track and accommodate

24   prisoners previously diagnosed with a learning disability and those claiming a learning

25   disability, to ensure that required accommodations are identified and provided, and to provide

26   class members with access to programs with reading level exclusions.  The parties held a

27   follow up telephone call in early November 2016 and met again on January 5, 2017 to continue

28   working collaboratively on these issues.

1   Defendants have agreed to make changes through the Office of Correctional Education

2   to improve the process for requesting school records and verifying people who allege a

3   learning disability.  At the January 5, 2017 meeting, Office of Correctional Education reported

4   that they have revised the school transcript request form to include a special request for

5   Individualized Education Plan and Special Education records.  The Office of Correctional

6   Education also presented a draft form, which will be available to institutional staff, to

7   document verified and non-verified learning disabilities, and requested accommodations

8   related to the learning disability.  Additionally, Defendants are in the process of improving the

9   1824 process for people who allege learning disabilities.  Defendants are committed to tracking

10   the class members who require accommodations, regardless of whether they have a verified

11   learning disability.  Finally, Defendants agreed to address potential barriers to program access.

12   Defendants provided Plaintiffs with a copy of a draft memorandum from the Office of

13   Correctional Education on learning disabilities setting forth a new approach to many of these

14   issues.  Plaintiffs are in the process of reviewing the memo and will provide Defendants with

15   written comments on the new memo in the near future.  The parties continue to work together

16   on these issues.

17   **I.    Video Remote Interpreting**

18   The *Plata* Receiver's office has installed video remote interpreting (VRI) equipment in

19   all clinics in prisons that house deaf prisoners, and health care staff were trained on its use and

20   the process for scheduling a sign language interpreter (SLI) from a different prison to provide

21   interpretation services via the VRI equipment.  According to monthly audit reports provided by

22   the Receiver's office, compliance rates are improving at all prisons, with the exception of

23   California Medical Facility (CMF).  The Receiver's office will continue to share the results of

24   their internal audits with the parties.

25   CDCR is in the process of implementing VRI technology in educational, vocational, and

26   substance abuse programing at prisons that house deaf class members. CDCR has signed a

27   contract for VRI interpretation services, and equipment has been installed at SATF, RJD, CIM,

28   and CMF.  Staff members and teachers at the four institutions were trained on how to use the

1   equipment.  The equipment is currently being utilized at these institutions.  Counsel for

2   Plaintiffs have expressed concern about the failure to install the interpreting equipment at the

3   other prisons housing deaf class members, especially Central California Women's Facility, as

4   the deaf women at that institution reported to counsel during the October 2016 monitoring tour

5   that they did not always have interpreters at evening substance abuse and self-help programs.

6   Defendants reported that they will evaluate Plaintiffs' counsel's recommendation to install

7   interpreting equipment at CCWF, and noted that North Kern State Prison, which houses deaf

8   prisoners, is a reception center that does not provide programs and education.  Defendants will

9   update the parties regarding installing interpreting equipment at Central California Women's

10  Facility and will continue to provide class members with accommodations to allow access to

11  these programs.

12          **J.      ADA Workers**

13          CDCR uses ADA workers to provide reasonable accommodations to prisoners with

14  disabilities.  ADA workers perform services including pushing prisoners in wheelchairs to

15  medical appointments or helping prisoners with visual impairments to read or write.  Plaintiffs

16  contend that there are problems with the ADA worker program, including the training and

17  supervision provided to ADA workers, the number of workers, and the pay scale for ADA

18  workers.  The parties have reached agreement regarding revisions to CDCR's ADA worker

19  program, governing memoranda, and training requirements.  CDCR issued a new ADA worker

20  memo to the institutions on December 12, 2016, but the portions of the memorandum relating

21  to training and supervision of the workers by custody officers was postponed pending

22  additional labor negotiations between CDCR and California Correctional Peace Officers

23  Association.  In the interim, ADA Associate Wardens are training and supervising ADA

24  workers pending resolution of the labor issue.

25          Plaintiffs also have raised the issue of CDCR not having ADA Worker programs in

26  place at the Reception Centers across the state, and the parties will continue to discuss this

27  matter to identify a way to accommodate prisoners with disabilities at the Reception Centers.

28

1   Plaintiffs will continue to monitor if the ADA worker program adequately serves class

2   members' needs at institutions across the state.

3       **K.**    **Medically Unassigned Prisoners**

4       The parties agreed to amend California Code of Regulations, Title 15 to allow medically

5   unassigned prisoners receive an annual four-point reduction in classification points if they are

6   totally medically disabled and incapable of performing an assignment.  The Title 15 revisions

7   are part of a larger roll-out of regulatory changes that should be final in February 2017.

8       **L.**    **ADA Structural Barriers and Master Planning Process**

9       Construction is well underway at several of the designated institutions.  Former Class

10   Action Management Unit Director Mike Knowles is overseeing the process, confirming

11   agreed-upon changes, and reporting on construction progress and anticipated timeframes in

12   monthly reports produced to Plaintiffs.

13       **M.**    **Parolees and Out to Court Prisoners with Disabilities on Parole and in**

14                  **County Jails**

15       Plaintiffs have notified Defendants regarding their concerns about the provision of sign

16   language interpretation services to deaf parolees, following a comprehensive review by

17   Plaintiffs' counsel of parole field files.  Plaintiffs allege that these parolee files show that deaf

18   parolees are repeatedly denied access to programs and services and are not able to effectively

19   communicate with their parole agents during due process encounters because of failures to

20   arrange for sign language interpretation services and inadequate contracts with third party sign

21   language providers.

