**The Second Re-Audit and Update of Suicide Prevention Practices
in the Prisons of the California Department of
Corrections and Rehabilitation**

Lindsay M. Hayes, M.S.
September 7, 2017

<u>**Executive Summary**</u>

## I.    <u>Introduction</u>

This report is submitted as an update to this reviewer's preceding report, "A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation [CDCR]" (ECF No. 5396, filed January 13, 2016).  The preceding report covered this reviewer's findings from a re-audit of suicide prevention practices at 18 selected CDCR prisons.  The report recommended that prisons which chronically struggled with their suicide prevention programs, as well as almost all prisons that contained Mental Health Crisis Bed (MHCB) units, undergo continued re-inspection, and that the defendants continue to work with the Special Master and Suicide Prevention Management Workgroup (SPMW) on outstanding initiatives previously committed to by CDCR.  On April 5, 2016, the *Coleman* court issued an order adopting the report in full (ECF No. 5429).

This report is the third on an audit of CDCR suicide prevention practices and covers this reviewer's recent re-audit at 23 selected CDCR prisons.  The re-audit began on February 23, 2016 and concluded on November 9, 2016.  The details and methodology of the re-audit/review process are discussed in Part II, below.  Part III of this report contains a summary of this reviewer's findings during the re-audit, including a status update on defendants' progress in implementing prior recommendations as contained in this reviewer's initial audit report and the accompanying report by the Special Master (ECF No. 5258, filed January 14, 2015).  Part IV covers this reviewer's conclusion and recommendations.  Lastly, Appendix A presents a prison-by-prison discussion of this reviewer's findings at each of the 23 re-audited prisons, together with summaries of CDCR Suicide Case Reviews of recent inmate suicides in those prisons.

Finally, it should be noted that CDCR, its management team and legal counsel, as well as local custody and mental health leadership at each of the prison facilities assessed during 2016, continued to demonstrate full cooperation during this reviewer's suicide prevention assessment process.

## II.    <u>Methodology</u>

This reviewer's selections of 23 CDCR prisons for on-site re-auditing were based on a variety of reasons, including their operation of MHCB units, findings during previous audit(s) that their suicide prevention practices were significantly problematic, having a significant population of inmates on the Mental Health Services Delivery System (MHSDS) caseload, and/or the facility experienced multiple inmate suicides.  As in the previous audits, this reviewer's re-audit consisted of a two-day on-site examination of suicide practices at each of the

prisons. There were two exceptions; Pelican Bay State Prison and Salinas Valley State Prison each necessitated three-day on-site examinations. The 23 re-audited prisons and the dates of their on-site assessments were:

1. Kern Valley State Prison (KVSP): February 23-24, 2016
2. North Kern State Prison (NKSP): February 25-26, 2016
3. California Institution for Women (CIW): March 22-23, 2016; January 25-26, 2017
4. California Institution for Men (CIM): March 24-25, 2016
5. California State Prison, Sacramento (CSP/Sac): April 5-6, 2016
6. California Correctional Institution (CCI): April 26-27, 2016
7. California State Prison, Los Angeles County (CSP/LAC): April 28-29, 2016
8. Central California Women's Facility (CCWF): May 10-11, 2016
9. Pleasant Valley State Prison (PVSP): May 12-13, 2016
10. California Medical Facility (CMF): May 24-25, 2016
11. California State Prison, Solano (CSP/Solano): May 26-27, 2016
12. Salinas Valley State Prison (SVSP): June 7-9, 2016
13. California State Prison, Corcoran (CSP/Corcoran): June 21-22, 2016
14. California Substance Abuse Treatment Facility (CSATF): June 23-24, 2016
15. Wasco State Prison (WSP): August 16-17, 2016
16. California Men's Colony (CMC): August 18-19, 2016
17. Deuel Vocational Institution (DVI): August 30-31, 2016
18. California Health Care Facility (CHCF): September 1-2, 2016
19. Pelican Bay State Prison (PBSP): September 13-15, 2016
20. Mule Creek State Prison (MCSP): September 27-28, 2016
21. San Quentin State Prison (SQ): September 29-30, 2016
22. Richard J. Donovan Correctional Facility (RJD): October 25-26, 2016
23. High Desert State Prison (HDSP): November 8-9, 2016

At each site, this reviewer examined the prison's performance with the following suicide prevention measurement tools:

- Thoroughness and degree of privacy afforded during the intake screening process
- Psych tech (PT) practices in restrictive housing units
- MHCB practices
- Use of suicide-resistant, retrofitted cells for new intake inmates assigned to administrative segregation units
- Use of alternative housing for inmates awaiting transfer to MHCBs
- Suicide risk assessments
- Safety planning for suicidal inmates
- Appropriate follow-up services provided to inmates discharged from a MHCB or alternative housing
- Custody rounds in restrictive housing units
- Emergency medical response equipment in housing units
- Compliance with suicide prevention training

2

- Review of meeting minutes of the institutional Suicide Prevention and Response Focused Improvement Teams (SPRFITs)

All inmate suicides which occurred during the review period for the 23 audited facilities were reviewed through examination of the inmates' health care records via Electronic Unit Health Records (eUHRs) or the Electronic Health Record Systems (EHRS), CDCR Suicide Reports, Quality Improvement Plans (QIPs), and/or California Correctional Health Care Services' (CCHCS) Combined Death Review Summary reports.

In addition, the Special Master held several SPMW meetings with his experts, the parties and CDCR management officials in order to assist in effectuating defendants' implementation of the recommendations contained in this reviewer's January 14, 2015 initial audit report. The meetings, some of which were held in conjunction with larger all-parties workgroup meetings, took place on March 15, 2016, June 10, 2016 and February 16, 2017. As detailed in previous reports by this reviewer, defendants agreed to the implementation of 29 of the 32 original recommendations. As explained in section III. D below, this reviewer now recommends the withdrawal of the three recommendations that were not implemented.

### III.    Summary of Suicide Prevention Practices in CDCR Facilities

Although the current reassessment revealed continued progress at varied speeds, certain problematic practices continued. In the areas related to initial health screening, PT practices, use of suicide-resistant MHCBs, use of suicide-resistant cells for newly admitted administrative segregation inmates and 30-minute welfare checks in restricted housing, there had been varying degrees of progress. The review found few positive changes with regard to SPRFIT practices. Findings were mixed within the areas related to MHCB practices, suicide risk evaluations (SRE) and five-day clinical follow-up and custody welfare checks, whereas significant problems were found related to the use of alternative housing. Finally, there were continuing problems found with safety planning in all 21 audited facilities with MHCBs.

The following provides (1) a brief summary of each of the main suicide prevention measurement tools and their relationship to this reviewer's original recommendations, (2) current findings related to CDCR's adoption and implementation of the recommendations and the reassessment of the 23 audited CDCR facilities, and (3) further recommendations for the remedy of outstanding deficiencies.

### A)    Initial Health Screening and Receiving and Release Unit Environment

**Summary**:

The original recommendations focused upon two areas of intake screening in receiving and release (R&R) units: (1) the adequacy of the intake screening form and ensuring that all questions were asked during the process, and (2) the adequacy of inmate privacy and confidentiality during the process. The issue of intake screening form adequacy was related to the presence of certain compound questions on the form, as well as the thoroughness of form

completion by nursing staff.  The issue of privacy and confidentiality was related to the practice of the door to the nurse's office remaining open during the screening process, officers stationed inside the office or at the door, intake screening conducted outside the nurse's office in an open area close to officers and other inmates, and multiple intake screenings and initial mental health assessments occurring simultaneously as inmates sat in close proximity to each other.

**Current Findings**:

There had been substantial progress since the 2015 audit when several facilities were using an outdated screening form and/or few had resolved privacy and confidentiality issues. This reviewer's current assessment found that nursing staff were using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015) in all 23 audited CDCR facilities.  In addition, 18 of 23 or 78 percent of audited facilities had adequate intake screening practices in their R&R units.  Problems found in five facilities (CIW, CSP/Corcoran, CSATF, KVSP and PVSP) included observations of nursing staff not asking all of the screening questions related to mental health and suicide risk (CIW and KVSP), and either the officer remaining in the nurse's office (CIW and CSP/Corcoran) or the door to the nurse's office remaining open (CSATF and PVSP).  Finally, although the most current version of the Initial Health Screening form (CDCR Form 7277) no longer contained compound questions, the version of the Initial Health Screening form embedded into the new EHRS still contained compound questions.

**Recommendation**:

CDCR should develop corrective action plans (CAPs) for the intake screening process in the five facilities outlined above.  In addition, CDCR should eliminate the compound questions contained on the Initial Health Screening form (CDCR Form 7277) embedded into the new EHRS.

> **B)**      **Psych Tech Practices**

**Summary**:

According to the MHSDS *Program Guide* (*Program Guide*), PTs are required to conduct daily rounds in all administrative segregation units and weekly rounds in Security Housing Unit (SHUs)/Psychiatric Services Unit (PSUs) "to attend to the mental health needs of all inmates, with documentation of their observations for each MHSDS inmate recorded on a Psych Tech Daily Rounds Form."  This reviewer's previous audits found inconsistent and problematic PT rounding in these units, ranging from "drive-by" rounds with little interaction with caseload inmates, to practices of PTs often completing the required forms following the completion of rounds rather than immediately following each inmate encounter as required by policy.  This reviewer's recommendation was that CDCR develop a CAP to ensure that supervising nursing staff regularly audited PT practices.

4

**Current Findings**:

Progress continued in this area.  This reviewer's current assessment found that 20 of 23 or 87 percent of audited facilities had adequate PT rounding practices in their restrictive housing units (administrative segregation, SHU, and PSU).  Problems found in three facilities (CCI, PVSP and SVSP) included PTs not completing documentation cell-side as required, and/or not consistently briefly conversing with non-MHSDS inmates.

**Recommendation**:

CDCR should develop CAPs for PT rounding practices in the three facilities outlined above.

**C)     Suicide-Resistant MHCBs**

**Summary**:

Previous audits found that, although most MHCBs were suicide-resistant, some were not.  Problems found in several MHCB units included rooms that contained a handicap railing with a several-inch gap between the railing and the wall and square-shaped stainless steel sinks protruding from the wall, both of which could be used as attachment points for a noose and thus were conducive to suicide attempts by hanging.  Other hazards included some rooms containing wall ventilation grates with holes that were larger than the industry standard 3/16 inch diameter, allowing for the possibility of being conducive to suicide attempts by hanging.  Many sink faucets had a horizontal slit (known as "anti-squirt slits") that could be used as an attachment point for a noose in a suicide attempt by hanging.  The recommendation was for CDCR to develop a CAP for each facility that had hazards in its MHCB units.

**Current Findings**:

There was significant progress in this area.  This reviewer's current assessment found that 20 of 21 or 95 percent of the audited facilities with MHCB units had either suicide-resistant MHCBs and/or had pending work orders for retrofitting MHCB rooms to be suicide-resistant before December 31, 2016.  An inspection of the MHCB unit in one facility (CSP/Corcoran) found that some rooms had wall ventilation grates containing holes that were in excess of 3/16 inch diameter, and there was *not* a pending work order to correct these hazards.

**Recommendation**:

CDCR should develop a work order for replacement of the wall ventilation grates in the MHCB unit at CSP/Corcoran.

**D)** **Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units**

**Summary**:

Pursuant to CDCR policy, all inmates initially placed in administrative segregation in single-cells are required to be placed in cells that have been retrofitted to be suicide-resistant for the first 72 hours. This reviewer's previous audits found several problems regarding the housing of newly admitted inmates in administrative segregation. Five original recommendations were offered to address these deficiencies, including, (Recommendation 12) ensure there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates, (Recommendation 13) enforce the existing policy of housing only newly admitted inmates in retrofitted cells (and re-housing inmates remaining in the retrofitted cells beyond their first 72 hours), (Recommendation 14) place inmates returning to administrative segregation from MHCB or alternative housing in new intake cells for the first 72 hours, (Recommendation 15) place all new intake inmates in suicide-resistant cells regardless of single- or double-cell placement, and (Recommendation 16) conduct a study to determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates. Defendants agreed to implement the first two recommendations; however, they expressed great concern over their ability to implement the remaining three.

**Current Findings**:

As a result of both a reduction in the overall administrative segregation census population statewide, as well as further retrofitting of additional new intake cells, meaningful progress has been made to ensure that all inmates initially placed in single cells in administrative segregation are placed in suicide-resistant retrofitted new intake cells. This reviewer's most recent assessment found that 15 of 23 or 65 percent of the audited facilities had adequate practices regarding the placement of newly admitted administrative segregation inmates in new intake cells.

Problems found in eight facilities (CCI, CMF, CSP/Corcoran, CSP/LAC, HDSP, MCSP, PVSP, and SVSP) included new intake inmates housed in unsafe, non-intake single cells during the first 72 hours of administrative segregation confinement. In several cases, inmates were placed in an unsafe cell because all new intake cells were occupied, in other cases, new intake cells were available, but custody staff had not appropriately relocated the inmates. At SVSP, three Short-Term Restricted Housing (STRH) new intake cells still had wall ventilation grates containing holes that were in excess of 3/16 inch in diameter, and there was not a pending work order to correct the hazards. At CSP/Solano and WSP, frosted exterior window glazing continued to be found in administrative segregation cells despite a 2014 CDCR headquarters directive mandating its removal.

**Recommendation**:

CDCR should develop CAPs in each of the eight facilities identified above to ensure that newly arrived administrative segregation inmates assigned to single cells are placed in new

intake cells for the first 72 hours of administrative segregation confinement.  In addition, CDCR should develop a work order for replacement of the wall ventilation grates in the STRH unit at SVSP.  Finally, CDCR should develop a work order for removal of frosted exterior window glazing in administrative segregation units at both CSP/Solano and WSP.

Following additional consideration, this reviewer recommends that the recommendations related to double-celling (Recommendation 15) and minimum length of stay in suicide-resistant cells (Recommendation 16) be withdrawn from the initial suicide prevention assessment report. On February 16, 2017, the Special Master convened a SPMW meeting with his experts, counsel for the parties and CDCR management officials.  During the meeting, this reviewer summarized findings from the 2016 suicide prevention facility assessments.  The recommendation related to inmates returning to administrative segregation from a MHCB or alternative housing (Recommendation 14) was further discussed without resolution.  Following that meeting, CDCR provided data indicating that almost 3,600 inmates were discharged from MHCBs and alternative housing back to administrative segregation units during 2016, including several hundred from high-user facilities such as CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP and RJD.  Following a review of this data and after careful consideration of the additional pressure placed on these facilities by having to retrofit additional suicide-resistant cells to accommodate a large number of inmates returning to their administrative segregation units, this reviewer recommends that Recommendation 14 be withdrawn from the initial suicide prevention assessment report.

### E)    Use of "Alternative Housing" for Suicidal Inmates

**Summary**:

According to the *Program Guide*, an inmate who meets the criteria for MHCB placement is required to be transferred to a crisis bed within 24 hours of referral.  In the interim, as well as in those cases in which physical transfer does not occur within that time frame, the inmate is required to be placed in "alternative housing."  The most recent policy enacted following issuance of the *Program Guide* relevant to alternative housing is Policy 12.05.301 ("Housing of Patients Pending Mental Health Crisis Bed Transfer"), revised October 15, 2015.  The policy listed the following preferred locations for housing suicidal inmates pending transfer to an MHCB: Correctional Treatment Center (CTC) licensed medical beds; Outpatient Housing Unit (OHU); OHU overflow cells; Large holding cells with toilets; Large holding cells without toilets; Triage and Treatment Area (TTA) or other clinic physical exam room; Other unit-housing where complete and constant visibility can be maintained; and CTC holding cells.

This reviewer's previous assessments found that suicidal inmates placed in alternative housing were often placed in hazardous, unsafe cells and observed at intervals that varied between constant observation and 15-minute intervals.  In addition, many suicidal inmates were housed in these locations for more than 24 hours and oftentimes not provided a bunk, instead having to sleep on a mattress on the floor, thus exacerbating their suicidal ideation (SI) and/or mental illness.  As a result, previous recommendations by this reviewer focused on requirements for suicide-resistant alternative housing and/or constant observation of inmates placed in

7

hazardous, unsafe alternative housing locations, as well as issuance of suicide-resistant bunks for any inmate housed in alternative housing for more than 24 hours.

As previously reported, defendants agreed to implement the above recommendations. CDCR issued various directives indicating that all suicidal patients placed in alternative housing would be placed on continuous 1:1 observation until they were transferred to a MHCB, as well as provided portable suicide-resistant beds (referred to as "stack-a-bunks") in those locations that did not already have available bunks.

Despite these changes, a dramatic increase in MHCB referrals throughout CDCR during 2016 resulted in corresponding increases in lengths of stay in alternative housing. For example, in February 2016 when this reviewer's most recent reassessment schedule began, there were 440 MHCB transfers throughout CDCR, of which 47 percent occurred within 24 hours. As a result, less than one percent of inmates were placed in alternative housing for longer than 72 hours. However, by June 2016, there were 462 MHCB transfers, of which less than one percent were transferred within 24 hours, with 71 percent of inmates placed in alternative housing longer than 72 hours. By November 2016, there were 387 MHCB transfers, of which 63 percent were transferred within 24 hours, with only four percent placed in alternative housing longer than 72 hours. It should be noted, however, that the November 2016 data still indicated that more than a third (approximately 37 percent) of all MHCB transfers throughout CDCR resulted in inmates spending more than 24 hours in alternative housing.

**Current Findings**:

This reviewer's most recent assessments found that many of these alternative housing locations were quite problematic. The review found that 14 of 23 or 61 percent of the audited facilities had adequate practices regarding the use of alternative housing for suicidal patients referred for MHCB placement. Significant problems were found in nine facilities (CIM, CSP/Corcoran, CSP/LAC, CSATF, CCWF, DVI, HDSP, PBSP and SVSP). In some facilities, dry cells (i.e., without sinks and toilets) reserved for Board of Parole Hearings (BPH) were used which had limited access to bunks, showers, and bathrooms. At CCWF, administrative segregation special management cells were used, and inmates were not provided any stack-a-bunks. At CIM and SVSP, dry holding tanks and holding cages (approximately three feet in diameter) in the CTC were used, with inmates often placed there for more than ten hours at a time. At CSP/Corcoran, inmates in alternative housing were prohibited from showering for over 72 hours. At DVI, a reduction in the use of alternative housing was found to have been caused by several clinicians informing suicidal inmates that their "clock" for reception center (RC) processing would be reset if they were placed in alternative housing. At PBSP, the required stack-a-bunks were not issued because custody staff believed (without any reported evidence) that an inmate might use the bunk to barricade themselves in the room.

Some of the worst conditions were observed at SVSP and CSATF. On June 8, 2016, this reviewer found 18 inmates on alternative housing status at SVSP. Of those, eight inmates were housed in various dry BPH cells throughout the facility. In addition, three inmates were assigned to TTA cells in the CTC. However, during medical clinic, these inmates were reassigned to holding "cages" for up to eight hours per day. Each of these inmates were reported to be housed

under these conditions of moving back and forth from TTA cells and holding cages for at least 48 hours. Three inmates were assigned to holding cells within the R&R unit. Four inmates were temporarily assigned to holding cages in the visiting room and gymnasium. According to one mental health clinician accompanying this reviewer, one of the inmates had remained overnight in the holding cage and had only been cleared for housing that morning (June 8). With the exception of the R&R unit and TTA cells, none of the alternative housing options included beds or stack-a-bunks. In addition, inmates were not afforded showers, inmates were not consistently seen on a daily basis by mental health clinicians, and officers assigned to provide 1:1 observation were observed to be sitting in chairs that obstructed their visibility into the BPH cells. Various Suicide Watch/Suicide Precaution Record observation forms in BPH cells were found not to be up-to-date.

Based upon these findings, as well as similar findings reported by the CDCR regional mental health team that was conducting a Continuous Quality Improvement (CQI) audit at the same time, an emergency meeting was held amongst CQI audit team members, CDCR and *Coleman* Special Master team observers, and CDCR headquarters officials on June 8, 2016. As a result, the deputy director of CDCR's Division of Adult Institutions subsequently announced that a housing pod in SVSP's D-8 Unit had been designated for alternative housing, and that BPH cells and TTA and visiting room/gymnasium holding cages would no longer be used for that purpose.

At CSATF, inmates placed in alternative housing were housed in a variety of locations, including four CTC holding cells (114-117), two TTA examination rooms (166-167), various cells in the STRH and E-1 administrative segregation units, and designated cells in housing units on Facilities C and D. The use of TTA examination rooms 166 and 167 was particularly alarming. On both days of the June 23 and 24, 2016 on-site assessment, this reviewer observed three inmates handcuffed to gurneys in Room 167. A subsequent review of documentation indicated that the three inmates had been handcuffed to the gurneys for at least two days. According to custody staff, the inmates were permitted to use the bathroom only upon request, and were offered showers after 72 hours. A review of one inmate's eUHR revealed additional disturbing practices in the utilization of Room 167 for alternative housing. The inmate had been placed in Room 167 on May 19, 2016 and handcuffed to a gurney. He remained confined under these conditions for four days. During the morning of May 22, 2016, the Suicide Watch/Suicide Precaution Record (CDCR Form 7365) indicated that the inmate "urinated on self, cleaned up." The inmate was subsequently discharged from suicide observation status later that morning, with the safety plan section of the discharging SRE simply stating, "IP to be discharged with 5-day follow-up."

This reviewer was informed by CSATF custody and mental health officials that the practice of handcuffing inmates to gurneys in alternative housing *had been occurring for almost a year.* This reviewer was subsequently informed prior to the exit meeting on June 24, 2016 that the practice of using gurneys for alternative housing would be immediately discontinued.

**Recommendation**:

Although defendants have made steady progress in reducing the length of stay in alternative housing throughout the CDCR system, the November 2016 data still indicated that more than a third (approximately 37 percent) of all MHCB transfers resulted in inmates spending more than 24 hours in alternative housing. Some of these conditions remained problematic, particularly when facilities used "dry cells" located in CTC and TTA areas, as well as BPH cells. As such, it is strongly recommended that any inmate placed in alternative housing be prohibited from placement in any type of dry cell or TTA or other clinic physical exam room for more than one hour. In addition, local SPRFIT committees should be much more proactive in the identification of inappropriate alternative housing locations within their facility.

### F)      MHCB Practices for Observation Statuses, Clothing, and Privileges

**Summary**:

Previous assessments by this reviewer found that, despite clear *Program Guide* requirements for two levels of observation (i.e., Suicide Watch requiring continuous 1:1 observation and Suicide Precaution requiring observation at staggered 15-minute intervals), some suicidal patients were being observed in MHCB units at 30- and 60-minute intervals under observational terms such as "psychiatric observation" or "crisis evaluation." In addition, inadequate practices were found in the timely completion of required "Suicide Watch/Suicide Precaution Record" observation forms by nursing staff, as well as disparate practices with regard to privileges provided to "medical" versus "mental health" patients within CTCs. Whereas patients admitted into a CTC for medical purposes were generally eligible for recreation, visits, or telephone calls, such privileges were generally prohibited for MHCB patients. Recommendations were provided for CDCR to enforce *Program Guide* requirements utilizing only two levels of observation, provision of better guidance and consistent guidelines regarding an acceptable level of observation for non-suicidal patients housed in MHCB units, and provision of a directive(s) to provide guidance on clothing and allowable privileges for both suicidal and non-suicidal MHCB patients.

**Current Findings**:

CDCR issued several memoranda to address the issues. One such memorandum, "Level of Observation and Property for Patients in Mental Health Crisis Beds" was issued on March 15, 2016. The directive required that for those MHCB patients who did not meet criteria for either Suicide Watch or Suicide Precaution, or who were no longer suicidal, orders were "not to be written for a frequency of more than twice an hour (30 minutes)," and that vague terms such as "psychiatric observation" or "behavioral observation" were not permitted. In addition, the March 15, 2016 memorandum stated that "all orders shall detail what specific items may be issued to a patient. Staff shall ensure all patients are provided with the clothing, bedding and allowable items permitted at the patient's level of observation."

On June 23, 2016, CDCR issued a memorandum on MHCB privileges available to MHCB patients entitled "Mental Health Crisis Bed Privileges." The directive stated that "IPs

admitted to the MHCB may be authorized for out-of-cell activities when specifically approved by the MHCB IDTT." Out-of-cell activities included, but were not limited to, dayroom, recreational activities and yard. These activities would be the responsibility of the recreation therapist assigned to each MHCB unit, and "custody staff may provide supervision for unstructured out-of-cell activity to include yard in dayroom." In addition, the memorandum stated that MHCB patients were entitled to both telephone access and visiting privileges "unless specifically restricted by the MHCB IDTT." In late 2016, the memorandum was revised on several occasions to strengthen authorizing language.

This reviewer's most recent assessments found that defendants have made steady progress in some, but not all, of the above areas. The review found that 19 of 21 or 90 percent of the audited facilities with MHCB units had adequate practices regarding observation levels that did not exceed 30-minute intervals for non-suicidal patients. Only two facilities (CSP/LAC and CSATF) had observation levels at 60-minute intervals.

In addition, although 17 of 23 or 74 percent of the audited facilities had adequate practices regarding the observation of suicidal patients by nursing staff, this reviewer observed falsification of observation forms of patients on suicide observation status in six facilities (CHCF, CMC, CSP/Corcoran, CSP/Sac, MCSP and PVSP). At PVSP, for example, nursing staff were observed by this reviewer on three separate occasions on May 12, 2016 to not be completing observations at 15-minute intervals. In two instances, nursing staff had not recorded an observation for over 35 minutes. In the third instance, a PT was observed falsifying an observation form by documenting time intervals that had not been observed. At CSP/Sac, this reviewer entered the Mental Health Crisis Bed Unit (MHCBU) at approximately 11:05 a.m. on April 5, 2016 and reviewed the observation forms of 12 inmates on Suicide Precaution status to find that no documentation had occurred since 10:45 a.m. Approximately ten minutes later at 11:15 a.m., this reviewer (and a CDCR headquarters representative) observed a nursing aide approaching the cell doors of each of the 12 inmates and writing "11:01 a.m., 11:10 a.m., and 11:21 a.m." on each of the forms.

It was noteworthy that falsification of observation forms was found in 26 percent of the most recently audited facilities, whereas only 11 percent, or two of the 18 audited facilities during the 2015 assessment were found to have this problem.

Finally, only three of 21 or 14 percent of the audited facilities with MHCB units had adequate practices with regard to the issuance of clothing and privileges for patients. Problems in the remaining 18 facilities varied and included: Interdisciplinary Treatment Teams (IDTTs) believing that the patient must be discharged from suicide observation status before receiving privileges; patients on non-suicide observation status (i.e., 30-minute checks) remaining clothed in smocks and/or partial-issue clothing; privileges such as telephone access and visiting privileges being withheld because of the lack of a recreation therapist; a limited recreation therapist presence resulting in limited privileges, such as choosing between the yard and program room, or providing yard only to patients who requested it; never providing full-issue clothing; the lack of inmate uniforms/jumpsuits on the unit; and clothing patients in "pink" partial-issue clothing of t-shirts and boxers (at HDSP).

**Recommendation**:

The final version of the "Mental Health Crisis Bed Privileges" memorandum was issued on February 14, 2017.  Although this final version requires that "the recreational therapist shall be responsible for facilitating all structured out-of-cell activity, and is expected to remain with the IP during these activities," this reviewer continues to have a concern about full access to out-of-cell activity in many MHCB units that do not have adequate recreation therapist staffing (i.e., the position is vacant or is not full-time).  Although CDCR contends that "custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom" in the absence of the recreational therapist, this reviewer found this option to be problematic during the most recent audits.  This reviewer recommends that this issue be audited further during future suicide prevention practices assessments.

CDCR should retrain all MHCB clinicians and other members of the IDTTs to allow all MHCB patients not on suicide observation status all of the following items: socks, full-issue clothing, underclothes, reading material, hygiene items, blanket, bed and mattress, and prescribed health care appliance.  Consistent with the "Level of Observation and Property for Patients in Mental Health Crisis Beds" memorandum dated March 15, 2016, "If fewer items are granted than specified in this memorandum, a rationale shall be provided detailing the patient's unique risk factors and clinical need, and updated at least every 24 hours while allowable items are limited."  Finally, a patient not on suicide observation status should never be clothed in a safety smock unless clinical justification is documented in the health care chart.

Lastly, although this reviewer reported findings regarding falsification of MHCB observation to nursing leadership at each facility, given the fact that the problem has increased since the last audit, it is strongly recommended that CDCR develop a process by which the observation of suicidal MHCB patients is audited on a regular basis.

### G)    30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs and Condemned Units

**Summary**:

CDCR's requirement that inmates housed in administrative segregation be observed at 30-minute intervals has been in place since 2006, with inmates housed in SHUs requiring the same level of observation since 2013.  Documentation was historically recorded by handwritten housing logs.  In 2014, CDCR implemented the Guard One system to electronically verify 30-minute welfare checks of all inmates in administrative segregation during the first 21 days of their stays.  Via a memorandum issued on May 9, 2014, the policy was subsequently revised to extend use of the Guard One system to all inmates in administrative segregation units, SHUs, PSUs, and condemned units at staggered intervals not to exceed 35 minutes for the duration of their stays.  This expansion was a significant and commendable policy change.  This reviewer's previous recommendation was, the "continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at PBSP and at the CHCF."

The Guard One system was fully implemented at the CHCF in August 2014. Guard One was initiated at PBSP on August 1, 2015. However, shortly after implementation, inmates housed in the SHU began voicing complaints about excessive noise generated from Guard One, particularly during First Watch (10:00 p.m. to 6:00 a.m.). Due to continuing noise complaints by inmates, the parties agreed to a permanent policy limited to the SHU at PBSP allowing for Guard One observation at 60-minute intervals during First Watch (see PBSP facility assessment below for more detail). The permanent stipulation was approved by the *Coleman* court on September 1, 2016 (ECF No. 5487).

**Current Findings**:

This reviewer's most recent assessment found 19 of 23 or 83 percent of the audited facilities had adequate practices regarding Guard One compliance in administrative segregation, SHUs, PSUs, and the condemned units. In four facilities (CCI, CIW, CCWF, and WSP), Guard One compliance was below 90 percent.

Data from the six currently active SHUs at PBSP revealed that compliance with the required checks that did not exceed 35-minute intervals during Second and Third Watches, and the required checks at 60-minute intervals during First Watch, ranged from 94 to 98 percent compliance. Overall compliance in these six SHUs was 95 percent.

**Recommendation**:

CDCR should develop CAPs for Guard One compliance rates below 90 percent in the four facilities outlined above.

> **H)**    **Suicide Risk Evaluations**

**Summary**:

This reviewer's previous assessments found that, although all emergency mental health referrals for reported SI and self-injurious behavior (SIB) resulted in an almost immediate response from mental health clinicians, these emergency referrals did not always result in completion of the required SREs. In addition, the quality of completed SREs was problematic. This reviewer's examination also found that institutional SPRFITs were not adequately monitoring and evaluating the SREs completed at their prisons, i.e., they were collecting only quantitative but not qualitative monthly data on completion of SREs. Recommendations included revision of the SRE mentoring program and better auditing of SRE quality on a monthly basis by local SPRFIT committees.

As previously reported, defendants agreed with this reviewer's assessments that the quality of completed SREs throughout CDCR was problematic and agreed to implement both recommendations. As such, CDCR released the "Revision to the Suicide Risk Evaluation Mentoring Program" memorandum on September 28, 2015. The memorandum was slightly revised on March 10, 2016 to include the requirement that "at least one SRE from each clinician shall be audited every six months."

**Current Findings**:

This reviewer's most recent assessment continued to find varying degrees of compliance with seven-hour SRE training and mentoring programs, as well as the completion of SREs following an emergency mental health referral. The review found that 15 of 23 or 65 percent of audited facilities had compliance rates above 90 percent for both the seven-hour SRE training and the mentoring programs. Most of the eight facilities (CSP/Corcoran, CSP/Sac, KVSP, NKSP, PBSP, PVSP, SVSP, and WSP) that had compliance rates below 90 percent struggled with maintaining acceptable levels of compliance with the SRE mentoring program.

In addition, only 11 of 23 or 48 percent of the audited facilities had required SREs completed for emergency mental health referrals for SI in 90 percent or more of sampled cases. In those 12 facilities (CHCF, CIM, CIW, CMF, CMC, CSP/Sac, CSP/Solano, CSATF, CCWF, PBSP, SVSP, and SQ) below 90 percent, compliance rates ranged from 82 to 89 percent. In addition, six facilities (CHCF, CSP/Corcoran, CSP/Sac, PBSP, SVSP, and SQ) had compliance rates below 90 percent for required SREs completed on patients discharged from a MHCB or alternative housing.

Although more audited facilities (12) had SRE compliance rates below 90 percent than above 90 percent, the average completion rate for all 23 audited facilities was 90 percent. This overall compliance rate was slightly higher than that found during the 2015 assessment, when the average completion rate was 87 percent.

**Recommendation**:

CDCR should develop CAPs for SRE mentoring and seven-hour training compliance rates below 90 percent in the eight facilities outlined above. In addition, CDCR should develop CAPs in the 12 facilities outlined above that struggled with completing required SREs for emergency mental health referrals involving SI.

    I)      **Safety Planning for Suicidal Inmates**

**Summary**:

This reviewer's previous assessments found the vast majority of treatment plans developed for suicidal patients were grossly inadequate and often simply repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-Day Follow-Up by Primary Clinician (PC), provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the inmate's suicide risk. In addition, there was little concordance between safety planning strategies and subsequent progress notes written by clinicians to justify safety plan objectives. Previous recommendations included additional "safety planning" training for clinicians.

Defendants embarked on a training program to train the majority of mental health clinicians during 2015. The program subsequently became mandatory and additional clinicians were trained in 2015 and 2016. Because not all CDCR clinicians were scheduled to be trained

during 2016, and facilities would have reported varying levels of compliance, this reviewer decided not to audit safety planning compliance during 2016. Such training will be audited in the future. In addition to safety planning training, and as an aid in encouraging clinicians to develop specific strategies for reduction of SI for each patient, CDCR slightly revised the "Safety/Risk Reduction Plan" section on page two of the SRE form to include the following instructions: "Target Acute Modifiable Risk Factors From Part I."

**Current Findings**:

This reviewer's most recent assessment found continuing problems with adequate safety planning for SI in *all* 21 audited facilities with MHCB units. Although pockets of adequate safety planning by individual clinicians were found throughout the CDCR system, none of the facilities demonstrated consistent safety planning. Continued examples of poor safety planning included simply repeating *Program Guide* requirements, decreasing depression and/or SI from a "10" to a "5" without specifying a strategy to do so, and/or instructing the inmate and referring outpatient clinician to "identify positive coping skills for dealing with suicidal ideation, develop skills for reducing suicidal ideation," a responsibility that actually fell to the MHCB clinician to develop prior to discharging the inmate from the MHCB.

**Recommendation**:

CDCR needs to more thoroughly audit the safety plan sections of SREs. As a first step, it is strongly recommended that CDCR develop a process by which each safety plan contained within the discharging SRE of an inmate released from a MHCB is reviewed by an SRE mentor at that facility. Without interfering with the physical and administrative discharge of the inmate from the MHCB, any safety plan found to be deficient (i.e., not containing a reasonably specific strategy to reduce SI) should be returned to the authoring clinician for revision.

**J)    MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks**

**Summary**:

The *Program Guide* requires that inmates discharged from a MHCB are required to receive a five-day follow-up assessment by mental health clinicians, and welfare checks by custody staff at 60-minute intervals for at least the first 24 hours. After the initial 24-hour period, a mental health clinician must determine whether there is a need for continued welfare checks by custody staff. This reviewer previously determined that the efficacy of this *Program Guide* requirement was questionable.

This reviewer's previous recommendations were to: (1) revise the "Interdisciplinary Progress Note – 5-Day Follow-Up" form to allow clinicians to use a separate sheet for each day of follow-up, (2) require inmates discharged from a MHCB or alternative housing for reasons of suicidal behavior to be observed at 30-minute intervals by custody staff for a length of time as determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's safety plan, and (3) require that five-day follow-up assessments and 30-minute checks

by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing SI and/or engaging in self-injurious behavior.

**Current Findings**:

Defendants developed several memoranda and compliance forms to strengthen the follow-up process following discharge from either an MHCB or alternative housing placement. Following numerous revisions, in March 2016, the "Interdisciplinary Progress Note – 5-Day Follow-Up" CDCR MH-7230-B form was released in final format. The accompanying policy, entitled "Release of Revised 5-Day Follow-Up Form," was released on May 31, 2016.

On January 27, 2016, CDCR released a joint memorandum from the Director of the Division of Adult Institutions and Deputy Director of the Statewide Mental Health Program entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy." The policy required custody staff to observe an inmate at 30-minute intervals for a minimum of 24 hours following MHCB discharge. The policy also required that a clinician perform daily mental health assessments to determine whether the 30-minute discharge checks were necessary beyond the minimum 24-hour requirement (up to 72 hours), or whether the inmate required a referral back to a MHCB. In May 2016, CDCR officials agreed to slightly revise the memorandum to include inmates expressing SI and referred to, and discharged from, alternative housing. At the time of this writing, the revised memorandum regarding alternative housing had *not* been issued.

To allow CDCR facilities sufficient time to come into compliance with the new initiative, this reviewer did not begin assessing compliance with the revised discharge custody checks policy until mid-May 2016.

This reviewer's most recent assessment included an audit of both the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form process by clinical staff, as well as the "Discharge Custody Check Sheet" (CDCR MH-7497) form process by both clinical and custody staff. Overall, this reviewer found that clinicians (and nursing staff in their absence) adequately completed "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms in most, but not all, of the required five days at all 23 audited CDCR facilities. However, similar to the chronic problems of safety planning found in all of the audited facilities that had MHCB units, this reviewer consistently found problems with concordance between the safety plans contained within discharging SREs and the safety plan summary sections of the CDCR MH-7497 forms. In most cases, the safety plan summary sections of the forms simply recited *Program Guide* requirements, contained narrative that was inconsistent with the safety plan of the discharging SRE, or was left blank.

With regard to the "Discharge Custody Check Sheet" (CDCR MH-7497) form process, this reviewer found that only two of 13 or 15 percent of the facilities audited for compliance after mid-May 2016 had adequate practices for "discharge custody checks" following an inmate's release from an MHCB or alternative housing. Those two facilities were CMC and CSATF. Problems in the other 11 facilities (CHCF, CMF, CSP/Corcoran, CSP/Solano, HDSP, MCSP, PBSP, PVSP, RJD, SVSP, and SQ) ranged from checks not being done consistently or not at all; checks being done at 60-minute, rather than 30-minute intervals; or checks not being done during

the First Watch. Two facilities (PBSP and SQ) in particular were plagued with multiple concerns regarding data collection, outdated local policies, and low percentage of form completion.

**Recommendation**:

CDCR should develop CAPs for the "Discharge Custody Check Sheet" (CDCR MH-7497) form process in the 13 facilities outlined above that were under 90-percent compliance. In addition, CDCR should reissue the "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy" memorandum to include inmates expressing SI and referred to, and discharged from, alternative housing.

### K)    Local SPRFITs

**Summary**:

Each local SPRFIT is required to meet at least monthly and carry out various responsibilities including ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, safety plans, etc. Previous assessments by this reviewer found that although the local SPRFIT concept was a valuable tool in CDCR's suicide prevention program, the process was not functioning as intended and needed to be rebooted. *Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable and should not have been identified for the first time by a Special Master's expert and/or monitor, but rather by the local SPRFIT.* Therefore, this reviewer's previous recommendation was for CDCR, under the guidance of the Special Master, to re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.

**Current Findings**:

In February 2016, CDCR's Statewide Mental Health Program held a two-day Suicide Prevention Summit to further discuss refinement of the SPRFIT's role in overall suicide prevention efforts within the department. All chiefs of mental health, wardens, and local SPRFIT coordinators were invited to the meeting, which was also attended by several of the Special Master's experts. In addition, SPMW meetings in March 2016 and June 2016 included continued discussions regarding revision of the local SPRFIT process.

This reviewer's most recent assessment found few positive changes in SPRFIT practices at each facility. The review found that 12 of 23 or 52 percent of the audited facilities had consistent required representation at monthly SPRFIT meetings. Two facilities (CIW and CMF) had robust SPRFIT meeting minutes and in-depth discussions of individual cases; with other facilities having unremarkable meeting minutes. Overall, local SPRFITs continued to collect more quantitative than qualitative data, with only a few establishing CAPs based upon this reviewer's previous assessments.

*Particularly troublesome was that this reviewer's observations during facility audits, including grossly inadequate alternative housing practices of inmates being handcuffed to gurneys and housed in dry cells and or holding cages for prolonged periods of time (as detailed above), remained unchecked and perhaps unknown to local SPRFIT committees.*

**Recommendation**:

CDCR provided a draft revision of the local SPRFIT policy to the Special Master and his experts in early February 2017. This reviewer's critique of the revised policy was submitted to CDCR on February 26, 2017 and included several recommendations for consideration.[1]

**L)    Suicide Prevention Training**

**Summary**:

A previous review of both pre-service and annual suicide prevention block training, including the *Mental Health Services Delivery System Instructor Guide*, found some concerns regarding content, length of training, and low completion rates for non-custody staff. As a result, this reviewer made recommendations to expand the length and content of both the pre-service and annual training workshops to include the following topics: (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) updated research on CDCR suicides, (4) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (5) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices. This reviewer made further recommendations that CDCR ensure that all custody and health care staff received both pre-service and annual suicide prevention training, and that the workshops were conducted by qualified mental health staff.

As previously reported, CDCR did not agree to expand the length of the pre-service suicide prevention curriculum beyond 2.5 hours of the eight-hour pre-service *Mental Health Services Delivery System Instructor Guide* curriculum. The curricula was revised on several occasions to include the recommended topics, initially on September 24, 2015, and then again following this reviewer's critique of a full-day workshop at the Basic Correctional Officers Academy Training on December 7, 2015.

**Current Findings**:

This reviewer most recently critiqued the eight-hour pre-service MHSDS training at the Basic Correctional Officers Academy in Galt on November 10, 2016. There were concerns about time management during the workshop, with only 110 minutes (and not the required 150

---

[1]Those recommendations included: to provide a clarifying definition for a quorum of mandatory SPRFIT members, to provide responsibility for review and tracking of all mental health referrals for suicidal ideation and/or self-injurious behavior to ensure completion of suicide risk evaluations, to conduct internal reviews of serious suicide attempts and deaths by suicide, to specify that internal reviews of incidents will include a comprehensive review of the patient's eUHR or EHR, to ensure that custody supervisors and housing unit custody staff are on the distribution list for high risk inmates, and to designate that DHCS, not local SPRFITs, have the responsibility for setting the criteria and procedures for high risk lists and inmates returning from court.

minutes, i.e., 2.5 hours) devoted to the topic of suicide prevention as required.  In addition, only one of four role-playing scenarios was presented during the suicide prevention section.  In sum, this reviewer continues to have concerns as to whether the critical topic of suicide prevention can be adequately presented within the currently allotted 2.5 hour time frame.

With regard to <u>annual</u> training, this reviewer's most recent assessments found that 12 of 23 or 52 percent of the audited facilities had compliance rates for annual suicide prevention block training that were at or above 90 percent.  In 11 facilities (CIM, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, HDSP, KVSP, RJD, SVSP, and SQ), compliance rates were below 90 percent (all for medical and/or mental health staff).  In addition, this reviewer audited five annual suicide prevention workshops during 2016:  at KVSP on February 23, 2016; at CIM on March 24, 2016; at PVSP on May 12, 2016; at CHCF on September 2, 2016; and at RJD on October 25, 2016.  Each of the sessions encompassed two hours of instruction and were led by competent and engaging mental health clinicians.  Some instructors struggled with completing all of the required material (PowerPoint slides, case studies, etc.) within the allotted two-hour time frame.  For example, at KVSP and CIM, all of the PowerPoint slides and both case studies were covered, but there was little time left for interaction between the instructor and trainees.  At CHCF, the instructor was very engaging, but unable to complete both the small group exercises and 17 of 58 PowerPoint slides.  At RJD, the instructor was using a PowerPoint version that included 74 slides, and neither the participant handbook or knowledge test was included in the workshop. There was, however, an excellent discussion on the recently enacted "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy" process.

**Recommendation**:

CDCR should incorporate this reviewer's recommended changes to the *Mental Health Services Delivery System Instructor Guide* pre-service curriculum that were previously forwarded to CDCR's Division of Health Care Services-Mental Health Program on December 21, 2015 and November 18, 2016.  In addition, CDCR should develop CAPs for annual suicide prevention block training in the 11 facilities outlined above that were below 90-percent compliance.  Finally, CDCR should ensure better consistency in the delivery of the annual suicide prevention block training, i.e., utilize the same PowerPoint presentation and determine the adequate number of PowerPoint slides that can reasonably be covered in a two-hour format.

**M)    Continuous Quality Improvement**

**Summary**:

By order of the *Coleman* court (ECF No. 4232, filed August 30, 2012; ECF No. 4561, filed April 23, 2013; ECF No. 5092, filed March 3, 2014 ), defendants were directed to develop an improved quality improvement process by which CDCR could identify issues and improve its performance levels in the delivery of mental health care.  The result was the development of a Continuous Quality Improvement Tool (CQIT).  During the course of the SPMW process,

CDCR agreed to incorporate this reviewer's suicide prevention audit checklist into its overall CQI process. The checklist included 19 measures.[2]

**Current Findings**:

Although CDCR used the CQIT tool to audit the delivery of mental health care in several prison facilities during 2016, due to scheduling conflicts, this reviewer did not have an opportunity to observe the process. A review of CDCR's revised *Continuous Quality Improvement On-Site Audit Guidebook*, issued on October 17, 2016 found it included many, but not all, of this reviewer's suicide prevention audit measures.

During a February 16, 2017 meeting with the Special Master's experts, CDCR confirmed that the 19 suicide prevention audit measures were incorporated into either the CQIT (and will be included in another revised version of the *Continuous Quality Improvement On-Site Audit Guidebook*) or three other CQI processes: the chart audit tool conducted by each local SPRFIT, Division of Health Care Services (DHCS) headquarters audit, and Unit Health Record/Electronic Health Record (UHR/EHR) Performance Reports.

**Recommendation**:

This reviewer has no further recommendations related to this issue. CDCR will be conferring with the Special Master's experts in the near future to decide how the above 19 suicide prevention audit measures, which are scheduled to be folded into the CQIT, chart audit tool, DHCS headquarters audit, and UHR/EHR Performance Report processes, will be presented in a final report format.

## IV.    **Conclusion and Recommendations**

As previously stated, it was noteworthy that CDCR, its management team and legal counsel, as well as local custody and mental health leadership at each of the prison facilities assessed during 2016, continued to display total cooperation during this reviewer's most recent suicide prevention assessment process. CDCR's implementation of this reviewer's initial recommendations, as well as correcting existing and often ongoing deficiencies, has progressed at varying speeds. While many required policy directives and memoranda were issued during 2016, some of these directives had not been fully implemented in CDCR facilities audited by this reviewer. Some directives were still in need of revision.

---

[2]The 19 measures were: Observation of R&R intake screening, confirming screening completeness and privacy and confidentiality; Administrative segregation new intake inmates housed in retrofitted new intake cells for 72 hours; Clothing allowance for MHCB patients; Treatment/safety planning for suicidal ideation in MHCBs; Use of alternative housing; Annual suicide prevention training for custody staff; Five-day clinical and custody follow-ups for MHCB returns; Guard One compliance; PT rounds in administrative segregation, SHU, and PSU; Suicide-resistant design of MHCBs; Five-day clinical and custody follow-ups for alternative housing, DSH, and Psychiatric Inpatient Program (PIP) returns; SREs required for emergency mental health referrals/TTA Log for suicidal ideation; SREs required for admission/discharge in MHCB and alternative housing; Privileges for MHCB patients; Emergency response equipment in housing units; Annual suicide prevention training for medical and mental health staff; CPR training for medical staff; SRE Mentoring/Seven-hour SRE training and Safety Planning training for clinicians; and SPRFIT responsibilities.

As shown in the table below, although there was a slight increase in the number of inmate suicides in CDCR during 2016, there were indications that the overall numbers were trending downward, particularly in the area of suicides within restrictive housing units (administrative segregation, SHUs, and PSUs). As of December 28, 2016, CDCR housed 117,612 inmates (in-state within its institutions and camps) and experienced 27 inmate suicides, resulting in a suicide rate of 22.9 deaths per 100,000 inmates.[3]

**TABLE**
**AVERAGE DAILY POPULATION, OVERALL SUICIDES/RESTRICTIVE HOUSING SUICIDES, AND SUICIDE RATES WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION 2013 THROUGH 2016***

| Year | ADP[4] | All Suicides/Rate | Suicides in Restrictive Units/Percent[5] |
|------|------|------|------|
| 2013 | 122,896 | 31/25.2 | 15/48.3 |
| 2014 | 119,069 | 23/18.7 | 14/60.8 |
| 2015 | 116,467 | 23/19.7 | 9/39.1 |
| 2016 | 117,612 | 27/22.9 | 10/37.0 |
| 2013-2016 | 476,044 | 104/21.8 | 48/46.1 |

*Source: California Department of Corrections and Rehabilitation

Caution should be exercised when viewing the above data. Suicide rates are most meaningful when viewed over a sustained period of time and, as stated in this reviewer's earlier reports, although the total number of inmate suicides and the corresponding suicide rate in any prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured. The best methodology for determining whether a correctional system has fully implemented its suicide prevention program continues to be (1) the assessment of suicide prevention practices within each prison, and (2) a review of each inmate suicide in relation to practices in the prison and determining its degree of preventability.

In conclusion, it is recommended that CDCR continue their efforts to fully implement this reviewer's previous recommendations, as well as develop CAPs based upon deficiencies found in this most recent assessment. As shown below, most of these necessary corrective actions are not necessarily based upon new recommendations, but rather by CDCR's continuing challenge of implementing and sustaining adequate suicide prevention practices. As such,

---

[3] By comparison, the suicide rate in state prison systems throughout the country was approximately 20 deaths per 100,000 inmates. See Noonan, M. (2016), *Mortality in State Prisons, 2001-2014 Statistical Tables*, Washington DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

[4] As of midnight last day of year, includes in-state CDCR institutions/camps only.

[5] Percent of suicides in administrative segregation, SHU, and PSU compared to total CDCR suicides.

CDCR should continue to cooperate with the Special Master and his experts through the SPMW process to:

- Develop CAPs for the intake screening process in the five facilities outlined above in Section III. A. In addition, CDCR should eliminate the compound questions contained on the Initial Health Screening form embedded into the new EHRS;

- Develop CAPs for the PT practices in the three facilities outlined above in Section III. B;

- Develop a work order for replacement of the wall ventilation grates in the MHCB unit at CSP/Corcoran;

- Develop CAPs in each of the eight facilities identified above to ensure that new intake inmates assigned to single cells are placed in new intake cells for the first 72 hours of administrative segregation confinement. In addition, CDCR should develop a work order for replacement of the wall ventilation grates in the STRH unit at SVSP. Finally, CDCR should develop a work order for removal of frosted exterior window glazing in administrative segregation units at both CSP/Solano and WSP;

- Prohibit the alternative housing placement of an inmate in any type of dry cell or TTA or other clinic physical exam room for more than one hour. In addition, local SPRFIT committees should be much more proactive in the identification of inappropriate alternative housing locations within their facility;

- Retrain all MHCB clinicians and other members of the IDTTs to allow all MHCB patients not on suicide observation status all of the following items: socks, full-issue clothing, underclothes, reading material, hygiene items, blanket, bed and mattress, and prescribed healthcare appliance. Any excluded items should be justified in the medical chart and reviewed every 24 hours. Finally, a patient not on suicide observation status should never be clothed in a safety smock unless clinical justification is documented in the health care chart. In addition, it is strongly recommended that CDCR develop a process by which the observation of suicidal MHCB patients is audited on a regular basis;

- Develop CAPs for Guard One compliance rates below 90 percent in the four facilities outlined above in Section III. G;

- Develop CAPs for SRE mentoring and seven-hour training compliance rates below 90 percent in the eight facilities outlined above in Section III. H. In addition, CDCR should develop CAPs in the 12 facilities outlined above in

Section III. H that struggled with completing required SREs for emergency mental health referrals involving SI;

- More thoroughly audit the safety plan sections of SREs.  As a first step, CDCR should develop a process by which each safety plan contained within the discharging SRE of an inmate released from a MHCB is reviewed by an SRE mentor at that facility.  Without interfering with the physical and administrative discharge of the inmate from the MHCB, any safety plan found to be deficient (i.e., not containing a reasonably specific strategy to reduce SI) should be returned to the authoring clinician for revision;

- Develop CAPs for the "Discharge Custody Check Sheet" (CDCR MH-7497) form process in the 13 facilities outlined above in Section III. J that were below 90-percent compliance;

- Reissue the "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy" memorandum to include inmates expressing SI and referred to, and discharged from, alternative housing;

- Issue a revised local SPRFIT policy based upon the recommendations of the Special Master's experts;

- Incorporate this reviewer's recommended changes to the *Mental Health Services Delivery System Instructor Guide* pre-service curriculum that were previously forwarded to CDCR's DHCS-Mental Health Program on December 21, 2015 and November 18, 2016.  In addition, CDCR should develop CAPs for annual suicide prevention block training in the 11 facilities outlined above in Section III. L that were below 90-percent compliance. Finally, CDCR should ensure better consistency in the delivery of the annual suicide prevention block training, i.e., utilize the same PowerPoint presentation and determine the adequate number of PowerPoint slides that can reasonably be covered in a two-hour format; and

- Confer with the Special Master's experts on how the 19 suicide prevention audit measures, which will be folded into the CQIT, Chart Audit Tool, DHCS headquarters audit, and UHR/EHR Performance Report processes, will be presented in a final report format.

In addition, as detailed in section III. D above, after careful, additional consideration, this reviewer recommends that Recommendations 14, 15 and 16 be withdrawn from the initial suicide prevention assessment report.  Finally, as stated in previous reports by this reviewer, it is recommended that continuing re-inspection of select CDCR facilities which chronically struggle with their suicide prevention programs would promote the continued provision of technical assistance, a measurement of the sustainability of CDCR's corrective actions, critique of the department's CQI process, and hopefully continued reduction of inmate suicides throughout the prison system.

# APPENDIX A

**Findings and Summaries of CDCR Suicide Case Reviews at 23 Re-Audited Prisons During 2016**

> 1) **Kern Valley State Prison (KVSP)**

**Inspection**:  February 23-24, 2016 (previous suicide prevention audit was on February 26-27, 2015).  KVSP housed approximately 3,932 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed two new admissions during the intake screening process in the R&R unit on February 23, 2016.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), but was observed *not* to be asking all of the required questions, particularly those related to mental health and suicide risk.  In one observed case, the inmate had significant mental health issues, including a recent MHCB discharge.  The nurse did not complete all the required mental health questions, possibly because she was initiating a mental health referral for further assessment.  Regardless, the practice of incomplete intake health screening was problematic.  Of note, and as shown below, inadequate intake screening was found to be a deficiency in one of the 2016 inmate suicides at KVSP.

A previously identified problem of inadequate privacy and confidentiality during the intake screening process because the door to the nurse's office remained open was corrected with installation of a therapeutic module for temporary placement of inmates during the intake process.  The nurse's office door was observed to be closed during the process, with officers stationed in the hallway.

In addition, daily PT rounds in the three administrative segregation units (B-1, ASU-2, and STRH) were observed on February 23-24.  The rounds in all three units were unremarkable and PTs were observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  KVSP had a 20-bed CTC, with 12 designated MHCBs (one MHCB was temporarily offline).  All the MHCB rooms were clean and mostly suicide-resistant, however, physical hazards previously identified by this reviewer in 2014 still had not been corrected.  Each room contained square-shaped stainless steel sinks protruding from the wall that could be conducive to suicide attempts by hanging.  Triangle-shaped stainless steel shelving (found in other CDCR facilities) should be attached to each side of the existing sinks so that any ligature would slide off during a suicide attempt.

In addition, each MHCB room continued to contain wall ventilation grates with holes that were larger than the industry standard 3/16 inch diameter allowing for the possibility of suicide attempts by hanging.  The ventilation grates should be replaced with grates comparable in size to those found in new intake cells in administrative segregation units.

A headquarters work order schedule provided for review indicated that the above described hazards would be corrected in November 2016.

25

The three administrative segregation units (B-1, which housed Enhanced Outpatient Program (EOP)/Correctional Clinical Case Manager System (3CMS) inmates; ASU-2, which housed general population (GP) inmates; and STRH, which housed 3CMS inmates) contained 26 retrofitted cells for inmates on new intake status. During tours of each unit, this reviewer found only one new intake inmate housed in an unsafe, non-new intake cell.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in the B-1 and STRH units, in addition to other designated cells throughout the facility. All inmates in alternative housing were observed on a 1:1 basis, furnished beds, and the vast majority were discharged within 24 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. In addition, inmates not on suicide observation status were being observed at 30-minute intervals. In fact, of 11 inmates in the MHCB unit on February 23, seven (64 percent) were being observed at 30-minute intervals. Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form in the MHCBs. Each form was located on the outside of each inmate's room door and found to be up-to-date.

This reviewer continued to observe a troubling practice in which a few inmates were clothed in safety smocks while being observed at 30-minute intervals. Inmates who are not currently assessed as being suicidal and not on a suicide observation level should *not* be clothed in a safety smock. This issue was previously raised by this reviewer in February 2015. In addition, despite a local operating procedure (LOP) (LOP No. 1051: "Suicide Prevention") which required that inmates discharged from suicide observation status be issued "one pair blue denim jeans and one blue chambray shirt or one jumpsuit," the Physician's Orders template used at KVSP did *not* list either jeans/shirt or jumpsuit (i.e., "full-issue"), and simply contained the option for "shorts/shirt" which was considered only "partial issue." Inmates who are not currently assessed as suicidal and not on a suicide observation level should always have "full-issue" unless there are exigent circumstances based upon clinical judgment clearly documented in the medical record.

Finally, a review of Guard One data for a recent 24-hour period found 95-percent compliance in the B-1 and STRH units with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a list of emergency mental health referrals from the Mental Health Tracking System (MHTS) for a two-month time frame. The TTA log for the same time period was also reviewed.[6] This reviewer's eUHR review of 41 emergency referrals for suicidal ideation/behavior from January and February 2016 revealed that clinical staff completed the required SREs in 93 percent of the cases. Completion of SREs for inmates housed in alternative housing was also audited. The review found that required SREs were completed in 90 percent (18 of 20) of cases.

---

[6]Unlike previous audits, this reviewer decided not to continue to audit the discrepancy between emergency mental health referral data found in the MHTS and the TTA log. Prior audits found the discrepancy was most likely caused by the clinician's failure to complete a MH-5 Mental Health Referral Chrono (for entry into the MHTS) after responding to the referral.

This reviewer examined 21 SREs of inmates released from a MHCB between December 2015 and February 2016. The sample findings were problematic. Although each of the 21 inmates had a discharge SRE, one-third (seven of 21) of the SREs contained narrative that was inconsistent with either chronic or acute risk levels, or both. In addition, approximately 14 percent (three of 21) of cases were missing the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B). Over 90 percent (19 of 21) of discharging SREs contained problematic safety plans that failed to contain adequate strategies for reducing SI. Most narratives in the safety plan section simply recited *Program Guide* requirements. For example, in one case (KVSP 1), the safety plan simply read: "IP is discharged to the yard, IP will be on a 5-day follow-up, IP is encouraged to seek mental health should the symptoms recur." In another case (KVSP 2), the clinician wrote: "IP should work on self advocation skills other than coming to MHCB to get his needs met. Recommend MH tx focus on developing alternative appropriate ways to get needs met instead of utilizing mental health. Recommend groups, *if available* (emphasis added), to develop coping skills and strategies." An inmate (KVSP 3) that was in a MHCB for a seven-day period of February 8, 2016 through February 15, 2016 had the following safety plan: "D/C to CCCMS LOC. Inmate made improvements in the following areas: identify and challenge the cognitive distortions that led to the behaviors that precipitated this admission, improving his frustration tolerance and decreasing impulse thinking; along with anger management." Such narrative might be a summary of the treatment received, but did not demonstrate safety planning to reduce SI.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambulatory Bag Used for Cardiopulmonary Resuscitation (Ambu bag), and cut-down tool.

**SPRFIT Meetings**: Similar to the 2015 audit, a review of three months of SPRFIT meeting minutes (November 2015 through January 2016) found that psychiatry (either the chief psychiatrist or senior psychiatrist) failed to attend any of the monthly meetings. The meetings appeared unremarkable and often lasted only 15 to 30 minutes. It was noteworthy that although data was presented to indicate that SREs were completed for over 90 percent of inmates discharged from a MHCB, the quality of safety planning was *not* addressed by the SPRFIT. Lack of discussion regarding safety planning was also observed during this reviewer's attendance at the February 23, 2016 SPRFIT meeting.

**Training**: According to training records, approximately 99 percent of custody staff and 100 percent of nursing staff were currently certified in Cardiopulmonary Resuscitation (CPR). In addition, 97 percent of custody staff had received annual suicide prevention training during 2015. Following repeated requests, KVSP officials failed to provide data on annual suicide prevention training for both medical and mental health staff, resulting in non-compliance for this area. Finally, as of February 2016, 60 percent of mental health clinicians had completed the SRE mentoring program, and 90 percent had received the seven-hour SRE training.

**Recent Suicides**: KVSP experienced three inmate suicides during the review period (all of which occurred during 2016). In the ***first*** case (KVSP 4), the inmate was found hanging from a shelf by a sheet in his administrative segregation cell a few minutes after midnight on January 13, 2016. The inmate entered the CDCR system in October 2008 to serve a 31-year and four-

month sentence for corporal injury to spouse, false imprisonment, assault with force to cause great bodily injury, terroristic threats, and vehicle theft.  In addition, he was charged with the murder of his cellmate on April 11, 2015 and was pending prosecution at the time of his death. He incurred ten Rules Violation Reports (RVRs) during his confinement, most of which involved battery on inmates and refusing a cellmate.  He was transferred to KVSP in April 2012.  The inmate had good support from family and friends, but few visits because most family members resided out-of-state.

According to available records, the inmate had a dysfunctional childhood, with his father leaving the family when he was three years old.  In addition, his mother was incarcerated when he was approximately 13 years old and he lived in various group home environments until his graduation from high school.  The inmate had various arrests as both a juvenile and adult, but was not thought to be gang-affiliated.  He attended college for three years on a football scholarship and was later drafted into the NFL where he played successfully for several years.

Although the inmate did not have a history of any mental health treatment in the community, he experienced both substance abuse and anger management problems during his college and professional football years.  Upon entry into CDCR, he denied any mental health problems, as well as SI and/or history, on multiple occasions.  He had one prior MHCB admission for five days during 2013 when he refused to eat state-issued food.  Completion of multiple SREs during his almost eight-year incarceration consistently found "low" chronic and acute risk for suicide. He was not a participant in the MHSDS.

The inmate did not have a serious or life-threatening medical problem, although he suffered from various joint issues related to his football career.

During the afternoon of January 12, 2016, the inmate returned to KVSP from a court hearing in which the judge found probable cause to proceed to trial on the murder of his cellmate.  If convicted, the inmate faced a possible death sentence.  According to the Initial Health Screening form completed by the nurse, the inmate refused to get out of the transportation vehicle and go into the nurse's office for screening, therefore, the nurse conducted the screening inside the vehicle.  The nurse subsequently told the CDCR reviewer in this case that refusal to leave the transportation vehicle was not unusual for some inmates.  The inmate answered "no" to all intake screening questions and stated "I'm good."  He was then escorted to the administrative segregation unit where he had been housed since the alleged murder of his cellmate in April 2015.

According to a progress note written by a PT at approximately 8:50 p.m. on January 12, 2016, she was approached by both the sergeant and lieutenant in the administrative segregation unit who were concerned that the inmate had received "bad news" in court that day and appeared depressed.  Custody staff performing Guard One had observed that the inmate had "his belongings packed and a note on top or at least it appeared to be that way.  I/P was squatting against the wall and toilet and bunk with face and hands as if he were praying."  The PT conferred with a nursing supervisor and TTA nurse "on the best course of action."  Because the inmate "never stated or mention at this point to medical or custody that he is suicidal," a decision was made to "step up observation" throughout the night and "check for any suicidal

paraphernalia for at least the next 24 hours". A few hours later at approximately 10:00 p.m., the sergeant initiated an urgent mental health referral that stated the inmate "will not talk or make eye contact. Looks depressed." Consistent with policy, the urgent referral was not reviewed by a mental health clinician until the following morning (after the inmate's death which occurred several hours earlier at approximately 12:05 a.m. on January 13, 2016).

Although two cryptic suicide notes were found in his cell, neither was elaborative regarding the reason(s) why the inmate chose to commit suicide. The CDCR reviewer noted the most obvious precipitating factor to the suicide being the "bad news" he had received in court several hours earlier.

The Suicide Report contained two recommendations for corrective action through a QIP: "1) Custody responders did not bring the cut down kit with them to the cell. The problem is a systems issue. Decisions about where the kit is kept and that it is stored in a container that allows easy access and transportation should standardize system wide; 2) Per the Nursing Death Review Summary, three nursing concerns **were** identified with required follow-up." The first nursing concern was that "the patient's behavior warranted an emergency referral to mental health and evaluation in the TTA instead of increased observations (not defined by order or documentation) by custody. No referral to mental health was made by nursing." The second concern was a "lack of communication upon the patient's return from court between custody and nursing related to the patient's receipt of bad news." The third concern was an approximate 30-minute delay in transporting the inmate from his cell to the TTA.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

In the *second* case (KVSP 5), the inmate was found hanging from a ventilation grate by a sheet in his administrative segregation cell during the early evening of June 17, 2016. The inmate entered the CDCR system in April 1999 to serve a life sentence (with parole consideration) for attempted murder, conspiracy to commit murder, and shooting at a person from a motor vehicle. In addition, the inmate received an additional 25-year sentence in 2007 for the attempted murder of an inmate. He was transferred to KVSP in October 2013. He incurred 17 RVRs during his confinement, the most recent of which occurred on May 12, 2016 when he was involved in a fight with another inmate resulting in his placement in administrative segregation. The inmate later expressed safety concerns related to an accumulating drug debt. He was known to be gang-affiliated. The inmate was unmarried, but had a daughter born in 1999. Although the inmate had previously received visits from his parents, those visits ended in 2000, and he did not have any subsequent family support or visits, and very limited correspondence.

Available records regarding the inmate's childhood were sparse, but indicated that he grew up in an intact family and was raised by both parents in poverty. He did not complete high school, had a very limited work history, and joined a gang at an early age. The inmate had several arrests as a juvenile, but only one adult conviction that resulted in his CDCR commitment. There was no known history of either mental illness or suicidal behavior, but the inmate did have a significant history of substance abuse. On multiple occasions he denied any mental health problems, as well as SI and/or history, as a result of either intake screening or pre-SHU/administrative segregation

assessment. Therefore, the inmate was never a participant in the MHSDS. Further, he did not have any serious or life-threatening medical problems that were thought to be contributory to the suicide.

The CDCR reviewer in this case did not find any specific precipitating factors to the suicide, other than the fact that the inmate had sought the administrative segregation placement due to safety concerns arising out of a significant drug debt on the yard. In addition, the reviewer noted that the inmate "left behind a small amount of correspondence as well as letters he never mailed. A close reading indicates that the inmate dealt with a good deal of regret, anger, and sorrow over the actions that led him to be incarcerated for life. He wrote of isolation from family and his daughter and appeared to lash out at himself at times for his life choices, and struggles with addiction. Yet there was little to suggest an ongoing depression or major mental disorder. He appeared to utilize material copied from books on Taoism, Buddhism, and various internal martial arts as a balm against these darker feelings."

The Suicide Report contained two recommendations for corrective action through a QIP: "1) Only the cut-down tool (shears) was retrieved at the time of the incident by custody staff. The cut-down kit was not transported immediately, as specified in policy memorandum; 2) One nursing care concern (regarding incomplete documentation by the Psych Tech during the Pre-ASU screening)."

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable. The rationale for these findings was unclear.

In the _**third**_ case (KVSP 6), the inmate was found hanging from the stool support bracket by a sheet in his GP Sensitive Needs Yard (SNY) cell during the early morning of July 1, 2016. The inmate entered the CDCR system at age 18 in June 2000 to serve four consecutive life sentences (without consideration for parole) for multiple counts of kidnapping for extortion and attempted murder of two adolescent girls. He was transferred to KVSP in June 2014. The inmate incurred 19 RVRs during his confinement, the most recent of which occurred in April 2014 and involved possession of a dangerous weapon. He also served two SHU terms totaling six months confinement. The inmate was known to be a gang dropout, and assigned to the SNY due to the nature of his offenses, as well as his gang affiliation. The inmate was never married and had no children. He had no known family, no visitors, and little correspondence during his confinement. According to both staff and inmates on the housing unit, the inmate was housed in a single cell because he did not get along with other inmates, had no friends on the unit, and did not attend either dayroom or yard activities.

According to available records, the inmate was initially raised in an intact family, but his parents divorced at an early age. He was subsequently raised by his mother until she died of a drug overdose when he was 12 years old. The inmate suffered extreme physical abuse from his mother, which included her intentionally scalding him with boiling water when he was two years old, "resulting in severe burns over 70 percent of his body. This resulted in deformity of his limbs, the loss of all toes on both feet and four fingers on his left hand, and extensive scarring, requiring more than 40 corrective surgeries during his lifetime. He was left with physical

injuries that caused a permanent disability." After his mother's death, the inmate lived with his father until his death by drug overdose. He subsequently lived with his stepmother for a short time after which he was either placed in various group homes or was homeless. (The inmate would subsequently report to CDCR clinicians that he was also repeatedly beaten with baseball bats by his stepbrothers as a youth.)

The inmate did not complete high school, had a very limited work history, and joined a gang at an early age. The inmate had several arrests as a juvenile, but only one adult conviction that resulted in his CDCR commitment. Upon entry into CDCR, he did not report any mental health problems until July 2004 when he entered the MHSDS at the 3CMS level of care. His admitting diagnosis was not found in the records. Except for two time periods from May 2007 until July 2008 when he was temporarily discharged from the MHSDS, as well as a two-month period in 2014 when he was elevated to the EOP level of care, the inmate remained at the 3CMS level of care for his entire CDCR confinement.

The inmate had a prior history of suicide that included two suicide attempts as a youth, the first of which was a drug overdose at age 13, followed by a hanging attempt while confined in a juvenile detention facility. While in CDCR, he attempted suicide in both April 2013 and July 2013 by cutting the veins to his shoulder and feet, as well as swallowing razor blades. Each incident resulted in MHCB placement. The inmate's last SRE, completed in August 2015, assessed a "moderate" chronic and "low" acute risk for suicide. He was also placed in the Department of State Hospitals (DSH) at the intermediate level of care from September 2013 through June 2014. His diagnoses were Depressive Disorder, Not Otherwise Specified (NOS), Antisocial Personality Disorder and Borderline Personality Disorder. The inmate was treated with psychotropic medications for most of his confinement up until December 2015 when he began refusing them. The medications were discontinued in March 2016. Scheduled follow-up appointments with the psychiatrist in May 2016 and June 2016 were canceled due to provider unavailability. The inmate was last seen by his PC on May 2, 2016. His mood was described as "euthymic," his level of depression was "3 or 4" out of ten, and he denied SI, intent or plan.

The inmate's Mental Health Treatment Plan developed on August 11, 2015 included a provision for the PC "to meet with IP weekly to engage in cognitive behavioral therapy (CBT) and supportive psychotherapy to improve IP's reality testing and increased coping mechanisms/skills." According to the CDCR reviewer's critique of the treatment plan, as well as subsequent PC contact, "*Weekly* clinician contact is a relatively intense treatment plan at the CCCMS level of care, suggesting that there was concern for the inmate's stability in August 2015. However, the treatment plan, as written, was never fully implemented and there is no rationale as to why a higher level of care was not considered. Weekly sessions to improve reality testing and increase coping skills were not provided."

As noted above, as well as in the Suicide Report, the inmate "had a long history of chronic pain, deformities of his feet, residual open wounds in the right leg secondary to skin grafting, and a chronic ulcer of the left leg. He was mobility impaired and used either a single point cane or a wheelchair, depending upon his comfort level.

The CDCR reviewer in this case did not find any specific precipitating factors to the suicide, and the inmate left three suicide notes which simply stated "I did it myself."  The Suicide Report contained four recommendations for corrective action through a QIP:

    1) There were problems in the frequency of treatment provided.  A Treatment Plan on 8/11/2015, approved by the IDTT, identified treatment goals, which included weekly primary clinician sessions.  There were four PC visits with the inmate between 8/11/2015 and the date of his death on 7/1/2016, according to the MHTS.

    There were two changes of CCCMS PCs, which occurred on 8/28/2015 and 12/15/2015.  In each case, it would have been reasonable for the newly assigned PC to become familiar with the Treatment Plan in effect, the inmate's diagnosis and suicide history, and the inmate's progress since the IDTT in August 2015.  The newly assigned PC would be expected to make whatever adjustments necessary to assure that the delivery of care intended by the IDTT was being carried out, or to reconvene an IDTT if a new treatment plan seemed necessary.  This was not done;

    2) Concerns about the quality and continuity of treatment were noted.  According to the treatment plan dated 8/11/2015, a clinician was to meet with the inmate weekly employing CBT to help him "identify, understand, and verbalize cognitive distortions and depression" and to develop "reality-based reasoning that challenges cognitive distortions and behavior."  There is no documentation of CBT intervention in the eUHR during 2015 or 2016.  Recommending weekly sessions in the CCCMS indicates there was significant concern about the inmate, but there was insufficient justification for the reduction in LOC or the lack of consideration of a higher LOC;

    3) On 11/5/2015, the acting CCCMS PC made an Urgent mental health referral to the psychiatrist treating the inmate for a medication review.  It appears that a mental health supervisor revised the request to make it a Routine mental health referral, and that contact with the psychiatrist occurred 12 days later, on 11/17/2015.  The response to the referral did not occur within *Program Guide* timelines for an Urgent or Routine mental health referral.  In addition, there was no documentation of the 11/17/2015 encounter;

    4) The assessment of "Moderate" chronic suicide risk by prior examiners did not capture the lethality of the most serious suicide attempts in 2013, and may have underemphasized the risk of future suicide attempts in ways that failed to alert clinicians at KVSP to the need for on-going, active clinical monitoring in contact with the inmate.  The SRE did not identify social disengagement, inability to maintain a cellmate, the lack of visitors, and the lack of family support.  Enhanced monitoring and recognition of risk, as well as regular and frequent contact with a clinical team, could have been important protective factors if they had been provided.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

### 2)     **North Kern State Prison (NKSP)**

**Inspection**:  February 25-26, 2016 (previous suicide prevention audit was on February 24-25, 2015).  NKSP housed approximately 4,143 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a nurse perform the intake screening process on two new admissions, and a colleague observed three mental health screenings by a psychologist in the RC on February 25, 2016.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and asked all of the required questions.  The door to the nurse's office remained closed with an officer stationed in the hallway.  A vast improvement was observed in the intake screening process during the current assessment.  During the 2015 assessment, this reviewer found several problems with the accurate completion of the intake screening process, including the use of an outdated form and a lack of reasonable privacy.  These deficiencies were observed to be corrected during the current assessment.  NKSP continued to maintain an excellent practice of stationing a psychiatrist in the RC to expedite mental health evaluations and assessment of medication needs.  In addition, a psychologist was observed correctly completing the 31-item mental health screening in the privacy of an office within the Diagnostic Building.

Daily PT rounds in the administrative unit (D-6) were observed on February 26.  The rounds were unremarkable and the PT correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  NKSP had a 16-bed CTC, with ten designated MHCBs.  All the MHCB rooms were clean and mostly suicide-resistant, however, a physical hazard continued to be observed.  Each room contained wall ventilation grates with holes that were larger than the industry standard 3/16 inch diameter allowing for the possibility of being conducive to suicide attempts by hanging.  The ventilation grates should be replaced with grates comparable in size to those found in new intake cells in the administrative segregation unit.  These hazardous ventilation grates were identified by this reviewer during previous assessments. This reviewer subsequently examined a headquarters work order schedule that indicated the above described hazards would be corrected in October 2016.

In addition, the administrative segregation unit (D-6) had a total of 12 new intake cells that had been retrofitted to be suicide-resistant (including two additional since the 2015 assessment).  During the on-site assessment, this reviewer observed that several intake cells were empty, with all new intake inmates housed in new intake cells.

Finally, **alternative housing** cells continued to be designated in A-4 to temporarily house suicidal patients prior to transfer to a MHCB.  All inmates in alternative housing were observed on a 1:1 basis and bunks were found in each cell, consistent with policy.  During the three-month period of December 24, 2015 through February 24, 2016, approximately 68 percent of inmates in

alternative housing were discharged within 24 hours, with the vast majority of the remaining 32 percent discharged within 48 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, inmates not on suicide observation status were being observed at 15-minute intervals, consistent with facility policy.  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form in the MHCBs.  Each form was located on the outside of each inmate's room door and found to be up-to-date.

The facility had a LOP (LOP No. 161: "Correctional Treatment Center") that required that inmates *not* on suicide observation status "will be allowed clothing consisting of boxer shorts, T-shirt, and socks unless specific clothing items are ordered removed by the physician, psychiatrist, and/or licensed psychologist."  Such a "limited issue" requirement was contrary to a subsequent CDCR directive dated March 15, 2016 ("Level of Observation and Property for Patients in Mental Health Crisis Beds") which required full issue clothing for all MHCB patients not on suicide observation status unless exigent circumstances were documented in the medical chart for each inmate.  The LOP also prohibited both visiting and routine telephone privileges for MHCB patients, a procedure that was contrary to a subsequent CDCR directive dated June 23, 2016 ("Mental Health Crisis Bed Privileges") which allowed such privileges when approved by the MHCB IDTT.  This reviewer was informed that inmates were afforded showers and yard privileges three times a week.  A medical chart review found several Physician's Order forms noteworthy for vague orders of "suicide precautions," without notations for possessions/privileges allowed or disallowed.

Two IDTT meetings in the MHCB unit were observed on February 25, 2016.  The treatment team sessions were generally unremarkable, with adequate discussion of current suicide risk and strategies to decrease ideation lacking in the one case of an inmate on suicide precautions.

A review of Guard One data for a recent 24-hour period found that in unit D-6, the level of compliance with required checks not exceeding 35-minute intervals was almost 100 percent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of 20 emergency mental health referrals from the MHTS for February 2016.  A review of the TTA log for the same time period found an additional six emergency mental health referrals.  This reviewer's eUHR review of 26 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in each case.  Completion of SREs for inmates housed in alternative housing was also audited.  The review found that required SREs were completed in all (20 of 20) cases reviewed during January and February 2016.  A similar finding was observed during the 2015 assessment and NKSP clinicians continued to exhibit good practices in this area.

However, other matters continued to be problematic.  The treatment plan sections of nine discharging SREs of inmates released from a MHCB during December 2015 and January 2016 were reviewed.  Contrary to recent instructions from the system-wide safety planning training, all were problematic and contained inadequate strategies for reducing SI.  Most treatment plans simply recited *Program Guide* requirements, e.g., "1) I/P will be discharged to EOP LOC; 2 )

*Coleman* f/u; 3) Custody f/u; 4) Contact with EOP primary clinician and psychiatrist, per EOP guidelines; 5) group therapy to address mood instability and increased distress tolerance." The most disturbing finding was that these boilerplate safety plan sections of discharging SREs often contained the *exact* narrative found in medical charts reviewed during the 2015 assessment. As such, there had been no progress in this area.

Finally, NKSP clinicians continued to often place a mental status examination template in the upper box of the SRE's second page, thereby not allowing room for any narrative that summarized chronic risk, acute risk and protective factors from the first page, as well as other pertinent historical and/or clinical information.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (December 2015 through February 2016) found that quorums were achieved at all three meetings. NKSP continued to exhibit an excellent practice of scheduling these monthly meetings to occur immediately after the Warden's morning meeting, the result of which was high attendance. The content of the meetings were otherwise brief and unremarkable.

**Training**: According to training records, approximately 100 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 100 percent of custody, medical, and mental health staff received annual suicide prevention training during 2015. Finally, as of February 2016, 81 percent of mental health clinicians had completed the SRE mentoring program, and 93 percent had received the seven-hour SRE training.

**Recent Suicides**: NKSP experienced one inmate suicide during the review period (occurring in 2016). In that case (NKSP 1), the inmate was found hanging from the light fixture by a sheet in his GP cell during the morning of July 25, 2016. The inmate entered CDCR for the second time in June 1988 to serve a life sentence (without consideration for parole) for multiple counts of murder, burglary, and robbery. He was transferred to NKSP on April 7, 2015. The inmate incurred seven RVRs during his confinement, all occurring subsequent to 2000; the most recent of which occurred on March 13, 2016 and involved being under the influence of a controlled dangerous substance (morphine). The inmate was known to be gang-affiliated. He was divorced and had two grown children. He had the support of various family members, mostly through letter correspondence. He was last visited in 2013 by his sisters. According to both staff and inmates on the housing unit, the inmate kept to himself, was respectful to staff, and held a variety of jobs that were interrupted by his frequent facility and housing unit moves (he had been housed in 13 facilities during his 28-year CDCR confinement).

Although most of his social history background was unclear and unconfirmed, according to available records, the inmate was raised in a dysfunctional family atmosphere in which his father was murdered when he was a young child, with unconfirmed reports that he was a witness to the murder. The inmate and his three siblings were raised by their mother, and various family members struggled with both serious mental illness and substance abuse. The inmate began using illegal drugs at age 12. There were reports that the inmate's mother died by suicide in

35

December 2009, as well as his brother committing suicide several months earlier in June 2009. Other reports suggested that his sister, and not his mother, had committed suicide.

The inmate had an extensive juvenile history, limited work history, and completed his GED while confined in the California Youth Authority (CYA). In 1979 at the age of 17, the inmate attempted to commit suicide by hanging in a juvenile detention facility following his arrest for robbery. He was sent to Patton State Hospital (PSH) for an evaluation of his competency to stand trial. Upon discharge from PSH, the inmate was sent to CYA where he finished his term. His first CDCR term was from August 1982 through January 1984.

Although the inmate entered CDCR for a second term in 1988, he did not have any contact with the MHSDS until September 2010 when he was placed at the 3CMS level of care following a psychiatric assessment indicating worsening stress, depressed mood, and insomnia for the past seven months. He also voiced complaints of mood swings, pacing, and auditory hallucinations (AH) which occurred when he did not sleep for three to four days. Although generally compliant with the psychotropic medication, the inmate often refused to participate in both individualized and group treatment. In September 2015, his psychotropic medication was discontinued after he had been non-compliant since June 2015, and denied any current symptoms of depression. He remained at the 3CMS level of care with a diagnosis of Major Depressive Disorder, Recurrent Mild.

Apart from the reported suicide attempt by hanging at age 17, the inmate did not have any other suicide attempts, but expressed SI in 2011. However, despite this history, as well as a family history of suicide, his most recent SRE completed on April 20, 2015 assessed both a "low" chronic and acute risk for suicide. He did not have any MHCB placements.

The inmate was last seen by his PC on June 6, 2016 and the progress note indicated that, although denying any SI, he was "feeling alright but a little stressed." The stress was caused "because he had not recently heard from his tribal attorney." Apparently the inmate had been consulting with a tribal attorney in Kansas and hoped to get a "clemency" and transfer to Kansas where "his native tribe would care for him." However, there were no formal documents in his correctional file to indicate that he had petitioned for such clemency, and it appeared unrealistic that he would be provided with such given his sentence of life without parole.

The inmate had medical issues that included chronic back pain and gastroesophageal reflux disease. He was also being seen by a medical provider for blood in his stool, and further diagnostic testing was pending at the time of his death. He shared his health concerns with a few other inmates, and it was unclear if these concerns were a precipitant to his suicide.

The CDCR reviewer in this case did not find any specific precipitating factors to the suicide and a suicide note was not found. The reviewer, however, noted that "there were a variety of stressors identified during the review, including the loss of multiple family members through death, geographical distance from family, non-compliance with medication, difficulty sustaining a job due to building moves, financial concerns, unclear hopes of an eventual parole, and finally chronic pain with the possibility of a major medical illness. Perhaps the totality of these concerns made the inmate decide life was not worth continuing."

The Suicide Report contained four recommendations for corrective action through a QIP:

> 1) Custody staff responding to this instance failed to respond with the appropriate cut-down kit, but rather the cut-down tool alone. California Code of Regulations (CCR), Title 15, Section 3365 (c) states in part, "A cut-down kit shall be immediately accessible on each unit and shall be used by staff in case of an attempted suicide by hanging";

> 2) There was a delay of 11 minutes before 911 was called by NKSP staff. IMS P&P Chapter 12: Emergency Medical Response instructions indicate that "all staff has the authority to initiate a 911 call for Emergency Medical Services (EMS)";

> 3) The SRE completed on April 20, 2015 did not accurately incorporate chronic and acute risk factors. As a result, the formulation of risk appeared to have been underestimated;

> 4) There does not appear to be concordance between the treatment plan on April 7, 2016 and subsequent progress notes. The progress notes do not document interventions or progress in treatment. Problems identified with this treatment plan included: lack of measurable goals and minimal information on progress in treatment. Additionally, the identified treatment goals did not indicate means or interventions to coincide with the respective goal.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

### 3)    California Institution for Women (CIW)

**Inspection**: March 22-23, 2016 (previous suicide prevention audit on May 19-20, 2015). CIW housed approximately 1,821 inmates at the time of the on-site assessment. A targeted follow-up on-site assessment was conducted on January 25-26 2017.

**Screening/Assessment**: The intake screening process within the R&R unit was not observed because there were not any new inmates who were admitted into the facility during the two-day assessment. However, a review of the Initial Health Screening form (CDCR Form 7277) that was embedded into the new EHRS[7] revealed that the form still contained compound questions. This reviewer had an opportunity to observe an intake screening within the PIP. The process was problematic because the nurse did *not* ask the inmate whether she was currently suicidal, and an officer was stationed inside the room, thus compromising privacy and confidentiality.

In addition, this reviewer observed daily rounds by two PTs assigned to administrative segregation, SHU, and PSU on March 22-23, 2016. The rounds in all three units were

---

[7]The new EHRS went live at both CIW and CCWF in late October 2015.

unremarkable and the two PTs were observed to be correctly completing the Psych Tech Daily Rounds Form on each caseload inmate at cell-front as required.

**Housing**:  CIW had a CTC with ten designated MHCBs.  During the assessment, this reviewer observed that sink faucets with anti-squirt slits were being replaced in several MHCB rooms.  As observed during prior assessments, many of the MHCB rooms contained a stainless steel sink that had sharp edges that could be used as an anchoring device in a suicide attempt by hanging.  This reviewer was subsequently informed that triangle extensions were attached to the stainless steel sinks in January 2017.  A previous deficiency of inmates not being provided mattresses had been corrected.

The administrative segregation unit contained seven retrofitted cells for inmates on new intake status.  Due to a low census during the on-site inspection, this reviewer observed only two of the new intake cells being utilized.

Finally, the four "swing" medical beds (Rooms 7, 8, 9, and 11) in the CTC were primarily used as **alternative housing** cells to temporarily house inmates awaiting MHCB placement.  The designated cells in the TTA and PSU could also be used for alternative housing.  All inmates in alternative housing within the CTC were observed on a 1:1 basis and were furnished beds.  Alternative housing was used extensively at CIW.  From January 1, 2016 through March 19, 2016, there were over 100 inmates placed in alternative housing, with 68 percent discharged within 24 hours.  The remaining 32 percent of inmates were confined well beyond 24 hours, with ten percent exceeding 72 hours.  Of note, upon return to CIW on a special assignment in January 2017, this reviewer and a colleague observed a dramatic reduction in the use of alternative housing at the facility.  This area will be reviewed further during a subsequent audit.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were regularly used in the CTC for patients identified as being suicidal.  In addition, inmates not on suicide observation status were being observed at 15-minute intervals.  Because CIW was using the new EHRS, observation sheets were no longer maintained on each patient's door.  Rather, nursing staff documented observation of MHCB patients on laptops and/or tablets.  This reviewer observed nursing staff positioned in the nurse's office and *not* in the corridor in close proximity to MHCB rooms.  This reviewer and an EHRS specialist from CDCR headquarters examined the observation forms embedded in the new EHRS and found documentation was not staggered; further, there was uncertainty as to whether the new health record was accurately recording the nursing rounds.  The EHRS specialist indicated that a slight revision in the EHRS was being considered to correct the problem.

This reviewer observed that MHCB clinicians remained uncertain regarding privileges such as telephone calls and visits afforded to inmates, and Physician's Order forms were not always completed on a daily basis for inmates who had restrictions.  In one case (CIW 1) observed by this reviewer during an IDTT meeting, the inmate appeared obsessed at being discharged from the MHCB that day so she would be able to have a telephone call, as well as an upcoming visit with her mother and four-month-old daughter scheduled for that weekend.  The treatment team did *not* address her concerns and the visit was subsequently canceled.  Ironically, the team

subsequently decided to discharge the inmate during the meeting, but it was unclear as to whether the canceled visit was rescheduled.

CIW had conflicting LOPs regarding the issue.  For example, one LOP regarding the MHCB (Volume 12, Chapter 5) stated that "Inmate-patients have the right of access to other persons outside the CTC by means of visitors and by verbal (i.e. telephone) and written communication consistent with CDCR and CIW rules and regulations.  Visitations shall be approved by the Warden and Chief Medical Officer" (at page 9).  Another LOP (No. 328: CTC) stated that "Any IP who is long-term (over 30 days) and has been to classification shall be entitled to utilize the IP telephone per their designated privilege group."  Both of these LOPs were contrary to a subsequent CDCR directive dated June 23, 2016 ("Mental Health Crisis Bed Privileges") which allowed such privileges when approved by the MHCB IDTT.  This reviewer was informed, and records reflected, that other privileges, such as showers and yard, occurred on a regular basis for MHCB patients.

Several IDTT meetings were observed on March 22-23, 2016, including the above case.  Overall, this reviewer observed good discussions regarding suicide risk and safety planning to reduce future recurrence of SI.

A review of Guard One data for a recent 24-hour period found 85-percent compliance with required checks not exceeding 35-minute intervals in administrative segregation, SHU, and PSU.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of September 1, 2015 through February 29, 2016.  In addition, this reviewer and a colleague reviewed a listing of emergency mental health referrals for suicidal behavior from the TTA log for parts of February and March 2016.  A total of 66 emergency mental health referrals were reviewed, with required SREs completed in only 89 percent (59 of 66) of the cases.  Of note, although this percentage was lower than desired, it reflected a sizable improvement from the 2015 assessment when only 63 percent of reviewed cases had SREs.  Further, this reviewer did not find any cases in which five-day follow-ups were ordered in lieu of required SREs, a lingering problem found during the previous assessment.  Of note, upon return to CIW on a special assignment in January 2017, a review of several emergency mental health referrals for SI from December 2016 and January 2017 revealed that the required SREs were completed in *all* cases.  This area will be further reviewed during a subsequent audit.

Finally, however, continuing problems with safety planning following MHCB discharge were found.  In March 2016, in preparation for this reviewer's assessment, the SPRFIT coordinator conducted an audit of 22 medical charts involving inmates that required both an SRE and safety planning due to SI and/or self-injurious behavior.  The audit found that only 59 percent (13 of 22) of cases resulted in required SREs and only eight percent (one of 13) of those cases that contained a completed SRE had an adequate safety plan.  Similar findings were discovered during the on-site audit.  Although required SREs were completed in 95 percent (18 of 19) of reviewed charts of inmates discharged from the MHCB unit, safety planning narratives contained in both the SREs and subsequent clinical five-day follow-up assessments were inadequate.  This

finding was surprising given the adequacy of IDTT discussion of safety planning observed during the on-site assessment.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (December 2015 through February 2016) of SPRFIT meeting minutes found that quorums were *not* achieved in any of the meetings, with psychiatry absent in two of the three committee meetings.  The meeting minutes were otherwise unremarkable.  Of note, upon return to CIW on a special assignment in January 2017, a review of an additional three months (October 2016 through December 2016) of SPRFIT meeting minutes found that quorums were met during all three months, with psychiatry represented at monthly meetings.  In fact, there were more than 15 committee members represented at each meeting.  In addition, meeting minutes included robust summaries of several serious suicide attempts, as well as of an inmate suicide occurring in November 2016.  The summaries were based upon chart reviews by the SPRFIT coordinator.  It was noteworthy that the SPRFIT coordinator chart reviews found additional deficiencies in both the April 2016 and November 2016 suicides at CIW than were found in the CDCR suicide reports by the CDCR reviewers.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were certified in CPR.  In addition, 99 percent of custody, 90 percent of medical, and 90 percent of mental health staff had completed annual suicide prevention block training during 2015.  Finally, as of March 2016, 98 percent of mental health clinicians had completed the SRE mentoring program, and 96 percent had received the seven-hour SRE training.

**Recent Suicides**:  CIW experienced two inmate suicides during the review period (both of which occurred in 2016).  In the ***first*** case (CIW 2), the inmate was found hanging from the ventilation grate by a sheet in her Support Care Unit (SCU) (EOP housing) cell during the early morning of April 14, 2016.  She was found in the state of rigor mortis.  The inmate entered the CDCR system in June 1997 at age 15 to serve a 19-year sentence for attempted second-degree murder of a group home supervisor.  She was discharged from that sentence in 2014, but remained in CDCR custody to continue serving a more than two-year sentence for drug possession sustained while in CDCR.  Her earliest possible parole date was July 20, 2016.  She incurred 45 RVRs during her confinement, most of which involved aggressive behavior and refusing to program and/or follow orders.  The last RVR occurred in 2015.  She had ten administrative segregation and three SHU placements during her almost 19 years of confinement.  The inmate was not gang-affiliated, and had marginal family support, with the last visit occurring in January 2016.

According to available records, the inmate had a very dysfunctional childhood.  She was initially raised by her mother until age seven, when her mother died suddenly.  Her father was in and out of jail and died of a heroin overdose in 2008, thought to be a possible suicide.  She was then raised by her maternal grandfather until age 14, when she was removed from the home following long-term physical and sexual abuse by her grandfather and other men.  She then spent time in several group homes until the instant offense.

The inmate had a significant history of substance abuse and, although not receiving mental health treatment until her confinement in county juvenile hall following two arrests, self-reported both AH and SIs beginning at age seven. Upon entry into CDCR, the inmate was placed in the MHSDS at the 3CMS level of care with a diagnosis of Major Depressive Disorder. In 2013, following her third MHCB admission, the inmate's level of care was elevated to EOP. She received varying diagnoses during her CDCR confinement, including Amphetamine Dependence, Antisocial Personality Disorder, Psychosis NOS, Psychotic Disorder, and Adjustment Disorder with anxiety. Her most recent diagnosis was Major Depressive Disorder. The inmate had a medical history that included both hypertension and migraines.

According to the CDCR reviewer, the inmate also had a significant history of suicidal and self-injurious behaviors, including eight self-reported incidents between ages seven and 14 that involved cutting, hitting walls, and attempted suicide by hanging. During her CDCR confinement, she attempted suicide three times. The inmate had at least nine MHCB placements and her chronic risk for suicide was almost always listed as "high." She saw her EOP clinician on a frequent basis, often two or three times per week during the last two years prior to her death. According to the CDCR reviewer, documentation "reflected a fairly consistent recent pattern of emotional lability, interpersonal struggles, anxiety, depression, isolation, fear of paroling, and continued self-injury (e.g., scratching her face, hitting walls)."

Most recently, the inmate expressed SI during the afternoon of March 31, 2016 after appearing frustrated at not receiving her psychotropic medication in a timely manner. She was placed on continuous observation in alternative housing overnight and assessed by a psychiatrist the following morning (April 1). During the assessment, the inmate revealed that she was beginning to feel increased anxiety regarding her upcoming parole hearing on April 15 and the possibility that she might have to face her victim for the first time in almost 20 years. According to the psychiatrist's discharge summary (from alternative housing) on that day, the inmate denied any current SI and although he "offered her opportunity to stay in MHCB, she politely declined, no indication for involuntary admission." Her medication was adjusted. An SRE was also completed by another clinician and determined that she was at "high" chronic risk and "low" acute risk for suicide. The low acute risk for suicide was predicated upon the assessment that the inmate was "denying SI and plan. She appears to be doing well in EOP /SCU. She is looking forward to paroling later this year to be with her children. Inmate reports she is taking her medication, and participating in Tx (groups and 1:1), and practicing limit setting. Pt has begun to use coping skills discussed in PC sessions to assist her with her anxiety, agitation and mood lability, depression, and isolation. Inmate denies SI, HI."

The inmate's safety plan included much of the above narrative, as well as a five-day follow-up. The inmate was then seen daily for five days from April 2 through April 6 by either a PT or the PC. Custody checks were also performed for five days. She presented as calm, cooperative, and well-groomed, and denied any SI each day. However, she was escorted to the TTA during the evening of April 2 after becoming upset and punching a locker with her fist. The five-day follow-up notes consistently stated that "IP continues to attend groups in EOP." In addition, the inmate was seen by her PC on both April 6, 2016 and April 11, 2016. The April 11 session ended prematurely because the inmate "became labile and wanted to go." She committed suicide three days later.

The CDCR reviewer interviewed various CIW staff and other inmates who stated that the inmate exhibited noticeable behavioral changes during the last several weeks of her life, kept to herself and stayed in her cell, increasingly refused psychotropic medication, and began fighting with her cellmate/girlfriend.  The reviewer noted numerous possible precipitating factors to her suicide including "significant evidence of distress, anxiety, depression, and isolation in the weeks prior to her death.  She had a BPH hearing that was scheduled to occur the day after her death.  This was a significant source of stress, as her victim would be given the opportunity to give a statement.  The inmate was incarcerated for most of her life and the anticipated release heightened her fears of failing in the community, and disappointing family and friends."

The Suicide Report contained seven recommendations for corrective action through a QIP:

1) September 11, 2015 treatment plan identified treatment goals to address depression and SIB, and medication compliance.  The updated Interdisciplinary Treatment Team (IDTT) meetings conducted on December 1, 2015 and February 23, 2016, indicated continued increased depression.  No treatment goals or documentation regarding the inmate's progress and EOP treatment since her previous IDTT were included.  The clinical summaries were identical in all plans since March 2015, and absent of any update of current clinical information. Subsequent clinical progress notes did not have treatment interventions or progress outcome measures.

2) The Mental Status Exam (MSE) on November 3, 2015, and clinical notes on November 3, 2015, November 6, 2015, March 8, 2016, April 4, 2016, and April 11, 2016 included the inmate's statements regarding increased depression and SI. These documents did not contain any information regarding additional interventions to address the reported increase in symptoms.

3) On March 1, 2016, the PC had a discussion with the inmate regarding counter-transference concerns and opined that it would be beneficial to transfer to another treating clinician.  The PC had been treating the inmate for over two years; there were no transitional or closure sessions with the inmate.

4) On April 4, 2016, after the MHCB discharge, documentation indicates that the PC discussed the inmate's recent MHCB admission and her maladaptive mechanisms to obtain her PRN.  The clinician documented: "Discussed the events with IP and asked her to take responsibility for using suicidal threats to get what she wanted, that the behavior was childish and most serious as people do kill themselves.  Discussed IP's need to learn different coping mechanisms to get her needs met.  Discussed the difference between a child and an adult.  Challenged IP to act in an adult fashion."

5) On April 5 and 6, 2016, the PC conducted the 5-day follow-up rounds.  The safety plan did not include interventions to address the reduction or elimination of suicidal ideations.  Further the documentation indicated that the 30-minute

custody checks were discontinued on Day 5, without an accompanying reason for extending custody checks or explanation for not making a MHCB referral.

6) On April 5, 2016, the PC modified an initial assessment that was completed by another clinician on November 3, 2015, resulting in deleted statements on the November assessment and replaced the new PC as the author. Consequently, it appeared as if the new PC removed clinical documentation and replaced it with new information, rather than completing new intake.

7) The SRE completed on March 3, 2016 formulated a moderate acute and high chronic risk. The safety plan did not address anxiety and SI/SIB. The SRE completed on April 1, 2016 was incomplete. The SRE acute risk factor and suicide attempt grid section was empty. The SRE contained information carried over previous assessments and did not include an update of current information.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

In the ***second*** case (CIW 3), the inmate was found hanging from the ventilation grate by a sheet in her SCU (EOP housing) cell during the early morning of November 10, 2016. The inmate entered the CDCR system on October 14, 2011 to serve a 12-year sentence for voluntary manslaughter of her ten-year-old daughter. (Of note, special mitigation was found in her case attributed to both a brain tumor and being "grossly psychotic" at the time of the offense.) She did not incur any RVRs during her five-year confinement, and was not gang-affiliated. The inmate was thought to have strong family support from her husband who visited her on a regular basis, as well as placed funds in her inmate trust account. (Of note, however, the records also reflected that the inmate had recently been informed by her husband that she could not live with him upon parole and either recommended that she return to her native South Korea upon release or that she might be deported upon her release. There was, however, no information available to indicate she was subject to deportation.)

According to available records, the inmate had been born into an intact family in South Korea, but her father died when she was an infant, and her mother died while she was an adolescent. The records were unclear as to where she lived following the death of her mother. The inmate completed a few years of college and worked as a dietitian, as well as being self-taught to buy and sell stocks in South Korea. She met her husband, an American military contractor, and they were married in 1991. The couple lived in various countries before settling in the United States. Their only daughter was born in January 2000.

Although the inmate did not have any "known" medical and/or mental health problems while growing up in South Korea, and did not have any history of substance abuse, she began experiencing a variety of medical symptoms in 2010 that were thought to be attributable to menopause. She had difficulty functioning as both a wife and mother, and became increasingly depressed and developed thoughts of suicide, as well as command AH to kill herself. In addition, because she believed that her daughter was "her life," the inmate began to have thoughts of killing both her daughter and herself. These thoughts subsequently resulted in the

stabbing of her ten-year-old daughter and herself on July 9, 2010. Although her husband was able to intervene and call 911, their daughter subsequently died at the hospital and the inmate survived her serious suicide attempt. She was subsequently arrested and transported to the county jail where she remained on suicide precautions for almost her entire 14-month incarceration (which included two additional suicide attempts by banging her head and pulling out the sutures from her lacerations on July 17, 2010, as well as a subsequent hanging attempt on January 29, 2011).

In addition to her three suicide attempts following the death of her daughter and subsequent county jail confinement, the inmate had three other suicide attempts while an adolescent and young adult in South Korea. The suicide attempts included swallowing poison at age 12, an overdose of sleeping pills at age 15, and an overdose of sleeping pills and alcohol at age 29. There was no indication that she received any ongoing mental health treatment for the suicide attempts.

Upon entry into CDCR, the inmate was immediately placed into a MHCB based upon her continuous placement on suicide precautions in the county jail. She was diagnosed with Major Depressive Disorder, Recurrent, Severe, with Psychotic Features. The inmate was housed in the MHCB from October 14 until November 8, 2011, whereupon she was placed at the intermediate level of care at PSH. She remained at PSH for 13 months and, although not engaging in any incidents of self-injurious or suicidal behavior, remained on close observation status during the first five months of her hospitalization due to ongoing SI. PSH records indicated that she remained severely depressed during hospitalization, with occasional thoughts of suicide, rumination about her crime, intense feelings of guilt and shame, nightmares, and low mood. She did, however, seem to find some comfort in regained religious beliefs. Yet even at the time of discharge, PSH staff considered her suicide risk to be high enough that she was always escorted to and from the bathroom. The inmate was transferred from PSH to the PIP in December 2012 when that facility opened. Her PIP hospitalization spanned from December 2012 through May 2014, a period of 17 months. The inmate initially reported no motivation to stay alive and thoughts of suicide almost every day. She denied any specific plan to commit suicide, stating to a clinician that "God doesn't allow suicide." The inmate was initially placed on suicide precautions at the PIP and clothed in a safety smock. She programmed well within the PIP, attending many treatment groups and remaining compliant with her psychotropic medication.

Upon her return discharge from the PIP in May 2014, the inmate was placed at the EOP level of care and assigned to the SCU at CIW based on ongoing depressive symptoms. Her diagnosis remained Major Depressive Disorder, Recurrent, Severe, with Psychotic Features. All SREs completed from October 2011 through September 2016 assessed the inmate's chronic risk for suicide as "high" and her acute risk for suicide as "moderate" (beginning on September 2, 2016). According to records, the inmate's mood initially improved in the SCU, but remained at a moderate level of severity for depression ("6 out of 10"). She continued to have passive SI, but denied any active plans to commit suicide.

According to the CDCR reviewer in this case, the inmate was placed on the "CIW High Risk List" and seen by her clinician on a weekly basis (although her EOP level of care already required weekly clinical contacts). She remained compliant with her psychotropic medication

and was seen monthly by her psychiatrist. The inmate's treatment plan included three problem areas of "nightmares, depression, and a history of suicide attempts." According to the CDCR reviewer, she remained an active participant in her EOP treatment, and attended approximately 95 percent of group therapy programming during the majority of her SCU placement, but her participation dropped to approximately 81 percent during the last six months of her life.

The inmate had two MHCB admissions while at CIW. The first occurred on January 16, 2015 when she expressed SI related to the impending anniversary of her daughter's birth. She remained in the MHCB for five days and returned to the SCU on January 21, 2015. The second MHCB admission occurred on September 2, 2016 after she returned from a local hospital following treatment for an episode of syncope (fainting due to low blood pressure) and informed staff that she would rather commit suicide than return to the SCU and her current cellmate. She remained in the MHCB for six days and discharged back to the SCU on September 8, 2016 with the following safety plan:

> PC will encourage IP to read and watch her TV as a way to reduce her depression, as improved mood reduces suicidal thinking. PC will teach IP assertiveness skills that IP can use when she talks with medical staff. PC will assist IP in identifying two supportive staff she can talk to regarding her medical concerns. PC will encourage IP to make contact with her husband, as he provides much emotional support. Thus, improving mood and reducing suicidal thinking. PC will encourage IP to attend her crafts groups as she enjoys this group which improves mood and reduces suicidal thinking.

According to the CDCR reviewer, the inmate appeared to be more anxious, with increased complaints of medication side-effects (including weight gain), ongoing nightmares, dizziness ("I feel like I will fall down"), and worries about her health (especially a recent diagnosis of diabetes) during the last nine months of her life. The reviewer also noted that her psychiatrist "diligently adjusted her medications but could not use the full formulary due to some cardiac side-effects of some of the antidepressants." In fact, following her release from the MHCB on September 8, 2016, the inmate was seen by a psychiatrist for the above complaints on approximately nine occasions until her death. She complained frequently about various medical issues and was seen frequently in the TTA. In October 2016, she accidentally spilled boiling hot water on her leg and foot, was subsequently treated by medical staff and frequently used a wheelchair to ambulate.

In addition, the inmate was seen on a weekly basis by her PC and frequently complained about increased stress and anxiety, much of it apparently related to multiple difficulties with assigned cellmates and other stressful incidents on the unit. For example, she apparently became very upset when another inmate (CIW 2) committed suicide in the SCU on April 14, 2016. Although many SCU inmates had multiple cellmates while placed in the unit, she appeared to have chronic difficulties in finding the right fit with an inmate that spoke her native language. Although she was assigned to bunk with another Korean inmate on two occasions, there were periodic difficulties in companionship. In fact, according to housing records examined by this reviewer, the inmate had approximately seven cell changes in the SCU from August 2014 through the date of her death, three of which occurred following her MHCB return in September 2016. In fact,

45

her increased anxiety, difficulty with cellmates, and depressed mood resulted in a panic attack on September 28.  (The inmate was placed on a five-day follow-up from September 30 through October 4, 2016.)

During the last month of her life, the inmate's levels of depression, stress, and anxiety continued to increase.  A progress note from her PC dated October 17, 2016 stated that the "IP rated her depression at a 7 or 8 out of 10 because of all the things she has been through," including multiple cellmates, spilling hot water on her leg and foot, and concerns about her husband. Several days earlier on October 14, despite a significant history of suicidal behavior, she was inexplicably assigned to the same cell in which the other inmate (CIW 2) had committed suicide in April 2016.  The following week on October 21, her PC responded to an urgent mental health request whereupon the inmate stated that "she is scared due to a ghost spirit keeping her awake, feels spirit is attacking her body."  The inmate was subsequently moved to another cell on October 25.  On November 7, three days before her death, the inmate was escorted to the TTA after complaints of vomiting and a racing heartbeat.  She also complained of increased anxiety, insomnia, and, according to nursing staff, had been refusing some of her psychotropic medication.  The inmate was seen by her PC who noted a blunt affect and anxious mood.  That same day (November 7), the PC discussed the inmate's condition with the IDTT and a PIP referral was considered "if IP continues to display she cannot function on SCU."  The inmate was seen the following day (November 8) by the psychiatrist and complained that "I'm having very bad anxiety and I feel the Buspar is making it worse and I can't sleep because the Vistaril doesn't work."  She also told the psychiatrist "that she had self-injurious (thoughts) last week but no desire to act on them."

The inmate's medication was adjusted and the psychiatrist "encouraged to continue with individual therapy with primary clinician and to attend her scheduled groups."  The inmate committed suicide two days later.

Although the final draft of the Suicide Report contained a brief summary of the inmate's medical history, specifically "Resection of left parietal-occipital meningioma (7/27/2010), hyperthyroidism, treated with medication, and new onset diabetes mellitus (10/2/2016, treated with medication)," the medical history on her "Problem List" contained within the EHRS indicated the following ongoing problems:  "abnormal mammogram, adult hyperthyroidism, borderline diabetes, diarrhea, dry eyes (bilateral), Dyslipidemia, Dyspepsia, GERD without esophagitis, MDD, Meningioma, obesity, rash."  As noted above, the inmate also periodically utilized a wheelchair to ambulate following being scalded by hot water on her leg and foot, as well as when feeling dizzy.  It was unknown as to whether any of these medical conditions were contributory to her suicide.

According to the CDCR reviewer, although there were no specific reasons why an inmate with a significant history of suicidal behavior would commit suicide when she did, and a suicide note was not found in her cell, "Given her predisposing history of depression and suicide attempts, cultural heritage, dependent personality traits, and the nature of her crime, it appears to this evaluator that a positive resolution for her chronic existential and psychological dilemma was a distant possibility."

The final draft of the Suicide Report (made available to the reviewer on January 23, 2017) contained four recommendations for corrective action through a QIP:

> 1) The CDCR Form 837s submitted by responding staff identifies a three-minute delay between the time inmate was observed hanging and sounding of an alarm notifying additional staff of the emergency. This delay in sounding an alarm postponed the response of medical staff and notification of paramedics;

> 2) Based on discrepancies between individual CDCR 837s, it is unclear if the 'entire' cut-down kit was taken to the scene of the emergency as required;

> 3) The CDCR 837s do not identify whether or not responding staff relieved pressure on the airway by using a stable object for support of the inmate's body or by physically lifting the inmate's weight off the noose prior to cutting her down;

> 4) On 11/3/16, an RN did not perform a focus assessment for CDCR 7362 with symptoms, but instead referred it directly to MH.  This is a deviation of the standard of care ….

Based upon the findings contained within the final draft of the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

**January 2017 Reassessment**

At the request of CDCR's DHCS Mental Health Program, and with the concurrence and approval of the *Coleman* Special Master, this reviewer and a *Coleman* expert returned to CIW on January 25 and 26, 2017.  The reassessment was focused on a review of two inmate suicides (CIW 2 and CIW 3), as well as any CDCR and CIW corrective actions resulting from the suicides.  Specifically, CDCR DHCS requested that the *Coleman* team: (1) review the suicide cases that occurred at CIW; (2) review actions taken and proposed actions at CIW; (3) interview mental health and custody staff, and inmates regarding suicide prevention practices and causes at CIW; (4) review physical locations where suicides occurred; (5) provide any additional recommendations CDCR might undertake specifically at CIW to address the high rate of suicides in that institution, noting anything CDCR might have missed; and (6) conduct an exit conference outlining preliminary findings, concerns, and recommendations with institutional staff.

We were presented with a four-page Excel spreadsheet entitled "Suicide Prevention Outreach Committee – SPOC" which included a listing of proposed and ongoing projects relevant to suicide prevention at CIW.  The SPOC met on a monthly basis and included the warden, chief of mental health (CMH), their respective supervisory and support staff, and representatives of the Woman's Advisory Council (a group of six inmates representing CIW inmate population).  The Excel spreadsheet was divided into three sections: outreach, program monitoring, and incident review.

The outreach section for inmates included 13 items (informational, suicide prevention week, informational brochure, two resource development items, peer support/mentoring program,

inmate orientation, crisis prevention team, GP open line, mental health presentations, religious services, peace day, and newsletter). The outreach section for custody staff included five items related to training. The program monitoring section included projects related to policy revisions (for the high risk list (HRL), alternative housing, and suicide prevention), HRL audit, five-day follow-up audit, SRE audit, senior SRE audit, wellness checks audit, TTA logs, suicide prevention block training, SRE mentoring, self-injury logs, MHCB utilization, urgent/emergent referral access to care, Collaborative Assessment Management of Suicidality (CAMS), PRN[8] usage, and the SCU. The incident review section included four projects regarding suicide attempt and self-harm review, review of completed suicides, patient safety, and staff and I/P debriefing.

In sum, the four-page Excel spreadsheet was an ambitious listing of numerous projects in various stages of completion or proposal. Given our time constraints, as well as the varying stages of completion for these projects, we were not in a position to opine on the effectiveness of any of these corrective actions in reducing inmate suicides at CIW. However, we did not review, and/or hear of any proposals that could be viewed as inappropriate.

In addition, we were presented with a few interesting proposals. For example, effective January 29, 2017, CIW initiated a Crisis Intervention Team (CIT) comprised of a clinical psychologist, supervising registered nurse, and lieutenant. The CIT would be available during Third Watch and respond to urgent and emergency mental health referrals throughout the facility. It was envisioned that the CIT would be better able to not only triage these referrals, but resolve incidents without the necessity for using either alternative housing and/or the MHCB unit unless clinically indicated.

Further, we were informed that there had been a dramatic decrease in inmates transferred between CIW and CCWF for MHCB placement, with each facility housing suicidal patients in their respective MHCB units. We were informed that such a policy has preliminarily resulted in the reduction of MHCB usage overall, with an expressed belief that inmates were no longer feigning SI in an attempt to be transferred out of either CIW or CCWF. In addition, we were also informed that an evening clinician had previously been added to the MHCB unit at CIW to both triage and respond to emergency mental health referrals throughout the facility.

We were informed that as a result of the decrease in inmates transferred between CIW and CCWF, as well as the addition of an evening clinician at the MHCB unit at CIW, there had been a dramatic reduction in alternative housing and MHCB usage. In fact, we were presented with data indicating that alternative housing at CIW had not been used since November 27, 2016, with the exception of one week in January 2017 when the MHCB was temporarily closed for renovation. We were also able to review several EHRS charts that preliminarily seemed to indicate a dramatic increase in the use of five-day follow-ups after clinicians responded to both urgent and emergency mental health referrals. The data indicating a dramatic reduction in the use of alternative housing was preliminarily encouraging. However, we cautioned CIW and CDCR mental health officials that further *Coleman* monitoring would be recommended to ensure that inmates identified as suicidal through an emergency mental health referral were appropriately assessed by completion of an SRE and referred to an MHCB as appropriate, and

---

[8] As Needed

that five-day follow-ups were not being used as an alternative to MHCB referrals (a problem identified in previous CIW assessments by the *Coleman* Special Master).

We were able to interview the six inmate representatives to the Women's Advisory Council on January 25, 2017. We asked the inmate representatives about the general atmosphere at CIW, as well as any insights that they may have regarding the high rate of suicide at the facility. In general, the inmates believed that the atmosphere within CIW had improved and there appeared to be less violence and less overall access to illegal drugs. Of interest, they attributed some of the decreased violence to a recent initiative of transferring problematic inmates to CCWF, and suggested that the initiative was created following an inmate death by homicide on June 1, 2016 (that was initially classified as a suicide). As a result of that death, these inmates believed that CDCR headquarters staff came to CIW and made various leadership changes, which the inmates believed resulted in an increased sensitivity to the isolation of women offenders at the facility. Also of interest, the inmates were not referring to the isolation of placement in either administrative segregation or the PSU, but rather the isolation of being confined to their individual housing units unable to socialize as a larger community on the yards. They did, however, stress that there was still much work ahead, and that there remained a staff culture of being indifferent to the significant issue of domestic violence amongst inmates. They also suggested that there was still a reluctance for inmates to self-report SI because it often resulted in custody staff "cuffing" inmates during transport to the TTA. Many inmates, particularly those of non-maximum-security status, found this practice humiliating.

We were also able to interview four inmates assigned to the SCU, the EOP GP housing unit and location for both 2016 suicides. We met with each of the inmates separately and most expressed consistent concerns regarding the housing unit, as well as opinions regarding the suicides of CIW 2 and CIW 3. In general, these four inmates were not as optimistic as the Women's Advisory Council representatives were regarding the level of violence and access to illegal drugs. They believed that they and other SCU inmates still had safety concerns and that illegal drugs were still prevalent on the unit. Regarding the two suicides, the inmates suggested that CIW 2 was an active drug user and was using illegal drugs in the days prior to her death, as well as experiencing the breakup of a romantic relationship with another inmate. (This information was not found in the inmate's Suicide Report.) With regard to the suicide of CIW 3, several inmates suggested that she was very anxious in the days leading up to her suicide and had great difficulty articulating her SI due to her limited use of the English language. Other concerns regarding this case are detailed below.

The SCU inmates who were interviewed also expressed concern regarding the recent history of PT staffing on the unit. PTs had previously been assigned to the SCU to provide group therapy, to provide consistent mental health presence and support on the unit, and to administer medications. PTs also provided cell-front wellness checks and contacts, as well as assistance in conducting the community meetings. Clinical staff and inmates alike reported that PTs had been re-directed during November 2014 to medication administration only. This resulted in less availability to provide group therapy and unit support. All who were interviewed expressed concern that this change resulted in greater stress on the unit with fewer supportive interventions available. The supervisory staff reported that there was also an increase in the use of PRN medications and more medication administration after this change occurred. After the suicide of

CIW 3, two positions for PTs were added as optional overtime positions.  Although these positions were temporary, it appeared that the return of the PTs in the SCU helped to improve conditions on that unit.  As the role of the PT is extremely important in frontline triage and to help to address issues with EOP inmates before they become emergent, it is critical that they are available to perform these essential duties.  CIW and headquarters staff should work to make these positions permanent in their efforts for suicide prevention.

Further, because both inmate suicides occurred within the SCU and both inmates used cell ventilation grates as the anchoring points to their respective suicides by hanging, CDCR and CIW officials authorized the replacement of all ventilation grates in the approximate 67-cell housing unit.  We inspected the SCU on January 25, 2017 and found that the new ventilation grates had been installed and were suicide-resistant, i.e., contained ventilation holes that were 3/16 inch in diameter and, therefore, reduced the opportunity for a suicide attempt by hanging.  In addition, porcelain sinks and toilets were being replaced with stainless steel sink/toilet combination fixtures.  The change in the ventilation grates and placement of a locker under the grates helped to address a blind spot that was present in the cell which did not allow for observers to easily visualize within the cell.  However, as noted in our debriefing with CIW officials on January 26, 2017, the retrofitting of these cells by replacing ventilation grates and sink/toilet fixtures should not be construed to mean that these SCU cells were now suicide-resistant and could safely house inmates identified as suicidal.  There were still several unsafe features in each cell, including wire mesh window screens and steel double bunks with horizontal brackets and gaps between the bunks and the walls that were conducive to suicide by hanging.  CIW officials appeared well aware that these SCU cells should not be used for Suicide Watch and/or Suicide Precaution statuses, and indicated that suicidal inmates would be referred to an MHCB pursuant to policy.  The renovation of the SCU was projected to be completed within the next several weeks.

As detailed above, the Suicide Report for CIW 2 was completed in August 2016 and contained seven recommendations for corrective action through QIPs.  The required corrective actions were in response to deficiencies surrounding inadequate treatment planning, safety planning, general clinical documentation, incomplete SREs, and counter-transference concerns.  We also found an additional concern regarding the dramatic underreporting of the inmate's absence in EOP group participation in the last few weeks of her life that was not discussed in the Suicide Report.  Other than the additional concern raised during our interviews with SCU inmates regarding CIW 2's recent drug use and relationship problems, we found the overall findings and QIPs within the Suicide Report to be appropriate.  In addition, it should be noted that the CIW SPRFIT committee and coordinator identified other deficiencies that warranted QIPs.  We found those actions to be commendable.

The final draft of the Suicide Report for CIW 3 was presented to us on January 23, 2017.  The report contained four recommendations for corrective action through QIPs.  Required corrective actions were in response to deficiencies surrounding both the emergency medical response to the suicide on November 10, 2016, as well as a nursing concern regarding an incomplete assessment prior to a November 3, 2016 mental health referral.

In addition to the deficiencies noted above in the final draft of the Suicide Report, our review of CIW 3's case found several other significant issues.

First, based upon the fact that the inmate had a history of six suicide attempts, as well as continued to express chronic SI without a plan based upon the killing of her ten-year-old daughter, it was not surprising that the final draft of the Suicide Report noted that "Given her history she was placed on the CIW High Risk List." However, there was *no* indication in the EHRS that the inmate was provided with any additional monitoring of her symptoms that exceeded what any other EOP inmate received. For example, inmates on the High Risk List (HRL) were required to have specific "HRL Progress Notes" written by the PC, with the HRL note specifying "the inclusion criteria for which the inmate remains on the HRL and the rationale for continuation of that status." In addition, the HRL policy required that all HRL inmates already at the EOP level of care and seen on a weekly basis by their PC also be considered for more frequent clinical contacts based upon their high risk. Further, this reviewer and a colleague's discussion with CIW mental health officials revealed that line custody officers were *not* formally notified when inmates were placed on the HRL. The final draft of the Suicide Report did not address any of these HRL deficiencies.

Second, while on-site at CIW on January 25-26, 2017, although this reviewer and a colleague were initially informed that the inmate had been placed on the HRL from August 10, 2016 until her death, we were subsequently informed during the exit meeting on January 26 that further review of the EHRS and discussion with CIW clinicians indicated the inmate had *never* been placed on the HRL "because she did not have any recent suicide attempts." Such a disclosure was very problematic for numerous reasons, including the fact that the lack of recent suicide attempts was not part of the exclusion criteria for the HRL.

This inmate had a history of six suicide attempts, one of which occurred immediately after the stabbing death of her ten-year-old daughter. She was on suicide observation status for the entire length of her county jail incarceration due to two of the suicide attempts. She was on close observation status during the first five months of her PSH stay, as well as on observation status for an unknown period of time while at the PIP. Upon return to CIW, the inmate had two MHCB admissions for SI, the most recent of which occurred on September 2, 2016. During her stay in the SCU, the inmate had ongoing thoughts of suicide (without a plan), most recently telling the psychiatrist on November 8 "that she had self-injurious (thoughts) last week but no desire to act on them." In the most recent SRE completed in September 2016, the inmate's chronic risk for suicide was rated as "high" and her acute risk for suicide was rated as "moderate." This inmate's profound history of suicidal behavior, her ongoing rumination about suicide, increased anxiety, and her chronic "high" and "moderate" acute risk for suicide exemplified the history and symptoms for which the HRL was created. Her exclusion from the HRL was unexplainable and should have resulted in a QIP in this case.

Third, although it was unclear from the final draft of the Suicide Report as to whether or not the CDCR reviewer interviewed other SCU inmates in preparation of the report, there was inconsistency in the records regarding the inmate's level of competence with the English language. The CDCR reviewer indicated that the inmate was fluent in English, although Korean was her first language and Korean-speaking clinicians were specifically assigned to her during

both the PSH and PIP hospitalizations. However, various SCU inmates interviewed by this reviewer and a colleague in January 2017 indicated that although the inmate was able to understand English, her ability to speak and articulate her feelings in English was very limited. Without any prompting, one SCU inmate stated that when the inmate expressed to staff that she was "anxious" (which was reflected throughout the EHRS) she was really trying to articulate that she was feeling suicidal. A few of these inmates also claimed that custody staff were often dismissive of the inmate's complaints, and that the inmate had walked up to the officer's station within the SCU on more than one occasion the night before her death and attempted to get (without success) an officer's attention regarding her increased anxiety. Further investigation regarding the veracity of these inmates' claims would be helpful and, if found that a language barrier impacted the delivery of services and/or ability to respond to an urgent/emergent request, a QIP should be developed regarding the training of staff in the availability of telephonic translation services.

Fourth, although the CDCR reviewer in this case indicated that the inmate's group participation "dipped to 81%" during the last six months of her life, further review of the EHRS by this reviewer found that the inmate actually stopped attending almost all of her group treatment on September 28, 2016, and only participated in a handful of groups during the last six weeks of her life. Such a profound reduction of group participation was not adequately reflected in any progress notes (nor final draft of the Suicide Report).

Fifth, the final draft of the Suicide Report did not note any deficiencies in safety planning and treatment planning despite the fact that the safety plan contained in the discharge SRE dated September 8, 2016 did *not* include any strategies to address the inmate's ongoing SI. In addition, the Mental Health Treatment Plan, with a problem area simply identified as "history of suicide attempts," was also unhelpful. In fact, given the extensive nature of this inmate's history of suicidal behavior, as well as ongoing SI exemplified by her continuing "moderate" acute risk for suicide, the absence of adequate safety planning and treatment planning was very problematic and should have resulted in a QIP in this case.

Sixth, given the inmate's significant history of suicidal behavior, and documentation suggesting she became very upset when another inmate (CIW 2) committed suicide in April 2016, she was inexplicably assigned to that inmate's cell from October 14 through October 25, 2016. It was unclear as to whether custody supervisors responsible for the cell assignment were aware of her profound history and/or sensitive to her ongoing SI. Had the inmate been placed on the HRL, and had such placement been known to line custody staff, the inmate might not have been relocated to that cell.

Based upon our findings, we were informed that the final draft of CIW's Suicide Report would be further revised.

**Summary**: *In summarizing the CIW assessment in 2015, this reviewer stated that the facility "continued to be a problematic institution that exhibited numerous poor practices in the area of suicide prevention, including extremely low completion of required SREs based upon emergency mental health referrals for SI, several cases in which patients were discharged from alternative housing without completion of SREs, inadequate treatment planning, low compliance rates for*

*annual suicide prevention training, and multiple patient suicides during the calendar year."*
*Although this March 2016 assessment continued to find lingering deficiencies, particularly in the*
*areas of SRE completion based upon emergency mental health referrals for SI, Guard One*
*compliance, and safety planning for inmates exhibiting SI, as well as two subsequent inmate*
*suicides occurring in April and November 2016 with numerous deficiencies, CIW custody and*
*health care officials have made some improvements in the area of suicide prevention. Upon*
*return for reassessment in January 2017, this reviewer and the Coleman expert were*
*preliminarily encouraged by the recent suicide prevention initiatives enacted to reduce the future*
*incidence of inmate suicides in the facility.*

### 4)     California Institution for Men (CIM)

**Inspection**: March 24-25, 2016 (previous suicide prevention audit was on December 5-6, 2013).
CIM housed approximately 3,388 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the intake
screening process on March 24, 2016. The nurse was using the most current version of the
Initial Health Screening form (CDCR Form 7277) (revised July 2015), as well as asking all of
the required questions. Good privacy and confidentiality was observed. In addition, the initial
31-item mental health screening form was completed in the private office of a clinical
psychologist during the RC process.

Daily PT rounds in the administrative segregation unit (Palm) were observed on March 25. The
rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech
Daily Rounds Form at cell-front for all caseload inmates. Of note, a STRH unit was scheduled
for activation in late April 2016.

**Housing**: Two units of the CTC at CIM contained 34 MHCBs. *None* of the MHCBs had any
suicide-resistant rooms. For example, Unit 1 had rooms with small gaps between the wall and
window frame, faucet handles, and ventilation grates with large holes in the ceiling (although the
ceilings were high and not within easy reach) that were conducive to suicide attempts by
hanging. Unit 4 also had rooms with small gaps between the wall and window frame, faucet
handles, exposed toilet chase piping, and ventilation grates with large holes in the ceiling
(although the ceilings were high and not within easy reach) that were conducive to suicide
attempts by hanging. Each MHCB contained suicide-resistant beds. The above deficiencies
were reported by this reviewer during the previous assessment in December 2013. This reviewer
was informed that although a work order request was initiated by CIM officials sometime in
2014, the final design of the project had not yet been approved. Although the headquarters work
order schedule for MHCB renovation previously examined by this reviewer did not contain
reference to the CIM work, CDCR informed this reviewer that the anticipated start date would be
December 2016.

In addition, this reviewer found that the Palm administrative segregation unit contained eight
new intake cells that had been retrofitted to be suicide-resistant, with an additional six new intake
cells being retrofitted at the time of the on-site assessment. Due to a low census, all new intake
inmates were in new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis at CIM. There were three options available, placement in cell 175 of the CTC, placement in any available OHU room of the CTC, or placement in holding tanks 1– 3 or holding cages 4 – 7 in the TTA. The holding tanks contained benches, and the holding cages (approximately three feet in diameter) were too small to contain stack-a-bunks. The bunks were used in the CTC's cell 175 and OHU rooms.

From January 2016 through March 22, 2016, approximately 59 inmates were placed in alternative housing, with 13 (22 percent) housed in cell 175, one (two percent) housed in an OHU room, and the remaining 45 (76 percent) housed in either a holding tank or cage. In addition, alternative housing stays exceeded 24 hours in approximately 31 percent of the cases. Alternative housing lengths of stay ranged from 31 minutes to 61 hours. Of the 45 inmates held in the holding tanks or cages, 64 percent were held more than ten hours. In addition to an absence of bunks, inmates housed in these holding tanks and cages did not have access to water, toilets, or showers except upon request. Given these deplorable conditions, the likelihood of an inmate continuing to express SI, the result of which would be their continued placement in these tanks and cages, was highly questionable. During this reviewer's exit meeting with CIM and CDCR officials on March 25, it was strongly recommended that the use of TTA tanks and holding cages be immediately discontinued and alternative solutions found. Several days later, this reviewer was informed by CDCR officials that alternative housing had been relocated to Cypress Hall in Facility B (the RC building) at CIM.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs. In addition, patients not on suicide observation status were being observed at 30-minute intervals. Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form; forms were located on a clipboard in the nurse's office, and not located on the outside of each inmate's room door. However, the forms were found to be up-to-date, an improvement from this reviewer's previous on-site assessment, which found problems with accurate documentation.

In addition, this reviewer did not observe any obvious problems with the issuance of possessions and privileges for inmates in the MHCBs. In fact, several inmates were observed to have "full issue" clothing while on suicide precautions based upon documented clinical judgment. This was a very good practice.

A review of Guard One data for a recent 24-hour period found 94-percent compliance in the Palm administrative segregation unit with required checks not exceeding 35 minutes.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of September 1, 2015 through February 29, 2016. In addition, the TTA log for the same period was also reviewed. This reviewer's eUHR review of 20 emergency referrals for SI behavior found that clinical staff subsequently completed the required SREs in 80 percent (16 of 20) of the cases. This finding was in contrast to an internal CIM audit of mental health referrals conducted in February 2016 and reported in the SPRFIT meeting minutes of March 10, 2016. One possible reason for the

discrepancy is the fact that many of the mental health referrals for SI in the MHTS were miscoded as "urgent," rather than "emergent," referrals.

Finally, this reviewer observed three different treatment teams conduct IDTT meetings on both March 24 and March 25.  Overall, there was good participation by all team members in all three treatment teams. However, discussion regarding safety planning to reduce SI was very uneven. Four case examples illustrate the problem.  In the first case (CIM 1), the PC decided to discontinue the inmate's suicide precaution status without any discussion with the team until a few minutes later when the Correctional Counselor I (CC I) spoke up and began to challenge the inmate "on what has changed from yesterday, what are the voices telling you now?" Fortunately, such questioning resulted in a lively discussion regarding the inmate's current suicide risk.  In another case (CIM 2), the PC initiated the IDTT by stating to the inmate that "this is your discharge IDTT" as the inmate walked into the room, suggesting that a decision had already been made regarding discharge.  There was very little, if any, discussion amongst team members regarding the case, and no discussion regarding safety planning.  In the third case (CIM 3), the inmate was admitted to the MHCB the previous day for SI and the PC spent very little time discussing suicide risk other than to state the "goal will be for you not to feel and vocalize any suicidal ideation for five straight days," and did not include any type of strategy to meet such a goal.  In the fourth case (CIM 4), the PC did do a much better job of initiating a discussion regarding current suicide risk by asking the IP "what's changed since yesterday when I asked you about your level of self-harm?"

A subsequent review of 18 SREs of inmates released from a MHCB during February and March 2016 found that very few, if any, contained adequate safety plan strategies to reduce SI, with most simply reflecting *Program Guide* requirements, for example:

> I/P has remained stable with no suicidal ideation, depression and anxiety during time in MHCB.  I/P will be discharged back to his 3CMS LOC with 5-day follow-up.  Treatment Risk/Reduction Plan: 1) Think about how he can ask questions and to whom (e.g., communication skills), 2) I/P will continue to be seen by primary clinician on 3CMS LOC schedule until he is paroled.

Of note, the CMH issued an inter-departmental memorandum to his clinical supervisors on March 19, 2016 that reiterated that safety planning should include strategies for "reducing imminent/acute/chronic risks, developing or increasing protective factors, and developing a risk reduction relapse prevention plan to prevent future episodes of suicide or decompensation."

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (December 2015 through February 2016) found that quorums were achieved in all of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, approximately 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, approximately 99 percent

of custody staff, 73 percent of medical staff, and 83 percent of mental health staff received annual suicide prevention block training during 2015 (although written verification of mental health staff compliance was not forwarded to this reviewer). Finally, as of March 2016, 94 percent of mental health clinicians had completed the SRE mentoring program, and 100 percent had received the seven-hour SRE training.

**Recent Suicides**: CIM did not experience any inmate suicides during the review period.

### 5)    **California State Prison - Sacramento (CSP/Sac)**

**Inspection**: April 4-5, 2016 (previous suicide prevention audit was on February 4-5, 2015). CSP/Sac housed approximately 2,354 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the intake screening process in the R&R unit on April 5. The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions on the form. Correcting a privacy problem previously identified by this reviewer, a large holding cage had been installed in the nurse's office to allow the door to remain closed while an officer provided security from the outside, thus ensuring privacy and confidentiality during the intake screening process.

Daily PT rounds in STRH, administrative segregation EOP, and the three PSUs were observed. The PT rounds were performed appropriately, with Psych Tech Daily Rounds sheets completed on each caseload inmate.

**Housing**: CSP/Sac had two CTCs; CTC-1 had 15 MHCBs and CTC-2 had ten MHCBs. This reviewer observed that sink faucets with anti-squirt slits were being replaced in several MHCBs that were otherwise suicide-resistant. In addition, all cells in the 20-bed MHCBU were designated as providing unlicensed MHCB level of care. Each cell was suicide-resistant, and had safe beds, ventilation grates, and light fixtures. As reported in the November 2013 assessment, the environment of the MHCBU remained sterile. Cells still appeared dirty and dark, and offered limited visibility of their interiors. Further, there continued to be no clinician offices in the MHCBU, therefore, clinical assessments were regularly conducted at cell-front or in therapeutic modules in the MHCBU. The modules were located in a high traffic area of the dayroom area that offered very limited privacy and confidentiality.

There were nine designated new intake cells (114-120, 217-218) in the administrative segregation EOP unit (A-5) that were found to be suicide-resistant [replacing the previously designated new intake cells (106-109) that contained metal grates on the inside of both the cell doors and exterior windows]. In addition, there were six designated new intake cells in the STRH unit that were found to be suicide-resistant. This reviewer did not observe any new intake inmates in non-new intake cells in these units.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis and primarily found in unit B-4 (previously an ASU), ZZ cells in the

OHU, and the PSU.  All inmates in alternative housing were observed on a continuous 1:1 basis, had beds or stack-a-bunks, and the vast majority were discharged within 24 hours.

Of note, however, there were complaints from inmates in the indecent exposure (IEX) program operating within the PSU during late 2015 that program participants expressing SI were excluded from MHCB placement, rather they automatically remained in the PSU on suicide observation status.  This reviewer was informed by CSP/Sac officials that since the opening of unit B-4 in January 2016, very few, if any, IEX inmates who threatened suicide remained in the PSU.  Rather, the majority were housed in either unit B-4 or ZZ cells in the OHU.  This reviewer's examination of alternative housing data from February and March 2016 found a different practice.  For example, from February 1 through March 10, 2016, 84 percent (16 of 19) of IEX inmates who threatened suicide remained in the IEX program housing unit (B-7) on 1:1 observation.  From March 10 through March 31, 2016, only four IEX inmates reportedly threatened suicide, and all were transferred to alternative housing in unit B-4.  Of note, during this reviewer's April 4-5 on-site assessment, two IEX inmates were housed on suicide precautions in MHCBs.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs and MHCBU.  In addition, patients not on suicide observation statuses were being observed at 30-minute intervals.  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form.  Each form was located on the outside of each inmate's room door and, with one exception, was found to be up-to-date.  The exception was in the MHCBU where this reviewer observed a nursing aide falsifying observation forms.  Specifically, at approximately 11:05 a.m. on April 5, a review of observation forms of 12 inmates on Suicide Precaution status found that no documentation had occurred since 10:45 a.m.  Approximately ten minutes later at 11:15 a.m., this reviewer observed a nursing aide approaching the cell doors of each of the 12 inmates and writing "11:01am, 11:10am, and 11:21am" on each of the forms.  A CDCR headquarters representative also observed this falsification.  A nursing supervisor was subsequently notified.

This reviewer did not observe any obvious problems with the issuance of possessions and privileges for inmates in the MHCBs and MHCBU.

A review of Guard One data for a recent 24-hour period found an overall 97-percent compliance rate with required checks not exceeding 35 minutes in STRH, administrative segregation EOP, SHU, and three PSUs.  The following is a breakdown of compliance for each unit:

> STRH:  96 percent
> ASU EOP: 99 percent
> SHU:  99 percent
> PSU 1:  95 percent
> PSU 2:  96 percent
> PSU 3:  97 percent

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for March 2016.  In addition, the

TTA log was also reviewed.  This reviewer's eUHR review of 47 emergency referrals for suicidal ideation/behavior in March 2016 revealed that clinical staff completed the required SREs in only 87 percent (41 of 47) of the cases.

In addition, this reviewer examined ten charts of inmates recently discharged from a MHCB. The sample findings were problematic.  Of the ten cases, two (20 percent) were missing discharging SREs.  Of the remaining eight cases, seven did not contain adequate safety plans, with most simply reciting *Program Guide* requirements.  For example, two MHCBU clinicians used virtually the same safety plan template for two inmates (SAC 1 and SAC 2):

    1)  IP will be released from MHCBU to EOP LOC.
    2)  He will receive weekly visits with a primary clinician.
    3)  Housing will include custody checks/monitoring q 30 mins.
    4)  He will receive weekly groups.
    5)  He will be released on a 5/8 day follow-up to monitor for escalation of SIB.
    6)  He will receive an IDTT within 14 days.
    7)  He will work with primary clinician to develop adaptive skills and conflict management skills.
    8)  He will work to identify and strengthen protective factors such as support systems, goals, and positive daily activities.
    9)  IP was encouraged to discuss any MH concerns with clinical staff.

Finally, this reviewer was not able to observe the IDTT processes in CTC-1, CTC-2, and the MHCBU on April 4-5, 2016 because no IDTT meetings were scheduled during those days.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  Similar to the 2015 assessment, a review of three months of SPRFIT meeting minutes (December 2015, January 2016 and March 2016) found that meetings lacked a quorum in all three months, with the February 2016 meeting being canceled due to scheduling problems.  The issue of "poor SPR-FIT meeting attendance" had been a monthly agenda item since 2012.  Quorums were primarily not reached due to the absence of nursing leadership.

**Training**:  According to training records, approximately 93 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 90 percent of custody staff had received annual suicide prevention block training during 2015, but only 81 percent of medical and 77 percent of mental health staff received comparable suicide prevention training during 2015.  Although the completion percentages for annual training were much lower for health care staff, they were vastly improved from 2014 when almost none of the health care staff received annual suicide prevention training.  Finally, as of March 2016, only 44 percent of mental health clinicians had completed the SRE mentoring program, and 88 percent had received the seven-hour SRE training.

**Recent Suicides**:  CSP/Sac experienced three inmate suicides during the review period (all of which occurred during 2016).  In the *__first__* case (SAC 3), the inmate was hanging from the

ventilation grate by a sheet in his PSU cell during the morning of September 1, 2016. The inmate entered CDCR on August 11, 2008 to serve a life sentence (without the possibility for parole) for murder, attempted murder, arson, solicitation to commit criminal offense, child endangerment, and burglary. The offense involved the murder of his brother-in-law, stabbing of his sister, and arson of their home. He was transferred to CSP/Sac on August 30, 2016, two days before his death to serve a SHU term in the PSU. The inmate incurred 19 RVRs during his eight-year confinement, the most recent of which occurred on June 28, 2016 involving the battery of a correctional officer. The inmate was known to be gang-affiliated, but following a serious assault in 2009, subsequently sought to renounce his gang-affiliation and was placed on SNY status in 2011. He was unmarried and had one child. The inmate had family support through visits until approximately 2013, but continued to receive contributions to his commissary account.

The inmate was known to be a poor and inconsistent historian, therefore, his social history remained unclear. According to the limited available records, he had multiple siblings, and might have been sexually abused as a child. He had a significant history of substance abuse as a child, mostly from methamphetamines. He did not complete high school and was minimally employed. His first use of mental health services occurred while confined in the county jail on the instant offense and involved treatment for both depression and anxiety.

Upon entry into CDCR, the inmate experienced many mental health problems resulting in his placement in the MHSDS from August 20, 2008 through April 5, 2012, and then from June 4, 2014 to his death. On September 3, 2008, the inmate was placed in a MHCB for SI and head-banging. He was placed at the 3CMS level of care until April 8, 2010. However, during this time, he had four MHCB admissions that should have resulted in his elevation to the EOP level of care. Following his discharge from a MHCB on April 8, 2010, he was placed at the EOP level of care. Several months later on July 15, 2010, the inmate was again placed in a MHCB for AH and grave disability. In September 2010, he received an order for involuntary medication for grave disability. The inmate had various diagnoses during this time, including Mood Disorder NOS, Methamphetamine Dependence, and Antisocial Traits. In January 2011, he was downgraded to the 3CMS level of care. On April 12, 2012, he was diagnosed with Malingering and Antisocial Personality Disorder, and discharged from the MHSDS.

Beginning in late October 2013 through early June 2014, a number of custody referrals were submitted to mental health staff due to the inmate refusing to leave his cell. In addition to a gradual decline in functioning observed during this period, it is noteworthy that the inmate also received a total of 11 RVRs for refusing to submit to urinalysis, and his family and friends stopped visiting. Finally, on June 4, 2014, he was readmitted into the MHSDS at the 3CMS level of care with a diagnosis of Bipolar Disorder. Involuntary medication for grave disability was also reordered. In early July 2015 he was placed in the Vacaville Psychiatric Program (VPP) program at DSH for presenting as "catatonic, naked, paranoid, a danger to others, and gravely disabled." He was discharged back to CDCR a few weeks later for refusing to program and elevated to the EOP level of care. In November 2015, he was returned to the VPP for several days, returned to CDCR, and then treated at DSH-Stockton from January 5, 2016 through March 28, 2016. He was noted to have "major management problems secondary to volitional, calculated assaultiveness to custody and health care staff." From March 5, 2016 through July 8,

2016, the inmate was placed in the intermediate care program at DSH-Stockton for "suicidality, and his primary presenting symptoms were noted as assaultiveness, unprovoked aggression, catatonic, depressed unresponsive behavior." During most of his DSH stay, the inmate stayed in the cell, remained in bed, and would rarely get up to talk to staff at cell-front. An assessment indicated his current mental health symptoms appeared to be due to psychotic symptoms which waxed and waned. As a result, his diagnoses at discharge were Schizophrenia, Methamphetamine Dependence, and Antisocial Personality Disorder.

Upon his return to CDCR at CSP/Corcoran, the inmate was housed in administrative segregation. During this time period, his mental health symptoms appeared to improve, he did not exhibit any behavioral problems, his cell and personal appearance were noted to be normal, he did not exhibit any psychotic symptoms, and he denied any SI or HI. PT daily rounds forms noted that the inmate was participating in the EOP groups. He was transferred from the administrative segregation unit at CSP/Corcoran to the PSU at CSP/Sac on August 30, 2016, two days before his death.

The inmate had a history of suicidal behavior that included periodic reports of SI throughout his incarceration, resulting in numerous MHCB and DSH admissions. In addition to the self-injurious behavior resulting in his MHCB admission in September 2008, subsequent SREs noted a suicide attempt by hanging in 2009, as well as an unverified attempt sometime in 2011. A review of numerous SREs completed during his incarceration found that the "estimation of risk for each SRE appeared to reflect accurate assessment of the chronic and acute risk factors (as 'moderate'), and the number of protective factors remain relatively low, except for 'family support' and 'future orientation'." However, the CDCR reviewer in this case found several concerns regarding the inmate's final SRE dated April 5, 2016. In that assessment, the clinician did not estimate the inmate's level of risk, while opining "I/P appears to be far more of an assault risk than a suicide risk!...May use odd behavior to feign MH distress to get out of unit."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and the inmate did not have any significant medical issues that could be viewed as contributory to his suicide. However, the reviewer noted that "while incarcerated, the inmate demonstrated a high degree of impulsivity, chronic anger, hybrid diligence, and committed 8 staff assaults during the last two years of his life. Clinicians agree that the inmate exhibited a number of complex psychological/personality factors, together with a long history of heavy methamphetamine use, and these factors probably impaired his ability to develop pro-social coping skills and to exercise adequate self-control." With that said, the reviewer also noted that "there were no obvious explanations as to the reason for his suicide occurring at this point in time."

The Suicide Report contained four recommendations for corrective action through a QIP:

> 1) Upon discharge from DSH-Stockton, a five-day follow-up dated March 31, 2016 was started a day late, there were no entries for the subsequent three days, and no SRE was performed as required, all breaches of policy. A similar situation occurred upon discharge from DSH-Stockton on July 8, 2016. The five-day follow-up was not started until July 15, 2016 and no SRE was performed;

2) Psychologist progress notes dated July 13, 2016 and July 14, 2016 contained information from another patient's file.  Due to the clinician confusing the inmate and this other patient, serious documentation errors occurred;

3) In an SRE dated April 5, 2016, the estimation of level of risk (both chronic and acute) was not noted, as required by policy.  Additionally, the clinician discounted multiple chronic and acute risk factors for suicide, and instead inappropriately used the process by concluding the inmate was a risk factor for violent behavior (without describing relevant risk factors for violent behavior);

4) Per the Nursing Death Review Summary, two nursing concerns were identified requiring follow-up" (on April 9, 2016, the MHCB nurse did not obtain the inmate's vital signs; PT daily rounds forms inaccurately reported on several dates during July and August 2016 that the inmate was actively participating in groups).

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

In the _**second**_ case (SAC 4), the inmate was found hanging from an unknown anchoring device in his EOP GP cell during the morning of November 24, 2016.  The inmate entered the CDCR on April 8, 2016 to serve a 75-year-to-life sentence for conspiracy to commit murder and possession of a firearm by a felon in a gang-related incident.  He was transferred to CSP/Sac on August 26, 2016.  The inmate incurred one RVR during his confinement, an assault on an officer that occurred on May 2, 2016.  He was placed in the administrative segregation unit until September 9, 2016, whereupon he was discharged to EOP GP housing.  The inmate was known to be gang-affiliated.  He was married and had two young children.  The inmate had family support of both his mother and sister, whom he received letter correspondence and visits from on a regular basis.  During a telephone conversation with his wife on November 23, 2016, the inmate threatened suicide after she informed him that she was filing for divorce. The telephone call was not monitored by facility staff.

According to available records, the inmate and three siblings were raised by their mother.  He had a traumatic childhood which included being sexually molested by a cousin for two years, as well as suffering both physical and emotional abuse by his mother.  He also had an extensive history of substance abuse beginning at age seven, and also became involved with gangs at an early age.  The inmate had an extensive juvenile and adult criminal history, and he was currently serving his fourth CDCR term.

Upon his most recent entry into CDCR, the inmate reported that he had been treated for depression, anxiety, and suicidal thoughts while housed in the county jail.  He also reported a suicide attempt by hanging, with a loss of consciousness, in December 2015 at that same jail. The inmate also reported a suicide attempt by overdose in 2006.  Two days after his April 8, 2016 CDCR admission, the inmate was admitted into a MHCB for SI.  He was discharged ten days later at the EOP level of care with a diagnosis of Psychotic Disorder NOS, Polysubstance Dependence in a controlled environment, and Antisocial Personality Disorder.  His most recent

SRE, completed on September 20, 2016, assessed the inmate's chronic risk for suicide as "high" and his acute risk for suicide as "moderate."

Following his release from administrative segregation, the inmate's initial adjustment to the EOP GP appeared to go smoothly, although he refused most of his group therapy treatment.  In October 2016, the inmate began refusing most of his psychotropic medication, suggesting that "my medicine is not doing anything."  With a few exceptions, he was seen by both his PC and psychiatrist at the required time frames and presented as "a person daily with a substantial amount of negative stress, and his statements contained a number of complaints related to AH and depressed moods."  He was last seen by the psychiatrist on November 23, 2016, and the note indicated the inmate appeared "depressed and withdrawn, sad, and almost tearful."  The inmate refused to elaborate on his presenting symptoms, only telling the clinician that "I don't trust you. I don't know you."

The inmate also had a medical history that included hypertension, asthma, cardiovascular disease-hypertension, history of pneumonia, and chronic neck and back pain.  None of these medical issues were thought to be contributory to his suicide.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide; however, as noted above, his wife had informed him during their last telephone call the night before his death that she was terminating their marriage.  In addition, an interview with the inmate's cellmate after his death revealed that he had asked his cellmate if he would "help me hang myself" several days earlier. The cellmate, who did not take the threat seriously, did not report the incident to any facility staff.

The draft Suicide Report contained four recommendations for corrective action through a QIP:

> 1) Based upon discrepancies between the individual CDCR 837s submitted by responding staff, it is unclear when rescue breathing was provided to the inmate. By all indications, it is clear no rescue breaths were provided prior to the arrival of the Ambu bag through the use of a CPR micro-shield, which all staff are mandated to carry in the event of a medical emergency requiring its use;

> 2) According to the MHCB, EOP psychiatry scheduling timelines were not met in October and November 2016;

> 3) A formal clinical psychiatry note for medication change on October 10, 2016 was not located, nor was a note documenting the cell-side performed together with the primary clinician on November 21, 2016.  Only the primary clinician's note was found;

> 4) Per the nursing review, five nursing care concerns are identified requiring follow-up (that involved Psych Tech and RN documentation errors on June 6, June 16, June 21, August 26, and September 1, 2016 while the inmate was in the ASU).

Based upon the findings contained within the draft Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

In the **_third_** case (SAC 5), the inmate was found unconscious in his EOP GP cell during the early morning of December 18, 2016. He was taken to the TTA and subsequently transferred to a local hospital for further medical treatment. He was pronounced dead on December 30, 2016 with the cause of death listed as suicide by overdose (of his psychotropic medication). The inmate entered the CDCR in January 1992 to serve a 15-year-to-life sentence (with the possibility for parole) for the second-degree murder of his brother-in-law. He was transferred to CSP/Sac on several occasions, most recently on June 13, 2016. The inmate incurred 27 RVRs during his almost 24-year confinement, the most recent of which occurred in May 2015 involving a fight with another inmate. The inmate was not known to be gang-affiliated. He was unmarried at the time of his death and had one child. The extent of any family support was unknown.

According to available records, the inmate and an older sister were initially raised by both parents who emigrated from Japan when the inmate was only four years old. Several years later, however, his parents divorced and he lived with his father. Records regarding his childhood were sparse, but he graduated from high school and attended four years of college without graduating. His work history was limited based upon self-reported "emotional difficulties." Such difficulties were thought to be the cause of the annulment of his first marriage, as well as divorce from his second wife. The inmate also reported that he was diagnosed with paranoid schizophrenia in approximately 1983, although the source of this diagnosis was unknown. According to probation records derived from his 1988 instant offense, the inmate "thinks his mental problems were caused by a telepathic communication with outer space aliens." He was sent to Atascadero State Hospital (ASH) in 1989 for a competency to stand trial evaluation. His mental health further deteriorated and he was sent to PSH from May 1999 through December 1999. His initial diagnosis was Schizophreniform Disorder.

Upon entry into CDCR in January 1992, the inmate almost immediately began receiving mental health services, including psychotropic medication. His initial diagnosis was Schizophrenia, Paranoid Type. Between January 1992 and December 2016, the inmate was admitted into DSH facilities on approximately 12 occasions. During that time, he was also admitted into a MHCB on six occasions. He was placed at the 3CMS level of care in 2003, but was elevated to the EOP level of care in December 2005, where he remained until his death. Throughout his CDCR confinement, the inmate displayed fairly consistent delusions that included being a special federal agent. His history of suicidal behavior included a suicide attempt in 2005 while at CCI and a suicide attempt by overdose in 2015 at CSP/Sac. His most recent SRE completed on September 7, 2016 assessed his chronic risk for suicide as "moderate" and his acute risk for suicide as "low." From September through December 2016, the inmate rarely left his cell, and did not actively participate in either group treatment or yard time. A progress note dated November 3, 2016 suggested deteriorating mental health, with the inmate reporting that "there are times I feel like I'm losing it. I am having a hard time hanging on. I feel so lonely at times." On November 8, the inmate reported "I am doubtful and fearful that things will get really bad….The end of contentment and eternal domination." The clinician noted vague SI without a

plan or intent. In a November 15 progress note, the clinician noted that the inmate stated, "thoughts about the world collapsing keeps me up at night. And I can't do anything to stop it….In a terrible way, where people don't believe in religion or tortured." The last progress note by the PC, dated December 13, 2016, noted that the inmate stated "I am not doing all that well. I keep praying and listening to NPR and that helps me."

The inmate had an insignificant medical history that did not include any medical issues that were perceived as contributory to his suicide.

The CDCR reviewer in this case did not find any specific precipitating factors that indicated the inmate was contemplating suicide, and a suicide note was not found. The draft Suicide Report contained seven recommendations for corrective action through a QIP:

> 1) Upon his return from DSH on June 13, 2016, an SRE was not performed in accordance with policy. *Program Guide* 12-10-9 states that within 72 hours of return from a Department of Mental Health facility or within 24 hours if clinically indicated based on a new arrival screening;

> 2) A 5-Day follow-up was not initiated upon return from an intermediate and Acute Discharge in accordance with Policy 12.0.501, Memorandum, May 9, 2012;

> 3) A 7386 full mental health evaluation was not undertaken in accordance with policy (Memorandum, May 12, 2015), that states a 7386-B can only be done if the 7386 full mental health evaluation is less than three-years-old;

> 4) The inmate was not placed on additional services (i.e., high risk list) even though he had a lethal suicide attempt history and was single celled;

> 5) The inmate was primarily seen cell front for the last three months of his life. Inmates are required to be seen in a confidential setting out of cell;

> 6) There were no records to indicate that the inmate was receiving the required 10 hours of therapeutic activity. Records do not indicate group therapy or any recreational therapy or other yard time;

> 7) Per the Nursing Death Review Summary, two nursing concerns were identified requiring follow-up [i.e., delay in activation of 911 and nursing documentation following the emergency].

Based upon the findings contained within the draft Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

Finally, it should be noted that an inmate suicide (DVI 2) occurring at DVI on October 12, 2015 contained nine recommendations for corrective action through a QIP, many of which were

directed at CSP/Sac because the inmate had been transferred from CSP/Sac to DVI on the same day of his suicide, see pages 146 through 149 of this report.

### 6)    California Correctional Institution (CCI)

**Inspection**:  April 26-27, 2016 (previous suicide prevention audit was on June 24-25, 2015). CCI housed approximately 3,213 inmates at the time of the on-site assessment.

**Screening/Assessment**:  Intake screenings for several new admissions was observed in Facility B on April 26.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015).  A holding cage had recently been installed to ensure privacy and confidentiality, and the door to the nurse's office remained closed during the intake screening process.  The only concern was that the nurse was seated at a desk with his back to the cage, therefore, there was no eye contact between the nurse and the inmate.  This reviewer was informed that another holding cage had also been installed in the Facility A intake nurse's office.

Daily PT rounds in several administrative segregation units and SHUs were observed on April 26-27.  The PT rounds conducted in several SHUs on April 26 were unremarkable and PTs were observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.  On April 27, however, the PT rounds in administrative segregation were problematic, with one PT *not* completing Psych Tech Daily Rounds Forms on caseload inmates at cell-front.

**Housing**:  CCI had eight of its 16 OHU cells designated to temporarily house inmates with mental illness and/or requiring suicide observation.  These OHU cells were designated as alternative housing and required 1:1 observation prior to transfer to a MHCB.  The cells had either fixed beds or stack-a-bunks.  In addition, pursuant to a new and progressive initiative of the CCI Warden, inmates awaiting transfer to an MCHB and housed in the OHU on 1:1 observation were *not* automatically placed in a safety smock.  Rather, pursuant to a LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Alternative Housing-Mental Health"), each inmate was "provided with a safety mattress, sheets, safety blanket, state issued clothing, including pants, shirt, socks, underclothes, reading materials, hygiene items, and a prescribed healthcare appliance as clinically indicated as per Policy 12.05.301."  Such a policy and practice was commendable.

This reviewer was presented with data indicating that 47 inmates were placed in **alternative housing** during the three-month period of February 2016 through April 2016.  The vast majority (96 percent) either discharged within 24 hours or within a few hours beyond the 24-hour limit. Only four percent of inmates remained in alternative housing well beyond 24 hours (i.e., two to three days).

Finally, this reviewer toured administrative segregation on April 27 and observed that the three suicide-resistant new intake cells were filled with new intake inmates.  Two additional new intake inmates were housed in unsafe non-new intake cells.

**Observation**:  Because CCI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB.  No other levels of observation were permitted within the OHU.  This reviewer did not observe any inmates in the OHU for purposes of SI and/or mental illness who were not on 1:1 observation, a correction from previous assessments.

In addition, the recently revised LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Alternative Housing-Mental Health") contained misleading narrative regarding requirements of custody checks following an inmate's discharge from a MHCB.  Page six of the LOP stated that the "The mental health clinician shall not discontinue the MHCB Discharge Custody Check until at least 24 hours have passed since initiation."  This directive might be interpreted that custody checks should be discontinued after 24 hours by default.  On the contrary, a CDCR memorandum entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy" (issued January 27, 2016) required that a mental health clinician reevaluate the inmate every 24 hours to determine whether 30-minute custody checks should be continued and, if the inmate required such custody checks after 72 hours, they should be readmitted into a MHCB.  The LOP should be revised accordingly to provide better clarification of this requirement.

A review of Guard One data for a recent 24-hour period found 94-percent compliance with the required checks not exceeding 35-minute intervals in the four SHUs and 85-percent compliance in administrative segregation.  These compliance rates were an improvement from the 2015 assessment.  Of note, however, when observing PT rounds in administrative segregation on April 27, this reviewer observed that the officer conducting Guard One rounds was *not* looking into each cell.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of October 1, 2015 through April 25, 2016.  This reviewer's eUHR review of these 44 emergency referrals for suicidal ideation/behavior found that mental health clinicians completed the required SREs in 93 percent (42 of 45) of the cases.

This reviewer did not review discharging SREs at CCI because most of the assessments were conducted by mental health clinicians at other MHCB facilities.  However, when inspecting the OHU on April 27, this reviewer observed a clinician complete an initial SRE on an inmate that had been brought into the unit a few hours earlier for SI.  The clinician had previously reviewed the inmate's chart and was observed to conduct a thorough assessment.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  Review of three months of SPRFIT meeting minutes reflected adequate attendance from most, but not all, required members.  Contrary to documentation in the meeting minutes, quorums were *not* achieved for any of the meetings.  Minutes were brief and unremarkable.

**Training**:  According to training records, approximately 90 percent of custody and 98 percent of nursing staff was currently certified in CPR.  In addition, approximately 95 percent of custody, 96 percent of medical, and 98 percent of mental health staff completed the annual suicide prevention block training during 2015.  Finally, as of April 2016, 97 percent of required mental health clinicians had completed the SRE mentoring program, and 91 percent had completed the seven-hour SRE training program.

**Recent Suicides**:  CCI experienced three inmate suicides during the review period (two of which occurred during 2016).  In the *__first__* case (CCI 1), the inmate was found hanging from the bunk by a sheet in his administrative segregation cell by a PT during the morning of August 8, 2015.  Of note, the inmate was found at approximately 10:06 a.m., but had allegedly received a Guard One check one minute earlier at 10:05 a.m.  The inmate entered CDCR on December 26, 2013 to serve a six-year sentence for vehicular manslaughter while intoxicated.  He was transferred to CCI on July 30, 2014.  The inmate was not known to be gang-affiliated, and incurred only one RVR during his confinement.  The RVR occurred on April 24, 2015 and involved obstructing a peace officer in the performance of his duties.  The inmate's medical history included Hepatitis C, benign prostatic hyperplasia, lower back pain and left flank and testicle pain.  There were also inconsistent reports of a seizure history.

Records revealed that the inmate had been treated for anxiety, depression, and substance abuse in the community, although the length of treatment in the community was unclear.  During the intake screening process in December 2013, he reported a prior history of mental illness, but denied any current symptoms, including SI.  The inmate was referred to a psychiatrist based upon his self-reporting of prior psychotropic medication.  He again denied any current symptoms of mental illness, although he acknowledged a family history of mental illness that did not include a family history of suicidal behavior.  As a result of the assessment, the psychiatrist did not diagnose the inmate with a major mental illness and he was not entered into the MHSDS.

On April 27, 2015, a mental health referral was initiated by custody staff based upon the inmate's perceived paranoid thoughts.  The inmate revealed to the clinician that he had paranoid thoughts of being assaulted, complained of poor sleep, and expressed extreme anxiety.  A psychiatric referral was initiated based upon "poor appetite/sad/fearful nervous, insomnia/sleeps too much and other stating 'IP extremely anxious regarding possible victimization; no sleep for three days.'"  The inmate was never seen by a psychiatrist and was placed in administrative segregation the following day (April 28) due to safety concerns.  He was seen by an administrative segregation clinician and the cursory assessment stated that he "reported he was feeling better off the yard."  (It was noteworthy that the inmate had previously been placed in administrative segregation on June 24, 2014 due to safety threats from a white supremacist gang that subsequently resulted in his designation as SNY and transfer to CCI.)

On May 26, 2015, the inmate submitted a Health Care Services Request stating that he was experiencing "severe anxiety and depression."  Although the inmate was seen by a clinician four days later on May 30, a progress note was not generated and the clinician simply wrote on the Request form that "Pt briefly seen presents stable, no SI.  Reports depressive symptom and med eval 1) schedule routine med review."  No follow-up referral to psychiatry was generated.  The inmate was seen by a mental health clinician again on June 2, 2015, again as a result of the

original May 26 self-referral.  The clinician wrote a progress note that stated, in part, that "he did not meet criteria for psychiatric appointment and was again encouraged to write the CC1 regarding his housing and exercise to reduce stress and also agreed to bring him some information regarding sleep hygiene when I am next in his building."  The note did not include any suicide risk inquiry.

On July 14, 2015, the inmate was seen by the administrative segregation mental health clinician "due to his having put in a referral stating 'requesting 1:1 with CM.'"  The clinician wrote a progress note that stated, in part, that "he went on to ask about the custody process and request intervention in his housing.  He was redirected several times to address his mental health concerns but he maintained his problems are custody related.  He was referred to his CC1.  He agreed to develop an exercise routine to assist in managing some of his discomfort but denied any other mental health needs."  The note did not include any suicide risk inquiry.

The inmate wrote several lengthy suicide notes that were found in his cell after his death.  The notes were written for CCI custody staff, his parents and brother.  The CDCR reviewer in this case offered several precipitating factors to the suicide based upon these suicide notes and other documentation initiated by the inmate.  The reviewer wrote that:

> Even though the inmate had considerable family and friends support, his fiancée recently broke off their two-year relationship and he had increasing fears for his safety.  While he had some jail time for substance use arrests, this was the first prison term and the pressures on the yard and in the ASU were consuming his thoughts.  In his final letters, there was an overwhelming sense he felt trapped, hopelessness, and helpless and that the suicide was his only option.  His thinking was most likely influenced by his fears, depression, and anxiety.  In the months before his death, he appeared to be reaching out for help, but was not able to communicate the extent of the distress he was feeling.

The reviewer also noted that although an SRE was never completed, had an assessment been conducted, the inmate would have been identified with multiple acute and chronic risk factors for suicide.

The Suicide Report contained ten recommendations for corrective action through a QIP:

> 1) There was no psychiatric evaluation conducted based upon an apparent referral written on April 27, 2015, as well as one written in May 2015;

> 2) There was no progress note or entry in MHTS for a mental health contact that occurred on May 30, 2015;

> 3) The inmate was seen in both June and July 2015 per his request and reported depression, anxiety, and significant distress for his safety.  There were no clinical evaluations conducted pursuant to Program Guide requirements to assess the need for MHSDS;

4) There was no documentation that the inmate was ever offered the opportunity for a confidential session with a mental health clinician;

5) CCI custody staff average 3 minutes to perform Guard One checks in the ASU. One round depicted 30 of the 32 cells were completed within 1 minute "which calls into question the thoroughness of the security/welfare checks being conducted.  As an example, only 1 minute elapsed between the last security/welfare check performed by custody staff in the medical round conducted by the PT when the inmate was discovered unresponsive with a sheet hanging as a curtain from the bunk's end, obscuring the view into the cell;"

6) The inmate was seen at his initial ICC on May 7, 2015 and retained pending completion of the disciplinary process.  The RVR in question was not a SHU offense and would not warrant retention in ASU pending disciplinary action;

7) The reason for segregation changed once it was determined the safety concerns were not validated and it was decided to retain the inmate for the disciplinary process.  No additional ASU Placement Notice documentation was found in the central file;

8) The final copy of the inmate's RVR was issued 40 days after adjudication of the RVR;

9) The inmate's case was not reviewed by the ICC within 90 days of the initial review; and

10) CSR review was not conducted until 91 days after the initial ICC, which was 61 days beyond the established time limit.

The suicide was also reviewed by the Suicide Case Review Committee, with the committee voting "there was moderate risk of foreseeability in the suicide based on the lack of solid clinical evaluation," and "this was a preventable suicide based on the various policy violations presented as concerns in this report."

In the _**second**_ case (CCI 2), the inmate was found hanging from the wall ventilation grate by a sheet in his administrative segregation cell during the afternoon of May 25, 2016.  The inmate entered CDCR on October 10, 2014 to serve an 18-year sentence for attempted second-degree murder with enhancements.  He was transferred to CCI on April 14, 2015.  The inmate incurred two RVRs during his short confinement, the most recent of which was possession of a deadly weapon on April 25, 2016.  The RVR was referred to the local district attorney's office for prosecution, signifying a possible third strike conviction and life sentence.  However, on May 26, 2016, the day after his death, CCI received notification that the district attorney's office had declined to prosecute the case.  The inmate was known to be gang-affiliated.  The inmate did not appear to have any family support, as he did not make any telephone calls or receive any visits.

According to available records, the inmate and a younger brother were raised by their mother and stepfather. He previously told a clinician that he was "tortured and mistreated" in his childhood, which included both emotional and physical abuse by his stepfather, as well as witnessing domestic violence, his mother's mental illness, and significant substance abuse by his parents. The inmate also had significant substance abuse issues which began when he was 13 years old. He denied any history of mental illness or suicidal behavior, but experienced the suicide of his wife following the loss of their son to sudden infant death syndrome. The inmate had an extensive history of prior arrests, including two prior CDCR terms, and was both unemployed and homeless at the time of the instant offense.

Upon admission into CDCR in October 2014 he was placed in the MHSDS at the 3CMS level of care based upon a prior history of depression and anxiety, including placement in the MHSDS during his two previous CDCR terms. His initial diagnoses were Mood Disorder NOS and Amphetamine Dependence. These diagnoses were later revised on April 24, 2016 to Adjustment Disorder with depressed mood and Rule Out (R/O) Major Depressive Disorder, Substance-Induced Mood Disorder. Progress notes generally indicated that the inmate was active in treatment and able to acquire positive coping skills. In November 2015, he was discharged from the MHSDS based upon his request and meeting treatment goals. However, several months later on April 25, 2016, the inmate was returned to administrative segregation following receipt of his second RVR and referred back to the MHSDS after telling a nurse that "I feel depressed, I don't like being in the cell." He was subsequently returned to the 3CMS level of care. However, the following month on May 12, 2016, the inmate requested to be removed from the 3CMS program. According to the CDCR reviewer in this case, there was inadequate documentation in the chart to indicate whether or not the inmate had completed all his treatment goals to again warrant removal from the MHSDS. When the PC was subsequently interviewed by the CDCR reviewer and asked why the inmate was removed from the MHSDS only a few weeks after being re-admitted, the clinician responded that the inmate was worried that he might be transferred from CCI if he was retained in the 3CMS program.

The inmate did not have any documented history of suicidal behavior, although he periodically verbalized a wish to be dead, even telling a clinician on April 29, 2016 (the month prior to his death) that "he would like to be dead and states he does not want to kill himself, i.e., 'I don't want anyone to suffer what I did with my wife' who shot herself." His most recent SRE, also completed on April 29, 2016, indicated a "moderate" chronic risk and "low" acute risk for suicide.

The inmate had a few minor medical issues, including chronic asthma that were not thought to be contributory to his suicide.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not leave a suicide note. However, the reviewer did note that "the pending district attorney referral and subsequent disciplinary action, interpersonal struggles with depression, anxiety, and substance abuse, possible safety concerns related to his STG affiliation, and loss of his wife and son are conceivably reasonable contributory factors." The Suicide Report contained three recommendations for corrective action through a QIP:

1)  The clinical documentation by the inmate's primary clinician left it unclear as to whether he had met his identified treatment goals and provided no rationale for his removal from the MHSDS that occurred one week prior to his death;

2)  Custody staff did not lift or support body before cutting the ligature;

3)  A registered nurse failed to follow the IMSPP, Volume 4, Chapter 1.3, by not assessing the patient before referring him to the mental health department [on December 31, 2015].

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

In the **_third_** case (CCI 3), the inmate was found hanging from the upper bunk brace by a sheet in his SHU cell during the early afternoon of June 11, 2016.  The inmate entered CDCR on April 12, 2013 to serve a life sentence without the possibility of parole for the first-degree murder of a 15-year-old girl, conspiracy to commit murder, and enhancements for aiding and abetting in the crimes of kidnapping and murder.  He was transferred to CCI on September 10, 2013.  The inmate incurred seven RVRs during his confinement, the most recent of which was for possession of an inmate manufactured weapon on May 26, 2014.  The inmate was known to be gang-affiliated, with other reports suggesting that he was a gang dropout and had initially agreed to testify against his co-defendants.  The inmate was thought to have limited family support, although he initially received several visits from friends and family, including his mother and grandparents, the most recent of which occurred in February 2014.  Due to his SHU term, he was unable to make telephone calls.  In fact, during his almost three-year CDCR confinement, the inmate spent most of his time housed in either the SHU or administrative segregation.

Available records regarding the inmate's social history background were very sparse, and only suggested that he had two sisters and his parents were divorced.  He had previously reported to mental health staff that he was both physically and emotionally abused as a child, as well as reported to medical staff that he suffered from seizures as a child.  The inmate also reported that he developed substance abuse problems at age 11, and had an extensive juvenile and adult criminal history.

The inmate did not have a documented history of mental health treatment in the community, but reported receiving psychotropic medication prior to his CDCR term in a county jail from 2010 to 2012.  Upon admission into CDCR in April 2013, he denied any mental health concerns and was not initially referred to the MHSDS.  However, one month later in May 2013, the inmate was placed in administrative segregation and subsequently referred to mental health staff.  He reported that his mother had Bipolar Disorder and his grandfather had died by suicide.  He also complained of having depression, irritability, and panic attacks.  As a result, the inmate was placed in the MHSDS at the 3CMS level of care with a diagnosis of an Adjustment Disorder.  Psychotropic medications were started.  His diagnoses were adjusted on two occasions, most recently on February 4, 2016 when his diagnoses were Major Depressive Disorder, Polysubstance Disorder, and Antisocial Personality Disorder.  One month later on March 30,

2016, the inmate was seen by a psychiatrist who added Post-Traumatic Stress Disorder (PTSD) as a diagnosis based upon his reporting of recurrent dreams and thoughts of beatings he received as a child, as well as bed-wetting.

The inmate did not report any history of suicidal behavior nor ever express any SI during his CDCR confinement. Based upon reported anxiety, anger, depression, hallucinations, and transient hopelessness, his SREs assessed a "moderate" chronic risk and "low" acute risk for suicide.

The inmate had a few minor medical issues, including two seizures as a child, as well as chronic jaw and shoulder pain that were not thought to be contributory to his suicide.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not leave a suicide note. However, the reviewer did note that "in January 2016, he was told that his mother had died, though he later received letters from her. He complained of excessive sleep, depression, and sadness at his perceived loss. He reported bothersome nightmares and memories of his past dramatic experiences. He experimented with his medications, studied anatomy, and reported 'terrible dreams,' and at some point decided to end his life on June 11, 2016."

The Suicide Report contained five recommendations for corrective action through a QIP:

> 1) There were three nursing care concerns (regarding Psych Tech rounds on February 5 and 6, 2016, as well as documentation errors regarding multiple medication refusals);

> 2) Timeliness for referral response and mental health screening were not met while the inmate was in the first five weeks at WSP RC;

> 3) The quality of treatment planning completed after the inmate re-entered the CCCMS program in 2016 was substandard. Specifically, a single short-term goal was poorly written and identified the inmate as the 'responsible discipline' to provide interventions to meet the treatment goal;

> 4) The inmate's psychiatrist established that he was distressed in part due to PTSD symptoms. This is not reflected in IDTT documents. It is not clear if the condition was discussed in the IDTT and not documented, or if the knowledge was not communicated between team members;

> 5) The inmate's last ICC action occurred on April 29, 2015. His next anticipated review date, a 180-day SHU review, should have occurred on October 19, 2015. There was no record that this review occurred. A SHU annual review should have occurred by the end of April 2016.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable and not preventable.

### 7) **California State Prison - Los Angeles County (CSP/LAC)**

**Inspection**: April 28-29, 2016 (previous suicide prevention audit was on November 12-13, 2013). CSP/LAC housed approximately 3,551 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the intake screening process in the R&R unit on April 28, 2016. The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions. Good privacy and confidentiality were observed during the intake screening process.

In addition, daily PT rounds in the two administrative segregation units (STRH and administrative segregation EOP) were observed on April 28-29. The rounds in both units were unremarkable and PTs were observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates. It was noteworthy, however, that there was questionable accuracy regarding documentation in the Psych Tech Daily Rounds Form for the inmate who committed suicide at the facility in April 2016.

**Housing**: CSP/LAC had a 16-bed CTC, with 12 rooms designated as MHCBs. All MHCB rooms were found to be suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The STRH unit had seven new intake cells and administrative segregation EOP had six new intake cells. During inspection of both units, this reviewer observed that one of the seven STRH new intake cells was occupied by a new intake inmate, with the remaining new intake cells housing non-new intake (i.e., beyond 72 hours) inmates. This reviewer observed that there were seven additional new intake inmates housed in unsafe non-new intake cells. All were in the MHSDS at the 3CMS level of care. Further, this reviewer observed that two of the six administrative segregation EOP new intake cells were occupied by new intake inmates, one new intake cell was empty, and the remaining three new intake cells housed non-new intake inmates. This reviewer observed at least five new intake inmates housed in unsafe non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in the seven new intake cells in administrative segregation EOP (Facility D, Building 5), holding cells within the CTC, eight dry holding cells within the visiting areas of Facilities A, B, C, and D and a holding cell in the STRH unit. This reviewer was informed that the CTC holding cells were currently offline and would remain so for approximately one year while the building underwent renovation. According to available data, approximately 32 percent of inmates housed in alternative housing remained over 24 hours, and approximately 13 percent of inmates remained in alternative housing for more than 48 hours. CSP/LAC officials could not provide data regarding the frequency and duration of use for the dry holding cells, a significant concern found by this reviewer in other CDCR facilities.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. In addition, patients not on suicide observation status were being observed at 60-minute intervals by nursing staff. Such a practice was contrary to a CDCR memorandum dated March

15, 2016 entitled "Level of Observation and Property for Patients in Mental Health Crisis Beds," which required that any inmate housed in a MHCB and not on a suicide observation status be observed at 30-minute intervals. In addition, this reviewer found more than a few medical charts in which physician orders allowed for "1:2 direct observation" of suicidal inmates. Such a level of observation is not permitted.

Review of the Daily CTC Census Reports for April 28-29 indicated that *none* of the 12 inmates in a MHCB for either day were on a suicide observation level. This reviewer's subsequent conversations with various members of IDTTs at CSP/LAC found that clinicians were confused as to the procedures for granting inmates access to both privileges and possessions while housed in a MHCB. Such confusion resulted in IDTT members expediting an inmate's discharge from a suicide observation level so that they would be "eligible" for activities such as yard, telephone calls, and visits. Such a practice was contrary to *Program Guide* requirements, as well as other CDCR memoranda meant to clarify the property and privileges of MHCB patients. In fact, such a practice was also contrary to a LOP memorandum dated February 24, 2016 entitled "Addendum to OP #500 Inmate Program and Activity Schedule for CTC," which clearly stated that "effective immediately, inmate-patients housed in a MHCB for short-term psychiatric care will be granted outdoor recreational activity if it is determined by the mental health treatment team this activity is consistent with inmate-patients' clinical needs." IDTT members appeared to be unaware of this memorandum.

This reviewer observed 11 IDTT meetings for MHCB patients on April 28 and April 29. The treatment teams were very uneven. In the first case (LAC 1) observed on April 28, the inmate was admitted to the MHCB on April 22 for threatening suicide. He was informed by the PC during the treatment team meeting that he would be discharged that day to the EOP level of care. The team did not inquire as to the inmate's current SI and the discussion regarding safety planning was limited to "exercise and work on anger … Will deal with it in the EOP program." In another case (LAC 2), the inmate was admitted to the MHCB on April 26 for hearing voices that suggested he tie a sheet around his neck. The treatment team did not inquire as to the inmate's current SI and the discussion about treatment planning included the following goals: "1) to decrease depression to a '5,' 2) no suicidal ideation for 5 straight days, and 3) stabilization on meds." There was no discussion regarding how the inmate's depression and SI were going to be reduced and/or eliminated. Most IDTTs observed by this reviewer did not contain a current suicide risk inquiry nor an adequate discussion on safety planning. Of the 11 IDTTs observed, only two contained either an adequate discussion on safety planning or inquiry regarding current suicide risk. In fact, the most noteworthy issue that arose during the treatment team meetings was clinicians asking inmates if they desired to make a telephone call (after this reviewer had informed them that they could use their clinical judgment in authorizing such privileges). Finally, this reviewer noticed that there was signage on each inmate's door in the MHCB that read "authorized for safety smock," a confusing order since none of the inmates were on a suicide observation level nor clothed in safety smocks.

A review of Guard One data for a recent 24-hour period found 90-percent compliance with required checks not exceeding 35 minutes in the STRH unit and 91-percent compliance in administrative segregation EOP. As shown below, however, there were questionable Guard One practices involving the inmate who committed suicide in the STRH unit in April 2016.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of March and April 2016.  In addition, the TTA log for the same time period was also reviewed.  This reviewer's eUHR review of 35 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in 91 percent of the cases.

This reviewer examined multiple SREs of inmates discharged from a MHCB during April 2016.  Despite being told by mental health leadership that safety planning training workshops were completed in March 2016, this reviewer found that all but one of the SREs did not contain adequate safety planning.  The one exception (LAC 3) was the following reasonable and thoughtful plan developed on April 4, 2016:

> 1) IP will be discharged to CCCMS with a five-day step-down. (triggers reported/watch for = 1. delayed gratification, i.e., when needs not met how he feels they should be, 2. bad news about his family, i.e., financial struggles, death).

> 2) While in CCCMS, it is recommended that PC continue to work with IP to increase distress tolerance by assisting PC to utilize identified alternative coping skills (contacting family, writing family, reading).

> 3) IP indicated that his brother's death in 2015 was a trigger for SA, IP becomes emotional when discussing brother, may be something to further process and explore.

> 4) IP has continued to struggle with 'bad news' or any upset in his plan resulting in SI, it is recommended that PC explore alternatives and appropriate channels to get his needs and wants met without resulting in SI/SA.

> 5) IP is not taking psych meds at this time (states he has refused them in the past but maybe that is something he will need) continue to consult with psychiatrist and nursing as needed.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of five months of SPRFIT meeting minutes reflected adequate attendance from most, but not all, required members and a lack of attendance by psychiatry.  Contrary to documentation in the meeting minutes, quorums were not achieved in any of the meetings.  Minutes were brief and unremarkable.

**Training**:  According to training records, approximately 100 percent of custody staff and 98 percent of nursing staff were currently certified in CPR.  In addition, approximately 99 percent of custody, 49 percent of medical, and 72 percent of mental health staff received annual suicide prevention block training during 2015.  Finally, as of April 2016, 96 percent of mental health clinicians had completed the SRE mentoring program, and 96 percent had received the seven-hour SRE training.

**Recent Suicides**:  CSP/LAC experienced two inmate suicides during the reporting period, both of which occurred during 2016.  In the *first* case (LAC 4), the inmate was found to have asphyxiated himself with headphone cords in his STRH cell during the evening of April 1, 2016. The inmate entered CDCR on June 1, 2015 to serve a 26-year sentence for multiple counts of possession of a firearm, assault, and committing a felony in association with a street gang.  He was transferred to CSP/LAC on January 27, 2016.  The inmate incurred three RVRs during his ten-month confinement, the most recent of which was for participation in a riot on December 10, 2015, in which he received a nine-month SHU term.  The inmate was known to be gang-affiliated, but had sought SNY classification on February 4, 2016 due to a desire to renounce his Security Threat Group status.  The inmate was said to have good family support, with visits from his mother and friends, as well as letter correspondence.

Available records regarding the inmate's social history background were very sparse, and only suggested that he had been married twice and had multiple children from previous relationships. He did not have any known mental health treatment in the community, but developed a significant history of substance abuse beginning as a teenager that was related to his involvement with both the juvenile and criminal justice system.  The inmate previously served a CDCR term from November 2002 through September 2010.

Upon entry into CDCR in June 2015, the inmate did not report any current or prior mental illness, and denied any current or previous SI.  Several months later on October 3, 2015, the inmate expressed both SI and AH after being involved in a fight and placed in administrative segregation at Calipatria State Prison.  He was transferred to a MHCB where he remained for 11 days before being discharged at the 3CMS level of care on October 16, 2015.  The inmate was initially diagnosed with Major Depressive Disorder with Psychotic Features, but the diagnosis was subsequently changed to Major Depressive Disorder, Single Episode or Adjustment Disorder and Polysubstance Dependence. Upon discharge from the MHCB, the SRE listed a "moderate" chronic and "low" acute risk for suicide, with the safety plan simply stating "IP will be made CCCMS upon discharge and transferred to RJD."

The inmate became a very reluctant participant in the MHSDS, was not compliant with his psychotropic medication (which was discontinued after a few weeks), did not attend group treatment, and was often seen at cell-front by his PC.  According to most PC contacts, as well as PT rounds, the inmate appeared to function well without medication, was sleeping appropriately, eating his meals, and generally managing his time in STRH.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not leave a suicide note. In addition, the inmate did not have any medical problems that were thought to be contributory to his death.  Other STRH inmates who were interviewed stated that, although the inmate was stressed regarding his pending SNY placement and possible enemy concerns from renouncing his gang affiliation, there was no indication that he was contemplating suicide.

The Suicide Report contained six recommendations for corrective action through a QIP:

1) The discharge suicide risk evaluation performed prior to discharge from the CMC MHCB unit contained little useful content in the sections entitled Mental Status, Justification of Risk, and Safety Plan;

2) The inmate was housed in ASU on December 15, 2015, but did not see a clinician until December 28, 2015, did not have an updated mental health evaluation completed until January 4, 2016.  The MHSDS *Program Guide* requires new arrivals in ASU be seen by a clinician weekly and that a mental health evaluation or addendum be completed within 10 working days of arrival;

3) The inmate refused multiple out-of-cell clinical contacts at RJD after his placement in ASU on December 15, 2015.  Given his list of problems and diagnoses (mood/anxiety disorder), the LAC treatment team did not list his repeated refusals (and possible social withdrawal) as a problem in the treatment plan;

4) Morning meetings between custodial and mental health staff in the LAC STRH/ASU were not documented in the ASU log book as required in Chapter 7 of the MHSDS *Program Guide*, 2009 revision;

5) The documentation of the emergency response in the inmate's death noted that his jaw was "locked" suggesting that rigor mortis had set in.  Documentation of Guard One welfare checks indicated that the inmate was alive and breathing approximate 30 minutes prior to his discovery.  The onset of rigor mortis typically indicates a time of death of approximately 35 minutes prior to the finding.  This suggests a discrepancy in the Guard One checks or lack of adequate completion of the check at 2116 hours;

6) Reports indicate that the gap between the last Guard One check and the activation of the alarm was four minutes.  Documentation of the officer's attempts to rouse the inmate was cursory and a more accurate description of why it took four minutes to decide that the inmate was in need of medical attention is required.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

In the ***second*** case (LAC 5), the inmate was found to have asphyxiated himself by wrapping a plastic bag and sheet around his neck in his GP EOP cell during the very early morning of November 20, 2016.  The inmate entered CDCR for the second time on July 23, 1985 to serve a 15-year-to-life sentence for second-degree murder, grand theft, and auto theft.  Prior to this offense, he had only spent three months in the community following his release from the first CDCR term.  The inmate was transferred to CSP/LAC on November 10, 2016.  He incurred 19 RVRs during his 31-year confinement, as well as received two additional sentences for possession of a weapon and assault.  His last RVR occurred on May 18, 2016 for obstructing a

correctional officer. The inmate was not known to be gang-affiliated. He was divorced and did not have any children, nor did he have any family support or visits during his long confinement.

According to available records, the inmate had a traumatic childhood that included both physical and sexual abuse beginning at age four. His parents divorced when he was very young and he lived with his mother in an unstable environment that included neglectful parenting and extensive substance abuse. As a result, the inmate subsequently was placed with a court-appointed guardian and other assorted family members throughout most of his childhood. Due to this dysfunctional family environment, he experienced behavioral problems at school and eventually dropped out, engaged in substance abuse, and had extensive juvenile and criminal histories with minimal employment. His previous CDCR term spanned from May 1977 through April 1984 following his conviction on two counts of murder. The inmate's history of mental illness began at an early age and included symptoms of depression and mood instability caused by his dysfunctional upbringing when he was eight years old. He also reported hearing voices, a symptom that reportedly contributed to his commitment offenses and plagued him throughout his life.

The inmate also reported several incidents of SI, suicide attempts, and self-injurious behaviors during his life. According to self-reports, he had two suicide attempts as a youth, the first occurring at age 11 when he overdosed on pills, and the second at age 16 when he tried to shoot himself. In addition, during both CDCR terms, the inmate attempted suicide by swallowing razor blades in 1983 and by cutting his throat in 1986 while at DSH (then referred to as the Department of Mental Health or DMH). In 1992, he underwent surgery after ingesting foreign objects, including nine ballpoint pens, spoons, and a razor blade. In 2004, he attempted suicide by hanging, and in both 2008 and 2009, was admitted into the OHU at CSP/Sac for SI. There was also an unconfirmed report of the inmate cutting his wrist in a suicide attempt on an unknown date, but prior to CDCR confinement. The inmate had two MHCB placements in February 2011 and June 2016. His last SRE was completed on September 13, 2013 with an assessment of "moderate" chronic risk and "low" acute risk for suicide.

Upon entry into CDCR for the second time in July 1985, the inmate was placed in DSH facilities on two occasions, from 1986 through 1988 and 1992 through 1993. During these time periods, the CDCR reviewer in this case noted that the inmate was "treated for symptoms of psychosis (command AH), paranoia, disorganized behavior, flat affect, delusional ideation, depression, sleep disturbance, anger management problems, and self-harming ideation and behaviors. He also had a well-documented history of impulsivity and agitation." In addition, from 2009 through 2011, the inmate received an order for involuntary medication due to grave disability. Except for one MHCB placement spanning five days from January 28, 2011 through February 4, 2011, the inmate was treated at the EOP level of care from 2007 through 2015 with a diagnosis of Bipolar Disorder, ranging from Bipolar Disorder NOS to Bipolar Disorder, Severe with Psychotic Features. In January 2015, he was moved down to the 3CMS level of care. However, in March and May 2016, he received two RVRs for battery with a deadly weapon and obstructing a peace officer. His level of care was increased back to EOP in June 2016 "in response to recent episodes of decompensation, specifically increased symptoms of target dyskinesia, increased agitation, recent suicidal ideation, and decrease in program participation."

On June 2, 2016, the inmate was admitted into a MHCB for SI and grave disability. It was noted by his IDTT that he had demonstrated "extremely disorganized and bizarre behavior, hyperactivity, failure to eat or dress himself appropriately, and was observed washing his naked body from the toilet." The inmate was discharged from the MHCB on June 16, 2016 at the EOP level of care. His diagnosis became Schizoaffective Disorder, Bipolar Type. He also received an order for involuntary medication and remained compliant with all of his medications during the next several months.

The inmate was last seen by both his PC and psychiatrist on November 17, 2016. It was noted that the inmate told his PC "I like it here so far," referring to his recent transfer to CSP/LAC on November 10, 2016. The PC documented that the inmate presented with a dysphoric mood, but appeared stable and denied any thoughts of self-harm or psychosis. He also appeared to be looking forward to speaking with the PC the following week. The psychiatrist noted that the inmate denied feelings of hopelessness or worthlessness, and indicated he was future-oriented and "motivated in psych treatment."

At age 63, the inmate had several serious and chronic medical problems, including hypertension, esophagitis/gastritis (with hiatal hernia), Barrett's metaplasia, intestinal metaplasia, end-stage liver disease, and chronic viral infection. According to the CDCR reviewer in this case, the inmate "was last seen by a physician on November 17, 2016, at which time changes were made to his medication regime, blood pressure checks and laboratory tests were ordered, and education was provided to the patient."

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and his brief suicide note was limited to a request for cremation. The reviewer noted, however, that "Given his life term, his lengthy history of mental illness and co-existing medical issues, along with the lack of social support, it is possible the inmate made the decision to end his life rather than continue to live with his existing stressors."

The Suicide Report contained four recommendations for corrective action through a QIP:

> 1) Two SREs completed on June 2, 2016 at HDSP failed to properly identify chronic and acute risk factors, provided low estimates of risk and lack sufficient safety/suicide risk reduction plans;

> 2) Missing treatment plan from IDTT on October 12, 2016 [from CSP/Sac];

> 3) Per the nursing review, three nursing care concerns are identified requiring follow-up [regarding the initiation of CPR by a nurse on the inmate while he was in rigor mortis, PT daily rounds not performed and Guard One rounds not documented for numerous days in which the inmate was in the administrative segregation at CSP/Sac]

> 4) The CDCR 837s submitted by responding staff identify a three-minute delay between the time the inmate was observed unresponsive and the sounding of

alarms notifying additional staff of the emergency. This delay in sounding an
alarm postponed the response of medical staff and notification of paramedics.

Based upon the findings contained within the Suicide Report, the Suicide Case Review
Committee found that this suicide was foreseeable, but not preventable.

### 8)    Central California Women's Facility (CCWF)

**Inspection**: May 10-11, 2016 (previous suicide prevention audit was on March 12-13, 2015).
CCWF housed approximately 2,907 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the intake
screening process in the RC on both May 10 and May 11. Two nurses were assigned to the area,
and conducting only one intake at a time. Although nursing staff were using the most recent
version of the Initial Health Screening form (CDCR Form 7277) that was embedded into the new
EHRS, similar to the review at CIW, the embedded form still contained compound questions.
Privacy and confidentiality was being maintained because the door to the nurse's office remained
closed. Due to a scheduling conflict, this reviewer was not able to observe the administration of
the 31-item mental health screening form completed by clinical psychologists during the first
seven days of the RC process.

Finally, daily PT rounds in the administrative segregation unit (Building 504) were observed on
May 11. Of note, Building 504 contained GP inmates, STRH (opened in April 2016),
administrative segregation EOP, the condemned unit, and alternative housing. The rounds were
unremarkable and the PT correctly completed the Psych Tech Daily Rounds Form on a laptop at
cell-front for all caseload inmates. In addition, although not observed by this reviewer, PTs were
said to conduct daily rounds of inmates housed in the condemned unit throughout the day when
condemned women were outside their cells in the enclosed program area.

**Housing**: CCWF had a 39-bed Skilled Nursing Facility or CTC, with 12 designated MHCBs in
eight rooms. All of the MHCB rooms were clean and mostly suicide-resistant, however, still
contained the physical hazards of square-shaped stainless steel sinks and faucets with a
horizontal slit (known as "anti-squirt slits"). This reviewer subsequently examined a
headquarters work order schedule that indicated the above described hazards would be corrected
in December 2016. In addition, administrative segregation (Building 504) contained four
retrofitted suicide-resistant cells for inmates on new intake status. During this reviewer's tour of
the unit, there were no new intake inmates housed in unsafe, non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were
primarily found in Building 503 (RC housing), A-73 (a holding cell in the CTC), and Building
504 (in the administrative segregation section). Although all inmates in alternative housing were
observed on a 1:1 basis, several problems were observed. For example, despite a LOP (MH-012,
effective January 2016) which required that "ASU Management Cells 125 and 127 shall *not* be
used for alternative housing," this reviewer found that such cells were used occasionally (and as
recently as May 6, 2016), and did *not* have any stack-a-bunks. CCWF alternative housing data
on 83 cases from March 12, 2016 through May 6, 2016 indicated that Building 503 cells were

used 59 percent (49) of the time, Cell A-73 was used 23 percent (19) of the time, and Building 504 was used 18 percent (15) of the time.  Of these 15 cases of inmates housed in administrative segregation, eight (53 percent) were housed in management cells 125 or 127.

Overall, almost half (48 percent) of all inmates housed in alternative housing from March 12, 2016 through May 6, 2016 stayed over 24 hours, and almost a third (32 percent) stayed between two and five days.  Of note, following this reviewer's finding that beds were not available in administrative segregation management cells 125 and 127, the CMH requested additional stack-a-bunks from CDCR headquarters on May 11, 2016.  However, the practice of placing these alternative housing inmates in the special management cells remained contrary to the LOP, as well as a CDCR memorandum entitled "Temporary Moratorium on Use of Management Cell Status for Inmates in the Mental Health Services Delivery System" dated August 14, 2014.  The practice of using these cells should be prohibited.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, inmates not on suicide observation status were being observed at 15-minute intervals.  Similar to findings at CIW, because CCWF was also using the new EHRS, observation sheets were no longer maintained on each patient's door.  Rather, nursing staff documented observation of MHCB patients on laptops and/or tablets.  This reviewer observed nursing staff positioned in the nurse's office and not in the corridor in close proximity to MHCB rooms.  This reviewer and an EHRS specialist from CDCR headquarters examined the observation forms embedded in the new EHRS and found that documentation was not staggered, and there was uncertainty as to whether the new health record was accurately recording the nursing rounds.  Slight revision in the EHRS was being considered to correct the problem.  Also similar to findings at CIW, this reviewer found that clinicians at CCWF were not making determinations on a daily basis as to possessions and privileges afforded to MHCB patients.  In practice, visits and telephone privileges were *not* afforded to such inmates.  Yard privileges were afforded.

This reviewer observed two IDTT meetings for MHCB patients on May 10.  The first case (CCWF 1) was very interesting and involved an inmate who was still going through the RC process in late April 2016 when she began engaging in self-injurious behavior (i.e., head banging) and expressing SI.  Following initial placement in alternative housing, the inmate had been housed in a MHCB since May 1.  The inmate had been stable since her admission and the intent of the May 10 IDTT meeting was to explore a discharge plan to complete the RC process at the 3CMS level of care.  The treatment team discussed the inmate's current risk for suicide, as well as her history of self-injurious behavior (beginning at age ten).  The proposed safety plan was also discussed, which included daily journaling and writing about understanding the repercussions, including possible brain damage, of continuing self-injurious behavior.  Most importantly, the IDTT meeting included an invitation to, and participation from, two clinicians from the RC and 3CMS yard where the inmate would subsequently be designated.  These two clinicians introduced themselves to the inmate and effectively explained the continuity of care process.  Overall, this IDTT team meeting was excellent.

The second case (CCWF 2) was not as encouraging and involved an inmate at the EOP level of care that had a long history of suicidal behavior and MHCB placements.  In addition, the inmate

had been treated in the CIW-PIP from September 2014 through December 2015. Most recently, she had been housed in the MHCB since April 21 for SI. The inmate was still on suicide precautions. During the May 10 IDTT meeting, the treatment team simply discussed the PC's referral recommendation back to the CIW-PIP. There was *no* discussion regarding the inmate's current SI.

A review of Guard One data for a recent 24-hour period within Building 504 found 82-percent compliance with the required checks not exceeding 35 minutes. It should be noted, however, that this level of compliance was not an accurate reflection of the overall level of observation of inmates housed in Building 504. As detailed in the 2015 assessment, Building 504 at CCWF was unique in that it housed the condemned unit containing 22 single cells. Seventeen of the cells were located within an enclosed program area on the first floor of the unit, with five cells located outside the enclosed program area. According to CCWF custody officials and staff, because condemned unit inmates had regular access to the enclosed program area outside their cells, but within the chain-link fenced area, Guard One rounds were *not* conducted except during the First Watch. A May 9, 2014 directive from the Director of the Division of Adult Institutions entitled "Security/Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures" supported such a practice by citing the "unique design and programs" of the enclosed condemned unit.

Despite assurances from CCWF custody officials and staff that condemned unit inmates were adequately observed while in the program area, similar to the 2015 assessment, this reviewer's most recent inspection found only a handful of condemned unit inmates (three or four) were out of their cells and visible within the program area, with the vast majority remaining in their cells and outside the view of correctional staff. In addition, five of the condemned unit cells remained outside the enclosed program area and adjacent to other administrative segregation unit cells that were subject to Guard One surveillance. There continued to be no practical reasons why these five condemned unit cells should not be subject to Guard One surveillance.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of January 2016 through April 2016. In addition, TTA logs for April and May 2016 were reviewed. This reviewer's EHRS review of 67 emergency mental health referrals for suicidal behavior revealed that clinical staff completed the required SREs for *only* 82 percent. Of note, the low completion rate included cases in which the required SREs were either very late and/or not completed until inmates were discharged from alternative housing two or three days later. A similarly low completion rate of 86 percent was found during the 2015 assessment.

A review of ten SREs of inmates released from a MHCB between February and May 2016 found that very few, if any, contained adequate safety plan strategies to reduce SI, with most simply reflecting *Program Guide* requirements. As noted above, one of the cases (<u>CCWF 1</u>) discussed during the May 10 IDTT meeting was the exception. In that case, the safety plan simply read: "Discharge to CCCMS LOC with ½ checks and 5-day follow-up. MH PC will continue to assist I/P in practicing self-soothing skills such as thought-stopping, deep breathing relaxation exercises, identifying her triggers to SIB, and journaling thoughts."

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes indicated that quorums were achieved at each meeting.  With one exception, meeting minutes were unremarkable.  The exception was the discussion during both the March and April 2016 meetings regarding the newly revised policy requiring custody staff to conduct 30-minute rounds of inmates discharged from an MHCB.  According to the minutes:

> Facility A Captain stated there are not enough custody staff to escort a patient where they need to go and suggested that maybe when on 30-minute check status, the patient be confined at a minimum to the housing unit.  AW HCO stated that it is at most a three-day watch period and letting them program or go out on the yard while on 30-minute checks increases risk.  Facility A Captain suggested clinicians utilize a lay in process or CDCR make a vest for patients to wear when on 30-minute checks.  AW HCO asked SPR-FIT Coordinator if she can request that patients who are put on 30-minute checks be put on lay in and do not let them go out to program.

The SPRFIT coordinator appropriately decided to seek clarification from the SPRFIT coordinator at mental health headquarters and reported back to the local SPRFIT during the April meeting.  During that meeting, the SPRFIT coordinator clarified CDCR's "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy" (effective January 27, 2016) which did *not* allow for a "lay-in" and only required custody staff to conduct 30-minute checks when the inmate was physically in the housing unit.

**Training**:  According to training records, approximately 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 100 percent of custody, 93 percent of medical, and 99 percent of mental health staff had received annual suicide prevention block training during 2015.  Finally, as of May 2016, 100 percent of mental health clinicians had completed both the SRE mentoring program and the seven-hour SRE training.

**Recent Suicides**:  CCWF experienced one inmate suicide during the reporting period (occurring in 2016).  In that case (CCWF 3), the inmate was found hanging from a window bar by a sheet in her eight-person dormitory cell during the afternoon of October 10, 2016.  She was subsequently pronounced dead at a local hospital four days later on October 14, 2016.  The inmate entered CDCR for the third time on September 5, 2012 to serve a four-year sentence for possession of a firearm and a controlled dangerous substance.  She subsequently received an additional four-year term for possession of a controlled dangerous substance during confinement.  The inmate incurred three RVRs during this confinement, the most recent of which occurred on August 3, 2015, involving possession of a cell phone.  She was not known to be gang-affiliated.  The inmate was unmarried and had one adult son.  She had the support of several family members, including her son, who visited her on a regular basis.  However, visits from her son and some other family members were terminated in August 2016 due to alleged drug trafficking.  The

inmate also had regular telephone conversation with various family members, predominately her son, but those conversations mostly involved drug trafficking.

According to available records, the inmate had a traumatic childhood in which she was raised primarily by her grandmother, and only resided with her mother during ages ten through 12. The records were unclear as to why her grandmother maintained custody for most of her childhood, but one record suggested that her mother was incarcerated for much of this time. There was no mention of her father in the records. In addition, the inmate was reportedly sexually abused by different men between the ages of seven and 12. She was introduced to illegal drugs at age six, and began using both methamphetamine and heroin at age 12. Due to this chaotic upbringing, she never graduated from high school, had minimal employment, and her substance abuse lifestyle resulted in significant juvenile and adult convictions. In 1992 at the age of 17, she was involved in a drive-by shooting and committed to CYA. She subsequently spent most of her remaining years incarcerated in either CYA or CDCR, with multiple failed releases on parole.

Although the inmate was involved in limited mental health treatment in the community while on parole as a juvenile, most of her treatment occurred during the most recent CDCR confinement. Her family also had a history of both mental illness and substance abuse. Her history of suicidal behavior included unconfirmed reports of a suicide attempt at age 14 by overdose, a suicidal gesture with a gun at age 18 resulting in a 72-hour psychiatric hold, a hanging attempt at age 20, and an incident at age 36 during the instant offense in which she was found in a closet with a handgun in her mouth.

Upon entry into CDCR for the third time in September 2012, the inmate was placed in the MHSDS at the 3CMS level of care on November 20, 2012. Her initial diagnoses were PTSD, Amphetamine Dependence, and Cannabis Dependence. A diagnosis of Mood Disorder NOS was subsequently added. The inmate began taking psychotropic medication after her mother died in 2013. At that time, she reported "intermittent suicidal ideation, depression four times per week, and negative cognitions about her life in prison." However, her compliance with psychotropic medication was sporadic during her confinement, and she only accepted it on eight of the last 45 days of her life.

In addition, in both mental health treatment plans and progress notes from 2013 and 2014, the identified goals included "monitoring for suicidal ideation or self-harming behaviors," with the inmate often stating that "I think about suicide, but I'll never do that. Instead, I do a lot of writing and focus on education." The suicide reviewer in this case noted that reference to reduction of SI as a treatment goal was missing from clinical notes from 2015 forward, with no documentation that the issue had been resolved. In fact, the reviewer noted that "overall, the mental health documentation from the last three years did not appear individualized and appeared general and vague." The inmate's last SRE was completed on September 13, 2012, with an assessment of both a "moderate" chronic and acute risk for suicide. She did not have any MHCB placements during her CDCR confinement. The inmate's last clinical contact was with her psychiatrist on September 7, 2016.

The inmate had several medical issues, including Hepatitis C, seizure disorder, and chronic joint pain that were not felt to be contributory to her death.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and a brief cryptic suicide note found in her dormitory cell could not be authenticated as hers.  The reviewer noted in the Suicide Report that the inmate's death was initially viewed as suspicious because two other cellmates were in the cell at the time of the death.  There were also reports that the inmate had a recent argument with her alleged girlfriend/cellmate.  A review of the inmate's recent telephone conversation with her son found that she appeared stressed and anxious regarding complications with a pending drug transaction.  According to the reviewer, "the inmate hung herself in the middle of the day, with two other inmates present in the room.  Additionally, there was an open program on the living unit, and line of sight from adjacent dorm rooms.  It is uncertain whether her intent was to die, or if her expectation was to be caught in the midst of her attempt.  It is unknown what ultimately led her to this decision.  The alleged discord with her roommates, recent barriers in the illegal substance distribution, combined with her personal substance use are conceivably reasonable contributory factors."

The Suicide Report contained nine recommendations for corrective action through a QIP:

1) The IDTT CCCMS mental health plan in 2014 indicates the absence of the PC;

2) The mental health treatment goals indicated the need for on-going "monitoring for suicidal ideations and self-harm behaviors."  However, there was no documentation of any evaluations on her suicide risk factors;

3) The treatment plans between 2013 and 2016 identified goals regarding monitoring and eliminating suicidal ideation and mood stabilization.  However, subsequent progress notes do not reflect treatment pertaining to these goals.  Progress notes were vague, did not identify interventions, did not reference progress, and they did not define the inmate's response to treatment;

4) The inmate's compliance rate for taking her prescribed psychotropic medication was 17% (8 out of 45 days prior to her death), and approximately 36% (13 out of 36 days leading up to her last appointment with the psychiatrist 9/7/2016).  There were no documented referrals or follow-up appointments to address the non-compliance;

5) The CDCR 837s contained discrepancies to include: whether two additional inmates were let in the cell by the Primary Officer at the time of the incident, supported the inmate's weight, cut her down and placed her on the floor where they initiated CPR until the arrival of medical staff;

6) Emergency response protocols, as outlined in MHSDS *Program Guide* and CDCR policy, were not followed, as responding staff did not respond appropriately with the cut-down kit;

7) During the review, numerous window coverings and inmate manufactured tents were observed throughout the cell.  In addition, evidence photos taken on the date of the incident depicted the same safety/security concerns identified during the Suicide Review;

8) During the on-site review, it was observed the MHSDS *Program Guide* was not followed as it pertains to the contents of the cut-down kit.  A review of the housing unit inventory identified an Ambu bag was present and accounted for on each shift.  However, a replacement Ambu bag had not been put back in the kit since the date of the incident.  This clearly prevents staff from having necessary life-saving equipment on hand in the event of future incidents;

9) Per the Nursing Death Review Summary, one nursing concern was identified requiring follow-up [regarding defective AED pads contained within the Emergency Medical Response Bag].

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

### 9)    Pleasant Valley State Prison (PVSP)

**Inspection**:  May 12-13, 2016 (previous suicide prevention audit on June 11-12, 2015).  PVSP housed approximately 3,239 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on May 12, 2016.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions.  Privacy and confidentiality, however, were compromised because the door to the nurse's office remained open.  Although the nurse informed this reviewer that they would be comfortable with the door closed if a holding cage was situated in the room, the office appeared too small to accommodate a holding cage.

Daily PT rounds in STRH were observed on May 13.  The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.  It should be noted, however, that timely completion of the Psych Tech Daily Rounds Form was noted as a deficiency in the January 2016 suicide of a PVSP inmate, as reported below.

**Housing**:  PVSP had six MHCBs.  A previous concern of sink faucets having horizontal slits (known as "anti-squirt slits") had been corrected; all cells were now suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.

The STRH unit had six retrofitted suicide-resistant cells designated for new intake inmates.  During inspection of the unit, this reviewer observed two new intake inmates in non-new intake cells.  Custody officers in the STRH unit indicated that it was not uncommon for three to four

new intake inmates to be housed in non-new intake cells on a weekly basis. There was no indication that additional new intake cells were being proposed.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was said to be infrequently utilized at PVSP. In fact, this reviewer found that there were only 16 inmates placed in alternative housing between March and April 2016, with only one placement exceeding 24 hours. When alternative housing was used, inmates were primarily housed in CTC medical beds, provided stack-a-bunks, and observed on a continuous 1:1 basis.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, inmates not on suicide observation status were observed at 15-minute intervals by nursing staff. Although nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door, nursing staff were observed by this reviewer on three separate occasions on May 12 to *not* be completing observation at 15-minute intervals. In two instances, nursing staff had *not* recorded an observation for over 35 minutes. In the third instance, this reviewer observed a PT falsifying an observation form by documenting time intervals that had *not* been observed.

This reviewer observed two IDTT meetings in the MHCB unit on May 12. Although the treatment team was well represented by mental health, medical, and custody staff, both meetings were problematic. In the first case (PVSP 1), the inmate had been admitted into a MHCB a few days earlier for SI and grave disability. Although there was a good discussion regarding the inmate's current SI (as the PC was completing an SRE), there was little discussion regarding safety planning or possessions and privileges. In the second case (PVSP 2), the inmate had been admitted from SVSP two days earlier after expressing SI because he had been threatened by gang members. He requested transfer to a safer environment and refused to be transferred back to SVSP. The inmate had also been refusing his psychotropic medication for several weeks, and had threatened to initiate a hunger strike unless he was able to make a telephone call to his mother. Although the PC inquired about current suicide risk while completing an SRE, there was no discussion regarding his level of observation or safety planning. Surprisingly, the inmate's level of observation was reduced from Suicide Watch to Suicide Precaution without any discussion by the IDTT. The inmate's request for a telephone call was deferred to the CC I.

Following the IDTT meeting, this reviewer asked the treatment team why they decided to defer to the CC I regarding the inmate's requested telephone call. The team explained that MHCB patients were normally prohibited from yard, telephone, and visiting privileges, and they referred the inmate to the CC I as a special request. In addition, it was learned that the MHCB unit did not have a recreation therapist, and the PT assigned to the unit informed this reviewer that "patients haven't asked to go to the yard, just the dayroom." Given the fact that inmates were afforded yard and telephone privileges during this reviewer's 2015 assessment of PVSP, the current practices of this IDTT team were surprising. This reviewer subsequently reviewed a revised LOP dated May 2016 for the CTC (entitled "Therapeutic Programs, Recreational Activities, and Out-of-Room Activities for CTC Patients") and found several examples of inaccurate procedures, including "only patients with a stay of 10 days or more are eligible for

CTC yard," "the following patients are not eligible to participate in the CTC standard dayroom activity or outside yard program….Suicide Watch or Suicide Precaution."

This LOP narrative was contrary to previous *Program Guide* and MHSDS memoranda.  Prior to the exit meeting on May 13, this reviewer was provided with a PVSP memorandum dated that day to all MHCB clinicians stating, in part, that "all Mental Health Crisis Bed patients in the Correctional Treatment Center are afforded certain rights and privileges.  These rights and privileges include, but are not limited to, out of cell activity, yard time, access to phone calls and visitation, showers, and clothing unless contraindicated by his/her treatment plan or due to safety concerns.  All restrictions must be documented in the patient's treatment plan as well as their daily orders with a brief justification."

A review of Guard One data for a recent 24-hour period in the STRH unit found 98-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period November 1, 2015 through April 30, 2016.  Only ten emergency mental health referrals for SI were reported, and this reviewer found no other emergency mental health referrals for suicidal behavior in the TTA log for the same time period.  A review of the ten cases in the eUHR found that mental health clinicians completed the required SREs in 90 percent (nine of ten) of the cases.

A review of 17 charts of inmates admitted to and discharged from the MHCB unit from November 1, 2015 through April 30, 2016, found that 94 percent (16 of 17) contained the required SREs.  This was a vast improvement from the 2015 assessment when only 68 percent of SREs were completed on a timely basis.  However, development of safety plans for patients discharged from a MHCB continued to be problematic.  For example, the safety plans contained within discharging SREs for three different inmates by three different MHCB clinicians stated the following:  "DC to EOP LOC for increased clinical contact" (PVSP 3); "Discharge from MHCB and return to ASP at CCCMS LOC.  It's recommended that patient be placed on a 5-day follow-up and speak with custody about housing issues he has there.  Continue to work on decreasing depression and anger and increasing coping skills" (PVSP 4); and "Patient will be discharged from MHCB as EOP LOC.  He will be monitored on a 5-day F/U for SI.  It is recommended that he work with clinician to increase coping skills and explore alternatives to deal with situational stressors" (PVSP 5).

This reviewer examined the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement.[9]

---

[9]Pursuant to a joint CDCR memorandum from the Director of the Division of Adult Institutions and Deputy Director of the Statewide Mental Health Program entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy," custody staff were required to observe an inmate at 30-minute intervals for a minimum of 24 hours following MHCB discharge.  (The previous requirement was observation at 60-minute intervals.)  In addition, mental health staff were required to assess the discharged inmate on a daily basis and could recommend continuation of the 30-minute checks for up to 72 hours.  This memorandum was issued on January 27, 2016 and effective within 30 calendar days.  CDCR officials subsequently agreed to revise the memorandum to include inmates expressing suicidal ideation and referred to, and discharged from, alternative housing.  To allow CDCR facilities sufficient time

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff. This reviewer was presented with documentation of 12 cases of inmates discharged from the MHCB unit that remained at PVSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required). Of these 12 cases, six (50 percent) had both pages of form CDCR MH-7497 completed as required. In most cases, mental health clinicians ordered 30-minute checks for only the first 24 hours. In the remaining six cases (50 percent, custody checks were documented incorrectly at 60-minute intervals and/or the first page of form CDCR MH-7497 was either not completed or missing.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes reflected good attendance from all required members, including the chief psychiatrist. This was a vast improvement from prior assessments by this reviewer in both 2014 and 2015. Meeting minutes were extremely brief and otherwise unremarkable. Of note, the SPRFIT previously developed a CAP based upon this reviewer's 2015 assessment. Approximately 13 items were contained within the CAP, with several marked as "closed" and others as "pending." Among those CAP items marked as "closed" were: (1) intake screening completed in a confidential area; (2) all new intake inmates housed in new intake cells within the STRH unit; and (3) MHCB patients permitted routine programming, yard, and dayroom activity. However, as reported above, these CAP items remained unresolved and should *not* have been closed by the SPRFIT.

**Training**: According to training records, 94 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 99 percent of custody staff, 96 percent of medical staff, and 97 percent of mental health staff received annual suicide prevention block training during 2015. Finally, as of May 2016, although only 67 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training.

**Recent Suicides**: PVSP experienced two inmate suicides during the review period, both of which occurred during 2016. In the ***first*** case (PVSP 6), the inmate was found hanging from a ventilation grate by a sheet in his STRH cell during the early evening of January 27, 2016. He was transported to a local hospital and pronounced dead two days later on January 29, 2016. The inmate entered the CDCR system on May 22, 2015 to serve a 32-month sentence for possession of a weapon. He was transferred to PVSP on September 22, 2015. The inmate incurred two RVRs during his confinement for IEX, the most recent of which occurred on January 8, 2016 and resulted in his placement in STRH. He was considered a gang dropout. The inmate had limited family support, and did not have any visits during his brief incarceration. During a telephone call with his mother on January 7, 2016 (the day before his STRH placement), she informed her son

---

to come into compliance with this new initiative, this reviewer started assessing compliance in mid-May 2016 beginning with PVSP.

that he was not welcomed in her home until he completed a substance abuse program following his CDCR discharge.

According to available records, the inmate had a dysfunctional childhood, which included living with other family members while his mother was incarcerated. His father was not involved in his upbringing. As a child, he also suffered both physical and sexual abuse and parental rights were terminated when he was 14. He spent the remainder of his youth in various residential and foster care facilities. As a young adult, he experienced minimal employment and long periods of homelessness leading up to his instant offense in November 2014.

The inmate had a history of mental health treatment in the community, including treatment for Attention Deficit Disorder, an undetermined mood disorder, and substance abuse. He self-reported two suicide attempts in the community, the first at 14 when he reportedly drank bleach while living in a group home, and then at 17 when he attempted suicide by hanging. He subsequently reported to a CDCR clinician that an aunt committed suicide, but when interviewed after his suicide, his mother denied that the aunt had died.

Upon entry into CDCR, the inmate screened positive for mental health issues, including the need for psychotropic medication. He was referred to, and assessed by, a psychiatrist on June 5, 2015. He reiterated a history of mental health treatment and psychotropic medication in the community, as well as a history of both physical and sexual abuse. He was diagnosed with Depressive Disorder NOS, and R/O PTSD. The inmate reported frequent nightmares of being beaten by his mother, as well as periodic self-harm during periods of depression. He was placed at the 3CMS level of care. During an initial SRE completed on June 18, 2015, a clinician assessed his chronic risk for suicide as "moderate" and his acute risk for suicide as "low" based upon a traumatic childhood and prior suicide attempts. He denied any current SI. From July 25 through August 20, 2015, the inmate was housed in STRH at DVI following an RVR for IEX. During that time, he was seen by clinicians on a regular basis, but was not an active participant in his treatment and did not attend groups on a regular basis when offered. He was, however, compliant with his psychotropic medication. Upon his transfer to PVSP in September 2015, the inmate remained at the 3CMS level of care. Another SRE completed on September 28 also indicated a chronic risk for suicide as "moderate" and acute risk for suicide as "low." He continued to deny any current SI, but struggled with ongoing symptoms of depressed mood. His diagnosis was changed to only Depressive Disorder NOS.

In early October 2015, the inmate began refusing his psychotropic medication and informed the psychiatrist that his mood had improved. By December 2015, he requested to be removed from the 3CMS program, believing that it would increase his chance for parole the next year. On January 8, 2016, the inmate incurred his second RVR for IEX and was placed in STRH.

In a progress note dated January 20, his PC wrote that the inmate "reported minor symptoms of depression but stated that he was adjusting well overall. Reported that while on the yard his depression was at a 1 and now it feels more like a 4." He also refused to attend his IDTT on that date (January 20), as well as refused a group activity two days later on January 22. Four days later on January 26, he met again with his PC who wrote in a progress note that the inmate "appears to be experiencing more depressive symptoms, sleeping at odd hours (mostly through

the mornings/early afternoons).  Has stopped coming out of the cell for individual and group sessions, also does not attend yard.  Gradual decline in mood and level of programming but smiles appropriately and continues to engage with clinician via cell front."  The inmate committed suicide the following day.

Although two cryptic suicide notes (stating that "I'm finally free") were found in the inmate's cell, neither was elaborative regarding the reason(s) why he chose to commit suicide.  In addition, the inmate did not have any significant medical issues that were thought to have contributed to his suicide.  The CDCR reviewer did not offer any specific precipitating factors to the suicide, other than offering "there is ample empirical evidence that the kinds of maltreatment, trauma, and general neglect that the inmate suffered as a child and adolescent certainly increased his vulnerability to stressful events and, given his history of suicidal behavior, the eventuality of additional suicide attempts."  The reviewer also cited several deficiencies regarding the delivery of mental health care for the inmate at PVSP, referring to it as "seemingly fragmented and superficial," but within the boundaries of the *Program Guide* requirements.  However, the review did find four nursing concerns (i.e., the Automatic Electronic Defibrillator (AED) was not applied at the scene, but rather later at the TTA; a delay in initiating CPR; a delay in communicating to TTA staff the exact nature of the emergency; and absence of Psych Tech Daily Rounds Forms for 2.5 weeks leading up to the inmate's death) that were referred to CCHCS' Death Review Committee.

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) The inmate was seen for his evaluation on June 18, 2015, 10 days after the deadline for his initial evaluation per MHSDS program guidelines; and

> 2) The treatment plan completed on October 12, 2015 indicated weekly meetings with the primary clinician until rapport was established.  Due to the death of the assigned clinician soon after the IDTT meeting, this was not completed and when the inmate was reassigned to another primary clinician, the clinician did not meet with the inmate until more than two months after the IDTT meeting.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

In the **_second_** case (PVSP 7), the inmate was found to have sustained a severe laceration to his left leg in his GP cell during the morning of December 12, 2016 that resulted in death and was determined to be suicide by exsanguination.  The inmate entered CDCR on November 30, 2004 to serve a 42-year to life sentence for multiple counts of aggravated sexual assault of a child and rape (of his step-daughter).  The inmate was transferred to PVSP on August 27, 2009.  He did not incur any RVRs during his 12-year confinement, and was not known to be gang-affiliated.  He was twice divorced, and had two sons in addition to his step-daughter.  The inmate had regular support from his family, particularly his parents and mostly from telephone calls and letter correspondence, but family visits ended in 2014 because of his parents' advanced ages.

According to available records, the inmate was born into an intact family and raised by his parents alongside three sisters. He reported physical abuse by his father. The inmate was a high school graduate and spent one year in the armed services before being honorably discharged due to a physical disability. He attended one year of college before withdrawing and becoming employed as a truck driver. He maintained steady employment until his arrest on the instant offense.

It appeared that the inmate did not have a history of mental illness and did not receive any treatment until he entered CDCR. He was placed in the MHSDS at the 3CMS level of care on December 16, 2004 with a diagnosis of Adjustment Disorder with Depressed Mood. At the time, the clinician noted that he appeared to be "overwhelmed with depression." He remained at the 3CMS level of care throughout his confinement and did not have any MHCB placements. His diagnosis was subsequently revised to Major Depressive Disorder, Severe, and he was prescribed psychotropic medication. He remained medication compliant throughout his confinement. The inmate did not report any history of suicidal behavior, and only expressed SI once to clinical staff during his confinement. In a note dated November 4, 2015, his PC wrote that "I/P reports having passive SI however denied a desire to act upon it as he has family support." When assessed after this date, the inmate always denied current SI, but often expressed hopelessness due to his life sentence and rated his depression at a "5" (out of ten). He met regularly with mental health staff (consistent with his 3CMS LOC). Recurrent themes in his therapy notes indicated a continuous struggle with depression. He often described his mood as "sad, empty, somber." The inmate was said to rely on his religious beliefs and family support to cope with his stressors and depression.

The inmate was last seen by his PC on November 7, 2016, and by the psychiatrist on November 9, 2016. In the session with the psychiatrist, he inquired about an increase in his Prozac due to "a rough time recently." The psychiatrist wrote that the inmate was "feeling depressed and sad recently for a few days for unclear reasons, for now would like to continue current dose but if symptoms worsen he is interested in raising Prozac, thankful for discussion of med options as he prefers to minimize polypharmacy and only increase doses if necessary." Both the PC and psychiatrist notes reflected that the inmate denied any SI.

Although the inmate did not have any significant medical issues at the time of his death except for dyslipidemia and obesity, he had suffered a neck injury sometime during 2014 which resulted in significant and long-lasting neck pain. In April 2016, he underwent neck surgery and reported significant relief. It did not appear to the CDCR reviewer in this case that any medical issues were contributory to his suicide.

The CDCR reviewer surmised that there were several possible precipitating factors that were unknown to staff indicating the inmate was contemplating suicide. Although the inmate did not leave a suicide note, the reviewer noted that there were several indications that the last telephone call between the inmate and his mother on December 10, 2016 had caused him significant stress. The inmate's mother "expressed anger and frustration about how the family's lives had been affected by the inmate's incarceration. She stated, 'I'm tired of all of this….You don't know how this affected all of our lives....You should be here….Your dad took a dump, he never came back. They arrested you and that was it for your dad, his life is over and now my grandsons too.'

She stated 'young lives that were just beginning that were ruined' in reference to (the inmate's) sons."

The reviewer surmised that the inmate "struggled with depression and hopelessness throughout his incarceration.  At the time of his death he was struggling with the impact his incarceration had on his family the lack of contact he had with the sons.  This was further exacerbated by the phone call he had with his mother the Saturday before his death.  The significance of the impact of this family support was evident, and threat of that support being removed was too overwhelming for the inmate to cope with.  Ultimately this led to his death."

The draft Suicide Report contained four recommendations for corrective action through a QIP:

> 1) There was no CDCR 7386 Mental Health Evaluation in the EUHR.  According to the 2009 Mental Health Services Delivery System *Program Guide*, "A Clinical Intake Assessment shall be completed within 10 working days of referral/arrival …. If there is no CDCR 7386 Mental Health Evaluation in the EUHR, a new CDCR 7386 Mental Health Evaluation must be done";

> 2) The CDCR 837s submitted by responding staff identify chest compressions were provided for approximately two minutes, however, there is no mention of rescue breaths being performed inside the cell which is inconsistent with CPR training provided by the department.  PVSP provided the current in-service training lesson plan for CPR instructors, which teaches two rescue breaths will be given after each set of 30 chest compressions at a rate of 100-150 compressions per minute;

> 3) The CDCR 837s do not identify whether or not responding staff took the necessary precautions to avoid exposure to what was described by nursing staff as a "copious, gross, and large" amount of blood being present during this incident.  Nor is there documentation responding supervisors took the necessary steps to protect their officers' safety by limiting risk to exposure.  California Code of Regulations (CCR), Title 15, Section 3365 (c) states in part, "Security and safety procedures shall be followed, including the use of required equipment and procedures to deal with bodily fluids";

> 4) The CDCR 837s submitted by responding staff identify a three-minute delay between the time the inmate was observed unresponsive and the sounding of alarms notifying additional staff of the emergency.  This delay in sounding an alarm postponed the response of medical staff and notification of paramedics.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

**10)**     **California Medical Facility (CMF)**

**Inspection**: May 24-25, 2016 (previous suicide prevention audit was on January 7-8, 2014). CMF housed approximately 2,581 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed two nurses separately conducting intake screening in the R&R unit on May 24, 2016. Both nurses were using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015). The nurse's office contained a holding cage which allowed correctional staff to maintain security from outside the closed door, thus ensuring sufficient privacy and confidentiality.

In addition, this reviewer had the opportunity to observe required daily rounds by PTs assigned to all three administrative segregation units on May 24-25. The PT rounds in two of the administrative segregation units (M-3 and Willis) were unremarkable and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front on all caseload inmates. However, PT rounds on the I-3 unit (an EOP Hub) were problematic because the PT did *not* consistently ask inmates whether they were currently suicidal.

**Housing**: CMF had 49 MHCBs located on two wings of the CTC. All rooms were suicide-resistant and were furnished with suicide-resistant beds.

This reviewer inspected the three administrative segregation units and found that seven new intake cells had been retrofitted to be suicide-resistant. An additional cell had been identified as a new intake cell, but was an ADA cell that had a non-suicide-resistant grab bar (i.e., an opening between the bar and the wall that was conducive to a suicide attempt by hanging). Similar to the 2014 review, this reviewer found that, although all new intake cells were full, there were at least seven new intake inmates housed in non-new intake cells. This issue remained problematic.

Finally, although **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were said to be used on a daily basis at CMF, only one to two inmates per day were in such housing. In addition, this reviewer found that of the 112 inmates placed in alternative housing during March 1 through May 20, 2016, only approximately 20 percent of placements exceeded 24 hours and most of those inmates were moved shortly thereafter. When alternative housing was used, inmates were primarily housed in the MHCB observation cells, CTC medical beds, or CTC holding cells. All were provided stack-a-bunks and observed on a continuous 1:1 basis.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, inmates not on suicide observation status were observed at 30-minute intervals by nursing staff. Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door. The forms were found to be up-to-date and accurate, a significant improvement from the 2014 assessment.

This reviewer observed five IDTT meetings in the MHCB unit on May 24-25. Although the treatment team was well represented by mental health, medical, and custody staff, the meetings

were uneven.  For example, there was a noticeable difference in the quality of the meetings based upon the presence of the CMH.  With the CMH in attendance, the meetings were overall very good, with adequate discussion regarding the inmate's presenting problem and level of care.  Without the CMH, the meetings were poor, with little discussion regarding safety planning.  In addition, in one case, there was confusion regarding an inmate's level of observation (Suicide Watch v. Suicide Precaution), and in another case, there was a decision regarding granting yard privileges without a discussion of the inmate's current suicide risk.  In a third case, the inmate had been issued "partial issue" of whites, t-shirt, and socks, as well as a safety smock, with team members suggesting that the smock was issued because the inmate complained of being cold.  (It was inappropriate to issue a safety smock simply for warmth, particularly when extra safety blankets were readily available.)  In addition, three of the five inmates had significant custody issues that were discussed in varying degrees of detail during the IDTTs, but the CC I *never* accessed their available computer to answer and potentially resolve those issues.  Of note, the MHCB unit had a full-time recreation therapist, and inmates were said to have regular access to the yard.

A review of Guard One data for a recent 24-hour period in the three administrative segregation units found a combined 92-percent compliance rate with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of January 1 through May 24, 2016.  In addition, the TTA log for the same period was reviewed.  Due to the high volume of emergency mental health referrals, this reviewer sampled a total of 44 referrals for SI and found that 82 percent (36 of 44) of the cases resulted in the required completion of SREs.

A review of a sample of ten charts of inmates admitted to and discharged from the MHCB unit from March 25 through May 20, 2016 found problematic issues with adequate safety planning.  For example, the safety plan section of the discharging SRE in one case (CMF 1) simply stated "Discharged to EOP LOC with 5-day suicide risk assessment follow-up.  Consulted with Ad Seg team to discuss support needs."  In CMF 2, the safety plan stated:  "At the present time, the patient denies suicidal ideation, intent, plan and access.  Patient stated that he would inform clinical staff if his suicidal ideation returned or his depression became too overwhelming.  The IDTT determined that the patient should be transferred to an EOP environment so he can receive treatment for his risk factors and develop coping strategies for prison adjustment."  The safety plans for two other inmates (CMF 3 and CMF 4) were especially problematic because they not only simply summarized *Program Guide* requirements, but were identical and copied by the same clinician, as well as combined treatment received in the MHCB with the recommended treatment in EOP:

> Discharge to EOP.  Structured therapeutic activities will be provided up to 10 hours per week.  Will be seen on a weekly basis by a clinical case manager.  His medications will be revised every 30 days and he will be seen by his treatment team every 90 days.  He will be housed in a protected housing wing and share a cell with another inmate.  Will be under 24-hour supervision by custody officers and have ready access to mental health and medical services.  His mental status

and suicide risk will be evaluated on a regular basis by a clinical case management context. Access to a higher level of care is readily available. Medication management and psychiatric care to reduce depressive and anxiety Sx. One to one clinical contact daily for supportive therapy and to learn coping skills for depression and anxiety management, 24/7 nursing care and monitoring for decompensation, safety and support. RT services to provide positive activities to reduce depression and anxiety.

Of note, this reviewer was subsequently informed during a SPRFIT meeting on May 24 (see below) that 11 CMF clinicians had been recently required to re-enter the SRE mentoring program because of inadequate completion of SREs.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was partially reviewed. The review was considered "partial" because not all the requested data was readily available, as well as the fact that the SPRFIT had been previously tracking such data on a regular basis. The first page of the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) containing "discharging information" that was completed daily by the mental health clinician was not readily available for review. The second page, representing the "custody checks" form completed by custody staff, had been reviewed by the SPRFIT on a monthly basis. The SPRFIT found that compliance with 30-minute custody checks for March 2016 was only 62 percent, and only 69 percent for April 2016. The low compliance rates were a result of custody staff conducting rounds at 60-minute intervals or otherwise missing the required checks.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes reflected good attendance from all required members, including the chief psychiatrist (who was the CMH). A review of meeting minutes, as well as this reviewer's observation of a meeting on May 24 found that the SPRFIT was very active. Agenda items included review of the monthly suicide videoconference, five-day follow-up results, outreach/primary interventions, serious and non-serious self-harm incidents, administrative segregation screening, Emergency Response and Death Review Committee, High-Risk Program, staffing changes for five-day follow-up, status of training, and CAMS. Of note, a 19-slide PowerPoint presentation developed by the CMH regarding the inmate suicide at CMF in March 2016 was found to be very comprehensive.

**Training**: According to training records, 95 percent of custody staff and 98 percent of nursing staff were currently certified in CPR. In addition, although 95 percent of custody staff received annual suicide prevention block training during 2015, only 76 percent of medical staff and 71 percent of mental health staff received the same annual training. Finally, as of May 2016, 91 percent of mental health clinicians had completed the SRE mentoring program, and 94 percent had received the seven-hour SRE training.

**Recent Suicides**: CMF experienced one suicide during the review period (occurring in 2016). In that case (CMF 5), the inmate jumped from a second tier housing unit at CSP/Sac on

November 24, 2015.  He sustained multiple serious injuries from the suicide attempt and spent several weeks at an outside hospital.  He was transferred to the CTC at CMF on January 8, 2016. One result of his multiple injuries was the inability to swallow food without regurgitation, resulting in a 40-pound weight loss.  The inmate became increasingly depressed and expressed SI on March 3, 2016.  That same day, he was transported to an outside hospital for "Hypernatremia/metabolic acidosis/electrolyte imbalance, dehydration, failure to thrive /poor oral intake, and rule out absence seizures."  The inmate died the following day (March 4).  The death was considered a suicide because it resulted from the medical consequences of his November 2015 suicide attempt.

The inmate entered CDCR on April 29, 1994 to serve a 16-year-to-life sentence for second-degree murder of his spouse (also his former treating psychiatrist).  He had been denied parole on three occasions, the last occurring in 2012.  As noted above, he was transferred to CMF on January 8, 2016.  The inmate had 26 RVRs during his almost 23 years of confinement, the most recent of which occurred in December 2014 and involved battery on a peace officer.  He was not gang-affiliated.  The inmate had limited family support from his mother and sister, and did not have any visits from friends or family after January 2007.

The inmate self-reported a normal childhood, free of any abuse or trauma.  Except for one minor arrest, he had no other prior involvement in the criminal justice system until the instant offense. He began experiencing symptoms of Bipolar Disorder beginning in his late 20s, with six hospitalizations occurring around age 30.  Some of these hospitalizations were the result of suicide attempts.  Upon arrival into CDCR, he was referred to a mental health clinician within a few days for bizarre and delusional behavior, as well as a self-reported history of hallucinations and three prior suicide attempts in the last ten years. He was diagnosed with Bipolar Disorder and started on psychotropic medication.  (Of note, these initial mental health services were provided prior to the inception of the MHSDS.)  The inmate was admitted into an acute care unit at DSH (then referred to as the Department of Mental Health or DMH), and then transferred to ASH from July 1995 through May 1996.  He was transferred back to CDCR at the EOP level of care.  By December 1996, the inmate's behavior had stabilized to a point that he was placed at the 3CMS level of care.  However, his behavior began to spiral downward and he was re-hospitalized for having stopped taking his medication.  The inmate was returned to the EOP level of care and subsequently placed on a _Keyhea_ order (and later PC 2602 involuntary medications) for the remainder of his CDCR confinement.  He continued to display bizarre behavior and engage in disruptive incidents on many occasions, marked by flooding his cell, cursing at staff, singing at all hours, remaining naked in his cell, and defecating or urinating at his cell door. Such behavior led to an additional six inpatient placements at DSH facilities, as well as more than a dozen placements in a MHCB during his confinement.  Most of his MHCB placements were based upon expressions of suicidal ideation or actual suicide attempts.  (For example, on November 9, 2009, the inmate jumped off the second tier housing unit at a DSH facility and suffered multiple serious injuries.)  However, by November 2014, the inmate's behavior had improved enough for him to be placed at the 3CMS level of care.

Shortly thereafter, the inmate's behavior again deteriorated and he was returned to the EOP level of care in December 2014.  His behavior stabilized during the first several months of 2015, but he began to refuse treatment in September 2015.  Clinicians at CSP/Sac found him to be

isolative, depressed, and desiring to be "left alone." During several clinical contacts in October and November 2015, the inmate expressed variable preoccupation with a suicide plan to jump from the second tier. For example, on October 29, he told his PC that "he was having suicidal ideation about jumping off the second tier when he goes to take a shower." The inmate also stated that he felt hesitant about this plan because when he previously attempted suicide by jumping in November 2009 "he was an invalid for so long." An SRE was apparently not completed during this encounter, and the inmate was not placed on suicide precautions. Then approximately two weeks later on November 9, the inmate was seen by another CSP/Sac clinician in alternative housing after expressing SI and appearing "very clinically depressed and psychotic." Although initially referred to a MHCB, the order was rescinded the following day (November 10), with another clinician assessing a "moderate" chronic risk for suicide and "low" acute risk. During the second day of his five-day follow-up after release from alternative housing, the inmate told a clinician that "I'm not good, suicidal." An SRE was not completed, and he was not referred to a MHCB. The following week on November 19, the inmate again mentioned feeling very depressed and having thoughts about jumping from the second tier of his housing unit. He had previously requested transfer to a DSH facility, and told the clinician that day that he will "await a transfer to DSH." Several days later on November 24, the inmate made what subsequently resulted in his final suicide attempt.

Following his hospitalization from the severe suicide attempt and return to CDCR custody at CMF on January 8, 2016, the inmate continued to express SI, informing a clinician on January 18 of a desire to 'bust head open." He was placed on suicide precautions, then discharged two days later on January 20. However, the inmate continued to endorse SI that same day, stating that "I am on a suicide run right now. I haven't eaten a full meal in two months….50% of myself wants to live and the other part wants to die." He also admitted to "frequent thoughts about death" on January 28, 2016. In addition, CMF nursing staff in the CTC suspected that he was engaging in starvation as a way to end his life. On March 2, the inmate admitted to a social worker that "he didn't have much of an appetite and he's ultimately trying to starve himself to death." The following day (March 3), the inmate was found to have a severe electrolyte imbalance. He was transferred to the local hospital and died the following morning.

Despite an extensive history of suicidal behavior, the inmate's chronic risk for suicide was almost always rated at "moderate." His diagnoses included Bipolar Disorder, Major Depressive Disorder and Schizoaffective Disorder, with a final diagnosis of Schizoaffective Disorder, Bipolar Type.

The CDCR reviewer in this case found that the inmate "exhibited ambivalence about living and a willingness, at times, to contemplate death of his own hands." He had a significant medical history, mostly the result of injuries sustained during suicide attempts. The reviewer noted that "whether he wasted away as the eventual result of these medical consequences, intentionally starved himself to death, or died from some combination of the two, the death remains (from a mental health perspective) as a result of his chronic and long-standing desire to end his life."

The Suicide Report contained eight recommendations for corrective action through a QIP at both CSP/Sac and CMF:

1) Nine nursing care concerns [involving inadequate observation while on suicide precautions, inadequate emergency response on November 24, 2015, inadequate documentation of weight loss on two occasions, and inadequate documentation of consumed food];

2) On October 28, 2015, the inmate expressed during a triage evaluation that he was considering jumping from the 2nd tier. The evaluating clinician [at CSP/Sac] stated, "Pt. reports SI with method of jumping off tier, but no specific plan…" The clinician rated acute risk is low "as there are no significant IS PATH WARM imminent warning signs," though ideation, hopelessness, recklessness, and mood change [the I, H, R, and M in IS PATH WARM] are noted in the evaluation. These errors represent poor risk formulation and risk management decision-making;

3) A number of concerns were identified with the care provided by the primary mental health clinician: on October 29, 2015, the inmate reported "he has been having suicidal ideation about jumping off the 2nd tier when he goes to take the shower." On November 12, 2015, the inmate stated to his primary clinician "I'm not good, suicidal." On November 19, 2015, the inmate again mentioned to primary clinician thought about jumping from the 2nd tier. The primary clinician showed a poor understanding of suicide risk formulation and risk management;

4) On November 9, 2015, the inmate was seen for crisis triage. He reported a desire to die and was 'very clinically depressed and psychotic.' He was placed in alternative housing cell and was referred to MHCB. An SRE conducted that day noted acute and high chronic risk for suicide. However, on the following day (November 10), the patient was seen again while in alternative housing and by a different clinician. The second clinician discharged the patient from alternative housing, lowered estimates of risk, rescinded the MHCB referral, and discontinued suicide precautions. The clinician did not adequately justify the lowered risk level and/or the decision to rescind the inpatient referral;

5) On two occasions within the span of two weeks, crisis evaluation completed by SAC clinicians did not recognize the significant risk present in the case and/or discounted the recognition of significant risk made by the other clinicians. On both occasions, the rationale for rescinding another clinician's recommendation for acute hospitalization should have been clearly stated. Adequate safety plans should have been developed on both occasions.

6) On January 18, 2016, the inmate "endorsed desire to bust head open" and was placed on suicide watch. He was initially recommended to be placed at a high level of care. For some reason, two SREs were completed by the same clinician and listed as at the same time [January 16, 2016, 2120]. One SRE listed moderate acute and moderate chronic risk, the other high acute and high chronic risk. This was despite the fact that all chronic, acute, and protective factors are rated in an

identical fashion on the two SREs. Safety planning and disposition differ between the two SREs;

7) The process of decision-making related to the rescission of the MHCB referral should be discussed by the DHCS SPR-FIT. Rescission decisions made in this case were problematic. Clinicians who rescind referrals to MHCB should (at a minimum) discuss what changed after the referral was made and/or what follow-up was arranged instead of crisis hospitalization in this case; and

8) The DHCS SPR-FIT should discuss the feasibility of recommending first-floor housing for patients who have reported thoughts of jumping from the tier as a means of suicide.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

### 11)    California State Prison-Solano (CSP/Solano)

**Inspection**:  May 26-27, 2016 (previous suicide prevention audit was on May 7-8, 2015). CSP/Solano housed approximately 3,783 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on May 26.  The nurse was using the current Initial Health Screening form (CDCR Form 7277) (revised July 2015).  Similar to the 2015 audit, the process was completed with sufficient privacy and confidentiality in the nurse's office, with the door closed and custody staff stationed in the corridor.

Daily PT rounds in administrative segregation (Building 10) were observed on May 27.  The census on the housing unit was very low, and the PT correctly completed the Psych Tech Daily Rounds Forms on the ten 3CMS inmates at cell-front as required.

**Housing**:  CSP/Solano had nine MHCBs.  A previous concern of sink faucets having horizontal slits (known as "anti-squirt slits") had been corrected; all cells were suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The administrative segregation unit (Building 10) contained a total of six retrofitted new intake cells.  Due to a low census, not all of the new intake cells were occupied during the review period, and all new intake inmates were housed in new intake cells as required.  However, it should be noted that each of the exterior cell windows contained frosted screening that obscured natural light into the cell.  CDCR headquarters had ordered that such screening be removed in 2015.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were said to be infrequently utilized at CSP/Solano.  In fact, this reviewer found that only 12 inmates were placed in alternative housing from March 23 through May 23, 2016, with all inmates transferred to either a MHCB or back to their original housing

units within 24 hours.  When alternative housing was used, inmates were housed in administrative segregation cells with beds, and observed on a continuous 1:1 basis.  A review of the eUHR charts for these 12 inmates found that the required SREs were completed in 92 percent (11 of 12) of the cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, inmates not on a suicide observation status were observed at 30-minute intervals by nursing staff.  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door.  The reviewed forms appeared accurate and up-to-date.

This reviewer's 2015 assessment found problematic practices in the MHCB regarding levels of observation and possessions/privileges afforded to patients.  Although there was some improvement found, problems remained.  For example, the LOP for the MHCB (entitled "Mental Health Crisis Bed Program") was revised again in March 2016 to delineate that inmates on 30-minute "clinical observation" status due to issues unrelated to suicide were to be given "full issue" clothing unless there was a documented clinical reason for not issuing such items, with instructions that "exceptions to 'full issue' should be rare."  Despite this directive, this reviewer examined several eUHR charts in which inmates on 30-minute observation levels in April and May 2016 were clothed in "partial issue" of a T-shirt, boxers, and socks, or simply a safety smock without documented clinical justification.  Such orders were contrary to the LOP that required full issue clothing for inmates not on a suicide observation level.  Of note, however, this reviewer, also found that all inmates (even those on either Suicide Watch or Suicide Precaution) were offered out-of-cell time, including yard privileges, on a regular basis, with the recreation therapist assigned to the CTC for 30 hours per week.  These were very good practices.

This reviewer observed four IDTT meetings on May 26-27.  Overall, although the treatment teams were well represented by mental health, medical, and custody staff, as well as good general discussion by team members found in each case, specific discussion of safety planning was uneven.  For example, in one case (SOL 1), the inmate had been in the MHCB for almost a week due to SIs and paranoia related to safety concerns.  The inmate was scheduled to parole in a few weeks and continued to express concerns regarding his safety.  The inmate's behavior had stabilized enough that further crisis treatment was not warranted, and the treatment team recommended that the inmate be discharged back to his original institution (Valley State Prison) and that the CC I work with facility officials in allowing him to be housed in administrative segregation until his parole date.  In another case (SOL 2), the inmate was placed in the MHCB for grave disability due to the lack of daily hygiene and eating.  He had not been cooperative with his MHCB treatment, and had been refusing medication.  The treatment team decided to discharge him at the EOP level of care and told the inmate that "EOP will decide which groups you need."  There was no discussion regarding the inmate's diagnosis or any other treatment planning.  In the third case (SOL 3), the inmate had been in the MHCB for ten days following a suicide attempt/gesture by hanging.  He was still clothed in a safety smock and on Suicide Watch, although allowed out-of-cell time, including yard privileges.  Although there was adequate discussion amongst the treatment team regarding step-down to the Suicide Precaution level of observation, given the fact that the inmate had been in the MHCB for ten days, there was

no discussion about safety planning, and little discussion regarding discharge planning, including a possible DSH referral.

A review of Guard One data for a recent 24-hour period in administrative segregation found 95-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of November 23, 2015 through May 23, 2016.  The TTA log for the same time period was also reviewed.  A total of 61 emergency mental health referrals for suicidal behavior were found.  This reviewer's eUHR review of these 61 cases found that mental health clinicians completed the required SREs in 84 percent (51 of 61) of the cases.  A similar compliance rate of 87 percent was found during the 2015 assessment.

MHCB patients were consistently seen daily by clinical staff while on suicide observation status.  However, in addition to problems related to limited issue possessions afforded to some inmates on 30-minute observation as cited above, there were continuing problems found in the safety planning sections of most of the discharging SREs.  With one exception, of the ten cases reviewed in the eUHR, although the vast majority did not simply repeat *Program Guide* requirements, the SREs lacked the specific strategies for continued reduction of suicide risk, with most MHCB clinicians seemingly deferring to outpatient clinicians for development of the safety plan.  In the one exception (<u>SOL 4</u>), the safety plan was individualized and adequately described as follows:

> Tx plan at EOP LOC may focus on reducing depression, anxiety, and psychosis.  In order to reduce depression, IP can identify negative thinking patterns and learn to challenge these thoughts w/CBT interventions.  In order to reduce anxiety, IP can learn and practice relaxation techniques amenable to using breathing exercises).  In order to reduce psychosis, IP can learn and practice coping and compensation techniques for managing psychosis, identify triggers for increased psychosis, and learn and practice coping skills for managing these triggers.  IP will receive medication management at EOP LOC to work towards ameliorating depression, anxiety, and psychosis, and will have frequent contact with his tx team to monitor, manage, and decrease all mental health symptoms.  Additionally IP may benefit from working w/tx team in regard to matters in which he can appropriately manage safety concerns.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was partially reviewed.  The review was considered "partial" because limited data was available for review.  For example, CSP/Solano had only been using the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) forms since May 2, 2016.  Prior to that date, custody staff had not been in compliance with the January 27, 2016 CDCR memorandum because they continued to observe discharged inmates at 60-minute intervals (and not the required 30-minute intervals).  Since May 2, this reviewer found only two applicable cases and both were documented consistently with the new memorandum.

**Intervention**:  All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes reflected that a quorum was not reached at any of the meetings, with psychiatry absent from two of the sessions. Meeting minutes were otherwise sparse and unremarkable.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were certified in CPR.  In addition, 100 percent of custody staff, 89 percent of medical staff, and 90 percent of mental health staff received annual suicide prevention block training during 2015.  Finally, as of May 2016, 100 percent of mental health clinicians had completed the SRE mentoring program and 98 percent had received the seven-hour SRE training.

**Recent Suicides**:  CSP/Solano did not experience any inmate suicides during the review period.

### 12)     Salinas Valley State Prison (SVSP)

**Inspection**:  June 7-9, 2016 (previous suicide prevention audit was on February 19-20, 2015). SVSP housed approximately 3,748 inmates during the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process on June 7, 2016.  The nurse assigned to the R&R Unit was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015). The nurse was observed to be asking all of the required questions.  The process was private and confidential, with the door to the nurse's office closed and an officer stationed outside in the hallway.

Daily PT rounds in the administrative segregation units (STRH, D-1, and D-8 [overflow]) were observed on June 7-8.  On June 7, the rounds were unremarkable and the PTs correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.  On June 8, however, a PT was observed failing to ask caseload inmates any questions from the Psych Tech Daily Rounds Form, and completed the forms following the rounds.  In addition, two PTs were observed inefficiently completing rounds together because only one Guard One pipe was available.

**Housing**:  SVSP had a 22-bed CTC, with ten designated MHCBs.  All of the MHCB rooms were clean and mostly suicide-resistant, however, as reported during the 2015 assessment, some physical hazards were observed.  Each room contained square-shaped stainless steel sinks protruding from the wall that could be conducive to suicide attempts by hanging.  Triangle-shaped stainless steel shelving (found in other CDCR facilities) should be attached to each side of the existing sinks so that any ligature would slide off during a suicide attempt.  This reviewer subsequently examined a headquarters work order schedule that indicated the above described hazards would be corrected in December 2016.

The three administrative segregation units (STRH, D-1, and D-8 [over-flow]) had a total of 20 new intake cells. Most, but not all, had been retrofitted to be suicide-resistant. The exception was three STRH cells (109-111) which had been identified as new intake cells subsequent to the 2015 assessment, but had wall ventilation grates containing large holes (in excess of 3/16 inch in diameter) that were conducive to suicide by hanging. Two other new intake cells (107-108) identified in the 2015 assessment as unsafe had since been retrofitted.

There continued to be problematic issues concerning the housing of newly admitted inmates in administrative segregation. Specifically, not all inmates within their first 72 hours of administrative segregation housing were in retrofitted cells, while not all retrofitted cells housed newly admitted inmates. For example, at least two new intake inmates (assigned to the unit within 72 hours) were observed to be in non-new intake cells in D-1.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on a daily basis at SVSP. Four options were used: (1) placement in TTA holding cells and holding "cages"; (2) BPH cells; (3) placement in R&R unit cells; and (4) placement in holding cages in the visiting room and gymnasium. According to available data, approximately 219 inmates were placed in alternative housing from April 1 through June 2, 2016. The average length of stay in alternative housing was 1.8 days. However, during the period of May 24 through June 2, 2016, the average length of stay dramatically increased to 3.2 days.

On June 8, there were 18 inmates on alternative housing status at SVSP. Of these, eight inmates were housed in various BPH cells throughout the facility. Three inmates were assigned to TTA cells in the CTC. However, during medical clinic, these inmates were reassigned to holding "cages" for up to eight hours per day. Each of these inmates were said to be housed under these conditions of moving back and forth from TTA cells and holding cages for at least 48 hours. Three inmates were assigned to holding cells within the R&R unit. Finally, four inmates were temporarily assigned to holding cages in the visiting room and gymnasium. According to one mental health clinician accompanying this reviewer, one of the inmates had remained overnight in the holding cage and had only been cleared for housing that morning (June 8). With the exception of the R&R unit and TTA cells, *none* of the alternative housing options included beds or stack-a-bunks. In addition, inmates were *not* afforded showers, inmates were *not* consistently seen on a daily basis by mental health clinicians, and officers assigned to provide 1:1 observation were observed to be sitting in chairs, obstructing their visibility into the BPH cells. Various Suicide Watch/Suicide Precaution Record observation forms in BPH cells were found to be *not* up-to-date.

Finally, when observing PT rounds in D-8 Unit on June 8, this reviewer observed an inmate in a holding cage outside the custody office. Upon inquiry, it was determined that the inmate had expressed SI and was awaiting MHCB placement in alternative housing. The inmate was *not* being observed by any CDCR staff. When the officer in the custody office was asked why the inmate was not on continuous 1:1 observation status, the officer replied that he understood the policy required observation at 15-minute intervals. In addition, a Suicide Watch/Suicide Precaution Record observation form was *not* being maintained. When a nurse in an adjacent office was asked about the suicidal inmate, the nurse replied that she assumed he was being observed on a 1:1 basis.

104

Based upon these findings, as well as similar findings reported by the CDCR regional mental health team that was conducting a CQIT audit at the same time, an emergency meeting was held amongst CQIT team members, CDCR and *Coleman* team observers, and CDCR headquarters officials on June 8.  As a result, the deputy director of CDCR's Division of Adult Institutions subsequently announced that a housing pod in D-8 unit had been designated for alternative housing, and that BPH cells and TTA and visiting room/gymnasium holding cages would no longer be utilized for that purpose.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs.  All other inmates not on a level of suicide observation were required to be observed at staggered 15-minute intervals.  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, which was located on the outside of each inmate's room door.  The reviewed forms appeared accurate and up-to-date.  In addition, this reviewer did not observe any obvious problems with the issuance of possessions.  However, contrary to CDCR policy, inmates in the MHCBs were not afforded yard privileges.  When this reviewer asked IDTT members why MHCB patients were not receiving yard, several responses were given, including that the yard area did not have a security roof.  When asked if CTC medical patients were provided yard privileges in the same area, the response from IDTT members was "yes."  It also appeared that out-of-cell privileges for MHCB patients were adversely affected by the fact that a recreation therapist was only available once a week in the evening.

A review of Guard One data for a recent 24-hour period found 94-percent compliance with required checks not exceeding 35 minutes in STRH, while the D-1 unit was at 93-percent compliance.  Of note, this reviewer observed an officer conducting rounds in the STRH unit on June 7 at a very rapid pace, who frequently did not look into each cell.  Given the fact that SVSP sustained an inmate suicide in an administrative segregation unit in March 2016 in which the inmate was found with a "fixed/locked jaw," an indication that Guard One checks were not properly conducted, such a finding was concerning.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of December 1, 2015 through May 31, 2016.  In addition, the TTA log for March 2016 was reviewed.  This reviewer examined a sample of 39 emergency mental health referrals for SI from both the MHTS and TTA Log.  The review found that the required SREs were completed in 34 of 39 cases or 87 percent.

In addition, when reviewing a sampling of medical charts for inmates released from either alternative housing or a MHCB, this reviewer found numerous examples of cases in which discharging SREs and clinical five-day follow-ups were *not* completed as required.

This reviewer observed several IDTTs in the MHCB unit on June 8 and June 9.  Overall, treatment team meetings were found to be problematic.  Nursing staff were not consistently represented at the IDTTs and said to be "too busy" with other CTC responsibilities.  The IDTT meeting on June 9 started with only a psychologist and CC I.  During the meeting, the CC I (who

had been in the role for approximately one year) revealed that he was unsure as to his role during treatment team meetings.

One IDTT meeting on June 8 was particularly troubling. The inmate (SVSP 1) had been admitted into alternative housing on June 1 for expressing SI and refusing all of his medications for the past month, including psychotropic medication to treat his Bi-Polar Disorder and medication to control his high blood pressure. He remained in alternative housing for five days and was eventually admitted into a MHCB on June 7. The inmate had not been seen by any mental health staff for three of the five days he was in alternative housing.

According to his medical chart, the inmate had a history of at least nine prior suicide attempts throughout his CDCR confinement, and eight prior MHCB admissions. The IDTT meeting started with a poor presentation of case factors and it appeared that few team members knew the extent of the inmate's history. Although the inmate had continually denied any SI since his initial placement in alternative housing, the admitting clinician was concerned about his extensive history of suicide attempts and MHCB admissions. When the inmate again adamantly denied any current SI during the meeting, another clinician told the inmate that "I'm on your side, you should be discharged back to EOP." The two clinicians began arguing in front of the inmate and a decision was eventually made to discharge the inmate from suicide precautions, but continue his MHCB placement. The admitting clinician subsequently told this reviewer that the other clinician had berated her the previous day (June 7) for admitting the inmate into the MHCB. The June 8 meeting did not contain an adequate discussion of the rationale for discontinuing suicide precautions or safety planning.

Two days later on June 10, the inmate was discharged from the MHCB. The safety plan contained within the discharging SRE stated the following:

> IP is being cleared to return from a MHCB with discharge follow-up and 24-hour custody observation. Discharge plan: continue to monitor psych med compliance to make adjustments as necessary, continue to monitor MH symptoms and evaluate for future SI or plan to harm self. IP would benefit from developing more effective social skills in order to get needed support when he starts to feel overwhelmed by anxiety, depression or due to an increase in psychotic symptoms. Help IP develop skills to deal more effectively with stressful situations as arise on the yard and to problem solve around problems with other inmates when he has difficulties getting along with them. CBT to address distorted thoughts that lead to irrational beliefs; anger management; distress tolerance and self-soothing skills such as distraction, visualization, and frustration tolerance. Help IP manage anxiety and enhance protective factors such as family supports and religious beliefs. MI interventions to assist IP in navigating successfully through the change process for personal growth.

Although some of the above safety plan was helpful, it did not address specific strategies to deal with recurring SI (a recurring theme found in most reviewed safety plans from discharging SREs). A review of subsequent five-day follow-up clinical progress notes for this inmate, as well as weekly clinical follow-up progress notes for June did not find any reference to the June

10 safety plan.  Of note, one five-day follow-up note dated June 12 stated the clinician had "reviewed the SRE dated June 1" (but apparently not the SRE dated June 10).

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.  This reviewer was presented with documentation of 200 cases of inmates discharged from either the MHCB unit or alternative housing that remained at SVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from March through May 2016.  Of those 200 cases, the first page of MHCB Discharge Custody Check Sheet (MH-7497) forms were completed in only 22 percent of the cases by a mental health clinician, and the second page of MH-7497 forms that documented required observation at 30-minute intervals were completed in only 36 percent of the cases by custody staff.  Of note, the absence of required 30-minute checks for inmates discharged from a MHCB was found in an inmate suicide at SVSP on April 2, 2016.  It was also noteworthy that mental health clinicians appeared to have a habit of writing "discharge from MHCB under 24-hour observation" on most SREs, and ordered discharge custody checks for only 24 hours in the vast majority of reviewed cases, perhaps reflecting a misunderstanding that such checks were limited to a 24-hour duration and not up to 72 hours as reflected in policy (see "Provision of Mental Health Crisis Bed Discharge Custody Checks Policy," CDCR Memorandum dated January 27, 2016).

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (March through May 2016) found that quorums were achieved in all of the meetings, with high attendance for both required and non-required committee members.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, approximately 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff had received annual suicide prevention block training during 2015, but only 43 percent of medical staff and 52 percent of mental health staff received annual suicide prevention training.  Finally, as of June 2016, 83 percent of mental health clinicians had completed the SRE mentoring program, and 98 percent had received the seven-hour SRE training.  Of note, this reviewer observed a one-hour "Suicide Prevention-Safety Planning" videoconference remotely at SVSP on June 8.  Of the approximate 62 mental health clinicians working at SVSP, only four were in attendance (either in the classroom or remotely from their office).  Given the concerns regarding adequate safety planning described above, such low attendance was problematic.

**Recent Suicides**:  SVSP experienced four inmate suicides during the review period, all of which occurred during 2016.  In the _**first**_ case (SVSP 2), the inmate was found hanging from the light

fixture by a sheet in his SNY cell during the late evening of January 14, 2016. The inmate entered the CDCR system on July 31, 2008 to serve a sentence of 25-years-to-life (plus 25 years) for multiple counts of rape and robbery. He had been housed at SVSP on several occasions, the most recent of which was on November 5, 2015. The inmate had a significant disciplinary record, including a battery on an inmate in 2013, as well as three IEX charges. He had a total of ten RVRs, the most recent of which was for battery on an inmate in April 2015. The inmate was housed in a SNY primarily due to his commitment offense and gang dropout status.

Although limited information was available regarding his social history, the inmate was born and raised in Mexico. His parents divorced when he was a child and he dropped out of high school. His mother, who is said to have a history of serious mental illness, died at an early age. The inmate came to the United States at age 16, and never married nor had any children. He was homeless at the time of his 2008 commitment offense, and had no contact with his family. The inmate had a history of substance abuse and, although he confided to a CDCR clinician that he began experiencing depression at age 13 related to his mother's death, he was not identified with a serious mental illness until he entered CDCR. In August 2008, he was diagnosed with Depressive Disorder NOS, Psychotic Disorder NOS, and Amphetamine Dependence. He was placed at the 3CMS level of care. In February 2010, the inmate was admitted to a MHCB following an attempted suicide by overdose. The admission was the first of several hospitalizations. He was subsequently placed in DSH facilities on seven occasions between 2010 and 2015. He also had six MHCB placements, the last of which occurred from August 5, 2015 through September 3, 2015. The inmate was elevated to the EOP level of care in January 2011 and, except for a brief period in early August 2015 in which he was downgraded to 3CMS, remained in the EOP program until his death. His most recent diagnosis was Schizophrenia, Paranoid Type, and Personality Disorder NOS (Antisocial Traits).

In addition to his February 2010 suicide attempt by overdose, the inmate engaged in self-injurious behavior on multiple occasions in March 2010 while in both a MHCB and in a DSH facility. According to DSH records, he was on suicide precautions multiple times in 2010, 2011, and 2012 for self-injurious behavior (primarily cutting). In 2013, the inmate was again admitted to a MHCB for cutting. His self-injurious behaviors continued during 2014 and 2015, and he self-reported a suicide attempt by hanging on August 4, 2015 that precipitated his final placement in a MHCB and subsequent DSH facility. Beginning in August 2015, the inmate's chronic risk for suicide in SREs was rated as "high," yet his final SRE completed on December 1, 2015 noted a "moderate" chronic risk for suicide.

The inmate had a medical history that included diagnoses of GERD, hyperthyroidism, and hyperlipidemia that were not thought to be precipitating factors to his suicide.

On January 11, 2016, the inmate attended a court hearing related to several battery charges that he had accumulated during his CDCR confinement. During the hearing, the court found that the inmate was "sane" at the time of the RVRs. As a result, he pled guilty and a sentencing hearing was scheduled for February 3, 2016. Upon return to SVSP, the inmate did not self-report any "bad news" from court to the intake nurse, and the transporting officers did not alert the nurse to any significant behavior displayed by the inmate. The following day (January 12), the inmate

was seen by his PC and said that the court proceeding "went fine." He did not appear to be in any distress.

Other than the adverse news received in court three days before his death, the CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, and a suicide note was not found. One inmate subsequently told the reviewer that the decedent had told him he was stressed about facing additional time as a result of the court hearing, and complained of not having contact with his family.

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) On January 11, 2016, the inmate returned from a court hearing. There was apparently little or no communication between the transporting officers and the R&R nurse. The nurse determined, solely on the report of the inmate, that no bad news had been received. A discussion with transporting officers about the day's events in court may have raised concerns about the inmate's well-being with either the R&R nurse or mental health clinicians. This reflects a cross discipline concern; and

> 2) On July 18, 2015, SAC clinicians discharged the inmate from EOP level of care to a lower level of care, CCCMS, because of a lack of participation in treatment. He declined to participate in the IDTT meeting where this determination was made. The clinicians did not seem to consider the seriousness of the inmate's prior psychiatric history and prior self- harm in making this determination …."

The Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

In the ***second*** case (SVSP 3), the inmate was found hanging from the bunk by a sheet in his administrative segregation unit cell during the evening of March 5, 2016. The inmate entered the CDCR system on July 23, 2015 to serve an 18-year sentence for two counts of lewd and lascivious behavior on a child. He was transferred to SVSP on December 4, 2015 and initially housed in a SNY due to his commitment offense. On February 25, 2016, the inmate was placed in administrative segregation for safety concerns. He had not incurred any RVRs during his brief CDCR confinement, and did not appear to be gang-affiliated.

Although limited information was available regarding his social history, the inmate was born and raised in Mexico and subsequently told a CDCR clinician that he had been a victim of sexual abuse at age six by a male neighbor. He came to the United States in 1992 at age 19 and married his wife in 2001. At the time of his death, he and his wife had nine children, ranging from ages five to 17. Although he did not receive any visits or funds placed in his commissary account, the inmate reportedly was in regular contact with his wife and children through telephone and letter correspondence.

The inmate had a history of substance abuse, but was not identified with a serious mental illness until he entered CDCR. On October 7, 2015, he was seen by a mental health clinician regarding his recent disclosure of sexual abuse as a child. During the assessment, the inmate reported "intermittent suicidal ideation with no intent," as well as previous SI while confined in the county jail. He was placed in the MHSDS at the 3CMS level of care on October 14, 2015 with a diagnosis of Adjustment Disorder. Several days later on October 19, an officer found the inmate in his cell with a sheet tied around his neck. He was sent to an outside hospital for evaluation, and subsequently to a MHCB at CMF. Upon discharge on November 3, 2015, the inmate was transferred to NKSP and subsequently placed in a MHCB after expressing fears for his safety and SI. His level of care was raised to EOP. The inmate regularly talked to mental health clinicians about fears for his safety and a belief that killing himself would be preferable to having others kill him. A psychiatrist interviewed the inmate and began to taper him off of his psychotropic medication with the rationale that the "paranoia" previously diagnosed was actually reality-based fears for his safety. A few weeks later on November 19, the inmate again expressed SI in NKSP and was temporarily placed in alternative housing. The next day (November 20), he was reassessed, denied SI, and was discharged from alternative housing with a safety plan which included a "discussion with custodial and mental health staff about alternatives to using suicidal language to express safety concerns."

Three days later on November 23, the inmate was found by a correctional officer with a sheet tied tightly around his neck in his cell. He was subsequently transferred to a MHCB at KVSP and continued to voice safety concerns that he would rather kill himself than have "another man kill me." A clinician noted his "clear intent, desire to die, and ongoing plan to kill himself if remaining in same environment." Psychotropic medication to treat his increased symptoms of anxiety and depression were prescribed. He was discharged from the MHCB at KVSP and transferred to SVSP on December 3. Of note, the KVSP clinician who completed the proposed safety plan section of the SRE justifying the inmate's admission into the MHCB on November 25 duplicated the same proposed safety plan to justify discharge from the MHCB on December 4: "MHCB treatment goals: stabilize by decreasing and managing acute symptoms of S/I, helplessness and hopelessness, dep/anxiety. While in MHCB, treatment team to evaluate the symptoms associated with crisis and provide initial stabilization and recommendations for follow-up care, post discharge. Provide medication management. Assist I/P in developing plan to address safety concerns and adjustment issues."

Upon transfer to SVSP on December 4, 2015, the inmate was seen by a mental health clinician who completed an SRE containing the following safety plan: "IP is being discharged back to his regular programming on a 24 hour/discharge summary. IP will be seen for a minimum of five days by a MH professional. IP was encouraged to talk with his PC about his thoughts and feelings. IP encouraged to speak with any staff member if his suicidal thoughts return." Several weeks later on December 17, the inmate met with his EOP treatment team who identified only the problem area of "depression." His diagnoses were Major Depressive Disorder and Adjustment Disorder.

According to the CDCR reviewer in this case, the inmate continued to voice concerns that he was being targeted by other inmates between December 2015 and February 2016, but "gave conflicting reports to staff about which inmates were doing this. He was also seen by staff

socializing with other inmates on the yard and in his housing unit." However, on February 17, 2016, the inmate told his clinician that "he has heard on the yard that others want to hurt him" and requested to be placed in a "safe environment." The clinician contacted custody staff and a sergeant discussed the issue with both the inmate and clinician. The following week, on February 22, the inmate continued to express concerns for his safety and identified two inmates whom he believed were "plotting against him." He was also concerned that custody staff would not protect him based upon his committing offense. Although an "Administrative Segregation Unit Pre-Placement Chrono form (128-MH7) was completed on February 23, the inmate was not moved to administrative segregation until two days later on February 25. A new 128-MH7 form was not completed. Records examined by this reviewer also indicated that the inmate was not placed in a new intake cell.

On March 2, the inmate was seen by an administrative segregation clinician and reported that he "feels a bit safer now that he is on ASU." The following day (March 3), the clinician completed an SRE which indicated a "moderate" chronic risk and "low" acute risk for suicide. The inmate committed suicide two days later on March 5. A "Psych Tech Daily Rounds Form" (7230-N) was completed daily from February 29 through March 6, 2016, and included Subjective Objective Assessment Plan Evaluation (SOAPE) entries for March 6, the day after the inmate's death. The form was scanned into the eUHR several months later on July 12, 2016.

The inmate did not have a significant medical history thought to be a precipitant to his suicide. According to the CDCR reviewer in this case, the inmate did not leave a suicide note and a review of various telephone calls with his wife, including one a few weeks before his death, did not contain any indication of his suicidal thoughts. The reviewer surmised that the inmate's "major psychological issue appeared to be the intractable anxiety in the belief that other inmates were going to kill him because of his commitment offense….. Despite numerous conversations with mental health clinicians and custodial staff, his fear never subsided altogether and eventually appeared to become so unbearable that he took his life."

The Suicide Report contained 12 recommendations for corrective action through a QIP:

> 1) The form used by the NKSP MHSDS clinician to document the initial psychological evaluation of the inmate was labeled "Mental Health Treatment Plan" and had a revision date of April 2009. Department policy requires the use of the most recently revised forms.

> 2) The inmate did not attend his IDTT meeting on November 12, 2015 because of an outside medical appointment. The IDTT did not endeavor to reschedule the team meeting so the inmate could attend.

> 3) Only one of two of the inmate's suicide attempts was logged, and the one event log was entered into the statewide log 58 days late.

> 4) Both of the inmate's self-harm events should have been classified as suicide attempts rather than the more nebulous term "gesture."

111

5) Neither of the inmate's self-harm events while at NKSP resulted in a Form 837 Crime/Incident Report.

6) While at the MHCB unit at CMF in October 2015, the IDTT treatment plan was completed three days late and a discharge SRE was not completed.

7) The inmate was hospitalized in the MHCB unit at KVSP from November 24, 2015 to December 4, 2015. There was no documentation found in the eUHR that an IDTT meeting for this inmate was held and there was no documentation found of an appropriate treatment plan having been completed.

8) When the inmate arrived at SVSP on December 4, 2015, he was prescribed two psychotropic medications. A telepsychiatrist renewed the medications later in the month but there was no documentation found that a psychiatrist met with the patient for a new intake evaluation.

9) Clinical documentation while the inmate was at SVSP contained a number of small errors and his treatment plan failed to mention that he was prescribed psychotropic medication and important therapeutic modality.

10) While housed on A yard and then D yard on ASU status, the inmate apparently showered twice. Documentation is not clear that he was offered the requisite three showers per week required by Title 15.

11) The inmate did not possess a loaner radio at the time of his death. CDCR policy requires ASU inmates be offered a loaner radio and that issuance or refusal by inmate be documented.

12) Suicide risk evaluations included many changes of chronic risk, typically a static factor. In addition, the rationale for risk levels was poorly documented by clinicians.

The Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

In the ***third*** case (SVSP 4), the inmate was found hanging from a ventilation grate by a shoelace in his GP cell during the late morning of April 1, 2016. The emergency medical response was adversely affected by the presence of the victim's "fixed/locked" jaw. The inmate re-entered the CDCR system (for the third term) on December 21, 2011 to serve a 50-year-to-life sentence with eligibility for parole for first-degree murder. He was transferred to SVSP on March 20, 2014. The inmate had only one RVR which occurred on June 16, 2015 and involved fighting with another inmate. He was not thought to be gang-affiliated, and appeared to be well-liked by both staff and other inmates. The inmate had been married, with two children, and enjoyed strong family support demonstrated by regular visits by his wife and mother, as well as almost daily telephone calls.

The inmate had a limited history of mental health treatment in the community, except for Attention Deficit Hyperactivity Disorder (ADHD) treatment as a teenager, and a four-day hospitalization for drug-induced psychosis in 1988.  He had an extensive history of substance abuse, began using drugs at age seven, and participated in several substance abuse treatment programs during his adolescence.  The inmate reported having a history of childhood trauma sexual abuse, and engaged in superficial cutting of his arms between the ages of 17 and 21.  He also had a significant history of suicide within the family, including two suicide attempts by his father and suicides by both a cousin and aunt.

Upon his arrival into CDCR in December 2011, he was placed in the MHSDS at the 3CMS level of care after self-reporting receiving psychotropic medication for depression while housed in the county jail system.  He also reported symptoms of chronic PTSD attributed to his childhood trauma and sexual abuse, with diagnoses of Depressive Disorder NOS, and Amphetamine Dependence.  The inmate's mental health care remained uneventful until March 31, 2013 when he was engaged in a very serious suicide attempt at RJD by sustaining deep cuts in his forearms. He needed to be resuscitated, subsequently hospitalized, and then admitted into a MHCB. According to a psychiatric note, the inmate became very concerned when, four days prior to his suicide attempt, he had overheard other inmates saying he had sexual offenses in his background. He was discharged from the MHCB approximately one week later on April 10 and remained at the 3CMS level of care.  On January 8, 2014, the inmate's level of care was raised to EOP following symptoms of increased mood, hopelessness, anxiety, and "fleeting suicidal ideation." Many of these symptoms were related to reflecting on his childhood trauma.  Upon transfer to SVSP in March 2014, he requested both single-cell status and administrative segregation placement due to safety concerns.  Due to his self-harm history, however, his request was considered "not clinically appropriate at this time."  He repeatedly requested single-cell status in order to avoid "awakening to dramatic nightmares of childhood sexual abuse he has experienced. He also reported having nightmares and calling out while asleep, annoying previous cellmates, and thus causing undue tensions within the cell."

In December 2014, his IDTT granted a 90-day single-cell status which was later renewed in April 2015.  In December 2015, however, his IDTT decided not to renew the single-cell status and he was assigned a cellmate.  The issue was revisited again the following month (January 13 2016) through the intervention of his wife.  The inmate was again provided with single-cell status and his mood appeared to improve.  Thereafter, he attended most of his scheduled appointments and was described to be "in a good mood."  He was last seen by a mental health clinician on March 30, 2016 in a treatment group a few days prior to his death.  His mood was described as "good."

The inmate had a medical history that included Hepatitis C, hypertension, and cluster headaches. In addition, he suffered from involuntary hand tremors "three times daily."  He walked with a cane due to an injury he sustained at age 19.  These medical issues were not thought to be precipitating factors to his suicide.

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, and a suicide note was not found.  In an interview with the CDCR reviewer after the suicide, the

inmate's wife stated that she had talked with her husband on the telephone on March 30 and "he did not seem depressed at all, nor did he exhibit any signs of being suicidal."

The Suicide Case Review Committee found that this suicide was not foreseeable or preventable.

The Suicide Report contained one minor recommendation for corrective action through a QIP involving a nursing concern.

In the ***fourth*** case (SVSP 5), the inmate was found hanging from the bunk by a shoelace in his GP cell by his cellmate during the afternoon of April 2, 2016. The inmate entered the CDCR system on July 12, 2001 to serve a seven-year-to-life sentence for two counts of attempted murder and one count of burglary. He was transferred to SVSP on February 26, 2015, but had most recently returned from a MHCB at CHCF on April 1, approximately 27 hours prior to his suicide. The inmate had numerous RVRs during his approximate 15-year confinement, most of which occurred during 2007-2009, and the last of which occurred in April 2015 and involved possession of a cell phone. On November 11, 2015, he was granted a three-year parole stipulation, contingent on program participation, medication compliance, and absence of RVRs. He was not thought to be gang-affiliated. The inmate had never been married, but had a son and daughter from previous relationships who he was in contact with on an occasional basis. He was estranged from other family members.

The inmate was born and raised in Mexico and entered the United States at the age of 19. He had been raised by both his mother and father until the age of 11 when his father died. He enjoyed a normal childhood without any evidence of physical or sexual abuse. His substance abuse history included alcohol beginning at age 13. The inmate did not have a history of mental health treatment in the community, and first received treatment for depression and SI in the county jail system during 2000. The history included suicide attempts in both 1999 and 2000.

Upon entry into CDCR in July 2001, he reported "feeling depressed all of the time," as well as experiencing AH. He was subsequently placed in the MHSDS at the 3CMS level of care. He remained at the 3CMS level of care until approximately 2008 when his psychosis, acting-out behavior resulting in numerous RVRs, and self-injury became more pronounced and his level of care was raised to EOP. The inmate also had a history of non-compliance with medications that led to an active court order for involuntary medication administration (PC 2602), as well as multiple MHCB admissions in 2008, 2009, twice in 2014, twice in 2015, and March 2016. His symptoms included AH, tangential thinking, delusional thinking, mood swings, SI, and suicide attempts. The inmate was primarily Spanish-speaking, had difficulty understanding English, and the need for a translator on a regular basis became an impediment to his mental health care. His most recent diagnoses were Schizoaffective Disorder, Borderline Functioning, and Mood Disorder NOS.

In addition to prior suicide attempts in the community during 1999 and 2000, the inmate apparently sustained several prior suicide attempts during CDCR confinement in 2001, 2004, and 2005, although there was no documentation to support the 2004 attempt. In January 2015, the inmate placed a ligature around his neck in an alleged suicidal gesture and was subsequently placed in a MHCB. In an interview with his former cellmate following the suicide, the inmate

114

was said to have threatened suicide to his cellmate on several occasions during the past year but the cellmate was able to de-escalate the situations without notifying prison staff. These incidents apparently stemmed from frustration regarding the lack of family contact, his desire to get paroled, and/or medical complaints. In sum, during his 15-year CDCR confinement, the inmate had been placed in a MHCB on 11 different occasions.

The inmate most recently expressed SI to a SVSP clinician on March 17, 2016. He also complained of AH and was placed in a MHCB at CHCF the following day (March 18). During his 13-day MHCB stay, the inmate's IDTT on March 19 included only two treatment team members and records indicated that he was not always seen on a daily basis by clinical staff. According to the CDCR reviewer in this case, documentation of his MHCB stay at CHCF "provided minimal information regarding specific treatment interventions, measured outcomes, and his response to treatment…. Progress notes did not have concordance with the IDTT treatment goals. Consequently, it is difficult to assert the factors that contributed to his treatment, stabilization, and subsequent discharge." The discharging SRE was completed on March 30 and "the formulation of chronic risk for suicide did not appear to be inclusive to his history of suicide attempts," and "the safety plan completed was broad, and was not individualized to his treatment needs and risk. More notable was the absence of a safety plan to address suicidal ideation and/or self-injurious behavior."

Upon transfer back to SVSP on April 1, another SRE was completed by a clinician that also reflected a "moderate" chronic risk and "low" acute risk for suicide that was inconsistent with the inmate's history and current presentation. According to the CDCR reviewer, "It is worth mentioning that both risk evaluations (March 30 and April 1) were conducted in English, without the use of an interpreter. Is it difficult to know if the inmate fully understood the questions, and whether the language barrier contributed to an inaccurate assessment of risk." The following day (April 2), the inmate was seen for his first five-day clinical follow-up after discharge from the MHCB. The interview was conducted in Spanish, with the inmate stating that he was "a little anxious." He committed suicide several hours later.

The inmate had a medical history that included hypothyroidism, hyperlipidemia, and gastrointestinal issues over the past eight to nine months that frequently resulted in vomiting and fatigue. In addition, he reportedly fell down a stairway in August 2015 resulting in broken bones and subsequent surgery several months later. It remained unclear if these medical issues, particularly his gastrointestinal issues, were precipitating factors to his suicide. However, it was noteworthy that the inmate had been corresponding with *Coleman* plaintiffs' counsel regarding his chronic medical issues and appeared frustrated by both his untreated symptoms and inability to communicate and understand English.

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, and a suicide note was not found. However, the reviewer noted that the inmate's "recent medical struggles, increased isolation, exacerbated mental health symptoms, impaired ability to communicate, and the severed contact with family are conceivably reasonable contributory factors."

The Suicide Report contained eight recommendations for corrective action through a QIP:

1) On March 19, 2016, the MHCB initial IDTT was conducted. The documentation indicates that only two treatment members, an LCSW and an RN, participated in this IDTT.

2) The SRE completed on March 30, 2016 did not accurately represent the inmate's chronic and acute risk for suicide. The SRE was absent several acute risk factors, chronic risk formulation did not account for his past suicidal behavior. The safety plan completed was broad, and not individualized to the inmate's treatment needs. More notable was the absence of a safety plan to address suicidal ideation and/or self-injurious behavior.

3) On April 1, 2016, an SRE was completed by SVSP upon the inmate's return from a MHCB. He was determined to have moderate chronic and low acute risk for suicide. The SRE did not appear to be an accurate reflection of his current or historical risk factors, most notably the exclusion of several acute risk factors that were indicated in recent clinical documentation, including, but not limited to, recent suicidal ideation, psychosis, and mood disturbance.

4) While at the CHCF MHCB, there were no clinical contacts reflected in the system for March 19 and 28, 2016.

5) The Psychiatric Initial Assessment on March 20, 2016 was incomplete. Additionally, the system reflects two psychiatry contacts during the inmate's stay in the MHCB.

6) On March 19, 2016, the MHCB initial IDTT documentation under the Barriers to Discharge section stated, "Spanish/English: Requires Interpreter"…. an interpreter was not utilized during the course of treatment at CHCF, nor was a Spanish-speaking clinician.

7) Per the Nursing Death Review Summary, two nursing concerns were identified requiring follow-up.

8) On April 1, 2016, the inmate was discharged from a MHCB and returned to general population housing at SVSP. In accordance with departmental memorandum dated January 27, 2016 titled 'Revision of Mental Health Crisis Bed Discharge Custody Checks Policy,' staff shall conduct a personal observation within the housing unit on the inmate-patient every 30 minutes during the initial 24 hours of placement and up to 72 hours as recommended by a mental health clinician. During the Suicide Review it was determined the custody checks were not being conducted.

The Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

**Summary**:  *In addition to the high number of inmate suicides sustained during 2016, this reviewer found that SVSP was a very problematic institution that exhibited numerous poor practices in the area of suicide prevention, including PTs not consistently documenting on caseload inmates; use of non-retrofitted new intake cells; new intake inmates housed in non-new intake cells; placement of inmates in horrific alternative housing conditions (including a lack of bunks and showers) well in excess of 24 hours, as well as these not consistently assessed daily by mental health staff; a suicidal inmate left unattended and unobserved in a holding cage; inconsistent completion of required SREs following emergency mental health referrals for SI; inconsistent completion of required SREs following inmates' discharge from either an MHCB or alternative housing; inconsistent completion of five-day follow-ups by clinical staff; low compliance rates of 30-minute observation checks for inmates discharged from a MHCB/alternative housing by custody staff; poor safety planning for suicidal patients; and low completion rates for annual suicide prevention training of medical and mental health staff.*

### 13)    California State Prison - Corcoran (CSP/Corcoran)

**Inspection**:  June 21-22, 2016 (previous suicide prevention audit was June 9-10, 2015). CSP/Corcoran housed approximately 3,658 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on June 21, 2016.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and observed to be asking all of the required questions.  Privacy and confidentiality, however, were compromised because the process was completed in the open doorway of the nurse's office, with the nurse sitting in a chair in the doorway while the inmate straddled a chair in the hallway.  An officer was standing on the back shoulder of each inmate being screened.  Although the door that separated the hallway from the holding cells in the unit was closed, with a sign reading "Screening in Progress - Please Do Not Enter" on the window, CSP/Corcoran staff were apparently unaware that reasonable privacy and confidentiality extended to non-health care staff, including custody officers.  Of note, a CAP was updated by CSP/Corcoran officials in March 2016 regarding deficiencies cited by this reviewer during the 2015 suicide prevention assessment.  The CAP inaccurately noted that the issue of privacy and confidentiality during the intake screening process had been "completed" because the process "cannot be overheard by other inmates."  The CAP needed to be expanded to include privacy and confidentiality from non-health care staff.

Daily PT rounds in two administrative segregation units were observed on June 22.  On one unit (ASU-EOP, 3A04), the rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front as required.  In addition, there were multiple complaints from STRH new intake inmates regarding the unavailability of loaner radios.

**Housing**:  CSP/Corcoran had 24 MHCBs.  A previously identified deficiency of one room not having a suicide-resistant bed had been corrected.  In addition, a previous concern of sink faucets having horizontal slits (known as "anti-squirt slits") was in the process of being completed.  The new equipment was delivered to CSP/Corcoran on June 16 and was in the process of being

installed during this reviewer's assessment. However, an additional deficiency in the MHCB unit was identified. An inspection of the MHCB unit, which was temporarily closed due to a problem with air-conditioning, found that some rooms had wall ventilation grates containing holes that were in excess of 3/16 inch diameter. A subsequent discussion with CSP/Corcoran officials revealed that there was *not* a pending work order to correct this hazard.

Further, during the 2015 assessment, this reviewer found that the STRH unit had six retrofitted suicide-resistant cells designated for new intake inmates. However, during the current assessment, designation of new intake cells had been relocated to another housing pod (cells 190-199) and inspection of these ten cells found that, although desks and shelves had been removed, they were not completely suicide-resistant because they had wall ventilation grates containing holes that were in excess of 3/16 inch diameter. A subsequent discussion with CSP/Corcoran officials revealed that, although a work order had been submitted to correct these hazards, approval of the work order was still pending. In addition, administrative segregation EOP (3A04) contained ten new intake cells, but two of the cells (126 and 128) had dangerous metal grates on the inside of each cell door. This reviewer had identified this deficiency in prior assessments. There were *no* pending work orders to correct this deficiency. As noted above, a CAP was updated by CSP/Corcoran officials in March 2016 regarding deficiencies cited by this reviewer during the 2015 suicide prevention assessment. The CAP inaccurately noted that the ten new intake cells in the administrative segregation EOP (3A04) had been retrofitted to be suicide-resistant.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement had been relocated to a housing unit previously used as administrative segregation EOP (3A03). In addition, four OHU cells in the CTC were used for alternative housing, but were temporarily offline during the site visit due to the previously referenced air-conditioning problem. All cells used for alternative housing had beds, with inmates required to be observed on a continuous 1:1 basis. This reviewer was informed by CSP/Corcoran officials that stack-a-bunks were utilized in the OHU cells, and that dry cells in both the TTA and SHU visiting area, previously identified for alternative housing during the 2015 assessment, were *no* longer used.

It should be noted that alternative housing was used extensively at CSP/Corcoran. In fact, there were nine inmates on alternative housing status in the 3A03 unit on June 21. At least three of these inmates had been on this status for more than 72 hours and *none* had received showers. A review of alternative housing data from April 1 through June 20, 2016 indicated that 314 inmates had been placed in alternative housing, with almost half (49 percent) confined beyond 24 hours. In fact, most inmates confined in alternative housing beyond 24 hours had lengths of stay between 48 and 72 hours.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB unit. In addition, inmates not on suicide observation status were observed at 30-minute intervals by nursing staff. Although nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door, this reviewer observed falsification of the forms. For example, this reviewer inspected the forms of five inmates on Suicide Precaution status at 1:28 p.m. on June 22

and found that observation checks had *not* been performed since 1:00 p.m.  When this reviewer subsequently returned a short time later and re-inspected each form, the following notations were found: "1:01pm, 1:13pm, and 1:25pm."

This reviewer observed several IDTT meetings in the MHCB unit on June 22.  With one exception, the treatment team was well represented by mental health, medical, and custody staff.  The exception was the recreation therapist who, although available full-time at the CTC, was not a consistent participant in the IDTT process.  There were generally good discussions during the IDTT meetings of safety planning to reduce SI, as well as possessions and privileges afforded to inmates.  However, as found in previous assessments in both 2014 and 2015, such discussions about possessions and privileges did *not* translate into practice.  For example, this reviewer again observed an inmate who was clothed in both a safety smock and t-shirt.  Such clothing orders were contradictory.  If clinical staff determined that the inmate was at a risk for suicide that required a safety smock, then a t-shirt should not have been issued.  If clinical staff determined that the inmate could have a t-shirt, then a safety smock should not have been issued.

In addition, although the treatment team discussed yard privileges for inmates, in practice, yard was *not* given to MHCB patients because of custody concerns that the designated yard for MHCB patients had a low roof line and there were concerns of allowing inmates on the yard without proper supervision.  As discussed in both this reviewer's 2014 and 2015 assessments, the CMH had previously requested that large therapeutic modules be installed in the yard as an alternative to major renovation of the area by raising the roof line.  To date, the issue had *not* been resolved.

A review of Guard One data for a recent 24-hour period (June 19) in seven administrative segregation units and SHUs found the following compliance rates:

| | |
|---|---|
| STRH Unit: | 97 percent |
| ASU-EOP (3A04): | 93 percent |
| SHU (4B3L): | 93 percent |
| SHU (4A2L): | 96 percent |
| SHU/ASU/GP (4B4R): | 82 percent |
| LTRH[10] (4B2L): | 93 percent |
| LTRH (4A1L): | 96 percent |

The overall compliance rate for these seven housing units was 93 percent, a significant improvement from the 2015 assessment which found an overall compliance rate of only 79 percent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period December 1, 2015 through May 31, 2016.  A review of a sample of 28 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in all (100 percent) of the cases.

---

[10] Long-Term Restricted Housing

Further, a review of eight charts of inmates admitted to and discharged from the MHCB unit found that only six (75 percent) cases contained the required discharging SRE. Of those six cases, there was problematic safety planning found in all of them. In two cases (COR 1 and COR 2), a clinician duplicated the exact safety plan for both inmates, and in the other four cases, safety plans were not transferred from the discharging SRE on to the first page of the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form. In fact, it appeared clear that the clinicians completing the first page of the MH-7230-B forms had not reviewed the respective safety plans contained in the discharging SREs.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff. This reviewer was presented with documentation of 15 cases of inmates discharged from either the MHCB unit or alternative housing that remained at CSP/Corcoran and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from April through June 2016. Of those 15 cases, the first page of MHCB Discharge Custody Check Sheet (MH-7497) forms were completed in only 79 percent of the cases by a mental health clinician, and the second page of MH-7497 forms that documented required observation at 30-minute intervals were completed in only 53 percent of the cases by custody staff. It was noteworthy that mental health clinicians ordered 30-minute checks for 72 hours in approximately 42 percent of the cases.

**Intervention**: All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: With one exception, a review of three months of SPRFIT meeting minutes (from March through May 2016) reflected good attendance from required members. The exception was the absence of representation from custody leadership at two of the monthly meetings. Meeting minutes included robust presentation of case studies, and were otherwise unremarkable.

**Training**: According to training records, 74 percent of custody and 100 percent of nursing staff were currently certified in CPR. In addition, 83 percent of custody staff, 45 percent of medical staff, and 37 percent of mental health staff completed annual suicide prevention block training during 2015. Low compliance rates with suicide prevention training were also found during the 2015 assessment. Finally, as of June 2016, 80 percent of mental health clinicians had completed both the SRE mentoring program and received the seven-hour SRE training.

**Recent Suicides**: CSP/Corcoran experienced one inmate suicide during the review period (occurring in 2015). In that case (COR 3), the inmate asphyxiated himself with a plastic bag and sheet in his CTC cell during the early morning of October 25, 2015. The inmate, found in rigor mortis, had been housed in the CTC due to numerous medical issues. He had entered CDCR in February 2004 to serve consecutive 12-year and 15-year-to-life sentences for multiple charges,

including second-degree murder. The inmate was transferred to CSP/Corcoran on August 12, 2015. He had three RVRs during his more than 11-year confinement, the last of which occurred in November 2009. The inmate was not gang-affiliated and had regular support from family (a sister) and friends.

The inmate did not report a history of mental illness or suicide, although he had a significant history of alcohol abuse which resulted in multiple arrests and the dissolution of two marriages. The inmate, 70-years-old at the time of his death, had significant medical problems including multiple cerebral vascular accidents, seizures, left hemiparesis, traumatic brain injury, syncope, episodic blindness, urinary incontinence, coronary artery disease (with two myocardial infarctions), and lower back pain. His medical problems required accommodations of a lower bunk, cane, wheelchair, first tier housing, and elevator access. As a result, the inmate was housed in the CTC at CSP/Corcoran at the time of his death. Although placed in a non-wheelchair accessible cell at the CTC, he appeared content with his housing placement.

Although the inmate was not a participant in the MHSDS, he was seen periodically by mental health clinicians during his CDCR confinement, normally as the result of required screening for facility transfers and/or administrative segregation placements. On April 17, 2015, the inmate was diagnosed with "Senility without Psychosis" by a nurse practitioner who did not document contact with the inmate or a rationale for the diagnosis. The diagnosis then triggered a referral to the Developmental Disability Program (DDP) and the inmate was subsequently assessed by a DDP psychologist on May 21, 2015. Although a formal mental status examination was not conducted, the clinician found that the inmate's cognitive functioning was "grossly intact…with no apparent global cognitive deficits," and a decision was made not to enroll him in the DDP. Perhaps coincidentally, the inmate began to miss multiple medication "pill lines" during the next month (June) resulting in several medication management referral chronos.

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, although there was some speculation from CSP/Corcoran staff interviewed after the death that the inmate was unhappy about the possibility of being transferred to CHCF.

The Suicide Report documented numerous deficiencies in this case, many of which related to the emergency medical response, and nine recommendations for corrective action through a QIP:

> 1) When discovered, the primary responder from custody did not sound an alarm or alert staff via institutional radio. The custody responder reported the incident to another officer, who in turn notified the custody supervisor of the unit. An alarm was never announced throughout this emergency;

> 2) A delay occurred from the time of discovery and removal of the ligatures and bag secured around the inmate's head and neck;

> 3) The CDCR 837 reports that the entire cut-down tool was not retrieved by staff;

> 4) The inmate had an item in his possession that is not on the CTC allowable list; namely, a large plastic bag he used to asphyxiate;

5) The inmate was discovered by staff at 0650 hours in a state of rigor mortis. The most recent inmate count prior to discovery was the 0430-0500 Positive Count. DOM 52020.5 states "A positive count is the actual number of inmates that each respective staff member has counted and reported to Central Control. (Note: A positive/physical means to count a living, breathing person and physically see that person);"

6) In and around February 2012, a PCP and psychologist at CMF missed an opportunity to identify, evaluate, and coordinate interventions related to the inmate's advancing neuro-cognitive decline and related mental health needs;

7) In July 2014, a primary care physician and psychologist at RJD missed an opportunity to identify, evaluate, and if necessary, coordinate interventions related to suspicions about the inmate's advancing neuro-cognitive decline and related mental health needs;

8) As noted in the mental health concerns at CMF and RJD, communication of consultation information between mental health clinicians and medical personnel was problematic in this case. Expectations for communicating between disciplines and documentation of these consults should be established; and

9) Per the Nursing Death Review Summary, one nursing concern was identified requiring follow-up [i.e., an error in documentation dated October 25, 2015 concerning whether the inmate was awake versus sleeping].

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

**14)    California Substance Abuse Treatment Facility (CSATF)**

**Inspection**: June 23-24, 2016 (previous suicide prevention audit on February 20-21, 2014). CSATF housed approximately 5,336 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer did not have an opportunity to observe the intake screening process in the R&R unit because there were not any new intake inmates processed during the two-day on-site assessment. This reviewer, however, interviewed a nurse assigned to the unit and determined that the most recent version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015) was being used. Although the nurse stated that the door to the nurse's office was normally closed, with an officer stationed outside in the hallway, if an inmate was assigned to administrative segregation or was otherwise displaying aggressive behavior, the door would remain open and the officer would be stationed inside the nurse's office. Of course, such a scenario would then compromise privacy and confidentiality. While inspecting the R&R unit, this reviewer noticed that a former examination room (Room 103) was designated for storage (and contained numerous boxes), yet contained a large holding cage. Due to the presence of the holding cage, this reviewer suggested that the room could be used for intake

screening on those inmates that nursing staff felt uncomfortable with sitting unsecured in the nurse's office. This reviewer was subsequently informed that a CAP would be initiated to renovate the room for use as a supplemental nurse's station.

Daily PT rounds in both of the administrative segregation units (E-1 and STRH) were observed. The rounds were unremarkable and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front for all caseload inmates.

**Housing**: CSATF had 20 MHCBs. All the rooms were clean, but not entirely suicide-resistant. Each room contained square-shaped stainless steel sinks protruding from the wall that could be conducive to suicide attempts by hanging. A work order to install stainless steel triangles for each side of the sink in each room was pending, with work scheduled to be completed in September 2016. In addition, one MHCB was temporarily offline due to loose floor tiles.

In addition, both the STRH and E-1 administrative segregation units each had nine new intake cells that had been retrofitted to be suicide-resistant. An inspection of both units found that there were not any new intake inmates housed in non-new intake cells, a significant improvement from the 2014 assessment.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was used on a daily basis. From May 1 through June 19, 2016, approximately 127 inmates were housed in alternative housing, with an average length of stay of more than 48 hours. Inmates were housed in a variety of locations, including four CTC holding cells (114-117), two TTA examination rooms (166-167), various cells in the STRH and E-1 administrative segregation units, and designated cells in housing units on Facilities C and D.

The use of TTA examination rooms 166 and 167 was particularly alarming. On both days of the on-site assessment, this reviewer observed three inmates *handcuffed* to gurneys in Room 167. A subsequent review of documentation indicated that the three inmates had been handcuffed to the gurneys for at least two days. According to custody officers, the inmates were permitted to use the bathroom only upon request, and offered showers after 72 hours. A review of another inmate's (CSATF 1) eUHR chart found additional disturbing practices in the use of room 167 for alternative housing. The inmate had been placed in room 167 on May 19, 2016 and handcuffed to a gurney. He remained confined under these conditions for four days. During the morning of May 22, the Suicide Watch/Suicide Precaution Record (Form CDCR 7365) indicated that the inmate "urinated on self, cleaned up." The inmate was subsequently discharged from suicide observation status later that morning, with the safety plan section of the discharging SRE simply stating: "IP to be discharged with 5-day follow-up."

*This reviewer was informed by CSATF custody and mental health officials that the practice of handcuffing inmates to gurneys in alternative housing had been occurring for almost a year.* This reviewer was subsequently informed prior to the exit meeting on June 24 that the practice of utilizing gurneys for alternative housing would be immediately discontinued.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, inmates not on suicide observation status were observed at 60-minute

intervals by nursing staff.  In fact, a review of Suicide Watch/Suicide Precaution Record observation forms from April 2 through June 23, 2016 found that 80 percent of inmates were observed at 60-minute intervals on any given day in the MHCB unit.  Such a practice is contrary to the CCHCS Memorandum entitled "Level of Observation and Property for Patients in Mental Health Crisis Beds" (dated March 15, 2016) which required that inmates not on suicide observation status be observed at a minimum of 30-minute intervals.  (The issue of inadequate levels of supervision for inmates on suicide observation status and other levels of observation was previously raised by this reviewer during the 2014 assessment.)  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, and forms were located on the outside of each inmate's room door.  The reviewed forms appeared accurate and up-to-date.

This reviewer observed six IDTT meetings in the MHCB unit on June 23.  Although the treatment team was well represented by mental health, medical, and custody staff, other than the PCs' presentation of each case, most team members were non-vocal.  In addition, with one exception involving a robust discussion of an inmate with a significant history of self-injurious behavior that required an immediate acute care referral, the remaining cases lacked discussions of current mental health status, including SI, as well as safety planning.  In fact, a PC in several cases simply stated that the safety "plan is to stop the suicidal ideation."  Of note, the IDTT meetings would have been even more problematic had it not been for the redirection provided by the attending senior psychologist supervisor.

This reviewer also observed several inmates attended their IDTT meetings with only "partial issue" clothing (i.e., t-shirts and boxers) despite the fact that they were being observed at 60-minute intervals.  When this reviewer asked why one such inmate was clothed in both a t-shirt and safety smock while required to be observed at 60-minute intervals, the IDTT could not offer an explanation, with one team member surmising that the inmate was "probably cold."  Of note, despite a Physician's Order for another inmate (CSATF 2) that documented the discontinuation of his safety smock on June 16, the inmate was still clothed in the smock during his June 23 IDTT meeting.  With regard to other privileges afforded inmates in the MHCB unit, this reviewer was informed that telephone calls were rarely given unless the inmate requested it, with a team member estimating that approximately three telephone calls were authorized during the previous nine months.  Although a recreation therapist was not assigned to the CTC, custody officers were said to be available to escort inmates to the yard.

A review of Guard One data for a recent 24-hour period in both the STRH and E-1 administrative segregation units found 100-percent compliance with required checks that did not exceed 35-minute intervals.  A similar high rate of compliance was found during the 2014 assessment.

**Management/Treatment Planning**:  This reviewer requested then subsequently reviewed a listing of emergency mental health referrals from the MHTS for the period of December 1, 2015 through May 31, 2016.  The TTA log for the same time period was also reviewed.  A review of a sample of 57 emergency mental health referrals for SI found that mental health clinicians subsequently completed the required SREs in 89 percent (51 of 57) of the cases.

124

Further, this reviewer conducted a sample review of seven charts of inmates admitted and discharged from the MHCB unit during May and June 2016. With two exceptions, safety plans to reduce SI included on discharging SREs were quite poor. The two exceptions were safety plans written by a clinician that adequately addressed strategies to reduce SI. One (CSATF 3) of those safety plans read as follows:

> Pt. will encourage cooperation and contact with MH staff, medication compliance x 100% per MAR, PC provide grief and loss education regarding different stages of grief regarding illness and impending death of father. CBT counseling to identify thoughts, feelings and behaviors that contribute to negative thoughts and acts of self-harm. Identify 3 coping skills IP can utilize pending death of father and upcoming parole. Replace negative self-talk with positive self-talk x 1 daily when feeling suicidal as evidenced by 0 self-harm and no MHCB admits until 2/2017. Pt to be engaged in parole planning.

The above safety plan was dramatically contrasted by the lack of adequate safety planning in the remaining five cases, reprinted below in their entirety:

> CSATF 4: "Discharge to EOP LOC, 5-day follow-up, C & PR notified."

> CSATF 5: "Discharge to EOP on 5-day follow-up recommending that Pt be considered for ICF referral at initial EOP IDTT. Pt has social anxiety paranoia and struggles with large groups, recommending that groups and treatment focus on decreasing those symptoms."

> CSATF 6: "Discharge to EOP on 5-day follow-up. Pt to have groups and tx. focused on processing the bad news regarding his stepmother and improving overall coping and distress tolerance skills."

> CSATF 7: "Discharge to CCCMS with 5-day F/U."

> CSATF 8: "Pt discharged to EOP (increase in LOC) for additional support in stabilizing symptoms and increase insight regarding his symptoms. Pt will be on a 5-day follow-up."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff. This reviewer was presented with documentation of 56 cases of inmates discharged from either the MHCB unit or alternative housing that remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during April through June 2016. Of these 56 cases, the first page of MHCB Discharge Custody Check Sheet (MH-7497) forms were completed in 91 percent of the cases by a mental

health clinician, and the second page of MH-7497 forms that documented required observation at 30-minute intervals were completed in 98 percent of the cases by custody staff.  It was noteworthy that mental health clinicians ordered 30-minute checks beyond 24 hours in approximately 55 percent of the cases.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  With one exception, a review of three months of SPRFIT meeting minutes (from March through May 2016) reflected good attendance from required members.  The exception was the absence of psychiatry representation at one meeting.  Meeting minutes were brief and otherwise unremarkable.

**Training**:  According to training records, 98 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 98 percent of custody staff, 77 percent of medical staff, and 84 percent of mental health staff received annual suicide prevention block training during 2015.  Finally, as of June 2016, 90 percent of mental health clinicians had completed the SRE mentoring program and 98 percent had received the seven-hour SRE training.

**Recent Suicides**:  CSATF did not experience any inmate suicides during the review period.

### 15)  <u>Wasco State Prison (WSP)</u>

**Inspection**:  August 16-17, 2016 (previous suicide prevention audit on March 25-26, 2014).  WSP housed approximately 5,069 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during both the medical intake screening process and the mental health diagnostic testing in the RC on August 16.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions.  The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.  The door to the RC psychologist's office was also closed and the clinician was observed to be conducting thorough assessments.  The psychologist was observed to have access to (and used) the Patient Health Information Portal during the process.  Both the medical intake screening and mental health diagnostic processes showed marked improvement from the 2014 assessment.

Daily PT rounds in the administrative segregation unit were observed on August 16.  The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  WSP had an 18-bed CTC, with six rooms designated as MHCBs.  With one exception, all rooms were found to be suicide-resistant.  Several of the rooms had ADA grab bars that were not suicide-resistant (i.e., an opening between the bar and the wall that was conducive to a suicide attempt by hanging).  This reviewer was informed that the grab bars were scheduled to be

replaced in September 2016. A previous concern of sink faucets having horizontal slits (known as "anti-squirt slits") had been corrected.

The administrative segregation unit had 12 retrofitted suicide-resistant cells designated for new intake inmates. During inspection of the unit, this reviewer observed that all new intake inmates were in new intake cells. However, it should be noted that each of the exterior cell windows contained frosted screening that obscured natural light into the cell. CDCR headquarters had previously ordered that such screening be removed in 2015. Many new intake inmates did not have "loaner radios."

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was used regularly on a daily basis. For example, there were 79 inmates placed in alternative housing during July 2016. Approximately 32 percent of these inmates were transferred within 24 hours, with the majority of inmates remaining in alternative housing for 48 to 72 hours. When alternative housing was used, inmates were primarily housed in Facility B (in either the SNY or GP housing units) or administrative segregation. All inmates were provided beds and observed on a continuous 1:1 basis. This reviewer was informed that TTA holding cells were *not* used for alternative housing.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, inmates not on suicide observation status were observed at 15-minute intervals by nursing staff. This reviewer observed that nursing staff were using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door. The reviewed forms appeared to be accurate and up-to-date.

This reviewer observed two IDTT meetings in the MHCB unit on August 17. Although the treatment team was well represented by mental health, medical, and custody staff, both meetings were problematic. In the first case (WSP 1), the inmate had been accepted into the Acute Psychiatric Program (APP) on August 10 and was awaiting transfer. There was limited discussion on treatment planning and coping skills to combat significant self-injurious behavior. In the second case (WSP 2), the inmate had been placed in alternative housing for SI on August 14. He was admitted into the MHCB on August 16. He was on Suicide Watch status and clothed in a smock. The inmate had nine previous MHCB admissions and had recently returned from DSH in early August 2016 following a seven-month stay. The inmate was a poor historian, and told the treatment team that he had last thought about suicide two weeks ago, despite the fact that he had expressed SI only three days ago on August 14 resulting in his alternative housing placement. There was no discussion about safety planning and the PC downgraded the inmate to Suicide Precaution status without any discussion with the treatment team.

This reviewer was informed by the IDTT that telephone calls and visits were currently *not* permitted in the MHCB unit, and that they were awaiting further direction from CDCR headquarters regarding the memorandum on "Mental Health Crisis Bed Privileges," which was issued on June 23, 2016. Yard privileges, however, were permitted and a recreation therapist was assigned to the CTC on a full-time basis.

127

A review of Guard One data for a recent 24-hour period in the administrative segregation unit found 88-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of February 1 through July 31, 2016.  The reviewer also reviewed the TTA log and found that there were *no* emergency mental health referrals for SI during the same time period.  It was subsequently determined that nursing staff stationed in various locations throughout WSP were *not* generating MH-5 documentation to the MHTS, resulting in a significant underreporting of emergency mental health referrals.  (The problem was discovered by WSP mental health staff in preparation for this reviewer's on-site assessment.)  This reviewer's subsequent sample review of 38 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in *all* (100 percent) of the cases.

A review of nine charts of inmates admitted and discharged from the MHCB unit found problematic safety planning in all cases.  Problems included plans limited to reciting *Program Guide* requirements and/or safety plans not transferred from the discharging SRE onto the first page of the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form.  In fact, it appeared obvious that clinicians completing the first page of the MH-7230-B form had not reviewed the respective safety plans contained in the discharging SREs.  One case (WSP 3) was symbolic of the problem.  The inmate was discharged from the MHCB unit on June 2, 2016 and the safety plan in the discharging SRE stated:

> 1) Discharge from MHCB, 2) 5-day follow-up, 30-minute custody checks, 10-day psychiatry follow-up, 3) Encourage IP to engage in EOP programming, 4) Be seen 2x/week by PC, 5) Identify positive coping skills for dealing with suicidal ideation, 6) Encourage IP to advocate for medication changes as needed.

The following day (June 3), the inmate was seen by another clinician pursuant to the required first day of the five-day clinical follow-up.  The safety plan on the second page of the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form, which should have contained the safety plan from the discharging SRE, simply stated: "Use CBT as a way to teach him positive ways to cope and distress tolerance."  Three days later on June 6 (the fourth day of the required five-day clinical follow-up), the second page of the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form stated:  "IP will try to engage in more EOP activities, take medications as prescribed and work w/PC on coping skills when sxs. become overwhelming."  The following day (June 7), the same clinician that saw the inmate a day earlier completed an SRE with the following safety plan:

> 1) IP will restart with EOP LOC and be seen 2x a week for the next month to ensure stability, 2) Implement crisis plan (when/if needed - the inmate/patient reports he will notify staff if his stressors increase to an unmanageable level and if he experiences any SI or feelings to harm himself, 3) provide ongoing CBT for depression, 4) educate, develop, and explore effective coping tools to manage mood disturbance and contain agitation to maintain stability, 5) provide EOP group for stress management, anger management, coping skills, and recreation

therapy, 6) encourage IP to maintain relationships outside of prison 7) IP will work with psychiatrist to be prescribed medications that will help with AH and depression.

Although the above narrative was a more robust attempt to create an adequate safety plan, three different clinicians interacted with this inmate in the span of five days and there was little concordance in the documentation.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was not reviewed due to time constraints.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (May through July 2016) of SPRFIT meeting minutes reflected adequate attendance from most, but not all, required members, with no attendance by psychiatry staff at any of the meetings.  Meeting minutes were very brief and unremarkable.  This reviewer observed the SPRFIT meeting on August 16, 2016.  Although well attended (with over 15 participants), the meeting was uneventful and lasted only 33 minutes.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 99 percent of custody staff, 83 percent of medical staff, and 93 percent of mental health staff received annual suicide prevention block training during 2015.  Finally, as of August 2016, only 69 percent of mental health clinicians had completed the SRE mentoring program, and 90 percent had received the seven-hour SRE training.  (Records reflected that three clinicians had begun working at WSP within the past 90 days and had not yet completed the required SRE mentoring and training programs.)

**Recent Suicides**:  WSP did not experience any inmate suicides during the review period.

**16)    California Men's Colony (CMC)**

**Inspection**:  August 18-19, 2016 (previous suicide prevention audit on February 4-5, 2014).  CMC housed approximately 4,133 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on August 18, 2016.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015) and was observed to be asking all of the required questions.  Privacy and confidentiality were provided, with the door to the nurse's office closed and an officer stationed in the hallway for security.  Of note, a new nurse's office was in the process of being constructed and scheduled to be completed in September 2016.  The observed process was an improvement from the 2014 assessment.

Daily PT rounds in the administrative segregation unit were observed on August 18. The rounds were unremarkable and the two PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front for all caseload inmates.

**Housing**: CMC had a 50-bed MHCB unit. All the rooms were suicide-resistant. The administrative segregation unit contained 16 new intake cells that had been retrofitted to be suicide-resistant. During inspection of this unit, this reviewer observed that there were no new intake inmates housed in unsafe, non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were used on a regular basis at CMC. During the two-month period of June 15 through August 15, 2016, there were 166 inmates placed in alternative housing, with an average length of stay of 48 hours. Alternative housing was located in the building which formally housed the interim MHCB unit. Because all of the cells in the unit were said to be suicide-resistant (and contained bunks), inmates on alternative housing status were observed at either staggered intervals not to exceed every 15-minutes or on a continuous 1:1 basis. This reviewer, however, inspected the alternative housing cells and found that the sink faucets contained horizontal slits (known as "anti-squirt slits") that were previously used in another CDCR facility as anchors in suicide attempts by hanging. The sink faucets in the unit should be replaced.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, inmates not on suicide observation status were observed at 15-minute intervals by nursing staff. Although nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door, nursing staff were observed by this reviewer to *not* be completing observation at the required 15-minute intervals. For example, this reviewer arrived at the MHCB unit on August 19, 2016 at approximately 10:42 a.m. An examination of the observation forms attached to room doors in the B1 through B12 corridor showed "10:12 a.m." as the most recent documentation of an observation. Several minutes later at approximately 10:46 a.m., this reviewer observed a nurse updating each observation form with the following times: "10:24am" and "10:36am." This reviewer then proceeded to the B13 through B25 corridor and examined the observation forms on each room door. The forms indicated that "10:17am" was the most recent documentation of an observation. At approximately 10:50 a.m., this reviewer observed a nurse updating each observation form with the following times: "10:29am," 10:41am," and 10:53am." This reviewer subsequently notified CMC's director of nursing of these problematic falsification practices.

This reviewer observed 13 IDTT meetings in both the A and B units of the MHCB unit on August 18 and 19. Although the treatment teams were well represented by mental health, medical, and custody staff, most were uneven and problematic in their discussions of adequate safety planning for inmates transferred to the MHCB for SI. For example, the psychiatrist in one case (CMC 1) appropriately inquired as to the inmate's current SI, as well as steps toward developing a safety plan by asking the inmate, "what strategies from the past have helped you that we can use here in your treatment plan." In another case (CMC 2), however, the PC informed the inmate that this was his initial IDTT and the "goal was to reduce his suicidal

ideation within three days," without any discussion on strategies that might lead to accomplishing that goal. In a third case (CMC 3), the inmate had been released from DSH on August 10 and admitted into the MHCB four days later on August 14 after expressing SI in the RC at WSP. The inmate denied any SI during the meeting (on Thursday, August 19), was given his "full issue" of clothing, and told that he would be discharged on Monday (August 22). There was *no* discussion regarding any safety planning. The subsequent safety plan section of the discharging SRE completed on August 19 stated the following:

> I/P to be discharged, EOP LOC, with 5-day f/u. Primary protective factors pertain to family and religious beliefs; these factors to be incorporated within possible interventions in future treatment planning. Medications per psychiatry. Individual/group treatment utilizing CBT to further develop symptom management skills as evidenced by I/P learning to identify his triggers, symptoms, and appropriate coping skills. Yard in group activities with RT in order for I/P to further develop stress management skills.

As indicated above, this safety plan contained narrative that was written upon the inmate's initial placement in the MHCB, and was *not* a discharge safety plan containing a strategy to reduce future SI. Not surprisingly, the inmate was returned to the MHCB a few days later when he again expressed SI and was subsequently referred to DSH intermediate care.

Of note, however, the IDTTs displayed a good working knowledge of the privileges afforded inmates in the MHCB unit. There were five full-time recreation therapists assigned to the MHCB unit, and all inmates were eligible for yard privileges, including those clothed in safety smocks. Yard was used seven days a week. Visiting privileges were said to be already available to inmates, and a telephone needed to be installed in one of the IDTT rooms to allow for telephone privileges. The appropriate use of clothing for inmates on suicide observation status was also observed.

A review of Guard One data for a recent 24-hour period in the administrative segregation unit found 95-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of February 1 through July 31, 2016. The TTA log for July 2016 was also reviewed. This reviewer's subsequent sample review of 27 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in 89 percent (24 of 27) of the cases.

A sample review of 14 cases of inmates admitted and discharged from the MHCB unit during June and July 2016 found that 93 percent (13 of 14) contained the required discharge SREs. However, development of safety plans for inmates discharged from a MHCB was problematic. Safety planning was limited to reciting *Program Guide* requirements and/or safety plans not transferred from the discharging SRE onto the first page of the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form. For example, one case (CMC 4) contained the following safety plan in the discharging SRE: "Discharge MHCB LOC with a 5-Day Follow-Up. IP would benefit from group and individual therapy focusing on impulse control, conflict

131

resolution skills, and coping skill development." The first day of the inmate's five-day follow-up contained the following safety plan: "1) Read handouts, 2) Contact staff." Further, one particular clinician simply duplicated the exact same safety plan for multiple inmates' (CMC 5 and CMC 6) discharged from the MHCB unit on June 13, 2016.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff. This reviewer sampled ten cases of inmates discharged from either the MHCB unit or alternative housing that remained at CMC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during June and July 2016. In these ten cases, both the first and second pages of MHCB Discharge Custody Check Sheet (MH-7497) forms were completed by mental health clinicians and custody staff, respectively, in *all* cases. All inmates were discharged from 30-minute custody checks after 24 hours.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: With one exception, a review of three months (April through June 2016) of SPRFIT meeting minutes reflected good attendance from required members. The exception was the absence of representation from custody leadership for the May 2016 meeting. Meeting minutes included robust presentation of case studies, and were otherwise unremarkable.

**Training**: According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 98 percent of custody staff, 78 percent of medical staff, and 73 percent of mental health staff received annual suicide prevention block training during 2015. (No explanation was provided regarding low compliance rates of both medical and mental health staff.) Finally, as of August 2016, 100 percent of mental health clinicians had completed the SRE mentoring program, and 98 percent had received the seven-hour SRE training.

**Recent Suicides**: CMC experienced five inmate suicides during the review period (three of which occurred during 2016). In the _**first**_ case (CMC 7), the inmate was found hanging from a shelf by a sheet in his GP cell during the afternoon of October 4, 2015. He had also severely cut his throat. The inmate entered the CDCR system in January 2002 to serve a life sentence without parole consideration for the second-degree murder of his girlfriend. He was transferred to CMC on May 16, 2013. The inmate incurred four RVRs during his 13-year confinement, the last of which occurred in January 2012 (for refusal to perform work as ordered). However, one of the other RVRs was for the murder of his cellmate on July 3, 2007. Although subsequently convicted of the murder in November 2010, due to an error in the adjudication process, the scheduling of his sentencing hearing was delayed until October 8, 2015, several days after his death. The inmate was not considered to be gang-affiliated. The inmate had good family

support of a brother and sister and, in fact, had a visit scheduled with them on the day of his suicide.

According to available records, the inmate had an extensive juvenile and adult criminal record, and spent considerable time incarcerated during his life. He reportedly had a dysfunctional upbringing which included both physical and sexual abuse by his father. The inmate also had a history of mental health treatment in the community that began when he was approximately 13 years old, and included treatment for depression, PTSD, Bi-Polar Disorder, and substance abuse. His most recent diagnosis was Schizophrenia, Paranoid type (by history). The inmate also had a history of suicidal behavior, including cutting both of his wrists immediately following the murder of his girlfriend in 1997. A second suicide attempt occurred in 1999 in the county jail following his release from PSH where he had been sent for a competency to stand trial evaluation. Upon entry into CDCR, the inmate was placed in a MHCB on three separate occasions for SI during his first month of confinement. He was placed at the 3CMS level of care and remained at that level within the MHSDS during his entire confinement. Thereafter, he consistently denied SI and did not have any other MHCB placements. The inmate was consistently assessed as a "moderate" chronic risk and "low" acute risk for suicide on periodic SREs, the last of which was completed in October 2014. He was viewed as cooperative and compliant with his overall mental health treatment, including psychotropic medication (until the last month of his life).

The inmate had an extensive medical history that included, but was not limited to, end-stage liver disease, Hepatitis C, chronic lower back pain, and heart problems. In mid-August 2015, the inmate was informed that he was not a candidate for surgery due to the collateral problem of cirrhosis of the liver. In late September 2015, his medical condition worsened and he began experiencing abdominal pain, nausea, and vomiting as a result of his end-stage liver disease. He was briefly hospitalized from September 25-30. Due to the inmate's nausea and vomiting, he began refusing his psychotropic medication. As his medical condition worsened, the inmate grew more isolative and spent most of the time in his cell either reading or sleeping. He was last seen by his psychiatrist on September 30, and by his PC on July 23. Despite his worsening condition and poor prognosis, both clinicians believed the inmate to be stable, handling the prognosis well, and not at any increased risk for suicide.

The CDCR reviewer in this case stated that "The main triggers for taking his own life appeared to be found in his reaction to the following issues: 1) the acute pain and its implication for future pain experiences, 2) the possible consequences for not being able to take or hold down the medications, which had supported a type of stability, 3) final decision from the surgeon that he was not a candidate for surgery." According to the reviewer, "Up until his death, the inmate exhibited forward-thinking, goal-oriented behaviors both to staff, other inmates, and to family as evidenced by all of the documentation reviewed, and the contents of interviews performed" at the facility following his death. In contrast, however, examination of the inmate's property after his suicide revealed that he had been planning his suicide for several weeks, with biblical passages about death and handwritten notes describing instructions for the distribution of his property found throughout the cell.

The Suicide Report contained one recommendation for corrective action through a QIP: "Per the Nursing Death Review Summary, there were two nursing concerns identified requiring follow-up ['Delay in EMS Activation' and 'Transportation to the TTA']."

Based upon findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

In the _**second**_ case (CMC 8), the inmate was found hanging from a shelf by a sheet in his GP cell during the afternoon of December 24, 2015. The inmate entered the CDCR system on October 11, 2013 to serve a four-year sentence for second-degree armed robbery. He was transferred to CMC on November 4, 2014. The inmate incurred two RVRs during his confinement, the most recent of which occurred on November 11, 2014 ("involving indecent exposure with masturbation"). He was not known to be gang-affiliated, and did not have any known family support.

According to available records, the inmate had a dysfunctional childhood. He was raised by his adoptive father until age 11 when he was removed from the home due to his father's arrest and placed in foster care and several group homes. He was never married and had no children. The inmate's history of mental health treatment in the community was largely unknown, but reportedly included treatment on psychotropic medication during group home placements. He was initially deemed incompetent to stand trial in the instant offense and spent several months at Metropolitan State Hospital. During his confinement in the county jail, he was treated for psychosis, substance abuse and SI.

Upon entry into CDCR, the inmate screened positive for mental health issues and was placed at the 3CMS level of care on October 28, 2013. His initial diagnosis was Psychotic Disorder. The inmate was deemed "a poor historian with a somewhat disorganized thought process....highly likely he is minimizing symptom severity." From January through September 2014, the inmate was housed at Folsom State Prison (FSP). Although periodically complaining of depression and displaying poor hygiene and a blunted affect, the inmate was an infrequent participant in treatment and asked to be removed from the MHSDS on several occasions. He continued to be monitored at reduced levels, but did not display any overt signs of psychosis. There were, however, periodic referrals to mental health clinicians from custody staff regarding his "bizarre behavior, bothering others, and appeared confused with no sense of time of day." Some FSP clinicians mistakenly believed that the inmate was _not_ in the MHSDS, with one clinician noting in a progress note that the inmate showed "no evidence of acute distress" and would be retained at "GP LOC."

On September 13, 2014, the inmate was referred to mental health by custody staff "due to aggressive and hostile verbalizations, disorganized thinking, and threatening and bizarre statements." He was placed in alternative housing and then transferred to a MHCB at CHCF on September 15. His diagnosis was changed to Schizophrenia, Paranoid Type. On September 26, the inmate was discharged at the EOP level of care and subsequently transferred to FSP and MCSP, before arriving at CMC on November 4, 2014. The following day (November 5), he was admitted into the MHCB unit for "persecutory delusions, disorganized thoughts, and odd behavior." He was involuntarily medicated and referred to the intermediate care program at

134

CHCF on December 9, 2014, and subsequently transferred to that program on January 30, 2015. During his intermediate care placement, the inmate continued to have a mental illness, yet presented as "mildly distractible and conceptually disorganized….with blunt affect and he appears mildly emotionally withdrawn." He voiced SI regarding both his current circumstances ("If I was dead, I wouldn't have to worry about being in prison") and subsequent parole consideration (including possible mentally disordered offender (MDO) designation). The inmate also frequently misused and hoarded his medication. Upon his discharge from the intermediate care program on October 5, 2015, a clinician warned in the discharge summary that "due to the patient's severe chronic mental illness, non-compliance with his medication regime is likely to result in psychotic decompensation, leading to increased danger to self or others."

Upon his return to CMC, the inmate continued to deny his mental illness, but would periodically express mild SI and anxiety regarding the possibility of a MDO designation. On November 9, he was placed in alternative housing for two days based upon incoherent speech; he denied any SI but, given his earliest possible release date of January 10, 2016, he was "stressed out about MDO." An SRE conducted on November 16 found both his chronic and acute risk for suicide to be "low." His PC continued to encourage the inmate to attend groups, take his medication, and participate in the pre-release program. The inmate met with MDO evaluators on both December 10 and December 22, 2015. The evaluations indicated that the inmate was both "minimally cooperative and largely disinterested," as well as "demonstrated poor insight and judgment….was an unreliable historian." One evaluator noted that the "inmate responded with delusional or purposefully evasive responses in an attempt to deny or minimize mental illness and violence." The following day (December 23), the inmate was notified by his IDTT that he was found to have met the MDO criteria. He expressed concern as to whether he would continue to be subjected to involuntary medications, as well as how long he would be confined at ASH. The inmate committed suicide the following day.

The inmate had a few minor medical issues that were not found to be precipitants to his suicide. According to the CDCR reviewer in this case, the inmate was "severely mentally ill and had little insight into his condition….. His overwhelming concern regarding his transfer to ASH and potential for continued involuntary medication could not be adequately resolved…. It is likely that the stress related to his pending transfer was a catalyst for his suicide."

The Suicide Report contained three recommendations for corrective action through a QIP:

> 1) The inmate's concerns regarding his pending MDO status and involuntary medication status were not consistently documented in the treatment plan or subsequent mental health progress notes, although was noted in the DSH discharge summary that the inmate should be monitored for danger to self if "MDO'd." However, the inmate was not evaluated for danger to self upon finding that he was designated as MDO and would be transferred to ASH;

> 2) Staff at several institutions displayed difficulty clarifying the inmate's diagnosis and need for treatment when he feigned being well despite clinical impressions of significant impairment; and

3) Per the Nursing Death Review Summary, two nursing concerns were identified requiring follow-up [regarding the inmate's November 9, 2015 alternative housing placement in which nursing notes were lacking and Suicide Precaution documentation was not staggered].

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

In the ***third*** case (CMC 9), the inmate was found to have asphyxiated himself by wrapping a plastic bag and string around his neck in his GP cell during the morning of July 25, 2016. He was found in rigor mortis. The inmate entered the CDCR on March 27, 1996 to serve a 20-year-to-life sentence for second-degree murder (of his brother). He was transferred to CMC on July 9, 2013. The inmate did not incur any RVRs during his 20-year incarceration. He was not gang-affiliated. The inmate was involved in many institutional group activities, including the Long-Term Offender Pilot Program during the last six months of his life.
According to available records, other than a severe alcohol dependence problem (that was a precipitant in the instant offense), the inmate did not experience any mental health problems in the community. Limited information was available regarding his upbringing, other than he was born and raised in Mexico and illegally entered the United States in 1971. As an adult, he had a minor criminal history. The inmate was married with five children, and had a very supportive family who frequently visited him and exchanged regular telephone and letter correspondence. Although not having any identifiable mental health problems in the community, the inmate was sent to PSH in 1996 for evaluation of his competency to stand trial in the instant offense. PSH evaluators noted depression over the offense, as well as transient psychosis. He was initially diagnosed with Alcohol-Induced Psychotic Behavior, with delusions. The inmate did not have any history of suicidal behavior, neither in the community nor CDCR, until October 2015.

Upon entry into CDCR, the inmate screened positive for mental health issues, with endorsement of depressive symptoms related to continued remorse over the instant offense. He was placed at the 3CMS level of care with initial diagnoses of "Major Depressive Disorder, Dysthymic Disorder, and Alcohol Abuse v. Dependence." The inmate remained in the MHSDS for almost nine years and "spoke often of feelings of guilt, struggling with 'trying to not always feel regret' and with memories about his family that provoked sadness. He appeared to endure severe acute episodes of depression during this period." He remained compliant with his psychotropic medication until December 2004. At that time, the medication was discontinued and the inmate continued to be followed in the program until November 2004, when he consented to leave the program.

The inmate remained outside of the MHSDS for almost ten years. On July 31, 2015, however, he was referred to a mental health clinician following complaints of insomnia and depression. He was evaluated, but reentry into the MHSDS was not deemed necessary. On September 29, 2015, the inmate was again referred to a mental health clinician after a sergeant overheard him express SI following a meeting with his attorney in which a decision was made to waive his parole hearing. A subsequent assessment by a mental health clinician again found that reentry into the MHSDS was not necessary. However, a few weeks later on October 15, 2015, the inmate reported to custody staff that he had cut himself with a razor or plastic knife. When seen

by a mental health clinician, the inmate admitted to "dysphoria, tearfulness, and feelings of guilt and worthlessness." He also acknowledged SI and was placed in alternative housing, followed by admission into a MHCB. He was diagnosed with Major Depressive Disorder and Alcohol Dependence. He remained in the MHCB for ten days and was discharged back into the GP on October 26, 2015 at the EOP level of care without completion of the required SRE. Two days later on October 28, an outpatient clinician wrote an SRE that was only partially completed, and the safety planning section of the form was blank. Several days later on November 4, 2015, the inmate consented to being placed back onto psychotropic medications, but they were discontinued approximately three weeks later following his non-compliance. His diagnosis was changed to Depressive Disorder, NOS, and Polysubstance Disorder.

During the next several months, the inmate continued to struggle with feelings of remorse over the instant offense. In a January 2016 treatment plan, a clinician wrote that "CTC and contacts with MHSDS appear secondary to surges in guilt/remorse for crime and impact upon him/family." In May 2016, the inmate was described as increasingly paranoid and continued to refuse psychotropic medication. On July 7, 2016, the inmate appeared confused, disoriented, and withdrawn. When seen by a psychiatrist, he complained of depression, anxiety, and of feeling overwhelmed in preparing to go before the BPH. He reported "occasional fleeting and vague SI." He again agreed to restart his psychotropic medication. Several days later on July 11, 2016, an emergency mental health referral was received following the inmate's visit with his daughter the day before (July 10). The referral stated: "Daughter reported (on a visit) IP appeared hopeless, giving away things, not himself; screen for SI." An SRE was completed, with the inmate endorsing depression and increased feelings of hopelessness, as well as "some sadness about his parole plans falling through." He denied any current SI. Both his chronic and acute risk for suicide was assessed as "moderate." The inmate was not placed on suicide precautions, but seen again the following day (July 12) by his PC, and then by medical staff following complaints of dizziness and confusion. The inmate was seen by his psychiatrist on July 19, and by his PC on July 20. He was seen by his psychiatrist again on July 22. He died five days later.

The inmate had several medical problems, including diabetes, hypertension, benign prostatic hypertrophy, degenerative joint disease, history of GERD, rotator cuff tears, and hyperlipidemia.

Although the CDCR reviewer in this case stated that "It is unclear why the inmate would not reveal his suicidal intentions to clinicians in the last days of his life…. He also kept his suicidal thinking away from his friends and other inmates," his daughter's July 10 visit prompted an emergency mental health referral because she felt that he appeared hopeless, talking about giving away his possessions, and was possibly suicidal. As a result, the inmate was seen more frequently by mental health staff during the next two weeks, but never placed on suicide precautions. Possible precipitants to the suicide included continuing depression and remorse over the instant offense, as well as anxiety regarding his next parole hearing in September 2016.

The Suicide Report contained three recommendations for corrective action through a QIP:

1) There was no safety plan written in the October 28, 2015 SRE, the first SRE done upon the inmate's discharge from a MHCB and entrance into EOP. The SRE also contains very little information related to justifying the level of risk

assigned. Even though the clinician completing the SRE no longer works at CMC, it is essential that discharge SREs to address the issues that resulted in the MHCB placement and are informative to EOP clinicians;

2) Security checks completed after 0030 hours appeared to have been inadequate to meet the Department Operational Manual (DOM) section 52020.5 definition of a positive, physical count of the inmate, which requires a "count of a living, breathing person." The inmate was described as lying under his bed and therefore could not be adequately seen and could not be confirmed to be a living, breathing person; and

3) EOP single cells, such as the one inhabited by the inmate, offer rather poor visibility for observation. The window on the cell doors is very small and there is a blind spot to each cell. Specifically, observers cannot see either the head or feet of an inmate lying on the cell bunk, depending on which way the inmate is lying. There is additionally a shelf installed over the bunk, further obscuring view.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that the suicide was not foreseeable, but was preventable.

In the _**fourth**_ case (CMC 10), the inmate was found to have sustained a severe laceration to his left arm in his EOP GP cell during the late evening of September 12, 2016 that resulted in death and was determined to be suicide by exsanguination. The inmate entered CDCR (for a fourth term) on February 25, 1998 to serve a 40-year-to-life sentence for a third strike conviction on multiple counts of burglary. The inmate was transferred to CMC on March 10, 2016, but then transferred to both a MHCB and DSH program, returning to CMC on August 22, 2016. He incurred eight RVRs during his 18-year confinement, including four separate SHU terms, but none since a February 13, 2011 incident involving threatening to kill a custody officer. He was not known to be gang-affiliated. The inmate never married and did not have any children. The inmate had regular support from his family, particularly his sister, through telephone calls, visits, and financial support.

According to available records, the inmate had a very traumatic childhood and was raised by his grandmother (with possibly three other siblings) because his mother was frequently hospitalized due to her mental illness (schizophrenia). He never met his father. At age five, the inmate was hit by a car and was comatose for an unknown period of time. Records also revealed a possible history of both physical and sexual abuse as a child. He dropped out of school in the eighth grade, and had a minimal employment history caused by an extensive juvenile history of arrest and convictions, culminating in a CYA term. The first of his four CDCR terms began in 1978 at age 18. In addition to his mother's mental illness, his sister committed suicide by shooting herself in 1997.

The inmate had significant histories of both mental illness and suicidal behavior. Prior clinicians summarized the inmate's "very long and profound mental health history" and an "extensive psychiatric history, dating to age 17." This history included childhood suicide attempts, treatment for ADHD, substance abuse and behavioral problems, and other self-harming

behaviors. During his three prior CDCR terms, the inmate spent considerable time in DSH (then DMH) programs. When the inmate entered CDCR in February 1998, he was placed at the EOP level of care with diagnoses of Bipolar Disorder NOS, and Polysubstance Disorder. From February 1998 through August 2016, he was placed in inpatient programs on approximately 12 occasions as follows: from February 1998 through May 1998 in an unknown inpatient program, from September 2001 through October 2001 in the DMH-APP, from October 2002 through February 2003 in the DMH-APP, in MHCBs during March 2003 and from September 2003 through November 2003, from May 2005 through July 2006 in the DMH-APP, from September 2006 through May 2008 in the DMH-APP, from May 2009 through 2011 in the DMH-VPP and DMH-SVPP[11], in MHCBs and DSH-ICF[12] during 2012 and 2013, in a MHCB during October 2013, from October 2014 through July 2015 in DSH-Stockton, and in a MHCB and DSH-APP from May 2016 through August 22, 2016.

According to the CDCR reviewer in this case, including all four CDCR terms, the inmate "was placed in DMH or DSH facilities on nearly 20 occasions over the length of his incarceration, with the least 20 additional admissions to Mental Health Crisis Bed settings. On the majority of occasions, suicidal ideation or suicide attempts prompted admission, with complaints of agitation from hallucinations, command hallucinations, delusions, and anxiety the most prominent feature. When not in in-patient settings, EOP treatment was necessary." The inmate had a variety of diagnoses during his most recent 18-year CDCR confinement, including Bipolar Disorder, Schizophrenia, Major Depressive Disorder and Schizoaffective Disorder. His most recent diagnoses in August 2016 were Schizoaffective Disorder, Polysubstance Dependence, and Antisocial Personality Disorder. He was prescribed psychotropic medication throughout his confinement and, although generally compliant, had an involuntary medication order for approximately ten years.

The inmate had a long and significant history of suicide attempts and self-injurious behavior throughout his life, beginning at childhood when he drank bleach at age eight. In later years, he overdosed on drugs, and began cutting as both suicidal and self-injurious behaviors. During his current CDCR term, the inmate either attempted suicide or engaged in self-injurious behavior on 15 separate occasions (in 2001, 2002 – twice, 2003, 2004 – twice, 2005 – twice, 2007 – twice, 2009 – twice, 2010, 2012, and May 9, 2016) resulting in either his admission to a MHCB and/or DSH program. Almost all SREs conducted since 2014 correctly identified the inmate's chronic risk for suicide as "high." He last saw his PC on September 6, 2016 and, although reporting being "worried about attending school," denied any current SI and denied "any distress ….from AH."

On September 12, the day of his death, the inmate wrote a sick call request that stated "I need to see my doctor as soon as possible, I'm in pain's (sic)." The request was triaged by a PT that same day and when they saw the inmate several hours later, he was complaining about insomnia and "grinding teeth, anxious, pacing, stomach pain." He committed suicide before being seen by a mental health clinician.

---

[11] Salinas Valley Psychiatric Program

[12] Intermediate Care Facility

Although the inmate had a history of seizures dating back to the head trauma and coma experienced at age five, as well as Hepatitis C and numerous scars from his self-injurious behaviors, these medical issues were not felt to be contributory to his suicide.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating the inmate was contemplating suicide, and the inmate did not leave a suicide note. The reviewer, however, noted that the inmate "was intensively treated within the CDCR and the DMH/DSH for a period of roughly 35 years. The number of prior attempts were prevented or interrupted due to the efforts of custody, nursing, and mental health staff. However, at times, the extent of the inmate's suicide attempt history seemed to become lost, and at times, the severity of psychotic symptoms and agitation from the symptoms became unknown. In hindsight, he was an extremely high risk individual, vulnerable to psychotic experiences, assaultive behavior, and severe suicide attempts for reasons such as 'releasing my sister's soul from hell'."

The Suicide Report contained seven recommendations for corrective action through a QIP:

    1) There were two nursing care concerns [regarding late application of the AED 12 minutes following arrival at the cell, and lack of 911 activation];

    2) Multi-system issue, Activation of EMS (911): At 2220 hrs. custody found the patient non-responsive with a laceration to left AC. Nursing arrived at 2222 hrs. Neither custody nor nursing staff activated 911;

    3) From 2013 to 2015, CDCR mental health clinicians repeated a statement made by the patient that he had only one past suicide attempt (by drug overdose) when documenting suicidal histories in SREs. This represents poor interview technique and/or inadequate record review. Safety planning was thus inadequate for the level of risk present in the case;

    4) In July 2016, DSH psychiatry staff decided to discontinue the inmate's antipsychotic medications, both Zyprexa and Risperdal, after questioning the veracity of the patient's reports of auditory hallucinations. This decision was made despite the patient's lengthy history (e.g., roughly 40 psychiatric in-patient stays) and long-term difficulties with psychotic agitation. In addition, a specific alert should be communicated directly to receiving clinicians regarding discontinuation of a class of psychotropic medication;

    5) The inmate was in possession of razor blades he had purchased at the canteen. Although this is an allowable item, an alert to not allow possession of razor blades was noted at DSH discharge and he was known to have used a razor blade in several prior nearly-lethal suicide attempts (including in May 2016);

    6) Some custody staff responders did not articulate in the reports the use of personal protective equipment (PPE). The Mental Health Services Delivery System *Program Guide*, Section 12-10-22, states the following: "When an inmate

attempts suicide by laceration: Use impervious latex gloves and/or appropriate, personal protective equipment";

7) The inmate resided on a unit that conducts safety checks every 60 minutes per Local Operating Procedure (LOP). His next reported safety check occurred after a period of 80 minutes, later than specified per LOP. He was found in algor mortis (cold then cyanotic) upon nursing arrival and with visible signs of rigor mortis and dependent lividity during a nursing assessment 14 minutes after discovery (at 2234 hours). The symptoms suggest he may have been deceased for a period of time extending earlier than the 2100 hour welfare/security check.

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

In the *fifth* case (CMC 11), the inmate was found hanging from the light fixture by a sheet in his administrative segregation cell during the late afternoon of December 10, 2016. The inmate entered the CDCR system on September 23, 2016 to serve a five-year sentence for assault with a deadly weapon. He was transferred to CMC on November 3, 2016. The inmate did not incur any RVRs during his brief confinement. He was an alleged gang-dropout and held in administrative segregation for the majority of his confinement due to expressed safety concerns. The inmate was not married, did not have any children, and did not have any known family support.

According to available records, the inmate had a dysfunctional childhood. He and seven other siblings were raised alone by his mother. His father's whereabouts were unknown. The inmate had a significant history of substance abuse, primarily methamphetamine, and had been homeless since age 19 (he was 25 at the time of his death), with no family contact. He was expelled from high school due to behavioral problems (but later obtained his GED), and had a minimal employment history.

Upon entry into CDCR, the inmate screened positive for mental health issues, reported safety concerns due to being a gang-dropout, and expressed SI. He was placed in alternative housing at WSP on September 24 and then transferred to a MHCB at CMC on September 27, 2016. The inmate was returned to WSP for further RC processing on October 10, 2016, but continued to express safety concerns and SI. He spent an additional day in alternative housing and then denied SI and was placed back into administrative segregation for safety concerns. During RC processing, the inmate reported a history of depression, anxiety, sleeping issues, AH, and paranoia. His history of mental health treatment in the community was unclear, but he self-reported three suicide attempts during prior county jail confinements from 2012 through 2015, as well as a fourth attempt in approximately March 2016 when he cut his wrist with a razor. The alleged attempt occurred during pre-trial confinement on the instant offense and he subsequently told a RC clinician that "I was depressed because I was locked up and I was hearing voices." During subsequent evaluations, the inmate again presented with "symptoms of depression, racing thoughts, psychomotor retardation, anxiety, paranoia, and feeling plotted against/poisoned, and command AH and visual hallucinations of people." He was placed at the EOP level of care with a diagnosis of Schizophrenia, Paranoid Type. The inmate was started on psychotropic

medication, although he began to refuse medication in October 2016. According to the CDCR reviewer in this case, the inmate had five SREs completed in just over 30 days of confinement. Of those assessments, all noted his chronic risk for suicide as "moderate" given his history of previous suicide attempts, depression, psychosis, history of violence, and first prison term.

The inmate was last seen by a psychiatrist on November 28, 2016. The progress note indicated that the inmate described his mood as "stressed out," but "good" sleep for the last three days. He denied SI or HI, but endorsed AH "all the time" with a male voice "like my conscience telling me people are out to get me." The note suggested that the inmate appeared to be responding to internal stimuli. When the psychiatrist informed the inmate that he had been observed to be screaming in his cell, he responded that "he argued with them and screams at them to quiet his mind." Additional psychotropic medication was ordered. Although the inmate was seen on a daily basis by an administrative segregation unit clinician (due to his EOP status), with behavior described as "cooperative" and mood as "good," the last progress note was dated December 6, 2016. In it, he told the clinician "I'm doing all right, little better, but I still get these voices, and I don't really … Like going out I mean I should be out, they got me locked up but my 33% should have kicked in and I should be out of here." The clinician noted that he appeared stable and seemed to be coping well in administrative segregation with minimal social interaction.

The inmate had a few minor medical issues, including hypertension and constipation that were not found to be precipitants to his suicide.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating the inmate was contemplating suicide, and the inmate did not leave a suicide note. The reviewer, however, noted that, "Although he did not report any suicidal ideation, intent, or plan to staff after his discharge from MHCB, he did appear to be decompensating in the last month of his life. He had stopped taking his psychiatric medications with any regularity, he continued to largely isolate in his ASU cell, and was regularly showing an increase in psychotic and depressive symptoms based on documentation. He additionally appeared to be operating under a delusional belief system that he would be paroled sooner than his June 2018 out date. On the day of his death, there were also mixed reports noting he was taunted by other inmates to kill himself in response to previous racial slurs he directed at them. Perhaps these stressors combined with his other static risk factors led to his decision to hang himself."

The draft Suicide Report contained six recommendations for corrective action through a QIP:

> 1) Day 3 of the 5-day follow-up (October 14, 2016) was missing from both the EUHR and MHTS. Per MHSDS *Program Guide* (2009 Revision) and a memorandum issued on May 31, 2016, all clinical follow-up post MHCB discharge shall be conducted on a daily basis. Clinical documentation for service shall be documented in the EUHR on the same day of service;

> 2) The SRE completed on October 17, 2016 was not entered into the MHTS. The MHSDS aggregates inmate data, such as suicide risk data, which accompanies an inmate whenever they are transferred between institutions to provide the receiving institution and treatment team with the inmate's suicide risk data. Failure to enter

critical suicide risk information into MHSDS can compromise the receiving institution's ability to identify critical suicide risk factors;

3) No psychiatric note was found in the EUHR or entered into the MHTS to document the decision to add Chlorpromazine to the patient's medication regimen December 5, 2016;

4) When the inmate was placed in alternative housing (at WSP) on October 10, 2016, it was noted that he was not given a safety mattress as none were available due to rips and tears, a violation of CDCR policy;

5) According to a CDCR 837 submitted by responding staff, the inmate was observed to have his window covered, the only window on the cell front which gives visual to the inside of the cell.  Once the officer removed the object covering the cell window, noting the cell light was off and very little light coming from the back of the cell window, it appeared the inmate was using the restroom. (Due to insufficient information on the officer's crime incident report, it is unclear as to the inmate's actual state once a window covering was removed.)  A CDCR 837 submitted by responding staff states "It is common for inmates in the ASU to put a piece of paper in a window while using the restroom."  In addition, the officer documents the inmate was known to cover his cell window for privacy. (For health, safety, and security purposes, it is imperative staff have a clear and unobstructed view of the inmate's cell/room at all times);

6)  Per the Nursing Death Review Summary, three nursing concerns were identified requiring follow-up [regarding PT daily rounds forms on 11 dates from October 2016 through December 2016 in both WSP and CMC which incorrectly noted that the inmate was medication compliant, and lack of an RN signature on a CDCR 7368 form dated October 28, 2016].

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

### 17)    Deuel Vocational Institution (DVI)

**Inspection**:  August 30-31, 2016 (previous suicide prevention audit was on March 26-27, 2015). DVI housed approximately 2,285 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process in the RC on August 30.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions.  The door to the nurse's office was closed, and an officer was stationed outside, thus ensuring both privacy and confidentiality.  Due to a scheduling conflict, the mental health diagnostic testing in the RC was not observed. No concerns were observed during the March 2015 assessment.

Daily PT rounds in the two administrative segregation units (K-1 and L-1) were observed on August 30 and August 31.  The rounds were unremarkable and each PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  DVI had ten OHU cells designated to temporarily house inmates with mental illness and/or requiring suicide observation.  (Four seclusion cells were previously decommissioned during 2015.)  These ten OHU cells were designated as **alternative housing** and required 1:1 observation prior to transfer to a MHCB.  Each of the cells had a bunk.  In addition, new intake cells located in the L-1 administrative segregation unit were designated as overflow alternative housing.

This reviewer was presented with data indicating that 80 inmates were placed in alternative housing during the two-month period of June and July 2016, with an average length of stay of 55 hours.  The data also indicated that only slightly more than one inmate was placed in alternative housing per day.  The reason for the low use of alternative housing at DVI is detailed below.

L-1 had been converted to a STRH unit for RC inmates since the time of this reviewer's 2015 assessment.  The K-1 administrative segregation unit contained 27 retrofitted suicide-resistant cells for new intake inmates.  Due to a low census, this reviewer observed that all new intake inmates were correctly housed in suicide-resistant new intake cells within K-1.

**Observation**:  Because DVI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB.  No other levels of observation were permitted within the OHU for suicidal inmates.

A review of Guard One data for a recent 24-hour period found 99-percent compliance in the administrative segregation units with the required checks not exceeding 35-minute intervals, a significant improvement from the 2015 assessment.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from January 1, 2016 through July 22, 2016.  This reviewer's subsequent sample review of 24 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in 96 percent (23 of 24) of the cases.

In addition, as noted above, review of alternative housing data indicated that only slightly more than one inmate was placed in alternative housing per day.  Upon further review, it was determined that almost half (48 percent) of the MHCB referrals from alternative housing during June and July 2016 were subsequently rescinded, with inmates returned to their original housing units.  Overall, it appeared that clinicians had a high threshold for MHCB referrals.  The following case was indicative of the issue.

The inmate (<u>DVI 1</u>) entered DVI to begin the RC process on April 29, 2016.  An emergency mental health referral was almost immediately initiated due to the inmate's self-report of command AH to hurt himself, as well as a history of self-injurious behavior by cutting.  An SRE was completed by a clinician that indicated several chronic risk factors, including family history

of suicide (by a half-brother), history of abuse, history of depressive disorder, and a history of poor impulse control. In addition, he reported numerous prior suicide attempts, including a suicide attempt by "cutting his wrist 2-3 months ago." The inmate was 18-years-old, Native American, and serving his first prison term. His acute risk was assessed as "moderate," and he was reporting "chronic voices regarding SI." The inmate was *not* placed on suicide precautions.

Two days later on May 2, the inmate received diagnostic mental health screening as part of the standard RC process. Much of the same information detailed above was repeated during the screening process, although the inmate denied any current SI. He was diagnosed with Psychotic Disorder NOS, Depressive Disorder NOS, and R/O Polysubstance Dependence in a Controlled Environment. The inmate was placed in the MHSDS at the 3CMS LOC.

A few months later during the late evening of July 20, the inmate was escorted to the TTA after engaging in self-injurious behavior by superficially cutting his wrist with a razor and punching his cell door. He was admitted into alternative housing on Suicide Watch status. The following morning (July 21), a clinician completed an SRE that indicated a "high" chronic risk and "moderate" acute risk for suicide. The inmate denied any current SI. The MHCB referral was rescinded and the inmate was discharged from alternative housing.

Approximately nine days later on July 30, the inmate was again escorted to alternative housing after being observed hitting his head against the wall and reporting SI. He was admitted into alternative housing on Suicide Watch status. The following morning (July 31), a clinician completed an SRE that indicated a "moderate" chronic risk and a "low-moderate" risk for suicide. The inmate "reported feeling worried and depressed about his baby mama and his daughter. Says he was mostly worried about the care of his daughter then admitted it was mostly about the mother and he had not heard from her in about two weeks." He denied any current SI. The MHCB referral was rescinded and the inmate was discharged from alternative housing.

Based upon the circumstances of the above case, this reviewer conversed with several RC inmates who had recent histories of initially expressing SI and subsequently were placed in alternative housing. Several inmates confided to this reviewer that, upon assessment of their SI, they were informed by mental health clinicians that *their "RC clocks" would be "reset" if they were sent out to a MHCB and required to restart the RC processing upon return to DVI. As a result, many RC inmates stated they recanted their SI upon placement in alternative housing, thus explaining the high rate of rescission in MHCB referrals.*

As a result of this reviewer's findings, the CMH and the SPRFIT coordinator initiated a CAP prior to the exit meeting on August 31, 2016 that included, but was not limited to, training "mental health staff regarding the identification of this trend, and that clinicians should not be discouraging referral to Alternative Housing by saying their time 'resets' or is in any way affected by placement into alternative housing."

This reviewer did not formally review discharging SREs at DVI because most of the assessments were conducted by mental health clinicians at other MHCB facilities. However, a review of several SREs of inmates discharged from alternative housing at DVI found problematic safety planning. In addition, safety plans contained within discharging SREs were not consistently

transposed onto "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms in most cases. As a result, the CMH and SPRFIT coordinator initiated another CAP to provide additional safety plan training.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff. This reviewer sampled ten cases of inmates discharged from alternative housing that remained at DVI and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during June through August 2016. In these ten cases, the first page of the MHCB Discharge Custody Check Sheet (MH-7497) form was completed by mental health clinicians in 80 percent (eight of ten) of cases, and clinicians recommended custody checks beyond 24 hours in *all* ten cases. With regard to the second page of the MHCB Discharge Custody Check Sheet (MH-7497) form completed by custody staff, hard copies of the forms were *not* available for review and, although the forms were said to be scanned into the eUHR, they were mislabeled as CDCR MH-7230-B (Interdisciplinary Progress Note) forms and difficult to find. As such, this process could not be audited.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of five months (April through August 2016) of SPRFIT meeting minutes reflected good attendance from all required members. Meeting minutes were otherwise unremarkable.

**Training**: According to training records, 100 percent of custody staff and 98 percent of medical staff were currently certified in CPR. In addition, 90 percent of custody staff, 94 percent of medical staff, and 95 percent of mental health staff received annual suicide prevention block training during 2015. Finally, as of August 2016, all mental health clinicians had completed both the SRE mentoring program and seven-hour SRE training.

**Recent Suicides**: DVI experienced three inmate suicides during the review period (all of which occurred during 2015). In the *__first__* case (__DVI 2__), the inmate was found hanging from a ventilation grate by a sheet in his administrative segregation cell during the evening of October 12, 2015. The inmate entered the CDCR system on October 25, 2007 to serve a 26-year-to-life sentence for first-degree murder. He had been convicted of the crime at age 15 in November 2004 and had been confined in a juvenile hall before his transfer to CDCR. The inmate was transferred to DVI on the morning of his death en-route to SVSP from CSP/Sac. He incurred three RVRs during his CDCR confinement, the last of which occurred in October 2015. The inmate had been gang-affiliated until May 2013 when he dropped out in order to receive protective custody and continue in mental health services. He had good family support, including his mother, but few visits during his confinement.

146

According to available records, the inmate was raised by his mother following the death of his father in an automobile accident. He did not have a history of either mental illness or suicide, and there was no such history in the family. The inmate was single and did not have any children. In addition, he did not have any significant medical problems.

The inmate was placed in the MHSDS at the 3CMS level of care on October 19, 2012. His initial diagnosis was Psychotic Disorder. He had three MHCB placements between 2012 and 2014. The first placement in October 2012 occurred after attacking a cellmate and expressing SI. The second MHCB placement occurred in May 2013 following an expression of AH. The third MHCB placement occurred in January 2014 following a drug overdose. Upon discharge, his level of care was increased to EOP and the inmate was transferred to CSP/Sac. The inmate performed well in the EOP program during the next year (and completed the PSU program at CSP/Sac in four months), but began refusing his medication in 2015 and was subsequently downgraded to the 3CMS level of care on July 15, 2015. His diagnosis was Major Depressive Disorder, Recurrent, Severe with Psychotic Symptoms. Three weeks later, however, the inmate's diagnosis was changed during an IDTT meeting to Schizophrenia, Disorganized Type, and Antisocial Personality Disorder, despite the fact that he was not seen that day (August 4) and did not attend the meeting. The inmate subsequently saw a psychiatrist on September 28, 2015 and agreed to restart his psychotropic medication.

On October 6, 2015, the inmate assaulted another inmate at CSP/Sac and, upon entry into the STRH unit, expressed both SI and safety issues. He was subsequently relocated to alternative housing and placed on Suicide Precaution status. The inmate told correctional officials that he initiated the fight because he had been threatened by a gang and he "wanted to get them before they got me." An SRE was completed and, although he stated that "he does not wish that he was dead," he continued to express SI. It was also noted that he was still not compliant with his medication. The following day (October 7), another SRE was completed and the clinician wrote that "although I/P endorses SI, he presents with no objective signs of acute decompensation, psychosis, mania, or depression… It is thought that I/P is dissembling SI to avoid transfer." Despite continued SI, his acute risk was assessed as "low," the MHCB referral was rescinded, and the inmate was discharged from alternative housing and placed in the STRH unit. Several hours later on October 7 when he was sitting in a holding cell in the STRH unit, the inmate again expressed SI to a clinician, as well as displaying several superficial cuts on his arms and stomach. The clinician completed another SRE, assessed his level of risk at "moderate" for both acute and chronic risk, but did not place the inmate on suicide precautions. He was placed on a five-day follow-up.

On October 12, the inmate was transferred from CSP/Sac to DVI, en route to SVSP. Later that day, CSP/Sac custody staff discovered bloodied linen and drops of blood in the inmate's vacant cell. The sergeant notified the watch commander at DVI and expressed concerns that the inmate might have smuggled contraband. Ironically, there was no such communication between CSP/Sac and DVI clinicians regarding the inmate's recent SI and five-day follow-up status.

Although the CDCR reviewer did not offer any specific precipitating factors to the suicide, it was noted that when the inmate became overwhelmed and reported safety concerns, the result was often expressions of SI and engagement in self-injurious behavior.

The Suicide Report contained nine recommendations for corrective action through a QIP. It was noteworthy that *six* of these recommendations were directed at *CSP/Sac* clinical staff:

1) Custody responders at DVI did not bring the cut down tool with them to the cell. This problem is a systems issue. Decisions about where the kit is kept and that it is in some kind of container that allows easy access and transportation should be standardized system wide;

2) The SAC watch commander communicated with the DVI watch commander about the bloodied linens found in the inmates SAC cell;

3) The inmate arrived at SAC on May 30, 2015. However, no CDCR 7386 Mental Health Evaluation or CDCR 7386 update (add-a-page) was completed. A comprehensive assessment is critical in formulating a treatment plan after placement;

4) The inmate was not present during his August 4, 2015, IDTT. In the last treatment plan, a diagnosis was changed to Schizophrenia, Disorganized Type from his previous diagnosis of MDD, Recurrent, Severe with Psychotic Features. This was a significant departure from previous treatment plans and recent psychiatry notes. The last treatment plan did not address self-injurious behavior, depression or hallucinations despite his documented history;

5) The inmate was not seen by his PC prior to his initial CCCMS IDTT on August 4, 2015. His clinician attempted to meet with him on August 27, 2015, but the inmate refused and there was no progress note to explain what happened or whether a follow-up appointment would be scheduled;

6) The inmate's case contained significant departures from policy and procedure in his care at SAC and in the documentation by his primary clinician in CCCMS;

7) The inmate was evaluated cell front prior to his transfer to DVI/SVSP. Other than a 5-day follow-up entry, there was no corresponding progress note at SAC explaining the events that transpired (refusing to cuff, results of the 5-day, and that he requested to speak to mental health) or indicating records had been reviewed;

8) There were several concerns about the inmate's fifth day follow-up documentation at SAC. There was also no corresponding progress note or notation on the follow-up itself to explain if the 5-day follow-up was completed or extended or whether an out-of-cell confidential session was offered; and

9) Per the Nursing Death Review Summary, two nursing concerns were identified requiring follow-up [i.e., at CSP/Sac, nursing staff did not complete the transfer

list for the inmate prior to his transfer to DVI, and there were several
documentation errors by DVI medical staff responding to the emergency].

Based upon the findings contained within the Suicide Report, the Suicide Case Review
Committee found that the suicide was both foreseeable and preventable.

In the **_second_** case (DVI 3), the inmate was found hanging from the ladder by a sheet in his
reception center cell (within the Special Processing Unit awaiting SNY transfer) during the early
morning of October 18, 2015.  The inmate entered the CDCR system a few months earlier on
June 26, 2015 to serve a four-year sentence for a probation violation.  He incurred one RVR
during his brief CDCR confinement, a battery on his cellmate on September 1, 2015.  The inmate
had been a gang-dropout (since 2010).  He had good family support, including his girlfriend and
two children.  The inmate was described as very religious by his fellow inmates.  He did not
report any significant medical issues during his brief CDCR confinement.

According to available records, the inmate was raised by both parents along with four other
siblings.  There was a history of substance abuse and mental illness in the family.  The inmate
had a significant history of substance abuse starting at age 12.  Although there were indications
in his central file that he had been treated for anxiety, depression, and substance abuse in both
the community and local jail, the length and/or type of treatment was unclear.  However, upon
entry into DVI, the inmate reported receiving psychotropic medication while confined in the
county jail.  He screened positive to several mental health issues during the RC process and
received a mental health evaluation on July 16, 2015.  The inmate was subsequently placed in the
MHSDS at the 3CMS level of care and given diagnoses of Delusional Disorder and
Amphetamine Dependence in a Controlled Environment.  The diagnoses were later slightly
revised by a psychiatrist on July 23 to "Delusional Disorder, Grandiose; Cannabis Use Disorder;
Hallucinogen Use Disorder, Severe; Anxiety Disorder NOS, Rule-Out Borderline Intellectual
Functions v. Mild Intellectual Disability, Rule-Out Mild ID."  The inmate had a history of one
suicide attempt in 2013.  An SRE completed on July 16, 2015 found a "moderate" chronic risk
and "low" acute risk for suicide.

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide,
although it was noted that the inmate informed custody staff a few hours prior to the suicide that
he was having safety concerns (but denied any SI).  Because he was already in a single cell
within the Special Processing Unit awaiting SNY transfer, custody staff did not feel further
classification changes were necessary.

The Suicide Report contained four recommendations for corrective action through a QIP:

> 1) The inmate was admitted to the MHSDS at the CCCMS level care on July 16,
> 2015.  He was scheduled for his 90-day routine PC follow-up on October 22,
> 2015.  However, per the 2009 Mental Health Program Guide, "Inmate-patients
> who require Correctional Clinical Case Management System (CCCMS) level of
> care shall be seen by the PC within 30 days of placement in CCCMS and at least
> every 90 days thereafter while at the RC, or more often if clinically indicated";

2) As inspection of the cut down kit reveals that it is located in a metal lockable box mounted to the wall within the officer's station. Should an item be needed, the responding officer would have to scoop up all the items and deploy it to the incident scene. A best practice that was observed from another prison had the kit in a canvas bag that can be brought to a location making all of the tools readily available;

3) The DVI psychiatrist documented concerns about the possibility the inmate struggled with an intellectual disability. Upon arrival to DVI on July 6, 2015, the inmate screened negative for the developmental disability program. It was determined that training and/or education is needed in Reception Centers statewide on the importance of submitting referrals for additional disability screenings and/or testing; and

4) Per the Nursing Death Review Summary, there was one nursing concern identified requiring follow-up [i.e., a documentation error pertaining to the emergency response time].

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that the suicide was not foreseeable or preventable.

In the _**third**_ case (DVI 4), the inmate was found hanging from the ladder by a sheet in his RC cell during the early morning of October 31, 2015. The inmate entered the CDCR system a few weeks earlier on October 1, 2015 to serve a two-year sentence for DUI with Injury. He did not incur any RVRs during his brief CDCR confinement, nor was he gang-affiliated. Although divorced without any children, he had family support from one of his brothers. Prior to the instant offense, the inmate had a master's degree in international business management, as well as a full-time job. However, on October 2, he was informed of a pending warrant and detainer for rape, and was in the process of being classified as SNY. Although no other records were available, the warrant appeared unrelated to the instant offense.

According to available records, the inmate was raised by both parents along with three brothers. There were no reports of either substance abuse or mental illness in the family, although, in addition to the instant offense, the inmate had three prior DUI convictions. Both of his parents died separately during 2015, and he had been divorced from his wife for approximately two years. According to one of the inmate's brothers who was interviewed by the CDCR reviewer following his death, the separation and subsequent divorce from his wife resulted in the inmate beginning to abuse alcohol, experiencing depression, and engaging in two suicide attempts (the first by driving a car into a pole and the second by overdosing on pills and bleach). All of his DUI convictions and two suicide attempts were apparently related to his failed marriage. According to the cellmate who was also interviewed, the inmate had appeared "stressed out a lot" during his brief incarceration, wrote several letters to his ex-wife and brothers without receiving any replies, and was still upset about the recent deaths of his parents. The inmate did not report any serious medical issues during his brief CDCR confinement.

Upon entry into DVI, the inmate did not report any significant history of mental illness during the initial R&R screening process, although he expressed some anxiety and depression regarding the deaths of his parents. He was assessed by a clinician during the mental health evaluation on October 15 and subsequently diagnosed with Bereavement, Alcohol Dependence, and Adjustment Disorder with Mixed Anxiety and Depressed Mood. Although the inmate reported both anxiety and depression approximately "seven days over the past two weeks," the clinician felt that the inmate was "high functioning" without significant depression and did not recommend him for placement in the MHSDS. Instead, a 30-day clinical follow-up was ordered. In addition, an SRE was also completed on that date and indicated both a "low" chronic and acute risk for suicide. Of note, the inmate's two prior suicide attempts as described by his brother were not disclosed to CDCR staff prior to the suicide.

Although the CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, it was noted that "while the inmate did not express suicidal ideation or reasons for his decision to commit suicide, he was experiencing a series of significant stresses which are known to be correlated with depression and suicidality. This was his first incarceration and he was facing additional charges, he experienced alienation from family as well as divorce from his wife. These factors, coupled with his inability to cope outside of the prison setting, were only exacerbated by his incarceration." The reviewer also noted that the "inmate presented himself as being more stable and well-adjusted than his actual experience. This impacted the ability for others to be able to intervene or provide adequate services to assist him with coping, adjusting to incarceration, divorce and pending charges."

The Suicide Report contained one recommendation for corrective action through a QIP: "1) Per the Nursing Death Review Summary, two nursing concerns were identified requiring follow-up [i.e., both documentation errors pertaining to the emergency response time]."

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that the suicide was not foreseeable or preventable.

### 18)  California Health Care Facility (CHCF)

**Inspection**: September 1-2, 2016 (previous suicide prevention audit was on July 21-23, 2015). CHCF housed approximately 2,423 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed one new admission during the intake screening process in the Patient Management Unit (referred to as the R&R unit in other CDCR facilities). The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (June 2015), and was observed to be asking all of the required questions. During the process, the door to the nurse's office remained closed and an officer was stationed outside providing security. This reviewer was informed that if a maximum-security status inmate was being screened, the process would be relocated to a holding cell with a privacy window in the corner of the unit, thus allowing for privacy and confidentiality while ensuring safety of staff.

Limited daily PT rounds in the administrative segregation unit were observed on September 1. The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms on caseload patients at cell-front as required.

**Housing**:  CHCF had 98 MHCBs in housing units 301A, 301B, and 302B.  All were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.  The administrative segregation unit had eight retrofitted suicide-resistant cells designated for new intake inmates.  A previous problem first identified by this reviewer during the 2014 assessment in which hazardous horizontal brackets connected desk stools to the cell walls had since been corrected, with both stools and brackets removed from the new intake cells. During the inspection, this reviewer did not observe any new intake inmates in non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were used on almost a daily basis at CHCF.  Housing units D1A and D1B were primarily used for alternative housing, although other housing unit D (OHU) locations could also be used.  Each inmate was provided a stack-a-bunk, and observed on a continuous 1:1 basis.  This reviewer was presented with data indicating that 169 inmates were placed in alternative housing from March 14 through August 9, 2016, with an average length of stay of 49 hours. Most were subsequently placed in a MHCB.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB units.  In addition, inmates not on suicide observation status were observed at 15-minute intervals by nursing staff.  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door.  However, this reviewer observed a nurse *not* completing observation at 15-minute intervals as required in one of the MHCB units on September 2, 2016.  This reviewer examined several observation forms at approximately 10:10 a.m. on September 2.  The forms indicated that the last room check had occurred at 9:47 a.m., well beyond the 15-minute requirement.  At approximately 10:15 a.m., this reviewer observed a nurse beginning their rounds and documenting on the observation forms.  This reviewer then re-examined the same forms that were previously reviewed and found that the nurse had falsified the observation forms by entering 9:59 a.m., 10:11 a.m., and 10:23 a.m., i.e., time intervals that had *not* been observed.

This reviewer observed nine IDTT meetings in all three MHCB units on September 1-2. Although all of the observed IDTTs were well represented by custody, medical, and mental health staff, there were multiple problems observed during these meetings.

*First*, the quality of the IDTTs was very uneven, with increased quality observed when the meetings were attended by the MHCB's senior psychologist supervisor.

*Second*, very few IDTTs contained a discussion of each inmate's current observation status (Suicide Watch v. Suicide Precaution).

*Third*, there were uneven discussions regarding safety planning for inmates being discharged from the MHCB.

*Fourth*, similar to this reviewer's findings during the 2015 assessment, there continued to be significant confusion amongst IDTT members regarding both clothing allowance and privileges afforded inmates within the MHCBs.  For example, in one case (CHCF 1), the inmate had been clothed in a safety smock and observed on Suicide Watch status for approximately 15 days.  IDTT members were debating whether an inmate placed on Suicide Watch could be clothed in anything other than a safety smock and/or could a clinician place an inmate on Suicide Watch status with "partial issue" clothing or put an inmate on Suicide Precaution status in a safety smock.  (The *Program Guide* allows for such flexibility "based on clinical judgment, with documentation of justification.")  In another case (CHCF 2), the CC I informed the IDTT that the inmate, who was on "cuff status" with no pending RVRs, was *not* eligible for any extra privileges such as telephone access and visits simply because of their "cuff status."  (This was an incorrect interpretation of the "Mental Health Crisis Bed Privileges" memorandum issued on June 23, 2016.")

Further, this reviewer again found the practice of MHCB clinicians issuing standing orders for Suicide Precaution status *at ten-day intervals*.  For example, a Physician's Orders form, with a boilerplate checklist, contained the following narrative:  "Continue Suicide Precautions for 24 hours x 10 days."  This Physician's Orders checklist form continued to be found in most eUHRs of MHCB inmates examined by this reviewer.  Such a practice was in direct violation of the *Program Guide* which required a clinical determination of suicide observation status "at a minimum of every 24 hours."  This practice resulted in clinicians not having to make decisions regarding an inmate's possessions and privileges for at least ten days.  This practice was initially observed by this reviewer during the 2015 assessment and had still *not* been corrected.  As a result of this reviewer's findings, the acting CMH initiated a CAP prior to the exit meeting on September 2, 2016 that would "ensure suicide observation orders are reviewed daily, orders renewed every 24 hours, and to ensure there are no standing orders for ten day intervals."

A review of Guard One data for a recent 24-hour period in the administrative segregation unit found 99-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from March 1, 2016 through July 31, 2016.  (It should be noted that this reviewer did not utilize emergency mental health referral data from the SEMS logs, referred to as the TTA in other CDCR facilities, because it mostly contained DSH referrals and/or patients who were already in a MHCB.)  This reviewer's subsequent sample review of 57 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in only 84 percent (48 of 57) of the cases.  Similar low percentages of SRE completion were found during this reviewer's 2014 and 2015 assessments.  Clinicians' responses to emergency mental health referrals were otherwise timely.

As a result of this reviewer's findings, the acting CMH initiated a CAP prior to the exit meeting on September 2, 2016 "to ensure an SRE is completed for every referral received for SI/DTS."

A review of ten charts of inmates admitted and discharged from the MHCB units in August 2016 found that although SREs were completed in each case, the presence of adequate safety plans to reduce SI continued to be problematic. For example, in one case (CHCF 3), both the safety plan contained in the discharging SRE and the safety plan summaries contained in the "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms were troublesome. The inmate was released from a MHCB on August 16, 2016 and the discharging SRE contained the following safety plan:

> I/P is being discharged to EOP level of care on a 5-day follow-up; if IP has any SIB or SI plan intent and means while not in MHCB refer to MHCB; If above while in MHCB rescind discharge and remove full issue and place back in safety smock and safety blanket. Follow-up with psychiatry and consider SW 1:1. Consult with psychiatry; In EOP level of care IP would benefit from PTSD groups, social interaction groups.

Although most of the above safety plan was unintelligible, the safety plan section of the *first* day (August 17) of the "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) form stated the following: "Contact custody when stressed." The safety plan section of the *second* day (August 18) of the "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) form stated the following: "Remain in EOP and be monitored, follow-up with a 5-day, Provide psychoeducation on the process of seeking help when in distress, Be medication compliant." The safety plan section of the *third* (August 19) of the "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) form stated the following: "Continue with EOP LOC, assign 12 groups to attend weekly." Both the *fourth* and *fifth* day of the five-day follow-up were performed by PT staff. The safety plan section of the *sixth* day (August 22) of the "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) form stated the following: "PT to stay in EOP LOC; Medication management; PT to partake in leisure activities to decrease isolation; PT knows to ask custody for help if feeling like hurting himself."

As a result of this reviewer's findings, the acting CMH initiated a CAP prior to the exit meeting on September 2, 2016 "to ensure a thorough safety plan is documented, discussed and articulated to patients admitted to the MHCB."

In addition and as previously noted above, this reviewer was presented with data indicating that 169 inmates were placed in alternative housing from March 14 through August 9, 2016. A sample review of 23 charts found that the required SREs were completed in 70 percent (16 of 23) of the cases.

As a result of this reviewer's findings, the acting CMH initiated a CAP prior to the exit meeting on September 2, 2016 "to ensure an SRE is completed for all patients discharged from alternative housing and returned to a regular housing unit."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by

the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer sampled 72 cases of EOP inmates discharged from a MHCB unit that remained at CHCF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during July and August 2016. In those 72 cases, *only* 31 percent (22 of 72) of the required forms could be located in either a hard copy or eUHR. Of those 22 cases, only 50 percent (11 of 22) of the second page (representing the custody check documentation) was found. Custody checks were made at the required 30-minute intervals and were discontinued after the first day in those 11 cases. CHCF officials were not certain why such a low percentage (31 percent) of "discharge custody checks" documentation was available for review, but surmised that custody staff in various EOP housing units had inconsistent practices in collecting and maintaining the documentation.

As a result of this reviewer's findings, the acting CMH initiated a CAP prior to the exit meeting on September 2, 2016 that stated, "Mental Health and Custody staff are actively collaborating on ensuring compliance with completion of 24-hour observation logs by custody staff for all patients on five-day follow-up. AW for Access to Care is drafting a OP which will clearly outline the process for completion, scanning into eUHR, and tracking of these logs."

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of four months (May through August 2016) of SPRFIT meeting minutes found that there was no psychiatry representation at two of the monthly meetings, and there was no documentation of custody staff representation at three of the monthly meetings. Meeting minutes were otherwise unremarkable.

**Training**: According to training records, 99 percent of both custody and medical staff were currently certified in CPR. In addition, 90 percent of custody staff, 93 percent of medical staff, and 92 percent of mental health staff received annual suicide prevention block training during 2015. Finally, as of August 2016, 92 percent of mental health clinicians had completed the SRE mentoring program, and 94 percent had received the seven-hour SRE training.

**Recent Suicides**: CHCF experienced one inmate suicide during the review period (occurring in late 2015). In that case (CHCF 4), the inmate was found to have asphyxiated himself with a bed sheet in his GP cell during the afternoon of December 17, 2015. The inmate entered the CDCR system on December 8, 2004 to serve a 25-year-to-life sentence for murder, burglary and possession of a controlled dangerous substance. He was transferred to CHCF on September 23, 2015. The inmate incurred three RVRs during his approximate 11-year confinement, the most recent of which occurred on June 11, 2014 for refusing to submit to a urinalysis. He was not known to be gang-affiliated, and had limited family support from a brother who resided out of state. The inmate was never married and did not have any children
According to available records, the inmate had been raised with his two brothers by his mother. He apparently never met his father. The inmate did not have any known juvenile history, but had

several adult criminal convictions.  He did not have any history of mental illness or suicidal behavior in the community, nor was there any such history in the family.  The inmate, however, had an extensive history of substance abuse beginning at age 14, and there was some indication that he was experiencing amphetamine-induced psychosis in the months leading up to the instant offense.  In addition, while confined in the county jail prior to his conviction on the instant offense, the inmate was diagnosed with Psychotic Disorder NOS and prescribed psychotropic medication.

Upon entry into CDCR, the inmate did not report any current or prior mental health issues and, therefore, was not referred for further evaluation.  However, several months later in March 2005, he was referred to mental health for unknown reasons and subsequently diagnosed with Schizophrenia, Paranoid Type, Polysubstance Dependence, and Antisocial Personality Disorder.  He was initially placed in the MHSDS at the 3CMS level of care and placed in a MHCB for several days in April 2005 for grave disability.  According to the records, "He exhibited rambling speech and paranoid/persecutory themes.  He was positive for AH, which he described as real people who used telepathy."  His level of care was subsequently raised to EOP in August 2005.  The inmate was returned to 3CMS care in October 2011, but his mental health symptoms worsened in October 2012 when he became non-compliant with his psychotropic medication and he was reinstated at the EOP level of care.  In addition, during September through November 2013, he was treated at ASH "for medication non-compliance and symptoms of both auditory hallucinations and psychosis."  Upon return to CDCR, the inmate was maintained at the EOP level of care until his death.  He had one other brief MHCB placement in March 2014 for HI.  An involuntary order for psychotropic medication was activated in April 2014 and continued until his death.  An SRE completed on September 24, 2015 indicated a "moderate" chronic risk and "low" acute risk for suicide.  He continued to deny any SI, or history of such.  The inmate was last seen by a psychiatrist two days before his death on December 15, 2015.  He presented with euthymic mood, with impaired judgment ("he does not believe that he has a mental illness or needs meds").  The inmate denied SI.  His most recent diagnosis of Schizophrenia, Paranoid Type, had remained unchanged since April 2015.

The inmate did have several serious medical issues, including keratoconus (a degenerative eye disorder) and Hepatitis C.  He underwent corneal transplant surgeries in 2008-2009 that were partially successful, but he was considered to be "legally blind."  However, his medical issues were not thought by the CDCR reviewer to be the proximate cause of his suicide.

As part of the standard investigation into the death, custody staff interviewed the inmate's cellmate who initially stated that he was growing more depressed and discouraged over the past several weeks and did not believe that he would ever parole.  However, the same cellmate was also interviewed by the CMH and stated that the inmate had been future-oriented and planning to attend more treatment programs and enroll in college courses.  Most mental health staff that interacted with the inmate appeared surprised by the suicide and believed the inmate had recently exhibited more stable behavior and improved mental status.  Although the CDCR reviewer did not offer any specific precipitating factors to the suicide, it was opined that the inmate's "consistent patterns of delusional thinking precluded him from developing some of the coping strategies necessary for establishing a more realistic long-term view of his true legal position and the probable consequences for his appeal process.  With a reduction in the protective aspects

associated with his delusions due to the court-ordered medication, it is the opinion of this reviewer that the inmate may have lost a part of his ability to cope with the reality of his legal situation and the realistic chances of his potential release from custody."

The Suicide Report did not contain any recommendations. Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that the suicide was not foreseeable and not preventable.

### 19)   Pelican Bay State Prison (PBSP)

**Inspection**: September 14-16, 2016 (previous suicide prevention audit was on April 8-9, 2015). PBSP housed approximately 2,335 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the intake screening process in the R&R unit on September 15. The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions. During the process, the inmate was placed in a holding cage in the nurse's office and the door remained closed with an officer stationed outside, thus ensuring privacy and confidentiality.

Daily PT rounds in administrative segregation were observed on September 16. The administrative segregation unit housed both STRH and GP/administrative segregation inmates. The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms on caseload patients at cell-front as required.

**Housing**: PBSP had ten MHCBs. A previous concern of sink faucets having horizontal slits (known as "anti-squirt slits") had been corrected; all cells were now suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.

The administrative segregation unit had 24 retrofitted suicide-resistant cells designated for new intake inmates, with 12 new intake cells designated in both the STRH and GP/administrative segregation sections of the unit. During inspection, this reviewer did not observe any new intake inmates housed in non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were used on a frequent, but not necessarily daily, basis at PBSP. This reviewer was presented with data indicating that 48 inmates were placed in alternative housing from March 28 through September 13, 2016, with an average length of stay of 41 hours. Inmates in alternative housing were primarily housed in either CTC medical rooms or the observation room within the MHCB unit. Inmates were issued a mattress, but *not* a stack-a-bunk. This reviewer was informed that stack-a-bunks were *not* used because custody staff believed an inmate might use the bunk to barricade themselves in the room. As there were no previous reports of such a scenario occurring, the substance for this concern was unknown and problematic. On rare occasions, CTC "specialty clinic" (i.e., TTA) cells were used for alternative housing, but stack-a-bunks did not fit inside the TTA cells. Inmates were required to be observed on a continuous 1:1 basis while in alternative housing. Of those 48 inmates, 26 (54

percent) were subsequently placed in a MHCB, with the remaining 22 discharged back to their housing units.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, inmates not on suicide observation status were observed at 15-minute intervals by nursing staff.  (However, despite this nursing staff practice, this reviewer examined numerous medical charts in which mental health clinicians were ordering observation at 30-minute intervals for inmates not on suicide observation status.  Such contradictory practices were problematic.)  Nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with forms located on the outside of each inmate's room door.  Reviewed forms appeared to be up-to-date and accurate.

This reviewer observed eight IDTT meetings in the MHCB unit during the three-day period of September 14-16.  Overall, the IDTT meetings were very problematic (and would have been worse had it not been for the presence of both the CMH and a captain who accompanied this reviewer to the meetings).  *First*, there was only one psychiatrist at PBSP during the time of the on-site assessment, who was thus not always available for IDTT meetings. In addition, the recreation therapist assigned to the CTC was only available three times per week and generally unavailable for IDTT meetings.  Finally, nursing staff was not consistently represented at the IDTT meetings and, when they did appear, their participation was negligible.

*Second*, there were uneven discussions regarding both current SI and safety planning during the meetings. One case (PBSP 1) was particularly troubling and is summarized as follows:

The inmate had been admitted into alternative housing at DVI on September 5 for both grave disability and SI.  He reported command AH to kill himself.  The inmate was at the 3CMS level of care, and an SRE completed the following day (September 6) at DVI assessed his acute risk for suicide as between "mild-moderate," while his chronic risk was "high," with more than ten prior suicide attempts.  He was transferred to the MHCB at PBSP several days later on September 9 and placed on Suicide Precaution status and clothed in a safety smock.  The inmate refused his initial IDTT meeting, but was assessed by a MHCB clinician on September 10.  He denied any current SI and requested to be discharged.  He was removed from Suicide Precaution status and placed on observation at 30-minute intervals with "partial issue" clothing (i.e., shorts, socks, and a t-shirt).

This reviewer attended the inmate's IDTT meeting on September 14.  The PC briefly summarized the case and then suggested that the inmate either be discharged the following day (at the 10th day) or given a ten-day MHCB extension.  There was no discussion regarding the inmate's current SI or safety plan.  The CMH, who was attending the IDTT meeting with this reviewer, then intervened and inquired about the inmate's observation level, as well as recommended that his level of care be increased to EOP.  The IDTT then approved the increased level of care and discharge on September 15.

This reviewer subsequently reviewed the inmate's UHR and for reasons that remained unclear from the medical chart, and despite unchanged behavior, the inmate remained in the MHCB at

PBSP for nine more days until September 22, 2016. He remained on observation at 30-minute intervals with "partial issue" clothing. A discharging SRE was *never* completed.

*Third*, as exemplified above, inmates on 30-minute observation and assessed as not suicidal were only given "partial issue" clothing (i.e., shorts, socks, and a t-shirt) which was contrary to their lack of suicide risk. In fact, this reviewer was informed that "full issue" clothing was *not* issued in the MHCB unit because there were *no* jumpsuits available.

*Fourth*, it appeared that MHCB clinicians were either routinely denying or not considering privileges for inmates because they were confused by the current policy. In fact, a local policy for the MHCB had been incorrectly revised on August 22, 2016 to state the following: "MHCB IPs whose clothing allowance has been restricted to a non-tear smock or a paper gown shall not be allowed access to out-of-cell privileges, until such time as the IP is permitted to possess clothing appropriate for participation and out of cell privileges." (The "Mental Health Crisis Bed Privileges" memorandum issued by CDCR on June 23, 2016 has no such prohibition.)

*Fifth*, because the recreation therapist was not full-time within the CTC and only available three times a week, MHCB clinicians were either writing orders that restricted yard privileges to only once a week or not at all, and rarely considered either telephone or visiting privileges for the same reason. Such decisions should be based upon the inmate's behavior, not recreation therapist availability.

*In sum, this reviewer found numerous problems within the MHCB unit, ranging from contradictory practices of clinicians ordering observation at 30-minute intervals for non-suicidal inmates while nursing staff provided observation at 15-minute intervals for the same inmates, to inmates never being issued full-issue clothing, as well as both confusion about, and restrictions placed upon, the issue of yard, telephone, and visiting privileges. IDTT case presentations and team attendance were also problematic. Of additional concern, many of these deficiencies were found during the 2015 assessment. As such, this entire area is in dire need of immediate corrective action.*

A review of Guard One data for a recent 24-hour period in the administrative segregation unit (housing both the STRH and GP/administrative segregation sections) found 96-percent compliance with the required checks that did not exceed 35-minute intervals. In addition, the PSU (located in the B-2 Unit and housing approximately ten inmates) was at 98-percent compliance for the same time period.

## Guard One and the Security Housing Unit (SHU)

Beginning in May 2014, CDCR implemented the Guard One system to electronically verify observation 24 hours a day at 30-minute intervals in all segregation units, including administrative segregation, SHU, PSU, and condemned housing within the prison system. Implementation was performed in phases, with PBSP scheduled to be operational on August 1, 2015. PBSP was the last CDCR facility to implement Guard One because of the SHU's "unique physical design" potentially causing a negative impact on both staff and inmates. Shortly after the August 1 implementation, inmates housed in the SHU began voicing complaints about the

excessive noise generated from Guard One, particularly during First Watch (10:00 p.m. to 6:00 a.m.). Noise complaints were primarily attributed to the sound caused by the metal "pipe" coming into contact with the metal memory button mounted to each cell door to record the time of the observation, sound of the frequent opening and closing of housing unit exterior doors, and the clanging of keys as officers moved through the housing units. Throughout the ensuing months, CDCR worked diligently in an attempt to reduce any excessive noise, including conducting noise studies and consulting with the company that installed the security doors.

As an interim measure resulting from continued complaints of excessive noise, CDCR submitted a proposal in December 2015 to temporarily reduce the frequency of Guard One checks during First Watch from 30-minute to 60-minute intervals. The proposal was subsequently accepted by plaintiffs' counsel and the Special Master, and submitted to the *Coleman* court for consideration.

The court approved the parties' stipulation on December 28, 2015. The requirement of checks not to exceed 35 minutes remained in effect during the Second and Third Watches. The stipulation was extended several times, most recently on June 30, 2016. CDCR subsequently informed both plaintiffs' counsel and the Special Master that the department and door contractor had completed all possible corrective actions to mitigate excessive noise generated during the Guard One checks. Due to continuing noise complaints by inmates, the parties agreed to a permanent policy limited to the SHU at PBSP allowing for Guard One observation at 60-minute intervals during the First Watch. The permanent stipulation was approved by the court on September 1, 2016.

In an attempt to assess both compliance with Guard One surveillance, as well as converse with SHU inmates regarding their general quality of life attributed to the noise issue, this reviewer scheduled an additional day at PBSP during this most recent on-site assessment. Although there were 22 SHUs located at PBSP, only ten housing units were activated as of September 16, 2016, and housed approximately 381 inmates. This reviewer spent several hours in the SHUs, much of the time accompanying the clinical psychologist assigned to the unit and responsible for twice monthly rounds. Of note, the psychologist demonstrated great rapport with inmates and was able to generate far more interchanges with them than this observer had seen from other clinicians during prior assessments in both 2014 and 2015. This reviewer also conversed with numerous SHU inmates and, with one exception, most seemed indifferent to the Guard One. There were few, if any, complaints about excessive noise. In fact, some of these inmates were familiar with the Guard One system from their previous restrictive housing unit placement in other facilities. The one exception was an inmate who informed this reviewer that he had submitted several medical requests complaining of inadequate sleep caused by the Guard One checks.

This reviewer also accompanied various officers on their rounds and observed the following: in an attempt to reduce excessive noise, custody staff set the Guard One pipe to silent mode 24 hours a day, officers held their hand over keys as they walked through the units in an effort to reduce noise, and plastic covers had been placed around chains that secured the outer doors in each unit. Overall, compared to prior observations by this reviewer, there appeared to be some reduction in the noise level. Ironically, the periodic flushing of toilets throughout the unit created more noise than the Guard One process.

A review of Guard One data for a recent 24-hour period in six SHUs found compliance with the required checks that did not exceed 35-minute intervals during Second and Third Watches, and 60-minute intervals during the First Watch, ranged from 94 to 98 percent.  Overall compliance in the six SHUs was at 95 percent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of March 1, 2016 through September 8, 2016.  This reviewer's subsequent sample review of 31 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in only 81 percent (25 of 31) of the cases.  A similar low percentage of SRE completion was found during this reviewer's 2015 assessment.  Of note, the failure to complete the required SREs based upon emergency mental health referrals was an issue found in the May 2016 suicide at PBSP (discussed below).  Clinician responses to emergency mental health referrals were otherwise timely.

A review of the 22 cases of inmates placed in alternative housing that were subsequently discharged back to their housing units, found 86 percent (19 of 22) had the required SREs.  Although there were uneven discussions regarding both current SI and safety planning during the observed IDTT meetings, a review of ten SREs of inmates discharged from the MHCB unit found an improvement in the quality of safety plans compared to the 2015 assessment.

Much of the improvement was attributable to the fact that the safety plans did not simply recite *Program Guide* requirements (e.g., "discharge back to custody at the CCCMS LOC, 5-day follow-up," etc.), but attempted to demonstrate reasonable strategies for reducing the recurrence of SI.  For example, in one case (PBSP 2), the safety plan stated:  "Recommend out-patient interventions: 1) Adjustment of psychiatric RX to address reported mood issues; 2) Medical to address SEs from HTN RX; 3) MH PC to work with patient on reality checks, stress, anger management, and relaxation techniques to help IM address his feelings of being trapped and hopelessness, as well as to cope with double celling situations; 4) To discuss need for DDP evaluation and possible help with completing documents."  Although not all of the safety plans in the reviewed discharging SREs were adequate, and there was a lack of concordance with safety plan summaries contained within some accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms, notable improvement was shown.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer examined 34 cases of EOP inmates discharged from a MHCB or alternative housing placement that remained at PBSP and were not transferred to the administrative segregation unit or SHU (where observation at 30-minute intervals was required) during March 1 through September 13, 2016.  (It should be noted that when this reviewer initially requested such

data, PBSP custody officials replied that *no* inmates were released from either a MHCB or alternative housing placement to a non-restrictive housing unit during the requested time intervals.  Sensing that such a scenario was unlikely, further data requests were made and resulted in discovery of the 34 cases.)  As a result, it was determined that the required two-page "Discharge Custody Check Sheet" (CDCR MH-7497) forms were *not* completed in any of the 34 cases.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (June through August 2016) of SPRFIT meeting minutes, as well as this reviewer's observation of the September 14 meeting, found that, with one exception, there was good attendance by required members.  The exception was that there was no psychiatry representation at any of the monthly meetings, caused primarily by the fact that the chief psychiatrist position at PBSP had been vacant for several months and only one psychiatrist was available at the facility.  Meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 100 percent of both custody staff and nursing staff were currently certified in CPR.  In addition, 96 percent of custody staff, 90 percent of medical staff, and 96 percent of mental health staff received annual suicide prevention block training during 2015.  Finally, as of September 2016, 89 percent of mental health clinicians had completed the SRE mentoring program, and 82 percent had received the seven-hour SRE training.

**Recent Suicides**:  PBSP experienced one inmate suicide during the review period.  In that case (PBSP 3), the inmate was found hanging from a light fixture by a sheet in his GP cell during the morning of May 28, 2016.  He entered the CDCR system (for a third term) on March 30, 2015 to serve a 19-year sentence for attempted murder.  The inmate was transferred to PBSP on March 1, 2016.  He had incurred three RVRs during his confinement, the most recent of which occurred on March 29, 2016 for refusing orders.  The inmate was considered to be gang-affiliated.  He was never married but had two children.  The inmate had family support from both his mother and older sister.

According to available records, the inmate had a dysfunctional childhood, which included physical abuse by his mother.  His father died at an unknown age, and the inmate was primarily raised by his grandparents.  His mother and grandfather were known to have significant problems with substance abuse.  The inmate began using illegal drugs at age eight.  He developed a significant substance abuse problem which resulted in various juvenile and adult convictions.

The inmate did not have any reported history of mental health treatment in the community, and first received mental health services in the county jail for both depression and anxiety prior to his CDCR commitment.  Upon entry into CDCR, the inmate screened positive for mental health issues during the RC process and was referred for further mental health assessment.  He was diagnosed with Anxiety Disorder NOS, enrolled in the MHSDS at the 3CMS level of care, and prescribed psychotropic medication.

The inmate reported a history of three prior suicide attempts in the community, the first at age 12 when he cut his wrist, the second in 2010 when he pulled a gun on police and encouraged them to shoot him, and the third in 2012 when he intentionally drove his car into a pole. He also once told a CDCR clinician that he wanted to be housed on a yard "where he might be harmed by others." An SRE completed on April 3, 2015 found both his chronic and acute risk for suicide to be "moderate." Several subsequent SREs assessed his acute risk for suicide at either "low" or "moderate."

By June 2015, the inmate was elevated to EOP "due to an increase in depression, including sadness, regret, rumination, and symptoms of anxiety." He also expressed SI on June 12, but a MHCB referral was not determined to be necessary. In early September 2015, the inmate reported to his PC that he was experiencing "severe social anxiety and did not like to be around a lot of people. He requested a modified program for this reason, explaining further that he stopped his medication because it made him feel ill." He also reported numbness, nausea and dizziness. In October 2015, he began reporting various symptoms that he believed were related to serious heart disease. A subsequent medical examination found that "although there are some medical difficulties, it appears that the majority of the reported symptoms are somatic and perpetuated by anxiety." On November 11, 2015, he expressed SI with a plan to hang himself if he was returned to his cell. Apparently he was both anxious and agitated surrounding complaints of chest pain that resulted in transport to a local hospital, but no resolution to his symptoms. The inmate was placed in alternative housing and discharged the following day after he denied any current SI, and was hopeful about getting his medical issues resolved.

From December 2015 through January 2016, the inmate appeared less anxious about his perceived medical problems. By early February 2016, however, he began to grow more depressed and anxious about these issues. He underwent numerous medical examinations, and was assessed for a broad range of potential heart problems, given neurological and endocrine tests, and gastrointestinal examinations. All of these tests were negative. On March 10, 2016, his diagnoses were changed to Generalized Anxiety Disorder; Stimulant Use Disorder in a Controlled Environment; and Somatic Symptoms Disorder.

Although the inmate continued to be seen by a mental health clinician on a weekly basis, most of the contacts occurred at cell-front as he rarely left his cell except to attend his numerous medical appointments. He also refused to attend his group therapy sessions because of recurring complaints of chest pain and dizziness, and he became non-compliant with his psychotropic medication due to complaints about side effects. His medication was subsequently discontinued.

On April 22, 2016, the inmate submitted an appeal concerning his discontinued psychotropic medication. In his appeal, he stated that "since my medication has been stopped, I've been having suicidal thoughts and deep depressions." As a result, an emergency mental health referral was generated that morning (April 22). Contrary to policy, the inmate was not seen by a mental health clinician until the following morning (April 23). The required SRE was *not* completed. Instead, the responding clinician wrote a progress note that indicated the inmate was no longer feeling suicidal, "is not displaying any MH distress at the present moment, and is not warranted a referral to MHCB at this time." Several days later on April 28, the inmate was escorted to the

TTA following complaints of vomiting, nausea, and chest pain. During the examination, he became anxious and agitated, as well as expressing SI. An emergency mental health referral was generated and he was seen by another mental health clinician shortly thereafter. He told the clinician that "I'm stressed out because medical is not taking me seriously, my blood pressure keeps speeding up and I keep passing out and they aren't doing anything about it." The inmate also complained about discontinuation of his psychotropic medication. He then denied SI and stated "no I don't want to go there, I just want my medical stuff taken care of." Contrary to policy, the required SRE was again *not* completed.

The inmate continued to be seen by his PC on a weekly basis during April and May 2016, and continued to be overwhelmed by his perceived medical problems. He was sent out to a local hospital and placed in the CTC on two occasions (April 4 through April 16 and then May 15 through May 27) for further medical testing of cardiovascular disease. He was also seen by a CTC psychiatrist on May 26, 2016, resulting in a psychiatric note that stated, in part, that "inmate again states that he would like to resume Remeron; c/o feeling depressed. He reports he has been thinking about his family and about his mortality. He asserts that he expects to die soon. He reports SI, elaborating that he wishes to not die of a heart attack or a stroke or to suffer brain damage. He volunteers that he has no plan for committing suicide. He reports peculiar perceptions including having the image of a cardiac defibrillator triggered by the sound of a slamming door, taking events in his environment as signs of coming demise and inaccurately interpreting the utterances of others - often with ideas of reference." An SRE was *not* completed. The psychiatrist determined that the inmate's psychotropic medication could not be restarted until after pending medical test results had been received. (It should be noted that the psychiatrist was interviewed following the inmate's suicide and stated that the notation "reports SI" was an error. Such a correction would be curious given the remainder of the sentence, i.e., "elaborating that he wishes to not die of a heart attack or a stroke or to suffer brain damage.)

Upon his discharge from the CTC the following day (May 27), the inmate completed a Physician Orders for Life-Sustaining Treatment (POLST) form because he was fearful of having a massive heart attack or stroke that resulted in being kept alive in a vegetative state. The inmate committed suicide the following morning (May 28). In addition to the warning signs of his eventual suicide that included the belief that he would soon die of a serious heart ailment and completing a POLST form the day prior to his death, there were several suicide letters or notes found in his property.

The Suicide Report contained only one recommendation for corrective action through a QIP: "Psychiatry notes authored on April 21, 2016, May 20, 2016, and May 26, 2016 lack sufficient psychiatrist plans and interventions."

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable, but was preventable.

### 20)    **Mule Creek State Prison (MCSP)**

**Inspection**: September 27-28, 2016 (previous suicide prevention audit was on March 24-25, 2015). MCSP housed approximately 3,504 inmates at the time of the on-site assessment.

164

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on May 28.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions.  The door to the new nurse's office was closed, with the officer stationed outside providing security.  Privacy and confidentiality were ensured, correcting a deficiency observed during previous assessments.

Daily PT rounds in the administrative segregation units (Buildings 12 and 13) were observed on September 27.  The rounds were unremarkable and the two PTs correctly completed the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  MCSP had a ten-bed CTC, with eight designated MHCBs.  A previous concern regarding sink faucets having horizontal slits (known as "anti-squirt" slits) had been corrected; all cells were now suicide-resistant and did not contain any obvious protrusions which could be utilized in a hanging suicide attempt.

Further, Building 12 (housing mostly administrative segregation EOP inmates) had 16 retrofitted suicide-resistant cells designated for new intake inmates.  During inspection of this unit, although this reviewer observed that all 16 new intake cells were full, only four inmates had been housed in these cells for 72 hours or less.  The remaining 12 inmates could have been relocated to other administrative segregation cells.  Inspection also found that three new intake inmates were in unsafe non-new intake cells.  In addition, Building 13 (previously self-described as the Mental Health Outpatient Housing Unit (MHOHU) and currently housing both administrative segregation 3CMS and GP inmates) also contained three new intake inmates housed in unsafe non-new intake cells.  The finding of new intake inmates housed in unsafe, non-retrofitted cells was previously found in both of this reviewer's 2014 and 2015 assessments.

Finally, **<u>alternative housing</u>** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were used on a daily basis at MCSP.  This reviewer was presented with data indicating that 291 inmates were placed in alternative housing from June 1 through September 27, 2016.  The majority (56 percent) of inmates were held over 24 hours, with 22 percent held in excess of 72 hours.  Building 13 (administrative segregation) was used for alternative housing, all inmates had beds, and all were required to be observed on a continuous 1:1 basis.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, inmates not on suicide observation status were observed at 30-minute intervals by nursing staff.  Although nursing staff were observed to be using the correct Suicide Watch/Suicide Precaution Record observation form, with the forms located on the outside of each inmate's room door, there were concerns that inmates were not being properly observed.  For example, this reviewer arrived at the MHCB unit at approximately 9:30 a.m. on May 28.  Two inmates were on Suicide Precaution status and the remaining six inmates were required to be observed at 30-minute intervals.  There were *not* any observation notations on forms for any of these eight inmates for well over 30 minutes.  Similar problems with the correct documentation of observation rounds were found during this reviewer's 2015 assessment.

This reviewer observed two IDTT meetings in the MHCB unit on May 28. There was an adequate discussion of each inmate's level of observation, as well as safety planning, observed during both meetings. In one case (MCSP 1), the inmate was on RC status and had been placed in the MHCB awaiting a DSH referral. Although RC inmates were normally prohibited from having telephone privileges, the IDTT granted the distraught inmate a special telephone call so that he could call his wife. Each of the eight inmates was clothed consistent with their observation and risk levels, correcting a problem that had been observed during the 2015 on-site assessment.

There were, however, concerns about the granting of other MHCB privileges. When this reviewer asked the IDTT about the frequency of yard use, several team members responded by saying that most inmates did *not* ask for yard privileges and preferred using the program room. Despite the presence of a full-time recreation therapist, it appeared that most inmates were incorrectly informed that they could choose either the yard *or* program room, and not both. Team members estimated that the yard had not been used for at least several weeks.

A review of Guard One data for a recent 24-hour period in the administrative segregation units found 99-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of March 1, 2016 through August 31, 2016. A review of the TTA log for the same time period was also completed. This reviewer's subsequent sample review of 30 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in *all* of the cases.

A review of ten charts of inmates discharged from the MHCB unit during August and September 2016 found that only 40 percent contained an adequate safety plan for reducing SI, with the majority (60 percent) containing narrative in safety plan sections that deferred such planning to EOP clinicians, and/or the safety plan summaries contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms failed to demonstrate any concordance with the safety plans from the discharging SREs.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 124 cases of inmates discharged from a MHCB or alternative housing placement that remained at MCSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during June 1 through September 27, 2016. The review found that 82 percent had page one of the "Discharge

Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. In addition, 70 percent of the "custody check" forms (page two) were completed correctly by correctional staff at 30-minute intervals, whereas 30 percent of the forms were completed in excess of 30-minute intervals or completed in part or not at all. Finally, 78 percent of the custody checks were discontinued by the clinician after 24 hours.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes reflected good attendance from all required members. Meeting minutes were otherwise unremarkable**.**

**Training**: According to training records, 98 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 98 percent of custody staff, 82 percent of medical staff, and 92 percent of mental health staff received annual suicide prevention block training during 2015. Finally, as of September 2016, 100 percent of mental health clinicians had completed both the SRE mentoring program and the seven-hour SRE training.

**Recent Suicides**: MCSP did not experience any inmate suicides during the review period.

### 21)    SAN QUENTIN STATE PRISON (SQ)

**Inspection**: September 29-30, 2016 (previous suicide prevention audit was on May 5-6, 2015). SQ housed approximately 3,814 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the medical intake screening process in the RC on September 29. The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions. The door to the nurse's office was closed, with the officer stationed outside in the hallway, thus ensuring both privacy and confidentiality. Due to a scheduling conflict, the mental health diagnostic testing in the RC was not observed.

Daily PT rounds in administrative segregation (Carson Unit) were observed on September 30. The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**: As part of a SQ mission change in 2014, all MHCBs had been converted to PIP rooms for condemned inmates. All non-condemned SQ patients requiring a crisis level of care were referred to outside MHCBs. All 40 PIP rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.

The administrative segregation unit contained approximately 45 new intake cells on the first and second tiers. Most, but not all, of the cells were retrofitted. Due to a low census, many of the new intake cells were empty and all new intake inmates were observed to be in retrofitted new intake cells.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was infrequently used at SQ. This reviewer found that there were only 25 inmates placed in alternative housing during the two-month period of August and September 2016, with an average length of stay of approximately 44 hours. The reason(s) for the infrequent use of alternative housing was unclear, particularly in light of the facility's RC mission, but might be partially explained by the fact that not all emergency mental health referrals for SI result in completion of required SREs (see below). When alternative housing was used, inmates were primarily housed in either the ten licensed medical beds in the CTC, TTA cells, or various large holding cells scattered throughout the CTC building. Inmates were required to be provided with a stack-a-bunk and observed on a continuous 1:1 basis (although an inmate committed suicide on alternative housing status in one of the CTC rooms in May 2015 without the required continuous observation [see below]). Approximately 80 percent of alternative housing inmates were subsequently placed in a MHCB.

**Observation**: All inmates in the PIP were required to be observed on a Q-15 minute level of observation, unless they were on Suicide Watch status and received constant observation. Because all inmates were required to be observed at 15-minute intervals, the term "Suicide Precaution" was not used. Although a different observation form was utilized in the PIP, review of the forms found that they were all documented at staggered intervals.

This reviewer observed three IDTT meetings on September 30. The IDTT was well represented by mental health, medical and custody staff. Due to the PIP being an inpatient setting, further assessment of overall suicide prevention practices, including safety planning, was deferred to the *Coleman* clinical team. Of note, however, prior to this reviewer's on-site assessment, the practice of PIP clinicians was *not* to offer yard, telephone, and visiting privileges to PIP patients "unless they requested it," a practice that was contrary to the "Mental Health Crisis Bed Privileges" memorandum issued on June 23, 2016.

A review of Guard One data for a recent 24-hour period found 95-percent compliance with required checks that did not exceed 35-minute intervals in administrative segregation, whereas the four condemned units (Donner, East, North, and Adjustment Center) had a compliance rate of 99 percent.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of March 1 through September 27, 2016. In addition, various TTA logs were also subsequently reviewed. (Of note, these documents were *not* submitted to the reviewer until the second day of the on-site assessment, thus delaying the analysis.) This reviewer's subsequent sample review of 15 cases of emergency mental health referrals for suicidal behavior from the MHTS from March and September 2016 found that clinicians completed the required SREs in *all* of the cases. However, a sample review of 11 emergency mental health referrals for suicidal behavior from the TTA log from August and September 2016 found that only 73 percent (eight of 11) resulted in completion of SREs. Thus, the overall compliance rate for SRE completion from both the MHTS and TTA log was 88 percent (23 of 26).

One case (SQ 1) was particularly troublesome.  The inmate was serving a 30-year-to-life sentence with parole consideration for several sexual offenses.  He expressed SI to RC custody staff during the morning of September 5, 2016, and was appropriately referred to a mental health clinician and seen shortly thereafter.  Although an SRE was *not* completed, the clinician wrote a progress note that stated the "IP expressed that he considered killing himself the night before and stated that he had a plan to hang himself, cut his wrist, and/or take pills.…IP reported command auditory hallucinations telling him to hurt himself and hurt others."  According to the progress note, "IP was immediately referred to the TTA for further evaluation by the High Risk Mental Health Team." Shortly thereafter, the inmate was seen by another clinician.  The subsequent progress note incorrectly indicated that the inmate was "referred to the TTA today by his primary clinician who was completing a PC Routine contact."

This second clinician's progress note also indicated that various records had been reviewed indicating that the inmate had an extensive history of prior suicidal behavior and attempts.  The inmate now denied any current SI.  He was "cleared to return back to housing on a 5-day follow-up for closer observation and additional support due to his conflicting presentation with this writer and his primary clinician."  The required SRE was *not* completed.

In addition, this reviewer also found that several cases of inmates sent to the TTA for an emergency mental health referral were problematic even if an SRE was completed.  For example, in one case (SQ 2), the inmate was referred to the TTA during the afternoon of August 4, 2016 for SI.  He was seen by a clinician who correctly completed an SRE, but did not review any records (e.g., SOMS[13] or eUHR).  The inmate reported that he had entered CDCR the previous day (August 3) to serve a sentence for statutory rape.  He was expressing both safety concerns and SI.  The inmate was assessed at a "moderate" acute risk for suicide, i.e., "notable risk factors include passive SI, early in term at SQ, safety concerns as a result of index crime."  He was *not* placed in alternative housing or referred to a MHCB, but spoke with custody staff regarding administrative segregation placement.  In a second case (SQ 3) involving the same clinician, a different inmate was referred to the TTA during the morning of August 5, 2016 for SI.  He was seen by the clinician who completed an SRE that found the inmate to be at "moderate" acute risk of suicide, i.e., "IP thinking more about suicide recently. Ideation without plan or intent.  Mood is depressed, and IP has continuing safety concerns.  IP in a single cell."  The inmate was *not* placed in alternative housing or referred to a MHCB, rather he "was placed on a 5-day follow-up for continued assessment."  In both cases, safety planning to reduce continued SI was absent.

Of note, although the SRE completion rate for emergency mental health referrals was 88 percent, the problem was exacerbated by the fact that several of the completed SREs, including those detailed above, were problematic.

Further, a sample review of 37 cases of inmates discharged from alternative housing back to SQ housing units found that only 84 percent (31 of 37) contained the required discharging SREs.  In addition, the majority of SREs that were completed did not contain an adequate safety plan for reducing SI, with most of the narrative contained in safety plan sections simply deferring such planning to other clinicians, and/or the safety plan summaries contained within accompanying

---

[13] Strategic Offender Management System

Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms failed to demonstrate any concordance with the safety plans from the discharging SREs.

As such, when the total number of sampled cases of inmates receiving emergency mental health referrals for SI from the MHTS and TTA logs were combined with the cases of inmates discharged from alternative housing, the result indicated that required SREs were completed in only 86 percent (54 of 63) of the cases.  A similar low percentage for SRE compliance was found during the 2015 assessment.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

At the outset, it should be noted that SQ custody and mental health officials initially informed this reviewer that although "Discharge Custody Check Sheet" (CDCR MH-7497) forms had been completed for *all* inmates discharged from a MHCB, alternative housing placement, or DSH, and *all* such inmates had been observed by custody staff at 30-minute intervals, such documentation could *not* be located.  This reviewer then narrowed the document request to include only August and September 2016, and again asked for documentation to show proof of practice.  This reviewer subsequently reviewed documentation of 32 cases of inmates discharged from an outside MHCB placement or internal alternative housing placement that remained at SQ and were not transferred to administrative segregation or the condemned unit (where observation at 30-minute intervals was required) in August and September 2016.  Much of the documentation was incomplete, with page one of the "Discharge Custody Check Sheet" (CDCR MH-7497) not located in many cases.  A review of page two of the forms which contained the "custody check" forms indicated that 81 percent (26 of 32) of observations were at 60-minute intervals, and 19 percent (six of 32) did *not* contain any time intervals.  Therefore, *none* of the custody checks forms contained observation at the required 30-minute intervals (and, in fact, a LOP [0-1023: "Suicide Prevention Policy"] revised August 2016 incorrectly stated that "custody staff will make rounds a minimum of every hour for the first 24 hours").

Of note, review of this five-day follow-up process uncovered another troubling practice.  This reviewer found a case (SQ 4) in which an inmate on a five-day follow-up complaining about the loss of his property (including his Bible, Bible dictionary, thesaurus, and writing materials) and foul smell of urine in his cell, was the recipient of a safety plan contained within the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) that stated the following:

> Explained that custody takes his property while he is on a 5-day follow-up and
> that we are working on changing this policy.  Discussed with IP how to deal with
> the urine smell, considering he has no property.  Suggested soaking a state towel

with the state-issued soap he does have and possibly sleeping with his head cell-front instead of next to the toilet.

CDCR policy ("Provision of Mental Health Crisis Bed Discharge Custody Checks Policy," Memorandum dated January 27, 2016) does *not* allow for the routine confiscation of basic property of inmates on five-day follow-up status.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (July through September 2016) of SPRFIT meeting minutes reflected good attendance from all required members.  Meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 90 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 98 percent of custody staff, 68 percent of medical staff, and 74 percent of mental health staff received annual suicide prevention block training during 2015.  Finally, as of September 2016, 94 percent of mental health clinicians had completed the SRE mentoring program, and 100 percent had received the seven-hour SRE training.  Low compliance rates for suicide prevention block training for medical and mental health staff were also found during this reviewer's 2015 assessment.

**Recent Suicides**:  SQ experienced two inmate suicides during the review period (both of which occurred during 2015).  In the **_first_** case (SQ 5), the inmate was found unresponsive with an electrical cord wrapped around his neck in a CTC "swing" medical bed used for alternative housing during the afternoon of May 25, 2015.  The inmate entered the CDCR system as a condemned inmate in January 1992 after receiving the death penalty for first-degree murder with special circumstances.  He incurred only one RVR during his confinement for use of a controlled substance in August 2014.

According to available records, the inmate and his brother were primarily raised by their mother after the divorce of their parents at a young age.  His father had been physically abusive, suffered from substance abuse, and later served time in prison.  Much of the information about the inmate's childhood and young adulthood was unknown, other than the fact that he struggled in school and developed a significant substance-abuse problem at age 11.  By age 16, he became involved in gangs, a lifestyle that resulted in various juvenile and adult convictions.  The inmate was never married, but had a son from a previous relationship.  Although there were records to indicate that the inmate was assessed by a psychiatrist at age 12 because of behavioral problems, as well as received several court-ordered psychiatric evaluations in 1992 pursuant to the death penalty proceedings in his case, the inmate had no other known mental health treatment in the community.

For the majority of his CDCR confinement, the inmate was not a participant in the MHSDS.  However, on January 28, 2015, he was admitted into the PIP following reports of AH, drug and alcohol abuse, depression, and SI.  He was discharged the following week on February 5, 2015 at the 3CMS level of care, where he remained until his death.  His diagnoses were Depressive

Disorder NOS and Methamphetamine Abuse. The inmate was also placed on psychotropic medication. The inmate did not report a prior history of suicidal behavior until his first SRE in January 2015. At that time, he reported three prior suicide attempts, all of which allegedly occurred during CDCR confinement and were not confirmed by any records. (The alleged incidents included drug overdoses and a hanging attempt.) His most recent SRE completed at discharge from the PIP in February 2015 assessed his chronic risk for suicide as "moderate" and his acute risk for suicide as "low."

The inmate had a medical history that included hypertension, obesity and a chronic skin condition. According to the CDCR reviewer in this case, there were no medical issues that were thought to be proximate causes of his suicide.

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide, although several handwritten notes were found in the inmate's property, ranging from themes involving cold cases of murder and rape, the recent death of his grandmother, and expressing frustration about not hearing from his family. On May 25, 2015, the inmate was placed in alternative housing after reporting SI, stating "I want to come off this poison" in reference to methamphetamine which he had allegedly been taking for the past three days. He was diagnosed with "drug-induced psychosis with suicidal ideation," and described as both paranoid and delusional. Contrary to alternative housing regulations, he was placed on Suicide Precaution status requiring observation at 15-minute intervals, as opposed to the required 1:1 continuous observation. Several hours later, the inmate was observed by nursing staff to be asphyxiating himself with an electrical cord in the room. An emergency was called, and both nursing and custody staff responded to the scene. The room door was opened, and the inmate began to yell, curse and become combative with intervening staff. He was subsequently placed in a wheelchair and restrained, but became unresponsive a short time later and died.

The Suicide Report contained five recommendations for corrective action through a QIP:

> 1) The inmate was discharged from the MHCB on February 5, 2015. The treatment plan specified that he would be seen by his PC at least monthly for depression, methamphetamine dependence, and suicidal ideation/attempts. However, the February 12, 2015 and March 18, 2015 progress notes documented plan was to meet with the inmate "in 60 days or sooner" but there was no rationale provided for why the monthly contacts were discontinued and what treatment had occurred to warrant the decreasing care or need for additional assessment;

> 2) Suicidal ideation was not a problem listed on the treatment plan dated February 5, 2015, on the last day of his MHCB discharge. He was admitted to the MHCB on January 28, 2015, and discharged on February 5, 2015 (8 days), for suicidal ideation with a plan to hang himself following a methamphetamine binge and paranoia. The February 17, 2015 CCCMS treatment plan included the problem of suicidal ideation/attempts. Documentation does not reflect consideration for a higher level of care;

3) SREs did not include or integrate imminent warning signs for suicide consistently and did not provide a risk reduction or safety plan following his MHCB discharge;

4) On May 25, 2015, patient was placed in a CTC medical bed on suicide precautions. Patient had access to an electrical cord that was used to choke himself while on suicide precautions. It is unclear why the inmate was placed in a CTC medical bed instead of the suicide-resistant MHCB; and

5) Per the Nursing Death Review Summary, five nursing concerns were identified requiring follow-up [all related to May 25, 2015, and included delay in rescue breathing, documentation errors, notification to medical provider, and delay in initiating suicide precautions and not performing vital signs in TTA prior to placement on suicide precautions].

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was both foreseeable and preventable.

In the ***second*** case (SQ 6), the inmate was found hanging from the door ventilation grate by a sheet in his administrative segregation cell during the early morning of September 13, 2015. The inmate entered the CDCR system on July 28, 2015 to serve a four-year sentence for assault with force likely to produce great bodily injury. He did not have any RVRs and, although not known to be gang-affiliated, reported enemy concerns regarding a disagreement and/or debt with gang members in the county jail prior to his CDCR confinement. The 21-year-old inmate was single with no children, but had good family support from his parents and sisters.

According to available records, the inmate was raised with his two older sisters in a traditional family manner by both parents. He did, however, report being molested on his fourteenth birthday by a male mentor. The inmate also had a history of learning difficulties, including ADHD. He also experienced problems with substance abuse, resulting in his brief hospitalization at age 16. The inmate was also placed in several youth ranch and wilderness programs as a result of several juvenile arrests and convictions. In addition, he had several adult convictions for drug offenses, as well as several probation failures.

The inmate's mental health treatment in the community was mostly associated with his substance abuse, however, he received several diagnoses as a teenager, including Psychotic Disorder NOS, Mood Disorder with Depressive Symptoms, Schizophrenia, Bipolar Disorder and Oppositional Defiant Disorder. While confined in the county jail prior to his CDCR confinement, the inmate was treated for depression and placed on suicide precautions from July 16-19, 2015 after expressing SI with a plan to cut himself with a razor. In addition, there was evidence of self-injurious behavior and SI during substance abuse treatment placements in 2010 and 2013. Upon his arrival to the RC at SQ on July 28, the inmate screened positive for mental health issues and met the criteria for the MHSDS at the 3CMS level of care. He was diagnosed with Mood Disorder NOS, Bipolar Disorder, Most Recent Episode Depressed with Psychotic Features. SREs completed on July 30 and August 12, 2015 both found that the inmate was at "low" chronic and acute risk for suicide. The inmate had an unremarkable medical history.

The CDCR reviewer in this case did not offer any specific precipitating factors to the suicide. However, several hours before his death, the inmate informed custody staff that he had safety concerns and requested to be moved to administrative segregation.  The request was granted and he was transferred at approximately 9:00 p.m. on September 12.  He denied SI during the administrative segregation pre-placement chrono completed at the TTA, and was found hanging approximately four hours later at 1:07 a.m. on September 13.  According to the CDCR reviewer, "The inmate was seen by SQ mental health clinicians but seemed to underreport his symptoms compared to what was observed by the inmate's cellmates…..who reported that he experienced sleep difficulties, made odd statements about being sent to prison by his parents in order to be stabbed and killed, appeared anxious and agitated (e.g., constant pacing), and made paranoid comments."  In an undated journal entry found after his death, the inmate apologized to his parents ("you and dad deserve better than I ever put forward, and for that I am apologizing").

The Suicide Report contained one recommendation for corrective action through a QIP:  "On-site review identified the steel mesh screen used to provide ventilation to Cell 1-C-18 provided a ligature point and is not in compliance with current retrofitted intake cell requirements."  (This reviewer's inspection of Cell 1-C-18 [an administrative segregation new intake cell] on September 29, 2016 found that the cell door contained a steel plate [not mesh screen] with ventilation holes of 3/16 inch diameter which was consistent with both CDCR requirements and the industry standard.)

Based upon the findings contained within the Suicide Report, the Suicide Case Review Committee found that this suicide was not foreseeable and not preventable.

### 22)    Richard J. Donovan Correctional Facility (RJD)

**Inspection**:  October 25-26, 2016 (previous suicide prevention audit was on April 19-20, 2015). RJD housed approximately 3,024 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on October 25, 2016.  Of note, the nurse's office had been renovated and enlarged, with construction completed the previous week, and now included a large window to enhance visibility.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and observed to be asking all of the required questions.  During the screening, the door to the nurse's office was closed, with an officer stationed outside in an adjoining room.  Privacy and confidentiality was ensured when the door was closed.  However, the nurse reported that if staff felt uncomfortable with a particular inmate, an officer was requested to stay inside the office.  The nurse's office was now large enough to accommodate a holding cage which should be used on a case-by-case basis if nursing staff felt uncomfortable during the screening process.

Daily PT rounds in the B-6 and B-7 administrative segregation units were observed on October 25.  The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front on all caseload inmates.

**Housing**:  RJD had 12 MHCBs, as well as two swing beds.  All 14 rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.  A previous concern of sink faucets containing potentially dangerous anti-squirt slits had been corrected.

Both administrative segregation units (B-6 and B-7) each contained 12 retrofitted new intake cells.  During inspection of each unit, this reviewer observed a low census and all new intake inmates were housed in new intake cells.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was frequently used at RJD.  This reviewer was provided data that indicated 59 inmates were placed in alternative housing in August 2016, with the majority (54 percent) housed for 48 hours or more.  In September 2016, 77 inmates were housed in alternative housing, with 73 percent housed for 48 hours or more.  When alternative housing was used, inmates were primarily housed in CTC medical beds and other designated cells throughout the facility, including the B-7 ASU.  All inmates were provided bunks (including stack-a-bunks in the CTC rooms) and observed on a continuous 1:1 basis.  According to available data, most inmates in alternative housing were subsequently admitted to a MHCB.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, inmates not on suicide observation status were observed at 15-minute intervals by nursing staff.  This reviewer observed that nursing staff were using the correct Suicide Watch/Suicide Precaution Record observation forms, with forms located on the outside of each inmate's room door.  The reviewed forms appeared to be accurate and up-to-date.

This reviewer observed three IDTT meetings in the MHCB unit on October 26.  The treatment team was well represented by mental health, medical, and custody staff.  Overall, there was very good discussion in each case regarding current suicide risk and safety planning.  One case (RJD 1), however, was problematic because the inmate had been housed in the MHCB for over 30 days (since September 23) for SI related to safety concerns.  Although his SI had been resolved shortly after admission, and he had *not* been on Suicide Precaution status for almost his entire stay, he remained in the MHCB.  The inmate was discharged to administrative segregation during the IDTT meeting on October 26, but it remained unclear why it took over 30 days to resolve the safety issues.

There was one issue regarding clothing provided to inmates in the MHCB that was problematic.  Despite a LOP (OP No. 18: CTC, last updated October 11, 2016) that stated:  "Clothing within the CTC shall include the following: State-issued blues (shirt and pants) or jumpsuit (for ASU IPs), whites (t-shirt, boxer, and socks), and shoes/shower shoes," as well as safety smocks issued as appropriate, the practice within the MHCB was only to provide "partial issue" (t-shirt, boxers, and socks) despite orders for "full issue."  This reviewer was informed that both "state-issued blues" and jumpsuits were *not* available in the CTC.  If correct, such an explanation was obviously problematic.

This reviewer observed no issues related to MHCB privileges.  RJD had a very proactive yard program within the MHCB unit that included an enthusiastic full-time recreation therapist that

tried to encourage inmates to attend yard twice a week (preferring not to use the program room because he viewed it as claustrophobic). Music, books, magazines, and photocopies of daily newspapers were available to inmates that attended yard.

A review of Guard One data for a recent 24-hour period in both administrative segregation units found 98-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period April 1 through October 10, 2016. The TTA log for the same time period was also reviewed. This reviewer's subsequent sample review of 57 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in 91 percent (52 of 57) of the cases.

Further, although data indicated that from April 1 through October 6, 2016 discharging SREs were completed in only 85 percent of cases, review of ten charts of inmates discharged from the MHCB unit during August and September 2016 found that most contained an adequate safety plan for reducing SI. For example, in one case (RJD 2), the safety plan stated the following:

> The following interventions are recommended for inclusion in IP's tx plan upon his return to EOP level of care: Initiate a MH follow-up protocol including daily safety checks by custody, daily check-ins with a mental health clinician and place IP on High Risk List to provide support through additional PC contacts. Schedule at least 10 hours a group. IP does not endorse imminent warning signs at this time. Due to IP's history of not being able to clearly contract for safety on the yard, continue to engage IP in safety planning and identify thoughts/triggers to crisis. It is recommended that his PC carefully builds rapport with him and meets with him weekly for individual sessions. IP may benefit from continued encouragement to participate in groups and treatment. IP may also benefit from being monitored for potential SI and current risk. IP can utilize EOP to practice CBT concepts such as the A-B-C model, cognitive distortions and self-talk (to address potential sx of depression). Pharmacotherapy and medication management to target depressive symptoms. Explore recent stresses that lead to his recent MHCB admission and teach DBT skills for emotion regulation when experiencing mood changes. To bolster protective factors, encourage IP to continue to utilize previously identified skills of maintaining family contact, encouraging continued spirituality, encouraging writing, art and program participation.

In a second case (RJD 3), the adequate safety plan from another clinician stated:

> 1) Crisis Plan: IP can clearly articulate a treatment plan: Speak with his clinician, resolve custody issues, and use TV to relax and stay busy. While in EOP: Frequent contacts with PC, attend groups, RT, and yard time.

176

2) Modifiable Risk Factors: Inmate discussed managing symptoms of trauma and severe depression.  Increased empathy and rapport with IP, as he reports opening up more with clinicians.  Trust could help facilitate healthy relationships, and modeling communication.  IP could also use more awareness on how to resolve problems such as anger, helplessness and advocacy skills when obtaining his TV/property.  Warning signs:  Help IP work on coping skills to decrease SI intensity and frequency.  He discussed upcoming parole in about a year with fears of homelessness, and parole planning may help decrease issues of purposelessness and hopelessness.

3) Protective Factors IP's only PF is his expressed desire for MH treatment.  Yard clinician can explore a possible DSH-ICF referral.  Development of future plans and goals would benefit a reduction in depression and hopelessness.  IP discussed being unable to engage in exercise due to his back injury and finding alternative ways to manage stress such as meditation may be beneficial.  Also, maintain psychotropic medications for stabilizing depression.

The concern with these safety plans is the ability to effectively translate onto the safety plan summary sections contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 52 cases of inmates discharged from a MHCB or alternative housing placement that remained at RJD and were not transferred to administrative segregation (where observation at 30-minute intervals was required) in August 2016 and October 1 through 15, 2016.  The review found that 79 percent of the cases had complete packets (both page one and page two of the forms).  Most of the remaining 21 percent of cases were missing page two (the "custody checks" form).  Although it appeared that clinicians ordered discharge custody checks for up to 72 hours in almost half (25 of 52) of the cases, and custody staff were correctly conducting checks at 30-minute intervals, custody staff did *not* complete the required checks during the first 24-hours in 40 percent (ten of 25) of the cases.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings:**  A review of three months (August through October 2016) of SPRFIT meeting minutes reflected good attendance from all required members.  Meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff, 68 percent of medical staff, and 70 percent of mental health staff received annual suicide prevention block training during 2015.  A similar low compliance rate for annual suicide prevention training by medical and mental health staff was found during the 2015 assessment.  Finally, as of October 2016, 99 percent of mental health clinicians had completed the SRE mentoring program, and 100 percent received the seven-hour SRE training.

**Recent Suicides**: RJD did not experience any inmate suicides during the review period.

### 23)    High Desert State Prison (HDSP)

**Inspection**:  November 8-9, 2016 (previous suicide prevention audit was on July 10-11, 2014).  HDSP housed approximately 3,751 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on November 8, 2016.  The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and observed to be asking all of the required questions.  During the screening, the door to the nurse's office was closed, with an officer stationed outside, thus ensuring privacy and confidentiality.  Each inmate was placed in a holding cage within the nurse's office.

Daily PT rounds in the STRH unit B-6 and B-7 administrative segregation units were observed on November 9.  The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front on all caseload inmates.

**Housing**:  HDSP had ten MHCBs; all rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.  A previous concern of the handicap railing not being suicide-resistant, as well as stainless steel sinks containing sharp edges, had been corrected.

The STRH unit contained six retrofitted new intake cells.  During inspection of the unit, this reviewer observed at least eight new intake inmates housed in unsafe, non-new intake cells.  In addition, at least two inmates in the new intake cells had been placed there more than 72 hours earlier and were eligible to be rehoused.  This reviewer was subsequently informed that the Warden had received approval for renovation of approximately 17 more new intake cells.  It was unclear when the new intake cells would be available.

Finally, this reviewer was provided *inconsistent* data regarding the extent of **alternative housing** use for inmates identified as suicidal and awaiting MHCB placement at HDSP.  For example, this reviewer was provided with MHTS data suggesting that nine inmates were placed in alternative housing during September 2016, and ten inmates were placed in alternative housing during October 2016.  The MHTS data also suggested that very few inmates remained in alternative housing longer than 24 hours.  However, internal "HDSP Weekly Alternative

178

Housing Log" data indicated that only two inmates were placed in alternative housing during September 2016, and nine inmates were placed in alternative housing during October 2016.

In addition to the disparity between the MHTS and "HDSP Weekly Alternative Housing Log" data, the average length of stay in alternative housing was underreported. For example, this reviewer found one inmate (HDSP 1) was placed in alternative housing from September 24 through September 28 and not recorded in either MHTS or "HDSP Weekly Alternative Housing Log" data. In another case (HDSP 2), the inmate was placed in alternative housing from October 24 through October 27, yet listed in both the MHTS and "HDSP Weekly Alternative Housing Log" data as only being in alternative housing for less than 24 hours. In yet another case (HDSP 3), the inmate was placed in alternative housing from October 29 through October 31, yet listed in the MHTS as only being in alternative housing for less than 24 hours, and not listed at all in the "HDSP Weekly Alternative Housing Log" data. This reviewer found several more examples during the months of September and October 2016. *Immediate corrective action is necessary to address both the underreporting and inaccurate nature of alternative housing data at HDSP.*

When alternative housing was used, inmates were primarily housed in CTC observation rooms or medical beds. All inmates were provided stack-a-bunks in the CTC rooms and observed on a continuous 1:1 basis. Due to the data reporting issues detailed above, this reviewer could not assess reliable data regarding the percentage of inmates in alternative housing who were subsequently admitted into a MHCB.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, inmates not on suicide observation status were observed at 30-minute intervals by nursing staff. This reviewer observed that nursing staff were using the correct Suicide Watch/Suicide Precaution Record observation forms, with forms located on the outside of each inmate's room door. The reviewed forms appeared to be accurate and up-to-date.

This reviewer observed six IDTT meetings in the MHCB unit on November 8. The treatment team was well represented by mental health, medical, and custody staff. The psychiatrist attended via tele-psychiatry. There were very good presentations of current suicide risk and safety planning found in four of the six cases, most notably due to the strong leadership skills of the MHCB supervisor, a senior clinical psychologist specialist. (Unfortunately, as indicated in the next section, adequate safety planning was not found in most of the SREs for inmates discharged from the MHCB.) In addition, this reviewer observed that most decisions regarding case management during the IDTTs were made by the MHCB supervisor and, therefore, overall discussion amongst team members was limited.

There were a few issues regarding issued clothing in the MHCB unit. In one case (HDSP 3), the inmate was on Suicide Precaution status and clothed in both a t-shirt and smock. In addition, all inmates on "partial issue" status were clothed in pink t-shirts and boxer shorts. There was no explanation given as to why white t-shirts and boxers were not supplied. There were no problems observed regarding the issue of privileges within the MHCB unit.

A review of Guard One data for a recent 24-hour period in the STRH unit found 100-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for both September and October 10, 2016.  The TTA log for the same time period was also reviewed.  This reviewer's subsequent sample review of 26 cases of emergency mental health referrals for suicidal behavior in the eUHR found that clinicians completed the required SREs in 92 percent (24 of 26) of the cases.

Further, a review of nine charts of inmates discharged from the MHCB during October and November 2016 found that adequate safety plans for reducing SI was problematic. For example, in one case (HDSP 1), the inmate had been placed in alternative housing for four days from September 24 through September 28, and then for six days in the MHCB from September 28 through October 4, 2016.  His discharge SRE on October 4 contained the following safety plan: "IP will return to its assigned housing on a MH follow-up.  He is to maintain treatment and medication compliance.  IP is to report any change in MH symptoms to the nearest staff member."  In another case (HDSP 4), the inmate was in alternative housing for two days, as well as in the MHCB unit for an additional five days.  Upon discharge from the MHCB on October 11, 2016, the discharge SRE simply contained narrative related to clothing allowance:  "Maintain current MHSDS LOC.  Continue psychotropic medication review and monitoring.  Maintain issue of socks, shorts, t-shirt, blanket, mattress, and reading material; issue toothbrush, toothpaste, and soap as part of the shower program; do not issue trousers, shirt, or jumpsuit to preclude suicidal behavior until transfer."  Not only was this discharge SRE problematic because it did not contain any safety plan, but it ordered only "partial issue" clothing for an inmate that had been discharged from suicide observation status.

In a third case (HDSP 5), the inmate was in the MHCB for five days and had a significant history of self-injurious and suicidal behaviors.  This reviewer attended his IDTT meeting on November 8.  The team decided to discharge the inmate that day with little discussion about safety planning other than the PC informing the inmate that "mindfulness" would be added to his safety plan.  The PC then asked the inmate if he knew what the term meant.  When the inmate answered "no," the term was explained to him.  The subsequent discharge SRE contained the following safety plan:

　　　1) Pt. will discharge from MHCB to EOP LOP on a MHCB 5-Day follow-up,

　　　2) Pt. will engage in treatment specifically related to distress tolerance and reducing anxiety and depressive symptoms (mindfulness and breathing exercises),

　　　3) Pt. will identify 2 problem solving skills (anger management- medications- focus on nice things),

　　　4) Pt. will be encouraged to increase his number of protective factors from 3 to 6 (Note: the November 8 SRE only listed two protective factors),

　　　Based on previous SRE: Treatment will focus on increasing hours asleep to at least 7 hours per night, increasing distress tolerance, decreasing anxiety and depression, stabilizing mood symptoms by implementing CBT techniques,

distress management strategies (including mindfulness, breathing exercises and visualization), and problem solving skills to avoid using MHCB as a way to solve his problem.

Although this safety plan had several strategies to reduce continuing SI, a review of the inmate's Mental Health Treatment Plan (MH-7388), also completed by the PC on November 8, as well as the safety plan sections in the subsequent Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms, found *no* concordance with the safety plan contained in the discharging SRE of November 8.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 47 cases of inmates discharged from a MHCB or alternative housing placement that remained at HDSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required) from July through October 2016. The review found that the first page was fully completed by the clinician in 53 percent (25 of 47) cases, and clinicians ordered discharge custody checks for the first 24 hours in approximately 72 percent of the cases. In addition, the second page containing the custody checks form was correctly completed in 49 percent (23 of 47) cases, with problems of missed checks at 30-minute intervals, checks not performed during the First Watch, or checks conducted at 60-minute intervals.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (July through September 2016) of SPRFIT meeting minutes reflected the absence of psychiatry at all three monthly meetings, as well as the absence of custody representation in two of the monthly meetings. Meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 97 percent of custody staff, 63 percent of medical staff, and 20 percent of mental health staff received annual suicide prevention block training during 2015. A similar low compliance rate for annual suicide prevention training by medical and mental health staff was found during the 2014 assessment. Finally, as of October 2016, 95 percent of mental health clinicians had completed both the SRE mentoring program and the seven-hour SRE training.

**Recent Suicides**:  HDSP did not experience any inmate suicides during the review period.

## ACRONYMS and ABBREVIATIONS

3CMS:                Correctional Clinical Case Manager System

ADHD:                Attention Deficit Hyperactivity Disorder

AED:                 Automatic Electronic Defibrillator

AH:                  Auditory Hallucinations

Ambu bag:            Ambulatory Bag Used for CPR

APP:                 Acute Psychiatric Program

ASH:                 Atascadero State Hospital

BPH:                 Board of Parole Hearings

CAMS:                Collaborative Assessment Management of Suicidality

CAP:                 Corrective Action Plan

CBT:                 Cognitive Behavioral Therapy

CC I:                Correctional Counselor I

CCHCS:               California Correctional Health Care Services

CCI:                 California Correctional Institution

CCWF:                Central California Women's Facility

CDCR:                California Department of Corrections and Rehabilitation

CHCF:                California Health Care Facility

CIM:                 California Institution for Men

CIT:                 Crisis Intervention Team

CIW:                 California Institution for Women

CMC:                 California Men's Colony

CMF:                 California Medical Facility

| | |
|---|---|
| CMH: | Chief of Mental Health |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CYA: | California Youth Authority |
| DDP: | Developmental Disability Program |
| DHCS: | Division of Health Care Services |
| DMH: | Department of Mental Health |
| DSH: | Department of State Hospitals |
| DVI: | Deuel Vocational Institution |
| EHR: | Electronic Health Record |
| EHRS: | Electronic Health Record System |
| EOP: | Enhanced Outpatient Program |
| eUHR: | Electronic Unit Health Record |
| FSP: | Folsom State Prison |
| GP: | General Population |
| HDSP: | High Desert State Prison |

HRL:                   High Risk List

ICF:                   Intermediate Care Facility

IDTT:                  Interdisciplinary Treatment Team

IEX:                   Indecent Exposure

IP or I/P:             Inmate Patient or Inmate/Patient

KVSP:                  Kern Valley State Prison

LOP:                   Local Operating Procedure

LTRH:                  Long-Term Restricted Housing

MCSP:                  Mule Creek State Prison

MDO:                   Mentally Disordered Offender

MHCB:                  Mental Health Crisis Bed

MHCBU:                 Mental Health Crisis Bed Unit

MHSDS:                 Mental Health Services Delivery System

MHTS:                  Mental Health Tracking System

NKSP:                  North Kern State Prison

NOS:                   Not Otherwise Specified

OHU:                   Outpatient Housing Unit

OP:                    Operating Procedure

PBSP:                  Pelican Bay State Prison

PC:                    Primary Clinician

PIP:                   Psychiatric Inpatient Program

POLST:                 Physician Orders for Life-Sustaining Treatment

PRN:                   As Needed

PSH:             Patton State Hospital

PSU:             Psychiatric Services Unit

PT:              Psychiatric Technician or Psych Tech

PTSD:            Post-Traumatic Stress Disorder

PVSP:            Pleasant Valley State Prison

QIP:             Quality Improvement Plan

R&R:             Receiving and Release

RC:              Reception Center

RJD:             Richard J. Donovan Correctional Facility

R/O:             Rule Out

RVR:             Rules Violation Report

SCU:             Support Care Unit

SHU:             Security Housing Unit

SI:              Suicidal Ideation

SNY:             Sensitive Needs Yard

SOMS:            Strategic Offender Management System

SPMW:            Suicide Prevention Management Workgroup

SPOC:            Suicide Prevention Outreach Committee

SPRFIT:          Suicide Prevention and Response Focused Improvement Team

SQ:              San Quentin State Prison

SRE:             Suicide Risk Evaluation

STRH:            Short-Term Restricted Housing

SVPP:            Salinas Valley Psychiatric Program

SVSP:               Salinas Valley State Prison

TTA:                Triage and Treatment Area

UHR:                Unit Health Record

VPP:                Vacaville Psychiatric Program

WSP:                Wasco State Prison