1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:   (415) 433-6830

9  RANJINI ACHARYA – 290877
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
11 Telephone:   (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:   (415) 621-2493

13 Attorneys for Plaintiffs

14             UNITED STATES DISTRICT COURT

15             EASTERN DISTRICT OF CALIFORNIA

17 RALPH COLEMAN, et al.,

18             Plaintiffs,

19        v.

20 EDMUND G. BROWN, JR., et al.,

21             Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' OPENING BRIEF RE:
OBSTACLES TO TIMELY ACCESS
TO MENTAL HEALTH CRISIS BEDS**

Judge:  Hon. Kimberly J. Mueller
Date:     September 28, 2017
Time:    10:00 a.m.
Crtrm.: 3, 15th Floor

[3168218.9]

Case No. 2:90-CV-00520-KJM-DB

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

I.    DEFENDANTS' PROPOSAL TO INCREASE THE USE OF
      ALTERNATIVE HOUSING FOR CLASS MEMBERS IN MENTAL
      HEALTH CRISIS IS DANGEROUS AND WOULD NOT EFFECTIVELY
      IMPROVE TRANSFER TIMELINESS. ............................................................ 3

      A.    Defendants' Plan to Dramatically Expand the Use of Alternative
            Housing Will Cause Serious Harm to Patients Requiring MHCB Care. ........ 5

      B.    The Proposal Seeks to Fix a Problem that Does Not Need to be Fixed
            and Will Not Significantly Reduce Transfer Timeliness or Increase
            Bed Capacity. ....................................................................................... 12

            1.    Defendants' Focus on Reducing After-Hours Rescissions is
                  Misplaced. .................................................................................. 12

            2.    The Proposal Will Not Achieve the Goals of Increasing MHCB
                  Capacity and Getting Patients into MHCBs Faster. ...................... 14

            3.    Defendants' Proposal Is Not Supported By Their Data, and
                  Does Not Offset the Significant Harm To Class Members
                  Caused by The Dramatic Expansion of Alternative Housing. .......... 15

      C.    Defendants' Proposal Exceeds the Scope of the Court's April 19,
            2017 Order. ........................................................................................... 17

II.   DEFENDANTS' PROPOSAL TO ALTER THE METRIC FOR MHCB-
      TRANSFER TIMELINES IS UNACCEPTABLE. ...................................... 18

      A.    The Program Guide Clearly Contemplates that a Transfer to an
            External MHCB is Only Complete Upon Arrival in the MHCB. ................ 20

      B.    Defendants' Approach Is Not Justified by its Apparent Long-Term
            Use, Because the Parties Never Agreed to this Metric, and the Court
            Has Not Sanctioned a Departure from the Plain Language of the
            Program Guide ...................................................................................... 21

      C.    Unforeseeable Obstacles to Timely Transfer to MHCBs Should Be
            Addressed as Exceptions. ...................................................................... 22

III.  THE COURT SHOULD REQUIRE DEFENDANTS TO DEVELOP AN
      AUTOMATED REPORTING SYSTEM FOR MHCB TRANSFER
      TIMELINESS IMMEDIATELY ............................................................... 23

CONCLUSION ............................................................................................... 24

1

**INTRODUCTION**

2    The Court's April 19, 2017 Order ("Order") held that "full compliance with the

3   twenty-four hour timeline for transfer to MHCBs is required to satisfy the Eighth

4   Amendment," but nonetheless found "ongoing large numbers of inmates waiting longer

5   than twenty-four hours to be transferred to an MHCB." Order, ECF No. 5610 at 11-12.[1]

6   Because of Defendants' longstanding non-compliance, the Court instructed the Special

7   Master to convene a workgroup to "focus on outstanding issues related to compliance with

8   the Program Guide timeline for transfer to MHCBs, … to resolve any and all issues the

9   parties can resolve without court intervention, and to identify any issues that remain for

10   consideration and resolution by the court. *Id.* at 13. The Special Master's workgroup has

11   been meeting regularly since June 2017, *see* August 29, 2017 Joint Report, ECF No. 5669

12   at 2, and through the workgroup process, the parties have agreed to explore and implement

13   a number of initiatives that may improve the timeliness of Defendants' transfers to mental

14   health crisis beds (MHCBs). *Id.* at 3-6.

15    As discussed in their August 29, 2017 joint report, the parties have identified three

16   issues requiring Court resolution in order to facilitate a complete analysis of Defendants'

17   compliance with the 24-hour requirement: (1) Defendants' proposal to expand

18   significantly the use of alternative housing and further delay patients' transfers to MHCBs

19   by allowing the placement of patients experiencing a mental health crisis after-hours—

20   when clinical staff are not on-site—in alternative housing without a referral to MHCB, as

21   required by existing policy; (2) Defendants' method of counting a placement into a MHCB

22   at an external institution as "timely" under the Program Guide when the patient is placed

23   on a transport vehicle within 24 hours of referral, even if several more hours elapse before

24   the patient is actually transferred to and admitted in the crisis bed for treatment; and

25   (3) Defendants' deficient data tracking system, which prevents Defendants from

26   ────────────────

27   [1] All citations to ECF documents are to the pagination of the PDF document.

28

1  automatically logging all crisis bed referral timelines, including the reasons for delay. *Id.*

2  at 7-10.

3      Defendants' alternative housing proposal should be squarely rejected. The existing

4  policy, which permits Defendants to hold patients in mental health crisis in alternative

5  housing only after a MHCB referral has been made, was extensively negotiated and

6  litigated with the specific goal of limiting critically ill patients' exposure to these harsh

7  environments. Not only do patients in mental health crisis receive no treatment in

8  alternative housing placements, which include holding cells with no toilets or beds and

9  sometimes cages that are standing room only, the record is replete with evidence that these

10  settings in fact exacerbate class members' conditions and discourage reporting of

11  suicidality. Defendants are wrong to assert that reducing rescissions of after-hours

12  referrals will impact MHCB capacity, and their own data suggests that the vast majority of

13  patients who are referred for MHCB care after-hours actually require that level of care.

14  Defendants' proposal to dramatically expand the use of alternative housing in the name of

15  dubious administrative efficiency gains, particularly in the face of CDCR's sky-high

16  suicide rate, should be rejected out of hand.

17      Next, despite very clear language in the Program Guide requiring Defendants to

18  place a patient *in a MHCB* within 24 hours of referral, and without clear disclosure to

19  Plaintiffs, the Special Master, and the Court, for years Defendants apparently have been

20  reporting placements to external MHCBs as timely when patients are placed on a transport

21  vehicle within 24 hours of the referral, without regard for the extra time required to

22  actually transport a patient to another prison with a vacant MHCB bed. Now Defendants

23  seek to have this existing inaccurate metric formally adopted. Plaintiffs strongly object.

