1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5

6

7

8

9  RANJINI ACHARYA – 290877
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
11 Telephone:   (415) 882-8200

12

13

14

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:   (415) 433-6830

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:   (415) 621-2493

Attorneys for Plaintiffs

15            UNITED STATES DISTRICT COURT

16            EASTERN DISTRICT OF CALIFORNIA

17

18 RALPH COLEMAN, et al.,

19            Plaintiffs,

20        v.

21 EDMUND G. BROWN, JR., et al.,

22            Defendants.

23

24

25

26

27

28

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF JESSICA
WINTER IN SUPPORT OF
PLAINTIFFS' OPENING BRIEF RE
OBSTACLES TO TIMELY ACCESS
TO MENTAL HEALTH CRISIS BEDS**

Judge:   Hon. Kimberly J. Mueller
Date:    September 28, 2017
Time:    10:00 a.m.
Crtrm.:  3, 15th Floor

[3170239.1]

Case No. 2:90-CV-00520-KJM-DB

DECLARATION OF JESSICA WINTER IN SUPPORT OF PLAINTIFFS' OPENING BRIEF RE OBSTACLES TO
TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

I, Jessica Winter, declare:

1.    I am an attorney duly admitted to practice before this Court.  I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Opening Brief re Obstacles to Timely Access to Mental Health Crisis Beds.

2.    On August 4, 2017, I attended a workgroup teleconference with Defendants' representatives, Defendants' counsel, Plaintiffs' counsel, and members of the Special Master's team.  I took contemporaneous notes during that teleconference.  After the meeting, I reviewed notes from other members of Plaintiffs' counsel and incorporated them into my notes.  During the August 4, 2017 teleconference, Defendants explained the most recent version of their proposal for increased use of alternative housing for patients experiencing mental health crises.  Specifically, Defendants stated their plan to place patients experiencing a mental health crisis in alternative housing, if the patients report their crises "after hours," meaning when CDCR mental health clinicians are no longer on site.  Overnight, the patients would be held in unlicensed alternative housing settings until an on-site clinician returns in the morning, at which point the clinician can conduct an in-person evaluation of the patient, and determine whether a referral to a crisis bed is warranted.

3.    On August 2, 2017, Defendants also provided us a letter, from Andrea S. Moon to Lisa Ells, memorializing their proposed change in the use of alternative housing for patients reporting crises.  A true and correct copy of that letter is attached hereto as **Exhibit A**.  In Andrea S. Moon's August 2, 2017 letter, Defendants reported the business hours for clinical staff at all CDCR institutions.

4.    On September 8, 2017, Defendants' counsel Nick Weber sent an email to my colleague Jenny Yelin, on which I was copied, stating that Defendants' alternative housing policy "would be flexibly applied to each institution based on when staff is onsite," that "inmates placed in safe housing would be seen the next morning, as quickly as possible

[3170239.1]

1    once staff get in," and that Defendants have not yet worked out the details regarding how

2    they "would handle weekend hours." A true and correct copy of that email and the chain

3    of emails that preceded it is attached hereto as **Exhibit B**.

4        5.    During the August 4, 2017 teleconference, Defendants referred Plaintiffs and

5    the Special Master's team to **Exhibit A**, pointing out that "after-hours" referrals—those

6    made between 5 p.m. and 5 a.m.—are more likely to result in rescissions than are referrals

7    made between 5 a.m. and 5 p.m.

8        6.    At various times during the workgroup teleconferences, including the

9    August 4, 2017 teleconference, as well as by email, Plaintiffs have asked Defendants to

10   provide data to support their assertion that evaluations performed by on-call clinicians—as

11   compared to face-to-face evaluations—are more likely to result in rescinded referrals.

12   Defendants' data regarding rescinded referrals distinguishes between only "after-hours"

13   and "business hours" referrals—between 5 p.m. and 5 a.m., and between 5 a.m. and 5 p.m.,

14   respectively—not between referrals made by clinicians in-person and those not made in

15   person, as shown in the tables in **Exhibit A**. **Exhibit B** includes an email from Jenny

16   Yelin to Nick Weber, on which I was copied, asking for data showing the rescission rates

17   for on-call versus in-person clinical evaluations. As of today's date, Defendants have not

18   provided this data to Plaintiffs.

19       7.    At the August 4, 2017 workgroup teleconference, we discussed with

20   Defendants the utility of adding Crisis Intervention Teams ("CITs") at institutions with

21   high rates of MHCB referrals and rescissions, particularly because the addition of CITs

22   would be a clinically appropriate measure for addressing high rescission rates.

23       8.    On July 6, 2017, I wrote a letter to Defendants formally objecting to their

24   proposed metric for measuring timeframes for transfers to external MHCBs. Attached

25   hereto as **Exhibit C** is a true and correct copy of that letter.

26       9.    On July 10, 2017, in response to my July 6 letter, Defendants sent Plaintiffs,

27   including me, an email attaching a December 23, 2014 memorandum purporting to

28   authorize the disputed practice for measuring timeframes for transfer to external MHCBs.

DECLARATION OF JESSICA WINTER IN SUPPORT OF PLAINTIFFS' OPENING BRIEF RE OBSTACLES TO
TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

[3170239.1]

1   A true and correct copy of that email is attached hereto as **Exhibit D**.  A true and correct

2   copy of Defendants' December 23, 2014 memorandum is attached hereto as **Exhibit E**.

3   On July 18, 2017, Lisa Ells sent an email to Nick Weber, on which I was copied.  A true

4   and correct copy of that email is included in **Exhibit D.**  As explained in Ms. Ells' email,

5   Plaintiffs performed a thorough and diligent search of their correspondence history and

6   files from 2014, yet have been unable to find any record of receiving a copy of the

7   December 23, 2014 memo.  Ms. Ells' email requested information about when Defendants

8   claimed to have transmitted the memo to Plaintiffs previously.  Defendants have yet to

9   respond to Ms. Ells' July 18, 2017 email.

10       10.       I was present for and took contemporaneous notes of the August 28

11   teleconference with the parties and the Special Master Team.  After the teleconference, I

12   reviewed my notes and worked with other members of Plaintiffs' counsel to incorporate

13   the notes from the teleconference into a master sets of notes.  During the August 28, 2017

14   teleconference, Defendants stated that HCPOP has one staff member who works from 8

15   a.m. to 4:30 p.m. to process daily MHCB referrals.  That single staff member spends the

16   first two hours of their shift processing the referrals, rescissions, and discharges that have

17   accumulated in the 13.5 hours since he or she left the previous day.

18       11.       At the August 28, 2017 workgroup teleconference, Defendants stated in

19   response to Plaintiffs' counsel's questions that CDCR does not have a single mechanism

20   for reporting MHCB transfer timelines, but rather a few, imperfect mechanisms that need

21   to be unified and clarified.  Similarly, at the August 4, 2017 workgroup teleconference,

22   Defendants represented that they did not have data they could use to report on exceptions

23   to the MHCB transfer timeframe.  Attached hereto as **Exhibits F** and **G** are Defendants'

24   document entitled "Factors that Contribute to Delays in Timely Transfers to Mental Health

25   Crisis beds and Proposed Solutions," and the update to that document.  In those

26   documents, Defendants acknowledge that they do not currently have a system to track

27   automatically tracking of crisis bed referral timelines, including reasons for delay.

28       12.       Defendants' August 2, 2017 letter (Exhibit A) had included some data,

DECLARATION OF JESSICA WINTER IN SUPPORT OF PLAINTIFFS' OPENING BRIEF RE OBSTACLES TO
TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

[3170239.1]

1  discussed at pages 3-4, from a one-week period in the beginning of June, showing a

2  comparison between the amount of time required to place someone on a transport vehicle

3  versus the amount of time required to place someone in an MHCB at an outside institution.

4  At the August 4, 2017 workgroup meeting, I asked Defendants to provide information

5  regarding MHCB transfer timeframes for more than a five-weekday period.  Specifically,

6  we asked for a month's worth of data so we could have data for all institutions (which was

7  not the case with the five days' worth of data), and so that we could see data for weekend

8  referrals.  At that meeting and since then, Defendants have represented that they are not

9  able to provide a month's worth of data because they do not have systems in place for

10 automatically gathering and reporting this data.

11         I declare under penalty of perjury under the laws of the United States of America

12 that the foregoing is true and correct, and that this declaration is executed at Berkeley,

13 California this 13th day of September, 2017.

14

15                                          _/s/ Jessica Winter_____
                                             Jessica Winter
16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JESSICA WINTER IN SUPPORT OF PLAINTIFFS' OPENING BRIEF RE OBSTACLES TO
TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS

[3170239.1]

Exhibit A

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 2, 2017

VIA EMAIL ONLY

Lisa Ells                                              Special Master Lopes
Rosen Bien Galvan & Grunfeld LLP        Pannone Lopes Devereaux and O'Gara LLC
50 Fremont Street, 19th Floor               Northwoods Office Park, Suite 215N
San Francisco, CA 94105                      1301 Atwood Avenue
                                                          Johnston, RI 02919

RE: Plaintiffs' July 6, 2017 Letter and Defendants' July 21, 2017 Response

Special Master Lopes and Lisa:

Defendants write to follow up on our July 21, 2017 letter regarding Mental Health Crisis Bed proposals and provide additional data requested during the all parties' workgroup discussion on July 24, 2017. Defendants look forward to continuing to engage in cooperative efforts to identify obstacles to full compliance with a 24-hour timeline for transfer of inmates to Mental Health Crisis Beds and possible solutions.

    1.   Updates on Initiatives to Ensure Proper Bed Utilization of Mental Health Crisis Beds

In Defendant's April 7, 2017, Response to the Court's March 24, 2017, Order to Show Cause, Defendants outlined several initiatives undertaken in the last year to help ensure appropriate use of Mental Health Crisis Beds (MHCB). Defendants also provided updates on those initiatives to Plaintiffs and the Special Master in their July 21 correspondence. Additional information and updates are discussed below.

    a.   Crisis Intervention Teams

Defendants will have Crisis Intervention Teams (CIT) at eleven institutions by fall 2017. Institutions most in need of crisis intervention teams are identified through a review of existing data on referral and rescission rates. Thereafter, each institution is required to identify one staff member each from the mental health, nursing, and custody disciplines to provide after-hours coverage seven days per week. If an institution does not already have staff currently assigned to cover after hours, headquarters has authorized mental health staff to take 13 hour shifts, three days per week. If no volunteers are identified, mandated coverage or call backs will be implemented.

CIT training includes a two-hour in-class training and shadowing a Master Trainer working with patients identified as requiring evaluations for possible MHCB referrals. Master Trainers are provided from the mental health, nursing, and custody disciplines.

RE: Mental Health Crisis Bed Proposal
Page 2

Crisis intervention teams have been activated at three institutions:  Salinas Valley State Prison (October 2016), California Institution for Women (January 2017), and California Health Care Facility (March 2017).  Defendants will activate Crisis Intervention Teams at eight more institutions by the end of September 2017:  Central California Women's' Facility (August 2017), California State Prison, Los Angeles County, (August 2017), California State Prison, Corcoran, (August 2017), R.J. Donovan Correctional Facility (August 2017), Wasco State Prison (September 2017), California State Prison, Sacramento (September 2017), Mule Creek State Prison (September 2017), and California Substance Abuse Treatment Facility (September 2017).

Attached as Exhibit A is a table showing historical referrals and rescissions in the California Institution for Women's (CIW) MHCBs from January 2015 through July 2017.  As indicated in Exhibit A, the CIT was implemented at CIW in January 2017 and demonstrates an overall reduction in the frequency of both referrals and rescissions post-CIT implementation as compared to previous years.  Prior to CIT implementation, the overall average number of referrals each month was 46.48, and rescissions comprised 12.5% of those referrals.  Post-CIT implementation, the overall average number of referrals each month has fallen to 34, with rescissions making up 7.8% of those referrals.

  b. After Hours Staffing

CDCR has expanded its after-hours staffing at many institutions.  The goal of increasing after-hours staffing is to decrease the number of rescissions.  Data has shown that a significant number of after-hours referrals to crisis beds are made between 5:00 P.M. and 1:00 A.M.  The following staffing hours chart updates the chart included in Defendants' July 21 letter:

| Institution | On-Site Hours | Days Per Week |
| --- | --- | --- |
| ASP | 0700-1700 | 7 |
| CAL | 0730-1730 | 7 |
| CCC | 0700-1700 | 7 |
| CCI | 0800-1700 | 5 |
| CCWF | 0600-1800 | 5 |
|  | 0700-1700 | Sat/Sun |
| CEN | 0730-1730 | 7 |
| CHCF | 0700-1700 | 5 |
| CIM | 0700-2400 | 7 |
| CIW | 0700-2200 | 7 |
| CMC | 0700-1700 | 7 |
| CMF | 0700-2300 | 5 |
|  | 0700-1700 | Sat/Sun |
| COR | 0700-1700 | 5 |
| CRC | 0700-1700 | 5 |
| CTF | 0600-1800 | 5 |
|  | 0700-1700 | Sat/Sun |
| CVSP | 0630-1800 | 7 |
| FSP | 0800-1600 | 5 |
| HDSP | 0700-1700 | 7 |
| ISP | 0630-1800 | 7 |

RE: Mental Health Crisis Bed Proposal
Page 3

| KVSP | 0700-1700 | 7 |
|------|-----------|---|
|      | 0800-1800 | 5 |
| LAC  | 0700-1700 | Sat/Sun/Mon |
|      | 0700-2200 | Tue/Wed/Thur |
|      | 0700-2000 | Fri |
| MCSP | 0600-2400 | Mon-Thur |
|      | 0600-1700 | Fri |
|      | 0700-1700 | Sat/Sun |
| NKSP | 0700-1700 | 7 |
| PBSP | 0700-1700 | Sat/Sun/Mon |
|      | 0700-2200 | Tue-Fri |
| PVSP | 0700-1700 | 7 |
| RJD  | 0700-2200 | 5 |
|      | 0700-1700 | Sat/Sun |
| SAC  | 0600-0100 | 7 |
| SATF | 0700-1700 | 7 |
| SCC  | 0730-1730 | 5 |
|      | 0800-1800 | Sat/Sun |
| SOL  | 0700-1700 | 7 |
| SQ   | 0600-2300 | M-Thur |
|      | 0600-1900 | Fri |
|      | 0700-1700 | Sat/Sun |
| SVSP | 0700-1700 | 5 |
|      | 1000-2300 | 5 (CIT) |
|      | 0700-1700 | Sat/Sun |
|      |           | MHCB Staff |
| VSP  | 0700-1700 | 7 |
| WSP  | 0700-1700 | 7 |

c.  Clustering of Mental Health Crisis Beds & Transport Timelines

In December 2016, Defendants clustered their crisis beds into three regions.  In comparing the average time for inmates to be transferred to outside crisis beds from the time periods of January – June 2016 (prior to clustering) and January – June 2017 (subsequent to clustering), the average length of time (in hours) from referral to HCPOP bed assignment for all three regions decreased by 17.54 hours and the average length of time (in hours) from referral to disposition decreased by 16.85 hours.

