XAVIER BECERRA
Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD A. STEGEMAN, State Bar No. 225745
TYLER V. HEATH, State Bar No. 271478
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DEFENDANTS' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS INCLUDING ISSUES DISPUTED WITH PLAINTIFFS' FOR SEPTEMBER 29, 2017 STATUS CONFERENCE.** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

## INTRODUCTION

The April 19 order required Defendants to review and report on the obstacles to full compliance with the Program Guide timeline for transfer to mental health crisis beds. In response, Defendants exhaustively assessed the Mental Health Crisis Bed (MHCB or crisis bed) system's ability to move every patient to crisis care within twenty-four hours from clinical referral. That assessment identified specific obstacles to compliance and a series of factors that contribute to

1

delays in transferring patients to crisis beds. Defendants have worked with the Plaintiffs and Special Master, including weekly workgroup meetings over the past three months, to review these findings and propose solutions to improve patient transfer timelines. This collaborative effort has resulted in a road map to improve the Mental Health Crisis Bed system. The road map shows the status of the system, the obstacles to perfect compliance with transfer timelines, and a set of proposals that will ensure Defendants are taking every reasonable step to meet their goal to admit patients to the right bed as expeditiously as possible.

Defendants request that the Court allow this collaborative effort to continue and, rather than issue further orders, stop short of requiring strict adherence to the twenty-four-hour transfer timeline for each *Coleman* class-member (under penalty of contempt for noncompliance). Respectfully, such an order would be legally inappropriate and ultimately self-defeating. A requirement of perfect compliance with this Program Guide timeline does not comport with the deliberate indifference standard under the Constitution or the Prison Litigation Reform Act (PLRA), nor is it attainable. The California Department of Corrections and Rehabilitation (CDCR) refers and admits over one thousand patients each month to crisis beds from its thirty-four prisons throughout the state. Custody-related considerations, medical concerns, housing and safety requirements, transportation and logistics, the availability of clinicians for after business hours evaluations, as well as the sheer volume of crisis-bed referrals, admissions, discharges, and rescissions that take place each day within CDCR contribute to the complexity of the system. No medical system—certainly not one as large and complex as CDCR's—could measure up under such an exacting standard of perfection.

Instead, the Court should evaluate whether Defendants are providing constitutionally adequate care and timely access to crisis beds on a system-wide basis. Defendants' systemic data shows that, on average, the vast majority of patients are transferred within the Program Guide timeline. In June 2017, seventy-one percent of patients were transferred and admitted to crisis care within twenty-four hours, and ninety percent were admitted within forty-eight hours. Defendants are committed to making further improvements to the system, but a process that tallies up every instance of deviation from a transfer timeline, despite the substantial efforts

currently underway to move patients quickly, will mire this case in endless enforcement and contempt proceedings.

While the parties have reached consensus on a host of areas, two issues need to be resolved based on disputes that have arisen over language in the Program Guide that states: "The inmate-patient shall be transferred within twenty-four hours of referral." (Program Guide at 12-5-4.) First, this Court should grant CDCR the flexibility to refer patients to crisis beds only after an *in-person* clinical evaluation, along with the leeway to modify a policy memorandum that automatically triggers a crisis bed referral whenever an inmate is placed overnight in alternative housing. The Program Guide lends support to Defendants' proposal for "pre-admission" screening and then "evaluation" by an on-site clinician, and Plaintiffs' assertion that Defendants are seeking to modify the Program Guide or its twenty-four-hour requirement is incorrect. Second, in cases where the patient is admitted to a crisis bed at another institution, the referral should be recorded as complete when the patient is "transferred," that is, placed on the medical transport vehicle. Defendants should not be held to the impossible requirement of squeezing multiple-hour transport times (which can vary considerably because of local traffic and weather conditions) within the already tight twenty-four hour timeline in every single instance. Plaintiffs request resolution of a third issue, namely production of additional data to assist in the workgroups, but that issue is best left resolved in the workgroups themselves.

