XAVIER BECERRA
Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD STEGEMAN, State Bar No. 225745
TYLER V. HEATH, State Bar No. 271478
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-4921
 Fax: (916) 324-5205
 E-mail:  Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF KATHERINE TEBROCK IN SUPPORT OF DEFENDANTS' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS** |

I, Katherine Tebrock, declare:

1.    I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR).  I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify.  I make this declaration in support of Defendants' Brief on Obstacles to Full Compliance with Program Guide Transfer Timelines for Crisis Beds.

1

1    2.    I was appointed as Deputy Director of the Statewide Mental Health Program in

2    November 2015.  I am familiar with the numerous and complex policies and procedures that

3    govern the prison mental health care delivery system.  I am also responsible for and supervise the

4    mental health system's headquarters and regional teams, and am familiar with *Coleman* mandates.

5    I previously served as Chief Deputy General Counsel of Policy with CDCR's Office of Legal

6    Affairs, where my duties included management and oversight of the health care legal team,

7    including the *Coleman* class action litigation.

8    3.    Under the supervision of the Special Master, CDCR participated in a collaborative

9    process with Plaintiffs to identify obstacles to full compliance with the twenty-four-hour timeline

10    for transfer of inmates to Mental Health Crisis Beds and possible solutions to overcome the

11    identified obstacles.  CDCR spent considerable resources to address the Court's April 19 order

12    and to improve its crisis bed referral system.

13    4.    At the Special Master's workgroups on June 26, July 10, July 17, July 24, August 4,

14    August 21, August 28, and September 6, 2017 the parties discussed Defendants' proposals,

15    including proposed exceptions for an addendum to the Program Guide and solutions to address

16    delays in crisis bed transfers.

17    5.    During the August 4, 2017 all-parties workgroup teleconference, CDCR also

18    described the implementation of the Crisis Intervention Team program and the success it has had

19    in reducing rates of rescission for crisis bed referrals.

20    **Mental Health Crisis Bed Data.**

21    6.    CDCR referred 15,268 patients to crisis beds in 2016 and 10,329 patients thus far in

22    2017 for an average of 1,280 referrals per month.  For the 2016 and 2017 year-to-date referrals,

23    8,669 patients were transferred to a crisis bed institution, 7,253 patients were internally admitted

24    into a crisis bed at their home institution, and 9,675 referrals were rescinded.

25    7.    The demand for crisis beds periodically outpaces the supply.  In 2001, CDCR had 182

26    crisis beds.  That number has grown to 449 today.  CDCR also acquired approval to build 100

27    new crisis beds in southern California within the next four years.

28

2

8.     According to the Health Care Placement Oversight Program's Endorsements and Referrals Tracking (HEART) system, in 2017, CDCR referred, on average 43 patients to crisis beds daily, admitted 27 patients to crisis beds daily, and discharged another 26 patients daily.

9.     The reports attached as Exhibit 7 to the Declaration of Nicholas Weber show that in June 2017, CDCR received 1,325 referrals to crisis beds, of which 390 patients transferred to crisis beds at different institutions, 443 patients were admitted to crisis beds at the referring institution, and 492 referrals (or 37% of referrals) were rescinded.  The 833 patients admitted to crisis beds were placed, on average, in a crisis bed within 21.94 hours – two hours faster than the twenty-four-hour Program Guide requirement.  Five-hundred and ninety patients or seventy percent (70%) were admitted to a crisis bed within twenty-four hours, waiting on average 11.87 hours.  For the 168 patients or twenty percent (20%) admitted between twenty-four and forty-eight hours, the average wait was 32.68 hours.  For the remaining ten percent (10%) of referrals, forty-three patients waited between forty-eight and seventy-two hours with an average wait time of 57.31 hours.  Thirty-two patients waited longer than seventy-two hours.

