DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:  (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:  (415) 433-6830

RANJINI ACHARYA – 290877
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:  (415) 882-8200

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:  (415) 621-2493

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

   Plaintiffs,

v.

EDMUND G. BROWN, JR., et al.,

   Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' REPLY TO DEFENDANTS' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS**

Judge: Hon. Kimberly J. Mueller
Date: September 29, 2017
Time: 10:00 a.m.
Crtrm.: 3, 15th Floor

Case No. 2:90-CV-00520-KJM-DB
PLS.' REPLY TO DEFS.' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS

[3172680.6]

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

I. A FOCUSED ORDER RESOLVING THE THREE PENDING ISSUES IS NECESSARY TO CLEARLY DEFINE COMPLIANCE WITH THE PROGRAM GUIDE, AND TO AID THE COLLABORATIVE WORKGROUP PROCESS ........................................................................................ 2

II. DEFENDANTS CANNOT ESTABLISH ANY JUSTIFICATION FOR THEIR ALTERNATIVE HOUSING EXPANSION PROPOSAL THAT COULD POSSIBLY OUTWEIGH THE SIGNIFICANT HARM IT WILL CAUSE ......................................................................................................................... 3

    A. Defendants Ignore the Well-Documented Harmful Effects of Long Alternative Housing Stays. ........................................................................ 3

        1. Alternative Housing is Not Safe, Contrary to Defendants' Assertion. ............................................................................................... 5

        2. Defendants' Own Evidence Shows that Class Members Already Spend Too Much Time in Alternative Housing. ................... 7

    B. Even if the Additional Significant Harm to Class Members Could be Justified, Defendants Do Not Show How Their Proposal Will Measurably Improve MHCB Transfer Times. ............................................ 10

III. TRANSPORT BETWEEN INSTITUTIONS MUST BE INCLUDED IN THE EXISTING TWENTY-FOUR HOUR TIMELINE ....................................... 13

    A. Defendants Are Wrong that the Program Guide Allows for Their Proposed Measure of Compliance. ................................................................ 13

    B. Unforeseen Circumstances Will Be Covered by the Program Guide's Exceptions, and Will Not Require Litigation. ................................................ 14

IV. AUTOMATED TRACKING OF MHCB TRANSFERS IS NECESSARY, AND SHOULD BE PART OF THE COURT'S ORDER ..................................... 16

CONCLUSION ..................................................................................................................... 17

i   Case No. 2:90-CV-00520-KJM-DB
PLS.' REPLY TO DEFS.' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS

[3172680.6]

# INTRODUCTION

Defendants devote most of their brief to a plea to the Court to refrain from entering any enforcement orders or issuing sanctions regarding their ongoing noncompliance with the Program Guide's twenty-four hour requirement for transfers to Mental Health Crisis Beds ("MHCBs").  *See* Defendants' Brief on Obstacles to Full Compliance with Program Guide Transfer Timelines for Crisis Beds Including Issues Disputed with Plaintiffs' for September 29, 2017 Status Conference ("Defs' Brief"), September 13, 2017, ECF No. 5680 at 1-8.[1]  But that issue is not even before the Court at this time.  The parties agree that they should continue the collaborative process, which has been productive to date, before the Court considers whether it is appropriate to enter enforcement orders.  However, that collaborative process cannot move forward without resolution of the issues identified in the parties' Joint Status Report.  Joint Report Re September 28, 2017 Evidentiary Hearing Re: Timely MHCB Access ("Joint Status Report"), August 29, 2017, ECF No. 5669 at 6-10.

Defendants' discussion of their alternative housing proposal entirely ignores the elephant in the room:  Alternative housing is dangerous and counter-therapeutic, and extending its use is likely to lead to significant harm to patients.  Defendants' proposal will dramatically expand the time patients in need of crisis care spend suffering, without any treatment, in alternative housing this Court has deemed "totally inappropriate" for their mental health needs.  Order, April 5, 2013, ECF No. 4539 at 51.  Defendants fail to provide any countervailing evidence showing that their proposal is likely to lead to improved Program Guide compliance, and instead base their argument on faulty data and inflated statistics that their own underlying evidence does not support.  Defendants' request to expose class members to many additional hours, or even days, in alternative housing before they are referred to crisis care in the name of ill-defined and marginal-at-

---

[1] Citations to ECF documents are to the pagination of the PDF document.

1

Case No. 2:90-CV-00520-KJM-DB
PLS.' REPLY TO DEFS.' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS

[3172680.6]

best administrative efficiencies must be rejected.

