XAVIER BECERRA
Attorney General of California
WILLIAM C. KWONG
Acting Senior Assistant Attorney General
DANIELLE F. O'BANNON
JAY C. RUSSELL
DAMON MCCLAIN
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD A. STEGEMAN, State Bar No. 225745
TYLER V. HEATH, State Bar No. 271478
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7318
  Fax:  (916) 324-5205
  E-mail:  Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' REPLY TO PLAINTIFFS' OPENING BRIEF REGARDING OBSTACLES TO TIMELY ACCESS TO MENTAL HEALTH CRISIS BEDS** |

## INTRODUCTION

Over the last several months, Plaintiffs and Defendants have productively worked together to identify various obstacles to complying with the Program Guide's twenty-four-hour transfer timeline for Mental Health Crisis Beds (MHCB).  With respect to one obstacle, however, there is vehement disagreement.

1

1    Defendants argue that when significant numbers of inmate referrals to mental health crisis

2    beds are rescinded, *Coleman* class members who are truly in need of timely care pay a price.

3    Large numbers of rescissions force an already stressed system that is scrambling to move

4    hundreds of patients into crisis beds within just twenty-four hours—often from one institution to

5    another—to waste time and resources preparing to transfer inmates who do not actually need a

6    crisis bed.  The result is delayed care, misallocated resources, and a system that struggles to get

7    ahead of the problem.  To remedy this, Defendants propose a common sense change in policy:

8    going forward, crisis bed referrals should be determined by in-person clinical evaluations of an

9    inmate and their symptoms, not by an arbitrary rule that automatically triggers a referral after-

10    hours if clinicians are unavailable to see a patient in distress.

11    Plaintiffs' objections fail to persuade.  First, Plaintiffs disagree at the threshold that high

12    rescission rates matter in any real way, casually glossing over the deleterious effect of thousands

13    of rescissions.  Second, Plaintiffs rely on faulty statistical analysis to paint a fundamentally

14    inaccurate picture of the problem.  Finally, Plaintiffs sidestep the real policy choice confronted by

15    Defendants—should an in-person clinical evaluation or an arbitrary rule determine a referral to

16    the highest and most expensive level of care in the state's correctional mental health system?—

17    and instead attempt to draw the Court into a false debate about the suitability of alternative

18    housing for treating mental health crises.

19    This Court should also reject Plaintiffs' attempt to effectively rewrite the Program Guide

20    and to alter the longstanding practice of treating transfers to external institutions as complete

21    when the patient is placed on a medical transport vehicle.  The Program Guide is clear that

22    movement to an external institution should be completed "in most cases," but not necessarily in

23    all cases.  Plaintiffs disagree, and now seek to move the goalposts, making compliance with the

24    Program Guide's twenty-four-hour timeframe even less achievable.

25    Finally, Plaintiffs' request for a court order to create a new tracking and reporting system,

26    as well as additional reports, duplicate much of the information that is already exchanged between

27    the parties and are beyond the scope of the April 19 order.

28

For the reasons stated below, the court should permit Defendants to implement the Proposal for a sufficient period of time to determine whether it has its intended effect, deny Plaintiffs' requests, and allow the parties to complete the process started within the Special Master's workgroup.

## I. DEFENDANTS' PROPOSAL TO COMPLETE CRISIS BED REFERRALS AFTER AN IN-PERSON CLINICAL ASSESSMENT IS REASONABLE, EMPIRICALLY-DRIVEN, AND DOES NOT REQUIRE WHOLESALE CHANGES TO CURRENT POLICIES OR PRACTICES.

As Defendants explained in their September 13 brief, requiring an in-person clinical evaluation of each patient before they are referred to a mental health crisis bed is sound policy that mirrors community practices and reflects the Program Guide's assessment that "[n]ot all crises require admission to the MHCB. Crisis episodes for some inmate-patients may be handled on an outpatient basis." (Program Guide at 12-5-1). Defendants have found that the current system does not provide clinicians sufficient time with after-hours referrals to do the work-up necessary to place all patients in the right bed, which forces premature referrals in some individual cases. A policy that allows clinical judgment to be appropriately exercised, and for certain patients, allows crisis episodes to be resolved overnight in a safe setting without an automatic referral to a crisis bed, should not be considered radical or earth shattering.

And yet, Plaintiffs aggressively mischaracterize Defendants' Proposal and offer a parade of horribles that has no basis in fact. As Defendants explain below:

- Their Proposal is necessary to alleviate an important obstacle to meeting the twenty-four-hour crisis bed transfer requirement—namely, the significant volume of after-hours referrals that are rescinded every day, complicating bed assignments and delaying for hours the timely placement of other class-members in crisis beds;

- Alternative Housing conditions are safe and are closely monitored by the *Coleman* Special Master and Suicide Expert; and

- Plaintiffs' fears of class-members languishing in Alternative Housing over the weekend or for sixteen hours or without access to bathrooms are unfounded. [1]

---

[1] Plaintiffs additionally argue that the Proposal exceeds the scope of the April 19 order. They are mistaken. The Proposal fits squarely within the parameters of the Court's order, which directed the parties to discuss issues related to obstacles to full compliance with the twenty-four-hour timeline for transfer to Mental Health Crisis Beds, including the use of alternative housing.

