REDACTED
# EXHIBIT 2
**(This Document was Submitted for Filing Under Seal)**

| | |
|---|---|
| **From:** | Lisa Ells |
| **To:** | Elise Thorn; Nick Weber |
| **Cc:** | Steve Fama; Margot Mendelson; Coleman Team - RBG Only; Coleman Special Master Team; Gabriel Sanchez (Gabriel.Sanchez@gov.ca.gov); Danielle OBannon; Chad Stegeman |
| **Subject:** | Follow Up re: Coleman: Plaintiffs" Response to Defs" MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468] |
| **Date:** | Wednesday, July 19, 2017 6:35:34 PM |
| **Attachments:** | JLW-Defs and Special Master, Response to MHCB Plan Proposal, 07-06-2017, 489-3.PDF<br>Dkt 5593 Pltfs" Resp to March 24 2017 Order re Enforcement of Timelines,....pdf |

Dear Nick and Elise,

We write to follow up on our multiple requests to substantively discuss a number of possible measures Defendants have taken, or could take, to address the ongoing MHCB transfer delays. It is imperative that Defendants provide sufficient information this week so that the parties and the Special Master team can understand and properly consider the various strategies that have been floated to date by Defendants in their April 7, 2017 pleadings and by Plaintiffs in their July 6, 2017 letter and April 7, 2017 pleadings. While Plaintiffs are more convinced than ever by Monday's inpatient census and compliance reports that the MHCB access problem (like the inpatient access problem) can never be fully resolved until Defendants comply with prior court orders requiring them to use the full complement of low-custody inpatient beds, Plaintiffs remain hopeful that Defendants' compliance with the MHCB 24-hour transfer timeline might nonetheless be improved through other measures. We believe that the Court's April Order requires us to explore all feasible possibilities in the workgroup setting, and we wish to be able to report to the Court on any successful measures or plans that the parties and Special Master can agree to in next week's joint statement in the hopes of narrowing the issues for the evidentiary hearing. We would much rather discuss these issues with you meaningfully now instead of being forced to explore them at the evidentiary hearing through testimony.

Specifically, Plaintiffs ask that Defendants provide an update on the following measures Defendants reported in April that they had undertaken in recent months to address MHCB transfer delays (ECF 5595 at 9, and 5597 at para. 5-6), including the status of each measure and Defendants' evaluation of its efficacy by reference to data or other reportable measures: (1) DBT program at CMF; (2) various training initiatives; (3) crisis intervention teams at CIW and SVSP; (4) studies of crisis bed readmissions in an effort to reduce them; (5) identification of local best practices, including after-hours staffing and behavior incentive and pain management programs; (6) utilization management initiatives; and (7) regional clustering aimed at reducing readmission rates and destabilization. On the last initiative, regional clustering, Plaintiffs again request information on the amount of time it takes patients to arrive at MHCBs after transportation is initiated. That information is not reported anywhere. While we may disagree on whether Defendants are currently required to initiate or complete transport within 24-hours, we cannot have a meaningful conversation about the practical effect of the distinction until we know why type of timeframes we are talking about. It will also help us understand if the regional clustering program is working or if it needs further refinement.

Plaintiffs further ask that Defendants respond substantively and in writing to Plaintiffs' prior requests to evaluate the following possible problem areas affecting MHCB transfer timeline compliance, outlined in our July 6 letter and our April 7 response to the OSC (both attached): (1) targeted efforts at institutions with disproportionately high rescission rates, including augmented staffing (July letter

Exhibit 2 - 001

at 5); (2) targeted efforts to address high readmission rates (July letter at 6-7); (3) reducing long-term crisis bed stays, including through finding alternative housing for inmate-patients who might have special or complex needs that stay in crisis beds for many months or even years (July letter at 7-8); (4) targeted interventions at outlier institutions with disproportionately high rates of non-compliance (ECF No. 5593 at 23).  Similarly, while Plaintiffs are heartened to hear that Defendants have finally begun transferring certain patients referred for inpatient care to Patton, it is not clear if additional efforts should be made to address the excessively long delays affecting women in need of crisis care (ECF No. 5593 at 22), and Plaintiffs request additional review of those issues as well.

We look forward to your response, and to a cooperative effort to understand the problems causing Defendants' ongoing difficulties complying with the Program Guide MHCB transfer timelines so that we can develop smart strategies to address them where possible.  We believe the Court's April 19 order requires nothing less.

Thanks,

---

**From:** Dylan Verner-Crist
**Sent:** Thursday, July 06, 2017 10:15 AM
**To:** Matt Lopes <mlopes@pldw.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Elise Thorn <Elise.Thorn@doj.ca.gov>; mmendelson@prisonlaw.com; Steve Fama <sfama@prisonlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** Coleman: Plaintiffs' Response to Defs' MHCB Plan Proposal, 07-06-2017, 489-3 [IWOV-DMS.FID7468]

Special Master Lopes and Mr. Weber,

Please see the attached letter from Jessica Winter, providing Plaintiffs' response to Defendants' June 23, 2017 proposal regarding MHCB access and the *Coleman* Court's April 19, 2017 order.

Thank you,

Dylan Verner-Crist
*Paralegal*



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
dverner-crist@rbgg.com

CONFIDENTIALITY NOTICE

Exhibit 2 - 002

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

Exhibit 2 - 003



50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email: jwinter@rbgg.com

July 6, 2017

VIA ELECTRONIC MAIL ONLY

> **PRIVILEGED AND CONFIDENTIAL**
>
> **SUBJECT TO PROTECTIVE ORDERS**

Nick Weber
CDCR Healthcare Legal Team
CDCR Office of Legal Affairs
P.O. Box 94283
Sacramento, CA 94283-0001
nicholas.weber@cdcr.ca.gov

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Deveraux & O'Gara LLC
1301 Atwood Ave., Suite 215N
Johnston, RI 02919
mlopes@pldw.com

> Re: MHCB Plan Proposal
> *Coleman v. Brown*
> Our File No. 0489-03

Dear Nick and Matt:

Plaintiffs write in response to Defendants' June 23, 2017 proposal ("Proposal") regarding MHCB access and the *Coleman* Court's April 19, 2017 order, ECF 5610 ("April Order"). We received the Proposal with little time to discuss it before the June 26, 2017 workgroup meeting. We continue to object strenuously to Defendants' attempt to reopen resolved policies regarding the use of alternative housing before a referral to a crisis bed is made, and to the suggestion to change the metric for transfer timeframes. We also provide responses below to Defendants' proposed exceptions to the 24-hour timeframe for transfer.

\\

\\

\\

\\

[3144519.7]

Exhibit 2 - 004

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 2

I.    **Defendants' Proposal to Extend Program Guide Timeframes for Transfers to MHCBs and to Expand the Use of Alternative Housing Is Dangerous and Unacceptable.**

Defendants' Proposal is both outside the scope of the April Order and completely objectionable to Plaintiffs.

A.    **Defendants' Proposal Exceeds the Scope of the April Order.**

The April Order does not permit consideration of changes to the operative timeframes for MHCB transfer, presumably because—as discussed more fully below—that issue is settled.  *See* April Order at 13 (stating that the parties' workgroup meetings will address the "use of alternative housing *when an inmate-patient is referred to* an MHCB," not before a referral is made (emphasis added)).  The April Order asks only that Defendants find ways to achieve compliance with the MHCB-transfer timeframe, as set forth in the Program Guide and associated policies, and to define any possible, but carefully circumscribed, exceptions to that timeframe.  *See* April Order at 4-5, 11-15. The Court made clear that the parties were to address compliance with the *existing* 24-hour timeframe, *see id.* at 14-15, not that Defendants could achieve compliance by fundamentally altering the applicable metric.  Such a facile "solution" to the MHCB-transfer problem does not address the underlying issue: ensuring that patients needing critical care receive that care in a timely manner.  And the April Order does not permit consideration of Defendants' proposal that patients needing crisis care be sidelined in nontherapeutic conditions for up to 48 hours before even *considering* their need for crisis care, and only then limiting their ostensible "wait" to 24 hours.

In addition, Defendants never raised the Proposal in briefing or at hearings on this subject.  *See* ECF 5522, 5544, 5552, 5595-97.  Aside from the potential for harm to patients awaiting crisis care, Defendants' attempt to discuss the issue now undermines the extensive proceedings that have already taken place, and puts them at risk of a civil contempt finding.

B.    **Plaintiffs Cannot and Will Not Agree to an Expansion of the Timelines for MHCB Transfers and of the Use of Alternative Housing.**

Plaintiffs do not and will not agree to change how alternative housing is used, including any renegotiation of the Program Guide or CDCR's associated policies and procedures.  Defendants issued a policy memorandum in 2012, reemphasizing an attached 2005 policy, that specifically stated that the use of "alternative housing for an

Exhibit 2 - 005

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 3

evaluation period and/or [to] provide short term treatment . . . . is not consistent with current policy." *See* CCHCS Memo re Use of Alternative Housing (May 16, 2012) & associated memoranda, attached as **Exhibit A** ("Alternative Housing Memo"), at 1.  The Alternative Housing Memo further states that "[i]nmate-patients *shall not* be placed in alternative housing until an evaluation by a qualified mental health clinician has been completed and it is documented that the inmate requires a referral to [an MHCB]." *Id.* (emphasis added).  The Alternative Housing Memo was not a new policy, but instead restates and reinforces earlier memos that already precluded the use of alternative housing in the manner Defendants now propose.  *Compare id.*, *with* associated memoranda.  The Program Guide provides the same by, for example, explaining that an in-depth screening of a patient to evaluate their need for crisis care will be conducted *after* a referral has been made, not before, *id.* at 12-5-7, and stating that when a patient is identified as requiring crisis care and placed in an OHU, HCPOP "shall be notified of the need for MHCB placement," implicitly acknowledging that such a patient will have already been referred for MHCB care, *id.* at 12-5-6.

Defendants' practice follows this guidance, as reflected in recent proposed revisions to MHSDS Policy 12.05.301.  That revision states: "Prior to placement in alternative housing, patients shall have a referral to an MHCB," and "[HCPOP] is contacted immediately when a patient is referred to an MHCB and *before* being placed in alternative housing."  Draft revision of MHSDS Policy 12.05.301, attached as **Exhibit B**, at 2 (emphasis added).  In addition, the revision describes the use of alternative housing for "[p]atients pending MHCB *transfer*" and its use "*only* . . . for patients *referred to* an MHCB." *Id.* at 1, 2 (emphases added).  Similarly, the extant version of that policy, effective October 15, 2015, states, "[a]lternative housing shall *only* be used for patients *referred to a MHCB*."  MHSDS Policy 12.05.301 (October 15, 2015), attached as **Exhibit C**, at 1 (emphases added).  The use of alternative housing in the proposed fashion is an issue that has been negotiated, litigated, and resolved.

And Plaintiffs would never agree to placing patients in crisis in alternative housing for any extended period, given the vulnerable state of such patients and the serious and dangerous deficiencies of alternative housing.  For example, Lindsay Hayes' most recent draft report noted that the following were recently and regularly used for alternative housing: cells without beds or bunks, cells without sinks or toilets (a.k.a., "dry" cells), 3-foot-diameter holding cages, and gurneys to which patients were handcuffed.  *See* Draft Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation (June 26, 2017), at 8-9.  Patients at certain locations had to request to use the restroom and many were not allowed to shower for more than 72 hours.  *Id.*  These counter-therapeutic conditions will exacerbate

Exhibit 2 - 006

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 4

patients' conditions and discourage them from reporting their crises.  This use of alternative housing is unacceptable.

Plaintiffs also cannot agree to an extension of the time class members spend waiting to be admitted to a crisis bed.  As the Court noted in its April Order, MHCBs are intended for use for those experiencing a mental health *crisis*, and who, therefore, need *immediate*, intensive care.  *See* April Order at 11 ("An inmate in need of an MHCB level of care is, by definition, in a mental health crisis." (citing Program Guide at 12-5-1)).  For precisely this reason, the rule has always been that Defendants have a 24-hour window to get patients to a crisis bed.  *See* Alternative Housing Memo at 1, 2 (providing that patients referred to an MHCB and placed in alternative housing "shall be transferred to the MHCB" or their referral rescinded within 24 hours of placement).  And while a certain number of individuals' crises may abate before they reach an MHCB, Defendants cannot presume this is generally the case and on that basis propose extensive delays in transfer of *every* patient in crisis.  Plaintiffs strenuously object to Defendants' attempt to triple, effectively, the length of time patients wait before receiving critical care.

Nor is expanding the transfer timeframe likely to have a significant impact on what Defendants treat as one of the major contributing factors to transfer delays— adequate bed space.  *See* Proposal at 1, 2-3, 5.  Furthermore, Defendants generally, but erroneously, presume that high rescission rates for MHCB referrals cause a delay in transfer.  *See* Proposal at 1-3.  But while an extended period in alternative housing may, in the short-term, reduce the administrative burden of processing MHCB referrals, in the long-run it is likely only to increase the need for crisis beds.  Further, a high rescission rate does not closely correlate with making more crisis beds available, as individuals whose referrals are rescinded never occupy the beds to which they were referred.

Rather than adopting their dangerous proposed approach, Defendants can increase the number of available crisis beds by better using the ones they have, and by ensuring that patients needing crisis and inpatient care flow through the system with fewer barriers.  To do so, Defendants should focus on the solutions identified in briefing on this subject.  For example, the data show that just a few institutions—specifically, CCWF, COR, FWF, MCSP, NKSP, and SAC—account for a significant proportion of rescissions; all have rescission rates above 50%.  *See* Table, MHCB Rescission Rates, attached as **Exhibit D**.  To the extent that faulty referrals are an administrative burden that impedes timely transfer—which Plaintiffs dispute—CDCR can address them with training and other efforts targeted at just six institutions.  In short, the rescission rate does not necessitate unraveling an essential element of the MHCB-transfer process.

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 5

Focusing on rescission rates as a key indicator *is* important for a different reason. Excessive numbers of rescissions can indicate—and have indicated in the history of this case—a serious breakdown in a system intended to treat those needing crisis or inpatient care. The Court understood and sought to address this very real problem in the context of inpatient transfers, *see* April Order at 3, 14 (ordering the Special Master to report to the Court regarding any "appreciable" uptick in rescissions or rejections of inpatient referrals following the April Order), and the same concern applies in the context of MHCB referrals. Tripling the time patients needing crisis care wait before actually being treated—and holding them in harsh, nontherapeutic conditions in the meanwhile—is likely only to exacerbate delays in transfer, compounding the pent-up need for higher levels of care and thereby impacting inpatient bed space, as well as MHCB availability.

## II.    Defendants Could Make Legitimate Efforts to Reduce Transfer Delays.

The Court ordered Defendants to address the problem with MHCB transfer delays, and the parties and Special Master Team to discuss with Defendants strategies to solve this problem. Until June 26, when Defendants circulated the Proposal, Defendants, Plaintiffs, and the Special Master Team had discussed a number of approaches to reducing transfer delays, all of which are within the scope of the April Order. They include:

(1) **Targeting efforts at reducing rescission rates and transfer delays at particular, problem institutions.** As mentioned above, six institutions have rescission rates over 50%. Defendants' efforts could have a big impact if they targeted training and/or improved clinical staffing at just these institutions. Defendants suggested staffing improvements as solutions to the transfer-delay problem in briefing on this issue. *See* ECF 5595 at 9; ECF 5597 at 1-2.