22       To assist parole agents in providing accommodations to parolees requiring sign

23   language, Defendants have committed to installing webcams for video remote interpreter

24   services in all 113 parole units.  Two-thirds of the webcams have been delivered, but training

25   and labor issues will delay implementation until at least the second quarter of 2017.  Plaintiffs

26   do not consider webcams a sufficient solution.  Defendants agreed to improve their sign

27   language contracts by centralizing contracts on a statewide level and recently executed new

28   contracts for 2017 through 2018.  Defendants provided Plaintiffs' counsel with a copy of the

1   completed contracts on January 9, 2017.  Plaintiffs have been monitoring the inadequate

2   contracts for years.  Plaintiffs' counsel contends that only significant changes to the statewide

3   sign language contract will remedy the repeated violations of ADA rights.

4          Defendants created a videotape of the *Armstrong* training for parole agents.  Plaintiffs

5   provided their comments after receiving the video.  After internal review and receiving

6   Plaintiffs' comments, Defendants are revising the training video.  Defendants provided annual

7   training to its Division of Adult Parole Operations agents in November and December 2016.

8   Plaintiffs' counsel attended one of the trainings and provided comments to Defendants.

9          In response to Plaintiffs' concern that out-to-court prisoners in county jails are not

10  provided with the postcards to receive the forms (2275-CJ) to request accommodations,

11  Defendants agreed to modify their practice.  Since October 1, 2015, notice agents (who already

12  met with parolees detained in county jails on a parole hold) are meeting with out-to-court

13  inmate (not parolee) class members within three business days of their arrival at the county jail,

14  providing those class members with a 2275-CJ form, and offering assistance in completing the

15  form if necessary.  Defendants provided logs from October 2015 through September 2016 to

16  Plaintiffs demonstrating that the new process was successful.  Defendants plan to amend their

17  Out-to-Court Memorandum to reflect that the postcard method is no longer in effect.

18         In recent correspondence and in a forthcoming tour report, Plaintiffs' counsel have

19  raised their concerns about agents taking uncounseled admissions from parolees with

20  developmental disabilities who are facing parole revocation.  *See* Attachment A, Letters from

21  Jenny Yelin to Patrick Jones dated December 9, 2016 and December 14, 2016, as well as a

22  forthcoming tour report on the Sacramento Jail.  Plaintiffs' counsel will continue to investigate

23  and monitor whether effective communication is being provided in due-process settings,

24  including parole revocation.  Defendants recently responded to the allegations in the December

25  9, 2016 letter, and will respond to the December 14, 2016 letter and Sacramento Jail tour

26  report.  Defendants will continue to work with Plaintiffs' counsel to resolve these issues.

27  ///

28  ///

**N.   Investigation of Los Angeles and San Diego County Jails**

Letters from Plaintiffs' counsel dating back to 2014 allege a pattern at the Los Angeles and San Diego County Jails of denying disability accommodations to class members. Most recently, in a July 25, 2016 letter, Plaintiffs detail allegations from multiple class members at these jails that they are without their required mobility accommodations. Plaintiffs detail examples of prisoners who were identified by CDCR as requiring accommodations and yet who are reporting they do not have canes, walkers, wheelchairs or other required accommodations in the jails. Plaintiffs allege that the failure of these jails to ensure that class members have their required disability accommodations evidences a problematic pattern at these jails. Plaintiffs, in their July 25th letter, and during the August 18, 2016 meet-and-confer, requested that Defendants investigate. Pursuant to the County Jail Plan, "[i]f a pattern [of denials of disability accommodations] is discovered, the Regional ADA Parole Administrator must write to the County's legal counsel (or designee) within five days of discovery and provide the evidence alleged." In addition, "[t]he Regional ADA Parole Administrator shall assign one of their Parole Agent Supervisors to investigate the alleged deficiencies at the specific county jail." *See* June 21, 2012, County Jail Plan at 7.

With respect to Los Angeles County Jail, Defendants continue to maintain that without that additional information from the jail, and because the county failed to respond to a September 15, 2016 letter from Defendants, they are without sufficient information to determine the existence of a pattern of denial. Because Defendants have not discovered a pattern of denial, Defendants maintain that they are not required under the Court's order to conduct an investigation. With respect to San Diego County Jail, Defendants maintain that a pattern of denials does not exist because information provided by the county, which was also provided to Plaintiffs' counsel in the form responses to tour reports, shows that county medical staff determined the class members did not to need the requested accommodations.

While Plaintiffs believe a pattern of denials of disability accommodations exists in the two jails, Plaintiffs are conducting further discovery, including deposing Los Angeles County

1    staff members. Defendants will continue to work with Plaintiffs' counsel to resolve these

2    issues.

3

4    January 13, 2017                         Respectfully submitted,

5                                        PRISON LAW OFFICE

6

7                                         /s/
                                     By:   Corene Kendrick

8                                             Attorneys for Plaintiffs

9    January 13, 2017                         KATHLEEN KENEALY

10                                       Acting Attorney General of the State of
                                      California

11

12                                        /s/
                                   By:   Sharon A. Garske

13                                          Deputy Attorney General
                                         Attorneys for Defendants

14

15        As required by Local Rule 5-1, I, Corene Kendrick, attest that I obtained concurrence in

16    the filing of this document from Sharon A. Garske and that I have maintained records to

17    support this concurrence.

18    January 13, 2017                         PRISON LAW OFFICE

19                                           /s/
                                   By:   Corene Kendrick

20                                             Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

Exhibit X

PRACTICE GUIDELINES FOR
# VIDEO-BASED ONLINE MENTAL HEALTH SERVICES

May 2013



American Telemedicine Association
Quality Healthcare Through Telecommunications Technology

## ACKNOWLEDGEMENTS

The American Telemedicine Association (ATA) wishes to express sincere appreciation to the ATA Telemental Health Practice Guidelines Work Group and the ATA Standards and Guidelines Committee for their invaluable contributions in the research, writing and development of the following guidelines.