24  Measuring compliance in this manner will countenance a significantly longer placement

25  period for patients who were unlucky enough to experience a mental health crisis at an

26  institution that does not have sufficient MHCBs, but who are no less in need of immediate

27  treatment than patients who can be placed internally. The Program Guide requirement is,

28  as the Court acknowledged, "defendants' assessment of what is necessary to meet their

1  Eighth Amendment obligations to inmates in mental health crises."  Order, ECF No. 5610

2  at 11.  Defendants cannot now move the target in an attempt to achieve compliance.

3        Finally, through the workgroup process, Plaintiffs have learned that Defendants lack

4  any accurate way to track crisis bed referral timelines, including the reasons for any delays.

5  Without a reliable tracking system that allows for automatic generation of data reports, the

6  parties and the Court will be unable to assess Defendants' overall compliance with the 24-

7  hour transfer timeline or the applicability of any exceptions to the Program Guide

8  timelines claimed by Defendants.  The Court should require Defendants to implement

9  immediately a system to track the precise times of all relevant events in the MHCB

10  transfer process for all patients.

11  **I.    DEFENDANTS' PROPOSAL TO INCREASE THE USE OF ALTERNATIVE**
        **HOUSING FOR CLASS MEMBERS IN MENTAL HEALTH CRISIS IS**
12      **DANGEROUS AND WOULD NOT EFFECTIVELY IMPROVE TRANSFER**
        **TIMELINESS.**
13

14        This Court has recognized that holding patients experiencing a mental health crisis

15  in alternative housing violates their constitutional rights.  In denying Defendants' motion

16  to terminate, the Court noted that although Defendants had presented evidence that no

17  patients were then waiting for MHCB placements, "that is only because they are being

18  housed in facilities totally inappropriate for a person in need of a mental health crisis bed."

19  April 5, 2013 Order, ECF No. 4539 at 51.  The Court found that "[t]his aspect of the

20  Eighth Amendment violation is ongoing," because "mentally ill inmates in need of [crisis

21  bed] care are held in conditions that defendants have now agreed should not be used to

22  house inmates in need of crisis care."  *Id.* at 53.

23        Now, however, in an attempt to lengthen the Program Guide's clear 24-hour

24  timeline by which Defendants must transfer a patient in need of crisis care into a MHCB,

25  Defendants propose to increase the use of this unsafe and unconstitutional housing.  Under

26  Defendants' proposal, patients experiencing mental health crises that happen to occur

27  "after-hours"—when CDCR clinicians are not on-site—would be held in unlicensed

28  alternative housing settings until an on-site clinician returns the next morning to conduct

1  an in-person evaluation and determine whether the individual should be referred for crisis

2  bed care.  *See* Declaration of Jessica Winter in Support of Plaintiffs' Opening Brief re:

3  Obstacles to Timely Access to Mental Health Crisis Beds ("Winter Decl.") ¶¶ 2-3 and

4  Ex. A at 2-4.  Because Defendants' "business hours" clinical staffing varies greatly among

5  institutions, some patients could be held in holding cages with no toilets or beds for up to

6  sixteen hours before receiving an in-person evaluation, and patients experiencing a crisis

7  on the weekends at multiple institutions may have to wait several *days* in alternative

8  housing before a referral to crisis bed treatment is even initiated.  *See id.* (describing

9  proposal and showing on-site clinician staffing at all institutions, some of which only have

10 clinicians available in person between 0700 or 0800 and 1700 hours five days per week,

11 and one of which (FSP) only has clinicians available in person between 0800 and 1600

12 hours five days per week); *id.* at ¶ 4 and Ex. B (confirming that Defendants' proposed

13 policy "would be flexibly applied to each institution based on when staff is onsite," and

14 "[i]nmates placed in safe housing would be seen the next morning, as quickly as possible

15 once staff get in," and noting that Defendants have not yet worked out details regarding

16 how they "would handle weekend hours").

17         The proposal is both misguided and dangerous, starting with Defendants'

18 characterization of alternative housing as "safe."  As the Court recently recognized, even

19 Defendants themselves have acknowledged that "alternative housing is not a clinically

20 appropriate location for inmates requiring MHCB level of care."  Dec. 9, 2016 Order, ECF

21 No. 5529, at 3 n.1.  The use of alternative housing for patients in need of crisis bed care is

22 extremely detrimental to their wellbeing and likely discourages patients from pursuing

23 treatment, as Plaintiffs explain more fully in Sections I.A. and I.B.2., *infra*.  The parties

24 have litigated and negotiated the limited parameters of Defendants' ability to use

25 unlicensed alternative housing placements over many years, starting from a time when the

26 overcrowding emergency was at its zenith and Defendants' own director of mental health

27 agreed the shortage of MHCBs was a "crisis."  *See* May 2, 2006 Order, ECF No. 1800, at

28 2-4, 6.  The current policy requiring that a patient only be placed in alternative housing

1  after a referral to a MHCB is a reasoned way to expedite the emergency treatment of

2  patients in crisis and limit their exposure to harsh environments that are counter-

3  therapeutic and exacerbate their conditions.

4         Although Defendants argue that their proposal will conserve resources by avoiding

5  unnecessary referrals, they have not shown that rescissions of after-hours referrals are

6  actually a major contributor to their inability to transfer patients to MHCBs promptly, or

7  that in-person evaluations are less likely to result in rescissions than those conducted by

8  telephone by on-call clinicians in consultation with on-site nursing staff.  The proposal is

9  an outsized and inappropriate response to a problem that does not need to be fixed:

10  Defendant's own data shows that the vast majority of after-hours referrals—roughly three-

11  quarters—are *not* rescinded, meaning that the vast majority of patients initially determined

12  to need crisis care "after-hours" are still in need of that care at the next evaluation.  Under

13  the proposal, those patients would have to wait dramatically longer to receive urgently

14  needed treatment, and would be kept in punitive, counter-therapeutic conditions in the

15  meantime.  The plan would not actually result in increased MHCB capacity or improved

16  transfer timelines for patients.  Finally, Defendants' proposal to expand the use of

17  alternative housing should be rejected because it is outside the scope of the Order.  *See*

18  ECF No. 5610.

19         **A.    Defendants' Plan to Dramatically Expand the Use of Alternative**
               **Housing Will Cause Serious Harm to Patients Requiring MHCB Care.**
20

21         Over five years ago, after discovering yet again that multiple institutions were using

22  alternative housing settings to hold patients in crisis rather than referring them to receive

23  treatment in a licensed MHCB, the parties and Special Master team agreed that Defendants

24  should issue a memorandum reinforcing and clarifying their longstanding policy expressly

25  prohibiting the use of "alternative housing for an evaluation period and/or [to] provide

26  short term treatment."  Declaration of Krista Stone-Manista in Support of Plaintiffs'

27  Opening Brief Re: Obstacles to Timely Access to Mental Health Crisis Beds ("Stone-

28  Manista Decl.") ¶ 2 and Ex. A (memorandum issued in May 2012 affirming longstanding

1  policy, which arose out of discussion at an April 2012 bed planning meeting wherein

2  Defendants admitted that some institutions were placing class members in alternative

3  housing and not referring them for crisis care); *see also* Decl. of Jane E. Kahn ISO Pl.