For comparison, attached as Exhibits B and C are tables showing the average length of time from referral to disposition by region and type of admission for January through June of 2016 and January through June of 2017.

Attached as Exhibits D and E are data from the first week of June 2017, illustrating the difference between the length of time to place an inmate on a transport vehicle versus the length of time to place the inmate into the receiving institution's bed.  These exhibits show that the average transportation time from sending to receiving institution is approximately 4.12 hours, with a range of 0.94 hours to 9.14 hours.  It should be noted that the same trip between institutions can vary widely.  For example, transfers between RJD and LAC took anywhere from 4.68 to 9.14 hours due to traffic and other conditions.  Based on varying transportation times between institutions, the overall short duration of time the inmate spends being transported, and

RE: Mental Health Crisis Bed Proposal
Page 4

the fact that the inmate is safe during transportation, it appears appropriate to measure completion of a referral for an inmate-patient transferring to an outside mental health crisis bed to occur at the time the inmate-patient is placed in a transport vehicle.

Finally, attached as Exhibit F is a table showing the average time to disposition for internal and external transfers and the number of internal and external transfers conducted by each institution from March through June 2017.

> 2. Rescission Rates

Defendants supplied data in their July 21 letter on rescission rates and the impact of after-hours referrals. Attached as Exhibit G, is an excel table showing the number of referrals made both after (5:00 PM to 5:00 AM) and during peak hours (5:00 AM to 5:00 PM), as well as data on the number of rescissions that occur at each institution. The data shows that over a quarter of all after hours referrals are rescinded (1,882 in six months) versus only 9.3% of referrals (or 678 over six months) made during peak hours. Of the total number of rescissions, 73% are rescissions of referrals made after hours. Rescissions cause delays at the institutional level by removing clinicians from direct patient care in order to complete rescission paperwork. Rescissions also cause delays at the HQ level, leaving HCPOP unable to identify true needs for placement until all rescissions are removed from pending waitlists.

Defendants propose to address the high after hours rescission rate by requiring that clinical evaluations be completed in person before an inmate can be referred to a mental health crisis bed. While Defendants have increased after hours staff and are expanding Crisis Intervention Teams (see Section 1(a) and 1(b), *infra.*), Defendants propose that inmates who seek after hours care be kept in a safe location under one-to-one observation until a clinician conducts an in-person evaluation. Defendants propose that such an evaluation will be conducted no later than the next morning, and referral to a crisis bed will commence after the in-person evaluation if warranted.

> 3. Readmission Rates

Defendants provided data in their July 21 letter regarding readmission rates. Attached as Exhibit H is institutional readmission rate data for the second quarter of 2017. The data shows the percentage of crisis bed and Department of State Hospitals/Psychiatric Inpatient Program discharges that were *not* readmitted within 30 days. The statewide readmission rate for that quarter was 20%.

> 4. Long Lengths of Stay in Mental Health Crisis Beds

Attached as Exhibit I is inmate-level, clinical data regarding the fifteen inmates identified in Defendants' July 21 correspondence with current crisis bed stays beyond thirty days in response to plaintiffs' request at the all-parties workgroup on July 24, 2017.

As indicated in Defendants' July 21 letter noting inmates in crisis beds beyond sixty days, that data was based on Defendants' monthly psychiatric aging report which identified several inmates

RE: Mental Health Crisis Bed Proposal
Page 5

who were out to court and not in a crisis bed, but remained on crisis bed status.  Of the eight inmates with the longest lengths of stay, one inmate was a SOMS coding error, one had a medical hold, one was chronically acutely and neurologically impaired and found inappropriate for acute or intermediate care, and five were out to court.  All but one of those inmates have since been transferred out of the crisis beds.

     5.   Female Transfers to Crisis Beds

CDCR continues to identify inmates custodially eligible for placement at Department of State Hospitals - Patton.  The following inmates are currently housed at DSH-Patton:

- Munoz, WA5387
- McCallum, WA9913
- Jones, WE5374
- Li, WF0002
- Odums, WF2782
- Lanza, WF3993
- Nicholson, WF5978
- Sullivan, WF6368
- Guadarrama, WF6561
- Sojorreeder, X34500

At CIW's Psychiatric Inpatient Program, two inmates (Freeman WF2134 and Robinson X09385), are custodially eligible for unlocked dorms.

     6.   Plan To Address Inpatient Waitlists

CDCR is aware of the impact that inpatient beds have on Mental Health Crisis Bed waitlists.  In response to the current inpatient waitlist, CDCR has undertaken several steps to increase the flow through the inpatient beds.  First, CDCR has begun admitting patients to the acute and intermediate programs on weekends to avoid having a patient wait extra days for admission. Second, CDCR is actively reviewing all inmates in the higher custody intermediate settings that are custodially eligible for unlocked dorms.  CDCR has directed its PIPs to begin referring nearly all of their unlocked dorm eligible inmates to their least restrictive housing.  Finally, CDCR has increased the census at CMF's L1 to 36 patients as of August 1, 2017.

////

///

//

/

RE: Mental Health Crisis Bed Proposal
Page 6

Defendants look forward to discussing the data and issues with Plaintiffs and the Special Master
at our workgroup on August 4, 2017.


Sincerely,


*/s/ Andrea S. Moon*

ANDREA S. MOON
Attorney
Office of Legal Affairs

Attachment(s):
   A.  CIW CIT Data Sheet
   B.  MHCB Time Frames Drill Down Jan – Jun 2016
   C.  MHCB Time Frames Drill Down Jan – Jun 2017
   D.  MHCB Transport and Placement Averages 6-5 6-9
   E.  MHCB Transport and Placement Timeframes 6-5 6-9
   F.  MHCB Data Summary w capacity
   G.  MHCB Ref Dis Jan-June 2017 Pivot
   H.  2nd Q 2017 Readmission Rates by Inst.
   I.  15 Patients in MHCB Over 30 Days

cc:

Special Master Lopes
Michael Bien
Tom Nolan
Steve Fama
Co-Counsel

Exhibit B

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov> |
| **Sent:** | Friday, September 8, 2017 6:19 PM |
| **To:** | Jenny Yelin; Moon, Andrea S@CDCR; Lisa Ells; Michael W. Bien; Cynthia Radavsky; Henry D. Dlugacz; Jeff Metzner; Jonelie Navarro; Kerry Courtney Hughes, MD; Kristina Hector; 'kwalsh@pldw.com' (kwalsh@pldw.com); Maria Masotta; Mohamedu Jones; Matt Lopes; Mary Perrien; Karen Rea-Williams; Rod Hickman; 'sraffa@PLDW.com'; Tim Rougeux |
| **Cc:** | Elise Thorn; Steve Fama; mmendelson@prisonlaw.com; Coleman Team - RBG Only; Coleman Special Master Team; Gabriel Sanchez; Danielle OBannon; Chad Stegeman; Patrick McKinney |
| **Subject:** | RE: Follow Up re: Coleman: Plaintiffs' Response to Defs' MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468] |

Jenny,

I don't believe the parties ever had an opportunity to discuss these finer points of Defendant's proposal.  Defendants certainly welcome further discussion of this topic during the workgroup.

While Defendants provided data comparing 5:00 AM to 5:00 PM against 5:00 PM to 5:00 AM to illustrate the problem with after-hours referrals and high rescission rates, a final policy would be based on the staffing hours at each institution.  Defendants' envision designing a policy that would be flexibly applied to each institution based on when staff is onsite.  Defendants provided Plaintiffs with staffing hours data for each institution in their letters from July 21 and August 2, 2017.  Inmates placed in safe housing would be seen the next morning, as quickly as possible once staff get in.

Defendants are willing to continue discussing this proposal in the workgroups, including details such as how Defendants would handle weekend hours.   Defendants are also willing to provide reports and data on rescissions, where reasonably available, however, Defendants are unlikely to be able to provide the additional data you request prior to September 13, 2017.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
Office (916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Jenny Yelin [mailto:JYelin@rbgg.com]
**Sent:** Thursday, September 07, 2017 8:13 PM
**To:** Weber, Nicholas@CDCR; Moon, Andrea S@CDCR; Lisa Ells; Michael W. Bien; Cynthia Radavsky; Henry D. Dlugacz; Jeff Metzner; Jonelie Navarro; Kerry Courtney Hughes, MD; Kristina Hector; 'kwalsh@pldw.com' (kwalsh@pldw.com); Maria Masotta; Mohamedu Jones; Matt Lopes; Mary Perrien; Karen Rea-Williams; Rod Hickman; 'sraffa@PLDW.com'; Tim

Rougeux
**Cc:** Elise Thorn; Steve Fama; mmendelson@prisonlaw.com; Coleman Team - RBG Only; Coleman Special Master Team; Gabriel Sanchez; Danielle OBannon; Chad Stegeman; McKinney, Patrick@CDCR
**Subject:** RE: Follow Up re: Coleman: Plaintiffs' Response to Defs' MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468]

Dear Nick,

We are writing to seek some clarity regarding a few aspects of Defendants' proposal to require in-person clinical evaluations before patients can be referred to an MHCB, as described in Andrea Moon's August 2, 2017 letter, in order to narrow the dispute for the Court in next week's briefing. The August 2 letter references data (attached as Exhibit G) showing numbers of referrals made between 5:00 pm and 5:00 am, calling these "after-hours referrals." As we understand the proposal, individuals who experience a mental health crisis between 5:00 pm and 5:00 am would be kept in alternative housing until a clinician could perform an in-person evaluation "no later than the next morning." However, the table of after-hours staffing levels Defendants provided in the same letter (Section 1.b) shows that: (1) at many institutions, clinicians are not on-site until 7 am or later (and at a few institutions they leave by 4 pm); and (2) at many institutions, clinicians are only on-site 5 days per week.

Under Defendants' proposal, would patients experiencing an "after-hours" crisis at the institutions that do not have clinicians on-site until 7 am be evaluated in person at 7 am, or do Defendants intend to increase staffing at all institutions to have clinicians onsite between 5 am and 5 pm? For institutions at which clinicians are only on-site 5 days per week, would a patient experiencing a mental health crisis on one of the two unstaffed days have to wait until on-site staff return to be evaluated the following weekday?

Relatedly, please provide us with the specific hours the CITs will be on-site at the institutions to which Defendants are expanding them in the Fall of 2017 per the August 2 letter at page 2. Will the mental health clinician that is a part of those CITs be available to conduct in-person evaluations of patients for referral to an MHCB, or would patients at those institutions still have to wait until a mental health clinician arrived in the morning to be evaluated and referred?

Finally, in our August 4 workgroup call, as well as possibly during another workgroup call, we requested additional data comparing the rescission rates of in-person versus on-call clinicians, particularly during the 5pm to 5am "off peak" timeframe for which Defendants provided overall rescission rate data in the August 2 letter at page 4, but we have not received this information to date. Please provide it. Similarly, given that Defendants state in the August 2 letter at page 2 that a "significant number" of after-hours referrals are made between 5pm and 1am, we request a comparison of rescission rates between 5pm and 1am, versus 1am to 5am, and that same information broken down by in-person versus on-call clinician referrals.

Please let us know if you wish to schedule a phone call to discuss these issues.

Thank you,

Jenny Yelin

---

**From:** Weber, Nicholas@CDCR [mailto:Nicholas.Weber@cdcr.ca.gov]
**Sent:** Wednesday, August 02, 2017 8:09 PM
**To:** Moon, Andrea S@CDCR <Andrea.Moon@cdcr.ca.gov>; Lisa Ells <LElls@rbgg.com>; Michael W. Bien <MBien@rbgg.com>; Cynthia Radavsky <cradavsky@gmail.com>; Henry D. Dlugacz <hdlugacz@blhny.com>; Jeff Metzner <jeffrey.metzner@ucdenver.edu>; Jonelie Navarro <jnavarro@pldw.com>; Kerry Courtney Hughes, MD <dockc99@aol.com>; Kristina Hector <khector@PLDW.com>; 'kwalsh@pldw.com' (kwalsh@pldw.com) <kwalsh@pldw.com>; Maria Masotta <maria@drmariamasotta.com>; Mohamedu Jones <mjones@pldw.com>; Matt Lopes <mlopes@pldw.com>; Mary Perrien <mperrien@aol.com>; Karen Rea-Williams <karenrea01@gmail.com>; Rod Hickman <rod@roderickqhickman.com>; 'sraffa@PLDW.com'; Tim Rougeux <trougeux@hotmail.com>
**Cc:** Elise Thorn <Elise.Thorn@doj.ca.gov>; Steve Fama <sfama@prisonlaw.com>; mmendelson@prisonlaw.com;

Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Gabriel Sanchez <Gabriel.Sanchez@GOV.CA.GOV>; Danielle OBannon <Danielle.OBannon@doj.ca.gov>; Chad Stegeman <Chad.Stegeman@doj.ca.gov>; Patrick McKinney <Patrick.McKinney@cdcr.ca.gov>
**Subject:** RE: Follow Up re: Coleman: Plaintiffs' Response to Defs' MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468]

All,

Attached please find a letter and additional data regarding mental health crisis bed transfers.  We look forward to continued discussions at our August 4, 2017, workgroup.