### I. DEFENDANTS WORKED DILIGENTLY TO COMPLETE THE WORK REQUIRED BY THE APRIL 19, 2017 ORDER.

The April 19, 2017 order acknowledged that Defendants may not be able to meet the twenty-four-hour transfer timeline for crisis beds in every instance, and provided Defendants an opportunity to identify the reasons why perfect compliance is unattainable. (Order at 13, ECF No. 5610, Apr. 19, 2017). The Court directed the parties to participate in workgroups convened by the Special Master to consider (1) use of alternative housing when an inmate-patient is referred to a Mental Health Crisis Bed, and (2) any and all obstacles to full compliance with the twenty-four-hour timeline for each individual transferred to Mental Health Crisis Beds. (*Id.*) The Court also directed the parties to develop an addendum to the Program Guide that identifies exceptions to the

twenty-four-hour timeline requirement and to complete and submit the addendum to the Court for review and final approval. (*Id.*)[1]

Since the issuance of its April 19, 2017 order, Defendants engaged in a collaborative process with Plaintiffs' counsel and the Office of the Special Master to identify possible mechanisms for streamlining the transfer process. The parties met eight times since June 26, 2017 to discuss Defendants' proposals, including proposed exceptions for an addendum to the Program Guide and solutions to address delays in crisis beds transfers. (Decl. of Katherine Tebrock In Support of Defs.' Brief (Tebrock Decl.) at ¶ 4.) On June 23, 2017, Defendants submitted a plan to the Special Master and Plaintiffs to address crisis bed transfers. (Declaration of Nicholas Weber In Support of Defs.' Brief (Weber Decl.), Exhibit 1.) Plaintiffs submitted their response on July 6 and July 19, 2017. (Weber Decl., Exhibit 2.) On July 21, 2017, Defendants responded to Plaintiffs' inquiries and provided additional data for discussion in the workgroup. (Weber Decl., Exhibit 3.) On August 2, 2017, Defendants provided Plaintiffs and the Special Master with a description of initiatives directed at resolving delays in transfers to crisis beds. (Weber Decl., Exhibit 4.) Defendants also provided Plaintiffs with data they requested and met again on August 4, 2017, to discuss the data and proposals. (*Id.*; Tebrock Decl. at ¶ 4.) Prior to the August 21 workgroup meeting, CDCR produced an initial outline of the factors that contribute to transfer delays and the solutions CDCR has implemented or will implement to address those factors. (Weber Decl., Exhibit 5.) An updated outline was provided in advance of the August 28 meeting. (Weber Decl. Exhibit 6.)

As reported in the parties' joint filing on August 29, 2017, Defendants developed initiatives that address the obstacles to compliance with current timelines over the course of these workgroups.[2] As with prior plans, even those approved by the Special Master and the Court, the

---

[1] The parties entered into a stipulation that was adopted by the Court, requiring the parties to file a status report on August 29, 2017; to work together to analyze exclusions to the twenty-four-hour transfer timeline; to develop a complete addendum to the Program Guide setting forth those exclusions; and to appear before the Court for further status conference or evidentiary hearing on September 28, 2017. (ECF No. 5660.) On August 29, the parties filed the joint status report. (ECF No. 5669.)

[2] Simultaneous with these workgroups, the parties and the Special Master have been touring the Psychiatric Inpatient Programs looking at the application of the Least Restrictive

(continued…)

proposals need to be time-tested to see whether their practical application will have their intended effect. Defendants also identified a need for further review of the process and seek additional time to continue to work with the Special Master and Plaintiffs to refine and improve the referral system to timely move patients in need of mental health crisis-bed level of care.

While Defendants worked diligently to overcome as many obstacles as possible, a more thoughtful review of the system is needed to permanently streamline the transfer process. Defendants propose that the parties continue workgroups, in some form, to reexamine the system. Defendants request that the Court hold further proceedings and imposition of sanctions in abeyance, in order to allow the parties to continue their discussions.