**The Mental Health Crisis Bed Referral Process.**

10.   The crisis bed referral process is overseen by CDCR's Health Care Placement Oversight Program (HCPOP).  The HCPOP Endorsements and Referrals Tracking (HEART) system is designed to track each step of the referral and transfer process for referrals to Mental Health Crisis Beds.  HEART is used to track and identify vacant crisis beds that are available for patient placement, redlined beds, and filled beds.  The data on bed availability in HEART is based on data from the Strategic Offender Management System (SOMS).

11.   The transfer of patients to Mental Health Crisis Bed level of care is extremely complex.  Many factors account for the complexity, including custody and medical issues, such as medical clearances, a patient's need for a hearing accommodation, Cocci clearance and disability accommodations.  CDCR clinicians and custody staff participate in the crisis bed referral process.

12.    The referral process poses challenges in meeting the twenty-four-hour transfer timeline for each individual.  CDCR tracks over forty data elements, including patient demographics, information required for the referral, and the referral outcome and timelines.

3

1    Local staff must provide headquarters sufficient information to affect the transfer.   As the

2    workflow attached as Exhibit 6 to the Weber Declaration indicates, HCPOP must make dozens of

3    inquiries to the crisis-bed institutions based on the individual needs for each referral.

4    Headquarters staff spend hours each day inputting data, assigning beds, and grappling with

5    rescissions, while also seeking out additional data from local institutions.  These challenges affect

6    headquarters staff overseeing rapid population movement, as well as their counterparts at the

7    local institutions in custody and mental health.

8          13.    Once a clinician makes the determination a patient needs crisis bed level of care, they

9    enter a level of care change in to the Electronic Health Record System, and send an e-mail to

10    HCPOP notifying them of the need for crisis bed placement.  The HCPOP Classification Staff

11    Representative enters all referrals it receives from the institutions in HEART, recording the

12    patient's CDCR number, the date and time of the referral, the referring institution, the reason for

13    the referral, and the patient's prior level of care.  Once a vacant bed is identified, the

14    Classification Staff Representative can "assign" it to a patient in HEART.  The date, time, and

15    location of the assignment is recorded.  HCPOP records the final disposition of all referrals (i.e.,

16    transferred, internally admitted, rescinded) in HEART.  Transfer timeline compliance is tracked

17    and monitored based on the date and time the referral is received and the date and time of final

18    disposition.  Final disposition is based on information in SOMS and for external transfers is the

19    date and time the patient leaves the referring institution.  For patients referred to a crisis bed at

20    their home institution or for internal referrals, final disposition is the date and time the patient is

21    placed in the Mental Health Crisis Bed housing program.

22          14.    HCPOP also uses HEART to monitor and track rescissions and each day the

23    Classification Staff Representative receives e-mails from the institutions that provide information

24    on rescissions and the date, time, and reason for rescission are entered into HEART.  Rescissions

25    cause delays at the institutional level by removing clinicians from direct patient care in order to

26    complete rescission paperwork.  Rescissions also cause delays at the headquarters level, leaving

27    HCPOP unable to identify true needs for placement until all rescissions are removed from

28    pending waitlists, and the waitlist is re-sorted and re-organized.

4

15.    HCPOP serves essentially like a central reservations unit ensuring that crisis beds located throughout the state at 20 different institutions are not double booked, as well as knowing which patient is on the way to which bed, which beds are closest to patients on the referral list, as well as knowing which patients are ready to be discharged and will be vacating a bed shortly.

16.    CDCR classification and parole representatives at the institution are also required to perform multiple tasks for each referral as detailed in the workflows for referrals to crisis beds, attached as Exhibit 6 to the Declaration of Nicholas Weber.  These tasks include but are not limited to:  planning for transportation of the inmate; clearing issues that could halt patient movement; contacting the receiving institution to confirm the patient is medically cleared for transport; contacting the sending and receiving institutions to provide the details of the transportation arrangements, including the coordination of all records, pharmacy needs and other items as necessary for each individual patient; completing the non-committee endorsement upon receipt of the transfer chrono (order) from mental health; contacting the receiving institution to ensure they were notified and can physically accept the inmate; and determining whether the receiving institution has any inmates that should be returned to the receiving institution.