Similarly, Defendants' proposal to modify formally the Program Guide's requirement that patients be placed into an MHCB bed within twenty-four hours is inconsistent with the Guide's clear language, and will harm patients in crisis by further delaying their much-needed treatment due to normal, fully predictable transport times endemic to Defendants' system. The proper way to address unforeseen circumstances outside of Defendants' control is through the exceptions process, and Defendants are incorrect that such a solution would involve time-consuming litigation in every instance.

Finally, although Defendants refuse to address the issue of their deficient tracking and reporting system in their brief, it is directly relevant to the parties' ability to develop a streamlined process for assessing claimed exceptions to the transfer requirement, and to enabling the Court to track compliance and identify obstacles thereto. It is important that the Court require Defendants to improve their tracking and reporting capabilities as soon as possible, in order for the parties' collaborative work to continue to move forward productively and so the Court can have a full understanding of the scope of non-compliance in case further orders on MHCB access barriers prove warranted.

## I. A FOCUSED ORDER RESOLVING THE THREE PENDING ISSUES IS NECESSARY TO CLEARLY DEFINE COMPLIANCE WITH THE PROGRAM GUIDE, AND TO AID THE COLLABORATIVE WORKGROUP PROCESS

Plaintiffs generally agree that the parties have made progress during the workgroup meetings that have occurred this summer, and are hopeful that several of the initiatives Defendants have undertaken or are considering, *see* Joint Status Report, ECF No. 5669 at 3-6, may significantly improve Defendants' ability to place patients in crisis in MHCBs within the Program Guide timeline. Plaintiffs fully intend to continue working collaboratively with Defendants, under the guidance of the Special Master, on identifying obstacles to compliance and testing various strategies for minimizing those obstacles.

Although Plaintiffs agree with Defendants that it is not yet appropriate or necessary for the Court to issue an enforcement order and begin imposing sanctions, Defs' Brief,

ECF No. 5680 at 2, 5, 13, that was never the intent of this briefing or the September 29, 2017 hearing.  *See* April 19, 2017 Order, ECF No. 5610 at 12-13 (focus of hearing is the set of unresolved issues related to obstacles to compliance and possible remedies that the parties were to identify); Joint Status Report, ECF No. 5669 at 7 (requesting briefing and declaration testimony in lieu of evidentiary hearing); September 1, 2017 Order, ECF No. 5670 (ordering briefing schedule).  It is still necessary, however, for the Court to resolve the three threshold issues identified in the Joint Status Report through a narrow and focused order.  Because all three issues pertain to how compliance should be measured and under what standards, this Court must resolve the instant issues to provide clarity to the workgroup proceedings, and to set a baseline understanding of what constitutes Program Guide compliance going forward in this case.

## II. DEFENDANTS CANNOT ESTABLISH ANY JUSTIFICATION FOR THEIR ALTERNATIVE HOUSING EXPANSION PROPOSAL THAT COULD POSSIBLY OUTWEIGH THE SIGNIFICANT HARM IT WILL CAUSE

### A. Defendants Ignore the Well-Documented Harmful Effects of Long Alternative Housing Stays.

Defendants' brief discusses at length the administrative challenges of managing crisis bed transfers, particularly as they relate to their long-standing policy requiring a referral to an MHCB prior to placement in alternative housing.  *See* Defs' Brief at 6-7, 9-10.  In fact, Defendants bemoan the "collateral consequences" of "placement in alternative housing" under the current policy, by which they mean the additional "time and resources" needed to generate a referral to a crisis bed that is sometimes later rescinded.  *Id.* at 9-10.

Yet Defendants completely ignore the true "collateral consequences" of housing patients experiencing a mental health crisis in alternative placements prior to referring them to MHCBs for placement within twenty-four hours.  At best, those consequences include an additional delay of hours or even days before suicidal, psychotic, or otherwise gravely disabled patients receive any treatment at all.  At worst, those consequences could include death.  Declaration of Krista Stone-Manista in Support of Plaintiffs' Opening Brief re: Obstacles to Timely Access to Mental Health Crisis Beds ("Stone-Manista Decl."),

ECF No. 5678, at ¶ 12 and Ex. G. at 29-30 (August 2017 California State Auditor report linking two recent suicides at CIW to the use of alternative housing); *see also* Decl. of Jane Kahn ISO Pls' Objections to Defs' Inpatient and MHCB Bed Plan, April 21, 2006, ECF No. 1790 at ¶¶ 15-22 (noting acts of self-mutilation and suicide while in unlicensed OHU beds); Expert Decl. of P. Stewart ISO Pls.' Opp. to Defs.' Motion to Terminate ("Stewart Termination Decl."), ECF No. 4381, Mar. 14, 2013, at ¶¶ 41-42, 394 (expert opining that use of alternative housing contributes to high suicide rates and that it discourages inmates from expressing suicidal ideation); Stone-Manista Decl. at ¶ 5 (recounting class member reports that harsh alternative housing conditions at SVSP discourage self-reporting of suicidality).