(continued…)

3

1   Defendants are committed to shrinking the time it takes to transfer individual patients to a

2   crisis bed, and the Proposal reasonably improves the referral process and patient access to the

3   limited crisis bed resource.  As Defendants discussed in their opening brief, the systemic data

4   shows that on average patients are transferred to a crisis bed in slightly less than twenty-two

5   hours.  Moreover, nearly three-quarters of all patients are transferred within the 24-hour Program

6   Guide timeline.  Based on the systemic data, Defendants believe that continuing the progress of

7   the workgroups is the best path forward for making systemic improvements and there is no basis

8   or need for the Court to issue further enforcement orders.

9       **A.   The Excessive Number of Rescissions Driven By After-Hours Referrals
        Causes Significant Delay and Waste, and Can Be Effectively Remedied
10       Through A More Thoughtful Policy**

11   Defendants' Opening Brief pointed to data showing that over half of the crisis bed referrals

12   made in the after-hours period when clinicians are often unavailable for in-person evaluations are

13   rescinded.  The data indicates that *these* rescissions amount to the overwhelming majority of all

14   rescissions.

15   In response, Plaintiffs argue that Defendants' Proposal is an "outsized and inappropriate

16   response to a problem that does not need to be fixed."  (ECF No. 5677 at 15.)  But Plaintiffs'

17   argument is based on clearly inaccurate statistics, which in turn lead Plaintiffs to vastly understate

18   the magnitude of the problem.  Plaintiffs then compound their error by glossing over the

19   deleterious effect of thousands of rescissions on an already stressed system.

20   To argue that Defendants' focus on rescissions is "misplaced," Plaintiffs claim that

21   Defendants' data shows that "approximately 25% of all after-hour referrals are rescinded" and

22   that "75% of all after-hours referrals are *not* rescinded."  (ECF No. 5677 at 12, 15.)  This is

23   Plaintiffs' core premise for dismissing the issue as "fundamentally not very significant."  (*Id.* at

24   13.)

25   In fact, the data shows rescissions based on after-hours referrals occur *twice* as frequently

26   as Plaintiffs claim.  The data shows that there were 3,635 referrals made between 5:00 pm and

27   (…continued)
    (ECF No. 5610 at 13.)

28

Defs.' Reply to Pls.' Brief Re: Obstacles to Timely Access to MHCBs (2:90-cv-00520 KJM-DB (PC))

5:00 a.m. in the first six months of this year.  (ECF No. 5680-5 at 19.)  Of those 3,635 after-hours referrals, 1,882 were rescinded.  (*Id.*)  That amounts to nearly fifty-two percent of after-hours referrals being rescinded, not twenty-five percent, as Plaintiffs claim.  And it flatly contradicts Plaintiffs' assertion that "[t]he vast majority of patients who are evaluated after-hours by on-call clinicians and are referred to a MHCB overnight continue to need crisis care the next morning." (ECF No. 5677 at 13.)  In fact, the data shows that a majority of patients—fifty-two percent— who receive crisis bed referrals after-hours do *not* need crisis care the next morning.  And since there were a total of 2,560 rescinded referrals during this period (ECF No. 5680-5 at 19), this means that approximately *seventy-four percent* of all rescinded crisis bed referrals received by the system—about three of four—arise from after-hours referrals.

As discussed in Defendants' Opening Brief, the high rate of rescissions resulting from after-hours referrals creates serious problems.  Inappropriate crisis bed referrals mean that institutions are spending scarce time and resources on clearing an inmate for transfer, identifying and reserving a bed, and arranging for an inmate's transport—all unnecessarily.  Such administrative waste comes directly at the expense of other inmates who truly do need crisis beds but who must wait because an inappropriately referred inmate claims a bed or transport—and then must be reassigned.

This significant waste, moreover, is not a normal part of the crisis bed referral process that is merely "to be expected."  As Defendants' data shows, only 678 of 3,627 referrals made during normal business hours were rescinded, translating into a rescission rate of just nineteen percent, versus fifty-two percent for after-hours referrals.  (ECF No. 5680-5 at 19.)  Rather, the reason for this substantial difference is rooted in current policy, which automatically triggers a crisis bed referral whenever an inmate is placed overnight in alternative housing.

To address the issue, Defendants have advanced a common-sense proposal that would trigger crisis bed referrals on the basis of in-person clinical assessments, as opposed to placement in alternative housing.  The primary objective of the crisis bed is to evaluate the symptoms associated with the crisis and provide initial stabilization and recommendations for follow-up care post discharge, with the goal to stabilize the patient sufficiently to be able to safely program in

1   their outpatient level of care housing unit unless they require a higher level of care.  (Suppl.

2   Brizendine Decl. ¶ 5.)

3         Defendants do not propose that crisis bed care should start in alternative housing.  Instead,

4   the Proposal is in line with the current policy and the purpose of alternative housing:  to ensure

5   that inmates are kept safe when they voice suicidal ideation until such time that an inmate can be

6   evaluated by a clinician.   (Brizendine Decl. ¶¶ 3 and 4.)  Alternative housing is a temporary

7   environment where the inmate can be kept safe, with a bed, and continuous direct observation by

8   staff until an evaluation can be performed.

9         Plaintiffs fail to understand that reducing the rescissions of after-hours referrals, benefits

10   the entire system, and significantly improves timely transfers by freeing up valuable resources

11   that can be used to process all crisis-bed referrals.  Even if the Proposal aligns the after-hours

12   rescission rate with the peak-hours rescission rate (nineteen percent), Defendants can achieve

13   substantial improvements in the referral and transfer process.