(2) **Focusing efforts on delays in the transfer of women to crisis beds.** Defendants' unwillingness to use inpatient beds at Patton for class members has caused a number of patients needing intermediate or acute care to repeatedly occupy crisis beds while awaiting transfer, often for long periods of time. *See* Plaintiffs' Letter re Inpatient Placements for Female Class Members (March 24, 2017), attached as **Exhibit E** ("March 24 Letter"). If Defendants were to make the Patton beds available promptly to class members on a regular basis, the backlog in the system could be alleviated and the existing crisis beds opened to meet female patients' needs. *Id.* Yet despite this at-the-ready solution, Defendants have not placed a female class member at Patton since we identified to them, in our March 24, 2017 letter, the very serious problem of the de facto closure of Patton to *Coleman* class members. At that time, Defendants had not placed a class

Exhibit 2 - 008

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 6

member in Patton for at least a year.  *See* March 24 Letter at 1-2.  Until Defendants solve this problem, they are not likely to solve the MHCB-transfer problem, or related inpatient-transfer delays.

Similarly, Plaintiffs object to DSH's suggestion at the June 26 workgroup meeting that it would begin to use an LRH process to sort women needing inpatient care. Defendants have never distinguished between female class members in this fashion, as Defendants have reported to the Court every month.  *See, e.g.*, Defendants' Census and Waitlists Reports for Inpatient Mental Health Care (June 15, 2017) ("June Inpatient Report"), ECF 5636 at 14 of 21.  Creating new custodial roadblocks for women in need of inpatient care also was never raised during the parties' recent extensive negotiations of the lift and shift policies.  Imposing new barriers to inpatient care at this juncture could only impede any progress Defendants might make toward compliance with the April Order.  It also will create a formal barrier preventing many female patients from accessing much needed inpatient care at Patton.  Such an impediment will, of course, have a trickle-down effect on the availability and timely transfer of women to crisis beds.

(3) **Targeting efforts to reduce MHCB readmission rates.**  Defendants already identified readmissions as "a heavy driver of all crisis bed admissions" in their response to the Court's March 24, 2017 order to show cause, yet the current proposal ignores the issue.  *See* ECF 5595 at 9.  Using point-in-time data from the April Psych Aging Report, attached as **Exhibit F**, Plaintiffs calculated that of the reported 916 MHCB placements in the reporting period, 79—or 8.6%—were readmissions.  These 79 readmittees stayed for a total of 1,046 days, *id.*, the equivalent of approximately 105 additional admissions.  In other words, reducing these rates could provide another hundred additional MHCB admissions.

The rate of readmissions indicates that clinical staff are not elevating patients to the level of care they need, when they need it.  Defendants stated that their regionalization plan would help reduce these rates.  *See* ECF 5595 at 9.  Has it?  If regionalization has not achieved sufficient reductions in readmissions, CDCR could address this problem with additional staff training or other efforts designed to ensure patients are placed in the appropriate level of care at the appropriate time.  CDCR could also take affirmative steps to address readmission rates at particular institutions.  For example, as Plaintiffs wrote in March, readmission rates to the female MHCBs are particularly high, in large part because Defendants have not been admitting *Coleman* patients needing inpatient care to Patton beds.  *See* March 24 Letter at 3-4.  The high rate of MHCB readmissions indicates a systemic obstacle to mental healthcare for those in

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 7

crisis, as Defendants themselves have told the Court, and Defendants should directly address it.

(4) **Dedicating significant and consistent effort to moving individuals needing inpatient care to ASH and other lower custody programs.** Placing all class members at their LRH will reduce overall competition for limited bed space and open up MHCBs to those who actually need crisis care, rather than having those beds occupied by individuals awaiting transfer to inpatient care. The Court, Plaintiffs, and the Special Master Team have repeatedly emphasized the need for Defendants in this way to focus their efforts on permitting the flow of patients through the system. Yet the data continue to show that Defendants are not placing *Coleman* class members into open beds at ASH, and that the problem is getting worse. For example, the June Inpatient Report shows that 77 of the 256 *Coleman* intermediate-care beds are open. *See* June Inpatient Report at 12, 13 of 21. Similarly, 34 of the low-custody beds at DSH-Vacaville and CSH are unused. *Id.* at 13 of 21. At the same time, however, 372 intermediate-care patients were held in high security beds, outside of their LRH designations. *Id.* at 12, 13 of 21. If Defendants choose not to use available inpatient beds, patients needing inpatient care will continue to tie up MHCBs unnecessarily and prevent Defendants from complying with Program Guide timelines for transfer to crisis care.

(5) **Finding alternatives to housing inmate-patients with long-term needs in crisis beds.** *See* Program Guide at 12-5-9 ("The MHCB shall accept inmates who meet the criteria for care and treatment and *shall continue to house only those inmates for whom [MHCB] care is appropriate*." (emphasis added)). MHCB stays should not exceed 10 days, *id.* at 12-5-1, but recent data shows that a number of patients have been held in MHCBs on a long-term basis, defined, for this purpose, as a stay over 60 days, *see* Table, MHCB Stays over 60 Days, attached as **Exhibit G**. Assuming the average MHCB stay lasts the maximum 10 days, finding non-crisis beds for the long-term MHCB population would allow hundreds more crisis-bed admissions annually. Defendants should fix this artificial MHCB shortage by opening these beds to class members who need crisis-level care. At the least, Defendants must show why these individuals have not been transferred out of crisis beds, which are intended for use only on a short-term basis.

The foregoing long-stay numbers include only individuals housed in MHCBs longer than 60 days—or at least *six times* the 10-day Program Guide limit for MHCB stays. *See* Program Guide at 12-5-1. But a very significant number of patients' stays last between 11 and 60 days. *See* Table, Excessive MHCB Lengths of Stay, April 2017, attached as **Exhibit H** (showing that 589 patients' stays lasted between 11 and 60 days). Using the rough approximation of a 10-day average MHCB stay, reducing these

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 8

individuals' stays to the Program Guide maximum would provide an additional 560 crisis bed admissions per year. *See id.* Defendants should study the percentage of crisis beds these individuals use, and find ways to open these beds for those who actually fit MHCB-treatment criteria, including the need for a stay of 10 days or less. Use of the full complement of lower custody inpatient beds, especially ASH, is an obvious first step.

In addition, a chief psychiatrist or his or her designee must approve stays exceeding 10 days. Program Guide at 12-5-1. Because so many patients occupy crisis beds for significantly longer than the 10-day maximum, justification and approval for such exceptional stays should come from Katherine Tebrock, Deputy Director of the Statewide Mental Health Program. MHCB-transfer delays are a statewide problem, so stays of exceptional length should be evaluated and approved at the state level.

Finally, long term housing of prisoners with psychiatric and/or other disabilities in MHCBs also violates their rights under the ADA and the Rehabilitation Act—equal access to programs and services are simply not provided in MHCBs. Defendants must develop appropriate housing and support services for these long-term residents outside of MHCB beds.

(6) **Fixing the fleet of transport vehicles.** In June, the *Plata* Receiver reported on Defendants' failure to stock and maintain an adequate transport-vehicle fleet. *See* Receiver's Thirty-Fifth Tri-Annual Report, ECF 5627 at 7-10 of 39. Plaintiffs have repeatedly asked Defendants to clarify the effect of this problem on inpatient- and MHCB-transfer delays, but Defendants have not responded. Is the status of Defendants' vehicle fleet an obstacle to timely transfers? If so, Defendants must find funding for additional vehicles and take the steps necessary to accelerate repair efforts.

(7) **Defendants' Previously Identified Efforts**. In their briefing on this topic, Defendants identified a number of the same potential solutions, as well as efforts they have already undertaken, to address MHCB transfer delays. They include:

First, CDCR has activated a dialectical behavior therapy program at California Medical Facility. This is an evidence based and effective program aimed at patients who regularly and repeatedly require inpatient treatment. The program is focusing on reducing the patients' need for inpatient care. Second, CDCR has launched trainings aimed at clinical evaluations and treatment skills, case formulation, triaging patients referred for crisis care, and improving the interdisciplinary treatment teams to ensure treatment goals are identified and tracked. Third, CDCR has created

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 9

 Crisis Intervention Teams that provide after-hours services to reduce the demand for after-hours inpatient referrals. The teams are currently at California Institution for Women and Salinas Valley State Prison. Fourth, CDCR is evaluating crisis bed readmissions to develop a process to reduce the frequency of readmissions. Fifth, CDCR has identified best practices at local institutions to apply statewide, e.g. staffing clinicians on site after hours to triage potential crises, a behavior incentive program, and a pain management program. Finally, CDCR is using utilization management to improve performance within the crisis beds.

ECF 5597 at 2-3; *see also* ECF 5595 at 9. Defendants should report the success of these initiatives to Plaintiffs and the Special Master Team.

 All of the foregoing possibilities are within the scope of the April Order and would help Defendants make strides toward compliance with MHCB transfer timelines.

### III. Defendants' Proposal to Alter the Metric for MHCB-Transfer Timelines Is Unacceptable and Outside the Scope of the April Order.

 We also object to Defendants' attempt to reframe the metric used for MHCB-transfer timelines. Due to the urgent nature of MHCB referrals, the expectation has always been that patients referred for crisis care reach their destination within 24 hours, not that they *begin* transport in that timeframe, no matter whether the transfer is intra- or inter-institution. *See* Program Guide at 12-1-14 ("The [table of transfer timelines] summarizes the time frames which CDCR must meet for the transfer of MHSDS inmate-patients between levels of care, *whether within the same institution or to another institution*." (emphasis added); *id.* at 12-5-3 to 12-5-4 ("If the institution does not have an MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be transferred to a designated MHCB institution . . . within 24 hours of referral"). Indeed, the Program Guide dispenses with Defendants' proposed approach. It specifically defines "Transfer" as "[t]he date the inmate-patient is *placed into* the LOC and program to which s/he was referred." *Id.* at 12-1-15 (emphasis added)). Defendants should not, in this way too, attempt to undo the clear rules under which the parties, Court, and Special Master have agreed to operate, as memorialized in the intensively negotiated Program Guide.

\\

\\

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 10

While the Program Guide acknowledges that "[i]n most cases" transfer should occur within 24 hours, *id.* at 12-5-4, any failure to comply with that timeframe should fall into a designated exception; that is precisely the purpose of the Court's request for the parties' to define limited exceptions. Specifically, any obstacles to timely transfer that cannot be anticipated and planned around—for example, when extreme and unprecedented traffic occurs or there are unforeseeable weather events or security concerns—should be addressed as exceptions, the application of which requires justification for both the existence and extent of the delay, as discussed more fully below.

Plaintiffs object to Defendants' attempt to avoid their responsibilities for timely transfer by altering the metric for timeliness.

## IV. Proposed Exceptions to Transfer Timeframes

Below are Plaintiffs' responses to Defendants' proposed exceptions.

### A. Out to court

Plaintiffs object to an out-to-court exception for MHCB-transfer timeframes. Such an exception makes more sense in the inpatient context, with the longer timeframe for transfer and the greater likelihood that a court date will arise while the patient is awaiting transfer.

In addition, patients awaiting crisis care need immediate attention. Sending them to court could be dangerous, given their vulnerable and potentially volatile conditions. Presumably, if a patient's court date falls within the time period for transfer to an MHCB, the patient and/or Defendants could seek leave from the court for an extension, given the emergent circumstances.

### B. Medical holds

Plaintiffs agree that medical holds can—on a case-by-case basis, with adequate justification—constitute exceptions to the MHCB-transfer timeframe. The Program Guide provides that medical clearance is necessary before a patient is transferred to a crisis bed. *See* Program Guide at 12-5-4. But any individual circumstance in which Defendants assert the medical exception requires a detailed explanation, balancing the patient's medical and mental health needs. Defendants must also justify the length of the delay, which should last no longer than necessary to resolve the medical concern.

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 11

In addition, Defendants must transparently report on use of this exception. Any such reporting must include the details of each case-specific evaluation of the need for the delay, and a justification for the length of the delay. The bald assertion "medical hold," as has appeared in the reporting regarding inpatient delays, *see* June Inpatient Report at 20 of 21, will not suffice. Defendants must also report both on the referrals that were rescinded due to a medical issue, and the medical circumstances that caused a delay in transfer of a patient whose referral was not rescinded.

### C.    Other

Plaintiffs also do not object to an "other" category of exceptions, so long as the exception is cabined and confined to unusual and unforeseeable circumstances out of Defendants' control. Application of any such exception should involve a careful, individualized balancing of the obstacle to transfer against the need for crisis care, and a case-specific evaluation of whether the circumstances justify the extent of the delay.

The "other" category must not permit Defendants to rely on foreseeable obstacles to timely transfer, including, for example, regular traffic patterns or construction needs that staff could reasonably anticipate and plan around. These limitations are necessary to ensure the "other" exception does not swallow the rule. *See* Stipulation and Order re Addendum to Program Guide Regarding Transfer Timeframes, ECF 5631, at 3.

*    *    *

The Court gave the parties only a short timeframe to resolve MHCB-transfer delays, before Defendants faced the possibility of contempt. Nevertheless, a full two months after the Order, Defendants presented this out-of-left-field Proposal, rather than addressing the issues that up to this point have been at play or those that are obvious from the face of Defendants' own data. Injecting these issues at this stage of the proceedings threatens the possibility of progress on this critical issue.

At the least, the Proposal violates the spirit of the April Order, which is to ensure those needing critical care receive it in a timely fashion. Plaintiffs will not relitigate in this context the use of alternative housing and the metric for timeliness of MHCB transfers. We hope for a constructive conversation about topics the April Order envisions, including steps to (1) increase the speed by which patients are transferred to

\\
\\

[3144519.7]

Exhibit 2 - 014

Nick Weber
Matthew A. Lopes, Jr.
July 6, 2017
Page 12


MHCBs, (2) better use the beds Defendants have, and (3) reduce the number of unnecessary referrals or rereferrals to MHCBs, as well as identifying any narrow exceptions to the designated timeframes.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By:   Jessica Winter

JLW
Attachments: Exhibits A-H
cc:     *Coleman* Special Master Team
        Elise Thorn
        Co-Counsel

Exhibit A

Exhibit 2 - 016



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



## MEMORANDUM

| Date | | MAY 1 6 2012 |
|------|---|--------------|
| To | : | Chief Executive Officers<br>Chiefs of Mental Health |
| From | : | Timothy G. Belavich, Ph.D., MSHCA, CCHP,<br>Deputy Director (A)<br>Statewide Mental Health Program,<br>Division of Correctional Health Care Services |
| Subject | : | Use of Alternative Housing |

The purpose of this memorandum is to ensure staff follows current Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision, requirements and policy memorandums related the use of alternative housing. Current practice at many institutions has been to utilize alternative housing for an evaluation period and/or provide short term treatment. This practice is not consistent with current policy.

Effective immediately:

- Inmate-patients shall not be placed in alternative housing until an evaluation by a qualified mental health clinician has been completed and it is documented that the inmate requires a referral to the Mental Health Crisis Bed (MHCB). The clinician's order shall read "Refer to Mental Health Crisis Bed for admission evaluation." Because of licensing requirements, "Only licensed clinicians with admitting privileges at the receiving MHCB program can write the actual "admission" order and this is performed at the actual time of admission..." (See attached September 6, 2005, memorandum entitled *Standardization of Mental Health Crisis Bed Admission Procedures*).