(Alphabetical Order)

## Practice Guidelines Work Group

Chair:  Carolyn Turvey, PhD, Associate Professor, Department of Psychiatry, University of Iowa, ATA Telemental Health SIG Chair

## Work Group Members

Mirean Coleman, LICSW, CT, Clinical Social Worker, National Association of Social Workers
Oran Dennison, Senior Software Architect, Alaska Native Tribal Health Consortium
Kenneth Drude, PhD, Psychologist, Board Member, Ohio Board of Psychology
Mark Goldenson, CEO, Breakthrough
Phil Hirsch, PhD, Chief Clinical Officer, HealthLinkNow
Bob Jueneman, Chief Scientist, Spyrus, Inc.
Greg M. Kramer, JD, PhD, Clinical Psychologist, National Center for Telehealth and Technology |T2|
David D. Luxton, PhD, Research Psychologist, Program Manager Research, Outcomes and Investigations |ROI|, National Center for Telehealth and Technology |T2|
Marlene M. Maheu, PhD, TeleMental Health Institute, Inc.
Tania S. Malik, JD, Founder and President of COPE Today
Matt C. Mishkind, PhD, Research Psychologist, Program Lead, Telehealth Program |THP|, National Center for Telehealth and Technology |T2|
Terry Rabinowitz, MD, DDS,  Professor, Departments of Psychiatry and Family Medicine, University of Vermont College of Medicine, Director, Division of Consultation Psychiatry and Psychosomatic Medicine and Director of Telemedicine, Fletcher Allen Health Care
Lisa J. Roberts, PhD, VP Clinical Innovations, Sales and Business Development, Viterion TeleHealthcare
Thomas Sheeran, PhD, ME, Assistant Professor (Research), Rhode Island Hospital, The Warren Alpert Medical School of Brown University, Adjunct Assistant Professor, Institute of Geriatric Psychiatry, Weill Cornell Medical College
Jay H. Shore, MD, MPH, Associate Professor, Department of Psychiatry, School of Medicine, Community and Behavioral Health, Colorado School of Public Health Centers for American Indian and Alaska Native Health, University of Colorado Anschutz Medical Campus
Peter Shore, PsyD, Assistant Professor of Psychiatry, Oregon Health & Science University
Frank van Heeswyk, CTO & VP Technical Services, Ontario Telehealth Network
Brian Wregglesworth, Director of Product Development, Alaska Native Tribal Health Consortium
Peter Yellowlees, MBBS, MD, Professor of Psychiatry, UC Davis, Director of the Health, Informatics Graduate Program, UC Davis, Sacramento, CA
Murray L. Zucker, MD, Regional Medical Director, San Francisco, Optum

## Contributors

David Kaplan, PhD, Chief Professional Office, American Counseling Association
Joel Yager, MD, Chair, Steering Committee on Practice Guidelines, American Psychiatric Association

## ATA Standards and Guidelines Committee

Chair:  Elizabeth A. Krupinski, PhD, Professor & Vice Chair of Research, Department of Medical Imaging, University of Arizona

## Committee Members

Nina Antoniotti, RN, MBA, PhD, Director of Telehealth, Marshfield Clinic TeleHealth Network
David Brennan, MSBE, Director, Telehealth Initiatives, MedStar Health
Anne Burdick, MD, MPH, Associate Dean for Telemedicine and Clinical Outreach, Professor of Dermatology, Director, Leprosy Program, University of Miami Miller School of Medicine
Jerry Cavallerano, PhD, OD, Staff Optometrist, Assistant to the Director, Joslin Diabetes Center, Beetham Eye Institute
Cindy K. Leenknecht, MS, APRN-CS, CCRP, Telehealth Project Coordinator-Montana Pediatric Project, St. Vincent Healthcare/Partners in Health Telemedicine Network
Helen K. Li, MD, Adjunct Associate Professor, University of Texas Health Science Center
Lou Theurer, Grant Administrator, Burn Telemedicine Program, University of Utah Health Sciences Center
Jill M. Winters, PhD, RN, President and Dean, Columbia College of Nursing

## ATA Staff

Jordana Bernard, MBA, Senior Director Program Services
Gary Capistrant, MA, Senior Director Public Policy
Jonathan D. Linkous, CEO
Maureen McGrath, MA, Director Program Services

American Telemedicine Association

# PRACTICE GUIDELINES FOR VIDEO-BASED ONLINE MENTAL HEALTH SERVICES

Table of Contents

PREAMBLE ..................................................................................................... 5

SCOPE............................................................................................................. 6

INTRODUCTION ............................................................................................. 7

PRACTICE GUIDELINES FOR VIDEO-BASED ONLINE MENTAL
HEALTH SERVICES ...................................................................................... 8
    Clinical Guidelines ................................................................................. 8
    Technical Guidelines ........................................................................... 15
    Administrative Guidelines .................................................................... 18

APPENDIX: References ................................................................................ 20

## PREAMBLE

The American Telemedicine Association (ATA), with members from throughout the United States and throughout the world, is the principal organization bringing together telemedicine practitioners, healthcare institutions, vendors and others involved in providing remote healthcare using telecommunications.  ATA is a nonprofit organization that seeks to bring together diverse groups from traditional medicine, academia, technology and telecommunications companies, e-health, allied professional and nursing associations, medical societies, government and others to overcome barriers to the advancement of telemedicine through the professional, ethical and equitable improvement in healthcare delivery.

ATA has embarked on an effort to establish practice guidelines and technical standards for telemedicine to help advance the science and to assure the uniform quality of service to patients.  These guidelines, based on clinical and empirical experience, are developed by work groups that include experts from the field and other strategic stakeholders and designed to serve as both an operational reference and an educational tool to aid in providing appropriate care for patients.  The guidelines and standards generated by ATA undergo a thorough consensus and rigorous review, with final approval by the ATA Board of Directors.  Existing products are reviewed and updated periodically.