4  Emergency Mot. for an Evidentiary Hearing Regarding the C5/C6 Project at Salinas

5  Valley State Prison, and Mot. to Shorten Time, ECF No. 3908, Ex. B, at 13-15 (letter to

6  Defendants documenting a similar discussion at a 2010 policy meeting, and requesting

7  confirmation that Defendants had not communicated to field clinicians that they should use

8  alternative housing for patients prior to referral to a MHCB).  In so doing, Defendants also

9  reiterated their existing policy that permits CDCR to place patients in crisis in alternative

10  housing only after "an evaluation by a qualified mental health clinician has been

11  completed and it is documented that the inmate requires a referral to the Mental Health

12  Crisis Bed (MHCB)."  Stone-Manista Decl. at ¶ 2 and Ex. A at 1.  These limits on

13  Defendants' use of alternative housing for patients undergoing a mental health crisis exist

14  as a result of years of negotiation and litigation, dating back at least to 2006, when the

15  massive shortage of crisis beds brought the issue to the fore.  *Id.*; May 2, 2006 Order, ECF

16  No. 1800, at 2-4, 6.

17       These prohibitions are codified in the Program Guide, which provides that in-depth

18  screening of a patient to evaluate their need for crisis care will be conducted after a referral

19  has been made, not before, *see* Program Guide at 12-5-7, and states that when a patient is

20  identified as requiring crisis care and placed in an OHU, HCPOP "shall be notified of the

21  need for MHCB placement" in order to coordinate the transfer within the 24-hour timeline,

22  *id.* at 12-5-6.  Most recently, Defendants again officially reinforced these sound limits on

23  alternative housing just two years ago.  Stone-Manista Decl. at ¶ 3 and Ex. B at 1-2

24  (October 15, 2015 memo mandating that "[a]lternative housing shall only be used for

25  patients referred to a MHCB," and requiring referral to MHCB "[p]rior to placement in

26  alternative housing").

27       There is a very strong rationale for the closely-negotiated existing policy, as

28  codified in the Program Guide.  Unlicensed alternative housing has always been intended

1   as a temporary measure to remedy the chronic shortage of MHCBs and the harm to class

2   members caused by that shortage, not as a replacement for actual mental health crisis care

3   and treatment in a licensed setting.  Indeed, the Court allowed Defendants to operate

4   unlicensed units as MHCBs over a decade ago only upon evidence of shocking, deadly

5   acts of self-harm committed by class members awaiting a crisis bed in alternative settings

6   that even CDCR's Director of Correctional Health Care admitted caused suffering and

7   mental health deterioration.  *See* May 2, 2006 Order, ECF No. 1800 at 2-4, 6 (waiving

8   licensing requirements to allow unlicensed MHCB unit at CMC to open in order to

9   alleviate the shortage of MHCBs, which was "leaving critically mentally ill inmates

10  languishing in horrific conditions without access to immediate necessary mental health

11  care"); *see also* Transcript of April 27, 2006 Hearing, Dkt. No. 1814 at 34, 39, 84 (Former

12  Director of Correctional Health Care Services Peter Farber-Szekrenyi testimony re:

13  "tremendous" MHCB shortage, and admitting class members are deteriorating and in pain

14  because of lack of mental health beds, which left CDCR in "crisis mode"); Decl. of Jane

15  Kahn ISO Pls' Objections to Defs' Inpatient and MHCB Bed Plan, April 21, 2006, ECF

16  No. 1790 at ¶¶ 15-22 (recounting Defendants' practices of housing class members in

17  mental health crisis in holding cells with no toilets, beds, mattresses, or suicide smocks,

18  and two instances of class members' horrific acts of self-mutilation and suicide while on

19  suicide watch in unlicensed OHUs).  But placing class members in need of crisis care in

20  other settings due to the massive bed shortage was countenanced by this Court, and

21  presented by Defendants, only as a short-term, emergency stop-gap until appropriate

22  numbers of crisis beds could be brought on line.  *See* Transcript of April 27, 2006 Hearing,

23  Dkt. No. 1814 at 47-48 (Farber-Szekrenyi noting "shortcuts" like opening unlicensed units

24  were necessary in the short term because of the "crisis" in the bed shortage and that "it is

25  better than no care at all," but only "given the fact that we'll have a permanent solution");

26  *see also id.* at 118-19 (Court warning that it was considering allowing Defendants' use of

27  unlicensed units and alternative housing in lieu of prompt access to MHCBs as emergency

28  measures, "and an emergency measure means emergency, not forever").

1    In 2013, this Court again made clear that Defendants' ongoing practice of housing

2  patients in crisis in alternative housing is "totally inappropriate for a person in need of a

3  mental health crisis bed," and constitutes an ongoing Eighth Amendment violation.

4  April 5, 2013 Order, ECF No. 4539 at 51, 53; *see also id.* at 51-52 (in declining to

5  terminate this case, citing Special Master's Twenty-Fifth Round Monitoring Report and

6  noting that "Defendants do not presently have a sufficient number of [MHCBs] to meet the

7  need for such beds" so "inmates in need of mental health crisis care have been placed in a

8  variety of alternative holding areas," and recounting that in 2012, the Court had ordered

9  Defendants to "incorporate the number of inmates placed in alternative housing areas into

10  their future planning for necessary MHCBs and to meet any increased need for such beds

11  identified by this process").[2]

12    Certainly, alternative housing has never been approved by this Court as a

13  replacement for licensed crisis care or as a screening mechanism to determine which

14  patients should be referred for crisis care. Yet despite years of being ordered to increase

15  MHCB capacity to reduce the time patients in crisis stay in alternative housing placements,

16  Defendants now wish to institutionalize and formalize the role of those harsh, inhumane

17  units—where acutely ill patients receive no actual treatment—and dramatically expand

18  their use in the name of mere administrative convenience.

19    Alternative housing placements are counter-therapeutic, dangerous, and likely to

20  deter patients from seeking treatment in the first place. Defendants' current policy allows

21  Defendants to use a variety of spaces to be used as alternative housing, including "[l]arge

22

23  [2] *See also Brown v. Plata*, 563 U.S. 493, 519, 519 n.6 (2011) (noting severe shortage of
    mental health treatment beds and the use of administrative segregation and "tiny, phone-
24  booth-sized cages" for patients waiting for care, and recounting story of patient who
    committed suicide after he was returned to administrative segregation because "no crisis
25  beds [were] open"); Reply Decl. of Jane E. Kahn ISO Pls' Mot. for Enf. of Court Orders &
    Affirm. Relief re Improper Housing & Treatment of Seriously Mentally Ill Prisoners in
26  Segregation, Aug. 23, 2013, ECF No. 4765 at ¶ 24 (explaining that the Program Guide's
    allowance of the use of alternative housing arose "during the extreme of the overcrowding
27  crisis, in recognition of the reality of the crisis bed shortages and the practice of using
    alternative placements indiscriminately").