Thanks.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
Office (916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Moon, Andrea S@CDCR
**Sent:** Friday, July 21, 2017 5:01 PM
**To:** lells@rbgg.com
**Cc:** Weber, Nicholas@CDCR; Elise Thorn; sfama@prisonlaw.com; mmendelson@prisonlaw.com; ColemanTeam-RBGOnly@rbgg.com; ColemanSpecialMasterTeam@rbgg.com; Gabriel Sanchez; Danielle OBannon; Chad Stegeman; McKinney, Patrick@CDCR
**Subject:** RE: Follow Up re: Coleman: Plaintiffs' Response to Defs' MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468]

Good afternoon Lisa,

Attached, please find defendant's response to your office's July 6, 2017 correspondence, as well as an attached data sheet.  We look forward to further discussion of these issues at the all parties' workgroup on Monday morning.

Thank you.

**Andrea S. Moon**
Attorney, Office of Legal Affairs
CA Department of Corrections & Rehabilitation
Email:   Andrea.Moon@cdcr.ca.gov
Phone: (916) 445-2795
Fax:      (916) 327-5306

---

**From:** Lisa Ells [mailto:LElls@rbgg.com]
**Sent:** Wednesday, July 19, 2017 6:32 PM

**To:** Elise Thorn <Elise.Thorn@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Gabriel Sanchez (Gabriel.Sanchez@gov.ca.gov) <Gabriel.Sanchez@gov.ca.gov>; Danielle OBannon <Danielle.OBannon@doj.ca.gov>; Chad Stegeman <Chad.Stegeman@doj.ca.gov>
**Subject:** Follow Up re: Coleman: Plaintiffs' Response to Defs' MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468]

Dear Nick and Elise,

We write to follow up on our multiple requests to substantively discuss a number of possible measures Defendants have taken, or could take, to address the ongoing MHCB transfer delays.  It is imperative that Defendants provide sufficient information this week so that the parties and the Special Master team can understand and properly consider the various strategies that have been floated to date by Defendants in their April 7, 2017 pleadings and by Plaintiffs in their July 6, 2017 letter and April 7, 2017 pleadings.  While Plaintiffs are more convinced than ever by Monday's inpatient census and compliance reports that the MHCB access problem (like the inpatient access problem) can never be fully resolved until Defendants comply with prior court orders requiring them to use the full complement of low-custody inpatient beds, Plaintiffs remain hopeful that Defendants' compliance with the MHCB 24-hour transfer timeline might nonetheless be improved through other measures.  We believe that the Court's April Order requires us to explore all feasible possibilities in the workgroup setting, and we wish to be able to report to the Court on any successful measures or plans that the parties and Special Master can agree to in next week's joint statement in the hopes of narrowing the issues for the evidentiary hearing.  We would much rather discuss these issues with you meaningfully now instead of being forced to explore them at the evidentiary hearing through testimony.

Specifically, Plaintiffs ask that Defendants provide an update on the following measures Defendants reported in April that they had undertaken in recent months to address MHCB transfer delays (ECF 5595 at 9, and 5597 at para. 5-6), including the status of each measure and Defendants' evaluation of its efficacy by reference to data or other reportable measures: (1) DBT program at CMF; (2) various training initiatives; (3) crisis intervention teams at CIW and SVSP; (4) studies of crisis bed readmissions in an effort to reduce them; (5) identification of local best practices, including after-hours staffing and behavior incentive and pain management programs; (6) utilization management initiatives; and (7) regional clustering aimed at reducing readmission rates and destabilization.  On the last initiative, regional clustering, Plaintiffs again request information on the amount of time it takes patients to arrive at MHCBs after transportation is initiated.  That information is not recorded anywhere.  While we may disagree on whether Defendants are currently required to initiate or complete transport within 24-hours, we cannot have a meaningful conversation about the practical effect of the distinction until we know why type of timeframes we are talking about.  It will also help us understand if the regional clustering program is working or if it needs further refinement.

Plaintiffs further ask that Defendants respond substantively and in writing to Plaintiffs' prior requests to evaluate the following possible problem areas affecting MHCB transfer timeline compliance, outlined in our July 6 letter and our April 7 response to the OSC (both attached): (1) targeted efforts at institutions with disproportionately high rescission rates, including augmented staffing (July letter at 5); (2) targeted efforts to address high readmission rates (July letter at 6-7); (3) reducing long-term crisis bed stays, including through finding alternative housing for inmate-patients who might have special or complex needs that stay in crisis beds for many months or even years (July letter at 7-8); (4) targeted interventions at outlier institutions with disproportionately high rates of non-compliance (ECF No. 5593 at 23).  Similarly, while Plaintiffs are heartened to hear that Defendants have finally begun transferring certain patients referred for inpatient care to Patton, it is not clear if additional efforts should be made to address the excessively long delays affecting women in need of crisis care (ECF No. 5593 at 22), and Plaintiffs request additional review of those issues as well.

We look forward to your response, and to a cooperative effort to understand the problems causing Defendants' ongoing difficulties complying with the Program Guide MHCB transfer timelines so that we can develop smart strategies to address them where possible.  We believe the Court's April 19 order requires nothing less.

Thanks,

---

**From:** Dylan Verner-Crist
**Sent:** Thursday, July 06, 2017 10:15 AM
**To:** Matt Lopes <mlopes@pldw.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Elise Thorn <Elise.Thorn@doj.ca.gov>; mmendelson@prisonlaw.com; Steve Fama <sfama@prisonlaw.com>;
Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team
<ColemanSpecialMasterTeam@rbgg.com>
**Subject:** Coleman: Plaintiffs' Response to Defs' MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468]

Special Master Lopes and Mr. Weber,

Please see the attached letter from Jessica Winter, providing Plaintiffs' response to Defendants' June 23, 2017 proposal
regarding MHCB access and the *Coleman* Court's April 19, 2017 order.

Thank you,

Dylan Verner-Crist
*Paralegal*



50 Fremont Street, 19th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
dverner-crist@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the
intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail
message in error, please e-mail the sender at rbgg@rbgg.com.
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not
intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally
privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review,
use or disclosure is prohibited and may violate applicable laws including the Electronic Communications
Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the
communication.

Exhibit C



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email: jwinter@rbgg.com

July 6, 2017

VIA ELECTRONIC MAIL ONLY

| PRIVILEGED AND CONFIDENTIAL |
| --- |
| SUBJECT TO PROTECTIVE ORDERS |

Nick Weber
CDCR Healthcare Legal Team
CDCR Office of Legal Affairs
P.O. Box 94283
Sacramento, CA 94283-0001
nicholas.weber@cdcr.ca.gov

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Deveraux & O'Gara LLC
1301 Atwood Ave., Suite 215N
Johnston, RI 02919
mlopes@pldw.com

   Re: MHCB Plan Proposal
     *Coleman v. Brown*
     Our File No. 0489-03

Dear Nick and Matt:

  Plaintiffs write in response to Defendants' June 23, 2017 proposal ("Proposal") regarding MHCB access and the *Coleman* Court's April 19, 2017 order, ECF 5610 ("April Order"). We received the Proposal with little time to discuss it before the June 26, 2017 workgroup meeting. We continue to object strenuously to Defendants' attempt to reopen resolved policies regarding the use of alternative housing before a referral to a crisis bed is made, and to the suggestion to change the metric for transfer timeframes. We also provide responses below to Defendants' proposed exceptions to the 24-hour timeframe for transfer.

\\

\\

\\

\\

[3144519.7]

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 2

I.      **Defendants' Proposal to Extend Program Guide Timeframes for Transfers to MHCBs and to Expand the Use of Alternative Housing Is Dangerous and Unacceptable.**

Defendants' Proposal is both outside the scope of the April Order and completely objectionable to Plaintiffs.

A.      **Defendants' Proposal Exceeds the Scope of the April Order.**

The April Order does not permit consideration of changes to the operative timeframes for MHCB transfer, presumably because—as discussed more fully below—that issue is settled.  *See* April Order at 13 (stating that the parties' workgroup meetings will address the "use of alternative housing *when an inmate-patient is referred to* an MHCB," not before a referral is made (emphasis added)).  The April Order asks only that Defendants find ways to achieve compliance with the MHCB-transfer timeframe, as set forth in the Program Guide and associated policies, and to define any possible, but carefully circumscribed, exceptions to that timeframe.  *See* April Order at 4-5, 11-15.  The Court made clear that the parties were to address compliance with the *existing* 24-hour timeframe, *see id.* at 14-15, not that Defendants could achieve compliance by fundamentally altering the applicable metric.  Such a facile "solution" to the MHCB-transfer problem does not address the underlying issue: ensuring that patients needing critical care receive that care in a timely manner.  And the April Order does not permit consideration of Defendants' proposal that patients needing crisis care be sidelined in nontherapeutic conditions for up to 48 hours before even *considering* their need for crisis care, and only then limiting their ostensible "wait" to 24 hours.

In addition, Defendants never raised the Proposal in briefing or at hearings on this subject.  *See* ECF 5522, 5544, 5552, 5595-97.  Aside from the potential for harm to patients awaiting crisis care, Defendants' attempt to discuss the issue now undermines the extensive proceedings that have already taken place, and puts them at risk of a civil contempt finding.

B.      **Plaintiffs Cannot and Will Not Agree to an Expansion of the Timelines for MHCB Transfers and of the Use of Alternative Housing.**

Plaintiffs do not and will not agree to change how alternative housing is used, including any renegotiation of the Program Guide or CDCR's associated policies and procedures.  Defendants issued a policy memorandum in 2012, reemphasizing an attached 2005 policy, that specifically stated that the use of "alternative housing for an

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 3

evaluation period and/or [to] provide short term treatment . . . . is not consistent with current policy." *See* CCHCS Memo re Use of Alternative Housing (May 16, 2012) & associated memoranda, attached as **Exhibit A** ("Alternative Housing Memo"), at 1. The Alternative Housing Memo further states that "[i]nmate-patients *shall not* be placed in alternative housing until an evaluation by a qualified mental health clinician has been completed and it is documented that the inmate requires a referral to [an MHCB]." *Id.* (emphasis added). The Alternative Housing Memo was not a new policy, but instead restates and reinforces earlier memos that already precluded the use of alternative housing in the manner Defendants now propose. *Compare id.*, *with* associated memoranda. The Program Guide provides the same by, for example, explaining that an in-depth screening of a patient to evaluate their need for crisis care will be conducted *after* a referral has been made, not before, *id.* at 12-5-7, and stating that when a patient is identified as requiring crisis care and placed in an OHU, HCPOP "shall be notified of the need for MHCB placement," implicitly acknowledging that such a patient will have already been referred for MHCB care, *id.* at 12-5-6.

Defendants' practice follows this guidance, as reflected in recent proposed revisions to MHSDS Policy 12.05.301. That revision states: "Prior to placement in alternative housing, patients shall have a referral to an MHCB," and "[HCPOP] is contacted immediately when a patient is referred to an MHCB and *before* being placed in alternative housing." Draft revision of MHSDS Policy 12.05.301, attached as **Exhibit B**, at 2 (emphasis added). In addition, the revision describes the use of alternative housing for "[p]atients pending MHCB *transfer*" and its use "*only . . . for patients referred to* an MHCB." *Id.* at 1, 2 (emphases added). Similarly, the extant version of that policy, effective October 15, 2015, states, "[a]lternative housing shall *only* be used for patients *referred to a MHCB*." MHSDS Policy 12.05.301 (October 15, 2015), attached as **Exhibit C**, at 1 (emphases added). The use of alternative housing in the proposed fashion is an issue that has been negotiated, litigated, and resolved.

And Plaintiffs would never agree to placing patients in crisis in alternative housing for any extended period, given the vulnerable state of such patients and the serious and dangerous deficiencies of alternative housing. For example, Lindsay Hayes' most recent draft report noted that the following were recently and regularly used for alternative housing: cells without beds or bunks, cells without sinks or toilets (a.k.a., "dry" cells), 3-foot-diameter holding cages, and gurneys to which patients were handcuffed. *See* Draft Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation (June 26, 2017), at 8-9. Patients at certain locations had to request to use the restroom and many were not allowed to shower for more than 72 hours. *Id.* These counter-therapeutic conditions will exacerbate

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 4

patients' conditions and discourage them from reporting their crises. This use of alternative housing is unacceptable.

Plaintiffs also cannot agree to an extension of the time class members spend waiting to be admitted to a crisis bed. As the Court noted in its April Order, MHCBs are intended for use for those experiencing a mental health *crisis*, and who, therefore, need *immediate*, intensive care. *See* April Order at 11 ("An inmate in need of an MHCB level of care is, by definition, in a mental health crisis." (citing Program Guide at 12-5-1)). For precisely this reason, the rule has always been that Defendants have a 24-hour window to get patients to a crisis bed. *See* Alternative Housing Memo at 1, 2 (providing that patients referred to an MHCB and placed in alternative housing "shall be transferred to the MHCB" or their referral rescinded within 24 hours of placement). And while a certain number of individuals' crises may abate before they reach an MHCB, Defendants cannot presume this is generally the case and on that basis propose extensive delays in transfer of *every* patient in crisis. Plaintiffs strenuously object to Defendants' attempt to triple, effectively, the length of time patients wait before receiving critical care.