## II. DEFENDANTS' SOLUTIONS TO IDENTIFIED OBSTACLES WILL EXPEDITE TRANSFERS AND IMPROVE THE MENTAL HEALTH CRISIS BED SYSTEM.[3]

Defendants identified a series of obstacles to transferring patients to crisis beds within twenty-four hours of referral. Those obstacles include policies that require clinical acceptance before admission of the patient to a crisis bed, and a medical clearance before transport; administrative requirements or processes unrelated to actual treatment of the patients (classification and parole representative workflows); an increased demand for crisis beds that periodically outpaces the supply; delays in discharging patients who no longer need crisis care; and automation of tracking and reporting of referrals, admissions and discharges to crisis care. (Tebrock Decl.) While Defendants will continue to develop and implement solutions to the obstacles identified thus far in the workgroups, in a system servicing over 100,000 inmates, there will still be patients who transfer to crisis beds hundreds of miles away more than twenty-four hours after referral. Because this is inherent in an extremely complex system, Defendants request that the Court not require strict adherence to the timelines in each individual case. A more

---

(…continued)
Housing reviews for patients currently in the inpatient program.

[3] As noted in the parties' joint report (ECF No. 5669), because the parties continue to meet and collaborate under the guidance of the Special Master on issues related to compliance with the Program Guide timeline for transfer to crisis bed, Defendants present only partial briefing on their work thus far in identifying and addressing obstacles to full transfer timeframe compliance. Defendants preserve their request to present full briefing including all evidence on their progress in this regard at the conclusion of the workgroup meetings in November 2017.

appropriate measure of the efficacy and constitutional adequacy of the system is a system-wide evaluation.

### A. CDCR's Complex Mental Health Crisis Bed System Requires The Referral, Admission, And Discharge Of Hundreds Of Patients Monthly.

Defendants have greatly increased the number of crisis beds within CDCR, from 182 in 2001 to 449 today. (Tebrock Decl. at ¶ 7.) In 2016, CDCR referred 15,268 patients to crisis care. (Tebrock Decl. at ¶ 6.) From January through August 2017, CDCR has referred 10,329 patients to crisis care. (*Id.*) For the 2016 and 2017 year-to-date referrals, 8,669 patients were transferred to a crisis bed institution, 7,253 patients were internally admitted into a crisis bed at their home institution, and 9,675 referrals were rescinded. (*Id.*)

On average, in 2017, CDCR referred 43 patients to crisis beds daily; admitted 27 patients to crisis beds daily; and discharged another 26 patients daily. (Tebrock Decl. at ¶ 8.) In June 2017, CDCR received 1,325 referrals to crisis beds, of which 390 patients transferred to different institutions' crisis beds; 443 patients were admitted to the referring institutions' crisis beds; and 492 referrals (or thirty-seven percent) were rescinded. (Tebrock Decl. at ¶ 9; Weber Decl., Ex 7, *Coleman* Data Submission for June 2017, Report 7a and 7c.) On average, CDCR placed the 833 patients admitted to crisis beds within 21.94 hours – two hours faster than the twenty-four-hour Program Guide requirement. (Tebrock Decl. at ¶ 9.) Five hundred ninety of the 833 patients (or seventy-one percent) were admitted to a crisis bed within twenty-four hours, waiting on average only 11.87 hours. (*Id.*) For the 168 patients (or twenty percent) admitted between twenty-four and forty-eight hours, the average wait was 32.68 hours. (*Id.*) For the remaining forty-three patients (or nine percent of referrals), they waited between forty-eight and seventy-two hours, with an average wait time of 57.31 hours. (*Id.*) Only thirty-two patients waited longer than seventy-two hours. (*Id.*; Weber Decl., Ex 7, *Coleman* Data Submission for June 2017, Report 7a and 7c.)

In addition to the large number of referrals, the referral process poses challenges in meeting the twenty-four-hour transfer timeline for each individual. (Tebrock Dec. at ¶ 12.) CDCR tracks over forty data elements, including patient demographics, information required for the referral,

6

and the referral outcome and timelines. (Tebrock Decl. at ¶ 12.) Local staff must provide headquarters sufficient information to affect the transfer. (*Id.*) As the workflow attached as Exhibit 6 to the Weber Declaration indicates, dozens of inquiries must be made based on the individual needs for each referral. Headquarters staff spend hours each day inputting data, assigning beds, and grappling with rescissions, while also seeking out additional data from local institutions. (*Id*. at ¶ 12 and Weber Decl., Exhibit 6.) These challenges affect headquarters staff overseeing rapid population movement, as well as their counterparts at the local institutions in custody and mental health. (Tebrock Decl. at ¶ 12.)