**Electronic Health Records System**.

17.    In 2016, CDCR implemented and began activating a new system-wide electronic health records system, called the Electronic Health Records System or EHRS.  As of this filing, the system is active at 28 institutions and the entire system is expected to be fully activated and operational by November 2017.

18.    CDCR expects to gain efficiencies in the crisis bed referral process once the Electronic Health Record System is fully implemented.  The system is set up to automatically populate orders for crisis bed care once a referral is made, and for discharge from the crisis bed. The orders that will automatically populate include mental health consults, the admission and discharge process, level of care designation, Interdisciplinary Treatment Team processes, and crisis bed rescission processes.  The Electronic Health Record System workflows which detail the individualized operations that occur automatically with every crisis bed referral are attached as Exhibit 6 to the Declaration of Nicholas Weber.

5

**CDCR's Tracking and Reporting of Mental Health Crisis Bed Referrals.**

19.     Since at least as early as 2003, CDCR has measured and reported on the twenty-four-hour timeline for crisis-bed placement from the time of referral until the time of placement on a transport vehicle for all out-of-institution referrals to crisis beds.

20.     Patients transported to crisis beds outside of their home institutions are transported in cars or special transport vans that provide a safe and secure environment.

21.     CDCR has a system in place to track all referrals to crisis beds.  This includes the date and time of referral, the level of care, the referring and receiving institutions, the time the inmate was transferred from the referring institution and the time of admission.  CDCR generates reports based on this data in CDCR's Mental Health Crisis Bed Psych Aging Report (Monthly report 7a) and the MHCB transfers and rescissions for June 2017 (Monthly report 7c) which are provided at Exhibit 7 to the Declaration of Nicholas Weber.

22.     CDCR plans to have the Electronic Health Record System automatically transmit the institution's request for a crisis bed to HCPOP when the clinician enters the referral in the system. This will provide HCPOP with real-time access to the list of pending referrals which will eliminate the time it takes staff to manually create lists each day for crisis-bed referrals and expedite the referral process.  HCPOP will receive the pending-referrals list every morning and begin work to assign beds.  The Healthcare Placement Oversight Program will no longer need to wait for notification from institution clinical staff.  This will increase reliability of the information sharing process and the speed of the transmission of information.

23.     CDCR's current tracking and reporting systems provide CDCR with the data it needs to ensure oversight and compliance with Program Guide timelines.  Notwithstanding the current robust system, CDCR is committed to further improving its system to capture additional patient detail.  However, these systems are not designed to track the minutia required to assess whether an individual referral that occurs outside the Program Guide transfer timeline could qualify for an exception to the timeline.  Crisis bed referrals happen at a fast pace.  And many different staff have a role in the transfer process.  Tracking the process and movement during the twenty-four-

1  hour period for transfer to a crisis bed is not practical and would detract staff from doing their

2  important work.

3  **Defendants' Solutions to Identified Obstacles That Will Expedite Crisis Bed Transfers And**

4  **Improve The System.**

5      24.    Over the past year, CDCR assessed how best to ensure the proper use of crisis beds to

6  improve the flow of patients in and out of crisis beds and developed the following initiatives:

7          (a)    Expansion of Crisis Intervention Teams to reduce the number of after-hour

8  referrals through early clinical intervention.  This program is intended to reduce the number of

9  late night referrals and rescissions thereby increasing availability of crisis beds for those truly in

10  need.

11         (b)    Addition of Dialectical Behavior Therapy programs aimed at patients who

12  regularly and repeatedly require inpatient treatment. This should help redirect inmates who are

13  high utilizers of crisis beds and ensure they get the treatment and coping skills to avoid

14  unnecessary hospitalizations.

15         (c)    Additional trainings regarding clinical evaluations, treatment skills, case

16  formulation, patient triaging, and improving inter-disciplinary treatment teams to ensure

17  treatment goals are being identified and tracked.  By improving clinical skills in evaluating

18  inmates for crisis bed care and treating patients within the crisis bed, CDCR anticipates utilizing

19  the beds more efficiently and ensuring only patients in need are referred for hospitalization.