There is simply no justification for Defendants' proposal to expose acutely ill patients in need of emergency mental health care to significantly longer stays in conditions that are counter-therapeutic and likely to deter accurate reporting of symptoms, *see, e.g.*, July 21, 2011 Order, ECF No. 4044 at 4; Stewart Termination Decl. at ¶ 394, simply for the sake of achieving some minor administrative efficiency that may in fact be illusory.[2] Defendants' own evidence shows that many patients in crisis are already spending far too long—much longer than the twenty-four hours contemplated by the Program Guide—in dangerous alternative housing. And in any case, Defendants' brief is devoid of any evidence that the proposal would even achieve the efficiencies they claim.

---

[2] Defendants mischaracterize the current policy as "automatically trigger[ing] a crisis bed referral upon placing an inmate in alternative housing overnight." Defs' Brief at 10. The policy actually makes clear that a patient is to be evaluated by a clinician and referred to an MHCB, and only then may be placed in alternative housing. Stone-Manista Decl., Ex. B at 1-2 (24-25 of PDF). Defendants' framing of the policy is strange, given that their justification for their proposal is supposedly based on the onerous paperwork required to refer a patient to an MHCB.

4

Case No. 2:90-CV-00520-KJM-DB
PLS.' REPLY TO DEFS.' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS

[3172680.6]

### 1. Alternative Housing is Not Safe, Contrary to Defendants' Assertion.

Defendants attempt to justify their proposed policy change by claiming that it will still "ensure patient safety by maintaining the requirement that the patient receives continuous and direct visual observation until the in-person clinical evaluation and referral decision are completed." Defs' Brief at 10; *see also* Declaration of Brittany Brizendine in Support Thereof ("Brizendine Decl."), ECF No. 5680-9 at ¶ 9 (the "proposal ensures that patients are kept safe in alternative housing while they wait for an onsite face-to-face assessment the next morning"). But just weeks ago the Special Master's suicide prevention expert, Lindsay Hayes, reported that patients in alternative housing at Salinas Valley State Prison ("SVSP"), which had four completed suicides in 2016 (the highest in CDCR), were not being properly observed to prevent them from harming themselves on the day of his audit. *See, e.g.*, Second Re-Audit and Update of Suicide Prevention Practices, Lindsay Hayes, September 7, 2017 ("Hayes Second Re-Audit"), ECF No. 5672 at 9 (officers at SVSP providing 1:1 observation for patients in alternative housing were sitting in chairs that obstructed their view, and observation forms were not up to date); *see also* Stone-Manista Decl., Ex. G at 68-69 (208-209 of PDF) (noting SVSP's four suicides in 2016).

Furthermore, Dr. Brizendine's assertion that patients suffering from mental health crises who are held in alternative housing are provided with beds is manifestly wrong. *See* Brizendine Decl. ¶ 4 ("Patients placed in alternative housing are observed on a continuous basis and receive a suicide resistant bed, a safety blanket, and a safety smock."). The face of Defendants' own policy, which allows for the use of cells and holding cages without beds as alternative housing, belies her claim. Stone-Manista Decl., Ex. B at 2 (25 of PDF) (current alternative housing policy providing that patients in alternative housing be provided with a mattress, but not necessarily a bed, and allowing the use of holding cages for up to four hours); *see also* Hayes Audit of Suicide Prevention Practices ("First Hayes Audit"), January 14, 2015, ECF No. 5259 at 28 (noting that few OHUs contained beds, and

5   Case No. 2:90-CV-00520-KJM-DB
PLS.' REPLY TO DEFS.' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS

[3172680.6]

concluding that "[f]orcing an inmate to sleep on a mattress on the floor can only exacerbate the suffering of those who are suicidal and/or mentally ill"). While Defendants recently agreed to implement Mr. Hayes's recommendation to increase the use of suicide resistant beds, those beds need only be provided *after* a patient in crisis has already been held in alternative housing for over twenty-four hours, in contravention of the Program Guide's requirement that they be placed in a crisis bed in that timeframe. Hayes Second Re-Audit at 7-8.