14         Further, Plaintiffs make several unsupported statements that Defendants intend to expand

15   the use of alternative housing to provide treatment. (Pls.' Brief 7:1-2 and 8:12-18.)  Nothing

16   could be further from the truth.  Defendants are not, and have never proposed, using alternative

17   housing for treatment.  Contrary to Plaintiffs' assertion (Plaintiffs' Brief at 7), alternative housing

18   was never meant to be a temporary measure to remedy the chronic shortage of mental health

19   crisis beds.  The Referral and Transfer section of Chapter 5 of the Program Guide contains an

20   entire section on the options and prioritization for housing an inmate pending transfer as well as

21   the safety precautions that must be taken when inmates are placed in such housing.  (Program

22   Guide 12-5-5.)  The Program Guide contemplates that inmates will have to wait somewhere, for

23   some amount of time, before transferring to a crisis bed.  The Proposal does not change this.

24       **B.**    **Alternative Housing Provides A Safe Environment To Place Inmates**
             **Pending An In-Person Clinical Evaluation.**

25

26         Defendants' Proposal is designed to provide a safe location for inmates who seek crisis care

27   during after-hours until the following morning when they can be evaluated in person by a

28   clinician.  Alternative Housing is primarily designed to keep the patient safe until such time as

1  they can be seen by a clinician or admitted to an inpatient unit if needed.  (Suppl. Brizendine Decl.

2  at ¶ 3.)  Patients in alternative housing are placed on continuous and direct visual observation

3  until the patient is transferred to a crisis bed.  (Suppl. Brizendine Decl. at ¶ 4.)  Each patient is

4  provided a safety (no-tear) mattress, safety (no-tear) blanket, and a safety (no-tear) smock.  (*Id.*)

5  Direct visual observation, suicide resistant linens and a cell void of other property that could be

6  used to self-harm, decreases not only the means to self-harm but also allows for a high rescue

7  probability. (*Id.*)

8        Plaintiffs attack Defendants' use of alternative housing, relying on dated court filings and

9  reports that refer to policies and conditions in place between 2005 and 2012 to argue that

10  alternative housing is unsafe or dangerous on a system-wide basis.  Their critique ignores that the

11  Program Guide, as amended by new policies, expressly permits CDCR to house patients in a

12  number of alternative housing settings pending transfer to a crisis bed unit according to an order

13  of preference.  (Tebrock Decl. Exhibit 1.)  Plaintiffs' stale attacks are not relevant to the current

14  policies and conditions that exist in alternative housing, and they ignore the numerous

15  improvements in recent years, including changes based on recommendations made by the Special

16  Master's suicide expert.[2]

17        In short, Plaintiffs attempt to distract from the Proposal by aiming their fire at the historical

18  use of alternative housing.  But Plaintiffs have not offered any basis—aside from pure

19  speculation—that the Proposal will result in systemic harm to *Coleman* class members.  As stated

20  above, Defendants do not propose to use alternative housing as a substitute for crisis-bed

21  treatment but merely to ensure patient safety pending an in-person evaluation to complete a

22  referral to a crisis bed.  Plaintiffs' argument focuses on past issues that arose when the system and

23  the policies were different than they are today, and on some outlier issues at a few institutions.

24  _____

25        [2] Plaintiffs correctly state that there have been numerous iterations of the alternative
   housing policy.  Those iterations resulted in substantial changes to the entire Mental Health
   Services Delivery System over the past decade.  But these policy directives are utilized to clarify
26  the Program Guide's provision for moving patients in crisis out of their housing units to another
   location when a crisis bed is not immediately available (Program Guide at 12-5-7) and do not
27  address the issue before the Court – whether a referral should be made only upon an in-patient
   clinical evaluation.

28

1    Decisions regarding how to address issues related to timely transfers should be based on today's

2    system, and how to improve it going forward, not on the system as it was in the past.

3         **1.    The Court's Suicide-Prevention Expert and the Special Master Agree
                 that CDCR's Current Policy on Alternative Housing is Protective.**

4

5         Defendants' current policies and practices for use of alternative housing provide inmates in

6    need of crisis care with a safe environment pending admission to a crisis bed.  Defendants' use of

7    alternative housing is the subject of close monitoring by both the Special Master's team and by

8    his suicide prevention expert, Lindsay Hayes.  Mr. Hayes has issued three audit reports on

9    CDCR's suicide prevention practices since 2014.[3] Those reports included reviews of alternative

10   housing and recommendations for ways to make alternative housing safer, including the use of

11   suicide resistant beds and continuous observation for all patients placed in alternative housing.