  When a face to face evaluation is not possible and a referral for admission to the MHCB is documented that results in placement into an alternative housing cell, the referral can be rescinded once a face to face evaluation is conducted and it is determined the inmate-patient does not require placement into the MHCB. The rescission and subsequent movement out of alternate housing and back to the inmate-patient's previous housing must occur within 24 hours of placement.

- Appropriate housing of inmate-patients pending transfer shall meet MHSDS Program Guide, 2009 Revision, requirements (p. 12-5-5). Housing shall be

determined in the following order of preferred locations:

1. Inpatient beds
2. Outpatient Housing Unit

The following locations are considered alternative housing:

3. Outpatient Housing Unit overflow cells
4. Large holding cells with toilets
5. Large holding cells without toilets
6. Triage and Treatment Area or other clinic physical exam room
7. Other unit-housing where constant visibility can be maintained
8. Holding cells within the licensed bed area of the Correctional Treatment Center

- Only inmate-patients who have been referred to the MHCB shall be placed in alternative housing.

- Although alternative housing locations are listed in the MHSDS Program Guide, 2009 Revision, as appropriate placements, the use of them shall be minimal. It is expected these locations will be used only as a last alternative and only when MHCB beds are not immediately available.

- All inmate-patients placed in alternative housing shall be transferred to the MHCB as soon as possible and placement shall not exceed 24 hours. "The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed." (MHSDS Program Guide, 2009 Revision, p. 12-5-4).

- A designated institution mental health staff member shall track alternative housing placement in accordance with the attached February 4, 2010, policy memorandum entitled *Implementation of Alternative/Temporary Housing Logs.*

- All electronic logs shall be e-mailed by a designated mental health staff member weekly to the Utilization Management (UM) mailbox at CDCR DCHCS DMH Referral Updates@cdcr.ca.gov.

- The electronic log must be received in the UM mailbox by close of business every Friday.

- Each log shall include only those inmates placed in alternative housing for the week in which the log is submitted (logs shall not include inmates placed in alternative housing the week prior – no running logs).

# MEMORANDUM

- Electronic logs shall include all inmate-patients placed in alternative housing beginning Friday and include all placements through close of business Thursday of the following week (Friday – Thursday record of placements).

Mandatory training for Chiefs of Mental Health or their designees was held on Wednesday, May 16, 2012, at 3:00 pm. Details regarding this training were sent to all Chiefs of Mental Health via email on May 3, 2012.

If you have any questions regarding these requirements you may contact Laura Ceballos, Ph.D. Chief of Quality Management, Statewide Mental Health Program, at (916) 691-0308.

Attachments

cc:    Judy Burleson
       Nathan Stanley
       Laura Ceballos, Ph.D.
       Steve Clavere, Ph.D.
       Tia Araminta, Ph.D.
       Richard Kendall, Ph.D.
       Lucinda McGill, R.N.
       Rick Johnson

State of California                                           California Department of Corrections and Rehabilitation

# Memorandum

Date    :    February 4, 2010

To      :    Wardens
             Health Care Managers/Chief Executive Officers
             Chiefs of Mental Health
             Directors of Nursing

Subject :    Implementation of Alternative / Temporary Housing Logs

On October 7, 2008, the *Coleman* court ordered the California Department of Corrections
and Rehabilitation (CDCR) to:

> ...implement and maintain institutional electronic and manual tracking logs for
> inmates who have been placed into alternative housing pending Mental Health
> Crisis Bed (MHCB) transfers, and the dates, times, and places of return to regular
> housing for inmates not transferred to an MHCB. The tracking logs should also
> indicate the specific levels of clinical monitoring that were required (suicide watch,
> suicide precaution, or psychiatric observation), and the clinical monitoring that
> occurred. When an inmate is referred to an MHCB for treatment of a suicidal
> behavior, and the referral is rescinded or the inmate-patient is not admitted to an
> MHCB, the inmate shall receive follow-up treatment including daily contact for
> five (5) consecutive days following his or her return to regular housing. Quality
> management for implementation of discharge planning, required when an inmate is
> discharged from an MHCB, shall be implemented for these inmates.

Based upon this court-ordered requirement, each institution will establish a Local Operating
Procedure (LOP) and a quality assurance system to ensure the established LOP pertaining to
the Alternative / Temporary Housing Logs are properly followed.

Accompanying this memorandum is a draft of the Alternative / Temporary Housing Log.
This log is in the process of being approved as an official CDCR form and will be available
on the Prison Industry Authority website by May 1, 2010. Beginning May 1, 2010, all
institutions shall implement this procedure. Within 30 days of receipt of this memorandum,
each institution will submit a copy of the institution's LOP pertaining to the Alternative /
Temporary Housing Log to Captain James "Tom" Lyons via e-mail to
James.Lyons@cdcr.ca.gov or faxed to (916) 323-2886, attention Captain James "Tom"
Lyons, Division of Adult Institutions.

The tracking of an inmate-patient placed in temporary/alternative housing shall be initiated
any time an inmate-patient cannot be returned to normal housing based upon clinical
placement on Psychiatric Observation, Suicide Precaution, or Suicide Watch. This log will
be used to track the location of the inmate any time s/he is housed in alternative/temporary
housing.

CDC 1617 (3/89)

Exhibit 2 - 020

Wardens
Health Care Managers
Directors of Nursing
Chiefs of Mental Health

Implementation of Alternative / Temporary Housing Logs
Page 2

The following processes shall be included in the LOP developed by each institution:

1. When a mental health practitioner is not on site to conduct an evaluation and a determination is made that the inmate-patient requires clinical monitoring, the triage treatment and assessment (TTA) nurse shall call Central Control, notify custody staff that the inmate requires temporary housing, and provide information regarding the level of clinical monitoring required (suicide watch, suicide precaution, psychiatric evaluation). Documentation in the Alternative / Temporary Housing Log (attached) will be initiated by Central Control staff.

2. When a mental health practitioner is on site, the practitioner shall call Central Control, notify custody staff that the inmate requires temporary housing, and provide information regarding the level of clinical monitoring required (suicide watch, suicide precaution, psychiatric evaluation). Documentation in the Alternative / Temporary Housing Log (attached) will be initiated by Central Control staff.

3. Central Control staff shall fax the Alternative / Temporary Housing Log to the Mental Health Crisis Bed unit (MHCB) daily by 9:00 AM and when inmate-patients on the log are moved.

4. In institutions without a MHCB, the Alternative / Temporary Housing Log shall be faxed by the Central Control staff to the Outpatient Housing Unit (OHU), Mental Health Outpatient Housing Unit (MOHU), or designated mental health office daily by 9:00AM and when inmate-patients on the log are moved.

5. The treating mental health practitioner will utilize the faxed Alternative / Temporary Housing Log to ensure all inmates awaiting assessment for, or placement into, a MHCB receive treatment and receive the appropriate level of clinical monitoring.

6. The treating mental health practitioner will notate clinical monitoring and indicate any change in level of clinical monitoring (suicide watch, suicide precaution, psychiatric observation) in the inmate-patient's 114A when the inmate-patient is seen by the clinician and at least daily. The treating clinician will also verbally notify the on duty custody officer where the inmate is housed of any change in monitoring.

7. When the inmate-patient returns to regular housing, Central Control staff shall immediately complete the Alternative / Temporary Housing Log and fax it to either the Mental Health Crisis Bed Unit or the Outpatient Housing Unit (according to which type of treatment facility is at the institution, as indicated above). The mental health practitioner will initiate a five day clinical follow-up consistent with the institution's current procedure for initiating five day follow-ups. The 114A shall be forwarded to Records for placement in the inmate's Central File, the log shall be

Exhibit 2 - 021

Wardens
Health Care Managers
Directors of Nursing
Chiefs of Mental Health

Implementation of Alternative / Temporary Housing Logs
Page 3

completed and forwarded to a mental health designee who will enter the information
into an electronic database.

8. When an inmate-patient is admitted to the MHCB, Central Control custody staff shall
immediately complete the Alternative / Temporary Housing Log, the 114A shall be
forwarded to Records for placement in the inmate's Central File, and the Alternative /
Temporary Housing Log shall be completed and forwarded to a mental health
designee, who will enter the information into an electronic database.

9. Institutions will develop a quality assurance system to ensure logs are filled out
completely and regularly.

If you have any questions or need any additional information regarding the Alternative /
Temporary Housing Log, you may contact Captain Lyons at (916) 324-5487 or via e-mail at
James.Lyons@cdcr.ca.gov.


MARION CHIURAZZI, PSY.D.                          GEORGE J. GIURBINO
Director (A)                                      Director
Statewide Mental Health Program                   Division of Adult Institutions


KAREN REA, PHN, MSN, FNP
Chief Nurse Executive
Correctional Healthcare Nursing

Attachments

cc: Associate Wardens of Health Care
    Associate Directors, DAI
    Regional Administrators, Division of Correctional Health Care Services (DCHCS)
    Regional Directors of Nursing, California Prison Health Care Receivership
    Sharon Aungst, Chief Deputy Secretary, DCHCS
    George Giurbino, Director, DAI
    M. Jackson Kahle, Ph.D., Deputy Director (A), Mental Health Clinical Practices, DCHCS

Exhibit 2 - 022

Wardens
Health Care Managers
Directors of Nursing
Chiefs of Mental Health

Implementation of Alternative / Temporary Housing Logs
Page 4

James Scaramozzino, Ph.D., Deputy Director (A), Mental Health Clinical Programs, DCHCS
Laura Ceballos, Ph.D. Chief Psychologist, Quality Management, Mental Health Program, DCHCS
Catherine Knox, Assistant Statewide Chief Nursing Executive, DCHCS
Thomas Gaines, AGPA, Wasco State Prison

Exhibit 2 - 023

| Inmate Name | CDCR # | Location and cell type* | DATE/TIME of placement | Clinical monitoring ordered** | DATE/TIME of transfer from temporary housing | New Housing Location |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

**INSTRUCTIONS**

Central Control Staff shall log all entries for inmates placed in alternative/temporary housing pending Mental Health Care and Services. A new entry shall be documented when an inmate's cell location is changed.

* Cell type shall be designated as zz, wet cell, etc.

** Indicate either psychiatric observation, suicide precaution, or suicide watch

Procedure: See Institution LOP

Authority: October 7, 2008 Coleman Court Order Document 3072
Exhibit 2 – 024

STATE ___ ALIFORNIA
ALTERNATE / TEMPORARY HOUSING LOG
CDCR 7476 (NEW, 03/10)

DEPARTMENT OF CORRECTIONS AND REHAB ___ TION

## ALTERNATE / TEMPORARY HOUSING LOG

| | Inmate Name | CDC # | Location and Cell Type * | DATE/TIME of Placement | Clinical Monitoring Ordered ** | DATE/TIME of Transfer from Temporary Housing | New Housing Location |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |
| 7. | | | | | | | |
| 8. | | | | | | | |
| 9. | | | | | | | |
| 10. | | | | | | | |
| 11. | | | | | | | |
| 12. | | | | | | | |
| 13. | | | | | | | |
| 14. | | | | | | | |
| 15. | | | | | | | |
| 16. | | | | | | | |
| 17. | | | | | | | |
| 18. | | | | | | | |
| 19. | | | | | | | |

### INSTRUCTIONS

Central Contr ___ ___ ___ ng all entries for inmates placed in alternative/temporary housing pending Mental Health Care and Services.  A new entry shall be documented when an inmate's cell location is changed.
* Cell type shall be designated as zz, wet cell, etc.
** Indicate either psychiatric observation, suicide precaution, or suicide watch.

Procedure:  See Institution LOP

Authority:  October 7, 2008 Coleman Court Order Document 3072

Exhibit 2 - 025

State of California                                              Department of Corrections and Rehabilitation

# Memorandum

Date  :   September 6, 2005

To    :   Wardens
          Health Care Managers
          Chiefs, Mental Health Program

| | |
|---|---|
| **DCHCS Memo Number :  05-0009** | |
| **Reason For Transmittal** | |
| [ · ]  State Law Change | |
| [  ]  Policy Change | |
| [  ]  Court Order or Settlement Agreement | |
| [x    Clarification Request | |
| [  ]  Other _____ | |
| **Supersedes:** | |
| Memorandum dated July 21, 2005 | |

Subject:   **STANDARDIZATION OF MENTAL HEALTH CRISIS BED ADMISSION PROCEDURES**

The California Department of Corrections and Rehabilitation (CDCR) Division of Correctional Health Care Services (DCHCS) is committed to the development of a bed management strategy which will increase the quantity of available Mental Health Crisis Beds (MHCB) and decrease waiting lists for this level-of-care. In the interim, inmate-patients in need of a MHCB must be housed in the safest and most humane settings possible utilizing existing physical plant options.

This memorandum addresses three issues relevant to inmate-patients waiting for a MHCB:

1. Holding environment pending transfer or placement.
2. Mattress, blanket, and gown issuance.
3. Five-Day follow-ups for suicidality.

### Holding Environment Pending Placement or Transfer to MHCB

When an inmate-patient is determined to need a MHCB and there are no available beds in the sending institution, the steps outlined in the attached memorandum from September 16, 2003, shall be followed pending placement/transfer. After a brief assessment of medical and mental health factors, inmate-patients currently housed in the Correctional Treatment Center (CTC) shall be thoroughly assessed for appropriateness to discharge. In addition, if appropriate, medical inpatients shall be considered for placement in the community hospital.

On occasion, some inmate-patients cannot be placed into a MHCB within the policy requirement of 24-hours due to a lack of available beds. To best manage such situations, each institution shall develop a local operating procedure (LOP) regarding the housing and care of inmate-patients waiting for a MHCB to codify their actual operating process. Physical plant options and specific mental health program missions at each institution necessitate

Exhibit 2 - 026

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 2

individualization of each LOP. However, each individualized LOP shall incorporate the following standardized procedures:

- When an inmate-patient is identified as needing a MHCB, the referring clinician's order shall read "Refer to Mental Health Crisis Bed for admission evaluation." Only licensed clinicians with admitting privileges at the receiving MHCB program can write the actual "admission" order and this is performed at the actual time of admission to a vacant bed.

- The LOP may require a 128C chrono be generated in addition to the clinician's order to notify custody staff.

- Until transferred to a MHCB the inmate-patient shall be observed and monitored, or if clinically indicated, placed under constant direct observation for suicide watch. Nursing shall also be available to administer medication and to provide nursing checks as clinically indicated and ordered. The LOP shall indicate procedures for administration of medication and for daily contact by a mental health clinician.

- Appropriate housing of inmate-patients pending MHCB transfer shall be determined by the sending institution and in the following order of preferred locations:

  1. Inpatient Beds.
  2. Outpatient Housing Unit.
  3. Outpatient Housing Unit overflow cells.
  4. Large holding cells with water/toilets including, but not limited to, "ZZ cells," "Wet cells," and/or "Clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.
  5. Large holding cells without water/toilets such as "Contraband Cells" (Not in a CTC licensed area.)
  6. Triage and Treatment Area or other clinic physical examining room
  7. Other unit-housing where complete and constant visibility can be maintained
  8. When none of the above are available, small holding cells (not in a CTC licensed bed area) that are designed for the inmate-patient to sit or stand may be used for up to four hours by which time consideration of a rotation to one of the above listed options shall have been considered and the outcome of such consideration documented. Inmate-patients shall be retained in sit/stand cells only with approval of the watch commander and notification of clinical staff on-call.