The practice of medicine is an integration of both the science and art of preventing, diagnosing, and treating diseases.  Accordingly, it should be recognized that compliance with these guidelines will not guarantee accurate diagnoses or successful outcomes with respect to the treatment of individual patients, and ATA disclaims any responsibility for such outcomes.  These guidelines are provided for informational and educational purposes only and do not set a legal standard of medical or other health care.  They are intended to assist practitioners in providing effective and safe medical care that is founded on current information, available resources, and patient needs.  The practice guidelines and technical standards recognize that safe and effective practices require specific training, skills, and techniques, as described in each document, and are not a substitute for the independent medical judgment, training, and skill of treating or consulting practitioners.

If circumstances warrant, a practitioner may responsibly pursue a course of action different from the guidelines when, in the reasonable judgment of the practitioner, such action is indicated by the condition of the patient, restrictions or limits on available resources, or advances in information or technology subsequent to publication of the guidelines.  Nonetheless, a practitioner who uses an approach that is significantly different from these guidelines is strongly advised to provide documentation, in the patient record, that is adequate to explain the approach pursued.

Likewise, the technical and administrative guidelines in this document do not purport to establish binding legal standards for carrying out telemedicine interactions.  Rather, they are result of the accumulated knowledge and expertise of the ATA work groups and intended to improve the technical quality and reliability of telemedicine encounters.  The technical aspects of and administrative procedures for specific telemedicine arrangements may vary depending on the individual circumstances, including location of the parties, resources, and nature of the interaction.

This practice guidelines document focuses on telemental health services delivered in real-time using internet-based videoconferencing technologies through personal computers and mobile devices.  These guidelines serve as a companion document to ATA's Practice Guidelines for Videoconferencing-based Telemental Health, a document adopted in 2009 that focuses on real-time videoconferencing-based telemental health services delivered using technologies other than the Internet.

Copyright American Telemedicine Association

## SCOPE

The scope of these guidelines covers the provision of mental health services provided by a licensed healthcare professional when using real-time videoconferencing services transmitted via the Internet.  Other certified professionals may take guidance from these guidelines, but the current version targets the practice of behavioral health by licensed healthcare professionals. The guidelines pertain to telemental health conducted between two parties, and do not address concerns related to multipoint videoconferencing.  These guidelines include telemental health services when the initiating, receiving, or both sites are using a personal computer with a webcam or a mobile communications device (e.g., "smart phone", laptop, or tablet) with two-way camera capability.  These guidelines do not address communications between professionals and clients or patients via texting, e-mail, chatting, social network sites, online "coaching" or other non-mental health services.

This document contains requirements, recommendations, or actions that are identified by text containing the keywords "shall," "should," or "may."  "Shall" indicates a required action whenever feasible and practical under local conditions.  These indications are found in bold throughout the document.  "Should" indicates an optimal recommended action that is particularly suitable, without mentioning or excluding others.  "May" indicates additional points that may be considered to further optimize the telemental healthcare process.

## INTRODUCTION

Telemental health is one of the most active telemedicine applications rendered in the United States. Telemental health is an intentionally broad term referring to the provision of mental health and substance abuse services from a distance. Mental health is particularly suited to the use of advanced communication technologies and the Internet for delivery of care. By using advanced communication technologies, mental health professionals are able to widen their reach to patients in a cost-effective manner, ameliorating the mal-distribution of specialty care.

Establishing guidelines for telemental health improves clinical outcomes and promotes informed and reasonable patient expectations. ATA has developed core standards for telemedicine operations that provide overarching guidance for clinical, technical and administrative standards (http://www.americantelemed.org/practice/standards/ata-standards-guidelines/core-standards-for-telemedicine-operations). (1) This document provides further guidance on the clinical, technical, administrative as well as ethical issues as related to electronic communication between professionals and patients using advances in internet-based videoconferencing technologies and the resulting treatment models. These guidelines also serve as a companion document to ATA's Practice Guidelines for Videoconferencing-based Telemental Health, a document that focuses on real-time, videoconferencing-based telemental health services delivered using methods other than the Internet (2,3) and applies to the groups and services described therein.

Other professional organizations in the US and abroad have published guidelines for the provision of mental healthcare utilizing the desktop and mobile internet-based communication technologies. (4-7) When guidelines, position statements, or standards from any professional organization or society exist, mental health professionals should also review these documents and, as appropriate, incorporate them into practice.

### Internet-based Telemental Health Models of Care Today

Today, mental health professionals are using inexpensive technologies available through the proliferation of personal computers, the Internet, mobile devices and videoconferencing software to provide mental health services. For example, many mental health professionals are using widely available, commercial software downloaded from the Internet to provide care directly to a patient's home or other non-institutional setting. Internet-based web sites can serve as a conduit or portal for mental health professionals and patients seeking treatment online. Mental health professionals can sign up with one or more web-based companies and provide a professional profile that can be viewed online by prospective patients. Patients find such sites by searching online or through word of mouth. In both of these models of care, telemental health services are delivered directly to the patient. Thus, methods to ensure patient safety and privacy as well as identity verification of both professionals and patients can be implemented.

In other scenarios, mental health services are outsourced to companies who contract with hospitals or other institutions in need of such resources. In turn, some companies also contract with outside professionals to provide telemental healthcare using technology maintained and provided by the company.

This is a rapidly growing and evolving field and the risks and benefits of telemental health services delivered using videoconferencing technologies are not widely discussed or addressed in formal training of mental health practitioners. Therefore, thoughtful elucidation of the key issues and the potential solutions are needed to better inform those who want to practice responsibly.

Copyright American Telemedicine Association

## CLINICAL GUIDELINES

### A. Professional and Patient Identity and Location

At the beginning of a video-based mental health treatment (i.e., not at every subsequent encounter unless circumstances warrant re-verification) with a patient, the following essential information shall be verified:

1. Provider and Patient Identity Verification

The name and credentials of the professional and the name of the patient shall be verified. For services with the patient at a remote healthcare institution, the verification of both professional and patient may occur at the host clinic. When providing professional services to a patient in a setting without an immediately available mental health professional, the telehealth provider shall provide the patient (or legal representative) with his or her qualifications, licensure information, and, when applicable, registration number and where the patient can verify this information.  Patients shall provide their full name. Professionals may ask patients to verify their identity more formally by showing a government issued photo ID on the video screen or by using a smart card.