28

1  holding cells without toilets," "Triage and Treatment Area (TTA) or other clinic physical

2  exam room," and "CTC holding cells."  Stone-Manista Decl. ¶ 3 and Ex. B at 1.  "Small

3  holding cells that are designed for the patient to sit or stand" may be used for up to four

4  hours, per the policy.  *Id.* at 2.  As recently as last year, many institutions were regularly

5  using spaces with "limited access to bunks, showers, and bathrooms" as alternative

6  housing.  The Second Re-Audit and Update of Suicide Prevention Practices, Lindsay

7  Hayes, September 7, 2017 ("Second Re-Audit"), ECF No. 5672 at 8.  At his June 2016

8  visit to Salinas Valley State prison (SVSP), the Special Master's Suicide Prevention expert

9  Lindsay Hayes found that 18 patients were on alternative housing status.  *Id.*  Several of

10  them were found to be held in "cages" for up to eight hours per day while their assigned

11  TTA cells were used for other purposes, and "[f]our inmates were temporarily assigned to

12  holding cages in the visiting room and gymnasium," one of whom had spent the night in

13  the cage.  *Id.*; *see also* Stone-Manista Decl. at ¶¶ 4-5 (noting that CDCR Headquarters staff

14  were apparently unaware of SVSP's pervasive use of ad-hoc and untenable alternative

15  housing placements, and that patients reported that the temperature in the TTA cells was

16  "like an icebox," which deterred them from reporting suicidal ideation).  At the Substance

17  Abuse Treatment Facility (SATF), Mr. Hayes observed patients in crisis held in TTA

18  examination rooms handcuffed to gurneys.  Second Re-Audit, ECF NO. 5672 at 9.  These

19  actively suicidal patients had been held in restraints, receiving no treatment, for at least

20  two days.  *Id.*  They were released from being handcuffed to a bed to use the toilet only

21  upon request, and offered showers only after three full days of being held in this deeply

22  inhumane condition.  *Id.*[3]

23  _____

24  [3] The Supreme Court has recognized Defendants' long history of putting patients in mental health crisis in small cages, forcing these suicidal prisoners to either sit on the floor or
25  stand for hours at a time while waiting for MHCB treatment. *See Plata*, 563 U.S. at 503–04 ("Because of a shortage of treatment beds, suicidal inmates may be held for prolonged
26  periods in telephone-booth-sized cages without toilets … A psychiatric expert reported observing an inmate who had been held in such a cage for nearly 24 hours, standing in a
27  pool of his own urine, unresponsive and nearly catatonic"); *id.* at 549, Appendix C (photo of holding cage); *see also* Ex. 81 to Decl. of Michael W. Bien ISO Plaintiffs' Opp. to
28  (footnote continued)

1    Spaces like these, often without toilets and/or beds, are "needlessly harsh" and "do[]

2  not serve therapeutic purposes."  July 21, 2011 Order, ECF No. 4044 at 2, 4 (adopting

3  Special Master's Recommendation to require Defendants to include beds in all MHCB

4  cells, and citing his experts' findings).  This Court has acknowledged, for instance, that

5  "the absence of beds may hinder identification of suicidal inmates" and "may even

6  contribute to an inmate's decision not to report thoughts of self-harm to staff."  *Id.* at 4; *see*

7  *also* ECF No. 5259 at 28 (Hayes Audit of Suicide Prevention Practices, Jan. 14, 2015)

8  ("Forcing an inmate to sleep on a mattress on the floor can only exacerbate the suffering of

9  those who are suicidal and/or mentally ill."); Expert Decl. of P. Stewart ISO Pls.' Opp. to

10  Defs.' Motion to Terminate, ECF No.  4381, Mar. 14, 2013, at ¶ 394 (concluding

11  alternative housing as a "punitive placement that … has the net effect of discouraging

12  inmates from expressing their suicidal ideation"); ¶¶ 41-42 (describing harsh alternative

13  housing settings and practices, which class members report make them "less likely to come

14  forward if they are suicidal", and opining that Defendants' ongoing reliance on alternative

15  housing "is a factor that has increased the overall suicide rate in the CDCR to its current

16  high levels").  In its August 2017 report, the California State Auditor linked two recent

17  suicides to the use of alternative housing in lieu of crisis care, both of whom were returned

18  to their housing after being held in alternative housing without ever receiving crisis care in

19  a MHCB.  Stone-Manista Decl. at ¶ 12 and Ex. G. at 29-30; *see also id.* at 38

20  (recommending that CDCR should "annually address its need for additional crisis beds" to

21  "minimize the number of inmates who spend more than 24 hours in alternative housing").

22  As the Court recently recognized, even Defendants themselves have acknowledged that

23  "alternative housing is not a clinically appropriate location for inmates requiring MHCB

24  level of care."  Dec. 9, 2016 Order, ECF No. 5529, at 3 n.1.

25  _____

26  Defendants' Mot. to Terminate Under the PLRA and to Vacate Under Rule 60(b)(5), ECF
No. 4403 at 23 (then-Acting Statewide Mental Health Deputy Director for CDCR Tim

27  Belavich testifying that to run the mental health delivery system with the resources he was
provided, CDCR had to use small cages as alternative housing).

28

Case No. 2:90-CV-00520-KJM-DB
PLAINTIFFS' OPENING BRIEF RE: OBSTACLES TO TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

[3168218.9]

Despite all of this, despite Defendants' already extremely high rates of suicides, *see* Stone-Manista Decl. ¶¶ 6-8 and Exs. C & D, and despite the Court's admonition that "[a]n inmate in need of a MHCB level of care is, by definition, in a mental health crisis" and in need of treatment, Order, ECF No. 5610 at 11, Defendants propose a policy change that would result in patients in crisis waiting many additional hours, and perhaps days, before receiving any treatment at all, and in conditions that are likely to exacerbate their symptoms.  Their proposal is particularly egregious given that Defendants already routinely exceed the Program Guide limit of 24 hours in alternative housing prior to placement in a MHCB, frequently by two full additional days.  Program Guide at 12-1-16. From July 2016 to June 2017, 39% of patients referred for MHCB care were held in alternative housing for longer than 24 hours after their referral, before either being transferred for crisis care or returned to their original housing unit.  Stone-Manista Decl. at ¶ 9 and Ex. E.  More than 20% of patients referred to MHCBs during that timeframe waited in alternative housing over 48 hours, and over 10% waited longer than 72 hours. *Id.*  The average patient who was referred for MHCB care spent more than 32 hours in alternative housing before reaching a crisis bed or having their referral rescinded without ever having received any treatment at all.  *Id.*

But even under the best case scenario where Defendants actually do comply with the 24-hour transfer requirement after a referral, Defendants' proposal would extend the total time a class member in mental health crisis spends in alternative housing prior to receiving any treatment by huge margins.  Almost every institution lacks on-site clinical staff for at least 8 hours during some portion of the week, meaning class members everywhere could be forced to suffer without treatment in alternative housing for 33% longer before receiving crisis care than current policy provides.  Winter Decl. at ¶ 3 and Ex. A at 2.  The vast majority of prisons lack on-site staff for fourteen or more hours a day some or all days of the week, meaning suicidal class members could face a 58% longer wait for emergency care while housed in cells without toilets or beds.  *Id.*  And the class members at the five prisons without any clinical coverage over the weekend could spend

Case No. 2:90-CV-00520-KJM-DB
PLAINTIFFS' OPENING BRIEF RE: OBSTACLES TO TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

1     close to 300% more time in these harsh conditions while receiving absolutely no care for

2     their mental health emergency.  *Id.*

3          The deterrent effect that already exists with the use of alternative housing under

4     Defendants' current policy would likely only worsen under this proposal—patients would

5     know that if they reported suicidality during certain hours, they would be guaranteed to

6     spend at least some time in "needlessly harsh" alternative housing before even being

7     considered for actual treatment, whereas now, it is only one possible outcome of making

8     such a report.  July 21, 2011 Order, ECF No. 4044 at 4.  Put simply, implementing

9     Defendants' proposal could very well result in the loss of life.  It cannot be countenanced,

10    and the Court should prohibit Defendants from pursuing it further.