Nor is expanding the transfer timeframe likely to have a significant impact on what Defendants treat as one of the major contributing factors to transfer delays—adequate bed space. *See* Proposal at 1, 2-3, 5. Furthermore, Defendants generally, but erroneously, presume that high rescission rates for MHCB referrals cause a delay in transfer. *See* Proposal at 1-3. But while an extended period in alternative housing may, in the short-term, reduce the administrative burden of processing MHCB referrals, in the long-run it is likely only to increase the need for crisis beds. Further, a high rescission rate does not closely correlate with making more crisis beds available, as individuals whose referrals are rescinded never occupy the beds to which they were referred.

Rather than adopting their dangerous proposed approach, Defendants can increase the number of available crisis beds by better using the ones they have, and by ensuring that patients needing crisis and inpatient care flow through the system with fewer barriers. To do so, Defendants should focus on the solutions identified in briefing on this subject. For example, the data show that just a few institutions—specifically, CCWF, COR, FWF, MCSP, NKSP, and SAC—account for a significant proportion of rescissions; all have rescission rates above 50%. *See* Table, MHCB Rescission Rates, attached as **Exhibit D**. To the extent that faulty referrals are an administrative burden that impedes timely transfer—which Plaintiffs dispute—CDCR can address them with training and other efforts targeted at just six institutions. In short, the rescission rate does not necessitate unraveling an essential element of the MHCB-transfer process.

[3144519.7]

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 5

Focusing on rescission rates as a key indicator *is* important for a different reason. Excessive numbers of rescissions can indicate—and have indicated in the history of this case—a serious breakdown in a system intended to treat those needing crisis or inpatient care. The Court understood and sought to address this very real problem in the context of inpatient transfers, *see* April Order at 3, 14 (ordering the Special Master to report to the Court regarding any "appreciable" uptick in rescissions or rejections of inpatient referrals following the April Order), and the same concern applies in the context of MHCB referrals. Tripling the time patients needing crisis care wait before actually being treated—and holding them in harsh, nontherapeutic conditions in the meanwhile—is likely only to exacerbate delays in transfer, compounding the pent-up need for higher levels of care and thereby impacting inpatient bed space, as well as MHCB availability.

## II.    Defendants Could Make Legitimate Efforts to Reduce Transfer Delays.

The Court ordered Defendants to address the problem with MHCB transfer delays, and the parties and Special Master Team to discuss with Defendants strategies to solve this problem. Until June 26, when Defendants circulated the Proposal, Defendants, Plaintiffs, and the Special Master Team had discussed a number of approaches to reducing transfer delays, all of which are within the scope of the April Order. They include:

(1) **Targeting efforts at reducing rescission rates and transfer delays at particular, problem institutions.** As mentioned above, six institutions have rescission rates over 50%. Defendants' efforts could have a big impact if they targeted training and/or improved clinical staffing at just these institutions. Defendants suggested staffing improvements as solutions to the transfer-delay problem in briefing on this issue. *See* ECF 5595 at 9; ECF 5597 at 1-2.

(2) **Focusing efforts on delays in the transfer of women to crisis beds.** Defendants' unwillingness to use inpatient beds at Patton for class members has caused a number of patients needing intermediate or acute care to repeatedly occupy crisis beds while awaiting transfer, often for long periods of time. *See* Plaintiffs' Letter re Inpatient Placements for Female Class Members (March 24, 2017), attached as **Exhibit E** ("March 24 Letter"). If Defendants were to make the Patton beds available promptly to class members on a regular basis, the backlog in the system could be alleviated and the existing crisis beds opened to meet female patients' needs. *Id.* Yet despite this at-the-ready solution, Defendants have not placed a female class member at Patton since we identified to them, in our March 24, 2017 letter, the very serious problem of the de facto closure of Patton to *Coleman* class members. At that time, Defendants had not placed a class

[3144519.7]

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 6

member in Patton for at least a year. *See* March 24 Letter at 1-2. Until Defendants solve this problem, they are not likely to solve the MHCB-transfer problem, or related inpatient-transfer delays.

Similarly, Plaintiffs object to DSH's suggestion at the June 26 workgroup meeting that it would begin to use an LRH process to sort women needing inpatient care. Defendants have never distinguished between female class members in this fashion, as Defendants have reported to the Court every month. *See, e.g.*, Defendants' Census and Waitlists Reports for Inpatient Mental Health Care (June 15, 2017) ("June Inpatient Report"), ECF 5636 at 14 of 21. Creating new custodial roadblocks for women in need of inpatient care also was never raised during the parties' recent extensive negotiations of the lift and shift policies. Imposing new barriers to inpatient care at this juncture could only impede any progress Defendants might make toward compliance with the April Order. It also will create a formal barrier preventing many female patients from accessing much needed inpatient care at Patton. Such an impediment will, of course, have a trickle-down effect on the availability and timely transfer of women to crisis beds.

(3) **Targeting efforts to reduce MHCB readmission rates.** Defendants already identified readmissions as "a heavy driver of all crisis bed admissions" in their response to the Court's March 24, 2017 order to show cause, yet the current proposal ignores the issue. *See* ECF 5595 at 9. Using point-in-time data from the April Psych Aging Report, attached as **Exhibit F**, Plaintiffs calculated that of the reported 916 MHCB placements in the reporting period, 79—or 8.6%—were readmissions. These 79 readmittees stayed for a total of 1,046 days, *id.*, the equivalent of approximately 105 additional admissions. In other words, reducing these rates could provide another hundred additional MHCB admissions.

The rate of readmissions indicates that clinical staff are not elevating patients to the level of care they need, when they need it. Defendants stated that their regionalization plan would help reduce these rates. *See* ECF 5595 at 9. Has it? If regionalization has not achieved sufficient reductions in readmissions, CDCR could address this problem with additional staff training or other efforts designed to ensure patients are placed in the appropriate level of care at the appropriate time. CDCR could also take affirmative steps to address readmission rates at particular institutions. For example, as Plaintiffs wrote in March, readmission rates to the female MHCBs are particularly high, in large part because Defendants have not been admitting *Coleman* patients needing inpatient care to Patton beds. *See* March 24 Letter at 3-4. The high rate of MHCB readmissions indicates a systemic obstacle to mental healthcare for those in

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 7

crisis, as Defendants themselves have told the Court, and Defendants should directly address it.

(4) **Dedicating significant and consistent effort to moving individuals needing inpatient care to ASH and other lower custody programs.** Placing all class members at their LRH will reduce overall competition for limited bed space and open up MHCBs to those who actually need crisis care, rather than having those beds occupied by individuals awaiting transfer to inpatient care. The Court, Plaintiffs, and the Special Master Team have repeatedly emphasized the need for Defendants in this way to focus their efforts on permitting the flow of patients through the system. Yet the data continue to show that Defendants are not placing *Coleman* class members into open beds at ASH, and that the problem is getting worse. For example, the June Inpatient Report shows that 77 of the 256 *Coleman* intermediate-care beds are open. *See* June Inpatient Report at 12, 13 of 21. Similarly, 34 of the low-custody beds at DSH-Vacaville and CSH are unused. *Id.* at 13 of 21. At the same time, however, 372 intermediate-care patients were held in high security beds, outside of their LRH designations. *Id.* at 12, 13 of 21. If Defendants choose not to use available inpatient beds, patients needing inpatient care will continue to tie up MHCBs unnecessarily and prevent Defendants from complying with Program Guide timelines for transfer to crisis care.

(5) **Finding alternatives to housing inmate-patients with long-term needs in crisis beds.** *See* Program Guide at 12-5-9 ("The MHCB shall accept inmates who meet the criteria for care and treatment and *shall continue to house only those inmates for whom [MHCB] care is appropriate.*" (emphasis added)). MHCB stays should not exceed 10 days, *id.* at 12-5-1, but recent data shows that a number of patients have been held in MHCBs on a long-term basis, defined, for this purpose, as a stay over 60 days, *see* Table, MHCB Stays over 60 Days, attached as **Exhibit G**. Assuming the average MHCB stay lasts the maximum 10 days, finding non-crisis beds for the long-term MHCB population would allow hundreds more crisis-bed admissions annually. Defendants should fix this artificial MHCB shortage by opening these beds to class members who need crisis-level care. At the least, Defendants must show why these individuals have not been transferred out of crisis beds, which are intended for use only on a short-term basis.

The foregoing long-stay numbers include only individuals housed in MHCBs longer than 60 days—or at least *six times* the 10-day Program Guide limit for MHCB stays. *See* Program Guide at 12-5-1. But a very significant number of patients' stays last between 11 and 60 days. *See* Table, Excessive MHCB Lengths of Stay, April 2017, attached as **Exhibit H** (showing that 589 patients' stays lasted between 11 and 60 days). Using the rough approximation of a 10-day average MHCB stay, reducing these

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 8

individuals' stays to the Program Guide maximum would provide an additional 560 crisis bed admissions per year.  *See id.*  Defendants should study the percentage of crisis beds these individuals use, and find ways to open these beds for those who actually fit MHCB-treatment criteria, including the need for a stay of 10 days or less.  Use of the full complement of lower custody inpatient beds, especially ASH, is an obvious first step.

In addition, a chief psychiatrist or his or her designee must approve stays exceeding 10 days.  Program Guide at 12-5-1.  Because so many patients occupy crisis beds for significantly longer than the 10-day maximum, justification and approval for such exceptional stays should come from Katherine Tebrock, Deputy Director of the Statewide Mental Health Program.  MHCB-transfer delays are a statewide problem, so stays of exceptional length should be evaluated and approved at the state level.

Finally, long term housing of prisoners with psychiatric and/or other disabilities in MHCBs also violates their rights under the ADA and the Rehabilitation Act—equal access to programs and services are simply not provided in MHCBs.  Defendants must develop appropriate housing and support services for these long-term residents outside of MHCB beds.

(6) **Fixing the fleet of transport vehicles.**  In June, the *Plata* Receiver reported on Defendants' failure to stock and maintain an adequate transport-vehicle fleet.  *See* Receiver's Thirty-Fifth Tri-Annual Report, ECF 5627 at 7-10 of 39.  Plaintiffs have repeatedly asked Defendants to clarify the effect of this problem on inpatient- and MHCB-transfer delays, but Defendants have not responded.  Is the status of Defendants' vehicle fleet an obstacle to timely transfers?  If so, Defendants must find funding for additional vehicles and take the steps necessary to accelerate repair efforts.

(7) **Defendants' Previously Identified Efforts**.  In their briefing on this topic, Defendants identified a number of the same potential solutions, as well as efforts they have already undertaken, to address MHCB transfer delays.  They include:

First, CDCR has activated a dialectical behavior therapy program at California Medical Facility.  This is an evidence based and effective program aimed at patients who regularly and repeatedly require inpatient treatment.  The program is focusing on reducing the patients' need for inpatient care.  Second, CDCR has launched trainings aimed at clinical evaluations and treatment skills, case formulation, triaging patients referred for crisis care, and improving the interdisciplinary treatment teams to ensure treatment goals are identified and tracked.  Third, CDCR has created

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 9

> Crisis Intervention Teams that provide after-hours services to reduce the demand for after-hours inpatient referrals. The teams are currently at California Institution for Women and Salinas Valley State Prison. Fourth, CDCR is evaluating crisis bed readmissions to develop a process to reduce the frequency of readmissions. Fifth, CDCR has identified best practices at local institutions to apply statewide, e.g. staffing clinicians on site after hours to triage potential crises, a behavior incentive program, and a pain management program. Finally, CDCR is using utilization management to improve performance within the crisis beds.

ECF 5597 at 2-3; *see also* ECF 5595 at 9. Defendants should report the success of these initiatives to Plaintiffs and the Special Master Team.

All of the foregoing possibilities are within the scope of the April Order and would help Defendants make strides toward compliance with MHCB transfer timelines.

**III.    Defendants' Proposal to Alter the Metric for MHCB-Transfer Timelines Is Unacceptable and Outside the Scope of the April Order.**

We also object to Defendants' attempt to reframe the metric used for MHCB-transfer timelines. Due to the urgent nature of MHCB referrals, the expectation has always been that patients referred for crisis care reach their destination within 24 hours, not that they *begin* transport in that timeframe, no matter whether the transfer is intra- or inter-institution. *See* Program Guide at 12-1-14 ("The [table of transfer timelines] summarizes the time frames which CDCR must meet for the transfer of MHSDS inmate-patients between levels of care, *whether within the same institution or to another institution*." (emphasis added); *id.* at 12-5-3 to 12-5-4 ("If the institution does not have an MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be transferred to a designated MHCB institution . . . within 24 hours of referral"). Indeed, the Program Guide dispenses with Defendants' proposed approach. It specifically defines "Transfer" as "[t]he date the inmate-patient is *placed into* the LOC and program to which s/he was referred." *Id.* at 12-1-15 (emphasis added)). Defendants should not, in this way too, attempt to undo the clear rules under which the parties, Court, and Special Master have agreed to operate, as memorialized in the intensively negotiated Program Guide.

\\

\\

[3144519.7]

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 10

While the Program Guide acknowledges that "[i]n most cases" transfer should occur within 24 hours, *id.* at 12-5-4, any failure to comply with that timeframe should fall into a designated exception; that is precisely the purpose of the Court's request for the parties' to define limited exceptions. Specifically, any obstacles to timely transfer that cannot be anticipated and planned around—for example, when extreme and unprecedented traffic occurs or there are unforeseeable weather events or security concerns—should be addressed as exceptions, the application of which requires justification for both the existence and extent of the delay, as discussed more fully below.

Plaintiffs object to Defendants' attempt to avoid their responsibilities for timely transfer by altering the metric for timeliness.

## IV.    Proposed Exceptions to Transfer Timeframes

Below are Plaintiffs' responses to Defendants' proposed exceptions.

### A.    Out to court

Plaintiffs object to an out-to-court exception for MHCB-transfer timeframes. Such an exception makes more sense in the inpatient context, with the longer timeframe for transfer and the greater likelihood that a court date will arise while the patient is awaiting transfer.