The complexity of the system is an unavoidable consequence of the large and diverse population that uses it and the plethora of requirements each team involved in the process must complete. The impact on transfer timelines is obvious but frequently understated. That impact must be a core consideration in the on-going work to improve timely transfers of patients to crisis beds and to determine standards for substantial compliance.

**B.  Defendants' Proposed Solutions To Expedite Crisis Bed Transfers Will Increase The Flow Of Patients Through The System And Open Up More Beds To Provide Care.**

As reported in the August 29, 2017, joint status report, Defendants identified numerous potential obstacles and have implemented, or are in the process of implementing solutions. To date, Defendants took steps to: (1) encourage better bed utilization, (2) change policies that add additional steps in the transfer process, (3) address transportation delays, (4) ensure timely discharges from crisis beds, (5) address the supply of available inpatient acute and intermediate beds, (6) focus on reducing the lengths of stay, and (7) deploy administrators to the psychiatric inpatient programs to ensure proper bed utilization throughout the inpatient system.

The list of initiatives Defendants have started to implement to increase efficiencies in transferring patients into open crisis beds more quickly is included on pages 2-4 of the parties' August 29 Joint Report. (ECF No. 5669.) Specifically, Defendants have continued to implement initiatives reported in January 2017, including crisis intervention teams, dialectical behavior therapy, enhanced trainings for staff on clinical evaluations and case formulations, increased after hours staffing, regionalized crisis beds to reduce travel time, and identified best practices at other

institutions to adopt statewide. Since the workgroups began, Defendants identified several policy changes that will expedite the crisis bed transfer process, including largely eliminating medical clearances. Defendants also tackled transportation issues that impacted the transfer to and transfer out of crisis beds to ensure timely transfer and expeditious emptying of crisis beds. Other measures address medication and pharmacy issues as well as utilizing all available crisis, acute, and intermediate beds to ensure timely transfer of patients throughout the inpatient system. These initiatives, and Defendants' status on implementing them, are laid out in more detail in the Declaration of Katherine Tebrock.

### III. ISSUES THAT REQUIRE RESOLUTION BY THE COURT TO FACILITATE THE COLLABORATIVE WORKGROUP EFFORT.

Defendants developed initiatives and proposals that address the obstacles to compliance with current timelines. Both the obstacles and initiatives have been the focus of eight Special Master's workgroups, which resulted in some agreements concerning the scope of delays and acceptable solutions to address the causes of the delays. Nonetheless, the parties remain unable to resolve two core issues that impact the ultimate determination of whether, and to what extent, CDCR is in compliance with the Program Guide transfer timelines for crisis beds. First, the Court must grant CDCR the flexibility to refer patients to crisis beds only after an *in-person* clinical evaluation, along with the leeway to modify a policy implemented years ago that automatically triggers a crisis bed referral whenever an inmate is placed overnight in alternative housing. Second, in cases where the patient is admitted to a crisis bed at another institution, Defendants should be permitted to continue to consider the referral complete when the patient is "transferred," that is, placed on the medical transport vehicle en route to the other institution. Defendants should not be held to the impossible requirement of successfully squeezing multiple-hour transport times (which can vary considerably because of local traffic and weather conditions) within the already tight twenty-four timeframe in every single instance.

///

///

8

### A.  CDCR Must Be Able to Refer Patients to Crisis Beds Only After A Full In-Person Clinical Assessment Of The Patient.

The Program Guide requires referral to a crisis bed when the inmate-patient is "suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others . . . ." (Program Guide at 12-5-3; *see also* "Specific Treatment Criteria"). While nursing staff may conduct an initial evaluation, the decision as to whether a patient meets the Program Guide criteria and qualifies for a referral is entrusted with a clinician qualified to make this kind of determination, such as the inmate-patient's psychiatrist, psychologist, or the Chief of Mental Health. (Program Guide at 12-5-4.)