20         (d)    Increased after-hours staffing to triage potential crises and reduce the number of

21  referral rescissions.  After hours staffing will reduce unnecessary after-hours referrals thereby

22  reducing rescissions and delays in the bed assignment system.

23         (e)    Regionalization of MHCBs to reduce crisis bed readmission rates and to

24  decrease the time for inmate-patient transfers to an outside crisis bed ("clustering").  By

25  regionalizing the crisis beds, CDCR has substantially reduced the average travel time for inmates

26  sent to crisis beds at other institutions.  This ensures that patients access care faster.

27         (f)    Identification of local best practices, including after-hours staffing, behavior-

28  incentive programs, and pain-management programs.  By seeking out best practices at local

7

1  institutions, CDCR can develop system wide practices that will help with better crisis bed
2  utilization.

3      25. CDCR has also identified policy requirements that contribute to delay in patient transfers:

4      (a)    Existing policies require a clinical acceptance, documented on a specific form
5  referred to as a 128C, before a patient may be admitted to a crisis bed.  CDCR identified this
6  obstacle and immediately gave direction to staff to allow for transfer to a crisis bed prior to
7  receipt of the 128C.

8      (b)    Title 22 and existing CDCR policy require a medical clearance before a patient may
9  be transported to another facility which can contribute to delays in transferring patients.  CDCR
10 identified this obstacle and directed staff that unless an active medical hold is in place, the patient
11 can be considered safe to transfer.

12     (c)    Improved coordination of medication and pharmacy needs for discharged patients
13 waiting to transfer out of a crisis bed will also help expedite crisis-bed discharges. CDCR is
14 currently working with the *Plata* Receiver's office to resolve pharmacy issues.

15     (d)    CDCR is developing a policy to reflect these improvements to the referral process
16 and expects to submit it to the Special Master and Plaintiffs for review within the context of the
17 Special Master workgroup.

18     26.    The transportation process is a potential source for delays.  The process requires
19 numerous communications and steps that take place for each referral to achieve the physical
20 transportation of an inmate to a crisis bed at a different institution.  Some delays are an
21 unavoidable part of the transportation process.

22      (a)  To address this issue, CDCR conducted an analysis to determine the scope of the
23 problem, both system-wide and at individual institutions.  As a proposed solution, HCPOP has
24 added the local Administrative Officer of the Day to the notification for bed assignments.  This
25 will help with after-hour and weekend admissions as the officer will receive all bed-assignment
26 notifications from HCPOP and will be responsible to track referrals and patient movement daily
27 at the local level.

28

8

1    (b)    Another transportation issue that can slow the referral and admission of inmates to

2  crisis beds is the practice currently in place to transport discharged patients back to their home

3  institutions or to inpatient beds.  In an effort to move discharged inmates more quickly out of

4  beds, CDCR plans on purchasing an additional 23 vehicles.  CDCR has also committed to

5  increase staff to assist with the transport.

6    (c)    CDCR also has proposed discharging patients to the housing unit at the crisis bed

7  institution they are discharged from instead of waiting in a crisis bed for a transport to their home

8  institution

9  **Bed Availability.**

10    27.    CDCR has been working for some time to expand its supply of crisis beds.  CDCR

11  currently has 427 crisis beds for males and 22 crisis beds for females.  In addition to its long-term

12  plan to increase the overall supply, CDCR developed initiatives to meet the increased need for

13  crisis beds.

14    28.    Patients who are clinically discharged or ready to leave the crisis bed, remain in crisis

15  beds pending physical discharge, on "administrative days."  As discussed in paragraph 26(b), the

16  purchase of additional vehicles will expedite the physical movement of discharged patients

17  thereby reducing administrative days, and freeing up crisis beds for patients pending admission.