Indeed, Mr. Hayes reported just this month that several institutions he visited during his recent suicide prevention re-audit placed suicidal patients in need of crisis care in alternative housing cells without beds. *Id.* at 8-9. Not only do Defendants deny patients in need of MHCB care beds in alternative housing, Mr. Hayes observed class members in crisis held in 3-foot-diameter cages without toilets or sinks, much less beds, at multiple institutions for eight to ten or more hours at a time, and sometimes overnight. *Id.*; *see also* Stone-Manista Decl. ¶ 5 (recounting SVSP class member reports of being held in freezing holding cells while awaiting crisis care, which they stated made them disinclined to report suicidality in the first place, and more likely to retract reports of suicidality (even if they were still experiencing it) to escape the harsh conditions). For almost a year, class members at the California Substance Abuse Treatment Facility ("SATF") awaiting emergency mental health treatment were handcuffed to gurneys for days on end with no ready access to toilets, and were denied showers unless they were held in this tortuous fashion for more than three days. Hayes Second Re-Audit at 9. One class member waiting to be admitted to an MHCB was held in this manner for four days. *Id.* After urinating on himself while handcuffed to the gurney on the fourth morning of his stay in alternative housing, this class member's crisis bed referral was rescinded, meaning he was sent back to regular housing after this prolonged suffering without ever receiving any treatment at all. *Id.* And these deeply inhumane practices all occur against the backdrop of increasingly long alternative housing stays. *See id.* at 8.

But fundamentally, even if CDCR were to keep every patient experiencing a mental

health crisis on direct, continuous observation and provide them with a bed, those patients would still not be "safe" in alternative housing, because patients in alternative housing do not receive any mental health *treatment* for their mental health emergencies.  In an MHCB, patients receive individualized treatment planning, medication evaluation and management, nursing care, therapy and counseling, rehabilitation therapy, and after-care planning.  *See* Program Guide at 12-5-11 to 12-5-15.  Patients receive none of those in alternative housing, because alternative housing placements lack clinical staffing.  Instead, patients are exposed to harsh conditions in alternative housing settings that are counter-therapeutic and likely to exacerbate their conditions and/or incentivize them to disclaim their actual symptoms while actual mental health treatment is delayed.  *See, e.g.*, First Hayes Audit, ECF No. 5259 at 28; Stewart Termination Decl., ECF No. 4381 at ¶¶ 41-42, 394.  Although Defendants are correct that the Program Guide contemplates that some patients experiencing a mental health crisis do not require the MHCB level of care, *see* Program Guide at 12-5-1, it is far preferable for those patients to be referred even if their condition improves before they transfer than for all patients identified by Defendants' clinicians as needing crisis care to further decompensate while they wait in alternative housing for an in-person referral.  Defs' Brief at 10-11.

### 2. Defendants' Own Evidence Shows that Class Members Already Spend Too Much Time in Alternative Housing.

Defendants cite statistics regarding their system-wide compliance with the Program Guide's twenty-four hour timeline to argue that their current practices are sufficient to meet constitutional standards.  Defs' Brief at 2; *see also id.* at 6.  Those numbers, however, actually demonstrate the serious and increased danger to the class posed by Defendants' alternative housing proposal.  According to Defendants, for the month of June 2017, seventy-one percent of patients "were admitted to a crisis bed" within twenty-four hours—meaning twenty-nine percent were not.  *Id.* at 6.  Twenty percent of patients—one in five—were admitted between twenty-four and forty-eight hours that month, and their average wait time was 32.68 hours.  *Id.*  Nine percent of patients—almost one in ten—

waited between forty-eight and seventy-two hours, with an average wait time of 57.31 hours. *Id.* "Only" thirty-two patients referred for crisis care in June, or approximately four percent, waited more than seventy-two hours in this single month alone. *Id.*

These numbers starkly illustrate that Defendants are not even coming close to placing all patients who have been referred for crisis care in MHCBs within twenty-four hours as required by the Program Guide, and in fact undercount the extent of the delays to an unknown degree because Defendants count many placements as timely even when the patient still has to wait several additional hours past the twenty-four hour limit on a van before actually receiving care. *See* Section III, *infra*. In fact, even as the MHCB workgroup has been meeting regularly to address these issues, Defendants' compliance has not improved, as its August waitlist snapshot report for MHCB transfers is particularly dismal. *See* Defendants' Mental Health Crisis Bed Coleman Patient Census and Waitlist Report as of August 28, 2017, ECF No. 5684 at 12 (as of August 28, 2017, 76% (13/17) of pending referrals for female patients were over twenty-four hours, and 36% (14/39) of pending referrals for male patients to MHCBs were over twenty-four hours). That means a very significant percentage of patients in crisis—twenty-nine percent in June 2017— already spend more time in the harsh, counter-therapeutic conditions of alternative housing than the maximum time Defendants have determined is acceptable "to meet their Eighth Amendment obligations." April 19, 2017 Order, ECF No. 5610 at 11.