12   (Hayes 2015 Audit Report, ECF No. 5259 at 24-28; Hayes 2016 Re-Audit Report, ECF No. 5396

13   at 17-21; and Hayes' Second Re-Audit Report, ECF No. 5672 at 7-10).)  CDCR accepted and

14   implemented all of these recommendations.  (Special Master's Report on His Expert's Second Re-

15   Audit and Update on Suicide Prevention Practices in The Prisons of the California Department of

16   Corrections and Rehabilitation, ECF No. 5671 at 4.)

17        The Special Master and his other experts also monitor the Mental Health Crisis Bed

18   program and use of alternative housing and opine on the safety of its use, and whether its use is

19   consistent with current policy. (Twenty-Sixth Round Monitoring Report of the Special Master on

20   The Defendants' Compliance with Provisionally Approved Plans, Policies, And Protocols; ECF

21   No 5439 at 4.)  The monitoring reports each include a section on the individual institution's use

22   of alternative housing as well as an overview on the system.  (See, e.g., ECF No 5439 at 84, 138-

23   39, 143-44, 152, 163-64, 168-69, 182, 196, 202-03, 214-15, 227-28, 239, 254, 272, 286-87, 302-

24   03, 319, 333, 344-45, 357-58, 370, 383, 398, 409, 426-27, 437, 449, 464, 489, 500, 516, and 539.)

25

26       [3] Hayes 2015 Audit Report (ECF No. 5259) and the Special Master's report (ECF No.
         5258); Hayes 2016 Re-Audit report (ECF No. 5396) and Special Master's report (ECF No. 5395);
27       and Hayes' Second Re-Audit report (ECF No. 5672) and the Special Master's Report (ECF No.
         5671.)
28

1    While the reports show some individual instances where the alternative housing policies

2  were violated, those instances are outliers.  When issues arise, CDCR, in conjunction with the

3  Special Master and Mr. Hayes, evaluate and address the individual issues.  (Hayes 2017 report at

4  7 – 10.)  Significantly, the recent reports do not conclude that the referral process is harmful, that

5  alternative housing is a dangerous place to house patients pending a crisis-bed placement, or

6  recommend that alternative housing is not appropriate to house patients waiting for transfer to a

7  crisis bed.

8              **2.      Plaintiffs have not presented evidence that current use of alternative**
                        **housing is unsafe on a system-wide basis.**
9

10    There is no evidence that Defendants' current use of alternative housing is unsafe or

11  dangerous on a system-wide basis.  Plaintiffs' examples of "harm" are taken from decade-old

12  court filings and testimony. (Plaintiffs' Brief at 3:14-22; 4:17-28; 5:21 – 6:16; 7:6-28; 8:1-11;

13  10:10-15; 12:3-10; and 14:1-10.)  Plaintiffs also cite to a number of outliers reported by the

14  Special Master's suicide-prevention expert from 2016 as evidence that alternative housing is

15  harmful.  (Plaintiffs' Brief at 9.)

16    First, out of the more than 25,000 referrals to crisis beds that took place in 2016, and to date

17  in 2017, Plaintiffs point to a handful of patients at Salinas Valley State Prison and the Substance

18  Abuse Treatment Facility whose alternative housing placements violated policy.  (Plaintiffs' Brief

19  at 9.)  Those situations were addressed when they were brought to CDCR's attention.  (ECF No.

20  5672, Hayes 2017 Re-Audit report at 8-9.)  For instance, in the case of Salinas Valley, Defendants

21  dedicated a portion of a housing unit to alternative housing, which ensures patients have their

22  own cell with toilet, sink, and suicide resistant bedding.  These outliers are not indicative of the

23  conditions for alternative housing in CDCR's institutions or evidence that such conditions exist

24  elsewhere in the system.

25    Second, Plaintiffs take inappropriate liberties in citing to the recent California State

26  Auditor's report on suicide prevention.  Plaintiffs claim that the state auditor "linked two recent

27  suicides to the use of alternative housing in lieu of crisis care." (Plaintiffs' Brief at 10:16-21.)

28  The California State Auditor made no such causal link.  Instead, the audit report states it is of

                                              9

1    "greater concern, [that] two inmates assigned to alternative housing ultimately committed suicide

2    after not being admitted to crisis beds based on the mental health staff's assessments of their

3    mental health." (Stone-Manista Decl., Exhibit G at 30.) At most, this comment points to the

4    need to improve the quality of the mental-health assessments, exactly what the Proposal seeks to

5    do. It does not lend any support for the assertion that alternative housing is dangerous, or led to

6    the two suicides in question.

7         Third, Plaintiffs' comparison of patients waiting for a crisis bed with a hypothetical

8    situation involving a patient complaining of chest pain in a cage with no toilet for fifteen hours

9    without treatment is a false analogy. Plaintiffs cite no evidence that either of these hypothetical

10   situations occurred. Moreover, the needs of a patient waiting for a crisis bed are appropriately

11   addressed by continuous observation and removal from his cell to a safe location. (Suppl.

12   Brizendine Decl. at 5.) While it would be inappropriate to lock an inmate suffering from a heart

13   attack in a holding cell and withhold life-saving treatment, in the case of a mental health crisis,

14   CDCR uses alternative housing and continuous observation to prevent the crisis from becoming a

15   potentially lethal event.

16        In determining appropriate ways to improve crisis-bed transfers, the parties and the Court

17   should focus on the current system as a whole and the steps Defendants can and should

18   reasonably take to improve compliance. Plaintiffs' criticisms of the current approved policy for

19   alternative housing do not contribute to identifying obstacles to compliance with the twenty-four-

20   hour transfer timeline.

21        **C.    Fears of Delayed Evaluation Over the Weekend and Long Stays in**
         **Alternative Housing Are Unfounded**
22

23        Plaintiffs protest that the Policy will "extend the total time a class member in mental health

24   crisis spends in alternative housing prior to receiving any treatment by huge margins."