Exhibit 2 - 027

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 3

    9. Holding cells within the licensed bed area of the CTC building (notification to
Department of Health Services of an unusual occurrence is required).

- The Health Care Placement Unit (HCPU) shall be contacted directly by telephone
regarding all inmate-patients pending transfer to a MHCB in accordance with the
September 16, 2003 memorandum (attached). If the goal is to place the inmate-patient
at the same institution's MHCB without requiring transport, the HCPU shall be
contacted when a bed is not immediately available. The information relayed to HCPU
shall include the inmate-patient's name, CDC number, prior level of care, identification
of the time that the determination for a MHCB was made, reason for MHCB placement,
current institution, and type and location of temporary housing.

- The HCPU shall be notified whenever a MHCB becomes available. For those
institutions with a CTC and MHCB program, HCPU may prioritize an inter-institution
transfer of an inmate-patient (based on clinical or temporary housing priority) into a
MHCB over internal admissions.

- When an inmate-patient verbalizes suicidal ideation without other signs and symptoms
of increased risk of suicide, the mental health clinician is responsible for evaluating any
contributing environmental stressors, including the completion of a Suicide Risk
Assessment form, and communicating with custody staff and supervisors regarding any
potentially solvable custody issues. Resolution of related environmental issues is
preferable to placement of an inmate-patient who is not genuinely at risk of suicide into
a MHCB.

- The primary clinician and the assigned psychiatrist shall assess the inmate-patient and
provide appropriate mental health services. When appropriate, the mental health
clinicians shall provide therapeutic intervention focused on ways the inmate-patient
may get perceived non-medical needs met without requiring MHCB placement. After
regular work hours, the psychiatrist on-call is encouraged to conduct a face-to-face
clinical assessment prior to admitting the inmate-patient to a MHCB. After work hours
when the psychiatrist on-call chooses not to admit a suicidal inmate-patient to MHCB,
a face-to-face clinical assessment is required.

- When involuntary/emergency medication is administered, all available documentation
related to the decision to medicate, including but not limited to, danger to self, others,
and/or grave disability, shall be forwarded to the treating clinicians in the MHCB.

- For inmate-patients discharged from a MHCB back to another sending institution or
new institution, the LOP may allow for placement into alternate housing pending
transfer, with appropriate mental health follow-up.

Exhibit 2 - 028

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 4

- Upon discharge, the clinician from the treating MHCB will call the Chief Psychiatrist, Chief of Mental Health, or designee at the institution to which the inmate-patient will return or be sent (See attached contact list.) If the contact person is not available, the MHCB clinician will leave the following information with a mental health supervisor for the contact person (or Health Care Manager if there is no mental health supervisor available):

  o  Name and CDCR number of inmate-patient.
  o  Contact information for the discharging clinician, including pager number.
  o  Discharge diagnosis.
  o  Follow-up requirements (i.e. daily contact required for suicide follow-up).

- The Discharge Summary, Suicide Risk Assessment, and Doctor's orders shall be faxed to the designated fax number. (See attached contact numbers at each institution.)

<u>Mattress, Blanket and Gown Issuance</u>

All inmate-patients who are deemed to need a MHCB because of suicidal ideation, threats or attempts, and who are housed in one of the above environments pending transfer to a MHCB, shall be issued a no-tear mattress, no-tear blanket, and a no-tear gown/smock, unless otherwise ordered in writing by the clinician. If the inmate-patient subsequently attempts to use any or all of these items to harm his or herself, the clinician may then order that one or more of these items be removed. However, it is important to stress that unless otherwise contraindicated, the inmate-patient shall be issued the above items since the inmate-patient's dignity and comfort must always be preserved to every extent possible while maintaining safety and security.

<u>"Five-Day" Clinical Follow-Up Plans and Custody Wellness Checks</u>

Inmate-patients who were determined to need a MHCB for suicidal precautions or watch, and who were held, pending transfer, in one of the above housing environments, but who subsequently are deemed to no longer be at risk of suicide and, therefore, are released back to their regular housing cell, shall receive appropriate clinical and custodial follow-up per existing policy and procedures (i.e. 5-day follow up procedures).

Exhibit 2 - 029

Wardens
Health Care Managers
Chiefs, Mental Health Program
Page 5


For questions, please contact Shama Chaiken, Ph.D., Chief Psychologist, DCHCS, at (916) 445-4114.


RENEE KANAN, M.D.
Director (A)
Division of Correctional Health Care Services

JOHN DOVEY
Director
Division of Adult Institutions

Attachments

cc: J. S. Woodford
    Associate Directors, Division of Adult Institutions
    Yulanda Mynhier
    Regional Administrators, DCHCS
    Lisa Tillman
    Kathleen Keeshen
    Timothy Fishback, M.D.
    Shama Chaiken, Ph.D.
    Margaret McAloon, Ph.D.
    Andrew Swanson, M.D.
    Irma Petrey

Exhibit 2 - 030

Exhibit B

Exhibit 2 - 031

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 05: PROVISION OF CARE, TREATMENT, OR SERVICES | Revision Date(s): | |
| | Supersedes: | 12.05.301 April 2015 |
| POLICY 12.05.301: HOUSING OF PATIENTS PENDING MENTAL HEALTH CRISIS BED TRANSFER | Attachments: | Yes☐ No☒ |
| | Directors Approval: | |

---

**12.05.301**     Housing of Patients Pending Mental Health Crisis Bed (MHCB) Transfer

---

**Policy**     Patients pending MHCB transfer shall be housed following the order of preferred locations as listed below.  Alternative housing shall only be used for patients referred to an MHCB.

---

**Order of Preferred Locations**     Housing of patients pending transfer to an MHCB where transfer is not expected for four or more hours shall be determined based on the needs of the patient and bed availability in the following order of preferred locations:

1. Outpatient Housing Unit (OHU)

2. OHU overflow cells

3. General Population housing (suicide resistant when available)

4. Large holding cells with toilets and a suicide resistant bed with safety (no-tear) mattress.

For time frames of four hours or less, the following locations should be utilized:

5. Large holding cells without toilets (maximum of 4 hours)

6. Triage and Treatment Area (TTA) or other clinic physical exam room

7. Other unit-housing where complete and constant visibility can be maintained

8. CTC holding cells

Small holding cells that are designed for the patient to sit or stand shall only be used as a last option for temporarily housing patients in crisis. These placements are not considered alternative housing, and use of these cells shall be documented on the custody log for small holding cells. Patients shall be transferred out of these cells as soon as possible and their placement is **never to exceed four hours**.

---

**Discussion**      The Mental Health Services Delivery System Program Guide (2009 Revision) clearly lists the order of priority for housing patients awaiting transfer to an MHCB. This policy serves as a clarification and shall be considered the current directive.

Staff shall ensure that patients housed in alternative housing have reasonable access to water and toilets. Patients shall be provided at minimum, with a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock while in alternative housing pending transfer. A clinician may order that one or more of the items be removed only when a patient attempts to use any or all of the issued items to harm him or herself.

OHU beds are considered alternative housing when a patient is temporarily placed within them pending MHCB placement. Patients shall not be placed in the OHU beds for mental health issues unless a referral to the MHCB has been made. The alternative housing requirements as set forth in this policy shall be followed when patients are placed into these beds.

All Alternative Housing use shall be logged on the *Alternative/Temporary Housing Log*.

---

**Compliance Indicators**

1. Prior to placement in alternative housing, the patient receives continuous and direct visual observation while pending a mental health evaluation. Once placed, all patients in alternative housing shall remain on continuous direct visual observation until the patient is transferred to an MHCB.

2. Prior to placement in alternative housing, patients shall have a referral to an MHCB.

3. Alternative housing length of stay shall not exceed 24 hours.

4. Alternative housing placements shall be tracked in the *Alternative/ Temporary Housing Log*.

5. When determining alternative housing placement, the order of preferred locations (as listed) is followed.

6. Patient has reasonable access to water and toilets.

7. Patients are provided, at minimum, a safety (no-tear) mattress, suicide resistant bed, safety (no-tear) blanket, and safety (no-tear) smock.

8. Health Care Placement Oversight Program is contacted immediately when a patient is referred to an MHCB and before being placed in alternative housing.

---

**Action required**      The following action is required for your institution to be in compliance with the new policy.

| If your institution … | then … |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP within 30 days of the effective date. Ensure the |

---

| | LOP is reviewed annually. |
|---|---|
| does not have an LOP | develop one within 30 days of the effective date that meets the new policy requirements.  Ensure the LOP is reviewed annually. |

**References**    *Coleman* v. *Brown* (E.D. Cal. Oct. 7, 2008, No. CIV S-90-0520 LKK JFM P)

Division of Correctional Health Care Services. (2009 Revision). *Mental Health Services Delivery System Program Guide.*  Mental Health Crisis Bed, Chapter 5

**Questions**    If you have any questions or need any additional information related to this Policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.

Exhibit C

Exhibit 2 - 035

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | 10/15/2015 |
|---|---|---|
| CHAPTER 05:<br>PROVISION OF CARE, TREATMENT, OR SERVICES | Revision Date(s): | 2/18/2015, 4/9/2015 |
| | Supersedes: | . |
| POLICY 12.05.301:<br>HOUSING OF PATIENTS PENDING MENTAL HEALTH CRISIS BED TRANSFER | Attachments: | Yes☐ No☒ |
| | Directors Approval: | _Be_____. PhD |

**12.05.301**   Housing of Patients Pending Mental Health Crisis Bed (MHCB) Transfer

**Policy**   Patients pending MHCB transfer shall be housed following the order of preferred locations as listed below. Alternative housing shall only be used for patients referred to a MHCB.

**Order of Preferred Locations**   Housing of patients pending transfer to an MHCB shall be determined based on the needs of the patient and bed availability in the following order of preferred locations:

1. Correctional Treatment Center (CTC) licensed medical beds
2. Outpatient Housing Unit (OHU)
3. OHU overflow cells
4. Large holding cells with toilets
5. Large holding cells without toilets
6. Triage and Treatment Area (TTA) or other clinic physical exam room
7. Other unit-housing where complete and constant visibility can be maintained
8. CTC holding cells

The following locations are considered alternative housing pending transfer to an MHCB and shall be logged/tracked as such:

- CTC licensed medical beds
- OHU beds and overflow cells
- Large holding cells with toilets
- Large holding cells without toilets
- TTA or other clinic physical exam room
- Other unit-housing where complete and constant visibility can be maintained
- CTC holding cells

Exhibit 2 - 036

**Discussion** The Mental Health Services Delivery System Program Guide (2009 Revision) clearly lists the order of priority for housing patients awaiting transfer to an MHCB. This policy serves as a clarification and shall be considered the current directive. A licensed inpatient bed is the preferred location for housing patients pending transfer to an MHCB.

Staff shall ensure that patients housed in alternative housing have reasonable access to water and toilets. While in alternative housing pending transfer, patients shall be provided at minimum, with a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock. Only when a patient attempts to use any or all of the issued items to harm him or herself, may a clinician order that one or more of the items be removed.

Use of licensed medical CTC beds for MHCB overflow shall be considered alternative housing. OHU beds are considered alternative housing when a patient, pending MHCB placement, is temporarily placed within them. Patients shall not be placed in the OHU or CTC beds for mental health issues unless a referral to the MHCB has been made. The alternative housing requirements as set forth in this policy shall be followed when patients are placed into these beds.

Utilizing holding cells within the licensed bed area of the CTC for housing patients shall be logged on the *Alternative/Temporary Housing Log*.

Small holding cells that are designed for the patient to sit or stand shall be used as infrequently as possible and only as a last option for temporarily housing patients in crisis. These placements are not considered alternative housing, and use of these cells shall be documented on the custody log for small holding cells. Patients shall be transferred out of these cells as soon as possible and their placement is **never to exceed four hours**.

**Compliance Indicators**

1. Prior to placement in alternative housing, the patient receives continuous and direct visual observation while pending a mental health evaluation. Once placed, all patients in alternative housing shall remain on continuous direct visual observation until the patient is transferred to an MHCB.

2. Prior to placement in alternative housing, patients shall have a referral to an MHCB.

3. Alternative housing length of stay shall not exceed 24 hours.

4. Alternative housing placements shall be tracked in the *Alternative/ Temporary Housing Log*.

5. When determining alternative housing placement, the order of preferred locations (as listed) is followed.

6. Patient has reasonable access to water and toilets.

7. Patients are provided, at minimum, a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock.

8. Health Care Placement Oversight Program is contacted immediately when a patient is referred to an MHCB and before being placed in alternative housing.

Exhibit 2 - 037

**Action required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution … | then … |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP within 30 days of the effective date. Ensure the LOP is reviewed annually. |
| does not have an LOP | develop one within 30 days of the effective date that meets the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

*Coleman* v. *Brown* (E.D. Cal. Oct. 7, 2008, No. CIV S-90-0520 LKK JFM P)

Division of Correctional Health Care Services. (2009 Revision). *Mental Health Services Delivery System Program Guide.* Mental Health Crisis Bed, Chapter 5

**Questions**

If you have any questions or need any additional information related to this Policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.