2. Provider and Patient Location Documentation

The location(s) where the patient will be receiving services by videoconferencing shall be confirmed and documented by the provider.  In addition, the location of the provider may need to be documented, especially in cases where such documentation is needed for the appropriate payment of services.  However, it is not necessary for the mental health provider to reveal their specific location to the patient, especially if the provider is located at home at the time of the service.

Verification of provider and patient location is critical for four key reasons:

The professional shall comply with the relevant licensing laws in the jurisdiction where the provider is physically located when providing the care and where the patient is located when receiving care. Note, in the United States the jurisdictional licensure requirement is usually tied to where the patient is physically located when he or she is receiving the care, not where the patient lives. (8)

The emergency management protocol is entirely dependent upon where the patient receives services.  Once again, where the patient resides is only relevant if that is also where he or she is receiving care.

Mandatory reporting and related ethical requirements such as duty to notify are tied to the jurisdiction where the patient is receiving services.

In some cases, provider payment amounts are tied to where the provider and patient are located.

When patients are receiving telemental health services at an accredited health center, the emergency management and reporting protocols shall be coordinated with the remote health center in accordance with applicable jurisdictional law and licensing requirements.

In instances where the mental health professional is providing services to patients in settings without clinical staff immediately available and/or to patients that change locations over the course of treatment, they should discuss the importance of consistency in where the patient chooses to receive care as it is tied to emergency management.  Though patients who change locations may likely remain in the same state, they may change cities, which will impact emergency management protocols related to police intervention and location of local emergency rooms willing to evaluate potentially lethal psychiatric issues.

3. Contact Information Verification for Professional and Patient

The contact information for both provider and patient shall be verified.  This shall include gathering telephone and mail contact information for both the provider and patient and may also include contact information through electronic sources such as email.

4. Verification of Expectations Regarding Contact Between Sessions

Reasonable expectations about contact between sessions shall be discussed and verified with the patient.  At the start of the treatment, the patient and provider should discuss whether or not the provider will be available for phone or electronic contact between sessions and the conditions under which such contact is appropriate.  The provider should provide a specific time frame for expected response between session contacts.  This should also include a discussion of emergency management between sessions.

B.  Patient Appropriateness for Videoconferencing-based Telemental Health

To date, no studies have identified any patient subgroup that does not benefit from, or is harmed by, mental healthcare provided through remote videoconferencing.  Recent large randomized controlled trials demonstrate effectiveness of telemental health with many smaller trials also supporting this conclusion. (9-11)  Regarding specific subgroups, such as patients with psychotic or phobic disorders, one review by Sharp et al. (12), found no evidence for inferiority of videoconferencing telemental health for patients with psychosis.  Dongier et al. (13) compared in-person versus videoconferencing interviews in psychotic patients and concluded that even those with delusions pertaining to the TV, responded appropriately to videoconferencing and did not incorporate their experience into their delusional system.  Bouchard et al. (14) found videoconferencing treatment effective for agoraphobia and panic disorder.

Copyright American Telemedicine Association

Appropriateness of Videoconferencing in Settings where Professional Staff are not Immediately Available

Mental health professionals should consider the patients' expectations and level of comfort with home-based care to determine the appropriateness of using videoconferencing in this setting. (15)  Provision of telemental health services in professionally unsupervised settings requires that the patient take a more active and cooperative role in the treatment process than in in-person settings. (15,16) Determining whether a patient can handle such demands may be more dependent on the patient's organizational and cognitive capacities, than on diagnosis.

When the patient is located outside an institutional location, the patient (guardian or caretaker) is responsible for setting up the videoconferencing system at his or her site, maintaining the appropriate computer settings, and establishing a private space.  In addition, even with establishment of a community based emergency management protocol, such as that described in the Emergency Management section of this document, patient cooperation is critical for effective safety management in settings where a professional is not immediately available.

Determining patient appropriateness for videoconferencing-based telemental health services should, in addition to considering the patient's ability to potentially benefit from them, rely on the professional's assessment of the patient's ability to arrange an appropriate setting for receiving videoconferencing services and the patient's continued cooperativeness regarding managing safety issues.  Professionals should also consider such things as patient's cognitive capacity, history regarding cooperativeness with treatment professionals, current and past difficulties with substance abuse, and history of violence or self-injurious behavior.

Professionals shall consider geographic distance to the nearest emergency medical facility, efficacy of patient's support system, current medical status, and patient's general level of competence around technology when determining patient appropriateness for videoconferencing.

Professionals should evaluate the potential for risk factors or problems at the start of providing videoconferencing services in settings where a professional is not immediately available.  In addition, evaluation of appropriateness of videoconferencing care should continue throughout the treatment including monitoring of symptoms and patient cooperativeness in assuming the responsibilities inherent in remote care.   The consent process shall include discussion of conditions of participation around session management so that if a professional decides a patient can no longer be managed through distance technology, the patient is aware that services may be discontinued if no longer appropriate.

American Telemedicine Association | Practice Guidelines for Video-based Online Mental Health Services

C.  Informed Consent

A thorough informed consent at the start of services shall be performed.  The consent should be conducted with the patient in real–time.  Local, regional and national laws regarding verbal or written consent shall be followed.   If written consent is required, then electronic signatures, assuming these are allowed in the relevant jurisdiction, may be used.   The provider shall document the provision of consent in the medical record.

The consent should include all information contained in the consent process for in-person care including discussion of the structure and timing of services, record keeping, scheduling, privacy, potential risks, confidentiality, mandatory reporting, and billing.  In addition, the informed consent process should include information specific to the nature of videoconferencing as described below.  The information shall be provided in language that can be easily understood by the patient. This is particularly important when discussing technical issues like encryption or the potential for technical failure.