11         **B.**      **The Proposal Seeks to Fix a Problem that Does Not Need to be Fixed**

12                  **and Will Not Significantly Reduce Transfer Timeliness or Increase Bed Capacity.**

13          Defendants' proposal is particularly misguided, because in addition to subjecting

14    patients experiencing mental health crises to the "totally inappropriate" conditions of

15    alternative housing, April 5, 2013 Order, ECF No. 4539 at 51, the plan will not actually

16    achieve the goal of improving the overall timeliness of transfers to MHCBs.  Instead, it is

17    merely an attempt to move the target so that Defendants appear to be compliant with the

18    Program Guide's 24-hour requirement when in fact they are tacking on as many as sixteen

19    additional hours, and apparently multiple *days* in prisons without weekend clinical

20    coverage, to the time Defendants have to transport patients in mental health crisis to a

21    licensed crisis bed for treatment.

22              **1.**      **Defendants' Focus on Reducing After-Hours Rescissions is**

23                      **Misplaced.**

24          During the workgroup sessions, Defendants provided data showing that referrals

25    made "after-hours" (between 5 p.m. and 5 a.m.) are more likely to result in rescissions than

26    referrals made during "peak hours" (between 5 a.m. and 5 p.m.).  *See* Winter Decl. ¶ 3 and

27    Ex. A at 4 (noting that approximately 25% of all after-hours referrals are rescinded, while

28    only 9.3% of referrals during "peak hours" are).  Yet Defendants have not shown that the

1   higher rate of nighttime rescissions is due to the lack of in-person evaluations, and not

2   simply that patients are more likely to express suicidality or experience mental health

3   crises at night. As discussed more fully below, the fact that 9.3% of referrals made during

4   "peak hours," when all evaluations are presumably conducted in-person, are still rescinded

5   suggests that Defendants' proposal would not eliminate the "problem" of processing

6   referrals for persons who stabilize by the next evaluation. There will always be some

7   referrals that result in rescissions, and Defendants' own data bear that out. The fact that

8   Defendants' focus is on saving administrative time spent on the relatively insubstantial

9   15% differential in recession rates between "after-hours" and "peak hours," without even

10  acknowledging the proven harm to the hundreds of acutely suicidal prisoners that will be

11  swept up in their proposal every month, is egregious.

12      Defendants' plan is an outsized response to a "problem" that is fundamentally not

13  very significant, and in fact protects patients from harm by being over-, instead of under-,

14  inclusive. Just as it is to be expected that some percentage of individuals who seek

15  medical treatment at an emergency room end up not needing treatment because their

16  symptoms resolve or improve, it is to be expected that some percentage of individuals who

17  seek emergency mental health treatment may stabilize or improve. Yet Defendants would

18  never suggest it is appropriate to hold patients complaining of chest pain in a cage with no

19  toilet for fifteen hours, while providing no treatment whatsoever, in the hopes that those

20  potentially life-threatening symptoms resolve on their own just to save some

21  administrative time on paperwork. As with possible medical emergencies, individuals

22  experiencing mental health crises must be encouraged to seek treatment and be referred for

23  treatment, even if their condition later changes.

24      Defendants' focus on the higher rates of rescission for after-hours referrals also

25  obscures a much more important conclusion from their data—75% of all after-hours

26  referrals are *not* rescinded. *See id.* The vast majority of patients who are evaluated after-

27  hours by on-call clinicians and are referred to a MHCB overnight continue to need crisis

28  care the next morning, as Defendants themselves admit. Under Defendants' plan, all of

1   those patients—who the parties fully agree actually belong at the MHCB level of care in a

2   licensed treatment facility—would be made to wait significantly longer than the 24 hours

3   contemplated by the Program Guide before receiving any care at all, and would be waiting

4   in "needlessly harsh" conditions likely to exacerbate their suicidality.  July 21, 2011 Order,

5   ECF No. 4044, at 4; *see also supra* Section I.A and *infra* Section I.B.2 (describing

6   previous court findings and evidence concluding that alternative housing is dangerous,

7   exacerbates suffering, and contributes to high rates of suicide).  Given the already high

8   suicide rates in CDCR institutions, Defendants' justification of saving some administrative

9   resources purportedly related to rescissions is imprudent and extremely dangerous.  *See*

10   July 21, 2011 Order, ECF No. 4044 at 4, fn. 2; Stone-Manista Decl. ¶¶ 6-8 and Exs. C &

11   D.

12        **2.**      **The Proposal Will Not Achieve the Goals of Increasing MHCB Capacity and Getting Patients into MHCBs Faster.**

13

14       Defendants' plan is unlikely to have a measurable effect on the availability of

15   licensed crisis beds to treat suicidal prisoners in a timely fashion, which is the gravamen of

16   this Court's concern.  While holding patients in alternative housing for longer than 24

17   hours may have a short-term impact on the administrative burden necessary to process

18   referrals, ultimately, it will have the opposite effect on Defendants' ability to comply with

19   the Program Guide and therefore the Constitution.  Patients who are in mental health crisis

20   and are held in counter-therapeutic conditions like alternative housing for extended periods

21   of time rather than provided with prompt treatment are likely to end up more acutely ill

22   and to take longer to stabilize and treat once they arrive in a crisis bed.  *Cf.* Mar. 24, 2017

23   Order, ECF No. No. 5583, at 21 ("Of great significance, reduction in the time it takes to

24   transfer inmates to inpatient care may reduce the risk of further decompensation and

25   increased acuity of mental illness, which can accompany delays in transfer to necessary

26   hospital care."); Decl. of P. Stewart in Support of Pls.' Br. on Evidentiary Hearing re: OSC

27   re: Inpatient Access, ECF No. 4055, Aug. 11, 2011, ¶ 15 ("In addition to the appalling and

28   completely preventable suffering caused by inadequate access to appropriate levels of care,

1  delays make seriously mentally ill prisoners even sicker, which means it takes longer to

2  stabilize and treat them once they reach the proper level of care."); *id.* ¶ 19 (referencing

3  literature showing the same). Because patients whose referrals are rescinded never occupy

4  a bed, delaying the time of referral will not increase overall MHCB capacity. In fact it

5  may ultimately lower capacity and increase delays, if more patients need longer stays in a

6  crisis bed to stabilize due to spending more time in alternative housing at the apex of their

7  crises.