In addition, patients awaiting crisis care need immediate attention. Sending them to court could be dangerous, given their vulnerable and potentially volatile conditions. Presumably, if a patient's court date falls within the time period for transfer to an MHCB, the patient and/or Defendants could seek leave from the court for an extension, given the emergent circumstances.

### B.    Medical holds

Plaintiffs agree that medical holds can—on a case-by-case basis, with adequate justification—constitute exceptions to the MHCB-transfer timeframe. The Program Guide provides that medical clearance is necessary before a patient is transferred to a crisis bed. *See* Program Guide at 12-5-4. But any individual circumstance in which Defendants assert the medical exception requires a detailed explanation, balancing the patient's medical and mental health needs. Defendants must also justify the length of the delay, which should last no longer than necessary to resolve the medical concern.

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 11

In addition, Defendants must transparently report on use of this exception. Any such reporting must include the details of each case-specific evaluation of the need for the delay, and a justification for the length of the delay. The bald assertion "medical hold," as has appeared in the reporting regarding inpatient delays, *see* June Inpatient Report at 20 of 21, will not suffice. Defendants must also report both on the referrals that were rescinded due to a medical issue, and the medical circumstances that caused a delay in transfer of a patient whose referral was not rescinded.

###    C.    Other

Plaintiffs also do not object to an "other" category of exceptions, so long as the exception is cabined and confined to unusual and unforeseeable circumstances out of Defendants' control. Application of any such exception should involve a careful, individualized balancing of the obstacle to transfer against the need for crisis care, and a case-specific evaluation of whether the circumstances justify the extent of the delay.

The "other" category must not permit Defendants to rely on foreseeable obstacles to timely transfer, including, for example, regular traffic patterns or construction needs that staff could reasonably anticipate and plan around. These limitations are necessary to ensure the "other" exception does not swallow the rule. *See* Stipulation and Order re Addendum to Program Guide Regarding Transfer Timeframes, ECF 5631, at 3.

*    *    *

The Court gave the parties only a short timeframe to resolve MHCB-transfer delays, before Defendants faced the possibility of contempt. Nevertheless, a full two months after the Order, Defendants presented this out-of-left-field Proposal, rather than addressing the issues that up to this point have been at play or those that are obvious from the face of Defendants' own data. Injecting these issues at this stage of the proceedings threatens the possibility of progress on this critical issue.

At the least, the Proposal violates the spirit of the April Order, which is to ensure those needing critical care receive it in a timely fashion. Plaintiffs will not relitigate in this context the use of alternative housing and the metric for timeliness of MHCB transfers. We hope for a constructive conversation about topics the April Order envisions, including steps to (1) increase the speed by which patients are transferred to

\\
\\

[3144519.7]

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 12


MHCBs, (2) better use the beds Defendants have, and (3) reduce the number of
unnecessary referrals or rereferrals to MHCBs, as well as identifying any narrow
exceptions to the designated timeframes.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By:   Jessica Winter

JLW
Attachments: Exhibits A-H
cc:      *Coleman* Special Master Team
         Elise Thorn
         Co-Counsel

Exhibit D

| | |
|---|---|
| **From:** | Lisa Ells |
| **Sent:** | Tuesday, July 18, 2017 2:21 PM |
| **To:** | Nick Weber |
| **Cc:** | 'Clifton Sarah O.'; Farnetti, Julia@CDCR; Toche, Diana@CDCR; Hernandez, Juanita@CDCR; Brecker, Carrie@CDCR; Martin, Kenneth@CDCR; Powell, Jay@CDCR; Jessica Winter; Gabriel Sanchez; Rei.Onishi@GOV.CA.GOV; Coleman Team - RBG Only; Jonelie Navarro; Dylan Verner-Crist; Thomas Gilevich; Regina Costa; Mitchell, Kelly@CDCR; Amy Eargle; Golding, Michael@CDCR; Mohamedu Jones; Michael Nunez; Kerry F. Walsh; Krista Stone-Manista; Matt Lopes; Hobbs, Eric@CDCR; Tebrock, Katherine@CDCR; Warburton, Katherine@DSH; Ahlin, Pam@DSH; Bachman, Ellen@DSH; Brizendine, Brittany@CDCR; Clendenin, Stephanie@DSH; Steve Raffa; Maynard, George@DSH; Kristina Hector; Burgess, Candius@DSH; Kerry F. Walsh; Williams, Joseph@CDCR; Ponciano, Angela@CDCR; Ekpo, Elaine@DSH; Allen, Trent G@CDCR; Macomber, Jeff@CDCR; Lorey, Dawn@CDCR; Laura Ceballos; Sarah O. Clifton; Rekart, John@CDCR; Michael W. Bien; Vess, James@CDCR; Jenny Yelin; Flores, Marcie@CDCR; Steve Fama; Rashkis, Sean@DSH; Elise Thorn; Danielle OBannon; 'Raffa Steven'; Shama Chaiken; Rod Hickman; Tim Rougeux; Maria Masotta; Steve Fama |
| **Subject:** | RE: Coleman - Memo re Transfers of Inmates to and from MHCBs [IWOV-DMS.FID6429] |

Nick,

We can't find anything in our system or our notes showing that this memo, in either draft or final form, was ever provided to us before now, or that its contents were discussed at any policy meetings before it was rolled out. Could you please let us know when Defendants transmitted it to us in draft and/or final form, and/or when it was discussed with the Special Master or Plaintiffs' counsel?

Thanks.

---

**From:** Weber, Nicholas@CDCR [mailto:Nicholas.Weber@cdcr.ca.gov]
**Sent:** Monday, July 10, 2017 2:28 PM
**To:** Jonelie Navarro <jnavarro@pldw.com>; Dylan Verner-Crist <DVerner-Crist@rbgg.com>; Thomas Gilevich <thomas.gilevich@cdcr.ca.gov>; Regina Costa <rcosta@pldw.com>; Mitchell, Kelly@CDCR <Kelly.Mitchell@cdcr.ca.gov>; Amy Eargle <Amy.Eargle@cdcr.ca.gov>; Lisa Ells <LElls@rbgg.com>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; Mohamedu Jones <mjones@pldw.com>; Michael Nunez <MNunez@rbgg.com>; Kerry Walsh <kwalsh@pldw.com>; Krista Stone-Manista <KStone-Manista@rbgg.com>; Matt Lopes <mlopes@pldw.com>; Hobbs, Eric@CDCR <Eric.Hobbs@cdcr.ca.gov>; Tebrock, Katherine@CDCR <Katherine.Tebrock@cdcr.ca.gov>; Warburton, Katherine@DSH <katherine.warburton@dsh.ca.gov>; Ahlin, Pam@DSH <pam.ahlin@dsh.ca.gov>; Bachman, Ellen@DSH <Ellen.Bachman@dsh.ca.gov>; Brizendine, Brittany@CDCR <Brittany.Brizendine@cdcr.ca.gov>; Clendenin, Stephanie@DSH <Stephanie.Clendenin@dsh.ca.gov>; Steve Raffa <sraffa@PLDW.com>; Maynard, George@DSH <george.maynard@dsh.ca.gov>; Kristina Hector <khector@PLDW.com>; Burgess, Candius@DSH <Candius.Burgess@dsh.ca.gov>; Kerry F. Walsh <kwalsh@pldolaw.com>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Ekpo, Elaine@DSH <Elaine.Ekpo@dsh.ca.gov>; Allen, Trent G@CDCR <Trent.Allen@cdcr.ca.gov>; Macomber, Jeff@CDCR <Jeffrey.Macomber@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Laura Ceballos <laura.ceballos@cdcr.ca.gov>; Sarah O. Clifton <sclifton@pldw.com>; Rekart, John@CDCR <John.Rekart@cdcr.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Vess, James@CDCR <James.Vess@cdcr.ca.gov>; Jenny Yelin <JYelin@rbgg.com>;

Flores, Marcie@CDCR <Marcie.Flores@cdcr.ca.gov>; Steve Fama <sfama@prisonlaw.com>; Rashkis, Sean@DSH
<Sean.Rashkis@dsh.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Danielle OBannon <Danielle.OBannon@doj.ca.gov>;
'Raffa Steven' <sraffa@pldolaw.com>; Shama Chaiken <shama.chaiken@cdcr.ca.gov>; Rod Hickman
<rod@roderickqhickman.com>; Tim Rougeux <trougeux@hotmail.com>; Maria Masotta <maria@drmariamasotta.com>
**Cc:** 'Clifton Sarah O.' <sclifton@pldolaw.com>; Farnetti, Julia@CDCR <Julia.Farnetti@cdcr.ca.gov>; Toche, Diana@CDCR
<Diana.Toche@cdcr.ca.gov>; Hernandez, Juanita@CDCR <Juanita.Hernandez@cdcr.ca.gov>; Brecker, Carrie@CDCR
<Carrie.Brecker@cdcr.ca.gov>; Martin, Kenneth@CDCR <Kenneth.Martin@cdcr.ca.gov>; Powell, Jay@CDCR
<Jay.Powell@cdcr.ca.gov>; Jessica Winter <JWinter@rbgg.com>; Gabriel Sanchez <Gabriel.Sanchez@GOV.CA.GOV>;
Rei.Onishi@GOV.CA.GOV; Charlotte Landes <CLandes@rbgg.com>
**Subject:** Coleman - Memo re Transfers of Inmates to and from MHCBs

All,

This morning we discussed a memorandum pertaining to transfers of inmates to and from crisis beds.  Attached is the
December 23, 2014, memorandum for your review.

Please let me know if you have any questions.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
Office (916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally
privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review,
use or disclosure is prohibited and may violate applicable laws including the Electronic Communications
Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the
communication.

Exhibit E

State of California                                          Department of Corrections and Rehabilitation

# Memorandum

Date    12/23/2014

To    :    See Distribution List

Subject:    **TRANSFER OF INMATES TO AND FROM MENTAL HEALTH CRISIS BEDS**

The purpose of this memorandum is to provide clarification of the interdisciplinary coordinated actions necessary, especially as it relates to custody staff, for transfer of inmate-patients (IP) who are clinically accepted to and discharged from a Mental Health Crisis Bed (MHCB) and to emphasize the importance of pre-discharge planning. This memorandum both supersedes specific prior California Department of Corrections and Rehabilitation's (CDCR) memorandums and should be implemented in conjunction with other departmental policies (Attachment A). This memorandum is an accompaniment to the Mental Health Services Policy 12.05.200 et al (Attachment B).

## MHCB Admissions

The Division of Correctional Health Care Services, Health Care Placement Oversight Program (HCPOP), is responsible for managing the utilization of designated specialized health care beds, including MHCBs. All IP placements into a MHCB require authorization from HCPOP.

The 24 hour MHCB transfer timeline begins upon clinical determination a MHCB is required.

Within one hour of clinical determination that an IP requires placement in a MHCB and/or prior to placement into alternative housing, the **referring clinician** shall contact both HCPOP and the Classification and Parole Representative (C&PR), or during non-business days/hours, the Watch Commander (WC).

- HCPOP can be contacted 24 hours per day, seven days per week at (916) 204-0321, or via e-mail at hcpop.mhcb@cdcr.ca.gov or on global as MHCB-HCPOP@CDCR.

- Provide IP name, CDCR number, mental health Level of Care (LOC) prior to MHCB, criteria for placement, referring institution, and contact name with callback number.

**HCPOP** monitors the Strategic Offender Management System (SOMS) for vacant MHCBs and determines bed availability. Once a vacant MHCB is identified HCPOP:

- Notifies the referring clinician of the bed assignment and if not internally admitted to a MHCB, furnishes receiving clinician contact information.

- If not internally admitted to a MHCB, directs the MHCB Clinical Director or designee (receiving clinician) to hold the available MHCB and furnishes IP information and referring clinician contact information to the receiving clinician.

See Distribution List
Page 2

Within two hours of bed availability notification by HCPOP and if not internally admitted the **referring clinician**, sends the completed referral packet and calls the receiving clinician.

Within one hour of receipt, the **receiving clinician** reviews the completed referral packet, conducts the pre-admission screening for placement, and notifies the referring clinician of acceptance. Missing paperwork shall not be a cause for non-acceptance. The receiving and referring clinician will work together to ensure all required paperwork has been provided/received.

Within one hour of acceptance from the receiving clinician, the **referring clinician** shall complete a CDCR Form 128-C, Medical/Psychiatric/Dental Chrono, indicating acceptance and the IP's bed number and forward the form to the receiving clinician and the C&PR or WC at the sending institution.

Immediately upon receipt of the 128-C, the Chief of Mental Health or designee at the receiving institution ensures the C&PR or WC at the receiving institution receives the 128-C, Medical/Psychiatric/Dental Chrono indicating acceptance.

MHCB transfers shall be done under authority of the Department Operations Manual, Section 62080.17 "Emergency Medical Transfers" and shall be done via the Classification Services Unit (CSU) teletype process on a "Psychiatric and Return" basis. The **C&PR at the receiving institution** shall contact CSU for teletype transfer approval. Emergency medical transfer to MHCB shall not be delayed pending teletype approval.

The 24 hour MHCB transfer timeline begins upon clinical determination a MHCB is required. A transfer is the day/time the IP leaves the institution for transport to/from a MHCB according to SOMS.

The C&PR at the sending institution shall notify Statewide Transportation of the request to transport. If Statewide Transportation is unable to complete transport within the required timelines, the institution transportation team shall complete the transport.

It is the responsibility of the sending institution, Clinical staff, HCPOP, CSU, and transportation to ensure transport within 24 hours of MHCB referral. Collaboration between all involved disciplines, divisions, and units is essential in order to achieve the 24 hour transfer requirement.

In the event HCPOP is unable to secure a MHCB placement immediately, the institution shall refer to the Alternative Housing Prioritization procedures as outlined in the Mental Health Services Policy 12.05.301, "Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer," dated October 2013, pending a MHCB bed placement.

In keeping with current policy, the sending institution shall retain an IP bed/cell for a minimum of ten days if the IP is transferred to a MHCB.