However, after hours — in the middle of the night, for example — clinicians may not be available on-site. (Weber Decl., Ex.1.) As a result, when a patient indicates after regular working hours that he or she is in need of crisis care, an on-call clinician, operating remotely, who does not directly communicate with the patient, usually must decide what to do. (Brizendine Decl. at ¶ 4.) Out of an abundance of concern for the patient's safety, the on-call clinician normally places the patient in alternative housing overnight, pending an in-person evaluation with the patient's clinician first thing in the morning. (Brizendine Decl. at ¶ 4.) Placement in alternative housing ensures that staff are able to maintain continuous direct, one-on-one visual observation of the patient during this period of crisis. (Brizendine Decl. at ¶ 4.)

But, in the context of ensuring thousands of patients timely access to care within an extraordinarily complex system, placement in alternative housing has collateral consequences. CDCR policy requires that anyone placed in alternative housing necessarily receive a referral to a mental health crisis bed, without exception. (Tebrock Decl. ¶ 36, Ex. 1). This policy memorandum is not part of the Program Guide and has been revised several times over the past few years. The result of this rule is that inmates who have not been clinically evaluated in-person are being automatically referred to crisis beds, but also are immediately inserted into a complex emergency referral process that has only twenty-four hours to be completed.

The consequence of this policy is that over half the inmates referred to a crisis bed overnight (from 5pm to 5am) are determined not to be in need of crisis bed referral after they are

evaluated in person by a clinician the following morning. (Weber Decl., Exs. 3 & 4.) In contrast, less than nineteen percent of crisis bed referrals made during regular working hours, which begin with an in-person evaluation, are rescinded. (Weber Decl., Exs. 3 & 4.) This is evidence that crisis evaluations made after hours, often made without direct patient-to-clinician contact, limits a clinician's ability to conduct assessments necessary to differentiate between an appropriate and inappropriate crisis bed referral. (Brizendine Decl. at ¶ 5.) These after-hours referrals make up the vast majority of all rescinded referrals statewide—seventy-three percent. (Weber Decl., Exs. 3 & 4.) And for each rescinded referral, the time and resources used to clear the inmate for transfer, identify an available bed, and transport the inmate are lost, causing unnecessary delays in making bed assignments for other class members. (Tebrock Decl. at ¶ 14.)

Defendants proposed two reasonable changes to address this serious issue. First, referrals to crisis beds should be made only after an in-person clinical evaluation. Second, Defendants propose modifying CDCR's current policy which automatically triggers a crisis bed referral upon placing an inmate in alternative housing overnight. CDCR has revised its alternative housing policy multiple times over the years, and the current state of affairs demands that further revisions be made. Such a policy change will enable CDCR to instead place an inmate in alternative housing without a crisis bed referral in after-hours cases where no in-person clinical assessment is possible, and require that an in-person assessment be made the following morning. CDCR will also ensure patient safety by maintaining the requirement that the patient receives continuous and direct visual observation until the in-person clinical evaluation and referral decision are completed.

Plaintiffs reject both proposals out-of-hand. But, contrary to what Plaintiffs argue, these proposals are consistent with the Program Guide and do not require the Program Guide to be amended. The Program Guide implicitly requires a full clinical assessment before a crisis bed referral, and Defendants do not here propose altering the twenty-four-hour timeframe once an inmate-patient is referred following the full assessment. Indeed, Defendants' proposals provide time for the clinician to work with the patient to determine whether a crisis bed is actually necessary, a scenario expressly contemplated by the Program Guide: "[n]ot all crises require

10

admission to the MHCB.  Crisis episodes for some inmate-patients may be handled on an outpatient basis." (Program Guide at 12-5-1.)

### B. Compliance with the Twenty-Four Timeline Should Not Hinge on Highly Variable and Unpredictable Traffic Conditions Affecting Transport Times of Patients To Crisis Beds Outside Their Home Institution.