18    29.    Another factor that can impact the timely discharge of patients from crisis beds is the

19  practice of initiating Clozaril treatment when a patient is admitted to a crisis bed.  CDCR will

20  modify its policy so that Clozaril initiations occur only when the patient is admitted to acute or

21  intermediate care and not while in a crisis bed.  This will reduce the crisis-bed length of stay

22  caused by the added time needed to complete the Clozaril treatment and allow for other patients

23  to be admitted to crisis beds.

24    30.    Another means to open up available beds faster to new referrals is to start the

25  discharge process from a crisis bed to an acute or intermediate care bed sooner during the

26  patient's crisis bed stay.  CDCR is working with its clinicians to refer patients to acute or

27  intermediate care earlier in the crisis bed stay and to increase the timely discharge of patients

28  when appropriate.

31.    In response to the current intermediate and acute care waitlist, CDCR implemented the following measures to increase the flow of patients through the inpatient beds:

a.    CDCR began admitting patients to acute-care beds on weekends and after-hours to avoid having a patient wait extra days for admission;

b.    CDCR is actively reviewing all inmates in higher custody intermediate settings that are custodially eligible for multi-person cells, locked dorms or unlocked dorms; and

c.    CDCR has increased the census at California Medical Facility's L-1 unit to 55 patients as of September 12, 2017.

32.    As part of its effort to assess and improve the inpatient referral process and to move patients, when clinically appropriate, to their Least Restrictive Housing, CDCR sent its Regional Administrators to each of its inpatient programs to provide training and mentoring to the clinicians.  The Department of State Hospitals also sent some of its clinicians to the programs. CDCR expects that focused management of patients housed above their Least Restrictive Housing designation will open beds at higher levels of acuity and higher levels of custody.  This may have the effect of moving patients in crisis beds into inpatient beds more quickly, which would allow for increased utilization of the crisis beds by other patients.

33.    In August 2017, CDCR assessed whether it could change an intermediate care unit at the California Health Care Facility to an acute-care program.  CDCR then took immediate steps to expedite the change and flexed unit B208A, a 29-bed intermediate unit to an acute unit in its Psychiatric Inpatient Program.  CDCR activated the new unit and admitted twenty-nine patients between August 18 and 29, 2017.  Increasing the supply of acute care beds, expedites patients awaiting transfer there from crisis bed care.

34.    A lack of available crisis beds for female patients also contributes to CDCR's issues in compliance with transfer timelines.  In 2016, CDCR decided that Central California Women's Facility and the California Institution for Women would refer their patients only to their own crisis bed units.  Over time California Institution for Women's need for crisis beds was less than the need at the Central California Women's Facility.  In response, in August 2017, CDCR

1   authorized Central California Women's Facility patients referred to a crisis bed to use the

2   California Institution for Women crisis beds on an as needed basis.

3        35.    In August 2017, CDCR informed the Special Master and Plaintiffs' counsel that it

4   planned to encourage the full use of all crisis beds at the Central California Women's Facility by

5   placing two inmates in cells designed for double-celling.  CDCR intends to discuss this more

6   fully in the MHCB workgroup.

7   **After-Hours Referrals Resulting in Alternative Housing Placement.**

8        36.    Current policy does not allow placement of an inmate in alternative housing absent a

9   referral to a crisis bed. (See Ex. 1, Policy re: Housing of Patients Pending Mental Health Crisis

10  Bed Transfer, October 15, 2015.) This policy results in premature referrals, particularly when the

11  consultation is conducted after hours by an on-call clinician who must make a quick referral

12  decision based on discussion with other staff by telephone, but no direct interaction with the

13  inmate.

14

15       I declare under penalty of perjury under the laws of the United States of America that the

16  foregoing is true and correct.  Executed in Elk Grove, California on September 13, 2017.

17

18                                      _____/s/ *Katherine Tebrock* _____
                                        KATHERINE TEBROCK
19                                      Deputy Director, Statewide Mental Health
                                        Program
20                                      *(original signature retained by attorney)*

21

22

23

24

25

26

27

28