Defendants blithely assert that the additional time class members would suffer in alternative housing under their proposed expansion policy would be "brief." Brizendine Decl. ¶ 9. Yet Defendants do not deny that patients could be made to wait as many as fifteen additional hours on weeknights in some institutions, and apparently as long as sixty-three additional hours if their crisis occurs on a weekend. *See* Declaration of Jessica Winter in Support of Plaintiffs' Opening Brief re: Obstacles to Timely Access to Mental Health Crisis Beds ("Winter Decl."), ECF No. 5679 ¶¶ 2-3 and Ex. A at 2-4 (8-10 of PDF).

In fact, Defendants' proposal is even broader: Because it would generally prohibit a referral to an MHCB until "after an in-person clinical evaluation," even patients who

experience a crisis during normal business hours, but whose on-site clinician happens to be unavailable to conduct an in-person evaluation, could be held in alternative housing during business hours for an unknown period of time before they are referred.  Defs' Brief at 10; *see* Brizendine Decl. at ¶ 4 (explaining that when on-site clinician is unavailable, an on-call clinician conducts the evaluation, even if not after-hours).  That means that if a patient is unfortunate enough to require crisis care when an on-site clinician is unavailable during the day, he or she could be kept in alternative housing for the remainder of the day and overnight, until an on-site clinician arrives the next morning.

Indeed, Defendants' alternative housing proposal has the possibility of operating as a giant loophole that further obscures the harm patients suffer from Defendants' chronic understaffing of its facilities.  *See* Special Master's Report on Defs' Staffing Plan, Feb. 6, 2017, ECF No. 5564 at 2, 28 (noting "long and tortured history behind CDCR's struggle to implement a viable staffing plan for the provision of adequate mental health treatment," and describing Defendants' efforts to maintain adequate clinical staffing as "never sufficient or long-lasting"); *see generally* Plaintiffs' Objections and Request for Additional Relief re: Special Master's Staffing Report, March 30, 2017, ECF No. 5590 (describing generally Defendants' resistance to various recommendations to improve clinical staffing and recounting harm to class members caused by deficient staffing); Defs' Response to the Special Master's Report on Defs' Staffing Plan, March 30, 2017, ECF No. 5591 at 4, 13-17 (objecting to recommendations requiring efforts to improve staffing).  The proposal further dis-incentivizes Defendants from employing adequate clinical staff, as it would give Defendants carte blanche to delay in-person evaluations indefinitely during the day if on-site staff are "unavailable" for any reason, including understaffing, and to forego hiring on-site staff to perform evaluations during after-hours shifts.  If Defendants are convinced that only in-person evaluations are sufficient, they should staff their prisons with clinicians who can perform that task any time of day for these emergency cases, or require on-call clinicians to come to the prison in lieu of a telephonic consult.  If they cannot or will not do so, *Defendants* should bear the cost associated with a minor uptick in referrals—to the

9   Case No. 2:90-CV-00520-KJM-DB
PLS.' REPLY TO DEFS.' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS

[3172680.6]

extent increased rescissions can even be linked with on-call evaluations—not class members who are already suffering for far too long in bleak, counter-therapeutic alternative housing settings.

In sum, even if Defendants' proposed policy change were the magic bullet that would solve their MHCB transfer issues, which it is not, *see* section II.B, *infra*, it would still not be justifiable because it promises to expand by up to multiple days the time class members spend in dangerous alternative housing placements without any treatment for the psychiatric conditions that landed them in crisis.

### B. Even if the Additional Significant Harm to Class Members Could be Justified, Defendants Do Not Show How Their Proposal Will Measurably Improve MHCB Transfer Times.