     (Plaintiffs' Brief at 11.) Plaintiffs are wrong and do not understand the after-hours staffing and
25
     weekend referral process.
26
          While it is true that some institutions do not have clinical staff available after-hours or on
27
     weekends, crisis bed referrals are still made during those times. And only four institutions
28

(California Correctional Facility, Corcoran, CRC and Folsom) do not have clinical staff coverage on the weekends.  To process after-hours or weekend crisis bed referrals at institutions that do not have late night or weekend clinical staff available, CDCR will call its on-call clinicians to return to the institution the following day or on a weekend day to provide the required face-to-face assessments

### D.    Plaintiff's "Administrative Solutions" are Misguided.

The Proposal addresses the issues that arise from a clinicians' inability to conduct full clinical assessments of patients who either request or are identified by staff, as needing after-hours crisis care.  Plaintiffs argue that because Defendants do not have data describing the details of how the in-person evaluations are an improvement over the on-call evaluations, there is no basis to believe that the Proposal will have a positive impact on rescissions.  (Plaintiffs' Brief at 15-16).[4]  But such data is not necessary to conclude that a full in-person clinical assessment provides dramatically improved clinical observation than a nurse's phone call to a clinician in the middle of the night that does not provide for a patient-to-clinician communication.  Common sense and the rescission rate data actual observation of this phenomenon in the field supports that this distinction is critical.

Plaintiffs' solution for crisis-bed referrals is for Defendants to hire staff to run the system and process referrals around the clock.  But it is a well-known fact that there is a nationwide shortage of mental health clinicians.  This severely affects Defendants' ability to hire staff to work during normal business hours, let alone at night.  (Defendants' Response to the Special Master's Staffing Report, ECF No. 5591.)  Thus, their suggestion that Defendants try to solve this problem with a hiring spree is not a good faith proposal.

Plaintiffs also suggest that Defendants should focus on determining why certain institutions have higher rescission rates.  Defendants have studied this issue, and Defendants' Proposal takes into account what they have learned about it.  After careful consideration, Defendants have determined that the current proposal is the best solution to resolve this issue.

---

[4] It is curious that Plaintiffs' embrace the notion that on-call evaluations for patients in crisis are sufficient but telepsychiatry is not.

1    Finally, Plaintiffs show their lack of comprehension or appreciation for the complexity of

2   the referral process by recommending that an expansion of administrative capabilities will

3   address the obstacles to Program Guide compliance identified in the workgroups. (Plaintiffs'

4   Brief at 17.)  As discussed in the workgroups, custody, medical, and clinical staff work together

5   to process referrals.  (Weber Decl. Exhibit 6.)  Contrary to Plaintiffs' assertion, the staff member

6   who processes referrals does not spend two hours "catching up on referrals, rescissions, and

7   discharges."  That person actually assigns the beds.  Additional staff, spend the remaining eight

8   hours of the day preparing the referrals for endorsement to a bed, and ensuring all information

9   necessary for the referral is received, and is accurate.  And referrals are processed throughout the

10   day, not just in the morning.  To process referrals after-hours, Defendants would need to add

11   transport, medical and on-site clinical staff.  Adding "inexpensive administrative staffs," as

12   suggested by Plaintiffs, will not result in an ability to process after-hours referrals.

13    To ensure that Plaintiffs have a better understanding of this process and the challenges

14   related to patient movement and the processing of referrals, CDCR is willing to invite Plaintiffs to

15   observe the referral process.

16   **II.    THE COURT SHOULD REJECT PLAINTIFFS' ATTEMPT TO**
       **EFFECTIVELY REWRITE THE PROGRAM GUIDE AND TO ALTER THE**
17     **LONGSTANDING PRACTICE OF TREATING TRANSFERS TO EXTERNAL**
       **INSTITUTIONS AS COMPLETE WHEN THE PATIENT IS PLACED ON A**
18     **MEDICAL TRANSPORT VEHICLE.**

19    Since 2003, CDCR has recorded a crisis bed transfer as completed when a patient is

20   "transferred" and placed on a medical transport vehicle enroute to the crisis bed institution.

21   (Tebrock Decl. at ¶ 7.)  This information is reported to, and monitored by, the Special Master's

22   team, and Defendants have never represented to Plaintiffs that it is measuring transfer time

23   compliance in a different way.

24    Consequently, Defendants were surprised to learn that Plaintiffs allegedly were not aware

25   of this long-standing practice.  And contrary to what Plaintiffs now argue, CDCR's approach is

26   squarely rooted in the Program Guide.  Where there are no mental health crisis beds available in

27   the institution in which the inmate-patient is housed, the Program Guide requires a patient who is

28   referred to a crisis bed to be transferred to a designated crisis bed institution within twenty-four

1  hours.  Program Guide at 12-5-3.  "*In most cases*," the Program Guide says, this means that the

2  "movement" of a patient between institutions "via special transport" should be completed within

3  twenty-four hours.  *Id.* at 12-5-4.  *In some cases*, however, this timeframe is simply not realistic—

4  whether because of traffic conditions, inclement weather, breakdowns, and other unpredicted

5  difficulties.  And by not requiring the transport between institutions to be completed within

6  twenty-four hours in all cases, the Program Guide clearly contemplates cases in which rigidly

7  mandating the twenty-four-hour timeframe for external transfers is unrealistic or impractical.