Exhibit 2 - 038

Exhibit D

Exhibit 2 - 039

# MHCB Rescission Rates

| Institution | April 2016 - April 2017 Percent of Total | | | | April 2016 - April 2017 Individual Percents | | |
|---|---|---|---|---|---|---|---|
| | Referrals | Placements | Rescissions | Placements Over 24 Hours | Placement Rate | Rescission Rate | Over Timeframes Placement Rate |
| ASP | 0.6% | 1.0% | 0.1% | 0.9% | 91.2% | 8.8% | 52.7% |
| CAL | 0.4% | 0.5% | 0.1% | 0.5% | 86.2% | 13.8% | 60.0% |
| CCC | 0.1% | 0.2% | 0.0% | 0.1% | 94.1% | 5.9% | 43.8% |
| CCI | 2.5% | 4.0% | 0.1% | 3.5% | 98.5% | 1.5% | 50.1% |
| CCWF | 3.2% | 1.4% | 6.1% | 2.2% | 25.5% | 74.5% | 92.5% |
| CCWF-RC | 1.9% | 0.8% | 3.6% | 1.3% | 26.0% | 74.0% | 90.1% |
| CEN | 0.2% | 0.3% | 0.1% | 0.4% | 86.8% | 13.2% | 66.7% |
| CHCF | 2.9% | 3.3% | 2.3% | 2.9% | 68.6% | 31.4% | 49.2% |
| CIM | 0.9% | 1.3% | 0.2% | 1.3% | 90.8% | 9.2% | 58.6% |
| CIM-RC | 1.4% | 2.3% | 0.1% | 2.6% | 98.3% | 1.7% | 64.0% |
| CIW | 3.2% | 4.5% | 1.1% | 5.6% | 86.4% | 13.6% | 70.5% |
| CMC | 5.3% | 6.0% | 4.1% | 4.9% | 69.2% | 30.8% | 46.4% |
| CMF | 3.0% | 3.5% | 2.3% | 2.3% | 70.1% | 29.9% | 36.8% |
| COR | 10.2% | 8.1% | 13.5% | 9.4% | 47.8% | 52.2% | 66.5% |
| CRC | 0.3% | 0.5% | 0.2% | 0.5% | 82.1% | 17.9% | 58.7% |
| CTF | 0.5% | 0.6% | 0.4% | 0.6% | 69.8% | 30.2% | 60.0% |
| CVSP | 0.1% | 0.1% | 0.0% | 0.1% | 75.0% | 25.0% | 33.3% |
| DVI | 0.6% | 0.7% | 0.5% | 0.5% | 68.4% | 31.6% | 44.6% |
| DVI-RC | 1.7% | 1.7% | 1.8% | 1.8% | 59.4% | 40.6% | 59.3% |
| FOL | 0.1% | 0.2% | 0.1% | 0.2% | 69.6% | 30.4% | 68.8% |
| FWF | 0.1% | 0.0% | 0.2% | 0.0% | 17.6% | 82.4% | 66.7% |
| HDSP | 1.3% | 1.3% | 1.2% | 0.7% | 63.1% | 36.9% | 31.3% |
| ISP | 0.5% | 0.6% | 0.3% | 0.8% | 76.9% | 23.1% | 71.7% |
| KVSP | 3.7% | 3.5% | 3.9% | 3.6% | 57.9% | 42.1% | 57.8% |
| LAC | 4.9% | 4.3% | 5.7% | 4.5% | 53.5% | 46.5% | 59.7% |
| MCSP | 6.7% | 5.3% | 8.7% | 4.7% | 48.1% | 51.9% | 51.2% |
| NKSP | 1.3% | 0.9% | 1.8% | 1.0% | 43.8% | 56.2% | 60.7% |
| NKSP-RC | 3.8% | 2.7% | 5.7% | 3.1% | 41.6% | 58.4% | 66.8% |
| PBSP | 1.2% | 1.4% | 0.9% | 1.2% | 70.5% | 29.5% | 50.0% |
| PVSP | 0.5% | 0.7% | 0.2% | 0.5% | 87.0% | 13.0% | 40.3% |
| RJD | 6.1% | 8.6% | 2.3% | 10.2% | 84.9% | 15.1% | 68.0% |
| SAC | 8.5% | 5.3% | 13.3% | 3.5% | 37.7% | 62.3% | 38.1% |
| SATF | 5.7% | 6.5% | 4.6% | 5.6% | 68.2% | 31.8% | 49.1% |
| SCC | 0.4% | 0.5% | 0.2% | 0.4% | 84.1% | 15.9% | 39.6% |
| SOL | 0.4% | 0.5% | 0.3% | 0.3% | 72.9% | 27.1% | 35.3% |
| SQ | 0.5% | 0.6% | 0.4% | 0.4% | 69.8% | 30.2% | 33.3% |
| SQ-RC | 1.0% | 1.4% | 0.4% | 1.0% | 83.0% | 17.0% | 39.4% |
| SVSP | 6.0% | 6.7% | 4.8% | 9.8% | 68.2% | 31.8% | 83.0% |
| VSP | 2.6% | 3.1% | 1.9% | 2.3% | 70.9% | 29.1% | 43.8% |
| WSP | 0.6% | 0.6% | 0.7% | 0.4% | 57.3% | 42.7% | 37.3% |
| WSP-RC | 4.7% | 4.0% | 5.8% | 4.2% | 51.2% | 48.8% | 59.9% |

Source: *Coleman* Monthly Reports, Enclosure 7c, Attachments 2A and 2B (MHCB Placements and Rescissions by Institution and Prior Level of Care), April 2016 - April 2017.

Exhibit 2 – 040

# Exhibit E

Exhibit 2 - 041



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Jenny S. Yelin
Email: jyelin@rbgg.com

March 24, 2017

VIA ELECTRONIC MAIL ONLY

> PRIVILEGED AND
> CONFIDENTIAL
>
> SUBJECT TO
> PROTECTIVE ORDERS

Matthew A. Lopes, Jr.
Pannone Lopes & Devereaux LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
mlopes@pldlaw.com

     Re:    *Coleman v. Brown*: Inpatient Placements for Female Class Members
           Our File No. 0489-03

Dear Mr. Lopes:

    We write to request that you, in connection with the current monitoring round, investigate and, if merited, issue a report and recommendations regarding female patients' timely access to inpatient psychiatric hospital placements, and specifically to review Defendants' utilization of available inpatient psychiatric hospital beds at Patton State Hospital ("PSH").

    At the Status Conference and Hearing regarding access to inpatient care on January 23, 2017, Pamela Ahlin, the Director of the Department of State Hospitals ("DSH") testified that there were thirty inpatient beds available for female *Coleman* patients at PSH (Transcript of Jan. 23, 2017 Hearing, Dkt. No. 5552 ("Tr."), at 22:13-20), and that if there were referrals for those beds, DSH would accept the referrals and place female class members in those beds as they became available. Tr. at 25:16-26:1. Yet she admitted that DSH has not received any referrals for inpatient care at PSH since March 2016. Tr. at 66:15-19. CDCR's Deputy Director for the Statewide Mental Health Program Katherine Tebrock similarly testified that CDCR had not referred any female class members to PSH in the year preceding the hearing, despite multiple instances in

Exhibit 2 - 042

[3111356-4]

PRIVILEGED AND CONFIDENTIAL
Matthew A. Lopes, Jr.
March 24, 2017
Page 5

inpatient care access to DSH hospitals which in turn causes long stays in MHCBs, have focused on male patients. *See, e.g.,* May 25, 2016 Special Master's Monitoring Report on the Mental Health Inpatient Care Programs, Dkt. 5448 at 6 of 371. But recent data suggests that the same effects are occurring for female class members.

As of Defendants' most recent snapshot data showing the census for February 27, 2017, six out of the seven women referred for MHCB admission, or 87%, had been waiting for more than the Program Guide limit of twenty-four hours. Dkt 5577 at 11 of 15; *see also* Program Guide at 12-5-3 – 12-5-4. Between March 2016 and January 2017, only 36% to 67% of female patients referred to MHCBs were admitted, and in five of those months, less than 50% of referrals resulted in admissions. *See Coleman* Monthly Reports, March 2016 – January 2017, Enclosure 7c, Attachments 2a and 2b, "MHCB Placements by Institution and Prior Level of Care" and "Rescinded MHCB Referrals by Institution and Prior Level of Care." At CCWF, which has 12 MHCBs, only 28% of MHCB referrals resulted in admissions from March 2016 until the present, meaning that 72% of patients referred for this emergency care were never even admitted. *Id.* (March 2016). These admission rates suggest that at least some female class members who required MHCB care did not receive it because the available MHCBs were full, resulting in long stays in alternative housing or patients returned to their housing units without receiving crisis intervention.

In fact, the bottleneck in higher levels of care, including inpatient and MHCB settings, routinely results in alternative housing stays beyond the 24-hour Program Guide requirement. In December 2016 and January 2017, female class members spent an average of over 55 hours at a time in alternative housing, and when only stays that resulted in an MHCB placement are taken into account, the average length of stay was nearly 63 hours during that period. *Id.* (December 2016 and January 2017). Those extended alternative housing stays prevent patients in crisis from receiving appropriate care in a hospital setting.

C.     Review of female class members' records further demonstrates that female class members are being harmed by CDCR's refusal to refer patients in need of inpatient care to Patton

Relying on the limited-capacity PIP as the only resource for the acute and intermediate levels of care for female class members also appears to have resulted in some class members who could have benefited from longer inpatient treatment being denied that treatment, resulting in long or repeated MHCB stays and/or continued mental health deterioration upon discharge from the PIP.

Exhibit 2 - 046

[3111356-4]

# Exhibit A

Exhibit 2 - 050

Exhibit H

Exhibit 2 - 210

# Excessive MHCB Lengths of Stay, April 2017

| Institution | Number of Stays | Number of Stays Over 10 Days | Total Number of Days Spent Past 10 Days | Number of Stays over 30 Days | Total Number of Days Spent Past 30 Days | Number of Stays over 60 Days | Total Number of Days Spent Past 60 Days |
|---|---|---|---|---|---|---|---|
| CCWF | 20 | 8 | 111 | 2 | 70 | 0 | 0 |
| CHCF | 249 | 189 | 1668 | 10 | 824 | 3 | 652 |
| CIM | 81 | 73 | 1094 | 13 | 641 | 3 | 331 |
| CIW | 42 | 7 | 93 | 2 | 54 | 0 | 0 |
| CMC | 95 | 60 | 1635 | 6 | 1219 | 1 | 1063 |
| CMF | 77 | 64 | 1028 | 20 | 684 | 2 | 120 |
| COR | 44 | 25 | 293 | 5 | 149 | 0 | 0 |
| HDSP | 13 | 7 | 115 | 1 | 90 | 1 | 90 |
| KVSP | 31 | 8 | 44 | 0 | 0 | 0 | 0 |
| LAC | 32 | 7 | 213 | 2 | 185 | 1 | 164 |
| MCSP | 20 | 4 | 11 | 0 | 0 | 0 | 0 |
| NKSP | 20 | 15 | 127 | 0 | 0 | 0 | 0 |
| PBSP | 7 | 6 | 59 | 0 | 0 | 0 | 0 |
| PVSP | 9 | 5 | 17 | 0 | 0 | 0 | 0 |
| RJD | 31 | 20 | 273 | 4 | 130 | 1 | 51 |
| SAC | 57 | 50 | 928 | 20 | 682 | 1 | 57 |
| SATF | 41 | 31 | 213 | 0 | 0 | 0 | 0 |
| SOL | 7 | 4 | 16 | 0 | 0 | 0 | 0 |
| SQ | 2 | 2 | 57 | 1 | 40 | 0 | 0 |
| SVSP | 24 | 11 | 63 | 0 | 0 | 0 | 0 |
| WSP | 14 | 6 | 66 | 1 | 22 | 0 | 0 |
| ALL | 916 | 602 | 8124 | 87 | 4790 | 13 | 2528 |

Source: Psychiatric Aging Report, April 2017, Enclosure 7a, *Coleman* Monthly Reports

Exhibit 2 - 211

1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California 94710-1916
4   Telephone:   (510) 280-2621

    MICHAEL W. BIEN – 096891
    JEFFREY L. BORNSTEIN – 099358
    JANE E. KAHN – 112239
    ERNEST GALVAN – 196065
    THOMAS NOLAN – 169692
    LISA ELLS – 243657
    JENNIFER L. STARK – 267062
    KRISTA STONE-MANISTA – 269083
    JESSICA WINTER – 294237
    ROSEN BIEN
    GALVAN & GRUNFELD LLP
    50 Fremont Street, 19th Floor
    San Francisco, California 94105-2235
    Telephone:   (415) 433-6830

    RANJINI ACHARYA – 290877
    K&L GATES LLP
    4 Embarcadero Center, Suite 1200
    San Francisco, California 94111-5994
    Telephone:   (415) 882-8200

    CLAUDIA CENTER – 158255
    AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN
    CALIFORNIA, INC.
    39 Drumm Street
    San Francisco, California 94111-4805
    Telephone:   (415) 621-2493

13   Attorneys for Plaintiffs

14                          UNITED STATES DISTRICT COURT

15                        EASTERN DISTRICT OF CALIFORNIA

16

17   RALPH COLEMAN, et al.,                 Case No. 2:90-CV-00520-KJM-DB

18              Plaintiffs,                 **PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR ACCESS TO INPATIENT CARE**

19        v.

20   EDMUND G. BROWN, JR., et al.,
                                            Judge:   Hon. Kimberly J. Mueller
21              Defendants.

22

23

24

25

26

27

28

[3118495-12]

                                                              2:90-CV-00520-KJM-DB
        PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
                          ACCESS TO INPATIENT CARE                    Exhibit 2 - 212

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

I.  PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS
    REGARDING DEFENDANTS' NON-COMPLIANCE WITH PROGRAM
    GUIDE TIMELINES FOR TRANSFERS TO ACUTE AND
    INTERMEDIATE CARE FACILITY HOSPITAL BEDS ....................................... 2

    A.  This Court Should Require Defendants to Come into Full and
        Permanent Compliance with Program Guide Timelines for Acute and
        ICF Transfers by May 15, 2017 ................................................................... 2

    B.  The Court Should Not Permit A Blanket Exemption to Program Guide
        Compliance Where Class Members Have Co-Existing Urgent Medical
        Care Needs or Are on Out-To-Court Status .................................................. 4

    C.  The Court Has the Power to Hold Defendants in Contempt and to
        Order Appropriate Relief, Including Monetary Sanctions ............................. 5

        (a)  Legal Requirements for Civil Contempt ..................................... 5

        (b)  Remedies for Civil Contempt .................................................... 6

        (c)  Plaintiffs' Proposal For How A Court Order Requiring
             Compliance With Program Guide Timelines Should be
             Enforced, Should the Court Decide to Impose Monetary
             Sanctions ................................................................................... 8

    D.  The Existing Court-Ordered Monthly Data Templates Are Not
        Sufficient to Allow the Court to Enforce Compliance with the
        Program Guide Timelines .......................................................................... 11

II. PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS
    REGARDING DEFENDANTS' NON-COMPLIANCE WITH PROGRAM
    GUIDE TIMELINES FOR TRANSFERS TO MENTAL HEALTH CRISIS
    BEDS ......................................................................................................................... 12

    A.  The Court Should Order Defendants to Comply with Program Guide
        Timelines for Mental Health Crisis Bed Transfers by May 15, 2017 .......... 12

    B.  The Court Should Require 100 Percent Compliance with the Program
        Guide's Twenty-Four-Hour Timeline For Mental Health Crisis Bed
        Transfers .................................................................................................... 13

    C.  The Court Should Consider Further Orders on Compliance with
        Mental Health Crisis Bed Transfer Timelines After an Additional
        Status Conference ...................................................................................... 16

        1.  A Status Conference is Needed To Determine Why Female
            Patients Are Being Affected Disproportionately by Significant
            Delays in Accessing Crisis Care ................................................ 17

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE

Exhibit 2 - 213

1

2.   A Status Conference is Needed Because the Record Indicates
     that Barriers to Compliance with Program Guide Timelines for
     Male Prisoners May Be Focused at Certain Troubled
     Institutions ......................................................................................... 18

3.   A Status Conference is Needed to Determine Whether
     Defendants are Reporting Accurately on Compliance with the
     Program Guide ................................................................................... 18

D.   The Monthly Data Templates Required By This Court Should Be
     Clarified or Revised to Permit the Court to Measure Compliance
     More Accurately .......................................................................................... 20

CONCLUSION.............................................................................................................. 20

[3118495-12]

2:90-CV-00520-KJM-DB

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE

Exhibit 2 - 214

1

**TABLE OF AUTHORITIES**

2

**Page**

3

<u>**CASES**</u>

4

*Balla v. Idaho State Bd. of Corr.*,
   869 F.2d 461 (9th Cir. 1989) ........................................................... 5

6

*Bowring v. Godwin*,
   551 F.2d 44 (4th Cir. 1977) ........................................................... 14

7

*Cabrales v. Cty. of Los Angeles*,
   864 F.2d 1454 (9th Cir. 1988), *vacated and remanded*, 490 U.S. 1087
   (1989), *reinstated*, 886 F.2d 235 (9th Cir. 1989) ...................................... 14

9

*Carty v. Turnbull*,
   144 F. Supp. 2d 395 (D. V.I. 2001) ..................................................... 8, 10

*Cole v. U.S. Dist. Court For Dist. of Idaho*,
   366 F.3d 813 (9th Cir. 2004) ........................................................... 10

12

*Coleman v. Brown*,
   428 Fed. App'x. 743 (9th Cir. Apr. 22, 2011) ........................................... 14

*Coleman v. Brown*,
   938 F. Supp. 2d 955 (E.D. Cal. 2013) ................................................... 1