Key topics that shall be reviewed include: confidentiality and the limits to confidentiality in electronic communication; an agreed upon emergency plan, particularly for patients in settings without clinical staff immediately available; process by which patient information will be documented and stored; the potential for technical failure, procedures for coordination of care with other professionals; a protocol for contact between sessions; and conditions under which telemental health services may be terminated and a referral made to in-person care.

D.  Physical Environment

Both the professional and the patient's room/environment should aim to provide comparable professional specifications of a standard services room.  Efforts shall be made to ensure privacy so clinical discussion cannot be overheard by others outside of the room where the service is provided.  If other people are in either the patient or the professional's room, both the professional and patient shall be made aware of the other person and agree to their presence.  Seating and lighting should be tailored to allow maximum comfort to the participants.  Both professional and patient should maximize clarity and visibility of the person at the other end of the video services.  For example, patients receiving care in non-traditional settings should be informed of the importance of reducing light from windows or light emanating from behind them.   Both provider and patient cameras should be on a secure, stable platform to avoid wobbling and shaking during the videoconferencing session.  To the extent possible, the patient and provider cameras should be placed at the same elevation as the eyes with the face clearly visible to the other person.

Copyright American Telemedicine Association

E.  Communication and Collaboration with the Patient's Treatment Team

Professionals shall acknowledge that optimal clinical management of patients depends on coordination of care between a multidisciplinary treatment team.  This shall be discussed with all patients.  However, patients may have specific privacy concerns about release of information about mental health treatment even to other health professionals providing services to them and these concerns shall be respected.

For patients who agree to coordination of care, telemental health professionals should arrange for appropriate and regular private communication with other professionals involved in care for the patient.  Moreover, professionals conducting telemental health to patients in settings without clinical staff immediately available are encouraged to develop collaborative relationships with local community professionals, such as a patient's local primary care provider, as these professionals may be invaluable in case of emergencies.

F.  Emergency Management

Providing mental healthcare to patients using videoconferencing involves particular considerations regarding patient safety.   There are also additional considerations when providing care to patients in settings without staff immediately available. (17) Below are issues that should be considered in both types of practice followed by separate sections for emergency management for supervised and unsupervised settings.

1. Education and Training

Professionals should review their discipline's definitions of "competence" prior to initiating telemental health patient care to assure that they maintain both technical and clinical competence for the delivery of care in this manner.  Professionals shall have completed basic education and training in suicide prevention. The depth of training and the definition of "basic" are solely at the professional's discretion.

2. Jurisdictional Mental Health Involuntary Hospitalization Laws

Each jurisdiction has its own involuntary hospitalization and duty-to-notify laws outlining criteria and detainment conditions.  Professionals shall know and abide by the laws in the jurisdiction where the patient is receiving services.

3. Patient Safety when Providing Services in a Setting with Immediately Available Professionals

When a professional sees a patient via personal computer and/or mobile device outside of the patient's home (e.g., local clinic, community-based outpatient clinic, school site, library) or other facility where dedicated staff may be present, it may be important that the professional become familiar with the facility's emergency procedures.  In some cases, the facility will not have procedures in place.  In such cases, the professional should coordinate with the distant site clinic to establish basic procedures.  The basic procedures may include: 1) identifying local emergency resources and phone numbers; 2) becoming familiar with location of nearest hospital emergency room capable of managing psychiatric emergencies; and 3) having patient's family / support contact information.  The professional may also learn the chosen emergency response system's average response time (30 minutes vs. 5 hours) and the contact information for other local professional associations, such as the city, county or state, provincial or other regional professional association(s) in case a local referral is needed to follow-up with a local professional.

4. Patient Safety when providing Services in a Setting without Immediately Available Professional Staff

For treatment occurring where the patient is in a setting without clinical staff, the professional may request the contact information of a family or community member who could be called upon for support in the case of an emergency.  This person will be called "the Patient Support Person" an individual selected by the patient.  In the case of an emergency, the professional may contact the Patient Support Person to request assistance in evaluating the nature of the emergency and/or initiating 9-1-1 from the patient's home telephone. (17).

5.  Patient Support Person and Uncooperative Patients

It is possible that a patient will not cooperate in his or her own emergency management, which underlies the practice of involuntary hospitalization in mental healthcare.  Professionals should be prepared for this as well as the possibility that Patient Support Persons also may not cooperate if the patients themselves are adamant that they do not want to seek emergency care.  Therefore, any emergency plan shall include local emergency personnel and knowledge of available resources in case of involuntary hospitalization.

Copyright American Telemedicine Association

6.  Transportation

As videoconferencing-based telemental health has developed, in part, to increase access to patients in geographically remote areas, it is expected that there may be barriers to transportation to local mental health services.  In light of this, the professional shall know any limitations the patient has in terms of self-transporting and/or access to transportation.  Strategies to overcome these limitations in light of an emergency shall be developed prior to starting treatment for patients in settings without staff immediately available.

In the event of a behavioral and/or medical emergency, the patient's Patient Support Person should discuss with emergency personnel whether they should transport the patient.

7.  Local Emergency Personnel

In providing care to patients in settings without professional staff immediately available, determining distance between local emergency personnel in the patient's community and the patient's location can shape the professional's decision process in determining appropriate actions.

Professionals shall acquire telephone numbers for local resources in the patient's community. At the beginning of each session, the professional shall have the patient's local emergency personnel telephone contact information readily available.   Prior to each session, the provider shall also determine the patient's location and whether there have been any changes to the patient's personal support system or the emergency management protocol.

G.  Medical Issues

In case of medication side effects, elevation in symptoms, and/or issues related to medication non-compliance, the professional should be familiar with the patient's prescription and medication dispensation options.

Likewise, when prescribing, the clinician should be aware of the availability of specific medications in the geographic location of the patient and that should inform prescribing choices.  Patients receiving treatment through telemental health services should have an active relationship with a prescribing professional in their physical vicinity.