8          Similarly, the plan is unlikely to do much to improve the timeliness of transferring

9  patients needing crisis care to available beds. It would improve Defendants' "compliance"

10 with the 24-hour requirement only by changing the start time for that metric and giving

11 Defendants as many as sixteen additional hours, or possibly even days, to transfer a patient

12 for treatment in a crisis bed. During that time, those patients will suffer and receive no

13 treatment. But regardless of whether a patient is referred immediately or in the morning

14 after he was initially assessed for treatment, Defendants have to perform the same

15 administrative steps of locating an available bed and arranging transport. Instead of

16 delaying the process of transferring patients to a crisis bed for emergency care even

17 further, Defendants should focus on improving efficiencies and more carefully targeting

18 their efforts related to reducing rescissions, as discussed further in Section I.B.3 *infra*,

19 rather than increasing patients' suffering.

20              **3.    Defendants' Proposal Is Not Supported By Their Data, and Does
                        Not Offset the Significant Harm To Class Members Caused by
21                      The Dramatic Expansion of Alternative Housing.**

22          Defendants justify their plan by claiming that evaluations performed by on-call

23 clinicians are not reliable, and are more likely to result in referrals that are later rescinded.

24 Winter Decl. ¶ 3 and Ex. A at 4. Plaintiffs have, at least twice, requested data establishing

25 that in-person evaluations are measurably "better" at identifying patients who truly need

26 MHCB care, resulting in fewer rescinded referrals. Winter Decl. ¶ 6 and Ex. B.

27 Defendants have never produced any such data, and instead simply rely on the comparative

28 rescission data for "peak hours" versus "after hours" timeframes even though those

1   timeframes do not match the actual times clinicians are available and on-site at most

2   institutions. *See id.* Decl. ¶ 5 and Ex. A.

3        It is thus not at all clear based on Defendants' data that the higher number of "after

4   hours" rescissions are due to any deficiency in their on-call clinicians' ability to

5   appropriately assess referrals over than the phone, rather than simply to patients'

6   desperation in the bleak hours of the night, which might naturally pass by the light of day

7   regardless of whether they are first assessed overnight in-person or not.

8        In short, Defendants have not established that the existing system is deficient in any

9   way that will be meaningfully addressed by their proposal, much less sufficient to offset

10  the significant, tangible harm the change will cause.  Defendants must maintain the current

11  system of allowing a clinician to make a referral to a MHCB after a phone evaluation.

12  Even if such evaluations are more likely to result in referrals that are ultimately rescinded

13  because the patient stabilizes more quickly than expected, it is highly preferable to have a

14  system that over-protects potentially suicidal patients than one that instead subjects

15  potentially suicidal patients to conditions that may exacerbate their suicidality, particularly

16  given Defendants' excessively and chronically high suicide rate.  Stone-Manista Decl.

17  ¶¶ 6-8.  And to the extent that "after hours" referrals are associated with slightly higher

18  rescission rates that can be attributed to on-call clinicians, which Defendants have not

19  established, the administrative burdens associated with those rescissions are more than off-

20  set by the reduced cost to CDCR of not providing around-the-clock clinical staffing on

21  site.

22        Instead of exacerbating class members' suffering and further delaying their right to

23  timely access crisis care, Defendants should focus on other ways to target the rescission

24  problem and/or improve administrative efficiencies.  First, Defendants can and should

25  continue to supplement their existing in-person after-hours staffing with additional

26  clinicians in MHCB units after 5 p.m. and the expansion of Crisis Intervention Teams into

27  additional institutions and for longer hours, which are clinically appropriate methods of

28  addressing Defendants' concerns with rescissions.  *See* Winter Decl. ¶ 7 and Ex. A at 1-2.

Case No. 2:90-CV-00520-KJM-DB

PLAINTIFFS' OPENING BRIEF RE: OBSTACLES TO TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

1    Second, Defendants should, as Plaintiffs repeatedly have suggested, focus on determining

2    why certain institutions have dramatically higher rescission rates than others, and then

3    target those institutions for further training, enhanced staffing, or procedural changes. *See*

4    Stone-Manista Decl. ¶ 11 and Ex. G (identifying prisons with high rescission rates from

5    most recent monthly data ); *see also* Winter Decl. ¶ 8 and Ex. C at 4(outlining various

6    prisons with high rescission rates based on earlier data).

7          Finally, Defendants could simply take steps to expand their administrative

8    capabilities for processing and completing such transfers to improve their compliance with

9    the Program Guide.  Right now, Defendants' Health Care Placement Oversight Program

10   ("HCPOP")—the headquarters administrative unit in charge of processing all MHCB

11   referrals, locating open beds throughout the system, and endorsing class members in crisis

12   to those beds so that they can be moved—contains exactly one person assigned to process

13   MHCB transfers, who only works from 8 a.m. through 4:30 p.m. each day.  Winter Decl.

14   ¶ 10.  That person spends approximately the first 2 hours of their 8.5 hour shift just

15   catching up on the referrals, rescissions, and discharges that have accumulated in the 13.5

16   hours since he or she left the previous day, before a single patient is actually endorsed to a

17   crisis bed.  *Id.*  Simply adding relatively inexpensive administrative staff to process MHCB

18   transfers during all hours of the day, or even a majority of the hours of the day, could

19   improve Defendants' ability to process and transfer efficiently class members in dire need

20   of crisis care to a hospital where they can receive treatment.  Defendants should focus on

21   solutions like these, which aim to decrease the amount of time those patients spend waiting

22   in clinically inappropriate and dangerous conditions before receiving treatment, rather than

23   their current proposal, which only prolongs suffering in the name of uncertain

24   administrative gains.

25   **C.    Defendants' Proposal Exceeds the Scope of the Court's April 19, 2017
            Order.**

26

27          Finally, the proposal to hold patients in alternative housing overnight—or possibly

28   even over the weekend—pending an in-person evaluation, is also outside the scope of what

PLAINTIFFS' OPENING BRIEF RE: OBSTACLES TO TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

1  this Court ordered the parties to accomplish in the workgroup meetings.  The Order

2  instructed the Special Master to convene the workgroup "to focus on outstanding issues

3  related to compliance with the Program Guide timeline for transfer to MHCBs, including

4  … use of alternative housing *when an inmate-patient is referred to* an MHCB."  Order,

5  ECF No. 5610 at 13 (emphasis added).  The Order does not contemplate or permit altering

6  the Program Guide's existing transfer timeline, likely because that issue is well-settled.[4]  If

7  anything, Defendants should be focusing their efforts on reducing and ultimately

8  eliminating their reliance on harsh, unlicensed OHUs and other alternative housing

9  settings, as this Court always anticipated they would when it—and Plaintiffs—first

10  grudgingly accepted the need to allow them, in an extremely limited fashion, to offset the

11  crisis-level shortage of beds and extreme overcrowding over a decade ago.  *See* May 2,

12  2006 Order, ECF No. 1800 at 2-4, 6; *see also* April 5, 2013 Order, ECF No. 4539 at 51-53.