See Distribution List
Page 3

## Rescinding a MHCB Referral

If HCPOP and the C&PR or WC were notified of the need for transfer, the **referring clinician** or designee immediately, and not to exceed one hour, notifies HCPOP and C&PR or WC of the rescission.

## MHCB Intake

Upon transfer to the assigned MHCB, the **receiving clinician** will admit the IP to the MHCB and provide MHCB services for an anticipated length of stay duration <u>up to 10 days</u>. The MHCB **Inter-Disciplinary Treatment Team (IDTT)** shall meet <u>within 72 hours</u> of an IP admission and at least weekly thereafter. The Chief Psychiatrist or designee must approve exceptions to this length of stay.

## Pre-Discharge Planning

The **IDTT** shall begin discharge planning <u>at the initial IDTT meeting</u>. An assessment shall be conducted at the initial IDTT relative to the likelihood of the IP's ability to return to the sending (referring) institution, should the IP's MHSDS LOC change from the LOC prior to MHCB placement.

<u>Rules regarding return to original institution</u>

- IPs discharged at the Correctional Clinical Case Management or Enhanced Outpatient Program (EOP) LOC shall not be returned to institutions that do not provide the discharged LOC.

- IPs with incomplete reception center (RC) processing shall be returned to the originating RC. For this purpose, Classification Staff Representative transfer endorsements shall not be considered part of the RC processing.

- IPs with completed RC processing shall not be returned to the RC. Contact HCPOP for placement assistance.

- IPs referred to an Intermediate Care Facility (ICF) or APP may remain in the MHCB until an ICF or APP bed becomes available.

- IPs requiring Administrative Segregation Unit (ASU) EOP hub placement consistent with California Code of Regulations, Title 15, Section 3335 shall be referred to HCPOP for placement assistance.

It is the expectation all cases determined during the **initial IDTT** to be highly unlikely to return to the originating institution be referred to the **C&PR** for *pre-discharge planning* with **HCPOP** to include, when appropriate, a Case Factor Sheet (CFS), completed by **a Correctional Counselor**. No CFS is required for IPs housed in ASU, Security Housing Unit (SHU), or Psychiatric Services Unit (PSU).

See Distribution List
Page 4

## Pre-Discharge Planning (continued)

The **IDTT** shall determine when an IP is *pending clinical discharge* and recommend a LOC that is appropriate. The mental health **Primary Clinician (PC)** shall immediately notify HCPOP and the C&PR of the *pending clinical discharge* and LOC to ensure transfer can be expedited.

The **MHCB institution C&PR** shall review the aforementioned rules regarding return to original institution, the IP case factors and/or prior completed CFS and determine which institution the IP should be returned to after clinical discharge from the MHCB.

If the IP is able to return to their originating referring institution the **MHCB institution C&PR** will notify the originating referring C&PR of the *pending clinical discharge*. The **referring C&PR** is to arrange for transportation so that transfer of the IP, once clinically discharged, occurs within 72 hours. The **referring C&PR** shall notify Statewide Transportation of the *pending clinical discharge* and request for transfer.

If the IP is unable to return to their originating institution, the case *pending clinical discharge* shall be referred to HCPOP for re-direction.

- Within four hours of PC notification of *pending clinical discharge* the **MHCB institution C&PR or designee** will notify HCPOP and provide the relevant CFS, if necessary. No CFS is required for ASU/SHU/PSU IPs.

- Within four business hours of C&PR or designee notification of *pending clinical discharge*, **HCPOP** will review the IP case factors and make a re-direction placement recommendation via case notes in the SOMS and notify the MHCB institution C&PR.

- As soon as possible, but no later than one business day, of HCPOP notification, the **MHCB institution C&PR or designee** shall notify the MHCB Clinical Director that a receiving CDCR Institution has been determined for placement *pending clinical discharge*.

- The **MHCB Clinical Director** or designee shall expeditiously notify the discharging clinician and institution to receive the IP once clinically discharged.

## MHCB Discharges

The **clinician discharging the IP** shall complete the clinical discharge on the CDCR Form 128-MH3, and contact the Chief of Mental Health or designee at the institution to receive the discharged IP. The mental health identifier (MHI) of the discharged IP shall then be entered into SOMS prior to physical discharge.

The **clinician discharging the IP** shall immediately notify HCPOP and the discharging institution's C&PR of the clinical discharge and shall provide a copy of the current CDCR Form 128-MH3, Mental Health Placement Chrono, to the C&PR or WC receiving the discharged IP in order to expedite the transfer.

See Distribution List
Page 5

If the IP is able to return to their originating referring institution the **MHCB institution C&PR** will notify the originating referring C&PR of the clinical discharge. Transfer of the discharged IP shall proceed according to pre-discharge plan.

If the IP is unable to return to their originating institution, **pursuant to the aforementioned pre-discharge plan**, the MHCB institution C&PR will have already received re-direction notification from HCPOP and a HCPOP re-direction placement recommendation will be present via the case notes in SOMS.

- Immediately upon notification by the clinician discharging the IP of clinical discharge, the **MHCB institution C&PR** shall present the case to the institution's assigned Classification Staff Representative (CSR) for an emergency transfer endorsement. If a CSR is not currently assigned to the MHCB institution at the time of the re-direct, the MHCB institution C&PR shall contact the Classification Staff Representative scheduler.

- Within four hours of notification by the MHCB institution C&PR, the **CSR** shall review the case for an emergency transfer endorsement. On difficult to place cases, the CSR shall coordinate with the CSU and Population Management Unit to ensure placement into the least restrictive housing.

  - If no CSR is available, the **MHCB institution C&PR** shall provide case factors to the re-direct institution's C&PR. The **re-direct C&PR** shall contact CSU for teletype endorsement if applicable and arrange IP transportation.

- The **MHCB institution C&PR or designee** shall additionally ensure a confirmed contact is made with the receiving C&PR or designee.

- Within 72 hours of clinical discharge, transfer of the discharged IP shall proceed according to **pre-discharge plan**. It is the responsibility of the institution receiving the discharged IP to make all transfer arrangements. Statewide Transportation may be used if they are able to meet the 72 hour time frame.

IPs clinically discharged from MHCB can be housed in general population, if placement is consistent with clinical needs, case factors, and appropriate program availability. This placement shall be coordinated and approved through the institution's Warden or designee.

For your convenience, please see the provided flowchart (Attachment C).

See Distribution List
Page 6


If you have any questions or require additional information, please contact
James Robertson, Chief, CSU, at (916) 322-2544 or Judy Burleson, Chief, HCPOP,
at (916) 691-0312.

M. D. STAINER
Director
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Service
Deputy Director, Statewide Mental Health

Attachments

Distribution List:

    Deputy Director(s), Division of Adult Institutions
    Associate Directors, Division of Adult Institutions
    Associate Directors, Statewide Mental Health Program
    Regional Chiefs of Mental Health
    Healthcare Executive Regionals
    Wardens
    Chiefs of Mental Health
    Chief Executive Officers
    Classification Staff Representatives
    Classification and Parole Representatives
    Correctional Counselors III, Reception Centers
    Chief, Transportation Unit
    Chief, Classification Services Unit
    Chief Psychologist, Clinical Policy and. Program Development, DCHCS

  cc:  Judy Burleson
       Vincent S. Cullen

# ATTACHMENT A

Policies outlined herein are to be **implemented in conjunction** with existing departmental policies outlined in the following memoranda, policies, and procedures:

1. *Mental Health Policy 12.05.200; Mental Health Crisis Bed Referral, Rescission, and Discharge Policy.*
2. *Mental Health Procedures; 12.05.200.P1 Mental Health Crisis Bed Referral Procedure, 12.05.200.P2 Mental Health Crisis Bed Rescinding a Referral, 12.05.200P3 Mental Health Crisis Bed Discharge Procedure.*
3. *Mental Health Policy 12.05.601; Documentation Required for Referral to Mental Health Crisis Bed.*
4. *Mental Health Services Delivery System, Program Guide,* 2009 revision.
5. *CDCR and DSH Acute and Intermediate Care Facility (ICF) Memorandum of Understanding* (MOU) dated August 11, 2006, and August 18, 2010.
6. *Mental Health Crisis Bed/Department of Mental Health Transports* dated March 30, 2012.
7. *Case-Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospitals Acute and Intermediate Facility Inmate-Patients* dated March 21, 2013.
8. *Implementation of Alternative /Temporary Housing* dated February 4, 2010
9. *Alternative Housing Cell Prioritization* and December 12, 2012
10. *Use of Alternative Housing* dated May 16, 2012

Policies outlined herein **supersede and integrate** within existing departmental policies outlined in the following memoranda:

1. *Procedures for Transfer of Inmate-Patients after Discharge from Mental Health Crisis Bed Treatment,* memorandum dated September 8, 2009.
2. *Procedures for Transfer of Inmate-Patients after Discharge from Mental Health Crisis Bed Treatment* memorandum dated August 11, 2008.
3. *Transfer of Inmates being Discharged from Mental Health Crisis Treatment,* memorandum dated May 23, 2002
4. *Amended November: 17, 2004, Memorandum,* dated November 2, 2005.
5. *Approval of Psychiatric and Return Process for Transfers to the California Medical Facility/Department of Mental Health,* memorandum dated April 10, 2000.
6. *Primary and Alternate Hub Designations for Placement of Inmates who require Administration Segregation Placement and Mental Health Services,* memorandum dated June 17, 2008.
7. *Retaining Beds for Mental Health Crisis Bed and Outpatient Housing Unit Cases,* memorandum dated December 20, 2002.
8. *Psychiatric and Return Policy,* dated November 17, 2004.
9. *Health Care Placement Unit Hours for Mental Health Crisis Bed Referrals,* memorandum dated September 16, 2003.

 **HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| Date: | 12/23/2014 |
| To: | Chief Executive Officers |
| | Chiefs of Mental Health |
| From: | |

TIMOTHY G. BELAVICH, PH.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services
and Deputy Director, Statewide Mental Health Program

M. D. STAINER
Director
Division of Adult Institutions

**Subject:    MENTAL HEALTH CRISIS BED - REFERRAL, REFERRAL RESCISSION, AND DISCHARGE POLICY**

The purpose of this memorandum is to announce the release of the Mental Health Crisis Bed (MHCB) - Referral, Referral Rescission, and Discharge policy (12.05.200) and procedures (12.05.200.P1, 12.05.200.P2 and 12.05.200.P3) (Attached).

Effective immediately the attached MHCB referral and discharge policy and procedures will supersede the following memoranda:

1. *Procedures for Transfer of Inmate-Patients After Discharge from Mental Health Crisis Bed and Department of Mental Health Treatment* dated September 8, 2009.
2. *Criteria for Prioritizing Mental Health Crisis Bed Admissions* dated October 3, 2008.
3. *Tracking and Transfer of Inmate-Patients Requiring Mental Health Crisis Bed Care* dated March 26, 2007.
4. *Standardization of Mental Health Crisis Bed Admission Procedures* dated September 6, 2005.
5. *Health Care Placement Unit Hours for Mental Health Crisis Bed Referrals* dated September 16, 2003.
6. *Retaining Beds for Mental Health Crisis Bed and Outpatient Housing Unit Cases* dated December 20, 2002.

Local operating procedures shall be updated to reflect these changes no later than January 15, 2015. Copies of the amended procedures should be forwarded to the following email address: CDCR MHPolicyUnit@CDCR. If you have clinical questions or need additional information contact Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health Program, Division of Health Care Services, at (916) 691-0308 or email at Laura.Ceballos@CDCR.ca.gov. For custody, transfer, or other operational questions, contact James Robertson, Chief, C5U, at (916) 322-2544 or Judy Burleson, Correctional Administrator, HCPOP, Field Operations, Statewide Mental Health Program by telephone at (916) 691-0312 or email at Judy.Burleson@CDCR.ca.gov.

HEALTH CARE SERVICES

# MEMORANDUM

Attachments

cc:    Angela Ponciano
        Nathan Stanley
        Amy Eargle, Ph.D.
        Laura Ceballos, Ph.D.
        Edward Kaftarian, M.D.
        Judy Burleson
        Kathleen Allison
        Kelly Harrington
        Jay Virbel
        Ralph Diaz
        Amy Miller
        Connie Gipson
        James Robertson
        John Herrera
        Regional Mental Health Administrators
        Regional Healthcare Executives

HEALTH CARE SERVICES

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
| --- | --- | --- |
| CHAPTER 05:<br>INPATIENT SERVICES | Revision Date(s): | NA |
| | Supersedes Memoranda<br>dated: (See Attachments) | 9/8/2009; 5/23/02;<br>9/06/05;12/20/02 |
| 12.05.200<br>MENTAL HEALTH CRISIS BED- REFERRAL, REFERRAL<br>RESCISSION, AND DISCHARGE POLICY | Attachments: | Yes ☒ No ☐ |
| | Director<br>Approval: | |

**Policy**

An inmate-patient (IP) suffering from an acute, serious mental disorder resulting in serious functional disabilities or who is a danger to self or others as a consequence of a serious mental disorder shall be referred to a mental health crisis bed (MHCB). All IP placements into an MHCB shall require authorization from the Health Care Placement Oversight Program (HCPOP) prior to placement. This includes internal placements made by institutions with vacant MHCBs. All MHCB referrals are to be transferred (see definition) to an MHCB within 24 hours of referral. If an MHCB is not available and a bed is occupied by an IP for medical reasons, HCPOP, in consultation with Utilization Management, may direct the movement of the medical placement to an outside hospital or other appropriate medical placement. All IPs discharged from an MHCB must be transferred within 72 hours of clinical discharge from an MHCB.

**Purpose**

To ensure the effective management of statewide MHCB resources; bring equity to IPs currently housed at institutions that do not have MHCBs; and ensure timely and equal access to care.

**Definition**

**Transfer** – The day/time the IP leaves the institution for transport to/from an MHCB according to the Strategic Offender Management System (SOMS) departure date/time.