The Program Guide recognizes a distinction between crisis-bed transfers within a single institution and transfers for admissions at a different institution.  For instance, in Chapter One at 12-1-16, the Program Guide states that CDCR has twenty-four hours to transfer a patient referred to a crisis bed. (*See also* Program Guide at 12-3-13, noting a transfer of a Correctional Clinical Case Management System patient must be "accomplished" within twenty-four hours.)  However, Chapter Five states that "[i]f the referring institution does not have a MHCB or there are no MHCB beds [sic] available where the inmate-patient is currently housed, the inmate-patient shall be transferred to a designated MHCB institution . . . within 24 hours of referral" and "[i]n most cases, movement from an institution to a MHCB shall be completed by institutional staff via special transport within 24 hours." (*Id*. at 12-5-3 and 12-5-4.)

Defendants historically reported on transfer timeline compliance by measuring the time between a patient's referral and the patient's placement on a special transport vehicle en route to another institution. (Weber Decl. Exhibit 3.)  This measure of Program Guide compliance is currently provided to the Court in the CDCR Mental Health Crisis Bed Patient Census and Waitlist Report, included as Exhibit C to the monthly Defendants' Census and Waitlist for Inpatient Mental Health Care report.  Defendants also report this measure of compliance in the Mental Health Crisis Bed Reports produced to the Special Master and Plaintiffs in Enclosure 7c as part of Defendants' monthly data. (Weber Decl., Exhibit 7 and ECF No. 5593 at 25; ECF No. 5594 at ¶ 9 & Ex. D.)

A policy that ends the twenty-four-hour timeline with placement on a special transport vehicle appropriately accounts for unavoidable traffic issues and avoids litigation over an exception based on traffic conditions, inclement weather, breakdowns and other unpredicted difficulties.  For example, litigating whether it was appropriate to make a timeline exception when a patient was stuck in traffic due to an unforeseen vehicle accident will require significant

motion practice, briefing, and adjudication, without advancing the overall goals of this lawsuit. And this policy already ensures patient safety as patients are transported in cars or special transport vans that provide a safe and secure environment. (Tebrock Decl. ¶ 20.)

Defendants' data shows that the average transportation time between institutions is just over four hours. But the data also shows that the transport time between the same two institutions can vary widely. (Weber Decl., Exhibit 4, at Exhibit F, MHCB Transportation and Bed Placement Timeframes.) For example, Defendants have no way to predict how long transfer times will take once the patient is placed on the special transport vehicle. Ending the clock at this time avoids unnecessary micro-management of every transportation event occurring within the system. Between March and June 2017, 1,562 referrals or forty-seven percent of all crisis-bed admissions were external transfers. (Weber Decl., Exhibit 4.) Consequently, if the Court rejects CDCR's current measure for external transfers, then traffic conditions and other problems that might prolong the transport should be covered by a new timeline exception to the Program Guide.

## CONCLUSION

The referral of patients to the Mental Health Crisis Bed program requires CDCR's clinical and custody divisions to quickly assess patients and perform significant casework to clear patients for movement to a crisis bed, all within twenty-four hours. CDCR performs this process daily for each of the thousands of patients referred to crisis beds each month. The systemic data demonstrates that, on average, CDCR is transferring patients to crisis beds within the Program Guide timeline. Thus, there is no basis to issue further orders that would insist on the unattainable goal of requiring perfect compliance with the transfer timeline in for each individual referred to crisis care. Nevertheless, Defendants are working diligently to improve the time it takes to transfer each patient, and proposed reasonable solutions to address obstacles identified by the workgroup.

Defendants request that the Court resolve the disputes posed in Section III by determining: (1) that a patient is considered referred for crisis bed treatment only after a clinician conducts an in-person evaluation and determines the referral is appropriate; and (2) that a referral that requires transport to another facility is complete when the patient is placed on the transport vehicle.

Defendants further request that the Court not issue any further orders and hold further proceedings in abeyance to allow the workgroup to continue its collaborative effort to resolve the transfer timeframe issues.

Dated: September 13, 2017				Respectfully submitted,

						XAVIER BECERRA
						Attorney General of California
						DANIELLE F. O'BANNON
						Supervising Deputy Attorney General


						*/s/ Elise Owens Thorn*
						ELISE OWENS THORN
						Deputy Attorney General
						*Attorneys for Defendants*

CF1997CS0003
33046282.doc