Much of Defendants' argument in support of the proposed change to the existing alternative housing policy rests on their assertion that "crisis evaluations made after hours, often made without direct patient-to-clinician contact, limits [sic] a clinician's ability to conduct assessments necessary to differentiate between an appropriate and inappropriate crisis bed referral," and are more likely to result in rescinded referrals. Defs' Brief at 10. Defendants still have not produced any data showing that an in-person evaluation is measurably better at producing a "necessary" MHCB referral than an on-call clinician's evaluation by phone in consultation with an on-site nurse. Dr. Brizendine claims, without citation to any evidence or data, or even any explanation beyond her mere assertion, that face-to-face evaluations are "preferable … to determine each patient's risk of harm and necessary level of care." Brizendine Decl. at ¶ 6. But even if an in-person evaluation is "preferable," that does not mean an on-call clinician's evaluation in consultation with an on-site nurse is inherently deficient. Indeed, in the only example she cites—of a patient who "require[s] a short time away from [his or her] housing unit"— Dr. Brizendine fails to explain why an in-person consultation by a nurse combined with a telephone evaluation by an on-call clinician could not determine that the patient simply needs a break from his or her housing. If an on-call clinician has any doubt about a patient's need for MHCB care after conducting a phone evaluation after-hours, he or she could and should come to the

institution immediately and evaluate the patient in-person.

Moreover, the statistics Defendants cite in support of their proposal are misleading and uninformative.  First, they rely on comparisons between referrals made between 5 a.m. and 5 p.m. and between 5 p.m. and 5 a.m. as a proxy for drawing comparisons between in-person and by telephone evaluations.  Defs' Brief at 9-10.  Yet their own staffing information shows that no institution has on-site clinicians available as early as 5 a.m., and at many institutions, clinicians are available in person past 5 p.m., so the proxy is inherently faulty—the statistics have necessarily captured some in-person evaluations in the after-hours numbers, and have included some on-call evaluations in the peak hours numbers.  Winter Decl., ¶¶ 2-3 and Ex. A at 2-4 (8-10 of PDF).  The proposed solution to the "problem" of referrals made by on-call clinicians does not match the actual data presented.

Second, even if the data accurately mapped the purported "problem," the statistics cited are not supported by Defendants' underlying evidence.  Defendants' brief claims that "over half" of patients referred between 5 p.m. and 5 a.m. "are determined not to be in need of crisis bed referral after they are evaluated in person by a clinician the following morning," while "less than nineteen percent" of referrals made between 5 a.m. and 5 p.m. are rescinded, pointing generally, without page citation, to the 37 pages comprising Exhibits 3 and 4 to the Declaration of Mr. Weber.  Defs' Brief at 10.  Those exhibits are July 21 and August 2 letters Defendants sent during the workgroup process, with data regarding rescission rates discussed and/or attached.  *See* Weber Decl., Ex. 3 at 6 (17 of PDF) and Ex. 4 at 4, 18 (31 and 45 of PDF).

Only Exhibit 4 provides any data comparing rescission rates for after-hours and peak hours referrals.  But it shows that 25.9 percent—not "over half"—of referrals made between 5 p.m. and 5 a.m. are rescinded, while 9.3 percent of those made between 5 a.m. and 5 p.m. are.  *Id.* at 18 (45 of PDF).  Nowhere in Defendants' declaration or documentary evidence is there support for the proposition that more than fifty percent of referrals made after-hours are rescinded, making Defendants' conclusions from their

11

mismatched data even more suspect. The sixteen-percent differential between "peak" hours and "after-hours" referrals shown by Defendants' data, even if that differential could be linked to some deficiency in on-call referrals, hardly justifies the dramatic expansion of alternative housing this Court has deemed "totally inappropriate for a person in need of a mental health crisis bed." April 5, 2013 Order, ECF No. 4539 at 51. That is especially true given that the overwhelming majority—more than seventy-four percent—of class members who are referred during "off peak" hours are confirmed to require MHCB care the next morning, as their referrals are not rescinded. Weber Decl., Ex. 4 at 18 (45 of PDF).

Finally, even if Defendants' statistics supported their story, they still would not explain how the best case scenario of eliminating a mere sixteen percent of all rescissions could measurably improve class members' timely access to crisis care. Defendants' claim that rescinded referrals require "time and resources" and cause "unnecessary delays in making bed assignments for other class members," Defs' Brief at 10, is undermined by other evidence promising they are making the MHCB referral process more streamlined and efficient. For example, Dr. Brizendine's declaration explains that "unnecessary" referrals require certain administrative steps and paperwork including a "Medical Clearance for Transfer." Brizendine Decl. at ¶ 8. Yet elsewhere, Defendants note that they have "largely eliminat[ed] medical clearances" in order to expedite transfers. Defs' Brief at 8. Deputy Director of the Statewide Mental Health Program Katherine Tebrock also testifies about efficiencies Defendants will gain in the referral process for MHCBs once Defendants' Electronic Health Record System is fully implemented, including additional automation that will reduce staff time. Declaration of Katherine Tebrock in Support of Defendants' Brief on Obstacles to Full Compliance with Program Guide Transfer Timelines for Crisis Beds ("Tebrock Decl."), September 13, 2017, ECF No. 5680-10 at ¶ 18. And in any event, Defendants have available to them many ways to target rescissions or improve administrative efficiencies, without increasing patient suffering by dramatically increasing alternative housing stays and further delaying crisis treatment. *See*