8      Plaintiffs now seek to rewrite the Program Guide by revising "in *most* cases" to effectively

9  mean "in *all* cases."  Defendants respectfully request that this Court not accede to Plaintiffs'

10  request to move the goalposts and make compliance with the Program Guide's twenty-four-hour

11  timeframe even less achievable.  While the regionalization of the crisis-bed program has

12  significantly reduced crisis-bed transportation times (Weber Decl. Exhibits 3 and 4), there will

13  always be traffic and other unpredictable transportation issues that make achieving transportation

14  between different institutions within twenty-four hours highly difficult.  On average,

15  transportation takes a little over four hours.  (Weber Decl. Exhibit 4 at pp 10-11.)  Were

16  Plaintiffs' approach adopted, the number of noncompliant crisis bed transfers would likely

17  increase substantially—by one calculation, nearly twenty-eight percent.  (*See* ECF No. 5680-4 at

18  6 (showing noncompliant crisis bed transfers increasing from 1,293 to 1,649 were Plaintiffs'

19  method used for the five-month period between February 12, 2017 and July 12, 2017).)  In

20  addition, the parties would constantly and wastefully litigate the individual circumstances of each

21  trip in an effect to determine whether any part of the trip warranted an exception from the

22  Program Guide timeframe.  Such litigation promises to be a wasteful misdirection of effort.

23  **III.  PLAINTIFFS' DEMAND THAT DEFENDANTS CREATE A SPECIAL
    REPORT TO ASSIST THEM WITH LITIGATING PROGRAM GUIDE
24      EXCEPTIONS IMPROPERLY EXPANDS THE COLEMAN DIRECTIVES.**

25      Plaintiffs seek a court order requiring Defendants to build a reporting scheme that will

26  capture and report seven "key metrics" and to create another report tracking any claimed

27  exceptions to the Program Guide's twenty-four-hour transfer timeline and the reasons therefore.

28

13

1    (Plaintiffs' Brief at 23-24.)  This request is beyond the scope of the April 19 order and it is not a

2    proposal that was addressed in the workgroups.  The April 19 order was to resolve issues that

3    occurred during the workgroups.  This report is not one of them.

4         In fact, Plaintiffs already receive much of the data.  The reports that include this data, are

5    not created for the purposes of litigation.  The reports provide CDCR and the Special Master with

6    sufficient data to ensure oversight and compliance with the Program Guide timelines.  Reporting

7    of these seven metrics would require defendants to prepare a new report similar to the inpatient

8    Bed Utilization Report that is filed with the Court monthly, identifying this information on a

9    patient-by-patient basis.  (ECF No. 2236.)  But such a report, would not provide any further

10   meaningful data, and would place pressure on a system that is already overburdened with reports

11   that have questionable utility.  Knowing the granular level details of each and every transfer does

12   not assist CDCR Headquarters in identifying system-wide trends that may cause delays, nor does

13   it help overcome any obstacles.  The Special Master and his experts already monitor the crisis-

14   bed system, including the referral process.  Defendants request that the court deny Plaintiffs'

15   demand for new reports and that the Special Master work with the parties and continue to monitor

16   the crisis-bed programs.

17        Plaintiffs also request a brand new report on claimed exceptions to the Program Guide

18   timelines.  Defendants are developing this report and this matter is best resolved in the

19   workgroups.

20                                        **CONCLUSION**

21        Defendants have proposed reasonable solutions to address obstacles to transferring patients

22   to crisis care within the Program Guide transfer timelines.  The Special Master and Plaintiffs have

23   been receptive to most of the proposals, and some require further discussion in the context of the

24   Special Master's workgroup.  Defendants' opening brief also included systemic data showing that,

25   on average, CDCR is transferring patients to crisis beds within the Program Guide timeline.

26   There is thus no basis to issue further orders that would insist on the unattainable goal of

27   requiring perfect compliance with the timeline in for each individual referred to crisis care.

28

Defs.' Reply to Pls.' Brief Re: Obstacles to Timely Access to MHCBs (2:90-cv-00520 KJM-DB (PC))

1  Rather than issue further orders, Defendants ask the Court to resolve the disputed issues and

2  allow the workgroups to reconvene.  Defendants' proposal to allow time for an in-person clinical

3  assessment for after-hours referrals is a reasonable solution that should be assessed in the field.

4  Similarly, Defendants request that the Court adopt their reasonable proposal to treat a referral that

5  requires transport to another facility as complete when the patient is placed on the transport

6  vehicle, which is supported by both the Program Guide and long-standing practice.  Finally,

7  Plaintiffs' request for a new set of reports is unnecessarily expands the *Coleman* directives and

8  should be denied because the Special Master and his experts already monitor the crisis-bed

9  system, including the referral process.