*Coleman v. Wilson*,
   912 F. Supp. 1282 (E.D. Cal. 1995) ..................................................... 15

*F.T.C. v. Affordable Media*,
   179 F.3d 1228 (9th Cir. 1999) .......................................................... 6

*Gates v. Shinn*,
   98 F.3d 463 (9th Cir. 1996) ............................................................ 5

*Gifford v. Heckler*,
   741 F.2d 263 (9th Cir. 1984) ........................................................... 6

*Hutto v. Finney*,
   437 U.S. 678 (1978) .................................................................... 7, 9

*In re Arthur Treacher's Franchisee Litig.*,
   689 F.2d 1150 (3d Cir. 1982) ........................................................... 7

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*,
   10 F.3d 693 (9th Cir. 1993) ............................................................ 6

*Inmates of Allegheny Cty. Jail v. Pierce*,
   612 F.2d 754 (3d Cir. 1979) ............................................................ 14

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) .................................................................. passim

[3118495-12]

iii

2:90-CV-00520-KJM-DB

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE

Exhibit 2 - 215

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir. 2016) ........................................................................ passim

*Kelly v. Wengler*,
   979 F. Supp. 2d 1104 (D. Idaho 2013) ...................................................... 11

*Lasar v. Ford Motor Co.*,
   399 F.3d 1101 (9th Cir. 2005) ...................................................... 6, 9, 10

*Lewis v. Casey*,
   518 U.S. 343 (1996) .................................................................................... 14

*Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*,
   389 U.S. 64 (1967) .................................................................................... 10

*N.L.R.B. v. Trans Ocean Export Packing, Inc.*,
   473 F.2d 612 (9th Cir. 1973) ...................................................... 6

*Perry v. O'Donnell*,
   759 F.2d 702 (9th Cir. 1985) ...................................................... 6

*SEC v. Hickey*,
   322 F.3d 1123 (9th Cir. 2003) ...................................................... 6

*Spallone v. United States*,
   493 U.S. 265 (1990) .................................................................................... 5

*Stone v. City & Cty. of San Francisco*,
   968 F.2d 850 (9th Cir. 1992) ...................................................... 6

*United States v. Asay*,
   614 F.2d 655 (9th Cir. 1980) ...................................................... 6

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947) ........................................................................ passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[3118495-12]

iv                                                                2:90-CV-00520-KJM-DB
PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE                                     Exhibit 2 - 216

**INTRODUCTION**

Defendants' chronic non-compliance with the required timelines for transferring the most vulnerable and acutely ill members of the *Coleman* class to inpatient psychiatric hospitalization and crisis care must end. The Program Guide[1]—Defendants' own remedial plan—lays out clear timeframes for transfer to acute, intermediate care, and mental health crisis bed placements, and these time limits "represent defendants' considered assessment of what is sufficiently 'ready access' to each level of care" under the Constitution. *Coleman v. Brown*, 938 F. Supp. 2d 955, 981 (E.D. Cal. 2013). Given Defendants' persistent violations of these timelines, resulting in dangerous and harmful delays in access to critically needed mental health treatment, this Court can and should issue an order requiring Defendants to meet the Program Guide transfer timelines consistent with their constitutional obligations under the Eighth Amendment by May 15, 2017.

Should Defendants fail to comply with this enforcement order as to inpatient psychiatric hospitalization, the Court should initiate contempt proceedings. Any such proceedings must provide Defendants with clear notice of the potential sanctions, a fair opportunity to be heard, and an opportunity to cure the violations before monetary or other sanctions can ensue. Plaintiffs propose a procedure that both complies with the law and is mindful of the Court's desire to end the constitutional violations in this case while avoiding micromanagement of Defendants' affairs.

As for Defendants' non-compliance with Program Guide timelines for transfers to mental health crisis beds ("MHCBs"), the Court should not permit anything less than 100 percent compliance with the Program Guide's twenty-four-hour timeline. The Court should also set a further status conference to explore the nature and extent of ongoing violations of the MHCB transfer timelines before contemplating sanctions such as

_____

[1] References to the Program Guide herein are to the 2009 Revision of the Program Guide, the operative remedial plan in this case. *See Coleman v. Brown*, 938 F. Supp. 2d 955, 961 (E.D. Cal. 2013).

1  monetary fines.  Further targeted orders may be more appropriate in the first instance to

2  address this problem, and additional reporting is required to enable the Court to properly

3  evaluate the problem and Defendants' compliance.

**I.  PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS REGARDING DEFENDANTS' NON-COMPLIANCE WITH PROGRAM GUIDE TIMELINES FOR TRANSFERS TO ACUTE AND INTERMEDIATE CARE FACILITY HOSPITAL BEDS**

7  With respect to acute and intermediate care facility ("ICF") psychiatric

8  hospitalization, the Court requested briefing on the following questions:  (1) whether

9  Defendants should be required to come into full and permanent compliance with Program

10  Guide timelines for acute and ICF transfers by May 15, 2017, *see* March 24, 2017 Order

11  (hereinafter "Order"), ECF No. 5583, at 25; (2) whether the Court should enforce

12  compliance with Program Guide timelines where class members referred for inpatient care

13  are being treated for urgent medical care needs or are on out-to-court status, *id*. at 25;

14  (3) what remedies are appropriate if Defendants violate any court order enforcing the

15  Program Guide timelines for inpatient care, including whether monetary sanctions are

16  appropriate, *id*. at 2, 25-26, and (4) whether monthly data templates required by this Court,

17  *see* ECF Nos. 5367, 5537, 5577, will provide sufficient information to allow the Court to

18  enforce any such order, Order at 2, 26.  Plaintiffs address each question in turn, below.

**A.  This Court Should Require Defendants to Come into Full and Permanent Compliance with Program Guide Timelines for Acute and ICF Transfers by May 15, 2017**

21  Decades have passed since this Court first found Defendants' failure to provide the

22  Plaintiff class with timely access to inpatient hospitalization violated the Eighth

23  Amendment and provisionally approved their first remedial plans to cure those

24  constitutional violations.  *See* Order at 3-4.  The Court approved Defendants' proposed

25  timelines for transfer to inpatient psychiatric treatment over ten years ago and ordered

26  them "immediately implemented," but, as noted by the Court, in the ensuing years

27  Defendants regularly exceed the timelines "as class members wait to receive the highest

28  and most urgent levels of mental health care."  *Id*. at 4.

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR ACCESS TO INPATIENT CARE

Exhibit 2 - 218

1    Defendants' intransigent refusal to ensure consistent access to timely inpatient

2    psychiatric hospitalization for *Coleman* class members is well-established.  *See id.* at 4-8;

3    *see also* Special Master's Monitoring Report on the Mental Health Inpatient Care

4    Programs, May 25, 2016, ECF No. 5448, at 22-39.  Today's crisis is merely the most

5    recent iteration of Defendants' chronic violations of class members' rights.  Prior to,

6    during, and since the January 23, 2017 evidentiary hearing, the Court has offered

7    Defendants multiple opportunities to present evidence justifying their continued non-

8    compliance with the Program Guide's requirements to transfer patients referred to acute

9    inpatient psychiatric hospitalization within ten days, and patients referred to ICF inpatient

10   psychiatric hospitalization within thirty days.  *See, e.g.*, Oct. 6, 2016 Order, ECF No. 5498

11   (reviewing persistency of waitlists at that time and setting status conference for Novem-

12   ber 10, 2016); Defs.' Reply to Pls.' Response to Defs.' Update re Inpatient Census, Nov. 4,

13   2016, ECF No. 5509; Nov. 17, 2016 Order, ECF No. 5519 (directing Defendants to show

14   cause why the waitlists could not be reduced to zero by November 23, 2016); Dec. 9, 2016

15   Order, ECF No. 5529 (requesting a response to eight questions regarding inpatient bed

16   capacity and access to inpatient care); Defs.' Response to Questions Posed in the Dec. 9,

17   2016 Order, Jan. 13, 2017, ECF No. 5544; Defs.' Objections to Pls.' Requests for Further

18   Relief on Inpatient Care, Jan. 13, 2017, ECF No. 5546; Jan. 19, 2017 Order, ECF No. 5551

19   (directing additional briefing prior to the January 23 hearing); Defs.' Additional Exs. and

20   Info., Jan. 27, 2017, ECF Nos. 5558 & 5559.

21   Defendants still have not cured the constitutional deprivations of class members'

22   rights, *see* Order at 4, despite the Court's well-founded conclusion that the record

23   establishes that Defendants "have sufficient options available to allow them to comply

24   now, fully and permanently, with the timeline requirements of the Program Guide for

25   transfers to acute and ICF inpatient care."  *Id*. at 8.  Defendants have both the means and

26   the capacity to resolve the waitlists by May 15, 2017, and a clear and specific order from

27   the Court directing them to do so is both warranted and necessary to prevent continuing

28   harms to the Plaintiff class.

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE

Exhibit 2 - 219

**B.  The Court Should Not Permit A Blanket Exemption to Program Guide Compliance Where Class Members Have Co-Existing Urgent Medical Care Needs or Are on Out-To-Court Status**

In years of Court oversight of inpatient waitlists, Defendants have neither proved, nor sought to prove, that it is impossible to comply with the timeframes set forth in their own Program Guide in any particular case or on a systemic basis.  Nor have Defendants sought to modify the timeframes.  Nevertheless, the Court's March 24 Order proposes to exclude from the Program Guide's ten and thirty-day transfer timelines any time in which a referred class member (1) is on a medical hold, and (2) is on out-to-court status pursuant to a court order or subpoena.  Order at 25.  Plaintiffs object to such a blanket exclusion, and instead recommend that such exemptions from Program Guide compliance be made on an individualized basis.  The testimony of Pam Ahlin upon which the Court relies is a cursory assertion, without explanation or citation to governing policies, that does not warrant a permanent exception to compliance.  *See* ECF No. 5522-1, ¶ 7.  Instead, the Court should, pursuant to Plaintiffs' proposed enforcement scheme outlined in Part I.C. below, permit Defendants to make an individualized showing as to each class member whose transfer to crucially necessary inpatient care is delayed for the aforementioned reasons to ensure such delay is actually warranted.

In particular, Defendants' process for referral, acceptance, and transfer of class members in need of inpatient care involves multiple steps, paperwork, and various inter- and intra-departmental handoffs.  *See* Order at 3 n.4 (referring to the document outlining the inpatient referral and acceptance process).  Defendants should be required to proceed with these steps to ensure a patient with a medical hold or on out-to-court status can transfer on time if his or her medical or legal status changes.  In other words, if a patient referred for clinically necessary ICF care has a temporary medical hold placed by CDCR two days after she or he is referred, but the hold is then released on the tenth day after the referral for ICF care, Defendants should not be permitted to cease processing the referral and preparing to transfer this seriously ill class member within Program Guide timelines for the eight days of the medical hold.  An eight-day delay beyond Program Guide

1 timelines in this case would be inexcusable and unnecessary, and would cause

2 unconstitutional harm to the patient.

3      Finally, the sealed Bed Utilization Report ("BUR") that Defendants file with the

4 Court monthly does not provide sufficient information for the Court or Special Master to

5 identify which, if any, patients have medical or legal statuses that truly make timely

6 transfer to critically needed inpatient care impossible.  *See* Decl. of Krista Stone-Manista

7 Supp. Pls.' Response to March 24, 2017 Order (hereinafter "Stone-Manista Decl."), filed

8 herewith, ¶ 2.  Individualized determinations of the appropriateness of delay past Program

9 Guide requirements for the hypothetical patients Ms. Ahlin describes is necessary and

10 appropriate, given the acutely ill and vulnerable nature of the class members in question.

11   **C.      The Court Has the Power to Hold Defendants in Contempt and to Order
           Appropriate Relief, Including Monetary Sanctions**
12

13      The Court has the inherent power to enforce compliance with the Constitution and

14 its previous court orders, including the Program Guide's timelines for transfer to ICF or

15 acute inpatient care, through civil contempt proceedings.  Order at 26; *see Spallone v.*

16 *United States*, 493 U.S. 265, 276 (1990) ("courts have inherent power to enforce

17 compliance with their lawful orders through civil contempt." (citation omitted)); *United*

18 *States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947) (holding that a court

19 may impose judicial sanctions in civil contempt proceedings "to coerce the defendant into

20 compliance with the court's order[]" or "to compensate the complainant for losses

21 sustained").

22            **(a)      Legal Requirements for Civil Contempt**

23      Prior to holding a defendant in civil contempt, a court must find by clear and

24 convincing evidence that:  (1) a valid court order exists that is sufficiently "specific and

25 definite," *see Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989); *see also*

26 *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996); (2) the defendant had knowledge of the

27 order, the potential penalties for failing to comply with said order, and an opportunity to be

28 heard about the alleged non-compliance, *Int'l Union, United Mine Workers of Am. v.*

1  *Bagwell*, 512 U.S. 821, 827 (1994); *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109-10 (9th

2  Cir. 2005); and (3) the defendant failed to take "*all* reasonable steps" to comply with the

3  order, *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original).

4        To be found in civil contempt, Defendants' non-compliance "need not be willful,

5  and there is no good faith exception to the requirement of obedience to a court order." *In*

6  *re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)

7  (citations omitted); *see also Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985); *Stone*

8  *v. City & Cty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (amended).  Should

9  Defendants seek to defend against a contempt finding by arguing inability to comply,

10  Defendants will be required to show "categorically and in detail" why they are unable to

11  comply.  *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

12  Moreover, impossibility cannot be a valid defense if Defendants are "responsible for the

13  inability to comply." *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980); *see also*

14  *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (suggesting that

15  impossibility may not be a defense if the inability to comply is self-induced).  "A court has

16  wide latitude in determining whether there has been contemptuous defiance of its order."

17  *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984).

18        **(b)**    **Remedies for Civil Contempt**

19        Once a defendant has been found in civil contempt, a court has "broad equitable

20  power to order appropriate relief in civil contempt proceedings." *SEC v. Hickey*, 322 F.3d

21  1123, 1128 (9th Cir. 2003).  When considering a sanction to make a defendant comply

22  with a court order, a court should consider "the character and magnitude of the harm

23  threatened by continued contumacy, and the probable effectiveness of any suggested

24  sanction in bringing about the result desired." *United Mine Workers*, 330 U.S. at 304.

25        The Court has the authority to issue monetary sanctions if it determines that such

26  sanctions are necessary to coerce compliance by Defendants.  *Id.* at 303–04 (a contempt

27  fine is considered civil and remedial if it either "coerce[s] the defendant into compliance

28  with the court's order, [or] … compensate[s] the complainant for losses sustained"); *see*

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE

Exhibit 2 - 222

1    *also Bagwell*, 512 U.S. at 829 (explaining that one of the paradigmatic civil contempt

2    sanctions "is a per diem fine imposed for each day a contemnor fails to comply with an

3    affirmative court order").  Should the Court decide to impose non-compensatory civil

4    contempt fines, however, it must afford Defendants an opportunity to reduce or avoid any

5    proposed fine through compliance.  *See id.* ("[A] flat, unconditional fine totaling even as

6    little as $50 announced after a finding of contempt is criminal if the contemnor has no

7    subsequent opportunity to reduce or avoid the fine through compliance." (citation

8    omitted)).