If services are provided in a setting where a professional is not immediately available, the patient may be at risk if there is an acute change in his or her medical condition.  The professional should be familiar with whom the patient is receiving medical services.

H.  Referral Resources

The professional shall be familiar with local in-person mental health resources should the professional exercise clinical judgment to make a referral for additional mental health or other appropriate services.

I.  Community and Cultural Competency

Professionals shall be culturally competent to deliver services to the populations that they serve. Examples of factors to consider include awareness of the client's language, ethnicity, race, age, gender, sexual orientation, geographical location, and socioeconomic and cultural backgrounds.  Mental health professionals may use online resources to learn of the community where the patient resides including any recent significant events and cultural mores of that community.

## TECHNICAL GUIDELINES

Videoconferencing can be characterized by key features: the videoconferencing application, device characteristics including their mobility, network or connectivity features, and how privacy and security are maintained.   The more recent use of desktop and mobile devices requires consideration of each of these.

A.   Videoconferencing Applications

 All efforts shall be taken to use video conferencing applications that have been vetted and have the appropriate verification, confidentiality, and security parameters necessary to be properly utilized for this purpose.

Video software platforms should not be used when they include social media functions that notify users when anyone on a contact list logs on. Many free video chat platforms include such functionality as a "default setting," which should be changed before providing video-based clinical services.  These platforms may also include the capability to create a video chat "Room" that allows others to enter at will. This type of functionality should be disabled.

B.   Device Characteristics

When using a personal computer, both the professional device for video-transmission and the patient's site should, when feasible, use professional grade or high quality cameras and audio equipment now widely available for personal computers.  Personal computers shall have up-to-date antivirus software and a personal firewall installed.  Providers should ensure their personal computer or mobile device has the latest security patches and updates applied to the operating system and third party applications that may be utilized for this purpose.

                                    Copyright American Telemedicine Association

Provider organizations should utilize mobile device management software to provide consistent oversight of applications, device and data configuration and security of the mobile devices used within the organization.

In the event of a technology breakdown, causing a disruption of the session, the professional shall have a backup plan in place.  The plan shall be communicated to the patient prior to commencement of treatment and may also be included in the general emergency management protocol.  The professional may review the technology backup plan on a routine basis.

The plan may include calling the patient via telephone and attempting to troubleshoot the issue together.  The plan may also include providing the patient with access to other mental healthcare.  If the technical issue cannot be resolved, the professional may elect to complete the session via a voice-based telecommunication system.

Screen-in-screen options, also known as picture-in-a-picture or "PIP" may also be used when feasible and are widely available in professional grade desktop videoconferencing software packages.  Professionals and patients may opt to use cameras that allow for pan, tilt, and zoom for maximal flexibility in viewing the remote room.

C.  Connectivity

Telemental healthcare services provided through personal computers or mobile devices that use internet-based videoconferencing software programs should provide such services at a bandwidth of 384 Kbps or higher in each of the downlink and uplink directions.  Such services should provide a minimum of 640 X 360 resolution at 30 frames per second.  Because different technologies provide different video quality results at the same bandwidth, each end point shall use bandwidth sufficient to achieve at least the minimum quality shown above during normal operation.

Where practical, providers may recommend preferred video conferencing software and/or video and audio hardware to the patient, as well as providing any relevant software and/or hardware configuration considerations.

The provider and/or patient may use link test tools (e.g., bandwidth test) to pre-test the connection before starting their session to ensure the link has sufficient quality to support the session.

Where possible, each party should use the most reliable connection method to access the Internet.  Where wired connections are available (e.g., Ethernet), they should be used.

The videoconference software should be able to adapt to changing bandwidth environments without losing the connection.

Copyright American Telemedicine Association

D.   Privacy

The videoconference software should be capable of blocking the provider's caller ID at the request of the provider.

All efforts shall be taken to make audio and video transmission secure by using point-to-point encryption that meets recognized standards.  Currently, FIPS 140-2, known as the Federal Information Processing Standard, is the US Government security standard used to accredit encryption standards of software and lists encryption such as AES (Advanced Encryption Standard) as providing acceptable levels of security. Providers should familiarize themselves with the technologies available regarding computer and mobile device security, and should help educate the patient.

When the patient and/or provider use a mobile device, special attention should be placed on the relative privacy of information being communicated over such technology.

Providers should ensure access to any patient contact information stored on mobile devices is adequately restricted.

Mobile devices shall require a passphrase or equivalent security feature before the device can be accessed.  If multi-factor authentication is available, it should be used.

Mobile devices should be configured to utilize an inactivity timeout function that requires a passphrase or re-authentication to access the device after the timeout threshold has been exceeded. This timeout should not exceed 15 minutes.

Mobile devices should be kept in the possession of the provider when traveling or in an uncontrolled environment.  Unauthorized persons shall not be allowed access to sensitive information stored on the device, or use the device to access sensitive applications or network resources.

Providers should have the capability to remotely disable or wipe their mobile device in the event it is lost or stolen.

Videoconference software shall not allow multiple concurrent sessions to be opened by a single user. Should a second session attempt to be opened, the system shall either log off the first session or block the second session from being opened.

Session logs stored in 3rd party locations (i.e., not on patients' or providers' access device) shall be secure.  Access to these session logs shall only be granted to authorized users.

Copyright American Telemedicine Association

Protected health information and other confidential data shall only be backed up to or stored on secure data storage locations.  Cloud services unable to achieve compliance shall not be used for PHI or confidential data.

Professionals may monitor whether any of the videoconference transmission data is intentionally or inadvertently stored on the patient or professional's computer hard drive.  If so, the hard drive of the provider should use whole disk encryption to the FIPS standard to ensure security and privacy.  Pre-boot authentication should also be used. Professionals should educate patients about the potential for inadvertently stored data and patient information and provide guidance on how best to protect privacy.