13  Instead, Defendants seek to dramatically expand suicidal patients' exposure to these

14  counter-therapeutic settings while delaying actual treatment, in order to hopefully achieve

15  marginal administrative efficiencies and falsely to improve their appearance of compliance

16  with the Program Guide.  That is the definition of deliberate indifference, and must be

17  rejected by this Court outright.

18  **II.    DEFENDANTS' PROPOSAL TO ALTER THE METRIC FOR MHCB-TRANSFER TIMELINES IS UNACCEPTABLE.**

19

20       During the recent workgroup meetings, Plaintiffs confirmed their suspicion that

21  Defendants have been measuring and reporting their compliance with the 24-hour transfer

22  requirement in a manner that directly contradicts clear language in the Program Guide.

23  *See* Stone-Manista Decl. ¶ 10 and Ex. F at 3-4; Winter Decl. ¶¶ 8, 9 and Exs. C, D & E;

24

25  ────────────────

26  [4] Defendants also never raised any proposal to extend the 24-hour timeline by delaying when an evaluation for crisis care would occur in any of their briefing or at the hearings on Program Guide transfer timelines leading up to the Order.  *See* ECF Nos. 5522, 5544, 5552, 5595-97.  Their attempt to do so now is improper, and undermines the extensive proceedings that have already taken place.

27

28

18

Case No. 2:90-CV-00520-KJM-DB

1    *see also* Plaintiffs' Response to March 24, 2017 Order Re: Enforcement of Timelines for

2    Access to Inpatient Care, ECF No. 5593 at 23 (requesting a status conference to determine

3    whether Defendants were reporting MHCB transfer timeline compliance inaccurately).

4    When a patient requiring crisis care is transferred to a MHCB outside of his or her home

5    institution (which Defendants refer to as an "external placement"), Defendants report[5] the

6    transfer as timely if the patient is placed on a transport vehicle within 24 hours of referral,

7    even if the time before he or she is in the MHCB and receiving appropriate care is

8    significantly longer.  Stone-Manista Decl. ¶ 10 and Ex. F at 4.  Indeed, Defendants do not

9    even track the amount of time it takes critically ill class members to actually reach

10   treatment in a crisis bed, and they reported that they could not manually assemble more

11   than five days' worth of such data for the workgroup's consideration.  Winter Decl. at

12   ¶¶ 11-12 and Ex. A at 3-4, Exs. F & G.

13           Defendants' use of this metric is misleading and harmful.  It constitutes a significant

14   departure from the closely negotiated court-ordered language of the Program Guide, and

15   runs contrary to the goal of providing crisis care promptly for patients who require it,

16   regardless of whether the class member is fortunate enough to be at a prison with an open

17   MHCB.  *See* Order, ECF No. 5610 at 11.  That Defendants apparently decided years ago to

18   report their compliance in this manner does not justify the use of the metric, since neither

19   the Court, the Special Master, nor Plaintiffs have agreed to this end-run around the

20   Program Guide's specific definition of the 24-hour timeline for crisis bed transfers.

21

22

23

---

24   [5] Defendants report their compliance in this manner to the Court in their CDCR Mental
     Health Crisis Bed Patient Census and Waitlist Report, included as Ex. C to the monthly
25   court-ordered Defendants' Census and Waitlist for Inpatient Mental Health Care, and to
     the Special Master and Plaintiffs in Enclosure 7c to their monthly data.  *See, e.g.*,
26   August 15, 2017 Census and Waitlist Reports for Inpatient Mental Health Care, ECF No.
     5664 at 12; Stone-Manista Decl. at ¶ 9 and Ex. E (enclosure 7c example); *see also* Order,
27   ECF. No. 5610-1 (attaching excerpt from Enclosure 7c of the monthly data).

28

**A.    The Program Guide Clearly Contemplates that a Transfer to an External MHCB is Only Complete Upon Arrival in the MHCB.**

In the section regarding level of care changes and the related governing transfer timelines, the Program Guide defines the term "transfer" as "[t]he date the inmate-patient is *placed into* the LOC and program to which s/he was referred."  Program Guide at 12-1-15 (emphasis added).  The section explicitly refuses to distinguish between the timeline for transfer between levels of care within the same institution and in two different institutions. *Id.* at 12-1-14 ("The following table summarizes the time frames which CDCR must meet for the transfer of MHSDS inmate-patients between levels of care, whether within the same institution or to another institution.").  The Program Guide section regarding MHCBs is similarly clear.  *See id.* at 12-5-3 to 12-5-4 ("If the institution does not have a MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be transferred *to a designated MHCB institution* … within 24 hours of referral;" "In most cases, movement from an institution to a MHCB bed shall be completed … within 24 hours." (emphasis added)).

Changing the metric will unfairly punish patients whose mental health crises happen to occur at institutions without MHCBs or without sufficient MHCBs, as they will now be made to wait longer than 24 hours before accessing urgently needed care.  Patients obviously receive no treatment for their mental health emergency during the hours they spend on a transport bus, which may well, for the reasons discussed in Section I, *supra*, exacerbate the acuity of patients' mental illness or discourage them from reporting feelings of self-harm.  *See, e.g.*, July 21, 2011 Order, ECF No. 4044 at 4; ECF No. 5259 at 28 (Hayes Audit of Suicide Prevention Practices, Jan. 14, 2015).  Defendants have provided absolutely no reason that normal transportation time should not be built into the 24-hour timeline that the Program Guide provides them to initiate treatment in a hospital setting for patients in crisis.  Extending that time, in the absence of any extenuating circumstances or unforeseeable obstacles, for patients who are unfortunate enough not to be sent to an internal crisis bed does nothing but prolong suffering, and should not be authorized.

**B.     Defendants' Approach Is Not Justified by its Apparent Long-Term Use, Because the Parties Never Agreed to this Metric, and the Court Has Not Sanctioned a Departure from the Plain Language of the Program Guide.**

There is no ambiguity about the intent of the Program Guide's language regarding the timeline for transfer to MHCBs.  *See* Order, ECF. No. 5610, at 11-13 (repeatedly referencing the Program Guide's requirement as the "twenty-four hour timeline for transfer *to MHCBs*" and substantially similar language (emphasis added)); *see also* Twenty-Sixth Round Monitoring Report of the Special Master, May 6, 2016, ECF No. 5439 at 93 (referring to "[t]ransfers *to MHCBs* within 24 hours of referral" (emphasis added)).  Yet, since at least 2014, Defendants have apparently been counting themselves as compliant with the Program Guide when patients awaiting external placements in MHCBs are placed on a transport vehicle within 24 hours of referral, rather than when they actually begin receiving treatment for their mental health crisis.  Stone-Manista Decl. ¶ 10 and Ex. F at 3-4; Winter Decl. ¶ 9 and Exs. D & E.