**Compliance Indicators**

MHCBs operate 24 hours a day, seven days a week. To be in compliance with this policy, the following requirements shall be met:

1. HCPOP shall be contacted within one hour of clinical determination that an IP requires placement in an MHCB and/or prior to an IP's placement into alternative housing (MH Policy 12.05.301 Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer).

2. HCPOP determines bed availability and notifies the referring clinician of the bed assignment.

3. HCPOP monitors the SOMS for vacant MHCBs. IP movement out of an MHCB shall be entered into SOMS immediately and reflect actual physical transfer date and time.

4. Upon receipt of the Clinical Director or designee's approval to transfer the IP to the receiving institution's MHCB, the Chief of Mental Health or designee at the sending institution shall complete a CDCR 128-C Chrono – Medical/Psychiatric/Dental, indicating acceptance. Within one hour of acceptance, copies of the CDCR 128-C Chrono shall to be forwarded to:

- the MHCB Clinical Director or designee at the receiving institution

- the Classification and Parole Representative (C&PR)/Watch Commander at the sending institution (MHSDS Program Guide Rev. 2009, p. 12-5-6).

**Compliance Indicators continued**

5. The C&PR/Watch Commander at the receiving institution are verbally notified within one hour by the referring clinician's or designee's acceptance of an IP to the MHCB.

6. HCPOP and respective custodial staff (i.e., C&PR/Watch Commander) are notified within one hour by the referring clinician or designee when a referral is rescinded. (See *Procedure* 12.05.200.P2 Mental Health Crisis Bed: Rescinding a Referral)

7. All MHCB IP's are transferred within 24 hours of referral to an MHCB unless the MHCB referral is rescinded.

8. All failures to complete an MHCB transfer within 24 hours of the MHCB referral are reported by HCPOP to the Deputy Director, Statewide Mental Health Program.

9. The treating clinician or designee shall immediately notify HCPOP of any MHCB clinical discharges that occur throughout the day. The treating clinician or designee shall immediately notify the respective C&PR or designee for placement determination of an IP discharged from MHCB.

10. IPs who have been clinically discharged from MHCB are transferred as soon as possible and within 72 hours. Pending transfer, the IP shall not be retained in the MHCB. IPs discharged from MHCB treatment can be housed in general population, if placement is consistent with clinical needs, case factors, and appropriate program availability. If the inmate has clinical case factors relating to interim placement, then the MHCB clinician shall inform HCPOP immediately.

11. IPs are returned to the sending institution unless the sending institution is not designated to provide for their mental health, custodial, or medical needs.

12. No IP's are transferred, upon clinical discharge, to an institution that is not designated to provide for their mental health level of care.

13. A local operating procedure, consistent with all requirements of the statewide MHCB Referral, Referral Rescission, and Discharge policy and procedure, is developed.

**Transportation**

It is the responsibility of the sending institution to ensure transport within 24 hours of MHCB referral and within 72 hours of clinical discharge. The C&PR at the sending institution shall notify Statewide Transportation of the requested transport. If Statewide Transportation is unable to complete the transport within the required timelines the institution transportation team shall complete the transport. The institution shall contact HCPOP immediately when there are transportation delays.

**Retaining Beds for MHCB Cases**

Staff shall retain an IP bed/cell for a minimum of ten (10) days if the IP is moved/transferred to an MHCB. This applies to intra-institutional moves as well as inter-institutional transfers.

**References**

California Code of Regulations (CCR) Title 22, Section 79789. Patient Transfers. licensing standards provide that a patient shall not be transferred unless and until the receiving facility has consented to accept the IP. Specifically, the CCR provides, in part, that no patient shall be transferred, or discharged for purposes of transferring, unless

arrangements have been made in advance for admission to a health facility.

Division of Correctional Health Care Services, *Mental Health Services Delivery System Program Guide,* Rev, 2009, Chapter 5, "Mental Health Crisis Bed."

Department Operations Manual, Section 62080.17. Emergency Medical Transfers.

September 8, 2009, *Procedures for Transfer of Inmate-Patients After Discharge from Mental Health Crisis Bed and Department of Mental Health Treatment*

June 17, 2008. *Primary and Alternate Hub Designations for Placement of Inmates who Require Administrative Segregation Placement and Mental Health Services.*

December 20, 2002, *Retaining Beds for Mental Health Crisis Bed and Outpatient Housing Unit Cases,*

October 9, 2013 MH Policy 12.05.301 *Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer*

Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure

**Questions**      If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR.

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
|---|---|---|
| CHAPTER 05:<br>INPATIENT SERVICES | Revision Date(s): | N/A |
| | Supersedes: | |
| PROCEDURE 12.05.200.P1:<br>MENTAL HEALTH CRISIS BED: REFERRAL PROCEDURE | Attachments: | Yes☒ No☐ |

**12.05.200.P1**    Mental Health Crisis Bed: Referral Procedure

**Discussion**    This document describes the steps required for submitting a Mental Health Crisis Bed (MHCB) referral for inmate-patients (IPs) requiring MHCB level of care (LOC).

Throughout the referral process, the referring clinician, receiving Clinical Director, and referring and receiving Classification and Parole Representatives (C&PR)/Watch Commanders communicate with each other to ensure all health care, classification, and transportation issues are addressed.

| STEP | PROCESS |
|---|---|
| 1 | A referring clinician or interdisciplinary treatment team determines an IP requires MHCB LOC. |
| | - **Referring clinician:** Documents the appointment on Clinician Daily Log (required for all contacts) and completes the Documentation Required for Admission to Mental Health Crisis Bed (Policy 12.05.601) also known as the referral packet (See Attached). For physician on duty (POD) evaluations, the referral packet is completed at the start of the next calendar day. |
| | - **Referring Data Entry Staff:** Inputs Daily Contact Log entries into Mental Health Tracking System (MHTS.net). |
| 2 | **The referring clinician:** |
| | - Contacts Health Care Placement Oversight Program (HCPOP) within one hour of clinical determination that an IP requires placement in an MHCB. |
| | - Contacts HCPOP prior to an IP's placement into alternative housing. |
| | - In conjunction with custodial staff, consults policy 12.05.301, *Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer*, when the IP requires alternative housing pending transfer to an MHCB. |
| | **HCPOP:** |
| | - Places the IP on the MHCB pending list upon notification of referral from referring clinical staff. |
| | - Locates and secures an MHCB for the IP in the order in which the need was determined so that no IP is placed ahead of another with the caveat that HCPOP is |

|   | expected to take time and distance into consideration. HCPOP uses discretion to balance placements in order to use MHCBs as efficiently as possible based on the overall needs of the Department. |
|---|---|
|   | - Directs the receiving MHCB Clinical Director or designee to hold the available MHCB. |
|   | - Upon chronological review of the MHCB pending list, immediately contacts the referring clinician or designee with the MHCB bed location and provides the receiving MHCB clinical staff contact information once a vacant MHCB is located. |

| 3 | The following table describes the process for writing the referral order. |
|---|---|

| If the referring clinician ... | then immediately ... |
|---|---|
| Is privileged to admit to the receiving MHCB. (Note- all placements, including those at the same institution, must be directed by HCPOP.) | 1. Writes the order to admit the IP.<br>2. Writes a CDCR 128-MH3, *Mental Health Placement Chrono*, indicating MHCB LOC, date, and the time of the referral.<br>3. Forwards the CDCR 128-MH3 to the referring Strategic Offender Management System (SOMS) Data Entry Staff, who enters the information into SOMS. |
| Is **NOT** privileged to admit | 1. Documents *"Refer to MHCB"* on a Physician's Orders CDCR 7221 form and forwards the order according to local operating procedures.<br>2. Completes a CDCR 128-MH3, *Mental Health Placement Chrono*, indicating MHCB LOC, date, and the time of the referral.<br>3. Forwards the CDCR 128-MH3 to referring SOMS Data Entry Staff. |

| 4 | Clinician-to-clinician contact is initiated between the referring and receiving institutions. |
|---|---|
|   | - **Referring Clinician**: Upon notification by HCPOP of bed availability, the referring clinician sends the completed referral packet (See attachment) and calls the receiving Clinical Director or designee within two hours of bed availability notification. |
|   | - **Receiving Clinical Director or designee**: Within one hour of receipt, the receiving clinician reviews the referral packet (See attachment), conducts the pre-admission screening to determine if the IP is appropriate for MHCB placement, and contacts the sending institution clinician on the status of the pre-admission review. |

| 5 | The following table describes the steps required based on the pre-admission review |
|---|---|

by the receiving Clinical Director or designee.

| If the inmate-patient is … | then … |
|---|---|
| Accepted* | **Chief of Mental Health or Designee at the Sending Institution:**<br><br>1. Completes the CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, indicating acceptance.<br><br>2. Within one hour of acceptance, forwards completed form with the IP's bed number to the:<br><br>- **Receiving Chief of Mental Health or designee**, who ensures the CDCR 128-C, *Chrono– Medical/Psychiatric/Dental was received by* the C&PR/Watch Commander.<br><br>- **Sending C&PR/Watch Commander** |
| Denied; however, the referring clinician believes the clinical need for transfer remains | The case shall be referred to HCPOP, who immediately contacts the Mental Health Regional Administrator (MHRA) for resolution. If an agreement cannot be reached, the IP shall be admitted and evaluated. |
| Denied and clinician does not believe the need for transfer remains | IP is not transferred. Referral is rescinded; HCPOP is notified of rescinded referral (refer to Chapter 05: Inpatient Services, Procedure 12.05.200-P2, *Rescinding a Referral*) immediately, but not to exceed one hour after the decision to rescind. |

**\*Note:** Before the IP can be transferred, the receiving facility agrees to the transfer (California Code of Regulations (CCR) Title 22, Section 79789) or provides just cause for the denial.

| 6 | The IP is transferred to an MHCB within 24 hours of referral. Please note: a transfer is the day/time the IP leaves the institution for transport to/from an MHCB according to the Strategic Offender Management System (SOMS) departure date/time.<br><br>- **Referring Clinical staff**: Contacts HCPOP immediately if any barriers to the transfer process are identified.<br><br>- **Receiving Clinical staff**: Completes the required evaluations according to the *Mental Health Services Delivery System Program Guide*.<br><br>- **Referring Clinical staff**: If applicable, notifies HCPOP and MHRA as soon as possible, but no later than the next business day, of the specific reason(s) which delayed the transfer of an IP to the MHCB institution within 24 hours of referral. |
|---|---|

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
|---|---|---|
| CHAPTER 05:<br>INPATIENT SERVICES | Revision Date(s): | N/A |
| PROCEDURE 12.05.200.P2:<br>MENTAL HEALTH CRISIS BED: RESCINDING A REFERRAL | Attachments: | Yes☐ No☒ |
| | Directors Approval: | |

**12.05.200.P2**   Mental Health Crisis Bed: Rescinding a Referral

**Discussion**   This document describes the process for rescinding a Mental Health Crisis Bed (MHCB) referral for inmate-patients (IPs) previously determined to require MHCB level of care (LOC).

After an MHCB referral has been initiated/submitted, it may be withdrawn at any time during the referral process by rescinding the referral.

| STEP | PROCESS |
|---|---|
| 1 | If Health Care Placement Oversight Program (HCPOP) and custodial staff (i.e., Classification and Parole Representative [C&PR]/Watch Commander) were notified of the need for transfer, the referring clinician or designee immediately, and not to exceed one hour, notifies HCPOP and respective custodial staff of the rescission. |
| 2 | The clinician documents the rationale for rescinding the referral on a progress note (CDCR MH-7230). |
| 3 | If the clinician had already completed a placement chrono (CDCR 128-MH3), then he or she writes a new chrono to remove the MHCB LOC documenting the IP's level of care upon return to his/her cell and submits it to data entry staff. If no CDCR 128-MH3 was written, then no action is required. |
| | a. The clinician notes the rescission date, time, and reason for rescission on the clinician daily log. |
| | b. The MHTS.net data entry staff enters the reason for rescission into the opened MHCB level of care event/Mental Health Identifier (MHI) change screen (in the patient record) in MHTS.net. |
| | c. The data entry staff enters the new mental health identifier, documented on the CDCR 128-MH3 into SOMS. |
| | d. If a bed has already been assigned by HCPOP, then the clinician notifies the receiving institution and respective custodial staff (i.e., C&PR/Watch Commander) regarding the rescission and cancellation of the MHCB transfer. |

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
|---|---|---|
| CHAPTER 05:<br>INPATIENT SERVICES | Revision Date(s): | N/A |
| | Supersedes: | |
| PROCEDURE 12.05.200.P3:<br>MENTAL HEALTH CRISIS BED: DISCHARGE PROCEDURE | Attachments: | Yes☐ No☒ |
| | Directors Approval: | |

| 12.05.200.P3 | Mental Health Crisis Bed: Discharge Procedure |
|---|---|

**Discussion**   This document describes the steps required for discharging an IP from the Mental Health Crisis Bed (MHCB) level of care (LOC).