12
Case No. 2:90-CV-00520-KJM-DB
PLS.' REPLY TO DEFS.' BRIEF ON OBSTACLES TO FULL COMPLIANCE WITH PROGRAM GUIDE TRANSFER TIMELINES FOR CRISIS BEDS

[3172680.6]

Plaintiffs' Opening Brief re: Obstacles to Timely Access to Mental Health Crisis Beds, September 13, 2017, ECF No. 5677 at 18-19.

Nothing in Defendants' brief or evidence shows how Defendants' proposal will have a significant impact on MHCB capacity or transfer timeliness, and certainly nothing shows how the increased time patients will spend in the harsh conditions of alternative housing could possibly be justified. The proposal should be rejected.

### III. TRANSPORT BETWEEN INSTITUTIONS MUST BE INCLUDED IN THE EXISTING TWENTY-FOUR HOUR TIMELINE

Defendants' only rationalization for their interpretation of the Program Guide's clear language regarding transfers to external crisis beds is that they do not currently comply with the deadline and doing so would be difficult. *See* Defs' Brief at 3. Yet Defendants cannot justify a modification of the entire rule—which is premised on the outer limits of what the Eighth Amendment can tolerate—on concerns about traffic and unpredictable weather in California, when they have never tried to build in even the regular transport time for external placements into the twenty-four hour deadline. *See* April 19, 2017 Order, ECF 5610 at 11. Defendants are incorrect that the Program Guide allows them to count patients as receiving crisis care when they are really just on a van receiving no treatment at all. And while Defendants may well be right that sometimes unforeseen circumstances will prevent them from completing a transfer within the timeline, those situations can be addressed efficiently through the exceptions process the parties have already begun developing with the Special Master at this Court's direction.

#### A. Defendants Are Wrong that the Program Guide Allows for Their Proposed Measure of Compliance.

Defendants attempt a tortured reading of the Program Guide's clear and heavily negotiated language in order to move the goalpost so that compliance will be easier to achieve. But even though they apparently decided at least fourteen years ago—without notice to Plaintiffs, the Special Master, or the Court—to apply their chosen metric, *see* Tebrock Decl. ¶ 19, it is not supported by the text this Court ultimately ordered.

Defendants correctly point out that the Program Guide acknowledges that some patients requiring crisis care will need to be transferred to other institutions. Program Guide at 12-5-3 to 12-5-4; *see also* Defs' Brief at 11. There is no distinction, however, in how the twenty-four hour timeline should be calculated for such placements; the Program Guide still specifies that for external placements, "[t]he inmate-patient shall be *transferred* within 24 hours of referral." *Id.* at 12-5-4 (emphasis added). It is true that the Program Guide anticipates that external placements will not occur within twenty-four hours 100% of the time, but it still sets an expectation that the general rule is that even external placements should be "completed" by twenty-four hours. *Id.* at 12-5-4; *see also id.* at 12-3-13 (mandating that transfers of CCCMS patients be "accomplished" within twenty-four hours of referral—accomplished means completed, not started).

### B. Unforeseen Circumstances Will Be Covered by the Program Guide's Exceptions, and Will Not Require Litigation.

The Court's April 19 Order instructed the parties, through the Special Master's workgroup process, to "develop an addendum to the Program Guide delineating exceptions, if any, to the twenty-four hour timelines requirement." April 19, 2017 Order, ECF No. 5610 at 13. The workgroup meetings will continue until November 2017, *see* Joint Status Report, ECF No. 5669 at 7, and a focus will be on agreeing on a clearly delineated set of exceptions to the twenty-four hour timeline. *See* Parties' Stipulated Request to Extend the Deadline to File an Addendum to the Program Guide re: MHCB Timeline Exceptions and to Continue the August 29, 2017 Evidentiary Hearing and Related Deadlines, July 27, 2017, ECF No. 5653 at 4-5. Once an addendum has been adopted, the parties will be able to apply any relevant exceptions straightforwardly and without "significant motion practice, briefing, and adjudication," contrary to Defendants' claim. Defs' Brief at 11-12.