10  Dated:  September 19, 2017                              Respectfully submitted,

11                                                          XAVIER BECERRA
                                                            Attorney General of California
12                                                          DANIELLE F. O'BANNON
                                                            Supervising Deputy Attorney General
13
                                                            */s/ Elise Owens Thorn*
14                                                          ELISE OWENS THORN
                                                            Deputy Attorney General
15                                                          *Attorneys for Defendants*

16  CF1997CS0003
    FINAL REPLY
17

18

19

20

21

22

23

24

25

26

27

28

1  XAVIER BECERRA
   Attorney General of California
2  WILLIAM C. KWONG
   Acting Senior Assistant Attorney General
3  DANIELLE F. O'BANNON
   JAY C. RUSSELL
4  DAMON MCCLAIN
   Supervising Deputy Attorneys General
5  ELISE OWENS THORN, State Bar No. 145931
   CHRISTINE M. CICCOTTI, State Bar No. 238695
6  CHAD STEGEMAN, State Bar No. 225745
   TYLER V. HEATH, State Bar No. 271478
7  Deputy Attorneys General
     1300 I Street, Suite 125
8    P.O. Box 944255
     Sacramento, CA 94244-2550
9    Telephone: (916) 324-4921
     Fax: (916) 324-5205
10   E-mail:  Elise.Thorn@doj.ca.gov
   Attorneys for Defendants

11

12                IN THE UNITED STATES DISTRICT COURT

13               FOR THE EASTERN DISTRICT OF CALIFORNIA

14                       SACRAMENTO DIVISION

15

16

17  **RALPH COLEMAN, et al.,**                 2:90-cv-00520 KJM-DB (PC)

                                  Plaintiffs,   **SUPPLEMENTAL DECLARATION OF**
18                                              **KATHERINE TEBROCK IN SUPPORT**
                                                **OF DEFENDANTS' BRIEF ON**
19       v.                                     **OBSTACLES TO FULL COMPLIANCE**
                                                **WITH PROGRAM GUIDE TRANSFER**
20  **EDMUND G. BROWN JR., et al.,**            **TIMELINES FOR CRISIS BEDS**

21                                Defendants.

22

23

24       I, Katherine Tebrock, declare:

25       1.    I am the Deputy Director of the Statewide Mental Health Program for the California

26  Department of Corrections and Rehabilitation (CDCR).  I am competent to testify to the matters

27  set forth in this declaration and if called upon to do so, I would and could so testify.  I make this

28

                                             1

1  declaration in support of Defendants' Brief on Obstacles to Full Compliance with Program Guide

2  Transfer Timelines for Crisis Beds.

3          2.    I was appointed as Deputy Director of the Statewide Mental Health Program in

4  November 2015.  I am familiar with the numerous and complex policies and procedures that

5  govern the prison mental health care delivery system.  I am also responsible for and supervise the

6  mental health system's headquarters and regional teams, and am familiar with *Coleman* mandates.

7  I previously served as Chief Deputy General Counsel of Policy with CDCR's Office of Legal

8  Affairs, where my duties included management and oversight of the health care legal team,

9  including the *Coleman* class action litigation.

10         3.    Defendants' proposal to start the twenty-four-hour timeline after an in-person clinical

11  assessment is completed, was discussed in several workgroups.  Defendants remain willing to

12  continue the discussion and to provide additional details of their proposal.  Further details and

13  discussions with Plaintiffs and the Special Master should answer many of the questions raised by

14  Plaintiffs' Opening Brief.

15         4.    Weekend clinical coverage is available and crisis bed referrals are processed during

16  over the weekend.  Four institutions (California Correctional Facility, Corcoran, California

17  rehabilitation Center and Folsom State Prison) do not have clinical staff coverage on the

18  weekends.

19         5.    To process after-hours crisis-bed referrals at institutions that do not have late night or

20  weekend clinical staff available, CDCR is able to call its on-call clinicians to return to the

21  institution the following day or on a weekend day to provide the required face-to-face

22  assessments.

23         6.    To complete the referral process requires action by custody, the Health Care

24  Placement Oversight Program, pharmacy, transport, medical and on-site clinical staff, which are

25  not available to process referrals after-hours.

26         7.    Although Defendants prepared a special one-time report combining the referral and

27  transportation data points to assist the parties during workgroup discussions, continuing to do so

28  on an ongoing basis would result in a disruption of the transfer process.  Staff at the Health Care

1  Placement Oversight Program who are responsible for bed movement, including the crisis bed

2  referrals, were pulled away from their daily work to create the one-time report.  These same

3  people would have to delay completing bed assignments and referrals on a regular basis to create

4  this report.

5          I declare under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct.  Executed in Elk Grove, California on September 19, 2017.

7

8                                                    _____/s/ Katherine Tebrock _____
                                                      KATHERINE TEBROCK
9                                                    Deputy Director, Statewide Mental Health
                                                      Program
10                                                   *(original signature retained by attorney)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1  XAVIER BECERRA
   Attorney General of California
2  WILLIAM C. KWONG
   Acting Senior Assistant Attorney General
3  DANIELLE F. O'BANNON
   JAY C. RUSSELL
4  DAMON MCCLAIN
   Supervising Deputy Attorneys General
5  ELISE OWENS THORN, State Bar No. 145931
   CHRISTINE M. CICCOTTI, State Bar No. 238695
6  CHAD STEGEMAN, State Bar No. 225745
   TYLER V. HEATH, State Bar No. 271478
7  Deputy Attorneys General
     1300 I Street, Suite 125
8    P.O. Box 944255
     Sacramento, CA 94244-2550
9    Telephone:  (916) 324-4921
     Fax:  (916) 324-5205
10   E-mail:  Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE EASTERN DISTRICT OF CALIFORNIA