9          There is a risk that imposing fines will discourage Defendants and their clinicians

10   from referring class members to ICF or acute inpatient care, or encourage clinicians to

11   rescind such referrals prior to transfer, in order to avoid sanctions.  *See United Mine*

12   *Workers*, 330 U.S. at 304 (requiring sanctioning court to consider the "probable

13   effectiveness of any suggested sanction in bringing about the result desired"); *cf.* Order,

14   ECF No. 5593, at 4 (citing prior findings that "unconscionable delays in access to inpatient

15   care" cause, *inter alia*, "periodic substantial decline in clinical referrals to necessary

16   care").[2]  As discussed below, careful reporting and monitoring will be required to assure

17   that this unintended and dangerous outcome is avoided.

18

19

20

21   _____

22   [2]  The Court also has the power pursuant to civil contempt proceedings to issue non-
     monetary sanctions to address Defendants' non-compliance with the Program Guide

23   timelines as to ICF and acute inpatient care.  *See Hutto*, 437 U.S. at 690 ("[F]ederal courts
     are not reduced to issuing injunctions against state officers and hoping for compliance.

24   Once issued, an injunction may be enforced."); *see In re Arthur Treacher's Franchisee*
     *Litig.*, 689 F.2d 1150, 1159 (3d Cir. 1982) ("In exercising remedial powers in civil

25   contempt proceedings, courts may require the contemnor to perform various affirmative
     acts, even though these actions were not mandated by the underlying decree."); *cf. Kelly*,

26   822 F.3d at 1097 (affirming a district court's decision to extend by two years a settlement
     agreement involving Idaho state prisoners as a compensatory civil sanction).  Plaintiffs

27   have suggested targeted orders to address the chronic inpatient waitlists for this Court's
     consideration previously.  *See* ECF No. 5503 at 11-16; *see also* ECF No. 5543.

28

[3118495-12]

7                                                    2:90-CV-00520-KJM-DB

(c)    **Plaintiffs' Proposal For How A Court Order Requiring Compliance With Program Guide Timelines Should be Enforced, Should the Court Decide to Impose Monetary Sanctions**

Assuming the Court concludes that, after years of protracted remedial proceedings, the most effective remedy for noncompliance with the Program Guide timelines is monetary sanctions, Plaintiffs recommend that the Court issue an order setting forth a framework involving monthly reporting and prospective, presumptive fines that may ultimately be avoided through compliance. Plaintiffs' proposal is mindful of both the law governing civil contempt sanctions and this Court's desire for a durable remedy that avoids micromanagement of Defendants' affairs.

Under Plaintiffs' recommended proposal, the Court's enforcement order should require Defendants, beginning May 15, 2017, to track on a day-by-day basis each person who is forced to wait past a Program Guide deadline for transfer to ICF or acute inpatient care. For each day in each month, Defendants should be required to report the number of patients waiting beyond ten days for transfer to an acute inpatient psychiatric program and beyond thirty days for transfer to an ICF program, as described in Part I.D below. Defendants should then be required to submit reports to the Court on the fifteenth day of each month, documenting the compliance information from the prior month.

This reporting mechanism will allow the Court to determine whether Defendants are in compliance with the Program Guide timelines. *See, e.g.*, *Carty v. Turnbull*, 144 F. Supp. 2d 395, 398 (D. V.I. 2001) (requiring, as part of ongoing contempt proceedings, that defendants provide plaintiffs with monthly documentation related to their compliance with a consent decree). At the time of this submission, or on a date certain shortly thereafter, Defendants may also file sworn declarations setting forth all steps taken to comply with the Court's order enforcing the Program Guide timelines, including, for instance, whether a patient's transfer was unavoidably delayed by an urgent medical hold or legal proceeding pursuant to a court order or subpoena. *See Kelly*, 822 F.3d at 1096; *see also* Part I.B.

The Court's enforcement order should also make clear that, for each day that a class

1   member is forced to wait past a Program Guide deadline for transfer to ICF or acute

2   inpatient care after May 15, 2017, Defendants may be fined up to $1,000 per day, per

3   person, for each violation.  *See* Order at 25.  Any such fine should then be held in

4   abeyance for six months, pending future compliance and further proceedings on the

5   appropriateness of such a sanction, in accordance with the Supreme Court's warning that

6   Defendants must be given an opportunity to cure, or purge, their non-compliance before

7   the issuance of monetary sanctions.  *See Bagwell*, 512 U.S. at 829.[3]

8        Assuming Defendants are not fully compliant with the Program Guide timelines in

9   the ensuing six months, the Court should then hold a hearing on or around November 15,

10  2017.  *See Lasar*, 399 F.3d at 1109-10 (explaining that due process protections of notice

11  and opportunity to be heard are indispensable prerequisites for monetary sanctions or a

12  contempt citation imposed under a federal district court's inherent powers).  At this

13  hearing, Defendants should be required to show that they have taken "all reasonable steps"

14  to comply with the Program Guide, subject to the Court's authority to issue monetary

15  sanctions or, if appropriate, additional court orders in lieu of sanctions, should it find that

16  Defendants remain in contempt.  *See Kelly*, 822 F.3d at 1096 (emphasis omitted); *see also*

17  *Hutto v. Finney*, 437 U.S. 678, 690 (1978)  If the Court deems it necessary or appropriate,

18  this hearing may involve live testimony.  In advance of the hearing, the parties should be

19  ordered to submit status conference statements and any further declarations addressing

20  whether Defendants are in contempt, including any explanations or excuses for non-

21  compliance within the period, and the appropriateness of any monetary sanctions or

22  alternate sanctions in light of the record.  *Id*.

23  _____

24  [3]  One way that Defendants may be able to cure their noncompliance is by preparing
    vacant space at Atascadero State Hospital ("ASH") or Coalinga State Hospital
25  ("Coalinga") as a "swing" unit ahead of future "[u]nexpected spikes" in the waitlist, such
    as those caused by the recent flooding at Salinas Valley Psychiatric Program ("SVPP"), as
26  well as in anticipation of the regular demand cycles that "should be obvious after more
    than a decade of focused remedial work in this area."  *See* Order, Dec. 9, 2016, ECF No.
27  5529, at 4; Order at 14.  As this Court has found, Coalinga has empty units that it appears
    could be prepared for patient use, *see* Order at 19, and ASH may as well, *see id*. at 18.

28

1   In addition, in order to ensure that the proposed framework outlined above

2   maximizes the "probable effectiveness of [the] suggested sanction in bringing about the

3   result desired," *United Mine Workers of Am.*, 330 U.S. at 304, and does not instead create a

4   perverse incentive for Defendants to refrain from referring patients in need of inpatient

5   psychiatric hospitalization (or to rescind referrals inappropriately), this Court should

6   require Defendants to file detailed reports on the number of referrals and rescissions per

7   month, identifying patients by name, and to order the Special Master to monitor and report

8   on this process.

9   This procedure protects Defendants' due process rights while serving the Court's

10  purpose of taking prompt action to ensure that Defendants come into "full and permanent

11  compliance with Program Guide timelines for transfer to inpatient care." *See* Order at 14.

12  First, the requirements to be laid out in the Court's enforcement order, and the Program

13  Guide timelines to which Defendants will be held accountable, are sufficiently "specific

14  and definite." *Balla*, 869 F.2d at 465. Defendants will therefore "know what the court

15  intends to require and what it means to forbid." *Longshoremen's Ass'n, Local 1291 v.*

16  *Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). Second, this framework puts

17  Defendants on clear notice of what sanctions may issue from failure to comply with the

18  Court's forthcoming enforcement order. *See Cole v. U.S. Dist. Court For Dist. of Idaho*,

19  366 F.3d 813, 821 (9th Cir. 2004) ("It is axiomatic that procedural due process requires

20  notice of the grounds for, and possible types of, sanctions."). Third, by affording

21  Defendants the opportunity to file sworn declarations, submit status conference statements,

22  and appear for an in-person hearing, this framework provides Defendants with an

23  opportunity to be heard. *Bagwell*, 512 U.S. at 827; *Lasar*, 399 F.3d at 1109-1110.

24  Defendants will therefore have several opportunities to demonstrate whether they have

25  taken "all reasonable steps" to comply with the Court' enforcement order. *Kelly*, 822 F.3d

26  at 1096.

27  Further, by providing Defendants with six months before any penalties are issued,

28  this framework provides Defendants with ample opportunity to "purge," *Bagwell*, 512 U.S.

1   at 829, and maximizes the "probable effectiveness" of monetary sanctions while

2   minimizing the harm "threatened by continued contumacy." *United Mine Workers*, 330

3   U.S. at 304; *see Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1117 n.27 (D. Idaho 2013)

4   (noting that a prospective fine schedule is not necessarily punitive because the point is to

5   "*prevent* the fine from reaching millions because Defendants will fix their behavior and

6   begin living up to their promise in the Settlement Agreement.  If a *prospective* fine leads to

7   $2.4 million in penalties, [Defendant Corrections Corporation of America] has no one to

8   blame but itself").  This proposed remedy also serves to compel Defendants to "achieve a

9   durable remedy" without requiring that the Court "micromanage defendants in this

10  process" or "convert[] the Special Master into a Receiver."  Order at 25.

   **D.    The Existing Court-Ordered Monthly Data Templates Are Not
11         Sufficient to Allow the Court to Enforce Compliance with the Program
12         Guide Timelines**

13          Defendants filed their proposed revised monthly reporting on access to inpatient

14  psychiatric hospitalization and mental health crisis beds on March 15, 2017.  ECF No.

15  5577.  Plaintiffs filed objections to the proposed revised reports on March 23, 2017,

16  describing the ways in which the proposed reports fail to provide a complete picture of

17  Defendants' attempts to provide timely access to inpatient care.  ECF No. 5582.  The Court

18  has now indicated that it "accepts the most recent monthly report in the form filed" on

19  March 15, "subject to hearing from the parties in response to this order regarding whether

20  that form will achieve the goals the court now contemplates."  Order at 2 n.2.  Neither the

21  proposed revised reports as filed by Defendants nor the reports requested by Plaintiffs

22  prior to entry of the Court's present Order will provide the Court with the information

23  necessary to enforce compliance with the framework for civil contempt proceedings set

24  forth above.

25          As discussed in further detail in Plaintiffs' March 23 filing, the information

26  contained in previous Exhibits B (capturing day-by-day accounting of patient movement

27  through the system) and C (providing information about trends over time and compliance

28  with the requirement that patients be transferred to inpatient care within 72 hours of

1   acceptance) remains critical to the Court's understanding of whether and how Defendants'

2   system is working as a durable remedy for Defendants' constitutional violations related to

3   delayed access to inpatient care. *See* ECF No. 5582, at 3-8. Monitoring compliance with

4   the proposed structure for further targeted orders or civil contempt sanctions set forth

5   above will also require the restoration of the now-omitted day-by-day reporting, although

6   in a slightly different format. Therefore, for each day in each month, Defendants will need

7   to report: (1) the number of patients waiting beyond ten days for transfer to an acute

8   inpatient psychiatric program, and (2) the number of patients waiting beyond thirty days

9   for transfer to an ICF program. Plaintiffs envision that such reporting will be most

10  efficiently handled by submission of a chart in calendar format, broken out by acute and

11  ICF, with a total for the month at the end.

12  **II.   PLAINTIFFS' RESPONSES TO THE COURT'S QUESTIONS REGARDING
13         DEFENDANTS' NON-COMPLIANCE WITH PROGRAM GUIDE
           TIMELINES FOR TRANSFERS TO MENTAL HEALTH CRISIS BEDS**

14          With respect to mental health crisis beds, the Court directed briefing on the

15  following questions: (1) whether the Court should issue an order requiring Defendants to

16  comply with the Program Guide timeline of twenty-four hours for transfers to mental

17  health crisis beds by May 15, 2017, Order at 2, 25; (2) whether such compliance should be

18  measured at 90 percent or 100 percent, *id*.; (3) what remedies are appropriate if Defendants

19  violate any court order enforcing the Program Guide timeline for crisis bed care, including

20  whether monetary sanctions are appropriate, *id*. at 2, 25-26; and (4) whether monthly data

21  templates required by this Court, *see* ECF No. 5367, will provide sufficient data to allow

22  the court to enforce any such order, Order at 2 n.2 & 26.

23      **A.   The Court Should Order Defendants to Comply with Program Guide
              Timelines for Mental Health Crisis Bed Transfers by May 15, 2017**
24

25          There is no question that this Court should find that Defendants have failed, and are

26  continuing to fail, to meet their constitutional obligation to timely transfer critically ill

27  class members in urgent need of crisis treatment to an MHCB, and that the Court should

28  consequently order Defendants to comply with the Program Guide's twenty-four-hour

1   transfer timeline by May 15, 2017. This Court's findings demonstrating Defendants' non-

2   compliance are sound and not in dispute. *See* Order at 22.

3       Furthermore, while it is possible that Defendants' non-compliance is actually even

4   worse than currently understood, as discussed in Part II.C. below, Defendants' most recent

5   reported data shows that they continue to violate class members' rights to timely access to

6   crisis care routinely. According to Defendants' January 2017 Report on MHCB

7   Placements by Institution and Prior Level of Care ("MHCB Transfers Report"), Enclosure

8   7c to Defendant's monthly document production, approximately 172 (or approximately

9   24%) of the 724 patients admitted either internally or to an MHCB at another institution

10  were not transferred within the Program Guide's timelines. Stone Manista Decl. ¶¶ 3-6 &

11  Ex. A. Of the 370 patients whose MHCB referrals were ultimately rescinded that month,

12  sixty-four had already waited beyond twenty-four hours before the referral was ultimately

13  rescinded, without ever receiving crisis care. *Id.* And Defendants' snapshot census data

14  for February 21 and February 27, 2017 both show a dozen class members waiting past

15  Program Guide timelines on each date. *See* Stone-Manista Decl. ¶ 7 & Ex. B (MIS Report

16  dated February 21, 2017, provided to Plaintiffs on March 8, 2017); ECF No. 5577 at 11

17  (CDCR MHCB Crisis Bed Census and Waitlist Report as of February 27, 2017).

18  Defendants can and should be ordered to comply with their constitutional obligations to

19  transfer critically ill class members to MHCBs in conformity with the Program Guide's

20  twenty-four-hour transfer timeline by May 15, 2017.

21      **B.    The Court Should Require 100 Percent Compliance with the Program
             Guide's Twenty-Four-Hour Timeline For Mental Health Crisis Bed**
22           **Transfers**

23      The Court's Order asks the parties to address whether "90 percent compliance with

24  the 24 hour transfer requirement is sufficient to achieve constitutional compliance or,

25  instead, whether 100 percent compliance with the requirement, with specific exceptions, is

26  required." Order at 23. Full compliance, measured at 100 percent, is required for two

27  reasons. First, delayed transfer to crisis bed care represents a constitutional harm for each

28

1   and every class member held in clinically inappropriate "settings that cannot provide them

2   with the emergency care they require to stabilize their mental health crisis."  Order at 22.

3   Second, the Program Guide represents Defendants' assessment of what is required to

4   provide constitutionally adequate mental health care, and they must be held to their own

5   standards, as this Court has previously held.

6       Under the Eighth Amendment, there is "no underlying distinction between the right

7   to medical care for physical ills and its psychological or psychiatric counterpart."  *Bowring*

8   *v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *accord Inmates of Allegheny Cty. Jail v.*

9   *Pierce*, 612 F.2d 754, 763 (3d Cir. 1979); *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454,

10  1461 (9th Cir. 1988), *vacated and remanded*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d

11  235 (9th Cir. 1989).  As would be true for denial of access to emergency room care for

12  medical needs, denial of timely access to crisis and inpatient psychiatric care is a serious

13  and irreparable constitutional violation in each case.  *See Coleman v. Brown*, 428 Fed.