Professionals and patients shall discuss any intention to record services and how this information is to be stored and how privacy will be protected.  Recordings should be encrypted for maximum security.  Access to the recordings shall only be granted to authorized users and should be streamed to protect from accidental or unauthorized file sharing and/or transfer.  The professional may also want to discuss his or her policy with regards to the patient sharing portions of this information with the general public.  Written agreements pertaining to this issue can protect both the patient and the professional.

If services are recorded, the recordings shall be stored in a secured location.  Access to the recordings shall only be granted to authorized users.

## ADMINISTRATIVE GUIDELINES

A.  Qualification and Training of Professionals

In addition to clinical, legal, and ethical training required for licensure for in-person services, professionals shall make use of the widely available resources providing education of proper conduct of videoconferencing to both professionally supervised settings and those without readily available clinical staff.   Mental health professionals shall also determine whether there are site-specific credentialing requirements where the patient is located.

Professionals shall conduct care consistent with the jurisdictional licensing laws and rules for their profession in both the jurisdiction in which they are practicing as well as the jurisdiction where the patient is receiving care.

Licensed mental health professionals should contact their licensing board to review their practice before starting any provision of telemental health services.  The professional should also contact the licensing board relevant to the patient's location during treatment, to determine whether or not the services provided fall under their jurisdiction and what, if any, restrictions exist.

B.  Documentation and Record Keeping

Professionals shall maintain an electronic record for each patient for whom they provide remote services. Such a record should include an assessment, client identification information, contact information, history, treatment plan, informed consent, and information about fees and billing.

A treatment plan based upon an assessment of the patient's needs should be developed and documented.  The plan should meet the professional's discipline standards and guidelines and include a description of what services are to be provided and the goals for services.

Services should be accurately documented as remote services and include dates, duration and type of service(s) provided.

Documentation shall comply with applicable jurisdictional and federal laws and regulations.  Policies for record retention and disposal should be in place.

All communications with the patient (e.g., written, audiovisual, or verbal) shall be documented in the patient's unique record and all such records shall be stored in compliance with relevant government regulations, such as HIPAA and HI-TECH within the US. (15)

Requests for access to such records shall require written authorization from the patient with a clear indication of what types of data and which information is to be released.  If professionals are storing the audiovisual data from the sessions, these cannot be released unless the patient authorization indicates specifically that this is to be released.  Upon direction and written approval by the patient, the patient's record shall be made available to another provider that is caring for the patient.

All billing and administrative data related to the patient shall be secured to protect confidentiality. Specifically, all records are confidential; HIPAA regulations regarding psychotherapy notes are adhered to; and only relevant information is released for reimbursement purposes as outlined by HIPAA in the US.

C.  Payment and Billing

Prior to the commencement of initial services, the patient shall be made aware of any and all financial charges that may arise from the services to be provided.  Arrangement for payment should be completed prior to the commencement of services.

Copyright American Telemedicine Association

APPENDIX:

REFERENCES

1.Core Standards for Telemedicine Operations. Washington DC: American Telemedicine Association, 2007. http://www.americantelemed.org/docs/default-source/standards/core-standards-for-telemedicine-operations.pdf?sfvrsn=4

 2.Grady B, Myers KM, Nelson EL, Belz N, Bennett L, Carnahan L, et al. Evidence-based practice for telemental health. Telemed J E Health. 2011;17(2):131-48.

3.Yellowlees P, Shore J, Roberts L. Practice guidelines for videoconferencing-based telemental health - October 2009. Telemed J E Health. 2010;16(10):1074-89.

4.APA Statement on Services by Telephone, Teleconferencing, and Internet: A statement by the Ethics Committee of the American Psychological Association1997 December 30, 2004: Available from: http://www.apa.org/ethics/education/telephone-statement.aspx.

5.Australian Psychological Society.  Guidelines for providing psychological services and products using the internet and telecommunications technologies.  2011: Available from: http://aaswsocialmedia.wikispaces.com/file/view/EG-Internet.pdf

6.Standards for Technology and Social Work Practice. National Association of Social Workers and ASWB Standards for Technology and Social Work Practice, 2005. http://www.socialworkers.org/practice/standards/naswtechnologystandards.pdf

7.Ohio Psychological Association.  Telepsychology Guidelines, 2010: Available from: http://www.ohpsych.org/psychologists/files/2011/06/OPATelepsychologyGuidelines41710.pdf.

8.Hyler SE, Gangure DP. Legal and ethical challenges in telepsychiatry. J Psychiatr Pract. 2004;10(4):272-6.

9.Day SX, Schneider PL. Psychotherapy using distance technology: A comparison of face-to-face, video, and audio treatment. J Couns Psychol. 2002;49(4):499-503.

10.O'Reilly R, Bishop J, Maddox K, Hutchinson L, Fisman M, Takhar J. Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. Psychiatr Serv. 2007;58(6):836-43.

11. Ruskin PE, Silver-Aylaian M, Kling MA, Reed SA, Bradham DD, Hebel JR, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. The American journal of psychiatry. 2004;161(8):1471-6.

12. Sharp IR, Kobak KA, Osman DA. The use of videoconferencing with patients with psychosis: a review of the literature. Annals of general psychiatry. 2011;10(1):14.

13. Dongier M, Tempier R, Lalinec-Michaud M, Meunier D. Telepsychiatry: psychiatric consultation through two-way television. A controlled study. Can J Psychiatry. 1986;31(1):32-4.

14. Bouchard S, Paquin B, Payeur R, Allard M, Rivard V, Fournier T, et al. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. Telemed J E Health. 2004;10(1):13-25.

15. Luxton DD, O'Brien K, McCann RA, Mishkind MC. Home-based telemental healthcare safety planning: what you need to know. Telemed J E Health. 2012;18(8):629-33.

16. Luxton DD, Sirotin AP, Mishkind MC. Safety of telemental healthcare delivered to clinically unsupervised settings: a systematic review. Telemed J E Health. 2010;16(6):705-11.

17. Shore P. Home-Based Telemental Health (HBTMH) Standard Operating Procedures Manual. 2011.