During the workgroup meetings, when Defendants proposed formally changing the metric, they asserted that they had shared a December 23, 2014 memo with Plaintiffs and the Special Master at the time of its issuance.  *See* Winter Decl. ¶ 9 and Exs. D & E.  The memo, regarding "Transfer of Inmates to and from Mental Health Crisis Beds," defines "transfer" as "the day/time the IP leaves the institution for transport to/from a MHCB according to SOMS."  *Id.*, Ex. E at 2.  Yet Defendants never shared the memo nor discussed its contents with Plaintiffs (or, to Plaintiffs' knowledge, the Special Master) prior to its implementation.[6]  Plaintiffs did not consent to this modification of the Program Guide's strict time limits for crisis bed transfers, and oppose Defendants' proposal to use it going forward.

---

[6] Plaintiffs' counsel completed a thorough and diligent search of their correspondence history and files from 2014 and could not find any record of having received a copy of the December 23, 2014 memo, either in draft form before its issuance or after its issuance, or of discussing anything along the lines of the memo's contents in advance of the instant workgroup discussions.  Winter Decl. ¶ 9.  Defendants ignored Plaintiffs' request for any evidence to the contrary.  *Id.* ¶ 9 and Ex. D.

1    More importantly, the Court has never authorized Defendants to deviate from the

2  clear language of the Program Guide.  In fact, the Order clearly contemplates that

3  Defendants do and should continue to measure their compliance as the time it takes to

4  place a patient into a MHCB, not on a transport vehicle.  *See* Order, ECF No. 5610 at 11

5  (noting that "full compliance with the twenty-four hour timeline for *transfer to MHCBs* is

6  required to satisfy the Eighth Amendment (emphasis added)); *id.* at 12 (referencing time to

7  "MHCB placement" and "wait[ing] … twenty-four hours for placement").  That

8  Defendants have apparently been ignoring the plain language of the Program Guide and

9  the expectations of Plaintiffs, the Special Master, and the Court does not justify their

10  proposal to formalize that departure.

11  **C.    Unforeseeable Obstacles to Timely Transfer to MHCBs Should Be
             Addressed as Exceptions.**

12

13    Plaintiffs acknowledge that limited unforeseen circumstances arise that may prevent

14  Defendants from placing every patient referred to a MHCB into a bed within 24 hours of

15  referral, including unusual traffic or natural disasters.  That is why the Program Guide

16  mandates that movement to a crisis bed within 24 hours should occur in "most cases."

17  Program Guide at 12-5-4.  But it is wholly improper for Defendants to expand the margins

18  of these limited unexpected situations so much that they re-define the underlying standard,

19  making it impossible to track Defendants' actual compliance with the timeline and causing

20  harm to large numbers of patients who will be made to wait more than twenty-four hours

21  before receiving necessary crisis mental health care.

22    In fact, the Order envisions a more appropriate way to address unpredictable

23  obstacles that may prevent Defendants from completing a transfer within 24 hours.  The

24  Order mandates that the Special Master's workgroup "develop an addendum to the

25  Program Guide delineating exceptions, if any," to the normal timeline.  Order, ECF No.

26  5610 at 13.  When unforeseen circumstances result in a transfer that takes longer than 24

27  hours from referral to admission to a crisis bed, Defendants will be required to explain the

28  delay and justify the application of a relevant exception.  The expectation, however, should

1   be that Defendants otherwise achieve full compliance with the 24 hour requirement, and

2   actively address—with the guidance of the Special Master and the workgroup—any

3   systemic or institution-specific issues that prevent Defendants from achieving full

4   compliance.

5   **III.    THE COURT SHOULD REQUIRE DEFENDANTS TO DEVELOP AN
          AUTOMATED REPORTING SYSTEM FOR MHCB TRANSFER
6          TIMELINESS IMMEDIATELY.**

7           During the workgroup meetings, Defendants represented that they do not currently

8   have a mechanism to record systematically MHCB referral timelines, or a mechanism to

9   generate automatic reports regarding transfer timelines or any claimed exceptions to those

10  timelines.  *See* Winter Decl. ¶¶ 10-11 and Ex. F at 2, Ex. G at 3; *see also* Joint Report,

11  ECF No. 5669 at 10 (noting that the "current system was not designed to report on the

12  proposed exceptions to the MHCB transfer timelines or data showing the time class

13  members spend on special transport before arriving in a crisis bed").

14          Accurate data regarding the movement of patients into and out of MHCBs is an

15  important pre-requisite to the parties' and the Court's ability to assess Defendants'

16  compliance with the transfer timelines, to analyze the applicability of any proposed

17  exceptions, and to identify and remedy additional obstacles to providing prompt crisis bed

18  care.  Furthermore, it is crucial that Defendants be able to generate such data automatically

19  and at regular intervals so that the Court has the ability to understand and respond to trends

20  when necessary.  Defendants have "agreed to review their reporting systems to determine

21  whether the data now sought can be automatically generated," *see* Joint Report, ECF No.

22  5669 at 10, but have not agreed to take any action if their review shows that such reporting

23  is not currently possible.

24          Plaintiffs request that the Court order Defendants to develop a system that can

25  automatically and accurately generate a report, which will ultimately be provided to the

26  Special Master and Plaintiffs as part of the monthly data, tracking the precise time and, if

27  appropriate, location of at least the following key metrics:  (1) each MHCB referral,

28  (2) placement into alternative housing, (3) HCPOP endorsement, (4) rescission, if

Case No. 2:90-CV-00520-KJM-DB

PLAINTIFFS' OPENING BRIEF RE: OBSTACLES TO TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

1  appropriate, (5) initiation of transport to an external MHCB, (6) arrival into MHCB (for

2  both internal and external transfers), and (7) discharge from MHCB.  Defendants should

3  also be required to create a report tracking any claimed exceptions to the Program Guide's

4  24-hour transfer timeline, and the reasons therefor.  For both reports, Defendants should be

5  required to provide a template proposal to the Special Master and Plaintiffs prior to

6  implementation, which can be discussed in the workgroup setting.

7                                   **CONCLUSION**

8         The Court should issue an order:  (1) prohibiting Defendants from modifying their

9  existing policy, which allows for the use of alternative housing only after a referral to a

10  MHCB has been made; (2) requiring Defendants to track and report external placements as

11  completed only when a patient is in a MHCB within 24 hours of referral, not merely on a

12  transport vehicle; and (3) requiring Defendants immediately to develop, as part of the

13  workgroup, a tracking system to record automatically key metrics necessary to track

14  compliance with the Program Guide's 24-hour timeline for MHCB transfers, as well as any

15  claimed exceptions to those timelines.

16

17  DATED:  September 13, 2017          Respectfully submitted,

18                                     ROSEN BIEN GALVAN & GRUNFELD LLP

19
                                       By:  */s/ Lisa Ells*
20                                          Lisa Ells

21                                     Attorneys for Plaintiffs

22

23

24

25

26

27

28