Throughout the discharge process, the primary MHCB clinician or designee, receiving Clinical Director, and MHCB institution and designated receiving Classification and Parole Representatives (C&PR)/Watch Commanders will communicate with each other to ensure all health care, classification, and transportation issues are addressed.

| STEP | PROCESS |
|---|---|
| 1 | **Upon clinical discharge:**<br><br>• The primary MHCB clinician or designee immediately notifies Health Care Placement Oversight Program (HCPOP) and the C&PR or designee of IP clinical discharge and documents the date and time of discharge on the clinician daily log and the 128 MH-3 Mental Health Placement Chrono.<br><br>• HCPOP will track administrative MHCB days.<br><br>• The primary MHCB clinician forwards the daily log and 128 MH-3 Mental Health Placement Chrono to the designated Mental Health Tracking System (MHTS.net) and Strategic Offender Management System (SOMS) data entry staff.<br><br>• Designated data entry staff enter the clinical discharge date and time into MHTS.net and enter the new LOC, and new LOC designation date and time (from the 128 MH-3 Mental Health Placement Chrono) into SOMS.<br><br>• Upon review of the IP's case factors. the C&PR, or designee will determine whether the IP can return to the original sending institution.<br>    o  If the IP requires Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) hub placement, HCPOP will be contacted for placement assistance.<br>    o  If the original sending institution cannot provide the necessary LOC, HCPOP will be contacted for placement assistance.<br><br>• When contacted by the respective MHCB institution's C&PR for placement assistance, HCPOP staff reviews the LOC bed availability and in accordance with the IP's case factors, provides the MHCB institution with a placement recommendation. within four (4) business hours (Monday through Friday 7:00 am to 5:00 pm), on a CDCR Form 128-B, General Chrono. |

| | |
|---|---|
| | • If IP is to be redirected, the C&PR at the MHCB institution presents the case to the institution's assigned Classification Staff Representative (CSR) for an emergency transfer endorsement. If a CSR is not currently assigned to the MHCB institution at the time of the redirect, the C&PR will contact the Classification Services Unit or the CSR Scheduler to request a CSR be assigned to conduct a remote emergency transfer endorsement. |
| 2 | **Special Housing Returns**<br><br>IPs who have been clinically discharged from MHCB are to be transferred as soon as possible and within 72 hours. The IP shall not be retained in the MHCB nor alternative housing pending transfer. If transitional placement is needed, it must be consistent with clinical needs, case factors, and appropriate program availability with the following provisions:<br><br>• IPs discharged from MHCB treatment who have a Security Housing Unit (SHU) term or are on ASU status will be placed in the ASU at the originating institution's primary or alternate ASU EOP Hub. If both the primary or alternate ASU EOP Hubs are unable to accept the IP due to having exceeded their capacity, then HCPOP will be contacted for placement assistance. Inmates on non disciplinary segregation (NDS) shall be handled according to current policy.<br><br>• IPs discharged from MHCB treatment who have general population status are placed into a general population unit, if placement is consistent with clinical needs, case factors, and appropriate program availability.<br><br>• IP's discharged from MHCB shall not be retained in an ASU unless they are MAX custody.<br><br>It is the responsibility of the designated receiving institution to make all transfer arrangements and remove the IP within 72 hours of clinical discharge. The C&PR at the receiving institution shall notify Statewide Transportation of the requested transport. If Statewide Transportation is unable to complete the transport within the required timelines the institution transportation team shall complete the transport. |

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | November 2014 |
|---|---|---|
| CHAPTER 05:<br>INPATIENT SERVICES | Revision Date(s): | November 2014 |
| | Supersedes Policy: | August 2014 |
| POLICY 12.05.601<br>DOCUMENTATION REQUIRED FOR REFERRAL TO MENTAL HEALTH CRISIS BED | Attachments: | Yes ☐ No ☒ |
| | Director<br>Approval: | ~~~ ~~~~~~ ~~~~ |

**Policy**    For all inmate-patient (IP) referrals to a Mental Health Crisis Bed (MHCB), referring/sending institutions shall complete and submit a referral packet as described in this policy.

**Purpose**    To standardize MHCB referral documentation; clarify the expectations between the sending and receiving institutions; improve the efficiency in generating the documentation to provide timely access to care; and ensure that the receiving MHCB staff has the necessary paperwork to admit the IP.

**Discussion**    When IPs are referred for and prior to acceptance into an MHCB, the referring/sending institution's mental health staff shall complete and make the referral packet available to the receiving MHCB staff. While the receiving MHCB staff may request additional documentation beyond what is required, the only documentation required for the referral and acceptance into the MHCB is listed in this policy. Each document shall be dated within the specified period of time indicated below for the purpose of the MHCB referral documentation.

**Compliance Indicators**    To be in compliance with this policy, the following documentation is required:

1. CDCR 128C Transfer Chrono – Dated within two (2) days of the documented date of referral.

2. CDCR 128-C3 Medical Classification Chrono – The most current per the medical classification policy (Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure).

3. CDCR 7221 Physician Order Form (written by a psychiatrist, who has competence in performing medical assessments, or primary care physician), must state on the form: "Medically cleared for transfer" with a corresponding progress note – SOAPE format – Dated within 48 hours of the documented date of referral.

4. CDCR MH-7230A Interdisciplinary Progress Notes – General (Including but not limited to PC 2602 history) – All CDCR MH-7230A's dated within seven (7) days of the documented date of referral.

5. CDCR 7371 Confidential Medical/MH Information Transfer – Dated within seven (7) days of the documented date of referral.

6. CDCR 7386 Mental Health Evaluation (or CDCR 7386 Mental Health Evaluation

Add-a-Page)

- If a CDCR 7386 or a CDCR 7386 Add-a-Page was completed more than seven (7) days prior to referral, a CDCR 7389 (Rev.06/06) Brief Mental Health Evaluation is to be completed by the referring clinician at the time of referral.

- If a CDCR 7386 or a CDCR 7386 Add-a-Page is not available or the most recent document is available but is not complete or accurate, a full CDCR 7386 must be completed by the referring clinician or the Primary Clinician at the time of referral.

7. CDCR MH-7447 Suicide Risk Evaluation – Dated within seven (7) days of the documented date of referral.

- The referring clinician is to complete the CDCR MH-7447 if the IP is referred for suicidal ideation a suicide attempt, or any type of self-harm.

- The receiving team may, upon clinical discretion, complete the CDCR MH-7447 if the IP is referred for any other reason.

8. Medication Profile (within last 30 days of the documented date of referral.) – Current medication reconciliation.

9. CDCR 128C Acceptance Chrono.

**References**   Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure

Division of Health Care Services (DHCS), Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision, Chapter 5, Mental Health Crisis Bed, p. 12-5-11.

**Questions**   If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

ATTACHMENT C

## MHCB Referral Process for All Institutions



## Gaines, Thomas@CDCR

| | |
|---|---|
| **From:** | Gaines, Thomas@CDCR on behalf of Katavich, John@CDCR |
| **Sent:** | Thursday, January 08, 2015 6:10 AM |
| **To:** | Gaines, Thomas@CDCR |
| **Subject:** | FW: Transfer of Inmates To and From Mental Health Crisis Beds |
| **Attachments:** | TRANSFER OF INMATES TO AND FROM MENTAL HEALTH CRISIS BEDS.pdf; Transfer of Inmates To and From Mental Health Crisis Beds Attachments.pdf |

**From:** Shimozaki, Donna@CDCR
**Sent:** Wednesday, January 07, 2015 4:27 PM
**To:** Harrington, Kelly@CDCR; Allison, Kathleen@CDCR; CDCR Institutions DAI Associate Directors; CDCR Institutions Wardens; CDCR Institutions DAI CSU CSRs & In-House CC IIIs; CDCR Institutions DAI CSU C and PRs; Herrera, John L. (HQ)@CDCR; Robertson, James@CDCR; Ponciano, Angela@CDCR; Stanley, Nathan@CDCR; Brown, Daryl@CDCR; Martin, Kenneth@CDCR; O'Meara, Kathleen@CDCR; Bylund, Steven@CDCR; Force, Elaine@CDCR; McAloon, Margaret@CDCR; Young, Charles@CDCR; Daye, Eureka@CDCR; Podratz, Christopher@CDCR; Herrick, Robert@CDCR; CDCR CCHCS CEOs; Ceballos, Laura@CDCR; Eargle, Amy@CDCR
**Cc:** Belavich, Tim@CDCR; Burleson, Judy@CDCR; Cullen, Vincent@CDCR; Shirley, Coyt C@CDCR; Weathersbee, Christopher@CDCR; Phillips, Christina@CDCR; Yamada, Karen@CDCR; Andersson, Dyann@CDCR; Belavich, Tim@CDCR; Scholl, Jason@CDCR; Peterson, John@CDCR; Romero, Michael@CDCR; Mendonca, Cherylann@CDCR; Sainz, Ernesto@CDCR
**Subject:** Transfer of Inmates To and From Mental Health Crisis Beds

*On Behalf of*
*Division of Adult Institutions*
*And*
*Division of Health Care Services*

If you have any questions regarding the subject matter, please refer to the attached memorandum for contact information.

*DONNA SHIMOZAKI*
*Executive Assistant to*
*Division of Adult Institutions*
*(916) 445-7688    Fax  (916) 327-2877*
*Email:  Donna.Shimozaki@cdcr.ca.gov*

1

Exhibit F

*Coleman v. Brown*

**Factors that Contribute to Delays in Timely Transfers
to Mental Health Crisis Beds and Proposed Solutions**

**Factors that Contribute to Delays**

1. Obtaining the 128C noting clinical acceptance prior to admission of the patient to a crisis bed.

   Proposed Solutions:

   a. Proceed with transfer prior to receipt of the 128C
   b. 128C must still be done but will not hold up transfer

2. Delay in obtaining medical clearance prior to transfer of a patient to the crisis bed

   Discussion Items:

   a. Define the scope of the issue – how widespread is the problem?
   b. Discussing alternatives to expediting medical clearance

3. Timely transportation upon endorsement to a crisis bed

   Proposed Solutions:

   a. CDCR is conducting an analysis to determine the scope of the problem, both system-wide and at the individual institutions.  The initial analysis should be complete by August 25, 2017.
   b. Added institution AOD on all bed assignment e-mails from HCPOP
   c. Added fine language to the bed assignment e-mails from HCPOP

4. Delay in bed assignments due to lack of available beds

   Proposed Solutions:

   a. Work on reducing the length of stay in crisis beds
      i. Refer to higher LOC sooner in the admission when appropriate
      ii. Discharge when appropriate (i.e., do not avoid discharge due to workload)
      iii. Consider Clozaril initiations only at Acute
   b. Improve length of stay in acute care beds to make room for crisis bed discharges.
   c. CHCF-PIP flexing 28 bed intermediate unit to acute unit B308A. Patient admissions scheduled to begin 8/18/17
   d. CCWF patients will be sent to CIW MHCB upon bed availability
   e. Operationalize safe double celling of MHCB patients at CCWF
   f. Sending all 4 Regional Administrators and teams to each of the PIPs for the next 3 weeks to help with LRH review and determination of discharge appropriateness.

5. MHCB discharge delays

   Proposed Solutions:

   a. Coordination of medication and pharmacy needs for discharged patients waiting to transfer out of a MHCB.
      i. Explore state law requirements for discharge medications
      ii. Evaluate Omni cell medication supply
   b. Consider transferring clinical discharged patients locally pending transfer to home institution (within 72 hours)


**Additional details and Proposed Solutions to Improve Transfer Times**:

1. CDCR has initiated a focus group to analyze and make recommendations on improving the workflow of the C&PR's.

2. CHCF PIP flipping 28 bed Intermediate unit to an acute unit. Patient admissions scheduled to begin 8/18/17

3. Monitoring and reporting reasons for delays. CDCR is working to automate tracking of crisis bed referral timelines, including reasons for delays.

Exhibit G

*Coleman v. Brown*

**Factors that Contribute to Delays in Timely Transfers
to Mental Health Crisis Beds and Proposed Solutions**
<u>August 28, 2017</u>

**Factors that Contribute to Delays**

1. **Obtaining the 128C (noting clinical acceptance) prior to admission of the patient to a crisis bed.**

   <u>Proposed Solutions</u>

   - Proceed with transfer prior to receipt of the 128C
   - 128C must still be done but will not hold up transfer

   <u>Status</u>
   a. Implemented

2. **Medical clearance delays**

   <u>Proposed Solutions</u>

   - Remove Medical Clearance requirement

   <u>Status</u>
   - Pending issuance of a memorandum

3. **Transportation**

   <u>Proposed Solutions</u>

   - CDCR is conducting an analysis to determine the scope of the problem, both system-wide and at the individual institutions.  The initial analysis should be complete by August 25, 2017.
   - In an effort to move inmates more quickly out of beds, Defendants are investigating the possible need for more transport vehicles to affect the change in practice.
   - Added institution AOD on all bed assignment e-mails from HCPOP
   - Added fine language to the bed assignment e-mails from HCPOP

4. **Delays in bed assignments due to lack of available beds.**

   <u>Proposed Solution</u>
   - Clozaril initiations only at Acute LOC

<u>Status</u>

- Memorandum pending

<u>Proposed Solution</u>

- CHCF PIP flipped 28 bed Intermediate unit to an Acute unit.

  <u>Status</u>

- Activation began 8/18/17

<u>Proposed Solution</u>

- CCWF patients will be sent to CIW MHCB upon bed availability

  <u>Status</u>

- Completed

<u>Proposed Solution</u>

- Operationalize safe double celling of MHCB patients at CCWF

  <u>Status</u>

- CCWF began actively working on double celling for MHCB on 8/24/17
- LOP DRAFT addendum complete for review

<u>Proposed Solution</u>

- Sending all 4 Regional Administrators and teams to each of the PIPs for the next 3 weeks to help with LRH review and determination of discharge appropriateness.

  <u>Status</u>

- Began 8/21/17

5. **MHCB Discharge Delays**

   <u>Proposed Solution</u>

   - Coordination of medication and pharmacy needs for discharged patients waiting to transfer out of a MHCB.
     - Explore state law requirements for discharge medications
     - Evaluate Omni cell medication supply

   <u>Status</u>

   - Continued research and discussion regarding this issue


   <u>Proposed Solution</u>

   - Consider transferring clinical discharged patients locally pending transfer to home institution (within 72 hours)

   <u>Status</u>

   - Working with SVSP on updating OP to allow for MHCB Discharges (to outside institutions) layover process


**Additional details and Proposed Solutions to Improve Transfer Times**:

1.  CDCR has initiated a focus group to analyze and make recommendations on improving the workflow of the C&PR's.

2. Monitoring and reporting reasons for delays.  CDCR is working to automate tracking of crisis bed referral timelines, including reasons for delays.