For example, during the workgroup process, Plaintiffs have suggested several possible exceptions to the Program Guide requirement so long as they are properly limited in scope, including an "other" category, which would be "confined to unusual and

unforeseeable circumstances out of Defendants' control," including traffic "due to an unforeseen vehicle accident" or unexpected inclement weather that makes transport challenging. Winter Decl., ECF No. 5679, Ex. C at 11 (30 of PDF); Defs' Brief at 11. If an individual transport to an external institution's MHCB took longer than twenty-four hours due to unexpected traffic or weather, the parties would be able to determine immediately—using information regarding the expected average transfer time between the two relevant institutions—whether the transfer falls into an exception or should be counted as an instance of Defendants' noncompliance.

Of course, the ability to have a streamlined, efficient exceptions process that does not inhibit "advance[ment of] the overall goals of this lawsuit," as Defendants fear, depends heavily on whether Defendants improve their tracking system for transfers. Defs' Brief at 12. During the workgroup process, Defendants manually compiled data regarding transport times for a five day period in June, *see* Weber Decl., Ex. 4 at Ex. E (39-43 of PDF), but when Plaintiffs asked for data for a month-long period—to be able to see trends for all institutions and for weekend referrals—Defendants stated they lacked any mechanism to produce such data. Winter Decl., ¶ 12. The upshot is that Defendants have no idea how long patients in need of crisis care spend without any treatment on a van en route to an MHCB, and therefore cannot meaningfully engage in a process to parse out whether any of that time is a consequence of unexpected events such that an exception might apply. Until this deficiency is remedied, it will be impossible for the parties to develop an evidence-based "other" exception, which takes into account the expected time for transfers between various institutions to incorporate into the twenty-four hour timeline.

It is simply not acceptable, however, for certain unpredictable events preventing a speedy transfer in a subset of cases to justify an extension of the entire twenty-four hour rule for all patients in crisis. Defendants claim that "[e]nding the clock [at the time of placement on a vehicle] avoids unnecessary micro-management of every transportation event occurring within the system." Defs' Brief at 12. But micro-management of every transportation event is actually necessary to avoid a system under which the norm is that

patients going to MHCBs outside of their home institution must wait significantly longer than twenty-four hours before receiving any care, and for a period of time Defendants do not even track. Rather than move the target for all patients, Defendants must focus their efforts on continuing to experiment with initiatives that will improve the efficiency of the referral and transfer process, so that they can comply with the clear dictates of the Program Guide and provide patients with timely access to emergency mental health care.

## IV. AUTOMATED TRACKING OF MHCB TRANSFERS IS NECESSARY, AND SHOULD BE PART OF THE COURT'S ORDER

Defendants decline to address the third topic identified in the parties' joint status report: Defendants' deficient data tracking system that does not have the capability to track transfers to MHCBs automatically or to generate system-wide reports. *See* Joint Status Report, ECF No. 5669 at 9-10. They assert that the issue "is best left resolved in the workgroups themselves." Defs' Brief at 3. But the parties have made no progress on this issue in the multiple months of workgroup meetings because, as they admit, Defendants currently have no way "to automate tracking of crisis bed referral timelines, including reasons for delays," Winter Decl. Ex. F at 2 (60 of PDF), and the most they have agreed to do is "review their reporting systems." *See* Joint Status Report, ECF No. 5669 at 10; *see also* Plaintiffs' Response to March 24, 2017 Order re: Enforcement of Timelines for Access to Inpatient Care, April 7, 2017, ECF No. 5593 at 25 (showing that Plaintiffs have been asking for months for more precise reporting regarding MHCB transfers). As such, the parties and Special Master, and ultimately this Court, lack the data and reporting necessary to assess Defendants' compliance or, for external transfers, to understand the magnitude of their non-compliance. It is also extremely difficult to identify and remedy obstacles to compliance or identify trends, or to evaluate any claimed exceptions to the Program Guide, which the parties have not even begun to discuss because Defendants lack the means to generate them.

For the reasons articulated in their opening brief and in Section III.B. above, Plaintiffs renew their request for an order requiring Defendants to develop a system to

track MHCB transfers accurately and to generate automatic reports that will be provided to the Special Master and Plaintiffs as part of the monthly data.  Although Plaintiffs are willing to work collaboratively with Defendants under the guidance of the Special Master regarding the specific mechanisms of any data tracking and reporting system, court intervention is necessary to ensure that Defendants take immediate action to implement such a system, so that it might be available sometime in the foreseeable future.

## CONCLUSION

Plaintiffs reiterate their request for an order encompassing the relief requested in their September 13, 2017 Opening Brief.  ECF No. 5677 at 26.

DATED:  September 19, 2017   Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Lisa Ells*
    Lisa Ells

Attorneys for Plaintiffs