14                    SACRAMENTO DIVISION

15

16 | **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |

17 | Plaintiffs, | **SUPPLEMENTAL DECLARATION OF** |

18 | | **B. BRIZENDINE, PSY. D. IN SUPPORT** |
   | v. | **OF DEFENDANTS' BRIEF ON** |

19 | | **OBSTACLES TO FULL COMPLIANCE** |
   | | **WITH PROGRAM GUIDE TRANSFER** |

20 | **EDMUND G. BROWN JR., et al.,** | **TIMELINES FOR CRISIS BEDS** |

21 | Defendants. | |

22

23

24      I, Brittany Brizendine, declare:

25      1.    I am the Acting Assistant Deputy Director of the Statewide Mental Health Program

26 for the California Department of Corrections and Rehabilitation (CDCR).  I am competent to

27 testify to the matters set forth in this declaration and if called upon to do so, I would and could so

28

                                    1

1    testify.  I make this declaration in support of Defendants' Brief on Obstacles to Full Compliance

2    with Program Guide Transfer Timelines for Crisis Beds.

3        2.    I was appointed as the Acting Assistant Deputy Director of the Statewide Mental

4    Health Program in May 2017.  I am familiar with the numerous and complex policies and

5    procedures that govern the prison mental health care delivery system.  I am responsible for

6    assisting in the supervision and management of the mental health system's headquarters and

7    regional operations, and am familiar with *Coleman* mandates.  I started my work with the prison

8    mental health care delivery system in 2008 as a staff psychologist at California State Prison,

9    Sacramento, where I also worked in the Mental Health Crisis Bed unit, the Enhanced Outpatient

10   Program Administrative Segregation Unit, and the Psychiatric Services Unit.  Prior to my current

11   appointment, I served as the Chief Executive Officer of Salinas Valley State Prison, and have

12   served as the Chief of Mental Health at Salinas Valley State Prison and the California Health

13   Care Facility.

14       3.    Alternative Housing is a temporary placement for patients, and is primarily designed

15   to keep the patient safe until they can be admitted to an inpatient unit.  Alternative Housing is not

16   intended to provide crisis-bed treatment but to ensure patient safety.

17       4.    Patients in alternative housing are placed on continuous and direct visual observation,

18   also known as "suicide watch," while pending a mental health evaluation and until the patient is

19   transferred to a crisis bed.  Each patient is provided a safety (no-tear) mattress, safety (no-tear)

20   blanket, and a safety (no-tear) smock.  Direct visual observation, suicide resistant linens and a cell

21   void of other property that could be used to self-harm, decreases not only the means to self-harm

22   but also allows for a high rescue probability.

23       5.    An inmate admitted to a crisis bed may have acute symptoms of a serious mental

24   disorder or may be suffering from a significant or life threatening event that contributes to either a

25   marked impairment of functioning in most areas (daily living activities, communication and

26   social interaction) requiring twenty-four-hour nursing care and/or dangerousness to others as a

27   consequence of a serious mental disorder/dangerousness to self.  The primary objective of the

28   crisis bed is to evaluate the symptoms associated with the crisis and provide initial stabilization

2

1   and recommendations for follow-up care post discharge, with the goal to stabilize the patient

2   sufficiently to be able to safely program in their outpatient level of care housing unit unless they

3   require a higher level of care.  In such cases, the role of the crisis bed treatment team is to refer

4   the patient to a higher level of care as clinically indicated.

5       6.   The current policy requires a crisis-bed referral for placement in alternative housing.

6   For after-hours referrals, when the on-site clinician is unavailable, the patient is assessed by

7   nursing staff who calls the on-call clinician to present the patient's clinical factors.  There is

8   typically no direct communication between the on-call clinician and the patient.  The on-call

9   clinician makes a determination to address the patient's immediate needs.  If warranted, the

10  patient is then referred to the mental health crisis bed level of care by the on-call clinician and

11  placed in alternative housing pending a crisis bed admission.

12      7.   One of the reasons after-hours referrals are rescinded is because the initial referrals

13  are made at night, without the benefit of a full and complete face-to-face clinical assessment.  An

14  inmate showing suicidal potential cannot be refused admission until there is a face-to-face

15  evaluation and a Suicide Risk Evaluation completed by a clinician trained to conduct suicide risk

16  assessments.  This policy is clinically appropriate, but with an emphasis on keeping a patient safe,

17  can lead to false-positive referrals.

18      8.   Certain factors contribute to higher rescission rates, which can explain why the

19  rescission rates vary between institutions.  Each institution has different levels of custody

20  designation and mission as well as differing healthcare missions, which impact the population

21  composition.  Furthermore, some institutions with large mental health populations and special

22  programs have comprehensive systems and specially trained teams to address patients in crisis.

23  Both individual clinical acumen, specifically in suicide risk assessment, as well as having a strong

24  local system or process to address patients in crisis strongly influence referral and rescission rates.

25  ///

26  ///

27

28

1  I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.  Executed in Elk Grove, California on September 19, 2017.

3

4                                                          ___/s/ *Brittany Brizendine* _____

5                                                          BRITTANY BRIZENDINE, Psy.D.
                                                           Acting Assistant Deputy Director,

6                                                          Statewide Mental Health Program
                                                           *(original signature retained by attorney)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Suppl. Decl. of B. Brizendine in Supp. Defs.' Brief on Transfers to Crisis Beds   (2:90-cv-00520 KJM-DB (PC))