14  App'x. 743, 744-45 (9th Cir. Apr. 22, 2011) (unpublished) (finding that the record of

15  denial of timely access to inpatient psychiatric hospitalization is "more than sufficient to

16  demonstrate that plaintiffs 'have suffered, or will imminently suffer, actual harm'" to

17  warrant emergency injunctive relief under the PLRA (quoting *Lewis v. Casey*, 518 U.S.

18  343, 349 (1996)).  The Court would not countenance Defendants' failure to timely transfer

19  one out of every ten prisoners suffering a medical crisis to an emergency room; neither

20  should it permit Defendants to fail to timely transfer one out of every ten prisoners

21  undergoing life-threatening mental health crises who urgently need treatment in an MHCB.

22      Not only are prisoners in crisis denied their constitutional right to timely access to

23  crisis care when Defendants do not comply with the twenty-four-hour transfer requirement,

24  but this Court found four years ago that many of the places where prisoners await MHCB

25  placement, often for days, are "totally inappropriate."  *See* Apr. 5, 2013 Order, ECF No.

26  4539, at 51-52.  Protracted housing in such conditions worsens patients' state of crisis and

27  makes it impossible to assess continuing suicidality accurately, thus placing them at a

28  significant risk of serious harm.  *See* ECF No. 5259, at 28 (Hayes Audit of Suicide

1   Prevention Practices, Jan. 14, 2015). This is a separate, and additional, constitutional

2   violation. Four years after the Court's finding about the pervasive use of inappropriate and

3   dangerous alternative housing placements, patients in crisis continue to languish in such

4   cells across the system as CDCR fails to timely transfer them to mental health crisis beds.

5   *See* Dec. 9, 2016 Order, ECF No. 5529, at 3 n.1 (noting Defendants' concession that

6   "alternative housing is not a clinically appropriate location for inmates requiring MHCB

7   level of care" (citation omitted)); Order at 22 (discussing data regarding delayed MHCB

8   access in September and November 2016 and January 2017).

9          Even if a patient awaiting MHCB transfer is not housed in one of the various

10  unacceptable alternative housing options, but is instead left in his or her regular housing

11  unit, he or she is not receiving the mental health care and monitoring deemed necessary by

12  clinicians. Each and every instance where Defendants fail to provide necessary treatment,

13  including by imposing an alternative housing or in-housing suicide watch program for

14  patients awaiting MHCB placement, represents a constitutional violation. *See Coleman v.*

15  *Wilson*, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995) (holding that among the minimum

16  elements of a constitutional prison mental health system is "a treatment program that

17  involves more than segregation and close supervision of mentally ill inmates"). As this

18  Court has noted in the context of inpatient referrals, each level of care in Defendants'

19  mental health delivery system has specific admission criteria, and holding patients

20  clinically determined to need a particular level of care—especially inpatient treatment like

21  crisis care—in a setting where lesser care is provided simply "maintain[s] an unacceptable

22  status quo for these inmates while access to essential [MHCB] care is delayed." Dec. 9,

23  2016 Order, ECF No. 5529, at 3.

24         Even without this clear and recent evidence of ongoing harms and constitutional

25  violations due to delayed MHCB transfers, the Program Guide itself is a measure of what

26  is necessary to avoid constitutional violations. Defendants previously have objected to the

27  Special Master's reporting on "compliance" with Program Guide requirements as

28  measured by whether Defendants are meeting Program Guide standards in 90% of relevant

1   cases on the grounds that his use of the term "compliance" (with the Program Guide) has

2   "nothing to do with constitutional compliance."  ECF No. 4347, at 18 (Defs.' Amended

3   Objections and Mot. to Strike and Modify 25th Round Monitoring Report, Feb. 19, 2013).

4   But as this Court found in rejecting those objections, "the Revised Program Guide

5   represents defendants' considered assessment … of what is required to remedy the Eighth

6   Amendment violations identified in this action and meet their constitutional obligation to

7   deliver adequate mental health care to seriously mentally ill inmates."  Feb. 28, 2013

8   Order, ECF No. 4361, at 3.  Defendants have determined that providing constitutionally

9   adequate mental health care requires that patients in need of mental health crisis bed care

10  be transferred to such care within twenty-four hours of referral.  Program Guide at 12-5-6.

11  Imposing a requirement of less than 100 percent compliance would demean that

12  assessment, diminish the life-preserving importance of timely access to crisis care, and

13  permit Defendants to continue routinely violating class members' constitutional rights to

14  timely access to adequate mental health care.

15   **C.    The Court Should Consider Further Orders on Compliance with Mental
          Health Crisis Bed Transfer Timelines After an Additional Status**
16        **Conference**

17        Assuming the Court issues an order fully enforcing the twenty-four hour timelines

18  required by the Program Guide for transfer to mental health crisis beds, additional

19  evidence should be taken about the nature of the problem.  Plaintiffs urge the Court to set a

20  status conference in order to better ascertain the extent and root causes of delayed transfers

21  to MHCBs, to ensure that Defendants' system is currently capable of full compliance with

22  the Program Guide's literal transfer timeline requirements, and, if appropriate, to issue

23  further targeted remedial orders subsequent to that hearing and prior to considering

24  monetary sanctions.

25        The most recent MHCB referral data available to Plaintiffs reveals several clear

26  problems that are contributing disproportionately to the MHCB waitlist, and that may be

27  better served through further targeted remedial orders (rather than broad monetary

28  sanctions) after full development of the record, including a status conference and live

1  testimony, if appropriate.

2        **1.**      **A Status Conference is Needed To Determine Why Female**
3                    **Patients Are Being Affected Disproportionately by Significant**
                  **Delays in Accessing Crisis Care**

4        Female class members are being affected disproportionately by long delays in

5  accessing MHCB crisis beds.  *See* Stone-Manista Decl. ¶¶ 3-6 & Ex. A (showing that, for

6  example, sixteen of nineteen patients transferred to MHCBs more than 72 hours after

7  referral were women).  The precise cause of this problem, however, is unclear.  Based on

8  Defendants' new proposed MHCB census and waitlist report, one cause may be that there

9  are far fewer crisis beds available for women than there are for men.  *See* ECF No. 5577, at

10  11 (CDCR Mental Health Crisis Bed Census and Waitlist Report, filed March 15, 2017);

11  *see also* Stone-Manista Decl. ¶ 7 & Ex. B (MIS Report showing 427 male and 22 female

12  MHCBs).  Additionally, as the Court is well aware, Defendants have ceased referring

13  female class members to Patton State Hospital, even when the psychiatric inpatient

14  program at the California Institution for Women ("CIW") is at or near capacity.  *See* ECF

15  No. 5543, at 6 (Pls.' Br. re Requested Remedies, Jan. 13, 2017).  Delays in access to

16  inpatient care appear to be causing exactly the snowballing effect of delayed access to

17  inpatient care at all levels described in the Court's Order.  *See* Order at 22.

18        A status conference is therefore needed to determine why female patients are being

19  affected disproportionately by significant delays in accessing crisis care.  If Defendants'

20  delays in timely transfers of female patients are due to a bed shortage, they should be

21  required to develop a plan to address that issue before any monetary sanctions are

22  appropriate.  If, as the January 2017 data strongly suggests, Defendants can eliminate a

23  substantial percentage of the number of patients waiting for MHCB placement beyond

24  Program Guide timeframes by simply managing the inpatient beds available to women

25  more efficiently, *see* Stone-Manista Decl. ¶¶ 4-6 (showing disproportionately long waits

26  for MHCB placement, and a disproportionately rate of MHCB rescissions after twenty-

27  four hours, for women), Defendants should be ordered to do so immediately.

28

Case 2:90-cv-00520-KJM-DB   Document 5593   Filed 04/07/17   Page 23 of 26

1
2

**2.      A Status Conference is Needed Because the Record Indicates that Barriers to Compliance with Program Guide Timelines for Male Prisoners May Be Focused at Certain Troubled Institutions**

3    The barriers to compliance with Program Guide timelines for male prisoners appear

4 to be focused largely at certain troubled institutions rather than a systemic problem.  Based

5 on an analysis of the 236 patients either admitted to an MHCB after twenty-four hours or

6 with referrals rescinded after twenty-four hours in January, it appears that the vast majority

7 of the male patients being forced to wait beyond the Program Guide timelines are coming

8 from Salinas Valley State Prison ("SVSP"), Richard J. Donovan State Prison ("RJD"), and

9 CSP-Corcoran ("COR").  *See* Stone-Manista Decl. ¶¶ 4-5 & Exs. A & B (showing that

10 43.9% of all patients admitted to MHCBs in January 2017 beyond twenty-four hours

11 originated at SVSP, RJD, or COR).  In contrast, even though Mule Creek State Prison

12 ("MCSP") has the largest EOP program in the state, it accounted for only 4.6% of such

13 delayed admissions.  *See id.* ¶¶ 5, 8 & Exs. A & C.  Similarly, the Substance Abuse

14 Treatment Facility and State Prison ("SATF"), which has the largest class member

15 population in the state, accounted for only 2.3% of all MHCB admissions over twenty-four

16 hours.  *Id.*  These statistics strongly suggest a need for targeted interventions focusing on

17 the outlier institutions, such as SVSP, RJD, and COR, in order to effectuate the Program

18 Guide requirement of transfer within twenty-four hours.  A status conference is needed to

19 better assess this problem.

20
21

**3.      A Status Conference is Needed to Determine Whether Defendants are Reporting Accurately on Compliance with the Program Guide**

22    Furthermore, a status conference devoted to delays in mental health crisis bed

23 transfers is necessary to ensure that Defendants are reporting accurately on compliance

24 with the literal Program Guide requirements.  The Program Guide requires patients

25 referred to an MHCB to be transferred within twenty-four hours, not merely to have their

26 transportation to a bed *initiated* within that time frame.  Program Guide at 12-1-16

27 (defining "Timeline for Transfer" to an MHCB to be "[w]ithin 24 hours of referral"); *see*

28 *also* Program Guide at 12-3-13 (for CCCMS patients referred for crisis care, "[t]he transfer

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR ACCESS TO INPATIENT CARE

Exhibit 2 - 234

1    to an MHCB shall be accomplished within 24 hours of referral"); Program Guide 12-4-5

2    (for EOP patients referred for crisis care, "[t]ransfers within the same institution of inmate-

3    patients previously identified and treated as EOP or from the institution's MHCB should

4    occur on the same day, or within 24 hours of referral").

5         Defendants, however, have not regularly reported on the lengths of time for actual

6    transport and admission to MHCBs, and the data on which the Court has relied over the

7    past several months appears to reflect time to *disposition*, not time to *placement*. *Compare*

8    Transcript of Jan. 23, 2017 Hearing, ECF No. 5552, at 164:13-165:7 (Ms. Tebrock

9    testifying that MHCB transfer data provided to Plaintiffs and Special Master reports "hours

10   waiting" as how long a patient waits to get on a bus to be transported to an MHCB, not the

11   time the patient actually arrives at the crisis bed), *and* ECF No. 5543, at 7 (Plaintiffs

12   identifying a lack of clarity in Defendants' reporting as to whether transfers to MHCB

13   placements were initiated, or completed, within twenty-four hours), *with* Stone-Manista

14   Decl. ¶ 3 & Ex. A; *id.* ¶ 9 & Ex. D (showing that, for the past two months, Defendants

15   have amended Enclosure 7c, including the MHCB Transfers Report and the "Rescinded

16   MHCB Referrals" report, to now refer to "Hours to Disposition" rather than "Hours

17   Waiting."). Similarly, Defendants' proposed MHCB census chart, filed as ECF No. 5577,

18   reports on the total number of patients whose MHCB referrals have been "pending" for

19   more than twenty-four hours. It is unclear whether the referral is deemed no longer

20   pending when the patients is placed on a bus to transfer, consistent with Defendants' other

21   reported data, or when that patient actually has arrived in the crisis bed. The latter is

22   required by the Program Guide, but it is not clear that Defendants consistently use this

23   measure internally or in their reports to the Court, Special Master, and Plaintiffs.

24        On the data presently in the record, Plaintiffs and the Court cannot assess the true

25   level of compliance with the Program Guide transfer requirements. Nor is it possible to

26   assess whether such compliance would be functionally achievable at this time with

27   Defendants' existing processes and resources in the high-volume short-turn-around context

28   of MHCB placement, and given the far-flung locations of some institutions relative to the

1   largest concentrations of MHCB referrals.  It is possible that additional court orders

2   requiring Defendants to develop a plan to better address transportation issues is an

3   appropriate remedy at this time.  Regardless, this ambiguity in the record should be

4   resolved with evidence and testimony before additional orders, and particularly before

5   monetary sanctions, are issued.

6       **D.**    **The Monthly Data Templates Required By This Court Should Be
    Clarified or Revised to Permit the Court to Measure Compliance More
7   Accurately**

8       Defendants' proposed charts, *see* ECF No. 5577, do not provide the Court with

9   sufficient information to understand the scope of their non-compliance, and are ambiguous

10  about how Defendants are measuring compliance.  Defendants should report, for each day

11  in each month, the number of class members who have been referred for crisis care but

12  have not transferred to a mental health crisis bed within twenty-four hours.  The data

13  should be reported separately for men and women due to the concerns outlined in Part II.C

14  above.  Finally, the Court should specify that the proper measure for compliance with the

15  Program Guide's timeline, and thus inclusion on the chart, is whether the patient's transfer

16  to the MHCB was completed within twenty-four hours of his or her referral, meaning the

17  patient physically reached the crisis bed within the twenty-four-hour window, not just

18  began a process to transfer to that bed.  Finally, further reporting may be warranted after

19  the status conference, such as targeted reporting on specific troubled institutions with

20  disproportionately high rates of non-compliance, depending on the evidence and testimony

21  taken.

22                       **CONCLUSION**

23      The Court should require Defendants to come into full and permanent compliance

24  with the Program Guide timelines for acute and ICF transfers by May 15, 2017.  The Court

25  should not permit a blanket exemption to Program Guide compliance for class members

26  who have co-existing urgent medical care needs or are on an out-to-court status.

27  Additionally, in order to address Defendants' past and current violations of the Program

28  Guide timelines for transfer to ICF or acute inpatient care, the Court can utilize civil

Exhibit 2 - 236

1   contempt proceedings to impose monetary sanctions, such as through the framework

2   suggested by Plaintiffs.

3        The Court should also order Defendants to come into full and permanent

4   compliance with the Program Guide timelines for MHCB transfers by May 15, 2017.  The

5   Court should require 100% compliance with the Program Guide's twenty-four-hour

6   timeline for MHCB transfers and should consider further orders on compliance with

7   MHCB transfer timelines after an additional status conference.  Finally, the monthly data

8   templates required by this Court should be clarified or revised to permit the Court to more

9   accurately measure compliance.

10

11   DATED: April 7, 2017                Respectfully submitted,

12                                        ROSEN BIEN GALVAN & GRUNFELD LLP

13                                        By:  */s/ Michael W. Bien*

14                                               Michael W. Bien

15                                        Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO MARCH 24, 2017 ORDER RE: ENFORCEMENT OF TIMELINES FOR
ACCESS TO INPATIENT CARE

Exhibit 2 - 237